# Exhibit 89

REDACTED

Confidential Information - Subject to Protective Order

```
 1        IN THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF NEW JERSEY

 2                   -  -  -

 3  IN RE:  VALSARTAN, LOSARTAN,  : MDL No. 2875

 4  AND IRBESARTAN PRODUCTS       : HON ROBERT B. KUGLER

 5  LIABILITY LITIGATION          : CIVIL NO. 19-2875 (RBK/JS)

 6  _____

 7  THIS DOCUMENT APPLIES TO ALL  :

 8  CASES                         :

 9                   -  -  -

10            APRIL 14, 2021

11                   -  -  -

         - CONFIDENTIAL INFORMATION -

12        SUBJECT TO PROTECTIVE ORDER

13              Remote Videotaped

14  Deposition, taken via Zoom, of DANIEL

15  BARRETO, commencing at 8:03 a.m., on the

16  above date, before Amanda

17  Maslynsky-Miller, Certified Realtime

18  Reporter and Notary Public in and for the

19  Commonwealth of Pennsylvania.

20

21                   -  -  -

22

         GOLKOW LITIGATION SERVICES

23    877.370.3377 ph | 917.591.5672 fax

              deps@golkow.com

24
```

Confidential Information - Subject to Protective Order

Page 2

APPEARANCES:

KANNER & WHITELEY, LLC
BY: DAVID J. STANOCH, ESQUIRE
BY: CONLEE S. WHITELEY, ESQUIRE
BY: LAYNE HILTON, ESQUIRE
701 Camp Street
New Orleans, Louisiana 70130
(504) 524-5777
D.Stanoch@kanner-law.com
C.whiteley@kanner-law.com
L.hilton@kanner-law.com
Representing the Plaintiffs

GREENBERG TRAURIG, LLP
BY: VICTORIA DAVIS LOCKARD, ESQUIRE
BY: STEVEN M. HARKINS, ESQUIRE
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, Georgia 30305
(678) 553-2100
Lockardv@gtlaw.com
Harkinss@gtlaw.com
Representing the Defendants, Teva
Pharmaceutical Industries, Ltd.,
Teva Pharmaceuticals USA, Inc.,
Actavis LLC, and Actavis Pharma, Inc.

CIPRIANI & WERNER, P.C.
BY: AMANDA A. RUGGIERI, ESQUIRE
450 Sentry Parkway
Suite 200
Blue Bell, Pennsylvania 19422
(610) 567-0700
aruggieri@c-wlaw.com
Representing the Defendants,
Aurobindo Pharma, USA, Inc., and
Aurolife Pharma, LLC

Page 3

APPEARANCES:  (Continued)

DUANE MORRIS, LLP
BY: JUSTIN M.L. STERN, ESQUIRE
1875 NW Corporate Boulevard
Suite 300
Boca Raton, Florida 3343
JMLStern@duanemorris.com
Representing the Defendants,
Zhejiang Huahai Pharmaceutical Co,
Ltd., Prinston Pharmaceutical
Inc., Huahai U.S., Inc., and
Solco Healthcare US, LLC.

FALKENBERG IVES, LLP
BY: MEGAN A. ZMICK, ESQUIRE
230 West Monroe Street
Suite 2220
Chicago, Illinois 60606
(312) 566.4808
Maz@falkenbergives.com
Representing the Defendant,
Humana

PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
BY: JASON M. REEFER, ESQUIRE
BY: FRANK H. STOY, ESQUIRE
One Oxford Centre, 38th Floor
Pittsburgh, Pennsylvania 15219
(412) 263-1840
Jmr@pietragallo.com
Fhs@pietragallo.com
Representing the Defendant,
Mylan Pharmaceuticals, Inc.

Page 4

APPEARANCES: (Continued)

ALSO PRESENT:

Kristalyn Duran, Videographer

David Marck, Teva Pharmaceuticals USA, Inc.

Rachel Gallagher, Teva Pharmaceuticals USA,
Inc.

- - -

Page 5

- - -
I N D E X
- - -

Testimony of:  DANIEL BARRETO

By Mr. Stanoch                11

- - -
E X H I B I T S
- - -

NO.        DESCRIPTION              PAGE

Teva-133    No Bates
            Amended Notice to Take
            Videotaped Oral Deposition  15

Teva-134    TEVA-MDL2875-DEPS-000027-031
            Consulting Agreement      22

Teva-135    TEVA-MDL2875-00116005-6007
            9/16/16 E-mail, Thomas to
            Harle                     47

Teva-136    TEVA-MDL2875-00042539
            Teva Corporate Standards
            CORP-0175                 71

Teva-137    TEVA-MDL2875-00586753
            Teva Corporate Standard,
            Corp-0896                 85

Teva-138    TEVA-MDL2875-00495102-5104
            7/6/18 E-mail, Drape to
            Vanderween                124

Confidential Information - Subject to Protective Order

Page 6

- - -
E X H I B I T S
- - -

NO.      DESCRIPTION      PAGE

Teva-139   TEVA-MDL2875-00020376
           Teva CORP-0092        135
Teva-140   TEVA-MDL2875-0934333-4435
           7/5/18 E-mail, Sawyer to
           Barak                 153
Teva-141   TEVA-MDL2875-00020519-0525
           7/4/18 E-mail, Barreto to
           Drape                 167
Teva-142   TEVA-MDL2875-00064409-4412
           7/12/18 E-mail, Barreto to
           Truemper              174
Teva-143   TEVA-MDL2875-00020744
           7/5/18 E-mail, Barreto to
           Koller-Dette          180
Teva-144   TEVA-MDL2875-00057196-7197
           7/6/18 E-mail, Sawyer to
           Drape                 205
Teva-145   TEVA-MDL2875-00021073-1074
           7/13/15 E-mail, Var to
           Koller-Dette          218
Teva-146   TEVA-MDL2875-00020898-0903,
           7/11/18 E-mail, Barreto to
           Lyons                 226
Teva-147   TEVA-MDL2875-00020853-0854
           7/8/18 E-mail, Barreto to
           Drape                 237
Teva-148   TEVA-MDL2875-00549865-9886
           7/9/18 E-mail, Osmian to
           Baeder                248

Page 7

- - -
E X H I B I T S
- - -

NO.      DESCRIPTION      PAGE

Teva-149   TEVA-MDL2875-00042637-2649
           8/14/18 Valsartan Testing
           Strategy              277
Teva-150   TEVA-MDL2875-00067084-7087
           12/13/18 E-mail, Drape to
           Barreto               294
Teva-151   TEVA-MDL2875-00731926
           NDA/ANDA Field Alert  297
Teva-152   TEVA-MDL2875-00073603-3612
           11/16/18 E-mail, Redmond to
           Barreto               301
Teva-153   TEVA-MDL2875-00415117
           Site Risk Assessment
           Protocol              328
Teva-154   TEVA-MDL2875-00132980
           10/2/17 E-mail, McClain to
           Barreto               350
Teva-155   TEVA-MDL2875-00546489-6492
           2/15/19 E-mail, Lyons to
           Gray                  363
Teva-156   TEVA-MDL2875-00083812-3877
           6/15/16 E-mail, Myers to
           Cheasty               376
Teva-157   TEVA-MDL2875-00495893-5896
           3/27/19 E-mail, Vanderweeen to
           Barreto               381
Teva-158   TEVA-MDL2875-00246006
           2/1/17 E-mail, Reitman to
           Hatt                  383

Page 8

- - -
E X H I B I T S
- - -

NO.      DESCRIPTION      PAGE

Teva-159   TEVA-MDL2875-00246006
           2/1/17 E-mail, Reitman to
           Hatt                  384
Teva-160   TEVA-MDL2875-00400799-0905
           6/13/19 E-mail, Hoover to
           Hatt                  397
Teva-161   TEVA-MDL2875-00067532-7537
           1/1/19 E-mail, Weissbazak
           to Denac              408

Page 9

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
Page Line    Page Line    Page Line
413    11

Request for Production of Documents
Page Line    Page Line    Page Line
None

Stipulations
Page Line    Page Line    Page Line
10    1

Question Marked
Page Line    Page Line    Page Line
None

Confidential Information - Subject to Protective Order

- - -

(It is hereby stipulated and agreed by and among counsel that sealing, filing and certification are waived; and that all objections, except as to the form of the question, will be reserved until the time of trial.)

- - -

VIDEO TECHNICIAN:   We are now on the record.  My name is Kristalyn Duran, a videographer for Golkow Litigation Services.  Today's date is April 14, 2021, and the time is 8:03 a.m.

This deposition is being held by remote Zoom in the matter of Valsartan, Losartan, and Irbesartan Products Liability Litigation.  The deponent today is Daniel Barreto.

All parties to this deposition are appearing remotely and have agreed to the witness

being sworn in remotely.  All appearances are noted on the stenographic record.

Will the court reporter please administer the oath?

- - -

DANIEL BARRETO, after having been duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. STANOCH:

Q.   Good morning, Mr. Barreto.

A.   Good morning.  How are you?

Q.   Good.  Thank you.

My name is David Stanoch, I'm an attorney for the plaintiffs in this action.  I'll be asking you most of the questions today.

Sir, have you been deposed before?

A.   No.

Q.   I'll go over some of the

ground rules, then, for today.

Obviously, you know, probably, that I'll be asking you a series of questions, and you'll be providing answers.  Everything we and anyone else says will be taken down by the stenographer and on the video.

Because of that, I just ask that you make sure to pause before you answer a question so we don't speak over each other, and I'll afford you the same courtesy.

Is that okay?

A.   That would be perfect.  Thank you.

Q.   If you do not understand a question, please tell me and I'll attempt to rephrase.  Otherwise, I'm going to assume that you understand.

Is that fair?

A.   It is.  Thank you.

Q.   From time to time, your attorney may object.  Unless she instructs you otherwise, you should

answer the question.

Do you understand that?

A.   I do.

Q.   And from time to time, you or someone else may need a break, just simply say so, if you need a refreshment break or to stretch your legs.  I'd just ask that if a question is pending, you answer the question and then we can take the break.

Is that okay?

A.   That will be perfect.

Q.   Great.  And, for the record, where are you located for today's remote video deposition?

A.   I'm in Oklahoma City.

Q.   Is that where you currently reside, sir?

A.   Yes, it is.

Q.   And you're in your home right now?

A.   I am located at the law office -- firm here in Oklahoma City.

Q.   Your counsel's office in

Confidential Information - Subject to Protective Order

Page 14

¹ Oklahoma City?
²      A.   Yes.
³      Q.   Is anybody else in the room
⁴ with you?
⁵      A.   Yes.
⁶      Q.   Who is in the room with you?
⁷      A.   Victoria Lockard.
⁸      Q.   So Ms. Lockard traveled to
⁹ Oklahoma City.  That was very nice of
¹⁰ her.
¹¹          Anybody else in the room?
¹²      A.   No, sir.
¹³      Q.   Okay.  Great.
¹⁴          You understand you are
¹⁵ testifying today as a corporate designee
¹⁶ on behalf of Teva on certain topics,
¹⁷ correct?
¹⁸      A.   I do understand that, yes.
¹⁹      Q.   I'm going to attempt to mark
²⁰ an exhibit, if you bear with me, sir.
²¹          MR. STANOCH:  This, for the
²²      record, will be, I believe, Teva
²³      133.
²⁴          MS. LOCKARD:  I'm not seeing

Page 15

¹ the link on the chat for the
² exhibits.  Is that supposed to be
³ up already?
⁴          - - -
⁵          (Whereupon, Exhibit
⁶ Teva-133, No Bates, Amended Notice
⁷ to Take Videotaped Oral
⁸ Deposition, was marked for
⁹ identification.)
¹⁰          - - -
¹¹          MR. STANOCH:  Mr. Barreto,
¹² and I guess, Ms. Lockard, do you
¹³ now have access and can see Teva
¹⁴ 133?
¹⁵          THE WITNESS:  Where would I
¹⁶ see that?  Is that on the chat?
¹⁷          MS. LOCKARD:  Give us one
¹⁸ moment.
¹⁹          MR. STANOCH:  Do you want us
²⁰ to go off the record, Ms. Lockard?
²¹          MS. LOCKARD:  Sure.  That's
²² fine.
²³          MR. STANOCH:  Let's go off
²⁴ the record for a moment, please.

Page 16

¹          VIDEO TECHNICIAN:  The time
² is 8:08 a.m.  Off the record.
³          - - -
⁴          (Whereupon, a brief recess
⁵      was taken.)
⁶          - - -
⁷          VIDEO TECHNICIAN:  The time
⁸ is now 8:09 a.m.  Back on the
⁹ record.
¹⁰ BY MR. STANOCH:
¹¹      Q.   Mr. Barreto, welcome back.
¹² Thanks for bearing with the technical
¹³ issues.
¹⁴          I understand now you're able
¹⁵ to view the marked exhibits; is that
¹⁶ right?
¹⁷      A.   That is correct.
¹⁸      Q.   Great.  So as I was saying
¹⁹ before, Teva-133 is the amended notice to
²⁰ take the videotaped oral deposition of
²¹ you.
²²          Do you see that?
²³      A.   Yes, I do.
²⁴      Q.   Have you seen this before?

Page 17

¹      A.   Yes, I have.
²      Q.   And if you flip to the
³ exhibit -- to Exhibit A, there are a
⁴ number of topics listed.
⁵          Do you see that?
⁶      A.   Yes, I have.
⁷      Q.   My understanding is that
⁸ you're designated as the corporate
⁹ designee on behalf of Teva on all the
¹⁰ topics listed except, and your counsel
¹¹ can correct me, 49 and 56; is that
¹² correct?
¹³          MS. LOCKARD:  I believe
¹⁴      that's correct.
¹⁵          Yep, that's correct.
¹⁶ BY MR. STANOCH:
¹⁷      Q.   Is that your understanding
¹⁸ as well, Mr. Barreto?
¹⁹      A.   It is.  Correct.
²⁰      Q.   Great.  Thank you.
²¹          And just for the record,
²² I'll note the topics, then, less 49 and
²³ 56, on which Mr. Barreto is designated is
²⁴ Topics 1, 2, 3, 4, 17, 18, 19, 29, 30,

Confidential Information - Subject to Protective Order

Page 18

¹ 31, 44, 45, 46, 47, 48 and 50.
²        MS. LOCKARD:  Correct.  And
³ let me just add, too, you know, as
⁴ counsel knows, but for the record,
⁵ we also designated Tony Binsol on
⁶ some of these topics as well.
⁷        And so, you know, as we
⁸ discussed in our meet-and-confers,
⁹ there may be some more specifics
¹⁰ of things like, you know, testing
¹¹ and analysis that will be reserved
¹² for Tony.
¹³        But if Mr. Barreto is not
¹⁴ able to answer them, then, you
¹⁵ know, we'll make sure that Mr.
¹⁶ Binsol is able to answer.
¹⁷        MR. STANOCH:  Acknowledged.
¹⁸ Thank you, counsel.
¹⁹ BY MR. STANOCH:
²⁰    Q.    Mr. Barreto, what did you do
²¹ to prepare for today's deposition?
²²        And, again, I don't want to
²³ hear anything about what you said to your
²⁴ counsel or not.  So I'm asking sort of

Page 19

¹ what you looked at and things like that.
²    A.    I received a number of
³ documents that pertained to the
⁴ discussion that we were going to have
⁵ today.  And I have gone over those
⁶ documents to make sure that I'm fully
⁷ prepared and refreshed, in terms of, you
⁸ know, the understanding that I have about
⁹ the discussions that we will have with
¹⁰ respect to this document that you just --
¹¹ Teva-133, that you just shared with me.
¹²    Q.    Great.  When were you first
¹³ contacted by Teva, or someone on Teva's
¹⁴ behalf, that you may be a potential
¹⁵ witness in this litigation?
¹⁶    A.    Yeah, that was, I would say,
¹⁷ sometime around January of this year.
¹⁸    Q.    Was that one of Teva's
¹⁹ counsel in this litigation who contacted
²⁰ you?
²¹    A.    Yes.  That was Rachel
²² Gallagher.
²³    Q.    And approximately how many
²⁴ times did you have a meeting with any

Page 20

¹ counsel on behalf of Teva to prepare for
² this deposition, whether it was in person
³ or by phone?  Just the number of
⁴ meetings.
⁵    A.    Sure.  I want to say several
⁶ times.  I want to say between four and
⁷ six times that we have met both in person
⁸ and via telephone.
⁹    Q.    And each time was that with
¹⁰ one or more in-house or outside counsel
¹¹ for Teva?
¹²    A.    That is correct.
¹³    Q.    Were there ever any
¹⁴ non-attorneys in any of the prep meetings
¹⁵ that you had for today's deposition?
¹⁶    A.    No.
¹⁷    Q.    Approximately how much time
¹⁸ do you think you spent in meetings,
¹⁹ telephone or in person, with counsel to
²⁰ prepare for today's deposition?
²¹    A.    I would say about 15 hours.
²² We met a couple of times in person here
²³ in Oklahoma City and via phone a couple
²⁴ of hours.  So I want to say between 15,

Page 21

¹ 20 hours.
²    Q.    Approximately how many
³ documents do you think you reviewed to
⁴ prepare for today's deposition, sir?
⁵    A.    I want to say that I've
⁶ looked at at least 50 to 100 documents,
⁷ you know.
⁸    Q.    About how much time did you
⁹ spend on your own preparing for today's
¹⁰ deposition, whether reviewing documents
¹¹ or otherwise, outside of the meetings
¹² with any counsel?
¹³    A.    I spent about, I want to
¹⁴ say, 30 to maybe 50 hours going over, you
¹⁵ know, the documents that were given to
¹⁶ me.
¹⁷    Q.    And I understand, sir, that
¹⁸ you had been, but at some point -- but
¹⁹ are no longer employed by Teva, right?
²⁰    A.    That is correct.
²¹    Q.    And you have a consulting
²² agreement with Teva as it relates to your
²³ testimony in this litigation; is that
²⁴ right?

Confidential Information - Subject to Protective Order

Page 22

1    A.   I do.
2         MR. STANOCH:  I'm going to
3    mark what I believe that agreement
4    is as Teva-134.
5         - - -
6         (Whereupon, Exhibit
7    Teva-134,
8    TEVA-MDL2875-DEPS-000027-031,
9    Consulting Agreement, was marked
10   for identification.)
11        - - -
12   BY MR. STANOCH:
13   Q.   Are you able to see that,
14   sir?
15   A.   I'm opening it.
16        Yes.
17   Q.   Is this the consulting
18   agreement that you have with Teva in this
19   litigation?
20   A.   It is.
21   Q.   And it's an agreement from
22   Ms. Lockard, Teva's outside counsel in
23   this case, and it's dated February 19th,
24   2021?

Page 23

1    A.   That is correct.
2    Q.   And it looks like you signed
3    the agreement at the end; that's your
4    signature, right, on Page 5?
5    A.   I'm looking at it.
6         Yes, I did.
7    Q.   And it was signed February
8    24th, 2021, yes?
9    A.   That is correct.
10   Q.   And you can refer to this
11   exhibit if you want.
12        My question is, I understand
13   you're being compensated for your time,
14   for your testimony or otherwise, in this
15   case; is that right?
16   A.   I'm not being compensated
17   for the testimony.  I'm being compensated
18   for the time lost from doing my regular
19   business.
20   Q.   Fair enough.
21        And in Paragraph 5, I
22   believe, is the compensation for your
23   time spent in connection with this
24   matter; is that right?

Page 24

1    A.   That is correct, yes.  And
2    that includes -- I'm sorry.
3    Q.   No, please, please.  Go
4    ahead.
5    A.   -- the time that I spent
6    reviewing documentation.
7    Q.   Understood.  That's part of
8    where I was going to go.
9         It looks like you're being
10   reimbursed at a rate of $286.68 per hour;
11   is that right?
12   A.   That is correct.
13   Q.   And you're being compensated
14   at that rate both for your preparation
15   for this deposition as well as your time
16   for this deposition; is that fair?
17   A.   The time, yeah -- yes,
18   correct.
19   Q.   Have you been paid yet by
20   Teva, under this consulting agreement,
21   for any of your time?
22   A.   No, sir.
23   Q.   I just want to touch briefly
24   on your educational and professional

Page 25

1    background, sir.
2         I understand that you
3    graduated from the University of Puerto
4    Rico with a Bachelor's Degree in biology;
5    is that right?
6    A.   That is correct.
7    Q.   What year did you graduate,
8    sir?
9    A.   That was in 1970 -- if I
10   recall, 1978.
11   Q.   And did you ever obtain any
12   other educational degree after that
13   Bachelor's Degree in biology from the
14   University of Puerto Rico in 1978?
15   A.   No.
16   Q.   And then you're in the
17   workforce.
18        You went right to -- I'm
19   sorry, you went right to work after you
20   obtained your degree, correct?
21   A.   Pretty much immediately,
22   yes.  While I was at the university, I
23   was actually already working for the U.S.
24   Food and Drug Administration under a

Confidential Information - Subject to Protective Order

Page 26

¹ special program for college students.
² Q.    Got it.
³       And it looks like you held
⁴ roles at the U.S. Food and Drug
⁵ Administration through about November of
⁶ 1996?
⁷ A.    Yes.
⁸ Q.    And we'll call the -- we'll
⁹ call the U.S. Food and Drug
¹⁰ Administration "FDA" today; is that okay?
¹¹ A.    That's fine.
¹² Q.    And then it looks like you
¹³ went into the private sector in November
¹⁴ of '96?
¹⁵ A.    That is correct.
¹⁶ Q.    And you held a number of --
¹⁷ you held a number of different jobs at
¹⁸ different companies.
¹⁹       Eventually you were at
²⁰ Sanofi-Aventis beginning in January 2012,
²¹ right?
²² A.    Correct.
²³ Q.    I'm sorry, prior to that,
²⁴ you were at CR Bard from April to

Page 27

¹ December of 2011, right?
² A.    That is correct.
³ Q.    So that was about, what,
⁴ about eight months you were at CR Bard?
⁵ A.    Oh, no, that would not be
⁶ correct.  Sorry.
⁷ Q.    I mean, I can put your C.V.
⁸ up.  I'm just trying to walk through it.
⁹ A.    Unless there is some kind of
¹⁰ a dating mistake.  But I spent more time
¹¹ at CR Bard.
¹²       I was at CR Bard from August
¹³ 2008 through December 2011.
¹⁴ Q.    Oh, I see.  You had one
¹⁵ position, and then you went into another
¹⁶ position.  I see.
¹⁷ A.    Yes, sir.
¹⁸ Q.    Got it.
¹⁹       And then you went to Sanofi
²⁰ January 2012?
²¹ A.    Correct.
²² Q.    And then you were there in
²³ two positions through the end of 2016?
²⁴ A.    Yes, sir.

Page 28

¹ Q.    And then in December 2016
² you went to Lachman, L-A-C-H-M-A-N,
³ Consultants?
⁴ A.    That is correct.
⁵ Q.    And what was Lachman
⁶ Consultants?
⁷ A.    So Lachman Consultants is a
⁸ company that is dedicated to providing
⁹ consulting and supporting -- technical
¹⁰ support services to pharmaceutical -- in
¹¹ the pharmaceutical industry.  But that
¹² also includes medical device companies,
¹³ regulatory issues as well.
¹⁴ Q.    And then it looks like you
¹⁵ were there for about six or seven months,
¹⁶ and then you're listed here as going to
¹⁷ DBC Consulting, July 2017 to September
¹⁸ 2017?
¹⁹ A.    That is correct.  DBC was
²⁰ just the first name that I gave to my
²¹ first consulting, small operation.
²² Q.    I see.  So you sort of went
²³ into business yourself for a couple of
²⁴ months; is that fair?

Page 29

¹ A.    That is correct.
² Q.    And then you started, it
³ looks like, at Teva in September of 2017?
⁴ A.    That is correct.
⁵ Q.    Briefly, what was the reason
⁶ for the transition from Lachman to your
⁷ own business for a couple of months to
⁸ Teva?
⁹ A.    It's -- after I left
¹⁰ Lachman, I had decided that, you know, I
¹¹ was going to try to do some consulting
¹² work to see how that would just work for
¹³ me.
¹⁴       And it just started to work
¹⁵ very well.  But then, of course, later on
¹⁶ an opportunity for work at Teva came.
¹⁷ Q.    Did you have an offer from
¹⁸ Teva when you parted from Lachman
¹⁹ Consultants?
²⁰ A.    No.  That was a few months
²¹ later.
²² Q.    And what were the
²³ circumstances of your departure from
²⁴ Lachman Consultants?

Confidential Information Subject to Protective Order

Page 30

1    A.   It was, basically, the
2 arrangement that we had, at least for
3 myself, in terms of the working
4 conditions there, the demands of the job,
5 it was not something that I found to be
6 what I wanted to do.
7         So I decided that the best
8 way to pursue something that I liked to
9 do was just to leave the organization.
10   Q.   Got it.  And then after
11 starting your own consulting business for
12 a couple of months, you began a position
13 at Teva in September 2017?
14   A.   That is correct.
15   Q.   And then you were there, it
16 looks like, through March 2020?
17   A.   Physically I was there until
18 January 2020.  And then the contract
19 basically expired in March 2020.
20   Q.   I see.  And then after that,
21 it looks like you went back into running
22 your own consulting business; is that
23 fair?
24   A.   That is correct.

Page 31

1    Q.   And that's PharmQ,
2 F-H-A-R-M-Q, Global Consulting?
3    A.   That is correct.
4    Q.   And you're the president and
5 CEO of that consulting firm?
6    A.   That is correct.
7    Q.   And that's been your role
8 since approximately April of 2020?
9    A.   Correct.
10   Q.   And what were the
11 circumstances about your departure from
12 Teva?
13   A.   There was an organizational
14 change and reorganization in terms of,
15 you know, priorities for the company.  So
16 as part of that reorganization, the
17 company decided that I would no -- not be
18 part of that reorganization.
19        So there was an
20 understanding that that would be the
21 case, and so I left.
22   Q.   Got it.  And did you
23 continue to receive any compensation of
24 any kind from Teva after your departure?

Page 32

1    A.   We engaged in a separation
2 agreement.  And that separation agreement
3 dictated, you know, a certain amount of
4 compensation that I would be granted.
5    Q.   And how long was the
6 compensation to run from that separation
7 agreement?
8    A.   So in this case, it was
9 intended to be a one-year understanding.
10   Q.   Okay.  So, approximately,
11 the compensation you were receiving under
12 your separation agreement from Teva ran
13 from a year from sometime in March of
14 2020?
15   A.   That is correct.
16   Q.   So that year, it sounds like
17 it just came up, right?
18   A.   That's correct.
19   Q.   Okay.  So as of right now,
20 today, you're not receiving any
21 compensation from Teva under that
22 separation agreement; is that right?
23   A.   I am not.
24   Q.   I want to focus on your time

Page 33

1 at Teva.
2         Your position was senior
3 global VP quality and compliance; is that
4 right?
5    A.   That is correct.
6    Q.   And that was your position
7 you held the entire two or three years
8 that you were at Teva; is that right?
9    A.   That is correct.
10   Q.   And where were you
11 physically located when you worked at
12 Teva?
13   A.   So I was residing in New
14 Jersey, in a city called New Providence.
15 And my offices were located in
16 Parsippany.
17   Q.   Got it.  And if you could
18 just tell me generally what your roles
19 and responsibilities were at Teva as
20 senior global VP quality and compliance?
21   A.   Certainly.  I had
22 responsibilities for the overall -- to
23 start with, we had the quality systems
24 management program.  So we had everything

Confidential Information - Subject to Protective Order

Page 34

1 that had to do with the corporate
2 standards and policies and procedures.
3 So I had a group of people who were
4 performing this type of work.
5          We had responsibilities for
6 the global audit program that fell under
7 my responsibility.  So we had a number of
8 people who -- auditors who would go to
9 the sites and to suppliers to perform
10 audits in accordance with Teva's
11 expectations.
12          I had a group of people who
13 were doing what we called regulatory
14 intelligence, which is more around
15 getting information that would help us to
16 be up to date with the regulatory
17 standards coming from the agencies.
18          I was the lead person for
19 what's called the MAC process, which is
20 the market action committee.  So whenever
21 we had a product that needed to be
22 assessed, whether that product should be
23 recalled or not, that was a
24 responsibility.

Page 35

1          I had, also,
2 responsibilities for supporting
3 troubleshooting issues within the
4 organization, across the globe, providing
5 organizational support, inspection
6 readiness for the organization as well.
7      Q.   Thank you for that.
8          And you touched on this, and
9 it may be evident from the title itself,
10 but your responsibilities were global in
11 nature; is that right?
12      A.   That is correct.
13      Q.   So your responsibilities
14 would touch on the different things you
15 listed before for Teva's operations
16 worldwide, not just for the United
17 States; is that fair?
18      A.   That is correct.
19      Q.   And just your own
20 understanding -- Teva obviously has
21 acquired a number of entities over time.
22          Do you recall, yourself,
23 when, I guess, the Allergan acquisition
24 by Teva occurred?  Was that before or

Page 36

1 after your joining Teva?
2      A.   That would have been before.
3 So my knowledge of those details is very
4 limited.  It's more, you know, general
5 knowledge and understanding.
6      Q.   For sure.
7          And I'm not going to quiz or
8 ask you about the specifics of that, sir.
9 I just -- as we go forward today, I may
10 refer to Teva.  And if we can be on the
11 same page when I say "Teva," I'm going to
12 mean, you know, Teva, the global
13 organization as it existed when you were
14 there from September 2017 forward; is
15 that fair?
16      A.   It is fair.  Thank you.
17      Q.   So that may encompass, for
18 instance, legacy Actavis or legacy
19 Allergan generic operations which had
20 been absorbed by Teva by the time you got
21 there; is that fair?
22      A.   That's fair.  And I'm quite
23 familiar with those operations.
24      Q.   Very good, sir.

Page 37

1          If I want to focus on those
2 operations specifically as apart from
3 sort of the global Teva entity, I'll try
4 to focus us, to say something like, the
5 legacy Actavis facility in Malta or
6 something like that; is that okay,
7 generally?
8      A.   It is okay.  I understand.
9      Q.   And, obviously, when we get
10 to those areas, please feel free, if you
11 need to clarify something about the
12 facility, just say so, just so we're on
13 the same page.
14      A.   Yes, sir.
15      Q.   Okay.  And, you know, while
16 we're at it, just some more housekeeping
17 for terminology.
18          Throughout the day we'll
19 probably reference the phrase or term
20 "API."
21          Can we agree that's active
22 pharmaceutical ingredient?
23      A.   Yes.
24      Q.   And that's the same thing as

Confidential Information Subject to Protective Order

Page 38

1  a -- I believe it's called a drug
2  substance?
3        A.   It is correct.
4        Q.   And can you just give me a
5  general understanding, so we're on the
6  same page, of what an API or a drug
7  substance is?
8        A.   So an API or a drug
9  substance is the chemical active
10  ingredient that is produced and that
11  serves as the basis for the ingredient
12  that provides the therapeutic value to
13  the patient.
14        Q.   Great.  Thank you.  And
15  throughout the day we may refer to drug
16  product or finished dose.
17             My understanding is that's
18  sort of the tablet or other medication
19  that a patient might ingest; is that
20  right?
21        A.   That is correct.
22        Q.   So the API is the chemical
23  active ingredient that goes into the
24  finished-dose product, right?

Page 39

1        A.   That is correct.
2        Q.   Great.  You're familiar with
3  the term "GMP," right?
4        A.   Yes, I am.
5        Q.   That's good manufacturing
6  practices?
7        A.   That is correct.
8        Q.   Sometimes it's called CGMP,
9  current good manufacturing practices?
10        A.   That is correct.
11        Q.   And we'll get into it in
12  more detail when we get to documents,
13  sir.
14             But just at a very high
15  level, could you tell us all your
16  understanding of what GMP -- GMPs are?
17        A.   The GMPs are the regulations
18  that were developed by the -- in this
19  case, the U.S. Food and Drug
20  Administration in response to the
21  expectations set by the Food and Drug
22  Act.  They are under what's called 21 CFR
23  Part 2.
24        Q.   And while we're at the

Page 40

1  terminology, a couple other things.
2             You're familiar with the
3  phrase "NDA" as well as "ANDA," yes?
4        A.   Yes, I am.
5        Q.   NDA is new drug application?
6        A.   That is correct.
7        Q.   A-N-D-A, or ANDA, is
8  abbreviated new drug application?
9        A.   That is correct.
10        Q.   And, again, just very high
11  level, so we're on the same page, can you
12  just tell us what an NDA and an ANDA are?
13        A.   So an NDA is a submission
14  that is made by an innovator drug
15  manufacturer.  So it's around new drugs
16  that are developed for which certain
17  expectations are set.
18             The ANDA attempts to -- will
19  be considered to be a clone or a
20  simulation or, let's say, a generic
21  example of what the innovator product is.
22        Q.   And in this litigation, the
23  valsartan drugs we're talking about, Teva
24  sold, in the United States, generic

Page 41

1  valsartan, correct?
2        A.   That is correct.
3        Q.   And so that would have been
4  subject to one or more ANDAs that Teva or
5  a predecessor entity had submitted to the
6  FDA, right?
7        A.   That is -- that is correct.
8        Q.   And as an ANDA holder, Teva
9  would have certain obligations under the
10  regulations and the FDCA, correct?
11        A.   Correct.
12        Q.   One of those obligations
13  would be to ensure the safety and
14  effectiveness of the drug's proposed use;
15  is that fair?
16        A.   I would say that the
17  responsibilities include safety,
18  efficacy, quality and purity for the
19  drugs that are marketed in the United
20  States.
21        Q.   Fair enough.
22             And would those obligations
23  extend also to the appropriateness of the
24  labeling of the product?

Confidential Information - Subject to Protective Order

---

Page 42

1    A.   Correct.
2    Q.   Again, I want to talk a
3  little bit about the integration of
4  certain legacy Actavis or Allergan
5  operations.  And, again, this isn't a
6  corporate relationship test, sir, it's
7  really just specifically with your
8  duties.
9         You mentioned that part of
10 your duties were to understand or oversee
11 Teva's standard operating procedures; is
12 that right?
13   A.   That is correct.
14   Q.   So did legacy Allergan or
15 Actavis facilities have their own SOPs at
16 the time that they were integrated into
17 Teva?
18   A.   At the time they were
19 integrated, I'm sure they had their own
20 policies and procedures, yes.
21   Q.   Were you involved in any way
22 in any timetable for the integration of
23 those legacy facilities becoming part of
24 and having to adopt Teva's own SOPs?

---

Page 43

1    A.   As part of my job when I
2  joined the company in 2017, every time
3  that a corporate policy or procedure was
4  developed, implemented or revised, that
5  procedure would go to every single one of
6  the facilities within the Teva network,
7  regardless of whether they were Actavis,
8  former legacy Actavis or whatever.
9    Q.   That would be for, I guess,
10 new procedures; is that right?
11   A.   That would be for all
12 procedures.
13   Q.   Okay.  So -- so what I'm
14 trying to understand is, let's say --
15 again, I'll just use the -- let me back
16 up.
17        You understand there was a
18 legacy Actavis facility in Malta that
19 purchased valsartan API and made
20 valsartan finished dose for sale into the
21 U.S. market, yes?
22   A.   Yes.
23   Q.   And I think that was -- what
24 do you want to call that?  The Malta

---

Page 44

1  facility; is that okay?
2    A.   That will be fine.
3    Q.   Okay.  So at the time the
4  Malta facility was then part of Teva, it
5  might have had an SOP for, what,
6  packaging, itself, right?
7    A.   Uh-huh.
8    Q.   Yes?
9    A.   Yes.
10   Q.   And Teva may have had its
11 own SOP for packaging, right?
12   A.   That is possible.
13   Q.   Sure.  And I'm just asking,
14 were you aware of a process by which that
15 legacy Actavis SOP would be formally
16 superceded by the Teva one so there
17 wasn't two contradictory policies about
18 the same thing?
19   A.   Understood.  I'm sure that
20 there was a transition that took place.
21 I don't know exactly the speed of that
22 transition at the time when legacy
23 product was acquired.
24        But I'm sure that one of the

---

Page 45

1  things that the audit program from the
2  company would do would be to ensure two
3  things.  One, that there is a procedure
4  that sets the expectations.  And, two, if
5  that procedure was not according to Teva
6  expectations, that that communication
7  would take place.  And then -- and then
8  adjustments, revisions to that procedure
9  would be made.
10        For the most part, I would
11 probably expect that the differences
12 between the procedure and expectations
13 set by Teva and what the companies had at
14 the time were probably about the same,
15 if -- if I could be fair with that
16 statement.
17   Q.   That's fine.  And throughout
18 the day, if we talk about standard
19 operating procedures, I just want to have
20 the table set so that if I put one
21 from -- that says a Teva policy from
22 2018, we're all going to believe that it
23 would be applicable to all the facilities
24 as they stood unless -- even if, say, the

---

Confidential Information - Subject to Protective Order

Page 46

1  Malta facility had something that had
2  been superceded.
3        That's what I'm trying to
4  get at, you understand, so you have an
5  idea?
6        A.   I understand.
7        Q.   Okay.  And if you have any
8  reason to think that's not the case any
9  time I put a policy in front of you, feel
10  free to speak up, okay?
11        A.   Will do.  Okay.
12        Q.   Great.
13        I'll put it in front of you
14  in a moment, but do you have a general
15  understanding that Teva had a policy
16  concerning contract manufacture and
17  analysis?
18        A.   Yes.
19        Q.   And that would be with
20  regards to outsourced activities for
21  manufacturing or analysis of substances
22  or products, right?
23        A.   Have you uploaded that
24  document already?

Page 47

1        Q.   I'll put it in front of you
2  right now, sir.
3        A.   Okay.
4        MR. STANOCH:  I'm putting in
5  front of you Teva Exhibit-135.
6  For the record, I'll state it's
7  Bates ending 00116005.
8        - - -
9        (Whereupon, Exhibit
10  Teva-135,
11  TEVA-MDL2875-00116005-6007,
12  9/16/16 E-mail, Thomas to Harle,
13  was marked for identification.)
14        - - -
15  BY MR. STANOCH:
16        Q.   Tell me when you see it,
17  sir.
18        A.   Let me refresh this.  Yes,
19  135.
20        Did you say you were sharing
21  a standard, or is this an e-mail?
22        Q.   Well, it's an e-mail from a
23  Michael Thomas to various folks attaching
24  a corporate standard, Corp-0046.

Page 48

1        Let me back up.
2        Do you see --
3        A.   I see it now.
4        Q.   -- the first page of the
5  exhibit?
6        A.   I see it now.
7        Q.   And you see the first page
8  is an e-mail from Mr. Michael Thomas to
9  others.
10        Do you see that?
11        A.   I see that.
12        Q.   And it says in the body,
13  among other things, The attached
14  corporate standards are now effective.
15        And then it lists Corp-0046?
16        A.   Yep.
17        Q.   Great.  And then if you --
18        A.   Yes.
19        Q.   Great.
20        And if you just flip a
21  couple of pages, you'll get to the actual
22  policy that was the attachment to the
23  e-mail.
24        A.   I am there.

Page 49

Confidential Information - Subject to Protective Order



Page 50

Page 51

Page 52

18  Q.   What is a change control?
19  A.   So a change control is
20  whenever a specific activity is going to
21  be revised to be performed in a different
22  way.  It could also include a change of
23  specification.
24        So anything -- anything that

Page 53

1  is a change to what is already known or
2  established, then it has to be managed
3  through the change control process.
4        Q.   So an API supplier to Teva
5  wishing to change its manufacturing
6  process for the API would be subject to
7  this change control procedure, right?
8        A.   That is correct.
9        Q.   And an API supplier of
10 Teva's wishing to change the testing
11 specifications for the API it's supplying
12 to Teva would be subject to this change
13 control procedure, correct?
14       A.   That is correct.
15       Q.   And an API manufacturer
16 supplying API to Teva who wishes to
17 change the subcontractors it intends to
18 use, it would have to first under -- get
19 authorization from Teva, and then if
20 there was a change involved, utilize the
21 change control procedure; is that right?
22       A.   If the conditions under
23 which the -- that understanding exist,
24 yeah, it would indicate so.

Confidential Information - Subject to Protective Order

Page 54



Page 56

6      Q.    What does it mean for a
7  contractor to be approved?
8      A.    So the approval -- first, I
9  think it's important to make a
10  distinction that I think is important at
11  this point.
12           When we talk about contract
13  manufacturing, I think it's a concept
14  that is also one that has to be more
15  defined.  Because when we engage in
16  contract manufacturing in this
17  environment, that means that we are
18  asking a company to make a product on our
19  behalf, for us.  It's usually our
20  product.  The same applies to
21  laboratory -- contract laboratory
22  testing.
23           So I think it's important to
24  make that distinction, number one.

Page 55

1      A.    Can we -- can you take me
2  back to the section that you're talking
3  about?
4      Q.    Sure, sure, sure.
5           Let's go to Section 5.1.2,
6  sir.  Tell me when you're there.
7      A.    Can you ask the question,
8  please?
9      Q.    Sure.

Page 57

1           Number two, approved means
2  that that facility has been -- has been
3  audited, that facility has been assessed
4  in terms of their capabilities to do the
5  work that we would expect them to do
6  under the CGMP conditions and the Teva
7  expectations from, you know, our
8  standards.

16           But I think it's important
17  to clarify that I see that for a contract
18  manufacturing activity, which is within
19  that strict definition, that quality
20  agreement is definitely one that you have
21  to have, because that contract
22  manufacturing facility is operating under
23  the same responsibilities for making that
24  product as if Teva was making this

Confidential Information — Subject to Protective Order

Page 58

¹ product.
²        Q.   It's ultimately API going
³ into Teva's finished-dose product, right?
⁴        A.    Not exactly.  This is where
⁵ I wanted to set the clarification.
⁶        Because when Teva contracts
⁷ with an API supplier to make API for
⁸ Teva, that API is actually owned by the
⁹ API supplier.  It's not -- it's not a
¹⁰ product that is owned by Teva.
¹¹        And this is why I think it's
¹² important to make this distinction.
¹³ Because that API supplier is solely
¹⁴ responsible for his product versus when
¹⁵ you are engaging contract manufacturing
¹⁶ for Teva within the strict definition, as
¹⁷ I understand it, then you're making a
¹⁸ Teva product for Teva, so that Teva's
¹⁹ responsibilities for that product are
²⁰ much higher than when Teva says to an API
²¹ supplier, we want you to make your API
²² for us.
²³        Q.    Are you saying Teva has no
²⁴ responsibilities for the API that a

Page 59

¹ contract manufacturer is making for Teva?
²        A.    Absolutely not.  That's not
³ correct.
⁴        Q.    Right.  Because we looked at
⁵ the responsibilities of Teva here in
⁶ Section 5.2, and there's a number of
⁷ things that Teva requires itself to have
⁸ responsibilities for vis-à-vis a contract
⁹ manufacturer, including one for API,
¹⁰ right?
¹¹        MS. LOCKARD:  Objection.
¹² Form.  It misstates his testimony.
¹³        MR. STANOCH:  You can
¹⁴ answer, sir.
¹⁵        THE WITNESS:  So what I'm
¹⁶ saying is the expectations are
¹⁷ going to be the same.  What I'm --
¹⁸ what I'm -- we don't see a
¹⁹ difference between the GMP
²⁰ expectations that we're setting
²¹ for the API manufacturer as we
²² would expect for a contract
²³ manufacturer.
²⁴        What I'm saying is that the

Page 60

¹ difference is that when that API
² supplier makes product for us, our
³ responsibility is to ensure that
⁴ they perform the activities for us
⁵ in accordance with GMPs.
⁶        But the product belongs to
⁷ them, so they also bear a high
⁸ degree of responsibility for, you
⁹ know, engaging in activities that
¹⁰ are in compliance with
¹¹ expectations.
¹²        It's not our product, that's
¹³ the only difference that I'm
¹⁴ making.
¹⁵ BY MR. STANOCH:
¹⁶        Q.   Right.  But Teva does take
¹⁷ possession of the API product from the
¹⁸ contract manufacturer after it's made,
¹⁹ right?
²⁰        A.    Absolutely.
²¹        Q.   Right.  And at least at that
²² point, as soon as it takes possession of
²³ it, then it's fully Teva's
²⁴ responsibility, wouldn't you say?

Page 61

¹        A.   It is correct.
²        But let me explain that once
³ that product has been manufactured,
⁴ tested and released by the API supplier,
⁵ Teva takes responsibility for ensuring
⁶ also that, you know, it received that
⁷ product in accordance with Teva
⁸ expectations, which is, there is going to
⁹ be an incoming inspection, there's going
¹⁰ to be testing of that product, there's
¹¹ going to be a -- internal certification
¹² by Teva that the receipt of that product
¹³ is in accordance with Teva requirements.
¹⁴        Q.   And we looked at this policy
¹⁵ in Section 5.2.2, in terms of Teva's
¹⁶ responsibilities vis-à-vis contract
¹⁷ manufacturers.
¹⁸        And one is to make sure the
¹⁹ contract manufacturers, say that
²⁰ manufacture API, operates under
²¹ appropriate CGMP conditions, right?
²²        A.    Yes.  And we do look for
²³ that, yes.
²⁴        Q.   As well as the obligation to

Confidential Information - Subject to Protective Order

Page 62

1 make sure a contract API manufacturer
2 uses processes and test methods that are
3 adequately validated, correct?
4       A.   That is correct.
5       Q.   And, ultimately, about --
6 when you believe the -- an API made by a
7 contract API manufacturer is in the
8 possession of the manufacturer or Teva,
9 ultimately when the product is sold with
10 that API in it, it's clearly Teva's
11 responsibility for that product; yes?
12       MS. LOCKARD:  Objection.
13    Form.  It's confusing.  You're
14    confusing contract manufacturers
15    and API suppliers.
16       MR. STANOCH:  You can
17    answer.
18       THE WITNESS:  So Teva's
19    responsibility for the finished
20    product includes the API, it
21    includes the excipients, and it
22    includes ensuring that the
23    manufacturing process and the
24    testing activities and anything

Page 63

1    that is associated with ensuring
2    the safety, quality and efficacy
3    and purity of that product, that
4    those -- those expectations are
5    set; not just for the API but for
6    everything.
7 BY MR. STANOCH:
8       Q.   Understood.
9            And back in the requirements
10 section, Subsection 5.1.2, the second
11 requirement was the binding, legal
12 quality agreement with Teva, right?
13       Do you see that?
14       A.   Yes.
15       Q.   And that agreement, in your
16 experience, would spell out certain
17 contractual responsibilities vis-à-vis
18 the manufacture of, say, API that Teva is
19 purchasing, correct?
20       A.   Can you repeat the question,
21 please?
22       MR. STANOCH:  Amanda, could
23    you read that back?  I'm sorry.
24            - - -

Page 64

1       (Whereupon, the court
2    reporter read the following part
3    of the record:
4       "Question:  And that
5    agreement, in your experience,
6    would spell out certain
7    contractual responsibilities
8    vis-à-vis the manufacture of, say,
9    API that Teva is purchasing,
10    correct?")
11         - - -
12       THE WITNESS:  If there is an
13    agreement, that is correct.
14 BY MR. STANOCH:
15       Q.   You said "if there is an
16 agreement."
17            I mean, it's a requirement,
18 under the Corporate Standard 0046, for
19 there to be a binding, legal quality
20 agreement with Teva and the contract
21 manufacturer, correct?
22       MS. LOCKARD:  Objection.
23    Form.  Conflating two issues here.
24    He's explained this.

Page 65

1       Go ahead.
2       THE WITNESS:  Yeah, again, I
3    want to clarify that Section
4    5.1.2, from my understanding, is
5    exclusive for contract
6    manufacturing activities.
7            That means Teva is asking
8    the contract manufacturer to
9    manufacture a Teva product for
10    Teva, where Teva's responsibility
11    is so complete that a binding,
12    legal agreement helps -- legal
13    quality agreement helps Teva to
14    ensure that it can monitor pretty
15    much every single activity that it
16    could monitor if Teva was
17    manufacturing that product.
18 BY MR. STANOCH:
19       Q.   So you're saying that Teva
20 doesn't need a quality agreement with an
21 API manufacturer?  That's what you're
22 saying, isn't it?
23       A.   That is not what I'm saying.
24 What I'm saying is that there are

Confidential Information - Subject to Protective Order

Page 66

1 instances where a quality agreement for
2 non-contract manufacturing activities may
3 or may not exist. And there are a number
4 of reasons for that.
5        One of those reasons would
6 include that the supplier may choose not
7 to engage in a quality agreement for
8 different reasons.
9     Q.   Right. And you're saying
10 this because you know there's no quality
11 agreement between Teva's Jerusalem
12 facility and Mylan that was supplying
13 valsartan API to Teva, right?
14        MS. LOCKARD: Objection to
15 form.
16 BY MR. STANOCH:
17     Q.   Sir, do you know whether or
18 not there is a quality agreement between
19 Teva's Jerusalem facility and Mylan's
20 Unit 8 for valsartan API?
21     A.   I know there was no quality
22 agreement.
23     Q.   Right. None existed, did
24 it?

Page 67

1     A.   Correct.
2     Q.   So you're telling me that
3 notwithstanding the lack of that
4 agreement, that it was not a breach of
5 this requirement because it wasn't
6 required under Corporate Policy 0046?
7     A.   Once again, I'd like to
8 clarify.
9        When I read this section,
10 the expectation for quality agreement in
11 this case is for a contract manufacturing
12 facility.
13     Q.   And you're saying that in
14 that -- in the substance of Mylan's
15 supply of API -- strike that.
16        You're saying in the
17 instance of Mylan's supply of valsartan
18 API to Teva's Jerusalem facility, that
19 was not a contract manufacturing
20 activity?
21     A.   That's exactly what I'm
22 saying.
23     Q.   So you're saying, then, that
24 Teva had no policy that required it to

Page 68

1 have any quality agreement with a
2 supplier of valsartan API?
3     A.   Can you tell me the time
4 period? Because I think that today Teva
5 does -- and this is one thing that when I
6 was at Teva, it was activity that I
7 wanted to ensure that we could, you know,
8 develop and transition into, with the
9 understanding still that obtaining a
10 quality agreement with a supplier may or
11 may not always be possible.
12     Q.   Well, you tell -- you tell
13 me your understanding of the time
14 periods.
15        Do you recall whether Teva
16 ever had any such policy?
17     A.   I don't think that that was
18 a policy, if it exists, that was clearly
19 defined. So I don't -- the answer would
20 be probably not, no.
21     Q.   And just so we're clear on
22 your testimony for the jury, you're
23 saying that in the instance of Mylan
24 supply of valsartan API to Teva's

Page 69

1 Jerusalem facility, Mylan was not acting
2 as a contract manufacturer, which is a
3 separate company that provides drug
4 product or processes, a drug product or
5 drug substance in accordance with
6 predetermined specifications; you're
7 saying it was not a contract
8 manufacturer?
9     A.   That's what I'm saying.
10     Q.   Are you aware of any
11 agreement between Teva's Jerusalem
12 facility and Mylan's Unit 8 concerning
13 Teva's purchase of valsartan API from
14 Mylan's Unit 8?
15        MS. LOCKARD: Objection.
16 Asked and answered.
17        MR. STANOCH: You can
18 answer.
19        THE WITNESS: I am sure that
20 there is some kind of a supply
21 agreement between Teva and Mylan.
22 I'm not familiar with it.
23        But it is typical for the
24 purchase of product to include a

Confidential Information - Subject to Protective Order

Page 70

1 supplier agreement or
2 understanding between the two
3 companies.
4 BY MR. STANOCH:
5     Q.   Right.  It is typical, isn't
6 it, right?
7     A.   Yes.
8     Q.   And you spent, what, 50
9 hours looking at documents to prepare for
10 today, yes?
11     A.   That is correct.
12     Q.   And you did not see any
13 instance of such an agreement, did you?
14         MS. LOCKARD:  Objection.
15     Vague.
16         MR. STANOCH:  You can
17     answer.
18         THE WITNESS:  Of what type
19     of agreement are you talking?
20 BY MR. STANOCH:
21     Q.   In your 50 hours of
22 preparation for today's deposition, did
23 you see any quality agreement concerning
24 Teva Jerusalem's purchase of valsartan

Page 71

1 API from Mylan's Unit 8?
2     A.   Quality agreement, no.
3     Q.   Did you see any agreement
4 between Teva, for the purchase of
5 valsartan API from Mylan Unit 8, for its
6 Jerusalem facility?
7     A.   I don't recall.
8     Q.   And you know that the
9 Jerusalem facility was the one that was
10 processing Mylan valsartan API into
11 finished dose for sale into the U.S.
12 market, right?
13     A.   I'm well aware of that, yes.
14         MR. STANOCH:  I'm going to
15     mark the next exhibit, sir.
16         This is Exhibit-136.  For
17     the record, it's Bates ending
18     00042539.
19         - - -
20         (Whereupon, Exhibit
21     Teva-136, TEVA-MDL2875-00042539,
22     Teva Corporate Standards
23     CORP-0175, was marked for
24     identification.)

Page 72

1         - - -
2 BY MR. STANOCH:
3     Q.   Tell me when you're able to
4 access that document, sir.
5     A.   Yes.

20     A.   That is correct.
21     Q.   And GXP, that refers to
22 either GMP or GCP, GLP or GDP, as
23 appropriate, right?
24     A.   That would be correct.

Page 73

Confidential Information - Subject to Protective Order

Page 74

10    Q.   Right.  So that -- right.
11  So this would include an arrangement
12  between Teva's Jerusalem facility and
13  Mylan's Unit 8 for the purchase of
14  valsartan API, yes?
15        MS. LOCKARD:  Objection.
16    Form.
17        MR. STANOCH:  You can
18    answer.
19        THE WITNESS:  Can you repeat
20    the question, please?
21  BY MR. STANOCH:
22    Q.   This policy would cover the
23  situation of Teva's Jerusalem facility
24  procuring API from Mylan's Unit 8,

Page 75

1  correct?
2    A.   That would be correct.
3        MS. LOCKARD:  Same
4    objection.
5  BY MR. STANOCH:
6    Q.   Right.  And one of the
7  requirements of Teva's own policies was
8  to -- shall prepare and fully approve a
9  quality technical agreement for that
10  purchase of valsartan API from Mylan Unit
11  8, correct?
12        MS. LOCKARD:  Objection.
13    Form.  Misstates the document.
14        MR. STANOCH:  You can
15    answer.
16        THE WITNESS:  Can you repeat
17    the question, please?
18        MR. STANOCH:  Amanda, if you
19    would.
20        - - -
21        (Whereupon, the court
22    reporter read the following part
23    of the record:
24        "Question:  And one of the

Page 76

1    requirements of Teva's own
2    policies was to -- shall prepare
3    and fully approve a quality
4    technical agreement for that
5    purchase of valsartan API from
6    Mylan Unit 8, correct?")
7        - - -
8        THE WITNESS:  Yes.
9  BY MR. STANOCH:
10    Q.   So as far as you know,
11  because you never could see it or find
12  any agreement between Teva and Mylan's
13  Unit 8 for the -- strike that.
14        So this requirement, as
15  reflected in Teva Policy Corp. 0175, as
16  far as you know, was not fulfilled,
17  because no agreement exists that you know
18  of, right?
19        MS. LOCKARD:  Objection.
20    Form.
21        THE WITNESS:  We are aware
22    that there was no quality
23    agreement.
24  BY MR. STANOCH:

Page 77

1    Q.   Right.  So this requirement,
2  5.2, to have such an agreement, was not
3  met, correct?
4    A.   I don't know if it was not
5  met, in terms of whether Jerusalem, at
6  one point, made an effort to contact
7  Mylan and to pursue the generation of a
8  quality agreement.
9        As I indicated to you
10  before, there are instances where you
11  pursue a quality agreement and the
12  supplier may choose not to accept it.
13    Q.   Sitting here today, can you
14  say whether Requirement 5.2 was met for
15  Teva Jerusalem's purchase of valsartan
16  API from Mylan's Unit 8?
17    A.   Let me go back to the
18  document, please.
19        Repeat the question, please.
20        MR. STANOCH:  Madam Court
21    Reporter, I'm sorry, if you could.
22        - - -
23        (Whereupon, the court
24    reporter read the following part

Confidential Information - Subject to Protective Order

1  of the record:
2       "Question:  Sitting here
3  today, can you say whether
4  requirement 5.2 was met for Teva
5  Jerusalem's purchase of valsartan
6  API from Mylan's Unit 8?")
7            -  -  -
8       THE WITNESS:  I would say
9  that besides the fact that the
10 quality agreement expectation in
11 this case may not have been met,
12 any other considerations that were
13 necessary to ensure that the
14 quality of product that we were
15 going to receive from Mylan, those
16 other expectations were met.
17 BY MR. STANOCH:
18    Q.   I'm only asking about the
19 requirement reflected in 5.2.
20       As far as you know, this
21 requirement was not met, correct?
22    A.   Correct.
23    Q.   And if you flip to Section
24 5.12, maintenance of documents.

1       Tell me when you're there.
2    A.   Yes.

6    Q.   Do you recall who the head
7  of quality assurance at Teva Jerusalem
8  was during your tenure at Teva?
9    A.   There were a number of
10 changes of personnel.  So at this moment,
11 I cannot exactly tell you who that person
12 was.
13    Q.   Even though it might not be
14 comprehensive, tell me anyone who you
15 think held that role during your tenure
16 at Teva.
17    A.   Leron is -- she took over, I
18 think it was Karen -- Karen -- I'm trying
19 to remember the names now, so my
20 apologies for that.
21       But I can visualize their
22 faces.  So we could -- we could get this
23 information later on for you.
24    Q.   That's fine, sir.  If you

1  don't recall right now, that's fine.
2       Look, if later in the day
3  you do, feel free to interject and say,
4  hey, I remember their name.  That's all.
5    A.   Yep.  Okay.
6    Q.   I appreciate that.
7       Sticking with this
8  section -- and then maybe we can take a
9  break soon, because we've been going over

18       Did I read that right?
19    A.   Yes, that is correct.
20    Q.   Are you familiar with Teva's
21 global QTA database?
22    A.   I'm familiar with its
23 existence.  But I did not look at it
24 during my tenure there.

Confidential Information Subject to Protective Order

Page 82



Page 83

1    A.    Correct.  Correct.

2    Q.    So if there was a quality

3  technical agreement between Teva

4  Jerusalem and Mylan Unit 8 for the

5  purchase of valsartan API, it would have

6  been someone within your group to ensure

7  that that agreement made its way into the

8  Teva global QTA database?

9        MS. LOCKARD:  Objection.

10  Form.

11        THE WITNESS:  If it was

12  under my or another group --

13  quality group responsibility, yes.

14  BY MR. STANOCH:

15    Q.    And sitting here today, you

16  don't know whether any agreement between

17  Teva Jerusalem and Mylan Unit 8

18  encompassing the purchase of valsartan

19  API exists in the Teva global QTA

20  database, correct?

21        MS. LOCKARD:  Objection.

22  Asked and answered.

23        THE WITNESS:  We have

24  confirmed that there is no such

Page 84

1  agreement.

2        MR. STANOCH:  Sir, we've

3  been going for a little over an

4  hour.  I'm happy to keep going,

5  but if you'd like a few-minute

6  break, let me know.

7        MS. LOCKARD:  A break would

8  be good.

9        MR. STANOCH:  Okay.  Let's

10  go off the record.

11        THE WITNESS:  I appreciate

12  it.

13        VIDEO TECHNICIAN:  The time

14  is 9:15 a.m.  Going off the

15  record.

16            -  -  -

17        (Whereupon, a brief recess

18  was taken.)

19            -  -  -

20        VIDEO TECHNICIAN:  The time

21  is 9:28 a.m.  Back on the record.

22  BY MR. STANOCH:

23    Q.    Welcome back, Mr. Barreto.

24    A.    Thank you.

Page 85

1    Q.    You're familiar with Teva's

2  operating procedures concerning data

3  integrity?

4    A.    Yes, I am.

5    Q.    And I'll put the policy in

6  front of you in a moment, sir.

7        But just generally, if you

8  could tell us what data integrity means?

9    A.    So data integrity is about

10  companies ensuring that they produce

11  documentation, that it meets what's

12  called the ALCOA expectation.  So for the

13  most part, to summarize, the data has to

14  be reliable, has to be trustworthy, has

15  to be correct.

16    Q.    And data integrity, in part,

17  is subject to GMP regulations, correct?

18    A.    It is correct.

19        MR. STANOCH:  I'm going to

20  mark the next exhibit, sir,

21  Teva-137.

22            -  -  -

23        (Whereupon, Exhibit

24  Teva-137, TEVA-MDL2875-00586753,

Confidential Information - Subject to Protective Order



Page 86

```
 1      Teva Corporate Standard,
 2   Corp-0896, was marked for
 3   identification.)
 4           -  -  -
 5      MR. STANOCH:  I'll state for
 6   the record it's Bates beginning --
 7   or ending 00586753.
 8  BY MR. STANOCH:
 9      Q.   Tell me when you can pull
10   that up, sir.
11      A.   I do -- I have it.
12      Q.   This is Corporate Standard
13   0896?
14      A.   That is correct.
```

Page 87

Page 88

Page 89

Confidential Information - Subject to Protective Order



Page 90

Page 92

13    MS. LOCKARD:  Objection.
14  Asked and answered.
15    MR. STANOCH:  You can
16  answer.
17    THE WITNESS:  So as I
18  indicated, that's -- the policy
19  proposes that that be the case,
20  that we do that through a quality
21  agreement.
22    There are instances where
23  that expectation from the policy
24  cannot be fulfilled, but --

Page 91

22    So I don't know the
23  specifics in this case.  But the absence
24  of a quality agreement does not preclude

Page 93

Confidential Information - Subject to Protective Order

Page 94

7        MR. STANOCH:  I'm going to
8    move to strike, sir, because it's
9    not responsive to the question.
10   BY MR. STANOCH:
11        Q.    The question is, Teva's own
12   policy, does it say that it would be nice
13   to have or propose to have a quality
14   agreement with a third-party contractor?
15        MS. LOCKARD:  Objection.
16   Asked and answered.
17   Argumentative.
18        And I believe the court has
19   said it's inappropriate to move to
20   strike the witness's answer.
21        MR. STANOCH:  You can
22   answer.
23        MS. LOCKARD:  The judgment
24   actually addressed that.

Page 95

1        MR. STANOCH:  You can
2    answer.
3        THE WITNESS:  So the policy
4    is an expectation that is set by
5    Teva.  And what I'm trying to say
6    is that there will be instances
7    where the expectations of the
8    policy cannot be met.  And that,
9    in my opinion, does not
10   necessarily represent that the
11   objectives and expectations of the
12   policy have not been met through
13   other means.
14   BY MR. STANOCH:
15        Q.    Well, again, in the instance
16   of Teva Jerusalem sourcing valsartan API
17   from Mylan's Unit 8, the expectation that
18   the activity of Mylan Unit 8 must be
19   controlled through a quality agreement is
20   not met, to your knowledge, right?
21        A.    The expectations of the
22   policy, no, they have not been met.
23        However, the expectations
24   that you would have from a quality

Page 96

1    agreement will have been met.
2        Q.    Going back to the last
3    exhibit, sir, it was --
4        A.    Are you speaking about the
5    data integrity --
6        Q.    No, sir, I'm sorry.  Let me
7    tell you the exhibit number.
8        It was the one that -- for
9    Corporate Policy 0046.  It was the one
10   with the e-mail that attached the
11   corporate policy concerning outsourced
12   activities, contract manufacture and
13   analysis.
14        MS. LOCKARD:  Exhibit-135.
15        MR. STANOCH:  Thank you,
16   counsel.
17        THE WITNESS:  I'm just
18   opening it.
19        Yes, sir.
20   BY MR. STANOCH:
21        Q.    Sure.  Are you there?
22        A.    Yes, sir.
23        Q.    We had spoken a little bit
24   about Subsection 5.2.4, Change Control.

Page 97

1        Do you recall that
2    subsection?
3        A.    Yes, I do.

11        Q.    Are you aware of any change
12   control procedure documented between Teva
13   Jerusalem, or Teva generally, and Mylan
14   Unit 8 relating to the manufacture and
15   purchase of valsartan API?
16        A.    Again, I think the
17   expectations of this section is -- speaks
18   more about the contract manufacturing
19   facility and goes back to what I think is
20   important -- an important distinction
21   that has to be made.
22        So in the event that a
23   contract manufacturing facility is
24   manufacturing a Teva product for Teva,

Confidential Information - Subject to Protective Order

| | |
|---|---|
| Page 98 | Page 100 |

**Page 98**

1  that change control procedure is
2  extremely important, because the
3  execution of any changes from that
4  contractor would affect the expectations
5  of a Teva product.
6      So that -- this is the
7  reason why it is so specific to contract
8  manufacturing facilities.
9         So in the case of a
10  third-party supplier of an activity, the
11  expectation is that the change control
12  procedure has to be controlled by the
13  contractor because they are the owners of
14  the product.
15      Q.   I think what you're saying
16  is that -- well, let's be specific.
17         So you know that -- we
18  already established Teva Jerusalem was
19  purchasing valsartan API from Mylan Unit
20  8, right?
21      A.   Yes.
22      Q.   And we know that the -- the
23  Malta facility was purchasing valsartan
24  API from Zhejiang Huahai Pharmaceuticals,

**Page 99**

1  or ZHP, correct?
2      A.   That's correct.
3      Q.   Right.  So in those
4  instances, the contractor, as you
5  referred to it, would be ZHP for the
6  Malta facility, and Mylan for the Teva
7  Jerusalem purchases, correct?
8      A.   A contractor within the
9  terms of -- not a contract manufacturer
10  for Teva, but contractor in terms of the
11  contractor being a supplier of its own
12  API.  That's where I want to make the
13  distinction.
14      Q.   Got it.
15         And this section we're
16  looking at, change control, it says
17  contractor, right?
18      A.   That's what it says, yes.
19      Q.   Right.  It's not saying
20  contract manufacturer, right?  This is
21  saying contractor, so that would include
22  ZHP and Mylan in the context of the
23  valsartan API, correct?
24         MS. LOCKARD:  Objection.

**Page 100**

1      THE WITNESS:  I disagree.
2      MS. LOCKARD:  Form.
3  Misstates the document.
4      MR. STANOCH:  You can
5  answer.
6      THE WITNESS:  I disagree
7  totally with this.
8      Because in this industry, if
9  you were to have a change control
10  procedure between a third party
11  and a purchaser of the product
12  from that third party, that is not
13  industry practice.
14      Again, I reaffirm on my
15  position that definitely a change
16  control procedure between Teva and
17  the contractor, being a contract
18  manufacturing facility for Teva,
19  that makes complete sense.
20      A change control procedure
21  between the third party and Teva,
22  that would -- that would not be
23  something that I would expect to
24  exist because that would not be

**Page 101**

1  possible from a practical
2  perspective, and it's not what,
3  you know -- it's not industry
4  practice.
5  BY MR. STANOCH:
6      Q.   Let's get the nomenclature
7  right for the rest of the day.
8         Specifically with respect to
9  ZHP supply of valsartan API to the Malta
10  facility, you're saying ZHP should be
11  called a third-party supplier?
12      A.   That's what I'm saying.
13      Q.   Okay.  And same with Mylan
14  Unit 8 supplying API to the Teva
15  Jerusalem, correct?
16      A.   That is what I'm saying.
17      Q.   Okay.  Regardless of whether
18  ZHP and Mylan's Unit 8 were contractors
19  or third-party suppliers, was it your
20  understanding that any manufacturing
21  change of valsartan API by ZHP or Mylan
22  Unit 8 would have had to have been shared
23  with Teva beforehand?
24      A.   I disagree.  The term "any,"

Confidential Information - Subject to Protective Order

Page 102

1 it would be an all-encompassing
2 expectation which goes against what I
3 just said before.
4         What I do expect, that any
5 significant change that would have an
6 impact on the composition, specifications
7 and on my finished drug product, then I
8 would expect that supplier to notify that
9 information to -- to us at Teva.
10        Q.   Are you aware of whether ZHP
11 ever informed Teva, or the legacy Actavis
12 Malta facility, prior to integration, of
13 any changes to the manufacture of the
14 valsartan API that ZHP was supplying to
15 Malta?
16        A.   I am.
17        Q.   Okay.  What are you aware
18 of?
19        A.    So there was a change to the
20 manufacturing process from what was
21 called the TEA process to the zinc
22 chloride process.
23        Q.   And we will have documents
24 to this effect.

Page 103

1         But do you recall when that
2 change was shared with the Malta facility
3 or Actavis generally?
4         A.   If I recall well, it was
5 either in 2012 or '13.
6         Q.   Do you recall any other
7 manufacturing changes concerning
8 valsartan API that ZHP shared with Teva
9 or the legacy Actavis entity?
10        A.   The --
11        MS. LOCKARD:  Sorry.  I'm
12 just going to object to the extent
13 we're getting outside the scope of
14 the deposition topics.  This
15 relates to any other changes other
16 than the one at issue in the
17 notice in the litigation.
18        MR. STANOCH:  Well, counsel,
19 he identified a manufacturing
20 process concerning TEA to zinc
21 chloride.  So I'm just asking any
22 others that he recalls.
23        MS. LOCKARD:  Okay.  And
24 that's fine and fair.  I mean, you

Page 104

1 can ask him.
2         I just want to make clear
3 that, you know, we do not
4 interpret any -- any and all
5 changes by ZHP over the course of
6 time to be encompassed by the
7 notice.
8         But you can ask him.  If he
9 has personal knowledge, he can
10 answer.
11 BY MR. STANOCH:
12        Q.   What other changes --
13        A.   I have no knowledge.
14        Q.   You have no personal
15 knowledge; is that correct, sir?
16 Correct?
17        A.   Nope.  Nope.  Correct.
18        MR. STANOCH:  Counsel, what
19 process changes, then, are you
20 saying are within the notice?
21 Just, if you want to tell me?
22 Manufacturing?  What else?  And
23 I'll use those phrases instead of
24 "any."

Page 105

1         MS. LOCKARD:  Okay.  So you
2 want me to pull up the notice
3 or --
4         MR. STANOCH:  It was your
5 objection, counsel.  You said any
6 process is outside the notice.  So
7 I just want to know what change is
8 within the notice, under your
9 interpretation.  That's all.
10        MS. LOCKARD:  Okay.  The
11 process change that he just
12 described with respect to the TEA
13 process, you know, anything that
14 relates to the change in the
15 formation of triethylamine.
16        You know, the underlying
17 root cause process, as outlined in
18 the notice, you know, that was
19 basis for the root cause that ZHP
20 provided to us and that Mr.
21 Barreto oversaw on Teva's end.
22        My point -- I'm not trying
23 to be difficult.  But I'm saying
24 you're opening up to any and all

Confidential Information - Subject to Protective Order

Page 106

1   process changes ever in all time,
2   whether or not they relate to, you
3   know, the creation of nitrosamines
4   or not.  I don't know if there are
5   some minor process change that
6   exists out there in the
7   documentation of Teva and ZHP.
8        But that's not the focus of
9   our deposition today.  And that's
10  not the focus of the root cause
11  process and it's not the focus of
12  the litigation.
13       So I don't have knowledge
14  and information about all the
15  other potential process changes or
16  even if there were other process
17  changes.  And we haven't prepped
18  Mr. Barreto on that.  That's my
19  only point.
20       MR. STANOCH:  Thank you,
21  counsel.
22  BY MR. STANOCH:
23       Q.   Mr. Barreto, other than the
24  manufacturing process change from the TEA

Page 107

1   process to the zinc chloride process, are
2   you aware of any other ZHP manufacturing
3   changes pertinent to its valsartan API?
4        A.   I'm not aware of any other
5   changes.
6        Q.   I believe you said you
7   understand that change was disclosed
8   to -- I guess it would be, what, legacy
9   Actavis at the time?
10       A.   It would -- that would be my
11  understanding.
12       Q.   Was the change to -- the
13  manufacturing change by ZHP from the TEA
14  process to the zinc chloride process ever
15  shared with Teva, to your knowledge?
16       A.   Yes.  And it was shared
17  through a communication to Teva, number
18  one.  And it was also shared with Teva
19  through the performance of an audit by
20  our corporate auditors who visited the
21  site.
22       Q.   Do you recall when the
23  manufacturing process change by ZHP from
24  the TEA process to the zinc chloride

Page 108

1   process was first --
2        A.   I think --
3        Q.   -- shared with Teva?
4        A.   I'm sorry.
5             I think it was around 2012.
6        Q.   And you mentioned it might
7   have been discussed as part of a Teva
8   audit of ZHP as well?
9        A.   That is correct.
10       Q.   Do you recall the year of
11  that audit you're thinking of?
12       A.   I want to remember the year.
13  But, again, it would have been either '12
14  or '13.  It's just right around the time
15  when we became aware of that change and
16  the decision was made to audit.
17       Q.   Are you aware of any
18  manufacturing changes by Mylan's Unit 8
19  concerning valsartan API that Mylan ever
20  shared with Teva?
21       A.   Yes.
22       Q.   Which --
23       A.   Again, I'd like to -- sorry.
24  I'd like to clarify.

Page 109

1             I'm not aware of all the
2   manufacturing changes, but I'm aware of
3   one manufacturing change.
4        Q.   To the extent you're aware
5   of -- just tell me what you're aware of.
6   I understand.
7        A.   I'm aware that there was a
8   change from what was called the VST
9   process to the VAA process.
10       Q.   And that change was post the
11  recalls that are underlying this
12  litigation, right?
13       A.   If I recall well, yes, that
14  was intended to be post recall.
15       Q.   And we'll get into that
16  later, when we go through the chronology
17  a little bit more.
18            But that was, I think,
19  what's referred to as sort of an
20  optimized process; is that right?
21       A.   That is correct.
22       Q.   And that was Mylan's effort
23  to address the nitrosamine impurities
24  that had been discovered in its valsartan

Confidential Information Subject to Protective Order

Page 110

1 API, right?
2      A.    That is correct.
3      Q.    So prior to the recalls
4 concerning nitrosamines in 2018, are you
5 aware of any manufacturing process
6 changes that Mylan shared with Teva?
7      A.    Prior to that, no, I'm not
8 aware.
9      Q.    Who at legacy Actavis would
10 be responsible for evaluating the
11 manufacturing process change in 2012 by
12 ZHP from the TEA process to the zinc
13 chloride process?
14      A.    So there were a number of
15 different evaluations that were
16 performed.  They start at the -- there's
17 RMV organization work, there is a site
18 work that is performed, a number of
19 studies and experiments that are
20 conducted.
21           And then, of course, later
22 on, you've -- all of this information
23 that is generated is picked up by the
24 regulatory organization who has the

Page 111

1 responsibility for submitting an ANDA
2 supplement.
3      Q.    Do you recall the specific
4 departments or persons at legacy Actavis
5 who were involved in that evaluation or
6 effort?
7      A.    There were various
8 organizations from within the local
9 facility, quality assurance, R&D,
10 technical operations.  These different
11 organizations were involved.
12      Q.    In your review of materials
13 concerning legacy Actavis's evaluation of
14 the ZHP manufacturing process change, did
15 you see anything in which legacy Actavis
16 conducted any gas chromatography or mass
17 spectrometry testing on the valsartan
18 API?
19      A.    No.  And they would not have
20 conducted anything around gas
21 chromatography specific for, I think,
22 what the concern is with respect to
23 valsartan.
24           The analytical test methods

Page 112

1 that were in place were the analytical
2 test methods that were authorized and
3 approved by the regulatory authorities.
4      Q.    Well, when you say "approved
5 by the regulatory authorities," that
6 would be, what, the DMF?  Or what are you
7 referring to?
8      A.    I'm referring to the
9 analytical test methods that are used to
10 confirm and certify the specifications
11 set for the product.  These analytical
12 test methods are USB test methods, so you
13 are expected and required to perform
14 those test methods on the products.
15      Q.    You mentioned nitrosamine.
16           So I guess, number one,
17 you're not aware of any testing that
18 legacy Actavis did in 2012 of the
19 valsartan API process change by ZHP that
20 would have detected nitrosamines, are
21 you?
22      A.    The analytical test methods
23 that were used at the time to test the
24 product from ZHP were intended to and

Page 113

1 designed to detect the impurities and the
2 active ingredient that were deemed to be
3 present in the product.
4           In 2012, there was no reason
5 to believe that there were nitrosamines
6 present in the ZHP process.
7      Q.    Well, there were no
8 nitrosamines identified as an impurity in
9 the DMF submitted by ZHP, right?
10      A.    Sorry, can you repeat the
11 question?
12      Q.    There were no -- there were
13 no nitrosamines impurities identified in
14 the DMF submitted by ZHP, right?
15      A.    That would be my
16 understanding.
17      Q.    So when you said Actavis
18 would have just done the testing that --
19 or the methods intended, there would not
20 have been a specific test done for
21 nitrosamines, at that time, when Actavis
22 was evaluating the ZHP manufacturing
23 process change from the TEA to the zinc
24 chloride process?

Confidential Information Subject to Protective Order

Page 114

1    A.   That is correct.  There
2 would be no test method designed to look
3 for something that we didn't expect that
4 would be present.
5    Q.   Well, that was not
6 identified by ZHP to Teva, or anyone
7 else, as being present; is that fair?
8    A.   That is correct.
9    Q.   And nitrosamines aside,
10 you're not aware of any use of gas
11 chromatography at all by Actavis when it
12 was evaluating the manufacturing process
13 change by ZHP in 2012 from the TEA
14 process to the zinc chloride process,
15 right?
16    A.   I'm not aware of any testing
17 that was done using GC-MS.
18    Q.   In terms of Teva itself, you
19 mentioned that Teva was made aware of the
20 change by ZHP in 2012 or 2013, right?
21    A.   Yes.
22    Q.   Are you aware of any tests
23 that Teva performed in evaluating the ZHP
24 manufacturing change from the TEA to the

Page 115

1 zinc chloride process that could detect
2 nitrosamines in the valsartan API?
3    A.   No.
4    Q.   Are you aware of whether
5 Teva performed any gas chromatography
6 testing in its evaluation of the ZHP
7 manufacturing process change from the TEA
8 process to the zinc chloride process?
9    A.   No, because that would not
10 have been expected.
11    Q.   Because -- it would not be
12 expected because it was not on the
13 specifications in the DMF on file by ZHP?
14    A.   Or in the NDA.
15    Q.   Correct.
16    A.   I'm sorry, ANDA.
17    Q.   That would be Teva's ANDA,
18 correct?
19    A.   Correct.
20    Q.   Because Teva's ANDA for any
21 valsartan product would refer to the DMF
22 submitted by ZHP in this instance,
23 correct?
24    A.   That is correct.

Page 116

1    Q.   And the testing parameters
2 or potential impurities that Teva would
3 be testing for would be only those that
4 ZHP had identified in the DMF to which
5 Teva's ANDA is referring?
6    A.   That is correct.
7        And the analytical test
8 methods that ZHP was using at the time
9 were also USB analytical test methods.
10    Q.   I'm going to fast-forward to
11 the 2018 time period a little bit, sir,
12 just to orient you, okay?
13    A.   Okay.
14    Q.   And I understand there came
15 a time that Teva issued a field alert
16 concerning valsartan products; is that
17 right?
18    A.   That is correct.
19    Q.   And in June of 2018, did you
20 have any responsibilities concerning the
21 issuance of field alerts?
22    A.   I did.
23    Q.   What were the scope of your
24 responsibilities at that time?

Page 117

1    A.   So I was designated to be
2 the main contact person, from a corporate
3 perspective, with respect to receiving,
4 reviewing and approving the issuance of
5 field alert reports to be submitted to
6 the FDA.
7    Q.   And so we're clear, can you
8 just tell us what a field report is?
9    A.   So a field alert report is
10 predicated on the fundamentals that
11 whenever a company comes to information
12 that indicates that there is a potential
13 quality/safety issue associated with a
14 product in distribution, even in the
15 absence of certain information, the -- it
16 is the responsibility of that company to
17 notify the U.S. Food and Drug
18 Administration of the initial issue.
19    Q.   I'm going to try to pull up
20 the next exhibit, sir.  One moment.
21        MR. STANOCH:  This exhibit,
22    I think, was previously marked as
23    Teva Exhibit-5.
24        You should be able to see

Confidential Information - Subject to Protective Order

Page 118

1 it, I think, sir.
2     THE WITNESS:  I'm
3 refreshing.
4     MR. STANOCH:  And, counsel,
5 I was trying to avoid double
6 marking something we've marked
7 before.  That's all.  Thank you
8 for your patience.
9     THE WITNESS:  So, yes, I
10 have it.
11 BY MR. STANOCH:
12     Q.   Great.  And this exhibit
13 previously marked as Teva Exhibit-5, it's
14 a cover e-mail from Constance Truemper
15 dated July 3rd, 2018, and then it
16 attaches what appears to be the field
17 alert.
18     Do you see that?
19     A.   Yes, I do.
20     Q.   And if you can just turn to
21 the field alert, this is the field alert
22 that Teva submitted concerning -- strike
23 that.
24     Just tell me, what's the

Page 119

1 field alert here?
2     A.   So in this case, the field
3 alert, as soon as we became aware and
4 collected information -- sufficient
5 information to put together a report to
6 the agency, we submitted that report to
7 the agency on July 3rd.
8     Q.   Right.  And it lists here a
9 number of the form information that Teva
10 filled out, right?
11     A.   That is correct.
12     Q.   And it identifies, I guess,
13 the Malta facility as the facility at
14 issue, right?
15     A.   That is correct.
16     Q.   It identifies the NDCs for
17 the valsartan products that the Malta
18 facility was selling into the United
19 States that incorporated valsartan API
20 from ZHP?
21     A.   That's what Section 4 says,
22 yes.
23     Q.   And then Section 9, it's --
24 the format is the date when notified

Page 120

1 about problems, or when problems first
2 became known to the application holder.

Page 121

9     Q.   Was that accurate at the
10 time this was written, to your knowledge?
11     A.   At the time, based on the
12 information that we had, we -- we assumed
13 and we decided that we wanted to make
14 sure that all the lots that were
15 manufactured within that time period
16 would be included.

Confidential Information — Subject to Protective Order

Page 122

```
1      Q.   In the field report, it said
2  you were notified about -- Teva was
3  notified about the problem, that was Box
4  9, that's what, June 28th, 2018?
5      A.   That's when we became aware
6  of the problem, yes.
7      Q.   Wasn't Teva aware of the
8  problem earlier than that?
9      A.   Excuse me?
10     Q.   Wasn't Teva aware of the
11 problem earlier than that?
12     MS. LOCKARD:  Object to the
13 form.  Vague.
14     THE WITNESS:  Prior to that
15 instance, we understand that there
16 was a communication between a
17 supplier and a Teva supply chain
18 organization where there were some
19 preliminary discussions as to
20 whether or not there was a
21 problem.
22     On 6/28, that's when us in
23 the quality organization became
24 aware that -- of this
```

Page 123

```
1  notification.  And that's the
2  point at which we started to now
3  gather all the information,
4  collect all the details that we
5  needed to gather.
6      That was on a Thursday when
7  we started to gather all the
8  details to make a prompt
9  submission to the FDA.
10 BY MR. STANOCH:
11     Q.   Well, Teva knew at least a
12 week or so earlier than June 28th about
13 the impurity in the valsartan API, didn't
14 it?
15     A.   Teva had -- the supply chain
16 organization, from my understanding, had
17 some preliminary information that
18 indicated that there was an apparent
19 problem with the product.
20     The details -- the more
21 formal details came later on, and that's
22 when we, in the quality organization,
23 came and had together all the details
24 that we needed to now initiate the
```

Page 124

```
1  process of putting together and releasing
2  a field alert report.
3      Q.   So you're saying June 28th
4  is when the quality department, your
5  department, got involved in this issue?
6      A.   That is correct.
7      MR. STANOCH:  I'm going to
8  mark the next exhibit.  One
9  moment.
10     This will be Exhibit-138.
11     - - -
12     (Whereupon, Exhibit
13 Teva-138,
14 TEVA-MDL2875-00495102-5104, 7/6/18
15 E-mail, Drape to Vanderweeen, was
16 marked for identification.)
17     - - -
18     THE WITNESS:  I'm trying to
19 refresh.
20     MR. STANOCH:  That's fine.
21 Just let me know.
22     And while you're doing that,
23 for the record, it's ending Bates
24 495102.
```

Page 125

```
1      THE WITNESS:  So I have it
2  there, yes.
3  BY MR. STANOCH:
4      Q.   Okay.  And this appears to
5  be an e-mail chain, topmost ^^ message
6  from an Eric Drape, sent on July 6th,
7  2018; is that right?
8      A.   That's what I see here.
9      Q.   And then you're copied on at
10 least the first couple of messages there,
11 the top messages, right?
12     A.   That is correct.
13     Q.   Do you recall this e-mail?
14     A.   Vaguely I do, yes.
15     Q.   And the original message
16 here is from July 6th, 2018, from a Ms.
17 Eva Wong.
18     Do you see that?
19     A.   Yes, I do.
20     Q.   It looks like she's
21 e-mailing regulators in Hong Kong,
22 correct?
23     A.   That is correct.
24     Q.   And it says here in her
```

Confidential Information Subject to Protective Order

Page 126

¹ signature block she's associate director,
² APAC commercial quality; is that right?
³     A.    Yes, that's right.
⁴     Q.    Was she within your
⁵ department at the time?
⁶     A.    No.  She was in another
⁷ organization.
⁸     Q.    Okay.  And in Ms. Wong's
⁹ message to the Hong Kong authorities, she
¹⁰ writes, in part, On June 20th, 2018, Teva
¹¹ was notified by Zhejiang Huahai that they
¹² came to be aware of a previously unknown
¹³ impurity that may create a risk to
¹⁴ patient health and safety and requested
¹⁵ Teva to put temporarily on hold the use
¹⁶ of all valsartan API immediately.
¹⁷         Do you see that?
¹⁸     A.    I see that.
¹⁹     Q.    I mean, if Ms. Wong in
²⁰ commercial quality is saying that she was
²¹ aware of the issue June 20, why did it
²² take until June 28th for you and your
²³ group to become aware of it and tell the
²⁴ FDA about it?

Page 127

¹         MS. LOCKARD:  Objection.
² Form.  Compound.
³         MR. STANOCH:  You can
⁴ answer.
⁵         THE WITNESS:  Okay.  So from
⁶ my perspective, I do not know
⁷ exactly what transpired between
⁸ the 20th and June 28.  So I don't
⁹ know exactly how that
¹⁰ communication did not get in to
¹¹ us.
¹²         The only thing that I can
¹³ tell you is that as soon as we
¹⁴ became aware of the situation, we
¹⁵ took immediate action.
¹⁶ BY MR. STANOCH:
¹⁷     Q.    At this time, Teva had a
¹⁸ standard operating procedure concerning
¹⁹ field alert reporting, didn't it?
²⁰     A.    Can you clarify, please?
²¹     Q.    Sure.  In 2018, Teva had a
²² corporate policy concerning field alert
²³ reporting, right?
²⁴     A.    That is correct.  That is

Page 128

¹ correct.
²     Q.    Right.  And I can put it in
³ front of you, but does it sound right to
⁴ you that the policy required Teva to
⁵ establish and maintain procedures to
⁶ ensure field alerts are filed with the
⁷ FDA within three working days of
⁸ discovery?
⁹     A.    That is correct.
¹⁰     Q.    Right.  So the discovery
¹¹ of -- at least from Ms. Wong's e-mail, it
¹² was June 20th, a field alert should have
¹³ been issued by Teva three days from that
¹⁴ date, right?
¹⁵         MS. LOCKARD:  Objection.
¹⁶ Form.  Vague.
¹⁷         THE WITNESS:  My response
¹⁸ to -- if we had become aware on
¹⁹ June 20th of this situation -- it
²⁰ appears, from what I'm reading,
²¹ that there was no, at that time,
²² understanding that this included
²³ U.S. production, as far as Ms.
²⁴ Wong was concerned.

Page 129

¹         I don't know.  Again, I
² would be speculating.
³         But the only thing that I
⁴ can tell you is that if we at Teva
⁵ corporate had become aware of this
⁶ situation on June 20th, then the
⁷ field alert report process would
⁸ have started at that point.
⁹ BY MR. STANOCH:
¹⁰     Q.    Well, you said earlier, too,
¹¹ that supply chain folks were having
¹² communications with ZHP about the
¹³ impurity prior to June 20th, right?
¹⁴     A.    That is -- that is correct.
¹⁵ That is correct.
¹⁶     Q.    Right.  So you know that
¹⁷ there was supply chain folks who knew
¹⁸ about the impurity with ZHP prior to June
¹⁹ 28th, right?
²⁰     A.    That is correct.
²¹     Q.    And we know from looking at
²² least at Ms. Wong, who is in quality,
²³ albeit for a different region, within
²⁴ Teva, was aware of the impurity prior to

Confidential Information Subject to Protective Order

Page 130

¹ June 28th, correct?
² A.   That is correct.
³ MS. LOCKARD:  Objection.
⁴ Form.
⁵ BY MR. STANOCH:
⁶ Q.   But the field alert was not
⁷ submitted to the FDA until June 28th?
⁸ A.   As I indicated to you, the
⁹ field alert was reported to the FDA as
¹⁰ soon as I and my organization became
¹¹ aware of the specific details associated
¹² with this situation.
¹³ Q.   So different people within
¹⁴ Teva were aware of the impurity in the
¹⁵ valsartan API for over a week before you
¹⁶ were; is that what you're saying?
¹⁷ MS. LOCKARD:  Objection.
¹⁸ Form.  Misstates the testimony.
¹⁹ THE WITNESS:  What I'm aware
²⁰ of is that different people are
²¹ aware of this situation under a
²² different level of understanding
²³ as to what this issue represented.
²⁴ So I'm sure that -- or I

Page 131

¹ could speculate that if I'm a
² supply chain organization, they
³ are looking at the issue from a
⁴ supply chain perspective.  Ms.
⁵ Wong was looking at it from a
⁶ regional perspective.
⁷ When the information gets to
⁸ us, then we look at it from a
⁹ global perspective.  And we are
¹⁰ the quality organization, the
¹¹ compliance organization.  We have
¹² a different level of understanding
¹³ as to exactly what needs to be
¹⁴ done under these circumstances.
¹⁵ BY MR. STANOCH:
¹⁶ Q.   There weren't any procedures
¹⁷ in place at Teva to ensure that folks in
¹⁸ different functions, such as supply chain
¹⁹ or maybe in a -- quality in a different
²⁰ region, passed on urgent information
²¹ about API impurities to you in your
²² group; is that right?
²³ MS. LOCKARD:  Objection.
²⁴ Form.  Misstates the evidence.

Page 132

¹ THE WITNESS:  The procedures
² were there.  And I'm sure that in
³ different locations, supply chain
⁴ organization, when they see an
⁵ issue, they're able to communicate
⁶ it based on their best
⁷ understanding.
⁸ In this situation, I don't
⁹ know exactly what happened.  But
¹⁰ they were looking at it from a
¹¹ different perspective.
¹² So when you see Ms. Wong,
¹³ she was actually initiating
¹⁴ corrective actions, from a quality
¹⁵ perspective, for activities within
¹⁶ her region.
¹⁷ BY MR. STANOCH:
¹⁸ Q.   Who is the first person to
¹⁹ tell you about the nitrosamine impurity
²⁰ in the valsartan API?
²¹ A.   Oh, I remember this very
²² well.  That was -- I was in Italy on that
²³ Thursday, and we received a call.  I
²⁴ don't remember -- I got it from my vice

Page 133

¹ president of quality in Europe, Edith
² Koller-Dette.  She communicated the issue
³ to me.  I don't recall now exactly who
⁴ she got the information from.
⁵ But as soon as we got it,
⁶ that's exactly the point at which we
⁷ decided that we needed to file a field
⁸ alert report.
⁹ Q.   So the first time you heard
¹⁰ about the valsartan API contamination
¹¹ issue from ZHP was June 28th?
¹² A.   That is correct.
¹³ Q.   Can you identify with
¹⁴ specificity any procedures at Teva, at
¹⁵ the time, that would have covered Ms.
¹⁶ Wong or someone in the supply chain or
¹⁷ some other function that knew about it
¹⁸ earlier to tell you about it sooner than
¹⁹ June 28th?
²⁰ A.   I would have to look at the
²¹ procedures.  But I'm sure that there are
²² some general procedures that would
²³ provide that level of guidance.
²⁴ Q.   Sure.  Sitting here right

Confidential Information - Subject to Protective Order

Page 134

1  now, can you recall which procedure, if
2  any, would cover that?
3      A.   Potentially the NTM
4  procedure, notification to management
5  procedure.
6      Q.   Any others?
7      A.   I would think that that
8  would be the -- maybe a complaint
9  procedure would be applicable in this
10 case.
11     Q.   Okay.  Any others?
12     A.   It could be -- I'm sure
13 there are others.  I just -- I'm thinking
14 about these two at this time.
15     Q.   Was this nitrosamine
16 impurity in the valsartan API from ZHP
17 also an out-of-specification issue?
18     A.   When the issue was found,
19 that would fit under the
20 out-of-specification conditions for
21 investigation.
22     Q.   Right.  So Teva has policies
23 concerning the handling of
24 out-of-specification or out-of-trend

Page 135

1  issues, correct?
2      A.   That is correct.
3      Q.   And those policies -- sorry.
4  Go ahead.
5      A.   I'm sorry.
6          There is a global policy and
7  then there's local policies and
8  procedures.
9      Q.   And the global policy would
10 apply to all Teva sites?
11     A.   That is correct.
12         MR. STANOCH:  Let's mark the
13 next exhibit, 139.
14           -  -  -
15         (Whereupon, Exhibit
16 Teva-139, TEVA-MDL2875-00020376,
17 Teva CORP-0092, was marked for
18 identification.)
19           -  -  -
20         MR. STANOCH:  While you're
21 pulling that up sir, I'll state
22 for the record it's Bates ending
23 20376.
24         Tell me when you have that

Page 136

1      in front of you, sir.
2          THE WITNESS:  I do.
3  BY MR. STANOCH:
4      Q.   And this document appears to
5  be Corporate Policy 0092, entitled,
6  Handling of Out-of-Specification, OOS,
7  and Out-Of-Trend, OOT, Test Results,
8  correct?
9      A.   That is correct.
10     Q.   And its effective date is
11 identified as June 8th, 2016?
12     A.   That is correct.
13     Q.   And this is the global
14 policy you were referring to earlier,
15 right?
16     A.   That is the policy I was
17 referring to, yes.

Page 137

6      A.   Allow me to read it for just
7  a second.
8      Q.   Sure.  Go ahead.
9          Tell me when you're done.
10     A.   Yes.

Confidential Information Subject to Protective Order

---

Page 138

1    MS. LOCKARD:  Objection.
2  Form.
3    THE WITNESS:  Can you repeat
4  the question?
5  BY MR. STANOCH:
6    Q.   It was a poor one.  I'll
7  repeat it.

[REDACTED]

15    Q.   And, again, we know others
16  in Teva, besides you, knew -- were
17  looking at this issue at least as early
18  as June 20th, 2018, if not earlier,
19  correct?
20    A.   The only difference here, I
21  think it's important, is the field -- the
22  purpose of the field alert report is,
23  again, to let the agency know about the
24  specific issue with sufficient

---

Page 139

1  information to ensure that the agency has
2  a good understanding of the situation.
3    Between June 28th and July
4  the 3rd, that's the point at which we
5  were able to gather the information that
6  we felt was necessary to file a
7  field alert report.
8    There is -- it is correct
9  that other people had a certain level of
10  knowledge, but not necessarily the
11  complete understanding of all the
12  information that was needed to file a
13  field alert report prior to this point.
14    Q.   Well, the Policy 0092, you
15  know, it states that the investigation
16  does not need to be completed to submit a
17  field alert to the FDA, correct?
18    A.   You don't have to have an
19  investigation completed.  But, as I
20  indicated to you, you have to have
21  sufficient information to be able to fill
22  out a form that, when received by the
23  FDA, the FDA is able to understand the
24  general concept of what the issue is all

---

Page 140

1  about.
2    Q.   Well, Ms. Wong, at least,
3  knew on June 30th that there was an
4  impurity in the valsartan API from ZHP
5  and can create a risk to patient health
6  and safety.
7    You're saying that wasn't
8  enough for you to issue a field alert
9  prior to June 28th?
10    A.   What I'm trying to say is
11  that Ms. Wong, at the time when she was
12  looking at the issue from her regional
13  perspective, she did not necessarily
14  understand that this issue involved
15  product that was intended for the U.S.
16    So because of the different
17  markets that are served, I don't know
18  what she was thinking in terms of whether
19  or not she needed to think about, well, I
20  need to report this in a different way.
21    But at the time, more than
22  likely, what Ms. Wong was concerned was
23  with the regional concerns that she had
24  based on the knowledge that she had.  She

---

Page 141

1  did not necessarily know that this
2  product may or may not have been
3  distributed in the United States.
4    Q.   Well, we can look at her
5  e-mail again.  You can pull it up, sir.
6    It's -- again, she knew a
7  few key points, which she highlighted
8  with the Hong Kong regulators.  She
9  writes -- she wrote, number one, the
10  impurity, NDMA, is defined as a probable
11  human carcinogen.
12    Do you see that?
13    A.   I need to go back to the
14  document, if you don't mind.
15    Q.   Sure.  Yes, please.  Tell me
16  when you're there.
17    A.   That would be Number 5?
18    Q.   No.  That is --
19    A.   138?
20    Q.   Correct.  Thank you.
21    A.   Okay.
22    Q.   And Ms. Wong wrote in her
23  original message there, There are a few
24  key points we would like to highlight

---

Confidential Information - Subject to Protective Order

Page 142

¹ here on top of our phone call this
² morning.
³          Do you see that?
⁴     A.   I'm looking for it.
⁵     Q.   Last page.
⁶     A.   My apologies.
⁷     Q.   Sure.  Tell me when you're
⁸ there.
⁹     A.   You're talking about the
¹⁰ July 6th, not the 11:42?
¹¹    Q.   Correct.
¹²    A.   Okay.  Yep.
¹³    Q.   And she noted that the
¹⁴ impurity was NDMA and it's defined as a
¹⁵ probable human carcinogen, yes?
¹⁶    A.   Yes.  That's what she
¹⁷ indicated, yes.
¹⁸    Q.   Right.  So you're telling me
¹⁹ that even though Ms. Wong, at least, and
²⁰ probably others in procurement, knew
²¹ about a probable human carcinogen in an
²² API, no one was -- within Teva was
²³ telling you or your department that
²⁴ something needs to be done about this for

Page 143

¹ other markets?
²     A.   Eventually that
³ communication was told to us.  I -- so
⁴ that is what happened later on in the
⁵ process.  So I -- eventually that
⁶ happened.
⁷     Q.   Right.  It didn't happen
⁸ until June 28th, correct?
⁹     A.   Correct.
¹⁰    Q.   Can you tell me why no one
¹¹ else at Teva, procurement, Ms. Wong,
¹² anyone else, did not inform you or your
¹³ department about the valsartan API
¹⁴ nitrosamine issue until June 28th?
¹⁵    A.   That would be a speculation
¹⁶ on my part.  As I indicated to you
¹⁷ before, more than likely they were
¹⁸ looking at the issue within the confines
¹⁹ of their own responsibilities and their
²⁰ understanding they had of the issue.
²¹          So as soon as they -- the
²² issue became -- the understanding of the
²³ issue became clearer to everybody, that's
²⁴ when, you know, the entire organization

Page 144

¹ just came together to address the issue
² in a global way.
³     Q.   What Teva region is the Teva
⁴ Jerusalem facility within?
⁵     A.   That would have been
⁶ Europe -- there was -- it was its own
⁷ region.  So it was the Asia-Pacific
⁸ region, if I recall well.
⁹     Q.   That's the same region that
¹⁰ Ms. Wong is the associate director for
¹¹ commercial quality, right?
¹²    A.   That is correct.
¹³    Q.   And so a facility in her
¹⁴ region is sourcing the same API that
¹⁵ she's e-mailing about with Hong Kong from
¹⁶ ZHP, and that Jerusalem facility is
¹⁷ selling it to the U.S., but still you
¹⁸ don't have any information about anyone
¹⁹ sharing any notice about this
²⁰ contamination issue until June 28th with
²¹ you and your department?
²²    A.   So when you operate within a
²³ global organization like this one, and,
²⁴ you know, you talk about commercial

Page 145

¹ quality, even though there's a
² commercial qualities there, it's a
³ separate entity by itself for which, you
⁴ know, it has a certain level of
⁵ responsibility.
⁶          So I -- again, I would be
⁷ speculating.  But what I see, what she
⁸ was trying to do, was to address the
⁹ issues within her region and based on her
¹⁰ best understanding of what she needed to
¹¹ do.
¹²    Q.   Are you aware of whether
¹³ anyone within Teva, prior to June 28th,
¹⁴ told anyone at Teva's Jerusalem facility
¹⁵ about the ZHP valsartan API nitrosamine
¹⁶ contamination issue?
¹⁷    A.   I am not aware.
¹⁸    Q.   Are you aware of whether
¹⁹ anyone at Teva told anyone at the Malta
²⁰ facility about the ZHP valsartan API
²¹ contamination issue prior to June 28th?
²²    A.   When you say "anyone," I
²³ couldn't say.  It could have been to a
²⁴ supply chain person again.  I don't know.

Confidential Information - Subject to Protective Order

Page 146

1    MS. LOCKARD:  We've been
2  going -- I'm sorry.
3    We've been going over an
4  hour.  So when you get to a good
5  point, can we take a break?
6    MR. STANOCH:  Yes, Ms.
7  Lockard.  I was done.  You did not
8  interrupt.  No problem.
9    We can take a break now.
10  That's fine.
11    VIDEO TECHNICIAN:  The time
12  is 10:32 a.m.  Going off the
13  record.
14    - - -
15    (Whereupon, a brief recess
16  was taken.)
17    - - -
18    VIDEO TECHNICIAN:  The time
19  is now 10:49 a.m.  Back on the
20  record.
21  BY MR. STANOCH:
22    Q.   We're back, Mr. Barreto.
23  Just a yes/no question.
24    Did you speak with your

Page 147

1  counsel concerning this deposition during
2  the break?
3    A.   Yes.
4    Q.   Did you speak with your
5  counsel about this deposition during the
6  last break we took?
7    A.   Yes.
8    Q.   Okay.  So are you familiar
9  with something called an HHA?
10    A.   Yes.
11    Q.   That's a health hazard
12  assessment?
13    A.   That is correct.
14    Q.   What's a health hazard
15  assessment at Teva?
16    A.   So a health hazard
17  assessment is a medical evaluation that



Page 148

1    Q.   There was a health hazard
2  assessment prepared for the valsartan
3  APIs that Teva was sourcing from ZHP,
4  correct?
5    A.   There was one, yes.
6    Q.   You recall that process and
7  the preparation of that HHA?
8    A.   Yes, I do.
9    Q.   You were involved in the
10  preparation of that HHA?
11    A.   No, I'm not.  That would be
12  a responsibility for the medical
13  organization.
14    Q.   Do you recall who in the
15  medical organization prepared the health
16  hazard assessment for the valsartan API
17  that Teva was purchasing from ZHP?
18    A.   I'm trying to remember the
19  name of the doctor.  At this point, I
20  don't recall.  But I can look at it.
21    Q.   We'll go through some
22  documents soon.
23    And does the name Siyu Liu
24  sound familiar, L-I-U?

Page 149

1    A.   Yes, that is correct.
2    Q.   First name is S-I-Y-U.  Last
3  name, L-I-U.
4    Do you recall that person?
5    A.   Yes, I do.
6    Q.   And what was that person's
7  role at Teva in July 2018, to your
8  knowledge?
9    A.   To my knowledge, he was a
10  medical doctor with responsibility for,
11  again, doing this type of -- the type of
12  assessment that would be required under
13  the HHA guidance.
14    Q.   And Teva had a standard
15  operating procedure concerning the
16  preparation of health hazard assessments
17  at the time that Teva became aware of the
18  nitrosamine issue in valsartan API,
19  correct?
20    A.   Yes.
21    Q.   And that SOP -- I mean, I
22  can put it in front of you, but it --
23  consistent with what you said, it's the
24  medical group, I think you said, who

Confidential Information - Subject to Protective Order

Page 150

1  prepare the health hazard assessment?

2      A.   That is correct.

3      Q.   Do you recall communications

4  with Raphael Nudelman about the health

5  hazard assessment for the ZHP valsartan

6  API?

7      A.   He was a member of the

8  cross-functional team that was working

9  with the valsartan situation.  So I'm

10 sure there were communications with him,

11 yes.

12     Q.   He's a toxicologist, I

13 think.

14     A.   That is -- that is correct.

15     Q.   Some of the e-mails I looked

16 at, it looked like he was on vacation

17 when the health hazard assessment was

18 being prepared.

19          Does that ring any bells to

20 you?

21          MS. LOCKARD:  Objection to

22     form.

23          THE WITNESS:  I don't

24     remember.

Page 151

1  BY MR. STANOCH:

2      Q.   And who is Eric Drape,

3  D-R-A-P-E?

4      A.   So, actually, the spelling

5  of his last name is Drape, because he's

6  French.

7      Q.   My apologies.  Same

8  spelling, wrong pronunciation.  I

9  apologize.  Thank you.

10     A.   No problem.

11          So Eric Drape was my

12 direct-line supervisor.  He was the

13 global head of quality.

14     Q.   And how about Tony Delicato?

15     A.   So Tony Delicato, he had

16 responsibility for the quality activities

17 with the Americas region.

18     Q.   Is that a regulatory role or

19 compliance role or something else, to

20 your knowledge?

21     A.   It's mostly a quality role.

22 But, obviously, there are compliance

23 activities that fall within that

24 responsibility.

Page 152

1      Q.   And do you recall the level

2  of recall -- well, strike that.

3          Teva issued a recall

4  concerning its finished-dose valsartan

5  products that contain ZHP valsartan API,

6  correct?

7      A.   That is correct.

8      Q.   And that was for all Teva

9  valsartan finished dose on the market at

10 the time that had ZHP valsartan API in

11 it, correct?

12     A.   That is correct.

13     Q.   And my understanding is

14 there is multiple classifications of a

15 recall level; is that right?

16     A.   That is correct.

17     Q.   Do you recall the level of

18 recall that Teva instituted for the

19 valsartan finished-dose products that it

20 sold in the United States that contained

21 ZHP's valsartan API?

22     A.   If I'm not mistaken, that

23 would have been a Class I recall.

24     Q.   And would that be the

Page 153

1  highest class recall under Teva's

2  procedures?

3      A.   It's the highest recall

4  level under Teva and FDA's procedures.

5          MR. STANOCH:  I'm going to

6  mark the next exhibit, sir.  Stand

7  by.

8          I'm marking Teva

9  Exhibit-140, which is Bates

10 beginning 934333.

11          - - -

12          (Whereupon, Exhibit

13 Teva-140,

14 TEVA-MDL2875-0934333-4435, 7/5/18

15 E-mail, Sawyer to Barak, was

16 marked for identification.)

17          - - -

18 BY MR. STANOCH:

19     Q.   Sir, take a moment to look

20 at that.  And let me know when you have

21 it.

22     A.   I do have it.

23     Q.   This appears to be an e-mail

24 chain, with the topmost message from Mr.

Confidential Information - Subject to Protective Order

Page 154

1 Corey Sawyer, dated July 5th, 2018, to
2 various individuals, including yourself,
3 at Teva.
4          Do you see that?
5     A.   Yes, I do.
6     Q.   And it's regarding the
7 valsartan HHA July 2018 NDMA draft?
8     A.   Okay.  Yes.
9     Q.   So this e-mail chain is
10 about the preparation of the health
11 hazard assessment we had just been
12 talking about that Teva prepared
13 concerning the ZHP valsartan API, right?
14    A.   Yes.
15    Q.   And if you'd look at the
16 message on the second page from Mr.
17 Delicato on July 25th, 2018.
18    A.   Yes.
19    Q.   And he has some comments to
20 Dr. Liu, who it looks like he had been
21 preparing the draft, and then he also has
22 a summary of the recall classifications
23 there in his e-mail.
24          Do you see that?

Page 155

1     A.   Yeah, I see that.



12    Q.   And that is consistent with
13 Teva's procedures defining the level of
14 recalls, correct?
15    A.   That would be the case, yes.
16    Q.   And, again, Teva instituted
17 a Class I recall for its valsartan
18 finished-dose products in the United
19 States that included ZHP valsartan API,
20 right?
21    A.   That is correct.
22    Q.   And Mr. Delicato writes in

Page 156





Page 157

8          And there's a reason for
9 that.  The information that we had at the
10 time did not make any sort of link of the
11 presence of the nitrosamines to any
12 human-related, you know, cancer or any
13 other type of link, from a carcinogenic
14 perspective.
15          So to make those statements
16 as indicating that may increase the risk
17 of cancer in a few patients, that --
18 there was no literature, there was no
19 data that we were aware of.  So from our
20 perspective, we felt it was important to
21 clarify this statement from Dr. Liu,
22 because in the absence of data -- the
23 statement, without data, could be
24 interpreted in different ways, and we

Confidential Information - Subject to Protective Order

Page 158

1 wouldn't have the data to support the
2 claim that it may increase the risk of
3 cancer in a few patients. We just didn't
4 have that information.
5        So from my perspective, we
6 felt that, you know, we needed to sort of
7 put this in a context that was
8 reasonable.
9        Q.   The question was, do you
10 remember that being your recommendation,
11 right?
12        And the answer is yes to
13 that?
14        A.   It is yes. But I felt that
15 it was important to provide
16 clarification.
17        Q.   Sure. Sure.
18        And you're not a medical
19 doctor, right?
20        A.   I am not a medical doctor.
21        Q.   You're not a toxicologist,
22 are you?
23        A.   I'm not a toxicologist.
24        Q.   You don't hold yourself out

Page 159

1 as an expert in pharmacovigilance, do
2 you?
3        A.   I do not hold myself as an
4 expert in pharmacovigilance, no.
5        Q.   You don't have any training
6 in epidemiology, biostatistics, anything
7 like that, do you?
8        A.   No.

22        We also felt the need to, as
23 part of the assessment that we were
24 doing, to understand that the elements

Page 160

1 included were supported. So while it is
2 correct that I don't have all those
3 specialties, I do have the experience to
4 evaluate these records and make
5 recommendations on them.
6        Q.   Right. And the conclusion
7 was not Dr. Liu's conclusion. He ended
8 up adopting the recommended conclusion
9 you said, correct?
10        A.   I think he ended up making
11 the recommendation that he understood
12 would fit the expectations of the data
13 that we were asking him to support his
14 recommendation with. The data was not
15 there.
16        Q.   You recommended the
17 conclusion, and that's ultimately the
18 conclusion that ended up in the health
19 hazard assessment, yes?
20        A.   But -- yes. But that is the
21 HHA assessment, not mine.



Page 161

7        And so we were adopting
8 language that we saw was being used by
9 the regulatory authorities in this case.
10        Q.   Did you do any analysis
11 yourself to quantify how many patients
12 may develop cancer from any use of
13 valsartan containing ZHP's valsartan API?
14        A.   There was -- there was no
15 analysis on our part. What we wanted to
16 convey to the agency was what we had
17 received as input from other regulatory
18 authorities.
19        Q.   So what did -- how many --
20 quantify it.

Confidential Information - Subject to Protective Order



Page 162

6        So, again, I would leave
7    that discussion of whether or not a study
8    was conducted to toxicologists.  But the
9    information we had at the moment was that
10    there was potential long-term use of the
11    product, based on the input from the
12    regulators.

Page 164

1        A.    I don't remember.  But he
2    copied me on that, so that was clear to
3    me.

Page 163

9        MS. LOCKARD:  Object to
10    form.  Asked and answered.
11        THE WITNESS:  No.
12    BY MR. STANOCH:

22        Q.    Do you remember specifically
23    talking to him about that or are you
24    guessing?

Page 165

1        A.    Can you repeat the question?
2        MR. STANOCH:  Madam
3    Reporter, if you would not mind.
4            - - -
5        (Whereupon, the court
6    reporter read the following part
7    of the record:

Confidential Information - Subject to Protective Order

Page 166

██████████████████████
██████████████████
████████████████

4     Q.    In the preparation of the
5  health hazard assessment, did you come to
6  have an understanding of whether NDMA was
7  a carcinogen?
8     A.    The understanding we had was
9  that it was a potential carcinogen, yes.
10    Q.    Well, not just a potential
11  carcinogen, isn't it correct that NDMA is
12  a potent mutagenic carcinogen?
13        MS. LOCKARD:  Objection.
14  Form.  Vague.
15        THE WITNESS:  The
16  understanding that we have is that
17  the studies that have been
18  conducted have been in animals,
19  and the correlation between these
20  findings and nitrosamines having a
21  carcinogenic impact in humans,
22  that has not been established.
23  That's why we were concerned.
24  BY MR. STANOCH:

Page 167

1     Q.    So you don't agree that NDMA
2  is a potent mutagenic carcinogen?
3     A.    I agree that it's a potent
4  carcinogenic impurity.
5        What I am saying is that we
6  have to make a distinction, where is it
7  that it is carcinogenic?
8        MR. STANOCH:  I'll mark
9  Teva-141.
10          - - -
11        (Whereupon, Exhibit
12  Teva-141,
13  TEVA-MDL2875-00020519-0525, 7/4/18
14  E-mail, Barreto to Drape, was
15  marked for identification.)
16          - - -
17  BY MR. STANOCH:
18    Q.    Tell me when you have that,
19  sir.
20        MR. STANOCH:  While you're
21  doing that, for the record, I'll
22  state it's Bates ending 20519.
23        THE WITNESS:  Yes, I have
24  it.

Page 168

1  BY MR. STANOCH:
2     Q.    This appears to be an e-mail
3  chain, topmost message from you to Eric
4  Drape, July 4th, 2018; is that right?
5     A.    Yes.
6     Q.    Do you recall this e-mail
7  chain?
8     A.    Yes.
9        MS. LOCKARD:  I'm sorry.
10  Okay.  Sorry to interrupt.  I
11  misheard the date.
12        THE WITNESS:  You're
13  speaking about the 7:39 a.m. page?
14  BY MR. STANOCH:
15    Q.    I was looking at the topmost
16  message from you to Mr. Drape.
17    A.    Yes.
██   ██████████████████████
  ██  ██
██    ███████
22    Q.    Okay.  We're on the same
23  page, then.
24        So if you could turn, then,

Page 169

1  to the next page, the message from Mr.
2  Nudelman?
3     A.    Yes.
4     Q.    And, again, Mr. Nudelman was
5  a toxicologist at Teva, right?
6     A.    That is correct.
██  ██████████████████████
██
██  ████████████████████████
██  ██████████████
13    A.    I'm going there, sorry.
14        I'm looking for it.  Is that
15  from Mr. Nudelman to Mr. Drape?
16    Q.    It's from Mr. Nudelman to,
17  it looks like, Corey Sawyer and Siyu Liu.
18    A.    It says, My apologies for
19  interrupting -- nope.
20    Q.    No.  Go one, two, three
21  messages up in the chain.
██  ██  ████████████████████████

Confidential Information - Subject to Protective Order



Confidential Information - Subject to Protective Order

Page 174

1  MR. STANOCH:  Teva-142 is
2  Bates ending 64409.  Take a moment
3  to refresh, and let me know when
4  you have it.
5      - - -
6  (Whereupon, Exhibit
7  Teva-142,
8  TEVA-MDL2875-00064409-4412,
9  7/12/18 E-mail, Barreto to
10  Truemper, was marked for
11  identification.)
12      - - -
13  THE WITNESS:  Yes, sir.
14  BY MR. STANOCH:
15  Q.   This is an e-mail from you
16  to Constance Truemper and Tony Delicato
17  on July 12th, 2018, attaching comments by
18  you to the recall notice issued by Teva.
19      Do you see that?
20  A.   Yes.

Page 175

Page 176

7  Q.   Do you recall anything that
8  Teva ever shared with the FDA in which it
9  categorized NDMA as a potent mutagenic
10  carcinogen?
11  A.   Not to the best of my
12  knowledge.
13  Q.   We can put that aside, sir.
14      So when Teva was -- let me
15  strike that.
16      So Teva put a hold on all of
17  its valsartan product that contained ZHP
18  valsartan API, correct?
19  A.   We did.
20  Q.   And initially did Teva put a
21  hold on all of its valsartan products
22  regardless of API supplier?
23  A.   We -- initially the
24  information that we had was with respect

Page 177

1  to ZHP.  That's what we did.
2  Q.   Well, I guess my question
3  was, was the hold that Teva placed
4  initially on all valsartan products?
5  A.   No.
6  Q.   It was only on products that
7  contained ZHP's valsartan API?
8  A.   Based on the information we
9  had received, as it was reported by ZHP,
10  yes.
11  Q.   Did Teva think to talk to
12  its other API suppliers about whether or
13  not NDMA or other nitrosamines could be
14  in their API as well?
15  A.   We did.  As the information
16  evolved, we generated a process whereby
17  we communicated with each API supplier,
18  and we requested that they provide to us
19  certain -- certification that their APIs
20  were not producing this type of impurity.
21  Q.   Who was responsible for
22  those communications with the various API
23  suppliers?
24  A.   So we were working within

Confidential Information - Subject to Protective Order

1  the compliance of what we call the CAC,
2  the corporate action committee.  This was
3  processed within that organization.
4          We were working also with
5  the supply chain organization, because
6  they are the ones who have consistent and
7  direct contact with the suppliers.
8          So we indicated to each and
9  every supplier that we needed to have
10 that certification.
11 Q.   So who on this
12 cross-functional team was responsible for
13 communicating with each valsartan API
14 supplier?
15 A.   So, again, supply chain
16 personnel from different regions.  And
17 Corey Sawyer, who worked for me and
18 Claire Lyons.
19 Q.   Who in the supply chain
20 department was contacting various API
21 suppliers?
22 A.   Our main contact was Jens.
23 I'm trying to remember now his last name.
24 Q.   Nassall?

1  A.   Nassall, yes.
2  Q.   Was he the main contact with
3  all the other API suppliers of valsartan
4  API to Teva, or was there someone else?
5  A.   No, he was not.  There were
6  different supply chain personnel in
7  different regions.
8          So if I recall, you know,
9  there was one person in Spain speaking
10 with suppliers from Spain.  So it was --
11 it was -- again, it was a team effort.
12 Q.   Who do you recall was the
13 person primarily responsible for
14 communicating with the manufacturer
15 Jubilant about valsartan API?
16 A.   I don't recall who was that
17 person.  It could have been Jens Nassal.
18 Q.   How about the person who was
19 primarily responsible for communicating
20 with Mylan?
21 A.   Again, I'm speculating, it
22 could have been Jens Nassal.
23 Q.   And who was having the
24 primary contact with ZHP at this time in

1  early July 2018?
2  A.   I think it was Jens Nassall
3  as well.  But, again, I'm speculating at
4  this point.
5          MR. STANOCH:  I'm going to
6  mark the next exhibit, sir,
7  Teva-143, Bates ending 20744.
8          - - -
9          (Whereupon, Exhibit
10 Teva-143, TEVA-MDL2875-00020744,
11 7/5/18 E-mail, Barreto to
12 Koller-Dette, was marked for
13 identification.)
14          - - -
15 BY MR. STANOCH:
16 Q.   Tell me when you've been
17 able to pull it up.
18 A.   Got it.
19 Q.   And this appears to be an
20 e-mail chain, topmost message is from

Confidential Information - Subject to Protective Order

Page 182





Page 183

7    Q.   Well, you were a senior
8  quality executive at the time in July
9  2018.
10        How would you know whether
11  or not a hold was in place for a
12  particular product or not?
13    A.   I would ask for that
14  information.  And then I would obtain it
15  through, you know, whatever distribution
16  center was responsible for providing that
17  response.
18        So I don't have access to --
19  I didn't have access to each distribution
20  center database.  But I could -- I could
21  send a request -- an e-mail and request a
22  certification that something was placed
23  on hold.
24    Q.   So there was no central

Page 184

1  system or -- in place at Teva at the time
2  that would have let you or someone else
3  find out all the product holds in place?
4    A.   There is potential for that
5  central system to be in place.  I
6  couldn't speak to it at this point.
7    Q.   Right.  I'm only asking
8  because you said you would have to
9  contact someone at a distribution center.
10        And Teva has a number of
11  distribution centers, I imagine, yes?
12    A.   That is correct.  Or, as I
13  did in the past, I would just speak with
14  the global supply chain vice president,
15  and he still would go to the distribution
16  centers and ask for that information.
17    Q.   Would a product hold only
18  relate to the finished product?
19    A.   A product hold could relate
20  to both finished product and API.  It
21  could relate to excipients.  It depends
22  on what is it that we need to put on
23  hold.
24    Q.   Do you recall whether or not

Page 185

1  Teva ever had a hold placed on all
2  finished-product valsartan in early July
3  of 2018?
4    A.   As I indicated to you, I'm
5  trying to recall, there may have been,
6  like, a one-day or two-day hold based on
7  the initial information, acting on, let's
8  say, a conservative approach.
9        I don't recall now.  But
10  that's probably what could have happened.
11    Q.   How about holds for API?  Is
12  there a different system for that?
13    A.   No, it's the same system.
14  It's just a product code that is assigned
15  to the API.
16        So I'm sure that every
17  valsartan lot from ZHP was placed on
18  hold.  The same -- the same for the
19  manufacturing process, we also put a hold
20  on that.
21    Q.   So you recall Teva putting a
22  hold on all valsartan API from ZHP as
23  well as the manufacturing of that API
24  into a finished-dose product?

Confidential Information - Subject to Protective Order

Page 186

1    A.   That is correct.

2    Q.   Do you recall whether Teva

3 ever had a hold on all valsartan API,

4 regardless of supplier, in place?

5    A.   As I indicated to you, if

6 there was a hold, and I'm trying to

7 remember now, it would have been -- it

8 would have been a temporary hold while,

9 you know, we were trying to understand

10 the implications from this situation.

11    Q.   And sitting here today, you

12 can't remember whether there would be a

13 centralized system that you, as quality,

14 could access to see which API or finished

15 product was subject to a hold?

16         MS. LOCKARD:  Objection.

17 Asked and answered.

18         THE WITNESS:  As I said, I

19 am not sure whether or not there's

20 such a central system.

21         But if we wanted to know

22 what is on hold in the entire

23 global network, this is something

24 that can be done.

Page 187

1 BY MR. STANOCH:

2    Q.   And who would you ask to

3 find that out?

4    A.   I would speak with the vice

5 president of supply chain.

6    Q.   And who was that at the time

7 in July of 2018?

8    A.   That would have been Daniel

9 Hoey.

10    Q.   Could you spell the last

11 name?

12    A.   H-O-E-Y.

13    Q.   Thank you.

14         And would that be for holds

15 on finished product as well as API or

16 just one or the other?

17    A.   For everything.

18    Q.   Do you ever recall speaking

19 to Mr. Hoey, or anyone in his department,

20 about holds on valsartan finished product

21 or valsartan API in July of 2018?

22    A.   More than likely there was a

23 discussion, as I said, yes.

24    Q.   Can you recall specifically

Page 188

1 any discussion you had with him?

2    A.   I'm sure that there was a

3 discussion around the hold for valsartan

4 from ZHP because we needed to ensure that

5 that product was not distributed.



Page 189

1    Q.   You mentioned product codes

2 earlier.

3         Would the product codes

4 trigger what would be put on hold

5 globally?

6    A.   So every item that is

7 received is given a product code.  So the

8 global notification actually comes from

9 the corporate organization, where we send

10 that notification, through the GMP

11 process, to the sites where we say, put

12 product on hold.

13    Q.   To your knowledge, is the

14 code for valsartan API from a given

15 supplier the same throughout the global

16 Teva network?

17    A.   I don't know the answer to

18 that question.



Confidential Information - Subject to Protective Order



Page 190

1    A.   Let me read here.
2    Q.   Sure.
3    A.   You're talking about the
4 last document that we've been discussing,
5 right?
6    Q.   Yes.  The e-mail.
7         I'm looking at the part in
8 bold and italics that you wrote.
9         Do you see that?
10   A.   Oh, I see what you're
11 saying.
12        Correct.

Page 191

Page 192

Page 193

5 BY MR. STANOCH:
6    Q.   Well, it's Teva's obligation
7 to ensure its products are safe and
8 efficacious, right?
9    A.   Our obligation is that our
10 products are safe, efficacious -- you
11 know, safety, efficacy, quality and
12 purity of the products, yes.
13   Q.   Teva didn't need FDA's
14 permission to put a hold on other API
15 suppliers' valsartan API, did it?
16   A.   We didn't need permission
17 from the FDA.  But we needed data to
18 ensure that there was scientific
19 rationale for putting product on hold.
20 Otherwise, we would create a drug
21 shortage situation which would create a
22 different set of challenges and problems
23 for us, our patients and the regulators.
24   Q.   Teva kept buying valsartan

Confidential Information Subject to Protective Order

Page 194

1 API from Mylan, even though it knew at
2 the time that ZHP had a nitrosamine issue
3 in its API, right?
4     A.   Can you repeat the question?
5     Q.   Teva was still purchasing
6 valsartan API from Mylan at the same time
7 it was putting a hold on ZHP valsartan
8 API?
9     A.   That is correct.  And --
10     Q.   And -- sorry.
11     A.   I just want to say, I mean,
12 this is a very evolving process.  This is
13 a process that is going -- you know,
14 changing from a -- day to day.
15         So even in the case where
16 you mentioned Mylan, Swissmedic had
17 tested product from Mylan and had
18 indicated to us that they had not seen
19 any nitrosamines in their testing.
20         So there's a lot of
21 information that is being shared.  So our
22 decision-making process is not only based
23 on the ZHP information but it's also
24 based, as the situation evolved, on input

Page 195

1 that we're getting from regulators.
2     Q.   Nothing in this e-mail we're
3 looking at mentions any communication
4 from Swissmedic, does it?
5     A.   This is -- this is what
6 happens later on in the process.  So
7 Swissmedic picks up on this, you know,
8 process later on.
9         So no.  But at the time,
10 based on our knowledge, the only problem
11 that we had identified was associated
12 with valsartan from ZHP.  We had no
13 information about any other API supplier.
14         So as far as we knew,
15 putting product on hold without
16 information was not the right thing to
17 do.
18     Q.   First of all, you just said,
19 right, communications with Swissmedic
20 happened later on, not in early July
21 2018, right?
22     A.   Correct.
23     Q.   And then, second, Teva was
24 saying nobody else contacted it about a

Page 196

1 similar problem, but Teva hadn't done
2 anything, by that point in time, to reach
3 out affirmatively and say, hey, Mylan,
4 tell us how your valsartan API is with
5 respect to nitrosamines; had that
6 happened yet?
7     A.   As far -- not at that point.
8         But this is part of the
9 evolution of the process where we put
10 together a certification process where we
11 are asking our API suppliers to give us
12 sufficient technical information for us
13 to be comfortable that they did not have
14 issues.  So we proactively actually
15 reached out to the API suppliers.
16     Q.   So instead of just putting a
17 hold on valsartan API from any supplier,
18 Teva just kept buying, processing and
19 selling finished dose with Mylan API,
20 with Jubilant API, et cetera, without
21 having received any information from
22 those suppliers or doing any analysis on
23 Teva's own?
24         MS. LOCKARD:  Objection to

Page 197

1 the form of the question.
2         THE WITNESS:  The testing of
3 those products that we received
4 indicated -- from these suppliers
5 indicated that those suppliers
6 were fulfilling the specifications
7 established.
8         At that point, we're still
9 trying to understand the next
10 steps that we're going to take.
11 And from a proactive perspective,
12 we have product meeting the
13 specifications, but we still,
14 later on, take the proactive
15 approach to seek certification
16 from the API suppliers.
17 BY MR. STANOCH:
18     Q.   NDMA was not in the
19 specification for any valsartan API from
20 anyone, correct?
21     A.   That is correct.
22     Q.   And, in fact, no
23 nitrosamines was in the specification for
24 any API suppliers' API that Teva was

Confidential Information Subject to Protective Order

Page 198

¹ buying, correct?

²    A.   That is correct.

³    Q.   So specification testing,

⁴ whatever extent it was being done, might

⁵ not necessarily be enough to know whether

⁶ there was nitrosamines in these other

⁷ suppliers' valsartan API, correct?

⁸    A.   But I think it's

⁹ important -- I think -- I'd like to

¹⁰ provide some clarification.

¹¹       When you look at the

¹² manufacturing process for ZHP, that

¹³ process was different from the

¹⁴ manufacturing process that we had at

¹⁵ Mylan.  So the fact that you have a

¹⁶ problem at one supplier site does not

¹⁷ necessarily imply that you have the same

¹⁸ problem at another location.

¹⁹       So with the knowledge that

²⁰ we had at the time, we felt that the most

²¹ important thing to do was to continue the

²² investigation with the -- ZHP's

²³ situation.  We were proactively seeking

²⁴ more information from our suppliers.

Page 199

¹       And as information became

² available and things change, then we took

³ the necessary proactive actions, whether

⁴ it was a recall, additional holds.

⁵       So the hold, from my

⁶ perspective, counsel, the holds happened

⁷ at the time we -- the data indicated that

⁸ we needed to -- to take -- to put those

⁹ holds in place.

¹⁰    Q.   So you're saying in early

¹¹ July 2018, Teva wanted to do more

¹² analysis of other valsartan API

¹³ suppliers' product to evaluate whether

¹⁴ the nitrosamine impurity might be in it?

¹⁵    A.   Yes.

¹⁶    Q.   And that would include

¹⁷ understanding the solvents used?

¹⁸    A.   At the time when we are

¹⁹ working with the ZHP situation, there was

²⁰ no discussion about solvents.  The issue

²¹ about solvents came later on when we

²² gained knowledge of the situation with

²³ Mylan.

²⁴       So the discussion that we

Page 200

¹ had regarding ZHP was around the fact

² that the manufacturing process had

³ changed and then there were certain

⁴ conditions within the manufacturing

⁵ process that would trigger this type of

⁶ formation of this impurity.

⁷       There was no knowledge about

⁸ anything else other than what we had at

⁹ the moment.  As the situation evolved,

¹⁰ that's when we tackled each issue in a

¹¹ certain way independently, because each

¹² issue was different, to a certain extent.

¹³    Q.   Well, part of the issue, as

¹⁴ you understood it, concerning ZHP was a

¹⁵ process issue involving the degradation

¹⁶ of the solvent dimethylamine, correct?

¹⁷    A.   So to explain.  The issue

¹⁸ with the ZHP, it's what I would call a

¹⁹ form of secondary issue, because you have

²⁰ the -- you have the Tetrasol grade

²¹ formation through this -- using DMS --

²² the DMS actually generates low traces of

²³ dimethylamine.  And then those low traces

²⁴ of dimethylamine, when they come in

Page 201

¹ contact, later on in the next step, with

² nitrous acid, that's when these

³ formations of the impurities happens.

⁴       So it's like a secondary

⁵ issue, because it's not exactly directly

⁶ related to the main ingredients reacting

⁷ with each other.  It's a by-product that

⁸ is caused by traces of small degradants

⁹ that are generated in the process.

¹⁰    Q.   You agree that the

¹¹ nitrosamine contamination in the

¹² valsartan API, it's a process impurity,

¹³ not a degradation impurity, right?

¹⁴    A.   What I'm saying is that to

¹⁵ the extent that it's a process impurity,

¹⁶ it happens in the process but at the

¹⁷ stage where, when you are assessing the

¹⁸ manufacturing process, those small traces

¹⁹ of degradants coming from the DMS turning

²⁰ into DEA, those you would not necessarily

²¹ be in a good position to predict, and

²² that's what I was saying.

²³    Q.   The question was merely,

²⁴ sir, do you agree that nitrosamine

Confidential Information Subject to Protective Order

Page 202

1 contamination of valsartan API, it's a
2 process impurity, not a degradation
3 impurity, correct?
4     A.   That is correct.
5     Q.   Right.  And that means that
6 the concentration of the impurity in the
7 API carries over to the finished product,
8 right?
9     A.   Yes.
10     Q.   Because the impurity is not
11 arising when the finished product is
12 degrading in some way, right?
13     A.   It comes with the API, as
14 far as we know.
15     Q.   And then earlier you were
16 talking about it is important to know
17 what happens in the process.
18         So a part of that is an
19 analysis of the route of synthesis for
20 creating the valsartan API, isn't it?
21     A.   Correct.
22     Q.   And you would think that
23 Teva would have looked at the route of
24 synthesis for the other valsartan APIs it

Page 203

1 was purchasing besides ZHP's, right?
2     A.   What we wanted to do -- the
3 route of synthesis is pretty much an
4 intellectual property for the company,
5 and most companies do not want to share
6 the route of synthesis.
7         So what we did is we asked
8 the API suppliers to perform a route of
9 synthesis analysis, to have that route of
10 synthesis analysis documented and sent to
11 us.
12         And then internally, with
13 our experts, those routes of synthesis
14 analysis assessments were again evaluated
15 internally by Teva personnel.
16     Q.   At the time of July 5th,
17 2018, Teva didn't have the route of
18 synthesis for its valsartan API
19 suppliers, did it?
20     A.   We would not have the route
21 of synthesis from any API supplier.  We
22 would have access to manufacturing
23 records.
24         But the extent to which an

Page 204

1 API supplier would share a route of
2 synthesis, that's just something that
3 would not necessarily be possible.
4     Q.   Right.  It would be very
5 helpful to Teva's analysis to have the
6 full route of synthesis so Teva can
7 conduct its own evaluation of the
8 valsartan API; is that fair?
9     A.   Under ideal conditions, yes.
10 But that's not the way the industry
11 works.
12     Q.   Did Teva ask non-ZHP
13 suppliers of valsartan API for routes of
14 synthesis?
15     A.   As I indicated to you, we
16 asked for a route of synthesis analysis
17 from them.  If some API suppliers, I'm
18 trying to remember, gave us sections of
19 their route of synthesis, that's
20 possible.  I remember certain -- but you
21 would not get the full route of
22 synthesis.
23         MR. STANOCH:  I'm going to
24     mark the next exhibit, Teva-144.

Page 205

1         -  -  -
2         (Whereupon, Exhibit
3     Teva-144,
4     TEVA-MDL2875-00057196-7197, 7/6/18
5     E-mail, Sawyer to Drape, was
6     marked for identification.)
7         -  -  -
8     THE WITNESS:  Okay.
9     MR. STANOCH:  It's Bates
10 ending 57196.
11 BY MR. STANOCH:
12     Q.   Tell me when you have it,
13 sir.
14     A.   Yes.
15     Q.   This is an e-mail chain,
16 topmost message is from Corey Sawyer,
17 dated July 6th, 2018, to Mr. Drape and
18 yourself, copying others.
19         Do you see that?
20     A.   Yes, I do.
21     Q.   And the attachment is for
22 Valsartan synthesis routes of Mylan and
23 Jubilant, right?
24     A.   Yes.

Confidential Information Subject to Protective Order

Page 206

1    Q.   And at this time, Teva was
2 purchasing valsartan API from Mylan and
3 Jubilant as well as ZHP, right?
4    A.   Yes.
5    Q.   And Mr. Sawyer was writing
6 to you and others about Teva's analysis
7 of the processing of the valsartan API by
8 Jubilant and Mylan, right?
9    A.   Yes.
10    Q.   And with respect to Mylan,
11 Mr. Sawyer has an excerpt from another
12 Teva person named Katherine, right, that
13 says, The document attached is a copy of
14 CEP from which we can see only the
15 solvent analyzed at final stage.
16 According to this, Mylan is not using
17 DMF, hence possibility is negligible.
18 They have not provided ROS document,
19 hence actual evaluation could not be
20 done.
21        Did I read that right?
22    A.   My apologies.  You're
23 reading from the top?
24    Q.   I'm looking at the first --

Page 207

1 the topmost e-mail message that begins,
2 To Mylan, in bold.
3        Do you see it?
4        MS. LOCKARD:  You can read
5     as much of the document as you
6     need to, though.
7        THE WITNESS:  Okay.
8     I'm reading here.  I'm
9     trying to see where you're reading
10     from.  Are you reading from the
11     top e-mail, 2:49 p.m.?
12 BY MR. STANOCH:
13    Q.   3:02:49, correct, sir?
14    A.   3:02.
15    Yes.  And what is your
16 question?  Sorry.
17    Q.   My question was just did I
18 read the excerpt correctly, where it
19 says, To Mylan, the document attached is
20 a copy of CEP from which we can see only
21 the solvent analyzed at final stage.
22 According to this, Mylan is not using
23 DMF, hence possibility is negligible.
24 They have not provided ROS document,

Page 208

1 hence actual evaluation could not be
2 done.
3        Do you see that?
4    A.   Yes, I see that.
5    Q.   So this is reflecting that
6 because Mylan had not provided the full
7 route of synthesis document, Teva
8 couldn't do an actual evaluation to
9 determine the extent to which Mylan's
10 valsartan API could have nitrosamine
11 contamination, right?
12    A.   And this goes to what I was
13 just telling you before, that the -- most
14 companies will not -- most companies will
15 not share the route of synthesis
16 analysis -- sorry, the route of
17 synthesis.
18        So this is one where the
19 certification that they provided said, we
20 don't use DMF.
21    Q.   Was -- go ahead.  I don't
22 want to cut you off, sir.  You're the
23 witness.
24    A.   Because we know DMF is

Page 209

1 important in the process of nitrosamine
2 formations.
3    Q.   It looks like Jubilant had
4 provided their route of synthesis, right?
5    A.   Let me read.
6        They may have or may not.  I
7 don't know.
8    Q.   And, again, the very first
9 e-mail in this is from Eric Drape.  And
10 he mentioned, in part, that, I discussed
11 with Carlo, and we are of the opinion
12 that we can lift the hold on batches from
13 other suppliers if exempt of Huahai
14 intermediates.
15        Do you see that?
16    A.   Correct.
17    Q.   Does that refresh your
18 recollection that there was a hold on all
19 valsartan API but then it was lifted as
20 to non-ZHP valsartan API?
21    A.   And that's exactly what I
22 told you before, that there could have
23 been, and there was, an immediate and
24 temporary hold while we understood

Confidential Information Subject to Protective Order

Page 210

¹ whether or not this was an issue that was
² isolated to one supplier or all
³ suppliers, all -- you know, all valsartan
⁴ products.  That's what I said.
⁵     Q.   Sure.  But then it looks
⁶ like Teva is lifting the hold as to
⁷ Mylan valsartan API, even though it could
⁸ not conduct the actual evaluation because
⁹ they didn't get enough documentation from
¹⁰ Mylan.
¹¹         That's what it says here in
¹² the top e-mail, isn't it?
¹³     A.   No, no.  What it says is
¹⁴ that when the ZHP situation came up, we
¹⁵ active -- proactively put every valsartan
¹⁶ that was produced on hold, regardless of
¹⁷ supplier.
¹⁸         And then we discussed, from
¹⁹ a risk-based approach, whether or not
²⁰ there was a reason to maintain that hold
²¹ on a more long-term basis.  And we
²² decided that there was no reason because
²³ there was no data at the point that would
²⁴ justify keeping product on hold.

Page 211

¹     Q.   Teva lifted its hold on
² Mylan valsartan API -- or product
³ containing Mylan valsartan API without
⁴ actually conducting an evaluation of the
⁵ Mylan route of synthesis; isn't that
⁶ right?
⁷     A.   Because that process came
⁸ later on in the -- in the whole chain of
⁹ events that we followed.  So at the time,
¹⁰ that decision to seek for -- a route of
¹¹ synthesis evaluation, that was not
¹² precedent at the time.
¹³         That came as we decided,
¹⁴ later on, to continue to ask for more
¹⁵ information.
¹⁶     Q.   Well, this isn't later on,
¹⁷ sir, this is July 6th, 2018, isn't it?
¹⁸     A.   This is -- but this is about
¹⁹ ZHP.  So at that point, the only
²⁰ information that we have is ZHP is the
²¹ problem.  We don't have any reason to
²² believe that there are other products
²³ involved.
²⁴     Q.   At the time you didn't have

Page 212

¹ any reason to believe there was not a
² problem either, though, with the Mylan
³ valsartan API, did you?
⁴     A.   At the time we -- what we
⁵ knew was that the product was fulfilling
⁶ specifications and that in light of the
⁷ fact that we had not received any
⁸ notification from other suppliers, the
⁹ approach to take was to continue with the
¹⁰ manufacturing process to ensure that
¹¹ patients had access to the medication.
¹²     Q.   ZHP's valsartan API was
¹³ fulfilling the specifications, too,
¹⁴ wasn't it?
¹⁵         MS. LOCKARD:  Object to
¹⁶ form.  Asked and answered.
¹⁷         THE WITNESS:  And for the
¹⁸ ZHP situation, based on the
¹⁹ additional information, regardless
²⁰ of them meeting specifications, we
²¹ identified that there was an
²² issue.  That's the difference.
²³ BY MR. STANOCH:
²⁴     Q.   Right.  My only point, sir,

Page 213

¹ for everyone listening to this, is that
² just because a given supplier's valsartan
³ API was fulfilling specifications did not
⁴ mean it was free of nitrosamine
⁵ contamination and should be distributed,
⁶ correct?
⁷         MS. LOCKARD:  Object to
⁸ form.  Asked and answered.
⁹ Argumentative.
¹⁰         THE WITNESS:  At the time
¹¹ when we made the decision to
¹² continue to manufacture, we had no
¹³ information whatsoever that would
¹⁴ indicate that we had a problem or
¹⁵ an issue with any of the products
¹⁶ manufactured by other suppliers.
¹⁷ That is -- that is normal.
¹⁸ BY MR. STANOCH:
¹⁹     Q.   Teva lifted its hold of
²⁰ product with Mylan valsartan API without
²¹ any evaluation of the Mylan route of
²² synthesis, correct?
²³     A.   At the time when we made
²⁴ that lift, we did not see a need to do

Confidential Information Subject to Protective Order

Page 214

1 that route of synthesis evaluation.
2     Q.   Teva lifted the hold on
3 Mylan valsartan API, and products
4 containing the same, without doing any
5 testing for nitrosamines in the Mylan
6 valsartan API or the finished product
7 containing same?
8     A.   At the time, the information
9 we had was that these products were
10 fulfilling specifications.  We did not
11 have any testing, analytical methods for
12 nitrosamines, let's say, to look into
13 those products.  We did not have the
14 equipment to do that either.
15     So that is something that as
16 more information became available, we put
17 in place a strategy to ensure that we
18 would have those capabilities.
19     Q.   Teva lifted the hold on the
20 Mylan valsartan API, and any product
21 containing same, without doing any
22 testing for nitrosamines in it, correct?
23     MS. LOCKARD:  Objection.
24 Asked and answered.

Page 215

1     MR. STANOCH:  You can
2 answer.
3     Sir, you can answer.
4     THE WITNESS:  Oh.  The
5 answer is that at the time when we
6 lifted the hold, we did not have
7 any indications that we had an
8 issue with the Mylan product.
9 BY MR. STANOCH:
10     Q.   Can you identify for me any
11 testing for nitrosamines that Teva did at
12 or before the time it lifted the hold on
13 Mylan valsartan API or finished product
14 containing same?
15     A.   There was no testing
16 performed because there were no
17 analytical methods that could perform
18 those tests.
19     Q.   Earlier you mentioned that
20 Teva didn't have the equipment.
21     Were you referring to gas
22 chromatography equipment?
23     A.   That piece of -- that type
24 of equipment was later identified as the

Page 216

1 right equipment, analytical equipment, to
2 perform this type of test.
3     Q.   Well, it wasn't later on,
4 sir.
5     I mean, Teva's facility in
6 India had a gas chromatography machine,
7 didn't it?
8     A.   In order for you to perform
9 the test on these products, you need two
10 things.  One is the equipment, but the
11 other thing that you need is the
12 validated analytical test method.  So
13 it's not as simple as just saying, here
14 is the equipment, just perform the test.
15     For us to ensure that we
16 would have the right analytical data, we
17 would have to not only find the
18 equipment, you mentioned the equipment,
19 it was an R&D piece of equipment that was
20 located, I think it was in India, but we
21 didn't have validated analytical test
22 methods at the time to perform the type
23 of testing.
24     Q.   We'll talk about methods

Page 217

1 later, sir.
2     But, you know, your answer
3 before, a few questions ago, related to
4 equipment.  So I'm focusing on equipment
5 now, all right?
6     A.   Okay.
7     Q.   And my question was,
8 certainly at this time, in early July
9 2018, Teva had -- in fact, it had, at
10 multiple facilities, gas chromatography
11 equipment, didn't it?
12     A.   I don't know how many pieces
13 of equipment we had.
14     But I have to -- again, I
15 have to say that the presence of the
16 equipment itself is not enough for you to
17 conduct the testing.  That's all I'm
18 saying.
19     I'm not trying to go into
20 analytical testing.  But -- the equipment
21 is one part.  But the availability of an
22 analytical test method to perform the
23 testing is also necessary.
24     Q.   Sure.  Again, I understand

Confidential Information - Subject to Protective Order



Page 218

¹ there's two parts to it.
²        And, again, just focusing on
³ the equipment.  Teva had the equipment
⁴ necessary to do a test for nitrosamines
⁵ in early July 2018, correct?
⁶      A.    The equipment was there.  I
⁷ don't know exactly what their
⁸ capabilities of the equipment were.  I
⁹ know that they were being used in
¹⁰ research and development.
¹¹        So I don't know if we had
¹² all the conditions that would be required
¹³ for that piece of equipment to be fully
¹⁴ operational for the purpose of performing
¹⁵ finished drug product testing, or even
¹⁶ API testing.
¹⁷        MR. STANOCH:  I'll mark
¹⁸      Teva-145, ending Bates 21073.
¹⁹          -  -  -
²⁰        (Whereupon, Exhibit
²¹      Teva-145,
²²      TEVA-MDL2875-00021073-1074,
²³      7/13/15 E-mail, Var to
²⁴      Koller-Dette, was marked for

Page 219

¹      identification.)
²          -  -  -
³ BY MR. STANOCH:
⁴      Q.    Tell me when you have that,
⁵ sir.
⁶      A.    Yes.
⁷      Q.    You have it?
⁸      A.    Yes, I have it.
⁹      Q.    This is a July 13th, 2018,

Page 221

¹      A.    Yes.
²      Q.    And HS-GC, that's HeadSpace
³ gas chromatography with the nitrogen
⁴ detection?
⁵      A.    Yes.

Confidential Information - Subject to Protective Order

Page 222

1  Q.   And it says they can supply
2  within a few days, right?
3  A.   I'm reading.
4      Yes.
5  Q.   So you were saying earlier
6  that -- we were discussing earlier that
7  Teva did not do any tests because it
8  needed more information, it needed
9  equipment, et cetera.
10     Well, at least as of July
11 13th, 2018, Teva had had the equipment it
12 needed in multiple places, right?
13 A.   As I indicated, there's
14 equipment in different locations.  I see
15 that there is activity trying to achieve
16 method validation.  So there is ongoing
17 activity, yes.
18 Q.   Sure.  And, ultimately, Teva
19 validated a method to test for
20 nitrosamines eventually, right?
21 A.   Yes.
22 Q.   And that was -- that was
23 using the gas chromatography with the NP
24 detection, correct?

Page 223

1  A.   I think so.
2  Q.   Right.  And, in fact, we'll
3  look at it later, Teva's e-mails and
4  belief was that HeadSpacec-GC and NP
5  detection was more accurate than the
6  method that was eventually recommended by
7  the FDA; isn't that right?
8  A.   This is -- this is -- at
9  that time, there's still a lot of
10 information that is going back and forth,
11 in terms of, you know, us coming to the
12 conclusion that, you know, that this
13 method or that method was the best method
14 to perform the test.
15 Q.   Do you or do you not believe
16 that Teva believed its method for testing
17 for nitrosamines was more accurate than
18 that recommended by the FDA?
19     MS. LOCKARD:  Object to the
20 form.  Misstates the document.
21 Confusing.
22     THE WITNESS:  What I believe
23 is that as soon as a test method
24 is validated and confirmed to be

Page 224

1  operational, that's the point at
2  which, you know, I can certify
3  that the use of that test method
4  is the right thing.
5      In this e-mail, I don't see
6  that there was any confirmed,
7  validated test method in place.
8  BY MR. STANOCH:
9  Q.   We'll get to, eventually,
10 the methods that were used and what Teva
11 thought about its method versus the FDA.



Page 225

6      MR. STANOCH:  Here is Teva
7  Exhibit-146.
8      MS. LOCKARD:  So we're
9  getting over -- we've been going
10 about an hour and 15 minutes.  So
11 we would like to take our break.
12 We had ordered some lunch on the
13 last one, and I think it's here.
14     But if you want to finish --
15 complete this exhibit, I'm not
16 going to cut you off.  But I do
17 want to take a break quickly.
18     MR. STANOCH:  I understand,
19 counsel.  Let's try to get through
20 the exhibit in a couple of
21 minutes.  Is that fair, Mr.
22 Barreto?
23     THE WITNESS:  Yes.
24         - - -

Confidential Information - Subject to Protective Order



Page 226

1    (Whereupon, Exhibit
2    Teva-146,
3    TEVA-MDL2875-00020898-0903,
4    7/11/18 E-mail, Barreto to Lyons,
5    was marked for identification.)
6    - - -
7    THE WITNESS:  We're ready.
8  BY MR. STANOCH:
9    Q.   This exhibit, sir, it's
10 Bates ending 20898.
11    Do you have it in front of
12 you?
13    A.   Yes, I do.
14    Q.   And this e-mail string,
15 you're at the topmost of this e-mail
16 string, right?  You see that?
17    A.   Yes.
18    Q.   This is July 11, 2018?
19    A.   Yes.

Page 227

3    A.   Do you mind if I read
4  through this?
5    Q.   Please.  And I'm
6  specifically looking at an e-mail from
7  Munish Var, July 10th, 2018.
8    But take your time and let
9  me know when you're ready.
10    A.   Yes.  I'm ready to answer
11 your question.

Page 228

Page 229

4  BY MR. STANOCH:
5    Q.   You're saying from your
6  perspective any test for nitrosamines in
7  API or finished dose would have to be via
8  a valid -- a validated method; is that
9  what you're telling me?
10    A.   That's what I'm saying.
11    Q.   And so --
12    A.   That's what the regulators
13 would expect of me as the manufacturer.

24    MS. LOCKARD:  Objection.

Confidential Information Subject to Protective Order

Page 230

1    Misstates testimony.
2         THE WITNESS:  What I'm
3    saying is -- what I'm clarifying
4    is that testing activities were
5    being performed toward getting to
6    the point where we could have the
7    test that would be reliable.
8         At that point, so long as I
9    see tests that are being performed
10   by an R&D organization, that is a
11   test that is subjected to being
12   challenged.
13        And it is -- it is a good
14   indicator that we were moving in
15   the right direction.  But that
16   does not necessarily mean that at
17   that point we already had all the
18   capabilities that were necessary
19   to perform reliable testing.
20        That's what I'm saying.
21   BY MR. STANOCH:
22        Q.   Well, certainly, wouldn't it
23   have been a good indicator to use the
24   same equipment and same analytical method

Page 231

1    being used at this Teva India facility to
2    test the Mylan valsartan API, too?
3         A.   Again, every API has to be
4    challenged against a specific test
5    method.  So even a test method -- a test
6    method is not always a good method for
7    two different APIs.  Just the fact that
8    it's, let's say, valsartan; well, the
9    valsartan process for Mylan is different
10   from ZHP and it's different from any
11   other organization.  So I still have to
12   ensure that that test method works for
13   every single one of these different APIs.
14        So what I'm trying to say
15   is, we did some work with API batches
16   produced by TAPI India, different
17   tests -- manufacturing processes.
18   Whether that test method would work with
19   any of the other suppliers, this is
20   something that had to be validated, had
21   to be confirmed.  That's my point.
22        Q.   Did Teva put a hold on its
23   own valsartan API and product that
24   incorporated its own valsartan API that

Page 232

1    was being made in the Teva India
2    facility?
3         MS. LOCKARD:  Object to the
4    form.  Outside the scope of the
5    deposition.  Outside of the court
6    discovery order.  TAPI API was
7    never sold in the United States.
8    So he's not testifying on that.
9         MR. STANOCH:  He can answer
10   individually.
11        MS. LOCKARD:  If you have
12   personal knowledge.
13        THE WITNESS:  I do not have
14   any information to provide with
15   respect to this -- the Teva API
16   batches.
17   BY MR. STANOCH:
18        Q.   As a global quality
19   executive, you don't recall whether you
20   or anyone else put a hold on Teva's own
21   valsartan API?
22        MS. LOCKARD:  Objection.
23   Same objections.  Outside of the
24   notice of deposition.  Outside the

Page 233

1    court discovery order.  And it's
2    been asked and answered and
3    objected to.
4    BY MR. STANOCH:
5         Q.   Go ahead, sir.
6         MS. LOCKARD:  Okay.  So it's
7    time for a break.
8    BY MR. STANOCH:
9         Q.   You can answer.
10        MR. STANOCH:  There's a
11   pending question.
12        THE WITNESS:  Well, my
13   answer is that at this point I'm
14   not able to determine the extent
15   to which I can answer your
16   question.
17        MR. STANOCH:  One more
18   minute, counsel, all right?
19        MS. LOCKARD:  Okay.
20   BY MR. STANOCH:
21        Q.   So Teva released its hold on
22   Mylan API -- or valsartan containing that
23   API without doing any testing for
24   nitrosamines, while at the same time

Confidential Information - Subject to Protective Order

Page 234

1  we've seen that Teva was using its own
2  equipment and doing its own testing of
3  its own valsartan API; isn't that right?
4      A.   No.
5          MS. LOCKARD:  Objection.
6  Asked and answered.
7          THE WITNESS:  No.  Two
8  different -- two different
9  situations.
10          Teva, at this point, is
11  trying to determine the extent to
12  which it can develop the test
13  method and whether it has the
14  equipment that is necessary to
15  perform testing.
16  BY MR. STANOCH:
17      Q.   And Teva lifting its hold of
18  Mylan API, or product containing therein,
19  without doing any testing of that
20  product?
21          MS. LOCKARD:  Objection.
22  Asked and answered.
23          THE WITNESS:  I already
24  answered the question.

Page 235

1          We released product based on
2  the fact that we had no
3  indications that there was a
4  problem with Mylan product at the
5  time when the decision was made.
6  BY MR. STANOCH:
7      Q.   You had no indication
8  because you had done no testing, correct?
9      A.   No.  We had no indication
10  because the product that we received from
11  Mylan at the time fulfilled all the
12  specifications that were set in the
13  approved submission.
14      Q.   Again, you lift the hold on
15  Mylan API, or finished dose containing
16  Mylan API, without conducting any
17  nitrosamine testing, correct?
18          MS. LOCKARD:  Objection.
19  Asked and answered.
20          MR. STANOCH:  You can
21  answer.
22          THE WITNESS:  So we did not
23  perform any testing because we did
24  not have analytical test methods

Page 236

1  to perform that type of test at
2  the time.
3          MR. STANOCH:  Let's go off
4  the record.
5          VIDEO TECHNICIAN:  The time
6  is now 12:16 p.m.  Going off the
7  record.
8              - - -
9          (Whereupon, a luncheon
10  recess was taken.)
11              - - -
12          VIDEO TECHNICIAN:  The time
13  is now 1:04 p.m.  Back on the
14  record.
15  BY MR. STANOCH:
16      Q.   Welcome back, sir.
17          Did you talk to anyone
18  besides Ms. Lockard during the break?
19      A.   No, only with Mr. Steven
20  Harkins.
21      Q.   Understood.  That's also
22  outside counsel for Teva?
23      A.   Yes.
24          MR. STANOCH:  I'm going to

Page 237

1  mark the next exhibit, sir.
2              - - -
3          (Whereupon, Exhibit
4  Teva-147,
5  TEVA-MDL2875-00020853-0854, 7/8/18
6  E-mail, Barreto to Drape, was
7  marked for identification.)
8              - - -
9          MR. STANOCH:  Teva-147 is
10  going to be Bates ending 20853.
11  BY MR. STANOCH:
12      Q.   Tell me when you can see
13  that, sir.
14      A.   I can see it now.
15      Q.   Great.  This is an e-mail
16  chain, July 8th, 2018, between you and
17  Eric Drape, and Eric Rubin, in fact?
18      A.   Yes.
19      Q.   Yes.
20          And who is Eric Rubin?
21      A.   He is the director of
22  communications for Teva.
23      Q.   Here it looks like you and
24  Mr. Drape and Mr. Rubin are communicating

Confidential Information - Subject to Protective Order

Page 238

about a media question-and-answer piece
concerning the valsartan API and the
nitrosamine contamination, yes?
    A.    Yes.
    Q.    And Mr. Drape asks, in the
middle, about the fact that the change
was implemented in 2012.
        Do you see that?
    A.    Yes, I do see that in the
report.
    Q.    Right.  He's referring to
the manufacturing process change at ZHP,
right?
    A.    Correct.
    Q.    And then in your e-mail
response, among other things, you note in
the last bullet, The manufacturing
process made in 2012 by the API supplier
was not notified to Teva.
        Do you see that?
    A.    Yes, I see that.  It's the
last bullet.
    Q.    Right.  So correct me if I'm
wrong, I thought you said earlier today

Page 239

that ZHP had told Teva about the
manufacturing process change from the TEA
to the zinc chloride method?
    A.    So at the time I put this
report together, I was not aware of these
details.  So that would have been my best
understanding at the time.  Obviously, if
additional information came later on, I
was -- I would stand corrected that,
indeed, there was a report from ZHP to
Teva.
    Q.    So at the time, in July
2018, when you're e-mailing with your
boss, Eric Drape, you were telling him
that ZHP had not shared with Teva
information about the manufacturing
process change at ZHP for the valsartan
API, right?
    A.    And that -- that was
incorrect.
    Q.    Right.  And you're telling
me you've since learned that Teva did
become aware of the change in the
process?

Page 240

    A.    Yes.  I told you that we
became aware of the process.
    Q.    And are you speaking to Teva
becoming aware or sort of legacy Actavis,
or both?  What do you mean?
    A.    So in 2012, that would have
been -- I'm trying now to look into the
history.  It could have been the legacy
Actavis.  That might have been the case,
yes.
    Q.    When did you learn that this
bullet here in your e-mail to Eric Drape
was inaccurate?
    A.    I'm trying to remember now
exactly when -- when that happened.
        Probably when I saw the
investigation report that they sent us.
    Q.    The investigation report
that ZHP sent to Teva?
    A.    Correct.
    Q.    In 2018?
    A.    In 2018, correct.
    Q.    So you believe that ZHP,
sometime in 2018, sent a report to Teva

Page 241

which noted somehow that ZHP had shared
the manufacturing process change at an
earlier date with Teva?
    A.    That is correct.
    Q.    Do you recall when you saw
that investigation report?
    A.    That must have been a couple
of weeks --
        MS. LOCKARD:  Don't
speculate.
        THE WITNESS:  Yes.  I don't
recall.  I don't recall.
BY MR. STANOCH:
    Q.    You saw -- go ahead.
    A.    It must have been sometime
during July.
    Q.    July of 2018?
    A.    Yes, sir.
    Q.    Sitting here today, can you
describe the report that you're thinking
of, what it would look like?
    A.    It's a report where ZHP
provides an explanation with respect to
the assessment they did of the situation

Confidential Information - Subject to Protective Order

Page 242

1 and the way in which they confirmed that
2 the -- they confirmed -- they established
3 a root cause for the presence of
4 nitrosamines.
5     Q.   Do you recall that report
6 specifically mentioning that ZHP had told
7 Teva or legacy Actavis about the change
8 in manufacture back in 2012?
9     A.   I'm trying to remember if it
10 was in that report or if it was later on.
11 Again, I'm trying to remember now.  I'm
12 speculating.  Because I don't recall if
13 it's specifically in that report.
14     Q.   Do you think it might be in
15 another report that you saw after July
16 2018?
17     A.   Oh, yes.  It may have
18 been -- yeah, I saw all the reports.  For
19 instance, the response that they had to
20 the 483, I think it mentioned something
21 about that as well.
22     Q.   You think -- you think ZHP's
23 response to the FDA's 483 concerning the
24 agency's inspection of ZHP mentions that

Page 243

1 ZHP had shared the manufacturing change
2 with Teva or legacy Actavis in 2012?
3     A.   I -- that's, again, I would
4 be speculating.  But I know I saw that
5 information in one of those reports.
6     And I'm just trying to
7 narrow it down, to the best you can
8 recall, what report you think is the
9 basis for you saying you were wrong in
10 this e-mail to your boss back in July
11 2018.
12     Is there any other things
13 besides the ZHP response to the FDA's
14 Form 483?
15     A.   Yeah.  It's the audit report
16 that actually was generated around the
17 time when the change was established.
18 That information is also documented
19 there.
20     Q.   That would be what, the ZHP
21 or an Actavis audit report of ZHP?
22     A.   It would have -- it would
23 have been an Actavis audit report.
24     Q.   So you think an Actavis

Page 244

1 audit report from the 2012 timeframe
2 makes note of it?
3     A.   '12, '13.  I'm trying to
4 remember now.
5     MS. LOCKARD:  Can I clarify
6 for the record?  It's not an audit
7 report, but there's a change
8 control document at Teva.  And
9 that's what he's referencing.
10     THE WITNESS:  We saw that
11 change control, yes.  I've seen
12 it.
13     But I also saw the
14 statements in the audit report.
15 Yes.
16     MS. LOCKARD:  I just want to
17 make sure you're not referring to
18 that as an audit report.
19     THE WITNESS:  Yes.  Thank
20 you.
21     MS. LOCKARD:  I'll butt out,
22 sorry.  I'm trying to be helpful.
23     MR. STANOCH:  Thanks for
24 trying, counsel.

Page 245

1 BY MR. STANOCH:
2     Q.   So now, per Ms. Lockard, we
3 think maybe it's a change control
4 document at Teva that mentions it, as
5 well as maybe an Actavis audit report
6 from the 2012, 2013 time period?
7     A.   Yes.
8     Q.   When do you recall first
9 seeing those documents?
10     A.   I don't recall now.  It was
11 a long time ago.
12     Q.   Was it before or after this
13 litigation started?
14     A.   It was before.
15     Q.   Was the change control
16 document to Teva or to Actavis?
17     A.   There is a change control
18 document at Teva that outlined the
19 process steps that were taken to process
20 the change control from receipt all the
21 way through closure.
22     Q.   That was classified as a
23 minor change; is that right?
24     A.   Correct.

Confidential Information - Subject to Protective Order

Page 246

1    Q.   Does that mean --
2    A.   Minor to moderate.
3    Q.   Right.  Which meant that it
4  didn't need a prior approval by a
5  regulatory agency for Teva to adopt that
6  change by ZHP, right?
7    A.   Yes.  And what it meant was
8  that we filed a CBE 30 to the agency once
9  the entire process, including the change
10  control requirements were completed.
11    Q.   And at that time, Teva, or
12  legacy Actavis, neither conducted their
13  own testing of the valsartan API
14  material, they only reviewed the work
15  that was done by ZHP, correct?
16    A.   There was testing conducted
17  by Teva according to the specifications
18  that were in place.
19    Q.   By Teva or legacy Actavis?
20    A.   Well, sorry.  By legacy
21  Actavis.  I'm saying "Teva" meaning that
22  I'm speaking on behalf of Teva right now.
23    Q.   I understand.  I appreciate
24  that, sir.

Page 247

1         Because we're talking back
2  in time, prior to the integration, I just
3  wanted to be precise, that's all.
4    A.   Understood.
5    Q.   Otherwise, you've been doing
6  an excellent job in terms of how you're
7  referring to Teva currently or post
8  integration.
9    A.   Thank you.  I appreciate
10  that.
11    Q.   The only testing that legacy
12  Actavis would have done would have been
13  that set forth in the specification at
14  the time, right?
15    A.   The specifications.  They
16  were also part of the filing with the
17  ANDA, yes.
18    Q.   And none of those
19  specifications related to testing for
20  nitrosamines, correct?
21    A.   That is correct.
22    Q.   And none of those
23  specifications, in fact, called for gas
24  chromatography testing of the API, did

Page 248

1  it?
2    A.   That is correct.
3    Q.   It was all HPLC,
4  high-performance liquid chromatography,
5  correct?
6    A.   That is correct, which is
7  the USB test method that we are bound to
8  follow.
9    Q.   And you're not aware of
10  whether Teva or ZHP, at the time of the
11  change control in 2012, did any gas
12  chromatography testing of the valsartan
13  API post change TEA to zinc chloride?
14    A.   I have not seen any
15  documented activity around that.
16    Q.   Is -- one moment.
17         Was Teva, in 2012,
18  purchasing valsartan API from ZHP itself,
19  apart from legacy Actavis at that time?
20    A.   I'm not aware of that.
21    MR. STANOCH:  I'm going to
22  mark the next exhibit, sir.
23         - - -
24    (Whereupon, Exhibit

Page 249

1  Teva-148,
2  TEVA-MDL2875-00549865-9886, 7/9/18
3  E-mail, Osmian to Baeder, was
4  marked for identification.)
5         - - -
6    MR. STANOCH:  Teva-148.
7    It's Bates ending 549865.
8  BY MR. STANOCH:
9    Q.   Let me know when you have
10  it.
11    A.   I have it.
12    Q.   This appears to be a July
13  9th, 2018, e-mail from Michelle Osmian,
14  and it's attaching various final
15  documents.
16         Do you see that?
17    A.   I'm looking at it, yes.
18    Q.   And you can -- the documents
19  should be behind the e-mail.  One is the
20  health hazard assessment for valsartan
21  40, 80, 160, 320.
22         Do you see that?
23    A.   I see that.
24    Q.   And then I believe there is

Confidential Information - Subject to Protective Order

Page 250

1 a similar, if not identical, assessment
2 for the valsartan hydrochlorothiazide
3 products?
4      A.   Yes.
5      Q.   And then there's the
6 toxicological assessment for NDMA in
7 valsartan drug substances.
8          Do you see that one?
9      A.   Yes.
10     Q.   And this looks like it's the
11 final one signed by Dr. Nudelman, right?
12     A.   I'm getting there.
13     Q.   Sure.
14     A.   I'm looking for the one that
15 is signed by Dr. Nudelman.
16          Where would you say that you
17 have the document of Dr. Nudelman?
18     Q.   Unfortunately, I can't -- it
19 wasn't produced with Bates numbers.  I'll
20 just --
21     A.   Oh, I see.  No problem.
22 Okay.  Right.
23          Oh, I found it.
24     Q.   Good.  And then the next

Page 251

1 document is something called a global
2 quality report.
3          Do you see that?
4      A.   Yes.



Confidential Information - Subject to Protective Order

Page 254

1 report.
2     Q.    A genotoxic potential
3 impurity wasn't important enough, on June
4 20th, on its own, to tell the agency,
5 right?
6     A.    That is not --
7         MS. LOCKARD:  Object to
8     form.  Argumentative.
9         THE WITNESS:  That is not
10     what I'm saying.
11         It is an important activity.
12     But in order to report it to the
13     FDA, we still need to gather more
14     information.
15 BY MR. STANOCH:
16     Q.    Nothing prevents Teva from
17 updating its field alerts to the FDA,
18 correct?
19     A.    But from my experience,
20 presenting a field alert report to the
21 FDA that is incomplete, it's also not a
22 good reflection of the responsibility
23 that we have for reporting.
24     Q.    And is it a good reflection

Page 255

1 on the responsibility to know about a
2 genotoxic impurity that your -- the
3 customers and consumers are taking and
4 not telling anyone about it?
5         MS. LOCKARD:  Object to the
6     form.  Argumentative.
7         THE WITNESS:  Again, from my
8     experience, my focus is on making
9     sure that once information is
10     provided, that we can gather as
11     much information as we can.
12         So even on June 20th, if
13     this information had been given,
14     that would not have immediately
15     triggered a field alert at that
16     point with that amount of
17     information.
18 BY MR. STANOCH:
19     Q.    Are you saying that based on
20 the GMP regulations or Teva's own SOP on
21 field alert or both?
22     A.    Based on the understanding
23 that we have of the purpose of field
24 alert reports.

Page 256

1         Allegations are made every
2 day about certain things, and the purpose
3 of the field alert report is to clearly
4 state to the FDA that you have a reason
5 to suspect that product in distribution
6 is -- may be affected by a quality issue.
7         In this case, what we had
8 was, in my opinion, not sufficient for us
9 to move on with the field alert report.
10 In my opinion, we needed more
11 information.
12     Q.    Does Teva's field alert
13 reporting corporate policies, 0053, that
14 we looked at earlier state that you must
15 identify a genotoxic impurity
16 specifically before informing the FDA
17 about it?
18     A.    That's not what I'm saying.
19 What I'm saying is that the facts around
20 the reporting, the location of that
21 impurity, how it was potentially found,
22 what -- if there was a testing done, what
23 did the testing indicate, what was the
24 impurity itself, that's all I'm saying.

Page 257



Confidential Information - Subject to Protective Order



Page 258

Page 260

3    Q.   My question a couple -- ago
4  was whether or not Teva had procedures in
5  place with ZHP to ensure that information
6  regarding the potential impurities were
7  immediately shared with Teva?
8    A.   In terms of the procedures
9  in place, if you're referring to a
10 quality agreement, I think there was a
11 quality agreement between Teva and ZHP.
12    Q.   Or any procedure, whether
13 it's in a quality agreement or otherwise.
14       Was there any procedure in
15 place, of any nature, concerning the
16 process and timeline for which ZHP would
17 need to inform Teva about an issue such
18 as a genotoxic impurity in valsartan API?
19    A.   I cannot think of any other
20 procedures within Teva.  But I'm sure
21 there are procedures within ZHP that
22 would indicate, you know, they would have
23 that level of responsibility, whenever
24 they find something that would have

Page 259

Page 261

1  impact on product safety, quality and
2  efficacy, to report to the customers.
3    Q.   Well, you're not testifying
4  on behalf of ZHP today, right?
5    A.   I am not.
6    Q.   Right.  And you can't speak
7  to ZHP's procedures in place as of 2018,
8  can you?
9    A.   I cannot speak to those.
10    Q.   All right.  You didn't
11 review any of those procedures at the
12 time back in June 2018, did you?
13    A.   No.
14       But what I'm trying to say
15 is that, based on the actions that ZHP
16 did perform of notifying Teva, they must
17 have had some kind of a process in place
18 to ensure that the customers were
19 notified.
20    Q.   And all I'm getting at, sir,
21 is you're just speculating at that, you
22 haven't actually seen what the process
23 is?
24    A.   That is correct.

Confidential Information – Subject to Protective Order

Page 262

1  Q.   And wouldn't it be incumbent
2 on Teva to ensure that its API supplier
3 did have such a process in place?
4  A.   Yes.
5  Q.   And do you know whether or
6 not Teva did, in fact, ensure that ZHP,
7 as its API supplier, had a process in
8 place for ZHP to promptly inform Teva of
9 a genotoxic impurity in API?
10  A.   I would say that more than
11 likely -- I would say the audit that was
12 performed by Actavis was in response of a
13 notification that ZHP did of the change
14 to the zinc chloride process.  So I would
15 suspect that that was part of that
16 process.
17      So was that looked at
18 specifically?  I don't know.
19  Q.   And you're referring to an
20 audit that might have been done back in
21 2012 or 2013 regarding the change --
22  A.   That is correct.
23  Q.   -- right?
24      You don't know, one way or

Page 263

1 the other, whether Teva, during any
2 audit, ensured that ZHP had a procedure
3 in place to ensure that ZHP promptly told
4 Teva about any genotoxic impurity in API,
5 correct?
6  A.   Correct.
7  Q.   And further down in this
8 global quality report, there's mention
9 about the potential carcinogenic risk
10 assessment by ZHP.
11      Do you see that last
12 paragraph there?
13  A.   You're talking about the
14 last paragraph where it says -- the title
15 would be, Teva Toxicological Assessment
16 Conclusion?
17  Q.   I'm looking at the last --
18 let me try to share my screen real quick,
19 that way it might speed this up for you,
20 sir.  I don't want to have you guessing.
21  A.   Okay.
22  Q.   I'm sorry there's no Bates
23 numbers, this is how it was produced to
24 us.  Just give me one moment.

Page 264

1  A.   No problem.
2  Q.   This might be easier.
3      Can you see my screen, sir?
4  A.   Yes, I do.
5  Q.   I'm on this document, you
6 see this one, the global quality report?
7  A.   I do.
8  Q.   And I was looking at this
9 paragraph down here.
10  A.   Oh, okay.



21  Q.   I mean, 32 parts per
22 million, that's many times the ultimate
23 in term limit that was set by the FDA,
24 right?

Page 265

1  A.   I think so.
2  Q.   Right.  Ultimately -- well,
3 the FDA, at one point, said no amount of
4 NDMA is permissible, right?  Do you
5 recall that?
6  A.   Well, actually --
7      MS. LOCKARD:  Object to the
8 form.
9      THE WITNESS:  -- what I
10 recall is that the FDA gave us
11 different instructions.  For
12 instance, at one point, even when
13 we did the recall, FDA indicated
14 that they had concern with the
15 patients not having access to
16 medication.  So as part of these
17 activities, patients were actually
18 expected to continue to take
19 medication.
20      So, yes, at one point, FDA
21 spoke about the so-called, you
22 know, NDMA-free expectation.  But
23 that position also changed later
24 on.

Confidential Information - Subject to Protective Order

Page 266

1       And today, you know, it is
2   very clear that it is not possible
3   to manufacture product that could
4   be, you know, totally free from
5   nitrosamines.  So there are
6   specifications now in place for
7   these products.
8   BY MR. STANOCH:
9       Q.   Nothing in my question was
10  regarding whether patients should keep
11  taking the drug, right?
12      Did you hear anything like
13  that in my question, sir?
14      MS. LOCKARD:  Objection.
15  That's argumentative.
16  BY MR. STANOCH:
17      Q.   Did you hear me ask anything
18  about that, sir?
19      A.   No.
20      But I wanted to clarify that
21  the FDA's position actually changed and
22  evolved in the process, the same way that
23  everything else evolved, in terms of, you
24  know, the view that we all had on the

Page 267

1   impact of these impurities.
2       So it went from zero to
3   tolerable levels.  So it just -- it
4   didn't -- at the time, it was not a
5   stable situation.
6       Q.   Sure.  And this will go
7   quicker for all of us if you follow my
8   syllogisms, sir, because where I was
9   going was, the FDA ultimately ended up
10  with 0.3 parts per million, correct; do
11  you recall that, for NDMA?
12      A.   Correct.
13      Q.   All right.  So we can say
14  that ZHP's recommendation -- or
15  conclusion, at least as of the date of
16  this report in July 2018, was, what, ten
17  times more NDMA it was saying was
18  permissible, is that right, than what is
19  the current limit today?
20      A.   I think it's 96 nanograms
21  per day, if I'm not mistaken.
22      Q.   31.2 parts per million is
23  much more than 0.3 parts per million,
24  right?

Page 268

1       A.   Of course.  That was the
2   assessment they did at the time.  There
3   were no specifications in place at the
4   time, so -- yeah.
5       Q.   And we saw documents where
6   some of Teva's own people, like Dr.
7   Nudelman, were calling ZHP's assessment
8   unacceptable when it came to evaluating
9   NDMA, right?
10      A.   I'm not in a good position
11  to, you know, challenge one way or the
12  other.
13      But I think that during the
14  discussions we had, there was a -- the
15  discrepancy was more around the way in
16  which data was going to be -- was being
17  interpreted and how certain, you know,
18  calculations were to be -- were to be
19  applied.



Page 269

Confidential Information - Subject to Protective Order



Page 270

Page 272

⁶ We knew that the situation
⁷ was evolving.  So we knew that as new
⁸ information was generated, then we would
⁹ revise our position with respect to these
¹⁰ activities, which we did.
¹¹     Q.   Teva wasn't testing any
¹² finished dose of valsartan, right?
¹³     A.   Teva was testing the
¹⁴ valsartan product according to the
¹⁵ established specifications.  Because as I
¹⁶ said to you this morning, there's no
¹⁷ validated analytical test method that we
¹⁸ could rely on to do that testing.
¹⁹     Q.   I should have been more
²⁰ precise.
²¹     I'm talking about, Teva
²² wasn't testing any valsartan finished
²³ dose for the presence of nitrosamines
²⁴ after June 2018?

Page 271

Page 273

¹     A.   Teva was not testing for
² nitrosamines because we did not have an
³ analytical test method for NDMA in the
⁴ finished product.
⁵     Q.   In fact, Teva was -- and you
⁶ specifically did not want to test
⁷ valsartan finished-dose products; is that
⁸ fair?
⁹     A.   That is -- that is not
¹⁰ exactly correct.
¹¹     What we decided at the time
¹² was that, based on the tests that were
¹³ being performed on API, then we would use
¹⁴ the information from the API to then
¹⁵ establish the -- what would be the
¹⁶ concentration of nitrosamines in finished
¹⁷ product if any impurities were found in
¹⁸ the API.
¹⁹     So we have the ability to
²⁰ make an extrapolation in the absence of
²¹ the test method.  We would -- we would
²² concentrate on using the data from the
²³ API to actually determine what would be
²⁴ the concentration of any of these

Confidential Information - Subject to Protective Order

Page 274

¹ impurities in the finished product.
² Q. And that's, in fact, what
³ Teva ultimately did, right? It tested
⁴ valsartan API and then made conclusions,
⁵ which it ultimately shared with the FDA,
⁶ about the NDMA concentrations in
⁷ finished-dose valsartan?
⁸ A. And that was the most
⁹ practical approach, because one API could
¹⁰ be used to manufacture a certain number
¹¹ of finished drug products. So we would
¹² have the ability to cover as many
¹³ finished drug products as we could.
¹⁴ Q. And there's a lot of
¹⁵ reference -- and I can pull documents
¹⁶ up -- about whether or not Teva was going
¹⁷ to test United States product or not.
¹⁸ Do you recall any of that?
¹⁹ A. The reason why we -- yes, I
²⁰ do.
²¹ And the reason for that was
²² that we had already recalled all the
²³ product from the United States. So for
²⁴ us, the question was, now that we don't

Page 275

¹ have any product in distribution, what is
² the immediate necessity to test product
³ in the United States?
⁴ Q. Well, it was -- you recalled
⁵ the product in the United States. I
⁶ mean, it was still within expiration,
⁷ some of it, right?
⁸ A. Yes.
⁹ Q. And certainly -- don't you
¹⁰ think the best way to know the
¹¹ concentrations of NDMA in finished-dose
¹² valsartan would be to test the actual
¹³ finished-dose valsartan?
¹⁴ A. Ideally, yes. But as I
¹⁵ indicated to you, every analytical test
¹⁶ method has to be developed and validated
¹⁷ for each specific formulation.
¹⁸ So for us, the focus was
¹⁹ really to concentrate on API testing,
²⁰ because that would give us a much -- an
²¹ expedient process and way, approach, to
²² get to the information that we wanted to
²³ obtain.
²⁴ Q. And it was Teva's position

Page 276

¹ that extrapolating the nitrosamine test
² results of the API to the valsartan
³ finished dose was appropriate?
⁴ A. In our position, that was
⁵ appropriate, yes.
⁶ Q. Do you recall working on a
⁷ valsartan testing strategy?
⁸ A. Yes.
⁹ Q. Okay. What was the purpose
¹⁰ of that document?
¹¹ A. So the valsartan testing
¹² strategy, if I recall well, was intended
¹³ to find a way whereby we could put
¹⁴ together conditions that would allow us
¹⁵ to test valsartan API, valsartan finished
¹⁶ product eventually. If you're talking
¹⁷ about the same thing.
¹⁸ Q. I will put up an exhibit,
¹⁹ sir, and you can tell me if this is what
²⁰ you were thinking of.
²¹ MR. STANOCH: Teva-50 --
²² strike that. Teva-149 will be
²³ Bates ending 42637.
²⁴ - - -

Page 277

¹ (Whereupon, Exhibit
² Teva-149,
³ TEVA-MDL2875-00042637-2649,
⁴ 8/14/18 Valsartan Testing
⁵ Strategy, was marked for
⁶ identification.)
⁷ - - -
⁸ THE WITNESS: Just give me
⁹ one second. I'm trying to get to
¹⁰ that.
¹¹ 149 you said?
¹² BY MR. STANOCH:
¹³ Q. Correct, sir.
¹⁴ A. Okay. Thank you.
¹⁵ May I just look at it for a
¹⁶ second?
¹⁷ Q. Sure, sure.
¹⁸ A. Yes.
¹⁹ As I indicated to you, it
²⁰ was a strategy to pursue testing of both
²¹ API and finished product.
²² Q. Right. And this is a draft,
²³ I understand that.
²⁴ But it looks like there's a

Confidential Information - Subject to Protective Order



Page 278

1 number of comments that you have made.
2 For example, on Page 3 of 13, Bates
3 ending 42639.
4        A.    Okay.  Page 3?
5        Q.    Yes.
6        A.    Comment DB5?
7        Q.    Yes.
8        A.    And what's the question?
9        Q.    Right.  I mean, that was one
10 of your comments to this draft testing
11 strategy document, right?
12        A.    Yes.

Page 280

11        Q.    And Mylan, for example,
12 submitted some justification to Teva for
13 its belief that NDMA could not form in
14 its valsartan product, right?
15        A.    NDMA, yes.  And NDEA later
16 on.
17        Q.    And that was a submission
18 sometime in mid August 2018, right?
19        A.    Yeah.  I think around that
20 very same time, if I'm not mistaken, we
21 had received information from Swissmedic
22 which indicated that they had tested
23 samples from Mylan and that product from
24 Mylan was not found to contain the

Page 279

Page 281

1 impurity.
2        So, again, it goes back to
3 the strategy -- the intent of the
4 strategy is focus on those APIs that you
5 suspect or have confirmed that could have
6 this issue.
7        Q.    How many valsartan APIs was
8 Teva purchasing?
9        A.    So I'm aware of ZHP.  Mylan.
10 I think we were acquiring from Jubilant.
11 And what was the other one?  But those
12 were not for the U.S.
13        So for the U.S., we were
14 only talking about ZHP and Mylan.
15        Q.    Right.  So there's only --
16 Teva was only purchasing valsartan API
17 from ZHP and Mylan for U.S. market
18 product, right?
19        A.    Yes.
20        Q.    And Teva had already, by
21 this time in August 2018, had placed a
22 hold on the ZHP API or the finished dose
23 containing it, right?
24        A.    Correct.

Confidential Information - Subject to Protective Order

Page 282

1    Q.   So, then, the only other --
2  only other company is Mylan, then, for --
3  vis-à-vis the U.S. market, right?
4    A.   That's correct.
5    Q.   And Teva, even by -- we
6  looked at it earlier, Teva did not test
7  Mylan API itself, at least as of August
8  2018, right?
9    A.   We did not test.  But,
10  again, we asked for the certification
11  from them and then we also had that
12  information from Swissmedic that gave us,
13  at the time, a certain level of assurance
14  that the Mylan product was not within the
15  scope of the investigation.
16    Q.   Well, Swissmedic, that was
17  testing product in the European market, I
18  assume, yes?
19    A.   Yes.
20         But Swissmedic is testing
21  product from Mylan, which is valsartan
22  product.  The finished product is for the
23  European market in that case, but the API
24  comes from Mylan.

Page 283

1    Q.   Right.  And it's a different
2  formulation; it's not the same VLN
3  process for the U.S. market that was
4  going to Teva Jerusalem, correct?
5    A.   I do not -- I cannot say
6  it's a different process or the same
7  process.  I would be speculating at this
8  time.
9    Q.   You're not sure one way or
10  the other?
11    A.   Correct.
12    Q.   And this Swissmedic
13  communication, when do you think it
14  happened?
15    A.   I want to say sometime the
16  middle of August.
17    Q.   So by middle of August, Teva
18  had not done any testing itself of Mylan
19  API, and Mylan had not provided any test
20  results of its valsartan API to Teva.
21         It just said, it can't form
22  because of the process we use; is that
23  right?
24    A.   We had that preliminary

Page 284

1  information where they confirmed that.
2  They didn't use DMF, which we knew would
3  be an important factor in the
4  formulation.  So that was an important
5  piece of information for us.
6    Q.   And I'm just focused,
7  laser-focused, on test results right now,
8  Mr. Barreto.
9         So as of August 2018, Teva
10  had not tested valsartan API from Mylan
11  for nitrosamines itself, right?
12    A.   That is correct.
13    Q.   And also by August 2018,
14  Mylan had not provided any test results
15  of its valsartan API for nitrosamines to
16  Teva?
17    A.   That is correct.
18    Q.   The only thing that Mylan
19  provided was a justification saying, we
20  don't use DMF so NDMA can't form in our
21  process, right?
22    A.   But I wouldn't say that was
23  the only thing.  It's an important
24  technical piece of information.

Page 285

1         Because in order for you to
2  have impurity, you have to have certain
3  conditions that are present.  Without
4  those conditions, then you will not have
5  the impurity.  So we -- that was an
6  important piece of information.
7    Q.   Ultimately, at some point,
8  though, Teva did test Mylan API and found
9  that it contained, in some instances,
10  NDMA; isn't that right?
11    A.   I think so.
12    Q.   So why, in August 2018, was
13  it good enough for Teva to take Mylan's
14  word for it without doing the testing
15  itself?
16    A.   As I indicated to you, at
17  the time when we received the
18  confirmation from them that the DMF was
19  not present in the process, you know, our
20  technical experts were comfortable with
21  the fact that if the manufactured process
22  is not prone to generating impurity, we
23  should not expect impurity to be present.
24    Q.   We talked about earlier,

Confidential Information Subject to Protective Order

Page 286

though -- we looked at the e-mail that
said that Teva's people said they
couldn't do an evaluation because they
didn't have the full route of synthesis,
right?
          Do you remember the
document?
     A.   We didn't have a full
evaluation of the route of synthesis,
you're correct.
          However, Mylan did provide a
certification that, in their process,
they were not using DMF.
     Q.   And Teva believed it was
sufficient for Teva to take Mylan's word
for it that nitrosamines can't formulate
in the valsartan API that Mylan was
selling to Teva?
     A.   Within the process that we
were running at that point in time, we
felt that we had information from Mylan
that would allow us to continue with the
process.
          However, the process didn't

Page 287

stop there.  I mean, we are monitoring
the situation, we continue to receive
information from different sources.
So -- and, eventually -- you know, Mylan
continued to communicate with us.
     Q.   Did the justification that
Mylan provided to Teva identify all of
the solvents that it was using in the
valsartan API manufacturing process?
     A.   Can you repeat the question?
     Q.   Did the justification Mylan
provided to Teva include a discussion of
all the solvents Mylan was using in the
valsartan API manufacturing process?
     A.   I don't remember.  But I
would not necessarily expect that they
would get into that type of detail --
     Q.   Would you be surprised if
Mylan's justification made no mention of
whether it was using fresh or recycled
solvents in its valsartan API
manufacturing process?
     A.   I'm sorry, what's the
question?

Page 288

     Q.   Would you be surprised to
hear that Mylan did not make any
indication whether it was using fresh or
recycled solvents in its valsartan API
manufacturing process?
     A.   Not necessarily.  I mean, it
is -- it is common practice, within the
industry, to use both fresh and recovered
solvents.  So that would not necessarily
indicate that Mylan was doing something
that was unacceptable.
     Q.   In your -- in your
preparation for today, did you see
anything suggesting that Teva knew that
Mylan was using recovered solvents in its
valsartan API manufacturing process?
          MS. LOCKARD:  As of what
     date?
          THE WITNESS: Yeah.
          MS. LOCKARD:  Objection.
     Vague.
BY MR. STANOCH:
     Q.   Did you see any information
suggesting that Teva knew, prior to June

Page 289

2018, that Mylan was using recovered
solvents in the valsartan manufacturing
process for the API it was selling to
Teva?
     A.   It is possible that we knew
of the existence of the use of solvent --
recovered solvents.  However, even during
an audit, or through other sources, if
this information was known and it was
shared with us, that would not have
necessarily generated any sort of concern
with respect to the extent to which the
use of those recovered solvents could
represent a problem in any production
process.
     Q.   I'm not asking for the scope
of any concern, Mr. Barreto.
          I'm just asking if you're
aware of any information, prior to June
2018, suggesting that Teva knew that
Mylan was using recovered solvents in the
valsartan API manufacturing process?
     A.   I do not recall.  I am --
more than likely, like I said, during the

Confidential Information - Subject to Protective Order

Page 290

¹ audit process, the auditors may have
² reported it -- and I don't recall now --
³ that recovered solvents were used. And
⁴ that would have been -- yeah, normal.
⁵      Q.   Do you recall -- strike
⁶ that.
⁷           As part of Teva's risk
⁸ assessment for nitrosamines, does Teva
⁹ ask the API suppliers to identify all of
¹⁰ the key starting-material suppliers?
¹¹      A.   As far as the risk
¹² assessment we were doing in response to
¹³ this issue?
¹⁴      Q.   Yes.
¹⁵      A.   I don't -- I'm trying to
¹⁶ remember. From my understanding, I think
¹⁷ the main focus was around the route of
¹⁸ synthesis, not necessarily around the
¹⁹ intermediates or other starting materials
²⁰ that were used. I think -- I think the
²¹ main focus of my interest was route of
²² synthesis.
²³      Q.   Right. The route of
²⁴ synthesis that Teva didn't know about

Page 291

¹ when all these recalls started, right?
²           You can -- strike that.
³           Teva could have had a
⁴ quality agreement in place with Mylan
⁵ that required Mylan to share the route of
⁶ synthesis for valsartan API with it; is
⁷ that correct?
⁸      A.   I would say that's
⁹ incorrect. As I indicated before, most
¹⁰ companies will not share their detailed
¹¹ route of synthesis with a company that is
¹² purchasing product from them. There are
¹³ many considerations, including
¹⁴ competition.
¹⁵           So I don't see how that
¹⁶ could happen through a quality agreement.
¹⁷      Q.   You don't -- you can't think
¹⁸ of any instance in which Teva had a full
¹⁹ route of synthesis for API it was
²⁰ purchasing from a supplier?
²¹      A.   That may be a possibility,
²² but I don't know.
²³      Q.   As part of Teva's risk
²⁴ assessment for nitrosamine, did Teva look

Page 292

¹ to see whether or not any other valsartan
² API supplier was sourcing materials from
³ ZHP?
⁴      A.   Yes. We were looking at the
⁵ extent to which intermediates that were
⁶ generated by ZHP were used in other
⁷ facilities.
⁸      Q.   Does Teva have -- strike
⁹ that.
¹⁰           Prior to July 2018, did Teva
¹¹ have procedures in place to ensure that
¹² its API suppliers were properly
¹³ performing chromatography and assay
¹⁴ testing?
¹⁵      A.   Yes.
¹⁶      Q.   And is it your understanding
¹⁷ that Teva required its API suppliers to
¹⁸ adhere to those procedures?
¹⁹      A.   Yes.



Page 293

¹⁶      Q.   Is it your understanding
¹⁷ that ZHP's chromatography and assay
¹⁸ methods did indicate the presence of
¹⁹ NDMA?
²⁰      A.   My understanding is that
²¹ they did not, because the test method
²² they were using, which were the USB test
²³ methods, would not allow them to detect
²⁴ the impurities.

Confidential Information - Subject to Protective Order

Page 294

1    Q.   The FDA had a different
2  view, correct?
3    A.   I understand that's the
4  case.
5    Q.   Right.  In fact, the FDA
6  stated that -- let's mark it.
7        Do you recall e-mails about
8  this?  I'm sure you do, right?
9    A.   Excuse me?
10    Q.   Do you remember e-mailing
11  with Mr. Drape about the FDA's findings
12  concerning ZHP?
13    A.   Can you show me the report?
14    Q.   Teva-150, Bates ending
15  67084.  Tell me when you have it.
16            - - -
17        (Whereupon, Exhibit
18    Teva-150,
19    TEVA-MDL2875-00067084-7087,
20    12/13/18 E-mail, Drape to Barreto,
21    was marked for identification.)
22            - - -
23  BY MR. STANOCH:
24    Q.   This e-mail chain between

Page 295

1  you and Mr. Drape, topmost message is
2  December 13, 2018.
3        The second message is from
4  you to Mr. Drape on December 11th, 2018,
5  right?
6    A.   Yes.

Page 296

9    Q.   And by this time, in
10  December 2018, had Teva conducted its own
11  testing of the ZHP valsartan API?
12    A.   By December 2018?  I'd have
13  to double check.  I think we may have
14  been there at the time.
15    Q.   We can go through the
16  documents.  That's fine.  It's not a
17  memory test, sir.
18    A.   Thank you.
19        Is that going to be a new
20  document?
21        MR. STANOCH:  Why don't we
22  just take a few-minute break and
23  let me sort of organize, so I can
24  have documents to assist you.

Page 297

1        THE WITNESS:  Okay.  Okay.
2  Sounds good.
3        VIDEO TECHNICIAN:  The time
4  is now 2:06 p.m.  Going off the
5  record.
6            - - -
7        (Whereupon, a brief recess
8    was taken.)
9            - - -
10        VIDEO TECHNICIAN:  The time
11  is now 2:24 p.m.  Back on the
12  record.
13  BY MR. STANOCH:
14    Q.   Welcome back, Mr. Barreto.
15    A.   Thank you.
16    Q.   So do you recall when Teva
17  notified the FDA about NDEA contamination
18  in valsartan drugs?
19    A.   Yes.
20        MR. STANOCH:  I'm going to
21  mark an exhibit, sir.  Teva-151.
22            - - -
23        (Whereupon, Exhibit
24    Teva-151, TEVA-MDL2875-00731926,

Page 298

1    NDA/ANDA Field Alert, was marked
2    for identification.)
3         - - -
4         MR. STANOCH:  Bates ending
5    731926.
6  BY MR. STANOCH:
7    Q.   It should be the field
8  alert, sir, when you get it.
9    A.   Yes, I'm looking for it.
10        You said 151, correct?
11   Q.   Yes.
12   A.   Yes.  I'm in front of it.
13   Q.   This looks to be the same
14 form we saw this morning about the field
15 alert about ZHP's NDMA impurity, right?
16   A.   Yes.

Page 299

Page 300

4    Q.   Teva was aware of potential
5  NDEA impurities in valsartan and other
6  sartans prior to November 5th, 2018;
7  isn't that right?
8    A.   I think so.  I think yes.
9    Q.   And despite that knowledge,
10 Teva did not do any testing of its own on
11 the Mylan valsartan API, or Teva's
12 finished dose incorporating that API,
13 until after Swissmedic reached out to
14 Teva in November of 2018; is that
15 correct?
16   A.   That is correct.
17        But, again, it goes back to
18 the fact that we had previously received
19 information from Swissmedic that they had
20 tested Mylan product and they had not
21 previously reported finding neither NDMA
22 nor NDEA in the product.
23   Q.   Teva was aware, though, of
24 the potential for NDEA contamination in

Page 301

1  valsartan product as early as August
2  2018, right?
3    A.   That -- that should be
4  correct.  And we're speaking now about
5  that being the case with ZHP.
6    Q.   Right.  So, for example --
7        MR. STANOCH:  I'll mark the
8  next exhibit, Teva-152, which is
9  Bates ending 73603.
10        - - -
11        (Whereupon, Exhibit
12    Teva-152,
13    TEVA-MDL2875-00073603-3612,
14    11/16/18 E-mail, Redmond to
15    Barreto, was marked for
16    identification.)
17        - - -
18        MR. STANOCH:  It's a
19    November 2018 e-mail from Michael
20    Redmond to you and others.
21 BY MR. STANOCH:
22   Q.   Do you see that?
23   A.   I'm looking at it, yes.
24   Q.   And it's drafting a response



Page 302

¹ to the Icelandic authorities, right?
²    A.   Yes.
³    Q.   And if you flip it over to
⁴ the first page -- are you there?
⁵    A.   Yes.

Page 303

²³    Q.   Are you aware that the
²⁴ different regulatory authorities

Page 304

¹ globally had reached out to Teva in
² August and September 2018 about potential
³ NDEA impurities in valsartan and other
⁴ sartan products?
⁵    A.   Yes.
⁶    Q.   So, again, there's multiple
⁷ instances in which Teva was informed by
⁸ third parties about the potential for
⁹ NDEA contamination in valsartan APIs,
¹⁰ right?
¹¹    A.   That is correct.
¹²       But, as I indicated to you,
¹³ we also had information from, in this
¹⁴ case, Swissmedic where they had
¹⁵ specifically tested valsartan API from
¹⁶ Mylan, and they had indicated that the
¹⁷ product did not have any nitrosamine
¹⁸ impurities.
¹⁹    Q.   Well, it looks like, then,
²⁰ that Teva didn't tell the FDA about NDEA
²¹ impurities until Swissmedic told Teva
²² about it; is that fair?
²³    A.   Can you repeat the question?
²⁴    Q.   It looks like Teva did not

Page 305

¹ tell the FDA about NDEA impurities until
² Swissmedic told Teva?
³    A.   We told the FDA about NDEA
⁴ when we came to the information that the
⁵ Mylan product which was shipped to the
⁶ U.S. contained NDEA.
⁷    Q.   The Mylan justification we
⁸ talked about earlier in August 2018, that
⁹ only spoke to NDMA; isn't that right?
¹⁰    A.   That is correct.
¹¹    Q.   And we've looked at now
¹² this -- at least this one document about
¹³ Iceland, and we've talked about others,
¹⁴ where Teva was aware of the potentiality
¹⁵ of NDEA contamination in August 2018 as
¹⁶ well, yes?
¹⁷    A.   Yes.
¹⁸    Q.   So Teva never followed up
¹⁹ with Mylan for a justification about NDEA
²⁰ impurities in the Mylan valsartan API,
²¹ did it?
²²    A.   It's not that we did not
²³ follow up with them.  The information
²⁴ they gave us was around NDMA, you're

Confidential Information - Subject to Protective Order

Page 306

1 correct.
2        And, again, because of all
3 the information that we had with respect
4 to Mylan, that it was free from this
5 impurity, at that time there was no
6 reason for us to necessarily go back to
7 Mylan.
8        Although we may have gone --
9 I don't remember now, but we may have
10 pursued a follow-up with Mylan.  I don't
11 recall.
12   Q.   So you don't recall whether
13 Teva ever asked Mylan to perform testing
14 for NDEA in valsartan API being sold to
15 Teva; is that fair?
16   A.   That would be fair.
17        But, again, when the
18 analysis was done for Mylan, we asked
19 them, remember, to give us a
20 certification for route of synthesis and
21 they did not use DMF.
22        So at the time, we did not
23 have as much knowledge, even though we
24 had some knowledge, as to how NDEA could

Page 307

1 be formed.
2        So I don't recall again --
3 but it was an evolving process.  So it is
4 highly possible that one of us within the
5 corporate group that was monitoring the
6 situation could have requested a
7 follow-up call with Mylan.  I just don't
8 remember.
9   Q.   And I'm not asking about --
10 for you to speculate, sir.
11        I'm just asking you, sitting
12 here today as Teva's corporate designee
13 and former vice president of quality,
14 whether you know, one way or the other,
15 whether anyone at Teva ever asked Mylan
16 for information concerning NDEA
17 impurities in the valsartan API Mylan was
18 supplying to Teva?
19   A.   And my answer is I don't
20 remember.
21   Q.   And you had also mentioned
22 the information that Mylan had provided.
23        That was information
24 provided in August of 2018 concerning

Page 308

1 NDMA, correct?
2   A.   Correct.
3   Q.   None of the information
4 provided in August 2018 related to NDEA,
5 or any other nitrosamine for that matter;
6 is that right?
7   A.   That's right.
8        And to the knowledge that we
9 had at the time, the potential formation
10 on the nitrosamines, again, required a
11 certain level of conditions.  So, again,
12 the knowledge was evolving at the time.
13        In August, we are still
14 evolving in terms of understanding, you
15 know, how many of these impurities are
16 actually being formed and how and where.
17   Q.   Well, you know, the burning
18 question that people are going to want to
19 know, Mr. Barreto, is in August of 2018,
20 Teva has information about NDEA, we saw
21 that in the Icelandic response; other
22 agencies are mentioning or asking about
23 NDEA; why didn't Teva just say, jeez,
24 Mylan, I'm hearing a lot about NDEA, go

Page 309

1 test for that and tell us a justification
2 for that, too?
3        Did anyone do that?
4        MS. LOCKARD:  Object to
5 form.  Compound.  Argumentative.
6        THE WITNESS:  My -- my --
7 based on the experience with this
8 process, my conclusion was that at
9 that time, based on that knowledge
10 that we had -- and, I think, based
11 also on the fact that, you know,
12 there had been a regulatory
13 authority which had tested
14 product, that we, at that point in
15 time, we did not see the need to
16 do a follow-up, if we didn't do a
17 follow-up.
18 BY MR. STANOCH:
19   Q.   It turned out, ultimately,
20 that there was NDEA in Mylan's valsartan
21 API, right?
22   A.   That is correct.
23   Q.   And, in fact, it was in
24 pretty high concentrations; do you recall

Confidential Information - Subject to Protective Order

Page 310

¹ that?
² A. Yes.
³ Q. And, in fact, there's some
⁴ reference in the documents to, you know,
⁵ five times the .08 limit that was
⁶ ultimately set.
⁷ Do you recall that?
⁸ A. I believe you're correct.
⁹ Q. Why did Mylan's recall of
¹⁰ product with Mylan API not become
¹¹ effective until November 13th, 2018, if
¹² it was aware of it, at the very latest,
¹³ on November 5th, 2018, as it told the
¹⁴ FDA?
¹⁵ A. There was an investigation
¹⁶ that was performed. We were in contact
¹⁷ with the FDA, and we were in discussions
¹⁸ with the FDA.
¹⁹ This was, again, one of
²⁰ those where we needed to make sure that
²¹ we had all the information that was
²² needed. The FDA also continued to have a
²³ concern with respect to supply to
²⁴ patients.

Page 311

¹ So, again, this is not a
² normal situation where, you know, you
³ just do a normal recall of product and
⁴ then you move on. So the situation was
⁵ as complex as it could be, so we had to
⁶ work with the agency. And there were
⁷ different communications with them.
⁸ Q. And you mentioned this in
⁹ the morning, Teva undertook to do a
¹⁰ for-cause audit of ZHP following the news
¹¹ about the nitrosamine impurities, right?
¹² A. That is correct.
¹³ Q. And that audit occurred
¹⁴ eventually in the fall of 2018?
¹⁵ A. I think so.
¹⁶ Q. And then did Teva ever do a
¹⁷ for-cause audit of Mylan?
¹⁸ A. I think so.
¹⁹ Q. Do you know when that
²⁰ occurred?
²¹ A. I would have to check. I
²² don't remember right now the exact date.
²³ Q. And I can put a document in
²⁴ front of you, but, you know, does July

Page 312

¹ 2019 sound right?
² A. I'm not sure. I would have
³ to check.
⁴ Q. Okay. I'll pull out the
⁵ document.
⁶ But I guess the question is
⁷ going to be, sir, is that Teva knew about
⁸ the potentiality of NDEA contamination as
⁹ early as August 2018, and then told the
¹⁰ FDA about it in November of 2018; why did
¹¹ it take so long, almost, you know, nine
¹² months or so, for Teva to conduct an
¹³ audit of Mylan?
¹⁴ A. We were in discussions with
¹⁵ Mylan in terms of looking for a way to
¹⁶ reach out to them to do that audit. So
¹⁷ we were in constant communication with
¹⁸ them.
¹⁹ Sometimes you're able to get
²⁰ an audit when the API supplier is
²¹ available and ready. They were
²² conducting their own investigations, and
²³ they were consistently asking us for the
²⁴ opportunity for them to continue to

Page 313

¹ perform those investigations, and then
² for the right time to be chosen when to
³ do a follow-up.
⁴ Q. It wasn't just that, they
⁵ were -- Mylan was actively refusing to
⁶ let Teva come do an audit; wasn't that
⁷ right?
⁸ A. I do not necessarily agree
⁹ with that. I mean, we were in constant
¹⁰ communication with them. The situation
¹¹ was an extremely complex situation.
¹² So they -- we knew, based on
¹³ also what we were experiencing, that we
¹⁴ needed to complete a certain number of
¹⁵ tasks responding to different regulatory
¹⁶ organizations.
¹⁷ So it was just a matter of
¹⁸ being able to find the right opportunity
¹⁹ and the right priority to conduct the
²⁰ audit.
²¹ Q. And the right priority or
²² opportunity was what, nine, ten months
²³ after the NDEA was disclosed?
²⁴ MS. LOCKARD: Objection.

Page 314

1 Argumentative.
2 THE WITNESS: The purpose of
3 the audit, from my perspective, in
4 terms of the timing -- for us,
5 what was important was to receive
6 the information from them. We
7 received investigation reports
8 from them.
9 So while we had not
10 conducted a true physical audit of
11 the facility, we had sufficient
12 information from them to assess
13 the situation.
14 We did perform a recall. We
15 did not continue to sell product
16 in the United States, because
17 there was no product to sell. So
18 in terms of risk to the market,
19 risk to patients, there was a
20 continuing action in that regard.
21 So for us -- you know, what
22 was really important for us was to
23 make sure that, at the point at
24 which Mylan was going to be able

Page 315

1 to demonstrate that it had
2 implemented the right level of
3 corrective actions, that we would
4 be in a good position to actually
5 perform that audit.
6 BY MR. STANOCH:
7 Q. Teva has procedures in
8 place, does it not, for how it is
9 supposed to conduct audits?
10 A. Of course.
11 Q. Right. And that includes
12 both periodic as well as for-cause
13 audits, correct?
14 A. That is correct.
15 Q. And isn't it your
16 understanding that for-cause audits are
17 supposed to happen promptly, not nine,
18 ten, eleven months after the fact?
19 A. The purpose of that is to
20 schedule those as promptly as we can.
21 And, obviously, in order to be able to do
22 that, we are dependent on the
23 availability of the API supplier to host
24 that audit.

Page 316

1 So for the most part, these
2 different conditions actually define the
3 extent to which we're able to fulfill
4 that expectation, which is dependent on
5 an external party to also support the
6 expectations of the policy.
7 Q. That external party, in this
8 instance, is one of Teva's vendors,
9 correct?
10 A. That is correct.
11 Q. So Teva was at the mercy of
12 its vendor to deem it okay for Teva to
13 come and conduct an on-site for-cause
14 audit concerning a global nitrosamine
15 impurity issue?
16 A. I would not characterize it
17 that way. And the reason for that is the
18 objective of the audit, in this case,
19 would have been to further assess the
20 extent to which corrective actions had
21 been implemented.
22 While the company -- the
23 vendor is engaging those corrective
24 actions, the objectives of the audit

Page 317

1 would not necessarily be met. So I'd
2 rather have my auditors go to a site that
3 has spent whatever amount of time it has
4 needed to do whatever corrective actions
5 they need to do before I can then go
6 there, do an assessment of the corrective
7 actions, and then come back to Teva and
8 say, they have implemented corrective
9 actions, we are able now to receive
10 product; or, no, they have not fulfilled
11 our expectations, and I propose that we
12 do not purchase product until the
13 correct -- the corrective actions are
14 effectively implemented.
15 Q. Do you think it was
16 reasonable for Teva to wait until July
17 2019 to conduct the on-site for-cause
18 audit of Mylan in connection with the
19 nitrosamine issues?
20 A. In this case, it is not
21 about, in my perspective, an issue of
22 reasonable. It's more an issue of the
23 timing.
24 Obviously, as they explained

Page 318

1 to us what they were doing and the reason
2 why they couldn't host the audit, it was
3 clear to us that the benefit of
4 conducting the audit would be better
5 served at the point at which they had
6 implemented corrective actions.
7      Q.   Mr. Barreto, I hear that.
8           But given the circumstances,
9 how can you trust Mylan, given the
10 sequence of events here?
11      A.   We received the information
12 that we needed to receive from them
13 through investigations, analytical data,
14 and we used that information to
15 effectively implement the most important
16 corrective action on our part, meaning
17 the removal of product from the market.
18           We are not making -- after
19 that, we were not receiving any materials
20 from them.  So attending -- or performing
21 an audit would not necessarily be a
22 value-added activity from my perspective.
23      Q.   Because Mylan told Teva in
24 August 2018 that there's no NDEA and that

Page 319

1 turned out to be wrong, right?
2      A.   Are we talking about NDEA?
3      Q.   Well, in August 2018, they
4 said there's no way NDMA --
5      A.   That's right.
6      Q.   -- could form at all, right?
7 And that turned out to be wrong to some
8 extent, correct?
9      A.   And the assessment that they
10 performed at that point in time fulfilled
11 our expectations.
12           And as I said to you, we
13 also had analytical data from a reliable
14 regulatory body that had indicated that
15 the product was free from -- from this
16 impurity.
17           So for us -- you know, we
18 have to rely on regulatory bodies and the
19 work that they do.  And to us, there was
20 no reason not to rely on the assessment
21 that Swissmedic did of the products from
22 Mylan at the time.
23      Q.   Right.  And you can rely on
24 other regulatory bodies, be it Iceland or

Page 320

1 Malta or Hong Kong, or a host of others,
2 that were contacting Teva simultaneously
3 saying that there's issues of potential
4 NDEA contamination, right?
5      A.   And we did.  And we did not
6 ignore that.  And we continued to pursue
7 our investigations.
8           And if I'm not mistaken, you
9 know, we continued to revise our
10 questionnaires.  We set a strategy for
11 ensuring that when we went back to the
12 API suppliers that they would respond to
13 specific questions with respect to not
14 only the NDMA but any other potential
15 impurities.  So we did -- we were
16 actually applying the learnings of this
17 unexpected experience.
18      Q.   That was well after -- this
19 questionnaire issue, this was after
20 November 2018 that any of that started to
21 happen; isn't that right?
22      A.   It is correct.
23      Q.   Right.  There's nothing
24 between June 28th, 2018, and November

Page 321

1 5th, 2018, that you're aware of, where
2 Teva was asking Mylan to do any testing
3 of its valsartan API, for example?
4      A.   Again, there was no reason
5 for us to -- to, let's say, question
6 Mylan's certification to us at the time.
7 There was no -- there was no reason for
8 that.
9      Q.   The only certification you
10 had was about NDMA, right?
11      A.   Correct.
12      Q.   You didn't have any
13 certification from Mylan about NDEA, did
14 you?
15      A.   No.
16           And I think it's important
17 to make a distinction here.  You know,
18 we -- we asked Mylan about NDMA because
19 we were interested in the manufacturing
20 process being a contributor to the
21 presence of impurities.
22           When you look at the NDEA
23 issue, it's a separate discussion.
24      Q.   The regulators that you keep

Confidential Information - Subject to Protective Order

Page 322

¹ mentioning, they talked about all
² nitrosamines impurities together, didn't
³ they?  Right.
⁴         So it's not a completely
⁵ separate issue, right?  That's really --
⁶ that's a little extreme; would you say
⁷ that's fair?
⁸     A.   Yeah.  But what I'm saying,
⁹ counsel, is that, you know, everything
¹⁰ started with NDMA and then followed by
¹¹ NDEA.  And if the story continued, there
¹² were actually other impurities that would
¹³ pop up.
¹⁴         So we learned as we went.
¹⁵ That's true for us in the industry.
¹⁶ That's true for the suppliers.  That's
¹⁷ true for the regulators.
¹⁸     Q.   And then shortly after Teva
¹⁹ was informed by Swissmedic of the NDEA on
²⁰ November 5th, 2018, Teva went ahead and
²¹ had some Mylan valsartan API tested for
²² NDEA; isn't that right?
²³     A.   I think so.
²⁴     Q.   And it had those results

Page 323

¹ within a week, I think; isn't that right?
²     A.   Those results were from
³ Mylan, if I'm not mistaken.
⁴     Q.   The Mylan test results were
⁵ within a week; is that right?
⁶     A.   I think so.
⁷     Q.   And Mylan's test results
⁸ showed that 9 out of 10 batches tested
⁹ above the specification of 0.8 part per
¹⁰ million for NDEA, correct?
¹¹     A.   Correct.
¹²     Q.   So once Teva told the FDA
¹³ about NDEA in Mylan API on November 8th
¹⁴ of 2018, less than a week later, Mylan
¹⁵ actually gets a test and sends test
¹⁶ results and shows NDEA in the API, right?
¹⁷     A.   Well, we -- part of the
¹⁸ communication that we had with Mylan, we
¹⁹ were asking them to produce test results
²⁰ for us.  So they -- they're in possession
²¹ of all their APIs, they're in possession
²² of the information.
²³         So it's part of the process
²⁴ where, you know, they had indicated to us

Page 324

¹ that they were working on doing the
² testing activities that were required.
³     Q.   Right.  And less than a week
⁴ after Teva made that request, they had in
⁵ hand, from Mylan, valsartan API test
⁶ results showing 9 out of 10 batches with
⁷ above-specification NDEA impurity
⁸ results, right?
⁹     A.   That's correct.
¹⁰     Q.   So, I mean, there's no
¹¹ reason to think that if Teva simply
¹² picked up the phone and made that request
¹³ back in August 2018 it would have had
¹⁴ those same results months earlier; isn't
¹⁵ that fair?
¹⁶         MS. LOCKARD:  Objection.
¹⁷ Calls for speculation.
¹⁸         THE WITNESS:  Yeah, I don't
¹⁹ recall.  But I know that as soon
²⁰ as we became aware of a potential
²¹ for NDEA, we immediately requested
²² Mylan to start the process of
²³ testing product, which is part of
²⁴ the commitment they also made.

Page 325

¹ BY MR. STANOCH:
²     Q.   What was the date of that
³ request from Teva to Mylan?
⁴     A.   I'd have to -- I'd have
⁵ to -- I want to say it was immediately
⁶ after we were notified, but I have to
⁷ look at the date.
⁸     Q.   Immediately after you were
⁹ notified by Swissmedic on November 5th,
¹⁰ 2018?
¹¹     A.   Correct.
¹²     Q.   That's fair.
¹³         I'm just -- are you aware of
¹⁴ anything that would have prevented Teva
¹⁵ from asking Mylan, back in August 2018,
¹⁶ for NDEA test results for the valsartan
¹⁷ API?
¹⁸     A.   I don't think so.
¹⁹     Q.   And, in fact, if we had a
²⁰ quality agreement between Mylan and Teva,
²¹ there might have been a provision, you
²² know, governing such a request, but we
²³ don't know because we don't have that
²⁴ agreement; is that right?

Confidential Information - Subject to Protective Order

Page 326

1    A.   Not necessarily.  I mean,
2  this is a very unique situation.  So I
3  think that the conditions were correct,
4  in place for -- as soon as we had the
5  information, we were able to communicate
6  the need for them to conduct the testing,
7  and they did.
8    Q.   Right.  And Teva waited for
9  someone else to tell them that NDEA was
10  found before Teva did the testing itself
11  or asked Mylan to do the testing?
12    A.   So because of the lack of
13  the analytical test methods on our part
14  and the number of APIs that we were
15  looking at, we definitely put that
16  first -- first responsibility for
17  providing the test results on the API
18  suppliers so that we could then use that
19  information to make decisions.
20    Q.   Right.  And Teva didn't ask
21  for that until on or after November 5th,
22  2018, from Mylan?
23    A.   I do not think that -- as I
24  said, I'm sure that we asked Mylan to

Page 327

1  give us test results as soon as we became
2  aware that there was a potential NDEA
3  issue with valsartan for Mylan.
4    Q.   Right.  And we went over
5  this.
6      All I'm saying is Swissmedic
7  informed Teva about NDEA on November 5th,
8  2018, right?  We saw that.
9    A.   Yes.
10    Q.   And then you're saying that
11  Teva asked Mylan for the test results
12  after it was informed.
13      So it must have been after
14  that November 5th, 2018, date, right?
15    A.   Yes.  Immediately after,
16  yes.
17    Q.   That -- are you familiar
18  with the reduced testing, sir?
19    A.   Yes.
20    Q.   What's your understanding of
21  reduced testing as it relates to incoming
22  valsartan API that Teva would be
23  purchasing?
24    A.   So reduced testing is a

Page 328

1  process whereby, after you have
2  established a certain level of
3  reliability of the quality of the
4  supplies that you receive, then you are
5  in a position to do testing at a lower
6  level of, let's say, oversight, based on
7  that historical performance of the API,
8  the quality of the API.
9    Q.   And is it your understanding
10  that Teva Jerusalem had the Mylan
11  valsartan API on a reduced testing
12  program?
13    A.   It may have indicated that.
14  I would have to double check that.
15      MR. STANOCH:  I'll mark
16  Exhibit-153.  Bates ending 415117.
17      - - -
18      (Whereupon, Exhibit
19  Teva-153, TEVA-MDL2875-00415117,
20  Site Risk Assessment Protocol, was
21  marked for identification.)
22      - - -
23  BY MR. STANOCH: ^^
24    Q.   Tell me when you have it,

Page 329

1  sir.
2    A.   Yes.
3    Q.   This appears to be a site
4  risk assessment protocol prepared by Teva
5  Jerusalem?
6    A.   Yes.

19      Can I read it, please?
20    Q.   Sure.
21    A.   My apologies, I'm looking at
22  this thing sideways.  My apologies,
23  counsel.
24      - - -

Confidential Information - Subject to Protective Order

Page 330

1    (Whereupon, a discussion off
2  the record occurred.)
3        - - -
4  BY MR. STANOCH:
5    Q.   I understand you're trying
6  to rotate the document on your screen.
7  We can wait.  That's fine.
8    A.   Thank you.  Let me look at
9  it sideways.  That's okay.
10        - - -
11    (Whereupon, a discussion off
12  the record occurred.)
13        - - -
14    VIDEO TECHNICIAN:  The time
15  is 2:58 p.m.  Going off the
16  record.
17        - - -
18    (Whereupon, a brief recess
19  was taken.)
20        - - -
21    VIDEO TECHNICIAN:  The time
22  is now 3:08 p.m.  Back on the
23  record.
24  BY MR. STANOCH:

Page 331

1    Q.   Mr. Barreto, before the
2  break for technical reasons, we were
3  looking at the exhibit ending 415117.  It
4  was the site risk assessment protocol for
5  the Teva Jerusalem facility.
6    Do you recall that?
7    A.   Yes.

Page 332

1    A.   That appears to be the case.
2    Q.   In fact, I see -- we'll
3  leave it at that.  Okay.
4    And you're not personally
5  familiar with the actual analytical
6  testing done at facilities, such as Teva
7  Jerusalem, of incoming API, are you?
8    A.   You mean in terms of the
9  general expectations I have, the
10  specifics I am not.
11    Q.   Right.
12    MR. STANOCH:  The specifics,
13  counsel, I assume that might be
14  better for Mr. Binsol perhaps.
15    MS. LOCKARD:  That's the
16  expectation.
17    MR. STANOCH:  Great.  Just
18  want to be on the same page.
19  BY MR. STANOCH:
20    Q.   Eventually, sir, you'll
21  recall that Teva did audit, finally,
22  Mylan's Unit 8 in 2019?
23    A.   I think so.
24    Q.   Right.  And do you recall

Page 333

1  the result that -- of that audit?
2    A.   I don't recall the
3  specifics.  But I think some
4  recommendations may have been made.  I
5  would have to look at that report again.
6    Q.   Okay.  I'll put it in front
7  of you.
8    But, ultimately, did Teva's
9  audit in July 2019 find Mylan's Unit 8 to
10  be acceptable?
11    A.   Yes, correct.  That's
12  correct.
13    Q.   That meant, as far as Teva
14  was concerned, Mylan had no major GMP
15  deviations and Teva could source product
16  from that Mylan facility, right?
17    A.   Correct.
18    Q.   I mean, are you aware that
19  the FDA issued a Form 483 to that very
20  same Mylan facility, Unit 8, later that
21  year?
22    A.   Yes.
23    Q.   And then in November of
24  2019 -- does that sound right to you?

Confidential Information - Subject to Protective Order

Page 334

1   A.   I think so.
2   Q.   And then, in fact, the FDA
3 found significant deviations from current
4 good manufacturing practices for active
5 pharmaceutical ingredients at Mylan's
6 Unit 8.
7        Do you recall that?
8   A.   Yes.
9   Q.   So Teva's audit went in and
10 said, Mylan Unit 8 is acceptable, but
11 then the FDA found significant deviations
12 of current good manufacturing practices
13 for active pharmaceutical ingredients; is
14 that right?
15   A.   That is -- that is correct.
16 But that's not completely unusual, and it
17 can happen both ways.
18   Q.   And Teva would defer to the
19 FDA's findings concerning deviations from
20 good manufacturing practices at vendors
21 that Teva is sourcing material from?
22   A.   What's the question?
23   Q.   Teva would defer to the
24 FDA's findings of significant deviations

Page 335

1 of current good manufacturing practices
2 at vendors from whom Teva is sourcing
3 API; is that fair?
4   A.   Teva would use information
5 from FDA inspections to actually do a
6 further assessment through the GMP
7 process.
8   Q.   Were you aware of any
9 sentiment at Teva to speed along Mylan's
10 Unit 8 being considered acceptable again
11 so Teva could start buying product from
12 it again?
13        MS. LOCKARD:  Objection.
14 Vague.
15        THE WITNESS:  The objective
16 of the audit that we performed for
17 Mylan was intended to establish
18 the extent to which we would be in
19 a position to accept or not the
20 product manufactured by Mylan.
21        Expediency in this case, and
22 in every case, but especially in
23 this one, because of the
24 seriousness of what the findings

Page 336

1 of impurities in valsartan, was
2 not a consideration.
3        It's not in the best
4 interest of Teva to purchase
5 materials that -- that would not
6 be considered to be acceptable and
7 then produce them into finished
8 product and then find itself
9 having to engage in a recall and
10 affecting, you know, the
11 credibility of the company as a
12 reputable company.
13        Expediency is not what we
14 want.
15 BY MR. STANOCH:
16   Q.   Did Teva change its prior
17 acceptable classification from Mylan's
18 Unit 8 after it became aware of the FDA's
19 Form 483 for that Mylan facility in
20 November of 2019?
21   A.   I would have to look into
22 exactly what we did.
23        But I can tell you that we
24 looked into those observations issued by

Page 337

1 the FDA, and we did an assessment.
2   Q.   And I don't have it in front
3 of me, can you remind me of when you
4 departed from Teva?
5   A.   I left Teva in January 2020.
6   Q.   And I'm looking at
7 information from November 2019 concerning
8 the FDA's warning letter on Mylan Unit 8.
9        That was shortly before,
10 then, that you were going to depart from
11 Teva?
12   A.   That's correct.
13   Q.   And who, if anyone, assumed
14 responsibilities you had vis-à-vis
15 follow-up audits or inquires of API
16 suppliers such as Mylan?
17   A.   You mean after my departure?
18   Q.   Yes, sir.
19   A.   In -- I know there was a
20 reorganization.  So at that time there
21 was some transition, so I could not
22 exactly tell you who was going to take
23 those responsibilities.
24        It could have been Mr.

Confidential Information - Subject to Protective Order

Page 338

1 Delicato, but I don't know.
2     Q.   Are you aware of any
3 assessment at Teva as to whether Teva's
4 audit of Mylan in July 2019 found the
5 same deviations or not as the FDA's?
6     A.   I don't recall.  I don't
7 think so.
8     Q.   Do you think it's possible
9 that Teva's audit of Mylan in July 2019
10 missed the same significant deviations
11 that the FDA caught and reflected in its
12 warning letter about Mylan's Unit 8?
13     A.   What I think happened is,
14 because you're asking me for my opinion,
15 based on my experience as an auditor and
16 a former FDA investigator, FDA
17 investigators are looking at certain
18 things in the course of their
19 inspection -- and this will also vary
20 from one investigator to another.
21          So the Teva audit also had
22 its own purpose and objective.  So you
23 will have instances where the findings
24 found -- reported by the FDA, it's not

Page 339

1 that the auditor did not find them, it's
2 that probably the auditor was looking at
3 other activities and other specific
4 issues.
5          In our case, I know that we
6 were interested in the manufacturing
7 process from a nitrosamine perspective.
8 So it was a focused audit.
9          So I think that it's just
10 different approaches that would yield
11 different results.
12     Q.   Right.  Teva's audit was
13 focused on the manufacture of valsartan
14 and other sartan API in light of the
15 nitrosamine issues, right?
16     A.   That's correct.
17     Q.   The FDA's inspection, at
18 least from what it said in its warning
19 letter, was about the manufacture,
20 testing and handling of active
21 pharmaceutical ingredients; you're aware
22 of that?
23     A.   Yes.  And that may or may
24 not have included just the sartans.

Page 340

1          But, again, the approach and
2 the focus from one auditor to another
3 will vary depending on their level of
4 skills and capabilities.
5     Q.   And you, obviously, sitting
6 here today, can't say, one way or the
7 other, what it is that caused the FDA to
8 find significant deviations in current
9 good manufacturing practices for active
10 pharmaceutical ingredients at Mylan's
11 Unit 8 and -- whereas Teva's audit did
12 not?
13     A.   No, I couldn't tell you.
14 Again, because it's very difficult to
15 predict or to analyze why certain things
16 are found in -- by one auditor and not by
17 another.
18     Q.   Did Teva cease sourcing
19 product from Mylan's Unit 8 after it
20 became aware of the FDA warning letter in
21 November of 2019?
22     A.   I would have to check,
23 because that may have been a decision
24 that was done, perhaps, after my -- when

Page 341

1 you say stopped, it could have been
2 permanent?  You mean a permanent stop?
3     Q.   Any stop.
4     A.   I'd have to check.  I
5 apologize.
6     Q.   No.  That's fine.
7          And that's actually a good
8 lead to a broader question.
9          In your role as a quality
10 executive at Teva, would the company --
11 what was the effect of a Teva audit
12 finding an API supplier acceptable or not
13 acceptable?
14     A.   So what's the question?  Is
15 this a general question?
16     Q.   General question.  Yes.
17     A.   Okay.  So what -- how do we
18 get to acceptable versus not acceptable?
19     Q.   No.  I was unclear.
20          So in the event auditors
21 under you find a site, let's say,
22 unacceptable, any site generally, what is
23 the effect on Teva at large's purchasing
24 or not from that supplier?

Confidential Information - Subject to Protective Order

Page 342

1    So even if you find someone
2 not acceptable, can Teva still say, on
3 the business side, we're still going to
4 purchase?
5    A.   So the whole objective of
6 unacceptable, it would have to --
7 different -- actually, different
8 potential outcomes.
9         If the unacceptability is
10 based on impact on product quality
11 because, you know, the way in which the
12 product is manufactured would have a
13 significance, so we would not purchase.
14        If the unacceptability has
15 other ramifications like, you know, they
16 don't necessarily have, let's say, strong
17 quality organization or a strong
18 manufacturing organization or we think
19 that, you know, the equipment that they
20 use is not up -- there would be a number
21 of potential reasons for unacceptability,
22 then we would have to make a risk-based
23 decision as to whether or not, you know,
24 that unacceptable is conclusively

Page 343

1 recommending that we don't purchase
2 product from that company.
3    Q.   And where does that ultimate
4 decision, within Teva, lie?
5    A.   The decision itself?
6    Q.   Yes.
7    So, again, I'll give you an
8 example.  A Teva audit results in a
9 finding of unacceptable for whatever
10 reason.  That's presented to someone.
11       Who is that someone to make
12 that decision whether they're going to
13 stop purchasing or not?



Page 344



Page 345

7    Q.   Are you aware of whether
8 Teva had ever audited any of Mylan's
9 suppliers of any materials used to make
10 valsartan API?
11    A.   I'm trying to remember now
12 if Mylan acquired an intermediate from
13 ZHP, for instance.  I don't know.  I
14 would have to further follow up.
15    Q.   And I -- let me back up.
16       I can put Teva audit reports
17 in front of you from 2015 and 2018, if
18 you'd like, I'm happy to do that, but,
19 you know, sitting here today, do you
20 recollect now, or even in your role as a
21 quality executive at Teva, whether Teva
22 ever audited any of the raw material
23 suppliers to Mylan for valsartan API?
24    A.   I don't -- I don't recall

Confidential Information - Subject to Protective Order

Page 346

1 seeing any of those activities done.
2     Q.   Do you --
3     A.   This would be -- the only
4 way that I think we would do that is if
5 there was a for-cost issue on our part.
6 And even at that point, I think that
7 our -- my expectation would be for us to
8 tell Mylan to perform its own audit of
9 that supplier and for them to give us a
10 report.
11     Q.   Fair enough.
12         Are you aware of Teva ever
13 informing Mylan that Mylan should conduct
14 an audit of one of its raw material
15 suppliers in connection with the
16 manufacture of valsartan API?
17     A.   I'm not aware.
18     Q.   Are you aware of Mylan ever
19 sharing any audit of Mylan's API raw
20 material suppliers with Teva?
21     A.   I'm not aware.
22     Q.   Are you aware of any
23 communications between Teva and Mylan
24 concerning solvents that Mylan used to

Page 347

1 make valsartan API from Lantech?
2     A.   I am not aware.
3     Q.   Are you aware of Teva ever
4 conducting any investigation or audit
5 itself of Lantech concerning the solvents
6 that it used to manufacture any valsartan
7 API?
8     A.   I'm not aware.
9     Q.   Are you aware of -- is Teva
10 aware of any information that Mylan ever
11 investigated Lantech's processes for
12 using solvents that are part of the
13 valsartan API manufacturing process?
14     A.   I'm not aware.
15     Q.   Are you aware of whether any
16 of Teva's audits of Mylan evaluated
17 whether the o-xylene solvent that Mylan
18 was using to make valsartan API sold to
19 Teva was recycled or not?
20     A.   I'm not aware of that
21 happening.
22         Again, something like that,
23 the fact that recycled o-xylene was used
24 would not necessarily trigger any sort of

Page 348

1 further investigation on the part of the
2 auditor in detail.
3     Q.   And you're not aware of
4 Mylan ever making Teva aware that it was
5 using recovered o-xylene solvent in the
6 manufacture of valsartan API sold to
7 Teva?
8     A.   I'm not aware of that.  But
9 I would not necessarily expect them to do
10 that unless they had a good reason for
11 it.
12     Q.   Would you expect Mylan's DMF
13 for valsartan API to disclose whether the
14 o-xylene used was fresh or recycled?
15     A.   Again, not necessarily.  I
16 mean, the use of recovered solvents, it's
17 a common practice within the industry.
18         So if Mylan was receiving --
19 or using recovered solvents and those
20 solvents were fulfilling their quality
21 expectations, if they report those to the
22 DMF or not, that would not necessarily be
23 a high issue of concern on my part.
24     Q.   But either way, it's

Page 349

1 something that you're not aware of Teva
2 ever being aware of?
3     A.   That is correct.
4     Q.   Were you aware of whether or
5 not Teva had a vendor qualification
6 policy while you were employed there?
7     A.   I'm sure we do have a vendor
8 qualification policy, yes.
9     Q.   Do you recall whether there
10 were any concerns about Teva facilities'
11 differing interpretations of that policy?
12     A.   I'm sorry, can you ask the
13 question again?
14     Q.   Sure.
15         Were you aware of any
16 concerns about different Teva facilities
17 having different interpretations of
18 Teva's vendor qualification policy?
19     A.   No, I'm not aware of any
20 concerns.
21         MR. STANOCH:  I'll mark the
22 next exhibit.
23         THE WITNESS:  You're going
24 to upload another document,

Confidential Information - Subject to Protective Order

Page 350

1  counsel?
2      MR. STANOCH:  I am.  Sorry,
3  stand by.  Teva Exhibit-154.
4  Bates ending 132980.
5          - - -
6      (Whereupon, Exhibit
7  Teva-154, TEVA-MDL2875-00132980,
8  10/2/17 E-mail, McClain to
9  Barreto, was marked for
10  identification.)
11         - - -
12 BY MR. STANOCH:
13     Q.   Tell me when you have it in
14 front of you, sir.
15     A.   I do have it.
16     Q.   And this appears to be an
17 e-mail from a Lorraine McClain,
18 October --
19     A.   Yes.
20     Q.   -- 2, 2017, to you and
21 others?
22     A.   Yes.
23     Q.   And it's attaching the Teva
24 vendor qualification policy, Corp Policy

Page 351

1  0082, yes?
2      A.   Yes.
3      Q.   And the policy that's
4  attached is effective August 26th, 2017?
5      A.   Yes.

14     Q.   And there's -- on the cover
15 e-mail of Ms. McClain -- actually, who is
16 Ms. McClain?  Do you recall?
17     A.   Yes, of course.  She was
18 actually the vendor qualification program
19 manager from the quality organization.
20 She left the company, I want to say,
21 sometime before -- was it before the end
22 of 2017?  I don't remember now.  But she
23 is no longer with the organization.



Confidential Information - Subject to Protective Order

Page 354



10    Q.   How was a facility
11  purchasing, say, API from a vendor
12  supposed to know what it was supposed to
13  do if a requirement was classified as a
14  case-by-case basis?
15    A.   Again, I don't know exactly
16  what was stated -- what was meant with
17  the case-by-case basis.  So it's a little
18  vague for me to actually really give you
19  a very good perspective on this.
20    Q.   Go ahead.
21    A.   The only thing -- the only
22  thing that I can tell you is that the
23  vendor qualification program, it's a very
24  extensive program.  And vendor

Page 355

1  qualification includes a number of
2  activities that are, you know, core.
3          One is the identification of
4  the vendor, the assessment of the vendor
5  capabilities to deliver product, even
6  their financial status, location,
7  geographical location, the type of
8  organization, building facilities.
9          And then, of course, when it
10  comes to product is whether or not
11  they're able to manufacture product
12  according to our specifications.
13          So I'm trying to
14  understand -- you know, there may have
15  been concerns from the sites, in terms of
16  clarity, which is normal, in terms of
17  what the document says.
18          But in terms of the
19  expectation that each site is supposed to
20  have for vendor qualification, that's
21  pretty clear, what -- you know, it's
22  pretty standard.
23    Q.   I'm going to share my screen
24  so you can follow along a little bit,

Page 356

1  sir, one moment.
2    A.   Okay.  Please do.  Let me --
3    Q.   Sorry.  One second.
4          Can you see that?
5    A.   Yes.
6    Q.   It's a flow chart,
7  Attachment 1.
8          It's in the same document
9  you have, it's just towards the end of
10  the policy, right?
11    A.   Uh-huh.
12    Q.   And if you go to the next
13  page, there's Attachment 2, it's, Vendor
14  qualification requirements per
15  material/service provider type.
16          Do you see that?
17    A.   Yes, I do.
18    Q.   And you'll see there's a
19  variety of requirements, vendor
20  questionnaire, declaration, drug master
21  file, et cetera.
22          Do you see those?
23    A.   Yes.
24    Q.   And then there are, I guess,

Page 357

1  the type of vendor, API, excipient,
2  intermediate, packaging, right?
3    A.   Yes, correct.
4    Q.   And then there's a code, a
5  letter in the chart, which is usually an
6  M or a C.
7    A.   I see what you're saying,
8  yes.
9    Q.   And this seems to suggest
10  that when something is a C, it's a
11  consider on a case-by-case basis, which
12  is being referred to in the cover e-mail;
13  is that fair?

Confidential Information - Subject to Protective Order

Page 358



Page 360

1  But, again, as I said, I
2  mean, I'm looking at it, and it's pretty
3  straightforward to me.  I'm hoping that
4  that will be the case for most
5  professionals within the organization.
6      And if it's not, then we
7  will provide clarification.
8      Q.  Do you recall ever providing
9  clarification, while you were at Teva,
10  concerning this policy?
11     A.  I'd have to look at the next
12  version.  But, again, this was delegated
13  on Ms. McClain.  So I don't recall if I
14  looked at the specifics at that point.
15     Q.  While we're on this, for
16  vendor-supplied API, a quality technical
17  agreement was mandatory, right?
18     A.  That is correct.
19         MS. LOCKARD:  Objection.
20  Asked and answered.
21  BY MR. STANOCH:
22     Q.  And then I think you said
23  test method and validation was -- is
24  classified as C, consider on a

Page 359

17     Q.  At the time you were at
18  Teva, were you aware of any written
19  guidelines or guidance that would have
20  helped Teva facilities understand how to
21  interpret or implement something
22  classified here in this policy as C,
23  consider on a case-by-case basis?
24     A.  I don't recall seeing one.

Page 361

1  case-by-case basis?
2      A.  And the reason for that was
3  in the event of a USB method, you don't
4  validate that test method, you verify it.
5      Q.  Eventually, at some point,
6  Teva did test or -- strike that.
7      Teva did validate a method
8  for testing nitrosamines, correct?
9      A.  That's my understanding.  I
10  think Mr. Binsol will give you much
11  better details as to the answer to that.
12     Q.  And, ultimately, the results
13  of the testing were reduced to a testing
14  report that was shared with the FDA?
15     A.  I think that happened after
16  my departure, so I would defer to Mr.
17  Binsol to give you those details.
18     Q.  Do you recall whether the
19  FDA shared any of its own test results
20  with Teva?
21     A.  Yes, they did.
22     Q.  All right.  And Teva --
23  strike that.
24     FDA did test some of Teva's

Confidential Information - Subject to Protective Order

Page 362

1  U.S. finished-dose valsartan, right?
2      A.   Yes.  They asked for
3  samples, and we supplied those samples to
4  them.
5      Q.   Right.  And the FDA's
6  testing of the Teva finished dose in the
7  U.S. market, it found NDMA in excess of
8  .3 parts per million, correct?
9      A.   I think that was the case.
10     Q.   And do you recall that
11 Teva's own testing of valsartan API from
12 ZHP confirmed the presence of NDMA,
13 right?
14     A.   I'm trying to remember if
15 that happened prior to or after my
16 departure.  Because I know that that was
17 a long discussion in terms of how -- I'm
18 trying to remember if that was our
19 testing or if it was just testing by
20 others.
21     Q.   And it was both, I think, in
22 that -- in that ZHP did its own testing
23 and then Teva did some of its own testing
24 as well.

Page 363

1          Do you recall that?
2      A.   Oh.  Oh, because we were --
3  I think we were using an external testing
4  laboratory at one point to do some
5  testing for us.  I remember that now.
6      Q.   Do you recall roughly when
7  that was?
8      A.   I want to say somewhere
9  between September or October 2018.
10     Q.   And I can put it in front of
11 you, but -- I'll put it in front of you,
12 give me one second, sir.  Stand by.
13     A.   Okay.  You're speaking --
14 okay.
15     Q.   Teva-155, sir.
16          -  -  -
17          (Whereupon, Exhibit
18     Teva-155,
19     TEVA-MDL2875-00546489-6492,
20     2/15/19 E-mail, Lyons to Gray, was
21     marked for identification.)
22          -  -  -
23 BY MR. STANOCH:
24     Q.   And there's various

Page 364

1  iterations of this.  This one is, there
2  are attachments to an e-mail from
3  February 15th, 2019.
4          Do you see that e-mail?
5      A.   It's uploading, just a
6  couple of seconds.
7      Q.   Sure.
8      A.   I'm looking at it, yes.

Page 365



Page 366

¹ again.  I'm happy to do that to move it
² along.
³       A.    Allow me a second, and I'll
⁴ let you know, counsel.
⁵       Q.    Sure.  I appreciate your
⁶ flexibility.
⁷       A.    Thank you.  I appreciate
⁸ that.  Counsel, do you mind sharing the
⁹ document with us?
¹⁰       Q.    No, that's fine.  I'll do
¹¹ that right now, sir.
¹²            This was just -- we were
¹³ just looking at -- here is the e-mail.
¹⁴            Do you see it?
¹⁵       A.    Yes.  Yes, sir.
¹⁶       Q.    And then we were looking at
¹⁷ the Dupnitsa results, right?
¹⁸       A.    That is correct.

Page 368

Page 367

Page 369

Confidential Information - Subject to Protective Order

Page 370

19    Q.   Great.  If you want to tell
20 me something about it, feel free, but I'm
21 happy to put the target on Mr. Binsol's
22 back for that one.
23    A.   I think -- I think Mr.
24 Binsol is more than prepared to assist

Page 371

1 you.
2    Q.   I'm sure.  Thank you.
3        You're aware that Teva had
4 conducted an on-site audit of ZHP shortly
5 before the news about the NDMA impurity
6 in 2018, right?
7    A.   I think so, yes.
8    Q.   And I think that was
9 conducted in late May, I believe.
10        Does that sound right?
11    A.   That may be right, yes.
12    Q.   And I can put the audit
13 report in front of you when we get to it,
14 but did you have any personal involvement
15 in that audit of ZHP?
16    A.   As part of my
17 responsibility, I have always had
18 interest in the audits performed by the
19 organization.  It was all part of an
20 objective of myself to look into how
21 audits were performed, because of my
22 responsibility, and whether or not the
23 auditors were either, you know, focusing
24 on the areas that they needed to focus

Page 372

1 on, from my perspective, or that the
2 reports that were generated, you know,
3 clearly described their findings and
4 their concerns and the extent to which,
5 you know, the client was responding to
6 the observations, that sort of thing.
7        So I did have a very
8 personal interest in a number of these
9 audits.  Definitely, yes.
10    Q.   I appreciate that as your
11 general view or approach to your
12 responsibilities.
13        But specifically concerning
14 the audit of ZHP in May of 2018 --
15    A.   I may have.  I may have.
16    Q.   Do you recall -- let's take
17 it step by step.
18        You didn't join the audit
19 team at ZHP's facility in May 2018,
20 correct?
21    A.   No, I did not.
22    Q.   And do you recall reviewing
23 drafts of the report, before it was
24 finalized, after the inspection?

Page 373

1    A.   I may have.  Because, again,
2 I had an interest in looking at a number
3 of reports to see if they reflected, you
4 know, the expectation that I had for the
5 quality of the report.
6    Q.   And sitting here today,
7 you're not sure, one way or the other,
8 whether you reviewed the May 2018 audit
9 report for ZHP?
10    A.   I don't recall.  But being
11 an API supplier -- I would not look at a
12 packaging, you know, facility, you know,
13 or a small, you know, processing of a
14 less significant product.
15        But the reason why I say I
16 may have is because I'm sure that -- and
17 I had three regions that I was
18 responsible for.  So I wanted to make
19 sure that I also looked at the activities
20 from each one of the regions to see if we
21 were even establishing some form of, you
22 know, standardization, harmonization in
23 our practice and approach.
24    Q.   And, in fact, Teva had also,

Confidential Information - Subject to Protective Order

Page 374

1 I think, audited Mylan in 2018, prior to
2 June 2018 and the NDMA revelations; is
3 that right?
4      A.   It may be, yes.
5      Q.   Did you have any personal
6 involvement in that audit?
7      A.   As I said before, I don't
8 recall.
9           But, again, given that this
10 was part of a region where, you know --
11 first, China, China being, by itself,
12 audited by Chinese auditors for the most
13 part; India, audited by Indian auditors
14 for the most part.  I had an interest.  I
15 don't recall if I specifically looked at
16 that audit report.
17      Q.   That's fair and
18 understandable.
19           And you joined Teva -- was
20 it 2017?
21      A.   September 2017.
22      Q.   So for audits conducted
23 prior to your joining Teva, did you go
24 back and review audit reports of, say,

Page 375

1 ZHP and Mylan for years predating your
2 arrival at the company?
3      A.   Probably not.
4           MR. STANOCH:  Let's take a
5      quick break off the record.
6           VIDEO TECHNICIAN:  The time
7      is now 3:56 p.m.  Going off the
8      record.
9                -  -  -
10           (Whereupon, a brief recess
11      was taken.)
12                -  -  -
13           VIDEO TECHNICIAN:  The time
14      is now 4:07 p.m.  Back on the
15      record.
16 BY MR. STANOCH:
17      Q.   Mr. Barreto, I think we
18 talked about, earlier, that Teva's
19 Jerusalem, Israel, facility was receiving
20 Mylan API and manufacturing it into
21 valsartan finished dose for the U.S.
22 market, right?
23      A.   That is correct.
24      Q.   Do you recall, when you were

Page 376

1 at Teva, any quality or compliance issues
2 with the Teva Jerusalem facility?
3      A.   Internal quality and
4 compliance issues?
5      Q.   Yes.
6      A.   Not anything that would be
7 out of the order in terms of, you know,
8 issues and recommendations.
9      Q.   Do you recall there ever
10 being any issues regarding the testing
11 methods of incoming API that the
12 Jerusalem facility employed?
13      A.   No, I don't recall any
14 issues around that.
15           MR. STANOCH:  I'll mark this
16      as the next exhibit, Teva-156.
17      It's Bates ending 83812.
18                -  -  -
19           (Whereupon, Exhibit
20      Teva-156,
21      TEVA-MDL2875-00083812-3877,
22      6/15/16 E-mail, Myers to Cheasty,
23      was marked for identification.)
24                -  -  -

Page 377

1 BY MR. STANOCH:
2      Q.   Tell me when you can see it,
3 sir.
4      A.   Yes, just let me make sure
5 it uploads.  The Internet seems to be
6 working much better.  Let's see if I'm
7 correct.  Still uploading, counsel.
8           Yes.
9      Q.   The first page is a cover
10 e-mail from a Linda Myers, dated June
11 15th, 2016, and she's attaching a copy of
12 a GRA audit for Teva Jerusalem.
13           Do you see that?
14      A.   Yes.
15      Q.   And if you flip it over,
16 it's the Teva audit of its own Jerusalem
17 facility for an audit conducted in
18 February 2015.
19           Do you see that?
20      A.   Okay.  Yes, I see it.
21      Q.   And I know this predates
22 your arrival at Teva, right?
23      A.   That is correct.
24      Q.   And have you seen this audit

Confidential Information Subject to Protective Order



Page 378

1  report before?
2     A.   I don't think so.
3     Q.   And among the observations
4  that Teva made of its own Jerusalem
5  facility -- if you can flip to the page
6  ending 83872.
7     A.   Excuse me, Page 8?
8     Q.   Page 60 of 65, Bates number
9  ending --
10    A.   Oh, I see.  I see.  60 of
11  65.  I'm going there.  Allow me a second.
12  It's a long report.
13         Did you say 60 of 65?
14    Q.   I did, sir.
15    A.   Okay.  60 of 65.  I'm there,
16  sir.
17    Q.   The first sentence --
18         MS. LOCKARD:  I'm just going
19  to object to the extent this is
20  outside of the scope of the
21  30(b)(6) notice.
22         But if he has personal
23  knowledge, he can answer.
24 BY MR. STANOCH:

Page 379

1     Q.   So the page begins,
2  According to SOP 00292.
3         Do you see that?
4     A.   I'm reading that, yes.

Page 380

21    Q.   And do you know whether
22 personally, or in your role as Teva's
23 quality executive, whether -- what
24 follow-up, if any, occurred at the Teva

Page 381

1  Jerusalem facility concerning this
2  observation?
3     A.   This is the first time that
4  I'm looking at this.  So I would have to
5  look at the response that the Teva
6  Jerusalem facility made with respect to
7  this.
8     Q.   That's fair.  I'm going to
9  mark another exhibit.
10    A.   Yes.
11    Q.   Stand by.
12         MR. STANOCH:  Teva
13  Exhibit-157.  Bates ending 246006.
14              - - -
15         (Whereupon, Exhibit
16  Teva-157,
17  TEVA-MDL2875-00495893-5896,
18  3/27/19 E-mail, Vanderweeen to
19  Barreto, was marked for
20  identification.)
21              - - -
22 BY MR. STANOCH:
23    Q.   Tell me when it pops up on
24 your screen, sir.

Confidential Information - Subject to Protective Order

Page 382

1     A.   I have it.
2     Q.   And this is an e-mail from
3  Inna Reitman, February 1, 2017, to David
4  Hatt.
5          Do you see that?
6     A.   Let me look at it, because
7  it's at the bottom, right?  It's at the
8  beginning of the string?
9     Q.   It's just at the first page.
10    A.   Let me look at it.  Let me
11 see.
12    Q.   I'm looking at this --
13    A.   Birk from --
14         MS. LOCKARD:  The e-mail I
15 see is --
16         THE WITNESS:  It's a
17 different one.
18         MS. LOCKARD:  -- Birk
19 Vanderweeen to Eric Drape.
20         THE WITNESS:  That's why I
21 was having a little bit of an
22 issue.
23 BY MR. STANOCH:
24    Q.   Well, put that one aside.

Page 383

1          MR. STANOCH:  And I'll mark
2  this.  I must have clicked on the
3  wrong button.  I was doing so well
4  all day, sir.  I apologize.
5          THE WITNESS:  I was just a
6  little confused.
7          MR. STANOCH:  No, no.  Let
8  me mark this.  I wish there was a
9  way to mark it inside the system.
10 Let's try this, Teva-158.
11         - - -
12         (Whereupon, Exhibit
13 Teva-158, TEVA-MDL2875-00246006,
14 2/1/17 E-mail, Reitman to Hatt,
15 was marked for identification.)
16         - - -
17         THE WITNESS:  Let me go
18 there.
19         MR. STANOCH:  That's the
20 same thing, isn't it?  That's the
21 same thing.
22         THE WITNESS:  It's
23 uploading, so I cannot tell you,
24 counsel.

Page 384

1          It is the same thing.
2          MR. STANOCH:  159, the third
3  time is the charm, sir.  I think I
4  got it now.  It looks like this.
5          - - -
6          (Whereupon, Exhibit
7  Teva-159, TEVA-MDL2875-00246006,
8  2/1/17 E-mail, Reitman to Hatt,
9  was marked for identification.)
10         - - -
11         THE WITNESS:  So let me go
12 back now to -- you want the
13 display from your screen?
14 BY MR. STANOCH:
15    Q.   I can do it either way.  I
16 can leave this up.  Whatever is easier
17 for you, sir.
18    A.   No, no.  Go ahead.  I'll
19 follow you.
20    Q.   This Exhibit-158, Bates
21 ending 246006, it's an e-mail from Inna
22 Reitman to David Hatt, February 1, 2017,
23 yes?
24    A.   Yes.

Page 385

1     Q.   Do you know who Inna Reitman
2  is?
3     A.   She was one of the auditors
4  from David Hatt's organization at the
5  time.
6     Q.   And what was David Hatt's
7  function vis-à-vis your function when you
8  arrived at Teva?  Did he report to you?
9     A.   So David -- he reported to
10 me, correct.
11    Q.   And was he sort of head of
12 audit?  Was that what his job was?
13    A.   He was a director of quality
14 audits, and -- yes.
15    Q.   And this is attaching
16 another Teva audit report of the Teva
17 Jerusalem facility.  This one is from an
18 audit performed in December of 2016.
19         Do you see that?
20    A.   Yes, which predates me.
21 Yes.
22    Q.   Right.  Then among other
23 things that they list here on page ending
24 112 is about quality agreements.

Confidential Information - Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order

Page 394



Page 396

Q.   You don't know, one way or the other, though, for sure whether any of these deficiencies were corrected, when or by whom; is that fair?

MS. LOCKARD:  Objection. Outside the scope of the 30(b)(6) notice.  Personal knowledge.

THE WITNESS:  I wouldn't know.

BY MR. STANOCH:

Q.   And between these two Teva audits, were you aware of any FDA inspection of the Teva Jerusalem facility in or about 2015 or 2016?

A.   I don't recall.  But more than likely -- I want to say I think there was one in 2017, yes.

Yes.  Because if I recall well, I actually visited the site -- was it 2017 or 2018?

Q.   2019.

A.   It could have been in 2019.

Q.   We'll get to that.  Let's stick in the 2015, '16 range, okay.

Page 395

MS. LOCKARD:  Objection. Vague.

MR. STANOCH:  You can answer.

THE WITNESS:  It would be applicable to the valsartan product.

BY MR. STANOCH:

Q.   Are you aware of any follow-up that was done to correct those or the other deficiencies identified in this report?

A.   Since this happened before my time, the only thing I can tell you is there are procedures in place for addressing these type of observations. And in the event of critical observation, that also gets a much higher level of attention.

So I have to say that if the procedure was followed, those deficiencies were corrected.

Page 397

A.   Okay.

MR. STANOCH:  The next exhibit, Teva-160.

- - -

(Whereupon, Exhibit Teva-160, TEVA-MDL2875-00400799-0905, 6/13/19 E-mail, Hoover to Hatt, was marked for identification.)

- - -

BY MR. STANOCH:

Q.   It should look like this on the first page.

MR. STANOCH:  For the record it's Bates ending 400799.

THE WITNESS:  If you want to proceed with guiding through your screen, I'll be okay with that.

BY MR. STANOCH:

Q.   Very good, sir.

The cover is an e-mail from Ms. Linda Hoover to David Hatt and Sean Israel, dated June 13th, 2019.

Do you see that?

Confidential Information Subject to Protective Order



Page 398

1    A.  Yes.

Page 400

23    Q.   I think you said before,
24  when your counsel was shuffling papers,

Page 399

Page 401

1  you don't want the analysts manipulating
2  the data, right?
3    A.   That is --
4      MS. LOCKARD:  Objection to
5  form or the suggestion that I
6  intentionally manipulated the
7  papers.  That's not appropriate,
8  David.
9      MR. STANOCH:  I wasn't
10  suggesting you did anything.  I
11  was saying you were rustling
12  papers.  And I heard him say, you
13  don't want analysts manipulating
14  the data.  And I was just
15  confirming that, counsel.
16  BY MR. STANOCH:
17    Q.   And the answer is yes,
18  correct?

Confidential Information Subject to Protective Order



Page 402

12    Q.    Sure.  But, generally
13  speaking, training of employees on their
14  functions to comply with GMP, that's
15  something that's required of a drug
16  manufacturer like Teva, right?
17    A.    That is correct.  And I'm
18  also aware that training is provided on a
19  continuous basis to employees.
20    Q.    And it seems here, though,
21  the FDA was disagreeing with that
22  supposition of yours and saying that
23  training was not given at the Jerusalem
24  facility, at least at the time of their

Page 403

1  inspection in 2015; is that right?
2    A.    I would have to look at the
3  details of the way in which the
4  investigator interpreted and concluded
5  that training was not provided.
6    Q.    You would agree that
7  regardless -- I don't have it because
8  things are redacted here by Teva.

18    A.    And what I'm trying to say
19  is what I'm missing here, which would
20  allow me to give you a much better
21  description, is the details as to what is
22  it exactly that the investigator was
23  objecting to.
24        Because most observations

Page 404

1  start with this type of general template
2  description, which is not necessarily the
3  detail that I -- that I would be
4  interested in.
5    Q.    Some of the detail may
6  appear in -- for example, under the area
7  that says, Supporting evidence and
8  relevance.
9    A.    Could have been.
10    Q.    Could have been.
11        We don't know because it's
12  redacted, right?

Page 405

Confidential Information Subject to Protective Order

Page 406



13   Q.   Do you know whether or not
14 the, as you sit here today, if the FDA
15 accepted those responses as adequate?
16   A.   We continued to manufacture
17 post that inspection, as far as I know,
18 and we continued to distribute to the
19 United States.  So that tells me that the
20 FDA found the corrective actions to be
21 acceptable.
22   Q.   But you don't know, one way
23 or the other, for sure if the FDA
24 found -- well, first of all, you don't

Page 407

1 know what corrective actions, if any,
2 were taken, number one, right?
3   A.   What I'm saying to you is
4 that knowing the procedures and from my
5 experience, I can assure you that a
6 written response was generated, based on
7 my understanding and my more than 40
8 years of experience in this field.
9      If you don't submit a
10 response, then your facility is
11 classified as unacceptable.  If a
12 facility is acceptable, it can continue
13 to manufacture.  So there was a response.
14   Q.   But you haven't seen the
15 response?
16   A.   That is correct.  That was
17 prior to my time.
18   Q.   Sure.  That's fair.  Stand
19 by.
20      MS. LOCKARD:  So we're on --
21 so we've now been going for 30
22 minutes, unless you want to get
23 through something else?
24      MR. STANOCH:  Yeah, let me

Page 408

1 just get through one more
2 document, Ms. Lockard.  I think
3 that will round out this specific
4 subject matter.  If you're okay
5 with that, Mr. Barreto.
6      THE WITNESS:  Absolutely.
7      MR. STANOCH:  You okay, Ms.
8 Lockard?
9      MS. LOCKARD:  Sure.  Sure.
10      MR. STANOCH:  Teva-161.
11 Bates ending 67532.
12          -  -  -
13      (Whereupon, Exhibit
14      Teva-161,
15      TEVA-MDL2875-00067532-7537, 1/1/19
16      E-mail, Weissbazak to Denac, was
17      marked for identification.)
18          -  -  -
19 BY MR. STANOCH:
20   Q.   I will share my screen again
21 to move it along.
22      You're seeing the same thing
23 I have here?
24   A.   Yes, sir.

Page 409

1   Q.   The topmost e-mail here is
2 one in a chain from an Liron Weissbazak
3 to yourself and others at Teva, dated
4 August 1, 2019.
5      Do you see that?
6   A.   Yes, I do remember that
7 inspection.
8   Q.   And it references an FDA
9 inspection of the Jerusalem site; is that
10 right?
11   A.   That is correct.
12   Q.   And this is the same Teva
13 Jerusalem site that we've been talking
14 about that manufactured valsartan
15 finished dose for the U.S. market, right?
16   A.   That is correct.



Confidential Information Subject to Protective Order

Page 410

4    Q.    And we've talked about,
5 today, valsartan recalls and the
6 investigation into the valsartan NDMA
7 contamination and other nitrosamine
8 contamination, right?
9    A.    Yes.
10    Q.    And we've talked about, a
11 little bit, vendor qualification and
12 specifically reduced testing as it
13 related to the API that Teva Jerusalem
14 was purchasing from Mylan, correct?
15    A.    Correct.
16    Q.    And do you -- you said you
17 recall this audit; is that right?
18    A.    Yes, I do.
19    Q.    And you were on the ground
20 for this one; is that what you said
21 earlier?
22    A.    I was -- I was on the
23 ground, yes.
24    Q.    And were valsartan-related

Page 411

1 issues and nitrosamine issues discussed
2 with the FDA auditors during this audit?
3    A.    They had an interest in
4 having a discussion around, yeah, the
5 recalls and investigations associated
6 with the nitrosamine, yes.
7    Q.    What did Teva discuss with
8 the FDA auditors during this July 2019
9 FDA inspection of the Teva Jerusalem
10 facility?
11    A.    We shared with them
12 analytical tests results; we shared with
13 them the activities associated with the
14 investigations that were performed,
15 associated with, you know, their receipt
16 and manufacturing activities with
17 valsartan; we gave them details about the
18 recall action that was taken; that sort
19 of discussion.
20    Q.    And were -- it looks like
21 there was an attachment, a PDF, here.
22         Were notes circulated after
23 each day of this -- I think it was a
24 five-day audit, circulated amongst Teva

Page 412

1 personnel?
2    A.    Yes.
3    Q.    And that was about the FDA's
4 inspection and potentially its
5 discussions with Teva about the valsartan
6 and nitrosamines issues, right?
7    A.    Correct.
8    Q.    Can you tell me, do you
9 recall any specifics in terms of what was
10 said to or by the FDA inspectors
11 concerning the valsartan issues and
12 nitrosamine contamination?
13    A.    I don't recall the
14 specifics.  But if I recall well from the
15 outcome of that inspection, the
16 inspectors had no concerns with respect
17 to the work that we had done.
18    Q.    As of this time, now a year
19 after the first recalls happened, this is
20 now August 2019, right?
21    A.    It's looking -- doing a
22 retrospective review.
23    Q.    Right.
24         MR. STANOCH:  Ms. Lockard,

Page 413

1 the attachment to this particular
2 e-mail was withheld.  And, in
3 fact, I don't think we have copies
4 of any of the other notes or
5 inspection-related documents for
6 this.
7         I think it's relevant and
8 discoverable, so we're going to
9 request it.
10         MS. LOCKARD:  I'll take a
11 look at that and get a response
12 back to you.
13         MR. STANOCH:  Thank you.
14         Why don't we adjourn for the
15 day, counsel, and, Mr. Barreto?
16         THE WITNESS:  That will be
17 fine, sir.
18         MR. STANOCH:  Okay.
19         VIDEO TECHNICIAN:  The time
20 is now 4:42 p.m.  Going off the
21 record.
22              - - -
23
24

Confidential Information Subject to Protective Order

Page 414

- - -

(Whereupon, the deposition adjourned at 4:42 p.m.)

- - -

---

Page 416

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within sixty (60) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

---

Page 415

CERTIFICATE

I, Amanda Maslynsky-Miller, Certified Realtime Reporter, do hereby certify that prior to the commencement of the examination, DANIEL BARRETO, was remotely sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_____
Amanda Miller
Certified Realtime Reporter
Dated: April 16, 2021

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

---

Page 417

- - - - - -

E R R A T A

- - - - - -

PAGE  LINE  CHANGE/REASON

_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____

---

Confidential Information Subject to Protective Order

Page 418

ACKNOWLEDGMENT OF DEPONENT

1
2

I,_____, do
3  hereby certify that I have read the
   foregoing pages,  1 - 414, and that the
4  same is a correct transcription of the
   answers given by me to the questions
5  therein propounded, except for the
   corrections or changes in form or
6  substance, if any, noted in the attached
   Errata Sheet.
7
8  _____
   DANIEL BARRETO            DATE
9
10

   Subscribed and sworn
11 to before me this
   _____ day of _____, 20____.
12
   My commission expires:_____
13
14 _____
   Notary Public
15
16
17
18
19
20
21
22
23
24

Page 419

   LAWYER'S NOTES

1
2  PAGE  LINE
3  _____  _____  _____
4  _____  _____  _____
5  _____  _____  _____
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17 _____  _____  _____
18 _____  _____  _____
19 _____  _____  _____
20 _____  _____  _____
21 _____  _____  _____
22 _____  _____  _____
23 _____  _____  _____
24 _____  _____  _____

Confidential Information Subject to Protective Order

## WORD INDEX

**< $ >**
**$286.68**  24:10

**< 0 >**
**0.3**  267:10, 23
369:5, 18
370:2
**0.5**  389:9
**0.8**  323:9
**00042539**
71:18
**00116005**  47:7
**00292**  379:2
**0046**  54:3
64:18  67:6
96:9
**0053**  256:13
**00586753**  86:7
**0082**  351:1
**0092**  136:5
139:14
**0175**  76:15
**08**  310:5
**0896**  86:13
89:17

**< 1 >**
**1**  9:17  17:24
352:9  356:7
382:3  384:22
409:4  418:3
**1.0**  389:8
**1/1/19**  8:10
408:15
**1:04**  236:13
**10**  9:17
229:19
264:18  323:8
324:6
**10/2/17**  7:15
350:8
**10:32**  146:12
352:2
**10:49**  146:19
**100**  21:6
365:6
**10th**  227:7, 13, 20

**11**  5:6  9:7
120:6  226:18
**11/16/18**  7:11
301:14
**11:42**  142:10
112  385:24
**11th**  295:4
**12**  108:13
244:3
**12/13/18**  7:8
294:20
**12:16**  236:6
**121**  368:24
**124**  5:23
**12th**  174:17
**13**  103:5
108:14  244:3
278:2  295:2
**132980**  350:4
**133**  14:23
15:14
**135**  6:6  47:19
**138**  141:19
**139**  135:13
**13th**  219:9
222:11
310:11  397:23
**14**  1:10  10:14
149  277:11
**15**  5:13
20:21, 24
225:10  406:2
**150**  359:6
**151**  298:10
**15219**  3:19
**153**  6:8
**159**  384:2
**15th**  49:2
364:3  377:11
**16**  396:24
415:18
**160**  249:21
**167**  6:10
**17**  17:24
398:9
**174**  6:12
**18**  17:24
**180**  6:14
**1875**  3:4
**18th**  221:10

**19**  17:24
**19-2875**  1:5
**19422**  2:21
**1970**  25:9
**1978**  25:10, 14
**1996**  26:6
398:20
**19th**  22:23

**< 2 >**
**2**  17:24
39:23  350:20
356:13
**2.1**  49:10
**2/1/17**  7:23
8:6  383:14
384:8
**2/15/19**  7:17
363:20
**2:06**  297:4
**2:24**  297:11
**2:49**  207:11
**2:58**  330:15
**20**  21:1
126:21  418:11
**200**  2:11, 20
365:7
**2008**  27:13
**2011**  27:1, 13
**2012**  26:20
27:20  103:5
108:5  110:11
112:18  113:4
114:13, 20
121:6  238:7,
18  240:6
242:8  243:2
244:1  245:6
248:11, 17
262:21
**2013**  114:20
221:10  245:6
262:21
**2015**  345:17
377:18  380:1
396:14, 24
398:9  403:1
**2016**  27:23
28:1  49:3
136:11

377:11
385:18  396:14
**2017**  28:17,
18  29:3
30:13  36:14
43:2  86:20
350:20  351:4,
22  374:20, 21
382:3  384:22
396:17, 20
**2018**  45:22
72:1  74:9
110:4  116:11,
19  118:15
120:4  121:22
122:4  125:7,
16  126:10
127:21
138:18  149:7
154:1, 7, 17
168:4  174:17
180:1, 21
183:9  185:3
187:7, 21
188:23
195:21
199:11
203:17
205:17
211:17  217:9
218:5  219:9
222:11
226:19  227:7,
13, 20  229:19
237:16
239:13
240:21, 22, 24
241:17
242:16
243:11
249:13
251:20, 23
257:16  258:1
261:7, 12
267:16
272:24
279:16, 22
280:18
281:21  282:8
284:9, 13
285:12  289:1,

20  292:10
295:2, 4
296:10, 12
299:20  300:6,
14  301:2, 19
303:18  304:2
305:8, 15
307:24  308:4,
19  310:11, 13
311:14  312:9,
10  318:24
319:3  320:20,
24  321:1
322:20
323:14
324:13
325:10, 15
326:22  327:8,
14  329:17
345:17  363:9
371:6  372:14,
19  373:8
374:1, 2
396:20
**2019**  312:1
317:17
332:22  333:9,
24  336:20
337:7  338:4,
9  340:21
364:3  396:21,
22  397:23
409:4  411:8
412:20
**2020**  30:16,
18, 19  31:8
32:14  337:5
**2021**  1:10
10:14  12:24
23:8  415:18
**20376**  135:23
**205**  6:16
**20519**  167:22
**20744**  180:7
**20853**  237:10
**20898**  226:10
**20th**  126:10
127:8  128:12,
19  129:6, 13
138:18
251:23  252:9,

Confidential Information Subject to Protective Order

12  253:7, 13
254:4  255:12
258:7, 14
259:20  303:4,
21
21  39:22
21073  218:18
211  368:6
218  6:18
22  5:15
221  365:8, 16
2220  3:12
226  6:20
230  3:11
237  6:22
246006
381:13  384:21
248  6:24
24th  23:8
2500  2:12
25th  86:20
154:17
302:24  303:5,
17
263-1840  3:19
26th  351:4
277  7:6
28  127:8
2875  1:3
28th  120:4
122:4  123:12
124:3  126:22
129:19  130:1,
7  133:11, 19
139:3  140:9
143:8, 14
144:20
145:13, 21
253:3, 20
303:6, 8
320:24
29  17:24
294  7:8
297  7:10

< 3 >
3  17:24
278:2, 4
362:8  367:1
404:14

3/27/19  7:21
381:18
3:02  207:14
3:02:49  207:13
3:08  330:22
3:56  375:7
30  17:24
21:14  246:8
365:6, 16
407:21
30(b)(6
378:21  396:6
300  3:4
301  7:12
30305  2:13
30th  140:3
31  18:1
31.2  264:18
267:22
312  3:13
32  264:21
320  249:21
328  7:14
3333  2:12
3343  3:5
350  7:16
363  7:18
37  368:6
376  7:20
381  7:22
383  7:24
384  8:6
38th  3:18
397  8:8
3rd  118:15
119:7  121:22
139:4  253:11

< 4 >
4  17:24  74:9
119:21
4.2  73:3
4.7  367:16
4:07  375:14
4:42  413:20
414:4
40  249:21
398:19  407:7
400799  397:15
408  8:10

412  3:19
413  9:7
414  418:3
415117
328:16  331:3
42637  276:23
42639  278:3
44  18:1
45  18:1
450  2:20
46  18:1
47  5:17  18:1
48  18:1
483  242:20,
23  243:14
333:19  336:19
49  17:11, 22
495102  124:24
4th  168:4

< 5 >
5  23:4, 21
73:19  88:6,
11, 12  141:17
5.1  54:3
88:16
5.1.2  54:6
55:5, 20
63:10  65:4
5.1.3  88:20
5.12  78:24
5.12.2  79:3
5.12.3  81:10,
16
5.2  50:8  59:6
73:19  77:2,
14  78:4, 19
90:6  136:19
5.2.2  50:14
61:15
5.2.3  51:24
90:7
5.2.3.3  52:3
5.2.3.6  52:9
5.2.4  52:14
96:24  136:23
5.2.4.1  97:4
50  18:1  21:6,
14  70:8, 21
389:11

504  2:5
524-5777  2:5
549865  249:7
553-2100  2:13
56  17:11, 23
566.4808  3:13
567-0700  2:21
57196  205:10
5th  154:1
180:21
190:22
203:16
299:19  300:6
310:13  321:1
322:20  325:9
326:21  327:7,
14

< 6 >
6/13/19  8:8
397:8
6/15/16  7:19
376:22
6/28  122:22
60  378:8, 10,
13, 15  416:16
60606  3:12
610  2:21
64409  174:2
65  378:8, 11,
13, 15
67084  294:15
67532  408:11
678  2:13
6th  72:11
125:6, 16
142:10
205:17
211:17
251:20
257:16  258:1
259:19

< 7 >
7/11/18  6:19
226:4
7/12/18  6:11
174:9
7/13/15  6:17
218:23

7/4/18  6:9
167:13
7/5/18  6:7, 13
153:14  180:11
7/6/18  5:22
6:15  124:14
205:4
7/8/18  6:21
237:5
7/9/18  6:23
249:2
7:39  168:13
701  2:4
70130  2:5
71  5:19
731926  298:5
73603  301:9

< 8 >
8  66:20
69:12, 14
71:1, 5  74:13,
24  75:11
76:6, 13
77:16  78:6
83:4, 17
90:18  95:17,
18  97:14
98:20  101:14,
18, 22  108:18
299:3, 8
332:22  333:9,
20  334:6, 10
335:10
336:18  337:8
338:12
340:11, 19
378:7
8/14/18  7:6
277:4
8:03  1:15
10:15
8:08  16:2
8:09  16:8
80  249:21
83812  376:17
83872  378:6
85  5:21
877.370.3377
1:23

**8th** 136:*11*
168:*18*
237:*16* 323:*13*

**< 9 >**
**9** 119:*23*
122:*4* 299:*17*
323:*8* 324:*6*
**9.6** 367:*16*
**9/16/16** 5:*16*
47:*12*
**9:15** 84:*14*
**9:28** 84:*21*
**917.591.5672**
1:*23*
**934333** 153:*10*
**96** 26:*14*
267:*20*
**9th** 249:*13*

**< A >**
**a.m** 1:*15*
10:*15* 16:*2, 8*
84:*14, 21*
146:*12, 19*
168:*13* 352:*2*
**abbreviated**
40:*8*
**ability** 90:*4*
273:*19*
274:*12* 415:*9*
**able** 16:*14*
18:*14, 16*
22:*13* 72:*3*
117:*24* 132:*5*
139:*5, 21, 23*
180:*17*
233:*14*
253:*13, 21*
295:*24*
312:*19*
313:*18*
314:*24*
315:*21* 316:*3*
317:*9* 326:*5*
355:*11*
**above-**
**specification**
324:*7*
**absence** 90:*24*
91:*5, 23*

117:*15*
157:*22*
191:*23* 273:*20*
**Absolutely**
59:*2* 60:*20*
257:*14* 408:*6*
**absorbed**
36:*20*
**accept** 77:*12*
335:*19*
**acceptable**
170:*19*
333:*10*
334:*10*
335:*10* 336:*6,*
*17* 341:*12, 13,*
*18* 342:*2*
343:*24* 388:*6*
390:*3, 9*
391:*18* 400:*5,*
*21* 406:*21*
407:*12*
**accepted**
164:*5* 406:*15*
**accepter** 72:*17*
**access** 15:*13*
72:*4* 183:*18,*
*19* 186:*14*
203:*22*
212:*11* 265:*15*
**accuracy** 87:*8*
387:*21*
**accurate**
121:*9* 223:*5,*
*17* 416:*20*
**achieve** 93:*15*
94:*4* 222:*15*
**achieving** 91:*1*
**acid** 201:*2*
**Acknowledged**
18:*17*
**ACKNOWLE**
**DGMENT**
418:*1*
**acquired**
35:*21* 44:*23*
345:*12*
**acquiring**
281:*10*
**acquisition**
35:*23*

**acronym**
399:*1*
**Act** 39:*22*
**Actavis** 2:*16*
36:*18* 37:*5*
42:*4, 15* 43:*7,*
*8, 18* 44:*15*
102:*11* 103:*3,*
*9* 107:*9*
110:*9* 111:*4,*
*15* 112:*18*
113:*17, 21*
114:*11* 240:*4,*
*9* 242:*7*
243:*2, 21, 23,*
*24* 245:*5, 16*
246:*12, 19, 21*
247:*12*
248:*19* 262:*12*
**Actavis's**
111:*13*
**acting** 69:*1*
185:*7*
**action** 11:*19*
34:*20* 127:*15*
178:*2* 193:*2*
314:*20*
318:*16*
411:*18*
415:*12, 14*
**actions**
132:*14*
192:*21* 199:*3*
261:*15*
293:*14, 15*
315:*3* 316:*20,*
*24* 317:*4, 7, 9,*
*13* 318:*6*
406:*4, 12, 20*
407:*1*
**active** 37:*21*
38:*9, 23*
113:*2* 210:*15*
334:*4, 13*
339:*20* 340:*9*
**actively** 313:*5*
**activities**
46:*20* 49:*6,*
*13* 50:*21*
60:*4, 9* 62:*24*
65:*6* 66:*2*

73:*11* 74:*7*
87:*6, 15*
90:*10* 91:*3*
92:*10* 93:*1*
96:*12* 132:*15*
151:*16, 23*
230:*4* 265:*17*
272:*10* 293:*4,*
*6* 324:*2*
339:*3* 346:*1*
355:*2* 373:*19*
411:*13, 16*
**activity** 52:*20*
57:*18* 65:*15*
67:*20* 68:*6*
89:*23* 95:*18*
98:*10* 222:*15,*
*17* 248:*15*
254:*11* 259:*6*
318:*22* 358:*15*
**actual** 48:*21*
174:*22*
206:*19* 208:*1,*
*8* 210:*8*
269:*12* 270:*4*
275:*12* 332:*5*
**add** 18:*3*
**addition**
390:*19*
**additional**
199:*4* 212:*19*
220:*21* 239:*8*
302:*9*
**address**
109:*23* 144:*1*
145:*8* 252:*2*
406:*5*
**addressed**
94:*24* 399:*5*
**addressing**
395:*18*
**adequate** 51:*3*
406:*15*
**adequately**
51:*11* 62:*3*
**adhere** 292:*18*
**adjourn**
413:*14*
**adjourned**
414:*4*

**adjustments**
45:*8*
**administer**
11:*5*

**Administration**
25:*24* 26:*5,*
*10* 39:*20*
117:*18*
**adopt** 42:*24*
246:*5*
**adopting**
160:*8* 161:*7*
**advance** 52:*4*
**adverse**
147:*20* 155:*8*
**affect** 88:*22*
98:*4*
**affirmatively**
191:*5* 196:*3*
**afford** 12:*11*
**agencies**
34:*17* 308:*22*
**agency** 119:*6,*
*7* 138:*23*
139:*1* 161:*16*
173:*7* 246:*5,*
*8* 254:*4* 311:*6*
**agency's**
242:*24*
**ago** 217:*3*
245:*11* 260:*3*
398:*19, 22*
**agree** 37:*21*
167:*1, 3*
201:*10, 24*
313:*8* 400:*1*
403:*6, 9*
404:*24*
**agreed** 10:*3,*
*24* 51:*17*
331:*9*
**Agreement**
5:*15* 21:*22*
22:*3, 9, 18, 21*
23:*3* 24:*20*
32:*2, 7, 12, 22*
54:*4, 10, 17*
55:*14* 56:*3*
57:*11, 13, 20*
63:*12, 15*

Confidential Information Subject to Protective Order

64:5, 13, 16, 20 65:12, 13, 20 66:1, 7, 11, 18, 22 67:4, 10 68:1, 10 69:11, 21 70:1, 13, 19, 23 71:2, 3 72:7 73:2 75:9 76:4, 12, 17, 23 77:2, 8, 11 78:10 83:3, 7, 16 84:1 90:11, 17, 24 91:6, 12, 18, 19, 24 92:5, 11, 21 93:6, 7, 9, 14, 18, 20, 24 94:6, 14 95:19 96:1 260:10, 11, 13 291:4, 16 325:20, 24 360:17 386:8, 14

**agreements** 72:16 73:6 385:24

**ahead** 24:4 65:1 135:4 137:8 208:21 228:4 233:5 241:14 322:20 354:20 384:18

**albeit** 129:23

**ALCOA** 85:12

**Alert** 7:10 116:15 117:5, 9 118:17, 21 119:1, 3 124:2 127:19, 22 128:12 129:7 130:6, 9 133:8 137:5, 14 138:22 139:7, 13, 17 140:8 253:18, 24 254:20

255:15, 21, 24 256:3, 9, 12 257:13 298:1, 8, 15 303:12

**alerts** 116:21 128:6 137:20, 22 138:12 254:17 257:9

**ALFANO** 3:14

**Allegations** 256:1

**all-encompassing** 102:1

**Allergan** 35:23 36:19 42:4, 14

**Allow** 137:6 270:21 276:14 286:22 293:23 359:12 366:3 378:11 399:13 403:20

**allowed** 389:15, 18

**Amanda** 1:16 2:19 63:22 75:18 415:1, 17

**ambiguity** 353:4

**Amended** 5:13 15:6 16:19

**Americas** 151:17

**amiss** 271:16

**amount** 32:3 255:16 265:3 317:3

**analyses** 228:7

**analysis** 18:11 46:17, 21 49:7, 12 96:13 161:10, 15 196:22 199:12 202:19 203:9, 10, 14 204:5,

16 206:6 208:16 228:19 306:18 391:16

**analysts** 399:12 400:13 401:1, 13, 20

**analytical** 111:24 112:1, 9, 11, 22 116:7, 9 214:11 215:17 216:1, 12, 16, 21 217:20, 22 219:11, 18 224:13, 22, 23 225:4 230:24 235:24 272:17 273:3 275:15 318:13 319:13 326:13 332:5 368:24 369:14 388:2 392:6 393:10 411:12

**analyze** 226:24 227:22 340:15

**analyzed** 206:15 207:21

**and/or** 49:12 415:21

**ANDA** 40:3, 7, 12, 18 41:8 111:1 115:16, 17, 20 116:5 247:17

**A-N-D-A** 40:7

**ANDAs** 41:4

**animal** 302:13

**animals** 166:18

**announcing** 172:17

**Answer** 9:5 12:10 13:1, 9 18:14, 16

59:14 62:17 68:19 69:18 70:17 74:18 75:15 92:16 94:20, 22 95:2 100:5 104:10 127:4 158:12 189:17 192:9 215:2, 3, 5 217:2 227:10 228:4 232:9 233:9, 13, 15 235:21 307:19 353:20 361:11 378:23 395:6 401:17, 19

**answered** 69:16 83:22 92:14 94:16 163:10 186:17 212:16 213:8 214:24 233:2 234:6, 22, 24 235:19 360:20

**answers** 12:5 169:23 418:4

**anybody** 14:3, 11

**APAC** 126:2

**apart** 37:2 248:19

**API** 37:20 38:6, 8, 22 43:19 49:24 50:4 53:4, 6, 9, 11, 15, 16 54:15 58:2, 7, 8, 9, 13, 20, 21, 24 59:9, 21 60:1, 17 61:4, 20 62:1, 6, 7, 10, 15, 20 63:5, 18 64:9 65:21 66:13, 20 67:15, 18 68:2, 24 69:13 71:1, 5,

10 74:14, 24 75:10 76:5 77:16 78:6 83:5, 19 88:4 89:14, 18 90:19 95:16 97:15 98:19, 24 99:12, 23 101:9, 14, 21 102:14 103:8 107:3 108:19 110:1 111:18 112:19 115:2 119:19 120:16, 21 121:6 123:13 126:16 130:15 131:21 132:20 133:10 134:16 140:4 142:22 143:13 144:14 145:15, 20 148:16 149:18 150:6 152:5, 10, 21 154:13 155:19 161:13 171:23 176:18, 22 177:7, 12, 14, 17, 22 178:13, 20 179:3, 4, 15 181:4, 10, 12 182:12 184:20 185:11, 15, 22, 23 186:3, 14 187:15, 21 188:8, 22 189:14 190:17, 23 191:1, 5, 19 192:3, 16 193:14, 15 194:1, 3, 6, 8 195:13 196:4,

Confidential Information Subject to Protective Order

11, 15, 17, 19,
20  197:16, 19,
24  198:7
199:12
201:12  202:1,
7, 13, 20
203:8, 18, 21
204:1, 8, 13,
17  206:2, 7
208:10
209:19, 20
210:7  211:2,
3  212:3, 12
213:3, 20
214:3, 6, 20
215:13
218:16
219:16
224:15
226:24
227:15, 22
229:7, 22
231:2, 3, 15,
23, 24  232:6,
15, 21  233:22,
23  234:3, 18
235:15, 16
238:2, 18
239:18
246:13
247:24
248:13, 18
252:1  258:15,
18  260:18
262:2, 7, 9
263:4  270:19
271:6, 17
273:13, 14, 18,
23  274:4, 9
275:19  276:2,
15  277:21
278:14, 21
279:7, 10, 17,
23  280:8
281:16, 22
282:7, 23
283:19, 20
284:10, 15
285:8  286:17
287:9, 14, 21
288:4, 16

289:3, 22
290:9  291:6,
19  292:2, 12,
17, 23  296:11
298:20  300:2,
11, 12  302:19
304:15
305:20
306:14
307:17
309:21
310:10
312:20
315:23
320:12  321:3
322:21
323:13, 16
324:5  325:17
326:17
327:22  328:7,
8, 11  329:10
331:12, 22
332:7  335:3
337:15
339:14
341:12  344:8
345:10, 23
346:16, 19
347:1, 7, 13,
18  348:6, 13
351:11
354:11  357:1
360:16
362:11
364:13, 19, 24
365:14
367:22  368:5
369:11, 14, 15
373:11
375:20
376:11  379:9,
15  380:9, 18
394:18  410:13
APIs  73:24
148:3  177:19
181:9  202:24
220:11  231:7,
13  281:4, 7
304:9  323:21
326:14  388:3
394:9

apologies
80:20  142:6
151:7  169:18
206:22
329:21, 22
apologize
151:9  341:5
383:4
apparent
123:18
apparently
192:2
appear  404:6
APPEARANC
ES  2:1  3:1
4:1  11:2
appearing
10:23
appears
118:16  125:4
128:20  136:4
153:23  168:2
180:19
249:12
259:12  329:3
332:1  350:16
352:20  398:4
appendices
79:5  81:13
applicable
45:23  73:12,
13  134:9
191:14  351:7
358:6  395:8
application
40:5, 8  120:2
applied  49:10
229:21  268:19
APPLIES  1:7
56:20  87:22
352:23
apply  50:2
135:10  353:5,
6  394:20
415:20
applying
320:16
appreciate
81:6  84:11
246:23  247:9

366:5, 7
372:10
approach
86:24  185:8
197:15
210:19  212:9
259:2  274:9
275:21  340:1
372:11  373:23
approaches
339:10
appropriate
61:21  72:23
89:19  137:4
276:3, 5
388:8  400:3
401:7  416:6
appropriately
392:22
appropriatenes
s  41:23
approval  56:8
246:4  400:3
approve  75:8
76:3
approved
54:9, 16, 24
55:13, 23
56:7  57:1
73:20  79:4
80:4  81:11
112:3, 4
235:13  331:18
approving
117:4
approximately
19:23  20:17
21:2  31:8
32:10  365:16
APRIL  1:10
10:14  26:24
31:8  415:18
area  404:6
areas  37:10
87:9  359:13
371:24
Argumentative
93:11  94:17
213:9  254:8
255:6  266:15

309:5  314:1
arising  202:11
arrangement
30:2  74:11
arrival  375:2
377:22
arrived  385:8
aruggieri@c-
wlaw.com
2:22
ascertain  90:3
Asia-Pacific
144:7
aside  114:9
176:13  382:24
Asked  69:16
83:22  92:14
94:16  163:10
164:7  186:17
203:7  204:16
212:16  213:8
214:24  233:2
234:6, 22
235:19
282:10
306:13, 18
307:15
321:18
326:11, 24
327:11  331:8
360:20  362:2
asking  11:19
12:3  18:24
44:13  56:18
65:7  78:18
92:7  103:21
160:13
164:17  184:7
196:11
289:16, 18
307:9, 11
308:22
312:23  321:2
323:19
325:15  338:14
asks  238:5
aspect  252:16
aspects  251:16
assay  292:13,
22  293:17
379:14

Confidential Information Subject to Protective Order

assess 314:*12* 316:*19* 345:*2* 358:*21*
assessed 34:*22* 57:*3* 405:*6*
assessing 201:*17* 358:*8*
Assessment 7:*13* 87:*14* 91:*2* 147:*12, 15, 17* 148:*2, 16* 149:*12* 150:*1, 5, 17* 154:*11* 159:*10, 18, 23* 160:*19, 21* 162:*16* 165:*23* 166:*5* 170:*12, 18, 21, 22* 171:*16, 23* 172:*7* 175:*11* 241:*24* 249:*20* 250:*1, 6* 263:*10, 15* 264:*12* 268:*2, 7, 23* 269:*10, 22* 270:*5* 290:*8, 12* 291:*24* 317:*6* 319:*9, 20* 328:*20* 329:*4* 331:*4* 335:*6* 337:*1* 338:*3* 344:*2* 355:*4*
assessments 149:*16* 203:*14*
assigned 185:*14*
assist 296:*24* 370:*24*
associate 126:*1* 144:*10*
associated 63:*1* 79:*5* 91:*3* 117:*13* 130:*11* 195:*11* 251:*16* 392:*5* 411:*5, 13, 15*

assume 12:*19* 282:*18* 332:*13*
assumed 121:*12* 337:*13*
assurance 50:*15* 79:*16, 20* 80:*2, 7* 111:*9* 282:*13*
assure 73:*12* 228:*8* 407:*5*
Atlanta 2:*13*
attach 398:*4*
attached 48:*13* 96:*10* 176:*4* 206:*13* 207:*19* 351:*4* 367:*3* 368:*10* 416:*12* 418:*6*
attaches 118:*16* 331:*16* 364:*9*
attaching 47:*23* 174:*17* 249:*14* 350:*23* 377:*11* 385:*15*
attachment 48:*22* 205:*21* 356:*7, 13* 411:*21* 413:*1*
attachments 364:*2* 398:*9*
attempt 12:*17* 14:*19*
attempts 40:*18*
attending 318:*20*
attention 395:*21*
attorney 11:*18* 12:*23* 415:*11, 13* 416:*16*
attributes 354:*9*
atypical 390:*20* 391:*9*
audit 34:*6* 45:*1* 89:*22, 23* 93:*21* 107:*19* 108:*8,

11, 16* 243:*15, 21, 23* 244:*1, 6, 14, 18* 245:*5* 262:*11, 20* 263:*2* 289:*8* 290:*1* 293:*2* 311:*10, 13, 17* 312:*13, 16, 20* 313:*6, 20* 314:*3, 10* 315:*5, 24* 316:*14, 18, 24* 317:*18* 318:*2, 4, 21* 332:*21* 333:*1, 9* 334:*9* 335:*16* 338:*4, 9, 21* 339:*8, 12* 340:*11* 341:*11* 343:*8* 344:*7, 11* 345:*16* 346:*8, 14, 19* 347:*4* 371:*4, 12, 15* 372:*14, 18* 373:*8* 374:*6, 16, 24* 377:*12, 16, 17, 24* 380:*15* 385:*12, 16, 18* 391:*8, 14* 392:*4, 16, 20* 393:*2, 6, 8, 17, 21* 394:*23* 398:*3, 5* 410:*17* 411:*2, 24*
audited 57:*3* 345:*8, 22* 374:*1, 12, 13*
auditor 293:*11* 338:*15* 339:*1, 2* 340:*2, 16* 343:*21, 22* 344:*1* 348:*2* 380:*19* 390:*7*
auditors 34:*8* 107:*20* 290:*1* 293:*3* 317:*2* 341:*20*

371:*23* 374:*12, 13* 379:*6* 385:*3* 409:*19* 411:*2, 8*
audits 34:*10* 90:*12* 315:*9, 13, 16* 337:*15* 347:*16* 371:*18, 21* 372:*9* 374:*22* 385:*14* 396:*12*
August 27:*12* 279:*16, 22* 280:*18* 281:*21* 282:*7* 283:*16, 17* 284:*9, 13* 285:*12* 301:*1* 302:*8, 18* 304:*2* 305:*8, 15* 307:*24* 308:*4, 13, 19* 312:*9* 318:*24* 319:*3* 324:*13* 325:*15* 351:*4* 409:*4* 412:*20*
Aurobindo 2:*23*
Aurolife 2:*23*
authorities 112:*3, 5* 126:*9* 156:*4* 159:*21* 161:*4, 9, 18* 162:*2, 24* 163:*3* 175:*19* 270:*24* 279:*7* 302:*1* 303:*24*
authority 89:*4* 309:*13*
authorization 52:*11* 53:*19*
authorized 112:*2*
availability 217:*21* 315:*23*
available 79:*4* 162:*3* 181:*13* 199:*2* 214:*16*

258:*11* 312:*21* 391:*14*
Avoid 52:*9* 118:*5*
avoided 400:*7*
aware 44:*14* 69:*10* 71:*13* 76:*21* 97:*11* 102:*10, 17* 107:*2, 4* 108:*15, 17* 109:*1, 2, 4, 5, 7* 110:*5, 8* 112:*17* 114:*10, 16, 19, 22* 115:*4* 119:*3* 122:*5, 7, 10, 24* 126:*12, 21, 23* 127:*14* 128:*18* 129:*5, 24* 130:*11, 14, 19, 21* 145:*12, 17, 18* 149:*17* 157:*19* 239:*5, 23* 240:*2, 4* 248:*9, 20* 258:*16* 281:*9* 289:*19* 300:*4, 23* 303:*23* 305:*14* 310:*12* 321:*1* 324:*20* 325:*13* 327:*2* 333:*18* 335:*8* 336:*18* 338:*2* 339:*21* 340:*20* 345:*7* 346:*12, 17, 18, 21, 22* 347:*2, 3, 8, 9, 10, 14, 15, 20* 348:*3, 4, 8* 349:*1, 2, 4, 15, 19* 359:*18* 370:*13* 371:*3* 395:*11* 396:*12* 399:*8* 402:*18* 405:*16* 406:*7*

< B >

**Bachelor's** 25:4, 13
**Back** 16:8, 11 30:21 43:15 48:1 55:2 63:9, 23 77:17 84:21, 23 96:2 97:19 141:13 146:19, 22 156:15 223:10 236:13, 16 242:8 243:10 247:1 252:13 261:12 262:20 280:6 281:2 297:11, 14 300:17 306:6 317:7 320:11 324:13 325:15 330:22 345:15 370:22 374:24 375:14 384:12 413:12
**background** 25:1
**bad** 400:20
**Baeder** 6:24 249:3
**Barak** 6:8 153:15
**Bard** 26:24 27:4, 11, 12
**BARRETO** 1:15 5:3 6:9, 11, 13, 19, 21 7:8, 12, 16, 22 10:21 11:7, 14 15:11 16:11 17:18, 23 18:13, 20 84:23 91:10 105:21 106:18, 23

146:22 159:15 167:14 174:9 180:11 225:22 226:4 237:6 259:8 284:8 289:17 294:20 297:14 301:15 308:19 318:7 331:1 350:9 375:17 381:19 408:5 413:15 415:5 418:8
**based** 121:11 132:6 140:24 145:9 161:24 162:11 173:3 177:8 181:18 182:20 185:6 192:13, 17, 22 194:22, 24 195:10 212:18 235:1 255:19, 22 261:15 273:12 278:24 279:5 302:13 309:7, 9, 10 313:12 328:6 338:15 342:10 344:1, 4, 23 387:14 389:21 407:6
**basically** 30:1, 19
**basis** 38:11 105:19 210:21 243:9 352:20 353:18 354:7, 14, 17 357:11, 21 358:22 359:23 361:1 402:19
**batch** 388:2 390:2
**Batches** 180:22

181:17 182:2, 9 209:12 227:15 231:15 232:16 323:8 324:6 364:24 369:1 370:1 379:15
**Bates** 5:10 15:6 47:7 71:17 86:6 124:23 135:22 153:9 167:22 174:2 180:7 205:9 218:18 226:10 237:10 249:7 250:19 263:22 276:23 278:2 294:14 298:4 301:9 328:16 350:4 376:17 378:8 381:13 384:20 397:15 408:11
**bear** 14:20 60:7
**bearing** 16:12
**becoming** 42:23 240:4
**began** 30:12
**beginning** 26:20 86:6 137:23 153:10 382:8
**begins** 207:1 379:1
**behalf** 14:16 17:9 19:14 20:1 51:11 56:19 246:22 261:4
**belief** 223:4 280:13
**believe** 14:22 17:13 22:3 23:22 38:1 45:22 62:6 94:18 107:6

113:5 191:22 211:22 212:1 223:15, 22 240:23 249:24 310:8 371:9
**believed** 223:16 286:14
**Bell** 2:21
**bells** 150:19
**belongs** 60:6
**benefit** 318:3
**best** 30:7 90:3 132:6 145:10 176:11 223:13 239:6 243:7 275:10 336:3 344:2 415:9
**better** 271:17 318:4 332:14 361:11 377:6 403:20
**beyond** 352:11
**big** 88:12
**binding** 54:9, 16 55:14 56:3 57:10 63:11 64:19 65:11 73:6
**Binsol** 18:5, 16 332:14 361:10, 17 370:24
**Binsol's** 370:21
**biology** 25:4, 13
**biostatistics** 159:6
**Birk** 382:13, 18
**bit** 42:3 96:23 109:17 116:11 269:5 355:24 359:1 382:21 410:11
**block** 126:1
**Blue** 2:21
**Boca** 3:5

**bodies** 319:18, 24
**body** 48:12 319:14
**bold** 190:8 207:2
**BOSICK** 3:14
**boss** 173:3 239:14 243:10
**bottom** 219:16 302:7 352:1 382:7
**Boulevard** 3:4
**bound** 248:7
**Box** 120:6 122:3 299:3, 8, 16
**breach** 67:4
**break** 13:5, 7, 10 54:20 81:9 84:6, 7 146:5, 9 147:2, 6 225:11, 17 233:7 236:18 296:22 331:2 375:5
**brief** 16:4 84:17 146:15 297:7 330:18 375:10
**briefly** 24:23 29:5
**bring** 252:16 253:21
**bringing** 253:2
**broader** 341:8
**building** 355:8
**Bulgaria** 221:19 364:18
**bullet** 238:17, 22 240:12
**burning** 308:17
**business** 23:19 28:23 29:7 30:11, 22 137:3 342:3
**butt** 244:21
**button** 383:3

Confidential Information Subject to Protective Order

buying 193:24 196:18 198:1 335:11
by-product 201:7

< C >
C.V 27:7
C.whiteley@kanner-law.com 2:6
CAC 178:1
calculations 268:18
call 26:8, 9 43:24 132:23 142:1 178:1 200:18 307:7 359:13
called 33:14 34:13, 19 38:1 39:8, 22 85:12 101:11 102:21 109:8 147:9 247:23 251:1
calling 268:7
Calls 324:17
Camp 2:4
canceled 329:14
cancer 156:2, 5, 12, 23 157:6, 12, 17 158:3 160:23 161:12 162:17 163:7, 15 164:21 165:11
capabilities 57:4 214:18 218:8 230:18 340:4 355:5
capture 182:24
carcinogen 120:17 141:11 142:15, 21 166:7, 9, 11, 12 167:2

171:11, 17, 21 173:16, 19 176:5, 10 269:3, 11, 13, 24 270:6, 11 302:13
carcinogenic 157:13 166:21 167:4, 7 263:9 264:12
carefully 416:4
Carlo 209:11
carries 202:7
case 22:23 23:15 31:21 32:8 39:19 46:8 67:11 78:11 90:2 91:23 92:6, 19 98:9 119:2 134:10 155:15 159:12 161:9 183:6 194:15 240:9 251:12 256:7 258:22 282:23 294:4 296:7 301:5 304:14 316:18 317:20 332:1 335:21, 22 339:5 360:4 362:9 389:21 391:24 394:4
case-by-case 352:20 353:18 354:7, 14, 17 357:11, 21 358:22 359:23 361:1
CASES 1:8 352:22
categories 169:11 170:6, 9 171:1
categorized 176:9
caught 338:11

cause 105:17, 19 106:10 155:8 242:3 272:1
caused 201:8 340:7
CBE 246:8
cease 340:18
center 183:2, 16, 20 184:9 188:11 299:15
centers 182:19 184:11, 16 299:11
central 183:24 184:5 186:20
centralized 186:13
Centre 3:18
CEO 31:5
CEP 206:14 207:20
certain 14:16 32:3 40:16 41:9 42:4 63:16 64:6 94:1 117:15 139:9 145:4 177:19 200:3, 11, 12 204:20 220:18 228:19 256:2 268:17 274:10 282:13 285:2 308:11 313:14 328:2 338:17 340:15 357:18
Certainly 33:21 217:8 230:22 275:9
Certificate 358:1 415:1
certification 10:4 61:11 177:19 178:10 183:22

196:10 197:15 208:19 279:2 282:10 286:12 306:20 321:6, 9, 13 415:20
certifications 191:18
Certified 1:17 415:1, 17
certify 112:10 224:2 415:4, 6, 11 418:3
certifying 415:22
cetera 196:20 222:9 271:12 356:21
CFR 39:22
CGMP 39:8 51:2 57:6 61:21
chain 122:17 123:15 125:5 129:11, 17 131:2, 4, 18 132:3 133:16 145:24 153:24 154:9 168:3, 7 169:21 178:5, 15, 19 179:6 180:20 181:2 184:14 187:5 205:15 211:8 219:10 237:16 294:24 409:2
challenge 268:11
challenged 230:12 231:4 344:4
challenges 193:22
change 31:14 52:15, 18, 19, 22 53:1, 3, 5, 7, 10, 12, 17, 20, 21 96:24

97:5, 11 98:1, 11 99:16 100:9, 15, 20 101:21 102:5, 19 103:2 105:7, 11, 14 106:5, 24 107:7, 12, 13, 23 108:15 109:3, 8, 10 110:11 111:14 112:19 113:23 114:13, 20, 24 115:7 199:2 238:6, 12 239:2, 17, 23 241:2 242:7 243:1, 17 244:7, 11 245:3, 15, 17, 20, 23 246:6, 9 248:11, 13 262:13, 21 336:16 400:14 405:2, 5
CHANGE/REASON 417:3
changed 200:3 265:23 266:21 344:4 401:21
changes 52:4 80:10 98:3 102:13 103:7, 15 104:5, 12, 19 106:1, 15, 17 107:3, 5 108:18 109:2 110:6 416:11 418:5
changing 194:14
characteristics 354:8 357:23
characterize 316:16
charm 384:3

Confidential Information Subject to Protective Order

chart 331:16
356:6 357:5
368:18
chat 15:1, 16
Cheasty 7:20
376:22
check 82:10
224:19
296:13
311:21 312:3
328:14
340:22 341:4
chemical 38:9,
22 257:11
Chicago 3:12
China 374:11
Chinese
374:12
chloride
102:22
103:21 107:1,
14, 24 110:13
113:24
114:14 115:1,
8 239:3
248:13 262:14
choose 66:6
77:12
chosen 313:2
CHP 258:23
chromatogram
394:24 401:22
chromatogram
s 292:22
295:9, 22
399:14, 19
400:2, 17
chromatograph
ic 379:16
393:9, 18
chromatograph
y 111:16, 21
114:11 115:5
215:22 216:6
217:10
219:22 221:3
222:23
224:24
226:22
227:16
247:24 248:4,

12 292:13
293:17 379:8,
23 380:2, 17
chronology
109:16
CIPRIANI
2:19
circulated
411:22, 24
circumstances
29:23 31:11
131:14 318:8
City 13:16, 23
14:1, 9 20:23
33:14
CIVIL 1:5
claim 158:2
Claire 178:18
191:10 251:6
clarification
58:5 158:16
198:10 360:7,
9
clarifications
359:16
clarifies
379:24
clarify 37:11
57:17 65:3
67:8 91:15
108:24
127:20
157:21 244:5
266:20
clarifying
230:3
clarity 355:16
359:1
Class 152:23
153:1 155:2,
5, 17
classic 156:17
classification
336:17
classifications
152:14 154:22
classified
245:22
302:12
354:13

359:22
360:24 407:11
classify 387:14
classifying
173:18
cleaning 293:5
clear 68:21
104:2 117:7
164:2 182:8
266:2 318:3
355:21 386:7
clearer 143:23
clearly 62:10
68:18 256:3
372:3
clicked 383:2
client 372:5
clinical 87:19
351:8
clone 40:19
closed 405:7
closure 245:21
code 185:14
189:7, 14
357:4
codes 189:1, 3
298:24
collect 123:4
collected 119:4
college 26:1
come 166:5
200:24 313:6
316:13 317:7
comes 117:11
189:8 202:13
271:15
282:24 355:10
comfortable
196:13
285:20 406:9
coming 34:17
159:15
201:19 223:11

commencement
415:4
commencing
1:15
Comment
278:6

commenting
156:10 278:13
comments
154:19
155:23
174:17 278:1,
10
commercial
126:2, 20
144:11, 24
145:2 351:8
379:14
commission
418:11
commitment
324:24
commitments
386:4
committee
34:20 178:2
common
288:7 348:17
391:16
Commonwealt
h 1:19
communicate
132:5 173:6
287:5 326:5
communicated
133:2 177:17

communicating
121:1 178:13
179:14, 19
237:24

communication
45:6 73:9
107:17
121:19
122:16
127:10 143:3
162:23
175:18 195:3
283:13
312:17
313:10 323:18
communication
s 129:12
150:3, 10
177:22

195:19
237:22 311:7
346:23
companies
26:18 28:12
45:13 70:3
85:10 203:5
208:14 271:6
291:10
company 28:8
31:15, 17
43:2 45:2
49:19 56:18
69:3 117:11,
16 203:4
282:2 291:11
316:22
336:11, 12
341:10 343:2
351:20 375:2
compensated
23:13, 16, 17
24:13
compensation
23:22 31:23
32:4, 6, 11, 21
competency
51:5
competent
270:23
competition
291:14
compiled
299:8
compiling
253:22
complaint
134:8 147:24
complete
65:11 100:19
139:11
225:15
313:14 391:16
completed
137:2 139:16,
19 246:10
completely
322:4 334:16
completeness
87:7

complex
311:*5* 313:*11*
compliance
33:*3*, *20*
60:*10* 73:*12*
131:*11*
151:*19*, *22*
178:*1* 228:*21*
376:*1*, *4*
comply 89:*3*
344:*10*, *18*
402:*14*
components
344:*17*
composition
102:*6* 257:*11*
Compound
127:*2* 309:*5*
comprehensive
80:*14*
Computer
392:*5* 395:*1*
computerized
183:*4* 393:*11*
concentrate
273:*22* 275:*19*
concentration
202:*6* 273:*16*,
*24* 367:*22*
concentrations
274:*6* 275:*11*
309:*24*
concept 56:*13*
139:*24*
concern
111:*22*
192:*17*
265:*14*
289:*11*, *17*
310:*23* 348:*23*
concerned
128:*24*
140:*22*
163:*19*
166:*23* 333:*14*
concerning
46:*16* 69:*12*
70:*23* 85:*2*
96:*11* 103:*7*,
*20* 108:*19*
110:*4* 111:*13*

116:*16*, *20*
118:*22*
127:*18*, *22*
134:*23*
138:*10* 147:*1*
149:*15* 152:*4*
154:*13*
172:*22*
173:*10*
200:*14* 238:*2*
242:*23*
258:*19*
260:*15*
294:*12*
307:*16*, *24*
316:*14*
334:*19* 337:*7*
346:*24* 347:*5*
360:*10*
372:*13* 381:*1*
394:*11*, *23*
412:*11*
concerns
140:*23* 161:*6*
349:*10*, *16*, *20*
353:*3* 355:*15*
372:*4* 406:*5*
412:*16*
concluded
391:*15* 403:*4*
concludes
170:*11* 370:*5*
concluding
264:*16*
conclusion
156:*1* 159:*17*
160:*6*, *7*, *8*, *17*,
*18* 162:*15*
164:*6* 223:*12*
263:*16*
267:*15*
269:*23* 270:*5*
309:*8* 368:*21*,
*23* 369:*13*
conclusions
274:*4* 293:*13*
conclusively
342:*24*
conditions
30:*4* 51:*3*
53:*22* 57:*6*

61:*21* 92:*4*
134:*20* 182:*8*
200:*4* 204:*9*
218:*12*
276:*14* 285:*3*,
*4* 308:*11*
316:*2* 326:*3*
389:*17* 400:*15*
conduct 93:*21*
204:*7* 210:*8*
217:*17*
312:*12*
313:*19* 315:*9*
316:*13*
317:*17* 326:*6*
346:*13*
conducted
110:*20*
111:*16*, *20*
162:*8* 166:*18*
246:*12*, *16*
279:*6* 296:*10*
314:*10* 371:*4*,
*9* 374:*22*
377:*17*
conducting
211:*4* 235:*16*
312:*22* 318:*4*
347:*4*
CONFIDENTI
AL 1:*11*
confines
143:*18*
confirm
112:*10* 191:*22*
confirmation
285:*18*
confirmed
83:*24* 223:*24*
224:*6* 231:*21*
242:*1*, *2*
279:*11* 281:*5*
284:*1* 362:*12*
confirming
51:*1* 302:*16*
401:*15*
Conflating
64:*23*
conflict 359:*4*,
*14*

confused
383:*6*
confusing
62:*13*, *14*
223:*21*
CONLEE 2:*3*
connection
23:*23* 317:*18*
346:*15*
consequences
155:*9*
conservative
185:*8*
consider
228:*13*
352:*19*
353:*18*
357:*11*
359:*23*
360:*24* 387:*15*
consideration
336:*2*
considerations
78:*12* 291:*13*
considered
40:*19* 121:*5*
335:*10* 336:*6*
consistency
87:*7*
consistent
149:*23* 155:*3*,
*12* 178:*6*
367:*19* 369:*8*,
*21* 386:*12*
391:*21*
consistently
312:*23*
Constance
118:*14* 174:*16*
constant
312:*17* 313:*9*
Consultants
28:*3*, *6*, *7*
29:*19*, *24*
Consulting
5:*15* 21:*21*
22:*9*, *17*
24:*20* 28:*9*,
*17*, *21* 29:*11*
30:*11*, *22*
31:*2*, *5*

consumers
255:*3*
contact 77:*6*
117:*2* 178:*7*,
*22* 179:*2*, *24*
184:*9* 201:*1*
303:*5*, *6*
310:*16*
contacted
19:*13*, *19*
195:*24* 299:*24*
contacting
178:*20* 320:*2*
contacts
221:*15*
contain 152:*5*
280:*24*
contained
152:*20*
176:*17* 177:*7*
285:*9* 305:*6*
containing
156:*21* 157:*4*
161:*13* 211:*3*
214:*4*, *7*, *21*
215:*14*
233:*22*
234:*18*
235:*15* 281:*23*
contamination
133:*10*
144:*20*
145:*16*, *21*
172:*18*
201:*11* 202:*1*
208:*11* 213:*5*
238:*3* 297:*17*
300:*24* 304:*9*
305:*15* 312:*8*
320:*4* 329:*16*
410:*7*, *8*
412:*12*
content
364:*12* 367:*5*
context 99:*22*
158:*7* 402:*10*
continue
31:*23* 198:*21*
211:*14* 212:*9*
213:*12*
265:*18* 272:*3*

286:*22* 287:*2* 312:*24* 314:*15* 407:*12* **Continued** 3:*1* 4:*1* 287:*5* 310:*22* 320:*6, 9* 322:*11* 406:*16, 18* **continuing** 314:*20* **continuous** 402:*19* **contract** 30:*18* 46:*16* 49:*6, 11, 18* 50:*9, 21* 51:*1* 54:*3, 7, 14* 55:*11* 56:*12, 16, 21* 57:*14, 17, 21* 58:*15* 59:*1, 8, 22* 60:*18* 61:*16, 19* 62:*1, 7, 14* 64:*20* 65:*5, 8* 67:*11, 19* 69:*2, 7* 72:*17, 18* 74:*4* 96:*12* 97:*18, 23* 98:*7* 99:*9, 20* 100:*17* 331:*18* **contracted** 74:*6* 87:*16* **contractor** 51:*12, 21* 55:*23* 56:*2, 7* 91:*4, 13, 21* 94:*14* 97:*7* 98:*4, 13* 99:*4, 8, 10, 11, 17, 21* 100:*17* **contractors** 54:*8* 55:*12* 87:*24* 88:*3* 89:*10* 101:*18* **contracts** 58:*6* **contractual** 63:*17* 64:*7* **contradictory** 44:*17*

**contributor** 321:*20* **control** 52:*15, 18, 19* 53:*3, 7, 13, 21* 96:*24* 97:*5, 12* 98:*1, 11* 99:*16* 100:*9, 16, 20* 244:*8, 11* 245:*3, 15, 17, 20* 246:*10* 248:*11* 387:*20* 394:*11* 404:*16, 18* 405:*6* 415:*21* **controlled** 90:*11* 92:*11* 93:*8* 95:*19* 98:*12* 171:*12* **controls** 50:*16* 51:*21* 405:*2* **convey** 161:*16* 163:*1* **conveyed** 163:*2* **copied** 125:*9* 164:*2* **copies** 413:*3* **copy** 206:*13* 207:*20* 377:*11* **copying** 205:*18* **core** 355:*2* **Corey** 154:*1* 169:*17, 22* 178:*17* 191:*10* 205:*16* **Corp** 76:*15* 350:*24* **Corp-0046** 47:*24* 48:*15* **CORP-0092** 6:*6* 135:*17* **CORP-0175** 5:*19* 71:*23* **Corp-0896** 5:*21* 86:*2* **Corporate** 3:*4* 5:*18, 20* 14:*15* 17:*8*

34:*1* 42:*6* 43:*3* 47:*24* 48:*14* 54:*2* 64:*18* 67:*6* 71:*22* 79:*21* 86:*1, 12* 89:*16* 96:*9, 11* 107:*20* 117:*2* 127:*22* 129:*5* 136:*5* 178:*2* 189:*9* 256:*13* 307:*5, 12* **correct** 14:*17* 16:*17* 17:*11, 12, 14, 15, 19* 18:*2* 20:*12* 21:*20* 23:*1, 9* 24:*1, 12, 18* 25:*6, 20* 26:*15, 22* 27:*2, 6, 21* 28:*4, 19* 29:*1, 4* 30:*14, 24* 31:*3, 6, 9* 32:*15, 18* 33:*5, 9* 35:*12, 18* 38:*3, 21* 39:*1, 7, 10* 40:*6, 9* 41:*1, 2, 7, 10, 11* 42:*1, 13* 49:*4, 8, 15, 22* 50:*1, 5, 6, 22, 23* 51:*6, 7, 12, 13, 19, 22, 23* 52:*1, 7, 12, 13, 17* 53:*8, 13, 14* 54:*11, 17* 55:*21, 24* 56:*4, 5* 57:*15* 59:*3* 61:*1* 62:*3, 4* 63:*19* 64:*10, 13, 21* 67:*1* 70:*11* 72:*9, 20, 24* 74:*8* 75:*1, 2, 11* 76:*6* 77:*3* 78:*21, 22* 79:*7* 81:*17, 19* 83:*1, 20*

85:*15, 17, 18* 86:*14, 21* 87:*9* 88:*1, 2, 4, 5, 17* 89:*12, 15, 21* 90:*5, 13, 21* 92:*12* 93:*9* 99:*1, 2, 7, 23* 101:*15* 104:*15, 16, 17* 108:*9* 109:*21* 110:*2* 114:*1, 8* 115:*15, 18, 19, 23, 24* 116:*6, 18* 119:*11, 15* 120:*7, 14* 121:*3, 24* 124:*6* 125:*12, 22, 23* 127:*24* 128:*1, 9* 129:*14, 15, 20* 130:*1, 2* 133:*12* 135:*1, 2, 11* 136:*8, 9, 12* 137:*17, 18, 24* 138:*14, 19* 139:*8, 17* 141:*20* 142:*11* 143:*8, 9* 144:*12* 147:*13* 148:*4* 149:*1, 19* 150:*2, 14* 152:*6, 7, 11, 12, 16* 155:*9, 14, 21* 156:*14* 160:*2, 9* 164:*24* 165:*14, 17* 166:*11* 169:*6, 24* 175:*12* 176:*1, 18* 182:*6* 184:*12* 186:*1* 188:*24* 190:*12, 20, 21* 192:*4, 5* 194:*9* 195:*22* 197:*20, 21* 198:*1, 2, 7* 200:*16* 202:*3, 4, 21* 207:*13*

209:*16* 213:*6, 22* 214:*22* 218:*5* 219:*19, 24* 220:*3* 221:*20, 23, 24* 222:*24* 227:*2, 17, 18, 23* 229:*23* 235:*8, 17* 238:*14, 23* 240:*20, 22* 241:*4* 245:*24* 246:*15* 247:*20, 21* 248:*2, 5, 6* 251:*8, 21* 252:*11, 20* 254:*18* 259:*21* 261:*24* 262:*22* 263:*5, 6* 267:*10, 12* 271:*2, 9* 273:*10* 277:*13* 281:*24* 282:*4* 283:*4, 11* 284:*12, 17* 286:*10* 291:*7* 294:*2* 298:*10* 299:*5, 21* 300:*3, 15, 16* 301:*4* 302:*11, 15* 304:*11* 305:*10* 306:*1* 308:*1, 2* 309:*22* 310:*8* 311:*12* 315:*13, 14* 316:*9, 10* 317:*13* 319:*8* 320:*22* 321:*11* 323:*10, 11* 324:*9* 325:*11* 326:*3* 333:*11, 12, 17* 334:*15* 337:*12* 339:*16* 349:*3* 357:*3* 360:*18* 361:*8* 362:*8* 365:*2, 12, 18*

366:*18, 21*
367:2, *12, 18*
368:*8, 22*
369:*12, 20*
370:*4, 8*
372:*20*
375:*23*  377:*7, 23*  385:*10*
386:*16*
387:*11*  390:*5, 11*  391:*12*
392:*1, 22*
393:*19, 20*
394:*2, 13*
395:*12*
398:*12*  399:*7*
401:*18*
402:*17*
403:*17*  405:*3, 15*  407:*16*
409:*11, 16*
410:*14, 15*
412:*7*  418:*4*
**corrected**
239:*9*  395:*24*
396:*3*
**corrections**
416:*5, 7*  418:*5*
**corrective**
132:*14*
293:*14, 15*
315:*3*  316:*20, 23*  317:*4, 6, 8, 13*  318:*6, 16*
406:*4, 11, 20*
407:*1*
**correctly**
55:*16*  121:*2*
207:*18*
**correlation**
147:*23*  166:*19*
**counsel** 10:*3*
17:*10*  18:*4, 18, 24*  19:*19*
20:*1, 10, 19*
21:*12*  22:*22*
96:*16*  103:*18*
104:*18*  105:*5*
106:*21*  118:*4*
147:*1, 5*
199:*6*  225:*19*

233:*18*
236:*22*
244:*24*  322:*9*
329:*23*
332:*13*  350:*1*
366:*4, 8*
377:*7*  383:*24*
400:*24*
401:*15*
413:*15*
415:*12, 13*
**counsel's**
13:*24*
**couple**  20:*22, 23*  28:*23*
29:*7*  30:*12*
40:*1*  48:*21*
125:*10*
155:*23*
225:*20*  241:*7*
260:*3*  364:*6*
**course**  29:*15*
104:*5*  110:*21*
182:*21*  268:*1*
315:*10*
338:*18*
351:*17*  355:*9*
**COURT**  1:*1*
11:*4*  64:*1*
75:*21*  77:*20, 23*  94:*18*
165:*5*  232:*5*
233:*1*  416:*20*
**courtesy**  12:*12*
**cover**  74:*22*
118:*14*  134:*2*
274:*12*
351:*14*
357:*12*  377:*9*
397:*21*
**covered**
133:*15*  280:*5*
409:*18*
**covering**
72:*16*  90:*19*
**CR**  26:*24*
27:*4, 11, 12*
**create**  126:*13*
140:*5*  193:*20, 21*

**creating**
202:*20*
**creation** 106:*3*
**credibility**
336:*11*
**critical**
386:*22*  387:*3, 6, 19*  390:*8*
391:*6, 7*
393:*24*  395:*19*
**cross-
functional**
150:*8*  173:*1*
178:*12*
**current**  39:*9*
267:*19*  334:*3, 12*  335:*1*
340:*8*  392:*7*
402:*4, 6*
403:*13, 15*
**currently**
13:*17*  81:*12*
182:*11*  247:*7*
393:*8*  400:*7*
**customer**
257:*18*
259:*18, 22*
**customers**
255:*3*  261:*2, 18*
**cut**  208:*22*
225:*16*

**< D >**
**D.Stanoch@ka
nner-law.com**
2:*6*
**DANIEL**  1:*14*
5:*3*  10:*21*
11:*7*  187:*8*
415:*5*  418:*8*
**Dan's**  156:*18*
**data**  85:*2, 8, 9, 13, 16*  86:*15*
87:*1, 8, 16, 23*
89:*2, 10, 19*
90:*4, 12*  91:*2*
93:*19*  96:*5*
157:*19, 22, 23*
158:*1*  160:*12, 14*  163:*20*

166:*1*  181:*19, 20, 21*  191:*22*
193:*17*  199:*7*
210:*23*
216:*16*
228:*22*  253:*1, 2, 4*  268:*16*
272:*3*  273:*22*
318:*13*
319:*13*
390:*22, 23, 24*
391:*15, 17*
392:*7, 17, 19, 21*  393:*3*
394:*12*  401:*2, 14, 21*
**data/data**
387:*21*
**database**
81:*14, 21*
82:*3, 24*  83:*8, 20*  182:*23*
183:*20*
**data-driven**
164:*17*
**date**  1:*16*
10:*14*  34:*16*
49:*2*  72:*10*
86:*19*  119:*24*
120:*3*  121:*21*
128:*14*
136:*10*  137:*3*
168:*11*  241:*3*
251:*19*
267:*15*
288:*18*
299:*17*  303:*9*
311:*22*  325:*2, 7*  327:*14*
415:*9*  416:*9*
418:*8*
**dated**  22:*23*
73:*21*  118:*15*
154:*1*  180:*21*
205:*17*
377:*10*
397:*23*  409:*3*
415:*18*
**dates**  259:*15*
299:*4, 7*  303:*8*
**dating**  27:*10*

**DAVID**  2:*3*
4:*1*  11:*17*
251:*7*  382:*3*
384:*22*  385:*4, 6, 9*  397:*22*
401:*8*
**DAVIS**  2:*10*
**day**  37:*18*
38:*15*  45:*18*
81:*2*  101:*7*
194:*14*  256:*2*
264:*18*
267:*21*  383:*4*
411:*23*
413:*15*  418:*11*
**days**  128:*7, 13*
137:*3, 12*
222:*2*  252:*22*
406:*2*  416:*16*
**DB5**  278:*6*
**DBC**  28:*17, 19*
**DEA**  201:*20*
**Dear**  169:*22*
**death**  155:*9*
**December**
27:*1, 13*  28:*1*
295:*2, 4*
296:*10, 12*
385:*18*
**decide**  352:*22*
**decided**  29:*10*
30:*7*  31:*17*
121:*13*  133:*7*
181:*14, 20*
192:*11*
210:*22*
211:*13*  273:*11*
**decider**  343:*23*
**decision**
108:*16*  173:*1*
188:*20*
211:*10*
213:*11*  235:*5*
340:*23*
342:*23*  343:*4, 5, 12*  380:*8*
**decision-
making**  194:*22*
**decisions**
326:*19*

Confidential Information Subject to Protective Order

declaration
356:*20*

dedicated  28:*8*

deem  316:*12*

deemed  113:*2*
416:*19*

deeper  295:*9,*
*22*

**Defendant**
3:*14, 21*

**Defendants**
2:*15, 22*  3:*6*

defer  334:*18,*
*23*  361:*16*

deferred
170:*20*

deficiencies
395:*13, 24*
396:*3*

define  72:*14*
73:*7*  316:*2*
393:*1*

defined  56:*15*
68:*19*  72:*18*
73:*2, 5*
141:*10*  142:*14*

defines  49:*17*

defining
155:*13*

definitely
57:*20*  100:*15*
326:*15*  372:*9*

definition
49:*16*  57:*19*
58:*16*

degradants
201:*8, 19*

degradation
200:*15*
201:*13*  202:*2*

degrading
202:*12*

Degree  25:*4,*
*12, 13, 20*  60:*8*

delegated
360:*12*

delete  173:*8*

**Delicato**
151:*14, 15*
154:*17*
155:*22*  156:*9*

163:*13*  164:*4,*
*15*  165:*24*
174:*16*  338:*1*

deliver  355:*5*

delivered
51:*17*

demands  30:*4*

demonstrate
315:*1*  389:*13*

demonstrated
51:*5*

**Denac**  8:*10*
408:*16*

depart  337:*10*

departed
337:*4*

department
82:*1*  124:*4, 5*
126:*5*  137:*4*
142:*23*
143:*13*
144:*21*
178:*20*  187:*19*

departments
111:*4*

departure
29:*23*  31:*11,*
*24*  337:*17*
361:*16*  362:*16*

dependent
315:*22*  316:*4*

depending
340:*3*

depends
184:*21*

deponent
10:*20*  418:*1*

deposed  11:*21*

deposing
416:*16*

**Deposition**
1:*14*  5:*13*
9:*2*  10:*16, 23*
13:*15*  15:*8*
16:*20*  18:*21*
20:*2, 15, 20*
21:*4, 10*
24:*15, 16*
70:*22*  103:*14*
106:*9*  147:*1,*
*5*  232:*5, 24*

414:*3*  416:*3,*
*13, 17, 19*

deps@golkow.c
om  1:*23*

describe
241:*20*

described
105:*12*  372:*3*

describes
120:*7*

**DESCRIPTIO
N**  5:*10*  6:*3*
7:*3*  8:*3*
120:*8*  403:*21*
404:*2*

designated
17:*8, 23*  18:*5*
117:*1*

designed
113:*1*  114:*2*
359:*12*

designee
14:*15*  17:*9*
307:*12*

despite  300:*9*

detail  39:*12*
287:*17*  348:*2*
404:*3, 5*

detailed
291:*10*

details  36:*3*
93:*19*  123:*4,*
*8, 20, 21, 23*
130:*11*  239:*6*
359:*11*
361:*11, 17*
370:*10, 16*
403:*3, 21*
411:*17*

detect  113:*1*
115:*1*  293:*23*

**Detectability**
329:*8*

detected
112:*20*  296:*5*

detection
221:*4*  222:*24*
223:*5*  226:*24*

**Detector**
219:*19, 23*
220:*21*

224:*15*  225:*1*
227:*17*

determination
379:*14*

determine
208:*9*  233:*14*
234:*11*
273:*23*
380:*18*  389:*4*

**D-E-T-T-E**
181:*24*

develop  68:*8*
161:*12*  234:*12*

developed
39:*18*  40:*16*
43:*4*  219:*17*
224:*14*  275:*16*

developing
156:*22*  157:*6*
160:*23*
162:*17*  163:*7*

development
87:*18*  88:*23*
218:*10*  219:*11*

deviations
293:*7*  333:*15*
334:*3, 11, 19,*
*24*  338:*5, 10*
340:*8*  399:*5*

device  28:*12*

dictated  32:*3*

difference
59:*19*  60:*1,*
*13*  138:*20*
212:*22*  228:*2*
359:*14*

differences
45:*11*

different
26:*17, 18*
35:*14*  52:*21*
66:*8*  93:*1*
110:*15*
111:*10*
129:*23*
130:*13, 20, 22*
131:*12, 18, 19*
132:*3, 11*
140:*16, 20*
156:*13*
157:*24*  171:*8*

178:*16*  179:*6,*
*7*  181:*22*
182:*19*
185:*12*
193:*22*
198:*13*
200:*12*
220:*16*
222:*14*  231:*7,*
*9, 10, 13, 16*
234:*8*  251:*15*
253:*1*  259:*1*
265:*11*  283:*1,*
*6*  287:*3*
294:*1*  303:*24*
311:*7*  313:*15*
316:*2*  339:*10,*
*11*  342:*7*
344:*5*  349:*16,*
*17*  353:*9*
358:*15*
382:*17*
389:*20*  398:*5*

differently
387:*14*

differing
349:*11*

difficult
105:*23*  340:*14*

dimethylamine
200:*16, 23, 24*

direct  178:*7*
415:*21*

**Direction**  9:*5*
230:*15*

direct-line
151:*12*

directly  201:*5*

director  126:*1*
144:*10*
237:*21*
385:*13*  398:*16*

disagree
100:*1, 6*
101:*24*

disagreeing
402:*21*

disclose
348:*13*

disclosed
107:*7*  313:*23*

**discouraged**
400:12
**discoverable**
413:8
**discovered**
109:24
**discovery**
128:8, 10
137:4  232:6
233:1
**discrepancy**
268:15  359:14
**discuss**  411:7
**discussed**
18:8  108:7
191:19
209:10
210:18
409:18  411:1
**discusses**
86:23
**discussing**
190:4  222:6
227:14
**discussion**
19:4  162:7
171:3  181:6
182:15
187:23  188:1,
3, 13  191:15
199:20, 24
287:12
321:23  330:1,
11  352:4
353:8  362:17
404:23  411:4,
19
**discussions**
19:9  122:19
224:19
268:14
310:17
312:14  344:5
412:5
**display**  384:13
**displayed**
400:16  401:22
**dispute**  171:16
**distinction**
56:10, 24
58:12  97:20

99:13  167:6
228:17  321:17
**distribute**
271:17  272:4
406:18
**distributed**
141:3  188:5
213:5
**distribution**
87:17  88:24
117:14
182:19  183:2,
15, 19  184:9,
11, 15  188:11
256:5  275:1
299:11, 15
**DISTRICT**
1:1
**DMF**  112:6
113:9, 14
115:13, 21
116:4  206:17
207:23
208:20, 24
284:2, 20
285:18
286:13
306:21
348:12, 22
**DMS**  200:21,
22  201:19
**doctor**  148:19
149:10
158:19, 20
**DOCUMENT**
1:7  19:10
46:24  72:4, 6
75:13  77:18
86:17  87:3,
10, 20  88:18
89:6  90:14
93:18  97:9
100:3  136:4
141:14
155:10
159:21
170:16  190:4
206:13, 18
207:5, 19, 24
208:7  223:20
228:1  244:8

245:4, 16, 18
250:17  251:1
252:6  264:5
276:10
278:11
279:15, 21
286:7  296:20
305:12
311:23  312:5
330:6  349:24
355:17  356:8
366:9  367:4
402:8  408:2
**documentation**
24:6  85:11
89:24  90:5
106:7  210:9
388:9
**documented**
97:12  203:10
243:18  248:15
**Documents**
9:10  19:3, 6
21:3, 6, 10, 15
39:12  70:9
78:24  102:23
148:22  171:2
191:11  245:9
249:15, 18
268:5  274:15
296:16, 24
310:4  413:5
**doing**  23:18
34:13  91:4, 8
92:1  124:22
149:11
159:24
167:21
196:22  214:4,
21  233:23
234:2, 19
247:5  252:24
271:11
285:14
288:10
290:12  318:1
324:1  353:10
380:17  383:3
388:24
389:20, 24
390:13

393:18
412:21  416:8
**dose**  38:16
43:20  71:11
152:9  188:8,
22  196:19
229:7  235:15
264:19
272:12, 23
276:3  281:22
298:19
300:12  362:6
367:10  368:1
375:21  409:15
**dosing**  380:10
**double**  82:10
118:5  224:18
296:13  328:14
**Dr**  154:20
157:21
159:12  160:7
164:5, 18
165:19  170:1,
2, 3, 4, 17, 20
171:8, 9, 16,
19  173:15
250:11, 15, 17
268:6  270:3
**draft**  154:7,
21  277:22
278:10
279:14, 20
368:9
**drafting**
301:24
**drafts**  372:23
**Drape**  5:22
6:10, 16, 22
7:8  124:15
125:6  151:2,
5, 11  167:14
168:4, 16
169:15
188:19
190:15  205:5,
17  209:9
237:6, 17, 24
238:5  239:14
240:12
294:11, 20

295:1, 4, 20
296:3  382:19
**D-R-A-P-E**
151:3
**Drape's**
188:17
**dropped**  270:3
**Drug**  25:24
26:4, 9  38:1,
6, 8, 15  39:19,
21  40:5, 8, 14
49:20, 21, 23
69:3, 4, 5
102:7  117:17
193:20
218:15
221:13  250:7
257:20
264:17
266:11
271:24
274:11, 13
356:20
357:24
368:24  369:3
402:15
**drugs**  40:15,
23  41:19
297:18
**drug's**  41:14
**DUANE**  3:3
**due**  91:11
380:10
**duly**  11:8
**Dupnitsa**
221:14, 18
364:12, 18
366:17  368:5
**Dupnitsa's**
367:5
**Duran**  4:1
10:12
**duties**  42:8, 10

**< E >**
**earlier**  122:8,
11  123:12
129:10
133:18
136:14  138:9,
18  155:3

159:9  163:14
175:9  189:2
202:15
215:19  222:5,
6  238:24
241:3  256:14
282:6  285:24
303:14  305:8
324:14
367:20
375:18
386:13  410:21
**early**  138:17
180:1  185:2
195:20
199:10  217:8
218:5  224:15
258:1  301:1
312:9
**easier**  264:2
384:16
**Edith**  133:1
181:24
**educational**
24:24  25:12
**effect**  102:24
341:11, 23
**effective**
48:14  49:2
72:10  81:12
86:19  136:10
310:11  351:4
**effectively**
317:14  318:15
**effectiveness**
41:14
**efficacious**
193:8, 10
**efficacy**  41:18
63:2  193:11
261:2
**effort**  77:6
109:22  111:6
179:11
**eight**  27:4
252:22
**EIR**  398:10,
14, 23  399:1,
8  401:24
405:13, 19, 21

**either**  72:17,
22  103:5
108:13  212:2
214:14
279:11  344:3
348:24
371:23  384:15
**electronic**
392:16  393:3
**elements**
159:24
**eleven**  315:18
386:23
**E-mail**  5:16,
22  6:7, 9, 11,
13, 15, 17, 19,
21, 23  7:8, 11,
15, 17, 19, 21,
23  8:6, 8, 10
47:12, 21, 22
48:8, 23
96:10  118:14
124:15  125:5,
13  128:11
141:5  153:15,
23  154:9, 23
155:23
156:10
163:16
167:14  168:2,
6  174:9, 15
180:11, 20
181:2  183:21
189:19  190:6
195:2  205:5,
15  207:1, 11
209:9  210:12
218:23
219:10  220:1
224:5, 23
226:4, 14, 15,
20  227:6, 13
237:6, 15
238:15
240:12
243:10  249:3,
13, 19  286:1
294:20, 24
301:14, 19
350:8, 17
351:15, 24

357:12
363:20  364:2,
4  366:13
367:4  376:22
377:10
381:18  382:2,
14  383:14
384:8, 21
397:8, 21
408:16  409:1
413:2
**e-mailing**
125:21
144:15
181:24
239:13  294:10
**e-mails**
150:15
175:10  223:3
229:19  294:7
**employed**
21:19  349:6
376:12
**employee**
415:11, 13
**employees**
401:24
402:13, 19
403:11
**encompass**
36:17  351:11
**encompassed**
104:6
**encompasses**
87:6
**encompassing**
83:18
**ended**  160:7,
10, 18  162:14
267:9
**endorsed**
344:4  390:17
**engage**  56:15
66:7  271:22
336:9
**engaged**  32:1
**engaging**
58:15  60:9
316:23
**ensure**  41:13
45:2  60:3

65:14  68:7
78:13  83:6
87:7  89:1, 18
90:12  128:6
131:17  139:1
183:4  188:4
193:7, 18
212:10
214:17
216:15
228:23
231:12
258:19  260:5
261:18  262:2,
6  263:3
271:20
292:11  344:9
353:12
**ensured**  263:2
**Ensuring**  51:9,
15  61:5
62:22  63:1
85:10  172:12
181:15
271:24
292:21  320:11
**entered**  54:9
55:13  56:2
**entire**  33:7
143:24
186:22  246:9
**entities**  35:21
**entitled**  49:5
86:15  136:5,
19
**entity**  37:3
41:5  103:9
145:3
**environment**
56:17
**epidemiology**
159:6
**equipment**
51:4  52:5
214:14
215:20, 22, 24
216:1, 10, 14,
18, 19  217:4,
11, 13, 16, 20
218:3, 6, 8, 13
221:7, 8, 9, 23

222:9, 11, 14
227:21
229:17, 20, 22
230:24  234:2,
14  342:19
380:2
**Eric**  125:6
151:2, 11
168:3  209:9
237:17, 20
239:14
240:12  382:19
**errata**  416:6,
9, 12, 15  418:6
**especially**
335:22
**ESQUIRE**
2:3, 4, 10, 11,
19  3:3, 11, 17,
18
**essential**
303:11
**establish**
128:5  273:15
335:17  345:4
**established**
53:2  89:2, 10,
19  97:6
98:18  166:22
197:7  221:14
242:2  243:17
272:15  328:2
369:5, 18
370:2  392:17,
24
**establishes**
86:24
**establishing**
373:21
**establishment**
398:10  399:2
**et**  196:20
222:9  271:12
356:21
**Europe**  133:1
144:6  220:18
358:3
**European**
282:17, 23
**Eva**  125:17

Confidential Information Subject to Protective Order

evaluate 160:4 199:13 388:21

evaluated 203:14 347:16

evaluating 110:10 113:22 114:12, 23 268:8

evaluation 111:5, 13 115:6 147:17 170:21 204:7 206:19 208:1, 8 210:8 211:4, 11 213:21 214:1 286:3, 9 389:4

evaluations 110:15

event 97:22 341:20 361:3 395:19 405:23

events 147:20 211:9 318:10

Eventually 26:19 143:2, 5 222:20 223:6 224:9 253:2 276:16 287:4 311:14 332:20 361:5

everybody 143:23

evidence 131:24 404:7

evident 35:9

evolution 196:9 258:9

evolved 177:16 194:24 200:9 266:22, 23

evolving 194:12 272:7 307:3 308:12, 14

exact 311:22

exactly 44:21 58:4 67:21

80:11 127:7, 9 131:13 132:9 133:3, 6 201:5 209:21 218:7 240:15 258:23 269:16 273:10 336:22 337:22 354:15 403:22

EXAMINATIO N 11:11 415:5

examined 11:8

example 40:21 51:1 278:2 280:11 298:24 301:6 321:3 343:8 352:9, 18 388:5 391:6 394:9 404:6 405:3

examples 359:2

excellent 247:6

excerpt 206:11 207:18

excess 362:7 366:24

exchanged 259:1

excipient 357:1

excipients 62:21 184:21 386:9 388:3

exclusive 65:5

exclusively 159:19

Excuse 122:9 294:9 378:7

execution 98:3 188:9 251:19 404:17

executive 183:8 232:19 341:10 345:21 380:23

exempt 209:13 278:21 280:8

exempted 278:16

exhibit 14:20 15:5 17:3 22:6 23:11 47:9 48:5 71:15, 20 85:20, 23 96:3, 7 117:20, 21 118:12 124:8, 12 135:13, 15 153:6, 12 167:11 174:6 180:6, 9 189:20 204:24 205:2 218:20 225:15, 20 226:1, 9 237:1, 3 248:22, 24 276:18 277:1 294:17 297:21, 23 301:8, 11 328:18 331:3 349:22 350:6 363:17 376:16, 19 381:9, 15 383:12 384:6 397:3, 5 408:13

Exhibit-135 47:5 96:14

Exhibit-136 71:16

Exhibit-138 124:10

Exhibit-140 153:9

Exhibit-146 225:7

Exhibit-153 328:16

Exhibit-154 350:3

Exhibit-157 381:13

Exhibit-158 384:20

Exhibit-5 117:23 118:13

exhibits 15:2 16:15

exist 53:23 66:3 91:8 100:24

existed 36:13 66:23

existence 57:12 81:23 90:23 289:6

exists 68:18 76:17 83:19 106:6

expect 45:11 57:5 59:22 100:23 102:4, 8 114:3 229:13 260:1 285:23 287:16 344:15 348:9, 12 367:24

expectation 67:10 78:10 85:12 92:23 95:4, 17 98:11 102:2 265:22 316:4 332:16 344:24 346:7 355:19 373:4 388:21 393:2 406:3

expectations 34:11 39:21 40:17 45:4, 6, 12 57:7 59:16, 20 60:11 61:8 63:4 78:16 93:16 95:7, 11, 21, 23 97:17 98:4 160:12 171:4 316:6 317:11

Exhibit-157 381:13

319:11 332:9 348:21 357:22

expected 112:13 115:10, 12 265:18 293:11 369:16, 24

Expediency 335:21 336:13

expedient 172:12 275:21

experience 63:16 64:5 160:3 254:19 255:8 309:7 320:17 338:15 407:5, 8

experiencing 313:13

experiments 110:19

expert 159:1, 4

expertise 352:21

experts 203:13 285:20

expiration 275:6 299:3, 7

expired 30:19

expires 418:11

explain 61:2 200:17 278:14 295:15 299:23

explained 64:24 317:24

explanation 241:23

explicitly 192:24

exposure 155:7

extend 41:23

extensive 354:24

extent 103:12 109:4 198:4 200:12 201:15

Confidential Information Subject to Protective Order

203:24  208:9
233:14
234:11
289:12  292:5
316:3, 20
319:8  335:18
372:4  378:19
394:16
**external**
316:5, 7  363:3
**extrapolated**
367:23
**extrapolating**
276:1
**extrapolation**
273:20
**extreme**  322:6
**extremely**
98:2  313:11

< F >
**faces**  80:22
**facilities**
42:15, 23
43:6  45:23
51:4  52:5
87:9  98:8
217:10
220:14, 19
292:7  293:3
332:6  349:10,
16  355:8
359:20
**facility**  37:5,
12  43:18
44:1, 4  46:1
57:2, 3, 22
66:12, 19
67:12, 18
69:1, 12  71:6,
9  74:12, 23
79:11  80:3
97:19, 23
98:23  99:6
100:18
101:10
102:12  103:2
111:9  119:13,
18  120:13
144:4, 13, 16
145:14, 20

216:5  220:3
221:19  231:1
232:2  298:19
314:11  331:5
333:16, 20
336:19
343:24
354:10
358:21
364:19
372:19
373:12
375:19  376:2,
12  377:17
378:5  379:7
380:1, 16
381:1, 6
385:17
388:14  391:8
393:16
394:17
396:13  402:1,
24  405:20
407:10, 12
411:10
**facility-specific**
79:20
**fact**  78:9
163:13, 19
175:23  182:4
197:22
198:15  200:1
212:7  217:9
223:2  229:21
231:7  235:2
237:17  238:6
247:23  262:6
273:5  274:2
285:21  294:5
300:18
309:11, 23
310:3  315:18
325:19  332:2
334:2  347:23
365:20
373:24
379:11
399:17  413:3
**factor**  284:3
**facts**  256:19
**fail**  416:18

**failing**  388:4,
16
**fair**  12:20
23:20  24:16
28:24  30:23
35:17  36:15,
16, 21, 22
41:15, 21
45:15  103:24
114:7  156:13
204:8  225:21
273:8  304:22
306:15, 16
322:7  324:15
325:12  335:3
346:11
357:13, 14
370:17, 18
374:17  381:8
390:18  396:4
407:18
**FALKENBER**
**G**  3:8
**fall**  82:13
151:23  173:2
311:14
**fallen**  82:20
**familiar**  36:23
39:2  40:2
69:22  81:20,
22  85:1
147:8  148:24
327:17  332:5
398:13
**far**  76:10, 16
78:20  128:23
195:14  196:7
202:14
290:11
333:13  406:17
**fast-forward**
116:10
**fax**  1:23
**FDA**  26:10
41:6  117:6
120:20, 24
123:9  126:24
128:7  130:7,
9  137:15
138:13
139:17, 23

156:4  172:14
176:8  192:19,
24  193:17
223:7, 18
224:11
252:23  253:4,
10, 13, 24
254:13, 17, 21
256:4, 16
257:2  264:23
265:3, 10, 13,
20  267:9
274:5  279:6
294:1, 5
295:8  296:7
297:17
304:20  305:1,
3  310:14, 17,
18, 22  312:10
323:12
333:19  334:2,
11  335:5
337:1  338:11,
16, 24  340:7,
20  361:14, 19,
24  368:13
369:4, 17
396:12
398:11, 14, 15
399:4, 12
401:24
402:21
403:10
405:14, 19, 23
406:3, 14, 20,
23  409:8
411:2, 8, 9
412:10
**FDA's**  153:4
193:13
242:23
243:13
266:21
294:11
295:21  296:3
334:19, 24
336:18  337:8
338:5  339:17
362:5  412:3
**FDCA**  41:10

**February**
22:23  23:7
364:3  377:18
379:24  382:3
384:22
**feedback**
353:9
**feel**  37:10
46:9  81:3
353:21  370:20
**fell**  34:6
**felt**  139:6
157:20  158:6,
14  159:22
198:20
286:21  303:10
**few-minute**
84:5  296:22
**F-H-A-R-M-Q**
31:2
**Fhs@pietragall**
**o.com**  3:20
**Field**  7:10
116:15, 21
117:5, 8, 9
118:16, 21
119:1, 2
121:19  122:1
124:2  127:19,
22  128:6, 12
129:7  130:6,
9  133:7
137:5, 14, 20,
22  138:8, 12,
21, 22  139:7,
13, 17  140:8
253:17, 24
254:17, 20
255:15, 21, 23
256:3, 9, 12
257:9, 13
298:1, 7, 14
303:12  407:8
**figure**  299:12
**file**  115:13
133:7  137:5
139:6, 12
356:21  358:1
**filed**  128:6
246:8

Confidential Information Subject to Protective Order

filing 10:4
247:16
fill 139:21
filled 119:10
final 172:6
206:15
207:21
249:14 250:11
finalized
372:24
finally 332:21
financial 355:6
financially
415:13
find 76:11
184:3 187:3
216:17
260:24
276:13
313:18 333:9
336:8 339:1
340:8 341:21
342:1 344:21
386:14
388:24 389:3
finding
300:21
341:12 343:9
findings
166:20
294:11
334:19, 24
335:24
338:23
343:21 372:3
399:3
fine 15:22
26:11 44:2
45:17 80:24
81:1 103:24
124:20
146:10
270:15
296:16 330:7
341:6 366:10
413:17
finish 225:14
finished 38:16
43:20 62:19
71:11 102:7
152:9 184:18,

20 186:14
187:15, 20
188:8, 22
196:19 202:7,
11 214:6
215:13
218:15 229:7
235:15
270:18 271:5
272:12, 22
273:4, 16
274:1, 11, 13
276:3, 15
277:21
281:22
282:22
298:18
300:12 336:7
362:6 367:10
368:1 375:21
379:15
380:10 409:15
finished-dose
38:24 50:5
58:3 152:4,
19 155:18
185:24 273:7
274:7 275:11,
13 300:1
362:1 367:14
finished-
product 185:2
firm 13:23
31:5
first 19:12
28:20, 21
48:4, 7 53:18
55:22 56:8
86:22 88:13
108:1 120:1
125:10
132:18 133:9
149:2 175:3
195:18
206:24 209:8
219:16 245:8
271:20 302:4
303:5 326:16
331:21
343:17 352:1
364:11

374:11 377:9
378:17 381:3
382:9 387:18
388:15
392:11
394:10
397:13 398:8
406:24 412:19
fit 134:19
160:12 252:22
fits 156:17
five 310:5
five-day
411:24
flexibility
366:6
flip 17:2
48:20 50:8
78:23 174:21
226:21
268:20 302:3
377:15 378:5
Floor 3:18
Florida 3:5
flow 356:6
focus 32:24
37:1, 4 106:8,
10, 11 255:8
275:18
279:10 281:4
290:17, 21
340:2 371:24
focused 284:6
339:8, 13
focusing
217:4 218:2
371:23
folks 47:23
129:11, 17
131:17
follow 248:8
267:7 268:21
305:23
345:14
355:24 384:19
followed
211:9 305:18
322:10 388:8
395:23 404:16
following 64:2
75:22 77:24

165:6 311:10
389:23 392:8
follows 11:9
follow-up
302:24 303:5
306:10 307:7
309:16, 17
313:3 337:15
380:24
395:12 405:17
Food 25:24
26:4, 9 39:19,
21 117:17
for-cause
311:10, 17
315:12, 16
316:13 317:17
for-cost 346:5
foregoing
415:6, 20
418:3
form 10:6
54:19 59:12
62:13 64:23
66:15 74:16
75:13 76:20
83:10 100:2
119:9 122:13
127:2 128:16
130:4, 18
131:24 138:2
139:22
150:22
163:10
166:14 192:7
197:1 200:19
212:16 213:8
220:6 223:20
228:1 232:4
243:14
253:24 254:8
255:6 265:8
280:13
283:21
284:20
298:14 309:5
319:6 333:19
336:19
373:21 401:5
418:5

formal 123:21
259:2, 7 406:3
formally 44:15
format 119:24
formation
105:15
190:18 200:6,
21 308:9
formations
201:3 209:2
formed 307:1
308:16
former 43:8
307:13
338:16 398:15
formulate
286:16
formulation
275:17 283:2
284:4
forth 223:10
247:13 415:9
forward 36:9,
14
found 30:5
134:18
250:23
256:21 257:2
273:17
280:24 285:8
299:24
326:10 334:3,
11 338:4, 24
340:16 362:7
388:4 390:7
406:20, 24
four 20:6
386:23
FRANK 3:18
free 37:10
46:10 81:3
213:4 266:4
306:4 319:15
353:21 370:20
French 151:6
fresh 287:20
288:3, 8
348:14
front 46:9, 13
47:1, 5 85:6
128:3 136:1

149:*22*
226:*11*
298:*12*
311:*24* 333:*6*
337:*2* 345:*17*
350:*14*
363:*10, 11*
371:*13*
**fulfill** 316:*3*
**fulfilled** 76:*16*
92:*24* 235:*11*
317:*10* 319:*10*
**fulfilling**
197:*6* 212:*5,*
*13* 213:*3*
214:*10* 348:*20*
**full** 204:*6, 21*
208:*6* 286:*4,*
*8* 291:*18*
329:*9* 331:*10,*
*16*
**fully** 19:*6*
60:*23* 73:*20*
75:*8* 76:*3*
218:*13*
**function** 82:*1*
133:*17* 385:*7*
393:*8* 402:*4*
403:*13*
**functional**
79:*14*
**functionality**
399:*13*
**functions**
131:*18*
402:*14* 404:*18*
**fundamentals**
117:*10*
**further** 263:*7*
316:*19* 335:*6*
344:*5* 345:*14*
348:*1* 369:*13*
390:*19*
391:*13* 392:*2*
393:*5* 415:*6,*
*11*

< G >
**gained** 199:*22*
**Gallagher** 4:*1*

19:*22*
**gaps** 392:*8*
**gas** 111:*16, 20*
114:*10* 115:*5*
215:*21* 216:*6*
217:*10*
219:*21* 221:*3*
222:*23*
224:*24*
226:*22*
227:*16*
247:*23*
248:*11*
379:*23* 380:*1*
**gather** 123:*3,*
*5, 7* 139:*5*
173:*4* 193:*4*
254:*13* 255:*10*
**gathered**
251:*15* 258:*4*
**gathering**
253:*1, 5*
**GC** 379:*17,*
*22* 380:*4*
393:*10*
**GC-MS**
114:*17*
**GCP** 72:*22*
**GDP** 72:*22*
73:*22* 351:*7*
**general** 36:*4*
38:*5* 46:*14*
86:*24* 90:*20*
133:*22*
139:*24* 332:*9*
341:*15, 16*
372:*11* 400:*5*
402:*10* 404:*1,*
*20*
**generally**
33:*18* 37:*7*
85:*7* 97:*13*
103:*3* 341:*22*
370:*13* 402:*12*
**generate**
87:*16* 253:*17*
359:*5* 369:*17,*
*24*
**generated**
87:*8* 90:*1*
110:*23* 173:*5,*

21 177:*16*
201:*9* 243:*16*
272:*8* 289:*11*
292:*6* 372:*2*
392:*21*
405:*22, 23*
407:*6*
**generates**
200:*22*
**generating**
87:*24* 172:*11*
285:*22*
**generation**
77:*7*
**generic** 36:*19*
40:*20, 24*
**genotoxic**
252:*4, 19*
253:*8, 15*
254:*2* 255:*2*
256:*15* 257:*5,*
*6, 11* 258:*8,*
*14* 260:*18*
262:*9* 263:*4*
**geographical**
355:*7*
**Georgia** 2:*13*
**getting** 34:*15*
103:*13*
175:*18* 195:*1*
225:*9* 230:*5*
250:*12*
261:*20* 353:*9*
**Give** 15:*17*
38:*4* 196:*11*
263:*24*
275:*20* 277:*8*
306:*19* 327:*1*
343:*7* 346:*9*
354:*18*
361:*10, 17*
363:*12* 403:*20*
**given** 21:*15*
189:*7, 14*
213:*2* 255:*13*
271:*7* 318:*8,*
*9* 358:*21*
374:*9* 389:*22*
402:*2, 23*
403:*11* 418:*4*

**giver** 72:*18*
**gives** 93:*24*
**Global** 31:*2*
33:*3, 20* 34:*6*
35:*10* 36:*12*
37:*3* 79:*21*
81:*14, 21*
82:*3, 24* 83:*8,*
*19* 131:*9*
135:*6, 9*
136:*13* 144:*2,*
*23* 151:*13*
184:*14*
186:*23* 189:*8,*
*15* 232:*18*
251:*1, 10*
257:*15*
259:*17* 263:*8*
264:*6* 269:*9,*
*18* 270:*16*
316:*14*
**globally** 189:*5*
304:*1*
**globe** 35:*4*
**GLP** 72:*22*
**GMP** 39:*3, 16*
59:*19* 72:*22*
73:*22* 85:*17*
189:*10*
255:*20*
258:*20*
333:*14* 335:*6*
343:*19*
344:*10* 351:*7*
387:*8, 11, 12*
392:*7* 399:*4*
402:*14* 405:*1*
**GMPs** 39:*16,*
*17* 60:*5*
**go** 11:*24*
15:*20, 23*
24:*3, 8* 34:*8*
36:*9* 43:*5*
55:*5* 65:*1*
77:*17* 84:*10*
109:*16* 135:*4*
137:*8* 141:*13*
148:*21*
169:*20*
184:*15* 191:*4*
208:*21*

217:*19* 228:*4*
233:*5* 236:*3*
241:*14*
252:*13*
253:*13* 267:*6*
296:*15*
299:*10* 306:*6*
308:*24* 317:*2,*
*5* 331:*19*
343:*18* 345:*1*
352:*10*
354:*20*
356:*12*
374:*23*
383:*17*
384:*11, 18*
388:*22*
**goals** 94:*4*
**goes** 38:*23*
73:*23* 87:*5*
97:*19* 102:*2*
208:*12* 220:*1,*
*20* 221:*12*
270:*17* 280:*6*
281:*2* 299:*23*
300:*17*
352:*16*
369:*14* 380:*6*
**going** 12:*18*
14:*19* 19:*4*
21:*14* 22:*2*
24:*8* 28:*16*
29:*11* 36:*7,*
*11* 45:*22*
50:*4* 52:*20*
54:*15* 58:*2*
59:*17* 61:*8, 9,*
*11* 71:*14*
78:*15* 81:*9*
84:*3, 4, 14*
85:*19* 93:*21*
94:*7* 96:*2*
103:*12*
116:*10*
117:*19* 124:*7*
146:*2, 3, 12*
153:*5* 156:*18*
169:*13* 171:*3*
180:*5* 191:*4*
192:*22*
194:*13*

197:10
204:23
223:10 225:9,
16 236:6, 24
237:10
248:21 267:9
268:16 271:4,
11, 13, 20
274:16
278:20 283:4
296:19 297:4,
20 308:18
312:7 314:24
330:15
337:10, 22
342:3 343:12
349:23
355:23
368:12 375:7
378:11, 18
381:8 389:11
407:21 413:8,
20
**GOLKOW**
1:21 10:13
**Good** 11:14,
15, 16 36:24
39:5, 9 84:8
139:2 146:4
201:21
230:13, 23
231:6 250:24
254:22, 24
268:10
278:22
285:13 297:2
315:4 334:4,
12, 20 335:1
340:9 341:7
348:10
354:19
397:20
400:19 402:4,
6 403:13, 15
405:10
**GORDON**
3:14
**governing**
325:22
**GRA** 377:12

**grade** 200:20
**graduate** 25:7
**graduated**
25:3
**granted** 32:4
**Gray** 7:18
363:20
**Great** 13:13
14:13 16:18
17:20 19:12
38:14 39:2
46:12 48:17,
19 49:1
118:12
237:15
332:17 370:19
**GREENBERG**
2:10
**ground** 12:1
399:20
410:19, 23
**group** 34:3,
12 79:14
82:8 83:6, 12,
13 126:23
131:22
147:18
149:24
159:12 229:3
307:5
**groups** 82:22
**group's** 82:21
**guess** 15:12
35:23 43:9
107:8 112:16
119:12 177:2
312:6 356:24
**guessing**
163:24 263:20
**guidance**
133:23
149:13
352:17
358:20 359:19
**guidelines**
359:19
**guiding** 397:17
**GXP** 72:16,
21 73:10
87:1, 8

**GXP-
impacting**
90:10 92:10
**GXPs** 73:12

**< H >**
**hand** 324:5
**handled**
392:22
**handling**
134:23 136:6
339:20
**happen** 94:2
143:7 291:16
315:17
320:21
334:17
343:16 353:14
**happened**
132:9 143:4,
6 185:10
195:20 196:6
199:6 240:15
283:14
338:13
361:15
362:15
395:15 412:19
**happening**
347:21 399:21
**happens**
195:6 201:3,
16 202:17
**happy** 84:4
345:18 366:1
370:21
**HARKINS**
2:11 236:20
**Harkinss@gtla
w.com** 2:14
**Harle** 5:17
47:12
**harmonization**
373:22
**Hatt** 7:24 8:6,
8 251:7
382:4 383:14
384:8, 22
397:8, 22
**Hatt's** 385:4, 6

**hazard**
147:11, 14, 16
148:1, 16
149:16 150:1,
5, 17 154:11
159:10, 18
160:19
162:15
165:23 166:5
171:23 172:6
175:10 249:20
**HCT** 367:6
**head** 79:15,
19 80:1, 6
151:13 385:11
**heading** 88:12
**HeadSpace**
219:21 221:2
224:24
226:23 227:16
**HeadSpacec-
GC** 219:18
223:4 224:14
**health** 89:3
126:14 140:5
147:11, 14, 16
148:1, 15
149:16 150:1,
4, 17 154:10
155:8 159:10,
18 160:18
162:15
165:23 166:5
171:22 172:6
175:10
249:20 270:24
**Healthcare** 3:8
**hear** 18:23
266:12, 17
288:2 318:7
**heard** 133:9
259:18 401:12
**hearing**
308:24
**held** 10:17
26:3, 16, 17
33:7 80:15
**help** 34:15
**helped** 359:20
**helpful** 204:5

244:22 268:22
**helps** 65:12, 13
**hereinbefore**
415:9
**hey** 81:4
196:3
**HHA** 147:9
148:7, 10
149:13 154:7
160:21 172:11
**high** 39:14
40:10 60:7
156:21 157:4
309:24 348:23
**higher** 58:20
395:20
**highest** 153:1,
3 155:4
**highlight**
141:24
**highlighted**
141:7 174:23
**highly** 307:4
**high-
performance**
248:4
**HILTON** 2:4
**historical**
328:7
**history** 240:8
**Hoey** 187:9, 19
**H-O-E-Y**
187:12
**hold** 126:15
158:24 159:3
176:16, 21
177:3 180:22
181:3, 8, 18
182:2, 3, 9, 11,
18 183:1, 5,
11, 23 184:17,
19, 23 185:1,
6, 18, 19, 22
186:3, 6, 8, 15,
22 188:3, 8,
23 189:4, 12
192:2 193:2,
14, 19 194:7
195:15
196:17 199:5
209:12, 18, 24

210:*6, 16, 20, 24*  211:*1*
213:*19*  214:*2, 19*  215:*6, 12*
231:*22*
232:*20*
233:*21*
234:*17*
235:*14*  271:*4, 5, 14, 21*
272:*2*  281:*22*
holder  41:*8*
120:*2*
holds  184:*3*
185:*11*
187:*14, 20*
192:*11, 13*
199:*4, 6, 9*
home  13:*20*
HON  1:*4*
Honestly
270:*8*
Hong  125:*21*
126:*9*  141:*8*
144:*15*  320:*1*
Hoover  8:*8*
397:*8, 22*
hoping  360:*3*
host  315:*23*
318:*2*  320:*1*
hour  24:*10*
81:*10*  84:*4*
146:*4*  225:*10*
hours  20:*21, 24*  21:*1, 14*
70:*9, 21*
housekeeping
37:*16*
HPLC  248:*3*
379:*16*  393:*10*
HS-GC
220:*21*  221:*2*
Huahai  3:*6, 7*
98:*24*  120:*13*
126:*11*  169:*8*
170:*5, 8, 22*
209:*13*  252:*1*
257:*17*
270:*19*
278:*15, 22*
364:*14*

Huahai's
171:*7*
human
141:*11*
142:*15, 21*
302:*13*
Humana  3:*14*
human-related
157:*12*
humans
166:*21*
hydrochlorothi
azide  250:*2*

< I >
i.e  156:*6*
228:*8*
IARC  169:*11*
170:*6*
Iceland
305:*13*  319:*24*
Icelandic
302:*1*  308:*21*
ICH  170:*9*
171:*2*
idea  46:*5*
ideal  204:*9*
Ideally  275:*14*
identical  250:*1*
identification
15:*9*  22:*10*
47:*13*  71:*24*
86:*3*  124:*16*
135:*18*
153:*16*
167:*15*
174:*11*
180:*13*  205:*6*
219:*1*  226:*5*
237:*7*  249:*4*
277:*6*  294:*21*
298:*2*  301:*16*
328:*21*
350:*10*  355:*3*
363:*21*
376:*23*
381:*20*
383:*15*  384:*9*
397:*9*  408:*17*
identified
103:*19*  113:*8,*

13  114:*6*
116:*4*  121:*22*
136:*11*
195:*11*
212:*21*
215:*24*  252:*4*
253:*15*  257:*5*
302:*8*  395:*13*
399:*11*  406:*12*
identifies
119:*12, 16*
298:*22*  299:*19*
identify  73:*11*
133:*13*
215:*10*
256:*15*  287:*7*
290:*9*  295:*24*
ignore  320:*6*
ignored
295:*12*  296:*8*
Illinois  3:*12*
imagine
184:*11*
immediate
127:*15*
182:*18*
209:*23*  275:*2*
immediately
25:*21*  126:*16*
255:*14*
258:*21*  260:*7*
324:*21*  325:*5, 8*  327:*15*
impact  102:*6*
166:*21*  261:*1*
267:*1*  342:*10*
impacting
87:*9*
imperative
416:*14*
implement
318:*15*  359:*21*
implemented
43:*4*  238:*7*
293:*14*  315:*2*
316:*21*  317:*8, 14*  318:*6*
370:*6, 11, 15*
406:*11*
implications

186:*10*
imply  198:*17*
important
56:*9, 10, 23*
57:*16*  58:*12*
90:*23*  97:*20*
98:*2*  138:*21*
157:*20*
158:*15*
181:*21*  198:*9, 21*  202:*16*
209:*1*  228:*18*
252:*16*  254:*3, 11*  284:*3, 4, 23*  285:*6*
303:*11*  314:*5, 22*  318:*15*
321:*16*
impurities
109:*23*  113:*1, 13*  116:*2*
131:*12*  191:*7*
201:*3*  258:*20*
260:*6*  267:*1*
273:*17*  274:*1*
280:*4*  292:*22*
293:*24*  300:*5*
302:*18*  304:*3, 18, 21*  305:*1, 20*  307:*17*
308:*15*
311:*11*
320:*15*
321:*21*  322:*2, 12*  336:*1*
impurity
113:*8*  120:*12*
121:*5*  123:*13*
126:*13*
129:*13, 18, 24*
130:*14*
132:*19*
134:*16*  140:*4*
141:*10*
142:*14*
156:*21*  157:*5*
162:*16*  163:*6*
167:*4*  170:*19*
177:*20*
190:*18*  191:*1*
199:*14*  200:*6*

201:*12, 13, 15*
202:*2, 3, 6, 10*
219:*12*  252:*3, 15, 18*  253:*8, 15*  254:*3*
255:*2*  256:*15, 21, 24*  257:*4, 12, 19, 24*
258:*8, 14*
260:*18*  262:*9*
263:*4*  279:*4*
281:*1*  285:*2, 5, 22, 23*
293:*10*
298:*15*  302:*9*
303:*15, 22*
306:*5*  316:*15*
319:*16*  324:*7*
367:*21*  369:*3*
370:*6, 10, 14*
371:*5*
inaccurate
240:*13*
inappropriate
94:*19*  390:*13*
incidentally
302:*22*
379:*22*  386:*1*
include  41:*17*
49:*24*  52:*22*
66:*6*  69:*24*
74:*11*  89:*9, 13*  99:*21*
165:*22*
199:*16*  287:*12*
included
121:*16*
128:*22*
155:*19*  160:*1*
172:*6*  339:*24*
390:*21*  391:*1*
includes  24:*2*
28:*12*  50:*24*
51:*9, 14*  52:*8*
62:*20, 21, 22*
73:*24*  88:*3*
315:*11*  355:*1*
including
59:*9*  81:*12*
154:*2*  246:*9*

Confidential Information Subject to Protective Order

291:*13*  344:*6*
386:*22*
**incoming**  61:*9*
147:*19*
327:*21*  332:*7*
376:*11*
**incomplete**
254:*21*
**incorporated**
119:*19*  231:*24*
**incorporating**
300:*12*
**incorrect**
239:*20*  291:*9*
**incorrectly**
170:*9*
**increase**
156:*1*  157:*16*
158:*2*  163:*15*
164:*20*  165:*10*
**increased**
156:*11*
**incumbent**
262:*1*
**independently**
200:*11*
**INDEX**  9:*2*
**India**  216:*6,
20*  219:*17*
220:*3, 16*
224:*13*
226:*22*  227:*1,
14*  231:*1, 16*
232:*1*  374:*13*
**Indian**  374:*13*
**indicate**  53:*24*
161:*24*  191:*8*
192:*15*
213:*14*
256:*23*
260:*22*
288:*10*
293:*18*
295:*11*  369:*15*
**indicated**  77:*9*
91:*16*  92:*18*
123:*18*  130:*8*
139:*20*
142:*17*
143:*16*
175:*16*  178:*8*

185:*4*  186:*5*
191:*17*
192:*20*
194:*18*  197:*4,
5*  199:*7*
204:*15*
222:*13*  258:*6*
265:*13*
275:*15*
277:*19*  280:*2,
22*  285:*16*
291:*9*  304:*12,
16*  319:*14*
323:*24*  328:*13*
**indicates**
117:*12*  257:*3*
**indicating**
157:*16*  252:*3*
257:*1*
**indication**
235:*7, 9*
252:*14*  288:*3*
**indications**
215:*7*  235:*3*
**indicator**
230:*14, 23*
**indicators**
296:*8*
**individually**
232:*10*
**individuals**
154:*2*
**Industries**
2:*15*
**industry**
28:*11*  100:*8,
13*  101:*3*
204:*10*  288:*8*
322:*15*  348:*17*
**inform**  143:*12*
260:*17*  262:*8*
**INFORMATIO
N**  1:*11*  34:*15*
52:*3*  80:*23*
102:*9*  106:*14*
110:*22*
117:*11, 15*
119:*4, 5, 9*
121:*12*  123:*3,
17*  131:*7, 20*
133:*4*  139:*1,

5, 12, 21*
144:*18*  157:*9*
158:*4*  161:*4*
162:*1, 9, 22*
172:*13*  173:*4,
5*  176:*24*
177:*8, 15*
181:*11*
183:*14*
184:*16*  185:*7*
192:*14, 23*
193:*4*  194:*21,
23*  195:*13, 16*
196:*12, 21*
198:*24*  199:*1*
211:*15, 20*
212:*19*
213:*13*  214:*8,
16*  222:*8*
223:*10*
232:*14*  239:*8,
16*  243:*5, 18*
251:*14*
252:*14*
253:*21*
254:*14*  255:*9,
11, 13, 17*
256:*11*  258:*3,
10, 19, 24*
260:*5*  270:*21,
22*  272:*8*
273:*14*
275:*22*  280:*1,
3, 21*  282:*12*
284:*1, 5, 24*
285:*6*  286:*21*
287:*3*  288:*23*
289:*9, 19*
300:*19*  302:*7,
17*  303:*10, 13*
304:*13*  305:*4,
23*  306:*3*
307:*16, 22, 23*
308:*3, 20*
310:*21*  314:*6,
12*  318:*11, 14*
323:*22*  326:*5,
19*  329:*15*
335:*4*  337:*7*
347:*10*  389:*22*

**informed**
102:*11*
257:*18*
259:*23*  304:*7*
322:*19*  327:*7,
12*
**informing**
256:*16*  346:*13*
**ingest**  38:*19*
**ingredient**
37:*22*  38:*10,
11, 23*  113:*2*
**ingredients**
201:*6*  334:*5,
13*  339:*21*
340:*10*  344:*17*
**in-house**  20:*10*
**initial**  117:*18*
137:*5*  185:*7*
388:*19, 22*
**initially**
176:*20, 23*
177:*4*  181:*3*
**initiate**  123:*24*
**initiated**
259:*23*
**initiating**
132:*13*  137:*13*
**injection**
379:*13*  380:*7*
389:*8*
**Inna**  382:*3*
384:*21*  385:*1*
**innovator**
40:*14, 21*
**input**  121:*2*
161:*17*
162:*11, 23*
175:*18*
192:*18*  194:*24*
**inquires**
337:*15*
**inside**  383:*9*
**inspection**
35:*5*  61:*9*
242:*24*
338:*19*
339:*17*
372:*24*
396:*13*  398:*3,
5, 10*  399:*2, 4,

22*  403:*1*
405:*22*
406:*17*  409:*7,
9*  411:*9*
412:*4, 15*
**inspection-
related**  413:*5*
**inspections**
335:*5*  398:*18,
21*
**inspectors**
412:*10, 16*
**instance**
36:*18*  67:*17*
68:*23*  70:*13*
95:*15*  115:*22*
122:*15*
242:*19*
265:*12*
291:*18*  316:*8*
345:*13*
357:*19*
358:*10*  389:*7*
**instances**  66:*1*
77:*10*  92:*22*
95:*6*  99:*4*
285:*9*  304:*7*
338:*23*  399:*18*
**instituted**
152:*18*  155:*16*
**instructions**
265:*11*  416:*1*
**instructs**  12:*24*
**instruments**
392:*6*
**integrated**
42:*16, 19*
**integration**
42:*3, 22*
102:*12*  247:*2,
8*  399:*14, 19*
400:*2, 10, 11*
**integrations**
400:*4*
**integrity**  85:*3,
8, 9, 16*  86:*16*
87:*1*  89:*3, 11,
20*  90:*13*
91:*2*  93:*19*
96:*5*  387:*22*
392:*7*  394:*12*

Confidential Information Subject to Protective Order

intellectual
203:4
intelligence
34:14  82:7
intended  32:9
52:10  109:14
112:24
113:19
140:15
276:12  335:17
intends  53:17
intent  279:22
281:3  357:17
intentionally
401:6
interest
279:11
290:21  336:4
371:18  372:8
373:2  374:14
411:3
interested
321:19  339:6
404:4  415:13
interject  81:3
intermediate
345:12  357:2
intermediates
209:14
290:19  292:5
internal  61:11
293:2  344:15
376:3
Internally
173:14
203:12, 15
international
73:14
Internet  377:5
interpret
104:4  171:4
359:21
interpretation
105:9  170:24
171:7  353:14
interpretations
349:11, 17
interpreted
156:13
157:24

268:17  296:3
403:4
interrupt
146:8  168:10
interrupting
169:19
introduction
251:23
invalidated
389:15
investigated
292:24  347:11
investigation
134:21  137:2,
13, 23  138:10
139:15, 19
198:22
240:17, 18
241:6  251:17
259:24
282:15
293:12, 13
310:15  314:7
347:4  348:1
388:10  410:6
investigations
312:22  313:1
318:13  320:7
409:20  411:5,
14
investigator
338:16, 20
403:4, 22
investigators
338:17  406:6
involved
42:21  53:20
88:21  111:5,
11  124:5
140:14  148:9
211:23
involvement
371:14  374:6
involving
200:15

IRBESARTAN
1:4  10:19
isolated  210:2
Israel  220:22
375:19  397:23

issuance  92:5
116:21  117:4
issue  103:16
117:13, 18
119:14  120:7
124:5  126:21
130:23  131:3
132:5  133:2,
11  134:17, 18
137:14
138:17, 24
139:24  140:8,
12, 14  143:14,
18, 20, 22, 23
144:1, 20
145:16, 21
149:18
163:14
164:20  165:9
172:18  194:2
199:20
200:10, 12, 13,
15, 17, 19
201:5  210:1
212:22
213:15  215:8
256:6  260:17
281:6  290:13
316:15
317:21, 22
320:19
321:23  322:5
327:3  346:5
348:23
358:19
382:22  389:5
issued  116:15
128:13  152:3
174:18
333:19
336:24
404:22  405:24
issues  16:13
28:13  35:3
64:23  135:1
145:9  196:14
257:13
317:19  320:3
339:4, 15
354:5  376:1,
4, 8, 10, 14

394:12
399:11
405:18  411:1
412:6, 11
italics  190:8
Italy  132:22
220:22
item  189:6
409:18
iterations
364:1
its  44:10
50:4, 20  53:5
71:5  72:10
81:22  83:7
87:24  89:9,
18  99:11
107:3  109:24
115:6  120:12
136:10  144:6
152:4  155:17
165:22
171:22
172:22
176:17, 21
177:12  183:3
193:7  194:3
203:18  204:7
211:1  213:19
223:16
224:11
231:22, 24
233:21  234:1,
2, 3, 17  252:2
254:4, 17
257:12  262:2,
7  271:11
280:13, 14
283:20
284:15
287:21  288:4,
15  292:12, 17
295:22
296:10
300:10
316:12  321:3
336:16
338:11, 22
339:18  344:8,
9  346:8, 14
354:8  361:19

362:22, 23
367:10, 14
377:16  378:4
380:15  391:8
412:4
IVES  3:8

< J >
January
19:17  26:20
27:20  30:18
337:5
JASON  3:17
jeez  308:23
Jens  178:22
179:17, 22
180:2
JERSEY  1:1
33:14
Jerusalem
66:11, 19
67:18  69:1,
11  71:6, 9
74:12, 23
77:5  79:11
80:7  83:4, 17
90:18  95:16
97:13  98:18
99:7  101:15
144:4, 16
145:14  283:4
298:19
328:10  329:5,
9  331:5, 10,
23  332:7
375:19  376:2,
12  377:12, 16
378:4  379:7
380:1, 15, 16
381:1, 6
385:17
386:15
388:14  391:8
393:16
394:17
396:13  398:3
399:9  402:1,
23  405:20
409:9, 13
410:13  411:9

Confidential Information Subject to Protective Order

Jerusalem's 70:24 77:15 78:5 80:2
JMLStern@du anemorris.com 3:5
Jmr@pietragal lo.com 3:20
job 30:4 43:1 92:1 247:6 385:12
jobs 26:17
join 372:18
joined 43:2 374:19
joining 36:1 374:23
Jubilant 179:15 196:20 205:23 206:3, 8 209:3 279:18, 24 281:10
judgment 94:23
July 28:17 118:15 119:7 121:22 125:6, 16 139:3 142:10 149:7 154:1, 7, 17 168:4, 18 174:17 180:1, 21 183:8 185:2 187:7, 21 188:23 190:22 195:20 199:11 203:16 205:17 211:17 217:8 218:5 219:9 221:10 222:10 224:16 226:18 227:7, 13, 20 229:19 237:16 239:12

241:16, 17
242:15
243:10
249:12
251:20
253:11
267:16
292:10
311:24
317:16 333:9
338:4, 9 411:8
June 72:11 116:19 120:4 122:4 123:12 124:3 126:10, 21, 22 127:8 128:12, 19 129:6, 13, 18 130:1, 7 133:11, 19 136:11 138:18 139:3 140:3, 9 143:8, 14 144:20 145:13, 21 251:23 252:9, 12 253:6, 13, 19 254:3 255:12 257:16 258:1, 7, 13 259:19, 20 261:12 272:24 288:24 289:19 302:24 303:4, 5, 6, 8, 17, 21 320:24 374:2 377:10 397:23
jury 68:22
justification 191:11 280:12 284:19 287:6, 11, 19 305:7, 19 309:1 388:9, 24
justified 389:6
justify 210:24

JUSTIN 3:3

< K >
KANNER 2:1
Karen 80:18
Katherine 206:12
keep 84:4 266:10 321:24
keeping 210:24
kept 193:24 196:18
key 141:7, 24 290:10
kind 27:9 31:24 69:20 261:17
knew 123:11 129:17 133:17 138:16 140:3 141:6 142:20 194:1 195:14 212:5 257:24 259:9 272:6, 7 284:2 288:14, 24 289:5, 20 312:7 313:12
know 12:2 18:3, 7, 10, 15 19:8 21:7, 15 29:10 31:15 32:3 36:4, 12 37:15 44:21 57:7 60:9 61:6 66:10, 17, 21 68:7 71:8 76:10, 16, 17 77:4 78:20 83:16 84:6 91:22 98:17, 22 101:3 104:3 105:7, 13, 16, 18 106:3, 4 124:21 127:6, 9 129:1, 16, 21 132:9 138:15, 23

139:15 140:17 141:1 143:24 144:24 145:4, 24 153:20 157:12 158:6 171:7, 19, 21 172:4, 15 174:3 179:8 182:19, 20 183:3, 10, 15 186:9, 21 189:17 192:12, 21 193:11 194:13 195:7 198:5 202:14, 16 208:24 209:7 210:3 217:2, 12 218:7, 9, 11 223:11, 12 224:2, 12, 16, 19 227:9 229:15 243:4 249:9 253:14 255:1 257:10 259:3, 13 260:22 262:5, 18, 24 265:22 266:1, 4, 24 268:11, 17 269:8 270:10 272:1 275:10 285:19 287:4 290:24 291:22 293:1 299:6 307:14 308:15, 17, 19 309:11 310:4 311:2, 19, 24 312:11 314:21 319:17 320:9 321:17 322:9 323:24 324:19 325:22, 23 336:10 337:19 338:1 339:5 342:11,

15, 19, 23
343:23
345:13, 19
354:8, 12, 15
355:2, 14, 21
357:19, 22
359:3 362:16
366:4 370:9
371:23 372:2, 5 373:4, 12, 13, 22 374:10
376:7 377:21
380:21 385:1
387:13
394:14 396:1, 9 398:16
400:6 404:11
405:7, 10, 11
406:13, 17, 22
407:1 411:15
knowing 407:4
knowledge 36:3, 5 95:20 104:9, 13, 15 106:13 107:15 121:10 139:10 140:24 149:8, 9 151:20 162:2 176:12 181:9 189:13 195:10 198:19 199:22 200:7 232:12 258:13 300:9 306:23, 24 308:8, 12 309:9 378:23 396:7
known 53:1 120:2 289:9 329:16
knows 18:4
Koller-Dette 6:14, 18 133:2 180:12 181:24 190:14 218:24

Confidential Information Subject to Protective Order

Kong 125:21
126:9 141:8
144:15 320:1
Kristalyn 4:1
10:12
KUGLER 1:4

< L >
L.hilton@kann
er-law.com
2:7
lab 331:18
labeling 41:24
laboratory
56:21 363:4
387:20, 21
390:22
392:16, 21
393:3 394:11,
19
laboratory-
related 389:5
394:4, 8
labs 221:15
Lachman
28:2, 5, 7
29:6, 10, 18, 24
L-A-C-H-M-A-
N 28:2
lack 67:3
326:12 358:20
lacked 393:16
language
156:17 161:8
162:14
172:21
174:23 175:8,
17 353:15
Lantech
347:1, 5
Lantech's
347:11
large's 341:23
laser-focused
284:7
late 168:19
371:9
latest 310:12
law 13:22
laws 73:14

LAWYER'S
419:1
LAYNE 2:4
lays 88:6
lead 34:18
341:8
learn 240:11
learned
239:22 322:14
learning
137:22
learnings
320:16
leave 30:9
162:6 332:3
384:16
left 29:9
31:21 337:5
351:20
legacy 36:18
37:5 42:4, 14,
23 43:8, 18
44:15, 22
102:11 103:9
107:8 110:9
111:4, 13, 15
112:18 240:4,
8 242:7
243:2 246:12,
19, 20 247:11
248:19
legal 54:10,
16 55:14
56:3 57:11,
13 63:11
64:19 65:12
Legally 73:5
legs 13:7
Leron 80:17
letter 337:8
338:12
339:19
340:20 357:5
level 39:15
40:11 130:22
131:12
133:23 139:9
145:4 152:1,
15, 17 153:4
155:4, 13
166:2 260:23

282:13
308:11 315:2
328:2, 6
340:3 395:20
levels 156:21
157:4 171:12
267:3 366:22
369:17
LIABILITY
1:5 10:19
lie 343:4
Lift 180:22
182:1, 8
209:12
213:24
235:14 271:4
lifted 209:19
211:1 213:19
214:2, 19
215:6, 12
lifting 210:6
234:17
light 212:6
339:14
liked 30:8
limit 264:17,
23 267:19
310:5 369:5,
18 370:2
limited 36:4
74:4
Linda 377:10
397:22
Line 9:6, 11,
16, 21 417:3
419:2
link 15:1
157:10, 13
linked 147:21
156:22 157:5
162:17 163:6
liquid 248:4
Liron 409:2
list 51:20
385:23 386:3
listed 17:4, 10
28:16 35:15
72:10 86:20
121:17 252:3
352:19

387:19 393:12
listening 213:1
lists 48:15
50:8 119:8
299:2 386:21
literally 57:12
literature
157:18
LITIGATION
1:5, 21 10:13,
20 19:15, 19
21:23 22:19
40:22 103:17
106:12
109:12 245:13
little 42:3
84:3 96:23
109:17
116:11 162:2
269:5 322:6
354:1, 17
355:24
358:24
382:21 383:6
410:11
Liu 148:23
154:20
156:15
157:21
159:13 164:5,
18 165:19
169:17
L-I-U 148:24
149:3
Liu's 160:7
LLC 2:1, 16,
23 3:8
LLP 2:10 3:3,
8, 17
local 79:23
111:8 135:7
located 13:14,
22 33:11, 15
216:20
220:15, 17
299:13
location
198:18
256:20 355:6,
7

locations
132:3 220:16
222:14
LOCKARD
2:10 14:7, 8,
24 15:12, 17,
20, 21 17:13
18:2 22:22
54:18 59:11
62:12 64:22
66:14 69:15
70:14 74:15
75:3, 12
76:19 83:9,
21 84:7
92:13 93:10
94:15, 23
96:14 99:24
100:2 103:11,
23 105:1, 10
122:12 127:1
128:15 130:3,
17 131:23
138:1 146:1,
7 150:21
163:9 166:13
168:9 186:16
192:6 196:24
207:4 212:15
213:7 214:23
220:5 223:19
225:8 227:24
229:24 232:3,
11, 22 233:6,
19 234:5, 21
235:18
236:18 241:9
244:5, 16, 21
245:2 254:7
255:5 265:7
266:14
288:17, 20
309:4 313:24
324:16
332:15
335:13
360:19
378:18
382:14, 18
386:17 395:3
396:5 401:4

407:20  408:2,
8, 9  412:24
413:10
**Lockardv@gtla**
**w.com**  2:14
**long**  32:5
230:8  245:11
312:11
362:17  378:12
**longer**  21:19
351:23  405:9
**long-term**
156:20  157:3
161:5  162:10
192:13  210:21
**look**  61:22
81:2, 23
89:24  114:2
131:8  133:20
136:18  141:4
147:19
148:20
153:19
154:15  171:1
172:1  173:20
198:11
214:12  223:3
240:7  241:21
259:6  277:15
291:24  293:4,
12  321:22
325:7  330:8
333:5  336:21
343:20
352:13  354:6
357:18, 20
358:7, 9
360:11
366:23
371:20
373:11  381:5
382:6, 10
392:3  397:12
402:9  403:2
413:11
**looked**  19:1
21:6  59:4
61:14  138:9
150:15, 16
202:23
256:14

262:17  282:6
286:1  295:8,
22  305:11
336:24
360:14
373:19
374:15
393:23  394:1
**looking**  23:5
70:9  99:16
129:21  131:3,
5  132:10
138:17
140:12  142:4
143:18
165:17
168:15
169:14  175:9
181:18  190:7
195:3  206:24
227:6  249:17
250:14
263:17  264:8
292:4  298:9
301:23
312:15
326:15
329:21  331:3
337:6  338:17
339:2  354:4
360:2  364:8
365:22
366:13, 16
373:2  379:20
381:4  382:12
405:13  412:21
**looks**  23:2
24:9  26:3, 12
28:14  29:3
30:16, 21
55:18  125:20
154:20
169:17  209:3
210:5  237:23
250:10  251:5
259:10
264:15
277:24
298:13
304:19, 24
331:15, 20

367:13  384:4
399:17  411:20
**Lorraine**
350:17  353:11
**LOSARTAN**
1:3  10:18
**lost**  23:18
**lot**  171:3
185:17
194:20  223:9
274:14  299:3,
7  308:24
331:21  365:13
**lots**  121:14
329:10
331:11  369:3
**Louisiana**  2:5
**low**  200:22, 23
**lower**  328:5
**lunch**  225:12
**luncheon**
236:9
**Lyons**  6:20
7:17  178:18
190:15  226:4
251:6  363:20

**< M >**
**M.L**  3:3
**M7**  170:9
171:4
**MAC**  34:19
**machine**  216:6
**Madam**  77:20
165:2
**main**  117:2
178:22  179:2
201:6  290:17,
21
**maintain**
128:5  210:20
**maintaining**
80:4  82:2, 23
**maintenance**
78:24
**major**  333:14
386:23
387:10  392:3,
12  393:23
**making**  57:23,
24  58:17

59:1  60:14
89:9  160:10
174:24
188:20  255:8
318:18  348:4
**Malta**  37:5
43:18, 24
44:4  46:1
98:23  99:6
101:9  102:12,
15  103:2
119:13, 17
145:19  320:1
**manage**  386:2
**managed**  53:2
**management**
33:24  82:9
88:21  134:4
**manager**
351:19
**mandatory**
360:17
**manipulate**
401:20
**manipulated**
401:6
**manipulating**
400:11  401:1,
13
**manual**
399:13, 18
400:1, 4, 9, 11
**manufacture**
46:16  49:7
50:3  61:20
63:18  64:8
65:9  96:12
97:14  102:13
213:12  242:8
266:3  272:4
274:10
298:18
339:13, 19
346:16  347:6
348:6  355:11
406:16  407:13
**manufactured**
61:3  120:12
121:6, 15
213:16
285:21

335:20
342:12
364:13  369:1
409:14
**manufacturer**
40:15  49:18
50:10, 22
51:2  53:15
54:14  57:14
59:1, 9, 21, 23
60:18  62:1, 7,
8  64:21  65:8,
21  69:2, 8
74:4  90:2
99:9, 20
179:14
229:13  252:1
402:16
**manufacturers**
61:17, 19
62:14
**manufacturing**
39:5, 9  46:21
49:12  53:5
54:7  55:11
56:13, 16
57:18, 22
58:15  62:23
65:6, 17  66:2
67:11, 19
87:17  88:23
97:18, 23, 24
98:8  100:18
101:20
102:20  103:7,
19  104:22
106:24  107:2,
13, 23  108:18
109:2, 3
110:5, 11
111:14
113:22
114:12, 24
115:7  185:19,
23  198:12, 14
200:2, 4
201:18
203:22
212:10
220:11  227:1
231:17

Confidential Information Subject to Protective Order

238:*12, 17*
239:*2, 16*
241:*2*  243:*1*
287:*9, 14, 22*
288:*5, 16*
289:*2, 22*
293:*5*  321:*19*
334:*4, 12, 20*
335:*1*  339:*6*
340:*9*  342:*18*
347:*13*
369:*16, 23*
375:*20*  402:*4,
6*  403:*14, 16*
411:*16*
**March**  30:*16,
19*  32:*13*
**Marck**  4:*1*
**mark**  14:*19*
22:*3*  71:*15*
85:*20*  124:*8*
135:*12*  153:*6*
167:*8*  180:*6*
204:*24*
218:*17*  237:*1*
248:*22*  294:*6*
297:*21*  301:*7*
328:*15*
349:*21*
376:*15*  381:*9*
383:*1, 8, 9*
**Marked**  9:*20*
15:*8*  16:*15*
22:*9*  47:*13*
71:*23*  86:*2*
117:*22*  118:*6,
13*  124:*16*
135:*17*
153:*16*
167:*15*
174:*10*
180:*12*  205:*6*
218:*24*  226:*5*
237:*7*  249:*4*
277:*5*  294:*21*
298:*1*  301:*15*
328:*21*  350:*9*
363:*21*
376:*23*
381:*19*

383:*15*  384:*9*
397:*9*  408:*17*
**market**  34:*20*
43:*21*  71:*12*
152:*9*  281:*17*
282:*3, 17, 23*
283:*3*  314:*18*
318:*17*  362:*7*
375:*22*  409:*15*
**marketed**
41:*19*
**markets**
140:*17*  143:*1*
**marking**
118:*6*  153:*8*
**Maslynsky-
Miller**  1:*17*
415:*1*
**mass**  111:*16*
**master**  356:*20*
358:*1*
**material**
246:*14*
334:*21*  344:*9,
21*  345:*22*
346:*14, 20*
**material/servic
e**  356:*15*
**materials**
51:*16*  111:*12*
290:*19*  292:*2*
318:*19*  336:*5*
344:*17*  345:*9*
351:*8*  388:*3*
**math**  259:*15*
**matter**  10:*17*
23:*24*  308:*5*
313:*17*  408:*4*
**maximum**
264:*19*
**Maz@falkenbe
rgives.com**
3:*13*
**McClain**  7:*15*
350:*8, 17*
351:*15, 16*
360:*13*
**MDL**  1:*3*
**mean**  27:*7*
36:*12*  54:*23*
56:*6*  64:*17*

79:*12, 17*
91:*6*  103:*24*
126:*19*
149:*21*  156:*5*
160:*22*
161:*21*  191:*4*
194:*11*  213:*4*
216:*5*  230:*16*
240:*5*  246:*1*
259:*14*
264:*21*  271:*3*
275:*6*  278:*9,
18*  287:*1*
288:*6*  313:*9*
324:*10*  326:*1*
332:*8*  333:*18*
337:*17*  341:*2*
348:*16*  360:*2*
400:*20*
**meaning**
246:*21*  318:*16*
**means**  54:*13*
56:*17*  57:*1*
65:*7*  80:*1*
85:*8*  94:*3*
95:*13*  202:*5*
354:*2*  388:*13,
17*  392:*19, 23*
415:*21*
**meant**  161:*1*
246:*3, 7*
333:*13*
353:*17*
354:*16*  359:*1*
**media**  238:*1*
**medical**  28:*12*
147:*17, 18, 19*
148:*12, 15*
149:*10, 24*
158:*18, 20*
159:*11, 19*
**medication**
38:*18*  212:*11*
265:*16, 19*
**meet**  51:*17*
392:*6*
**meet-and-
confers**  18:*8*
**meeting**  19:*24*
197:*12*  212:*20*

**meetings**  20:*4,
14, 18*  21:*11*
**meets**  85:*11*
**MEGAN**  3:*11*
**member**  150:*7*
**memory**
296:*17*
**mention**
90:*23*  263:*8*
287:*19*  352:*9*
**mentioned**
42:*9*  108:*6*
112:*15*
114:*19*  189:*1*
194:*16*
209:*10*
215:*19*
216:*18*
242:*20*
307:*21*  311:*8*
**mentioning**
242:*6*  308:*22*
322:*1*
**mentions**
195:*3*  221:*14*
242:*24*  245:*4*
257:*16*
**mercy**  316:*11*
**merely**  201:*23*
**message**
125:*5, 15*
126:*9*  141:*23*
153:*24*
154:*16*  163:*2*
168:*3, 16*
169:*1*  180:*20*
205:*16*  207:*1*
219:*15*
221:*22*  295:*1,
3*
**messages**
125:*10, 11*
169:*21*
**met**  20:*7, 22*
77:*3, 5, 14*
78:*4, 11, 16,
21*  90:*21*
95:*8, 12, 20,
22*  96:*1*  317:*1*
**method**  114:*2*
216:*12*

217:*22*
219:*18*
222:*16, 19*
223:*6, 13, 16,
23*  224:*3, 7,
11, 13, 22, 23*
225:*5*  227:*22*
228:*24*  229:*2,
8, 17, 20, 21*
230:*24*  231:*5,
6, 12, 18*
234:*13*  239:*3*
248:*7*  272:*17*
273:*3, 21*
275:*16*
293:*21*
358:*11, 13, 14,
15, 16*  360:*23*
361:*3, 4, 7*
**methods**
51:*10*  62:*2*
111:*24*  112:*2,
9, 12, 14, 22*
113:*19*  116:*8,
9*  214:*11*
215:*17*
216:*22, 24*
221:*8*  224:*10*
228:*20*
235:*24*
293:*18, 23*
295:*11*  296:*5*
326:*13*
376:*11*  379:*16*
**Michael**  47:*23*
48:*8*  301:*19*
**Michelle**
249:*13*
**micrograms**
264:*18*
**mid**  279:*15,
21*  280:*18*
**middle**  238:*6*
283:*16, 17*
**Miller**  415:*17*
**milliliters**
389:*8, 9*
**million**
264:*19, 22*
267:*10, 22, 23*
323:*10*  362:*8*

365:*17*
367:*17*  368:*7*
369:*6, 19*
370:*3*
**mind**  141:*14*
162:*20*  163:*5*
165:*3*  175:*14,
22*  227:*3*
366:*8*
**mine**  160:*21*
**minor**  106:*5*
245:*23*  246:*2*
386:*23*
**minute**  233:*18*
**minutes**
225:*10, 21*
407:*22*
**misheard**
168:*11*

**misrepresented**
163:*21*
**missed**  338:*10*
**missing**  403:*19*
**misstates**
59:*12*  75:*13*
100:*3*  130:*18*
131:*24*  192:*7*
223:*20*  228:*1*
230:*1*
**mistake**  27:*10*
**mistaken**
152:*22*
182:*10*
267:*21*
280:*20*  320:*8*
323:*3*
**misunderstandi
ng**  169:*10*
170:*6*  191:*14*
**misunderstood**
163:*21*
**moderate**
246:*2*
**moment**
15:*18, 24*
46:*14*  80:*10*
85:*6*  117:*20*
124:*9*  153:*19*
162:*9*  174:*2*

200:*9*  248:*16*
263:*24*  356:*1*
**monitor**  65:*14,
16*
**monitoring**
88:*24*  287:*1*
307:*5*
**monograph**
329:*9*  331:*11,
17*
**Monroe**  3:*11*
**months**  27:*4*
28:*15, 24*
29:*7, 20*
30:*12*  312:*12*
313:*22*
315:*18*
324:*14*  405:*3,
9*
**morning**
11:*14, 15*
142:*2*  269:*6*
272:*16*
298:*14*  311:*9*
**MORRIS**  3:*3*
**move**  94:*8, 19*
256:*9*  311:*4*
366:*1*  408:*21*
**moving**  230:*14*
**multi-
disciplinary**
343:*20*
**multiple**
152:*14*
217:*10*
222:*12*  304:*6*
**Munish**  227:*7*
**mutagenic**
166:*12*  167:*2*
171:*11, 17, 21*
173:*16, 19*
176:*5, 9*
269:*3, 11, 13,
23*  270:*6, 10*
**Myers**  7:*19*
376:*22*  377:*10*
**Mylan**  3:*21*
66:*12*  68:*23*
69:*1, 21*  71:*5,
10*  75:*10*
76:*6*  77:*7*

78:*15*  83:*4,
17*  95:*18*
97:*13*  98:*19*
99:*6, 22*
101:*13, 21*
108:*19*  110:*6*
179:*20*  194:*1,
6, 16, 17*
196:*3, 19*
198:*15*
199:*23*
205:*22*  206:*2,
8, 10, 16*
207:*2, 19, 22*
208:*6*  210:*7,
10*  211:*2, 3, 5*
212:*2*  213:*20,
21*  214:*3, 5,
20*  215:*8, 13*
231:*2, 9*
233:*22*
234:*18*  235:*4,
11, 15, 16*
279:*18, 24*
280:*11, 23, 24*
281:*9, 14, 17*
282:*2, 7, 14,
21, 24*  283:*18,
19*  284:*10, 14,
18*  285:*8*
286:*11, 17, 21*
287:*4, 7, 11,
13*  288:*2, 10,
15*  289:*1, 21*
291:*4, 5*
298:*20*  300:*2,
11, 20*  304:*16*
305:*5, 7, 19,
20*  306:*4, 7,
10, 13, 18*
307:*7, 15, 17,
22*  308:*24*
310:*10*
311:*17*
312:*13, 15*
313:*5*  314:*24*
317:*18*  318:*9,
23*  319:*22*
321:*2, 13, 18*
322:*21*  323:*3,
4, 13, 14, 18*

324:*5, 22*
325:*3, 15, 20*
326:*11, 22, 24*
327:*3, 11*
328:*10*
329:*11*
331:*12*
333:*14, 16, 20*
334:*10*
335:*17, 20*
336:*19*  337:*8,
16*  338:*4, 9*
345:*12, 23*
346:*8, 13, 18,
23, 24*  347:*10,
16, 17*  348:*4,
18*  374:*1*
375:*1, 20*
386:*15*  410:*14*
**Mylan's**  66:*19*
67:*14, 17*
69:*12, 14*
71:*1*  74:*13,
24*  76:*12*
77:*16*  78:*6*
90:*18*  95:*17*
101:*18*
108:*18*
109:*22*  208:*9*
285:*13*
286:*15*
287:*19*
309:*20*  310:*9*
321:*6*  323:*7*
332:*22*  333:*9*
334:*5*  335:*9*
336:*17*
338:*12*
340:*10, 19*
345:*8*  346:*19*
348:*12*

< N >
**name**  10:*11*
11:*17*  28:*20*
79:*12*  81:*4*
148:*19, 23*
149:*2, 3*
151:*5*  178:*23*
187:*11*

**named**  206:*12*
**names**  80:*19*
**nanograms**
267:*20*
**narrow**  243:*7*
**Nassal**  179:*17,
22*
**Nassall**
178:*24*  179:*1*
180:*2*
**national**  73:*13*
**nature**  35:*11*
260:*15*
**ND**  220:*21*
**NDA**  40:*3, 5,
12, 13*  115:*14*
**NDA/ANDA**
7:*10*  298:*1*
**NDC**  298:*23*
**NDCs**  119:*16*
**NDEA**  280:*15*
297:*17*
299:*24*  300:*5,
22, 24*  302:*10,
12, 18*  304:*3,
9, 20*  305:*1, 3,
6, 15, 19*
306:*14, 24*
307:*16*  308:*4,
20, 23, 24*
309:*20*  312:*8*
313:*23*  319:*2*
320:*4*  321:*13,
22*  322:*11, 19,
22*  323:*10, 13,
16*  324:*7, 21*
325:*16*  326:*9*
327:*2, 7*
329:*16*
**NDMA**
120:*11, 16*
141:*10*
142:*14*  154:*7*
166:*6, 11*
167:*1*  170:*18*
171:*10, 17, 20*
173:*16*  176:*4,
9*  177:*13*
197:*18*
219:*11*
227:*15*  250:*6*

257:*19, 24*
259:*9, 18*
264:*17* 265:*4*
267:*11, 17*
268:*9* 269:*3,
11, 23* 270:*5*
273:*3* 274:*6*
275:*11*
280:*13, 15*
284:*20*
285:*10*
293:*19*
295:*12, 24*
298:*15*
300:*21* 303:*1*
305:*9, 24*
308:*1* 318:*24*
319:*4* 320:*14*
321:*10, 18*
322:*10* 362:*7,
12* 364:*12*
365:*1, 5, 15,
20* 366:*23*
367:*5, 11, 15,
21* 368:*4*
369:*10, 17*
370:*1, 7, 14*
371:*5* 374:*2*
410:*6*
**NDMA-free**
265:*22*
**NE** 2:*12*
**necessarily**
95:*10* 139:*10*
140:*13* 141:*1*
198:*5, 17*
201:*20* 204:*3*
228:*12*
230:*16*
287:*16* 288:*6,
9* 289:*11*
290:*18* 306:*6*
313:*8* 317:*1*
318:*21* 326:*1*
342:*16*
347:*24* 348:*9,
15, 22* 404:*2*
**necessary**
78:*13* 139:*6*
199:*3* 217:*23*
218:*4* 230:*18*

234:*14* 272:*3*
303:*11*
392:*20* 406:*5*
416:*4*
**necessity**
275:*2*
**need** 13:*5, 6*
37:*11* 65:*20*
139:*16*
140:*20*
141:*13*
159:*22*
184:*22*
193:*13, 16*
207:*6* 213:*24*
216:*9, 11*
229:*16* 246:*4*
254:*13*
260:*17*
278:*14*
309:*15* 317:*5*
326:*6* 344:*23*
358:*9* 399:*5*
**needed** 34:*21*
123:*5, 24*
133:*7* 139:*12*
140:*19*
145:*10* 158:*6*
178:*9* 182:*17,
20* 188:*4*
193:*17* 199:*8*
222:*8, 12*
256:*10*
278:*22*
310:*20, 22*
313:*14* 317:*4*
318:*12* 371:*24*
**needs** 131:*13*
142:*24*
171:*12* 183:*5*
353:*15* 405:*6*
**negligible**
206:*17* 207:*23*
**neither**
246:*12*
300:*21*
415:*11, 12*
**network** 43:*6*
186:*23* 189:*16*

**never** 76:*11*
181:*8* 232:*7*
258:*13* 305:*18*
**NEW** 1:*1* 2:*5*
33:*13, 14*
40:*5, 8, 15*
43:*10* 272:*7*
296:*19* 302:*7*
389:*19*
**news** 311:*10*
371:*5*
**nice** 14:*9*
91:*6, 12* 93:*5*
94:*12*
**nine** 312:*11*
313:*22* 315:*17*
**nitrogen**
219:*22* 221:*3*
225:*1* 226:*23*
227:*16*
**nitrosamine**
109:*23*
112:*15*
132:*19*
134:*15*
143:*14*
145:*15*
149:*18*
190:*18* 191:*1,
7* 194:*2*
199:*14*
201:*11, 24*
208:*10* 209:*1*
213:*4* 235:*17*
238:*3* 276:*1*
291:*24* 302:*9*
304:*17* 308:*5*
311:*11*
316:*14*
317:*19* 339:*7,
15* 410:*7*
411:*1, 6*
412:*12*
**nitrosamines**
106:*3* 110:*4*
112:*20* 113:*5,
8, 13, 21*
114:*9* 115:*2*
157:*11*
166:*20*
177:*13*

191:*23*
194:*19* 196:*5*
197:*23* 198:*6*
214:*5, 12, 22*
215:*11* 218:*4*
222:*20*
223:*17*
227:*23* 229:*6,
23* 233:*24*
242:*4* 247:*20*
266:*5* 272:*23*
273:*2, 16*
284:*11, 15*
286:*16* 290:*8*
308:*10* 322:*2*
361:*8* 412:*6*
**nitrosodiethyla**
**mine** 302:*10*
**nitrosodimethy**
**lamine** 120:*11*
**nitrous** 201:*2*
**nomenclature**
101:*6*
**non-attorneys**
20:*14*
**non-contract**
66:*2*
**non-Zhejiang**
270:*19*
**non-ZHP**
192:*3* 204:*12*
209:*20*
**Nope** 104:*17*
169:*19*
**normal**
213:*17* 290:*4*
311:*2, 3*
353:*13* 355:*16*
**Notary** 1:*18*
418:*14*
**note** 17:*22*
164:*15*
238:*16* 244:*2*
**notebook**
390:*23*
**noted** 11:*2*
142:*13* 241:*1*
409:*18*
416:*11* 418:*6*
**notes** 251:*22*
302:*23* 329:*7*

386:*2* 390:*19*
411:*22* 413:*4*
419:*1*
**Notice** 5:*13*
15:*6* 16:*19*
103:*17* 104:*7,
20* 105:*2, 6, 8,
18* 144:*19*
173:*23*
174:*18, 22*
175:*24* 176:*3*
232:*24*
378:*21* 396:*7*
**notification**
123:*1* 134:*4*
189:*8, 10*
190:*16* 212:*8*
251:*24* 252:*9*
253:*7* 259:*4,
7, 20* 262:*13*
**notified**
119:*24* 122:*2,
3* 126:*11*
238:*19*
261:*19*
297:*17*
299:*17* 325:*6,
9*
**notify** 102:*8*
117:*17*
**notifying**
261:*16*
**notwithstandin**
**g** 67:*3*
**November**
26:*5, 13*
299:*19* 300:*6,
14* 301:*19*
310:*11, 13*
312:*10*
320:*20, 24*
322:*20*
323:*13* 325:*9*
326:*21* 327:*7,
14* 329:*17*
333:*23*
336:*20* 337:*7*
340:*7*
**NP** 219:*19*
222:*23* 223:*4*

Confidential Information Subject to Protective Order

224:*14*
**NTM** 134:*3*
**Nudelman**
150:*4* 169:*2, 4, 15, 16*
170:*2, 3, 4*
171:*10*
173:*15*
250:*11, 15, 17*
268:*7* 270:*4*
**Nudelman's**
170:*17, 20*
171:*8, 16, 20*
**number** 17:*4*
19:*2* 20:*3*
26:*16, 17*
34:*7* 35:*21*
56:*24* 57:*1*
59:*6* 66:*3*
80:*9* 96:*7*
107:*17*
110:*14, 18*
112:*16* 119:*9*
141:*9, 17*
162:*19* 163:*5*
184:*10*
220:*19*
274:*10* 278:*1*
295:*17*
313:*14*
326:*14*
342:*20* 352:*9*
355:*1* 364:*10*
366:*24* 372:*8*
373:*2* 378:*8*
386:*21*
393:*11* 398:*4*
406:*10* 407:*2*
**numbers**
250:*19*
263:*23* 299:*3, 7*
**NW** 3:*4*

**< O >**
**oath** 11:*5*
**object** 12:*23*
103:*12*
122:*12* 163:*9*
212:*15* 213:*7*
223:*19*

227:*24* 232:*3*
254:*7* 255:*5*
265:*7* 309:*4*
378:*19*
**objected** 233:*3*
**objecting**
403:*23*
**Objection**
54:*18* 59:*11*
62:*12* 64:*22*
66:*14* 69:*15*
70:*14* 74:*15*
75:*4, 12*
76:*19* 83:*9, 21* 92:*13*
93:*10* 94:*15*
99:*24* 105:*5*
127:*1* 128:*15*
130:*3, 17*
131:*23* 138:*1*
150:*21*
166:*13*
186:*16* 192:*6*
196:*24*
214:*23* 220:*5*
229:*24*
232:*22* 234:*5, 21* 235:*18*
266:*14*
288:*20*
313:*24*
324:*16*
335:*13*
360:*19*
386:*17* 395:*3*
396:*5* 401:*4*
**objections**
10:*6* 232:*23*
**objective**
251:*13*
316:*18*
335:*15*
338:*22* 342:*5*
371:*20*
**objectives**
94:*5* 95:*11*
316:*24*
**obligation**
61:*24* 193:*6, 9*

**obligations**
41:*9, 12, 22*
73:*9*
**observation**
381:*2* 387:*4, 7, 16, 18, 19*
390:*8* 391:*7*
392:*3, 11, 13*
393:*24*
394:*10, 19, 23*
395:*19*
404:*14, 21*
405:*13*
**observations**
336:*24* 372:*6*
378:*3* 379:*5*
380:*14*
386:*21, 22*
387:*10*
393:*22* 394:*2, 4* 395:*18*
401:*23*
403:*24*
405:*18, 24*
**observed**
257:*19*
293:*11* 392:*8*
**observes** 269:*2*
**Observing**
136:*19*
**obtain** 25:*11*
181:*21*
183:*14* 275:*23*
**obtained**
25:*20* 270:*23*
388:*7* 390:*4, 10* 391:*1*
**obtaining** 68:*9*
**Obviously**
12:*2* 35:*20*
37:*9* 151:*22*
239:*7* 279:*9*
280:*4* 315:*21*
317:*24* 340:*5*
**occurred**
35:*24* 311:*13, 20* 330:*2, 12*
380:*24*
**occurring**
164:*8*

**October**
86:*20* 350:*18*
363:*9*
**offer** 29:*17*
**offhand** 299:*6*
**office** 13:*23, 24*
**offices** 33:*15*
**official** 386:*3*
390:*22*
**Oh** 27:*5, 14*
132:*21*
190:*10* 215:*4*
242:*17*
250:*21, 23*
264:*10* 270:*7*
343:*14*
352:*15* 363:*2*
378:*10*
**okay** 12:*13*
13:*11* 14:*13*
26:*10* 32:*10, 19* 37:*6, 8, 15*
43:*13* 44:*1, 3*
46:*7, 10, 11*
47:*3* 81:*5*
82:*12* 84:*9*
101:*13, 17*
102:*17*
103:*23* 105:*1, 10* 116:*12, 13*
125:*4* 126:*8*
127:*5* 134:*11*
141:*21*
142:*12* 147:*8*
154:*8* 159:*9*
168:*10, 22*
169:*22* 205:*8*
207:*7* 217:*6*
220:*20* 233:*6, 19* 250:*22*
263:*21*
264:*10* 276:*9*
277:*14* 278:*4*
297:*1* 312:*4*
316:*12* 330:*9*
332:*3* 333:*6*
341:*17*
351:*10* 356:*2*
358:*9* 363:*13, 14* 377:*20*

378:*15*
379:*20*
396:*24* 397:*1, 18* 408:*4, 7*
413:*18*
**Oklahoma**
13:*16, 23*
14:*1, 9* 20:*23*
**once** 61:*2*
67:*7* 246:*8*
255:*9* 323:*12*
**one-day** 185:*6*
**ones** 178:*6*
**one-year** 32:*9*
**ongoing** 192:*4*
222:*16* 224:*20*
**on-site** 316:*13*
317:*17* 371:*4*
**OOS** 136:*6, 19* 137:*13*
138:*10*
388:*18* 389:*2, 3, 23* 390:*20*
**OOT** 136:*7*
388:*5*
**open** 405:*1, 2, 6, 8*
**opening** 22:*15*
96:*18* 105:*24*
**operate** 144:*22*
**operates** 51:*2*
61:*20*
**operating**
42:*11* 45:*19*
57:*22* 85:*2*
127:*18*
149:*15* 257:*9*
391:*22* 400:*14*
**operation**
28:*21*
**operational**
218:*14* 224:*1*
**operations**
35:*15* 36:*19, 23* 37:*2* 42:*5*
111:*10* 402:*3*
403:*12*
**opinion** 95:*9*
209:*11* 256:*8, 10* 338:*14*
344:*20* 359:*15*

opportunity
29:16  312:24
313:18, 22
opposed  164:8
optimized
109:20
Oral  5:13
15:7  16:20
ORDER  1:12
216:8  228:21
232:6  233:1
254:12  280:7
285:1  315:21
358:8  376:7
ordered
225:12
organization
30:9  35:4, 6
36:13  110:17,
24  122:18, 23
123:16, 22
126:7  130:10
131:2, 10, 11
132:4  143:24
144:23
148:13, 15
159:20  178:3,
5  188:15, 16,
18  189:9
220:9  228:11
230:10
231:11
342:17, 18
343:15
351:19, 23
355:8  360:5
371:19  385:4
organizational
31:13  35:5
organizations
111:8, 11
259:1  313:16
353:10  359:10
organize
296:23
orient  116:12
original  79:4
125:15
141:23  416:15
Orleans  2:5
OS  293:12, 13

Osmian  6:23
249:3, 13
outcome
412:15
outcomes
342:8
outlined
105:17  245:18
out-of-
specification
134:17, 20, 24
136:6  388:19,
20  391:9
out-of-trend
134:24  136:7
outside  20:10
21:11  22:22
103:13  105:6
232:4, 5, 23,
24  236:22
378:20  396:6
outsourced
46:20  49:6,
13  50:21
54:14  73:22
74:6  96:11
outsourced/con
tracted  73:10
outsourcing
50:3
overall  33:22
oversaw
105:21
oversee  42:10
oversight
328:6
owned  58:8,
10
owners  98:13
Oxford  3:18
o-xylene
347:17, 23
348:5, 14

< P >
P.C  2:19
p.m  207:11
236:6, 13
297:4, 11
330:15, 22

375:7, 14
413:20  414:4
packaging
44:6, 11
357:2  373:12
PAGE  5:10
6:3  7:3  8:3
9:6, 11, 16, 21
23:4  36:11
37:13  38:6
40:11  48:4, 7
49:17  90:6
121:18  142:5
154:16
168:13, 23
169:1  219:16
226:21
268:20  278:2,
4  299:22
302:4  329:8
332:18  352:1
356:13
365:19  377:9
378:5, 7, 8
379:1  382:9
385:23
397:13  417:3
419:2
pages  48:21
359:7  418:3
paid  24:19
papers  400:24
401:7, 12
Paragraph
23:21  263:12,
14  264:9
302:7
parameter
400:14
parameters
116:1
paraphrasing
136:24
Parkway  2:20
Parsippany
33:16
part  24:7
31:16, 18
39:23  42:9,
23  43:1  44:4
45:10  52:9

64:2  75:22
77:24  85:13,
16  108:7
126:10
143:16
159:23
161:15  165:6
169:7  190:7
196:8  200:13
202:18
209:10
217:21
247:16
262:15
264:19
265:16  290:7
291:23  316:1
318:16  323:9,
17, 23  324:23
326:13  344:7,
11  346:5
347:12  348:1,
23  371:16, 19
374:10, 13, 14
394:10  402:3
403:13
parted  29:18
particular
162:19
183:12  402:2
403:12  413:1
parties  10:22
73:7  87:15
88:22  304:8
415:12
parts  218:1
220:17, 18
264:21
267:10, 22, 23
362:8  365:16
367:16  368:7
369:5, 18
370:2
party  52:10
90:1  100:10,
12, 21  316:5,
7  345:2
passed  131:20
passing  391:1,
11
patience  118:8

patient  38:13,
19  126:14
140:5  181:15,
16
patients  156:2,
12, 23  157:6,
17  158:3
160:24
161:11, 22
162:18, 20
163:8, 16
164:9, 21
165:11  175:4,
24  193:23
212:11
265:15, 17
266:10
310:24  314:19
pause  12:9
PDF  81:11
411:21
peaks  295:10,
23
pending  13:8
233:11
Pennsylvania
1:19  2:21
3:19
penultimate
302:6
people  34:3, 8,
12  130:13, 20
139:9  253:1
268:6  286:2
308:18  344:6
percent  389:11
perfect  12:14
13:12
perform  34:9
51:5  60:4
112:13  203:8
215:17  216:2,
8, 14, 22
217:22
223:14
228:19
230:19
234:15
235:23  236:1
261:16
306:13  313:1

Confidential Information Subject to Protective Order

| | | | |
|---|---|---|---|
| 314:*14* 315:*5* 329:*9* 346:*8* 402:*3* 403:*12* **performance** 107:*19* 147:*21* 293:*4* 328:*7* 354:*5* **performed** 51:*10* 52:*21* 89:*24* 110:*16, 18* 114:*23* 115:*5* 147:*18* 215:*16* 228:*10* 230:*5, 9* 262:*12* 273:*13* 310:*16* 319:*10* 331:*17* 335:*16* 371:*18, 21* 379:*12* 385:*18* 411:*14* **performing** 34:*4* 218:*14* 292:*13* 318:*20* 331:*10* 379:*8* **period** 68:*4* 116:*11* 121:*15* 245:*6* **periodic** 315:*12* **periods** 68:*14* **permanent** 341:*2* **permissible** 265:*4* 267:*18* **permission** 193:*14, 16* **permitted** 54:*8* 55:*12* **person** 20:*2, 7, 19, 22* 34:*18* 79:*13* 80:*3, 11* 82:*6* 117:*2* 132:*18* 145:*24* 149:*4* 179:*9, 13, 17, 18* 206:*12* | **personal** 104:*9, 14* 232:*12* 371:*14* 372:*8* 374:*5* 378:*22* 396:*7* **personally** 175:*20* 332:*4* 380:*22* 405:*16* **personnel** 80:*10* 88:*21* 178:*16* 179:*6* 203:*15* 399:*20* 412:*1* **persons** 111:*4* **person's** 149:*6* **perspective** 101:*2* 117:*3* 127:*6* 131:*4, 6, 9* 132:*11, 15* 140:*13* 157:*14, 20* 158:*5* 188:*10, 13* 197:*11* 199:*6* 228:*21* 229:*6* 314:*3* 317:*21* 318:*22* 339:*7* 354:*19* 372:*1* **pertained** 19:*3* **pertinent** 107:*3* **ph** 1:*23* **Pharma** 2:*16, 23* **Pharmaceutical** 2:*15* 3:*6, 7* 28:*10, 11* 37:*22* 252:*2* 270:*19* 334:*5, 13* 339:*21* 340:*10* **Pharmaceuticals** 2:*16* 3:*21* 4:*1* 98:*24* 257:*17* **pharmacovigilance** 159:*1, 4* **PharmQ** 31:*1* | **phone** 20:*3, 23* 142:*1* 324:*12* **phosphorous** 225:*1* 226:*23* 227:*17* **phrase** 37:*19* 40:*3* 163:*15* 171:*22* **phrases** 104:*23* **physical** 314:*10* **Physically** 30:*17* 33:*11* **picked** 110:*23* 324:*12* **picks** 195:*7* **piece** 215:*23* 216:*19* 218:*13* 238:*1* 284:*5, 24* 285:*6* **pieces** 217:*12* 258:*24* **Piedmont** 2:*12* **PIETRAGALLO** 3:*14* **Pittsburgh** 3:*19* **place** 44:*20* 45:*7* 91:*20* 112:*1* 131:*17* 182:*4, 11* 183:*3, 11* 184:*1, 3, 5* 186:*4* 188:*8* 199:*9* 214:*17* 224:*7* 246:*18* 258:*18* 260:*5, 9, 15* 261:*7, 17* 262:*3, 8* 263:*3* 266:*6* 268:*3* 291:*4* 292:*11* 315:*8* 326:*4* 353:*16* 395:*17* 415:*9* **placed** 177:*3* 183:*5, 22* 185:*1, 17* | 281:*21* **places** 222:*12* **Plaintiffs** 2:*7* 11:*18* **plan** 279:*16* **please** 11:*5* 12:*17* 15:*24* 24:*3* 37:*10* 55:*8* 63:*21* 74:*20* 75:*17* 77:*18, 19* 127:*20* 141:*15* 164:*12, 13* 227:*5* 329:*19* 356:*2* 380:*3* 416:*3, 8* **point** 21:*18* 56:*11* 60:*22* 77:*6* 105:*22* 106:*19* 123:*2* 129:*8* 133:*6* 139:*4, 13* 146:*5* 148:*19* 180:*4* 184:*6* 196:*2, 7* 197:*8* 210:*23* 211:*19* 212:*24* 224:*1* 225:*3* 230:*6, 8, 17* 231:*21* 233:*13* 234:*10* 251:*17* 255:*16* 265:*3, 12, 20* 285:*7* 286:*20* 309:*14* 314:*23* 318:*5* 319:*10* 346:*6* 360:*14* 361:*5* 363:*4* **points** 141:*7, 24* **policies** 34:*2* 42:*20* 44:*17* 73:*15* 75:*7* 76:*2* 134:*22* 135:*3, 7* 256:*13* | **policy** 43:*3* 45:*21* 46:*9, 15* 48:*22* 49:*1, 10* 50:*2* 61:*14* 67:*6, 24* 68:*16, 18* 74:*3, 9, 22* 76:*15* 85:*5* 86:*24* 87:*6, 22* 88:*8* 89:*17* 90:*7, 21* 91:*11* 92:*18, 23* 93:*5* 94:*12* 95:*3, 8, 12, 22* 96:*9, 11* 127:*22* 128:*4* 135:*6, 9* 136:*5, 14, 16* 137:*11, 20* 138:*9, 10* 139:*14* 316:*6* 349:*6, 8, 11, 18* 350:*24* 351:*3, 6* 352:*6, 10, 18* 353:*22* 356:*10* 359:*5, 22* 360:*10* **poor** 138:*6* **pop** 322:*13* **pops** 381:*23* **population** 156:*6* **position** 27:*15, 16* 30:*12* 33:*2, 6* 79:*20, 22, 24* 100:*15* 201:*12* 265:*23* 266:*21* 268:*10* 272:*9* 275:*24* 276:*4* 296:*4* 315:*4* 328:*5* 335:*19* **positions** 27:*23* **positive** 365:*1* **possession** 60:*17, 22* |

Confidential Information Subject to Protective Order

62:8  323:20,
21
**possibility**
162:4  206:17
207:23  291:21
**possible**  44:12
68:11  101:1
204:3, 20
266:2  289:5
307:4  338:8
**post**  109:10,
14  247:7
248:13  406:17
**potent**  166:12
167:2, 3
171:11, 17, 20
172:5, 16
173:9, 16, 18
176:4, 9
269:12  270:3,
6, 10
**potential**
19:14  106:15
116:2  117:12
162:10  166:9,
10  184:4
252:4, 19
253:8, 16
254:2  257:5,
6  258:20
260:6  263:9
280:3  292:21
300:4, 24
304:2, 8
308:9  320:3,
14  324:20
327:2  342:8,
21  352:5
**potentiality**
191:6  305:14
312:8
**Potentially**
134:3  256:21
412:4
**practical**
101:1  274:9
359:9
**practice**
100:13  101:4
288:7  348:17
373:23  388:7

391:16  400:3,
6, 19, 20, 21
402:6  403:16
**practices**  39:6,
9  334:4, 12,
20  335:1
340:9  402:5
403:14
**precaution**
182:21
**precedent**
211:12
**precise**  247:3
272:20
**precisely**
257:10
**preclude**  91:1,
8, 24
**predates**
377:21  385:20
**predating**
375:1
**predecessor**
41:5
**predetermined**
69:6
**predicated**
117:10
**predict**
201:21  340:15
**preliminary**
122:19
123:17  283:24
**prep**  20:14
**preparation**
24:14  70:22
148:7, 10
149:16
154:10  166:4
288:13
379:13  380:7
391:17
**prepare**  18:21
20:1, 20  21:4
70:9  75:8
76:2  150:1
**prepared**  19:7
73:20  148:2,
15  150:18
154:12
159:11, 19

279:21  329:4
370:24
**preparing**
21:9  154:21
**prepped**
106:17
**prescription**
94:1
**presence**
157:11
191:23
217:15  242:3
272:23
293:18
295:11
321:21  362:12
**PRESENT**
4:1  113:3, 6
114:4, 7
121:6  253:4
285:3, 19, 23
**presentation**
253:23
**presented**
343:10
**presenting**
254:20
**president**
31:4  133:1
184:14  187:5
307:13
**Pretty**  25:21
65:14  203:3
309:24
355:21, 22
360:2
**prevented**
92:4  325:14
**prevents**
254:16
**previous**  258:3
**previously**
117:22
118:13
126:12
300:18, 21
**primarily**
179:13, 19
**primary**
179:24

**principles**
87:13
**Prinston**  3:7
**prior**  26:23
52:11  102:12
110:3, 7
122:14
129:13, 18, 24
139:13  140:9
145:13, 21
246:4  247:2
288:24
289:19
292:10  300:6
336:16
362:15  374:1,
23  407:17
415:4
**priorities**
31:15
**priority**
313:19, 21
**private**  26:13
**proactive**
197:11, 14
199:3
**proactively**
196:14
198:23  210:15
**probabilities**
164:24  165:14
**probability**
155:6  162:5,
19  163:4
164:8  175:14,
21
**probable**
120:17
141:10
142:15, 21
302:13
**probably**  12:3
37:19  45:11,
14  68:20
142:20
185:10
240:16
278:14  339:2
370:15  375:3
**problem**
120:7, 9

122:3, 6, 8, 11,
21  123:19
137:22  146:8
151:10
192:15
195:10  196:1
198:16, 18
211:21  212:2
213:14  235:4
250:21  264:1
289:14  299:18
**problems**
120:1  193:22
**procedure**
43:3, 5  45:3,
5, 8, 12  53:7,
13, 21  97:5,
12  98:1, 12
100:10, 16, 20
127:18  134:1,
4, 5, 9  149:15
257:9  260:12,
14  263:2
358:20
388:18  389:2,
23  390:16
391:22
392:24
395:23  405:5
**procedures**
34:2  42:11,
20  43:10, 12
45:19  85:2
128:5  131:16
132:1  133:14,
21, 22  135:8
153:2, 4
155:13  260:4,
8, 20, 21
261:7, 11
292:11, 18, 21
315:7  344:8,
12, 13, 14
390:16
395:17  402:5
403:15
404:16  406:1
407:4  409:24
**proceed**
397:17

Confidential Information Subject to Protective Order

process 34:*19*
44:*14* 53:*3, 6*
62:*23* 102:*20,*
*21, 22* 103:*20*
104:*19* 105:*6,*
*11, 13, 17*
106:*1, 5, 11,*
*15, 16, 24*
107:*1, 14, 23,*
*24* 108:*1*
109:*9, 20*
110:*5, 11, 12,*
*13* 111:*14*
112:*19* 113:*6,*
*23, 24* 114:*12,*
*14* 115:*1, 7, 8*
124:*1* 129:*7*
143:*5* 148:*6*
177:*16*
181:*17*
185:*19*
189:*11*
191:*24* 192:*3*
194:*12, 13, 22*
195:*6, 8*
196:*9, 10*
198:*12, 13, 14*
200:*2, 5, 15*
201:*9, 12, 15,*
*16, 18* 202:*2,*
*17* 209:*1*
211:*7* 212:*10*
228:*14, 15*
231:*9* 238:*12,*
*18* 239:*2, 17,*
*24* 240:*2*
241:*2* 245:*19*
246:*9* 253:*5*
260:*16*
261:*17, 22*
262:*3, 7, 14,*
*16* 266:*22*
275:*21* 283:*3,*
*6, 7, 22*
284:*21*
285:*19, 21*
286:*12, 19, 23,*
*24* 287:*9, 14,*
*22* 288:*5, 16*
289:*3, 15, 22*
290:*1* 293:*5*

307:*3* 309:*8*
321:*20*
323:*23*
324:*22* 328:*1*
335:*7* 339:*7*
343:*18, 19*
347:*13*
359:*11, 15*
367:*21*
369:*16, 23*
394:*20*
404:*15, 17*
processed
51:*16* 178:*3*
processes
49:*20* 51:*10*
62:*2* 69:*4*
73:*9* 231:*17*
258:*17* 345:*3*
347:*11*
processing
71:*10* 196:*18*
206:*7* 373:*13*
procured
73:*24*
procurement
142:*20* 143:*11*
procuring
74:*24*
produce 52:*5*
85:*10* 88:*4*
323:*19* 336:*7*
produced
38:*10* 210:*16*
231:*16*
250:*19*
263:*23* 370:*1*
producing
177:*20*
product 34:*21,*
*22* 38:*16, 24*
40:*21* 41:*24*
44:*23* 49:*20*
52:*6* 56:*18,*
*20* 57:*24*
58:*1, 3, 10, 14,*
*18, 19* 60:*2, 6,*
*12, 17* 61:*3, 7,*
*10, 12* 62:*9,*
*11, 20* 63:*3*
65:*9, 17* 69:*4,*

*24* 78:*14*
89:*1* 97:*24*
98:*5, 14*
100:*11* 102:*7*
112:*11, 24*
113:*3* 115:*21*
117:*14*
123:*19*
140:*15* 141:*2*
147:*23* 155:*8*
156:*20* 157:*4*
162:*11*
172:*23*
176:*17*
182:*24* 183:*5,*
*12* 184:*3, 17,*
*18, 19, 20*
185:*14, 24*
186:*15*
187:*15, 20*
188:*5, 7*
189:*1, 3, 7, 12*
193:*3, 19*
194:*17*
195:*15*
197:*12*
199:*13* 202:*7,*
*11* 210:*24*
211:*2* 212:*5*
213:*20* 214:*6,*
*20* 215:*8, 13*
218:*15*
221:*13*
231:*23*
234:*18, 20*
235:*1, 4, 10*
256:*5* 261:*1*
266:*3* 270:*18,*
*22* 271:*5, 15,*
*21* 272:*2, 14*
273:*4, 17*
274:*1, 17, 23*
275:*1, 2, 5*
276:*16*
277:*21* 279:*4*
280:*14, 23*
281:*18*
282:*14, 17, 21,*
*22* 291:*12*
293:*9* 300:*1,*
*20, 22* 301:*1*

304:*17* 305:*5*
309:*14*
310:*10* 311:*3*
314:*15, 17*
317:*10, 12*
318:*17*
319:*15*
324:*23*
333:*15*
335:*11, 20*
336:*8* 340:*19*
342:*10, 12*
343:*2* 344:*23*
355:*5, 10, 11*
358:*2, 7*
369:*3* 373:*14*
379:*15*
380:*11* 395:*9*
**Production**
9:*10* 128:*23*
289:*14*
404:*15, 17*
**PRODUCTS**
1:*4* 10:*19*
46:*22* 50:*5*
51:*16* 87:*19*
112:*14*
116:*16*
119:*17*
137:*16*
147:*22* 152:*5,*
*19* 155:*18*
173:*10*
176:*21* 177:*4,*
*6* 188:*21*
193:*7, 10, 12*
197:*3* 210:*4*
211:*22*
213:*15* 214:*3,*
*9, 13* 216:*9*
250:*3* 264:*17*
266:*7* 272:*5*
273:*7* 274:*11,*
*13* 298:*23*
299:*13* 304:*4*
319:*21*
357:*18* 358:*6*
professional
24:*24*
professionals
360:*5*

program 26:*1*
33:*24* 34:*6*
45:*1* 82:*9*
89:*3, 22*
293:*2* 328:*12*
351:*18*
354:*23, 24*
programs
89:*11, 20*
prompt 123:*8*
promptly
262:*8* 263:*3*
315:*17, 20*
prone 285:*22*
prongs 221:*8*
pronunciation
151:*8*
properly
292:*12, 23*
property
203:*4*
proposal
174:*24*
propose 94:*13*
317:*11*
proposed
41:*14*
proposes
92:*19* 93:*6*
propounded
418:*5*

**PROTECTIVE**
1:*12*
**Protocol** 7:*14*
328:*20* 329:*4*
331:*4*
**Provide** 52:*3*
133:*23*
158:*15* 166:*2*
177:*18*
198:*10*
232:*14*
251:*13*
286:*11* 359:*2,*
*15* 360:*7*
provided
105:*20*
137:*15*
169:*23*
206:*18*

207:24  208:6,
19  209:4
255:10
283:19
284:14, 19
287:7, 12
302:24
303:17
307:22, 24
308:4  358:24
402:18  403:5
**Providence**
33:14
**provider**
356:15
**provides**
38:12  49:19
69:3  241:23
**providing**
12:5  28:8
35:4  183:16
326:17  351:7
360:8
**provision**
325:21
**Public**  1:18
173:17  418:14
**Puerto**  25:3,
14
**pull**  86:9
105:2  117:19
141:5  172:3
180:17
274:15  312:4
**pulling**  135:21
**purchase**
69:13, 24
70:24  71:4
74:13  75:10
76:5  77:15
78:5  83:5, 18
90:19  97:15
317:12  336:4
342:4, 13
343:1
**purchased**
43:19  279:17
331:22
**purchaser**
100:11

**purchases**
99:7
**purchasing**
63:19  64:9
98:19, 23
148:17  194:5
203:1  206:2
248:18
279:23  281:8,
16  291:12, 20
327:23
341:23
343:13
354:11  410:14
**purity**  41:18
63:3  193:12
**purpose**  72:13
86:23  138:22
218:14  251:9
255:23  256:2
258:5  271:23
276:9  314:2
315:19
338:22  353:10
**pursue**  30:8
77:7, 11
277:20
303:12  320:6
**pursued**
306:10
**pursuit**  91:17
**purview**  82:13
**put**  27:7
45:20  46:9,
13  47:1  85:5
119:5  126:15
128:2  149:22
158:7  176:13,
16, 20  184:22
185:19  189:4,
11  191:10
192:2, 12
193:1, 14
196:9  199:8
210:15
214:16
231:22
232:20  239:4
271:14
276:13, 18
311:23

326:15  333:6
345:16
363:10, 11
370:21
371:12  382:24
**putting**  47:4
124:1  181:17
185:21  188:7
193:19  194:7
195:15
196:16
253:23  272:2

**< Q >**
**QA**  386:2
**QC**  390:24
**QTA**  79:4
81:14, 21
82:3, 24  83:8,
19  386:4, 8
**QTAs**  73:11,
19  80:4  81:12
**qualification**
349:5, 8, 18
350:24
351:18  352:6
353:7  354:4,
23  355:1, 20
356:14
409:24  410:11
**qualities**  145:2
**quality**  33:3,
20, 23  41:18
50:15  54:10,
17  55:14
56:3  57:11,
13, 19  63:2,
12  64:19
65:13, 20
66:1, 7, 10, 18,
21  67:10
68:1, 10
70:23  71:2
72:7, 15  73:1,
8  75:9  76:3,
22  77:8, 11
78:10, 14
79:6, 10, 16,
19  80:2, 7
82:8  83:2, 13
90:11, 17, 24

91:5, 12, 17,
19, 24  92:5,
11, 20  93:6, 7,
9, 14, 17, 20, 24
94:5, 13
95:19, 24
111:9  122:23
123:22  124:4
126:2, 20
129:22
131:10, 19
132:14  133:1
144:11  145:1
151:13, 16, 21
183:8  186:13
188:12, 14, 21
193:11
232:18  251:2,
10  256:6
257:15
259:17
260:10, 11, 13
261:1  263:8
264:6  269:9,
18  270:16
291:4, 16
307:13
325:20  328:3,
8  341:9
342:10, 17
343:14
345:21
348:20
351:19
360:16  373:5
376:1, 3
380:9, 18, 23
385:13, 24
386:4, 8, 14
**quality/safety**
117:13
**quantification**
175:14, 22
**quantify**
161:11, 20
**Question**  9:20
10:7  12:10,
17  13:1, 8, 9
23:12  55:7
63:20  64:4
74:20  75:17,

24  77:19
78:2  94:9, 11
113:11  138:4
146:23  158:9
165:1, 8
177:2  189:18
194:4  197:1
201:23
207:16, 17
217:7  227:11
233:11, 16
234:24  260:3
266:9, 13
269:15
274:24  278:8
279:19
287:10, 24
304:23
308:18  312:6
321:5  334:22
341:8, 14, 15,
16  349:13
**question-and-
answer**  238:1
**questionnaire**
320:19  356:20
**questionnaires**
320:10
**questions**
11:20  12:4
156:3  217:3
320:13  418:4
**quick**  263:18
375:5
**quicker**  267:7
**quickly**  225:17
**quite**  36:22
**quiz**  36:7
**quote**  74:4

**< R >**
**R&D**  111:9
216:19  229:1,
2  230:10
**Rachel**  4:1
19:21
**raise**  156:3
**raised**  147:24
**ramifications**
342:15

Confidential Information Subject to Protective Order

**ran** 32:*12*
**range** 396:*24*
**ranging**
367:*16*
**Raphael** 150:*4*
**RASPANTI**
3:*17*
**rate** 24:*10, 14*
**ratio** 181:*16*
**rationale**
193:*19* 280:*9*
**rationalization**
278:*23* 280:*10*
**Raton** 3:*5*
**raw** 344:*9, 17*
345:*22*
346:*14, 19*
388:*2* 390:*23*
391:*15*
**RBK/JS** 1:*5*
**reach** 196:*2*
312:*16*
**reached**
196:*15*
300:*13* 304:*1*
**reacting** 201:*6*
**read** 49:*14*
55:*16* 57:*10*
63:*23* 64:*2*
67:*9* 72:*19*
73:*16* 75:*22*
77:*24* 81:*15,*
*18* 82:*18*
89:*5* 97:*4, 8*
136:*24* 137:*6*
164:*12* 165:*6*
182:*13* 190:*1*
206:*21* 207:*4,*
*18* 209:*5*
227:*3* 295:*13,*
*14* 329:*19*
352:*24*
353:*19* 359:*6*
380:*3* 388:*11*
391:*3, 19*
392:*18* 416:*3*
418:*3*
**readiness** 35:*6*
**reading**
128:*20*
206:*23* 207:*8,*

9, 10 222:*3*
353:*1* 379:*4*
405:*12*
**reads** 55:*11*
81:*11* 90:*9*
156:*20* 168:*18*
**ready** 226:*7*
227:*9, 10*
253:*3* 312:*21*
**reaffirm**
100:*14*
**real** 263:*18*
**really** 42:*7*
171:*11*
270:*11*
275:*19*
314:*22* 322:*5*
345:*4* 354:*18*
**Realtime** 1:*17*
415:*4, 17*
**reason** 29:*5*
46:*8* 98:*7*
113:*4* 157:*8*
171:*15* 172:*8*
210:*20, 22*
211:*21* 212:*1*
256:*4* 270:*9,*
*14* 274:*19, 21*
306:*6* 316:*17*
318:*1* 319:*20*
321:*4, 7*
324:*11*
343:*10*
348:*10* 361:*2*
373:*15* 405:*7,*
*10* 416:*5*
**reasonable**
155:*6* 158:*8*
317:*16, 22*
**reasons** 66:*4,*
*5, 8* 191:*22*
331:*2* 342:*21*
389:*20*
**reassessed**
182:*22*
**recall** 25:*10*
35:*22* 68:*15*
71:*7* 80:*6*
81:*1* 82:*16*
97:*1* 103:*1, 4,*
*6* 107:*22*

108:*10*
109:*13, 14*
111:*3* 125:*13*
133:*3* 134:*1*
138:*8* 144:*8*
148:*6, 14, 20*
149:*4* 150:*3*
152:*1, 2, 3, 15,*
*17, 18, 23*
153:*1, 3*
154:*22* 155:*2,*
*5, 17* 156:*16*
157:*2* 168:*6*
172:*2* 173:*12,*
*23* 174:*18, 22*
175:*24* 176:*3,*
*7* 179:*8, 12,*
*16* 182:*18*
184:*24* 185:*5,*
*9, 21* 186:*2*
187:*18, 24*
199:*4* 232:*19*
241:*5, 12*
242:*5, 12*
243:*8* 245:*8,*
*10* 265:*5, 10,*
*13* 267:*11*
271:*22*
274:*18* 276:*6,*
*12* 289:*23*
290:*2, 5*
294:*7* 297:*16*
306:*11, 12*
307:*2* 309:*24*
310:*7, 9*
311:*3* 314:*14*
324:*19* 331:*6*
332:*21, 24*
333:*2* 334:*7*
336:*9* 338:*6*
345:*24* 349:*9*
351:*16* 353:*2*
359:*24* 360:*8,*
*13* 361:*18*
362:*10* 363:*1,*
*6* 372:*16, 22*
373:*10* 374:*8,*
*15* 375:*24*
376:*9, 13*
396:*15, 18*
409:*19*

410:*17*
411:*18* 412:*9,*
*13, 14*
**recalled** 34:*23*
274:*22* 275:*4*
**recalling**
173:*11*
**recalls** 103:*22*
109:*11* 110:*3*
155:*14*
172:*17, 22*
173:*9, 17*
291:*1* 410:*5*
411:*5* 412:*19*
**receipt** 61:*12*
245:*20*
411:*15* 416:*17*
**receive** 31:*23*
78:*15* 287:*2*
314:*5* 317:*9*
318:*12* 328:*4*
344:*18*
**received** 19:*2*
61:*6* 132:*23*
139:*22*
161:*17*
162:*22* 177:*9*
189:*7, 21*
190:*16*
191:*18*
192:*14, 18, 23*
196:*21* 197:*3*
212:*7* 235:*10*
251:*24* 252:*9*
259:*19*
280:*21*
285:*17*
300:*18* 302:*8*
314:*7* 318:*11*
**receives**
270:*20*
**receiving**
32:*11, 20*
117:*3* 318:*19*
348:*18*
375:*19* 394:*17*
**recess** 16:*4*
84:*17* 146:*15*
236:*10* 297:*7*
330:*18* 375:*10*

**recollect**
345:*20*
**recollection**
209:*18*
**recommend**
191:*9*
**recommendatio**
**n** 156:*19*
157:*3* 158:*10*
159:*16*
160:*11, 14*
164:*6* 175:*8*
267:*14*
343:*16* 344:*1,*
*3*
**recommendatio**
**ns** 160:*5*
333:*4* 376:*8*
386:*24*
**recommended**
160:*8, 16*
162:*13*
165:*23* 223:*6,*
*18*
**recommending**
175:*23* 343:*1*
**record** 10:*11*
11:*3* 13:*13*
14:*22* 15:*20,*
*24* 16:*2, 9*
17:*21* 18:*4*
47:*6* 64:*3*
71:*17* 75:*23*
78:*1* 84:*10,*
*15, 21* 86:*6*
124:*23*
135:*22*
146:*13, 20*
165:*7* 167:*21*
236:*4, 7, 14*
244:*6* 297:*5,*
*12* 330:*2, 12,*
*16, 23* 375:*5,*
*8, 15* 391:*17*
397:*14*
398:*24* 413:*21*
**recorded**
391:*10, 11*
**records** 160:*4*
203:*23* 390:*23*

Confidential Information Subject to Protective Order

recovered
288:8, 15
289:1, 7, 13,
21  290:3
348:5, 16, 19
recycled
287:20  288:4
347:19, 23
348:14
redacted
403:8  404:12
Redmond
7:11  301:14,
20
reduced
327:18, 21, 24
328:11
329:15
331:13, 23
361:13
409:24  410:12
REEFER  3:17
refer  23:10
36:10  38:15
115:21  353:22
reference
37:19  173:8
175:4  176:2
224:22
274:15  310:4
references
120:10
224:23
226:21  409:8
referencing
221:7, 9  244:9
referred  99:5
109:19  357:12
referring
112:7, 8
116:5  136:14,
17  164:20
165:10
170:23
171:20
173:15
215:21
238:11
244:17  247:7
260:9  262:19

357:16
refers  72:21
reflect  399:3
reflected
76:15  78:19
172:16
338:11  373:3
405:18
reflecting
208:5
reflection
254:2, 24
refresh  47:18
124:19  174:3
209:17
refreshed  19:7
refreshing
118:3
refreshment
13:6
refusing  313:5
regard  314:20
regarding
154:6  200:1
260:6  262:21
266:10
298:17
376:10  394:9
regardless
43:7  101:17
176:22  186:4
210:16
212:19  403:7
regards  46:20
region  129:23
131:20
132:16  144:3,
7, 8, 9, 14
145:9  151:17
374:10
regional
131:6  140:12,
23
regions
178:16  179:7
373:17, 20
regular  23:18
regulations
39:17  41:10
73:14  85:17
89:4  255:20

352:11  402:7
403:16
regulators
125:21  141:8
162:12
191:12
193:23  195:1
228:23
229:12
321:24  322:17
regulatory
28:13  34:13,
16  82:7
110:24  112:3,
5  151:18
159:21  161:9,
17  162:24
163:3  175:19
246:5  279:7
303:24
309:12
313:15
319:14, 18, 24
reimbursed
24:10
Reitman  7:23
8:6  382:3
383:14  384:8,
22  385:1
rejected
389:10
relate  106:2
184:18, 19, 21
related  87:15
201:6  217:3
247:19  293:4
308:4  379:7
410:13
relates  21:22
52:15  103:15
105:14
155:24  327:21
relating  97:14
relationship
42:6
relative
415:11, 12
release  270:18,
22

released  61:4
233:21  235:1
271:8
releasing
124:1
relevance
293:9  404:8
relevant
270:23  413:7
reliability
328:3  387:20
reliable  85:14
228:22  230:7,
19  319:13
rely  272:18
319:18, 20, 23
remediation
405:17
remember
80:19  81:4
108:12
132:21, 24
148:18
150:24
158:10
163:22  164:1
178:23  186:7,
12  204:18, 20
224:17
240:14  242:9,
11  244:4
286:6  287:15
290:16
294:10
295:16  306:9,
19  307:8, 20
311:22
345:11
351:22
362:14, 18
363:5  365:2
409:6
remind  337:3
Remote  1:13
10:17  13:14
remotely
10:23  11:1
415:5
removal
318:17

reorganization
31:14, 16, 18
337:20
repeat  63:20
74:19  75:16
77:19  113:10
138:3, 7
165:1  194:4
269:15
279:19
287:10  304:23
rephrase
12:18
report  117:8,
9  119:5, 6
120:18, 20
121:19  122:1
124:2  129:7
133:8  138:22
139:7, 13
140:20
238:10  239:5,
10  240:17, 18,
24  241:6, 20,
22  242:5, 10,
13, 15  243:8,
15, 21, 23
244:1, 7, 14,
18  245:5
251:2, 10, 13,
22  253:18
254:1, 12, 20
256:3, 9
257:1, 3, 16
258:5  259:16,
17  261:2
263:8  264:6
267:16  269:2,
9, 12, 18
270:10, 16
294:13
302:23
303:12, 16, 21
333:5  346:10
348:21
361:14
368:10
371:13
372:23  373:5,
9  374:16
378:1, 12

Confidential Information Subject to Protective Order

385:8, 16
392:4  395:14
398:10  399:2
**reported**
120:22, 24
130:9  177:9
257:12  290:2
300:21
338:24  385:9
390:24
**Reporter**  1:18
11:4  64:2
75:22  77:21,
24  165:3, 6
415:4, 17, 22
**reporting**
127:19, 23
254:23
256:13, 20
296:2
**reports**  117:5
147:19, 20
173:21
242:18  243:5
255:24  314:7
345:16  372:2
373:3  374:24
398:3, 5
**re-prepare**
389:19
**represent**
95:10  289:14
**representative**
121:18
**represented**
130:23
**Representing**
2:7, 15, 22
3:6, 14, 21
**reproduction**
415:21
**reputable**
336:12
**Request**  9:10
183:21  299:9
324:4, 12
325:3, 22
413:9
**requested**
126:14

177:18  307:6
324:21
**requests**  279:1
**require**
257:10  344:8
406:1
**required**  51:6
67:6, 24  88:7
112:13  128:4
149:12
218:12  291:5
292:17
308:10  324:2
402:5, 15
403:15
**requirement**
55:20  57:10
63:11  64:17
67:5  76:14
77:1, 14  78:4,
19, 21  90:20
352:22
354:13  393:1
405:1
**requirements**
50:15  51:21
54:2  55:19
61:13  63:9
72:15  73:18
75:7  76:1
88:7, 13
246:10
344:16  345:5
352:19  353:5
356:14, 19
392:8
**requires**  59:7
405:5
**rerunning**
388:14
**resampling**
388:23
**research**
218:10  228:10
**reserved**  10:7
18:11
**reside**  13:18
**residing**  33:13
**respect**  19:10
73:10  91:11
101:8  105:12

111:22  117:3
176:24  196:5
206:10
232:15
241:23  272:9
289:12  296:4
306:3  310:23
320:13  381:6
393:21  412:16
**respective**
73:7
**respond**  299:8
320:12
**responding**
313:15  372:5
**response**
39:20  128:17
183:17
238:16
242:19, 23
243:13
262:12
290:12
301:24
308:21
368:13  381:5
406:2, 4, 8, 10
407:6, 10, 13,
15  413:11
**responses**
406:15
**responsibilities**
33:19, 22
34:5  35:2, 10,
13  41:17
50:9, 20
51:15  57:23
58:19, 24
59:5, 8  61:16
63:17  64:7
73:8  88:9, 17
89:9  116:20,
24  143:19
337:14, 23
372:12
**responsibility**
34:7, 24  51:9
60:3, 8, 24
61:5  62:11,
19  65:10
82:13, 21

83:13  89:17
111:1  117:16
145:5  148:12
149:10
151:16, 24
173:2  254:22
255:1  260:23
326:16
371:17, 22
**responsible**
58:14  79:6,
10  80:3  82:2,
6, 8, 23  89:1
110:10
172:21
177:21
178:12
179:13, 19
183:16  188:6
220:10  373:18
**responsive**
94:9
**rest**  101:7
**result**  333:1
369:2  380:10
388:16, 20, 22
389:3, 10, 14
390:7
**Results**  136:7
138:11  276:2
283:20  284:7,
14  293:6
322:24  323:2,
4, 7, 16, 19
324:6, 8, 14
325:16
326:17  327:1,
11  339:11
343:8  361:12,
19  364:10, 11,
12, 18, 23
365:1, 5, 15,
20  366:17, 20,
24  367:5, 16,
24  368:4, 6,
19  369:4, 10,
15  388:2, 6
390:3, 10, 20,
21  391:1, 10,
11, 18  411:12

**retained**  79:6
**retest**  389:16
**retested**  388:6
390:3, 9
**retesting**
388:7, 23
**retrospective**
412:22
**return**  416:15
**revealed**  393:6
**revelations**
374:2
**review**  111:12
261:11
374:24  379:8
392:15  393:2,
8, 17  405:1
412:22
**reviewed**  21:3
87:14  246:14
373:8
**reviewing**
21:10  24:6
117:4  372:22
**revise**  272:9
320:9
**revised**  43:4
52:21  353:15
**Revision**  74:9
**revisions**  45:8
352:5
**Rho**  220:23
**R-H-O**  220:23
**Rico**  25:4, 14
**right**  13:21
16:16  21:19,
24  23:4, 15,
24  24:11
25:5, 18, 19
26:21  27:1
32:17, 19, 22
33:4, 8  35:11
38:20, 24
39:3  41:6
42:12  43:10
44:6, 11
46:22  47:2
49:7, 14
51:18  53:7,
21  55:20
58:3  59:4, 10

60:*16, 19, 21*
61:*21* 63:*12*
66:*9, 13, 23*
70:*5, 6* 71:*12*
72:*8, 19, 23*
73:*16* 74:*1, 5,
10* 75:*6*
76:*18* 77:*1*
80:*5* 81:*1, 15,
18* 82:*17*
86:*20* 87:*19*
89:*5* 93:*22*
95:*20* 97:*8*
98:*20* 99:*3,
17, 19, 20*
101:*7* 108:*14*
109:*12, 20*
110:*1* 113:*9,
14* 114:*15, 20*
116:*17* 119:*8,
10, 14* 120:*13,
17, 19, 20, 23*
125:*7, 11*
126:*2, 3*
127:*23* 128:*2,
3, 10, 14*
129:*13, 16, 19*
131:*22*
133:*24*
134:*22*
136:*15* 137:*5,
15, 19* 142:*18*
143:*7* 144:*11*
152:*15*
154:*13* 155:*2,
20* 158:*11, 19*
159:*17* 160:*6*
163:*17*
164:*19* 165:*8*
168:*4* 169:*5,
8, 24* 173:*19,
22* 175:*5, 11,
15, 24* 181:*5*
184:*7* 190:*5*
191:*1* 193:*8*
194:*3* 195:*16,
19, 21* 201:*13*
202:*5, 8, 12*
203:*1* 204:*4*
205:*23* 206:*3,
8, 12, 21*

208:*11* 209:*4*
211:*6* 212:*24*
216:*1, 16*
217:*5* 221:*7,
10, 19* 222:*2,
12, 20* 223:*2,
7* 224:*4, 21*
225:*1, 2*
226:*16*
230:*15*
233:*18* 234:*3*
238:*11, 13, 23*
239:*18, 21*
245:*23* 246:*3,
6, 22* 247:*14*
250:*11, 22*
252:*5, 10, 19*
253:*6, 8*
254:*5* 258:*1,
15* 259:*8, 11,
14, 15, 20*
261:*4, 6, 10*
262:*23*
264:*13, 24*
265:*2, 4*
266:*11*
267:*13, 18, 24*
268:*9* 269:*3,
6, 19, 24*
271:*18*
272:*12* 274:*3*
275:*7* 277:*22*
278:*9, 11, 16*
280:*9, 14, 18*
281:*15, 18, 23*
282:*3, 8*
283:*1, 23*
284:*7, 11, 21*
285:*10* 286:*5*
290:*23* 291:*1*
294:*5, 8*
295:*5, 7, 13,
14, 17, 24*
296:*1* 298:*15,
20* 300:*2, 7*
301:*2, 6*
302:*1, 14, 19,
21* 303:*6*
304:*10* 305:*9*
308:*6, 7*
309:*21*

311:*11, 22*
312:*1* 313:*2,
7, 18, 19, 21*
315:*2, 11*
319:*1, 5, 6, 23*
320:*4, 21, 23*
321:*10* 322:*3,
5, 22* 323:*1, 5,
16* 324:*3, 8*
325:*24* 326:*8,
20* 327:*4, 8,
14* 332:*11, 24*
333:*16, 24*
334:*14*
339:*12, 15*
351:*9, 12*
352:*24*
356:*10* 357:*2*
360:*17*
361:*22* 362:*1,
5, 13* 364:*20*
365:*1, 10, 21*
366:*11, 17*
367:*7, 11*
368:*1, 2, 7, 15,
17, 21* 369:*6,
19* 370:*7, 11*
371:*6, 10, 11*
374:*3* 375:*22*
377:*22* 379:*9*
380:*2, 18*
382:*7* 385:*22*
386:*15*
388:*11, 16*
390:*1, 4, 10,
13* 391:*3, 19,
23* 392:*2, 13,
17* 394:*5*
395:*2* 398:*11*
401:*2* 402:*7,
16* 403:*1*
404:*12, 13, 24*
405:*14* 407:*2*
409:*10, 15*
410:*8, 17*
412:*6, 20, 23*
**ring** 150:*19*
**Risk** 7:*13*
126:*13* 140:*5*
156:*2, 6, 11*
157:*16* 158:*2*

163:*15*
164:*21*
165:*10* 263:*9*
264:*12* 290:*7,
11* 291:*23*
314:*18, 19*
328:*20* 329:*4*
331:*4*
**risk/benefit**
181:*16*
**risk-based**
210:*19* 342:*22*
**risks** 156:*22*
157:*5* 162:*17*
163:*7*
**RMV** 110:*17*
**Road** 2:*12*
**ROBERT** 1:*4*
**robust** 188:*12*
**role** 31:*7*
80:*15* 149:*7*
151:*18, 19, 21*
341:*9* 345:*20*
380:*22*
**roles** 26:*4*
33:*18* 73:*8*
88:*9, 16*
**room** 14:*3, 6,
11*
**root** 105:*17,
19* 106:*10*
242:*3*
**ROS** 206:*18*
207:*24*
**rotate** 330:*6*
**roughly** 363:*6*
**round** 408:*3*
**route** 202:*19,
23* 203:*3, 6, 8,
9, 17, 20*
204:*1, 6, 16,
19, 21* 208:*7,
15, 16* 209:*4*
211:*5, 10*
213:*21* 214:*1*
286:*4, 9*
290:*17, 21, 23*
291:*5, 11, 19*
306:*20*
**routes** 203:*13*
204:*13* 205:*22*

**routinely**
293:*2*
**Rubin** 237:*17,
20, 24*
**RUGGIERI**
2:*19*
**rules** 12:*1*
**run** 32:*6*
229:*2* 388:*15*
400:*16*
**running** 30:*21*
286:*20*
**rustling**
401:*11*

< S >
**safe** 193:*7, 10*
**safety** 41:*13,
17* 63:*2*
126:*14* 140:*6*
193:*11* 261:*1*
**sale** 43:*20*
71:*11*
**sample**
379:*12*
389:*16* 390:*8*
391:*17* 400:*15*
**samples**
280:*23* 362:*3*
388:*2* 390:*2*
391:*2*
**Sanofi** 27:*19*
**Sanofi-Aventis**
26:*20*
**sartan** 304:*4*
339:*14*
**sartans** 300:*6*
339:*24*
**saved** 81:*13*
**saw** 137:*20*
161:*8* 175:*9*
240:*16* 241:*5,
14* 242:*15, 18*
243:*4* 244:*10,
13* 258:*2*
268:*5* 298:*14*
308:*20* 327:*8*
**Sawyer** 6:*7,
15* 153:*15*
154:*1* 169:*17*
178:*17*

Confidential Information Subject to Protective Order

190:*15* 205:5,
*16* 206:5, *11*
**saying** 16:*18*
58:23 59:*16,
24* 65:*19, 22,
23, 24* 66:*9*
67:*13, 16, 22,
23* 68:*23*
69:*7, 9* 92:*9*
93:*13, 23*
98:*15* 99:*19,
21* 101:*10, 12,
16* 104:*20*
105:*23* 124:*3*
126:*20*
130:*16* 140:*7*
156:*10* 164:*9*
167:*5* 170:*5*
190:*11, 19, 21*
195:*24*
199:*10*
201:*14, 22*
216:*13*
217:*18* 222:5
229:*5, 10*
230:*3, 20*
243:*9* 246:*21*
252:*8* 253:*14,
19* 254:*10*
255:*19*
256:*18, 19, 24*
258:*9* 267:*17*
270:*2* 271:*3,
10, 13, 19*
284:*19* 296:*6,
7* 303:*4, 17*
320:*3* 322:*8*
327:*6, 10*
357:*7* 358:*5,
18* 380:*20*
399:*20*
401:*11*
402:*22* 406:*9*
407:*3*
**says** 12:*6*
45:*21* 48:*12*
52:*15* 54:*3, 7*
57:*12* 58:*20*
86:*18, 23*
87:*4, 11, 21*
88:*19* 89:*7*

90:*15* 92:*9*
93:*8* 97:*10*
99:*16, 18*
119:*21* 120:*5,
18* 125:*24*
137:*1* 155:*4,
11, 24* 169:*18,
22* 170:*16*
206:*13*
207:*19*
210:*11, 13*
219:*17* 222:*1*
252:*7* 259:*17*
263:*14* 269:*9,
12, 23* 270:*5,
10* 271:*7, 15*
355:*17*
364:*11*
379:*11* 380:*4*
390:*1* 391:*13*
402:*9* 404:*7*
**schedule**
315:*20*
**scientific**
193:*18*
**scope** 49:*9*
103:*13*
116:*23* 232:*4*
279:*13*
282:*15*
289:*16*
378:*20* 396:*6*
**screen** 263:*18*
264:*3* 268:*21*
330:*6* 355:*23*
365:*24*
381:*24*
384:*13*
397:*18* 408:*20*
**scroll** 364:*10,
22*
**sealing** 10:*4*
**Sean** 397:*22*
**second** 56:*1*
57:*9* 63:*10*
137:*7* 154:*16*
155:*24*
173:*24*
195:*23*
251:*11* 277:*9,
16* 295:*3*

329:*7* 352:*14*
356:*3* 363:*12*
366:*3* 378:*11*
**secondary**
200:*19* 201:*4*
**seconds** 364:*6*
**section** 49:*17*
50:*8, 14*
51:*24* 52:*3, 8,
14* 54:*3, 6*
55:*2, 5* 59:*6*
61:*15* 63:*10*
65:*3* 67:*9*
73:*2, 19*
78:*23* 81:*8*
86:*22* 88:*6,
12* 97:*17*
99:*15* 119:*21,
23* 136:*18*
268:*23*
269:*21* 270:*9*
**sections**
204:*18*
**sector** 26:*13*
**see** 15:*13, 16*
16:*22* 17:*5*
22:*13* 27:*14,
16* 28:*22*
29:*12* 30:*20*
47:*16* 48:*2, 3,
6, 7, 10, 11*
50:*13, 17, 18*
57:*17* 59:*18*
63:*13* 70:*12,
23* 71:*3*
73:*24* 74:*1*
76:*11* 111:*15*
117:*24*
118:*18* 121:*7*
125:*8, 18*
126:*17, 18*
132:*4, 12*
136:*21*
141:*12* 142:*3*
145:*7* 154:*4,
24* 155:*1*
156:*7, 24*
164:*11*
168:*20*
169:*12* 170:*1,
4, 7, 10, 14, 15*

171:*5, 9, 13,
14* 172:*8*
174:*19* 175:*1*
176:*2* 180:*24*
186:*14*
189:*24* 190:*9,
10* 205:*19*
206:*14* 207:*3,
9, 20* 208:*3, 4*
209:*15*
213:*24*
219:*13*
220:*24*
221:*16*
222:*14* 224:*5*
225:*3* 226:*16*
227:*12* 230:*9*
237:*12, 14*
238:*8, 9, 20,
21* 249:*16, 22,
23* 250:*8, 21*
251:*3* 257:*21,
22* 263:*11*
264:*3, 6*
268:*24* 270:*7*
271:*1* 288:*13,
23* 291:*15*
292:*1* 301:*22*
303:*2* 309:*15*
329:*12* 332:*2*
343:*14* 352:*2,
12, 15* 356:*4,
16, 18, 22*
357:*7, 15*
364:*4, 15*
366:*14* 373:*3,
20* 377:*2, 6,
13, 19, 20*
378:*10* 379:*3,
18* 380:*4, 12,
13* 382:*5, 11,
15* 385:*19*
386:*5, 10, 11*
387:*1, 2, 23*
392:*9* 393:*13,
14* 397:*24*
398:*6* 399:*15,
23* 404:*19, 20*
409:*5, 21*
410:*2*

**seeing** 14:*24*
245:*9* 346:*1*
359:*24* 408:*22*
**seek** 197:*15*
211:*10*
**seeking** 91:*19*
198:*23*
**seen** 16:*24*
194:*18* 225:*5*
229:*18* 234:*1*
244:*11*
248:*14*
261:*22*
295:*10, 23*
368:*14*
377:*24* 407:*14*
**sell** 314:*15, 17*
**selling** 119:*18*
144:*17*
196:*19*
286:*18* 289:*3*
**send** 183:*21*
189:*9* 293:*3*
**sends** 323:*15*
**senior** 33:*2,
20* 183:*7*
**sense** 100:*19*
260:*1*
**sent** 125:*6*
203:*10*
240:*17, 19, 24*
**sentence**
378:*17* 390:*2*
**sentiment**
335:*9*
**Sentry** 2:*20*
**separate**
49:*19* 69:*3*
145:*3* 321:*23*
322:*5*
**separation**
32:*1, 2, 6, 12,
22*
**September**
28:*17* 29:*3*
30:*13* 36:*14*
49:*2* 304:*2*
363:*9* 374:*21*
398:*9*
**sequence**

Confidential Information Subject to Protective Order

318:*10*
**series** 12:*4*
**serious** 155:*8*
**seriousness**
 173:*6* 335:*24*
**served** 140:*17*
 318:*5*
**serves** 38:*11*
**SERVICES**
 1:*21* 10:*13*
 28:*10* 72:*16*
 73:*22* 351:*9*
**set** 39:*21*
 40:*17* 45:*13,*
 *20* 55:*10, 19*
 58:*5* 63:*5*
 95:*4* 112:*11*
 193:*22*
 235:*12*
 247:*13*
 264:*18, 23*
 310:*6* 320:*10*
 344:*24*
 364:*11* 368:*4*
 415:*9*
**sets** 45:*4*
 138:*11*
**setting** 59:*20*
**seven** 28:*15*
**severe** 387:*4*
**share** 170:*17*
 191:*12* 203:*5*
 204:*1* 208:*15*
 263:*18* 291:*5,*
 *10* 355:*23*
 365:*24* 408:*20*
**shared** 19:*11*
 101:*22* 103:*2,*
 *8* 107:*15, 16,*
 *18* 108:*3, 20*
 110:*6* 176:*8*
 194:*21*
 239:*15* 241:*1*
 243:*1* 258:*21*
 260:*7* 274:*5*
 289:*10*
 361:*14, 19*
 411:*11, 12*
**sharing** 47:*20*
 144:*19*
 346:*19* 366:*8*

**sheet** 390:*22*
 391:*1* 416:*7,*
 *9, 12, 15* 418:*6*
**shipped** 305:*5*
**shortage**
 193:*21*
**shortages**
 271:*24*
**shortly**
 322:*18* 337:*9*
 371:*4*
**show** 93:*19*
 294:*13*
**showed** 323:*8*
 365:*15*
**showing**
 324:*6* 365:*1,*
 *5* 367:*15*
 368:*6*
**shown** 403:*10*
**shows** 323:*16*
 366:*22* 369:*2*
**shuffling**
 400:*24*
**side** 342:*3*
**sides** 91:*18*
**sideways**
 329:*22* 330:*9*
**sign** 416:*8*
**signature**
 23:*4* 73:*21*
 126:*1*
**signatures**
 251:*6*
**signed** 23:*2, 7*
 73:*21* 250:*11,*
 *15* 259:*17*
 269:*19*
**significance**
 342:*13* 387:*15*
**significant**
 102:*5* 334:*3,*
 *11, 24* 338:*10*
 340:*8* 373:*14*
 387:*7*
**signing** 416:*10*
**similar**
 189:*22* 196:*1*
 250:*1*
**simple** 216:*13*
 259:*15*

**simply** 13:*6*
 324:*11* 403:*10*
**simulation**
 40:*20*
**simultaneously**
 320:*2*
**single** 43:*5*
 65:*15* 231:*13*
 365:*13*
 379:*13* 380:*7*
**Sir** 11:*21*
 13:*18* 14:*12,*
 *20* 21:*4, 17*
 22:*14* 24:*22*
 25:*1, 8* 27:*17,*
 *24* 36:*8, 24*
 37:*14* 39:*13*
 42:*6* 47:*2, 17*
 55:*6* 59:*14*
 66:*17* 71:*15*
 72:*4* 79:*18*
 80:*24* 81:*10*
 84:*2* 85:*6, 20*
 86:*10* 92:*8*
 94:*8* 96:*3, 6,*
 *19, 22* 104:*15*
 116:*11*
 117:*20* 118:*1*
 135:*21* 136:*1*
 141:*5* 153:*6,*
 *19* 167:*19*
 174:*13*
 176:*13* 180:*6*
 201:*24*
 205:*13*
 207:*13*
 208:*22*
 211:*17*
 212:*24* 215:*3*
 216:*4* 217:*1*
 219:*5* 220:*8*
 226:*9* 233:*5*
 236:*16* 237:*1,*
 *13* 241:*18*
 246:*24*
 248:*22*
 261:*20*
 263:*20* 264:*3*
 266:*13, 18*
 267:*8* 268:*20*
 269:*1* 276:*19*

277:*13*
 295:*18*
 296:*17*
 297:*21* 298:*8*
 307:*10* 312:*7*
 327:*18* 329:*1*
 332:*20*
 337:*18*
 350:*14* 352:*1*
 353:*22* 356:*1*
 363:*12, 15*
 366:*11, 15*
 377:*3* 378:*14,*
 *16* 381:*24*
 383:*4* 384:*3,*
 *17* 397:*20*
 398:*17, 24*
 399:*9* 408:*24*
 413:*17*
**sit** 406:*14*
**Site** 7:*13*
 107:*21*
 110:*17*
 198:*16*
 220:*23* 317:*2*
 328:*20* 329:*3*
 331:*4* 341:*21,*
 *22* 355:*19*
 379:*8, 12*
 386:*2* 393:*19*
 396:*19* 399:*6,*
 *9* 409:*9, 13*
**sites** 34:*9*
 49:*10* 135:*10*
 189:*11*
 191:*11*
 352:*21* 353:*5*
 355:*15*
**site-wide**
 394:*2, 7*
**Sitting** 77:*13*
 78:*2* 83:*15*
 133:*24*
 186:*11*
 241:*19*
 307:*11* 340:*5*
 345:*19* 373:*6*
**situation**
 74:*23* 127:*14*
 128:*19* 129:*6*
 130:*12, 21*

132:*8* 139:*2*
 150:*9* 155:*5*
 173:*7* 182:*22*
 186:*10*
 193:*21*
 194:*24*
 198:*23*
 199:*19, 22*
 200:*9* 210:*14*
 212:*18*
 241:*24* 267:*5*
 272:*6* 287:*2*
 307:*6* 311:*2,*
 *4* 313:*10, 11*
 314:*13* 326:*2*
**situations**
 234:*9*
**six** 20:*7*
 28:*15* 405:*3, 9*
**sixty** 416:*16*
**Siyu** 148:*23*
 169:*17, 23*
**S-I-Y-U** 149:*2*
**skills** 340:*4*
**small** 28:*21*
 201:*8, 18*
 373:*13*
**so-called**
 265:*21*
**Solco** 3:*8*
**sold** 40:*24*
 62:*9* 152:*20*
 232:*7* 306:*14*
 347:*18* 348:*6*
 358:*2*
**solely** 58:*13*
**solution** 389:*9,*
 *19*
**solvent**
 200:*16*
 206:*15*
 207:*21* 289:*6*
 347:*17* 348:*5*
**solvents**
 199:*17, 20, 21*
 287:*8, 13, 21*
 288:*4, 9, 15*
 289:*2, 7, 13,*
 *21* 290:*3*
 346:*24* 347:*5,*

Confidential Information Subject to Protective Order

12  348:16, 19, 20

**soon**  60:22
81:9  119:3
127:13
130:10  133:5
143:21
148:22
223:23
324:19  326:4
327:1
**sooner**  133:18
**SOP**  44:5, 11, 15  149:21
255:20  379:2
392:15  393:7, 16
**SOPs**  42:15, 24
**sorry**  24:2
25:19  26:23
27:6  63:23
77:21  89:23
96:6  103:11
108:4, 23
113:10
115:16  135:3, 5  146:2
168:9, 10
169:13
181:12
191:13
194:10
207:16
208:16
244:22
246:20
263:22
287:23
349:12  350:2
356:3
**sort**  18:24
28:22  37:3
38:18  109:19
157:10  158:6
192:21  240:4
289:11
296:23
347:24
353:11  372:6
379:23

385:11
400:14  411:18
**sound**  128:3
148:24  312:1
333:24
365:10  371:10
**sounds**  32:16
297:2
**source**  333:15
**sourced**
329:10
331:12  364:19
**sources**  287:3
289:8
**sourcing**
95:16  144:14
148:3  292:2
334:21  335:2
340:18
**space**  416:6
**Spain**  179:9, 10
**speak**  12:10
46:10  92:2
146:24  147:4
164:7, 23
165:13  184:6, 13  187:4
261:6, 9
**speaking**  96:4
168:13  179:9
187:18  240:3
246:22  301:4
303:7, 8, 20
363:13  402:13
**speaks**  97:17
**special**  26:1
**specialties**
160:3
**specific**  52:20
92:8  98:7, 16
111:3, 21
113:20
130:11
138:24  163:5
164:10, 22
165:12  231:4
252:13  270:9, 13, 20  275:17
303:14
320:13  339:3

344:16  386:9
389:3  408:3
**specifically**
37:2  42:7
101:8  159:12
163:22
187:24  227:6
242:6, 13
256:16
262:18  273:6
302:20
304:15
370:12
372:13
374:15  410:12
**specification**
52:23  197:19, 23  198:3
247:13  323:9
344:22
**specifications**
51:17  53:11
69:6  102:6
112:10
115:13  197:6, 13  212:6, 13, 20  213:3
214:10
235:12
246:17
247:15, 19, 23
266:6  268:3
272:15  293:7
344:19
355:12  388:4
**specificity**
133:14
165:18, 22
166:3
**specifics**  18:9
36:8  91:23
332:10, 12
333:3  360:14
412:9, 14
**spectrometry**
111:17
**speculate**
131:1  241:10
307:10
**speculating**
92:3  129:2

145:7  179:21
180:3  242:12
243:4  261:21
283:7  354:3
**speculation**
143:15  324:17
**speed**  44:21
263:19
331:20  335:9
**spell**  63:16
64:6  187:10
**spelling**  151:4, 8
**spend**  21:9
**spent**  20:18
21:13  23:23
24:5  27:10
70:8  317:3
**spoke**  265:21
303:21  305:9
**spoken**  96:23
**stable**  267:5
**staff**  51:4
**stage**  201:17
206:15  207:21
**Stand**  153:6
239:9  350:3
363:12
381:11  407:18
**standalone**
393:10
**Standard**
5:20  42:11
45:18  47:21, 24  54:2
64:18  72:14
86:1, 12
127:18
149:14
156:16  257:8
355:22  391:22

**standardization**
373:22
**Standards**
5:18  34:2, 17
48:14  57:8
71:22
**standpoint**
188:21

**STANOCH**
2:3  5:6
11:13, 17
14:21  15:11, 19, 23  16:10
17:16  18:17, 19  22:2, 12
47:4, 15
54:20, 22
59:13  60:15
62:16  63:7, 22  64:14
65:18  66:16
69:17  70:4, 16, 20  71:14
72:2  74:17, 21  75:5, 14, 18  76:9, 24
77:20  78:17
83:14  84:2, 9, 22  85:19
86:5, 8  92:15
93:3  94:7, 10, 21  95:1, 14
96:15, 20
100:4  101:5
103:18
104:11, 18
105:4  106:20, 22  117:21
118:4, 11
123:10  124:7, 20  125:3
127:3, 16
129:9  130:5
131:15
132:17
135:12, 20
136:3  138:5
146:6, 21
151:1  153:5, 18  163:12
165:2, 20
166:24  167:8, 17, 20  168:1, 14  174:1, 14
180:5, 15
187:1  192:8
193:5  197:17
204:23  205:9, 11  207:12

212:*23*
213:*18* 215:*1,
9* 218:*17*
219:*3* 220:*7*
224:*8* 225:*6,
18* 226:*8*
229:*4* 230:*21*
232:*9, 17*
233:*4, 8, 10,
17, 20* 234:*16*
235:*6, 20*
236:*3, 15, 24*
237:*9, 11*
241:*13*
244:*23* 245:*1*
248:*21* 249:*6,
8* 254:*15*
255:*18* 266:*8,
16* 276:*21*
277:*12*
288:*22*
294:*23*
296:*21*
297:*13, 20*
298:*4, 6*
301:*7, 18, 21*
309:*18* 315:*6*
325:*1* 328:*15,
23* 330:*4, 24*
332:*12, 17, 19*
336:*15*
349:*21* 350:*2,
12* 360:*21*
363:*23* 375:*4,
16* 376:*15*
377:*1* 378:*24*
381:*12, 22*
382:*23* 383:*1,
7, 19* 384:*2,
14* 386:*19*
395:*5, 10*
396:*10* 397:*2,
11, 14, 19*
401:*9, 16*
407:*24* 408:*7,
10, 19* 412:*24*
413:*13, 18*
**start** 33:*23*
110:*16*
253:*20, 22*

324:*22*
335:*11* 404:*1*
**started** 29:*2,
14* 123:*2, 7*
129:*8* 245:*13*
291:*1* 320:*20*
322:*10*
**starting** 30:*11*
290:*19*
**starting-
material**
290:*10*
**state** 47:*6*
86:*5* 135:*21*
156:*1* 167:*22*
256:*4, 14*
416:*5*
**stated** 294:*6*
354:*16*
**statement**
45:*16* 120:*9*
156:*3* 157:*21,
23* 163:*20*
165:*19*
402:*11* 404:*20*
**statements**
157:*15*
164:*18* 244:*14*
**STATES** 1:*1*
35:*17* 40:*24*
41:*20* 72:*13*
73:*19* 79:*3*
87:*13* 88:*20*
119:*19*
136:*23*
139:*15* 141:*3*
152:*20*
155:*19* 232:*7*
274:*17, 23*
275:*3, 5*
299:*16* 302:*6*
314:*16* 388:*1*
406:*19*
**stating** 137:*11*
**status** 355:*6*
386:*4*
**stenographer**
12:*7*
**stenographic**
11:*3*

**stenographicall
y** 415:*8*
**step** 201:*1*
372:*17*
**steps** 197:*10*
245:*19*
**STERN** 3:*3*
**STEVEN**
2:*11* 236:*19*
**stick** 396:*24*
**Sticking** 81:*7*
**stipulated** 10:*2*
**Stipulations**
9:*15*
**stood** 45:*24*
**stop** 287:*1*
341:*2, 3*
343:*13*
**stopped** 341:*1*
**story** 322:*11*
**STOY** 3:*18*
**straightforwar
d** 360:*3*
**Strategy** 7:*6*
214:*17* 276:*7,
12* 277:*5, 20*
278:*11* 281:*3,
4* 320:*10*
**Street** 2:*4*
3:*11*
**stretch** 13:*7*
**strict** 57:*19*
58:*16*
**strike** 67:*15*
76:*13* 94:*8,
20* 118:*22*
152:*2* 176:*15*
276:*22* 290:*5*
291:*2* 292:*8*
361:*6, 23*
394:*15*
**string** 226:*14,
16* 382:*8*
**stringent**
352:*10*
**strong** 342:*16,
17*
**students** 26:*1*
**studies** 110:*19*
166:*17* 302:*14*

**study** 162:*7*
368:*10*
**subcontracting**
52:*9*
**subcontractors**
53:*17*
**SUBJECT**
1:*12* 41:*4*
53:*6, 12*
85:*17* 180:*21*
182:*1* 186:*15*
188:*22* 398:*2*
400:*10* 408:*4*
416:*10*
**subjected**
230:*11*
**subjecting**
394:*18*
**submission**
40:*13* 87:*18*
123:*9* 138:*12*
235:*13* 280:*17*
**submit** 137:*21*
139:*16*
159:*20*
228:*22* 407:*9*
**submitted**
41:*5* 113:*9,
14* 115:*22*
117:*5* 118:*22*
119:*6* 121:*21*
130:*7* 280:*12*
406:*11*
**submitting**
111:*1*
**Subscribed**
418:*8*
**subsection**
55:*11, 20*
63:*10* 81:*10*
87:*12* 88:*11*
90:*7* 92:*8*
96:*24* 97:*2*
**subsidiaries**
49:*11*
**substance**
38:*2, 7, 9*
49:*21, 24*
67:*14* 69:*5*
257:*20* 369:*1*
418:*6*

**substances**
46:*21* 250:*7*
**sub-TTC**
171:*12*
**sufficient**
119:*4* 138:*24*
139:*21* 173:*5*
196:*12*
253:*17* 256:*8*
286:*15*
314:*11* 380:*8*
393:*7, 17*
**suggest** 181:*3*
357:*9*
**suggested**
163:*6*
**suggesting**
164:*22*
165:*12*
288:*14, 24*
289:*20* 401:*10*
**suggestion**
401:*5*
**suitability**
358:*1*
**Suite** 2:*12, 20*
3:*4, 12*
**summarize**
85:*13*
**summary**
120:*8* 154:*22*
**superceded**
44:*16* 46:*2*
**supervision**
415:*22*
**supervisor**
151:*12*
**supplement**
111:*2*
**supplied** 362:*3*
**supplier** 53:*4,
9* 58:*7, 9, 13,
21* 60:*2* 61:*4*
66:*6* 68:*2, 10*
70:*1* 77:*12*
98:*10* 99:*11*
101:*11* 102:*8*
120:*16, 22*
121:*2* 122:*17*
176:*22*
177:*17* 178:*9,*

*14* 186:*4*
189:*15*
190:*23*
191:*19*
195:*13*
196:*17*
198:*16*
203:*21* 204:*1*
210:*2, 17*
238:*18* 257:*3,*
*13* 258:*18*
262:*2, 7*
280:*8* 291:*20*
292:*2* 312:*20*
315:*23*
341:*12, 24*
346:*9* 373:*11*
**suppliers** 34:*9*
62:*15* 89:*14,*
*18* 101:*19*
177:*12, 23*
178:*7, 21*
179:*3, 10*
180:*23* 181:*4,*
*22* 182:*2, 5,*
*10, 12* 189:*22*
190:*17* 191:*6*
192:*16*
193:*15*
196:*11, 15, 22*
197:*4, 5, 16,*
*24* 198:*7, 24*
199:*13* 203:*8,*
*19* 204:*13, 17*
209:*13* 210:*3*
212:*8* 213:*16*
231:*19*
270:*20*
278:*15, 21*
279:*3, 8, 10*
290:*9, 10*
292:*12, 17, 23*
320:*12*
322:*16*
326:*18*
337:*16* 344:*9,*
*10* 345:*6, 9,*
*23* 346:*15, 20*
351:*12* 386:*3*
**supplier's**

213:*2*
**supplies** 328:*4*
**supply** 67:*15,*
*17* 68:*24*
69:*20* 101:*9*
122:*17*
123:*15*
129:*11, 17*
131:*2, 4, 18*
132:*3* 133:*16*
145:*24* 178:*5,*
*15, 19* 179:*6*
184:*14* 187:*5*
188:*10*
221:*23* 222:*1*
310:*23*
**supplying**
53:*11, 16*
66:*12* 101:*14*
102:*14* 307:*18*
**SUPPORT**
9:*2* 28:*10*
35:*5* 87:*17*
158:*1* 160:*13*
316:*5*
**supported**
160:*1*
**supporting**
28:*9* 35:*2*
404:*7*
**supposed** 15:*2*
91:*9* 159:*11*
315:*9, 17*
353:*6* 354:*12*
355:*19*
388:*15* 389:*7*
400:*16*
**supposition**
402:*22*
**sure** 12:*9*
15:*21* 18:*15*
19:*6* 20:*5*
36:*6* 42:*19*
44:*13, 19, 24*
55:*4, 9* 61:*18*
62:*1* 69:*19*
82:*19* 89:*9*
93:*4* 96:*21*
121:*14*
127:*21*
130:*24* 132:*2*

133:*21, 24*
134:*12* 137:*8*
141:*15* 142:*7*
150:*10*
158:*17*
163:*18*
182:*14*
185:*16*
186:*19* 188:*2*
190:*2* 191:*18*
210:*5* 217:*24*
222:*18* 228:*7*
244:*17*
250:*13* 255:*9*
260:*20* 267:*6*
269:*17*
277:*17* 283:*9*
294:*8* 310:*20*
312:*2* 314:*23*
326:*24*
329:*20* 349:*7,*
*14* 353:*21*
354:*5* 364:*7*
366:*5* 371:*2*
373:*7, 16, 19*
377:*4* 396:*2*
402:*12*
406:*23*
407:*18* 408:*9*
**surprised**
287:*18* 288:*1*
**suspect** 256:*5*
262:*15* 281:*5*
388:*5*
**suspected**
279:*12*
**Swissmedic**
194:*16* 195:*4,*
*7, 19* 280:*21*
282:*12, 16, 20*
283:*12*
299:*23*
300:*13, 19*
304:*14, 21*
305:*2* 319:*21*
322:*19* 325:*9*
327:*6*
**sworn** 11:*1, 8*
415:*5* 418:*8*
**syllogisms**
267:*8*

**synthesis**
202:*19, 24*
203:*3, 6, 9, 10,*
*13, 18, 21*
204:*2, 6, 14,*
*16, 19, 22*
205:*22* 208:*7,*
*15, 17* 209:*4*
211:*5, 11*
213:*22* 214:*1*
286:*4, 9*
290:*18, 22, 24*
291:*6, 11, 19*
306:*20*
**system** 182:*23*
183:*3, 4*
184:*1, 5*
185:*12, 13*
186:*13, 20*
383:*9*
**systems** 33:*23*
51:*3* 82:*9*
345:*3* 392:*5*
393:*9, 11*
395:*1*

**< T >**
**table** 45:*20*
55:*10* 252:*17*
**tablet** 38:*18*
**tablets** 367:*6,*
*11, 14*
**tackled** 200:*10*
**Take** 5:*13*
13:*9* 15:*7*
16:*20* 45:*7*
55:*1* 60:*16*
81:*8* 126:*22*
146:*5, 9*
153:*19* 174:*2*
192:*22*
197:*10, 14*
199:*8* 212:*9*
225:*11, 17*
227:*8* 265:*18*
285:*13*
286:*15*
296:*22*
312:*11*
337:*22*

372:*16* 375:*4*
413:*10*
**taken** 1:*14*
12:*6* 16:*5*
84:*18* 146:*16*
236:*10*
245:*19* 297:*8*
330:*19*
375:*11* 407:*2*
411:*18* 415:*8*
**takes** 60:*22*
61:*5* 353:*16*
**talk** 42:*2*
45:*18* 56:*12*
79:*18* 144:*24*
177:*11*
216:*24*
221:*12*
236:*17* 370:*15*
**talked** 162:*4*
269:*5* 285:*24*
305:*8, 13*
322:*1* 367:*20*
375:*18*
386:*13* 410:*4,*
*10*
**talking** 40:*23*
55:*2* 70:*19*
74:*5* 142:*9*
154:*12* 161:*5*
163:*23* 190:*3*
202:*16*
219:*10*
229:*15* 247:*1*
263:*13*
264:*11*
272:*21*
276:*16*
281:*14* 319:*2*
409:*13*
**talks** 221:*22*
270:*17* 392:*4*
**TAPI** 219:*17*
220:*2, 8, 9, 20*
228:*3* 231:*16*
232:*6*
**T-A-P-I** 220:*2*
**target** 370:*21*
**tasks** 51:*6*
313:*15*

Confidential Information Subject to Protective Order

**TEA**  102:*21*
103:*20*
105:*12*
106:*24*
107:*13, 24*
110:*12*
113:*23*
114:*13, 24*
115:*7*  239:*2*
248:*13*
**team**  150:*8*
178:*12*
179:*11*
343:*20*
372:*19*  391:*8*
**technical**
16:*12*  28:*9*
72:*7, 15*  73:*2*
75:*9*  76:*4*
83:*3*  111:*10*
196:*12*
278:*23*  280:*9*
284:*24*
285:*20*  331:*2*
344:*6*  358:*12*
360:*16*
**TECHNICIAN**
10:*10*  16:*1, 7*
84:*13, 20*
146:*11, 18*
236:*5, 12*
297:*3, 10*
330:*14, 21*
375:*6, 13*
413:*19*
**technique**
358:*11*
**telephone**
20:*8, 19*
**tell**  12:*17*
33:*18*  39:*15*
40:*12*  47:*16*
50:*11*  55:*6*
68:*3, 12*  72:*3*
79:*1*  80:*11,*
*14*  85:*8*  86:*9*
96:*7*  104:*21*
109:*5*  117:*8*
118:*24*
126:*23*
127:*13*  129:*4*

132:*19*
133:*18*
135:*24*  137:*9*
141:*15*  142:*7*
143:*10*
167:*18*
173:*21*
180:*16*
191:*21*  193:*1*
196:*4*  205:*12*
219:*4*  220:*8*
237:*12*
252:*22*  254:*4*
259:*9*  276:*19*
294:*15*
304:*20*  305:*1*
309:*1*  326:*9*
328:*24*
331:*20*
336:*23*
337:*22*
340:*13*  346:*8*
350:*13*
354:*22*
370:*19*  377:*2*
381:*23*
383:*23*
395:*16*  406:*8*
412:*8*
**telling**  67:*2*
142:*18, 23*
182:*3*  208:*13*
229:*9*  239:*14,*
*21*  255:*4*
295:*20*
**tells**  259:*22*
295:*8*  406:*19*
**template**  404:*1*
**Temple**  399:*9*
405:*19*
**temporarily**
126:*15*
**temporary**
186:*8*  209:*24*
**ten**  267:*16*
313:*22*  315:*18*
**tenure**  80:*8,*
*15*  81:*24*
**term**  37:*19*
39:*3*  101:*24*
264:*23*

**terminology**
37:*17*  40:*1*
**Terminus**  2:*11*
**terms**  19:*7*
30:*3*  31:*14*
57:*4*  61:*15*
77:*5*  99:*9, 10*
114:*18*
140:*18*
181:*15*
192:*12*
223:*11*  247:*6*
258:*10*  260:*8*
266:*23*
308:*14*
312:*15*  314:*4,*
*18*  332:*8*
355:*15, 16, 18*
362:*17*
367:*20*  376:*7*
412:*9*
**test**  42:*6*
51:*10*  62:*2*
111:*24*  112:*2,*
*9, 12, 14, 22, 23*
113:*20*  114:*2*
116:*7, 9*
136:*7*  216:*2,*
*9, 12, 14, 21*
217:*22*  218:*4*
222:*19*
223:*14, 23*
224:*3, 7, 15*
225:*4*  228:*9,*
*13, 20, 24*
229:*1, 2, 6, 16,*
*22*  230:*7, 11*
231:*2, 4, 5, 12,*
*18*  234:*12*
235:*24*  236:*1*
248:*7*  272:*17*
273:*3, 6, 21*
274:*17*  275:*2,*
*12, 15*  276:*1,*
*15*  279:*17, 22*
282:*6, 9*
283:*19*  284:*7,*
*14*  285:*8*
293:*6, 21, 22*
296:*17*  309:*1*
323:*4, 7, 15,*

*19*  324:*5*
325:*16*
326:*13, 17*
327:*1, 11*
358:*10, 13, 14,*
*16*  360:*23*
361:*4, 6, 19,*
*24*  364:*17, 23*
368:*4, 18*
369:*14*
389:*10*
390:*22, 24*
**tested**  61:*4*
194:*17*
227:*14*  274:*3*
280:*22*
284:*10*
300:*20*
304:*15*
309:*13*
322:*21*  323:*8*
344:*22*
364:*24*
365:*14*
367:*15*  391:*2*
**testified**  11:*9*
**testify**  415:*5*
**testifying**
14:*15*  232:*8*
261:*3*
**Testimony**
5:*3*  21:*23*
23:*14, 17*
59:*12*  68:*22*
130:*18*  192:*7*
230:*1*  415:*8*
**Testing**  7:*6*
18:*10*  53:*10*
56:*22*  61:*10*
62:*24*  87:*18*
88:*23*  111:*17*
112:*17*
113:*18*
114:*16*  115:*6*
116:*1, 3*
194:*19*  197:*2*
198:*3*  214:*5,*
*11, 22*  215:*11,*
*15*  216:*23*
217:*17, 20, 23*
218:*15, 16*

219:*16*
221:*13*
223:*16*
228:*14*  230:*4,*
*19*  233:*23*
234:*2, 15, 19*
235:*8, 17, 23*
246:*13, 16*
247:*11, 19, 24*
248:*12*
256:*22, 23*
271:*11*
272:*11, 13, 18,*
*22*  273:*1*
275:*19*  276:*7,*
*11*  277:*4, 20*
278:*10, 16, 21*
279:*5*  282:*17,*
*20*  283:*18*
285:*14*
292:*14, 23*
296:*11*
300:*10*
306:*13*  321:*2*
324:*2, 23*
326:*6, 10, 11*
327:*18, 21, 24*
328:*5, 11*
329:*10, 15*
331:*11, 13, 17,*
*23, 24*  332:*6*
339:*20*  361:*8,*
*13*  362:*6, 11,*
*19, 22, 23*
363:*3, 5*
365:*20*
366:*20*
367:*10, 22*
368:*24*  369:*2,*
*10*  370:*7, 10,*
*14*  376:*10*
380:*17*
393:*18*
394:*19, 24*
410:*1, 12*
**tests**  114:*22*
215:*18*  222:*7*
228:*11*  230:*9*
231:*17*
273:*12*
388:*14*  411:*12*

**Tetrasol**
200:*20*
**Teva**  2:*15, 16*
4:*1*  5:*18, 20*
6:*6*  14:*16, 22*
15:*13*  17:*9*
19:*13*  20:*1,*
*11*  21:*19, 22*
22:*18*  24:*20*
29:*3, 8, 16, 18*
30:*13*  31:*12,*
*24*  32:*12, 21*
33:*1, 8, 12, 19*
35:*20, 24*
36:*1, 10, 11,*
*12, 20*  37:*3*
40:*23*  41:*4, 8*
42:*17*  43:*6*
44:*4, 10, 16*
45:*5, 13, 21*
46:*15*  47:*5*
50:*9, 14, 20*
51:*11*  52:*4, 6,*
*11*  53:*4, 12,*
*16, 19*  54:*10,*
*15, 17*  55:*15*
56:*4*  57:*6, 11,*
*14, 24*  58:*6, 8,*
*10, 16, 18, 20,*
*23*  59:*1, 5, 7*
60:*16*  61:*5, 7,*
*12, 13*  62:*8*
63:*12, 18*
64:*9, 20*  65:*7,*
*9, 10, 13, 16, 19*
66:*13*  67:*24*
68:*4, 6, 15*
69:*21*  70:*24*
71:*4, 22*
72:*17*  73:*15*
76:*12, 15*
77:*15*  78:*4*
79:*10*  80:*2, 7,*
*8, 16*  82:*4, 14*
83:*3, 8, 17, 19*
86:*1*  87:*1, 16,*
*19*  88:*4, 7, 20,*
*24*  89:*8, 17*
90:*18*  91:*19*
94:*3*  95:*5, 16*
97:*6, 12, 13,*

*24*  98:*5, 18*
99:*6, 10*
100:*16, 18, 21*
101:*14, 23*
102:*9, 11*
103:*8*  106:*7*
107:*15, 17, 18*
108:*3, 7, 20*
110:*6*  114:*6,*
*18, 19, 23*
115:*5*  116:*2,*
*15*  117:*23*
118:*13, 22*
119:*9*  120:*4,*
*6, 19, 23*
121:*4, 22*
122:*2, 7, 10,*
*17*  123:*11, 15*
126:*10, 15*
127:*17, 21*
128:*4, 13*
129:*4, 24*
130:*14*
131:*17*
133:*14*
134:*22*
135:*10, 17*
138:*16*
142:*22*
143:*11*  144:*3*
145:*13, 19*
147:*15*  148:*3,*
*17*  149:*7, 14,*
*17*  152:*3, 8,*
*18*  153:*4, 8*
154:*3, 12*
155:*16*
165:*21*  169:*5*
171:*22*  172:*6,*
*22*  173:*9, 17*
174:*18*  176:*8,*
*14, 16, 20*
177:*3, 11*
179:*4*  181:*3*
184:*1, 10*
185:*1, 21*
186:*2*  188:*7*
189:*16*
190:*16, 23, 24*
191:*4*  192:*2*
193:*13, 24*

194:*5*  195:*23*
196:*1, 18*
197:*24*
199:*11*
202:*23*
203:*15, 17*
204:*6, 12*
206:*1, 12*
208:*7*  210:*6*
211:*1*  213:*19*
214:*2, 19*
215:*11, 20*
217:*9*  218:*3*
220:*10*
221:*18*  222:*7,*
*11, 18*  223:*16*
224:*10, 12*
225:*6*  226:*22*
227:*1, 14, 20*
228:*2*  229:*19*
231:*1, 22*
232:*1, 15*
233:*21*  234:*1,*
*10, 17*  236:*22*
237:*22*
238:*19*  239:*1,*
*11, 15, 22*
240:*3, 19, 24*
241:*3*  242:*7*
243:*2*  244:*8*
245:*4, 16, 18*
246:*5, 11, 17,*
*19, 21, 22*
247:*7*  248:*10,*
*17*  251:*23*
252:*9, 21*
253:*10*
254:*16*
257:*10, 23*
258:*13, 17, 21*
259:*9, 19*
260:*4, 7, 11,*
*17, 20*  261:*16*
262:*2, 6, 8*
263:*1, 4, 15*
268:*22*
269:*10*
270:*17*
271:*10, 13, 14,*
*19*  272:*11, 13,*
*21*  273:*1, 5*

274:*3, 16*
279:*23*
280:*12*  281:*8,*
*16, 20*  282:*5,*
*6*  283:*4, 17,*
*20*  284:*9, 16*
285:*8, 13*
286:*14, 15, 18*
287:*7, 12*
288:*14, 24*
289:*4, 20*
290:*8, 24*
291:*3, 18, 24*
292:*8, 10, 17*
293:*9*  296:*10*
297:*16*  299:*8,*
*17, 24*  300:*4,*
*10, 14, 23*
302:*17*  303:*1*
304:*1, 7, 20,*
*21, 24*  305:*2,*
*14, 18*  306:*13,*
*15*  307:*15, 18*
308:*20, 23*
311:*9, 16*
312:*7, 12*
313:*6*  315:*7*
316:*11, 12*
317:*7, 16*
318:*23*  320:*2*
321:*2*  322:*18,*
*20*  323:*12*
324:*4, 11*
325:*3, 14, 20*
326:*8, 10, 20*
327:*7, 11, 22*
328:*10*  329:*4,*
*8*  331:*5, 9, 17,*
*22*  332:*6, 21*
333:*13, 15*
334:*18, 21, 23*
335:*2, 4, 9, 11*
336:*4, 16*
337:*4, 5, 11*
338:*3, 21*
340:*18*
341:*10, 11, 23*
342:*2*  343:*4,*
*8*  344:*8*
345:*8, 16, 21*
346:*12, 20, 23*

347:*3, 9, 19*
348:*4, 7*
349:*1, 5, 10,*
*16*  350:*3, 23*
351:*9*  353:*3*
359:*18, 20*
360:*9*  361:*6,*
*7, 20, 22*
362:*6, 23*
365:*14*
367:*15*  370:*6,*
*10*  371:*3*
373:*24*
374:*19, 23*
376:*1, 2*
377:*12, 16, 22*
378:*4*  379:*6*
380:*24*  381:*5,*
*12*  385:*8, 16*
386:*15*  391:*7,*
*23*  393:*15*
394:*17*
396:*11, 13*
399:*19*  402:*1,*
*16*  403:*8*
405:*19*  406:*1*
409:*3, 12*
410:*13*  411:*7,*
*9, 24*  412:*5*
**Teva-133**  5:*10*
15:*6*  16:*19*
19:*11*
**Teva-134**  5:*13*
22:*4, 7*
**Teva-135**  5:*16*
47:*10*
**Teva-136**  5:*18*
71:*21*
**Teva-137**  5:*20*
85:*21, 24*
**Teva-138**  5:*22*
124:*13*
**Teva-139**  6:*3*
135:*16*
**Teva-140**  6:*7*
153:*13*
**Teva-141**  6:*9*
167:*9, 12*
**Teva-142**  6:*11*
174:*1, 7*

Teva-143  6:13 180:7, 10
Teva-144  6:15 204:24 205:3
Teva-145  6:17 218:18, 21
Teva-146  6:19 226:2
Teva-147  6:21 237:4, 9 249:1, 6
Teva-148  6:23 249:1, 6
Teva-149  7:3 276:22 277:2
Teva-150  7:6 294:14, 18
Teva-151  7:8 297:21, 24
Teva-152  7:11 301:8, 12
Teva-153  7:13 328:19
Teva-154  7:15 350:7
Teva-155  7:17 363:15, 18
Teva-156  7:19 376:16, 20
Teva-157  7:21 381:16
Teva-158  7:23 383:10, 13
Teva-159  8:3 384:7
Teva-160  8:6 397:3, 6
Teva-161  8:8 408:10, 14
Teva-50 276:21
TEVA-MDL2875-00020376  6:3 135:16
TEVA-MDL2875-00020519-0525  6:9 167:13
TEVA-MDL2875-

00020744  6:13 180:10
TEVA-MDL2875-00020853-0854  6:21 237:5
TEVA-MDL2875-00020898-0903  6:19 226:3
TEVA-MDL2875-00021073-1074  6:17 218:22
TEVA-MDL2875-00042539  5:18 71:21
TEVA-MDL2875-00042637-2649  7:3 277:3
TEVA-MDL2875-00057196-7197  6:15 205:4
TEVA-MDL2875-00064409-4412  6:11 174:8
TEVA-MDL2875-00067084-7087  7:6 294:19
TEVA-MDL2875-00067532-7537  8:8 408:15
TEVA-MDL2875-00073603-3612  7:11 301:13
TEVA-MDL2875-00083812-3877  7:19 376:21
TEVA-MDL2875-00116005-6007  5:16 47:11

TEVA-MDL2875-00132980  7:15 350:7
TEVA-MDL2875-00246006  7:23 8:3 383:13 384:7
TEVA-MDL2875-00400799-0905  8:6 397:7
TEVA-MDL2875-00415117  7:13 328:19
TEVA-MDL2875-00495102-5104  5:22 124:14
TEVA-MDL2875-00495893-5896  7:21 381:17
TEVA-MDL2875-00546489-6492  7:17 363:19
TEVA-MDL2875-00549865-9886  6:23 249:2
TEVA-MDL2875-00586753  5:20 85:24
TEVA-MDL2875-00731926  7:8 297:24
TEVA-MDL2875-0934333-4435  6:7 153:14
TEVA-MDL2875-DEPS-000027-031  5:13 22:8
Teva's  19:13, 18 22:22

34:10 35:15 42:11, 24 50:3 51:8, 14 53:10 58:3, 18 60:23 61:15 62:10, 18 65:10 66:11, 19 67:18 68:24 69:11, 13 74:12, 23 75:7 76:1 81:14, 20 82:2, 23 85:1 87:23 89:8, 14, 16 93:4 94:11 105:21 115:17, 20 116:5 145:14 153:1 155:13 172:16 173:14 193:6 196:23 204:5 206:6 216:5 220:3 223:3 232:20 255:20 256:12 257:8 259:16 268:6 269:22 271:4 275:24 279:16, 22 286:2 290:7 291:23 292:20 298:19 299:24 300:11 307:12 316:8 333:8 334:9 338:3, 9 339:12 340:11 344:7, 12, 13 347:16 349:18 361:24 362:11 364:18 367:9 375:18 379:6 380:15, 22

Thank  11:16 12:15, 21 17:20 18:18 35:7 36:16 38:14 79:17 84:24 96:15 106:20 118:7 141:20 151:9 187:13 244:19 247:9 277:14 296:18 297:15 330:8 353:23 366:7 371:2 413:13
Thanks  16:12 244:23
therapeutic 38:12
thing  37:24 44:18 68:5 127:12 129:3 195:16 198:21 216:11 224:4 276:17 284:18, 23 329:22 353:11 354:21, 22 372:6 383:20, 21 384:1 395:16 408:22 409:23
things  18:10 19:1 35:14 40:1 45:1, 3 48:13 49:19 50:7 52:2 59:7 94:2 189:21 199:2 216:10 229:17 238:16 243:12 256:2 264:16 338:18 340:15 385:23 403:8 409:17

think 20:18
21:3 43:23
46:8 56:9, 10,
13, 23 57:16
58:11 68:4,
17 80:15, 18
90:22 97:16,
19 98:15
108:2, 5
109:18
111:21
117:22 118:1
134:7 138:21
140:19
149:24
150:13
156:16
160:10 173:4
177:11 180:2
198:8, 9
202:22
216:20 223:1
225:13
242:14, 20, 22
243:8, 24
245:3 258:23
259:5 260:10,
19 265:1
267:20
268:13
275:10
280:19
281:10
283:13
285:11
290:16, 20
291:17
296:13 300:8
303:14
309:10
311:15, 18
317:15
321:16
322:23 323:1,
6 324:11
325:18 326:3,
23 331:9
332:23 333:3
334:1 338:7,
8, 13 339:9
342:18 346:4,

6 354:1
357:16 358:4,
17, 23 359:8
360:22
361:10, 15
362:9, 21
363:3 370:23
371:7, 8
374:1 375:17
378:2 379:19
384:3 396:16
400:23 408:2
411:23 413:3,
7
thinking
108:11
134:13
140:18
241:20 276:20
third 52:10
87:15 88:22
89:2 90:1
100:10, 12, 21
304:8 345:2
384:2
third-party
90:10 92:9
94:14 98:10
101:11, 19
Thomas 5:16
47:12, 23 48:8
thought
224:11
238:24 252:21
three 33:7
128:7, 13
137:3, 12
169:20
373:17 386:21
three-business-
day 137:21
138:11
Thursday
123:6 132:23
time 10:8, 15
12:22 13:4
16:1, 7 20:9,
17 21:8
23:13, 18, 23
24:5, 15, 17,
21 27:10

32:24 35:21
36:20 42:16,
18 43:2 44:3,
22 45:14
46:9 68:3, 13
84:13, 20
92:3 104:6
106:1 107:9
108:14
112:23
113:21 116:8,
11, 15, 24
121:10, 11, 15
126:5 127:17
128:21 133:9,
15 134:14
140:11, 21
146:11, 18
149:17
152:10
157:10 161:3,
23 162:21
172:10
179:24
181:19 182:4
183:8 184:1
187:6 188:7
194:2, 6
195:9 196:2
198:20 199:7,
18 203:16
206:1 211:9,
12, 24 212:4
213:10, 23
214:8 215:5,
12 216:22
217:8 223:9
227:8 233:7,
24 235:5, 11
236:2, 5, 12
239:4, 7, 12
243:17 245:6,
11 246:11
247:2, 14
248:10, 19
261:12 267:4
268:2, 4
273:11
279:14, 20
280:2, 20
281:21

282:13 283:8
285:17
286:20 296:9,
14 297:3, 10
306:5, 22
308:9, 12
309:9, 15
313:2 317:3
319:10, 22
321:6 330:14,
21 337:20
359:17 375:6,
13 381:3
384:3 385:5
388:15
395:16
402:24
407:17
412:18
413:19 415:8
timeframe
244:1
timeline
138:12 253:6
260:16
Timelines
136:20
times 19:24
20:6, 7, 22
264:22
267:17 310:5
timetable
42:22
timing 314:4
317:23
title 35:9
263:14
titled 72:6
today 10:20
11:20 12:1
14:15 19:5
26:10 32:20
36:9 68:4
70:10 77:13
78:3 83:15
106:9 186:11
238:24
241:19 261:4
266:1 267:19
288:13
307:12 340:6

345:19 373:6
406:14 410:5
Today's 10:14
13:14 18:21
20:15, 20
21:4, 9 70:22
told 143:3
145:14, 19
190:24
209:22 239:1
240:1 242:6
253:10
258:13 263:3
304:21 305:2,
3 310:13
312:9 318:23
323:12
tolerable
267:3
Tony 18:5, 12
151:14, 15
174:16
top 125:11
142:1 189:20
191:9 206:23
207:11
210:12
221:21, 22
topics 14:16
17:4, 10, 22,
24 18:6
103:14
topmost 125:5
153:24 168:3,
15 180:20
205:16 207:1
226:15 295:1
409:1
totally 100:7
170:12 266:4
touch 24:23
35:14
touched 35:8
toxicological
250:6 263:15
268:23
269:10, 22
toxicologist
150:12
158:21, 23
169:5 173:15

toxicologists
162:8
toxicology
270:4
traces 200:22,
23 201:8, 18
tracked 81:13
trail 391:14
393:8, 21
trails 392:16
393:3, 17
394:24
training 159:5
402:2, 13, 18,
23 403:5, 11
transcript
415:8, 20
416:17, 19
transcription
418:4
transfer
358:12
transition
29:6 44:20,
22 68:8
337:21
transpired
127:7
TRAURIG
2:10
traveled 14:8
trial 10:8
triethylamine
105:15
trigger 189:4
200:5 347:24
triggered
255:15
troubleshooting
35:3
true 227:19
314:10
322:15, 16, 17
394:22
Truemper
6:12 118:14
174:10, 16
trust 318:9
trustworthy

85:14
truth 415:5, 6
try 29:11
37:3 117:19
225:19
263:18
299:12 383:10
trying 27:8
43:14 46:3
80:18 93:2
95:5 105:22
118:5 124:18
140:10 145:8
148:18 163:1
178:23 185:5
186:6, 9
197:9 204:18
207:9 217:19
222:15
224:17 225:3
231:14
234:11 240:7,
14 242:9, 11
243:6 244:3,
22, 24 261:14
269:14, 16
277:9 290:15
330:5 345:11
355:13
362:14, 18
403:18
turn 118:20
120:23 168:24
turned 309:19
319:1, 7
turning 201:19
Twenty-four
398:22
two 27:23
33:7 44:17
45:2, 4 55:18
57:1 64:23
70:2 73:6
91:18 134:14
169:20 216:9
218:1 220:21
221:8, 15
229:16 231:7
234:7, 8
259:10 396:11
two-day 185:6

type 34:4
70:18 149:11
157:13
177:20 200:5
215:23 216:2,
22 236:1
287:17
303:14 355:7
356:15 357:1
387:4 395:18
404:1, 22
types 156:4
typical 69:23
70:5

< U >
U.S 3:7
25:23 26:4, 9
39:19 43:21
71:11 117:17
128:23
137:15
140:15
144:17
281:12, 13, 17
282:3 283:3
299:14, 15
305:6 362:1,
7 375:21
409:15
Uh-huh 44:7
356:11
ultimate
173:1 264:22
343:3, 23
ultimately
58:2 62:5, 9
160:17
162:14
165:21
172:21
222:18 251:5
265:2 267:9
274:3, 5
285:7 309:19
310:6 333:8
361:12

unacceptability
342:9, 14, 21

unacceptable
170:13 268:8
288:11
341:22 342:6,
24 343:9
390:7 407:11
unclear 341:19
underlying
105:16 109:11
understand
12:16, 19
13:2 14:14,
18 16:14
21:17 23:12
25:2 37:8
42:10 43:14,
17 46:4, 6
58:17 107:7
109:6 116:14
122:15
139:23
140:14
159:24
164:17 186:9
197:9 217:24
225:18
246:23
257:23
269:14, 16
270:15
277:23 294:3
330:5 355:14
358:17
359:10, 20

understandable
374:18
understanding
17:7, 17 19:8
31:20 32:9
35:20 36:5
38:5, 17
39:16 46:15
53:23 65:4
68:9, 13 70:2
101:20
107:11
113:16
123:16
128:22
130:22

131:12 132:7
139:2, 11
143:20, 22
145:10
152:13 161:2
166:6, 8, 16
191:2 199:17
239:7 255:22
290:16
292:16
293:16, 20
308:14
315:16
327:20 328:9
361:9 369:9,
22 407:7
Understood
24:7 44:19
63:8 160:11
200:14
209:24
236:21 247:4
undertook
311:9
unexpected
171:6 257:18
320:17
Unfortunately
250:18
unique 326:2
357:22
Unit 66:20
69:12, 14
71:1, 5 74:13,
24 75:10
76:6, 13
77:16 78:6
79:6, 10 83:4,
17 90:18
95:17, 18
97:14 98:19
101:14, 18, 22
108:18
332:22 333:9,
20 334:6, 10
335:10
336:18 337:8
338:12
340:11, 19
UNITED 1:1
35:16 40:24

Confidential Information Subject to Protective Order

41:*19*   119:*18*
141:*3*   152:*20*
155:*18*   232:7
274:*17, 23*
275:*3, 5*
314:*16*   406:*19*
**University**
25:*3, 14, 22*
**unknown**
126:*12*   252:*3,
15, 18*   257:*2,
4*   258:7
293:*10*   303:*22*
**unusual**
334:*16*
**update**   251:*14*
**updating**
254:*17*
**upload**   349:*24*
**uploaded**
46:*23*
**uploading**
364:5   365:*23*
377:7   383:*23*
**uploads**   377:5
**upwards**   365:6
**urgent**   131:*20*
**USA**   2:*16, 23*
4:*1*
**USB**   112:*12*
116:*9*   248:7
293:*22*
358:*13, 14*
361:*3*
**use**   41:*14*
43:*15*   50:*4*
53:*18*   54:*15*
104:*23*
114:*10*
126:*15*   155:7
156:*18, 20*
157:*3*   161:*12*
162:*10*   166:*2*
175:8   208:*20*
224:*3*   228:*14*
230:*23*
273:*13*
283:*22*   284:*2,
20*   288:8
289:*6, 13*
306:*21*

326:*18*   335:*4*
342:*20*   348:*16*
**uses**   62:*2*
**usually**   56:*19*
357:5
**utilize**   53:*20*
**utilizing**   49:*11*

< V >
**VAA**   109:*9*
**vacation**
150:*16*
**vaccines**
357:*19*
**Vague**   70:*15*
122:*13*
128:*16*
166:*14*
288:*21*
335:*14*   354:*1,
18*   386:*18*
395:*4*
**Vaguely**
125:*14*
**valid**   229:8
**validate**   361:*4,
7*
**validated**
51:*12*   62:*3*
216:*12, 21*
222:*19*
223:*24*   224:7
225:*4*   228:*15,
24*   229:8
231:*20*
272:*17*   275:*16*
**validation**
222:*16*
358:*11, 14*
360:*23*
**VALSARTAN**
1:*3*   7:6
10:*18*   40:*23*
41:*1*   43:*19,
20*   66:*13, 20*
67:*17*   68:*2,
24*   69:*13*
70:*24*   71:*5,
10*   74:*14*
75:*10*   76:5
77:*15*   78:5

83:5, *18*
89:*18*   90:*2,
19*   95:*16*
97:*15*   98:*19,
23*   99:*23*
101:*9, 21*
102:*14*   103:8
107:*3*   108:*19*
109:*24*
111:*17, 23*
112:*19*   115:*2,
21*   116:*16*
119:*17, 19*
123:*13*
126:*16*
130:*15*
132:*20*
133:*10*
134:*16*   140:*4*
143:*13*
145:*15, 20*
148:*2, 16*
149:*18*   150:*5,
9*   152:*4, 5, 9,
10, 19, 21*
154:*7, 13*
155:*17, 19*
161:*13*
171:*23*
172:*18, 23*
173:*10*
176:*17, 18, 21*
177:*4, 7*
178:*13*   179:*3,
15*   180:*22*
181:*4, 10*
182:*1*   185:*2,
17, 22*   186:*3*
187:*20, 21*
188:*3*   189:*14,
23*   192:*3*
193:*15, 24*
194:*6, 7*
195:*12*   196:*4,
17*   197:*19*
198:7   199:*12*
201:*12*   202:*1,
20, 24*   203:*18*
204:*8, 13*
205:*22*   206:*2,
7*   208:*10*

209:*19, 20*
210:*3, 7, 15*
211:*2, 3*
212:*3, 12*
213:*2, 20*
214:*3, 6, 20*
215:*13*
219:*11*
224:*15*
226:*24*
227:*15, 22*
229:*22*   231:*2,
8, 9, 23, 24*
232:*21*
233:*22*   234:*3*
238:*2*   239:*17*
246:*13*
248:*12, 18*
249:*20*   250:*2,
7*   251:*24*
257:*19*
258:*15*
260:*18*
264:*17*   271:*5,
6, 17*   272:*12,
14, 22*   273:7
274:*4, 7*
275:*12, 13*
276:*2, 7, 11,
15*   277:*4*
279:*17, 23*
280:*14*   281:*7,
16*   282:*21*
283:*20*
284:*10, 15*
286:*17*   287:*9,
14, 21*   288:*4,
16*   289:*2, 22*
291:*6*   292:*1*
296:*11*
297:*18*
298:*18, 20*
300:*2, 5, 11*
301:*1*   302:*19,
21*   304:*3, 9,
15*   305:*20*
306:*14*
307:*17*
309:*20*   321:*3*
322:*21*   324:*5*
325:*16*   327:*3,*

22*   328:*11*
329:*10*
331:*11, 22*
336:*1*   339:*13*
345:*10, 23*
346:*16*   347:*1,
6, 13, 18*
348:*6, 13*
362:*1, 11*
364:*13, 19*
365:*14*   367:*6,
11, 14*   369:*11,
15, 23*   370:7
375:*21*
394:*18*   395:8
409:*14, 19*
410:5, *6*
411:*17*   412:*5,
11*
**valsartan-
related**   410:*24*
**value**   38:*12*
**value-added**
318:*22*
**Vanderweeen**
5:*23*   7:*21*
124:*15*
381:*18*   382:*19*
**Var**   6:*17*
218:*23*   227:7
**variety**   356:*19*
**various**   47:*23*
50:*19*   111:7
154:*2*   177:*22*
178:*20*
249:*14*
363:*24*   366:*22*
**Var's**   227:*13*
**vary**   338:*19*
340:*3*
**vendor**   87:*14*
90:*12*   316:*12,
23*   349:5, 7,
18*   350:*24*
351:*18*   352:5
353:6   354:*4,
6, 7, 11, 23, 24*
355:*4, 20*
356:*13, 19*
357:*1*   409:*23*
410:*11*

Confidential Information Subject to Protective Order

vendors 316:8
334:20 335:2
351:7
vendor-
supplied
360:16
verbatim
415:8
verification
358:12, 16
verify 361:4
version 360:12
versus 58:14
224:11 341:18
vice 132:24
184:14 187:4
307:13
VICTORIA
2:10 14:7
VIDEO 10:10
12:7 13:15
16:1, 7 84:13,
20 146:11, 18
236:5, 12
297:3, 10
330:14, 21
375:6, 13
413:19
Videographer
4:1 10:12
Videotaped
1:13 5:13
15:7 16:20
view 16:15
170:18
266:24 294:2
295:20, 21
372:11
violation 387:8
violations
258:20
387:11, 13
violative 155:7
vis-à-vis
50:20 59:8
61:16 63:17
64:8 282:3
337:14 385:7
visited 107:20
396:19

visualize 80:21
VLN 283:2
VP 33:3, 20
VST 109:8

< W >
wait 252:22
317:16 330:7
waited 326:8
waived 10:5
walk 27:8
want 15:19
18:22 20:5, 6,
24 21:5, 13
23:11 24:23
32:24 37:1
42:2 43:24
45:19 58:21
65:3 82:5
99:12 104:2,
21 105:2, 7
108:12
194:11 203:5
208:22
225:14, 17
228:6 244:16
263:20 273:6
283:15
308:18 325:5
332:18
336:14
351:20
359:11 363:8
370:19
384:12
396:16
397:16
400:13 401:1,
13, 19 407:22
wanted 30:6
58:5 68:7
91:15 121:13
161:15, 23
186:21
191:17
192:20 193:1,
4 199:11
203:2 247:3
266:20
275:22 279:9

353:11 373:18
wants 359:6
warning
337:8 338:12
339:18 340:20
way 30:8
42:21 52:22
82:17 83:7
140:20 144:2
171:22 172:4
173:22
200:11
202:12
204:10 242:1
245:21
262:24
263:19
266:22
268:11, 15
275:10, 21
276:13 283:9
307:14
312:15
316:17 319:4
340:6 342:11
346:4 348:24
373:7 379:7
383:9 384:15
389:24
394:14 396:1
401:21 403:3
406:22
ways 93:14
156:13
157:24 334:17
week 123:12
130:15 323:1,
5, 14 324:3
weeks 241:8
259:10
Weissbazak
8:10 408:16
409:2
welcome
16:11 84:23
236:16 297:14
well 17:18
18:6 24:15
28:13 29:15
35:6 40:3
47:22 55:10

61:24 68:12
71:13 87:23
88:11 91:10
95:15 98:16
103:4, 18
108:8 109:13
112:4 113:7
114:5 123:11
129:10
132:22
139:14 140:2,
19 141:4
144:8 152:2
163:18
166:10 177:2,
14 180:3
183:7 185:23
187:15 193:6
200:13 206:3
211:16 216:3
222:10
230:22 231:8
233:12
242:21 245:5
246:20 261:3
265:2, 6
271:19 275:4
276:12
282:16
304:19
305:16
308:17
315:12 319:3
320:18
323:17
362:24 369:9
382:24 383:3
394:15
396:19
398:16
406:24 412:14
went 25:18,
19 26:13
27:15, 19
28:2, 22
30:21 267:2
320:11
322:14, 20
327:4 334:9
we're 37:12,
16 38:5

39:24 40:11,
23 45:22
59:20 68:21
91:9 93:21
99:15 103:13
117:7 121:1
146:22
168:22 195:1,
2 197:8, 10
225:8 226:7
247:1 253:20
301:4 303:8
316:3 342:3
360:15 389:7
405:13
407:20 413:8
WERNER
2:19
West 3:11
we've 81:9
84:2 118:6
146:1, 3
173:5 190:4
225:9 229:18
234:1 305:11,
13 407:21
409:13 410:4,
10
whatsoever
213:13
WHITELEY
2:1, 3
window
137:21
wish 383:8
wishes 53:16
wishing 53:5,
10
withdraw
54:21
withheld 413:2
Witness 9:5
10:24 15:15
19:15 59:15
62:18 64:12
65:2 69:19
70:18 74:19
75:16 76:8,
21 78:8
83:11, 23
84:11 92:17

93:12 95:3
96:17 100:1,
6 118:2, 9
122:14
124:18 125:1
127:5 128:17
130:19 132:1
136:2 138:3
150:23
163:11
165:16
166:15
167:23
168:12
174:13
186:18
192:10 197:2
205:8 207:7
208:23
212:17
213:10 215:4
223:22
225:23 226:7
228:5 230:2
232:13
233:12 234:7,
23 235:22
241:11
244:10, 19
254:9 255:7
265:9 277:8
288:19 297:1
309:6 314:2
324:18
335:15
349:23
382:16, 20
383:5, 17, 22
384:11 395:7
396:8 397:16
408:6 413:16
416:1
**witness's**
94:20
**Wong** 125:17
126:19
128:24
129:22 131:5
132:12
133:16 140:2,
11, 22 141:22

142:19
143:11 144:10
**Wong's** 126:8
128:11
**word** 172:5,
15 173:9
270:3 285:14
286:15
**words** 295:10
**work** 25:19
29:12, 14, 16
34:4 52:10
57:5 91:3, 9
110:17, 18
231:15, 18
246:14 311:6
319:19 394:9
412:17
**worked** 33:11
178:17 279:15
**workforce**
25:17
**working**
25:23 30:3
128:7 150:8
172:11
177:24 178:4
199:19 276:6
324:1 377:6
**works** 204:11
231:12
**world** 388:18
**worldwide**
35:16
**write** 189:20
220:2
**writes** 126:10
141:9 155:22
156:15 169:7
182:7
**writing**
190:14 206:5
295:16
**written** 73:6
120:3 121:10
358:20
359:18 402:5
403:14
404:15, 21
407:6

**wrong** 151:8
238:24 243:9
319:1, 7 383:3
**wrote** 121:4
141:9, 22
160:23 164:4
171:10
175:15, 23
190:8 295:7

**< Y >**
**Yeah** 19:16
24:17 53:24
65:2 82:21
155:1 157:7
242:18
243:15 268:4
280:19
288:19 290:4
322:8 324:18
407:24 411:4
**year** 19:17
25:7 32:13,
16 108:10, 12
333:21 412:18
**years** 33:7
375:1 398:19,
22 407:8
**Yep** 17:15
48:16 81:5
142:12 410:3
**yes/no** 146:23
**yield** 339:10
**yielded** 369:3

**< Z >**
**zero** 267:2
**Zhejiang** 3:6
98:24 126:11
252:1 257:17
364:13
**ZHP** 99:1, 5,
22 101:9, 10,
18, 21 102:10,
14 103:8
104:5 105:19
106:7 107:2,
13, 23 108:8
110:12
111:14
112:19, 24

113:6, 9, 14,
22 114:6, 13,
20, 23 115:6,
13, 22 116:4,
8 119:20
120:16
129:12, 18
133:11
134:16 140:4
144:16
145:15, 20
148:3, 17
150:5 152:5,
10 154:13
155:19 169:8
170:12
171:24
176:17 177:1,
9 179:24
181:5, 12
185:17, 22
188:4 190:23
193:3 194:2,
7, 23 195:12
198:12
199:19 200:1,
14, 18 206:3
210:14
211:19, 20
212:18
231:10
238:12 239:1,
10, 15, 17
240:19, 23
241:1, 22
242:6, 24
243:1, 13, 20,
21 246:6, 15
248:10, 18
253:7 257:24
258:12, 18
259:2, 6, 9, 18,
22 260:5, 11,
16, 21 261:4,
15 262:6, 8,
13 263:2, 3,
10 264:16
271:21 281:9,
14, 17, 22
292:3, 6
294:12

295:21 296:4,
11 301:5
302:20, 24
311:10
345:13
362:12, 22
364:20
365:14, 21
368:5 369:1,
11, 15 371:4,
15 372:14
373:9 375:1
**ZHP-observed**
120:11
**ZHP's** 152:21
161:13
170:18 177:7
198:22 203:1
212:12
242:22 261:7
264:12
267:14 268:7
293:17
298:15
366:20
369:22 372:19
**zinc** 102:21
103:20 107:1,
14, 24 110:12
113:23
114:14 115:1,
8 239:3
248:13 262:14
**ZMICK** 3:11
**Zoom** 1:14
10:17

# Exhibit 90

REDACTED

Confidential Information Subject to Protective Order

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
2                     -  -  -
3    IN RE:  VALSARTAN,      :  MDL NO. 2875
     LOSARTAN, AND          :
4    IRBESARTAN PRODUCTS     :  HON. ROBERT
     LIABILITY LITIGATION    :  B. KUGLER
5    _____  :
                             :
6    THIS DOCUMENT APPLIES   :
     TO ALL CASES            :
7

          - CONFIDENTIAL INFORMATION -
8          SUBJECT TO PROTECTIVE ORDER
9                     -  -  -
10                June 30, 2021
11                     -  -  -
12
13          Videotaped remote deposition of
     JENS NASSALL, taken pursuant to notice,
14   was held via Zoom Videoconference,
     beginning at 12:02 p.m., (Central
15   European Summer Time) on the above date,
     before Michelle L. Gray, a Registered
16   Professional Reporter, Certified
     Shorthand Reporter, Certified Realtime
17   Reporter, and Notary Public.
18
                     -  -  -
19
20          GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
21             deps@golkow.com
22
23
24

Confidential Information Subject to Protective Order

Page 2

1
2  ZOOM APPEARANCES:
3  KANNER & WHITELEY, LLC
   BY: DAVID J. STANOCH, ESQ.
      CONLEE S. WHITELEY, ESQ.
4  701 Camp Street
   New Orleans, Louisiana  70130
5  (504) 524-5777
   d.stanoch@kanner-law.com
6  c.whiteley@kanner-law.com
7  Representing the Plaintiffs
8  GREENBERG TRAURIG, LLP
   BY: VICTORIA DAVIS LOCKARD, ESQ.
9      BARDIA SANJABI, ESQ.
   Terminus 200
10 3333 Piedmont Road NE
   Suite 2500
11 Atlanta, Georgia 30305
   (678) 553-2312
12 lockardv@gtlaw.com
   Sanjabib@gtlaw.com
13 Representing the Defendants, Teva
   Pharmaceutical Industries, Ltd., Teva
14 Pharmaceuticals USA, Inc., Actavis LLC,
   and Actavis Pharma, Inc.
15
16 CIPRIANI & WERNER, P.C.
   BY: ETHAN FELDMAN, ESQ.
17 450 Sentry Parkway, Suite 200
   Blue Bell, Pennsylvania 19422
18 (610) 567-0700
   Efeldman@c-wlaw.com
19 Representing the Defendants, Aurobindo
   Pharma, USA, Inc. and Aurolife Pharma,
20 LLC
21
22
23
24

Page 3

1  ZOOM APPEARANCES:  (Cont'd.)
2
3  DUANE MORRIS, LLP
   BY: JOVALIN DEDAJ, ESQ.
   30 South 17th Street
4  Philadelphia, Pennsylvania 19103
   (215) 979-1164
5  jdedaj@duanemorris.com
   Representing the Defendants, Zhejiang
6  Huahai Pharmaceutical Co, Ltd., Prinston
   Pharmaceutical Inc., Huahai U.S., Inc.,
7  and Solco Healthcare US, LLC
8
   PIETRAGALLO GORDON ALFANO BOSICK &
9  RASPANTI, LLP
   BY:  FRANK H. STOY, ESQ.
10 One Oxford Centre
   38th Floor
11 Pittsburgh, Pennsylvania 15219
   (412) 263-1840
12 fhs@pietragallo.com
   Representing the Defendant, Mylan N.V.,
13 Mylan Pharmaceuticals Inc., and Mylan
   Laboratories Limited
14
15 HINSHAW & CULBERTSON, LLP
   BY:  GEOFFREY M. COAN, ESQ.
16 53 State Street, 27th Floor
   Boston, Massachusetts  02109
17 (617) 213-7047
   Gcoan@hinshawlaw.com
18 Representing the Defendant, ScieGen
   Pharmaceuticals, Inc.
19
20 FALKENBERG IVES, LLP
   BY:  MEGAN A. ZMICK, ESQ.
21 230 W. Monroe Street, Suite 2220
   Chicago, Illinois 60606
22 (312) 566.4808
   Maz@falkenbergives.com
23 Representing the Defendant, Humana
24

Page 4

1
2  ZOOM APPEARANCES:  (Cont'd.)
3  ALSO PRESENT:
   VIDEOTAPE TECHNICIAN:
4  Ingrid Rodriguez
5
6  ALSO PRESENT:
7  Rachel Gallagher
   (Teva)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1
2            - - -
             I N D E X
3            - - -
4
   Testimony of:
5
6              JENS NASSALL
7  By Mr. Stanoch              12
8  By Ms. Lockard             330
9
10
11
12            E X H I B I T S
13            - - -
14
15 NO.        DESCRIPTION           PAGE
16 Teva-315    Fourth Amended Notice 15
17             To Take Videotaped
             Oral Deposition
18 Teva-316    Curriculum vitae and  21
             LinkedIn profile
19
20 Teva-317    E-mail thread         89
             9/22/2011, Subject is
21             Huahai,
             TEVA-MDL2875-0051286
22             - 87
23
24

Page 6

E X H I B I T S (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Teva-318 | E-mail thread. 9/23/2011, Subject is Huahai issues TEVA-MDL2875-00107585 | 104 |
| Teva-319 | E-mail thread 8/19/2014, Subject is Global Sales Analysis -.Teva - region wise/ site wise/product wise for CY11,CY12, CY13 and CY14LE TEVA-MDL2875-00108342 - 345 | 131 |
| Teva-320 | E-mail thread 6/29/2018, Subject is Notification for Valsartan, with attachment TEVA-MDL2875-00102401 | 158 |
| Teva-321 | E-mail thread. 5/8/2018, Subject is Following demand TEVA-MDL2875-00872512 - 513 | 180 |
| Teva-322 | E-mail thread. 6/28/2018, Subject is GNTM-CORP-QRM-2018-018 has been added - impact on Amlo/Vals/HCTZ Dubnitsa file TEVA-MDL2875-00509197 - 203 | 191 |

Page 7

E X H I B I T S (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Teva-323 | E-mail thread. 7/9/2018, Subject is Valsartan - more questions ZHP01090696 - 702 | 197 |
| Teva-324 | E-mail thread . 7/20/2018, Subject is Urgent and important: Genotoxic impurity notification from valsartan ex Huahai ZHP02321449 - 453 | 205 |
| Teva-325 | E-mail thread. 7/27/2018, Subject is Valsartan - second wave test results from Huahai TEVA-MDL2875-00103279 - 292 | 211 |
| Teva-326 | E-mail thread. 8/1/2018, Subject is Valsartan - more batches to be tested TEVA-MDL2875-00036505 - 507 | 220 |
| Teva-327 | E-mail thread. 8/9/2018, Subject is Urgent: Valsartan update TEVA-MDL2875-00053929 - 937 | 224 |

Page 8

E X H I B I T S (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Teva-328 | E-mail thread. 8/10/2018, Subject is Urgent Request - Valsartan update GNTM-CORP-QRM-2018 -018-Huahai TEVA-MDL2875-00042244 - 249 | 237 |
| Teva-329 | E-mail thread. 8/7/2018, Subject is Valsartan update TEVA-MDL2875-00109885 - 893 | 243 |
| Teva-330 | E-mail thread 8/10/2018, Subject is Short notes on our call : Valsartan update TEVA-MDL2875-00109905 - 915 | 250 |
| Teva-331 | E-mail thread. 8/13/2018, Subject is FDA-483 observations from 2017 and current Valsartan situation ZHP00912962 - 967 | 256 |
| Teva-332 | E-mail thread. 8/23/2018, Subject is NDEA - possible other impurity TEVA-MDL2875-00137077 - 78 | 282 |

Page 9

E X H I B I T S (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Teva-333 | E-mail thread. 9/18/2018, Subject is NDEA - possible other impurity TEVA-MDL2875-00209015 - 17 | 287 |
| Teva-334 | E-mail thread. 9/21/2018, Subject is Huahai redacted 485 TEVA-MDL2875-00423475 - 478 | 298 |
| Teva-335 | E-mail thread. 11/5/2018, Subject is Payments for Huahai TEVA-MDL2875-00055166 - 167 | 306 |
| Teva-336 | Confidential Settlement Agreement Execution version TEVA-MDL2875-00492240 - 248 | 313 |
| Teva-337 | Greenberg Traurig letterhead, letter of indemnification dated 6/28/2018 MAJOR_DNJ-Sartan_001478 - 1482 | 328 |

Confidential Information Subject to Protective Order

Page 10

```
1                - - -
2       DEPOSITION SUPPORT INDEX
3                - - -
4
5  Direction to Witness Not to Answer
6  PAGE   LINE
   None.
7
8  Request for Production of Documents
9  PAGE   LINE
   None.
10
11 Stipulations
12 PAGE   LINE
   None.
13
14 Questions Marked
15 PAGE   LINE
   None.
16
17
18
19
20
21
22
23
24
```

Page 11

```
1                - - -
2       THE VIDEOGRAPHER:  We are
3  now on the record.
4       My name is Ingrid Rodriguez.
5  I'm a videographer for Golkow
6  Litigation Services.
7       Today's date is June 30,
8  2021, and the time is 12:02 p.m.
9       This remote video deposition
10 is being held in the matter of In
11 Re valsartan, losartan, and
12 irbesartan products liability
13 litigation for the United States
14 District Court, District of New
15 Jersey.
16      The deponent is Jens
17 Nassall.
18      All parties to this
19 deposition are appearing remotely
20 and have agreed to the witness
21 being sworn in remotely.
22      Due to the nature of remote
23 reporting, please pause briefly
24 before speaking to ensure all
```

Page 12

```
1  parties are heard completely.
2       All counsel present will be
3  noted on the stenographic record.
4       The court reporter is
5  Michelle Gray and will now swear
6  in the witness.
7                - - -
8       ... JENS NASSALL, having
9  been first duly sworn, was
10 examined and testified as follows:
11               - - -
12           EXAMINATION
13               - - -
14 BY MR. STANOCH:
15      Q.   Hello, Mr. Nassall, we met a
16 moment ago.  My name is David Stanoch,
17 I'm one of the lawyers for the plaintiffs
18 in this action.  I will be asking you
19 questions today.
20      A.   Nice to meet you.
21      Q.   Same.
22           Have -- I'll add, thank you
23 for appearing remotely from Europe for
24 this deposition.
```

Page 13

```
1       A.   You're welcome.
2       Q.   Have you been deposed
3  before, sir?
4       A.   No, I have not.
5       Q.   I will go over some of the
6  rules for today's deposition.  I'm sure
7  you are familiar with these from your own
8  counsel.
9            As I'm sure you are aware, I
10 will be asking you a series of questions
11 and you will be providing answers.
12 Everything everyone says will be taken
13 down by the court stenographer, as well
14 as the videographer.  Do you understand
15 that?
16      A.   Yes, I do.
17      Q.   Because everything is being
18 taken down, I will try to pause before I
19 speak so I don't speak over you.  I'd ask
20 if you try to do the same so we don't
21 speak at the same time.  Is that fair?
22      A.   That's fair.
23      Q.   If you do not understand one
24 of my questions, please say so.  I'll
```

Page 14

1  attempt to rephrase.  Otherwise I will
2  assume you understood my question.  Is
3  that fair?
4      A.   That's fair as well.
5      Q.   From time to time your
6  attorney may object.  You should still
7  answer the question unless she instructs
8  you otherwise.  Do you understand that?
9      A.   Yes, I do.
10      Q.   We can take breaks
11  throughout the day.  This is not an
12  endurance test.  I just ask that if a
13  question is pending, answer the question,
14  and then we can take a break.  Okay?
15      A.   Okay.
16      Q.   And is there any reason why
17  you cannot testify truthfully and
18  accurately today?
19      A.   No.
20      Q.   And you understand you're
21  under oath to tell the truth today,
22  right?
23      A.   Yes, I do.
24      Q.   And I also understand or --

Page 15

1  strike that.
2          You understand that you are
3  also testifying on behalf of Teva as to
4  certain topics; is that right?
5      A.   Yes, for certain topics I
6  do.
7      Q.   Stand by, I'm going to
8  attempt to mark the first exhibit, sir.
9      A.   Okay.
10          (Document marked for
11      identification as Exhibit
12      Teva-315.)
13  BY MR. STANOCH:
14      Q.   Sir, I've just marked
15  Exhibit 315.  You should have access to
16  that in the documents folder.  Let me
17  know when you can see it.
18      A.   All right.  I see it in the
19  folder.  Give me a moment.  Yes, it
20  opened.
21      Q.   Great.  This appears to be a
22  copy of the deposition notice for your
23  deposition today, right?
24      A.   Yes, it does.

Page 16

1      Q.   You've seen this before,
2  right?
3      A.   Yes, I did.
4      Q.   And if you scroll, there's
5  some topics listed there beginning with
6  44.  Do you see that?
7      A.   Yes, I see.
8      Q.   Either you or Ms. Lockard,
9  you can stipulate too, what topics are
10  you prepared to testify on today on
11  behalf of Teva of those listed here?
12          I can -- or Mr. Nassall,
13  which of these -- which of these topics
14  are you prepared to testify on behalf of
15  Teva today?
16      A.   Let me check.  Impurity --
17  sorry.  I need to read them.
18      Q.   Sure.
19      A.   I can't recall the number by
20  heart.
21      Q.   Sure.
22      A.   So I remember it's
23  Number 48, Teva's product recall for
24  valsartan finished dose, including who

Page 17

1  Teva communicated with, how, about what,
2  and the retention of recalled or
3  sequestered valsartan finished dose.  And
4  this topic I can cover on the API level.
5          Then it's Teva oral and
6  written communication with ZHP with
7  regard to the valsartan API, and the same
8  with Mylan.
9      Q.   That would be topic, listed
10  here, 44 and 45, correct?
11      A.   Yes.  Correct.
12      Q.   And the one you mentioned
13  earlier was Topic 48, correct?
14      A.   Yes, correct.
15      Q.   And I understand you're also
16  prepared to testify on Topic 49 to the
17  extent it relates to indemnifications
18  paid or provided by or to Teva in
19  connection with the nitrosamine impurity
20  within valsartan?
21      A.   Yes, that sounds correct.
22      Q.   I believe that you are not
23  prepared today to testify on behalf of
24  Teva as to Topics 46 and 47; is that

Confidential Information Subject to Protective Order

Page 18

1  correct?
2          MS. LOCKARD:  We just object
3      to form.  He's not being offered
4      for those.
5          MR. STANOCH:  That's fine.
6  BY MR. STANOCH:
7      Q.   Is that correct?
8      A.   So that's correct, I will
9  not testify for 46 and 47.
10     Q.   Okay.  What did you do --
11 strike that.
12         What did you do to prepare
13 for today's deposition, sir?
14     A.   I had some meetings with our
15 lawyers, reviewed some documents.  So I
16 tried recalling.
17     Q.   When did you first learn
18 that you were going to be a potential
19 deponent in this litigation
20 approximately?
21     A.   Approximately a few months
22 ago.
23     Q.   And you said you had some
24 meetings with your counsel to prepare for

Page 19

1  today's deposition.
2          Approximately how many
3  meetings have you had with your counsel
4  to prepare for today's deposition?
5      A.   Approximately four, five.
6      Q.   Were those all remote or
7  were any of those in person?
8      A.   They were all remote.
9      Q.   And the only people at those
10 meetings besides yourself was that Teva
11 inhouse or outside counsel?
12     A.   Yes.  Correct.
13     Q.   Did you ever have any
14 meetings to prepare for today's
15 deposition with any nonlawyers?
16     A.   No, I did not.
17     Q.   You did not talk to any
18 colleagues to get any information to
19 prepare for today's deposition, nonlawyer
20 colleagues?
21     A.   No, I didn't.
22     Q.   Approximately how many
23 documents did you review to prepare for
24 today's deposition?

Page 20

1      A.   Approximately 50.
2      Q.   Between meetings with your
3  counsel and your own review of documents,
4  how much time roughly would you say you
5  spent preparing for today's deposition?
6      A.   You mean how much time I
7  spend with the counsel or by myself?
8      Q.   Oh.  You can do each
9  separately and then altogether, sir.
10     A.   I would say with a
11 counselor, must have been 15 hours
12 roughly, probably.  And then I've -- I'm
13 not sure, a few more hours reading some
14 of the documents.
15     Q.   That's fine.  All right.
16 Thank you.
17         You can put that exhibit
18 aside.
19         MR. STANOCH:  I'm going to
20     mark the next exhibit, sir, to go
21     over some of your educational and
22     professional background.  All
23     right?
24 BY MR. STANOCH:

Page 21

1      Q.   All right?
2      A.   All right.
3          (Document marked for
4      identification as Exhibit
5      Teva-316.)
6  BY MR. STANOCH:
7      Q.   Teva 316.  Let me know when
8  you can access that.
9      A.   Yes, I opened it.
10     Q.   This appears to be a copy of
11 your resumé or CV, as well as your
12 LinkedIn profile?
13     A.   Let me shortly scroll
14 through it.  CV and the LinkedIn profile,
15 yes.
16     Q.   Did you prepare both the CV
17 and the LinkedIn profile?
18     A.   Yes.
19     Q.   And you can refer to these
20 as we go through, I just want to get some
21 basic background of your education and
22 professional work.  Okay?
23     A.   Okay.
24     Q.   And it looks like you --

Confidential Information Subject to Protective Order

Page 22

1  help me out some education.  From what
2  university did you graduate for what
3  would be equivalent of a four-year
4  college in the United States?
5      A.   I'm not fully sure about the
6  four-year U.S. version.
7      Q.   That's fine.
8      A.   But the main graduation was
9  from University of Konstanz with a
10 chemistry diploma, which is nowadays a
11 master degree.
12     Q.   I see.  And then you went to
13 Technical University of Munich?
14     A.   Yes, I did, where I started
15 my Ph.D. and continued that in -- at the
16 Technical University of Chemnitz, as my
17 professor who was guiding me through my
18 Ph.D. thesis moved to Chemnitz.
19     Q.   I see.  And then did you
20 obtain your Ph.D. from Chemnitz?
21     A.   No, I did not.
22     Q.   And that would have -- that
23 was -- well, what was the area of focus
24 for your Ph.D. when you were studying?

Page 23

1      A.   For the Ph.D., it was this
2  thesis on new catalysts for oxidations,
3  which was meant to be used mainly in
4  detergents; there are some catalysts
5  helping removing stains.
6      Q.   Have you continued to pursue
7  classes from 2003 to obtain the Ph.D.?
8      A.   I mean the classes, and the
9  practical work which needs to be done in
10 the lab was completed in 2003.  So I did
11 not attend any further classes.
12     Q.   And I'm sorry, I think you
13 said that you did not complete and were
14 not awarded the Ph.D.?
15     A.   No, the -- the last step in
16 obtaining a Ph.D. in Germany is writing
17 down the thesis, hand it in, and then
18 defend it.  That never happened.  The
19 idea was to do that while I had my first
20 position at ratiopharm and somehow there
21 never was any time left.
22     Q.   You went to work for a
23 pharmaceutical company, correct?
24     A.   Yes, that's correct.

Page 24

1      Q.   And then did you obtain a
2  couple of postgraduate degrees from
3  University of Hagen, H-A-G-E-N; is that
4  right?
5      A.   Yes.
6      Q.   And those were in what
7  fields?
8      A.   Those were in the fields of
9  business and labor law and economics.
10     Q.   You obtained certificates or
11 the equivalent for those studies?
12     A.   For those, no, I never
13 finished.  I just joined some lectures.
14 No.
15     Q.   Understood.  Your first, I
16 guess, true professional job was at
17 ratiopharm; is that correct?
18     A.   Yes, that's correct.
19     Q.   And you can refer to your
20 resumé or LinkedIn here.  But just
21 generally tell us what you were doing
22 when you first joined ratiopharm?
23     A.   Ok.  When I first joined
24 ratiopharm, my official job title was

Page 25

1  licensing manager, and the main tasks
2  were in-licensing finished product and
3  doses, usually together with the product
4  supply which then ratiopharm was
5  marketing mainly in Germany and also some
6  other European countries.
7      Q.   Was licensing, so you were
8  working to get the legal rights to obtain
9  certain molecules or treatments?
10     A.   Yes.  Ratiopharm's R&D
11 capabilities for finished dosage form was
12 limited, but what ratiopharm did was
13 still offering more or less a complete
14 generic portfolio in Germany and some
15 other European countries.  And then most
16 of these products were developed by
17 external partners and we in-licensed the
18 rights.  They also supplied the product,
19 and then after a while, usually
20 production was moved from the external
21 partners to inhouse production at
22 ratiopharm.
23     Q.   I see.  And then around
24 February 2007 you went to work briefly

Confidential Information Subject to Protective Order

Page 26

1  for another company; is that right?
2      A.   Yes, that's correct.  I went
3  from another German generic company owned
4  by Torrent.
5      Q.   And were you doing generally
6  the same types of licensing activities
7  while you were at Heumann?
8      A.   Yes, I was.  In general,
9  same tasks, responsibilities were a
10 little wider.  The company was a little
11 bit smaller, so less people, and that was
12 the interesting part there.
13     Q.   And then it looks like you
14 returned to, is it ratiopharm?
15     A.   Yes.  I did.
16     Q.   And what position did you
17 return, it looks like in January of 2008?
18     A.   Yes.  Ratiopharm wanted me
19 back and offered me the position of chief
20 representative at the ratiopharm office
21 in Shanghai.  So this was not in
22 licensing anymore.  It was leading
23 procurement of materials from Southeast
24 Asia.

Page 27

1      Q.   The materials included API,
2  the active pharmaceutical ingredient?
3      A.   Yes.
4      Q.   What other materials did
5  your role encompass?
6      A.   There were also some
7  packaging materials, promotional
8  materials.  We also worked on some
9  finished dosage forms.  But the main part
10 was the API.
11     Q.   And the API that you were
12 responsible for sourcing during this
13 time, was then made into finished dose
14 at -- for ratiopharm and other
15 facilities?
16     A.   Yes, correct.  At ratiopharm
17 production facilities.
18     Q.   And Southeast Asia, you
19 don't -- I don't need perfection, but
20 generally what countries did your
21 territory encompass at the time?
22     A.   The main sourcing came from
23 People's Republic of China.  And there
24 were also some manufacturers in South

Page 28

1  Korea, Taiwan.  That's mainly it.
2      Q.   Okay.  And then you have
3  listed here that you began working in
4  January of 2011 for Teva Generics Systems
5  in Ulm, Germany, correct?
6      A.   Yes, that's correct.
7      Q.   And at this time was
8  ratiopharm acquired by Teva, or was Teva
9  a standalone company at the time?
10     A.   No.  While I was -- it
11 happened during 2010, that Teva acquired
12 ratiopharm and Merckle, the two German
13 companies which I was working for.
14     Q.   Got it.  So you didn't leave
15 ratiopharm to go work somewhere else --
16     A.   No.
17     Q.   -- where you were working
18 was acquired essentially?
19     A.   Yes, correct.
20     Q.   And you can -- you can tell
21 me, but it looks like you had some of the
22 same responsibilities in sourcing that
23 you had while it was ratiopharm itself;
24 is that right?

Page 29

1      A.   It's not exactly the same.
2  During the ratiopharm time in China, I
3  was responsible to lead the team buying
4  the materials in Southeast Asia.
5          Then when it was Teva
6  Generics Systems, it was R&D sourcing.
7  So it was no longer commercial -- or no
8  longer material for commercial production
9  but for the R&D activities of Teva.  And
10 the responsibility was to get the
11 materials needed by the European R&D
12 sides of Teva.
13          And there were also some --
14 some R&D sites outside of Europe so I did
15 not take care of that.  And it was then
16 sourcing from global suppliers, not only
17 from Asia.
18     Q.   I see.  Thank you.
19          And just so we are clear,
20 sourcing for R&D, you were obtaining API
21 for products that Teva had not yet began
22 to sell in a particular market.  Is that
23 fair?
24     A.   Yes.  That's fair to say.

Confidential Information Subject to Protective Order

Page 30

1  Q.   And commercialized product,
2  that means the product is sort of
3  approved and everything else is okay for
4  Teva is then selling the finished dose
5  product in a given market.  Is that fair?
6  A.   Yes, that's fair.
7  Q.   Thanks.
8       So at this time you were
9  sourcing for the R&D side of Teva only?
10  A.   Correct, for the European
11  Teva R&D sites, yes.
12  Q.   And then it looks like
13  around May 2014, you became director
14  global API category strategy at Teva,
15  correct?
16  A.   Yes, that's correct.
17  Q.   And tell me how your
18  responsibilities changed when you assumed
19  that position.
20  A.   That was then again more on
21  the commercial demand of API and
22  developing the strategies of -- from
23  which suppliers we want to source, which
24  API.  So this is, again, then less of the

Page 31

1  R&D activities, but for commercial
2  production of finished dosage forms.
3  Q.   I see.  Then you had another
4  position you took in December of 2017, it
5  looks like at a Teva facility in -- for
6  Japan?
7  A.   That's correct.  That was
8  partly in parallel.  So I was also
9  responsible for the procurement in
10  Nagoya, Japan, for the materials.  I also
11  stayed for almost a year in Nagoya.
12  Q.   I see.  And then around
13  March 2019, you came back to Germany as
14  senior director, head of global strategic
15  sourcing?
16  A.   Yes, that's correct.
17  Q.   And how did your
18  responsibilities change if at all when
19  you assumed that position?
20  A.   That was then again more
21  focused on the R&D activities for Teva.
22  At that time then it was for all global
23  Teva R&D sites, and for all materials,
24  not only API but also excipients and

Page 32

1  packaging material.
2  Q.   And then it looks like since
3  approximately March 2020, you have
4  another position at Teva, senior director
5  head of global strategy implementation
6  for API, excipients, and raw materials,
7  and China procurement; is that correct?
8  A.   Yeah, that's correct.
9  Q.   And what do your current --
10  strike that.
11       You are still in that
12  position today, right?
13  A.   Yeah, correct.
14  Q.   What do your current
15  responsibilities entail?
16  A.   So the responsibilities now,
17  we just structured it a little bit
18  differently.  So it's still the direct
19  materials category I'm taking care of
20  with a special focus on how to implement
21  the strategies in all of the Teva sites.
22  So it's a little bit more of internal
23  responsibility.  Yeah.
24  Q.   Are you focused on R&D or

Page 33

1  commercial or both now?
2  A.   The focus is a little bit
3  more on the commercial part.  But from
4  time to time it's also involved the R&D
5  area.
6  Q.   Throughout your tenure at
7  ratiopharm or Teva, is it fair to say
8  your job responsibilities focused on
9  licensing or sourcing?
10  A.   It's fair to say that, yes.
11  Q.   But you never had any
12  responsibilities concerning the
13  manufacture of API or finished dose,
14  right?
15  A.   Yeah, that's correct.
16  Q.   You've never had any
17  responsibilities for the testing of API
18  or finished dose, correct?
19  A.   That's as well correct.
20  Q.   And you've never had any job
21  responsibilities for quality assurance
22  for API or finished dose, right?
23  A.   Correct.  No responsibility
24  for that.

Confidential Information Subject to Protective Order

Page 34

1    Q.   And you are familiar with
2  the term "GMP," right?
3    A.   Yes, I am.
4    Q.   And that's good
5  manufacturing practices?
6    A.   Correct.
7    Q.   And you've never had any job
8  responsibilities for ensuring GMP
9  compliance at ratiopharm or Teva,
10 correct?
11   A.   Correct.  Never had that.
12   Q.   And did you ever have any
13 responsibilities for auditing Teva or
14 ratiopharm suppliers of API?
15   A.   Never had any
16 responsibilities for that, no.
17   Q.   Okay.  And Mr. Nassall, if
18 you can look at your LinkedIn profile too
19 there.  Do you see that?
20   A.   Yes, I see it.
21   Q.   And look, I don't mean to
22 belabor this.  These things happen.  But
23 some of the dates don't line up for your
24 LinkedIn profile experience and your CV

Page 35

1  experience.  Just for instance on your
2  resumé, it says since March 2020 you have
3  been in your current position.  On the
4  LinkedIn it says May 2020.  Do you see
5  that?
6    A.   Wait a second.  May 2020.
7  Yes, I see that.  That's probably -- as I
8  recall it, it always takes me a little
9  bit longer to update my LinkedIn profile.
10   Q.   Sure.  Right, right.  And
11 there's a couple other, you know, date
12 distinctions as well.  If you look on the
13 LinkedIn, it says director global API
14 category strategy October 2015 to
15 April 2018.  Do you see that?
16   A.   I see that.
17   Q.   And then on the resumé, I
18 think it was saying for that position
19 May 2014 and December of 2017.
20        So do you see that?
21   A.   Wait a second.  May '14 to
22 '17.  Yes, I see that.  I was probably
23 trying to make it a little bit -- you
24 know, it's pretty -- it can be pretty

Page 36

1  complex, what the organization looks like
2  at Teva.  So the CV is for sure the more
3  correct version I would say.
4    Q.   Right.  And then for senior
5  director global API category head on your
6  LinkedIn, it says May 2018 to
7  February 2019, right?
8    A.   Yes.
9    Q.   And then it looks like the
10 dates are a little off there.  Almost --
11 this one it looks like it says what,
12 March 2019 to March 2020 on your resumé.
13   A.   This is potentially also
14 because that stay in Nagoya was at the
15 same time and somewhere in between,
16 that's not -- not that easy on LinkedIn
17 to cover that correctly, at least my
18 capabilities with that online platform
19 are not at a professional level.
20   Q.   Sure.  Sure.  No, I
21 understand.
22        And then just to round it
23 out, for your senior director head of
24 global API category role in Japan, the

Page 37

1  LinkedIn was March -- March 2019,
2  April '20.  It's December 17th to
3  March 2018 in your resumé, right?
4    A.   That's because I really
5  stayed in Nagoya from December '17 to
6  May '18.  But I was responsible for Teva
7  Takeda for the full time mentioned in the
8  CV.
9    Q.   Okay.  So it's fair -- it
10 also looks like in education, your time
11 or study at Chemnitz on LinkedIn, it says
12 2000 to 2004.  And on your resumé it says
13 2000 to 2003, right?
14   A.   Yes.  But this is -- I
15 started in April 2004 at ratiopharm.  And
16 the real work at the university ended in
17 December 2003 so it's more or less the
18 same.
19   Q.   Well, they both say that you
20 started ratiopharm in April 2003, right?
21   A.   Yes.
22   Q.   Were you studying at
23 Chemnitz at the same time that you were
24 at ratiopharm?

Confidential Information Subject to Protective Order

Page 38

1    A.   That was the time where we
2   were still -- where I still continued
3   communicating with my professor working
4   on the Ph.D. in parallel, because there
5   was the idea that I should finish it and
6   also ratiopharm wanted to give me time to
7   finish it.  So it continued for a little
8   longer in parallel, but as I said, it
9   never happened in the end.
10   Q.   Right.  And, again, I'm not
11  looking to belabor it, Mr. Nassall.  Is
12  it fair to say that if I wanted the
13  accurate dates, the CV in this exhibit is
14  the most accurate document, right?
15   A.   Yes, that's correct.
16   Q.   And just between comparing
17  the CV and the LinkedIn profile right
18  now, and you can take the time if you
19  want, is there anything in your CV that
20  you want to change or update now or does
21  it look good now that you're looking at
22  it at this moment?
23   A.   If I looked at the CV?
24   Q.   Mm-hmm.

Page 39

1    A.   Give me a second.
2    Q.   Sure.
3    A.   So education, I would keep
4   it exactly as it is.  Ratiopharm from
5   April '3 to January '7, then Heumann
6   until December.  Then moving to Shanghai
7   for three years.  Then it was R&D
8   sourcing.  Yeah, I would keep the CV.
9    Q.   Okay.  Very good.
10       So you understand that this
11  case focuses in large parts on the
12  discovery of nitrosamines in the
13  valsartan API, correct?
14   A.   I do understand that, yes.
15   Q.   And I wanted to focus in on
16  some time periods from your tenure at
17  ratiopharm in Teva.
18       It looks like again you
19  were -- starting in 2011, you were
20  director of API sourcing R&D at Teva,
21  correct?
22   A.   Correct, for the European
23  R&D sites.
24   Q.   Right.  So from January 2011

Page 40

1   to May 2014, you do not have any
2   responsibilities for sourcing API for any
3   Teva commercialized product; is that
4   right?
5    A.   That's right.
6    Q.   And you didn't start to have
7   those responsibilities until about
8   May 2014, correct?
9    A.   Sorry, give me a second.
10   Q.   Sure.  Please.
11   A.   My Zoom disappeared.  I'm
12  not sure why.
13       Ah, there you are.
14       Sorry.  Could you repeat the
15  question?
16   Q.   Yes.  You did not have
17  responsibilities for sourcing API for
18  commercialized product until
19  approximately May 2014, right?
20   A.   Yes.  Right.
21   Q.   And then you would have had
22  responsibilities for sourcing API for
23  commercial products then from May 2014
24  forward?

Page 41

1    A.   Yes, correct.



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Page 46

Page 47

Page 48

18   Q.   And would you negotiate the
19   supply agreements?
20   A.   Me and my team, yes, mainly.
21   Q.   Sure.  I'm sure you had
22   support from other folks within the
23   company, such as legal, et cetera, right?
24   A.   Correct.

Page 49

1   Q.   And tell me generally again,
2   we're sticking with this January 2011 to
3   May 2014 time period, how you and your
4   team negotiated the pricing for API to be
5   sourced.
6       MS. LOCKARD:  I'm just going
7   to object to the form.  I think
8   you're getting outside the scope
9   of the deposition.
10      And also, you know, I've
11   given you some leeway just in
12   terms of establishing his
13   background, but this is really
14   getting outside the discovery
15   order as well.
16      You're asking him about
17   pricing negotiations involving API
18   for R&D not commercialized in
19   Europe, and the focus of the
20   deposition really needs to stay on
21   the commercialized product at
22   issue in this litigation which is
23   in the U.S.
24      So that's my objection, and

Confidential Information Subject to Protective Order



Page 50

1  I'll keep making it.  But, you
2  know.
3       MR. STANOCH:  I'm going to
4  ask -- I'm going to ask your
5  procurement witness how he
6  procured API from vendors that
7  Teva used to ultimately develop
8  the products that are at issue in
9  this case.
10      But I hear your -- I hear
11  your objections.  It's noted,
12  counsel.
13  BY MR. STANOCH:
14      Q.   Go ahead, Mr. Nassall.  Do
15  you need me to repeat the question?
16      A.   Yes, that would be nice.
17      MR. STANOCH:  Madam court
18  reporter, could you read back the
19  question please.
20      (Whereupon, the court
21  reporter read back the requested
22  portion of testimony.)
23      MS. LOCKARD:  Reiterate my
24  objection.  Outside the scope of

Page 51

1  the deposition and outside the
2  scope of the discovery order.

Confidential Information - Subject to Protective Order



Confidential Information Subject to Protective Order

Page 58

Q.   Right.  And -- okay.  I
mean, all else being equal with API from
competing potential suppliers, I mean
price is going to be one of the
significant differentiators, right?
A.   It is one of many
differentiators.
Q.   Is it one of the -- is it
one of the -- is it
one of the more important
differentiators?
A.   Well, for a generic
pharmaceutical company, it's, of course,
an important one.  It's definitely not
the most important one.  And it's
difficult to rank it.  That's also why
the decisions are usually not taken --
Q.   Are you able --
A.   -- lightly.

Page 59

Sorry.
Q.   No, I apologize.  I thought
you were done, sir.  Are you finished?
A.   Yes.
Q.   Are you able to say what the
most important factor is when Teva is
sourcing API for commercial product?
A.   It's -- it varies from
product to product, from project to
project.
I mean the overarching
scheme I would say is that the API needs
to comply with the current rules and
regulations and current GMP.
Q.   How about patient safety, is
that an important factor in sourcing API?
A.   Patient safety is --
MS. LOCKARD:  Objection.
Vague.
THE WITNESS:  Sorry?
MS. LOCKARD:  I said
objection to form.  Vague.
THE WITNESS:  So patient
safety is something quality team

Page 60

usually needs to weigh in.  It is
an important factor.  But it also
always needs to be -- you know,
you need to weight it overall.
BY MR. STANOCH:
Q.   In your view then, is
patient safety not the most important
factor in an API that Teva sources?
MS. LOCKARD:  Objection.
Vague.
THE WITNESS:  As I said
before, it is one of the important
factors.
BY MR. STANOCH:
Q.   But not the most important?
MS. LOCKARD:  Objection.
Vague.  Asked and answered.
THE WITNESS:  As I said
before, it's important factor.
BY MR. STANOCH:
Q.   You can't rank for me the
important factors that Teva considers
when sourcing API, right?
A.   This is one of the tasks we

Page 61

always try doing.  There is no way of
ranking the factors.  It really is
depending on the specific product and the
projects.  So there's no ranking.
Q.   What factor is more
important than patient safety to Teva in
sourcing API?
MS. LOCKARD:  Objection.
Vague.
THE WITNESS:  As I said
before, it is -- it is an
important factor.  No doubts about
that.
Patient safety as well
covers, you know, drug
availability, for example.  So it
all needs to be taken into
account.
As I mentioned before, it
all starts that with whichever API
we are considering procuring and
using for one of our products.
The current GMP is a must.  And
after that, it's all evaluating

Page 62

1    the overall picture of the API,
2    and as there is quality involved,
3    they will weigh in when it comes
4    to patient safety.
5  BY MR. STANOCH:
6    Q.    And you in your procurement
7  role, I think you've said this earlier,
8  you never had any role in evaluating the
9  quality aspect of API, right?
10    A.    I was not responsible to
11  rule on the quality aspect of the API.
12    Q.    Right.  And you were not
13  responsible for ruling on the patient
14  safety effects of API that Teva was
15  sourcing, correct?
16        MS. LOCKARD:  Objection.
17    Vague.
18        THE WITNESS:  So for this --
19    the people from quality
20    department.  There are also other
21    departments in toxicology,
22    pharmacovigilance, who have, like
23    a veto right in case a
24    manufacturer is suggested which

Page 63

1    they don't consider being good
2    enough.  So this is another
3    department.
4  BY MR. STANOCH:
5    Q.    Right.  The impact on
6  patient safety, that was not an ultimate
7  responsibility on you and your
8  procurement department, it was on other
9  departments within Teva, correct?
10        MS. LOCKARD:  Objection to
11    form.
12        THE WITNESS:  Well, it's
13    something which procurement needs
14    to take into consideration.  But
15    the final judgment on that is
16    another department.
17  BY MR. STANOCH:
18    Q.    Right.  Got it.
19        So patient safety and API
20  sourcing is something you and your
21  sourcing department should take into
22  consideration, but don't have the final
23  say on it?
24    A.    Well, it's not only issue.

Page 64

1  We have to take it into consideration.
2  But it's all in direct communication with
3  those departments.
4    Q.    Those being quality
5  assurance and quality compliance.  Any
6  others?
7    A.    Yeah, pharmacovigilance
8  which is part of that.
9    Q.    You mentioned toxicology,
10  right?
11    A.    Yes, which is also part of
12  that.
13    Q.    Right.  Any others?
14    A.    I would refer to all of that
15  on the quality.
16    Q.    Understood.
17        You are familiar with the
18  entity Zhejiang Huahai Pharmaceutical,
19  right?
20    A.    I know the company, yes.
21    Q.    Right.  And is it okay if we
22  call them ZHP today?
23    A.    That's fine.
24    Q.    And you understand that one

Page 65

1  of the main issues in this litigation
2  that we're here for this deposition today
3  is about valsartan API that Teva and
4  others sourced from ZHP, right?
5    A.    I do understand, yes.
6    Q.    When did you roughly first
7  have professional dealings with ZHP?
8    A.    My first dealings with ZHP
9  should have been in 2008 when I was
10  staying in Shanghai.
11    Q.    Right.  I'm just looking at
12  your resumé.  That's when you were chief
13  representative of ratiopharm Shanghai,
14  correct?
15    A.    Correct.
16    Q.    And I take it ZHP was one of
17  the potential API suppliers that you
18  would evaluate at the time for API for
19  ratiopharm, yes?
20    A.    At that time that was still
21  the time when ratiopharm was not part of
22  Teva.  So ratiopharm still was mainly
23  in-licensing finished product from
24  finished product manufacturers.

Confidential Information Subject to Protective Order

Page 66

1    Q.   I see.
2    A.   And there were only very few
3  projects where we were looking for API.
4  So there were some first contacts, but if
5  I recall it correctly at that time,
6  ratiopharm was not yet buying API
7  directly from ZHP.
8    Q.   Was ratiopharm engaging in
9  any licensing agreements with ZHP for
10  finished dose products while you were
11  chief representative at Shanghai?
12    A.   No, we did not.
13    Q.   Okay.  And then when your
14  employer formally became Teva in
15  January -- or January 2011 is when you
16  were R&D API sourcing at Teva, right?
17    A.   Right.
18    Q.   And so from that time, that
19  role, from January 2011 to May 2014, did
20  you have any dealings with ZHP?
21    A.   Yes.
22    Q.   Okay.  And were you
23  evaluating API from ZHP for Teva products
24  at that time?

Page 67

1    A.   So I can't recall on, you
2  know, at which exact point of time we did
3  or did not.  There were for sure regular
4  discussions with ZHP, but whether it got
5  to a point that we really evaluated the
6  API or if it was just discussions, that I
7  can't recall anymore.
8         And for Teva, I do recall
9  that ZHP, their development of APIs was
10  usually a little bit too late for Teva's
11  finished dosage form development.
12    Q.   Could you just explain what
13  that means?
14    A.   So when Teva started the
15  development of the finished product, that
16  used to happen at a very early stage when
17  sometimes just the originator launched
18  sometimes the product.
19         So at that time there were
20  only very few API manufacturers already
21  offering or working on the relevant API.
22  And ZHP usually started development of
23  the API just a little too late so that we
24  could consider them in our finished

Page 68

1  product R&D.
2    Q.   I see.
3         Do you recall any
4  discussions you had with ZHP regarding
5  any valsartan API while you were director
6  Europe R&D from January 2011 to May 2014?
7    A.   So that would have been for
8  our R&D of any finished dosage form
9  valsartan.  I cannot recall that we had
10  discussions on that.
11    Q.   Do you recall if Teva had a
12  finished dose valsartan while you were in
13  the director Europe R&D sourcing
14  position, in commercialized finished dose
15  valsartan?
16    A.   As far as I recall, Teva had
17  valsartan, yes.
18    Q.   Do you recall during your
19  time as director of Europe API sourcing
20  from whom Teva was sourcing API for its
21  finished dose valsartan?
22    A.   For the commercial product,
23  you mean?
24    Q.   Yes, correct.

Page 69

1    A.   I mean I do know now.
2         But at that time, I don't
3  think that I knew.
4    Q.   And -- go ahead.  Go ahead.
5  Were you done, sir, I'm sorry?
6    A.   Yeah, I'm done.  Sorry.
7    Q.   All right.  And maybe we can
8  just set up a little bit of a timeline.
9  That's what we all understand now, right?
10  I mean you understand that Teva had --
11  was manufacturing, among other places,
12  finished dose valsartan product,
13  commercial market at the Jerusalem
14  facility.  Do you understand that?
15    A.   Yes, Jerusalem was one of
16  the manufacturing sites at Teva, right.
17    Q.   You understand that the
18  Jerusalem facility was sourcing API from
19  Mylan for that finished dose valsartan,
20  right?
21    A.   Jerusalem, yes, was sourcing
22  from Mylan.  Right.
23    Q.   And then there was also,
24  among others, a Malta facility which Teva

Confidential Information Subject to Protective Order

Page 70

1 acquired through an Actavis acquisition,
2 right?
3      A.   The Actavis facility on
4 Malta was also manufacturing valsartan.
5      Q.   Right.  And that Malta
6 facility was sourcing valsartan API from
7 ZHP, correct?
8      A.   Actavis Malta facility was
9 using ZHP valsartan.
10      Q.   And to your knowledge, as it
11 stands now, was Teva sourcing valsartan
12 API from Mylan for any other facility
13 besides the Jerusalem facility?
14      A.   Yes.  But this was then not
15 for the U.S. markets.
16      Q.   Right.  There might have
17 been one or more other facilities
18 purchasing valsartan API from Mylan, but
19 they were making finished dose valsartan
20 product for non-U.S. markets, correct?
21      A.   That is correct.
22      Q.   To your knowledge, as it
23 stands today, were there other Teva
24 facilities besides the Malta Actavis

Page 71

1 facility that was sourcing valsartan API
2 from ZHP?
3      A.   And again, yes, there were
4 other Teva facilities sourcing from ZHP.
5 Again, it was not for the U.S. market.
6      Q.   Right.  The only facility
7 that you're aware of that was sourcing
8 valsartan API from ZHP for the U.S.
9 market was the Malta Actavis facility,
10 right?
11      A.   That's the only one I'm
12 aware of, yes.
13      Q.   And with that, the Malta
14 facility -- I'll call it the Malta
15 facility, is that okay?
16      A.   That's fine.
17      Q.   With the Malta facility, my
18 understanding, you can correct me if I'm
19 wrong, my understanding since Teva
20 acquired that facility, there was already
21 a supply arrangement in place between the
22 Malta facility and ZHP for the valsartan
23 API, right?
24      A.   If I recall that correctly,

Page 72

1 then there was no written agreement
2 between the Actavis Malta facility and
3 ZHP.  But they used ZHP and the agreement
4 usually was based on purchase orders.
5      Q.   Did you or your department
6 have any role in Teva's continued
7 procurement of valsartan API from ZHP for
8 the Malta facility, once the facility
9 became part of Teva?
10      A.   Once Teva acquired Actavis,
11 during the integration, so there was a --
12 there is a global procurement team which
13 I'm part of, and also local procurement
14 team at the end as part of global
15 procurement.
16      But what we did is, you
17 know, integrating the two different
18 procurements and then handle it the same
19 way we did it in Teva.
20      So for -- for the strategic
21 suppliers, the important products, then
22 there was always some kind of involvement
23 of the global procurement team.
24      Q.   Got it.  Was ZHP considered

Page 73

1 a strategic supplier of Teva while you
2 were director global API category
3 strategy?
4      A.   I cannot say for sure that
5 they have been considered from the very
6 start.  But ZHP turned out to be one of
7 the bigger suppliers for Actavis.  So
8 then after the acquisition, they also
9 became an important supplier for Teva.
10 More important than they were before.
11      Q.   And do you have a sense of
12 how much of the API that Teva sourced
13 from ZHP, what percentage of either
14 unique APIs or overall volume ZHP
15 represented for Teva?
16      A.   That's something we would
17 need to check in details and the
18 percentages are always difficult because
19 there are quantities, there is value.
20      So -- also the importance of
21 a supplier is not always defined by the
22 spend of money which we have with them.
23 But it's also defined by what the
24 finished product is, it goes into, and

Confidential Information Subject to Protective Order

Page 74

1 how important that is for the specific
2 market in which it is being sold.
3        But taking all of that
4 together, then Huahai became one -- so
5 ZHP became one, one of our more important
6 manufacturers.
7      Q.   Prior to 2018, would you say
8 that ZHP provided the most API to Teva
9 for generic products?
10      A.   So besides the fact that,
11 you know, I cannot be 100 percent sure
12 without checking the numbers, but I'm
13 pretty sure that they were not the
14 biggest supplier of API for Teva.
15      Q.   Who was, if you recall?
16      A.   I really don't recall
17 especially at that time.  That's
18 something we would need to --
19      Q.   Sure.  And what type of
20 document would you look at to determine
21 the answer to that question?
22      A.   We would need to dig into
23 historical spend data.
24      Q.   Is there any sort of summary

Page 75

1 reports that were regularly maintained
2 that would, you know, top line summarize
3 this type of information in terms of
4 biggest supplier of API generic?
5        MS. LOCKARD:  Objection.
6 Form.  Vague.
7 BY MR. STANOCH:
8      Q.   I'm looking, sir, if you
9 have any more specific documents or data
10 besides spend data that we could look at
11 to answer these questions.  That's all.
12        Can you think of anything?
13      A.   Not right now.  I mean --
14      Q.   Do you recall, even if you
15 don't know the name, do you recall, you
16 know, documents in the ordinary course of
17 your job that would break out which
18 suppliers represented the largest share
19 in dollars or volume of API for generic
20 products?
21      A.   So right now, I don't
22 recall.  What I do recall is at that time
23 ZHP -- and also up to now, ZHP never was
24 the biggest supplier.

Page 76

1      Q.   Was it the top five?
2      A.   I don't recall, but I would
3 say that in 2018 they were not top five.
4      Q.   Do you recall them ever
5 being a top five?
6      A.   I really can't say for sure
7 now.
8        MS. LOCKARD:  David, if --
9 when you get to a good transition
10 point, let's go ahead and take a
11 break.  We've been going over an
12 hour please.
13        MR. STANOCH:  That's fine.
14 We can take a break now.  Let's go
15 off the record.
16        THE VIDEOGRAPHER:  The time
17 right now is 1:18 p.m.  We're off
18 the record.
19        (Short break.)
20        THE VIDEOGRAPHER:  The time
21 right now is 1:28 p.m.  We're back
22 on the record.
23 BY MR. STANOCH:
24      Q.   Mr. Nassall, just yes or no,

Page 77

1 did you speak with your counsel during
2 the break?
3      A.   Yes, I shortly spoke.
4      Q.   Okay.  Are you familiar with
5 a Sonia Costi, C-O-S-T-I?
6      A.   I do recall the name.  She
7 was one of the R&D sourcing members a
8 while back.
9      Q.   How about Pnina, P-N-I-N-A,
10 Weitz, W-E-I-T-Z?
11      A.   I do recall her, she was my
12 manager.
13      Q.   Okay.  Manager in R&D
14 sourcing?
15      A.   Yes.  During R&D sourcing.
16      Q.   How about Birgit Schnitter,
17 S-C-H-N-I-T-T-E-R?
18      A.   Birgit was a team member of
19 R&D sourcing and for certain periods part
20 of my team reporting to me.
21      Q.   How about a Gili Oshri,
22 O-S-H-R-I?  Gili is G-I-L-I.
23      A.   Gili was also part of the
24 R&D sourcing.  Not reporting to me, but a

Confidential Information Subject to Protective Order

Page 78

1  team member also reporting to Pnina.
2      Q.   Who was Inbal, I-N-B-A-L,
3  Kan-Tor, K-A-N hyphen T-O-R?
4      A.   Inbal, if I recall
5  correctly, was part of the commercial API
6  category.  And I'm not sure if she was
7  always reporting to me in that function,
8  but for sure again for a certain period
9  of time.
10     Q.   Commercial API sourcing,
11 right?
12     A.   Yes.
13     Q.   And how about Lina, L-I-N-A,
14 Cogan, C-O-G-A-N?
15     A.   I don't recall the name.
16 Give me a second.
17     Q.   Sure.  No problem.
18     A.   I'm not totally sure if she
19 was part of the R&D sourcing.  But I
20 think she was part more again of the
21 commercial procurement.
22     Q.   And how about Andreja
23 Schmitz, A-N-D-R-E-J-A, S-C-H-M-I-T-Z?
24     A.   I do recall that name.  She

Page 79

1  has been my manager since I was in
2  commercial procurement.  So from 2014
3  until now.
4      Q.   Is Ms. Schmitz still with
5  Teva?
6      A.   Yes, she is.
7      Q.   And how about Joerg Fluch,
8  J-O-E-R-G, F-L-U-C-H?
9      A.   He is still part of Teva.
10 And for certain period of time he was
11 also part of my team.  Right now he's not
12 anymore.
13     Q.   Okay.  When you worked with
14 him, was he with you in commercial API
15 procurement?
16     A.   Yes.
17     Q.   And one more name for now,
18 sir.  Gervan Klooster, G-E-R-V-A-N,
19 K-L-O-O-S-T-E-R?
20     A.   Okay.  Gervan was always
21 part of the commercial API team.  Certain
22 period he was part of my team.  He is
23 still with Teva, but not in my team
24 anymore.

Page 80

1      Q.   Thank you for that.  Excuse
2  me.
3          How about Walton Wang?  I
4  misspoke, I had a couple more names, sir,
5  sorry about that.  Then we'll move on.  I
6  promise, it's not a nervous test of names.
7          Walton Wang, sir.
8      A.   No problem.  That's an easy
9  one.  Walton is still part of Teva.  He
10 is in the China procurement team.  He was
11 for most of the time responsible for the
12 R&D sourcing of API.  Right now I think
13 as well still with R&D.
14     Q.   Did he have any -- okay.
15 Sorry.
16     A.   No, no.  Strike that.  Go
17 ahead.
18     Q.   Did Mr. Wang have any
19 responsibilities to your knowledge for
20 auditing potential API suppliers of Teva?
21     A.   No.  Mr. Wang was never an
22 official auditor, neither for ratiopharm,
23 nor for Teva.
24     Q.   Who is Mr. Pan Lin?

Page 81

1      A.   Mr. Pan Lin also part of the
2  Teva China team.  He is an official
3  auditor for quality audits in Teva.
4      Q.   And could you just describe
5  for me generally from your perspective,
6  what the official auditors who conduct
7  the quality audits on behalf of Teva,
8  what are their responsibilities?
9      A.   Obviously for the details,
10 you should probably directly ask the
11 quality audit team.
12          From what I do know is they
13 inspect the manufacturers or audit the
14 manufacturers, having a look at
15 production, documentation, the labs, and
16 see if this is all in accordance with
17 cGMP and all other rules and regulations
18 which are there from Teva authorities,
19 but also according to what Teva wants to
20 set as a standard for us.
21     Q.   And we'll just say from your
22 time in commercial API sourcing, so
23 that's May 2014 or thereabouts forward,
24 you and your department of procurement,

Confidential Information Subject to Protective Order

Page 82

1 you had no role in auditing API
2 suppliers, right?
3      A.   The procurement team had no
4 role in any of quality audits.  We might
5 have initiated them and helped organizing
6 them.  But that's it.
7      Q.   Right.  And you can correct
8 me if I'm wrong, but given that you
9 were -- you and your department in
10 procurement were sort of the
11 supplier-facing function, you may -- you
12 may have communications about logistics
13 and arranging audits, but you weren't
14 responsible in any way for actually
15 conducting the audits.  Is that fair?
16      A.   It's fair to say we never
17 conducted any of the quality audits.
18      Q.   If you know, when did
19 Mylan -- strike that.
20           When did -- if you know,
21 when did Teva begin to source valsartan
22 API from Mylan?
23      A.   I cannot recall when Teva
24 started sourcing valsartan from Mylan.

Page 83

1      Q.   Did you have any role in,
2 personally, in Teva's choosing Mylan to
3 supply valsartan API to the Teva
4 Jerusalem facility?
5      A.   If I recall it correctly,
6 then this was done before I was part of
7 the team.
8      Q.   Right.  That was going --
9 that was where I was going to go, sir.
10           My understanding was that
11 Teva would have began purchasing
12 valsartan API from Mylan for the
13 Jerusalem facility prior to your
14 involvement.
15      A.   As far as I recall, yes.
16      Q.   And prior to 2018, do you --
17 did you have any interactions that you
18 recall with Mylan concerning the sourcing
19 of valsartan API for the Jerusalem
20 facility?
21      A.   I would say -- I mean we had
22 regular discussions with most of our
23 manufacturers, especially like Mylan and
24 ZHP.  There were also some personal

Page 84

1 meetings, and we discussed for sure a lot
2 of API during those meetings.  I cannot
3 recall a specific topic on valsartan with
4 Mylan before 2018.
5      Q.   Would you have been the
6 person at Teva who would have discussed
7 the procurement of valsartan API from
8 Mylan for the Jerusalem facility?
9      A.   I mean if it had been after
10 I became -- then I would say this would
11 have been when I would have been
12 involved, yes.
13      Q.   Now, again focusing now in
14 director global API category, May 2014
15 forward, okay, just to help orient you?
16      A.   Okay.
17      Q.   Were there specific members
18 in your group assigned to specific API
19 suppliers to liaise with?
20      A.   So at the beginning, our
21 focus was on the products.  And there was
22 a responsibility within my team and the
23 other global procurement teams, that
24 someone was responsible for certain APIs.

Page 85

1           Then very early we also
2 started having responsibilities to
3 certain API manufacturers.  And then it
4 gradually changed over time, that
5 responsibility was -- you know, at the
6 beginning it was more important that we
7 have someone who was responsible for a
8 certain product.  And then it more and
9 more moved towards responsibility with
10 API manufacturers.
11      Q.   So starting in May 2014,
12 were there persons in global procurement
13 who were responsible for valsartan API?
14      A.   As far as I recall, yes.
15      Q.   Who do you recall were those
16 persons?
17      A.   In 2014, I don't recall.
18      Q.   How about going forward in
19 time from 2014, do you recall any of the
20 persons within procurement who had
21 responsibilities specifically for
22 valsartan API?
23      A.   So I cannot tell you at
24 which date it officially started.  But

Confidential Information Subject to Protective Order

Page 86

¹ Ms. Inbal Kan-Tor, whom you mentioned
² before, was at a certain period
³ responsible for valsartan.
⁴        Later on, Mr. Joerg Fluch
⁵ took over the responsibility for
⁶ valsartan. And as far as I can recall,
⁷ there was -- I'm really not sure, if you
⁸ have a document would showing me
⁹ something different -- but I would say
¹⁰ Ms. Inbal Kan-Tor and Joerg Fluch and
¹¹ probably no one else.
¹²        Q.    And then -- and you
¹³ mentioned at some point it may have
¹⁴ shifted and that responsibilities began
¹⁵ more focused on API manufacturer versus a
¹⁶ specific API product.
¹⁷        Do you recall whether there
¹⁸ were specific people in procurement who
¹⁹ were responsible for interactions with
²⁰ ZHP and Mylan for commercial API?
²¹        A.    Well, yes, I do recall.
²²        Q.    Okay.  And if you can please
²³ list them both, you know, for me?
²⁴        A.    Mm-hmm.

Page 87

¹        Q.    Thank you.
²        A.    If I remember correctly,
³ then both for Mylan and for ZHP it was at
⁴ one point of time Dalia Reuven.
⁵        Q.    Could you spell that last
⁶ name?
⁷        A.    The last name is
⁸ R-E-U-V-E-N.
⁹        Q.    Thank you.
¹⁰        A.    But if I also recall
¹¹ correctly, she left the team early 2018.
¹² And the responsibility again, if I recall
¹³ it correctly for both Mylan and ZHP, went
¹⁴ on to Joerg Fluch.
¹⁵        Q.    And for both of those
¹⁶ persons, the responsibilities of Mylan
¹⁷ and ZHP would have encompassed the
¹⁸ sourcing of valsartan API, right?
¹⁹        A.    Well, there was -- as I
²⁰ mentioned, there were also still
²¹ responsibilities on the API and then also
²² on the suppliers, and it was always, if
²³ there was a specific topic, day-to-day
²⁴ business on the product, then usually the

Page 88

¹ product responsible one was directly
² dealing with that, with the relevant
³ manufacturer.
⁴        Those for the product
⁵ specific responsible persons, they also
⁶ were thinking of, you know, several Teva
⁷ sites, buying the same API.  They were
⁸ trying to come up with ideas how to do
⁹ that in the future, do we want to change
¹⁰ something.
¹¹        But then if it came to -- to
¹² any longer or bigger discussions with
¹³ more than just one API, then these
¹⁴ supplier relationship managers, let's
¹⁵ say, took over.  And usually, you know,
¹⁶ the biggest APIs which we're buying from
¹⁷ these suppliers also defined who became
¹⁸ responsible for the manufacturer.
¹⁹        MR. STANOCH:  Stand by for
²⁰ the next exhibit, sir.  Strike
²¹ that.
²² BY MR. STANOCH:
²³        Q.    I know it was a while ago in
²⁴ time, sir, but do you recall any issues

Page 89

¹ with Teva's sourcing of valsartan API
² from ZHP back in 2011?
³        MS. LOCKARD:  Objection to
⁴ form.  Vague.
⁵        THE WITNESS:  In 2011?
⁶ BY MR. STANOCH:
⁷        Q.    Yes.
⁸        A.    Did I hear that correct?
⁹        Q.    Yes.  Correct.
¹⁰        A.    So I think -- first of all,
¹¹ this was a time in 2011 that was shortly
¹² after Teva acquired ratiopharm and I was
¹³ part of R&D sourcing.
¹⁴        So I would not be involved
¹⁵ in any of the commercial aspects.  And it
¹⁶ also cannot be anything related directly
¹⁷ to the topic we are talking about today.
¹⁸        I mean, over such long
¹⁹ period of time there can be discussions
²⁰ on -- so no, I don't recall.
²¹        MR. STANOCH:  Stand by.
²²        (Document marked for
²³        identification as Exhibit
²⁴        Teva-317.)

Confidential Information Subject to Protective Order



Page 90

1      MR. STANOCH:  I'm marking
2   Teva 317 for the record.  It's
3   Bates ending 5126.
4  BY MR. STANOCH:
5      Q.   Mr. Nassall, just let me
6  know when you can access that exhibit.
7      A.   Okay.  Reloading.  Opening.
8  Okay, I see that document now.

Page 91

Page 92

Page 93

Confidential Information Subject to Protective Order



Page 94

Page 95

Page 96

16    Q.   I'm going to share my screen
17  for a prior marked exhibit.  If you can
18  see my screen.  Can you see my screen,
19  sir?
20    A.   No.
21    Q.   Well, stand by.  I'm going
22  to -- let me try that again.  Sorry about
23  that.  Stand by.
24        How about now?

Page 97

1    A.   I can see parts of it.  Yes.
2    Q.   You see it's --
3        MR. STANOCH:  For the
4    record, this is previously marked
5    Teva 270.
6  BY MR. STANOCH:

Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Page 102

Page 104

4      MR. STANOCH:  I'm going to
5  mark the next exhibit, sir.
6  Teva 318.
7      Stand by.  For the record it
8  will be Bates number ending
9  187585.
10     (Document marked for
11  identification as Exhibit
12  Teva-318.)
13  BY MR. STANOCH:
14     Q.   Let me know, sir, when you
15  can access that document?
16     A.   318.  Yes.
17     Q.   This is --
18     A.   I see it.

Page 103

Page 105

Confidential Information - Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information - Subject to Protective Order

Page 114

■
■
■

4  BY MR. STANOCH:
5      Q.   Mm-hmm.  You considered ZHP
6  to be a very cost competitive supplier of
7  API, didn't you?
8      A.   This is, I would say,
9  depending on the product.  They were not
10 always competitive on all the APIs which
11 they were offering.  But for some, they
12 also were competitive.
13     Q.   Right.
14     A.   But the main thing being is
15 they were also really a reliable and good
16 supplier.
17     Q.   Mm-hmm.  Mm-hmm.
18          Well, in terms of cost
19 effectiveness, for valsartan API, you
20 know, because you are aware of the
21 pricing from procurement of -- generally,
22 right?
23     A.   In general, I'm aware of
24 pricing.

Page 115

1      Q.   Right.  And ZHP's prices for
2  valsartan API was very competitive,
3  wasn't it?
4      A.   Again, I mean this changed
5  over time as prices change and processes
6  change.
7          In general, ZHP for
8  valsartan was not necessarily the
9  cheapest.  But they were competitive and
10 competitive they have been price-wise and
11 quality-wise.
12     Q.   ZHP's valsartan API was
13 cheaper than a lot of competing API
14 suppliers of valsartan API, wasn't it?
15     A.   Again, that depends on at
16 which exact time you are asking.  Prices
17 change.  Often ZHP for valsartan was
18 competitive, not necessarily always the
19 cheapest but competitive with respect to
20 prices and quality.
21     Q.   Let's talk before 2018.
22          ZHP was one of the cheapest
23 options for valsartan API to Teva
24 systems, correct?

Page 116

1      A.   I cannot fully recall.  But
2  I can only say the same, again.  ZHP for
3  valsartan was at many points of time
4  competitive, and this competitive is not
5  only with respect to price.
6          And again, they were not
7  always the cheapest.  They were
8  competitive with respect to the price and
9  to the quality of the product.
10     Q.   Mm-hmm.  And we'll look at
11 specific pricing later today for sure,
12 Mr. Nassall, and examples of it for ZHP's
13 valsartan's API prices.
14          But -- but you would
15 certainly agree though that ZHP's prices
16 for valsartan API prior to 2018 was among
17 the cheapest that Teva had for its
18 system, correct?
19          MS. LOCKARD:  Objection.
20 Asked and answered.
21          THE WITNESS:  As I said
22      before, Huahai was competitive
23      with respect to price and quality,
24      and I would not recall if they had

Page 117

1      been always the cheapest.  I would
2      say they were not.  But they were
3      always in the competitive range.
4  BY MR. STANOCH:
5      Q.   Whoever sold cheaper
6  valsartan API to Teva prior to 2018?
7      A.   I cannot recall.
8      Q.   Right.  So you can't recall
9  whether ZHP was the cheapest valsartan
10 API, can you?
11     A.   I cannot recall at, you
12 know, every specific point in time who
13 was the cheapest offer.  And I'm pretty
14 sure there were cheaper offers, because
15 we also -- I would not be able to tell
16 you the name, but we didn't -- most of
17 the cases when we -- when we look for
18 prices for certain API, there is always
19 someone producing this API for
20 nonregulated markets and you get offers
21 of this API and they usually are the
22 cheapest.  So I'm pretty sure that they
23 have been also cheaper than Huahai.  But
24 this is nothing we can use them in our

Confidential Information Subject to Protective Order

Page 118

1 production for the U.S. or for Europe.
2    Q.   Right.  That's a good point,
3 sir.  Let's focus on valsartan API
4 intended for finished dose in the U.S.
5 market.
6         ZHP's valsartan API was
7 among the cheapest available to Teva for
8 that product, correct?
9    A.   So again, I don't recall
10 exactly how the market situation before
11 2018 was.  And I don't recall who was the
12 cheapest.  But I can tell you that ZHP
13 for sure was a competitive manufacturer
14 for valsartan for the U.S. market.  And
15 this was with respect to price and
16 quality.
17    Q.   Mm-hmm.  Well, Teva never
18 changed its sourcing for valsartan API
19 from ZHP for the Malta facility prior to
20 2018, did it?
21    A.   Sorry, again.
22    Q.   Prior to 2018, Teva did not
23 change its valsartan API supplier for the
24 Malta facility from ZHP, correct?

Page 119

1    A.   So there -- you know, first
2 of all, this Malta manufacturing site
3 came with the acquisition of Actavis.
4 They had a manufacturer for the API for
5 this product which, if I recall
6 correctly, was ZHP.
7         Then the integration of a
8 company like Actavis requires already
9 quite an effort, capacity, and energy.
10        So the first thing what you
11 do in such -- or after such an
12 acquisition and during the integration
13 phase, is that you need to harmonize the
14 products.  Because of cost there were
15 some finished products which Teva
16 produced before the acquisition and then
17 Actavis had the same product, and then
18 you need to come up with a decision which
19 of the two products you keep at the
20 market or maybe both.
21        And for that we didn't --
22 this is not only procurement.  This is
23 portfolio people.  This is also
24 regulatory people, quality people,

Page 120

1 evaluating the overall situation of these
2 products and then coming up with a
3 decision with which one you keep.
4         And only then -- then
5 there's also an integration of which of
6 the manufacturing sites you keep and
7 maybe, you know, after such an
8 acquisition you have two big
9 manufacturing capabilities.
10        And then there were also
11 many examples of a manufacturing of a
12 finished dosage form shifted to another
13 site.  And only then you start evaluating
14 do we now need, you know, to improve
15 something else.
16        So ZHP API came with the
17 acquisition of Actavis.  And then if you
18 want to do a real material change and
19 introduce a new API source, then you also
20 need to evaluate -- price is not the only
21 thing there.  But even if there had been
22 a cheaper source compared to ZHP, then
23 the question is how big is the price
24 difference and which other pros and cons

Page 121

1 come with the new API source for this
2 product.
3         So at the end, until 2018,
4 there was obviously not enough reasons to
5 introduce another new source, but that
6 does not necessarily mean that for the
7 whole time ZHP was the cheapest source.
8    Q.   And you were director of
9 global API category strategy at Teva at
10 the time of the Actavis integration,
11 correct?
12    A.   Yes, that's correct.
13    Q.   And you never recommended
14 that the Malta facility switch valsartan
15 API suppliers away from ZHP, did you?
16    A.   As far as I recall, we did
17 not recommend that.
18    Q.   Right.  And the Malta
19 facility continued to source valsartan
20 API from ZHP after the Actavis
21 integration, right?
22    A.   That's correct.  And that's
23 what you also usually do after an
24 acquisition.  You are not moving

Confidential Information Subject to Protective Order

Page 122

1 everything at the same time.
2      Q.   Right.  And then for the
3 years after the acquisition through the
4 recalls that began in 2018, Teva's Malta
5 facility continued to source the ZHP
6 valsartan API, right?
7      A.   You mean after the topic
8 occurred in June 2018?
9      Q.   Up to that point.
10      A.   Up to that point.  Up to
11 that point, as far as I recall, the
12 Actavis Malta facility continued
13 procuring valsartan for the U.S. market
14 from ZHP.
15      Q.   Right.  And then even after
16 the nitrosamine issue surfaced in the
17 summer of 2018, Teva was still looking
18 into continuing to source a valsartan API
19 from ZHP, isn't that right?
20      A.   So the Actavis facility in
21 Malta for the U.S. stopped production for
22 the U.S.  So there was no procuring of
23 valsartan from ZHP for the U.S. market.
24 And if I recall it correctly, there was

Page 123

1 also no other Teva site manufacturing
2 valsartan for the U.S. market anymore.
3      Q.   Right.  Well, the production
4 from the Malta facility was transferred
5 to the Dupnitsa facility, correct?
6      A.   Dupnitsa is manufacturing
7 for the European market.
8      Q.   And are they -- they are
9 manufacturing valsartan finished product
10 for the European market today, right?
11      A.   Dupnitsa is also today
12 manufacturing for the European markets.
13      Q.   Valsartan, correct?
14      A.   Yeah, valsartan, sorry.
15      Q.   Are they sourcing valsartan
16 API from ZHP?
17      A.   Dupnitsa for the European
18 market is currently procuring valsartan
19 from ZHP.
20      Q.   So -- so the same company
21 that goes back to 2011 with quality
22 issues that had all these nitrosamine
23 issues in 2018, to this day now, Teva is
24 sourcing valsartan API from ZHP for the

Page 124

1 European market?
2      MS. LOCKARD:  Objection.
3 Form.  Vague.
4      THE WITNESS:  Sorry.  Was
5 there a question?  I missed it.
6 BY MR. STANOCH:
7      Q.   Yes.
8      A.   Could you repeat then?
9 Sorry.
10      Q.   Sure.
11      So for the same ZHP that
12 we've seen Teva had valsartan API issues
13 with back to 2011, through the
14 nitrosamine issues in 2018, despite all
15 of that, today Teva is still sourcing
16 valsartan API from ZHP for the European
17 market?
18      MS. LOCKARD:  Objection.
19 Form.  Vague.
20      THE WITNESS:  So first of
21 all, I would not say that this --
22 again, I did not see now what the
23 result was.
24      But from what I do recall in

Page 125

1 2011, this was at the end not a
2 big quality issue and it has
3 nothing to do with valsartan.  It
4 was on another product.
5      The valsartan impurity topic
6 which happened in 2018, it turned
7 out at the end that it does not
8 only -- it did not only affect the
9 material coming from ZHP, but many
10 other API manufacturers.
11      And ZHP and also many of the
12 other valsartan manufacturers in
13 the meantime fixed the problem.
14      So there's no reason why we
15 could not continue buying for the
16 markets as long as they complied
17 with cGMP and the current
18 regulations on this product.
19      And this is what you usually
20 do.  I mean, if there is an
21 impurity issue or any other
22 problem, you solve it so that you
23 can continue.
24 BY MR. STANOCH:

Confidential Information - Subject to Protective Order

Page 126

1    Q.   Would Teva be sourcing
2 valsartan API from ZHP for the U.S.
3 market but for the FDA import ban on ZHP?
4         MS. LOCKARD:  Objection.
5 Calls for speculation.
6         THE WITNESS:  So that I
7 could only wildly guess, because
8 the situation is what the
9 situation is.
10        Currently there's an import
11 ban.  There's also warning letter,
12 so there is no way for us to
13 source valsartan for the U.S.
14        And Teva also completely
15 stopped marketing valsartan in the
16 U.S.  This was a decision at least
17 not only because of the impurity
18 topic.  The market situation in
19 the U.S. is in a way the currently
20 the position is that we don't sell
21 valsartan in the U.S.
22        In case Huahai would solve
23 the issue also in a way that it
24 complies with all current rules

Page 127

1 and regulations for the U.S., and
2 if they qualify, if our quality
3 team does an audit, then there is
4 no reason why not.  And this is
5 theoretically and hypothetically,
6 to also procure from ZHP.
7 BY MR. STANOCH:
8    Q.   Are you aware of any plans
9 within Teva to re-introduce finished dose
10 valsartan in the U.S. market?
11    A.   Currently at this point of
12 time, I'm not aware of anything.
13    Q.   And from a procurement
14 perspective, would ZHP be a potential API
15 supplier of valsartan if the regulatory
16 issues were cleared up?
17        MS. LOCKARD:  Objection.
18 Calls for speculation.
19        THE WITNESS:  This is
20 something at the end, our quality
21 department would need to judge on
22 the quality.  Regulatory
23 department would need to judge on
24 documentation.

Page 128

1         So this would be full
2 involvement of everyone involved
3 in the sourcing process.  And if
4 rules and regulations are kept and
5 if everything is according to
6 current GMP, then there would be a
7 decision which I cannot give you
8 right now in a hypothetical way.
9 BY MR. STANOCH:



Page 129

13 BY MR. STANOCH:
14    Q.   From your perspective as a
15 procurement professional, it would be a
16 competitive disadvantage to Teva if it
17 stopped sourcing API from ZHP; is that
18 right?
19    A.   If you mean this competitive
20 with respect to -- again, it's the
21 overall package.  They were competitive
22 with respect to the price.  But they were
23 also competitive with their competitors
24 with respect to reliability, the security

Confidential Information Subject to Protective Order



Page 130

1 of supply, and the quality of the
2 products which they were supplying.
3        I definitely do not want to
4 say that they were only just the cheapest
5 available source.  Overall, for many --
6 many examples, they should take
7 everything into consideration.  They were
8 one of the best sources.
9     Q.   Let's look -- let's look
10 at -- so your -- so with valsartan API,
11 would you say price is the only issue,
12 assuming all else equal?
13     A.   Sorry, I don't understand.
14     Q.   Sure.
15        Assuming everything with
16 quality, for competing with valsartan API
17 suppliers is the same, would price for
18 that valsartan API be the only issue?
19     A.   If you say that quality wise
20 everything is the same, then there are a
21 lot of other factors, not only the price.
22 There are factors like reliability of
23 supply, security of supply, if you always
24 get delivered on time and in full.

Page 131

1     Q.   So you never said that price
2 is the only issue for valsartan API?
3     A.   I would not say that right
4 now.
5     Q.   Have you ever said that?
6     A.   Not that I can recall.
7        MR. STANOCH:  Let's take a
8 look at the next exhibit.  Teva
9 319.  For the record, it's Bates
10 ending 108342.
11        (Document marked for
12 identification as Exhibit
13 Teva-319.)
14 BY MR. STANOCH:
15     Q.   Let me know when you can
16 access that document, sir.
17     A.   I'm sorry.  3 what?  19?
18     Q.   18, I believe it was.
19     A.   18.  Sorry.
20     Q.   No, I apologize.  I
21 apologize.  You were right.  I was wrong
22 sir.  I muddied the record.
23        Teva 319, please.  It's
24 Bates ending 108342.  My apologies.

Page 132

1     A.   Yes.
2     Q.   Are you there?
3     A.   Yes.

Page 133

Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Page 138

Page 140

11  Q.   Since the nitrosamine issues
12  that led to the recalls in 2018, have you
13  had any hesitancy in sourcing API from
14  ZHP?
15  A.   Teva in general, it's going
16  the same process.  We are evaluating --
17  and it depends on the product, and what
18  then the audit situation is, on the exact
19  manufacturing site of ZHP, what the
20  auditing situation is on the product
21  you're looking for.
22  And if then for this
23  specific product coming from this
24  specific site, if everything is according

Page 139

Page 141

1  to cGMP and if our audit team gives the
2  green light, then there's currently no
3  reason of not considering them.
4  Q.   So today, you have no
5  hesitancy in dealing with ZHP for API,
6  notwithstanding all the nitrosamine
7  issues that occurred in 2018 and forward?
8  A.   I would say that there's the
9  same hesitancy for -- for all the API
10  manufacturers, especially now after that
11  nitrosamine topic.  Authorities are
12  asking for risk assessments for all
13  chemically manufactured API.
14  So there's a whole new set
15  of evaluation we need to do and this is
16  going to depend on who is the API
17  manufacturer.
18  Q.   So there's nothing specific
19  in terms of how Teva's procurement has
20  changed when it comes to sourcing API
21  from ZHP after 2018?
22  A.   Let me think.  I mean, of
23  course now we ask all the questions
24  related to -- related to the nitrosamine

Confidential Information Subject to Protective Order

Page 142

¹ topics and we are trying to be more
² cautious.  But I would not say that it's
³ in any special way different to ZHP than
⁴ to other manufacturers as far as I recall
⁵ that.
⁶      Q.   Is Teva's procurement
⁷ approach of API from ZHP any different
⁸ today, other than asking about
⁹ nitrosamines, than it was prior to 2018?
¹⁰     A.   Well, I mean nitrosamine is
¹¹ the most prominent factor that changed
¹² since 2018.  But there are constant
¹³ changes in all rules and regulations.
¹⁴      There are also some -- some
¹⁵ new questions we now ask after the
¹⁶ experience of Covid last year.  So I
¹⁷ would not say that this is the only one.
¹⁸ But this is maybe the most prominent
¹⁹ change since 2018.
²⁰     Q.   Other than asking about
²¹ nitrosamines and asking about Covid
²² concerns, are there any other specifics
²³ you can describe for me as how Teva's
²⁴ procurement approach has changed with ZHP

Page 143

¹ since the 2018 recalls?
²      MS. LOCKARD:  Objection.
³ Asked and answered.
⁴      THE WITNESS:  As I just
⁵ mentioned, I mean all rules and
⁶ regulations keep changing.  And
⁷ this is true for -- for all the
⁸ health authorities which we are
⁹ dealing with in each of the
¹⁰ countries where we are selling
¹¹ products.
¹²      So I'm pretty sure that a
¹³ lot has changed since 2018 and
¹⁴ this is also always influencing
¹⁵ our sourcing process in certain
¹⁶ ways.
¹⁷ BY MR. STANOCH:
¹⁸     Q.   Do you trust ZHP today as
¹⁹ much as you did prior to 2018?
²⁰      MS. LOCKARD:  Objection.
²¹ Vague.
²²      THE WITNESS:  I trust that
²³ we are asking the right questions
²⁴ and that we are doing the right

Page 144

¹ evaluation to, at the end, find
² the best source for -- for API.
³ BY MR. STANOCH:
⁴     Q.   Because in 2018, isn't it
⁵ correct that ZHP made a number of
⁶ statements about nitrosamines to Teva
⁷ that turned out to be incorrect?
⁸     A.   In 2018.  So I guess you
⁹ might have a document to help me remember
¹⁰ that.
¹¹      Right now I would say the
¹² whole -- the whole period starting end of
¹³ June 2018 until the end of 2018, this was
¹⁴ a developing story and the situation
¹⁵ changed sometimes on a daily basis.
¹⁶      Also, what we knew and what
¹⁷ the fact was -- were changed sometimes on
¹⁸ a daily basis.  The requests from health
¹⁹ authorities were updated, maybe not on a
²⁰ daily basis, but they probably updated on
²¹ a weekly basis.  So I cannot recall if
²² there -- if there was anything wrong.
²³      But as I said, the overall
²⁴ situation was very dynamic.  No, sorry.

Page 145

¹      Q.   You done?
²      A.   Yes.
³      Q.   No, I just want to make sure
⁴ because you --
⁵      A.   Sorry.
⁶      Q.   No.  Thank you.  No.  It's
⁷ fine.
⁸      And it's harder over the
⁹ video.  I appreciate your patience with
¹⁰ it.
¹¹      So I mean, we can look at
¹² specific examples, and we will, sir.  But
¹³ certainly you recall that there were
¹⁴ times after June 2018 where ZHP would
¹⁵ tell Teva something about nitrosamines
¹⁶ and it would turn out that that was
¹⁷ inaccurate, correct?
¹⁸      MS. LOCKARD:  Objection.
¹⁹ Vague.
²⁰      THE WITNESS:  Again, what I
²¹ just said was it was a very
²² dynamic situation.  Some facts
²³ kept changing constantly.  So I'm
²⁴ pretty sure that everyone, not

Page 146

1    only ZHP, potentially also Teva,
2    said something on any given day
3    which then a few days later might
4    have been seen as wrong as the
5    whole situation changed.
6  BY MR. STANOCH:
7    Q.   You didn't want to lose ZHP
8  as an API supplier for Teva, did you?
9    A.   Well, why would I want to
10 wish losing them, especially as we saw
11 that the impurity was -- it was nothing
12 which was only in ZHP products.  I would
13 not have known to switch to -- with
14 valsartan.
15   Q.   Right.  There were a number
16 of other producers of valsartan API,
17 right?
18   A.   Of course there are.
19   Q.   Right.  And today, Teva
20 sells a number of products that contain
21 valsartan throughout the world and they
22 source that API from multiple other
23 companies besides ZHP, right?
24   A.   Yes.  And we also did that

Page 147

1  already before.
2    Q.   Right.  And ZHP was a very
3  important source of API generally from
4  your perspective in procurement, isn't
5  that correct?
6    MS. LOCKARD:  Objection.
7  Asked and answered.
8    THE WITNESS:  ZHP was one of
9  the important manufacturers of API
10 for Teva.  And there are also many
11 others.
12 BY MR. STANOCH:
13   Q.   Right.  And you as a
14 procurement officer at Teva, even after
15 the nitrosamine issues in 2018, you did
16 not want to lose ZHP as an API supplier
17 generally for Teva, did you?
18   MS. LOCKARD:  Objection.
19 Asked and answered.
20   THE WITNESS:  I would not
21 want to lose any of our API
22 manufacturers whom we currently
23 consider as the important ones.
24   And there are more than --

Page 148

1    than Huahai, and I don't wish to
2    lose any of those.
3  BY MR. STANOCH:
4    Q.   Well, Teva changes API
5  suppliers from time to time for various
6  APIs, right?
7    A.   Yes.
8    Q.   But to this day, Teva is
9  still sourcing API from ZHP, right?
10   A.   Yes, we are still sourcing
11 API from ZHP for several markets.  We are
12 not sourcing API from ZHP for the U.S.
13 markets.  And this is the same as what we
14 do with many API manufacturers.
15   Q.   And, in fact, Teva is
16 sourcing a lot of API from ZHP to this
17 day, isn't that right?
18   A.   ZHP is still one of the
19 important manufacturers from whom we
20 source many API.  But there are also a
21 lot of other manufacturers from whom we
22 source a similar or even bigger amount of
23 API.
24   Q.   Right.  And you from a

Page 149

1  procurement perspective did not want to
2  lose ZHP as an API supplier even after
3  all the nitrosamine issues and recalls in
4  2018, correct?
5    MS. LOCKARD:  Objection.
6  Asked and answered.
7    THE WITNESS:  So especially
8  for those what we know in this
9  conversation or this session
10 called the important API
11 manufacturers, those are the ones
12 where we buy several API.
13   And I don't want to lose any
14 of them, because this would mean a
15 lot of material changes in a lot
16 of our manufacturing sites which
17 is -- would mean a lot of capacity
18 of what we can do, would be then
19 stuck in such a case.
20   And for all of our important
21 manufacturers, we always try and
22 hope that they can -- you know, if
23 there is an issue, that it can be
24 solved and that then we can

Confidential Information - Subject to Protective Order



Page 150

1    continue doing business.  And this
2    is not only for ZHP, but for all
3    of the important manufacturers.
4  BY MR. STANOCH:
5      Q.    Well, Teva gets a very
6  competitive price from ZHP generally for
7  APIs, to this day, right?
8      A.    I would tend to say, and I
9  believe that this is true, that Teva gets
10  a competitive price from all of its
11  manufacturers.
12      Q.    Well, let's talk ZHP
13  specifically, sir.

Page 151

Page 152

20        Just a couple more questions
21  and we'll take a break, sir, if that's
22  okay.
23        In your view, it would hurt
24  Teva's bottom line if it stopped sourcing

Page 153

1  API from ZHP, correct?
2        MS. LOCKARD:  Objection.
3    Form.  Vague.
4        THE WITNESS:  No.  And I
5    also didn't understand.  Sorry.
6  BY MR. STANOCH:
7      Q.    Sure.
8        Teva sources very
9  competitive API from ZHP, right?
10      A.    This is what we do and what
11  we also do from others, but, yeah.
12      Q.    Right.  Right.  You try to,
13  but the ZHP pricing, it has a direct
14  impact on Teva's bottom line as a cost
15  for its finished dose products, right?
16      A.    Well, I mean the price we
17  pay for an API is -- whoever the
18  manufacturer is, is directly affecting
19  the bottom line --
20      Q.    Right.  Of course.  So if
21  ZHP's prices are low for an API, that's
22  good for Teva's profitability, correct?
23      A.    Again, ZHP's price is
24  competitive, but it's also very

Confidential Information Subject to Protective Order

Page 154

1  competitive with many of our other
2  manufacturers.  And it's not always the
3  cheapest.
4           And what I just said with
5  respect to that agreement, and I really
6  hope that we will have a look at it, what
7  it exactly says, this is meant so that we
8  can recover at least parts of the damages
9  and losses which we suffered through this
10 nitrosamine.
11      Q.   You know that if Teva
12 stopped sourcing API from ZHP, it would
13 have to go to different API suppliers who
14 have higher prices, right?
15      MS. LOCKARD:  Objection.
16 Speculation.
17      THE WITNESS:  This depends
18      and is different from API to API.
19      By accident we just had a
20      comparison again, and I can tell
21      you that ZHP is definitely not the
22      cheapest available source for any
23      given API.
24 BY MR. STANOCH:

Page 155

1      Q.   Well, we'll talk about that
2  a little more.
3           But you, from a procurement
4  perspective, did not want to lose ZHP as
5  an API supplier because of ZHP's
6  competitive pricing, right?
7      MS. LOCKARD:  Objection.
8  Asked and answered.
9      THE WITNESS:  We, in
10      procurement, always try not losing
11      any of our good and big and
12      reliable API suppliers who are
13      competitive with respect to price,
14      quality, reliability.
15      And there are many, and not
16      only ZHP's.
17 BY MR. STANOCH:
18      Q.   Is ZHP a reliable supplier
19 after it cost Teva millions and millions
20 of dollars because of the nitrosamine
21 issues?
22      MS. LOCKARD:  Objection.
23 Argumentative.
24      THE WITNESS:  This is --

Page 156

1      for -- I mean this is always an
2  ongoing evaluation.  And it's not
3  only my opinion which counts in
4  this case.  And it keeps changing
5  and it also kept changing since
6  2018.
7           And if at the current stage
8  there would need to be a decision
9  of who can be an API source, then
10 again it would be a team effort of
11 quality, regulatory, manufacturing
12 people, and also procurement,
13 trying to assess the overall
14 situation.
15 BY MR. STANOCH:
16      Q.   Do you consider ZHP --
17 sorry.
18      A.   That's okay.
19           And then from -- I mean,
20 from the internal evaluation of the
21 current stage to us, it looks like the
22 nitrosamine situation, which was not --
23 not only hitting ZHP but many other
24 companies, currently the situation is

Page 157

1  under control.  And if it fits to the
2  product, and, you know, with current GMP,
3  then ZHP also can be considered as a
4  reliable supplier.
5      Q.   Do you consider ZHP to be a
6  reliable supplier today?
7      MS. LOCKARD:  Objection.
8  Asked and answered.
9      THE WITNESS:  Again, it's
10      not -- not only my opinion that
11      counts there.  And it's a team
12      effort, if you take a decision
13      like this.
14      And it depend on the
15      specific situation.  For example,
16      currently I would not say that ZHP
17      is a reliable supplier for
18      valsartan in the U.S.
19      But in many other cases,
20      depending on the API and the
21      overall situation, they can be
22      considered as a reliable supplier.
23      MR. STANOCH:  Let's take
24      that break now, Mr. Nassall.

Confidential Information Subject to Protective Order

Page 158

1    Thank you.
2        THE WITNESS:  Okay.
3        THE VIDEOGRAPHER:  The time
4    right now is 3:03 p.m.  We are off
5    the record.
6        (Short break.)
7        THE VIDEOGRAPHER:  The time
8    right now is 3:16 p.m.  We're back
9    on the record.
10   BY MR. STANOCH:
11       Q.    Welcome back, Mr. Nassall.
12   Yes or no, did you speak with your
13   counsel during the break?
14       A.    Yes, I did.
15       Q.    You learned from ZHP about
16   the nitrosamine issues in valsartan API
17   in June 2018, right?
18       A.    That's correct.
19       MR. STANOCH:  I'm going to
20   mark an exhibit.  Teva 320.  Stand
21   by.  I'll state for the record,
22   it's Bates ending 102401.
23       (Document marked for
24   identification as Exhibit

Page 159

1    Teva-320.)
2    BY MR. STANOCH:
3        Q.    Let me know when you can
4    access that document, sir.
5        A.    One moment.  Yes, I have
6    access.



Confidential Information Subject to Protective Order



Page 162

Page 163

ⁱⁿ⁹ Q.   So I just want to go through
²⁰ the timeline to make sure we have it
²¹ right.
²²        So you were in China and you
²³ were having dinner preplanned already
²⁴ with ZHP representatives on June 20th?

Page 164

¹ A.   Yeah.
² Q.   And it was you and
³ Mr. Fluch, and anyone else you recall
⁴ from Teva?
⁵ A.   I -- I would say it's only
⁶ the two of us.
⁷ Q.   Who from ZHP attended?
⁸ A.   Okay.  I do recall that
⁹ there was Mr. Cai.
¹⁰ Q.   T-S-A-I?
¹¹ A.   C-A-I.
¹² Q.   C -- oh, yes, C-A-I.  Thank
¹³ you.
¹⁴ A.   And Karen Xu, X-U.
¹⁵ Q.   X-U.  Thank you.
¹⁶ A.   I'm not sure who else from
¹⁷ ZHP.
¹⁸ Q.   And what do you recall were
¹⁹ Mr. Cai and Ms. Xu's roles at ZHP?
²⁰ A.   The official titles at that
²¹ time, for me, Mr. Cai was the highest
²² ranking sales and marketing guy at ZHP.
²³ Ms. Xu was directly reporting to him, she
²⁴ was also relatively high ranking, and

Page 165

¹ most of the time responsible for dealing
² with Teva I would say.
³        I can't hear you.
⁴ Q.   My apologies.
⁵        When was this June 20th
⁶ dinner with ZHP planned?
⁷ A.   I do not fully recall.  What
⁸ is usually happening is that CPhI thing
⁹ closes somewhere between 6 and 7, and
¹⁰ then you usually -- if you have a dinner
¹¹ scheduled you go directly from the fair
¹² to dinner, so I would say that dinner was
¹³ scheduled at 8.
¹⁴ Q.   Thank you.  And I guess I
¹⁵ was imprecise.
¹⁶        Was the dinner planned that
¹⁷ same day or had you had a schedule
¹⁸ predating the conference where the dinner
¹⁹ was scheduled to happen?
²⁰ A.   Okay.  So that was
²¹ prescheduled.
²² Q.   Had you -- so someone at
²³ Teva had had contact with ZHP prior to
²⁴ June 20th to schedule the dinner that you

Confidential Information Subject to Protective Order

Page 166

1  had?
2      A.   And also to schedule the
3  meeting, like all the meetings during --
4  during that thing, we had all of that
5  prescheduled.
6      Q.   Got it.  And approximately
7  when did -- did you schedule the meetings
8  with ZHP you were going to have at the
9  conference as well as the dinner you had
10  with them?
11     A.   I can't recall.  Usually
12  this happens maybe two or three weeks in
13  advance.
14     Q.   That's fair.  And was that
15  you personally doing the schedule or did
16  Mr. Fluch handle it?
17     A.   I can't recall how it was in
18  this special case for ZHP.
19          It could even be that
20  someone from our China office did this
21  for us, so...
22     Q.   Understood.
23          Was there a particular
24  agenda or list of topics for your

Page 167

1  meetings or dinner with ZHP at the CPH
2  conference?
3      A.   I can't recall in 2018.
4  Depending if there was a certain project
5  that required special attention, then it
6  was mentioned on the agenda.
7          But most of the time,
8  especially during the CPhI events, it's a
9  very -- you know, there's no specific
10  agenda.  You run through whatever happens
11  until then.
12     Q.   Did you discuss valsartan
13  with anyone at ZHP at the event prior to
14  the June 20, 2018 dinner?
15     A.   As far as I recall, no.
16     Q.   And did you meet with any
17  ZHP people prior to the June 20th dinner
18  at the conference?
19     A.   Mm-hmm.
20          I can't recall if that was
21  before or after.
22     Q.   Okay.  So you are at the
23  conference.  The conference that day
24  wraps up.  You go to dinner with

Page 168

1  Mr. Fluch, with Mr. Cai, and Ms. Xu.
2          What do they convey to you
3  and Mr. Fluch about the valsartan API
4  issues?
5      A.   So at the end of the dinner,
6  they said that they have they have
7  important topic which they still need to
8  discuss with us.
9          They mainly showed us the
10  e-mail they are about to send.  So like
11  giving us a few minutes of a heads-up.
12  And asking us so what do you think about
13  it.  There was -- there was no more
14  information than what was in the e-mail.
15  Let's put it that way.
16     Q.   Right.  That was going to be
17  my next question.
18          Was there anything else
19  specific discussed about the valsartan
20  API at the dinner that you recall?
21     A.   No, I don't recall anything
22  else.  It was mainly the message that
23  they have found a potentially genotoxic
24  impurity in the valsartan.

Page 169

1      Q.   Did they give you any more
2  information about the nature of the
3  impurity?
4      A.   No.
5      Q.   Did they mention it was a
6  nitrosamine potentially?
7      A.   At that point of time, what
8  they said is that they don't know what
9  structure, what compound it is.
10     Q.   Did they tell you how they
11  found it?
12     A.   I mean by testing for it.
13  But no, I don't -- no, I don't -- they
14  didn't say how they found it.
15     Q.   I mean it's my understanding
16  that another customer of ZHP's brought
17  the issue to their attention.  Is that
18  your understanding?
19     A.   This is also what we heard
20  by -- I mean at that point of time,
21  especially after -- the day after, we
22  obviously also asked other potential
23  manufacturers of sartan APIs and
24  intermediate manufacturers what they

Confidential Information Subject to Protective Order

Page 170

1 heard. I mean, overnight it became the
2 industry talk.
3          And what I heard from
4 manufacturers of this API is that some,
5 some of the customers somehow were
6 involved.
7     Q.   Okay. I just want to go
8 through the whole timeline.
9          So after the dinner on
10 June 20th, this e-mail goes out to you
11 and others. You forwarded it on, as you
12 testified earlier.
13          Next day, June 21st. Okay?
14 That's where I am now.
15          You remain in China that
16 day?
17     A.   Yes.
18     Q.   Okay. When did you come
19 back from China to your office in
20 Germany?
21     A.   I think this was only more
22 than a week later. I can't remember the
23 exact date. But I am pretty sure that I
24 stayed at least one more week after CPhI

Page 171

1 ended. So it must have been the very end
2 of June, maybe even early July.
3     Q.   Did you stay there on work
4 or did you take a holiday after the
5 convention?
6     A.   No, that was on work.
7     Q.   And you stayed in the Teva
8 Shanghai office?
9     A.   Teva Shanghai office. And
10 we also had some more meetings after CPhI
11 with other manufacturers.
12     Q.   Did you have any
13 conversations with anyone else at ZHP
14 about the valsartan API issues after
15 June 20th for that next week while you
16 are in China?
17     A.   So after that, we learned
18 that from ZHP, there were several, you
19 know, not necessarily in the scheduled
20 meetings which we had with some
21 manufacturers, but with people you meet
22 during -- during CPhI and if we knew that
23 this company we're currently at, people
24 stopping by, that they also manufacture

Page 172

1 valsartan or intermediate for valsartan,
2 then we obviously tried asking what do
3 they know, have they heard, and to find
4 out some more information on what was
5 going on.
6     Q.   Who do you -- strike that.
7          Which companies'
8 representatives do you recall talking to
9 to find out more information about the
10 valsartan API issues at ZHP?
11     A.   For finding out what's going
12 on at ZHP, we only talked with ZHP
13 people.
14     Q.   Okay.
15     A.   But in general, the question
16 was there were other manufacturers for
17 valsartan. And whomever -- if I had a
18 meeting with such a company and I know
19 they also manufacture valsartan, then I
20 also asked them, have you heard, what
21 about yours, you know.
22     Q.   Do you recall which
23 suppliers' representatives you had that
24 type of conversation with, if anyone?

Page 173

1     A.   There for sure were several.
2 Especially also with all the intermediate
3 manufacturing which is happening in
4 China.
5          I do recall one that was to
6 Zhejiang Tianyu. Tianyu.
7     Q.   If you can, I'm going to ask
8 you to spell that for the benefit of the
9 court reporter, sir.
10     A.   Sure. So Zhejiang is the
11 province, that's Z-H-E-J-I-A-N-G --
12     Q.   That's what I would --
13 that's what I would mispronounce as
14 Zhejiang, right?
15     A.   Okay, yeah.
16          MR. STANOCH: The same
17     thing, madam court reporter.
18 BY MR. STANOCH:
19     Q.   Go ahead, sir.
20     A.   And the company name,
21 Tianyu, that's T-I-A-N-Y-U.
22     Q.   Thank you.
23          What do you recall
24 discussing with, I'll call it Tianyu,

Confidential Information Subject to Protective Order

Page 174

1 about valsartan API at that time?
2    A.   So I knew that they are one
3 of the biggest intermediate manufacturers
4 for not only valsartan, but for many
5 valsartan -- for many sartan, also other
6 sartans.  And I knew that they are also
7 producing valsartan.
8          So I asked them if they have
9 heard from Huahai and what -- what they
10 think.
11          As you seen the statement
12 from Huahai, so far was only that they
13 have found an unknown impurity which is
14 potentially genotoxic.
15          So the question was, have
16 they heard, and the answer most of the
17 time was yes.  Because as I said, it was
18 relatively quick news to everyone.
19          And then the question was
20 also if they have it in their product --
21 and not because I'm concerned about
22 Tianyu's product in this case, but to
23 find out if they maybe already know more
24 than this very basic statement that

Page 175

1 there's an unknown impurity.
2    Q.   And forgive me.  Did you say
3 if you had any person-to-person
4 communications with anyone else at ZHP
5 after the June 20th dinner about the
6 valsartan API issues?
7    A.   If I recall it correctly,
8 then I had no further personal
9 interaction after that.
10    Q.   Got it.  So the day after
11 the dinner, you didn't go back to the ZHP
12 booth or talk to any ZHP representatives
13 while you were still in China, right?
14    A.   I didn't.  The schedule was
15 full with other meetings.  And especially
16 on the very next day, it was just there
17 is an unknown impurity.  I was also
18 trying to await for feedback from our
19 quality team, how serious they consider
20 this.  And we were sure that we anyhow
21 would need to wait for the details, what
22 it exactly is, and if it's really
23 genotoxic.
24    Q.   Right.  And then you were in

Page 176

1 China for about a week after the dinner.
2          At any point in that week,
3 did you talk in person with any ZHP
4 representative or call any of them on the
5 phone about the valsartan API issues?
6    A.   I am not totally sure.  It
7 very well was possible that I might have
8 called them, either -- probably most
9 likely would have been Karen.  But I
10 can't recall if that was in the week
11 while I was still in China or only after
12 I was back.
13    Q.   Did you have a company
14 issued phone at the time?
15    A.   Yes.
16    Q.   Okay.  Do you still have the
17 same phone today?
18    A.   Yes.
19    Q.   Same number --
20    A.   Not -- the same number.
21    Q.   Same number.  I hope it's a
22 different phone, sir.  Although mine is
23 pretty old as well.
24    A.   That's what mine is now.

Page 177

1    Q.   Earlier you had mentioned
2 you somehow learned or heard from someone
3 else that the contamination -- that the
4 issue with valsartan API at ZHP was told
5 to ZHP about -- from a customer, I think?
6 Isn't that -- you said something to that
7 effect?
8    A.   There were many different
9 stories not only the next day, but also
10 in the following weeks.
11          I have to say that it never
12 came to a final conclusion, at least not
13 to me, of what was just a rumor.  What
14 might have some, some parts of truth
15 there or not.
16          So one of the things we
17 heard is that it might have been because
18 of a potential customer who was
19 interested in buying the material from
20 ZHP, that they found it or had the
21 suspicion that it could be there.  I
22 don't know exactly how it was.
23    Q.   What rumors did you hear
24 about which customers might have told ZHP

Confidential Information Subject to Protective Order

Page 178

1  about the contamination in the valsartan
2  API?
3          I'm focused just on the time
4  period while you are in China after the
5  June 20th dinner, sir.
6      A.   Okay.  Then I would say that
7  during that time, I didn't hear it yet.
8      Q.   Eventually you did?
9      A.   Again, it's rumors so...
10     Q.   Understood, sir.
11  Understood.
12          What do you recall hearing
13  about the customer or customers who
14  informed ZHP about the issue?
15     A.   That was Novartis and
16  Sandoz.  And I don't know if they really
17  informed them or if they asked them the
18  right questions so that they would look
19  for.  And as I said, this is what -- what
20  I would say are rumors.
21     Q.   I understand.
22          Did you ever talk to anyone
23  at Novartis or Sandoz about the ZHP
24  valsartan API contamination issues?

Page 179

1      A.   No, I did not.
2      Q.   Are you aware of anyone at
3  Teva who did so?
4      A.   I would not think so.
5  There's no special connection between
6  Sandoz, Novartis, and Teva.
7      Q.   Do you recall hearing
8  chitchat about when Novartis or Sandoz
9  informed ZHP about the valsartan API
10  contamination issues?
11     A.   No.
12     Q.   Other than Tianyu, do you
13  recall any other specific companies'
14  representatives whom you discussed the
15  valsartan API contamination issues with
16  while you were still in China after the
17  June 20th dinner with ZHP?
18     A.   No, I don't recall any
19  specific companies.
20     Q.   Do you recall who you spoke
21  with at Tianyu?
22     A.   Most likely, this should
23  have been -- I'm trying to recall his
24  name.  Benny Wu?  I'm not sure.

Page 180

1      Q.   Thank you.
2          Do you recall whether, in
3  the month prior to the conference in
4  China, whether ZHP asked Teva to place
5  new orders for valsartan ASAP?
6      A.   No, I don't recall that.
7          MR. STANOCH:  I'm going to
8  put a document up real quick.
9  Stand by, sir.  Teva 321.
10          (Document marked for
11  identification as Exhibit
12  Teva-321.)
13          MR. STANOCH:  For the
14  record, it's 872512, Bates ending.
15  BY MR. STANOCH:
16     Q.   Sir, just let me know when
17  you can access that document.
18     A.   I have it open.
19     Q.   Very good.

Page 181

Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Page 190

10    Q.    Yeah.
11         MR. STANOCH:  Stand by for
12    the next exhibit, sir.
13         Sorry, let me repeat that,
14    sir.
15    BY MR. STANOCH:
16    Q.    After receiving the
17    notifications from ZHP in June 2018 about
18    the valsartan API issues, did Teva
19    attempt to identify alternate sources of
20    valsartan API?
21    A.    Again, sir, you wanted to
22    pull up an exhibit.  There's nothing
23    right now, right?
24    Q.    There's no exhibit now.  You

Page 191

1    can put the exhibit away.  Sorry.
2    A.    We're still reloading the
3    page.
4    Q.    No, I understand.  I'm
5    sorry, sir.  If we were in the same room,
6    I'd hand you a piece of paper.
7    A.    Yeah, I know.
8    Q.    Thank you for bearing with
9    me.
10    A.    So, sorry, again, what was
11    the question now?
12    Q.    After Teva received the
13    notifications from ZHP in June of 2018
14    about the valsartan API contamination
15    issues, did Teva attempt to identify
16    alternate sources for valsartan API?
17    A.    So this -- this -- after
18    June '18 is a very long period of time.
19    And, yes, we were also looking into
20    potential alternate sources.
21    Q.    I'm now marking Teva 332,
22    Bates ending 609197.
23         (Document marked for
24    identification as Exhibit

Page 192

1    Teva-322.)
2         MR. STANOCH:  I'm so sorry.
3    Thank you, counsel.
4         Teva 322.  I did it again.
5         THE WITNESS:  No problem.
6    I've got it.
7         I have it open.
8    BY MR. STANOCH:

Page 193

Confidential Information Subject to Protective Order



Page 194

Page 195

¹⁹     Q.   You can put that aside for
²⁰ now.  Thank you, sir.
²¹       Just before I forget, I just
²² want to go back very briefly to the
²³ dinner that you had on June 20th with
²⁴ Mr. Cai and was it Ms. Xu?

Page 196

¹     A.   Sure, yes.
²     Q.   Do you recall the restaurant
³ you went to?
⁴     A.   Three years ago.  Not the
⁵ exact name.  But you too -- there was a
⁶ common misunderstanding between, between
⁷ ZHP and us, and I always believed that
⁸ they want to go to steakhouses and they
⁹ always believe that I want to go to
¹⁰ steakhouses.  So we usually ended up in a
¹¹ steakhouse.  I can't recall which one.
¹²     Q.   Okay.  And that was in
¹³ Shanghai where the convention was?
¹⁴     A.   Yes.
¹⁵     Q.   And do you recall just
¹⁶ generally about how long the whole dinner
¹⁷ was from start to finish, from when you
¹⁸ arrived to when you left?
¹⁹     A.   So usually it's -- the
²⁰ Chinese dinners are pretty -- pretty
²¹ quick.  In Shanghai it can be a little
²² bit longer due to all the -- everyone
²³ after the fair is doing this.  So my
²⁴ assumption would be that it probably was

Page 197

¹ from 8 to 10 or 11.
²     Q.   Fine.  I will not get so
³ granular to ask you what you ate that
⁴ day, sir, so don't worry.
⁵       And who paid for the dinner,
⁶ you and Mr. Fluch or the ZHP personnel?
⁷     A.   As this was in Shanghai, I'm
⁸ pretty sure that at the end it was ZHP.
⁹     MR. STANOCH:  Stand by for
¹⁰ the next exhibit, sir.
¹¹     (Document marked for
¹² identification as Exhibit
¹³ Teva-323.)
¹⁴     MR. STANOCH:  Teva 323.
¹⁵ Will be Bates ZHP01090696.  Please
¹⁶ stand by, sir.
¹⁷ BY MR. STANOCH:
¹⁸     Q.   Please let me know when you
¹⁹ can access that document.
²⁰     A.   I have it open now.

Confidential Information Subject to Protective Order



Confidential Information - Subject to Protective Order



Page 202

Page 203

Page 204

Page 205

2  BY MR. STANOCH:
3      Q.   You can put this aside for
4  now.  Thank you.
5      A.   Okay.
6          MR. STANOCH:  Next exhibit,
7  Teva 324, Bates ending
8  ZHP02321449.
9          (Document marked for
10  identification as Exhibit
11  Teva-324.)
12  BY MR. STANOCH:
13      Q.   Let me know when you can
14  access the document, sir.
15      A.   324, open now.

Confidential Information Subject to Protective Order



Confidential Information - Subject to Protective Order



Page 210

Page 212

Page 211

6    Q.   You can put that aside.
7  Thank you, sir.
8        MR. STANOCH:  Teva 325.
9        (Document marked for
10  identification as Exhibit
11  Teva-325.)
12       MR. STANOCH:  Bates ending
13  103279.
14  BY MR. STANOCH:
15       Q.   Please let me know when you
16  can access that, sir.
17       A.   325, open.

Page 213

Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Page 218

Page 220

8    Q.    You can put that aside.
9  Thank you, sir.
10        MR. STANOCH:  Stand by for
11  the next exhibit.
12        (Document marked for
13  identification as Exhibit
14  Teva-326.)
15        MR. STANOCH:  Teva 326.
16  Bates ending 00036505.
17  BY MR. STANOCH:
18    Q.    Please let me know when you
19  can access that exhibit, sir?
20    A.    I opened it.

Page 219

Page 221

Confidential Information - Subject to Protective Order



Page 222

Page 224

18          MR. STANOCH:  I'll mark the
19   next exhibit, sir.  Teva 327.
20   Bates ending 53929.
21          Document marked for
22   identification as Exhibit
23   Teva-327.)
24   BY MR. STANOCH:

Page 223

Page 225

1          Q.   Please let me know when you
2   can access that document.
3          A.   227.  Yes, have it.

Confidential Information - Subject to Protective Order



MS. LOCKARD:  No, no, no.

Confidential Information - Subject to Protective Order



Page 230

1  That is not the rule.  The judge
2  has ruled otherwise.
3       "Objection to form" is not
4  an appropriate objection.  We
5  are --
6       MR. STANOCH:  It's not?
7  "Objection to form" is not
8  appropriate?
9       MS. LOCKARD:  You can
10  review -- you can review Judge
11  Vanaskie's ruling on this.
12       He said we are entitled to
13  give a basis for our form
14  objection, and that, in fact, we
15  should be giving a basis for our
16  form objection.
17       MR. STANOCH:  Are you done
18  with your speaking objection,
19  counsel?
20       Are you done?
21       MS. LOCKARD:  No, I was
22  responding to you.
23  BY MR. STANOCH:

Confidential Information Subject to Protective Order



Page 234

Page 236

Page 235

Page 237

17    Q.    Okay.  Let's look at
18  Teva 328.
19        MR. STANOCH:  Stand by.
20        (Document marked for
21    identification as Exhibit
22    Teva-328.)
23  BY MR. STANOCH:
24    Q.    Tell me when you can access



Page 238

1  that.  It's exhibit -- Bates ending
2  42244.
3      A.   Yes.  Have it open.

Page 239

Page 240

Page 241

Confidential Information Subject to Protective Order



Page 242

Page 243

5    Q.   I'm going to mark the next
6  exhibit, sir.  Teva 329.  Let me know
7  when you can access it.
8         (Document marked for
9     identification as Exhibit
10    Teva-329.)
11         MR. STANOCH:  For the
12    record, it's Bates ending 109885.
13         THE WITNESS:  I have it
14    open.
15  BY MR. STANOCH:

Page 244

Page 245

20  BY MR. STANOCH:
21     Q.   Did Teva ever ask Mylan to
22  test valsartan API it was selling to Teva
23  for nitrosamines?
24     A.   Again, this is a question

Page 246

¹ for quality. I'm not prepared and did
² not check on what we tested and when we
³ tested.
⁴      Q.    Well, you're designated on
⁵ the communications with API suppliers,
⁶ including ZHP and Mylan, right?
⁷      A.    Yeah, you are right.
⁸      Q.    And you and Mr. Fluch, in
⁹ fact, were some of the point people
¹⁰ communicating with Mylan at this time
¹¹ concerning nitrosamine issues, correct?
¹²      A.    That is also correct.
¹³      Q.    Did you or Mr. Fluch or
¹⁴ anyone else at Teva ask Mylan, we'll say
¹⁵ in August 2018, to test valsartan APIs
¹⁶ for nitrosamines?
¹⁷      A.    And that would have been my
¹⁸ next sentence.
¹⁹        I'm not -- I'm not
²⁰ 100 percent sure of the exact timing.
²¹ But I'm pretty sure that we at some point
²² of time also asked Mylan for testing of
²³ several of the nitrosamines.
²⁴      Q.    And the Mylan -- we can look

Page 247

¹ at the e-mail, sir, for sure, I'm sure
² you are aware of them. Mylan never got
³ back to Teva until November 2018; is that
⁴ right?
⁵      A.    Again, I don't recall the
⁶ exact dates. And if you have something,
⁷ please feel free to show me, to help me
⁸ recall. So I don't know the exact
⁹ timelines when.
¹⁰      Q.    Okay. We can go through the
¹¹ e-mails.
¹²        But sitting here right now,
¹³ do you recall one way or the other of
¹⁴ whether Mylan provided nitrosamine
¹⁵ testing results to Teva for valsartan API
¹⁶ in August 2018?
¹⁷      A.    Without looking at the
¹⁸ e-mails, I don't recall for sure at which
¹⁹ point of time they did. Because this was
²⁰ one -- you know, really one long process
²¹ from June for the next six months, until
²² everything was clearer.
²³      Q.    Same question. Sitting here
²⁴ right now, one way or the other, can you

Page 248

¹ say whether Mylan provided nitrosamine
² testing results to Teva in September or
³ October of 2018?
⁴      A.    And again, I don't recall by
⁵ heart when we got the testing results.
⁶      Q.    Mm-hmm. Do you think it was
⁷ before or after Teva instituted its
⁸ recall of finished dose valsartan that
⁹ contained Mylan valsartan API?
¹⁰      A.    And again, by heart, I don't
¹¹ recall the order of each of the events.
¹²      Q.    Do you think it would be
¹³ important to have the test results sooner
¹⁴ rather than later from Mylan?
¹⁵        MS. LOCKARD: Objection.
¹⁶ Vague. Outside the scope of the
¹⁷ deposition.
¹⁸        THE WITNESS: And again, as
¹⁹ mentioned before, there were so
²⁰ many topics happening all at the
²¹ same time. And we asked for
²² testing of hundreds of batches.
²³ And it was not only Teva asking
²⁴ for that. There are many other

Page 249

¹ customers for -- for all the
² manufacturers we are talking here
³ about, and they also asked.
⁴        And I'm pretty sure that
⁵ both ZHP and Mylan did whatever
⁶ was within the capabilities of
⁷ their testing.
⁸ BY MR. STANOCH:
⁹      Q.    After this revelation in
¹⁰ August 2018 that older process valsartan
¹¹ API from ZHP is contaminated with NDMA as
¹² well, can you still believe you could
¹³ trust ZHP?
¹⁴        MS. LOCKARD: Objection to
¹⁵ the form. Mischaracterizes the
¹⁶ evidence. Vague.
¹⁷        THE WITNESS: I mean, this
¹⁸ again is the same as before. It's
¹⁹ a developing story. And I fully
²⁰ trust that our manufacturers told
²¹ us what they knew at the time when
²² they told us.
²³        And then the situation
²⁴ changes and you find out some new

Confidential Information Subject to Protective Order

Page 250

1    details, and then you communicate
2    that.
3         MR. STANOCH:  Teva 330, sir.
4         (Document marked for
5    identification as Exhibit
6    Teva-330.)
7         MS. LOCKARD:  I'm going to
8    need a break again soon.  We've
9    been going for quite a while now,
10    so...
11   BY MR. STANOCH:
12        Q.   Sir, do you want to take a
13   break now or just finish this one e-mail?
14        A.   It's just one e-mail, no,
15   yeah, I think it's right.  Let's take a
16   short break.
17        Q.   Okay.
18        MR. STANOCH:  Let's go off
19   the record.
20        THE VIDEOGRAPHER:  The time
21   right now is 4:59 p.m.  We are off
22   the record.
23        (Short break.)
24        THE VIDEOGRAPHER:  The time

Page 251

1    right now is 5:16 p.m.  We're back
2    on the record.
3    BY MR. STANOCH:
4        Q.   Welcome back, Mr. Nassall.
5    Did you speak with your counsel at the
6    break?  Just yes, no.
7        A.   Yes.
8        Q.   You have Exhibit 330 in
9    front of you?
10        A.   One second.  Yes, I have it.



Confidential Information - Subject to Protective Order



Page 254

Page 256

17    Q.   Well, let's take a look at
18  Exhibit 331.
19          (Document marked for
20      identification as Exhibit
21      Teva-331.)
22          MR. STANOCH:  For the Bates,
23      it's ZHP009129692.
24  BY MR. STANOCH:

Page 255

Page 257

1    Q.   Let me know when you can
2  access that document, sir.
3    A.   Yes, I have it.

Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information - Subject to Protective Order



Confidential Information Subject to Protective Order



Page 286

Page 288

¹ BY MR. STANOCH:

²      Q.    Tell me when you can access

³ it.

⁴      A.    One second.  I have it.

Page 287

Page 289

²¹      MR. STANOCH:  Teva 333.

²²      (Document marked for

²³ identification as Exhibit

²⁴ Teva-333.)

Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



MR. STANOCH:  Next exhibit, sir.



Page 298

```
 1          Teva -- it should be 334.
 2      Give me one -- let me try that
 3      again.
 4          THE WITNESS:  Yes.
 5          (Document marked for
 6      identification as Exhibit
 7      Teva-334.)
 8   BY MR. STANOCH:
 9      Q.   Teva 334, sir.
10      A.   All right.  It's loading.
11          Go ahead.
12          MR. STANOCH:  It's Bates
13      ending 423475.
14   BY MR. STANOCH:
```

Confidential Information - Subject to Protective Order



Confidential Information - Subject to Protective Order



Page 306

7          MR. STANOCH:  Next exhibit,
8      sir.  335.
9          (Document marked for
10     identification as Exhibit
11     Teva-335.)
12 BY MR. STANOCH:
13     Q.   Tell me when you can --
14 stand by.
15         MR. STANOCH:  For the
16     record --
17         THE WITNESS:  I have it up.
18         MR. STANOCH:  Very good.
19     I'll state for the record, it's
20     Bates ending 55166.
21 BY MR. STANOCH:

Page 307

Page 308

Page 309

Confidential Information - Subject to Protective Order



Page 310

Page 311

Page 312

⁴ BY MR. STANOCH:
⁵     Q.   Mm-hmm.  Mm-hmm.  I'm going
⁶ to move up in time to make sure we cover
⁷ and talk about some indemnification
⁸ issues now.  Okay?
⁹     A.   Okay.
¹⁰     Q.   And which entities, if any,
¹¹ has Teva requested indemnification of in
¹² connection with valsartan API and
¹³ nitrosamines?
¹⁴     A.   So there is a settlement
¹⁵ agreement with ZHP which covers some
¹⁶ areas.  With all other valsartan
¹⁷ manufacturers, there is no written
¹⁸ agreement.  With Mylan, there was only --
¹⁹ we -- got the -- the API which we could
²⁰ not use anymore was refunded to us.
²¹     Q.   Okay.  I'll start with ZHP.
²² So first, ZHP valsartan API that Teva had
²³ on hand at the moment Teva initiated
²⁴ recalls, is it correct that ZHP offered

Page 313

¹ to refund Teva for that unused valsartan
² API?
³     A.   If I recall correctly, then
⁴ yes, this is what they offered and
⁵ probably it would make any further
⁶ questions easier if we can have a look at
⁷ the settlement agreement.
⁸         MR. STANOCH:  Sure.  Teva
⁹     336.
¹⁰         (Document marked for
¹¹     identification as Exhibit
¹²     Teva-336.)
¹³ BY MR. STANOCH:
¹⁴     Q.   Tell me when you can access.
¹⁵     A.   Yep.  Got it.

Confidential Information Subject to Protective Order



Confidential Information - Subject to Protective Order



Confidential Information - Subject to Protective Order



Confidential Information Subject to Protective Order



Page 326

Page 328

12        MR. STANOCH:  And I'll mark
13    Teva 337.
14        (Document marked for
15    identification as Exhibit
16    Teva-337.)
17  BY MR. STANOCH:
18    Q.   Tell me when you can see it.
19    A.   Correct.

Page 327

Page 329

7        MR. STANOCH:  Why don't we
8    take a break.
9        THE VIDEOGRAPHER:  The time
10    right now is 6:42 p.m.  We are off
11    the record.
12        (Short break.)
13        THE VIDEOGRAPHER:  The time
14    right now is 7:06 p.m.  We're back
15    on the record.
16  BY MR. STANOCH:
17    Q.   Welcome back, Mr. Nassall.
18  Again, yes or no, did you talk to your
19  counsel during our break?
20    A.   Yes, I did.
21    Q.   Did Teva continue to source
22  valsartan API from Mylan after the
23  nitrosamine issues?
24    A.   Not for the U.S.  But in

Confidential Information Subject to Protective Order

Page 330

1  general, yes.
2      Q.   Right, right.  Because Teva
3  discontinued selling valsartan products
4  in the U.S., right?
5      A.   Yes.  That's correct.
6      Q.   Right.  And then so to this
7  day, Teva is sourcing valsartan API for
8  non-U.S. markets from Mylan?
9      A.   Yes, we do, yes.
10       MR. STANOCH:  I think that's
11  all the questions I have for now.
12  I appreciate your time, especially
13  with the time zone, and I
14  appreciate that English is not
15  your native language, so I
16  appreciate it.
17       And I'll reserve any time I
18  have left until after Ms. Lockard
19  questions you.
20       THE WITNESS:  Welcome.
21          - - -
22       EXAMINATION
23          - - -
24  BY MS. LOCKARD:

Page 331

1      Q.   Mr. Nassall, thank you for
2  your patience.  It's Victoria Lockard for
3  Teva.  Just a few follow-up questions for
4  you.



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order





Page 342

Page 344

19    Q.   Just one moment.  Bear with
20  me.
21    A.   Okay.
22        MS. LOCKARD:  Okay.  I think
23  those are all the questions I have
24  for you, Mr. Nassall.  Thank you

Page 343

Page 345

1   for your patience today.
2       We'll see if Mr. Stanoch has
3   anything else.
4       MR. STANOCH:  I have no
5   further questions.
6       MS. LOCKARD:  Okay.
7       MR. STANOCH:  Off the
8   record.
9       THE VIDEOGRAPHER:  The time
10  right now is 7:25 p.m.  We're off
11  the record.
12      MS. LOCKARD:  We'll reserve
13  the right to read and sign the
14  deposition.
15      MR. STANOCH:  Okay.
16      (Excused.)
17      (Deposition concluded at
18  approximately 7:25 p.m. Central
19  European Summer Time.)
20
21
22
23
24

Confidential Information Subject to Protective Order

Page 346

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, JENS NASSALL, have the opportunity to read and sign the deposition transcript.

_____
MICHELLE L. GRAY,
A Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter and Notary Public
Dated: July 2, 2021

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

Page 347

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 348

- - - - - -
E R R A T A
- - - - - -

PAGE  LINE  CHANGE

_____ _____ _____
       REASON: _____
_____ _____ _____
       REASON: _____
_____ _____ _____
       REASON: _____
_____ _____ _____
       REASON: _____
_____ _____ _____
       REASON: _____
_____ _____ _____
       REASON: _____
_____ _____ _____
       REASON: _____
_____ _____ _____
       REASON: _____
_____ _____ _____
       REASON: _____
_____ _____ _____
       REASON: _____

Page 349

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 350, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
JENS NASSALL              DATE

Subscribed and sworn to before me this _____ day of _____, 20_____.
My commission expires:_____

_____
Notary Public

Confidential Information - Subject to Protective Order

Page 350

1        LAWYER'S NOTES
2   PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____

Confidential Information - Subject to Protective Order

## WORD INDEX

**< $ >**
**$106**  194:*14*
**$110**  194:*12*
**$141**  194:*17*
**$90**  194:*22*
**$95**  194:*22*

**< 0 >**
**00036505**
 220:*16*
**018-Huahai**
 8:*8*
**02109**  3:*16*

**< 1 >**
**1**  199:*11*
 200:*1*  203:*23*
 204:*6*  209:*6*
 210:*1*  213:*22*
 214:*1*  233:*12*
 349:*6*
**1:18**  76:*17*
**1:28**  76:*21*
**10**  197:*1*
 238:*6, 14*
 240:*13*
 251:*13*  253:*2,*
 *24*  257:*15*
 264:*18*
**100**  74:*11*
 222:*21*  239:*5*
 246:*20*
**102401**  158:*22*
**103279**  211:*13*
**104**  6:*6*
**108342**
 131:*10, 24*
**109885**  243:*12*
**10th**  251:*24*
 272:*11*  273:*21*
**11**  197:*1*
**11/5/2018**  9:*13*
**12**  5:*7*  313:*24*
**12:02**  1:*14*
 11:*8*
**13**  257:*5*
**131**  6:*7*
**137077**  283:*5*

**13th**  267:*12*
 272:*13*  273:*23*
**14**  35:*21*
**1482**  9:*21*
**15**  5:*16*  20:*11*
**15219**  3:*11*
**158**  6:*12*
**16:12**  257:*16*
**167**  9:*14*
**17**  9:*8*  35:*22*
 37:*5*  205:*1*
 288:*22*
**17th**  3:*3*  37:*2*
 288:*14*  289:*3,*
 *8, 12*
**18**  37:*6*
 131:*18, 19*
 191:*18*  204:*22*
**180**  6:*17*
**187585**  104:*9*
**19**  131:*17*
 132:*6*
**191**  6:*20*
**19103**  3:*4*
**19422**  2:*17*
**197**  7:*6*
**1st**  220:*23*
 221:*21*

**< 2 >**
**2**  204:*6*
 210:*8*  214:*4*
 346:*15*
**20**  37:*2*
 159:*8, 24*
 160:*3*  167:*14*
 205:*18*
 208:*19*  349:*20*
**200**  2:*9, 17*
**2000**  37:*12, 13*
**2003**  23:*7, 10*
 37:*13, 17, 20*
**2004**  37:*12, 15*
**2007**  25:*24*
**2008**  26:*17*
 65:*9*
**2010**  28:*11*
**2011**  28:*4*
 39:*19, 24*
 41:*4*  45:*15*
 46:*3*  49:*2*

**66**:*15, 19*
**68**:6  89:*2, 5,*
 *11*  90:*11, 24*
 97:*9*  98:*23*
 99:*19*  100:*7*
 103:*15*
 104:*20*
 111:*18*  112:*8*
 123:*21*
 124:*13*  125:*1*
 338:*15*  339:*6*
**2014**  30:*13*
 35:*19*  40:*1, 8,*
 *19, 23*  41:*5*
 45:*15*  46:*4*
 49:*3*  53:*16*
 55:*17*  66:*19*
 68:*6*  79:*2*
 81:*23*  84:*14*
 85:*11, 17, 19*
 132:*6, 15*
 134:*11*  138:*9*
**2015**  35:*14*
**2017**  8:*18*
 31:*4*  35:*19*
 203:*13*
 204:*18*  258:*4,*
 *9*  259:*11*
 260:*5*  261:*5*
 262:*19*
 264:*17*
 266:*13, 22*
 267:*18*
 268:*13*
 269:*19*
 274:*20*
 277:*23*  297:*3,*
 *10*
**2018**  35:*15*
 36:*6*  37:*3*
 74:*7*  76:*3*
 83:*16*  84:*4*
 87:*11*  115:*21*
 116:*16*  117:*6*
 118:*11, 20, 22*
 121:*3*  122:*4,*
 *8, 17*  123:*23*
 124:*14*  125:*6*
 139:*21*
 140:*12*  141:*7,*
 *21*  142:*9, 12,*

**19**  143:*1, 13,*
 *19*  144:*4, 8,*
 *13*  145:*14*
 147:*15*  149:*4*
 156:*6*  158:*17*
 159:*9, 24*
 160:*4*  167:*3,*
 *14*  180:*22*
 184:*16*  185:*7*
 186:*1*  190:*6,*
 *17*  191:*13*
 192:*10*
 193:*20, 22*
 194:*21*
 195:*16*
 197:*24*  198:*4*
 199:*5*  201:*18*
 205:*18*
 208:*20*
 211:*21*
 212:*18*  213:*3*
 218:*18*  220:*1,*
 *23*  221:*21*
 223:*8, 23*
 224:*6*  225:*6,*
 *16*  228:*11*
 231:*3, 24*
 232:*2*  233:*13*
 238:*6, 15*
 240:*13*  242:*3,*
 *20*  243:*17, 23*
 244:*19*  245:*2*
 246:*15*  247:*3,*
 *16*  248:*3*
 249:*10*
 251:*13*  253:*2,*
 *24*  257:*5, 16*
 259:*10*
 264:*18*  267:*6,*
 *7*  268:*4, 15*
 269:*4*  277:*19*
 283:*12*  285:*1*
 288:*22*  291:*6,*
 *8, 9*  293:*15*
 295:*9, 15*
 296:*11*
 298:*18*  300:*9,*
 *19*  306:*24*
 320:*15*
**2019**  31:*13*
 36:*7, 12*  37:*1*

**2020**  32:*3*
 35:*2, 4, 6*
 36:*12*  319:*9*
**2021**  1:*10*
 11:*8*  346:*10*
**2022**  319:*10*
**203**  6:*23*
**205**  7:*9*
**20th**  163:*6, 24*
 165:*5, 24*
 167:*17*
 170:*10*
 171:*15*  175:*5*
 178:*5*  179:*17*
 185:*2*  195:*23*
 208:*24*  209:*3*
**21**  5:*18*
 298:*18*
**211**  7:*13*
**213-7047**  3:*17*
**215**  3:*4*
**21st**  170:*13*
**22**  90:*11*
**220**  7:*17*
**2220**  3:*21*
**224**  7:*19*
**227**  225:*3*
**23**  104:*20*
 283:*12*  285:*1*
 291:*8*
**230**  3:*21*
**237**  8:*6*
**23rd**  289:*8, 12*
**243**  8:*9*
**248**  9:*17*
**249**  8:*9*
**250**  8:*12*
**2500**  2:*10*
**256**  8:*17*
**263-1840**  3:*11*
**27**  211:*21*
 212:*18*
**270**  97:*5*
**27th**  3:*16*
**28**  192:*10*
**282**  8:*19*
**287**  9:*6*
**2875**  1:*3*
**292**  7:*16*
**298**  9:*8*

**< 3 >**

**3** 39:5
131:17 204:6
**3:03** 158:4
**3:16** 158:8
**30** 1:10 3:3
11:7 347:16
**30(b)(6**
241:10 264:24
**30305** 2:11
**306** 9:11
**312** 3:22
**313** 9:14
**315** 15:15
**316** 21:7
**317** 90:2
338:14
**318** 104:6, 16
**319** 131:9, 23
**320** 158:20
234:2
**321** 180:9
**322** 192:4
**323** 197:14
**324** 205:7, 15
**325** 211:8, 17
234:3, 6
**326** 220:15
234:14 341:15
**327** 224:19
**328** 9:17
237:18
**329** 243:6
**330** 5:8
250:3 251:8
**331** 256:18
**332** 191:21
282:21
**333** 287:21
**3333** 2:10
**334** 298:1, 9
**335** 306:8
**336** 313:9
**337** 328:13
**345** 6:12
**350** 349:6
**38th** 3:10

**< 4 >**

**4** 204:10
**4.6** 325:11
**4:59** 250:21
**412** 3:11
**42244** 238:2
**423475** 298:13
**44** 16:6 17:10
**45** 17:10
**450** 2:17
**453** 7:12
**46** 17:24 18:9
**47** 17:24 18:9
**478** 9:11
**48** 16:23
17:13
**483** 9:10
261:4 262:18
263:22 299:7
301:3, 13
302:7
**49** 17:16

**< 5 >**

**5** 198:4
199:5 201:18
306:24
327:10 344:7
**5/8/2018** 6:17
**5:16** 251:1
**50** 20:1
**504** 2:5
**507** 7:19
**5126** 90:3
**513** 6:19
**524-5777** 2:5
**53** 3:16
**53929** 224:20
**55166** 306:20
**553-2312** 2:11
**566.4808** 3:22
**567-0700** 2:18
**569** 226:14
**5th** 97:9
198:23

**< 6 >**

**6** 165:9
225:16
**6/28/2018** 6:20
**6/28/2019** 9:20

**6/29/2018** 6:14
**6:42** 329:10
**60606** 3:21
**609197** 191:22
**610** 2:18
**617** 3:17
**65** 257:16
**678** 2:1
**6th** 234:23
235:1

**< 7 >**

**7** 39:5 165:9
231:24 232:2
243:23
244:18 245:2
314:12 323:3,
13 324:2
**7/20/2018** 7:9
**7/27/2018** 7:13
**7/9/2018** 7:6
**7:06** 329:14
**7:25** 345:10,
18
**70** 318:6
319:11 320:8
334:4
**701** 2:4
**70130** 2:4
**702** 7:8
**78** 8:23

**< 8 >**

**8** 165:13
180:22
184:16 197:1
**8/1/2018** 7:17
**8/10/2018** 8:6,
14
**8/13/2018** 8:17
**8/19/2014** 6:9
**8/23/2018** 8:21
**8/7/2018** 8:11
**8/9/2018** 7:21
**87** 5:21
**872512** 180:14
**877.370.3377**
1:20
**89** 5:18
**893** 8:12

**< 9 >**

**9** 197:23
225:6 228:11
231:3
**9/18/2018** 9:6
288:7
**9/21/2018** 9:10
**9/22/2011** 5:20
**9/23/2011** 6:6
**915** 8:16
**917.591.5672**
1:20
**937** 7:23
**967** 8:19
**979-1164** 3:4

**< A >**

**able** 58:23
59:5 117:15
267:3 270:23
308:22
**abreast**
186:19, 24
**absolute** 334:6
**absolutely**
128:22
**AC** 316:4
**access** 15:15
21:8 43:18
90:6 104:15
131:16 159:4,
6 180:17
197:19
205:14
211:16
220:19 225:2
237:24 243:7
257:2 283:3
288:2 313:14
**accident**
154:19
**account** 56:19
57:13 61:18
331:8
**accurate**
38:13, 14
347:20
**accurately**
14:18

**ACKNOWLE
DGMENT**
349:2
**acquired** 28:8,
11, 18 70:1
71:20 72:10
89:12 100:2
**acquisition**
70:1 73:8
119:3, 12, 16
120:8, 17
121:24 122:3
**Actavis** 2:14
70:1, 3, 8, 24
71:9 72:2, 10
73:7 100:1,
11 112:12
119:3, 8, 17
120:17
121:10, 20
122:12, 20
181:4, 14
**action** 12:18
**actions** 254:5
289:22
**active** 27:2
**actively**
200:11 202:2
**activities** 26:6
29:9 31:1, 21
52:5 290:15
**actual** 47:13
**add** 12:22
54:18 57:18,
20 199:13
302:1
**added** 6:21
**addition**
227:15
**additional**
163:13 232:9
236:2, 12
314:12
333:24 337:10
**Additionally**
308:5
**address**
161:20 181:4
**addresses**
193:9

**adequate**
98:*17*
**adequately**
99:*1* 340:*24*
341:*7*
**adjust** 332:*5*
**adjusting**
44:*24*
**admit** 152:*4*
**advance**
166:*13* 182:*16*
**advise** 343:*21*
**advises** 284:*6*
**advising**
283:*19*
**affairs** 42:*21*
45:*13* 56:*21*
204:*12*
**affect** 58:*6*
125:*8* 210:*21,*
*24*
**affiliates**
322:*3, 5*
**affirmatively**
229:*17*
**afford** 113:*9*
303:*21* 304:*3,*
*6, 7*
**afraid** 276:*13*
**afternoon**
214:*18*
**agency** 258:*12*
297:*15*
**agenda**
166:*24* 167:*6,*
*10* 264:*10*
**ago** 12:*16*
18:*22* 88:*23*
99:*6* 134:*13*
135:*20* 196:*4*
233:*1* 253:*12*
259:*6*
**agree** 93:*19*
116:*15*
204:*17* 205:*1*
253:*22*
276:*20* 303:*21*
**agreed** 11:*20*
135:*11, 17*
203:*12* 254:*5*
273:*1, 6*

274:*2* 324:*23*
325:*9* 327:*9*
332:*1*
**agreeing** 304:*2*
**Agreement**
9:*16* 47:*12*
48:*14* 72:*1, 3*
150:*14, 19, 20*
151:*2* 152:*11*
154:*5* 311:*20*
312:*15, 18*
313:*7, 19, 22*
314:*17, 22*
315:*10, 13*
317:*24*
319:*17*
320:*18, 22*
321:*3* 324:*11*
325:*3* 327:*3,*
*15* 333:*12, 14*
334:*4* 344:*6*
**agreements**
46:*14, 15*
47:*16, 19, 21,*
*23* 48:*2, 6, 19*
66:*9*
**Ah** 40:*13*
**ahead** 50:*14*
69:*4* 76:*10*
80:*17* 133:*15*
137:*2* 173:*19*
201:*11, 22*
276:*3* 298:*11*
303:*8* 332:*19*
339:*11* 340:*13*
**alerted** 283:*20*
**ALFANO** 3:*7*
**alleged** 316:*15*
**alternate**
54:*15* 58:*6*
190:*19*
191:*16, 20*
192:*20*
335:*20*
337:*20, 22*
**altogether**
20:*9*
**ambiguous**
182:*13*
**Amended** 5:*16*

**Amlo/Vals/HC**
**TZ** 6:*22*
**amount**
148:*22* 226:*2*
235:*13* 242:*8*
341:*10, 11*
**amounts**
235:*3* 236:*6*
237:*7* 239:*13*
253:*1* 278:*13*
279:*10, 16*
**Analysis** 6:*9*
**analytical**
93:*2, 14, 16,*
*18* 95:*14*
96:*1, 14*
109:*16*
**and/or** 322:*2,*
*4, 5* 346:*21*
**Andreja** 78:*22*
**A-N-D-R-E-J-**
**A** 78:*23*
**Answer** 10:*5*
14:*7, 13*
74:*21* 75:*11*
151:*16*
174:*16* 215:*1*
236:*6* 265:*2*
315:*19*
**answered**
60:*17* 116:*20*
143:*3* 147:*7,*
*19* 149:*6*
155:*8* 157:*8*
201:*16*
209:*21*
255:*19* 269:*6*
273:*16* 297:*6*
**answering**
332:*14*
**answers** 13:*11*
349:*8*
**anymore**
26:*22* 42:*17*
44:*3* 55:*14*
67:*7* 79:*12,*
*24* 123:*2*
233:*22* 266:*6*
307:*24*
308:*16, 22*

310:*19* 312:*20*
**anytime** 112:*7*
**anyway**
222:*17* 231:*19*
**apart** 100:*11*
**API** 17:*4, 7*
27:*1, 10, 11*
29:*20* 30:*14,*
*21, 24* 31:*24*
32:*6* 33:*13,*
*17, 22* 34:*14*
35:*13* 36:*5,*
*24* 39:*13, 20*
40:*2, 17, 22*
41:*3, 6, 9, 14,*
*18, 21* 42:*5,*
*17, 23* 43:*4*
44:*7, 10, 11,*
*23* 45:*4, 17*
46:*1, 5, 9, 11,*
*12, 20, 21*
47:*14* 48:*2,*
*12* 49:*4, 17*
50:*6* 51:*13*
52:*18, 23*
53:*2, 9, 14, 17,*
*20, 22* 54:*1*
55:*6, 15, 18,*
*22* 58:*8* 59:*7,*
*12, 16* 60:*8,*
*23* 61:*7, 20*
62:*1, 9, 11, 14*
63:*19* 65:*3,*
*17, 18* 66:*3, 6,*
*16, 23* 67:*6,*
*20, 21, 23*
68:*5, 19, 20*
69:*18* 70:*6,*
*12, 18* 71:*1, 8,*
*23* 72:*7* 73:*2,*
*12* 74:*8, 14*
75:*4, 19* 78:*5,*
*10* 79:*14, 21*
80:*12, 20*
81:*22* 82:*1,*
*22* 83:*3, 12,*
*19* 84:*2, 7, 14,*
*18* 85:*3, 10,*
*13, 22* 86:*15,*
*16, 20* 87:*18,*
*21* 88:*7, 13*

89:*1* 91:*12*
92:*3* 97:*18*
98:*21, 23*
99:*19* 100:*6,*
*12, 19* 101:*20*
103:*24* 105:*1,*
*8* 108:*20*
109:*4* 111:*20*
112:*7, 14, 24*
113:*8, 16*
114:*7, 19*
115:*2, 12, 13,*
*14, 23* 116:*13,*
*16* 117:*6, 10,*
*18, 19, 21*
118:*3, 6, 18,*
*23* 119:*4*
120:*16, 19*
121:*1, 9, 15,*
*20* 122:*6, 18*
123:*16, 24*
124:*12, 16*
125:*10* 126:*2*
127:*14*
128:*17, 22*
129:*17*
130:*10, 16, 18*
131:*2* 133:*12*
134:*9* 137:*17*
138:*22* 139:*3,*
*9, 22* 140:*13*
141:*5, 9, 13,*
*16, 20* 142:*7*
144:*2* 146:*8,*
*16, 22* 147:*3,*
*9, 16, 21*
148:*4, 9, 11,*
*12, 14, 16, 20,*
*23* 149:*2, 10,*
*12* 150:*17*
151:*5* 152:*13*
153:*1, 9, 17,*
*21* 154:*12, 13,*
*18, 23* 155:*5,*
*12* 156:*9*
157:*20*
158:*16*
159:*14, 18, 24*
168:*3, 20*
170:*4* 171:*14*
172:*10* 174:*1*

175:6  176:5
177:4  178:2,
24  179:9, 15
182:11
185:12, 15
186:4, 7, 16,
20  187:1, 12
188:16  189:1,
12, 22  190:18,
20  191:14, 16
192:21
193:15
194:23  195:5
199:7  202:17
203:2  207:6,
12  210:18
212:6  217:17
218:16  219:1
220:4  221:7,
23  223:14, 21
224:5  225:12
227:5  228:10,
23  231:3, 11
232:15
233:17
234:17
238:17
239:16
240:14  241:2,
7  242:5, 21
244:18  245:4,
22  246:5
247:15  248:9
249:11
252:19
254:16  255:2,
9  256:9
257:21
259:24
269:18, 21
272:2  274:24
275:4, 16
277:20
279:24
281:14, 18
282:3  284:9
286:23  287:6,
13  290:11
291:6, 11
292:13
294:16

304:12  307:9,
18  311:8, 11,
21  312:12, 19,
22  313:2
314:3, 8, 13,
20  315:16
318:15  319:3,
13, 16  320:4,
5  321:16, 21
322:3, 16
323:4, 9
324:14, 19, 23
325:6, 10, 20
326:2, 12, 13
327:23
329:22  330:7
331:9  332:17
333:15, 19
334:4, 12
337:8, 10
341:16  342:3
**APIs**  56:1
67:9  73:14
84:24  88:16
114:10  148:6
150:7  169:23
181:21
183:20
199:16
200:15  201:4,
23  246:15
282:13
283:21
284:18, 20
285:2, 12, 20
286:14
292:15
304:23
316:15  335:20
**apologies**
131:24  165:4
**apologize**
59:2  131:20,
21  339:12
**Appasaheb**
295:3
**APPEARANC
ES**  2:1  3:1
4:1
**appearing**
11:19  12:23

**appears**  15:21
21:10  90:9,
20  159:7
205:16
211:18  284:2
328:20
**APPLIES**  1:6
318:18, 20
**apply**  316:2
334:5  346:19
**applying**
93:14  218:17
**appreciate**
139:1  145:9
315:9  330:12,
14, 16
**approach**
142:7, 24
**appropriate**
230:4, 8
289:10
292:13
318:21  338:9
347:6
**approve**  52:22
**approved**
30:3  319:24
**approving**
53:14
**approximately**
18:20, 21
19:2, 5, 22
20:1  32:3
40:19  41:4
166:6  345:18
**April**  35:15
37:2, 15, 20
39:5
**area**  22:23
33:5  48:10
58:5  187:7
**areas**  312:16
**Argumentative**
155:23  276:18
**arising**  316:12,
14  338:23
**arose**  319:14
340:20
**arrangement**
47:13  71:21
333:11

**arrangements**
325:18
**arranging**
82:13
**arrived**  196:18
**article**  258:6,
8  259:10
260:11
265:11, 16
270:13  280:5
**ASAP**  180:5
182:2
**Asia**  26:24
27:18  29:4, 17
**aside**  20:18
195:19  205:3
211:6  220:8
324:6
**asked**  53:11
60:17  91:18
116:20  143:3
147:7, 19
149:6  155:8
157:8  169:22
172:20  174:8
178:17  180:4
200:9, 12
203:9  209:21
210:3  215:5,
8  222:16, 23
246:22
248:21  249:3
255:5, 11, 19
256:15
259:17  260:7
263:7, 9
264:15
265:21  269:6
272:8, 10, 12
273:5, 16
275:19
279:19
281:18, 22
284:17
294:20  297:6,
18  332:11
334:22
338:13
341:14  344:5
**asking**  12:18
13:10  49:16

115:16
136:20
141:12  142:8,
20, 21  143:23
161:2  168:12
172:2  182:19
185:22  199:6
200:15  207:2
210:13  219:9
221:6  235:19
236:10  242:2,
16, 17, 19
248:23
252:11, 15
255:1  260:4
275:8, 11
285:1, 10
294:2, 8
311:8  317:17,
18
**asks**  182:1
207:23
**aspect**  62:9, 11
**aspects**  89:15
**assess**  156:13
**assessment**
287:19
**assessments**
141:12
**assigned**  84:18
**association**
162:6
**assume**  14:2
46:24  105:10
200:8  296:20
**assumed**
30:18  31:19
**assuming**
55:15, 21, 22
130:12, 15
**assumption**
108:7  109:12,
14  135:21
138:16
196:24
218:14  261:1
279:2, 3
303:16
**assurance**
33:21  64:5

ate 197:3
Atlanta 2:11
at-mail 237:5
attached
226:3 235:3,
14 347:12
349:11
attaches
159:12
attachment
6:15
attempt 14:1
15:8 190:19
191:15
attend 23:11
342:20, 22
attended 164:7
attending
162:20
attention
167:5 169:17
attorney 14:6
347:16
attributed
132:23
attributing
134:20
audit 53:10
81:11, 13
93:5, 9
100:19 127:3
140:18 141:1
185:6, 16, 21
186:1 260:9
264:9 266:1,
8, 9, 15, 16, 21
267:3, 4, 5, 9,
10, 11, 24
268:3, 9, 21
269:3, 11, 12
270:4, 7, 16
271:2 272:20,
24 276:7
277:8 280:19
295:21 296:5
297:9 300:1,
8, 20 302:10,
11, 12, 16, 21
303:3, 17
305:19, 20
306:4 319:8

338:15, 23
342:24 343:4
audited 93:6
auditing
34:13 80:20
82:1 101:8
140:20
297:22 343:8
auditor 80:22
81:3 98:8
103:1, 3, 18
281:6
auditors 81:6
92:8 102:22
267:18 270:23
audits 81:3, 7
82:4, 13, 15,
17 101:20
103:14, 19, 24
185:12
186:15 281:9
342:21, 23
August 132:6
220:23
221:21 225:6,
16 228:11
231:3, 24
232:2 233:12
234:23 235:1
238:6, 14
240:13 242:3,
20 243:17, 23
244:18 245:2,
13 246:15
247:16
249:10
251:13, 24
253:2, 24
257:5, 15
259:10
264:18
267:12
272:11, 13
273:21
277:18
283:12 285:1
289:4, 8, 12
291:8, 19
Aurobindo
2:19
Aurolife 2:19

authorities
81:18 141:11
143:8 144:19
187:20
188:13, 15
283:19
318:23 319:23
authority
284:3 286:13
319:6
automatism
311:14
availability
61:16
available 42:3
43:5 48:12
118:7 130:5
154:22
161:16
163:17
223:23
267:16 293:8
avoid 105:14
106:11, 20, 23
107:3 110:2,
13 111:3
113:2 207:16,
21
await 175:18
awarded 23:14
aware 13:9
71:7, 12 93:4,
8 103:22
104:1 108:12
112:22
114:20, 23
127:8, 12
136:14, 22
137:3, 15
152:5 159:17,
21 160:2
179:2 184:13,
15, 18, 19, 24
185:5, 8
187:5, 19
240:12 245:1
247:2 259:9,
13, 14 264:16
266:20, 24
279:22
287:15 295:8,

13 296:18
315:13, 19
317:8 320:21,
23 327:2, 19
328:2 329:2
azide 208:1
209:7 210:10

< B >
back 26:19
31:13 46:16
50:18, 21
76:21 77:8
89:2 99:5, 8
123:21
124:13
128:10
134:19 152:1
158:8, 11
170:19
175:11
176:12 189:4
190:1 195:22
205:21
221:10
225:11
234:14 247:3
251:1, 4
252:21
261:24
311:21
318:15, 17
321:10
322:21, 23
329:14, 17
background
20:22 21:21
49:13 136:4,
6 137:10, 20
310:4
bad 99:12
195:10
276:11
297:17
299:21 301:6,
8 302:7
balance
108:13, 18
109:2
ban 126:3, 11

bans 319:23
BARDIA 2:9
based 52:13
72:4 101:24
109:16 138:8
139:11 195:2
235:23 236:5
277:3 280:4,
7 292:5 296:5
basic 21:21
174:24
333:20 334:1
basis 144:15,
18, 20, 21
230:13, 15
279:6
batch 223:20
batches 7:18
51:14 202:11,
12, 17, 23
203:3, 9, 13
204:17, 24
212:6, 12
221:7, 21
222:2, 17, 21,
24 223:6, 14
226:4, 8, 19,
24 227:4, 7
231:11 234:8
237:3 238:9
239:7, 14, 23
240:15, 23
242:8, 22
248:22 255:2,
6, 13
Bates 90:3
104:8 131:9,
24 158:22
180:14
191:22
197:15 205:7
211:12
220:16
224:20 238:1
243:12
256:22 283:4
298:12 306:20
Bear 344:19
bearing 191:8

Confidential Information Subject to Protective Order

**began** 28:*3*
29:21 83:*11*
86:*14* 122:*4*
**beginning**
1:*14* 16:5
84:20 85:6
94:*13* 203:23
225:*18* 240:*4*
275:3 287:*18*
293:7 302:*11,*
*15* 305:22
318:*14*

**beginning....but**
299:*24*
**behalf** 15:*3*
16:*11, 14*
17:23 81:7
204:16 223:*4*
256:1 285:*11*
**belabor** 34:*22*
38:*11*
**believe** 17:*22*
102:*16, 24*
112:*2, 6*
131:*18* 133:*1*
136:7 150:9
183:*13* 185:*4*
192:*16* 196:9
198:*17* 199:*2*
218:*10*
222:20
249:*12* 252:6
253:*3, 9*
254:*10, 19*
257:*11*
259:22 268:*1*
276:*10* 279:6
321:*4* 324:*10*
338:*14*
**believed**
196:7 254:*20*
279:7
**believing**
253:*19* 278:*18*
**Bell** 2:*17*
**benchmark**
51:*22*
**benefit** 173:*8*
**Benny** 179:*24*

**best** 130:*8*
139:*19* 144:*2*
220:*2* 339:23
**better** 160:*6*
183:9 311:*17*
**BI** 193:*20, 21*
194:*1, 6*
**big** 91:*22*
94:*4, 10, 14,*
*18, 20* 113:7
120:*8, 23*
125:*2* 155:*11*
308:*23* 309:*7,*
*22* 336:*24*
**bigger** 73:7
88:*12* 148:*22*
292:*3* 293:*18*
**biggest** 74:*14*
75:*4, 24*
88:*16* 112:23
113:*15, 18*
128:*16, 17*
174:*3*
**Birgit** 77:*16,*
*18*
**bit** 26:*11*
32:*17, 22*
33:*2* 35:9, *23*
44:*21* 51:*12*
67:*10* 69:*8*
90:*17* 101:*24*
162:*13*
183:*10*
196:*22* 240:9
265:*12*
300:*11* 310:*3*
314:*23* 333:*3*
**black** 308:*15*
311:*15*
**blacklisted**
312:*2*
**blame** 215:*13*
**block** 97:*17*
**Bloomberg**
257:*20* 258:*1,*
*22* 259:*10, 18*
260:*10*
265:*19*
270:*12* 277:*3*
**Blue** 2:*17*
**board** 311:*1*

**Boixados**
180:*21*
**B-O-I-X-A-D-
O-S** 180:*22*
**booth** 175:*12*
**BOSICK** 3:7
**Boston** 3:*16*
**bottom**
152:*24*
153:*14, 19*
193:7 243:*22*
244:*2, 4*
288:*23*
299:*13* 307:7
**break** 14:*14*
75:*17* 76:*11,*
*14, 19* 77:*2*
151:*14, 17*
152:*19, 21*
157:*24* 158:*6,*
*13* 233:*11*
250:*8, 13, 16,*
*23* 251:*6*
276:*15*
303:*22* 304:*3,*
*7, 17* 305:*9,*
*12* 329:*8, 12,*
*19* 335:*1, 16*
336:*23* 337:*1*
**breaks** 14:*10*
**Brian** 344:*12*
**briefly** 11:*23*
25:*24* 195:*22*
322:*1* 326:*4*
**brought**
169:*16*
216:*23* 297:*16*
**buckets** 314:*5*
**business** 24:9
87:*24* 135:*22,*
*24* 138:*18*
150:*1* 194:*5,*
*21* 195:*4, 9*
304:*21* 308:*7,*
*16* 309:*21*
310:*8, 19*
314:*7, 13*
321:*12* 323:*4*
**busy** 190:*8*
200:*6* 292:*21,*
*23*

**buy** 92:*18*
149:*12*
185:*15*
307:*21*
314:*13, 14*
319:*10* 320:*2*
335:*21*
**buying** 29:*3*
66:*6* 88:7, *16*
125:*15*
177:*19* 287:7
304:*12* 314:9
320:*5* 337:*17*

**< C >**
c.whiteley@ka
nner-law.com
2:*6*
**Cai** 164:9, *19,*
*21* 168:*1*
195:*24*
212:*22* 213:*2*
216:9, *12, 19*
259:*1*
**C-A-I** 164:*11,*
*12* 212:23
**call** 8:*15*
64:22 71:*14*
135:*2* 173:*24*
176:*4* 212:*22*
213:*8, 9*
214:*18*
294:*19* 295:7
**called** 149:*10*
176:*8* 188:*8*
194:*5*
**calls** 43:*16, 23*
126:*5* 127:*18*
190:*2, 7*
213:*15*
289:*17* 294:*1,*
*5, 6, 10, 12, 17,*
*20, 23* 295:*3,*
*4* 341:*5*
**Camp** 2:*4*
**Candesartan**
199:*19*
**capabilities**
25:*11* 36:*18*
120:9 240:*21*

249:*6* 343:*8,*
*19*
**capability**
245:*15*
**capacity**
119:9 149:*17*
332:*3*
**carcinogenic**
286:*6, 10*
**Cardinal**
328:23
**care** 29:*15*
32:*19* 96:5
184:7
**carefully**
347:*4*
**carryover**
209:7
**carving** 317:*2*
**case** 39:*11*
41:*16* 42:*4*
48:*8* 50:9
54:21 62:23
126:*22*
129:*10*
149:*19* 156:*4*
166:*18*
174:*22*
185:*19*
216:*18*
274:*20*
275:*22*
281:*11*
284:*15* 294:7
334:*1* 336:9
337:*6* 342:*1*
**CASES** 1:*6*
41:*18* 44:*19*
55:*11* 117:*17*
157:*19* 305:*8*
336:*13*
**cash** 313:*24*
314:*5* 315:*14*
**catalysts** 23:*2,*
*4*
**category**
30:*14* 32:*19*
35:*14* 36:*5,*
*24* 73:*2* 78:*6*
84:*14* 121:9

Confidential Information Subject to Protective Order

caused 92:14 93:1
causes 54:3 211:3
cautious 142:2 215:16 314:23
cc 198:9
Central 1:14 345:18
Centre 3:10
CEP 218:14, 17 219:24 320:1
certain 15:4, 5 25:9 53:3 58:5 77:19 78:8 79:10, 21 84:24 85:3, 8 86:2 117:18 143:15 167:4 181:21 201:15 215:14 221:6 235:19 310:22
certainly 116:15 145:13 192:18 198:18 221:4
CERTIFICATE 346:2
certificates 24:10
certification 346:18
Certified 1:16 346:13, 14
CERTIFY 346:5 349:5
certifying 346:22
cetera 48:23 324:13
cGMP 81:17 125:17 141:1
chain 90:10, 15 132:4, 19, 23 134:18, 23 180:20 192:9,

15 197:22 198:3, 19, 22 205:21 206:1 211:19 212:2, 11 220:21 221:2, 5 225:4 231:23 238:4 243:16, 20 251:11, 16 257:5, 9 263:24 265:9 275:18 288:11 298:15, 21 306:22 307:3 338:22 342:10
chance 135:10 161:8 259:4 267:13 288:15
change 31:18 38:20 54:3, 5, 18 57:1 88:9 98:15 115:5, 6, 17 118:23 120:18 142:19 208:21 211:3 338:4 341:18 348:4
changed 30:18 43:12 85:4 115:4 118:18 141:20 142:11, 24 143:13 144:15, 17 146:5 241:17
changes 54:1 57:4 142:13 148:4 149:15 249:24 347:11 349:10
changing 43:7 143:6 145:23 156:4, 5 239:11
chart 202:10
cheaper 115:13 117:5,

14, 23 120:22 323:24
cheapest 115:9, 19, 22 116:7, 17 117:1, 9, 13, 22 118:7, 12 121:7 130:4 154:3, 22 195:6
check 16:16 41:11 54:15 73:17 109:10 111:13 199:15 201:12 236:5 246:2 281:14, 19 282:13 284:9 285:2, 6, 20, 24 286:15, 19 299:10 313:17
checked 202:5 284:21 285:13 333:7
checking 44:22 54:5 74:12 201:22
checks 286:18
Chemical 162:9
chemically 141:13
chemistry 22:10
Chemnitz 22:16, 18, 20 37:11, 23
Chemo 194:11
C-H-E-M-O 194:12
Chicago 3:21
chief 26:19 65:12 66:11 299:19
China 27:23 29:2 32:7 80:10 81:2 90:24 103:18 112:24 113:16, 22

128:18 136:1 139:4 160:24 161:7 162:4, 15 163:22 166:20 170:15, 19 171:16 173:4 175:13 176:1, 11 178:4 179:16 180:4 184:11 190:2 218:1 219:24
China's 183:5
Chinese 97:24 136:6, 16 137:12, 17, 20 138:1, 21 183:3 196:20 220:4 308:6, 21 310:6, 9, 10, 12, 17 311:15
chitchat 179:8
choose 335:19
choosing 83:2
Chuannan 186:1
CIPRIANI 2:16
claim 317:3
claims 314:19 316:11 317:5, 9, 11 324:13 327:4
Claire 211:20 225:6 228:16 238:5 239:4 342:11
Claire's 228:16
class 181:15
classes 23:7, 8, 11
clause 151:8 322:14 324:3
clear 19:19 44:17 188:22 261:10 342:16
cleared 127:16
clearer 247:22

close 219:16 233:24 274:20
closed 275:22 297:11
closes 165:9
COAN 3:15
codes 221:13, 15 222:3, 5 234:8
Cogan 78:14
C-O-G-A-N 78:14
colleague 43:4 159:9 193:1 285:8
colleagues 19:18, 20 45:8 107:1, 19 108:17 109:1 111:1 192:11, 20 204:2, 12 211:23 212:5 214:24 307:21 309:4, 17 343:17
college 22:4
combination 204:11
combinations 282:8
come 88:8 119:18 121:1 132:24 170:18 190:1 206:18 278:4 281:12, 17 300:2 311:19 341:7
comes 62:3 141:20 185:11
coming 41:19 43:10 45:2, 6 53:4, 23 108:18 120:2 125:9 136:4 137:19 138:17 140:23 200:20 201:3, 7 203:18

Confidential Information Subject to Protective Order

204:7   206:23
208:8   277:8
293:3   314:2
321:4   326:5
**comment**
102:20
**commercial**
29:7, 8   30:21
31:1   33:1, 3
40:23   42:6
48:17   51:11,
18   53:19
54:24   55:19
59:7   68:22
69:13   78:5,
10, 21   79:2,
14, 21   81:22
86:20   89:15
318:6, 13, 14
322:4
**commercializat**
**ion** 100:13

**commercialized**
30:1   40:3, 18
49:18, 21
53:15, 17
55:5, 18
68:14   338:24
342:13
**commercially**
112:16
**commission**
349:21
**commit** 319:10
**commitments**
319:2
**committed**
319:15
**committing**
318:4   319:1
**common** 196:6
**communicate**
250:1
**communicated**
17:1   302:23
303:1

**communicating**
38:3   246:10

**communication**
17:6   45:20
64:2
**communication**
**s** 82:12   175:4
189:5   246:5
**companies**
28:13   146:23
156:24   172:7
179:13, 19
200:8   310:18
**company**
23:23   26:1, 3,
10   28:9
48:23   58:18
64:20   95:11
96:6   98:14,
16   119:8
123:20
139:20
171:23
172:18
173:20
176:13   184:8
258:18   280:6
290:2   308:6,
14, 21   310:7,
11   311:16
312:3   328:24
**comparable**
322:8
**compare**
93:18, 22
95:14   109:20
**compared**
120:22
**comparing**
38:16   54:11
95:20
**comparison**
154:20
**competing**
56:1   58:9
115:13   130:16
**competitive**
52:16   114:6,
10, 12   115:2,
9, 10, 18, 19
116:4, 8, 22
117:3   118:13

129:16, 19, 21,
23   150:6, 10
153:9, 24
154:1   155:6,
13   322:7
**competitors**
51:23   113:8,
20   129:7, 23
**complaint**
98:18   99:2
214:3   215:23
216:14   217:3
**complete**
23:13   25:13
**completed**
23:10   260:18
**completely**
12:1   111:22
126:14
135:20
138:12
181:12   204:7
233:8
**completion**
346:8
**complex** 36:1
56:2
**compliance**
34:9   64:5
97:18   98:22
186:7   333:20
**complied**
125:16
**complies**
126:24   319:21
**comply** 59:13
**compound**
169:9   278:9
293:21
**concern**
101:10   138:3
260:18
261:11
293:19   338:3
**concerned**
174:21   337:7
**concerning**
33:12   83:18
92:10   98:2
246:11   257:21

**concerns**
99:18   103:22
109:2   142:22
235:23
340:21   343:7
**concluded**
345:17
**conclusion**
177:12   317:17
**conclusions**
98:13   111:11
**condition**
338:10
**conditions**
319:3
**conduct** 81:6
103:24   188:7
**conducted**
82:17   103:14
185:6   217:15
300:9
**conducting**
82:15   186:15
**conference**
165:18   166:9
167:2, 18, 23
180:3
**CONFIDENTI**
**AL** 1:6   9:14
256:12
272:18
279:23   319:17
**confirm**
231:19   332:7
**confirmation**
253:17
**confirmed**
219:23
**Confusing**
278:9
**CONLEE** 2:3
**connection**
17:19   93:6
179:5   295:10
296:10
312:12
315:15   317:3,
10   325:24
**cons** 48:4
120:24   292:1

**consider** 63:1
67:24   147:23
156:16   157:5
175:19
273:23   332:21
**consideration**
55:22   63:14,
22   64:1
130:7   290:20
331:11
**considered**
72:24   73:5
114:5   157:3,
22   332:13
**considering**
61:21   141:3
**considers**
60:22
**constant**
142:12
**constantly**
54:11   145:23
**contact** 41:22
45:16   165:23
**contacts** 66:4
**contain** 146:20
**contained**
223:21   224:5
248:9   290:11
291:5, 11
325:5   326:13
**containing**
227:17
341:16   342:3
**contains**
195:11
**contaminated**
249:11
**contamination**
159:23   177:3
178:1, 24
179:10, 15
182:9   184:16
185:1   189:7
191:14
217:16
221:24
277:16
316:15
319:13   325:20

**Cont'd** 3:*1*
4:*1* 6:*2* 7:*2*
8:*2* 9:*2*
**context**
198:*20*
212:*15*
300:*11* 301:*7*
**continue**
110:*15*
111:*20*
125:*15, 23*
150:*1* 278:*6*
325:*17*
329:*21* 340:*4*
**continued**
22:*15* 23:*6*
38:*2, 7* 47:*22*
72:*6* 121:*19*
122:*5, 12*
314:*8*
**continuing**
122:*18* 333:*15*
**control** 98:*16*
157:*1* 346:*21*
**convention**
171:*5* 196:*13*
**conversation**
149:*9* 172:*24*
213:*6*
**conversations**
171:*13*
**convey** 168:*2*
**conveying**
309:*3, 16*
**cooking**
276:*11*
**cooperate** 57:*8*
**copied** 193:*11*
**copy** 15:*22*
21:*10* 160:*17*
258:*1* 261:*4*
262:*17* 263:*5,
21* 266:*21*
267:*22* 268:*8,
12* 269:*3, 9,
14* 270:*18, 24*
272:*6* 273:*11*
275:*9, 13*
296:*16, 23*
297:*1*

**copying**
159:*10*
180:*23*
211:*22* 263:*1*
283:*10* 288:*6*
306:*23*
**copy-pasted**
203:*20*
**Corey** 211:*21*
**corporation**
56:*5*
**correct** 17:*10,
11, 13, 14, 21*
18:*1, 7, 8*
19:*12* 23:*23,
24* 24:*17, 18*
26:*2* 27:*16*
28:*5, 6, 19*
30:*10, 15, 16*
31:*7, 16* 32:*7,
8, 13* 33:*15,
18, 19, 23*
34:*6, 10, 11*
36:*3* 38:*15*
39:*13, 21, 22*
40:*8* 41:*1*
44:*5* 48:*24*
62:*15* 63:*9*
65:*14, 15*
68:*24* 70:*7,
20, 21* 71:*18*
82:*7* 89:*8, 9*
97:*19* 100:*15*
104:*21* 105:*2,
21* 107:*4*
109:*13*
115:*24*
116:*18* 118:*8,
24* 121:*11, 12,
22* 123:*5, 13*
132:*6, 7, 10*
134:*19* 144:*5*
145:*17* 147:*5*
149:*4* 150:*18*
151:*8* 153:*1,
22* 158:*18*
159:*10, 11, 14,
15* 162:*20, 21*
182:*2* 183:*21*
186:*17*
187:*23, 24*

189:*23, 24*
192:*12, 13*
195:*7, 17*
198:*6* 205:*22*
208:*13* 209:*1,
8* 210:*11, 14,
18* 211:*1*
218:*12*
221:*14* 222:*8*
225:*7, 8*
226:*21* 227:*3,
7* 228:*4, 11,
15, 23* 231:*4*
232:*17*
233:*20* 234:*4,
19* 235:*15, 19*
236:*14* 238:*6,
7, 18* 241:*3, 8*
242:*5* 246:*11,
12* 251:*13, 14*
257:*22* 258:*5*
259:*24* 262:*7,
11* 275:*3*
282:*15*
284:*11* 285:*3*
286:*24* 287:*1*
289:*9* 295:*16*
296:*14*
303:*12* 304:*4*
308:*24* 309:*8*
312:*24* 316:*1*
317:*1* 319:*18*
328:*19* 330:*5*
336:*19* 349:*7*
**corrected**
135:*1*
**corrections**
347:*5, 7*
349:*10*
**correctly**
36:*17* 66:*5*
71:*24* 78:*5*
83:*5* 87:*2, 11,
13* 113:*4*
119:*6* 122:*24*
135:*14, 15*
150:*20* 175:*7*
183:*18* 208:*3*
233:*23* 236:*7*
239:*19*

308:*10, 11*
313:*3*
**cost** 54:*11*
114:*6, 18*
119:*14*
153:*14*
155:*19* 210:*24*
**Costi** 77:*5*
104:*21* 105:*7*
128:*12*
**C-O-S-T-I**
77:*5*
**costing** 304:*19*
**costs** 311:*4*
316:*10*
**counsel** 12:*2*
13:*8* 18:*24*
19:*3, 11* 20:*3,
7* 50:*12* 77:*1*
136:*19*
158:*13* 192:*3*
229:*21*
230:*19* 251:*5*
315:*2* 317:*19*
328:*21, 22*
329:*19* 344:*14*
**counselor**
20:*11*
**countless**
190:*6*
**countries** 25:*6,
15* 27:*20*
135:*24* 143:*10*
**country** 57:*21*
58:*2*
**counts** 156:*3*
157:*11*
**couple** 24:*2*
35:*11* 80:*4*
152:*20* 181:*3*
277:*18* 293:*13*
**course** 54:*21*
56:*16* 58:*18*
75:*16* 90:*18*
92:*16* 95:*16*
100:*3* 108:*1*
141:*23*
146:*18*
153:*20* 187:*3*
287:*8* 302:*18*

336:*7* 338:*6,
11*
**COURT** 1:*1*
11:*14* 12:*4*
13:*13* 50:*17,
20* 106:*3*
151:*22, 24*
173:*9, 17*
322:*22* 347:*20*
**cover** 17:*4*
36:*17* 150:*21*
262:*6, 8*
310:*19* 312:*6*
313:*22*
**covering**
310:*17*
**covers** 53:*12*
56:*9, 11*
61:*15* 312:*15*
313:*23*
**Covid** 142:*16,
21*
**CPH** 167:*1*
**CPhI** 160:*24*
162:*8* 165:*8*
167:*8* 170:*24*
171:*10, 22*
182:*17* 219:*5*
**CPI** 162:*4*
**CPO** 301:*10*
**credit** 314:*6,
12, 15* 323:*3,
6, 13* 324:*2*
**credits** 315:*15*
**criteria** 322:*13*
**critical** 94:*23*
95:*1*
**criticisms**
343:*7*
**CULBERTSO
N** 3:*15*
**cultural** 136:*4,
5* 137:*9, 20*
138:*3*
**current** 8:*18*
32:*9, 14* 35:*3*
52:*6* 57:*17*
59:*13, 14*
61:*23* 125:*17*
126:*24* 128:*6*
156:*7, 21*

157:2  318:21
319:21
324:17  329:3
**currently**
123:18
126:10, 19
127:11  141:2
147:22
156:24
157:16
171:23
320:10, 14
325:21  335:21
**Curriculum**
5:18
**customer**
150:17
152:14
169:16  177:5,
18  178:13
214:2, 5
215:6, 15, 23
216:3, 13, 22
217:2, 11, 15
277:14  293:2
**customers**
170:5  177:24
178:13  249:1
273:10
316:19  322:9
323:21  326:7,
12  327:21
336:5
**cut**  304:22
**cutout**  257:20
**CV**  21:11, 14,
16  34:24
36:2  37:8
38:13, 17, 19,
23  39:8
**CVS**  326:17,
22  327:5, 21
328:6, 9  344:6
**CY11**  6:11
**CY12**  6:11
**CY13**  6:11
**CY14LE**  6:11

**< D >**

d.stanoch@kan
ner-law.com
2:5
**daily**  144:15,
18, 20
**Dalia**  87:4
160:10
**damages**
150:21, 24
151:4  154:8
316:10
**data**  42:3
74:23  75:9,
10  276:6
277:7
**database**
41:12, 13
43:6, 9, 14, 19
194:7, 21
195:5, 10
**databases**
41:11, 15  43:3
**date**  1:15
11:7  35:11
85:24  170:23
186:7  267:9
282:17
287:16  347:9
349:16
**dated**  9:20
90:11  97:9
104:20  159:8
180:22
205:18
212:18  346:15
**dates**  34:23
36:10  38:13
247:6
**DAVID**  2:3
12:16  76:8
**DAVIS**  2:8
**day**  14:11
123:23  146:2
148:8, 17
150:7  159:21
160:1  165:17
167:23
169:21
170:13, 16
175:10, 16
177:9  197:4

260:14
261:10, 20
262:15  330:7
349:20
**days**  146:3
261:24
272:15  347:16
**day-to-day**
87:23
**deal**  344:9
**dealing**  88:2
139:3, 9
141:5  143:9
165:1
**dealings**  65:7,
8  66:20
**dear**  193:9
206:6  225:19
232:4  288:14
**December**
31:4  35:19
37:2, 5, 17
39:6  319:10
**decide**  189:19
241:19  242:7
243:3  291:14
**decided**
242:11
280:17  291:23
**decision**  42:13,
19, 23  47:10
53:5  54:18,
20  56:3
57:14  119:18
120:3  126:16
128:7  139:19
156:8  157:12
242:15
291:13  334:10
**decisions**
58:22  108:14
139:11  331:9
332:17  344:2
**DEDAJ**  3:3
**deemed**
347:19
**Deepak**  295:7
**defend**  23:18
**Defendant**
3:12, 18, 23

**Defendants**
2:13, 19  3:5
**defer**  344:1
**defined**  73:21,
23  88:17
317:5, 12
318:24
**definitely**
58:19  130:3
154:21
282:16  315:4
**degree**  22:11
**degrees**  24:2
**delicate**
135:12, 18
136:8  138:15
**deliver**  332:4,
8
**delivered**
130:24  255:6,
13
**deliveries**
56:9  194:4, 8
195:13  311:5
**delivery**  47:1
**demand**  6:18
30:21  318:13,
14  319:11
320:10
**department**
54:22  62:20
63:3, 8, 16, 21
72:5  81:24
82:9  102:20
127:21, 23
188:12  204:2
206:24
245:19
253:22
259:22  260:1
264:13  265:6
337:7  340:1,
23  343:22
**departments**
62:21  63:9
64:3  303:2
**depend**  57:16
93:13  139:24
141:16  157:14
**depending**
44:15  45:22

51:9  61:3
93:15  111:9
114:9  157:20
167:4  295:6
**depends**
51:12  53:21
55:8  115:15
140:17
154:17  241:14
**deponent**
11:16  18:19
349:2
**deposed**  13:2
**deposing**
347:16
**deposition**
1:13  5:17
10:2  11:9, 19
12:24  13:6
15:22, 23
18:13  19:1, 4,
15, 19, 24
20:5  49:9, 20
51:1  65:2
245:7  248:17
264:24
345:14, 17
346:6, 8, 9
347:3, 13, 17,
19
**deps@golkow.c
om**  1:21
**describe**  41:5
81:4  138:5
142:23
**described**
139:14  333:13
**DESCRIPTIO
N**  5:15  6:5
7:5  8:5  9:5
**designated**
246:4
**despite**  124:14
**details**  73:17
81:9  175:21
213:13  250:1
259:16
263:12
280:19  328:3
**detect**  237:2

detection
237:8
detergents
23:4
determine
74:20
develop 50:7
240:2
developed
25:16 289:20
343:11
developing
30:22 144:14
240:7 249:19
254:7 341:9
development
41:18 42:7,
15 46:14
47:18 67:9,
11, 15, 22
developments
239:10
difference
95:21 120:24
327:10
different
44:14 53:15
72:17 86:9
93:2, 15 94:1
96:14 109:17
142:3, 7
154:13, 18
161:20
176:22 177:8
221:12 235:9
240:9 303:10
305:21 309:5
315:11
differentiators
55:24 58:11,
13, 16
differently
32:18 109:20
207:17 260:11
difficult 58:21
73:18 138:7
253:12
332:14 335:18
dig 74:22
dinner 163:7,
23 165:6, 10,

12, 16, 18, 24
166:9 167:1,
14, 17, 24
168:5, 20
170:9 175:5,
11 176:1
178:5 179:17
195:23
196:16 197:5
213:3, 7
dinners 196:20
diploma 22:10
direct 32:18
42:11 45:24
64:2 153:13
212:14 299:1
346:21
Direction 10:5
directly 55:13
66:7 81:10
88:1 89:16
91:1 94:16
153:18
164:23
165:11 204:8
206:23
219:10
277:19
316:18 328:2
director 30:13
31:14 32:4
35:13 36:5,
23 39:20
46:12 68:5,
13, 19 73:2
84:14 97:18
121:8 228:5
269:22, 24
287:4
disadvantage
129:16
disappeared
40:11
disclose
269:19
disclosed
271:16
discontinue
335:8
discontinued
330:3

discovered
207:5 215:8
265:10
discovery
39:12 49:14
51:2 218:20
discuss
167:12 168:8
311:18
discussed
84:1, 6
168:19
179:14
199:12
242:13
272:24
338:22 342:10
discussing
173:24 333:5
discussion
42:11 45:11
47:11 100:3
199:24 200:4
236:24 321:5
326:24
333:16 342:1
discussions
45:23, 24
67:4, 6 68:4,
10 83:22
88:12 89:19
192:19 200:6
237:2 272:14
321:1 328:3
dishonest
103:5, 11
dispute 311:21
dissolution
92:20
distinction
227:18
distinctions
35:12
distribution
92:15 108:4
111:15
338:17 339:6,
17 340:3, 9
DISTRICT
1:1 11:14

DOCUMENT
1:6 15:10
21:3 38:14
74:20 86:8
89:22 90:8
104:10, 15
131:11, 16
134:24 144:9
152:16
158:23 159:4
160:23 180:8,
10, 17 191:23
197:11, 19
205:9, 14
211:9 220:12
224:21 225:2
228:13 229:2
237:20 243:8
250:4 256:19
257:2 282:22
287:22 298:5
302:1 306:9
313:10, 16
321:8 328:14
344:11
documentation
56:23 81:15
127:24
Documents
10:8 15:16
18:15 19:23
20:3, 14 75:9,
16 202:1
255:21
282:19
287:15 292:10
doing 24:21
26:5 54:6
61:1 102:23
135:24
138:18 139:6,
7 143:24
150:1 166:15
196:23 252:6
253:10
254:21
255:10, 24
266:8 267:4
281:9 309:21
310:8 347:8

dollars 75:19
155:20 304:20
dosage 25:11
27:9 31:2
42:9 44:16
67:11 68:8
120:12
dose 16:24
17:3 27:13
30:4 33:13,
18, 22 66:10
68:12, 14, 21
69:12, 19
70:19 118:4
127:9 153:15
202:19
223:20 224:4
248:8 290:10
291:4, 10
321:17 325:4
326:12 339:7
341:17
doses 25:3
dotted 91:3, 7
doubts 61:12
drug 61:15
drugs 258:11
DUANE 3:1
Dubnitsa 6:22
Due 11:22
196:22
duly 12:9
346:5
Dupnitsa
123:5, 6, 11,
17 202:18
311:2
dynamic
144:24
145:22 202:5

< E >
EAR 276:22
earlier 17:13
44:20 62:7
112:3, 5, 11
170:12 177:1
183:10 185:4,
13 186:13
217:23
239:10

255:*16*
259:*21*
261:*12*  272:*1*
331:*21*
**earliest**  257:*14*
**early**  47:*17*
51:*10*  67:*16*
85:*1*  87:*11*
171:*2*  184:*20*
245:*13, 16*
285:*1*  291:*19*
293:*15*
**easier**  313:*6*
**easiest**  43:*18*
**easily**  94:*15*
110:*21*
111:*11*
135:*23*
340:*11, 16*
**easy**  36:*16*
42:*16*  80:*8*
96:*11*  111:*16*
335:*22*
**economics**
24:*9*
**EDQM**  218:*19*
**education**
21:*21*  22:*1*
37:*10*  39:*3*
**educational**
20:*21*
**Efeldman@c-**
**wlaw.com**
2:*18*
**effect**  177:*7*
254:*20*
**effectiveness**
114:*19*
**effects**  62:*14*
**efficacy**
331:*13*
332:*16*  333:*1,*
*21*  334:*2*
**effort**  119:*9*
156:*10*
157:*12*  334:*9*
**EHS**  183:*7*
184:*1*
**eight**  182:*16*
**EIR**  262:*6*
264:*7*  265:*23*

270:*8, 15*
271:*2, 9, 10*
274:*21*
275:*20*  276:*9,*
*22*  277:*6*
280:*10, 15, 21,*
*23*  297:*12, 20*
**Either**  16:*8*
73:*13*  93:*19*
176:*8*  268:*20*
315:*7*
**eliminated**
337:*9*
**EMA**  300:*2*
**E-mail**  5:*18*
6:*6, 7, 12, 17,*
*20*  7:*6, 9, 13,*
*17, 19*  8:*6, 9,*
*12, 17, 19*  9:*6,*
*8, 11*  90:*9, 14*
91:*15*  92:*11,*
*13, 24*  93:*10*
94:*1*  97:*8, 22*
98:*8, 9, 10, 13*
99:*7, 10, 15,*
*20*  100:*17, 23,*
*24*  104:*19*
106:*8*  111:*1*
112:*20*
128:*11*  132:*4,*
*19*  133:*2, 22*
134:*17, 22*
135:*1, 4*
159:*7*  161:*6,*
*19, 23*  163:*10*
168:*10, 14*
170:*10*
180:*20*  181:*4*
182:*5, 14*
183:*1, 18*
187:*6*  192:*9,*
*14*  195:*7, 17*
197:*21*
198:*12, 15, 22*
200:*11*
201:*18*  202:*9*
203:*17, 20, 24*
205:*17, 21, 24*
208:*19, 23*
209:*18, 24*
210:*7*  211:*19*

212:*2, 8, 17,*
*21*  213:*10, 12*
215:*21*  216:*9*
217:*20*  218:*8*
219:*8*  220:*21*
221:*1, 5*
222:*4*  223:*5,*
*10, 16*  225:*4*
226:*9*  227:*4,*
*6, 12, 22*
228:*16, 20*
231:*8, 12, 16,*
*23*  232:*6, 14*
233:*16*  234:*7,*
*22*  235:*18*
236:*16*  238:*4,*
*20*  239:*3*
243:*16, 20*
247:*1*  250:*13,*
*14*  251:*11, 16*
253:*14, 24*
257:*4, 8*
261:*15, 20*
262:*12*
263:*15, 24*
265:*8*  267:*11,*
*19, 21, 22*
274:*6, 24*
275:*18, 19*
283:*10, 14, 18*
284:*4, 12*
285:*16*
286:*20*  288:*6,*
*10, 16*  289:*4*
295:*1*  298:*15,*
*20*  299:*7*
301:*13, 14*
306:*22*  307:*3*
338:*22*  341:*5*
342:*10, 15, 17*
**e-mailing**
199:*5*  206:*5*
212:*5*  228:*8*
257:*19*
**e-mails**
109:*12*  190:*7*
223:*8*  247:*11,*
*18*  252:*18, 23*
264:*2*  267:*1*
275:*6*  293:*13,*
*24*  294:*9*

297:*19*
300:*22*
301:*15, 21*
302:*5*  334:*22*
341:*24*
**e-mail's**
226:*23*
**employee**
133:*10*
**employer**
66:*14*
**encompass**
27:*5, 21*
**encompassed**
87:*17*
**endanger**
338:*12*
**ended**  37:*16*
171:*1*  196:*10*
271:*2*
**endurance**
14:*12*
**energy**  119:*9*
**engaging**  66:*8*
333:*23*
**English**  152:*6*
184:*5*  265:*13*
315:*1*  330:*14*
**ensure**  11:*24*
308:*15*
**ensuring**  34:*8*
322:*14*
**entail**  32:*15*
**enter**  47:*16*
**entered**  47:*12*
150:*15*
320:*18, 22*
327:*15*
**entities**
312:*10*  328:*5*
**entitled**  230:*12*
**entity**  64:*18*
328:*9*
**environment**
184:*10*
**environmental**
184:*2, 3, 9*
**equal**  58:*8*
130:*12*
**equivalent**
22:*3*  24:*11*

**errata**  347:*6,*
*9, 12, 15*
349:*12*
**especially**
74:*17*  83:*23*
112:*18*  137:*4,*
*5*  141:*10*
146:*10*  149:*7*
167:*8*  169:*21*
173:*2*  175:*15*
223:*10*
232:*22*  260:*7*
310:*5*  320:*13*
330:*12*  336:*13*
**ESQ**  2:*3, 8, 9,*
*16*  3:*3, 9, 15,*
*20*
**essentially**
28:*18*  110:*3*
**establish**
333:*19*
**established**
188:*3*  334:*3*
**establishing**
49:*12*
**estimation**
51:*10*
**et**  48:*23*
324:*13*
**ETHAN**  2:*16*
**Europe**  12:*23*
29:*14*  46:*5, 6,*
*12*  49:*19*
68:*6, 13, 19*
112:*24*  118:*1*
128:*17*
162:*11*  193:*3,*
*5*  224:*16*
**European**
1:*15*  25:*6, 15*
29:*11*  30:*10*
39:*22*  123:*7,*
*10, 12, 17*
124:*1, 16*
138:*19*
202:*19, 24*
233:*8*  238:*23*
319:*24*  339:*3*
342:*19*  345:*19*
**evaluate**
65:*18*  109:*9*

110:*4* 120:*20*
236:*5*
**evaluated**
53:*8* 67:*5*
**evaluating**
61:*24* 62:*8*
66:*23* 120:*1,*
*13* 140:*3, 16*
**evaluation**
42:*2* 140:*7*
141:*15* 144:*1*
156:*2, 20*
321:*11*
**evening** 163:*6*
**event** 162:*6, 8,*
*10, 20* 167:*13*
**events** 162:*13*
167:*8* 248:*11*
**Eventually**
178:*8* 223:*14*
282:*1*
**evidence**
249:*16*
**ex** 7:*11*
**exact** 51:*19*
55:*9* 67:*2*
115:*16*
140:*18*
170:*23*
188:*18* 196:*5*
246:*20* 247:*6,*
*8* 255:*22*
267:*8* 282:*17*
287:*15* 295:*6,*
*19* 315:*3*
**exactly** 29:*1*
39:*4* 91:*18*
118:*10* 154:*7*
175:*22*
177:*22* 202:*3*
222:*23*
236:*23*
237:*13*
271:*21*
272:*21* 296:*4*
325:*13*
**EXAMINATIO
N** 12:*12*
330:*22*
**examined**
12:*10*

**example**
61:*16* 157:*15*
255:*16*
333:*10* 335:*13*
**examples**
116:*12*
120:*11* 130:*6*
136:*11* 145:*12*
**exchanged**
341:*24*
**excipients**
31:*24* 32:*6*
**exclude** 140:*10*
**excluding**
139:*12*
**Excuse** 44:*4*
80:*1* 244:*6*
282:*11*
**Excused**
345:*16*
**executed**
313:*18*
**Execution**
9:*16*
**exhibit** 15:*8,*
*11, 15* 20:*17,*
*20* 21:*4*
38:*13* 88:*20*
89:*23* 90:*6*
96:*17* 99:*5*
104:*5, 11*
105:*2, 9*
112:*21*
128:*10* 131:*8,*
*12* 158:*20, 24*
180:*11*
190:*12, 22, 24*
191:*1, 24*
197:*10, 12*
205:*6, 10*
211:*10*
220:*11, 13, 19*
224:*19, 22*
226:*20*
233:*12, 21*
237:*21* 238:*1*
243:*6, 9*
250:*5* 251:*8*
256:*18, 20*
282:*23*
287:*23*

297:*23* 298:*6*
306:*7, 10*
313:*11*
328:*15*
338:*14, 19*
341:*15, 21*
**existing** 44:*22*
53:*20* 54:*1, 6,*
*8, 13* 186:*4,*
*20* 187:*1, 12*
195:*14* 314:*7*
316:*11* 336:*1*
337:*18* 338:*9*
**expanded**
254:*8*
**expect** 101:*15,*
*23* 184:*21*
223:*12* 256:*4*
265:*5* 303:*5*
332:*7* 342:*18*
**expectation**
233:*2, 3*
302:*16*
**expected**
254:*9* 272:*2*
305:*21* 323:*15*
**expensive**
208:*1, 11, 15*
209:*12*
210:*10, 17*
**experience**
34:*24* 35:*1*
56:*22* 57:*6*
93:*11* 108:*6*
109:*15*
110:*20*
111:*14*
113:*23* 129:*4*
138:*21*
139:*17*
142:*16*
331:*14* 340:*8,*
*15*
**experienced**
290:*1*
**expired**
227:*15*
231:*18* 236:*4*
**expires** 349:*21*

**explain** 67:*12*
138:*6* 184:*4*
310:*3*
**explaining**
278:*11*
**explains** 92:*2*
**explanation**
57:*23* 278:*23*
279:*13, 15*
280:*9*
**exporter**
112:*23*
**exporters**
113:*16* 128:*17*
**expression**
152:*4*
**extent** 17:*17*
254:*13* 317:*16*
**external**
25:*17, 20*
41:*13* 43:*3,*
*17* 161:*21*
343:*18*

**< F >**
**facilities**
27:*15, 17*
70:*17, 24* 71:*4*
**facility** 31:*5*
69:*14, 18, 24*
70:*3, 6, 8, 12,*
*13* 71:*1, 6, 9,*
*14, 15, 17, 20,*
*22* 72:*2, 8*
83:*4, 13, 20*
84:*8* 112:*13*
118:*19, 24*
121:*14, 19*
122:*5, 12, 20*
123:*4, 5*
186:*2* 221:*8,*
*23*
**fact** 74:*10*
92:*7* 113:*14*
144:*17*
148:*15*
207:*23*
230:*14* 246:*9*
269:*19*
296:*24* 306:*2*
317:*19* 337:*6*

**factor** 59:*6,*
*16* 60:*2, 8, 19*
61:*5, 12*
92:*19* 142:*11*
**factors** 60:*13,*
*22* 61:*2*
130:*21, 22*
331:*7, 11, 19*
332:*13*
**facts** 139:*11*
145:*22* 261:*2*
262:*2*
**fail** 347:*18*
**failed** 98:*14,*
*17* 99:*1*
**failure** 98:*14,*
*24*
**failures** 258:*19*
**fair** 13:*21, 22*
14:*3, 4* 29:*23,*
*24* 30:*5, 6*
33:*7, 10* 37:*9*
38:*12* 44:*13*
45:*19* 46:*22,*
*23* 82:*15, 16*
128:*23*
134:*16*
165:*11*
166:*14*
196:*23*
203:*21* 286:*11*
**fairly** 340:*10*
**FALKENBER
G** 3:*20*
**fall** 268:*4, 14*
269:*4* 293:*15*
**falls** 187:*7*
**familiar** 13:*7*
34:*1* 64:*17*
77:*4* 181:*7*
188:*4, 9*
**family** 199:*17*
**far** 68:*16*
83:*15* 85:*14*
86:*6* 100:*14*
112:*15*
121:*16*
122:*11* 142:*4*
161:*22*
163:*12*
167:*15*

174:*12*
187:*14*
189:*15*
201:*14* 203:*5,
16* 254:*2, 4*
255:*14*
256:*11, 12, 13,
15* 262:*2*
267:*23* 269:*8*
280:*2* 285:*16*
295:*22, 24*
296:*4, 13*
299:*21* 321:*5*
326:*17* 327:*24*
**farther** 135:*4*
**favorable**
295:*21*
**favored** 151:*7*
**fax** 1:*20*
**FDA** 126:*3*
188:*7, 24*
258:*4, 9*
259:*14* 260:*5*
261:*5* 262:*18*
263:*5, 22*
264:*7, 16*
266:*12, 22*
267:*13, 17, 22*
268:*2, 8*
269:*19* 270:*7*
271:*8* 272:*7*
274:*19*
275:*23*
276:*21*
279:*19, 21*
280:*2, 10, 12,
14* 281:*2*
295:*8, 13, 17,
20* 296:*9*
297:*2, 9*
299:*7* 300:*1,
8, 19* 302:*20*
**FDA-483** 8:*18*
**FDA's** 259:*11*
268:*13*
**February**
25:*24* 36:*7*
**feedback**
108:*18*
175:*18*
225:*20*

234:*24*
302:*11, 19*
**feel** 247:*7*
**feeling** 102:*6*
137:*8*
**feelings** 138:*9*
**FELDMAN**
2:*16*
**fhs@pietragall
o.com** 3:*12*
**fields** 24:*7, 8*
**file** 6:*22*
**final** 54:*17*
63:*15, 22*
177:*12*
324:*11* 327:*3*
**finalized**
320:*24*
326:*23* 327:*15*
**finally** 201:*22*
**financial**
310:*12*
**find** 44:*11*
54:*7* 109:*23*
110:*17* 144:*1*
172:*3, 9*
174:*23* 182:*6*
193:*21*
201:*24*
225:*19*
226:*18*
249:*24* 274:*8*
279:*11*
281:*10* 316:*2*
343:*18*
**finding** 161:*8*
172:*11*
**findings** 303:*5*
**fine** 18:*5*
20:*15* 22:*7*
44:*4* 64:*23*
71:*16* 76:*13*
109:*22* 145:*7*
188:*21* 197:*2*
212:*9* 266:*2*
270:*17* 271:*4,
12* 273:*2*
275:*22* 276:*1*
277:*20*
280:*17*
297:*13* 317:*20*

**finish** 38:*5, 7*
196:*17* 250:*13*
**finished** 16:*24*
17:*3* 24:*13*
25:*2, 11* 27:*9,
13* 30:*4* 31:*2*
33:*13, 18, 22*
42:*9* 44:*16*
56:*20* 59:*3*
65:*23, 24*
66:*10* 67:*11,
15, 24* 68:*8,
12, 14, 21*
69:*12, 19*
70:*19* 73:*24*
92:*21* 95:*2*
118:*4* 119:*15*
120:*12* 123:*9*
127:*9* 153:*15*
202:*19*
223:*20* 224:*4*
227:*17*
231:*12* 248:*8*
290:*9* 291:*4,
10* 318:*7*
321:*17* 325:*4*
326:*12* 339:*7*
341:*17*
**firm** 344:*13*
**first** 12:*9*
15:*8* 18:*17*
23:*19* 24:*15,
22, 23* 41:*23*
42:*1* 56:*4, 7*
65:*6, 8* 66:*4*
89:*10* 91:*15*
93:*24* 102:*19*
105:*19* 119:*1,
10* 124:*20*
159:*17, 21*
163:*8* 185:*2*
193:*7* 207:*15*
208:*7* 212:*18*
213:*22* 217:*3*
219:*2* 227:*9*
231:*5* 236:*21*
238:*22*
243:*23* 244:*1,
3* 252:*23*
256:*10*
261:*15, 21*

263:*5* 264:*15*
265:*10*
278:*12, 19*
281:*22*
283:*22, 23*
286:*2* 288:*23*
289:*15*
290:*13*
291:*12*
312:*22*
318:*12* 336:*18*
**fit** 260:*8*
**fits** 157:*1*
**five** 19:*5*
76:*1, 3, 5*
**fixed** 51:*19*
125:*13*
**flip** 234:*14*
321:*10*
**Floor** 3:*10, 16*
**Fluch** 79:*7*
86:*4, 10*
87:*14* 159:*9*
160:*6* 161:*1*
163:*3* 164:*3*
166:*16* 168:*1,
3* 180:*23*
197:*6* 198:*5,
9* 246:*8, 13*
283:*10, 18*
284:*1* 288:*6,
13* 289:*5*
293:*15*
294:*10* 295:*2*
306:*24*
**F-L-U-C-H**
79:*8*
**Fluch's** 285:*4*
288:*21*
**focus** 22:*23*
32:*20* 33:*2*
39:*15* 49:*19*
84:*21* 118:*3*
189:*9* 212:*17*
**focused** 31:*21*
32:*24* 33:*8*
55:*16* 86:*15*
178:*3* 326:*6*
**focuses** 39:*11*
**focusing** 44:*7*
84:*13* 251:*23*

**folder** 15:*16,
19*
**folks** 48:*22*
55:*6* 107:*19*
109:*3*
**follow** 54:*5*
187:*18*
242:*24* 261:*9*
265:*8* 289:*13*
**followed**
262:*15*
**Following**
6:*18* 98:*15*
177:*10*
199:*16*
293:*16* 294:*9*
340:*23* 341:*4*
**follows** 12:*10*
**follow-up**
190:*2* 223:*4,
18* 331:*3*
340:*19*
**follow-ups**
223:*9, 11*
**forced** 54:*3*
57:*4*
**foregoing**
346:*18* 349:*6*
**forget** 195:*21*
**forgive** 175:*2*
**form** 18:*3*
25:*11* 42:*9*
44:*16* 49:*7*
59:*22* 63:*11*
67:*11* 68:*8*
75:*6* 89:*4*
103:*8* 105:*16*
107:*24* 110:*7*
113:*12*
120:*12* 124:*3,
19* 153:*3*
204:*20*
229:*22* 230:*3,
7, 13, 16*
249:*15*
263:*15, 22*
268:*17*
280:*22* 310:*1*
332:*19*
334:*15*
335:*11*

Confidential Information Subject to Protective Order

337:*13*
339:*20*
340:*13*  342:*5*
349:*10*
**formal**  43:*20*
**formally**  66:*14*
**formed**
200:*22*
278:*24*  279:*4,*
*15*
**forms**  27:*9*
31:*2*
**formulated**
206:*18*
**formulation**
44:*24*
**forth**  205:*21*
319:*4*
**forward**
40:*24*  47:*10*
55:*17*  81:*23*
84:*15*  85:*18*
141:*7*  333:*3*
**forwarded**
160:*19*  161:*1,*
*5*  170:*11*
**forwarding**
161:*3*  187:*6*
**found**  168:*23*
169:*11, 14*
174:*13*
177:*20*
207:*11*
240:*10*
241:*18*  258:*9*
260:*19, 23*
261:*11*  264:*4*
265:*24*
278:*13, 20*
279:*9*  281:*5,*
*10*  282:*5*
**Foundation**
224:*9*  232:*19*
**four**  19:*5*
**Fourth**  5:*16*
**four-year**
22:*3, 6*
**frame**  332:*5*
**FRANK**  3:*9*
**free**  247:*7*

**freely**  185:*20*
**front**  251:*9*
**full**  37:*7*
56:*10*  98:*12*
128:*1*  130:*24*
140:*7*  163:*2*
175:*15*
262:*11, 13*
264:*3*  266:*5,*
*11, 17*  297:*21*
307:*4*  318:*2*
**fully**  22:*5*
116:*1*  136:*15*
137:*16*  152:*5*
165:*7*  203:*12*
204:*16*  205:*1*
249:*19*
260:*20*
279:*21*  296:*18*
**function**  78:*7*
82:*11*
**functions**
181:*11*
**further**  23:*11*
175:*8*  198:*2*
202:*8*  214:*15,*
*16*  225:*10*
258:*17*
276:*10*  308:*4,*
*20*  313:*5*
325:*22*  345:*5*
**future**  52:*5*
88:*9*  100:*4*
105:*14*
106:*12, 21, 23*
107:*4*  111:*4*
210:*22*
316:*12*  319:*1,*
*16*

**< G >**
**Gallagher**  4:*4*
**Gcoan@hinsha**
**wlaw.com**
3:*17*
**general**  26:*8*
114:*23*  115:*7*
135:*21, 23*
137:*9, 11*
140:*15*
172:*15*  183:*3*

188:*5, 6*
310:*14*
320:*12*  330:*1*
**generally**
24:*21*  26:*5*
27:*20*  49:*1*
81:*5*  114:*21*
137:*17*  147:*3,*
*17*  150:*6*
188:*4, 9*
196:*16*
207:*20*  212:*4*
326:*10*  331:*5*
**generic**  25:*14*
26:*3*  48:*7*
52:*11, 12*
58:*17*  74:*9*
75:*4, 19*
**Generics**  28:*4*
29:*6*
**Genotoxic**
7:*10*  168:*23*
174:*14*
175:*23*  207:*5*
**gentlemen**
277:*12*
**GEOFFREY**
3:*15*
**Georgia**  2:*11*
**German**  26:*3*
28:*12*
**Germany**
23:*16*  25:*5,*
*14*  28:*5*
31:*13*  170:*20*
**Gervan**  79:*18,*
*20*
**G-E-R-V-A-N**
79:*18*
**getting**  49:*8,*
*14*  99:*12*
290:*5*  293:*17*
**Gili**  77:*21, 22,*
*23*
**G-I-L-I**  77:*22*
**Give**  15:*19*
38:*6*  39:*1*
40:*9*  78:*16*
100:*21*  128:*7*
135:*10*
136:*10*  169:*1*

215:*18*  229:*9*
230:*13*
238:*19*
262:*10*
263:*12*  272:*6,*
*10*  274:*7*
275:*13*
296:*15*  298:*2*
300:*13*
307:*11*  334:*10*
**given**  30:*5*
49:*11*  52:*23*
82:*8*  146:*2*
154:*23*  241:*2,*
*7*  278:*7*
332:*4, 22*
333:*8*  337:*22*
346:*6*  349:*8*
**gives**  141:*1*
**giving**  168:*11*
230:*15*  263:*21*
**glance**  94:*1*
**Global**  6:*9*
29:*16*  30:*14*
31:*14, 22*
32:*5*  35:*13*
36:*5, 24*
72:*12, 14, 23*
73:*2*  84:*14,*
*23*  85:*12*
91:*6*  121:*9*
139:*4*  161:*11*
162:*10*
269:*22*  270:*1*
287:*4*  318:*6*
**globally**
161:*17*
325:*12, 14*
**GMP**  34:*2, 8*
59:*14*  61:*23*
128:*6*  157:*2*
318:*21*  319:*21*
**GNTM-CORP-**
**QRM-2018**
8:*8*
**GNTM-CORP-**
**QRM-2018-**
**018**  6:*21*
**go**  13:*5*
20:*20*  21:*20*
28:*15*  42:*15*

44:*11*  47:*10*
50:*14*  69:*4*
76:*10, 14*
80:*16*  83:*9*
91:*15*  95:*16*
106:*4*  133:*15*
137:*2*  154:*13*
163:*19*
165:*11*
167:*24*  170:*7*
173:*19*
175:*11*
185:*17*
195:*22*  196:*8,*
*9*  231:*22*
238:*20*
247:*10*
250:*18*  276:*3*
298:*11*  303:*8*
320:*2*  332:*19*
339:*11*  340:*13*
**Goa**  106:*10*
**goes**  42:*1*
73:*24*  123:*21*
170:*10*
**going**  15:*7*
18:*18*  20:*19*
49:*6*  50:*3, 4*
51:*16*  53:*2*
57:*4*  58:*10*
76:*11*  83:*8, 9*
85:*18*  92:*22*
96:*16, 21*
104:*4*  106:*2,*
*3*  108:*18*
140:*15*
141:*16*
151:*12*
158:*19*  166:*8*
168:*16*  172:*5,*
*11*  173:*7*
180:*7*  189:*4*
198:*21*
208:*11*
210:*16*
212:*17*  243:*5*
250:*7, 9*
276:*4, 7*
277:*11, 13*
281:*13*

Confidential Information Subject to Protective Order

305:24  312:5
315:23
**GOLKOW**
1:20  11:5
**good**  34:4
38:21  39:9
63:1  76:9
103:1  114:1,
3, 15  118:2
129:5  153:22
155:11
180:19  243:2
259:19
265:20  266:4,
7  269:13
270:20, 21
273:3, 9
274:1  277:9
279:14  280:8,
18  297:11
304:20  305:2,
7  306:18
320:1  336:15
**GORDON**  3:7
**gosh**  277:23
**government**
183:6
**grade**  202:19
**gradually**  85:4
**graduate**  22:2
**graduation**
22:8
**granular**
197:3
**Gray**  1:15
12:5  322:20
346:12
**Great**  15:21
160:22  257:13
**green**  141:2
319:7
**GREENBERG**
2:8  9:17
**group**  84:18
97:18  98:22
103:21  186:14
**group's**  186:18
**grown**  335:17
**guarantee**
332:24

**guess**  24:16
126:7  144:8
165:14
244:10
296:19
301:17  334:11
**guiding**  22:17
**Guillem**
180:21
**guy**  164:22
237:11

**< H >**
**Hagen**  24:3
**H-A-G-E-N**
24:3
**half**  151:14
**hand**  23:17
191:6  312:23
324:24
**handed**  160:10
**handle**  72:18
166:16
**handled**  45:20
**handling**
232:21
**happen**  34:22
67:16  165:19
310:17
**happened**
23:18  28:11
38:9  110:18
125:6  202:3
217:22
224:14  254:7
259:5  270:22
272:22  297:10
**happening**
165:8  173:3
248:20  290:7
292:20
**happenings**
289:22
**happens**
166:12
167:10  290:3
**hard**  300:21
**harder**  145:8
293:12
**harmonize**

119:13
**hasty**  110:4
**Hauhai**  226:4
**HCl**  235:12
**head**  31:14
32:5  36:5, 23
299:1
**heads-up**
168:11
**health**  143:8
144:18  184:3,
6  187:20
318:22  319:6,
22  328:23
**Healthcare**  3:7
**hear**  50:10
89:8  165:3
177:23  178:7
187:3  303:2
**heard**  12:1
104:3  106:8,
10, 21  107:8
108:2, 3
111:7, 9
169:19  170:1,
3  172:3, 20
174:9, 16
177:2, 17
217:24
219:10, 19
220:6  277:24
297:14  306:3
**hearing**
105:13  111:2,
6  178:12
179:7
**heart**  16:20
222:19
224:13  248:5,
10  290:14
**hectic**  200:10
**held**  1:14
11:10  162:11
**Hello**  12:15
**help**  22:1
84:15  144:9
161:3  247:7
**helped**  82:5
215:7  217:7
**helping**  23:5
185:19

**hesitancy**
139:3, 22
140:13  141:5,
9
**hesitant**
334:24
**Heumann**
26:7  39:5
**hey**  286:16
**Hi**  91:21
193:21  238:8
303:20
**high**  164:24
323:12
**higher**  151:1
154:14
278:21  286:6
295:4
**highest**  164:21
**highly**  279:22
**HINSHAW**
3:15
**hint**  109:23
**historical**
74:23
**history**  56:5
102:1, 10
135:22
138:18, 21
139:17  273:14
**hitting**  138:1
156:23  270:13
**hold**  189:12,
17, 21, 22
**holiday**  171:4
**HON**  1:4
**honest**  100:18
102:11, 14
295:24
**honor**  272:5
**honored**
201:11
**hope**  149:22
154:6  176:21
263:13
**hopeful**  302:14
**Horizon**  43:18
**hotline**  161:6,
10, 15, 16
**hour**  76:12
151:13

**hours**  20:11,
13
**Huahai**  3:6
5:20  6:7
7:11, 15  9:10,
13  64:18
74:4  91:11
98:1  99:11
106:11, 20, 23
107:3, 12, 13
110:13
112:22
113:15
116:22
117:23
126:22  135:5,
7  148:1
174:9, 12
194:23
195:16
199:16
212:23  215:7,
22  216:13
219:1  227:17
235:5, 10
236:5  252:6
253:10
260:10, 18
299:22  301:2,
13  304:9, 10,
13, 14  307:23
308:5  316:16
322:8
**Huahai's**
106:9  214:2
316:9
**huge**  277:14
341:11
**Humana**  3:23
**hundreds**
209:2  210:3
223:7, 8
248:22
**hurt**  100:3
152:23
**hyphen**  78:3
**hypothetical**
128:8
**hypothetically**
127:5

Confidential Information Subject to Protective Order

**< I >**
**idea** 23:*19*
38:*5* 51:*24*
311:*3, 7*
**ideas** 44:*21*
57:*19* 88:*8*
200:*19* 201:*1*
216:*10*
**identification**
15:*11* 21:*4*
89:*23* 104:*11*
131:*12*
158:*24*
180:*11*
191:*24*
197:*12*
205:*10*
211:*10*
220:*13*
224:*22*
237:*21* 243:*9*
250:*5* 256:*20*
282:*23*
287:*23* 298:*6*
306:*10*
313:*11* 328:*15*
**identified**
107:*20*
217:*15*
221:*11* 269:*20*
**identifies**
183:*19*
**identify** 41:*6*
190:*19* 191:*15*
**identity** 328:*8*
**I-e** 321:*11, 13*
**ignore** 273:*10*
**ignored**
258:*10*
**Igor** 97:*8, 14*
99:*3*
**II-c** 316:*5*
317:*12*
**III** 317:*23*
319:*1*
**Illinois** 3:*21*
**imagine** 293:*1*
**immediate**
201:*17*

**immediately**
140:*10*
242:*10*
285:*24*
290:*23* 337:*19*
**impact** 6:*22*
63:*5* 153:*14*
308:*23* 309:*22*
**impacted**
221:*14, 16, 24*
222:*3, 15*
223:*6* 226:*2*
233:*19*
234:*10* 235:*2,*
*13* 339:*7*
**imperative**
347:*14*
**implement**
32:*20*
**implementation**
32:*5*
**import** 126:*3,*
*10*
**importance**
73:*20*
**important**
7:*10* 58:*15,*
*19, 20* 59:*6,*
*16* 60:*2, 7, 12,*
*15, 19, 22*
61:*6, 12*
72:*21* 73:*9,*
*10* 74:*1, 5*
85:*6* 92:*17,*
*19* 96:*8*
147:*3, 9, 23*
148:*19*
149:*10, 20*
150:*3* 168:*7*
195:*8* 210:*15*
248:*13* 261:*9*
269:*18*
286:*22* 287:*2,*
*9*
**imprecise**
46:*17* 165:*15*
186:*12*
**improve**
120:*14* 184:*12*

**impurities**
160:*3* 207:*11*
282:*9* 316:*17*
**impurity** 7:*10*
8:*22* 9:*7*
16:*16* 17:*19*
125:*5, 21*
126:*17*
137:*24*
146:*11*
168:*24* 169:*3*
174:*13* 175:*1,*
*17* 183:*14*
200:*20* 201:*7*
207:*5, 21*
237:*3* 283:*21*
304:*11* 305:*3,*
*5* 314:*10*
318:*19* 339:*18*
**inaccurate**
145:*17*
**Inbal** 78:*2, 4*
86:*1, 10*
132:*5, 9, 11*
138:*14*
**I-N-B-A-L**
78:*2*
**incident** 337:*3*
**include**
254:*16* 255:*2*
256:*1*
**included** 27:*1*
264:*9*
**includes** 42:*2*
**including**
16:*24* 181:*21*
246:*6*
**incoming**
244:*11, 17*
245:*3*
**incorrect**
144:*7*
**increasing**
183:*6* 240:*22*
341:*10*

**indemnification**
9:*19* 312:*7,*
*11* 314:*19, 24*
315:*3* 326:*5,*

*11* 327:*22*
329:*4*
**indemnification
s** 17:*17*
**indemnity**
316:*20* 317:*9*
324:*13*
325:*24* 327:*4*
333:*11* 344:*7,*
*17*
**INDEX** 10:*2*
**India** 101:*7*
**Indian** 138:*18*
**indication**
48:*10*
**individuals**
181:*3*
**Industries**
2:*13*
**Industry**
162:*9* 170:*2*
289:*23*
**influencing**
143:*14*
**inform** 185:*3*
**informal**
102:*11*
**INFORMATIO
N** 1:*6* 19:*18*
41:*8, 16, 24*
43:*15* 75:*3*
163:*17*
168:*14* 169:*2*
172:*4, 9*
187:*22*
188:*14*
195:*11* 203:*2*
256:*2* 260:*4*
261:*16*
272:*18* 284:*8*
341:*1, 8, 10*
**informed**
163:*9* 178:*14,*
*17* 179:*9*
184:*24*
**ingredient**
27:*2*
**ingredients**
184:*7*
**Ingrid** 4:*4*
11:*4*

**inhouse** 19:*11*
25:*21*
**initial** 189:*13*
208:*7* 224:*6*
**initially**
239:*15*
**initiate** 45:*23*
**initiated** 82:*5*
312:*23*
**initiator**
185:*14*
**injury** 316:*13*
317:*4, 11*
**in-licensed**
25:*17*
**in-licensing**
25:*2* 65:*23*
**inset** 202:*10*
**inspect** 81:*13*
92:*9*
**inspected**
295:*9, 14, 18*
**inspection**
188:*3, 7, 24*
256:*3, 7*
258:*4, 9*
259:*11, 17*
260:*5* 264:*17*
265:*17*
266:*12, 13, 22*
267:*18*
268:*13, 14*
269:*20*
270:*22* 271:*8,*
*15, 23* 272:*7*
273:*12* 276:*8,*
*24* 277:*23*
279:*19*
296:*11* 297:*2,*
*4* 299:*8*
300:*19*
**inspections**
187:*22*
188:*15*
259:*15, 23*
**inspector**
97:*24*
**instance** 35:*1*
103:*10* 281:*4*
**instances**
47:*21*

instituted 248:7
in-stock 325:9
INSTRUCTIONS 347:1
instructs 14:7
insurance 308:6, 14 310:7, 10, 18 311:16 312:2
insured 308:8 310:10
insurer 308:9
integrating 72:17 138:11
integration 72:11 119:7, 12 120:5 121:10, 21
Intelligence 194:5, 21 195:5, 9
intended 118:4
intending 111:9
interaction 175:9
interactions 83:17 86:19
interested 177:19
interesting 26:12 219:6
intermediate 169:24 172:1 173:2 174:3 201:8
intermediates 200:23 201:6
internal 32:22 41:12 43:2, 6, 9, 19 156:20 161:23
interpret 301:9, 10
interpretation 265:18
interpreting 302:4
introduce 120:19 121:5

investigate 99:1
investigated 260:20
investigation 98:17
invoices 307:9, 18 308:7 309:6, 19 310:16, 21 311:10
involved 33:4 42:21, 22 52:3 55:2, 7, 12, 14 62:2 84:12 89:14 128:2 170:6 328:2 343:13, 15, 17 344:8, 15
involvement 72:22 83:14 128:2 185:10, 24 186:5
involving 49:17 225:5 243:17 251:12

IRBESARTAN 1:4 11:12 183:2, 20
issue 49:22 50:8 63:24 91:10, 14 92:3, 10 93:7 95:4, 5, 8, 11, 13, 17, 19 96:2, 6, 8, 10, 13 98:2, 23 105:8 107:20 108:2, 5 109:7 111:10, 16, 18 122:16 125:2, 21 126:23 129:11 130:11, 18 131:2 133:5, 12, 24 134:9 149:23 169:17 177:4

178:14 188:8 189:7 199:18 200:17 201:13 219:1 239:17 240:4 270:3, 8, 10 276:14 277:15 281:5 286:22 289:14 294:13 304:19 310:14 314:10 315:10 318:19 336:4, 17, 18 337:7 338:21 339:6, 17 340:3
issued 176:14 264:7 265:23 270:9 275:21 276:22 280:10, 15, 24 296:2, 6, 10 303:6, 11, 14 306:2
issues 6:7 57:10 65:1 88:24 91:17 104:24 106:9 109:15 123:22, 23 124:12, 14 127:16 140:11 141:7 147:15 149:3 155:21 158:16 159:18 161:18 168:4 171:14 172:10 175:6 176:5 178:24 179:10, 15 182:9 183:5 184:2, 16 186:20 187:1, 13 190:18 191:15 199:7 208:8 218:22

241:3, 8 246:11 252:14 253:4 254:1 271:16 272:3 273:13 277:1 295:10, 15 296:12 300:20 304:21 305:6 309:19 312:8 315:17 319:14, 20 320:4 326:2 329:23 336:3, 10
issuing 274:21
its 68:20 116:17 118:18, 23 150:10, 16 153:15 240:14 248:7 256:8 276:15 281:13, 18 282:2, 13 285:2 287:12 296:11 300:19 304:4 310:21 314:18 319:17 322:2, 5, 8 326:11 327:20 333:20 342:2
IV 320:16
IVES 3:20

< J >
January 26:17 28:4 39:5, 24 41:4 49:2 66:15, 19 68:6 319:9
Japan 31:6, 10 36:24
jdedaj@duane morris.com 3:5
JENS 1:13 5:3 11:16 12:8 91:21

227:10 238:8 303:20 346:8 349:16
JERSEY 1:1 11:15
Jerusalem 69:13, 15, 18, 21 70:13 83:4, 13, 19 84:8
Joanne 307:14
job 24:16, 24 33:8, 20 34:7 75:17 305:7
Joerg 79:7 86:4, 10 87:14 159:9 160:11 163:3 238:9
J-O-E-R-G 79:8
joined 24:13, 22, 23 295:5
joint 42:18, 22 45:10, 11 53:5 54:20
JOVALIN 3:3
Jubilant 194:14 244:8
judge 127:21, 23 219:15 230:1, 10 270:11 286:8 292:21 295:24
judging 102:22
judgment 63:15
judgments 335:7
July 171:2 197:23 198:4, 23 199:5 201:18 204:22 205:18 208:19, 24 209:3 211:21 212:18 346:15
jump 111:11

Confidential Information Subject to Protective Order

**June** 1:*10*
11:*7* 122:*8*
144:*13*
145:*14*
158:*17* 159:*8,
24* 160:*3*
163:*6, 24*
165:*5, 24*
167:*14, 17*
170:*10, 13*
171:*2, 15*
175:*5* 178:*5*
179:*17* 185:*1,
2* 190:*17*
191:*13, 18*
192:*10*
195:*23* 209:*3*
213:*3* 223:*23*
224:*6* 247:*21*
289:*20*
**jury** 277:*12*
**justifies**
241:*21*
**Jutta** 193:*9*

**< K >**
**K-A-N** 78:*3*
**KANNER** 2:*1*
**Kan-Tor** 78:*3*
86:*1, 10*
132:*5, 9*
133:*3, 9* 134:*7*
**Karen** 164:*14*
176:*9* 197:*23*
**keep** 39:*3, 8*
50:*1* 119:*19*
120:*3, 6*
143:*6* 186:*19*
292:*14* 336:*12*
**keeping** 186:*6,
24*
**keeps** 156:*4*
**kept** 128:*4*
145:*23* 156:*5*
190:*8* 239:*11*
259:*22*
**key** 200:*23*
**kilogram**
194:*12, 15, 18,
22*

**kind** 72:*22*
91:*14* 102:*22*
111:*10* 160:*9*
253:*20* 322:*21*
**Klooster**
79:*18* 180:*23*
**K-L-O-O-S-T-
E-R** 79:*19*
**knew** 52:*6, 9,
11* 69:*3*
144:*16*
171:*22* 174:*2,
6* 185:*4*
227:*11*
249:*21*
254:*14* 260:*9*
265:*7* 270:*6*
275:*5*
**know** 15:*17*
21:*7* 35:*11,
24* 41:*9*
42:*15* 49:*10*
50:*2* 54:*11*
56:*4* 60:*3*
61:*15* 64:*20*
67:*2* 69:*1*
72:*17* 74:*11*
75:*2, 15, 16*
81:*12* 82:*18,
20* 85:*5*
86:*23* 88:*6,
15, 23* 90:*6*
91:*17* 97:*12,
14* 101:*18*
102:*5, 15*
103:*13*
104:*14*
109:*13*
111:*17* 112:*3*
113:*6, 18, 19*
114:*20*
117:*12* 119:*1*
120:*7, 14*
131:*15* 136:*5*
138:*10* 149:*8,
22* 154:*11*
157:*2* 159:*3*
161:*7, 22*
167:*9* 169:*8*
171:*19* 172:*3,
18, 21* 174:*23*

177:*22*
178:*16*
180:*16* 181:*9,
10* 182:*23*
185:*14* 187:*5,
14* 188:*6*
191:*7* 195:*8*
197:*18*
199:*13*
203:*18*
205:*13*
207:*15*
210:*16*
211:*15* 215:*5,
13, 14* 217:*5,
6* 218:*11*
220:*18*
222:*11*
223:*17* 225:*1*
226:*11*
232:*21, 24*
236:*22* 243:*6*
244:*16, 21*
247:*8, 20*
256:*6, 11, 12,
13* 257:*1*
259:*14, 16*
260:*8* 265:*4,
12* 266:*18*
267:*8, 15*
268:*18, 19*
269:*2, 15, 21*
270:*2* 271:*5,
7, 21* 274:*5,
18, 23* 275:*4*
277:*13*
279:*11* 280:*3*
287:*2, 5, 9, 11*
292:*8, 10, 22*
301:*8* 302:*19*
303:*9* 311:*1*
315:*22* 316:*7*
318:*18* 320:*7,
24* 321:*5*
323:*8* 327:*14*
328:*1, 4, 8*
335:*24* 337:*5*
343:*16*
**knowledge**
41:*20* 70:*10,
22* 80:*19*

103:*20*
159:*22*
188:*17*
264:*16* 265:*2*
268:*7, 11*
279:*1* 325:*23*
326:*3, 14, 22*
327:*9, 16*
339:*24* 343:*4*
**known** 146:*13*
261:*1*
**knows** 91:*19*
136:*21*
**Konstanz** 22:*9*
**Korea** 28:*1*
**KUGLER** 1:*4*

**< L >**
**lab** 23:*10*
**labor** 24:*9*
**Laboratories**
3:*13*
**labs** 81:*15*
**lack** 160:*6*
**ladies** 277:*12*
**language**
188:*2* 315:*1,
10* 318:*3*
330:*15*
**large** 39:*11*
**largest** 75:*18*
273:*14*
**late** 67:*10, 23*
**launched**
67:*17*
**launching**
193:*2*
**law** 24:*9*
**lawyer** 315:*1,
22*
**lawyers** 12:*17*
18:*15*
**LAWYER'S**
350:*1*
**lead** 29:*3*
47:*2* 273:*13*
332:*2* 336:*2*
**leadership**
161:*2*
**leading** 26:*22*

91:*6*
**leads** 42:*13*
**learn** 18:*17*
**learned**
158:*15*
171:*17* 177:*2*
286:*2*
**learning**
162:*23*
**learns** 286:*12*
**leave** 28:*14*
334:*11*
**lectures** 24:*13*
**led** 140:*12*
218:*19, 23*
**leeway** 49:*11*
**left** 23:*21*
87:*11* 196:*18*
330:*18*
**legal** 25:*8*
48:*23* 317:*17*
321:*9* 326:*1*
**legit** 133:*2*
307:*6*
**letter** 9:*19*
126:*11* 188:*8*
262:*6, 8*
296:*6, 10, 16,
23* 302:*17*
303:*6, 11, 14*
306:*1, 2, 6*
328:*21* 344:*12*
**letterhead**
9:*19*
**letting** 41:*9*
**level** 17:*4*
36:*19* 52:*12*
161:*12*
278:*21* 295:*5*
304:*15*
320:*12*
323:*12, 23*
340:*19*
**LIABILITY**
1:*4* 11:*12*
316:*9, 13*
317:*4, 11*
**liaise** 84:*19*
**licensing** 25:*1,
7* 26:*6, 22*

33:9  66:9
**life** 139:9
**Lifshitz** 97:8, 12, 14, 23
98:7, 21  99:3
**lifted** 319:23
**lifting** 189:22
**light** 141:2
192:21 208:9
259:5 319:7
**lightly** 58:24
**likelihood** 58:4
**limit** 237:8
**Limited** 3:13
25:12
**Lin** 80:24
81:1  92:8
93:5  98:1, 8, 11  103:13
107:12
111:24
197:23 338:15
**Lina** 78:13
159:8  197:23
206:10 220:22
**L-I-N-A** 78:13
**LINE** 10:6, 9, 12, 15  34:23
75:2  91:3, 7
152:24
153:14, 19
318:20 335:2
341:20 348:4
350:2
**link** 258:1
**LinkedIn**
5:18  21:12, 14, 17 24:20
34:18, 24
35:4, 9, 13
36:6, 16  37:1, 11  38:17
**Lin's** 343:8
**list** 86:23
166:24
213:18, 19
222:20
308:15
310:20 311:15
**listed** 16:5, 11
17:9  28:3

195:6 203:23
215:20
222:14, 24
226:5
**lists** 183:21
**LITIGATION**
1:4, 20  11:6, 13 18:19
49:22 65:1
**little** 26:10
32:17, 22
33:2  35:8, 23
36:10 38:7
44:21 51:12
53:21 67:10, 23 69:8
90:16 101:24
155:2 162:13
183:10
196:21
202:10
238:20 240:9
244:23
252:17
265:12
300:11 310:3
314:23
**LLC** 2:1, 14, 20 3:7
**LLP** 2:8 3:1, 9, 15, 20
**loading** 298:10
**local** 57:7
72:13 91:2
181:13
**located** 103:18
**location** 57:17
139:13
**LOCKARD**
2:8 5:8 16:8
18:2 49:6
50:23 59:18, 21 60:9, 16
61:8 62:16
63:10 75:5
76:8 89:3
101:12 103:7
105:15
107:23 110:6
113:11
116:19 124:2,

18 126:4
127:17
128:24
133:14, 16
136:17, 23
143:2, 20
145:18 147:6, 18 149:5
151:9, 18
153:2 154:15
155:7, 22
157:7 182:12
204:19
209:20 224:8
228:12, 24
229:12, 24
230:9, 21
232:18 234:3
241:9 245:5
248:15
249:14 250:7
253:5 255:18
263:14
264:19, 22
268:16 269:5
271:18
273:15
276:17 278:8
292:16
293:20 297:5
309:9, 24
317:14
330:18, 24
331:2 333:9
334:20 337:4
338:1 339:15, 22 340:17
342:8 344:22
345:6, 12
**lockardv@gtla w.com** 2:12
**logistics** 82:12
**long** 89:18
125:16
138:17 190:9
191:18
196:16
212:10
213:19
218:15

222:20 233:1
247:20 305:6
**longer** 29:7, 8
35:9 38:8
55:6 88:12
196:22
**look** 34:18, 21
35:12 38:21
74:20 75:10
81:14 93:24
94:12 105:18
109:19
116:10
117:17 130:9
131:8 132:18
145:11
152:16 154:6
178:18
198:19
204:11 221:4
225:9 227:8
234:22
237:17
246:24
256:17
258:18 266:7
269:10
270:23 277:7
278:4 279:12
280:18
288:15
297:21 313:6
317:22 337:10
**looked** 38:23
94:7, 13
252:24 266:6
**looking** 38:11, 21 65:11
66:3 75:8
98:3 99:6
122:17
128:11
139:16 140:6, 21 191:19
198:22 202:9
207:14 209:5
223:16
234:20
247:17
255:21
282:18

287:14 292:9
333:10
**looks** 21:24
26:13, 17
28:21 30:12
31:5 32:2
36:1, 9, 11
37:10 39:18
91:8, 20
100:5, 9
156:21 198:2
199:4, 8
202:15, 21
205:20
207:13 221:5
238:9 239:7, 12 258:1
260:13
262:12 269:9
289:2 299:11
303:4 307:5
**LOSARTAN**
1:3 11:11
**lose** 146:7
147:16, 21
148:2 149:2, 13 155:4
**losing** 146:10
155:10
**losses** 150:22, 24 151:4
154:9 316:9
**lot** 57:12
84:1 115:13
129:7 130:21
136:2, 3
143:13
148:16, 21
149:15, 17
200:6 202:5
240:23
300:12 310:23
**Louisiana** 2:4
**low** 153:21
320:11 323:23
**lowest** 150:16
152:12
195:17 322:6, 15
**Lyons** 211:20
225:6 227:9,

Confidential Information Subject to Protective Order

23  230:24
231:17  238:5,
8, 15  244:5
252:1, 11
342:11

< M >
Madam  50:17
151:22  173:17
mail  94:7
227:12  288:16
main  22:8
25:1  27:9, 22
65:1  98:13
114:14
215:17
235:22  331:19
maintained
75:1
maintains
161:16
Major  328:22
329:3  344:14,
16
MAJOR_DNJ-
Sartan_001478
9:20
making  50:1
57:14  70:19
161:10
227:18  326:7
331:8  332:17
335:7
Malta  69:24
70:4, 5, 8, 24
71:9, 13, 14,
17, 22  72:2, 8
112:12, 18
118:19, 24
119:2  121:14,
18  122:4, 12,
21  123:4
221:8, 22
238:10  239:7
283:19  284:3
286:12  295:3
management
57:16  161:12
227:24  228:6
manager  25:1
77:12, 13

79:1  102:7
132:9  160:14
181:15
managers
88:14
manually
43:15, 22
manufacture
33:13  171:24
172:19  256:8
manufactured
42:5  141:13
203:13
204:18, 24
manufacturer
42:7, 24
51:13, 23
52:19, 23
53:3, 21  54:1,
6, 13  56:14,
17, 23  57:1, 5,
9, 11, 18, 20
58:1  62:24
86:15  88:3,
18  109:18
114:1  118:13
119:4  141:17
153:18
185:20
218:16, 21, 22
219:18, 21
242:22  281:1
311:19, 22
333:6  335:23
manufacturers
27:24  41:13,
17, 20, 23
42:12  44:19,
23  46:2
48:12  51:6
65:24  67:20
74:6  81:13,
14  83:23
85:3, 10
93:21  125:10,
12  136:6
137:13, 21
138:1, 19, 20,
22  139:10
141:10  142:4
147:9, 22

148:14, 19, 21
149:11, 21
150:3, 11
154:2  169:23,
24  170:4
171:11, 21
172:16  174:3
183:4, 8
187:23  218:1
220:4  240:3
241:6  242:14
249:2, 20
279:24
281:23  282:7
305:5  310:9
312:17
332:23
334:18  335:15
manufacturing
34:5  45:9, 12
57:2, 7  69:11,
16  70:4
119:2  120:6,
9, 11  123:1, 6,
9, 12  140:19
149:16
156:11  173:3
221:13  222:6,
7
March  31:13
32:3  35:2
36:12  37:1, 3
mark  15:8
20:20  104:5
158:20
224:18  243:5
328:12
Marked  10:14
15:10, 14
21:3  89:22
96:17  97:4
104:10
131:11
158:23
180:10
191:23
197:11  205:9
211:9  220:12
224:21
237:20  243:8
250:4  256:19

282:22
287:22  298:5
306:9  313:10
328:14
market  29:22
30:5  48:13
52:8  69:13
71:5, 9  74:2
118:5, 10, 14
119:20
122:13, 23
123:2, 7, 10,
18  124:1, 17
126:3, 18
127:10
133:13
134:10  140:2
202:24  203:4
223:21  224:4
227:14  228:9,
18, 22  229:7,
16, 18  231:2,
20  233:5, 9
237:15
238:10, 16, 23
239:6, 8
318:16, 17
319:24
320:12, 13
325:15
326:20
327:22  336:6
339:4  342:19
marketed
342:14
marketing
25:5  52:4
126:15
164:22  290:15
markets
70:15, 20
112:19
117:20
123:12
125:16
148:11, 13
242:9  290:11
330:8
market's
332:10

marking  90:1
191:21
Massachusetts
3:16
massive
308:24
master  22:11
match  44:12
material  29:8
32:1  54:18
92:18  95:15
99:24  120:18
125:9  149:15
177:19  211:3
227:15, 18
228:23
231:17, 21
237:15
241:14
244:12  331:24
materials
26:23  27:1, 4,
7, 8  29:4, 11
31:10, 23
32:6, 19
56:13  200:24
201:6  299:2
matter  11:10
277:18
325:19  326:1
Maz@falkenbe
rgives.com
3:22
MDL  1:3
mean  20:6
23:8  34:21
46:13  47:16
51:21  58:8, 9
59:11  68:23
69:1, 10
75:13  83:21
84:9  89:18
94:23  100:2
101:6  115:4
121:6  122:7
125:20
129:19
133:21
141:22
142:10  143:5
145:11

149:*14, 17*
153:*16* 156:*1, 19* 169:*12, 15, 20* 170:*1*
182:*23*
201:*24*
213:*11*
218:*20*
249:*17* 253:*8*
293:*12, 23*
308:*21*
323:*19*
331:*21* 338:*8*
**meaning**
315:*3* 322:*7*
**means** 30:*2*
67:*13* 265:*24*
271:*3* 276:*23*
280:*16* 301:*1*
346:*20*
**meant** 23:*3*
106:*19*
150:*20* 154:*7*
253:*13* 291:*2*
302:*5, 9*
**measuring**
235:*5*
**medication**
291:*1*
**meet** 12:*20*
167:*16*
171:*21* 258:*11*
**meeting**
163:*14* 166:*3*
172:*18* 182:*17*
**meetings**
18:*14, 24*
19:*3, 10, 14*
20:*2* 41:*19*
43:*16* 84:*1, 2*
166:*3, 7*
167:*1* 171:*10, 20* 175:*15*
**meets** 46:*21*
**MEGAN** 3:*20*
**member**
77:*18* 78:*1*
**members** 77:*7*
84:*17*
**memory** 80:*6*
134:*6*

**mention**
169:*5* 218:*10*
304:*20*
**mentioned**
17:*12* 37:*7*
44:*1* 61:*19*
64:*9* 86:*1, 13*
87:*20* 99:*23*
143:*5* 162:*4*
167:*6* 177:*1*
185:*13* 213:*12*
218:*4* 219:*3, 19* 231:*6*
248:*19*
289:*18* 297:*8*
304:*6* 305:*1*
331:*16, 20*
338:*7*
**mentioning**
219:*13* 239:*10*
**Merckle** 28:*12*
**mess** 215:*15*
**message**
90:*10* 132:*5*
133:*4* 168:*22*
180:*21* 181:*2, 19* 192:*10*
193:*6* 197:*22*
198:*3, 23*
199:*5* 205:*18*
206:*5* 211:*20*
220:*22* 225:*5, 11, 16* 238:*5*
243:*22*
251:*12, 24*
257:*6, 14*
260:*14, 15, 16*
264:*6* 284:*2*
288:*7, 22*
298:*16*
299:*12*
303:*19*
306:*22* 307:*8*
**messages**
132:*22* 199:*1*
**met** 12:*15*
55:*23* 319:*4*
322:*14*
**method** 93:*2, 14, 16, 20*
237:*9*

**methods**
93:*18, 21*
95:*20* 96:*14*
109:*16, 21*
293:*8*
**Michelle** 1:*15*
12:*5* 346:*12*
**middle** 284:*3*
**million**
313:*24*
314:*12* 323:*3, 13* 324:*2*
325:*11*
**millions**
155:*19* 304:*20*
**mine** 176:*22, 24* 243:*2*
**minimum**
334:*1, 7*
**minute** 99:*14*
**minutes**
168:*11*
**Mischaracteriz es** 249:*15*
**mispronounce**
173:*13*
**misrepresentati on** 229:*20*
**missed** 124:*5*
**missing** 301:*16*
**misspoke** 80:*4*
**Misstatement**
309:*10*
**Misstates**
107:*24*
113:*12* 129:*1*
204:*20*
228:*13* 229:*1*
263:*15*
**misunderstand**
242:*23*
**misunderstandi ng** 196:*6*
**misunderstandi ngs** 136:*3*
**mitigate**
207:*4, 10*
**Mm-hmm**
38:*24* 86:*24*
91:*13* 94:*3, 17, 21* 98:*4*

114:*5, 17*
116:*10*
118:*17*
137:*14*
167:*19*
183:*22* 185:*5*
193:*4, 10*
200:*14* 202:*8*
206:*4* 209:*17*
215:*10* 223:*1*
226:*10, 22*
233:*14*
240:*24* 248:*6*
264:*1, 14*
281:*3* 286:*21*
294:*21* 312:*5*
316:*6*
**model** 207:*19*
**molecules** 25:*9*
**moment**
12:*16* 15:*19*
38:*22* 99:*6*
132:*18* 159:*5*
238:*19*
257:*17* 274:*8*
312:*23*
321:*13* 344:*19*
**money** 73:*22*
**monitor**
188:*23*
**monitoring**
187:*11* 188:*13*
**Monroe** 3:*21*
**month** 180:*3*
**months** 18:*21*
247:*21*
271:*15* 327:*18*
**MORRIS** 3:*1*
**move** 80:*5*
312:*6*
**moved** 22:*18*
25:*20* 85:*9*
**moving** 39:*6*
121:*24* 333:*2*
**muddied**
131:*22*
**multiple**
146:*22*
264:*15* 272:*8*
273:*10, 20*
**Munich** 22:*13*

**Mylan** 3:*12, 13* 17:*8*
69:*19, 22*
70:*12, 18*
82:*19, 22, 24*
83:*2, 12, 18, 23* 84:*4, 8*
86:*20* 87:*3, 13, 16* 194:*17*
244:*8* 245:*21*
246:*6, 10, 14, 22, 24* 247:*2, 14* 248:*1, 9, 14* 249:*5*
255:*16*
282:*12*
283:*11, 19*
284:*14* 285:*2, 11, 20* 286:*15, 19, 23* 287:*11*
288:*6, 14*
289:*4, 13*
290:*12* 291:*5, 11* 292:*8, 13, 22, 24* 293:*12, 16* 294:*2, 6, 13, 22* 312:*18*
324:*8, 12, 19, 22* 325:*3, 6, 8, 17* 326:*1, 13*
329:*22* 330:*8*
337:*9* 340:*18, 24* 341:*6*
**Mylan's** 287:*6*
295:*6*

**< N >**
**N.V** 3:*12*
**Nagoya** 31:*10, 11* 36:*14* 37:*5*
**name** 11:*4*
12:*16* 43:*20*
75:*15* 77:*6*
78:*15, 24*
79:*17* 87:*6, 7*
117:*16*
173:*20*
179:*24* 196:*5*
259:*2*
**names** 44:*3*

80:*4, 6*  181:*9*
**naming**  195:*10*
**NASSALL**
1:*13*  5:*3*
11:*17*  12:*8,*
*15*  16:*12*
34:*17*  38:*11*
50:*14*  76:*24*
90:*5*  97:*7*
116:*12*  137:*2*
157:*24*
158:*11*
230:*24*  251:*4*
253:*9*  277:*11*
309:*17*  315:*7*
329:*17*  331:*1*
342:*21*
344:*24*  346:*8*
349:*16*
**Nassall's**
242:*20*
**Natasa**  299:*13*
300:*23*  303:*1,*
*15*
**nation**  151:*8*
**native**  152:*6*
330:*15*
**nature**  11:*22*
169:*2*
**ND**  235:*6*
237:*4*
**NDEA**  8:*21*
9:*7*  282:*2, 13,*
*14*  283:*20*
284:*21*  285:*3,*
*6, 13, 21*
286:*2, 5, 13,*
*24*  287:*2, 7,*
*10, 13*  289:*6,*
*13*  291:*20*
292:*15*
293:*12*  294:*6,*
*13, 16*  316:*17*
340:*20*
**NDMA**
184:*15*
200:*16*  214:*3,*
*6*  215:*24*
216:*3, 14*
217:*2, 11, 16*
221:*14, 16, 24*

222:*15*  223:*6,*
*15*  225:*13*
226:*3*  231:*10*
233:*20*
234:*10, 19*
235:*14*
239:*13, 17, 22*
241:*3, 17*
249:*11*
252:*19*
260:*23*  261:*1,*
*13*  262:*24*
275:*8*  277:*21*
278:*20*
281:*15, 20, 24*
282:*17*
284:*16*  286:*7*
297:*3*  300:*20*
316:*16*
**NE**  2:*10*
**necessarily**
101:*4*  115:*8,*
*18*  121:*6*
171:*19*
285:*23*  305:*8*
**necessary**
244:*21*
245:*18*  347:*4*
**need**  16:*17*
27:*19*  41:*9*
44:*18*  46:*21*
50:*15*  53:*22*
60:*4*  73:*17*
74:*18, 22*
95:*15*  96:*5*
102:*20*
108:*12*  109:*8,*
*9*  119:*13, 18*
120:*14, 20*
127:*21, 23*
141:*15*
151:*14, 16*
152:*15*  156:*8*
168:*7*  175:*21*
187:*4*  210:*21*
232:*9*  236:*1,*
*4*  244:*11*
250:*8*  266:*5*
270:*5*  287:*19*
290:*20*  291:*1*
310:*2*  318:*10*

**needed**  29:*11*
44:*10*  45:*4*
241:*24*
323:*10*  337:*24*
**needs**  23:*9*
42:*13, 14*
49:*20*  52:*15*
59:*12*  60:*1, 3*
61:*17*  63:*13*
95:*6*  236:*11*
242:*12*  340:*7*
**negotiate**
46:*10, 19*
48:*18*
**negotiated**
49:*4*  51:*4*
324:*18*  326:*23*
**negotiating**
52:*18*  344:*9*
**negotiations**
46:*13*  49:*17*
324:*17*
325:*17, 22*
327:*20*  344:*15*
**neither**  80:*22*
**never**  23:*18,*
*21*  24:*12*
33:*11, 16, 20*
34:*7, 11, 15*
38:*9*  62:*8*
75:*23*  80:*21*
82:*16*  100:*11*
112:*13*
118:*17*
121:*13*  131:*1*
177:*11*
214:*11*  215:*1*
216:*17*
219:*22, 23*
222:*16*  247:*2*
268:*8, 12*
269:*9*  271:*13*
274:*15*
277:*24*
280:*21*  281:*3*
290:*3*  297:*1*
**NEW**  1:*1*  2:*4*
11:*14*  23:*2*
53:*22*  54:*19*
120:*19*  121:*1,*
*5*  141:*14*

142:*15*  180:*5*
193:*2*  199:*6*
210:*20*  211:*5*
216:*22*  218:*6,*
*21*  219:*18*
222:*11*
244:*11*
249:*24*
311:*10*
314:*13*  321:*4,*
*11, 17, 22*
323:*3, 4, 9*
337:*10*
**newer**  278:*20*
**Newport**  43:*18*
**news**  174:*18*
187:*12*  258:*2,*
*3*  265:*11, 16*
270:*12*  277:*3*
280:*5*  297:*15*
**Nice**  12:*20*
50:*16*
**Nikola**  181:*14,*
*20*
**nitrosamine**
17:*19*  122:*16*
123:*22*
124:*14*
137:*24*
140:*11*  141:*6,*
*11, 24*  142:*10*
147:*15*  149:*3*
150:*23*
154:*10*
155:*20*
156:*22*
158:*16*
159:*18, 23*
160:*2*  169:*6*
201:*13*
207:*11*  208:*8*
218:*23*  241:*8*
246:*11*
247:*14*  248:*1*
252:*14*  253:*4*
254:*1*  271:*16*
272:*3*  273:*13*
277:*15*  282:*9*
286:*3*  295:*10,*
*15*  296:*12*
304:*19*

315:*16*
316:*17*
319:*13*  320:*4*
325:*19*  326:*2*
329:*23*  339:*18*
**nitrosamines**
39:*12*  142:*9,*
*21*  144:*6*
145:*15*
201:*23*  224:*7*
245:*3, 23*
246:*16, 23*
274:*11, 14, 17*
278:*23*
281:*15, 19, 24*
282:*5*  296:*24*
299:*9*  312:*13*
**nitroso**  184:*19*
**nondetectable**
226:*5*
**nonlawyer**
19:*19*
**nonlawyers**
19:*15*
**nonregulated**
117:*20*
**non-U.S**  70:*20*
330:*8*
**normal**  272:*14*
**Notary**  1:*17*
346:*14*  349:*23*
**note**  99:*10*
112:*20*
183:*17*
199:*11*  314:*6,*
*12, 15*  323:*3,*
*6, 14*  324:*2*
**noted**  12:*3*
50:*11*  338:*15*
347:*11*  349:*11*
**notes**  8:*14*
135:*3*  194:*10*
350:*1*
**notice**  1:*13*
5:*16*  15:*22*
241:*12*  245:*7*
264:*24*
**Notification**
6:*14*  7:*11*
159:*12*
160:*18*

162:*16, 24*
182:*8*  189:*13*
224:*6*  226:*3*
227:*13*  235:*4,*
*14, 24*  270:*5*
**notifications**
190:*17*  191:*13*
**notify**  308:*5*
**notwithstandin**
**g**  141:*6*
**Novartis**
178:*15, 23*
179:*6, 8*
216:*21*
**November**
247:*3*  291:*6,*
*9, 24*  306:*24*
**nowadays**
22:*10*
**nuance**  315:*9*
**number**  16:*19,*
*23*  104:*8*
144:*5*  146:*15,*
*20*  176:*19, 20,*
*21*  199:*11*
200:*1*  202:*17,*
*22*  203:*23*
204:*9, 10*
209:*6*  210:*1,*
*8*  213:*22*
214:*1, 4*
**numbered**
210:*8*
**numbers**
74:*12*  222:*14,*
*19*

**< O >**
**oath**  14:*21*
**object**  14:*6*
18:*2*  49:*7*
**objection**
49:*24*  50:*24*
59:*18, 22*
60:*9, 16*  61:*8*
62:*16*  63:*10*
75:*5*  89:*3*
101:*12*  103:*7*
105:*15*
107:*23*  110:*6*
113:*11*

116:*19*  124:*2,*
*18*  126:*4*
127:*17*
128:*24*
133:*14, 17*
136:*17, 24*
143:*2, 20*
145:*18*  147:*6,*
*18*  149:*5*
151:*9*  153:*2*
154:*15*  155:*7,*
*22*  157:*7*
182:*12*
204:*19*
209:*20*  224:*8*
228:*12*  229:*1,*
*22*  230:*3, 4, 7,*
*14, 16, 18*
232:*18*  241:*9*
245:*5*  248:*15*
249:*14*  253:*5*
255:*18*
263:*14*
264:*19, 22*
268:*16*  269:*5*
271:*18*
273:*15*
276:*17*  278:*8*
292:*16*
293:*20*  297:*5*
309:*9, 24*
317:*15*
332:*18*
334:*14*
335:*10*
337:*12*  339:*9,*
*19*  340:*12*
342:*4*
**objections**
50:*11*
**obligated**
333:*18*
**obligations**
333:*13*
**observation**
338:*16*
**observations**
8:*18*
**obtain**  22:*20*
23:*7*  24:*1*

25:*8*
**obtained**  24:*10*
**obtaining**
23:*16*  29:*20*
**obviously**
43:*13*  56:*14*
81:*9*  121:*4*
169:*22*  172:*2*
195:*16*
210:*12*  216:*8*
236:*18*  272:*24*
**occur**  337:*16*
**occurred**
122:*8*  141:*7*
316:*10*
**October**
35:*14*  248:*3*
**offer**  41:*14*
117:*13*
150:*16*
323:*19, 20*
**offered**  18:*3*
26:*19*  272:*19*
312:*24*  313:*4*
**offering**  25:*13*
67:*21*  114:*11*
**offers**  117:*14,*
*20*  150:*17*
152:*13*  322:*8,*
*16*
**office**  26:*20*
102:*3*  166:*20*
170:*19*  171:*8,*
*9*
**officer**  147:*14*
299:*19*
**official**  24:*24*
80:*22*  81:*2, 6*
97:*15*  164:*20*
182:*2, 7*
302:*19*
**officially**
85:*24*  92:*16*
96:*10*  103:*1*
**Oh**  20:*8*
132:*13*
164:*12*
277:*22*  303:*7*
**Ok**  24:*23*
**Okay**  14:*14,*
*15*  15:*9*

18:*10*  21:*22,*
*23*  28:*2*  30:*3*
34:*17*  37:*9*
39:*9*  51:*3*
53:*18*  55:*19,*
*20*  58:*7*
64:*21*  66:*13,*
*22*  71:*15*
77:*4, 13*
79:*13, 20*
80:*14*  84:*15,*
*16*  86:*22*
90:*7, 8*
100:*16*
105:*24*
107:*10*  112:*2*
132:*13, 17*
152:*22*
156:*18*  158:*2*
164:*8*  165:*20*
167:*22*  170:*7,*
*13, 18*  172:*14*
173:*15*
176:*16*  178:*6*
189:*7, 8*
196:*12*
197:*21*
198:*18*
202:*14*
203:*21*  205:*5,*
*16*  210:*6*
212:*4*  237:*17*
238:*21*  244:*3*
247:*10*
250:*17*  257:*4,*
*17, 24*  264:*2*
278:*5*  288:*5*
299:*15*
301:*23*
307:*13*  312:*8,*
*9, 21*  315:*18*
316:*22, 24*
319:*8*  321:*14*
323:*1*  324:*8,*
*9, 10, 16*
326:*4, 6, 8, 9*
327:*7*  344:*21,*
*22*  345:*6, 15*
**old**  176:*23*
226:*1*  235:*1,*

*11*  236:*17*
341:*17*
**older**  222:*11*
225:*12*
234:*18*
239:*16, 23*
249:*10*
252:*20*
277:*19*
278:*15*  279:*4,*
*16*
**Olmesartan**
199:*20*
**once**  72:*8, 10*
272:*12, 13*
318:*18, 20*
319:*5*  333:*4*
340:*19*
**ones**  43:*17*
147:*23*
149:*11*  195:*6*
218:*3*  226:*8*
**ongoing**  156:*2*
321:*6*  327:*19*
328:*3*
**on-hand**
240:*14*
**online**  36:*18*
258:*13*
**OOS**  98:*18*
**open**  44:*21*
102:*14*
180:*18*  192:*7*
197:*20*
205:*15*
211:*17*
233:*22*  238:*3*
243:*14*  283:*7*
315:*4*
**opened**  15:*20*
21:*9*  220:*20*
**Opening**  90:*7*
**opinion**  94:*11*
102:*8*  113:*24*
156:*3*  157:*10*
195:*10*
**opportunity**
113:*2*  346:*9*
**option**  276:*5*
**options**  115:*23*

Oral 5:17 17:5
orally 134:8
ORDER 1:8 47:2 49:15 51:2 182:20 183:9 222:10 248:11 284:10 318:5 323:4 331:24 340:3, 24
ordered 323:5
orders 72:4 180:5 182:10 194:4, 7 195:12 321:12 332:5, 8
ordinary 75:16
organization 36:1 91:2
organizing 82:5 162:10 185:19
orient 84:15
original 240:10 347:15
originally 203:17
originator 67:17
originator's 52:8, 9
Orleans 2:4
Oshri 77:21
O-S-H-R-I 77:22
out-of-specification 91:10
outside 19:11 29:14 49:8, 14 50:24 51:1 241:10 245:6 248:16 264:23 328:21, 22 344:13
overall 60:4 62:1 73:14

120:1 129:21 130:5 140:1 144:23 150:23 156:13 157:21 210:20 290:21 304:9, 13 320:12
overarching 59:11
overcome 336:20
overexaggerating 265:15
overnight 170:1
owned 26:3
Oxford 3:10
oxidations 23:2

< P >
P.C 2:16
p.m 1:14 11:8 76:17, 21 158:4, 8 250:21 251:1 329:10, 14 345:10, 18
package 129:21
packaging 27:7 32:1
PAGE 5:15 6:5 7:5 8:5 9:5 10:6, 9, 12, 15 159:13 191:3 193:8 212:18 225:17 227:9 243:23 244:1, 3 257:16 288:23, 24 299:14, 15 348:4 350:2
pages 349:6
paid 17:18 197:5
Pan 80:24 81:1 92:8

93:5 97:24 98:8, 11 100:18 101:7, 19 102:24 103:13 107:11 111:24 197:22 338:15 343:8
Pan's 101:10 103:23
paper 191:6
paragraph 317:5, 12, 23 318:11
parallel 31:8 38:4, 8
parentheses 316:14
Parkway 2:17
part 26:12 27:9 33:3 57:24 64:8, 11 65:21 72:9, 13, 14 77:19, 23 78:5, 19, 20 79:9, 11, 21, 22 80:9 81:1 83:6 89:13 92:17 102:2 105:13 150:14 151:2 225:22 234:20 251:17 263:2 266:14 302:21 310:6 323:17
participating 266:15 306:4
particle 92:15, 19 108:4 111:15, 17 338:16 339:5, 16 340:2, 9
particular 29:22 139:23 152:13 166:23 322:16

particularly 259:13
parties 11:18 12:1
partly 31:8
partners 25:17, 21
parts 39:11 97:1 154:8 177:14 256:12 257:10 271:22 315:4
pass 264:8
passing 258:19
paste 284:2
pasted 235:11
patents 56:20
patience 145:9 331:2 345:1
patient 59:15, 17, 23 60:7 61:6, 14 62:4, 13 63:6, 19 290:21, 24 292:4 336:8 338:2, 12
patients 332:10 338:8
Patzova 181:8
pause 11:23 13:18
pay 153:17 310:15 311:10 327:10
paying 308:7 309:6, 18 310:21 311:4
payment 307:9, 18 311:21 313:24 314:6
Payments 9:13 315:14 325:18
peak 274:10
peaks 260:19, 21 261:11 262:23

269:20 275:7, 15
pending 14:13 274:14
Pennsylvania 2:17 3:4, 11
people 19:9 26:11 42:21 43:22 45:12 46:1 53:6, 7 54:23, 24 55:1 62:19 86:18 94:15 95:12 106:22 107:2 108:19 110:2, 10, 14 119:23, 24 156:12 160:20 161:4, 9 162:19 167:17 171:21, 23 172:13 198:8 206:23 246:9 290:2 294:24 302:4, 21
People's 27:23
percent 74:11 239:5 246:20 318:6 319:11 320:8 327:10 334:4 344:7
percentage 73:13
percentages 73:18
perfect 107:13, 21
perfection 27:19
performed 343:12
period 41:3 43:2 49:3 55:16 78:8 79:10, 22 86:2 89:19 144:12 178:4 191:18 318:4
periodically 187:21

periods 39:*16*
77:*19*
person 19:*7*
84:*6* 160:*7*
162:*23* 176:*3*
274:*3*
personal
83:*24* 102:*6,*
*8* 140:*9*
175:*8* 265:*1*
316:*13* 317:*4,*
*10*
personally
45:*5* 83:*2*
139:*2* 166:*15*
266:*16* 269:*1*
334:*24*
342:*20* 343:*6*
344:*8*
personnel
197:*6* 198:*10*
283:*11*
persons 85:*12,*
*16, 20* 87:*16*
88:*5* 198:*4*
person-to-
person 175:*3*
perspective
81:*5* 92:*10*
96:*3* 107:*17*
127:*14*
129:*14* 147:*4*
149:*1* 155:*4*
331:*6* 334:*9*
pertinent
256:*8* 341:*1*
ph 1:*20*
Ph.D 22:*15,*
*18, 20, 24*
23:*1, 7, 14, 16*
38:*4*
Pharma 2:*14,*
*19*

Pharmaceutical
2:*13* 3:*6*
23:*23* 27:*2*
58:*18* 64:*18*
162:*5, 8, 9*
280:*7* 289:*23*

Pharmaceutical
s 2:*14* 3:*13,*
*18* 98:*1*
328:*23* 329:*4*
344:*14, 16*
pharmacovigila
nce 62:*22*
64:*7* 161:*6,*
*10, 14, 17*
162:*2*
phase 42:*15*
48:*17* 51:*8*
119:*13*
Philadelphia
3:*4*
phone 43:*16*
135:*1* 176:*5,*
*14, 17, 22*
216:*10*
289:*16*
293:*24* 294:*5,*
*6* 341:*5*
phrase 96:*4*
229:*13* 241:*13*
picture 44:*17*
62:*1* 304:*10*
piece 191:*6*
261:*16*
Piedmont 2:*10*
PIETRAGALL
O 3:*7*
pinpoint
215:*14*
Pittsburgh
3:*11*
place 71:*21*
180:*4* 182:*1,*
*4, 20* 311:*24*
places 69:*11*
189:*12*
placing
189:*17, 21*
Plaintiffs 2:*6*
12:*17*
plan 52:*4*
planned 165:*6,*
*16*
plans 127:*8*
platform
36:*18*
play 332:*16*

please 11:*23*
13:*24* 40:*10*
50:*19* 76:*12*
86:*22* 105:*4*
112:*21*
131:*23*
151:*20* 152:*7*
197:*15, 18*
199:*15*
211:*15*
220:*18* 225:*1,*
*19* 241:*4*
247:*7* 254:*18*
261:*3* 262:*16*
283:*2* 291:*15*
347:*3, 8*
Pnina 77:*9*
78:*1* 91:*5*
P-N-I-N-A
77:*9*
point 42:*13*
43:*24* 45:*16*
47:*7* 54:*7*
67:*2, 5* 76:*10*
86:*13* 87:*4*
95:*18* 117:*12*
118:*2* 122:*9,*
*10, 11* 127:*11*
129:*5* 137:*5*
160:*7* 169:*7,*
*20* 176:*2*
189:*11*
201:*15*
204:*10* 246:*9,*
*21* 247:*19*
280:*11*
285:*15, 22*
291:*8* 296:*8*
310:*22*
324:*18* 341:*2*
points 56:*4*
116:*3*
policy 187:*10*
polluting
184:*10*
popular 43:*17*
populated
43:*22*
portfolio
25:*14* 52:*2,*
*14* 119:*23*

portion 50:*22*
152:*2* 322:*24*
POs 182:*2*
pose 206:*13*
position 23:*20*
26:*16, 19*
30:*19* 31:*4,*
*19* 32:*4, 12*
35:*3, 18* 43:*8*
45:*1* 68:*14*
97:*15* 126:*20*
possibility
284:*21* 285:*3,*
*6, 13* 287:*18*
291:*20*
possible 8:*21*
9:*7* 152:*17*
176:*7* 213:*23*
239:*13*
242:*10*
254:*11, 15, 21*
255:*10* 256:*1*
272:*3, 4*
282:*8* 287:*5*
314:*16*
posted 258:*13*
postgraduate
24:*2*
potential
18:*18* 45:*17*
46:*11* 58:*9*
65:*17* 80:*20*
127:*14* 162:*1*
169:*22*
177:*18*
186:*20* 187:*1*
191:*20*
192:*20*
199:*18*
200:*16*
207:*14*
217:*16*
277:*15*
283:*20* 286:*6*
317:*2* 321:*16,*
*21*
potentially
36:*13* 45:*13*
47:*1, 3* 111:*8,*
*23* 114:*2*
146:*1* 168:*23*

169:*6* 174:*14*
185:*11* 211:*5*
215:*6* 216:*21*
220:*7* 260:*24*
265:*14* 271:*6*
297:*13* 343:*18*
PR 304:*21*
practical 23:*9*
practice
187:*10*
practices 34:*5*
predating
165:*18*
prefer 54:*8*
261:*14*
preference
48:*1, 5, 14*
prefix 226:*21*
pregabalin
183:*2*
prepare 18:*12,*
*24* 19:*4, 14,*
*19, 23* 21:*16*
prepared
16:*10, 14*
17:*16, 23*
246:*1*
preparing
20:*5*
preplanned
163:*23*
prescheduled
165:*21* 166:*5*
presence
214:*3* 215:*24*
PRESENT
4:*1, 4* 12:*2*
press 257:*20*
pressure 183:*7*
pretty 35:*24*
51:*19* 74:*13*
117:*13, 22*
143:*12*
145:*24*
170:*23*
176:*23*
196:*20* 197:*8*
204:*7* 217:*4*
224:*15*
246:*21* 249:*4*

Confidential Information Subject to Protective Order

270:6  289:15
294:19
**prevent**
311:12  323:8
**prevents**  312:1
**previous**
102:7  109:14
**previously**
97:4  260:24
**price**  51:8, 11
52:1, 6, 9, 12,
15  56:16
58:10  116:5,
8, 23  118:15
120:20, 23
129:22
130:11, 17, 21
131:1  133:5,
12, 23  134:8
139:18  150:6,
10, 16  152:12
153:16, 23
155:13  195:4,
18  211:5
322:6, 7, 15
323:9, 20
**prices**  51:4,
22  115:1, 5,
16, 20  116:13,
15  117:18
153:21
154:14
193:15  194:11
**price-wise**
115:10
**pricing**  47:6,
8  49:4, 17
52:23  54:12
114:21, 24
116:11  140:5
151:4, 8
152:10
153:13  155:6
195:12
**Prinston**  3:6
**prior**  43:23
74:7  83:13,
16  96:17
105:1, 9
116:16  117:6
118:19, 22

139:21  142:9
143:19
159:24
165:23
167:13, 17
180:3  222:6
226:20  259:9
264:17
268:14  269:4
297:2  333:23
341:18
**prioritized**
242:11
**probably**
20:12  35:7,
22  47:5
81:10  86:11
101:24
105:14
106:11, 20, 22
107:5  111:3
144:20  176:8
196:24
200:11  209:2
236:3  253:16
309:13  313:5
**problem**
78:17  80:8
91:22  94:4,
14, 18, 20
125:13, 22
192:5
**problematic**
307:24
**problems**
162:1  319:20
**procedure**
98:16  187:11
**proceed**
135:13
**proceeding**
290:18  303:3
**process**  51:16
53:14  57:2
128:3  139:15
140:16
143:15
208:21
210:20  222:8
226:1  232:10,
17, 23, 24

233:18, 19
234:9  235:2,
12  236:3, 13,
17  239:23
240:9  241:16
245:16
247:20
249:10
252:20
277:20
341:17, 18
343:1, 4
**processes**
115:5  222:6,
10  225:12
227:19
231:10
234:18
239:17
278:15, 21
279:5, 17
**procure**  127:6
**procured**  50:6
**procurement**
26:23  31:9
32:7  44:8
50:5  54:14,
22  62:6  63:8,
13  72:7, 12,
13, 15, 23
78:21  79:2,
15  80:10
81:24  82:3,
10  84:7, 23
85:12, 20
86:18  96:3
109:1  114:21
119:22
127:13
129:15  139:5
141:19  142:6,
24  147:4, 14
149:1  155:3,
10  156:12
161:2, 11
181:13, 15
185:9  186:6,
23  187:9, 15
189:16, 20
193:1  194:3
204:13

211:22
269:23  270:1
285:8  287:4
291:15  299:2,
19  302:24
331:6  335:6
340:22  341:3
343:14, 16
**procurements**
72:18
**procurement's**
188:23
**procuring**
61:21  122:13,
22  123:18
**produced**
51:13  119:16
278:15
**producers**
146:16
**producing**
41:21  117:19
174:7
**product**  16:23
25:2, 3, 18
30:1, 2, 5
40:3, 18  48:9,
11, 17  49:21
53:3, 7, 17
55:9  56:21
59:7, 9  61:3
65:23, 24
67:15, 18
68:1, 22
69:12  70:20
73:24  85:8
86:16  87:24
88:1, 4  92:21
95:1, 2  114:9
116:9  118:8
119:5, 17
121:2  123:9
125:4, 18
140:1, 17, 20,
23  157:2
174:20, 22
208:2  210:11
224:4  227:14,
17  228:9, 17,
22  229:7, 16,
18  231:2, 12

232:9, 15, 23
236:2, 4, 12
238:17  275:1
291:5, 23
316:13
317:11  320:1
325:4  331:12,
13  333:2, 21
338:11, 24
339:3  340:6,
20  342:12
**Production**
10:8  25:20,
21  27:17
29:8  31:2
47:2  53:20
54:2, 4  55:1
57:10  81:15
94:24  95:12,
24  118:1
122:21  123:3
200:22
**PRODUCTS**
1:4  11:12
25:16  29:21
40:23  48:8
50:8  53:19
55:19  61:22
66:10, 23
72:21  74:9
75:20  84:21
119:14, 15, 19
120:2  130:2
143:11
146:12, 20
153:15  193:3
199:17
200:16
201:12  282:6
290:23
291:10
307:10, 22, 23
309:5, 7
317:4  318:8
321:17, 22
330:3
**Professional**
1:16  20:22
21:22  24:16
36:19  65:7
129:15  139:9

Confidential Information Subject to Protective Order

331:6  335:6
340:22  341:3
346:13
**professionals**
344:2
**professor**
22:17  38:3
**profile**  5:18
21:12, 14, 17
34:18, 24
35:9  38:17
**profitability**
153:22
**project**  42:24
53:4  55:9
59:9, 10  167:4
**projects**  41:8
44:15, 16
61:4  66:3
100:4  113:3
**prominent**
142:11, 18
**promise**  80:6
**promotional**
27:7
**properly**
208:12
**propounded**
349:9
**proprietary**
43:20
**pros**  48:4
120:24  292:1
**protect**  323:10

**PROTECTIVE**
1:8
**proven**  336:14
**provide**  41:24
56:24  261:3
262:17
302:22  334:4
**provided**
17:18  74:8
221:22  226:4
247:14  248:1
255:17
297:19
304:15  319:3
322:13

**providing**
13:11  254:17
302:13
**province**
173:11
**provision**
152:10
**PSD**  92:14, 15
98:18  109:15
110:20  129:11
**Public**  1:17
346:14  349:23
**publicly**
161:15
**publish**  187:21
**published**
188:14
**pull**  99:8
152:18  190:22
**purchase**
47:13  72:4
111:20  194:4
195:12  319:2,
16  321:16, 21
332:7
**purchased**
112:17  316:16
**purchases**
43:23
**purchasing**
70:18  83:11
**purposes**
100:7  111:21
322:4, 5
**pursuant**  1:13
**pursue**  23:6
**pursued**
316:19, 20
**push**  276:14
**pushing**
182:10
292:14  293:11
**put**  20:17
43:14  111:19
168:15  180:8
191:1  195:19
205:3  211:6
217:7  220:8
302:14
308:15

317:15  324:5

**< Q >**
**QA**  97:18
98:22  106:9
225:21
234:24  235:1
**qualifications**
101:11
103:24  318:22
**qualified**
100:19
101:20  103:2
**qualify**  127:2
**quality**  33:21
42:2, 20  44:9
45:3, 8, 12
46:8  53:7, 9,
10  55:2, 23
56:3  59:24
62:2, 9, 11, 19
64:4, 5, 15
81:3, 7, 11
82:4, 17  92:9
95:1  96:1, 10
100:2  102:20
103:2, 21
104:3  107:19
108:2, 19
109:3, 7
110:1, 9, 13
111:10
115:20  116:9,
23  118:16
119:24
123:21  125:2
127:2, 20, 22
130:1, 16, 19
139:16  140:4
155:14
156:11  161:9
175:19  186:7,
14, 15, 18, 20
187:1, 4, 13,
16  188:18, 20
189:18
203:19  204:2,
8  206:24
224:12, 17
226:15  228:5
240:17

241:19  242:7,
17  243:1
245:10, 19
246:1  253:21
254:5  258:10
259:21  260:1
261:17
264:12  265:6
266:3  268:21
269:12  270:2,
5, 16  271:7,
21  273:1
276:5  278:17
281:9  291:16,
22  295:23
296:20  319:7
320:17
331:12  340:1
342:22
343:21, 22
344:1
**quality's**  187:8
**quality-wise**
115:11
**quantifying**
236:6
**quantities**
73:19  337:24
**quenching**
207:16  208:1
209:7, 13
210:10, 17
**question**  14:2,
7, 13  40:15
50:15, 19
56:2, 7  74:21
95:10  105:5
111:24
120:23  124:5
151:16, 20
168:17
172:15
174:15, 19
191:11
198:21
201:16  204:9
207:23
208:10, 18, 24
209:9, 18
211:4  212:14
224:11, 17

225:20
226:12  237:7
245:9, 24
247:23  267:9
268:20  271:6
272:10
274:16  281:8
291:16
296:19
300:16
321:19
322:17  340:19
**questioned**
210:8
**questioning**
227:12  335:3
341:20
**questions**  7:7
10:14  12:19
13:10, 24
75:11  141:23
142:15
143:23
152:20
178:18  199:6
203:6, 18, 22
204:1, 6, 10,
12  206:13, 16,
17  207:1, 4, 9,
14  209:2, 16
210:1, 3, 13,
20  212:16
213:18  214:8
215:1, 20
216:7  218:19
235:19, 20
282:17  293:4
313:6  321:8,
9  330:11, 19
331:3  332:11
334:21
341:15  344:5,
23  345:5
349:8
**quick**  108:14
174:18  180:8
196:21
226:17  335:7
**quicker**  254:8
**quickly**  42:10
310:16

**quietly** 105:*22*
226:*6*
**quite** 119:*9*
250:*9*
**quotation**
51:*6, 7, 18*
**quote** 135:*10*

**< R >**
**R&D** 25:*10*
29:*6, 9, 11, 14,*
*20* 30:*9, 11*
31:*1, 21, 23*
32:*24* 33:*4*
39:*7, 20, 23*
41:*3, 6, 7, 10*
42:*1, 8, 11, 14,*
*19, 20* 44:*7,*
*16, 20* 45:*8,*
*11, 21, 24*
46:*4, 12*
49:*18* 51:*8,*
*20* 52:*3* 53:*4,*
*6, 11* 54:*21*
55:*6, 12*
66:*16* 68:*1, 6,*
*8, 13* 77:*7, 13,*
*15, 19, 24*
78:*19* 80:*12,*
*13* 89:*13*
90:*21* 91:*1, 3,*
*6* 100:*7*
108:*17* 109:*5*
111:*21* 339:*2*
**R&D/regulator**
**y** 322:*4*
**RA** 55:*3*
**Rachel** 4:*4*
**raised** 109:*2*
214:*2* 215:*23*
216:*13* 217:*2*
**range** 117:*3*
**rank** 58:*21*
60:*21*
**ranking** 61:*2,*
*4* 164:*22, 24*
**ranks** 332:*12*
**RASPANTI**
3:*9*
**ratiopharm**
23:*20* 24:*17,*

*22, 24* 25:*4,*
*12, 22* 26:*14,*
*18, 20* 27:*14,*
*16* 28:*8, 12,*
*15, 23* 29:*2*
33:*7* 34:*9, 14*
37:*15, 20, 24*
38:*6* 39:*4, 17*
43:*10* 65:*13,*
*19, 21, 22*
66:*6, 8* 80:*22*
89:*12*
**Ratiopharm's**
25:*10*
**raw** 32:*6*
276:*6* 277:*7*
**reached** 325:*3*
344:*6*
**reaction**
108:*13*
**read** 16:*17*
50:*18, 21*
90:*16* 92:*11*
97:*21* 98:*12,*
*19* 105:*3, 4*
106:*3, 14, 15,*
*16, 17* 107:*15*
113:*4* 133:*7*
135:*14, 15*
152:*1* 199:*21,*
*22* 204:*3*
206:*20* 208:*3*
212:*15*
214:*20*
221:*19*
228:*20* 236:*7*
238:*11*
244:*13*
258:*14* 261:*6,*
*7* 263:*11, 23*
267:*3, 13*
270:*18*
272:*19*
283:*18*
284:*22, 23*
288:*19* 300:*3,*
*10* 303:*23*
307:*5* 308:*1,*
*10, 11* 316:*22,*
*23* 318:*2, 10*
322:*21, 23*

345:*13* 346:*9*
347:*3* 349:*5*
**reading** 20:*13*
96:*15* 105:*22*
182:*19* 226:*6*
227:*22*
229:*10, 13*
231:*15* 235:*7,*
*23* 236:*16*
238:*22* 239:*4*
253:*14*
260:*10* 267:*1,*
*20* 269:*8*
273:*8* 274:*4*
276:*6*
**reads** 93:*10*
94:*1* 97:*20*
182:*5*
**reagent** 226:*2*
235:*2, 13*
236:*18*
**real** 37:*16*
111:*13*
120:*18*
137:*21* 180:*8*
**realize** 227:*13*
229:*15* 231:*1*
**realized** 91:*22*
**really** 37:*4*
48:*16* 49:*13,*
*20* 55:*7* 61:*2*
67:*5* 74:*16*
76:*6* 86:*7*
94:*10* 95:*21*
99:*21* 104:*2*
109:*10*
110:*17* 112:*1*
113:*9* 114:*15*
136:*12* 138:*7,*
*14* 152:*15*
154:*5* 175:*22*
178:*16* 183:*5*
212:*10, 13, 16*
238:*24*
247:*20*
274:*12* 276:*6*
280:*6* 299:*21*
300:*23, 24*
301:*5, 8*
302:*7* 303:*21*

314:*3* 332:*8*
333:*5*
**Realtime** 1:*16*
346:*14*
**reason** 14:*16*
102:*24*
109:*10*
111:*13*
125:*14* 127:*4*
129:*9* 132:*21*
133:*1* 137:*21*
141:*3* 183:*12*
185:*4* 198:*14,*
*16, 24* 199:*2,*
*14* 251:*18*
257:*11*
275:*10*
276:*10* 305:*9*
347:*5* 348:*6,*
*8, 10, 12, 14, 16,*
*18, 20, 22, 24*
**reasonable**
182:*21*
**reasons** 121:*4*
182:*18* 240:*8*
243:*3* 290:*19*
**recall** 16:*19,*
*23* 35:*8* 43:*2*
44:*2* 66:*5*
67:*1, 7, 8*
68:*3, 9, 11, 16,*
*18* 71:*24*
74:*15, 16*
75:*14, 15, 22*
76:*2, 4* 77:*6,*
*11* 78:*4, 15,*
*24* 82:*23*
83:*5, 15, 18*
84:*3* 85:*14,*
*15, 17, 19*
86:*6, 17, 21*
87:*10, 12*
88:*24* 89:*20*
90:*14, 19*
92:*12* 94:*19*
97:*15* 99:*21*
100:*14, 15*
101:*14* 103:*4,*
*9, 16* 106:*18*
107:*7, 9*
110:*11* 111:*7,*

*22* 112:*1, 15*
116:*1, 24*
117:*7, 8, 11*
118:*9, 11*
119:*5* 121:*16*
122:*11, 24*
124:*24* 131:*6*
132:*15, 18*
134:*14*
135:*20* 142:*4*
144:*21*
145:*13*
150:*19*
160:*21, 23*
163:*13* 164:*3,*
*8, 18* 165:*7*
166:*11, 17*
167:*3, 15, 20*
168:*20, 21*
172:*8, 22*
173:*5, 23*
175:*7* 176:*15*
178:*12* 179:*7,*
*13, 18, 20, 23*
180:*2, 6*
185:*24* 186:*3*
190:*3, 4*
192:*14* 196:*2,*
*11, 15* 198:*12*
199:*23* 200:*3,*
*12* 201:*10, 14,*
*20, 21* 202:*2*
203:*5, 16*
204:*15, 22*
205:*24* 212:*1*
213:*5, 11*
215:*24* 216:*4,*
*19, 24* 217:*12,*
*18* 219:*11*
221:*1* 222:*9,*
*18, 19, 23*
223:*3, 10, 17,*
*19* 224:*2, 13,*
*14* 232:*9*
236:*1, 11*
240:*18*
243:*19*
245:*10* 247:*5,*
*8, 13, 18*
248:*4, 8, 11*
251:*15*

255:14, 15, 22
256:15 257:8
261:22 267:2,
23, 24 272:21
281:11 282:4,
18 283:14
286:9 288:10
290:14, 16, 18,
19, 22 291:9,
13, 14, 23
292:2, 4
294:18
295:17, 18, 22
296:13
298:20
301:21 307:2
313:3 326:18,
19 327:12
333:16, 17
335:2, 4
341:19, 20
342:11, 13, 16
343:6
**recalled** 17:2
227:16
228:19
231:19
232:14
236:14 291:4
342:2
**recalling** 18:16
**recalls** 122:4
140:12 143:1
149:3 232:22
273:14 312:24
**receipt** 347:17
**receive** 44:9
132:22 199:1
251:21
270:19 314:5
322:15
**received**
43:15 160:17
191:12
195:15
202:18, 23
203:3, 9
204:1 212:6
218:18
236:19
288:17 326:10

**receiving**
190:16
**recollection**
281:4, 7
**recommend**
121:17
**recommendatio
n** 52:14
242:24
**recommended**
121:13 343:11
**reconfirmation**
253:21
**record** 11:3
12:3 56:12,
24 76:15, 18,
22 90:2 97:4
104:7 107:24
113:12 129:1
131:9, 22
133:18 158:5,
9, 21 180:14
243:12
250:19, 22
251:2 306:16,
19 317:16
329:11, 15
345:8, 11
346:6
**recorded**
258:20
**recover** 154:8
311:3
**recovering**
151:3
**redacted** 9:10
300:12, 22
301:3, 13
**reduce** 58:3
**refer** 21:19
24:19 43:4
64:14 226:15
292:19
**reference**
184:1 193:19
200:1 217:23
320:17 322:2
**referenced**
213:9 220:5
**references**
258:4

**referencing**
97:23
**referred** 151:7
**referring**
135:16 136:8
199:24 218:6
303:15
**reflect** 314:17
**refund** 313:1
314:1 323:13
324:23 325:9
**refunded**
312:20 324:19
**reg** 42:21
45:13 204:12
**regard** 17:7
**regarding**
68:4 203:2
253:4 260:5
272:3 307:8
314:23
327:23
340:20 341:15
**regardless**
242:22
**regards**
321:15, 20
**region** 6:10
57:21 58:2
**regional**
162:12
**Registered**
1:15 346:13
**regular** 67:3
83:22
**regularly** 75:1
187:11 341:4
**regulation**
184:2
**regulations**
59:14 81:17
125:18 127:1
128:4 142:13
143:6
**regulator**
281:5
**regulatory**
56:21 119:24
127:15, 22
156:11
187:20

188:13, 14
256:2, 7
259:23
**re-introduce**
127:9
**Reiterate**
50:23 262:23
**rejected** 56:15
**rejections**
56:12
**relate** 207:9
222:6
**related** 89:16
110:21
141:24
161:17 214:3
215:11, 23
238:24
260:22
261:12
262:24
274:10, 13, 17
275:7 311:5
318:22
338:14 339:17
**relates** 17:17
**relating** 207:4
316:12
**relations**
304:23
**relationship**
88:14 160:7,
14 276:15
303:22 304:4,
8, 14, 17
305:9, 13
335:1, 8, 16
336:12 337:2
340:4
**relatively**
164:24
174:18 278:22
**release** 257:21
316:8
**releases**
315:24
**relevant**
67:21 88:2
319:22
**reliability**
129:24

130:22
139:16 140:5
155:14
331:13, 20, 22,
23
**reliable** 56:8
114:15 129:6
155:12, 18
157:4, 6, 17,
22 336:15
**reliably** 332:9
**relies** 309:4
**Reloading**
90:7 191:2
**rely** 252:12
331:24
**remain** 170:15
**remember**
16:22 87:2
138:14 144:9
170:22
181:16
189:15
213:13 215:9
216:15
233:23
239:19 254:2,
4 268:1, 6
296:1, 5
302:8 323:2
338:18, 20
342:17
**remote** 1:13
11:9, 22 19:6,
8
**remotely**
11:19, 21
12:23
**removing** 23:5
**Rena** 206:6
225:19 232:4
236:17
**repay** 311:8
**repeat** 40:14
50:15 105:4
124:8 151:20,
23 190:13
318:17
**repeatedly**
293:16

Confidential Information Subject to Protective Order

rephrase 14:1
108:21 152:7
254:18
replied 273:22
replies 216:6
reply 214:11
216:1, 4
261:21
265:22 277:5
288:17 289:9
290:5
report 91:1
93:5, 9
132:14
161:24 188:3
258:2, 3, 12,
20, 23 261:18,
19 262:1, 6,
11, 13 263:5
264:3, 7
265:17, 22
266:5, 7, 12,
17, 22 267:3,
14, 17, 22
268:2, 9, 13
269:4 270:4
271:2, 3, 9, 11,
14, 22 272:7,
20 273:12
275:9, 14
277:4, 24
279:20
295:21 297:2,
22 300:1
reported
282:2 299:3
Reporter 1:16,
17 12:4
50:18, 21
106:4 151:22
152:1 173:9,
17 322:23
346:13, 14, 22
reporting
11:23 77:20,
24 78:1, 7
91:5 107:1
110:24
132:11
164:23 259:18

reports 75:1
189:1 256:3,
7 280:2
represent
291:3
representative
26:20 65:13
66:11 176:4
representatives
163:24 172:8,
23 175:12
179:14
represented
73:15 75:18
Representing
2:6, 13, 19
3:5, 12, 18, 23
reproduction
346:20
Republic
27:23
reputation
99:12
Request 8:7
10:8 201:11
225:20 272:5
273:21, 24
285:19, 24
286:15
292:14
325:24
326:16
328:10 329:4
344:17
requested
50:21 152:1
286:19
312:11
322:23 341:8
346:6
requests
144:18
273:11, 20
293:4 326:5,
7, 11, 20 328:5
required
167:5 339:24
340:2 341:10
requirement
320:8

requirements
318:7 319:22
333:20
requires
119:8 150:15
241:21
resentment
139:13
resentments
137:11
reservations
335:7
reserve
330:17 345:12
resolution
327:3, 8
resolvable
111:16
resolved
266:1 319:6
340:3, 10
resolves
318:18
resourced
340:7
respect
115:19 116:5,
8, 23 118:15
129:20, 22, 24
137:4 139:7
140:4 154:5
155:13
253:24
295:14 300:8
314:20
324:12 325:4
333:14
338:16 340:18
responded
235:18
260:13
263:10 289:5
responding
230:22
response
261:5 262:18
263:20
responses
215:19 293:17
responsibilities
26:9 28:22

30:18 31:18
32:15, 16
33:8, 12, 17,
21 34:8, 13,
16 40:2, 7, 17,
22 80:19
81:8 85:2, 21
86:14 87:16,
21
responsibility
29:10 32:23
33:23 63:7
84:22 85:5, 9
86:5 87:12
101:4 186:19,
24 188:23
189:21 343:21
responsible
27:12 29:3
31:9 37:6
62:10, 13
80:11 82:14
84:24 85:7,
13 86:3, 19
88:1, 5, 18
160:11 165:1
186:15
188:12 193:2
226:16 245:11
rest 190:6
198:19, 22
224:14
263:23 318:10
restate 309:13
restaurant
196:2
result 107:12
109:19
124:23
235:10
302:17
305:20, 24
338:4
results 7:14
93:13, 15, 24
95:15, 22
226:4 235:9
236:19
247:15 248:2,
5, 13 255:17
258:19 292:7

293:17
294:16
341:16 342:9,
12
resumé 21:11
24:20 35:2,
17 36:12
37:3, 12 65:12
retention 17:2
retired 233:1
return 26:17
347:15
returned
26:14
Reuven 87:4
R-E-U-V-E-N
87:8
revelation
249:9
revelations
297:3 299:8
review 19:23
20:3 192:18
212:8 230:10
268:2
reviewed
18:15 192:17
reviewing
302:1
right 14:22
15:4, 18, 23
16:2 20:15,
23 21:1, 2
24:4 26:1
28:24 32:12
33:14, 22
34:2 35:10
36:4, 7 37:3,
13, 20 38:10,
14, 17 39:24
40:4, 5, 19, 20
45:4, 7, 9, 14,
18 46:5, 7
47:3, 6, 14
48:23 55:4, 7
58:7, 11
60:23 62:9,
12, 23 63:5,
18 64:10, 13,
19, 21 65:4,
11 66:16, 17

69:7, 9, 16, 20, 22 70:2, 5, 16 71:6, 10, 23 75:13, 21 76:17, 21 78:11 79:11 80:12 82:2, 7 83:8 87:18 90:22 91:11, 12, 20 92:4, 10 94:3, 5 98:3, 5, 19 99:2, 12, 20 100:8, 10 105:9, 12 106:14, 16, 24 107:7, 15 108:20 110:1 111:4 112:8, 14 113:10 114:13, 22 115:1 117:8 118:2 121:18, 21 122:2, 6, 15, 19 123:3, 10 128:8, 18 129:18 131:3, 21 133:7, 9, 13, 20 134:3, 12, 21 138:16 143:23, 24 144:11 146:15, 17, 19, 23 147:2, 13 148:6, 9, 17, 24 150:7 151:6, 15 153:9, 12, 15, 20 154:14 155:6 158:4, 8, 17 159:16, 19, 20 161:3, 8 162:15, 17, 18 163:21 168:16 173:14 175:13, 24 178:18 183:18, 23 184:17 185:1, 8 186:16

187:9 189:14 190:23 193:12, 16 194:12, 15, 16, 18, 24 195:2 198:13 199:21, 22 202:1, 15 207:3, 6, 12 208:21, 22 209:4, 6, 14, 17, 19 210:18, 23 212:7, 23, 24 213:1, 3, 20 214:10, 20 218:8 220:23, 24 221:20 222:1, 5 223:9, 15 225:9 226:24 227:1, 24 228:2, 21 233:2, 15 234:13 236:10, 22 238:4, 11, 14 239:17, 24 241:16 243:17 244:13, 16 246:6, 7 247:4, 12, 24 250:15, 21 251:1 252:6, 8, 13, 16, 21 253:3, 10 255:17 258:3, 8, 14, 17, 21, 24 260:3, 6, 14 261:6, 7, 13, 23 262:10, 14, 22, 24 263:6, 9, 13 264:5, 10, 14 265:13 266:18, 23 268:4 269:4 270:11 271:17 272:21 274:8 275:1, 5, 9, 12, 16 280:22

282:1, 2, 3, 20 283:9, 12, 13, 15 284:1, 4, 22, 23, 24 285:7, 8, 10, 14 286:3, 7, 21 287:3 288:19 289:6 290:12 291:11, 18 292:8 295:11, 20 296:7, 9, 12, 22 298:10 299:9 300:3, 9, 20 301:3, 6 303:23 304:18, 24 305:17 306:2 307:10, 18, 20 308:1, 17 309:12 318:8 319:12 322:12 324:14, 15, 24 325:1, 6, 7, 12 329:10, 14 330:2, 4, 6 338:21 345:10, 13
rights 25:8, 18
risk 57:15 141:12 209:6 227:24 228:5 241:20 287:19 290:24 308:23 309:7, 11, 20, 22 310:12
Road 2:10
ROBERT 1:4
Rodriguez 4:4 11:4
role 27:5 36:24 45:15 62:7, 8 66:19 72:6 82:1, 4 83:1 185:10 187:17 189:17 298:24

332:16 340:21 343:20
roles 164:19
room 191:5
rough 51:24
roughly 20:4, 12 65:6 182:15
round 36:22
Rubenstein 344:13
rule 62:11 187:15 230:1
ruled 230:2
rules 13:6 59:13 81:17 126:24 128:4 142:13 143:5
ruling 62:13 230:11
rumor 177:13 218:9, 13 220:5
rumors 177:23 178:9, 20 216:16 217:24 218:3 219:6
run 167:10

< S >
safe 241:23 279:2
safety 59:15, 17, 24 60:7 61:6, 14 62:4, 14 63:6, 19 184:4 290:21, 24 292:4 332:12, 16 333:1, 21 334:2 336:9 338:3, 12
sale 223:22
Sales 6:9 52:4 164:22 290:15
Samardiev 181:8
Sananes 298:17

S-A-N-A-N-E-S 298:17
Sandoz 178:16, 23 179:6, 8 216:21
SANJABI 2:9
Sanjabib@gtlaw.com 2:12
sartan 169:23 174:5 200:15 201:4, 12, 23 281:23 282:6, 13 283:21 284:17, 20 285:2, 12, 20 286:14 292:15 316:15
sartans 174:6 201:9 202:7 282:10 291:21
Satish 295:7
saw 105:1, 9 146:10 226:21 233:12 239:18, 20 252:18 265:19 271:14, 22 277:17 280:21 289:4 341:6
Sawyer 211:21
saying 35:18 94:17 98:22 100:17 102:9 107:2, 18 109:7 110:2, 3, 10, 12, 16, 19 134:3 137:14, 19 138:14 204:16 223:5 229:17 231:11, 15 253:20 261:14 285:19 286:1, 14 301:10, 18
says 13:12 35:2, 4, 13

Confidential Information Subject to Protective Order

36:6, 11
37:11, 12
92:7, 13, 24
97:17 98:6
100:18 105:3,
20 133:8
135:9 154:7
183:24
192:22
193:21
194:14, 17, 20
202:13 208:4,
14, 17 209:10,
11 221:13, 15,
17 222:4, 13
228:2, 5, 17,
20, 21 229:3,
6 231:16
237:4 238:13
239:22
257:24 258:7,
9, 15, 16, 17, 21,
23 262:5
264:6 270:9
274:20
280:24
284:13, 14
301:5 302:6
319:8 323:18
scale 42:6
schedule
165:17, 24
166:2, 7, 15
175:14
scheduled
165:11, 13, 19
171:19
scheduling
185:11
scheme 59:12
Schmitz 78:23
79:4 298:16,
24 303:20
304:2 306:23
S-C-H-M-I-T-
Z 78:23
Schnitter
77:16
S-C-H-N-I-T-
T-E-R 77:17
ScieGen 3:18

science
279:11 280:7
scope 49:8
50:24 51:2
241:2, 7, 10
245:6 248:16
264:23
screen 96:16,
18
scroll 16:4
21:13 97:16
Scrolling
226:13 244:2
search 187:18
second 7:14
35:6, 21 39:1
40:9 78:16
100:22
128:14
159:13 193:8
206:2 207:22
208:9, 18, 24
209:18 214:1
225:17 229:9
234:1 251:10
272:11
273:24 288:4,
23 299:13, 15
300:14 307:11
section 315:24
316:4 317:2,
23 319:1
320:16
321:11, 20
322:10, 11, 13
secure 48:15
security
129:24 130:23
see 15:17, 18
16:6, 7 22:12,
19 25:23
29:18 31:3,
12 34:19, 20
35:4, 7, 15, 16,
20, 22 42:7
43:4 45:1
57:3 66:1
68:2 81:16
90:8, 12, 13
91:24 92:1, 5
93:22 94:9

95:20 96:18
97:1, 2, 7, 9,
11, 22 98:9,
10 99:9, 13,
15 100:16, 20
101:6 104:18
105:19 106:7,
13 110:4
124:22 129:9
133:1, 21
134:18, 24
135:6, 8
160:16
180:24 181:1,
5, 6, 23, 24
182:3, 24
193:20, 24
194:3, 19
197:24 198:1,
7 202:10, 11,
14 203:14, 15
206:7, 14, 15
209:23
212:19
213:19, 21
214:7, 8, 13
225:10, 14
227:20 229:6,
8 232:6, 11,
12 234:24
241:20
243:24 244:3
252:1, 3, 9, 10
257:23 259:7,
8 260:15, 16
262:1, 3, 4, 20,
21 263:17
265:9 266:11,
16 272:9
273:20 274:6
283:21, 23
285:23
287:19 288:8,
9, 13 289:1
299:14
300:13 316:5,
6 322:10, 11
328:18, 24
329:1 341:12
345:2

seen 16:1
124:12
137:23 146:4
174:11
252:22 254:3
284:15
293:13, 14
sees 194:11
selection 53:1
sell 29:22
126:20
308:22 322:3
selling 30:4
143:10
245:22 290:9
291:10 330:3
sells 146:20
send 132:22
161:21
168:10
198:15, 17
199:1 251:19
267:1 272:17
sending 91:16
161:9 200:10
273:7 283:11
senior 31:14
32:4 36:4, 23
290:1
sense 73:11
284:20 285:5,
12, 17 286:16
334:24
sent 162:16
163:10
261:19 266:21
sentence
101:1 105:19
106:3, 13, 15
217:19 218:7
238:12
246:18
283:22, 24
sentiment
136:13 137:4,
15 138:4
Sentry 2:17
separate
208:2 210:11
separately
20:9 209:8, 13

September
90:11, 24
97:9 104:20
248:2 267:7
288:14, 22
289:3, 8, 12
291:19 298:18
sequestered
17:3
series 13:10
serious 95:4,
8, 11, 13, 17, 19
96:2 98:14,
24 175:19
227:11
seriously
109:9 277:4
service 304:15
SERVICES
1:20 11:6
session 149:9
set 41:23
69:8 81:20
95:16 141:14
204:9 319:3
323:11
settle 325:19
Settlement
9:16 312:14
313:7, 19, 22
319:17 321:2
settling 314:18
seven 134:13
135:19 223:2
Shanghai
26:21 39:6
65:10, 13
66:11 93:11
102:2 162:14
171:8, 9
196:13, 21
197:7
share 75:18
96:16 101:9
102:15
213:24
256:14
263:11 280:1
284:7 320:14
shared 101:19
256:6, 14

sharing 102:6, 11 108:24 256:1

shear 242:8

shed 259:5

sheet 347:7, 9, 12, 15 349:12

shifted 86:14 120:12

ship 307:23

Short 8:14 76:19 158:6 250:16, 23 329:12

shortage 337:8, 15 338:4

Shorthand 1:16 346:13

shortly 21:13 77:3 89:11 90:16 163:10 199:12 204:3 206:20 215:4 220:1 299:10 300:10 343:17

show 193:23 247:7

showed 168:9 195:17 235:9 236:18 237:6 258:11

showing 86:8 194:22 195:4

shown 334:22 344:12

side 30:9 53:15 55:2, 5 163:4 241:23 295:6 313:23 343:14, 16

sides 29:12

sign 345:13 346:9 347:8

signature 97:17

signed 313:18 321:3

significant 58:11

signing 347:10

similar 111:8 148:22 201:5 203:6 253:18 334:19

sir 13:3 15:8, 14 18:13 20:9, 20 46:17 59:3 69:5 75:8 79:18 80:4, 7 83:9 88:20, 24 96:19 97:22 99:7 104:5, 14 105:19 106:2 118:3 131:16, 22 138:5 145:12 150:13 152:21 159:4 173:9, 19 176:22 178:5, 10 180:9, 16 190:12, 14, 21 191:5 193:8 195:20 197:4, 10, 16 198:20 205:14 211:7, 16 212:2 220:9, 19 224:19 229:8 231:7, 23 234:14 242:3, 18 243:6 247:1 250:3, 12 257:2 269:22 288:24 297:24 298:9 302:2 306:8 317:22 321:8 324:6

site 6:10 57:7 98:2 112:17 119:2 120:13 123:1 140:19, 24 202:18 274:3 292:3

sites 29:14 30:11 31:23 32:21 39:23

69:16 88:7 120:6 149:16 181:14 307:22 310:23 311:2 314:14 341:11

sitting 184:14 247:12, 23

situation 8:19 107:21 118:10 120:1 126:8, 9, 18 135:11, 18 136:9 138:15 140:1, 4, 18, 20 144:14, 24 145:22 146:5 156:14, 22, 24 157:15, 21 249:23 324:8

six 182:15 222:24 247:21

size 92:15, 19 108:4 111:15, 18 338:17 339:5, 16 340:2, 9

slightest 219:15

slightly 273:7

small 239:13

smaller 26:11 162:13 323:15

Solco 3:7

sold 74:2 117:5 255:3 286:23 325:5

soluble 92:20

solve 96:11 107:14 125:22 126:22 129:10 305:7

solved 94:15 95:6, 19 108:9 110:22 111:18 149:24 319:20 340:16

somebody

259:20

Sonia 77:5

soon 250:8 278:22 287:5

sooner 248:13 261:1

sorry 16:17 23:12 40:9, 14 59:1, 20 69:5, 6 80:5, 15 92:21 94:6 96:22 106:5 107:9 108:21 112:9 118:21 123:14 124:4, 9 130:13 131:17, 19 144:24 145:5 151:21 152:5 153:5 156:17 186:9 190:13 191:1, 5, 10 192:2 193:5 207:7 212:3 218:20 224:1 226:14 228:4 234:6 241:4 254:18 258:15 273:17 276:2, 22 281:16 288:20, 21 295:12 296:2, 3 300:15 303:8 321:18 322:19 323:1

sort 30:2 43:21 74:24 82:10 91:3 161:15 334:10

sounded 259:19 260:11 297:16 306:5

sounds 17:21 46:18 235:8

source 30:23 41:6 42:17 53:2, 22 54:7 58:6 82:21

120:19, 22 121:1, 5, 7, 19 122:5, 18 126:13 130:5 144:2 146:22 147:3 148:20, 22 154:22 156:9 241:2 329:21 333:15, 18 337:18

sourced 49:5 65:4 73:12 92:4 100:11 109:4 112:6, 13 221:8

sources 54:16 60:8 130:8 153:8 189:22 190:19 191:16, 20 337:8, 23

sourcing 27:12, 22 28:22 29:6, 16, 20 30:9 31:15 33:9 39:8, 20 40:2, 17, 22 41:4, 10 42:20 44:8 45:21 46:4, 12 51:20 52:22 53:11, 17 55:6, 18 59:7, 16 60:23 61:7 62:15 63:20, 21 66:16 68:13, 19, 20 69:18, 21 70:6, 11 71:1, 4, 7 77:7, 14, 15, 19, 24 78:10, 19 80:12 81:22 82:24 83:18 87:18 89:1, 13 90:21 91:1, 4, 6 99:19 100:6 108:17

Confidential Information Subject to Protective Order

113:9  118:18
123:15, 24
124:15  126:1
128:3, 21
129:17
139:15, 22
140:13
141:20
143:15  148:9,
10, 12, 16
152:24
154:12
192:21
304:23  330:7
331:8  332:17
**South**  3:3
27:24
**Southeast**
26:23  27:18
29:4
**space**  347:6
**spare**  321:9
**speak**  13:19,
21  77:1
158:12  251:5
**speaker**  152:6
**speaking**
11:24  230:18
**spec**  46:22
**special**  32:20
48:9  142:3
166:18  167:5
179:5  334:10,
12, 17
**specific**  48:10
61:3  74:1
75:9  84:3, 17,
18  86:16, 18
87:23  88:5
93:9  116:11
117:12
136:11
140:23, 24
141:18
145:12
157:15  167:9
168:19
179:13, 19
190:5  200:4
244:24  294:18

**specifically**
85:21  132:20
150:13
183:19  216:19
**specifications**
44:10, 12, 17,
23  45:3, 6
46:9, 20
55:23  92:18
**specifics**
142:22  213:6
**specified**
315:12
**speculation**
126:5  127:18
136:18, 21
154:16  271:19
**spell**  87:5
173:8
**spend**  20:7
73:22  74:23
75:10  299:1
**spent**  20:5
**split**  51:7
**spoke**  77:3
179:20  186:13
**spot**  274:9
**spreadsheet**
43:21  44:2
**stage**  44:20
47:20  67:16
156:7, 21
**stains**  23:5
**Stand**  15:7
88:19  89:21
96:21, 23
104:7  158:20
180:9  190:11
197:9, 16
220:10
237:19  306:14
**standalone**
28:9
**standard**  48:7
81:20
**standards**
258:12
**standpoint**
96:1  304:22

**stands**  70:11,
23  162:8
194:6
**STANOCH**
2:3  5:7
12:14, 16
15:13  18:5, 6
20:19, 24
21:6  50:3, 13,
17  52:20
60:5, 14, 20
62:5  63:4, 17
75:7  76:13,
23  88:19, 22
89:6, 21  90:1,
4  97:3, 6
101:17
103:12  104:4,
13  105:17
108:15
110:23  114:4
117:4  124:6
125:24  127:7
128:9  129:13
131:7, 14
133:19
136:19  137:1
143:17  144:3
146:6  147:12
148:3  150:4
151:15, 21
152:9  153:6
154:24
155:17
156:15
157:23
158:10, 19
159:2  173:16,
18  180:7, 13,
15  183:16
190:11, 15
192:2, 8
197:9, 14, 17
205:2, 6, 12
210:5  211:8,
12, 14  220:10,
15, 17  224:18,
24  228:14
229:5, 14, 21
230:6, 17, 23
233:10  234:4,

12  237:19, 23
242:1  243:11,
15  245:20
249:8  250:3,
11, 18  251:3
253:7  255:23
256:22, 24
263:19
266:10
268:24
269:16
271:24
274:22
277:10
280:20
282:21  283:1,
4, 8  287:21
288:1  293:10
294:3  297:23
298:8, 12, 14
306:7, 12, 15,
18, 21  309:11,
14  312:4
313:8, 13
317:18, 21
322:20  324:4
328:12, 17
329:7, 16
330:10
332:18
334:14
335:10
337:12  339:9,
11, 19  340:12
342:4  345:2,
4, 7, 15
**start**  40:6
54:4  73:6
120:13
196:17
203:12
204:17
312:21  333:5
337:19
**started**  22:14
37:15, 20
41:17  43:8
52:18  67:14,
22  82:24
85:2, 24
201:22

215:15
240:19
289:19  300:13
**starting**  39:19
41:2  53:16
85:11  144:12
200:23  201:5
331:12
**starts**  42:12
47:17  61:20
**State**  3:16
158:21
306:19
309:15  347:5
**stated**  204:23
**statement**
101:24
102:17
138:12
174:11, 24
271:11
276:20  285:5
300:24
**statements**
144:6
**STATES**  1:1
11:13  22:4
188:1  316:7
339:1, 8
**stating**  113:14
**status**  260:9
324:17  329:3
**stay**  36:14
49:20  171:3
**stayed**  31:11
37:5  93:11
170:24  171:7
**staying**  65:10
102:3
**steakhouse**
196:11
**steakhouses**
196:8, 10
**stenographer**
13:13
**stenographic**
12:3
**step**  23:15
255:7
**sticking**  49:2
**stipulate**  16:9

Confidential Information Subject to Protective Order

**Stipulations**
10:*11*
**stock** 324:*20*
**stop** 113:*9*
128:*21* 309:*6*,
*18* 335:*1*
337:*17*
**stopped**
122:*21*
126:*15*
129:*17*
152:*24*
154:*12*
290:*14* 324:*21*
**stopping**
171:*24*
**stops** 309:*21*
**stories** 177:*9*
219:*6, 12*
240:*1*
**story** 92:*12,
14* 144:*14*
240:*7* 249:*19*
254:*7* 341:*9*
**STOY** 3:*9*
**strategic**
31:*14* 72:*20*
73:*1*
**strategies**
30:*22* 32:*21*
**strategy** 30:*14*
32:*5* 35:*14*
73:*3* 121:*9*
**Street** 2:*4*
3:*3, 16, 21*
**stressing**
299:*22*
**strike** 15:*1*
18:*11* 32:*10*
80:*16* 82:*19*
88:*20* 112:*4*
172:*6* 187:*18*
266:*19* 267:*6*
268:*9* 296:*8*
**structure**
54:*12* 169:*9*
**structured**
32:*17*
**stuck** 149:*19*
**studies** 24:*11*
**study** 37:*11*

**studying**
22:*24* 37:*22*
**SUBJECT**
1:*8* 5:*20* 6:*6,
9, 14, 17, 20*
7:*6, 9, 13, 17,
21* 8:*6, 11, 14,
17, 21* 9:*6, 10,
13* 301:*2, 4*
347:*10*
**Subscribed**
349:*19*
**subsequent**
103:*14*
**substance**
349:*11*
**successful**
276:*24*
**successfully**
316:*20*
**suffered**
150:*22* 154:*9*
**sufficient**
264:*8*
**suggested**
62:*24* 297:*20*
334:*23*
**suggesting**
113:*7*
**suggestion**
54:*15* 272:*16*
274:*1* 285:*16,
18*
**suitable** 140:*5*
**Suite** 2:*10, 17*
3:*21*
**suits** 42:*8*
**summarize**
75:*2*
**summary**
74:*24*
**Summer** 1:*15*
122:*17* 295:*9,
15, 19* 345:*19*
**supervise**
133:*10*
**supervision**
346:*22*
**supplied** 25:*18*
**supplier**
45:*18* 46:*11*

53:*10* 54:*19,
20* 56:*6, 8*
73:*1, 9, 21*
74:*14* 75:*4,
24* 88:*14*
113:*7* 114:*3,
6, 16* 118:*23*
127:*15* 129:*6*
136:*16*
139:*18* 146:*8*
147:*16* 149:*2*
155:*5, 18*
157:*4, 6, 17,
22* 160:*14*
194:*11*
254:*17* 255:*3*
292:*13* 305:*2*
331:*14, 15*
334:*13* 335:*2,
9, 20, 24*
336:*16* 338:*5*
**supplier-facing**
82:*11*
**suppliers**
29:*16* 30:*23*
34:*14* 48:*2,
16* 56:*1* 58:*9*
65:*17* 72:*21*
73:*7* 75:*18*
80:*20* 82:*2*
84:*19* 87:*22*
88:*17* 115:*14*
121:*15*
130:*17*
137:*17* 139:*4*
148:*5* 154:*13*
155:*12*
172:*23*
185:*12* 186:*4,
8, 16, 21*
187:*2, 12*
188:*15* 189:*1*
242:*5* 245:*4*
246:*5* 255:*9,
12* 259:*15, 24*
269:*18* 272:*2,
6* 281:*14, 19*
282:*10*
291:*21* 304:*8*
332:*1, 24*

334:*19*
336:*22* 337:*11*
**supplies**
181:*21* 195:*15*
**supply** 25:*4*
46:*14* 47:*20,
22* 48:*1, 6, 14,
15, 19* 71:*21*
83:*3* 130:*1,
23* 331:*9*
332:*9* 333:*24*
336:*2, 4, 9*
337:*8, 23*
338:*3, 10*
340:*4*
**supplying**
130:*2* 188:*16*
**SUPPORT**
10:*2* 48:*16,
22* 227:*10*
**sure** 13:*6, 9*
16:*18, 21*
20:*13* 22:*5*
35:*10* 36:*2,
20* 39:*2*
40:*10, 12*
48:*15, 21*
51:*15* 67:*3*
73:*4* 74:*11,
13, 19* 76:*6*
78:*6, 8, 17, 18*
84:*1* 86:*7*
95:*5, 13*
100:*23*
102:*17*
103:*18* 105:*6*
107:*13*
108:*23*
112:*10*
116:*11*
117:*14, 22*
118:*13*
124:*10*
130:*14*
134:*16*
143:*12* 145:*3,
24* 151:*18*
152:*18* 153:*7*
161:*11* 163:*4,
20* 164:*16*
170:*23* 173:*1,

10* 175:*20*
176:*6* 179:*24*
196:*1* 197:*8*
201:*15* 203:*8*
204:*4, 7*
206:*21, 22*
207:*8* 210:*6*
213:*16* 217:*4,
5* 224:*2, 15*
237:*10, 11, 16*
239:*5* 244:*21,
23* 245:*14, 17*
246:*20, 21*
247:*1, 18*
249:*4* 265:*4*
270:*6* 274:*9,
18* 277:*9*
284:*10*
286:*18, 19, 20*
289:*16*
292:*10*
293:*14*
294:*19*
307:*12* 312:*6*
313:*8* 323:*22*
**surfaced**
122:*16*
**surprised**
262:*1*
**surprisingly**
305:*20*
**suspicion**
177:*21*
218:*24* 292:*5*
**swear** 12:*5*
**switch** 42:*17*
54:*19* 121:*14*
146:*13*
**switching**
151:*11*
**sworn** 11:*21*
12:*9* 346:*5*
349:*19*
**system** 116:*18*
**Systems** 28:*4*
29:*6* 115:*24*

**< T >**
**table** 203:*11*
**tabulation**

Confidential Information Subject to Protective Order

202:16
Taiwan 28:1
Take 5:16
14:10, 14
29:15 38:18
57:13 63:14,
21 64:1
65:16 76:10,
14 96:5
108:14 109:8
130:6 131:7
132:17
151:14, 17
152:21
157:12, 23
171:4 250:12,
15 256:17
290:20 329:8
331:8, 11
Takeda 37:7
taken 1:13
13:12, 18
42:14, 23
56:19 58:22
61:17 254:6
takes 35:8
talk 19:17
47:1, 6
115:21
150:12 155:1
162:22 170:2
175:12 176:3
178:22 219:4
294:22 312:7
326:4 329:18
talked 163:1
172:12
213:14 215:4
226:19
255:16 259:20
talking 55:9,
17 89:17
92:5 94:16
172:8 218:1
225:23
226:24 227:4,
7 237:7
239:1 241:15
249:2 264:12
297:9
task 187:8

tasks 25:1
26:9 60:24
TEA 226:1
235:2, 12
236:17 240:8
341:18
team 29:3
41:10 45:21,
24 46:6, 10,
19 48:20
49:4 52:3
59:24 72:12,
14, 23 77:18,
20 78:1
79:11, 21, 22,
23 80:10
81:2, 11 82:3
83:7 84:22
87:11 90:24
95:14 103:2
104:3 127:3
141:1 156:10
157:11 161:2
175:19
185:22
203:19 204:8
225:21 232:5
234:24
240:17
261:17 264:9
266:3, 8, 15
267:3, 10
268:1, 21, 22
269:12 270:6,
16 271:7, 21
272:24 273:1
276:5 278:17
281:9 288:14
291:22
292:22 319:8
teams 84:23
292:23
Technical
22:13, 16
42:3 44:9
45:3, 22 46:1,
9, 20 55:23
94:15 320:17
TECHNICIAN
4:1

tell 14:21
24:21 28:20
30:17 49:1
85:23 117:15
118:12
145:15
154:20
169:10
185:16 187:4
202:6 203:7
214:16
216:12 217:9,
13 219:10
220:2 231:24
237:24
263:21 275:2,
14, 17 278:2
283:2 288:2
300:21
306:13
313:14
328:18 332:2
telling 108:16
221:20
238:15
254:12
278:19 280:9
tells 234:21
291:24
Telmisartan
199:19
tend 150:8
tenure 33:6
39:16
term 34:2
Terminus 2:9
terms 49:12
75:3 114:18
141:19
332:12 343:10
territory 27:21
test 7:14
14:12 80:6
214:5 216:3
217:11, 14
222:17, 22
241:1, 6
242:4, 10, 21
243:4 244:11
245:15, 22
246:15

248:13 255:5,
12, 17 287:20
292:7, 14
293:8, 12, 17
294:16
341:16 342:9,
11
tested 7:18
237:12, 13
240:23
242:13 246:2,
3 342:12
testified 12:10
112:3, 5
170:12
testify 14:17
16:10, 14
17:16, 23
18:9 301:11,
19
testifying 15:3
Testimony
5:3 50:22
152:2 204:20
231:8, 13
322:24 346:6
testing 33:17
169:12
203:12
204:17, 24
221:12
226:16 235:9
236:18
237:11
240:13, 18, 19,
21 241:21, 24
242:12
244:10, 17
245:3, 12
246:22
247:15 248:2,
5, 22 249:7
254:16 255:2
258:10
260:19
287:12, 16
294:8 343:10,
18, 22 344:3
tests 318:21
Teva 2:13
4:7 6:10

15:3 16:11,
15 17:1, 5, 18,
24 19:10
21:7 28:4, 8,
11 29:5, 9, 12,
21 30:4, 9, 11,
14 31:5, 21,
23 32:4, 21
33:7 34:9, 13
36:2 37:6
39:17, 20
40:3 41:5, 12
43:11 45:17
47:10 48:1, 5,
16 50:7
52:21 53:5
55:2, 22 59:6
60:8, 22 61:6
62:14 63:9
65:3, 22
66:14, 16, 23
67:8, 14
68:11, 16, 20
69:10, 16, 24
70:11, 23
71:4, 19 72:9,
10, 19 73:1, 9,
12, 15 74:8,
14 79:5, 9, 23
80:9, 20, 23
81:2, 3, 7, 18,
19 82:21, 23
83:3, 11 84:6
88:6 89:12
90:2 92:4
97:5, 17
98:17 99:17,
23 100:5, 10
101:11, 21
104:6 105:13
107:2 108:17,
19 109:1, 3,
18 110:1, 9
111:2, 19
112:6, 13
114:3 115:23
116:17 117:6
118:7, 17, 22
119:15 121:9
122:17 123:1,
23 124:12, 15

Confidential Information Subject to Protective Order

126:*1, 14*
127:*9*  128:*21*
129:*16*  131:*8, 23*  132:*24*
135:*22, 23*
136:*14*
137:*10, 16, 20*
138:*11, 17, 20*
139:*5, 20*
140:*15*  144:*6*
145:*15*  146:*1, 8, 19*  147:*10, 14, 17*  148:*4, 8, 15*  150:*5, 9, 15, 16, 24*
152:*11*  153:*8*
154:*11*
155:*19*
158:*20*  160:*8, 19*  161:*16, 24*
162:*17*  164:*4*
165:*2, 23*
171:*7, 9*
179:*3, 6*
180:*4, 9*
182:*11*  185:*6, 12*  186:*1, 6, 14, 19, 21*
187:*9, 17*
188:*12, 16*
189:*1, 6, 12, 22*  190:*18*
191:*12, 15, 21*
192:*4*  197:*14*
198:*5*  203:*3*
204:*16, 23*
205:*7*  206:*19*
207:*23*  208:*9*
210:*15*  211:*1, 8*  212:*6*
217:*1, 10, 14*
220:*15*
221:*21*  223:*4, 19*  224:*3, 19*
228:*9*  232:*14*
233:*17*
234:*14*
236:*11, 13*
237:*18*  238:*6, 15*  239:*15*
240:*12*  241:*1,*

6 242:*4, 21*
243:*6*  244:*17*
245:*2, 21, 22*
246:*14*  247:*3, 15*  248:*2, 7, 23*  250:*3*
252:*12*
254:*17*  255:*4, 6, 13, 17*
256:*9*  259:*21, 24*  264:*14, 16*
266:*23*  268:*7, 11*  269:*3*
271:*13*
276:*13*  281:*3, 13, 18*  282:*11, 12, 21*  283:*20*
285:*1, 11, 20*
286:*1, 2, 12, 14, 23*  287:*6, 9, 21*  289:*11*
290:*9*  291:*4, 7, 22, 23*
292:*6, 23*
293:*2, 11, 19*
296:*17*  298:*1, 9*  299:*19*
304:*3, 16, 19, 22*  305:*3, 11*
308:*6, 15, 16, 22*  309:*4, 12, 17, 20, 21, 23*
312:*1, 11, 22, 23*  313:*1, 8, 19*  315:*15*
316:*16, 18, 21*
317:*3, 9*
318:*4*  319:*1, 14*  320:*4, 19*
322:*5, 14*
323:*7, 21*
324:*8, 12, 20, 23, 24*  325:*3, 16, 23*  326:*7, 8, 10*  327:*4, 9, 20*  328:*13*
329:*5, 21*
330:*2, 7*
331:*3, 7*
333:*12, 14, 18*
334:*23*  335:*5*

337:*6*  339:*24*
340:*22*  342:*2*
343:*12*
**Teva-315**  5:*16*
15:*12*
**Teva-316**  5:*18*
21:*5*
**Teva-317**  5:*18*
89:*24*
**Teva-318**  6:*6*
104:*12*
**Teva-319**  6:*7*
131:*13*
**Teva-320**  6:*12*
159:*1*
**Teva-321**  6:*17*
180:*12*
**Teva-322**  6:*20*
192:*1*
**Teva-323**  7:*6*
197:*13*
**Teva-324**  7:*9*
205:*11*
**Teva-325**  7:*13*
211:*11*
**Teva-326**  7:*17*
220:*14*
**Teva-327**  7:*19*
224:*23*
**Teva-328**  8:*6*
237:*22*
**Teva-329**  8:*9*
243:*10*
**Teva-330**  8:*12*
250:*6*
**Teva-331**  8:*17*
256:*21*
**Teva-332**  8:*19*
282:*24*
**Teva-333**  9:*6*
287:*24*
**Teva-334**  9:*8*
298:*7*
**Teva-335**  9:*11*
306:*11*
**Teva-336**  9:*14*
313:*12*
**Teva-337**  9:*17*
328:*16*

**TEVA-MDL2875-00036505**  7:*19*
**TEVA-MDL2875-00042244**  8:*9*
**TEVA-MDL2875-00053929**  7:*22*
**TEVA-MDL2875-00055166**  9:*14*
**TEVA-MDL2875-00102401**  6:*16*
**TEVA-MDL2875-00103279**  7:*15*
**TEVA-MDL2875-00107585**  6:*7*
**TEVA-MDL2875-00108342**  6:*12*
**TEVA-MDL2875-00109885**  8:*12*
**TEVA-MDL2875-00109905**  8:*15*
**TEVA-MDL2875-00137077**  8:*22*
**TEVA-MDL2875-00209015**  9:*8*
**TEVA-MDL2875-00423475**  9:*11*
**TEVA-MDL2875-00492240**  9:*17*
**TEVA-MDL2875-00509197**  6:*23*
**TEVA-MDL2875-0051286**  5:*21*
**TEVA-MDL2875-00872512**  6:*18*

**Teva's**  16:*23*
42:*8*  67:*10*
72:*6*  83:*2*
89:*1*  93:*20*
99:*1*  122:*4*
141:*19*  142:*6, 23*  152:*11, 24*
153:*14, 22*
163:*4*  195:*4*
201:*11*
202:*17*
208:*22*
261:*10*
267:*18*
269:*18*
277:*14*  281:*6*
292:*13*
307:*17*
314:*18*  316:*9, 19*  318:*6*
321:*11, 15, 20*
328:*21*  334:*8*
339:*7*
**thank**  12:*22*
20:*16*  29:*18*
57:*22*  80:*1*
87:*1, 9*  145:*6*
158:*1*  164:*12, 15*  165:*14*
173:*22*  180:*1*
191:*8*  192:*3*
195:*20*  205:*4*
211:*7*  220:*9*
229:*22*  234:*5*
303:*18*  324:*5*
331:*1*  344:*24*
**Thanks**  30:*7*
227:*10*
**theoretically**
127:*5*
**theories**
200:*19*
**thereabouts**
81:*23*
**thesis**  22:*18*
23:*2, 17*
**thing**  114:*14*
119:*10*
120:*21*  165:*8*
166:*4*  173:*17*
184:*6*  212:*15*

Confidential Information Subject to Protective Order

215:*17* 252:*6,
13* 253:*4, 10*
273:*19* 277:*2*
289:*19*
335:*18*
336:*19, 24*
**things** 34:*22*
46:*8, 18*
57:*13* 107:*11*
177:*16*
183:*17*
199:*11* 202:*5*
210:*24* 211:*2*
213:*17, 20, 21*
219:*4* 244:*6,
7* 259:*23*
262:*16*
275:*24*
292:*20*
307:*21*
308:*13* 337:*15*
**think** 23:*12*
35:*18* 44:*6*
49:*7* 53:*11*
62:*7* 69:*3*
75:*12* 78:*20*
80:*12* 89:*10*
95:*7* 101:*22*
102:*15*
110:*10*
112:*11, 16*
132:*8, 21*
138:*22, 24*
141:*22*
161:*20* 162:*8*
168:*12*
170:*21*
174:*10* 177:*5*
179:*4* 181:*17*
186:*10* 194:*5*
198:*15, 24*
199:*11* 201:*2*
206:*2* 221:*3*
248:*6, 12*
250:*15*
251:*18*
253:*15*
254:*23* 264:*8*
266:*19*
269:*17*
280:*13*

289:*10*
292:*12*
303:*14*
309:*10*
310:*24*
330:*10*
331:*16, 17*
338:*7* 344:*22*
**thinking** 88:*6*
231:*17*
**thinks** 253:*17*
**third-party**
316:*11*
**thirty** 347:*16*
**thoroughly**
302:*2*
**thought** 59:*2*
227:*14* 261:*8*
303:*8*
**thoughts**
208:*20, 22*
**thousands**
223:*9*
**thread** 5:*18*
6:*6, 7, 12, 17,
20* 7:*6, 9, 13,
17, 19* 8:*6, 9,
12, 17, 19* 9:*6,
8, 11*
**threat** 292:*3*
**threatening**
336:*8*
**three** 39:*7*
93:*12* 166:*12*
183:*20* 196:*4*
206:*13, 15*
213:*19, 21*
214:*8* 222:*12*
253:*11*
261:*24* 272:*15*
**Thursday**
258:*13*
**Tianyu** 173:*6,
21, 24* 179:*12,
21* 244:*9*
**T-I-A-N-Y-U**
173:*21*
**Tianyu's**
174:*22*
**Tibor** 192:*23*
**tight** 181:*20*

**Time** 1:*15*
11:*8* 13:*21*
14:*5* 20:*4, 6*
23:*21* 27:*13,
21* 28:*7, 9*
29:*2* 30:*8*
31:*22* 33:*4*
36:*15* 37:*7,
10, 23* 38:*1, 6,
18* 39:*16*
41:*3* 42:*4*
43:*1, 7, 10*
44:*1, 7* 45:*2,
15, 20* 47:*2, 7,
15* 48:*5* 49:*3*
52:*24* 54:*14*
56:*10* 65:*18,
20, 21* 66:*5,
18, 24* 67:*2,
19* 68:*19*
69:*2* 74:*17*
75:*22* 76:*16,
20* 78:*9*
79:*10* 80:*11*
81:*22* 85:*4,
19* 87:*4*
88:*24* 89:*11,
19* 90:*21*
99:*19, 22, 23*
100:*7* 107:*18*
108:*7* 109:*13*
113:*22, 24*
115:*5, 16*
116:*3* 117:*12*
121:*7, 10*
122:*1* 127:*12*
129:*5* 130:*24*
132:*8* 137:*6,
9* 138:*9*
148:*5* 158:*3,
7* 159:*17*
160:*5, 10, 12,
24* 163:*16*
164:*21* 165:*1*
167:*7* 169:*7,
20* 174:*1, 17*
176:*14* 178:*3,
7* 182:*20*
184:*12* 185:*2*
190:*9* 191:*18*
192:*12* 200:*6*

201:*15, 18*
202:*6* 203:*1*
208:*10*
218:*15*
227:*24* 228:*6*
232:*13* 233:*1*
240:*13, 22*
242:*3, 7*
244:*22* 245:*2*
246:*10, 22*
247:*19*
248:*21*
249:*21*
250:*20, 24*
254:*4, 8, 11,
14* 257:*14*
263:*6* 268:*14*
271:*7* 274:*24*
280:*11*
281:*12, 17, 21*
285:*15, 22*
290:*7, 9*
291:*17* 292:*2,
20, 24* 298:*23*
299:*4, 17, 18*
310:*23* 312:*6*
325:*21*
326:*21* 329:*9,
13* 330:*12, 13,
17* 332:*2, 4, 8,
14* 341:*23*
345:*9, 19*
**timeline** 46:*4*
69:*8* 163:*2,
20* 170:*8*
189:*5* 272:*14*
**timelines** 42:*4,
8* 247:*9*
**times** 47:*1, 2*
55:*13* 93:*12*
145:*14* 272:*8*
**timing** 246:*20*
255:*22*
**TIN** 233:*17*
234:*8*
**Tinka** 181:*13,
19* 193:*21*
**title** 24:*24*
**titles** 164:*20*
**today** 12:*19*
14:*18, 21*

15:*23* 16:*10,
15* 17:*23*
32:*12* 64:*22*
65:*2* 70:*23*
89:*17* 116:*11*
123:*10, 11*
124:*15* 141:*4*
142:*8* 143:*18*
146:*19* 157:*6*
176:*17*
184:*14* 345:*1*
**Today's** 11:*7*
13:*6* 18:*13*
19:*1, 4, 14, 19,
24* 20:*5*
**told** 133:*11*
134:*7* 163:*8*
177:*4, 24*
184:*21* 216:*9,
15, 20* 217:*1,
23* 218:*7*
219:*2, 11, 23*
233:*16*
239:*15* 240:*3*
249:*20, 22*
274:*15*
275:*20*
277:*19* 305:*24*
**tool** 194:*3*
**top** 75:*2* 76:*1,
3, 5* 97:*8*
100:*23* 225:*5,
18* 238:*5*
239:*4* 251:*24*
252:*7* 257:*6*
306:*22*
**topic** 17:*4, 9,
13, 16* 84:*3*
87:*23* 89:*17*
92:*12, 22*
94:*24* 103:*17*
105:*11* 122:*7*
125:*5* 126:*18*
137:*24*
141:*11*
150:*23*
151:*12*
160:*13* 163:*8*
168:*7* 183:*15*
184:*19* 190:*8*
215:*3* 239:*1*

Confidential Information Subject to Protective Order

243:*1*  278:*12*
279:*18*
289:*17*  290:*6*
304:*11*  305:*4,
19*  314:*22*
**topics**  15:*4, 5*
16:*5, 9, 13*
17:*24*  56:*18*
94:*2, 13*
110:*21*  142:*1*
166:*24*
248:*20*  321:*4*
**topmost**  90:*10*
132:*5*  133:*4*
180:*21*
192:*10*
197:*22*
205:*17*  206:*4*
211:*20*
220:*22*
251:*12*  264:*6*
288:*7*  298:*16*
303:*19*
**T-O-R**  78:*3*
**Torrent**  26:*4*
**total**  202:*13,
14, 16*  229:*19*
**totality**  314:*18*
**totally**  78:*18*
176:*6*
**touch**  101:*5*
**touched**
278:*13*  321:*24*
**touching**
162:*1*  304:*12*
**toxicology**
62:*21*  64:*9*
**trace**  226:*2*
235:*3, 13*
236:*6*  237:*7*
253:*1*  278:*13*
279:*9, 16*
**track**  56:*11,
24*  259:*22*
**trade**  162:*5*
**trained**  103:*2*
342:*24*  343:*3*
**training**  101:*7*
102:*21*
**transactions**
308:*8*

**transcript**
346:*9, 19*
347:*17, 19*
**transcription**
349:*7*
**transferred**
123:*4*
**transition**
76:*9*  160:*10*
**transparent**
299:*23*  300:*7,
18*  303:*17*
305:*11, 15*
**TRAURIG**
2:*8*  9:*17*
**treat**  207:*19*
208:*12*
**treated**  334:*18*
**treatment**
207:*24*
208:*15*
209:*12*  210:*9*
291:*2*  334:*11,
12, 17*  338:*9*
**treatments**
25:*9*
**trended**  93:*24*
**trick**  315:*6*
**tried**  18:*16*
139:*10*  172:*2*
**triethylamine**
233:*19*  235:*12*
**trigger**  214:*5*
216:*2*  217:*10*

**trimethylamine**
232:*10, 17*
233:*18*  234:*9*
236:*3, 13*
**true**  24:*16*
143:*7*  150:*9*
346:*6*
**truly**  219:*11*
279:*7*
**trust**  143:*18,
22*  219:*13*
249:*13, 20*
252:*7, 13*
253:*23*  278:*7*
280:*14*  281:*2*
293:*5*

**trusted**  102:*7*
254:*12*  280:*12*
**trusting**
136:*15*  137:*16*
**truth**  14:*21*
177:*14*
214:*19*
219:*16*  254:*13*
**truthfully**
14:*17*
**try**  13:*18, 20*
44:*11*  47:*15*
57:*13*  61:*1*
96:*22*  110:*17*
149:*21*  151:*3*
153:*12*
155:*10*  186:*9*
207:*10*
253:*16*
278:*10*
294:*11*  298:*2*
301:*20*
315:*11*  336:*19*
**trying**  35:*23*
54:*23*  88:*8*
99:*21*  108:*10*
109:*23*
111:*12*
113:*14*
133:*17*  138:*2,
4*  139:*19*
142:*1*  156:*13*
175:*18*
179:*23*  207:*4,
21*  253:*20*
267:*2*  315:*6*
316:*2*  341:*7*
**T-S-A-I**
164:*10*
**Tuesday**  91:*23*
**turn**  109:*21*
145:*16*  189:*4*
257:*14*  324:*7*
**turned**  73:*6*
96:*12*  125:*6*
144:*7*  183:*8*
277:*21*  319:*15*
**Turning**
128:*10*
**turns**  223:*13*
**twice**  279:*20*

**two**  28:*12*
72:*17*  98:*16*
119:*19*  120:*8*
164:*6*  166:*12*
206:*15*  210:*1*
211:*22*  290:*4*
297:*19*  314:*4*
318:*5*
**type**  74:*19*
75:*3*  172:*24*
**typed**  98:*20*
**types**  26:*6*
**typing**  303:*24*

**< U >**
**U.S**  3:*6*  22:*6*
49:*23*  70:*15*
71:*5, 8*
112:*19, 24*
118:*1, 4, 14*
122:*13, 21, 22,
23*  123:*2*
126:*2, 13, 16,
19, 21*  127:*1,
10*  128:*17*
133:*5, 13*
134:*9*  148:*12*
157:*18*  203:*4,
10*  239:*1*
258:*11*  270:*7,
12*  271:*8*
274:*19*
275:*23*
276:*21*
277:*13*
279:*19, 21*
280:*10, 12, 14*
281:*2*  290:*10*
295:*17*  297:*8,
15*  302:*20*
325:*15*  326:*1,
20*  327:*22*
329:*24*  330:*4*
342:*2*
**Ulm**  28:*5*
**ultimate**  63:*6*
**ultimately**
47:*9*  50:*7*
52:*22*  100:*10*
296:*9, 15*

**unconfirmed**
214:*17*  217:*21*
**understand**
13:*14, 23*
14:*8, 20, 24*
15:*2*  17:*15*
36:*21*  39:*10,
14*  64:*24*
65:*5*  69:*9, 10,
14, 17*  106:*6*
130:*13*  138:*3,
5*  153:*5*
178:*21*
181:*18*  191:*4*
206:*24*
213:*23*
219:*17*
263:*13*  286:*5*
297:*17*  317:*14*
**understanding**
71:*18, 19*
83:*10*  169:*15,
18*  189:*2*
227:*16*
228:*18*
314:*24*  317:*7*
318:*3*  342:*7*
**understood**
14:*2*  24:*15*
64:*16*  166:*22*
178:*10, 11*
185:*23*  270:*14*
**unique**  73:*14*
**UNITED**  1:*1*
11:*13*  22:*4*
188:*1*  338:*24*
339:*8*
**university**
22:*2, 9, 13, 16*
24:*3*  37:*16*
**unknown**
174:*13*  175:*1,
17*  260:*19*
261:*11*
269:*20*  275:*7*
**unnamed**
258:*11*
**unofficial**
214:*17*  217:*21*
**unprecedented**
289:*21*

Confidential Information Subject to Protective Order

unredacted
261:*4, 18*
262:*11, 17*
263:*5, 22*
266:*12, 21*
267:*17, 21*
268:*8, 12*
270:*18* 272:*6,*
*20* 273:*11*
275:*13*
279:*20* 280:*2,*
*22* 296:*16, 23*
297:*1, 21*
unsecure
310:*20*
unused 313:*1*
unusual 182:*6*
upcoming
181:*20* 183:*14*
update 7:*22*
8:*7, 11, 15*
35:*9* 38:*20*
214:*18*
updated
144:*19, 20*
upward
263:*24*
Urgent 7:*10,*
*21* 8:*7* 97:*23*
USA 2:*14, 19*
USD 313:*24*
314:*12* 323:*3*
325:*11*
use 93:*19*
99:*24* 117:*24*
161:*24* 201:*4*
311:*9* 312:*20*
314:*7* 323:*6*
useful 324:*2*
usually 25:*3,*
*19* 42:*10*
45:*11* 51:*7*
55:*12* 56:*24*
57:*19* 58:*22*
60:*1* 67:*10,*
*22* 72:*4*
87:*24* 88:*15*
94:*14* 95:*22*
109:*15*
110:*21*
111:*15*

117:*21*
121:*23*
125:*19* 136:*5*
162:*11* 165:*8,*
*10* 166:*11*
183:*11* 185:*9*
196:*10, 19*
253:*15*
265:*23* 280:*1*
294:*24* 295:*2*
310:*9* 332:*2,*
*5* 336:*11*
340:*15*

< V >
Vague 59:*19,*
*22* 60:*10, 17*
61:*9* 62:*17*
75:*6* 89:*4*
101:*13* 110:*7*
124:*3, 19*
143:*21*
145:*19*
151:*10* 153:*3*
182:*13*
248:*16*
249:*16* 253:*6*
278:*9* 292:*17*
validation
51:*14*
VALSARTAN
1:*3* 6:*15* 7:*7,*
*11, 14, 18, 21*
8:*7, 11, 15, 19*
11:*11* 16:*24*
17:*3, 7, 20*
39:*13* 65:*3*
68:*5, 9, 12, 15,*
*17, 21* 69:*12,*
*19* 70:*4, 6, 9,*
*11, 18, 19*
71:*1, 8, 22*
72:*7* 82:*21,*
*24* 83:*3, 12,*
*19* 84:*3, 7*
85:*13, 22*
86:*3, 6* 87:*18*
89:*1* 91:*10,*
*17* 92:*3, 14*
98:*2, 23*
100:*6, 12*

105:*1, 8*
106:*10*
108:*20* 109:*4*
111:*20* 112:*7,*
*14, 17* 114:*19*
115:*2, 8, 12,*
*14, 17, 23*
116:*3, 16*
117:*6, 9*
118:*3, 6, 14,*
*18, 23* 121:*14,*
*19* 122:*6, 13,*
*18, 23* 123:*2,*
*9, 13, 14, 15, 18,*
*24* 124:*12, 16*
125:*3, 5, 12*
126:*2, 13, 15,*
*21* 127:*10, 15*
129:*12*
130:*10, 16, 18*
131:*2* 133:*4,*
*12* 134:*9*
139:*3, 8*
146:*14, 16, 21*
157:*18*
158:*16*
159:*13, 18, 24*
160:*3, 12*
167:*12* 168:*3,*
*19, 24* 171:*14*
172:*1, 10, 17,*
*19* 174:*1, 4, 5,*
*7* 175:*6*
176:*5* 177:*4*
178:*1, 24*
179:*9, 15*
180:*5* 181:*22*
182:*8, 11, 24*
183:*19*
189:*12*
190:*18, 20*
191:*14, 16*
192:*21*
193:*15*
194:*23* 195:*5,*
*15* 199:*7*
202:*20* 207:*6,*
*12* 210:*18*
217:*17*
218:*15, 17*
221:*7, 23*

223:*14, 20, 21*
224:*3, 5*
225:*12* 227:*5*
228:*10, 23*
231:*3, 6, 11*
232:*15*
233:*17*
234:*17*
238:*16, 17*
239:*1, 16*
240:*14* 241:*1,*
*7* 242:*5, 21*
244:*18* 245:*4,*
*22* 246:*15*
247:*15* 248:*8,*
*9* 249:*10*
254:*16* 255:*2,*
*9, 12* 256:*8*
257:*21*
269:*21*
274:*24*
275:*16* 278:*1,*
*3, 14* 282:*3*
284:*9, 16*
286:*23* 287:*6,*
*13* 290:*10, 11*
291:*2, 4, 5, 11*
294:*16*
299:*23* 300:*8*
309:*19* 311:*6*
312:*12, 16, 22*
313:*1* 314:*20*
315:*16* 318:*7,*
*15* 319:*3, 11,*
*13, 16* 320:*4,*
*5, 11, 14*
324:*14, 22, 23*
325:*6, 10, 20*
326:*2, 12*
327:*23*
329:*22* 330:*3,*
*7* 339:*7* 342:*3*
valsartan's
116:*13*
value 73:*19*
314:*3*
Vanaskie's
230:*11*
Varga 192:*23*
194:*10* 195:*3*

V-A-R-G-A
192:*24*
varies 59:*8*
various 148:*5*
192:*11* 198:*4*
283:*11* 307:*9*
310:*21*
vendor 53:*14*
310:*21*
vendors 50:*6*
310:*13*
version 9:*16*
22:*6* 36:*3*
214:*17*
217:*21* 313:*18*
versus 86:*15*
veto 62:*23*
VICTORIA
2:*8* 331:*2*
video 11:*9*
145:*9*
Videoconferenc
e 1:*14*
VIDEOGRAP
HER 11:*2, 5*
13:*14* 76:*16,*
*20* 158:*3, 7*
250:*20, 24*
329:*9, 13*
345:*9*
VIDEOTAPE
4:*1*
Videotaped
1:*13* 5:*16*
Vidmar
299:*13, 16*
300:*6, 17, 23*
301:*12*
305:*16, 18*
view 60:*6*
95:*3, 18*
101:*19*
128:*20* 140:*9*
152:*23* 241:*1,*
*5* 242:*4, 20*
297:*11*
302:*22* 341:*3*
views 102:*12*
visible 193:*15*
visit 97:*24*
vitae 5:*18*

**volume** 73:*14*
75:*19*

**< W >**
**Wait** 35:6, *21*
99:*14* 175:*21*
234:*1* 261:*20*
289:*11* 300:*10*
**Walton** 80:*3,*
*7, 9* 90:*10*
91:*16* 99:*7*
101:*2* 102:*1,*
*4* 343:*3*
**Walton's**
101:*4*
**Wang** 80:*3, 7,*
*18, 21* 90:*11,*
*21* 91:*9, 21*
94:*4, 6, 8*
99:*7* 101:*2,*
*18* 102:*1, 9*
103:*4, 22*
159:*8* 180:*24*
181:*3, 19*
197:*23*
206:*10*
220:*22*
221:*10*
225:*11, 15*
231:*9* 234:*16*
343:*3*
**Wang's**
100:*17, 24*
101:*10*
183:*18* 223:*5*
**want** 21:*20*
30:*23* 38:*19,*
*20* 88:*9*
120:*18* 130:*3*
135:*9* 145:*3*
146:*7, 9*
147:*16, 21*
149:*1, 13*
155:*4* 163:*19*
170:*7* 185:*15*
188:*19*
195:*22* 196:*8,*
*9* 212:*13*
213:*24*
215:*12*
226:*14*

250:*12*
261:*17*
269:*21* 270:*1*
272:*17*
276:*15*
277:*13* 284:*9*
287:*4* 300:*13*
301:*9* 304:*17,*
*22* 305:*12*
315:*21* 336:*11*
**wanted** 26:*18*
38:*6, 12*
39:*15* 129:*3*
184:*11*
188:*22*
190:*21*
216:*22*
263:*17* 284:*7*
296:*3* 311:*11*
323:*7, 22*
**wants** 81:*19*
161:*21*
**warning**
126:*11* 188:*8*
296:*6, 10, 16,*
*23* 302:*17*
303:*6, 11, 13*
306:*1, 5*
**waste** 207:*19,*
*24* 208:*12, 15*
209:*12* 210:*9*
**water** 207:*24*
208:*12, 15*
209:*12* 210:*9*
**wave** 7:*14*
289:*21*
**way** 61:*1*
72:*19* 82:*14*
95:*1* 126:*12,*
*19, 23* 128:*8*
129:*11* 134:*6*
142:*3* 150:*24*
168:*15*
184:*14* 207:*2*
217:*8* 219:*15*
233:*6* 236:*15*
238:*21*
247:*13, 24*
267:*15* 269:*2*
270:*19*
297:*17*

302:*14*
304:*14*
315:*11* 326:*6*
334:*19*
339:*17* 344:*15*
**ways** 143:*16*
207:*15*
**website** 188:*24*
**week** 170:*22,*
*24* 171:*15*
176:*1, 2, 10*
239:*21* 252:*17*
**weekly** 144:*21*
**weeks** 166:*12*
177:*10* 182:*7,*
*16* 208:*7*
240:*5* 277:*18*
289:*3, 11*
290:*5* 327:*17*
**weigh** 60:*1*
62:*3*
**weight** 60:*4*
**Weitz** 77:*10*
91:*5* 104:*20*
105:*7* 128:*12*
**W-E-I-T-Z**
77:*10*
**welcome** 13:*1*
158:*11* 251:*4*
329:*17* 330:*20*
**well** 13:*13*
14:*4* 21:*11*
22:*23* 33:*19*
35:*12* 37:*19*
49:*15* 58:*3,*
*17* 61:*14*
63:*12, 24*
80:*13* 86:*21*
87:*19* 92:*11*
94:*3* 96:*21*
99:*22* 105:*18*
107:*13*
110:*24*
114:*18*
118:*17* 123:*3*
129:*3* 134:*1*
135:*10* 139:*6*
142:*10* 146:*9*
148:*4* 150:*5,*
*12* 151:*12*
153:*16* 155:*1*

166:*9* 176:*7,*
*23* 185:*7*
187:*3* 198:*5*
208:*14*
209:*17* 210:*6*
212:*13* 222:*9*
223:*13, 19*
226:*20, 24*
227:*5* 231:*22*
233:*11*
236:*15*
239:*23* 242:*2,*
*23* 244:*8, 9*
246:*4* 249:*12*
256:*17*
267:*15* 271:*1*
275:*24* 285:*4*
293:*3* 301:*2*
304:*5* 305:*1,*
*14, 16, 23*
315:*2* 318:*9*
319:*5* 331:*10*
332:*20*
334:*21* 336:*1*
**went** 22:*12*
23:*22* 25:*24*
26:*2* 87:*13*
92:*8* 196:*3*
201:*11, 22*
202:*7* 318:*15*
**we're** 49:*2*
55:*17* 65:*2*
76:*17, 21*
88:*16* 151:*11*
158:*8* 171:*23*
191:*2* 202:*9*
209:*5* 251:*1*
262:*1* 329:*14*
345:*10*
**WERNER**
2:*16*
**We've** 76:*11*
124:*12*
151:*12* 250:*8*
252:*22* 293:*13*
**whichever**
61:*20*
**WHITELEY**
2:*1, 3*
**wider** 26:*10*

**wildly** 126:*7*
**willing** 185:*21*
**wise** 6:*10*
130:*19*
**wise/product**
6:*10*
**wish** 146:*10*
148:*1*
**Witness** 10:*5*
11:*20* 12:*6*
50:*5* 51:*3*
59:*20, 23*
60:*11, 18*
61:*10* 62:*18*
63:*12* 89:*5*
101:*14* 103:*9*
108:*1* 110:*8*
113:*13*
116:*21* 124:*4,*
*20* 126:*6*
127:*19* 129:*2*
133:*15* 143:*4,*
*22* 145:*20*
147:*8, 20*
149:*7* 151:*19*
152:*3* 153:*4*
154:*17* 155:*9,*
*24* 157:*9*
158:*2* 182:*14*
192:*5* 204:*21*
209:*22*
224:*10* 229:*4*
232:*20* 234:*6*
241:*12*
243:*13* 245:*8*
248:*18*
249:*17*
255:*20*
263:*16*
264:*20* 265:*3*
268:*18* 269:*7*
271:*20*
273:*17*
276:*19*
278:*10* 283:*6*
292:*18*
293:*22* 297:*7*
298:*4* 306:*17*
310:*2* 323:*1*
330:*20*
332:*20*

Confidential Information Subject to Protective Order

334:*16*
335:*12*
337:*14*
339:*10, 13, 21*
340:*14*  342:*6*
346:*5, 6, 8*
347:*1*
**word**  160:*6*
219:*19*
229:*10*  304:*5*
**worded**  200:*13*
**words**  265:*14*
**work**  21:*22*
23:*9, 22*
25:*24*  28:*15*
37:*16*  102:*23*
110:*5*  171:*3,*
*6*  280:*24*
305:*6*  341:*12*
**worked**  27:*8*
79:*13*  107:*22*
**working**  25:*8*
28:*3, 13, 17*
38:*3*  53:*6*
67:*21*  99:*18*
113:*1, 20*
129:*8*  161:*24*
331:*7*  337:*19*
**world**  146:*21*
187:*21*
**worldwide**
162:*7*
**worry**  197:*4*
**worrying**
290:*6*
**wraps**  167:*24*
**write**  106:*7*
107:*11*
112:*21*
203:*12*  206:*5*
234:*23*
235:*22*  244:*5*
258:*24*
260:*17*  308:*5,*
*12*
**writes**  98:*11*
133:*3*  181:*20*
231:*9*  238:*8*
261:*24*
288:*13*
299:*20*  308:*4*

**writing**  23:*16*
91:*9*  104:*23*
105:*6, 12, 20*
109:*11*  111:*5*
113:*5*  128:*15*
133:*11*  134:*8*
193:*14, 18*
203:*17*
214:*12, 24*
215:*2, 19*
216:*1, 5, 7, 17*
219:*7*  227:*9*
231:*1*  234:*17*
289:*9*  299:*6*
300:*6, 17*
301:*12*  311:*24*
**written**  17:*6*
47:*22*  48:*1*
72:*1*  106:*17*
195:*3*  213:*12*
235:*21*  236:*8*
237:*4*  244:*14*
263:*3*  300:*4*
308:*2, 18*
309:*1*  312:*17*
315:*5*
**wrong**  44:*6*
71:*19*  82:*8*
94:*7*  131:*21*
138:*12*
144:*22*  146:*4*
181:*12*  233:*8*
277:*21*
**wrote**  91:*21*
94:*9*  99:*4*
101:*3, 7*
107:*16*  111:*1*
128:*19*  134:*2,*
*19*  195:*1*
200:*2*  214:*10,*
*16, 22*  215:*1*
221:*10*
232:*14*
235:*16, 17*
252:*1, 4*
253:*9*  261:*15*
262:*9*  264:*11*
274:*7*  303:*20*
307:*7, 13, 20*
308:*20*

**Wu**  179:*24*

**< X >**
**Xu**  164:*14, 23*
168:*1*  195:*24*
197:*23*  259:*1,*
*2, 3*  261:*23*
263:*20*
**X-U**  164:*14,*
*15*
**X-U-M-I**
259:*3*
**Xu's**  164:*19*

**< Y >**
**Yeah**  32:*8, 13,*
*23*  33:*15*
39:*8*  55:*3*
64:*7*  69:*6*
91:*16*  99:*16*
106:*1*  107:*10,*
*19*  123:*14*
132:*15, 16*
133:*16*
153:*11*  164:*1*
173:*15*
185:*18*
190:*10*  191:*7*
193:*10*  201:*2*
206:*17*
207:*22*
209:*15*
213:*16*
216:*11*  218:*2*
226:*22*  228:*3*
229:*4*  235:*20*
246:*7*  250:*15*
251:*14*  263:*1,*
*7, 16*  296:*3*
301:*4*  302:*3*
304:*5*  315:*8*
320:*3*  325:*1*
**year**  31:*11*
142:*16*
162:*11*  259:*5*
260:*23*
261:*12*
270:*22*
271:*14*  274:*14*
**year-old**
273:*12*

**years**  39:*7*
93:*12*  122:*3*
134:*13*
135:*19*  196:*4*
222:*12*
253:*12*  318:*5*
335:*17*
**Yep**  221:*18*
313:*15*  316:*2*
325:*13*
**yield**  51:*15*

**< Z >**
**Zhejiang**  3:*5*
64:*18*  91:*11*
98:*1*  173:*6,*
*10, 14*
**Z-H-E-J-I-A-**
**N-G**  173:*11*
**ZHP**  17:*6*
64:*22*  65:*4, 7,*
*8, 16*  66:*7, 9,*
*20, 23*  67:*4, 9,*
*22*  68:*4*  70:*7,*
*9*  71:*2, 4, 8,*
*22*  72:*3, 7, 24*
73:*6, 13, 14*
74:*5, 8*  75:*23*
83:*24*  86:*20*
87:*3, 13, 17*
89:*2*  92:*4, 9*
93:*3, 6*  98:*24*
99:*11, 18, 24*
100:*6, 12*
103:*14, 19*
105:*8, 14*
107:*3, 21*
108:*19*  109:*4*
110:*2*  111:*3,*
*21*  112:*7, 14*
113:*7, 24*
114:*5*  115:*7,*
*17, 22*  116:*2*
117:*9*  118:*12,*
*19, 24*  119:*6*
120:*16, 22*
121:*7, 15, 20*
122:*5, 14, 19,*
*23*  123:*16, 19,*
*24*  124:*11, 16*
125:*9, 11*

126:*2, 3*
127:*6, 14*
128:*16, 22*
129:*5, 17*
135:*18*
136:*15*  137:*4*
139:*23*  140:*4,*
*14, 19*  141:*5,*
*21*  142:*3, 7,*
*24*  143:*18*
144:*5*  145:*14*
146:*1, 7, 12,*
*23*  147:*2, 8,*
*16*  148:*9, 11,*
*12, 16, 18*
149:*2*  150:*2,*
*6, 12, 15, 16*
152:*11, 12*
153:*1, 9, 13*
154:*12, 21*
155:*4, 18*
156:*16, 23*
157:*3, 5, 16*
158:*15*  159:*8,*
*19*  160:*7, 14,*
*18*  162:*16, 19,*
*23*  163:*7, 24*
164:*7, 17, 19,*
*22*  165:*6, 23*
166:*8, 18*
167:*1, 13, 17*
171:*13, 18*
172:*10, 12*
175:*4, 11, 12*
176:*3*  177:*4,*
*5, 20, 24*
178:*14, 23*
179:*9, 17*
180:*4, 22, 24*
182:*2, 7, 9*
184:*15, 24*
185:*6*  189:*6,*
*13*  190:*3, 7,*
*17*  191:*13*
194:*23*  196:*7*
197:*6, 8*
198:*5, 9*
199:*6*  200:*7,*
*15*  201:*10*
202:*18, 23*
203:*3*  205:*22*

Confidential Information Subject to Protective Order

206:*11*  207:*6,*
*10, 23*  208:*10,*
*18, 21*  210:*4,*
*7, 13, 17*
212:*7*  214:*24*
215:*12, 18*
216:*7, 22*
217:*1, 3, 9, 11,*
*13, 17*  218:*14*
220:*4*  221:*6,*
*7, 13, 20, 22*
222:*8, 16*
223:*4, 22*
224:*5*  228:*10,*
*23*  231:*4, 6*
232:*16*
233:*16*
234:*16*
235:*19*
236:*11, 20*
237:*2, 12*
238:*18*
239:*15, 22*
246:*6*  249:*5,*
*11, 13*  252:*12,*
*13, 18*  253:*3,*
*15, 23*  254:*5,*
*21*  256:*6*
257:*5, 20*
258:*5, 10*
259:*12*
261:*10, 24*
264:*15, 17*
266:*9, 16, 20*
267:*16*  268:*3*
270:*24*  273:*4,*
*10*  275:*2, 12,*
*20*  276:*1, 14*
277:*14, 19*
278:*7, 18*
279:*7*  282:*2*
295:*9, 14*
296:*11, 15*
297:*18*  300:*7,*
*9, 18, 19*
302:*12*  303:*3*
304:*4, 24*
305:*2, 10, 13,*
*23*  307:*9, 18*
309:*5, 8, 21*
311:*8*  312:*15,*

*21, 22, 24*
313:*20*
314:*19, 22*
315:*14, 15*
317:*3*  318:*18,*
*20*  319:*2, 14,*
*16, 20*  320:*2,*
*6, 19*  321:*16,*
*21*  322:*2, 15*
323:*11*  325:*9*
326:*13*
333:*12, 15, 19,*
*24*  334:*5, 10*
335:*1, 9, 14,*
*21*  336:*14*
337:*9*  340:*5*
341:*16*  342:*3,*
*21, 23*
**ZHP00912962**
*8:19*

**ZHP009129692**
*256:23*
**ZHP01090696**
*7:8*  197:*15*
**ZHP02321449**
*7:12*  205:*8*
**ZHP's**  91:*11*
93:*20*  104:*24*
115:*1, 12*
116:*12, 15*
118:*6*  153:*21,*
*23*  155:*5, 16*
169:*16*  186:*1*
195:*6*  256:*1*
257:*21*
297:*11*  309:*18*
**ZMICK**  3:*20*
**zone**  330:*13*
**Zoom**  1:*14*
2:*1*  3:*1*  4:*1*
40:*11*

# Exhibit 91

REDACTED

Confidential Information - Subject to Protective Order

1            IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY

2                       -  -  -

3   IN RE:  VALSARTAN,     :  MDL NO. 2875
    LOSARTAN, AND          :

4   IRBESARTAN PRODUCTS    :  HON. ROBERT
    LIABILITY LITIGATION   :  B. KUGLER

5   _____ :
                          :

6   THIS DOCUMENT APPLIES  :
    TO ALL CASES           :

7

8         - CONFIDENTIAL INFORMATION -
          SUBJECT TO PROTECTIVE ORDER
9                  VOLUME I
10                     -  -  -
11              March 9, 2021
12                     -  -  -
13

14        Videotaped remote deposition of
    RICHARD DEREK GLOVER, taken pursuant to
15   notice, was held via Zoom
    Videoconference, beginning at 9:02 a.m.,
16   EST, on the above date, before Michelle
    L. Gray, a Registered Professional
17   Reporter, Certified Shorthand Reporter,
    Certified Realtime Reporter, and Notary
18   Public.
19

                       -  -  -

20

21        GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
22            deps@golkow.com
23

24

Confidential Information - Subject to Protective Order

Page 2

ZOOM APPEARANCES:

SLACK DAVIS SANGER, LLP
BY:  JOHN R. DAVIS, ESQ.
6001 Bold Ruler Way, Suite 100
Austin, Texas 78746
(512) 795-8686
jdavis@slackdavis.com
Representing the Plaintiffs

KANNER & WHITELEY, LLC
BY:  LAYNE HILTON, ESQ.
701 Camp Street
New Orleans, Louisiana  70130
(504) 524-5777
L.hilton@kanner-law.com
Representing the Plaintiffs

FARR LAW FIRM, P.A.
BY:  GEORGE T. WILLIAMSON, ESQ.
99 Nesbit Street
Punta Gorda, Florida 33950
(941) 639-1158
gwilliamson@farr.com
Representing the Plaintiffs

GOLOMB & HONIK P.C.
BY:  RUBEN HONIK, ESQ.
1835 Market Street
Suite 2900
Philadelphia, Pennsylvania 19102
(215) 327-9166
ruben@honiklaw.com.com
Representing the Plaintiffs

Page 3

ZOOM APPEARANCES:  (Cont'd.)

PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
BY:  CLEM C. TRISCHLER, ESQ.
BY:  JASON M. REEFER, ESQ.
One Oxford Centre, 38th Floor
Pittsburgh, Pennsylvania 15219
(412) 263-1840
cct@pietragallo.com
jmr@pietragallo.com
Representing the Defendant, Mylan
Pharmaceuticals, Inc. and the Witness

DUANE MORRIS, LLP
BY:  JESSICA PRISELAC, ESQ.
600 Grant Street, Suite 5010
Pittsburgh, Pennsylvania 15219
(215) 979-1159
jpriselac@duanemorris.com
Representing the Defendants, Zhejiang
Huahai Pharmaceutical Co., Ltd., Prinston
Pharmaceutical Inc., Huahai U.S., Inc.,
and Solco Healthcare US, LLC.

BARNES & THORNBURG, LLP
BY:  KARA KAPKE, ESQ.
11 S. Meridian Street
Indianapolis, Indiana 46204
(317) 231-6491
kara.kapke@btlaw.com
Representing CVS Pharmacy, Inc., and Rite
Aid Corporation

HUSCH BLACKWELL LLP
BY:  MATTHEW D. KNEPPER, ESQ.
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105-3433
(314) 345.6664
matt.knepper@huschblackwell.com
Representing the Defendant, Express
Scripts, Inc.

Page 4

ZOOM APPEARANCES:  (Cont'd.)

GREENBERG TRAURIG, LLP
BY:  BRIAN RUBENSTEIN, ESQ.
1717 Arch Street
Philadelphia, Pennsylvania 19103
(215) 988-7800
rubensteinb@gtlaw.com
Representing the Defendants, Teva
Pharmaceutical Industries, Ltd., Teva
Pharmaceuticals USA, Inc., Actavis LLC,
and Actavis Pharma, Inc.

FALKENBERG IVES, LLP
BY:  KIRSTEN B. IVES, ESQ.
230 W. Monroe Street, Suite 2220
Chicago, Illinois 60606
(312) 566.4808
KBI@falkenbergives.com
Representing the Defendant, Humana

HILL WALLACK, LLP
BY:  NAKUL Y. SHAH, ESQ.
21 Roszel Road
Princeton, New Jersey 08543
(609) 734-6358
Nshah@hillwallack.com
Representing the Defendant, Hetero, USA,
Inc., Hetero Labs

Page 5

ZOOM APPEARANCES:  (Cont'd.)

NORTON ROSE FULBRIGHT, US, LLP
BY:  D'LESLI M. DAVIS, ESQ.
2200 Rose Avenue, Suite 3600
Dallas, Texas 75201
(214) 855-8000
dlesli.davis@nortonrosefulbright.com
Representing the Defendant, McKesson

CIPRIANI & WERNER P.C.
BY:  CAITLIN E. LAWLOR, ESQ.
450 Sentry Parkway, Suite 200
Blue Bell, Pennsylvania 19422
(610) 567-0700
Clawlor@c-wlaw.com
Representing the Defendant, Aurobindo
Pharmaceuticals

CROWELL MORING LLP
BY:  MIMI S. DENNIS, ESQ
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
(202) 624-2774
mdennis@crowell.com
Representing the Defendants, Cardinal
Health, Inc.

ALSO PRESENT:

VIDEOTAPE TECHNICIAN:
Ingrid Rodriguez
Bradley Matta, Esq.
(Mylan)

Beth Questad - Paralegal
(Slack Davis)

Page 6

- - -

INDEX

- - -

Testimony of:
RICHARD DEREK GLOVER
By Mr. Davis          15

- - -

EXHIBITS

- - -

NO.          DESCRIPTION          PAGE

PL-Glover-1  Notice of Deposition  21
Exhibit A

PL-Glover-2  Amended Notice       23
Of Deposition

PL-Glover-3  Curriculum Vitae     28
Richard Derek Glover
Viatris

PL-Glover-4  Guidance for Industry 34
Q9 Quality Risk
Management
June 2006

PL-Glover-5  Quality Risk         47
Management SOP
MYLAN-MDL287500369663

Page 7

- - -

EXHIBITS (Cont'd.)

- - -

NO.          DESCRIPTION          PAGE

PL-Glover-6  E-mail Thread        67
10/17/14
Subject, Quality Risk
Assessment of Usage of
Recovered Solvents
MYLAN-MDL287500421388

PL-Glover-7  Quality Risk         69
Assessment
MYLAN-MDL287500421389-01

PL-Glover-8  E-mail Thread        97
9/15/14
Subject, MSDS and HSE
Summary of Alkyl
Amines
MYLAN-MDL287500257214

PL-Glover-9  Safety Data Sheet    97
Triethylamine
6/10/12

PL-Glover-10 Summary of the       102
Risk Assessments,
Activities Performed
For Valsartan Manufactured
At Unit 8
MYLAN-MDL287500618180

PL-Glover-11 E-mail Thread        120
12/31/18
Subject, Usage of
Recovery Solvents
12/31/18
MYLAN-MDL287500297980

Page 8

- - -

EXHIBITS (Cont'd.)

- - -

NO.          DESCRIPTION          PAGE

PL-Glover-12 Quality Risk         120
Assessment
Usage of Recovered
Solvents in Manufacturing
MYLAN-MDL287500297981-93

PL-Glover-13 E-mail Thread        120
10/4/12
Subject, Valsartan
Recovery Solvents/Materials
MYLAN-MDL287500283572-75

PL-Glover-14 Mylan Laboratories   128
SOP Change
Management Process

PL-Glover-15 Slide Deck           134
The Pharmaceutical
Quality System PQS
7/15-16/2015

PL-Glover-16 E-mail Thread        159
10/1/14
Subject, Comments
MYLAN-MDL287500468745

PL-Glover-17 WHO Audit            173
Compliance Report
MYLAN-MDL287500468746-07

PL-Glover-18 Guidance for Industry 173
Process Validation
General Principles
And Practices
January 2011

Page 9

- - -

EXHIBITS (Cont'd.)

- - -

NO.          DESCRIPTION          PAGE

PL-Glover-19 Biocon Ltd           184
Quality Audit Report
10/5/18

PL-Glover-20 E-mail Thread        200
6/29/18
Subject, Audit Report
Valsartan Mylan
MYLAN-MDL287500342341-43

PL-Glover-21 Biocon Inspection    206
Compliance Report
Date of Inspection
10/5/18
MYLAN-MDL287500342344-48

PL-Glover-22 E-mail Thread        212
11/29/18
Subject, Recovered
Solvents
MYLAN-MDL287500281315

PL-Glover-23 E-mail Thread        219
11/26/18
Subject, Recovered
Solvents
MYLAN-MDL287500530156-57

PL-Glover-24 Charting, Product    223
Codes, Stages, SAP
Code Name of
Recovery Solvent



Page 10

- - -
E X H I B I T S (Cont'd.)
- - -

NO.        DESCRIPTION        PAGE

PL-Glover-25 E-mail Thread      224
11/30/19
Subject Reg Design
Individual Solvents
MYLAN-MDL287500249392-93

PL-Glover-26 Letter from FDA     239
To Dr. Reddy  3/4/19

PL-Glover-27 Response to FDA     245
483 Observations
1/2/19
MYLAN-MDL287500720361-75

PL-Glover-28 E-mail Thread      266
6/23/20
Subject, US FDA
MYLAN-MDL287500281626

PL-Glover-29 Establishment      267
Inspection Report
Official Correspondence
MYLAN-MDL287500281628

PL-Glover-30 E-mail Thread      276
3/20/19
Subject, Backup for
FDA Call
MYLAN-MDL287500347222

PL-Glover-31 Investigation of    276
Lantech
MYLAN-MDL287500347223-24

Page 11

- - -
E X H I B I T S (Cont'd.)
- - -

NO.        DESCRIPTION        PAGE
PL-Glover-32 E-mail Thread      282
8/19/19
Subject, Good ANDA
Submission Practices
Notification
MYLAN-MDL287500300611-14

PL-Glover-33 E-mail Thread      295
12/9/19
Subject, Lantech Data
2011-2019
MYLAN-MDL287500396834-36

PL-Glover-34 Contract Manufacturer 298
Evaluation Report for
Recovered Solvents
Matrix
MYLAN-MDL287500492061

PL-Glover-35 CMU Evaluation      300
Report Review Based
On Inspection
MYLAN-MDL287500492062

PL-Glover-36 CMU Manufacturer    303
General Information
Form
MYLAN-MDL2875

PL-Glover-37 FDA Inspection      308
Observations
3/6-15/2019

Page 12

- - -
E X H I B I T S (Cont'd.)
- - -

NO.        DESCRIPTION        PAGE
PL-Glover-38 Audit Report       334
Lantech Pharmaceuticals
Limited
6/23/15
MYLAN-MDL287500467826

Page 13

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
PAGE   LINE
None.

Request for Production of Documents
PAGE   LINE
None.

Stipulations
PAGE   LINE
None.

Questions Marked
PAGE   LINE
None.

Confidential Information Subject to Protective Order

Page 14

```
1              - - -
2         THE VIDEOGRAPHER:  We are
3    now on the record.  My name is
4    Ingrid Rodriguez.  I'm a
5    videographer for Golkow Litigation
6    Services.
7         Today's date is March 9,
8    2021.  And the time is 9:02 a.m.
9         This remote video deposition
10   is being held in the matter of In
11   Re Valsartan Losartan, and
12   Irbesartan Products Liability
13   Litigation, for the United States
14   District Court for the District of
15   New Jersey.
16        The deponent is Derek
17   Glover.
18        All parties to this
19   deposition are appearing remotely
20   and have agreed to the witness
21   being sworn in remotely.
22        Due to the nature of remote
23   reporting, please pause briefly
24   before speaking to ensure all
```

Page 15

```
1    parties are heard completely.
2         All counsel present will be
3    noted on the stenographic record.
4         The court reporter is
5    Michelle Gray and will now swear
6    in the witness.
7              - - -
8         ... RICHARD DEREK GLOVER,
9    having been first duly sworn, was
10   examined and testified as follows:
11             - - -
12        EXAMINATION
13             - - -
14   BY MR. DAVIS:
15        Q.   Okay.  Good morning,
16   Mr. Glover.  How are you?
17        A.   I'm good.  Thank you.
18        Q.   I'm just going to tell you
19   that I have like three monitors set up.
20   So if I'm not, you know, looking at you
21   directly on the screen, that doesn't mean
22   that I'm not paying attention.  I
23   apologize for that.
24        Have you given a deposition
```

Page 16

```
1    before?
2         A.   Yes, I have.
3         Q.   Have you given a Zoom
4    deposition before?
5         A.   I have not.
6         Q.   Okay.  Well, that makes two
7    of us.  I've defended one.  This is the
8    first one I'm taking.  So hopefully we
9    can get through this with minimal
10   difficulties.
11        Let me just ask, do you have
12   a computer in front of you or what's the
13   camera there?
14        A.   Yeah.  We have a laptop
15   camera set up, and then I have a slightly
16   larger screen behind that I'm hoping will
17   help me read things.
18        Q.   I'm just going to ask right
19   now that you disable any, if any are
20   open, any chat features or text features
21   on the laptop.
22        A.   I don't see anything.  It's
23   not mine, so I'm assuming that they've
24   already taken care of that.
```

Page 17

```
1         Q.   Okay, great.  You said you
2    had given some previous depositions
3    before.
4         How many total?
5         A.   Just a couple.
6         Q.   Okay.  What were the nature
7    of the cases that you were deposed in?
8         A.   One was a case years ago
9    where we disputed over the release or
10   rejection of a product.  And the other
11   one was a longer time ago related to an
12   investigation at the site that I was
13   working in.
14        Q.   What was the site?
15        A.   Morgantown.  Morgantown
16   facility.
17        Q.   Okay.  Approximately what
18   year was that?
19        A.   I'm not exactly sure.  2009
20   maybe.  2010.
21        Q.   Do you recall what the
22   nature of the investigation was?
23        A.   Again, I apologize if it was
24   a deposition or maybe it was just some
```

Confidential Information Subject to Protective Order

Page 18

1 interviews related to a potential
2 deposition. It was prep work anyway. It
3 was related to an investigation
4 associated with the plant and some news
5 articles that were around about the
6 investigation.
7          Yeah. I don't know how else
8 to describe it. It was just an
9 investigation related to the
10 manufacturing facility.
11     Q.  Who was conducting the
12 investigation?
13     A.  I was, as head of quality at
14 the time.
15     Q.  Was there an external
16 investigation or was this a purely
17 internal matter?
18     A.  Internal matter. And
19 eventually it became a news article, and
20 so we ended up working with the FDA.
21 They came in and found no issues, which
22 basically stopped the entire inquiry.
23     Q.  Okay. What were -- what was
24 the substance of the matter that was

Page 19

1 being investigated?
2     A.  An investigation process for
3 in-process manufacturing controls.
4     Q.  What was alleged to have
5 been done wrong?
6     A.  There was no allegation. It
7 was simply a report that operators were
8 using the equipment improperly. And
9 again, we investigated it, found that
10 there was no evidence of them, you know,
11 doing anything inappropriate.
12          FDA inspected the facility
13 twice and found no issues as well.
14     Q.  Okay. I'm going to attempt
15 to introduce my first exhibit here.
16 Let's see how this goes.
17          MR. DAVIS: Clem, for
18     naming, these exhibits, should I
19     just say Mylan for the prefix and
20     01? Or how would you prefer to do
21     that?
22          MR. TRISCHLER: Whatever you
23     prefer. If you want to mark them
24     Mylan -- why don't you mark them

Page 20

1 Plaintiffs' Exhibit 1. Plaintiff
2 Mylan-1, because it's your
3 exhibit, right?
4          MR. DAVIS: Yeah.
5          MR. HONIK: This is Ruben.
6 May I suggest you name them
7 Glover-1 and so forth. There are
8 going to be lots of Mylan
9 depositions.
10          MR. TRISCHLER: That's fine.
11          MR. DAVIS: Sure. Although
12 I thought we were trying to -- and
13 I don't know how other defendants
14 are doing it, but I think we were
15 supposed to do it sequentially,
16 you know, and reuse exhibits
17 throughout. And I'm not sure if
18 that's what CMO 20 says. But I'm
19 happy to do it whichever way.
20          MR. HONIK: We can re-number
21 them later. Why don't you call
22 them Glover-1 and so forth. We
23 can re-number if need be.
24          MR. DAVIS: Clem, are you

Page 21

1 okay with that?
2          MR. TRISCHLER: Sure.
3          MR. DAVIS: Okay. I'll call
4 it PL for plaintiff and then
5 Glover, and then one.
6          (Document marked for
7 identification as Exhibit
8 PL-Glover-1.)
9          MR. DAVIS: Okay. That
10 would be Tab 2 in the binder,
11 Clem, or at least that number
12 what -- so what I've done with the
13 file names was number them from
14 tab. So I'm not going to be going
15 sequentially through -- I'll
16 mostly be going sequentially
17 through, but in some cases I'm
18 going to be jumping around. But
19 the file name should start with a
20 two. It's the 30(b)(6) notice.
21          MR. TRISCHLER: Okay.
22          MR. DAVIS: Or actually,
23 rather -- sorry, the 30(b)(6)
24 topics, rather.

Confidential Information Subject to Protective Order

Page 22

BY MR. DAVIS:

Q.   Mr. Glover, you can let me know when you've had a chance to put that in front of you?

A.   I have Exhibit A in front of me.

Q.   Okay.  So that -- we're going to call that Plaintiff Glover-1, Exhibit 1 for this deposition.
This is the Court's order with the 30(b)(6) topics in this case.  And if you go to page -- rather, Exhibit C, which is Page 21 of 82 at the top.  If you see the blue lettering at the top.  You'll see Page 21 of 82.  That starts with Exhibit C which is the 30(b)(6) topics for Mylan.

A.   Okay.

Q.   Have you reviewed this document before today?

A.   It doesn't look familiar to me.

Q.   So you don't think you reviewed it before today?

Page 23

A.   No.

Q.   Do you recognize that you're designated on approximately 24 or 25 of the topics that are listed on the next following pages?

A.   Yes, I read a notice previously.  But it didn't look like this one.

Q.   Okay.  That might be what I show you next.  Let's, in fact, go to that now.

MR. DAVIS:  That would be Tab 3, Clem, which is the amended notice of deposition.

(Document marked for identification as Exhibit PL-Glover-2.)

MR. TRISCHLER:  Yes, he has it.

BY MR. DAVIS:

Q.   Okay.  Have you seen this document, Mr. Glover?

A.   Yes, sir.

MR. TRISCHLER:  And just to

Page 24

be clear, John, what you said Tab 3 is Exhibit 2, correct?

MR. DAVIS:  Exhibit 2.

Right.

BY MR. DAVIS:

Q.   So you have seen Exhibit 2, Mr. Glover?

A.   I have.

Q.   When did you first learn that you would be designated as a corporate representative to testify in this case?

A.   Approximately two -- two to three months ago.

Q.   At that point, did you have -- or did you also learn the topics on which you would be designated at that point?

A.   I got a general overview, yes.

Q.   Okay.  Do you understand that you're here today to testify on behalf of Mylan Laboratories Limited, Mylan MB and Mylan Pharmaceuticals, Inc.?

Page 25

A.   Yeah.

Q.   Okay.  So when I refer to Mylan in this case, can we agree that I'm referring to all of those entities inclusively?

A.   Okay.

Q.   Okay.  And if there's -- at any point that you want to refer to one in particular, just let me know that.  I'm just going to assume that when you say Mylan that you're referring to any and all unless you specifically tell me otherwise, and I'll do the same for you.
If you go to the bottom of Exhibit 2, you'll see an exhibit -- Exhibit B, which is on the second-to-last page.

A.   All right.  So is this Exhibit 2 now?  Or is that Exhibit 2?

MR. TRISCHLER:  You're holding Exhibit 2.

THE WITNESS:  Okay.  The bottom of which page?

Confidential Information Subject to Protective Order

Page 26

¹ BY MR. DAVIS:
² Q.   The bottom of the
³ second-to-last page, which is Page 8.
⁴ A.   Okay.
⁵ Q.   So there's two document
⁶ requests there, one being a CV which I
⁷ can represent that we've received.
⁸ The second is a production
⁹ of custodial documents.  And I'll just
¹⁰ give you some background here.  We don't
¹¹ have a custodial file production for you
¹² because one wasn't given to us.
¹³ Let me just ask, if it
¹⁴ becomes necessary for us to ask for a
¹⁵ custodial file in the future, did you
¹⁶ receive a litigation hold notice related
¹⁷ to this matter at any point?
¹⁸ MR. TRISCHLER:  Just note my
¹⁹ objection, John, because you've
²⁰ mischaracterized the record.  A
²¹ request for custodial file was
²² made in the court on a motion by
²³ plaintiff, and the court ordered
²⁴ that no custodial production

Page 27

¹ needed to be made for Mr. Glover.
² So I think you've mischaracterized
³ the record.
⁴ MR. DAVIS:  Well, sure.  And
⁵ I'm not trying to dispute about
⁶ that.
⁷ I'm just saying in the
⁸ future if we need to again request
⁹ one as a result of this
¹⁰ deposition, for instance, I want
¹¹ to see if his custodial file has
¹² been preserved through, for
¹³ example, getting a litigation hold
¹⁴ letter.
¹⁵ So that's the extent of my
¹⁶ question.
¹⁷ BY MR. DAVIS:
¹⁸ Q.   Did you receive a litigation
¹⁹ hold letter related to this litigation?
²⁰ A.   I don't have a specific
²¹ recollection of it.  But it's standard
²² practice, so it's likely that I did.
²³ Q.   When you say standard
²⁴ practice, does that go to everyone at the

Page 28

¹ company?
² A.   Well, anyone at my level.  I
³ don't know how far they go.  But I
⁴ usually get them.
⁵ Q.   What is your current title?
⁶ A.   I'm the head of global
⁷ quality.
⁸ MR. DAVIS:  I'm going to
⁹ introduce your CV as Exhibit 3.
¹⁰ (Document marked for
¹¹ identification as Exhibit
¹² PL-Glover-3.)
¹³ BY MR. DAVIS:
¹⁴ Q.   Do you recognize this as
¹⁵ your CV?
¹⁶ A.   Yes.
¹⁷ Q.   And so you're head of global
¹⁸ quality.  Who do you report to?
¹⁹ A.   I report to Rajiv Malik.
²⁰ Q.   You report directly to
²¹ Mr. Malik?
²² A.   Yes.
²³ Q.   And he's the president of
²⁴ Mylan?

Page 29

¹ A.   Now Viatris, yes.
² Q.   Now, Viatris.  Okay.  I'm
³ just going to -- for my own sake, I've
⁴ been calling y'all Mylan for now --
⁵ A.   Okay.
⁶ Q.   -- so I'm going to keep
⁷ doing that if you don't mind.
⁸ A.   That's fine.
⁹ Q.   So when you say you're head
¹⁰ of global quality, does that include
¹¹ quality assurance and quality control?
¹² A.   Sure.  So quality control
¹³ and quality assurance being general
¹⁴ terms, and would be specific.  Within our
¹⁵ global infrastructure we don't
¹⁶ necessarily have differentiated quality
¹⁷ control and quality assurance at the
¹⁸ global level or regional levels.  Those
¹⁹ are typically, in our world, site-level
²⁰ functions.  But they do report up to me
²¹ through several layers.
²² Q.   Is there -- at what point is
²³ there a distinction between quality
²⁴ assurance and quality control at Mylan?

Page 30

1    A.   At the site level.
2    Q.   At the site level.
3         What's -- just in general
4 terms, how would you describe the
5 difference between the two?  What does
6 quality assurance do and what does
7 quality control do?
8    A.    Within our company, the
9 terminology quality control is used
10 predominately as laboratory operations or
11 quality control laboratory operations.
12 It's typically the analytical testing
13 function within the quality program.
14         Quality assurance being a
15 host of other supporting
16 compliance-related functions and programs
17 within quality.
18    Q.   So is one sort of more -- is
19 quality control sort of more
20 retrospective, meaning laboratory
21 analysis of stuff that's already been
22 done or materials that have already been
23 manufactured, whereas quality assurance
24 is more proactive on the front end

Page 31

1 ensuring quality?
2         MR. TRISCHLER:  Objection to
3 form.
4 BY MR. DAVIS:
5    Q.   Do I not have that right?
6         THE WITNESS:  Do I answer
7 the question or --
8         MR. TRISCHLER:  You can
9 answer.  Unless counsel wants to
10 rephrase or re-ask the question,
11 you should answer as best you can.
12         THE WITNESS:  I mean, based
13 on the way you asked the question,
14 the answer would be no.
15         Quality control involves
16 testing and testing can be, you
17 know, realtime testing, stability
18 testing, a variety and host of
19 testing.
20         Quality assurance, also
21 influences both realtime,
22 historic, and proactive measures
23 that may be taking place.
24         There's nothing time bound

Page 32

1    about quality control versus
2    quality assurance, I guess, is the
3    way I would probably try to answer
4    your question.
5 BY MR. DAVIS:
6    Q.   Okay.  That makes sense.  So
7 it's -- I guess the distinction is more
8 just that quality control is more
9 laboratory-based whereas quality
10 assurance is everything else?
11    A.    To the greater extent, yes.
12 Not exclusively, but definitely that's
13 where the focus is.
14    Q.   As head of global quality,
15 does that give you oversight of all of
16 Mylan's manufacturing sites, whether
17 they're in India or the U.S. or anywhere
18 else?
19    A.   Yes.
20    Q.   When it comes to sort of
21 standardization of quality practices, is
22 each site sort of left to their own
23 devices or is there a concerted effort at
24 Mylan to have consistent quality related

Page 33

1 SOPs and practices at all the sites?
2    A.   Each site has to have, and
3 maintains its own infrastructure and
4 program policies, you know, in accordance
5 with the regulatory laws.
6         You know, we do try to
7 establish, you know, some level of
8 standardization on particular topics
9 which is consistent within the industry,
10 but there's no way to standardize every
11 single topic or every single detail from
12 facility to facility or region to region.
13 That would be impossible.
14    Q.   Which part -- you had
15 mentioned particular topics.  Can you
16 give me some examples of those?
17    A.   Yeah, key programs like
18 complaint investigations or
19 investigations in the plant, validation,
20 things like that.
21    Q.   Okay.  Validation, like
22 process validation?
23    A.   Yes.
24    Q.   What about risk management?

Confidential Information Subject to Protective Order

Page 34

1    A.   I don't think there's a
2  standardized policy on risk management at
3  this point.
4    Q.   Can you describe what risk
5  management is in the context of Mylan's
6  quality efforts?
7    A.   Again, that's a hard
8  question to answer.
9        Risk management exists in
10 dozens of different applications and
11 interpretations.  So you'd have to be
12 more specific, I think.
13   Q.   Okay.
14       MR. DAVIS:  I'm marking
15   Exhibit 4.
16       (Document marked for
17       identification as Exhibit
18       PL-Glover-4.)
19 BY MR. DAVIS:
20   Q.   Let me know when you have
21 that in front of you and you've had a
22 chance to view it.
23       MR. TRISCHLER:  By virtue of
24   your last question, I'm assuming,

Page 35

1    pulled from the pile, Tab 5, which
2  is Guidance For Industry, Q9
3  Quality Risk Management.  Is that
4  your Exhibit 4, John?
5        MR. DAVIS:  Yes, that's
6    right.
7        MR. TRISCHLER:  Okay.  The
8    issue that I have on this end,
9    just so that, you know, my
10   comments don't seem strange, is
11   that when these were brought up
12   from my copy center, Post Its of
13   the tabs were put on everything.
14       So what you just labeled as
15   Exhibit 4, as opposed to 5 on it,
16   so that's why I'm just trying to
17   clarify.
18       MR. DAVIS:  Sure.  And we're
19   going to be moving away -- you
20   know, the tabs are purely internal
21   identifiers for me.
22       MR. TRISCHLER:  Right.  No,
23   I understand.  I just want to make
24   sure -- I just want to make sure

Page 36

1    we have the correct -- we're
2  talking about the same document.
3  That's all.
4        MR. DAVIS:  Sure.
5  BY MR. DAVIS:
6    Q.   Mr. Glover, let me know when
7  you've had a chance to review
8  sufficiently to talk about it.
9    A.   Okay.
10   Q.   Do you recognize this as an
11 FDA guidance document?
12   A.   I do.
13   Q.   Have you -- do you work with
14 these documents in your role as head of
15 quality at Mylan?
16   A.   I have somebody that is
17 primarily responsible for this, but yes.
18   Q.   Okay.  What does ICH stand
19 for?
20   A.   I will screw up the acronym.
21 It's like international committee for
22 harmonization, something like that.  It's
23 a group that works on standardizing best
24 practices within our industry.

Page 37

1    Q.   Okay.  And so these -- these
2  FDA guidance documents that, you know,
3  are referred to as like ICH 9 or
4  something, for example, quality risk
5  management, these are sort of setting for
6  the best practices, as you say?
7    A.   Yeah.  I think the
8  intention -- FDA puts a disclaimer in all
9  of their guidances that state that these
10 are not legally enforceable but represent
11 FDA's current thinking on a particular
12 topic.  Does not operate or bind FDA or
13 the public.  There's a big disclaimer on
14 the front end that basically indicates
15 that these are suggested practices.
16   Q.   Let me have you turn to Page
17 6 of this document.
18   A.   I'm sorry, Page 6?
19   Q.   The numbering at the bottom.
20   A.   Okay.
21   Q.   One second.  Actually,
22 sorry, go back to start at Page 1, which
23 is this -- I guess page -- numbered Page
24 5.  But it's numbered 1 at the bottom.

Confidential Information Subject to Protective Order

Page 38

1    A.   Okay.
2    Q.   The FDA sort of has this
3  introduction section here, and they say
4  in the last sentence of the first
5  paragraph that the importance of quality
6  systems has been recognized in the
7  pharmaceutical industry and it is
8  becoming evident that quality and risk
9  management is a valuable component of an
10 effective quality system.
11     Does Mylan agree with that?
12     A.   As a general statement, the
13 value of quality risk management, yes, we
14 agree.
15     Q.   If you flip to the next
16 page, the first paragraph right in the
17 middle there, it says, "An effective
18 quality risk management approach can
19 further ensure the high quality of the
20 drug product to the patient by providing
21 a proactive means to identify and control
22 potential quality issues during
23 development and manufacturing."
24     Does that strike you as a

Page 39

1  pretty good definition of quality risk
2  management?
3    A.   I interpret that as an
4  example of what a quality risk management
5  program may achieve.
6    Q.   So a proactive means to
7  identify and control potential quality
8  issues during development and
9  manufacturing.  Do you disagree with that
10 as a good definition of quality risk
11 management?
12     MR. TRISCHLER:  Objection to
13 form.  Asked and answered.
14     You can answer.
15     THE WITNESS:  Yeah, I -- can
16 you ask the question again?  I'm
17 sorry.
18 BY MR. DAVIS:
19     Q.   Sure.  Do you --
20     MR. TRISCHLER:  And unless I
21 instruct you not to answer when I
22 lodge an objection, just go ahead
23 and give your answer, Mr. Glover.
24     THE WITNESS:  Okay.  Thank

Page 40

1    you.
2  BY MR. DAVIS:
3    Q.   Do you disagree with the
4  FDA's definition of quality risk
5  management there, which is a proactive
6  means to identify and control potential
7  quality issues during development and
8  manufacturing?
9    A.   Well, I disagree with your
10 interpretation that this is a definition.
11 I think the sentence says, "An effective
12 quality risk management approach can
13 further ensure," and those words, I
14 interpret to mean that it may achieve and
15 may provide opportunities to identifying
16 quality and control issues.
17     So a quality risk management
18 program isn't necessarily defined by this
19 sentence.  It simply provides an example
20 of an opportunity that it may introduce.
21     Q.   If it's something different
22 in some context in your mind, how would
23 you amend this?  What would be different
24 in your mind?

Page 41

1    A.   I just don't think this is
2  intended to be the definition.  I'm just
3  simply answering your question.
4    Q.   Can you give me your
5  definition?
6    A.   I haven't really thought
7  about a definition of quality risk
8  management.  But I think again, back to
9  our original conversation, quality risk
10 management by my interpretation is
11 defined 100 different ways for 100
12 different contexts.
13     And so when I've had these
14 discussions with industry partners and
15 regulators, risk management is a process
16 whereby risk is either contemplated,
17 identified, assessed, you know, in
18 various capacities across all walks of
19 the GMP spectrum.
20     And so to give it one
21 definition, I think, does not really
22 effectively do it justice.
23     Q.   Well, do you agree that a
24 quality risk management system is

Confidential Information Subject to Protective Order

Page 42

¹ essential to ensuring the quality of
² Mylan's products?
³      A.   I think quality risk
⁴ management is a part of many, many
⁵ different quality systems.
⁶      Q.   And one that's essential to
⁷ ensuring the quality of Mylan's product,
⁸ correct?
⁹           MR. TRISCHLER:  Objection to
¹⁰      form.
¹¹           THE WITNESS:  Yeah.  Again,
¹²      I believe it's a part of every
¹³      quality system.
¹⁴ BY MR. DAVIS:
¹⁵      Q.   If a quality system did not
¹⁶ have any risk management controls, would
¹⁷ that be an effective quality system in
¹⁸ Mylan's opinion?
¹⁹           MR. TRISCHLER:  Objection to
²⁰      form.  Incomplete hypothetical.
²¹           THE WITNESS:  Yeah, I don't
²²      think there's such a thing as a
²³      quality system without risk
²⁴      management.

Page 43

¹ BY MR. DAVIS:
²      Q.   Okay.  Can a quality system
³ be GMP compliant if it did not have a
⁴ risk management system?
⁵           MR. TRISCHLER:  Objection to
⁶      form.  Incomplete hypothetical.
⁷           THE WITNESS:  Again, I'm not
⁸      even sure we are speaking of the
⁹      same thing.  A quality system is
¹⁰      risk management.  And so we may
¹¹      wax poetically about this for a
¹²      long time.
¹³           The words "risk management"
¹⁴      versus the activity of risk
¹⁵      management are completely
¹⁶      different and semantic.  All
¹⁷      quality systems are risk
¹⁸      management.
¹⁹ BY MR. DAVIS:
²⁰      Q.   Okay.  And so without risk
²¹ management, you don't have a quality
²² system is what you're saying, correct?
²³      A.   I'm saying without quality
²⁴ systems, you don't have risk management.

Page 44

¹      Q.   Okay.  If you go to the
² bottom of the page that we're on, there's
³ a section header, "2.  Scope."
⁴           Do you see that?
⁵      A.   Yes.
⁶      Q.   It says, "This guidance
⁷ provides principles and examples of tools
⁸ for quality risk management that can be
⁹ applied to different aspects of
¹⁰ pharmaceutical quality.  These aspects
¹¹ include development, manufacturing,
¹² distribution, inspection, submission
¹³ review processes throughout the lifecycle
¹⁴ of drug substances, drug products,
¹⁵ biological/biotechnological products
¹⁶ including the use of raw materials,
¹⁷ solvents, excipients, packaging and
¹⁸ labeling materials in drug products,
¹⁹ biological and biotechnological
²⁰ products."
²¹           Did I read that correctly?
²²      A.   Yep.
²³      Q.   Does Mylan agree that the
²⁴ scope of quality risk management should

Page 45

¹ be used across the lifecycle of its drug
² products and substances used in those
³ products?
⁴      A.   Yes.
⁵      Q.   Does Mylan agree that
⁶ quality risk management principles should
⁷ be applied to the use of raw materials
⁸ and solvents and excipients in addition
⁹ to API formulations and finished doses?
¹⁰      A.   Yeah.
¹¹      Q.   Okay.  Who is responsible at
¹² Mylan for actually conducting risk
¹³ assessments?
¹⁴      A.   Again, it depends on the
¹⁵ context of the risk assessment itself.
¹⁶ It can be a large number of people.
¹⁷      Q.   Is it sort of
¹⁸ interdisciplinary?
¹⁹      A.   Can be.
²⁰      Q.   But quality assurance sort
²¹ of leads the effort when it comes to a
²² risk assessment?
²³      A.   Not always, but in many
²⁴ cases, yes.

Confidential Information Subject to Protective Order

Page 46

1    Q.   When it comes to potential
2 quality issues that can arise during
3 manufacturing processes, who is involved
4 in a risk assessment to evaluate those
5 potential quality issues?
6    A.   It will depend on the stage
7 of the process.  So if we're in the
8 development stage, it will be heavily
9 weighted with development scientists.
10       As we go into commercial,
11 then it would be a cross-function of
12 quality, technical services, R&D,
13 production.  Again, it's a large list of
14 people that participate in this type of
15 activity.
16    Q.   By development, do you mean
17 preapproval?
18    A.   Yes.
19    Q.   Can effective risk
20 management be done just purely in the
21 abstract, or do you have to actually
22 drill into particular manufacturing
23 processes in order for an effective risk
24 assessment to be done related to those --

Page 47

1 those processes?
2    A.   What do you mean by the
3 abstract?
4    Q.   Sure.  I mean, could you --
5 is it sufficient just to have a risk
6 assessment on quality, for example, or do
7 you have to drill into various processes
8 that can affect quality?
9    A.   Your question sounds very,
10 very vague.
11    Q.   Let me rephrase -- let me
12 rephrase it.
13       When -- how specific does
14 Mylan generally get with its risk
15 assessments?
16    A.   It all depends on the topic.
17 So with a more specific question, I might
18 be able to answer your question.
19    Q.   Okay.  We'll come back to
20 that.
21       (Document marked for
22       identification as Exhibit
23       PL-Glover-5.)
24       MR. DAVIS:  I'm introducing

Page 48

1    Tab 6, which will be Exhibit 5.
2 BY MR. DAVIS:
3    Q.   Let me know when you've had
4 a chance to review that.
5    A.   Okay.  Okay.
6    Q.   Can you tell me what this
7 document is?
8    A.   I can tell by the header
9 that it is an SOP.  And I can tell by the
10 numbering convention that it applies to
11 MLL.  I'm not positive whether it's a
12 site-level SOP or it could be a corporate
13 level or regionally based SOP.  It's not
14 a global SOP.
15    Q.   That was going to be my next
16 question, was the numbering convention.
17 MLLCRP.  Does that suggest to you that
18 it's corporate for Mylan Laboratories
19 Limited?
20    A.   Yeah.  Again, I won't
21 know -- I'm hesitant to guess.  I can at
22 least tell you that MLL clearly stands
23 for Mylan India.  And it's possible that
24 CRP stands for corporate.

Page 49

1    But corporate in the way
2 they use that nomenclature, I think, is a
3 grouping of SOPs that are regionally
4 based for the API units.  But that would
5 be better answered by someone other than
6 me.
7    Q.   So would this quality risk
8 management SOP have applied to Unit 8
9 then?
10    A.   It's quite possible.
11    Q.   Do you have any reason to
12 think that it would not have applied to
13 Unit 8?
14    A.   No.  It would be my best
15 guess.
16    Q.   Okay.  And this is the
17 version as it existed around 2016 based
18 on the dates, correct?
19    A.   Yeah.  It says effective as
20 of September 2016.
21    Q.   Okay.  Do you think there's
22 any variability between the quality risk
23 management SOPs for Mylan Laboratories
24 Limited and any of the other Mylan

Confidential Information Subject to Protective Order

Page 50

1 entities out there?
2      A.   It's quite possible.
3      Q.   If you look at -- I'm going
4 to go through this document, I think, by
5 sort of the section numbering.  I think
6 that'll be easier than page numbering.
7           So if you look at Section
8 1.1, which is "Purpose."
9           It says that the purpose is
10 to lay down the procedure for assessing
11 the various quality risks associated with
12 specific process, system, equipment,
13 instrument, in order to evaluate the
14 impact on quality of the product or
15 services being provided to ensure patient
16 safety.
17           Did I read that correctly?
18      A.   Yes.
19      Q.   Does Mylan agree that
20 quality risk management is important to
21 ensuring patient safety?
22      A.   We agree that all quality
23 programs are built in a manner that --
24 with a goal of ensuring patient safety,

Page 51

1 yes.
2      Q.   Going to Section 2.1,
3 "Scope," and this might answer our
4 previous question.  It says that it shall
5 be applicable to all Mylan API sites
6 located in India.  Does that suggest to
7 you that it's applicable to Unit 8?
8      A.   It does.
9      Q.   And that would include the
10 valsartan API manufactured at Unit 8 that
11 was destined for the U.S. market?
12      A.   Yep.
13      Q.   Moving to the next section,
14 "Responsibility," it says, "Each
15 department head is responsible to
16 identify the list of process, system,
17 equipment, instrument, and assess the
18 quality risks involved in their
19 respective areas and mitigate them with
20 adequate corrective and preventive
21 actions."
22           Did I read that correctly?
23      A.   Yep.
24      Q.   Do the department heads --

Page 52

1 for example, does the department heads of
2 Unit 8 in quality, do they report up the
3 chain of command eventually to you as
4 head of global quality?
5      A.   Eventually, yes.
6      Q.   How far down the chain of
7 command is any particular department head
8 at Mylan Unit 8?
9      A.   From me it would be three
10 layers, I believe.  I have a vertical
11 head that reports to me.  And then there
12 will be regional or cluster heads, and
13 the site heads.  So three layers.
14      Q.   Who is that currently for
15 those layers?  Do you know their names?
16      A.   Vertical head?
17           The vertical head for API is
18 Dr. Antony Gomes.
19      Q.   Okay.  And then the layer
20 below him, you described as what?
21 Regional --
22      A.   A cluster head.
23      Q.   Cluster head?
24      A.   Yeah.  Well, they call it

Page 53

1 regional or cluster depending on where we
2 are.  I think the API uses the
3 terminology cluster.
4      Q.   And who would be the person
5 in that role currently reporting to
6 Dr. Gomes?
7      A.   I'm not certain.  It may be
8 an open position.  But I can't say for
9 certain.
10      Q.   Okay.  And then this
11 department head mentioned in this SOP
12 would report to that person?
13      A.   Correct.  Or it could be an
14 open position, like I said.
15      Q.   Okay.  This mentions
16 corrective and preventive actions.  Is
17 the acronym for that a CAPA?
18      A.   Yes.
19      Q.   So is a CAPA -- so a CAPA
20 being both preventive and sort of --
21 well, let me rephrase that.
22           A CAPA can be made to both
23 prevent some kind of quality failure or
24 to address the quality failure that

Confidential Information Subject to Protective Order

Page 54

1 happened, correct?  It doesn't
2 necessarily have to be responsive, is
3 what I'm getting at, right?
4     A.   In the terminology that we
5 apply this word CAPA, they are both
6 conventionally used after something
7 happens.  It sounds like you're looking
8 for something else.  It probably falls in
9 line with continuous improvement, maybe.
10    Q.   Okay.  So when Mylan uses
11 the term "CAPA," it's meaning to respond
12 to something as opposed to something else
13 which would be preventing -- you know,
14 identifying a risk and taking measures to
15 prevent it from happening in the first
16 place?
17    A.   I would say they're used not
18 exclusively.  I just wouldn't want to
19 infer that all proactive measures are
20 CAPAs.  Proactive measures can come in a
21 variety of forms.
22    Q.   Okay.  Let's move down to
23 Section 6 which is "Procedure."  6.1
24 says, "The quality risk assessment shall

Page 55

1 be performed on the specific process,
2 system, equipment, and instrument wherein
3 the anticipated quality risk is
4 involved."
5         Did I read that correctly?
6    A.   Yes.
7    Q.   This sort of gets to my
8 earlier question about conducting risk
9 assessments in the abstract.
10        Do you read this procedure
11 to instruct the department heads to
12 actually do a risk assessment on the
13 specific -- on specific processes
14 involved in the manufacturing process?
15    A.   I think it gives the head of
16 quality the flexibility to apply this to
17 a variety of risk signals.
18        And so, the way I would
19 interpret this is that they would look
20 for any signal that might indicate risk,
21 and then they would apply this procedure
22 or these fundamental, you know,
23 applications to that risk evaluation.
24    Q.   And would that be on, like,

Page 56

1 a particular product basis or would that
2 be, you know, applicable to just, you
3 know, all the products at that site?
4    A.   It can literally be
5 anything.
6    Q.   Okay.  But sometimes it
7 could be applicable to the particular --
8 a particular product or particular
9 manufacturing process for that product,
10 correct?
11    A.   Yeah, it could.
12    Q.   There's a scoring system for
13 risk assessments that appears on Page 10
14 of 20.  I just want to make sure that I
15 understand this right and whether this is
16 currently how risk assessments are
17 scored.
18        Can you -- can you walk me
19 through what this is discussing in terms
20 of how to score various risks that are a
21 result of a risk assessment?
22    A.   This Page 10 just describes
23 a progression of severity and occurrence
24 likelihood.  So a higher number means

Page 57

1 that there is a higher risk on severity.
2 And a high number on occurrence means
3 it's more likely to occur.
4    Q.   Go to the next page, 6.6.25.
5    A.   Mm-hmm.
6    Q.   And you see there's a little
7 table that has risk level and obtained
8 score.  And it has high, medium and low
9 risk and various numbers associated with
10 that.
11        How are those numbers
12 arrived at?
13    A.   I think 6.6.24 explains that
14 you multiply the three scores together,
15 and then you'll get one number, and then
16 you just drop it into one of those three
17 categories according to this SOP.
18    Q.   Understood.  So, for
19 example, if something had a moderate
20 severity, three, a possible likelihood of
21 occurrence, three, and a detection level
22 of not effective or likely to be
23 detected, that would result in a score of
24 27?

Confidential Information Subject to Protective Order

Page 58

1    A.   Right.
2    Q.   Okay.  And that would be
3 characterized as medium risk, correct?
4    A.   Yeah.
5    Q.   Okay.  When something is
6 characterized as high or medium risk,
7 what's -- what's the next step to take on
8 Mylan's end?
9    A.   Again, this is an SOP, so I
10 don't know if they go into that level of
11 detail or not.  There's no standard
12 expectations.
13    Q.   Are medium -- sorry, I
14 didn't mean to cut you off there.  Keep
15 going.
16    A.   Page six explains medium.
17 It sounds like there's a communication
18 requirement to the site head.
19    Q.   Are you looking at Section
20 6.6.29?
21    A.   I was actually looking at
22 6.6.31.
23    Q.   Gotcha.  Is the goal to --
24 for high and medium risks, is the goal to

Page 59

1 implement CAPAs to the point that you
2 arrive at a low risk score?
3    A.   I don't think I would say
4 that's specifically the goal, no.  I
5 think the idea would be to understand the
6 risk, managing it to an acceptable level.
7    Q.   Sure.  Through, for example,
8 what this SOP describes as mitigation
9 plans or --
10    A.   Sure.
11    Q.   -- risk reduction process
12 and procedures?
13       And so even if -- so if you
14 look at -- go back to Page 11 of 20, the
15 detection category.  If something is very
16 effective or 100 percent likelihood of
17 detection, it still could be low risk,
18 even if it's almost certain to occur and
19 a fundamental severity of impact,
20 correct, because five times five is 25
21 and that's below 27, correct?
22    A.   That's possible.
23    Q.   And is the eventual goal of
24 this exercise to always end up in the low

Page 60

1 risk category through arriving at, for
2 medium and high risk, initial scores
3 arriving at mitigation plans or risk
4 reduction processes that reduce the
5 scoring to low risk?
6    A.   No.  I would not say the
7 goal is to find a way to low risk.
8    Q.   Explain to me.  Why?
9    A.   It is quite possible that
10 the risk is intrinsic to the process and
11 that the risk is understood, accepted,
12 and managed acceptably and that the
13 benefit of the product may be greater
14 than the risk.
15    Q.   So are you saying in some
16 instances Mylan is okay with medium or
17 high risk?
18    A.   I'm saying not only Mylan,
19 that the health authorities and the
20 entire medical community may be okay with
21 that.
22    Q.   If there are mitigation --
23 what about if there are mitigation
24 possibilities or risk reduction processes

Page 61

1 that can be implemented, should those be
2 implemented --
3       MR. TRISCHLER:  Objection to
4    form.
5 BY MR. DAVIS:
6    Q.   -- to arrive at a low risk
7 result or are you saying that Mylan still
8 can consider acceptable a medium or high
9 risk?
10       MR. TRISCHLER:  Sorry, John.
11    Objection to form.
12       THE WITNESS:  I think it's
13    just -- it's got to be more
14    specific than that.  It's hard to
15    speculate generally about, you
16    know, everything under the sun.
17       I mean, these -- risk-based
18    decisions are made in a very
19    specific context.  We'd have to be
20    speaking about a very particular
21    case.
22 BY MR. DAVIS:
23    Q.   Look at 6.6.29.  It says,
24 "To scrutinize the risks as high/medium,

Confidential Information Subject to Protective Order

Page 62

¹ identify the person responsible for
² notification of the risk and the CAPA
³ identified. Low risk shall be considered
⁴ acceptable."
⁵          I read that as medium and
⁶ high risk not being considered
⁷ acceptable. Do you read that
⁸ differently?
⁹          A.   I read that as, if it's low
¹⁰ risk, you're not required to do anything
¹¹ else to further understand it.
¹²          If they identified through
¹³ their signal evaluation that they had a
¹⁴ medium or high risk, then the expectation
¹⁵ is that they would do all the work to
¹⁶ understand it.
¹⁷          Q.   Regardless --
¹⁸          A.   But that doesn't necessarily
¹⁹ mean that --
²⁰          Q.   Regardless, there is an
²¹ obligation set forth in 6.6.35 to
²² implement CAPAs to reduce the respective
²³ risk, correct?
²⁴          MR. TRISCHLER: Objection to

Page 63

¹      form.
²          THE WITNESS: Again, I think
³      the goal is to identify whatever
⁴      possibilities exist to reduce the
⁵      risk. It doesn't necessarily mean
⁶      that they will arrive at low.
⁷ BY MR. DAVIS:
⁸          Q.   Okay. In order for a high
⁹ or medium risk to occasionally be
¹⁰ acceptable to Mylan, does that require at
¹¹ least being informed of all the
¹² information that goes into that risk
¹³ level and then accepting that risk?
¹⁴          MR. TRISCHLER: Objection.
¹⁵      Objection to form.
¹⁶          THE WITNESS: Sorry. Could
¹⁷      you repeat the question?
¹⁸ BY MR. DAVIS:
¹⁹          Q.   Sure. So you said there is
²⁰ some instances where risk is intrinsic,
²¹ right? I think that was your word. Do
²² you remember that?
²³          A.   Yeah.
²⁴          Q.   And that it might be

Page 64

¹ acceptable in some instances for
² something that might be scored as high or
³ medium risk to -- to be acceptable.
⁴          Does that presuppose Mylan
⁵ at least understanding all the
⁶ information that goes into that -- into
⁷ that risk designation?
⁸          MR. TRISCHLER: Objection to
⁹      form.
¹⁰          THE WITNESS: I mean, again,
¹¹      I think Mylan attempts to
¹²      understand as much as feasible or
¹³      reasonable for a particular risk
¹⁴      evaluation.
¹⁵          I don't know that this SOP
¹⁶      overrides or requires anything
¹⁷      beyond that.
¹⁸ BY MR. DAVIS:
¹⁹          Q.   But if -- if in these
²⁰ situations where Mylan is going to accept
²¹ a medium or high risk and still move
²² forward with whatever the process we're
²³ talking about is -- and I understand that
²⁴ we're talking about this sort of in the

Page 65

¹ abstract since this is an SOP and it's
² designed to, you know, be applicable to,
³ you know, any number of quality risk
⁴ situations that may arise.
⁵          So with that understanding
⁶ that this is somewhat of an abstract
⁷ discussion, don't you agree that for
⁸ those medium and high risks, that Mylan
⁹ is willing to accept, that Mylan should
¹⁰ at least be knowledgeable as much as it
¹¹ can be about what those risks are?
¹²          MR. TRISCHLER: Objection to
¹³      form.
¹⁴          THE WITNESS: Yeah, again, I
¹⁵      think it really just depends on
¹⁶      the case whether I can say yes to
¹⁷      that or not. It's really hard to
¹⁸      follow the question. It's very
¹⁹      abstract.
²⁰ BY MR. DAVIS:
²¹          Q.   I thought it was pretty
²² simple. I mean, don't you agree that
²³ Mylan should be -- should educate itself
²⁴ as much as possible as to the various

Page 66

¹ risks involved, especially when we're
² dealing with situations where Mylan may
³ be willing to accept medium or high risk?
⁴         MR. TRISCHLER:  Objection to
⁵     form.  Objection.  Asked and
⁶     answered.
⁷         You can answer if you can.
⁸     THE WITNESS:  I don't know
⁹     how to answer it.  I mean, I think
¹⁰     I've already said that we --
¹¹     according to this SOP and our own
¹²     practices, we attempt to identify
¹³     risks to the extent possible and
¹⁴     feasible.
¹⁵ BY MR. DAVIS:
¹⁶     Q.   Okay.  Let's talk about
¹⁷ recovered solvents for a little bit,
¹⁸ something a little more specific.
¹⁹         Do you know when Mylan
²⁰ started engaging with the recovery of
²¹ solvents for its products?
²²         MR. TRISCHLER:  Are you
²³     talking about valsartan, John?
²⁴     MR. DAVIS:  I'm talking

Page 67

¹     about generally.
² BY MR. DAVIS:
³     Q.   Do you know when Mylan
⁴ generally started using recovered
⁵ solvents?
⁶         MR. TRISCHLER:  Objection.
⁷     Beyond the scope, if it's not
⁸     limited to valsartan.
⁹         But you can answer if you
¹⁰     know.
¹¹         THE WITNESS:  I couldn't
¹²     say.
¹³ BY MR. DAVIS:
¹⁴     Q.   Okay.  To your knowledge,
¹⁵ did Mylan ever conduct a risk assessment
¹⁶ regarding quality issues that could arise
¹⁷ from Mylan's use of recovered solvents?
¹⁸     A.   I'm not sure.
¹⁹         MR. DAVIS:  I'm going to
²⁰     mark -- this is Tab 7, which I'm
²¹     marking as Exhibit 6.
²²         (Document marked for
²³     identification as Exhibit
²⁴     PL-Glover-6.)

Page 68

¹         MR. TRISCHLER:  Okay.
² BY MR. DAVIS:
³     Q.   I'm more interested in the
⁴ attachment to this e-mail.  But I wanted
⁵ to show you the e-mail for context.
⁶         Do you see that, the person
⁷ sending it, Mr. Reddy, is from Unit 8 in
⁸ his signature line?
⁹     A.   Yep.
¹⁰     Q.   And do you see that the date
¹¹ is October 17, 2014?
¹²     A.   Yep.
¹³     Q.   And the subject is "Quality
¹⁴ Risk Assessment."  And it has in
¹⁵ quotations, I guess the title:  "Usage of
¹⁶ recovered solvents in manufacturing of
¹⁷ pharmaceutical intermediate API."
¹⁸         Do you see that?
¹⁹     A.   Yeah.
²⁰     Q.   Okay.  And it has an
²¹ attachment there.  I'm going to show you
²² that next.
²³     A.   Okay.
²⁴         MR. DAVIS:  This is tab

Page 69

¹ eight.  Which is now Exhibit 7.
²         (Document marked for
³     identification as Exhibit
⁴     PL-Glover-7.)
⁵ BY MR. DAVIS:
⁶     Q.   Take a moment to review
⁷ that.  And let me know when you're ready
⁸ to discuss it.
⁹         (Whereupon, a discussion was
¹⁰     held off the record to discuss the
¹¹     technicalities of Zoom speaker
¹²     positioning.)
¹³ BY MR. DAVIS:
¹⁴     Q.   Have you had sufficient time
¹⁵ to review the document Mr. Glover?
¹⁶     A.   Sorry.  Just a couple more
¹⁷ minutes.
¹⁸     Q.   Sure.
¹⁹     A.   Okay.
²⁰     Q.   Have you seen this document
²¹ before?
²²     A.   I have not.
²³     Q.   So you would not --
²⁴     A.   I should clarify.  I don't

Page 70

¹ believe I have seen it. I have seen
² hundreds of documents. And so if I have
³ seen it, I don't recall reading it.
⁴     Q.   Okay. Did you review any
⁵ documents in preparing for the
⁶ deposition?
⁷     A.   I reviewed many, yes.
⁸     Q.   About how many?
⁹     A.   I could never guess at how
¹⁰ many.
¹¹     Q.   This was, to the best of
¹² your memory, not one of the ones that you
¹³ reviewed?
¹⁴     A.   Correct. It doesn't look
¹⁵ familiar to me.
¹⁶     Q.   I'll note for you this is a
¹⁷ draft -- what appears to be a draft risk
¹⁸ assessment based on the e-mail, which is
¹⁹ the last exhibit, and the fact that this
²⁰ is unsigned.
²¹         Did you see that it was
²² unsigned when you reviewed it?
²³     A.   I see it now, yeah.
²⁴     Q.   So you haven't seen any

Page 71

¹ documents that are similar to this that
² are signed?
³     A.   I have not.
⁴     Q.   And so you wouldn't know if
⁵ this was ever actually signed or another
⁶ draft of this was eventually signed,
⁷ would you?
⁸     A.   No, I don't know.
⁹     Q.   Okay. If there was one that
¹⁰ was eventually signed off on, who would I
¹¹ go talk to to find that?
¹²     A.   It seems like -- well, I
¹³ would start with Dr. Antony. But if he
¹⁴ hasn't the ability, then whatever this
¹⁵ gentleman's name is, maybe would know.
¹⁶     MR. TRISCHLER: By
¹⁷ Dr. Antony, do you mean Dr. Antony
¹⁸ Gomes?
¹⁹     THE WITNESS: Dr. Gomes,
²⁰ yeah. These folks report to him.
²¹ So he would know.
²²     MR. TRISCHLER: Sorry, John,
²³ I just didn't want there to be
²⁴ confusion on the name.

Page 72

¹     MR. DAVIS: Sure.
² BY MR. DAVIS:
³     Q.   Under scope, on the -- so
⁴ you have, you know, the first page, which
⁵ is a blank signature page. You have the
⁶ second page, which is the table of
⁷ contents.
⁸         The first substantive page
⁹ has a Section 2.0, which is "Scope."
¹⁰     A.   Okay.
¹¹     Q.   It says that, "The scope of
¹² the risk assessment is applicable to the
¹³ usage of recovered solvents for
¹⁴ manufacturing of pharmaceutical
¹⁵ intermediate API Unit 8 Mylan
¹⁶ Laboratories Limited."
¹⁷         Did I read that right?
¹⁸     A.   Yep.
¹⁹     Q.   And so that would include
²⁰ valsartan API?
²¹     A.   Yeah.
²²     Q.   Including valsartan API
²³ destined for the U.S. market, correct?
²⁴     A.   Yes.

Page 73

¹     Q.   Is it Mylan's standard
² practice to sign off on risk assessments
³ like this one if they're actually
⁴ conducted to completion?
⁵     A.   Normally I would think, yes,
⁶ unless there was some decision not to
⁷ finish it.
⁸     Q.   Okay. And once it's signed
⁹ off on, if it ever was signed off on, it
¹⁰ says below that in Section 3, that once
¹¹ the risk assessment is closed, it shall
¹² be reviewed for adequacy once in three
¹³ years. Is that a standard practice
¹⁴ across Mylan?
¹⁵     A.   No. I don't think we have a
¹⁶ global standard practice on that. That
¹⁷ would be established within their local
¹⁸ SOPs.
¹⁹     Q.   Okay. So again, on Pages 4
²⁰ and 5, you see again sort of what we saw
²¹ in the SOP, which is likelihood of the
²² risk occurring scoring, severity of
²³ impact scoring, and the existing
²⁴ mitigation controls scoring.

Confidential Information Subject to Protective Order

---

Page 74

1    Do you see that?
2    A.   Yep.
3    Q.   And then there's a table.
4  This is a little different from the SOP
5  that we looked at.  But there is a table
6  that has likelihood and severity, and the
7  sort of eventual risk scoring, correct?
8    Do you see that?
9    A.   Yep.  I'm assuming you're on
10 Page 7 at this point?
11   Q.   I'm on page -- let's see.
12 I'm on page -- there's a numbering at the
13 top right corner.
14   Do you see that?
15   A.   Yeah, yeah.
16   Q.   I'm on page Number 5.
17   A.   Oh, I'm sorry.  I got ahead
18 of you.
19   Q.   So do you see that?  Do you
20 read that bottom table on Page 5 as sort
21 of the outcome scoring of the risk
22 assessment?
23   A.   Yeah, that's sort of a
24 depiction of the matrix.  I don't think

Page 75

1  that's intended to be -- this particular
2  risk assessment output, my understanding
3  is this is an example.
4    Q.   Correct.  That's how I read
5  it too.
6    And then the sort of next
7  page after that, Page 6, is sort of the
8  recommended actions to take based on the
9  scoring matrix, correct?
10   A.   Right.
11   Q.   And then for, you know, no
12 and low risk, you know, no risk is, you
13 know, no additional risk control measures
14 are needed.  Low risk is additional
15 controls may be considered.  Medium risk
16 is additional controls CAPAs must be
17 implemented.  And then high risk is, you
18 know, must be reduced to at least medium
19 risk.
20   Did I -- did I read all that
21 correctly?
22   A.   That's what it says.
23   Q.   So the bottom line of this
24 is basically, if there is a medium or

Page 76

1  high risk, that additional controls have
2  to be implemented, at least according to
3  this chart?
4    A.   I think this is the
5  instruction they've given the people
6  executing this, yes.  But it doesn't
7  preclude the possibility that we may need
8  to make an exception.
9    Q.   But the bottom line is that
10 if something, you know, according to
11 these instructions, if the outcome of
12 this risk assessment is medium or high
13 risk, that more work had to be done?
14   A.   At least attempted to be
15 done, yes.
16   Q.   Okay.  And then the next
17 page is -- do you agree with me that's
18 where, like, the actual risk assessment
19 starts?
20   A.   Yes.
21   Q.   So the very first one, which
22 is S Number 1, under the description of
23 risk it reads, "Usage of recovered
24 solvents in manufacturing process."  And

Page 77

1  then it says, "Risk factors, Number 1,
2  contamination; Number 2, impurities."
3    Do you see that?
4    A.   Yep.
5    Q.   And that's -- those are the
6  very first risks that are identified,
7  right?
8    A.   Yep.
9    Q.   If the risk factors -- the
10 main risk factors are contamination or
11 impurities of the API through the use of
12 recovered solvents, what would be some
13 logical risk management activities that
14 Mylan might take to reduce that risk?
15   A.   Well, you can see the choice
16 they made, which was to execute the test
17 on every incoming batch.  So on the right
18 side, the additional control is to apply
19 the analytical testing required for fresh
20 solvent and apply the exact same specs
21 and methods to the recovered.
22   Q.   Gotcha.  So doing
23 impurity -- basically testing for
24 impurities?

Page 78

1    A.    Whatever the registered and
2  approved specifications were for the
3  incoming solvent, they applied both the
4  same to the fresh and the recovered.
5    Q.    If the -- if the main risks
6  are contamination and impurities, would
7  it make sense to test for impurities?
8    A.    Not necessarily.  There are
9  other ways of testing material like that,
10  and they may have tested it for potency
11  or -- I mean, purity itself may be
12  constituting a total area type of
13  calculation.  It might be an overall
14  content of the analyte or the solvent of
15  interest.  There's a bunch of ways to
16  evaluate the overall impurity of the
17  material.  That test method would have
18  been disclosed and agreed upon to some
19  level with the health authorities.
20    Q.    Well, I wasn't talking about
21  testing for purity though.  I was talking
22  about -- because the description of the
23  risk says, you know, that the top risk
24  factors are contamination and impurities.

Page 79

1    So my question is, would it
2  make sense to test for impurities if
3  those are the risks?
4    A.    Yeah, again, not
5  necessarily.  You know, it's a standard
6  practice, and has been a standard
7  practice to use purity itself as an
8  acceptable level.  And the inference
9  being if you have sufficient purity, then
10  you have reduced the total impurities to
11  an acceptable level.



Confidential Information - Subject to Protective Order

Page 82



```
 8      Q.   I mean, Mylan recalled its
 9   products, correct?
10      A.   We did.
11          MR. TRISCHLER:  John, you're
12   getting beyond the document now.
13   I think in fairness to the
14   witness, I want to take a break.
15   So I'm going to take one now.
16   Okay?
17          MR. DAVIS:  Okay.  All
18   right.  Let's take a break.
19          THE VIDEOGRAPHER:  The time
20   right now is 10:29 a.m., and we
21   are off the record.
22          (Short break.)
23          THE VIDEOGRAPHER:  The time
24   right now is 10:38 a.m., and we
```

Confidential Information Subject to Protective Order

Page 86

1    are back on the record.
2  BY MR. DAVIS:
3      Q.   We were discussing
4  Exhibit 7, I believe.  Is it Exhibit 7?
5      A.   Yes.
6      Q.   Okay.  We were discussing
7  Exhibit 7 when we took a break.  Let me
8  ask you, Mr. Glover, is there anyone else
9  in the room with you other than you and
10 Mr. Trischler?
11     A.   We have another counsel with
12 us.
13     Q.   Who is that person?
14     A.   Bradley Matta.
15     Q.   Is that a Mylan inhouse
16 lawyer?
17     A.   Yes.
18         MR. TRISCHLER:  And just to
19     be clear, John, Jason Reefer is in
20     and out of the deposition.  But
21     he's not here right now.  That's
22     why Mr. Glover only indicated
23     Brad's presence.
24         MR. DAVIS:  I think, Clem,

Page 87

1  we agreed that if any counsel
2  counsel were going to be in the
3  room, that they would have their
4  screens up.
5      Is that possible for
6  Bradley.
7         MR. TRISCHLER:  Sure.  I
8  thought that -- I didn't realize
9  they were not.  Can you log on to
10 the --
11     Are you logged onto the
12 Zoom, Brad?
13         MR. MATTA:  No.  I'll get
14 the information and log in.
15         MR. TRISCHLER:  Let me -- do
16 you want to give me two minutes to
17 give him the login information?
18         MR. DAVIS:  Sure, that's
19 fine.
20         THE VIDEOGRAPHER:  Counsel,
21 do you want to go off the record?
22         MR. DAVIS:  Sure.  Just for
23 two minutes.
24         MR. TRISCHLER:  Sure, we

Page 88

1  can.
2         THE VIDEOGRAPHER:  The time
3  is 10:40 a.m., and we're off the
4  record.
5         (Short break.)
6         THE VIDEOGRAPHER:  The time
7  right now is 10:45 a.m., and we're
8  back on the record.
9  BY MR. DAVIS:
10     Q.   Okay, Mr. Glover.  As we
11 mentioned we were -- we went off the
12 record while we were in the midst of
13 discussing Exhibit 7, which is this draft
14 risk assessment on the use of recovered
15 solvents, correct?
16     A.   Yeah.
17     Q.   Did you review this document
18 further during the break?
19     A.   I did not.
20     Q.   Okay.  So when we left off,
21 you -- and if I'm mischaracterizing what
22 you're saying, I'm sure you or Clem will
23 let me know.  But you were saying that
24 the nitrosamine contamination, in your

Page 89

1  view, was not a quality failure of the
2  product?
3      A.   No.  I think I was saying
4  that the way this words -- it says
5  carryover recovery -- recovering the
6  intended solvent lead to quality failure
7  of the product.
8      I interpret that to be
9  failure of the product to meet
10 specifications, and those specifications
11 being established within the DMF, in this
12 case the solvent specifications being the
13 incoming test requirement.
14     I don't think nitrosamine
15 would have caused it to fail its
16 specifications --
17     Q.   The product --
18     A.   -- according to what I had
19 read --
20     Q.   Does the product here refer
21 to the API, the way you read it?
22     A.   Well, or the solvent.  The
23 solvent itself will also have limits
24 applied to the testing for its incoming

Confidential Information Subject to Protective Order

Page 90

evaluation.

Q.   Let's just take -- remove the specification discussion for a second and bear with me.

Would Mylan agree that the carryover of volatile -- of organic volatile compounds while recovering the intended solvent led to contamination and impurities in the case of valsartan?

MR. TRISCHLER:  Objection to form.  Objection.  Beyond the scope.

You can answer again.

THE WITNESS:  Again, I didn't quite follow it.  You'll have to repeat it, and then I can try.

BY MR. DAVIS:

Q.   Sure.  Sure.

[redacted]

Page 91

your individual capacity.

Would you agree that the root cause investigation that was conducted by Mylan found that the carryover of organic volatile compounds while recovering o-xylene led to contamination and impurities in the valsartan API and finished dose?

A.   I think you're missing a couple steps based on my study of the investigation.

It sounds like that's a general way to describe it.  But there were, you know, basically side reactions of trace elements that were in those carryovers that eventually manifested in that, you know, generation of nitrosamine impurity.  But it wasn't like primary carryover versus, you know, the reagents being used.  It was byproducts of the reagents and trace, you know, presences within the carryover solvents themselves.

So I don't know, it seems like you are simplifying it a little

Page 92

[redacted]

MR. TRISCHLER:  That's a different question.

BY MR. DAVIS:

Q.   -- inaccurate about that?

MR. TRISCHLER:  That's a different question.

Object to form as beyond the scope.

He's not been designated on this subject matter.  Also mischaracterizes prior testimony.

Page 93

You can answer it back.

THE WITNESS:  I'll have to hear the question again.  I'm sorry.

MR. DAVIS:  Can you read the question back.

MR. HONIK:  You know, respectfully, there should not be speaking objections.  It's making it very difficult for the witness to hear the question and respond promptly.

So I would ask respectfully that you defer from making a speaking objection.

MR. TRISCHLER:  I don't think I made one.  But I understand what -- I understand what the rules are, Ruben, and I follow them.

MR. DAVIS:  Michelle, can you read back my previous question.

(Whereupon, the court

Confidential Information - Subject to Protective Order

Page 94

1  reporter read back the requested
2  portion of testimony.)
3      MR. TRISCHLER:  Objection.
4  Beyond the scope.
5      MS. DAVIS:  This is D'Lesli
6  Davis.  I just want to state real
7  quickly there's a difference in
8  opinion from Mr. Davis when he is
9  defending depositions and what --
10     MR. DAVIS:  Come on,
11 D'Lesli.  This is -- this is --
12     MS. DAVIS:  No, I just --
13 no, I have to put it on the
14 record.
15     MR. DAVIS:  There's a
16 question pending, D'Lesli.
17     MS. DAVIS:  Mr. Davis, let
18 me speak.  Let me speak.
19     My objection is that
20 Mr. Davis, when he is defending
21 the depositions, has routinely
22 engaged in speaking objections.  I
23 appreciate what Mr. Honik said.  I
24 want the record to note that there

Page 96

1  carrying over.
2      And it wasn't the carryover.
3  It was something inside the
4  carryover that was unanticipated
5  that eventually reacted with a
6  side product of some other
7  reaction.
8      And eventually, yes, that
9  led to the generation of the
10 nitrosamine.
11 BY MR. DAVIS:

Page 95

1  is an inconsistency in approach by
2  plaintiff's counsel generally and
3  by Mr. Davis at this deposition
4  when he is taking it versus when
5  he's defending.
6      MR. DAVIS:  D'Lesli, you're
7  not defending the witness.
8      MR. HONIK:  There's a
9  question pending.  Let the witness
10 answer it, please.
11     MR. DAVIS:  Do you want the
12 question read back again,
13 Mr. Glover.
14     THE WITNESS:  I think what
15 I'm struggling is with the use of
16 the word "carryover."
17     And so maybe you can read it
18 again.  But my problem with the
19 use of the word "carryover" is
20 that the generality of
21 carryover -- and maybe you're
22 thinking of it that way.
23     When I think of carryover, I
24 think of one particular thing

Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Page 102

7        MR. DAVIS:  I'm going to
8    mark Tab 58 as Exhibit 10.
9        (Document marked for
10    identification as Exhibit
11    PL-Glover-10.)
12 BY MR. DAVIS:
13    Q.   Do you have that in front of
14 you?
15    A.   I do.
16    Q.   It's a 50-page document.
17 So -- and I really only want to ask about
18 one part or one statement in it.
19        But let me just ask of you,
20 does this look like a document that
21 you've ever seen?
22    A.   I can't say for certain.  It
23 doesn't look familiar.
24    Q.   Okay.  I'll represent to you

Page 103

1 that the metadata for this document says
2 that it was created on December 14th,
3 2019, and that the file name is "Unit 8
4 Risk Review Report 28/11/19.PDF."
5        And I'm going to take you
6 down to Page 5.  There's a numbering
7 convention at the bottom right corner.
8 Page 5 of 49.  Section D, evaluation of
9 risk of general raw materials used for
10 valsartan manufacturing process.
11        Do you see that?
12    A.   Yeah.
13    Q.    Then if you go down to Page
14 8 of 49, you'll see triethylamine.
15    A.   Okay.
16    Q.    And then there's a column
17 called "Evaluation of Risk Through
18 Chemistry."
19        Do you see that?
20    A.    Yeah.

Confidential Information Subject to Protective Order

Page 106

¹ personal capacity.
² THE WITNESS:  Do I have to
³ answer again?
⁴ MR. TRISCHLER:  Yes.
⁵ THE WITNESS:  Okay.  As I
⁶ said before, I think the
⁷ diethylamine was only identified
⁸ as a trace element to
⁹ triethylamine, which was also
¹⁰ identified as a trace element,
¹¹ coming over in the organic layer.
¹² It did not react with sodium
¹³ nitrite or HCl.  It reacted with a
¹⁴ side reaction which generated
¹⁵ nitro -- that's my understanding
¹⁶ of the root cause of why
¹⁷ nitrosamine was formed.
¹⁸ BY MR. DAVIS:
¹⁹ Q.    Are sodium nitrite and
²⁰ hydrochloric acid nitrosating agents?
²¹ A.    That would be beyond my
²² expertise as a chemist.  I can't tell
²³ you.  But I don't believe so.
²⁴ Q.    You'll see in the column

Page 108

¹ Q.    And you spent a few years
² as -- working in chemistry for Mylan at
³ the beginning of your career at Mylan?
⁴ A.    I did.
⁵ Q.    How long ago was that?
⁶ A.    1997.
⁷ Q.    Okay.  Would you call
⁸ yourself -- do you have any current roles
⁹ that involve chemistry?
¹⁰ A.    I mean, evaluation of work
¹¹ that I do involves chemistry, but I don't
¹² actually work in the chemistry lab
¹³ anymore.
¹⁴ Q.    And it's been how many years
¹⁵ since you did work in the chemistry lab?
¹⁶ A.    I don't know.  Approximately
¹⁷ 15.
¹⁸ Q.    Okay.  There's a reference
¹⁹ under "in process distillation" there to
²⁰ an MBPR.  Can you tell me what that is?
²¹ A.    A master batch production
²² record.
²³ Q.    Do recovered solvents have a
²⁴ master batch production record that's

Page 107



⁶ Do you see that?
⁷ A.    Yeah.
⁸ Q.    Do you know which of these
⁹ procedures was used for the recovery of
¹⁰ o-xylene?
¹¹ A.    I do not.
¹² Q.    Can you explain to me just
¹³ in general terms the difference between
¹⁴ them?
¹⁵ A.    I'd be hesitant to try.  I'm
¹⁶ not really familiar with them.
¹⁷ Q.    Okay.  You're not a chemist,
¹⁸ are you?
¹⁹ A.    I am.
²⁰ Q.    Do you have any graduate
²¹ degrees?
²² A.    I have a BS in chemistry.
²³ Q.    Where did you get that from?
²⁴ A.    West Virginia University.

Page 109

¹ unique to them?
² A.    I believe so.

²³ Q.    How would you know that?
²⁴ A.    We reviewed it as part of

Confidential Information Subject to Protective Order

Page 110

1  preparation.
2            MR. TRISCHLER:  Just as a
3  word of caution, Mr. Glover, you
4  don't have to disclose things that
5  you reviewed with me.
6            THE WITNESS:  Oh sorry.
7            MR. TRISCHLER:  That would
8  be privileged.  I understand.  But
9  you know, I don't think John wants
10  you to disclose and identify
11  things that you reviewed with me.
12  BY MR. DAVIS:
13       Q.   Well, I certainly don't want
14  you to disclose communications that you
15  had with counsel.  However, I do think
16  I'm entitled, especially since you're a
17  30(b)(6) witness, to know what documents
18  that you reviewed to prepare for the
19  deposition.  But, you know, we can --
20            MR. TRISCHLER:  That's a
21  different -- that's a different
22  question.  And I don't want to
23  get -- I'm not trying to get --
24            MR. DAVIS:  We don't have to

Page 111

1  have that fight now.
2            MR. TRISCHLER:  -- down a
3  rabbit hole, John.
4            MR. DAVIS:  Yeah.
5            MR. TRISCHLER:  But I think
6  there's a difference between what
7  he reviewed for the deposition and
8  things that I may have reviewed
9  with him.
10            MR. DAVIS:  Sure, okay.  All
11  right.  That's fair.  And if I --
12  BY MR. DAVIS:
13       Q.   If, Mr. Glover, I ask you
14  about those documents that you reviewed
15  to prepare, do you follow the distinction
16  that counsel is making?
17            No?  Okay.  We'll cross
18  that -- we'll cross that bridge when we
19  get there.
20            So on the end column on
21  Exhibit 7, and I believe you referred to
22  this earlier, that there should be a
23  recovered solvent comparison with
24  merchant solvent specification.

Page 112

1            Do you see that?
2       A.   Yes.
3       Q.   Okay.  How would -- how
4  would such a comparison potentially
5  address contamination or impurities
6  resulting from the carryover of volatile
7  organic compounds leading -- in the
8  recovered solvent process?
9            MR. TRISCHLER:  Objection to
10  form.
11            THE WITNESS:  Yeah, I don't
12  quite follow the question.  But
13  the comparison is meant to
14  establish that both the recovered
15  and the virgin solvent achieve the
16  same level of quality, or the same
17  level of, you know, critical
18  quality attributes established
19  within the spec.
20            It meets the same standard
21  established within that
22  registration.
23  BY MR. DAVIS:

Page 113

Confidential Information Subject to Protective Order

Page 114

2  BY MR. DAVIS:
3      Q.   Are you aware of any
4  regulatory agency telling Mylan it
5  shouldn't do that?
6      A.   Shouldn't do what?
7      Q.   Shouldn't just test
8  recovered solvents for purity as opposed
9  to also testing them for impurity?
10     A.   I'm not aware of any
11 regulatory body telling us, no.
12          We share these
13 specifications with the regulatory body
14 when we registered the DMF.
15     Q.   That's assuming that
16 recovered solvents are part of the DMF,
17 correct?
18     A.   Yes.
19     Q.   And if recovered solvents
20 are not part of the DMF, then no
21 specification would be included in the
22 DMF for those recovered solvents,
23 correct?
24     A.   The virgin solvent spec

Page 115

1  would.  And in this case, obviously we
2  established that they would be identical.
3      Q.   You've established that
4  recovered solvents and virgin solvents
5  would be identical?
6      A.   They would be tested to the
7  identical specification.  I thought we
8  were talking about the specification.
9      Q.   Gotcha.  Okay.  I just
10 wanted to clarify that.
11          If you go to Page 11, you'll
12 see the conclusion.
13          The conclusion was low risk,
14 according to this, right?
15     A.   Yes.
16     Q.   Okay.  And that meant, based
17 on what we looked at above, in terms of,
18 you know, the action items to take per
19 whoever was instructing these individuals
20 to do this risk assessment, low risk
21 meant that, you know, follow-up or
22 additional controls were not required to
23 be put in place, correct?
24     A.   Correct.

Page 116

1      Q.   Okay.  Who do you think that
2  person would be?  Would that be Dr. Gomes
3  for this risk assessment to talk to about
4  -- you mentioned -- like there's a "they"
5  I think you threw out when you were
6  talking about the instructions that were
7  given to these folks.  Would that be Dr.
8  Gomes?
9      A.   Instructions?  I'm sorry.
10 You're losing me.
11     Q.   Sure.  I'm referencing what
12 we were talking about earlier with the
13 scoring system here, which is on Pages 4
14 and 5.  And you mentioned that, you know,
15 these individuals in the e-mail all
16 report up to Dr. Gomes.
17          Is Dr. Gomes the person that
18 I should talk to about this risk
19 assessment, or is there somebody else
20 that you might think would be more
21 factually knowledgeable about this?
22     A.   No, I think he'd be fine.  I
23 mean, I don't have a better name for you.
24     Q.   Okay.  Do you know whether,

Page 117

1  prior to recall, Mylan ever did a risk
2  assessment specifically regarding its use
3  of recovered solvents in the manufacture
4  of valsartan?
5      A.   Say that again.  I'm sorry.
6  I'm getting confused with the difference
7  between what you just asked me and what
8  we just reviewed.  Didn't we just review
9  a risk assessment?
10     Q.   Sure.  But that's not unique
11 to valsartan, correct?  Exhibit --
12     A.   It not particularly
13 exclusive of valsartan either, right?
14     Q.   Sure.  And I -- exactly.
15          But I'm asking a different
16 question, slightly, which is:  Did Mylan
17 ever do a risk assessment specifically
18 for recovered solvents that were used in
19 valsartan?
20     A.   I'm not sure.  I haven't
21 seen one, if there is one.  At least I
22 don't think I have.
23

Confidential Information Subject to Protective Order

Page 118

▮▮▮▮▮▮▮▮▮▮▮

11  BY MR. DAVIS:
12      Q.   Yeah.  I mean, you're
13  designated on this topic, are you not?
14  Did you do any investigation to see if
15  such activities were done?
16      A.   Not specifically the way
17  you're asking it, no.
18      Q.   Okay.  What documents did
19  you review to prepare for this topic,
20  namely, you know, evaluating the risk of
21  the solvents used in the manufacture of
22  valsartan?
23      A.   The only thing that I can
24  think of that -- I mean, I -- it's so

Page 119

1  hard for me to reflect and memorize
2  everything I read.
3          I read the responses to our
4  483s and warning letters.  And there was
5  discussion about that topic in there, I
6  think.
7          The DMF deficiency responses
8  were other documents that had discussions
9  about that.
10      Q.   So you did not investigate
11  whether Mylan, prior to recall, actually
12  evaluated the risks of using recovered
13  solvents in valsartan specifically?
14          MR. TRISCHLER:  Objection to
15      form.
16          THE WITNESS:  I don't recall
17      asking for that, no.
18  BY MR. DAVIS:
19      Q.   Who would you have asked for
20  that?
21      A.   It would have been
22  Dr. Gomes, likely, if I was looking for
23  something like that.  But I don't recall
24  asking for it.

Page 120

1          MR. DAVIS:  Okay.  I'm going
2  to mark another exhibit.  This is
3  Tab 10, which I'm marking as
4  Exhibit 11.
5          (Document marked for
6      identification as Exhibit
7      PL-Glover-11.)
8          MR. DAVIS:  And I'm going to
9  mark Tab 11 also, which is an
10  attachment to that e-mail, as
11  Exhibit 12.
12          (Document marked for
13      identification as Exhibit
14      PL-Glover-12.)
15  BY MR. DAVIS:
16      Q.   Let's start with the e-mail.
17      A.   Okay.
18      Q.   So do you see that the dates
19  on this e-mail are December 31st, 2018?
20      A.   I do.
21      Q.   Okay.  And then if you look
22  at Tab 11, which is exhibit -- which
23  exhibit is that again?  What did we mark
24  that as?

Page 121

1      A.   12.
2      Q.   12.  If you look at the
3  attachment, which is Exhibit 12, do you
4  see that that's another unsigned draft of
5  this quality risk assessment on usage of
6  recovered solvents?
7      A.   Yep.
8      Q.   Does it look similar to the
9  one that we looked at earlier?
10      A.   It looks like it has similar
11  format, yes.
12      Q.   December 31st, 2018, is
13  after the recall, correct?
14      A.   Yes.
15      Q.   Do you see that this one --
16  this version is also unsigned?
17      A.   Yes.
18      Q.   Go to Page 7.  Okay.  Do you
19  see that the risk severity has been
20  denoted as severe?
21      A.   Yeah.
22      Q.   That's a change from
23  Exhibit 7, correct, where the risk
24  severity was only denoted as moderate?

Confidential Information Subject to Protective Order

Page 122

1    A.   I don't see a severity in
2  Section 1 of the original document.
3    Q.   If you go to Page 7 of the
4  original document, Tab -- sorry,
5  Exhibit 7?
6    A.   Oh, I'm sorry.  Yeah, you're
7  right.
8    Q.   So do you see that it's been
9  changed from moderate to severe?
10   A.   Yes.
11   Q.   If you go back to Page 4 on
12 Exhibit 12, which is the second version
13 of this risk assessment, you'll see that
14 the severity of impact table defines
15 severe as, "May cause permanent damage.
16 Additional controls have to be in place
17 before work commences"?
18   A.   Yes, I see it.
19   Q.   Okay.  Who would I talk to
20 about why that risk severity designation
21 was changed?  Would that be Dr. Gomes as
22 well?
23   A.   I mean, he's probably the
24 most familiar with it.  Obviously this

Page 123

1  risk assessment was generated after the
2  investigation and the recall, so I'm sure
3  they re-visited several aspects of it.
4    Q.   The far right column has
5  some additional language in it as well,
6  on Page 7 of Exhibit 12.  It says,
7  "Volatile organic compounds that can be
8  contributed from the parent manufacturing
9  process shall be considered in designing
10 the recovery procedure for the solvents."
11   Do you see that?
12   A.   Okay.
13   Q.   What does that mean?
14   A.   Again, I didn't draft it.
15 I'm not sure.  I can only guess that
16 they're trying to add some additional
17 controls to anticipate the learnings from
18 this investigation.
19   Q.   How can you -- how can you
20 consider volatile organic compounds that
21 can be contributed from the parent
22 manufacturing process without looking at
23 the -- looking at it on a
24 product-by-product basis?

Page 124

1    A.   That's exactly how I
2  interpret this risk assessment to state,
3  that if, in fact, you're going to use
4  recovered solvents, that you have to
5  consider that on a product basis.
6    Q.   Okay.  Can you explain why
7  the metadata says that this second
8  version of this risk assessment that
9  we're looking at, Exhibit 12, was also
10 created in 2014?
11   A.   Can you tell me what you
12 mean by metadata?
13   Q.   Sure.  That's the
14 information that comes with a document
15 that has sort of, you know, file names,
16 dates, unique hash identifiers, et
17 cetera.
18   The metadata that was
19 produced to us by Mylan says that this
20 document was also created in late 2014.
21   Do you have any idea why it
22 was being recirculated in 2018 and when
23 the text of that document was changed in
24 the ways that we just went through?

Page 125

1    MR. TRISCHLER:  Objection to
2  the extent it's beyond the scope.
3    John, is the metadata you're
4  asking him about what's on
5  Exhibit 11?  I think that might
6  help the witness to understand.
7    MR. DAVIS:  It's not,
8  unfortunately.
9    MR. TRISCHLER:  Oh.
10   MR. DAVIS:  The --
11 Exhibit 11 is an e-mail from
12 December 31st, 2018.
13 BY MR. DAVIS:
14   Q.   However I'll represent to
15 you, Mr. Glover, that the attachment,
16 Exhibit 12, has a date stamp of 2014.
17   And my question is do you
18 have any idea why this document was being
19 recirculated after the recall and when
20 those changes to the text were made?  And
21 if the answer is no, you don't know, then
22 that's fine.
23   MR. TRISCHLER:  I'll just
24 object to the extent that it's

Confidential Information Subject to Protective Order

Page 126

1  beyond the scope of the
2  designation.
3      THE WITNESS:  I don't
4  understand what he's looking at.
5      I mean, where do you see
6  2014 date stamping on the document
7  from '18?
8  BY MR. DAVIS:
9      Q.   Sure.  There's a metadata
10 that comes with the production files that
11 we get from Mylan.
12     A.   I don't know what that
13 means.
14     Q.   Yeah, and it's fine if you
15 don't know what that means.  I'm just
16 going to represent to you that the date
17 of the document in those electronic
18 metadata fields say it was from 2014.
19     And so my question is, do
20 you know why this was being recirculated
21 in late 2018 and when those changes to
22 the text were made to it?
23     A.   I mean, I'm not an IT
24 expert.  I have no idea why that would be

Page 127

1  that way.
2      I would imagine that if
3  someone were writing a revision to this
4  risk assessment, they would start by
5  using the original data file and then
6  just updating that and saving that as a
7  new file, rather than waste time
8  generating all this from scratch.
9      And so in your terms of
10 metadata, I don't know if that somehow
11 captures the original file nomenclature.
12 But that's just pure unadulterated
13 speculation.
14     Q.   Sure.  And I don't want you
15 to speculate.
16     Maybe look at the -- if you
17 have Exhibit 12 in front of you.  Look at
18 the top right corner.  You'll see Report
19 Number RAR/QAD/GEN/014/14.
20     A.   Right.
21     Q.   Do those 14s refer to the
22 year?  Do either of those 14s refer to
23 the year?
24     A.   I don't know.  But if they

Page 128

1  do, and if their local process is to
2  issue revisions and then simply version
3  it, that's always possible.  We'd have to
4  interview Dr. Antony.  I think he'd have
5  a better understanding of the local
6  change process.
7      MR. DAVIS:  Okay.  I'm
8  marking Tab 12 as Exhibit 13.
9      (Document marked for
10 identification as Exhibit
11 PL-Glover-13.)
12 BY MR. DAVIS:
13     Q.   Let me know when you've had
14 a chance to review that.
15     MR. TRISCHLER:  I haven't
16 even given it to him yet, John,
17 because I think I've lost the
18 extra copy, so we only got one
19 copy of it.
20     But let me -- here, let me
21 just put a mark on that so I know
22 what it is.
23     Okay.  He has it now.
24 BY MR. DAVIS:

Page 129

1      Q.   Let me know when you've had
2  a chance to review that, Mr. Glover.
3      A.   Okay.
4      Q.   Do you see that this e-mail
5  chain is -- takes place in September and
6  early October, I guess, of 2012?
7      A.   Yeah.
8      Q.   And that the subject of the
9  e-mail chain is "Valsartan recovery
10 solvents/materials"?
11     A.   Yeah.
12     Q.   Okay.  Is this around the
13 time that Mylan made a decision to use
14 recovered solvents in valsartan?
15     A.   Again, I can't remember.  I
16 think we even covered that here today,
17 and I can't remember exactly when we
18 decided to use it.  But, yes, I think
19 it's around that time.
20     Q.   Okay.  And in fact, the very
21 first e-mail of that chain on Page 3 says
22 that, "The following is a proposal for
23 the usage of recovered solvents of the
24 Unit 3 VSN process and the Unit 8 VST

Confidential Information Subject to Protective Order

Page 130

1  process."
2      Do you see that?
3      A.   Yeah.
4      Q.   Was VSN the old process code
5  for valsartan that was developed by
6  Matrix?
7      A.   I believe so.
8      Q.   Okay.  Was VSN ever
9  commercialized or did that change?
10     A.   I'm not certain.
11     Q.   Okay.  If you go up to
12  Page 1 again of this e-mail, the e-mail
13  is from Sashant Pokhariyal.  And forgive
14  me if I butcher the name.
15      Do you know him?
16     A.   I do not.
17     Q.   Okay.  He's asking if there
18  are any concerns to consume recovered
19  solvents.
20      Do you see that?
21     A.   Yes.
22     Q.   Is that a question that
23  Mylan's quality department ever looked
24  at?

Page 131

1      A.   I think we've already looked
2  at a risk assessment from 2012 that said
3  they did evaluate recovered solvents.
4      Q.   Well, that was a draft,
5  unsigned one, correct, the one we
6  reviewed?
7      A.   Yeah, it's the only evidence
8  that I have that it happened.  So I don't
9  know of any other exercises.
10     Q.   What was your role in 2012
11  around the time that this e-mail was
12  written?
13     A.   I think I was just
14  transitioning out of head of quality at
15  Morgantown into head of North America
16  quality.
17     Q.   Okay.  In your time in
18  quality between, you know, the time of
19  this e-mail and up to pre-recall, were
20  there any discussions that you
21  participated in regarding concerns about
22  using recovered solvents?
23     A.   No.
24     Q.   The proposal to use

Page 132

1  recovered solvents in valsartan was
2  eventually adopted, right?
3      A.   Yeah.
4      Q.   To the point that pretty
5  much all batches of valsartan that were
6  intended for the U.S. market were
7  manufactured using recovered solvents?
8      MR. TRISCHLER:  Objection to
9  the form.
10      THE WITNESS:  I'm not
11  certain.  I haven't done that type
12  of a review.
13  BY MR. DAVIS:
14     Q.   Sticking with this e-mail
15  chain, do you see in the e-mails on Page
16  2 and on Page 1 there's references to
17  change control forms?
18     A.   Yes.
19     Q.   What's a change control
20  form?
21     A.   It's a documented process by
22  which you propose a change and gain
23  approval.
24     Q.   Internal approval or

Page 133

1  external approval?
2      A.   It can be both.  The change
3  control process is internal.  But if it
4  coincides with a requirement to notify
5  and gain outside approval from a health
6  authority, then that is part of the
7  process also.
8      Q.   In that same e-mail from
9  Sashant, he says, "A clearance is in
10  place to consume the recovered solvents
11  in valsartan, then why we refrain from
12  raising change control form?"
13      Do you see that?
14     A.   Yeah.
15     Q.   Do you know what he's
16  talking about there?
17     A.   I don't.
18     Q.   Do you know what a clearance
19  is?
20     A.   I mean, we know clearance is
21  authorization just in general.  But I
22  don't know what he's talking about here.
23     Q.   I think you might have
24  obliquely referenced that there are

Confidential Information Subject to Protective Order

Page 134

1 procedures to follow on change.
2          Is that the SOP on change
3 management process -- or processes?
4          A.   I don't know what it's
5 titled in MLL.  But yeah, it could say
6 change management or change control.
7          MR. DAVIS:  Okay.  I'm
8      marking Tab 14 as Exhibit 14.
9          MR. TRISCHLER:  Do you want
10     this back?
11         THE WITNESS:  Okay.
12         (Document marked for
13     identification as Exhibit
14     PL-Glover-14.)
15 BY MR. DAVIS:
16     Q.   Take a moment to review that
17 and let me know when you're ready to
18 discuss.
19         MR. DAVIS:  Clem, I'm going
20     to go off camera and refill my
21     water glass.  I'll be right back.
22         MR. TRISCHLER:  Okay.
23 BY MR. DAVIS:
24     Q.   Have you sufficiently

Page 135

1 reviewed the document, Mr. Glover?
2     A.   I'm going to need a couple
3 more minutes.  It's 41 pages.
4          Okay.
5     Q.   Did you review any SOPs on
6 change management in prepping for this
7 deposition?
8     A.   I don't believe so.
9     Q.   Okay.  Is this an SOP you've
10 reviewed before?
11     A.   I have not read this one,
12 but I have reviewed the global policy.
13     Q.   This SOP does fall under
14 quality assurance, correct?
15     A.   Yes.
16     Q.   And like the risk management
17 one that we reviewed earlier, this one
18 appears to apply to Mylan Laboratories
19 Limited and all the API manufacturing
20 sites?
21     A.   Yeah.
22     Q.   Including Unit 8?
23     A.   Yeah.
24     Q.   If you look at the

Page 136

1 "Responsibility" section, 3.1.1 says
2 that, "The originating department is
3 responsible for initiating the change
4 control in Trackwise with required
5 information."
6          Do you see that?
7     A.   Yep.
8     Q.   What is Trackwise?
9     A.   It's an electronic system
10 used to document change control.
11     Q.   And those change controls
12 are stored in that system?
13     A.   They are.
14     Q.   So if you were to, for
15 example, search for -- could you search
16 Trackwise?
17     A.   Yeah.
18     Q.   Okay.  So if there were
19 change controls for substituting
20 recovered solvents for fresh solvents for
21 valsartan, would that -- would those
22 change controls live in Trackwise?
23     A.   I can't say for certain when
24 Trackwise was implemented at Unit 8 or

Page 137

1 the API sites.  But yes, when Trackwise
2 was implemented, from that point forward
3 that's where they would have put change
4 control.
5          I'm just -- we're talking
6 all the way back to 2012.  I don't know
7 for certain when Trackwise was deployed
8 there.
9     Q.   Sure.  And this is from
10 December of 2015.
11         Do you see that?
12     A.   I do.
13     Q.   So it at least existed back
14 to then, correct?
15     A.   Correct.
16     Q.   Okay.  Who would you -- if
17 you were, for example, in the course of
18 your responsibilities as head of global
19 quality, if you wanted to see what change
20 controls were made regarding recovered
21 solvents in valsartan throughout the
22 years, who would you go talk to about
23 that?
24     A.   I would likely ask

Confidential Information Subject to Protective Order

Page 138

1 Dr. Gomes, honestly, to start with him.
2      Q.   If you go to Page 4, you'll
3 see some definitions.
4      A.   Okay.
5      Q.   You'll see one that is a CC
6 risk assessment, do you see that, 5.4?
7      A.   Yes.
8      Q.   And it says that that's
9 defined as an assessment of the changes
10 which relates risk to patient safety,
11 regulatory implications, and business,
12 correct?
13     A.   Yeah.
14     Q.   Do you know if the -- if the
15 change from fresh to recovered solvents
16 for valsartan yielded a change control CC
17 risk assessment?
18         MR. TRISCHLER:  Objection to
19     form.
20         THE WITNESS:  I don't know
21     the answer to that.  I think,
22     based on what we've already read,
23     it sounds like recovered solvents
24     may have been contemplated in

Page 139

1     2012.  If that's the case, that
2     would be prior to approval.  And
3     so it's uncertain to me whether it
4     would have required a change
5     control specific to valsartan.
6 BY MR. DAVIS:
7      Q.   What do you mean by that?
8      A.   I mean, if you submitted in
9 your DMF and in your applications with
10 the designation of recovered solvents,
11 then there would be no requirement for a
12 change control, because that's your
13 original submission.  Normally the change
14 control process starts at square one, and
15 square one being the approval of the
16 product itself.
17     Q.   Gotcha.  Okay.  So
18 basically, changes are evaluated based
19 on, you know, if day zero is, you know,
20 approval, anything that's changed beyond
21 approval could potentially implicate a
22 change form, but not stuff that was
23 implemented prior to approval?
24     A.   Yeah.  Again, it's not

Page 140

1 exclusive.  I mean, they can use this
2 workflow prior to approval, if it's
3 convenient for them.  But it's not always
4 mandated.
5         So -- and it certainly
6 wouldn't be all that relevant, because
7 while you're developing and submitting
8 and engaging with the health authority,
9 you have a lot of back and forth, and
10 you're making a lot of adjustments.  So
11 it's not quite as rigid as it is after
12 approval.
13     Q.   What about changes that are
14 made preapproval?  You know, if, you
15 know, Mylan intended, for example, to
16 use -- let's stick with recovered
17 solvents, because that's what we are
18 talking about.
19         If, for example, Mylan
20 intended to use fresh solvents and then
21 prior to approval decided to use
22 recovered solvents, how would those
23 changes be archived or documented?
24     A.   Are you talking about after

Page 141

1 submission?
2      Q.   After submission but prior
3 to approval.
4      A.   Yeah, it would --
5         MR. TRISCHLER:  Objection to
6     form.  Objection to form.
7         But go ahead.
8         THE WITNESS:  After
9     submission, prior to approval, any
10    change would be communicated with
11    the health authority.  And they
12    may use this process, but they
13    would have a process on top of
14    that that would require some type
15    of communication with a health
16    authority.
17 BY MR. DAVIS:
18     Q.   What would be the process on
19 top of this one?
20     A.   I think typically the
21 term -- and again, this goes a little
22 outside of my scope, but they use the
23 term "gratuitous amendment" in the United
24 States.

Confidential Information Subject to Protective Order

Page 142

1    And so regulatorily those
2 are the types of changes that would
3 typically qualify as a gratuitous
4 amendment.
5    Q.   Okay.  Does --  is there an
6 SOP --
7        (Zoom audio interruption.)
8 BY MR. DAVIS:
9    Q.   -- on gratuitous amendments?
10    A.   I don't know if there's an
11 SOP on the topic or not.  That would be a
12 regulatory question.
13    Q.   What about presubmission
14 changes?  Are those archived in any way
15 or is that just, you know, something that
16 eventually if the change was made, it's
17 in the submission?
18    A.   Yeah.  It would be a
19 question for R&D.  I'm not certain.
20    Q.   Go to 5.16, which is
21 "Regulatory Impact."
22    A.   5.16?  Oh, 5.16.  Okay.  Got
23 it.
24    Q.   I guess before we move to

Page 143

1 that, one more question came to mind,
2 which is, for changes that are
3 postsubmission, preapproval, are those
4 changes in any way conveyed to any API
5 customers that Mylan has?
6    A.   Okay.  So you're talking
7 about in the API space?
8    Q.   Sure.  Yeah, so in the API
9 space where Mylan manufactures API and
10 supplies it to a finished dose
11 manufacturer, for changes that are
12 postsubmission, preapproval, does Mylan
13 have any procedure to notify finished
14 dose customers that it may have at that
15 point of any changes?
16    A.   I don't know about
17 requirements.  I know that everything is
18 transparent with the health authority, in
19 this case, in the U.S., FDA.  So the DMF
20 for the API is with the FDA.
21        The customer will file his
22 finished product.  And that triggers the
23 review of both the DMF and the
24 application.

Page 144

1    So at that time, you know,
2 all -- all information is there readily
3 available for FDA.
4        I can't say for certain if
5 there's a program for communication back
6 to customers if changes are implemented
7 or contemplated.
8    Q.   Would that be true even
9 after approval?
10    A.   I mean, I'm not sure.  I
11 would be guessing as to the answer of
12 that.
13    Q.   But everything should be in
14 the DMF, I guess, is what you're saying?
15    A.   Yes.
16    Q.   Okay.  Going back to the
17 regulatory impact, 5.16 in Exhibit 14.
18 That's defined as, "Any change that
19 impacts or is associated with revisions
20 to the conditions established," and
21 there's an API section below that that
22 says, that this includes changes to
23 processes -- or I'm going to read the --
24 what I think is the relevant language and

Page 145

1 skip a little bit.
2        But, "This includes changes
3 to processes, which include but are not
4 limited to, manufacturing procedures,
5 specifications, analytical test methods,
6 raw materials," et cetera, et cetera.
7        Do you see that?
8    A.   I do.
9    Q.   Does the use of recovered
10 solvents or the change from fresh solvent
11 to recovered solvent, does that amount to
12 a change to a process including a
13 manufacturing procedure or raw material?
14        MR. TRISCHLER:  Objection to
15        form of the question, to the
16        extent that it mischaracterizes
17        facts.
18        MR. DAVIS:  Let me -- let me
19        rephrase it.
20 BY MR. DAVIS:
21    Q.   Does this 5.16.3 in your
22 mind, does that -- do -- do changes from
23 fresh to recovered solvents fall within
24 the scope of this language?

Confidential Information Subject to Protective Order

Page 146

1    A.   I can't say it definitely
2   does, no.
3        Q.   Why not?
4        A.   It would all depend on how
5   the batch manufacturing record details
6   processes.
7            In many cases, at that level
8   of solvent, it may just state "use
9   solvent" by name.  It may not articulate
10  whether or not it's recovered or fresh or
11  specify either.  It wouldn't be that
12  detailed.
13           In the case of valsartan, I
14  understand it did.  But I can't say
15  always that would be required.
16       Q.   What would be a situation
17  where it would not be required?
18       A.   Again, just speculating.  I
19  don't know.  It would have to be a
20  case-by-case discussion with FDA.
21           And I think FDA typically
22  wants to know that you are using a
23  particular material and testing it
24  according to a particular test at against

Page 147

1   a particular spec, and that's usually
2   where the conversation ends.
3        Q.   So the onus is on Mylan in
4   the first instance to notify the FDA and
5   then have that conversation with them,
6   correct?
7        A.   Notify them about what?
8        Q.   About the, for example, the
9   change from fresh to recovered solvents.
10       A.   I don't know that we're
11  obligated to tell them about a change
12  from fresh to recovered.
13           We're obligated to comply
14  with the registration.
15       Q.   Okay.  Well, you said that
16  that would be whether -- you know,
17  whether there would be a regulatory
18  impact depended on those discussions.
19           So doesn't that presuppose
20  that you're informing them of it?
21  Because how can you have a discussion
22  with them otherwise, right?
23           MR. TRISCHLER:  Objection to
24  form.

Page 148

1            THE WITNESS:  I think --
2   yeah, purely coincidental though.
3   I mean, what detail is in the
4   batch record is -- it's just a
5   matter of who wrote the batch
6   record.
7   BY MR. DAVIS:
8        Q.   When you say the batch
9   record, are you referring to the master
10  batch records for the validation batches?
11       A.   For the DMF.  The DMF filing
12  itself is the information that FDA has
13  and reviews.
14       Q.   And there are batch records
15  that are part of that DMF?
16       A.   Yeah.
17       Q.   And what are those batch
18  records of?
19       A.   The process, the synthetic
20  pathway.
21       Q.   Are those typically called
22  validation batches?
23       A.   No.  I'm not used to hearing
24  that term applied to the DMF contents.  I

Page 149

1   mean, you may hear that term "validation"
2   applied loosely to finished product.  And
3   finished product, the submission or
4   exhibit batch can sometimes be called
5   validation batches.  But --
6        Q.   Is that what you're
7   referring to -- I'm sorry.
8        A.   -- validation batch is a
9   much more general term.
10       Q.   Yeah, I guess I'm just
11  trying to understand what is the batch
12  that you're referring to in the DMF.  Is
13  that like a test batch or a submission
14  batch or what you just called it?
15       A.   It's not any batch.  It's
16  just a recipe, basically, for the batch
17  to put it in laypeople's terms.
18       Q.   Okay.  Does Mylan typically
19  run through the recipe a few times
20  before -- before commercializing?
21           MR. TRISCHLER:  Objection to
22  the form.  Objection beyond the
23  scope.
24           THE WITNESS:  That is beyond

Page 150

1  my expertise.  I can't tell you
2  precisely what the API units do
3  before they file DMF.
4  BY MR. DAVIS:
5    Q.   Okay.  So you wouldn't know
6  if those were called validation batches?
7    A.   I would not.
8    Q.   All right.  Going to the
9  next page, which is Page 8 of 41.  You'll
10  see some 5.22, 23, and 24 distinguished
11  between minor, major, and critical
12  changes.
13    A.   Yeah.
14    Q.   Do you see that?
15    A.   Yeah.
16    Q.   Would you agree that, at
17  least the way this is defined here, that
18  the touchstone for whether something is a
19  minor, major, or critical change is
20  patient safety?
21    A.   It is one consideration.  I
22  wouldn't say it's the only consideration.
23    Q.   The other considerations
24  would be quality, purity, at least

Page 151

1  according to this?
2    A.   Yeah.  Quality for sure.
3  And quality, being defined by the ability
4  of a process to meet all regulatory
5  requirements.  And a lot of those have
6  very little to do with patient safety.
7    Q.   But safety is listed right
8  afterwards, correct?
9    A.   Yeah.
10    Q.   Okay.  So anything that
11  affects -- that may have an impact on the
12  final product quality, purity or safety,
13  would be a major change, for example,
14  according to 5.23?
15    A.   Yes.
16    Q.   In retrospect, do you agree
17  that the change from fresh to recovered
18  solvents in valsartan had an effect on
19  product quality, purity, and safety?
20      MR. TRISCHLER:  Objection to
21  the form.  Misstates facts and
22  mischaracterizes evidence.
23      You can answer if you can.
24      THE WITNESS:  Yeah, I -- I

Page 152

1  don't even know that this
2  implementation of recovered
3  solvents is a change control
4  discussion.
5      If it was -- if it was
6  implemented as part of the
7  original DMF, then I don't know
8  that it would be even subject to
9  change control.
10  BY MR. DAVIS:
11    Q.   Let's assume that it was.
12  Would you agree that the change from --
13  and assuming that it's a change.  Would
14  you agree that the change from fresh to
15  recovered solvents in valsartan had an
16  impact on the final product quality,
17  purity, or safety?
18      MR. TRISCHLER:  Objection.
19  Objection to the form.
20      THE WITNESS:  Sorry, can you
21  repeat it again?
22  BY MR. DAVIS:
23    Q.   Sure.  Assuming that the
24  change from -- assuming that moving from

Page 153

1  fresh solvents to recovered solvents was
2  indeed a change, would you agree that
3  that change had an impact on final
4  product quality, purity, or safety?
5      MR. TRISCHLER:  Objection to
6  form.
7      THE WITNESS:  I understand.
8  My answer is no.  And based on the
9  criteria given within this SOP,
10  the change from fresh to recovered
11  solvent resulted in product that
12  met all regulatory requirements.
13  BY MR. DAVIS:
14    Q.   You -- Mylan recalled it
15  though, correct?
16    A.   We did.
17    Q.   Because the FDA told Mylan
18  to recall it?
19    A.   Because the FDA established
20  new limits to a new impurity that was not
21  previously contemplated.
22    Q.   What about purity or safety?
23  Does the -- does contamination with
24  nitrosamines affect purity or safety in

Page 154

1 Mylan's opinion?
2         MR. TRISCHLER:  Objection to
3 the extent that it's beyond the
4 scope of the designation.
5 Objection to form.  You can answer
6 if you can.
7         THE WITNESS:  Regarding
8 safety, my understanding is that
9 we've already conducted a risk
10 assessment and determined that the
11 impact to patient safety was
12 negligible.
13         Regarding purity of the
14 product, met all registered
15 specifications and limits for
16 purity.
17 BY MR. DAVIS:
18    Q.   You are not designated on
19 those topics, though, are you?
20    A.   I don't even know what I am
21 designated for.  And I'm not -- I don't
22 know if it's listed in that list or not.
23         I'm sorry.  I'm not sure.
24    Q.   Because I'm happy to take

Page 155

1 that up with someone else.  But you --
2         MR. TRISCHLER:  He's not
3 been designated -- he's not been
4 designated -- just to make the
5 record clear, John, he's not been
6 designated on Mylan's risk
7 assessment with respect to
8 nitrosamines.
9         THE WITNESS:  Human
10 toxicology, yeah, I'm not
11 designated for that.
12         MR. DAVIS:  Or root cause.
13 That's fine.
14 BY MR. DAVIS:
15    Q.   Would you agree that
16 changing a facility -- you know, adding a
17 facility -- a contract manufacturing
18 facility, to do solvent recovery could
19 have an impact on product quality,
20 purity, or safety?
21         MR. TRISCHLER:  Objection to
22 the form.
23         THE WITNESS:  Again, I need
24 you to repeat the question.  I'm

Page 156

1    sorry.
2 BY MR. DAVIS:
3    Q.   Would you agree that
4 adding -- let's take recovered solvents,
5 for example, again, and twist the
6 hypothetical around a little bit.
7         Let's say that Mylan was
8 recovering solvents at Unit 8 for
9 valsartan and then decided to outsource
10 those recovery operations to a contract
11 manufacturing unit, or a CMU.  Would that
12 change potentially have an impact on
13 final product quality, purity, or safety
14 in your opinion?
15         MR. TRISCHLER:  Objection to
16 form.
17         THE WITNESS:  Any -- any
18 change contemplated in the GMP
19 process has potential to impact,
20 and that's why we do the
21 evaluation.
22 BY MR. DAVIS:
23    Q.   That's why you do a change
24 control risk assessment, is what you're

Page 157

1 saying?
2    A.   Correct.
3         MR. TRISCHLER:  Hey, John,
4 it's 12:15.  I'd like to take a
5 lunch break.
6         MR. DAVIS:  Sure.
7         MR. TRISCHLER:  At least
8 it's 12:15 here.  I'm not sure --
9 it's probably 11:15 at your place,
10 but let's take a lunch break, if
11 we can.
12         MR. DAVIS:  Let me see if I
13 have any more cleanup on this.
14         Yeah, this is a good time.
15 What time do you want to come back
16 on?
17         MR. TRISCHLER:  I think we
18 can shoot for 1 o'clock on this
19 end.
20         MR. DAVIS:  Sure.  That's
21 fine.
22         MR. TRISCHLER:  If that's
23 fine for you and everybody else.
24         MR. DAVIS:  Yeah, actually

Confidential Information Subject to Protective Order

Page 158

1  let's give it a full hour --
2      MR. TRISCHLER:  Is that okay
3  with everybody else?
4      MR. DAVIS:  Let's give it a
5  full hour and do 1:15 your time.
6      MR. TRISCHLER:  Okay.
7      THE VIDEOGRAPHER:  The time
8  right now is 12:15 p.m., and we
9  are off the record.
10      - - -
11      (Whereupon, a luncheon
12  recess was taken.)
13      - - -
14   A F T E R N O O N   S E S S I O N
15      - - -
16      THE VIDEOGRAPHER:  The time
17  right now is 1:20 p.m., and we're
18  back on the record.
19      - - -
20      EXAMINATION  (Cont'd.)
21      - - -
22  BY MR. DAVIS:
23      Q.   All right.  Mr. Glover, did
24  you review any documents on the break?

Page 159

1      A.   I did not.
2      MR. DAVIS:  I'm going to
3  introduce what I've marked as Tab
4  101 as plaintiffs Exhibit 15.
5      (Document marked for
6  identification as Exhibit
7  PL-Glover-15.)
8      MR. DAVIS:  And then what
9  I'm going to do is share my
10  screen.
11  BY MR. DAVIS:
12      Q.   Okay.  Can you see that,
13  Mr. Glover?
14      A.   Yes.
15      Q.   Let me represent to you that
16  I pulled this document off the FDA's
17  website.
18      And for the record the URL
19  is HTTPS --
20      MR. DAVIS:  I'm getting some
21  feedback.
22      Also, Brad, can you turn
23  your camera back on from our
24  earlier discussion?  You can keep

Page 160

1  yourself muted, but please turn
2  your camera back on, if you're in
3  the room.  Thank you.
4      For the record, the URL on
5  this, Exhibit 15, it's
6  https://www.fda.gov/media/92818/
7  download.
8      And it's a 57-page PDF
9  document of what looks to be a
10  July 15-16, 2015 presentation
11  given by a gentleman named Robert
12  Iser.
13      Do you know who Robert Iser
14  is, Mr. Glover?
15      THE WITNESS:  I'm familiar
16  with his name.
17  BY MR. DAVIS:
18      Q.   He's an FDA employee?
19      A.   That's my understanding.
20      Q.   Have you seen this
21  presentation --
22      A.   Was -- was an FDA.
23      Q.   Was.  Okay.  We talked
24  earlier a little bit about quality and

Page 161

1  I'm going to paraphrase what I think you
2  said, and feel free to correct me if I'm
3  wrong.
4      But you said that your
5  definition of quality was simply meeting
6  the predefined spec.  Do you remember
7  that?
8      A.   I don't remember saying that
9  the way you said it.  But I remember
10  establishing -- I think we had a
11  conversation about the failure of quality
12  or something to that effect.
13      Q.   And how did you define it?
14      A.   In the context of the
15  document we were reading, I was
16  interpreting that paragraph to mean a
17  failure to meet the established
18  acceptance criteria.
19      Q.   That would be Exhibit 7, I
20  believe, which is the first iteration of
21  the unsigned draft risk assessment we
22  looked at?
23      A.   Correct.
24      Q.   Okay.  But you didn't write

Confidential Information Subject to Protective Order

Page 162

1 that, did you?
2      A.   No.
3      Q.   And you never looked at it
4 before today?
5      A.   No.
6      Q.   Do you personally know any
7 of the people that wrote that?
8      A.   I need to look at it again
9 to see the names, but I don't believe so.
10 Would you like me to go find it?
11     Q.   Sure.  Why don't you -- why
12 don't you take a look at it.  It's Tab --
13 Exhibit 6 and 7.
14          We can skip this exercise if
15 you're just willing to agree that you're
16 speculating as to what they meant by it,
17 correct?  You don't have personal
18 knowledge of how that word was used
19 there, do you?
20     A.   I can interpret it in
21 context, no different than anyone else.
22 I don't think I know any of these people,
23 no.
24     Q.   In what context -- you said

Page 163

1 that you can interpret it based on the
2 context, what context makes you think
3 that quality failure there simply means
4 failure to meet the predefined spec?
5      A.   Hang on.  Let me go back to
6 the document and I'll --
7          Just my experience of
8 hearing folks use language like this.
9 When we say "lead to quality failure of
10 the product," there's two predominate
11 ways people would make that statement.
12          Either it's -- failure of
13 the product would be rejection of the
14 product, or failure of the product would
15 be failure of the product to meet the
16 established acceptance criteria.
17          I'm not used to hearing
18 folks in quality use that language in any
19 other way.  That's the context that I
20 would provide.
21     Q.   Well, it's referencing the
22 API right next to it, is it not, under
23 description of risk?
24     A.   Sure.  And whether it was

Page 164

1 API or finished product, that statement
2 still, to me, means the same thing.
3      Q.   And below that it references
4 contamination as impurities under the
5 description of the risk, correct?
6      A.   In a different section?
7      Q.   No.  In the same section,
8 just the different -- the column that
9 identifies the description of the risk
10 and there's --
11     A.   Yeah.  And, again, the
12 inference would be that the contamination
13 would manifest in a product that doesn't
14 mean the registered acceptance criteria.
15     Q.   So how are you defining --
16 again, what context makes you think that
17 quality failure is simply failure to meet
18 the spec when it's discussing this in the
19 context of contamination and impurities
20 in the API?
21          MR. TRISCHLER:  Objection.
22     Asked and answered.
23          THE WITNESS:  Yeah, again, I
24     believe that my experience of

Page 165

1      interpreting language such as this
2      is that we would rely on the
3      registered established acceptance
4      criteria for quality failure type
5      of language.
6 BY MR. DAVIS:
7      Q.   You don't have anything
8 other than your experience that you're
9 relying on there, do you?
10     A.   That is my experience.  And
11 I've worked in this field a long time,
12 so...
13     Q.   So how are you defining
14 quality there then?
15     A.   Quality failure is what you
16 would need to define.  I don't think you
17 define quality.  Quality failure in the
18 sentence I define as a failure of the
19 product to meet the established
20 acceptance criteria.
21     Q.   It says quality though,
22 right?  I mean, a failure is the failure
23 of quality.  So talk to me about what you
24 interpret quality to mean.

Confidential Information Subject to Protective Order

---

Page 166

1    MR. TRISCHLER:  Objection.
2 Excuse me.  Objection to form.
3    THE WITNESS:  Again, I
4    interpret quality failure as a
5    failure of the product to meet the
6    established acceptance criteria.
7 BY MR. DAVIS:
8    Q.   Okay.  But again, you didn't
9 write this and you don't know the people
10 who wrote it, and you never saw it before
11 today?
12    A.   That's correct.
13    Q.   Okay.  I'm going back to
14 exhibit -- what I believe is 15, which is
15 what I've pulled off the FDA website and
16 is a presentation by Robert Iser, who you
17 testified was formerly an FDA employee.
18    He was an FDA employee at
19 the time that he gave this presentation?
20 Do you know?
21    A.   I think so.  I'm not sure if
22 he's still there or not.  But in 2015, I
23 believe he was.
24    Q.   Take a look at Page 3, which

---

Page 167

1 is -- I'm screen sharing it for you.  It
2 says, "Stop.  First things first, what is
3 quality?"
4    Do you see that?
5    A.   Yep.
6    Q.   And then the next page with
7 the header, "What is quality of a
8 pharmaceutical product?"
9    Can you read those -- aloud
10 those bullet points in quotation?
11    A.    "It delivers the properties
12 described on the label and is not
13 contaminated - Dr. Woodcock.
14    "Fitness for intended use.
15    "Freedom for defects.
16    "Meeting or exceeding
17 customer expectations.
18    "Customer's definition of
19 quality is the only one that matters.
20    "Modified from Juran and
21 Deming."
22    Q.   Who is Dr. Woodcock?
23    A.   At the time she was the head
24 of CDER, I believe.

---

Page 168

1    Q.   Okay.  What is CDER?  What
2 is that acronym?
3    A.   Center for Drug, something,
4 Research.  It's one of the FDA
5 subdivisions.
6    Q.   Is there anything about
7 these definitions of quality that Mylan
8 disagrees with?
9    A.   I don't know that I agree or
10 disagree with the statements.  I think
11 that they are vague and not further
12 defined.  And so without the definition
13 of the word "contaminated," it's just a
14 general statement from Dr. Woodcock.
15    Q.   What's there to be confused
16 about with the definition of
17 "contaminated"?
18    A.   There's plenty to be
19 interpreted about the word
20 "contaminated."  And so if inferences are
21 made that contaminated means that
22 impurities are present, then all drugs
23 have impurities.  And it makes no sense
24 to make a blanket statement that no drug

---

Page 169

1 should have impurities.
2    Q.   So there's nothing that you
3 disagree with about this statement, is
4 there?
5    MR. TRISCHLER:  Objection to
6    form.
7 BY MR. DAVIS:
8    Q.   Or these bulleted statements
9 on Page 4 of this Exhibit 15?
10    MR. TRISCHLER:  Objection to
11    form.  You've repeated the
12    question.  He's asked and answered
13    it.  It's asked and answered.
14 BY MR. DAVIS:
15    Q.   You can answer again.
16    A.   Again, I don't disagree with
17 any statements made, but emphatically
18 feel they are generalized and could be
19 taken out of context.
20    I don't believe that
21 inferences between contamination and
22 presence of impurities is appropriate.
23    Q.   But you acknowledge that the
24 FDA -- that FDA employees wrote this and

---

Page 170

1  are quoting other FDA employees saying
2  this, correct?
3          MR. TRISCHLER:  Objection to
4      form.
5          THE WITNESS:  I understand
6      that former and current FDA
7      employees were involved in this
8      presentation.
9  BY MR. DAVIS:
10     Q.   You mentioned Dr. Gomes.  He
11 reports directly to you, correct?
12     A.   Yes.
13     Q.   Would Dr. Gomes have been
14 directly involved in the process
15 validation work regarding API processes
16 for Mylan's drug products?
17     A.   In what time frame?
18     Q.   Any time from, you know,
19 initial development of valsartan through
20 present.
21     A.   I mean, he is currently the
22 head of API quality and has been for at
23 least two or three years.
24          What his involvement is on

Page 171

1  the front-end development, I'm not
2  certain.
3      Q.   Does process validation fall
4  within API quality if it relates to API?
5      A.   In some regard, yes.  It
6  depends, again, on how you use the word
7  process validation.
8      Q.   How do you use the word
9  process validation?
10     A.   My definition of process
11 validation includes all three phases of
12 development, qualification, and continued
13 process monitoring.
14     Q.   So three phases meaning
15 chronological phases, and you said -- can
16 you go through that again for me?
17 There's three phases.  What's the first
18 one?
19     A.   Development.
20     Q.   And what is development?
21 Let's just stick with development for a
22 second.
23          When does the development
24 phase end?

Page 172

1      A.   It ends at the time of
2  approval and then you go into
3  qualification of the process --
4      Q.   And then --
5      A.   -- to be more specific.
6          There are occasions where
7  you might actually start qualification
8  when you're anticipating approval.  It's
9  not a very good idea to do it very early,
10 because you may get changes coming out of
11 your health authority review.
12          So it typically coincides
13 closely with the approval process.
14     Q.   What is the qualification --
15 what work is involved in the
16 qualification process typically?
17     A.   It varies broadly.  Sorry.
18          MR. TRISCHLER:  Objection to
19     form.
20          THE WITNESS:  And it would
21     depend on the case.
22          MS. HILTON:  John, you're
23     just sharing your screen.  Just as
24     an FYI, you're still sharing.

Page 173

1          MR. DAVIS:  Yeah.  Let's
2      take that down.
3  BY MR. DAVIS:
4      Q.   I'm going to introduce --
5  well, actually, do you -- are you
6  familiar with a World Health Organization
7  inspection of Mylan Unit 3 that occurred
8  in June 2014?
9      A.   I don't have it committed to
10 memory.  I'm sure I probably saw the
11 report at some point in my travels.
12     Q.   Okay.  Did Unit 3 make
13 valsartan API?
14     A.   My understanding is that
15 they were an early manufacturing site for
16 the API.
17          MR. DAVIS:  I'm marking Tab
18     16 as Exhibit 16.
19          (Document marked for
20     identification as Exhibit
21     PL-Glover-16.)
22          MR. DAVIS:  And Tab 17 as
23     Exhibit 17.
24          (Document marked for

Confidential Information Subject to Protective Order

| Page 174 | Page 176 |

Page 174

1    identification as Exhibit
2    PL-Glover-17.)
3        THE WITNESS:  Okay.  I have
4    both documents.
5  BY MR. DAVIS:
6    Q.    Exhibit 16 is just an
7  e-mail.  It attaches the -- a document
8  called Mylan CAPAs_Comments From
9  Inspectors.docx.
10      Do you see that?
11    A.    Yes.
12    Q.    And Dr. Gomes is one of the
13  recipients of this e-mail, is he not?
14    A.    Yes.
15    Q.    Okay.  Then turn to
16  Exhibit 17.  You'll see that the title of
17  the document is WHO Audit Compliance
18  Report.
19      Do you see that?
20    A.    Yep.
21    Q.    And that it relates to API
22  Unit 3, that the contact person is
23  Dr. Gomes, and that the date of
24  inspection is June 16th to 19, 2014?

Page 175

1    A.    Yep.
2    Q.    Okay.  Does this look like
3  to you it's Mylan's responses to the
4  WHO's observations from that inspection?
5    A.    I mean, it looks like it
6  could be at least a draft response or
7  update.  I can't quite tell which.
8    Q.    Sure.
9    A.    Actually, it's got
10  assessment by inspector language in it
11  also.  That's a little confusing for me.
12  I'm not used to seeing that in a
13  response.
14    Q.    Let's go through those
15  columns.  Observations would be the WHO
16  inspector's observations, correct?
17    A.    Yeah.
18        MR. TRISCHLER:  Objection to
19  form.
20  BY MR. DAVIS:
21    Q.    Proposed CAPA, does that
22  strike you as Mylan's responses?
23    A.    Typically that's where we
24  would put our proposal, yes.

Page 176

1    Q.    Okay.  And then assessment
2  by inspector might be the inspector's
3  responses to those proposed CAPAs?
4    A.    It's possible.  But I'm not
5  used to seeing that.  So that would infer
6  that this came from WHO instead of from
7  us.  But the e-mail seems to come from
8  our employee.
9        And it says forwarding the
10  report for preparation, as if it's
11  something that our guys are working on.
12        So I'm not exactly sure what
13  assessment by inspector means.
14    Q.    I assume you might want to
15  refer me to Dr. Gomes, since he is the
16  contact person on this?
17    A.    I think it's a very good
18  idea that he would probably know what was
19  going on with that last column.
20        MR. TRISCHLER:  Excuse me.
21    Mr. Glover, try to wait until
22    Mr. Davis finishes his question
23    because I think what will happen
24    is that the two of you will drown

Page 177

1    each other out, and the court
2    reporter won't be able to hear
3    anything due to the mechanics of
4    trying to do this remotely, okay?
5        THE WITNESS:  Apologies.
6  BY MR. DAVIS:
7    Q.    I'll try not to stomp over
8  you either.
9        So on Page 4 of the
10  document, you'll see -- and we're under
11  major observations.
12        Do you see that at the top
13  of these pages, including Page 4?
14    A.    Yes.

Confidential Information Subject to Protective Order

Page 178

1     Q.    Are those done annually?
2     A.    Typically, yes.
3     Q.    And what would -- what
4  information would go into them?
5     A.    Again, it widely varies.
6  It's intended to be a yearly review of
7  various key aspects of product
8  performance.



Confidential Information Subject to Protective Order



Page 182

22    MR. DAVIS:  Okay.  I'm going
23  to mark Tab 18 as Exhibit 18.
24    (Document marked for

Page 185

1    identification as Exhibit
2    PL-Glover-18.)
3  BY MR. DAVIS:
4    Q.   Do you recognize this as
5  another one of these FDA guidance
6  documents?
7    A.   Yep.
8    Q.   And this one relates to
9  process validation?
10    A.   Yep.
11    Q.   Dated January 2011?
12    A.   Yeah.
13    Q.   Have you looked at this
14  document before?
15    A.   Yes, years ago.
16    Q.   Take a look at the page that
17  has the Number 4 at the bottom of it.
18  We'll go by the numbering at the bottom
19  of these pages.
20    A.   Okay.
21    Q.   Do you see where it says,
22  "For purposes of this guidance, process
23  validation is defined as the collection
24  and evaluation of data from the process

Confidential Information Subject to Protective Order

Page 186

1 design stage through commercial
2 production which establishes scientific
3 evidence that a process is capable of
4 consistently delivering quality product"?
5     A.   Yeah.
6     Q.   Does Mylan take any issue
7 with that definition of process
8 validation?
9     A.   No.
10     Q.   Can you describe to me why
11 process validation is important?
12     A.   In general, process
13 validation, we rely on it to establish
14 consistency from batch to batch,
15 reliability of the process.
16     Q.   And other things such as
17 safety and identity, purity?
18     A.   We tend to rely --
19         MR. TRISCHLER:  Objection to
20 form.
21         THE WITNESS:  We tend to
22 rely on the registered acceptance
23 criteria more for that.
24

Page 187

1 BY MR. DAVIS:
2     Q.   Well, it says in the same
3 page, just below, in the middle
4 paragraph, that, "The manufacturer should
5 have gained a high degree of assurance in
6 the performance of the manufacturing
7 process such that it will consistently
8 produce APIs and drug products meeting
9 those attributes relating to identity,
10 strength, quality, purity, and potency."
11     Do you see that?
12     A.   Yes.  And those attributes
13 are reflected in the acceptance criteria
14 for the product.
15     Q.   What do you mean by
16 acceptance criteria for the product?
17     A.   The registered
18 specifications, test methods,
19 manufacturing conditions.
20     Q.   Doesn't this go back to our
21 dispute about what the definition of
22 quality means?  You keep trying to limit
23 it to the specification, but that's
24 clearly not what the FDA is saying,

Page 188

1 right?
2         MR. TRISCHLER:  Objection
3 to -- objection to form.
4         THE WITNESS:  So far, I
5 think that's exactly what FDA is
6 saying.  I mean, the way I read
7 these sentences is that FDA
8 is reflecting back to attributes.
9         And if you hear them talk
10 about quality attributes, quality
11 attributes are measurable,
12 measurable and determined to be
13 reflected against the established
14 acceptance criteria in the
15 registration.
16 BY MR. DAVIS:
17     Q.   I don't see that in that
18 sentence that I just read.
19         MR. TRISCHLER:  Is that a
20 question or just a declarative
21 statement?  Because if it's a
22 question, objection to form.  I
23 mean, you're arguing.
24 BY MR. DAVIS:

Page 189

1     Q.   Do you see that statement in
2 that paragraph that we're looking at?
3         MR. TRISCHLER:  Objection to
4 form.
5 BY MR. DAVIS:
6     Q.   -- that you just said --
7 where do you see the word "acceptance
8 criteria" on that paragraph -- in that
9 paragraph?
10     A.   I'm simply stating that the
11 term attributes in quality GMP language
12 is typically preceded by the words
13 critical quality attributes or CQA.  It's
14 a commonly used term in our business.
15 When FDA references attributes such as
16 identity, strength, quality, purity, and
17 potency, these are all quality attributes
18 that are measured and tested.
19         And those measurements and
20 testing are performed in accordance with
21 the registered specifications and
22 acceptance criteria established in the
23 application.
24     Q.   That's not one of the

Confidential Information Subject to Protective Order

Page 190

1 definitions that we read in Exhibit 15,
2 that the FDA provided in its
3 presentation, is it, though, for quality?
4      A.   Mr. Iser's presentation may
5 or may not have been comprehensive in all
6 GMP terminology.  I can't speak to what
7 his intention was.
8      Q.   Move to the next page if you
9 don't mind, page Number 5.
10      And it says, just below
11 Header 3, "Process validation for drugs,
12 finished pharmaceuticals, and components
13 is a legally enforceable requirement."
14      Do you see that?
15 A.   Yep.
16      Q.   Does Mylan agree that
17 process validation is a legally
18 enforceable requirement under 21 U.S.C.
19 351(a)(2)(b)?
20      MR. TRISCHLER:  Objection to
21 form and foundation.
22      THE WITNESS:  I'm not a
23 lawyer.  I couldn't possibly weigh
24 in on whether this statement is,

Page 191

1 you know, something that we agree
2 with or disagree with.
3      I know that the premise of
4 the guidance is that it's FDA's
5 current thinking or suggested best
6 practices.
7      So I don't -- I can't weigh
8 in on a statement like this.  It's
9 outside the scope of my expertise.
10 BY MR. DAVIS:
11      Q.   Do you agree that at
12 minimum, the FDA views process validation
13 as really important?
14      A.   Yeah.
15      Q.   Look below where it says,
16 "Process validation is required in both
17 general and specific terms by the cGMP
18 regulations in Parts 210 and '11."
19      Do you see that?
20      A.   Yeah.
21      Q.   Does Mylan agree that
22 process validation is required in both
23 general and specific terms by 21 C.F.R.
24 Parts 210 and '11?

Page 192

1      A.   We understand process
2 validation is required.  But the
3 definition of process validation and the
4 extent with which it needs to be
5 conducted is variable based on the case
6 and circumstances.
7      Q.   If the FDA told Mylan that
8 it should process validate something,
9 does that mean it's required?
10      MR. TRISCHLER:  Objection to
11 form.
12      THE WITNESS:  I don't
13 understand the question.  Could
14 you repeat it?
15 BY MR. DAVIS:
16      Q.   Sure.  Is the FDA the final
17 arbiter of what process validation is
18 required under Parts 210 and 11?
19      A.   No.  I mean, FDA obviously
20 has a heavy hand in suggesting best
21 practices.  But they don't necessarily
22 get to establish new legal -- legal
23 statute without, you know, working
24 through amendments to the GMP.

Page 193

1      So there's a process by
2 which things like that can be mandated.
3 We usually don't get that far in the
4 industry because we typically agree on a
5 best practice and move forward.
6      Q.   Well, it says -- I mean, the
7 FDA is saying that under the current --
8 you know, at least as of 2011 when this
9 document was written, that under the then
10 current cGMP regulations, that process
11 validation was required in specific
12 terms.
13      If the FDA told -- told
14 Mylan, for example, that process
15 validation was required for some
16 particular process, isn't the agency the
17 person best able to interpret its own
18 regulations?
19      MR. TRISCHLER:  Objection.
20 Objection to the form of the
21 question.
22      THE WITNESS:  I think the
23 best way to answer your question
24 is just to explain that while

Confidential Information Subject to Protective Order

Page 194

1   process validation may be expected
2   by FDA, process validation is not
3   a black-and-white,
4   one-size-fits-all type of process
5   or program.
6         It is highly variable,
7   customized per case, and nothing
8   in this document precludes that or
9   mandates a particular
10  interpretation of it.
11  BY MR. DAVIS:
12      Q.   Sure.  It's not expected of
13  the FDA.  It's required of the FDA,
14  correct?  That's what this document says,
15  right, that process validation is
16  required, right?
17      A.   It's required in certain
18  cases, yes.
19      Q.   And if the FDA said that a
20  certain case was one of those cases where
21  it was required, then it's required,
22  right?
23          MR. TRISCHLER:  Objection to
24      the form.

Page 195

1          THE WITNESS:  Yeah, I didn't
2      understand that either.
3   BY MR. DAVIS:
4      Q.   Okay.  If FDA --
5      A.   If the FDA says it's
6   required, then it's required?
7      Q.   Sure.  You said in certain
8   cases it may be required, right?
9          And the FDA --
10     A.   Sure.  Yes.
11     Q.   -- said any particular case
12  was one of those certain cases where it
13  was required, the FDA has the final word
14  on that, right?
15     A.   No, I disagree.  I mean, if
16  an FDA walks through the door and says,
17  "I require validation," it doesn't
18  necessarily mean that that's the law.
19  That means it's his opinion.  And there's
20  a process for that as well, where you can
21  have a discussion with FDA and have a
22  debate about it.  It's just not that
23  black and white.
24     Q.   Okay.  What about from

Page 196

1   Mylan's own internal perspective?  Does
2   Mylan want to ensure that its processes
3   work in the way they intend them to?
4      A.   Yep.
5      Q.   Take a look at the top of
6   Page 6.
7      A.   Okay.
8      Q.   The FDA says, "For example,
9   Section 211.110(a), Sampling and Testing
10  of in-Process Materials and Drug
11  Products, requires the control procedures
12  be established to monitor the output and
13  to validate" -- and that's emphasized --
14  "the performance of those manufacturing
15  processes that may be responsible for
16  causing variability in the
17  characteristics of in-process material
18  and the drug product."
19         Do you see that?
20     A.   Yep.
21     Q.   Would recovered -- would
22  recovered solvents potentially be
23  responsible for causing variability in
24  the characteristics of in-process

Page 197

1   material of the drug product?
2          MR. TRISCHLER:  Objection to
3      form.  Incomplete hypothetical.
4   BY MR. DAVIS:
5      Q.   Let me start somewhere else.
6   Is solvent an in-process material?
7      A.   No.  I don't think, by these
8   definitions.
9          I think we tend to classify
10  a solvent as a raw material for -- for
11  API manufacturing.  I think that's the
12  term that I'm used to hearing.
13  In-process materials, I think, tend to be
14  intermediates in drug products in this
15  vocabulary.
16     Q.   Where do you see a
17  definition of in-process material here?
18     A.   You won't find it.  I don't
19  see it in this paragraph either.  Again,
20  I'm just leveraging my own experience of
21  those terms.
22         Normally when I hear the
23  terms "in-process materials" and
24  "intermediates," those are used somewhat

Confidential Information Subject to Protective Order

Page 198

1 interchangeably.  Drug product is almost
2 always finished product.  API and the
3 precursors to API are either -- or share
4 a primary or secondary intermediate are
5 also intermediate, and then solvents I've
6 always heard clustered in something
7 called raw materials.
8          But again, I'm --
9     Q.   Solvents are used during the
10 manufacturing process, correct?
11    A.   They are.
12    Q.   And solvents -- I think this
13 is an easy one.  They're materials,
14 correct?
15    A.   They are.
16    Q.   Do you know if Mylan did any
17 process validation work for the use of
18 recovered solvents in valsartan prior to
19 recall at any point prior to recall?
20    A.   My understanding is that
21 valsartan API was originally developed,
22 submitted in the DMF validated with the
23 recovered solvent.  It was always a
24 recovered solvent that was in the DMF,

Page 199

1 and the DMF reflects that.
2          So again, I haven't reviewed
3 that information.  But my understanding
4 is that the answer is yes, that the
5 original development and validation
6 included recovered or used exclusively
7 recovered solvents, and that that was
8 transparently disclosed in the DMF to
9 FDA.
10    Q.   Are you referring to what we
11 were talking about earlier, like the
12 validation batches?
13    A.   So again, the use of the
14 word "validation batch," I'm not sure
15 whether they called it exhibit,
16 validation, or submission batches.  But
17 there will be something in the DMF that
18 was provided to FDA that would have been
19 batches manufactured, set down on
20 stability.
21          And my understanding is
22 those batches were made with recovered
23 solvent, and that the DMF clearly
24 reflects that.

Page 200

1     Q.   So I would refer to the DMF,
2 then, to get an answer on whether -- on
3 whether that was done?
4     A.   Sure.

7          MR. TRISCHLER:  Hey, John,
8 while he's reviewing that, I'm
9 going to run to the men's room if
10 that's all right.
11          MR. DAVIS:  Sure.  That's
12 fine.
13          MR. TRISCHLER:  And even if
14 it's not all right, I'm going to
15 run to the men's room.
16          MR. DAVIS:  All right.
17 Sounds good.  I'll wait to ask any
18 questions.
19          MR. TRISCHLER:  Okay.  Thank
20 you.
21          MR. DAVIS:  No problem.
22 BY MR. DAVIS:
23    Q.   Mr. Glover, let me know when
24 you're ready.

Confidential Information Subject to Protective Order



Page 202

1    A.   Okay.  Thanks.
2         Okay.
3    Q.   So if you look at page -- if
4  you see in the top right corner there's a
5  numbering convention.  If you look at
6  Page 2 of 9.
7    A.   Yep.
8    Q.   You'll see that the purpose
9  of the audit was to approve Mylan as an
10 approved supplier of valsartan.

22   Q.   Those discussions you
23 referenced, were those with counsel or
24 other Mylan individuals?

Page 203

1    A.   I'm not exactly sure.  I
2  think it might have been with the review
3  team.
4    Q.   When you say the review
5  team, who do you mean by that?
6    A.   Sorry.  Jason Reefer, Brad
7  Matta.  It's always possible Dr. Gomes
8  may have been in that conversation as
9  well.  I'm pretty fuzzy on the details.
10   Q.   Have you -- did you -- have
11 you talked to Dr. Gomes or any other
12 Mylan personnel that are not counsel
13 without the presence of lawyers in
14 preparing -- in preparing for the
15 deposition?
16   A.   Not in preparing for the
17 deposition.  But I speak to Dr. Gomes
18 every day.  We work together.
19   Q.   If you go to the
20 second-to-last page, which is numbered 8
21 of 9.  And actually starting on the
22 bottom of Page 7, you'll see where audit
23 findings start.  And then they spill over
24 into Page 8.

Page 204

1    A.   Okay.

13   Q.   Well, did Mylan -- are you
14 aware of Mylan ever saying, "Hey, that's
15 confusing.  Can you tell us what you mean
16 by that so we can respond?"
17   A.   Yeah, I wasn't involved in
18 the response, so I don't know what the
19 response says.
20   Q.   Who would have been involved
21 in this response?
22   A.   Most likely Dr. Gomes.
23       MR. DAVIS:  Okay.  I'm going
24   to mark Exhibits 20 -- that's Tab

Confidential Information - Subject to Protective Order

Page 206

25 -- and Exhibit 21, which is Tab
26.
　　　(Document marked for
identification as Exhibit
PL-Glover-20.)
　　　(Document marked for
identification as Exhibit
PL-Glover-21.)
　　　THE WITNESS:  Okay.
BY MR. DAVIS:
　　Q.　So let me know when you've
had a chance to review --
　　　MR. DAVIS:  What were the
exhibit numbers on these again,
Clem.
　　　MR. TRISCHLER:  I have 20
and 21.
　　　MR. DAVIS:  20 and 21.
BY MR. DAVIS:



6　　Q.　Let me unscramble that a
7  bit.
8　　　What you're saying is how
9  you're interpreting this is that since
10 recovered solvents were validated in the
11 DMF, that validation was not extended to
12 recovered solvents after that?
13　　A.　Yes.  So there's a bunch of
14 ways to validate things, and so you could
15 choose to validate solvent recovery all
16 by itself and stop right inside the
17 validation of the recovery itself.
18　　　So you can do your testing
19 of the recovered solvents and call that a
20 validation.  Or you can do what these
21 guys did.  They actually took the
22 recovery of solvents, incorporated it
23 into the validation process -- or
24 valsartan process validation, which would

Confidential Information Subject to Protective Order



Page 210

1  have allowed for a far more extensive
2  battery of testing at both intermediate
3  stages and at the finished API stage.  It
4  would have given them a greater degree of
5  assurance that the recovered solvent was
6  going to produce valsartan API that met
7  all registered acceptance criteria, which
8  it sounds like that's what they did.
9      Q.   Let me ask you, if the
10  recovered solvents were just simply
11  listed in a master batch production
12  record as an option but not actually
13  manufactured as part of the test batches
14  or validation batches or whatever you
15  want to call them, that's not process
16  validation, is it?
17      A.   I'm sorry.  Could you say
18  that again?
19      Q.   Is simply listing something
20  in a master batch production record in
21  the recipe process validation, or do you
22  actually have to do some work on top of
23  that?
24      A.   No.  You would do the work.

Page 211

1  And so it sounds like these guys did the
2  work, as you said, in preparation for the
3  DMF filing.  And it was all bundled in
4  the validation of the valsartan -- of the
5  API process itself.
6      Q.   I don't see, though, in the
7  response where it says we did this in the
8  DMF.  Where in this language in their
9  response are they saying that?
10      A.   I'm making the critical
11  assumption that the valsartan process
12  validation preceded or was inclusive in
13  the DMF.
14          And in fairness, I cannot
15  say for certain.  I just am presuming,
16  because DMFs require validation, that
17  this is the validation they're
18  referencing.

Confidential Information - Subject to Protective Order



Page 214

Confidential Information Subject to Protective Order



Page 218

Page 220

1 right?
2      A.   As good as I could do.  I'm
3 not sure.
4      Q.   Do you know this person?
5      A.   It sounds familiar.  I
6 couldn't say for certain.
7      Q.   He's e-mailing some
8 colleagues and he says, "Please prepare
9 following list for RS validation status."
10 And there's a table there, and recovered
11 solvent is one of the columns.
12          Do you see that?
13      A.   Yeah.
14      Q.   Do you read him as asking
15 for the status of recovered solvent
16 validation to be provided to him?
17      A.   It looks like he's asking
18 for a tentative date for completion.
19      Q.   If not completed, right?
20      MR. TRISCHLER:  Objection to
21 form.
22 BY MR. DAVIS:
23      Q.   Because there's also a
24 column for a completed date.

Page 221

1          Do you see that?
2      A.   Sure.
3      Q.   And then the very top
4 e-mail, do you see that on Page 1?
5      A.   I do.
6      Q.   Which is an e-mail back to
7 him.  It says, "Dear sir, we have not yet
8 done any recovery solvent validation at
9 Unit 8.  As per new procedure, we have to
10 plan accordingly."
11          Do you see that?
12      A.   Yep.
13      Q.   Were you aware that Unit 8
14 was not doing any recovery solvent
15 validation?
16      A.   Again, I don't know what it
17 means.  It looks like it's taken at least
18 somewhat out of context.
19          And they say, "As per new
20 procedure."

8          MR. DAVIS:  Okay.  Let's --
9 let me mark something else.
10          I'm marking Exhibit 23 which
11 is Tab 20.
12          (Document marked for
13 identification as Exhibit
14 PL-Glover-23.)
15      THE WITNESS:  Okay.
16 BY MR. DAVIS:
17      Q.   Do you see that this e-mail
18 is just a few days before Dr. Gomes'
19 e-mail on November 26, 2018?
20      A.   Okay.  Yeah.
21      Q.   Okay.  And then the very
22 bottom e-mail, the subject of it is
23 "Recovered Solvents."  And
24 Mr. Sreenivasarao -- did I get that

Confidential Information Subject to Protective Order

Page 222

⁸     Q.   As head of global quality,
⁹ would you view it as problematic if there
¹⁰ was no recovery solvent validation work
¹¹ done in the DMF and there was no recovery
¹² solvent validation done at Unit 8 at any
¹³ point for valsartan?
¹⁴     A.   Again, it would all depend
¹⁵ on our definition of our words "recovery
¹⁶ solvent validation."  As long as the API
¹⁷ process is sufficiently validated, then I
¹⁸ would be comfortable, and the DMF would
¹⁹ not be approved within an application
²⁰ unless it was found acceptable.
²¹        And so that infers that FDA
²² has also reviewed it.
²³     Q.   Assuming that Mylan had
²⁴ disclosed everything correctly, right?

Page 223

¹     A.   I think if FDA would see
² something missing, they would be the
³ first to tell us about it.  We get DMF
⁴ deficiency letters all the time.
⁵       MR. DAVIS:  Did I mark the
⁶    attachment to this e-mail?
⁷       MR. TRISCHLER:  No.
⁸       MR. DAVIS:  Tab 21 is
⁹    Exhibit 24.
¹⁰      (Document marked for
¹¹    identification as Exhibit
¹²    PL-Glover-24.)
¹³ BY MR. DAVIS:
¹⁴     Q.   Let me know when you have
¹⁵ that Excel spreadsheet up.  Mr. Glover,
¹⁶ do you have a printed copy of it, or are
¹⁷ you looking at it on a computer?
¹⁸     A.   I have a printed copy.  It's
¹⁹ in front of me.
²⁰     Q.   Do you see that this list
²¹ includes all of the products manufactured
²² at Unit 8 at the time?
²³     A.   I can only assume that's
²⁴ right.  I don't have the products at Unit

Page 224

¹ 8 memorized.  But it looks like a pretty
² extensive list.
³     Q.   Okay.  And you'll see in
⁴ Rows 113 through 128, is valsartan with
⁵ various process codes including VST, VAA,
⁶ VLN, and stages.
⁷       Do you see that?
⁸     A.   Yeah, I don't have the
⁹ numbers just so you know, but I do see
¹⁰ them.
¹¹     Q.   Okay.  And the validation
¹² completed date is blank.
¹³       Do you see that?
¹⁴     A.   It looks like both of the
¹⁵ right columns are blank for everything.
¹⁶     Q.   For every single one of the
¹⁷ products, right?
¹⁸     A.   Right.
¹⁹       MR. DAVIS:  Okay.  I'm
²⁰    marking Tab 22 as Exhibit 25.
²¹      (Document marked for
²²    identification as Exhibit
²³    PL-Glover-25.)
²⁴ BY MR. DAVIS:

Page 225

¹     Q.   This e-mail is one day after
² Dr. Gomes' e-mail.  Do you see that, that
³ we looked at earlier, November 30th --
⁴ oh, wait, sorry, never mind.  I take that
⁵ back.
⁶       November 30, 2019, do you
⁷ see that?
⁸     A.   Okay.
⁹     Q.   And do you see in the
¹⁰ first -- the bottom e-mail there's a
¹¹ reference to CAPA details.  And as we
¹² mentioned CAPAs or corrective and
¹³ preventive actions, right?
¹⁴     A.   Yeah.

Confidential Information Subject to Protective Order

Page 226



Confidential Information Subject to Protective Order



Page 230

Page 231

¹² Q. If that was done?

MR. TRISCHLER: Objection to form.

THE WITNESS: Yeah. Again, we've spoken about that. I think validation is required with the DMF.

MR. DAVIS: Do you want to take a break? We've been going quite a bit.

MR. TRISCHLER: Sure. That's fine. Hey, John, can I ask a favor?

Page 232

1  MR. DAVIS: Sure.
2  MR. TRISCHLER: I have a
3  call at 3:30 that I've got to
4  take. So I'd like to stop at
5  3:30. And then if it runs longer
6  than 15 minutes or so, you know,
7  we'll take a 15-minute break, I
8  would propose, at 3:30.
9  If it runs long -- if my
10 call runs longer than that, a few
11 minutes, Jason can defend the
12 deposition during the few minutes
13 that I'll be out. But if we break
14 at 3:30, it will eliminate the
15 time that I have to be away, if
16 that's okay.
17 MR. DAVIS: Let's still take
18 a five-minute break. Let's just
19 take a short break now. I might
20 be moving to different topics. So
21 I just want to collect my
22 thoughts.
23 MR. TRISCHLER: Sure.
24 MR. DAVIS: So why don't we

Page 233

1  reconvene -- it's 2:45. Why don't
2  we reconvene at 2:50.
3  MR. TRISCHLER: Thank you.
4  THE VIDEOGRAPHER: The time
5  right now is 2:45 p.m., and we are
6  off the record.
7  (Short break.)
8  THE VIDEOGRAPHER: The time
9  right now is 2:56 p.m. We are
10 back on the record.
11 BY MR. DAVIS:
12 Q. So Mr. Glover, we've been
13 talking for a while about process
14 validation on recovered solvents, right?
15 A. Yep.
16 Q. And I don't want to put
17 words in your mouth, but -- and correct
18 me if I'm misstating any of this, but
19 what you're saying is that the process
20 validation work for recovered solvents
21 with regard to valsartan, that that was
22 done in the -- in the DMF workup,
23 correct?

Confidential Information Subject to Protective Order



20    Q.   Well, we've seen evidence
21 that -- you know, let's separate, you
22 know, the DMF versus the non-DMF.  And
23 we've seen evidence that no process
24 validation work was done, right, after --

1 excluding the DMF, we've seen e-mails
2 where individuals are saying that no
3 process validation work was done for
4 recovered solvents for valsartan, right?
5         MR. TRISCHLER:  Objection.
6    Mischaracterizes the evidence.
7         THE WITNESS:  The only thing
8    that I've seen is e-mails stating
9    that they're looking for a
10    recovered solvent validation
11    report.
12         And if Unit 8 combined it
13    with the valsartan validation,
14    then it's an argument on whether
15    you need a separate validation or
16    you can do them together.
17 BY MR. DAVIS:
18    Q.   I mean, what's unclear about
19 someone saying we have not yet done any
20 recovered solvent validation at Unit 8?
21 What's unclear about that?
22         MR. TRISCHLER:  Objection to
23    form.

23    Q.   Okay.  Well, we can agree
24 that you've seen -- you don't have any

1 evidence to suggest that Mylan, after the
2 DMF, did any process validation work on
3 recovered solvents.  Can you point me to
4 anything?
5    A.   I haven't looked for any.
6    Q.   You haven't looked.  I mean,
7 you're --
8    A.   No, I don't have any in my
9 possession.
10    Q.   This is a topic that you're
11 designated on, to testify on behalf of
12 Mylan.  Do you understand that?
13    A.   Sure.
14    Q.   Okay.  And what you're --
15 what you're -- what you're speculating is
16 that it's likely that that recovered
17 solvent validation work was done as part
18 of the DMF.
19         Can you explain to me what
20 work you would envisage being done in the
21 DMF for process validation if that was
22 done?
23    A.   Again, it would be highly
24 speculative for me to, you know, speak to

Confidential Information Subject to Protective Order

Page 238

¹ that.  I can't say for certain how much
² additional work or what kind of
³ additional work would have been done, but
⁴ I know extensive additional work is done
⁵ traditionally as part of DMF validation.
⁶      Q.    And we talked about this
⁷ earlier.  But just -- I mean, I think we
⁸ agreed on this actually, is that just
⁹ simply listing recovered solvents in the
¹⁰ master batch production record, it would
¹¹ not be sufficient for process validation.
¹² Simply just putting it in the recipe
¹³ doesn't mean it's validated, right?
¹⁴      MR. TRISCHLER:  Objection.
¹⁵      Asked and answered.
¹⁶      THE WITNESS:  Right.  And
¹⁷      the validation itself will be
¹⁸      incorporated in the DMF and will
¹⁹      include some expanded testing and
²⁰      a bunch of additional work,
²¹      customized per the synthetic
²²      process.  And that would also be
²³      there in the DMF.
²⁴ BY MR. DAVIS:

Page 239

¹      Q.    When you say expanded
² testing, like testing for impurities, for
³ example?
⁴      A.    Again, it varies case by
⁵ case.  I can't say for certain what they
⁶ did for the valsartan DMF.
⁷      MR. DAVIS:  I'm marking Tab
⁸      27 which is plaintiffs Exhibit 26.
⁹      (Document marked for
¹⁰      identification as Exhibit
¹¹      PL-Glover-26.)
¹² BY MR. DAVIS:
¹³      Q.    Do you recognize this as the
¹⁴ FDA's establishment inspection report of
¹⁵ Unit 8 that was transmitted to Mylan on
¹⁶ or about March 4th, 2019, for inspection
¹⁷ dates of December 3rd to December 10,
¹⁸ 2018?
¹⁹      A.    Yeah.
²⁰      Q.    Okay.  And this inspection
²¹ was triggered by Mylan's recall of its
²² valsartan that was manufactured at Unit 8
²³ for API, right?
²⁴      A.    We have no reason to believe

Page 240

¹ that.  I don't think that was stated.
²      Q.    I mean the inspection
³ related almost exclusively to Mylan's
⁴ valsartan API production, did it not?
⁵      A.    I haven't read it
⁶ comprehensively, but again, I don't think
⁷ inspectors typically come in and tell you
⁸ if they're triggered based off of some
⁹ event.
¹⁰      Q.    So you're the global head of
¹¹ quality, and you haven't read fully this
¹² FDA inspection report?
¹³      A.    I read the 483 and the
¹⁴ response and I've scanned through the
¹⁵ EIR.  But I don't believe you'll find
¹⁶ anywhere in here where they say, "We
¹⁷ triggered this inspection because of your
¹⁸ recall."  That's not -- I've never seen
¹⁹ FDA do that before.  Let's put it that
²⁰ way.
²¹      Q.    On Page 3 of 36 -- do you
²² see the numbering convention at the
²³ bottom of the actual EIR?
²⁴      A.    Yeah.

Page 241

¹      Q.    Do you see, "Where it says
² during the course of this inspection,
³ Mylan announced a consumer level
⁴ voluntary nationwide recall to include
⁵ all lots of valsartan-containing products
⁶ within expiry"?
⁷      A.    Yep.
⁸      Q.    Okay.  Go to Page 18 of 36.
⁹      A.    Okay.
¹⁰      Q.    Sorry.  I mean -- or yeah,
¹¹ 18 of 36.  My apologies.
¹²      At the top full paragraph
¹³ there.
¹⁴      A.    Okay.



Confidential Information Subject to Protective Order



Page 242

Page 244

12    Q.    Well, with due respect, you
13 are the corporate designee on this.  I
14 should be entitled to testimony from the
15 company on these questions.
16         Did you look into this at
17 all in preparing for your deposition?
18    A.    I did not review the DMF
19 specific to fresh or recovered solvents,
20 no.
21    Q.    And you didn't look to see
22 whether process validation was done in
23 any context in preparing for this
24 deposition, did you?

Page 243

Page 245

1    A.    I did not review process
2 validation, no.
3         MR. DAVIS:  I'm going to
4    mark Tab 28, which is now
5    Exhibit 27.
6         (Document marked for
7    identification as Exhibit
8    PL-Glover-27.)
9 BY MR. DAVIS:
10    Q.    Before I move on to that,
11 there's one other thing that I want to
12 call to your attention in this EIR that's
13 on that same page, Page 19, which is the
14 last sentence of that paragraph.
15         "While discussing the
16 impurity situation with Dr. Gomes, he
17 stated that moving forward the firm will
18 evaluate their solvent recovery process,
19 including establishing limits on reuse
20 and enhanced risk assessment."
21         Did I read that correctly?
22    A.    Yeah.
23    Q.    Is Dr. Gomes admitting there
24 that Mylan did no process validation for

Confidential Information Subject to Protective Order

Page 246

1  its recovered solvents?
2      A.   I don't read it that way at
3  all.  What I'm understanding is that this
4  is right on the heels of the recall where
5  they identified opportunities to improve
6  the recovery process, and that's what
7  he's saying, is that they're going to
8  evaluate the recovery process and add the
9  additional controls as needed.
10      Q.   I mean, don't you think that
11  would have been an appropriate place for
12  Dr. Gomes to tell the FDA, hey, we did do
13  process validation for recovered
14  solvents?
15          MR. TRISCHLER:  Objection to
16      form.
17          THE WITNESS:  It doesn't
18      appear to me like this paragraph
19      is discussing process validation
20      specifically.  It looks like
21      they're talking about just
22      differences in the VAA, VST
23      process and the introduction of
24      the nitrosamines.

Page 247

1  BY MR. DAVIS:
2      Q.   They are referring to fresh
3  o-xylene being used for the validation
4  batches and showing no levels of NDEA and
5  all subsequent and commercial batches
6  going to patients using recovered
7  solvents and containing NDEA.
8          Don't you read that that the
9  FDA calling attention to the fact that
10  Mylan only used fresh solvent in their
11  validation batches?
12      A.   Yeah, I can't make that
13  correlation just from that sentence, no.
14      Q.   What about enhanced risk
15  assessment?  Dr. Gomes refers to enhanced
16  risk assessment.  Do you know if he was
17  referring to any risk assessment that had
18  been done on recovered solvents?
19      A.   Again, I don't know.  I
20  would be purely speculating if I guessed
21  at what those words mean.
22      Q.   But you're unaware of any
23  risk assessment that was done on
24  recovered solvents other than the draft

Page 248

1  risk assessments -- the two draft risk
2  assessments that we looked at, correct?
3      A.   Right.
4      Q.   And no risk assessments were
5  done, that you're aware of, that relate
6  specifically to valsartan or the
7  recovered solvents used in valsartan,
8  correct?
9      A.   Again, yeah, I don't know of
10  any that were done historically.  I think
11  you showed me one today earlier.
12      Q.   As a result of this
13  inspection, this is where Mylan committed
14  to the FDA to not use recovered solvents
15  anymore for valsartan that we were
16  talking about?
17          MR. TRISCHLER:  Objection to
18      form.
19          THE WITNESS:  I think we had
20      already decided not to use
21      recovered solvents as a result of
22      the investigation.  And we
23      included that information in our
24      response likely.

Page 249

1  BY MR. DAVIS:
2      Q.   And that's what's in this
3  next paragraph, staying with the EIR on
4  Page 19, "Moving forward, the firm
5  intends" -- do you see that?
6      A.   Yes.



18      Q.   Look at the VAA process
19  below.  "Mylan appears to be saying that
20  they are not going to use recovered
21  material from VST and VAA, but the firm
22  does permit itself to use recovered
23  material from VAA in subsequent VAA
24  batches."

Confidential Information Subject to Protective Order

Page 250

1    Is that currently being
2  done, or is what you told me earlier more
3  accurate, that VAA was not -- was also
4  not used in recovered materials or
5  solvents?
6    A.    Again, I'm not sure about
7  the changeover time, but I know as of
8  today I don't believe they use any
9  recovered material.
23  BY MR. DAVIS:
24    Q.   Look at the next exhibit

Page 251

1  which I think I marked before moving back
2  to this one.  Is there a number on that
3  one.  It's Tab 28.  I believe we are at
4  Exhibit 27 now.
5    MR. DAVIS:  Is that
6  Exhibit 27?
7    MR. TRISCHLER:  It is.
8    THE WITNESS:  What -- yes.
9  The response to the 483?  Is that
10  what you're marking as 27?
11    MR. DAVIS:  That's correct.
12  BY MR. DAVIS:
13    Q.    And Mr. Glover, you told me
14  that you were involved in drafting this
15  response earlier, correct?
16    A.   Yes.
17    Q.   Okay.  Take a few moments to
18  review that and let me know when you are
19  ready to talk about it.
20    A.   Okay.
21    Q.   I want to direct your
22  attention to page -- Page 6 of 15.
23  You'll see the numbering in the top
24  right.

Page 252

1    A.   Okay.
2    Q.    There's a paragraph right
3  below the tables there.  It says, "We
4  have included specific CAPAs and amended
5  our batch manufacturing records of VST
6  and VAA processes so as to control
7  recovered solvent usage.  In case of VST
8  process, the recovered solvent usage is
9  eliminated as triethylamine is used in
10  the process; therefore, the risk of
11  impurity introduction through recovered
12  solvent usage is high."
13    Do you see that?
14    A.   Yeah.
15    Q.   You were involved in
16  drafting that response to the FDA's
17  observation there?
18    A.   Yeah.
19    Q.   Okay.  And the risk of
20  impurity introduction through recovered
21  solvent use is high when triethylamine is
22  used because of its ability to interact
23  with nitrosating agents, such as sodium
24  nitrite and hydrochloric acid, correct?

Page 253

1    A.   Sorry.  Could you repeat
2  that?



Page 254

Page 256

1  I thought we saw a draft from 2012.
2      Q.   No.  We saw an e-mail from
3  2012 where somebody was asking if there
4  were any concerns.
5      I think you'd agree that
6  that doesn't qualify as a risk
7  assessment, correct?
8      A.   Now you're confusing me.  I
9  thought we had a risk assessment for
10 recovered solvents from 2012.  Are you
11 asking --
12     Q.   You may be referring to the
13 draft one from 2014 that we looked at?
14     A.   Oh, I'm sorry.  Maybe it is
15 '14.
16     Q.   And that one did not relate
17 specifically to valsartan or any of the
18 recovered solvents as we saw, right?
19     A.   Fair enough.
20     Q.   There's -- it says a number
21 of times in this 483 response -- let me
22 find an example of it.
23     If you go back to the page
24 before, in the middle of that first

Page 257

1  paragraph on -- this is Page 5 of 15.
2  "As the formation of this impurity is
3  occurring outside the primary synthetic
4  process, the presence of this impurity in
5  the API was not anticipated."
6      Do you see that?
7      A.   Yeah.
8      Q.   Factually, that was --
9  that's correct, right, that Mylan
10 factually did not anticipate the
11 impurity?
12     A.   That is correct.
13     Q.   Don't you think it should
14 have been anticipated though?
15     MR. TRISCHLER:  Objection to
16 the extent that it's beyond the
17 scope.  Objection to form.
18     THE WITNESS:  Yeah, I wasn't
19 involved in development.  I think
20 it's probably inappropriate for me
21 to speculate on what the
22 development team should or should
23 not have anticipated.
24

21     Q.   Well, there was no risk
22 assessment done, was there, for valsartan
23 and recovered solvents?
24     A.   I'm not sure of that either.

Confidential Information Subject to Protective Order

Page 258

BY MR. DAVIS:

Q.   Do you think that if Mylan had done a risk assessment specifically related to valsartan and the use of recovered solvents in valsartan, or had done process validation of its recovered solvents, that it would have been more likely that Mylan could have anticipated this?

MR. TRISCHLER:  Objection to form.

THE WITNESS:  Yeah, I have no way of, again -- again, you speculate so much in that sentence that it sounds like you're basically saying, if we had done everything we did in the comprehensive investigation on the heels of FDA's findings, would we have found this.

BY MR. DAVIS:

Q.   That's not what I'm saying. I'm saying -- I'm saying had Mylan done a risk assessment at the time or had they

Page 259

done process validation at the time, isn't that the reason that those things exist in quality assurance?  Why else is risk assessment done?

MR. TRISCHLER:  Objection to the form of the question.

THE WITNESS:  My understanding is that upon first contact from FDA in July, we did do a risk assessment.  So did FDA. We both concluded there was no risk of nitrosamine impurities.

And so any further speculation about what could have or should have been done is purely that, speculation.

BY MR. DAVIS:

Q.   You're talking about a risk assessment post-recall, correct?

A.   No, no.  I'm talking about the first attempt to understand the risk in July of 2018, whenever -- the very first conversation on NDMA started.

Q.   Well, at that point Mylan

Page 260

had been using recovered solvents for years at that point in valsartan, correct?

A.   Yeah.

Q.   I'm asking, at the time, you know, Mylan made that decision to start using recovered solvents, shouldn't a risk assessment have been done.  Isn't that why risk assessments exist, is to identify these exact issues?

MR. TRISCHLER:  Objection. Asked and answered.

THE WITNESS:  The use of the recovered solvent was established based on the established acceptance criteria, which was filed within the DMF for both fresh and recovered solvents.  We understood the risk to be negligible based on the assumption that we were going to get pure solvent back.  And we were testing every batch incoming.

Page 261

BY MR. DAVIS:

Q.   Testing every batch --

MR. TRISCHLER:  John, I need to -- I need to take that break.

MR. DAVIS:  Okay.  All right.  That's fine.  Clem, 15 minutes?

MR. TRISCHLER:  Yeah.  If I'm not done by 3:45, I'll have -- Jason will sign in and you guys can start at that time, okay? Because I don't want to hold it up.  But I'm hoping to be done. Okay?

MR. DAVIS:  Okay.  Sounds good.

MR. TRISCHLER:  Appreciate it.

THE VIDEOGRAPHER:  The time right now is 3:28 p.m., and we're off the record.

(Short break.)

THE VIDEOGRAPHER:  The time right now is 3:48 p.m., and we are

Confidential Information Subject to Protective Order

Page 262

1  back on the record.
2       MR. DAVIS:  Michelle, I've
3  forgotten where we left off during
4  the break.
5       Is there any chance that you
6  can read back the last question
7  and answer?
8       (Whereupon, the court
9  reporter read back the requested
10  portion of testimony.)
11  BY MR. DAVIS:
12       Q.   Okay.  Yes or no,
13  Mr. Glover.  Are you aware of a risk
14  assessment that was done at any point
15  prior to being contacted about potential
16  nitrosamine contamination that
17  specifically related to recovered
18  solvents and valsartan?
19       A.   Again, I really don't think
20  it's a yes or no question.  I mean, the
21  risk evaluation is incorporated within
22  the DMF.  The development, the
23  submission, everything about the process
24  validation is conducted, is also risk

Page 263

1  evaluation.
2       The risk assessment in the
3  format that you looked at, I'm not aware
4  of any other old risk assessments.  That
5  format may not have even existed back in
6  2012 to '14.  So I can't say for certain
7  what -- or what elements of risk
8  evaluation were performed.
9       Q.   So aside from what you
10  contend may be in the DMF, you're not
11  aware of any risk assessment that was
12  done regarding valsartan and recovered
13  solvents, correct?
14       A.   Separate from the
15  development and validation conducted in
16  support of the DMF, I'm not aware of any
17  other supplemental risk assessment.
18       Q.   And you're not aware of what
19  validation work was actually done in the
20  DMF either, are you?
21       A.   Only that I know something
22  had to be done or it wouldn't be
23  approved.
24       Q.   Or maybe it wasn't

Page 264

1  disclosed?
2       MR. TRISCHLER:  Objection to
3  form.
4       THE WITNESS:  Then it
5  wouldn't be approved.
6  BY MR. DAVIS:
7       Q.   You mentioned a risk
8  assessment that was done after the
9  nitrosamine issue was raised, correct?
10       A.   You're talking about in
11  July, August of 2018?
12       Q.   Right.  And beyond.
13       A.   Yes, and again, I want to be
14  careful with your use of the word "risk
15  assessment."  It may or may not take the
16  shape of that document that you've gotten
17  used to looking at.  It could be in many
18  forms.
19       But there was an evaluation
20  of nitrosamine risk performed early in
21  the process in -- I think it was July of
22  '18 when NDMA was first uncovered, and
23  this was done by both Mylan and the FDA.
24       Q.   And Mylan actually at that

Page 265

1  time found that there was no risk of
2  nitrosamine contamination, correct?
3       A.   Correct.  That was
4  corroborated by the FDA as well.
5       Q.   Based on what they knew,
6  correct?
7       A.   Based on what both of us
8  knew, yes.
9       Q.   Let me show you -- I'm not
10  sure if this is documents that I provided
11  today.  I didn't intend to use them
12  today.  But --
13       MR. DAVIS:  Clem, how
14  fast -- how fast could you print
15  out a one-page e-mail and
16  three-page attachment?
17       MR. TRISCHLER:  Two minutes.
18       MR. DAVIS:  Sure.  Can we do
19  that, because I'm going to
20  e-mail --
21       MR. TRISCHLER:  Did you send
22  it to me?
23       MR. DAVIS:  Yes.
24       MR. TRISCHLER:  Okay.  When

Confidential Information Subject to Protective Order

Page 266

1  did you send it, John?  Because
2  I'm not finding it.
3      MR. DAVIS:  Oh, I'm sending
4  it right now.
5      MR. TRISCHLER:  Oh.  All
6  right.
7      MR. DAVIS:  I'm going to
8  keep going.  Clem, can you have
9  somebody print these, and you can
10  let me know when you have printed
11  copies.
12      MR. TRISCHLER:  Yeah.  I
13  still haven't received an e-mail.
14  But I'll keep an eye out for it.
15      MR. DAVIS:  It should be
16  coming right now.
17      MR. TRISCHLER:  All right.
18  Go ahead.
19      MR. DAVIS:  I'm going to
20  mark Tabs 59 and 60.
21      59 is Exhibit 28.
22      (Document marked for
23  identification as Exhibit
24  PL-Glover-28.)

Page 267

1      MR. DAVIS:  60, is
2  Exhibit 29.
3      (Document marked for
4  identification as Exhibit
5  PL-Glover-29.)
6  BY MR. DAVIS:
7      Q.   Let me know when you have
8  those in front of you, Mr. Glover.
9      A.   I have them both.
10      Q.   Do you recognize -- do you
11  recognize Exhibit 29 as the 2019 EIR of
12  Unit 8?
13      A.   Yes.
14      Q.   And the previous exhibit is
15  FDA's transmittal e-mail of that EIR,
16  correct?
17      A.   Yeah.
18      Q.   And that occurred in June of
19  2020?
20      A.   Yes.
21      Q.   Take a look at Page 3 or --
22  sorry, page -- the numbering is on the
23  bottom right corner.  Page 2.
24      A.   Sorry.  Say the page number

Page 268

1  again.
2      Q.   Actually spilling into the
3  top of Page 1.
4      So basically the first
5  numbered page, Page 1, at the very bottom
6  and spilling over into Page 2.
7      A.   Okay.
8      Q.   Have you seen this EIR
9  before?
10      A.   I have.
11      Q.   Have you read it?
12      A.   Not comprehensively, no.
13      Q.   Okay.  At the bottom of Page
14  1, the FDA references, "The previous FDA
15  inspection was conducted 12/3 to
16  12/10/2018 and resulted in the issuance
17  of a three-item FDA Form 483."
18      Do you see that?
19      A.   Yeah.
20      Q.   And then the third bullet,
21  one of those three items is, "The
22  analytical methods used to determine
23  purity, strength, quality, and identity
24  of drug substances are not the same as

Page 269

1  the conditions in which they were
2  validated."
3      Did I read that correctly?
4      A.   Yep.
5      Q.   And then below that, the FDA
6  says, "The firm did not fully resolve the
7  earlier deficiencies such that all three
8  observations were repeat observations in
9  the current inspection."
10      Did I read that correctly?
11      A.   Yes.
12      Q.   Okay.  Go to Page 8.
13      A.   Okay.

Confidential Information Subject to Protective Order



Page 270

Page 272

¹ recovered solvents and the use of sodium
² nitrite?
³      A.   I don't think that's what
⁴ that means.  I think what he's trying to
⁵ say is that he disagreed with our
⁶ approach to cleaning of shared equipment.
⁷ If you read Observation 2 his focus is on
⁸ the potential for cross-contamination
⁹ within this facility.
¹⁰      He uses the general terms
¹¹ "risk assessment."  But what he's really
¹² talking about is our understanding of
¹³ cross-contamination.
¹⁴      We did not agree with this
¹⁵ observation.  His whole premise was based
¹⁶ on an argument that we should have been
¹⁷ testing for swab residue samples.  We had
¹⁸ a scientific argument why we didn't feel
¹⁹ that was necessary.
²⁰      You know, this was just a --
²¹ it's FDA's opinion, the inspector's
²² opinion, based on what he saw.
²³      Q.   Well look at -- look at the
²⁴ bottom of page -- or sorry.  Look at Page

Page 273

¹ 17.
²      A.   Okay.
³      Q.   The last paragraph of the
⁴ production system section.  Let me know
⁵ when you're there.
⁶      A.   I think I'm there.  You are
⁷ talking about, "I focused"?
⁸      Q.   Yes.  "I observed that the
⁹ firm's investigation was inadequate such
¹⁰ that the firm did not evaluate the risk
¹¹ associated with using sodium nitrite in
¹² the solvent recovery systems and the
¹³ cleaning validation with respect to NDMA
¹⁴ and NDEA contaminations."
¹⁵      A.   Yes.  The words -- "the
¹⁶ cleaning validation" -- well, the
¹⁷ cleaning validation piece is what he was
¹⁸ focused on.
¹⁹      Q.   To me it sounds like he's
²⁰ focused on both.
²¹      MR. TRISCHLER:  Objection to
²² form.
²³      THE WITNESS:  We were with
²⁴ the inspector.  And he was very

²⁰      Q.   So the FDA is telling Mylan
²¹ that it had still not done an adequate
²² risk assessment, almost two years after
²³ learning of not only the nitrosamine
²⁴ contamination, but what caused it, namely

Confidential Information Subject to Protective Order

Page 274

1  clear that in his mind, because of
2  the nitrosamine presence, that the
3  cleaning validation should have
4  taken that into consideration, and
5  he wanted to see a very specific
6  test being performed, which we
7  argued scientifically was
8  unnecessary.
9  BY MR. DAVIS:
10      Q.   What test was that?
11      A.   A swab recovery test, a swab
12  residue test for nitrosamine itself as
13  opposed to the intrinsic carrier
14  molecule.
15      Q.   What's the intrinsic carrier
16  molecule?
17      A.   It depends on the stage, but
18  if you have a contamination and you
19  clean, you can test for the residue of
20  the highest concentration, and then you
21  can back calculate the relative potential
22  carryover.
23          It would have been
24  impossible to test for nitrosamine

Page 275

1  reliably at the levels that would have
2  been supposedly present in the residue
3  after cleaning.
4          Still to this day, that's
5  the case.  It's more reliable to test for
6  the actual analyte of interest or the
7  intrinsic carrier molecule.  And that's
8  still what we do.  We added this
9  nitrosamine test to satisfy the FDA, but
10  it's a meaningless test.
11      Q.   How does that work with
12  regard to Mylan's use of contract
13  manufacturing units to actually do the
14  solvent recovery?
15      A.   It had nothing to do with
16  it.  It had to do with shared equipment
17  within the facility itself.
18          And his concerns that any
19  shared equipment within the facility
20  needed to be cleaned to a definition
21  based on his interpretation.
22      Q.   Within Mylan --
23      A.   -- cleaning being --
24          MR. TRISCHLER:  Let him

Page 276

1  finish, John.
2          MR. DAVIS:  Yeah.  Sorry.  I
3  didn't mean to cut you off.
4          THE WITNESS:  No, just clean
5  being defined by the results of
6  swab testing, which we always did
7  and still contend that our swab
8  testing was the most appropriate
9  way to verify cleaning.
10          MR. TRISCHLER:  John, I have
11  the other exhibits, or those other
12  documents that you asked to be
13  copied.
14          MR. DAVIS:  Okay.  Let's
15  look at those.
16          All right.  I'm introducing
17  Tab 64 as Exhibit 30.
18          (Document marked for
19  identification as Exhibit
20  PL-Glover-30.)
21          MR. DAVIS:  And Tab 65 as
22  Exhibit 31.
23          (Document marked for
24  identification as Exhibit

Page 277

1  PL-Glover-31.)
2  BY MR. DAVIS:
3      Q.   This is an e-mail --
4  Exhibit 30 is an e-mail on March 20,
5  2019, which -- does that remind you -- or
6  do you recall that the EIR from Unit 8
7  for the December 2018 inspection was
8  delivered to Mylan just before this?
9      A.   Okay.
10      Q.   And the subject of the
11  e-mail is "Backup for FDA call."
12          Do you see that?
13      A.   Okay.
14      Q.   And then there's an
15  attachment, Valsartan-FDA.docx.
16          Do you see that?
17      A.   I do.
18      Q.   Exhibit 31 is that
19  attachment.
20      A.   Yep.

Confidential Information Subject to Protective Order

Page 278

[REDACTED]

7    Q.   Does that remind you that
8  recovered solvents were not validated as
9  part of Mylan's DMFs for valsartan?
10    A.   Again, our understanding of
11  the DMF filing is that it currently
12  includes the recovered solvent
13  referenced.
14       You know, I can't say for
15  certain whether it was in the original
16  DMF filing or whether it was subsequently
17  amended.
18       I haven't done that
19  research.
20    Q.   Amended after discovery of
21  nitrosamine contamination, correct?
22    A.   I have no idea.
23    Q.   I mean, do you have any
24  reason to doubt what this document says?

Page 279

1    A.   Oh, sure.  I mean, I don't
2  necessarily know who even wrote it.
3    Q.   Well, it's from Dr. Gomes,
4  who you say you speak to every day and
5  reports directly to you, isn't it?
6    A.   I don't know if it came from
7  him or it's attached by one of the other
8  folks that are on here.  Again, I have no
9  way of validating the statement.
10    Q.   Well, Dr. Gomes is sending
11  it to Walt Owens and says, "Here is your
12  backup for the FDA call."
13       I mean, clearly he approved
14  what was in it, correct, even if he
15  didn't write it?
16    A.   Understood.
17    Q.   Okay.  Do you have any
18  reason to doubt that Dr. Gomes is
19  accurately conveying that, "Solvent
20  recovery processes were not any part of
21  our API DMFs"?
22    A.   Yes, because I understand
23  that at least in one case it is there.
24  So I just don't know the details on when

Page 280

1  or how it is there, so...
2    Q.   How -- where did you come to
3  that understanding from?
4    A.   Through various discussions
5  in the past two months.
6    Q.   With who?
7    A.   With Dr. Gomes.
8    Q.   You don't think Dr. Gomes
9  would encourage Walt Owens to lie to the
10  FDA about something, right?
11       MR. TRISCHLER:  Objection to
12  form.
13       THE WITNESS:  I mean, I
14  don't even know how to answer
15  that.  No one would encourage
16  someone to lie to the FDA.
17  BY MR. DAVIS:
18    Q.   I mean, this is a -- I mean,
19  did you read the context of this e-mail,
20  and attachment based on the title of the
21  document is valsartan-FDA and the e-mail
22  being "Backup For FDA Call," that these
23  are talking points to deliver to the FDA?
24    A.   I understand this is

Page 281

1  background for a discussion, yes.

[REDACTED]

Confidential Information Subject to Protective Order



Page 282

11    MR. DAVIS:  I'm marking Tab
12  71 as Exhibit 32.
13    (Document marked for
14  identification as Exhibit
15  PL-Glover-32.)
16    THE WITNESS:  Okay.
17  BY MR. DAVIS:
18    Q.   Who is Denise Mercer?
19    A.   I'm not sure.  She works for
20  Mylan.
21    Q.   If you go to Page 3 of this
22  attachment -- or sorry, this e-mail,
23  you'll see an e-mail from her that's
24  dated July 25th, 2019.

Page 283

1    Do you see that?
2    A.   Yes.
3    Q.   And then it actually has her
4  e-card down there.  She is an API senior
5  specialist, it appears, at Morgantown.
6    She says, "Per the guidance,
7  Mylan's FDA 356h form must include all
8  facilities related to the manufacture of
9  the API, i.e., micronization sites,
10  contract laboratory testing sites, all
11  cGMP storage warehousing facilities, et
12  cetera."
13    Do you see that?
14    A.   Yes.

Confidential Information - Subject to Protective Order

Page 286



Confidential Information Subject to Protective Order



Page 290

[redacted]

4    MR. DAVIS:  So I've got some
5  good news and bad news, Clem,
6  which is the good news being that
7  we've moved faster than I thought
8  we would.  I've exhausted all of
9  the about 45, I think, exhibits
10  that I gave this morning.
11    MR. TRISCHLER:  Well, that's
12  never -- that's never bad news,
13  John.
14    MR. DAVIS:  Yeah, the bad
15  news is, you know, I'm moving into
16  territory where you don't have
17  printed copies.
18    What do you want to do about
19  that?  I can e-mail another link
20  to y'all, and we can take a break,
21  and y'all can print and we can
22  come back on and do another, you
23  know, hour or so.
24    How many hours, Michelle,

Page 293

1  have we been on so far?
2    MR. TRISCHLER:  My
3  calculation is about five and a
4  half.
5    THE VIDEOGRAPHER:  Exactly
6  five hours, 30 minutes.
7    MR. TRISCHLER:  Hey, pretty
8  good.
9    I'm fine with -- I guess
10  I -- I guess I should talk to
11  Mr. Glover.  I was going to say
12  I'm fine to take a break and
13  continue for another hour or so.
14  But what --
15    MR. DAVIS:  Let's take a
16  break.  I'll send the document --
17  actually, we can go off the record
18  so you you're not having to take
19  this down, Michelle.  Sorry about
20  that.
21    THE VIDEOGRAPHER:  The time
22  right now is 4:26 p.m., and we're
23  off the record.
24    (Short break.)

Confidential Information Subject to Protective Order



1      THE VIDEOGRAPHER:  The time
2  right now is 4:57 p.m., and we are
3  back on the record.
4  BY MR. DAVIS:
5      Q.   Okay.  We've been talking
6  about Mylan's CMU, contract manufacturing
7  units, their vendors for recovered
8  solvents, correct?
9      A.   Sure.

1  find what you're calling Tab 75.
2      MR. DAVIS:  Sure.  The file
3  name should have had 75 in front
4  of it.
5      MR. TRISCHLER:  Yep, I got
6  it.
7      MR. DAVIS:  That would be
8  MYLAN-MDL-2875-00396834.
9      MR. TRISCHLER:  Yes, I have
10  it now.
11  BY MR. DAVIS:
12      Q.   Do you have the e-mail in
13  front of you doctor -- Mr. Glover?
14      A.   Yes, sir.

14      A.   Again, I would start with
15  Dr. Gomes.
16      MR. DAVIS:  I'm marking Tab
17  75 which is Exhibit 33.
18      (Document marked for
19  identification as Exhibit
20  PL-Glover-33.)
21      MR. TRISCHLER:  These are
22  marked a little differently than
23  the first set, John, so bear with
24  me while I try to see if I can

Confidential Information Subject to Protective Order

Page 298



20    MR. DAVIS:  I'm going to
21 move to Tab 76, which is now
22 marked as Plaintiffs' Exhibit 34.
23    (Document marked for
24 identification as Exhibit

Page 299

1    PL-Glover-34.)
2 BY MR. DAVIS:
3    Q.   The first page is just a
4 slip page, by the way.  I don't know if
5 I've explained this yet.  That's just a
6 page that produces the file path as it
7 was given to us.  It's not part of the
8 document.  It just includes the file
9 path -- like, some of the metadata that
10 we talked about.
11       If you go to the first --
12 it's a one-page document by itself.  And
13 do you see that it's on Matrix headers?
14    A.   I do.
15    Q.   Okay.  Do you see the date
16 of April 13, 2011?
17    A.   Yeah.
18    Q.   Does this look like to you
19 that it's an approval form for using
20 Lantech for recovered solvent?
21    A.   It appears to be a
22 evaluation report.
23    Q.   And the evaluation comments
24 and handwriting say, "Facility is

Page 300

1 suitable to carry out recovery activity
2 of o-xylene for valsartan for Unit 8"?
3    A.   Right.
4    Q.   Do you know if any other
5 evaluation was actually done of Lantech
6 other than what's reflected in this
7 document, which is checking a few boxes?
8       MR. TRISCHLER:  Objection to
9 form.
10    THE WITNESS:  Yeah, no, I am
11 not aware of or don't know of what
12 else would be out there or what
13 they've done.
14       MR. DAVIS:  Actually, I'm
15 going to show you Tab 77 which is
16 Exhibit 35.
17    (Document marked for
18 identification as Exhibit
19 PL-Glover-35.)
20 BY MR. DAVIS:
21    Q.   The title of this document
22 is "Contract Manufacturer Evaluation
23 Report Review Based on Inspection."
24    Do you see that.

Page 301

1    A.   Yep.
2    Q.   And it lists the company
3 name as Lantech.  It lists the date of
4 inspection as January 25th, 2011.
5       Do you see that?
6    A.   Yeah.
7    Q.   And then there's a
8 multiple-page checklist that follows.
9       Do you see that?
10    A.   Yep.
11    Q.   Number 8 is, "Lab testing
12 facilities found to be adequate."
13       And that's checked yes,
14 correct?
15    A.   Yes.
16    Q.   Number 10 is, "The
17 production and quality assurance
18 departments are independent."  Yes.
19       Do you see that?
20    A.   Yes.
21    Q.   Number 11 on the next page,
22 "Quality assurance system program is
23 functional."  Yes.
24       Do you see that?

Confidential Information Subject to Protective Order

Page 302

1    A.    Yes.
2    Q.    Number 14, "Product failures
3  are reviewed."  Yes.
4          Do you see that?
5    A.    Yes.
6    Q.    Number 23, "Quality control
7  procedures are available and followed."
8  Yes.
9          Do you see that?
10   A.    Yeah.
11   Q.    Number 27, "Quality control
12 is independent of production and
13 decisionmaking."  Yes.
14         Do you see that?
15   A.    Yes.
16   Q.    Number 33, "Validation
17 programs for methods, instruments,
18 personnel are available."
19         Do you see that?
20   A.    Yes.
21   Q.    36, "Testing of raw
22 materials is done prior to release or use
23 in production."
24         Do you see that?

Page 303

1    A.    Yep.
2    Q.    And that's checked yes also?
3    A.    Yeah.
4    Q.    40C, "Following our
5  available validation (process, cleaning
6  and method)."  Yes.
7          Do you see that?
8    A.    Yeah.
9    Q.    45, "Segregation of area is
10 done to prevent cross-contamination."
11 Yes.
12         Do you see that?
13   A.    Yeah.
14   Q.    So Mylan found Lantech
15 adequate in all these areas, at least
16 according to its inspection done in 2011,
17 correct?
18   A.    Yeah.
19         MR. DAVIS:  I'm marking Tab
20 74, which is Plaintiffs'
21 Exhibit 36.
22         (Document marked for
23 identification as Exhibit
24 PL-Glover-36.)

Page 304

1  BY MR. DAVIS:
2    Q.    Do you see the approved date
3  on this?  It appears to be November 28th,
4  2013.
5    A.    Yeah.
6    Q.    Did you catch my question
7  there?
8    A.    I'm sorry.  I said yes.
9    Q.    Oh.  Okay.  Sorry about
10 that.
11         Again, this document is
12 related to Lantech, and it's called
13 "Contract Manufacturer General
14 Information Form."
15         Have you seen this document
16 before?
17   A.    I have not.
18   Q.    Okay.  And the person who's
19 signing it here from Mylan is part of
20 Mylan's quality assurance department, is
21 he not?  Is he not?
22   A.    It's very hard to tell.  I
23 mean, I see a header that says corporate
24 QA India.  And then his -- yeah, his

Page 305

1  designation is GM-CQA.  I can only assume
2  that's quality.
3    Q.    Do you not know whether that
4  designation is part of quality assurance?
5    A.    I can't say definitively.  I
6  would have to again defer to Dr. Gomes.
7  He would know better than me.
8    Q.    Okay.  If you go to the next
9  page.  Do you see Numbered 14, "Is the
10 facility approved by any regulatory
11 agencies?  (USFDA/MHRA/EDQM/TGA, et
12 cetera)"?
13   A.    Yeah.
14   Q.    Do you see where no is
15 checked there?
16   A.    Yes.
17   Q.    What does that mean?
18   A.    I don't know.  I haven't
19 seen the form before.  I'm not sure how
20 they interpret that.
21   Q.    I assume I should talk to
22 Dr. Gomes about that also?
23   A.    Yep.

Confidential Information Subject to Protective Order

Page 306



Case 1:19-md-02875-RMB-SAK   Document 2009-11   Filed 04/12/22   Page 373 of 1280 PageID: 61827



Page 310

Page 314



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order

Page 322



Confidential Information - Subject to Protective Order

Page 326



Confidential Information Subject to Protective Order

Page 330



Confidential Information - Subject to Protective Order



Page 334

9          MR. DAVIS:  I'm marking Tab
10     78 as Plaintiffs' Exhibit 38.
11          (Document marked for
12     identification as Exhibit
13     PL-Glover-38.)
14          THE WITNESS:  Okay.
15  BY MR. DAVIS:

Confidential Information Subject to Protective Order

Page 338



Confidential Information Subject to Protective Order

Page 342

7

8          MR. TRISCHLER:  Hey, John.
9   It's about 6 o'clock.  So I'd like
10  to adjourn, per the deposition
    protocol.  Okay?
11         MR. DAVIS:  Yep.  That's
12  fine.  We can pick it back up on
13  Thursday.
14         MR. TRISCHLER:  We starting
15  at 9:00 a.m. again?
16         MR. DAVIS:  That's fine with
17  me.
18         Mr. Glover, does that work
19  for you?
20         THE WITNESS:  Yes, sir.
21         MR. DAVIS:  Are we off the
22  record?
23         THE VIDEOGRAPHER:  One
24  second.

Page 343

1          The time right now is
2   5:56 p.m., and we're off the
3   record.
4          (Excused.)
5          (Deposition adjourned at
6   approximately 5:56 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 344

1
2          CERTIFICATE
3
4
5          I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
6   deposition is a true record of the
    testimony given by the witness.
7
           It was requested before
8   completion of the deposition that the
    witness, RICHARD DEREK GLOVER, have the
9   opportunity to read and sign the
    deposition transcript.
10
11
12
    _____
13  MICHELLE L. GRAY,
    A Registered Professional
    Reporter, Certified Shorthand
14  Reporter, Certified Realtime
    Reporter and Notary Public
15  Dated:  March 16, 2021
16
17
18         (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24

Page 345

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8          After doing so, please sign
9   the errata sheet and date it.
10         You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14         It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Confidential Information Subject to Protective Order

Page 346

1

- - - - - -
E R R A T A
- - - - - -

2

3

4  PAGE  LINE  CHANGE

5  _____

6  _____  REASON: _____

7  _____

8  _____  REASON: _____

9  _____

10  _____  REASON: _____

11  _____

12  _____  REASON: _____

13  _____

14  _____  REASON: _____

15  _____

16  _____  REASON: _____

17  _____

18  _____  REASON: _____

19  _____

20  _____  REASON: _____

21  _____

22  _____  REASON: _____

23  _____

24  _____  REASON: _____

Page 348

1  LAWYER'S NOTES

2  PAGE  LINE

3  _____ _____  _____

4  _____ _____  _____

5  _____ _____  _____

6  _____ _____  _____

7  _____ _____  _____

8  _____ _____  _____

9  _____ _____  _____

10  _____ _____  _____

11  _____ _____  _____

12  _____ _____  _____

13  _____ _____  _____

14  _____ _____  _____

15  _____ _____  _____

16  _____ _____  _____

17  _____ _____  _____

18  _____ _____  _____

19  _____ _____  _____

20  _____ _____  _____

21  _____ _____  _____

22  _____ _____  _____

23  _____ _____  _____

24  _____ _____  _____

Page 347

1

2     ACKNOWLEDGMENT OF DEPONENT

3

4     I,_____, do

5  hereby certify that I have read the

6  foregoing pages, 1 - 348, and that the

7  same is a correct transcription of the

8  answers given by me to the questions

9  therein propounded, except for the

10  corrections or changes in form or

11  substance, if any, noted in the attached

12  Errata Sheet.

13

14

15  _____

16  RICHARD DEREK GLOVER          DATE

17

18

19  Subscribed and sworn
    to before me this

20  _____ day of _____, 20____.

21  My commission expires:_____

22

    _____

23  Notary Public

24

Confidential Information Subject to Protective Order

## WORD INDEX

**< 0 >**
**01** 19:*20*
**08543** 4:*14*

**< 1 >**
**1** 20:*1* 22:9
37:*22, 24*
76:22 77:1
81:*15* 122:2
130:*12*
132:*16*
157:18 221:4
268:3, 5, 14
310:*14, 23*
311:5, 22
347:6
**1.1** 50:*8*
**1/2/19** 10:*12*
**1:15** 158:5
**1:20** 158:17
**10** 56:*13, 22*
100:*10* 102:8
120:3 239:17
301:*16*
**10/1/14** 8:*17*
**10/17/14** 7:6
**10/4/12** 8:9
**10/5/18** 9:7, 12
**10:29** 85:*20*
**10:38** 85:*24*
**10:40** 88:3
**10:45** 88:7
**100** 2:3
41:*11* 59:16
**1001** 5:*13*
**101** 159:4
**102** 7:*17*
**11** 3:*16*
59:*14* 115:*11*
120:*4, 9, 22*
125:5, *11*
191:*18, 24*
192:*18* 301:*21*
**11/26/18** 9:*17*
**11/29/18** 9:*14*
**11/30/19** 10:6
**11:15** 157:9
**113** 224:*4*

**12** 120:*11*
121:*1, 2, 3*
122:*12* 123:6
124:9 125:*16*
127:*17* 128:8
313:*13* 323:6
**12/10/2018**
268:*16*
**12/3** 268:*15*
**12/31/18** 7:*21,*
22
**12/9/19** 11:*10*
**12:15** 157:4, 8
158:8
**120** 7:*19* 8:6,
9
**128** 8:*12*
224:*4*
**13** 128:8
299:*16*
313:*23* 334:*19*
**134** 8:*13*
**14** 134:8
144:*17*
256:*15* 263:6
302:2 305:9
**14s** 127:*21, 22*
**14th** 103:2
**15** 6:6
108:*17* 159:*4*
160:5 166:*14*
169:9 190:*1*
232:6 251:22
257:*1* 261:7
**15-16** 160:*10*
**15219** 3:5, *10*
**159** 8:*17*
**15-minute**
232:7
**15th** 309:*17*
**16** 173:*18*
174:6 323:*20*
344:*15*
**16th** 174:*24*
**17** 68:*11*
173:*22, 23*
174:*16* 273:*1*
**1717** 4:3
**173** 8:*18, 20*

**18** 126:7
184:*23* 241:*8,*
*11* 264:22
**1835** 2:*17*
**184** 9:6
**19** 174:*24*
200:*21* 212:5
243:9 245:*13*
249:4 271:7
289:4 308:*4,*
17
**190** 3:*21*
**19102** 2:*18*
**19103** 4:4
**19422** 5:8
**1997** 108:6

**< 2 >**
**2** 21:*10* 24:*2,*
3, 6 25:*15, 19,*
21 44:3 77:2
132:*16* 202:6
267:*23* 268:6
272:7
**2.0** 72:9
**2.1** 51:2
**2:45** 233:*1, 5*
**2:50** 233:2
**2:56** 233:9
**20** 20:*18*
56:*14* 59:14
205:24
206:*16, 18, 21*
216:9 219:*11*
277:4 347:*20*
**200** 5:8 9:8
**20004** 5:*13*
**2006** 6:*20*
**2009** 17:*19*
**2010** 17:*20*
**2011** 8:*23*
185:*11* 193:8
241:*21*
296:*20* 297:1
298:5 299:*16*
301:*4* 303:*16*
318:*16*
323:*11*
330:*12, 23*
**2011-2019**
11:*11*

**2012** 129:6
131:*2, 10*
137:6 139:*1*
184:*14* 256:*1,*
3, *10* 263:6
297:*10*
**2013** 241:*18,*
21 304:*4*
**2014** 68:*11*
84:2 101:*1*
104:*21*
124:*10, 20*
125:*16* 126:6,
*18* 173:8
174:*24*
254:*12* 256:*13*
**2015** 137:*10*
160:*10*
166:22
332:24
334:*16*
339:*16* 341:5
**2016** 49:*17, 20*
**2017** 241:*19*
**2018** 104:*18*
120:*19*
121:*12*
124:22
125:*12*
126:*21*
200:*17* 207:3
212:*11, 20*
213:*2, 15*
219:*19* 236:4
239:*18*
259:22
264:*11*
271:*13* 277:7
289:4 308:*12*
317:3 323:*19*
**2019** 103:3
104:*18* 225:6
227:22 228:9
239:*16*
267:*11*
270:22 277:5
282:24
285:*10*
296:*21*
307:*18* 308:6
309:*17*

**2012** 129:6
131:*2, 10*
137:6 139:*1*
184:*14* 256:*1,*
3, *10* 263:6
297:*10*
**2020** 267:*19*
270:*16* 271:*1,*
15 290:8
**2021** 1:*11*
14:*8* 344:*15*
**206** 9:*11*
**21** 4:*14* 6:*14*
22:*13, 15*
190:*18*
191:*23* 206:*1,*
17, *18* 207:7
223:8
**210** 191:*18,*
24 192:*18*
**211.110(a**
196:9
**212** 9:*14*
**214** 5:*4*
**215** 2:*18*
3:*11* 4:4
**219** 9:*17*
**21st** 323:*19*
**22** 212:*4*
224:*20*
**2200** 5:3
**2220** 4:9
**223** 9:*20*
**224** 10:6
**23** 6:*14*
150:*10*
219:*10* 302:6
**230** 4:9
**231-6491** 3:*17*
**239** 10:9
**23rd** 213:2
**24** 23:3
150:*10*
200:*21* 223:9
**245** 10:*11*
**25** 23:3
59:*20* 81:3
206:*1* 224:*20*
**25th** 282:*24*
301:*4*
**26** 206:2
219:*19* 239:8
**263-1840** 3:5

**313:**23 314:3
330:*24* 340:3
**202** 5:*14*

**266** 10:*12*
**267** 10:*16*
**27** 57:*24*
59:*21* 239:*8*
245:*5* 251:*4,*
*6, 10* 302:*11*
**276** 10:*17, 20*
**28** 6:*17*
245:*4* 251:*3*
266:*21*
**28/11/19.PDF**
103:*4*
**282** 11:*6*
**2875** 1:*3*
**28th** 304:*3*
**29** 97:*8, 21*
212:*11, 20*
267:*2, 11*
**2900** 2:*17*
**295** 11:*8*
**298** 11:*11*

< 3 >
**3** 23:*13* 24:*2*
28:*9* 73:*10*
79:*22* 80:*5*
129:*21, 24*
166:*24* 173:*7,*
*12* 174:*22*
190:*11* 207:*7,*
*14* 240:*21*
267:*21*
282:*21* 313:*12*
**3.0** 335:*7*
**3.1.1** 136:*1*
**3.7** 335:*13, 23,*
*24*
**3/20/19** 10:*19*
**3/4/19** 10:*9*
**3/6-15/2019**
11:*21*
**3:28** 261:*20*
**3:30** 232:*3, 5,*
*8, 14*
**3:45** 261:*9*
**3:48** 261:*24*
**30** 97:*13*
225:*6* 276:*17*
277:*4* 293:*6*
345:*16*

**30(b)(6** 21:*20,*
*23* 22:*11, 16*
110:*17*
**300** 11:*14*
**303** 11:*18*
**308** 11:*19*
**30th** 225:*3*
**31** 276:*22*
277:*18*
**312** 4:*10*
**314** 3:*22*
**317** 3:*17*
**31st** 120:*19*
121:*12* 125:*12*
**32** 282:*12*
**327-9166** 2:*18*
**33** 295:*17*
302:*16*
**334** 12:*6*
**33950** 2:*13*
**34** 6:*19*
298:*22*
**345.6664** 3:*22*
**348** 347:*6*
**35** 300:*16*
**351(a)(2)(b**
190:*19*
**356h** 183:*24*
281:*14, 19*
283:*7* 285:*14,*
*20* 287:*20*
288:*1*
**36** 240:*21*
241:*8, 11*
243:*9* 302:*21*
303:*21*
**3600** 5:*3*
**37** 308:*22*
**38** 334:*10*
**38th** 3:*4*
**3rd** 239:*17*

< 4 >
**4** 34:*15* 35:*4,*
*15* 73:*19*
100:*11*
116:*13*
122:*11* 138:*2*
169:*9* 177:*9,*
*13* 185:*17*

**323:*5*
**4.0** 336:*16*
**4.5** 339:*9*
**4:26** 293:*22*
**4:57** 294:*2*
**40C** 303:*4*
**41** 135:*3*
150:*9*
**412** 3:*5*
**45** 292:*9*
303:*9*
**450** 5:*8*
**46204** 3:*16*
**47** 6:*20*
**483** 10:*11*
227:*21*
240:*13* 251:*9*
256:*21*
268:*17*
309:*16*
310:*12*
311:*14* 315:*6,*
*15* 316:*1*
317:*19, 21*
329:*11*
**483s** 119:*4*
290:*21* 291:*1,*
*13*
**49** 103:*8, 14*
**4th** 239:*16*

< 5 >
**5** 35:*1, 15*
37:*24* 48:*1*
73:*20* 74:*16,*
*20* 103:*6, 8*
116:*14* 190:*9*
204:*3* 207:*14*
257:*1* 313:*13*
329:*10* 330:*5*
**5.16** 142:*20,*
*22* 144:*17*
**5.16.3** 145:*21*
**5.22** 150:*10*
**5.23** 151:*14*
**5.4** 138:*6*
**5:56** 343:*2, 6*
**5010** 3:*10*
**504** 2:*9*
**50-page**

**102:*16*
**512** 2:*4*
**524-5777** 2:*9*
**566.4808** 4:*10*
**567-0700** 5:*9*
**57-page** 160:*8*
**58** 102:*8*
**59** 266:*20, 21*

< 6 >
**6** 37:*17, 18*
48:*1* 54:*23*
67:*21* 75:*7*
162:*13* 196:*6*
251:*22* 323:*6*
331:*4* 342:*8*
**6.1** 54:*23*
**6.6.24** 57:*13*
**6.6.25** 57:*4*
**6.6.29** 58:*20*
61:*23*
**6.6.31** 58:*22*
**6.6.35** 62:*21*
**6/10/12** 7:*16*
**6/23/15** 12:*7*
**6/23/20** 10:*14*
**6/29/18** 9:*8*
**60** 266:*20*
267:*1*
**600** 3:*10, 21*
**6001** 2:*3*
**60606** 4:*10*
**609** 4:*15*
**610** 5:*9*
**624-2774** 5:*14*
**63105-3433**
3:*21*
**639-1158** 2:*13*
**64** 276:*17*
**65** 276:*21*
**67** 7:*6*
**69** 7:*8*
**6th** 309:*17*

< 7 >
**7** 67:*20* 69:*1*
74:*10* 86:*4, 7*
88:*13* 97:*6*
105:*8* 111:*21*
121:*18, 23*
122:*3, 5*

**123:*6* 161:*19*
162:*13* 203:*22*
**7/15-16/2015**
8:*16*
**701** 2:*8*
**70130** 2:*8*
**71** 282:*12*
**72** 308:*22*
**734-6358** 4:*15*
**74** 303:*20*
**75** 295:*17*
296:*1, 3*
**75201** 5:*4*
**76** 298:*21*
**77** 300:*15*
**78** 334:*10*
**78746** 2:*4*
**795-8686** 2:*4*

< 8 >
**8** 7:*19* 26:*3*
49:*8, 13* 51:*7,*
*10* 52:*2, 8*
68:*7* 72:*15*
97:*22* 98:*8*
101:*2* 103:*3,*
*14* 129:*24*
135:*22*
136:*24* 150:*9*
156:*8* 180:*13*
181:*1* 200:*18*
201:*5* 203:*20,*
*24* 221:*9, 13*
222:*12*
223:*22* 224:*1*
235:*12, 20*
239:*15, 22*
267:*12*
269:*12, 15, 23*
277:*6* 287:*4*
300:*2* 301:*11*
334:*19*
**8/19/19** 11:*6*
**82** 22:*13, 15*
**855-8000** 5:*4*
**877.370.3377**
1:*21*

< 9 >

**9**  1:*11*  14:7
37:3  99:6
202:6  203:*21*
**9/15/14**  7:*12*
**9:00**  342:*15*
**9:02**  1:*15*
14:8
**917.591.5672**
1:*21*
**941**  2:*13*
**95**  339:2
**97**  7:*10, 15*
79:*17, 21*
**979-1159**  3:*11*
**98**  79:17
**988-7800**  4:4
**99**  2:*12*  79:17

**< A >**
**a.m**  1:*15*
14:8  85:*20,*
*24*  88:3, 7
342:*15*
**ability**  71:*14*
151:*3*  222:5
252:22  253:6
**able**  47:*18*
177:2  193:*17*
244:*10*
285:*21*
288:*14*  324:6,
*22*
**absolutely**
316:*19*  326:*1*
**abstract**
46:*21*  47:3
55:9  65:*1, 6,*
*19*
**accept**  64:*20*
65:9  66:3
**acceptability**
327:5
**acceptable**
59:6  61:8
62:4, 7  63:*10*
64:*1, 3*  79:8,
*11, 18*  80:15
113:*19*  222:20
**acceptably**
60:*12*

**acceptance**
161:*18*
163:*16*
164:*14*  165:*3,*
*20*  166:6
186:22
187:*13, 16*
188:*14*  189:7,
*22*  210:7
260:*16*
**accepted**  60:*11*
**accepting**
63:*13*
**access**  181:*23*
320:5  322:4
**access-
controlled**
336:*22*
**accomplished**
184:*20*
**accurate**
250:3  345:*20*
**accurately**
84:3  279:*19*
**accusations**
317:*15*
**achieve**  39:5
40:*14*  79:*17*
112:*15*
**acid**  82:*14*
83:5  105:*18*
106:*20*  118:3
252:24  253:8,
*11*  254:2, 4, 5
255:8  312:7,
*19*
**acknowledge**
169:*23*
**ACKNOWLE
DGMENT**
347:2
**acquiring**
320:*19*  321:*18*
**acronym**
36:*20*  53:*17*
168:2
**Actavis**  4:6, 7
**action**  115:*18*
325:9  335:3
341:*15*

**actions**  51:*21*
53:*16*  75:8
225:*13*  341:*20*
**Activities**
7:*18*  77:*13*
118:*15*
**activity**  43:*14*
46:*15*  118:*10*
300:*1*
**actual**  76:*18*
183:*1*  208:*21*
240:*23*  275:6
**add**  123:*16*
246:8  327:*23*
**added**  178:*16*
275:8
**adding**  155:*16*
156:*4*
**addition**  45:8
320:5
**additional**
75:*13, 14, 16*
76:*1*  77:*18*
115:22
122:*16*  123:*5,*
*16*  178:*15*
229:*11*  230:5
231:5, 7, 9
236:*17*  238:*2,*
*3, 4, 20*  246:9
325:*11*
**address**  53:*24*
112:5
**addressees**
212:*15*
**addresses**
212:*16*
**adequacy**
73:*12*
**adequate**
51:*20*  271:*21*
301:*12*
303:*15*  331:5
**adjourn**  342:9
**adjourned**
343:5
**adjustments**
140:*10*
**administrator**
314:4  315:22

319:3  320:*1,*
*21*  321:7
**administrators**
322:*13*
**admission**
315:*21*  316:6
**admit**  287:23
**admitted**
322:*16, 21*
325:4
**admitting**
245:23
**adopted**  132:2
**adverse**
341:*15*
**affairs**  283:*21*
**affect**  47:8
153:*24*  334:24
**agencies**
305:*11*
**agency**  114:4
193:*16*
**agents**  100:*14,*
*20*  101:6, *13,*
*16*  104:22
106:*20*
252:23  253:7
254:*14*
**ago**  17:8, *11*
24:*14*  108:5
185:*15*
**agree**  25:3
38:*11, 14*
41:*23*  44:*23*
45:5  50:*19,*
*22*  65:7, 22
76:*17*  82:8,
*22*  84:*1, 15*
90:5, *20*  91:2
150:*16*
151:*16*
152:*12, 14*
153:2  155:*15*
156:3  162:*15*
168:9  190:*16*
191:*1, 11, 21*
193:*4*  236:23
256:5  272:*14*
319:8

**agreed**  14:*20*
78:*18*  79:*15*
87:*1*  238:8
**ahead**  39:22
74:*17*  98:*12*
141:7  218:*12*
266:*18*  317:9
321:*15*
**Aid**  3:*18*
**alert**  289:*10,*
*17, 21, 23, 24*
290:6, 8
317:22
**ALFANO**  3:*1*
**algorithm**
216:*19*
**Alkyl**  7:*13*
97:*24*  98:7,
*15*  100:*24*
**allegation**  19:6
**alleged**  19:*4*
**allowable**
113:*11*
**allowed**  210:*1*
290:*1*  291:3
**aloud**  167:9
**amend**  40:23
**Amended**
6:*14*  23:*13*
252:4  278:*17,*
*20*
**amendment**
141:*23*  142:*4*
**amendments**
142:9  192:*24*
288:*13*
**America**
131:*15*
**Amines**  7:*13*
97:*24*  98:7,
*15*  100:*24*
**amount**
145:*11*  339:*4*
**analysis**  30:*21*
117:*24*
243:*20*
314:*16*
323:*22*
325:*11*  333:*10*
**analyte**  78:*14*
275:6  338:8

Confidential Information Subject to Protective Order

analytical
30:*12*  77:*19*
145:*5*  178:*24*
268:*22*  314:*5*
331:*14*
and/or  92:*12*
101:*17*
216:*16*  331:*8*
344:*21*
ANDA  11:*7*
286:*10, 16*
287:*6, 11, 21*
288:*3, 4, 10,*
*12*  298:*7*
ANDAs
297:*19*
announced
241:*3*
annually  178:*1*
Answer  13:*5*
31:*6, 9, 11, 14*
32:*3*  34:*8*
39:*14, 21, 23*
47:*18*  51:*3*
66:*7, 9*  67:*9*
80:*8*  82:*17*
90:*13*  92:*6*
93:*1*  95:*10*
100:*6*  104:*12*
105:*24*  106:*3*
125:*21*
138:*21*
144:*11*
151:*23*  153:*8*
154:*5*  169:*15*
193:*23*  199:*4*
200:*2*  213:*10*
244:*10*
250:*18*  262:*7*
277:*24*
280:*14*
298:*14, 17*
306:*10*
315:*12*  316:*7*
answered
39:*13*  49:*5*
66:*6*  105:*21*
164:*22*
169:*12, 13*
238:*15*
254:*16*  260:*12*

answering
41:*3*
answers  347:*8*
anticipate
123:*17*
257:*10*  313:*7*
anticipated
55:*3*  97:*2*
257:*5, 14, 23*
258:*8*
anticipating
172:*8*
Antony  52:*18*
71:*13, 17*
128:*4*  296:*18*
333:*12, 15*
anymore
108:*13*
216:*15*  248:*15*
anyway  18:*2*
API  45:*9*
49:*4*  51:*5, 10*
52:*17*  53:*2*
68:*17*  72:*15,*
*20, 22*  77:*11*
89:*21*  91:*8*
135:*19*  137:*1*
143:*4, 7, 8, 9,*
*20*  144:*21*
150:*2*  163:*22*
164:*1, 20*
170:*15, 22*
171:*4*  173:*13,*
*16*  174:*21*
197:*11*  198:*2,*
*3, 21*  208:*12*
210:*3, 6*
211:*5*  213:*7,*
*16*  221:*23*
222:*16*  234:*5*
239:*23*  240:*4*
257:*5*  278:*2*
279:*21*  283:*4,*
*9, 17*  284:*22*
287:*4*  326:*8,*
*10, 17*  333:*18*
APIs  187:*8*
269:*18*  270:*5*
331:*6, 16*
Apologies
177:*5*  241:*11*

apologize
15:*23*  17:*23*
98:*9*
appear
212:*15*  246:*18*
APPEARANC
ES  2:*1*  3:*1*
4:*1*  5:*1*
appearing
14:*19*
appears  56:*13*
70:*17*  135:*18*
207:*8*  208:*24*
211:*24*
212:*14*
242:*15, 18*
249:*19*  283:*5*
299:*21*  304:*3*
applicable
51:*5, 7*  56:*2,*
*7*  65:*2*  72:*12*
109:*12*
application
143:*24*
189:*23*
222:*19*
286:*10*  287:*3,*
*7, 11*  316:*16*
applications
34:*10*  55:*23*
139:*9*  322:*11*
applied  44:*9*
45:*7*  49:*8, 12*
78:*3*  89:*24*
148:*24*  149:*2*
216:*19*
APPLIES  1:*6*
48:*10*
apply  54:*5*
55:*16, 21*
77:*18, 20*
135:*18*
332:*19*
333:*19*  344:*19*
applying
332:*22*
appreciate
94:*23*  261:*17*
approach
38:*18*  40:*12*
95:*1*  272:*6*

appropriate
169:*22*  231:*6*
246:*11*  276:*8*
332:*9*  345:*6*
appropriately
331:*13*  332:*6*
approval
132:*23, 24*
133:*1, 5*
139:*2, 15, 20,*
*21, 23*  140:*2,*
*12, 21*  141:*3,*
*9*  144:*9*
172:*2, 8, 13*
298:*6*  299:*19*
approve  202:*9*
approved
78:*2*  202:*10*
222:*19*
263:*23*  264:*5*
279:*13*  304:*2*
305:*10*  306:*3,*
*19*
approving
294:*16*  295:*9,*
*12*
Approximately
17:*17*  23:*3*
24:*13*  108:*16*
343:*6*
April  290:*8*
299:*16*
arbiter  192:*17*
Arch  4:*3*
archived
140:*23*  142:*14*
area  78:*12*
214:*17*  303:*9*
areas  51:*19*
303:*15*
argued  274:*7*
arguing
188:*23*  208:*15*
argument
208:*23*
235:*14*
272:*16, 18*
arrive  59:*2*
61:*6*  63:*6*
80:*14*
arrived  57:*12*

arriving  60:*1,*
*3*
article  18:*19*
articles  18:*5*
articulate
146:*9*
articulating
83:*16*
aside  263:*9*
asked  31:*13*
39:*13*  66:*5*
105:*21*  117:*7*
119:*19*
164:*22*
169:*12, 13*
182:*9*  238:*15*
254:*16*
260:*12*  276:*12*
asking  83:*22*
109:*15*
117:*15*
118:*17*
119:*17, 24*
125:*4*  130:*17*
220:*14, 17*
256:*3, 11*
260:*5*
aspects  44:*9,*
*10*  123:*3*
178:*7*
assess  51:*17*
312:*16*  313:*9*
assessed  41:*17*
assessing
50:*10*
Assessment
7:*7, 10*  8:*6*
45:*15, 22*
46:*4, 24*  47:*6*
54:*24*  55:*12*
56:*21*  67:*15*
68:*14*  70:*18*
72:*12*  73:*11*
74:*22*  75:*2*
76:*12, 18*
84:*2*  88:*14*
105:*9*  115:*20*
116:*3, 19*
117:*2, 9, 17*
121:*5*  122:*13*
123:*1*  124:*2,*

Confidential Information Subject to Protective Order

8 127:4
131:2 138:6,
9, 17 154:10
155:7 156:24
161:21
175:10 176:1,
13 178:21
245:20
247:15, 16, 17,
23 255:17, 20,
22 256:7, 9
258:3, 24
259:4, 10, 19
260:8 262:14
263:2, 11, 17
264:8, 15
270:9, 13
271:22
272:11 313:2
319:18
**Assessments**
7:17 45:13
47:15 55:9
56:13, 16
73:2 248:1, 2,
4 260:9 263:4
**associated**
18:4 50:11
57:9 144:19
273:11
**assume** 25:10
99:13 152:11
176:14
223:23 305:1,
21 306:18
314:15 319:2
**assumes** 80:23
**assuming**
16:23 34:24
74:9 114:15
152:13, 23, 24
222:23
234:17
290:15 315:6
**assumption**
211:11 260:20
**assurance**
29:11, 13, 17,
24 30:6, 14,
23 31:20
32:2, 10

45:20 135:14
187:5 210:5
259:3 301:17,
22 304:20
305:4 325:4
335:2
**attach** 178:18
**attached**
279:7 345:12
347:11
**attaches** 174:7
**attachment**
68:4, 21 98:3,
4, 11 120:10
121:3 125:15
206:22 223:6
265:16
277:15, 19, 22
280:20 282:22
**attempt** 19:14
66:12 259:21
**attempted**
76:14
**attempts** 64:11
**attention**
15:22 245:12
247:9 251:22
**attorney**
345:16
**attributes**
112:18 187:9,
12 188:8, 10,
11 189:11, 13,
15, 17
**audio** 142:7
**Audit** 8:18
9:6, 9 12:6
174:17
182:20
200:18 201:5
202:9 203:22
206:23 207:3,
4, 9, 16 234:1,
3 318:11, 23
320:8 322:6
330:12
334:17 339:6
**auditing**
307:10
**auditors**
334:22

**audits** 182:6
307:15
**augmentation**
217:4
**August** 264:11
**Aurobindo**
5:10
**Austin** 2:4
**author** 225:15
**authorities**
60:19 78:19
80:14 289:18
**authority**
80:21 133:6
140:8 141:11,
16 143:18
172:11
**authorization**
133:21
**automatically**
338:14
**availability**
178:17
**available**
144:3 302:7,
18 303:5
318:21
330:14
335:15, 20
339:11
**Avenue** 5:3, 13
**avoid** 101:5,
12 104:21
**avoided**
100:14
**aware** 114:3,
10 202:13
205:14
221:13
227:10 248:5
255:18
262:13 263:3,
11, 16, 18
300:11
**azide** 312:9

**< B >**
**back** 37:22
41:8 47:19
59:14 86:1
88:8 93:6, 22

94:1 95:12
97:5 105:8
122:11
134:10, 21
137:6, 13
140:9 144:5,
16 157:15
158:18
159:23 160:2
163:5 166:13
187:20 188:8
213:7 221:6
225:5 233:10
251:1 256:23
260:22 262:1,
6, 9 263:5
274:21
292:22 294:3
298:5 315:1
324:13
327:17 340:5
342:12
**background**
26:10 281:1
**backing** 314:6
315:24
316:13 319:5
**Backup** 10:19
277:11
279:12
280:22
322:23
339:10, 11, 22,
23 340:13, 18,
22, 23 341:6
**backups**
316:20
**bad** 292:5, 12,
14
**banned**
289:22 317:23
**BARNES** 3:15
**Based** 11:16
31:12 48:13
49:4, 17
70:18 75:8
91:10 98:14
101:1 115:16
138:22
139:18 153:8
163:1 179:4

192:5 214:4
240:8 243:1
260:15, 20
265:5, 7
272:15, 22
275:21
280:20
300:23
307:12
319:12 341:17
**basically**
18:22 37:14
75:24 77:23
91:14 139:18
149:16 228:6
258:16 268:4
310:23
**basis** 56:1
79:12 123:24
124:5
**batch** 77:17
108:21, 24
109:4, 18
146:5 148:4,
5, 8, 10, 14, 17
149:4, 8, 11,
13, 14, 15, 16
186:14
199:14
210:11, 20
238:10 252:5
260:23 261:2
314:16
326:10 327:16
**batches** 132:5
148:10, 22
149:5 150:6
178:24
199:12, 16, 19,
22 210:13, 14
243:17, 21, 23
247:4, 5, 11
249:24 326:4
328:11
**battery** 210:2
**bear** 90:4
295:23
**becoming** 38:8
**began** 282:8
**beginning**
1:15 108:3

**behalf** 24:*23*
237:*11*
**believe** 42:*12*
52:*10* 70:*1*
82:*4, 7* 86:*4*
106:*23* 109:*2*
111:*21* 130:*7*
135:*8* 161:*20*
162:*9* 164:*24*
166:*14, 23*
167:*24*
169:*20* 209:*1*
239:*24*
240:*15* 250:*8*
251:*3* 307:*20*
**Bell** 5:*8* 310:*8*
**benefit** 60:*13*
**benefiting**
104:*16*
**best** 31:*11*
36:*23* 37:*6*
49:*14* 70:*11*
81:*12* 191:*5*
192:*20* 193:*5,
17, 23* 324:*24*
**Beth** 5:*20*
**better** 49:*5*
116:*23* 128:*5*
305:*7*
**beyond** 64:*17*
67:*7* 82:*16*
85:*12* 90:*11*
92:*1, 20* 94:*4*
104:*9* 105:*2,
22* 106:*21*
125:*2* 126:*1*
139:*20*
149:*22, 24*
154:*3* 213:*9*
236:*5* 250:*16*
257:*16*
264:*12*
291:*20* 298:*12*
**big** 37:*13*
319:*6, 7, 12*
**bind** 37:*12*
**binder** 21:*10*
**Bio** 200:*9*
**Biocon** 9:*6, 11*
200:*6, 11, 13,
18* 201:*6*

202:*12, 17*
204:*11*
206:*23* 207:*3,
4, 9, 16*
211:*20*
221:*21* 234:*19*
**B-I-O-C-O-N**
200:*11*
**Biocon's**
234:*1, 3*
**biological**
44:*19*
**biological/biote
chnological**
44:*15*
**biotechnologica
l** 44:*19*
**bit** 66:*17*
145:*1* 156:*6*
160:*24* 209:*7*
231:*21* 309:*8*
**black** 195:*23*
**black-and-
white** 194:*3*

**BLACKWELL**
3:*20*
**blank** 72:*5*
224:*12, 15*
**blanket** 168:*24*
**Block** 330:*5*
**Blue** 5:*8*
22:*14*
**body** 114:*11,
13*
**Bold** 2:*3*
**borrowing**
342:*3*
**BOSICK** 3:*1*
**bottom** 25:*14,
23* 26:*2*
37:*19, 24*
44:*2* 74:*20*
75:*23* 76:*9*
100:*10* 103:*7*
185:*17, 18*
203:*22*
219:*22*
225:*10* 226:*1*
240:*23*
267:*23* 268:*5,

13* 272:*24*
313:*13* 319:*22*
**bound** 31:*24*
**boxes** 300:*7*
**Brad** 87:*12*
159:*22* 203:*6*
**Bradley** 5:*20*
86:*14* 87:*6*
**Brad's** 86:*23*
**break** 81:*4*
85:*14, 18, 22*
86:*7* 88:*5, 18*
157:*5, 10*
158:*24*
231:*20* 232:*7,
13, 18, 19*
233:*7* 261:*4,
22* 262:*4*
292:*20*
293:*12, 16, 24*
**BRIAN** 4:*3*
**bridge** 111:*18*
**briefly** 14:*23*
**bring** 290:*1*
**bringing**
236:*10*
**broadly**
172:*17*
**brought** 35:*11*
**BS** 107:*22*
**built** 50:*23*
**bullet** 167:*10*
227:*5* 249:*14*
268:*20*
**bulleted** 169:*8*
**bunch** 78:*15*
209:*13* 238:*20*
**bundled**
211:*3* 221:*23*
**business**
138:*11*
189:*14*
200:*15* 291:*8*
292:*1*
**butcher**
130:*14*
**butchering**
338:*10*
**buy** 99:*4*

**byproduct**
253:*13, 21*
254:*1*
**byproducts**
91:*20* 253:*14,
19*

**< C >**
**C.F.R** 191:*23*
**CAITLIN** 5:*7*
**calculate**
274:*21* 339:*4*
**calculation**
78:*13* 293:*3*
**Call** 10:*20*
20:*21* 21:*3*
22:*8* 52:*24*
108:*7* 209:*19*
210:*15* 232:*3,
10* 245:*12*
277:*11*
279:*12* 280:*22*
**called** 103:*17*
113:*2, 3*
148:*21* 149:*4,
14* 150:*6*
174:*8* 198:*7*
199:*15* 304:*12*
**calling** 29:*4*
247:*9* 296:*1*
327:*19*
**calls** 289:*13*
**camera** 16:*13,
15* 134:*20*
159:*23* 160:*2*
**Camp** 2:*8*
**CAPA** 53:*17,
19, 22* 54:*5,
11* 62:*2*
175:*21*
225:*11, 18, 19*
226:*4, 20*
**capability**
215:*6* 216:*2,
5, 13, 17, 18, 22*
217:*1, 3, 8, 11,
16*
**capable** 186:*3*
**capacities**
41:*18* 284:*5*

**capacity** 91:*1*
104:*13* 106:*1*
284:*12*
286:*12* 306:*15*
**CAPAs** 54:*20*
59:*1* 62:*22*
75:*16* 176:*3*
225:*12* 252:*4*
**CAPAs_Comm
ents** 174:*8*
**capture** 215:*3*
**captured**
180:*5*
**captures**
127:*11*
**Cardinal** 5:*15*
**care** 16:*24*
**career** 108:*3*
**careful** 264:*14*
**carefully**
99:*19* 345:*4*
**Carondelet**
3:*21*
**carrier**
274:*13, 15*
275:*7*
**carry** 300:*1*
**carrying** 96:*1,
22*
**carryover**
81:*15* 82:*10,
24* 84:*8* 89:*5*
90:*6* 91:*5, 19,
22* 92:*10*
95:*16, 19, 21,
23* 96:*2, 4*
105:*14* 112:*6*
274:*22*
**carryovers**
91:*16*
**case** 17:*8*
22:*11* 24:*12*
25:*3* 61:*21*
65:*16* 89:*12*
90:*9* 115:*1*
139:*1* 143:*19*
146:*13*
172:*21*
184:*12* 192:*5*
194:*7, 20*
195:*11* 239:*4,

5  252:7
275:5  279:23
340:16
case-by-case
146:20
CASES  1:6
17:7  21:17
45:24  80:11
146:7  194:18,
20  195:8, 12
catch  304:6
categories
57:17
category
59:15  60:1
cause  83:10,
12, 17  90:21
91:3  92:9
106:16
122:15
155:12  291:16
caused  89:15
271:24
causes  310:17
311:2, 24
causing
196:16, 23
caution  110:3
CC  138:5, 16
cct@pietragallo
.com  3:6
CDER  167:24
168:1
center  35:12
168:3
Centre  3:4
certain  53:7,
9  59:18
79:16  102:22
130:10
132:11
136:23  137:7
142:19  144:4
171:2  181:6
183:2  194:17,
20  195:7, 12
211:15
216:10  220:6
238:1  239:5
244:7  263:6
278:15

286:14
287:15
290:23  291:2,
12  309:23
315:7  340:11
certainly
110:13  140:5
307:7
certificate
314:15  344:2
certification
344:18
Certified  1:17
344:13, 14
CERTIFY
344:5  347:5
certifying
344:22
cetera  124:17
145:6  179:1
283:12  305:12
cGMP  191:17
193:10
283:11
290:12
306:23  325:24
chain  52:3, 6
129:5, 9, 21
132:15  207:2
287:9
challenged
215:12
chance  22:3
34:22  36:7
48:4  128:14
129:2  206:12
262:5
Change  8:12
121:22  128:6
130:9  132:17,
19, 22  133:2,
12  134:1, 2, 6
135:6  136:3,
10, 11, 19, 22
137:3, 19
138:15, 16
139:4, 12, 13,
22  141:10
142:16
144:18
145:10, 12

147:9, 11
150:19
151:13, 17
152:3, 9, 12,
13, 14, 24
153:2, 3, 10
156:12, 18, 23
208:9  226:22
229:23  346:4
changed
122:9, 21
124:23  139:20
changeover
250:7
changes
125:20
126:21  138:9
139:18
140:13, 23
142:2, 14
143:2, 4, 11,
15  144:6, 22
145:2, 22
150:12
172:10  307:6
345:11  347:10
changing
155:16
characteristics
196:17, 24
characterizatio
n  316:5
characterize
96:17
characterized
58:3, 6
chart  76:3
Charting  9:20
chat  16:20
checked
301:13  303:2
305:15  330:13
checking
300:7
checklist  301:8
chemical
107:3
Chemicals
97:24  98:8,
16  99:14, 20

chemist
106:22  107:17
Chemistry
103:18
107:22  108:2,
9, 11, 12, 15
214:18  255:13
Chicago  4:10
chloride
213:19, 23
226:9, 16
243:16
249:10
312:11  323:21
choice  77:15
choose  178:18
209:15
chromatograph
ic  320:1
chromatograph
y  313:24
314:11
chronological
171:15
CIPRIANI  5:7
circumstances
192:6  254:6
citation  330:24
claim  218:1
claims  317:15
clarification
208:1  215:23
297:16
clarified  179:2
clarify  35:17
69:24  115:10
classified
336:6  339:16
341:7
classify  197:9
Clawlor@c-
wlaw.com  5:9
clean  274:19
276:4
cleaned  275:20
cleaning
272:6  273:13,
16, 17  274:3
275:3, 23
276:9  303:5

cleanup
157:13
clear  24:1
86:19  155:5
226:24  274:1
310:11  340:17
clearance
133:9, 18, 20
clearly  48:22
187:24
199:23  279:13
CLEM  3:3
19:17  20:24
21:11  23:13
86:24  88:22
90:22  134:19
206:15  261:6
265:13  266:8
292:5
closed  73:11
226:21
closely  172:13
182:24
closer  284:23
cluster  52:12,
22, 23  53:1, 3
clustered
198:6
CMO  20:18
CMU  11:14,
18  156:11
281:10  294:6
CMVEH
241:22  242:2
Code  9:21
81:24  130:4
Codes  9:20
82:24  224:5
229:19
coincide  118:9
coincidental
148:2
coincides
133:4  172:12
colleagues
220:8
collect  232:21
collection
185:23
column
103:16

Confidential Information Subject to Protective Order

106:24  107:3,
4  111:20
123:4  164:8
176:19
178:21
220:24  330:6
**columns**
175:15
220:11  224:15
**combination**
80:19  287:6,
19
**combined**
234:4  235:12
**come**  47:19
54:20  94:10
97:5  157:15
176:7  240:7
280:2  292:22
315:1
**comes**  32:20
45:21  46:1
113:20
124:14
126:10  306:24
**comfortable**
222:18
**coming**  97:1
106:11
172:10
266:16  335:12
**command**
52:3, 7
**commences**
122:17
**Comments**
8:18  35:10
299:23
**commercial**
46:10  186:1
247:5

**commercialized**
130:9
**commercializin
g**  149:20
**commission**
347:21
**commissioning**
180:17

**commitment**
226:13  227:6,
11
**committed**
173:9  248:13
**committee**
36:21
**common**
113:18, 24
230:9  315:17
317:19
**commonly**
189:14
**communicated**
141:10
308:11, 16

**communication**
58:17  141:15
144:5
**communication
s**  110:14
**community**
60:20
**companies**
335:12
**company**  28:1
30:8  98:18
181:2  244:15
301:2
**comparison**
111:23  112:4,
13  255:8
**complaint**
33:18
**complete**
83:19
**completed**
220:19, 24
224:12
**completely**
15:1  43:15
317:18  322:24
**completion**
73:4  220:18
344:8
**Compliance**
8:20  9:11
174:17
306:23  335:1

**compliance-
related**  30:16
**compliant**
43:3
**comply**  147:13
**component**
38:9
**components**
96:19  190:12
**compound**
82:3, 6  105:12
**compounds**
81:16  84:9
90:7  91:5
92:11  112:7
123:7, 20
**comprehensive**
190:5  209:2
258:18
**comprehensivel
y**  240:6
268:12
**computer**
16:12  223:17
336:21
**concentration**
274:20
**concept**
216:16
**concerns**
130:18
131:21
230:11  256:4
275:18
**concerted**
32:23
**concluded**
259:11  291:24
**conclusion**
115:12, 13
**concurrence**
286:9
**condition**
334:23  335:1
**conditions**
104:2  144:20
187:19  269:1
**conduct**  67:15
**conducted**
73:4  91:4
154:9  192:5

262:24
263:15
268:15  313:1
**conducting**
18:11  45:12
55:8
**CONFIDENTI
AL**  1:6
**confirm**  290:4
324:18
**conflict**
321:13, 17
**conform**  331:7
**confused**
117:6  168:15
234:2
**confusing**
175:11
204:15, 23
205:1, 15
256:8  298:2
**confusion**
71:24  231:7
**consider**  61:8
123:20  124:5
341:22
**consideration**
150:21, 22
274:4
**considerations**
150:23
**considered**
62:3, 6  75:15
123:9
**consistency**
186:14
**consistent**
32:24  33:9
330:19
**consistently**
186:4  187:7
**constituting**
78:12
**consume**
130:18  133:10
**consumer**
241:3
**contact**
174:22
176:16  259:9

**contacted**
262:15
**contain**  101:7,
17  104:23
312:17
**containing**
247:7
**contaminated**
85:1  167:13
168:13, 17, 20,
21
**contamination**
77:2, 10  78:6,
24  80:2
84:11  88:24
90:8  91:7
92:12  105:19
112:5  113:5
153:23  164:4,
12, 19  169:21
214:2  262:16
265:2  270:5,
18  271:18, 24
274:18  278:21

**contaminations**
273:14
**Cont'd**  3:1
4:1  5:1  7:2
8:2  9:2  10:2
11:2  12:2
158:20
**contemplated**
41:16  83:15
138:24  144:7
153:21
156:18  236:18
**contend**
263:10  276:7
**content**  78:14
**contents**  72:7
148:24
**context**  34:5
40:22  45:15
61:19  68:5
84:18  161:14
162:21, 24
163:2, 19
164:16, 19
169:19  179:5
208:1  221:18

Confidential Information Subject to Protective Order

228:*14*
236:*20*
244:*23*
255:*16*
280:*19* 310:*5*
315:*16*
317:*18* 323:*1*
**contexts** 41:*12*
**continue**
228:*18* 293:*13*
**continued**
171:*12*
**continuing**
328:*15*
**continuous**
54:*9*
**Contract**
11:*11* 155:*17*
156:*10*
183:*23*
200:*14*
275:*12*
283:*10* 291:*5*
294:*6* 300:*22*
304:*13* 306:*22*
**contradiction**
323:*10*
**contributed**
123:*8, 21*
**contributor**
214:*1*
**control** 29:*11,
12, 17, 24*
30:*7, 9, 11, 19*
31:*15* 32:*1, 8*
38:*21* 39:*7*
40:*6, 16*
75:*13* 77:*18*
113:*13*
132:*17, 19*
133:*3, 12*
134:*6* 136:*4,
10* 137:*4*
138:*16* 139:*5,
12, 14* 152:*3,
9* 156:*24*
196:*11*
226:*22* 252:*6*
302:*6, 11*
313:*19*
318:*14, 20*

320:*4* 323:*16*
325:*3* 331:*5*
336:*11, 14*
337:*11* 344:*21*
**controls** 19:*3*
42:*16* 73:*24*
75:*15, 16*
76:*1* 107:*1*
115:*22*
122:*16*
123:*17*
136:*11, 19, 22*
137:*20* 246:*9*
313:*17* 335:*10*
**convenient**
140:*3* 178:*14*
**convention**
48:*10, 16*
103:*7* 202:*5*
240:*22*
**conventionally**
54:*6*
**conversation**
41:*9* 147:*2, 5*
161:*11* 203:*8*
259:*23* 315:*8*
333:*12*
**conveyed**
143:*4*
**conveying**
279:*19*
**copied** 276:*13*
**copies** 266:*11*
292:*17*
**copy** 35:*12*
128:*18, 19*
223:*16, 18*
**corner** 74:*13*
103:*7* 127:*18*
202:*4* 267:*23*
313:*14*
**corporate**
24:*11* 48:*12,
18, 24* 49:*1*
244:*13* 304:*23*
**Corporation**
3:*18*
**correct** 24:*2*
36:*1* 42:*8*
43:*22* 49:*18*
53:*13* 54:*1*

56:*10* 58:*3*
59:*20, 21*
62:*23* 70:*14*
72:*23* 74:*7*
75:*4, 9* 81:*19*
82:*3* 83:*23*
85:*9* 88:*15*
99:*12* 101:*1,
22* 109:*19*
114:*17, 23*
115:*23, 24*
117:*11*
121:*13, 23*
131:*5* 135:*14*
137:*14, 15*
138:*12* 147:*6*
151:*8* 153:*15*
157:*2* 161:*2,
23* 162:*17*
164:*5* 166:*12*
170:*2, 11*
175:*16* 182:*9*
194:*14*
198:*10, 14*
205:*5* 212:*21*
213:*7, 19*
215:*18*
228:*22* 230:*4*
233:*17, 23*
241:*24* 242:*4,
18, 21* 248:*2,
8* 251:*11, 15*
252:*24* 253:*8,
19* 254:*3, 5,
12, 24* 256:*7*
257:*9, 12*
259:*19* 260:*3*
263:*13* 264:*9*
265:*2, 3, 6*
267:*16*
270:*20* 271:*3,
13* 278:*21*
279:*14*
281:*15* 284:*3,
17* 286:*1*
287:*22*
288:*16*
289:*11, 20*
290:*12* 291:*5*
294:*8* 295:*9,
10* 297:*5, 19*

301:*14*
303:*17* 311:*5*
315:*2* 317:*24*
318:*15, 22*
319:*6* 321:*7,
21* 322:*17*
323:*11*
324:*11*
326:*16, 18*
327:*20*
329:*20*
330:*20*
332:*17, 18*
336:*7* 339:*18*
341:*12* 347:*7*
**corrections**
345:*5, 7*
347:*10*
**corrective**
51:*20* 53:*16*
225:*12*
**correctly**
44:*21* 50:*17*
51:*22* 55:*5*
75:*21* 104:*4*
215:*14*
222:*24*
226:*17* 244:*1*
245:*21* 269:*3,
10* 270:*10*
312:*22*
**correlate**
340:*9, 24*
**correlation**
247:*13*
**Correspondenc
e** 10:*17*
**corresponding**
317:*4*
**corroborated**
265:*4*
**counsel** 15:*2*
31:*9* 86:*11*
87:*2, 20* 95:*2*
110:*15*
111:*16*
202:*23* 203:*12*
**country**
317:*24*

**couple** 17:*5*
69:*16* 81:*10*
91:*10* 135:*2*
**course** 137:*17*
241:*2* 308:*18*
309:*9*
**COURT** 1:*1*
14:*14* 15:*4*
26:*22, 23*
93:*24* 177:*1*
262:*8* 345:*20*
**Court's** 22:*10*
**covered**
129:*16*
**covers** 208:*16*
**CPK** 216:*20*
**CQA** 189:*13*
**created** 103:*2*
124:*10, 20*
**criteria** 153:*9*
161:*18*
163:*16*
164:*14* 165:*4,
20* 166:*6*
186:*23*
187:*13, 16*
188:*14* 189:*8,
22* 210:*7*
260:*16*
**critical**
112:*17*
150:*11, 19*
189:*13* 211:*10*
**cross** 111:*17,
18*
**cross-
contamination**
270:*6* 272:*8,
13* 303:*10*
**cross-function**
46:*11*
**CROWELL**
5:*12*
**CRP** 48:*24*
**current** 28:*5*
37:*11* 108:*8*
170:*6* 191:*5*
193:*7, 10*
215:*5* 218:*8,
19* 269:*9*

Confidential Information Subject to Protective Order

**currently**
52:*14*  53:*5*
56:*16*  170:*21*
184:*17*  250:*1*
278:*11*
**Curriculum**
6:*17*
**custodial**  26:*9,*
*11, 15, 21, 24*
27:*11*
**customer**
143:*21*
167:*17*
202:*12*
287:*12*
323:*22*  324:*2,*
*18*  325:*15*
**customers**
143:*5, 14*
144:*6*  200:*7*
312:*12*  324:*15*
**Customer's**
167:*18*
**customized**
194:*7*  238:*21*
**cut**  58:*14*
200:*9*  276:*3*
307:*24*
**CV**  26:*6*  28:*9,*
*15*
**CVS**  3:*18*

**< D >**
**D.C**  5:*13*
**Dallas**  5:*4*
**damage**
122:*15*
**Data**  7:*15*
11:*10*  99:*9,*
*12, 16, 19, 24*
101:*5, 12*
102:*2*  104:*20*
127:*5*  185:*24*
255:*4, 9, 10*
296:*19, 20*
313:*18*  314:*2,*
*5, 14, 20*
315:*23*  317:*3,*
*16*  318:*14*
319:*5*  320:*1,*
*7, 19*  321:*18*

322:*5, 17, 22*
336:*18*
339:*10, 11, 22*
340:*5*  341:*6*
**date**  1:*16*
9:*12*  14:*7*
68:*10*  125:*16*
126:*6, 16*
174:*23*
220:*18, 24*
224:*12*  271:*9*
299:*15*  301:*3*
304:*2*  328:*3*
345:*9*  347:*16*
**Dated**  185:*11*
282:*24*  344:*15*
**dates**  49:*18*
120:*18*
124:*16*  239:*17*
**DAVIS**  2:*1, 3*
5:*3, 22*  6:*6*
15:*14*  19:*17*
20:*4, 11, 24*
21:*3, 9, 22*
22:*1*  23:*12,*
*20*  24:*3, 5*
26:*1*  27:*4, 17*
28:*8, 13*  31:*4*
32:*5*  34:*14,*
*19*  35:*5, 18*
36:*4, 5*  39:*18*
40:*2*  42:*14*
43:*1, 19*
47:*24*  48:*2*
61:*5, 22*  63:*7,*
*18*  64:*18*
65:*20*  66:*15,*
*24*  67:*2, 13,*
*19*  68:*2, 24*
69:*5, 13*  72:*1,*
*2*  80:*22*  81:*5,*
*11, 13*  82:*21*
83:*20*  84:*7,*
*23*  85:*17*
86:*2, 24*
87:*18, 22*
88:*9*  90:*18*
92:*2, 5, 16*
93:*5, 21*  94:*5,*
*6, 8, 10, 12, 15,*
*17, 20*  95:*3, 6,*

*11*  96:*11*
97:*7, 12, 19*
100:*5*  102:*7,*
*12*  104:*11*
105:*7, 23*
106:*18*
110:*12, 24*
111:*4, 10, 12*
112:*23*  114:*2*
118:*11*
119:*18*  120:*1,*
*8, 15*  125:*7,*
*10, 13*  126:*8*
128:*7, 12, 24*
132:*13*  134:*7,*
*15, 19, 23*
139:*6*  141:*17*
142:*8*  145:*18,*
*20*  148:*7*
150:*4*  152:*10,*
*22*  153:*13*
154:*17*
155:*12, 14*
156:*2, 22*
157:*6, 12, 20,*
*24*  158:*4, 22*
159:*2, 8, 11,*
*20*  160:*17*
165:*6*  166:*7*
169:*7, 14*
170:*9*  173:*1,*
*3, 17, 22*
174:*5*  175:*20*
176:*22*  177:*6*
179:*13*  182:*7*
183:*5, 21*
184:*22*  185:*3*
187:*1*  188:*16,*
*24*  189:*5*
191:*10*
192:*15*
194:*11*  195:*3*
197:*4*  200:*10,*
*16, 20*  201:*2,*
*11, 16, 21, 22*
205:*23*
206:*10, 13, 18,*
*19*  212:*3, 9*
213:*13*
214:*20*
216:*11*  218:*3,*

*14*  219:*8, 16*
220:*22*  223:*5,*
*8, 13*  224:*19,*
*24*  229:*14*
230:*24*
231:*19*  232:*1,*
*17, 24*  233:*11*
235:*17*
236:*22*
238:*24*  239:*7,*
*12*  243:*7*
245:*3, 9*
247:*1*  249:*1*
250:*23*  251:*5,*
*11, 12*  254:*21*
258:*1, 21*
259:*17*  261:*1,*
*5, 15*  262:*2,*
*11*  264:*6*
265:*13, 18, 23*
266:*3, 7, 15,*
*19*  267:*1, 6*
270:*23*  271:*2,*
*10*  274:*9*
276:*2, 14, 21*
277:*2*  280:*17*
282:*11, 17*
286:*19*
288:*24*
290:*19*  292:*4,*
*14*  293:*15*
294:*4*  295:*16*
296:*2, 7, 11*
298:*20*  299:*2*
300:*14, 20*
303:*19*  304:*1*
306:*17*
307:*11*
308:*21*  309:*2,*
*14*  311:*12*
313:*8*  315:*19*
316:*24*
317:*20*
318:*10*
319:*21*  322:*2*
323:*4*  334:*9,*
*15*  341:*2*
342:*11, 16, 21*
**day**  139:*19*
203:*18*  225:*1*

275:*4*  279:*4*
309:*9*  347:*20*
**days**  212:*21*
219:*18*  345:*16*
**DEA**  96:*17*
**deactivate**
312:*8*
**dealing**  66:*2*
**Dear**  221:*7*
296:*17*
**debate**  195:*22*
**December**
103:*2*  120:*19*
121:*12*
125:*12*
137:*10*
227:*15*
239:*17*  271:*6*
277:*7*  317:*3*
323:*19*
**decide**  250:*10*
**decided**  80:*18,*
*19*  129:*18*
140:*21*  156:*9*
228:*8*  229:*13,*
*20*  248:*20*
**decides**  230:*15*
**deciding**
228:*15*
**decision**  73:*6*
129:*13*
228:*12*
229:*15*  260:*6*

**decisionmaking**
302:*13*
**decisions**
61:*18*
**Deck**  8:*13*
**declarative**
188:*20*
**deemed**
345:*19*
**deeply**  183:*3*
**defects**  167:*15*
**defend**  232:*11*
**Defendant**  3:*7,*
*23*  4:*11, 16*
5:*5, 10*

Defendants
3:*12*  4:*5*
5:*15*  20:*13*
defended  16:*7*
defending
94:*9, 20*  95:*5,
7*
defer  93:*14*
231:*3*  305:*6*
deficiencies
269:*7*
deficiency
119:*7*  223:*4*
336:*7*  339:*17*
341:*8, 10*
define  161:*13*
165:*16, 17, 18*
defined  40:*18*
41:*11*  138:*9*
144:*18*
150:*17*  151:*3*
168:*12*
185:*23*  276:*5*
334:*22*  341:*11*
defines  122:*14*
defining
164:*15*
165:*13*  217:*18*
definitely
32:*12*  99:*3*
definition
39:*1, 10*  40:*4,
10*  41:*2, 5, 7,
21*  161:*5*
167:*18*
168:*12, 16*
171:*10*  186:*7*
187:*21*  192:*3*
197:*17*
222:*15*
275:*20*  319:*13*
definitions
138:*3*  168:*7*
190:*1*  197:*8*
definitively
146:*1*  305:*5*
degree  187:*5*
210:*4*
degrees  107:*21*
delete  314:*19*
319:*4*  336:*23*

deleted  317:*2*
340:*4*
deletes  314:*5*
315:*23*
deleting  320:*7*
322:*5, 21*
325:*23*
deletion
316:*15*
deliver  280:*23*
delivered
277:*8*
delivering
186:*4*
delivers
167:*11*
Deming
167:*21*
demonstration
215:*6*
Denise  282:*18*
DENNIS  5:*12*
denoted
121:*20, 24*
department
51:*15, 24*
52:*1, 7*  53:*11*
55:*11*  102:*5*
130:*23*  136:*2*
255:*12*  304:*20*
departments
301:*18*
depend  46:*6*
146:*4*  172:*21*
222:*14*
depended
147:*18*
depending
53:*1*  80:*11*
320:*15*  327:*7*
depends
45:*14*  47:*16*
65:*15*  171:*6*
214:*24*
274:*17*
291:*21*
311:*19*  326:*6,
23*  336:*13*
depiction
74:*24*

deployed
137:*7*
deponent
14:*16*  347:*2*
deposed  17:*7*
deposing
345:*16*
deposition
1:*14*  6:*14, 16*
13:*2*  14:*9, 19*
15:*24*  16:*4*
17:*24*  18:*2*
22:*9*  23:*14*
27:*10*  70:*6*
86:*20*  95:*3*
110:*19*  111:*7*
135:*7*  202:*18*
203:*15, 17*
232:*12*
244:*17, 24*
310:*4*  342:*9*
343:*5*  344:*6,
8, 9*  345:*3, 13,
17, 19*
depositions
17:*2*  20:*9*
94:*9, 21*
deps@golkow.c
om  1:*22*
DEREK  1:*14*
6:*5, 17*  14:*16*
15:*8*  344:*8*
347:*16*
derivation
216:*21*
describe  18:*8*
30:*4*  34:*4*
91:*13*  186:*10*
described
52:*20*  167:*12*
describes
56:*22*  59:*8*
describing
255:*15*
DESCRIPTIO
N  6:*13*  7:*5*
8:*5*  9:*5*  10:*5*
11:*5*  12:*5*
76:*22*  78:*22*
163:*23*  164:*5,
9*  311:*16*

Design  10:*7*
186:*1*  225:*16,
19*  226:*6*
designated
23:*3*  24:*10,
17*  92:*22*
118:*13*
154:*18, 21*
155:*3, 4, 6, 11*
237:*11*
designation
64:*7*  104:*10*
122:*20*  126:*2*
139:*10*  154:*4*
298:*13*  305:*1,
4*
designed  65:*2*
designee
244:*13*
designing
123:*9*
despite  328:*16*
destined
51:*11*  72:*23*
destroyed
322:*17*
detail  33:*11*
58:*11*  148:*3*
311:*6, 17*
325:*19*  330:*9*
detailed
146:*12*
details  146:*5*
203:*9*  225:*11,
19*  226:*4*
279:*24*
316:*10*  319:*18*
detectable
243:*21*
detected  57:*23*
detection
57:*21*  59:*15,
17*
determination
337:*19*
determine
231:*4*  268:*22*
341:*19*
determined
154:*10*  188:*12*

developed
130:*5*  198:*21*
developing
140:*7*
development
38:*23*  39:*8*
40:*7*  44:*11*
46:*8, 9, 16*
170:*19*  171:*1,
12, 19, 20, 21,
23*  199:*5*
257:*19, 22*
262:*22*  263:*15*
device  338:*13*
devices  32:*23*
dialogues
80:*13*
diethylamine
82:*5, 11*  83:*1*
96:*18*  101:*7,
17*  103:*23*
104:*24*
105:*11, 15*
106:*7*  253:*18*
difference
30:*5*  94:*7*
107:*13*  111:*6*
117:*6*
differences
246:*22*
different
34:*10*  40:*21,
23*  41:*11, 12*
42:*5*  43:*16*
44:*9*  74:*4*
92:*15, 19*
110:*21*
117:*15*
162:*21*  164:*6,
8*  216:*6*
232:*20*
326:*19*  327:*1*
335:*12*
differentiated
29:*16*
differently
62:*8*  295:*22*
difficult  93:*10*
difficulties
16:*10*

dimethylamine
101:8, 18
103:24
104:24 253:19
direct 251:21
344:21
Direction 13:5
directly 15:21
28:20 170:11,
14 279:5
283:18 285:22
director
329:19 330:3
disable 16:19
disagree 39:9
40:3, 9 104:7
168:10 169:3,
16 191:2
195:15
disagreed
272:5
disagrees
168:8
discard 327:9
discarded
325:6 326:2
327:13
disclaimer
37:8, 13
disclose 110:4,
10, 14 228:6
287:21 288:4
disclosed
78:18 199:8
222:24 264:1
281:19
285:14, 19
286:11
287:10
288:11 298:7
308:8 317:5
discovery
278:20
discrepancies
335:9 336:17
discuss 69:8,
10 134:18
discussed
216:24 229:7
234:11 331:1

discussing
56:19 86:3, 6
88:13 164:18
245:15 246:19
discussion
65:7 69:9
80:20 90:3
119:5 146:20
147:21 152:4
159:24
195:21 208:2
281:1
discussions
41:14 80:10
119:8 131:20
147:18
202:14, 22
280:4
disorganized
309:8
dispute 27:5
187:21
disputed 17:9
distillation
107:2, 3, 5
108:19 215:7
216:2 330:6
distinction
29:23 32:7
111:15
distinguished
150:10
distribution
44:12
DISTRICT
1:1 14:14
D'LESLI 5:3
94:5, 11, 16
95:6
dlesli.davis@no
rtonrosefulbrig
ht.com 5:5
DMF 89:11
114:14, 16, 20,
22 119:7
139:9 143:19,
23 144:14
148:11, 15, 24
149:12 150:3
152:7 183:24
184:9 198:22,

24 199:1, 8,
17, 23 200:1
205:6 209:11
211:3, 8, 13,
23 222:11, 18
223:3 231:10,
18 233:22
234:13, 17, 18,
22 235:1
237:2, 18, 21
238:5, 18, 23
239:6 244:5,
18 260:17
262:22
263:10, 16, 20
278:4, 11, 16
281:4, 15, 18
282:4 285:16,
20 286:7, 9,
23 287:5, 10,
18 288:12
298:8
DMFs 211:16
277:23 278:2,
9 279:21
doctor 296:13
DOCUMENT
1:6 21:6
22:20 23:15,
22 26:5
28:10 34:16
36:2, 11
37:17 47:21
48:7 50:4
67:22 69:2,
15, 20 81:6
85:12 88:17
97:9, 15
102:9, 16, 20
103:1 120:5,
12 122:2, 4
124:14, 20, 23
125:18 126:6,
17 128:9
134:12 135:1
136:10 159:5,
16 160:9
161:15 163:6
173:19, 24
174:7, 17
177:10

184:24
185:14 193:9
194:8, 14
200:22
202:21 206:3,
6 212:6
219:12
223:10
224:21 239:9
245:6 255:19
264:16
266:22 267:3
276:18, 23
278:24
280:21
282:13
284:10
293:16
295:18
298:23 299:8,
12 300:7, 17,
21 303:22
304:11, 15
308:23 309:3,
21 310:9
318:17 333:1
334:11
documentation
180:4, 12, 20
290:17
documented
132:21 140:23
Documents
13:8 26:9
36:14 37:2
70:2, 5 71:1
110:17
111:14
118:18 119:8
158:24 174:4
178:17 180:6
181:23 182:5
185:6 202:17
265:10
276:12 307:12
doing 19:11
20:14 29:7
77:22 221:14
222:1 228:16
282:8 291:8

318:13 336:4
341:6 345:8
door 195:16
227:24
dose 91:8
143:10, 14
213:17
doses 45:9
doubt 278:24
279:18
download
160:7
dozens 34:10
Dr 10:9
52:18 53:6
71:13, 17, 19
116:2, 7, 16,
17 119:22
122:21 128:4
138:1 167:13,
22 168:14
170:10, 13
174:12, 23
176:15 203:7,
11, 17 205:22
212:12 215:4
219:18 225:2
244:9 245:16,
23 246:12
247:15 279:3,
10, 18 280:7,
8 284:22
285:1 295:15
296:17, 18
305:6, 22
324:23
333:12, 15
draft 70:17
71:6 84:2
88:13 121:4
123:14 131:4
161:21 175:6
207:8, 18
247:24 248:1
256:1, 13
drafting
251:14 252:16
drill 46:22
47:7
drop 57:16
drown 176:24

drug 38:20
44:14, 18
45:1 168:3,
24 170:16
187:8 196:10,
18 197:1, 14
198:1 268:24
drugs 168:22
190:11
DUANE 3:9
Due 14:22
177:3 225:18
241:21
244:12 316:15
duly 15:9
344:5

< E >
earlier 55:8
111:22
116:12 121:9
135:17
159:24
160:24
199:11 225:3
238:7 248:11
250:2 251:15
269:7 281:8
318:12 322:16
early 129:6
172:9 173:15
221:23 264:20
easier 50:6
easily 221:24
310:7 316:2
easy 198:13
e-card 283:4
editing 320:7
322:5
educate 65:23
effect 151:18
161:12
effective
38:10, 17
40:11 42:17
46:19, 23
49:19 57:22
59:16
effectively
41:22

effort 32:23
45:21
efforts 34:6
egregious
290:12 325:18
EH&F 102:4
eight 69:1
318:23
EIR 240:15,
23 245:12
249:3 267:11,
15 268:8
270:23 277:6
EIRs 290:21,
24
either 41:16
117:13
127:22
146:11
163:12 177:8
195:2 197:19
198:3 255:24
263:20
269:20
288:11
290:20 291:7
310:6 336:3,
15
electronic
126:17 136:9
313:18
316:14 336:18
element 106:8,
10
elements
91:15 97:1
263:7
eliminate
232:14
eliminated
252:9
E-mail 7:6, 10,
19 8:9, 17
9:8, 14, 17
10:6, 12, 17
11:6, 8 68:4,
5 70:18
97:24 98:3, 6,
7, 10, 15
100:24 101:2
116:15

120:10, 16, 19
125:11 129:4,
9, 21 130:12
131:11, 19
132:14 133:8
174:7, 13
176:7 206:23
207:2 212:11,
16 219:5, 17,
19, 22 221:4,
6 223:6
225:1, 2, 10,
16 226:11
227:2, 4
228:14 256:2
265:15, 20
266:13
267:15 277:3,
4, 11 280:19,
21 282:22, 23
292:19
296:12, 15, 16,
20
e-mailing
220:7
e-mails
132:15 235:1,
8 236:21
emerging
216:15, 24
emphasized
196:13
emphatically
169:17
employee
160:18
166:17, 18
176:8
employees
169:24 170:1,
7 212:18
Empower
320:2
enable 230:21
enabled
336:23 339:6
encompasses
209:5 333:16
encountered
215:10 331:21

encourage
280:9, 15
endeavor
229:12
ended 18:20
ends 147:2
172:1
enforceable
37:10 190:13,
18
engaged 94:22
engaging
66:20 140:8
enhanced
245:20
247:14, 15
enhancement
222:1
ensure 14:24
38:19 40:13
50:15 182:11
196:2 306:22
320:18 331:5
ensuring 31:1
42:1, 7 50:21,
24
entire 18:22
60:20 339:3
entities 25:4
50:1 288:10,
15 289:2
entitled
110:16 244:14
entity 200:6
environmental
230:10
envisage
237:20
equipment
19:8 50:12
51:17 55:2
272:6 275:16,
19
errata 345:6,
9, 12, 15
347:12
especially
66:1 110:16
306:23
ESQ 2:3, 7,
12, 16 3:3, 4,

9, 15, 20 4:3,
9, 13 5:3, 7,
12, 20
essential 42:1,
6
essentially
289:22
EST 1:16
establish 33:7
112:14
186:13
192:22 331:7
established
73:17 84:20
85:5 89:11
112:18, 21
113:8 115:2,
3 144:20
153:19
161:17
163:16 165:3,
19 166:6
188:13
189:22
196:12
260:14, 15
establishes
113:10 186:2
establishing
161:10 245:19
Establishment
10:16 239:14
et 124:16
145:6 179:1
283:11 305:11
EU 226:14, 20
227:6
evaluate 46:4
50:13 78:16
131:3 216:24
245:18 246:8
273:10
310:16 311:1,
24 327:5
evaluated
119:12 139:18
evaluating
118:20
Evaluation
11:13, 14
55:23 62:13

64:14 90:1
103:8, 17
108:10
156:21
185:24
216:17
262:21 263:1,
8 264:19
299:22, 23
300:5, 22
327:13
**event** 240:9
**eventual**
59:23 74:7
**eventually**
18:19 52:3, 5
71:6, 10
83:22 84:3
91:16 96:5, 8
132:2 142:16
289:2, 9
307:17
327:13 340:3
342:2
**everybody**
157:23 158:3
**evidence**
19:10 131:7
151:22 186:3
234:20, 23
235:6 237:1
**evident** 38:8
**ex** 328:2
**exact** 77:20
260:10
**exactly** 17:19
83:9 117:14
124:1 129:17
176:12
180:11 181:5
188:5 202:20
203:1 254:10
290:23 293:5
308:11, 14
322:9
**EXAMINATIO
N** 15:12
158:20
**examined**
15:10

**example**
27:13 37:4
39:4 40:19
47:6 52:1
57:19 59:7
75:3 79:21
80:23 99:11
109:3, 11, 16
136:15
137:17
140:15, 19
147:8 151:13
156:5 193:14
196:8 239:3
256:22
281:14 287:4
291:15
311:14 312:6
318:19 323:18
**examples**
33:16 44:7
**exceeding**
167:16
**Excel** 223:15
**exception** 76:8
**exchange**
228:14
**excipients**
44:17 45:8
**excluding**
235:1
**exclusive**
117:13 140:1
**exclusively**
32:12 54:18
199:6 240:3
255:11
**Excuse** 166:2
176:20 316:4
**Excused** 343:4
**execute** 77:16
338:13
**executing**
76:6 321:10
**exercise** 59:24
162:14
**exercised**
313:17
**exercises**
131:9

**exhausted**
292:8
**Exhibit** 6:14
19:15 20:1, 3
21:7 22:5, 9,
12, 16 23:16
24:2, 3, 6
25:15, 16, 19,
21 28:9, 11
34:15, 17
35:4, 15
47:22 48:1
67:21, 23
69:1, 3 70:19
86:4, 7 88:13
97:5, 6, 10, 16,
22 98:8 99:6
101:2 102:8,
10 105:8
111:21
117:11 120:2,
4, 6, 11, 13, 22,
23 121:3, 23
122:5, 12
123:6 124:9
125:5, 11, 16
127:17 128:8,
10 134:8, 13
144:17 149:4
159:4, 6
160:5 161:19
162:13
166:14 169:9
173:18, 20, 23
174:1, 6, 16
184:23 185:1
190:1 199:15
200:21, 23
206:1, 4, 7, 14,
21 207:7
212:4, 7
219:10, 13
223:9, 11
224:20, 22
239:8, 10
245:5, 7
250:24 251:4,
6 266:21, 23
267:2, 4, 11,
14 276:17, 19,
22, 24 277:4,

18 282:12, 14
295:17, 19
298:22, 24
300:16, 18
303:21, 23
308:22, 24
334:10, 12
**exhibits** 19:18
20:16 205:24
276:11 292:9
**exist** 63:4
180:12 259:3
260:9
**existed** 49:17
137:13 263:5
**existence**
285:23 288:15
**existing** 73:23
107:1 212:1
**exists** 34:9
**expanded**
238:19 239:1
**expectation**
62:14
**expectations**
58:12 167:17
**expected**
194:1, 12
**experience**
163:7 164:24
165:8, 10
197:20
**experiences**
316:11
**expert** 126:24
287:24
**expertise**
106:22 150:1
191:9 214:18
**experts** 231:4
298:19
**expires** 347:21
**expiry** 241:6
**Explain** 60:8
107:12 124:6
193:24 219:3
237:19
**explained**
299:5 318:4
**explains**

57:13 58:16
**explore** 228:1
**exploring**
236:9
**exposes** 270:5
**Express** 3:23
**extended**
207:22 209:11
**extensive**
104:17 210:1
224:2 238:4
307:10, 16
**extent** 27:15
32:11 66:13
125:2, 24
145:16 154:3
180:12
182:22 192:4
250:16
257:16 298:12
**external**
18:15 133:1
**extra** 128:18
306:21
**extraneous**
334:5
**extremely**
113:17 339:1
**eye** 266:14
**EZChrom**
320:3

**< F >**
**facilities**
215:11
218:18 283:8,
11 287:13
289:9 301:12
**facility** 17:16
18:10 19:12
33:12 155:16,
17, 18 183:14,
23 204:19, 20
228:2 269:21
272:9 275:17,
19 283:16
287:9 299:24
305:10
**fact** 23:10
70:19 124:3
129:20

Confidential Information Subject to Protective Order

182:*12* 247:*9*
295:*7* 315:*15*
317:*8* 324:*19*
328:*16*
**factor** 80:*3*
**factors** 77:*1, 9,*
*10* 78:*24*
**facts** 145:*17*
151:*21* 319:*19*
**factual** 315:*7*
**factually**
116:*21* 257:*8,*
*10* 319:*4*
**fail** 89:*15*
345:*18*
**failed** 312:*16*
313:*6, 9*
323:*17*
**failure** 53:*23,*
*24* 81:*18*
84:*10, 17*
89:*1, 6, 9*
161:*11, 17*
163:*3, 4, 9, 12,*
*14, 15* 164:*17*
165:*4, 15, 17,*
*18, 22* 166:*4,*
*5* 215:*8*
**failures** 302:*2*
**fair** 104:*19*
111:*11* 256:*19*
**fairly** 307:*15*
**fairness** 85:*13*
211:*14*
**FALKENBER**
**G** 4:*7*
**fall** 104:*17*
135:*13*
145:*23* 171:*3*
283:*19* 308:*12*
**falls** 54:*8*
**familiar** 22:*21*
70:*15* 102:*23*
107:*16*
122:*24*
160:*15* 173:*6*
220:*5* 289:*1,*
*15* 290:*5*
**far** 28:*3* 52:*6*
123:*4* 188:*4*
193:*3* 210:*1*

214:*15*
289:*24* 293:*1*
310:*9* 320:*14*
**FARR** 2:*10*
**fast** 265:*14*
**faster** 292:*7*
**favor** 231:*24*
**fax** 1:*21*
**FDA** 10:*9, 11,*
*14, 20* 11:*19*
18:*20* 19:*12*
36:*11* 37:*2, 8,*
*12* 38:*2*
143:*19, 20*
144:*3* 146:*20,*
*21* 147:*4*
148:*12*
153:*17, 19*
160:*18, 22*
166:*15, 17, 18*
168:*4* 169:*24*
170:*1, 6*
183:*7, 13*
184:*7, 10, 21*
185:*5* 187:*24*
188:*5, 7*
189:*15* 190:*2*
191:*12* 192:*7,*
*16, 19* 193:*7,*
*13* 194:*2, 13,*
*19* 195:*4, 5, 9,*
*13, 16, 21*
196:*8* 199:*9,*
*18* 222:*21*
223:*1* 227:*11,*
*21* 228:*7*
240:*12, 19*
242:*19, 21*
246:*12* 247:*9*
248:*14* 259:*9,*
*10* 264:*23*
265:*4* 268:*14,*
*17* 269:*5*
270:*14*
271:*20* 275:*9*
277:*11*
279:*12*
280:*10, 16, 22,*
*23* 281:*20, 23*
283:*7* 285:*10,*
*21* 286:*6, 8,*

*18* 287:*1, 16*
288:*14, 22*
289:*4, 13*
290:*11, 18*
291:*17* 306:*3,*
*5, 19, 20*
307:*17* 308:*8,*
*19* 309:*16*
311:*4, 13*
312:*24* 317:*5,*
*15* 318:*3*
319:*3* 321:*4,*
*19, 22* 330:*20*
332:*11* 340:*3,*
*15* 341:*1*
342:*2*
**FDA's** 37:*11*
40:*4* 159:*16*
184:*15* 191:*4*
239:*14*
252:*16*
258:*19*
267:*15*
272:*21*
286:*13*
290:*16, 21*
**feasible** 64:*12*
66:*14*
**features** 16:*20*
**February**
314:*2*
**feedback**
159:*21*
**feel** 161:*2*
169:*18* 212:*1*
272:*18* 332:*8*
**FEI** 285:*11*
**felt** 342:*5*
**field** 165:*11*
327:*23*
**fields** 126:*18*
**fight** 111:*1*
**figure** 324:*5,*
*7, 17, 22*
**figured** 213:*4,*
*14*
**file** 21:*13, 19*
26:*11, 15, 21*
27:*11* 103:*3*
124:*15* 127:*5,*
*7, 11* 143:*21*

150:*3* 296:*2*
299:*6, 8*
**filed** 260:*17*
**files** 126:*10*
181:*17* 287:*3*
**filing** 148:*11*
184:*9* 211:*3*
278:*11, 16*
**final** 151:*12*
152:*16* 153:*3*
156:*13*
192:*16* 195:*13*
**find** 60:*7*
71:*11* 162:*10*
197:*18*
240:*15*
256:*22* 282:*4,*
*5* 286:*18*
296:*1* 316:*21*
317:*16*
**finding** 266:*2*
309:*10*
**findings**
182:*20*
203:*23*
258:*19* 291:*23*
**fine** 20:*10*
29:*8* 87:*19*
116:*22*
125:*22*
126:*14*
155:*13*
157:*21, 23*
201:*12*
231:*23* 261:*6*
293:*9, 12*
342:*12, 16*
**finish** 73:*7*
81:*5* 276:*1*
**finished** 45:*9*
91:*8* 143:*10,*
*13, 22* 149:*2,*
*3* 164:*1*
190:*12* 198:*2*
210:*3* 213:*17*
287:*2, 19*
**finishes** 176:*22*
**FIRM** 2:*10*
80:*18* 243:*15*
245:*17* 249:*4,*
*8, 21* 269:*6,*

*15* 270:*7*
273:*10* 312:*6*
322:*14*
323:*19*
329:*19* 330:*4*
331:*12*
**firm's** 273:*9*
315:*21* 320:*3*
**first** 15:*9*
16:*8* 19:*15*
24:*9* 38:*4, 16*
54:*15* 72:*4, 8*
76:*21* 77:*6*
97:*20* 129:*21*
147:*4* 161:*20*
167:*2* 171:*17*
212:*22, 24*
213:*22* 219:*4*
223:*3* 225:*10*
227:*5* 256:*24*
259:*8, 21, 23*
264:*22* 268:*4*
269:*14*
295:*23* 297:*7*
299:*3, 11*
308:*15*
**Fitness** 167:*14*
**five** 59:*20*
293:*3, 6*
**five-minute**
232:*18*
**five-year**
328:*2*
**flexibility**
55:*16*
**flip** 38:*15*
**flipping**
207:*13*
**Floor** 3:*4*
**Florida** 2:*13*
**focus** 32:*13*
272:*7*
**focused** 273:*7,*
*18, 20*
**folders** 336:*21*
**folks** 71:*20*
116:*7* 163:*8,*
*18* 279:*8*
**follow** 65:*18*
90:*15* 93:*20*
111:*15*

112:*12*  134:*1*
341:*19*
**followed**
107:*4*  215:*11*
219:*1*  294:*15*
295:*7*  302:*7*
308:*18*  318:*21*
**following**  23:*5*
129:*22*  220:*9*
286:*21*  303:*4*
330:*14*  335:*8*
336:*17*
**follows**  15:*10*
301:*8*
**follow-up**
115:*21*
**foreclose**
250:*11*
**foregoing**
344:*18*  347:*6*
**forgive**
130:*13*  338:*9*
**forgotten**
262:*3*
**Form**  11:*19*
31:*3*  39:*13*
42:*10, 20*
43:*6*  61:*4, 11*
63:*1, 15*  64:*9*
65:*13*  66:*5*
80:*7*  82:*16*
84:*6*  90:*11*
92:*20*  99:*23*
105:*18*
112:*10*
113:*16*  118:*6*
119:*15*  132:*9,
20*  133:*12*
138:*19*
139:*22*  141:*6*
145:*15*
147:*24*
149:*22*
151:*21*
152:*19*  153:*6*
154:*5*  155:*22*
156:*16*  166:*2*
169:*6, 11*
170:*4*  172:*19*
175:*19*  179:*7,
8*  182:*2, 16*

183:*17, 24*
186:*20*  188:*3,
22*  189:*4*
190:*21*
192:*11*
193:*20*
194:*24*  197:*3*
213:*9, 21*
215:*21*
217:*22*
218:*10*
220:*21*
228:*24*
230:*23*
231:*14*
235:*23*
242:*23*
246:*16*
248:*18*
257:*17*
258:*11*  259:*6*
264:*3*  268:*17*
270:*22*
273:*22*
280:*12*
281:*14, 19*
283:*7*  286:*3*
287:*20*  288:*1,
18*  290:*14, 21*
291:*20*
298:*11*
299:*19*  300:*9*
304:*14*
305:*19*  306:*8*
307:*4*  309:*16*
311:*9, 14*
312:*20*  313:*4*
315:*4*  316:*4*
317:*7*  318:*7*
319:*10*  322:*1,
19*  340:*7*
347:*10*
**formally**
332:*4*  334:*4*
**format**  121:*11*
263:*3, 5*
**formation**
82:*12*  83:*3*
100:*19*
101:*14*  104:*1*

257:*2*  342:*1*
**formed**  106:*17*
**former**  170:*6*
**formerly**
166:*17*
**forms**  54:*21*
132:*17*
264:*18*  285:*14*
**formulations**
45:*9*  99:*15*
**forth**  20:*7, 22*
62:*21*  140:*9*
324:*13*
**forward**
64:*22*  137:*2*
193:*5*  245:*17*
249:*4*  286:*16*
287:*14*
**forwarding**
176:*9*
**found**  18:*21*
19:*9, 13*
83:*22*  91:*4*
92:*9*  222:*20*
258:*20*  265:*1*
291:*17*
301:*12*
303:*14*
318:*12*
323:*10*  335:*9*
339:*21*  340:*3,
4*  342:*2*
**foundation**
183:*17*
190:*21*  213:*9*
**frame**  170:*17*
**free**  161:*2*
**Freedom**
167:*15*
**fresh**  77:*19*
78:*4*  136:*20*
138:*15*
140:*20*
145:*10, 23*
146:*10*  147:*9,
12*  151:*17*
152:*14*  153:*1,
10*  242:*9, 17*
243:*15, 16*
244:*19*  247:*2,*

*10*  249:*10*
260:*18*  333:*21*
**front**  16:*12*
22:*4, 5*  30:*24*
34:*21*  37:*14*
102:*13*
127:*17*
223:*19*  267:*8*
296:*3, 13*
**front-end**
171:*1*
**FULBRIGHT**
5:*1*
**full**  158:*1, 5*
208:*12*  234:*7*
241:*12*
269:*15*  320:*5*
322:*4*
**fully**  240:*11*
269:*6*
**function**  30:*13*
**functional**
301:*23*
**functions**
29:*20*  30:*16*
**fundamental**
55:*22*  59:*19*
**further**  38:*19*
40:*13*  62:*11*
88:*18*  168:*11*
208:*20*  222:*2*
259:*13*
291:*10*  311:*6*
312:*19*
323:*18*  338:*17*
**future**  26:*15*
27:*8*  215:*13*
229:*24*
**fuzzy**  203:*9*
**FW**  296:*20*
**FYI**  172:*24*

**< G >**
**gain**  132:*22*
133:*5*
**gained**  187:*5*
**gas**  313:*24*
314:*11*
**gather**  294:*19*
**GC**  313:*24*
314:*22*  333:*9*

334:*1*  337:*13*
339:*11*  340:*5*
**GCMS**  337:*20*
**GCs**  332:*17,
20, 23*  333:*17*
341:*7*
**General**  8:*22*
11:*18*  24:*19*
29:*13*  30:*3*
38:*12*  91:*13*
103:*9*  107:*13*
133:*21*  149:*9*
168:*14*
186:*12*
191:*17, 23*
217:*23*
250:*21*
272:*10*
304:*13*
311:*15*
319:*23*  321:*6,
9*  325:*2*  328:*6*
**generality**
95:*20*
**generalized**
169:*18*  288:*9*
311:*4*
**generally**
47:*14*  61:*15*
67:*1, 4*  79:*14*
95:*2*
**generate**  270:*4*
**generated**
106:*14*  123:*1*
**generating**
127:*8*
**generation**
91:*17*  96:*9*
**gentleman**
160:*11*
**gentleman's**
71:*15*
**GEORGE**
2:*12*
**getting**  27:*13*
54:*3*  85:*12*
117:*6*  159:*20*
**give**  26:*10*
32:*15*  33:*16*
39:*23*  41:*4,
20*  87:*16, 17*

Confidential Information Subject to Protective Order

98:10 158:1, 4 177:17 310:21
given 15:24 16:3 17:2 26:12 76:5 116:7 128:16 153:9 160:11 210:4 285:11 299:7 344:6 347:8
giver 306:22
givers 291:5
gives 55:15
glass 134:21
global 28:6, 17 29:10, 15, 18 32:14 48:14 52:4 73:16 135:12 137:18 222:8 240:10
GLOVER 1:14 6:5, 17 14:17 15:8, 16 21:5 22:2 23:22 24:7 27:1 36:6 39:23 69:15 86:8, 22 88:10 95:13 110:3 111:13 125:15 129:2 135:1 158:23 159:13 160:14 176:21 201:23 206:21 223:15 233:12 251:13 262:13 267:8 293:11 296:13 309:4 342:18 344:8 347:16
Glover-1 20:7, 22 22:8
Glover-8 97:8

Glover-9 97:14
GM-CQA 305:1
GMP 41:19 43:3 156:18 189:11 190:6 192:24 335:2
GMPs 341:11
go 22:12 23:10 25:14 27:24 28:3 37:22 39:22 44:1 46:10 50:4 57:4 58:10 59:14 71:11 87:21 98:12 100:9 103:13 105:8 115:11 121:18 122:3, 11 130:11 134:20 137:22 138:2 141:7 142:20 162:10 163:5 171:16 172:2 175:14 178:4, 20 183:3 185:18 187:20 203:19 205:1 218:11 241:8 256:23 266:18 269:12 282:21 289:23 293:17 299:11 305:8 311:6, 17 313:12 317:9 320:13 321:15 326:8 329:10 334:19
goal 50:24 58:23, 24 59:4, 23 60:7 63:3 184:19, 20

goes 19:16 63:12 64:6 141:21 310:18
going 15:18 16:18 19:14 20:8 21:14, 16, 18 22:8 25:10 28:8 29:3, 6 35:19 48:15 50:3 51:2 58:15 64:20 67:19 68:21 81:1, 2 85:15 87:2 92:2 97:4, 5, 13 102:7 103:5 120:1, 8 124:3 126:16 134:19 135:2 144:16, 23 150:8 159:2, 9 161:1 166:13 173:4 176:19 184:22 201:9, 14 205:23 210:6 211:21 212:3 228:10 231:20 236:14 245:3 246:7 247:6 249:20 260:21 265:19 266:7, 8, 19 288:8 292:1 293:11 298:20 300:15 307:1 321:16 330:16
GOLKOW 1:21 14:5
GOLOMB 2:16
Gomes 52:18 53:6 71:18, 19 116:2, 8, 16, 17 119:22 122:21 138:1 170:10, 13 174:12, 23

176:15 203:7, 11, 17 205:22 212:12 215:4 219:18 225:2 244:9 245:16, 23 246:12 247:15 279:3, 10, 18 280:7, 8 284:22 285:1 295:15 296:17 305:6, 22 324:23
Good 11:7 15:15, 17 39:1, 10 157:14 172:9 176:17 201:17 220:2 261:16 292:5, 6 293:8
Gorda 2:13
GORDON 3:1
Gotcha 58:23 77:22 115:9 139:17 290:3
gotten 264:16 309:7
graduate 107:20
Grant 3:10
gratuitous 141:23 142:3, 9
Gray 1:16 15:5 344:12
great 17:1
greater 32:11 60:13 210:4 332:2, 16
GREENBERG 4:1
group 36:23 254:20
grouping 49:3
guarantee 324:14
Guaranteed 184:3, 4, 12 254:6, 9
guess 32:2, 7 37:23 48:21

49:15 68:15 70:9 79:22 97:21 123:15 129:6 142:24 144:14 149:10 214:13, 24 288:5, 6 293:9, 10
guessed 247:20
guessing 144:11 338:1, 16
Guidance 6:19 8:20 35:2 36:11 37:2 44:6 185:5, 22 191:4 283:6
guidances 37:9
guys 176:11 208:6 209:21 211:1 261:10
gwilliamson@f arr.com 2:14

< H >
half 293:4 328:13
hand 192:20
handle 331:13, 20
handled 332:6
handling 100:2 333:9 336:18
handwriting 299:24
handy 97:6
Hang 163:5
happen 109:21 176:23 230:21 315:18 340:14
happened 54:1 84:4, 22 131:8 227:21
happening

54:15 204:18
happens 54:7
happy 20:19
154:24
hard 34:7
61:14 65:17
119:1 304:22
309:10
315:12 340:11
harmonization
36:22
hash 124:16
HCl 106:13
253:23
head 18:13
28:6, 17 29:9
32:14 36:14
51:15 52:4, 7,
11, 16, 17, 22,
23 53:11
55:15 58:18
131:14, 15
137:18
167:23
170:22 222:8
240:10
284:22 285:7
header 44:3
48:8 167:7
190:11 304:23
headers
299:13
heads 51:24
52:1, 12, 13
55:11
Health 5:15
60:19 78:19
80:13, 20
102:5 133:5
140:8 141:11,
15 143:18
172:11 173:6
Healthcare
3:13
hear 93:3, 11
149:1 177:2
188:9 197:22
213:12
heard 15:1
98:19 198:6
285:1, 3

hearing
148:23 163:8,
17 197:12
hearsay 316:5,
6
heavily 46:8
heavy 192:20
he'd 116:22
128:4
heels 246:4
258:19
held 1:15
14:10 69:10
327:11, 17
329:3
help 16:17
125:6
hesitant 48:21
107:15
Hetero 4:16
Hey 80:24
157:3 201:7
205:14
231:23
246:12 293:7
342:7
high 38:19
57:2, 8 58:6,
24 60:2, 17
61:8 62:6, 14
63:8 64:2, 21
65:8 66:3
75:17 76:1,
12 187:5
252:12, 21
253:4 313:16
high/medium
61:24
higher 56:24
57:1
highest 274:20
highly 194:6
237:23 320:14
HILL 4:13
HILTON 2:7
172:22
hindsight
104:16
historic 31:22
historically
248:10

history
182:21 183:7
hold 26:16
27:13, 19
261:12
283:22
310:20
325:16 329:8
holding 25:21
hole 111:3
HON 1:4
honestly
138:1 204:13
HONIK 2:16
20:5, 20 93:7
94:23 95:8
hopefully 16:8
hoping 16:16
261:13
host 30:15
31:18
hosted 243:5
hour 81:3
158:1, 5
292:23 293:13
hours 292:24
293:6
house 181:17
HSE 7:12
HTTPS
159:19
https://www.fd
a.gov/media/92
818 160:6
Huahai 3:12,
13
huge 320:23
Human 155:9
Humana 4:11
hundreds 70:2
HUSCH 3:20
hydrochloric
82:14 83:4
105:18
106:20 118:3
252:24 253:8,
10 254:4
255:8 312:7
hypothetical
42:20 43:6

80:7 156:6
197:3

< I >
i.e 283:9
ICH 36:18
37:3
idea 59:5
124:21
125:18
126:24 172:9
176:18
278:22
281:22
315:14
316:19 328:24
ideas 178:13
identical
115:2, 5, 7
identification
21:7 23:16
28:11 34:17
47:22 67:23
69:3 97:10,
16 102:10
113:3 120:6,
13 128:10
134:13 159:6
173:20 174:1
185:1 200:23
206:4, 7
212:7 219:13
223:11
224:22
239:10 245:7
266:23 267:4
276:19, 24
282:14
295:19
298:24
300:18
303:23
308:24
334:12
337:18 338:4,
6, 7
identified
41:17 62:3,
12 77:6
83:11 84:3
85:6 106:7,

10 213:24
214:8 229:4
246:5 314:1
identifiers
35:21 124:16
identifies
164:9
identify 38:21
39:7 40:6
51:16 62:1
63:3 66:12
110:10
260:10 313:7
identifying
40:15 54:14
113:5
identity
186:17 187:9
189:16 268:23
IDs 339:10
Illinois 4:10
imagine 127:2
338:17 341:18
immediately
286:8
impact 50:14
59:19 73:23
122:14
142:21
144:17
147:18
151:11
152:16 153:3
154:11
155:19
156:12, 19
230:10 319:16
impacts
144:19
imperative
345:14
impetus
306:21
implement
59:1 62:22

implementation
152:2
implemented
61:1, 2 75:17
76:2 136:24

137:2  139:23
144:6  152:6
implicate
139:21
implications
138:11
import  289:9,
17, 21, 23, 24
290:6, 7
317:22
importance
38:5
important
50:20  80:1, 4
99:18  186:11
191:13  230:6
291:15  320:17
importing
317:23
impossible
33:13  274:24
340:9
improperly
19:8
improve  246:5
improvement
54:9  217:5
impurities
77:2, 11, 24
78:6, 7, 24
79:2, 10, 23
80:3  84:12
85:5  90:9
91:7  92:12
101:18  104:1
112:5  113:6,
11, 14  164:4,
19  168:22, 23
169:1, 22
239:2  259:12
312:21  333:24
impurity
77:23  78:16
80:16  91:18
113:4, 20
114:9  153:20
214:11
245:16
252:11, 20
253:3  257:2,

4, 11  338:23
342:1
inaccurate
92:8, 17
inadequate
273:9  310:15
311:1, 23
inappropriate
19:11  257:20
include  29:10
44:11  51:9
72:19  145:3
238:19  241:4
270:7  283:7
287:14  320:7
included
114:21  199:6
242:8  248:23
252:4  277:24
includes
144:22  145:2
171:11  205:4
208:15  209:3
223:21
278:12
294:10  299:8
including
44:16  72:22
84:11  118:2
135:22
145:12
177:13  224:5
225:17  226:7
245:19
281:15  337:13
Inclusion
270:2
inclusive
211:12
inclusively
25:5
incoming
77:17  78:3
89:13, 24
182:22
260:23  312:17
Incomplete
42:20  43:6
80:7  197:3
inconsistency
95:1

incorporated
208:11
209:22  234:8
238:18
255:19  262:21
independent
208:3  301:18
302:12
INDEX  13:2
India  32:17
48:23  51:6
99:4  304:24
Indiana  3:16
Indianapolis
3:16
indicate  55:20
177:16  212:1
indicated
86:22
indicates
37:14  318:17
Individual
10:7  91:1
225:17, 20
226:6  321:12
339:10
individuals
115:19
116:15
202:24  235:2
Industries  4:6
Industry  6:19
8:20  33:9
35:2  36:24
38:7  41:14
193:4  215:5
218:8, 19
230:9  319:16
infer  54:19
176:5
inference  79:8,
13  113:19
164:12
inferences
168:20  169:21
inferring
84:18  233:24
infers  222:21
influences
31:21

INFORMATIO
N  1:6  11:18
63:12  64:6
87:14, 17
124:14  136:5
144:2  148:12
178:4  179:24
199:3  248:23
281:23
291:10
304:14
308:12  314:3
325:21
informed
63:11
informing
147:20
infrared  337:6
infrastructure
29:15  33:3
Ingrid  5:19
14:4
inhouse  86:15
229:10  236:11
initial  60:2
170:19
241:18, 19
243:14  281:9
initiating
136:3
innocuously
318:4
in-process
19:3  107:2
196:10, 17, 24
197:6, 13, 17,
23
inquiry  18:22
inside  96:3
209:16  253:15
inspect
289:19  306:5
307:18
inspected
19:12  285:10
289:3  306:13,
20  307:22
308:3, 5, 19
341:4
Inspection
9:11, 12

10:16  11:16,
19  44:12
173:7  174:24
175:4  182:21
183:7, 14
184:1, 8, 12
239:14, 16, 20
240:2, 12, 17
241:2  243:6
248:13
268:15  269:9
271:6, 9
277:7  281:10
290:22
300:23  301:4
303:16  308:7,
17  309:18
339:17  341:5,
16
inspections
183:8  281:24
290:11
inspector
175:10  176:2,
13  178:21
179:4  273:24
321:5, 22
332:8
inspectors
240:7
inspector's
175:16  176:2
272:21
311:19  312:2
321:1  323:13

Inspectors.docx
174:9
installed  320:3
instance
27:10  147:4
instances
60:16  63:20
64:1
instruct  39:21
55:11  314:18
325:16
instructing
115:19
instruction
76:5

instructions
76:11 116:6,
9 345:1
instrument
50:13 51:17
55:2
instruments
302:17 320:4
integrity
317:16
intend 196:3
265:11
intended 41:2
75:1 81:17
84:10 89:6
90:8 132:6
140:15, 20
167:14 178:6
intends 249:5
intention 37:8
190:7
interact 118:3
252:22 253:6
interacted
105:17
interacts 253:9
interchangeabl
y 198:1
interdisciplinar
y 45:18
interest 78:15
275:6 338:8
interested 68:3
intermediate
68:17 72:15
198:4, 5 210:2
intermediates
197:14, 24
331:6, 15
internal 18:17,
18 35:20
132:24 133:3
196:1 228:16
internally
228:2
international
36:21
interpret 39:3
40:14 55:19
89:8 124:2
162:20 163:1

165:24 166:4
193:17 305:20
interpretation
40:10 41:10
194:10 234:7
275:21
interpretations
34:11
interpreted
168:19 243:3
interpreting
161:16 165:1
209:9
interruption
142:7
interview
128:4
interviewing
222:7
interviews
18:1
intrinsic
60:10 63:20
274:13, 15
275:7
introduce
19:15 28:9
40:20 159:3
173:4 230:15
introduced
214:10
introducing
47:24 213:6
276:16
introduction
38:3 246:23
252:11, 20
253:4
investigate
119:10 255:6
334:5
investigated
19:1, 9 289:3
332:4
investigating
332:15
Investigation
10:20 17:12,
22 18:3, 6, 9,
12, 16 19:2
83:13, 18

91:3, 11 92:9
118:14 123:2,
18 227:14
248:22
258:18 273:9
291:16
308:13 312:16
investigations
33:18, 19
215:8 227:18
289:7 310:15,
24 311:22
investigative
104:17
involve 108:9
involved 46:3
51:18 55:4,
14 66:1
81:15 170:7,
14 172:15
205:17, 20
251:14
252:15 257:19
involvement
170:24
285:23
288:15 306:24
involves 31:15
108:11
IR 336:22
337:2, 6 338:3

IRBESARTAN
1:4 14:12
Iser 160:12,
13 166:16
Iser's 190:4
issuance
268:16
issue 35:8
128:2 186:6
264:9
issued 309:16
issues 18:21
19:13 38:22
39:8 40:7, 16
46:2, 5 67:16
260:10 319:15
item 113:12
277:22 281:3
336:16

items 115:18
268:21
iteration
161:20
its 33:3
35:12 45:1
47:14 66:21
85:8 89:15,
24 99:21
117:2 118:1
182:12 190:2
193:17 196:2
218:18
239:21 246:1
252:22 258:6
271:11
285:14, 20
303:16
318:14
333:23 334:8
340:4 341:6
IVES 4:7, 9

< J >
January 8:23
185:11
227:22 301:4
314:2
JASON 3:4
86:19 203:6
232:11 261:10
jdavis@slackda
vis.com 2:5
JERSEY 1:1
4:14 14:15
JESSICA 3:9
jmr@pietragall
o.com 3:6
jogs 201:4
JOHN 2:3
24:1 26:19
35:4 61:10
66:23 71:22
80:24 81:1
85:11 86:19
110:9 111:3
125:3 128:16
155:5 157:3
172:22 200:9
201:7 231:23
261:3 266:1

276:1, 10
292:13
295:23 309:7
342:7
jpriselac@duan
emorris.com
3:11
July 160:10
259:9, 22
264:11, 21
282:24
jump 310:19
jumping 21:18
June 6:20
173:8 174:24
200:17 207:3
267:18
270:16 271:1,
15
Juran 167:20
justice 41:22

< K >
KANNER 2:7
KAPKE 3:15
KARA 3:15
kara.kapke@bt
law.com 3:17
KBI@falkenbe
rgives.com
4:11
keep 29:6
58:14 97:3, 6
159:24 180:3
187:22 266:8,
14 327:8
kept 327:6, 21
key 33:17
80:3 178:7
kind 53:23
117:24 238:2
241:15 337:15
KIRSTEN 4:9
KNEPPER
3:20
knew 265:5, 8
306:2
know 15:20
18:7 19:10
20:13, 16
22:3 25:9

Confidential Information Subject to Protective Order

28:3  31:17
33:4, 6, 7
34:20  35:9,
20  36:6  37:2
41:17  48:3,
21  52:15
54:13  55:22
56:2, 3  58:10
61:16  64:15
65:2, 3  66:8,
19  67:3, 10
69:7  71:4, 8,
15, 21  72:4
75:11, 12, 13,
18  76:10
78:23  79:5
80:2  82:18
88:23  90:21
91:14, 17, 19,
21, 23  93:7
96:22  97:12,
20  98:24
99:1, 3, 8
101:20  105:5
107:8  108:16
109:21, 23
110:9, 17, 19
112:17
115:18, 21
116:14, 24
118:8, 20
124:15
125:21
126:12, 15, 20
127:10, 24
128:13, 21
129:1  130:15
131:9, 18
133:15, 18, 20,
22  134:4, 17
137:6  138:14,
20  139:19
140:14, 15
142:10, 15
143:16, 17
144:1  146:19,
22  147:10, 16
150:5  152:1,
7  154:20, 22
155:16
160:13  162:6,

22  166:9, 20
168:9  170:18
176:18
179:14, 20, 23
180:3  181:6,
12, 13  184:13,
19  191:1, 3
192:23  193:8
198:16  200:6
201:4, 23
202:15
204:10, 14, 17,
24  205:12, 18
206:11  214:9
218:1  220:4
221:16
223:14  224:9
227:22  228:5
232:6  234:21,
22  236:1
237:24  238:4
244:7  247:16,
19  248:9
250:7, 18
251:18  254:8
260:6  263:21
266:10  267:7
271:12
272:20  273:4
278:14  279:2,
6, 24  280:14
281:5, 20
282:2  284:4,
5, 6, 11  285:6,
9, 13, 15, 17, 21
287:24
288:14, 21, 22
289:6  290:24
291:9, 10
292:15, 23
294:11  295:6,
11  297:15
298:15, 16
299:4  300:4,
11  305:3, 7,
18, 24  306:6,
10, 12  307:5
308:2, 3, 4, 14,
19  310:2
314:10, 13
316:16

319:11
320:22  323:2
324:1, 12, 22
325:17
328:10, 11, 14
329:6  330:10,
21, 22  332:7
333:11  336:5
337:2  341:14
**knowing**
316:10, 18, 19
318:9  328:7
330:8  332:11
**knowledge**
67:14  162:18
255:2  284:14,
19  294:14
295:5
**knowledgeable**
65:10  116:21
**KUGLER**  1:4

**< L >**
**l.hilton@kanne**
**r-law.com**  2:9
**lab**  108:12, 15
301:11
316:23  337:12
**label**  167:12
**labeled**  35:14
**labeling**  44:18
**Laboratories**
8:12  24:23
48:18  49:23
72:16  135:18
212:17  306:1
323:17  326:2
**laboratory**
30:10, 11, 20
283:10
313:19  314:1,
19  316:12
318:14  320:4
325:6  331:5
**laboratory-**
**based**  32:9
**Labs**  4:16
**Lack**  331:4
**lacking**  323:15
**lacks**  323:7
331:12

**lamivudine**
329:23
**language**
123:5  144:24
145:24  163:8,
18  165:1, 5
175:10
177:15
189:11  211:8
**Lantech**
10:22  11:10
12:6  181:1, 8,
15, 21  182:9
183:15
214:11  236:6
269:22  278:3
281:3, 10, 17,
21  282:8
283:16
285:19
288:11  290:6,
22  291:4
294:10, 11, 16
295:9, 13
296:20  298:8
299:20  300:5
301:3  303:14
304:12  306:2,
18  307:18
308:16, 20
309:16
312:24
314:12, 23, 24
315:9  316:23
317:2, 22
318:4, 11, 12
319:2, 4
322:16  324:8
325:10, 16
328:8  329:11
334:17
336:12  338:2
340:4  341:4,
6, 15
**Lantech's**
229:5  306:22,
24  308:8
315:22
**laptop**  16:14,
21

**large**  45:16
46:13  339:2
**larger**  16:16
**late**  124:20
126:21
**LAW**  2:10
195:18
**LAWLOR**  5:7
**laws**  33:5
**lawyer**  86:16
190:23
**lawyers**
203:13
**LAWYER'S**
348:1
**lay**  50:10
**layer**  52:19
82:11  83:1
105:15  106:11
**layers**  29:21
52:10, 13, 15
**LAYNE**  2:7
**laypeople's**
149:17
**lead**  81:17
89:6  163:9
311:15
**leading**  112:7
**leads**  45:21
84:10
**learn**  24:9, 16
**learned**
270:17  271:11
**learning**
271:17, 23
**learnings**
123:17
**leaves**  79:22
**led**  90:8  91:6
92:11  96:9
**left**  32:22
88:20  262:3
**legal**  192:22
**legally**  37:10
190:13, 17
**Letter**  10:9
27:14, 19
319:23
323:14  330:1
331:12
**lettering**  22:14

letters 119:4
223:4
level 28:2
29:18 30:1, 2
33:7 48:13
57:7, 21
58:10 59:6
63:13 78:19
79:8, 11
112:16, 17
113:11 146:7
180:19 214:4
241:3 285:6
313:16
levels 29:18
80:15 113:19
243:21, 24
247:4 275:1
leveraging
197:20
LIABILITY
1:4 14:12
lie 182:19
280:9, 16
Life 269:22
283:24
327:22 328:1,
4, 17
lifecycle 44:13
45:1
likelihood
56:24 57:20
59:16 73:21
74:6
limit 187:22
Limited 12:7
24:23 48:19
49:24 67:8
72:16 98:1, 8,
16 135:19
145:4 212:17
306:1
limits 85:5
89:23 113:9
153:20
154:15 245:19
LINE 13:6, 9,
12, 15 54:9
68:8 75:23
76:9 346:4

348:2
link 292:19
list 46:13
51:16 154:22
220:9 223:20
224:2 282:3
289:11, 14, 16,
21
listed 23:4
151:7 154:22
210:11 284:11
listing 210:19
238:9 281:14
lists 301:2, 3
literally 56:4
LITIGATION
1:4, 21 14:5,
13 26:16
27:13, 18, 19
329:8
little 57:6
66:17, 18
74:4 91:24
92:1 141:21
145:1 151:6
156:6 160:24
175:11 226:2,
3 288:9
295:22 298:2
live 136:22
336:10
lives 179:24
LLC 2:7
3:13 4:6
LLP 2:1 3:3,
9, 15, 20 4:1,
7, 13 5:1, 12
local 73:17
128:1, 5
located 51:6
location
316:17 329:5
locked 336:23
lodge 39:22
log 87:9, 14
logged 87:11
logical 77:13
login 87:17
long 43:12
108:5 165:11

222:16 232:9
296:16 327:21
longer 17:11
81:7 232:5,
10 249:8
long-term
327:12
look 22:21
23:7 50:3, 7
55:19 59:14
61:23 70:14
81:14 98:6,
13 102:20, 23
120:21 121:2,
8 127:16, 17
135:24 162:8,
12 166:24
175:2 185:16
191:15 196:5
202:3, 5
206:20 207:6
227:24
244:16, 21
249:18
250:24
267:21
272:23, 24
276:15
277:21
296:15
299:18
310:13
319:22 323:5
334:16 341:23
looked 74:5
115:17 121:9
130:23 131:1
161:22 162:3
185:13 225:3
237:5, 6
248:2 256:13
263:3 295:1
looking 15:20
54:7 58:19,
21 119:22
123:22, 23
124:9 126:4
189:2 223:17
235:9 264:17
309:7 330:1

looks 121:10
160:9 175:5
207:1 220:17
221:17 224:1,
14 246:20
297:21 307:9,
15 329:22
loosely 149:2
LOSARTAN
1:3 14:11
losing 116:10
lost 128:17
225:23
310:20
315:17 335:21
lot 96:14
140:9, 10
151:5 284:23
338:19
lots 20:8
241:5 242:9,
16
Louis 3:21
Louisiana 2:8
low 57:8
59:2, 17, 24
60:5, 7 61:6
62:3, 9 63:6
75:12, 14
115:13, 20
lunch 157:5,
10
luncheon
158:11

< M >
main 77:10
78:5
maintains 33:3
major 150:11,
19 151:13
177:11 204:7
334:23 335:7
336:7 339:17
341:7, 10
making 93:9,
14 111:16
140:10 211:10
Malik 28:19,
21

managed
60:12
Management
6:20, 22 8:13
33:24 34:2, 5,
9 35:3 37:5
38:9, 13, 18
39:2, 4, 11
40:5, 12, 17
41:8, 10, 15,
24 42:4, 16,
24 43:4, 10,
13, 15, 18, 21,
24 44:8, 24
45:6 46:20
49:8, 23
50:20 77:13
134:3, 6
135:6, 16
228:11
manager
319:24 321:6,
9 325:2, 3
managing 59:6
mandated
140:4 193:2
mandates
194:9
manifest
164:13
manifested
91:16
manner 50:23
manually
338:14
manufacture
117:3 118:21
208:10 242:8,
11 283:8
Manufactured
7:18 30:23
51:10 132:7
199:19
210:13
223:21 239:22
Manufacturer
11:11, 18
143:11 187:4
200:14
283:17 287:3,

*13* 300:*22*
304:*13*
**manufacturers**
295:*3*
**manufactures**
143:*9*
**Manufacturing**
8:*7* 18:*10*
19:*3* 32:*16*
38:*23* 39:*9*
40:*8* 44:*11*
46:*3, 22*
55:*14* 56:*9*
68:*16* 72:*14*
76:*24* 81:*23*
99:*21* 103:*10*
104:*3* 118:*4*
123:*8, 22*
135:*19* 145:*4,*
*13* 146:*5*
155:*17*
156:*11*
173:*15*
177:*17*
183:*23* 187:*6,*
*19* 196:*14*
197:*11*
198:*10* 204:*5,*
*22* 205:*3, 5, 9*
252:*5* 269:*17*
275:*13*
285:*24* 294:*6*
**March** 1:*11*
14:*7* 239:*16*
277:*4* 307:*18*
308:*3, 6*
309:*17*
313:*23* 314:*3*
344:*15*
**mark** 19:*23,*
*24* 67:*20*
97:*13* 102:*8*
120:*2, 9, 23*
128:*21*
184:*23*
205:*24* 212:*4*
219:*9* 223:*5*
245:*4* 266:*20*
**Marked** 13:*14*
21:*6* 23:*15*
28:*10* 34:*16*

47:*21* 67:*22*
69:*2* 97:*9, 15*
102:*9* 120:*5,*
*12* 128:*9*
134:*12* 159:*3,*
*5* 173:*19, 24*
184:*24*
200:*22* 206:*3,*
*6* 212:*6*
219:*12*
223:*10*
224:*21* 239:*9*
245:*6* 251:*1*
266:*22* 267:*3*
276:*18, 23*
282:*13*
295:*18, 22*
298:*22, 23*
300:*17*
303:*22*
308:*23* 334:*11*
**Market** 2:*17*
51:*11* 72:*23*
132:*6* 307:*2*
**marking**
34:*14* 67:*21*
97:*7* 120:*3*
128:*8* 134:*8*
173:*17*
200:*20*
219:*10*
224:*20* 239:*7*
251:*10*
282:*11*
295:*16*
303:*19*
308:*21* 334:*9*
**master** 108:*21,*
*24* 109:*4, 18*
148:*9* 210:*11,*
*20* 238:*10*
**material** 78:*9,*
*17* 79:*18*
80:*12* 145:*13*
146:*23*
196:*17* 197:*1,*
*6, 10, 17*
241:*23* 242:*9,*
*17* 249:*21, 23*
250:*9, 14*
327:*6*

**materials**
30:*22* 44:*16,*
*18* 45:*7*
79:*16* 100:*13*
103:*9* 145:*6*
182:*23*
196:*10*
197:*13, 23*
198:*7, 13*
242:*4* 250:*4*
302:*22* 331:*6*
**Matrix** 11:*14*
74:*24* 75:*9*
130:*6* 299:*13*
**matt.knepper@**
**huschblackwell**
**.com** 3:*22*
**Matta** 5:*20*
86:*14* 87:*13*
203:*7*
**matter** 14:*10*
18:*17, 18, 24*
26:*17* 92:*23*
148:*5* 255:*4*
**matters**
167:*19*
**MATTHEW**
3:*20*
**MB** 24:*24*
**MBPR** 108:*20*
**McKesson** 5:*5*
**mdennis@crow**
**ell.com** 5:*14*
**MDL** 1:*3*
**mean** 15:*21*
31:*12* 40:*14*
46:*16* 47:*2, 4*
58:*14* 61:*17*
62:*19* 63:*5*
64:*10* 65:*22*
66:*9* 71:*17*
78:*11* 85:*8*
104:*14*
108:*10*
116:*23*
118:*12, 24*
122:*23*
123:*13*
124:*12* 126:*5,*
*23* 133:*20*
139:*7, 8*

140:*1* 144:*10*
148:*3* 149:*1*
161:*16*
164:*14*
165:*22, 24*
170:*21* 175:*5*
180:*15*
187:*15* 188:*6,*
*23* 192:*9, 19*
193:*6* 195:*15,*
*18* 203:*5*
205:*12, 15*
217:*17*
229:*23*
235:*18*
236:*21* 237:*6*
238:*7, 13*
240:*2* 241:*10*
246:*10*
247:*21*
262:*20*
270:*22* 276:*3*
278:*23* 279:*1,*
*13* 280:*13, 18*
286:*4* 304:*23*
305:*17*
307:*24*
311:*18*
315:*20, 24*
321:*9* 324:*21*
340:*20*
**meaning**
30:*20* 54:*11*
171:*14*
**meaningless**
275:*10*
**means** 38:*21*
39:*6* 40:*6*
56:*24* 57:*2*
126:*13, 15*
163:*3* 164:*2*
168:*21*
176:*13*
187:*22*
195:*19*
204:*14*
221:*17* 222:*6*
229:*2* 234:*6*
272:*4* 297:*15,*
*23* 298:*5*

319:*12* 323:*3*
332:*12* 344:*20*
**meant** 112:*13*
115:*16, 21*
162:*16*
217:*12* 218:*2*
219:*3, 6* 229:*3*
**measurable**
188:*11, 12*
**measured**
189:*18*
**measurements**
189:*19*
**measures**
31:*22* 54:*14,*
*19, 20* 75:*13*
**mechanics**
177:*3*
**medical** 60:*20*
**medium** 57:*8*
58:*3, 6, 13, 16,*
*24* 60:*2, 16*
61:*8* 62:*5, 14*
63:*9* 64:*3, 21*
65:*8* 66:*3*
75:*15, 18, 24*
76:*12*
**meet** 84:*19*
85:*3* 89:*9*
151:*4* 161:*17*
163:*4, 15*
164:*17*
165:*19* 166:*5*
215:*9*
**meeting** 161:*5*
167:*16* 187:*8*
306:*23*
**meets** 112:*20*
**memorize**
119:*1*
**memorized**
224:*1* 333:*4*
**memory**
70:*12* 173:*10*
201:*5*
**men's** 201:*9,*
*15*
**mentioned**
33:*15* 53:*11*
88:*11* 116:*4,*
*14* 170:*10*

Confidential Information - Subject to Protective Order

183:6  225:12
264:7  332:13
**mentioning**
177:19
178:10  226:21
**mentions**
53:15  179:20,
22
**Mercer**  282:18
**merchant**
111:24
**Meridian**  3:16
**met**  85:2
104:2  153:12
154:14  210:6
**metadata**
103:1  124:7,
12, 18  125:3
126:9, 18
127:10  299:9
**method**  78:17
182:13  214:5
303:6
**methods**
77:21  145:5
187:18
268:22
302:17  333:20
**Michelle**  1:16
15:5  93:21
262:2  292:24
293:19  344:12
**micronization**
283:9
**mid-2019**
290:7
**middle**  38:17
103:21  187:3
241:16  256:24
**midst**  88:12
**MIMI**  5:12
**mind**  29:7
40:22, 24
97:4  143:1
145:22  190:9
225:4  274:1
333:3
**mine**  16:23
**minimal**  16:9
**minimize**
230:10

**minimum**
181:15  191:12
**minor**  150:11,
19
**minutes**  69:17
81:3, 10
87:16, 23
135:3  216:9
232:6, 11, 12
261:7  265:17
293:6
**mischaracteriz
ation**  317:8
**mischaracteriz
ed**  26:20  27:2
**mischaracteriz
es**  92:24
145:16
151:22  235:6
**mischaracterizi
ng**  88:21
**misleading**
222:4
**misrepresentati
on**  96:24
**missing**  91:9
223:2
**misspeak**
308:10
**Misstates**
151:21
**misstating**
233:18
**mitigate**  51:19
**mitigation**
59:8  60:3, 22,
23  73:24
107:1  250:22
**MLL**  48:11,
22  134:5
269:23
**MLLCRP**
48:17
**Mm-hmm**
57:5  322:8
**MO**  3:21
**moderate**
57:19  121:24
122:9
**Modified**
167:20

**modifying**
320:7  322:5, 6
**molecule**
274:14, 16
275:7  338:21
**moment**  69:6
134:16
**moments**
201:3  251:17
**monitor**
196:12
**monitoring**
171:13
**monitors**
15:19
**Monroe**  4:9
**months**  24:14
230:14, 18
280:5  314:6,
24  322:22
**Morgantown**
17:15  131:15
283:5
**MORING**
5:12
**morning**
15:15  292:10
**MORRIS**  3:9
**motion**  26:22
**mouth**  233:17
**move**  54:22
64:21  92:3
142:24  190:8
193:5  226:23
243:8  245:10
298:21  312:4
335:6
**moved**  292:7
**moving**  35:19
51:13  152:24
232:20
245:17  249:4
251:1  292:15
324:13
**MSDS**  7:12
105:6  254:19
255:14
**multiple**
105:21
**multiple-page**

301:8
**multiply**  57:14
**multitude**
340:14
**muted**  160:1
**Mylan**  3:7
5:20  8:12
9:9  19:19, 24
20:8  22:17
24:23, 24
25:3, 11
28:24  29:4,
24  32:24
36:15  38:11
44:23  45:5,
12  47:14
48:18, 23
49:23, 24
50:19  51:5
52:8  54:10
60:16, 18
61:7  63:10
64:4, 11, 20
65:8, 9, 23
66:2, 19  67:3,
15  72:15
73:14  77:14
82:8, 22  85:8
86:15  90:5,
20  91:4
98:15, 22
99:15, 20
100:24  102:2
108:2, 3
114:4  117:1,
16, 24  119:11
124:19
126:11
129:13
135:18
140:15, 19
143:5, 9, 12
147:3  149:18
153:14, 17
156:7  168:7
173:7  174:8
181:22  182:3,
11  186:6
190:16
191:21  192:7
193:14  196:2

198:16
200:18  201:5
202:9, 24
203:12
204:10, 19, 20
205:13, 14
212:17  213:4,
14  215:16
218:17
222:23
228:20
229:20
230:13, 15, 18
237:1, 12
239:15  241:3
242:20
245:24
247:10
248:13
249:19
250:10  255:3
257:9  258:2,
8, 23  259:24
260:6  264:23,
24  270:17, 24
271:11, 20
275:22  277:8
282:2, 9, 20
284:16
285:13, 19, 22
288:16, 20
291:3  294:15
298:7  303:14
304:19  306:1,
21  307:21
308:7  314:10,
18, 22  317:4
320:11  322:4,
13  323:10
324:2, 10, 11,
19, 20  328:14
331:19
332:14
333:23  334:4,
17, 22  336:6
339:16, 21
341:3, 7, 11, 14
**Mylan.in**
212:16
**Mylan-1**  20:2

Confidential Information Subject to Protective Order

MYLAN-MDL2875  11:*19*

MYLAN-MDL28750024 9392-93  10:*8*

MYLAN-MDL28750025 7214  7:*14*

MYLAN-MDL28750028 1315  9:*16*

MYLAN-MDL28750028 1626  10:*15*

MYLAN-MDL28750028 1628  10:*17*

MYLAN-MDL28750028 3572-75  8:*11*

MYLAN-MDL28750029 7980  7:*23*

MYLAN-MDL28750029 7981-93  8:*8*

MYLAN-MDL28750030 0611-14  11:*8*

MYLAN-MDL28750034 2341-43  9:*10*

MYLAN-MDL28750034 2344-48  9:*13*

MYLAN-MDL28750034 7222  10:*20*

MYLAN-MDL28750034 7223-24  10:*22*

MYLAN-MDL28750036 9663  6:*22*

MYLAN-MDL-2875-00396834  296:*8*

MYLAN-MDL28750039 6834-36  11:*11*

MYLAN-MDL28750042 1388  7:*8*

MYLAN-MDL28750042 1389-01  7:*10*

MYLAN-MDL28750046 7826  12:*8*

MYLAN-MDL28750046 8745  8:*18*

MYLAN-MDL28750046 8746-07  8:*20*

MYLAN-MDL28750049 2061  11:*14*

MYLAN-MDL28750049 2062  11:*17*

MYLAN-MDL28750053 0156-57  9:*19*

MYLAN-MDL28750061 8180  7:*19*

MYLAN-MDL28750072 0361-75  10:*12*

**Mylan's**  32:*16* 34:*5*  42:*2, 7, 18*  58:*8* 67:*17*  73:*1* 92:*9*  130:*23* 154:*1*  155:*6* 170:*16*  175:*3, 22*  180:*23* 196:*1*  200:*7* 207:*8, 17* 212:*21, 22* 213:*5, 16, 18* 239:*21*  240:*3* 254:*11*  255:*2, 6*  275:*12* 278:*9*  283:*7* 285:*24* 291:*16*  294:*6*

297:*19* 304:*20* 318:*11*  326:*3* 330:*12*

**< N >**

**NAKUL**  4:*13*

**Name**  9:*21* 14:*3*  20:*6* 21:*19*  71:*15, 24*  103:*3* 116:*23* 130:*14*  146:*9* 160:*16*  181:*2* 202:*19*  296:*3* 301:*3*  337:*22*

**named**  160:*11* 200:*6*

**names**  21:*13* 52:*15*  124:*15* 162:*9*

**naming**  19:*18* 183:*22*

**NaNO2**  269:*20*  270:*2, 8*

**nationwide**  241:*4*

**nature**  14:*22* 17:*6, 22*

**NDA**  286:*10* 287:*6*

**NDEA**  82:*13* 83:*3*  243:*22, 24*  247:*4, 7* 270:*6*  271:*11* 273:*14*  323:*22*

**NDMA**  82:*13* 83:*3*  243:*22* 259:*23* 264:*22*  270:*6* 273:*13*  325:*11*

**Nearly**  340:*8*

**necessarily**  29:*16*  40:*18* 54:*2*  62:*18* 63:*5*  78:*8* 79:*5*  178:*18* 192:*21* 195:*18*  279:*2* 325:*14*

**necessary**  26:*14*  272:*19* 345:*4*

**need**  20:*23* 27:*8*  76:*7* 135:*2*  155:*23* 162:*8*  165:*16* 205:*1*  213:*11* 215:*23* 235:*15*  261:*3, 4*  285:*7* 292:*3*  297:*16*

**needed**  27:*1* 75:*14*  246:*9* 275:*20*

**needs**  192:*4* 208:*1*

**negligible**  154:*12*  260:*20*

**neither**  112:*24*  215:*10*

**Nesbit**  2:*12*

**never**  70:*9* 162:*3*  166:*10* 184:*11*  225:*4* 240:*18*  285:*1* 292:*12*

**NEW**  1:*1*  2:*8* 4:*14*  14:*15* 127:*7*  153:*20* 192:*22* 216:*14, 15* 221:*9, 19* 241:*22*

**news**  18:*4, 19* 292:*5, 6, 12, 15*

**nitrite**  82:*14* 83:*4*  105:*17* 106:*13, 19* 118:*2*  252:*24* 253:*8, 10, 22* 254:*4*  255:*7* 272:*2*  273:*11* 312:*7*

**nitrites**  100:*19*  101:*15*

**nitro**  106:*15*

**nitrosamine**  88:*24*  89:*14* 91:*17*  96:*10* 104:*1*  105:*18*

106:*17*  214:*2, 10*  259:*12* 262:*16*  264:*9, 20*  265:*2* 270:*18* 271:*17, 23* 274:*2, 12, 24* 275:*9*  278:*21* 312:*18, 20* 342:*1*

**nitrosamines**  85:*1*  100:*19* 101:*17* 153:*24*  155:*8* 213:*7, 16* 246:*24*  270:*4* 325:*12*

**nitrosating**  100:*14, 20* 101:*6, 13, 15* 104:*21* 106:*20* 252:*23*  253:*7* 254:*13*

**nitrous**  254:*2, 5*  312:*19*

**noise**  332:*3*

**nomenclature**  49:*2*  127:*11* 336:*14*

**non-DMF**  234:*22*

**nonresponsive**  92:*4*

**Normally**  73:*5*  139:*13* 197:*22*

**North**  131:*15*

**NORTON**  5:*1*

**Notary**  1:*17*  344:*14* 347:*23*

**note**  26:*18* 70:*16*  94:*24* 178:*10*

**noted**  15:*3* 254:*17, 18* 345:*11*  347:*11*

**NOTES**  348:*1*

**notice**  1:*15* 6:*14*  21:*20*

23:6, *14*
26:16 329:*8*
**noticed** 336:*17*
**Notification**
11:*8* 62:*2*
**notify** 133:*4*
143:*13* 147:*4*,
7
**November**
212:*11*, 20
213:2, *15*
219:*19* 225:*3*,
6 271:*13*
304:*3*
**Nshah@hillwal**
**lack.com** 4:*15*
**number** 21:*11*,
*13* 45:*16*
56:*24* 57:*2*,
*15* 65:*3*
74:*16* 76:*22*
77:*1*, 2 81:*15*
127:*19*
178:*24*
183:*19*
185:*17* 190:*9*
204:*3* 212:*15*
251:*2* 256:*20*
267:*24*
285:*11*
301:*11*, *16*, *21*
302:2, *6*, *11*,
*16* 335:*22*
**numbered**
37:*23*, *24*
203:*20* 268:*5*
305:*9*
**numbering**
37:*19* 48:*10*,
*16* 50:*5*, *6*
74:*12* 103:*6*
185:*18* 202:*5*
240:*22*
251:*23* 267:*22*
**numbers** 57:*9*,
*11* 206:*14*
224:*9*
**Numeral**
226:*3*
**numerous**

317:*14*
**NW** 5:*13*

< O >
**object** 90:*22*
92:*3*, *20*
125:*24* 213:*20*
**objection**
26:*19* 31:*2*
39:*12*, *22*
42:*9*, *19* 43:*5*
61:*3*, *11*
62:*24* 63:*14*,
*15* 64:*8*
65:*12* 66:*4*, *5*
67:*6* 80:*6*
82:*15* 83:*7*
84:*5*, *14*
90:*10*, *11*
93:*15* 94:*3*,
*19* 99:*22*
104:*8* 105:*1*,
*2*, *20*, *22*
112:*9* 113:*15*
118:*5* 119:*14*
125:*1* 132:*8*
138:*18* 141:*5*,
*6* 145:*14*
147:*23*
149:*21*, *22*
151:*20*
152:*18*, *19*
153:*5* 154:*2*,
*5* 155:*21*
156:*15*
164:*21* 166:*1*,
*2* 169:*5*, *10*
170:*3* 172:*18*
175:*18* 179:*6*,
*8* 182:*1*, *15*
183:*16*
186:*19* 188:*2*,
*3*, *22* 189:*3*
190:*20*
192:*10*
193:*19*, *20*
194:*23* 197:*2*
213:*8* 215:*20*
217:*21* 218:*9*,
*10*, *22* 220:*20*
228:*23*

230:*22*
231:*13* 235:*5*,
*22* 238:*14*
242:*22*
246:*15*
248:*17*
250:*15*
254:*15*
257:*15*, *17*
258:*10* 259:*5*
260:*11* 264:*2*
270:*21*
273:*21*
280:*11* 286:*2*
288:*17*
290:*13*
291:*19*, *20*
298:*10*, *11*
300:*8* 306:*7*
307:*3* 311:*8*
313:*3* 315:*3*
316:*3*, *4*
317:*6*, 7
318:*6* 319:*9*
321:*24*
322:*18* 340:*6*
**objections**
93:*9* 94:*22*
**obligated**
147:*11*, *13*
**obligation**
62:*21*
**obliquely**
133:*24*
**observation**
177:*15* 204:*2*
207:*9*, *14*, *17*
252:*17* 272:*7*,
*15* 310:*14*, *23*
311:*5*, *16*, *22*
313:*12*
321:*21* 323:*5*
329:*10*, *23*
331:*4*
**Observations**
10:*11* 11:*21*
175:*4*, *15*, *16*
177:*11* 269:*8*
311:*14* 318:*3*
334:*20*, *23*
335:*8*

**observed**
273:*8* 313:*23*
330:*23*
**observing**
330:*20*
**obtained** 57:*7*
**obvious**
306:*11*
**obviously**
104:*15* 115:*1*
122:*24*
192:*19* 282:*5*
**occasionally**
63:*9*
**occasions**
172:*6*
**occur** 57:*3*
59:*18* 308:*7*
**occurred**
173:*7* 241:*17*,
*19*, *20* 267:*18*
271:*6*
**occurrence**
56:*23* 57:*2*, *21*
**occurring**
73:*22* 257:*3*
**o'clock**
157:*18* 342:*8*
**October**
68:*11* 129:*6*
271:*13*
**Official** 10:*17*
327:*15*
**offsite** 269:*21*
329:*5*
**Oh** 74:*17*
110:*6* 122:*6*
125:*9* 142:*22*
180:*2* 225:*4*
227:*1* 249:*16*
256:*14* 266:*3*,
*5* 279:*1*
285:*3* 289:*15*
304:*9* 330:*2*
335:*24*
**Okay** 15:*15*
16:*6* 17:*1*, *6*,
*17* 18:*23*
19:*14* 21:*1*, *3*,
*9*, *21* 22:*7*, *18*
23:*9*, *21*

24:*21* 25:*2*, *6*,
*7*, *22* 26:*4*
29:*2*, *5* 32:*6*
33:*21* 34:*13*
35:*7* 36:*9*, *18*
37:*1*, *20* 38:*1*
39:*24* 43:*2*,
*20* 44:*1*
45:*11* 47:*19*
48:*5* 49:*16*,
*21* 52:*19*
53:*10*, *15*
54:*10*, *22*
56:*6* 58:*2*, *5*
60:*16*, *20*
63:*8* 66:*16*
67:*14* 68:*1*,
*20*, *23* 69:*19*
70:*4* 71:*9*
72:*10* 73:*8*,
*19* 76:*16*
80:*1* 81:*8*
85:*16*, *17*
86:*6* 88:*10*,
*20* 97:*18*
98:*12* 99:*5*, 7
100:*9*, *12*
101:*4* 102:*24*
103:*15*
105:*10* 106:*5*
107:*17* 108:*7*,
*18* 111:*10*, *17*
112:*3* 115:*9*,
*16* 116:*1*, *24*
118:*18* 120:*1*,
*17*, *21* 121:*18*
122:*19*
123:*12* 124:*6*
128:*7*, *23*
129:*3*, *12*, *20*
130:*8*, *11*, *17*
131:*17* 134:*7*,
*11*, *22* 135:*4*,
*9* 136:*18*
137:*16* 138:*4*
139:*17* 142:*5*,
*22* 143:*6*
144:*16*
147:*15*
149:*18* 150:*5*
151:*10* 158:*2*,

Confidential Information Subject to Protective Order

6 159:12
160:23
161:24 166:8,
13 168:1
173:12 174:3,
15 175:2
176:1 177:4
180:6 181:22
183:10
184:22
185:20 195:4,
24 196:7
201:1, 19
202:1, 2, 16
204:1 205:23
206:9, 20
207:21
211:19 212:3
215:4 218:4
219:8, 15, 20,
21 224:3, 11,
19 225:8, 15
226:5, 10, 11
227:4 229:18
232:16
236:23
237:14
239:20 241:8,
9, 14 242:16
249:16
251:17, 20
252:1, 19
254:10 261:5,
11, 14, 15
262:12
265:24 268:7,
13 269:12, 13
271:15 273:2
276:14 277:9,
13 279:17
281:2, 8, 13,
17 282:7, 16
283:22
284:13 288:2
290:10 294:5,
14 295:6, 11
296:24
299:15 304:9,
18 305:8, 24
309:12
311:21

313:15 323:8
325:1, 9
328:5 334:14,
21 337:22
339:5, 15
342:10
old 130:4
263:4
older 314:23
338:24
once 73:8, 10,
12 287:2
319:17 320:24
one-page
265:15 299:12
ones 70:12
one-size-fits-all
194:4
onsite 269:23
onus 147:3
OOS 215:7
open 16:20
53:8, 14
opened 227:24
OpenLab
320:2
operate 37:12
operation
320:16
operations
30:10, 11
99:21 156:10
316:12
operators 19:7
opinion 42:18
94:8 154:1
156:14
195:19
272:21, 22
312:3 321:2
323:13 325:24
opportunities
40:15 246:5
opportunity
40:20 182:4
344:9
opposed
35:15 54:12
114:8 274:13
338:14

option 210:12
336:23
ORDER 1:8
22:10 46:23
50:13 63:8
326:17
ordered 26:23
organic 81:16
82:3, 6, 11
83:1 84:8
90:6 91:5
92:10 105:12,
15 106:11
112:7 123:7,
20
Organization
173:6
original 41:9
122:2, 4
127:5, 11
139:13 152:7
199:5 278:15
345:15
originally
198:21
originating
136:2
Orleans 2:8
ortho-xylene
109:14, 22
113:12 214:7
226:8 236:7,
10 284:15
298:9
outcome
74:21 76:11
output 75:2
196:12
outside 90:23
133:5 141:22
191:9 204:20
218:7, 19
257:3 310:5
outsource
156:9
overall 78:13,
16
overrides
64:16

oversight
32:15 294:21
323:7
overstated
214:4
overview
24:19
Owens 279:11
280:9
Oxford 3:4
o-xylene
82:12 83:2
91:6 92:11
105:16
107:10 109:4,
6, 16 118:1
180:23
213:18
225:18
243:15, 24
247:3 249:9
269:22
270:20 282:9
297:1, 11
298:3 300:2
312:10

< P >
P.A 2:10
P.C 2:16 5:7
p.m 158:8, 17
233:5, 9
261:20, 24
293:22 294:2
343:2, 6
packaging
44:17
PAGE 6:13
7:5 8:5 9:5
10:5 11:5
12:5 13:6, 9,
12, 15 22:12,
13, 15 25:17,
23 26:3
37:16, 18, 22,
23 38:16
44:2 50:6
56:13, 22
57:4 58:16
59:14 72:4, 5,
6, 8 74:10, 11,

12, 16, 20
75:7 76:17
100:11, 18
103:6, 8, 13,
22 115:11
121:18 122:3,
11 123:6
129:21
130:12
132:15, 16
138:2 150:9
166:24 167:6
169:9 177:9,
13 185:16
187:3 190:8,
9 196:6
202:3, 6
203:20, 22, 24
207:7, 13
221:4 240:21
241:8 243:9
245:13 249:4
251:22
256:23 257:1
267:21, 22, 23,
24 268:3, 5, 6,
13 269:12, 15
272:24
282:21 299:3,
4, 6 301:21
305:9 310:23
312:5 313:13
319:23 323:6,
15 331:11
334:19 335:6
339:20 346:4
348:2
pages 23:5
73:19 116:13
135:3 177:13
185:19 347:6
paper 316:13
paragraph
38:5, 16
109:14
161:16 187:4
189:2, 8, 9
197:19
241:12
243:10
245:14

Confidential Information Subject to Protective Order

246:*18*  249:*3*
252:*2*  257:*1*
269:*14, 15*
273:*3*
**Paralegal**  5:*20*
**paraphrase**
161:*1*
**parent**  118:*4*
123:*8, 21*
338:*20*
**parentheses**
216:*3*
**Parkway**  5:*8*
**part**  33:*14*
42:*4, 12*
99:*21*  102:*18*
109:*24*
114:*16, 20*
133:*6*  148:*15*
152:*6*  210:*13*
214:*22*
237:*17*  238:*5*
278:*2, 3, 9*
279:*20*  281:*4,
18*  288:*3*
299:*7*  304:*19*
305:*4*  329:*7*
**participate**
46:*14*
**participated**
131:*21*
**particular**
25:*9*  33:*8, 15*
37:*11*  46:*22*
52:*7*  56:*1, 7,
8*  61:*20*
64:*13*  75:*1*
95:*24*  146:*23,
24*  147:*1*
193:*16*  194:*9*
195:*11*  326:*10*
**particularly**
117:*12*
**parties**  14:*18*
15:*1*
**partners**  41:*14*
**Parts**  191:*18,
24*  192:*18*
**path**  299:*6, 9*
**pathway**
148:*20*

**pathways**
288:*21*
**patient**  38:*20*
50:*15, 21, 24*
138:*10*
150:*20*  151:*6*
154:*11*
**patients**  247:*6*
**pause**  14:*23*
**paying**  15:*22*
**PDF**  160:*8*
**peak**  332:*2*
**peaks**  331:*14,
20*  332:*15*
333:*9*  334:*1, 5*
**pending**  94:*16*
95:*9*
**Pennsylvania**
2:*18*  3:*5, 10*
4:*4*  5:*8, 13*
**people**  45:*16*
46:*14*  76:*5*
162:*7, 22*
163:*11*  166:*9*
212:*16*  222:*7*
243:*5*  316:*23*
322:*10*  341:*4*
**percent**  59:*16*
79:*17, 21, 22*
80:*5*  339:*2*
**performance**
178:*8*  187:*6*
196:*14*
**Performed**
7:*18*  55:*1*
189:*20*  204:*4*
205:*8*  231:*10*
263:*8*  264:*20*
274:*6*  329:*13,
20*  330:*5*
**period**  340:*22*
**permanent**
122:*15*
**permanently**
250:*11*  314:*4,
19*  315:*23*
**permission**
216:*20*
**permit**  249:*22*
**person**  53:*4,
12*  62:*1*  68:*6*

86:*13*  116:*2,
17*  174:*22*
176:*16*
193:*17*  220:*4*
284:*18*
304:*18*
320:*18*  322:*3,
7*  324:*24*
**personal**
104:*13*  106:*1*
162:*17*
284:*14*  321:*2*
**personally**
162:*6*
**personnel**
100:*3, 4*
203:*12*
302:*18*  306:*2*
**perspective**
196:*1*
**ph**  1:*21*
**Pharma**  4:*7*
269:*22*

**Pharmaceutical**
3:*12, 13*  4:*6*
8:*15*  38:*7*
44:*10*  68:*17*
72:*14*  167:*8*
**Pharmaceutical
s**  3:*7*  4:*6*
5:*10*  12:*6*
24:*24*  190:*12*
**Pharmacy**
3:*18*
**phase**  171:*24*
**phases**  171:*11,
14, 15, 17*
**Philadelphia**
2:*18*  4:*4*
**pick**  342:*12*
**picked**  286:*24*
287:*5*
**piece**  273:*17*
**PIETRAGALL
O**  3:*1*
**pile**  35:*1*
**Pittsburgh**
3:*5, 10*
**PL**  21:*4*

**place**  31:*23*
54:*16*  115:*23*
122:*16*  129:*5*
133:*10*  157:*9*
234:*11*
246:*11*
286:*17*
294:*21*
310:*21*
335:*11*  336:*15*
**placed**  290:*6,
7*  317:*22*
**places**  287:*8*
**Plaintiff**  20:*1*
21:*4*  22:*8*
26:*23*  97:*8, 14*
**Plaintiffs**  2:*5,
10, 14, 19*
20:*1*  159:*4*
239:*8*  298:*22*
303:*20*  334:*10*
**plaintiff's**  95:*2*
**plan**  221:*10*
**planned**  297:*2,
11, 15, 21, 24*
298:*4*
**plans**  59:*9*
60:*3*
**plant**  18:*4*
33:*19*  330:*6*
335:*10*
**Plaza**  3:*21*
**please**  14:*23*
95:*10*  160:*1*
218:*13*  220:*8*
345:*3, 8*
**plenty**  168:*18*
**PL-Glover-1**
6:*14*  21:*8*
**PL-Glover-10**
7:*17*  102:*11*
**PL-Glover-11**
7:*19*  120:*7*
**PL-Glover-12**
8:*6*  120:*14*
**PL-Glover-13**
8:*9*  128:*11*
**PL-Glover-14**
8:*12*  134:*14*
**PL-Glover-15**
8:*13*  159:*7*

**PL-Glover-16**
8:*17*  173:*21*
**PL-Glover-17**
8:*18*  174:*2*
**PL-Glover-18**
8:*20*  185:*2*
**PL-Glover-19**
9:*6*  200:*24*
**PL-Glover-2**
6:*14*  23:*17*
**PL-Glover-20**
9:*8*  206:*5*
**PL-Glover-21**
9:*11*  206:*8*
**PL-Glover-22**
9:*14*  212:*8*
**PL-Glover-23**
9:*17*  219:*14*
**PL-Glover-24**
9:*20*  223:*12*
**PL-Glover-25**
10:*6*  224:*23*
**PL-Glover-26**
10:*9*  239:*11*
**PL-Glover-27**
10:*11*  245:*8*
**PL-Glover-28**
10:*12*  266:*24*
**PL-Glover-29**
10:*16*  267:*5*
**PL-Glover-3**
6:*17*  28:*12*
**PL-Glover-30**
10:*17*  276:*20*
**PL-Glover-31**
10:*20*  277:*1*
**PL-Glover-32**
11:*6*  282:*15*
**PL-Glover-33**
11:*8*  295:*20*
**PL-Glover-34**
11:*11*  299:*1*
**PL-Glover-35**
11:*14*  300:*19*
**PL-Glover-36**
11:*18*  303:*24*
**PL-Glover-37**
11:*19*  309:*1*
**PL-Glover-38**
12:*6*  334:*13*

Confidential Information Subject to Protective Order

PL-Glover-4 6:*19* 34:*18*
PL-Glover-5 6:*20* 47:*23*
PL-Glover-6 7:6 67:*24*
PL-Glover-7 7:8 69:*4*
PL-Glover-8 7:*10* 97:*11*
PL-Glover-9 7:*15* 97:*17*
plus 328:*4*
poetically 43:*11*
point 24:*15, 18* 25:8 26:*17* 29:*22* 34:*3* 59:*1* 74:*10* 132:4 137:2 143:*15* 173:*11* 182:8 198:*19* 207:*18* 213:5, *15* 222:*13* 227:5 237:*3* 259:*24* 260:2 262:*14* 286:6, *13* 314:*12* 318:5
points 167:*10* 280:*23*
Pokhariyal 130:*13*
policies 33:*4*
policy 34:2 135:*12*
portion 94:2 262:*10*
positing 211:*22*
position 53:*8, 14*
positioning 69:*12*
positive 48:*11* 291:*1*
possession 237:9

possibilities 60:*24* 63:*4* 236:*12*
possibility 76:7 100:*18* 101:*14* 236:9, *16*
possible 48:*23* 49:*10* 50:2 57:*20* 59:*22* 60:9 65:*24* 66:*13* 87:5 103:*24* 128:*3* 176:4 203:7 234:*15* 281:*16* 316:*11*
Possibly 184:2 190:*23*
Post 35:*12* 271:*17*
post-recall 259:*19*
postsubmission 143:3, *12*
potency 78:*10* 80:*16* 187:*10* 189:*17*
potential 18:*1* 38:*22* 39:7 40:6 46:*1, 5* 81:*20* 85:7 156:*19* 262:*15* 270:*4, 7* 272:8 274:*21* 310:*16* 311:2, 24*
potentially 112:4 139:*21* 156:*12* 196:*22*
potentiometer 338:*10, 12* 339:*4*
PPK 216:*20*
PQR 177:*16, 23* 178:*11, 16, 19*
PQS 8:*15*
practice 27:*22, 24* 73:2, *13, 16* 79:6, 7, *15*

193:5 218:*18* 230:9 278:*3* 326:*3*
Practices 8:*23* 11:7 32:*21* 33:*1* 36:*24* 37:6, *15* 66:*12* 183:2 184:*15, 16* 191:6 192:*21* 215:*11* 218:*24* 335:*3*
pre-ANDA 298:*6*
preapproval 46:*17* 140:*14* 143:3, *12* 297:*18*
preceded 189:*12* 211:*12*
precisely 105:5 150:2 317:*4*
preclude 76:7
precludes 194:8
precursors 198:*3* 312:*18*
predefined 161:6 163:*4*
predetermined 208:*17*
predominate 163:*10*
predominately 30:*10*
prefer 19:*20, 23*
preference 311:*19*
prefix 19:*19*
premise 191:*3* 272:*15*
prep 18:*2*
preparation 110:*1* 176:*10* 202:*18* 211:2 310:9
prepare 110:*18*

111:*15* 118:*19* 220:8
preparing 70:5 203:*14, 16* 244:*17, 23* 310:*4*
prepping 135:6
pre-recall 131:*19*
presence 83:*18* 86:*23* 169:*22* 203:*13* 257:*4* 274:2
presences 91:*21*
PRESENT 5:*15* 15:2 168:*22* 170:*20* 213:*16* 275:2 312:9 339:*1*
presentation 160:*10, 21* 166:*16, 19* 170:8 190:*3, 4*
preserved 27:*12*
president 28:*23*
presubmission 142:*13*
presuming 211:*15*
presuppose 64:4 147:*19*
pretty 39:*1* 65:*21* 84:2 132:4 203:9 224:*1* 289:8 291:*23* 293:7 307:9 319:6, 7, 12*
prevent 53:*23* 54:*15* 303:*10*
prevented 325:*10*
preventing 54:*13*

preventive 51:*20* 53:*16, 20* 225:*13*
previous 17:*2* 51:*4* 93:*22* 267:*14* 268:*14*
previously 23:7 153:*21*
primarily 36:*17*
primary 91:*18* 181:9 198:*4* 257:*3*
Princeton 4:*14*
Principles 8:*22* 44:7 45:6
Prinston 3:*12*
print 265:*14* 266:9 292:*21*
printed 223:*16, 18* 266:*10* 292:*17*
prior 92:*24* 117:*1, 23* 119:*11* 139:2, 23* 140:2, 21* 141:2, 9* 198:*18, 19* 227:*15* 262:*15* 285:9 302:*22* 310:7 317:*3* 318:*24*
PRISELAC 3:9
privilege 322:*10*
privileged 110:8
privileges 320:6 322:*4*
privy 291:*1*
proactive 30:*24* 31:*22* 38:*21* 39:6 40:5 54:*19, 20*
proactively 228:7
probably 32:*3* 54:8 122:*23* 157:9 173:*10*

Confidential Information Subject to Protective Order

176:18
214:16, 17
228:13
257:20
320:24
324:24  336:10
**problem**
95:18  201:21
229:4  318:18
319:6, 7
321:20
**problematic**
222:9
**Procedural**
335:10
**procedure**
50:10  54:23
55:10, 21
123:10
143:13
145:13  221:9,
20  331:13, 20
332:1, 7, 14
335:14, 19
336:3, 10
**procedures**
59:12  107:9
134:1  145:4
196:11
294:15  302:7
318:21
**Process**  8:13,
22  19:2
33:22  41:15
46:7  50:12
51:16  55:1,
14  56:9
59:11  60:10
64:22  76:24
81:23  82:23
96:19, 23, 24
103:10  104:3
108:19  109:6
112:8  118:1,
4  123:9, 22
128:1, 6
129:24  130:1,
4  132:21
133:3, 7
134:3  139:14
141:12, 13, 18

145:12
148:19  151:4
156:19
170:14  171:3,
7, 9, 10, 13
172:3, 13, 16
177:18  179:1,
14, 17, 22, 23
180:4, 9, 17
181:16, 20, 21
182:18  185:9,
22, 24  186:3,
7, 11, 12, 15
187:7  190:11,
17  191:12, 16,
22  192:1, 3, 8,
17  193:1, 10,
14, 16  194:1,
2, 4, 15
195:20
198:10, 17
204:5, 23
205:4, 5, 9
208:5, 13
209:3, 23, 24
210:15, 21
211:5, 11
214:12, 14, 21,
22  215:6, 17
216:1, 5, 12,
16, 17, 18, 21
217:1, 3, 8, 10,
16  221:24
222:17  224:5
228:1, 18, 21
229:5, 19
230:1, 17
233:13, 19
234:5, 8, 12,
16, 23  235:3
237:2, 21
238:11, 22
241:17, 20
242:7  243:15,
18  244:4, 22
245:1, 18, 24
246:6, 8, 13,
19, 23  249:7,
15, 18  250:12
252:8, 10
257:4  258:6

259:1  262:23
264:21
269:17, 19
270:3  286:23
291:7  294:21
297:2, 4, 5
303:5  312:8,
20  320:22
327:4  329:12,
14, 19  330:4,
14, 22  331:2
**processes**
44:13  46:3,
23  47:1, 7
55:13  60:4,
24  82:9
134:3  144:23
145:3  146:6
170:15  196:2,
15  213:6
242:14  252:6
278:1  279:20
286:1  307:1
**processing**
79:19
**produce**
187:8  210:6
**produced**
124:19
**produces**
299:6
**Product**  9:20
17:10  38:20
42:7  50:14
56:1, 8, 9
60:13  81:18
84:11  89:2, 7,
9, 17, 20  96:6
124:5  139:16
143:22  149:2,
3  151:12, 19
152:16  153:4,
11  154:14
155:19
156:13
163:10, 13, 14,
15  164:1, 13
165:19  166:5
167:8  177:24
178:7  186:4
187:14, 16

196:18  197:1
198:1, 2
287:2, 19
302:2  327:22
334:24
**product-by-
product**
123:24
**Production**
13:8  26:8, 11,
24  46:13
108:21, 24
109:5, 18
126:10  186:2
210:11, 20
238:10  240:4
243:17  273:4
301:17
302:12, 23
326:5  330:5
**PRODUCTS**
1:4  14:12
42:2  44:14,
15, 18, 20
45:2, 3  56:3
66:21  85:9
170:16  187:8
196:11
197:14
223:21, 24
224:17  241:5
289:18  307:1
**Professional**
1:16  344:13
**program**
30:13  33:4
39:5  40:18
144:5  194:5
301:22
**programs**
30:16  33:17
50:23  302:17
**progression**
56:23
**promptly**
93:12
**proper**  254:5
**properties**
167:11

**proposal**
129:22
131:24  175:24
**propose**
132:22  232:8
**Proposed**
175:21  176:3
**propounded**
347:9

**PROTECTIVE**
1:8
**protocol**
342:10
**protocols**
225:21  226:7
**provide**  40:15
163:20
**provided**
50:15  190:2
199:18
220:16
226:14  227:6,
11  242:21
265:10  296:19
**provider**
180:11, 15
181:2  183:15
236:6  306:14
**providers**
181:4  182:12
**provides**
40:19  44:7
311:13
**providing**
38:20
**provisions**
269:16
**Public**  1:18
37:13  344:14
347:23
**pull**  286:15
287:13
**pulled**  35:1
159:16
166:15
326:13  327:3,
16
**Punta**  2:13

pure 79:*17,
21* 127:*12*
260:*21*
purely 18:*16*
35:*20* 46:*20*
148:*2* 247:*20*
259:*15* 307:*13*
purging
316:*15*
purity 78:*11,
21* 79:*7, 9*
80:*15* 113:*18,
20* 114:*8*
150:*24*
151:*12, 19*
152:*17* 153:*4,
22, 24* 154:*13,
16* 155:*20*
156:*13*
186:*17*
187:*10*
189:*16*
268:*23* 331:*8*
334:*7*
Purpose 50:*8,
9* 202:*8*
255:*15* 338:*5*
purposes
185:*22* 327:*10*
pursuant 1:*14*
pursue 228:*10*
pursued 291:*9*
purview
288:*23*
put 22:*3*
35:*13* 94:*13*
101:*21* 105:*5*
115:*23*
128:*21* 137:*3*
149:*17*
175:*24*
233:*16*
240:*19*
306:*20*
321:*20* 326:*5*
puts 37:*8*
putting 238:*12*

< Q >
Q9 6:*19* 35:*2*

QA 304:*24*
319:*1, 6*
QC 323:*17*
325:*2, 5*
QC-2 314:*1*
qualification
171:*12* 172:*3,
7, 14, 16*
208:*18* 295:*2*
qualifications
295:*4*
qualify 142:*3*
256:*6*
qualifying
182:*18*
Quality 6:*19,
20* 7:*7, 8* 8:*6,
15* 9:*6* 18:*13*
28:*7, 18*
29:*10, 11, 12,
13, 16, 17, 23,
24* 30:*6, 7, 9,
11, 13, 14, 17,
19, 23* 31:*1,
15, 20* 32:*1, 2,
8, 9, 14, 21, 24*
34:*6* 35:*3*
36:*15* 37:*4*
38:*5, 8, 10, 13,
18, 19, 22*
39:*1, 4, 7, 10*
40:*4, 7, 12, 16,
17* 41:*7, 9, 24*
42:*1, 3, 5, 7,
13, 15, 17, 23*
43:*2, 9, 17, 21,
23* 44:*8, 10,
24* 45:*6, 20*
46:*2, 5, 12*
47:*6, 8* 49:*7,
22* 50:*11, 14,
20, 22* 51:*18*
52:*2, 4* 53:*23,
24* 54:*24*
55:*3, 16* 65:*3*
67:*16* 68:*13*
81:*18* 84:*10,
17* 89:*1, 6*
112:*16, 18*
121:*5* 130:*23*
131:*14, 16, 18*

135:*14*
137:*19*
150:*24* 151:*2,
3, 12, 19*
152:*16* 153:*4*
155:*19*
156:*13*
160:*24* 161:*5,
11* 163:*3, 9,
18* 164:*17*
165:*4, 14, 15,
17, 21, 23, 24*
166:*4* 167:*3,
7, 19* 168:*7*
170:*22* 171:*4*
177:*24* 186:*4*
187:*10, 22*
188:*10*
189:*11, 13, 16,
17* 190:*3*
222:*8* 231:*1,
2* 240:*11*
259:*3* 268:*23*
294:*20*
301:*17, 22*
302:*6, 11*
304:*20* 305:*2,
4* 313:*18*
318:*14, 20*
319:*7, 24*
320:*4* 321:*6,
9* 323:*6, 15,
16* 325:*3*
331:*7* 334:*24*
335:*2* 336:*11,
14* 337:*11*
quantitative
338:*20*
quantity 339:*2*
quarters
271:*17*
quenching
214:*13, 21*
253:*21* 312:*8,
20*
Questad 5:*20*
question
27:*16* 31:*7,
10, 13* 32:*4*
34:*8, 24*
39:*16* 41:*3*

47:*9, 17, 18*
48:*16* 51:*4*
55:*8* 63:*17*
65:*18* 79:*1*
82:*20* 92:*7,
15, 19* 93:*3, 6,
11, 23* 94:*16*
95:*9, 12*
101:*10*
110:*22*
112:*12*
117:*16*
125:*17*
126:*19*
130:*22*
142:*12, 19*
143:*1* 145:*15*
155:*24*
169:*12*
176:*20*
188:*20, 22*
192:*13*
193:*21, 23*
218:*12*
244:*11* 259:*6*
262:*6, 20*
277:*22*
283:*20, 23*
298:*18* 304:*6*
306:*10, 15*
311:*11*
315:*13* 329:*1*
Questions
13:*14* 201:*18*
244:*15* 347:*8*
quickly 94:*7*
quite 49:*10*
50:*2* 60:*9*
90:*15* 112:*12*
140:*11* 175:*7*
231:*21*
294:*12*
316:*10*
317:*19* 340:*24*
quotation
167:*10*
quotations
68:*15*
quoting 170:*1*

< R >

R&D 46:*12*
142:*19*
rabbit 111:*3*
raised 264:*9*
raising 133:*12*
Rajiv 28:*19*
RAR/QAD/GE
N/014/14
127:*19*
RASPANTI
3:*3*
rate 211:*19*
ratio 332:*16*
raw 44:*16*
45:*7* 103:*9*
145:*6, 13*
197:*10* 198:*7*
302:*21* 331:*6*
react 106:*12*
253:*14* 312:*19*
reacted 96:*5*
106:*13*
reaction 96:*7*
106:*14*
253:*15* 254:*2*
reactions
91:*14*
reactivity
100:*11*
reactor 107:*3,
4*
read 16:*17*
23:*6* 44:*21*
50:*17* 51:*22*
55:*5, 10* 62:*5,
7, 9* 72:*17*
74:*20* 75:*4,
20* 81:*19*
89:*19, 21*
93:*5, 22* 94:*1*
95:*12, 17*
98:*3, 10, 11*
104:*4* 109:*13*
119:*2, 3*
135:*11*
138:*22*
144:*23* 167:*9*
177:*21* 188:*6,
18* 190:*1*
207:*12, 19*
215:*14*

218:*15*
220:*14*
226:*17* 240:*5,*
*11, 13* 244:*1*
245:*21* 246:*2*
247:*8* 262:*6,*
*9* 268:*11*
269:*3, 10*
270:*10* 272:*7*
280:*19* 281:*3*
312:*22*
318:*22*
322:*20* 344:*9*
345:*3* 347:*5*
**readily** 144:*2*
**reading** 70:*3*
98:*4* 161:*15*
225:*24* 249:*13*
**reads** 76:*23*
**ready** 69:*7*
134:*17*
201:*24* 251:*19*
**reagents**
91:*19, 21*
**real** 94:*6*
**realize** 87:*8*
**really** 41:*6, 21*
65:*15, 17*
102:*17*
107:*16* 179:*9,*
*12* 191:*13*
216:*15* 219:*2*
236:*20* 244:*7*
262:*19*
272:*11* 284:*2*
288:*20*
315:*13*
325:*17, 21*
330:*10* 336:*1*
340:*10, 11, 17*
**Realtime** 1:*17*
31:*17, 21*
344:*14*
**re-ask** 31:*10*
**reason** 49:*11*
101:*4, 11*
104:*6* 211:*22*
239:*24*
250:*20* 259:*2*
278:*24*
279:*18* 345:*5*

346:*6, 8, 10,*
*12, 14, 16, 18,*
*20, 22, 24*
**reasonable**
64:*13*
**recall** 17:*21*
70:*3* 117:*1,*
*23* 119:*11, 16,*
*23* 121:*13*
123:*2* 125:*19*
153:*18*
198:*19* 200:*5,*
*17* 202:*19*
212:*21, 22, 24*
227:*15*
239:*21*
240:*18* 241:*4*
246:*4* 254:*24*
277:*6* 282:*7*
284:*1, 2*
328:*14*
**recalled** 85:*8*
153:*14*
**receipt** 314:*16*
345:*17*
**receive** 26:*16*
27:*18*
**received** 26:*7*
266:*13* 289:*9*
**recess** 158:*12*
**recipe** 149:*16,*
*19* 210:*21*
238:*12*
**recipients**
174:*13*
**recirculated**
124:*22*
125:*19* 126:*20*
**recognize**
23:*2* 28:*14*
36:*10* 97:*23*
98:*21* 185:*4*
239:*13*
267:*10, 11*
309:*15*
**recognized**
38:*6*
**recollection**
27:*21* 236:*4*
244:*4* 310:*11*

**recommended**
75:*8* 335:*3*
**reconvene**
233:*1, 2*
**record** 14:*3*
15:*3* 26:*20*
27:*3* 69:*10*
85:*21* 86:*1*
87:*21* 88:*4, 8,*
*12* 94:*14, 24*
108:*22, 24*
109:*5, 18*
146:*5* 148:*4,*
*6, 9* 155:*5*
158:*9, 18*
159:*18* 160:*4*
210:*12, 20*
233:*6, 10*
238:*10*
261:*21* 262:*1*
293:*17, 23*
294:*3* 342:*22*
343:*3* 344:*6*
**records**
148:*10, 14, 18*
252:*5*
**recover** 208:*9*
229:*7* 236:*7*
**Recovered**
7:*8* 8:*7* 9:*15,*
*18* 11:*13*
66:*17* 67:*4,*
*17* 68:*16*
72:*13* 76:*23*
77:*12, 21*
78:*4* 88:*14*
108:*23* 109:*3,*
*13, 17* 111:*23*
112:*8, 14*
113:*1* 114:*8,*
*16, 19, 22*
115:*4* 117:*3,*
*18* 119:*12*
121:*6* 124:*4*
129:*14, 23*
130:*18* 131:*3,*
*22* 132:*1, 7*
133:*10*
136:*20*
137:*20*
138:*15, 23*

139:*10*
140:*16, 22*
145:*9, 11, 23*
146:*10* 147:*9,*
*12* 151:*17*
152:*2, 15*
153:*1, 10*
156:*4* 180:*1*
196:*21, 22*
198:*18, 23, 24*
199:*6, 7, 22*
204:*21* 208:*8,*
*16* 209:*4, 10,*
*12, 19* 210:*5,*
*10* 213:*5, 18*
215:*8, 17*
219:*23*
220:*10, 15*
228:*22*
229:*21* 230:*3,*
*16, 19* 233:*14,*
*20* 234:*9*
235:*4, 10, 20*
237:*3, 16*
238:*9* 243:*23*
244:*19* 246:*1,*
*13* 247:*6, 18,*
*24* 248:*7, 14,*
*21* 249:*9, 20,*
*22* 250:*4, 9,*
*12* 252:*7, 8,*
*11, 20* 253:*5*
255:*6, 23*
256:*10, 18*
258:*5, 6*
260:*1, 7, 14,*
*18* 262:*17*
263:*12*
269:*16*
270:*19* 272:*1*
278:*8, 12*
283:*15* 294:*7,*
*16* 295:*3*
299:*20*
312:*10*
323:*20*
331:*15, 22*
332:*19, 23*
333:*17, 20, 24*
334:*2* 335:*14,*
*20*

**recovering**
81:*17* 84:*9*
89:*5* 90:*7*
91:*6* 92:*11*
156:*8*
**Recovery**
7:*22* 8:*10*
9:*21* 66:*20*
83:*2* 89:*5*
105:*16* 107:*9*
109:*6* 118:*1*
123:*10* 129:*9*
155:*18*
156:*10*
177:*19*
178:*11, 23*
179:*15, 20*
180:*10, 17, 23*
181:*19, 21*
182:*14* 204:*3,*
*18, 20* 205:*4,*
*8* 207:*23*
209:*15, 17, 22*
214:*8, 12, 22*
215:*1, 2*
221:*8, 14*
222:*10, 11, 15*
225:*18, 20*
226:*7, 14, 19*
227:*7, 12, 19*
228:*1, 17*
229:*5* 230:*7,*
*8* 245:*18*
246:*6, 8*
269:*19* 270:*3*
273:*12*
274:*11*
275:*14* 278:*1*
279:*20* 282:*8*
284:*15* 297:*1,*
*11* 298:*3, 9*
300:*1* 329:*14*
335:*10*
**recycling**
236:*11*
**red** 289:*11, 13,*
*16*
**Reddy** 10:*9*
68:*7* 227:*17*

Confidential Information Subject to Protective Order

reduce 60:4
62:22 63:4
77:14
reduced 75:18
79:10
reduction
59:11 60:4, 24
REEFER 3:4
86:19 203:6
refer 25:2, 8
89:20 127:21,
22 176:15
200:1
reference
108:18
177:17
178:19 207:3
225:11
referenced
133:24
202:23
206:22
278:13 324:19
references
107:2 132:16
164:3 189:15
268:14 269:24
referencing
116:11
163:21
211:18 242:13
referred 37:3
109:9 111:21
270:14
referring 25:4,
11 96:12
148:9 149:7,
12 199:10
216:10 247:2,
17 256:12
329:18 333:2
335:19
refers 204:18
247:15
refill 134:20
reflect 119:1
reflected
187:13
188:13
207:17 300:6
316:1

reflecting
188:8
reflection
321:1
reflects 199:1,
24 323:12
refrain 133:11
refresh 244:3
refuted 214:6
Reg 10:7
regard 171:5
218:6 233:21
275:12
regarding
67:16 117:2
131:21
137:20 154:7,
13 170:15
179:24
263:12 295:2
308:12
Regardless
62:17, 20
254:22
322:15
326:16 336:6
341:3
region 33:12
regional
29:18 52:12,
21 53:1
regionally
48:13 49:3
Registered
1:16 78:1
84:19 85:4
113:9 114:14
154:14
164:14 165:3
186:22
187:17
189:21 210:7
286:24 344:13
registration
112:22
147:14 188:15
regulations
191:18
193:10, 18
regulatorily
142:1

regulators
41:15
regulatory
33:5 114:4,
11, 13 138:11
142:12, 21
144:17
147:17 151:4
153:12
283:21
287:24
298:19
305:10
306:16 335:1
re-introducing
230:2
reiterating
83:12
rejection
17:10 163:13
relate 248:5
256:16 337:8,
23 338:15
related 17:11
18:1, 3, 9
26:16 27:19
32:24 46:24
202:17 240:3
258:4 262:17
283:8, 16
294:23
304:12
313:18
323:15 336:3
341:24
relates 138:10
171:4 174:21
185:8
relating 187:9
relative 274:21
release 17:9
302:22
relevance
330:10
relevant
140:6 144:24
reliability
186:15
reliable 275:5
reliably 275:1

rely 165:2
186:13, 18, 22
relying 165:9
182:19
remaining
325:5
remember
63:22 83:9
129:15, 17
161:6, 8, 9
236:8 281:11
286:6 330:16
remind
202:11 277:5
278:7
remote 1:14
14:9, 22
remotely
14:19, 21
177:4 341:24
remove 90:2
removed
226:19 277:23
re-number
20:20, 23
repeat 63:17
82:20 90:16
152:21
155:24
192:14
207:11
218:12 253:1
269:8 311:10
repeated
169:11
rephrase
31:10 47:11,
12 53:21
145:19 288:8
replaced
242:10
Report 8:20
9:6, 9, 11
10:16 11:13,
16 12:6 19:7
28:18, 19, 20
29:20 52:2
53:12 71:20
103:4 116:16
127:18
173:11

174:18
176:10
235:11
239:14
240:12
299:22
300:23 341:18
Reporter 1:17
15:4 94:1
177:2 262:9
344:13, 14, 22
reporting
14:23 53:5
reports 52:11
170:11
208:21 279:5
represent
26:7 37:10
102:24
125:14
126:16 159:15
representative
24:11 327:15
Representing
2:5, 10, 14, 19
3:7, 12, 18, 23
4:5, 11, 16
5:5, 10, 15
reproduction
344:20
Request 13:8
26:21 27:8
291:3
requested
94:1 262:9
314:11, 14, 22
344:6
requests 26:6
require 63:10
141:14
181:24
195:17 211:16
required
62:10 77:19
104:2 115:22
136:4 139:4
146:15, 17
180:18
181:16
191:16, 22
192:2, 9, 18

Confidential Information Subject to Protective Order

193:*11, 15*
194:*13, 16, 17,*
*21* 195:*6, 8,*
*13* 231:*17*
306:*13* 332:*3*
**requirement**
58:*18* 89:*13*
133:*4* 139:*11*
190:*13, 18*
333:*14*
**requirements**
143:*17* 151:*5*
153:*12* 208:*18*
**requires**
64:*16* 196:*11*
**Research**
168:*4* 205:*2*
278:*19* 285:*8*
**residual** 326:*8,*
*13, 17* 332:*17*
333:*17, 21*
334:*2, 6*
**residue**
272:*17*
274:*12, 19*
275:*2*
**resolve** 269:*6*
**respect** 155:*7*
244:*12*
273:*13* 294:*17*
**respectfully**
93:*8, 13*
**respective**
51:*19* 62:*22*
226:*22*
**respond** 54:*11*
93:*11* 205:*16*
234:*18*
**responded**
204:*11*
**Response**
10:*11* 175:*6,*
*13* 205:*2, 18,*
*19, 21* 206:*23*
207:*8, 18*
211:*7, 9, 24*
221:*21*
227:*20* 234:*1*
240:*14*
248:*24* 251:*9,*

*15* 252:*16*
256:*21* 315:*11*
**responses**
119:*3, 7*
175:*3, 22*
176:*3*
**responsibilities**
137:*18* 307:*7*
**Responsibility**
51:*14* 136:*1*
**responsible**
36:*17* 45:*11*
51:*15* 62:*1*
136:*3* 196:*15,*
*23*
**responsive**
54:*2*
**result** 27:*9*
56:*21* 57:*23*
61:*7* 248:*12,*
*21* 317:*21*
341:*16*
**resulted** 82:*12*
83:*2* 153:*11*
268:*16*
**resulting**
112:*6* 213:*17*
**results** 178:*24*
276:*5* 289:*6*
314:*7, 11, 23*
315:*24* 337:*9*
**retain** 323:*17*
328:*15*
**retaining**
326:*4*
**retention**
318:*15* 327:*7,*
*19* 328:*20, 21,*
*22* 329:*2*
**retrospect**
151:*16*
**retrospective**
30:*20*
**return** 345:*15*
**reuse** 20:*16*
245:*19*
**revalidated**
241:*21*
**revealed**
290:*11*

**Review** 11:*16*
36:*7* 44:*13*
48:*4* 69:*6, 15*
70:*4* 88:*17*
98:*14* 99:*19*
102:*6* 103:*4*
117:*8* 118:*19*
128:*14* 129:*2*
132:*12*
134:*16* 135:*5*
143:*23*
158:*24*
172:*11*
177:*24* 178:*6,*
*14* 201:*3*
202:*16* 203:*2,*
*4* 206:*12*
244:*18* 245:*1*
251:*18* 286:*5*
287:*17, 18*
300:*23*
**reviewed**
22:*19, 24*
70:*7, 13, 22*
73:*12* 97:*21*
100:*1, 7, 8*
102:*1, 3*
109:*24* 110:*5,*
*11, 18* 111:*7,*
*8, 14* 117:*8*
131:*6* 135:*1,*
*10, 12, 17*
178:*23*
179:*16, 21*
199:*2* 222:*22*
255:*3* 286:*8,*
*9* 287:*1*
294:*18, 23*
302:*3*
**reviewing**
201:*8*
**reviews** 148:*13*
**revision** 127:*3*
**revisions**
128:*2* 144:*19*
**re-visited**
123:*3*
**RICHARD**
1:*14* 6:*5, 17*
15:*8* 344:*8*
347:*16*

**right** 16:*18*
20:*3* 24:*4*
25:*18* 31:*5*
35:*6, 22*
38:*16* 54:*3*
56:*15* 58:*1*
63:*21* 72:*17*
74:*13* 75:*10*
77:*7, 17* 81:*9*
85:*18, 20, 24*
86:*21* 88:*7*
103:*7* 109:*11*
111:*11*
115:*14*
117:*13* 122:*7*
123:*4* 127:*18,*
*20* 132:*2*
134:*21*
147:*22* 150:*8*
151:*7* 158:*8,*
*17, 23* 163:*22*
165:*22*
177:*21*
183:*11* 184:*3*
188:*1* 194:*15,*
*16, 22* 195:*8,*
*14* 201:*10, 14,*
*16* 202:*4*
209:*16*
211:*23* 213:*3*
220:*1, 19*
222:*24*
223:*24*
224:*15, 17, 18*
225:*13* 227:*9*
233:*5, 9, 14*
234:*24* 235:*4*
238:*13, 16*
239:*23* 246:*4*
248:*3* 251:*24*
252:*2* 254:*7,*
*14* 256:*18*
257:*9* 261:*6,*
*20, 24* 264:*12*
266:*4, 6, 16,*
*17* 267:*23*
271:*5* 276:*16*
280:*10* 282:*2*
293:*22* 294:*2,*
*12, 13* 297:*23*
300:*3* 306:*6*

312:*1* 313:*9,*
*10, 13* 325:*12*
340:*3* 343:*1*
**rigid** 140:*11*
**ring** 310:*8*
**Risk** 6:*19, 20*
7:*7, 8, 17* 8:*6*
33:*24* 34:*2, 4,*
*9* 35:*3* 37:*4*
38:*8, 13, 18*
39:*1, 4, 10*
40:*4, 12, 17*
41:*7, 9, 15, 16,*
*24* 42:*3, 16,*
*23* 43:*4, 10,*
*13, 14, 17, 20,*
*24* 44:*8, 24*
45:*6, 12, 15,*
*22* 46:*4, 19,*
*23* 47:*5, 14*
49:*7, 22*
50:*20* 54:*14,*
*24* 55:*3, 8, 12,*
*17, 20, 23*
56:*13, 16, 21*
57:*1, 7, 9*
58:*3, 6* 59:*2,*
*6, 11, 17* 60:*1,*
*2, 3, 5, 7, 10, 11,*
*14, 17, 24*
61:*6, 9* 62:*2,*
*3, 6, 10, 14, 23*
63:*5, 9, 12, 13,*
*20* 64:*3, 7, 13,*
*21* 65:*3* 66:*3*
67:*15* 68:*14*
70:*17* 72:*12*
73:*2, 11, 22*
74:*7, 21* 75:*2,*
*12, 13, 14, 15,*
*17, 19* 76:*1,*
*12, 13, 18, 23*
77:*1, 9, 10, 13,*
*14* 78:*23*
80:*3* 81:*14,*
*20* 84:*2*
88:*14* 103:*4,*
*9, 17* 105:*9*
115:*13, 20*
116:*3, 18*
117:*1, 9, 17*

118:20  121:5,
19, 23  122:13,
20  123:1
124:2, 8
127:4  131:2
135:16  138:6,
10, 17  154:9
155:6  156:24
161:21
163:23  164:5,
9  245:20
247:14, 16, 17,
23  248:1, 4
250:21
252:10, 19
253:3  255:17,
19, 21  256:6,
9  258:3, 24
259:4, 10, 12,
18, 21  260:8,
9, 19  262:13,
21, 24  263:2,
4, 7, 11, 17
264:7, 14, 20
265:1  270:8,
13  271:22
272:11
273:10
312:16  313:2,
7, 10
risk-based
61:17
risks  50:11
51:18  56:20
58:24  61:24
65:8, 11  66:1,
13  77:6  78:5
79:3  119:12
Rite  3:18
Road  4:14
ROBERT  1:4
160:11, 13
166:16
robust  212:2
Rodriguez
5:19  14:4
role  36:14
53:5  131:10
308:8  320:19
roles  108:8
Roman  226:3

room  79:22
86:9  87:3
160:3  201:9,
15
root  83:10, 12,
17  90:21
91:3  92:9
106:16
155:12
177:18
291:16
310:16  311:2,
24
ROSE  5:1, 3
Roszel  4:14
round  212:22
routine  255:5
routinely
94:21  100:7
102:3  326:2
Rows  224:4
RS  220:9
RUBEN  2:16
20:5  93:19
ruben@honikla
w.com.com
2:19
RUBENSTEIN
4:3
rubensteinb@g
tlaw.com  4:5
rule  328:6
ruled  230:12
Ruler  2:3
rules  93:19
335:2
ruling  230:7
run  149:19
201:9, 15
326:17
runs  232:5, 9,
10

< S >
Safety  7:15
50:16, 21, 24
99:8, 12, 16,
19, 24  100:3
101:5, 12
102:2, 5
104:20

138:10
150:20  151:6,
7, 12, 19
152:17  153:4,
22, 24  154:8,
11  155:20
156:13
186:17
230:11
254:20  255:4,
9, 10, 11
sake  29:3
sample  325:1
326:12, 13, 15,
24  339:3
samples
272:17
323:17, 21
324:13  325:5,
10, 17, 23
326:1, 4, 7, 9,
20, 22  327:2,
3, 6, 7, 8, 11, 12,
14, 15, 19
328:8, 15, 18,
20, 21, 22
329:3
Sampling
196:9  335:13,
19  336:10
SANGER  2:1
SAP  9:20
Sashant
130:13  133:9
satisfactory
291:22
satisfy  275:9
saving  127:6
saw  73:20
166:10
173:10  256:1,
2, 18  272:22
307:14  310:6
318:12, 19, 20
322:15
330:12  340:15
saying  27:7
43:22, 23
60:15, 18
61:7  80:4
84:24  88:22,

23  89:3
109:16
144:14  157:1
161:8  170:1
180:8  187:24
188:6  193:7
204:21  205:7,
14  208:7
209:1, 8
211:9  215:16
218:4, 16, 17,
20, 23  225:16
233:19
234:14  235:2,
19  242:18
246:7  249:19
258:16, 22, 23
308:1  313:6,
10
says  20:18
38:17  40:11
44:6  49:19
50:9  51:4, 14
54:24  61:23
72:11  73:10
75:22  77:1
78:23  89:4
100:13, 18
101:5, 12
103:1, 22
123:6  124:7,
19  129:21
133:9  136:1
138:8  144:22
165:21  167:2
176:9  177:16
178:22
179:19
185:21  187:2
190:10
191:15  193:6
194:14  195:5,
16  196:8
204:7  205:19
207:22  211:7
215:4, 15
217:7, 10
220:8  221:7
226:12  241:1,
15  242:7
243:13, 22

244:2  249:8,
17  252:3
256:20  269:6
278:24
279:11  281:2
283:6  296:17
297:10
304:23
310:14  312:6,
15  313:11, 22
321:5  323:16
329:12  332:5
335:8, 13
336:21  339:5,
9
scanned
240:14
Sciences
269:23  284:1
scientific
186:2  272:18
scientifically
274:7
scientists  46:9
Scope  44:3,
24  51:3  67:7
72:3, 9, 11
82:16  90:12,
23  92:21
94:4  104:9
105:3, 22
125:2  126:1
141:22
145:24
149:23  154:4
191:9  213:10
250:17
257:17
283:19
291:20  298:12
score  56:20
57:8, 23  59:2
scored  56:17
64:2
scores  57:14
60:2
scoring  56:12
60:5  73:22,
23, 24  74:7,
21  75:9

Confidential Information Subject to Protective Order

116:*13*
scratch  127:*8*
screen  15:*21*
  16:*16*  159:*10*
  167:*1*  172:*23*
screening
  214:*5*
screens  87:*4*
screw  36:*20*
Scripts  3:*23*
scrutinize
  61:*24*  183:*1*
search  136:*15*
second  26:*8*
  37:*21*  72:*6*
  90:*3*  122:*12*
  124:*7*  171:*22*
  243:*13*
  286:*13*
  310:*21*  312:*5*
  342:*24*
secondary
  198:*4*
seconds  98:*11*
second-to-last
  25:*16*  26:*3*
  203:*20*
section  38:*3*
  44:*3*  50:*5, 7*
  51:*2, 13*
  54:*23*  58:*19*
  72:*9*  73:*10*
  100:*10*  103:*8*
  122:*2*  136:*1*
  144:*21*  164:*6,*
  *7*  179:*11*
  196:*9*  207:*20*
  226:*1*  273:*4*
  312:*5*  334:*20*
  335:*7*
see  16:*22*
  19:*16*  22:*14,*
  *15*  25:*15*
  27:*11*  44:*4*
  57:*6*  68:*6, 10,*
  *18*  70:*21, 23*
  73:*20*  74:*1, 8,*
  *11, 14, 19*
  77:*3, 15*  80:*4*
  100:*15, 21*
  103:*11, 14, 19*

106:*24*  107:*6*
  112:*1*  115:*12*
  118:*14*
  120:*18*  121:*4,*
  *15, 19*  122:*1,*
  *8, 13, 18*
  123:*11*  126:*5*
  127:*18*  129:*4*
  130:*2, 20*
  132:*15*
  133:*13*  136:*6*
  137:*11, 19*
  138:*3, 5, 6*
  145:*7*  150:*10,*
  *14*  157:*12*
  159:*12*  162:*9*
  167:*4*  174:*10,*
  *16, 19*  177:*10,*
  *12*  181:*24*
  182:*4*  185:*21*
  187:*11*
  188:*17*  189:*1,*
  *7*  190:*14*
  191:*19*
  196:*19*
  197:*16, 19*
  202:*4, 8*
  203:*22*  204:*2,*
  *8*  206:*21*
  207:*10, 21*
  208:*21*  211:*6*
  212:*10*  216:*1*
  219:*17*
  220:*12*  221:*1,*
  *4, 11*  223:*1,*
  *20*  224:*3, 7, 9,*
  *13*  225:*2, 7, 9,*
  *22*  226:*19*
  240:*22*  241:*1*
  242:*6*  243:*9*
  244:*9, 21*
  249:*5*  251:*23*
  252:*13*  257:*6*
  268:*18*  274:*5*
  277:*12, 16*
  278:*5, 6*
  282:*23*  283:*1,*
  *13*  287:*16*
  290:*24*
  291:*17*
  295:*24*

296:*22, 24*
  297:*13, 20*
  299:*13, 15*
  300:*24*  301:*5,*
  *9, 19, 24*
  302:*4, 9, 14,*
  *19, 24*  303:*7,*
  *12*  304:*2, 23*
  305:*9, 14*
  312:*13*
  313:*20*  314:*8*
  318:*16*  320:*9*
  323:*23*  325:*7*
  329:*15*  330:*7*
  331:*9, 17*
  335:*4, 16*
  336:*19, 24*
  339:*7, 13, 24*
  340:*21, 23*
seeing  175:*12*
  176:*5*  179:*11*
  202:*19*
  226:*18*  291:*2*
seeking  290:*4*
seen  23:*21*
  24:*6*  69:*20*
  70:*1, 3, 24*
  102:*21*
  117:*21*
  160:*20*  219:*5*
  234:*20, 23*
  235:*1, 8*
  236:*24*
  240:*18*  268:*8*
  290:*20*
  294:*23*
  304:*15*
  305:*19*  309:*3,*
  *21, 24*  310:*2,*
  *11*  315:*10*
  317:*14*  319:*14*
segregate
  335:*11*
segregated
  321:*3*
Segregation
  303:*9*
seize  289:*18*
semantic
  43:*16*

send  265:*21*
  266:*1*  293:*16*
sending  68:*7*
  266:*3*  279:*10*
senior  283:*4*
  319:*23*  321:*5*
sense  32:*6*
  78:*7*  79:*2*
  168:*23*
sensitive
  338:*21*
sent  100:*24*
sentence  38:*4*
  40:*11, 19*
  165:*18*
  188:*18*  242:*7*
  243:*13*
  245:*14*
  247:*13*
  258:*14*  312:*6*
  332:*5*
sentences
  188:*7*
Sentry  5:*8*
separate
  208:*4*  234:*21*
  235:*15*
  263:*14*  320:*21*
September
  49:*20*  129:*5*
sequentially
  20:*15*  21:*15,*
  *16*
service  180:*10,*
  *14*  181:*2, 3*
  182:*12*
  183:*14*  236:*6*
SERVICES
  1:*21*  14:*6*
  46:*12*  50:*15*
set  15:*19*
  16:*15*  62:*21*
  199:*19*  295:*23*
setting  37:*5*
setup  320:*12*
severe  121:*20*
  122:*9, 15*
severity  56:*23*
  57:*1, 20*
  59:*19*  73:*22*

74:*6*  121:*19,*
  *24*  122:*1, 14,*
  *20*
SHAH  4:*13*
shape  264:*16*
share  114:*12*
  159:*9*  198:*3*
shared  254:*19*
  272:*6*  275:*16,*
  *19*
sharing  167:*1*
  172:*23, 24*
Sheet  7:*15*
  99:*9, 12*
  101:*5, 12*
  104:*21*  255:*9,*
  *10*  345:*7, 9,*
  *12, 15*  347:*12*
sheets  99:*16,*
  *20*  100:*1*
  102:*2*  255:*4,*
  *14*
shelf  328:*1, 4,*
  *17*
shoot  157:*18*
Short  85:*22*
  88:*5*  232:*19*
  233:*7*  261:*22*
  293:*24*
Shorthand
  1:*17*  344:*13*
show  23:*10*
  68:*5, 21*  97:*4*
  265:*9*  300:*15*
  341:*22*  342:*3*
showed
  243:*21, 24*
  248:*11*  307:*13*
showing  247:*4*
shown  307:*8*
shows  297:*22*
side  77:*18*
  91:*14*  96:*6*
  106:*14*
  253:*21*  255:*13*
sign  73:*2*
  261:*10*  344:*9*
  345:*8*
signal  55:*20*
  62:*13*  332:*3*
signals  55:*17*

Confidential Information Subject to Protective Order

signal-to-noise
332:*16*

signature
68:*8*  72:*5*

signed  71:*2, 5, 6, 10*  73:*8, 9*

significant
214:*1*

signing
304:*19*  345:*10*

similar  71:*1*
121:*8, 10*
333:*10*  340:*2*

simple  65:*22*

simplifying
91:*24*

simply  19:*7*
40:*19*  41:*3*
128:*2*  161:*5*
163:*3*  164:*17*
189:*10*
210:*10, 19*
229:*3*  238:*9, 12*  327:*12*

single  33:*11*
224:*16*
297:*22*
321:*11*  322:*3, 7*

sir  23:*23*
221:*7*  296:*14*
342:*20*

sit  180:*10, 20*
181:*21*

site  17:*12, 14*
30:*1, 2*  32:*22*
33:*2*  52:*13*
56:*3*  58:*18*
173:*15*
178:*16*  180:*3, 7, 13*  182:*5*
222:*1*  285:*6*
306:*5*  329:*1, 5*

site-level
29:*19*  48:*12*

sites  32:*16*
33:*1*  51:*5*
135:*20*  137:*1*
283:*9, 10*
291:*18*

situation
146:*16*
245:*16*  330:*11*

situations
64:*20*  65:*4*
66:*2*

six  58:*16*
230:*14, 17*
328:*3*

size  320:*15*

skip  145:*1*
162:*14*

SLACK  2:*1*
5:*22*

Slide  8:*13*

slightly  16:*15*
117:*16*  253:*16*

slip  299:*4*

sodium  82:*13*
83:*4*  105:*17*
106:*12, 19*
118:*2*  252:*23*
253:*7, 10, 22, 24*  254:*3*
255:*7*  272:*1*
273:*11*  312:*7, 9*

software
316:*16*  320:*2*

Solco  3:*13*

Solvent  9:*21*
77:*20*  78:*3, 14*  81:*17*
84:*10*  89:*6, 12, 22, 23*
90:*8*  96:*23*
109:*17, 19*
111:*23, 24*
112:*8, 15*
113:*1, 24*
114:*1, 24*
145:*10, 11*
146:*8, 9*
153:*11*
155:*18*
178:*23*
179:*15, 20*
182:*13*  197:*6, 10*  198:*23, 24*
199:*23*
204:*18, 19*

205:*4*  209:*4, 5, 15*  210:*5*
213:*6*  215:*9*
220:*11, 15*
221:*8, 14*
222:*10, 12, 16*
225:*17, 20*
226:*6, 15*
227:*7, 12*
234:*9*  235:*10, 20*  237:*17*
242:*10*
245:*18*
247:*10*  252:*7, 8, 12, 21*
253:*5*  260:*14, 22*  269:*19*
270:*3*  273:*12*
275:*14*  278:*1, 12*  279:*19*
282:*8*  283:*15*
295:*3*  299:*20*
312:*11*
323:*20*
326:*17*
329:*14*
333:*18, 21*
334:*3*  335:*9, 11*

Solvents  7:*8, 22*  8:*7*  9:*15, 18*  10:*7*
11:*13*  44:*17*
45:*8*  66:*17, 21*  67:*5, 17*
68:*16*  72:*13*
76:*24*  77:*12*
81:*22*  88:*15*
91:*22*  108:*23*
109:*12, 13*
114:*8, 16, 19, 22*  115:*4*
117:*3, 18*
118:*21*
119:*13*  121:*6*
123:*10*  124:*4*
129:*14, 23*
130:*19*  131:*3, 22*  132:*1, 7*
133:*10*
136:*20*

137:*21*
138:*15, 23*
139:*10*
140:*17, 20, 22*
145:*10, 23*
147:*9*  151:*18*
152:*3, 15*
153:*1*  156:*4, 8*  177:*20*
178:*11*  180:*1*
196:*22*  198:*5, 9, 12, 18*
199:*7*  204:*3, 21*  205:*8*
207:*23*  208:*8, 9, 16*  209:*10, 12, 19, 22*
210:*10*
215:*18*
219:*23*
227:*19*  228:*1, 17, 22*  229:*8, 21*  230:*3, 8, 16, 19*  233:*14, 20*  235:*4*
236:*2*  237:*3*
238:*9*  242:*17*
244:*19*  246:*1, 14*  247:*7, 18, 24*  248:*7, 14, 21*  249:*10*
250:*5, 12*
255:*6, 23*
256:*10, 18*
258:*5, 7*
260:*1, 7, 18*
262:*18*
263:*13*
269:*16, 20*
270:*1*  272:*1*
278:*8*  294:*8, 17*  312:*17*
326:*9, 14*
331:*15, 22*
332:*17, 20, 23*
333:*17, 21, 24*
334:*2, 6, 7*
335:*14, 20*

Solvents/Mater
ials  8:*10*
129:*10*

somebody
36:*16*  102:*1, 4*  116:*19*
256:*3*  266:*9*

somethings
96:*14, 15*

somewhat
65:*6*  197:*24*
221:*18*

SOP  6:*22*
8:*12*  48:*9, 12, 13, 14*  49:*8*
53:*11*  57:*17*
58:*9*  59:*8*
64:*15*  65:*1*
66:*11*  73:*21*
74:*4*  134:*2*
135:*9, 13*
142:*6, 11*
153:*9*  333:*3, 5, 8, 13, 16*
334:*8*  339:*23*

SOPs  33:*1*
49:*3, 23*
73:*18*  135:*5*
294:*19*  295:*2, 7, 8*  333:*20*

sorry  21:*23*
37:*18, 22*
39:*17*  58:*13*
61:*10*  63:*16*
69:*16*  71:*22*
74:*17*  81:*2*
82:*19*  84:*14*
93:*4*  97:*21*
98:*2, 12*
101:*9*  105:*2*
110:*6*  116:*9*
117:*5*  122:*4, 6*  149:*7*
152:*20*
154:*23*  156:*1*
172:*17*  179:*8, 17*  200:*8*
203:*6*  207:*11*
210:*17*
218:*11*  225:*4*
226:*23*  227:*2*
241:*10*
249:*12*  253:*1*
256:*14*

Confidential Information Subject to Protective Order

267:*22, 24*
272:*24* 276:*2*
282:*22*
286:*20, 22*
289:*3* 293:*19*
304:*8, 9*
307:*24* 308:*2*
311:*11*
321:*15* 330:*2*
335:*21*
**sort** 30:*18, 19*
32:*20, 22*
37:*5* 38:*2*
45:*17, 20*
50:*5* 53:*20*
55:*7* 64:*24*
73:*20* 74:*7,*
*20, 23* 75:*6, 7*
124:*15*
286:*17*
294:*20* 311:*3,*
*15* 338:*22*
**sound** 179:*3*
325:*13*
**sounds** 47:*9*
54:*7* 58:*17*
83:*11, 16*
91:*12* 138:*23*
201:*17* 210:*8*
211:*1* 213:*3*
220:*5* 258:*15*
261:*15* 273:*19*
**space** 143:*7, 9*
316:*15* 345:*6*
**speak** 94:*18*
184:*21* 190:*6*
203:*17*
237:*24* 279:*4*
290:*17* 307:*23*
**speaker** 69:*11*
**speaking**
14:*24* 43:*8*
61:*20* 93:*9,*
*15* 94:*22*
**spec** 112:*19*
114:*24* 147:*1*
161:*6* 163:*4*
164:*18*
**specialist**
283:*5*

**specific** 27:*20*
29:*14* 34:*12*
47:*13, 17*
50:*12* 55:*1,*
*13* 61:*14, 19*
66:*18* 80:*10*
109:*5, 14, 18*
139:*5* 172:*5*
181:*19*
191:*17, 23*
193:*11*
202:*12*
217:*24*
244:*19* 252:*4*
253:*16* 274:*5*
284:*6* 329:*23*
340:*21*
**specifically**
25:*12* 59:*4*
96:*13* 117:*2,*
*17* 118:*16*
119:*13* 222:*6*
236:*8* 244:*11*
246:*20* 248:*6*
253:*22*
256:*17* 258:*3*
262:*17*
313:*22*
325:*16* 326:*13*
**specification**
85:*2* 90:*3*
111:*24* 113:*2,*
*7, 10, 22*
114:*21* 115:*7,*
*8* 187:*23*
215:*9*
**specifications**
78:*2* 84:*20*
85:*4* 89:*10,*
*12, 16* 114:*13*
145:*5* 154:*15*
187:*18* 189:*21*
**specify** 146:*11*
**specs** 77:*20*
208:*17*
**spectral**
337:*18*
**spectrum**
41:*19*
**speculate**
61:*15* 127:*15*

179:*12*
217:*11*
257:*21*
258:*14* 336:*1*
**speculating**
146:*18*
162:*16*
237:*15* 244:*8*
247:*20* 294:*22*
**speculation**
127:*13*
259:*14, 16*
**speculative**
237:*24*
**spend** 228:*15*
**spent** 108:*1*
269:*19*
**spill** 203:*23*
**spilling** 268:*2,*
*6*
**spoken** 231:*16*
**spreadsheet**
223:*15*
**spring** 228:*9*
**square** 139:*14,*
*15*
**Sreenivasarao**
219:*24* 226:*12*
**Srinivas**
296:*16*
**St** 3:*21*
**stability** 31:*17*
100:*11*
199:*20* 242:*10*
**stage** 46:*6, 8*
186:*1* 210:*3*
274:*17*
**Stages** 9:*20*
210:*3* 224:*6*
**stamp** 125:*16*
**stamping**
126:*6*
**stand** 36:*18*
337:*3, 5*
**standalone**
313:*24*
**standard**
27:*21, 23*
58:*11* 73:*1,*
*13, 16* 79:*5, 6*

112:*20* 215:*5*
218:*20* 331:*7*

**standardization**
32:*21* 33:*8*
**standardize**
33:*10*
**standardized**
34:*2*
**standardizing**
36:*23*
**standards**
218:*8*
**standpoint**
231:*2* 319:*1*
**stands** 48:*22,*
*24* 229:*16*
**start** 21:*19*
37:*22* 71:*13*
120:*16* 127:*4*
138:*1* 172:*7*
197:*5* 203:*23*
260:*6* 261:*11*
284:*21*
295:*14* 332:*22*
**started** 66:*20*
67:*4* 236:*9*
259:*23*
**starter** 241:*23*
242:*3* 250:*13*
**starting**
203:*21*
241:*15* 298:*5*
342:*14*
**starts** 22:*15*
76:*19* 139:*14*
243:*10* 310:*24*
**state** 37:*9*
94:*6* 124:*2*
146:*8* 345:*5*
**stated** 240:*1*
245:*17*
**statement**
38:*12* 92:*8*
102:*18* 104:*7,*
*19* 163:*11*
164:*1* 168:*14,*
*24* 169:*3*
188:*21* 189:*1*
190:*24* 191:*8*

279:*9* 311:*4*
329:*18*
**statements**
168:*10* 169:*8,*
*17*
**STATES** 1:*1*
14:*13* 141:*24*
**stating** 189:*10*
235:*8*
**statistical**
216:*5, 12, 19,*
*21* 217:*8*
**statistically**
327:*16*
**status** 220:*9,*
*15*
**statute** 192:*23*
**staying** 249:*3*
**stenographic**
15:*3*
**step** 58:*7*
250:*22*
**steps** 91:*10*
227:*23* 230:*20*
**stick** 98:*6*
140:*16* 171:*21*
**Sticking**
132:*14*
**stipulates**
221:*22* 332:*1*
**Stipulations**
13:*11*
**stomp** 177:*7*
**Stop** 167:*2*
209:*16* 232:*4*
**stopped** 18:*22*
291:*8*
**stoppers**
341:*22* 342:*3*
**storage**
283:*11* 316:*17*
**stored** 136:*12*
325:*5*
**strange** 35:*10*
**strategies**
231:*5*
**Street** 2:*8, 12,*
*17* 3:*10, 16*
4:*3, 9*

Confidential Information Subject to Protective Order

strength
187:10
189:16  268:23
Strict  313:17
strike  38:24
92:3  175:22
struggling
95:15
study  91:10
stuff  30:21
139:22  298:1
337:23
subdivisions
168:5
SUBJECT
1:8  7:7, 12,
21  8:10, 18
9:9, 15, 18
10:7, 14, 19
11:7, 10
68:13  92:23
129:8  152:8
219:22
226:20
277:10  329:7
345:10
subletter
329:21
Submission
11:7  44:12
139:13  141:1,
2, 9  142:17
149:3, 13
199:16
231:10
262:23  325:2
submissions
278:4  281:4,
18
submit  316:9
submitted
139:8  198:22
323:19  324:10
submitting
140:7  325:10
Subscribed
347:19
subsequent
177:20
243:23  247:5
249:23

subsequently
278:16
substance
18:24  347:11
substances
44:14  45:2
268:24
substantive
72:8
substituting
136:19
sufficient  47:5
69:14  79:9
212:2  238:11
sufficiently
36:8  134:24
222:17
suggest  20:6
48:17  51:6
237:1
suggested
37:15  191:5
suggesting
192:20
suitable  300:1
Suite  2:3, 17
3:10, 21  4:9
5:3, 8
Summary
7:13, 17
311:21
sun  61:16
supervision
344:22
supplemental
222:2  263:17
supplier
182:19
202:10  287:5,
9  294:21
supplies
143:10
SUPPORT
13:2  229:12
263:16
supporting
30:15
supposed
20:15
supposedly
275:2

sure  17:19
20:11, 17
21:2  27:4
29:12  35:18,
24  36:4
39:19  43:8
47:4  56:14
59:7, 10
63:19  67:18
69:18  72:1
81:10, 11
82:22  87:7,
18, 22, 24
88:22  90:19,
22  98:5
102:6  104:20
111:10
116:11
117:10, 14, 20
123:2, 15
124:13  126:9
127:14  137:9
143:8  144:10
151:2  152:23
154:23  157:6,
8, 20  162:11
163:24
166:21
173:10  175:8
176:12
179:19
180:11  181:5
182:10
184:14
192:16
194:12  195:7,
10  199:14
200:4  201:11
202:20  203:1
207:13, 15
216:14  220:3
221:2  231:22
232:1, 23
237:13  250:6,
19  255:24
265:10, 18
270:15  279:1
282:19
283:19  285:4
289:8  291:12,
23  292:2

294:9, 12
296:2  297:23
305:19
308:10
309:24
311:13  322:9
324:16  329:4
332:10  340:15
surprise
284:24
suspicious
317:2
swab  272:17
274:11  276:6,
7
swear  15:5
sworn  14:21
15:9  344:5
347:19
synthesis
177:18  249:11
synthetic
148:19
238:21  257:3
System  8:15
38:10  41:24
42:13, 15, 17,
23  43:2, 4, 9,
22  50:12
51:16  55:2
56:12  116:13
136:9, 12
273:4  301:22
320:2  322:12
systems  38:6
42:5  43:17,
24  273:12
320:6  339:12

< T >
Tab  21:10, 14
23:13  24:1
35:1  48:1
67:20  68:24
97:7, 13, 21
102:8  120:3,
9, 22  122:4
128:8  134:8
159:3  162:12
173:17, 22
184:23

200:20
205:24  206:1
212:4  219:11
223:8  224:20
239:7  245:4
251:3  276:17,
21  282:11
295:16  296:1
298:21
300:15
303:19
308:21  334:9
table  57:7
72:6  74:3, 5,
20  122:14
220:10
tables  252:3
tabs  35:13, 20
266:20
take  58:7
69:6  75:8
77:14  79:20
81:4  85:14,
15, 18  90:2
103:5  115:18
134:16
154:24  156:4
157:4, 10
162:12
166:24  173:2
185:16  186:6
196:5  201:3
206:20  225:4
230:16, 20
231:20  232:4,
7, 17, 19
251:17  261:4
264:15
267:21
277:21
292:20
293:12, 15, 18
296:15
310:13
319:22  323:5
taken  1:14
16:24  158:12
169:19
221:17
227:23  274:4
317:18

Confidential Information Subject to Protective Order

322:*24*
326:*16, 20*
341:*20*
**takes** 129:*5*
**talk** 36:*8*
66:*16* 71:*11*
116:*3, 18*
122:*19*
137:*22*
165:*23* 188:*9*
251:*19*
293:*10*
295:*12*
305:*21*
316:*22* 324:*4,*
*17, 24*
**talked** 160:*23*
203:*11* 238:*6*
281:*8* 299:*10*
**talking** 36:*2*
64:*23, 24*
66:*23, 24*
78:*20, 21*
90:*24* 115:*8*
116:*6, 12*
133:*16, 22*
137:*5* 140:*18,*
*24* 143:*6*
199:*11* 216:*4,*
*8* 217:*12, 14*
233:*13*
234:*18* 236:*3*
246:*21*
248:*16*
259:*18, 20*
264:*10*
272:*12* 273:*7*
280:*23* 294:*5*
324:*7* 326:*7*
328:*18* 340:*18*
**TBTC** 227:*7*
**TEA** 96:*17*
103:*22*
254:*11* 255:*9,*
*10*
**team** 203:*3, 5*
257:*22* 306:*16*
**technical**
46:*12* 231:*4*
**technicalities**
69:*11*

**TECHNICIAN**
5:*15*
**techniques**
217:*6*
**technologies**
337:*10*
**technology**
314:*4* 338:*24*
**tell** 15:*18*
25:*12* 48:*6, 8,*
*9, 22* 106:*22*
108:*20*
124:*11*
147:*11* 150:*1*
175:*7* 179:*10*
205:*15* 219:*6*
222:*6* 223:*3*
240:*7* 246:*12*
304:*22*
317:*13* 340:*12*
**telling** 114:*4,*
*11* 181:*10*
211:*20*
271:*20* 312:*24*
**ten** 317:*14*
332:*2, 16*
**tend** 186:*18,*
*21* 197:*9, 13*
**tentative**
220:*18*
**term** 54:*11*
141:*21, 23*
148:*24* 149:*1,*
*9* 189:*11, 14*
197:*12*
217:*24* 342:*3*
**terminated**
227:*18* 229:*6*
**terminology**
30:*9* 53:*3*
54:*4* 190:*6*
222:*4*
**terms** 29:*14*
30:*4* 56:*19*
107:*13*
115:*17* 127:*9*
149:*17*
191:*17, 23*
193:*12*
197:*21, 23*
272:*10* 318:*13*

**territory**
292:*16*
**test** 77:*16*
78:*7, 17* 79:*2*
89:*13* 113:*14,*
*18* 114:*7*
145:*5* 146:*24*
149:*13*
187:*18*
210:*13* 274:*6,*
*10, 11, 12, 19,*
*24* 275:*5, 9,*
*10* 333:*19, 23*
334:*2*
**tested** 78:*10*
115:*6* 189:*18*
327:*4*
**testified** 15:*10*
166:*17* 284:*2*
**testify** 24:*11,*
*22* 237:*11*
**Testimony**
6:*3* 92:*24*
94:*2* 244:*14*
262:*10* 344:*6*
**testing** 30:*12*
31:*16, 17, 18,*
*19* 77:*19, 23*
78:*9, 21*
79:*15* 80:*16,*
*17* 89:*24*
113:*4* 114:*1,*
*9* 146:*23*
182:*23*
189:*20* 196:*9*
209:*18* 210:*2*
238:*19* 239:*2*
260:*22* 261:*2*
272:*17* 276:*6,*
*8* 283:*10*
301:*11*
302:*21*
314:*17*
320:*22*
321:*10*
323:*18* 326:*9,*
*14, 18, 22*
327:*10*
331:*14, 21*
333:*22* 334:*6,*
*7* 337:*9, 11,*

*13, 15, 17, 18*
338:*4, 6, 23*
**tests** 337:*23*
**Teva** 4:*5, 6*
**Texas** 2:*4* 5:*4*
**text** 16:*20*
124:*23*
125:*20* 126:*22*
**Thank** 15:*17*
39:*24* 160:*3*
200:*12*
201:*19* 233:*3*
**Thanks** 202:*1*
**thing** 42:*22*
43:*9* 95:*24*
104:*14*
118:*23* 164:*2*
205:*1* 235:*7*
245:*11* 316:*8*
320:*17*
**things** 16:*17*
33:*20* 110:*4,*
*11* 111:*8*
167:*2* 178:*13,*
*15* 179:*21*
183:*19*
186:*16* 193:*2*
209:*14* 230:*3*
259:*2* 311:*7*
321:*2* 332:*11*
336:*2*
**think** 20:*14*
22:*23* 27:*2*
34:*1, 12* 37:*7*
40:*11* 41:*1, 8,*
*21* 42:*3, 22*
49:*2, 12, 21*
50:*4, 5* 53:*2*
55:*15* 57:*13*
59:*3, 5* 61:*12*
63:*2, 21*
64:*11* 65:*15*
66:*9* 73:*5, 15*
74:*24* 76:*4*
80:*9* 83:*14*
84:*16, 21*
85:*13* 86:*24*
89:*3, 14* 91:*9*
93:*17* 95:*14,*
*23, 24* 96:*16*
99:*18* 104:*22*

106:*6* 109:*9*
110:*9, 15*
111:*5* 116:*1,*
*5, 20, 22*
117:*22*
118:*24* 119:*6*
125:*5* 128:*4,*
*17* 129:*16, 18*
131:*1, 13*
133:*23*
138:*21*
141:*20*
144:*24*
146:*21* 148:*1*
157:*17* 161:*1,*
*10* 162:*22*
163:*2* 164:*16*
165:*16*
166:*21*
168:*10*
176:*17, 23*
182:*17* 184:*5,*
*18* 188:*5*
193:*22* 197:*7,*
*9, 11, 13*
198:*12*
202:*13* 203:*2*
207:*24*
208:*14*
212:*23*
213:*23* 214:*3*
215:*2, 19*
223:*1* 225:*23*
229:*2, 3*
230:*6* 231:*16*
234:*2, 10*
235:*24* 238:*7*
240:*1, 6*
242:*5* 246:*10*
248:*10, 19*
251:*1* 253:*9,*
*12, 15, 23*
256:*5* 257:*13,*
*19* 258:*2*
262:*19*
264:*21*
270:*22* 272:*3,*
*4* 273:*6*
280:*8* 291:*14*
292:*9* 297:*6*
298:*17*

Confidential Information Subject to Protective Order

308:*11*  313:*5*
317:*1*  318:*2*
324:*6*  326:*11*
335:*18*
**thinking**
37:*11*  95:*22*
191:*5*  333:*6*
**third**  268:*20*
**thirty**  345:*16*

**THORNBURG**
3:*15*
**thought**  20:*12*
41:*6*  65:*21*
87:*8*  115:*7*
255:*5*  256:*1,
9*  271:*7*
292:*7*  321:*19*
**thoughts**
232:*22*
**Thread**  7:*6,
10, 19*  8:*9, 17*
9:*8, 14, 17*
10:*6, 12, 17*
11:*6, 8*
**three**  15:*19*
24:*14*  52:*9,
13*  57:*14, 16,
20, 21*  73:*12*
170:*23*
171:*11, 14, 17*
242:*9, 16*
243:*16, 20*
268:*21*  269:*7*
271:*16*  314:*6,
24*  322:*22*
328:*12*
**three-item**
268:*17*
**three-page**
265:*16*
**threshold**
334:*6*
**threw**  116:*5*
**thumb**  328:*6*
**Thursday**
342:*13*
**time**  14:*8*
17:*11*  18:*14*
31:*24*  43:*12*
69:*14*  79:*15*

85:*19, 23*
88:*2, 6*
117:*24*  127:*7*
129:*13, 19*
131:*11, 17, 18*
144:*1*  157:*14,
15*  158:*5, 7,
16*  165:*11*
166:*19*
167:*23*
170:*17, 18*
172:*1*  207:*2*
219:*5*  223:*4,
22*  227:*21*
228:*3, 11, 16*
232:*15*  233:*4,
8*  243:*19*
250:*7*  258:*24*
259:*1*  260:*5*
261:*11, 19, 23*
265:*1*  287:*1*
293:*21*  294:*1*
306:*3*  308:*15*
309:*10*  343:*1*
**times**  59:*20*
105:*21*
149:*19*
256:*21*  308:*5,
19*  332:*2*
338:*19*
**timestamp**
101:*1*
**title**  28:*5*
68:*15*  174:*16*
280:*20*  300:*21*
**titled**  134:*5*
333:*8*
**titration**
338:*12*
**titrations**
338:*13*
**today**  22:*20,
24*  24:*22*
129:*16*  162:*4*
166:*11*
225:*19*
229:*16, 17, 22*
248:*11*  250:*8*
265:*11, 12*
**Today's**  14:*7*

**told**  153:*17*
192:*7*  193:*13*
250:*2*  251:*13*
254:*11*  319:*3*
333:*16*
**toluylene**
312:*10*
**tool**  216:*24*
**tools**  44:*7*
**top**  22:*13, 14*
74:*13*  78:*23*
127:*18*
141:*13, 19*
177:*12*  196:*5*
202:*4*  206:*23*
210:*22*  221:*3*
227:*1, 4*
241:*12*
251:*23*  268:*3*
285:*7*
**topic**  33:*11*
37:*12*  47:*16*
118:*13, 19*
119:*5*  142:*11*
237:*10*  294:*19*
**topics**  21:*24*
22:*11, 17*
23:*4*  24:*16*
33:*8, 15*
154:*19*  232:*20*
**total**  17:*4*
78:*12*  79:*10*
323:*20*
**touch**  286:*13*
**touchstone**
150:*18*
**toxicology**
155:*10*
**trace**  91:*15,
21*  106:*8, 10*
**traces**  103:*23*
**Trackwise**
136:*4, 8, 16,
22, 24*  137:*1, 7*
**traditional**
217:*5*
**traditionally**
238:*5*
**trails**  320:*8*
322:*6*  339:*6*

**transcript**
344:*9, 19*
345:*17, 19*
**transcription**
347:*7*
**transitioning**
131:*14*
**transmittal**
267:*15*
**transmitted**
239:*15*  270:*24*
**transparent**
143:*18*
**transparently**
199:*8*
**TRAURIG**  4:*1*
**travels**  173:*11*
**treated**  82:*13*
83:*3*  269:*20*
**treatment**
96:*23*  107:*4*
**tributyltin**
213:*19, 23*
226:*8, 15*
243:*16*  249:*9*
312:*11*  323:*21*
**Triethylamine**
7:*15*  81:*24*
82:*2, 10, 24*
96:*18*  98:*23*
99:*4*  101:*6,
16, 19*  103:*14*
106:*9*  243:*11*
252:*9, 21*
253:*6*  254:*13*
**triethylene**
250:*13*
**trigger**  183:*13,
20, 24*  184:*8*
281:*9*
**triggered**
239:*21*  240:*8,
17*
**triggers**
143:*22*  281:*23*
**TRISCHLER**
3:*3*  19:*22*
20:*10*  21:*2,
21*  23:*18, 24*
25:*20*  26:*18*
31:*2, 8*  34:*23*

35:*7, 22*
39:*12, 20*
42:*9, 19*  43:*5*
61:*3, 10*
62:*24*  63:*14*
64:*8*  65:*12*
66:*4, 22*  67:*6*
68:*1*  71:*16,
22*  80:*6, 24*
81:*8*  82:*15*
83:*6*  84:*5, 13*
85:*11*  86:*10,
18*  87:*7, 15,
24*  90:*10*
92:*14, 18*
93:*16*  94:*3*
99:*22*  104:*8*
105:*1, 20*
106:*4*  110:*2,
7, 20*  111:*2, 5*
112:*9*  113:*15*
118:*5*  119:*14*
125:*1, 9, 23*
128:*15*  132:*8*
134:*9, 22*
138:*18*  141:*5*
145:*14*
147:*23*
149:*21*
151:*20*
152:*18*  153:*5*
154:*2*  155:*2,
21*  156:*15*
157:*3, 7, 17,
22*  158:*2, 6*
164:*21*  166:*1*
169:*5, 10*
170:*3*  172:*18*
175:*18*
176:*20*  179:*6*
182:*1, 15*
183:*16*
186:*19*  188:*2,
19*  189:*3*
190:*20*
192:*10*
193:*19*
194:*23*  197:*2*
200:*8, 12*
201:*7, 13, 19*
206:*16*  213:*8,

20 215:20
217:21 218:9,
21 220:20
223:7 228:23
230:22
231:13, 22
232:2, 23
233:3 235:5,
22 238:14
242:22
246:15
248:17
250:15 251:7
254:15
257:15
258:10 259:5
260:11 261:3,
8, 17 264:2
265:17, 21, 24
266:5, 12, 17
270:21 271:4
273:21
275:24
276:10
280:11 286:2
288:17
290:13
291:19
292:11 293:2,
7 295:21
296:5, 9
298:10 300:8
306:7 307:3
309:6 311:8
313:3 315:3
316:3 317:6
318:6 319:9
321:24
322:18 340:6
342:7, 14
**true** 144:8
281:6 319:4
330:22 344:6
**try** 32:3 33:6
90:17 107:15
176:21 177:7
295:24
**trying** 20:12
27:5 35:16
83:9 110:23
123:16

149:11 177:4
187:22
207:12 272:4
324:16
**turn** 37:16
99:5 159:22
160:1 174:15
**twice** 19:13
**twist** 156:5
**two** 16:6
21:20 24:13
26:5 30:5
87:16, 23
98:11 163:10
170:23
176:24
215:10 248:1
253:14
265:17
270:17
271:16, 22
280:5 287:8
328:12, 13
340:10
**type** 46:14
78:12 132:11
141:14 165:4
194:4 222:1
315:16
322:10 326:6,
23 340:18
**types** 142:2
327:1, 8 331:2
**typically**
29:19 30:12
100:1 141:20
142:3 146:21
148:21
149:18
172:12, 16
175:23 178:2
189:12 193:4
240:7 311:7
327:11, 23
337:17 338:5,
6, 23

< U >
**U.S** 3:13
32:17 51:11
72:23 132:6

143:19
226:14, 20
227:6 290:2
297:4 307:2
**U.S.C** 190:18
**ultraviolet**
337:7
**unadulterated**
127:12
**unanticipated**
96:4
**unaware**
247:22
**uncertain**
139:3
**unclear**
178:22
235:18, 21
236:1
**uncommon**
178:12 311:20
**uncovered**
264:22
**underneath**
297:24
**understand**
24:21 35:23
56:15 59:5
62:11, 16
64:12, 23
93:18 100:2
110:8 125:6
126:4 146:14
149:11 153:7
170:5 180:2
184:17 192:1,
13 195:2
214:16 217:2
219:2 237:12
243:4 259:21
279:22
280:24
289:20
309:19 318:1
**understanding**
64:5 65:5
75:2 106:15
128:5 154:8
160:19
173:14 184:6
198:20 199:3,

21 227:13
246:3 253:13
254:9 259:8
272:12
278:10 280:3
288:2 297:8
325:18 332:24
**Understood**
57:18 60:11
83:21 243:3
260:19
279:16 319:17
**unfortunately**
125:8 310:10
**unique** 109:1,
19 113:23
117:10 124:16
**Unit** 7:19
49:8, 13 51:7,
10 52:2, 8
68:7 72:15
103:3 129:24
135:22
136:24 156:8,
11 173:7, 12
174:22
180:13 181:1
200:18 201:5
221:9, 13
222:12
223:22, 24
235:12, 20
239:15, 22
267:12
269:23 277:6
287:4 300:2
323:6, 15
336:11
**UNITED** 1:1
14:13 141:23
**units** 49:4
150:2 275:13
294:7
**University**
107:24
**unknown**
331:13, 20
332:15 333:9
334:1
**unnecessary**
274:8

**unreacted**
312:9
**unscramble**
209:6
**unsigned**
70:20, 22
121:4, 16
131:5 161:21
**untoward**
318:13
**unusual**
320:15
**update** 175:7
**updating**
127:6
**URL** 159:18
160:4
**USA** 4:6, 16
**Usage** 7:7, 21
8:7 68:15
72:13 76:23
121:5 129:23
177:20 179:1
252:7, 8, 12
253:5
**use** 44:16
45:7 49:2
67:17 77:11
79:7, 18
88:14 95:15,
19 117:2
118:2 124:3
129:13, 18
131:24 140:1,
16, 20, 21
141:12, 22
145:9 146:8
163:8, 18
167:14 171:6,
8 198:17
199:13 208:7,
16 215:1
216:20 217:3,
13 229:20
243:11
248:14, 20
249:8, 20, 22
250:8 252:21
254:13 255:7
258:4 260:13
264:14

Confidential Information Subject to Protective Order

265:*11*
269:*16*  272:*1*
275:*12*
302:*22*
338:*24*  339:*3*
**useful**  113:*5*
**user**  339:*10*
**uses**  53:*2*
54:*10*  99:*20*
272:*10*  287:*4*
312:*7*  338:*2*
**USFDA/MHR**

**A/EDQM/TGA**
305:*11*
**usually**  28:*4*
147:*1*  193:*3*
**UV**  336:*22*
337:*2, 7*  338:*5*

**< V >**
**VAA**  224:*5*
230:*17, 19*
241:*19*
242:*14*
243:*10, 14, 18,*
*23*  244:*5*
246:*22*
249:*18, 21, 23*
250:*3*  252:*6*
**vague**  47:*10*
168:*11*
**validate**  192:*8*
196:*13*
209:*14, 15*
**validated**
182:*13*
198:*22*
209:*10*
222:*17*
238:*13*  269:*2*
278:*8*
**validating**
279:*9*
**Validation**
8:*22*  33:*19,*
*21, 22*  118:*9*
148:*10, 22*
149:*1, 5, 8*
150:*6*  170:*15*
171:*3, 7, 9, 11*

179:*1, 15, 18,*
*22, 24*  180:*4,*
*9, 19*  181:*17,*
*20*  183:*1*
185:*9, 23*
186:*8, 11, 13*
190:*11, 17*
191:*12, 16, 22*
192:*2, 3, 17*
193:*11, 15*
194:*1, 2, 15*
195:*17*
198:*17*  199:*5,*
*12, 14, 16*
204:*4*  205:*8*
207:*22*  208:*3,*
*4, 11, 12, 15, 19,*
*21*  209:*2, 11,*
*17, 20, 23, 24*
210:*14, 16, 21*
211:*4, 12, 16,*
*17*  212:*2*
215:*7, 17*
216:*3, 7, 16*
217:*5, 15, 19*
218:*7, 16*
220:*9, 16*
221:*8, 15, 22,*
*23*  222:*2, 10,*
*12, 16*  224:*11*
225:*18, 20*
226:*7, 15, 16*
227:*7, 8, 12*
228:*4, 21*
229:*11*  230:*2*
231:*5, 9, 17*
233:*14, 20*
234:*4, 5, 8, 12,*
*16, 24*  235:*3,*
*10, 13, 15, 20*
236:*17*  237:*2,*
*17, 21*  238:*5,*
*11, 17*  241:*17,*
*18, 20*  243:*14*
244:*4, 22*
245:*2, 24*
246:*13, 19*
247:*3, 11*
258:*6*  259:*1*
262:*24*
263:*15, 19*

273:*13, 16, 17*
274:*3*  302:*16*
303:*5*  329:*13,*
*20*  330:*4, 15,*
*23*  331:*3*
**validations**
242:*8*
**VALSARTAN**
1:*3*  7:*18*
8:*10*  9:*9*
14:*11*  51:*10*
66:*23*  67:*8*
72:*20, 22*
81:*24*  82:*23*
84:*4*  85:*1*
90:*9*  91:*8*
99:*11*  103:*10*
117:*4, 11, 13,*
*19*  118:*22*
119:*13*  129:*9,*
*14*  130:*5*
132:*1, 5*
133:*11*
136:*21*
137:*21*
138:*16*  139:*5*
146:*13*
151:*18*
152:*15*  156:*9*
170:*19*
173:*13*
180:*24*
198:*18, 21*
202:*10, 12*
204:*5, 22*
205:*3, 9*
208:*5, 10, 12*
209:*3, 24*
210:*6*  211:*4,*
*11*  222:*13*
224:*4*  226:*20*
227:*19*
229:*19*
233:*21*  234:*5*
235:*4, 13*
239:*6, 22*
240:*4*  241:*24*
248:*6, 7, 15*
255:*22*
256:*17*  258:*4,*
*5*  260:*2*

262:*18*
263:*12*
269:*17*
270:*19*
271:*12*  278:*9*
282:*9*  284:*7,*
*12, 16*  285:*24*
294:*17*  297:*2,*
*11*  298:*4, 9*
300:*2*  328:*11,*
*23*
**valsartan-**
**containing**
241:*5*
**valsartan-FDA**
280:*21*
**Valsartan-**
**FDA.docx**
277:*15*
**valuable**  38:*9*
**value**  38:*13*
113:*21*
**variability**
49:*22*  196:*16,*
*23*
**variable**
192:*5*  194:*6*
**varies**  172:*17*
178:*5*  239:*4*
**variety**  31:*18*
54:*21*  55:*17*
319:*14*  336:*2*
337:*16*
**various**  41:*18*
47:*7*  50:*11*
56:*20*  57:*9*
65:*24*  178:*7*
224:*5*  280:*4*
337:*10*
**Vasireddy**
296:*16*
**Vega**  269:*22*
283:*24*  285:*2,*
*11, 14, 19*
288:*10*  290:*7,*
*22*  291:*4*
294:*11, 12, 16*
295:*9, 13*
**Vega's**  285:*22*
**vendor**  98:*22*
241:*22*

254:*11*
283:*16*  295:*3*
**vendors**
284:*19*  294:*7*
314:*19*
**vendor's**
269:*21*
**verification**
339:*21*  340:*23*
**verify**  276:*9*
**version**  49:*17*
121:*16*
122:*12*  124:*8*
128:*2*
**versus**  32:*1*
43:*14*  91:*19*
95:*4*  234:*22*
330:*24*
**vertical**  52:*10,*
*16, 17*
**Viatris**  6:*18*
29:*1, 2*
**video**  14:*9*
**Videoconferenc**
**e**  1:*15*
**VIDEOGRAP**
**HER**  14:*2, 5*
85:*19, 23*
87:*20*  88:*2, 6*
158:*7, 16*
233:*4, 8*
261:*19, 23*
293:*5, 21*
294:*1*  342:*23*
**VIDEOTAPE**
5:*15*
**Videotaped**
1:*14*
**view**  34:*22*
89:*1*  222:*9*
**views**  191:*12*
**violates**  335:*2*
**violation**
320:*23*
325:*14, 24*
**violations**
290:*12*  341:*11*
**virgin**  112:*15*
113:*1*  114:*24*
115:*4*

**Virginia**
107:*24*
**virtue** 34:*23*
**Vitae** 6:*17*
**VLN** 81:*23*
82:*9, 23*
224:*6* 297:*2,
4, 12*
**vocabulary**
197:*15*
**volatile** 81:*16*
82:*3, 6* 84:*9*
90:*6, 7* 91:*5*
92:*10* 105:*11*
112:*6* 123:*7,
20*
**VOLUME** 1:*9*
**voluntary**
241:*4*
**VSN** 129:*24*
130:*4, 8*
**VST** 81:*24*
82:*9, 23*
129:*24* 224:*5*
241:*17, 20*
242:*14* 244:*5*
246:*22* 249:*7,
11, 14, 21*
250:*12* 252:*5,
7* 253:*4*
297:*7, 12*

**< W >**
**wait** 176:*21*
201:*17* 225:*4*
**walk** 56:*18*
**walks** 41:*18*
195:*16*
**WALLACK**
4:*13*
**Walt** 279:*11*
280:*9*
**want** 19:*23*
25:*8* 27:*10*
35:*23, 24*
54:*18* 56:*14*
71:*23* 85:*14*
87:*16, 21*
92:*6* 94:*6, 24*
95:*11* 102:*17*
110:*13, 22*

127:*14* 134:*9*
157:*15*
176:*14*
182:*11* 196:*2*
210:*15*
228:*15* 229:*7,
9* 231:*19*
232:*21*
233:*16*
245:*11*
251:*21*
261:*12*
264:*13* 288:*6*
292:*18* 308:*9*
310:*19*
340:*21, 23*
**wanted** 68:*4*
115:*10*
137:*19* 274:*5*
**wanting** 98:*2*
**wants** 31:*9*
110:*9* 146:*22*
230:*18*
**warehousing**
283:*11*
**warning** 119:*4*
**Washington**
5:*13*
**waste** 127:*7*
**water** 134:*21*
**wax** 43:*11*
**Way** 2:*3*
20:*19* 31:*13*
32:*3* 33:*10*
49:*1* 55:*18*
60:*7* 89:*4, 21*
91:*13* 95:*22*
99:*1* 118:*16*
127:*1* 137:*6*
142:*14* 143:*4*
150:*17* 161:*9*
163:*19*
179:*12* 188:*6*
193:*23* 196:*3*
230:*10*
240:*20* 246:*2*
258:*13* 276:*9*
279:*9* 282:*1*
285:*5, 21*
286:*22*
288:*13*

297:*20* 299:*4*
316:*21*
317:*11* 318:*8*
328:*7*
**ways** 41:*11*
78:*9, 15*
124:*24*
163:*11*
209:*14* 282:*6*
340:*14*
**website**
159:*17* 166:*15*
**weigh** 190:*23*
191:*7* 208:*22*
319:*20* 325:*21*
**weighing**
317:*11*
**weighted** 46:*9*
**Well** 16:*6*
19:*13* 27:*4*
28:*2* 40:*9*
41:*23* 52:*24*
53:*21* 71:*12*
77:*15* 78:*20*
89:*22* 96:*16*
109:*15*
110:*13*
122:*22* 123:*5*
131:*4* 147:*15*
163:*21* 173:*5*
178:*20* 187:*2*
193:*6* 195:*20*
203:*9* 204:*17*
205:*13*
211:*24*
214:*21*
216:*14*
227:*13, 15*
234:*20*
236:*23* 242:*2*
244:*12*
253:*21*
255:*21*
259:*24* 265:*4*
270:*23* 271:*4,
7* 272:*23*
273:*16* 279:*3,
10* 282:*1*
286:*4* 292:*11*
297:*9, 18*
314:*17*

315:*20*
317:*21* 321:*4*
324:*9, 15*
326:*15*
337:*16* 339:*5*
340:*16* 341:*3*
**went** 88:*11*
124:*24*
291:*18* 318:*20*
**we're** 22:*7*
35:*18* 36:*1*
44:*2* 46:*7*
64:*22, 24*
66:*1* 88:*3, 7*
96:*22* 97:*5*
124:*9* 137:*5*
147:*10, 13*
158:*17*
177:*10* 189:*2*
230:*7* 261:*20*
270:*16* 290:*1*
293:*22* 315:*5*
340:*18* 343:*2*
**WERNER** 5:*7*
**West** 107:*24*
**we've** 26:*7*
81:*1, 2* 131:*1*
138:*22* 154:*9*
231:*16, 20*
233:*12*
234:*20, 23*
235:*1* 244:*8*
284:*5* 292:*7*
294:*5* 307:*9*
314:*13*
**whatsoever**
316:*21*
**whichever**
20:*19* 295:*8*
**white** 195:*23*
**WHITELEY**
2:*7*
**widely** 178:*5*
**WILLIAMSO
N** 2:*12*
**willing** 65:*9*
66:*3* 162:*15*
**wise** 296:*19*
**Witness** 3:*7*
13:*5* 14:*20*
15:*6* 25:*22*

31:*6, 12*
39:*15, 24*
42:*11, 21*
43:*7* 61:*12*
63:*2, 16*
64:*10* 65:*14*
66:*8* 67:*11*
71:*19* 80:*9*
82:*19* 83:*8*
84:*15* 85:*14*
90:*14* 93:*2,
10* 95:*7, 9, 14*
97:*18* 99:*24*
105:*4* 106:*2,
5* 110:*6, 17*
112:*11*
113:*17* 118:*7*
119:*16* 125:*6*
126:*3* 132:*10*
134:*11*
138:*20* 141:*8*
148:*1* 149:*24*
151:*24*
152:*20* 153:*7*
154:*7* 155:*9,
23* 156:*17*
160:*15*
164:*23* 166:*3*
170:*5* 172:*20*
174:*3* 177:*5*
179:*9* 182:*3,
17* 183:*18*
186:*21* 188:*4*
190:*22*
192:*12*
193:*22* 195:*1*
200:*13* 201:*1*
206:*9* 213:*11,
22* 215:*22*
217:*23*
218:*11, 23*
219:*15* 229:*1*
231:*15* 235:*7,
24* 238:*16*
242:*24*
246:*17*
248:*19*
250:*19* 251:*8*
254:*17*
257:*18*
258:*12* 259:*7*

Confidential Information Subject to Protective Order

260:*13*  264:*4*
271:*5*  273:*23*
276:*4*  280:*13*
282:*16*  286:*4*
288:*19*
290:*15*
291:*21*
298:*16*
300:*10*  306:*9*
307:*5*  309:*12*
311:*10*  313:*5*
315:*5*  316:*8*
317:*10*  318:*8*
319:*11*
322:*20*
334:*14*  340:*8*
342:*20*  344:*5,
6, 8*  345:*1*
**Woodcock**
167:*13, 22*
168:*14*
**word**  54:*5*
63:*21*  95:*16,
19*  110:*3*
162:*18*
168:*13, 19*
171:*6, 8*
189:*7*  195:*13*
199:*14*  215:*1*
216:*1*  217:*3*
264:*14*
297:*15, 21, 24*
**words**  40:*13*
43:*13*  89:*4*
189:*12*
205:*11*
222:*15*
226:*18*
233:*17*
247:*21*  273:*15*
**work**  18:*2*
36:*13*  62:*15*
76:*13*  104:*17*
108:*10, 12, 15*
122:*17*
170:*15*
172:*15*
180:*19, 20*
196:*3*  198:*17*
203:*18*
210:*22, 24*

211:*2*  222:*10*
228:*16*  230:*6,
13*  233:*20*
234:*16, 24*
235:*3*  237:*2,
17, 20*  238:*2,
3, 4, 20*  244:*5*
263:*19*
275:*11*  342:*18*
**worked**
165:*11*
214:*19*  284:*11*
**workflow**
140:*2*
**working**
17:*13*  18:*20*
108:*2*  176:*11*
192:*23*  328:*9*
**works**  36:*23*
99:*15*  282:*19*
286:*23*
**workup**
233:*22*
**world**  29:*19*
173:*6*
**write**  161:*24*
166:*9*  279:*15*
**writes**  332:*11*
**writing**  127:*3*
**written**
131:*12*  179:*4,
11*  193:*9*
315:*15, 16*
331:*12, 19*
332:*7*  336:*3*
**wrong**  19:*5*
161:*3*  204:*12*
271:*8*
**wrote**  148:*5*
162:*7*  166:*10*
169:*24*  279:*2*

**< Y >**
**y'all**  29:*4*
292:*20, 21*
**Yeah**  16:*14*
18:*7*  20:*4*
25:*1*  33:*17*
37:*7*  39:*15*
42:*11, 21*
45:*10*  48:*20*

49:*19*  52:*24*
56:*11*  58:*4*
63:*23*  65:*14*
68:*19*  70:*23*
71:*20*  72:*21*
74:*15, 23*
79:*4*  80:*9*
83:*8, 15, 24*
88:*16*  100:*16,
22*  103:*12, 20*
104:*14*  107:*7*
111:*4*  112:*11*
118:*12*
121:*21*  122:*6*
126:*14*  129:*7,
11*  130:*3*
131:*7*  132:*3*
133:*14*  134:*5*
135:*21, 23*
136:*17*
138:*13*
139:*24*  141:*4*
142:*18*  143:*8*
148:*2, 16*
149:*10*
150:*13, 15*
151:*2, 9, 24*
155:*10*
157:*14, 24*
164:*11, 23*
173:*1*  175:*17*
182:*3*  183:*6,
9, 12*  185:*12*
186:*5*  191:*14,
20*  195:*1*
205:*17*
207:*19*
212:*23, 24*
215:*2, 22*
219:*20*
220:*13*  224:*8*
225:*14*  227:*3*
231:*3, 15*
239:*19*
240:*24*
241:*10*  242:*1,
3, 19*  243:*12,
19*  245:*22*
247:*12*  248:*9*
249:*16*
252:*14, 18*

257:*7, 18*
258:*12*  260:*4*
261:*8*  266:*12*
267:*17*
268:*19*
271:*19*  276:*2*
288:*7, 19, 22*
289:*5, 23*
290:*9, 20*
292:*14*
297:*14*
299:*17*
300:*10*  301:*6*
302:*10*  303:*3,
8, 13, 18*
304:*5, 24*
305:*13*  306:*9*
310:*22*
311:*18*  312:*3,
14*  313:*21*
314:*9*  317:*10*
321:*16, 23*
323:*24*
324:*21*  325:*8*
328:*3*  329:*24*
330:*8, 18*
333:*7*  335:*5,
17*  336:*20*
**year**  17:*18*
127:*22, 23*
271:*16*
296:*18*  297:*1,
22*  327:*23*
328:*17*
**yearly**  178:*6*
**years**  17:*8*
73:*13*  108:*1,
14*  137:*22*
170:*23*
185:*15*  260:*2*
270:*17*
271:*16, 22*
317:*14*
318:*23*  328:*3,
12, 13*
**Yep**  44:*22*
51:*12, 23*
68:*9, 12*
72:*18*  74:*2, 9*
77:*4, 8*  101:*3*
109:*7*  121:*7*

136:*7*  167:*5*
174:*20*  175:*1*
185:*7, 10*
190:*15*  196:*4,
20*  202:*7*
207:*5, 19*
212:*13*
221:*12*
233:*15*  241:*7*
242:*12*  269:*4*
270:*12*
277:*20*  296:*5*
301:*1, 10*
303:*1*  305:*23*
339:*14*  340:*1*
341:*9*  342:*11*
**yielded**  138:*16*

**< Z >**
**zero**  139:*19*
**Zhejiang**  3:*12*
**Zoom**  1:*15*
2:*1*  3:*1*  4:*1*
5:*1*  16:*3*
69:*11*  87:*12*
142:*7*

# Exhibit 92

REDACTED

Confidential Information - Subject to Protective Order

```
 1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
 2                 CAMDEN VICINAGE
 3

                    -   -   -
 4

     IN RE:  VALSARTAN,       :  MDL NO. 2875
 5   LOSARTAN, AND            :
     IRBESARTAN PRODUCTS      :  CIVIL NO.
 6   LIABILITY LITIGATION     :  19-2875
     _____ :  (RBK/JS)
 7                            :
     THIS DOCUMENT APPLIES    :  HON. ROBERT
 8   TO ALL CASES             :  B. KUGLER
 9        - CONFIDENTIAL INFORMATION -
            SUBJECT TO PROTECTIVE ORDER
10
11                  -   -   -
12              April 9, 2021
13                  -   -   -
14
15        Videotaped remote deposition of
     ANTONY RAJ GOMAS, Ph.D., taken pursuant
16   to notice, was held via Zoom
     Videoconference, beginning at 2:30 p.m.,
17   India Standard Time, on the above date,
     before Michelle L. Gray, a Registered
18   Professional Reporter, Certified
     Shorthand Reporter, Certified Realtime
19   Reporter, and Notary Public.
20
                    -   -   -
21
22        GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
23            deps@golkow.com
24
```

Page 2

1
2  ZOOM APPEARANCES:
3  SLACK DAVIS SANGER, LLP
   BY:  JOHN R. DAVIS, ESQ.
4  6001 Bold Ruler Way, Suite 100
   Austin, Texas 78746
5  (512) 795-8686
   jdavis@slackdavis.com
6  Representing the Plaintiffs
7  KANNER & WHITELEY, LLC
   BY:  LAYNE HILTON, ESQ.
8  701 Camp Street
   New Orleans, Louisiana  70130
9  (504) 524-5777
   l.hilton@kanner-law.com
10  Representing the Plaintiffs
11  GOLOMB & HONIK P.C.
   BY:  RUBEN HONIK, ESQ.
12  1835 Market Street, Suite 2900
   Philadelphia, Pennsylvania 19102
13  (215) 327-9166
   ruben@honiklaw.com
14  Representing the Plaintiffs
15
16  MORGAN & MORGAN
   BY:  QUINN STINE, ESQ.
17  600 N. Pine Island Road, Suite 400
   Plantation, Florida 33324
18  (954) 318-0268
   qstine@forthepeople.com
19  Representing the Plaintiffs
20
21
22
23
24

Page 3

1  ZOOM APPEARANCES:  (Cont'd.)
2
3  PIETRAGALLO GORDON ALFANO BOSICK &
   RASPANTI, LLP
   BY:  CLEM C. TRISCHLER, ESQ.
4      FRANK H. STOY, ESQ.
   One Oxford Centre
5  38th Floor
   Pittsburgh, Pennsylvania 15219
6  (412) 263-1840
   cct@pietragallo.com
7  fhstoy@pietragallo.com
   Representing the Defendant, Mylan
8  Pharmaceuticals, Inc.
9
10  GREENBERG TRAURIG, LLP
   BY:  BRIAN RUBENSTEIN, ESQ.
11  1717 Arch Street
   Philadelphia, Pennsylvania 19103
12  (215) 988-7800
   rubensteinb@gtlaw.com
13  Representing the Defendants, Teva
   Pharmaceutical Industries, Ltd., Teva
14  Pharmaceuticals USA, Inc., Actavis LLC,
   and Actavis Pharma, Inc.
15
16  DUANE MORRIS, LLP
   BY:  BARBARA A. SCHWARTZ, ESQ.
   30 South 17th Street
17  Philadelphia, PA 19103
   (215) 979-1164
18  baschwartz@duanemorris.com
   Representing the Defendants, Zhejiang
19  Huahai Pharmaceutical Co, Ltd., Prinston
   Pharmaceutical Inc., Huahai U.S., Inc.,
20  and Solco Healthcare US, LLC
21
22
23
24

Page 4

1
2  ZOOM APPEARANCES:  (Cont'd.)
3  CIPRIANI & WERNER, P.C.
   BY:  JILL H. FERTEL, ESQ
4  450 Sentry Parkway, Suite 200
   Blue Bell, Pennsylvania 19422
5  (610) 567-0700
   Jfertel@c-wlaw.com
6  Representing the Defendants, Aurobindo
   Pharma, USA, Inc. and Aurolife
7  Pharma, LLC
8  HUSCH BLACKWELL LLP
   BY:  SARAH ZIMMERMAN, ESQ.
9  190 Carondelet Plaza, Suite 600
   St. Louis, MO 63105-3433
10  (314) 345.6664
   Sarah.zimmerman@huschblackwell.com
11  Representing the Defendant, Express
   Scripts, Inc.
12
13
14  VIDEOGRAPHER:
   Bill Geigert
15
16  ALSO PRESENT:
17  Bradley Matta, Esq.
   Savitha Adla, Esq.
18  (Mylan - Viatris)
19
   Beth Questad - Paralegal
20  (Slack Davis)
21
22
23
24

Page 5

1       - - -
2      I N D E X
3       - - -
4
5  Testimony of:
6      ANTONY RAJ GOMAS, Ph.D.
   By Mr. Davis          16
7
8
9
10
11       - - -
12      E X H I B I T S
13       - - -
14  NO.      DESCRIPTION        PAGE
   Mylan
15  PL-Gomas-1  E-mail Thread      48
16           4/23/20
           Subject, Small
17           Write-up for
           Refreshing Memory
18           MYLAN-MDL2875-00303180-81
19
   Mylan
20  PL-Gomas-2  E-mail Thread      59
           11/5/19
21           Subject, WL Response
           MYLAN-MDL2875-00611854-55
22
23
24

Page 6

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE

Mylan
PL-Gomas-3   Observations        59
            MYLAN-MDL2875-00611856

Mylan
PL-Gomas-4   E-mail Thread      97
            11/15/18
            Subject, Total No.
            Of API Batches
            MYLAN-MDL2875-00675422

Mylan
PL-Gomas-5   Excel Spreadsheet  99
            Amlodipine and Valsartan
            MYLAN-MDL2875-00895544

Mylan
PL-Gomas-6   E-mail Thread      162
            11/21/18
            Subject, Response to
            5 Queries from FDA
            MYLAN-MDL2875-00305548-49

Mylan
PL-Gomas-7   E-mail Thread      191
            3/25/20
            Subject, Mylan
            Laboratories Limited
            Unit 8
            MYLAN-MDL2875-00281618

Mylan
PL-Gomas-8   Status of Commitments 192
            Related to FDA Form 483
            Issued on 6/5/19
            MYLAN-MDL2875-00281619

Page 7

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE

Mylan
PL-Gomas-9   E-mail Thread      201
            8/9/20
            Subject, US FDA Official
            Correspondence
            MYLAN-MDL2875-00303272-73

Mylan
PL-Gomas-10  Warning Letter     205
            Response
            320-20-44
            Response
            9/11/20

Mylan
PL-Gomas-11  E-mail Thread      305
            Stoy and Davis
            3/28/21
            Subject, Mylan

Mylan
PL-Gomas-12  Process Validation 310
            Report for Valsartan
            Stage I Initial
            MYLAN-MDL2875-00895528

Mylan
PL-Gomas-13  Process Validation 310
            Report
            Valsartan Stage I
            (VST-I)
            Valeryl Chloride
            MYLAN-MDL2875-00895533

Page 8

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE

Mylan
PL-Gomas-14  Process Validation 310
            Report Initial Process
            VST Valsartan Stage II
            MYLAN-MDL2875-00895535

Mylan
PL-Gomas-15  Process Validation 311
            Report
            Valsartan Stage II
            (VST II) Valeryl Chloride
            MYLAN-MDL2875-00895534

Mylan
PL-Gomas-16  Matrix Laboratories 344
            Process Validation
            Report for Valsartan
            VLN-1 Initial Process
            MYLAN-MDL2875-00895529

Mylan
PL-Gomas-17  Process Validation 344
            Report for Valsartan
            Stage I
            Recovery o-xylene
            MYLAN-MDL2875-00895531

Mylan
PL-Gomas-18  Process Validation 344
            Report for Valsartan
            VLN Stage II
            Initial Process
            MYLAN-MDL2875-00895530

Page 9

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE

Mylan
PL-Gomas-19  Process Validation 344
            Report for Valsartan
            Stage II
            VLN Recovery o-xylene
            MYLAN-MDL2875-00895532

Mylan
PL-Gomas-20  Typical Examples for 364
            Changes and Proposed
            Action Item Matrix
            MYLAN-MDL2875-00263716

Mylan
PL-Gomas-21  E-mail Thread      373
            12/9/19
            Subject, Lantech Data
            2019
            MYLAN-MDL2875-00396834-36

Mylan
PL-Gomas-22  E-mail Thread      382
            3/11/19
            Subject, Important Info
            MYLAN-MDL2875-00698730

Mylan
PL-Gomas-23  E-mail Thread      385
            10/10/19
            Subject, Valsartan Mylan
            EMS
            MYLAN-MDL2875-00671867

Page 10

- - -
E X H I B I T S (Cont'd.)
- - -

NO.        DESCRIPTION        PAGE
Mylan
PL-Gomas-24  E-mail Thread        397
2/20/20
Subject, U-8 EIR &
483 Response
MYLAN-MDL2875-00303091

Page 11

- - -
P R E V I O U S L Y  M A R K E D
E X H I B I T S
- - -

NO.        DESCRIPTION        PAGE
Mylan
PL-Snider-9  E-mail Thread        89
7/16/19
Subject, Valsartan API
MYLAN-MDL2875-00461433-37

Mylan
PL-Glover-14 Mylan Laboratories    357
SOP Change
Management Process
Mylan
PL-Glover-22 E-mail Thread        276
11/29/18
Subject, Recovered
Solvents
MYLAN-MDL2875-00281315

Mylan
PL-Glover-23 E-mail Thread        248
11/26/18
Subject, Recovered
Solvents
MYLAN-MDL2875-00530156-57
Mylan
PL-Glover-24 Charting, Product    248
Codes, Stages, SAP
Code Name of
Recovery Solvent

Page 12

- - -
P R E V I O U S L Y  M A R K E D
E X H I B I T S (Cont'd.)
- - -

NO.        DESCRIPTION        PAGE
Mylan
PL-Glover-29 Establishment        392
Inspection Report
Official Correspondence
MYLAN-MDL2875-00281628
Mylan
PL-Glover-30 E-mail Thread        146
3/20/19
Subject, Backup for
FDA Call
MYLAN-MDL2875-00347222

Mylan
PL-Glover-31 Investigation of    146
Lantech
MYLAN-MDL2875-00347223-24
Mylan
PL-Glover-56 Establishment        299
Inspection Report
2/24/20
MYLAN-MDL2875-00708138
Mylan
PL-Glover-58 E-mail Thread        292
1/13/16
Subject, Recovery Solvent
Management SOP
MYLAN-MDL2875-00395755

Page 13

- - -
P R E V I O U S L Y  M A R K E D
E X H I B I T S (Cont'd.)
- - -

NO.        DESCRIPTION        PAGE
Mylan
PL-Glover-59 SOP Recovery Solvent  295
Management
MYLAN-MDL2875-00395758

Page 14

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
PAGE   LINE
None.

Request for Production of Documents
PAGE   LINE
None.

Stipulations
PAGE   LINE
None.

Questions Marked
PAGE   LINE
None.

Page 15

- - -

THE VIDEOGRAPHER:   Good afternoon.  We are now on the record.

My name is Bill Geigert. I'm a videographer for Golkow Litigation Services.

Today's date is April 9th, 2021.  And the time is 2:30 p.m.

This remote video deposition is being held in the matter of Valsartan, Losartan, and Irbesartan Products Liability Litigation for the United States District Court for the District of New Jersey.

The deponent is Dr. Antony Raj Gomas.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.

Due to the nature of remote reporting, please pause briefly

Page 16

before speaking to ensure all parties are heard completely.

All counsel will be noted on the stenographic record.

The court reporter is Michelle Gray and she will now swear in the witness.

- - -

... ANTONY RAJ GOMAS, Ph.D., having been first duly sworn, was examined and testified as follows:

- - -

THE VIDEOGRAPHER:  Please proceed.

- - -

EXAMINATION

- - -

BY MR. DAVIS:
Q.   Good morning, Dr. Gomas.  We met briefly off the record.  For the record, it's good morning my time.  It's good afternoon your time.

Can you just tell me where you're located right now?

Page 17

A.   I'm located in Hyderabad, India.
Q.   And are you at Mylan Laboratories Limited headquarters?
A.   Yes, sir.
Q.   Okay.  Is there anyone else in the room that you're sitting in?
A.   I have my counsel, Savitha, sitting in the room.
Q.   Okay.  Anyone else?
A.   No, sir.
Q.   Okay.  Do you have any screens open in front of you other than the one that has the camera on it?
A.   No.
Q.   Per our protocol here -- obviously, we're in a new world with Zoom depositions.  I'll just ask that any chat windows or text message functions, any kinds of methods of communication textwise, that those be shut off and you not look at any of those while we are on the record.  Is that fair?
A.   Absolutely none.  Thank you.

Confidential Information Subject to Protective Order

Page 18

1    Q.   Okay.  Thank you.
2         Have you given a deposition
3  before, Dr. Gomas?
4    A.   No.  This is the first one.
5    Q.   Okay, great.  So I guess let
6  me -- I think Clem and the videographer
7  put it pretty well.  The rules are pretty
8  simple.  Let's just, the main one is
9  let's try not to talk over each other.
10  It can be difficult in person sometimes.
11  It can be even more difficult on Zoom.
12         I'll do my best not to cut
13  you off.  Sometimes I'm not very good at
14  that.
15         If you'll wait for me to
16  finish my question as well, that will
17  especially help Michelle Gray, who's our
18  court reporter today.
19         So with that, do you have
20  any questions about how we'll proceed
21  today?
22    A.   No, sir.  Thank you.
23    Q.   Okay.  Thanks.  What's your
24  educational background, Dr. Gomas?

Page 19

1    A.   I have a Ph.D. in analytical
2  chemistry, specialization.
3    Q.   Okay.  Where did you get
4  that from?
5    A.   From India, university in
6  India.
7    Q.   What is the name of the
8  university?
9    A.   It is from a city situated
10  in Andhra Pradesh.  Yeah.  Andhra
11  Pradesh.
12    Q.   And what was -- it's in an
13  Andhra Pradesh.  But what is the name of
14  the university again?
15    A.   It is called -- I can't
16  recall the name because it is an initial.
17  So...
18    Q.   Oh, okay.  What are the
19  initials?
20    A.   No, that's what I meant, the
21  initials.  My apologies, I'm not able to
22  recall the initials.
23    Q.   Do you have -- sorry, I
24  didn't mean to cut you off there.  Do you

Page 20

1  have a resumé or a CV, a curriculum vitae
2  that you have?
3    A.   I haven't printed one yet.
4  But maybe on the break I could, if it is
5  okay, I could take it and then provide
6  you that information.
7    Q.   Sure.  That would be
8  fantastic.  If you wouldn't mind.
9    A.   Thank you.
10    Q.   We'll probably take a break
11  in about an hour.
12    A.   Certainly.
13    Q.   That's sort of protocol.  If
14  you wouldn't mind doing that, that would
15  be fantastic.
16    A.   Certainly.
17    Q.   When you -- what year did
18  you earn your Ph.D., about?
19    A.   It's in the years, somewhere
20  in the year 2009 or '10, something, that
21  time frame, while working.
22    Q.   Okay.  And did you have a
23  professional career before earning your
24  Ph.D. or was that the --

Page 21

1    A.   Yes.
2    Q.   Okay.  What did you do
3  before earning that Ph.D.?
4    A.   I was always working in the
5  pharmaceutical quality field.
6    Q.   Since what year did you
7  start working in pharmaceutical quality?
8    A.   I think it is somewhere in
9  1987 or so.
10    Q.   Can you give me a brief
11  narrative of the companies that you
12  worked for -- well, let me strike that
13  and start this way.
14         About how many
15  pharmaceutical companies have you worked
16  for since 1987?
17    A.   Including here at
18  Mylan/Viatrus, it is four.
19    Q.   Four.  Okay.  Let's go
20  through those if you don't mind.  In 1987
21  when you got started in the field, what
22  company did you go work for?
23    A.   I started my career with a
24  company called Cipla.  And then I worked

Confidential Information Subject to Protective Order

Page 22

1 for that organization for 15 years in
2 quality.  And then --
3      Q.   So until about 2002, you
4 worked for Cipla?
5      A.   I worked until 1995.
6      Q.   1995?
7      A.   1990 -- no, sorry.  2003.
8      Q.   2003, okay.
9      A.   Yes.
10      Q.   What was your role at Cipla
11 between '87 and 2003?
12      A.   So I started as a laboratory
13 QC analyst.  And then I grew up in the
14 organization.  And when I left the
15 organization, I was the head quality
16 control for one of the sites.
17      Q.   Was the division between
18 quality control and quality assurance at
19 Cipla similar to what it is at Mylan
20 currently?
21           MR. TRISCHLER:  Objection to
22 the form of the question.
23           And you may answer.
24           And Dr. Gomas, occasionally

Page 23

1 I may have legal objections to
2 John's questions.
3           Most times, unless and in
4 rare circumstances, unless I
5 instruct you not to answer, you
6 should try to, you know, just
7 ignore my objections.  They're for
8 the judge to resolve, perhaps at
9 some other point in time.
10           But what I would just ask --
11 again, it's a Zoom thing -- if you
12 can pause a little bit to give me
13 an opportunity to put that
14 objection on the record before you
15 answer Mr. Davis' questions.
16 Okay?
17           THE WITNESS:  Thank you.
18 BY MR. DAVIS:
19      Q.   Sure.  So let me -- given
20 that, so basically what Clem is saying,
21 is if he -- as long as he doesn't
22 instruct you not to answer, if he places
23 an objection on the record, you're still
24 required to answer the question, if that

Page 24

1 makes sense.
2           So let me repeat the
3 question for you since it's been a little
4 bit.
5           Was the division of
6 responsibility of the QC department at
7 Cipla between quality control and quality
8 assurance, was that similar to the
9 division between quality assurance and
10 quality control at Mylan?
11           MR. TRISCHLER:  Same
12 objection.
13           THE WITNESS:  In Cipla, the
14 quality control, like any other
15 industry, quality division is
16 having two sections, QC and QA.
17 And there is a head who is from
18 quality who manages both.  That is
19 pretty much the industry standard,
20 at least in India.
21 BY MR. DAVIS:
22      Q.   Okay.  So the quality
23 control at Cipla that you worked in, that
24 was more like laboratory quality control?

Page 25

1      A.   That's right.
2      Q.   What city were you based in
3 at Cipla?
4      A.   Initially I started my
5 career in Bombay.  I worked there for
6 five years.
7      Q.   And then?
8      A.   Then go to Bangalore.
9      Q.   Okay.  So you said that you
10 left Cipla in about 2003?
11      A.   Yes.
12      Q.   What caused you -- what
13 caused you to leave Cipla?
14      A.   I wanted to expand my role
15 and go to a bigger organization or bigger
16 role -- my two roles.
17      Q.   Okay.  Where did you go to
18 after that?
19      A.   So I came to a company
20 called Dr. Reddy's in Hyderabad.
21      Q.   Okay.  And what was your
22 initial position there in 2003?
23      A.   I was responsible for head
24 of quality control for all the

Page 26

1 formulation facilities.  There are
2 multiple facilities.
3       Q.   How long were you at
4 Dr. Reddy's in total?
5       A.   Five years.
6       Q.   Was your -- for those five
7 years, was your role the same?  Were you
8 head of quality control for formulation
9 the entire time?
10      A.   For -- yeah.  For all the
11 facilities, yes.  That was the role,
12 yeah.
13      Q.   When you say all facilities,
14 does that include API and finished dose?
15      A.   It was only OSD.  It was
16 only OSD.
17      Q.   Okay.  What does OSD stand
18 for?
19      A.   Oral solid dosage forms and
20 injectables.
21      Q.   That would include both API
22 and finished dose for OSDs?
23      A.   No.  In Dr. Reddy's it was
24 only dosage forms.  In Cipla it was both

Page 27

1 API and, you know, dosage forms.
2       Q.   Okay.  Was Dr. Reddy's not
3 an API manufacturer?
4       A.   Yes.  But it was a different
5 division.
6       Q.   Okay.  Understood.  So your
7 time at Dr. Reddy's between 2003 and
8 2008, you had only dealt with finished
9 dose manufacturing?
10      A.   Yes.
11      Q.   Okay.  And then what caused
12 you to leave Dr. Reddy's in 2008?
13      A.   I wanted to take a bigger
14 role so I moved to a company as head of
15 quality.
16      Q.   Which company was that?
17      A.   It is a company called
18 Shasun.
19      Q.   Could you spell that for me?
20      A.   S-H-A-S-U-N, Shasun.
21 Pharmaceuticals.  S-H-A-S-U-N.
22      Q.   Okay.  S-H-A-S-U-N?
23      A.   Yes.
24      Q.   Shasun.  Okay.  And you were

Page 28

1 there from 2008, roughly?
2       A.   Yes.  2008 to 2011.
3       Q.   Okay.  I have not heard of
4 Shasun before.  Is that still an existing
5 company or no?
6       A.   The name is changed now I
7 think.  But Shasun used to be one of the
8 largest manufacturers of ibuprofen in the
9 world.  Yeah.
10      Q.   Okay.  Were they really just
11 an over-the-counter drug manufacturer or
12 did they do prescription drugs as well?
13      A.   They were manufacturing
14 over-the-counter -- I'm sorry, not
15 over-the-counter.  Generics, both API and
16 finished dosage forms.
17      Q.   And during this time you
18 were also getting your Ph.D.?
19      A.   That's right.  I was --
20 before that I had a master's degree.
21 So -- and you know, bachelor degree.  So
22 I took Ph.D.
23      Q.   Okay.  Was your master's
24 degree also in analytical chemistry?

Page 29

1       A.   Yes.
2       Q.   From the same university?
3       A.   No, it is a different
4 university.  I will send you all the
5 details in that so I don't misspell my
6 initials.
7       Q.   Okay.  All right.  Sounds
8 good.
9       A.   Yeah.
10      Q.   So what happened to Shasun?
11 Are they still around?
12      A.   They are still around.  But
13 they got bought by somebody -- someone
14 else recently, about two years back.  And
15 they have become a slightly bigger
16 company now.
17      Q.   Okay.  What was your role at
18 Shasun?
19      A.   Shasun, I was head of
20 quality and regulatory affairs.
21      Q.   So oversight of both quality
22 assurance and quality control?
23      A.   That's right, yes.
24      Q.   And regulatory affairs?

Confidential Information Subject to Protective Order

Page 30

1    A.   That's right.
2    Q.   Did Shasun have any approved
3 ANDAs in the United States?
4    A.   Yes.  They had, if my memory
5 serves me well, they had their own, as
6 well as they were also contract
7 manufacturing for some of the customers.
8    Q.   As an API contract
9 manufacturer?
10    A.   Both.  They had that space,
11 they were working that space for both API
12 as well as solid dosage forms.
13    Q.   Did you interact with the
14 FDA as part of your role as head of
15 regulatory affairs at Shasun?
16    A.   As -- mostly as a quality
17 head, because during inspections, it was
18 mostly as a functional head for quality.
19    Q.   What caused you to leave
20 Shasun in 2011?
21    A.   I was actually away from the
22 town where my family was, in Hyderabad.
23 My family is from Hyderabad.  For Shasun
24 I had to go to the city, 600,

Page 31

1 700 kilometers away from Hyderabad from
2 there.  And that's why I look for
3 opportunities in Hyderabad to come back
4 to home.
5    Q.   Okay.  What city was Shasun
6 in?
7    A.   Shasun was in Pondichery.
8 It is south of a city called Chennai.
9 Called -- previously it's called Madras.
10    Q.   And then did you join Mylan
11 next in 2011?
12    A.   That's right, sir.
13    Q.   Since 2011, you've always
14 worked out of Mylan's corporate office in
15 Hyderabad?
16    A.   That's right.
17    Q.   What was your role when you
18 first joined Mylan?
19    A.   Yeah, Mylan in 2011 when I
20 joined, I joined as head of quality for
21 third-party manufacturing in India
22 region.  So we had products that are
23 manufactured by third-party
24 manufacturers.  So I was providing

Page 32

1 quality oversight from Mylan standpoint.
2    Q.   When you say third-party
3 manufacturing, are you referring to
4 like --
5    A.   Non-Mylan -- non-Mylan
6 facilities.
7    Q.   Okay.  Manufacturing what
8 exactly?
9    A.   Dosage forms.
10    Q.   API or finished dose forms?
11    A.   No.  It was for -- it was
12 for -- sorry.  It was for formulations?
13    Q.   Okay.  What is the
14 difference between -- what do you mean by
15 formulations?
16    A.   It has got all types of
17 formulations like creams, ointments,
18 injectables, you know, tablets.  So
19 that's why I did not say OSD.  I said
20 different types of formulations for
21 different markets.
22    Q.   And those could be in their
23 finished state, you know, ready-to-sell
24 form?

Page 33

1    A.   Yeah, that's right.
2    Q.   How long were you head of
3 quality for third-party manufacturing?
4    A.   I think until early 2004.
5    Q.   2014?
6    A.   I'm sorry, 2014.
7    Q.   Okay.  And then in 2014,
8 what role did you move to?
9    A.   I took the role of head of
10 quality for APIs.
11    Q.   Is that the role that you
12 are still in currently?
13    A.   No.  There is an enhancement
14 in the role.
15    Q.   Okay.  What is that?
16    A.   Yeah, after that I also was
17 provided additional responsibility of
18 India OSD.  That is Indian solid oral
19 dosage form facilities, quality
20 oversight, somewhere in 2016 --
21    Q.   Okay.
22    A.   -- as a national role.
23    Q.   Okay.  And so you said that
24 was India OSD --

Confidential Information Subject to Protective Order

Page 34

1    A.   Correct.
2    Q.   -- for Indian facilities?
3    A.   That's correct.  Finished
4 dose and API.
5    Q.   Was there -- did that
6 include the U.S. market or was that
7 solely the India market?
8    A.   No, this is for the
9 manufacturing site that is situated in
10 India, but serving all the markets across
11 the world.
12    Q.   Understood.  So essentially
13 the difference between your 2014 head of
14 quality for API role, and in 2016, the
15 increased responsibility included, for
16 example, finished dose facilities like
17 Nashik or Aurangabad?
18    A.   Yeah.  In somewhere in end
19 of 2018, I got additional responsibility
20 of global OSD.
21    Q.   That was also in 2016?
22    A.   No, 2018 or somewhere in '19
23 beginning.  I don't exactly recollect.
24 That's the role that I'm currently in.

Page 35

1    Q.   Okay.  And what is the title
2 for that role exactly?
3    A.   That role -- currently the
4 role's title is head of global quality
5 for OSD and APIs.
6    Q.   Who do you report to
7 currently?
8    A.   I report to Derek Glover.
9    Q.   Have you reported to Derek
10 Glover since 2018 or at some point before
11 that?
12    A.   I exactly don't recollect.
13 It could be somewhere in that time.
14    Q.   Okay.  When you were head of
15 India OSD in 2016, who did you report to?
16    A.   I reported to -- I reported
17 to Reem Malki.  She was head of
18 operations quality at that time.
19    Q.   Who took over for the head
20 of quality for API role when you moved to
21 India OSD?
22    A.   As I said, it was an
23 additional responsibility.
24    Q.   Okay.  Is there --

Page 36

1    A.   The role -- go ahead.
2    Q.   Is there a person who is
3 now head -- overseeing API quality that
4 reports to you now that you have
5 increased responsibilities?
6    A.   We have cluster for sites.
7 So there are two cluster heads who
8 reporting to me.
9    Q.   Okay.  Who would be the
10 cluster head for Unit 8 that reports to
11 you for API quality?
12    A.   Currently it is a gentleman
13 called Samba Siva Rao.  Samba.
14    Q.   Okay.  How do you spell that
15 name?
16    A.   S-A-M-B-A.  S-A-M -- B for
17 Bombay.  Samba.  S for -- I'm sorry.
18    Q.   Okay.  And is that his first
19 name or last name?
20    A.   Yeah, it's the first name.
21 Samba.
22    Q.   Okay.  And I think you said
23 another name as well.
24    A.   Other name is Rao.  R-A-O.

Page 37

1 Rao.  That's the surname.
2    Q.   And Samba Rao has been the
3 cluster head for API quality at Unit 8
4 since when?
5    A.   I think he is from 2019.
6    Q.   Who was in that role before
7 that?
8    A.   I think it was -- Srinivasa
9 Rao before that.  Srinivasa Rao.
10 S-R-I-N-I-V-A-S-A, Rao.
11    Q.   Okay.  Who is responsible
12 for -- and it might be these cluster
13 heads for API quality.  But is there
14 someone who's responsible for raw
15 material vendors?
16    A.   Raw material vendors?
17 There is -- there is a group, a group of
18 people who work on quality oversight for
19 raw material vendor, and that gentleman
20 reported in to me.
21    Q.   Okay.  Who is that
22 gentleman?
23    A.   That gentleman's name was
24 Narendar Reddy, N-A-R-E-N-D-A-R, and the

Confidential Information Subject to Protective Order

Page 38

¹ surname is Reddy, R-E-D-D-Y.  Narendar
² Reddy.
³     Q.   What was his title?
⁴     A.   He was head of -- head of
⁵ quality for -- let me think exactly --
⁶ for supply -- for supplier, you know,
⁷ audits.  His title is something like
⁸ that, that he is overall responsible for
⁹ supplier audits and qualification.
¹⁰     Q.   Are you familiar with an
¹¹ individual named Vasireddy who was
¹² responsible in some way for vendors?
¹³     A.   Yes.  He was from the
¹⁴ commercial and operations site.
¹⁵     Q.   What was his title?
¹⁶     A.   I don't exactly remember
¹⁷ what his title was.  But I know he was --
¹⁸ he was once upon a time also responsible
¹⁹ for managing, you know, supplies from our
²⁰ commercial and operations standpoint.
²¹     Q.   Let's talk about your
²² preparation a little bit today.  There
²³ might be some questions that I ask you to
²⁴ answer with just a yes or a no.  I'm not

Page 39

¹ looking to get into the substance of any
² of your communications with any lawyers.
³ So -- and I'll let you know when I ask a
⁴ question like that, that I'm just looking
⁵ for a yes or a no.
⁶       So about how many hours did
⁷ you spend preparing for today's
⁸ deposition?
⁹     A.   I have not counted.  Maybe a
¹⁰ couple -- I don't know how to say that.
¹¹ A few hours, for sure.
¹²     Q.   Okay.  Over one day or
¹³ multiple days?
¹⁴     A.   Maybe a week, ten days, over
¹⁵ a period of time, yes.
¹⁶     Q.   Okay.  Who were the lawyers
¹⁷ that you met with either in person or
¹⁸ virtually to prepare for today?
¹⁹     A.   I have virtually met Brad
²⁰ from our team, and Mr. Clem and Jason.
²¹     Q.   Okay.  Anyone else?
²²     A.   I don't recollect anyone
²³ else.
²⁴     Q.   What was the longest one of

Page 40

¹ those meetings?  How long -- for -- you
² know, you said that you spent several
³ hours over about ten days preparing.  Was
⁴ there a day where, you know, you spent a
⁵ substantial chunk of the day preparing
⁶ for this?
⁷     A.   The longest could be like
⁸ two hours maybe.  Two, two and a half
⁹ hours, I don't know.
¹⁰     Q.   Did you review documents in
¹¹ preparing for today?
¹²     A.   Some exhibits that were
¹³ given to me I have reviewed.  And there
¹⁴ were some other documents which I just
¹⁵ scanned through some of them.
¹⁶     Q.   Sorry, Dr. Gomas.  You got a
¹⁷ little choppy there.  Could you repeat
¹⁸ that.
¹⁹     A.   I'm sorry.  Your voice came
²⁰ a little later than the video.  Sorry
²¹ about that.  Could you repeat your
²² question once again?
²³     Q.   I think we had a bad
²⁴ connection there for a second.

Page 41

¹       So, I think you were telling
² me about documents that you reviewed in
³ preparing for today.
⁴     A.   Yeah, there was -- there was
⁵ a set of documents that was given to me
⁶ as exhibits.  I did have a look at that.
⁷ And during the course of our discussion
⁸ with lawyers, I had an opportunity to see
⁹ or review some documents, yes.
¹⁰     Q.   That set of exhibits you're
¹¹ referring to, when did you review that?
¹²     A.   I'm sorry, sir.  Which one?
¹³     Q.   You said the set of
¹⁴ exhibits.  When did you review that?
¹⁵     A.   The exhibits came the day
¹⁶ before yesterday, I think.  So it come
¹⁷ the day before yesterday or yesterday.  I
¹⁸ don't recollect.  Somewhere in between
¹⁹ the timeline, yeah.
²⁰     Q.   Okay.  Who sent those to
²¹ you?
²²     A.   Brad sent them.
²³     Q.   Do you recall about how many
²⁴ documents that was?

Confidential Information Subject to Protective Order

Page 42

¹ A. Close to 100. 100 or
² something like that. I don't recollect
³ exact number.
⁴ Q. Did they have yellow exhibit
⁵ tabs on them?
⁶ A. Yeah, one set of documents
⁷ had -- yes, both yellow -- yellow tag,
⁸ yes, saying exhibit, yeah.
⁹ Q. Did all of them have the
¹⁰ exhibit tabs or did some of them not have
¹¹ the exhibit tabs on them?
¹² A. One set of documents don't
¹³ have an exhibit tab on that.
¹⁴ Q. Okay.
¹⁵ A. I have record and I kept.
¹⁶ Q. Did you -- aside from those
¹⁷ documents, were there documents that you
¹⁸ reviewed on your own in preparing for the
¹⁹ deposition?
²⁰ A. I did go through some of the
²¹ guidelines, just to -- you know, and some
²² communications, yeah.
²³ Q. Can you tell me specifically
²⁴ what you're referring to?

Page 43

¹ MR. TRISCHLER: Objection.
² THE WITNESS: I was looking
³ at the nitrosamine guideline. And
⁴ a couple of other communications,
⁵ FDA has put through, to refresh
⁶ my -- what I was thinking, yeah.
⁷ BY MR. DAVIS:
⁸ Q. So the FDA's guidelines on
⁹ nitrosamines?
¹⁰ A. That's right. I just
¹¹ reading through and see.
¹² Q. You mentioned communications
¹³ also. What did you look at there?
¹⁴ A. FDA had put a lot of
¹⁵ communications out over time about
¹⁶ nitrosamines. I had read previously, but
¹⁷ I just -- I just, you know, went through
¹⁸ it about a couple of vendors just to
¹⁹ refresh my memory.
²⁰ Q. Okay. Let's transition a
²¹ bit and talk about Mylan's root cause
²² investigation into how NDEA and to some
²³ extent NDMA got into its valsartan API
²⁴ and finished dose.

Page 44

¹ Do you know what I'm
² referring to when I refer to Mylan's root
³ cause investigation?
⁴ A. I presume that you're
⁵ talking about nitrosamine impurities.
⁶ Q. Yes, I am. And so what's
⁷ your understanding of what that root
⁸ cause investigation found?
⁹ A. In the API?
¹⁰ Q. Yes.
¹¹ A. Thank you.
¹²



Page 45





Page 46

Page 47

---

Page 48

1    A.   I'm sorry.  Sorry.  Could
2  you re-ask the question?  I thought you
3  were asking -- both are being used?
4

20    Q.   What's the difference
21  between organic chemistry and analytical
22  chemistry?
23    A.   Analytical chemistry is more
24  on understanding the measurements of, you

Page 49

1  know, compounds, and whereas organic
2  chemistry is on the reaction mechanisms
3  and how chemicals interact, et cetera.
4  So there is completely two different, you
5  know, specialization.
6    Q.   Okay.  And your expertise is
7  more in the analytical realm, not the
8  reaction realm of organic chemistry?
9    A.   Analytical measurements and
10  instrumentation, yes.
11    MR. DAVIS:  I'm going to
12    mark my first exhibit.  This is
13    Tab 23.
14    (Document marked for
15    identification as Exhibit
16    PL-Gomas-1.)
17    MR. DAVIS:  I'm going to
18    mark that as Plaintiff Gomas-1.
19  BY MR. DAVIS:
20    Q.   Do you -- you said that you
21  had a set of documents, Dr. Gomas.
22    How are those organized for
23  you?
24    A.   I have organized by the --

Page 47 (continued)

19    MR. TRISCHLER:  Objection to
20  form.  Incomplete hypothetical.
21    You can answer if you can.
22  BY MR. DAVIS:
23    Q.   Your answer was yes,
24  Dr. Gomas?

Confidential Information Subject to Protective Order

1 by the serial number.
2      Q.   Okay.  So is there a serial
3 number that says 23 on it in that stack?
4      A.   May I have I look at it,
5 sir.
6      Q.   Sure.  Absolutely.  That's
7 the one that I just marked.  I want you
8 to find it so you can look at it with me.
9      A.   Thank you.  23, you said,
10 sir?
11     Q.   23, yes.  Are you looking at
12 a document that is a two-page document
13 that is two April 23rd, 2020 e-mails?
14     A.   No.  This is not that
15 document.  I'm looking at the Exhibit
16 PL-Glover-23.
17     Q.   Okay.  That's a different
18 one.  What I'll do then is I'll just
19 share my screen.  We'll do it that way
20 with this document.
21     A.   Okay.
22     Q.   Okay.  Can you see this?
23     A.   Yes, sir.
24     Q.   I'm going to -- since I

1 can't hand over the mouse to you, I'll be
2 your designated scroller.
3      A.   Okay.
4      Q.   Take a moment to review this
5 and let me know when you're ready to talk
6 about it.  It's just a short document.
7 And I'll start with this longer e-mail
8 from Naveen Kumar Kolla.  And I'll start
9 with the question, who is Naveen Kumar
10 Kolla?
11     A.   Naveen was an employee who
12 was working in the process development,
13 process development laboratory.
14     Q.   Okay.  Is he a Ph.D.?
15     A.   I'm not sure.  Sorry.
16     Q.   Okay.  Do you understand
17 that he's a scientist?
18     A.   He's a chemist.  Yes.
19     Q.   Okay.  So do you see that he
20 is sending you and Jyothi Abbineni an
21 e-mail titled "Valsartan - nitrosamine"?
22     A.   Yes.
23     Q.   Okay.  Take a moment to read
24 this, and let me know when you need me to

1 scroll down further.
2      A.   Thank you.
3           MR. TRISCHLER:  Dr. Gomas,
4 he just wants you to let him know
5 when you're done reading the
6 e-mail okay.
7           THE WITNESS: Sure, okay.
8           Yes, I just read these two
9 paragraphs.
10 BY MR. DAVIS:
11     Q.   Okay.
12     A.   Thank you.
13     Q.   And there's one more here.
14     A.   Yeah, sure.  Yes, I finished
15 reading.
16     Q.   Okay.  I'm going to go up to
17 your e-mail at the top.  You forward this
18 e-mail to Walt Owens, Derek Glover and
19 Sanjeev Sethi.
20          Do you see that?
21     A.   Yes, sir.
22     Q.   You say that it's just for
23 refreshing everyone's memory on specifics
24 of chemistry.

1           Do you see that?
2      A.   Yes.
3      Q.   Okay.  Is there anything in
4 Dr. Kolla's analysis here that you
5 disagree with?
6      A.   It is a description of
7 process chemistry.  So in this e-mail,
8 I'm providing a process chemistry of data
9 or what has been presented to me to
10 Dr. Walt.  That would have been -- you
11 know, I don't recollect exactly what
12 context it was asked because it is in
13 2020.
14          So but -- it is basically
15 forwarding the chemistry details that has
16 been, you know, shared with me,
17 forwarding it.
18     Q.   Okay.  There's -- at the
19 time that you forwarded it, you didn't
20 note that you had any disagreement with
21 what Dr. Kolla was saying, correct?
22     A.   I don't think it was for me
23 to determine -- have any disagreement or
24 opinion.  For me, I think the context

Confidential Information Subject to Protective Order



Page 54

1  from this e-mail, it appears, you know,
2  that the process chemist, an expert, has
3  provided an explanation, which I'm
4  forwarding to the leadership, Walt Owen,
5  was R&D head at the time, I think.
6        Q.   Take a look down -- I'm
7  going to highlight the sentence for you
8  that I want to discuss.
9        A.   Sure.
10       Q.   Do you see the highlighted
11 sentence?
12       A.   Yes, I see that.
13

Page 55

1
15       What is Dr. Kolla saying
16 there?
17       MR. TRISCHLER:  Objection to
18 form.
19       THE WITNESS:  I cannot
20 really paraphrase what he's
21 saying.  I'm just reading what is
22 written, so I have not made any --
23 I cannot understand beyond what is
24 written here.

Page 56

1  BY MR. DAVIS:
2
13       MR. TRISCHLER:  Objection to
14 form.
15       THE WITNESS:  I cannot -- I
16 cannot really, what he -- what
17 context he has written it and what
18 are other limits that need to be
19 considered.
20       So since I'm not the author,
21 I'm not really able to interpret
22 beyond what is written here.
23 BY MR. DAVIS:
24       Q.   Well, he sent it to you, did

Page 57

1  he not?
2        A.   Yeah.  I just forwarded that
3  as an information so -- because many
4  times, you know, the senior leadership,
5  they call whoever they want and they ask
6  for information, they don't -- they don't
7  have time to kind of chase each one.
8        So if they send it to me, I
9  will go to individuals and gather that
10 and pass it on to make it a little easier
11 for them.  So this is one such
12 information.
13       Q.   Did you read the e-mail at
14 the time?
15       A.   I cannot really remember
16 that I read it fully.  It is too -- it's
17 almost a year back.  I get hundreds of
18 e-mails.  Unfortunately I won't be able
19 to really say yes or no.
20       Q.   When is the last time that
21 you reviewed this e-mail?
22       A.   This one?
23       Q.   Mm-hmm.
24       A.   This e-mail, just now when

Page 58



¹ you are showing me.
²

²⁴    Q.    Yeah.

Page 59

¹         MR. TRISCHLER:  Excuse me,
²    John.  Before we leave that
³    document.
⁴         Is that being identified as
⁵    Gomas Exhibit 1, that e-mail.
⁶         MR. DAVIS:  Yes.  I believe
⁷    I've marked it.  Correct?
⁸         MR. TRISCHLER:  I wasn't
⁹    sure.  That's why I was asking.
¹⁰ BY MR. DAVIS:
¹¹    Q.    Sure.  And, Dr. Gomas, if
¹² you wouldn't mind, there's going to be
¹³ times I might go back to documents.  So
¹⁴ if you wouldn't mind keeping them in an
¹⁵ orderly format.
¹⁶         So what I typically advise
¹⁷ witnesses to do is to place the first
¹⁸ document facedown and then just create a
¹⁹ stack, so that, you know, that will be
²⁰ Exhibit 1.  It will be on the bottom.
²¹ And when you flip it back over, it will
²² be on the top.
²³         Do you understand?
²⁴    A.    Yeah.  But this document, I

Page 60

¹ don't have.  So I just --
²    Q.    Oh, right.  Okay.  Sounds
³ good.  All right.  Well, I'll make a note
⁴ then that if we go back to this one, I'll
⁵ just share my screen again.
⁶    A.    Thank you.
⁷ BY MR. DAVIS:
⁸    Q.    I'm going to mark another
⁹ one.  Let's see if you have this one.
¹⁰ You might not, because this was one of
¹¹ the later ones I sent.
¹²         MR. DAVIS:  I'm marking Tab
¹³    34 as Exhibit 2.
¹⁴         (Document marked for
¹⁵    identification as Exhibit
¹⁶    PL-Gomas-2.)
¹⁷         MR. DAVIS:  And Tab 35 as
¹⁸    Exhibit 3.
¹⁹         (Document marked for
²⁰    identification as Exhibit
²¹    PL-Gomas-3.)
²² BY MR. DAVIS:
²³    Q.    Do you have those documents,
²⁴ Dr. Gomas, in printed format, or no?

Page 61

¹    A.    Could you please repeat the
² number, sir.  32 and --
³    Q.    34 and 35.  And those would
⁴ not be -- not be previously marked
⁵ exhibits.  Those -- for ones that were
⁶ not marked I had a tab number on the file
⁷ name.
⁸         So I'm not sure if those
⁹ were reflected in what was printed for
¹⁰ you or not.
¹¹         MR. TRISCHLER:  Maybe I can
¹²    help.  Dr. Gomas and Savitha,
¹³    Frank Stoy from my office sent you
¹⁴    those documents in an e-mail at
¹⁵    4:57 a.m. my time which would be
¹⁶    about 2:27 your time, a few
¹⁷    minutes before the deposition
¹⁸    began.
¹⁹         So I don't know if there's
²⁰    a -- that's where you'll find
²¹    those documents.  I don't know if
²²    that's --
²³         MR. DAVIS:  Should we --
²⁴    we've been going for about an

Confidential Information Subject to Protective Order

---

Page 62

1  hour.  Should we take a ten-minute
2  break and have those documents
3  printed?
4       MR. TRISCHLER:  I think that
5  might make sense, John.
6       MR. DAVIS:  Okay.
7       MR. TRISCHLER:  We'll be
8  able to find those.
9       MR. DAVIS:  Let's go off the
10  record.
11       THE VIDEOGRAPHER:  Off the
12  record.  3:25 p.m.
13       (Short break.)
14       THE VIDEOGRAPHER:  We are
15  back on the record at 3:46 p.m.
16  BY MR. DAVIS:
17       Q.   Okay.  Dr. Gomas, we left
18  off, I had just marked Tabs 34 and 35 as
19  Exhibits 2 and 3.
20       I'm going to pull up Tab 34
21  and share my screen with you.  I'm going
22  to give you the control.  Take a moment
23  to review that e-mail chain, two-page
24  e-mail chain, and let me know when you're

---

Page 63

1  ready to discuss it.
2       A.   Okay.  I read through.
3       Q.   Okay.  So do you recognize
4  the name Lachman Consultants?
5       A.   Yes, sir.
6       Q.   Who are they?
7       A.   They are GMP consultants
8  that the -- they are GMP consultants,
9  yes.
10       Q.   And Mylan had retained them
11  to consult on the nitrosamine issue with
12  valsartan?
13       A.   As far as my knowledge was,
14  Lachman Consultants are used by the
15  industry for, you know, sometimes
16  responses and for any audit, you know,
17  responses, et cetera.
18       So this was regarding the
19  warning letter response.  I think we were
20  consulting them to help us, review it.
21       Q.   Okay.  Do you see -- do you
22  see that someone named Frances Zipp at
23  Lachman says, "We have a person on our
24  team who is an expert in nitrosamine in

---

Page 64

1  sartans and other drugs, and I asked her
2  to take a quick look at the first item.
3  She's been quite busy."
4       Do you see that?
5       A.   I read it now.  Yes, sir.
6       Q.   Okay.  And then do you
7  see --
8       A.   I'm sorry.
9       Q.   I'm sorry.
10       A.   I need to put my credentials
11  into my laptop, because it stopped.  I'm
12  sorry to interrupt.  Can I do that?
13       Q.   Sure.  Sure.  Let's -- how
14  long will that take?
15       A.   Just one second.
16       (Whereupon, a discussion was
17  held off the stenographic record.)
18  BY MR. DAVIS:
19       Q.   Do you see on November 25,
20  2019, two days after Frances Zipp e-mail,
21  that you are sending back a few comments?
22       Do you see that?
23       A.   I see what I've written,
24  yes, sir.

---

Page 65

1       Q.   You see there's an
2  attachment, "WL Mylan comments by Aloka
3  003 edit 23 November.docx"?
4       A.   Yes.
5       Q.   Okay.  Is Aloka the person
6  that Frances was referring to who is the
7  expert on nitrosamines in sartans?
8       A.   I really don't recollect now
9  if it is same person or if it is somebody
10  who had sent the e-mail and that is where
11  the name comes.  I'm sorry.  I really
12  don't recollect.
13       Q.   And there's no one that you
14  know named Aloka at Mylan, is there?
15       A.   I don't -- I know -- at
16  least in my -- in my knowledge, there is
17  no one whom I know as Aloka --
18       Q.   Okay.
19       A.   -- in Mylan.
20       Q.   I'm going to show you
21  the attachment.  This is a pretty lengthy
22  ten-page document.  Do you want a few
23  minutes to review it?  We can do that,
24  and we can go off the record and you can

---

Confidential Information Subject to Protective Order

Page 66

¹ take as much time as you want to review
² it, or I'm really just going to ask you
³ about one portion of it.
⁴         So what's your preference,
⁵ Doctor?  Or do you want to review the
⁶ whole thing or do you want to go to the
⁷ section that I'm going to refer to?
⁸     A.   If you -- if you're going to
⁹ that section, and if I'm okay to read
¹⁰ that section, that would be helpful, sir.
¹¹     Q.   Okay.  Sure.
¹²     A.   I just -- 34, 35, I have
¹³ that in front of me too.  Just now they
¹⁴ brought it.
¹⁵     Q.   Great.  Excellent.
¹⁶ Excellent.  Okay.  So then I'll stop
¹⁷ sharing, and I'll direct your attention
¹⁸ to Page 2 of this.  And I believe you
¹⁹ testified that this was -- that Lachman
²⁰ was helping you with audit responses.
²¹         Does this look to you to be
²² a draft 483 response to the FDA?
²³     A.   This -- from the title, I
²⁴ understood that it is a warning letter

Page 67

¹ response, sir.
²     Q.   Understood, yeah.  Correct.
³ Yeah, yeah.  Because of the WL in the
⁴ title?
⁵     A.   That's right.
⁶     Q.   Okay.  So this is a draft
⁷ Mylan warning letter response, correct?
⁸     A.   Yes, sir.  This is a WL
⁹ response.
¹⁰     Q.   Okay.  And related to Unit
¹¹ 8?
¹²     A.   This is related to Unit 8.
¹³     Q.   Go to Page 2.  And you'll
¹⁴ see, I suppose Mylan's draft response in
¹⁵ gray at the bottom of the page.
¹⁶         Do you see that?
¹⁷     A.   I'm sorry, sir.  Which page?
¹⁸ Sorry.  I missed that one.
¹⁹     Q.   Page 2 at the bottom.
²⁰     A.   Okay.  Thanks.
²¹     Q.   And do you see where Mylan's
²² response starts with "Response" at the
²³ bottom of the page?
²⁴     A.   Yes.

Page 68

¹     Q.   Okay.  Do you see some
² commenters on the side.  There's an AS1
³ and there's an NK2?
⁴     A.   Yes.  I can see that.  Yes.
⁵     Q.   Okay.  Do you think NK is
⁶ Naveen Kumar Kolla?
⁷     A.   I really cannot say that,
⁸ what the abbreviation was used here.
⁹     Q.   Okay.  Do you think AS1 is
¹⁰ Aloka at Lachman?
¹¹     A.   From the comment, it looks
¹² like maybe this is a consultant was
¹³ commenting, yeah.
¹⁴     Q.   Okay.  So you'll see the
¹⁵ first -- the first sentence of Mylan's
¹⁶ draft response, and I'll read it because
¹⁷ it is a little bit grayed out.
¹⁸


Page 69

¹         Do you see that?
²     A.   I read that, yes.
³     Q.   Okay.  Mylan drafted that,
⁴ correct, that sentence?
⁵     A.   I can't make whether --
⁶ because it is grayed out.
⁷     Q.   Do you recall that sentence
⁸ making it into Mylan's final response to
⁹ the warning letter?
¹⁰     A.   Until I see, because it a
¹¹ lengthy warning letter response.  So I
¹² don't recollect any specific element.
¹³     Q.   You see it's a draft here,
¹⁴ correct?
¹⁵     A.   It's here, but I do not know
¹⁶ whether it is commented upon or it's
¹⁷ really --
¹⁸     Q.   Sure.  Do you see how
¹⁹ it's -- that sentence is highlighted
²⁰ compared to the rest of the paragraph?
²¹     A.   Yes.
²²     Q.   Okay.  And do you see a line
²³ that goes up to the very top comment from
²⁴ AS1?

Confidential Information Subject to Protective Order



Page 70

1    A.   Okay.

2    Q.   Okay.  So that comment from

3 AS1 relates to that sentence?

4    A.   Okay.  Yeah, so what's the

5 question, sir?

6 ███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

22    MR. TRISCHLER:  Objection to

23 form and foundation.

24    You can answer, if you know.

Page 71

1    THE WITNESS:  I'm sorry.

2 Sorry.  I missed that one.

3    MR. TRISCHLER:  I said

4 objection to form and foundation.

5 BY MR. DAVIS:

6    Q.   And you can answer the

7 question.

8    A.   I think I really don't

9 recollect this comment, but from what I

10 understood from our investigation, the

11 formation it is not in the downstream

12 because we have already -- you know, as

13 we have seen that, you know, previously

14 in our investigation report.

15 ███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

Page 72

Page 73

Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order





Page 82

6      MR. TRISCHLER:  Objection
7   to -- objection to form.
8      The witness doesn't speak
9   for Mylan.
10      Objection, asked and
11   answered.
12 BY MR. DAVIS:
13   Q.   Did you draft --
14      MR. TRISCHLER:  He's giving
15   you his opinion, John, on it.
16 BY MR. DAVIS:
17   Q.   Did you assist in drafting
18 this, Dr. Gomas?
19   A.   I was -- I was part of it,
20 but maybe -- but not in all sections, and
21 because there were multiple, you know,
22 leadership, like more too.  So I do not
23 know how much I can recollect which part
24 of it was kind of done by me and it's --

Page 83

1 but I can generally understand it, but
2 not specifically a comment on this
3 section, what finally -- you know,
4 how it is this test, sorry.
5   Q.   Okay.  Yes or no, Dr. Gomas,
6 do you see a reference in this sentence
7 to Mylan's valsartan products, in this
8 one sentence?
9   A.   I saw -- yeah, it is -- it
10 is written --
11   Q.   Dr. Gomas, let me cut you
12 off.  I'm just looking for a simple yes
13 or no answer.
14      Is -- does this sentence
15 anywhere in it refer specifically to
16 Mylan's valsartan product?
17      MR. TRISCHLER:  Objection.
18 Objection to form.  Argumentative.
19      The witness can answer the
20 question as he deems appropriate.
21 It's not proper to instruct the
22 witness on how to answer a
23 question.
24      MR. DAVIS:  I'm entitled --

Page 84

1   look, I'm entitled to an answer to
2   my question.  It's a simple
3   question.  Yes or no, is there a
4   reference in this sentence to
5   Mylan's valsartan.
6      MR. TRISCHLER:  He's
7   answered -- John, he's answered
8   the question.  What you're not --
9   what you're not entitled to is to
10   instruct him on how to answer.
11 BY MR. DAVIS:
12   Q.   You can answer the question
13 again, Dr. Gomas.  Is there a reference
14 in this sentence specifically to Mylan's
15 valsartan?
16

Page 85

1

Confidential Information Subject to Protective Order



Page 86

Page 88

18    Q.    Thank you.
19

Page 87

Page 89

15    Q.    Let's take a look at
16  Plaintiffs' Snider 9.
17    A.    Yes, sir.
18    (Previously marked
19  PL-Snider-9.)
20    THE WITNESS:  Can I open the
21  file?
22  BY MR. DAVIS:
23    Q.    You may.
24    A.    Thank you.

Confidential Information Subject to Protective Order

Page 90

1    Q.   Actually before we move onto
2  that, do you -- do you agree, and this is
3  just a very simple pro forma question.
4         For Exhibit 2, do you agree
5  that you did forward that e-mail on
6  November 25, 2019, with comments?
7         Do you want to go back and
8  look at it?
9    A.   The name what you showed me,
10 that I sent to, what one?
11   Q.   Exhibit 2, which is your
12 e-mail to Derek Glover saying, "Dear
13 Derek, we have reviewed this and have a
14 few comments.  Thank you for sharing the
15 inputs from Lachman."
16        You did author -- you
17 authored that e-mail, correct?
18   A.   Yes, sir.  I did, yes.
19   Q.   Okay.  Thank you.
20        Back to Plaintiff Snider 9.
21 Do you have that in front of you?
22   A.   Yes, sir.
23   Q.   Okay.  When is the last time
24 you reviewed this e-mail exchange?

Page 91

1    A.   This I reviewed it as part
2  of the exhibits when I took -- when I
3  took printouts.
4    Q.   So yesterday?
5    A.   Yesterday, yeah.
6    Q.   Okay.  And you did write
7  this e-mail on July 16, 2019 that's the
8  top e-mail?
9    A.   Yes, sir.



Confidential Information Subject to Protective Order



Page 94

Page 96

Page 95

Page 97

23    Q.   Okay.  Did you -- let's
24  transition and talk about nitrosamine

Page 98

¹ testing a little bit, when Mylan started
² testing its API and finished dose for
³ nitrosamine impurities. Did you
⁴ spearhead that effort?
⁵     A.   I would -- I would say that
⁶ yes as a head of quality, I was -- I was
⁷ overseeing the, you know, the
⁸ investigation and program for testing.
⁹ Because we also had to manage a lot of
¹⁰ resources, review the new
¹¹ instrumentation.
¹²     So it is not a normal
¹³ investigation as you -- as you would have
¹⁴ recognized it. So we had to -- we had to
¹⁵ mobilize instrumentation. So I was -- I
¹⁶ was definitely involved in that, yes.
¹⁷     Q.   Okay.
¹⁸     MR. DAVIS:  I'm going to
¹⁹ mark Tab 6 as Exhibit 4.
²⁰     (Document marked for
²¹ identification as Exhibit
²² PL-Gomas-4.)
²³     MR. TRISCHLER:  That's part
²⁴ of the stack that I think is being

Page 99

¹ copied, John. So you may have to
² display that one. I don't think
³ the document is back yet.
⁴     MR. DAVIS:  Okay. Sounds
⁵ good.
⁶ BY MR. DAVIS:
⁷     Q.   I'm going to share my
⁸ screen, Dr. Gomas.
⁹     A.   Yes, sir.
¹⁰     Q.   Okay. This is -- some of
¹¹ these documents that are produced to us
¹² by Mylan come with a slip sheet as the
¹³ first page so I'm going to scroll past
¹⁴ that.
¹⁵     And then do you see this
¹⁶ e-mail chain around November 15, 2018?
¹⁷     A.   Yes, sir.
¹⁸     Q.   Okay. And I'm just going to
¹⁹ focus on one thing you say which is on
²⁰ November 14, 2018, you write an e-mail
²¹ that says, "We are planning to analyze
²² batches, latest to old."
²³     Do you see that?
²⁴     A.   Yes, sir.

Page 100

¹     Q.   Okay. Is that, in fact,
² what Mylan did?
³     A.   I don't really recollect how
⁴ finally we tested, whether -- whether all
⁵ the batches that are within the expiry, I
⁶ don't recollect, sir. I'm sorry. It's
⁷ two years back.
⁸     Q.   Let me share another
⁹ document with you then.
¹⁰     MR. DAVIS:  I'm going to
¹¹ mark Tab 7 as Exhibit 5, which is
¹² an Excel spreadsheet that I'm
¹³ going to display.
¹⁴     (Document marked for
¹⁵ identification as Exhibit
¹⁶ PL-Gomas-5.)
¹⁷     THE WITNESS:  Yes, sir.
¹⁸ BY MR. DAVIS:
¹⁹     Q.   Okay. Do you see this,
²⁰ Dr. Gomas?
²¹     A.   Yes, I do see, yes.
²²     Q.   For the record this is
²³ MYLAN-MDL2875-00895544.
²⁴     I'll give you a little

Page 101

¹ backstory to this. I requested that
² Mylan produce the latest testing results
³ for nitrosamines that Mylan had done.
⁴ And this is what counsel provided to me.
⁵     Did you assist counsel in
⁶ any way looking for that -- this
⁷ document?
⁸     A.   This -- I have organized for
⁹ the site to provide one document that was
¹⁰ asked to me about the updated ST list.
¹¹ But I don't know whether it is this or
¹² any other document. But I did not see
¹³ it.
¹⁴     Q.   Okay. Approximately when
¹⁵ did that happen?
¹⁶     A.   About last week or
¹⁷ something.
¹⁸     Q.   Okay. So I'll represent to
¹⁹ you this is the only document with
²⁰ testing results that I received and it
²¹ corresponds to that timeline. So I
²² believe we're referring to this document.
²³     So have you -- do you see
²⁴ that the worksheets at the bottom here,

Page 102

¹ that I'm scrolling over?
² A. Yes, sir.
³ Q. Okay. And these refer to
⁴ the different ANDAs for
⁵ valsartan-containing products that Mylan
⁶ has approved for the U.S. market,
⁷ correct?
⁸ A. I can see the product name
⁹ and the batch number.
¹⁰ Q. I'm referring simply to the
¹¹ worksheets at the bottom. For example,
¹² the one we are on right now, 090483 AML
¹³ VAL. What does that refer to?
¹⁴ A. Oh, I'm so sorry, sir. I'm
¹⁵ not able to see that on the screen.
¹⁶ Q. Oh. Now can you see it?
¹⁷ A. You're talking about the
¹⁸ additional Excel sheet files attached to
¹⁹ this one?
²⁰ Q. Sure. I'm toggling between
²¹ some worksheets right now. And do you
²² see what the worksheet title is at the
²³ bottom of each?
²⁴ A. I'm sorry. I'm only able to

Page 103

¹ see the 41, the Line Item 41. That is
² 43. That is the last item that I see on
³ my screen.
⁴ Q. Okay. Well, let me just --
⁵ I'll read it into the record. This
⁶ worksheet is titled 090483-AML-VAL.
⁷ Do you see that refers to
⁸ the ANDA number for amlodipine valsartan?
⁹ A. Can you please tell me once
¹⁰ again? I'm so sorry. Let me hear you
¹¹ once again.
¹² Q. Sure. 090483 does that
¹³ correspond to the ANDA number for Mylan's
¹⁴ amlodipine valsartan product?
¹⁵ A. I'm so sorry. I'm not very
¹⁶ familiar with the ANDA numbers, how the
¹⁷ number system is, so sorry about that.
¹⁸ Q. Okay. Let's do it this way.
¹⁹ Do you see the column here "Description,
²⁰ finished dose form"?
²¹ A. Yes.
²² Q. Okay. Do you see how it
²³ said, "Amlodipine/valsartan tab"?
²⁴ A. Yes.

Page 104

¹ Q. Okay?
² A. I can see that.
³ Q. Okay. And for this next
⁴ worksheet that I've clicked on, do you
⁵ see how it says, "Valsartan/HCTZ tab"?
⁶ A. Yes, sir.
⁷ Q. Okay. And then for this
⁸ final worksheet, do you see how it just
⁹ says it's plain valsartan tab?
¹⁰ A. Yes.
¹¹ Q. How did you know to find
¹² this document when -- when counsel asked
¹³ you for it?
¹⁴ A. I had requested the site
¹⁵ quality team to find out, you know,
¹⁶ because there were more than, if I
¹⁷ recollect, hundreds of batches we tested.
¹⁸ So I asked them to find an
¹⁹ Excel sheet or document, whatever was
²⁰ made, whether recently or previously or
²¹ updated. So they have sent this.
²² I really do not know when
²³ this was present or they updated it,
²⁴ because it is quite some time before all

Page 105

¹ these batches were tested.
² Q. Mm-hmm. And when you asked
³ the site quality team for this, who -- do
⁴ you have a name for me?
⁵ A. I'm sorry?
⁶ Q. Do you have a name of an
⁷ individual that you went to at the site
⁸ quality team to ask this for this?
⁹ A. Yeah. The quality head of
¹⁰ the site, yes. His name is Venkat.
¹¹ Q. Venkat?
¹² A. Yes, sir.
¹³ Q. What's his last name?
¹⁴ A. Venkat Bopana, B-O-P-A --
¹⁵ B-O-P-A-N-A.
¹⁶ Q. Okay. And when you asked
¹⁷ him for this, did you ask him for the
¹⁸ most recent or the most updated
¹⁹ nitrosamine testing results?
²⁰ A. I am really sorry. I am not
²¹ able to recollect what exactly I asked
²² him.
²³ Q. What did you -- what did you
²⁴ ask him for specifically that yielded

Confidential Information Subject to Protective Order

Page 106

1 this document?
2     A.   I said that, you know, the
3 up-to-date list of testing or something
4 like that.  Maybe said -- I really don't
5 recollect what exactly I said.
6     Q.   You don't recall asking for
7 the most recent testing?
8     A.   I'm sorry.  Whether it was
9 that -- no, I don't recollect the dates,
10 sorry.  It's about a week back.  Exactly
11 what I asked them, I don't recollect.
12     Q.   Okay.  Do you know if Mylan
13 has tested all of the API batches for
14 valsartan?
15     A.   I need to go back and review
16 the documents, but -- but I could
17 definitely say that we have tested close
18 to about 800 API lots if I'm not -- if my
19 memory -- if my memory is right, I mean
20 across all the markets together.
21     Q.   Okay.  And for -- how many
22 for the U.S. market?
23     A.   U.S. market, I think, if my
24 memory serves me well, it is about 160 or

Page 107

1 150.  I need to go back and check the
2 documents.  But I remember something with
3 that number.
4     Q.   Okay.  Do you agree --
5     A.   The number.
6     Q.   Sure.  Okay.  And do you,
7 and I'm happy to go through this with
8 you.  And I can even hand control over of
9 the mouse to you, I believe.  So let's
10 see.  Okay.  I'm going to hand remote
11 control to you, Dr. Gomas.
12     A.   Yes, sir.
13     Q.   Okay.  What I want you to do
14 is -- first of all, do you agree with me
15 that Column K of this particular
16 worksheet refers to the NDEA content in
17 parts per million of the API batches?
18     A.   It's very hard to read.  One
19 second, sir.  Let me read it.
20     Q.   You can zoom in if you like
21 or I can zoom in for you.
22     A.   I can read now.  NDEA
23 content, in bracket, ppm.  And I can't
24 read the next line.  API, not more than

Page 108

1 0.08 ppm as per FDA guidelines.
2         Is that right, sir?
3     Q.   Yes.  I think it says as per
4 EU guidelines.
5     A.   EU guidelines because --
6     Q.   Otherwise -- right.
7     A.   The cursor was blocking it.
8     Q.   Okay.  So what I want you to
9 do is scroll down, and you'll see a bunch
10 of rows that say "yet to be analyzed."
11         Do you see that?
12     A.   Yes, sir.
13     Q.   Okay.  Do you know whether
14 those were tested or not?
15     A.   No, I wouldn't be able to
16 answer that question without seeing
17 really the documents.
18     Q.   Okay.  Regardless, this
19 document was provided to you a week ago
20 by the site quality team?
21     A.   It was not provided to me.
22 I asked them to send it to -- send the
23 document.  It was not sent to me.  It was
24 sent to Brad, I think.

Page 109

1     Q.   Okay.  But that was about a
2 week ago that that request was made?
3     A.   Yeah, maybe a week, ten
4 days.  It could be something of that
5 sort, yes, sir.
6     Q.   Okay.  So this document was
7 pulled from the site quality team's file
8 a week ago, is your understanding?
9     A.   I could ask them, you know,
10 whether this is an updated one or is the
11 usual one.
12     Q.   Why would -- why do you
13 think that they would send you one that's
14 not the most recent version?
15         MR. TRISCHLER:  Objection to
16     form.
17         THE WITNESS:  I don't know
18     in what context this was asked
19     for.  So I really do not
20     understand whether this is an
21     updated one or not.
22         I myself just not able to
23     make out from this, by -- not on
24     analyzed word alone.

Confidential Information Subject to Protective Order



Page 110

1    I'm sorry.  I'm not able to
2  give you -- you know, the wrong
3  thing here, because I'm not
4  familiar with this -- with this
5  particular document, what -- which
6  is presented here, so...
7  BY MR. DAVIS:
8

Confidential Information Subject to Protective Order

Page 114

14    Let me go up to this
15 comments here. And it's present in all
16 of the worksheets. And I've highlighted
17 it for you. It says, "Product within
18 expiry recalled."
19    Do you see that?
20    A.   Yes, yeah.
21    Q.   Okay. Is it correct that
22 Mylan only recalled valsartan that had
23 not passed its shelf life?
24    A.   I think I need to -- I need

Page 115

1 to refer to documentation, because off
2 the cuff I don't recollect this. It's
3 about three years now, so exactly what
4 was recalled, I'm not able to recollect.
5    Q.   Okay. So you don't know for
6 example, and I'll -- I'm going to pick an
7 example from a while back.
8



15    You don't know whether that
16 batch was recalled or whether it was not
17 recalled simply due to the fact that it
18 was expired already?
19    A.   I need to -- I need to
20 refer -- you know, refer this to the team
21 that really did the recall, that is the
22 U.S. team that manages it.
23    Q.   Okay. Who would I talk
24 to -- who would I talk to about that in

Page 116

1 particular?
2    A.   Derek Glover, Mr. Derek
3 Glover could have someone from his team,
4 you know, could definitely give you that
5 answer.
6    Q.   Okay. Do you know if Mylan
7 is still testing valsartan API and
8 finished dose for nitrosamine content
9 that was manufactured prior to the
10 recall?
11    A.   I -- as my -- my knowledge
12 goes, no, sir. Because we have -- we
13 have done the recall and we moved onto
14 the new process.
15    Q.   Okay. Let's talk about --
16    A.   I received the printout --
17 sorry, sir -- before you ask the
18 question.
19    Q.   Yeah, sure.
20    (Whereupon, a discussion was
21 held off the record.)
22    THE WITNESS:  I have all the
23 things printed.
24 BY MR. DAVIS:

Page 117

1    Q.   Okay, great. Thank you.
2 Thank you.
3    Let's talk about Mylan's
4 risk assessment activities for its
5 recovered solvent processes that were
6 done prior to the recall.
7    Do you follow the topic I'm
8 going to?
9    A.   Yes, sir.
10    Q.   Okay. What did Mylan do
11 from a risk assessment perspective for
12 its recovered solvent processes prior to
13 recall in 2018 for valsartan?
14    A.   Risk assessment as a
15 specific exercise or risk assessment as a
16 whole? What we -- because risk
17 assessments are performed in multiple
18 ways, you know, across cGMP processes.
19    So we have under product
20 specification design, control of testing,
21 control of process parameters. So all of
22 them we consider a risk assessment.
23    So if you could be more
24 specific, please.

Confidential Information Subject to Protective Order



Page 118

1      Q.   Sure.  Let me make sure I
2  got you right on this.
3      A.   Yes, sir.
4      Q.   You mentioned three things.
5  You said the specification testing --
6      A.   Yes, sir.
7



Page 122

1

Page 123

1

3    Q.   Who is the head -- who was
4 the head of R&D, you know, between 2010
5 and 2018?
6    A.   Oh, I -- 2010, I don't know.
7 But when I join in 2014, in the API
8 group, there was a gentleman, Dr. -- he
9 left, so I'm not recollecting his name.
10    I really don't know who the
11 people that were previously.
12    Q.   Who is the current --
13    A.   I can tell you the current
14 name.
15    Q.   Who is the current person?
16    A.   The current R&D head for the
17 API sections Dr. Chandra Has.
18    Q.   Can you spell that for me
19 please?
20    A.   Yes, sir.  C-H-A-N-D-R-A,
21 H-A-S.  Chandra Has.
22    Q.   H-A-S?
23    A.   Yes, sir.  Chandra Has.
24    Q.   And that's the head of R&D

Page 124

1 for API?
2    A.   For API, yes, sir.
3    Q.   Where is Dr. Has based out
4 of?
5    A.   He is based out of Hyderabad
6 R&D center.
7

8

Page 125

1

Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Page 130

Page 132

23    MR. DAVIS:  Am I getting
24    lost?

Page 131

Page 133

1    Hey, Bill, can you hear me
2    okay?
3    THE VIDEOGRAPHER:  I can
4    hear you.
5    MR. DAVIS:  Okay.  Where is
6    the choppiness, is it on my end or
7    the witness's?
8    THE VIDEOGRAPHER:  I mean I
9    think it's on the witness's end.
10    I see him freeze for a bit and
11    then the video catches up, but the
12    audio sounds okay.  And then it
13    lines up again, so -- it doesn't
14    happen often.  But I feel --
15    MR. DAVIS:  Okay.
16    THE VIDEOGRAPHER:  I feel
17    like the doctor just said
18    something.  I didn't hear him.
19    THE WITNESS:  So what we
20    could do, sir, we will --
21    THE VIDEOGRAPHER:  It's okay
22    now though.
23    THE WITNESS:  We will -- we
24    will ask our IT folks during any

Confidential Information Subject to Protective Order



Page 134

1   of the breaks when we get if they
2   can look at it and see if anything
3   else they can do.
4       (Whereupon, a discussion was
5   held off the record.)
6 BY MR. DAVIS:
7       Q.   Okay.  Well, yeah.  Let's
8 have you look into that on the next break
9 if there's a -- you know, a better
10 location for example where you might get
11 better signal.
12      A.   Yes.
13

Page 136

18      MR. TRISCHLER:  John, we've
19   been going for about an hour and a
20   half so I'd like to give the
21   witness a break.
22      MR. DAVIS:  Okay, sure.
23   Yeah, we can take a break right
24   now.

Page 135

Page 137

1       What time do you want to --
2   you want to do ten minutes?  We
3   can go off the record.
4       MR. TRISCHLER:  Yeah, just
5   five or ten minutes so he can
6   stretch his legs, get a cup of
7   coffee or whatever, but --
8       MR. DAVIS:  Okay.  Ten
9   minutes sounds good.
10      THE VIDEOGRAPHER:  Off
11   video, 5:08 p.m.
12      (Short break.)
13      THE VIDEOGRAPHER:  We are
14   back on the record at 5:21 p.m.
15 BY MR. DAVIS:
16      Q.   Okay.  Just to refresh our
17 memory of what we were talking about,
18 Dr. Gomas.
19      We -- we had discussed the
20 testing that goes into creating a
21 specification for recovered solvents and
22 the process parameters that are looked at
23 when doing risk evaluation, and you
24 referred me over to R&D for that stuff,

Confidential Information Subject to Protective Order





Page 142

Page 143

Page 144

Page 145

```
20    Q.   Can I ask you to open your
21  binder and pull out Plaintiff Glover-30
22  and Plaintiff Glover-31.
23    A.   Sure, sir.  30 and 31,
24  right, sir?
```

Confidential Information Subject to Protective Order

Page 146

1    Q.   Plaintiff Glover 030, and
2 031.
3    A.   Yes, sir.  I do have in
4 front of me.
5        (Previously marked
6    PL-Glover-30.)
7        (Previously marked
8    PL-Glover-31.)
9 BY MR. DAVIS:
10   Q.   Okay.  So if you look at
11 Plaintiff Glover-30 which is the e-mail,
12 do you see that you are -- it's two
13 e-mails from you, the first e-mail on
14 March 20th, 2019?
15       That was several months
16 after the recall, correct?
17   A.   I'm looking at the e-mail,
18 so that we are looking at the same
19 document.  I'm looking at the e-mail that
20 was sent by me on 20th of March 2019,
21 sir.
22   Q.   Yes.  And do you agree that
23 that's several months after the recall?
24   A.   Yes, it's a couple of

Page 147

1 months, three months maybe, three,
2 four months after recall, yes, sir.
3    Q.   Okay.  And Mylan had done
4 its root cause investigation by this
5 point, correct?
6    A.   Yes, we have done the
7 investigation report and provided to --
8 provided, yes.
9    Q.   Okay.  So your -- the
10 subject of your first e-mail is "Backup
11 for FDA call."
12       Do you see that?
13   A.   Yes, sir.
14   Q.   And then you're e-mailing it
15 to Dr. Walt Owens, and you're saying,
16 "Kindly see the attachment."
17       Do you see that?
18   A.   That's right, sir.
19   Q.   Okay.  And then if you go to
20 the top e-mail, you'll see an attachment
21 that says Valsartan FDA.docx.
22       Do you see that?
23   A.   The attachment print starts
24 with date of investigation of Lantech.

Page 148

1 And that is the Exhibit 31, sir.
2    Q.   Yes.  Do you recognize this
3 document?
4    A.   Let me have a look at it.
5        Yeah, it's -- it's some
6 questions from Dr. Walt, yes, sir.
7    Q.   Okay.  Well, it's a -- the
8 title of the document, as you can see
9 from Plaintiff Glover-30, the top e-mail
10 is "Valsartan - FDA.docx."
11       Do you see that?
12   A.   On the e-mail, I can see in
13 the subject, but on the exhibit it only
14 say PL-Glover-30 and Exhibit
15 PL-Glover-31.
16   Q.   Look at the top e-mail on
17 Exhibit 30, also from you, dated
18 March 20th, 2019, at 10:13 a.m.
19       Do you see that?
20   A.   Yes, sir.
21   Q.   Okay.  And do you see
22 underneath "Subject:  FW:  Backup for FDA
23 call" an attachment, "Valsartan - FDA"?
24   A.   Oh, yeah, I'm sorry.  I see

Page 149

1 that now, yes, sir.  Sorry.
2    Q.   Yeah.  Does that remind you
3 that Plaintiff Glover-31, the attachment
4 was backup for an FDA call that Mylan was
5 going to have?
6    A.   I believe so, sir.
7    Q.   Okay.  Did you assist in
8 drafting Plaintiff Glover-31?
9    A.   Let me -- it is sent from
10 my, you know, mail.  So I'm just reading
11 it.  Yes, I have read it.  Can I answer
12 now?
13   Q.   Okay.  Sure.  You can
14 answer.
15   A.   Yes, sir.  So there is --
16 the context here is that Dr. Walt, I
17 remember that maybe he said that he was
18 supposed to have call with FDA.  I don't
19 exactly remember the details of call.
20       But it was for a call, so
21 before the call he was asking a few
22 information.  So I have gathered this
23 information, either by phone or mail.  I
24 don't recollect how it is.  But it looks



Page 150

1 like a summary of all the questions, what
2 he asked for, has been gathered and sent
3 from my mail.
4      Q.   Okay.  Thank you.  When is
5 the last time that you reviewed this
6 document?
7      A.   This one, when I got the,
8 you know -- for the printouts, when I
9 took the exhibits, I did have an
10 opportunity.
11      Q.   Okay.  And that was
12 yesterday?
13      A.   It was -- from the -- I also
14 had an opportunity to go through the --
15 Mr. Glover's, you know, information, so
16 that maybe I would have seen too.  I
17 don't recollect.
18      Q.   Did you read the deposition
19 transcript for Mr. Glover?
20      A.   A little bit of them, sir,
21 yes.
22      Q.   Okay.  How about Dr. Snider?
23      A.   I didn't get an opportunity
24 to read it, sir.  I didn't read it.

Page 151

1      Q.   Okay.  Take a look --
2          MR. TRISCHLER:  Yeah, all
3      the -- all the work that we do is
4      of no interest to anybody, John.
5          MR. DAVIS:  I'm shocked.
6 BY MR. DAVIS:
7      Q.   So take a look down at the
8 last item on Page 2, Dr. Gomas.
9      A.   Yes, sir.
10      Q.   It asks, "Were they removed
11 from our DMFs if they were ever
12 included?"
13          Do you see that?
14      A.   I can read it, yes.
15      Q.   Okay.  And "DMF" refers to
16 drug master file?
17      A.   Yes, sir.
18

Page 152

1

Page 153

1

Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order

Page 162



23    Q.   Okay.  I'm going to mark Tab
24  3 as Exhibit 6.

Page 163

1        (Document marked for
2    identification as Exhibit
3    PL-Gomas-6.)
4        MR. TRISCHLER:  Dr. Gomas,
5    did you get copies yet of the
6    materials?
7        THE WITNESS:  I got all
8    the -- I got all the copies, sir.
9        MR. DAVIS:  Okay.
10  BY MR. DAVIS:
11    Q.   Okay.  Can you pull Tab 3
12  out of that binder, Dr. Gomas.
13        MR. DAVIS:  Let's go off the
14    record while he locates this.
15        THE VIDEOGRAPHER:  Off the
16    record at 5:48 p.m.
17        (Short break.)
18        THE VIDEOGRAPHER:  We are
19    back on the record at 5:50 p.m.
20  BY MR. DAVIS:
21    Q.   Dr. Gomas, do you recognize
22  this to be two e-mails, both from you to
23  a number of people?
24    A.   Kindly give me time to read,

Page 164

1  sir, please.  Just a few seconds.
2    Q.   Okay.  Are you ready to
3  discuss the document, Dr. Gomas?
4    A.   One moment, please.  Okay.
5    Q.   I'm going to focus on the
6  bottom e-mail from you to a number of
7  people.  And specifically the last
8  paragraph that's on Page 2 that starts
9  with, "The specification for purity of
10  recovered o-xylene is not less than
11  97 percent."
12        Do you see that?
13    A.   Yes, sir.
14    Q.   Okay.  Do you see the last
15  sentence of this paragraph?  It says,
16  "The analytical method is designed for
17  determining the overall purity and not
18  for any specific impurities, such as
19  NDEA."
20        Do you see that?
21    A.   I see that.
22    Q.   Is what you wrote there
23  accurate?
24    A.   This is in November 2018.

Page 165

1    Q.   At the time, was what you
2  wrote accurate?
3    A.   I think -- I think I need to
4  provide -- because I recollect, you know,
5  understanding this concept, because if
6  you look at the analytical methodologies
7  that are prescribed by every regulatory
8  agencies, as well as the industry, it's
9  extremely sophisticated and sensitive
10  instruments for that nitrosamines
11  impurities because of the levels that are
12  expected.  So a conventional GC method is
13  not expected to see such low levels.  So
14  from --
15    Q.   Before -- before you go on,
16  Dr. Gomas, I'm going to cut you off
17  because you're talking about nitrosamine
18  testing.
21        Do you understand that?
22        MR. TRISCHLER:  John, I
23    don't think it's fair to cut the
24    witness off.  It's not fair at



Page 166

```
1        all.
2              MR. DAVIS:  I don't think
3     it's fair --
4              MR. TRISCHLER:  At the
5     beginning of the deposition, you
6     said that you were not going to do
7     that.
8              MR. DAVIS:  I don't think
9     this filibustering is fair either.
10             MR. TRISCHLER:  Well, you
11    know, I object to the
12    characterization of filibustering.
13             I think the witness was
14    trying to answer the question.
15    And so I would just appreciate the
16    courtesy of allowing him to do
17    that.
18 BY MR. DAVIS:
19       Q.   Okay.  Let me ask my
20    question again, Dr. Gomas, just to make
21    it extra clear.
22
23
```

Confidential Information Subject to Protective Order



Confidential Information - Subject to Protective Order





Page 178

Page 180

18    MR. TRISCHLER:  Objection.
19  BY MR. DAVIS:
20    Q.   Do you want -- do you want
21  to go back to the document and talk about
22  it more now that you're willing to talk
23  about it?
24    MR. TRISCHLER:  Well, he

Page 179

Page 181

1    doesn't want to do anything except
2    answer your questions, and I
3    haven't heard one, John.  You're
4    just arguing.  What's the
5    question?
6  BY MR. DAVIS:
7    Q.   Let's take a look at
8  Plaintiff Glover-6 and 7.
9    A.   You said 67?  Six and seven,
10  sorry.
11    MR. TRISCHLER:  Excuse me,
12    John, before we go to that, the
13    e-mail that we were just talking
14    about, I think was --
15    MR. DAVIS:  That's
16    Exhibit 6.
17    MR. TRISCHLER:  Exhibit 6.
18    Thank you.
19    THE WITNESS:  Yes, I have it
20    in front of me, sir.
21  BY MR. DAVIS:
22    Q.   Okay.  Take a look at
23  Exhibit 6 and the participants to this
24  e-mail chain, all of whom appear to be

Confidential Information Subject to Protective Order

---

Page 182

¹ Mylan individuals.  Mylan.in, is that
² Mylan Laboratories Limited?
³     A.   Yes, sir.
⁴     Q.   Okay.  Do you recognize any
⁵ of these individuals' names?
⁶     A.   I can recognize Venkata
⁷ Anabathula.  That is one person that I
⁸ can recognize.
⁹     Q.   Okay.  He's in the quality
¹⁰ assurance department?
¹¹     A.   He is -- at that time, I do
¹² not know whether he was in QA or QC, but
¹³ it was at least safe to say he's a
¹⁴ quality -- a quality function individual.
¹⁵     Q.   Okay.  How about the author
¹⁶ of the e-mail, Sudhakar Reddy?
¹⁷     A.   I don't know him.  I don't
¹⁸ know which level because there are
¹⁹ hundreds of employees.  I'm sorry.  I
²⁰ don't know this individual.
²¹     Q.   Okay.  Do you see his
²² signature line says that he's in quality
²³ assurance at Unit 8?
²⁴     A.   It says that he's -- I'm

Page 183

¹ sorry.  It says that he is from Unit 8
² quality assurance, but I don't know him
³ personally, so...
⁴     Q.   Okay.  But you do -- you
⁵ recognize Venkata?
⁶     A.   Venkata, yes, I know he's in
⁷ the quality function.
⁸     Q.   Okay.  Do you see that the
⁹ subject of the e-mail is "Quality risk
¹⁰ assessment of usage of recovered solvents
¹¹ in manufacturing of pharmaceutical
¹² intermediate API"?
¹³     A.   I do see that, sir.
¹⁴     Q.   Okay.  Do you see there's an
¹⁵ attachment that says, "Usage of
¹⁶ recovered solvents in manufacturing of
¹⁷ pharmaceutical intermediate API.doc"?
¹⁸     A.   I do see that.
¹⁹     Q.   Okay.  And then looking at
²⁰ Plaintiff Glover-7, is that a document
²¹ you reviewed before?
²²     A.   I would have seen it, but I
²³ don't recollect.  There are so many
²⁴ attachments.  I would have seen it too.

Page 184

¹     Q.   Okay.  You would have seen
² it in preparing for this deposition or,
³ you know, prior to that?
⁴     A.   I can't recollect.  There
⁵ are so many documents we went through.
⁶ I'm sorry.  I'm not able to recollect.
⁷     Q.   Okay.  My question is, at
⁸ the time this e-mail and attachment was
⁹ sent on October 17th, 2014, as you see
¹⁰ from the e-mail Plaintiff Glover-6, did
¹¹ you have any awareness of this document's
¹² existence around that time?
¹³     A.   No, sir.  I have not -- no.
¹⁴     Q.   Okay.
¹⁵     A.   I don't recollect.
¹⁶     Q.   But you did look at it at
¹⁷ some point as part of preparation for
¹⁸ today?
¹⁹     A.   Yes, sir.  Yesterday when we
²⁰ looked into those, I looked at it.  Yeah.
²¹     Q.   Do you see from the title of
²² the risk assessment that it says that it
²³ relates to the usage of recovered
²⁴ solvents in the manufacturing of

Page 185

¹ pharmaceutical intermediate and API?
²     A.   Yes.  It does say that, sir,
³ yes.
⁴     Q.   And that's in fact what it
⁵ relates to, correct, this risk
⁶ assessment?
⁷     A.   I've not gone through the
⁸ entire document line by line.  At least
⁹ the title say so.
¹⁰     Q.   Okay.  Well, based on your
¹¹ review of it at some point before today,
¹² would you agree that the document in fact
¹³ does relate to the usage of recovered
¹⁴ solvents in the manufacturing of
¹⁵ pharmaceutical intermediate and API?
¹⁶     If you want a few -- if you
¹⁷ want a few minutes to review it,
¹⁸ Dr. Gomas, we can go off the record and
¹⁹ you can do that.  Would you like that?
²⁰     A.   I would like to see this
²¹ objective and scope for more time just to
²² read it.
²³     MR. DAVIS:  Okay.  We can go
²⁴ off the record.

Confidential Information Subject to Protective Order

Page 186

1  THE WITNESS:  Yes, sir.
2  Thank you.
3  THE VIDEOGRAPHER:  Off the
4  record.  6:14 p.m.
5  (Short break.)
6  THE VIDEOGRAPHER:  We are
7  back on the record.  6:14 p.m.
8  BY MR. DAVIS:
9  Q.   Okay.  Having reviewed the
10  scope and objective of the document,
11  which for the record is on Page 3, do you
12  agree that in fact this risk assessment
13  from October 2014 looks at the usage of
14  recovered solvents in manufacturing of
15  pharmaceutical intermediate and API?
16  A.   That's what the scope of the
17  document says, sir.
18  Q.   Okay.  Thank you.  You'll
19  notice on the last page -- or
20  second-to-last page, 12 of 13, that it's
21  unsigned.
22  Do you see that?
23  A.   I recognize that, yes, sir.
24  Q.   Okay.  Is it Mylan's quality

Page 187

1  assurance practice not to sign documents
2  like this or do these routinely get
3  signed once they are completed?
4  A.   I really do not know the
5  context of this document, and I have not
6  seen it until it was presented to me as
7  an exhibit.  And so it is -- absolutely I
8  don't have any understanding of what the
9  background behind it, and I absolutely
10  have no understanding of this document.
11  Q.   Okay.  Well, I'm referring
12  more generally to quality assurance
13  documents, since you are the head of
14  global quality for API.
15  And so, you know, and
16  Unit 8, you would agree, is an API
17  manufacturing facility, right?
18  A.   Yes.
19  Q.   Okay.  And this -- you see
20  in the top left corner of the document
21  that it says it's a Unit 8 document?
22  A.   That is right.
23  Q.   Okay.  And then you see in
24  the top right corner of the document, a

Page 188

1  report number that includes QAD in the
2  number.
3  Do you see that?
4  A.   It says QAD, yes.
5  Q.   And that refers to the
6  quality assurance department at Unit 8?
7  A.   I presume, yes, that would
8  be the abbreviation, yes, sir.
9  Q.   Okay.  And so -- and you
10  have oversight as the global head -- or
11  the head of global quality for API over
12  the quality assurance department at
13  Unit 8, correct?
14  A.   Yes, sir.
15  Q.   Okay.  And is it the
16  practice of the quality assurance
17  department at Unit 8 for reports similar
18  to this -- I'm not talking specifically
19  about this report, but similar reports
20  that are generated that those reports
21  actually be signed when they're finished?
22  A.   Any GMP documentation that
23  is finalized and then reviewed and
24  approved would have all the signatures.

Page 189

1  Absolutely.  Yes.
2  Q.   So if this were -- if this
3  were finalized, there should be a signed
4  version of this somewhere?
5  A.   If this was finalized, there
6  should have been a signature version,
7  sir.
8  Q.   Okay.  Based on your review
9  of this document, do you agree that it
10  pertains to recovered solvents generally
11  and not to any particular recovered
12  solvent or particular API?
13  MR. TRISCHLER:  Objection to
14  the form.
15  You can answer.
16  THE WITNESS:  As I said, I'm
17  just going by the text, what is
18  written, without any context of
19  why it was made.
20  But at least from the text
21  on the title, it seems -- it looks
22  like it is a common approach kind
23  of a thing.
24  BY MR. DAVIS:

Confidential Information Subject to Protective Order

1    Q.   Okay.  You don't see any
2 reference to any particular recovered
3 solvent anywhere in this document, do
4 you?
5    A.   At least whatever quick
6 readthrough I did, I didn't notice
7 anyone -- anything.
8    Q.   Okay.  You don't see any
9 reference to any particular API product
10 in this document, do you?
11    A.   Whatever -- whatever little
12 bit briefly I looked at it, I didn't see
13 anything.
14    Q.   Okay.  Do you know if
15 Mylan's quality assurance department
16 created any kind of risk assessment
17 similar to this that pertained
18 specifically to valsartan API and the use
19 of recovered solvents?
20    MR. TRISCHLER:  At Unit 8 or
21 anywhere, John?
22    MR. DAVIS:  At -- well,
23 since it's valsartan API, I'm
24 assuming that I'm limiting the

1 question to Unit 8.
2 BY MR. DAVIS:
3    Q.   You can answer, Dr. Gomas.
4    A.   I'm not aware of any such
5 documentation.
6    Q.   Okay.  And how about any
7 particular recovered solvents at all
8 regardless of the API for Unit 8?
9    A.   Again, I wouldn't be able
10 to, you know, say that because it is a
11 site level documentation.  It is not
12 necessary all the documentations of site
13 would come to my purview or review.  So I
14 really do not know whether any such
15 documents exist.
16    Q.   Okay.  Are you personally
17 aware of anyone, whether it's quality
18 assurance or anyone else at Mylan,
19 actually doing a risk assessment for
20 recovered solvents and their use in
21 valsartan API?
22    A.   As my memory goes, sir, I
23 cannot recollect any such document, you
24 know, in my -- to have come across.

1    Q.   Okay.  As part of its
2 corrective actions taken at Unit 8, as a
3 result of the two FDA inspections in 2018
4 and '19, Mylan did agree to do recovered
5 solvent risk assessments as part of those
6 corrective actions, did it not?
7    A.   I need to really
8 specifically look at that section.  I
9 won't recollect it by memory, sir.
10    Q.   Okay.
11    A.   But there are several of
12 that review every one.
13    Q.   All right.  Let me help you
14 by marking an exhibit or two.
15    A.   Yes, sir.
16    MR. DAVIS:  All right.  This
17 is Tab 18 which is Exhibit 7.
18    (Document marked for
19 identification as Exhibit
20 PL-Gomas-7.)
21    THE WITNESS:  If you could
22 tell me the bottom number, sir,
23 that would be extremely helpful.
24    MR. DAVIS:  Sure.

1    And then Tab 19, which would
2 be the one right after it is
3 Exhibit 8.  And I'll give you the
4 Bates number right now.
5    THE WITNESS:  But only the
6 last three digits if you can,
7 that's fine.
8    MR. DAVIS:  Okay.
9    THE WITNESS:  Thank you.
10 Sorry about that.
11    MR. DAVIS:  Not a problem.
12    (Document marked for
13 identification as Exhibit
14 PL-Gomas-8.)
15    MR. DAVIS:  All right.  So
16 Tab 18, Exhibit 7, is a one-page
17 e-mail.  The last three would be
18 618 of the Bates number.
19    THE WITNESS:  Yes, sir, I
20 have it in front of me.
21 BY MR. DAVIS:
22    Q.   Okay.  And then the document
23 behind that should be roughly a 21-page
24 document that's titled Commitment Status

Confidential Information Subject to Protective Order

Page 194

1 Periodic Update.
2        Do you see that?
3        A.   Yeah, the attachments, at
4 least the first one says USFDA Periodic
5 Update, yes, sir.
6        Q.   Okay.  Do you want a few
7 minutes to review the attachment or do
8 you want to talk about it?
9        A.   I'm sorry.  Here, I have
10 these two document.  Let me confirm.  The
11 other one, the number is 619, sir, at the
12 bottom?
13       Q.   That's correct.
14       A.   Thank you, sir.  I really --
15       Q.   Sure, yeah, if you need a
16 few minutes.
17           MR. DAVIS:  We can go off
18       the record.
19           THE WITNESS:  Thank you.
20           THE VIDEOGRAPHER:  Off the
21       record 6:23 p.m.
22           (Short break.)
23           THE VIDEOGRAPHER:  We are
24       back on the record at 6:27 p.m.

Page 195

1 BY MR. DAVIS:
2        Q.   Okay.  Looking at Exhibit 7,
3 Dr. Gomas, do you see that that's an
4 e-mail sent on March 25, 2020?
5        A.   Yes, sir.
6        Q.   Okay.  Sent to the FDA?
7        A.   That's right.
8        Q.   The attachment you'll see
9 referenced in the e-mail says U.S. FDA
10 Periodic Update - Mylan API Unit-8,
11 (FEI#3002785310).pdf.  Do you see that?
12       A.   Yes.
13       Q.   What were these periodic
14 updates that Mylan was providing to the
15 FDA?
16       A.   So during our inspection
17 they have forwarded three observations
18 that were issued.
19           Within 15 days there every
20 organization needs to respond with what
21 actions we are initiating, what
22 corrections.  And so within 15 days, the
23 organization sent the response to FDA.
24 Because most of the actions probably will

Page 196

1 not get completed in 15 days, because
2 it's too short, we sent -- the
3 organization sent periodic update saying
4 what are the actions that have occurred
5 and how it is progressing.  So this is
6 one of those documents.
7        Q.   Does that continue until
8 the -- the FDA is satisfied with the --
9 the corrective actions?
10       A.   There could be -- no.  It is
11 two ways to look at it.  Sorry.  One is
12 this is a way of communication to the FDA
13 how we are progressing on corrective
14 actions.
15           And so -- so, you know, they
16 can -- they can look at it and make a
17 decision that all the corrective actions
18 could be there, some are corrective
19 actions, so they can make an assessment
20 of a site, you know, evaluation based on
21 that.  Sometimes it is not necessarily
22 all the corrective actions need to be
23 completed.
24       Q.   Okay.  Is Mylan still in the

Page 197

1 process of providing periodic updates
2 like this to the FDA for Unit 8?
3        A.   If my memory goes right for
4 Unit 8 we have completed the periodic
5 updates, that's what my memory says.  I
6 can check, but -- yeah, because it is
7 2018 inspection, 2019 inspection.  So I
8 feel that they were completed the
9 periodic updates, unless -- I can --
10 exactly I cannot remember, but we would
11 have -- we would have -- we would have
12 probably completed I think.
13       Q.   Okay.  When would that
14 have -- when would the last one of these
15 periodic updates have been sent, do you
16 think?
17       A.   I'm sorry, very difficult to
18 recollect that.  I'm sorry about that.  I
19 won't remember that.
20       Q.   Okay.  Let's look at
21 Exhibit 8, and I'm going to direct your
22 attention to Page 15.  There is a
23 numbering at the bottom center.
24       A.   Yes, sir.

Page 198

¹      Q.   And you'll see Page 15 of
² 20.
³      A.   I'm there, sir.
⁴      Q.   And then you'll see the
⁵ column that says Commitment, do you see
⁶ that?
⁷      A.   Yes, sir.
⁸      Q.   That's Mylan's commitment to
⁹ the FDA, correct?
¹⁰     A.   I'm sorry, I missed that.  I
¹¹ was reading, sorry.
¹²     Q.   Yeah, sure.  I am just
¹³ trying to understand what commitment
¹⁴ refers to.
¹⁵          And is -- does commitment
¹⁶ refer to the commitment Mylan made to the
¹⁷ FDA in regards to corrective actions as a
¹⁸ result of the inspection of Unit 8 in
¹⁹ 2019?
²⁰     A.   Yeah.  These are the
²¹ commitments from 483 and warning letter
²² combined, and one of this commitment was
²³ June 2020.  But as I recollect, that
²⁴ action also was completed.

Page 199

¹      Q.   Okay.  And that's -- that's
² actually my question is, PR -- I'm
³ looking at PR Number 2039727.  Do you see
⁴ that one?
⁵      A.   Yes, sir.
⁶      Q.   Okay.  What does -- what
⁷ does that number refer to?
⁸      A.   This number refers to a
⁹ record that is -- that is generated in
¹⁰ Trackwise, so -- so that -- that it is,
¹¹ you know, it is -- every action, every
¹² CAPA corrective action is notified by a
¹³ number.
¹⁴     Q.   Okay.  So in Trackwise you
¹⁵ can go in and plug in that number for
¹⁶ example, and pull up all the associated
¹⁷ documents that -- that were created by
¹⁸ Mylan as part of this particular
¹⁹ corrective action?
²⁰     A.   Yeah.  There could be
²¹ attachments for those.  And so there
²² could be a parent document which says
²³ these are the corrections.  Then the
²⁴ evidence would be attached or it would be

Page 200

¹ kept separated.  Or hard copies would be
² available.  Depends on how we do the
³ site's manager.  But definitely the
⁴ status would be available in the PR
⁵ number, yes, sir.
⁶      Q.   Okay.  And direction, at
⁷ least a direction as to how to locate the
⁸ associated documents would be in
⁹ Trackwise?
¹⁰     A.   Yes, sir.  Yes, sir.
¹¹     Q.   Okay.  Okay.  So for this PR
¹² Number 2039727, which says, "Execute a
¹³ risk assessment of our API manufacturing
¹⁴ processes, including raw materials,
¹⁵ solvents, reagents, catalysts,
¹⁶ byproducts, and recovery processes to
¹⁷ identify any risk of formation or
¹⁸ introduction of other mutagenic
¹⁹ impurities."
²⁰          Do you see that?
²¹     A.   Yes, sir.
²²     Q.   Okay.  And it says that the
²³ due date is June 2020?
²⁴     A.   Yes.

Page 201

¹      Q.   Okay.  Was that, in fact,
² completed?
³      A.   If I -- if I recollect by
⁴ memory, I think it was completed, yeah.
⁵      Q.   Okay.  Let's go to the next
⁶ page.  I'm looking at PR Number 2039860.
⁷          Do you see that?
⁸      A.   Yes.
⁹      Q.   And similar, that would also
¹⁰ be in Trackwise?
¹¹     A.   Yes, that is the Trackwise,
¹² yes.
¹³



Confidential Information Subject to Protective Order

Page 202



12    Q.   Okay.  Yeah, I'm not asking
13  you to remember something that you don't
14  remember.
15    A.   Sorry.
16        MR. DAVIS:  Let me mark --
17  not a problem.
18        Let me mark Tab 22 as
19  Exhibit 9.
20        (Document marked for
21  identification as Exhibit
22  PL-Gomas-9.)
23        MR. DAVIS:  And the Bates,
24  last three on that is 272.  It's a

Page 203

1  two-page e-mail.
2        MR. TRISCHLER:  Hey, John,
3  I'm not seeing that in the first
4  shared file stack, which I think
5  is what Dr. Gomas is probably
6  looking through.
7        MR. DAVIS:  Let's go off the
8  record.
9        THE VIDEOGRAPHER:  Off the
10  record 6:36 p.m.
11        (Whereupon, a discussion was
12  held off the record.)
13        THE VIDEOGRAPHER:  Back on
14  the record at 6:37 p.m.
15  BY MR. DAVIS:
16    Q.   Do you recall, Dr. Gomas,
17  receiving, in June 2020, the warning
18  letter for Unit 8 as a result of the
19  June 2019 inspection?
20    A.   In 2019 inspection, warning
21  letter, yes, sir.
22    Q.   That warning letter was
23  transmitted to Mylan in this June 23,
24  2020 e-mail that's the bottom e-mail on

Page 204

1  the first page?
2    A.   Yeah.  I guess so, so yes.
3    Q.   Okay.  And then do you see
4  your e-mail dated August 9, 2020, that's
5  the top e-mail?  Do you see where it
6  says, "Warm regards, Antony," there?
7    A.   Yeah, that is in the
8  month -- it's in September that made.
9    Q.   Oh, okay.  Is the date -- so
10  that would be September 8th, 2020, as
11  opposed to August 9th?
12    A.   Yeah.
13    Q.   Okay.  Understood.
14    A.   Yeah.
15    Q.   Okay.  And do you recall
16  writing this e-mail?
17    A.   I don't really, but I can
18  read it and have a context if it is
19  necessary.  I wouldn't probably remember
20  why I wrote what I wrote.  But yeah, this
21  is my name for sure.
22    Q.   Do you see where you write,
23  "So the OAI status continues"?
24    A.   Yes, sir.

Page 205

1    Q.   Okay.  OAI refers to
2  official action indicated, does it not?
3    A.   That's right.
4    Q.   Okay.  Meaning that the FDA
5  was not satisfied with Mylan's responses
6  to its 483 and EIR and warning letters
7  for Unit 8?
8        MR. TRISCHLER:  Excuse me.
9  Objection to form.
10        You can answer the question,
11  Dr. Gomas, if you're able.
12        THE WITNESS:  Yes, sir.
13  Yes, sir.
14        So, sir, can you please
15  repeat the question please once
16  again?  Sorry.  I missed that.
17  BY MR. DAVIS:
18    Q.   Sure.  Let me ask, what does
19  OAI mean --
20    A.   OAI means --
21    Q.   -- in the context of --
22    A.   -- official action
23  initiated.
24    Q.   Okay.  And what does that

Confidential Information – Subject to Protective Order

Page 206

1 signify when the FDA says that Mylan
2 Unit 8, for example, is OAI?
3        A.   It could -- the -- what
4 actions need to be taken is at the
5 prerogative of FDA.  In our case, we
6 receive a warning letter, and we continue
7 to manufacture products, and we are
8 allowed to manufacture and distribute
9 product to -- to the U.S. and other
10 countries from Unit 8, because FDA still,
11 you know, identifies that it is not risky
12 to manufacture product in our facility.
13        Q.   And is Mylan Unit 8 still
14 under OAI designation by the FDA?
15        A.   At this moment in time, yes,
16 sir.
17        Q.   Thank you.  How about Unit
18 7?  Is Unit 7 OAI as well?
19        A.   Yes.  At this moment, yes.
20        MR. DAVIS:  I'm marking Tab
21 16 as Exhibit 10.
22        (Document marked for
23 identification as Exhibit
24 PL-Gomas-10.)

Page 207

1        (Whereupon, a discussion was
2 held off the stenographic record.)
3 BY MR. DAVIS:
4        Q.   This one, unfortunately,
5 does not have a Bates number at the
6 bottom right corner.  But the first page
7 is Mylan Unit 7 warning letter response
8 dated September 11, 2020.
9        It is a 23-page document.
10       A.   Yes, sir.
11       Q.   Do you have that?
12       A.   Unit 8 right, sir.
13       Q.   Unit 7 on this one?
14       A.   Unit 7 warning letter.  Okay
15 I have that.
16       Q.   This is Mylan's response, as
17 it says on the first page.
18       Do you see that?
19       A.   You are correct, yes, sir.
20       Q.   Okay.  I only have one thing
21 that I want to point out and ask a
22 question about.  So if you go -- or at
23 least right now I do.
24       If you go to the

Page 208

1 second-to-last page, 22 of 23.
2        A.   Yes.



Page 209

Confidential Information Subject to Protective Order



Page 210

Page 211

11    Q.    Okay.
12         MR. DAVIS:  Do you mind if
13    we take a quick break?  I need to
14    get some more coffee in me.
15         MR. TRISCHLER:  Yeah, that's
16    fine.  It's been almost, you know,
17    an hour and 45 minutes since we
18    broke so now's a good time.
19         MR. DAVIS:  Let's go off the
20    record.
21         THE VIDEOGRAPHER:  6:47 p.m.
22    (Short break.)
23         THE VIDEOGRAPHER:  We are
24    back on the record at 7:04 p.m.

Page 212

1    BY MR. DAVIS:
2         Q.    Dr. Gomas, earlier we were
3    talking about sort of risk evaluation
4    activities that could be done related to
5    recovered solvent processes.  Do you
6    recall that discussion?
7         A.    I do, yes, sir.
8         Q.    Okay.  And is process
9    validation one of those activities?
10         A.    Process validation of API?
11    Yes.
12         Q.    I'm talking about process
13    validation of the recovered solvent
14    process itself.  Is that something that
15    was -- that could be done as part of a
16    risk evaluation regarding the recovered
17    solvent process?
18         A.    As I said, the risk
19    evaluation, risk assessment covers
20    several facets of the process.
21              So if -- specifically if
22    you're asking about the recovered solvent
23    one, using recovered solvent in a process
24    in an API where the API is validated with

Page 213

1    that solvent also would be considered as
2    an adequate, you know, accepted factors
3    from a historical standpoint, yes.
4         Q.    Okay.  My question though
5    is -- relates to process validation for
6    the recovered solvent process in context
7    of it being used in the API, and you had
8    mentioned process parameters as one of
9    the things that can be done from a risk
10    evaluation standpoint.
11              My question is, does process
12    validation fall within what you described
13    as process parameters?
14         A.    That is what I'm trying to
15    kind of explain, that when we use
16    recovered solvent in a fine -- in an API
17    process and validate the process of API
18    and determining the quality equivalence
19    of that API, that is the demonstration of
20    sort of repeat of the process for the
21    recovered solvent too.

Confidential Information - Subject to Protective Order



Confidential Information Subject to Protective Order



Page 218

Page 220

BY MR. DAVIS:
18      Q.   Do you agree that it's the
19 job of the quality assurance to establish
20 quality not just based on meeting the
21 spec or simply testing, but to actually
22 evaluate the chemistry and the route of
23 synthesis and everything, that that's
24 also part of quality assurance?  Do you

Page 219

Page 221

1 agree?
2          MR. TRISCHLER:  Objection to
3    form.
4          THE WITNESS:  I think I
5    remember previously, you know,
6    describing the process of
7    specifications and the chemistry
8    that may be behind, you know,
9    those specifications.  And that is
10    all in this job.
11          As I said previously also,
12    and I'm reiterating now, that you
13    are right in one aspect that it is
14    not -- you know, it is not the
15    specification alone.
16          There are other GMP aspects;
17    that is, material -- material
18    input specifications, the process
19    validation of the materials, any
20    deviations, investigations.
21          Those are all elements of
22    quality that goes into ensuring
23    the product quality.
24          So, however, but when it

Confidential Information Subject to Protective Order



Page 222

1  comes to demonstrating the
2  repeatability of a product's
3  quality through a validation,
4  which is the purpose of a
5  validation, repeatability, we have
6  to -- we have to refer to
7  previously approved and aligned
8  and agreed quality attributes,
9  that is the specification.
10      And as I said, sir, the
11  final API specification, because
12  the APIs are derived from chemical
13  synthesis, the regulatory
14  agencies, as well as guidelines,
15  qualifies or rather allows the
16  impurities that can originate from
17  various routes in three different
18  buckets, organic impurities,
19  inorganic impurities, and
20  solvents, residual solvents.
21      All three of them are part
22  of our specification, has an
23  overall ensuring quality of the
24  product.

Page 223

1      So -- so the validation
2  finally, at the -- at the end has
3  to comply with the preapproved
4  quality attribute of the
5  specification.  And that's the
6  true measurement of repeatability
7  of the process.
8  BY MR. DAVIS:
9

Confidential Information Subject to Protective Order



Confidential Information - Subject to Protective Order



Confidential Information Subject to Protective Order



Page 234

Page 236

Page 235

Page 237

8  BY MR. DAVIS:
9      Q.   You can answer.  Was that a
10  yes?
11      A.   No, no, no.  I'm just
12  asking, should I answer?  Okay.
13      Q.   Yes.
14      MR. TRISCHLER:  Dr. Gomas,
15  as I indicated at the beginning of
16  the deposition, I may place
17  objections on the record --
18      THE WITNESS:  Yes, sir.
19      MR. TRISCHLER:  -- and tell
20  you not to answer.  Once I've
21  stated the objection, please
22  answer.
23      THE WITNESS:  Thank you for
24  the clarification.  Thank you.



Page 238

1  Thank you.
2      Yes, so I will answer that.
3

Page 239

1

Page 240

1

Page 241

1

20  BY MR. DAVIS:
21      Q.   Is that an expectation that
22  you have?
23          MR. TRISCHLER:  Excuse me.
24  Objection to the commentary.



Page 242

1  Objection to counsel's arguing --
2  argument with the witness.  Also
3  object that the question has been
4  asked and answered multiple times.
5  And objection, lack of foundation,
6  given that he's told you multiple
7  times that he does not work in
8  R&D.
9      MR. DAVIS:  It's not been
10  answered, frankly.
11      MR. TRISCHLER:  It has,
12  John.
13      MR. DAVIS:  It has not.
14      MR. TRISCHLER:  Answer it
15  again, Dr. Gomas, to the extent
16  that you can.
17  BY MR. DAVIS:
18

Page 243

1

Page 244

1
13      MR. TRISCHLER:  Is that a
14  closing argument or a question?
15      MR. DAVIS:  It's a question.
16  I'm trying to get an answer.
17      MR. TRISCHLER:  Which one?
18  Which question?
19      MR. HONIK:  That's not an
20  objection.  If you want to state
21  an objection, do so.  Don't make a
22  speech.
23      MR. TRISCHLER:  Hey, Ruben,
24  I just heard a speech.  One

Page 245

1  lawyer -- one lawyer per side.
2  Stay quiet.
3  BY MR. DAVIS:
4

Confidential Information Subject to Protective Order



Page 246

Page 248

¹ correct?

² MR. TRISCHLER: Objection to
³ the form. Asked and answered.
⁴ THE WITNESS: May I ask you
⁵ to clarify whether it is for a
⁶ specific solvent, or are you
⁷ asking as a general question, sir?

⁸ BY MR. DAVIS:

⁹ Q. Sure. Let me show you
¹⁰ Plaintiff Glover-23 and 24.

¹¹ A. Again, I was supplied some
¹² documents in the break. If you could
¹³ kindly give me the bottom number, that
¹⁴ would be really helpful, sir.

¹⁵ (Previously marked
¹⁶ PL-Glover-23.)

¹⁷ (Previously marked
¹⁸ PL-Glover-24.)

¹⁹ BY MR. DAVIS:

²⁰ Q. Well, that would be in the
²¹ exhibit binders.

²² A. Oh, okay. Sorry.

²³ Q. Plaintiff Glover-23 and 24.

²⁴ A. Yes. I have it in front of

Page 247

Page 249

¹ me, sir.

² Q. Okay. Who is MVRBS --

³ A. Subrahmanyam?

⁴ Q. -- Subrahmanyam? Yes.

⁵ A. He is a colleague from
⁶ quality assurance in Unit 8, sir.

⁷ Q. Okay. Did he report to you?

⁸ A. No. He reported in to the
⁹ quality head of the site.

¹⁰ Q. Who then reported to you?

¹¹ A. Who then reported to the
¹² cluster head.

¹³ Q. Who then reported to you?

¹⁴ A. Yes, sir.

¹⁵ Q. Okay. Thank you.

¹⁶ So he was within your sphere
¹⁷ of control or oversight as -- as head of
¹⁸ global quality for APIs?

¹⁹ A. I would say that he is part
²⁰ of the quality team.

²¹ Q. Okay. Does he -- he reports
²² up the chain of command to you, does he
²³ not?

²⁴ A. That's true, sir.

¹¹ BY MR. DAVIS:

¹² Q. Who would I talk to at R&D
¹³ to get an answer to my questions?

¹⁴ A. What is the current head of
¹⁵ R&D name, I have already given to you.
¹⁶ That is the only name that I can think of
¹⁷ as the R&D head.

¹⁸ Q. Okay. And who is that
¹⁹ again?

²⁰ A. That is Dr. Chandra Has.
²¹ Chandra Has. C-H-A-N-D-R-A, H-A-S.

²² Q. Okay. The fact is that
²³ Mylan did not do any process validation
²⁴ for recovered solvents; isn't that

Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Page 258

7    Q.   Let's, if you don't mind,
8  flip back to Exhibit 8.  Do you have that
9  handy?
10    A.   Exhibit 8?
11    Q.   This is the Unit 8 periodic
12  commitments.
13    A.   Yes, sir.  I'm just --
14    Q.   Do you have it, Dr. Gomas?
15    A.   I have that, yes, sir.
16    Q.   Okay.  Go to Page 5 of 20 of
17  that document, the numbering is in the
18  bottom center.
19    A.   Yes, sir.
20    Q.   Okay.  Do you see under the
21  commitment column another PR column like
22  the ones that we looked at earlier,
23  PR 1908077?
24    A.   Okay.

Page 259

1    Q.   And just like the other
2  ones, the documents associated with that,
3  would live in Trackwise, correct?
4    A.   That's right, sir.

Page 260

Page 261

Confidential Information Subject to Protective Order



**Page 262**

22    MR. TRISCHLER:  Objection.
23  Objection to the form and the
24  scope.

**Page 263**

1  BY MR. DAVIS:
2    Q.   Did we just lose each other
3  there, Dr. Gomas?  You got a little
4  choppy there for a second.
5    MR. TRISCHLER:  I just said
6  objection to form and scope, John.
7  I don't know if you --
8  BY MR. DAVIS:
9    Q.   Did you hear my question,
10  Dr. Gomas, or did we lose each other?
11    A.   There was a little bit of
12  lagging.  Sorry.  If you could repeat it,
13  sir.
14

**Page 264**

1

**Page 265**

1

19  BY MR. DAVIS:
20    Q.   So let's unpack that.  What
21  you're saying is that now, as a result of
22  these learnings, regulators, including
23  the FDA now have set an expectation that
24  recovered solvent processes be validated

Confidential Information Subject to Protective Order

Page 266

¹ on an individual solvent basis; is that
² right?
³     A.   That is what our
⁴ interpretation -- that is what our
⁵ learning is, yes, sir.
⁶     Q.   Okay.  And what you're
⁷ saying here today now is that back in
⁸ 2018, that was not industry standard?
⁹     A.   That is, at least to my
¹⁰ knowledge, up to that nitrosamine
¹¹ knowledge came, I have not seen any
¹² specific requirements coming neither from
¹³ the regulatory agencies, in my
¹⁴ experience, nor from any specific, you
¹⁵ know, comment.  But once the -- once the,
¹⁶ you know, once the industry as well as
¹⁷ regulators understood about the root
¹⁸ causes that was identified for -- for,
¹⁹ you know, nitrosamine impurities, we
²⁰ provide to do, you know, the position.
²¹     And we thought that this is
²² maybe an expectation that was emerging,
²³ and then we took a decision to
²⁴ incorporate this as an additional

Page 267

¹ control.
²     Q.   It was an expectation at the
³ time, wasn't it?
⁴     A.   My interpretation is that
⁵ maybe the industry was -- so until that
⁶ time was following it probably.  But
⁷ surely not an expectation from
⁸ regulatory, because I had not had a
⁹ personal experience of anyone being
¹⁰ written up for recovered solvent not
¹¹ validated, at least to my knowledge.  As
¹² I said --
¹³     Q.   So you're not aware --
¹⁴ sorry.  Go ahead.  I didn't mean to cut
¹⁵ you off.
¹⁶     A.   I'm sorry, sir.
¹⁷     As I said, you know,
¹⁸ industry follows recovered solvent usage,
¹⁹ for the last how many years I don't
²⁰ recollect.  But, I mean, that's a
²¹ practice.
²²     Q.   Okay.  You're not aware of
²³ Mylan receiving any DMF deficiency
²⁴ letters from the FDA prior to 2018

Page 268

¹ saying, Your DMF is deficient because you
² haven't put your recovered solvent
³ process in here?
⁴     A.   I do not have -- I do not go
⁵ through every deficiency that may come,
⁶ because deficiencies are usually shared
⁷ between the regulatory team who receives
⁸ it and then provides it to the site, as
⁹ well as the R&D to provide response.
¹⁰     But at least a few of them
¹¹ that would come to my notice, I do not
¹² recollect anything such -- at least prior
¹³ to the nitrosamine solvent.
¹⁴     Q.   Okay.  And what about audits
¹⁵ by Mylan's API customers?  Are you aware
¹⁶ of any audits prior to 2018 where a
¹⁷ customer said, "Hey, you're not -- you're
¹⁸ not doing recovery solvent process
¹⁹ validation."  Are you aware of any of
²⁰ that?
²¹     A.   I am not have privy to all
²² of the audits of customers, but at least
²³ in my -- in my general understanding and
²⁴ knowledge, I have not come across any

Page 269

¹ such reference prior to 2018 when this
² knowledge of nitrosamines unfolded.  Post
³ 2018, probably yes, but not prior to
⁴ 2018, sir.
⁵     Q.   I'm going to publish a
⁶ previously marked exhibit.  This isn't
⁷ one that would be in your --
⁸     MR. DAVIS:  Oh, hey, Bill, I
⁹     think we got some more choppiness
¹⁰     here.
¹¹ BY MR. DAVIS:
¹²     Q.   Dr. Gomas, can you hear me?
¹³     A.   Yes, I can hear you, sir.
¹⁴     Q.   You are speeding up or
¹⁵ slowing down at least on the video a
¹⁶ little bit.
¹⁷     MR. DAVIS:  So I'm going to
¹⁸ publish Plaintiff Glover-19.
¹⁹     THE WITNESS:  Yes, sir.
²⁰     (Previously marked
²¹     PL-Glover-19.)
²² BY MR. DAVIS:
²³     Q.   It's not in the documents
²⁴ that you have, so you'll have to do it on

Confidential Information Subject to Protective Order

Page 270

¹ the screen with me.
²         MR. TRISCHLER:  He might
³ just -- if it helps, John, he
⁴ might have it, because you had
⁵ indicated that you might use the
⁶ prior exhibits so I think that --
⁷         MR. DAVIS:  Oh, okay.
⁸         MR. TRISCHLER:  -- I had
⁹ asked that they be printed out.
¹⁰ So he may have it if you want him
¹¹ to look.
¹² BY MR. DAVIS:
¹³     Q.   Sure.  Yeah.  Could you see
¹⁴ if you have Plaintiff Glover-19?
¹⁵     A.   Yes.  I have the exhibit.
¹⁶ Yes, sir.
¹⁷



Confidential Information Subject to Protective Order



Page 274

Page 276

21 BY MR. DAVIS:
22     Q.   Let me show you Plaintiff
23 Glover 22.
24     A.   Yes, sir.

Page 275

Page 277

1          (Previously marked
2      PL-Glover-22.)
3 BY MR. DAVIS:
4     Q.   Do you see this is an e-mail
5 that you wrote on November 29, 2018?
6     A.   Yes, sir.
7     Q.   And the subject of it is
8 recovered solvents?
9     A.   Yes, sir.
10     Q.   Okay.  And the attachment
11 even is recovery solvent data.pptx.  Do
12 you see that?
13     A.   Yes, sir.
14     Q.   Do you see the second
15 sentence that you wrote, "Current
16 industry standard is to have
17 demonstration of process capability of
18 demonstration/validation"?
19          Do you see that?
20     A.   Yes, sir.
21     Q.   Okay.  And then do you see
22 this next sentence below that, "Neither
23 of these two practices," and one of those
24 two practices is what I just read to you,

Confidential Information Subject to Protective Order

Page 278

1  "are followed in our facilities and we
2  may be challenged for this in the
3  future."
4          Do you see that?
5      A.   I'm seeing that, yes, sir.
6      Q.   Okay.  And you wrote this --
7  this e-mail, did you not?
8      A.   Right, I did write this
9  e-mail, sir.
10     Q.   Okay.  In 2018, November of
11 2018, correct?
12     A.   That is right.  Yes, sir.
13     Q.   And you're referring to
14 current -- then current industry
15 standards, correct?
16     A.   Yes.  That is -- that is a
17 timeline when the complete understanding
18 of nitrosamines are the most, towards the
19 end of the year.  So I am -- as a
20 responsible quality lead for the
21 organization, I'm giving context here,
22 saying that yes, this is what we're
23 learning and this is what the industry is
24 thinking, we need a choice of what is

Page 279

1  current, but it is -- it is to be
2  understood in a context, sir.
3          We are at the end of the
4  year, where we already have understood,
5  the industry has understood very well,
6  you know, the nitrosamine root causes and
7  the work requirements have come, what are
8  the levels that are allowed as to the new
9  guidelines, so the new controls are
10 emerging, so I'm making a pitch to my
11 team, saying that this is something which
12 you need to start doing it.  Let's make a
13 CAPA of this.
14         So this -- this is an
15 internal communication.  The language is
16 based on, you know, certain strategy or,
17 you know, the way I want to address.  But
18 the basic theme and that essence is that
19 this is a new expectation, let us start
20 doing it.
21     Q.   Okay.  You're saying it's a
22 current expectation though, in your
23 e-mail, correct?
24     A.   Maybe I would have used

Page 280

1  current because at that time the
2  reference or the situation or the time
3  frame is that we are post understanding
4  nitrosamine.  So that is -- that is why
5  maybe the word "current" was in my mind,
6  because this is a scenario
7  post-nitrosamine.
8      Q.   This is -- this is roughly
9  -- this is a matter of days after Mylan
10 recalled its valsartan, correct?
11     A.   That also shows our
12 earnestness to get to the new
13 requirements quickly and show that we --
14 we correct them and we improve.  So
15 that -- that should be taken as a
16 positive note, that -- that quality head
17 is reacting such to our position that
18 these are improvements that we need to
19 do.  And I would always discharge my
20 duties that way.
21     Q.   I appreciate that.  But
22 didn't you testify earlier that both
23 Unit 7 and Unit 8 remain under OAI
24 designation to this day?

Page 281

1          MR. TRISCHLER:  Objection.
2  Asked and answered.
3          THE WITNESS:  As I -- as I
4  previously said, sir, OAI has got,
5  you know, several, you know, the way
6  they can you, you know, interpret.
7          So from an FDA standpoint,
8  when they -- when they say that it
9  is an official action initiated,
10 they would have -- they may have
11 something in their mind what they
12 would like to achieve from that.
13         But from a -- from a safety
14 standpoint or a risk of using a
15 side standpoint, if they have
16 decided that it is risky to use,
17 continue to use our manufacturing
18 site for providing lifesaving
19 medicine to people, they wouldn't
20 allow us to manufacture
21 continuously and deliver the
22 products for the patients.
23         So OAI from an FDA
24 standpoint, I'm not qualified to,

Page 282

1    you know, comment, what the what
2    intention and purpose and the tool
3    they use.
4         But from a simple quality
5    assurance person and professional,
6    I would say that FDA, irrespective
7    of the OAI categorization, has
8    deemed, you know, that our
9    facility is safe to operate, our
10   medicines are safe for
11   consumption, and Unit 7, Unit 8,
12   irrespective of being a warning
13   letter and OAI, continues to
14   manufacture essential medicines
15   and supplies to U.S., as well as
16   across the world.
17   BY MR. DAVIS:
18        Q.   What's the next step after
19   OAI?  What would be the next punishment
20   the FDA could levee?
21        MR. TRISCHLER:  Objection to
22   form.
23        THE WITNESS:  I think --
24   yeah, I think I wouldn't say that

Page 283

1    kind of word, because I do not
2    know what FDA would do.
3         From an industry standpoint,
4    I can tell you that once there is
5    a warning letter, if there is a
6    warning letter, once all the
7    required compliance status is --
8    you know, the CAPA is closed, we
9    will send periodic updates, as you
10   have seen.
11        And we also see meetings --
12   regulatory meetings with the FDA,
13   which we saw, we had.
14        But unfortunately, because
15   of the Covid, the FDA could not
16   travel and, you know, probably
17   come to -- for inspections of our
18   site because of the pandemic
19   situation for the last, almost one
20   year, three, four months.
21        We have regularly indicated
22   to the agency, inviting them for
23   the last year itself, officially,
24   that we have completed all the

Page 284

1    actions that we have committed, so
2    please do come and inspect us so
3    that we know that you can
4    reevaluate.
5         Meanwhile, I would also like
6    to provide you that even though
7    FDA has not come for -- or
8    provided an inspection, we already
9    had European as well as Australian
10   inspections of our Unit 8 facility
11   through virtual.
12        And then we have got
13   favorable reports in case of -- we
14   received a certificate of GMP.
15        In case of European agency
16   we have already been provided
17   reports with no particular
18   observations.
19        So -- but we are reaching
20   out to FDA and seeking them to
21   please do an inspection since last
22   year.
23   BY MR. DAVIS:
24        Q.   Well, at least, let's stick

Page 285

1    with this individual solvent process
2    validation.
3



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Page 290

Page 291

20   MR. TRISCHLER:  John, if
21 you're going to go to a new
22 exhibit, can we take a restroom
23 break because it's been about an
24 hour and a half.

Page 292

1   MR. DAVIS:  Sure, that's
2 fine.  Ten minutes?
3   MR. TRISCHLER:  Sure.
4   THE VIDEOGRAPHER:  Going off
5 the record.  8:27 p.m.
6   (Short break.)
7   THE VIDEOGRAPHER:  We are
8 back on the record at 8:43 p.m.
9 BY MR. DAVIS:
10   Q.   Okay.  I'm going to have you
11 pull Plaintiff Glover 58, Dr. Gomas.
12   A.   Yes, sir.  Yes, sir.
13   (Previously marked
14 PL-Glover-58.)
15 BY MR. DAVIS:
16   Q.   Okay.  Do you see that
17 that's a January 13, 2016 e-mail from a
18 gentleman I think you've mentioned today,
19 Venkata Anabathula?
20   A.   Yes, sir.
21   Q.   Okay.  And do you see that
22 the subject is recovery solvent OOS?
23   A.   Yes.
24   Q.   Okay.  And do you see the

Page 293

1 second sentence, "Recovered solvents are
2 not included in the scope of LIR/OOS SOPs
3 to initiate failure investigation"?
4   A.   I do read that, yes, sir.
5   Q.   Okay.  And then the darker
6 and slightly larger text at the bottom
7 is -- do you recognize that as text that
8 he's pulled from the SOP?
9   A.   It is from a different SOP.
10   Q.   Okay.  Which SOP is this
11 from?
12   A.   He is referring to plan
13 recovery solvent management SOP.
14   Q.   Okay.  And which SOP are you
15 referring to where you claim that Mylan
16 did, in fact, do OOS investigations for
17 recovered solvents coming from vendors?
18   A.   I think, you know, that what
19 I'm reading from this e-mail is not -- it
20 is not to me, the discussion that I had
21 with you.
22   What I understand from this
23 mail is, sir, he's referring to not
24 raising OOS investigation as I think is

Confidential Information Subject to Protective Order

Page 294

¹ from internal recovered solvent.  Because
² he's also here referring to internal
³ solvent SOP, plan recovery SOP, to
⁴ determine what the SOP says, therefore,
⁵ he is not making a laboratory
⁶ investigation for internally recovered
⁷ solvent.
⁸       So I think if you read it
⁹ altogether, it implies that the standard
¹⁰ discussions based on the recovery that is
¹¹ being performed internally.
¹²     Q.   Okay.  And my question is
¹³ what -- what SOP are you referring to
¹⁴ that says to do OOS investigations for
¹⁵ recovered solvents coming from vendors
¹⁶ that fail to meet spec?
¹⁷     A.   I think any -- anything that
¹⁸ is coming from external, what we consider
¹⁹ as material that we receive from outside,
²⁰ that includes the recovered solvent.  So
²¹ the OOS SOP incorporates -- covers all
²² the raw materials and solvents.
²³       So anything that comes from
²⁴ external sources will be covered in the

Page 295

¹ SOP along with it, as I said, OOS also
² performed for all the intermediates and
³ APIs that we manufacture internally.
⁴ So -- so it applies to all.
⁵       But this gentleman who is
⁶ referring to, to the best of my
⁷ ability when I'm reading it altogether,
⁸ it again talks about the -- the solvents
⁹ that are internally recovered, though
¹⁰ they are not going through a formal
¹¹ investigation process, they go for
¹² redistillation, and upon redistillation,
¹³ if it complies, they use -- that's what
¹⁴ the entire mail is writing.
¹⁵     Q.   Let me have you look at the
¹⁶ very next exhibit which is Plaintiff
¹⁷ Glover 59.
¹⁸     A.   Sure.
¹⁹       (Previously marked
²⁰       PL-Glover-59.)
²¹ BY MR. DAVIS:
²²     Q.   That's the -- that's the
²³ attached recovery solvent management SOP
²⁴ to this e-mail.

Page 296

¹     A.   59?
²     Q.   Yes.
³     A.   Yes, I have it, yeah.  Yeah.
⁴     Q.   Okay.  Do you see on Page 2
⁵ of -- of this Section 6.0, Procedure?
⁶     A.   Yes, sir.
⁷     Q.   And do you see 6.1 says,
⁸ "Solvents shall be recovered through any
⁹ of the following approaches/methods."
¹⁰       And then do you see the
¹¹ second to last bullet point, "Solvents
¹² recovered by contract/job work unit," do
¹³ you see that?
¹⁴     A.   That's right, yes, sir.
¹⁵     Q.   Okay.  Then if you go to
¹⁶ Section 6.5 there's some more detail on
¹⁷ handling solvents recovered by
¹⁸ contract/job work unit, do you see that?
¹⁹     A.   Yes, sir.
²⁰     Q.   And then 6.5.3 refers to "a
²¹ written quality agreement with
²² contract/job unit shall be there with all
²³ the pertinent conditions."
²⁴       Do you see that?

Page 297

¹     A.   Yes, sir.
²     Q.   That's referring to an
³ external vendor recovered solvents, is it
⁴ not?
⁵     A.   That's right, yes, sir.
⁶     Q.   Okay.  So this -- this SOP
⁷ here references externally sourced
⁸ recovered solvents, does it not?
⁹     A.   It does quote a limit of
¹⁰ external recovered solvents here.  This
¹¹ is an SOP that talks about recovered
¹² solvent management as a whole.  So it may
¹³ be talking about external vendors and
¹⁴ internal vendor.  But when I'm talking
¹⁵ about an investigation SOP, as I said,
¹⁶ sir, it cut across all the type of
¹⁷ materials.  It cut across raw materials
¹⁸ that we receive from external sources.
¹⁹ The intermediates that we manufacture.
²⁰ The API we manufacture.
²¹       So that is an investigation
²² SOP that covers all type of material.
²³ But this SOP, because it is talking about
²⁴ recovered solvent and management as a

Page 298

1 whole, it talks about how the recovered
2 solvents are contracted out in this --
3 this portion.
4      Q.   Okay.
5      A.   So -- so there's no conflict
6 in this -- in the SOP, sir.
7      Q.   Well, sure, sure.  So how
8 can you be sure that, for example, that
9 Mr. Anabathula in Plaintiff Glover 58 was
10 aware that another SOP should take
11 precedence and OOS investigations, in
12 fact, should be done when he's saying in
13 2016 that they don't -- they aren't done
14 and he references only this SOP?
15      A.   I think -- as I said, you
16 know, when we are reading it altogether
17 in entirety, it is -- it is absolutely
18 that is my understanding.  But planned
19 recovery SOP, management SOP, given what
20 we know, based on this data we can go in
21 to redistill.
22           So he's referring about in a
23 letter that is talked about in the
24 beginning, and then they are justifying,

Page 299

1 why that, even though the SOP doesn't
2 say, and what is the reason for it, for
3 going forward with the, you know, new
4 investigation process.  So it -- it
5 negates the scenario of what is
6 internally recovered, sir.
7



Confidential Information Subject to Protective Order



Page 302

Page 304

Page 303

Page 305

6    Q.   Let's go to --
7        MR. DAVIS:  I'm going to
8    mark a few exhibits for you,
9    Dr. Gomas.
10       THE WITNESS:  Okay, sir.
11       MR. DAVIS:  I'm marking Tab
12   25 as Plaintiff Gomas 11.
13       (Document marked for
14   identification as Exhibit
15   PL-Gomas-11.)
16   BY MR. DAVIS:
17       Q.   You'll see this is an e-mail
18   from Mylan's counsel to me.  Do you see
19   that?
20       A.   Give me one second.  I will
21   get the document.
22       (Whereupon, a discussion was
23   held off the record.)
24       MR. TRISCHLER:  This

Page 306

1 document would be in the stack
2 that was copied for you this
3 morning.
4         THE WITNESS:  Oh, okay.
5         MR. DAVIS:  It's --
6         MR. TRISCHLER:  It's tab --
7 it's tab --
8         MR. DAVIS:  25.
9         MR. TRISCHLER:  25.  Thanks,
10 John.
11         THE WITNESS: Tab 25.
12         MR. DAVIS:  We can go off
13 the record while he looks.
14         THE WITNESS:  We can -- is
15 it an e-mail, sir?
16         MR. DAVIS:  It's an e-mail
17 from Mr. Frank Stoy to me.
18         THE VIDEOGRAPHER:  Off the
19 record, sir?
20         MR. DAVIS:  Do you have it,
21 Dr. Gomas, or no?
22         THE WITNESS:  I will need
23 maybe few seconds.  Okay.
24         MR. DAVIS:  Let's go off the

Page 307

1 record.
2         THE VIDEOGRAPHER:  Off the
3 record.  9:00 p.m.
4         (Whereupon, a discussion was
5 held off the record.)
6         THE VIDEOGRAPHER:  We are
7 back on the record at 9:03 p.m.
8 BY MR. DAVIS:
9         Q.   Dr. Gomas, at the beginning
10 of Day 2 of his deposition, Mr. Glover
11 told me that he consulted with you about
12 some process validation reports that are
13 in the DMF or DMF updates.
14         Do you know what I'm
15 referring to, what conversation I'm
16 referring to?
17         A.   I think I recall a
18 conversation with the counsel along --
19         Q.   Okay, yeah.  Don't tell --
20 okay, yeah, don't tell me what was said
21 then if counsel was present.
22         But do you recall that
23 conversation happening between -- between
24 the first and second days of the Glover

Page 308

1 deposition?
2         A.   It's quite a few days back,
3 but there could be something about
4 process validation here.
5         Q.   Okay.  And as a result of
6 what Mr. Glover testified, which he
7 consulted with you and you referred him
8 to some process validation reports, I
9 asked counsel to provide those to me.
10         And the reason that I've
11 marked Tab 25 as Exhibit 11 is, you'll
12 see counsel is referring me to a
13 particular Bates range of documents.
14 It's about -- it looks like roughly nine
15 to ten documents.  "The process
16 validation reports are found in the
17 following Bates range."
18         Do you see that?
19         A.   Yes, sir.
20         Q.   Okay.  So I pulled the --
21 we'll go over the VLN ones first.  There
22 are several that relate to VLN, several
23 that relate to VST, and a couple that
24 relate to VAA.

Page 309

1         So let's go through the VLN
2 ones first -- sorry, hold on.  Let's go
3 through the VST ones first, which are
4 Tabs 26 through 29.
5         A.   There is a small confusion
6 here.  I have -- 26 is the VLN process
7 validation.
8         27 is voluntary recall
9 documentation.  28, 29.
10         MR. DAVIS:  Okay.  Let's go
11 off the record again.
12         THE VIDEOGRAPHER:  Off the
13 record at 9:06 p.m.
14         (Whereupon, a discussion was
15 held off the record.)
16         THE VIDEOGRAPHER:  We are
17 back on the record at 9:13 p.m.
18 BY MR. DAVIS:
19         Q.   Okay.  So, Dr. Gomas, we
20 were referring to Exhibit 11 and Mylan's
21 counsel providing me the process
22 validation reports that are from Bates
23 range 00895528 through 00895539.
24         Do you see those numbers

Page 310

1  referenced in that e-mail?
2      A.   Yes.  Sorry.
3      Q.   Okay.  And those include
4  process validation reports related to
5  VLN, VST, and VAA.
6          What I have pulled for you
7  are the VLN and VST reports.
8      A.   Okay.
9      Q.   You have seven of them, of
10 the eight of them, in front of you.  I'm
11 going to mark Tab 26 as Exhibit 12.
12         (Document marked for
13         identification as Exhibit
14         PL-Gomas-12.)
15         MR. DAVIS:  Tab 27 as
16 Exhibit 13.
17         (Document marked for
18         identification as Exhibit
19         PL-Gomas-13.)
20         MR. DAVIS:  Tab 28 as
21 Exhibit 14.
22         (Document marked for
23         identification as Exhibit
24         PL-Gomas-14.)

Page 311

1          MR. DAVIS:  And Tab 29 as
2  Exhibit 15.
3          (Document marked for
4          identification as Exhibit
5          PL-Gomas-15.)
6  BY MR. DAVIS:
7      Q.   Okay.  Next I'm going to --
8  Exhibit 12 is the one that you do not
9  have.  So I'm going to display that on my
10 screen.
11         Can you see that, Dr. Gomas?
12     A.   Yes.  VST Stage I initial
13 process validation.
14     Q.   Yes.  That is actually going
15 to be my first question is, you were
16 involved in tracking these documents
17 down, were you not?
18     A.   I have requested the site to
19 provide process validation as performed
20 using the recovered solvent.  That was
21 the section, sir.
22     Q.   Okay.  And these are the
23 documents that they provided that counsel
24 then gave to me?

Page 312

1      A.   Yes, sir.
2      Q.   Okay.  And those were paper
3  copy documents, were they not?
4      A.   Yes.
5      Q.   Okay.  So they had no
6  electronic file names to them, did they?
7      A.   Usually these documents are
8  printed and signed, sir.
9      Q.   Okay.  But there was no
10 electric -- being that it was not an
11 electronic document, there was not an
12 electronic file name for it, was there?
13     A.   I don't think these are
14 electronical -- electronic filings.
15 These are all manual documentation, yeah,
16 that's why.
17     Q.   Yeah.  Do you know who gave
18 these documents their file names?
19     A.   This -- this the -- you are
20 mentioning the -- I'm sorry, you are
21 mentioning the file name or you're
22 mentioning --
23     Q.   Sure.  For example, this
24 file name is 7 VST Stage I initial

Page 313

1  process validation.
2          Do you see that?
3      A.   I think probably the site,
4  when they sent it to the counsel, the
5  probably attached the files and for
6  recognition they will have said what this
7  file means.
8      Q.   Okay.  But you're --
9      A.   That's what my guess is,
10 sir.
11     Q.   You don't know whether it
12 was the site or whether it was Mylan's
13 outside counsel that, in fact, gave the
14 file name to the names?
15     A.   I cannot -- I cannot really,
16 because I was -- I was not involved in
17 sending it.  I asked them to send it.  So
18 I really do not know whether it was
19 counsel made these file names or the
20 site.
21         But I guess my guess is that
22 site would know the documents so they
23 would have said this is the file and this
24 is the document description, so --

Page 314

¹    Q.   Okay.  But I'm not asking --
²         MR. TRISCHLER:  Yeah, and
³    I'll just counsel you, Dr. Gomas,
⁴    don't guess.  If you know, give us
⁵    the answer.  If you don't know,
⁶    nobody --
⁷         THE WITNESS:  I don't know.
⁸    I don't know.
⁹ BY MR. DAVIS:
¹⁰   Q.    That's exactly what I was
¹¹ going to say also, is, you know, I'm not
¹² asking for, you know, perfect knowledge
¹³ of every single item here.  So if you
¹⁴ don't know an answer to a question it's
¹⁵ fine to say that.
¹⁶        So you don't know who gave
¹⁷ these file names their file names?
¹⁸   A.   Yes, sir, I don't know.
¹⁹   Q.   Okay.  Okay.  Do you see
²⁰ that the title, at least on the document
²¹ here, is Process Validation Report For
²² Valsartan, and that it's on Matrix's
²³ header.
²⁴   A.   Yes, sir.

Page 315

¹    Q.   And the date is, I believe,
² January 8, 2011?
³    A.   Yes, sir.
⁴    Q.   Okay.  And the reference
⁵ protocol number is PVP/U-8/VST-1/10/001?
⁶    A.   Yes, sir.
⁷



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information - Subject to Protective Order



Confidential Information Subject to Protective Order





Confidential Information Subject to Protective Order



Page 342

1       MR. DAVIS:  I need -- Clem,
2   I need an answer to my question
3   here.  Like, I've let the witness
4   say what he wants to say, but I'm
5   entitled to an answer to my
6   question, which is quite limited.
7       MR. TRISCHLER:  I think he
8   has answered it to the best --
9       MR. DAVIS:  He has not.  He
10  has not answered the question.
11      MR. TRISCHLER:  You can
12  argue --
13      MR. DAVIS:  Respectfully, he
14  has not.
15      MR. TRISCHLER:  You can
16  argue with him and argue with me.
17  I've not instructed him not to
18  answer it again.
19      So you can --
20      MR. DAVIS:  I'm asking
21  simply where the words appear in
22  the document.  This is not a
23  question that requires much
24  analytical thought.

Page 343

1       It's where do the words
2   appear in the documents.  And --
3       MR. TRISCHLER:  Okay.
4

Page 344

4       MR. DAVIS:  All right.  I'm
5   going to mark Tab 30 as
6   Exhibit 16.
7       (Document marked for
8   identification as Exhibit
9   PL-Gomas-16.)
10      MR. DAVIS:  31 as
11  Exhibit 17.
12      (Document marked for
13  identification as Exhibit
14  PL-Gomas-17.)
15      MR. DAVIS:  32 as
16  Exhibit 18.
17      (Document marked for
18  identification as Exhibit
19  PL-Gomas-18.)
20      MR. DAVIS:  And 33 as
21  Exhibit 19.
22      (Document marked for
23  identification as Exhibit
24  PL-Gomas-19.)

Page 345

1  BY MR. DAVIS:
2      Q.   Hopefully we can get through
3  these.  My question is going to be
4  roughly quite similar for these
5  documents.
6       I've got Exhibit 16 up on
7  the screen.  And that's file name "3 VLN
8  Stage I initial process validation."
9       Do you see that?
10     A.   Yes, sir.
11

Confidential Information - Subject to Protective Order



Confidential Information Subject to Protective Order





Page 354

13    MR. DAVIS:  Let's take a
14  short five-minute break.  I'm at a
15  section break in my outline.
16    MR. TRISCHLER:  Okay.
17    THE VIDEOGRAPHER:  Going off
18  the record at 10:01 p.m.
19    (Short break.)
20    THE VIDEOGRAPHER:  We are
21  back on the record at 10:09 p.m.
22  BY MR. DAVIS:
23

Page 355

Page 356

17    A.    This is what they've sent,
18  initial and validations, later
19  validations.
20    Q.    And that's the site quality
21  team, is -- is that --
22    A.    Yes, sir.  The site quality
23  team.
24    Q.    Do you have a name for me?

Page 357

1    A.    The name is Venkat, Venkat
2  Bopana.
3    Q.    Okay.  Venkat again.  Thank
4  you.
5    A.    Yes, sir.
6    Q.    Let's discuss change
7  management a little bit.
8    MR. DAVIS:  I'm going to
9  publish Plaintiff Glover 14.
10    THE WITNESS:  I have the
11  document in front of me, sir.
12    (Previously marked
13  PL-Glover-14.)
14  BY MR. DAVIS:
15    Q.    Okay.  Do you recognize this
16  as the change management process SOP as
17  it applied to Mylan Laboratory Ltd.'s
18  sites effective around December 2015?
19    A.    One moment, sir.
20    There's a -- this, I think,
21  is printed from the document.  So -- so
22  this is -- this document is printed the
23  24 hours from 16 December, sir.  One
24  second.

Confidential Information Subject to Protective Order

Page 358

1      Yes, sir, this is -- this is
2  from December of 2015, this copy is, yes,
3  sir.
4      Q.   Okay.  And do you see the --
5  the purpose on Page 1 is to lay down the
6  procedure to control, review, approve,
7  implementation of all GMP changes
8  connected with the manufacturing and
9  testing of APIs during their lifecycle
10 and to formally document reviews before
11 authorizing any change for implementation
12 through Trackwise?  Do you see that?
13     A.   Yes, I see the purpose of
14 the document, yes, sir.
15     Q.   Okay.  And has Mylan used
16 this Trackwise system since you've been
17 at Mylan?
18     A.   Oh, I recollect being --
19 being used since at least 2015, if not
20 earlier.  It could be there around 2014
21 too.  I guess so, yeah.  It was there for
22 quite some time.  Yes, sir.
23     Q.   Do you know whether it was
24 there when you arrived at Mylan in 2011?

Page 359

1      A.   I -- because I wouldn't be
2  dealing with the sites of the -- that
3  panel wasn't dealing with the sites of
4  Mylan.  I was dealing with the sites
5  which are external third-party quality, I
6  probably wouldn't be able to make a
7  statement for that period of time again.
8      Q.   For changes that were
9  accomplished through this SOP, would
10 there be a Trackwise file for those
11 changes as stated here?
12     A.   After the implementation of
13 Trackwise, I'm confident that every
14 change that is initiated would go through
15 the, you know, Trackwise system.
16     Q.   Okay.  How about before
17 Trackwise.  Do you know whether and --
18 and/or how such changes were documented?
19     A.   Before the Trackwise system
20 it would have been a paper-based system,
21 sir.
22     Q.   Okay.  Are those paper files
23 still maintained by Mylan, or did they
24 get put into Trackwise or digitized in

Page 360

1  any way?
2      A.   I don't have an answer.  But
3  it is very highly unlikely that would
4  have been digitized, because they would
5  have been so many years of document also,
6  right.
7      Q.   Would those documents be
8  still somewhere in a warehouse or
9  something like that?
10     A.   All our -- all our documents
11 have a retention policy for such
12 documents.  So -- so we have to look at
13 it like what is our retention policy at
14 that time for such documents like change
15 control.  So I really don't want to
16 speculate like in that time what the
17 procedure was.
18     Q.   And you don't know what the
19 actual retention policy was for documents
20 like change controls?
21     A.   The prior two Trackwise
22 system manual, I don't -- I don't
23 remember, sir.
24     Q.   Okay.  How about now that

Page 361

1  Trackwise is in place, do you know, is
2  there -- is there a retention policy or
3  do the documents just live in Trackwise
4  forever?
5      A.   I think the -- the documents
6  stay in Trackwise and it is backed up.  I
7  do not know whether those electronic
8  information is ever deleted.  I would
9  have to look at the procedures.  I guess
10 it is -- it is there in Trackwise, if it
11 is electronic, since it is electronic.
12     Q.   Okay.  Go to Page 5 of 41 in
13 the definitions.  You'll see 5.11, a GMP
14 change is defined as any change that has
15 a potential GMP impact.
16     Do you see that?
17     A.   I see it.
18     Q.   And did you see -- do you
19 see below it, 5.11.1, that it includes
20 changes to processes, raw materials, and
21 vendor information among other things?
22     A.   Yes, sir.
23     Q.   Okay.  Do you know if a
24 change control was created in Trackwise

Confidential Information Subject to Protective Order

Page 362

1 or otherwise created relating to the
2 substitution of recovered solvents in
3 valsartan API?
4     A.   It is purely a site
5 procedure.  So I would probably -- may
6 have to check with the site whether
7 any -- any change control was made or it
8 was through the -- through the batch
9 record amendment.  It would be -- it
10 would be indicated.  So I really do not
11 have an answer, sir.
12     Q.   Well, you would agree that
13 this change management process SOP
14 applies to Unit 8 among other MLL sites
15 in India, correct?
16     A.   Yes, I agree with you.  Yes,
17 sir.
18     Q.   Okay.  And so it's not like
19 Unit 8 could come up with their own
20 change management process that
21 contradicts this, can they?
22     A.   I believe since the
23 implementation of this SOP, they should
24 be following this SOP, yes.

Page 363

1     Q.   Okay.  Do you know whether
2 when Mylan switched vendors for recovered
3 o-xylene for valsartan, did that -- do
4 you know if a change control event was
5 created in Trackwise or if it was prior
6 to Trackwise in paper form that way?
7     A.   I think the vendor
8 qualification has got several other
9 aspects that will ensure that the vendors
10 are, you know, identified by codes and
11 the city, et cetera, et cetera.
12         But I'm not able to answer
13 for the site level, whether they would
14 take one change control for all the
15 changes or each of the items they would
16 have different change controls.  So I am
17 not able to answer that extremely, you
18 know, confidently at this moment, sir,
19 without checking.
20     Q.   Who would you check with?
21     A.   The site quality head could
22 be able to provide, based on the actual
23 contents there.
24     Q.   And who is that person

Page 364

1 again?
2     A.   Venkat.
3     Q.   Oh, Venkat.  Okay, good.
4     A.   Site quality head.
5         MR. DAVIS:  I'm going to
6 mark Tab 12 as Exhibit 20.  This
7 would be in -- not the exhibit
8 folders that you received, but the
9 materials in the link that I sent
10 that was passed along.
11         THE WITNESS:  Yes.
12         (Document marked for
13 identification as Exhibit
14 PL-Gomas-20.)
15         THE WITNESS:  The bottom
16 number, sir?
17         MR. DAVIS:  Yeah, the bottom
18 number end in 716.
19         MR. TRISCHLER:  Hey, John --
20 hey, John, while he's looking for
21 that, do you remember I mentioned
22 to you that I have movers coming?
23 They're here.
24         Can we take five, 10 minutes

Page 365

1 so I can talk to them and do what
2 I need to do?
3         MR. DAVIS:  Sure.  Let's go
4 off the record.
5         THE VIDEOGRAPHER:  Off the
6 record.  10:22 p.m.
7         (Short break.)
8         THE VIDEOGRAPHER:  We are
9 back on the record at 10:35 p.m.
10         MR. DAVIS:  Did I mark as
11 Tab 12 as Exhibit 20 already, or
12 was I waiting to do that?
13         THE WITNESS:  No, I have it
14 in my hand, sir.
15         MR. DAVIS:  And Michelle
16 that's been marked as 20?  Okay.
17 BY MR. DAVIS:
18     Q.   Okay.  Looking -- before we
19 move to that real fast, Plaintiff
20 Glover-14 which is the SOP we were
21 looking at on change management process,
22 do you see that that SOP is MLL CRP SOP
23 CQA GMP 0066 is the number?
24     A.   Yes.

Confidential Information Subject to Protective Order

Page 366

1  Q.   Okay.  Exhibit 20 -- and
2  I'll read you the file name because it's
3  not on the document.
4       The file name is MLL CRP SOP
5  CQA GMP 0066, Attachment 7.2.
6  A.   Yes, sir.
7  Q.   Did you get that?
8  A.   Yes, sir.
9  Q.   Okay.  So does that tell you
10 that this is an attachment to the change
11 management SOP we were looking at?
12 A.   Yes, it does.
13 Q.   Okay.  Have you seen this
14 document before?
15 A.   I could have seen it within
16 the course of some discussion or doing an
17 inspection, possible.  But I won't
18 recollect every word in that or sentence.
19 I'm familiar with this SOP, yes, sir.
20 Q.   Okay.  And this is -- this
21 attachment refers to some typical
22 examples of situations that might arise
23 under the SOP and how to handle them?
24 A.   That's right, sir, as it

Page 367

1  states on Page Number 36 of the SOP, yes,
2  sir.
3  Q.   Okay.  Let's start at the
4  bottom with vendor change, 09.
5       Do you see that?
6  A.   Yes, sir.
7  Q.   On Page 3.  Do you know --
8  and it says, "Starting material vendor
9  changes."
10      Do you see that?
11 A.   Yes, sir.
12 Q.   Would that include recovered
13 solvents?
14 A.   No, sir.
15 Q.   Okay.  So where would vendor
16 changes for recovered solvents be
17 handled?
18 A.   As I said, you know, because
19 the change management system also is
20 linked with the regulatory requirements
21 too, because, for example, each starting
22 material change needs validation prior to
23 execution of such changes.
24      So a raw material that is

Page 368

1  designated as key starting material may
2  undergo much more, you know, rigorous,
3  you know, evaluation in the -- in the
4  hierarchy of regulatory requirements,
5  vis-à-vis a recovered solvent, because
6  the recovered solvent, as I have
7  explained to you, sir, from the
8  regulatory filing itself, there is no
9  commitment for process.  It is only for
10 specification and CoA.
11      So that change from Vendor A
12 to Vendor B would be handled through the
13 regular, you know, the controls from GMP
14 and not to regulatory change management,
15 you know, action standpoint based on --
16 Q.   What --
17 A.   -- the requirements.
18 Q.   Sorry.  I didn't mean to cut
19 you off there.
20      So what did Mylan do for
21 changing purely recovered solvent
22 vendors?  What actions did Mylan take for
23 those changes, if any?
24 A.   If I recollect the whole

Page 369

1  management of vendor of recovered
2  solvent, there would be a vendor
3  qualification step for those vendors that
4  would include inspection of the facility,
5  technical agreements, and then testing of
6  samples when it comes, and, you know,
7  compliance to specification.
8       So those are the broad
9  elements that would be considered, you
10 know, for such change.
11 Q.   What about filing a form
12 356h as part of the ANDA?
13 A.   My -- my understanding from
14 my experience -- I'm not talking from a
15 regulatory expert standpoint.  I think,
16 you know, at least from my experience is
17 that when a -- because there is no
18 commitment for process for such solvents
19 as a recovered solvent, there is no need
20 for filing this, because the filing
21 requirements very clearly states in the
22 U.S. DMF requirements, for reagents and
23 solvents, only two documents are required
24 to be filed, specification, test results

Confidential Information Subject to Protective Order

Page 370

¹ CoA.
² Q. Where are you pulling that
³ from?
⁴ A. It is guideline for filing
⁵ DMF based on GDUFA -- I don't exactly
⁶ remember the title, sir.
⁷ Q. Is it one of the -- is it an
⁸ ICH document --
⁹ A. No, sir. It's not an ICH
¹⁰ document. I think it is the FDA
¹¹ guidelines for filing DMFs. I think it
¹² is a GDUFA based guidelines.
¹³ Q. GDUFA?
¹⁴ A. Yeah, the GDUFA. I remember
¹⁵ seeing the guidances for -- too. But it
¹⁶ is a guideline for the industry. What
¹⁷ are -- what are the documents that need
¹⁸ to be there in a DMF and what
¹⁹ requirements for different types of
²⁰ materials.
²¹ Q. So you're saying that your
²² understanding is that Mylan wasn't
²³ required to file its recovered solvent
²⁴ vendors as part of the ANDA or the DMF

Page 371

¹ and so it didn't?
² A. Yeah, I'm talking from the
³ DMF standpoint, sir, from an API
⁴ manufacturing standpoint, that the
⁵ filings for DMF filing, that's not
⁶ mandated beyond CoA and the
⁷ specification.
⁸ Q. Okay. And that CoA and
⁹ specification, that's not vendor specific
¹⁰ is what you're saying?
¹¹ A. It is not specifically
¹² mentioned like whether it should be
¹³ vendor or ours. Because when we look at
¹⁴ the previous section in the guidelines,
¹⁵ sir, under key starting material, raw
¹⁶ material, there are two requirements, in
¹⁷ addition to all the requirements
¹⁸ mentioned, that is, you have to have
¹⁹ vendor CoA and the manufacturer CoA. I
²⁰ mean that is the DMF CoA.
²¹ But when it comes to
²² solvent, it simply says specification and
²³ CoA. So generally it is a specification
²⁴ and CoA is what Mylan would test would go

Page 372

¹ into the, you know, generally would go
² into the DMF in my -- in my
³ understanding.
⁴ Q. Okay. So, and I'm just
⁵ trying to follow you here because this is
⁶ some technical stuff.
⁷ A. Yes, sir.
⁸ Q. You're saying that your
⁹ understanding is that Mylan was not
¹⁰ required to list any vendor information
¹¹ for recovered solvents in the DMF, and so
¹² it did not, in fact, list vendor
¹³ information for its recovered solvents in
¹⁴ the DMF for valsartan?
¹⁵ A. My -- my clarification is
¹⁶ that, you know, it is under the title
¹⁷ Solvents and Reagents. So -- so that is
¹⁸ a typo. So it doesn't distinguish
¹⁹ between fresh or recovered, but for the
²⁰ solvents, whether it is fresh or
²¹ recovered, that is what we preferred.
²² But the requirement is the specification
²³ and CoA is the guidelines that I know.
²⁴ ███ ████████████████████

Page 373

¹ ████████████████████████████
² ██████████████████████████
███████████████████
³ █████████████████████████
████████████
⁴ ███████████████████████████
⁵ ████████████████████████████
███████████
⁶ ███████████████████████████
⁷ █████████████████████████████
██████
⁸ ███████████████████████████
⁹ ████████████
¹⁰ ██████████
¹¹ ███████████
¹² ███████████████
¹³ ████████████████
¹⁴ A. I'm sorry, I don't
¹⁵ recollect. I can't recollect.
¹⁶ Q. No worries. I can help you
¹⁷ out there.
¹⁸ MR. DAVIS: I'm marking
¹⁹ Tab 75 as Exhibit 21.
²⁰ (Document marked for
²¹ identification as Exhibit
²² PL-Gomas-21.)
²³ THE WITNESS: Is it
²⁴ something that you would like to



Page 374

1     show, sir, or I can pick out from
2     my --
3 BY MR. DAVIS:
4     Q.   Oh sure.  Well, here, I'll
5 just -- it's only a two, two or
6 three-page e-mail, so I'll just share my
7 screen with it, if you can't find it.
8     A.   I appreciate it, sir.  I
9 appreciate it.
10     Q.   Okay.  Do you have -- do you
11 see that?
12     A.   Yes, sir.
13     Q.   Okay.  So I'm going to
14 scroll down to the bottom, and you'll see
15 that there's an e-mail titled Forward
16 Lantech data - 2011 to 2019.  Do you see
17 that?
18     A.   Yes, sir.
19     Q.   And it's to Mr. Vasireddy
20 who we just discussed off the record,
21 right?
22     A.   Yes, sir.
23

Confidential Information - Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information – Subject to Protective Order



Confidential Information Subject to Protective Order



9      MR. DAVIS:  Can we take a
10   short break.  I'm going to --
11   let's go off the record.
12      THE VIDEOGRAPHER:  Off the
13   record, 11:11 p.m.
14      (Short break.)
15      THE VIDEOGRAPHER:  We are
16   back on the record at 11:14 p.m.
17      MR. DAVIS:  Okay.  I have a
18   lot more I'd like to do,
19   Dr. Gomas, with two minutes and
20   30 seconds left.
21      I'm just going to do one
22   thing which is, I'm marking Tab 68
23   as Exhibit 24.
24      (Document marked for

Confidential Information Subject to Protective Order

Page 398

1    identification as Exhibit
2    PL-Gomas-24.)
3  BY MR. DAVIS:
4    Q.   Then I'll publish this to
5  you.  Do you see this?
6    A.   Yes, sir.
7    Q.   Okay.  All I want to do is
8  what's called authenticate this document.
9         And so, I would have more
10 questions about it, but all I -- all I
11 want to do right now is just confirm.
12        Can you confirm that you
13 wrote this e-mail at the top and received
14 the e-mail below it?
15    A.   It looks like I have sent
16 this e-mail, but is it okay if I read it
17 for a second?
18    Q.   Sure.  Absolutely.
19    A.   Thank you, sir.  Yes, sir.
20    Q.   Can you confirm that you are
21 the author of the top e-mail and a
22 recipient of the bottom e-mail on
23 Exhibit 24?
24    A.   Yes, sir.  Yes, sir.

Page 399

1         MR. DAVIS:  Okay.  I feel
2  like that's all I can accomplish
3  in two minutes and however much
4  remaining.
5         So with that, that's all I
6  have today, Dr. Gomas, and thank
7  you for your time.  I know it's
8  late there.  I got an early start
9  here.
10        So thank you very much.
11        And I'll pass the witness.
12        THE WITNESS:  Thank you so
13 much for your time.  Thank you.
14 Appreciate it.
15        MR. TRISCHLER:  We'll
16 reserve -- sorry, sorry,
17 Dr. Gomas.
18        We'll reserve questioning
19 and the witness will read the
20 transcript.
21        THE VIDEOGRAPHER:  That
22 concludes today's deposition.
23        The time is 11:16 p.m.
24        *****

Page 400

1         (Excused.)
2         (Deposition concluded at
3  approximately 11:16 p.m., India
4  Standard Time.)

Page 401

1
2         CERTIFICATE
3
4
5         I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.
7
         It was requested before
8  completion of the deposition that the
   witness, ANTONY RAJ GOMAS, Ph.D., have
9  the opportunity to read and sign the
   deposition transcript.
10
11
12
   _____
13 MICHELLE L. GRAY,
   A Registered Professional
   Reporter, Certified Shorthand
14 Reporter, Certified Realtime
   Reporter and Notary Public
15 Dated:  April 13, 2021
16
17
18        (The foregoing certification
19 of this transcript does not apply to any
20 reproduction of the same by any means,
21 unless under the direct control and/or
22 supervision of the certifying reporter.)
23
24

Confidential Information Subject to Protective Order

Page 402

## INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 404

## ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 405, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
ANTONY RAJ GOMAS, Ph.D.        DATE

Subscribed and sworn
to before me this
_____ day of _____, 20____.
My commission expires:_____

_____
Notary Public

Page 403

- - - - -
E R R A T A
- - - - -

PAGE  LINE  CHANGE

_____ _____ _____
REASON: _____
_____ _____ _____
REASON: _____
_____ _____ _____
REASON: _____
_____ _____ _____
REASON: _____
_____ _____ _____
REASON: _____
_____ _____ _____
REASON: _____
_____ _____ _____
REASON: _____
_____ _____ _____
REASON: _____
_____ _____ _____
REASON: _____

Page 405

## LAWYER'S NOTES

PAGE  LINE
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____

# Exhibit 93

REDACTED

Confidential Information Subject to Protective Order

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

- - -

IN RE:  VALSARTAN,    :  MDL NO. 2875
LOSARTAN, AND        :
IRBESARTAN PRODUCTS  :  CIVIL NO.
LIABILITY LITIGATION :  19-2875
_____ :  (RBK/JS)
                          :
THIS DOCUMENT APPLIES :  HON. ROBERT
TO ALL CASES         :  B. KUGLER

- CONFIDENTIAL INFORMATION -
SUBJECT TO PROTECTIVE ORDER

VOLUME II

- - -

May 28, 2021

- - -

Continued videotaped remote deposition of JUN DU, taken pursuant to notice, was held via Zoom Videoconference, beginning at 9:12 a.m., EST, on the above date, before Michelle L. Gray, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Page 218

1
2   ZOOM APPEARANCES:
3   MAZIE SLATER KATZ & FREEMAN, LLC
    BY: ADAM SLATER, ESQ.
4       CHERYLL A. CALDERON, ESQ.
        CHRISTOPHER J. GEDDIS, ESQ.
5       MICHAEL R. GRIFFITH, ESQ.
        JULIA S. SLATER, ESQ.
6   103 Eisenhower Parkway, 2nd Floor
    Roseland, New Jersey 07068
7   (973) 228-9898
    aslater@mazieslater.com
8   ccalderon@mazieslater.com
    cgeddis@mazieslater.com
9   mgriffith@mazieslater.com
    jslater@mazieslater.com
10  Representing the Plaintiffs
11  GOLDENBERG LAW, PLLC
    BY: MARLENE J. GOLDENBERG, ESQ.
12  800 LaSalle Avenue, Suite 2150
    Minneapolis, Minnesota 55402
13  (612) 436-5028
    mjgoldenberg@goldenberglaw.com
14  Representing the Plaintiffs
15
16  FARR LAW FIRM, P.A.
    BY: GEORGE T. WILLIAMSON, ESQ.
17  99 Nesbit Street
    Punta Gorda, Florida 33950
18  (941) 639-1158
    gwilliamson@farr.com
19  Representing the Plaintiffs
20  FLEMING NOLEN JEZ, LLP
    BY: DAVID HOBBS, ESQ.
21  2800 Post Oak Boulevard, Suite 4000
    Houston, Texas 77056
22  (713) 621-7944
    david_hobbs@fleming-law.com
23  Representing the Plaintiffs
24

Page 220

1   ZOOM APPEARANCES:  (Cont'd.)
2
3   DUANE MORRIS, LLP
    BY: SETH A. GOLDBERG, ESQ.
4       BARBARA A. SCHWARTZ, ESQ.
        RAYMOND VANDERHYDEN, ESQ.
5   30 South 17th Street
    Philadelphia, Pennsylvania 19103
6   (215) 979-1164
    sagoldberg@duanemorris.com
7   baschwartz@duanemorris.com
    ravanderhyden@duanemorris.com
8       - and -
9   DUANE MORRIS, LLP
    BY: GREGORY D. HERROLD, ESQ.
10  1940 Route 70 East, Suite 100
    Cherry Hill, New Jersey 08003
11  (856) 874-4225
    Gdherrold@duanemorris.com
12  Representing the Defendants, Zhejiang
    Huahai Pharmaceutical Co., Ltd., Prinston
13  Pharmaceutical Inc., Huahai U.S., Inc.,
    and Solco Healthcare US, LLC
14
15  GREENBERG TRAURIG, LLP
    BY: KATE WITTLAKE, ESQ.
16  4 Embarcadero Center
    Suite 3000
17  San Francisco, California 94111
    (415) 655-1285
18  wittlakek@gtlaw.com
    Representing the Defendants, Teva
19  Pharmaceutical Industries, Ltd., Teva
    Pharmaceuticals USA, Inc., Actavis LLC,
20  and Actavis Pharma, Inc.
21
22
23
24

Page 219

1
2   ZOOM APPEARANCES:  (Cont'd.)
3   LOWEY DANNENBERG, P.C.
    BY: ANTHONY CHRISTINA, ESQ.
4   One Tower Bridge
    100 Front Street, Suite 520
5   Bridgeport, Pennsylvania 19428
    (215) 399-4752
6   Achristina@lowey.com
    Representing the Plaintiffs
7
8   HOLLIS LAW FIRM, P.A.
    BY: IRIS SIMPSON, ESQ.
9   8101 College Boulevard
    Suite 260
10  Overland Park, Kansas 66210
    (913) 385-5400
11  isimpson@hollislawfirm.com
    Representing the Plaintiffs
12
13  MORGAN & MORGAN
    BY: HANNAH FUJIMAKI, ESQ.
14      STEPHANIE JACKSON, ESQ.
15  600 N. Pine Island Road
    Suite 400
16  Plantation, Florida 33324
    (954) 318-0268
17  hfujimaki@forthepeople.com
    sjackson@forthepeople.com
18  Representing the Plaintiffs
19  RIVERO MESTRE LLP
    BY: CHARLIE WHORTON, ESQ.
20  2525 Ponce De Leon Boulevard
    Miami, Florida 33134
21  (305) 455-2500
    cwhorton@riveromestre.com
22  Representing the Plaintiffs
23
24

Page 221

1   ZOOM APPEARANCES:  (Cont'd.)
2
3   PIETRAGALLO GORDON ALFANO BOSICK &
    RASPANTI, LLP
4   BY: FRANK H. STOY, ESQ.
    One Oxford Centre
5   38th Floor
    Pittsburgh, Pennsylvania 15219
6   (412) 263-1840
    fhs@pietragallo.com
7   Representing the Defendant, Mylan N.V.,
    Mylan Pharmaceuticals Inc., and Mylan
8   Laboratories Limited
9
10  FALKENBERG IVES, LLP
    BY: KATHERINE PLOMINSKI-GLOEDE, ESQ.
    230 W. Monroe Street, Suite 2220
11  Chicago, Illinois 60606
    (312) 566.4808
12  KPG@falkenbergives.com
    Representing the Defendant, Humana
13
14
15  ALSO PRESENT:
16  Dr. Yang Shao
    (Interpreter)
17
    Evelyn Yang Garland
18  (Check Interpreter)
19  Phil Hughes
    (Check Interpreter)
20
    VIDEOTAPE TECHNICIAN:
21  (Judy Diaz)
22
23
24

Confidential Information Subject to Protective Order

Page 222

```
1          - - -
2    I N D E X
3          - - -
4
5  Testimony of:
6       JUN DU
   By Mr. Slater      226
7
8
9
10
11         - - -
12   E X H I B I T S
13         - - -
14 NO.       DESCRIPTION       PAGE
15
16 ZHP-433    Isolation and      244
           Identification
17         Of Process Impurities
           (Jing Nie)
18 ZHP-434    E-mail Thread      275
           11/2/18
19         Subject, Happy Chinese
           New Year!
20         ZHP 00675949-56
21
22
23
24
```

Page 223

```
1          - - -
2  P R E V I O U S L Y   M A R K E D
3    E X H I B I T S
4          - - -
5
6  NO.       DESCRIPTION       PAGE
7  ZHP-204    Deviation Report   287
           ZHP 00004352-71
8
9  ZHP-212    Investigation     251
           Report
10         6/6/18
           ZHP 00662283-09
11 ZHP-213    Warning Letter    234
           11/29/18
12         ZHP 01344159-64
13 ZHP-312    Establishment     230
           Inspection Report
14         7/23/18
           PRINSTON 00162349-06
15
16 ZHP-319    E-mail Thread     280
           7/17/18
17         Subject, Hello and
           Help
18         CHARLESWANG 000447-49
19 ZHP-321    Concise           288
           International
20         Chemical Assessment
           Document 38
21         NDMA
           WHO 2002
22
23
24
```

Page 224

```
1          - - -
2  DEPOSITION SUPPORT INDEX
3          - - -
4
5  Direction to Witness Not to Answer
6  PAGE   LINE
   None.
7
8  Request for Production of Documents
9  PAGE   LINE
   None.
10
11 Stipulations
12 PAGE   LINE
   None.
13
14 Questions Marked
15 PAGE   LINE
   None.
16
17
18
19
20
21
22
23
24
```

Page 225

```
1          - - -
2       THE VIDEOGRAPHER:  We are
3  now on the record.
4       My name is Judy Diaz, I'm a
5  legal videographer for Golkow
6  Litigation Services.
7       Today's date is May 28,
8  2021, and the time is 9:12 a.m.
9       This remote video deposition
10 is being held in the matter of
11 valsartan, losartan, and
12 irbesartan products liability
13 litigation MDL.
14      This is the continuation of
15 the deponent Jun Du.
16      All parties to this
17 deposition are appearing remotely
18 and have agreed to the witness
19 being sworn in remotely.
20      All counsel will be noted on
21 the stenographic record.
22      The court reporter is
23 Michelle Gray.
24      The witness and interpreter
```

Page 226

```
1      are already under oath.
2              - - -
3          ... YANG SHAO and EVELYN
4      YANG GARLAND, having been
5      previously duly sworn, translated
6      Chinese to English, as follows:
7              - - -
8          ... JUN DU, having been
9      previously sworn, was examined and
10     testified as follows:
11             - - -
12         CONTINUED EXAMINATION
13             - - -
14  BY MR. SLATER:
15     Q.    On the screen we have
16  Exhibit 430.
17         Let's look at the bottom
18  paragraph on the first page please.
19         This is your letter to the
20  FDA August 26, 2018.
21         The bottom paragraph says --
22         MR. SLATER:  I'm sorry.
23  I'll start over.
24         THE WITNESS:  Can you give
```

Page 228

```
1   stated at the bottom of the letter?
2       A.   Yes.
3       Q.   One thing I just want to
4   clarify is, in retrospect you also found
5   out that there was NDMA and NDEA from the
6   TEA process, the triethylamine process
7   with sodium nitrite quenching.  It turned
8   out that also had the nitrosamine
9   contamination, correct?
10      A.   One, that question was
11  responded at that time.  The issue of TEA
12  or NDEA was not discovered yet.  Besides
13  NDEA is not a contaminant, it is an
14  impurity rather.
```

Page 227

```
1      me a few seconds to take a look at
2      this document?
3   BY MR. SLATER:
4      Q.    Yeah, all right.  I didn't
5   even -- I was halfway through my question
6   so I'll start over.  But you can go ahead
7   and look first.
8         MR. SLATER:  Keep track of
9      the time, please.
10        THE WITNESS:  I'm ready.
11  BY MR. SLATER:
12     Q.    Looking now at Exhibit 430,
13  which is your August 26, 2018 letter to
14  the FDA.  I want to look at the bottom
15  paragraph on Page 1.
16         You wrote in this letter,
17  "One of the key questions about this
18  inspection as well as about our own
19  investigation is," quote -- and quoting
20  what the FDA asked -- "'why NDMA was not
21  detected or considered during the process
22  change from the triethylamine process to
23  zinc chloride process.'"
24         Do you see where that's
```

Page 229

```
21        MR. SLATER:  Cheryll, let's
22     digress for a moment and go to
23     Exhibit 312, please, and then
24     we'll come back to this document.
```

Confidential Information Subject to Protective Order

Page 230

1    Let's go if we could, to the
2 cover first.
3    (Previously marked Exhibit
4 ZHP-312.)
5 BY MR. SLATER:
6    Q.   Looking at Exhibit 312, this
7 is the FDA establishment inspection
8 report for the inspection from July 23,
9 2018 to August 3, 2018.  Do you see that
10 on the screen?
11    A.   Hold on, let me take a look.
12    Excuse me, what exhibit
13 number is this?
14    Q.   312.
15    A.   Thank you.  I see it.
16    Q.   Let's go, if we could, to
17 Page 25 of 58; the Bates number at the
18 bottom is Prinston00162373 for that page.
19    Perfect.
20    A.   Please allow me a few
21 seconds to review this EI report.
22    MR. SLATER:  Keep track of
23 the time, please.
24    THE WITNESS:  I'm ready.  I

Page 231

1 just finished reviewing.
2 BY MR. SLATER:
3    Q.   Looking now at the
4 paragraph, the short paragraph --
5 rephrase.
6    Looking at the paragraph in
7 the middle of the page which is reciting
8 the discussions with the FDA
9 investigators, it states in part,

Page 232

8    Q.   Let's go back to Exhibit 430
9 please.  Let's look now at Page 2 of the
10 letter.
11    Let's look now at the third
12 paragraph on the page, please.  Can
13 you -- rephrase.
14    Your letter to the FDA
15 states in the third paragraph on Page 2,
16 in the current -- excuse me, I've got to
17 start over.

Page 233

17    A.   What are you referring to by
18 "the company"?
19    Q.   ZHP, who you were -- who you
20 were writing on behalf of -- rephrase.
21    ZHP, on whose behalf you
22 were writing this letter as executive
23 vice president.
24    A.   That is correct.  That's

Confidential Information Subject to Protective Order

Page 234

1 what ZHP wrote.
2    Q.   You signed the letter as
3 executive vice president of the company,
4 right?
5    A.   That is correct.  I signed
6 this letter on behalf of ZHP.
7       MR. SLATER:  Let's go now,
8    Cheryll if we could to
9    Exhibit 213, the FDA's response.
10    (Previously marked Exhibit
11    ZHP-213.
12 BY MR. SLATER:
13    Q.   On the screen we have
14 Exhibit 213, which is the FDA's
15 November 29, 2018 letter written in
16 response to your August 26, 2018 letter
17 that we were just discussing.
18    A.   Could you give me a few
19 seconds to review this document.  I am
20 ready.
21    Q.   First of all, in the middle
22 of the first page the fourth paragraph
23 down states, "We reviewed your August 26,
24 2018 response in detail and acknowledge

Page 235

1 receipt of your subsequent
2 correspondence."
3       The August 26th letter is
4 the letter we were just discussing prior
5 to this document, correct?
6    A.   That is correct.
7    Q.   Just above the sentence that
8 I just read, the FDA informed you, on
9 November 29, 2018, "Because your methods,
10 facilities, or controls for
11 manufacturing, processing, packing, or
12 holding do not conform to cGMP, your API
13 are adulterated within the meaning of
14 Section 501(a)(2)(B) of the Federal Food,
15 Drug, and Cosmetic Act, 21 U.S.C.
16 351(a)(2)(B)."
17       Do you know what adulterated
18 means?
19    A.   I do.
20    Q.   What does adulterated mean?
21    A.   What they meant was that it
22 was involved in a fraud or fake
23 substance.  However, this is their
24 uniform statement in the warning letter.

Page 236

1 If you try to find out what they
2 specifically referred to, you have to
3 resort to the text below.
4       MR. GOLDBERG:  Just note my
5    objection to the last question as
6    calling for a legal conclusion.
7 BY MR. SLATER:
8    Q.   Going up one more paragraph,
9 there's a single sentence paragraph that
10 says, "This warning letter summarizes
11 significant deviations from current good
12 manufacturing practice (cGMP) for active
13 pharmaceutical ingredients (API)."
14       And what I'd like to now do
15 is go through one of the specifics.  If
16 we can turn now to Page 4 of the letter,
17 which the Bates stamp is ZHP01344162 for
18 that page so we can look at one of the
19 specific examples.

Page 237

Confidential Information - Subject to Protective Order



Confidential Information Subject to Protective Order



Page 242

Page 243

7 most important rule that you need to
8 follow, and that ZHP needed to follow, in
9 manufacturing drugs for sale to patients?
10      MR. GOLDBERG:  Objection to
11 form.  Misstates testimony.
12      THE WITNESS:  To any drug
13 manufacturer, ensuring the
14 product -- let me put it this way.
15 Let me start all over again.
16      To any drug manufacturer
17 utilizing their utmost knowledge
18 and effort to ensure the safety to
19 the patient for any of their
20 product is correct.
21      This statement is correct.
22      MR. SLATER:  Cheryll, I want
23 to go to another document.  Don't
24 lose this.  We'll come right back

Page 244

1 to it.
2      I want to go to an article
3 titled Isolation and
4 Identification of Process
5 Impurities in Crude Valsartan.
6 There we go.
7      Just for the record what
8 exhibit number is this?
9      MS. CALDERON:  433.
10      (Document marked for
11 identification as Exhibit
12 ZHP-433.)
13 BY MR. SLATER:
14      Q.   433.  Thank you.
15      Looking now at Exhibit 433,
16 this is an article that was published in
17 the Journal of Liquid Chromatography &
18 Related Technologies in 2006.
19      And if we could, let's go to
20 the second page so we can see who the
21 authors are.
22      Do you see there's three
23 authors, and the third one is Danhua Wang
24 from ZHP?

Page 245

1      A.   I see it.
2      Q.   So this is an article
3 published in 2006 in a medical journal
4 and one of the authors was a ZHP
5 employee.  You see that, correct?
6      A.   I see it.  However, could
7 you please give me a few seconds to
8 review this document, because I've never
9 seen this document before, nor do I have
10 the relevant technical knowledge.
11      MR. SLATER:  Let's keep time
12 on this.
13      THE WITNESS:  I'm ready.
14 BY MR. SLATER:
15      Q.   Looking at the introduction
16 to this 2006 article authored in part by
17 a ZHP employee, it starts out stating,
18 "The quality and safety of
19 pharmaceuticals can be significantly
20 effected by the presence of impurities."
21      Do you see what I just read?
22      A.   That's correct.  That's what
23 it says here.
24      Q.   In the case of ZHP's

Confidential Information Subject to Protective Order



Page 246

1 valsartan, the quality and safety of
2 valsartan was significantly affected by
3 the presence of nitrosamine impurities,
4 correct?
5         MR. GOLDBERG:  Objection to
6 form.  Vague.
7         THE WITNESS:  Could you
8 please repeat your question?
9 BY MR. SLATER:
10      Q.   The quality and safety of
11 the valsartan manufactured by ZHP was
12 significantly effected by the presence of
13 nitrosamine impurities, NDMA and NDEA,
14 correct?
15         MR. GOLDBERG:  Objection to
16 form.  Vague.
17         THE WITNESS:  I do not agree
18 with your opinion.  If we are
19 talking about a product of
20 quality, if the manufacturer
21 manufactures the product, if the
22 process approved by the FDA, and
23 the manufacturing was in
24 compliance with the requirements

Page 247

1 of the GMP, then that product
2 would be considered a product of
3 quality.
4         As for the safety of a
5 product, it's up to the science to
6 identify and determine the safety.
7         One, ZHP manufactured this
8 product.  FDA did not require us
9 to test NDMA, nor did it set any
10 standard for NDMA.
11         MR. SLATER:  Let's go back
12 to the warning letter please.
13         Not that warning letter.
14         Perfect.
15 BY MR. SLATER:
16      Q.   Looking now  -- rephrase.

Page 248

Page 249

Confidential Information Subject to Protective Order



Page 250

Page 251

16      MR. SLATER:  Okay.  We can
17  take that document down now.
18      Let's go to Exhibit 212.
19      (Previously marked Exhibit
20  ZHP-212.)
21      MR. GOLDBERG:  Adam, if
22  you're in between documents, can
23  we just take a two-minute break,
24  not a long break?

Page 252

1      MR. SLATER:  Sure.
2      MR. GOLDBERG:  Thank you.
3      MR. SLATER:  Let's go off
4  the record.
5      THE VIDEOGRAPHER:  The time
6  right now is 10:08 a.m.
7      We're off the record.
8      (Short break.)
9      THE VIDEOGRAPHER:  The time
10  right now is 10:12 a.m.  We're
11  back on the record.
12 BY MR. SLATER:

Page 253

Confidential Information - Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Page 266

Page 268

24    MR. SLATER:  Let's go --

Page 267

Page 269

1    Cheryll, let's take -- oh.  We're
2    actually in this document.  Can
3    you go back to the fourth page of
4    this document, please,
5    Exhibit 213?
6        Perfect.
7  BY MR. SLATER:

Confidential Information - Subject to Protective Order

Page 270



11    MR. SLATER:  Cheryll, let's
12 go to Exhibit 212, please.
13 BY MR. SLATER:
14    Q.   Exhibit 212 is a draft of
15 the deviation investigation report titled
16 Investigation Regarding an Unknown
17 Impurity (Genotoxic Impurity).
18    Do you see that on the
19 screen?
20    A.   That is correct.
21    I would request a few
22 seconds to review this document.
23    MR. SLATER:  Keep time on
24 this, please.

Page 271

1    THE WITNESS:  I am ready.  I
2 have finished the review.
3 BY MR. SLATER:

Page 272

16    MR. SLATER:  Cheryll, let's
17 go back to Exhibit 430.  Page 2.
18 Third paragraph.  The fifth line
19 down.
20 BY MR. SLATER:
21    Q.   You said, "It is this extra
22 dimension over the current industry
23 practice that obscured us from foreseeing
24 this impurity during the process change

Page 273

1 from triethylamine process to zinc
2 chloride process."

Confidential Information Subject to Protective Order



Page 274

Page 275

Page 276

Page 277

4      MR. SLATER:  Let's go off
5  the record.
6      THE VIDEOGRAPHER:  The time
7  right now is 11:02 a.m.  We are
8  off the record.
9      (Short break.)
10     THE VIDEOGRAPHER:  The time
11 right now is 11:17 a.m.  We're
12 back on the record.
13     MR. SLATER:  Cheryll, let's
14 go to the document ZHP00675949.
15     What exhibit number is this
16 now?
17     (Document marked for
18 identification as Exhibit
19 ZHP-434.)
20     MS. CALDERON:  434.
21     MR. SLATER:  Thank you.
22 BY MR. SLATER:



Page 280

```
10      A.   Based on the current
11  exchange rate, 1 USD is equivalent to
12  6.4 rmb based on which you can do a
13  simple calculation.
14          MR. SLATER:  Let's go to
15  Exhibit 319, please.
16          (Previously marked Exhibit
17  ZHP-319.)
18          THE WITNESS:  Can you allow
19  me to find this document in the
20  link.
21          I have found it.  Can you
22  give me a few seconds to review
23  it?
24          MR. SLATER:  Fine.  We keep
```

Page 281

```
1   track of all the time.  We can
2   take whatever time you need.
3           THE WITNESS:  I'm ready.
4   BY MR. SLATER:
```



Page 282

Page 284

BY MR. SLATER:

Q.   Have you seen the deposition testimony given from Min Li?

A.   Would you please repeat your question?

Q.   Have you seen Min Li's deposition transcript and read what he testified to about your interactions with Charles Wang?

A.   No, I've not seen it.

Q.   Were you on calls with Charles Wang and Min Li together where all three of you spoke?

A.   Are you suggesting that we discussed as a group, the three of us?

Q.   Did you, Charles Wang, and Min Li discuss the NDMA contamination of valsartan together on conference calls or in WeChat?

A.   First of all, I do not agree with your statement that NDMA is a

Page 283

Page 285

contaminant.

Secondly, I believe there was some discussion among the three of us in WeChat.

MR. SLATER:  Take that document down.  Let's go to Exhibit 210.

It's not coming up on my screen for some reason.  There we go.

BY MR. SLATER:

Q.   Looking now at Exhibit 210. This is the deviation investigation report prepared November 5, 2018, according to the front of the document.

This was an official report prepared by ZHP with regard to the nitrosamine contamination of the valsartan, correct?

A.   It is about an investigation regarding unknown impurity of valsartan API TEA process.

MR. SLATER:  Let's go to Page 11 of 236, please.

Page 286

1    Actually, let's go to
2 Page 10 first, Cheryll.
3    THE WITNESS:  Please allow
4 me some time to scroll to this
5 page.
6    MR. SLATER:  Keep time on
7 this as well please.
8    THE WITNESS:  I am ready.
9 BY MR. SLATER:

Page 287

4    MR. SLATER:  Cheryll, is it
5 possible, this might take you a
6 moment, can you try to also pull
7 up Exhibit 204, please.
8    (Previously marked Exhibit
9 ZHP-204.)
10    THE WITNESS:  Hold on.  Let
11 me open this document too, from
12 the link.
13    MR. SLATER:  That's not the
14 version that I have in front of
15 me, marked as 204.
16    This is a problem.  All
17 right.
18    THE WITNESS:  I don't see
19 that.
20    MR. SLATER:  No, take --
21 take the document down.
22    All right.  Let's go now to
23 Exhibit 321, which is the World
24 Health Organization article that

Page 288

1 was referenced in the deviation
2 investigation report.
3    This is Exhibit 321.
4    (Previously marked Exhibit
5 ZHP-321.)
6    THE WITNESS:  Hold on.  I
7 don't see that in the link.
8    Okay.  I see it.
9    Could you allow me a few
10 seconds to review this document?
11    I am ready, but I cannot
12 understand this document.
13 BY MR. SLATER:
14    Q.    Let's go to Page 23, please.
15 Top of the page.
16    A.    Hold on.  Let me scroll to
17 Page 21.
18    MR. GOLDBERG:  I think it's
19 23, Jun.
20    THE WITNESS:  I'm ready.
21 I'm on this page.
22 BY MR. SLATER:
23    Q.    Looking at the top of
24 Page 23 in this article that was cited in

Page 289

1 ZHP's own deviation investigation report,
2 it states in the top right, "Therefore,
3 owing to the considerable evidence of
4 carcinogenicity of NDMA in laboratory
5 species, evidence of direct interaction
6 with DNA consistent with tumor formation,
7 and the apparent lack of qualitative
8 species-specific differences in the
9 metabolism of this substance, NDMA is
10 highly likely to be carcinogenic to
11 humans."
12    And that language again is
13 found in an article cited by ZHP in its
14 own deviation investigation report,
15 correct?
16    A.    It does not sound the same
17 as the quote you just provided.  I did
18 not make the comparison myself.
19    Q.    Are you saying that I didn't
20 read the language accurately?
21    A.    What you just quoted from
22 this document was right.
23    Q.    The World Health
24 Organization article from 2002 concluded

Confidential Information Subject to Protective Order

Page 290

¹ that NDMA is highly likely to be
² carcinogenic to humans, correct?
³     A.   Judging from what it says in
⁴ this document, the statement you just
⁵ made is correct.
⁶         MR. SLATER:  Cheryll, can
⁷     you go back to Exhibit 204,
⁸     please.  I'd like to get to the
⁹     part where the deviation report,
¹⁰     DCE-18001 begins.
¹¹         THE WITNESS:  Hold on.  Give
¹²     me some time to review.
¹³         MR. SLATER:  You can do
¹⁴     whatever you want.  I'm just
¹⁵     getting to the document where I
¹⁶     want to use it.
¹⁷         THE WITNESS:  So what's the
¹⁸     exhibit number again --
¹⁹         MR. SLATER:  204.
²⁰         THE WITNESS:  What I opened
²¹     from the link is different from
²²     what you're showing on the screen.
²³ BY MR. SLATER:
²⁴     Q.   You need to scroll 12 pages

Page 291

¹ in and you'll find this page.
²         MR. SLATER:  Please keep
³     track of all this time.  I'm
⁴     literally going to bring him to
⁵     one page and identify that the WHO
⁶     article is identified again.  So
⁷     all this time is unnecessary.
⁸         MR. GOLDBERG:  Counsel, you
⁹     keep doing that and it is --
¹⁰     you're the one directing the
¹¹     witness to the documents.
¹²         The -- he is scrolling
¹³     through, and he has told you that
¹⁴     he can't find the page you're
¹⁵     referring to.  Okay.
¹⁶         You've got to give the
¹⁷     witness a chance to look at the
¹⁸     document and get to the page.
¹⁹         MR. SLATER:  Nobody is
²⁰     stopping him from doing that.  The
²¹     page that I'm --
²²         MR. GOLDBERG:  This is your
²³     time and we're -- and your
²⁴     continual reference to the time,

Page 292

¹     you don't have to do it every
²     single time the document goes up.
³     Your people are taking -- keeping
⁴     that time.
⁵         THE WITNESS:  Can you repeat
⁶     the exhibit number?  I go to
⁷     Exhibit 204, but the one that I
⁸     see is different from what you
⁹     have shown.
¹⁰ BY MR. SLATER:
¹¹     Q.   This is the exhibit.  It's
¹² Page 12 of the exhibit.
¹³     A.   I would like you to tell me
¹⁴ the exhibit number again?  What's the
¹⁵ number, 200 and what?
¹⁶         MR. SLATER:  I can't do
¹⁷     this.  Cheryll, can you help him,
¹⁸     please?
¹⁹         MS. CALDERON:  Mr. Du, it's
²⁰     page -- Exhibit 204, ZHP
²¹     Exhibit 204.
²²         And then you can just -- you
²³     can actually just go to the little
²⁴     box at the top that says "of 120."

Page 293

¹     You can put in the number 12.
²         This is the front of the
³     page.  Then you just scroll down
⁴     to the 12th page.
⁵         Do you see that?  Right
⁶     there.
⁷         THE WITNESS:  I see it.  I
⁸     see it.  We are on different
⁹     pages.
¹⁰         MS. CALDERON:  Yes.
¹¹         THE WITNESS:  Now I see it.
¹² BY MR. SLATER:
¹³     Q.   Looking within Exhibit 204,
¹⁴ is the deviation investigation report
¹⁵ dated July 20, 2018, it's entitled
¹⁶ Investigation regarding a Suspected
¹⁷ Genotoxic Impurity of Valsartan,
¹⁸ DCE-18001.
¹⁹         Do you see that?
²⁰     A.   Yes.
²¹         MR. SLATER:  Cheryll, please
²²     turn to Page 24 of 33 within
²³     this -- this document.  It's
²⁴     ZHP0004388.

Confidential Information Subject to Protective Order

Page 294



¹ BY MR. SLATER:

²² Q. And again, that World Health
²³ Organization article that is cited in
²⁴ your company's official report concluded

Page 295

¹ that NDMA is highly -- highly likely to
² be carcinogenic to humans. We just went
³ over that, correct?
⁴ A. That is correct.
⁵ MR. SLATER: Thank you. I
⁶ have no further questions at this
⁷ time, subject to my right to
⁸ request continuation or additional
⁹ testimony based on motion practice
¹⁰ subsequent to the deposition.
¹¹ Thank you.
¹² MR. GOLDBERG: We'll take a
¹³ few minute break and then we'll
¹⁴ come back in. Can we go off the
¹⁵ record for a few minutes?
¹⁶ THE VIDEOGRAPHER: The time
¹⁷ right now is 11:52 a.m. We are
¹⁸ off the record.
¹⁹ (Short break.)
²⁰ THE VIDEOGRAPHER: The time
²¹ right now is 12:05 p.m. We're
²² back on the record.
²³ MR. GOLDBERG: We have no
²⁴ questions for the witness at this

Page 296

¹ time. Thank you.
² MR. SLATER: Okay. Thanks
³ everybody.
⁴ THE VIDEOGRAPHER: The time
⁵ right now is 12:06 p.m. We are
⁶ off the record.
⁷ (Excused.)
⁸ (Deposition concluded at
⁹ approximately 12:06 p.m.)
¹⁰
¹¹
¹²
¹³
¹⁴
¹⁵
¹⁶
¹⁷
¹⁸
¹⁹
²⁰
²¹
²²
²³
²⁴

Page 297

¹
²
³ CERTIFICATE
⁴
⁵ I HEREBY CERTIFY that the
witness was duly sworn by me and that the
⁶ deposition is a true record of the
testimony given by the witness.
⁷
⁸ It was requested before
completion of the deposition that the
witness, JUN DU, have the opportunity to
⁹ read and sign the deposition transcript.
¹⁰
¹¹
¹² MICHELLE L. GRAY,
A Registered Professional
¹³ Reporter, Certified Shorthand
Reporter, Certified Realtime
¹⁴ Reporter and Notary Public
Dated: June 2, 2021
¹⁵
¹⁶
¹⁷ (The foregoing certification
¹⁸ of this transcript does not apply to any
¹⁹ reproduction of the same by any means,
²⁰ unless under the direct control and/or
²¹ supervision of the certifying reporter.)
²²
²³
²⁴

Page 298

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

---

Page 300

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 217 - 301, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____

JUN DU                    DATE

Subscribed and sworn to before me this _____ day of _____, 20____.
My commission expires:_____

_____

Notary Public

---

Page 299

- - - - -
E R R A T A
- - - - -

PAGE  LINE  CHANGE

_____ _____ _____
REASON: _____
_____ _____ _____
REASON: _____
_____ _____ _____
REASON: _____
_____ _____ _____
REASON: _____
_____ _____ _____
REASON: _____
_____ _____ _____
REASON: _____
_____ _____ _____
REASON: _____
_____ _____ _____
REASON: _____
_____ _____ _____
REASON: _____

---

Page 301

LAWYER'S NOTES
PAGE  LINE
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____

**WORD**
**INDEX**

**< 0 >**
**00004352-71**
223:7
**000447-49**
223:17
**00162349-06**
223:14
**00662283-09**
223:10
**00675949-56**
222:20
**01344159-64**
223:12
**07068** 218:6
**08003** 220:10

**< 1 >**
**1** 227:15
280:11
**10** 286:2, 10
**10:08** 252:6
**10:12** 252:10
**100** 219:4
220:10
**103** 218:5
**11** 285:24
286:15
**11/2/18** 222:18
**11/29/18**
223:11
**11:02** 275:7
**11:17** 275:11
**11:52** 295:17
**110125** 237:10
**12** 290:24
292:12 293:1
**12:05** 295:21
**12:06** 296:5, 9
**120** 292:24
**12th** 293:4
**15219** 221:5
**17** 283:7
**17th** 220:4
**19103** 220:5
**19-2875** 217:5
**1940** 220:10
**19428** 219:5

**< 2 >**
**2** 232:9, 15,
19 236:21
247:19 249:2
269:11
272:17
278:16 279:1
297:14
**20** 293:15
300:20
**200** 292:15
**2002** 223:21
286:20
**289:24** 294:5,
11
**2006** 244:18
245:3, 16
**2011** 237:8
**2017** 252:16
253:9, 18
254:9 255:19
256:12, 21
257:4, 15, 23
260:10
261:20
263:10
264:18
267:18 268:1
278:5
**2018** 226:20
227:13 230:9
234:15, 16, 24
235:9 247:18
250:19 251:5
252:14 253:8
254:3, 5, 23
255:7 256:13
269:9 272:11
278:5, 16
279:2 283:7,
14 285:14
293:15
**2019** 255:6
**2021** 217:8
225:8 255:14,
17 256:19
257:1, 14, 21
297:14
**204** 287:7, 15
290:7, 19

292:7, 20, 21
293:13
**21** 235:15
288:17
**210** 285:7, 12
**212** 251:18
270:12, 14
273:5 274:7,
11
**213** 234:9, 14
269:5, 8
**215** 219:5
220:5
**2150** 218:12
**217** 300:6
**2220** 221:10
**226** 222:6
**228-9898**
218:6
**23** 230:8
288:14, 19, 24
**230** 221:10
223:13
**234** 223:11
**236** 285:24
**24** 293:22
**244** 222:14
**25** 230:17
**251** 223:7
**2525** 219:20
**26** 226:20
227:13
234:16, 23
272:11
**260** 219:9
**263-1840**
221:6
**26th** 235:3
**27** 257:15, 22
260:10
261:20
263:10
264:18 267:18
**275** 222:18
**28** 217:8
225:7 251:5
255:14, 17
256:19 257:1,
14, 21
**280** 223:14

**2800** 218:21
**287** 223:7
**2875** 217:2
**288** 223:17
**29** 234:15
235:9 247:18
252:14 253:7
254:5, 23
269:9
**2nd** 218:5

**< 3 >**
**3** 230:9
232:18
**3.1.2** 286:11
**30** 220:4
298:16
**3000** 220:16
**301** 300:6
**305** 219:21
**308** 271:6
**312** 221:11
229:23 230:6,
14
**318-0268**
219:16
**319** 278:11
280:15 281:5
**321** 287:23
288:3
**33** 293:22
**33134** 219:20
**33324** 219:15
**33950** 218:17
**351(a)(2)(B**
235:16
**38** 223:20
286:18
**385-5400**
219:10
**38th** 221:5
**399-4782**
219:5

**< 4 >**
**4** 220:16
236:16
**4.1.2** 294:16
**400** 219:15
**4000** 218:21

**412** 221:6
**415** 220:17
**430** 226:16
227:12 232:8
272:17
**433** 244:9, 14,
15
**434** 275:20,
23 276:11
278:14
**436-5028**
218:13
**45,000** 279:2,
11, 15, 16, 21
280:7
**455-2500**
219:21
**483** 242:11
253:22

**< 5 >**
**5** 285:14
**5.2** 271:4, 7
**501(a)(2)(B**
235:14
**520** 219:4
**55402** 218:12
**566.4808**
221:11
**58** 230:17

**< 6 >**
**6** 250:23
251:3
**6.4** 280:12
**6/6/18** 223:9
**600** 219:14
**60606** 221:11
**612** 218:13
**621-7944**
218:22
**639-1158**
218:17
**655-1285**
220:17
**66210** 219:10
**66-40** 251:5

**< 7 >**
**7/17/18** 223:16

Confidential Information Subject to Protective Order

7/23/18 223:14
70 220:10
713 218:22
77056 218:21
7th 278:13

< 8 >
800 218:12
8101 219:9
856 220:11
874-4225
220:11
877.370.3377
217:21

< 9 >
9:12 217:15
225:8
913 219:10
917.591.5672
217:21
941 218:17
94111 220:17
954 219:16
973 218:6
979-1164
220:5
99 218:16

< A >
a.m 217:15
225:8 252:6,
10 275:7, 11
295:17
ability 274:1
280:6
accepted
241:10
accurate
298:20
accurately
289:20
Achristina@lo
wey.com 219:6
acid 228:23,
24 232:22
233:1
acknowledge
234:24

ACKNOWLE
DGMENT
300:2
Act 235:15
Actavis
220:19, 20
action 239:19
242:2 243:1
267:7, 14, 15
actions 241:5
242:14 267:6
active 236:12
248:13 249:23
activities
262:5
activity 229:20
ADAM 218:3
251:21
addition
240:22 258:17
additional
239:9 295:8
adds 233:2
adequate
248:1 249:8
269:18
adequately
237:22
adulterated
235:13, 17, 20
advised 257:17
affairs 260:4
afraid 281:16
agree 232:2
242:4 243:6
246:17 250:9,
14 252:23
253:6, 15
259:10
263:15
267:23 270:4
273:7 284:23
agreed 225:18
ahead 227:6
Alert 251:5, 6
ALFANO
221:3
allow 230:20
280:18 286:3
288:9 294:7

allowed
229:11, 12
allowing 266:8
ambiguous
265:19
America
251:10
amount
232:23 279:15
analytical
239:9
and/or 297:20
ANDA 240:18
animal 281:20
Answer 224:5
254:21 258:3
261:9, 12
262:18, 20
263:1 265:5,
8, 14, 21
266:5, 9, 23
268:23 279:14
answered
254:15 255:3
256:1 260:13
answering
294:8
answers 266:2
300:8
ANTHONY
219:3
anybody 260:8
API 228:18
229:13, 18
235:12
236:13, 24
237:9 238:9,
10, 15 239:12
240:1, 12, 19
248:14
249:24 251:7,
12 285:22
apologized
231:11
apology 232:4
apparent
289:7
APPEARANC
ES 218:1
219:1 220:1
221:1

appearing
225:17
APPLIES
217:6
apply 297:18
appropriate
298:6
appropriately
239:11
approved
237:8, 16
238:24
239:12
240:16, 19
246:22
approximate
280:5
approximately
296:9
argument
282:4
article 244:2,
16 245:2, 16
286:17 287:1,
24 288:24
289:13, 24
291:6 294:5,
11, 23
asked 227:20
249:13
254:14 255:3
256:1 260:8,
13 261:10
asking 250:14
aslater@mazies
later.com
218:7
assess 237:22
Assessment
223:19 286:18
assignment
262:13
Assumes
252:21
253:12
254:13 255:2,
23
assurance
259:23
attached
298:12 300:11

attorney
298:16
August
226:20
227:13 230:9
234:16, 23
235:3 272:11
authored
245:16
authors
244:21, 23
245:4
available
282:18
Avenue 218:12
Average
294:17
aware 252:15,
17 253:7
254:7 256:11,
12 258:24
259:8, 12
264:19
267:21 283:16

< B >
back 229:24
232:1, 8
243:24
247:11, 17
249:16 250:4
252:11 269:3
272:17 274:6,
10 275:12
281:8 290:7
295:14, 22
background
259:13 260:9
ban 251:11
BARBARA
220:3
baschwartz@d
uanemorris.co
m 220:6
based 255:7
260:5 274:4
280:10, 12
295:9
Bates 230:17
236:17 271:5

beginning 217:15

begins 290:10

behalf 233:20, 21 234:6

believe 229:14 253:6, 16 265:6 267:17 268:12 273:17 285:2

best 241:9 280:5 283:3

better 266:13

beyond 261:5, 15 262:15

Board 261:18 262:1 263:23 265:9, 13 267:1 268:10

body 282:1

BOSICK 221:3

bottom 226:17, 21 227:14 228:1 230:18 294:2

Boulevard 218:21 219:9, 20

box 292:24

break 251:23, 24 252:8 275:9 295:13, 19

Bridge 219:4

Bridgeport 219:5

bring 291:4

bringing 233:15

business 260:5

< C >

calculation 280:13

CALDERON 218:3 244:9 275:20 292:19 293:10

California

220:17

calling 236:6

Calls 258:1 263:13 265:18 284:14, 21

CAMDEN 217:2

CAPA 241:5

carcinogen 238:8 281:20 282:3

carcinogenic 289:10 290:2 295:2

carcinogenicity 289:4

carefully 298:4

case 245:24 266:7, 15 281:17

CASES 217:7

cause 232:6 273:21

ccalderon@ma zieslater.com 218:7

CEMAT 261:1 264:13

Center 220:16

Centre 221:4

CEO 258:14, 22 259:5 260:18 268:11

certainly 266:16

CERTIFICAT E 297:2

certification 297:17

Certified 217:17 297:13

CERTIFY 297:5 300:5

certifying 297:21

cgeddis@mazie slater.com 218:8

cGMP 235:12 236:12 248:4, 7, 12, 19 249:23

chain 275:24

chair 262:1

chairman 261:17 263:22 265:9, 13 266:24 268:9

chance 291:17

change 227:22 228:19 229:9 231:11, 13, 18, 19 233:8 237:1, 2, 5, 9, 13 238:23, 24 239:13 240:14, 16 241:20, 21 272:24 299:4

changed 229:15

changes 236:23 239:16 298:11 300:10

channel 259:24 260:7

characteristics 286:12

characterizing 269:20

Charles 276:1, 17, 21 277:2, 4, 9, 13, 15, 18, 19 278:3, 8, 17 279:1 281:7, 16 283:7, 13, 17 284:12, 15, 19

CHARLESWA NG 223:17

CHARLIE 219:19

Check 221:18, 19

Chemical

223:19 286:18

Cherry 220:10

CHERYLL 218:3 229:21 234:8 243:22 269:1 270:11 272:16 275:13 286:2 287:4 290:6 292:17 293:21

Chicago 221:11

Chinese 222:19 226:6 279:18

chloride 227:23 229:6, 10 231:20 233:9, 14 237:3, 5, 13 238:16 239:24 240:10, 15 241:15, 20 251:8 273:2

CHRISTINA 219:3

CHRISTOPHE R 218:4

Chromatograp hy 244:17

Chuannan 251:13

citation 286:16, 21 294:4

cited 288:24 289:13 294:12, 23

citing 286:24

CIVIL 217:4

clarifications 241:3

clarify 228:4

clear 273:20

clearly 274:13 282:2

CMC 282:11

collect 260:19

College 219:9

come 229:24 243:24 282:11 295:14

coming 285:8

commission 300:21

common 248:2, 17 249:9

communicated 254:22

companies 257:5, 18 258:24 259:8

company 233:13, 18 234:3 240:20 257:12 265:14 276:22 282:4

company's 294:24

compared 272:14

comparison 289:18

compelling 282:16

complete 256:16

completion 297:8

complex 273:9, 10

compliance 246:24 250:21

compound 281:23

Concise 223:17 286:17

concluded 289:24 294:24 296:8

conclusion 236:6 263:14

conduct 260:4 261:2 274:1

conference 277:17 284:21

CONFIDENTI AL 217:8

confirm 238:13
confirming 278:16
confirms 279:3
conform 235:12
consider 238:2 239:1
considerable 289:3
considered 227:21 238:22 239:2 247:2
consistent 248:4, 19 249:11 289:6
consulted 276:18, 23 277:18 278:1, 3, 8 281:9
contaminant 228:13 282:12 285:1
contamination 228:9 284:20 285:18
Cont'd 219:1 220:1 221:1
content 240:4 259:9
contents 257:18 259:1 268:16
continual 291:24
continuation 225:14 295:8
continue 242:13
Continued 217:14 226:12
continues 237:18 274:22
control 231:11 271:8 297:20
controlled 239:11

controls 235:10
correct 228:9 229:6, 7, 13 231:20 233:24 234:5 235:5, 6 237:14, 15 238:17, 18 239:23 240:2, 9, 13 241:16 242:7 243:20, 21 245:5, 22 246:4, 14 248:14 250:1, 17 251:10 252:18 254:23 259:2, 9 263:11 270:20 271:19, 24 272:5 273:6 274:19 276:19, 20, 23 277:20 278:5, 18 279:7 283:14, 15, 19 285:19 287:1, 3 289:15 290:2, 5 295:3, 4 300:7
corrections 298:5, 7 300:10
corrective 242:14
correspond 280:8
correspondence 235:2
corresponding 262:6
Cosmetic 235:15
cost 231:14 232:6
costs 229:12 237:21

counsel 225:20 258:6 291:8
COURT 217:1 225:22 298:20
cover 230:2
creating 233:16
Crude 244:5
cured 281:24
currency 279:19
current 232:16, 20 233:2, 6 236:11 247:23 248:12 249:6, 22 269:16 272:22 280:10
cwhorton@rive romestre.com 219:21

< D >
daily 260:5 262:14 264:10 294:17
Danhua 244:23
DANNENBER G 219:3
date 217:16 225:7 298:9 300:16
dated 272:11 278:16 293:15 297:14
DAVID 218:20
david_hobbs@f leming-law.com 218:22
day 300:20
days 298:16
DCE-18001 290:10 293:18
De 219:20
Dear 249:19

decide 258:11, 15 267:13 268:3
decision 251:14 261:3 263:5 264:15
decisions 262:10
decomposition 238:21
deemed 298:19
Defendant 221:7, 12
Defendants 220:12, 18
degradant 238:5
degradants 238:4
degradation 238:22 239:1 271:14, 16
department 258:9 259:15, 16, 17, 18 260:3, 4, 23, 24 262:7, 8 263:3, 4 264:12, 13 267:10, 11 268:2 274:2
departments 258:10 261:2 262:6 263:5 264:14 267:12 268:3
depend 268:5
depends 267:9
deponent 225:15 300:2
deposing 298:16
deposition 217:14 224:2 225:9, 17 266:7, 11 284:5, 10 295:10 296:8 297:6, 8, 9

298:3, 13, 17, 19
deps@golkow.c om 217:22
depth 271:10 274:14
DESCRIPTIO N 222:14 223:6 261:6 273:18, 20, 23
detail 234:24
detect 239:15
detectable 282:13
detected 227:21 239:11, 18 241:24 242:23
determine 247:6
developed 239:23 240:10
developing 239:14, 15
development 248:1 249:8 269:17 273:11, 14 274:23
Deviation 223:7 270:15 272:8 274:12 285:13 288:1 289:1, 14 290:9 293:14 294:12
deviations 236:11 248:11 249:21
Diaz 221:21 225:4
difference 272:15
differences 289:8
different 273:4, 17 290:21 292:8 293:8
differently 277:12

Confidential Information Subject to Protective Order

difficult 282:6, 24
digits 271:5
digress 229:22
dimension 233:2, 5 247:23 249:6 269:16 272:22 273:10
dimethylamine 228:22 232:23 238:5, 6
dimethylforma mide 228:20
dimethylnitros amine 281:19
direct 289:5 297:20
directing 291:10
Direction 224:5
Directors 261:18 262:2 263:23 265:9, 13 267:1 268:10
disagree 248:2 249:9
disclose 258:4 261:20
discovered 228:12
discovery 238:20
discuss 283:24 284:20
discussed 231:19 237:4 258:5 284:18
discussing 234:17 235:4
discussion 281:21 285:3
discussions 231:8
disease 282:20
DISTRICT 217:1

DMF 228:20 232:21, 24 237:11 238:3, 4, 22 239:1
DNA 289:6
DOCUMENT 217:6 223:20 227:2 229:24 234:19 235:5 241:18 243:23 244:10 245:8, 9 251:17 252:21 253:13 254:14 255:2, 24 264:20 266:14 267:21 269:2, 4 270:22 271:8, 18, 22 272:2 273:5, 12, 22 274:19, 21 275:14, 17 276:4, 8 280:19 285:6, 15 286:18 287:3, 11, 21 288:10, 12 289:22 290:4, 15 291:18 292:2 293:23
Documents 224:8 251:22 272:14 273:18 274:5 278:24 291:11
doing 291:9, 20 298:8
dollar 280:1
dollars 279:21 280:8
dominant 231:16 232:7
dose 240:2 258:19
Dr 221:16 260:11 261:20 281:8, 9, 15 283:18

draft 270:14 272:3 274:11
drinking 281:22
Drug 235:15 239:20 242:2, 5 243:1, 4, 12, 16
drugs 242:15 243:9 248:6 250:8, 10, 16
DU 217:14 222:5 225:15 226:8 231:10, 13 249:19 292:19 297:8 300:16
DUANE 220:1, 9
due 228:18 269:23 271:9
duly 226:5 297:5

< E >
e.g 282:18
early 271:11 274:15
East 220:10
effect 236:22
effected 245:20 246:12
effective 229:19
effort 243:18
EI 230:21 231:24
Eisenhower 218:5
either 239:2 278:23
E-mail 222:18 223:14 256:21, 22 257:4, 5, 16, 19, 23 259:1, 7, 9, 12, 14 260:10 261:21 262:21 263:10 264:1,

18 267:18 268:1, 4, 12, 16 275:24 278:15, 19, 20, 24 279:3, 9 281:6, 11, 13, 14, 15
Embarcadero 220:16
embedded 256:8
emphasize 273:24
employed 276:21
employee 245:5, 17
English 226:6
ensure 239:9, 20 242:2, 14 243:1, 18
ensuring 242:4 243:4, 13
entire 266:15
entitled 293:15
Environment 294:18
equivalent 279:20 280:11
errata 298:6, 9, 12, 15 300:12
ESQ 218:3, 4, 5, 11, 16, 20 219:3, 8, 13, 14, 19 220:3, 4, 9, 15 221:4, 10
EST 217:16
Establishment 223:13 230:7
evaluate 236:22 239:8, 19 242:1, 13, 24
evaluation 233:4 286:13
Evelyn 221:16 226:3
event 232:20

everybody 296:3
evidence 252:22 255:3, 23 282:1 289:3, 5
exact 280:9
exactly 282:7
EXAMINATIO N 226:12
examined 226:9
examples 236:19
exchange 279:24 280:11
Excuse 230:12 232:16
Excused 296:7
executive 231:10 233:22 234:3 261:18 262:12
Exhibit 226:16 227:12 229:23 230:3, 6, 12 232:8 234:9, 10, 14 244:8, 11, 15 251:18, 19 269:5, 8 270:12, 14 272:17 274:7, 11 275:15, 18, 23 276:12 278:11, 14 280:15, 16 281:5 285:7, 12 287:7, 8, 23 288:3, 4 290:7, 18 292:6, 7, 11, 12, 14, 20, 21 293:13
existence 254:2 256:11 257:3 259:1 264:20 267:21 268:16

existing
282:14
expect 282:15,
20
expires 300:21
explain 233:12
explanation
259:19
explanations
241:3
Exposure
294:17
exposures
282:3
extent 258:3
271:10 274:14
extra 233:5
247:23 249:6
269:15
272:21 273:9

< F >
facilities
235:10 258:19
facility 238:11
251:13
fact 268:18
269:21
facts 252:21
253:12
254:13 255:2,
8, 23
fail 298:18
failed 237:22
239:8
Failure 236:21
fake 235:22
FALKENBER
G 221:8
far 266:6
FARR 218:14
fast 229:19
fax 217:21
FDA 226:20
227:14, 20
229:5 230:7
231:8 232:14
233:11 235:8
237:7, 16, 18
238:19, 23
239:2, 7, 21

240:5, 8, 17,
20, 24 241:10,
12 246:22
247:8, 18
248:9 250:7,
18, 20 251:4,
15 252:15
253:7 254:6,
10, 23 255:18
256:20, 22
257:23
258:13
261:21
262:20, 21
263:7, 11
264:2 269:9,
20 272:5, 10,
11 273:4
282:20, 23
FDA's 234:9,
14 242:11
248:16
253:22 270:6
Federal
235:14
feedback
259:24
fhs@pietragall
o.com 221:6
field 277:23
fifth 272:18
financial
264:19
265:12 267:8
find 236:1
241:6 248:22
272:14
280:19 291:1,
14
Fine 280:24
finished 231:1
240:2 258:19
271:2
FIRM 218:14
219:8 231:16
251:4
first 226:18
227:7 230:2
234:21, 22
248:9, 15
249:15, 16

251:2 261:24
264:9 272:1
278:12, 15
281:12, 14
284:23 286:2
FLEMING
218:20
Floor 218:5
221:5
Florida
218:17
219:15, 20
fluctuates
280:2
focus 243:3
follow 243:8
following
281:7
follows 226:6,
10
Food 235:14
foregoing
297:17 300:6
foreseeing
233:7 272:23
form 233:1
238:3, 8
243:11 246:6,
16 252:20
253:12
254:12 255:1
258:1 260:13
261:23
262:24
263:13 264:5,
22 265:18
277:22
279:23
283:21 300:10
formal 242:20
259:23
format 272:3
formation
237:23
238:21
247:21 249:4
269:14 289:6
formed 229:5
forth 281:8
forwards
283:8

found 228:4
280:21
281:23 289:13
Foundation
279:5 283:21
fourth 234:22
250:5 269:3
Francisco
220:17
FRANK 221:4
fraud 235:22
FREEMAN
218:1
Front 219:4
285:15
287:14 293:2
FUJIMAKI
219:13
full 251:2
fully 239:18
242:1, 24
259:8
further
231:13 233:2
271:15 295:6

< G >
Garland
221:16 226:4
Gdherrold@du
anemorris.com
220:11
GEDDIS
218:4
general 273:23
generated
228:23
genotoxic
233:4 270:2,
17 271:13
274:17 275:2
293:17
GEORGE
218:16
getting 290:15
give 226:24
234:18 245:7
276:3, 13
280:4, 6, 22
290:11 291:16

given 282:8
284:6 297:6
300:8
Glaxo 276:22
GMP 247:1
250:22
go 227:6
229:22 230:1,
16 232:1, 8
234:7 236:15
243:23 244:2,
6, 19 247:11
249:16 250:4,
23 251:18
252:3 268:24
269:3 270:12
271:4 272:17
274:6 275:4,
14 280:14
285:6, 10, 23
286:1 287:22
288:14 290:7
292:6, 23
295:14
goes 292:2
Going 236:8
247:17 258:4
266:6 274:10
291:4
GOLDBERG
220:3 236:4
243:10 246:5,
15 251:21
252:2, 19
253:11
254:11, 24
255:22
257:24
260:12
261:22
262:23
263:12 264:4,
21 265:17
277:21 279:4,
22 283:20
288:18 291:8,
22 295:12, 23
GOLDENBER
G 218:11
GOLKOW
217:21 225:5

Confidential Information Subject to Protective Order

good 236:11 248:12 249:22 283:1
Gorda 218:17
GORDON 221:3
gradually 275:3
Gray 217:16 225:23 297:12
GREENBERG 220:15
GREGORY 220:9
GRIFFITH 218:4
groundwater 281:24
group 284:18
gwilliamson@farr.com 218:18

< H >
half 266:13
halfway 227:5
handle 268:4
HANNAH 219:13
happens 282:22
Happy 222:19
Heading 249:2 269:11 286:10 294:20
Health 286:20 287:24 289:23 294:4, 11, 22
Healthcare 220:13
hear 282:16
held 217:15 225:10
Hello 223:16
Help 223:17 281:17 292:17
HERROLD 220:9

hfujimaki@forthepeople.com 219:16
high 262:3 282:8
higher 239:17 241:23 242:22
highly 289:10 290:1 295:1
Hill 220:10
HOBBS 218:20
Hold 230:11 231:21 271:20 287:10 288:6, 16 290:11
holder 240:19
holding 235:12 280:9
HOLLIS 219:8
HON 217:6
Hope 283:2
hours 266:14
Houston 218:21
Huahai 220:12, 13 255:15 257:3, 17 258:23 259:6 260:3 268:12
Hughes 221:19
human 238:7 282:2 294:16
Humana 221:12
humans 289:11 290:2 295:2
hydrochloric 228:24
hypothetical 254:17 256:15

< I >
idea 280:5
Identification 222:16 244:4, 11 275:18

identified 238:10, 14 291:6
identify 247:6 291:5
II 217:8
Illinois 221:11
immediately 263:11
imperative 298:14
implemented 237:24 239:24 240:11
Import 251:4, 6, 11
important 242:6 243:7
improve 229:16 237:19
improvement 241:4
Impurities 222:16 233:5 237:24 238:3 239:10, 15, 18, 19 241:24 242:1, 23, 24 244:5 245:20 246:3, 13 270:2 271:13 274:17 275:2
impurity 228:14 229:11 233:7 239:3 267:20 268:15 270:17 272:24 285:21 293:17
impurity/degradant 228:21 232:24
included 237:10
including 238:4 241:2
increase 229:12 237:20
independently 277:10

in-depth 274:24
INDEX 224:2
indicated 248:10
Industries 220:19
industry 233:6 247:23 248:3, 18 249:6, 10 269:16 272:22
influence 267:5
INFORMATION 217:8 254:9, 22 258:2, 5, 12, 18 260:6, 20 261:11 262:19 265:11, 16 272:4, 9 283:17
informed 235:8
ingredients 236:13 248:13 249:24
Inspection 223:13 227:18 230:7, 8 250:18 253:24
inspections 250:20
instituted 233:14
instruct 266:4
INSTRUCTIONS 298:1
insufficient 269:24 270:1 271:9, 11 273:15 274:14, 16
Intake/Exposure 294:18
intend 257:22 264:17

intention 237:19
interaction 289:5
interactions 284:11
interested 282:22
interfere 264:10
interim 262:13
International 223:19 286:17
Interpreter 221:16, 18, 19 225:24 257:8, 9
intervene 267:2
introduced 228:20 277:5, 10
introduction 245:15
Investigation 223:7 227:19 228:16 238:6 261:3 270:15, 16 272:8 274:2, 2 285:13, 20 288:2 289:1, 14 293:14, 16 294:12
investigators 231:9
involved 235:22 262:4 272:7

IRBESARTAN 217:4 225:12
IRIS 219:8
isimpson@hollislawfirm.com 219:11
Island 219:14
Isolation 222:14 244:3

issue 228:11
259:20, 21
260:1 275:2
issues 264:15
its 228:21
251:7 259:1
289:13
IVES 221:8

< J >
JACKSON
219:14
JERSEY
217:1 218:6
220:10
JEZ 218:20
Jim 281:6, 10
283:3, 7
Jing 222:17
Jinsheng
256:11 257:4,
16, 23 260:11
261:20
job 261:6, 16
262:16
Journal
244:17 245:3
jslater@mazies
later.com
218:9
Judge 266:17
judging
241:20 287:2
290:3
judgment
263:20 268:6
Judy 221:21
225:4
JULIA 218:5
July 230:8
252:16 253:9
254:9 255:19
256:21 257:4,
15, 22 260:10
261:20
263:10
264:18
267:18
278:13 283:7,
14 293:15

JUN 217:14
222:5 225:15
226:8 231:10
288:19 297:8
300:16
June 254:3
256:13
283:14 297:14

< K >
Kansas 219:10
KATE 220:15
KATHERINE
221:10
KATZ 218:1
Keep 227:8
230:22
245:11
270:23
280:24 282:5
286:6 291:2, 9
keeping 292:3
key 227:17
knew 253:8
255:20
know 235:17
249:11 259:7,
13 268:15
272:6 277:4,
9 278:7, 22
279:7, 12
282:22 283:22
knowledge
243:17
245:10
252:16 254:1
255:8 261:14
263:19 268:8
273:16 278:9
283:24 284:3
known 253:17
KPG@falkenbe
rgives.com
221:12
KUGLER
217:7

< L >
Laboratories
221:8

laboratory
289:4
lack 273:16
289:7
language
271:23
274:10, 18
289:12, 20
LaSalle 218:12
LAW 218:11,
14 219:8
LAWYER'S
301:1
learned 283:18
leave 282:17
led 229:10
legal 225:5
236:6 263:13
Leon 219:20
Letter 223:11
226:19
227:13, 16
228:1 229:8
232:10, 14, 19
233:12, 22
234:2, 6, 15,
16 235:3, 4,
24 236:10, 16
239:5, 7
240:4, 24
241:2, 8
242:11, 18
247:12, 13, 18
248:9, 10, 20,
23 249:16, 17,
21 250:3, 6,
13, 24 252:14
253:22 269:9
270:7 272:10
273:19
level 262:3, 9
levels 239:17
241:24
242:23
281:22 282:8,
13
Li 276:18, 23
277:6, 11, 13
278:8 284:6,
15, 20

LIABILITY
217:5 225:12
life-
threatening
282:19
Limited 221:8
251:13
Lin 256:21
257:4, 16, 23
260:11 261:21
LINE 224:6, 9,
12, 15 272:18
299:4 301:2
lines 253:20
link 276:5, 10
280:20 283:8
287:12 288:7
290:21
Liquid 244:17
Li's 284:9
literally 291:4
LITIGATION
217:5, 21
225:6, 13
little 292:23
LLC 218:1
220:13, 19
LLP 218:20
219:19 220:1,
9, 15 221:3, 8
logic 233:3
long 251:24
look 226:17
227:1, 7, 14
230:11 232:9,
11 236:18
269:10 291:17
looked 273:13,
22 294:5
Looking
227:12 230:6
231:3, 6
232:18
241:19
244:15
245:15
247:16 269:8
271:7 275:23
278:11, 14
281:5 285:12
288:23

293:13 294:2,
13
LOSARTAN
217:4 225:11
lose 243:24
lots 281:21
lower 237:21
LOWEY
219:3

< M >
MacDonald
281:6, 8, 10,
15 283:8, 18
making 239:16
manage
262:14
manufacture
240:1
manufactured
238:11, 16
240:12
246:11 247:7
251:8
manufacturer
229:18
243:13, 16
246:20
manufactures
246:21
manufacturing
235:11
236:12, 23
237:20 238:9
239:16, 22
240:9, 11, 18
241:13, 15, 17
243:9 246:23
247:22
248:12 249:5,
22 250:19
251:12
259:17 269:15
Marked
224:14 230:3
234:10
244:10
251:19
275:17
280:16 287:8,
15 288:4

market
231:16 232:7
240:21 267:8
282:5, 18
markets
264:19 265:12
MARLENE
218:11
material
271:17
matter 225:10
268:18
MAZIE 218:1
MDL 217:2
225:13
mean 235:20
279:11
meaning
235:13
means 235:18
297:19
meant 235:21
meats 281:24
medical 245:3
meet 277:13,
15
meeting
282:23
mentioned
262:11
merely 250:13
MESTRE
219:19
met 277:17
metabolism
289:9
methods
235:9 239:9,
14
mgriffith@maz
ieslater.com
218:8
Miami 219:20
MICHAEL
218:4
Michelle
217:16
225:23 297:12
middle 231:7
234:21 281:12

Min 276:18,
23 277:6, 11,
13 278:8
284:6, 9, 15, 20
minimally
282:12
Minneapolis
218:12
Minnesota
218:12
minute 295:13
minutes
295:15
Mischaracteriz
es 252:20
253:13
254:13 255:1,
24
Misstates
243:11
mjgoldenberg
@goldenbergla
w.com 218:13
moment
229:22 287:6
money 231:13
Monroe
221:10
MORGAN
219:13
MORRIS
220:1, 9
motion 295:9
moving 266:1
multiple
252:17
mutagenic
237:23 238:2
Mylan 221:7

< N >
N.V 221:7
name 225:4
NDEA 228:5,
12, 13 246:13
268:15
NDMA
223:20
227:20 228:5,
17 229:5, 11
232:20 233:1,

16 238:8, 10,
13, 15, 21
246:13 247:9,
10, 21 249:4
252:18
253:10 254:2,
8 255:20
256:11, 13
267:20
268:15
269:14 278:9
281:18
284:20, 24
286:11, 13
289:4, 9
290:1 295:1
necessary
255:11
258:11, 15
260:19 298:4
need 239:8
243:7 265:15
266:22 281:2
290:24
needed 243:8
needs 242:5
Nesbit 218:16
never 245:8
278:20
NEW 217:1
218:6 220:10
222:19
237:24
239:17
241:23
242:22 266:20
Nie 222:17
nine 279:2
nitrite 228:7,
24
nitrosamine
228:8 246:3,
13 285:18
nitrous
228:23
232:21 233:1
N-
nitrosodimethy
lamine 286:19
NOLEN

218:20
normal 229:20
Notary
217:17
297:14 300:23
note 236:4
265:23
noted 225:20
298:11 300:11
NOTES 301:1
notice 217:15
notified 254:6
255:18
256:20 257:2
November
234:15 235:9
237:8 247:18
252:14 253:7
254:5, 23
269:9 278:16
279:1 285:14
number
230:13, 17
236:20, 21
241:21 244:8
249:2 269:11
271:5 275:15
276:9, 12
280:9 290:18
292:6, 14, 15
293:1

< O >
Oak 218:21
oath 226:1
objection
236:5 243:10
246:5, 15
252:19
253:11
254:11, 12, 24
255:22
257:24 258:1
260:12
261:22
262:23
263:12 264:4,
21 265:17
277:21 279:4,
22 283:20

obscured
233:7 272:23
occurred
237:12
official 242:19
259:23, 24
260:7 270:8
272:2 285:16
286:23 294:24
oh 269:1
Okay 251:16
288:8 291:15
296:2
Once 242:17
ongoing 238:6
open 276:4
287:11
opened 290:20
operations
262:15
264:11 267:3
opined 238:19
opinion 241:7
242:11, 16
246:18
252:24
253:15 274:3
opinions 241:4
opportunity
297:8
ORDER
217:8 266:2
Organization
286:20
287:24
289:24 294:4,
11, 23
original
242:12 298:15
outset 269:23
outside 266:6
277:5
Overland
219:10
owing 289:3
Oxford 221:4

< P >
P.A 218:14
P.C 219:3

Confidential Information Subject to Protective Order

p.m 295:21
296:5, 9
PA 219:8
packing
235:11
PAGE 222:14
223:6 224:6,
9, 12, 15
226:18
227:15
230:17, 18
231:7, 22
232:9, 12, 15,
19 234:22
236:16, 18
244:20 248:9
249:15, 16
250:5, 23
251:3 269:3
271:21
272:17
278:12, 15
281:12
285:24 286:2,
5, 10, 11, 15
288:14, 15, 17,
21, 24 291:1,
5, 14, 18, 21
292:12, 20
293:3, 4, 22
294:3, 8, 20
299:4 301:2
pages 290:24
293:9 300:6
paid 278:17,
23 279:1
paragraph
226:18, 21
227:15 231:4,
6 232:12, 15,
18 234:22
236:8, 9
239:4, 6
241:23
242:22
247:19
248:15, 21, 24
249:2, 14, 18
250:2 251:2,
3 269:10
270:5 272:18

274:22
286:16 294:3
Park 219:10
Parkway
218:5
part 231:9
237:13 243:4
245:16
266:13 271:9
290:9
participate
262:4
particularly
281:17
parties 225:16
passed 250:20
patient 243:19
patients
239:20 242:3,
5 243:2, 5, 9
267:19 268:14
PCRC 237:9
Pennsylvania
219:5 220:5
221:5
people 252:17
253:8 254:7
255:19 262:8
276:1 292:3
Perfect
230:19
247:14 269:6
period 283:13
permissible
281:21
person 284:1
personal
241:9 242:15
268:6 270:9
274:3
personnel
253:21 256:10
ph 217:21
Ph.D 277:20
281:7
Pharma
220:20

Pharmaceutical
220:12, 13, 19

236:13
248:13 249:23
Pharmaceutical
s 220:19
221:7 245:19
Phil 221:19
Philadelphia
220:5

Physiochemical
286:12
PIETRAGALL
O 221:3
Pine 219:14
Pittsburgh
221:5
place 250:19
placed 251:4
Plaintiffs
218:9, 14, 18,
23 219:6, 11,
17, 22
plan 282:11
Plantation
219:15
please 226:18
227:9 229:23
230:20, 23
232:9, 12
240:6 241:7
245:7 246:8
247:12
250:24 269:4
270:12, 24
276:7 277:7
280:6, 15
284:7 285:24
286:3, 7
287:7 288:14
290:8 291:2
292:18
293:21 294:7
298:3, 8
PLLC 218:11
PLOMINSKI-
GLOEDE
221:10
point 248:24
259:19
pointed 239:21

Ponce 219:20
portion 265:24
posed 266:3
position 283:1
possible
231:15 287:5
Post 218:21
potential
233:4 236:22
237:23 238:2
271:12
274:17 275:1
practice
229:20 233:6
236:12
247:24 248:3,
12, 18 249:7,
10, 22 269:16
272:23 295:9
precluded
251:6
predict 282:24
predicting
247:21 249:4
269:13
prepared
285:14, 17
286:24
presence
228:17 229:2
245:20 246:3,
12
PRESENT
221:15
president
231:10
233:23 234:3
261:19 262:12
pretty 281:19
282:1
previous
273:12, 21
previously
226:5, 9
230:3 234:10
251:19
280:16 287:8
288:4
primary 238:4
Prinston
220:12

223:14
240:18
255:15 257:2,
16 258:17, 22
259:5 260:2
268:11
Prinston001623
73 230:18
prior 235:4
250:20 254:3,
19
privileged
258:2
probable
238:7 294:16
probably
282:10
problem
274:13 287:16
Process
222:16
227:21, 22, 23
228:6, 18
229:6, 10, 11,
15, 17 231:18,
20 233:8, 9,
10, 14 236:23
237:3, 5, 9, 13,
20 238:1, 9,
17, 23, 24
239:13, 23, 24
240:11, 13, 14,
15 241:16, 17,
20, 21 244:4
246:22
247:22, 24
249:5, 7
251:9 254:3
269:15, 17, 24
271:10
272:24 273:1,
2 274:14
285:22
processes
239:17 240:9
241:13
processing
235:11
produce
248:6 250:9

Confidential Information Subject to Protective Order

produces 250:*11, 16*
product 229:*2*
237:*20*
240:*20*
243:*14, 20*
246:*19, 21*
247:*1, 2, 5, 8*
271:*14* 282:*5,
14, 17, 18*
283:*1*
Production
224:*8* 237:*21*
PRODUCTS
217:*4* 225:*12*
251:*12*
271:*14, 16*
281:*22*
Professional
217:*16* 262:*9*
263:*19*
283:*23* 284:*2*
297:*12*
profile 282:*6*
progress
274:*23*
propounded
300:*9*

PROTECTIVE
217:*8* 266:*1*
provide
257:*22*
259:*18* 260:*9*
262:*21*
263:*10* 265:*6*
267:*7* 270:*9*
274:*3* 279:*14*
provided
240:*24*
242:*19*
254:*10* 255:*6*
256:*22* 257:*4,
15* 261:*10*
262:*19* 263:*6*
264:*2* 270:*7*
289:*17*
Public 217:*18*
267:*19*
268:*13*
297:*14* 300:*23*

publicly
264:*18* 265:*14*
published
244:*16* 245:*3*
286:*19*
pull 287:*6*
Punta 218:*17*
purpose
231:*12*
pursuant
217:*14*
pursue 229:*18*
put 229:*14*
243:*14* 256:*2*
293:*1*

< Q >
QA 258:*9*
259:*15* 260:*3,
23* 263:*3*
264:*12* 268:*2*
274:*2*
QC 258:*9*
259:*15*
260:*23* 263:*3*
264:*13* 268:*2*
qualitative
289:*7*
quality
236:*24*
245:*18* 246:*1,
10, 20* 247:*3*
248:*5* 250:*8,
10, 15* 259:*20,
23* 262:*8*
267:*9*
quenching
228:*7* 229:*1*
question
227:*5* 228:*10*
236:*5* 240:*7*
241:*1* 242:*9*
246:*8* 250:*12*
254:*17* 255:*5,
12* 256:*4, 5, 9,
15, 17* 258:*8*
259:*4* 260:*16*
261:*9, 12*
263:*2* 264:*7,
24* 265:*18, 22*
266:*3, 21, 23*

268:*19* 277:*8*
279:*13* 284:*8*
294:*8*
Questions
224:*14*
227:*17*
240:*23*
242:*18* 253:*2,
20, 23* 266:*10*
278:*5* 295:*6,
24* 300:*8*
quote 227:*19*
289:*17*
quoted 242:*9*
248:*16, 22*
250:*2* 270:*6*
274:*20* 289:*21*
quoting
227:*19* 250:*13*

< R >
R&D 273:*13*
raised 240:*23*
242:*18* 254:*17*
range 280:*7*
RASPANTI
221:*3*
rate 280:*1, 11*
ravanderhyden
@duanemorris.
com 220:*7*
raw 271:*17*
RAYMOND
220:*4*
RBK/JS 217:*5*
reaction
271:*13, 16*
reactions
269:*22*
reacts 228:*22*
232:*21, 24*
read 235:*8*
240:*3* 245:*21*
249:*1* 259:*7*
272:*4, 10*
273:*5* 283:*4*
284:*10*
289:*20* 297:*9*
298:*3* 300:*5*
ready 227:*10*
230:*24*

234:*20*
245:*13* 271:*1*
276:*15* 281:*3*
286:*8* 288:*11,
20* 294:*9*
realize 233:*13*
realized
249:*12*
Realtime
217:*17* 297:*13*
reason 228:*17*
269:*22* 270:*3*
273:*15, 21*
282:*17* 285:*9*
298:*5* 299:*6,
8, 10, 12, 14, 16,
18, 20, 22, 24*
recall 282:*13,
21*
recalled 283:*9*
receipt 235:*1*
298:*17*
receive
258:*18*
259:*22* 260:*6*
reciting 231:*7*
recommend
282:*10*
record 225:*3,
21* 244:*7*
252:*4, 7, 11*
265:*24* 275:*5,
8, 12* 295:*15,
18, 22* 296:*6*
297:*6*
reduce 229:*12,
16*
reduction
231:*14* 232:*6*
refer 241:*11*
248:*7*
reference
291:*24*
referenced
288:*1*
referred
236:*2* 240:*14*
241:*18* 249:*15*
referring
233:*17* 257:*6,

12* 277:*24*
291:*15*
refers 240:*8*
241:*12*
reflect 260:*1*
reformulate
282:*14*
regard 240:*22*
242:*17*
252:*13* 256:*7*
258:*7* 267:*24*
269:*19* 278:*4*
285:*17*
regarding
242:*10* 253:*3*
270:*16*
285:*21* 293:*16*
regards 283:*3*
Registered
217:*16* 297:*12*
regulatory
260:*4*
related 241:*4*
244:*18*
258:*10* 261:*1*
263:*4* 264:*14*
267:*12* 268:*3*
278:*9*
release 264:*17*
265:*11, 15*
Relevance
264:*22*
relevant
245:*10*
253:*21*
256:*10*
259:*18* 268:*7*
remain
254:*18* 265:*2*
268:*21*
remind 248:*2*
249:*9*
remote
217:*14* 225:*9*
remotely
225:*17, 19*
remove 282:*11*
repeat 240:*6*
246:*8* 259:*3*
266:*23*

Confidential Information Subject to Protective Order

268:22 277:7
284:7 292:5
**rephrase**
231:5 232:13
233:20
236:20
237:17 239:5
241:11
247:16
255:16 265:7
278:13
**Report** 223:7,
9, 13 230:8,
21 231:24
258:12 263:6
267:8 270:15
274:12
285:14, 16
286:24 288:2
289:1, 14
290:9 293:14
294:13, 24
**Reporter**
217:17
225:22
297:13, 14, 21
**reports** 279:2
**Representing**
218:9, 14, 18,
23 219:6, 11,
17, 22 220:12,
18 221:7, 12
**reproduction**
297:19
**Request** 224:8
270:21 295:8
**requested**
297:6
**require** 247:8
**required**
238:7 247:22
249:5 269:15
**requirement**
248:19
**requirements**
246:24 248:4,
8
**requires** 273:9
**research**
269:24
271:10

273:10, 14
274:15 275:1
**residual**
232:21
**resort** 236:3
**respected**
277:19
**respond**
255:11 256:16
**responded**
228:11 253:2,
19, 22 256:5
260:16 264:7,
24 268:19
**response**
228:15 234:9,
16, 24 241:8,
10 242:8, 10,
12, 20 247:20
248:16 249:3
254:18, 19
255:4, 6
265:2 268:22
269:13, 21
270:5, 8
**responses**
241:1
**responsibilities**
261:16 262:16
**responsibility**
261:7
**responsible**
239:13 248:5
250:8, 9, 15
265:10
**retrospect**
228:4
**retrospectively**
238:19
**return** 298:15
**revealed**
228:16
**review** 230:21
234:19 241:7
245:8 270:22
271:2 276:14
280:22
288:10 290:12
**reviewed**
234:23

**reviewing**
231:1
**right** 227:4
233:16 234:4
237:3 241:19
243:24
250:11 252:6,
10 263:9, 17,
24 272:12
275:7, 11
279:3 280:6
287:17, 22
289:2, 22
293:5 295:7,
17, 21 296:5
**risk** 233:15
**RIVERO**
219:19
**rmb** 279:2, 11,
15, 16, 17, 18,
21 280:1, 7, 12
**Road** 219:14
**ROBERT**
217:6
**Roseland**
218:6
**Route** 220:10
**Routes** 294:16
**routine** 262:5
**rule** 243:7

**< S >**
**safe** 239:20
242:2, 5
243:1, 4
**safety** 242:14
243:18
245:18 246:1,
10 247:4, 6
sagoldberg@du
anemorris.com
220:6
**sale** 243:9
**San** 220:17
**save** 231:13
**saw** 248:19
**saying** 253:6
289:19
**says** 226:21
229:8 231:24
236:10 239:7

245:23
248:17
249:19, 20
250:7 251:4
273:8, 13
274:21
278:20 279:9
287:2 290:3
292:24
**scale** 281:18
**SCHWARTZ**
220:3
**science** 247:5
274:24
**scope** 261:5,
15 266:6
**screen** 226:15
230:10
234:13
270:19 285:9
290:22
**scroll** 286:4
288:16
290:24 293:3
294:7
**scrolling**
231:21
271:20 291:12
**second** 244:20
248:21
249:14, 18
286:15
**Secondly**
264:12 285:2
**seconds** 227:1
230:21
234:19 245:7
270:22 276:4,
14 280:22
288:10
**Section**
235:14
247:19 271:4,
7 294:15
**see** 227:24
230:9, 15
231:23
244:20, 22
245:1, 5, 6, 21
270:18
271:22 276:2,

9 281:11, 13,
14 283:4, 10
286:15, 21
287:18 288:7,
8 292:8
293:5, 7, 8, 11,
19 294:6, 10,
19
**seeing** 282:9
**seen** 245:9
278:20 284:5,
9, 13
**selling** 251:7
**sentence**
235:7 236:9
241:22
242:21 251:3
269:12
**September**
251:5
**serious** 282:19
**SERVICES**
217:21 225:6
**set** 247:9
**SETH** 220:3
**Shao** 221:16
226:3
**share** 231:17
232:7
**sheet** 298:7, 9,
12, 15 300:12
**short** 231:4
252:8 275:9
295:19
**Shorthand**
217:17 297:13
**showing**
283:8 290:22
**shown** 292:9
**side** 271:13
**sign** 297:9
298:8
**signed** 234:2, 5
**significant**
231:15
236:11
248:11 249:21
**significantly**
245:19 246:2,
12
**signing** 298:10

simple  279:*13,
14*  280:*13*
SIMPSON
219:*8*
single  236:*9*
292:*2*
situ  228:*23*
sjackson@forth
epeople.com
219:*17*
SLATER
218:*1, 3, 5*
222:*6*  226:*14,
22*  227:*3, 8,
11*  229:*21*
230:*5, 22*
231:*2*  234:*7,
12*  236:*7*
243:*22*
244:*13*
245:*11, 14*
246:*9*  247:*11,
15*  250:*23*
251:*1, 16*
252:*1, 3, 12*
253:*4*  254:*4,
20*  255:*13*
256:*18*
257:*13*
258:*21*  261:*8*
262:*17*  263:*8,
21*  264:*16*
265:*4*  266:*20*
267:*16*
268:*24*  269:*7*
270:*11, 13, 23*
271:*3*  272:*16,
20*  274:*6, 9*
275:*4, 13, 21,
22*  276:*6, 11,
16*  278:*2*
279:*10*  280:*3,
14, 24*  281:*4*
284:*4*  285:*5,
11, 23*  286:*6,
9*  287:*4, 13,
20*  288:*13, 22*
290:*6, 13, 19,
23*  291:*2, 19*
292:*10, 16*
293:*12, 21*

294:*1*  295:*5*
296:*2*
sodium  228:*7,
24*
Solco  220:*13*
255:*16*  257:*2,
16*  258:*23*
259:*6*  260:*2*
268:*11*
sold  240:*2, 13,
20*
solvent
228:*19*  237:*11*
sorry  226:*22*
sound  289:*16*
South  220:*4*
space  298:*6*
speak  277:*1*
speaking
238:*20*  283:*12*
species  289:*5*
species-specific
289:*8*
specific
236:*19*  267:*2,
5*
specifically
236:*2*  237:*7*
238:*1*  241:*14*
specification
260:*21*
specifics
236:*15*
259:*14*
260:*10, 21, 22*
272:*7*  279:*8*
speculated
253:*16*
speculation
255:*9*  256:*3,
8*  265:*19*
270:*10*
speculations
268:*6*
spent  266:*12*
spoke  284:*16*
stage  271:*11*
274:*15*
stamp  236:*17*
stand  255:*10*
279:*17*

standard
247:*10*
stands  279:*18*
start  226:*23*
227:*6*  232:*17*
243:*15*  257:*9*
starts  245:*17*
state  232:*5*
298:*5*
stated  228:*1*
231:*11, 12, 14*
statement
232:*3*  235:*24*
242:*9*  243:*21*
259:*11*
263:*16*
267:*24*
269:*20*  270:*5*
273:*8*  284:*24*
290:*4*
statements
274:*4*
STATES
217:*1*  228:*15*
231:*9*  232:*15,
19*  234:*23*
237:*7*  239:*5*
241:*23*
242:*22*
247:*20*  249:*3*
251:*9*  269:*12,
13*  271:*9, 19,
24*  273:*6*
274:*13*
279:*21*  289:*2*
stating  245:*17*
stenographic
225:*21*
step  229:*1, 3*
232:*22*
STEPHANIE
219:*14*
Stipulations
224:*11*
stop  238:*12*
stopped
251:*11*
stopping
291:*20*
STOY  221:*4*

strategy  233:*3*
271:*8*  282:*10*
Street  218:*16*
219:*4*  220:*4*
221:*10*
studied  271:*15*
study  248:*1*
249:*8*  269:*17*
270:*1*  271:*12*
274:*16*
SUBJECT
217:*8*  222:*19*
223:*16*  295:*7*
298:*10*
Subscribed
300:*19*
subsequent
229:*1*  235:*1*
295:*10*
substance
235:*23*  289:*9*
300:*11*
sufficient
242:*12*  282:*3*
suggest  282:*1*
suggesting
284:*17*
suitable
239:*14*
Suite  218:*12,
21*  219:*4, 9,
15*  220:*10, 16*
221:*10*
summarizes
236:*10*
248:*11*  249:*21*
supervision
297:*21*
SUPPORT
224:*2*
supposed
262:*14*
Sure  252:*1*
272:*13*
276:*24*  278:*6*
282:*7*
Suspected
293:*16*
sworn  225:*19*
226:*5, 9*

297:*5*  300:*19*

< T >
take  227:*1*
230:*11*
239:*19*  242:*2,
13*  243:*1*
251:*17, 23*
267:*6, 13, 15*
269:*1*  281:*2*
285:*5*  287:*5,
20, 21*  295:*12*
taken  217:*14*
talk  238:*13*
talked  248:*8*
talking  237:*2*
238:*14*
241:*14*  246:*19*
TEA  228:*6,
11*  285:*22*
technical
245:*10*
259:*14*  260:*9,
20, 22*  261:*14*
264:*15*
TECHNICIAN
221:*19*
Technologies
244:*18*
technology
259:*16*
260:*24*  262:*7*
267:*10*
tell  256:*9*
292:*13*
tells  281:*16*
term  229:*19*
terms  229:*5*
test  247:*9*
testified
226:*10*  284:*11*
Testimony
222:*3*  243:*11*
284:*6*  295:*9*
297:*6*
Teva  220:*18,
19*
Texas  218:*21*
text  236:*3*
Thank  230:*15*
244:*14*  252:*2*

275:*21* 295:*5,
11* 296:*1*
**Thanks** 296:*2*
**thing** 228:*3*
242:*6* 263:*9,
18, 24* 265:*10*
**things** 282:*23*
284:*1*
**think** 255:*10*
265:*10*
266:*17* 272:*1*
282:*9* 288:*18*
**thinking** 233:*3*
**third** 232:*11,
15* 244:*23*
247:*19* 249:*1*
269:*10* 272:*18*
**thirty** 298:*16*
**Thread**
222:*18* 223:*14*
**three** 244:*22*
257:*18*
258:*24* 259:*8*
271:*5* 284:*16,
18* 285:*3*
**time** 225:*8*
227:*9* 228:*11*
230:*23*
245:*11*
250:*18* 252:*5,
9* 270:*23*
275:*6, 10*
276:*6, 22*
280:*2* 281:*1,
2, 14, 18*
283:*13* 286:*4,
6* 290:*12*
291:*3, 7, 23,
24* 292:*2, 4*
295:*7, 16, 20*
296:*1, 4*
**times** 253:*3*
256:*6* 268:*20*
**title** 262:*11*
**titled** 244:*3*
270:*15* 271:*8*
286:*17* 294:*16*
**today** 255:*14,
17* 256:*6, 19*
257:*1, 14, 21*
**Today's** 225:*7*

**told** 229:*4*
233:*11* 272:*5,
11* 273:*3*
291:*13*
**top** 278:*12, 15*
286:*11*
288:*15, 23*
289:*2* 292:*24*
294:*20*
**topic** 253:*3*
**Tower** 219:*4*
**toxic** 238:*3*
**toxicological**
286:*13*
**toxicologist**
276:*18* 277:*20*
**toxicology**
278:*4, 10*
**toxin** 281:*20*
**trace** 232:*23*
**track** 227:*8*
230:*22* 281:*1*
291:*3*
**traded** 265:*14*
**transcript**
266:*1* 284:*10*
297:*9, 18*
298:*17, 19*
**transcription**
300:*7*
**translated**
226:*5*
**TRAURIG**
220:*15*
**treat** 282:*19*
**triethylamine**
227:*22* 228:*6*
233:*9* 273:*1*
**true** 269:*21*
297:*6*
**truthfully**
253:*24*
**try** 233:*12*
236:*1* 287:*6*
**tumor** 289:*6*
**turn** 236:*16*
286:*14* 293:*22*
**turned** 228:*7*
**two** 266:*13*
272:*14* 273:*18*

**two-minute**
251:*23*
**type** 259:*20*

< U >
**U.S** 220:*13*
240:*21*
255:*15* 257:*3,
17* 258:*23*
259:*6* 260:*3*
268:*12* 280:*1,
8*
**U.S.C** 235:*15*
**ultimate**
228:*17*
**ultimately**
268:*1*
**unanticipated**
239:*10*
**unaware**
271:*15*
**understand**
232:*4* 261:*15*
288:*12*
**understanding**
241:*10* 270:*1*
271:*12*
274:*16* 275:*1*
**understood**
269:*23* 275:*3*
**unexpected**
239:*3*
**unexpectedly**
228:*22*
**uniform**
235:*24*
**UNITED**
217:*1* 251:*9*
279:*21*
**Unknown**
270:*16* 285:*21*
**unnecessary**
291:*7*
**USA** 220:*19*
**USD** 280:*11*
**use** 237:*10*
290:*16*
**utilizing**
243:*17*
**utmost** 243:*17*

< V >
**Vague** 246:*6,
16* 265:*20*
**VALSARTAN**
217:*2* 225:*11*
228:*18*
229:*13* 237:*6,
9* 238:*9, 10,
15* 239:*12*
241:*16* 244:*5*
246:*1, 2, 11*
247:*22* 249:*5*
251:*7, 14*
252:*18*
253:*10* 254:*2,
8* 255:*20*
267:*20*
268:*14*
269:*14* 278:*9*
283:*9* 284:*21*
285:*19, 21*
293:*17*
**Vanaskie**
266:*18*
**VANDERHYD**
**EN** 220:*4*
**various** 278:*4*
**version** 287:*14*
**vice** 231:*10*
233:*23* 234:*3*
261:*17, 19*
262:*1, 12*
263:*22* 265:*9,
12* 266:*24*
268:*9*
**VICINAGE**
217:*2*
**video** 225:*9*
**Videoconferenc**
**e** 217:*15*
**VIDEOGRAP**
**HER** 225:*2, 5*
252:*5, 9*
275:*6, 10*
295:*16, 20*
296:*4*
**VIDEOTAPE**
221:*19*
**videotaped**
217:*14*

**view** 263:*24*
264:*1* 283:*2*
**VOLUME**
217:*8*

< W >
**Wang** 244:*23*
276:*1, 17, 21*
277:*2, 4, 9, 13,
16, 18, 19*
278:*3, 8, 17*
279:*1* 281:*7,
9, 16* 283:*7,
13, 17* 284:*12,
15, 19*
**want** 227:*14*
228:*3* 238:*12*
241:*6* 243:*3,
22* 244:*2*
261:*19*
262:*18, 20*
269:*10*
282:*15*
290:*14, 16*
**Warning**
223:*11*
235:*24*
236:*10* 240:*4,
23* 241:*2, 8*
247:*12, 13, 18*
248:*10, 20, 23*
249:*20* 250:*3,
13* 269:*9*
270:*6*
**waste** 229:*17*
**water** 281:*22*
**way** 229:*15*
243:*14* 248:*17*
**ways** 273:*17*
**WeChat**
284:*22* 285:*4*
**week** 259:*12*
**well** 227:*18*
241:*4* 255:*16*
261:*1* 267:*11*
268:*10*
271:*11* 273:*9*
274:*15, 20, 24*
283:*2, 18*
286:*7*

Confidential Information Subject to Protective Order

**well-known**
281:*20*
**went** 295:*2*
**We're** 252:*7,
10* 269:*1*
275:*11*
291:*23*
294:*13* 295:*21*
**WHORTON**
219:*19*
**WILLIAMSO
N** 218:*16*
**withdraw**
249:*12*
**Witness** 224:*5*
225:*18, 24*
226:*24*
227:*10*
230:*24*
243:*12*
245:*13* 246:*7,
17* 252:*23*
253:*14*
254:*16* 255:*4*
256:*2* 257:*11*
258:*7* 260:*15*
261:*24* 263:*1,
15* 264:*6, 23*
266:*5, 9, 22*
271:*1* 276:*8,
13* 277:*23*
279:*6, 24*
280:*18* 281:*3*
283:*22* 286:*3,
8* 287:*10, 18*
288:*6, 20*
290:*11, 17, 20*
291:*11, 17*
292:*5* 293:*7,
11* 295:*24*
297:*5, 6, 8*
298:*1*
**WITTLAKE**
220:*15*
**wittlakek@gtla
w.com** 220:*18*
**work** 277:*24*
278:*17*
**world** 231:*16*
232:*7* 286:*20*
287:*23*

289:*23* 294:*4,
10, 22*
**worthwhile**
267:*15*
**writes** 283:*7*
**writing**
233:*20, 22*
270:*8*
**written** 232:*5*
234:*15* 252:*14*
**wrote** 227:*16*
234:*1*

**< Y >**
**Yang** 221:*16*
226:*3, 4*
**Yeah** 227:*4*
**Year** 222:*19*
**Yesterday**
253:*1* 254:*15*
256:*1, 6*
260:*14, 17*
**yield** 229:*13,
16* 237:*21*

**< Z >**
**Zhejiang**
220:*12*
**ZHP** 222:*20*
223:*7, 10, 12*
229:*12*
233:*19, 21*
234:*1, 6*
239:*23* 240:*2,
10, 11, 13, 17,
24* 241:*7*
242:*6, 19*
243:*8* 244:*24*
245:*4, 17*
246:*11* 247:*7*
250:*9, 10, 15,
16* 251:*7*
252:*17* 253:*8,
17, 21* 254:*1,
6, 7, 21* 255:*6,
15, 18, 19*
256:*20* 257:*2,
15* 258:*20*
259:*18*
261:*18, 19*
262:*2* 263:*23*

267:*12*
268:*10*
269:*23* 270:*7*
272:*5* 276:*1*
277:*18* 278:*1,
3, 7, 18*
285:*17*
286:*24*
289:*13*
292:*20* 294:*12*
**ZHP0004388**
293:*24*
**ZHP00675949**
275:*14*
**ZHP01344162**
236:*17*
**ZHP-204**
223:*7* 287:*9*
**ZHP-212**
223:*7* 251:*20*
**ZHP-213**
223:*11* 234:*11*
**ZHP-312**
223:*13* 230:*4*
**ZHP-319**
223:*14* 280:*17*
**ZHP-321**
223:*17* 288:*5*
**ZHP-433**
222:*14* 244:*12*
**ZHP-434**
222:*18* 275:*19*
**ZHP's** 239:*22*
245:*24*
256:*10* 258:*8*
263:*3* 267:*5*
289:*1*
**zinc** 227:*23*
229:*6, 9*
231:*20* 233:*9,
14* 237:*3, 5,
13* 238:*16*
239:*24*
240:*10, 15*
241:*15, 19*
251:*8* 273:*1*
**Zoom** 217:*15*
218:*1* 219:*1*
220:*1* 221:*1*

# Exhibit 94

REDACTED

Confidential Information - Subject to Protective Order

1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEW JERSEY
2                    CAMDEN VICINAGE
3

     ****************************
4    IN RE:  VALSARTAN, LOSARTAN,   MDL No. 2875
     AND IRBESARTAN PRODUCTS
5    LIABILITY LITIGATION             Civil No.
                                      19-2875
6    ****************************  (RBK/JS)
     THIS DOCUMENT APPLIES TO ALL
7    CASES                            HON ROBERT B.
                                      KUGLER
8    ****************************
9              - CONFIDENTIAL INFORMATION -
               SUBJECT TO PROTECTIVE ORDER
10
11
12           Remote Videotaped via Zoom
13   Deposition of LIHONG (LINDA) LIN, commencing
14   at 7:05 a.m. China Standard Time, on the 5th
15   of May, 2021, before Maureen O'Connor
16   Pollard, Registered Diplomate Reporter,
17   Realtime Systems Administrator, Certified
18   Shorthand Reporter.
19
20                    - - -
21

            GOLKOW LITIGATION SERVICES
22      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
23
24

Confidential Information Subject to Protective Order

Page 126

1  APPEARANCES:  ALL PARTIES APPEARED REMOTELY
2
3  MAZIE SLATER KATZ & FREEMAN, LLC
   BY:  ADAM SLATER, ESQ.
4  BY:  CHERYLL A. CALDERON, ESQ.
   BY:  MICHAEL R. GRIFFITH, ESQ.
5  BY:  JULIA S. SLATER, ESQ.
   BY:  CHRISTOPHER GEDDIS, ESQ.
6     103 Eisenhower Parkway
      Roseland, New Jersey 07068
7     973-228-9898
      aslater@mazieslater.com
8     ccalderon@mazieslater.com
      cgeddis@mazieslater.com
9     mgriffith@mazieslater.com
      Representing the Plaintiffs
10
11 KANNER & WHITELEY, LLC
   BY:  LAYNE HILTON, ESQ.
12    701 Camp Street
      New Orleans, Louisiana 70130
13    504-524-5777
      l.hilton@kanner-law.com
14    Representing the Plaintiffs
15
   HOLLIS LAW FIRM
16 BY:  IRIS SIMPSON, ESQ.
      8101 College Boulevard, Suite 260
17    Overland Park, Kansas 66210
      800-701-3672
18    iris@hollislawfirm.com
      Representing the Plaintiffs
19
20 MORGAN & MORGAN
   BY:  STEPHANIE JACKSON, ESQ.
21 BY:  HANNAH FUJIMAKI, ESQ.
      20 North Orange Avenue, Suite 1600
22    Orlando, Florida 32801
      sjackson@forthepeople.com
23    hfujimaki@forthepeople.com
      Representing the Plaintiffs
24

Page 127

1
2  APPEARANCES (Continued):
3  FLEMING NOLAN JEZ, LLP
   BY:  DAVID HOBBS, ESQ.
4     2800 Post Oak Boulevard
      Houston, Texas 77056
5     713-621-7944
      david_hobbs@fleming-law.com
6     Representing the Plaintiffs
7  GREENBERG TRAURIG, LLP
   BY:  KATE M. WITTLAKE, ESQ.
8     4 Embarcadero Center, Suite 3000
      San Francisco, California 94111
9     415-655-1285
      wittlakek@gtlaw.com
10    Representing the Defendants Teva
      Pharmaceutical Industries, Ltd., Teva
11    Pharmaceuticals SA, Inc., Actavis LLC,
      and Actavis Pharma, Inc.
12
13 DUANE MORRIS, LLP
14 BY:  JESSICA PRISELAC, ESQ.
      600 Grant Street, Suite 5010
15    Pittsburgh, Pennsylvania 15219
      215-979-1159
16    jpriselac@duanemorris.com
      Representing the Defendants Zhejiang
17    Huahai Pharmaceutical Co., Ltd.,
      Prinston Pharmaceutical Inc., Huahai
18    U.S., Inc., and Solco Healthcare US,
      LLC
19 DUANE MORRIS, LLP
20 BY:  COLEEN W. HILL, ESQ.
      30 South 17th Street
21    Philadelphia, Pennsylvania 19103
      215-979-1164
22    cwhill@duanemorris.com
      Representing the Defendants Zhejiang
23    Huahai Pharmaceutical Co., Ltd.,
      Prinston Pharmaceutical Inc., Huahai
24    U.S., Inc., and Solco Healthcare US,
      LLC

Page 128

1  APPEARANCES (Continued):
2
   HUI ZHONG LAW FIRM
3  BY:  YIDAM LI, ESQ.
      Suite 1228, South Tower
4     Beijing Kerry Center
      1 Guanghua Road
5     Chaoyang District
      Beijing 100020, China
6     +86 10 5639 9688
7     Representing the Defendants Zhejiang
      Huahai Pharmaceutical Co., Ltd.,
8     Prinston Pharmaceutical Inc., Huahai
      U.S., Inc., and Solco Healthcare US,
9     LLC
10 CIPRIANI & WERNER, P.C.
11 BY:  ETHAN FELDMAN, ESQ.
      450 Sentry Parkway
12    Blue Bell, Pennsylvania 19422
      610-567-0700
13    efeldman@c-wlaw.com
      Representing the Defendant Aurobindo
14    Pharmaceuticals
15 Interpreter:  Evelyn Yang Garland
16
17 Check Interpreters:  Phil Hughes
               I Ching Ng
18
19 Videographer:  Judy Diaz
20
21
22
23
24

Page 129

1               INDEX
2  EXAMINATION                    PAGE
3  LIHONG (LINDA) LIN
4  BY MR. SLATER                  132
5
6
7          E X H I B I T S
8  NO.       DESCRIPTION           PAGE
9  ZHP-342   PowerPoint, July 27, 2017
             Jinsheng Lin Email,
10           N-Nitrosodimethylamine
             Occurs in Valsartan When
11           Quenched with Sodium
             Nitrite.....................  171
12
13
14
15
16
17
18
19
20
21
22
23
24

Confidential Information Subject to Protective Order

---

Page 130

- - -

## DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
PAGE  LINE
None.

Request for Production of Documents
PAGE  LINE
None.

Stipulations
PAGE  LINE
None.

Questions Marked Highly Confidential
PAGE  LINE
None.

---

Page 131

1          P R O C E E D I N G S

2

3          THE VIDEOGRAPHER:  We're now on

4   the record.

5          My name is Judy Diaz.  I am a

6   legal videographer for Golkow

7   Litigation Services.

8          Today's date is May 5, 2021,

9   and the time is 7:05 a.m.

10          This remote video deposition is

11   being held in the matter of Valsartan,

12   Losartan, and Irbesartan Products

13   Liability Litigation MDL.

14          The deponent is Lihong Lin.

15   This is a continuation.

16          All parties to this deposition

17   are appearing remotely and have agreed

18   to the witness being sworn in

19   remotely.

20          All counsel will be noted on

21   the stenographic record.

22          The court reporter is Maureen

23   Pollard and will now swear in the

24   interpreter.

---

Page 132

1          EVELYN YANG GARLAND, Interpreter,

2   having been duly sworn to translate the

3   proceedings to the best of her ability,

4   translated as follows:

5

6          LIHONG (LINDA) LIN,

7   having been previously remotely sworn to tell

8   the truth, was examined and testified as

9   follows through the interpreter:

10          MR. SLATER:  Chris, could you

11   put up Exhibit 202, please?

12          FURTHER EXAMINATION

13   BY MR. SLATER:

14          Q.    On the screen is Exhibit 202.

15   Do you see that?

16          A.    On the screen I see it, but the

17   font is really small, and it does not look

18   like there's any update.

19          Q.    On the screen is Exhibit 202.

20   Do you see that?  Yes or no.

21          A.    Yes, I see it.

---

Page 133

Confidential Information Subject to Protective Order



**Page 134**

3      MS. PRISELAC:  Objection.  The
4   document speaks for itself.

19      MR. SLATER:  All right.  Chris,
20   we can take that down.  I'm going to
21   now skip to Exhibit 195, please.  Make
22   it bigger.  Perfect.
23   BY MR. SLATER:

12      MS. PRISELAC:  Objection.

**Page 135**

3      MS. PRISELAC:  Objection.
4   I'd ask the interpreter to wait
5   until I have a moment to make an
6   objection.
7      So my first objection -- okay.
8   Now, Adam, if you can give a moment
9   until the exhibit is going to be
10   loaded, since you're not apparently
11   loading them before directing Chris to
12   do so, so that I and the witness have
13   a time -- have time to look at them.
14      It's up here now, but you go
15   into this without giving an
16   opportunity for the document to be
17   uploaded, and this one is quite long.
18      MR. SLATER:  Are you saying I
19   can't proceed, or are you telling me I
20   can proceed?
21      MS. PRISELAC:  I was just
22   asking you to give a moment before
23   it's actually uploaded.  Now it's
24   finally uploaded to mine.

**Page 136**

1   BY MR. SLATER:
2      Q.     You can answer the question,
3   please.

9      MR. SLATER:  Chris, can you
10   scroll down to the bottom part of the
11   page, please?  Perfect.  Thank you.

16      MS. PRISELAC:  Objection.  The
17   document speaks for itself.
18      So I'd just ask Ms. Garland
19   again to give me a moment to object
20   before you begin to translate.

24      MR. SLATER:  Chris, please go

**Page 137**

1   to the second page.
2   BY MR. SLATER:

8      MS. PRISELAC:  Objection.
9   Misstates the evidence, misinterprets
10   the document.  The document speaks
11   itself.

15      MR. SLATER:  Chris, please go
16   the page where the Bates number is
17   099.
18      Jessica, I don't think that the
19   interpreter needs to instruct my
20   instructions to Chris.  Do you care?
21      MS. PRISELAC:  No, that's fine.
22      Ms. Garland, you don't have to
23   do that.
24      THE INTERPRETER:  Okay.

Confidential Information Subject to Protective Order



Page 138

1    MR. SLATER:  Chris, do you have
2  that?  I want you to go to the
3  page 099, please.  It's the same
4  document.
5    MR. GEDDIS:  Sorry.  My Zoom
6  just turned off.  I'm sharing my thing
7  now.
8    MR. SLATER:  Okay.  Perfect.
9  Thank you.  Could you make it a little
10  bit bigger?
11  BY MR. SLATER:
17    MS. PRISELAC:  Objection.  The
18  document speaks for itself.  Objection
19  to completeness.
20    Could you just let me know what
21  page that's on?
22    MR. SLATER:  I said it.  099 is
23  the Bates number.
24    MS. PRISELAC:  Thank you.

Page 139

1    A.    Let me take a look at this
2  document, as I'm still looking for this page.
3    MS. PRISELAC:  It's page 34 of
4  the PDF.
5    (Pause.)
6    MR. SLATER:  Let's go off the
7  clock if she's going to look for a
8  while.  You can stay on the record,
9  we're just going to stop the clock on
10  the time, please.
11    A.    I see this page.  I need to
12  check the context.
13    (Witness reviewing document.)
14    A.    This page, I've read the
15  context.  I forgot the attorney's question
16  just now.
17    MR. SLATER:  We can go back on
18  the clock.
19  BY MR. SLATER:

Page 140

1    MS. PRISELAC:  Objection.
2  Completeness.  The document speaks for
3  itself.
4    You can go ahead and answer.
12    MS. PRISELAC:  Objection.
13  Argumentative.
14    She can answer.

Page 141

5  BY MR. SLATER:
6    Q.    However, my question was not
7  what you addressed.  My question is this.
8  I'll try to ask it a little differently,
9  maybe, to ask a better question.
14    MS. PRISELAC:  Objection.
15  Ambiguous.



Page 142

6      MS. PRISELAC:  Objection.
7  Compound, ambiguous.

20      MR. SLATER:  Let's take that
21  document down, Chris, and go to
22  Exhibit 205.
23  BY MR. SLATER:

Page 143

4      Do you see that?
5      MS. PRISELAC:  Objection.  The
6  document speaks for itself.
7      Also, I think we need a minute
8  for it to upload.
9  BY MR. SLATER:
10  Q.    Tell me when I can proceed,
11  please.

18      MS. PRISELAC:  Objection.  The
19  document speaks for itself.
20      MR. SLATER:  I'm going to
21  withdraw the question.
22      In the interest of time, Chris,
23  go, if you could, to 148 of 172.  The
24  last four Bates numbers are 7899.

Page 144

1      Wow, that was quick.  Good job.
2  Can you scroll down a little bit,
3  though?  No, the other way, the other
4  down.  Perfect, thank you.
5  BY MR. SLATER:

18      MS. PRISELAC:  Objection.  The
19  document speaks for itself.
20      You can answer.

Page 145

9      MS. PRISELAC:  Objection.  The
10  document speaks for itself.

Page 146

MR. SLATER: Let's go off the
clock.
MS. PRISELAC: Go back on the
clock.
MR. SLATER: I just didn't want
to interrupt while the translator was
speaking.
MS. PRISELAC: I understand.
Thanks.

Page 147

MS. PRISELAC: Objection.
Ambiguous, the document speaks for
itself.
She can answer.

Page 148

Page 149

MS. PRISELAC: Adam, this has
happened in every other deposition
where somebody knows some English,
where the witness was able to identify
maybe a specific technical term that
they're familiar with that may have
been mistranslated.
MR. SLATER: Let's go to the
next page, Chris, 365, please.
MS. PRISELAC: If you want to
ask Ms. Lin about her abilities under
oath, then you can do that rather than
cast aspersions.
MR. SLATER: I'm sorry. I
literally just want to go to the next
page.
BY MR. SLATER:



Confidential Information - Subject to Protective Order



Page 150

1
2          MS. PRISELAC:  Objection to
form.  The document speaks for itself.

17          MS. PRISELAC:  Objection.  The
18    document speaks for itself.
19          MR. SLATER:  I'm sorry, Evelyn.
20    Just one second.  I just want to reask
21    the question.  There was an objection,
22    so I'm going to ask it differently.
23    BY MR. SLATER:

Page 152

11          MS. PRISELAC:  Objection.
12    Foundation, the document speaks for
13    itself.

Page 151

7          MS. PRISELAC:  Objection.  The
8    document speaks for itself.
9    BY MR. SLATER:

That is my question.
13          MS. PRISELAC:  Objection.  The
14    document speaks for itself.
15          She can answer.
16

Page 153

6          MS. PRISELAC:  Objection.
7    Ambiguous.
8          I'm sorry, I wasn't finished.
9          I'm just going to reiterate my
10    standing objection from last night
11    also, which is that at this point
12    we're talking about her personal
13    testimony,

everything has been her
20    personal testimony unless we designate
21    it otherwise.
22          But she can go ahead and
23    answer.
24          And you don't have to repeat --

Confidential Information Subject to Protective Order



**Page 154**

1  you don't have to translate any of
2  that, Ms. Garland.
3       MR. SLATER:  I disagree.
4  BY MR. SLATER:
5       Q.    Please answer the question.

**Page 155**

1       MS. PRISELAC:  Objection.
2  Misstates the prior testimony and the
3  evidence.

**Page 156**

6       MS. PRISELAC:  Objection.
7  Argumentative, ambiguous, misstates
8  the evidence.
9       She can answer.

**Page 157**

11       MS. PRISELAC:  I think we've
12  been going a little over an hour.  Can
13  we take a break?
14       MR. SLATER:  Yes.  Let's go off
15  the record.
16       THE VIDEOGRAPHER:  The time
17  right now is 8:21 a.m.  We're now off
18  the record.
19       (Whereupon, a recess was
20  taken.)
21       THE VIDEOGRAPHER:  The time
22  right now is 8:38 a.m.  We're back on
23  the record.
24       ///

Confidential Information Subject to Protective Order

Page 158

1 BY MR. SLATER:

2 Q. The chemical reactions that
3 caused the NDMA to form in the zinc chloride
4 process were scientifically known to the
5 general scientific community by 2011,
6 correct?

7 MS. PRISELAC: Objection.
8 Ambiguous.

9 She can go ahead and answer.

10 A. Well, first, I'm not expert on
11 chemistry.



24 MS. PRISELAC: Objection.

Page 159

1 Misstates the prior testimony.

2 She can go ahead and answer.

14 MR. SLATER: Chris, put up
15 Exhibit 211, please. Thank you.

16 BY MR. SLATER:

20 Therefore, I'm showing you this
21 article from 2010, titled "Theoretical
22 Investigation of N-Nitrosodimethylamine
23 Formation from Nitrosation of
24 Trimethylamine."

Page 160

1 Do you see this article, which
2 was published in 2013 in the scientific
3 literature?

4 MS. PRISELAC: Objection to
5 form. Misstates prior testimony. The
6 document speaks for itself.

7 A. As I mentioned earlier, I'm not
8 a chemistry expert. I work on regulatory
9 affairs. Technical evaluation is the job
10 responsibility of our technical department.
11 With respect to this document, I did not see
12 it then.

13 MR. SLATER: Chris, please
14 scroll down to the "Introduction"
15 section, the bottom half of the page.
16 Perfect, perfect.

17 BY MR. SLATER:

18 Q. Looking now at Section 1, the
19 "Introduction," the second paragraph says,
20 "Because dialkylnitrosamines are of great
21 interest in carcinogenesis, much attention
22 has been focused on their formation
23 mechanism, especially from secondary amines.
24 Consequently, NDMA is generally believed to

Page 161

1 be formed from the reactions of
2 dimethylamine," which is DMA, "and
3 nitrosating agents, such as N2O3, N2O4 and
4 ONCl."

5 Do you see what I just read
6 from this 2010 scientific article?

7 MS. PRISELAC: Objection to
8 form. The document speaks for itself.

9 She can answer.

10 A. Well, first, I did not see this
11 before.

12 Second, here it says that DMA
13 may react with nitrosating agents to form
14 NDMA. It is only talking about DMA here.

15 BY MR. SLATER:

16 Q. The paragraph continues, "In
17 addition to secondary amines, however, a wide
18 variety of tertiary amines have also been
19 demonstrated to react with nitrous acid to
20 produce N-nitrosamines in aqueous solution."

21 Do you see what I just read?

22 That's my only question. Do you see what I
23 just read?

24 MS. PRISELAC: Objection to

Confidential Information Subject to Protective Order

Page 162

1    form.  The document speaks for itself.
2          Adam, are you contending that
3    this is still within her topics, or
4    can we both agree at this point that
5    you're well beyond that?
6          MR. SLATER:  We disagree.
7          MS. PRISELAC:  Okay.
8       A.    It feels like you're testing me
9    on my chemistry.  Just now I did see what is
10   written here.  Well, I feel all this is about
11   chemistry mechanisms.  This time here, I'm
12   not sure why you want me to read such
13   documents about chemical mechanisms.  No
14   matter what, I will try my best.
15   BY MR. SLATER:
16      Q.    Therefore, as of 2010, we see
17   at least one scientific article describing
18   exactly what happened to form the NDMA with
19   the zinc chloride process; DMA reacted with
20   nitrous acid and formed NDMA.

24          MS. PRISELAC:  Objection to

Page 163

1    form.  Foundation.  The document
2    speaks for itself, misstates the prior
3    testimony, outside the scope of the
4    30(b)(6) topics.
5          You can answer if you are able.

Page 164

3          MR. SLATER:  Chris, let's take
4    that down and go to Exhibit 197,
5    please.
6    BY MR. SLATER:
7       Q.    In front of you is Exhibit 197,
8    which is an article from the scientific
9    literature in 2009 titled
10   "N,N-Dimethylformamide: much more than a
11   solvent."
12          Do you see the document in
13   front of you?
14      A.    I see this document.
15          MR. SLATER:  Chris, let's go to
16   the third page of the document,
17   Section 3 on the right-hand side.  It
18   says "Source of carbon monoxide."
19   Perfect.
20      Q.    Looking now -- rephrase.
21          Looking at the third page,
22   which is page 8315 in the top right,
23   Section 3 says, "DMF decomposes slightly at
24   its boiling point to afford dimethylamine and

Page 165

1    carbon monoxide, this reaction occurring even
2    at room temperature in the presence of some
3    acidic or basic materials."
4          So this article from 2009
5    pointed out that DMF can decompose and give
6    off dimethylamine, correct?
7          MS. PRISELAC:  Objection.
8    Foundation, document speaks for
9    itself.
10      A.    Well, again, like I said
11   before, I am not an expert on chemistry.
12          DMF is a stable solvent that is
13   used widely in industry and in chemical
14   engineering.  Here it says that under acidic
15   or basic conditions, under room temperature
16   it is not stable.
17          This is what we did not know.
18   What we knew was that it is a good and stable
19   solvent, and I did not read this document
20   before.
21   BY MR. SLATER:

Confidential Information for Subject to Protective Order



**Page 166**

11    MS. PRISELAC:  Objection to
12  form.  Ambiguous, lack of foundation.

24    MS. PRISELAC:  Objection to

**Page 167**

1  form.  Lack of foundation,
2  argumentative.
3    You can answer.

16    MS. PRISELAC:  Objection to
17  form.  Ambiguous.
18    You can answer.

**Page 168**

5    MS. PRISELAC:  Objection.
6  Misstates the prior testimony, lack of
7  foundation, ambiguous.
8    You can answer.

23    MR. SLATER:  Let's take this
24  down and go to Exhibit 209.

**Page 169**

1  BY MR. SLATER:
2    Q.    On the screen is Exhibit --
3  rephrase.
4    Here we have Exhibit 209, "IARC
5  Monograph" --
6    MR. SLATER:  Chris, you have to
7  scroll up as I do this.  Let me start
8  over.
9    Q.    On the screen is Exhibit 209,
10  the IARC Monographs on the Evaluation of the
11  Carcinogenic Risk of Chemicals to Humans,
12  Some N-Nitroso Compounds, Volume 17.
13    If you'll scroll to the bottom,
14  please, you'll see that this is dated in
15  May 1978.
16    Do you see that document in
17  front of you?
18    A.    Yes, I see the document that
19  you shared, but with the link I have -- is it
20  a very large document?  It's taking a long
21  time for me to download it.
22    MR. SLATER:  Stop the timer.
23    Q.    Would you like to read the
24  document?  It is over 300 pages long, and I'm



Page 170

1  going to ask you about one sentence on
2  page 36.  But if you'd like to read the whole
3  thing, we can stop and give you time.
4      A.    I finished downloading, and I'm
5  on page 36 now.
6      MR. SLATER:  Okay.  We can
7  start the clock again.
8      Let's go to page 36, please,
9  Chris.  Perfect.
10     Q.    Looking at page 36 --
11     MR. SLATER:  Can you make this
12  a little bigger, Chris?  I'm sorry.
13  Perfect.
14     Q.    Looking now at page 36, the
15  third paragraph starts, "It has been known
16  since 1865 that the reaction of dimethylamine
17  hydrochlorothiazide with sodium nitrite at an
18  acidic pH yields N-nitrosodimethylamine,"
19  which is NDMA.
20     So that's been known since
21  1865, yet ZHP's technical people couldn't
22  figure that out in 2011, correct?
23     MS. PRISELAC:  Objection to
24  form.  Lack of foundation.  The

Page 171

1  document speaks for itself.
2      You can answer.
3      A.    Well, I don't work on the
4  technical work.  Based on this document, my
5  personal speculation here is that amine
6  reacts with nitroso agents to form NDMA.
7      MR. SLATER:  Let's take that
8  document down and put up that
9  PowerPoint slide that you have, Chris,
10  when you get a second.
11     (Whereupon, Exhibit Number
12  ZHP-342 was marked for
13  identification.)
14  BY MR. SLATER:

Page 172

1      MS. PRISELAC:  Objection to
2  form.  Lack of foundation, misstates
3  the prior testimony, and misstates the
4  evidence.  The e-mail -- the e-mail
5  speak for itself.
6      MR. SLATER:  I'm going to reask
7  the question.  I'm withdrawing the
8  question, so I'm going to ask it again
9  differently.
10  BY MR. SLATER:

19     MS. PRISELAC:  Objection to
20  form.  Misstates the prior testimony.
21  Lack of foundation.  The July 27, 2017
22  e-mail speaks for itself.
23     And she can answer if she can.

Page 173

Confidential Information Subject to Protective Order



Page 174

6      MS. PRISELAC:  Adam, are you
7  trying to admit this PowerPoint as an
8  exhibit?  What is this?
9      MR. SLATER:  It's an exhibit
10  I'm using during the deposition.  It's
11  Exhibit 342.
12      MS. PRISELAC:  What is it?
13  It's a PowerPoint you created?
14      MR. SLATER:  I didn't do it.
15      MS. PRISELAC:  What is it?
16      MR. SLATER:  Let's go off the
17  timer while we have this conversation.
18      MS. PRISELAC:  No, we don't
19  need to.
20      MR. SLATER:  Well, we are.
21      But I'm not sure -- I wouldn't
22  know how to create a PowerPoint.
23  Something else did, who is much more
24  savvy than me.  We thought it was

Page 175

1  pretty good.  It looks good, right?
2      MS. PRISELAC:  I don't
3  understand what it is, though.  I'm
4  asking for a proffer.  What is this?
5      MR. SLATER:  I asked a
6  question.  I used that as part of the
7  foundation for the question.  It's a
8  demonstrative exhibit.
9      MS. PRISELAC:  Well, I'm
10  objecting to the use of this.
11      Okay.  Go ahead, finish.
12      MR. SLATER:  I do it a lot, but
13  who knows, I could be wrong.
14      MS. PRISELAC:  I'm objecting to
15  the use of this.  And anyway, I'm also
16  objecting to the content as
17  misleading, mischaracterizes the
18  evidence, and, you know, misstates --
19  and, I'm sorry, lack of foundation.
20      So please go ahead.
21      MR. SLATER:  Go back on the
22  clock.
23  BY MR. SLATER:

Page 176

7      MS. PRISELAC:  Objection.
8  Misstates the prior testimony, lack of
9  foundation, ambiguous.
10      You can answer.
21      MS. PRISELAC:  Adam, if you're
22  not going to ask about what's on the
23  slide, then you need to take it down.
24  I know you're trying to harass the

Page 177

1  witness.
2      MR. SLATER:  You know, I'm
3  really not.  I don't --
4      MS. PRISELAC:  Then why are you
5  using it?  I'm asking for a proffer.
6      MR. SLATER:  You're not letting
7  me talk.  I'm sorry.
8      I'm questioning the witness
9  about the content of this e-mail.
10  That is what this line of questions is
11  about.
12      MS. PRISELAC:  Okay.  But you
13  don't have the e-mail up.  Where is
14  the e-mail?
15      MR. SLATER:  You just stopped
16  me again.
17      I believe this is an
18  appropriate demonstrative tool to use
19  in a deposition.  I'm going to proceed
20  now.
21      MS. PRISELAC:  It is absolutely
22  inappropriate when you have the actual
23  e-mail, and so I'm asking that you
24  take it down now.

Confidential Information Subject to Protective Order

Page 178

1    MR. SLATER: I'm not going to.
2    MS. PRISELAC: It's misleading,
3  intimidating, and harassing. You have
4  the e-mail. Put up the e-mail if you
5  want to show it to her.
6    MR. SLATER: I appreciate your
7  position. I'm going to continue the
8  deposition now.
9    MS. PRISELAC: I'm going to ask
10  you again to take it down.
11    MR. SLATER: Let's go off the
12  clock. Please go off the clock.
13    Now you can say whatever you
14  want. I just was afraid we were
15  eating up time with your discussion.
16    MS. PRISELAC: Why would this
17  be more appropriate than the actual
18  e-mail, which is the best evidence?
19  This is a misleading summary.
20    MR. SLATER: I don't believe
21  so, and it's something I do all the
22  time in my deposition --
23    MS. PRISELAC: It doesn't mean
24  it's right.

Page 179

1    MR. SLATER: I know that it's
2  late. You're interrupting me, though,
3  so it's hard for me to state my
4  position.
5    MS. PRISELAC: Keep going.
6    MR. SLATER: No, I'm just
7  saying I think it's totally
8  appropriate to use a demonstrative
9  exhibit. Under these circumstances I
10  don't think it's misleading, and I'd
11  like to continue the deposition.
12    MS. PRISELAC: How is it a
13  demonstrative exhibit if you're trying
14  to show the contents of an e-mail and
15  you have the actual e-mail?
16    MR. SLATER: This is what we do
17  as lawyers all the time in these
18  cases.
19    MS. PRISELAC: No, it's not
20  true. I hate when you say that. Give
21  me a rule. Give me the law. I gave
22  you the law.
23    MR. SLATER: I'm not going to
24  argue the rules of evidence with you.

Page 180

1  It's appropriate to use.
2    MS. PRISELAC: I think you have
3  to give me one, though.
4    MR. SLATER: I don't have to
5  give you anything. I need to continue
6  the deposition. I'm confident this is
7  appropriate.
8    There will be -- at the time
9  that we designate testimony for trial,
10  you'll have your objections and the
11  Court will rule. I understand that.
12    I just would like to continue
13  the deposition now, if I could,
14  please.
15    MS. PRISELAC: No, because it's
16  harassing to the witness and an
17  attempt to intimidate her. So take it
18  down.
19    MR. SLATER: So you're not
20  going to let the deposition continue?
21    Look, I don't appreciate how
22  you're talking to me, with all due
23  respect. Telling me to take it down I
24  don't think is appropriate.

Page 181

1    I'm going to continue the
2  deposition. I'm very comfortable that
3  what I'm doing is appropriate. This
4  is the basis for this line of
5  questioning that your witness brought
6  us into with many statements she made.
7    This is now questioning her on
8  her testimony, and I think I can
9  proceed.
10    So I'd really appreciate it if
11  we could go back on the clock and if I
12  could continue with these substantive
13  questions, please.
14    MS. PRISELAC: So are you
15  telling me now on the record you are
16  refusing -- let me make it clear --
17  you are refusing to put up the actual
18  e-mail, and instead are relying on --
19  only put up a slide made by you or
20  someone from your office to -- instead
21  of the actual e-mail in a line of
22  questioning that's about e-mail, even
23  though you have the e-mail?
24    Is that your position?

Page 182

1    MR. SLATER:  I mean, you can
2  characterize it any way you want.  I'm
3  using this PowerPoint slide for the
4  time being.  It's more efficient.  I
5  believe it's not misleading in any
6  way, and I'd like to continue, if I
7  could, please.
8    MS. PRISELAC:  You're using it
9  for what purpose exactly?
10    MR. SLATER:  I'm using it as a
11  demonstrative exhibit to help to
12  facilitate testimony of the deponent.
13    MS. PRISELAC:  Okay.  A
14  demonstrative exhibit.  Demonstrating
15  what?
16    MR. SLATER:  Honestly, with all
17  due respect, I'm done with this
18  question-and-answer.  I feel that I
19  don't need to go further.  I've given
20  as much information --
21    MS. PRISELAC:  I'm entitled to
22  ask of a demonstrative what are you
23  attempting to demonstrate?  Because I
24  believe the answer is the contents of

Page 183

1  the e-mail, which makes it an
2  inappropriate demonstrative.
3    MR. SLATER:  Okay.  Well, then
4  we have a disagreement on the --
5    MS. PRISELAC:  But I'd like to
6  get on the record for the judge what
7  you're trying to demonstrate.
8    MR. SLATER:  This is all on the
9  record.
10    MS. PRISELAC:  So tell me now
11  what you're trying to demonstrate
12  through this slide so it's on the
13  record, and we can take it up with the
14  judge.
15    MR. SLATER:  A portion of the
16  substantive content of the e-mail
17  that's directly relevant to the
18  question.
19    I'm not sure why you're
20  laughing.  I don't know why it's funny
21  to you.
22    MS. PRISELAC:  Okay.  Okay,
23  great.  I have the perfect answer
24  because it proves my point, so we'll

Page 184

1  take it up with the judge.
2    I'm going to tell Ms. Lin that
3  she should disregard and not look
4  whatsoever at this PowerPoint.  She
5  can answer your questions.
6    MR. SLATER:  I guess you can
7  tell your client whatever you want.  I
8  mean, I wouldn't stop you from telling
9  you her anything.  I don't have the
10  right to do that.
11    MS. PRISELAC:  Okay.  So we can
12  go back on the timer and back on the
13  record -- I mean, we're on the record,
14  but we can go back on the timer.
15    And, Ms. Garland, please direct
16  Ms. Lin not to look at this
17  PowerPoint, and to only listen to
18  Mr. Slater's questions.
19    MR. SLATER:  You don't need to
20  translate it.  Your client is nodding.
21  She understood everything you just
22  said.
23    MS. PRISELAC:  No, absolutely
24  not, Adam.  And if you want to cast

Page 185

1  aspersions again --
2    MR. SLATER:  Then go off the
3  clock again.  Don't start the clock
4  again.
5    MS. PRISELAC:  If you want to
6  cast aspersions about her language
7  abilities, that's fine.  But I'm
8  asking Ms. Garland to translate that
9  because she does not understand
10  English well.
11    MR. SLATER:  I'm sorry, that's
12  not an aspersion when I say somebody
13  understood.  I think it would be the
14  opposite.  I saw Ms. Lin nodding along
15  with you, so I assumed she understood
16  what you were saying.  It wasn't an
17  aspersion.
18    MS. PRISELAC:  Well, she didn't
19  say anything.
20    MR. SLATER:  We're off the
21  clock, so we can go back and forth all
22  you want.  I just want to try to
23  continue the deposition as I can.
24    MS. PRISELAC:  Well, and I want

Page 186

1  to make a record about your conduct
2  and your inappropriate exhibit, so...
3       MR. SLATER:  You know, you've
4  said this a lot of times about me to
5  try to create an impression about me.
6  I don't appreciate it.
7       MS. PRISELAC:  You're using an
8  inappropriate, harassing PowerPoint.
9  I think that's the first time this has
10  come up, Adam.
11      So, okay, Ms. Garland, if you
12  could please translate for the witness
13  that she should not view this
14  PowerPoint, and she should only listen
15  to your translation of Mr. Slater's
16  questions when she's answering
17  questions.  So thank you.
18      There's no pending question.
19      MR. SLATER:  I'm sorry,
20  Maureen, I can't remember what
21  happened before the colloquy, whether
22  I asked a question and there was no
23  answer or if an answer was given.
24      Can you tell me and read to me

Page 187

1  the last thing that happened?  I'd
2  appreciate that.
3       Oh, actually, you know what,
4  I'm going to save you the work.  I
5  just checked my notes and I
6  remembered.  Sorry about that,
7  Maureen.
8       Okay.  So we're on the clock
9  now.  We can go back on.  I'm going to
10  continue the questioning now.
11  BY MR. SLATER:
12  Q.   You testified that the --
13  rephrase.

22      MS. PRISELAC:  Objection.
23  Foundation, misstates the prior
24  testimony, ambiguous.

Page 188

23      MS. PRISELAC:  Objection to
24  form.  Lack of foundation.

Page 189

1       You can answer if you can.

24      MS. PRISELAC:  Is that a





Page 190

```
1      question?
2   BY MR. SLATER:
3      Q.   -- right?
4          MS. PRISELAC:  Objection to
5   form.  Lack of foundation.
6          You can answer if you can.
```

```
20          MS. PRISELAC:  Objection to
21   form.  Lack of foundation.
22          You can answer if you can.
```

Page 191

```
10          MS. PRISELAC:  Objection to
11   form.  Ambiguous, lack of foundation.
```

```
21          MS. PRISELAC:  Objection to
22   form.  Lack of foundation.
23          She can answer if she's able.
```

Page 192

```
6          MS. PRISELAC:  Objection to
7   form.
8          Is that a question.
9          MR. SLATER:  She asked me, so I
10   was answering.  I'll answer it
11   differently.  I'll start it over.
12   BY MR. SLATER:
```

```
17          MS. PRISELAC:  Objection to
18   form.  Lack of foundation, ambiguous.
19          She can answer if she's able.
```

Page 193

```
12          MS. PRISELAC:  Objection to
13   form.  Compound, ambiguous,
14   argumentative.
15          MR. SLATER:  I'll reask the
16   question differently.
17   BY MR. SLATER:
```

```
23          MS. PRISELAC:  Objection to
24   form.  Compound, ambiguous,
```

Confidential Information Subject to Protective Order



Page 194

1 argumentative.
2       She can answer if she's able.
3     A.    Well, this is a long question.
4 I did not hear it very clearly, and it sounds
5 like it involves several questions.  Could
6 you break it down to single questions?
7 BY MR. SLATER:

16       Is that your testimony?
17       MS. PRISELAC:  Objection to
18 form.  Compound, ambiguous, misstates
19 the prior testimony.
20       She can answer if she's able.

Page 195

6       MS. PRISELAC:  Adam, we've been
7 going like over an hour and a half.
8 Do you want to take a break?  I'd like
9 to ask you to take a break.
10       MR. SLATER:  I'd like to go
11 just a couple more minutes, and then
12 we'll hit a good break point.
13       MS. PRISELAC:  That's fine with
14 me if it's okay with the translator
15 and the witness.
16       THE INTERPRETER:  It's okay
17 with me.
18       And would you like me to check
19 with the witness?
20       MS. PRISELAC:  Yes.
21     A.    I'll do whatever my attorney
22 tells me to do.
23       MS. PRISELAC:  Okay.  Well,
24 then let's just -- five more minutes,

Page 196

1 Adam, that's fine.
2       MR. SLATER:  Sure.
3 BY MR. SLATER:

14       MS. PRISELAC:  Objection to
15 form.  Misstates the evidence, lack of
16 foundation, compound.
17       She can answer if she's able.

Page 197

2 BY MR. SLATER:
3     Q.    Can you please answer my
4 question?
5       MS. PRISELAC:  Objection to
6 form.
7 BY MR. SLATER:
8     Q.    I'll ask it again.

16       MS. PRISELAC:  Objection to
17 form.  Objection to the use of
18 Exhibit 342 rather than the actual
19 e-mail.  Mischaracterizes the
20 evidence.  Mischaracterizes the actual
21 exhibit.  Lack of foundation,
22 ambiguous, asked and answered.

Confidential Information Subject to Protective Order

Page 198

9  BY MR. SLATER:
10  Q.  Can you please answer my
11  question?
12  MS. PRISELAC:  Adam, we're way
13  past five minutes now, so can we take
14  a break?
15  MR. SLATER:  I realize that,
16  I'm just -- we can take a break.
17  MS. PRISELAC:  You can ask her
18  when we come back.
19  MR. SLATER:  It's fine.  We can
20  break.  Let's go off the record.
21  THE VIDEOGRAPHER:  The time
22  right now is 10:12 a.m.  We're now off
23  the record.
24  ///

Page 199

1  (Whereupon, a recess was
2  taken.)
3  THE VIDEOGRAPHER:  The time
4  right now is 10:32 a.m.  We're back on
5  the record.
6  BY MR. SLATER:
7  Q.  On the screen is Exhibit 213,
8  which is a November 29, 2018 Warning Letter
9  from the FDA to ZHP.
10  You're familiar with that
11  document, right?
12  A.  I am aware of the existence of
13  this document.  But am I familiar with it?
14  It's been a long time, so I can't say that
15  now I'm very familiar with this document.
16  Q.  On the screen we have
17  Exhibit 213, a November 29, 2018 Warning
18  Letter from the FDA to ZHP.
19  Do you see that on the screen?
20  MS. PRISELAC:  I just want
21  to -- could somebody upload it to the
22  website?  Because it's not here.
23  A.  I see this document.
24  ///

Page 200

1  BY MR. SLATER:
2  Q.  The first paragraph says the
3  FDA inspected ZHP's manufacturing facility
4  July 23 to August 3, 2018.
5  That was after ZHP disclosed
6  the NDMA in its valsartan, correct?
7  MS. PRISELAC:  Objection to
8  form.  The document speaks for itself.
9  A.  Yes, that is what is said on
10  this document.
11  BY MR. SLATER:
12  Q.  The second paragraph says,
13  "This warning letter summarizes significant
14  deviations from current good manufacturing
15  practice (CGMP) for active pharmaceutical
16  ingredients (API)."  Correct?
17  MS. PRISELAC:  Objection to
18  form.  The document speaks for itself.
19  A.  Yes, that is how it's described
20  here in this document.
21  MR. SLATER:  Scroll up a little
22  bit, Chris, please.  Perfect.
23  BY MR. SLATER:
24  Q.  The third paragraph states,

Page 201

1  "Because your methods, facilities, or
2  controls for manufacturing, processing,
3  packing, or holding do not conform to CGMP,
4  your API are adulterated within the meaning
5  of Section 501(a)(2)(B) of the Federal Food,
6  Drug, and Cosmetic Act, 21 USC 351(a)(2)(B)."
7  Do you understand what
8  "adulterated" means?
9  MS. PRISELAC:  Objection to
10  form.  The document speaks for itself.
11  Lack of foundation.
12  A.  Based on my personal
13  understanding, this is a boilerplate sentence
14  that appears in all warning letters from the
15  FDA.  All of our manufacturing conforms to
16  GMP.
17  BY MR. SLATER:
18  Q.  Please answer my question.  I
19  asked if you understood what "adulterated"
20  means as used in that sentence.
21  MS. PRISELAC:  Objection to
22  form.  Asked and answered,
23  argumentative.  My prior objection
24  also stands.

Confidential Information Subject to Protective Order

Page 202

1     A.    My answer is that this sentence
2  appears in all FDA warning letters.
3          I would like to emphasize here
4  that the manufacturing of API by ZHP is in
5  compliance with our quality system, and it is
6  in compliance with GMP.
7  BY MR. SLATER:
8     Q.    Can you please answer my
9  question?  What is your understanding of what
10 "adulterated" means as used in that sentence?
11         MS. PRISELAC:  Objection to
12    form.  Asked and answered.  My prior
13    objection stands also.
14    A.    My answer is that in this
15 entire sentence, my personal understanding is
16 that it appears in all warning letters from
17 the FDA, and this sentence comes from this
18 regulation here.
19 BY MR. SLATER:
20    Q.    Are you refusing to tell me
21 your understanding of what the word
22 "adulterated" means as used in that sentence?
23 Because that's my question.
24         MS. PRISELAC:  Objection to

Page 203

1     form.  Asked and answered,
2     argumentative.
3          She can answer if she's able.
4     A.    Well, the meaning of this word
5  in the whole sentence must be put in the
6  context of this entire sentence.  And based
7  on what I know, this sentence is a
8  boilerplate of the FDA.
9  BY MR. SLATER:
10    Q.    What does "adulterated" mean as
11 used in that sentence?
12         MS. PRISELAC:  Objection to
13    form.  Asked and answered.
14         She can answer if she's able.
15    A.    All of our manufacturing
16 follows cGMP requirements and conditions.  We
17 believe that our API meets applicable
18 standards, and this sentence, according to
19 what I know, is really a boilerplate
20 sentence.
21 BY MR. SLATER:
22    Q.    Do you know what the word
23 "adulterated" means as used in the federal
24 regulations in the United States?

Page 204

1          MS. PRISELAC:  Objection to
2     form.  Calls for a legal conclusion,
3     ambiguous.
4          She can answer if she's able.
5     A.    Well, for the meaning of this
6  word, we need to look at the regulation.  My
7  understanding is that the manufacturing and
8  control of our APIs are all in compliance
9  with what is stated in our filed documents
10 and in compliance with cGMP.
11 BY MR. SLATER:
12    Q.    You are the director of
13 regulatory affairs for all of ZHP.  Do you
14 know what "adulterated" means as defined in
15 the laws that are cited there in the letter,
16 or don't you know?
17         MS. PRISELAC:  Asked and
18    answered.
19         She can answer if she's able.
20    A.    The meaning of this word should
21 be defined in the law.
22         As of now, my understanding is
23 that the manufacturing of our valsartan --
24 excuse me.

Page 205

1          The manufacturing of our
2  valsartan API was in compliance with cGMP,
3  and our products did not have these problems.
4  BY MR. SLATER:
5     Q.    Do you not know the definition
6  of "adulterated," the regulatory definition
7  as used in that sentence, or do you?
8          MS. PRISELAC:  Objection to
9     form.  Asked and answered.
10 BY MR. SLATER:
11    Q.    I'll ask it again.  New
12 question.
13         What is the definition of
14 "adulterated"?
15    A.    What I want to say is this
16 paragraph is in a warning letter from the
17 FDA.  In this letter, the source of this word
18 is cited, so the meaning of this word can be
19 found, or should be found, in the document
20 cited here.
21         Based on my current knowledge,
22 our products are manufactured and tested in
23 accordance with cGMP and GMP system.  Our
24 entire system is in compliance with GMP.

Page 206

1    MR. SLATER:  Let's go to page 4
2  of this letter.
3    Q.    This letter lists the
4  deviations that were found by the
5  investigators, and this is deviation number
6  2, "Failure to evaluate the potential effect
7  that changes in the manufacturing process may
8  have on the quality of your API."
9        That was deviation number 2
10  identified by the FDA investigators, correct?
11    MS. PRISELAC:  Objection to
12  form.  The document speaks for itself.



21  BY MR. SLATER:
22    Q.    All I asked you is if number 2
23  is the second deviation identified by the
24  investigators according to this letter.

Page 207

1        Is it?
2    A.    That is how it is stated in
3  this document.  However, we had objection to
4  the deviation.
5    Q.    Under the heading number 2, the
6  FDA writes, "In November 2011 you approved a
7  valsartan API process change (PCRC - 11025)
8  that included the use of the solvent DMF."
9        That's referring to the process
10  change to use the zinc chloride process,
11  right?
12    A.    Yes.
13    Q.    The paragraph continues, "Your
14  intention was to improve the manufacturing
15  process, increase product yield, and lower
16  production costs."
17        The focus on increasing the
18  yield and lowering the cost was important for
19  ZHP in instituting the zinc chloride process,
20  right?
21    MS. PRISELAC:  Objection to
22  form.  The document speaks for itself,
23  lack of foundation.

Page 208

11  BY MR. SLATER:
12    Q.    All right.  Let's jump to
13  Exhibit 312, and then we'll come back to
14  this.
15        Exhibit 312 is the
16  Establishment Inspection Report that the FDA
17  served on ZHP regarding that inspection from
18  July 23, 2018 to August 3, 2018, the same
19  inspection discussed in Exhibit 213, correct?
20    A.    Exhibit 213, is it the document
21  we just reviewed?
22    Q.    Right, the FDA Warning Letter
23  from November 2018.
24    A.    That was of the same

Page 209

1  inspection.
2        MR. SLATER:  Chris, go to
3  page 25 of 58.  The numbers are at the
4  bottom of the pages, please.  Thank
5  you.
6    Q.    Looking at the paragraph at the
7  center of the page, this report discusses
8  a -- rephrase.
9        Looking at the paragraph in the
10  center of the page, the investigator reports
11  a discussion wherein "Mr. Jun Du, Executive
12  Vice President...stated the change control
13  should have stated the purpose of the change
14  was to save money.  Mr. Du further stated the
15  cost reduction was so significant is what
16  made it possible for the firm to dominate the
17  world market share."
18        Do you see what I just read,
19  documenting what Jun Du told the FDA the
20  purpose of the process change was?
21    A.    Well, I see that in this
22  document it says so, but in my recollection I
23  do not recall Mr. Du saying this to the FDA.
24  This is not what I can recall.



Page 210

6   Q.   Are you saying Jun Du didn't
7  know what he was talking about?
8        MS. PRISELAC:  Objection to
9   form.  Argumentative.
10   A.   I said in my recollection, I do
11  not recall him saying that to the FDA.
12  Throughout the inspection I was not always
13  with Mr. Du Jun, so what I'm saying is that I
14  personally do not recall him saying that.
15  BY MR. SLATER:
16   Q.   Jun Du -- rephrase.

24        MS. PRISELAC:  Objection to

Page 211

1  form.  Compound, misstates the prior
2  testimony.
3        You can answer if you're able.
4        MR. SLATER:  Actually, I'm
5  going to withdraw the question,
6  because there was so many objections
7  I'm going to reask the question.
8        MS. PRISELAC:  There were only
9  objections because you asked about
10  three questions in one question, among
11  my other objections.
12  BY MR. SLATER:

18        MS. PRISELAC:  Objection.  Lack
19  of foundation, misstates the prior
20  testimony.

Page 212

1

12        MS. PRISELAC:  Objection to
13  form.  Misstates the prior testimony.

Page 213

15        MS. PRISELAC:  Objection to
16  form.

Confidential Information Subject to Protective Order



Page 214

10          MS. PRISELAC:  Objection to
11   form.

Page 216

1   starting in the third sentence on the third
2   line, "However, you failed to adequately
3   assess the potential formation of mutagenic
4   impurities when you implemented the new
5   process.  Specifically, you did not consider
6   the potential for mutagenic or other toxic
7   impurities to form from DMF degradants,
8   including the primary DMF degradant,
9   dimethylamine."
10          That's a true statement
11   regarding a failing in the risk assessment
12   performed by ZHP, correct?
13          MS. PRISELAC:  Objection to
14   form.  The document speaks for itself,
15   ambiguous.

Page 215

3          MS. PRISELAC:  Objection to
4   form.  Misstates the prior testimony,
5   compound.
6          She can answer if she's able.

18          MR. SLATER:  Let's go back to
19   Exhibit 213 where we left off, please.
20   Impressive.
21   BY MR. SLATER:
22   Q.    Going back now to the
23   November 29, 2018 warning letter, the
24   paragraph under number 2, the FDA pointed out

Page 217

15   BY MR. SLATER:

Confidential Information Subject to Protective Order



Page 218

2          MS. PRISELAC:  Objection to
3    form.
4          Do you want to --
5          MR. SLATER:  I'm going to reask
6    it, actually.  I'll ask another
7    question.
8          MS. PRISELAC:  Okay.
9          MR. SLATER:  I'm going to have
10    to ask a new question.
11    BY MR. SLATER:

19          MS. PRISELAC:  Objection to
20    form.

Page 219

23          MS. PRISELAC:  Objection to
24    form.  Misstates the prior testimony,

Page 220

1    asked and answered.

7    BY MR. SLATER:
8          Q.    Do you recall the scientific
9    literature I showed you earlier that
10    specifically said that DMF could degrade and
11    yield dimethylamine?
12          MS. PRISELAC:  Objection to
13    form.  Misstates the evidence.
14          A.    Before, we did not have any
15    knowledge that DMF was not stable and could
16    degrade to DMA.  I personally did not have
17    that knowledge, and no one told me about it.
18          At ZHP, no one mentioned that
19    they were aware of this particular
20    literature.  It was only when Mr. Slater
21    showed me this document that I saw it for the
22    first time.
23          MS. PRISELAC:  Adam, I think
24    we've been going like 70 minutes.  Can

Page 221

1    we take a break?
2          MR. SLATER:  Sure.  Let's go
3    off the record.
4          THE VIDEOGRAPHER:  The time
5    right now is 11:45 a.m.  We're now off
6    the record.
7          (Whereupon, a recess was
8    taken.)
9          THE VIDEOGRAPHER:  The time
10    right now is 11:56 a.m.  We're back on
11    the record.
12          MR. SLATER:  Can we get that
13    document back up, Chris?  Thanks.
14    BY MR. SLATER:
15          Q.    Looking at the second paragraph
16    under number 2, the FDA stated, "You also
17    failed to evaluate the need for additional
18    analytical methods to ensure that
19    unanticipated impurities were appropriately
20    detected and controlled in your valsartan API
21    before you approved the process change."
22          That's certainly one of the
23    reasons why ZHP did not know there was NDMA
24    in its valsartan when it developed the zinc

Page 222

¹ chloride process, right?

² MS. PRISELAC: Objection to

³ form. Lack of foundation.

⁴ A. Personally, I'm not sure why

⁵ this is written here. As according to my

⁶ knowledge, we had already developed methods

⁷ and tested for all impurities that we could

⁸ think of back then. In 2012, these were all

⁹ listed in the document that we submitted to

¹⁰ the FDA.

¹¹ BY MR. SLATER:

¹² Q. In the second paragraph under

¹³ deviation number 2, the second sentence says,

¹⁴ "You are responsible for developing and using

¹⁵ suitable methods to detect impurities when

¹⁶ developing, and making changes to, your

¹⁷ manufacturing processes. If new or higher

¹⁸ levels of impurities are detected, you should

¹⁹ fully evaluate the impurities and take action

²⁰ to ensure the drug is safe for patients."

²¹ In terms of detecting

²² impurities as discussed there, ZHP failed to

²³ detect the NDMA impurity when it developed

²⁴ the zinc chloride process, right?

Page 223

¹ MS. PRISELAC: Objection to

² form. Vague.



¹⁸ BY MR. SLATER:

¹⁹ Q. Whatever ZHP did failed to

²⁰ detect NDMA as a potential impurity, failed

²¹ to identify it in the valsartan manufactured

²² with the zinc chloride process, correct?

²³ MS. PRISELAC: Objection to

²⁴ form. Compound, vague.

Page 224

¹ BY MR. SLATER:

² Q. I'll ask a new question.

³ Whatever ZHP did, it was a

⁴ failure in identifying NDMA as a potential

⁵ impurity because NDMA was not identified,

⁶ correct?

⁷ MS. PRISELAC: Objection.

⁸ Vague.

⁹ A. After June 2018, it was only

¹⁰ after then that we learned about the

¹¹ existence of NDMA in our products. Before

¹² that, we did not know about it. Therefore,

¹³ in 2012, for the evaluation in 2012, we

¹⁴ believe our evaluation was complete.

¹⁵ BY MR. SLATER:

¹⁶ Q. You were wrong, isn't that so?

¹⁷ MS. PRISELAC: Objection to

¹⁸ form. Vague.

¹⁹ BY MR. SLATER:

²⁰ Q. Hang on, I'll ask it again.

²¹ You just said you thought your

²² evaluation was complete; but, in fact, you

²³ were wrong, isn't that so?

²⁴ A. Any evaluation is associated

Page 225

¹ with a time period. The discovery of NDMA

² depended on analytical method means for

³ discovery and the understanding of the

⁴ process, and these evolve over time. In

⁵ 2012, when we started on the process change

⁶ involving zinc chloride, our risk assessment

⁷ at that time was adequate.

⁸ Q. Well, in fact, your risk

⁹ assessment was inadequate and failed to

¹⁰ identify the risk of NDMA forming. That's

¹¹ the truth, isn't it?

¹² MS. PRISELAC: Objection to

¹³ form. Argumentative, compound.

¹⁴ A. In 2012, based on our knowledge

¹⁵ level then, we believed that our evaluation

¹⁶ at that time was adequate, and that was the

¹⁷ basis for our approval of this change.

¹⁸ MR. SLATER: Chris, let's jump

¹⁹ to another document for a moment.

²⁰ Let's go to Exhibit 310, please.

²¹ Thank you.

²² BY MR. SLATER:

²³ Q. I'm showing you Exhibit 310.

²⁴ That is the ICH M7 guideline from February of

Confidential Information Subject to Protective Order

Page 226

1  2013.
2        Do you see that?
3     A.   I see it.
4     Q.    The title is "Assessment and
5  Control of DNA Reactive (Mutagenic)
6  Impurities in Pharmaceuticals to Limit
7  Potential Carcinogenic Risk."
8        That's the title, right?
9        MS. PRISELAC:  Objection.  The
10  document speaks for itself.
11     A.    This is the title of this
12  document.
13        MR. SLATER:  Chris, please go
14  to page 10.  Can we get it a little
15  bigger, please?  I'm going to want the
16  top paragraph to start.  Perfect.
17  BY MR. SLATER:
18     Q.    Looking at the top of page 10
19  of the M7 guideline from 2013, it says, "A
20  disproportionally high number of members of
21  some structural classes of mutagens, i.e.,
22  aflatoxin like, N-nitroso-, and azoxy
23  structures, of which some may occur as
24  impurities in pharmaceuticals, display

Page 227

1  extremely high carcinogenic potency.
2  Acceptable intakes for these high-potency
3  carcinogens would likely be significantly
4  lower than the acceptable intakes defined in
5  this guideline."
6        An N-nitroso compound includes
7  NDMA, correct?
8        MS. PRISELAC:  Objection to
9     form.  The document speaks for itself.
10     She can answer if she is able.
11     A.    This is what is written here in
12  this document.

Page 228

3        MR. SLATER:  Let's scroll down,
4     Chris, to the second paragraph after
5     Section 8.  A little more.  Perfect.
6  BY MR. SLATER:
7     Q.    Looking now at Section 8 under
8  the heading "Control," after the bullet
9  points it says, "When an impurity has been
10  characterized as mutagenic, it is important
11  to develop a control strategy that assures
12  that the level of this impurity in the drug
13  substance and drug product is below the
14  acceptable limit.  A thorough knowledge of
15  the chemistry associated with the drug
16  substance manufacturing process, the drug
17  product manufacturing process, along with an
18  understanding of the overall stability of the
19  drug substance and drug product is
20  fundamental to developing the appropriate
21  controls."
22        In the case of the zinc
23  chloride process, ZHP did not have a thorough
24  knowledge of the chemistry involved in that

Page 229

1  process, and that's why NDMA was not
2  considered or detected, correct?
3        MS. PRISELAC:  Objection to
4     form.  The document speaks for itself.
5     Lack of foundation.
6        Adam, can we at least get an
7     agreement now that you're well past
8     the 30(b)(6) topics?
9        MR. SLATER:  No, we can't get
10     an agreement.
11        MS. PRISELAC:  Okay.  I want
12     to -- because, I mean, this is --
13        MR. SLATER:  You know what, off
14     the timer.  Go off the timer.  If
15     we're going to get -- if I'm going to
16     get lectured, I'd rather not use my
17     time to be lectured.
18        MS. PRISELAC:  Adam, let's just
19     make something clear.  I'm allowed to
20     ask you what your basis is for you
21     considering anything in this document
22     as part of a 30(b)(6) topic.  I have
23     my standing objection, and it does
24     stand.

Confidential Information Subject to Protective Order



Page 230

1   But you're on now to documents
2 that have nothing to do with a
3 regulatory authority.  So tell me, I
4 am entitled to know, how you think
5 this fits into any of her topics.
6   MR. SLATER:
21   So I think it's appropriate for
22 both reasons.  I'm ready to continue
23 any time.
24   MS. PRISELAC:  Okay.  So this

Page 231

1 has nothing to do with her topics, so
2 I'm glad we got that clear.
3   Back on the timer.  Let's move
4 on.
5   MR. SLATER:  I thought that we
6 were going to try to minimize these
7 kinds of comments.  I'd really
8 appreciate it if you'd just move along
9 with the deposition.
10   MS. PRISELAC:  I'm absolutely
11 entitled to know what your basis for
12 claiming these are in the topics.
13   But it's not on the timer and
14 you're not prejudiced in any way, so
15 let's just move on.
16   MR. SLATER:  Is it okay for me
17 to continue now?
18   MS. PRISELAC:  What I just
19 said, Adam.
20   MR. SLATER:  Let's go back on
21 the timer.
22 BY MR. SLATER:
23   Q.   Answer the question, please.

Page 232

18   MR. SLATER:  Chris, let's go
19 back to Exhibit 213, please.
20   Q.   Looking now at the third
21 paragraph under heading number 2, the FDA
22 said, "Your response states that predicting
23 NDMA formation during the valsartan
24 manufacturing process required an extra

Page 233

1 dimension over current industry practice, and
2 that your process development study was
3 adequate.  We disagree.  We remind you that
4 common industry practice may not always be
5 consistent with CGMP requirements and that
6 you are responsible for the quality of drugs
7 you produce."
8   So, therefore, the FDA
9 specifically rejected the argument that you
10 just made in the answer to the last question,
11 correct?
12   MS. PRISELAC:  Objection to
13 form.  Lack of foundation, misstates
14 the evidence.  You can -- and this
15 document speaks for itself.
16   You can answer the question if
17 you're able.
18   A.   Here in this report, I
19 personally believe that it is the personal
20 opinion of the inspector.  After this event,
21 there were FDA documents discussing FDA's
22 opinion about the discovery of NDMA.
23   In 2012 when this change was
24 proposed, we did perform evaluation on the

Confidential Information Subject to Protective Order

---

Page 234

1 change strictly in accordance with cGMP;
2 therefore, personally I believe that we were
3 in compliance with cGMP requirements.
4         MR. SLATER:  Chris, let's go to
5     page 6 of this letter, the last page,
6     please.
7 BY MR. SLATER:
8     Q.    Starting from the bottom.
9 Let's look at the bottom.
10        This letter was signed by
11 someone named "Francis Godwin, the Acting
12 Director of the Office of Manufacturing
13 Quality, Office of Compliance, Center for
14 Drug Evaluation and Research" at the FDA,
15 correct?
16        MS. PRISELAC:  Objection to
17     form.  The document speaks for itself.
18     A.    This is what is written here in
19 this document.
20        I would like to make a
21 clarifying correction.  When I said
22 "inspector" earlier, for us all FDA officials
23 are inspectors.
24        MR. SLATER:  Let's go to the

---

Page 235

1     top of the page, Chris.  Perfect.
2 BY MR. SLATER:
3     Q.    Looking at the top of the
4 page 6, this first full paragraph, which is
5 just one line, says, "FDA" -- rephrase.
6        Looking at the top of page 6,
7 the FDA warned ZHP in this warning letter
8 that "FDA placed your firm on Import Alert
9 66-40 on September 28, 2018."
10        That import alert restricted
11 ZHP from selling drugs in the United States,
12 is that correct?
13     A.    Based on my personal knowledge,
14 this import ban was specifically targeting
15 APIs manufactured in the Chuannan facility of
16 ZHP.
17     Q.    Was the import alert ever
18 lifted?
19     A.    This import ban has not been
20 lifted due to the pandemic last year.  We
21 have been requesting the FDA to conduct
22 another inspection, but due to the pandemic
23 this second inspection never happened.
24     Q.    Is ZHP currently selling any

---

Page 236

1 drugs into the United States?
2     A.    This is a question I believe
3 that I cannot answer, because I am not a
4 salesperson.
5         MR. SLATER:  Let's take that
6     document down.
7     Q.    Ultimately -- rephrase.
8

16        MS. PRISELAC:  Objection to
17     form.  Compound, vague, misstates the
18     prior testimony.
19        She can answer if she is able.
20     A.    Sorry, I wasn't focusing just
21 now.  Could you state your question again?
22        MR. SLATER:  I think it would
23     be for you, the translator, to just
24     read the question to her again, right?

---

Page 237

1         THE INTERPRETER:  Interpreter
2     will interpret the question again.

18        MR. SLATER:  Let's go to
19     Exhibit 212, please.
20 BY MR. SLATER:

---

Confidential Information Subject to Protective Order



Page 238

20      MS. PRISELAC:  Objection to
21  form.  Lack of foundation, misstates
22  the prior testimony.  Completeness, as
23  this appears to be a draft.
24      I would also state that other

Page 239

1  witnesses were specifically assigned
2  the topic of talking about
3  investigation and deviation reports
4  that are not Ms. Lin.
5      But she can go ahead and answer
6  in her personal capacity if she's
7  able.

22      MR. SLATER:  Let's take this
23  document down and go to Exhibit 210.
24      ///

Page 240

1  BY MR. SLATER:
2      Q.    On the screen is Exhibit 210,
3  "Deviation Investigation Report."  It has a
4  date of November 5, 2018 as its preparation
5  date.
6          Do you see that?
7      A.    I see it on the shared screen.
8          MR. SLATER:  Chris, could you
9  go to page 12 of 236, please?  Thank
10  you.
11      Q.    It states in the middle of
12  Section 3 point -- rephrase.
13          Looking at the second paragraph
14  on page 12 it states, "Carcinogenicity
15  studies in animals demonstrated that NDMA is
16  carcinogenic.  However, no evidence is
17  available to confirm that NDMA is
18  carcinogenic in humans.  Nevertheless, NDMA
19  is considered a probable human carcinogen
20  based on projection from the animal studies."
21          And this is a report written by
22  ZHP, correct?
23          MS. PRISELAC:  Objection to
24  form.  The document speaks for itself.

Page 241

1      A.    First, I did not write this
2  document.  Strike that.
3          First, this is what is written
4  in this document.
5          Second, I did not write this
6  document, and I am not an expert on
7  toxicology.  I do not know who wrote this
8  paragraph.  What I do know is that NDMA is a
9  potential genotoxic impurity.
10          MR. SLATER:  Go to the prior
11  page, Chris, please, page 11.
12  Perfect.
13  BY MR. SLATER:
14      Q.    In the second paragraph on
15  page 11, there's a citation to an article
16  from the World Health Organization in 2002.
17          Do you see that?
18          MS. PRISELAC:  Objection.  The
19  document speaks for itself.
20      A.    That is what's written here in
21  this paragraph.
22          MR. SLATER:  Chris, let's go
23  back to the next page again, page 12.
24          Actually, you know what, let's

Confidential Information Subject to Protective Order

Page 242

1    just take this -- let's go to the
2    next.  You can put that aside.
3           Let's go to the next exhibit,
4    which is Exhibit 321, which is the
5    article -- rephrase.
6    BY MR. SLATER:
7       Q.    Looking now at the screen is
8    Exhibit 321, which is the article I just
9    identified in the ZHP Deviation Investigation
10   Report, Exhibit 210.
11          Do you see that in front of
12   you?
13          MS. PRISELAC:  Objection to
14   form.  Lack of foundation, outside the
15   scope of the 30(b)(6) topic.
16          She can answer if she's able.
17      A.    I have not read this entire
18   document.  And as I said, I'm not an expert
19   on toxicology; therefore, I cannot answer
20   these type of questions.
21          MR. SLATER:  Chris, could you
22   go now to page 23, please, of this
23   article which is cited in the ZHP site
24   investigation report?  Top of the

Page 243

1    page.  Perfect.
2           MS. PRISELAC:  Objection,
3    because I would also note that that
4    deviation investigation report is,
5    again, outside the scope of her
6    30(b)(6) topics.
7           MR. SLATER:  You are aware it
8    was provided to the FDA, right?
9           MS. PRISELAC:  Excuse me?
10          MR. SLATER:  You are aware it
11   was provided to the FDA, right?
12          MS. PRISELAC:  You're not
13   asking her -- are you going to ask her
14   that question, lay a foundation?
15          MR. SLATER:  I'm going to
16   continue.  You're eating my time.  I'm
17   going to continue.
18          MS. PRISELAC:  I'm allowed to
19   object to foundation.  You're not
20   going to bully me out of it.
21          You're on the clock.  Keep
22   going.
23          MR. SLATER:  We can go back on
24   now.

Page 244

1    BY MR. SLATER:
2       Q.    Looking now on page 23 of this
3    World Health Organization article from 2002,
4    in the top right of the column, it says,
5    "Therefore, owing to the considerable
6    evidence of carcinogenicity of NDMA in
7    laboratory species, evidence of direct
8    interaction with DNA consistent with tumour
9    formation, and the apparent lack of
10   qualitative species-specific differences in
11   the metabolism of this substance, NDMA is
12   highly likely to be carcinogenic to humans."
13          Do you see what I just read?
14          MS. PRISELAC:  Objection to
15   form.  The document speaks for itself.
16          She can answer if she's able.
17      A.    I see this paragraph, but as I
18   said, I'm not an expert on toxicology;
19   therefore, I cannot comment on the content
20   here.  I know that NDMA is a potential
21   genotoxic impurity.
22          MR. SLATER:  Chris, let's go
23   back, if we could, to the deviation
24   investigation report, Exhibit 210,

Page 245

1    page 12.
2           MS. PRISELAC:  Can I get an
3    official time on the record?
4           MR. SLATER:  Go off the clock.
5           THE VIDEOGRAPHER:  Five hours
6    and two minutes.
7           MS. PRISELAC:  Okay.  This is
8    your last question, Adam.
9           MR. SLATER:  I would appreciate
10   some level of -- I don't know what to
11   even call it.  I would like to finish.
12   I have a couple more questions.
13          MS. PRISELAC:  Okay.  Back on
14   the record.
15          MR. SLATER:  Yeah, we'll go
16   back on.  I have a couple more
17   questions.
18          And I don't think we're at
19   5:02, because there's been a lot of
20   times we've stopped the clock, and I
21   don't think it's been captured.  So
22   I'm going to ask a couple more
23   questions --
24          MS. PRISELAC:  Actually, it has

Page 246

1  been.  I've been very on top of it, so
2  this is it.
3          MR. SLATER:  I have about five
4  more minutes.
5          MS. PRISELAC:  No, you don't.
6          And you have several more hours
7  and several more days, so this is your
8  last question.
9          MR. SLATER:  In that case, go
10 to Exhibit 319, please, Chris.  You've
11 got to blow it up.
12 BY MR. SLATER:



Page 247

8          That information was not placed
9  into that deviation investigation report
10 which was provided to the FDA.  Instead, you
11 had a sentence in there saying that there's
12 no evidence that NDMA is a human carcinogen,
13 correct?
14         MS. PRISELAC:  Objection to
15 form.  Lack of foundation,
16 completeness, hearsay, unable to know
17 whether it misstates the testimony
18 since you haven't laid a foundation
19 for it.
20         She can answer if she's able.
21 A.    Well, I think there must have
22 been a context for their communication.
23 Without this context, I cannot answer this
24 question, because if I provide my personal

Page 248

1  speculation, it might be misleading.
2          MS. PRISELAC:  Okay.  That's
3  the end of the deposition.  Let's go
4  off the record.
5          MR. SLATER:  Well, we're not
6  going off the record because I'm going
7  to say something, but you can end the
8  deposition, but I'll certainly make it
9  clear that --
10         MS. PRISELAC:  What are you
11 going to say?
12         MR. SLATER:  I can't -- I don't
13 want to interrupt you.  I didn't
14 realize you were talking again.
15         Can I speak, please?
16         MS. PRISELAC:  Go for it, Adam.
17         MR. SLATER:  I would like to be
18 able to continue for a few more
19 minutes and finish this line of
20 questioning.  Defense counsel has
21 determined to stop the deposition
22 tonight and preclude me from asking
23 any further questions.
24         I wish that I was able to

Page 249

1  finish this line of questions, but
2  I've been told by defense counsel I
3  cannot, and defense counsel
4  unilaterally ended the deposition for
5  tonight.
6          MS. PRISELAC:  I'm ending the
7  deposition because it is over four
8  hours and 1:15 in the morning, which
9  is well within the rules of the
10 protocol.  And this witness has
11 several more hours and two entire more
12 days of deposition testimony, so you
13 can continue your questioning,
14 Mr. Slater, tomorrow, and that will
15 not prejudice you in any way.
16         So good evening, and have a
17 good night.
18         MR. SLATER:  Thank you.
19 Thanks, everybody.
20         Thank you, Maureen.  Thank you,
21 team.  Really enjoyed it tonight.
22         THE VIDEOGRAPHER:  The time
23 right now is 1:15 p.m.  We are now off
24 the record.

Confidential Information Subject to Protective Order

Page 250

```
 1          (Whereupon, the deposition was
 2      adjourned.)
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 252

```
 1          INSTRUCTIONS TO WITNESS
 2
 3          Please read your deposition over
 4      carefully and make any necessary corrections.
 5      You should state the reason in the
 6      appropriate space on the errata sheet for any
 7      corrections that are made.
 8          After doing so, please sign the
 9      errata sheet and date it.  It will be
10      attached to your deposition.
11          It is imperative that you return
12      the original errata sheet to the deposing
13      attorney within thirty (30) days of receipt
14      of the deposition transcript by you.  If you
15      fail to do so, the deposition transcript may
16      be deemed to be accurate and may be used in
17      court.
18
19
20
21
22
23
24
```

Page 251

```
 1              CERTIFICATE
 2          I, MAUREEN O'CONNOR
 3      POLLARD, Registered Diplomate
        Reporter, Realtime Systems
 4      Administrator, and Certified Shorthand
        Reporter, do hereby certify that prior
 5      to the commencement of the
        examination, LIHONG (LINDA) LIN, was
 6      remotely duly identified and sworn by
        me to testify to the truth, the whole
 7      truth, and nothing but the truth.
 8          I DO FURTHER CERTIFY that
        the foregoing is a verbatim transcript
 9      of the testimony as taken
        stenographically by and before me at
10      the time, place, and on the date
        hereinbefore set forth, to the best of
11      my ability.
12          I DO FURTHER CERTIFY that
        I am neither a relative nor employee
13      nor attorney nor counsel of any of the
        parties to this action, and that I am
14      neither a relative nor employee of
        such attorney or counsel, and that I
15      am not financially interested in the
        action.
16
17
18      _____
19      MAUREEN O'CONNOR POLLARD
        NCRA Registered Diplomate Reporter
20      Realtime Systems Administrator
        Certified Shorthand Reporter
21      Notary Public
22      Dated:  May 10, 2021
23
24
```

Page 253

```
 1          - - - - - -
            E R R A T A
 2          - - - - - -
 3      PAGE  LINE  CHANGE
 4      ___ ____ _____
 5        REASON: _____
 6      ___ ____ _____
 7        REASON: _____
 8      ___ ____ _____
 9        REASON: _____
10      ___ ____ _____
11        REASON: _____
12      ___ ____ _____
13        REASON: _____
14      ___ ____ _____
15        REASON: _____
16      ___ ____ _____
17        REASON: _____
18      ___ ____ _____
19        REASON: _____
20      ___ ____ _____
21        REASON: _____
22      ___ ____ _____
23
24
```

Confidential Information - Subject to Protective Order

Page 254

ACKNOWLEDGMENT OF DEPONENT

I, _____, do
Hereby certify that I have read the foregoing
pages, and that the same is a correct
transcription of the answers given by me to
the questions therein propounded, except for
the corrections or changes in form or
substance, if any, noted in the attached
Errata Sheet.

_____
Lihong (Linda) Lin          Date

Subscribed and sworn
To before me this
_____ day of _____, 20_____.

My commission expires: _____

_____
Notary Public

Page 255

LAWYER'S NOTES

PAGE  LINE

_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____

## WORD INDEX

**< 0 >**
**07068**  126:*6*
**099**  137:*17*
 138:*3, 22*

**< 1 >**
**1**  128:*4*
 133:*23*
 156:*16*
 160:*18*  173:*3*
**1:15**  249:*8, 23*
**10**  128:*6*
 132:*22*  133:*5*
 226:*14, 18*
 251:*20*
**10:12**  198:*22*
**10:32**  199:*4*
**100020**  128:*5*
**103**  126:*6*
**11**  241:*11, 15*
**11:45**  221:*5*
**11:56**  221:*10*
**11025**  207:*7*
**12**  240:*9, 14*
 241:*23*  245:*1*
**1228**  128:*3*
**132**  129:*4*
**148**  143:*23*
 144:*6*
**149**  149:*19*
 150:*13*  151:*2*
**15219**  127:*14*
**1600**  126:*21*
**17**  169:*12*
**171**  129:*11*
**172**  143:*23*
 144:*6*  149:*19*
 151:*2*
**17th**  127:*20*
**1865**  170:*16,*
*21*
**19103**  127:*20*
**19-2875**  125:*5*
**19422**  128:*11*
**195**  134:*21, 24*
**197**  164:*4, 7*
**1978**  169:*15*

**< 2 >**
**2**  137:*3*
 149:*21*  206:*6,*
*9, 22*  207:*5*
 215:*24*
 221:*16*
 222:*13*  232:*21*
**20**  126:*21*
 254:*17*
**2002**  241:*16*
 244:*3*
**2009**  164:*9*
 165:*4*
**2010**  159:*21*
 161:*6*  162:*16*
**2011**  158:*5*
 170:*22*  196:*9*
 197:*13*
 206:*14*  207:*6*
 237:*3*
**2012**  140:*16,*
*17, 23*  141:*16,*
*21*  142:*17*
 154:*8*  163:*17,*
*20*  166:*17, 20*
 167:*4, 19*
 168:*9, 19*
 189:*2*  190:*7,*
*23*  191:*2, 5,*
 194:*21*
 196:*10*
 197:*13*  213:*2,*
*21*  214:*13*
 217:*5, 8, 10*
 219:*2*  222:*8*
 223:*3, 13*
 224:*13*  225:*5,*
*14*  227:*19*
 232:*4*  233:*23*
 237:*3, 12*
 239:*12, 13*
**2013**  132:*22*
 133:*5*  134:*5*
 143:*1, 13*
 144:*23*
 145:*11*
 147:*24*  148:*3*
 151:*19*
 152:*22*
 158:*21*  159:*3,*

*13, 19*  160:*2*
 192:*21*
 194:*10*
 196:*10*  226:*1,*
*19*
**2017**  129:*9*
 154:*20*  155:*8*
 157:*10*
 171:*17*
 172:*14, 21*
 173:*1*
**2018**  140:*21*
 141:*18*
 144:*22*
 145:*15*  148:*2*
 151:*17*
 152:*18*
 154:*12*
 155:*15*
 158:*13*
 159:*12, 13*
 163:*11*
 168:*15*  192:*4,*
*13*  196:*11, 18,*
*21*  197:*14*
 198:*2*  199:*8,*
*17*  200:*4*
 208:*18, 23*
 212:*23*  213:*1*
 215:*23*
 216:*17*  217:*2*
 218:*1*  220:*2,*
*5*  224:*9*
 232:*10*  235:*9*
 237:*13*
 239:*11, 19, 20*
 240:*4*
**202**  132:*11,*
*14, 19*
**2021**  125:*15*
 131:*8*  142:*15*
 251:*20*
**205**  142:*22*
**209**  168:*24*
 169:*4, 9*
**21**  201:*6*
**210**  239:*23*
 240:*2*  242:*10*
 244:*24*
**211**  159:*15*
**212**  237:*19, 21*

**213**  199:*7, 17*
 208:*19, 20*
 215:*19*  232:*19*
**215-979-1159**
 127:*15*
**215-979-1164**
 127:*21*
**23**  200:*4*
 208:*18*
 242:*22*  244:*2*
**236**  240:*9*
**25**  209:*3*
**260**  126:*16*
**27**  129:*9*
 154:*20*  155:*8*
 171:*17*
 172:*21*  173:*1*
**28**  235:*9*
**2800**  127:*3*
**2875**  125:*4*
**29**  199:*8, 17*
 215:*23*

**< 3 >**
**3**  134:*15*
 164:*17, 23*
 200:*4*  208:*18*
 240:*12*
**30**  127:*20*
 252:*13*
**30(b)(6**
 153:*16*  163:*4*
 229:*8, 22*
 242:*15*  243:*6*
**300**  169:*24*
**3000**  127:*8*
**308**  238:*2*
**310**  225:*20, 23*
**312**  208:*13, 15*
**319**  246:*10, 13*
**321**  242:*4, 8*
**32801**  126:*22*
**34**  139:*3*
**342**  174:*11*
 196:*5*  197:*10,*
*18*
**351(a)(2)(B**
 201:*6*
**36**  170:*2, 5, 8,*
*10, 14*

**365**  149:*10*

**< 4 >**
**4**  127:*8*
 134:*16*
 137:*14*  206:*1*
**415-655-1285**
 127:*9*
**450**  128:*11*

**< 5 >**
**5**  131:*8*  240:*4*
**5.2**  238:*5*
**5:02**  245:*19*
**501(a)(2)(B**
 201:*5*
**5010**  127:*14*
**504-524-5777**
 126:*13*
**5639**  128:*6*
**58**  209:*3*
**5th**  125:*14*

**< 6 >**
**6**  234:*5*
 235:*4, 6*
**600**  127:*14*
**610-567-0700**
 128:*12*
**66210**  126:*17*
**66-40**  235:*9*

**< 7 >**
**7.3.3**  138:*12*
 139:*20*
**7:05**  125:*14*
 131:*9*
**70**  220:*24*
**701**  126:*12*
**70130**  126:*12*
**713-621-7944**
 127:*4*
**77056**  127:*4*
**7899**  143:*24*

**< 8 >**
**8**  228:*5, 7*
**8:21**  157:*17*
**8:38**  157:*22*
**800-701-3672**

126:*17*

**8101** 126:*16*
**8315** 164:*22*
**86** 128:*6*
**877.370.3377**
126:*22*

**< 9 >**
**917.591.5672**
126:*22*
**94111** 127:*8*
**9688** 128:*6*
**973-228-9898**
126:*7*

**< A >**
**a.m** 125:*14*
131:*9* 157:*17,
22* 198:*22*
199:*4* 221:*5,
10*
**abilities**
149:*12* 185:*7*
**ability** 132:*3*
251:*11*
**able** 149:*5*
150:*10* 163:*5,
15* 191:*12, 23*
192:*19* 194:*2,
20* 196:*17*
203:*3, 14*
204:*4, 19*
211:*3* 213:*3,
4* 214:*3*
215:*6* 227:*10*
233:*17*
236:*19* 239:*7*
242:*16*
244:*16*
247:*20*
248:*18, 24*
**absolutely**
177:*21*
184:*23* 231:*10*
**accept** 217:*9*
**Acceptable**
227:*2, 4*
228:*14*
**account**
162:*22*

**accurate**
148:*13* 163:*9*
166:*10*
190:*18* 252:*16*
**accurately**
176:*4*
**acid** 161:*19*
162:*20* 171:*23*
**acidic** 165:*3,
14* 170:*18*
**ACKNOWLE
DGMENT**
254:*2*
**Act** 201:*6*
**Actavis** 127:*11*
**Acting** 234:*11*
**action** 222:*19*
251:*13, 15*
**active** 200:*15*
**actual** 177:*22*
178:*17*
179:*15*
181:*17, 21*
197:*18, 20*
**ADAM** 126:*3*
135:*8* 149:*2*
162:*2* 174:*6*
176:*21*
184:*24*
186:*10* 195:*6*
196:*1* 198:*12*
220:*23* 229:*6,
18* 231:*19*
245:*8* 248:*16*
**added** 134:*11,
16* 168:*15*
**adding** 134:*9*
**addition**
161:*17* 212:*4*
**additional**
221:*17*
**Additionally**
157:*1*
**addressed**
141:*7*
**addressing**
143:*2*
**adequacy**
230:*19*
**adequate**
154:*10*

167:*21* 168:*4,
11, 22* 189:*9,
10, 19* 190:*24*
225:*7, 16*
233:*3* 239:*16*
**adequately**
216:*2* 236:*12*
**adjourned**
250:*2*

**Administration**
132:*24*
**Administrator**
125:*17* 251:*4,
19*
**admit** 174:*7*
**adulterated**
201:*4, 8, 19*
202:*10, 22*
203:*10, 23*
204:*14* 205:*6,
14*
**advises** 151:*3*
**advising**
154:*20*
**affairs** 156:*1,
11* 160:*9*
165:*23*
172:*17* 173:*7*
187:*15*
190:*15, 17*
194:*9* 204:*13*
214:*22* 215:*8*
**affect** 237:*10*
**afford** 164:*24*
**aflatoxin**
146:*19* 226:*22*
**aflatoxin-like**
146:*1*
**afraid** 178:*14*
**agents** 161:*3,
13* 164:*2*
171:*6* 172:*13*
223:*6*
**agree** 151:*11*
162:*4* 172:*16*
213:*13*
**agreed** 131:*17*
**agreement**
229:*7, 10*
**agrees** 148:*18*

**ahead** 140:*4*
153:*22* 158:*9*
159:*2* 175:*11,
20* 239:*5*
**Alert** 235:*8,
10, 17*
**allowed**
214:*24*
229:*19*
230:*16* 243:*18*
**Ambiguous**
133:*8, 17*
141:*15* 142:*7*
147:*10* 153:*7*
156:*7* 158:*8*
166:*12*
167:*17* 168:*7*
176:*9* 187:*24*
191:*11*
192:*18*
193:*13, 24*
194:*18*
197:*22* 204:*3*
216:*15*
**Amendment**
133:*23* 143:*1*
145:*8* 158:*20*
**amine** 171:*5*
**amines**
160:*23*
161:*17, 18*
172:*12*
**amount** 208:*6*
**analysis**
194:*15*
**analytical**
154:*14, 21*
196:*22*
216:*24*
221:*18* 225:*2*
232:*2, 12*
**ANDA** 192:*23*
**animal** 213:*20*
240:*20*
**animals**
240:*15*
**Answer** 130:*2*
136:*2* 140:*4,
14* 144:*20*
147:*12*
151:*15*

153:*23* 154:*5*
156:*9* 158:*9*
159:*2* 161:*9*
163:*5* 167:*3,
18* 168:*8*
171:*2* 172:*23*
176:*10*
182:*24*
183:*23* 184:*5*
186:*23* 189:*1*
190:*6, 22*
191:*12, 23*
192:*10, 19*
194:*2, 20*
196:*17* 197:*3*
198:*10*
201:*18* 202:*1,
8, 14* 203:*3,
14* 204:*4, 19*
211:*3* 215:*6*
219:*21*
227:*10*
231:*23*
233:*10, 16*
236:*3, 19*
239:*5* 242:*16,
19* 244:*16*
247:*20, 23*
**answered**
197:*22*
201:*22*
202:*12* 203:*1,
13* 204:*18*
205:*9* 220:*1*
**answering**
186:*16* 192:*10*
**answers** 254:*5*
**anybody**
217:*18, 24*
218:*14*
**anyway**
175:*15*
**API** 156:*13*
200:*16* 201:*4*
202:*4* 203:*17*
205:*2* 206:*8*
207:*7* 221:*20*
**APIs** 204:*8*
235:*15*
**apparent**
244:*9*

apparently 135:*10*

APPEARANCES 126:*1* 127:*1* 128:*1*

APPEARED 126:*1*

appearing 131:*17*

appears 201:*14* 202:*2, 16* 238:*23*

applicable 190:*9* 203:*17* 206:*18*

APPLIES 125:*6*

applying 239:*12*

appreciate 178:*6* 180:*21* 181:*10* 186:*6* 187:*2* 231:*8* 245:*9*

approached 246:*17*

appropriate 177:*18* 178:*17* 179:*8* 180:*1, 7, 24* 181:*3* 228:*20* 230:*21* 252:*6*

appropriately 221:*19*

approval 225:*17*

approved 192:*23* 207:*6* 221:*21* 239:*16*

aqueous 161:*20*

argue 179:*24*

argument 233:*9* 247:*2*

Argumentative 140:*13* 156:*7* 167:*2* 193:*14* 194:*1* 201:*23* 203:*2* 210:*9* 225:*13*

arm 154:*21*

article 159:*21* 160:*1* 161:*6* 162:*17* 164:*1, 8* 165:*4* 241:*15* 242:*5, 8, 23* 244:*3*

articles 163:*10*

aside 242:*2*

asked 175:*5* 186:*22* 192:*9* 197:*22* 201:*19, 22* 202:*12* 203:*1, 13* 204:*17* 205:*9* 206:*22* 211:*9* 220:*1*

asking 135:*22* 151:*10* 175:*4* 177:*5, 23* 185:*8* 243:*13* 248:*22*

aslater@mazieslater.com 126:*7*

aspect 188:*6*

aspersion 185:*12, 17*

aspersions 149:*14* 185:*1, 6*

assess 216:*3*

assessed 150:*6*

Assessment 138:*13* 139:*21* 152:*6, 9* 159:*4* 191:*19* 192:*1* 193:*2, 20* 194:*12* 216:*11* 225:*6, 9* 226:*4* 232:*8* 238:*16* 239:*15*

assessments 152:*14*

assigned 239:*1*

associated 224:*24* 228:*15*

assumed 185:*15*

assures 228:*11*

attached 252:*10* 254:*7*

attack 230:*20*

attempt 180:*17*

attempting 182:*23*

attention 160:*21*

attorney 142:*11* 195:*21* 251:*13, 14* 252:*13*

attorney's 139:*15*

August 200:*4* 208:*18*

Aurobindo 128:*13*

authorities 156:*12*

authority 191:*2* 230:*3*

available 240:*17*

Avenue 126:*21*

aware 140:*17, 23* 141:*1, 17, 19* 145:*17* 147:*6, 13* 166:*7* 198:*7* 199:*12* 212:*24* 213:*1* 220:*19* 232:*9, 15, 17* 236:*14* 243:*7, 10*

awareness 142:*17, 19* 144:*24* 145:*12, 14* 158:*17*

azide 150:*6* 217:*12* 227:*23*

azoxy 146:*20* 226:*22*

azoxy-compound 146:*2*

back 139:*17* 140:*23* 141:*16, 21* 142:*16* 145:*16* 146:*7* 152:*16* 154:*7* 157:*7, 22* 163:*17, 20* 167:*5* 168:*13* 175:*21* 181:*11* 184:*12, 14* 185:*21* 187:*9* 188:*4* 191:*1, 4, 6* 198:*18* 199:*4* 206:*14* 208:*13* 213:*2, 21* 215:*18, 22* 216:*18* 217:*8, 10* 221:*10, 13* 222:*8* 223:*8, 17* 227:*19* 231:*3, 20* 232:*19* 239:*13* 241:*23* 243:*23* 244:*23* 245:*13, 16*

ban 235:*14, 19*

based 140:*17* 141:*22, 23* 142:*18* 145:*13, 18* 150:*3, 9* 151:*19* 152:*14, 24* 154:*8* 157:*8* 159:*4, 6* 163:*23* 166:*16, 22* 167:*5* 168:*10, 20* 171:*4* 190:*7, 24* 191:*4, 7, 15* 194:*21* 197:*23* 201:*12* 203:*6* 205:*21* 206:*14* 210:*1* 213:*22, 23*

219:*18* 225:*14* 227:*16* 232:*5* 235:*13* 237:*4, 8* 239:*14, 19* 240:*20*

basic 165:*3, 15*

basis 181:*4* 225:*17* 229:*20* 231:*11*

Bates 137:*16* 138:*23* 143:*24* 238:*2*

beginning 142:*13* 153:*18* 154:*7* 236:*15*

Beijing 128:*4, 5*

believe 147:*14* 148:*10* 167:*6* 177:*17* 178:*20* 182:*5, 24* 189:*8* 191:*15* 194:*23* 203:*17* 206:*19* 217:*12* 223:*13* 224:*14* 233:*19* 234:*2* 236:*2*

believed 160:*24* 193:*2* 206:*15* 225:*15*

Bell 128:*11*

best 132:*3* 162:*14* 178:*18* 251:*10*

better 141:*9*

beyond 153:*15* 162:*5*

bigger 134:*22* 138:*10* 170:*12* 226:*15*

bit 138:*10* 144:*2* 200:*22*

blow 246:*11*

Blue 128:*11*

body 246:*23*

**boilerplate**
201:*13*  203:*8,*
*19*
**boiling**  164:*24*
219:*5*
**bottom**
136:*10, 12*
150:*24*
160:*15*
169:*13*  209:*4*
234:*8, 9*
**Boulevard**
126:*16*  127:*3*
**box**  136:*12, 14*
**break**  157:*13*
194:*6*  195:*8,*
*9, 12*  198:*14,*
*16, 20*  221:*1*
**brome**  150:*5*
**Br-OTBN**
150:*4*  217:*11*
227:*23*
**brought**  181:*5*
**bullet**  228:*8*
**bully**  243:*20*

**< C >**
**CALDERON**
126:*4*
**California**
127:*8*
**call**  245:*11*
**called**  134:*1*
**Calls**  204:*2*
**CAMDEN**
125:*2*
**Camp**  126:*12*
**capacity**  239:*6*
**captured**
245:*21*
**carbon**
164:*18*  165:*1*
**carcinogen**
213:*10*
240:*19*  247:*1,*
*12*
**carcinogenesis**
160:*21*
**Carcinogenic**
169:*11*  226:*7*

227:*1*  240:*16,*
*18*  244:*12*
**Carcinogenicit
y**  240:*14*
244:*6*
**carcinogens**
227:*3*
**care**  137:*20*
**carefully**
252:*4*
**case**  228:*22*
231:*24*  246:*9*
**CASES**  125:*7*
179:*18*
**cast**  149:*14*
184:*24*  185:*6*
**cause**  158:*23*
172:*16*
**caused**  158:*3*
**ccalderon@ma
zieslater.com**
126:*8*
**CEMAT**
154:*20*
**Center**  127:*8*
128:*4*  209:*7,*
*10*  234:*13*
**certain**  192:*24*
**certainly**
221:*22*  248:*8*
**CERTIFICAT
E**  251:*1*
**Certified**
125:*17*  251:*4,*
*20*
**certify**  251:*4,*
*8, 12*  254:*4*
**cgeddis@mazie
slater.com**
126:*8*
**CGMP**
200:*15*  201:*3*
203:*16*
204:*10*  205:*2,*
*23*  233:*5*
234:*1, 3*
**challenge**
230:*16*
**change**
132:*24*  134:*2*
135:*1*  136:*5,*

6, *14, 21, 22, 23*
137:*4, 6, 7, 14*
138:*14*
139:*22*
142:*10*
163:*18*
166:*18*  188:*6,*
*11*  192:*21*
206:*13*  207:*7,*
*10*  208:*4, 8, 9*
209:*12, 13, 20*
210:*2, 5, 19*
211:*13*  212:*4,*
*8, 10, 14, 18*
213:*21*  214:*3,*
*8, 13*  215:*10,*
*11, 13*  221:*21*
225:*5, 17*
227:*13*
233:*23*  234:*1*
237:*4, 8, 9, 11*
239:*17*  253:*3*
**Changes**
133:*24*  134:*7,*
*9*  188:*12*
206:*7, 16*
208:*1*  222:*16*
254:*6*
**Chaoyang**
128:*5*
**characterize**
182:*2*
**characterized**
228:*10*
**charge**  157:*2*
188:*20*
**Charles**
246:*15, 17, 19*
**Check**  128:*15*
139:*12*  195:*18*
**checked**
136:*14*  187:*5*
**chemical**
158:*2, 22*
162:*13*
165:*13*
194:*13*
206:*18*  237:*10*
**Chemicals**
169:*11*

**chemistry**
158:*11*  160:*8*
162:*9, 11*
165:*11*
228:*15, 24*
**CHERYLL**
126:*4*
**China**  125:*14*
128:*5*
**Ching**  128:*17*
**chloride**
133:*1*  134:*10,*
*15*  135:*2*
136:*7*  140:*9*
141:*11, 20*
142:*3*  144:*17,*
*23*  153:*4, 15*
154:*6*  158:*3,*
*14*  162:*19*
163:*13*  189:*3,*
*21*  194:*11*
196:*8, 20*
197:*12*  198:*7*
207:*10, 19*
211:*14*  213:*4,*
*8*  214:*7, 22*
217:*22*
218:*14*
219:*12*  222:*1,*
*24*  223:*9, 22*
225:*6*  228:*23*
236:*11*  238:*18*
**Chris**  132:*10*
134:*19*
135:*11*  136:*9,*
*24*  137:*15, 20*
138:*1*  142:*21*
143:*22*
149:*10*
159:*14*
160:*13*  164:*3,*
*15*  169:*6*
170:*9, 12*
171:*9*  200:*22*
209:*2*  221:*13*
225:*18*
226:*13*  228:*4*
232:*18*  234:*4*
235:*1*  240:*8*
241:*11, 22*

242:*21*
244:*22*  246:*10*
**CHRISTOPHE
R**  126:*5*
**Chuannan**
157:*2*  235:*15*
**CIPRIANI**
128:*10*
**circumstance**
239:*15*
**circumstances**
179:*9*
**citation**  241:*15*
**cited**  204:*15*
205:*18, 20*
242:*23*
**Civil**  125:*5*
**claiming**
231:*12*
**Clarification**
148:*14*
**clarifying**
234:*21*
**classes**  226:*21*
**Classification**
137:*5*
**clear**  155:*11*
181:*16*  217:*4*
229:*19*  231:*2*
248:*9*
**clearly**  155:*18*
194:*4*  246:*24*
**client**  184:*7,*
*20*  230:*12*
**clock**  139:*7, 9,*
*18*  146:*6, 8*
170:*7*  175:*22*
178:*12*
181:*11*  185:*3,*
*21*  187:*8*
243:*21*  245:*4,*
*20*
**COLEEN**
127:*19*
**colleagues**
176:*20*
**College**  126:*16*
**colloquy**
186:*21*
**column**  244:*4*

Confidential Information Subject to Protective Order

come 168:13
186:10
198:18 208:13
comes 176:12
202:17
comfortable
181:2
coming 230:17

commencement
251:5
commencing
125:13
comment
244:19
comments
231:7
commission
254:17
common
219:17 233:4
communicate
156:12
communicated
159:8

communication
247:22
communication
s 230:8
community
158:5
company
147:5 165:24
166:4, 7
187:20
188:18
189:18
236:13 247:3
complete
167:6, 7, 10,
20 189:9, 10,
18 193:2
194:12
206:17, 20
215:12
224:14, 22
completed
206:17
completely
191:20

completeness
138:19 140:2
238:22 247:16
compliance
202:5, 6
204:8, 10
205:2, 24
234:3, 13
component
147:21 148:5,
16
components
208:6
Compound
142:7 147:17
148:9, 17
193:13, 24
194:18
196:16 211:1
215:5 223:24
225:13 227:6
236:17 246:22
compounds
147:4, 7
169:12
comprehensive
237:7
Conclusion
138:13
139:20
140:20
141:23
142:18
166:14
173:17 204:2
conclusions
141:4 155:13
conditions
165:15 203:16
conduct 186:1
235:21
conducted
141:22 232:8
237:7
confident
180:6
CONFIDENTI
AL 125:9
130:12
confirm
240:17

confirmed
172:11 196:24
conform 201:3
conforms
201:15
Consequently
160:24
consider
168:2 216:5
considerable
244:5
considered
217:18
218:15 229:2
240:19
considering
229:21
consistent
233:5 244:8
contact
173:22 174:3
contained
133:19 173:24
contending
162:2
content 133:9
155:21
173:10
175:16, 24
177:9 183:16
244:19
contents
179:14 182:24
context
139:12, 15
203:6 247:22,
23
continuation
131:15
continue
178:7 179:11
180:5, 12, 20
181:1, 12
182:6 185:23
187:10
230:22
231:17
243:16, 17
248:18 249:13

Continued
127:1 128:1
142:14
continues
161:16 207:13
Control 137:4
204:8 209:12
223:15, 16
226:5 227:24
228:1, 8, 11
232:8, 13
237:16 238:6
controlled
221:20
controls 201:2
228:21
conversation
174:17
correct 133:2,
6, 15 134:2,
11 135:2
136:7, 15
137:7 141:13
143:17
144:17 145:8
146:23 147:8
148:11
149:24
150:16
152:10 156:5
158:6 162:23
165:6 166:2,
10, 23 170:22
171:24
172:18 191:9
192:16
196:13
197:15 200:6,
16 206:10
208:19
211:17
216:12
223:22 224:6
227:7 229:2
233:11
234:15
235:12
236:15
238:19
240:22
247:13 254:5

correcting
148:22
correction
234:21
corrections
252:4, 7 254:6
correctly
215:2 223:8
corresponding
152:18 154:14
correspondingl
y 140:20
Cosmetic
201:6
cost 207:18
208:7 209:15
210:20
211:15 212:3
214:16
costs 207:16
counsel
131:20
248:20 249:2,
3 251:13, 14
couple 195:11
245:12, 16, 22
COURT
125:1 131:22
180:11 252:17
create 174:22
186:5
created
140:10
152:12 153:5,
14 174:13
213:8 239:9
creating
219:11
critical
136:13, 22
137:5, 7
cured 246:23
current
200:14
205:21 233:1
currently
235:24
cwhill@duane
morris.com
127:21

< D >

**dangerous** 188:*18*

**data** 154:*15* 155:*11* 173:*17* 176:*12, 13, 17* 187:*15, 16, 20* 213:*20*

**date** 131:*8* 240:*4, 5* 251:*10* 252:*9* 254:*10*

**dated** 169:*14* 251:*20*

**DAVID** 127:*3*

**david_hobbs@f leming- law.com** 127:*5*

**day** 153:*5* 254:*17*

**days** 246:*7* 249:*12* 252:*13*

**DEA** 134:*15*

**December** 132:*22* 133:*5* 143:*1*

**decompose** 165:*5*

**decomposes** 164:*23*

**deemed** 252:*16*

**Defendant** 128:*13*

**Defendants** 127:*10, 16, 22* 128:*6*

**Defense** 248:*20* 249:*2, 3*

**defined** 204:*14, 21* 227:*4*

**definition** 205:*5, 6, 13*

**degradant** 216:*8* 217:*21* 218:*18*

**degradants** 216:*7* 217:*20* 218:*17* 219:*15*

**degradation** 238:*11, 13*

**degrade** 219:*3, 11* 220:*4, 10, 16*

**demonstrate** 182:*23* 183:*7, 11*

**demonstrated** 144:*10* 161:*19* 240:*15*

**demonstrates** 195:*4*

**Demonstrating** 182:*14*

**demonstrative** 175:*8* 177:*18* 179:*8, 13* 182:*11, 14, 22* 183:*2*

**department** 160:*10* 166:*16* 173:*7* 176:*16, 18, 19* 188:*2* 189:*4* 191:*14* 215:*8*

**departments** 176:*20*

**depended** 225:*2*

**deponent** 131:*14* 182:*12* 254:*2*

**deposing** 252:*12*

**Deposition** 125:*13* 130:*1* 131:*10, 16* 148:*21* 149:*3* 171:*16* 174:*10* 177:*19* 178:*8, 22* 179:*17* 180:*6, 13, 20* 181:*2* 185:*23* 231:*9* 248:*3, 8, 21* 249:*4, 7, 12* 250:*1*

**252:*3, 10, 14, 15***

**deps@golkow.c om** 125:*22*

**depth** 238:*7*

**described** 200:*19*

**describing** 162:*17*

**DESCRIPTIO N** 129:*8* 217:*4*

**designate** 153:*20* 180:*9*

**designated** 137:*6*

**detect** 222:*15, 23* 223:*20* 227:*24*

**detected** 152:*2* 155:*16* 159:*11* 221:*20* 222:*18* 229:*2* 232:*1*

**detecting** 198:*2* 222:*21*

**detection** 196:*23*

**determine** 213:*3*

**determined** 197:*1* 248:*21*

**develop** 223:*15* 228:*11*

**developed** 152:*18* 154:*13* 196:*22* 198:*3* 221:*24* 222:*6, 23* 223:*10* 227:*23* 232:*12* 237:*14*

**developing** 222:*14, 16* 228:*20*

**development** 213:*24* 218:*13* 219:*12* 233:*2* 237:*6*

**deviation** 206:*5, 9, 23* 207:*4* 222:*13* 239:*3* 240:*3* 242:*9* 243:*4* 244:*23* 247:*9*

**deviations** 200:*14* 206:*4*

**DHS** 156:*18*

**dialkylnitrosa mines** 160:*20*

**Diaz** 128:*17* 131:*5*

**differences** 244:*10*

**differently** 141:*8* 150:*22* 172:*9* 192:*11* 193:*16*

**difficult** 247:*4*

**digits** 238:*3*

**dimension** 233:*1*

**dimethylamine** 161:*2* 164:*24* 165:*6* 170:*16* 171:*23* 216:*9* 217:*21* 218:*18* 219:*11* 220:*11*

**Diplomate** 125:*16* 251:*3, 19*

**direct** 184:*15* 244:*7*

**directing** 135:*11*

**Direction** 130:*2*

**directly** 183:*17*

**director** 155:*24* 156:*10* 194:*9* 204:*12* 215:*7* 234:*12*

**disagree** 151:*11* 154:*3* 162:*6* 233:*3*

**disagreeing** 210:*17, 22*

**disagreement** 183:*4*

**disagrees** 191:*18*

**disclose** 158:*21*

**disclosed** 171:*22* 172:*17* 176:*4* 200:*5*

**disclosures** 166:*1, 9, 21* 188:*21* 230:*8*

**discovered** 154:*11, 17* 163:*12*

**discovery** 197:*23* 225:*1, 3* 233:*22*

**discussed** 174:*2* 208:*19* 222:*22*

**discusses** 209:*7*

**discussing** 143:*14* 233:*21*

**Discussion** 144:*7* 178:*15* 209:*11*

**display** 226:*24*

**disproportional ly** 226:*20*

**disregard** 184:*3*

**DISTRICT** 125:*1* 128:*5*

**DMA** 161:*2, 12, 14* 162:*19* 164:*1* 220:*16*

**DMF** 134:*10, 16, 17* 142:*24* 145:*8* 158:*20* 159:*19* 162:*21* 164:*23* 165:*5, 12* 193:*21* 194:*10* 207:*8* 216:*7, 8* 217:*20, 21* 218:*16, 17, 22* 219:*1, 3, 6, 11,*

14, 17, 19
220:3, 5, 10,
15  223:9
**DNA**  226:5
244:8
**DOCUMENT**
125:6  134:4,
6  135:16
136:4, 17, 21
137:10, 12
138:4, 18
139:2, 13
140:2, 6, 15
142:12, 21
143:6, 12, 15,
19  144:19, 23
145:2, 10
147:10, 16
148:1, 3
150:2, 3, 18
151:8, 14, 18,
23  152:12, 21
159:3, 7
160:6, 11
161:8  162:1
163:1, 21
164:12, 14, 16
165:8, 19
167:19
168:12
169:16, 18, 20,
24  171:1, 4, 8
189:11  191:4
192:22  195:1
199:11, 13, 15,
23  200:8, 10,
18, 20  201:10
205:19
206:12, 13
207:3, 22
208:20
209:22
216:14
217:16  219:8
220:21
221:13  222:9
225:19
226:10, 12
227:9, 12
229:4, 21
233:15

234:17, 19
236:6  238:6
239:8, 18, 23
240:24  241:2,
4, 6, 19
242:18  244:15
**documenting**
209:19
**Documents**
130:8  162:13
166:13
168:18  188:1
192:5, 15, 20
204:9  230:1
233:21
**document's**
168:16
**doing**  142:15
181:3  230:7,
10  252:8
**dominate**
209:16
210:21
211:16  214:24
**download**
169:21
**downloading**
170:4
**Dr**  173:22
174:3  187:17
246:21
**draft**  237:22
238:23  239:9,
21
**Drug**  132:23
133:24
187:19  201:6
222:20
228:12, 13, 15,
16, 19  234:14
**drugs**  176:5
233:6  235:11
236:1
**Du**  209:11, 14,
19, 23  210:6,
13, 16, 18
214:23
**DUANE**
127:13, 19
**due**  171:22
180:22

182:17
235:20, 22
238:7
**duly**  132:2
251:6

**< E >**
**earlier**  151:16
157:6, 8
160:7  173:13
220:9  234:22
**early**  238:8
**eating**  178:15
243:16
**efeldman@c-
wlaw.com**
128:12
**effect**  206:6,
16
**efficient**  182:4
**Eisenhower**
126:6
**either**  212:16,
21  232:17
**Email**  129:9
**e-mail**  153:19
154:19, 23
155:7, 10, 19
156:14, 17, 20,
22  157:7, 10
171:17  172:4,
14, 22  173:1,
3, 9, 10, 13, 16,
21  174:3, 5
176:1  177:9,
13, 14, 23
178:4, 18
179:14, 15
181:18, 21, 22,
23  183:1, 16
187:17  188:4,
5  197:19
246:14, 18
**Embarcadero**
127:8
**emphasize**
188:3  202:3
219:16
**employee**
251:12, 14
**ended**  249:4

**engineering**
165:14
**English**  136:8
149:4  185:10
**enjoyed**
249:21
**ensure**  221:18
222:20
**entire**  152:16
193:19
202:15  203:6
205:24
218:23
230:10
232:16
242:17  249:11
**entitled**
182:21  230:4
231:11
**equipment**
197:24  237:14
**errata**  252:6,
9, 12  254:7
**especially**
160:23  214:4
**ESQ**  126:3, 4,
5, 11, 16, 20, 21
127:3, 7, 13,
19  128:3, 10
**establish**
230:18
**established**
232:13  237:16
**establishing**
230:7
**Establishment**
208:16
**ETHAN**
128:10
**evaluate**
206:6  218:24
221:17
222:19
223:10, 14
**evaluated**
163:22  214:1
217:10, 13
219:10  227:17
**Evaluation**
136:13  137:4,
13  138:14

139:21
140:19  141:3,
22  151:20
154:7, 10
160:9  166:15
167:4, 7, 9, 13,
20, 23  168:1,
3, 10, 17, 21
169:10  189:5
190:10, 12
191:14
194:22, 23
195:4  206:15,
19  212:15, 19
214:14
215:12
218:23
224:13, 14, 22,
24  225:15
233:24
234:14  237:8,
9
**evaluations**
213:3
**Evelyn**  128:15
132:1  148:8
150:19
**evening**
249:16
**event**  233:20
**everybody**
249:19
**evidence**
137:9  155:3
156:8  172:4
175:18
178:18
179:24
196:15
197:20
220:13
233:14
240:16  244:6,
7  246:24
247:12
**evolution**
232:1
**evolve**  225:4
**evolved**  237:14
**evolving**  198:1

**exactly**
162:*18*
172:*15* 182:*9*
247:*5*
**EXAMINATIO**
**N** 129:*2*
132:*12* 251:*5*
**examined**
132:*8*
**example**
153:*14* 211:*23*
**excuse** 204:*24*
243:*9*
**Executive**
209:*11*
**Exhibit**
132:*11, 14, 19*
134:*21, 24*
135:*9* 142:*22*
159:*15* 164:*4,*
*7* 168:*24*
169:*2, 4, 9*
171:*11* 174:*8,*
*9, 11* 175:*8*
179:*9, 13*
182:*11, 14*
186:*2* 196:*5*
197:*10, 18, 21*
199:*7, 17*
208:*13, 15, 19,*
*20* 215:*19*
225:*20, 23*
232:*19*
237:*19, 21*
239:*23* 240:*2*
242:*3, 4, 8, 10*
244:*24*
246:*10, 13*
**exist** 146:*22*
**existed** 140:*24*
147:*14*
163:*12*
196:*19* 198:*7*
**existence**
154:*18*
155:*12*
158:*14*
163:*19* 197:*1*
199:*12*
216:*23*

224:*11* 232:*5,*
*11*
**expert** 158:*10*
160:*8* 165:*11*
241:*6* 242:*18*
244:*18*
**expires** 254:*17*
**explosion**
173:*4* 188:*8*
**exposures**
247:*2*
**expressed**
148:*18* 155:*10*
**extent** 238:*7*
**extra** 232:*24*
**extremely**
227:*1*

**< F >**
**facilitate**
182:*12*
**facilities** 201:*1*
**facility** 157:*2*
200:*3* 235:*15*
**fact** 141:*10*
147:*3* 154:*19*
172:*13*
211:*13*
212:*10* 213:*7*
224:*22* 225:*8*
236:*8*
**fail** 252:*15*
**failed** 166:*4*
216:*2* 221:*17*
222:*22*
223:*19, 20*
225:*9* 236:*12*
**failing** 216:*11*
**failure** 152:*9*
206:*6* 224:*4*
**familiar** 149:*7*
199:*10, 13, 15*
**far** 213:*19*
219:*4* 232:*15*
**fax** 125:*22*
**FDA** 133:*5,*
*14* 143:*13*
159:*8* 162:*22*
166:*9* 167:*11,*
*14* 168:*4, 12*
171:*22*

172:*17* 176:*6,*
*14* 187:*16*
188:*21*
189:*12, 15, 17,*
*21* 190:*13*
191:*18* 192:*1,*
*15, 21* 193:*1,*
*5, 9, 19, 22*
194:*11* 195:*2*
199:*9, 18*
200:*3* 201:*15*
202:*2, 17*
203:*8* 205:*17*
206:*10* 207:*6*
208:*16, 22*
209:*19, 23*
210:*11*
215:*24*
221:*16*
222:*10* 230:*9,*
*19* 232:*21*
233:*8, 21*
234:*14, 22*
235:*5, 7, 8, 21*
243:*8, 11*
247:*10*
**FDA's** 233:*21*
**February**
225:*24*
**Federal** 201:*5*
203:*23*
**feel** 162:*10*
182:*18*
**feels** 162:*8*
**FELDMAN**
128:*10*
**figure** 170:*22*
**figured** 159:*10*
**file** 191:*2*
**filed** 143:*1*
162:*21*
166:*13* 204:*9*
**filing** 176:*11*
**finally** 135:*24*
**financially**
251:*15*
**find** 163:*15*
**fine** 137:*21*
185:*7* 195:*13*
196:*1* 198:*19*

**finish** 175:*11*
245:*11*
248:*19* 249:*1*
**finished** 153:*8*
170:*4*
**FIRM** 126:*14*
128:*1* 209:*16*
235:*8*
**first** 135:*7*
153:*4* 158:*10*
161:*10* 186:*9*
200:*2* 211:*23*
213:*18*
220:*22* 235:*4*
241:*1, 3*
**fits** 230:*5*
**five** 195:*24*
198:*13* 245:*5*
246:*3*
**FLEMING**
127:*1*
**Florida** 126:*22*
**focus** 207:*17*
**focused** 160:*22*
**focusing**
236:*20*
**follow** 157:*4*
**follows** 132:*4,*
*9* 144:*11*
203:*16*
**font** 132:*17*
**Food** 132:*23*
201:*5*
**foregoing**
251:*8* 254:*4*
**forgot** 139:*15*
**Form** 135:*1*
137:*13* 150:*2*
158:*3* 160:*5*
161:*8, 13*
162:*1, 18*
163:*1* 164:*2*
166:*12* 167:*1,*
*17* 170:*24*
171:*6* 172:*2,*
*13, 20* 188:*24*
190:*5, 21*
191:*11, 22*
192:*7, 18*
193:*13, 24*
194:*18*

196:*15* 197:*6,*
*17* 200:*8, 18*
201:*10, 22*
202:*12* 203:*1,*
*13* 204:*2*
205:*9* 206:*12*
207:*22* 210:*9*
211:*1* 212:*13*
213:*16*
214:*11* 215:*4*
216:*7, 14*
217:*19* 218:*3,*
*16, 20* 219:*24*
220:*13* 222:*3*
223:*2, 24*
224:*18*
225:*13* 227:*9*
229:*4* 233:*13*
234:*17*
236:*17*
238:*21*
240:*24*
242:*14*
244:*15*
247:*15* 254:*6*
**Formation**
159:*23*
160:*22* 216:*3,*
*19* 217:*6*
232:*23* 244:*9*
**formed** 161:*1*
162:*20*
**forming**
225:*10*
**forth** 185:*21*
251:*10*
**found** 147:*17,*
*20* 148:*1, 2*
154:*9* 191:*19*
192:*14* 198:*5*
205:*19* 206:*4*
227:*19* 246:*22*
**Foundation**
152:*12* 163:*1*
165:*8* 166:*12*
167:*1* 168:*7*
170:*24* 172:*2,*
*21* 175:*7, 19*
176:*9* 187:*23*
188:*24* 190:*5,*
*21* 191:*11, 22*

Confidential Information Subject to Protective Order

192:*18*
196:*16*
197:*21*
201:*11*
207:*23*
211:*19* 222:*3*
229:*5* 233:*13*
238:*21*
242:*14*
243:*14, 19*
247:*15, 18*
**foundations**
230:*11*
**four** 143:*24*
249:*7*
**F-R-A-E-N-E-**
**N-E** 148:*12*
**Francis** 234:*11*
**Francisco**
127:*8*
**FREEMAN**
126:*3*
**front** 164:*7,*
*13* 169:*17*
242:*11*
**FUJIMAKI**
126:*21*
**full** 141:*3*
235:*4*
**fully** 222:*19*
**fundamental**
228:*20*
**funny** 183:*20*
**FURTHER**
132:*12*
182:*19*
209:*14*
238:*12*
248:*23* 251:*8,*
*12*

**< G >**
**gained** 158:*16*
239:*11*
**Garland**
128:*15* 132:*1*
136:*18*
137:*22* 154:*2*
184:*15* 185:*8*
186:*11*

**GC-MS** 198:*3*
232:*1*
**GEDDIS**
126:*5* 138:*5*
**general** 158:*5,*
*16* 188:*1*
211:*21*
**generally**
160:*24* 176:*15*
**generate**
176:*17*
**genotoxic**
146:*1* 149:*22*
150:*14* 151:*4,*
*21* 152:*1, 8,*
*17, 23* 163:*23*
167:*7* 176:*4*
188:*18* 189:*6*
191:*9* 213:*9,*
*18* 217:*11, 14*
227:*22*
236:*11*
237:*23*
238:*10* 241:*9*
244:*21*
**genotoxicity**
151:*19*
**give** 135:*8, 22*
136:*19* 165:*5*
170:*3* 179:*20,*
*21* 180:*3, 5*
**given** 182:*19*
186:*23*
189:*20* 247:*6*
254:*5*
**gives** 137:*5*
**giving** 135:*15*
**glad** 231:*2*
**GMP** 201:*16*
202:*6* 205:*23,*
*24*
**go** 135:*14*
136:*24*
137:*15* 138:*2*
139:*6, 17*
140:*4* 141:*16*
142:*21*
143:*23* 146:*5,*
*7* 149:*9, 16*
153:*22*
157:*14* 158:*9*

159:*2* 163:*14*
164:*4, 15*
168:*24* 170:*8*
174:*16*
175:*11, 20, 21*
178:*11, 12*
181:*11*
182:*19*
184:*12, 14*
185:*2, 21*
187:*9* 193:*9,*
*19* 195:*10*
198:*20* 206:*1*
209:*2* 215:*18*
221:*2* 225:*20*
226:*13*
229:*14*
231:*20*
232:*18* 234:*4,*
*24* 237:*18*
238:*3* 239:*5,*
*23* 240:*9*
241:*10, 22*
242:*1, 3, 22*
243:*23*
244:*22* 245:*4,*
*15* 246:*9*
248:*3, 16*
**Godwin**
234:*11*
**going** 134:*20*
135:*9* 139:*7,*
*9* 140:*22*
143:*20*
145:*16*
150:*22* 153:*9*
157:*12* 170:*1*
172:*6, 8*
176:*22*
177:*19* 178:*1,*
*7, 9* 179:*5, 23*
180:*20* 181:*1*
184:*2* 187:*4,*
*9* 193:*6, 22*
194:*12* 195:*7*
211:*5, 7*
215:*22* 218:*5,*
*9* 220:*24*
226:*15*
229:*15* 231:*6*
243:*13, 15, 17,*

*20, 22* 245:*22*
248:*6, 11*
**GOLKOW**
125:*20* 131:*6*
**Good** 144:*1*
165:*18* 175:*1*
195:*12*
200:*14*
249:*16, 17*
**Grant** 127:*14*
**great** 160:*20*
183:*23*
**GREENBERG**
127:*7*
**GRIFFITH**
126:*4*
**groundwater**
246:*23*
**group** 146:*1*
**Guanghua**
128:*4*
**guess** 174:*5*
184:*6*
**guessing** 173:*7*
**guideline**
225:*24*
226:*19* 227:*5*
**guidelines**
227:*16*

**< H >**
**half** 160:*15*
195:*7*
**Hang** 224:*20*
**HANNAH**
126:*21*
**happened**
149:*3* 154:*12*
162:*18*
186:*21* 187:*1*
235:*23*
**harass** 176:*24*
**harassing**
178:*3* 180:*16*
186:*8*
**hard** 179:*3*
**hate** 179:*20*
**heading** 144:*7*
207:*5* 228:*8*
232:*21*

**Health** 241:*16*
244:*3*
**Healthcare**
127:*17, 23*
128:*8*
**hear** 194:*4*
**heard** 148:*8*
**hearsay**
247:*16*
**held** 131:*11*
**help** 182:*11*
**hereinbefore**
251:*10*
**hfujimaki@fort**
**hepeople.com**
126:*23*
**high** 145:*24*
219:*3* 226:*20*
227:*1* 247:*6*
**higher** 222:*17*
**Highly** 130:*12*
244:*12*
**high-potency**
227:*2*
**HILL** 127:*19*
**HILTON**
126:*11*
**hindsight**
155:*24*
**hit** 195:*12*
**HOBBS** 127:*3*
**holding** 201:*3*
**HOLLIS**
126:*14*
**homework**
193:*6, 9*
**HON** 125:*7*
**Honestly**
182:*16*
**hour** 157:*12*
195:*7*
**hours** 245:*5*
246:*6* 249:*8,*
*11*
**Houston** 127:*4*
**Huahai**
127:*16, 17, 22,*
*23* 128:*7*
**Hughes** 128:*15*
**HUI** 128:*1*

human
240:19  247:1,
12
Humans
169:11
240:18  244:12
hydrochlorothi
azide  170:17
hydrolysis
145:23
146:16, 18, 22
147:5, 19, 23
148:6
hypothetical
142:8

< I >
i.e  226:21
IARC  169:4,
10  172:12
ICH  225:24
identification
171:13
identified
140:22
144:21  145:1,
3, 15  149:23
150:11
151:17, 21
152:2, 20
154:12, 21
168:18
206:10, 23
216:17  223:8
224:5  239:10
242:9  251:6
identifies
150:14
identify  149:5
166:4  223:21
225:10
227:21  237:15
identifying
224:4
immediately
168:16
imperative
252:11
implemented
216:4  228:1

Import  235:8,
10, 14, 17, 19
important
193:8  207:18
228:10
impression
186:5
Impressive
215:20
improve
207:14  208:1,
6, 10  211:22
212:8, 9
improved
214:12, 16
improvement
212:2, 16, 20
213:11
improvements
211:22
improving
214:19
Impurities
143:3, 14
144:7, 9, 10
145:3, 13, 17,
23  146:3, 15,
17  147:2, 4,
18, 22  148:6
149:21, 22
150:15  151:4,
22  152:1, 17,
23  154:9
155:21, 22
156:16
163:23  166:2
173:2, 14
176:5  188:19
189:6, 7
190:19  191:3,
9  212:20
213:5  214:1,
4  216:4, 7
217:13, 19
218:16
221:19  222:7,
15, 18, 19, 22
223:5, 7, 11,
15, 16  226:6,
24  227:15, 17,

20  232:9
236:11  238:10
impurity
143:16
144:16  145:7
146:21  147:6
152:8  153:3
166:14
187:19  208:5
210:3, 4
212:1, 5, 11,
22  213:9, 19
214:14, 18, 23
215:13, 14
222:23
223:20  224:5
228:9, 12
237:12, 23, 24
238:18  241:9
244:21
inaccurate
140:11  168:2,
3
inadequacy
230:7
inadequate
152:9  166:22
191:20  192:2
225:9  238:17
inappropriate
177:22  183:2
186:2, 8
incident
141:18
include
168:17  176:3
included
146:3  159:7,
19  189:10
191:3  207:8
214:15  223:9
includes  227:6
including
134:9  156:12
216:8  217:11,
20  218:17
incomplete
192:22
incorrect
167:14

increase
207:15
increasing
207:17
INDEX  129:1
130:1
indicating
217:24
218:13  219:9
Industries
127:10
industry
158:16
165:13
219:18
232:16  233:1,
4
INFORMATIO
N  125:9
133:4, 13, 18
159:5, 18
167:11
173:23  174:1
182:20  189:5,
9, 11, 19, 20
190:12, 17
196:4  197:9
219:19  220:3,
5  247:8
informed
157:5
ingredients
200:16
initial  137:13
210:5
inspected
200:3
Inspection
208:16, 17, 19
209:1  210:12
235:22, 23
inspector
217:3, 7
233:20  234:22
inspectors
234:23
instituting
207:19
instruct
137:19

instructions
137:20  252:1
insufficient
166:22  191:7,
8  238:7, 9
intakes  227:2,
4
intention
207:14
interaction
244:8
interest
143:22  160:21
interested
251:15
internal  136:5
interpret
237:2
Interpreter
128:15
131:24  132:1,
9  135:4
137:19, 24
148:14, 15, 17
195:16  237:1
Interpreters
128:15
interrupt
146:10  248:13
interrupting
179:2
intimidate
180:17
intimidating
178:3
Introduction
160:14, 19
investigated
156:2
Investigation
156:15
159:22  173:2,
14  237:22
239:3  240:3
242:9, 24
243:4  244:24
247:9
investigator
209:10
investigators
206:5, 10, 24

Confidential Information - Subject to Protective Order

involved 228:24
involves 194:5
involving 225:6

IRBESARTAN 125:4 131:12 155:20, 22 156:16, 18 173:3, 15 188:7
IRIS 126:16
iris@hollislawfirm.com 126:18
isomer 210:4 214:4
issue 188:13 218:1
Item 136:13
Items 137:4
its 164:24 168:12 200:6 221:24 240:4

< J >
JACKSON 126:20
James 246:18
January 218:1
JERSEY 125:1 126:6
JESSICA 127:13 137:18
JEZ 127:1
Jim 246:14, 16
Jinsheng 129:9 153:18 155:7, 20 171:17 172:14 173:1
job 144:1 156:19, 23 160:9 173:11 176:1, 2 215:17
jobs 236:13
jpriselac@duanemorris.com 127:15

judge 183:6, 14 184:1
Judy 128:17 131:5
JULIA 126:5
July 129:9 154:20 155:8 157:10 171:17 172:21 173:1 200:4 208:18
jump 208:12 225:18
Jun 209:11, 19 210:6, 13, 16, 18
June 140:21 144:22 151:17 154:12 155:15 159:12 163:11 168:15 196:18, 21 198:2 212:23 213:1 216:17 217:1 220:4 224:9 232:10 237:13 239:11

< K >
KANNER 126:11
Kansas 126:17
KATE 127:7
KATZ 126:3
Keep 179:5 243:21 247:3
Kerry 128:4
kinds 231:7
knew 157:1 165:18
know 138:20 142:2, 4 148:11 149:1 165:17 167:15 171:21 173:20 174:22

175:18
176:24 177:2
179:1 183:20
186:3 187:3
189:23
191:18
196:19 203:7, 19, 22 204:14, 16 205:5
210:7 213:19
216:20, 22
217:6 219:2, 4 220:3
221:23
224:12
229:13 230:4
231:11
232:16 241:7, 8, 24 244:20
245:10 247:16
knowing 142:10
knowledge 140:18 141:22, 24 142:19 145:18 150:4, 10 151:19 152:15, 24 154:8, 16 158:12, 16 159:4, 6 163:14, 18, 24 166:17, 20 167:5 168:19, 21 188:17 190:7 191:1, 4, 6 194:22 205:21 206:14 210:2 213:23 217:8 220:15, 17 222:6 223:4 225:14 228:14, 24 232:2, 7 235:13 237:4 239:14
known 142:13 152:24 158:4 170:15, 20

212:20 213:5
214:4 217:13
227:15
knows 149:4 175:13
KUGLER 125:7

< L >
l.hilton@kanner-law.com 126:13
lab 188:11
laboratory 244:7
lack 166:12 167:1 168:6 170:24 172:2, 21 175:19 176:8 188:24 190:5, 21 191:11, 22 192:18 196:15 197:21 201:11 207:23 211:18 222:3 229:5 233:13 238:21 242:14 244:9 247:15
laid 247:18
language 144:13 185:6
large 169:20
late 179:2
laughing 183:20
LAW 126:14 128:1 179:21, 22 204:21
laws 204:15
lawyers 179:17
LAWYER'S 255:1
lay 243:14
laying 230:11
LAYNE 126:11

learned 159:13 224:10
lectured 229:16, 17
left 215:19
legal 131:6 204:2
letter 133:20 199:8, 18 200:13 204:15 205:16, 17 206:2, 3, 24 208:22 215:23 234:5, 10 235:7
letters 201:14 202:2, 16
letting 177:6
level 142:19 150:4 152:24 168:10, 21 190:8 212:1, 22 213:24 214:14 225:15 228:12 237:5, 12 245:10
levels 222:18 247:7
LI 128:3 246:15, 20, 21
LIABILITY 125:5 131:13
lifted 235:18, 20
LIHONG 125:13 129:3 131:14 132:6 251:5 254:10
Limit 226:6 228:14
LIN 125:13 129:3, 9 131:14 132:6 149:12 153:18 155:7, 20 156:2 171:17 172:14 173:1, 22 174:3

184:*2, 16*
185:*14*
187:*17* 239:*4*
251:*5* 254:*10*
**LINDA**
125:*13* 129:*3*
132:*6* 251:*5*
254:*10*
**LINE** 130:*4, 8,*
*12, 15* 177:*10*
181:*4, 21*
216:*2* 235:*5*
248:*19* 249:*1*
253:*3* 255:*2*
**link** 169:*19*
**list** 227:*14*
**listed** 143:*16*
144:*11, 15*
145:*2, 6, 13*
150:*8, 16*
151:*5, 12, 24*
152:*4, 7, 22*
222:*9* 223:*3*
**listen** 184:*17*
186:*14*
**listened** 156:*2*
**lists** 145:*16*
206:*3*
**literally**
149:*16* 151:*10*
**literature**
160:*3* 163:*7,*
*16* 164:*9*
166:*5, 8*
220:*9, 20*
**LITIGATION**
125:*5, 20*
131:*7, 13*
**little** 138:*9*
141:*8* 144:*2*
157:*12*
170:*12*
200:*21*
226:*14* 228:*5*
**LLC** 126:*3,*
*11* 127:*11, 18,*
*24* 128:*8*
**LLP** 127:*1, 7,*
*13, 19*
**loaded** 135:*10*
**loading** 135:*11*

**long** 135:*17*
169:*20, 24*
194:*3* 199:*14*
**look** 132:*17*
135:*13* 139:*1,*
*7* 163:*14*
180:*21* 184:*3,*
*16* 204:*6*
216:*18* 234:*9*
239:*8*
**looked** 154:*13*
217:*24*
**Looking**
137:*3* 138:*12*
139:*2* 144:*6*
145:*21* 147:*1*
149:*19*
150:*13, 24*
160:*18*
164:*20, 21*
170:*10, 14*
171:*15* 209:*6,*
*9* 221:*15*
226:*18* 228:*7*
232:*20* 235:*3,*
*6* 238:*5*
240:*13* 242:*7*
244:*2* 246:*13*
**looks** 175:*1*
**LOSARTAN**
125:*4* 131:*12*
**lot** 175:*12*
186:*4* 230:*13*
245:*19*
**Louisiana**
126:*12*
**lower** 138:*14*
139:*22*
141:*12* 142:*4*
207:*15* 219:*5*
227:*4*
**lowering**
207:*18*

**< M >**
**M7** 225:*24*
226:*19*
**MacDonald**
246:*15, 17, 19,*
*21*

**main** 155:*21*
208:*4, 9*
211:*24* 214:*17*
**major** 136:*23*
**making**
166:*21* 176:*3*
188:*21*
189:*14, 16*
222:*16*
**manufactured**
196:*19*
205:*22*
223:*21* 235:*15*
**manufacturing**
133:*1, 24*
163:*13*
196:*12* 198:*8*
200:*3, 14*
201:*2, 15*
202:*4* 203:*15*
204:*7, 23*
205:*1* 206:*7*
207:*14*
222:*17*
227:*13*
228:*16, 17*
232:*24* 234:*12*
**Marked**
130:*12* 171:*12*
**market**
209:*17*
210:*22*
211:*17* 215:*1,*
*16* 247:*4*
**material**
238:*14*
**materials**
165:*3*
**matter** 131:*11*
133:*19* 162:*14*
**Maureen**
125:*15*
131:*22*
186:*20* 187:*7*
249:*20* 251:*1,*
*15*
**MAZIE** 126:*3*
**MDL** 125:*4*
131:*13*
**mean** 133:*18*
147:*19*

178:*23* 182:*1*
184:*8, 13*
203:*10* 229:*12*
**meaning**
155:*9* 201:*4*
203:*4* 204:*5,*
*20* 205:*18*
**means** 147:*16*
201:*8, 20*
202:*10, 22*
203:*23*
204:*14* 225:*2*
232:*3, 13*
**meant** 146:*20*
148:*10*
155:*10* 173:*21*
**measures**
237:*16*
**meats** 246:*23*
**mechanism**
159:*10*
160:*23*
163:*15, 16*
212:*24*
216:*19, 21*
217:*6*
**mechanisms**
162:*11, 13*
**meets** 203:*17*
**members**
226:*20*
**mentioned**
155:*4* 160:*7*
173:*12* 212:*3*
220:*18* 227:*18*
**merely** 208:*7*
214:*17*
**metabolism**
244:*11*
**method**
152:*19*
154:*16*
196:*22* 198:*2,*
*3, 4* 216:*24*
225:*2* 232:*12*
237:*14, 15*
**methods**
154:*14* 201:*1*
221:*18* 222:*6,*
*15* 223:*10, 15*
227:*24*

mgriffith@maz
ieslater.com
126:*9*
**MICHAEL**
126:*4*
**middle** 133:*22*
240:*11* 246:*14*
**Min** 246:*15,*
*20, 21*
**mine** 135:*24*
**minimize**
231:*6*
**Minor** 133:*23*
134:*1, 7* 137:*6*
**minute** 143:*7*
**minutes**
195:*11, 24*
198:*13*
220:*24* 245:*6*
246:*4* 248:*19*
**mischaracteriz
es** 175:*17*
197:*19, 20*
**misinterprets**
137:*9*
**misleading**
175:*17* 178:*2,*
*19* 179:*10*
182:*5* 248:*1*
**Misstates**
137:*9* 155:*2*
156:*7* 159:*1*
160:*5* 163:*2*
168:*6* 172:*2,*
*3, 20* 175:*18*
176:*8* 187:*23*
194:*18*
196:*15* 211:*1,*
*19* 212:*13*
215:*4* 219:*24*
220:*13*
233:*13*
236:*17*
238:*21* 247:*17*
**mistranslated**
149:*8*
**misunderstandi
ng** 147:*15*
**moment**
135:*5, 8, 22*
136:*19* 225:*19*

**money** 209:*14* 210:*19* 211:*14*
**Monograph** 169:*5* 172:*12*
**Monographs** 169:*10*
**monoxide** 164:*18* 165:*1*
**MORGAN** 126:*20*
**morning** 249:*8*
**MORRIS** 127:*13, 19*
**move** 231:*3, 8, 15*
**MTBE** 134:*16, 17* 223:*9*
**muffled** 173:*4* 188:*8*
**multiple** 155:*4* 158:*19*
**mutagenic** 176:*4* 188:*18* 213:*9* 216:*3, 6* 217:*19* 218:*15* 226:*5* 228:*10*
**mutagens** 226:*21*

**< N >**
**N,N-Dimethylforma mide** 164:*10*
**N2O3** 161:*3*
**N2O4** 161:*3*
**name** 131:*5*
**named** 234:*11*
**narrative** 230:*15, 16*
**NCRA** 251:*19*
**NDMA** 140:*10, 17, 22, 23* 141:*1, 10, 17, 19* 142:*2, 10, 17* 143:*16* 144:*15, 21, 24* 145:*6, 12, 15* 147:*6, 14, 21* 148:*1* 149:*24* 150:*15* 151:*6,*

11, 17* 152:*4, 7, 20* 153:*3, 13* 154:*11, 13, 16, 18, 22* 155:*12, 13, 16* 156:*3* 158:*3, 14, 17, 21, 23* 159:*10, 11* 160:*24* 161:*14* 162:*18, 20* 163:*12, 19* 164:*2* 168:*16, 17* 170:*19* 171:*6* 172:*13* 173:*18, 24* 196:*6, 19, 23* 197:*1, 10, 23* 198:*3, 5, 7* 200:*6* 212:*11, 24* 213:*8, 18* 216:*18, 19, 23* 217:*6* 221:*23* 222:*23* 223:*20* 224:*4, 5, 11* 225:*1, 10* 227:*7* 229:*1* 231:*24* 232:*5, 11, 23* 233:*22* 236:*14* 237:*15, 17* 238:*18* 239:*10, 20* 240:*15, 17, 18* 241:*8* 244:*6, 11, 20* 247:*12*
**necessary** 252:*4*
**need** 139:*11* 143:*7* 174:*19* 176:*23* 180:*5* 182:*19* 184:*19* 204:*6* 221:*17*
**needed** 157:*4*
**needs** 137:*19*
**Neither** 149:*23* 151:*5* 251:*12, 14*

**never** 155:*11* 235:*23*
**Nevertheless** 240:*18*
**NEW** 125:*1* 126:*6, 12* 205:*11* 216:*4* 218:*10* 222:*17* 223:*7, 11* 224:*2*
**Ng** 128:*17*
**night** 153:*10, 17* 249:*17*
**Nitrite** 129:*11* 170:*17* 171:*20* 196:*8* 197:*12*
**nitrosating** 161:*3, 13*
**Nitrosation** 159:*23*
**nitroso** 147:*17, 19, 21* 148:*5, 9, 16, 19* 171:*6*
**nitrous** 161:*19* 162:*20* 164:*2* 171:*23* 172:*13*
**N-nitrosamines** 161:*20*
**N-nitroso** 146:*2, 20* 147:*3, 7* 169:*12* 226:*22* 227:*6*
**N-Nitrosodimethy lamine** 129:*10* 159:*22* 170:*18* 171:*19* 196:*6*
**nodding** 184:*20* 185:*14*
**NOLAN** 127:*1*
**North** 126:*21*
**Notary** 251:*20* 254:*20*
**note** 243:*3*

**noted** 131:*20* 254:*7*
**notes** 187:*5* 255:*1*
**November** 199:*8, 17* 207:*6* 208:*23* 215:*23* 240:*4*
**Number** 133:*23* 137:*3, 16* 138:*23* 163:*8* 171:*11* 206:*5, 9, 22* 207:*5* 215:*24* 221:*16* 222:*13* 226:*20* 230:*11, 12* 232:*21* 238:*2*
**numbers** 143:*24* 209:*3*

**< O >**
**Oak** 127:*3*
**oath** 149:*13*
**object** 136:*19* 243:*19*
**objecting** 175:*10, 14, 16*
**Objection** 133:*7, 16* 134:*3, 12* 135:*3, 6, 7* 136:*16* 137:*8* 138:*17, 18* 140:*1, 12* 141:*14* 142:*6* 143:*5, 18* 144:*18* 145:*9* 147:*9* 150:*1, 17, 21* 151:*7, 13* 152:*11* 153:*6, 10* 155:*1* 156:*6* 158:*7, 24* 160:*4* 161:*7, 24* 162:*24* 165:*7* 166:*11, 24* 167:*16* 168:*5* 170:*23* 172:*1, 19*

176:*7* 187:*22* 188:*23* 190:*4, 20* 191:*10, 21* 192:*6, 17* 193:*12, 23* 194:*17* 196:*14* 197:*5, 16, 17* 200:*7, 17* 201:*9, 21, 23* 202:*11, 13, 24* 203:*12* 204:*1* 205:*8* 206:*11* 207:*3, 21* 210:*8, 24* 211:*18* 212:*12* 213:*15* 214:*10* 215:*3* 216:*13* 218:*2, 19* 219:*23* 220:*12* 222:*2* 223:*1, 23* 224:*7, 17* 225:*12* 226:*9* 227:*8* 229:*3, 23* 233:*12* 234:*16* 236:*16* 238:*20* 240:*23* 241:*18* 242:*13* 243:*2* 244:*14* 247:*14*
**objections** 180:*10* 211:*6, 9, 11*
**obtain** 159:*6, 19*
**obtained** 154:*14* 159:*18*
**occasions** 156:*13*
**occur** 226:*23*
**occurring** 165:*1*
**Occurs** 129:*10* 171:*19* 196:*6* 197:*11*

Confidential Information Subject to Protective Order

O'Connor
125:*15*  251:*1,*
*15*
office  181:*20*
234:*12, 13*
official  245:*3*
officials
234:*22*
Oh  187:*3*
okay  135:*7*
137:*24*  138:*8,*
*12*  162:*7*
170:*6*  175:*11*
177:*12*
182:*13*  183:*3,*
*22*  184:*11*
186:*11*  187:*8*
195:*14, 16, 23*
218:*8*  229:*11*
230:*24*
231:*16*  245:*7,*
*13*  248:*2*
ONCl  161:*4*
ongoing
188:*10*
opinion
233:*20, 22*
opportunity
135:*16*  142:*12*
opposite
185:*14*
option  137:*5*
Orange  126:*21*
ORDER  125:*9*
Organic
144:*9, 10*
145:*3, 7*
189:*5*  223:*5*
227:*14, 20*
Organization
241:*16*  244:*3*
original
252:*12*
Orlando
126:*22*
Orleans
126:*12*
outcome
214:*18*  215:*14*

outcomes
208:*8*  212:*4*
214:*15, 17*
outside  163:*3*
242:*14*  243:*5*
Overall  188:*5*
214:*14*  228:*18*
Overland
126:*17*
owing  244:*5*

< P >
P.C  128:*10*
p.m  249:*23*
packing  201:*3*
PAGE  129:*2,*
*8*  130:*4, 8, 12,*
*15*  133:*22*
136:*11*  137:*1,*
*16*  138:*3, 21*
139:*2, 3, 11,*
*14*  144:*6*
145:*22*
149:*10, 17, 19*
150:*13*  151:*1,*
*2*  160:*15*
164:*16, 21, 22*
170:*2, 5, 8, 10,*
*14*  206:*1*
209:*3, 7, 10*
226:*14, 18*
234:*5*  235:*1,*
*4, 6*  238:*2, 3*
240:*9, 14*
241:*11, 15, 23*
242:*22*  243:*1*
244:*2*  245:*1*
246:*14*  253:*3*
255:*2*
pages  169:*24*
209:*4*  254:*5*
pandemic
235:*20, 22*
paragraph
140:*7*  145:*22*
146:*14*  147:*1*
156:*16*
160:*19*
161:*16*
170:*15*  173:*3*
200:*2, 12, 24*

205:*16*
207:*13*  209:*6,*
*9*  215:*24*
221:*15*
222:*12*
226:*16*  228:*4*
232:*21*  235:*4*
240:*13*  241:*8,*
*14, 21*  244:*17*
Park  126:*17*
Parkway
126:*6*  128:*11*
part  136:*10*
142:*24*
156:*19*
171:*18*
173:*11*  175:*6*
176:*1*  215:*17*
229:*22*  246:*22*
particular
208:*3*  211:*23*
220:*19*
PARTIES
126:*1*  131:*16*
251:*13*
passed  190:*16*
patients
222:*20*
Pause  139:*5*
PCRC  207:*7*
PDF  139:*4*
peaks  154:*13*
pending
186:*18*
Pennsylvania
127:*14, 20*
128:*11*
people  141:*17,*
*19*  152:*5*
165:*23*  166:*3,*
*7*  170:*21*
189:*17*
190:*16*  236:*8*
people's
152:*15*
Perfect
134:*22*
136:*11*  138:*8*
144:*4*  160:*16*
164:*19*  170:*9,*
*13*  183:*23*

200:*22*
226:*16*  228:*5*
235:*1*  241:*12*
243:*1*
perform
193:*19*  217:*1*
233:*24*  236:*9,*
*12*
performed
140:*19*  141:*3*
152:*6, 19*
167:*6*  190:*10,*
*24*  196:*23*
198:*4*  216:*12*
223:*11*  238:*16*
period  225:*1*
person  156:*21*
188:*20*
personal
153:*12, 20*
171:*5*  201:*12*
202:*15*
233:*19*
235:*13*  239:*6*
247:*24*
Personally
142:*9*  163:*20*
210:*14*
220:*16*  222:*4*
232:*16*
233:*19*  234:*2*
perspective
193:*1*  195:*4*
210:*18*
230:*18*
239:*11, 19*
ph  125:*22*
170:*18*
Pharma
127:*11*

Pharmaceutical
127:*10, 16, 17,*
*22, 23*  128:*7*
200:*15*
Pharmaceutical
s  127:*11*
128:*13*  226:*6,*
*24*
Phil  128:*15*

Philadelphia
127:*20*
physical
206:*18*  237:*10*
Pittsburgh
127:*14*
place  251:*10*
placed  235:*8*
247:*8*
Plaintiffs
126:*9, 14, 18,*
*23*  127:*5*
please  132:*11*
134:*21*  136:*3,*
*11, 24*  137:*15*
138:*3*  139:*10*
143:*11*
149:*10*  154:*5*
159:*15*
160:*13*  164:*5*
169:*14*  170:*8*
175:*20*
178:*12*
180:*14*
181:*13*  182:*7*
184:*15*
186:*12*  197:*3*
198:*10*
200:*22*
201:*18*  202:*8*
209:*4*  215:*19*
225:*20*
226:*13, 15*
231:*23*
232:*19*  234:*6*
237:*19*  240:*9*
241:*11*
242:*22*
246:*10*
248:*15*  252:*3,*
*8*
Plus  156:*20*
192:*22*  239:*20*
point  153:*11*
156:*4*  162:*4*
164:*24*
183:*24*
195:*12*  198:*6*
219:*5, 8, 22*
232:*14*  240:*12*

**pointed** 165:5 215:24

**points** 134:14 155:5 228:9

**Pollard** 125:16 131:23 251:3, 15

**portion** 183:15

**position** 178:7 179:4 181:24 193:7

**possible** 152:23 163:23 167:7 209:16 210:21 211:16 216:20 217:2

**Post** 127:3

**potency** 145:24 227:1

**Potential** 143:2 144:9, 16 145:3, 7, 12, 17 147:6 149:21 152:8, 17, 22 153:3 154:9 158:17 166:1 191:3, 9 194:13 206:6, 16 212:20 213:18 216:3, 6 217:18 218:15 219:10 223:5, 16, 20 224:4 226:7 227:14, 20 236:10 238:10 241:9 244:20

**potentially** 149:22 150:7, 9, 14 151:3, 21, 24 227:22

**PowerPoint** 129:9 171:9 174:7, 13, 22 182:3 184:4,

17 186:8, 14 196:5 197:10

**practice** 200:15 233:1, 4

**preclude** 248:22

**predicting** 232:22

**prefer** 156:1

**prejudice** 249:15

**prejudiced** 231:14

**Preliminary** 156:15

**preparation** 240:4

**presence** 165:2

**President...stat ed** 209:12

**pretty** 175:1 246:24

**previously** 132:7

**primary** 207:24 210:2 216:8 217:20 218:17

**Prinston** 127:17, 23 128:7

**prior** 155:2 159:1 160:5 163:2 168:6 172:3, 20 176:8 187:23 194:19 201:23 202:12 211:1, 19 212:13 215:4 219:24 236:18 238:22 241:10 251:4

**PRISELAC** 127:13 133:7, 16 134:3, 12 135:3, 21 136:16 137:8, 21 138:17, 24

139:3 140:1, 12 141:14 142:6 143:5, 18 144:18 145:9 146:7, 12 147:9 149:2, 11 150:1, 17 151:7, 13 152:11 153:6 155:1 156:6 157:11 158:7, 24 160:4 161:7, 24 162:7, 24 165:7 166:11, 24 167:16 168:5 170:23 172:1, 19 174:6, 12, 15, 18 175:2, 9, 14 176:7, 21 177:4, 12, 21 178:2, 9, 16, 23 179:5, 12, 19 180:2, 15 181:14 182:8, 13, 21 183:5, 10, 22 184:11, 23 185:5, 18, 24 186:7 187:22 188:23 189:24 190:4, 20 191:10, 21 192:6, 17 193:12, 23 194:17 195:6, 13, 20, 23 196:14 197:5, 16 198:12, 17 199:20 200:7, 17 201:9, 21 202:11, 24 203:12 204:1, 17 205:8 206:11 207:21 210:8, 24 211:8, 18 212:12 213:15

214:10 215:3 216:13 218:2, 8, 19 219:23 220:12, 23 222:2 223:1, 23 224:7, 17 225:12 226:9 227:8 229:3, 11, 18 230:24 231:10, 18 233:12 234:16 236:16 238:20 240:23 241:18 242:13 243:2, 9, 12, 18 244:14 245:2, 7, 13, 24 246:5 247:14 248:2, 10, 16 249:6

**probable** 213:10 240:19

**probably** 173:9

**problems** 205:3

**proceed** 135:19, 20 143:10 177:19 181:9

**proceedings** 132:3

**process** 133:1, 2 134:10, 11, 17 135:2 136:7 140:9, 24 141:2, 11, 20 142:3, 10, 14 144:17, 24 152:15, 16 153:4, 5, 15 154:6 156:18 158:4, 15 162:19 163:13, 19 166:14 173:5 189:3, 4, 22 191:7 194:11,

14 195:3 196:9, 12, 20 197:13, 15 198:8 206:7 207:7, 9, 10, 15, 19 208:1, 8, 9 209:20 210:19 211:13, 21 212:4, 8, 10, 11 213:4, 8 214:7, 22 216:5 217:22 218:14, 23 219:13 221:21 222:1, 24 223:22 225:4, 5 227:12 228:16, 17, 23 229:1 232:6, 24 233:2 236:9, 12 237:8 238:8, 18 239:12

**processes** 222:17

**processing** 201:2

**produce** 161:20 233:7

**product** 145:23 147:5, 19 207:15 214:19 228:13, 17, 19 237:11 238:11 247:4

**Production** 130:8 207:16

**PRODUCTS** 125:4 131:12 146:16, 18, 22 147:14, 23 148:7 159:11 198:5 205:3, 22 224:11 238:11, 13

**proffer** 175:4 177:5

**profile** 247:5

Confidential Information Subject to Protective Order

projection 240:20

pronounce 148:11

properties 237:10

proposed 163:18 233:24 237:4

propounded 254:6

**PROTECTIVE** 125:9

protocol 137:14 249:10

proves 183:24 193:1

provide 189:18 247:24

provided 133:4, 14 143:13 166:15, 16 173:17 174:1 190:11 219:19 230:9 243:8, 11 247:10

provides 176:13 187:15

Public 251:20 254:20

published 160:2

purity 212:9 213:12

purpose 182:9 207:24 208:9 209:13, 20 210:2, 5, 18 211:23, 24 212:7 215:12

purposes 208:4

put 132:11 159:14 171:8 178:4 181:17, 19 203:5 242:2

< Q >
qualitative 244:10

quality 138:15 139:23 141:12 142:5 156:21 157:2 176:19 202:5 206:8 208:2, 10 211:22 212:8 213:11 214:19 233:6 234:13

Quenched 129:11 171:20 196:7 197:11

question 133:13 136:2 139:15 141:6, 7, 9 142:9 143:21 149:1 150:21 151:12 154:5 161:22 172:7, 8 175:6, 7 183:18 186:18, 22 190:1 192:8 193:16 194:3 197:4 198:11 201:18 202:9, 23 205:12 211:5, 7, 10 218:7, 10 219:21 224:2 231:23 233:10, 16 236:2, 21, 24 237:2 243:14 245:8 246:8 247:24

question-and-answer 182:18

questioning 177:8 181:5, 7, 22 187:10 248:20 249:13

**Questions** 130:12 168:13 177:10 181:13 184:5, 18 186:16, 17 194:5, 6 195:2 211:10 230:14 242:20 245:12, 17, 23 248:23 249:1 254:6

quick 144:1

quite 135:17

< R >
R&D 188:11, 13

raise 195:2

rationalizations 230:20

raw 238:13

RBK/JS 125:6

reached 140:19 141:3

react 161:13, 19 164:2 172:12

reacted 162:19

reaction 159:9 165:1 170:16 171:23 172:15 194:13 219:4 223:6 238:11, 13

reactions 158:2, 22 161:1

Reactive 226:5

reacts 171:6

read 139:14 144:13 161:5, 21, 23 162:12 163:21 164:1 165:19 169:23 170:2 173:8 186:24

192:4, 16 209:18 236:24 238:15 242:17 244:13 252:3 254:4

reading 155:7 157:9, 10 188:4

ready 230:22

realize 158:22 198:15 248:14

realized 158:13 232:11

really 132:17 177:3 181:10 203:19 217:4 231:7 249:21

Realtime 125:17 251:3, 19

reask 150:20 172:6 193:15 211:7 218:5

reason 158:20 173:8 238:16 252:5 253:5, 7, 9, 11, 13, 15, 17, 19, 21

reasons 221:23 230:22

recall 157:7 173:8 188:4 209:23, 24 210:11, 14 220:8 223:8

recap 148:4

receipt 252:13

receive 189:4

received 154:19, 23 176:18

receives 188:2

recess 157:19 199:1 221:7

recollection 155:6 157:9 208:4 209:22 210:10 219:6

record 131:4, 21 139:8 157:15, 18, 23 181:15 183:6, 9, 13 184:13 186:1 198:20, 23 199:5 221:3, 6, 11 245:3, 14 248:4, 6 249:24

reduce 208:5, 7 210:3 211:24 213:4 214:3 215:13 237:11

reduced 212:5 214:15, 16, 18, 23 215:15

reduction 209:15 210:20 211:15 212:3

Referring 133:9 207:9

refers 147:2

refusing 181:16, 17 202:20

regard 149:20 196:8 238:17

regarding 132:24 155:21 173:13 189:21 190:18 208:17 216:11 237:23

Registered 125:16 251:3, 19

regulation 202:18 204:6

regulations 203:24

regulatory 156:1, 11 160:8 165:22 172:17 173:6 187:15

190:*15, 17*
192:5, *14*
194:9  204:*13*
205:6  214:*21*
215:8  230:3
**reiterate**  153:*9*
**rejected**  233:9
**related**  188:*13*
**relative**
251:*12, 14*
**relayed**  246:*20*
**relevant**
183:*17*
188:*19*  223:4
**relied**  165:23
166:*21*  189:*17*
**relying**  166:6
181:*18*
**remember**
186:20
**remembered**
187:6
**remind**  233:3
**Remote**
125:*12*  131:*10*
**REMOTELY**
126:*1*  131:*17,*
*19*  132:7
251:6
**removed**
134:*18*
**repeat**  153:*24*
**rephrase**
152:6  164:*20*
167:*24*  169:3
187:*13*
189:*15*  209:8
210:*16*  235:5
236:7  240:*12*
242:5
**replace**
134:*15*  189:*3*
**report**  176:*14*
208:*16*  209:7
233:*18*
237:*22*  238:*4*
240:*3, 21*
242:*10, 24*
243:*4*  244:*24*
247:9

**reported**
187:*16*
**Reporter**
125:*16, 18*
131:*22*  251:*3,*
*4, 19, 20*
**reports**  188:*2*
209:*10*  239:*3*
**Representing**
126:9, *14, 18,*
*23*  127:5, *10,*
*16, 22*  128:*6,*
*13*
**Request**  130:*8*
135:*1*  246:*16*
**requesting**
235:*21*
**required**
133:5, *15*
232:*24*
**requirements**
190:*9, 11*
203:*16*  233:5
234:*3*
**requiring**
217:7
**research**
166:*23*
190:*24*  191:7
217:*1*  234:*14*
236:9  238:*8*
**residue**  189:6
218:*24*  223:5,
*6*
**residues**  167:*8*
**respect**
134:*13*
155:*19*
156:*13*  159:9
160:*11*
166:*18*
172:*24*
173:*23*
180:*23*
182:*17*  189:*2*
191:*13*  208:*3*
212:*14, 18*
215:*11, 16*
227:*12*
**respected**
187:*18*

**response**
232:*22*
**responsibilities**
156:*19, 24*
173:*11*  176:*2,*
*3*  215:*17*
**responsibility**
156:*11*  160:*10*
**responsible**
152:5  156:*5,*
*21, 23*  222:*14*
233:*6*  236:9
**restricted**
235:*10*
**result**  208:8
217:*21*
**resulted**
212:*10*
**results**  212:*15,*
*19*
**return**  252:*11*
**review**  168:*12*
193:*3*
**reviewed**
208:*21*
**reviewing**
139:*13*
**rhetorical**
148:*24*
**right**  134:*19*
140:*11*  142:5
151:6  153:*5*
154:*24*
157:*17, 22*
158:*23*
164:*22*
167:*15*  175:*1*
178:*24*
184:*10*
188:*22*  190:*3,*
*19*  191:*20*
198:*22*  199:*4,*
*11*  207:*11, 20*
208:*12, 22*
212:*11*
213:*14*  221:*5,*
*10*  222:*1, 24*
226:8  236:*24*
243:*8, 11*
244:*4*  249:*23*

**right-hand**
164:*17*
**Risk**  138:*13,*
*15*  139:*21, 22*
141:*12*  142:*4*
152:5, *9, 14*
169:*11*
191:*19*
193:*20*
194:*12*
216:*11*  225:*6,*
*8, 10*  226:7
238:*16*
**Road**  128:*4*
**ROBERT**
125:7
**room**  165:*2,*
*15*
**root**  172:*16*
**Roseland**
126:6
**rule**  179:*21*
180:*11*
**rules**  179:*24*
249:9

**< S >**
**SA**  127:*11*
**safe**  222:*20*
**safety**  138:*15*
139:*23*
141:*13*  142:5
**salesperson**
236:*4*
**samples**
152:*19*  196:*24*
**San**  127:8
**save**  187:*4*
209:*14*  210:*19*
**saved**  211:*14*
**savvy**  174:*24*
**saw**  185:*14*
220:*21*
**saying**  135:*18*
155:*13*
173:*17*  179:7
185:*16*
209:*23*  210:*6,*
*11, 13, 14*
247:*11*

**says**  133:*23*
136:*13*
138:*13*
139:*21*  144:9
145:*24*
149:*20*
160:*19*
161:*12*
164:*18, 23*
165:*14*  200:*2,*
*12*  209:*22*
222:*13*
226:*19*  228:9
235:5  244:*4*
**science**
165:*24*  193:7
213:*24*
**scientific**
158:5  160:*2*
161:6  162:*17*
163:7, *10, 16*
164:8  166:*4,*
*8*  194:*23*
213:7, *23*
220:8  237:*5, 7*
**scientifically**
158:*4*  167:*14*
168:2, *3*
190:*18*  191:*15*
**scientist**
187:*18*
**scope**  153:*16*
163:*3*  242:*15*
243:5
**screen**  132:*14,*
*16, 19*  134:*24*
169:2, *9*
171:*15*  199:*7,*
*16, 19*  237:*21*
240:2, *7*  242:7
**scroll**  136:*10*
144:2  160:*14*
169:7, *13*
200:*21*  228:3
**second**  137:*1*
150:*20*  155:9
158:*12*
160:*19*
161:*12*
171:*10*
173:*12*

200:*12*
206:*23* 210:*1*
212:*2* 221:*15*
222:*12, 13*
228:*4* 235:*23*
240:*13* 241:*5,
14*
**secondary**
160:*23* 161:*17*
**Section** 137:*3*
143:*2* 160:*15,
18* 164:*17, 23*
201:*5* 228:*5,
7* 238:*5, 6*
240:*12*
**see** 132:*15, 16,
20, 21* 138:*16*
139:*11, 24*
142:*12* 143:*4*
144:*12, 14*
146:*4, 14*
160:*1, 11*
161:*5, 10, 21,
22* 162:*9, 16*
164:*12, 14*
169:*14, 16, 18*
199:*19, 23*
209:*18, 21*
226:*2, 3*
240:*6, 7*
241:*17*
242:*11*
244:*13, 17*
**seeing** 157:*7*
173:*9* 247:*7*
**seen** 217:*17*
**select** 137:*14*
**selling** 156:*3*
176:*5* 235:*11,
24*
**sent** 156:*20*
171:*17* 187:*19*
**sentence**
170:*1* 201:*13,
20* 202:*1, 10,
15, 17, 22*
203:*5, 6, 7, 11,
18, 20* 205:*7*
216:*1* 222:*13*
247:*11*
**Sentry** 128:*11*

**September**
235:*9*
**served** 208:*17*
**SERVICES**
125:*20* 131:*7*
**set** 227:*16*
251:*10*
**share** 189:*20*
209:*17*
210:*22*
211:*17* 215:*1,
16*
**shared** 169:*19*
240:*7*
**sharing** 138:*6*
**sheet** 252:*6, 9,
12* 254:*7*
**Shorthand**
125:*18* 251:*4,
20*
**show** 178:*5*
179:*14*
217:*16, 17, 23*
218:*12*
**showed**
212:*15, 19*
220:*9, 21*
**showing**
155:*11*
159:*20* 225:*23*
**side** 164:*17*
238:*10*
**sign** 252:*8*
**signed** 234:*10*
**significant**
200:*13*
209:*15*
210:*20* 211:*15*
**significantly**
227:*3*
**SIMPSON**
126:*16*
**single** 194:*6*
**site** 242:*23*
**sjackson@forth
epeople.com**
126:*22*
**skip** 134:*21*
**SLATER**
126:*3, 5*
129:*4* 132:*10,*

*13* 133:*10, 21*
134:*8, 19, 23*
135:*18* 136:*1,
9, 24* 137:*2,
15* 138:*1, 8,
11, 22* 139:*6,
17, 19* 140:*8*
141:*5* 142:*1,
20, 23* 143:*9,
20* 144:*5*
145:*5, 20*
146:*5, 9, 24*
148:*20* 149:*9,
15, 18* 150:*12,
19, 23* 151:*9*
152:*3* 153:*2*
154:*3, 4*
155:*23*
157:*14* 158:*1,
18* 159:*14, 16*
160:*13, 17*
161:*15* 162:*6,
15* 164:*3, 6,
15* 165:*21*
166:*19*
167:*12, 22*
168:*23* 169:*1,
6, 22* 170:*6,
11* 171:*7, 14*
172:*6, 10*
174:*9, 14, 16,
20* 175:*5, 12,
21, 23* 177:*2,
6, 15* 178:*1, 6,
11, 20* 179:*1,
6, 16, 23*
180:*4, 19*
182:*1, 10, 16*
183:*3, 8, 15*
184:*6, 19*
185:*2, 11, 20*
186:*3, 19*
187:*11*
188:*16*
189:*13* 190:*2,
14* 191:*5, 17*
192:*3, 9, 12*
193:*4, 15, 17*
194:*7* 195:*10*
196:*2, 3*
197:*2, 7*

198:*9, 15, 19*
199:*6* 200:*1,
11, 21, 23*
201:*17* 202:*7,
19* 203:*9, 21*
204:*11* 205:*4,
10* 206:*1, 21*
208:*11* 209:*2*
210:*15* 211:*4,
12* 212:*6*
213:*6* 214:*6,
20* 215:*18, 21*
217:*15* 218:*5,
9, 11* 219:*7*
220:*7, 20*
221:*2, 12, 14*
222:*11*
223:*18* 224:*1,
15, 19* 225:*18,
22* 226:*13, 17*
228:*3, 6*
229:*9, 13*
230:*6* 231:*5,
16, 20, 22*
232:*18* 234:*4,
7, 24* 235:*2*
236:*5, 22*
237:*18, 20*
239:*22* 240:*1,
8* 241:*10, 13,
22* 242:*6, 21*
243:*7, 10, 15,
23* 244:*1, 22*
245:*4, 9, 15*
246:*3, 9, 12*
248:*5, 12, 17*
249:*14, 18*
**Slater's**
184:*18* 186:*15*
**slide** 171:*9*
176:*23*
181:*19* 182:*3*
183:*12* 196:*5*
197:*10*
**slightly** 164:*23*
**small** 132:*17*
**Sodium**
129:*11*
170:*17*
171:*20* 196:*7*

197:*11*
217:*12* 227:*23*
**Solco** 127:*17,
23* 128:*8*
**sold** 187:*19*
**solution**
161:*20*
**solvent**
164:*11*
165:*12, 19*
207:*8* 218:*23*
219:*17, 20*
220:*6*
**solvents** 223:*6*
**somebody**
149:*4* 185:*12*
199:*21*
**Sorry** 138:*5*
149:*15*
150:*19* 153:*8*
170:*12*
175:*19* 177:*7*
185:*11*
186:*19* 187:*6*
236:*20*
**sounds** 194:*4*
214:*8*
**source** 142:*17*
164:*18* 205:*17*
**sources** 141:*17*
**South** 127:*20*
128:*3*
**space** 252:*6*
**speak** 172:*5*
248:*15*
**speaking**
146:*11* 214:*21*
**speaks** 134:*4*
136:*17*
137:*10*
138:*18* 140:*2*
143:*6, 19*
144:*19*
145:*10*
147:*10* 150:*2,
18* 151:*8, 14*
152:*12* 160:*6*
161:*8* 162:*1*
163:*2* 165:*8*
171:*1* 172:*22*
200:*8, 18*

Confidential Information Subject to Protective Order

201:*10*
206:*12*
207:*22*
216:*14*
226:*10* 227:*9*
229:*4* 233:*15*
234:*17*
240:*24*
241:*19* 244:*15*
**species** 244:*7*
**species-specific**
244:*10*
**specific** 149:*6*
196:*22*
**Specifically**
216:*5* 220:*10*
233:*9* 235:*14*
239:*1*
**speculation**
157:*8* 171:*5*
248:*1*
**spell** 148:*12*
**stability**
228:*18*
**stable** 165:*12,*
*16, 18* 218:*22*
219:*20* 220:*4,*
*6, 15*
**stage** 188:*11,*
*13* 238:*8*
**stand** 229:*24*
**Standard**
125:*14*
**standards**
203:*18*
**standing**
153:*10* 229:*23*
**stands** 201:*24*
202:*13*
**start** 166:*5*
169:*7* 170:*7*
185:*3* 192:*11*
226:*16*
**started**
141:*19* 225:*5*
**starting** 216:*1*
234:*8*
**starts** 170:*15*
**state** 179:*3*
236:*21*
238:*24* 252:*5*

**stated** 171:*18*
172:*12* 204:*9*
207:*2* 209:*13,*
*14* 221:*16*
**statement**
146:*23*
148:*18*
216:*10* 238:*15*
**statements**
181:*6* 192:*14*
230:*13*
**STATES**
125:*1* 176:*6*
200:*24*
203:*24*
232:*22*
235:*11* 236:*1*
238:*7* 240:*11,*
*14*
**stay** 139:*8*
**stayed** 212:*22*
**stenographic**
131:*21*
**stenographicall**
**y** 251:*9*
**step** 134:*15, 16*
**STEPHANIE**
126:*20*
**Stipulations**
130:*9*
**stop** 139:*9*
169:*22* 170:*3*
184:*8* 248:*21*
**stopped** 156:*3*
177:*15*
196:*11*
197:*15* 245:*20*
**strategy**
228:*11* 238:*6*
**Street** 126:*12*
127:*14, 20*
**strictly** 234:*1*
**strike** 212:*17*
241:*2*
**structural**
226:*21*
**structure**
146:*19* 147:*18*
**structures**
146:*21*
147:*20, 22*

148:*5* 226:*23*
227:*18, 21*
**studied** 238:*12*
**studies** 240:*15,*
*20*
**study** 191:*8*
233:*2* 236:*10*
238:*9*
**SUBJECT**
125:*9*
**submission**
132:*23* 133:*14*
**submissions**
189:*14, 16*
**submitted**
144:*22*
147:*24* 148:*3*
151:*18*
167:*10, 13, 20*
168:*11*
189:*11*
192:*20*
193:*20*
194:*10* 195:*1*
222:*9*
**submitting**
134:*5*
**Subscribed**
254:*10*
**Substance**
133:*24* 150:*6*
228:*13, 16, 19*
244:*11* 254:*7*
**substances**
150:*9* 167:*8*
217:*11, 14*
227:*22* 228:*1*
**substantive**
181:*12* 183:*16*
**success** 214:*8,*
*23*
**sufficient**
191:*16* 193:*3*
194:*24* 195:*5*
206:*17* 247:*2*
**suggest**
173:*22* 174:*2*
**suggests**
246:*24*
**suitable**
222:*15*

**Suite** 126:*16,*
*21* 127:*8, 14*
128:*3*
**summarizes**
200:*13*
**summary**
178:*19*
**SUPPORT**
130:*1* 176:*12*
193:*3*
**supposed**
187:*21*
**sure** 162:*12*
166:*1* 174:*21*
176:*3* 183:*19*
188:*21*
194:*14* 196:*2*
221:*2* 222:*4*
247:*5*
**suspected**
150:*5*
**swear** 131:*23*
**switch** 135:*1*
**sworn** 131:*18*
132:*2, 7*
251:*6* 254:*10*
**system** 176:*13*
187:*14, 20*
202:*5* 205:*23,*
*24*
**Systems**
125:*17* 251:*3,*
*19*

**< T >**
**table** 144:*8,*
*12* 145:*16, 21*
147:*2*
**take** 134:*20*
139:*1* 142:*20*
157:*13*
162:*22* 164:*3*
168:*23* 171:*7*
176:*23*
177:*24*
178:*10*
180:*17, 23*
183:*13* 184:*1*
195:*8, 9*
198:*13, 16*
221:*1* 222:*19*

236:*5* 239:*22*
242:*1*
**taken** 157:*20*
199:*2* 221:*8*
230:*15* 251:*9*
**talk** 163:*6*
177:*7*
**talked** 156:*17*
173:*4*
**talking**
146:*15, 17*
153:*12*
161:*14*
172:*14*
180:*22* 210:*7*
239:*2* 248:*14*
**talks** 145:*22*
**targeting**
235:*14*
**TEA** 189:*3*
**team** 249:*21*
**Technical**
133:*23* 149:*6*
160:*9, 10*
165:*23* 166:*3,*
*7, 15* 170:*21*
171:*4* 176:*18*
188:*6, 10, 12*
189:*17*
190:*16* 191:*14*
**technology**
197:*24*
**tell** 132:*7*
143:*10*
183:*10* 184:*2,*
*7* 186:*24*
202:*20* 230:*3*
**telling** 135:*19*
180:*23*
181:*15* 184:*8*
**tells** 195:*22*
**temperature**
165:*2, 15*
219:*3, 5*
**tens** 163:*8*
**term** 148:*10,*
*13* 149:*6*
**terms** 138:*15*
139:*22*
141:*12* 142:*5*
222:*21*

**tertiary**
161:*18*

**test** 216:*24*

**tested** 205:*22*
222:*7*

**testified** 132:*8*
159:*17*
165:*22*
187:*12, 14*
246:*16*

**testify** 251:*6*

**testimony**
153:*13, 16, 20*
155:*2* 159:*1*
160:*5* 163:*3*
168:*6* 172:*3,*
*20* 176:*8*
180:*9* 181:*8*
182:*12*
187:*24* 194:*8,*
*16, 19* 211:*2,*
*20* 212:*13*
214:*9* 215:*4*
219:*24*
236:*18*
238:*22*
246:*21*
247:*17*
249:*12* 251:*9*

**testing** 152:*19*
154:*21* 162:*8*
188:*11*
196:*24*
197:*24* 198:*2,*
*4* 223:*12*
232:*2* 237:*13*

**testings** 206:*19*

**Teva** 127:*10*

**Texas** 127:*4*

**Thank** 136:*11*
138:*9, 24*
144:*4* 159:*15*
186:*17* 209:*4*
225:*21* 240:*9*
249:*18, 20*

**Thanks**
146:*13*
221:*13* 249:*19*

**Theoretical**
159:*21*

**thing** 138:*6*
156:*5* 170:*3*
187:*1*

**things** 155:*17*

**think** 137:*18*
140:*15* 142:*9*
143:*7* 157:*11*
163:*20* 179:*7,*
*10* 180:*2, 24*
181:*8* 185:*13*
186:*9* 193:*5*
214:*2* 219:*6*
220:*23* 222:*8*
230:*4, 21*
236:*22* 239:*9*
245:*18, 21*
247:*7, 21*

**thinking** 188:*7*

**third** 164:*16,*
*21* 170:*15*
200:*24* 216:*1*
232:*20*

**thirty** 252:*13*

**thorough**
228:*14, 23*

**thought**
174:*24*
193:*22*
194:*11*
224:*21* 231:*5*

**thousand**
163:*8*

**thousands**
163:*7*

**Three** 155:*15*
173:*16* 208:*6*
211:*10* 238:*3*

**Time** 125:*14*
131:*9* 134:*14,*
*17* 135:*13*
139:*10*
140:*16, 17, 18*
141:*2, 24*
142:*19*
143:*22* 145:*4,*
*14, 18, 19*
147:*13* 148:*2*
150:*4, 10*
151:*18, 20*
152:*2, 16*
153:*1* 154:*10*

**157**:*16, 21*
159:*5, 7*
162:*11*
163:*22, 24*
167:*9* 168:*10,*
*20, 21* 169:*21*
170:*3* 173:*9*
178:*15, 22*
179:*17* 180:*8*
182:*4* 186:*9*
188:*10* 189:*8*
190:*8, 10*
193:*1* 194:*22*
198:*1, 21*
199:*3, 14*
206:*15*
212:*20*
213:*22, 23*
214:*1, 2*
215:*10, 11*
220:*22* 221:*4,*
*9* 225:*1, 4, 7,*
*16* 227:*16*
229:*17*
230:*10, 23*
232:*5, 7, 12,*
*14* 237:*5, 6,*
*16* 239:*15*
243:*16* 245:*3*
249:*22* 251:*10*

**timer** 169:*22*
174:*17*
184:*12, 14*
229:*14* 231:*3,*
*13, 21*

**times** 155:*4*
158:*20* 186:*4*
245:*20*

**title** 156:*14*
173:*2* 226:*4,*
*8, 11*

**titled** 139:*20*
159:*21* 164:*9*
237:*22*

**Today's** 131:*8*

**told** 158:*19*
190:*16*
209:*19* 219:*9,*
*14* 220:*17*
230:*19*
246:*19* 249:*2*

**tomorrow**
249:*14*

**tonight**
248:*22* 249:*5,*
*21*

**tool** 177:*18*

**top** 149:*20*
151:*2* 164:*22*
226:*16, 18*
235:*1, 3, 6*
242:*24* 244:*4*
246:*1*

**topic** 229:*22*
239:*2* 242:*15*

**topics** 162:*3*
163:*4* 229:*8*
230:*5* 231:*1,*
*12* 243:*6*

**totally** 179:*7*

**Tower** 128:*3*

**toxic** 150:*5, 7,*
*9* 216:*6*
217:*19* 218:*16*

**toxicology**
241:*7* 242:*19*
244:*18*

**transcript**
251:*8* 252:*14,*
*15*

**transcription**
254:*5*

**translate**
132:*2* 136:*20*
154:*1* 184:*20*
185:*8* 186:*12*

**translated**
132:*4*

**translation**
136:*4* 148:*23*
186:*15*

**translator**
146:*10*
148:*21*
195:*14* 236:*23*

**translator's**
148:*23*

**TRAURIG**
127:*7*

**trial** 180:*9*

**Trimethylamin
e** 159:*24*

**true** 133:*6, 12,*
*20* 179:*20*
196:*9, 10*
197:*12, 13, 14*
216:*10*

**trust** 176:*19*

**truth** 132:*8*
225:*11* 251:*6,*
*7*

**truthful**
133:*15* 188:*22*

**truthfully**
190:*12, 15*

**try** 141:*8*
162:*14*
185:*22* 186:*5*
230:*18* 231:*6*

**trying** 174:*7*
176:*24*
179:*13* 183:*7,*
*11*

**tumour** 244:*8*

**turn** 238:*1*

**turned** 138:*6*
214:*3*

**two** 134:*13*
150:*8, 14*
151:*3, 5, 24*
152:*17*
227:*21*
230:*12* 245:*6*
249:*11*

**type** 187:*20*
242:*20*

**< U >**

**U.S** 127:*17,*
*23* 128:*8*

**Ultimately**
236:*7*

**unable** 247:*16*

**unanticipated**
221:*19*

**unaware**
232:*4* 238:*12*

**understand**
146:*12*
165:*24* 175:*3*
180:*11* 185:*9*
201:*7* 215:*2*
236:*10*

Confidential Information Subject to Protective Order

**understanding**
191:8 193:11,
18 201:13
202:9, 15, 21
204:7, 22
213:22
218:22
219:18 225:3
228:18 232:6
238:9 239:20
**understood**
184:21
185:13, 15
201:19
**Unfortunately**
189:19
**unilaterally**
249:4
**UNITED**
125:1 176:6
203:24
235:11 236:1
**unknown**
154:13
156:15
173:14 237:23
**update** 132:18
**upload** 143:8
199:21
**uploaded**
135:17, 23, 24
**USC** 201:6
**use** 175:10, 15
177:18 179:8
180:1 197:17
207:8, 10
229:16

**< V >**
**Vague** 223:2,
24 224:8, 18
236:17
**VALSARTAN**
125:4 129:10
131:11
140:10
141:11 142:3
143:3, 14, 16
144:11, 16
145:7 150:15
154:22

155:12, 14
156:3 158:17
163:13
166:18
171:19
173:18, 24
196:7, 12, 19
197:11 198:8
200:6 204:23
205:2 207:7
210:3, 4
211:17 212:9
213:12 214:5
216:23
221:20, 24
223:21
227:13
232:23
236:14 239:10
**variety** 161:18
**verbatim**
251:8
**Vice** 209:12
**VICINAGE**
125:2
**video** 131:10
**Videographer**
128:17 131:3,
6 157:16, 21
198:21 199:3
221:4, 9
245:5 249:22
**Videotaped**
125:12
**view** 186:13
**Volume**
169:12

**< W >**
**wait** 135:4
**Wang** 246:15,
17, 19
**want** 138:2
146:9 149:11,
16 150:20
162:12 178:5,
14 182:2
184:7, 24
185:5, 22, 24
195:8 199:20
205:15

213:17 218:4
219:16
226:15
229:11 248:13
**warned** 235:7
**Warning**
199:8, 17
200:13
201:14 202:2,
16 205:16
208:22
215:23 235:7
**waste** 208:6
**wastewater**
156:17 173:5
188:9, 14
**way** 144:3
153:15 174:4
182:2, 6
196:11
197:14
198:12
231:14 249:15
**website** 199:22
**well** 134:10,
18 142:8
150:7 151:1
156:10
158:10
161:10 162:5,
10 163:6
165:10 167:4
171:3 172:24
174:20 175:9
176:11 183:3
185:10, 18, 24
188:17
191:24 194:3
195:23 203:4
204:5 209:21
212:16
213:17
214:12
216:16, 22
219:4 225:8
228:2 229:7
238:9 247:21
248:5 249:9
**We're** 131:3
139:9 148:20
153:12

157:17, 22
184:13
185:20 187:8
198:12, 22
199:4 221:5,
10 229:15
245:18 248:5
**WERNER**
128:10
**we've** 157:11
171:16 195:6
220:24 245:20
**whatsoever**
184:4
**WHITELEY**
126:11
**wide** 161:17
**widely** 165:13
**wish** 248:24
**withdraw**
143:21 211:5
**withdrawing**
172:7
**withdrawn**
151:1
**Witness** 130:2
131:18
135:12
139:13
148:22 149:5
174:4 177:1,
8 180:16
181:5 186:12
195:15, 19
230:17
249:10 252:1
**witnesses**
239:1
**WITTLAKE**
127:7
**wittlakek@gtla**
**w.com** 127:9
**word** 202:21
203:4, 22
204:6, 20
205:17, 18
**work** 160:8
171:3, 4
173:6 187:4
**works** 176:15

**world** 209:17
210:22
211:17
214:24
241:16 244:3
**worry** 193:9
**Wow** 144:1
**write** 134:6
241:1, 5
**writes** 207:6
**written**
136:22 140:5,
7, 16 162:10
217:5 222:5
227:11
234:18
239:18
240:21 241:3,
20
**wrong** 167:23
175:13
189:22
224:16, 23
**wrote** 217:3
241:7

**< Y >**
**Yang** 128:15
132:1
**Yeah** 245:15
**year** 166:17
235:20
**yesterday**
155:18
**YIDAM** 128:3
**yield** 207:15,
18 208:7
212:2 214:16
220:11
**yields** 170:18

**< Z >**
**Zhejiang**
127:16, 22
128:6
**ZHONG** 128:1
**ZHP** 132:23
134:1 137:6
145:11 151:3
154:21
155:16 156:2

Confidential Information Subject to Protective Order

158:*13, 21*
159:*18*
163:*21*
172:*16*  176:*3*
187:*18*
196:*18*
197:*14*  198:*6*
199:*9, 18*
200:*5*  202:*4*
204:*13*
207:*19*
208:*17*
210:*21*
211:*14, 16*
212:*23, 24*
214:*8, 21, 24*
215:*8*  216:*12*
217:*5, 18, 24*
218:*14*
219:*10*
220:*18*
221:*23*
222:*22*
223:*19*  224:*3*
228:*23*  235:*7, 11, 16, 24*
238:*17*
240:*22*  242:*9, 23*
**ZHP-342**
129:*9*  171:*12*
**ZHP's** 152:*8*
170:*21*  193:*7*
200:*3*
**zinc** 133:*1*
134:*10, 14*
135:*2*  136:*6*
140:*9*  141:*11, 20*  142:*3*
144:*16, 23*
153:*4, 14*
154:*6*  158:*3, 14*  162:*19*
163:*12*  189:*3, 21*  194:*10*
196:*8, 20*
197:*12*  198:*7*
207:*10, 19*
211:*14*  213:*4, 8*  214:*7, 22*
217:*22*

218:*14*
219:*12*
221:*24*
222:*24*  223:*9, 22*  225:*6*
228:*22*
236:*11*  238:*18*
**Zoom**  125:*12*
138:*5*

# Exhibit 95

REDACTED

```
 1        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW JERSEY
 2                  CAMDEN VICINAGE
 3                - - - - -
 4
      IN RE:  VALSARTAN,          MDL NO. 2875
 5    LOSARTAN, AND
      IRBESARTAN PRODUCTS         CIVIL ACTION NO.
 6    LIABILITY LITIGATION        19-2875
                                  (RBK/JS)
 7
                        - - - - -
 8
      THIS DOCUMENT APPLIES       HONORABLE
 9    TO ALL CASES                ROBERT B. KUGLER
10          - CONFIDENTIAL INFORMATION -
             SUBJECT TO PROTECTIVE ORDER
11
                        - - - - -
12
13            Thursday, May 13, 2021
14
                        - - - - -
15
16          Videotaped remote deposition of DAWN
17    CHITTY, taken pursuant to notice, was held via Zoom
18    Videoconference, commencing at 9:07 a.m., by and
19    before Robin L. Clark, Registered Professional
20    Reporter and Notary Public.
21
22                      - - - - -
23
24
```

Page 2

1  REMOTE APPEARANCES:
2
3      LEVIN, PAPANTONIO, RAFFERTY, PROCTOR,
       BUCHANAN, O'BRIEN, BARR & MOUGEY, P.A.
4      BY:  MADELINE PENDLEY, ESQ.
         SARA PAPANTONIO, ESQ.
       316 South Baylen Street, Suite 600
5      Pensacola, Florida 32502-5996
       850.435.7032
6          For the Plaintiffs
7
       BARTON AND BURROWS, LLC
8      BY:  STACY A. BURROWS, ESQ.
       5201 Johnson Drive, Suite 110
9      Mission, Kansas 66205
       913-563-6255
10     stacy@bartonburrows.com
           For the Plaintiffs
11
12     KIRKLAND & ELLIS LLP
       BY:  BRITTNEY NAGLE, ESQ.
13     601 Lexington Avenue
       New York, New York 10022
14     212-446-4800
       brittney.nagle@kirkland.com
15         For the Defendant, Torrent
       Pharmaceuticals, Ltd.
16
17
       CIPRIANI & WERNER, P.C.
18     BY:  CAITLIN E. LAWLOR, ESQ.
       450 Sentry Parkway, Suite 200
19     Blue Bell, Pennsylvania 19422
       610-567-0700
20     clawlor@c-wlaw.com
           Representing the Defendants,
21     Aurobindo Pharma USA, Inc. and
       Aurolife Pharma, LLC
22
23
24

Page 3

1  REMOTE APPEARANCES, continued:
2
3      CROWELL & MORING LLP
       BY:  MIMI S. DENNIS, ESQ.
4      1001 Pennsylvania Avenue, NW
       Washington, D.C. 20004
5      202-624-2538
       mdennis@crowell.com
6          For the Defendant, Cardinal
       Health, Inc.
7
8      NORTON ROSE FULBRIGHT US LLP
       BY:  ELLIE NORRIS, ESQ.
9        JACLYN GALLIAN, ESQ.
         KIRA LATHAM, ESQ.
10     2200 Ross Avenue, Suite 3600
       Dallas, Texas 75201
11     214-855-8074
       ellie.norris@nortonrosefulbright.com
12     jaclyn.gallian@nortonrosefulbright.com
       kira.latham@nortonrosefulbright.com
13         For the Defendant, McKesson
       Corporation
14
15     ULMER & BERNE LLP
16     BY:  EMILY PREM, ESQ.
       600 Vine Street, Suite 2800
17     Cincinnati, Ohio 45202-2409
       513-698-5000
18     eprem@ulmer.com
           For the Defendant,
19     AmerisourceBergen Corporation
20
21
22
23
24

Page 4

1  ZOOM APPEARANCE, continued:
2      GREENBERG TRAURIG, LLP
       BY: KELLY M. PESCE, ESQ.
3      One International Place, Suite 2000
       Boston, Massachusetts 02110
4      617-310-5224
       kpesce@gtlaw.com
5          Representing the Defendants,
       Teva Pharmaceutical Industries, Ltd.,
6      Teva Pharmaceuticals USA, Inc.,
       Actavis LLC, and Actavis Pharma, Inc.
7
8  ALSO PRESENT:
9      CHRIS RITONA, VIDEOGRAPHER
10     CHRIS GRIMM, EXHIBIT TECH
11     VIDHI KOTAK
12     LAUREN MASSEY
13     S. RODIRIGUEZ
14
           - - - - -
15
16
17
18
19
20
21
22
23
24

Page 5

1              I N D E X
2  WITNESS                      PAGE
3  DAWN CHITTY
     BY MS. PENDLEY:            10
4    BY MS. PAPANTONIO:         185
     BY MS. NAGLE:             435
5
6         E X H I B I T S
7  NUMBER      DESCRIPTION           MARKED
8  Torrent
9  Exhibit 77  Interim Limits for NDMA,    23
             NDEA, and NMBA in
10            Angiotensin II Receptor
             Blockers (ARBs)
11
   Exhibit 78  Valsartan API NDMA and NDEA  59
12            Results
13 Exhibit 79  Details of Finished Good    67
             Batches Bates
14            TORRENT-MDL-2875-00072916
15 Exhibit 80  Curriculum Vitae           97
16 Exhibit 81  Quality Deficient - Minor  119
             Letter Bates
17            TORRENT-MDL2875-00009022
18 Exhibit 82  Email String Bates         121
             TORRENT-MDL2875-00010178 to
19            179
20 Exhibit 83  Email String Bates         133
             TORRENT-MDL2875-00010187 to
21            187
22 Exhibit 84  ANDA Application Bates      156
             TORRENT-MDL2875-00003433
23 Exhibit 85  Email String Bates         172
             TORRENT-MDL2875-00085415 to
24            85416

Page 6

Exhibit 86   Email String Bates          178
         TORRENT-MDL2875-00156990 to
         156993

Exhibit 87   Email String Bates          179
         TORRENT-MDL2875-00030454 to
         90463

Exhibit 88   Valsartan New Process Batch  180
         Tracking Bates
         TORRENT-MDL2875-00090464

Exhibit 89   Email String Bates          189
         TORRENT-MDL2875-00005067 to
         5068

Exhibit 90   FDA News Release            248

Exhibit 91   Email String Bates          255
         TORRENT-MDL2875-00504801
Exhibit 92   Notification Bates          287
         TORRENT-MDL2875-00131255

Exhibit 93   Email dated 9/7/18 Bates    349
         TORRENT-MDL2875-006044834
Exhibit 94   Torrent Recall Timeline     354
EXHIBITS PREVIOUSLY MARKED AND REFERRED TO:
Exhibit 1                      16
Exhibit 2                      26
Exhibit 3                      36
Exhibit 4                      38
Exhibit 5                      50
Exhibit 6                      51
Exhibit 7                      70
Exhibit 8                      73

Page 7

EXHIBITS PREVIOUSLY MARKED AND REFERRED TO
Exhibit 9                      86
Exhibit 10                    112
Exhibit 12                    142
Exhibit 13                    144
Exhibit 14                    153
Exhibit 15                    158
Exhibit 16                    160
Exhibit 19                    199
Exhibit 20                    212
Exhibit 21                    212
Exhibit 22                    381
Exhibit 23                    236
Exhibit 25                    314
Exhibit 26                    329
Exhibit 27                    347
Exhibit 28                    417
Exhibit 29                    423

Page 8

DEPOSITION SUPPORT INDEX

- - - - -

Direction to Witness Not to Answer
Page  Line
NONE
Request for Production of Documents
Page  Line
NONE
Question Marked
Page  Line
NONE

Page 9

THE VIDEOGRAPHER:  We are now on the record.  My name is Chris Ritona.  I'm the videographer with Golkow Litigation Services.  Today's date is May 13, 2021, and the time is approximately 9:07 Eastern.

This remote video deposition is being held in the matter of the valsartan, losartan and irbesartan products liability litigation, MDL No. 2875 in the United States District Court, District of New Jersey, civil case number 19-2875.  The deponent today is Dawn Chitty.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.  Due to the nature of remote reporting, please pause briefly before speaking to ensure all parties are

Confidential Information Subject to Protective Order

Page 10

1 heard completely.
2        All counsel will be
3 noted upon the stenographic record.
4 The court reporter today is Robin
5 Clark and she will now please swear
6 in the witness.
7        THE STENOGRAPHER:  Do
8 you want to raise your right hand,
9 please?  Do you swear the testimony
10 you are about to give in this
11 deposition will be the truth, the
12 whole truth, and nothing but the
13 truth, so help you God?
14        THE WITNESS:  I do.
15        - - - - -
16     DAWN CHITTY, having been duly
17 sworn, was examined and testified as
18 follows:
19        - - - - -
20 BY MS. PENDLEY:
21     Q.  Good morning.  You can go ahead
22 and state your name for the record, please.
23     A.  Dawn Chitty.
24     Q.  Ms. Chitty, you have been

Page 11

1 deposed before, correct?
2     A.  Yes.
3     Q.  About how many times would you
4 say?
5     A.  Five or six.
6     Q.  Okay.  So you probably know
7 most of the basics, but I'm going to remind
8 you of a couple of things to make sure
9 we're on the same page.  So as you heard,
10 it's really important we don't speak over
11 each other, so just let me get through my
12 question before you respond.  Okay?
13     A.  Yes.
14     Q.  And we're going to need all
15 verbal responses from you, because the
16 transcript is being taken so no "uh-uhs,"
17 "uh-huhs," nodding or shaking your head,
18 just anything verbal she can put down on
19 the record.  Okay?
20     A.  Yes.
21     Q.  Your attorney is going to be
22 objecting from time to time, I'm pretty
23 sure, so when she does, again, unless she
24 explicitly instructs you not to answer, you

Page 12

1 can still answer the question.  Okay?
2     A.  Yes.
3     Q.  All right.  So did you meet
4 with your attorneys to prepare for this
5 deposition today?
6     A.  Yes.
7     Q.  About how long?
8     A.  Probably four or five hours.
9     Q.  And you are a former Torrent
10 employee, right, you don't currently work
11 there?
12     A.  That's correct.
13     Q.  And you worked there from
14 roughly 2004 to about 2018; is that
15 correct?
16     A.  Yes.
17     Q.  Is it fair to say that you held
18 various regulatory affairs positions while
19 you were there?
20     A.  Yes.
21     Q.  We'll get into those job titles
22 in a little bit more detail later on in the
23 depo, but we can agree that patient safety
24 is Torrent's number one priority, right?

Page 13

1     A.  Yes.
2     Q.  We can agree that patient
3 safety was your main focus while you worked
4 at Torrent?
5     A.  Safety as well as compliance,
6 yes.
7     Q.  And part of your job at Torrent
8 was to make sure that Torrent followed the
9 rules and regulations that applied to it,
10 right?
11     A.  As a regulatory advisor within
12 the company, I was one of the people who
13 advised local U.S. requirements to our
14 team, yes, to contribute to making sure we
15 meet all requirements.
16     Q.  Okay.  And you understand that
17 those requirements or those rules, those
18 are in place to protect patients, right?
19     A.  Correct.
20     Q.  Those are in place to make sure
21 that Torrent sells drugs that are safe,
22 right?
23     A.  Correct.
24     Q.  And in your role, there's

Confidential Information Subject to Protective Order

Page 14

1 nothing more important than patient safety;
2 is that fair?
3          MS. NAGLE:  Objection,
4      form.
5          THE WITNESS:  Patient
6      safety is definitely one of the top
7      priorities, but probably not the
8      only.
9 BY MS. PENDLEY:
10     Q.  Okay.  Do you agree that
11 pharmaceutical companies like Torrent
12 should be honest with their patients?
13         MS. NAGLE:  Objection,
14     form.
15         THE WITNESS:  Yes.
16 BY MS. PENDLEY:
17     Q.  And we can agree that
18 pharmaceutical companies should give their
19 patients enough information to make a
20 well-informed decision about whether or not
21 to put a drug in their body, right?
22         MS. NAGLE:  Objection,
23     form.
24         THE WITNESS:  It's

Page 15

1      information for the patients, but
2      also information for physicians and
3      people who are, I guess, more of a
4      learned intermediary who can also
5      advise on a situation, because your
6      average person isn't necessarily
7      always capable of understanding all
8      of the technical aspects of a
9      pharmaceutical product.
10 BY MS. PENDLEY:
11     Q.  Okay.  That's fair.  But you
12 would want to provide patients with all the
13 information they need to make that
14 decision?
15         MS. NAGLE:  Objection,
16     form.
17         THE WITNESS:  We provide
18     doctors and patients with accurate
19     information.  Who makes that
20     decision is not something I'm aware
21     of, so.
22 BY MS. PENDLEY:
23     Q.  And your job requires you to
24 regularly communicate with the FDA?

Page 16

1     A.  Yes.
2     Q.  And when you communicated with
3 the FDA, you understood it was important to
4 be honest with them too, right?
5     A.  Yes.
6     Q.  And we can agree that you
7 should provide the FDA with all the
8 information they need to fully assess the
9 situation?
10         MS. NAGLE:  Objection to
11     form.
12         THE WITNESS:  Yes.
13 BY MS. PENDLEY:
14     Q.  And you did that when you
15 worked at Torrent, right?
16     A.  Correct.
17     Q.  Let's pull up LP 1110.  This
18 has previously marked as Torrent Exhibit 1.
19 Ms. Chitty, do you recognize this?
20     A.  That looks like the Torrent web
21 page.
22     Q.  Great.  This is from Torrent's
23 website.  It's publicly accessible if you
24 just go to the internet and pull this up,

Page 17

1 so you look under the word "manufacturing"
2 in here.  And the first sentence it says
3 "At Torrent, we strongly believe in
4 providing quality medicines at affordable
5 price to the patients."  Explain quality
6 for me, what does Torrent mean when they
7 use the word "quality"?
8         MS. NAGLE:  Objection.
9     Form and foundation.
10         THE WITNESS:  Quality in
11     a general sense means that it meets
12     the standards that have been set by
13     the regulatory bodies that we
14     interact with and are governed by.
15 BY MS. PENDLEY:
16     Q.  Does it mean safe?
17         MS. NAGLE:  Objection.
18     Form and foundation.
19         THE WITNESS:  That's
20     kind of really beyond my expertise
21     to decide if quality also means
22     safe.
23 BY MS. PENDLEY:
24     Q.  Okay.  And we mentioned that

Page 18

¹ this is their public website, so if a
² customer were to go to Torrent's website
³ and they would see this sentence, do you
⁴ understand that customers think they're
⁵ buying a quality safe drug from Torrent?
⁶         MS. NAGLE:  Objection.
⁷     Form and foundation.
⁸         THE WITNESS:  I really
⁹     can't speak to the way an
¹⁰     individual reader would interpret
¹¹     the word "quality."
¹² BY MS. PENDLEY:
¹³     Q.   Do you agree that customers
¹⁴ should be getting a safe drug?
¹⁵         MS. NAGLE:  Objection,
¹⁶     form.
¹⁷         THE WITNESS:  Safe is,
¹⁸     again, somewhat of a vague term.
¹⁹     The products that Torrent
²⁰     manufactures meet requirements and
²¹     quality standards, as I had said
²²     before.
²³ BY MS. PENDLEY:
²⁴     Q.   All right.  How do you define

Page 19

¹ safe?
²     A.   It's really not within my
³ expertise to define safe.
⁴     Q.   All right.  Let's put expertise
⁵ to the side for a second.  If you were
⁶ asked as a layperson, what does safe mean,
⁷ what's your response?
⁸     A.   Safe means that the product
⁹ you're taking helps more than it hurts your
¹⁰ personal situation.  There's always a
¹¹ benefit and a risk associated with
¹² everything that you take.
¹³     Q.   Okay.  So helps more than it
¹⁴ hurts.  Do you agree that patients should
¹⁵ be getting a medication that helps more
¹⁶ than it hurts?
¹⁷     A.   Yes.
¹⁸     Q.   Then we agree in order to have
¹⁹ a quality finished product, you would have
²⁰ to have quality ingredients, right?
²¹         MS. NAGLE:  Objection,
²²     form.
²³         THE WITNESS:  Yes.
²⁴

Page 20

¹ BY MS. PENDLEY:
²     Q.   If you have an issue with an
³ ingredient that goes into a drug, you could
⁴ have an issue with the final product; is
⁵ that fair?
⁶         MS. NAGLE:  Objection,
⁷     form.
⁸         THE WITNESS:  It's a
⁹     fairly accurate statement, yes.
¹⁰ BY MS. PENDLEY:
¹¹     Q.   For valsartan that was sold in
¹² the U.S., Torrent is what is called a
¹³ finished dose manufacturer, right?
¹⁴     A.   Yes.
¹⁵     Q.   Okay.  So finished dose means
¹⁶ the drug is done being produced once it
¹⁷ leaves Torrent's facility, right?
¹⁸     A.   Finished dose means Torrent is
¹⁹ making the product that patients and
²⁰ consumers will eventually consume and use.
²¹     Q.   Okay.  Is it ready to be
²² consumed when it leaves Torrent's facility?
²³     A.   Yes.
²⁴     Q.   And Torrent is essentially the

Page 21

¹ last line of defense for that drug before
² it goes to customers, right?
³         MS. NAGLE:  Objection.
⁴     Form and foundation.
⁵         THE WITNESS:  I would
⁶     not characterize it as the last
⁷     line of defense, but we do the last
⁸     checks to make sure that it meets
⁹     current regulatory standards before
¹⁰     it is released to the public.
¹¹ BY MS. PENDLEY:
¹²     Q.   And to make sure it meets
¹³ current regulatory standards, that includes
¹⁴ things like testing the drug, right?
¹⁵         MS. NAGLE:  Objection.
¹⁶     Form, foundation.
¹⁷         THE WITNESS:  Products
¹⁸     are tested before they leave the
¹⁹     product -- I'm sorry, before they
²⁰     leave the plant, yes, but it's kind
²¹     of not my area.  I wasn't involved
²²     in those types of release
²³     activities.
²⁴

Confidential Information Subject to Protective Order

Page 22

BY MS. PENDLEY:

Q.   Okay.  And because patient safety is very important at Torrent, like you told me earlier, Torrent had a responsibility to ensure that its drugs are safe when they leave its facility, right?

MS. NAGLE:  Objection to form.

THE WITNESS:  Again, safe is a non -- I would say, regulatory word.  They are required to make sure it meets current specifications and is compliant with the agreed-upon standards before it leaves the plant.

BY MS. PENDLEY:

Q.   Okay.  You know we're here today because the medication valsartan was recalled, correct?

A.   Yes.

Q.   And it was recalled because it contained nitrosamines, right?

A.   Correct.

Q.   Specifically NDMA and NDEA,

Page 23

right?

A.   Is that a question?  Yeah, to my knowledge, those were the two impurities.

Q.   Okay.  Let's pull up the FDA limits website, it's at LP 1469.

EXHIBIT TECH:  I'm sorry, what's the LP number?

MS. PENDLEY:  1469.

EXHIBIT TECH:  One second.

- - - - -

(Interim Limits for NDMA, NDEA, and NMBA in Angiotensin II Receptor Blockers (ARBs) marked Torrent Exhibit 77 for identification.)

- - - - -

BY MS. PENDLEY:

Q.   What has been marked as Torrent Exhibit 77, Ms. Chitty, this is a portion of the page from the FDA websites that sets out the limits for nitrosamines.  Do you see this?

A.   Yes.

Page 24

Q.   All right.  We're going to look at this first row where it says valsartan to the left and we're going to look at those levels.  Do you see where it's the third column from the left, acceptable intake for NDMA nanograms per day.  Do you see where it says 96?

A.   Yes.

Q.   And you see the next column over says .3 parts per million, right?

A.   Yes.

Q.   And for NDEA, you see that it's 26.5 nanograms per day and .083 parts per million?

A.   Yes.

Q.   Okay.  So you understand this is, like, the daily acceptable threshold limit set by the FDA, right?

A.   Yes.

Q.   The medications cannot, specifically, valsartan cannot contain more than those levels of NDMA and NDEA, right?

A.   Was that a question?  Yes.

Q.   Yes.  So the FDA created these

Page 25

limits in order to keep customers safe, we can agree?

A.   Yes.

Q.   Okay.  And it's up to the manufacturers to ensure that their products don't contain more nitrosamines than this, right?

MS. NAGLE:  Objection, foundation.

THE WITNESS:  Yes, but I think the timing of this information is somewhat -- somewhat critical.  That web page is dated from 2021, not at the time we were initially making decisions related to the recall.

BY MS. PENDLEY:

Q.   Move to strike as nonresponsive.  You know that it helped the manufacturers to ensure that their drugs don't contain more nitrosamines than this, right, based on what we know today?

MS. NAGLE:  Objection, foundation.

Confidential Information Subject to Protective Order

Page 26

1          THE WITNESS:  Based upon
2      once these standards were
3      established, yes.
4   BY MS. PENDLEY:
5      Q.   Pull up LP 1102.  It was
6   previously marked as Torrent Exhibit 2.
7   Now, just looking at the cover page here,
8   have you seen this before?
9      A.   Not that I recall.
10     Q.   So looking in the middle of the
11  page, we see that it is called
12  N-nitrosodimethylamine, that means NDMA,
13  right?
14     A.   I'm not sure; I believe that's
15  what that stands for.
16     Q.   We see that it's published,
17  looking down at the bottom of the page, in
18  2002, right?
19     A.   That is the date.  I'm not sure
20  if that's a publication date or not.
21     Q.   And it's published by the World
22  Health Organization, right?
23     A.   It appears so, yes.
24     Q.   I'll show you what is marked as

Page 27

1   page 4.  Looking at the right-hand side,
2   third paragraph down, you can blow that up.
3   It says "Based upon laboratory studies in
4   which tumours have been introduced in all
5   species examined at relatively low doses,
6   NDMA is clearly carcinogenic."  Do you see
7   that?
8      A.   Yes.
9      Q.   What does carcinogenic mean?
10         MS. NAGLE:  Objection,
11     foundation.
12         THE WITNESS:  I'm really
13     not a toxicologist.  To my basic
14     knowledge, it means that it
15     potentially causes cancer.
16  BY MS. PENDLEY:
17     Q.   Let's look at the last sentence
18  on that paragraph, "Qualitatively, the
19  metabolism of NDMA appears to be similar in
20  humans and animals; as a result, it is
21  considered highly likely that NDMA is
22  carcinogenic to humans, potentially at
23  relatively low levels of exposure."  That
24  means it can give people cancer, right?

Page 28

1          MS. NAGLE:  Objection.
2      Form and foundation.
3          THE WITNESS:  I'm really
4      not, again, a toxicologist and
5      qualified to interpret fully what
6      that sentence means.
7   BY MS. PENDLEY:
8      Q.   You just told me carcinogenic
9   means causes cancer, right?
10         MS. NAGLE:  Objection,
11     form.
12         THE WITNESS:  I don't
13     believe that's exactly what I said
14     and I said it potentially causes
15     cancer.
16  BY MS. PENDLEY:
17     Q.   Okay.  So potentially causes
18  cancer to humans is what that says?
19     A.   Again, it's outside of my area
20  of expertise.  I am really not qualified or
21  knowledgeable to draw any conclusions from
22  that text.
23     Q.   And you know what the English
24  word "carcinogenic" means, right?

Page 29

1      A.   Generally.
2      Q.   Okay.  So the sentence NDMA is
3   carcinogenic to humans tells us that NDMA
4   likely causes cancer to humans, right?
5      A.   It says "highly likely," and
6   again, I'm not really qualified to draw any
7   conclusions beyond what that says.
8      Q.   Okay.  Well, it goes on to say
9   it could be -- "NDMA is carcinogenic to
10  humans potentially at relatively low levels
11  of exposure."  That last part means it
12  doesn't require very much NDMA at all to be
13  carcinogenic, right?
14         MS. NAGLE:  Objection.
15     Form and foundation.
16         THE WITNESS:  It says
17     potentially, so I don't really know
18     how to interpret that.
19  BY MS. PENDLEY:
20     Q.   You know how to interpret low
21  levels of exposure, right?
22         MS. NAGLE:  Objection to
23     form.
24         THE WITNESS:  Low levels

Confidential Information Subject to Protective Order

Page 30

1  can mean a variety of things.
2  BY MS. PENDLEY:
3      Q.  Okay.  We'll come back to this
4  and I'll show you what I'm talking about in
5  a minute.  Let's go to page 5.  Left-hand
6  side, first paragraph.  The last sentence
7  says "NDMA is a genotoxic carcinogenic, and
8  exposure to be reduced to the extent
9  possible."  Do you see that?
10     A.  Yes.
11     Q.  So exposure should be reduced
12 to the extent possible, that means try to
13 expose people to it as little as possible,
14 right?
15         MS. NAGLE:  Objection,
16     form.
17         THE WITNESS:  It means
18     what it says, reduce to the extent
19     possible.
20 BY MS. PENDLEY:
21     Q.  Okay.  It means try to keep
22 people away from it?
23         MS. NAGLE:  Objection,
24     form.

Page 31

1          MS. PENDLEY:  Right?
2          THE WITNESS:  I wouldn't
3      necessarily agree with the way you
4      stated it.  I can't really
5      elaborate beyond what's written
6      here again.
7  BY MS. PENDLEY:
8      Q.  What does reduced mean?
9      A.  To decrease.
10     Q.  Okay.  So exposure should be
11 decreased to the extent possible, do you
12 agree with that?
13         MS. NAGLE:  Objection.
14     Form and foundation.
15         THE WITNESS:  It pretty
16     much says the same thing as to what
17     is written on the page and I can't
18     elaborate beyond that as to intent.
19 BY MS. PENDLEY:
20     Q.  Right.  We saw at the beginning
21 of this document was published in 2002,
22 which is well before the recall that
23 happened in 2018, right?
24     A.  2002 is before 2018, yes.

Page 32

1      Q.  So when Torrent was told that
2  NDMA is what was in their drug, people at
3  your company understood how dangerous NDMA
4  was, right?
5          MS. NAGLE:  Objection to
6      form and foundation.
7          THE WITNESS:  I can't
8      really speak to what other people
9      were aware of.
10 BY MS. PENDLEY:
11     Q.  Were you aware of how dangerous
12 NDMA is?
13         MS. NAGLE:  Objection,
14     form.
15         THE WITNESS:  No, not
16     until we started receiving some
17     information from FDA.
18 BY MS. PENDLEY:
19     Q.  When you first got the notice
20 that NDMA was in a drug you were assisting
21 with, you did not know that it was a
22 carcinogen?
23     A.  That is a compound or a
24 by-product that I was not familiar with

Page 33

1  prior to conversations around the sartan
2  products started in 2018.
3      Q.  This document uses the word
4  genotoxic."  What does that mean?
5          MS. NAGLE:  Objection,
6      form.
7          THE WITNESS:  Yeah, I'm
8      not sure.
9  BY MS. PENDLEY:
10     Q.  You don't know what the word
11 "genotoxic" means?
12     A.  Not specifically, no.
13     Q.  Do you know that it means
14 causes damage to DNA?
15     A.  If that's your definition,
16 again, I couldn't give you a concise
17 definition myself.
18     Q.  Do you know that things that
19 are genotoxic cause mutations?
20         MS. NAGLE:  Objection to
21     form.
22         THE WITNESS:  No, that's
23     not, again, my area of expertise.
24     I'm not a toxicologist, so I don't

1     have a background in this type of
2     area.
3  BY MS. PENDLEY:
4     Q.   Okay.  But you've worked in the
5  pharmaceutical industry for, like, 20
6  years, right?
7     A.  Yes.
8     Q.   And you don't know what the
9  word "genotoxic" means?
10    A.   We have experts that advise on
11 these types of issues.  So again, if
12 someone asked me for a specific definition
13 of genotoxic, I would go to my
14 toxicologist.  I wouldn't make it up
15 myself.
16    Q.   Okay.  Well, your toxicologist
17 isn't here, so I'm asking you, what do you
18 think the word "genotoxic" means?
19        MS. NAGLE:  Objection.
20     Form and foundation.
21        THE WITNESS:  Again, I,
22     you know, I only have vague ideas
23     of what this means.
24

1  BY MS. PENDLEY:
2     Q.   Give me one of those vague
3  ideas.
4     A.   It's a word that has a negative
5  connotation.  It does say the word "toxic"
6  as part of it.  So it is something that is
7  potentially, potentially harmful.
8     Q.   Okay.  Can we agree that
9  genotoxic compounds or whatever they may be
10 should be taken very seriously; is that
11 fair?
12        MS. NAGLE:  Objection to
13     form.
14        THE WITNESS:  Yes.
15 BY MS. PENDLEY:
16    Q.   Obviously, the company should
17 take necessary steps to identify genotoxic
18 impurities, right?
19        MS. NAGLE:  Objection.
20     Form and foundation.
21        THE WITNESS:  Yes.
22 BY MS. PENDLEY:
23    Q.   You don't want genotoxic
24 impurities in your drug; is that fair?

1        MS. NAGLE:  Objection.
2     Form and foundation.
3        THE WITNESS:  There are
4     limits on all drugs specifically
5     and there are some allowable limits
6     for things that are potentially
7     perceived as genotoxic or
8     carcinogenic, so it's not an all or
9     nothing.  There are some
10     international standards that are
11     set around these types of
12     impurities.
13 BY MS. PENDLEY:
14    Q.   Okay.  Let me reask that.  You
15 wouldn't want more than the FDA threshold
16 of genotoxic impurity in your drug?
17    A.   Correct.
18    Q.   Okay.  Let's pull up LP 1064.
19 This was previously marked as Torrent
20 Exhibit 3.  So this is an email and we're
21 going to look at the attachment of the
22 email.  So if we can kind of zoom in on
23 this top section so we can see who the
24 email was sent to.  We see that it was sent

1  on August 18, 2018.  Do you see that?
2     A.   Yes.
3     Q.   And we see it's sent from
4  Sanjay Sharma.  Who is that?
5     A.   I don't recall.  It's been a
6  number of years since I left and so I have
7  been having a hard time remembering exactly
8  who some of the folks are that were
9  participating in these activities.  So I
10 don't remember who Sanjay is.
11    Q.   Okay.  We see that it was sent
12 to you, right?
13    A.   Yes.
14    Q.   And so you worked for Torrent
15 U.S., right?
16    A.   Yes.
17    Q.   There's also a Torrent --
18 that's not the official name, but Torrent
19 India as well, right?
20    A.   Yes.
21    Q.   Does Sanjay work for Torrent
22 U.S. or Torrent India?
23    A.   By his email, he looks like he
24 works for Torrent in India, because it has

Confidential Information Subject to Protective Order

Page 38

1 a dot com extension on it.
2 Q. Okay, it's a torrentpharma.com
3 is India and U.S. is torrentpharma.us?
4 A. I believe so, yeah.
5 Q. Okay. We can see the
6 attachment here is HHE valsartan,
7 amlodipine, HCTZ medical assessment.
8 That's what we're going to look at. So if
9 we could pull up LP 1065. This was
10 previously marked as Torrent Exhibit 4. We
11 can see that this is a Torrent document,
12 right, by that logo up in the right-hand
13 corner?
14 A. Yes.
15 Q. Do you remember seeing this
16 document?
17 A. I don't recall specifically,
18 but it was obviously sent to me.
19 Q. We can see that it's called
20 "Health Hazard Evaluation
21 Amlodipine/Valsartan/Hydrochorothiazide."
22 Did Torrent India draft this document as
23 far as you're aware?
24 A. As far as I'm aware, yes.

Page 39

1 Q. Look at page 3. And under that
2 heading "Effect in Animals," go to that
3 first paragraph, this says "NDMA has been
4 found to increase the occurrence of cancer
5 in animal studies. Based on these animal
6 studies, NDMA is considered as a probable
7 human carcinogen, a chemical that can
8 increase the risk of cancer in humans." Do
9 you see that?
10 A. Yes.
11 Q. We just saw the World Health
12 Organization document that said it's highly
13 likely NDMA is a carcinogen. Do you
14 remember that?
15 A. Yes.
16 Q. And here Torrent chose the
17 phrase "probable human carcinogen." You do
18 understand that NDMA is a probable human
19 carcinogen, because at this point, it's
20 unethical to expose people to NDMA to
21 determine its true carcinogenic effect,
22 right?
23 MS. NAGLE: Form and
24 foundation.

Page 40

1 THE WITNESS: Can you
2 repeat the question? I'm sorry,
3 that was a bit long.
4 BY MS. PENDLEY:
5 Q. Yeah. And I'm emphasizing the
6 word "probable," to be clear, so it is a
7 probable rather than a certain human
8 carcinogen, because at this point, we can't
9 expose people to it, right?
10 MS. NAGLE: Objection.
11 Form and foundation.
12 THE WITNESS: I don't
13 think I understand the question as
14 to how you're tying probable to not
15 exposing people. I'm sorry, I'm
16 just not understanding the
17 question.
18 BY MS. PENDLEY:
19 Q. It was only a probable human
20 carcinogen, probable meaning not certain,
21 right?
22 A. If that's your definition of
23 probable, sure. I'm not sure if there are
24 other definitions or medical implications

Page 41

1 of the word "probable." I'm not sure.
2 Q. What is your definition of the
3 word "probable"?
4 A. It may be.
5 Q. Okay. So it may be a human
6 carcinogen, right, as opposed to it
7 definitely is a human carcinogen, because
8 we're not allowed to give NDMA to people.
9 Do you understand that?
10 MS. NAGLE: Objection to
11 form and foundation.
12 THE WITNESS: Again, I'm
13 not understanding where your
14 conclusion of we can't give it to
15 people is coming from.
16 BY MS. PENDLEY:
17 Q. Okay. We do know this document
18 tells that NDMA is so harmful to animals
19 that we can't intentionally give it to
20 people, right?
21 MS. NAGLE: Objection to
22 form.
23 THE WITNESS: That is
24 not, I believe, what that sentence

Confidential Information Subject to Protective Order

Page 42

1   is saying by my interpretation.
2   BY MS. PENDLEY:
3       Q.   We followed the World Health
4   Organization said NDMA is high likely to be
5   a carcinogen.
6       I want to take you to the next
7   page and we're going to look at the levels
8   of NDMA in Torrent's valsartan.  Okay?  If
9   you could zoom in on Table 2.  See where it
10  says Table 2 and the colon, it says
11  amlodipine/valsartan/hydrochlorothiazide?
12      A.   Yes.
13      Q.   And then these columns and in
14  this chart, you can see the fifth column of
15  the left says ppm level tested at Huahai.
16  Do you see that?
17      A.   Yes.
18      Q.   Ppm means parts per million,
19  right?
20      A.   Yes.
21      Q.   And Huahai, that the API
22  manufacturer?
23      A.   Correct.
24      Q.   You see number one, it lists

Page 43

1   amlodipine, valsartan, HCTZ and the batch
2   number.  Do you see that?
3       A.   Yes.
4       Q.   And all the way down the
5   spreadsheet, it's different batch numbers,
6   right, 14 different ones?
7       A.   Yes, there appears to be 14
8   there.
9       Q.   Looking at that first row,
10  under the ppm level, Huahai received 63.4.
11  Do you see that?
12      A.   Yes.
13      Q.   So earlier when we looked at
14  the FDA levels, it says no more than .3
15  parts per million of NDMA valsartan, right?
16      A.   I don't recall specifically,
17  but if that's what the document says, then
18  that's fine.
19      Q.   63.4 is significantly more than
20  .3, right?
21          MS. NAGLE:  Objection to
22      form.
23          THE WITNESS:  63.4 is
24      higher than .3.

Page 44

1   BY MS. PENDLEY:
2       Q.   It's more than triple that,
3   right?
4       A.   Yes.
5       Q.   More than 100 times the limit,
6   right?
7       A.   Yes.
8       Q.   Pull up a calculator real
9   quick, if we can, Chris.  63.4 divided by
10  .3, so we can see that 63.4 parts per
11  million is 211 times higher than the FDA
12  threshold for NDMA, right?
13      A.   These based on a purely
14  numerical standpoint, yes, but I think
15  you're comparing apples and oranges,
16  because my understanding of this ppm level
17  here is the level in the API.  The previous
18  limit you're referencing was the daily
19  limit in consuming the maximum dose of drug
20  product.  So it's really not an
21  apples-to-apples comparison.
22      Q.   The maximum dose of valsartan
23  is 320 milligrams, right?
24      A.   I don't recall.

Page 45

1       Q.   Okay.  You see that, if we
2   could take the calculator down real quick,
3   under product name, it says amlo/val/HCTZ
4   and you can see the milligrams listed for
5   valsartan is 320, right?
6       A.   That details that there are
7   320 milligrams of valsartan in that tablet.
8   That does not necessarily equate to the
9   maximum dose.
10      Q.   Okay.
11      A.   Again, apples and oranges.
12      Q.   Let's take this down real
13  quick.  I want to pull up LP 1469 again.
14  You can see right there next to valsartan,
15  it says maximum daily dose milligrams per
16  day, 320, right?
17      A.   Okay, yes.
18      Q.   Okay.  And it says for 320, the
19  acceptable intake for NDMA parts per
20  million is .3?
21      A.   That is what the table says.
22      Q.   Okay.  If we do .3 parts per
23  million times 320, that puts it at
24  96 nanograms per day, right?

Confidential Information Subject to Protective Order

Page 46

1    A.   Yes.
2    Q.   Now that we have got that,
3  let's go back LP 1065, once again, we've
4  got that ppm level tested at Huahai is 211
5  times more NDMA than the maximum daily
6  exposure limit, right?
7    A.   That is the level in the API
8  before it is processed into the final drug
9  product.  That's the way I understand the
10  information in this table.  That is not the
11  limit of NDMA in the finished dose product.
12    Q.   Okay.  63.4 parts per million
13  in NDMA in batch one.  I want you to look
14  at the rest of these batches with me.
15  Batch two, same thing, 63.4, and we can see
16  all the way down, unless it says not
17  available, they're all upwards of 60,
18  right?
19    A.   Yes, for the ones where there
20  is a given number given.
21    Q.   So they're all over 200 times
22  over the amount of NDMA that the FDA says
23  people can be exposed to?
24    A.   Roughly.  And again, those are

Page 47

1  quantities in the API batch before it's
2  unprocessed into finished drug product.
3    Q.   So this document shows us that
4  the contamination was in valsartan that you
5  guys knew about at this point was
6  significantly higher than the FDA limit; is
7  that fair?
8         MS. NAGLE:  Objection to
9     form.
10         THE WITNESS:  No, I
11     don't agree with that conclusion,
12     because, again, the way I interpret
13     this table, this is the amount of
14     NDMA in the API before it is
15     processed into drug product.  When
16     you manufacture drug products,
17     there are opportunities to continue
18     to remove impurities sometimes.  So
19     I don't interpret this as
20     necessarily meaning that the ppm
21     level for this batch of product, if
22     you were to test a tablet, is 63.4.
23  BY MS. PENDLEY:
24    Q.   Why is that your interpretation

Page 48

1  of this document?
2    A.   Because the vendor of the API
3  would not have been testing our tablets.
4  They sell API, they test API, they had, to
5  my knowledge, no reason to be testing our
6  tablets.
7    Q.   So the HP or Huahai would never
8  be testing Torrent finished dose product?
9    A.   I can't say never, but that's
10  not a standard practice and I'm not aware
11  that it necessarily happened with these
12  products.
13    Q.   Well, was Torrent testing the
14  API that it received from Hauhai?
15    A.   Torrent has procedures on what
16  they test whenever we receive a specific
17  component that we used in making drugs,
18  yes.
19    Q.   Did Torrent confirm Hauhai's
20  testing for these batches?
21    A.   I don't really know.  That
22  document doesn't detail that here.
23    Q.   We can agree that the issue
24  with valsartan is it was the API that was

Page 49

1  contaminated, right, valsartan API?
2    A.   To my knowledge, the valsartan
3  API contained the impurity, yes.
4    Q.   Okay.  This pill has
5  320 milligrams of valsartan API in it,
6  correct?  Line 1, we're looking at.
7    A.   The first line that as
8  320 milligrams, yes, of valsartan.
9    Q.   And it is the API that is
10  contaminated, right?
11    A.   The API contains this impurity,
12  yes.
13    Q.   Do you believe that the
14  contamination or impurities are somehow
15  removed when processed into finished
16  product?
17    A.   They potentially can be.
18    Q.   There's no evidence that NDMA
19  contamination is removed when processed
20  into finished product, right?
21         MS. NAGLE:  Objection to
22     form.
23         THE WITNESS:  Just
24     speaking from my general knowledge,

Confidential Information Subject to Protective Order

Page 50

1      there is an ability to sometimes
2      decrease impurity levels through
3      processing and manufacturing of
4      drug products.
5  BY MS. PENDLEY:
6      Q.  Do you know that to be true
7  specifically for NDMA?
8      A.  Specifically for NDMA, no.
9      Q.  Do you know it to be true
10 specifically for NDEA?
11     A.  No.
12     Q.  Let's look at LP 1034,
13 previously marked as Torrent Exhibit 5.
14 Same idea, this is the email and then we're
15 going to look at the attachment.  So once
16 Torrent found out that its valsartan
17 product was contaminated, it put out a
18 press release to customers, right?
19     A.  I'm sorry, can you repeat the
20 question?
21     Q.  Once Torrent found out its
22 valsartan product was contaminated, it put
23 out a press release to customers?
24     A.  I don't remember the sequence

Page 51

1  of events specifically without seeing some
2  documents to detail the timing.  The press
3  release was part of our recall activities.
4      Q.  And we can see from this email,
5  it's August 18, 2018, right?
6      A.  That is the date of the email,
7  yes.
8      Q.  And it's sent to you.  Do you
9  see that?
10     A.  Yes.
11     Q.  And then this is another email
12 that's sent from Sanjay Sharma at Torrent
13 India, right?
14     A.  Yes.
15     Q.  We can see the attachment is
16 valsartan Q&A final document.  That's what
17 we are going to look at.  If we can pull up
18 LP 1030 tab, previously marked as Torrent
19 6. So I'm going to look at number two,
20 "Why is this product being recalled?"
21         "This product is being recalled
22 due to the detection of trace amounts of an
23 unexpected impurity found in active
24 pharmaceutical ingredient or (API)."

Page 52

1      So despite the testing of we
2  just looked at, when Torrent was informing
3  customers of the contamination issue, they
4  chose the word "trace."  Do you see that?
5      A.  Yes.
6      Q.  How do you define trace?
7      A.  Trace means small.
8      Q.  Like not very much, right?
9          MS. NAGLE:  Objection to
10     form.
11         THE WITNESS:  As I said,
12     small.
13 BY MS. PENDLEY:
14     Q.  And you remember looking at
15 that World Health Organization document, it
16 only takes small amounts of NDMA to be
17 dangerous, right?
18         MS. NAGLE:  Objection to
19     form.
20         THE WITNESS:  I don't
21     remember what the term was used in
22     the World Health Organization
23     document.
24

Page 53

1  BY MS. PENDLEY:
2      Q.  Okay.  Do you agree that it
3  said relatively low doses of NDMA can be
4  dangerous?
5          MS. NAGLE:  Objection,
6     form.
7         THE WITNESS:  I believe
8     it said relatively low doses.
9  BY MS. PENDLEY:
10     Q.  All right.  We can think about
11 it from a common sense standpoint too,
12 because think about the concept of parts
13 per million, right?  So if you have one
14 part per million that is one in a million,
15 right?
16     A.  Sure.
17     Q.  Okay.  And the FDA limit for
18 NDMA is .3 parts per million, so it's even
19 smaller than one part per million?
20     A.  .3 is smaller than one, yes.
21     Q.  So .3 parts per million is a
22 very small amount of something, we can
23 agree?
24         MS. NAGLE:  Objection,

Confidential Information Subject to Protective Order

---

Page 54

1      form.
2              THE WITNESS:  Small,
3      trace, they're all relative terms.
4  BY MS. PENDLEY:
5      Q.  Well, we can agree that Torrent
6  used the word "trace" in order to minimize
7  the impact of finding a carcinogen in their
8  drug, right?
9              MS. NAGLE:  Objection to
10     form and foundation.
11             THE WITNESS:  No, I
12     don't agree that was the intention
13     of the word "trace."
14  BY MS. PENDLEY:
15     Q.  Okay.  Well, we can agree this
16  document does not say Torrent detected over
17  200 times the FDA limit of NDMA, right?
18     A.  At the time this was written, I
19  don't recall if there was an acceptable
20  limit in August of 2018 or if it was, I
21  don't recall what it was.  Again, that .3
22  is data from 2021 by the document you
23  showed.
24     Q.  That document was pulled from

Page 55

1  the internet in 2021.  It's not really new
2  information, but you did know that the FDA
3  limit certainly wasn't, like, 50 parts per
4  million for NDMA, right?
5              MS. NAGLE:  Objection to
6      form.
7              THE WITNESS:  I would
8      have to see documents.  I have no
9      idea what day FDA put out specific
10     numbers.  So it's been almost three
11     years.  So if you can show me
12     documents as to what FDA
13     communicated as a limit at this
14     time, then we can discuss that in
15     context.
16  BY MS. PENDLEY:
17     Q.  You have no memory of what you
18  guys thought the limit might be back when
19  this was published?
20             MS. NAGLE:  Objection to
21     form.
22             THE WITNESS:  A memory
23     from three years ago, no.
24

Page 56

1  BY MS. PENDLEY:
2      Q.  All right.  Look now at number
3  three.  It's interesting you told me you
4  guys weren't aware of the FDA limit at this
5  point, if you look at that highlighted
6  sentence it says, "The amounts of NDMA in
7  air, water, or food that result in health
8  effects.  Consuming up to 96 nanograms per
9  day is considered reasonably safe."  Do you
10  see that?
11     A.  Actually no, I do not.  Hold
12  on.
13     Q.  It's the last sentence of the
14  paragraph that's highlighted in bright
15  yellow.
16     A.  So the last sentence, I see
17  the -- oh, that.  Okay.  I see what you
18  were referring to.
19     Q.  That 96 nanograms of NDMA per
20  day, did Torrent make that up?
21     A.  I'm not sure where that came
22  from.  Again, I wasn't responsible for kind
23  of putting together this type of
24  information.  It's not my area of

Page 57

1  expertise.
2      Q.  You reviewed it when they sent
3  it to you, right?
4      A.  I did review it, yes.
5      Q.  Did you ever think, hmm, how
6  did they come up with 96 nanograms per day?
7              MS. NAGLE:  Objection,
8      form.
9              THE WITNESS:  I'm
10     confident that our experts within
11     Torrent whose job it is to evaluate
12     this information took it from
13     reasonable, accurate sources.  It's
14     not my job to second guess them.
15  BY MS. PENDLEY:
16     Q.  You think they maybe got it
17  from the FDA?
18     A.  I don't know where they got it.
19     Q.  We can agree that 96 nanograms
20  per day, if you do that math we just did,
21  you did .3 parts per million times
22  320 milligrams, you get 96 nanograms of
23  NDMA, right?
24     A.  Yes.

Confidential Information Subject to Protective Order

1 Q. That's probably where that
2 number came where, do you agree?
3 MS. NAGLE: Objection to
4 form.
5 THE WITNESS: Again, I
6 don't know where that number in
7 this document specifically came
8 from.
9 BY MS. PENDLEY:
10 Q. Right? It make sense if
11 Torrent was relying on FDA limits at this
12 time as opposed to making up arbitrary
13 numbers, right?
14 MS. NAGLE: Objection,
15 form.
16 THE WITNESS: As I
17 stated, I don't recall where this
18 number came from specifically.
19 BY MS. PENDLEY:
20 Q. Okay. We can see in 2018, you
21 guys at least thought that NDMA threshold
22 was 96 nanograms per day based on this
23 document?
24 A. Could you repeat that question?

1 Sorry, you cut out just a little bit.
2 Q. From this document, we can see
3 that in August 2018, Torrent thought
4 consuming up to 96 nanograms of NDMA per
5 day was the limit, right?
6 MS. NAGLE: Objection to
7 form.
8 THE WITNESS: It stated
9 that it's considered reasonably
10 safe for ingestion.
11 BY MS. PENDLEY:
12 Q. How?
13 A. I don't know if I interpret
14 that as a strict limit, but.
15 Q. Go to LP 1137. Let's do 1337,
16 sorry. This has been marked as Torrent
17 Exhibit 78. You can see across the top it
18 says "Valsartan API NDMA and NDEA Results."
19 Do you see that?
20 A. Yes.
21 - - - - -
22 (Valsartan API NDMA and NDEA
23 Results marked Torrent Exhibit 78 for
24 identification.)

1 - - - - -
2 BY MS. PENDLEY:
3 Q. And if we look at the chart, we
4 see that last column is NDEA content in
5 parts per million. So I want to look at
6 this first row where it says 14.13. Do you
7 remember from that other document, the ppm
8 limit for NDEA is .083, right?
9 A. I don't recall that, but if
10 that's what it says, that's fine.
11 Q. Okay. 14.13 is significantly
12 higher than .083, right?
13 MS. NAGLE: Objection to
14 form.
15 THE WITNESS: It is
16 higher.
17 BY MS. PENDLEY:
18 Q. If we can pull up the
19 calculator again, please. If we could do
20 14.13 divided by .083. We can see that the
21 NDEA content in this batch is 170 times
22 higher than the threshold limit, right?
23 A. I agree with the math.
24 Q. Okay. Let's go down and look

1 at rows 14 and 15. 15.29, that's also
2 higher than .083, right?
3 A. Yes.
4 Q. Pull up the calculator. We're
5 going to do 15.29 divided by .083. 184
6 times higher than the limit. Do you see
7 that?
8 A. Yes.
9 Q. Let's go to batches 19, we'll
10 go to that one first. 13.93, same thing,
11 let's do 13.93 divided by .083. 167 times
12 the limit. Do you see that?
13 A. I agree with the math.
14 Q. And then let's do batches 27
15 and 28. 16.93. Let's do 16.93 divided by
16 .083. 203 times higher than the NDEA
17 limit. Do you see that?
18 A. Yes.
19 Q. Were you not aware that .3
20 parts per million was the threshold limit?
21 A. I just don't recall when the
22 discussion of limits from FDA occurred kind
23 of in this time frame, because it has been
24 so long.

Page 62

1    Q.  Look at row 14.  So it has got
2  15.29 parts per million of NDEA, right?
3  184 times the threshold for NDEA, right?
4    A.  If that's what the math said, I
5  don't recall.
6    Q.  And this batch also has NDMA in
7  it too.  Do you see that?
8    A.  Yes.
9    Q.  5.44 parts per million, right?
10   A.  Yes.
11   Q.  And we know the threshold for
12 NDMA, again, is .3 parts per million, so if
13 we could do 5.44 divided by .3, and that's
14 18 times the threshold limit for NDEA,
15 right, in the same batch?
16   A.  Yes.
17   Q.  Row 14 specifically has 184
18 times the threshold amount for NDEA and 18
19 times the threshold amount for NDMA,
20 correct?
21   A.  If those were the thresholds at
22 the time, yes.
23   Q.  And this is in Torrent's
24 valsartan product, right?

Page 63

1    A.  I can't tell from this
2  document.  These to me look like API batch
3  numbers, so this seems to be a list of API
4  batch content, but I'm missing the top of
5  the document, so.
6    Q.  This is API that was used in
7  Torrent's valsartan product, right?
8         MS. NAGLE:  Objection,
9    foundation.
10        THE WITNESS:  I don't
11   know if this API was used in our
12   products versus just having been in
13   inventory.
14 BY MS. PENDLEY:
15   Q.  Okay.  Let's zoom out for a
16 second and show the whole document.  Okay.
17 Do you see the Torrent logo up there, so
18 this is at least your product in some
19 capacity, right?
20   A.  It is our document.  That's
21 what that means.
22   Q.  Okay.  And it doesn't really
23 make sense that Torrent would be testing
24 somebody else's products, right?

Page 64

1         MS. NAGLE:  Objection to
2    form.
3         THE WITNESS:  Again,
4    when you look at the title, this is
5    valsartan API, so this is not
6    testing of a drug product.
7  BY MS. PENDLEY:
8    Q.  Right.  It is valsartan API
9  that Torrent used in their product, right?
10   A.  No, you can't conclude that.
11 As I said, I don't know if these batches
12 were, of API were used in finished drug
13 product or whether these were just batches
14 that were in inventory awaiting use.
15   Q.  Okay.  But it's definitely
16 batches that Torrent purchased, right?
17   A.  That is a likely conclusion,
18 yes, that these are batches that we had
19 purchased.
20   Q.  Look at row 4.  See for NDMA
21 here, it's 125.03 parts per million.  Do
22 you see it?
23   A.  Yes.
24   Q.  Go to the calculator one more

Page 65

1  time.  We'll do 125.03 divided by .3.  So
2  416.76 times the threshold limit in this
3  batch, right?
4    A.  The math is correct.
5         MS. PENDLEY:  Okay.  We
6    having going about an hour.  Do you
7    all want to take a break?
8         MS. NAGLE:  Sure.
9         MS. PENDLEY:  Ten
10   minutes, is that good for you?
11        MS. NAGLE:  That works.
12        MS. PENDLEY:  We'll be
13   back in ten minutes.
14        THE VIDEOGRAPHER:
15   10:05, we are off the video record.
16        - - - - -
17   (A recess was taken at this time.)
18        - - - - -
19        THE VIDEOGRAPHER:
20   10:22, we are on the video record.
21 BY MS. PENDLEY:
22   Q.  If you could put LP 1337 back
23 up.  I'm going to show you, when I asked
24 you if this was Torrent's product or API

Confidential Information Subject to Protective Order

Page 66

1 that was used in Torrent's product, you
2 said you weren't sure if it made it all the
3 way to the finished dose drug.  Do you
4 remember that?
5     A.  Yes.
6     Q.  Okay.  So I want to show you a
7 couple of examples.  I want to look at
8 row 8, and first we're going to look at the
9 levels of NDMA that are in this batch.  So
10 you can see 111.72 parts per million of
11 NDMA.  Do you see that?
12     A.  Yes.
13     Q.  So if we can divide that .3,
14 372 times over the limit, right?
15     A.  I agree with the math.
16     Q.  If we could also pull LP 1218.
17 Okay.  If we could keep 1337 up too, so I
18 can compare batch numbers, please.  Okay.
19 So looking at row 8, under column 3 is the
20 batch number on this one, 1337.  Can you
21 see that batch number is AR11D0743.  Do you
22 see that?
23     A.  Yes.
24     Q.  So this is for the one we just

Page 67

1 did the math on.  It has got 372 times the
2 levels of NDMA.  So when we look at LP
3 1218, looking at rows 51 and 52, there's
4 the -- let me see, they're on the second
5 page.  Okay.  Looking at document LP 1218,
6 which is going to be Torrent Exhibit 79, we
7 see that these are finished goods.  Do you
8 see that column that FG batch number, Ms.
9 Chitty?
10     A.  Yes.
11         - - - - -
12     (Details of Finished Good Batches
13     Bates TORRENT-MDL-2875-00072916 marked
14     Torrent Exhibit 79 for
15     identification.)
16         - - - - -
17 BY MS. PENDLEY:
18     Q.  And the FG code, do you see
19 that?
20     A.  Yes.
21     Q.  So these are finished goods
22 batch numbers?
23     A.  Yes.
24     Q.  And if we look at the TPL AR

Page 68

1 number, seventh column, so that is Torrent
2 Pharma Limited, right?
3     A.  Yes.
4     Q.  And if we look at the bottom
5 half of 51 and 52 we see that same batch
6 number, the ARI11D0743, right?
7     A.  Yes.
8     Q.  This is showing us that that
9 API batch made it into that corresponding
10 finished good, that finished dose product,
11 right?
12     A.  Yes.
13     Q.  Okay.  Let's look another one.
14 Let's do row 14 from LP 1337.  So we
15 already did you the math on this one.  This
16 was the one that had 18 times the threshold
17 amount of NDMA and 184 times the threshold
18 amount of NDEA.  Do you remember that?
19     A.  I don't remember the math, but
20 if that's what you say that is, that's
21 fine.
22     Q.  All right.  Let's look at the
23 batch number here, it's ARIIB0022.  And
24 then if we go to row 70 on LP 1218, we see

Page 69

1 that same batch number again under the TPL
2 AR number, right?
3     A.  Yes.
4     Q.  So we can see that that API
5 batch that 100 -- that had 18 times the
6 NDMA limit and the 184 times the NDEA limit
7 was used in Torrent's finished dose batch,
8 that one listed?
9     A.  Correct.  For that specific
10 batch.
11     Q.  Okay let's shift gears a little
12 bit.  We can take this document down.
13 Let's talk a little bit about how this
14 happened.  So after about 2010, Torrent
15 started getting its API for valsartan from
16 a Chinese company called ZHP, right?
17     A.  I don't recall when we started
18 purchasing from ZHP.
19     Q.  Okay.  But you did purchase
20 from ZHP for valsartan API, right?
21     A.  Yes, at some point.
22     Q.  Okay.  So let's talk about how
23 Torrent came to chose ZHP as the API
24 manufacturer.  We can agree that Torrent

Confidential Information Subject to Protective Order

Page 70

1 wanted to find a cheap API product, right?
2          MS. NAGLE:  Objection.
3     Form and foundation.
4          THE WITNESS:  We're
5     always looking for multiple sources
6     of API.  Price is not necessarily
7     always the main driver.
8 BY MS. PENDLEY:
9     Q.  Okay.  Let me see you something
10 and see what you think.  Let's pull up LP
11 1047.  It's previously in as Torrent
12 Exhibit 7, previously marked as Torrent
13 Exhibit 7.  This is an email, if we can
14 zoom in on the top.  You can see that it's
15 sent December 20, 2006.  Do you see that?
16     A.  Yes.
17     Q.  Did you work at Torrent at this
18 point?
19     A.  Yes, I did.
20     Q.  Okay.  But we can see you're
21 not on this email, right?
22     A.  Correct.
23     Q.  And based on what you told me
24 earlier, are these all Torrent India email

Page 71

1 addresses?
2     A.  From what I can tell by the
3 email address, yes.
4     Q.  Okay.  Do you see the subject
5 line is API processing?  So I want to go
6 down to the body of the email.  It says
7 "API Processing," and there's a chart that
8 says "APIs identified/Need for processing."
9 And in this chart, we see valsartan on the
10 left-hand side.  Are you with me?
11     A.  Yes.
12     Q.  It says "valsartan," and in the
13 right-hand side, it says "develop second
14 source with 60 percent price reduction."
15 Do you see that?
16     A.  Yes.
17     Q.  Okay.  So 2006 was years before
18 Torrent actually put valsartan on the
19 market, right?
20     A.  Yes.
21     Q.  So they knew, Torrent India
22 knew back in 2006 that they wanted to
23 reduce the cost of valsartan's API even
24 back that, correct?

Page 72

1          MS. NAGLE:  Objection.
2     Form, foundation.
3          THE WITNESS:  My
4     interaction with this team mostly
5     focused more around developing a
6     second source, which is a risk
7     minimization step in manufacturing
8     in case something happens to one of
9     your sources, then you have a
10     second source.
11 BY MS. PENDLEY:
12     Q.  Okay.  But they didn't want
13 just any second source, you can see they
14 want a second source with 60 percent price
15 reduction, right?
16          MS. NAGLE:  Objection to
17     form.
18          THE WITNESS:  That is
19     what the text says and with
20     everything that we do in a given
21     business or industry, price is
22     always one of the considerations,
23     not necessarily always the biggest
24     or most important.

Page 73

1 BY MS. PENDLEY:
2     Q.  Sure.  So we can see that
3 60 percent price reduction, that just means
4 that something is 60 percent cheaper than
5 the source they have right now; is that
6 fair?
7     A.  Yes.
8     Q.  Okay.  Let's look at LP 1088.
9 Another email, we'll look at the top.  You
10 can see that it's, this will be -- it
11 already was marked as Torrent Exhibit 8.
12 We can see it's January 5, 2015.  And this
13 is from Kelly Gegenheimer and it's a U.S.
14 email address.  Who is that?
15     A.  Kelly was one of our
16 salespeople in the U.S.
17     Q.  Okay.  How often did you work
18 with -- is Kelly a boy or a girl?
19     A.  Male.
20     Q.  All right.  How often did you
21 work with him?
22     A.  We worked together for a number
23 of years at Torrent.
24     Q.  Okay.  And the rest of the

Page 74

1  email addresses on here, those are all
2  Torrent U.S. people as well, right?
3      A.  Yes.
4      Q.  Okay.  You're not on this
5  email, but have you ever -- we can zoom out
6  and show her the whole thing, but have you
7  ever seen this before?
8      A.  I don't recall if I've seen an
9  email from 2015 or not.
10     Q.  Okay.  So if we go down to the
11 bottom of the page.  This is going to be
12 the first email in the chain from Sanjay
13 Gupta, and that last sentence says "We are
14 using cheaper Chinese API so our costs
15 should be very competitive."  Do you see
16 that?
17     A.  Yes.
18     Q.  Cheaper Chinese API, that would
19 be referencing ZHP at this point, right?
20         MS. NAGLE:  Objection,
21     foundation.
22         THE WITNESS:  I'm not
23     sure.  I think that's referencing
24     ZHP.

Page 75

1  BY MS. PENDLEY:
2      Q.  So who is Sanjay Gupta?
3      A.  Sanjay was the CEO of the U.S.
4  company at this time.
5      Q.  Okay.  Do you know anybody else
6  who is on this email?
7      A.  Yeah, Jim, Kelly, Chip, Noopur
8  are all sales team related for the U.S. and
9  Lokesh is the CFO for the U.S.
10     Q.  Okay.  So this email is the CEO
11 of U.S. telling his salespeople that we are
12 using cheaper Chinese API?
13     A.  Yes.
14     Q.  Which you told me is
15 referencing ZHP?
16     A.  I believe it references ZHP.
17     Q.  Ms. Chitty, you're familiar
18 with the idea you get what you pay for,
19 have you ever had that before?
20     A.  I've heard that phrase.
21     Q.  Do you know what it means?
22     A.  Quite literally, you get what
23 you pay for.
24     Q.  Does it mean, you know, if

Page 76

1  something is cheap, it may be low quality;
2  is that fair?
3          MS. NAGLE:  Objection,
4      form.
5          THE WITNESS:  That is --
6      that could be the interpretation of
7      that phrase, yes.
8  BY MS. PENDLEY:
9      Q.  And to make sure that is not
10 the case, you know, you need to be careful,
11 you need to decide if what you're
12 purchasing is worth that lower cost, right?
13         MS. NAGLE:  Objection to
14     form.
15         THE WITNESS:  Correct.
16 BY MS. PENDLEY:
17     Q.  So in order to ensure that this
18 cheaper Chinese API is also not low quality
19 or somehow problematic, Torrent should do
20 its homework, right?
21         MS. NAGLE:  Objection,
22     form.
23         THE WITNESS:  Correct,
24     and there are processes in place

Page 77

1      for vetting any new materials that
2      we use within our -- within the
3      Torrent products to make sure that
4      they meet current standards and so
5      those, I'm sure, were followed in
6      this situation as well.
7  BY MS. PENDLEY:
8      Q.  Okay.  And one of those
9  procedures is inspecting the API facility,
10 right?
11         MS. NAGLE:  Objection,
12     foundation.
13         THE WITNESS:  I don't
14     recall the specific Torrent
15     procedure, because we were -- I
16     wasn't directly involved with that
17     type of vetting activity.  I know
18     that sometimes, you do an on-site
19     visit, sometimes, you do not,
20     according to our procedures and
21     what they would allow.
22 BY MS. PENDLEY:
23     Q.  Okay.  Torrent as a finished
24 dose manufacturer, we can agree, probably

Confidential Information Subject to Protective Order

Page 78

¹ should inspect the facilities of any
² manufacturer it's using, right?
³            MS. NAGLE:  Objection.
⁴      Form and foundation.
⁵            THE WITNESS:  Again,
⁶      that's not my decision.  There are
⁷      industry and regulator expectations
⁸      and the firm requirement for an
⁹      on-site visit, I don't believe is
¹⁰     part of any current FDA guidance.
¹¹ BY MS. PENDLEY:
¹²     Q.  Okay.  So how do you know
¹³ what's going on at those facilities if
¹⁴ nobody from Torrent ever goes there to
¹⁵ check them out?
¹⁶            MS. NAGLE:  Objection to
¹⁷     form and foundation.
¹⁸            THE WITNESS:  Again,
¹⁹     this is a little out of my area of
²⁰     expertise, because I didn't
²¹     participate in this activity
²²     directly, but I believe the team
²³     does paper types of surveys and
²⁴     research and obtains historical

Page 79

¹      documents, for instance, from
²      sites.  They would test samples,
³      for instance, things along those
⁴      lines.
⁵ BY MS. PENDLEY:
⁶      Q.  So if nobody from Torrent or
⁷ somebody working for Torrent like a third
⁸ party ever goes and inspects these
⁹ facilities, Torrent would just be relying
¹⁰ on information they get from the
¹¹ facilities; is that fair?
¹²            MS. NAGLE:  Objection to
¹³     form and foundation.
¹⁴            THE WITNESS:  Again, I'm
¹⁵     not intimately familiar with all
¹⁶     the details of that activity, but
¹⁷     there are procedures that dictate
¹⁸     what was allowable.
¹⁹ BY MS. PENDLEY:
²⁰     Q.  No, I know, you mentioned that
²¹ if you don't inspect, you would be relying
²² on testing data and other documents.  So
²³ would those testing data and other
²⁴ documents be from the facility?

Page 80

¹      A.  They would potentially be from
² the facility.  They would potentially, I
³ know sometimes we ask for inspection
⁴ reports, you know, from other regulators.
⁵ Things along those lines.  I'm sure that's
⁶ not an exhaustive list of the materials
⁷ that they would review when vetting a
⁸ supplier.
⁹      Q.  So when you're asking for FDA
¹⁰ inspections from other suppliers, you mean
¹¹ inspections that the FDA has done of
¹² another facility, you would ask for those.
¹³ Is that what you're saying?
¹⁴     A.  Potentially, yes.
¹⁵     Q.  Okay.  And we can agree that if
¹⁶ you don't actually send somebody to go look
¹⁷ at the facility, you would have to be
¹⁸ relying on information either from the FDA
¹⁹ or that facility, right?
²⁰            MS. NAGLE:  Objection.
²¹     Form and foundation.
²²            THE WITNESS:  I guess
²³     I'm just not familiar with all of
²⁴     the potential sources of

Page 81

¹      information.  So that's why I'm not
²      answering yes to that question.
³ BY MS. PENDLEY:
⁴      Q.  Okay.  Let's break it down a
⁵ little more simple then.  If Torrent is not
⁶ witnessing the facility for themselves,
⁷ they, obviously, have to rely on somebody
⁸ else to give them information, right?
⁹      A.  That seems reasonable, yes.
¹⁰     Q.  Okay.  We can agree that the
¹¹ point of an inspection had one been done
¹² would be to kind of supervise the facility?
¹³            MS. NAGLE:  Objection.
¹⁴     Form and foundation.
¹⁵            THE WITNESS:  Was that a
¹⁶     question, I'm sorry?
¹⁷ BY MS. PENDLEY:
¹⁸     Q.  Yes.
¹⁹     A.  You used the word "supervise,"
²⁰ so no.  Our intent in observing a potential
²¹ vendor is not to supervise the facility.
²²     Q.  What is the point of an
²³ inspection?
²⁴     A.  To probably observe the

Confidential Information Subject to Protective Order

Page 82

¹ facility.
² Q. Okay. What are you observing
³ for? Are you looking for problems?
⁴ A. You are looking for, for
⁵ instance, what the facility, how the
⁶ facility is structured. How they're
⁷ operating. I believe when people do
⁸ on-site inspections, they tend to review
⁹ procedures, things like that.
¹⁰ Q. Okay. Is it fair to say that
¹¹ when you're doing an inspection, you're
¹² trying to ensure that the facility is
¹³ operating in the way that you would want it
¹⁴ to?
¹⁵ MS. NAGLE: Objection.
¹⁶ Form and foundation.
¹⁷ THE WITNESS: In a
¹⁸ general sense, I think that's a
¹⁹ reasonable expectation.
²⁰ BY MS. PENDLEY:
²¹ Q. Okay. And generally, the way
²² you would want the facility to operate is
²³ in a way that protects patient safety,
²⁴ right?

Page 83

¹ MS. NAGLE: Objection.
² Form and foundation.
³ THE WITNESS: You would
⁴ want the facility to operate in
⁵ compliance with their own
⁶ procedures as well as regulator
⁷ expectations.
⁸ BY MS. PENDLEY:
⁹ Q. So protecting patient safety is
¹⁰ not factored into the equation there?
¹¹ MS. NAGLE: Objection.
¹² Form and foundation.
¹³ THE WITNESS: The
¹⁴ regulations that are in place are
¹⁵ designed to ensure that things are
¹⁶ done properly with the end patient
¹⁷ safety in mind.
¹⁸ BY MS. PENDLEY:
¹⁹ Q. Okay. We can agree that when
²⁰ conducting an inspection, it's important
²¹ that the inspector would know what to look
²² for or be educated in the proper
²³ procedures, right?
²⁴ MS. NAGLE: Objection.

Page 84

¹ Form and foundation.
² THE WITNESS: I would
³ assume so.
⁴ BY MS. PENDLEY:
⁵ Q. Okay. It's important that when
⁶ they are there, they're looking for the
⁷ appropriate information; is that fair?
⁸ MS. NAGLE: Objection.
⁹ Form and foundation.
¹⁰ THE WITNESS: Yes.
¹¹ BY MS. PENDLEY:
¹² Q. If the inspector doesn't know
¹³ what to look for, it would make sense that
¹⁴ they would not be giving Torrent accurate
¹⁵ information, right?
¹⁶ MS. NAGLE: Objection.
¹⁷ Form and foundation.
¹⁸ THE WITNESS: And it's
¹⁹ very theoretical. I mean, we're
²⁰ talking in theoretical scenarios
²¹ about something I am not intimately
²² familiar with, so.
²³ BY MS. PENDLEY:
²⁴ Q. Okay. If you don't know that

Page 85

¹ the inspector is properly trained, how do
² you know that you're going to get proper
³ information back from that inspection?
⁴ MS. NAGLE: Objection.
⁵ Form and foundation.
⁶ THE WITNESS: So
⁷ typically, if we're hiring or
⁸ working with an inspector, part of
⁹ the process of using that inspector
¹⁰ should be to confirm that they have
¹¹ the proper background to do the
¹² proper job that we expect them to
¹³ do.
¹⁴ BY MS. PENDLEY:
¹⁵ Q. Okay. And it would be
¹⁶ important that they had that training,
¹⁷ right?
¹⁸ MS. NAGLE: Objection.
¹⁹ Form and foundation.
²⁰ THE WITNESS: I don't
²¹ know if I agree with the word
²² "training," but the proper
²³ background and knowledge.
²⁴

Confidential Information - Subject to Protective Order

Page 86

¹ BY MS. PENDLEY:
² Q. Okay, let's pull up LP 1191.
³ This is previously marked as Torrent
⁴ Exhibit 9.
⁵ All right. We can see from the
⁶ first page, that this was an inspection
⁷ that took place in May 2016. Do you see
⁸ that?
⁹ A. Yes, okay.
¹⁰ Q. All right. And then the
¹¹ facility that was inspected is the Indrad
¹² facility kind of up at the top?
¹³ A. Correct.
¹⁴ Q. That's in India, right?
¹⁵ A. Yes.
¹⁶ Q. Okay. If we can go to what's
¹⁷ marked as page 5. Okay. Do you see that
¹⁸ where it says Post-Inspectional
¹⁹ Correspondence should be addressed to the
²⁰ following individuals." And then you are
²¹ the second name listed. Do you see that?
²² A. Correct.
²³ Q. So does this mean that you
²⁴ would get a copy of all the FDA inspections

Page 87

¹ of Torrent facilities or correspondence
² that comes after the fact?
³ A. I'm sorry, can you repeat the
⁴ first part of your question?
⁵ Q. Yes. Do you receive copies of
⁶ FDA inspections of Torrent facilities?
⁷ A. Yes.
⁸ Q. Okay. All of them?
⁹ A. I believe I normally receive
¹⁰ all of them. Sometimes, the notice does go
¹¹ directly to the head of the site rather
¹² than me. I normally get a courtesy copy,
¹³ because I was their U.S. agent.
¹⁴ Q. Okay. So does that include the
¹⁵ inspection itself as well as any 483s?
¹⁶ A. When you say the inspection, so
¹⁷ the notice of inspection?
¹⁸ Q. Yes.
¹⁹ A. Typically, I saw most of those.
²⁰ Again, occasionally, I think they would go
²¹ directly to the site, so I may not have
²² seen all of them.
²³ Q. Okay. Do you know if you've
²⁴ seen this inspection before?

Page 88

¹ A. I don't recall. It was from
² 2016, right?
³ Q. Yes.
⁴ A. Yeah, I don't recall
⁵ specifically.
⁶ Q. Okay. Let's look through it a
⁷ little bit. If we could go to the next
⁸ page. Right there at the top, it lists
⁹ some people that were at this facility and
¹⁰ the first name is Dr. Nilesh Trivedi, the
¹¹ general manager of quality. Have you
¹² worked with him before?
¹³ A. Yes.
¹⁴ Q. Okay. So we can see that he's
¹⁵ overall responsible for the quality of the
¹⁶ Indrad site and was present throughout the
¹⁷ inspection.
¹⁸ Let's go to page 11. And this
¹⁹ first paragraph under supplier
²⁰ qualifications, if we could look at that.
²¹ Okay. So this says "The firm used a
²² third-party auditor to conduct a site
²³ audit/vendor qualification without training
²⁴ the third-party auditor or verifying the

Page 89

¹ third-party auditor's vendor qualification
² program." Do you see that?
³ A. Yes.
⁴ Q. It goes on to say "The audit
⁵ report for the Valsartan API manufacturer
⁶ was written by a third-party auditor, Jian
⁷ Yang of Dragonfarm Co. Limited." So at
⁸ this point in 2016, the valsartan API
⁹ manufacturer was ZHP, right?
¹⁰ A. I don't recall when we started
¹¹ using the ZHP API.
¹² Q. Okay. So this says that -- are
¹³ you familiar with Dragonfarm? Have you
¹⁴ heard of that company before?
¹⁵ A. No.
¹⁶ Q. Okay. Were you aware that
¹⁷ Torrent used a third party to inspect the
¹⁸ valsartan API manufacturer?
¹⁹ A. I don't recall off the top of
²⁰ my head, but according to this document,
²¹ which I probably saw at some point, that's
²² what it says here.
²³ Q. Who or what department at
²⁴ Torrent makes the decision to use a

Page 90

1 third-party auditor versus a direct Torrent
2 employee?
3     A.  I'm not sure specifically.
4 Quality is involved in that, but I'm not
5 sure who all the decision-makers would be
6 for that type of vendor decision.
7     Q.  Do you think the head of
8 quality would be involved in that?
9         MS. NAGLE:  Objection.
10     Form and foundation.
11         THE WITNESS:  Yeah, I'm
12     not sure.
13 BY MS. PENDLEY:
14     Q.  Okay.  All right.  Let's keep
15 reading, it says "I asked Dr. N. Trivedi if
16 the firm verified or qualified this
17 vendor's supplier qualification program."
18 And it says "Dr. Trivedi stated no."  So
19 what that's saying is that Torrent did not
20 verify or qualify this vendor's supplier
21 qualification program, right?
22     A.  That is what that sentence
23 says.
24     Q.  All right.  And then the next

Page 91

1 sentence says "I asked Dr. Trivedi if the
2 firm trained this vendor to follow their
3 vendor qualification program and procedures
4 and Dr. Trivedi stated no."  So that means
5 Torrent did not train this auditor to
6 follow their procedures.  Do you see that?
7     A.  That's what it says.
8     Q.  So if Torrent isn't training
9 their auditor or verifying its procedures,
10 how can Torrent ensure that the inspection
11 was accurate?
12         MS. NAGLE:  Objection.
13     Form and foundation.
14         THE WITNESS:  Yeah,
15     again, this isn't something I was
16     involved in from a decision-making
17     or a day-to-day standpoint, so I
18     don't really have any background on
19     the specific situation.
20 BY MS. PENDLEY:
21     Q.  I understand that.  Just from a
22 common sense standpoint, I know you have
23 been doing regulatory a long time, what do
24 you think about sending an inspector that's

Page 92

1 not properly trained to do an inspection?
2         MS. NAGLE:  Objection.
3     Form and foundation.
4         THE WITNESS:  I'm not
5     sure if not properly trained is the
6     right phrase.  It seems like there
7     were maybe a couple of steps that
8     we should have, additional steps
9     that we should have taken in the
10     process of vetting that vendor.
11 BY MS. PENDLEY:
12     Q.  I want to take you back,
13 because I mean, training is the issue here.
14 It literally says Dr. Trivedi asked the
15 firm, asked if the firm trained the vendor
16 and the answer was no.  Do you see that?
17     A.  I see it.
18     Q.  Okay.
19     A.  I'm not sure that it's required
20 that we necessarily train the firm.  Again,
21 this is a little outside my everyday area
22 of expertise.
23     Q.  Okay.  Ms. Chitty, say you were
24 going to send somebody to go do your job on

Page 93

1 your behalf, would it make sense that you
2 train that person to do your job for you?
3         MS. NAGLE:  Objection to
4     form.
5         THE WITNESS:  Not if
6     they were otherwise properly
7     qualified and experienced.
8 BY MS. PENDLEY:
9     Q.  Okay.  If Torrent doesn't
10 properly train their auditors, how do they
11 know they're properly trained?
12         MS. NAGLE:  Objection.
13     Form and foundation.
14         THE WITNESS:  Yeah, and
15     again, I didn't do this, you know,
16     hands-on, so I assume there was
17     some sort of checking that went on,
18     but I can't really speak to the
19     details of that.
20 BY MS. PENDLEY:
21     Q.  Okay.  So you don't know for
22 sure how Torrent trains their auditors at
23 all?
24     A.  No.

Confidential Information Subject to Protective Order

Page 94

1    Q.  Okay.  Let's go to the next
2  paragraph, because it seems like the FDA
3  has similar concerns that I'm asking of
4  you.  It says "I asked Dr. Trivedi if the
5  firm doesn't train the auditor in the
6  firm's vendor audit program or verify the
7  third-party auditor's vendor qualification
8  program if the firm can be sure that the
9  third party auditor conducted the audit in
10  a manner satisfactory to the firm."  Do you
11  see that?
12    A.  Yes.
13    Q.  And Dr. Trivedi stated no,
14  right?
15    A.  That's what it says.
16    Q.  So the FDA inspector is asking
17  a Torrent employee if you guys don't train
18  your auditor, how do you know it's
19  conducted in a satisfactory manner, right?
20    A.  That seems to be the question
21  here.
22    Q.  And Torrent's employee said no,
23  as in no, we can't ensure that it's
24  conducted in a satisfactory manner, right?

Page 95

1    A.  That's what the document
2  details.
3    Q.  Okay.  Let's go to page, I
4  think it's 29, so this copy that we got is
5  a little bit hard to read.  Okay.  It's
6  even worse for you, so I'll read part of it
7  to you.  There's a paragraph here about
8  halfway down.  Starting on the left-hand
9  side it says, "Form No. CQA-037/03 dated
10  November 11, 2014, is the returned
11  self-completed questionnaire for the
12  third-party auditor the firm used to
13  conduct a site inspection/vendor audit of
14  the API manufacturer," and it's the Chinese
15  name for ZHP, okay.  "ZHP of Valsartan USP
16  in Linhai, China.  The response recorded,"
17  two words I can't read, "is N/A."  Okay.
18  So we can see that they are talking about
19  the auditor that audited ZHP, your API
20  manufacturer, right?
21    A.  I mean, I can't really make
22  much out of that middle part there,
23  unfortunately, so I'm, you know, it's
24  something related to ZHP.

Page 96

1    Q.  Okay.  I promise I'm not making
2  it up.  I'm reading what's on my copy.  So
3  it goes on to say, "I asked Dr. Trivedi if
4  the firm trained Jenny Yang to conduct site
5  inspection vendor audits according to their
6  procedures.  Dr. Trivedi stated no."  So
7  once again, we've got a more specific
8  example, Torrent is confirming they did not
9  train their inspectors specifically to
10  inspect ZHP's API facility.  Okay?
11    A.  It talks about training them to
12  our Torrent procedures.
13    Q.  Right.  And that didn't happen,
14  right?
15    A.  According to this, no.
16    Q.  Okay.  It says "I asked Dr.
17  Trivedi if the firm had verified the vendor
18  qualification procedure followed by Jenny
19  Yang.  And Dr. Trivedi stated no."  Right?
20    A.  Again, I can't really confirm
21  that from this version, but that somewhat
22  looks like what's there on the document.
23    Q.  Okay.  So while Jenny Yang may
24  have been trained by somebody, whatever

Page 97

1  procedure she was using was not verified by
2  Torrent, right?
3    A.  That seems to be what this is
4  saying.
5    Q.  And you don't know who at
6  Torrent during this time frame would be
7  responsible for training its auditors?
8    A.  No, I'm not specifically sure
9  which group or person handled that.
10    Q.  Okay.  Let's shift gears a
11  little bit and talk about your role in this
12  case.  If we could pull up LP 1453.  This
13  will be Torrent Exhibit 80.
14        Now, Ms. Chitty, you've seen
15  this before, right?
16    A.  Yes.
17    Q.  And this is your CV?
18    A.  Correct.
19        - - - - -
20        (Curriculum Vitae marked Torrent
21        Exhibit 80 for identification.)
22        - - - - -
23  BY MS. PENDLEY:
24    Q.  In the beginning here at this

Confidential Information Subject to Protective Order

Page 98

1 top paragraph, it says "Over 25 years'
2 experience as a pharmaceutical scientist,
3 regulatory affairs professional and
4 strategic leader within the pharmaceutical
5 industry."  It goes on to say "Significant
6 contributor to the successful global drug
7 development and approval in multiple
8 therapeutic areas for a $400 million
9 company."  At the end, it says you were a
10 "Senior decision maker responsible for
11 identifying market potential, advising on
12 risks and identifying potentially
13 regulatory hurdles while providing
14 financially viable solutions."  Do you see
15 that?
16      A.  Yes.
17      Q.  All right.  And if we go down
18 to your job history, you're currently
19 working at PRA Health Sciences?
20      A.  Correct.
21      Q.  Tell me a little bit about your
22 job there.
23      A.  Currently, I oversee a
24 regulatory strategy team within PRA.  PRA

Page 99

1 is a contract research organization, so we
2 support a variety of clients in a broad
3 variety of ways.
4      Q.  Okay.  Are you being paid for
5 your time here today, Ms. Chitty?
6      A.  No.
7      Q.  So you currently work for what
8 sounds like a consulting company.  Is it
9 fair to say you advise other companies on
10 regulatory strategies?
11      A.  Correct, my group does.
12      Q.  Okay.  And so prior to that,
13 you worked at Torrent, right?
14      A.  Yes.
15      Q.  If you go to page 2.  So it
16 looks like you worked at Torrent for about
17 14 years; is that right?
18      A.  Correct.
19      Q.  You've had various titles,
20 including director of regulatory affairs,
21 vice president of regulatory affairs, and
22 then vice president of strategy and
23 scientific affairs.  So how is your VP in
24 strategy and scientific affairs different

Page 100

1 than your regulatory affairs position?
2      A.  The strategy and scientific
3 affairs component kind of included
4 oversight of regulatory as well as
5 additional activities such as product
6 selection that we were targeting for
7 development.  I had a team of people,
8 project managers in projects that were in
9 development for Torrent, kind of a subset
10 of their portfolio that I oversaw the local
11 development of in the U.S. and I had some
12 employees that project managed that work.
13      Q.  Okay.  So I want to focus on a
14 couple of things here, so under VP of
15 regulatory affairs, that first bullet
16 "Directed all U.S. regulatory functions
17 relating to U.S. development and commercial
18 activities," and it goes on to say
19 "included oversight of a team of four
20 regulatory affairs individuals."  Who are
21 those people?
22      A.  I don't remember necessarily at
23 the time.  I know that Susan Perry was
24 working for me in this time frame.  I think

Page 101

1 Brijesh Patel was working for me and I
2 believe I had a person in Canada who was
3 called Dagmar Nelson.  I don't remember who
4 the fourth person is.
5      Q.  All right.  And then you say
6 you're the U.S. agent for Torrent
7 Pharmaceuticals Limited for all FDA
8 communications.  Do you see that?
9      A.  Yes.
10      Q.  So does that mean that all
11 communication from the FDA would be sent
12 through you in some capacity?
13      A.  Typically, it should be.
14 Again, occasionally, there may have been
15 one-off communications that I was not
16 included in, but I saw the majority of
17 things coming into the company.
18      Q.  Okay.  Is that for all drug
19 products that Torrent was involved with?
20      A.  Correct.
21      Q.  Okay.  Under director of
22 regulatory affairs, you say you mentor the
23 regulatory affairs group in India regarding
24 U.S. requirements.  So you've mentioned

Page 102

¹ some email addresses to me during this, so
² we know there's an Indian and an U.S.
³ division of Torrent.  How often would you
⁴ and your U.S. department meet with somebody
⁵ in the Indian division?
⁶     A.  Meet, we would probably
⁷ communicate every day.
⁸     Q.  Okay.  Are you responsible for
⁹ updating India on any particular U.S.
¹⁰ regulatory issues?
¹¹     A.  Typically, if I became aware of
¹² new guidelines, new information coming out,
¹³ yeah, we would share that with our team in
¹⁴ India.
¹⁵     Q.  Okay.  So are you supposed to
¹⁶ update them on new things that are
¹⁷ happening in the U.S.?
¹⁸     A.  I think that's a fair
¹⁹ characterization, yeah.
²⁰     Q.  Okay.  So which division, U.S.
²¹ or India, actually conducts testing of the
²² drugs that you guys sell?
²³     A.  Our teams in India do that
²⁴ testing.

Page 103

¹     Q.  Is that true for valsartan too?
²     A.  As far as I can remember, yes,
³ I believe it was solely tested in India.
⁴     Q.  Was that true for the API and
⁵ the finished dose?
⁶     A.  Yes, as far as I can remember.
⁷     Q.  So once that testing is
⁸ conducted, any relevant testing would
⁹ obviously have to be sent from India to the
¹⁰ U.S., right?
¹¹     A.  No, because on a routine basis,
¹² the testing that we do is not something
¹³ that would be shared with me nor shared
¹⁴ with the FDA.  You know, it's kind of
¹⁵ the -- just the common business.  You save
¹⁶ those records at your manufacturing
¹⁷ facility.  You don't necessarily share them
¹⁸ with FDA or people, other people within the
¹⁹ company outside of manufacturing.
²⁰     Q.  Okay.  So what I mean is if you
²¹ were to receive testing results about a
²² drug, it would have had to have come from
²³ India; is that right?
²⁴     A.  If I were to receive testing

Page 104

¹ results.  If we were doing the testing, it
² would have come from India.  There are
³ certain, I would say, situations where
⁴ sometimes the API supplier, you know, might
⁵ have been testing something.  There are
⁶ also, I think I can remember times when FDA
⁷ requested samples from us, as they
⁸ routinely sometimes do, just to verify
⁹ compliance.  So it's possible we might have
¹⁰ gotten results back from FDA as well.  So
¹¹ it could have come from various sources,
¹² but it, to my knowledge, was not coming
¹³ from Torrent U.S.  We had no capabilities
¹⁴ to test.
¹⁵     Q.  Okay.  So if you were receiving
¹⁶ testing that Torrent was doing, it would be
¹⁷ Torrent India's testing?
¹⁸     A.  Correct.
¹⁹     Q.  Okay.  And so we've seen that
²⁰ Torrent India sends you in the U.S. certain
²¹ documents like that Health Hazard
²² Evaluation, like the testing levels, so
²³ when Torrent sends you documents like that,
²⁴ are you able to actually make any changes

Page 105

¹ or edits or do you have to accept it as
² it's sent to you?
³     A.  In most cases, I was also a
⁴ reviewer to kind of, you know, apply my
⁵ U.S.-specific knowledge in guiding them on
⁶ certain relevant issues.
⁷     Q.  So if you make edits to a
⁸ document, do those have to be approved by
⁹ Torrent India or are you allowed to send it
¹⁰ out as you've made changes to it?
¹¹     A.  It depends on what it is.  For
¹² instance, if they were to send me a
¹³ technical document, I may make suggestions,
¹⁴ but that would probably, for instance, have
¹⁵ to go back to the team in India to decide
¹⁶ whether they agree or disagree with
¹⁷ changes.  And then there's, you know,
¹⁸ certain people who probably sign off on
¹⁹ specific things, so that would be the
²⁰ decision of the final person or group
²¹ responsible for whichever document it may
²² be.
²³     Q.  What group is typically
²⁴ responsible for approving documents that

Confidential Information Subject to Protective Order

Page 106

1  you would edit?
2      A.  That's a really broad question.
3  I mean, I would see a lot of different
4  documents.  So it's a very broad potential
5  group of people that may be responsible for
6  them.
7      Q.  All right.  Let's talk about a
8  document, say, like the Health Hazard
9  Evaluation that we looked at earlier where
10 you guys are discussing the dangers of
11 NDMA.  If you were to make an edit to a
12 document like that, who would have to
13 approve it?
14     A.  The medical team that was
15 responsible for producing the document.
16     Q.  So what communication, if any,
17 do you have about Torrent Pharmaceuticals'
18 regulatory issues, you know, how often do
19 you relay that information to India?
20         MS. NAGLE:  Objection to
21     form.
22         THE WITNESS:  Yeah, I'm
23     not sure I understand the question.
24

Page 107

1  BY MS. PENDLEY:
2      Q.  If the FDA comes to you with a
3  problem about a drug that Torrent sells, do
4  you always relay that information to
5  Torrent India?
6      A.  Yes.
7      Q.  Okay.  Torrent sells drugs in
8  other countries aside from the U.S. and
9  India, right?
10     A.  Correct.
11     Q.  Do those other countries kind
12 of report back to India in the same way
13 that you do in the U.S.?
14         MS. NAGLE:  Objection,
15     foundation.
16         THE WITNESS:  I don't
17     know the specifics, because I
18     wasn't involved, but I believe that
19     there was a similar relationship
20     for the other markets --
21 BY MS. PENDLEY:
22     Q.  Okay.
23     A.  -- as to what we had in the
24 U.S.

Page 108

1      Q.  Okay.  So Torrent India kind of
2  supervises the Torrent facilities in other
3  countries; is that fair?
4         MS. NAGLE:  Objection.
5     Form and foundation.
6         THE WITNESS:  I'm not
7     sure if supervises is the right
8     word.  We have a relationship and
9     they are experts in certain areas,
10     so they, you know, they control
11     certain aspects of the business, I
12     will say.
13 BY MS. PENDLEY:
14     Q.  All right.  Particularly on
15 this case, was it Torrent U.S. or Torrent
16 India who made the decision to recall the
17 product?
18     A.  A recall decision is by
19 procedure the decision of the quality unit
20 in India.
21     Q.  Okay.  Okay.  So you understand
22 that in order to ensure that drug
23 manufacturers are selling quality drugs,
24 federal regulations apply to manufacturers

Page 109

1  that sell drugs in the United States,
2  right?
3         MS. NAGLE:  Objection.
4     Form and foundation.
5         THE WITNESS:  Correct, I
6     agree.
7  BY MS. PENDLEY:
8      Q.  So Torrent sells drugs in the
9  U.S., so Torrent has to abide by these
10 regulations; is that fair?
11     A.  Correct.
12     Q.  And you're familiar with these
13 regulations due to your regulatory affairs
14 experience?
15     A.  Yes.
16     Q.  So you understand that under
17 federal law, pharmaceutical drugs must be
18 manufactured in accordance with what's
19 called good manufacturing practices or
20 CGMP, right?
21     A.  Correct.
22     Q.  You know that CGMP sets a
23 minimum standard, meaning companies can do
24 that more than that, they just can't do

Confidential Information Subject to Protective Order

Page 110

¹ less?
² A. Correct.
³ Q. If a drug is manufactured in a
⁴ way that violates CPMG, it is considered
⁵ adulterated, right?
⁶ A. Correct.
⁷ Q. So CGMPs require manufacturers
⁸ to ensure that their drug meets, among
⁹ other things, four standards of identity,
¹⁰ strength, quality, and purity, right?
¹¹ MS. NAGLE: Objection to
¹² form.
¹³ THE WITNESS: Correct.
¹⁴ BY MS. PENDLEY:
¹⁵ Q. Those things help ensure that a
¹⁶ drug is safe, right?
¹⁷ MS. NAGLE: Objection,
¹⁸ form.
¹⁹ THE WITNESS: Correct.
²⁰ BY MS. PENDLEY:
²¹ Q. If Torrent was not prepared to
²² ensure that its drugs met those four
²³ standards, that would be a problem, right?
²⁴ MS. NAGLE: Objection to

Page 111

¹ form.
² THE VIDEOGRAPHER: I'm
³ sorry for the interruption. Your
⁴ objections are barely audible. If
⁵ you could speak up little louder or
⁶ get a little closer to the
⁷ microphone, that would be great.
⁸ MS. NAGLE: Sure. Sorry
⁹ about that.
¹⁰ THE VIDEOGRAPHER: Thank
¹¹ you.
¹² THE WITNESS: Sorry, can
¹³ you repeat that question, please?
¹⁴ BY MS. PENDLEY:
¹⁵ Q. Yeah. If Torrent was not
¹⁶ prepared to ensure that its drugs met those
¹⁷ four standards, identity, strength,
¹⁸ quality, and purity, that would be a
¹⁹ problem, right?
²⁰ MS. NAGLE: Same
²¹ objection.
²² THE WITNESS: Torrent
²³ was meeting those standards for the
²⁴ most part.

Page 112

¹ BY MS. PENDLEY:
² Q. And if they weren't, that drug
³ would be adulterated, right?
⁴ MS. NAGLE: Objection,
⁵ form.
⁶ THE WITNESS: Correct.
⁷ BY MS. PENDLEY:
⁸ Q. And if a drug is adulterated,
⁹ it cannot be sold?
¹⁰ A. Correct.
¹¹ Q. So it's fair to say that
¹² Torrent should not be able to sell those
¹³ drugs until those standards are met, right?
¹⁴ A. Torrent must meet the standards
¹⁵ that are in place at the time, correct,
¹⁶ before marketing a drug.
¹⁷ Q. Okay. Let's look at LP 1055.
¹⁸ This was previously marked as Torrent
¹⁹ Exhibit 10. And look at the first page.
²⁰ You can see this is an inspection that took
²¹ place in April 2017, again, at the Indrad
²² facility in India. Have you seen this
²³ inspection before?
²⁴ A. I don't recall specifically,

Page 113

¹ but I probably have seen this.
² Q. Okay. Let's go to what's
³ marked as page 2. Second paragraph here it
⁴ says "A four-item FDA 483, Inspectional
⁵ Observations were issued for," and it lists
⁶ four things. The first one, "the
⁷ responsibilities and procedures applicable
⁸ to the Quality Unit are not fully
⁹ followed." And the fourth thing says
¹⁰ "laboratory controls do not include the
¹¹ establishment of scientifically sound and
¹² appropriate test procedures designed to
¹³ assure that drug products conform to
¹⁴ appropriate standards of identity,
¹⁵ strength, quality, and purity." Do you see
¹⁶ that?
¹⁷ A. Yes.
¹⁸ Q. So this is saying -- well, one,
¹⁹ to back up, those are the same four things
²⁰ you told me about earlier, right, those
²¹ CGMP standards?
²² A. The identity, strength,
²³ quality, purity, yes.
²⁴ Q. Okay. And you told me we have

Confidential Information Subject to Protective Order

Page 114

1 to have the identity, strength, quality,
2 and purity standards met in order to sell a
3 drug, correct?
4     A.  Yes.
5     Q.  So we can see that in 2017,
6 this inspector notated that Torrent did not
7 have the proper controls to ensure its
8 drugs met those standards, right?
9     A.  So I think it's important to
10 understand that the phrasing of these types
11 of findings and the language that's used in
12 the reports has to kind of hearken back to
13 the language of the regulations.  So the
14 phrasing that is here is kind of very
15 specific and limited when they refer to
16 what kind of potential improvements need to
17 be made at a facility.
18        You know, you also see on that
19 same page, that this inspection was
20 classified as a voluntary action indicated
21 by FDA, which means it did not raise to a
22 very significant level in the regulator's
23 mind.  And that the responses that we had
24 made to these items that were brought to

Page 115

1 our attention had been adequately
2 addressed.
3     Q.  That's all fine, but I'm going
4 to direct you back to my question.  My
5 question, it's a simple yes or no, at this
6 point, the inspector indicated that Torrent
7 did not have the proper controls to ensure
8 identity, strength, quality, and purity,
9 correct?
10     A.  Specifically, laboratory
11 controls in relation to whatever the
12 specifically identified product was.
13     Q.  Okay.  So you told me earlier
14 that Torrent was required to submit an ANDA
15 in order to put valsartan on the market,
16 right?
17     A.  I don't remember if I said
18 that, but that is correct.  They are
19 required to submit an abbreviated
20 application to get a drug approved.
21     Q.  And in that ANDA, you know, in
22 the submission as a whole, you have to show
23 that the drug does meet the strength,
24 identity, quality, and purity standards

Page 116

1 that we've talked about, right?
2     A.  Correct.
3     Q.  So the FDA actually allows
4 manufacturers like Torrent to rely on other
5 drug manufacturers' drug master files in
6 their ANDA submission, right?
7     A.  We reference API manufacturer
8 drug master files, not other finished
9 product master files.
10     Q.  Okay.  So just API.  And here,
11 Torrent did rely on ZHP's DMF for their
12 API, right?
13     A.  For at least one API source.  I
14 believe there was a second one that was
15 originally filed in the ANDA.
16     Q.  Okay.  And so we can agree,
17 it's ultimately Torrent's ANDA submission
18 that gives Torrent approval to sell the
19 drug, right?
20     A.  Correct.
21     Q.  So meaning if their ANDA,
22 Torrent's ANDA is not approved, Torrent
23 can't sell the drug yet?
24     A.  Correct.

Page 117

1     Q.  Since the DMF is contained or
2 cited back to in the ANDA, Torrent needs to
3 make sure that the information in the DMF
4 is correct, to the extent that it can?
5        MS. NAGLE:  Objection,
6     form.
7        THE WITNESS:  I don't
8     know if correct is the proper word.
9     They need to be comfortable that
10     the information that we are allowed
11     to see from the DMF, because we
12     don't get to see everything, is
13     consistent with current guidelines.
14 BY MS. PENDLEY:
15     Q.  Okay.  So you mentioned you
16 don't get to see the whole DMF.  What parts
17 or what types of information does Torrent
18 get to see of an API supplier's DMF?
19     A.  It varies a little bit supplier
20 to supplier.  But there's always an open
21 part that should summarize at a high level
22 the steps that go into making the API, the
23 ingredients that are used, and the final
24 specification and testing that they do on

Confidential Information Subject to Protective Order

Page 118

1 the final API product.
2      Q.  Okay.  So when Torrent made the
3 decision to include ZHP's DMF in the ANDAs
4 for valsartan, did anybody at Torrent India
5 actually review the DMF or whatever
6 information they were allowed to do?
7      A.  It's a standard part of the
8 procurement process, not something I was
9 involved in, but I would expect that, yes,
10 someone had reviewed the open part of the
11 ZHP DMF.
12      Q.  Do you know if anybody at
13 Torrent U.S. reviewed the DMF?
14      A.  I don't recall.
15      Q.  If there were to be a
16 regulatory issue with the DMF, meaning the
17 FDA found a problem with it, would Torrent
18 be notified?
19      A.  Typically, yes.  As part of our
20 ANDA submission, when they are reviewing
21 the quality section, we would be notified
22 that there were questions and deficiencies
23 ongoing relating to the DMF.
24      Q.  When you say "we would be

Page 119

1 notified," is that Torrent U.S. or
2 India or both?
3      A.  Both.  The applicant for our
4 drugs was always Torrent India.  I, as
5 their U.S. agent, was typically the first
6 point of contact on that type of
7 information.
8      Q.  So had you or anyone else that
9 you know of at Torrent U.S. ever been
10 notified of a regulatory issue with ZHP's
11 DMF?
12      A.  I don't recall.  I'm sure there
13 are letters and documents that could detail
14 that.
15      Q.  Okay.  Let's look at LP 1393.
16 This will be marked as Torrent Exhibit 81.
17           - - - - -
18      (Quality Deficient - Minor Letter
19      Bates TORRENT-MDL2875-00009022 marked
20      Torrent Exhibit 81 for
21      identification.)
22           - - - - -
23 BY MS. PENDLEY:
24      Q.  You can see up in the top left,

Page 120

1 it has got the date on it, I believe it
2 says December 2010.
3      A.  Yes.
4      Q.  And then it is attention to
5 you, so this was sent directly to you; is
6 that right?
7      A.  Yes, it appears so.
8      Q.  Okay.  And down kind of the
9 middle here it says "The Division of
10 Chemistry has completed its review of the
11 submissions referenced above and has
12 identified deficiencies."  Look at the next
13 page.  Under A where it says deficiencies,
14 I want to look at number one.  It says the
15 "Drug Master File 23491 was reviewed and
16 found to be deficient."  So that's ZHP's
17 DMF that's being referenced right here,
18 right?
19      A.  I do not know their DMF
20 numbers, so I'm not sure which API supplier
21 that DMF is from.
22      Q.  Okay.  Let's pull up LP 1216
23 really quick and we'll come back to this.
24 This will be Torrent Exhibit 82.

Page 121

1           - - - - -
2      (Email String Bates
3      TORRENT-MDL2875-00010178 to 179 marked
4      Torrent Exhibit 82 for
5      identification.)
6           - - - - -
7 BY MS. PENDLEY:
8      Q.  And this email in the middle
9 the email is Dr. Brijesh Patel.  It says
10 "Dear Dawn," and then later it says "Please
11 note the DMF holder ZHP has filed amendment
12 to DMF No. 23491."  Do you see that?
13      A.  Yes.
14      Q.  Okay.  So the ZHP's DMF number
15 for valsartan is 23491 based on this email?
16      A.  Correct.
17      Q.  Keeping that in mind, let's go
18 back to 1393.  Go back to the page we were
19 looking at.  Next page.  Okay.  So drug
20 master file 23491, that would be
21 referencing ZHP's DMF, right?
22      A.  Yes.
23      Q.  So in 2010, the FDA found their
24 DMF to be deficient, right?

Page 122

1    A.  Yes.
2    Q.  So when something like this
3 happens, does the FDA inform Torrent of why
4 the DMF is deficient?
5    A.  No, that's proprietary
6 information, so they communicate directly
7 with the DMF holder.
8    Q.  Okay.  So nobody ever sees the
9 actual deficiency notice or whatever you
10 want to call it that's sent to ZHP?
11    A.  It's not provided to us from
12 FDA.  A lot of times we would reach out
13 then to the DMF holder to try and
14 understand specifics of the deficiency.
15 Sometimes, companies will share them,
16 sometimes, they will not.
17    Q.  I know it has been a while, but
18 do you know if anybody at Torrent reached
19 out to ZHP about this deficiency?
20    A.  Yeah, I don't remember.
21    Q.  All right.  Okay.  But this
22 would not be information that's coming from
23 the FDA, you would get the reason for the
24 deficiency directly from ZHP; is that fair?

Page 123

1    A.  Correct.
2    Q.  So you were not made aware that
3 ZHP's DMF was deficient for the ability to
4 perform tertiary amines, right?
5    A.  Not via the FDA, no.
6    Q.  Okay.  And you do understand
7 that tertiary amines are considered a
8 potentially significant precursor for
9 nitrosamine formation.  Are you familiar
10 with that idea?
11    A.  I'm familiar with the term.
12 I'm not sure that the NDMA comes via that
13 pathway or is considered that type of
14 product, but --
15    Q.  So if Torrent was informed that
16 ZHP's DMF contained information about the
17 potential to form tertiary amines, is that
18 something Torrent would have looked into,
19 do you think?
20       MS. NAGLE:  Objection to
21    form.
22       THE WITNESS:  Sorry.
23    Brittney, we couldn't quite hear
24    you on that.

Page 124

1       MS. NAGLE:  Object to
2 the form.
3       THE WITNESS:  You know,
4    we would have tried to get more
5    information, and again, sometimes,
6    we're shared a lot of details and
7    sometimes, the suppliers provide
8    more general types of information.
9    So I don't know if we were aware at
10    that time what the specific issue
11    was.
12 BY MS. PENDLEY:
13    Q.  Okay.  Would you say it's
14 Torrent's routine or procedure to reach out
15 when they hear about a DMF deficiency or
16 does it just depend on the situation?
17    A.  I think, typically, it would be
18 normally standard to reach out and try and
19 find out more information.
20       MS. PENDLEY:  Okay.
21    Okay.  We have been going about
22    another hour, how about we take
23    another quick break.  Does that
24    work?

Page 125

1       THE WITNESS:  Sure.
2       MS. PENDLEY:  All right.
3    Let's do ten minutes.
4       THE VIDEOGRAPHER:  Okay,
5    11:22.  We are off the video
6    record.
7          - - - - -
8    (A recess was taken at this time.)
9          - - - - -
10       THE VIDEOGRAPHER:  It's
11    11:46, we are on the video record.
12 BY MS. PENDLEY:
13    Q.  Okay.  Ms. Chitty, we were
14 telling me a little bit about the testing
15 that Torrent does before it puts a drug on
16 the market.  Do you remember that?
17    A.  Not really, to tell you the
18 truth, but we can jump back into a specific
19 question, I guess.
20    Q.  Okay.  We'll real recap some of
21 it.  So you mentioned that Torrent has a
22 responsibility to test the finished dose
23 product before it goes on the market,
24 right?

Page 126

1    A.  Correct.
2    Q.  Okay.  We can agree that it's
3  extremely important that the drugs that
4  Torrent sells are safe, right?
5           MS. NAGLE:  Objection to
6      form.
7           THE WITNESS:  It's
8      important that they meet the
9      standards that are in place at the
10     time, yes, which translates into
11     safety.
12 BY MS. PENDLEY:
13     Q.  Okay.  And the health of
14 Torrent's customer is of utmost importance
15 to Torrent, right?
16          MS. NAGLE:  Objection to
17     form.
18          THE WITNESS:  Correct.
19 BY MS. PENDLEY:
20     Q.  Because health and safety are
21 so important to Torrent, if there's any
22 question about whether or not a drug
23 they're making is safe, Torrent should
24 investigate that, right?

Page 127

1           MS. NAGLE:  Objection to
2      form.
3           THE WITNESS:  As we
4      become aware of new information,
5      yes, Torrent would investigate that
6      situation.
7  BY MS. PENDLEY:
8      Q.  Okay.  So once Torrent is
9  informed of a contaminant in a drug, for
10 example, Torrent would have a
11 responsibility to look into that upon
12 learning that information?
13          MS. NAGLE:  Objection to
14     form.
15          THE WITNESS:  I don't
16     like the use of the word
17     "contaminant," but any type of
18     situation that potentially could
19     impact our products should be
20     investigated, yes.
21 BY MS. PENDLEY:
22     Q.  Okay.  And so that testing
23 obligation also extends to the API,
24 correct, meaning Torrent has an obligation

Page 128

1  to test the API that it's putting in its
2  products?
3      A.  We are obligated to test API,
4  yes.
5      Q.  Okay.  And when you worked at
6  Torrent, you understood the importance of
7  testing the drug, correct?  You agree that
8  that's something that Torrent should be
9  doing?
10          MS. NAGLE:  Objection to
11     form.
12          THE STENOGRAPHER:  We're
13     not hearing your objections.
14          MS. NAGLE:  Objection to
15     form.
16          THE WITNESS:  I agree.
17 BY MS. PENDLEY:
18     Q.  Okay.  Let's look at LP 1063.
19 This is previously marked as Torrent
20 Exhibit 25.  So these emails, the way they
21 were produced, the earliest one is actually
22 on the last page, so the bottom of the
23 first page where it starts and then it
24 carries off.  So this bottom email here is

Page 129

1  sent from you.  Do you see that?
2      A.  Yes.
3      Q.  Okay.  And then it is sent to
4  Sushil Jaiswal, and he works at Torrent
5  India, right?
6      A.  Correct.
7      Q.  This email is from August 16,
8  2018.  Do you know what his position would
9  have been at this time?
10     A.  I don't recall what his
11 position was at that time.
12     Q.  He works for quality though,
13 doesn't he?
14     A.  I, honestly, I don't remember
15 exactly what his function was at that time.
16     Q.  Okay.  So August 16, 2018,
17 that's around the time that you guys are
18 learning that your drug is contaminated.
19 So let's look at the body of the email.
20 You say "FDA has requested a meeting
21 tomorrow afternoon regarding taking market
22 action for valsartan products found to
23 contain NDMA."  Do you see that?
24     A.  Yes.

Confidential Information Subject to Protective Order

Page 130

1    Q.  "Via the FDA sample analysis.
2  They've given me no more information so I'm
3  not sure if they've tested API batches or
4  finished goods."  So you are clearly
5  talking about the levels of NDMA in
6  Torrent's product; is that fair?
7    A.  Yes.
8    Q.  Go to the next page, you say
9  "We really need a method to evaluate these
10 products ourselves," right?
11   A.  Correct.
12   Q.  And so what you told me earlier
13 is that testing that happens is happening
14 at Torrent India, right?
15   A.  Correct.
16   Q.  And so you are telling Torrent
17 India, "We really need a method to evaluate
18 these products ourselves."  So you
19 understood how important it was for Torrent
20 to test its own product, right?
21        MS. NAGLE:  Objection to
22    form.
23        THE WITNESS:  Correct.
24    And it's not a matter of whether we

Page 131

1     were testing, the issue was having
2     a method that was good enough to
3     pick up the very small levels of
4     these impurities.
5  BY MS. PENDLEY:
6    Q.  Right.  So you didn't want to
7  rely on, you know, the API manufacturer,
8  you didn't want to rely on the FDA, you
9  wanted to figure this problem out for
10 yourself, right?
11        MS. NAGLE:  Objection to
12    form.
13        THE WITNESS:  We either
14    needed to know the FDA method or we
15    needed our own method to try and be
16    able to test at those very small
17    levels.
18 BY MS. PENDLEY:
19   Q.  Okay.  So what I'm trying to
20 say here is you seem to be the one that's
21 being proactive about this issue.  So India
22 is the one that's doing the testing,
23 they're not coming to you saying, hey, we
24 need a method, you're having to go to India

Page 132

1  saying we need a method to test those
2  products; is that fair?  You know, you're
3  the one trying to make sure that Torrent
4  figures this stuff out.
5        MS. NAGLE:  Objection to
6    form.
7        THE WITNESS:  From a
8    timing standpoint, this is just a
9    bit out of context for me, because
10   in this email, yes, I was telling
11   them, you know, that I thought we
12   really need a method, but there's a
13   lot of other things going on in the
14   background.  You know, there's
15   communications with FDA.  There's
16   communications with the API
17   supplier.  And so I don't
18   necessarily think this is me for
19   the first time saying within
20   Torrent, we've got to get a method
21   for this.
22 BY MS. PENDLEY:
23   Q.  Of course.
24   A.  So it's just a bit out of

Page 133

1  context for me, but yes, I am aware of
2  the method and our ability to test is very
3  important.
4    Q.  Okay.  And so you at Torrent
5  U.S. were trying to get a test method for
6  NDMA from Torrent India, right?
7    A.  I don't know if I was trying to
8  get one, but I was trying to make sure that
9  we were working towards adapting that
10 method that we normally would have used to
11 make sure that it could detect again these
12 very small levels of impurities.
13   Q.  Okay.  So let's look at LP
14 1394.  This will be marked as Torrent
15 Exhibit 83.
16        - - - - -
17    (Email String Bates
18    TORRENT-MDL2875-00010187 to 187 marked
19    Torrent Exhibit 83 for
20    identification.)
21        - - - - -
22 BY MS. PENDLEY:
23   Q.  Same idea for this email, the
24 first one is actually at the back.  We're

Confidential Information Subject to Protective Order

Page 134

¹ jumping around timewise a little bit, but
² this is from 2014.  You see this first
³ email is from Brijesh Patel.  And he works
⁴ at Torrent India, right?
⁵     A.   Correct.
⁶     Q.   Okay.  And you're on this email
⁷ as well as Sue Perry.  She's at Torrent
⁸ U.S. too, right?
⁹     A.   Yes.
¹⁰     Q.   Okay.  So here he's saying
¹¹ attached is the CMC amendment for AVH,
¹² that's valsartan, amlodipine,
¹³ hydrochlorothiazide, right?
¹⁴     A.   Yes.
¹⁵     Q.   "For Valsartan USP synthesized
¹⁶ by alternate manufacturing process with
¹⁷ minor change."  We're going to talk about
¹⁸ the change in depth a little more in a
¹⁹ little bit.  But I want you to look at
²⁰ Sue's response with you, which part of it
²¹ is on page 2, part of it is on page 1.  So
²² basically she's telling Brijesh that she
²³ has some concerns about this process
²⁴ change.  Okay.  So she says "I have some

Page 135

¹ concerns with this amendment.  Of course I
² haven't seen their full DMF but; they,"
³ which would be ZHP, "have used different
⁴ solvents, but I see nothing that indicates
⁵ they tested for the DMF and MTBE and they
⁶ were not found."  Do you see that?
⁷     A.   Yes.
⁸     Q.   So this is a Torrent U.S.
⁹ employee reaching out to Torrent India
¹⁰ saying I have some concerns with ZHP's DMF
¹¹ amendment, right?
¹²     A.   Correct, sir.
¹³     Q.   So she's saying, you know, she
¹⁴ wants to be sure that they have actually
¹⁵ tested to ensure certain things are not
¹⁶ found in the API; is that right?
¹⁷     A.   Correct.
¹⁸     Q.   Okay.  And that response that's
¹⁹ hyphened under the highlighted section,
²⁰ that's going to be Brijesh's response that
²¹ he puts in the email, he says "Vendor has
²² tested."  The vendor would be ZHP, right?
²³     A.   I believe, yeah, that's the API
²⁴ supplier in this situation.

Page 136

¹     Q.   And so basically Sue Perry is
² coming to India saying we've got concerns,
³ you know, has this stuff been tested and
⁴ Torrent India responds with, yes, the
⁵ vendor has tested this, meaning ZHP has
⁶ tested this?
⁷     A.   That's what it says, yes.
⁸     Q.   It doesn't say that Torrent has
⁹ tested it, right?
¹⁰     A.   At least on the excerpt here,
¹¹ no, it doesn't.
¹²     Q.   Okay.  And in this excerpt, it
¹³ doesn't say, you know, Torrent has tested
¹⁴ and verified ZHP's results, right, not at
¹⁵ this point?
¹⁶     A.   No, it does not say that here,
¹⁷ correct.
¹⁸     Q.   Okay.  So is it fair to say
¹⁹ that at this point, whatever results they
²⁰ are talking about, Torrent India would have
²¹ to be relying on information from ZHP?
²²     A.   It appears that the Attachment
²³ 1 that's referenced here is ZHP's data.
²⁴     Q.   Okay.  So the next bullet says

Page 137

¹ "Our writeup states that the route of
² synthesis and intermediate remain same and
³ there is not change in qualitative and
⁴ quantitative impurity profile."  And she
⁵ goes on to say "Please verify that the DMF
⁶ manufacturer has evaluated the impurity."
⁷ Again, the DMF manufacturer is ZHP, right?
⁸     A.   Correct.
⁹     Q.   Okay.  And then she goes on to
¹⁰ say you know, "and no new impurities are
¹¹ possible with the new solvents and
¹² catalysts."
¹³         So we see the response from
¹⁴ Torrent India again, it says "Yes, DMF
¹⁵ holder has already provided confirmation
¹⁶ for the same."  So he's saying, yes, ZHP
¹⁷ has provided us with this information,
¹⁸ right?
¹⁹     A.   That is what that says, yes.
²⁰     Q.   Again, it's not saying Torrent
²¹ has tested or Torrent has confirmed at this
²² point?
²³     A.   In this message, it does not
²⁴ say that.

Confidential Information Subject to Protective Order

Page 138

1   Q.  And in the last one on page 2,
2  Sue asks "Have we Torrent done testing of a
3  batch of API using the new manufacturing
4  process to verify the results?"
5        And the response is, hang on,
6  it's on the top of page 2.  So the response
7  is, you know, we have planned to verify the
8  testing, however, it has not been received
9  yet.
10       So at this point, Torrent U.S.
11  is, once again, asking Torrent India, can
12  we test to be sure and Torrent India is
13  saying, you know, we're planning to but we
14  haven't yet, right?
15   A.  That is what this says, yes.
16   Q.  Okay.  And you're copied on all
17  these emails, right?
18   A.  Yes, it appears I am copied on
19  that.
20   Q.  Okay.  And so we can see from
21  this generally that Torrent U.S. is asking
22  Torrent India to either confirm information
23  for them or test the product themselves,
24  right?

Page 139

1   A.  In this email, those are
2  topics, yes.
3   Q.  And like you told here earlier,
4  Torrent U.S. doesn't have the ability to
5  test the drug themselves, right?
6   A.  Correct.
7   Q.  So they are relying on Torrent
8  India to do it for them?
9   A.  Correct.
10   Q.  And they have to, right, that's
11  the way Torrent is set up?
12   A.  I wouldn't say they have to,
13  had we had a lab in the U.S., we could have
14  tested, but that was not the way the
15  company was structured from a
16  responsibility standpoint at this time.
17   Q.  Sure.  So let me rephrase.
18  There's nothing you could do in Torrent
19  U.S. to fix that problem, it's the way
20  Torrent India structured the company?
21   A.  I guess I'm not sure what
22  problem you're referring to.  I mean, there
23  were certain activities and certain
24  responsibilities that were divided amongst

Page 140

1  groups.  That's not a problem.
2   Q.  Okay.  So there's nothing you
3  could do in Torrent U.S. to test this drug,
4  right, you have to rely on Torrent India to
5  do that?
6   A.  At this time currently, we had
7  no way to test ourselves.
8   Q.  Okay.  Let's shift gears and
9  talk about India testing in particular.  So
10  despite Torrent India's obligation to test
11  the drug, at the time of the recall,
12  Torrent India still did not know how to
13  test for NDMA, right?
14   A.  At the time of the recall, you
15  said Torrent India -- I'm sorry, could you
16  just repeat part of that?
17   Q.  Yeah.  Despite Torrent India's
18  obligations to test their product, at the
19  time of the recall, Torrent India still did
20  not know how to test for NDMA?
21       MS. NAGLE:  Object to
22    form.
23       THE WITNESS:  That was
24    an evolving situation.

Page 141

1    Essentially, when these initial
2    kind of conversations and data
3    started, nobody had the ability to
4    test for this impurity, you know,
5    FDA included.  So the timeline of
6    this matters, so, yes, there was a
7    point where we were still working
8    on method of development along with
9    everybody else who was involved to
10    try and be able to measure for
11    those, again, what are really very
12    small quantities of impurities.
13  BY MS. PENDLEY:
14   Q.  So let me clarify my question.
15  In July when valsartan was initially
16  recalled, Torrent did not have a test for
17  NDMA yet, right?
18       MS. NAGLE:  Object to
19    form.
20       THE WITNESS:  I have to
21    see some specifics on timeline.  I
22    don't remember off the top of my
23    head when valsartan was initially
24    recalled.

Confidential Information Subject to Protective Order

Page 142

BY MS. PENDLEY:
Q.   Okay.
A.   And kind of the sequence of all of these events from three years ago, I'm sorry.
Q.   All right.  Let's look at LP 682.  This was previously marked as Torrent Exhibit 12.  So down at the bottom of the page, we see an email on August 11, 2018, from you.  And you're emailing, among other people, Sushil Jaiswal, I believe.  All right.  Let's see.  If we can go to the second page.  Okay.  Right there it says "Hi Sushil," we can go down to what you say to him, that last sentence.  It says "Also, have we been able to develop or transfer a method to test for NDMA?"  Do you see that?
A.   Yes.
Q.   So, once again, you at Torrent U.S. are having to reach out to Torrent India to figure out if you guys know how to test for NDMA, right?
        MS. NAGLE:  Objection to form.

Page 143

        THE WITNESS:  I'm asking the question --
        MS. PENDLEY:  Right.
        THE WITNESS:  -- just to try and make sure that I'm informed, because at this point, I'm not aware that we have a method that can detect the NDMA at the levels that they were expecting.
BY MS. PENDLEY:
Q.   Right.  And because, once again, it's not Torrent U.S.'s job to test the drug, they can't, right?
A.   Correct.
Q.   So you're having to go to Torrent India whose job it is to test the drug, right?
A.   Correct.
Q.   Okay.  This is August 11.  We can see from this email that you are one of the people that is actively encouraging Torrent India to come up with a test for NDMA, correct?
A.   Correct.

Page 144

Q.   All right.  Let's look at LP 1039.  This was previously marked as Torrent Exhibit 13.  Same thing, the last one is at the back, so on the third page, if we go to the bottom, we can see that you send an email and we'll look at the fourth page to see what you sent.
        So, once again, this is from you on August 17, 2018.  Do you see that?
A.   Yes.
Q.   So this is a week after that email we just looked at, right?
A.   Correct.
Q.   And the subject line is "valsartan recall discussion needed."  Right?
A.   Yes.
Q.   Right.  If we go down to page 4 and look at the body of your email, so you can see under that underlined section, the "FDA has confirmed that they tested the finished goods using their own developed method, GC-MS," is that gas chromatography?
A.   Gas chromatography/mass spec,

Page 145

yes.
Q.   Okay.  It says "They have agreed to share the method details but I have not received anything of as now."
        So as August 18, Torrent U.S. at least had not received the testing method from the FDA, right?
A.   As of whatever the date of this email was, I'm sorry, I just don't remember if it was the 18th.
Q.   Okay.
A.   Something close to that.
Q.   And you said right under that, "I'm of the opinion that we need to recall these five batches."  Do you see that?
A.   Yes.
Q.   So you were making the recommendation to Torrent India that you guys need to recall some of your product, right?
A.   That is my opinion.
Q.   Okay.  Did you have to get approval from Torrent India to do that?
A.   Final recall decisions are made

Page 146

1 within quality assurance, so I can
2 contribute my opinion, but the final
3 decision comes from quality assurance.
4     Q.   Okay.  So you tell quality
5 assurance in India I think we should recall
6 these batches due to them being
7 contaminated with a nitrosamine, right?
8     A.   Based on the information from
9 FDA saying they had confirmed presence of
10 that impurity, that was my opinion that
11 those five batches should be recalled.
12     Q.   Okay.  And like you told me
13 earlier, you had not received the actual
14 testing method from the FDA, right, so you
15 guys hadn't been able to confirm those
16 results yet; is that true?
17     A.   Correct.
18     Q.   Okay.  But still even without
19 having been able to confirm it yourself,
20 you wanted to go ahead and recall this
21 stuff, right?
22     A.   For the batches where there was
23 data that suggested the presence of the
24 impurities, yes.

Page 147

1     Q.   Because you know that even a
2 suggestion of the presence of NDMA should
3 be taken very seriously, right?
4     A.   The suggestion of the presence
5 is not enough to recall, but receiving firm
6 confirmation from FDA for these five
7 batches specifically, I felt was
8 sufficient, sufficient data to consider
9 that recall.
10     Q.   Okay.  So based on the
11 information that the FDA gave you, you
12 wanted to recall those batches and you made
13 the suggestion to Torrent India, right?
14     A.   Correct.
15     Q.   Okay.  Further up in the email
16 if we could go to page 2, looking kind of
17 in the middle of the page, the email from
18 Samir.  It says Samir/Corporate/Torrent
19 Limited, who is that?
20     A.   He is the CEO of the
21 India-based parent company for Torrent.
22     Q.   Okay.  And at this point, they
23 have taken you off the email chain.  Do you
24 see that?

Page 148

1     A.   Correct.
2     Q.   So prior to today, had you ever
3 seen this email?
4     A.   I don't recall specifically if
5 I've seen this before.
6     Q.   Okay.  On August 18, 2018, and
7 he's emailing from people including Jaiswal
8 again who is in Torrent India and he says
9 "since 26.6, what action did we take to
10 conclude if C batches had any issues or
11 not?"  He's referencing valsartan, right?
12     A.   It is in this trail regarding
13 valsartan, so I assume so.
14     Q.   Okay.  He says "Why could we
15 not find it on our own that C batches also
16 had issues rather than the FDA conveying it
17 to us?"  Right?
18     A.   That is what he has written.
19     Q.   So in this email, like I said,
20 you're not even on it.  He's asking India
21 why could we not find this out, right?
22     A.   That is the question, yes.
23     Q.   Because like you've told me,
24 it's India's responsibility to test this

Page 149

1 drug?
2     A.   Correct.
3     Q.   Okay.  Then he goes on to say
4 on page 1, Samir again responding to the
5 same group of quality people, "How have we
6 concluded that 15 batches need to be
7 recalled and not 100?"  So on August 18,
8 2018, he's asking his quality department
9 how have we concluded that the appropriate
10 number of batches have been recalled,
11 right?
12     A.   Yes, that seems to be his
13 question.
14     Q.   Okay.  And at this point, as
15 far as you're aware, did Torrent India have
16 a method to test for NDMA?
17     A.   On the 18th, I don't believe we
18 had received any information from FDA nor
19 did we have our own in-house method yet.
20     Q.   Okay.  So since Torrent didn't
21 yet know how to test for NDMA, can we agree
22 that it could have hired an independent lab
23 to do that for them?
24     A.   Torrent could have hired a lab,

Page 150

¹ however, the time to develop a method, it
² takes time, so that lab would have been
³ starting from scratch, because there was
⁴ not kind of out in the public domain, the
⁵ method of how to appropriately test for
⁶ these impurities, which is why we were
⁷ trying to get information from FDA, because
⁸ there's -- it's just not public knowledge,
⁹ the lab could go replicate and test these
¹⁰ products tomorrow and have an answer.
¹¹    Q.  Okay.  So you realized that
¹² another lab called Novartis was able to
¹³ find a lab that did mass spectrometry and
¹⁴ discovered NDMA in valsartan, right?
¹⁵        MS. NAGLE:  Objection.
¹⁶    Form and foundation.
¹⁷        THE WITNESS:  I'm not
¹⁸    aware of -- I don't remember who
¹⁹    first noticed this impurity.  I
²⁰    know it was not the API supplier
²¹    who originally initiated this
²²    conversation.
²³ BY MS. PENDLEY:
²⁴    Q.  Okay.  Do you know that it's

Page 151

¹ because one manufacturer actually hired an
² independent lab and that's who found NDMA?
³        MS. NAGLE:  Objection to
⁴    form.
⁵        THE WITNESS:  No, I was
⁶    not aware they hired an independent
⁷    lab.
⁸ BY MS. PENDLEY:
⁹    Q.  Okay.  Torrent has actually
¹⁰ used independent labs in the past for other
¹¹ testing assignments, right?
¹²        MS. NAGLE:  Objection to
¹³    form and foundation.
¹⁴        THE WITNESS:  Yes.  In
¹⁵    certain circumstances where we felt
¹⁶    we couldn't perform the test
¹⁷    ourselves in-house for one reason
¹⁸    or another.
¹⁹ BY MS. PENDLEY:
²⁰    Q.  Right.  And some of these
²¹ independent labs were actually included on
²² ANDAs that you submitted while you worked
²³ for Torrent, right?
²⁴    A.  Correct.

Page 152

¹    Q.  All right.  You actually used
² labs called Sipra and Choksi at various
³ times, right?
⁴    A.  Yeah, I believe those are the
⁵ names of some of the labs we had used.
⁶    Q.  We can agree you never actually
⁷ used those labs to test valsartan API
⁸ specifically?
⁹    A.  Brittney, I didn't hear that
¹⁰ objection, I'm sorry.
¹¹        MS. NAGLE:  Objection,
¹²    foundation.
¹³        THE WITNESS:  I don't
¹⁴    recall if these labs were
¹⁵    specifically used for valsartan.
¹⁶    They would have been referenced in
¹⁷    the ANDA if they had.
¹⁸ BY MS. PENDLEY:
¹⁹    Q.  Okay.  And the ANDA has to
²⁰ include all manufacturers and independent
²¹ testing facilities that were used, right?
²²    A.  Correct.
²³    Q.  So if a lab is not listed on
²⁴ the ANDA, it was not being used for

Page 153

¹ testing?
²    A.  If it is being used for
³ commercial release decisions and compliance
⁴ decisions, it's listed.  We may have labs
⁵ that were supporting research, for
⁶ instance, that may not be listed in the
⁷ ANDA, because those are research types of
⁸ activities that are going on as opposed to
⁹ controlling finished goods and the
¹⁰ materials that go into those finished
¹¹ goods.  Those are the companies and labs
¹² that have to be listed in the ANDA.
¹³    Q.  So if the lab was testing API,
¹⁴ it would be listed in the ANDA, right?
¹⁵    A.  If it was used for commercial
¹⁶ testing of API, yes.
¹⁷    Q.  Okay.  Let's look at LP 1187.
¹⁸ This was marked as Torrent Exhibit 14.  So
¹⁹ we can see here this is at least part of an
²⁰ ANDA submission, right?
²¹    A.  Yes, that looks like an ANDA
²² binder.
²³    Q.  All right.  If you go to the
²⁴ next page, you see the date of submission

Confidential Information - Subject to Protective Order

Page 154

¹ up there near the top right is
² September 11, 2012?
³     A.  Yes.
⁴     Q.   And then your name is under
⁵ that, right?
⁶     A.  Correct.
⁷     Q.   Do you actually put these ANDAs
⁸ together or does someone put them together
⁹ and you approve them?
¹⁰     A.  At various times, it has been a
¹¹ combination.  I used to have more of an
¹² active hand in assembling probably earlier
¹³ in my time with Torrent than I would have
¹⁴ in 2012.
¹⁵     Q.  Okay.  So it says under product
¹⁶ description, it says for amlodipine,
¹⁷ valsartan, and hydrochlorothiazide.  If we
¹⁸ could go to page 3, we can see towards the
¹⁹ end of this paragraph, it says basically
²⁰ this is being used to add the use of Choksi
²¹ Labs as an outside testing lab for the
²² required routine testing of raw materials.
²³ Do you see that?
²⁴     A.  I'm sorry, I'm just moving my

Page 155

¹ window so I can read that whole thing.
² Yes.
³     Q.  Okay.  So this lines up with
⁴ what you told me earlier, that when you add
⁵ extra labs, you have to put them in the
⁶ ANDA submission.  So let's look at page 5
⁷ and so here it lists Sipra, which is the
⁸ lab you guys are going to stop using,
⁹ right?
¹⁰     A.  Correct.
¹¹     Q.  And it lists everything that
¹² was being tested under name of material, it
¹³ lists what's being tested and under tests
¹⁴ conducted it lists how it's being
¹⁵ conducted, right, or what it's being tested
¹⁶ for?
¹⁷     A.  Correct.
¹⁸     Q.  Okay.  So if we go to the next
¹⁹ page, we can see what Choksi is going to be
²⁰ testing and then at the top there, it says
²¹ "hydrochlorothiazide USP," correct?
²²     A.  Yes.
²³     Q.  Okay.  So that is the API for
²⁴ hydrochlorothiazide; is that fair?

Page 156

¹     A.  Yes.
²     Q.   And then the rest of this stuff
³ that's listed are things like filler and
⁴ colorance and lubricants and things like
⁵ that, right?
⁶     A.  They're essentially inactive
⁷ ingredients, yes.
⁸     Q.  Okay.  So we don't see
⁹ valsartan USP or valsartan API on this
¹⁰ list?
¹¹     A.  Correct.
¹²     Q.  So it's safe to say that Choksi
¹³ Labs at this point would be not have been
¹⁴ testing valsartan API?
¹⁵     A.  At this time point, no.
¹⁶     Q.  Okay.  Let's look at LP 1127.
¹⁷ This will be Torrent Exhibit 84.
¹⁸         - - - - -
¹⁹       (ANDA Application Bates
²⁰       TORRENT-MDL2875-00003433 marked
²¹       Torrent Exhibit 84 for
²²       identification.)
²³         - - - - -
²⁴

Page 157

¹ BY MS. PENDLEY:



Confidential Information Subject to Protective Order

Page 158

1 ANDA, nobody is doing testing for valsartan
2 API, right?
3        A.   Correct.
4        Q.   Okay.  LP 1130 is previously
5 marked as Torrent Exhibit 15.  Up at the
6 top, the date of submission is February 5,
7 2016.  We can see that this is also for
8 valsartan USP for that solo valsartan,
9 right?
10        A.   Correct.
11        Q.   And we go to page 4.  This is
12 where they start listing the other
13 facilities that they're using, they have
14 ZHP at the top and on the bottom we have
15 Sipra, one of those labs we talked about
16 earlier.  And you see in the bottom it's
17 the last box on the page it says
18 "Manufacturing Steps and/or type of
19 Testing."  See where it says the "testing
20 of raw materials specifically," and then it
21 lists a bunch of stuff.  Do you see that?
22        A.   Yes.
23        Q.   Okay.  So in that section what
24 we don't see is valsartan USP, correct?

Page 159

1        A.   Correct.
2        Q.   We don't see anything that's
3 valsartan API, right?
4        A.   Correct.
5        Q.   We see that same list of the
6 inactive ingredients is what you referred
7 to them as, I believe, right?
8        A.   Yes, I'm not sure if it's the
9 same, but those are all inactive ingredient
10 tests.
11        Q.   Okay.  We'll go to page 5.  We
12 see Choksi up at the top, another lab from
13 before, and if we go down to manufacturing
14 steps and/or type of testing, once again,
15 it says "testing of raw materials
16 specifically," and lists a bunch of
17 inactive ingredients, right?
18        A.   Correctly.
19        Q.   So no valsartan API?
20        A.   Correct.
21        Q.   So at this point at least in
22 2016, Torrent was not using an independent
23 lab to test its valsartan API; is that
24 fair?

Page 160

1        A.   Yes, that's correct.
2        Q.   Okay.  If we could look at LP
3 1078.  This was previously marked as
4 Torrent Exhibit 16.  From the top here, do
5 you see the date, August 27, 2018, in the
6 upper right?
7        A.   Yes.
8        Q.   And let's go to the next page,
9 page 2.  You're not on this email so, I'll
10 walk through it a little bit slower.
11 Basically the subject line is notification,
12 Valsartan - no genotoxic impurity potential
13 - Hauhai."  Do you see that?
14        A.   Yes.
15        Q.   So it goes on to say "Please
16 find batches test results, as well as list
17 of batches supplied to Torrent with old
18 process from 2015."  Now, 2015 was three
19 years before the recall, right?
20        A.   Yes.
21        Q.   And here one chart says "API
22 stocks available" and lists a bunch of API
23 batch numbers as well as parts per million.
24 Do you see that in the first chart?

Page 161

1        A.   Yes.
2        Q.   And then the bottom chart says
3 "lot number from 2015" and also provides
4 API batch numbers, right?
5        A.   Correct.
6        Q.   So we're going to match a
7 couple of these up, looking at the lot
8 numbers from 2015, six rows up from the
9 bottom, we see the batch number C5069-15
10 and then it ends in 049M.  And then if we
11 look at the chart on the top, we also that
12 same batch number again, fourth row down.
13 Are you with me so far?
14        A.   Yes.
15        Q.   So we can see that that batch
16 has 56.5 parts per million, right?
17        A.   According to this, yes.
18        Q.   Okay.  And that limit of .03,
19 so 56.5 is over 100 times that FDA limit of
20 NDMA?
21        A.   Again, I agree with my math,
22 I'm not sure if that was the limit that was
23 in place at the time of this email, but
24 your math is correct.

Confidential Information Subject to Protective Order

Page 162

1    Q.  All right.  Let's look at
2  there's another batch in the 2015 table,
3  that ends in 050M and then we see that
4  batch again in the 2015 table.  56.2 parts
5  per million.  Do you see that?
6    A.  Yes.
7    Q.  Also 100 times over the limit,
8  right?
9    A.  Your math is correct, yes.
10    Q.  Next row, the 2015 table ends
11  in 051M, that's on their twice and then we
12  see it twice in the 2015 table, listing
13  parts per million at 56.4.  Do you see
14  that?
15    A.  Yes.
16    Q.  Also 100 times over the FDA
17  limit?
18    A.  Math is correct, yes.
19    Q.  Then we've got the one that
20  ends in 052M, we see on the 2015 at 51
21  parts per million, right?
22    A.  Yes.
23    Q.  Also 100 times over the FDA
24  limit?

Page 163

1    A.  Yes.
2    Q.  And the last one we see that
3  ends in 053M, we see it on the 2015 table
4  again and we see it in the contaminated
5  table at 63.1 parts per million.  So what
6  this is telling us is that these lot
7  numbers in 2015 end up contaminated with
8  NDMA, right?
9    A.  It is showing that, yes, these
10  lot numbers from 2015 contain NDMA.
11    Q.  Okay.  If it's a lot number
12  from 2015, does that mean it was
13  manufactured in 2015?
14    A.  I'm not sure if that means it
15  was bought in 2015 or manufactured in 2015.
16    Q.  All right.  Well, if it was
17  bought in 2015, it would be manufactured in
18  at least 2015 if not earlier; is that fair?
19    A.  Yes.
20    Q.  Okay.  So it was at least
21  manufactured by 2015?
22    A.  At the latest in 2015.
23    Q.  Okay.  At the latest.  So if a
24  lab knew how to test NDMA at 2015 and these

Page 164

1  batches were tested, they could have found
2  NDMA, right?
3    A.  Brittney, I didn't hear that.
4  Sorry, is it just me that's not hearing
5  Brittney or is everybody else picking that
6  up?
7      THE VIDEOGRAPHER:  No,
8    I'm still having a hard time
9    hearing her, yes.
10      MS. NAGLE:  So,
11    objection to form, but actually,
12    Counsel, do you mind if we can,
13    around 12:30, if we can take a bit
14    of a lunch break, I can try to get
15    this mike thing situated or
16    resolved.
17      MS. PENDLEY:  Yeah, I've
18    just got a few minutes, that's
19    fine.
20      MS. NAGLE:  Okay.  Yeah,
21    so apologies if it sounds like I'm
22    screaming at you.  I just have a
23    mike issue.
24      MS. PENDLEY:  No, you're

Page 165

1    fine.
2      MS. NAGLE:  Thank you.
3  BY MS. PENDLEY:
4    Q.  All right.  Okay.  So I'm
5  asking you again, so as you told me, these
6  batches were manufactured in at least 2015,
7  right?
8    A.  Correct.
9    Q.  So if there was a lab that knew
10  how to test for NDMA back then, and these
11  batches were tested for NDMA in 2015, they
12  could have found NDMA in 2015?
13      MS. NAGLE:  Objection,
14    form.
15      THE WITNESS:  I don't
16    believe that's what this email
17    says.  This email is not implying
18    that the tests were done in 2015.
19  BY MS. PENDLEY:
20    Q.  I know -- let me, let me
21  rephrase.  So I'm not asking if it
22  happened.  If a lab knew how to test for
23  NDMA in 2015, we can see that these batches
24  contained NDMA back in 2015, right?

Confidential Information Subject to Protective Order

Page 166

1          MS. NAGLE:  Objection to
2     form.
3          THE WITNESS:  Not
4     necessarily.  Some impurities form
5     over time, so all you can conclude
6     from this data is that on the day
7     it was tested, it contained that
8     impurity.
9   BY MS. PENDLEY:
10     Q.   Okay.  You have no evidence to
11   support the fact that NDMA sporadically,
12   randomly appeared in these batches, right,
13   you know that's not how this contamination
14   happened?
15          MS. NAGLE:  Objection to
16     form.
17          THE WITNESS:  I'm not
18     specifically aware of how the
19     contamination happened, but I do
20     know that impurities can increase
21     over time.  Whether it specifically
22     happens with this one, I do not
23     have the background to say
24     definitively yes or no.

Page 167

1   BY MS. PENDLEY:
2     Q.   Okay.  And so you don't have
3   the background to say definitively yes or
4   no whether NDMA can increase over time,
5   right?
6          MS. NAGLE:  Objection to
7     form.
8          THE WITNESS:  Correct.
9   BY MS. PENDLEY:
10     Q.   Okay.  I want to ask you about
11   one more thing and shift gears a little
12   bit.  So we looked at some ANDAs that were
13   submitted for valsartan.  Do you remember
14   the year that Torrent initially submitted
15   valsartan's ANDA for the first time?
16     A.   No.
17     Q.   It would be prior to 2012,
18   right?
19     A.   I don't recall.
20     Q.   We just looked at ANDAs with
21   2012 on them, right?
22     A.   Show me a document.  I'm sure
23   you have something that shows when it was
24   submitted.  I'm sorry, I just can't recall

Page 168

1   random dates from three years ago, so.
2     Q.   I did show you a document about
3   five minutes ago when we were looking at
4   the independent labs and it had 2012 on it.
5   Do you remember that?
6     A.   Can you show it again?  I
7   remember seeing something from 2012, I just
8   don't remember which product it was.  We
9   have been talking about a couple of
10   different products.
11     Q.   To clarify, we're only talking
12   about valsartan today.  So if you were --
13   we were looking --
14     A.   To clarify, you've already
15   shown me valsartan, amlodipine,
16   hydrochlorothiazide.  You've shown me
17   valsartan tablets, those are different
18   products.  So I just want to be accurate,
19   that's all.  We sell a lot of things.
20     Q.   Okay.  All variations of
21   valsartan, the question I'm asking is, you
22   submit an initial ANDA and then anything
23   after that initial ANDA, is that considered
24   an amendment or is it a separate ANDA?

Page 169

1     A.   If it is for the same drug
2   product, it is the same ANDA and it's an
3   amendment.  If it's for a different drug
4   product, it's a separate ANDA.
5     Q.   Okay.  Torrent at some point
6   submitted four different ANDAs.  They
7   submitted one for valsartan solo product,
8   right?
9     A.   Yes.
10     Q.   And they submitted for
11   valsartan and amlodipine, right?
12     A.   Yes.
13     Q.   And they decided one for
14   valsartan and
15   amlodipine/hydrochlorothiazide right?
16     A.   Yes.
17     Q.   And they submitted one for
18   valsartan/hydrochlorothiazide, right?
19     A.   Yes.
20     Q.   So anything after that initial
21   ANDA for each of those variations would
22   need an amendment, right?
23     A.   Correct.
24     Q.   So on Torrent's ANDA submission

Confidential Information Subject to Protective Order

Page 170

1 for each of those four drugs, Torrent
2 relied on ZHP's DMF, right?
3     A.  I don't remember if we used ZHP
4 for all four of those products or not.
5     Q.  Okay.  That DMF number was
6 23491, right?
7     A.  Again, I'm not remembering off
8 the top of my head, but I think that sounds
9 correct.
10     Q.  Do you remember that DMF 23491
11 initially used what was referred to as a
12 TEA manufacturing process for manufacturing
13 valsartan API?
14          MS. NAGLE:  Objection to
15      form.
16          THE WITNESS:  I know
17      there was an old process and a
18      revised process.
19 BY MS. PENDLEY:
20     Q.  If we could pull up LP 1216.
21 Let's mark this Torrent Exhibit 82.  So
22 this is what we were looking at earlier
23 today, if you remember, it's in the middle
24 of the page.  It's from Torrent India to

Page 171

1 you, it says "Please note that DMF holder
2 ZHP has filed an amendment to DMF 23491 for
3 valsartan USP." So that happened in
4 December 2013, right?
5     A.  According to this, yes.
6     Q.  And underneath it says "For the
7 same, we would like to filed an amendment
8 to our submitted ANDA for valsartan
9 tablets, amlodipine/valsartan tablets, and
10 amlodipine/valsartan/hydrochlorothiazide
11 tablets, right?
12     A.  Yes.
13     Q.  So if you all are filing an
14 amendment in 2013, the actual ANDA would be
15 submitted before that, right?
16     A.  Correct.
17     Q.  Okay.  And so what we don't see
18 in this email is the
19 valsartan/hydrochlorothiazide, we only see
20 three types of valsartan here, right?
21     A.  Yes.
22     Q.  Do you know why that is?
23     A.  No.
24     Q.  Now, you mentioned to me the

Page 172

1 old process and a revised process.  Do you
2 remember which manufacturing process was
3 associated with old or revised?
4     A.  I'm sorry, I don't understand
5 the question.  Could you --
6     Q.  Do you know -- hang on, I'll
7 show you a document.  Let's look at LP
8 1219.  This will be Torrent Exhibit 85.
9 And we will go to page 2.  So this says "As
10 discussed, this is regarding valsartan
11 series products - Huahai API - change in
12 manufacturing process.
13          "We have filed an amendment for
14 the proposed change, which is (API
15 manufacturing process change which is the
16 major change as per the guidance) for all
17 three products as mentioned below and
18 decided to use this modified API after
19 getting approval.  Meanwhile, we decided to
20 go with old process API for launch of the
21 product." Have you seen this email before?
22     A.  I don't recall it specifically.
23          - - - - -
24          (Email String Bates

Page 173

1          TORRENT-MDL2875-00085415 to 85416
2          marked Torrent Exhibit 85 for
3          identification.)
4          - - - - -
5 BY MS. PENDLEY:
6     Q.  Okay.  Does any of this new
7 process/old process stuff sound familiar to
8 you?
9     A.  Yes.
10     Q.  Okay.  So they're saying they
11 applied, they submitted the ANDA with old
12 process API, right?
13     A.  Originally, yes.
14     Q.  Okay.  And then they filed an
15 amendment for the new process API, right?
16     A.  Correct.
17     Q.  Okay.  And then we see here,
18 again, it's only the three types of
19 valsartan not the
20 valsartan/hydrochlorothiazide.  So for
21 valsartan tablets, it says the amendment
22 was filed in April 2014 and under the
23 remarks column it says "The proposed change
24 was not accepted by the FDA." So that

Confidential Information Subject to Protective Order

Page 174

¹ means the proposed change to use the new
² process was not accepted by the FDA. Do
³ you see that?
⁴     A.  Yes.
⁵     Q.  Do you have any idea why that
⁶ was?
⁷     A.  It potentially was around
⁸ timing of approval of the original
⁹ application.  FDA doesn't like it if you
¹⁰ submit significant information too close to
¹¹ an expected approval or action date, which
¹² is kind of what this sounds like.  They
¹³ like many months' worth of time to review
¹⁴ what's referred to here I think as a major
¹⁵ type of change.
¹⁶     Q.  Okay.  So you mentioned they
¹⁷ don't like information submitted close to a
¹⁸ major approval date.  So if that were the
¹⁹ reason this was not accepted, would that
²⁰ mean that valsartan's ANDA had been
²¹ approved already or that it had not been
²² approved yet?
²³     A.  I am guessing by the time, and
²⁴ we can obviously check this, I don't

Page 175

¹ remember exactly when it was approved, but
² I think it was approved after this date of
³ April 2014.
⁴     Q.  Okay.  So we can see that the
⁵ change was not approved for valsartan solo
⁶ tablets, but then when we see the
⁷ amlodipine, and we see the
⁸ amlodipine/valsartan/hydrochlorothiazide,
⁹ apparently the FDA had no comment on this
¹⁰ amendment.  Do you see that?
¹¹     A.  I'm not sure.  I'm just reading
¹² the other part of the email here.  It looks
¹³ to me that based on the rest of the text
¹⁴ there, we just had not heard back on those
¹⁵ two specific applications yet.  Because it
¹⁶ goes on to say that we're going to do the
¹⁷ same thing we're doing for valsartan and
¹⁸ file it after getting final approval for
¹⁹ those drug products as well.
²⁰     Q.  Okay.  Thank you.  Look under
²¹ this chart, second little paragraph it says
²² "We expected the query for A," which is
²³ amlodipine, right?
²⁴     A.  Yes.

Page 176

¹     Q.  And AVH, which is the
² amlodipine/valsartan/hydrochlorothiazide,
³ right?
⁴     A.  Yes.
⁵     Q.  "Tablets and decided to file
⁶ PAS with one batch data after getting
⁷ approval."  So they're saying we expected
⁸ to get the same remark from the FDA, but
⁹ just haven't yet; is that right?
¹⁰     A.  That's the way I read that,
¹¹ yes.
¹²     Q.  Do you know of them ever
¹³ getting this question from the FDA about
¹⁴ these two batches?
¹⁵     A.  I'm not sure.
¹⁶         MS. NAGLE:  Objection to
¹⁷     form.
¹⁸         THE WITNESS:  Sorry.
¹⁹ BY MS. PENDLEY:
²⁰     Q.  I'm just clarifying my
²¹ question.  You're okay.
²²     A.  It would be in the
²³ communication files for those ANDAs if we
²⁴ did receive comments regarding that

Page 177

¹ valsartan API change.
²     Q.  All right.  It goes on to say
³ "But, we have received the final achieve
⁴ for A and AVH tablets without any query
⁵ from FDA for the modified.  Hence we can
⁶ use modified manufacturing process API
⁷ directly."  So they're saying we received
⁸ approval for new process from the FDA?
⁹     A.  It says, so as I read that
¹⁰ paragraph, it seems like we did not receive
¹¹ comments then on the amlodipine/valsartan
¹² and the AVH prior to final approval of the
¹³ drug product.
¹⁴     Q.  Okay.  So does that mean they
¹⁵ can use the new process now or not?
¹⁶     A.  If it was submitted as an
¹⁷ amendment and there were no questions, yes,
¹⁸ they can use it.
¹⁹     Q.  Okay.  So as far as you're
²⁰ aware, did Torrent actually use this new
²¹ manufacturing process in any of its
²² valsartan product?
²³     A.  I don't recall.  I know there
²⁴ were lots of communications regarding old

Page 178

1  process versus new process, so I would have
2  to go back to the communications to say for
3  certain.
4      Q.  I'm going to ask you about a
5  couple of more documents, if we could do LP
6  1234.  This will be Torrent Exhibit 86.
7          - - - - -
8      (Email String Bates
9      TORRENT-MDL2875-00156990 to 156993
10     marked Torrent Exhibit 86 for
11     identification.)
12         - - - - -
13 BY MS. PENDLEY:
14     Q.  Turn to page 3.  You're not on
15 this email.  It seems to be between mostly
16 Indian employees.  And near the bottom of
17 the page, it says "Beyond 2015, it will not
18 be process to provide old process valsartan
19 from ZHP."  Do you see that?
20     A.  Yes.
21     Q.  Did you ever hear anything else
22 about this as to whether or not they were
23 able to to continue to buy old process from
24 ZHP?

Page 179

1      A.  I'm really -- I don't remember.
2  I'm not aware whether we were still buying
3  old process after 2015.
4      Q.  Okay.  Do you know who would be
5  aware of that?
6      A.  Likely someone within
7  procurement.
8      Q.  Okay.  So whoever was in
9  procurement in 2015 would be the person we
10 should ask about that?
11     A.  Probably 2015 or after, yeah.
12     Q.  Okay.  Okay.  Okay.  Let's look
13 at LP 193.  This will be Torrent
14 Exhibit 87.
15         - - - - -
16     (Email String Bates
17     TORRENT-MDL2875-00030454 to 90463
18     marked Torrent Exhibit 87 for
19     identification.)
20         - - - - -
21 BY MS. PENDLEY:
22     Q.  And we'll go to page 2.  Okay.
23 So this says "Please kindly note the batch
24 numbers for the valsartan API based on zinc

Page 180

1  chloride process.  We supplied these since
2  August 2013."  Do you see that?
3      A.  No, I don't.
4          MS. NAGLE:  Yeah, I
5      don't think that's what's on the
6      screen.
7          MS. PENDLEY:  Let me see
8      where we are.  It's looks like the
9      same email, just in chart form.  We
10     can do it with LP 208.  This will
11     be Torrent Exhibit 88.
12         - - - - -
13     (Valsartan New Process Batch
14     Tracking Bates
15     TORRENT-MDL2875-00090464 marked
16     Torrent Exhibit 88 for
17     identification.)
18         - - - - -
19 BY MS. PENDLEY:
20     Q.  So this we can see it says
21 "Valsartan New Process Batch Tracking."  Do
22 you see that?
23     A.  Yes.
24     Q.  So this would be referencing

Page 181

1  that new or revised process you were
2  telling me about?
3      A.  I believe so.
4      Q.  If we look at the last column
5  here, it says "PO date."  What do you think
6  that means?
7      A.  PO stands for purchase order.
8      Q.  Okay.  So all the dates in that
9  column would be the purchase order date,
10 right?
11     A.  I believe so, yes.
12     Q.  All right.  And if we look at
13 the market, which is the column on the far
14 left-hand side, we see that they're all for
15 the U.S., right?
16     A.  The top section is for the U.S.
17 The bottom section is for Europe.
18     Q.  Okay.  So the whole top section
19 is U.S.  Let's look at the lot numbers.  We
20 can see these are all batches that start
21 with D5191, right?
22     A.  Correct.
23     Q.  All right.  And then this
24 spreadsheet is titled "New Process Batch

Page 182

1 Tracking." So I want to ask you a couple
2 of questions about whether or not this
3 stuff got used in finished product, if you
4 know. So the batch status column says
5 things like used for development. What
6 does that mean?
7    A.  It means that we were using
8 that essentially for research, you know,
9 potentially for developing different types
10 of tablets that we would eventually use,
11 you know, working on stability potentially
12 and in a research and development capacity.
13    Q.  Okay. What does 56 kilograms
14 used for EB, what does EB mean?
15    A.  EB typically stands for exhibit
16 batch, which is the batch we use that would
17 eventually be submitted potentially in an
18 ANDA.
19    Q.  All right. Why would something
20 be blocked?
21    A.  Do not know.
22    Q.  Why would it be under custom,
23 do you know?
24    A.  Under custom means it's under

Page 183

1 customs clearance.
2    Q.  Okay. What's involved in
3 clearing something from customs?
4       MS. NAGLE:  Objection.
5    Form and foundation.
6       THE WITNESS:  I don't
7    know.
8 BY MS. PENDLEY:
9    Q.  All right. So do you have any
10 knowledge as to whether or not these new
11 process batches were ever used in valsartan
12 sold in the U.S.?
13    A.  Not from this sheet, no.
14    Q.  Do you have any knowledge not
15 from this sheet whether or not it made it
16 to the U.S.?
17    A.  We would have to go back and
18 look at more documents. We were tracking
19 old process/new process batches and where
20 that was in the supply chain potentially,
21 so there should be information that covers
22 that.
23    Q.  Okay. And then that batch
24 number, last thing, some of them end in M,

Page 184

1 I think they all do on this sheet, but what
2 does it mean when the batch ends in the
3 letter M, do you know?
4    A.  No, I don't know.
5    Q.  So you don't know the
6 difference between a single M and a double
7 M and all that?
8    A.  No.
9    Q.  Do you know who would know
10 that?
11    A.  Somebody within the plant would
12 know kind of what all of those details go
13 into the numbering and naming of batches.
14    Q.  Okay. The plant in India?
15    A.  Correct.
16    Q.  Okay. Okay. What do you say
17 we break for lunch?
18    A.  Sounds good.
19       MS. NAGLE:  Thank you.
20       MS. PENDLEY:  All right.
21    Let's do an hour.
22       THE VIDEOGRAPHER:  12:46
23    p.m., we are off the video record.
24       - - - - -

Page 185

1    (A recess was taken at this time.)
2       - - - - -
3       THE VIDEOGRAPHER:  1:47,
4    we are on the video record.
5 BY MS. PAPANTONIO:
6    Q.  All right. Good afternoon,
7 Ms. Chitty. My name is Sara Papantonio.
8 I'm going to be doing the remaining
9 questioning here. Okay?
10    A.  Sounds good.
11    Q.  All right. Now, Ms. Chitty,
12 you have been in this industry for a long
13 time; isn't that right?
14    A.  Yes.
15    Q.  And working in the
16 pharmaceutical industry since 2000, about
17 2002?
18    A.  A little before that. I was a
19 chemist and I worked in a lab before that,
20 but yeah, roughly.
21    Q.  You're actually an organic
22 chemist; isn't that right?
23    A.  Correct.
24    Q.  And with that chemistry degree,

Confidential Information Subject to Protective Order

Page 186

1 you also have over 20 years of experience
2 in regulatory affairs; is that right?
3      A.  Correct.
4      Q.  So you're no stranger to this
5 industry, you absolutely know how it works,
6 right?
7           MS. NAGLE:  Objection,
8      form.
9           THE WITNESS:  I am
10      familiar with the responsibilities
11      that I've had over my time in the
12      industry, yeah.
13 BY MS. PAPANTONIO:
14      Q.  Right.  And because of how much
15 time you spent in this industry, you
16 actually counsel other pharmaceutical
17 companies, right, on how to follow the
18 regulations?
19      A.  In my current position,
20 correct.
21      Q.  Right, in your current
22 position, you teach other companies how to
23 comply with the FDA standards?
24      A.  Compliance is not a huge part

Page 187

1 of my current role, but we advise on other
2 types of guidelines and regulations, yes.
3      Q.  Okay.  And we can agree that no
4 company would ever want to have to go
5 through a recall, right?
6           MS. NAGLE:  Objection,
7      form.
8           THE WITNESS:  Ideally,
9      no.
10 BY MS. PAPANTONIO:
11      Q.  And so part of your role as a
12 consultant is you actually get to advise
13 companies on how to stay within all the
14 regulations and how to avoid certain
15 recalls, right?
16           MS. NAGLE:  Objection,
17      form.
18           THE WITNESS:  My current
19      focus is more on development work
20      as opposed to commercial activities
21      currently.
22 BY MS. PAPANTONIO:
23      Q.  So developing regulatory
24 departments in pharmaceutical companies?

Page 188

1      A.  Developing products that are
2 under evaluation for eventual marketing in
3 the U.S.
4      Q.  Okay.  Well, with all that
5 experience in mind, I want to talk about
6 your time at Torrent, because you put a lot
7 of years into Torrent, didn't you, 14,
8 right?
9      A.  Correct.
10      Q.  And so you actually, you know,
11 you didn't start as vice president of
12 science, you had to work your way up to
13 that; isn't that correct?
14      A.  Yeah, vice president of
15 regulatory and eventually strategy and
16 scientific affairs.
17      Q.  Did you enjoy your time at
18 Torrent?
19      A.  I did.
20      Q.  We're going to talk about the
21 time in terms of the recall, because we
22 were talking earlier about the use of a
23 timeline.  So I'm going to actually use a
24 timeline throughout our testimony so we can

Page 189

1 really understand the breakdown of what
2 happened while you were at Torrent.  Okay?
3      A.  Sure.
4      Q.  From me taking notes of dates
5 as we go and we're going to start with LP
6 1385.  That is going to be marked as
7 Torrent 89.
8           - - - - -
9      (Email String Bates
10      TORRENT-MDL2875-00005067 to 5068
11      marked Torrent Exhibit 89 for
12      identification.)
13           - - - - -
14 BY MS. PAPANTONIO:
15      Q.  Okay.  We can see this is an
16 email.  And we can also see that you
17 received this email, right, under cc, Dawn
18 Chitty?
19      A.  Correct.
20      Q.  Do you remember this email?
21      A.  Not specifically, no.
22      Q.  Okay.  It looks like it is sent
23 on July the 6th, 2018.  Okay.  And so
24 before we get into the contents of the

Confidential Information Subject to Protective Order

Page 190

1  email, I just want to talk generally.
2  Torrent supplies drugs to countries all
3  over the world, right?
4       A.  Correct.
5       Q.  Countries like Brazil, Spain,
6  all kinds of European countries?
7       A.  Brazil --
8            MS. NAGLE:  Objection.
9       Form and foundation.
10           THE WITNESS:  Sorry,
11      Brazil, yes.  I'm not sure about
12      which specific EU countries, but we
13      did business in EU.
14 BY MS. PAPANTONIO:
15      Q.  Right.  And the company you
16 work for, Torrent USA, is ultimately
17 responsible for monitoring the valsartan in
18 USA, right?
19      A.  The U.S. company is not solely
20 responsible for, I guess, monitoring that
21 product.  It's, as we've talked earlier,
22 kind of a partnership between the parent
23 company in India as well as us in the U.S.
24      Q.  Right.  But for the most part,

Page 191

1  Torrent USA is monitoring Torrent USA
2  drugs?
3       A.  I don't know if I agree with
4  the word "monitoring."  We are obviously
5  aware of what's going on and helping in the
6  development of products for the U.S.
7  market.
8       Q.  Okay.  And as part of that
9  development, if Torrent USA learned that
10 another country had found something wrong
11 with one of its products that you also sell
12 in the U.S., you would want to know that
13 information, right?
14           MS. NAGLE:  Objection,
15      form.
16           THE WITNESS:  We do like
17      to know of analogous products in
18      other markets, yes.
19 BY MS. PAPANTONIO:
20      Q.  So if a country found out that
21 valsartan was potentially dangerous, that
22 information would be relevant to your job
23 in Torrent USA?
24           MS. NAGLE:  Objection,

Page 192

1       form.
2            THE WITNESS:  Dangerous
3       is kind of strange in that sentence
4       the way it is worded, but as I
5       said, if we have other information
6       regarding a product that's similar
7       to what we use in the U.S., it
8       would be useful to know that.
9  BY MS. PAPANTONIO:
10      Q.  Okay.  And when you're dealing
11 with compliance issues in the United
12 States, you would agree it's better to be
13 proactive than it is to be reactive?
14           MS. NAGLE:  Objection,
15      form.
16           THE WITNESS:  Compliance
17      is kind of a continuous thing.  You
18      need to build compliance and steps
19      into everything that you do.
20 BY MS. PAPANTONIO:
21      Q.  Right, exactly.  It is
22 important that you take steps to ensure
23 that the drug you're selling is a quality
24 drug?

Page 193

1            MS. NAGLE:  Objection,
2       form.
3            THE WITNESS:  I would
4       agree with that statement.
5  BY MS. PAPANTONIO:
6       Q.  You would want to know if
7  there's a quality issue with a drug before
8  it actually becomes a problem on the
9  market?
10           MS. NAGLE:  Objection,
11      form.
12           THE WITNESS:  The sooner
13      you know any issues, the better.
14 BY MS. PAPANTONIO:
15      Q.  Okay.  With that in mind, let's
16 take a look at this email.  Like we said,
17 these emails start from the back, but we're
18 only going to look at the first page,
19 because the back page is not relevant.
20           Now, we can see this is an
21 email from Humana to Torrent Pharma USA.
22 Who is Chip McCorkle?
23      A.  Chip is one of -- was one of
24 Torrent's salespeople in the U.S.

Page 194

1     Q.  And it says "Please see the
2  attached news release regarding the Europe
3  recall of valsartan-containing products."
4  Do you recall the Europe recall of
5  valsartan-containing products?
6     A.  I remember it happening.  I
7  don't necessarily remember in the sequence
8  of events, but I see it here.
9     Q.  And then we can see these news
10  articles say, in the link it says the
11  title, so it says "Europe recalls generic
12  heart drug made in China on cancer fears."
13  Do you see that?
14     A.  Yes.
15     Q.  Cancer fears, that's a red flag
16  in the pharmaceutical industry, right?
17          MS. NAGLE:  Objection,
18      form.
19          THE WITNESS:  I mean,
20      again, it's the title of an
21      article.  You know, I hate to -- I
22      can't put too much credence in the
23      wording, I guess, of the way it's
24      worded, but.

Page 195

1  BY MS. PAPANTONIO:
2     Q.  Right, but if you see, if you
3  see a drug that you sell, valsartan,
4  associated with the word "cancer," that
5  would be information to you, right,
6  information that you would have to have?
7          MS. NAGLE:  Objection,
8      form.
9          THE WITNESS:
10      Information that I would like to
11      have, yes.
12  BY MS. PAPANTONIO:
13     Q.  And it says, it recalls the
14  generic heart drug made in China.  That
15  would be ZHP, right, your Chinese API
16  manufacturer?
17          MS. NAGLE:  Objection.
18      Form and foundation.
19          THE WITNESS:  From the
20      title of the article, I'm not sure
21      which product that's referring to.
22  BY MS. PAPANTONIO:
23     Q.  Okay.  And then someone is
24  responding to you.  We've got, it looks

Page 196

1  like Chip is responding or writing you a
2  letter.  And he's asking "Is this a problem
3  for Torrent?"  Now, at this point, do you
4  believe this is a problem for Torrent that
5  there's cancer in or cancer -- excuse me,
6  move to strike.
7          At this point, would it be a
8  problem that valsartan is linked to cancer
9  in Europe?
10          MS. NAGLE:  Objection,
11      form.
12          THE WITNESS:  You have
13      to really understand the details
14      of, again, the product and the
15      situation in Europe.  We were aware
16      in this early July time frame
17      through our communications with ZHP
18      that they were investigating
19      potential issues with their route
20      of -- their new route of synthesis.
21  BY MS. PAPANTONIO:
22     Q.  Okay.  And he further says "A
23  quick glance our API supplier -- at our API
24  supplier looks like we do source our API

Page 197

1  from this company in China."  So it's safe
2  to say we are talking about ZHP, right?
3     A.  I believe so.  There was a link
4  there from ZHP further down too, so I'm not
5  sure what, again, is referred to in the
6  news article that was referenced, but
7  there's information there from ZHP
8  specifically itself too.
9     Q.  Now, as far as you know, after
10  receiving notice that Europe was recalling
11  their valsartan based on cancer fears, did
12  Torrent USA ever take any measures to test
13  the drug to see if you might have the same
14  problem?
15          MS. NAGLE:  Objection,
16      form.
17          THE WITNESS:  As I've
18      mentioned already, most of the
19      testing was pretty much exclusively
20      done by our team in India, so I was
21      vaguely aware we were looking into
22      the issue.  I do not know of the
23      specific actions that were taken
24      from this email and this article

Page 198

1   specifically.
2   BY MS. PAPANTONIO:
3      Q.   As far as you know, did anyone
4   from Torrent India insinuate that the drug
5   needed to -- the U.S. product needed to be
6   tested for this cancer-causing carcinogen?
7      A.   I think at this time in July,
8   we were still gathering a lot of
9   information and wanting to, you know,
10  develop methods that might be able to help
11  us detect these small amounts of
12  impurities, but again, I think at this
13  stage in the timeline, the expectation was
14  that the new API route of synthesis product
15  was impacted, which we believed we did not
16  have on the market at the time.
17     Q.   Right.  And if you had tested
18  valsartan U.S. product at this time for
19  NDMA, you would have learned that that
20  product was in fact contaminated with NDMA?
21          MS. NAGLE:  Objection.
22     Form and foundation.
23          THE WITNESS:  Not
24     necessarily.  We had a method in

Page 199

1      place at times -- at the time of
2      this for testing our product for
3      release and it was not detecting
4      the very small amounts of NDMA.
5   BY MS. PAPANTONIO:
6      Q.   We're going to talk about that
7   testing in a little bit, but now I want to
8   move to LP 1170.  This has already been
9   marked as Torrent 19.  So we can see this
10  document is dated June 20.  So this is when
11  the contamination story really starts for
12  Torrent, right?
13     A.   This is the date that we were
14  notified that there was a new unknown
15  impurity in the ZHP API.
16     Q.   I want to break this down.  You
17  got this notification from your API
18  manufacturer, ZHP, right?
19     A.   It seems, yes, that's where
20  that came from.
21     Q.   And it says "Recently, we
22  became aware of a previously unknown
23  impurity."  What does impurity mean?
24     A.   An impurity is something

Page 200

1   besides the active ingredient or the
2   inactive ingredients in a drug product.
3      Q.   Right, impurity means not pure,
4   right?
5          MS. NAGLE:  Objection to
6      form.
7          THE WITNESS:  By its
8      pure definition, that's a likely
9      definition, yeah.
10  BY MS. PAPANTONIO:
11     Q.   It means that's something is
12  wrong with the drug?
13          MS. NAGLE:  Objection,
14     form.
15          THE WITNESS:  No, I
16     would not draw that conclusion.
17  BY MS. PAPANTONIO:
18     Q.   Well, if an impurity has
19  genotoxic potential, that means that it's a
20  cancer-causing impurity, correct?
21          MS. NAGLE:  Objection,
22     form.
23          THE WITNESS:  No, again,
24     it says "may have genotoxic

Page 201

1   potential."
2   BY MS. PAPANTONIO:
3      Q.   "May have genotoxic potential,"
4   so that means it may cause cancer?
5          MS. NAGLE:  Objection,
6      form.
7          THE WITNESS:  As written
8      here, I really can't elaborate any
9      further.  As we've discussed
10     already, I'm not a toxicologist,
11     so.
12  BY MS. PAPANTONIO:
13     Q.   Right, but you are an organic
14  chemist; isn't that right?
15     A.   Correct.
16     Q.   Did you ever study genotoxicity
17  in your master's degree?
18     A.   Twenty-five, 30 years ago, yes.
19     Q.   So you at least have a
20  foundation for it, right?
21     A.   I have a very minimal
22  understanding.  Again, it's not my area of
23  expertise.
24     Q.   Okay.  And at a minimum, what

Confidential Information Subject to Protective Order

Page 202

1 we know is that something with genotoxic
2 potential is not something that we would
3 want to ingest?
4         MS. NAGLE:  Objection,
5     form.
6         THE WITNESS:  If you can
7     avoid it, that would probably be
8     advisable.
9 BY MS. PAPANTONIO:
10     Q.  Okay.  And so what we know now,
11 we didn't know at the time, what Torrent
12 knows now is that this genotoxic impurity
13 was actually NDMA, right?
14     A.  That is, I believe, what that
15 impurity turned out to be, yes.
16     Q.  So on June 20, 2018, were you
17 aware that the only medical use of NDMA was
18 actually to form tumors in lab rats?
19         MS. NAGLE:  Objection,
20     form.
21         THE WITNESS:  No, I was
22     not aware of that.
23 BY MS. PAPANTONIO:
24     Q.  Were you that NDMA is a

Page 203

1 chemical that they used to form rocket
2 fuel?
3         MS. NAGLE:  Objection,
4     form.
5         THE WITNESS:  No, I'm
6     not aware of that.
7 BY MS. PAPANTONIO:
8     Q.  At this point, July 20, did you
9 know just how dangerous NDMA was as a
10 carcinogen?
11         MS. NAGLE:  Objection,
12     form.
13         THE WITNESS:  I was not
14     aware of NDMA -- now I can't say
15     the right letters, sorry, NDMA at
16     this date at all.
17 BY MS. PAPANTONIO:
18     Q.  That's fine.  We'll just call
19 it a carcinogen.  So what's happening right
20 now is Torrent can't actually test the
21 product to determine if the carcinogen is
22 present in their valsartan, right?
23     A.  You can test the product at
24 this point, but we could not detect that

Page 204

1 specific chemical based on the method we
2 had at the time.
3     Q.  So based on the method that
4 Torrent had -- let me just make I'm
5 understanding this, based on the method
6 that Torrent had, you could test to see if
7 NDMA was present, but you could not test
8 the level of NDMA in the product; is that
9 right?
10     A.  I can't even say that you could
11 test for its presence at this point in the
12 status of the method essentially.
13     Q.  Okay.  And so at this point,
14 Torrent USA is relying on information that
15 they're getting from ZHP in China, right?
16         MS. NAGLE:  Objection to
17     form.
18         THE WITNESS:  I don't
19     know if I can say relying on.  I
20     mean, this is one piece of
21     information that we had received.
22 BY MS. PAPANTONIO:
23     Q.  Okay.  And we're going to walk
24 through how Torrent reacted to this.  LP

Page 205

1 1169.  Do you recognize this document,
2 Ms. Chitty?
3     A.  I don't know if I remember it
4 specifically, but it's addressed to me.
5     Q.  We'll walk through it.  We can
6 see that it's a Torrent document.  It has
7 got Torrent Pharma up in the right-hand
8 corner and we see it is a letter written to
9 you, right?
10     A.  To me, yes.
11     Q.  And this was on July 7.  And
12 this letter is from Vijay Patel.  Who is
13 that?
14     A.  I'm sorry, I'm just moving my
15 screen around so I can see the bottom of
16 the document.  It says that he's the
17 assistant general manager from QA at our
18 parent company in India.
19     Q.  Did you communicate with
20 Mr. Patel on a regular basis?
21     A.  I honestly don't remember.
22     Q.  Okay.  But we do know that
23 Mr. Patel is from Torrent India, right?
24     A.  Yes, according to his signature

Confidential Information Subject to Protective Order

Page 206

1 block there.
2     Q.  Okay.  And so this is two
3 weeks, what we can see this is on July 7,
4 so it's two weeks after you got official
5 notice from ZHP that there is a genotoxic
6 impurity in valsartan, right?
7     A.  It is approximately two weeks
8 after that initial notification, yes.
9     Q.  So at this point, July 7,
10 Torrent USA has to make a decision, right?
11         MS. NAGLE:  Objection,
12     form.
13         THE WITNESS:  Torrent
14     U.S. is not the decisionmaker
15     essentially, as I've stated before.
16 BY MS. PAPANTONIO:
17     Q.  Well, you've got to communicate
18 to the FDA whether or not you are going to
19 recall U.S. valsartan, right?
20     A.  I'm just going to take a minute
21 and read this.
22     Q.  We'll walk through it together.
23 Let's read it together.  So what he's
24 telling you is starting on that first line,

Page 207

1 which we already know, "We received a
2 notification from valsartan API
3 manufacturer ZHP dated the 6th -- or 26th
4 of June regarding a genotoxic impurity
5 observed in the valsartan."  Right, that's
6 the document we just saw.  Do you remember
7 that?
8     A.  Was that other document from
9 the 20th or the 26th?  I don't think that's
10 the document this letter is referring to.
11     Q.  Okay.  But we do know you
12 received word from ZHP?
13     A.  Correct.
14     Q.  And then Mr. Patel writes that
15 "Hauhai has informed that they're using two
16 manufacturing processes."  And we kind of
17 talked about that earlier today, there's an
18 old process and there's a new process,
19 right?
20     A.  Correct.
21     Q.  And Torrent U.S. only used that
22 old process?
23     A.  Again, the timing of this, yes,
24 I believe we were only using the old

Page 208

1 process.
2     Q.  So Mr. Patel in the next line
3 is telling us that genotoxic impurity
4 identified is in the new process and but we
5 can see that this is based on the
6 information that ZHP provided Torrent,
7 right?
8         MS. NAGLE:  Objection,
9     form.
10         THE WITNESS:  I'm not
11     sure if that's based upon the
12     June 26 letter or not.  We haven't
13     seen that.
14 BY MS. PAPANTONIO:
15     Q.  Well, let's look at this second
16 paragraph.  It says Hauhai has informed us
17 or has informed, right, so we know that
18 Torrent is getting information from ZHP?
19     A.  That they're using two
20 manufacturing processes, yes.
21     Q.  And that there is no NDMA in
22 the new process, that's what we conclude in
23 this last -- let's look at this last
24 paragraph, it says "These batches were

Page 209

1 manufactured and tested according to
2 standard approved process by using the old
3 API process, hence, it does not pose any
4 adverse quality impact," right?  Do you see
5 that?
6     A.  Yes, that's what it says.
7     Q.  So Torrent is relying on
8 information from ZHP and concludes that
9 there's no adverse quality impact to U.S.
10 valsartan?
11     A.  Correct.
12     Q.  Right.  And so what we
13 ultimately conclude here is no market
14 action is required, right?
15     A.  As of this date, yes.
16     Q.  That means Torrent USA can
17 continue selling the drug?
18     A.  Was that a question, I'm sorry?
19     Q.  Right.  Is that what that
20 means, if there's no market action, you can
21 continue to supply the drug and sell the
22 drug?
23     A.  Correct.
24     Q.  And so, like you said, Torrent

Confidential Information Subject to Protective Order

---

Page 210

¹ USA is not making the decision whether or
² not to recall, they're getting that
³ information from Torrent India, right?
⁴     A.  Yes.
⁵     Q.  So you're just following orders
⁶ at this point?
⁷     A.  Correct.
⁸     Q.  Okay.  And at this point, on
⁹ July 7, if Torrent had actually developed a
¹⁰ test to detect NDMA in their valsartan,
¹¹ Torrent would have found that the valsartan
¹² was contaminated with NDMA?
¹³         MS. NAGLE:  Objection.
¹⁴     Form and foundation.
¹⁵         THE WITNESS:  I can't
¹⁶     say definitively what they would
¹⁷     have found at this point.
¹⁸ BY MS. PAPANTONIO:
¹⁹     Q.  You're aware that Torrent
²⁰ valsartan was recalled in the end?
²¹     A.  Some of it was, yes.
²²     Q.  And you're aware it was
²³ recalled because of the presence of NDMA?
²⁴     A.  In the affected batches, yes.

---

Page 211

¹     Q.  So if you had tested a range of
² batches at this time, Torrent would have
³ found that NDMA was present in those
⁴ batches?
⁵         MS. NAGLE:  Objection.
⁶     Form and foundation.
⁷         THE WITNESS:  Again, if
⁸     the method was suitable to have
⁹     detected the NDMA, it could have
¹⁰     detected that presence at that
¹¹     time.
¹² BY MS. PAPANTONIO:
¹³     Q.  And had you detected that
¹⁴ presence, the valsartan would have been
¹⁵ taken off the market, right?
¹⁶         MS. NAGLE:  Objection.
¹⁷     Form and foundation.
¹⁸         THE WITNESS:  Typically,
¹⁹     once we have new data, we would
²⁰     reevaluate.
²¹ BY MS. PAPANTONIO:
²²     Q.  And as far as you're aware, did
²³ anyone from Torrent India come to you and
²⁴ say, we have tested the valsartan batches,

---

Page 212

¹ they are free of NDMA?
²     A.  I don't recall specifically.
³     Q.  So what we can see here is that
⁴ Torrent India is simply relying on the
⁵ statements made by ZHP?
⁶         MS. NAGLE:  Objection,
⁷     form.
⁸         THE WITNESS:  In this
⁹     message, it seems that they were
¹⁰     utilizing information from ZHP.
¹¹ BY MS. PAPANTONIO:
¹²     Q.  And we would hope that at the
¹³ time, ZHP was giving accurate information,
¹⁴ right?
¹⁵         MS. NAGLE:  Objection,
¹⁶     form.
¹⁷         THE WITNESS:  I would
¹⁸     hope, yes.
¹⁹ BY MS. PAPANTONIO:
²⁰     Q.  This one was, sorry, I forgot,
²¹ this one is marked as Torrent 20.  Okay.
²² Next we're going to look at 1093, which is
²³ marked as Torrent 21.  All right.  Let's
²⁴ start from the back here.  Okay.  Let's

---

Page 213

¹ blow up that last email.  Okay.  So ZHP
² notifies you on June 20 of the
³ contamination and this is -- or excuse me,
⁴ yeah, June 20 and this is July 10, correct?
⁵     A.  That is the date of this email.
⁶     Q.  It's about 20 days later?
⁷     A.  Roughly, yes.
⁸     Q.  So this is about -- this is
⁹ over two weeks after Torrent has learned
¹⁰ that there's a cancer-causing compound in
¹¹ valsartan?
¹²         MS. NAGLE:  Objection,
¹³     form.
¹⁴         THE WITNESS:  Again, the
¹⁵     phrasing has been in our
¹⁶     communications from ZHP that it was
¹⁷     potentially there.  The, you know,
¹⁸     message or the memo that we looked
¹⁹     at just previously confirmed that
²⁰     our belief was it only impacted the
²¹     new process API, which we had not
²²     utilized.
²³ BY MS. PAPANTONIO:
²⁴     Q.  Right.  And that's information

---

Confidential Information Subject to Protective Order

Page 214

1 that you're relying on from ZHP still at
2 this time?
3          MS. NAGLE:  Objection,
4      form.
5          THE WITNESS:  As of the
6      10th of July, I can't really speak
7      to what other testing Torrent might
8      have done.
9 BY MS. PAPANTONIO:
10     Q.  But as far as you know, up to
11 this point, July 10, Torrent still has no
12 capabilities of testing for NDMA in its
13 product?
14     A.  Correct.
15     Q.  And so this email is to you
16 from Arun Verma.  Who is that?
17     A.  Arun was the chief operating
18 officer for the U.S. Torrent-based company.
19     Q.  And he's telling you that we
20 need to communicate to our customers our
21 quality position on this product.  Ms.
22 Chitty, I mean, working in regulatory, you
23 know how important it is to communicate
24 with customers, right?

Page 215

1          MS. NAGLE:  Objection to
2      form.
3          THE WITNESS:  That's not
4      really a regulatory concern for me,
5      communicating with customers.  I
6      was communicating with FDA
7      primarily.
8 BY MS. PAPANTONIO:
9     Q.  Well, just generally, you
10 understand the importance of communicating
11 quality issues to customers who take your
12 product, right?
13          MS. NAGLE:  Objection,
14      form.
15          THE WITNESS:  It's
16      important to keep our customers
17      informed if there is any concern or
18      indication that there may be a
19      quality issue, yes.
20 BY MS. PAPANTONIO:
21     Q.  Absolutely.  And let's talk
22 about why that's important.  It's important
23 because customers take this product
24 sometimes every day, right?

Page 216

1     A.  People routinely take our
2 products every day.
3     Q.  Yeah, and it's used to treat
4 high blood pressure, right?
5     A.  Correct.
6     Q.  So it's important to know if a
7 drug that you're taking every single day
8 potentially has a carcinogen in it,
9 correct?
10          MS. NAGLE:  Objection,
11      form.
12          THE WITNESS:  Consumers
13      have, you know, a certain amount of
14      information that's available with
15      them and so do doctors and kind of
16      all of the other relevant people
17      who can help them make decisions
18      about what they're taking every
19      day.
20 BY MS. PAPANTONIO:
21     Q.  Right.  They have got to be
22 able to make an informed decision about the
23 product that they're using?
24          MS. NAGLE:  Objection,

Page 217

1      form.
2          MS. PAPANTONIO:  Right?
3          THE WITNESS:  I would
4      agree.
5 BY MS. PAPANTONIO:
6     Q.  For instance, Ms. Chitty, if
7 you were taking a drug that potentially had
8 a carcinogen in it, you would want to know?
9          MS. NAGLE:  Objection,
10      form.
11          THE WITNESS:  I would
12      want to know that information so
13      that I could talk with my doctor
14      essentially.
15 BY MS. PAPANTONIO:
16     Q.  Okay.  And let's go a few
17 emails up on this to the -- this is the
18 second page, to the email dated July 11.
19 Again, we can see that you're cc'd on this
20 email.  And it's from the same person,
21 Mr. Verma, and we're talking about
22 inventory here.  He says Torrent has three
23 to four months of inventory left.  What is
24 inventory?

Page 218

1    A.  Inventory would refer to the
2  amount of finished product we have in
3  stock, kind of based on our average monthly
4  selling quantity.
5    Q.  So that's in Torrent
6  facilities, right, in your warehouses?
7    A.  Yes, that would be considered
8  within Torrent, Torrent facilities or
9  warehouses.
10    Q.  So did your company ever go to
11  those warehouses, take a pill, and test
12  that pill for NDMA on July 11, 2018?
13         MS. NAGLE:  Objection.
14      Form and foundation.
15      THE WITNESS:  If the
16      product is in the U.S., again, we
17      didn't have the ability to test and
18      weren't doing any testing.  I can't
19      really speak to whether on July 11
20      anyone else took product from a
21      Torrent facility and tested it.
22  BY MS. PAPANTONIO:
23    Q.  All right.  And in this same
24  email, Verma is asking what are our

Page 219

1  timelines to test these impurities, right?
2  So it looks like Torrent is trying to
3  develop a way to test for these impurities,
4  correct?
5    A.  Correct.
6    Q.  And then he further says to
7  "validate our assumption that the ROD does
8  not have an issue," right?  Assumption
9  means guess?
10         MS. NAGLE:  Objection,
11      form.
12      THE WITNESS:  The email
13      says to "validate our assumption."
14  BY MS. PAPANTONIO:
15    Q.  And assumption means guess,
16  right?
17         MS. NAGLE:  Objection to
18      form.
19      THE WITNESS:  Yeah, I'm
20      not a dictionary, sorry.
21  BY MS. PAPANTONIO:
22    Q.  Well, so what this is saying is
23  that Torrent is guessing that the old ROD
24  does not have the issue, right?

Page 220

1         MS. NAGLE:  Objection,
2      form.
3      THE WITNESS:  No.  It
4      says that they are assuming that
5      the old route of synthesis does not
6      have an issue.
7  BY MS. PAPANTONIO:
8    Q.  And that assumption is made on
9  the facts that ZHP is providing Torrent at
10  this time?
11         MS. NAGLE:  Objection.
12      Form and foundation.
13      THE WITNESS:  I'm not
14      sure what all that assumption is
15      based on.  It's at least partially
16      on that data from ZHP.
17  BY MS. PAPANTONIO:
18    Q.  Right.  And so let's go back to
19  the inventory, right.  Torrent has got
20  three to four months of inventory.  How
21  many pills is that?
22         MS. NAGLE:  Objection,
23      foundation.
24      THE WITNESS:  I have no

Page 221

1      idea.
2  BY MS. PAPANTONIO:
3    Q.  You don't how many patients
4  three to four months of inventory can
5  supply?
6         MS. NAGLE:  Objection,
7      foundation.
8      THE WITNESS:  No.
9  BY MS. PAPANTONIO:
10    Q.  But we do know that if you had
11  tested this inventory on July 11, what you
12  would have found is that it was
13  contaminated with NDMA?
14         MS. NAGLE:  Objection.
15      Form and foundation.
16      THE WITNESS:  I don't
17      know that.
18  BY MS. PAPANTONIO:
19    Q.  So at this point, July 11, this
20  is now three weeks later from the ZHP
21  notice of a genotoxic impurity, right?
22    A.  It is approximately three weeks
23  after their initial notification to us.
24    Q.  And three weeks after the

Confidential Information Subject to Protective Order

1 initial notification, Torrent has still not
2 verified that there's no NDMA in their drug
3 valsartan?
4          MS. NAGLE: Objection,
5      form.
6          THE WITNESS: Again,
7      that seems to be the case, based on
8      the information here.
9 BY MS. PAPANTONIO:
10     Q.  So then we can assume that for
11 three weeks, you're still selling the drug
12 valsartan?
13     A.  Yes.
14     Q.  We can assume that you're still
15 telling customers that Torrent's valsartan
16 is safe to use?
17          MS. NAGLE: Objection,
18      form.
19          THE WITNESS: I don't
20      know what was communicated to
21      customers within those three weeks.
22 BY MS. PAPANTONIO:
23     Q.  Well, at this point, you're
24 communicating with the FDA that your

1 product is still safe, right?
2          MS. NAGLE: Objection,
3      form.
4          THE WITNESS: We can go
5      back through some specific emails,
6      but at this point, we have no
7      information and no data to show
8      that our product is containing the
9      impurity.
10 BY MS. PAPANTONIO:
11     Q.  And we can agree a way to get
12 data is to test products?
13     A.  You can test products to get
14 data, yes.
15     Q.  Right.  So if you wanted data,
16 you could test the valsartan?
17     A.  Again, the issue is whether our
18 ability to test at this point actually
19 would detect any of the impurity that was
20 there.
21     Q.  So you're familiar with GC-MS
22 testing, right?
23          MS. NAGLE: Objection,
24      foundation.

1          THE WITNESS: Vaguely.
2 BY MS. PAPANTONIO:
3     Q.  That's gas chromatography and
4 mass spectrometry?
5     A.  Correct.
6     Q.  You're aware that they used
7 GC-MS testing to determine that NDMA was in
8 valsartan products?
9     A.  If that's -- at some point, we
10 learned that was the method that was being
11 used.  I don't know what was -- what I knew
12 at this point.
13     Q.  Are you aware that GC-MS
14 testing has been around since the nineties?
15          MS. NAGLE: Objection,
16      form.
17          THE WITNESS: It is a
18      testing method that has been around
19      a while, yes.
20 BY MS. PAPANTONIO:
21     Q.  That for 30 years now companies
22 have been able to test for nitrosamines
23 using the GC-MS test method?
24          MS. NAGLE: Objection,

1      form.
2          THE WITNESS: GC-MS is
3      not a test method.  Well, I talk
4      about test method, it means that
5      there's a very specific set of
6      criteria that are used on that
7      GC-MS that are specific to each
8      drug product, specific to each API,
9      for instance.  So it's not as if
10      there was a method in 1990 that
11      existed to detect this impurity.
12      That's completely false.
13 BY MS. PAPANTONIO:
14     Q.  You had no idea that there was
15 GC-MS testing of nitrosamines for the last
16 30 years?  That's not information that you
17 knew?
18          MS. NAGLE: Objection,
19      form.
20          THE WITNESS:
21      Specifically of nitrosamines, no.
22 BY MS. PAPANTONIO:
23     Q.  But you do know that Torrent
24 internationally has labs across the world,

Confidential Information Subject to Protective Order

Page 226

¹ right?
² MS. NAGLE:  Objection,
³ form.
⁴ THE WITNESS:  I'm aware
⁵ of the labs that we used in
⁶ connection with the testing of
⁷ materials for our U.S. products.
⁸ BY MS. PAPANTONIO:
⁹ Q.  Right, but Torrent, the
¹⁰ company, has its own laboratories that they
¹¹ use to test the quality of their drugs,
¹² right?
¹³ A.  Torrent does have its own labs,
¹⁴ yes.
¹⁵ Q.  They employ hundreds of
¹⁶ scientists to conduct these quality checks?
¹⁷ MS. NAGLE:  Objection.
¹⁸ Form and foundation.
¹⁹ THE WITNESS:  I can't
²⁰ really say how many specifically,
²¹ but we have -- did have labs, yes.
²² BY MS. PAPANTONIO:
²³ Q.  Okay.  So we're going to move
²⁴ on later in this email.  We can see that

Page 227

¹ you are in this email dated July 11, but if
² we go up to the first email on this page,
³ we see that you've actually been cut out of
⁴ this email.  So I want to actually start,
⁵ because I want to see who is talking in
⁶ these emails.  So let's go to this middle
⁷ email.  So we know Jaiswal is in quality,
⁸ right?
⁹ A.  I believe, I believe so.  I
¹⁰ don't recall actual what his -- which group
¹¹ he was working with at the manufacturing
¹² facility, but.
¹³ Q.  What about this next
¹⁴ individual?  I'm not even going to try to
¹⁵ pronounce it.
¹⁶ A.  Jayatibha is -- she was part of
¹⁷ the quality organization, yes.
¹⁸ Q.  Also in the quality department.
¹⁹ We know that you were a part of the quality
²⁰ department as well?
²¹ A.  No, I'm not.
²² Q.  Or regulatory department?
²³ A.  Regulatory and quality are two
²⁴ different things.  So I was part of the

Page 228

¹ regulatory department.
² Q.  Okay.  What about Modi?
³ A.  Amit is in the U.S. office.  He
⁴ was part of our supply chain team.
⁵ Q.  Supply chain.  And what about
⁶ Agrawal?
⁷ A.  Vineet is also from the U.S.
⁸ office, I believe he was also in supply
⁹ chain with Amit.
¹⁰ Q.  Okay.  And then the next
¹¹ person, Sekhar?
¹² A.  Sekhar, I believe, was from
¹³ either supply chain or procurement at the
¹⁴ India-based company.
¹⁵ Q.  Okay.  And then Sheth?
¹⁶ A.  Same with Paras, she was based
¹⁷ in India, either with procurement or supply
¹⁸ chain.
¹⁹ Q.  So in this email that we're
²⁰ looking at now, we have all the quality
²¹ people, we've got supply chain people, and
²² procurement people, as well as you in the
²³ regulatory department.
²⁴ Now, the following email, they

Page 229

¹ cut all those people out, right?  And what
² they're talking about, what we can see is
³ who is in this email chain, who is
⁴ Siddhaye?
⁵ A.  I don't recall who that is.
⁶ The rest of the folks on the email chain
⁷ are either supply chain or sales in the
⁸ U.S.
⁹ Q.  All right.  So we go from
¹⁰ talking about quality to talking about
¹¹ sales.  And what this email says is asking
¹² is "what is the annual budget sales and
¹³ margin impact if we were to discontinue all
¹⁴ valsartan-containing products?"  Do you see
¹⁵ that?
¹⁶ A.  Yes.
¹⁷ Q.  So once your colleagues start
¹⁸ talking about money, you are cut out of the
¹⁹ email chain.  Do you see that?
²⁰ MS. NAGLE:  Objection,
²¹ form.
²² THE WITNESS:  I'm not on
²³ this message, correct.
²⁴

Confidential Information Subject to Protective Order

Page 230

BY MS. PAPANTONIO:
    Q.   And we can agree if Torrent found something bad in its products that that would ultimately affect sales, right?
        MS. NAGLE:  Objection, form.
        THE WITNESS:  It depends on what action was taken, but recalls do have an impact on sales.
BY MS. PAPANTONIO:
    Q.   If there was a potent carcinogen found in the drug, it would ultimately affect how that drug was sold?
        MS. NAGLE:  Objection, form.
        THE WITNESS:  For any reason, if we have to recall a product, it impacts how that drug is sold, yes.
BY MS. PAPANTONIO:
    Q.   In your time at Torrent, were you ever aware that in the same breath, your Torrent colleagues are talking about safety and testing timelines, but there's

Page 231

also talking about losing money?
        MS. NAGLE:  Objection, form.
        THE WITNESS:  So, you know, Torrent is a business and all of our actions have financial implications, so the financial piece is always a part of any conversation related to quality issues.  It's never the most important part of the conversation.
BY MS. PAPANTONIO:
    Q.   But we can agree the longer that valsartan is on the market, the more money Torrent makes?
        MS. NAGLE:  Objection, form.
        THE WITNESS:  While Torrent is selling a product, they are making money.
BY MS. PAPANTONIO:
    Q.   And if Torrent discontinues a product, they stop making money, right?
    A.   That product specifically, yes.

Page 232

    Q.   Okay.  So let's see how much money valsartan makes Torrent.  Let's go to the next -- or the first page now.  Again, in the second email, we've got all our salespeople.  And in this first line it says "We sold around 11 mn tabs."  Does that mean 11 million tabs, tablets?
        MS. NAGLE:  Objection, foundation.
        THE WITNESS:  In that context, yes, it means 11 million tabs.
BY MS. PAPANTONIO:
    Q.   Okay.  So 11 million tablets were given to customers in the year 2018?
        MS. NAGLE:  Objection, form.
        THE WITNESS:  I'm not sure what this year refers to, which time frame, honestly, so.
BY MS. PAPANTONIO:
    Q.   Okay.  And we do know that this contamination happened between, let's say, 2014 and 2018?

Page 233

        MS. NAGLE:   Objection.  Form and foundation.
        THE WITNESS:  We were first notified of the potential impurity in June of 2018.
BY MS. PAPANTONIO:
    Q.   Okay.  We'll talk about that later.  Okay.  And it says total sales were 2.2 million, right?  Do you see that?
    A.   I do see that.
    Q.   With a 52 percent gross margin.  Do you see that too?
    A.   Yes.
    Q.   Okay.  So now earlier we were talking about cheap Chinese API and that's how Torrent had referred to ZHP.  Do you remember that?
    A.   I think it was referred to as cheaper API.
    Q.   Cheaper API.  And Torrent was buying from ZHP in order to save money, right?
        MS. NAGLE:  Objection, form.

Confidential Information Subject to Protective Order

Page 234

1           THE WITNESS:  As I had
2     said before, it's also a derisking
3     strategy.  Most of our products
4     always had multiple API sources in
5     case of interruption at one
6     supplier or another.
7  BY MS. PAPANTONIO:
8     Q.   Right.  And what you also said
9  before is that Torrent is a business in the
10 business of making money, right?
11    A.   I don't know that I said that,
12 but Torrent is a business and so the price
13 of our materials is always something that's
14 taken into consideration when we make
15 decisions.
16    Q.   And cheap doesn't always mean
17 bad, right, Ms. Chitty?
18    A.   Cheap does not always
19 necessarily mean bad, I would agree with
20 that.
21    Q.   But it does mean that you have
22 to follow up and conduct due diligence on
23 those products?
24           MS. NAGLE:  Objection,

Page 235

1     form.
2           THE WITNESS:  As we
3     discussed earlier, there's
4     procedures for procurement of any
5     of our materials that are followed
6     for whether it's API or whether
7     it's inactives.
8  BY MS. PAPANTONIO:
9     Q.   You have to make sure that
10 cheap product you're getting is still a
11 quality product?
12           MS. NAGLE:  Objection,
13    form.
14           THE WITNESS:  We have to
15    make sure every product we get
16    meets standards that are in place
17    at the time.
18 BY MS. PAPANTONIO:
19    Q.   Are you aware that if Torrent
20 would have tested one of these 11 million
21 pills with API from ZHP, they would have
22 found that it was contaminated with NDMA?
23           MS. NAGLE:  Objection,
24    form.

Page 236

1           THE WITNESS:  No,
2     there's -- I can't draw any
3     conclusions that that would have
4     happened.
5  BY MS. PAPANTONIO:
6     Q.   So Torrent is talking about
7  saving money here.  Are you aware that it
8  only cost a couple of thousand dollars to
9  test for NDMA?
10           MS. NAGLE:  Objection,
11    form.
12           THE WITNESS:  No, I'm
13    not familiar with the cost
14    associated with testing of
15    products.
16 BY MS. PAPANTONIO:
17    Q.   1093.  Okay.  Let's do 1096.
18 Okay.  Again, we're going to that -- we'll
19 stay on the first page.
20           MS. NAGLE:  Sorry,
21    Counsel, could you let me what
22    exhibit number this is?
23           MS. PAPANTONIO:  Oh,
24    sorry, Torrent 23.

Page 237

1           MS. NAGLE:  Thank you.
2  BY MS. PAPANTONIO:
3     Q.   I apologize.  Okay.  We see
4  that this email is dated -- let's look at
5  the second email or third email.  The one
6  from you, Dawn Chitty.  And this is dated
7  July 17, right?
8     A.   Yes.
9     Q.   Now, this is almost a month
10 after your company learned that ZHP
11 valsartan was in fact contaminated?
12           MS. NAGLE:  Objection,
13    form.
14           THE WITNESS:  It's a
15    month after we were notified of a
16    new unknown impurity.
17 BY MS. PAPANTONIO:
18    Q.   Okay.  And this is on the 17th,
19 so I really want to take note of this date.
20 So July 17, we're having this conversation.
21 Okay.  Let's talk about who these people
22 are in the email.  I think we haven't met
23 Sumit Basu, who is that?
24    A.   I do not recall who that is.

Confidential Information Subject to Protective Order

Page 238

1    Q.  Okay.  Can't remember cc'ing
2  him on this email?
3    A.  No.
4    Q.  Okay.  And so you are talking
5  to these people, it looks like we've got a
6  person in quality, two people in quality,
7  Patel and Jaiswal, right?
8    A.  Yes.
9    Q.  And you're talking, saying
10  "What method are they using to detect the
11  amounts in other routes of synthesis,"
12  right?
13    A.  In the other route of
14  synthesis, yes.
15    Q.  Right.  You're asking what are
16  we doing to test?
17        MS. NAGLE:  Objection,
18      form.
19        THE WITNESS:  I'm not
20      sure who the "they" refers to, but
21      I'm asking about testing specifics
22      to try to detect the impurity.
23  BY MS. PAPANTONIO:
24    Q.  Right.  Because at this point,

Page 239

1  a month later, you understand the
2  importance of getting an answer to this
3  question of whether or not Torrent
4  valsartan is contaminated with NDMA?
5        MS. NAGLE:  Objection,
6      form.
7        THE WITNESS:  We are
8      definitely at this point all still
9      working towards having an accurate
10      ability to test for the impurity.
11  BY MS. PAPANTONIO:
12    Q.  Right.  And you're telling
13  colleagues in India, you're pushing them
14  and asking them what the methods are to
15  test, right?
16        MS. NAGLE:  Objection,
17      form.
18        THE WITNESS:  I am
19      asking about the method, correct.
20  BY MS. PAPANTONIO:
21    Q.  And you're telling them that
22  the FDA is expecting that we're going to
23  prove that there's no NDMA in the API
24  batches that we've used, right?

Page 240

1    A.  That is correct.
2    Q.  Because you, in regulatory
3  affairs, have to communicate that
4  information to the FDA, right?
5    A.  I have to communicate
6  information on risk, known risk to FDA,
7  correct.
8    Q.  Right, because you understand
9  that Torrent as the ANDA holder, as the
10  finished dose manufacturer, has the
11  ultimate duty to make sure that your
12  product is safe, right?
13        MS. NAGLE:  Objection,
14      form.
15        THE WITNESS:  We have
16      the duty to confirm that it is
17      meeting specifications that are in
18      place at the time.
19  BY MS. PAPANTONIO:
20    Q.  But you have to ensure that
21  Torrent's drug is not hurting people?
22        MS. NAGLE:  Objection,
23      form.
24        THE WITNESS:  Again,

Page 241

1      it's not about determining safety
2      or hurting people.  That's a
3      benefit-risk analysis, like I
4      mentioned before.  Nothing is
5      without risk.  It has to be looked
6      at singularly for each product and
7      each person.
8  BY MS. PAPANTONIO:
9    Q.  But you're ultimately the
10  person communicating that information to
11  the FDA.  They're relying on you, right?
12    A.  I am the liaison between
13  Torrent and FDA, yes.
14    Q.  And you say "They are not going
15  to let us release any product unless
16  there's conclusive proof," right?
17    A.  That's what the message says,
18  yes.
19    Q.  And that's reasonable?
20        MS. NAGLE:  Objection,
21      form.
22        THE WITNESS:  Was that a
23      question or a statement?
24

Page 242

¹ BY MS. PAPANTONIO:
²    Q.  Right, you want to ensure that
³ the product you are selling is actually
⁴ safe?
⁵         MS. NAGLE:  Objection,
⁶     form.
⁷         THE WITNESS:  We are
⁸     wanting to make sure the product
⁹     we're selling is meeting current
¹⁰     specifications, yes.
¹¹ BY MS. PAPANTONIO:
¹²    Q.  And that statements from the
¹³ vendor are not sufficient, right?  The
¹⁴ vendor in this case is ZHP, correct?
¹⁵    A.  The vendor is ZHP.
¹⁶    Q.  So you're telling your
¹⁷ colleagues that we can't trust what ZHP is
¹⁸ saying is true, right?
¹⁹         MS. NAGLE:  Objection,
²⁰     form.
²¹         THE WITNESS:  I don't
²²     believe that's the intent here.
²³     You know, my intent is I would like
²⁴     a second piece of data to confirm

Page 243

¹     what we're hearing from ZHP.
² BY MS. PAPANTONIO:
³    Q.  Right.  You want to be
⁴ absolutely sure that the product that
⁵ you're providing does not have NDMA in it?
⁶         MS. NAGLE:  Objection,
⁷     form.
⁸         THE WITNESS:  Again,
⁹     yes, we are all agreeing within
¹⁰     Torrent that we need to have some
¹¹     testing around this and develop the
¹²     appropriate methods.
¹³ BY MS. PAPANTONIO:
¹⁴    Q.  Well, let's see if you guys are
¹⁵ agreeing, but first I want to talk about
¹⁶ this last sentence.  It says "We need to
¹⁷ get this verified as soon as possible."
¹⁸ Would you agree with that statement?
¹⁹    A.  I'm sorry, I'm just moving my
²⁰ screen around here.  "We need to get this
²¹ verified/validated as soon as possible."
²² That is what the email says.
²³    Q.  Right, so you are telling your
²⁴ Indian Torrent colleagues, we have to get a

Page 244

¹ method validated, right?
²    A.  Correct, that is my opinion.
³    Q.  That we need additional
⁴ evidence in addition to ZHP's statements?
⁵         MS. NAGLE:  Objection.
⁶         THE WITNESS:  Correct.
⁷ BY MS. PAPANTONIO:
⁸    Q.  And now you've just told us
⁹ that everyone at Torrent was on board with
¹⁰ those statements that you were making, so
¹¹ let's look at the next email from Verma.
¹² Now, remind me who Verma is again?
¹³    A.  Arun is the chief operating
¹⁴ officer for the U.S. Torrent-based company.
¹⁵    Q.  Okay.  So we've got the guy who
¹⁶ is responsible for the money talking now,
¹⁷ right?
¹⁸    A.  He oversees supply chain as
¹⁹ well as other operational activities.
²⁰    Q.  Okay.  And Arun says that "All
²¹ customers have been back-ordered."  Do you
²² see that?
²³    A.  Yes.
²⁴    Q.  "And every single day counts."

Page 245

¹ Do you see that?
²    A.  Yes.
³    Q.  "Our failure to supply
⁴ penalties will start kicking in, so the
⁵ earlier we submit data to the FDA," right?
⁶    A.  That is what the email says,
⁷ yes.
⁸    Q.  So at this point, your company
⁹ could be facing millions of dollars of
¹⁰ supply penalties, right, if they don't get
¹¹ valsartan back on the market?
¹²         MS. NAGLE:  Objection.
¹³     Form and foundation.
¹⁴         THE WITNESS:  I'm really
¹⁵     not aware of what those penalties
¹⁶     are.
¹⁷ BY MS. PAPANTONIO:
¹⁸    Q.  But you know that your COO is
¹⁹ saying that every single day counts?
²⁰    A.  That is what the email says.
²¹    Q.  Right, if we continue to fail
²² to supply valsartan, then penalties will
²³ start kicking in?
²⁴    A.  Correct, so there are certain

Confidential Information Subject to Protective Order

Page 246

1 penalties in certain agreements with
2 customers.
3     Q.  But nowhere in here does he
4 say, yes, Dawn, you're correct, let's test
5 this product to verify?
6     A.  He, again, is a more
7 business-focused person.  He's aware that
8 the quality team is working on this and so
9 just in this email, he is focused on more
10 of the financial aspects of the situation.
11 It does --
12     Q.  And in this -- excuse me,
13 sorry, go ahead.
14     A.  I was going to say, it does not
15 mean that the other quality aspects are
16 still not being considered by the
17 appropriate people involved.
18     Q.  Well, so in the same breath
19 that you were talking about the importance
20 of testing the drug, he's talking about the
21 penalties that Torrent faces, right, if
22 they don't get the drug back on the market?
23          MS. NAGLE:  Objection,
24     form.

Page 247

1          THE WITNESS:  Again,
2     that is his focus and job within
3     the company.
4 BY MS. PAPANTONIO:
5     Q.  And if we had tested the
6 Torrent valsartan on this date, July 17,
7 you would have found that NDMA was present
8 in Torrent valsartan?
9          MS. NAGLE:  Objection,
10     form.
11          THE WITNESS:  Again,
12     testing at this date with a method
13     that's not appropriate to detect
14     that impurity would not have
15     necessarily detected it.
16 BY MS. PAPANTONIO:
17     Q.  If they had listened to you,
18 Ms. Chitty, and actually taken steps to
19 develop a method on this date, July 17,
20 they would have found that Torrent's
21 valsartan was contaminated with a potent
22 carcinogen, right?
23          MS. NAGLE:  Objection.
24     Form and foundation.

Page 248

1          THE WITNESS:  So I don't
2     believe, number one, that they
3     are -- they were not listening to
4     me.  I know they were working on
5     this diligently.  And developing a
6     method is just not something you do
7     overnight.  Especially, this type
8     of method, I understand, is
9     complex, to be able to detect
10     something at those very, very small
11     quantities that these impurities
12     were occurring at.
13          MS. PENDLEY:  Okay.  I
14     want to look at LP 1143.  This will
15     be marked Torrent 90.
16          - - - - -
17     (FDA News Release marked Torrent
18     Exhibit 90 for identification.)
19          - - - - -
20 BY MS. PAPANTONIO:
21     Q.  Okay.  We can see that this is
22 the FDA announcement of the recall for
23 valsartan drugs, right?
24     A.  Yes, that's what this appears

Page 249

1 to be.
2     Q.  This recall was on July 13,
3 2018?
4     A.  That is the date of the press
5 release, yes.
6     Q.  And so that means that is the
7 day that all of the products were recalled?
8          MS. NAGLE:  Objection.
9     Form and foundation.
10          THE WITNESS:  That will
11     be the date that the information
12     here is referring to.  I don't know
13     what all the products means, but --
14 BY MS. PAPANTONIO:
15     Q.  I'm sorry, I'll clarify that in
16 a minute.  So we see that the FDA is saying
17 in this first paragraph that this recall is
18 due to an impurity, NDMA, which was found
19 in the recalled products.  Right?
20     A.  Correct.  That's what it says.
21     Q.  And that NDMA is classified as
22 a probable human carcinogen?
23     A.  Correct.
24     Q.  And, okay, and then if we go to

Confidential Information Subject to Protective Order

Page 250

¹ the next page, we see all of the
² manufacturers who had to recall their
³ product?
⁴        A.   As of this date, these were the
⁵ manufacturers that were recalling product,
⁶ yes.
⁷        Q.   Major Pharmaceuticals recalled
⁸ their valsartan, right?
⁹        A.   Yes, according to this.
¹⁰        Q.   Solco Healthcare, are you
¹¹ familiar with them?
¹²        A.   I'm familiar with the same.
¹³        Q.   Are you familiar with Teva?
¹⁴        A.   Yes.
¹⁵        Q.   Okay.  So five manufacturers
¹⁶ had to recall their valsartan due to the
¹⁷ presence of NDMA, right?
¹⁸              MS. NAGLE:  Objection,
¹⁹        form.
²⁰              THE WITNESS:  Right
²¹        here, there's three manufacturers,
²²        it looks like.
²³ BY MS. PAPANTONIO:
²⁴        Q.   Oh, right, because this is just

Page 251

¹ a different form of valsartan.  Okay.
² Three manufacturers were able to test their
³ product and determine that NDMA was present
⁴ in their product on July 13?
⁵              MS. NAGLE:  Objection.
⁶        Form and foundation.
⁷              THE WITNESS:  It's
⁸        unclear who was testing products or
⁹        why they were recalled at this
¹⁰        point.  So I can't conclude that
¹¹        Major, Solco, and Teva were testing
¹²        their own products at this point.
¹³ BY MS. PAPANTONIO:
¹⁴        Q.   We know that these products
¹⁵ were recalled because of the presence of
¹⁶ NDMA, right?
¹⁷        A.   Presumably, as explained in
¹⁸ this letter, that's why they were recalled.
¹⁹        Q.   But in order to know there's
²⁰ NDMA in the products, you have to test the
²¹ product, right?
²²        A.   Someone has to test the
²³ products and as you guys are aware, FDA had
²⁴ been requesting and testing samples also.

Page 252

¹ So that's why I say I don't know who was
² testing these products.  Somebody was
³ testing these products.
⁴        Q.   So we know that on July 13
⁵ someone was able to develop a test to find
⁶ NDMA in these three manufacturers' product?
⁷        A.   And it was probably FDA.  We
⁸ had some communication from FDA around the
⁹ similar time frame that they had developed
¹⁰ a method to test for NDMA, but had not
¹¹ shared the details of that testing method
¹² with Torrent.
¹³        Q.   Ms. Chitty, at what point did
¹⁴ Torrent send samples to the FDA and say we
¹⁵ want to know if our product is safe, please
¹⁶ test it now?
¹⁷              MS. NAGLE:  Objection,
¹⁸        form.
¹⁹              THE WITNESS:  FDA
²⁰        requested samples from us at
²¹        various time points.  So we could
²²        go back through those
²³        communications.  I don't recall
²⁴        exactly when it was we were

Page 253

¹        providing samples, because we
²        provided multiple sets of samples.
³ BY MS. PAPANTONIO:
⁴        Q.   At what point did Torrent USA
⁵ contact Major Pharmaceuticals and say who
⁶ tested your API, we want to know if our
⁷ product is safe?
⁸              MS. NAGLE:  Objection,
⁹        form.
¹⁰              THE WITNESS:  I'm not
¹¹        aware if anyone within Torrent
¹²        contacted Major.
¹³ BY MS. PAPANTONIO:
¹⁴        Q.   Not aware of anyone from
¹⁵ Torrent contacting Solco Healthcare and
¹⁶ saying, hey, guys, can we borrow your
¹⁷ method so we can determine whether or not
¹⁸ our drug has NDMA in it?
¹⁹              MS. NAGLE:  Objection,
²⁰        form.
²¹              THE WITNESS:  I'm not
²²        aware, and again, as I had
²³        mentioned before, methods are
²⁴        actually very specific to drug

Confidential Information Subject to Protective Order

Page 254

1 products. So for instance, if
2 Solco added different inactive
3 ingredients than what Torrent had,
4 those methods may not work on other
5 people's products, because of the
6 differences in inactives and things
7 like that. Methods tend to be very
8 specific to the drug product or the
9 API at hand.
10 BY MS. PAPANTONIO:
11 Q. And we can agree in order to
12 find out a manufacturer's method, you have
13 to ask the question?
14         MS. NAGLE: Objection.
15         MS. PAPANTONIO: Right?
16         THE WITNESS: I would
17     agree you have to ask a question to
18     get an answer. But talking to
19     other manufacturers about
20     proprietary information is not
21     something I'm aware of as being
22     common in the pharma industry.
23 BY MS. PAPANTONIO:
24 Q. So talking to manufacturers in

Page 255

1 an effort to save patients is not common in
2 the manufacturing industry, pharmaceutical
3 industry?
4         MS. NAGLE: Objection,
5     form.
6         THE WITNESS: Talking
7     about saving patients is, you know,
8     I don't know what that -- don't
9     know what that means. But
10     companies typically do not share
11     proprietary information with each
12     other, so.
13 BY MS. PAPANTONIO:
14 Q. But what we do know at this
15 point is that Torrent, you're not aware of
16 Torrent ever asking for their methods on
17 how to test the NDMA?
18 A. I personally am not aware. It
19 doesn't mean it didn't happen. It just
20 means that I'm personally not aware of it.
21 Q. Okay. Let's look at LP 1108.
22 And this will be Torrent 91.
23         - - - - -
24     (Email String Bates

Page 256

1 TORRENT-MDL2875-00504801 marked
2 Torrent Exhibit 91 for
3 identification.)
4         - - - - -
5 BY MS. PAPANTONIO:
6 Q. Okay. We're going to go to
7 page 3. Okay. You remember that in the
8 email we just looked at a minute ago, you
9 were talking about testing the product on
10 July 17, right?
11 A. Correct.
12 Q. You were telling your
13 colleagues that it's important we test the
14 valsartan to verify what ZHP is saying is
15 true. Do you remember that?
16 A. Correct.
17 Q. Do you remember saying that the
18 statements from the vendor, ZHP, were not
19 sufficient?
20 A. Correct, I was requesting
21 additional information.
22 Q. Right. So this is on the same
23 day that you were telling your colleagues
24 we need to test the product, July 17,

Page 257

1 looking at that last email on this page?
2 A. Yeah, I believe that's the same
3 day.
4 Q. Okay. Let's blow that up. And
5 on this day, you're talking back and forth
6 with the FDA, right?
7 A. Correct.
8 Q. That's an FDA email address?
9 A. Yes.
10 Q. Okay. You understand that the
11 FDA relies on the information that Torrent
12 USA gives them, right?
13         MS. NAGLE: Object to
14     form.
15         THE WITNESS: Yes, they
16     rely on our information.
17 BY MS. PAPANTONIO:
18 Q. And you understand that,
19 ultimately, it's not the FDA's job to tell
20 Torrent that their product is safe?
21         MS. NAGLE: Objection,
22     form.
23         THE WITNESS: I don't
24     think I agree with that statement.

Confidential Information Subject to Protective Order

Page 258

BY MS. PAPANTONIO:

Q. You know it's ultimately not the FDA's job to tell Torrent that their product is a quality product?

MS. NAGLE: Objection to form.

THE WITNESS: It is the FDA's job to monitor those things.

BY MS. PAPANTONIO:

Q. And it's Torrent's job to create a quality product, right?

MS. NAGLE: Objection, form.

THE WITNESS: Correct.

BY MS. PAPANTONIO:

Q. Okay. So looking at this letter, we see you're talking with the FDA and you say "We contacted customers by email on Thursday of last week, July 12. Here's the basic text of our message." So the message below is what you're communicating to customers, right?

A. Yes, that's what that seems to be.

Page 259

Q. This is the information that you're giving them on the potential impurity?

A. Correct.

Q. And in this letter, you inform customers that ZHP, your API manufacturer, has notified us, Torrent, that the impurity is isolated in one route of synthesis, right. Do you see that?

A. Yes.

Q. And then you say that "There are no Torrent products in the U.S. that use this route of synthesis where the impurity is identified," right?

A. Yeah, I'm just waiting for the rest of the text to come up. Correct.

Q. So you're parroting the information that ZHP gave you to your customers, right?

A. We are communicating what we know at this time to our customers.

Q. And that's because at this point, Torrent is still operating under the assumption that ZHP is correct?

Page 260

MS. NAGLE: Objection, form.

THE WITNESS: We are considering the information that we have at the time, which is information from ZHP.

BY MS. PAPANTONIO:

Q. Well, you're not just considering it, Ms. Chitty, you're actually telling that information to your customers?

A. We are transmitting, again, the information we have at our -- at that time to our customers.

Q. And you're transmitting the information from ZHP, because at this time, on July 17, you still have no way to test the product and verify the information from ZHP?

MS. NAGLE: Objection, form.

THE WITNESS: At this point in time, we did not have a method to be able to test those products specifically for that

Page 261

impurity.

BY MS. PAPANTONIO:

Q. Okay. So you were providing the FDA in this email with a -- well, you sent a copy of this message to the FDA, right, which you had sent to your customers?

A. Correct.

Q. Okay. And you are telling the FDA, based on what we know from ZHP, our valsartan has not been affected by this recall, right?

A. Correct.

Q. You're giving -- Torrent is giving assurances to the FDA that their product is safe?

MS. NAGLE: Objection, form.

THE WITNESS: We are sharing, again, the data and information that we have at the time and have no reason to second guess.

Confidential Information Subject to Protective Order

Page 262

1 BY MS. PAPANTONIO:
2      Q.  Right.  And on the same day,
3 you were telling colleagues that statements
4 from your vendor, ZHP, weren't sufficient,
5 you're telling the FDA and your customers
6 that there's no NDMA in our product?
7           MS. NAGLE:  Objection,
8      form.
9           THE WITNESS:  Those
10      communications did happen on the
11      same day, yes.
12 BY MS. PAPANTONIO:
13      Q.  And on the -- go ahead.
14      A.  No, go ahead.
15      Q.  And on the same day that your
16 COO, chief operating officer, is saying
17 that we can't wait anymore, that there's
18 penalties that are going to be invoked,
19 you're telling your customers and the FDA
20 that your product is safe?
21           MS. NAGLE:  Objection,
22      form.
23           THE WITNESS:  So we are
24      sharing information that it doesn't

Page 263

1      seem like our products are
2      impacted.  We're also communicating
3      that we're taking steps to hold
4      products while we're waiting for
5      additional information.
6 BY MS. PAPANTONIO:
7      Q.  You know what, actually, I want
8 to do a side by side of this.  Can we pull
9 up LP 1096?  All right.  Let's do page 1 of
10 1096.  Let's highlight that second email.
11 So, Ms. Chitty, I just want to make sure
12 I'm getting this right and make sure I know
13 the information that you're communicating.
14 On the same day your COO says failure to
15 supply and penalties will kick in, right,
16 that's on 1096?
17           MS. NAGLE:  Sorry,
18      Counsel, do you mind just using the
19      exhibit numbers?  That might make
20      things a little easier.
21 BY MS. PAPANTONIO:
22      Q.  Torrent 23.  So let's highlight
23 that email where your chief operating
24 officer is saying "Every single day counts

Page 264

1 as our failure supply penalties will start
2 kicking in."  Page 1 of 23, Torrent 23.
3 Highlight that that's on the 18th.
4           Okay.  And then on the same
5 day, July 18, you're asking the FDA at this
6 very top email on page 3, Are we able to
7 release our valsartan products for
8 quarantine at this time?  Do you see that?
9      A.  Yes, I see that.
10      Q.  And the same day your chief
11 operating officer is saying how quickly you
12 have to get valsartan back on the market,
13 you are asking FDA to release the product?
14           MS. NAGLE:  Objection,
15      form.
16           THE WITNESS:  At this
17      point, again, we have no data to
18      suggest that the products we have
19      in quarantine are impacted.
20 BY MS. PAPANTONIO:
21      Q.  And you have no data, because
22 you've never tested the product yourself to
23 validate what ZHP is telling you is true,
24 right?

Page 265

1           MS. NAGLE:  Objection,
2      form.
3           THE WITNESS:  At this
4      point, the method has not been
5      developed to accurately detect or
6      measure the NDMA.
7 BY MS. PAPANTONIO:
8      Q.  And based on the information
9 that you are giving your customers and the
10 information that you're giving the FDA, the
11 FDA relies on that, right, and they allow
12 you to release the product?
13           MS. NAGLE:  Objection,
14      form.
15           THE WITNESS:  I do not
16      know if the FDA allows us to
17      release.
18 BY MS. PAPANTONIO:
19      Q.  All right, let's only go back
20 to Torrent 91, page 2.  All right.  And
21 this last email, based on the information
22 and assurances that Torrent provided the
23 FDA, they allowed Torrent to release
24 valsartan back on the market, correct?

Confidential Information Subject to Protective Order

Page 266

1    MS. NAGLE:  Objection.
2  Form and foundation.
3    THE WITNESS:  This is
4  telling us we can release whatever
5  is discussed above.
6  BY MS. PAPANTONIO:
7    Q.  Based on the information that
8  you had provided to the FDA, information
9  saying that your process was not affected,
10 correct?
11   MS. NAGLE:  Same
12  objections.
13   THE WITNESS:  So we are
14  providing information to FDA, yes,
15  based on data we have in hand at
16  the time.  FDA also is getting data
17  from ZHP and other sources, as well
18  as doing their own testing.  So
19  it's not, I would believe, a sole
20  decision based on what we're
21  saying.  It's a collective decision
22  based on all of the information FDA
23  may have and I don't know what all
24  that was.

Page 267

1  BY MS. PAPANTONIO:
2    Q.  Ms. Chitty, don't you think
3  that a method should have been validated
4  before you asked the FDA to release your
5  product?
6    MS. NAGLE:  Objection,
7  form.
8    THE WITNESS:  Not
9  necessarily.  Again, based on data
10  in hand at the time, there was no
11  reason to not sell the product.
12  There was no data indicating that
13  these batches contained the
14  impurity.
15  BY MS. PAPANTONIO:
16   Q.  Again, let me back us up.
17  There was no data, because there was no
18  test method?
19   A.  Is that a question?
20   Q.  Yes.
21   A.  There was no data, because the
22  method was not yet developed to a state to
23  where it would give us accurate data on
24  whether the impurity was present at this

Page 268

1  point.
2    Q.  And you don't think that
3  Torrent should have tested the product to
4  see if it was contaminated with NDMA and
5  NDEA before releasing that product back
6  onto the market?
7    MS. NAGLE:  Objection to
8  form.
9    THE WITNESS:  That's not
10  what I said.  We didn't have the
11  ability to test accurately at this
12  point as far as I was aware of.
13  BY MS. PAPANTONIO:
14   Q.  And so it's your -- so you
15  didn't believe that Torrent should wait
16  until they had the ability to test for NDMA
17  and NDEA before releasing that product onto
18  the market?
19   MS. NAGLE:  Objection to
20  form.
21   THE WITNESS:  At this
22  point, the data we had did not give
23  us any indication to not sell.  We
24  were pushing for more information,

Page 269

1  but all of the various data pieces
2  that we had at this date just gave
3  no indication that the impurity was
4  present.
5  BY MS. PAPANTONIO:
6    Q.  It gave no indication, because
7  there was no test, Ms. Chitty, the test
8  that you were pushing your company,
9  Torrent, to take, right?
10   MS. NAGLE:  Objection to
11  form.
12   THE WITNESS:  We were
13  all aware that an appropriate
14  method had to be developed so
15  additional data could be generated.
16  BY MS. PAPANTONIO:
17   Q.  Ms. Chitty, on this very day,
18  July 18, you're telling Torrent, we've got
19  to test this product for NDMA and NDEA,
20  right?
21   MS. NAGLE:  Objection,
22  form.
23   THE WITNESS:  I am
24  telling them, as I said in my

Confidential Information Subject to Protective Order

Page 270

1    email, that we should confirm the
2      results and have our --
3  BY MS. PAPANTONIO:
4      Q.  So then you --
5      A.  -- and have our own method in
6    place.
7      Q.  So then you believe,
8  Ms. Chitty, that you should have validated
9  the procedure and tested for NDMA before
10  releasing that market on the market?
11            MS. NAGLE:  Objection,
12      form.
13  BY MS. PAPANTONIO:
14      Q.  That's reasonable?
15      A.  No, that's not what I said and
16  that's not how we acted.
17            MS. PAPANTONIO:  All
18      right.  Are we ready to take a
19      ten-minute break?
20            MS. NAGLE:  Sure.
21            THE WITNESS:  Sure.
22            THE VIDEOGRAPHER:  Okay.
23      3:03, we are off the video record.
24            - - - - -

Page 271

1    (A recess was taken at this time.)
2            - - - - -
3            THE VIDEOGRAPHER:  3:19,
4      we are on the video record.
5  BY MS. PAPANTONIO:
6      Q.  All right.  Ms. Chitty, are you
7  there?
8      A.  Yeah, I'm here.
9      Q.  All right.  I couldn't see your
10  screen.  Okay.  I really just want to make
11  sure we have a clear understanding for the
12  jury of what this timeline looks like for
13  Torrent.  Okay.  So I just want to walk
14  through this step by step.  What we know is
15  that on June 20, Torrent got a notification
16  from ZHP that there's a potentially
17  genotoxic impurity in valsartan, right?
18      A.  I don't remember the exact
19  wording, but they were notified of an --
20  I'm sorry, unidentified impurity that was,
21  I think, potentially genotoxic.
22      Q.  Right.  And so sometime during
23  that time, the FDA had instructed Torrent
24  to quarantine their batches, right?

Page 272

1            MS. NAGLE:  Objection,
2      form.
3            THE WITNESS:  I don't
4      recall whether that was an FDA
5      instruction or whether that was a
6      Torrent decision.
7  BY MS. PAPANTONIO:
8      Q.  Okay.  But regardless,
9  Torrent's products were in quarantine for a
10  period of time while Torrent was trying to
11  figure out whether or not this genotoxic
12  impurity affected their valsartan, right?
13      A.  Correct.
14      Q.  So from the June 20 to the
15  July 17 email with the FDA that we were
16  looking at, Torrent is trying to determine
17  whether or not NDMA or NDEA is in the
18  valsartan product, correct?
19            MS. NAGLE:  Objection,
20      form.
21            THE WITNESS:  During
22      the -- during that time frame,
23      we're continuing to gather
24      information.  I think at the early

Page 273

1      part when we were first notified,
2      we didn't even know what the
3      potential impurity was.
4  BY MS. PAPANTONIO:
5      Q.  Right.
6      A.  You can't test for something
7  you don't really know what it is or where
8  it occurs, so.
9      Q.  And in the month you're
10  learning of that impurity is actually NDMA,
11  Torrent has to make a decision of whether
12  or not they release their product to the
13  public or keep that product in quarantine,
14  right?
15            MS. NAGLE:  Objection to
16      form.
17            THE WITNESS:  That is a
18      Torrent decision unless we are
19      instructed by a regulator to take
20      some action in the meantime.
21  BY MS. PAPANTONIO:
22      Q.  Right.  And what we know based
23  on the documents we just saw that during
24  that time, three other manufacturers had

Page 274

1 recalled their product because they had
2 tested it and it had NDMA in the valsartan.
3 Do you remember seeing that document?
4        A.   I remember seeing the recall
5 notification and I remember mentioning that
6 we don't know who tested that product, but
7 there apparently was some data to indicate
8 that the NDMA was present in those finished
9 drug products at those manufacturers.
10       Q.   And so during that time,
11 Torrent is relying on the data from ZHP
12 which suggests that Torrent's product is
13 not affected by NDMA, right?
14       A.   Torrent is evaluating that data
15 and also working to understand our own
16 method and develop our own method to be
17 able to also test for the impurity.
18       Q.   And Torrent, like we said,
19 during this time does not have the ability
20 to test the product itself, so they're
21 relying on the assurances from ZHP that
22 their product is not affected by NDMA,
23 right?
24            MS. NAGLE:  Objection,

Page 275

1        form.
2            THE WITNESS:  During
3        this time, Torrent does not yet
4        have a method to detect the
5        impurity and are taking into
6        consideration the data and the
7        information that ZHP is sharing.
8 BY MS. PAPANTONIO:
9        Q.   Right.  And like we saw in
10 earlier documents, Torrent is assuming that
11 the information ZHP is giving them is
12 accurate?
13           MS. NAGLE:  Objection,
14       form.
15           THE WITNESS:  I think
16       we're -- we were taking the
17       information as it was given and,
18       again, continuing to work to try
19       and verify for ourselves.
20 BY MS. PAPANTONIO:
21       Q.   And do you remember that during
22 this period of time, you're communicating
23 to your colleagues and saying that the
24 statements from ZHP are not sufficient, but

Page 276

1 we have to test the product?  Do you
2 remember saying that?
3            MS. NAGLE:  Objection,
4        form.
5            THE WITNESS:  Yes, I was
6        encouraging our team to continue to
7        gather more additional data on the
8        situation.
9 BY MS. PAPANTONIO:
10       Q.   So, Ms. Chitty, my question,
11 what I'm really trying to understand is if
12 you could not test the product to determine
13 NDMA wasn't present, why would you not just
14 wait until you could test the product?
15           MS. NAGLE:  Objection,
16       form.
17           THE WITNESS:  Wait in
18       what manner?
19 BY MS. PAPANTONIO:
20       Q.   When Torrent is deciding
21 whether or not to keep their product in
22 quarantine or they release it back on the
23 market, why did Torrent not just wait until
24 they could test the product themselves and

Page 277

1 validate that there was no NDMA in their
2 valsartan?
3            MS. NAGLE:  Objection.
4        Form and foundation.
5            THE WITNESS:  We have to
6        rely on data from our suppliers.
7        You know, that's kind of a big step
8        in what we do, right?  We don't
9        verify every single little piece of
10       information that comes from
11       suppliers.  There are times when we
12       gather our own additional
13       information and this was an
14       important situation, which is why I
15       was suggesting that we should go
16       ahead and continue to try and
17       gather our own data on this
18       situation.
19 BY MS. PAPANTONIO:
20       Q.   I understand that you were
21 trying to do the right thing, Ms. Chitty,
22 and you were telling your company that this
23 is the right thing to do, but why did
24 Torrent not do the right thing?  Why did

Confidential Information Subject to Protective Order

Page 278

1 they not wait to release the product until
2 they could test it themselves?
3              MS. NAGLE:  Objection.
4 Form and foundation.
5              THE WITNESS:  It's not a
6 matter of Torrent not doing the
7 right thing or Torrent not working
8 to the same goal that I had of
9 having our own test method.  To my
10 knowledge, those activities were
11 going on in parallel.
12 BY MS. PAPANTONIO:
13      Q.  So if those activities were
14 going on, then you would only have to wait
15 a few short days longer until Torrent could
16 verify that their product was not
17 containing a carcinogen?
18              MS. NAGLE:  Objection.
19 Form and foundation.
20              THE WITNESS:  I don't
21 know what the time frame would have
22 been.  I don't think we had an
23 estimate of how long it was going
24 to take us to have an appropriate

Page 279

1 method and you don't -- it's not
2 standard to take action on
3 something based on a theoretical
4 situation.  You know, we make
5 decisions based on data and we were
6 making decisions based on the data
7 we had in hand.
8 BY MS. PAPANTONIO:
9      Q.  Ms. Chitty, you understand that
10 this isn't a theoretical scenario, that
11 NDMA is a carcinogen and was linked to
12 valsartan, you understand that, right?
13              MS. NAGLE:  Objection,
14 form.
15              THE WITNESS:  It was
16 linked to certain types of
17 valsartan.
18 BY MS. PAPANTONIO:
19      Q.  And it was potentially linked
20 to Torrent valsartan, right?
21              MS. NAGLE:  Objection,
22 form.
23              THE WITNESS:  At that
24 time, no, we had no indication that

Page 280

1 it was linked to the route of
2 synthesis we had been using in our
3 products.
4 BY MS. PAPANTONIO:
5      Q.  But why didn't you just test
6 the route of synthesis to verify that the
7 NDMA was not in your products?
8              MS. NAGLE:  Objection.
9 Form and foundation.
10              THE WITNESS:  Can you
11 repeat that question, I'm sorry?
12 BY MS. PAPANTONIO:
13      Q.  Why did you just -- why didn't
14 you just wait to release the product?  Why
15 didn't you test it yourself?
16              MS. NAGLE:  Same
17 objections.
18              THE WITNESS:  Same
19 answer.  We were working to try and
20 test it ourselves, but there was no
21 data in hand to indicate the
22 product could not be sold at that
23 time.
24

Page 281

1 BY MS. PAPANTONIO:
2      Q.  Is it true that you were
3 worried about penalties at that time and
4 that's the reason you didn't test to verify
5 there was NDMA in your product?
6              MS. NAGLE:  Objection,
7 form.
8              THE WITNESS:  For
9 myself, there was not the
10 consideration of penalties going
11 into any of the decision-making
12 that I was doing or suggestions
13 that I was making.
14 BY MS. PAPANTONIO:
15      Q.  But your COO understood that
16 the longer you wait to release valsartan,
17 that the more penalties would kick in.  Do
18 you remember him saying that?
19              MS. NAGLE:  Objection,
20 form.
21              THE WITNESS:  He did --
22 he was considering that, obviously,
23 by his, by his emails, but again,
24 the money aspects were not driving

Confidential Information Subject to Protective Order

Page 282

1    the quality decisions.
2    BY MS. PAPANTONIO:
3        Q.   Well, they were driving the
4    quality decisions, because you understand
5    that you were telling your customers that
6    the statements from ZHP weren't sufficient,
7    we have to test the drug.  But instead, you
8    released it.  So why didn't you wait to
9    test the drug?
10                MS. NAGLE:  Objection.
11        Form and foundation.
12                THE WITNESS:  And I'm
13        not sure that we were telling our
14        customers that the data wasn't
15        sufficient either.
16    BY MS. PAPANTONIO:
17        Q.   Ms. Chitty, do you understand
18    that with every day that goes by, patients
19    are taking your drug?
20                MS. NAGLE:  Objection,
21        form.
22                THE WITNESS:  Patients
23        take our products every day, yes.
24

Page 283

1    BY MS. PAPANTONIO:
2        Q.   And with every day that went by
3    here, patients were taking a product that
4    had NDMA in it?
5                MS. NAGLE:  Objection,
6        form.
7                THE WITNESS:  We did not
8        know at that time that the products
9        contained NDMA.
10    BY MS. PAPANTONIO:
11        Q.   And that when you released that
12    product back on to the market, you were
13    actually releasing a contaminated
14    valsartan?
15                MS. NAGLE:  Objection,
16        form.
17                THE WITNESS:  We did not
18        know at the time the products were
19        released to the market that they
20        did not meet specifications.
21    BY MS. PAPANTONIO:
22        Q.   You had no idea that when
23    Torrent decided that they wanted to save
24    money and release the valsartan API that

Page 284

1    customers were actually getting -- taking
2    drugs with NDMA in them?
3                MS. NAGLE:  Objection,
4        form.
5                THE WITNESS:  There was
6        no knowledge at that time that
7        there was NDMA present in those
8        products.
9    BY MS. PAPANTONIO:
10        Q.   There was no knowledge that
11    NDMA was present, because you never tested
12    the drug to determine it was present?
13                MS. NAGLE:  Objection,
14        form.
15                THE WITNESS:  We weren't
16        able to test to detect those small
17        levels of NDMA if they were present
18        at that time that the batches were
19        released.
20    BY MS. PAPANTONIO:
21        Q.   If you had not released -- do
22    you understand that when you release this
23    product back on the market that you were
24    releasing valsartan that was 400 times the

Page 285

1    FDA threshold limit?
2                MS. NAGLE:  Objection,
3        form.
4                THE WITNESS:  As I said,
5        we had no knowledge at the time of
6        release that there was NDMA present
7        in any of those batches.
8    BY MS. PAPANTONIO:
9        Q.   Do you understand that had you
10    waited and not released the valsartan in
11    the market that you could have actually
12    saved people's lives?
13                MS. NAGLE:  Objection,
14        form.
15                THE WITNESS:  I don't
16        think that there's been any
17        conclusions that even if people
18        ingested product with these
19        impurities that it has cost people
20        their lives.  That's a lot of
21        speculation.
22    BY MS. PAPANTONIO:
23        Q.   Well, the jury is actually
24    going to be able to see plenty of examples

Confidential Information Subject to Protective Order

Page 286

1 of that when we show this in trial.  But do
2 you understand that had you not released
3 this product from the market that you could
4 have saved a person from taking valsartan
5 that was contaminated with NDMA that was
6 400 times the FDA threshold?
7           MS. NAGLE:  Objection,
8     form.
9           THE WITNESS:  Again, we
10     had no indication the NDMA was
11     present.
12 BY MS. PAPANTONIO:
13     Q.  Okay.  1171.  We're going to LP
14 1171.  Okay.  Ms. Chitty, the FDA --
15 Torrent released valsartan back onto the
16 market on July 18; isn't that right?
17     A.  I don't recall the exact date,
18 but it was something close to that.
19     Q.  Okay.  And what we know now is
20 that the product that Torrent released was
21 contaminated with NDMA, right?
22           MS. NAGLE:  Objection,
23     form.
24           THE WITNESS:  I would

Page 287

1     have to look at the specific
2     batches, because I believe there
3     were some batches that were
4     containing that impurity and some
5     that were not.
6     - - - - -
7     (Notification Bates
8     TORRENT-MDL2875-00131255 marked
9     Torrent Exhibit 92 for
10     identification.)
11     - - - - -
12 BY MS. PAPANTONIO:
13     Q.  Okay.  And on August 3rd, this
14 is now about 45 days after you had gotten
15 the initial notice from ZHP, right, you're
16 getting another notification from ZHP?
17     A.  This is dated August 3, yes,
18 and it's roughly a month and a half after
19 their initial communication.
20     Q.  For a month and a half, Torrent
21 believed that what ZHP was telling them was
22 accurate information?
23           MS. NAGLE:  Objection,
24     form.  And, counsel, can we just

Page 288

1     get an exhibit number, please?
2           MS. PAPANTONIO:  Ninety-
3     two, sorry, Torrent 92.
4           MS. NAGLE:  Thank you.
5           THE WITNESS:  So leading
6     up to this communication, we had
7     not been aware that there was any
8     trace amounts of NDMA in the old
9     process API.
10 BY MS. PAPANTONIO:
11     Q.  And let's take a look at what
12 this communication is actually telling you,
13 right.  The title says valsartan API and
14 then NDMA, right?
15     A.  Yes.
16     Q.  And then ZHP tells you that
17 after further assessment "trace amounts of
18 NDMA is detected in the valsartan API
19 manufactured with old process," right?
20     A.  That is what that says.
21     Q.  Was that a shock to you?
22           MS. NAGLE:  Objection,
23     form.
24           THE WITNESS:  It was new

Page 289

1     information that we had not seen.
2 BY MS. PAPANTONIO:
3     Q.  Right, because for a month and
4 a half, you had relied on ZHP to give you
5 accurate information?
6           MS. NAGLE:  Objection,
7     form.
8           THE WITNESS:  We were
9     relying on the information from ZHP
10     as being accurate.
11 BY MS. PAPANTONIO:
12     Q.  For this entire time, a month
13 and a half, you were conveying to the FDA
14 and customers that Torrent valsartan was
15 safe?
16           MS. NAGLE:  Objection,
17     form.
18           THE WITNESS:  Based on
19     the information we had in hand at
20     the time of those communications,
21     we were communicating that we did
22     not think the discussed impurity
23     was in our batches.
24

Confidential Information Subject to Protective Order

Page 290

BY MS. PAPANTONIO:

Q.  For that month and a half, Torrent continued to sell valsartan, right?

A.  I don't know for the entire month and a half.  At some point, we had product under quarantine and then it was subsequently released.

Q.  And we know it was released around the 18th, so between the 18th and now the 3rd, contaminated valsartan is on the market, right?

MS. NAGLE:  Objection, form.

THE WITNESS:  And again, I don't know if those batches that were quarantined were batches that were impacted by this impurity.

BY MS. PAPANTONIO:

Q.  Okay.  August 3, you learned NDMA is in Torrent's product.  On August 3, does Torrent pull that product off the market?

MS. NAGLE:  Objection, form.

Page 291

THE WITNESS:  I would have to review some emails.  I don't remember exactly what we did on August 3, but one of the important points in this is that they're referring to trace amounts, so at this point, we don't really know how much is there and if it might be below allowable levels.

BY MS. PAPANTONIO:

Q.  Ms. Chitty, but now you know that trace amounts actually means 400 times the FDA threshold limit for NDMA in a product, right?

MS. NAGLE:  Objection, form.

THE WITNESS:  There were data presented at some point that I am aware of now, yes, that show some of those API batches that Torrent had utilized were over the allowable limits.

BY MS. PAPANTONIO:

Q.  And what you're telling us

Page 292

today is that trace amounts equates to 400 times the FDA threshold?

MS. NAGLE:  Objection, form.

THE WITNESS:  No, my point was we can't define what trace amounts are.

BY MS. PAPANTONIO:

Q.  Right.  So at this point on August 3, after Torrent learns that its product is contaminated with NDMA, Torrent responds by saying, it's no big deal, it's just trace amounts, right?  That's what you're telling us?

MS. NAGLE:  Objection, form.

THE WITNESS:  I'm telling you that we have to have quantifiable numbers, because there are situations where certain amounts of impurities, even genotoxic or carcinogenic impurities, are allowed in drug products by regulation.  So there's

Page 293

nothing in this letter that tells us, you know, definitively how much a trace amount means.

BY MS. PAPANTONIO:

Q.  And on August 3, did Torrent immediately test this product to determine what trace amount means?

MS. NAGLE:  Objection. Form and foundation.

THE WITNESS:  On August 3, I would have to go back to, again, see if we had a method at this time that was able to adequately and accurately detect the small amounts of the potential impurities.

BY MS. PAPANTONIO:

Q.  We're going to talk about that method in a few minutes, but as far as you're aware, on August 3, Torrent did not have a way to test this product to determine whether or not there were trace amounts?

MS. NAGLE:  Objection,

Confidential Information Subject to Protective Order

Page 294

```
1       form.
2               THE WITNESS:  I don't
3       recall.  Again, there's a lot of,
4       you know, kind of information
5       coming from different places as of
6       August 3.  I don't recall where we
7       were in developing or obtaining
8       details of the method.
9  BY MS. PAPANTONIO:
10      Q.  Do you recall Torrent
11  immediately sending samples to independent
12  labs for them to verify the NDMA in
13  Torrent's valsartan?
14              MS. NAGLE:  Objection.
15      Form and foundation.
16              THE WITNESS:  That's not
17      something I really would have been
18      involved in.
19  BY MS. PAPANTONIO:
20      Q.  Do you recall Torrent reaching
21  out to the other manufacturers who had
22  already tested the NDMA to ask for help on
23  how to test Torrent's product?
24              MS. NAGLE:  Objection.
```

Page 295

```
1       Form and foundation.
2               THE WITNESS:  Again,
3       that's not something I was aware of
4       or necessarily would have been
5       involved in.
6  BY MS. PAPANTONIO:
7       Q.  So we're at August 3, Torrent
8  learns that there's NDMA in their product,
9  and they don't do anything?
10              MS. NAGLE:  Objection,
11      form.
12              THE WITNESS:  So this
13      notification from August 3 does not
14      specify which batches of old
15      process product it was detected in.
16      So, again, at this point, we don't
17      really have any information on the
18      specifics and we should have taken
19      the action stated here to go ahead
20      and quarantine product until more
21      information is available.
22  BY MS. PAPANTONIO:
23      Q.  So you believe that at this
24  point Torrent should have immediately
```

Page 296

```
1  quarantined their product?
2       A.  We would have likely
3  quarantined the API as noted here.
4       Q.  Not likely, do you believe that
5  Torrent should have quarantined their
6  product?
7       A.  In my personal opinion, we
8  should have quarantined the API and
9  potential product.
10      Q.  In your experience, based as a
11  regulatory consultant, do you think that
12  Torrent should have recalled their product
13  on August 3?
14      A.  As of August 3, we still don't
15  have enough details to know, again, which
16  batches might contain the impurity nor at
17  what levels, because there are allowable
18  levels associated with certain impurities,
19  so we have -- we have no data at this point
20  to know which batches to recall and which
21  batches might be impacted.
22      Q.  But we do know that on
23  August 3, Torrent has customers that are
24  still taking Torrent's valsartan, right?
```

Page 297

```
1              MS. NAGLE:  Objection.
2       Form and foundation.
3              THE WITNESS:  It is
4       likely consumers were still taking
5       Torrent product on August 3.
6  BY MS. PAPANTONIO:
7       Q.  Okay.  I want to talk about
8  this from the consumer perspective, because
9  you know, what we talked about is that the
10  FDA recalled three manufacturers' valsartan
11  on July 13.  Do you remember that?
12      A.  Yeah, I believe it was the
13  13th of July.
14      Q.  And you understand that that
15  when a product is recalled, it is removed
16  from the shelves, people can no longer buy
17  it?
18      A.  It depends on what level of
19  recall it is.  But product is removed from
20  the markets.  It doesn't necessarily mean
21  that consumers aren't still buying it or
22  using it.
23      Q.  All right.  So the products
24  that were recalled on July 13 were no
```

Confidential Information Subject to Protective Order

| Page 298 |
|---|

¹ longer available to valsartan users?
²         MS. NAGLE:  Form and
³     foundation.
⁴         THE WITNESS:  Again, it
⁵     depends on the level of recall.  So
⁶     I'm not 100 percent sure of the
⁷     details of those recalls from that
⁸     time.
⁹ BY MS. PAPANTONIO:
¹⁰     Q.   Well, you know just from your
¹¹ experience with Torrent that when Torrent
¹² recalled its product, it actually asked all
¹³ of the customers to send the product back
¹⁴ to Torrent, right?
¹⁵     A.   That was part of the
¹⁶ instructions related to the Torrent
¹⁷ product.  The communications also very
¹⁸ clearly told patients to not stop taking
¹⁹ product until they had spoken with their
²⁰ doctors.
²¹     Q.   Exactly.  You don't -- so
²² people who rely on valsartan as a blood
²³ pressure medication that had that
²⁴ medication recalled would have to find an

| Page 299 |
|---|

¹ alternative medication after the July 13
² recall, right?
³         MS. NAGLE:  Objection.
⁴     Form and foundation.
⁵         THE WITNESS:  If you
⁶     were taking a recalled product, a
⁷     product that was recalled from the
⁸     July 13 recall, yes, your doctor
⁹     would have recommended a different
¹⁰     product for you, most likely.
¹¹ BY MS. PAPANTONIO:
¹²     Q.   And after the July 13 recall,
¹³ Torrent was advertising their product as
¹⁴ being safe?
¹⁵         MS. NAGLE:  Objection.
¹⁶     Form and foundation.
¹⁷         THE WITNESS:  We do no
¹⁸     advertising in the generic
¹⁹     business, so no, we were not
²⁰     advertising our product as safe.
²¹ BY MS. PAPANTONIO:
²²     Q.   Well, let me rephrase the
²³ question.  If one of these customers who
²⁴ relied on recalled valsartan had called

| Page 300 |
|---|

¹ Torrent up and asked you if your product
² was recalled, you would have told them no?
³         MS. NAGLE:  Objection,
⁴     form.
⁵         THE WITNESS:  That's
⁶     correct, at that time, our product
⁷     was not recalled.
⁸ BY MS. PAPANTONIO:
⁹     Q.   You would have told that
¹⁰ customer that Torrent's product is safe to
¹¹ use and not a part of the recall?
¹²         MS. NAGLE:  Objection,
¹³     form.
¹⁴         THE WITNESS:  We would
¹⁵     have confirmed it was not part of
¹⁶     the recall, yes.
¹⁷ BY MS. PAPANTONIO:
¹⁸     Q.   Are you aware that customers
¹⁹ actually switched from a recalled brand
²⁰ valsartan to Torrent's brand valsartan
²¹ because they believed the product had no
²² NDMA in it?
²³         MS. NAGLE:  Objection,
²⁴     form.

| Page 301 |
|---|

¹         THE WITNESS:  I'm not
²     personally aware of that, no.
³ BY MS. PAPANTONIO:
⁴     Q.   Are you aware that valsartan
⁵ users switched to Torrent valsartan because
⁶ they believed that Torrent valsartan was
⁷ safe?
⁸         MS. NAGLE:  Objection,
⁹     form.
¹⁰         THE WITNESS:  No, I'm
¹¹     not personally aware of that.
¹² BY MS. PAPANTONIO:
¹³     Q.   Are you aware that the
¹⁴ customers who relied on recalled valsartan
¹⁵ that later switched to Torrent valsartan
¹⁶ could have been taking 400 times the level
¹⁷ of NDMA in Torrent's valsartan each day?
¹⁸         MS. NAGLE:  Objection,
¹⁹     form.
²⁰         THE WITNESS:  Again,
²¹     there weren't testing data -- there
²²     weren't results indicating that
²³     impurity at that time, so no, I'm
²⁴     not personally aware of consumers

Confidential Information Subject to Protective Order

Page 302

1    taking specific products.
2  BY MS. PAPANTONIO:
3    Q.  Are you aware of any
4  conversation that happened after the
5  July 13 recall of Torrent's sales
6  increasing because more customers were
7  switching to Torrent valsartan?
8          MS. NAGLE:  Objection,
9      form.
10         THE WITNESS:  Not that I
11     recall.
12 BY MS. PAPANTONIO:
13     Q.  Are you aware of any increase
14 in demands for Torrent's valsartan product?
15         MS. NAGLE:  Objection,
16     form.
17         THE WITNESS:  Not that I
18     can recall.
19 BY MS. PAPANTONIO:
20     Q.  Do you understand though that
21 valsartan customers who relied on the
22 recalled product could actually have been
23 taking a more dangerous product had they
24 switched to Torrent?

Page 303

1          MS. NAGLE:  Objection,
2      form.
3          THE WITNESS:  No, I am
4      not aware of what you mentioned.
5  BY MS. PAPANTONIO:
6      Q.  Okay.  So back to this August 3
7  notification, are you aware that Torrent
8  didn't actually recall its valsartan until
9  August 22?
10     A.  I don't recall the exact date,
11 but I remember it was not recalled in
12 relation to this August 3 notification,
13 again, because it's not specific in its
14 details to give us enough information to
15 really make an informed decision.
16     Q.  And on August 3, Torrent didn't
17 immediately seek out information to
18 determine whether or not its valsartan was
19 safe?
20         MS. NAGLE:  Objection,
21     form.
22         THE WITNESS:  I can't
23     speak personally for what all of
24     Torrent was doing on August 3 to

Page 304

1  seek out information, sorry.
2  BY MS. PAPANTONIO:
3      Q.  But you can speak for yourself
4  and at any point did you contact Torrent
5  quality in India and demand that they test
6  this drug to determine if NDMA is present?
7          MS. NAGLE:  Objection,
8      form.
9          THE WITNESS:  I'm not
10     sure what communications I sent
11     specifically on August 3.  We had
12     already been discussing the need
13     for additional confirmatory testing
14     and method development.
15 BY MS. PAPANTONIO:
16     Q.  So after this recall, things
17 were just business as usual or after this
18 notification, things at Torrent were just
19 business as usual?
20         MS. NAGLE:  Objection,
21     form.
22         THE WITNESS:  No, this
23     was, again, a new piece of
24     information.  Again, I just don't

Page 305

1      specifically recall what I did
2      three years ago on this day and I
3      can't really speak to all of the
4      other activities that might have
5      been going on at that time.
6  BY MS. PAPANTONIO:
7      Q.  Okay.  Let's look at LP 682.
8  This is marked as Torrent 12.  Okay.  We're
9  going to go to the second page.  We can see
10 we're looking at another email sent by you,
11 Ms. Chitty.  And this looks like it's to a
12 couple of people.  So Jaiswal is in
13 quality, correct?
14     A.  I can't remember what he was
15 doing.  He somehow was associated with the
16 plant.
17     Q.  What about Vora?
18     A.  I don't remember specifically
19 what Hardik was responsible for.
20     Q.  Okay.  We can see that this
21 email was send by you on August 11, 2018,
22 right, that is one week after you got
23 notification from ZHP?
24     A.  Yes.

Confidential Information Subject to Protective Order

Page 306

1    Q.   And if we look at the email,
2  you tell us that the FDA is requesting
3  information on a specific batch.  The
4  C50691553.  Do you see that?
5    A.  Yes.
6    Q.  That C number is an API code
7  from ZHP, right?
8    A.  That is an API batch number,
9  yes.
10    Q.  And you tell us that the FDA
11  believes that there might be NDMA in this
12  batch, right?  That's on the second --
13  there we go.
14    A.  Correct.  That is in the
15  message.
16    Q.  So, again, the FDA is telling
17  you that your product is not safe, Torrent
18  is not actually testing the product
19  themselves, correct?
20      MS. NAGLE:  Objection,
21    form.
22      THE WITNESS:  I mean, I
23    think that the question here seems
24    to be whether we've received that

Page 307

1    batch or not.
2  BY MS. PAPANTONIO:
3    Q.  Okay.  And so at this point, a
4  full week after you got notification from
5  ZHP that NDMA was an old process, Torrent
6  is still selling the drug valsartan?
7      MS. NAGLE:  Objection,
8    form.
9      THE WITNESS:  I am not
10    certain what status we are here in
11    terms of quarantining product and
12    things like that, so I can't say if
13    we're still selling at this point.
14  BY MS. PAPANTONIO:
15    Q.  Okay.  But what you do conclude
16  is you say "Also, have we been able to
17  develop or transfer a method to test for
18  NDMA?"  Do you see that?
19    A.  Yes.
20    Q.  This is one week after you
21  learn that NDMA is in Torrent's product and
22  you still cannot test your product to
23  determine whether or not it's safe; is that
24  accurate?

Page 308

1      MS. NAGLE:  Objection,
2    form.
3      THE WITNESS:  As of the
4    11th, it seems that we still don't
5    have a method that's suitable for
6    accurately testing for the
7    impurity.
8  BY MS. PAPANTONIO:
9    Q.  This is now two months after
10  you got the initial notice of a genotoxic
11  impurity?
12    A.  Not quite two months.
13    Q.  Right.  Six days short, a
14  couple of days short.  We can agree it's a
15  long time, Ms. Chitty, right?
16      MS. NAGLE:  Objection,
17    form.
18      THE WITNESS:  It's
19    slightly under two months.
20  BY MS. PAPANTONIO:
21    Q.  Okay.  And so two months after
22  you learn that there's a potentially
23  dangerous carcinogen in valsartan, you
24  still cannot test the valsartan drug to

Page 309

1  make sure that it is safe?
2      MS. NAGLE:  Objection,
3    form.
4      THE WITNESS:  I mean,
5    again, I think the notification we
6    received in June, we did not
7    believe applied to the product we
8    were using, the API route of
9    synthesis that we were using at the
10    time, and we continued to work on a
11    method to try to be able to test
12    accurately and understand the
13    situation better.
14  BY MS. PAPANTONIO:
15    Q.  And now, a full week after, you
16  get notification that your drug is actually
17  affected by NDMA, you still can't test to
18  determine whether or not what ZHP is saying
19  is correct?
20      MS. NAGLE:  Objection,
21    form.
22      THE WITNESS:  Again,
23    this is a week after we're given
24    data that's difficult to quantify,

Confidential Information Subject to Protective Order

Page 310

1    because we don't know the levels.
2    We don't know the batches that may
3    be impacted.
4  BY MS. PAPANTONIO:
5        Q.   Ms. Chitty, would you agree
6  that this is a big deal that NDMA is in
7  your product?
8               MS. NAGLE:  Objection,
9        form.
10              THE WITNESS:  It is
11       definitely important.
12 BY MS. PAPANTONIO:
13       Q.   Right.  So you should be
14 finding a method as soon as possible,
15 right?
16              MS. NAGLE:  Objection,
17       form.
18              THE WITNESS:  And to my
19       knowledge, the team was working on
20       developing that method or obtaining
21       a method as soon as they could.
22 BY MS. PAPANTONIO:
23       Q.   And on August 11, you still
24 don't have it?

Page 311

1        A.   That appears to be the case by
2  this email, yes.
3  BY MS. PAPANTONIO:
4        Q.   Okay.  And then you go on to
5  say, "If this batch creates NDMA it creates
6  a potential problem."  What is that
7  problem?
8        A.   It raises the question of NDMA
9  being present in the old process route of
10 synthesis, I believe, what I meant by that
11 statement.
12       Q.   Well, it's more than just that,
13 it's a potential problem because your
14 consumers are potentially taking the
15 carcinogenic pill, right?  Would you agree
16 with that?
17              MS. NAGLE:  Objection,
18       form.
19              THE WITNESS:  Consumers
20       are potentially taking a product
21       with an impurity at a level we
22       don't know and, likely, I think, at
23       this point, I'm not sure if FDA had
24       set standard limits that were

Page 312

1    acceptable at this point yet.
2  BY MS. PAPANTONIO:
3        Q.   Well, we know they had set
4  standards limits because those limits were
5  imposed in the initial recall on July 13?
6               MS. NAGLE:  Objection.
7        Form and foundation.
8               THE WITNESS:  Okay.
9        Yeah, I just -- I don't remember
10       the sequence of when those limits
11       came out.
12 BY MS. PAPANTONIO:
13       Q.   Ms. Chitty, will you agree that
14 this is more than a potential problem,
15 because consumers take this drug on a daily
16 basis?
17              MS. NAGLE:  Objection,
18       form.
19              THE WITNESS:  I think
20       the frequency of a consumer taking
21       a product doesn't really impact our
22       decision, you know, if it was
23       important, and we were certainly
24       concerned and actively trying to

Page 313

1    gather information on this to make
2  sure we were acting appropriately.
3  BY MS. PAPANTONIO:
4        Q.   So if a consumer had taken
5  valsartan with NDMA over 400 times the FDA
6  threshold every single day for four years,
7  that wouldn't be a potential problem for
8  Torrent?
9               MS. NAGLE:  Objection,
10       form.
11              THE WITNESS:  You know,
12       I can't kind of evaluate the
13       potential impact of that type of
14       situation.  Again, I'm not a
15       toxicologist.  I'm not a doctor.
16       And the limits were just starting
17       to come out from regulators as we
18       were working through all of these
19       details.
20 BY MS. PAPANTONIO:
21       Q.   Right.  You go on to say "If
22 this batch creates NDMA it creates a
23 potential problem unless we can prove our
24 batches do not contain NDMA."  So at this

Confidential Information Subject to Protective Order

Page 314

¹ point, you're still trying to prove ZHP
² wrong, right?
³          MS. NAGLE:  Objection,
⁴     form.
⁵          THE WITNESS:  I'm not
⁶     sure that we're trying to prove ZHP
⁷     wrong, no.  I think we're trying to
⁸     gather our own additional data to
⁹     confirm the data that we have.
¹⁰ BY MS. PAPANTONIO:
¹¹     Q.  Right.  And at this point, you
¹² still cannot test the batch to determine
¹³ whether your batches do or do not contain
¹⁴ NDMA?
¹⁵     A.  By the context of this email,
¹⁶ yeah, it seems that there's still not an
¹⁷ appropriate method of testing of the
¹⁸ impurity.
¹⁹     Q.  Okay, let's look at LP 1063.
²⁰ Okay.  Looking at this email, this is
²¹ another email -- oh, Exhibit No. 25, excuse
²² me, Torrent 25.  Okay.  Let's look at the
²³ second email here or the third email here.
²⁴ We see that it's sent by you.  And then the

Page 315

¹ subject is "FDA meeting regarding
² valsartan" and it says urgent, right?  And
³ it's urgent because Torrent's product
⁴ potentially contains a carcinogen, right?
⁵          MS. NAGLE:  Objection,
⁶     form.
⁷          THE WITNESS:  Sorry, I'm
⁸     just trying to look at the details.
⁹     Yeah, it is urgent because FDA is
¹⁰     at this point telling us that
¹¹     they've detected NDMA in certain
¹²     samples that we provided to them.
¹³ BY MS. PAPANTONIO:
¹⁴     Q.  Right, so the FDA has a test,
¹⁵ but Torrent still does not have a test to
¹⁶ determine whether or not its product is
¹⁷ safe?
¹⁸          MS. NAGLE:  Objection,
¹⁹     form.
²⁰          THE WITNESS:  I'm not
²¹     sure, but I think on this date, we
²²     still did not have an appropriate
²³     method.
²⁴

Page 316

¹ BY MS. PAPANTONIO:
²     Q.  And this date is August 16?
³     A.  Yes.
⁴     Q.  That is now 13 days, almost two
⁵ weeks after you got notice from ZHP that
⁶ Torrent's valsartan contained NDMA?
⁷          MS. NAGLE:  Objection,
⁸     form.
⁹          THE WITNESS:  It is
¹⁰     approximately two weeks after the
¹¹     notification that said that ZHP had
¹²     detected the impurity in some
¹³     batches.  Again, we did not know
¹⁴     which batches nor whether those
¹⁵     batches specifically were used in
¹⁶     Torrent product at that time.
¹⁷ BY MS. PAPANTONIO:
¹⁸     Q.  And at this point, Torrent had
¹⁹ still not recalled the valsartan product?
²⁰     A.  I believe not.  I think you
²¹ said that date was the 22nd or the 23rd of
²² August.
²³     Q.  Despite knowing that Torrent's
²⁴ valsartan was contaminated with NDMA.

Page 317

¹          MS. NAGLE:  Objection,
²     form.
³          THE WITNESS:  Again, on
⁴     this date, we did not have
⁵     conclusive information that the
⁶     batches that Torrent had used were
⁷     impacted.
⁸ BY MS. PAPANTONIO:
⁹     Q.  And you don't have conclusive
¹⁰ information, because you don't have the
¹¹ ability to test; isn't that correct?
¹²          MS. NAGLE:  Objection,
¹³     form.
¹⁴          THE WITNESS:  To
¹⁵     accurately test at this point,
¹⁶     correct.
¹⁷ BY MS. PAPANTONIO:
¹⁸     Q.  So, Ms. Chitty, let me ask you,
¹⁹ at this point, since you can't test the
²⁰ product, why not just recall it?
²¹          MS. NAGLE:  Objection.
²²     Form and foundation.
²³          THE WITNESS:  In
²⁴     general, you don't recall something

Confidential Information Subject to Protective Order

Page 318

1  without information.  You know, I
2  know that at some point, there were
3  also market concerns regarding
4  shortages.  There's just a lot of
5  consequences of taking a product
6  off the market for no reason.  So
7  you don't make those decisions
8  until you have some firm data in
9  hand to support them.
10  BY MS. PAPANTONIO:
11      Q.  Ms. Chitty, would you also
12  agree with me that there's a lot of
13  consequences to taking valsartan
14  contaminated with a carcinogen?
15          MS. NAGLE:  Objection,
16      form.
17          THE WITNESS:  Again, I'm
18      not a toxicologist or doctor, so
19      I'm really not qualified to make a
20      conclusion.
21  BY MS. PAPANTONIO:
22      Q.  Would you agree with me that
23  there are a lot of consequences to taking
24  valsartan that is contaminated with NDMA at

Page 319

1  levels 400 times over the FDA threshold?
2          MS. NAGLE:  Objection,
3      form.
4          THE WITNESS:  Again, I'm
5      not qualified to make that
6      decision.
7  BY MS. PAPANTONIO:
8      Q.  Do you understand that one of
9  the consequences of ingesting NDMA is
10  cancer?
11          MS. NAGLE:  Objection,
12      form.
13          THE WITNESS:  Again, I'm
14      not specifically aware of that
15      information.
16  BY MS. PAPANTONIO:
17      Q.  Do you understand, are you
18  aware of the fact that one of the
19  consequences of cancer is actually death?
20          MS. NAGLE:  Objection,
21      form.  And, Counsel, the tone is
22      getting a little bit much.
23          MS. PAPANTONIO:  You can
24      answer the question.

Page 320

1          THE WITNESS:  One of the
2      potential consequences of cancer
3      can be death, yes.
4  BY MS. PAPANTONIO:
5      Q.  So the consequences Torrent is
6  dealing with is the loss of income, right?
7          MS. NAGLE:  Objection,
8      form.
9          THE WITNESS:  No.  As
10      I've mentioned, there's always
11      financial considerations in what
12      we're doing, but those are not the
13      primary drivers for quality-based
14      decisions.
15  BY MS. PAPANTONIO:
16      Q.  But you understand that one of
17  the consequences for your customers, for
18  people taking this valsartan, could
19  actually be death?
20          MS. NAGLE:  Objection,
21      form.
22          THE WITNESS:  No.
23      Again, I'm not trained in the
24      proper area to be able to conclude

Page 321

1      that that is a likely or probable
2      scenario.
3  BY MS. PAPANTONIO:
4      Q.  But you understand that when
5  Torrent was evaluating the consequences of
6  whether or not they keep their drug on the
7  market, they chose to continue to sell the
8  drug?
9          MS. NAGLE:  Objection,
10      form.
11          THE WITNESS:  Torrent
12      made data-based decisions and as
13      soon as we were aware of NDMA
14      contamination in batches, we took
15      action to recall those.
16  BY MS. PAPANTONIO:
17      Q.  And the longer it takes Torrent
18  to develop a test method to test NDMA, the
19  longer valsartan stays on the market; would
20  you agree with that statement?
21          MS. NAGLE:  Objection.
22      Form and foundation.
23          THE WITNESS:  I can't
24      really, I mean, connect those two

Confidential Information Subject to Protective Order

Page 322

1    things directly.
2  BY MS. PAPANTONIO:
3    Q.  I think you can, Ms. Chitty.
4  Let's break it down.  As more time goes by,
5  more people continue to take valsartan by
6  Torrent?
7           MS. NAGLE:  Objection.
8      Form and foundation.
9           THE WITNESS:  As -- I
10     mean, I don't think I can answer
11     that question.  I mean,
12     knowledgeably, there are people in
13     the market taking our product.  I
14     can't really quantify in a very
15     specific way.
16 BY MS. PAPANTONIO:
17     Q.  Okay.  And the longer it takes
18 Torrent to develop a testing method, the
19 longer Torrent valsartan stays on the
20 market?
21           MS. NAGLE:  Objection,
22      form.
23           THE WITNESS:  The method
24      was being developed, you know, I

Page 323

1      think as quickly -- as quickly as
2      it could and we were also taking
3      information from other sources.  So
4      the Torrent results from potential
5      testing were not the only piece of
6      information that was driving, you
7      know, decision-making at that
8      point.
9  BY MS. PAPANTONIO:
10     Q.  Okay.  Let's look at what
11 you're telling your colleagues on this
12 second page of your email that you sent.
13 We already looked at this earlier today,
14 but we're putting it in context to this
15 timeline.  Okay.  Let's blow that up.
16 You're telling the quality department in
17 India, we really need a method to evaluate
18 these products ourselves, right?  Do you
19 agree that two weeks after Torrent learns
20 its product is unsafe that you really need
21 a method to test the product?  Is that an
22 accurate statement?
23           MS. NAGLE:  Objection,
24      form.

Page 324

1           THE WITNESS:  Outside of
2      the timing context, you know, I had
3      always been a strong proponent of
4      getting this method together so
5      that we have additional data to
6      make decisions off of.
7  BY MS. PAPANTONIO:
8      Q.  I mean, absolutely, Ms. Chitty,
9  because you truly understand that there are
10 patients at risk at this time, right?
11           MS. NAGLE:  Objection,
12      form.
13           THE WITNESS:  I mean,
14      based at this point in time, we
15      were not in possession of data to
16      suggest that our batches were
17      directly impacted by this impurity
18      other than, I think, what was
19      mentioned originally from FDA in
20      this email chain.
21 BY MS. PAPANTONIO:
22     Q.  And you're emphasizing to the
23 people who are responsible for getting that
24 data, you're emphasizing for the third time

Page 325

1  now, we need this data, we've got to have
2  it.  That's what you're telling Torrent
3  India, right?
4           MS. NAGLE:  Objection,
5      form.
6           THE WITNESS:  I'm not
7      sure if I categorize it as
8      emphasizing, but I'm stating my
9      opinion again.
10 BY MS. PAPANTONIO:
11     Q.  Well, just in the grand scheme
12 of things, this is now the third time that
13 you have asked Torrent India to give you
14 the data you need?
15           MS. NAGLE:  Objection,
16      form.
17           THE WITNESS:  Was that a
18      question, I'm sorry?
19 BY MS. PAPANTONIO:
20     Q.  Right.  So you've asked Torrent
21 India to give you the data you need so you
22 can communicate that information to the
23 FDA?
24     A.  I had asked India for

Confidential Information Subject to Protective Order

Page 326

1 additional data, yes.
2     Q.  Right.  Because then you follow
3 that statement by saying or else we'll have
4 no evidence to argue with them if they're
5 telling us that they are finding impurities
6 in our testing, right?
7     A.  That is what the email says,
8 yes.
9     Q.  You're saying there is no way
10 to argue with the FDA about impurity
11 levels?
12             MS. NAGLE:  Objection,
13       form.
14             THE WITNESS:  I think
15       what I'm trying to say here is that
16       we would have no additional data of
17       our own to, you know, bring to FDA.
18 BY MS. PAPANTONIO:
19     Q.  Right.  You would have no
20 additional data to tell the FDA that their
21 tests are inaccurate?
22     A.  Correct, that is the point of
23 this couple sentences.
24     Q.  You would have no data to tell

Page 327

1 the FDA that Torrent should actually keep
2 their drug on the market?
3             MS. NAGLE:  Objection,
4       form.
5             THE WITNESS:  Again, was
6       that a question or a statement, I'm
7       sorry?
8 BY MS. PAPANTONIO:
9     Q.  That was a question.
10     A.  Could you repeat --
11     Q.  That's why you need the data,
12 to convince the FDA to keep Torrent's
13 product on the market?
14             MS. NAGLE:  Objection,
15       form.
16             THE WITNESS:  Again,
17       that didn't seem like a question to
18       me, I'm sorry.
19 BY MS. PAPANTONIO:
20     Q.  Well, would you agree with that
21 statement?
22     A.  Can you repeat that statement?
23     Q.  The reason Torrent needs data
24 is so that they can argue with the FDA and

Page 328

1 ask the FDA to keep Torrent's product on
2 the market?
3             MS. NAGLE:  Same
4       objection.
5             THE WITNESS:  I think
6       it's mischaracterization to say
7       that our intent was to keep the
8       product on the market.  I think my
9       intent is we want our own data to
10       understand our specific product
11       situation, because as I mentioned
12       before, methods are very specific
13       to the composition of tablets, for
14       instance.  And so since we don't
15       know a lot about the FDA method,
16       we're not sure how accurately it
17       might work on our specific
18       products, for instance, so --
19 BY MS. PAPANTONIO:
20     Q.  Well, Ms. Chitty, in your
21 words, you would have no evidence to argue
22 with them.  Do you see that?
23     A.  Correct, that's what it says.
24     Q.  In other words, you would just

Page 329

1 have to take the information that the FDA
2 is giving without argument?
3             MS. NAGLE:  Objection,
4       form.
5             THE WITNESS:  We would
6       have no kind of additional data for
7       discussion, correct, if we don't
8       have our own method at the time.
9 BY MS. PAPANTONIO:
10     Q.  Okay.  LP 1033.  Do you
11 recognize this email?
12     A.  I don't remember it
13 specifically, but obviously, this was
14 minutes of a follow-up call with FDA.
15     Q.  Right.  So this is email was
16 sent on the same day of that email we were
17 just looking at where you were saying we
18 had to test the product, right?
19             MS. NAGLE:  Sorry, just
20       real quickly, Counsel, can you just
21       give us the exhibit number again
22       before the --
23             MS. PAPANTONIO:  Yup,
24       Torrent 26.  Sorry.

Confidential Information Subject to Protective Order

Page 330

1    MS. NAGLE:  Thank you so
2 much.
3    THE WITNESS:  Yeah, I
4 believe this is the same day.
5 BY MS. PAPANTONIO:
6    Q.  And the subject of this is
7 "WebEx meeting with the FDA about valsartan
8 products."  Do you recall that meeting?
9    A.  Yes, I recall that meeting.
10    Q.  Okay.  We can see this email
11 was sent to you by Jocelyn Rivera, right?
12 Does she work for you?
13    A.  Yes, she did at the time.
14    Q.  Okay.  And what we can see is
15 that the FDA is calling a meeting with
16 Torrent, right?
17    A.  Correct.
18    Q.  And then the attendees from
19 Torrent are you, Dawn Chitty, and Jocelyn
20 Rivera, right?
21    A.  Correct.
22    Q.  And then from the FDA, there
23 are 18 attendees, right?
24    A.  I'll take your word that that's

Page 331

1 about 18 attendees there in that list.
2    Q.  That's a lot of people -- this
3 is, obviously, pretty important to the FDA,
4 right?
5    MS. NAGLE:  Objection,
6 form.
7    THE WITNESS:  It is hard
8 to judge importance or significance
9 from the number of people that
10 attend an FDA meeting just because
11 of the way they're structured,
12 there's lots of divisions, lots of
13 areas, so I don't know if I've ever
14 had an FDA meeting with less than,
15 you know, ten or 12 FDA attendees
16 in participation.
17 BY MS. PAPANTONIO:
18    Q.  Okay.  Well, Torrent only sent
19 two people, right, you and Ms. Rivera?  So
20 who is Ms. Rivera?
21    A.  Jocelyn was someone that worked
22 for me in the regulatory affairs team in
23 the U.S.
24    Q.  Is Ms. Rivera someone that you

Page 332

1 trusted?
2    MS. NAGLE:  Objection,
3 form.
4    THE WITNESS:  She was a
5 good employee.  Certainly someone I
6 didn't not trust.
7 BY MS. PAPANTONIO:
8    Q.  So did you often rely on
9 Ms. Rivera?
10    MS. NAGLE:  Objection,
11 form.
12    THE WITNESS:  Again, she
13 was one of the people who worked
14 for me, so yes, she was someone who
15 would participate in various
16 activities.
17 BY MS. PAPANTONIO:
18    Q.  Did she communicate with the
19 FDA often?
20    A.  Typically, I was the main
21 person communicating with FDA.
22    Q.  But overall, do you think she
23 was a pretty good employee?
24    MS. NAGLE:  Objection,

Page 333

1 form.
2    THE WITNESS:  Yes.
3 BY MS. PAPANTONIO:
4    Q.  Now, is Ms. Rivera someone who
5 is ultimately responsible for the quality
6 of Torrent's valsartan?
7    MS. NAGLE:  Objection,
8 form.
9    THE WITNESS:  No.
10 Again, she worked within my U.S.
11 regulatory team, not necessarily
12 within quality assurance, for
13 instance.
14 BY MS. PAPANTONIO:
15    Q.  Okay.  So let's look at the
16 purpose of the meeting.  It says the
17 purpose of the meeting is "to share
18 analytical information from the FDA."
19 Right, because we know that at this point,
20 August 18, Torrent still does not know how
21 to test its own products for NDMA; is that
22 correct?
23    MS. NAGLE:  Objection,
24 form.

Confidential Information Subject to Protective Order

Page 334

1     THE WITNESS:  At this
2   point, this meeting is, as
3   mentioned here, they're going to
4   share information with us regarding
5   the testing that they had done.
6   BY MS. PAPANTONIO:
7     Q.   Right.  And they're sharing
8   that information with Torrent, because
9   Torrent doesn't have that information
10  themselves at this point?
11            MS. NAGLE:  Objection,
12        form.
13            THE WITNESS:  They're
14        sharing that information with
15        Torrent because they have that
16        information to share.
17  BY MS. PAPANTONIO:
18    Q.   And on this date, like you said
19  in the previous email, you have no evidence
20  to argue with the FDA about the NDMA levels
21  in Torrent's valsartan at this meeting?
22            MS. NAGLE:  Objection,
23        form.
24            THE WITNESS:  As of this

Page 335

1       date, it seemed that we did not
2       have the method adequately
3       developed to accurately test for
4       the impurity.
5   BY MS. PAPANTONIO:
6     Q.   So at this date on August 28 --
7   move to strike that, actually.  So Torrent
8   has been selling valsartan since around
9   2010, right?
10            MS. NAGLE:  Objection.
11        Form and foundation.
12            THE WITNESS:  I don't
13        recall when it was approved.
14  BY MS. PAPANTONIO:
15    Q.   Does that sound about right?
16    A.   I don't think so.  I think
17  that's too early.  But again, I don't
18  recall specifically.
19    Q.   You have been selling it, let's
20  say, at least five to seven years at this
21  point?
22            MS. NAGLE:  Objection.
23        Form and foundation.
24            THE WITNESS:  I'm not

Page 336

1   sure.  You guys should have
2   approval letters.  I mean, that's
3   publicly available information, so.
4   BY MS. PAPANTONIO:
5     Q.   Okay.  But you do sell
6   valsartan to multiple countries, right?
7             MS. NAGLE:  Objection.
8         Form and foundation.
9             THE WITNESS:  I was
10        primarily responsible for the U.S.,
11        so I don't know the specifics, but
12        yes, I believe it was being sold in
13        other countries besides the U.S.
14        also.
15  BY MS. PAPANTONIO:
16    Q.   And you sell tens of millions
17  of pills each year?
18            MS. NAGLE:  Objection.
19        Form and foundation.
20            THE WITNESS:  I can't
21        really comment on exact quantities.
22        That wasn't kind of my area, so.
23  BY MS. PAPANTONIO:
24    Q.   Right, but we know at this

Page 337

1   date, August of 2018, you had been selling
2   valsartan -- Torrent has been selling
3   valsartan for years, right?
4             MS. NAGLE:  Objection,
5         form.
6             THE WITNESS:  Again, I
7         don't have the exact date, but we
8         had been selling it for some bit of
9         time since it had been approved.
10  BY MS. PAPANTONIO:
11    Q.   Torrent had been manufacturing
12  that finished dose again for a long period
13  of years?
14            MS. NAGLE:  Objection,
15        form.
16            THE WITNESS:  I can't
17        really define what you mean by long
18        period of years, so, without a
19        date.
20  BY MS. PAPANTONIO:
21    Q.   Okay.  Now, Ms. Chitty, you
22  understand that it's not the FDA's job to
23  find problems with Torrent's drugs, right?
24            MS. NAGLE:  Objection,

Confidential Information Subject to Protective Order

Page 338

1    form.
2            THE WITNESS:  That is
3    potentially not their primary job.
4    It is something that they do even
5    under routine situations of testing
6    product to confirm compliance.
7    BY MS. PAPANTONIO:
8        Q.   As a finished dose
9    manufacturer, you understand that it is
10   your job to test your own product to
11   determine whether or not it meets quality
12   standards?
13           MS. NAGLE:  Objection.
14       Form and foundation.
15           THE WITNESS:  Correct.
16       It is our job to test our product
17       before it's released.
18   BY MS. PAPANTONIO:
19       Q.   So this is a meeting with the
20   FDA where they have tested your drug for
21   quality and you have not tested the drug?
22           MS. NAGLE:  Objection,
23       form.
24           THE WITNESS:  No, that's

Page 339

1    not an accurate statement.  We had
2        tested the product.  We did not
3        have the ability at the time to
4        test specifically for these small
5        quantities of this impurity.
6    BY MS. PAPANTONIO:
7        Q.   And the FDA tells Torrent that
8    present -- on this email it says present at
9    high sides with values ranging between 37
10   ppm to 39 ppm NDMA was found?
11       A.   That's what's noted there in
12   that message, yes.
13       Q.   Right.  And this is actually on
14   the low end of what we have seen today,
15   this 37 ppm?
16           MS. NAGLE:  Objection,
17       form.
18           MS. PAPANTONIO:  Right?
19           THE WITNESS:  I'm not
20       sure what you're referring to when
21       you say what we've seen today.
22       There's been a lot of data from
23       various sources.
24

Page 340

1    BY MS. PAPANTONIO:
2        Q.   We have actually seen NDMA in
3    Torrent's valsartan that fell as high as
4    200 ppm.  Do you remember that?
5        A.   I don't recall specifically but
6    there were higher values than 37 and 39 in
7    some of those tables, yes.
8        Q.   All right.  And so this is the
9    FDA, this is the first time you become
10   aware of NDMA present in Torrent's
11   valsartan?
12           MS. NAGLE:  Objection,
13       form.
14           THE WITNESS:  In
15       Torrent's drug product for
16       amlodipine/valsartan/
17       hydrochlorothiazide, yes, this is
18       the first that we've seen test
19       results implying that this impurity
20       is there.
21   BY MS. PAPANTONIO:
22       Q.   And the FDA is providing you
23   information on these tests?
24       A.   FDA is providing us information

Page 341

1    on these results, yes.
2        Q.   In other words, you had to rely
3    on the FDA to do your testing, because
4    Torrent did not have the capabilities of
5    doing so?
6           MS. NAGLE:  Objection,
7       form.
8           THE WITNESS:  It was
9       something that was in progress at
10      Torrent, and again, we had been
11      trying to find further information
12      from FDA on how they were testing
13      as well to try and help move our
14      work along also.
15   BY MS. PAPANTONIO:
16       Q.   Right.  If you look down from
17   the third paragraph to the bottom, it says
18   "Dawn actually requested some details on
19   the method they are using and the FDA
20   agreed to share that information."  Right?
21   So let me ask you, had you asked the FDA
22   for their method on how to test weeks ago,
23   weeks before this, you would have learned
24   that NDMA was in Torrent's valsartan,

Confidential Information Subject to Protective Order

Page 342

1  right?
2          MS. NAGLE:  Objection,
3      form.
4          THE WITNESS:  Kind of
5      two, a couple of parts to that, I
6      guess.  I think I did ask FDA prior
7      to this for details, and again,
8      trying to understand FDA's method
9      is just kind of part of the work
10     that would have to be done to
11     confirm that it's an appropriate
12     method to use on our specific
13     tablets.
14  BY MS. PAPANTONIO:
15     Q.  Well, you know it's an
16  appropriate method to use on your specific
17  tablets, because the FDA tested Torrent
18  specific tablets.
19         MS. NAGLE:  Objection,
20     form.
21         MS. PAPANTONIO:
22     Correct?
23         THE WITNESS:  No, so
24     again, without knowing details

Page 343

1      behind the method, and some of the
2      things that go into that type of
3      analytical development, we can't
4      judge whether this 37, 39, whether
5      these numbers are actually accurate
6      without knowing more behind the
7      method details.
8  BY MS. PAPANTONIO:
9      Q.  Are you questioning the
10  accuracy of the FDA's tests right now?
11         MS. NAGLE:  Objection,
12     form.
13         THE WITNESS:  You always
14     have to look at data and understand
15     where it comes from.  So, yeah, I'm
16     saying, again, based on analytical
17     procedures, the way methods get
18     developed and validated to deem
19     them appropriate, we don't know how
20     accurate that number is without
21     understanding more details.
22  BY MS. PAPANTONIO:
23     Q.  And just to be clear, at this
24  point, you don't even have a test of your

Page 344

1  own to test for NDMA, but yet you're
2  questioning the accuracy of FDA?
3          MS. NAGLE:  Objection,
4      form.
5          THE WITNESS:  You know,
6      I think you're casting my
7      questioning of data in a very
8      negative light.  You know, whenever
9      you get data, you have to
10     understand where it's coming from
11     and understand its basis or else
12     you may make poor decisions.
13  BY MS. PAPANTONIO:
14     Q.  Okay.  But you weren't even in
15  a position where you could understand your
16  own data, because you did not have it at
17  this point?
18         MS. NAGLE:  Objection,
19     form.
20         THE WITNESS:  The
21     method, again, internally that
22     Torrent was trying to develop was
23     not at a stage of being able to
24     detect these small quantities.

Page 345

1  BY MS. PAPANTONIO:
2      Q.  Not at a stage where you could
3  argue with the FDA over these testing
4  levels?
5          MS. NAGLE:  Objection,
6      form.
7          MS. PAPANTONIO:  Right.
8          THE WITNESS:  Not -- we
9      did not have any additional data at
10     this point to be able to discuss
11     with them in detail the specifics
12     of their results.
13  BY MS. PAPANTONIO:
14     Q.  Okay.  Let's switch gears a
15  little bit and go to this next line where
16  it says "Per Dawn, we will quarantine the
17  products we are in possession with and
18  discuss with TPL QA the recall."  Right?
19  So at this point, August 16, Torrent had
20  not quarantined its valsartan product?
21     A.  I would have to go back and
22  look at details, I mean, at least in
23  relation to this drug product for the
24  amlodipine/valsartan/hydrochlorothiazide,

Page 346

1 it doesn't appear that we had at least
2 quarantined everything that was in our
3 possession.
4     Q.   That means that between
5 August 3rd, when you got notice that NDMA
6 was in your product, to two weeks later,
7 August 16, you continued to put valsartan
8 on the market?
9         MS. NAGLE:  Objection,
10     form.
11         THE WITNESS:  And as I
12     mentioned before, the notice on
13     August 3 did not give us
14     appropriate levels of information
15     to understand how much of that
16     impurity may be present or in what,
17     within which batches.
18         MS. PAPANTONIO:  Do you
19     want to take a five-minute break?
20         MS. NAGLE:  Sure.
21         THE WITNESS:  Sure.
22         THE VIDEOGRAPHER:  4:25,
23     we are off the video record.
24         - - - - -

Page 347

1     (A recess was taken at this time.)
2         - - - - -
3         THE VIDEOGRAPHER:  4:37,
4     we are on the video record.
5 BY MS. PAPANTONIO:
6     Q.   Okay.  We're going to call up
7 LP 1144, and that's marked as Torrent 27.
8 Okay.  We can see that this is the date
9 August 22, right?
10     A.   Of 2018, yes.
11     Q.   Of 2018.  And what the title
12 says is "additional lots added," and that's
13 added to the FDA recall, right?
14     A.   I believe so.
15     Q.   All right.  Below it says "The
16 recall has been completed and FDA has
17 terminated this recall."  And it says
18 additional lots added, Torrent
19 Pharmaceuticals, right?  So on August 22,
20 Torrent Pharmaceuticals recalls its
21 versions of valsartan, correct?
22     A.   At least the listed batches
23 that were recalled on that date, yes.
24     Q.   Okay.  And so this date is 19

Page 348

1 days after Torrent got notice from ZHP of
2 contamination in Torrent's valsartan
3 products, right?
4     A.   This is 19 days after ZHP
5 notified Torrent that potentially some of
6 the old route of synthesis batches
7 contained the impurity, not necessarily the
8 Torrent batches had been specifically known
9 to contain that impurity.
10     Q.   And then the FDA lists all of
11 the batches of Torrent valsartan that have
12 been recalled, right?  And we see there are
13 about 13 pages of batches that have been
14 recalled, if we just scroll through this
15 real quick.  Right?  So we're looking at
16 all the batches of Torrent valsartan that
17 have NDMA above the FDA threshold, right?
18     A.   Yeah, I don't remember if it's
19 one impurity or both of the impurities, but
20 yes, impurities above the FDA threshold.
21     Q.   Right.  Because, Ms. Chitty,
22 you know there was also another impurity in
23 Torrent's valsartan, right?  Look at 1109.
24 Let's pull up LP 1109.  Do you recognize

Page 349

1 this email?
2     A.   Not specifically, but it's
3 addressed to me.
4         MS. PAPANTONIO:  This is
5     going to be Torrent 93.
6         - - - - -
7     (Email dated 9/7/18 Bates
8     TORRENT-MDL2875-006044834 marked
9     Torrent Exhibit 93 for
10     identification.)
11         - - - - -
12 BY MS. PAPANTONIO:
13     Q.   We can see that this email is
14 from the FDA, right?  Right here at the
15 bottom.
16     A.   Correct.
17     Q.   And this was sent on
18 September 7, correct?
19     A.   Yes.
20     Q.   So that is about two weeks
21 after Torrent had recalled its valsartan
22 for NDMA?
23     A.   Correct.
24     Q.   Okay.  And now, two weeks

Confidential Information Subject to Protective Order

Page 350

1 later, the FDA is telling Torrent that
2 another contaminant has been found in its
3 batches of valsartan, right, NDEA?
4      A.   Yes, that's what's stated here.
5      Q.   Right.  So at this point, had
6 Torrent -- did Torrent have the
7 capabilities to test its product for
8 nitrosamines?
9           MS. NAGLE:  Objection,
10      form.
11           THE WITNESS:  I'm not
12      sure.  I would have to look at
13      other communications to kind of put
14      it in context, so.
15 BY MS. PAPANTONIO:
16      Q.   But what we do know is that it
17 is the FDA telling Torrent that there's
18 another nitrosamine in their product,
19 right?
20           MS. NAGLE:  Objection,
21      form.
22           THE WITNESS:  In this
23      email, yes, that appears to be the
24      topic.

Page 351

1 BY MS. PAPANTONIO:
2      Q.   Is this the first time on
3 August -- or September 7 that you learned
4 NDEA was in Torrent's valsartan?
5      A.   I'm not sure.  Again, I would
6 have to look through kind of all of those
7 communications.
8      Q.   But just to be fair, you have
9 no memory of NDEA being in Torrent
10 valsartan up until this point?
11           MS. NAGLE:  Objection,
12      form.
13           THE WITNESS:  I just
14      don't remember.
15 BY MS. PAPANTONIO:
16      Q.   Okay.  Do you know what NDEA
17 is?
18      A.   It's a similar structure
19 impurity as to the first one.
20      Q.   Were you aware that NDEA is
21 actually more potent than NDMA?
22           MS. NAGLE:  Objection,
23      form.
24           THE WITNESS:  At the

Page 352

1      time, no.
2 BY MS. PAPANTONIO:
3      Q.   Are you aware that the FDA --
4 are you aware that NDEA is -- let me move
5 to strike.
6           Are you aware that the
7 threshold for NDEA is actually lower than
8 the FDA threshold for NDMA?
9           MS. NAGLE:  Objection,
10      form.
11           THE WITNESS:  I think we
12      saw that earlier in one of the
13      tables that was presented.
14 BY MS. PAPANTONIO:
15      Q.   And were you aware that that
16 was because it is a more potent carcinogen
17 than NDEA?
18           MS. NAGLE:  Objection,
19      form.
20           THE WITNESS:  I am now.
21      I don't recall if I was at the
22      time.
23 BY MS. PAPANTONIO:
24      Q.   So at this point, the FDA is

Page 353

1 telling Torrent, there's another carcinogen
2 in valsartan.  Was Torrent able to confirm
3 this fact based on -- by using testing?
4           MS. NAGLE:  Objection.
5      Form and foundation.
6           THE WITNESS:  As of this
7      day, I'm not sure.  Again, there
8      were lots of communications, so I
9      just can't recall from memory.
10           MS. PAPANTONIO:  You
11      have no idea if Torrent had
12      actually developed a testing method
13      for its valsartan by September 7,
14      2018?
15           MS. NAGLE:  Objection,
16      form.
17           THE WITNESS:  I don't
18      recall specifically just because it
19      was so long ago.
20 BY MS. PAPANTONIO:
21      Q.   Okay.  Now -- let's put that
22 away.  Ms. Chitty, remember at the
23 beginning of this, I told you that we were
24 going to write down all of these dates in a

Confidential Information Subject to Protective Order

Page 354

1 timeline form so we can condense kind of
2 what happened here?
3      A.   Sure.
4      Q.   We're going to look at that
5 now.  Okay?  Can we pull up the timeline
6 document?  Okay.  We're going to have to
7 zoom on this a little bit, because it's a
8 bit long.  Okay.  I want to start with that
9 first day.  Let's zoom in there.
10          MS. NAGLE:  Sorry,
11      Counsel, before you start asking
12      questions, does this have an
13      exhibit number?
14          MS. PAPANTONIO:  Yeah,
15      Torrent 94.
16          - - - - -
17      (Torrent Recall Timeline marked
18      Chitty Exhibit 94 for identification.)
19          - - - - -
20          MS. NAGLE:  Okay.  Thank
21      you.
22 BY MS. PAPANTONIO:
23      Q.   Okay.  Now, this first date,
24 June 20, that's when ZHP notifies Torrent

Page 355

1 of NDMA in the valsartan API.  Do you
2 remember we talked about that?
3      A.   I remember that date and that
4 notification, I don't recall it
5 specifically mentions NDMA at that point.
6      Q.   Okay.  But we know that this
7 was what put you on notice of the genotoxic
8 impurity, right?
9      A.   Potentially genotoxic impurity
10 I believe is the phrase that they used.
11      Q.   And then we saw that 16 days
12 later, Torrent learns of the European
13 recall of valsartan, right?
14      A.   Again, I don't recall the
15 specific date.  That seems roughly about
16 right.
17      Q.   Okay.  So between June 20 and
18 July 6, that's 16 days, right?
19      A.   I don't have a calendar in
20 front of me, but close to 16, I'm sure.
21      Q.   But what we do know is that
22 during this time, Torrent is selling
23 valsartan?
24          MS. NAGLE:  Objection,

Page 356

1      form.
2          THE WITNESS:  Correct.
3      We are selling valsartan-containing
4      products during this time.
5 BY MS. PAPANTONIO:
6      Q.   During this time, Torrent is
7 communicating with customers that the
8 valsartan is not contaminated with NDMA?
9          MS. NAGLE:  Objection,
10      form.
11          THE WITNESS:  I don't
12      recall those specific dates of
13      those communications.
14 BY MS. PAPANTONIO:
15      Q.   What we do know is that during
16 this time between June 20 and June 6 [sic],
17 Torrent has not yet developed a test method
18 to determine whether or not NDMA is in its
19 product, right?
20      A.   Between June 20 and July 6?  I
21 think you said June -- I think you said
22 June 6.
23      Q.   Oops, sorry.
24      A.   During that time, correct, we

Page 357

1 have not developed a method to accurately
2 detect the impurity.
3      Q.   Okay.  And now let's jump down
4 from June 20 to July 13 when the FDA makes
5 that first initial recall for certain
6 valsartan manufacturers, right?  Do you
7 remember that?
8      A.   Yeah, I believe it was around
9 the 13th.
10      Q.   Yeah, we can see that that's 23
11 days after Torrent got notice of a
12 potential genotoxic impurity, right?
13      A.   Correct, that's roughly 23
14 days.
15      Q.   And during this time, Torrent
16 continued to sell its valsartan product,
17 right, it didn't recall the product?
18          MS. NAGLE:  Objection,
19      form.
20          THE WITNESS:  During
21      that time, it did not, Torrent did
22      not recall the product?
23 BY MS. PAPANTONIO:
24      Q.   Yeah.

Page 358

1    A.  I can't, again, specifically
2  talk to whether product was under hold at a
3  certain point and I also can't speak to
4  other countries outside of the U.S. as to
5  what they were doing.
6    Q.  Okay.  In terms of U.S.
7  customers, what we do know is that Torrent
8  was communicating with U.S. customers that
9  there was no NDMA in the product, right?
10    MS. NAGLE:  Objection,
11    form.
12    THE WITNESS:  From a
13    timeline standpoint, I'm not -- I
14    don't remember exactly when those
15    communications were happening, but
16    sometime in July, we were
17    communicating with customers what
18    we knew at the time.
19  BY MS. PAPANTONIO:
20    Q.  And had Torrent tested its
21  product for NDMA on July 13, 2018, it would
22  have found that the product was -- had
23  contained NDMA, right?
24    MS. NAGLE:  Objection,

Page 359

1    form.
2    THE WITNESS:  Again, we
3    did not have an appropriate method
4    in the middle of July to be able to
5    detect those impurities.
6  BY MS. PAPANTONIO:
7    Q.  If you had an appropriate
8  method, you would have learned that NDMA
9  was in Torrent's valsartan, correct?
10    MS. NAGLE:  Objection,
11    form.
12    THE WITNESS:  It was not
13    in all batches or all product.
14    Again, I can't really speculate on
15    details to say all products.
16  BY MS. PAPANTONIO:
17    Q.  Let me rephrase.  If you had
18  tested Torrent's valsartan product on
19  July 13, 2018, you would have found that
20  NDMA was present in some of Torrent's
21  valsartan batches?
22    MS. NAGLE:  Objection,
23    form.
24    THE WITNESS:  As of that

Page 360

1  time frame, we did not have the
2    ability to test to detect the
3    impurities.
4  BY MS. PAPANTONIO:
5    Q.  It's not my question of whether
6  you had the ability.  If you had tested the
7  valsartan API, Torrent would have found
8  that some batches were contaminated with
9  NDMA?
10    MS. NAGLE:  Objection,
11    form.
12    THE WITNESS:  Again, it
13    only impacted certain batches, so I
14    don't know -- I can't kind of
15    blanket state that we would have
16    definitely seen that, because I
17    don't know what we had in stock at
18    that time.
19  BY MS. PAPANTONIO:
20    Q.  But you are aware that on
21  July 13, there were some batches that
22  contained NDMA?
23    MS. NAGLE:  Objection,
24    form.

Page 361

1    THE WITNESS:  Again, I'm
2    not aware if there were batches
3    that Torrent had of API in its
4    possession that had NDMA present on
5    that date.
6  BY MS. PAPANTONIO:
7    Q.  And if you had tested those
8  contaminated batches, you would have
9  learned that there were levels of NDMA that
10  were above the FDA threshold?
11    MS. NAGLE:  Objection,
12    form.
13    THE WITNESS:  Again, I
14    just -- I can't speculate on a
15    theoretical.  I don't know, I don't
16    know what batches we had.  There
17    was impurities in some batches and
18    no impurities in others.  So
19    without talking, you know, kind of
20    very specifically and having data
21    and results from further in time, I
22    just can't say what you, obviously,
23    want me to say.
24

Confidential Information Subject to Protective Order

Page 362

1 BY MS. PAPANTONIO:
2      Q.  Well, Ms. Chitty, let me just
3 get this straight.  We're not speaking in
4 theory.  This is not theoretical.  You're
5 aware that Torrent's valsartan was
6 contaminated with NDMA, right, across the
7 board?
8           MS. NAGLE:  Objection,
9      form.
10          THE WITNESS:  No, that's
11      not an accurate statement.
12 BY MS. PAPANTONIO:
13      Q.  All of Torrent's valsartan had
14 NDMA and/or NDEA?
15          MS. NAGLE:  Objection,
16      form.
17 BY MS. PAPANTONIO:
18      Q.  You had no idea?
19      A.  No, I don't believe it was all
20 of Torrent's valsartan.  As I said, I think
21 there were some batches that had
22 contamination and some that did not.
23      Q.  But what we can agree on is
24 that on July 3, 2018, Torrent did not have

Page 363

1 the capability of testing its valsartan to
2 verify this?
3           MS. NAGLE:  Objection,
4      form.
5           THE WITNESS:  In the
6      middle of July, Torrent did not
7      have a method to adequately test
8      API or finished goods or adequately
9      measure and accurately measure
10     potential impurities.
11 BY MS. PAPANTONIO:
12     Q.  Okay.  Let's go to the next
13 one.  July 17, when you're telling your
14 colleagues at Torrent that we really need a
15 method to evaluate these products
16 ourselves, had you tested Torrent's
17 batches, Torrent would have found that some
18 NDMA was in those batches?
19          MS. NAGLE:  Objection,
20     form.
21          THE WITNESS:  Again, it
22     was in some batches and not others.
23     So I can't say that if we had
24     tested what we had in our

Page 364

1      possession that day, it would have
2      come back as showing that impurity.
3 BY MS. PAPANTONIO:
4      Q.  In your role as a regulatory
5 official, did you ever lay eyes on a batch
6 that did not contain NDMA or NDEA?
7           MS. NAGLE:  Objection,
8      form.
9           THE WITNESS:  I believe
10     there were batches that did not
11     contain either impurity, yeah.
12 BY MS. PAPANTONIO:
13     Q.  Which one?
14     A.  Did I lay eyes on them?  No, I
15 don't lay eyes on product.  I can't recall
16 batch numbers from three, four years ago.
17     Q.  All right.  Let's go back to
18 what we can agree on.  On July 17, 27 days
19 after Torrent received notice of a
20 genotoxic impurity, Torrent still does not
21 have a method to evaluate whether or not
22 its valsartan has NDMA; is that correct?
23          MS. NAGLE:  Objection to
24     form.

Page 365

1           THE WITNESS:  At that
2      time, that's correct.  Our method
3      was still not able to detect the
4      impurities at those levels.
5 BY MS. PAPANTONIO:
6      Q.  Okay.  July 19, when Torrent
7 releases the valsartan out of quarantine,
8 at this point, Torrent still does not have
9 a method to detect whether or not NDMA is
10 present in its valsartan, correct?
11          MS. NAGLE:  Objection,
12     form.
13          THE WITNESS:  I believe
14     at that time, the method was still
15     not available, correct.
16 BY MS. PAPANTONIO:
17     Q.  And at this point, had you
18 tested all of the Torrent batches, you
19 would have found that some of those batches
20 contained levels of NDMA above the FDA
21 threshold, correct?
22          MS. NAGLE:  Objection,
23     form.
24          THE WITNESS:  Again, I

Confidential Information Subject to Protective Order

Page 366

1 don't know which batches were in
2 quarantine at that point, so I
3 can't say that they all would have
4 contained that impurity.
5 BY MS. PAPANTONIO:
6    Q.  I'm not asking which batches.
7 I'm asking if you tested all of Torrent's
8 batches, some of those batches would have
9 come back positive for NDMA; is that
10 correct?
11          MS. NAGLE:  Objection.
12    Form and foundation.
13          THE WITNESS:  Again, at
14    that point in time, I don't know
15    what those batches were, so they
16    may not have been batches that
17    eventually were shown to contain
18    the impurity.
19 BY MS. PAPANTONIO:
20    Q.  But you know that Torrent's
21 valsartan was contaminated with high levels
22 of NDMA?
23          MS. NAGLE:  Objection,
24    form.

Page 367

1          THE WITNESS:  No, again,
2    only specific batches were
3    eventually shown to have the
4    impurity.  At this point, we're not
5    aware that the old route of
6    synthesis batches contain that
7    impurity.
8 BY MS. PAPANTONIO:
9    Q.  Let's pull up LP 1065.  Pull up
10 LP 1218.  All right.  Ms. Chitty, I just
11 want to make sure we're absolutely clear on
12 what was happening at Torrent.
13          MS. NAGLE:  I'm sorry to
14    interrupt again, can I just get the
15    exhibit number for the record,
16    please?
17          MS. PAPANTONIO:  Yup,
18    one second.
19          MS. NAGLE:  Thank you.
20          MS. PAPANTONIO:  All
21    right.  This is Torrent 79.
22          MS. NAGLE:  Thank you.
23 BY MS. PAPANTONIO:
24    Q.  Okay.  We've already looked at

Page 368

1 this document earlier today, Ms. Chitty.
2 Do you remember it?
3    A.  Not specifically.  We've looked
4 at a lot today.
5    Q.  Okay.  Well, let's rehash what
6 we're looking at.  At the very top, it says
7 "finished dose goods," right?
8    A.  Yes.
9    Q.  And these are finished dose
10 batches made by Torrent Pharmaceuticals,
11 right?
12    A.  Correct, manufactured at our
13 Indrad plant.
14    Q.  At Indrad.  Okay.  And then if
15 you look at these numbers, let's look at
16 the NDMA results at TPL.  Do you see that?
17    A.  Yes.
18    Q.  All right.  Do you see that all
19 of these batches tested positive for NDMA?
20    A.  I mean, it's noted there on
21 some of those that there's below 0.25,
22 which is probably, like, the limit of
23 detection, I would guess, so when it's
24 below a limit of detection, that implies

Page 369

1 that it's not necessarily there.
2    Q.  No, it implies that it's there,
3 just that it's below detection, correct?
4          MS. NAGLE:  Objection.
5    Form and foundation.
6          THE WITNESS:  No, I
7    would disagree, it does not imply
8    that it's necessarily there.  It
9    implies that the method can't tell
10    whether it's there or not.
11 BY MS. PAPANTONIO:
12    Q.  All right.  We're going to go
13 to LP 1337.  All right.  This has already
14 been marked.  Yeah, I'm sorry, we're trying
15 to get situated here.
16          MS. NAGLE:  Okay.  It's
17    just for the record, I'm sorry to
18    keep bugging you.
19          MS. PAPANTONIO:  Huh?
20          MS. NAGLE:  I said I'm
21    sorry to keep bugging you, it's
22    just for the record.
23          MS. PAPANTONIO:  Okay.
24    So, Madeline, look up and see what

Confidential Information Subject to Protective Order

Page 370

1 number. We're going to mark this
2 Torrent Exhibit 95.
3          MS. NAGLE: Thank you.
4          EXHIBIT TECH: I have
5 this marked as Torrent 78.
6          MS. PAPANTONIO:
7 Perfect. We have multiple copies
8 here, so we couldn't figure out
9 which one it was, that was the
10 hassle.
11          Okay. We looked at this
12 document earlier, Ms. Chitty, you
13 saw that these batch numbers were
14 later put into Torrent finished
15 dose batches. Do you remember
16 that?
17          THE WITNESS: I believe
18 I remember looking at this document
19 before. I'm not clear if these
20 were actually used in all finished
21 dose batches or not.
22 BY MS. PAPANTONIO:
23     Q. But we do know that the batch
24 number is assigned an AR number, right? Do

Page 371

1 you see that?
2     A. Yes.
3     Q. And that AR number is assigned
4 by Torrent Pharmaceuticals, right?
5     A. Correct.
6     Q. That means that this batch is
7 in Torrent's possession?
8     A. Correct.
9     Q. And if we're looking at the
10 testing levels on this document, we can see
11 that there is NDMA content in parts per
12 million that is in the 100s, Ms. Chitty.
13 Do you see that?
14     A. Some of them are in the
15 hundreds, yes.
16     Q. Now, just to be clear, that's a
17 lot more than .3 parts per million, right?
18          MS. NAGLE: Objection,
19      form.
20          THE WITNESS: Yes, 100
21      is more than .3.
22 BY MS. PAPANTONIO:
23     Q. And had this batch gone into a
24 finished dose batch, it would have been

Page 372

1 later distributed to a consumer, right?
2          MS. NAGLE: Objection.
3      Form and foundation.
4          THE WITNESS: If the
5      finished dose batch met the current
6      testing specifications at the time,
7      it would have been released to
8      market, yes.
9 BY MS. PAPANTONIO:
10     Q. So my question, Ms. Chitty, is
11 do you understand that Torrent was
12 supplying valsartan with NDMA parts per
13 million in the 100s to consumers?
14          MS. NAGLE: Objection,
15      form.
16          THE WITNESS: Again,
17      this is -- these are API results, I
18      believe, based on the context of
19      the document. At no point did
20      Torrent knowingly distribute
21      product with above set limits into
22      the market. As soon as they became
23      aware of limits and the ability to
24      test, product that was over the

Page 373

1      allowable limits, and the
2      allowable limits, was recalled.
3 BY MS. PAPANTONIO:
4     Q. Okay. Ms. Chitty, you said at
5 no point did Torrent knowingly distribute
6 product that was over the FDA limit. Okay.
7 That's what you said, right?
8     A. Correct.
9     Q. And we agree that to know
10 information, you have to have all of the
11 data, right?
12     A. You have to make decisions
13 based on data you have in your possession
14 at the time.
15     Q. And if you want to know about
16 something, you actually have to seek out
17 additional data at times, right?
18          MS. NAGLE: Objection,
19      form.
20          THE WITNESS: Seeking
21      information is one way to obtain
22      data and in this case, we were
23      obtaining information from multiple
24      sources.

Confidential Information Subject to Protective Order

Page 374

BY MS. PAPANTONIO:

Q. Right. And a sure proof way to obtain data is to test a product, right?

MS. NAGLE: Objection to form.

THE WITNESS: And that's what we were working towards trying to be able to do.

BY MS. PAPANTONIO:

Q. You were working towards it, but as far as what we've seen here today, you were never able to test the product; is that correct?

MS. NAGLE: Objection, form.

THE WITNESS: I don't think that we were never able to test the product, because didn't you just show me results that were generated at TPL?

BY MS. PAPANTONIO:

Q. Between the time Torrent was -- at the time Torrent was recalled, we did not have the ability to test the product;

Page 375

isn't that right?

A. At the initial recall, the first recall date of, I think that was August 22nd of 2018, at that time, they did not have the ability to accurately test for the impurities.

Q. So until August 22nd when the valsartan was recalled, Torrent knowingly allowed its valsartan to be on the market without testing it to determine if NDMA was in the product?

MS. NAGLE: Objection, form.

THE WITNESS: Again, we did not know of any positive or over-specification results for a product we had on the market at the time.

BY MS. PAPANTONIO:

Q. But, Ms. Chitty, do you understand that you did not know because you did not test the product?

A. The product wasn't able to be tested at that point based on the lack of

Page 376

method, you know, within our own labs.

Q. And you understand that multiple manufacturers had tested their products successfully and found NDMA prior to August 22nd, you know that, right?

MS. NAGLE: Objection, form.

THE WITNESS: No, I don't know who was testing other manufacturers' products.

BY MS. PAPANTONIO:

Q. In order to learn information, all you need to do is ask, right? And we established that you never asked those manufacturers how they tested their product for NDMA.

MS. NAGLE: Objection, form.

THE WITNESS: That's not a question. That's a statement. Do you have a question?

BY MS. PAPANTONIO:

Q. Do you agree with that statement, that Torrent never asked other

Page 377

manufacturers how to test for NDMA?

A. As I stated before, I personally was not aware of other manufacturers being asked. I can't say conclusively whether somebody else within the company had asked or not.

Q. And Torrent has got laboratories all across the world, none of those laboratories tested for NDMA, right?

MS. NAGLE: Objection, form.

THE WITNESS: Again, I'm aware of the laboratories that Torrent has within India and our partners, partner laboratories within India, and at the time, none of those labs that I'm aware of were able to test accurately for the presence of these impurities.

BY MS. PAPANTONIO:

Q. And we've established that for two months, you were not able to develop a test in-house, but we did talk about independent testing sites that you could

Confidential Information Subject to Protective Order

Page 378

¹ have sent your product to, right, Torrent
² never did that?
³         MS. NAGLE:  Objection,
⁴     form.
⁵         THE WITNESS:  And as I
⁶     mentioned at the time, this is not
⁷     an off the shelf kind of test.  You
⁸     don't just randomly send it to the
⁹     corner lab to get these tests done.
¹⁰     It was complex.  It's difficult.
¹¹     You know, you may be unaware, but
¹²     typically developing a method takes
¹³     months and months of time.  So it's
¹⁴     not out of the -- I would say
¹⁵     unusual that this activity was
¹⁶     going on for potentially a couple
¹⁷     of months without satisfactory
¹⁸     results.
¹⁹ BY MS. PAPANTONIO:
²⁰     Q.  But you are aware that other
²¹ organizations were able to do it
²² significantly faster than Torrent, correct?
²³         MS. NAGLE:  Objection,
²⁴     form.

Page 379

¹         THE WITNESS:  And,
²     again, as I stated before, I don't
³     really know what other companies
⁴     were doing nor where they were
⁵     getting results from.
⁶ BY MS. PAPANTONIO:
⁷     Q.  And Torrent never reached out
⁸ to any of these other companies to see if
⁹ they had already developed a method, did
¹⁰ they?
¹¹         MS. NAGLE:  Objection,
¹²     form.
¹³         THE WITNESS:  I
¹⁴     personally did not and I'm not
¹⁵     aware of what everyone else in the
¹⁶     company was doing or not doing in
¹⁷     that regard.
¹⁸ BY MS. PAPANTONIO:
¹⁹     Q.  You're not aware of any Torrent
²⁰ employee reaching out to independent labs
²¹ to determine whether or not they had
²² already developed a method for this?
²³         MS. NAGLE:  Objection,
²⁴     form.

Page 380

¹         THE WITNESS:
²         Personally, no, I'm not aware of
³         whether that happened or not.
⁴ BY MS. PAPANTONIO:
⁵     Q.  What you do know is that
⁶ Torrent waited to develop its own method
⁷ and that method had still not been
⁸ developed on August 22?
⁹         MS. NAGLE:  Objection,
¹⁰     form.
¹¹         THE WITNESS:  I wouldn't
¹²     categorize it as Torrent waited.
¹³     They were, to my knowledge,
¹⁴     actively working on trying to
¹⁵     develop the new method to
¹⁶     adequately be able to test for the
¹⁷     impurities.
¹⁸ BY MS. PAPANTONIO:
¹⁹     Q.  And the FDA beat them to it,
²⁰ right?
²¹         MS. NAGLE:  Objection,
²²     form.
²³         THE WITNESS:  The FDA
²⁴     did seem to have a method for

Page 381

¹     testing for the impurities prior to
²     Torrent had developed their method.
³ BY MS. PAPANTONIO:
⁴     Q.  .Okay, let's take this down.
⁵ And switch gears.  We're going to talk
⁶ about ZHP.  One second.  1192.  LP 1192,
⁷ please.  And this is Torrent 22.
⁸         All right.  Ms. Chitty, have
⁹ you reviewed the 2017 inspection reports
¹⁰ that documents the FDA's inspection of ZHP
¹¹ in 2017?
¹²     A.  I don't recall specifically
¹³ having seen this inspection report.
¹⁴     Q.  Are you aware of anyone else in
¹⁵ Torrent that might have reviewed ZHP's
¹⁶ inspection report?
¹⁷     A.  I don't know.
¹⁸     Q.  Okay.  We can see that this is
¹⁹ a document created by the FDA, right, in
²⁰ the top right corner?
²¹     A.  Correct.
²²     Q.  FDA is a U.S. government
²³ organization, right?
²⁴     A.  Correct.

Confidential Information Subject to Protective Order

Page 382

1    Q.   Therefore, this is considered a
2   public document under the Freedom of
3   Information Act, right?
4            MS. NAGLE:  Objection.
5       Form and foundation.
6            THE WITNESS:  Yeah, I
7       really don't know what falls under
8       the purview of FOIA, so.
9   BY MS. PAPANTONIO:
10      Q.   Well, in your capacity as
11  regulatory affairs manager or director, you
12  could have requested this document --
13           MS. NAGLE:  Objection.
14           MS. PAPANTONIO:  -- from
15      the FDA?
16           MS. NAGLE:  I'm sorry.
17      Objection, form.
18           THE WITNESS:  In the
19      past, I have requested inspection
20      reports, yes.
21  BY MS. PAPANTONIO:
22      Q.   Okay.  And those are -- okay.
23  Okay.  So an inspection report is an
24  investigation conducted by the FDA, right?

Page 383

1       A.   It's a report that summarizes
2   an inspection that has typically been done
3   by FDA.
4       Q.   Okay.  And in this case, the
5   FDA is conducting an inspection of ZHP,
6   right?
7       A.   Yes, it appears that way.
8       Q.   And the inspection date is May
9   of 2017?
10      A.   Yes.
11      Q.   And at this time, May of 2017,
12  ZHP is supplying valsartan API to Torrent,
13  right?
14      A.   Yeah, I believe so.
15      Q.   Now, earlier, we talked about
16  how Torrent was buying API from ZHP because
17  it's cheap.  Remember that conversation?
18           MS. NAGLE:  Objection,
19      form.
20           THE WITNESS:  I remember
21      discussing that we were buying API
22      from ZHP that was less costly than
23      our other supplier.
24

Page 384

1   BY MS. PAPANTONIO:
2       Q.   Right.  And because, like you
3   told me, Torrent is also a business, right,
4   it has to make financial decisions?
5       A.   Correct.
6       Q.   Got to save money where they
7   can?
8            MS. NAGLE:  Objection,
9       form.
10           THE WITNESS:  You make
11      business decisions based on
12      economic factors.
13  BY MS. PAPANTONIO:
14      Q.   And in order -- even if
15  something is cheaper, it can still be good
16  quality, but you have to follow up on that,
17  right, as a business?
18           MS. NAGLE:  Objection,
19      form.
20           THE WITNESS:  Price does
21      not necessarily dictate quality,
22      correct.
23  BY MS. PAPANTONIO:
24      Q.   All right.  Now, here the FDA

Page 385

1   is investigating ZHP, but the FDA is not
2   the only organization that can conduct
3   investigations on drug facilities like ZHP,
4   right?
5            MS. NAGLE:  Objection.
6       Form and foundation.
7            THE WITNESS:  I mean, I
8       guess other regulators can do
9       inspections is what you're
10      implying --
11  BY MS. PAPANTONIO:
12      Q.   Well, actually, let me
13  rephrase.  Torrent can conduct audits on
14  its contractors, right?
15           MS. NAGLE:  Objection.
16      Form and foundation.
17           THE WITNESS:  Yes, with
18      the agreement of those vendors,
19      Torrent can do inspections.
20  BY MS. PAPANTONIO:
21      Q.   So with that being said,
22  Torrent can conduct an audit of ZHP if it
23  wanted to, right?
24      A.   With agreement of the vendor or

Confidential Information Subject to Protective Order

Page 386

1  the site, yes.
2       Q.   Right.   So if Torrent wanted to
3  verify that its API is good quality, it
4  could audit ZHP?
5       A.   It could.
6       Q.   Okay.   So let's take a look at
7  what the FDA found here.   This is May 2017,
8  so we're about a year before this NDMA
9  contamination occurred, right?
10      A.   Before the issue became known,
11  yes.
12      Q.   Right.   Okay.   And so looking
13  at page 2, what we see is that the FDA says
14  that "The current investigation -- or
15  inspection was a system based approach,
16  with a focus on Quality, Laboratory
17  control, Facilities and Equipment and
18  Production Systems."   Why is it important
19  to focus on the quality of a contractor or
20  vendor?
21           MS. NAGLE:   Objection,
22       form.
23           THE WITNESS:   I think
24       this means that it was focusing on

Page 387

1       the quality system.
2  BY MS. PAPANTONIO:
3       Q.   Okay.   What does that mean?
4       A.   Typically, in manufacturing,
5  the quality system is the procedures that
6  govern all of the various activities used
7  when making a product.
8       Q.   Okay.   What are laboratory
9  controls?
10      A.   Those are the procedures that
11  are in place specifically related to the
12  laboratories to make sure, for instance,
13  equipment is, you know, calibrated, you
14  know, solvents are within date, those kinds
15  of items.
16      Q.   Okay.   And we can see that the
17  FDA came up with three conclusions.   Do you
18  see that?   The first conclusion is that
19  "Appropriate controls are not implemented
20  over Quality Control to ensure the
21  integrity of the analytical system."   When
22  was the first time you learned that ZHP
23  could not ensure integrity of its
24  analytical system?

Page 388

1       A.   Again, I don't know if I've
2  specifically seen this report, since it
3  wasn't part of my job to kind of vet
4  suppliers and contractors.
5       Q.   Before today, had you ever
6  learned that ZHP's anomalies were not
7  investigated in their analytical testing?
8       A.   I'm not familiar with that
9  topic, no.
10      Q.   As a VP of regulatory affairs,
11  did anyone ever tell you that ZHP lacked
12  integrity in their analytical testing
13  system?
14           MS. NAGLE:   Objection,
15       form.
16           THE WITNESS:   I don't
17       recall a specific instance where I
18       was notified of that, but again,
19       it's been a while.
20  BY MS. PAPANTONIO:
21      Q.   Is that information that would
22  be important for you to learn?
23           MS. NAGLE:   Objection,
24       form.

Page 389

1           THE WITNESS:   It's
2       information I would like to know.
3       Again, there's many units within
4       Torrent that are responsible for
5       overseeing quality of suppliers on
6       these types of issues.
7  BY MS. PAPANTONIO:
8       Q.   Who is responsible at Torrent
9  for overseeing ZHP?
10           MS. NAGLE:   Objection,
11       form.
12           THE WITNESS:   I mean,
13       specifically, I'm not sure, but
14       there's quality unit
15       responsibilities and then I think
16       there's a separate group that does
17       vendor qualification and oversight
18       as well.
19  BY MS. PAPANTONIO:
20      Q.   Okay.   The second thing that
21  the FDA concludes is that ZHP "Facilities
22  and equipment are not maintained to ensure
23  quality attributes of the drug product."
24  Now, just to be clear, ZHP is making

Confidential Information Subject to Protective Order

Page 390

¹ Torrent's valsartan API in these
² facilities, right?
³          MS. NAGLE:  Objection.
⁴     Form and foundation.
⁵          THE WITNESS:  I'm not
⁶     sure how many facilities ZHP has,
⁷     but it makes Torrent valsartan API
⁸     in one of their facilities.
⁹ BY MS. PAPANTONIO:
¹⁰     Q.  Okay.  Let's just go to the
¹¹ fourth page really quick.  Okay.  On this
¹² page, we can see the products that are
¹³ being manufactured at this facility that
¹⁴ the FDA is inspecting.  Do you see that
¹⁵ first line where it says valsartan USP?
¹⁶     A.  Yes.
¹⁷     Q.  So this is the facility that
¹⁸ valsartan API is being made that the FDA is
¹⁹ investigating, okay?
²⁰     A.  It may be one of the
²¹ facilities.  Again, I don't know the
²² details.  They may have multiple sites and
²³ could manufacture with that same DMF number
²⁴ at multiple sites.

Page 391

¹     Q.  But what we can agree on is
² this is the first time that you've heard
³ that ZHP facilities and equipment are not
⁴ maintained to ensure quality, right?
⁵          MS. NAGLE:  Objection,
⁶     form.
⁷          THE WITNESS:  And,
⁸     agree.  Again, me, personally, I
⁹     don't recall when I became aware of
¹⁰     this and I don't really know when
¹¹     others within Torrent might or
¹² might not have known about this.
¹³ BY MS. PAPANTONIO:
¹⁴     Q.  Okay.  Let's go back to the, or
¹⁵ the second page with these conclusions.
¹⁶ Okay.  The third conclusion that the FDA
¹⁷ makes about ZHP facilities is that
¹⁸ "Invalidation of out-of-specification
¹⁹ results lack adequate scientific
²⁰ justification."  Have you ever heard that
²¹ before?
²²     A.  I've heard that phrase.  I've
²³ not necessarily been aware of it in
²⁴ relation to ZHP specifically.

Page 392

¹     Q.  Let's break this down.  What
² does out of specification mean?
³     A.  Out of specification means that
⁴ of all of the various tests you do, let's
⁵ say if you're getting ready to release API,
⁶ something does not meet the current
⁷ specification.
⁸     Q.  Okay.  And so when a drug is
⁹ out of specification, it means that's
¹⁰ something is wrong with it, right?
¹¹          MS. NAGLE:  Objection,
¹²     form.
¹³          THE WITNESS:  It means
¹⁴     that it does not meet current
¹⁵     standards and so should not be
¹⁶     directly released for normal use.
¹⁷ BY MS. PAPANTONIO:
¹⁸     Q.  And so this is telling us that
¹⁹ your API supplier invalidates
²⁰ out-of-specification products without
²¹ scientific justification, right?
²²     A.  That is what, apparently, the
²³ FDA inspectors observed on some product.
²⁴     Q.  And like you told us, Torrent

Page 393

¹ has the ability to audit vendors like ZHP
² at any time, right?
³          MS. NAGLE:  Objection,
⁴     form.
⁵          THE WITNESS:  Again, at
⁶     any time, I don't know, but with
⁷     coordination from the vendor, we
⁸     could audit.
⁹ BY MS. PAPANTONIO:
¹⁰     Q.  So in May of 2017, before
¹¹ this -- you learn of this recall, Torrent
¹² could have audited ZHP with their
¹³ permission and found this information?
¹⁴          MS. NAGLE:  Objection,
¹⁵     form.
¹⁶          THE WITNESS:  I don't
¹⁷     know what Torrent would have found
¹⁸     had they audited.  I mean, it's not
¹⁹     a requirement that you have to do
²⁰     on-site audits of your vendors.
²¹ BY MS. PAPANTONIO:
²²     Q.  But it is a part of due
²³ diligence, wouldn't you agree?
²⁴          MS. NAGLE:  Objection,

Confidential Information Subject to Protective Order

Page 394

form.

THE WITNESS:  It can be a part of due diligence.  Again, it's not a required part of due diligence.

BY MS. PAPANTONIO:

Q.  But as a finished dose manufacturer, you want to make sure that you're getting quality ingredients from your vendors, right?

MS. NAGLE:  Objection, form.

THE WITNESS:  Yes, and there are multiple ways of doing that.

BY MS. PAPANTONIO:

Q.  Right.  One of those ways is testing the product, which we know you didn't do?

MS. NAGLE:  Objection, form.

THE WITNESS:  We tested our products, so.

Page 395

BY MS. PAPANTONIO:

Q.  And then another way is investigating the vendor site like the FDA is doing here, right?

MS. NAGLE:  Objection, form.

THE WITNESS:  We can audit.  Again, it's not required.

BY MS. PAPANTONIO:

Q.  And as far as you know, Torrent never audited ZHP's facility in 2017?

A.  In 2017, I really don't know. I wasn't part of that group that does audits, so.

Q.  Who was in the group that does audits?  Were you able to give me any names of those individuals?

A.  Again, it's, I think, some cooperative effort between the quality assurance team and the vendor management team.

Q.  Okay.  Let's go to page 14. All right.  Now, we can see on little paragraph C right here, the FDA has

Page 396

concluded that "the following batches exhibit out-of-trend results."  What does out of trend mean?

MS. NAGLE:  Objection to form.

THE WITNESS:  Yeah, that's a little outside of my kind of knowledge base too.

BY MS. PAPANTONIO:

Q.  So you don't know what that means?

A.  Other than the obvious of it seems to be out of trend, no, I don't specifically know that.  I'm not an analytical chemist.

Q.  Okay.  So the FDA is concluding that out-of-trend results were retested without an investigation due to greater than a 1 percent differential in replicate assay injections.  Excuse me.  And then we see below that are valsartan batches, right?

A.  Yes, there are three valsartan batches listed.

Page 397

Q.  Do you know that there are C batches listed?

A.  Yes.

Q.  Are you aware that C batches are the old process?

A.  Yes.

MS. NAGLE:  Objection, form.

BY MS. PAPANTONIO:

Q.  And you also know that Torrent used the old process, right?

A.  Correct.

Q.  And so these are potentially batches that Torrent is getting from ZHP?

MS. NAGLE:  Objection, form.

THE WITNESS:  I have no idea whether Torrent received those batches.

BY MS. PAPANTONIO:

Q.  But the same company who is telling you that Torrent products are okay and not contaminated with NDMA are not investigating out-of-trend results, were

Confidential Information Subject to Protective Order

Page 398

¹ you aware of that?
² MS. NAGLE: Objection,
³ form.
⁴ THE WITNESS: No.
⁵ BY MS. PAPANTONIO:
⁶ Q. If we look at A, we're talking
⁷ about -- excuse me, paragraph A, we're
⁸ talking about another valsartan batch,
⁹ right? And the last sentence tells us "Due
¹⁰ to this large differential, this batch of
¹¹ valsartan was retested without conducting
¹² an investigation and that passing results
¹³ were reported." Were you aware that ZHP
¹⁴ would retest its products and give it a
¹⁵ passing result without investigation?
¹⁶ MS. NAGLE: Objection,
¹⁷ form.
¹⁸ THE WITNESS: No, I was
¹⁹ not aware of that.
²⁰ BY MS. PAPANTONIO:
²¹ Q. But this is the same company,
²² ZHP, that Torrent relied on for information
²³ relating to the NDMA contamination, right?
²⁴ MS. NAGLE: Objection,

Page 399

¹ form.
² THE WITNESS: Same, same
³ company, yes.
⁴ BY MS. PAPANTONIO:
⁵ Q. If you had learned this
⁶ information in 2017, would you have been
⁷ concerned?
⁸ MS. NAGLE: Objection,
⁹ form.
¹⁰ THE WITNESS: This
¹¹ information is useful to know and
¹² it is useful to investigate more
¹³ into the specific situations around
¹⁴ this. You know, it's hard to draw
¹⁵ conclusions from one batch and one
¹⁶ instance when things come from a
¹⁷ very large manufacturing plant like
¹⁸ this.
¹⁹ BY MS. PAPANTONIO:
²⁰ Q. Right. But we can agree that
²¹ had Torrent audited ZHP at this time, they
²² would have found that ZHP does not
²³ investigate out-of-trend results for its
²⁴ valsartan, right?

Page 400

¹ MS. NAGLE: Objection.
² Form and foundation.
³ THE WITNESS: No,
⁴ there's no guarantee that we would
⁵ have seen these same things or
⁶ stumbled across similar, similar
⁷ items.
⁸ BY MS. PAPANTONIO:
⁹ Q. But we do know that they're
¹⁰ happening because the FDA is reporting them
¹¹ in this investigation report, right?
¹² MS. NAGLE: Objection,
¹³ form.
¹⁴ THE WITNESS: As I had
¹⁵ mentioned, I was not aware, I don't
¹⁶ remember seeing this report and I'm
¹⁷ not sure who within Torrent might
¹⁸ have or might not have been aware
¹⁹ of this.
²⁰ BY MS. PAPANTONIO:
²¹ Q. Okay. Let's move onto page 16.
²² Looking at the last paragraph. Here the
²³ FDA is concluding at ZHP that "Given the
²⁴ firm's repeat assay testing due to

Page 401

¹ variations among assay replicates, it is
² unclear how the firm demonstrates the
³ validity of their own assay testing." Do
⁴ you see that?
⁵ A. Yes, I see that.
⁶ Q. So the FDA is concluding that
⁷ ZHP does not have valid testing; is that
⁸ correct?
⁹ MS. NAGLE: Objection,
¹⁰ form.
¹¹ THE WITNESS: I don't
¹² know that that's the conclusion
¹³ that they're drawing here.
¹⁴ BY MS. PAPANTONIO:
¹⁵ Q. Is it fair to say that Torrent
¹⁶ never figured out that ZHP doesn't
¹⁷ demonstrate validity in their testing,
¹⁸ because Torrent didn't have the ability to
¹⁹ test the product themselves?
²⁰ MS. NAGLE: Objection.
²¹ Form and foundation.
²² THE WITNESS: I'm not
²³ sure how those two things go
²⁴ together. I'm sorry, I don't

Confidential Information Subject to Protective Order

Page 402

1    understand.
2    BY MS. PAPANTONIO:
3        Q.   We can agree that throughout
4    this contamination period, Torrent was
5    relying on information from ZHP?
6            MS. NAGLE:  Objection,
7        form.
8            THE WITNESS:  Once we
9        became aware that there was a new
10       impurity, the information being
11       provided to us from ZHP was one of
12       the data sources that we were
13       utilizing to make decisions.
14   BY MS. PAPANTONIO:
15       Q.   It was the only data source you
16   were utilizing to make decisions?
17           MS. NAGLE:  Objection,
18       form.
19           THE WITNESS:  No, that's
20       not true.
21   BY MS. PAPANTONIO:
22       Q.   What other data were you
23   getting about the NDMA contamination?
24       A.   We were also receiving

Page 403

1    information from FDA.
2        Q.   All right.  Let's look at F --
3    excuse me, page 23.  Okay.  This actually
4    is going to start on page 22, sorry.  Okay.
5    Paragraph A at the bottom.  Okay.  Let's
6    look at this next-to-last sentence, where
7    the FDA inspector is saying "I attempted to
8    delineate the firm considers the initial
9    out-of-spec result invalid, but a passing
10   retest as valid.  Upon inquiry with Mr. Li,
11   Mr. Jun Du clarified that that is a ghost
12   peak."  Do you know what a ghost peak is?
13       A.   No.
14       Q.   He goes on to say "I indicated
15   that I am not familiar with this concept
16   and Mr. Du explained that this unknown peak
17   was causing the out of specification as a
18   ghost peak that appears from time to time
19   in chromatograms."  Do you see that?  "For
20   undetermined reasons," it goes on to say.
21       A.   I see that.
22       Q.   Are you aware that the
23   independent lab that determined NDMA was
24   present in valsartan tested one of these

Page 404

1    ghost peaks that ZHP is discussing and
2    found that the ghost peak was in fact NDMA?
3    Were you aware of that?
4            MS. NAGLE:  Objection,
5        form.
6            THE WITNESS:  No.
7    BY MS. PAPANTONIO:
8        Q.   Are you aware that ZHP
9    recognized ghost peaks and simply ignored
10   them in their testing?
11           MS. NAGLE:  Objection,
12       form.
13           THE WITNESS:  No.
14   BY MS. PAPANTONIO:
15       Q.   Are you aware that the FDA
16   inspector warned ZHP that their actions
17   were wrong?
18           MS. NAGLE:  Objection,
19       form.
20           THE WITNESS:  No.
21   BY MS. PAPANTONIO:
22       Q.   That the FDA told ZHP they
23   should not refer to these peaks as ghost
24   peaks, but rather they should investigate

Page 405

1    unknown peaks and identify them themselves?
2            MS. NAGLE:  Objection,
3        form.
4            THE WITNESS:  No.
5    BY MS. PAPANTONIO:
6        Q.   Are you aware that had ZHP
7    identified one of these ghost peaks, they
8    would have found that it was NDMA in
9    valsartan?
10           MS. NAGLE:  Objection,
11       form.
12           THE WITNESS:  No.
13   BY MS. PAPANTONIO:
14       Q.   Are you aware that had Torrent
15   tested the product and labeled one of these
16   ghost peaks, they would have found that
17   NDMA was present in valsartan?
18           MS. NAGLE:  Objection,
19       form.
20           THE WITNESS:  I'm sorry,
21       could you repeat that question?
22   BY MS. PAPANTONIO:
23       Q.   Did you know that if Torrent
24   had identified one of these ghost peaks in

Confidential Information Subject to Protective Order

Page 406

¹ the chromatogram, they would have learned
² that it was actually the presence of NDMA?
³         MS. NAGLE:  Same
⁴     objection.
⁵         THE WITNESS:  I don't
⁶     know if Torrent was seeing these
⁷     ghost peaks.
⁸ BY MS. PAPANTONIO:
⁹     Q.   Are you aware that your API
¹⁰ vendor, ZHP, continued to ignore these
¹¹ ghost peaks even after the FDA inspector
¹² issued them a warning?
¹³         MS. NAGLE:  Objection,
¹⁴     form.
¹⁵         THE WITNESS:  No.
¹⁶ BY MS. PAPANTONIO:
¹⁷     Q.   And that that later led to the
¹⁸ recall of valsartan?
¹⁹         MS. NAGLE:  Objection.
²⁰     Form and foundation.
²¹         THE WITNESS:  No.
²² BY MS. PAPANTONIO:
²³     Q.   Is this information that you
²⁴ would have wanted to know at the time

Page 407

¹ valsartan was being recalled?
²     A.   I think all information is good
³ information, so it would have been useful
⁴ to know at that point.
⁵     Q.   This certainly would have been
⁶ useful to know at the time Torrent was
⁷ deciding whether or not to keep their
⁸ product quarantined or release it, right?
⁹         MS. NAGLE:  Objection,
¹⁰     form.
¹¹         THE WITNESS:  It would
¹²     have been another data point, yes.
¹³ BY MS. PAPANTONIO:
¹⁴     Q.   And, again, Torrent had the
¹⁵ ability to audit ZHP with ZHP's permission,
¹⁶ right?
¹⁷     A.   Yes.
¹⁸         MS. NAGLE:  Objection,
¹⁹     form.
²⁰ BY MS. PAPANTONIO:
²¹     Q.   And had they audited ZHP in
²² 2017, and found these same ghost peaks as
²³ the FDA, Torrent could have found NDMA in
²⁴ valsartan?

Page 408

¹         MS. NAGLE:  Objection,
²     form.
³         THE WITNESS:  As I
⁴     mentioned before, it's not a
⁵     forgone conclusion that we would
⁶     have seen the same information and
⁷     these ghost peaks had we audited.
⁸ BY MS. PAPANTONIO:
⁹     Q.   But it's certainly possible,
¹⁰ right?
¹¹         MS. NAGLE:  Objection,
¹²     form.
¹³         THE WITNESS:
¹⁴     Theoretically.
¹⁵ BY MS. PAPANTONIO:
¹⁶     Q.   And, Ms. Chitty, let me ask you
¹⁷ this, why didn't Torrent audit ZHP in the
¹⁸ two months it was deciding -- it was
¹⁹ determining whether NDMA was present in its
²⁰ valsartan?
²¹         MS. NAGLE:  Objection.
²²     Form and foundation.
²³         THE WITNESS:  I don't
²⁴     know.

Page 409

¹ BY MS. PAPANTONIO:
²     Q.   Do you believe it would have
³ been a good idea to investigate the
⁴ facility that Torrent is putting so much
⁵ trust in?
⁶         MS. NAGLE:  Objection,
⁷     form.
⁸         THE WITNESS:  Again,
⁹     that's not area of expertise, so
¹⁰     I'm not sure what is kind of
¹¹     standard and expected in those
¹²     situations.
¹³ BY MS. PAPANTONIO:
¹⁴     Q.   If you had the chance, would
¹⁵ you have advised Torrent India to
¹⁶ investigate ZHP's facilities?
¹⁷         MS. NAGLE:  Objection,
¹⁸     form.
¹⁹         THE WITNESS:  I'm not
²⁰     sure, again, what necessarily value
²¹     that adds.  It's good to inspect,
²²     but it's not a guarantee.  You only
²³     see certain, you know, data at
²⁴     certain points in time, so.

Confidential Information Subject to Protective Order

Page 410

¹ BY MS. PAPANTONIO:
²    Q.   And in this evaluation, the FDA
³ was able to see that ZHP ignores ghost
⁴ peaks on their chromatographs, right?
⁵         MS. NAGLE:  Objection,
⁶    form.
⁷         THE WITNESS:  That
⁸    appears to be what is discussed
⁹    here.
¹⁰ BY MS. PAPANTONIO:
¹¹    Q.   Okay.  Now, to put this all
¹² into context, this is 2017 that this
¹³ inspection is happening, right?  Valsartan
¹⁴ is on the market?
¹⁵    A.   Correct, Torrent valsartan
¹⁶ products are on the market.
¹⁷    Q.   Torrent valsartan has been sold
¹⁸ on the market for years at this point?
¹⁹         MS. NAGLE:  Objection,
²⁰    form.
²¹         THE WITNESS:  Again, I
²²    don't recall exactly when it was
²³    approved, but it is on the market
²⁴    in 2017 for multiple products.

Page 411

¹ BY MS. PAPANTONIO:
²    Q.   Can you tell me how many
³ patients are relying on Torrent's valsartan
⁴ at this point in 2017?
⁵         MS. NAGLE:  Objection.
⁶    Form and foundation.
⁷         THE WITNESS:  No, I
⁸    don't know that information.
⁹ BY MS. PAPANTONIO:
¹⁰    Q.   Can you tell me how many
¹¹ valsartan pills Torrent is selling at the
¹² time of this investigation?
¹³         MS. NAGLE:  Objection.
¹⁴    Form and foundation.
¹⁵         THE WITNESS:  No, I
¹⁶    don't know that information.
¹⁷ BY MS. PAPANTONIO:
¹⁸    Q.   And you understand that this is
¹⁹ the FDA investigating one of Torrent's
²⁰ vendors, ZHP, right?
²¹    A.   It is FDA inspecting one of
²² Torrent's vendors, yes.
²³    Q.   So by the time the FDA has
²⁴ conducted this investigation in 2017,

Page 412

¹ Torrent has been relying on ZHP to supply
² their API for years at this point?
³         MS. NAGLE:  Objection,
⁴    form.
⁵         THE WITNESS:  I don't
⁶    know when we started sourcing API
⁷    from ZHP.
⁸ BY MS. PAPANTONIO:
⁹    Q.   But you do know you have been
¹⁰ sourcing ZHP API since at least 2014?
¹¹    A.   I don't recall specifically.
¹² Again, as to when those products, when we
¹³ started sourcing API from this company.
¹⁴    Q.   But you know you have been
¹⁵ sourcing ZHP API for, let's say, at least
¹⁶ four years?
¹⁷    A.   I really can't quantify.  I
¹⁸ don't know.
¹⁹    Q.   Okay.  But you do know patients
²⁰ have been taking the drug for that long?
²¹         MS. NAGLE:  Objection.
²²    Form and foundation.
²³         THE WITNESS:  Again, I'm
²⁴    not sure how long.

Page 413

¹ BY MS. PAPANTONIO:
²    Q.   Okay.  But you do know that for
³ the period you're supplying Torrent's
⁴ valsartan ZHP API, patients are taking
⁵ that?
⁶         MS. NAGLE:  Objection,
⁷    form.
⁸         THE WITNESS:  As I said,
⁹    I don't know how long we had been
¹⁰    utilizing the ZHP API.
¹¹ BY MS. PAPANTONIO:
¹²    Q.   And, Ms. Chitty, do you
¹³ understand that it is not the FDA's job to
¹⁴ find problems with Torrent's vendors?
¹⁵         MS. NAGLE:  Objection,
¹⁶    form.
¹⁷         THE WITNESS:  Yeah, I
¹⁸    don't quite understand that
¹⁹    question, sorry.
²⁰ BY MS. PAPANTONIO:
²¹    Q.   As a finished dose
²² manufacturer, it is ultimately Torrent's
²³ job to determine if there's problems
²⁴ related to the production of its drug?

Confidential Information Subject to Protective Order

Page 414

1          MS. NAGLE:  Objection,
2     form.
3          THE WITNESS:  We are
4     responsible for controlling the
5     quality of our products coming out
6     of our facilities, yes.
7  BY MS. PAPANTONIO:
8     Q.  Right, so Torrent should be
9  able to find out that its own vendor, ZHP,
10  does not have integrity in their quality
11  control systems, right?
12          MS. NAGLE:  Objection,
13     form.
14          THE WITNESS:  Torrent,
15     you know, followed, as far as I
16     knew, the standard procedures for
17     vetting suppliers.
18  BY MS. PAPANTONIO:
19     Q.  And we know that based on those
20  procedures, Torrent never found out that
21  ZHP does not have integrity in their
22  quality control system like we see in this
23  document?
24          MS. NAGLE:  Objection to

Page 415

1     form.
2          THE WITNESS:  Yeah, I'm
3     sorry, I got a little confused in
4     the question there.  Can you repeat
5     that?
6  BY MS. PAPANTONIO:
7     Q.  As far as you know, Torrent
8  never learned that its own vendor, ZHP,
9  lacks quality in ZHP's control system,
10  quality control system?
11          MS. NAGLE:  Same
12     objection.
13          THE WITNESS:  Again, I'm
14     not aware of what everyone within
15     Torrent knew regarding the
16     situation.
17  BY MS. PAPANTONIO:
18     Q.  That information was never
19  communicated to you?
20     A.  Not that I can remember, no.
21     Q.  And like you said, you've
22  requested EIRs, inspection reports in the
23  past, but you never came across this ZHP
24  inspection report, right?

Page 416

1     A.  I don't recall, no, ever seeing
2  this one specifically.
3     Q.  So then you never learned that
4  your own vendor, ZHP, doesn't use science
5  when it tests the quality of its own API?
6          MS. NAGLE:  Objection,
7     form.
8          THE WITNESS:  Like I
9     said, I was not aware and it isn't
10     necessarily my responsibility to
11     seek out those things necessarily,
12     so.
13  BY MS. PAPANTONIO:
14     Q.  And that's what I want to know,
15  whose job was it at Torrent to monitor this
16  vendor, ZHP?  Whose job was it to find this
17  information?
18          MS. NAGLE:  Objection.
19     Form and foundation.
20          THE WITNESS:  And as
21     I've already mentioned, it's some
22     function of quality and the vendor
23     management system.
24

Page 417

1  BY MS. PAPANTONIO:
2     Q.  So would that be Sushil
3  Jaiswal?
4     A.  As I mentioned before, I don't
5  exactly remember where Sushil fits within
6  the groups at the plant.  I don't know
7  exactly what his position was.
8     Q.  We do know even if this did --
9  Torrent did have this information, it was
10  never communicated to you, right?
11     A.  I don't recall receiving it.
12     Q.  LP 1156.  Can we actually do
13  1151 first?  LP 1151.
14          Okay.  I don't believe you're
15     on this email, Ms. Chitty, but let's start
16     from the second page.
17          MS. NAGLE:  I'm sorry,
18     before you start asking questions,
19     Counsel, can we just get an exhibit
20     number?
21          MS. PENDLEY:  LP --
22     Torrent 28, I'm sorry.
23          MS. NAGLE:  Thank you.
24

Confidential Information Subject to Protective Order

Page 418

BY MS. PAPANTONIO:

Q.   Okay.  Starting on the second page of that last email, do you know who this Tarak is?

A.   No, I don't recall who that is.

Q.   Okay, some of these other names are Torrent employees, though, right, Paras or Sheth Paras and Shah Dhrumit?

A.   I remember Paras.  I'm not sure about Mr. Shah.

Q.   Okay.  But we see the subject line is "Valsartan notification - Torrent India," right?

A.   Correct.

Q.   So this is a communication between Torrent and ZHP?

A.   It is definitely from -- involving Torrent, I'm not sure who these other people are.

Q.   Okay.  If you just scroll out real quick, we can see the ZHP logo up top.  Do you see that?  The green little logo, it says Hauhai Pharmaceutical.

A.   Yeah.  Is that an association

Page 419

with that email you were showing or --

Q.   Yeah.

A.   -- the one above it?

Q.   Let's see.  It's on the bottom one, but okay, we'll just continue here.

It is -- well, this is Torrent communicating with ZHP.  So that's ZHP's reply and we'll get to that.

So in this bottom email, Torrent is asking for the analytical method of residual solvents, GC, gas chromatography testing, right?  Do you see that?

A.   Yes.

Q.   And they're also asking for various information, like the latest three batches of chromatograms and the relative retention time of NDMA.  So Torrent is asking ZHP for information, right?

A.   Yes.

Q.   Information about NDMA?

A.   Yes.

Q.   And at this point on July 2, 2018, Torrent needs that information from

Page 420

ZHP because they don't have a testing method of their own, right?

MS. NAGLE:  Objection, form.

THE WITNESS:  Correct.

BY MS. PAPANTONIO:

Q.   Okay.  And let's see how ZHP replies to Torrent in the next email.  Okay.  Can we zoom in on the first email on this page -- on this page, sorry.  Okay.  So first we see it says "So, we thought it is not necessary to provide a current analytical method of residual solvents."  So ZHP is denying Torrent's request for a test method at this point.  Do you see that?

MS. NAGLE:  Objection, form.

THE WITNESS:  Yeah, I believe that's what that says.

BY MS. PAPANTONIO:

Q.   Okay.  So at this point, neither Torrent nor ZHP has the test method for NDMA, right?

Page 421

MS. NAGLE:  Objection.  Form and foundation.

THE WITNESS:  I'm not sure whether NDMA would be detected under the residual solvents test versus one of the other tests, so no, I don't agree with that conclusion.

BY MS. PAPANTONIO:

Q.   Okay.  But we do see that ZHP signs this email with "PS:  For better and further communication, please kindly sign the attached CDA as soon as possible."

A.   I see that, yes.

Q.   And then on the first page, we see that the CDA they're referring to is a nondisclosure agreement.  Are you aware that ZHP would only provide Torrent with better and further information if Torrent agreed to sign a nondisclosure agreement?

MS. NAGLE:  Objection, form.

THE WITNESS:  No, I don't recall being aware of this.

Page 422

¹ BY MS. PAPANTONIO:
²      Q.  In other words, in order for
³ Torrent to get information about the NDMA
⁴ or genotoxic impurity issue, Torrent was
⁵ required to sign this nondisclosure
⁶ agreement.
⁷                MS. NAGLE:  Objection,
⁸     form.
⁹ BY MS. PAPANTONIO:
¹⁰     Q.  Were you aware of that?
¹¹     A.  No.
¹²     Q.  And then we see on the very
¹³ first email here Mr. Shah from Torrent
¹⁴ saying this is very critical and urgent.
¹⁵ Do you see that?
¹⁶     A.  Yes.
¹⁷     Q.  Okay.  So let's take a look at
¹⁸ this confidential -- this confidentiality
¹⁹ agreement between ZHP and Torrent.  And
²⁰ just to be clear, as VP of science, you had
²¹ no idea this confidentiality agreement
²² existed?
²³     A.  Yeah, I'm not VP of science,
²⁴ but I was not aware that this existed.

Page 423

¹      Q.  Okay.  Let's take a look at
² what it says.  Oh, and this would be LP
³ 1156 and it is marked as Torrent 29.  Okay.
⁴ On the first page, it looks like an Indian
⁵ rupee, right, that's India's form of money,
⁶ right?
⁷      A.  That is 100 rupees, yes.
⁸      Q.  100 rupees.  Okay.  And we can
⁹ see that the title of this is a
¹⁰ nondisclosure agreement.  Do you see that?
¹¹     A.  Yes.
¹²     Q.  And what is your understanding
¹³ of what a nondisclosure agreement is?
¹⁴     A.  It's an agreement to define
¹⁵ what two parties feel are confidential
¹⁶ information and cannot be disclosed outside
¹⁷ of the relationship described here.
¹⁸     Q.  Right.  So we've got Torrent
¹⁹ Pharmaceuticals, Limited as the receiving
²⁰ party and ZHP as the disclosing party.  So
²¹ keeping that in mind, let's take a look at
²² what are the limitations of this agreement.
²³ So turning to page 2, number, yeah, under
²⁴ confidentiality, number two, we can see

Page 424

¹ that ZHP defines confidentiality.  Right
² and they define it as "the existence or
³ contents of this agreement and the fact
⁴ that the disclosing party is investigating
⁵ the potential quality issue."  Do you see
⁶ that?
⁷      A.  No, sorry, I'm not.
⁸      Q.  We're looking at 2.1, I'm
⁹ sorry, I should have directed better here.
¹⁰ 2.1, "The parties acknowledge that the
¹¹ disclosing party has provided --"
¹²     A.  Okay.
¹³     Q.  Okay.  And then we're defining
¹⁴ what confidential information is here,
¹⁵ which is in bold, right?  It says
¹⁶ "Confidential Information, orally, in
¹⁷ writing or intangible form, whether prior
¹⁸ to, on or after this date."  And then it
¹⁹ says "For clarity, Confidential Information
²⁰ also includes the existence of this
²¹ content -- of the contents of this
²² agreement," right?  So what that means is
²³ that you can't even talk about this
²⁴ confidentiality agreement, right?

Page 425

¹                MS. NAGLE:  Objection.
²     Form and foundation.
³                THE WITNESS:  Yeah, I'm
⁴     not really sure what that means,
⁵     sorry.
⁶ BY MS. PAPANTONIO:
⁷      Q.  And you don't -- to be fair,
⁸ you never knew it existed, because no one
⁹ ever told you about it, right?
¹⁰                MS. NAGLE:  Objection,
¹¹     form.
¹²                THE WITNESS:  Yeah, I
¹³     don't recall ever knowing of this.
¹⁴ BY MS. PAPANTONIO:
¹⁵     Q.  And that's because by
¹⁶ definition, confidential information is the
¹⁷ existence of this agreement.  Did you know
¹⁸ that?
¹⁹     A.  No.
²⁰     Q.  It says Torrent also can't
²¹ disclose the fact that the disclosing party
²² is investigating a potential quality issue.
²³ Did you know that?
²⁴     A.  No.

Page 426

1    Q.  So as a regulatory agent, were
2  you aware that this is the only way that
3  ZHP agreed to give Torrent information on
4  this contamination?
5          MS. NAGLE:  Objection,
6      form.
7          THE WITNESS:  No.
8  BY MS. PAPANTONIO:
9    Q.   As a regulatory agent, did you
10  know that that means that a customer --
11  excuse me, move to strike.
12          Were you aware that Torrent
13  couldn't even tell customers that there
14  might be a carcinogen in their medications
15  based on this confidential agreement?
16          MS. NAGLE:  Objection,
17      form.
18          THE WITNESS:  I wasn't
19      aware of the agreement.
20  BY MS. PAPANTONIO:
21    Q.  That means that Torrent can't
22  tell doctors that prescribe the drug that
23  there's potentially a deadly carcinogen in
24  the valsartan Torrent API?

Page 427

1          MS. NAGLE:  Objection,
2      form.
3          THE WITNESS:  I don't
4      really know the full implications
5      of the legal document, sorry.
6  BY MS. PAPANTONIO:
7    Q.  Okay.  Well, let's go down to
8  2.2 and then 2.2 tells us what is not
9  confidential information.  It says
10  "Confidential Information shall not include
11  any of the following, any information which
12  the Receiving Party can demonstrate to the
13  Disclosing Party."
14          So under 2.2c, we see that
15  confidential information is not
16  confidential if "it is discovered
17  independently developed by the Receiving
18  Party or independent of any disclosures by
19  the Disclosing Party."  So what that means
20  is that if Torrent had gotten independent
21  information about the NDMA contamination
22  from an independent lab, they could share
23  that with the public?
24          MS. NAGLE:  Objection,

Page 428

1      form.
2          THE WITNESS:  I'm sorry,
3      was that a question?  I mean, that
4      was you explaining what was here,
5      but I don't know what the question
6      was.
7  BY MS. PAPANTONIO:
8    Q.  Were you aware that Torrent
9  could share information about the
10  contamination if Torrent had gotten that
11  information from an independent source?
12          MS. NAGLE:  Objection,
13      form.
14          THE WITNESS:  No, I was
15      not aware of the subtleties related
16      to this agreement.  Again, because
17      I didn't know about the agreement.
18  BY MS. PAPANTONIO:
19    Q.  Right.  You didn't know.  And
20  let's talk about why you might not have
21  known about this agreement.  Let's go to
22  2.3.  It says "the Receiving Party shall
23  not disclose Confidential Information to
24  anyone other than its employees,

Page 429

1  consultants, agents or advisors thereby
2  known as Authorized Recipients to whom
3  shall -- to whom it shall disclose on a
4  need-to-know basis."
5          So if you did not know about
6  this confidentiality agreement, that means
7  you were not on a need-to-know basis at
8  Torrent.  Would you agree with that
9  statement?
10          MS. NAGLE:  Objection,
11      form.
12          THE WITNESS:  I don't
13      know.
14  BY MS. PAPANTONIO:
15    Q.  So as the person who
16  communicates with the FDA, provides
17  information, according to Torrent, is not a
18  need-to-know employee?
19          MS. NAGLE:  Objection,
20      form.
21  BY MS. PAPANTONIO:
22    Q.  Do you consider yourself an
23  employee who needs to know information
24  related to a carcinogen contamination?

Confidential Information Subject to Protective Order

Page 430

1    MS. NAGLE: Objection,
2    form.
3    THE WITNESS: I would
4    believe that I do need to know
5    about potential carcinogen
6    contamination.
7 BY MS. PAPANTONIO:
8    Q.   Are you aware that your company
9 didn't believe that you needed to know this
10 information as VP of science and strategy?
11    MS. NAGLE: Objection,
12    form.
13    THE WITNESS: Again, as
14    I stated, I was not aware of any of
15    this.
16 BY MS. PAPANTONIO:
17    Q.   Okay.  And then if we go to
18 number three.  If we look at 3.1, this is
19 kind of a long sentence, but I'll try to
20 break it down.  It says "The Receiving
21 Party," which is Torrent, "shall use the
22 Confidential Information only for the
23 purpose of fulfilling its regulatory
24 obligations in the relevant territory,

Page 431

1 provided that (a) such obligations are
2 mandatorily required by applicable laws."
3 So that means that Torrent has to share
4 information that's mandatory to things like
5 the U.S. government or the FDA, right?
6 Would you agree with that?
7    MS. NAGLE: Objection to
8    form.
9    THE WITNESS: That's --
10    that's your interpretation.  I
11    don't know.  I'm not a lawyer here,
12    so, sorry.
13 BY MS. PAPANTONIO:
14    Q.   No, I understand.  All right.
15 And then it says "(b) the Receiving Party
16 shall use reasonable efforts to minimize
17 the scope of disclosure."  So as you sit
18 here, do you understand that Torrent is
19 taking every step it can to minimize
20 disclosure about this contamination?
21    MS. NAGLE: Objection,
22    form.
23    THE WITNESS: No, I'm
24    not aware of steps to minimize

Page 432

1 disclosure.
2 BY MS. PAPANTONIO:
3    Q.   Okay.  And then let's look at
4 3.3.  "The Disclosing Party," which is ZHP
5 in this case, "has not made and will not
6 make any express or implied representations
7 or warranty in this agreement as to the
8 accuracy or completeness of the
9 Confidential Information."  This is ZHP
10 telling Torrent that the information we
11 give you might not be accurate.  And we now
12 know, right, the information ZHP was not in
13 fact accurate and you know that?
14    MS. NAGLE: Objection to
15    form.
16    THE WITNESS: I'm sorry,
17    your question is that we were aware
18    that information was not accurate?
19 BY MS. PAPANTONIO:
20    Q.   Does it surprise you to know
21 that Torrent entered into an agreement with
22 ZHP where ZHP asserted that they did not
23 have to give accurate information to
24 Torrent?

Page 433

1    MS. NAGLE: Objection to
2    form.
3    THE WITNESS: I really
4    have no context or background to
5    understand what is standard in a
6    confidentiality agreement, sorry.
7 BY MS. PAPANTONIO:
8    Q.   Okay.  And then I just want to
9 go to the final page just show you that
10 this agreement was signed.  Okay.  Do you
11 see -- do you know who this Chandrasekhar
12 is at the bottom here, vice president of
13 procurement signed it?
14    A.   I think that's the person in
15 previous emails.  He's referred to as
16 Chakar, so yes, I'm familiar with that
17 person.
18    Q.   All right.  And then we have
19 the vice president of finance who signs
20 this.  Now, knowing this information,
21 Ms. Chitty, does it surprise you to hear
22 that Torrent was withholding information
23 related to the contamination from the
24 public?

Confidential Information Subject to Protective Order

Page 434

1     MS. NAGLE:  Objection,
2     form.
3         THE WITNESS:  I don't
4     know that Torrent was withholding
5     information from the public.
6 BY MS. PAPANTONIO:
7     Q.  Does it surprise you to see
8 this confidentiality agreement between
9 Torrent and ZHP?
10    A.  Again, it's not part of my
11 normal business or area of expertise.  I
12 don't know what's normal or common.  I just
13 wasn't aware of this.
14        MS. PAPANTONIO:  Okay.
15    One second.  All right.  We're
16    going to take a break, ten minutes.
17        THE VIDEOGRAPHER:  It's
18    6:01, we are off the video record.
19        - - - - -
20    (A recess was taken at this time.)
21        - - - - -
22        THE VIDEOGRAPHER:  6:13,
23    we are on the video record.
24

Page 435

1         MS. PAPANTONIO:  All
2     right.  Ms. Chitty, I want to thank
3     you so much for your time.  We
4     really appreciate you coming here
5     today and that is all the questions
6     that we have.
7         THE WITNESS:  Okay.
8         MS. PAPANTONIO:  We can
9     go off the record.
10        MS. NAGLE:  I have a few
11    quick questions.
12        MS. PAPANTONIO:  Okay.
13    Back on the record we go.
14        MS. NAGLE:  Are we still
15    on the record?
16        THE VIDEOGRAPHER:  We
17    are.
18 BY MS. NAGLE:
19    Q.  Okay.  Great.  So, Ms. Chitty,
20 you were asked a couple of times today
21 about why Torrent didn't act or recall when
22 you were notified there was an issue with
23 the new process for the API.  Why, why
24 didn't you guys also, you know, start

Page 436

1 immediately testing the old process?
2     A.  So the first notification that
3 we had received in June, as you said, it
4 was about the new process and a potential
5 unknown impurity.  An impurity profile of a
6 drug is very specific to the way that it's
7 made.  Because these two routes of
8 synthesis are different, it's not inherent
9 that an impurity you see with one route of
10 synthesis you will see with a second.
11    Q.  And I think you were also asked
12 by counsel, you know, why not, you know,
13 quarantine old process just to be sure.
14 Can you explain what little bit, you know,
15 why you wouldn't quarantine or take a drug
16 off market?
17    A.  Yeah, as I mentioned, when we
18 were talking about that, you don't recall a
19 product without firm data in hand.  These
20 products, as we've talked about multiple
21 times today, are for people with high blood
22 pressure.  And so it's critical that they
23 have the ability to get this medication and
24 potentially also harmful if there's not

Page 437

1 product on the market and shortages and
2 things like that that an unnecessary recall
3 can lead to.
4         MS. NAGLE:  Nothing
5     further.
6         THE VIDEOGRAPHER:  Okay.
7     Off the video record then?
8     6:16 p.m., we are off the video
9     record.  This concludes the video
10    deposition of Dawn Chitty.
11        - - - - -
12    (Whereupon, the deposition was
13    concluded at 6:16 p.m.
14        - - - - -
15
16
17
18
19
20
21
22
23
24

Confidential Information Subject to Protective Order

Page 438

1    C E R T I F I C A T I O N

2

3

4         I HEREBY CERTIFY that the proceedings and

5    evidence are contained fully and accurately in the

6    stenographic notes taken by me upon the foregoing

7    matter on May 13, 2021, and that this is a correct

8    transcript of same.

9

10

11

12

13

14    _____

15         Robin L. Clark

Registered Professional Reporter

16

17

18

19

20

21         (The foregoing certification of this

22    transcript does not apply to any reproduction of the

23    same by any means unless under the direct control

24    and/or supervision of the certifying reporter.)

Page 440

1

2         E R R A T A

3         ------

4    PAGE   LINE   CHANGE/REASON

5

6    _____  _____  _____

7    _____  _____  _____

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24   _____  _____  _____

Page 439

1         INSTRUCTIONS TO WITNESS

2

3         Please read your deposition over carefully

4    and make any necessary corrections.

5    You should state the reason in the appropriate

6    space on the errata sheet for any corrections

7    that are made.

8         After doing so, please sign the errata

9    sheet and date it.

10        You are signing same subject to the

11   changes you have noted on the errata sheet,

12   which will be attached to your deposition.

13        It is imperative that you return the

14   original errata sheet to the deposing attorney

15   within thirty (30) days of receipt of the deposition

16   transcript by you.  If you fail to do so, the

17   deposition transcript may be deemed to be accurate

18   and may be used in court.

19

20

21

22

23

24

Page 441

1    ACKNOWLEDGMENT OF DEPONENT

2         I, DAWN CHITTY, do hereby

3    certify that I have read the foregoing pages

4    and that the same is a correct

5    transcription of the answers given by me to

6    the questions therein propounded, except for

7    the corrections or changes in form or

8    substance, if any, noted in the attached

9    Errata Sheet.

10

11   _____    _____

DAWN CHITTY                DATE

12   Subscribed and sworn to before me this

13        day of             ,

14   2021.

15

16   My commission expires:

17

18

19

20   Notary Public

21

22

23

24

**WORD**
**INDEX**

**< $ >**
**$400**  98:8

**< 0 >**
**0.25**  368:21
**02110**  4:3
**03**  161:18
**049M**  161:10
**050M**  162:3
**051M**  162:11
**052M**  162:20
**053M**  163:3
**083**  24:13
60:8, 12, 20
61:2, 5, 11, 16

**< 1 >**
**1**  6:17  16:18
49:6  134:21
136:23  149:4
263:9  264:2
396:19
**1:47**  185:3
**10**  5:3  7:3
112:19  213:4
214:11
**10:05**  65:15
**10:22**  65:20
**100**  44:5
69:5  149:7
161:19  162:7,
16, 23  298:6
371:20  423:7,
8
**1001**  3:3
**10022**  2:13
**100s**  371:12
372:13
**1030**  51:18
**1033**  329:10
**1034**  50:12
**1039**  144:2
**1047**  70:11
**1055**  112:17
**1063**  128:18
314:19
**1064**  36:18

**1065**  38:9
46:3  367:9
**1078**  160:3
**1088**  73:8
**1093**  212:22
236:17
**1096**  236:17
263:9, 10, 16
**10th**  214:6
**11**  88:18
95:10  142:9
143:19  154:2
217:18
218:12, 19
221:11, 19
227:1  232:6,
7, 11, 14
235:20
305:21  310:23
**11:22**  125:5
**11:46**  125:11
**110**  2:8
**1102**  26:5
**1108**  255:21
**1109**  348:23,
24
**111.72**  66:10
**1110**  16:17
**112**  7:3
**1127**  156:16
**1130**  157:22
158:4
**1137**  59:15
**1143**  248:14
**1144**  347:7
**1151**  417:13
**1156**  417:12
423:3
**1169**  205:1
**1170**  199:8
**1171**  286:13,
14
**1187**  153:17
**119**  5:16
**1191**  86:2
**1192**  381:6
**11th**  308:4
**12**  7:4  142:8
258:19  305:8
331:15

**12:30**  164:13
**12:46**  184:22
**121**  5:18
**1216**  120:22
170:20
**1218**  66:16
67:3, 5  68:24
367:10
**1219**  172:8
**1234**  178:6
**125.03**  64:21
65:1
**13**  1:13  7:5
9:6  144:3
249:2  251:4
252:4  297:11,
24  299:1, 8,
12  302:5
312:5  316:4
348:13  357:4
358:21
359:19
360:21  438:7
**13.93**  61:10,
11
**133**  5:20
**1337**  59:15
65:22  66:17,
20  68:14
369:13
**1385**  189:6
**1393**  119:15
121:18
**1394**  133:14
**13th**  297:13
357:9
**14**  7:6  43:6,
7  61:1  62:1,
17  68:14
99:17  153:18
188:7  395:22
**14.13**  60:6, 11,
20
**142**  7:4
**144**  7:5
**1453**  97:12
**1469**  23:6, 9
45:13
**15**  7:7  61:1
149:6  158:5

**15.29**  61:1, 5
62:2
**153**  7:6
**156**  5:22
**156993**  6:2
178:9
**158**  7:7
**16**  6:17  7:8
129:7, 16
160:4  316:2
345:19  346:7
355:11, 18, 20
400:21
**16.93**  61:15
**160**  7:8
**167**  61:11
**17**  144:9
237:7, 20
247:6, 19
256:10, 24
260:16
272:15
363:13  364:18
**170**  60:21
**172**  5:23
**178**  6:1
**179**  5:19  6:2
121:3
**17th**  237:18
**18**  37:1  51:5
62:14, 18
68:16  69:5
145:5  148:6
149:7  264:5
269:18
286:16
330:23  331:1
333:20
**180**  6:4
**184**  61:5
62:3, 17
68:17  69:6
**185**  5:4
**187**  5:21
133:18
**189**  6:6
**18th**  145:10
149:17  264:3
290:9

**19**  7:9  61:9
199:9  347:24
348:4  365:6
**19-2875**  1:6
9:16
**193**  179:13
**19422**  2:19
**199**  7:9
**1990**  225:10

**< 2 >**
**2**  6:18  26:6
42:9, 10
99:15  113:3
134:21  138:1,
6  147:16
160:9  172:9
179:22
265:20
386:13
419:23  423:23
**2.1**  424:8, 10
**2.2**  233:9
427:8
**2.2c**  427:14
**2.3**  428:22
**20**  7:10  34:5
70:15  157:3
186:1  199:10
202:16  203:8
212:21  213:2,
4, 6  271:15
272:14
354:24
355:17
356:16, 20
357:4
**200**  2:18
46:21  54:17
340:4
**2000**  4:3
185:16
**20004**  3:4
**2002**  26:18
31:21, 24
185:17
**2004**  12:14
**2006**  70:15
71:17, 22

**2010**  69:14
120:2  121:23
335:9
**2012**  154:2,
14  157:4
167:17, 21
168:4, 7
**2013**  171:4,
14  180:2
**2014**  95:10
134:2  173:22
175:3  232:24
412:10
**2015**  73:12
74:9  160:18
161:3, 8
162:2, 4, 10,
12, 20  163:3,
7, 10, 12, 13, 15,
17, 18, 21, 22,
24  165:6, 11,
12, 18, 23, 24
178:17  179:3,
9, 11
**2016**  86:7
88:2  89:8
158:7  159:22
**2017**  112:21
114:5  381:9,
11  383:9, 11
386:7  393:10
395:11, 12
399:6  407:22
410:12, 24
411:4, 24
**2018**  12:14
31:23, 24
33:2  37:1
51:5  54:20
58:20  59:3
129:8, 16
142:9  144:9
148:6  149:8
160:5  189:23
202:16
218:12
232:15, 24
233:5  249:3
305:21  337:1
347:10, 11
353:14

358:21
359:19
362:24  375:4
419:24
**2021**  1:13
9:6  25:14
54:22  55:1
438:7  441:11
**202-624-2538**
3:4
**203**  61:16
**208**  180:10
**20th**  207:9
**21**  7:11
212:23
**211**  44:11
46:4
**212**  7:10, 11
**212-446-4800**
2:14
**214-855-8074**
3:10
**22**  7:12
303:9  347:9,
19  380:8
381:7  403:4
**2200**  3:9
**22nd**  316:21
375:4, 7  376:5
**23**  5:9  7:13
236:24
263:22  264:2
357:10, 13
403:3
**23491**  120:15
121:12, 15, 20
170:6, 10
171:2
**236**  7:13
**23rd**  316:21
**248**  6:8
**25**  7:14  98:1
128:20
314:21, 22
**255**  6:8
**26**  6:18  7:15
208:12  329:24
**26.5**  24:13
**26.6**  148:9
**26th**  207:3, 9

**27**  7:16
61:14  160:5
347:7  364:18
**28**  7:17
61:15  335:6
417:22
**2800**  3:16
**287**  6:12
**2875**  1:3  9:13
**29**  7:18  95:4
423:3

< 3 >
**3**  6:19  24:10
36:20  39:1
43:14, 20, 24
44:10  45:20,
22  53:18, 20,
21  54:21
57:21  61:19
62:12, 13
65:1  66:13,
19  154:18
178:14  256:7
264:6  287:17
290:19, 20
291:4  292:10
293:5, 11, 20
294:6  295:7,
13  296:13, 14,
23  297:5
303:6, 12, 16,
24  304:11
346:13
362:24
371:17, 21
**3.1**  430:18
**3.3**  432:4
**3:03**  270:23
**3:19**  271:3
**30**  201:18
224:21
225:16  439:15
**314**  7:14
**316**  2:4
**320**  44:23
45:5, 7, 16, 18,
23  49:5, 8
57:22
**32502-5996**

2:5
**329**  7:15
**347**  7:16
**349**  6:12
**354**  6:15
**36**  6:19
**3600**  3:9
**37**  339:9, 15
340:6  343:4
**372**  66:14
67:1
**38**  6:20
**381**  7:12
**39**  339:10
340:6  343:4
**3rd**  287:13
290:10  346:5

< 4 >
**4**  6:20  27:1
38:10  64:20
144:18
157:14  158:11
**4:25**  346:22
**4:37**  347:3
**400**  284:24
286:6  291:12
292:1  301:16
313:5  319:1
**416.76**  65:2
**417**  7:17
**423**  7:18
**435**  5:4
**45**  287:14
**450**  2:18
**45202-2409**
3:16
**483**  113:4
**483s**  87:15

< 5 >
**5**  6:21  30:5
50:13  73:12
86:17  155:6
158:6  159:11
**5.44**  62:9, 13
**50**  6:21  55:3
**5068**  6:8
189:10
**51**  6:22  67:3
68:5  162:20

**513-698-5000**
3:17
**52**  67:3  68:5
233:11
**5201**  2:8
**56**  182:13
**56.2**  162:4
**56.4**  162:13
**56.5**  161:16,
19
**59**  5:10

< 6 >
**6**  6:22  51:19
355:18
356:16, 20, 22
**6:01**  434:18
**6:13**  434:22
**6:16**  437:8, 13
**60**  46:17
71:14  72:14
73:3, 4
**600**  2:4  3:16
**601**  2:13
**610-567-0700**
2:19
**617-310-5224**
4:4
**63.1**  163:5
**63.4**  43:10, 19,
23  44:9, 10
46:12, 15
47:22
**66205**  2:9
**67**  5:13
**682**  142:7
305:7
**6th**  189:23
207:3

< 7 >
**7**  6:23  70:12,
13  205:11
206:3, 9
210:9  349:18
351:3  353:13
**70**  6:23  68:24
**73**  6:24
**75201**  3:10
**77**  5:9  23:16,
20

**78** 5:10 59:17, 23 370:5
**79** 5:13 67:6, 14 367:21

**< 8 >**
**8** 6:24 66:8, 19 73:11
**80** 5:15 97:13, 21
**81** 5:16 119:16, 20
**82** 5:18 120:24 121:4 170:21
**83** 5:20 133:15, 19
**84** 5:22 156:17, 21
**85** 5:23 172:8 173:2
**850.435.7032** 2:5
**85416** 5:24 173:1
**86** 6:1 7:2 178:6, 10
**87** 6:2 179:14, 18
**88** 6:4 180:11, 16
**89** 6:6 189:7, 11

**< 9 >**
**9** 7:2 86:4
**9/7/18** 6:12 349:7
**9:07** 1:18 9:7
**90** 6:8 248:15, 18
**90463** 6:4 179:17
**91** 6:8 255:22 256:2 265:20
**913-563-6255** 2:9
**92** 6:12 287:9 288:3

**93** 6:12 349:5, 9
**94** 6:15 354:15, 18
**95** 370:2
**96** 24:7 45:24 56:8, 19 57:6, 19, 22 58:22 59:4
**97** 5:15

**< A >**
**a.m** 1:18
**abbreviated** 115:19
**abide** 109:9
**ability** 50:1 123:3 133:2 139:4 141:3 218:17 223:18 239:10 268:11, 16 274:19 317:11 339:3 360:2, 6 372:23 374:24 375:5 393:1 401:18 407:15 436:23
**able** 104:24 112:12 131:16 141:10 142:16 146:15, 19 150:12 178:23 198:10 216:22 224:22 248:9 251:2 252:5 260:23 264:6 274:17 284:16 285:24 293:13 307:16 309:11 320:24 344:23

345:10 353:2 359:4 365:3 374:8, 12, 17 375:23 377:18, 22 378:21 380:16 395:16 410:3 414:9
**absolutely** 186:5 215:21 243:4 324:8 367:11
**accept** 105:1
**acceptable** 24:5, 17 45:19 54:19 312:1
**accepted** 173:24 174:2, 19
**accessible** 16:23
**accuracy** 343:10 344:2 432:8
**accurate** 15:18 20:9 57:13 84:14 91:11 168:18 212:13 239:9 267:23 275:12 287:22 289:5, 10 307:24 323:22 339:1 343:5, 20 362:11 432:11, 13, 18, 23 439:17
**accurately** 265:5 268:11 293:14 308:6 309:12 317:15 328:16 335:3 357:1 363:9 375:5 377:18 438:5
**achieve** 177:3

**acknowledge** 424:10
**ACKNOWLEDGMENT** 441:1
**Act** 382:3 435:21
**Actavis** 4:6
**acted** 270:16
**acting** 313:2
**ACTION** 1:5 114:20 129:22 148:9 174:11 209:14, 20 230:8 273:20 279:2 295:19 321:15
**actions** 197:23 231:6 404:16
**active** 51:23 154:12 157:12 200:1
**actively** 143:21 312:24 380:14
**activities** 21:23 37:9 51:3 100:5, 18 139:23 153:8 187:20 244:19 278:10, 13 305:4 332:16 387:6
**activity** 77:17 78:21 79:16 378:15
**actual** 122:9 146:13 171:14 227:10
**adapting** 133:9
**add** 154:20 155:4
**added** 254:2 347:12, 13, 18
**addition** 244:4
**additional** 92:8 100:5

244:3 256:21 263:5 269:15 276:7 277:12 304:13 314:8 324:5 326:1, 16, 20 329:6 345:9 347:12, 18 373:17
**address** 71:3 73:14 257:8
**addressed** 86:19 115:2 205:4 349:3
**addresses** 71:1 74:1 102:1
**adds** 409:21
**adequate** 391:19
**adequately** 115:1 293:14 335:2 363:7, 8 380:16
**adulterated** 110:5 112:3, 8
**adverse** 209:4, 9
**advertising** 299:13, 18, 20
**advisable** 202:8
**advise** 15:5 34:10 99:9 187:1, 12
**advised** 13:13 409:15
**advising** 98:11
**advisor** 13:11
**advisors** 429:1
**affairs** 12:18 98:3 99:20, 21, 23, 24 100:1, 3, 15, 20 101:22, 23 109:13 186:2 188:16 240:3 331:22 382:11 388:10
**affect** 230:4, 13

**affordable**
17:4
**afternoon**
129:21  185:6
**agent**  87:13
101:6  119:5
426:1, 9
**agents**  429:1
**ago**  55:23
142:4  168:1,
3  201:18
256:8  305:2
341:22
353:19  364:16
**Agrawal**  228:6
**agree**  12:23
13:2  14:10,
17  16:6
18:13  19:14,
18  25:2  31:3,
12  35:8
47:11  48:23
53:2, 23  54:5,
12, 15  57:19
58:2  60:23
61:13  66:15
69:24  77:24
80:15  81:10
83:19  85:21
105:16  109:6
116:16  126:2
128:7, 16
149:21  152:6
161:21  187:3
191:3  192:12
193:4  217:4
223:11  230:2
231:13
234:19
243:18
254:11, 17
257:24
308:14  310:5
311:15
312:13
318:12, 22
321:20
323:19
327:20
362:23
364:18  373:9

376:23  391:1,
8  393:23
399:20  402:3
421:7  429:8
431:6
**agreed**  9:20
145:3  341:20
421:20  426:3
**agreed-upon**
22:14
**agreeing**
243:9, 15
**agreement**
385:18, 24
421:17, 20
422:6, 19, 21
423:10, 13, 14,
22  424:3, 22,
24  425:17
426:15, 19
428:16, 17, 21
429:6  432:7,
21  433:6, 10
434:8
**agreements**
246:1
**ahead**  10:21
146:20
246:13
262:13, 14
277:16  295:19
**air**  56:7
**allow**  77:21
265:11
**allowable**
36:5  79:18
291:9, 22
296:17  373:1,
2
**allowed**  41:8
105:9  117:10
118:6  265:23
292:23  375:9
**allows**  116:3
265:16
**alternate**
134:16
**alternative**
299:1
**amendment**
121:11

134:11  135:1,
11  168:24
169:3, 22
171:2, 7, 14
172:13
173:15, 21
175:10  177:17
**AmerisourceBe**
**rgen**  3:18
**amines**  123:4,
7, 17
**Amit**  228:3, 9
**amlo/val/HCT**
**Z**  45:3
**amlodipine**
38:7  43:1
134:12
154:16
168:15
169:11  175:7,
23
**amlodipine/hyd**
**rochlorothiazid**
**e**  169:15
**amlodipine/vals**
**artan**  171:9
177:11  340:16
**amlodipine/vals**
**artan/hydrochl**
**orothiazide**
42:11  171:10
175:8  176:2
345:24
**Amlodipine/Va**
**lsartan/Hydroc**
**horothiazide**
38:21
**amount**  46:22
47:13  53:22
62:18, 19
68:17, 18
216:13  218:2
293:3, 7
**amounts**
51:22  52:16
56:6  198:11
199:4  238:11
288:8, 17
291:6, 12
292:1, 7, 13,
21  293:15, 23

**analogous**
191:17
**analysis**  130:1
241:3
**analytical**
333:18  343:3,
16  387:21, 24
388:7, 12
396:15
419:10  420:13
**and/or**  158:18
159:14
362:14  438:24
**ANDA**  5:22
115:14, 21
116:6, 15, 17,
21, 22  117:2
118:20
152:17, 19, 24
153:7, 12, 14,
20, 21  155:6
156:19  158:1
167:15
168:22, 23, 24
169:2, 4, 21,
24  171:8, 14
173:11
174:20
182:18  240:9
**ANDAs**  118:3
151:22  154:7
167:12, 20
169:6  176:23
**Angiotensin**
5:10  23:14
**animal**  39:5
**animals**  27:20
39:2  41:18
**announcement**
248:22
**annual**  229:12
**anomalies**
388:6
**Answer**  8:4
11:24  12:1
92:16  150:10
239:2  254:18
280:19
319:24  322:10
**answering**

81:2
**answers**  441:1
118:4, 12
122:18
**anymore**
262:17
**API**  5:10
42:21  44:17
46:7  47:1, 14
48:2, 4, 14, 24
49:1, 3, 5, 9,
11  51:24
59:18, 22
63:2, 3, 6, 11
64:5, 8, 12
65:24  68:9
69:4, 15, 20,
23  70:1, 6
71:5, 7, 23
74:14, 18
75:12  76:18
77:9  89:5, 8,
11, 18  95:14,
19  96:10
103:4  104:4
116:7, 10, 12,
13  117:18, 22
118:1  120:20
127:23  128:1,
3  130:3
131:7  132:16
135:16, 23
138:3  150:20
152:7  153:13,
16  155:23
156:9, 14
157:9  158:2
159:3, 19, 23
160:21, 22
161:4  170:13
172:11, 14, 18,
20  173:12, 15
177:1, 6
179:24
195:15
196:23, 24
198:14
199:15, 17
207:2  209:3
213:21  225:8

233:*15, 19, 20*
234:*4* 235:*6,*
*21* 239:*23*
253:*6* 254:*9*
259:*6* 283:*24*
288:*9, 13, 18*
291:*20* 296:*3,*
*8* 306:*6, 8*
309:*8* 355:*1*
360:*7* 361:*3*
363:*8* 372:*17*
383:*12, 16, 21*
386:*3* 390:*1,*
*7, 18* 392:*5,*
*19* 406:*9*
412:*2, 6, 10,*
*13, 15* 413:*4,*
*10* 416:*5*
426:*24* 435:*23*
**APIs** 71:*8*
**apologies**
164:*21*
**apologize**
237:*3*
**apparently**
175:*9* 274:*7*
392:*22*
**appear** 346:*1*
**APPEARANC**
**E** 4:*1*
**APPEARANC**
**ES** 2:*1* 3:*1*
**appeared**
166:*12*
**appearing**
9:*19*
**appears** 26:*23*
27:*19* 43:*7*
120:*7* 136:*22*
138:*18*
248:*24* 311:*1*
350:*23* 383:*7*
403:*18* 410:*8*
**apples** 44:*15*
45:*11*
**apples-to-**
**apples** 44:*21*
**applicable**
113:*7* 431:*2*
**applicant**
119:*3*

**Application**
5:*22* 115:*20*
156:*19* 174:*9*
**applications**
175:*15*
**applied** 13:*9*
173:*11* 309:*7*
**APPLIES** 1:*6*
**apply** 105:*4*
108:*24* 438:*22*
**appreciate**
435:*4*
**approach**
386:*15*
**appropriate**
84:*7* 113:*12,*
*14* 149:*9*
243:*12*
246:*17*
247:*13*
269:*13*
278:*24*
314:*17*
315:*22*
342:*11, 16*
343:*19*
346:*14* 359:*3,*
*7* 387:*19*
439:*5*
**appropriately**
150:*5* 313:*2*
**approval** 98:*7*
116:*18*
145:*23*
172:*19* 174:*8,*
*11, 18* 175:*18*
176:*7* 177:*8,*
*12* 336:*2*
**approve**
106:*13* 154:*9*
**approved**
105:*8* 115:*20*
116:*22*
174:*21, 22*
175:*1, 2, 5*
209:*2* 335:*13*
337:*9* 410:*23*
**approving**
105:*24*

**approximately**
9:*7* 206:*7*
221:*22* 316:*10*
**April** 112:*21*
173:*22* 175:*3*
**AR** 67:*24*
69:*2* 370:*24*
371:*3*
**AR11D0743**
66:*21*
**arbitrary**
58:*12*
**ARBs** 5:*10*
23:*15*
**area** 21:*21*
28:*19* 33:*23*
34:*2* 56:*24*
78:*19* 92:*21*
201:*22*
320:*24*
336:*22* 409:*9*
434:*11*
**areas** 98:*8*
108:*9* 331:*13*
**argue** 326:*4,*
*10* 327:*24*
328:*21*
334:*20* 345:*3*
**argument**
329:*2*
**ARI1D0743**
68:*6*
**ARIIB0022**
68:*23*
**article** 194:*21*
195:*20* 197:*6,*
*24*
**articles** 194:*10*
**Arun** 214:*16,*
*17* 244:*13, 20*
**aside** 107:*8*
**asked** 19:*6*
34:*12* 65:*23*
90:*15* 91:*1*
92:*14, 15*
94:*4* 96:*3, 16*
267:*4* 298:*12*
300:*1* 325:*13,*
*20, 24* 341:*21*
376:*14, 24*

377:*4, 6*
435:*20* 436:*11*
**asking** 34:*17*
80:*9* 94:*3, 16*
138:*11, 21*
143:*1* 148:*20*
149:*8* 165:*5,*
*21* 168:*21*
196:*2* 218:*24*
229:*11*
238:*15, 21*
239:*14, 19*
255:*16* 264:*5,*
*13* 354:*11*
366:*6, 7*
417:*18*
419:*10, 15, 19*
**asks** 138:*2*
**aspects** 15:*8*
108:*11*
246:*10, 15*
281:*24*
**assay** 396:*20*
400:*24* 401:*1,*
*3*
**assembling**
154:*12*
**asserted**
432:*22*
**assess** 16:*8*
**assessment**
38:*7* 288:*17*
**assigned**
370:*24* 371:*3*
**assignments**
151:*11*
**assistant**
205:*17*
**assisting** 32:*20*
**associated**
19:*11* 172:*3*
195:*4* 236:*14*
296:*18* 305:*15*
**association**
418:*24*
**assume** 84:*3*
93:*16* 148:*13*
222:*10, 14*
**assuming**
220:*4* 275:*10*

**assumption**
219:*7, 8, 13,*
*15* 220:*8, 14*
259:*24*
**assurance**
146:*1, 3, 5*
333:*12* 395:*20*
**assurances**
261:*15*
265:*22* 274:*21*
**assure** 113:*13*
**attached**
134:*11* 194:*2*
421:*13*
439:*12* 441:*1*
**attachment**
36:*21* 38:*6*
50:*15* 51:*15*
136:*22*
**attempted**
403:*7*
**attend** 331:*10*
**attendees**
330:*18, 23*
331:*1, 15*
**attention**
115:*1* 120:*4*
**attorney**
11:*21* 439:*14*
**attorneys** 12:*4*
**attributes**
389:*23*
**audible** 111:*4*
**audit** 89:*4*
94:*6, 9* 95:*13*
385:*22* 386:*4*
393:*1, 8*
395:*8* 407:*15*
408:*17*
**audit/vendor**
88:*23*
**audited** 95:*19*
393:*12, 18*
395:*11*
399:*21*
407:*21* 408:*7*
**auditor** 88:*22,*
*24* 89:*6* 90:*1*
91:*5, 9* 94:*5,*
*9, 18* 95:*12, 19*

**auditors**
93:*10, 22*  97:*7*
**auditor's**  89:*1*
94:*7*
**audits**  96:*5*
385:*13*
393:*20*
395:*14, 16*
**August**  37:*1*
51:*5*  54:*20*
59:*3*  129:*7,*
*16*  142:*9*
143:*19*  144:*9*
145:*5*  148:*6*
149:*7*  160:*5*
180:*2*  287:*13,*
*17*  290:*19, 20*
291:*4*  292:*10*
293:*5, 11, 20*
294:*6*  295:*7,*
*13*  296:*13, 14,*
*23*  297:*5*
303:*6, 9, 12,*
*16, 24*  304:*11*
305:*21*
310:*23*  316:*2,*
*22*  333:*20*
335:*6*  337:*1*
345:*19*  346:*5,*
*7, 13*  347:*9,*
*19*  351:*3*
375:*4, 7*
376:*5*  380:*8*
**Aurobindo**
2:*21*
**Aurolife**  2:*21*
**Authorized**
429:*2*
**available**
46:*17*  160:*22*
216:*14*
295:*21*  298:*1*
336:*3*  365:*15*
**Avenue**  2:*13*
3:*3, 9*
**average**  15:*6*
218:*3*
**AVH**  134:*11*
176:*1*  177:*4,*
*12*

**avoid**  187:*14*
202:*7*
**awaiting**  64:*14*
**aware**  15:*20*
32:*9, 11*
38:*23, 24*
48:*10*  56:*4*
61:*19*  89:*16*
102:*11*  123:*2*
124:*9*  127:*4*
133:*1*  143:*7*
149:*15*
150:*18*  151:*6*
166:*18*
177:*20*  179:*2,*
*5*  191:*5*
196:*15*
197:*21*
199:*22*
202:*17, 22*
203:*6, 14*
210:*19, 22*
211:*22*  224:*6,*
*13*  226:*4*
230:*22*
235:*19*  236:*7*
245:*15*  246:*7*
251:*23*
253:*11, 14, 22*
254:*21*
255:*15, 18, 20*
268:*12*
269:*13*  288:*7*
291:*19*
293:*20*  295:*3*
300:*18*  301:*2,*
*4, 11, 13, 24*
302:*3, 13*
303:*4, 7*
319:*14, 18*
321:*13*
340:*10*
351:*20*  352:*3,*
*4, 6, 15*
360:*20*  361:*2*
362:*5*  367:*5*
372:*23*  377:*3,*
*13, 17*  378:*20*
379:*15, 19*
380:*2*  381:*14*
391:*9, 23*

397:*4*  398:*1,*
*13, 19*  400:*15,*
*18*  402:*9*
403:*22*  404:*3,*
*8, 15*  405:*6,*
*14*  406:*9*
415:*14*  416:*9*
421:*17, 24*
422:*10, 24*
426:*2, 12, 19*
428:*8, 15*
430:*8, 14*
431:*24*
432:*17*  434:*13*

**< B >**
**back**  30:*3*
46:*3*  55:*18*
65:*13, 22*
71:*22, 24*
85:*3*  92:*12*
104:*10*
105:*15*
107:*12*
113:*19*
114:*12*  115:*4*
117:*2*  120:*23*
121:*18*
125:*18*
133:*24*  144:*4*
165:*10, 24*
175:*14*  178:*2*
183:*17*
193:*17, 19*
212:*24*
220:*18*  223:*5*
245:*11*
246:*22*
252:*22*  257:*5*
264:*12*
265:*19, 24*
267:*16*  268:*5*
276:*22*
283:*12*
284:*23*
286:*15*
293:*11*
298:*13*  303:*6*
345:*21*  364:*2,*
*17*  366:*9*
391:*14*  435:*13*

**background**
34:*1*  85:*11,*
*23*  91:*18*
132:*14*
166:*23*  167:*3*
433:*4*
**back-ordered**
244:*21*
**bad**  230:*3*
234:*17, 19*
**barely**  111:*4*
**BARR**  2:*3*
**BARTON**  2:*6*
**base**  396:*8*
**based**  25:*22*
26:*1*  27:*3*
39:*5*  44:*13*
58:*22*  70:*23*
121:*15*  146:*8*
147:*10*
175:*13*
179:*24*
197:*11*  204:*1,*
*3, 5*  208:*5, 11*
218:*3*  220:*15*
222:*7*  228:*16*
261:*10*  265:*8,*
*21*  266:*7, 15,*
*20, 22*  267:*9*
273:*22*  279:*3,*
*5, 6*  289:*18*
296:*10*
324:*14*
343:*16*  353:*3*
372:*18*
373:*13*
375:*24*
384:*11*
386:*15*
414:*19*  426:*15*
**basic**  27:*13*
258:*20*
**basically**
134:*22*  136:*1*
154:*19*  160:*11*
**basics**  11:*7*
**basis**  103:*11*
205:*20*
312:*16*
344:*11*  429:*4,*

*7*
**Basu**  237:*23*
**Batch**  6:*4*
43:*1, 5*  46:*13,*
*15*  47:*1, 21*
60:*21*  62:*6,*
*15*  63:*2, 4*
65:*3*  66:*9, 18,*
*20, 21*  67:*8,*
*22*  68:*5, 9, 23*
69:*1, 5, 7, 10*
138:*3*  160:*23*
161:*4, 9, 12,*
*15*  162:*2, 4*
176:*6*  179:*23*
180:*13, 21*
181:*24*  182:*4,*
*16*  183:*23*
184:*2*  306:*3,*
*8, 12*  307:*1*
311:*5*  313:*22*
314:*12*  364:*5,*
*16*  370:*13, 23*
371:*6, 23, 24*
372:*5*  398:*8,*
*10*  399:*15*
**Batches**  5:*13*
46:*14*  48:*20*
61:*9, 14*
64:*11, 13, 16,*
*18*  67:*12*
130:*3*  145:*15*
146:*6, 11, 22*
147:*7, 12*
148:*10, 15*
149:*6, 10*
160:*16, 17*
164:*1*  165:*6,*
*11, 23*  166:*12*
176:*14*
181:*20*
183:*11, 19*
184:*13*
208:*24*
210:*24*  211:*2,*
*4, 24*  239:*24*
267:*13*
271:*24*
284:*18*  285:*7*
287:*2, 3*
289:*23*

290:*15, 16*
291:*20*
295:*14*
296:*16, 20, 21*
310:*2*  313:*24*
314:*13*
316:*13, 14, 15*
317:*6*  321:*14*
324:*16*
346:*17*
347:*22*  348:*6,*
*8, 11, 13, 16*
350:*3*  359:*13,*
*21*  360:*8, 13,*
*21*  361:*2, 8,*
*16, 17*  362:*21*
363:*17, 18, 22*
364:*10*
365:*18, 19*
366:*1, 6, 8, 15,*
*16*  367:*2, 6*
368:*10, 19*
370:*15, 21*
396:*1, 21, 24*
397:*2, 4, 14,*
*19*  419:*17*
**Bates**  5:*13, 16,*
*18, 20, 22, 23*
6:*1, 2, 6, 8, 12*
67:*13*  119:*19*
121:*2*  133:*17*
156:*19*
172:*24*  178:*8*
179:*16*
180:*14*  189:*9*
255:*24*  287:*7*
349:*7*
**Baylen**  2:*4*
**beat**  380:*19*
**beginning**
31:*20*  97:*24*
353:*23*
**behalf**  93:*1*
**belief**  213:*20*
**believe**  17:*3*
26:*14*  28:*13*
38:*4*  41:*24*
49:*13*  53:*7*
75:*16*  78:*9,*
*22*  82:*7*  87:*9*
101:*2*  103:*3*

107:*18*
116:*14*  120:*1*
135:*23*
142:*11*
149:*17*  152:*4*
159:*7*  165:*16*
181:*3, 11*
196:*4*  197:*3*
202:*14*
207:*24*  227:*9*
228:*8, 12*
242:*22*  248:*2*
257:*2*  266:*19*
268:*15*  270:*7*
287:*2*  295:*23*
296:*4*  297:*12*
309:*7*  311:*10*
316:*20*  330:*4*
336:*12*
347:*14*
355:*10*  357:*8*
362:*19*  364:*9*
365:*13*
370:*17*
372:*18*
383:*14*  409:*2*
417:*14*
420:*20*  430:*4,*
*9*
**believed**
198:*15*
287:*21*
300:*21*  301:*6*
**believes**
306:*11*
**Bell**  2:*19*
**benefit**  19:*11*
**benefit-risk**
241:*3*
**BERNE**  3:*15*
**better**  192:*12*
193:*13*
309:*13*
421:*11, 19*
424:*9*
**beyond**  17:*20*
29:*7*  31:*5, 18*
178:*17*
**big**  277:*7*
292:*12*  310:*6*

**biggest**  72:*23*
**binder**  153:*22*
**bit**  12:*22*
40:*3*  59:*1*
69:*12, 13*
88:*7*  95:*5*
97:*11*  98:*21*
117:*19*
125:*14*  132:*9,*
*24*  134:*1, 19*
160:*10*
164:*13*
167:*12*  199:*7*
319:*22*  337:*8*
345:*15*  354:*7,*
*8*  436:*14*
**blank**  157:*17*
**blanket**  360:*15*
**block**  206:*1*
**blocked**
182:*20*
**Blockers**  5:*10*
23:*15*
**blood**  216:*4*
298:*22*  436:*21*
**blow**  27:*2*
213:*1*  257:*4*
323:*15*
**Blue**  2:*19*
**board**  244:*9*
362:*7*
**bodies**  17:*13*
**body**  14:*21*
71:*6*  129:*19*
144:*19*
**bold**  424:*15*
**borrow**  253:*16*
**Boston**  4:*3*
**bottom**  26:*17*
68:*4*  74:*11*
128:*22, 24*
142:*8*  144:*5*
158:*14, 16*
161:*2, 9*
178:*16*
181:*17*
205:*15*
341:*17*
349:*15*  403:*5*
419:*4, 9*
433:*12*

**bought**
163:*15, 17*
**box**  158:*17*
**boy**  73:*18*
**brand**  300:*19,*
*20*
**Brazil**  190:*5,*
*7, 11*
**break**  65:*7*
81:*4*  124:*23*
164:*14*
184:*17*
199:*16*
270:*19*  322:*4*
346:*19*  392:*1*
430:*20*  434:*16*
**breakdown**
189:*1*
**breath**  230:*22*
246:*18*
**briefly**  9:*23*
**BRIEN**  2:*3*
**bright**  56:*14*
**Brijesh**  101:*1*
121:*9*  134:*3,*
*22*
**Brijesh's**
135:*20*
**bring**  326:*17*
**BRITTNEY**
2:*12*  123:*23*
152:*9*  164:*3, 5*
**brittney.nagle**
**@kirkland.com**
2:*14*
**broad**  99:*2*
106:*2, 4*
**brought**
114:*24*
**BUCHANAN**
2:*3*
**budget**  229:*12*
**bugging**
369:*18, 21*
**build**  192:*18*
**bullet**  100:*15*
136:*24*
**bunch**  158:*21*
159:*16*  160:*22*

**BURROWS**
2:*6, 8*
**business**
72:*21*  103:*15*
108:*11*
190:*13*  231:*5*
234:*9, 10, 12*
299:*19*
304:*17, 19*
384:*3, 11, 17*
434:*11*
**business-**
**focused**  246:*7*
**buy**  178:*23*
297:*16*
**buying**  18:*5*
179:*2*  233:*21*
297:*21*
383:*16, 21*
**by-product**
32:*24*

**< C >**
**C5069-15**
161:*9*
**C50691553**
306:*4*
**CAITLIN**
2:*18*
**calculator**
44:*8*  45:*2*
60:*19*  61:*4*
64:*24*
**calendar**
355:*19*
**calibrated**
387:*13*
**call**  122:*10*
203:*18*
329:*14*  347:*6*
**called**  20:*12*
26:*11*  38:*19*
69:*16*  101:*3*
109:*19*
150:*12*  152:*2*
299:*24*
**calling**  330:*15*
**CAMDEN**  1:*2*
**Canada**  101:*2*
**cancer**  27:*15,*
*24*  28:*9, 15,*

18 29:4 39:4,
8 194:12, 15
195:4 196:5,
8 197:11
201:4 319:10,
19 320:2
**cancer-causing**
198:6 200:20
213:10
**capabilities**
104:13
214:12 341:4
350:7
**capability**
363:1
**capable** 15:7
**capacity**
63:19 101:12
182:12 382:10
**carcinogen**
32:22 39:7,
13, 17, 19
40:8, 20 41:6,
7 42:5 54:7
198:6 203:10,
19, 21 216:8
217:8 230:12
247:22
249:22
278:17
279:11
308:23 315:4
318:14
352:16 353:1
426:14, 23
429:24 430:5
**carcinogenic**
27:6, 9, 22
28:8, 24 29:3,
9, 13 30:7
36:8 39:21
292:22 311:15
**Cardinal** 3:5
**careful** 76:10
**carefully**
439:3
**carries** 128:24
**case** 9:15
72:8 76:10
97:12 108:15
222:7 234:5

242:14 311:1
373:22 383:4
432:5
**CASES** 1:9
105:3
**casting** 344:6
**catalysts**
137:12
**categorize**
325:7 380:12
**cause** 33:19
201:4
**causes** 27:15
28:9, 14, 17
29:4 33:14
**causing** 403:17
**cc** 189:17
**cc'd** 217:19
**cc'ing** 238:1
**CDA** 421:13,
16
**CEO** 75:3, 10
147:20
**certain** 40:7,
20 104:3, 20
105:6, 18
108:9, 11
135:15
139:23
151:15 178:3
187:14
216:13
245:24 246:1
279:16
292:20
296:18
307:10
315:11 357:5
358:3 360:13
409:23, 24
**certainly** 55:3
312:23 332:5
407:5 408:9
**certification**
438:21
**CERTIFY**
438:4 441:1
**certifying**
438:24
**CFO** 75:9

**CGMP**
109:20, 22
113:21
**CGMPs** 110:7
**chain** 74:12
147:23
183:20 228:4,
5, 9, 13, 18, 21
229:3, 6, 7, 19
244:18 324:20
**Chakar**
433:16
**chance** 409:14
**Chandrasekhar**
433:11
**change**
134:17, 18, 24
137:3 172:11,
14, 15, 16
173:23 174:1,
15 175:5
177:1
**CHANGE/RE
ASON** 440:4
**changes**
104:24
105:10, 17
439:11 441:1
**characterizatio
n** 102:19
**characterize**
21:6
**chart** 42:14
60:3 71:7, 9
160:21, 24
161:2, 11
175:21 180:9
**cheap** 70:1
76:1 233:15
234:16, 18
235:10 383:17
**cheaper** 73:4
74:14, 18
75:12 76:18
233:19, 20
384:15
**check** 78:15
174:24
**checking**
93:17

**checks** 21:8
226:16
**chemical** 39:7
203:1 204:1
**chemist**
185:19, 22
201:14 396:15
**Chemistry**
120:10 185:24
**chief** 214:17
244:13
262:16
263:23 264:10
**China** 95:16
194:12
195:14 197:1
204:15
**Chinese** 69:16
74:14, 18
75:12 76:18
95:14 195:15
233:15
**Chip** 75:7
193:22, 23
196:1
**CHITTY** 1:17
5:3 9:17
10:16, 23, 24
16:19 23:20
67:9 75:17
92:23 97:14
99:5 125:13
185:7, 11
189:18 205:2
214:22 217:6
234:17 237:6
247:18
252:13 260:9
263:11 267:2
269:7, 17
270:8 271:6
276:10
277:21 279:9
282:17
286:14
291:11
305:11
308:15 310:5
312:13
317:18
318:11 322:3

324:8 328:20
330:19
337:21
348:21
353:22
354:18 362:2
367:10 368:1
370:12
371:12
372:10 373:4
375:20 381:8
408:16
413:12
417:15
433:21 435:2,
19 437:10
441:1, 11
**chloride** 180:1
**Choksi** 152:2
154:20
155:19
156:12 159:12
**chose** 39:16
52:4 69:23
321:7
**CHRIS** 4:9,
10 9:4 44:9
**chromatogram**
406:1
**chromatogram
s** 403:19
419:17
**chromatograph
s** 410:4
**chromatograph
y** 144:23
224:3 419:12
**chromatograph
y/mass** 144:24
**Cincinnati**
3:16
**CIPRIANI**
2:15
**circumstances**
151:15
**cited** 117:2
**CIVIL** 1:5
9:15
**clarified**
403:11

Confidential Information Subject to Protective Order

clarify 141:*14*
168:*11, 14*
249:*15*
clarifying
176:*20*
clarity 424:*19*
Clark 1:*19*
10:*5* 438:*15*
classified
114:*20* 249:*21*
clawlor@c-
wlaw.com
2:*20*
clear 40:*6*
271:*11*
343:*23*
367:*11*
370:*19*
371:*16*
389:*24* 422:*20*
clearance
183:*1*
clearing 183:*3*
clearly 27:*6*
130:*4* 298:*18*
clients 99:*2*
close 145:*12*
174:*10, 17*
286:*18* 355:*20*
closer 111:*6*
CMC 134:*11*
code 67:*18*
306:*6*
colleagues
229:*17*
230:*23*
239:*13*
242:*17*
243:*24*
256:*13, 23*
262:*3* 275:*23*
323:*11* 363:*14*
collective
266:*21*
colon 42:*10*
colorance
156:*4*
column 24:*5,*
*9* 42:*14* 60:*4*
66:*19* 67:*8*
68:*1* 173:*23*

181:*4, 9, 13*
182:*4*
columns 42:*13*
com 38:*1*
combination
154:*11*
come 30:*3*
57:*6* 103:*22*
104:*2, 11*
120:*23*
143:*22*
211:*23*
259:*16*
313:*17* 364:*2*
366:*9* 399:*16*
comes 87:*2*
107:*2* 123:*12*
146:*3* 277:*10*
343:*15*
comfortable
117:*9*
coming 41:*15*
101:*17*
102:*12*
104:*12*
122:*22*
131:*23* 136:*2*
294:*5* 344:*10*
414:*5* 435:*4*
commencing
1:*18*
comment
175:*9* 336:*21*
comments
176:*24* 177:*11*
commercial
100:*17* 153:*3,*
*15* 187:*20*
commission
441:*16*
common
53:*11* 91:*22*
103:*15*
254:*22* 255:*1*
434:*12*
communicate
15:*24* 102:*7*
122:*6* 205:*19*
206:*17*
214:*20, 23*

240:*3, 5*
325:*22* 332:*18*
communicated
16:*2* 55:*13*
222:*20*
415:*19* 417:*10*
communicates
429:*16*

communicating
215:*5, 6, 10*
222:*24*
241:*10*
258:*22*
259:*20* 263:*2,*
*13* 275:*22*
289:*21*
332:*21* 356:*7*
358:*8, 17*
419:*7*

communication
101:*11*
106:*16*
176:*23* 252:*8*
287:*19* 288:*6,*
*12* 418:*15*
421:*12*
communication
s 101:*8, 15*
132:*15, 16*
177:*24* 178:*2*
196:*17*
213:*16*
252:*23*
262:*10*
289:*20*
298:*17*
304:*10*
350:*13* 351:*7*
353:*8* 356:*13*
358:*15*
companies
14:*11, 18*
99:*9* 109:*23*
122:*15*
153:*11*
186:*17, 22*
187:*13, 24*
224:*21*

255:*10* 379:*3,*
*8*
company
13:*12* 32:*3*
35:*16* 69:*16*
75:*4* 89:*14*
98:*9* 99:*8*
101:*17*
103:*19*
139:*15, 20*
147:*21* 187:*4*
190:*15, 19, 23*
197:*1* 205:*18*
214:*18*
218:*10*
226:*10*
228:*14*
237:*10*
244:*14* 245:*8*
247:*3* 269:*8*
277:*22* 377:*6*
379:*16*
397:*21*
398:*21* 399:*3*
412:*13* 430:*8*
compare 66:*18*
comparing
44:*15*
comparison
44:*21*
competitive
74:*15*
completed
120:*10* 347:*16*
completely
10:*1* 225:*12*
completeness
432:*8*
complex
248:*9* 378:*10*
compliance
13:*5* 83:*5*
104:*9* 153:*3*
186:*24*
192:*11, 16, 18*
338:*6*
compliant
22:*13*
comply 186:*23*
component
48:*17* 100:*3*

composition
328:*13*
compound
32:*23* 213:*10*
compounds
35:*9*
concept 53:*12*
403:*15*
concern 215:*4,*
*17*
concerned
312:*24* 399:*7*
concerns 94:*3*
134:*23* 135:*1,*
*10* 136:*2*
318:*3*
concise 33:*16*
conclude
64:*10* 148:*10*
166:*5* 208:*22*
209:*13*
251:*10*
307:*15* 320:*24*
concluded
149:*6, 9*
396:*1* 437:*13*
concludes
209:*8* 389:*21*
437:*9*
concluding
396:*16*
400:*23* 401:*6*
conclusion
41:*14* 47:*11*
64:*17* 200:*16*
318:*20*
387:*18*
391:*16*
401:*12* 408:*5*
421:*8*
conclusions
28:*21* 29:*7*
236:*3* 285:*17*
387:*17*
391:*15* 399:*15*
conclusive
241:*16* 317:*5,*
*9*
conclusively
377:*5*

Confidential Information Subject to Protective Order

condense 354:1
conduct 88:22 95:13 96:4 226:16 234:22 385:2, 13, 22
conducted 94:9, 19, 24 103:8 155:14, 15 382:24 411:24
conducting 83:20 383:5 398:11
conducts 102:21
confident 57:10
CONFIDENTIAL 1:10 422:18 423:15 424:14, 16, 19 425:16 426:15 427:9, 10, 15, 16 428:23 430:22 432:9
confidentiality 422:18, 21 423:24 424:1, 24 429:6 433:6 434:8
confirm 48:19 85:10 96:20 138:22 146:15, 19 240:16 242:24 270:1 314:9 338:6 342:11 353:2
confirmation 137:15 147:6
confirmatory 304:13
confirmed 137:21 144:21 146:9 213:19 300:15

confirming 96:8
conform 113:13
confused 415:3
connect 321:24
connection 226:6
connotation 35:5
consequences 318:5, 13, 23 319:9, 19 320:2, 5, 17 321:5
consider 147:8 429:22
consideration 234:14 275:6 281:10
considerations 72:22 320:11
considered 27:21 39:6 56:9 59:9 110:4 123:7, 13 168:23 218:7 246:16 382:1
considering 260:4, 9 281:22
considers 403:8
consistent 117:13
consultant 187:12 296:11
consultants 429:1
consulting 99:8
consume 20:20
consumed 20:22
consumer 297:8 312:20 313:4 372:1

consumers 20:20 216:12 297:4, 21 301:24 311:14, 19 312:15 372:13
consuming 44:19 56:8 59:4
contact 119:6 253:5 304:4
contacted 253:12 258:18
contacting 253:15
contain 24:21 25:6, 21 129:23 157:12 163:10 296:16 313:24 314:13 348:9 364:6, 11 366:17 367:6
contained 22:22 49:3 117:1 123:16 165:24 166:7 267:13 283:9 316:6 348:7 358:23 360:22 365:20 366:4 438:5
containing 223:8 278:17 287:4
contains 49:11 315:4
contaminant 127:9, 17 350:2
contaminated 49:1, 10 50:17, 22 129:18 146:7 163:4, 7 198:20 210:12 221:13

235:22 237:11 239:4 247:21 268:4 283:13 286:5, 21 290:10 292:11 316:24 318:14, 24 356:8 360:8 361:8 362:6 366:21 397:23
contamination 47:4 49:14, 19 52:3 166:13, 19 199:11 213:3 232:23 321:14 348:2 362:22 386:9 398:23 402:4, 23 426:4 427:21 428:10 429:24 430:6 431:20 433:23
content 60:4, 21 63:4 371:11 424:21
contents 189:24 424:3, 21
context 55:15 132:9 133:1 232:11 314:15 323:14 324:2 350:14 372:18 410:12 433:4
continue 47:17 178:23 209:17, 21 245:21 276:6 277:16 321:7 322:5 419:5
continued 3:1 4:1 290:3 309:10 346:7 357:16 406:10
continuing 272:23 275:18

continuous 192:17
contract 99:1
contractor 386:19
contractors 385:14 388:4
contribute 13:14 146:2
contributor 98:6
control 108:10 386:17 387:20 414:11, 22 415:9, 10 438:23
controlling 153:9 414:4
controls 113:10 114:7 115:7, 11 387:9, 19
conversation 150:22 231:9, 11 237:20 302:4 383:17
conversations 33:1 141:2
conveying 148:16 289:13
convince 327:12
COO 245:18 262:16 263:14 281:15
cooperative 395:19
coordination 393:7
copied 138:16, 18
copies 87:5 370:7
copy 86:24 87:12 95:4 96:2 261:5
corner 38:13 205:8 378:9 381:20

Confidential Information - Subject to Protective Order

Corporation 3:*13*, *18*
correct 11:*1* 12:*12, 15* 13:*19, 23* 16:*16* 22:*19, 23* 36:*17* 42:*23* 49:*6* 62:*20* 65:*4* 69:*9* 70:*22* 71:*24* 76:*15, 23* 86:*13, 22* 97:*18* 98:*20* 99:*11, 18* 101:*20* 104:*18* 107:*10* 109:*5, 11, 21* 110:*2, 6, 13, 19* 112:*6, 10, 15* 114:*3* 115:*9, 18* 116:*2, 20, 24* 117:*4, 8* 121:*16* 123:*1* 126:*1, 18* 127:*24* 128:*7* 129:*6* 130:*11, 15, 23* 134:*5* 135:*12, 17* 136:*17* 137:*8* 139:*6, 9* 143:*14, 18, 23, 24* 144:*13* 146:*17* 147:*14* 148:*1* 149:*2* 151:*24* 152:*22* 154:*6* 155:*10, 17, 21* 156:*11* 158:*3, 10, 24* 159:*1, 4, 20* 160:*1* 161:*5, 24* 162:*9, 18* 165:*8* 167:*8* 169:*23* 170:*9* 171:*16* 173:*16* 181:*22* 184:*15* 185:*23* 186:*3, 20* 188:*9, 13*

189:*19* 190:*4* 200:*20* 201:*15* 207:*13, 20* 209:*11, 23* 210:*7* 213:*4* 214:*14* 216:*5, 9* 219:*4, 5* 224:*5* 229:*23* 239:*19* 240:*1, 7* 242:*14* 244:*2, 6* 245:*24* 246:*4* 249:*20, 23* 256:*11, 16, 20* 257:*7* 258:*14* 259:*4, 16, 24* 261:*8, 13* 265:*24* 266:*10* 272:*13, 18* 300:*6* 305:*13* 306:*14, 19* 309:*19* 317:*11, 16* 326:*22* 328:*23* 329:*7* 330:*17, 21* 333:*22* 338:*15* 342:*22* 347:*21* 349:*16, 18, 23* 356:*2, 24* 357:*13* 359:*9* 364:*22* 365:*2, 10, 15, 21* 366:*10* 368:*12* 369:*3* 371:*5, 8* 373:*8* 374:*13* 378:*22* 381:*21, 24* 384:*5, 22* 397:*12* 401:*8* 410:*15* 418:*14* 420:*5* 438:*7* 441:*1*
corrections 439:*4, 6* 441:*1*

Correctly 159:*18*
Correspondenc e 86:*19* 87:*1*
corresponding 68:*9*
cost 71:*23* 76:*12* 236:*8, 13* 285:*19*
costly 383:*22*
costs 74:*14*
counsel 10:*2* 164:*12* 186:*16* 236:*21* 263:*18* 287:*24* 319:*21* 329:*20* 354:*11* 417:*19* 436:*12*
countries 107:*8, 11* 108:*3* 190:*2, 5, 6, 12* 336:*6, 13* 358:*4*
country 191:*10, 20*
counts 244:*24* 245:*19* 263:*24*
couple 11:*8* 66:*7* 92:*7* 100:*14* 161:*7* 168:*9* 178:*5* 182:*1* 236:*8* 305:*12* 308:*14* 326:*23* 342:*5* 378:*16* 435:*20*
course 132:*23* 135:*1*
COURT 1:*1* 9:*14* 10:*4* 439:*18*
courtesy 87:*12*
cover 26:*7*
covers 183:*21*
CPMG 110:*4*
CQA-037/03 95:*9*
create 258:*11*

created 24:*24* 381:*19*
creates 311:*5* 313:*22*
credence 194:*22*
criteria 225:*6*
critical 25:*13* 422:*14* 436:*22*
CROWELL 3:*1*
current 21:*9, 13* 22:*12* 77:*4* 78:*10* 117:*13* 186:*19, 21* 187:*1, 18* 242:*9* 372:*5* 386:*14* 392:*6, 14* 420:*12*
currently 12:*10* 98:*18, 23* 99:*7* 140:*6* 187:*21*
Curriculum 5:*15* 97:*20*
custom 182:*22, 24*
customer 18:*2* 126:*14* 300:*10* 426:*10*
customers 18:*4, 13* 21:*2* 25:*1* 50:*18, 23* 52:*3* 214:*20, 24* 215:*5, 11, 16, 23* 222:*15, 21* 232:*15* 244:*21* 246:*2* 258:*18, 22* 259:*6, 19, 21* 260:*10, 13* 261:*7* 262:*5, 19* 265:*9* 282:*5, 14* 284:*1* 289:*14* 296:*23* 298:*13* 299:*23* 300:*18*

301:*14* 302:*6, 21* 320:*17* 356:*7* 358:*7, 8, 17* 426:*13*
customs 183:*1, 3*
cut 59:*1* 227:*3* 229:*1, 18*
CV 97:*17*

< D >
D.C 3:*4*
D5191 181:*21*
Dagmar 101:*3*
daily 24:*17* 44:*18* 45:*15* 46:*5* 312:*15*
Dallas 3:*10*
damage 33:*14*
dangerous 32:*3, 11* 52:*17* 53:*4* 191:*21* 192:*2* 203:*9* 302:*23* 308:*23*
dangers 106:*10*
data 54:*22* 79:*22, 23* 136:*23* 141:*2* 146:*23* 147:*8* 166:*6* 176:*6* 211:*19* 220:*16* 223:*7, 12, 14, 15* 242:*24* 245:*5* 261:*20* 264:*17, 21* 266:*15, 16* 267:*9, 12, 17, 21, 23* 268:*22* 269:*1, 15* 274:*7, 11, 14* 275:*6* 276:*7* 277:*6, 17* 279:*5, 6* 280:*21* 282:*14* 291:*18* 296:*19*

301:*21*
309:*24*  314:*8,*
*9*  318:*8*
324:*5, 15, 24*
325:*1, 14, 21*
326:*1, 16, 20,*
*24*  327:*11, 23*
328:*9*  329:*6*
339:*22*
343:*14*  344:*7,*
*9, 16*  345:*9*
361:*20*
373:*11, 13, 17,*
*22*  374:*3*
402:*12, 15, 22*
407:*12*
409:*23*  436:*19*

**data-based**
321:*12*

**date**  9:*6*
26:*19, 20*
51:*6*  120:*1*
145:*8*  153:*24*
157:*2*  158:*6*
160:*5*  174:*11,*
*18*  175:*2*
181:*5, 9*
199:*13*
203:*16*
209:*15*  213:*5*
237:*19*  247:*6,*
*12, 19*  249:*4,*
*11*  250:*4*
269:*2*  286:*17*
303:*10*
315:*21*  316:*2,*
*21*  317:*4*
334:*18*  335:*1,*
*6*  337:*1, 7, 19*
347:*8, 23, 24*
354:*23*  355:*3,*
*15*  361:*5*
375:*3*  383:*8*
387:*14*
424:*18*  439:*9*
441:*11*

**dated**  6:*12*
25:*13*  95:*9*
199:*10*  207:*3*
217:*18*  227:*1*

237:*4, 6*
287:*17*  349:*7*

**dates**  168:*1*
181:*8*  189:*4*
353:*24*  356:*12*

**DAWN**  1:*16*
5:*3*  9:*17*
10:*16, 23*
121:*10*
189:*17*  237:*6*
246:*4*  330:*19*
341:*18*
345:*16*
437:*10*  441:*1,*
*11*

**day**  24:*6, 13*
45:*16, 24*
55:*9*  56:*9, 20*
57:*6, 20*
58:*22*  59:*5*
102:*7*  166:*6*
215:*24*  216:*2,*
*7, 19*  244:*24*
245:*19*  249:*7*
256:*23*  257:*3,*
*5*  262:*2, 11,*
*15*  263:*14, 24*
264:*5, 10*
269:*17*
282:*18, 23*
283:*2*  301:*17*
305:*2*  313:*6*
329:*16*  330:*4*
353:*7*  354:*9*
364:*1*  441:*11*

**days**  213:*6*
278:*15*
287:*14*
308:*13, 14*
316:*4*  348:*1,*
*4*  355:*11, 18*
357:*11, 14*
364:*18*  439:*15*

**day-to-day**
91:*17*

**deadly**  426:*23*

**deal**  292:*12*
310:*6*

**dealing**
192:*10*  320:*6*

**Dear**  121:*10*

**death**  319:*19*
320:*3, 19*

**December**
70:*15*  120:*2*
171:*4*

**decide**  17:*21*
76:*11*  105:*15*

**decided**
169:*13*
172:*18, 19*
176:*5*  283:*23*

**deciding**
276:*20*  407:*7*
408:*18*

**decision**  14:*20*
15:*14, 20*
78:*6*  89:*24*
90:*6*  98:*10*
105:*20*
108:*16, 18, 19*
118:*3*  146:*3*
206:*10*  210:*1*
216:*22*
266:*20, 21*
272:*6*  273:*11,*
*18*  303:*15*
312:*22*  319:*6*

**decisionmaker**
206:*14*

**decision-
makers**  90:*5*

**decision-
making**  91:*16*
281:*11*  323:*7*

**decisions**
25:*15*  145:*24*
153:*3, 4*
216:*17*
234:*15*  279:*5,*
*6*  282:*1, 4*
318:*7*  320:*14*
321:*12*  324:*6*
344:*12*
373:*12*  384:*4,*
*11*  402:*13, 16*

**decrease**  31:*9*
50:*2*

**decreased**
31:*11*

**deem**  343:*18*

**deemed**
439:*17*

**Defendant**
2:*15*  3:*5, 12,*
*18*

**Defendants**
2:*20*  4:*5*

**defense**  21:*1, 7*

**deficiencies**
118:*22*
120:*12, 13*

**deficiency**
122:*9, 14, 19,*
*24*  124:*15*

**Deficient**  5:*16*
119:*18*
120:*16*
121:*24*  122:*4*
123:*3*

**define**  18:*24*
19:*3*  52:*6*
292:*6*  337:*17*
423:*14*  424:*2*

**defines**  424:*1*

**defining**
424:*13*

**definitely**
14:*6*  41:*7*
64:*15*  239:*8*
310:*11*
360:*16*  418:*17*

**definition**
33:*15, 17*
34:*12*  40:*22*
41:*2*  200:*8, 9*
425:*16*

**definitions**
40:*24*

**definitively**
166:*24*  167:*3*
210:*16*  293:*2*

**degree**  185:*24*
201:*17*

**delineate**
403:*8*

**demand**  304:*5*

**demands**
302:*14*

**demonstrate**
401:*17*  427:*12*

**demonstrates**
401:*2*

**DENNIS**  3:*3*

**denying**
420:*14*

**department**
89:*23*  102:*4*
149:*8*  227:*18,*
*20, 22*  228:*1,*
*23*  323:*16*

**departments**
187:*24*

**depend**  124:*16*

**depends**
105:*11*  230:*7*
297:*18*  298:*5*

**depo**  12:*23*

**deponent**  9:*16*
441:*1*

**deposed**  11:*1*

**deposing**
439:*14*

**deposition**
1:*16*  8:*1*
9:*10, 19*
10:*11*  12:*5*
437:*10, 12*
439:*3, 12, 15,*
*17*

**depth**  134:*18*

**derisking**
234:*2*

**described**
423:*17*

**DESCRIPTIO
N**  5:*7*  154:*16*
157:*5*

**designed**
83:*15*  113:*12*

**despite**  52:*1*
140:*10, 17*
316:*23*

**detail**  12:*22*
48:*22*  51:*2*
119:*13*  345:*11*

**Details**  5:*13*
45:*6*  67:*12*
79:*16*  93:*19*
95:*2*  124:*6*
145:*3*  184:*12*
196:*13*

252:*11*  294:*8*
296:*15*  298:7
303:*14*
313:*19*  315:*8*
341:*18*  342:7,
*24*  343:7, *21*
345:22
359:*15*  390:*22*
**detect**  133:*11*
143:*8*  198:*11*
203:*24*
210:*10*
223:*19*
225:*11*
238:*10*, *22*
247:*13*  248:*9*
265:5  275:*4*
284:*16*
293:*14*
344:*24*  357:2
359:5  360:2
365:*3*, *9*
**detected**
54:*16*  211:*9*,
*10*, *13*  247:*15*
288:*18*
295:*15*
315:*11*
316:*12*  421:*4*
**detecting**
199:*3*
**detection**
51:22  368:*23*,
*24*  369:*3*
**determine**
39:*21*  203:*21*
224:7  251:*3*
253:*17*
272:*16*
276:*12*
284:*12*  293:*6*,
*22*  303:*18*
304:*6*  307:*23*
309:*18*
314:*12*
315:*16*
338:*11*
356:*18*
375:*10*
379:*21*  413:*23*

**determined**
403:*23*
**determining**
241:*1*  408:*19*
**develop**  71:*13*
142:*16*  150:*1*
198:*10*  219:*3*
243:*11*
247:*19*  252:5
274:*16*
307:*17*
321:*18*
322:*18*
344:22
377:22  380:*6*,
*15*
**developed**
144:22  210:*9*
252:*9*  265:5
267:22
269:*14*
322:*24*  335:*3*
343:*18*
353:*12*
356:*17*  357:*1*
379:*9*, *22*
380:*8*  381:2
427:*17*
**developing**
72:5  182:*9*
187:*23*  188:*1*
248:5  294:7
310:*20*  378:*12*
**development**
98:7  100:7, *9*,
*11*, *17*  141:*8*
182:5, *12*
187:*19*  191:*6*,
*9*  304:*14*
343:*3*
**Dhrumit**  418:*8*
**dictate**  79:*17*
384:*21*
**dictionary**
219:*20*
**difference**
184:*6*
**differences**
254:*6*
**different**  43:5,
*6*  99:*24*

106:*3*  135:*3*
168:*10*, *17*
169:*3*, *6*
182:*9*  227:*24*
251:*1*  254:2
294:5  299:*9*
436:*8*
**differential**
396:*19*  398:*10*
**difficult**
309:*24*  378:*10*
**diligence**
234:*22*
393:*23*  394:*3*,
5
**diligently**
248:5
**direct**  90:*1*
115:*4*  438:*23*
**Directed**
100:*16*  424:*9*
**Direction**  8:*4*
**directly**  77:*16*
78:22  87:*11*,
*21*  120:5
122:*6*, *24*
177:7  322:*1*
324:*17*  392:*16*
**director**  99:*20*
101:*21*  382:*11*
**disagree**
105:*16*  369:7
**disclose**
425:*21*
428:*23*  429:*3*
**disclosed**
423:*16*
**disclosing**
423:*20*  424:*4*,
*11*  425:*21*
427:*13*, *19*
432:*4*
**disclosure**
431:*17*, *20*
432:*1*
**disclosures**
427:*18*
**discontinue**
229:*13*
**discontinues**
231:*22*

**discovered**
150:*14*  427:*16*
**discuss**  55:*14*
345:*10*, *18*
**discussed**
172:*10*  201:*9*
235:*3*  266:5
289:22  410:*8*
**discussing**
106:*10*
304:*12*
383:*21*  404:*1*
**discussion**
61:22  144:*15*
329:7
**distribute**
372:*20*  373:5
**distributed**
372:*1*
**DISTRICT**
1:*1*  9:*14*, *15*
**divide**  66:*13*
**divided**  44:*9*
60:*20*  61:5,
*11*, *15*  62:*13*
65:*1*  139:*24*
**division**  102:*3*,
5, *20*  120:*9*
**divisions**
331:*12*
**DMF**  116:*11*
117:*1*, *3*, *11*,
*16*, *18*  118:*3*,
5, *11*, *13*, *16*, *23*
119:*11*
120:*17*, *19*, *21*
121:*11*, *12*, *14*,
*21*, *24*  122:*4*,
7, *13*  123:*3*,
*16*  124:*15*
135:2, 5, *10*
137:5, 7, *14*
170:2, 5, *10*
171:*1*, 2
390:*23*
**DNA**  33:*14*
**doctor**  217:*13*
299:*8*  313:*15*
318:*18*

**doctors**  15:*18*
216:*15*
298:*20*  426:22
**DOCUMENT**
1:*6*  31:*21*
33:*3*  38:*11*,
*16*, *22*  39:*12*
41:*17*  43:*17*
47:*3*  48:*1*, *22*
51:*16*  52:*15*,
*23*  54:*16*, *22*,
*24*  58:7, *23*
59:2  60:7
63:2, 5, *16*, *20*
67:5  69:*12*
89:*20*  95:*1*
96:22  105:*8*,
*13*, *21*  106:*8*,
*12*, *15*  167:22
168:2  172:7
199:*10*  205:*1*,
*6*, *16*  207:*6*, *8*,
*10*  274:*3*
354:*6*  368:*1*
370:*12*, *18*
371:*10*
372:*19*
381:*19*  382:2,
*12*  414:*23*
427:5
**Documents**
8:7  51:2
55:*8*, *12*  79:*1*,
22, *24*  104:*21*,
*23*  105:*24*
106:*4*  119:*13*
178:5  183:*18*
273:*23*
275:*10*  381:*10*
**doing**  82:*11*
91:*23*  104:*1*,
*16*  128:*9*
131:*22*  158:*1*
175:*17*  185:*8*
218:*18*
238:*16*
266:*18*  278:*6*
281:*12*
303:*24*
305:*15*
320:*12*  341:5

Confidential Information Subject to Protective Order

358:5  379:4,
16  394:14
395:4  439:8
**dollars**  236:8
245:9
**domain**  150:4
**dose**  20:13, 15,
18  44:19, 22
45:9, 15
46:11  48:8
66:3  68:10
69:7  77:24
103:5  125:22
240:10
337:12  338:8
368:7, 9
370:15, 21
371:24  372:5
394:7  413:21
**doses**  27:5
53:3, 8
**dot**  38:1
**double**  184:6
**Dr**  88:10
90:15, 18
91:1, 4  92:14
94:4, 13  96:3,
6, 16, 19  121:9
**draft**  38:22
**Dragonfarm**
89:7, 13
**draw**  28:21
29:6  200:16
236:2  399:14
**drawing**
401:13
**Drive**  2:8
**driver**  70:7
**drivers**  320:13
**driving**
281:24  282:3
323:6
**drug**  14:21
18:5, 14  20:3,
16  21:1, 14
32:2, 20
35:24  36:16
44:19  46:8
47:2, 15, 16
50:4  54:8
64:6, 12  66:3

98:6  101:18
103:22  107:3
108:22  110:3,
8, 16  112:2, 8,
16  113:13
114:3  115:20,
23  116:5, 8,
19, 23  120:15
121:19
125:15
126:22  127:9
128:7  129:18
139:5  140:3,
11  143:13, 17
149:1  169:1,
3  175:19
177:13
192:23, 24
193:7  194:12
195:3, 14
197:13  198:4
200:2, 12
209:17, 21, 22
216:7  217:7
222:2, 11
225:8  230:12,
13, 18  240:21
246:20, 22
253:18, 24
254:8  274:9
282:7, 9, 19
284:12
292:23  304:6
307:6  308:24
309:16
312:15  321:6,
8  327:2
338:20, 21
340:15
345:23  385:3
389:23  392:8
412:20
413:24
426:22  436:6,
15
**drugs**  13:21
22:5  25:20
36:4  48:17
102:22  107:7
108:23  109:1,
8, 17  110:22

111:16
112:13  114:8
119:4  126:3
170:1  190:2
191:2  226:11
248:23  284:2
337:23
**Du**  403:11, 16
**Due**  9:21
51:22  109:13
146:6  234:22
249:18
250:16
393:22  394:3,
4  396:18
398:9  400:24
**duly**  10:16
**duty**  240:11,
16

< E >
**earlier**  22:4
43:13  70:24
106:9  113:20
115:13
130:12  139:3
146:13
154:12  155:4
158:16
163:18
170:22
188:22
190:21
207:17
233:14  235:3
245:5  275:10
323:13
352:12  368:1
370:12  383:15
**earliest**  128:21
**early**  196:16
272:24  335:17
**easier**  263:20
**Eastern**  9:8
**EB**  182:14, 15
**economic**
384:12
**edit**  106:1, 11
**edits**  105:1, 7
**educated**

83:22
**Effect**  39:2, 21
**effects**  56:8
**effort**  255:1
395:19
**efforts**  431:16
**EIRs**  415:22
**either**  80:18
131:13
138:22
228:13, 17
229:7  282:15
364:11
**elaborate**
31:5, 18  201:8
**ELLIE**  3:8
**ellie.norris@no
rtonrosefulbrig
ht.com**  3:11
**ELLIS**  2:12
**else's**  63:24
**Email**  5:18,
20, 23  6:1, 2,
6, 8, 12  36:20,
22, 24  37:23
50:14  51:4, 6,
11  70:13, 21,
24  71:3, 6
73:9, 14  74:1,
5, 9, 12  75:6,
10  102:1
121:2, 8, 9, 15
128:24  129:7,
19  132:10
133:17, 23
134:3, 6
135:21  139:1
142:9  143:20
144:6, 12, 19
145:9  147:15,
17, 23  148:3,
19  160:9
161:23
165:16, 17
171:18
172:21, 24
175:12  178:8,
15  179:16
180:9  189:9,
16, 17, 20
190:1  193:16,

21  197:24
213:1, 5
214:15
217:18, 20
218:24
219:12
226:24  227:1,
2, 4, 7  228:19,
24  229:3, 6,
11, 19  232:4
237:4, 5, 22
238:2  243:22
244:11  245:6,
20  246:9
255:24  256:8
257:1, 8
258:19  261:4
263:10, 23
264:6  265:21
270:1  272:15
305:10, 21
306:1  311:2
314:15, 20, 21,
23  323:12
324:20  326:7
329:11, 15, 16
330:10
334:19  339:8
349:1, 7, 13
350:23
417:15  418:3
419:1, 9
420:8, 9
421:11  422:13
**emailing**
142:10  148:7
**emails**  128:20
138:17
193:17
217:17  223:5
227:6  281:23
291:2  433:15
**EMILY**  3:15
**emphasizing**
40:5  324:22,
24  325:8
**employ**  226:15
**employee**
12:10  90:2
94:17, 22
135:9  332:5,

23  379:20
429:18, 23
**employees**
100:12
178:16  418:7
428:24
**encouraging**
143:21  276:6
**ends**  161:10
162:3, 10, 20
163:3  184:2
**English**  28:23
**enjoy**  188:17
**ensure**  9:24
22:5  25:5, 20
76:17  82:12
83:15  91:10
94:23  108:22
110:8, 15, 22
111:16  114:7
115:7  135:15
192:22
240:20  242:2
387:20, 23
389:22  391:4
**entered**  432:21
**entire**  289:12
290:4
**eprem@ulmer.
com**  3:17
**equate**  45:8
**equates**  292:1
**equation**  83:10
**Equipment**
386:17
387:13
389:22  391:3
**errata**  439:6,
8, 11, 14  441:1
**Especially**
248:7
**ESQ**  2:3, 4, 8,
12, 18  3:3, 8,
9, 15  4:2
**essentially**
20:24  141:1
156:6  182:8
204:12
206:15  217:14

**established**
26:3  376:14
377:21
**establishment**
113:11
**estimate**
278:23
**EU**  190:12, 13
**Europe**
181:17  194:2,
4, 11  196:9,
15  197:10
**European**
190:6  355:12
**evaluate**
57:11  130:9,
17  313:12
323:17
363:15  364:21
**evaluated**
137:6
**evaluating**
274:14  321:5
**Evaluation**
38:20  104:22
106:9  188:2
410:2
**events**  51:1
142:4  194:8
**eventual**  188:2
**eventually**
20:20  182:10,
17  188:15
366:17  367:3
**everybody**
141:9  164:5
**everyday**
92:21
**evidence**
49:18  166:10
244:4  326:4
328:21
334:19  438:5
**evolving**
140:24
**exact**  271:18
286:17
303:10
336:21  337:7
**exactly**  28:13
37:7  129:15

175:1  192:21
252:24  291:3
298:21
358:14
410:22  417:5,
7
**examined**
10:17  27:5
**example**  96:8
127:10
**examples**  66:7
285:24
**excerpt**
136:10, 12
**exclusively**
197:19
**excuse**  196:5
213:3  246:12
314:21
396:20  398:7
403:3  426:11
**exhaustive**
80:6
**EXHIBIT**
4:10  5:9, 10,
13, 15, 16, 18,
20, 22, 23  6:1,
2, 4, 6, 8, 12, 15,
17, 18, 19, 20,
21, 22, 23, 24
7:2, 3, 4, 5, 6,
7, 8, 9, 10, 11,
12, 13, 14, 15,
16, 17, 18
16:18  23:7,
10, 15, 20
26:6  36:20
38:10  50:13
59:17, 23
67:6, 14
70:12, 13
73:11  86:4
97:13, 21
112:19
119:16, 20
120:24  121:4
128:20
133:15, 19
142:8  144:3
153:18
156:17, 21

158:5  160:4
170:21  172:8
173:2  178:6,
10  179:14, 18
180:11, 16
182:15
189:11
236:22
248:18  256:2
263:19  287:9
288:1  314:21
329:21  349:9
354:13, 18
367:15  370:2,
4  396:2
417:19
**EXHIBITS**
6:16  7:1
**existed**  225:11
422:22, 24
425:8
**existence**
424:2, 20
425:17
**expect**  85:12
118:9
**expectation**
82:19  198:13
**expectations**
78:7  83:7
**expected**
174:11
175:22  176:7
409:11
**expecting**
143:9  239:22
**experience**
98:2  109:14
186:1  188:5
296:10  298:11
**experienced**
93:7
**expertise**
17:20  19:3, 4
28:20  33:23
57:1  78:20
92:22  201:23
409:9  434:11
**experts**  34:10
57:10  108:9
**expires**  441:16

**Explain**  17:5
436:14
**explained**
251:17  403:16
**explaining**
428:4
**explicitly**
11:24
**expose**  30:13
39:20  40:9
**exposed**  46:23
**exposing**  40:15
**exposure**
27:23  29:11,
21  30:8, 11
31:10  46:6
**express**  432:6
**extends**  127:23
**extension**  38:1
**extent**  30:8,
12, 18  31:11
117:4
**extra**  155:5
**extremely**
126:3
**eyes**  364:5, 14,
15

**< F >**
**faces**  246:21
**facilities**  78:1,
13  79:9, 11
87:1, 6  108:2
152:21
158:13  218:6,
8  385:3
386:17
389:21  390:2,
6, 8, 21  391:3,
17  409:16
414:6
**facility**  20:17,
22  22:6  77:9
79:24  80:2,
12, 17, 19
81:6, 12, 21
82:1, 5, 6, 12,
22  83:4
86:11, 12
88:9  96:10
103:17

112:*22*
114:*17*
157:*18, 24*
218:*21*
227:*12*
390:*13, 17*
395:*11* 409:*4*
**facing** 245:*9*
**fact** 87:*2*
166:*11*
198:*20*
237:*11*
319:*18* 353:*3*
404:*2* 424:*3*
425:*21* 432:*13*
**factored** 83:*10*
**factors** 384:*12*
**facts** 220:*9*
**fail** 245:*21*
439:*16*
**failure** 245:*3*
263:*14* 264:*1*
**fair** 12:*17*
14:*2* 15:*11*
20:*5* 35:*11,*
*24* 47:*7* 73:*6*
76:*2* 79:*11*
82:*10* 84:*7*
99:*9* 102:*18*
108:*3* 109:*10*
112:*11*
122:*24* 130:*6*
132:*2* 136:*18*
155:*24*
159:*24*
163:*18* 351:*8*
401:*15* 425:*7*
**fairly** 20:*9*
**falls** 382:*7*
**false** 225:*12*
**familiar** 32:*24*
75:*17* 79:*15*
80:*23* 84:*22*
89:*13* 109:*12*
123:*9, 11*
173:*7* 186:*10*
223:*21*
236:*13*
250:*11, 12, 13*
388:*8* 403:*15*
433:*16*

**far** 38:*23, 24*
103:*2, 6*
149:*15*
161:*13*
177:*19*
181:*13* 197:*9*
198:*3* 211:*22*
214:*10*
268:*12*
293:*19*
374:*11*
395:*10*
414:*15* 415:*7*
**faster** 378:*22*
**FDA** 6:*8*
15:*24* 16:*3, 7*
23:*5, 21*
24:*18, 24*
32:*17* 36:*15*
43:*14* 44:*11*
46:*22* 47:*6*
53:*17* 54:*17*
55:*2, 9, 12*
56:*4* 57:*17*
58:*11* 61:*22*
78:*10* 80:*9,*
*11, 18* 86:*24*
87:*6* 94:*2, 16*
101:*7, 11*
103:*14, 18*
104:*6, 10*
107:*2* 113:*4*
114:*21* 116:*3*
118:*17*
121:*23* 122:*3,*
*12, 23* 123:*5*
129:*20* 130:*1*
131:*8, 14*
132:*15* 141:*5*
144:*21* 145:*7*
146:*9, 14*
147:*6, 11*
148:*16*
149:*18* 150:*7*
161:*19*
162:*16, 23*
173:*24* 174:*2,*
*9* 175:*9*
176:*8, 13*
177:*5, 8*
186:*23*

206:*18* 215:*6*
222:*24*
239:*22* 240:*4,*
*6* 241:*11, 13*
245:*5* 248:*17,*
*22* 249:*16*
251:*23* 252:*7,*
*8, 14, 19*
257:*6, 8, 11*
258:*17* 261:*4,*
*5, 10, 15*
262:*5, 19*
264:*5, 13*
265:*10, 11, 16,*
*23* 266:*8, 14,*
*16, 22* 267:*4*
271:*23* 272:*4,*
*15* 285:*1*
286:*6, 14*
289:*13*
291:*13* 292:*2*
297:*10* 306:*2,*
*10, 16* 311:*23*
313:*5* 315:*1,*
*9, 14* 319:*1*
324:*19*
325:*23*
326:*10, 17, 20*
327:*1, 12, 24*
328:*1, 15*
329:*1, 14*
330:*7, 15, 22*
331:*3, 10, 14,*
*15* 332:*19, 21*
333:*18*
334:*20*
338:*20* 339:*7*
340:*9, 22, 24*
341:*3, 12, 19,*
*21* 342:*6, 17*
344:*2* 345:*3*
347:*13, 16*
348:*10, 17*
349:*14* 350:*1,*
*17* 352:*3, 8,*
*24* 357:*4*
361:*10*
365:*20* 373:*6*
380:*19, 23*
381:*19, 22*
382:*15, 24*

383:*3, 5*
384:*24* 385:*1*
386:*7, 13*
387:*17*
389:*21*
390:*14, 18*
391:*16*
392:*23* 395:*3,*
*24* 396:*16*
400:*10, 23*
401:*6* 403:*1,*
*7* 404:*15, 22*
406:*11*
407:*23* 410:*2*
411:*19, 21, 23*
429:*16* 431:*5*
**FDA's** 257:*19*
258:*3, 8*
337:*22* 342:*8*
343:*10*
381:*10* 413:*13*
**fears** 194:*12,*
*15* 197:*11*
**February**
158:*6*
**federal**
108:*24* 109:*17*
**feel** 423:*15*
**fell** 340:*3*
**felt** 147:*7*
151:*15*
**FG** 67:*8, 18*
**fifth** 42:*14*
**figure** 131:*9*
142:*21*
272:*11* 370:*8*
**figured** 401:*16*
**figures** 132:*4*
**File** 120:*15*
121:*20*
175:*18* 176:*5*
**filed** 116:*15*
121:*11* 171:*2,*
*7* 172:*13*
173:*14, 22*
**files** 116:*5, 8,*
*9* 176:*23*
**filing** 171:*13*
**filler** 156:*3*
**final** 20:*4*
46:*8* 51:*16*

105:*20*
117:*23* 118:*1*
145:*24* 146:*2*
175:*18* 177:*3,*
*12* 433:*9*
**finance** 433:*19*
**financial**
231:*6, 7*
246:*10*
320:*11* 384:*4*
**financially**
98:*14*
**find** 70:*1*
124:*19*
148:*15, 21*
150:*13*
160:*16* 252:*5*
254:*12*
298:*24*
337:*23*
341:*11*
413:*14* 414:*9*
416:*16*
**finding** 54:*7*
310:*14* 326:*5*
**findings**
114:*11*
**fine** 43:*18*
60:*10* 68:*21*
115:*3* 164:*19*
165:*1* 203:*18*
**Finished** 5:*13*
19:*19* 20:*13,*
*15, 18* 46:*11*
47:*2* 48:*8*
49:*15, 20*
64:*12* 66:*3*
67:*7, 12, 21*
68:*10* 69:*7*
77:*23* 103:*5*
116:*8* 125:*22*
130:*4* 144:*22*
153:*9, 10*
182:*3* 218:*2*
240:*10* 274:*8*
337:*12* 338:*8*
363:*8* 368:*7,*
*9* 370:*14, 20*
371:*24* 372:*5*
394:*7* 413:*21*

Confidential Information Subject to Protective Order

firm 78:8
88:21 90:16
91:2 92:15,
20 94:5, 8, 10
95:12 96:4,
17 147:5
318:8 401:2
403:8 436:19
firm's 94:6
400:24
first 17:2
24:2 30:6
32:19 39:3
43:9 49:7
60:6 61:10
66:8 74:12
86:6 87:4
88:10, 19
100:15
112:19 113:6
119:5 128:23
132:19
133:24 134:2
150:19
160:24
167:15
193:18
206:24 227:2
232:3, 5
233:4 236:19
243:15
249:17 273:1
340:9, 18
351:2, 19
354:9, 23
357:5 375:3
387:18, 22
390:15 391:2
417:13 420:9,
11 421:15
422:13 423:4
436:2
fits 417:5
Five 11:5
12:8 145:15
146:11 147:6
168:3 250:15
335:20
five-minute
346:19

fix 139:19
flag 194:15
Florida 2:5
focus 13:3
100:13
187:19 247:2
386:16, 19
focused 72:5
246:9
focusing
386:24
FOIA 382:8
folks 37:8
229:6
follow 91:2, 6
186:17
234:22 326:2
384:16
followed 13:8
42:3 77:5
96:18 113:9
235:5 414:15
following
86:20 210:5
228:24 396:1
427:11
follows 10:18
follow-up
329:14
food 56:7
foregoing
438:6, 21
441:1
forgone 408:5
forgot 212:20
form 14:4, 14,
23 15:16
16:11 17:9,
18 18:7, 16
19:22 20:7
21:4, 16 22:8
28:2, 11
29:15, 23
30:16, 24
31:14 32:6,
14 33:6, 21
34:20 35:13,
20 36:2
39:23 40:11
41:11, 22
43:22 47:9

49:22 52:10,
19 53:6 54:1,
10 55:6, 21
57:8 58:4, 15
59:7 60:14
64:2 70:3
72:2, 17 76:4,
14, 22 78:4,
17 79:13
80:21 81:14
82:16 83:2,
12 84:1, 9, 17
85:5, 19
90:10 91:13
92:3 93:4, 13
95:9 106:21
108:5 109:4
110:12, 18
111:1 112:5
117:6 123:17,
21 124:2
126:6, 17
127:2, 14
128:11, 15
130:22
131:12 132:6
140:22
141:19
142:24
150:16 151:4,
13 164:11
165:14 166:2,
4, 16 167:7
170:15
176:17 180:9
183:5 186:8
187:7, 17
190:9 191:15
192:1, 15
193:2, 11
194:18 195:8,
18 196:11
197:16
198:22 200:6,
14, 22 201:6
202:5, 18, 20
203:1, 4, 12
204:17
206:12 208:9
210:14 211:6,
17 212:7, 16

213:13 214:4
215:2, 14
216:11 217:1,
10 218:14
219:11, 18
220:2, 12
221:15 222:5,
18 223:3
224:16 225:1,
19 226:3, 18
229:21 230:6,
15 231:3, 17
232:17 233:2,
24 235:1, 13,
24 236:11
237:13
238:18 239:6,
17 240:14, 23
241:21 242:6,
20 243:7
245:13
246:24
247:10, 24
249:9 250:19
251:1, 6
252:18 253:9,
20 255:5
257:14, 22
258:6, 13
260:2, 20
261:18 262:8,
22 264:15
265:2, 14
266:2 267:7
268:8, 20
269:11, 22
270:12 272:2,
20 273:16
275:1, 14
276:4, 16
277:4 278:4,
19 279:14, 22
280:9 281:7,
20 282:11, 21
283:6, 16
284:4, 14
285:3, 14
286:8, 23
287:24
288:23 289:7,
17 290:13, 24

291:16 292:4,
16 293:9
294:1, 15
295:1, 11
297:2 298:2
299:4, 16
300:4, 13, 24
301:9, 19
302:9, 16
303:2, 21
304:8, 21
306:21 307:8
308:2, 17
309:3, 21
310:9, 17
311:18 312:7,
18 313:10
314:4 315:6,
19 316:8
317:2, 13, 22
318:16 319:3,
12, 21 320:8,
21 321:10, 22
322:8, 22
323:24
324:12 325:5,
16 326:13
327:4, 15
329:4 331:6
332:3, 11
333:1, 8, 24
334:12, 23
335:11, 23
336:8, 19
337:5, 15
338:1, 14, 23
339:17
340:13 341:7
342:3, 20
343:12 344:4,
19 345:6
346:10
350:10, 21
351:12, 23
352:10, 19
353:5, 16
354:1 356:1,
10 357:19
358:11 359:1,
11, 23 360:11,
24 361:12

Confidential Information Subject to Protective Order

362:9, 16
363:4, 20
364:8, 24
365:12, 23
366:12, 24
369:5  371:19
372:3, 15
373:19  374:5,
15  375:13
376:7, 18
377:11  378:4,
24  379:12, 24
380:10, 22
382:5, 17
383:19  384:9,
19  385:6, 16
386:22
388:15, 24
389:11  390:4
391:6  392:12
393:4, 15
394:1, 12, 21
395:6  396:5
397:8, 16
398:3, 17
399:1, 9
400:2, 13
401:10, 21
402:7, 18
404:5, 12, 19
405:3, 11, 19
406:14, 20
407:10, 19
408:2, 12, 22
409:7, 18
410:6, 20
411:6, 14
412:4, 22
413:7, 16
414:2, 13
415:1  416:7,
19  420:4, 18
421:2, 22
422:8  423:5
424:17  425:2,
11  426:6, 17
427:2  428:1,
13  429:11, 20
430:2, 12
431:8, 22

432:15  433:2
434:2  441:1
**formation**
123:9
**former**  12:9
**forth**  257:5
**found**  39:4
50:16, 21
51:23  118:17
120:16
121:23
129:22  135:6,
16  151:2
164:1  165:12
191:10, 20
210:11, 17
211:3  221:12
230:3, 12
235:22  247:7,
20  249:18
339:10  350:2
358:22
359:19  360:7
363:17
365:19  376:4
386:7  393:13,
17  399:22
404:2  405:8,
16  407:22, 23
414:20
**foundation**
17:9, 18  18:7
21:4, 16  25:9,
24  27:11
28:2  29:15
31:14  32:6
34:20  35:20
36:2  39:24
40:11  41:11
54:10  63:9
70:3  72:2
74:21  77:12
78:4, 17
79:13  80:21
81:14  82:16
83:2, 12  84:1,
9, 17  85:5, 19
90:10  91:13
92:3  93:13
107:15  108:5
109:4  150:16

151:13
152:12  183:5
190:9  195:18
198:22
201:20
210:14  211:6,
17  218:14
220:12, 23
221:7, 15
223:24
226:18  232:9
233:2  245:13
247:24  249:9
251:6  266:2
277:4  278:4,
19  280:9
282:11  293:9
294:15  295:1
297:2  298:3
299:4, 16
312:7  317:22
321:22  322:8
335:11, 23
336:8, 19
338:14  353:5
366:12  369:5
372:3  382:5
385:6, 16
390:4  400:2
401:21
406:20
408:22  411:6,
14  412:22
416:19  421:2
425:2
**four**  12:8
100:19  110:9,
22  111:17
113:6, 19
169:6  170:1,
4  217:23
220:20  221:4
313:6  364:16
412:16
**four-item**
113:4
**fourth**  101:4
113:9  144:6
161:12  390:11
**frame**  61:23
97:6  100:24

196:16
232:20  252:9
272:22
278:21  360:1
**free**  212:1
**Freedom**
382:2
**frequency**
312:20
**front**  355:20
**fuel**  203:2
**FULBRIGHT**
3:6
**fulfilling**
430:23
**full**  135:2
307:4  309:15
427:4
**fully**  16:8
28:5  113:8
438:5
**function**
129:15  416:22
**functions**
100:16
**Further**
147:15  157:5
196:22  197:4
201:9  219:6
288:17
341:11
361:21
421:12, 19
437:5

**< G >**

**GALLIAN**  3:8
**gas**  144:23, 24
224:3  419:11
**gather**  272:23
276:7  277:12,
17  313:1
314:8
**gathering**
198:8
**GC**  419:11
**GC-MS**
144:23
223:21  224:7,
13, 23  225:2,
7, 15

**gears**  69:11
97:10  140:8
167:11
345:14  381:5
**Gegenheimer**
73:13
**general**  17:11
49:24  82:18
88:11  124:8
205:17  317:24
**Generally**
29:1  82:21
138:21  190:1
215:9
**generated**
269:15  374:20
**generic**
194:11
195:14  299:18
**genotoxic**
30:7  33:4, 11,
19  34:9, 13,
18  35:9, 17,
23  36:7, 16
160:12
200:19, 24
201:3  202:1,
12  206:5
207:4  208:3
221:21
271:17, 21
272:11
292:22
308:10  355:7,
9  357:12
364:20  422:4
**genotoxicity**
201:16
**getting**  18:14
19:15  69:15
172:19
175:18  176:6,
13  204:15
208:18  210:2
235:10  239:2
263:12
266:16  284:1
287:16
319:22  324:4,
23  379:5

392:5  394:9
397:14  402:23
**ghost**  403:11,
12, 18  404:1,
2, 9, 23  405:7,
16, 24  406:7,
11  407:22
408:7  410:3
**girl**  73:18
**give**  10:10
14:18  27:24
33:16  35:2
41:8, 14, 19
81:8  267:23
268:22  289:4
303:14
325:13, 21
329:21
346:13
395:16
398:14  426:3
432:11, 23
**given**  46:20
72:20  130:2
232:15
275:17
309:23
400:23  441:1
**gives**  116:18
257:12
**giving**  84:14
212:13  259:2
261:14, 15
265:9, 10
275:11  329:2
**glance**  196:23
**global**  98:6
**go**  10:21
16:24  18:2
30:5  34:13
39:2  46:3
59:15  60:24
61:9, 10
64:24  68:24
71:5  74:10
80:16  86:16
87:10, 20
88:7, 18
92:24  94:1
95:3  98:17
99:15  105:15

113:2  117:22
121:17, 18
130:8  131:24
142:12, 14
143:15  144:5,
18  146:20
147:16  150:9
153:10, 23
154:18
155:18
157:13
158:11
159:11, 13
160:8  172:9,
20  178:2
179:22
183:17
184:12  187:4
189:5  217:16
218:10
220:18  223:4
227:2, 6
229:9  232:2
246:13
249:24
252:22  256:6
262:13, 14
265:19
277:15
293:11
295:19  305:9
306:13  311:4
313:21  343:2
345:15, 21
363:12
364:17
369:12
390:10
391:14
395:22
401:23  427:7
428:21
430:17  433:9
435:9, 13
**goal**  278:8
**God**  10:13
**goes**  20:3
21:2  29:8
78:14  79:8
89:4  96:3
98:5  100:18

125:23  137:5,
9  149:3
160:15
175:16  177:2
282:18  322:4
403:14, 20
**going**  11:7, 14,
21  24:1, 3
36:21  38:8
42:7  50:15
51:17, 19
61:5  65:6, 23
66:8  67:6
74:11  78:13
85:2  92:24
115:3  124:21
132:13
134:17
135:20  153:8
155:8, 19
157:5, 15, 21
161:6  175:16
178:4  185:8
188:20, 23
189:5, 6
191:5  193:18
199:6  204:23
206:18, 20
212:22
226:23
227:14
236:18
239:22
241:14
246:14  256:6
262:18
278:11, 14, 23
281:10
285:24
286:13
293:18  305:5,
9  334:3
347:6  349:5
353:24  354:4,
6  369:12
370:1  378:16
381:5  403:4
434:16
**Golkow**  9:5
**Good**  5:13
10:21  65:10

67:12  68:10
109:19  131:2
184:18  185:6,
10  332:5, 23
384:15  386:3
407:2  409:3,
21
**goods**  67:7, 21
130:4  144:22
153:9, 11
363:8  368:7
**gotten**  104:10
287:14
427:20  428:10
**govern**  387:6
**governed**
17:14
**government**
381:22  431:5
**grand**  325:11
**Great**  16:22
111:7  435:19
**greater**  396:18
**green**  418:22
**GREENBERG**
4:2
**GRIMM**  4:10
**gross**  233:11
**group**  97:9
99:11  101:23
105:20, 23
106:5  149:5
227:10
389:16
395:13, 15
**groups**  140:1
417:6
**guarantee**
400:4  409:22
**guess**  15:3
57:14  80:22
125:19
139:21
190:20
194:23  219:9,
15  261:23
342:6  368:23
385:8
**guessing**
174:23  219:23

**guidance**
78:10  172:16
**guidelines**
102:12
117:13  187:2
**guiding**  105:5
**Gupta**  74:13
75:2
**guy**  244:15
**guys**  47:5
55:18  56:4
58:21  94:17
102:22
106:10
129:17
142:21
145:19
146:15  155:8
157:16
243:14
251:23
253:16  336:1
435:24

< H >
**half**  68:5
287:18, 20
289:4, 13
290:2, 5
**halfway**  95:8
**hand**  10:8
154:12  254:9
266:15
267:10  279:7
280:21
289:19  318:9
436:19
**handled**  97:9
**hands-on**
93:16
**hang**  138:5
172:6
**happen**  96:13
255:19  262:10
**happened**
31:23  48:11
69:14  165:22
166:14, 19
171:3  189:2
232:23  236:4

302:4  354:2
380:3
**happening**
102:17
130:13  194:6
203:19
358:15
367:12
400:10  410:13
**happens** 72:8
122:3  130:13
166:22
**hard** 37:7
95:5  164:8
331:7  399:14
**Hardik** 305:19
**harmful** 35:7
41:18  436:24
**hassle** 370:10
**hate** 194:21
**Hauhai** 48:14
160:13
207:15
208:16  418:23
**Hauhai's**
48:19
**Hazard** 38:20
104:21  106:8
**HCTZ** 38:7
43:1
**head** 11:17
87:11  89:20
90:7  141:23
170:8
**heading** 39:2
**Health** 3:6
26:22  38:20
39:11  42:3
52:15, 22
56:7  98:19
104:21  106:8
126:13, 20
**Healthcare**
250:10  253:15
**hear** 123:23
124:15  152:9
164:3  178:21
433:21
**heard** 10:1
11:9  75:20

89:14  175:14
391:2, 20, 22
**hearing**
128:13  164:4,
9  243:1
**hearken**
114:12
**heart** 194:12
195:14
**held** 1:17
9:10  12:17
**help** 10:13
110:15
198:10
216:17
294:22  341:13
**helped** 25:19
**helping** 191:5
**helps** 19:9, 13,
15
**hey** 131:23
253:16
**HHE** 38:6
**Hi** 142:14
**high** 42:4
117:21  216:4
339:9  340:3
366:21  436:21
**higher** 43:24
44:11  47:6
60:12, 16, 22
61:2, 6, 16
340:6
**highlight**
263:10, 22
264:3
**highlighted**
56:5, 14
135:19
**highly** 27:21
29:5  39:12
**hired** 149:22,
24  151:1, 6
**hiring** 85:7
**historical**
78:24
**history** 98:18
**hmm** 57:5
**Hold** 56:11
263:3  358:2

**holder** 121:11
122:7, 13
137:15  171:1
240:9
**homework**
76:20
**honest** 14:12
16:4
**honestly**
129:14
205:21 232:20
**HONORABLE**
1:6
**hope** 212:12,
18
**hour** 65:6
124:22  184:21
**hours** 12:8
**HP** 48:7
**Huahai** 42:15,
21  43:10
46:4  48:7
172:11
**huge** 186:24
**Huh** 369:19
**human** 39:7,
17, 18  40:7,
19  41:5, 7
249:22
**Humana**
193:21
**humans** 27:20,
22  28:18
29:3, 4, 10
39:8
**hundreds**
226:15  371:15
**hurdles** 98:13
**hurting**
240:21  241:2
**hurts** 19:9, 14,
16
**hydrochlorothi
azide** 134:13
154:17
155:21, 24
168:16  340:17
**hyphened**
135:19

< I >

**idea** 50:14
55:9  75:18
123:10
133:23  157:2
174:5  221:1
225:14
283:22
353:11
362:18
397:18  409:3
422:21
**Ideally** 187:8
**ideas** 34:22
35:3
**identification**
23:16  59:24
67:15  97:21
119:21  121:5
133:20
156:22  173:3
178:11
179:19
180:17
189:12
248:18  256:3
287:10
349:10  354:18
**identified**
115:12
120:12  208:4
259:14  405:7,
24
**identified/Need**
71:8
**identify** 35:17
405:1
**identifying**
98:11, 12
**identity** 110:9
111:17
113:14, 22
114:1  115:8,
24
**ignore** 406:10
**ignored** 404:9
**ignores** 410:3
**II** 5:10  23:14
**immediately**
293:6  294:11
295:24
303:17  436:1

**impact** 54:7
127:19  209:4,
9  229:13
230:9  312:21
313:13
**impacted**
198:15
213:20  263:2
264:19
290:17
296:21  310:3
317:7  324:17
360:13
**impacts**
230:18
**imperative**
439:13
**implemented**
387:19
**implications**
40:22  231:7
427:4
**implied** 432:6
**implies**
368:24  369:2,
9
**imply** 369:7
**implying**
165:17
340:19  385:10
**importance**
126:14  128:6
215:10  239:2
246:19  331:8
**important**
11:10  14:1
16:3  22:3
72:24  83:20
84:5  85:16
114:9  126:3,
8, 21  130:19
133:3  192:22
214:23
215:16, 22
216:6  231:11
256:13
277:14  291:5
310:11
312:23  331:3
386:18  388:22
**imposed** 312:5

Confidential Information Subject to Protective Order

improvements
114:*16*
**impurities**
23:*4* 35:*18,*
*24* 36:*12*
47:*18* 49:*14*
131:*4* 133:*12*
137:*10*
141:*12*
146:*24* 150:*6*
166:*4,* *20*
198:*12* 219:*1,*
*3* 248:*11*
285:*19*
292:*21,* *23*
293:*16*
296:*18* 326:*5*
348:*19,* *20*
359:*5* 360:*3*
361:*17,* *18*
363:*10* 365:*4*
375:*6* 377:*19*
380:*17* 381:*1*
**impurity**
36:*16* 49:*3,*
*11* 50:*2*
51:*23* 137:*4,*
*6* 141:*4*
146:*10*
150:*19*
160:*12* 166:*8*
199:*15,* *23,* *24*
200:*3,* *18,* *20*
202:*12,* *15*
206:*6* 207:*4*
208:*3* 221:*21*
223:*9,* *19*
225:*11* 233:*5*
237:*16*
238:*22*
239:*10*
247:*14*
249:*18* 259:*3,*
*7,* *14* 261:*1*
267:*14,* *24*
269:*3* 271:*17,*
*20* 272:*12*
273:*3,* *10*
274:*17* 275:*5*
287:*4* 289:*22*
290:*17*

296:*16*
301:*23* 308:*7,*
*11* 311:*21*
314:*18*
316:*12*
324:*17*
326:*10* 335:*4*
339:*5* 340:*19*
346:*16* 348:*7,*
*9,* *19,* *22*
351:*19* 355:*8,*
*9* 357:*2,* *12*
364:*2,* *11,* *20*
366:*4,* *18*
367:*4,* *7*
402:*10* 422:*4*
436:*5,* *9*
**inaccurate**
326:*21*
**inactive** 156:*6*
159:*6,* *9,* *17*
200:*2* 254:*2*
**inactives**
235:*7* 254:*6*
**include** 87:*14*
113:*10* 118:*3*
152:*20* 427:*10*
**included**
100:*3,* *19*
101:*16* 141:*5*
151:*21*
**includes**
21:*13* 424:*20*
**including**
99:*20* 148:*7*
**income** 320:*6*
**increase** 39:*4,*
*8* 166:*20*
167:*4* 302:*13*
**increasing**
302:*6*
**independent**
149:*22* 151:*2,*
*6,* *10,* *21*
152:*20*
159:*22* 168:*4*
294:*11*
377:*24*
379:*20*
403:*23*

427:*18,* *20,* *22*
428:*11*
**independently**
427:*17*
**INDEX** 8:*1*
**India** 37:*19,*
*22,* *24* 38:*3,*
*22* 51:*13*
70:*24* 71:*21*
86:*14* 101:*23*
102:*9,* *14,* *21,*
*23* 103:*3,* *9,*
*23* 104:*2,* *20*
105:*9,* *15*
106:*19* 107:*5,*
*9,* *12* 108:*1,*
*16,* *20* 112:*22*
118:*4* 119:*2,*
*4* 129:*5*
130:*14,* *17*
131:*21,* *24*
133:*6* 134:*4*
135:*9* 136:*2,*
*4,* *20* 137:*14*
138:*11,* *12,* *22*
139:*8,* *20*
140:*4,* *9,* *12,*
*15,* *19* 142:*21*
143:*16,* *22*
145:*18,* *23*
146:*5* 147:*13*
148:*8,* *20*
149:*15*
170:*24*
184:*14*
190:*23*
197:*20* 198:*4*
205:*18,* *23*
210:*3* 211:*23*
212:*4* 228:*17*
239:*13* 304:*5*
323:*17* 325:*3,*
*13,* *21,* *24*
377:*14,* *16*
409:*15* 418:*13*
**India-based**
147:*21* 228:*14*
**Indian** 102:*2,*
*5* 178:*16*
243:*24* 423:*4*

**India's** 104:*17*
140:*10,* *17*
148:*24* 423:*5*
**indicate** 274:*7*
280:*21*
**indicated**
114:*20* 115:*6*
403:*14*
**indicates**
135:*4*
**indicating**
267:*12* 301:*22*
**indication**
215:*18*
268:*23* 269:*3,*
*6* 279:*24*
286:*10*
**individual**
18:*10* 227:*14*
**individuals**
86:*20* 100:*20*
395:*17*
**Indrad** 86:*11*
88:*16* 112:*21*
368:*13,* *14*
**Industries** 4:*5*
**industry** 34:*5*
72:*21* 78:*7*
98:*5* 185:*12,*
*16* 186:*5,* *12,*
*15* 194:*16*
254:*22* 255:*2,*
*3*
**inform** 122:*3*
259:*5*
**INFORMATIO
N** 1:*10* 14:*19*
15:*1,* *2,* *13,* *19*
16:*8* 25:*12*
32:*17* 46:*10*
55:*2* 56:*24*
57:*12* 79:*10*
80:*18* 81:*1,* *8*
84:*7,* *15* 85:*3*
102:*12*
106:*19* 107:*4*
117:*3,* *10,* *17*
118:*6* 119:*7*
122:*6,* *22*
123:*16* 124:*5,*
*8,* *19* 127:*4,*

*12* 130:*2*
136:*21*
137:*17*
138:*22* 146:*8*
147:*11*
149:*18* 150:*7*
174:*10,* *17*
183:*21*
191:*13,* *22*
192:*5* 195:*5,*
*6,* *10* 197:*7*
198:*9* 204:*14,*
*21* 208:*6,* *18*
209:*8* 210:*3*
212:*10,* *13*
213:*24*
216:*14*
217:*12* 222:*8*
223:*7* 225:*16*
240:*4,* *6*
241:*10*
249:*11*
254:*20*
255:*11*
256:*21*
257:*11,* *16*
259:*1,* *18*
260:*4,* *6,* *10,*
*12,* *15,* *17*
261:*21*
262:*24* 263:*5,*
*13* 265:*8,* *10,*
*21* 266:*7,* *8,*
*14,* *22* 268:*24*
272:*24* 275:*7,*
*11,* *17* 277:*10,*
*13* 287:*22*
289:*1,* *5,* *9,* *19*
294:*4* 295:*17,*
*21* 303:*14,* *17*
304:*1,* *24*
306:*3* 313:*1*
317:*5,* *10*
318:*1* 319:*15*
323:*3,* *6*
325:*22* 329:*1*
333:*18* 334:*4,*
*8,* *9,* *14,* *16*
336:*3* 340:*23,*
*24* 341:*11,* *20*
346:*14*

373:*10, 21, 23*
376:*12*  382:*3*
388:*21*  389:*2*
393:*13*
398:*22*  399:*6,
11*  402:*5, 10*
403:*1*  406:*23*
407:*2, 3*
408:*6*  411:*8,
16*  415:*18*
416:*17*  417:*9*
419:*16, 19, 21,
24*  421:*19*
422:*3*  423:*16*
424:*14, 16, 19*
425:*16*  426:*3*
427:*9, 10, 11,
15, 21*  428:*9,
11, 23*  429:*17,
23*  430:*10, 22*
431:*4*  432:*9,
10, 12, 18, 23*
433:*20, 22*
434:*5*
**informed**
123:*15*  127:*9*
143:*6*  207:*15*
208:*16, 17*
215:*17*
216:*22*  303:*15*
**informing**
52:*2*
**ingest**  202:*3*
**ingested**
285:*18*
**ingesting**
319:*9*
**ingestion**
59:*10*
**ingredient**
20:*3*  51:*24*
157:*12*  159:*9*
200:*1*
**ingredients**
19:*20*  117:*23*
156:*7*  159:*6,
17*  200:*2*
254:*3*  394:*9*
**inherent**  436:*8*

**in-house**
149:*19*
151:*17*  377:*23*
**initial**  141:*1*
168:*22, 23*
169:*20*  206:*8*
221:*23*  222:*1*
287:*15, 19*
308:*10*  312:*5*
357:*5*  375:*2*
403:*8*
**initially**  25:*15*
141:*15, 23*
167:*14*  170:*11*
**initiated**
150:*21*
**injections**
396:*20*
**inquiry**  403:*10*
**insinuate**
198:*4*
**inspect**  78:*1*
79:*21*  89:*17*
96:*10*  409:*21*
**inspected**
86:*11*
**inspecting**
77:*9*  390:*14*
411:*21*
**inspection**
80:*3*  81:*11,
23*  82:*11*
83:*20*  85:*3*
86:*6*  87:*15,
16, 17, 24*
88:*17*  91:*10*
92:*1*  96:*5*
112:*20, 23*
114:*19*  381:*9,
10, 13, 16*
382:*19, 23*
383:*2, 5, 8*
386:*15*
410:*13*
415:*22, 24*
**inspection/vend
or**  95:*13*
**Inspectional**
113:*4*
**inspections**
80:*10, 11*

82:*8*  86:*24*
87:*6*  385:*9, 19*
**inspector**
83:*21*  84:*12*
85:*1, 8, 9*
91:*24*  94:*16*
114:*6*  115:*6*
403:*7*  404:*16*
406:*11*
**inspectors**
96:*9*  392:*23*
**inspects**  79:*8*
**instance**  79:*1,
3*  82:*5*
105:*12, 14*
153:*6*  217:*6*
225:*9*  254:*1*
328:*14, 18*
333:*13*
387:*12*
388:*17*  399:*16*
**instructed**
271:*23*  273:*19*
**instruction**
272:*5*
**instructions**
298:*16*  439:*1*
**instructs**  11:*24*
**intake**  24:*6*
45:*19*
**intangible**
424:*17*
**integrity**
387:*21, 23*
388:*12*
414:*10, 21*
**intent**  31:*18*
81:*20*  242:*22,
23*  328:*7, 9*
**intention**
54:*12*
**intentionally**
41:*19*
**interact**  17:*14*
**interaction**
72:*4*
**interesting**
56:*3*
**Interim**  5:*9*
23:*13*

**intermediary**
15:*4*
**intermediate**
137:*2*
**internally**
344:*21*
**International**
4:*3*  36:*10*
**internationally**
225:*24*
**internet**  16:*24*
55:*1*
**interpret**
18:*10*  28:*5*
29:*18, 20*
47:*12, 19*
59:*13*
**interpretation**
42:*1*  47:*24*
76:*6*  431:*10*
**interrupt**
367:*14*
**interruption**
111:*3*  234:*5*
**intimately**
79:*15*  84:*21*
**introduced**
27:*4*
**invalid**  403:*9*
**invalidates**
392:*19*
**Invalidation**
391:*18*
**inventory**
63:*13*  64:*14*
217:*22, 23, 24*
218:*1*  220:*19,
20*  221:*4, 11*
**investigate**
126:*24*  127:*5*
399:*12, 23*
404:*24*  409:*3,
16*
**investigated**
127:*20*  388:*7*
**investigating**
196:*18*  385:*1*
390:*19*  395:*3*
397:*24*
411:*19*  424:*4*
425:*22*

**investigation**
382:*24*
386:*14*
396:*18*
398:*12, 15*
400:*11*
411:*12, 24*
**investigations**
385:*3*
**invoked**
262:*18*
**involved**
21:*21*  77:*16*
90:*4, 8*  91:*16*
101:*19*
107:*18*  118:*9*
141:*9*  183:*2*
246:*17*
294:*18*  295:*5*
**involving**
418:*18*

**IRBESARTAN**
1:*5*  9:*12*
**isolated**  259:*8*
**issue**  20:*2, 4*
48:*23*  52:*3*
92:*13*  118:*16*
119:*10*
124:*10*  131:*1,
21*  164:*23*
193:*7*  197:*22*
215:*19*  219:*8,
24*  220:*6*
223:*17*
386:*10*  422:*4*
424:*5*  425:*22*
435:*22*
**issued**  113:*5*
406:*12*
**issues**  34:*11*
102:*10*  105:*6*
106:*18*
148:*10, 16*
192:*11*
193:*13*
196:*19*
215:*11*
231:*10*  389:*6*
**items**  114:*24*
387:*15*  400:*7*

Confidential Information Subject to Protective Order

its 22:5, 6
39:21 50:16,
21 69:15
76:20 91:9
97:7 110:22
111:16 114:7
120:10 128:1
130:20
159:23
177:21
191:11 200:7
204:11
214:12
226:10, 13
230:3 292:10
298:12 303:8,
13, 18 315:16
323:20
333:21
344:11
345:20
347:20
349:21 350:2,
7 353:13
356:18
357:16
358:20 361:3
363:1 364:22
365:10 375:9
380:6 385:14
386:3 387:23
398:14
399:23
408:19
413:24 414:9
415:8 416:5
428:24 430:23

< J >
JACLYN 3:8
jaclyn.gallian@
nortonrosefulb
right.com 3:11
Jaiswal 129:4
142:11 148:7
227:7 238:7
305:12 417:3
January 73:12
Jayatibha
227:16

Jenny 96:4,
18, 23
JERSEY 1:1
9:15
Jian 89:6
Jim 75:7
job 12:21
13:7 15:23
57:11, 14
85:12 92:24
93:2 98:18,
22 143:12, 16
191:22 247:2
257:19 258:3,
8, 10 337:22
338:3, 10, 16
388:3 413:13,
23 416:15, 16
Jocelyn
330:11, 19
331:21
Johnson 2:8
judge 331:8
343:4
July 141:15
189:23
196:16 198:7
203:8 205:11
206:3, 9
210:9 213:4
214:6, 11
217:18
218:12, 19
221:11, 19
227:1 237:7,
20 247:6, 19
249:2 251:4
252:4 256:10,
24 258:19
260:16 264:5
269:18
272:15
286:16
297:11, 13, 24
299:1, 8, 12
302:5 312:5
355:18
356:20 357:4
358:16, 21
359:4, 19
360:21

362:24 363:6,
13 364:18
365:6 419:23
jump 125:18
357:3
jumping 134:1
Jun 403:11
June 199:10
202:16 207:4
208:12 213:2,
4 233:5
271:15
272:14 309:6
354:24
355:17
356:16, 20, 21,
22 357:4
436:3
jury 271:12
285:23
justification
391:20 392:21

< K >
Kansas 2:9
keep 25:1
30:21 66:17
90:14 215:16
273:13
276:21 321:6
327:1, 12
328:1, 7
369:18, 21
407:7
Keeping
121:17 423:21
KELLY 4:2
73:13, 15, 18
75:7
kick 263:15
281:17
kicking 245:4,
23 264:2
kilograms
182:13
kind 17:20
21:20 36:22
56:22 61:22
81:12 86:12
100:3, 9
103:14 105:4

107:11 108:1
114:12, 14, 16
120:8 141:2
142:3 147:16
150:4 174:12
184:12
190:22 192:3,
17 207:16
216:15 218:3
277:7 294:4
313:12 329:6
336:22 342:4,
9 350:13
351:6 354:1
360:14
361:19 378:7
388:3 396:7
409:10 430:19
kindly 179:23
421:12
kinds 190:6
387:14
KIRA 3:9
kira.latham@n
ortonrosefulbri
ght.com 3:12
KIRKLAND
2:12
knew 47:5
71:21, 22
163:24 165:9,
22 224:11
225:17
358:18
414:16
415:15 425:8
know 11:6
22:17 25:19,
22 28:23
29:17, 20
32:21 33:10,
13, 18 34:8,
22 41:17
48:21 50:6, 9
55:2 57:18
58:6 59:13
62:11 63:11
64:11 75:5,
21, 24 76:10
77:17 78:12
79:20 80:3, 4

83:21 84:12,
24 85:2, 21
87:23 91:22
93:11, 15, 21
94:18 95:23
97:5 100:23
102:2 103:14
104:4 105:4,
17 106:18
107:17
108:10
109:22
114:18
115:21 117:8
118:12 119:9
120:19
122:17, 18
124:3, 9
129:8 131:7,
14 132:2, 11,
14 133:7
135:13 136:3,
13 137:10
138:7, 13
140:12, 20
141:4 142:21
147:1 149:21
150:20, 24
157:9 165:20
166:13, 20
170:16
171:22 172:6
176:12
177:23 179:4
182:4, 8, 11,
21, 23 183:7
184:3, 4, 5, 9,
12 186:5
188:10 191:3,
12, 17 192:8
193:6, 13
194:21 197:9,
22 198:3, 9
202:1, 10, 11
203:9 204:19
205:3, 22
207:1, 11
208:17
213:17
214:10, 23
216:6, 13

217:8, 12
221:10, 17
222:20
224:11
225:23 227:7,
19 231:5
232:22
234:11
242:23
245:18 248:4
249:12
251:14, 19
252:1, 4, 15
253:6 255:7,
8, 9, 14 258:2
259:21
261:10 263:7,
12 265:16
266:23
271:14 273:2,
7, 22 274:6
277:7 278:21
279:4 283:8,
18 286:19
290:4, 8, 15
291:8, 11
293:2 294:4
296:15, 20, 22
297:9 298:10
310:1, 2
311:22 312:3,
22 313:11
316:13 318:1,
2 322:24
323:7 324:2
326:17
328:15
331:13, 15
333:19, 20
336:11, 24
342:15
343:19 344:5,
8 348:22
350:16
351:16 355:6,
21 356:15
358:7 360:14,
17 361:15, 16,
19 366:1, 14,
20 370:23
373:9, 15

375:15, 21
376:1, 5, 9
378:11 379:3
380:5 381:17
382:7 387:13,
14 388:1
389:2 390:21
391:10 393:6,
17 394:18
395:10, 12
396:10, 14
397:1, 10
399:11, 14
400:9 401:12
403:12
405:23 406:6,
24 407:4, 6
408:24
409:23 411:8,
16 412:6, 9,
14, 18, 19
413:2, 9
414:15, 19
415:7 416:14
417:6, 8
418:3 425:17,
23 426:10
427:4 428:5,
17, 19 429:5,
13, 23 430:4,
9 431:11
432:12, 13, 20
433:11 434:4,
12 435:24
436:12, 14
**knowing**
316:23
342:24 343:6
425:13 433:20
**knowingly**
372:20 373:5
375:8
**knowledge**
23:3 27:14
48:5 49:2, 24
85:23 104:12
105:5 150:8
183:10, 14
278:10 284:6,
10 285:5

310:19
380:13 396:8
**knowledgeable**
28:21
**knowledgeably**
322:12
**known** 240:6
348:8 386:10
391:12
428:21 429:2
**knows** 202:12
**KOTAK** 4:11
kpesce@gtlaw.
com 4:4
**KUGLER** 1:9

< L >
**lab** 139:13
149:22, 24
150:2, 9, 12,
13 151:2, 7
152:23
153:13
154:21 155:8
159:12, 23
163:24 165:9,
22 185:19
202:18 378:9
403:23 427:22
**labeled** 405:15
**laboratories**
226:10 377:8,
9, 13, 15
387:12
**laboratory**
27:3 113:10
115:10
386:16 387:8
**labs** 151:10,
21 152:2, 5, 7,
14 153:4, 11
154:21 155:5
156:13
158:15 168:4
225:24 226:5,
13, 21 294:12
376:1 377:17
379:20
**lack** 375:24
391:19

**lacked** 388:11
**lacks** 415:9
**language**
114:11, 13
**large** 398:10
399:17
**latest** 163:22,
23 419:16
**LATHAM** 3:9
**launch** 172:20
**LAUREN** 4:12
**law** 109:17
**LAWLOR**
2:18
**laws** 431:2
**lawyer** 431:11
**lay** 364:5, 14,
15
**layperson** 19:6
**lead** 437:3
**leader** 98:4
**leading** 288:5
**learn** 307:21
308:22
376:12
388:22 393:11
**learned** 15:4
191:9 198:19
213:9 224:10
237:10
290:19
341:23 351:3
359:8 361:9
387:22 388:6
399:5 406:1
415:8 416:3
**learning**
127:12
129:18 273:10
**learns** 292:10
295:8 323:19
355:12
**leave** 21:18,
20 22:6
**leaves** 20:17,
22 22:15
**led** 406:17
**left** 24:3, 5
37:6 42:15
119:24 217:23

**Left-hand**
30:5 71:10
95:8 181:14
**legal** 427:5
**Letter** 5:16
119:18 184:3
196:2 205:8,
12 207:10
208:12
251:18
258:17 259:5
293:1
**letters** 119:13
203:15 336:2
**level** 42:15
43:10 44:16,
17 46:4, 7
47:21 114:22
117:21 204:8
297:18 298:5
301:16 311:21
**levels** 24:4, 22
27:23 29:10,
21, 24 42:7
43:14 50:2
66:9 67:2
104:22 130:5
131:3, 17
133:12 143:9
284:17 291:9
296:17, 18
310:1 319:1
326:11
334:20 345:4
346:14 361:9
365:4, 20
366:21 371:10
**LEVIN** 2:1
**Lexington**
2:13
**Li** 403:10
**LIABILITY**
1:6 9:12
**liaison** 241:12
**light** 344:8
**limit** 24:18
44:5, 18, 19
46:6, 11 47:6
53:17 54:17,
20 55:3, 13,
18 56:4 59:5,

Confidential Information Subject to Protective Order

14 60:8, 22
61:6, 12, 17,
20 62:14
65:2 66:14
69:6 161:18,
19, 22 162:7,
17, 24 285:1
291:13
368:22, 24
373:6
**limitations**
423:22
**Limited** 68:2
89:7 101:7
114:15
147:19 423:19
**Limits** 5:9
23:6, 13, 22
25:1 36:4, 5
58:11 61:22
291:22
311:24 312:4,
10 313:16
372:21, 23
373:1, 2
**Line** 8:5, 8, 11
21:1, 7 49:6,
7 71:5
144:14
160:11
206:24 208:2
232:5 345:15
390:15
418:12 440:4
**lines** 79:4
80:5 155:3
**Linhai** 95:16
**link** 194:10
197:3
**linked** 196:8
279:11, 16, 19
280:1
**list** 63:3 80:6
156:10 159:5
160:16 331:1
**listed** 45:4
69:8 86:21
152:23 153:4,
6, 12, 14
156:3 157:14,

18, 24 347:22
396:24 397:2
**listened**
247:17
**listening** 248:3
**listing** 158:12
162:12
**lists** 42:24
88:8 113:5
155:7, 11, 13,
14 158:21
159:16
160:22 348:10
**literally** 75:22
92:14
**LITIGATION**
1:6 9:5, 13
**little** 12:22
30:13 59:1
69:11, 13
78:19 81:5
88:7 92:21
95:5 97:11
98:21 111:5,
6 117:19
125:14 134:1,
18, 19 160:10
167:11
175:21
185:18 199:7
263:20 277:9
319:22
345:15 354:7
395:23 396:7
415:3 418:22
436:14
**lives** 285:12,
20
**LLC** 2:6, 21
4:6
**LLP** 2:12 3:1,
6, 15 4:2
**local** 13:13
100:10
**logo** 38:12
63:17 418:21,
22
**Lokesh** 75:9
**long** 12:7
40:3 61:24
91:23 185:12

278:23
308:15
337:12, 17
353:19 354:8
412:20, 24
413:9 430:19
**longer** 231:13
278:15
281:16
297:16 298:1
321:17, 19
322:17, 19
**look** 17:1
24:1, 3 27:17
36:21 38:8
39:1 42:7
46:13 50:12,
15 51:17, 19
56:2, 5 60:3,
5, 24 62:1
63:2 64:4, 20
66:7, 8 67:2,
24 68:4, 13,
22 73:8, 9
80:16 83:21
84:13 88:6,
20 112:17, 19
119:15
120:12, 14
127:11
128:18
129:19
133:13
134:19 142:6
144:1, 6, 19
153:17 155:6
156:16
157:21 160:2
161:11 162:1
172:7 175:20
179:12 181:4,
12, 19 183:18
193:16, 18
208:15, 23
212:22 237:4
244:11
248:14
255:21 287:1
288:11 305:7
306:1 314:19,
22 315:8

323:10
333:15
341:16
343:14
345:22
348:23
350:12 351:6
354:4 368:15
369:24 386:6
398:6 403:2,
6 422:17
423:1, 21
430:18 432:3
**looked** 43:13
52:2 106:9
123:18
144:12
167:12, 20
213:18 241:5
256:8 323:13
367:24 368:3
370:11
**looking** 26:7,
10, 17 27:1
43:9 49:6
52:14 66:19
67:3, 5 70:5
82:3, 4 84:6
121:19
147:16 161:7
168:3, 13
170:22
197:21
228:20 257:1
258:16
272:16
305:10
314:20
329:17
348:15 368:6
370:18 371:9
386:12
400:22 424:8
**looks** 16:20
37:23 96:22
99:16 153:21
175:12 180:8
189:22
195:24
196:24 219:2
238:5 250:22

271:12
305:11 423:4
**LOSARTAN**
1:5 9:11
**losing** 231:1
**loss** 320:6
**lot** 106:3
122:12 124:6
132:13 161:3,
7 163:6, 10,
11 168:19
181:19 188:6
198:8 285:20
294:3 318:4,
12, 23 328:15
331:2 339:22
368:4 371:17
**lots** 177:24
331:12
347:12, 18
353:8
**louder** 111:5
**low** 27:5, 23
29:10, 20, 24
53:3, 8 76:1,
18 339:14
**lower** 76:12
352:7
**LP** 16:17
23:6, 8 26:5
36:18 38:9
45:13 46:3
50:12 51:18
59:15 65:22
66:16 67:2, 5
68:14, 24
70:10 73:8
86:2 97:12
112:17
119:15
120:22
128:18
133:13 142:6
144:1 153:17
156:16
157:22 158:4
160:2 170:20
172:7 178:5
179:13
180:10 189:5
199:8 204:24

248:*14*
255:*21* 263:*9*
286:*13* 305:*7*
314:*19*
329:*10* 347:*7*
348:*24* 367:*9,*
*10* 369:*13*
381:*6* 417:*12,*
*13, 21* 423:*2*
**lubricants**
156:*4*
**lunch** 164:*14*
184:*17*

**< M >**
**MADELINE**
2:*3* 369:*24*
**main** 13:*3*
70:*7* 332:*20*
**maintained**
389:*22* 391:*4*
**major** 172:*16*
174:*14, 18*
250:*7* 251:*11*
253:*5, 12*
**majority**
101:*16*
**maker** 98:*10*
**making** 13:*14*
20:*19* 25:*15*
48:*17* 58:*12*
96:*1* 117:*22*
126:*23*
145:*17* 210:*1*
231:*20, 23*
234:*10*
244:*10* 279:*6*
281:*13* 387:*7*
389:*24*
**Male** 73:*19*
**managed**
100:*12*
**management**
395:*20* 416:*23*
**manager**
88:*11* 205:*17*
382:*11*
**managers**
100:*8*
**mandatorily**
431:*2*

**mandatory**
431:*4*
**manner** 94:*10,*
*19, 24* 276:*18*
**manufacture**
47:*16* 157:*15*
390:*23*
**manufactured**
109:*18* 110:*3*
163:*13, 15, 17,*
*21* 165:*6*
209:*1* 288:*19*
368:*12* 390:*13*
**manufacturer**
20:*13* 42:*22*
69:*24* 77:*24*
78:*2* 89:*5, 9,*
*18* 95:*14, 20*
116:*7* 131:*7*
137:*6, 7*
151:*1* 195:*16*
199:*18* 207:*3*
240:*10* 259:*6*
338:*9* 394:*8*
413:*22*
**manufacturers**
25:*5, 20*
108:*23, 24*
110:*7* 116:*4,*
*5* 152:*20*
250:*2, 5, 15,*
*21* 251:*2*
252:*6* 254:*19,*
*24* 273:*24*
274:*9* 294:*21*
297:*10* 357:*6*
376:*3, 10, 15*
377:*1, 4*

**manufacturer's**
254:*12*
**manufactures**
18:*20*
**manufacturing**
17:*1* 50:*3*
72:*7* 103:*16,*
*19* 109:*19*
134:*16* 138:*3*
157:*24*
158:*18*
159:*13*

170:*12* 172:*2,*
*12, 15* 177:*6,*
*21* 207:*16*
208:*20*
227:*11* 255:*2*
337:*11* 387:*4*
399:*17*
**margin**
229:*13* 233:*11*
**mark** 170:*21*
370:*1*
**MARKED**
5:*7* 6:*16* 7:*1*
8:*10* 16:*18*
23:*15, 19*
26:*6, 24*
36:*19* 38:*10*
50:*13* 51:*18*
59:*16, 23*
67:*13* 70:*12*
73:*11* 86:*3,*
*17* 97:*20*
112:*18* 113:*3*
119:*16, 19*
121:*3* 128:*19*
133:*14, 18*
142:*7* 144:*2*
153:*18*
156:*20* 158:*5*
160:*3* 173:*2*
178:*10*
179:*18*
180:*15* 189:*6,*
*11* 199:*9*
212:*21, 23*
248:*15, 17*
256:*1* 287:*8*
305:*8* 347:*7*
349:*8* 354:*17*
369:*14* 370:*5*
423:*3*
**market** 71:*19*
98:*11* 115:*15*
125:*16, 23*
129:*21*
181:*13* 191:*7*
193:*9* 198:*16*
209:*13, 20*
211:*15*
231:*14*
245:*11*

246:*22*
264:*12*
265:*24* 268:*6,*
*18* 270:*10*
276:*23*
283:*12, 19*
284:*23*
285:*11* 286:*3,*
*16* 290:*11, 22*
318:*3, 6*
321:*7, 19*
322:*13, 20*
327:*2, 13*
328:*2, 8*
346:*8* 372:*8,*
*22* 375:*9, 17*
410:*14, 16, 18,*
*23* 436:*16*
437:*1*
**marketing**
112:*16* 188:*2*
**markets**
107:*20*
191:*18* 297:*20*
**mass** 150:*13*
224:*4*
**Massachusetts**
4:*3*
**MASSEY** 4:*12*
**master** 116:*5,*
*8, 9* 120:*15*
121:*20*
**master's**
201:*17*
**match** 161:*6*
**material**
155:*12*
**materials**
77:*1* 80:*6*
153:*10*
154:*22*
158:*20*
159:*15* 226:*7*
234:*13* 235:*5*
**math** 57:*20*
60:*23* 61:*13*
62:*4* 65:*4*
66:*15* 67:*1*
68:*15, 19*
161:*21, 24*
162:*9, 18*

**matter** 9:*11*
130:*24* 278:*6*
438:*7*
**matters** 141:*6*
**maximum**
44:*19, 22*
45:*9, 15* 46:*5*
**McCorkle**
193:*22*
**McKesson**
3:*12*
**mdennis@crow**
**ell.com** 3:*5*
**MDL** 1:*3*
9:*13*
**mean** 17:*6, 16*
19:*6* 27:*9*
30:*1* 31:*8*
33:*4* 75:*24*
80:*10* 84:*19*
86:*23* 92:*13*
95:*21* 101:*10*
103:*20* 106:*3*
139:*22*
163:*12*
174:*20*
177:*14* 182:*6,*
*14* 184:*2*
194:*19*
199:*23*
204:*20*
214:*22* 232:*7*
234:*16, 19, 21*
246:*15*
255:*19*
297:*20*
306:*22* 309:*4*
321:*24*
322:*10, 11*
324:*8, 13*
336:*2* 337:*17*
345:*22*
368:*20* 385:*7*
387:*3* 389:*12*
392:*2* 393:*18*
396:*3* 428:*3*
**meaning**
40:*20* 47:*20*
109:*23*
116:*21*

Confidential Information Subject to Protective Order

118:*16*
127:*24*  136:*5*
**means**  17:*11,*
*21*  19:*8*
20:*15, 18*
26:*12*  27:*14,*
*24*  28:*6, 9, 24*
29:*11*  30:*12,*
*17, 21*  33:*11,*
*13*  34:*9, 18,*
*23*  42:*18*
52:*7*  63:*21*
73:*3*  75:*21*
91:*4*  114:*21*
163:*14*  174:*1*
181:*6*  182:*7,*
*24*  200:*3, 11,*
*19*  201:*4*
209:*16, 20*
219:*9, 15*
225:*4*  232:*11*
249:*6, 13*
255:*9, 20*
291:*12*  293:*3,*
*7*  346:*4*
371:*6*  386:*24*
392:*3, 9, 13*
396:*11*
424:*22*  425:*4*
426:*10, 21*
427:*19*  429:*6*
431:*3*  438:*23*
**meant**  311:*10*
**measure**
141:*10*  265:*6*
363:*9*
**measures**
197:*12*
**medical**  38:*7*
40:*24*  106:*14*
202:*17*
**medication**
19:*15*  22:*18*
298:*23, 24*
299:*1*  436:*23*
**medications**
24:*20*  426:*14*
**medicines**  17:*4*
**meet**  12:*3*
13:*15*  18:*20*
77:*4*  102:*4, 6*

112:*14*
115:*23*  126:*8*
283:*20*  392:*6,*
*14*
**meeting**
111:*23*
129:*20*
240:*17*  242:*9*
315:*1*  330:*7,*
*8, 9, 15*
331:*10, 14*
333:*16, 17*
334:*2, 21*
338:*19*
**meets**  17:*11*
21:*8, 12*
22:*12*  110:*8*
235:*16*  338:*11*
**memo**  213:*18*
**memory**
55:*17, 22*
351:*9*  353:*9*
**mentioned**
17:*24*  79:*20*
101:*24*
117:*15*
125:*21*
171:*24*
172:*17*
174:*16*
197:*18*  241:*4*
253:*23*  303:*4*
320:*10*
324:*19*
328:*11*  334:*3*
346:*12*  378:*6*
400:*15*  408:*4*
416:*21*  417:*4*
436:*17*
**mentioning**
274:*5*
**mentions**
355:*5*
**mentor**  101:*22*
**message**
137:*23*  212:*9*
213:*18*
229:*23*
241:*17*
258:*20, 21*

261:*5*  306:*15*
339:*12*
**met**  110:*22*
111:*16*
112:*13*  114:*2,*
*8*  237:*22*
372:*5*
**metabolism**
27:*19*
**method**  130:*9,*
*17*  131:*2, 14,*
*15, 24*  132:*1,*
*12, 20*  133:*2,*
*5, 10*  141:*8*
142:*17*  143:*7*
144:*23*  145:*3,*
*7*  146:*14*
149:*16, 19*
150:*1, 5*
198:*24*  204:*1,*
*3, 5, 12*  211:*8*
224:*10, 18, 23*
225:*3, 4, 10*
238:*10*
239:*19*  244:*1*
247:*12, 19*
248:*6, 8*
252:*10, 11*
253:*17*
254:*12*
260:*23*  265:*4*
267:*3, 18, 22*
269:*14*  270:*5*
274:*16*  275:*4*
278:*9*  279:*1*
293:*12, 19*
294:*8*  304:*14*
307:*17*  308:*5*
309:*11*
310:*14, 20, 21*
314:*17*
315:*23*
321:*18*
322:*18, 23*
323:*17, 21*
324:*4*  328:*15*
329:*8*  335:*2*
341:*19, 22*
342:*8, 12, 16*
343:*1, 7*
344:*21*

353:*12*
356:*17*  357:*1*
359:*3, 8*
363:*7, 15*
364:*21*  365:*2,*
*9, 14*  369:*9*
376:*1*  378:*12*
379:*9, 22*
380:*6, 7, 15,*
*24*  381:*2*
419:*10*  420:*2,*
*13, 15, 23*
**methods**
198:*10*
239:*14*
243:*12*
253:*23*  254:*4,*
*7*  255:*16*
328:*12*  343:*17*
**microphone**
111:*7*
**middle**  26:*10*
95:*22*  120:*9*
121:*8*  147:*17*
170:*23*  227:*6*
359:*4*  363:*6*
**mike**  164:*15,*
*23*
**milligrams**
44:*23*  45:*4, 7,*
*15*  49:*5, 8*
57:*22*
**million**  24:*10,*
*14*  42:*18*
43:*15*  44:*11*
45:*20, 23*
46:*12*  53:*13,*
*14, 18, 19, 21*
55:*4*  57:*21*
60:*5*  61:*20*
62:*2, 9, 12*
64:*21*  66:*10*
98:*5*  160:*23*
161:*16*  162:*5,*
*13, 21*  163:*5*
232:*7, 11, 14*
233:*9*  235:*20*
371:*12, 17*
372:*13*
**millions**  245:*9*

336:*16*
**MIMI**  3:*3*
**mind**  83:*17*
114:*23*
121:*17*
164:*12*  188:*5*
193:*15*
263:*18*  423:*21*
**minimal**
201:*21*
**minimization**
72:*7*
**minimize**  54:*6*
431:*16, 19, 24*
**minimum**
109:*23*  201:*24*
**Minor**  5:*16*
119:*18*  134:*17*
**minute**  30:*5*
206:*20*
249:*16*  256:*8*
**minutes**  65:*10,*
*13*  125:*3*
164:*18*  168:*3*
293:*19*
329:*14*  434:*16*
**mischaracteriz**
**ation**  328:*6*
**missing**  63:*4*
**Mission**  2:*9*
**mn**  232:*6*
**Modi**  228:*2*
**modified**
172:*18*  177:*5,*
*6*
**money**  229:*18*
231:*1, 15, 20,*
*23*  232:*2*
233:*21*
234:*10*  236:*7*
244:*16*
281:*24*
283:*24*  384:*6*
423:*5*
**monitor**  258:*8*
416:*15*
**monitoring**
190:*17, 20*
191:*1, 4*
**month**  237:*9,*
*15*  239:*1*

273:9  287:18,
20  289:3, 12
290:2, 5
**monthly**  218:3
**months**
  174:13
  217:23
  220:20  221:4
  308:9, 12, 19,
  21  377:22
  378:13, 17
  408:18
**MORING**  3:1
**morning**  10:21
**MOUGEY**  2:3
**Move**  25:18
  196:6  199:8
  226:23  335:7
  341:13  352:4
  400:21  426:11
**moving**
  154:24
  205:14  243:19
**MTBE**  135:5
**multiple**  70:5
  98:7  234:4
  253:2  336:6
  370:7  373:23
  376:3  390:22,
  24  394:14
  410:24  436:20
**mutations**
  33:19

**< N >**
**N/A**  95:17
**NAGLE**  2:12
  5:4  14:3, 13,
  22  15:15
  16:10  17:8,
  17  18:6, 15
  19:21  20:6
  21:3, 15  22:7
  25:8, 23
  27:10  28:1,
  10  29:14, 22
  30:15, 23
  31:13  32:5,
  13  33:5, 20
  34:19  35:12,
  19  36:1

39:23  40:10
41:10, 21
43:21  47:8
49:21  52:9,
18  53:5, 24
54:9  55:5, 20
57:7  58:3, 14
59:6  60:13
63:8  64:1
65:8, 11  70:2
72:1, 16
74:20  76:3,
13, 21  77:11
78:3, 16
79:12  80:20
81:13  82:15
83:1, 11, 24
84:8, 16  85:4,
18  90:9
91:12  92:2
93:3, 12
106:20
107:14  108:4
109:3  110:11,
17, 24  111:8,
20  112:4
117:5  123:20
124:1  126:5,
16  127:1, 13
128:10, 14
130:21
131:11  132:5
140:21
141:18
142:23
150:15  151:3,
12  152:11
164:10, 20
165:2, 13
166:1, 15
167:6  170:14
176:16  180:4
183:4  184:19
186:7  187:6,
16  190:8
191:14, 24
192:14  193:1,
10  194:17
195:7, 17
196:10
197:15

198:21  200:5,
13, 21  201:5
202:4, 19
203:3, 11
204:16
206:11  208:8
210:13  211:5,
16  212:6, 15
213:12  214:3
215:1, 13
216:10, 24
217:9  218:13
219:10, 17
220:1, 11, 22
221:6, 14
222:4, 17
223:2, 23
224:15, 24
225:18  226:2,
17  229:20
230:5, 14
231:2, 16
232:8, 16
233:1, 23
234:24
235:12, 23
236:10, 20
237:1, 12
238:17  239:5,
16  240:13, 22
241:20  242:5,
19  243:6
244:5  245:12
246:23  247:9,
23  249:8
250:18  251:5
252:17  253:8,
19  254:14
255:4  257:13,
21  258:5, 12
260:1, 19
261:17  262:7,
21  263:17
264:14  265:1,
13  266:1, 11
267:6  268:7,
19  269:10, 21
270:11, 20
272:1, 19
273:15
274:24

275:13  276:3,
15  277:3
278:3, 18
279:13, 21
280:8, 16
281:6, 19
282:10, 20
283:5, 15
284:3, 13
285:2, 13
286:7, 22
287:23  288:4,
22  289:6, 16
290:12, 23
291:15  292:3,
15  293:8, 24
294:14, 24
295:10  297:1
298:2  299:3,
15  300:3, 12,
23  301:8, 18
302:8, 15
303:1, 20
304:7, 20
306:20  307:7
308:1, 16
309:2, 20
310:8, 16
311:17  312:6,
17  313:9
314:3  315:5,
18  316:7
317:1, 12, 21
318:15  319:2,
11, 20  320:7,
20  321:9, 21
322:7, 21
323:23
324:11  325:4,
15  326:12
327:3, 14
328:3  329:3,
19  330:1
331:5  332:2,
10, 24  333:7,
23  334:11, 22
335:10, 22
336:7, 18
337:4, 14, 24
338:13, 22
339:16

340:12  341:6
342:2, 19
343:11  344:3,
18  345:5
346:9, 20
350:9, 20
351:11, 22
352:9, 18
353:4, 15
354:10, 20
355:24  356:9
357:18
358:10, 24
359:10, 22
360:10, 23
361:11  362:8,
15  363:3, 19
364:7, 23
365:11, 23
366:11, 23
367:13, 19, 22
369:4, 16, 20
370:3  371:18
372:2, 14
373:18  374:4,
14  375:12
376:6, 17
377:10  378:3,
23  379:11, 23
380:9, 21
382:4, 13, 16
383:18  384:8,
18  385:5, 15
386:21
388:14, 23
389:10  390:3
391:5  392:11
393:3, 14, 24
394:11, 20
395:5  396:4
397:7, 15
398:2, 16, 24
399:8  400:1,
12  401:9, 20
402:6, 17
404:4, 11, 18
405:2, 10, 18
406:3, 13, 19
407:9, 18
408:1, 11, 21
409:6, 17

410:5, *19*
411:5, *13*
412:3, *21*
413:6, *15*
414:*1, 12, 24*
415:*11* 416:6,
*18* 417:*17, 23*
420:3, *17*
421:*1, 21*
422:7 425:*1,*
*10* 426:5, *16*
427:*1, 24*
428:*12*
429:*10, 19*
430:*1, 11*
431:*7, 21*
432:*14* 433:*1*
434:*1* 435:*10,*
*14, 18* 437:*4*
**name** 9:*3*
10:*22* 37:*18*
45:*3* 86:*21*
88:*10* 95:*15*
154:*4* 155:*12*
185:*7*
**names** 152:*5*
395:*16* 418:*6*
**naming** 184:*13*
**nanograms**
24:6, *13*
45:*24* 56:*8,*
*19* 57:6, *19,*
*22* 58:*22* 59:*4*
**nature** 9:*22*
**NDEA** 5:*9, 10*
22:*24* 23:*13*
24:*12, 22*
50:*10* 59:*18,*
*22* 60:*4, 8, 21*
61:*16* 62:*2, 3,*
*14, 18* 68:*18*
69:*6* 268:*5,*
*17* 269:*19*
272:*17* 350:*3*
351:*4, 9, 16,*
*20* 352:*4, 7,*
*17* 362:*14*
364:*6*
**NDMA** 5:*9,*
*10* 22:*24*
23:*13* 24:*6,*

22 26:*12*
27:*6, 19, 21*
29:*2, 3, 9, 12*
30:*7* 32:*2, 3,*
*12, 20* 39:*3, 6,*
*13, 18, 20*
41:*8, 18* 42:*4,*
*8* 43:*15*
44:*12* 45:*19*
46:*5, 11, 13,*
*22* 47:*14*
49:*18* 50:*7, 8*
52:*16* 53:*3,*
*18* 54:*17*
55:*4* 56:*6, 19*
57:*23* 58:*21*
59:*4, 18, 22*
62:*6, 12, 19*
64:*20* 66:*9,*
*11* 67:*2*
68:*17* 69:*6*
106:*11*
123:*12*
129:*23* 130:*5*
133:*6* 140:*13,*
*20* 141:*17*
142:*17, 22*
143:*8, 23*
147:*2* 149:*16,*
*21* 150:*14*
151:*2* 161:*20*
163:*8, 10, 24*
164:*2* 165:*10,*
*11, 12, 23, 24*
166:*11* 167:*4*
198:*19, 20*
199:*4* 202:*13,*
*17, 24* 203:*9,*
*14, 15* 204:*7,*
*8* 208:*21*
210:*10, 12, 23*
211:*3, 9*
212:*1* 214:*12*
218:*12*
221:*13* 222:*2*
224:*7* 235:*22*
236:*9* 239:*4,*
*23* 243:*5*
247:*7* 249:*18,*
*21* 250:*17*
251:*3, 16, 20*

252:*6, 10*
253:*18*
255:*17* 262:*6*
265:*6* 268:*4,*
*16* 269:*19*
270:*9* 272:*17*
273:*10* 274:*2,*
*8, 13, 22*
276:*13* 277:*1*
279:*11* 280:*7*
281:*5* 283:*4,*
*9* 284:*2, 7, 11,*
*17* 285:*1, 6*
286:*5, 10, 21*
288:*8, 14, 18*
290:*20*
291:*13*
292:*11*
294:*12, 22*
295:*8* 300:*22*
301:*17* 304:*6*
306:*11* 307:*5,*
*18, 21* 309:*17*
310:*6* 311:*5,*
*8* 313:*5, 22,*
*24* 314:*14*
315:*11* 316:*6,*
*24* 318:*24*
319:*9* 321:*13,*
*18* 333:*21*
334:*20*
339:*10* 340:*2,*
*10* 341:*24*
344:*1* 346:*5*
348:*17*
349:*22*
351:*21* 352:*8*
355:*1, 5*
356:*8, 18*
358:*9, 21, 23*
359:*8, 20*
360:*9, 22*
361:*4, 9*
362:*6, 14*
363:*18* 364:*6,*
*22* 365:*9, 20*
366:*9, 22*
368:*16, 19*
371:*11*
372:*12*
375:*10* 376:*4,*

*16* 377:*1, 9*
386:*8* 397:*23*
398:*23*
402:*23*
403:*23* 404:*2*
405:*8, 17*
406:*2* 407:*23*
408:*19*
419:*18, 21*
420:*24* 421:*4*
422:*3* 427:*21*
**near** 154:*1*
157:*3* 178:*16*
**necessarily**
15:*6* 31:*3*
45:*8* 47:*20*
48:*11* 70:*6*
72:*23* 92:*20*
100:*22*
103:*17*
132:*18* 166:*4*
194:*7* 198:*24*
234:*19*
247:*15* 267:*9*
295:*4* 297:*20*
333:*11* 348:*7*
369:*1, 8*
384:*21*
391:*23*
409:*20*
416:*10, 11*
**necessary**
35:*17* 420:*12*
439:*4*
**need** 11:*14*
15:*13* 16:*8*
76:*10, 11*
114:*16* 117:*9*
130:*9, 17*
131:*24* 132:*1,*
*12* 145:*14, 19*
149:*6* 169:*22*
192:*18*
214:*20*
243:*10, 16, 20*
244:*3* 256:*24*
304:*12*
323:*17, 20*
325:*1, 14, 21*
327:*11*

363:*14*
376:*13* 430:*4*
**needed**
131:*14, 15*
144:*15* 198:*5*
430:*9*
**needs** 117:*2*
327:*23*
419:*24* 429:*23*
**need-to-know**
429:*4, 7, 18*
**negative** 35:*4*
344:*8*
**neither** 420:*23*
**Nelson** 101:*3*
**never** 48:*7, 9*
152:*6* 231:*10*
264:*22*
284:*11*
374:*12, 17*
376:*14, 24*
378:*2* 379:*7*
395:*11*
401:*16*
414:*20* 415:*8,*
*18, 23* 416:*3*
417:*10* 425:*8*
**NEW** 1:*1*
2:*13* 6:*4*
9:*15* 55:*1*
77:*1* 102:*12,*
*16* 127:*4*
137:*10, 11*
138:*3* 173:*6,*
*15* 174:*1*
177:*8, 15, 20*
178:*1* 180:*13,*
*21* 181:*1, 24*
183:*10*
196:*20*
198:*14*
199:*14*
207:*18* 208:*4,*
*22* 211:*19*
213:*21*
237:*16*
288:*24*
304:*23*
380:*15* 402:*9*
435:*23* 436:*4*

**News** 6:8
194:2, 9
197:6 248:17
**next-to-last**
403:6
**Nilesh** 88:10
**nineties**
224:14
**Ninety** 288:2
**nitrosamine**
123:9 146:7
350:18
**nitrosamines**
22:22 23:22
25:6, 21
224:22
225:15, 21
350:8
**NMBA** 5:9
23:14
**N-**
**nitrosodimethy**
**lamine** 26:12
**nodding** 11:17
**non** 22:10
**nondisclosure**
421:17, 20
422:5 423:10,
13
**nonresponsive**
25:19
**Noopur** 75:7
**normal**
392:16
434:11, 12
**normally** 87:9,
12  124:18
133:10
**NORRIS** 3:8
**NORTON** 3:6
**Notary** 1:20
441:20
**notated** 114:6
**note** 121:11
171:1 179:23
237:19
**noted** 10:3
296:3 339:11
368:20
439:11 441:1

**notes** 189:4
438:6
**notice** 1:17
32:19 87:10,
17 122:9
197:10 206:5
221:21
287:15
308:10 316:5
346:5, 12
348:1 355:7
357:11 364:19
**noticed** 150:19
**Notification**
6:12 160:11
199:17 206:8
207:2 221:23
222:1 271:15
274:5 287:7,
16 295:13
303:7, 12
304:18
305:23 307:4
309:5, 16
316:11 355:4
418:12 436:2
**notified**
118:18, 21
119:1, 10
199:14 233:4
237:15 259:7
271:19 273:1
348:5 388:18
435:22
**notifies** 213:2
354:24
**Novartis**
150:12
**November**
95:10 157:3
**NUMBER** 5:7
9:16 12:24
23:8 37:6
42:24 43:2
46:20 51:19
56:2 58:2, 6,
18 66:20, 21
67:8 68:1, 6,
23 69:1, 2
73:22 120:14
121:14

149:10 161:3,
9, 12 163:11
170:5 183:24
236:22 248:2
288:1 306:6,
8 329:21
331:9 343:20
354:13
367:15 370:1,
24 371:3
390:23
417:20
423:23, 24
430:18
**numbering**
184:13
**numbers** 43:5
55:10 58:13
63:3 66:18
67:22 120:20
160:23 161:4,
8 163:7, 10
179:24
181:19
263:19
292:19 343:5
364:16
368:15 370:13
**numerical**
44:14
**NW** 3:3

**< O >**
**Object** 124:1
140:21
141:18 257:13
**objecting**
11:22
**Objection**
14:3, 13, 22
15:15 16:10
17:8, 17 18:6,
15 19:21
20:6 21:3, 15
22:7 25:8, 23
27:10 28:1,
10 29:14, 22
30:15, 23
31:13 32:5,
13 33:5, 20
34:19 35:12,

19 36:1
40:10 41:10,
21 43:21
47:8 49:21
52:9, 18 53:5,
24 54:9 55:5,
20 57:7 58:3,
14 59:6
60:13 63:8
64:1 70:2
72:1, 16
74:20 76:3,
13, 21 77:11
78:3, 16
79:12 80:20
81:13 82:15
83:1, 11, 24
84:8, 16 85:4,
18 90:9
91:12 92:2
93:3, 12
106:20
107:14 108:4
109:3 110:11,
17, 24 111:21
112:4 117:5
123:20 126:5,
16 127:1, 13
128:10, 14
130:21
131:11 132:5
142:23
150:15 151:3,
12 152:10, 11
164:11
165:13 166:1,
15 167:6
170:14
176:16 183:4
186:7 187:6,
16 190:8
191:14, 24
192:14 193:1,
10 194:17
195:7, 17
196:10
197:15
198:21 200:5,
13, 21 201:5
202:4, 19
203:3, 11

204:16
206:11 208:8
210:13 211:5,
16 212:6, 15
213:12 214:3
215:1, 13
216:10, 24
217:9 218:13
219:10, 17
220:1, 11, 22
221:6, 14
222:4, 17
223:2, 23
224:15, 24
225:18 226:2,
17 229:20
230:5, 14
231:2, 16
232:8, 16
233:1, 23
234:24
235:12, 23
236:10
237:12
238:17 239:5,
16 240:13, 22
241:20 242:5,
19 243:6
244:5 245:12
246:23 247:9,
23 249:8
250:18 251:5
252:17 253:8,
19 254:14
255:4 257:21
258:5, 12
260:1, 19
261:17 262:7,
21 264:14
265:1, 13
266:1 267:6
268:7, 19
269:10, 21
270:11 272:1,
19 273:15
274:24
275:13 276:3,
15 277:3
278:3, 18
279:13, 21
280:8 281:6,

19  282:10, 20
283:5, 15
284:3, 13
285:2, 13
286:7, 22
287:23
288:22  289:6,
16  290:12, 23
291:15  292:3,
15  293:8, 24
294:14, 24
295:10  297:1
299:3, 15
300:3, 12, 23
301:8, 18
302:8, 15
303:1, 20
304:7, 20
306:20  307:7
308:1, 16
309:2, 20
310:8, 16
311:17  312:6,
17  313:9
314:3  315:5,
18  316:7
317:1, 12, 21
318:15  319:2,
11, 20  320:7,
20  321:9, 21
322:7, 21
323:23
324:11  325:4,
15  326:12
327:3, 14
328:4  329:3
331:5  332:2,
10, 24  333:7,
23  334:11, 22
335:10, 22
336:7, 18
337:4, 14, 24
338:13, 22
339:16
340:12  341:6
342:2, 19
343:11  344:3,
18  345:5
346:9  350:9,
20  351:11, 22
352:9, 18

353:4, 15
355:24  356:9
357:18
358:10, 24
359:10, 22
360:10, 23
361:11  362:8,
15  363:3, 19
364:7, 23
365:11, 22
366:11, 23
369:4  371:18
372:2, 14
373:18  374:4,
14  375:12
376:6, 17
377:10  378:3,
23  379:11, 23
380:9, 21
382:4, 13, 17
383:18  384:8,
18  385:5, 15
386:21
388:14, 23
389:10  390:3
391:5  392:11
393:3, 14, 24
394:11, 20
395:5  396:4
397:7, 15
398:2, 16, 24
399:8  400:1,
12  401:9, 20
402:6, 17
404:4, 11, 18
405:2, 10, 18
406:4, 13, 19
407:9, 18
408:1, 11, 21
409:6, 17
410:5, 19
411:5, 13
412:3, 21
413:6, 15
414:1, 12, 24
415:12  416:6,
18  420:3, 17
421:1, 21
422:7  425:1,
10  426:5, 16
427:1, 24

428:12
429:10, 19
430:1, 11
431:7, 21
432:14  433:1
434:1
**objections**
111:4  128:13
266:12  280:17
**obligated**
128:3
**obligation**
127:23, 24
140:10
**obligations**
140:18
430:24  431:1
**Observations**
113:5
**observe**  81:24
**observed**
207:5  392:23
**observing**
81:20  82:2
**obtain**  373:21
374:3
**obtaining**
294:7  310:20
373:23
**obtains**  78:24
**obvious**
396:12
**Obviously**
35:16  38:18
81:7  103:9
174:24  191:4
281:22
329:13  331:3
361:22
**occasionally**
87:20  101:14
**occurred**
61:22  386:9
**occurrence**
39:4
**occurring**
248:12
**occurs**  273:8
**office**  228:3, 8
**officer**  214:18
244:14

262:16
263:24  264:11
**official**  37:18
206:4  364:5
**oh**  56:17
236:23
250:24
314:21  423:2
**Ohio**  3:16
**Okay**  11:6, 12,
19  12:1
13:16  14:10
15:11  17:24
19:13  20:15,
21  22:2, 17
23:5  24:16
25:4  28:17
29:2, 8  30:3,
21  31:10
34:4, 16  35:8
36:14, 18
37:11  38:2, 5
41:5, 17  42:8
45:1, 10, 17,
18, 22  46:12
49:4  53:2, 17
54:15  56:17
58:20  60:11,
24  63:15, 16,
22  64:15
65:5  66:6, 17,
18  67:5
68:13  69:11,
19, 22  70:9,
20  71:4, 17
72:12  73:8,
17, 24  74:4,
10  75:5, 10
77:8, 23
78:12  80:15
81:4, 10  82:2,
10, 21  83:19
84:5, 24
85:15  86:2, 9,
16, 17  87:8,
14, 23  88:6,
14, 21  89:12,
16  90:14
92:18, 23
93:9, 21  94:1
95:3, 5, 15, 17

96:1, 10, 16,
23  97:10
99:4, 12
100:13
101:18, 21
102:8, 15, 20
103:20
104:15, 19
107:7, 22
108:1, 21
112:17  113:2,
24  115:13
116:10, 16
117:15  118:2
119:15  120:8,
22  121:14, 19
122:8, 21
123:6  124:13,
20, 21  125:4,
13, 20  126:2,
13  127:8, 22
128:5, 18
129:3, 16
131:19  133:4,
13  134:6, 10,
24  135:18
136:12, 18, 24
137:9  138:16,
20  140:2, 8
142:2, 13
143:19  145:2,
11, 22  146:4,
12, 18  147:10,
15, 22  148:6,
14  149:3, 14,
20  150:11, 24
151:9  152:19
153:17
154:15  155:3,
18, 23  156:8,
16  157:8, 13,
21, 22  158:4,
23  159:11
160:2  161:18
163:11, 20, 23
164:20  165:4
166:10  167:2,
10  168:20
169:5  170:5
171:17  173:6,
10, 14, 17

174:*16*  175:*4,*
*20*  176:*21*
177:*14, 19*
179:*4, 8, 12,*
*22*  181:*8, 18*
182:*13*  183:*2,*
*23*  184:*14, 16*
185:*9*  187:*3*
188:*4*  189:*2,*
*15, 22, 23*
191:*8*  192:*10*
193:*15*
195:*23*
196:*22*
201:*24*
202:*10*
204:*13, 23*
205:*22*  206:*2*
207:*11*  210:*8*
212:*21, 24*
213:*1*  217:*16*
226:*23*  228:*2,*
*10, 15*  232:*1,*
*14, 22*  233:*7,*
*8, 14*  236:*17,*
*18*  237:*3, 18,*
*21*  238:*1, 4*
244:*15, 20*
248:*13, 21*
249:*24*
250:*15*  251:*1*
255:*21*  256:*6,*
*7*  257:*4, 10*
258:*16*  261:*3,*
*9*  264:*4*
270:*22*
271:*10, 13*
272:*8*  286:*13,*
*14, 19*  287:*13*
290:*19*  297:*7*
303:*6*  305:*7,*
*8, 20*  307:*3,*
*15*  308:*21*
311:*4*  312:*8*
314:*19, 20, 22*
322:*17*
323:*10, 15*
329:*10*
330:*10, 14*
331:*18*
333:*15*  336:*5*

337:*21*
344:*14*
345:*14*  347:*6,*
*8, 24*  349:*24*
351:*16*
353:*21*  354:*5,*
*6, 8, 20, 23*
355:*6, 17*
357:*3*  358:*6*
363:*12*  365:*6*
367:*24*  368:*5,*
*14*  369:*16, 23*
370:*11*  373:*4,*
*6*  381:*4, 18*
382:*22, 23*
383:*4*  386:*6,*
*12*  387:*3, 8,*
*16*  389:*20*
390:*10, 11, 19*
391:*14, 16*
392:*8*  395:*22*
396:*16*
397:*22*
400:*21*  403:*3,*
*4, 5*  410:*11*
412:*19*  413:*2*
417:*14*  418:*2,*
*6, 11, 20*
419:*5*  420:*7,*
*9, 10, 22*
421:*10*
422:*17*  423:*1,*
*3, 8*  424:*12,*
*13*  427:*7*
430:*17*  432:*3*
433:*8, 10*
434:*14*  435:*7,*
*12, 19*  437:*6*
**old**  160:*17*
170:*17*  172:*1,*
*3, 20*  173:*11*
177:*24*
178:*18, 23*
179:*3*  183:*19*
207:*18, 22, 24*
209:*2*  219:*23*
220:*5*  288:*8,*
*19*  295:*14*
307:*5*  311:*9*
348:*6*  367:*5*

397:*5, 11*
436:*1, 13*
**once**  20:*16*
26:*2*  46:*3*
50:*15, 21*
96:*7*  103:*7*
127:*8*  138:*11*
142:*19*
143:*11*  144:*8*
159:*14*
211:*19*
229:*17*  402:*8*
**one-off**  101:*15*
**ones**  43:*6*
46:*19*
**ongoing**
118:*23*
**on-site**  77:*18*
78:*9*  82:*8*
393:*20*
**Oops**  356:*23*
**open**  117:*20*
118:*10*
**operate**  82:*22*
83:*4*
**operating**
82:*7, 13*
214:*17*
244:*13*
259:*23*
262:*16*
263:*23*  264:*11*
**operational**
244:*19*
**opinion**
145:*14, 21*
146:*2, 10*
244:*2*  296:*7*
325:*9*
**opportunities**
47:*17*
**opposed**  41:*6*
58:*12*  153:*8*
187:*20*
**orally**  424:*16*
**oranges**  44:*15*
45:*11*
**ORDER**  1:*10*
19:*18*  25:*1*
54:*6*  76:*17*
108:*22*  114:*2*

115:*15*  181:*7,*
*9*  233:*21*
251:*19*
254:*11*
376:*12*
384:*14*  422:*2*
**orders**  210:*5*
**organic**
185:*21*  201:*13*
**Organization**
26:*22*  39:*12*
42:*4*  52:*15,*
*22*  99:*1*
227:*17*
381:*23*  385:*2*
**organizations**
378:*21*
**original**  174:*8*
439:*14*
**originally**
116:*15*
150:*21*
173:*13*  324:*19*
**out-of-spec**
403:*9*
**out-of-**
**specification**
391:*18*  392:*20*
**out-of-trend**
396:*2, 17*
397:*24*  399:*23*
**outside**  28:*19*
92:*21*  103:*19*
154:*21*  324:*1*
358:*4*  396:*7*
423:*16*
**overall**  88:*15*
332:*22*
**overnight**
248:*7*
**oversaw**
100:*10*
**oversee**  98:*23*
**overseeing**
389:*5, 9*
**oversees**
244:*4*
**oversight**
100:*4, 19*
389:*17*

**over-**
**specification**
375:*16*

**< P >**
**P.A**  2:*3*
**P.C**  2:*15*
**p.m**  184:*23*
437:*8, 13*
**PAGE**  5:*2*
8:*5, 8, 11*
11:*9*  16:*21*
23:*21*  25:*13*
26:*7, 11, 17*
27:*1*  30:*5*
31:*17*  39:*1*
42:*7*  67:*5*
74:*11*  86:*6,*
*17*  88:*8, 18*
95:*3*  99:*15*
112:*19*  113:*3*
114:*19*
120:*13*
121:*18, 19*
128:*22, 23*
130:*8*  134:*21*
138:*1, 6*
142:*9, 13*
144:*4, 7, 18*
147:*16, 17*
149:*4*  153:*24*
154:*18*  155:*6,*
*19*  157:*14, 17*
158:*11, 17*
159:*11*  160:*8,*
*9*  170:*24*
172:*9*  178:*14,*
*17*  179:*22*
193:*18, 19*
217:*18*  227:*2*
232:*3*  236:*19*
250:*1*  256:*7*
257:*1*  263:*9*
264:*2, 6*
265:*20*  305:*9*
323:*12*
386:*13*
390:*11, 12*
391:*15*
395:*22*
400:*21*  403:*3,*

Confidential Information Subject to Protective Order

*4* 417:16 418:3 420:10 421:15 423:4, 23 433:9 440:4
**pages** 348:13 441:1
**paid** 99:4

**PAPANTONIO** 2:1, 4 5:4 185:5, 7 186:13 187:10, 22 189:14 190:14 191:19 192:9, 20 193:5, 14 195:1, 12, 22 196:21 198:2 199:5 200:10, 17 201:2, 12 202:9, 23 203:7, 17 204:22 206:16 208:14 210:18 211:12, 21 212:11, 19 213:23 214:9 215:8, 20 216:20 217:2, 5, 15 218:22 219:14, 21 220:7, 17 221:2, 9, 18 222:9, 22 223:10 224:2, 20 225:13, 22 226:8, 22 230:1, 10, 20 231:12, 21 232:13, 21 233:6 234:7 235:8, 18 236:5, 16, 23 237:2, 17 238:23 239:11, 20 240:19 241:8

242:1, 11 243:2, 13 244:7 245:17 247:4, 16 248:20 249:14 250:23 251:13 253:3, 13 254:10, 15, 23 255:13 256:5 257:17 258:1, 9, 15 260:7 261:2 262:1, 12 263:6, 21 264:20 265:7, 18 266:6 267:1, 15 268:13 269:5, 16 270:3, 13, 17 271:5 272:7 273:4, 21 275:8, 20 276:9, 19 277:19 278:12 279:8, 18 280:4, 12 281:1, 14 282:2, 16 283:1, 10, 21 284:9, 20 285:8, 22 286:12 287:12 288:2, 10 289:2, 11 290:1, 18 291:10, 23 292:8 293:4, 17 294:9, 19 295:6, 22 297:6 298:9 299:11, 21 300:8, 17 301:3, 12 302:2, 12, 19 303:5 304:2, 15 305:6 307:2, 14 308:8, 20 309:14 310:4, 12, 22 311:3

312:2, 12 313:3, 20 314:10 315:13 316:1, 17 317:8, 17 318:10, 21 319:7, 16, 23 320:4, 15 321:3, 16 322:2, 16 323:9 324:7, 21 325:10, 19 326:18 327:8, 19 328:19 329:9, 23 330:5 331:17 332:7, 17 333:3, 14 334:6, 17 335:5, 14 336:4, 15, 23 337:10, 20 338:7, 18 339:6, 18 340:1, 21 341:15 342:14, 21 343:8, 22 344:13 345:1, 7, 13 346:18 347:5 349:4, 12 350:15 351:1, 15 352:2, 14, 23 353:10, 20 354:14, 22 356:5, 14 357:23 358:19 359:6, 16 360:4, 19 361:6 362:1, 12, 17 363:11 364:3, 12 365:5, 16 366:5, 19 367:8, 17, 20, 23 369:11, 19, 23 370:6, 22 371:22 372:9 373:3 374:1, 9, 21 375:19

376:11, 22 377:20 378:19 379:6, 18 380:4, 18 381:3 382:9, 14, 21 384:1, 13, 23 385:11, 20 387:2 388:20 389:7, 19 390:9 391:13 392:17 393:9, 21 394:6, 16 395:1, 9 396:9 397:9, 20 398:5, 20 399:4, 19 400:8, 20 401:14 402:2, 14, 21 404:7, 14, 21 405:5, 13, 22 406:8, 16, 22 407:13, 20 408:8, 15 409:1, 13 410:1, 10 411:1, 9, 17 412:8 413:1, 11, 20 414:7, 18 415:6, 17 416:13 417:1 418:1 420:6, 21 421:9 422:1, 9 425:6, 14 426:8, 20 427:6 428:7, 18 429:14, 21 430:7, 16 431:13 432:2, 19 433:7 434:6, 14 435:1, 8, 12
**paper** 78:23
**paragraph** 27:2, 18 30:6 39:3 56:14 88:19 94:2 95:7 98:1 113:3 154:19 175:21

177:10 208:16, 24 249:17 341:17 395:24 398:7 400:22 403:5
**parallel** 278:11
**Paras** 228:16 418:7, 8, 9
**parent** 147:21 190:22 205:18
**Parkway** 2:18
**parroting** 259:17
**part** 13:7 29:11 35:6 51:3 53:14, 19 78:10 85:8 87:4 95:6, 22 111:24 117:21 118:7, 10, 19 134:20, 21 140:16 153:19 175:12 186:24 187:11 190:24 191:8 227:16, 19, 24 228:4 231:8, 11 273:1 298:15 300:11, 15 342:9 388:3 393:22 394:3, 4 395:13 434:10
**partially** 220:15
**participate** 78:21 332:15
**participating** 37:9
**participation** 331:16
**particular** 102:9 140:9
**Particularly** 108:14

Confidential Information Subject to Protective Order

**parties** 9:*18,* *24* 423:*15* 424:*10*

**partner** 377:*15*

**partners** 377:*15*

**partnership** 190:*22*

**parts** 24:*10,* *13* 42:*18* 43:*15* 44:*10* 45:*19, 22* 46:*12* 53:*12, 18, 21* 55:*3* 57:*21* 60:*5* 61:*20* 62:*2, 9, 12* 64:*21* 66:*10* 117:*16* 160:*23* 161:*16* 162:*4, 13, 21* 163:*5* 342:*5* 371:*11, 17* 372:*12*

**party** 79:*8* 89:*17* 94:*9* 423:*20* 424:*4, 11* 425:*21* 427:*12, 13, 18, 19* 428:*22* 430:*21* 431:*15* 432:*4*

**PAS** 176:*6*

**passing** 398:*12, 15* 403:*9*

**Patel** 101:*1* 121:*9* 134:*3* 205:*12, 20, 23* 207:*14* 208:*2* 238:*7*

**pathway** 123:*13*

**patient** 12:*23* 13:*2* 14:*1, 5* 22:*2* 82:*23* 83:*9, 16*

**patients** 13:*18* 14:*12, 19* 15:*1, 12, 18* 17:*5* 19:*14*

20:*19* 221:*3* 255:*1, 7* 282:*18, 22* 283:*3* 298:*18* 324:*10* 411:*3* 412:*19* 413:*4*

**pause** 9:*23*

**pay** 75:*18, 23*

**peak** 403:*12, 16, 18* 404:*2*

**peaks** 404:*1, 9, 23, 24* 405:*1, 7, 16, 24* 406:*7, 11* 407:*22* 408:*7* 410:*4*

**penalties** 245:*4, 10, 15, 22* 246:*1, 21* 262:*18* 263:*15* 264:*1* 281:*3, 10, 17*

**PENDLEY** 2:*3* 5:*3* 10:*20* 14:*9, 16* 15:*10, 22* 16:*13* 17:*15, 23* 18:*12, 23* 20:*1, 10* 21:*11* 22:*1, 16* 23:*9, 18* 25:*17* 26:*4* 27:*16* 28:*7, 16* 29:*19* 30:*2, 20* 31:*1, 7, 19* 32:*10, 18* 33:*9* 34:*3* 35:*1, 15, 22* 36:*13* 40:*4, 18* 41:*16* 42:*2* 44:*1* 47:*23* 50:*5* 52:*13* 53:*1, 9* 54:*4, 14* 55:*16* 56:*1* 57:*15* 58:*9, 19* 59:*11* 60:*2, 17* 63:*14* 64:*7* 65:*5, 9, 12, 21* 67:*17* 70:*8*

72:*11* 73:*1* 75:*1* 76:*8, 16* 77:*7, 22* 78:*11* 79:*5, 19* 81:*3, 17* 82:*20* 83:*8, 18* 84:*4, 11, 23* 85:*14* 86:*1* 90:*13* 91:*20* 92:*11* 93:*8, 20* 97:*23* 107:*1, 21* 108:*13* 109:*7* 110:*14, 20* 111:*14* 112:*1, 7* 117:*14* 119:*23* 121:*7* 124:*12, 20* 125:*2, 12* 126:*12, 19* 127:*7, 21* 128:*17* 131:*5, 18* 132:*22* 133:*22* 141:*13* 142:*1* 143:*3, 10* 150:*23* 151:*8, 19* 152:*18* 157:*1* 164:*17, 24* 165:*3, 19* 166:*9* 167:*1, 9* 170:*19* 173:*5* 176:*19* 178:*13* 179:*21* 180:*7, 19* 183:*8* 184:*20* 248:*13* 417:*21*

**Pennsylvania** 2:*19* 3:*3*

**Pensacola** 2:*5*

**people** 13:*12* 15:*3* 27:*24* 30:*13, 22* 32:*2, 8* 39:*20* 40:*9, 15* 41:*8, 15, 20* 46:*23* 74:*2* 82:*7* 88:*9* 100:*7, 21* 103:*18*

105:*18* 106:*5* 142:*11* 143:*21* 148:*7* 149:*5* 216:*1, 16* 228:*21, 22* 229:*1* 237:*21* 238:*5, 6* 240:*21* 241:*2* 246:*17* 285:*17, 19* 297:*16* 298:*22* 305:*12* 320:*18* 322:*5, 12* 324:*23* 331:*2, 9, 19* 332:*13* 418:*19* 436:*21*

**people's** 254:*5* 285:*12*

**perceived** 36:*7*

**percent** 71:*14* 72:*14* 73:*3, 4* 233:*11* 298:*6* 396:*19*

**Perfect** 370:*7*

**perform** 123:*4* 151:*16*

**period** 272:*10* 275:*22* 337:*12, 18* 402:*4* 413:*3*

**permission** 393:*13* 407:*15*

**Perry** 100:*23* 134:*7* 136:*1*

**person** 15:*6* 93:*2* 97:*9* 101:*2, 4* 105:*20* 179:*9* 217:*20* 228:*11* 238:*6* 241:*7, 10* 246:*7* 286:*4* 332:*21* 429:*15* 433:*14, 17*

**personal** 19:*10* 296:*7*

**personally** 255:*18, 20*

301:*2, 11, 24* 303:*23* 377:*3* 379:*14* 380:*2* 391:*8*

**perspective** 297:*8*

**PESCE** 4:*2*

**Pharma** 2:*21* 4:*6* 68:*2* 193:*21* 205:*7* 254:*22*

**Pharmaceutical** 4:*5* 14:*11, 18* 15:*9* 34:*5* 51:*24* 98:*2, 4* 109:*17* 185:*16* 186:*16* 187:*24* 194:*16* 255:*2* 418:*23*

**Pharmaceuticals** 2:*15* 4:*6* 101:*7* 106:*17* 250:*7* 253:*5* 347:*19, 20* 368:*10* 371:*4* 423:*19*

**phrase** 39:*17* 75:*20* 76:*7* 92:*6* 355:*10* 391:*22*

**phrasing** 114:*10, 14* 213:*15*

**physicians** 15:*2*

**pick** 131:*3*

**picking** 164:*5*

**piece** 204:*20* 231:*8* 242:*24* 277:*9* 304:*23* 323:*5*

**pieces** 269:*1*

**pill** 49:*4* 218:*11, 12* 311:*15*

**pills** 220:*21* 235:*21* 336:*17* 411:*11*

Confidential Information Subject to Protective Order

**Place** 4:*3*
13:*18, 20*
76:*24* 83:*14*
86:*7* 112:*15,*
*21* 126:*9*
161:*23* 199:*1*
235:*16*
240:*18* 270:*6*
387:*11*
**places** 294:*5*
**Plaintiffs** 2:*6,*
*10*
**planned** 138:*7*
**planning**
138:*13*
**plant** 21:*20*
22:*15* 184:*11,*
*14* 305:*16*
368:*13*
399:*17* 417:*6*
**please** 9:*23*
10:*5, 9, 22*
60:*19* 66:*18*
111:*13*
121:*10* 137:*5*
160:*15* 171:*1*
179:*23* 194:*1*
252:*15* 288:*1*
367:*16* 381:*7*
421:*12* 439:*3,*
*8*
**plenty** 285:*24*
**PO** 181:*5, 7*
**point** 39:*19*
40:*8* 47:*5*
56:*5* 69:*21*
70:*18* 74:*19*
81:*11, 22*
89:*8, 21*
115:*6* 119:*6*
136:*15, 19*
137:*22*
138:*10* 141:*7*
143:*6* 147:*22*
149:*14*
156:*13, 15*
157:*23*
159:*21* 169:*5*
196:*3, 7*
203:*8, 24*
204:*11, 13*

206:*9* 210:*6,*
*8, 17* 214:*11*
221:*19*
222:*23* 223:*6,*
*18* 224:*9, 12*
238:*24* 239:*8*
245:*8* 251:*10,*
*12* 252:*13*
253:*4* 255:*15*
259:*23*
260:*22*
264:*17* 265:*4*
268:*1, 12, 22*
290:*5* 291:*7,*
*18* 292:*6, 9*
295:*16, 24*
296:*19* 304:*4*
307:*3, 13*
311:*23* 312:*1*
314:*1, 11*
315:*10*
316:*18*
317:*15, 19*
318:*2* 323:*8*
324:*14*
326:*22*
333:*19* 334:*2,*
*10* 335:*21*
343:*24*
344:*17*
345:*10, 19*
350:*5* 351:*10*
352:*24* 355:*5*
358:*3* 365:*8,*
*17* 366:*2, 14*
367:*4* 372:*19*
373:*5* 375:*24*
407:*4, 12*
410:*18* 411:*4*
412:*2* 419:*23*
420:*15, 22*
**points** 252:*21*
291:*5* 409:*24*
**poor** 344:*12*
**portfolio**
100:*10*
**portion** 23:*20*
**pose** 209:*3*
**position** 100:*1*
129:*8, 11*
186:*19, 22*

214:*21*
344:*15* 417:*7*
**positions**
12:*18*
**positive** 366:*9*
368:*19* 375:*15*
**possession**
324:*15*
345:*17* 346:*3*
361:*4* 364:*1*
371:*7* 373:*13*
**possible** 30:*9,*
*12, 13, 19*
31:*11* 104:*9*
137:*11*
243:*17, 21*
310:*14* 408:*9*
421:*13*
**Post-**
**Inspectional**
86:*18*
**potent** 230:*11*
247:*21*
351:*21* 352:*16*
**potential**
80:*24* 81:*20*
98:*11* 106:*4*
114:*16*
123:*17*
160:*12*
196:*19*
200:*19* 201:*1,*
*3* 202:*2*
233:*4* 259:*2*
273:*3* 293:*15*
296:*9* 311:*6,*
*13* 312:*14*
313:*7, 13, 23*
320:*2* 323:*4*
357:*12*
363:*10* 424:*5*
425:*22* 430:*5*
436:*4*
**potentially**
27:*15, 22*
28:*14, 17*
29:*10, 17*
35:*7* 36:*6*
49:*17* 80:*1, 2,*
*14* 98:*12*
123:*8* 127:*18*

174:*7* 182:*9,*
*11, 17* 183:*20*
191:*21*
213:*17* 216:*8*
217:*7* 271:*16,*
*21* 279:*19*
308:*22*
311:*14, 20*
315:*4* 338:*3*
348:*5* 355:*9*
378:*16*
397:*13*
426:*23* 436:*24*
**ppm** 42:*15, 18*
43:*10* 44:*16*
46:*4* 47:*20*
60:*7* 339:*10,*
*15* 340:*4*
**PRA** 98:*19, 24*
**practice** 48:*10*
**practices**
109:*19*
**precursor**
123:*8*
**PREM** 3:*15*
**prepare** 12:*4*
**prepared**
110:*21* 111:*16*
**prescribe**
426:*22*
**presence**
146:*9, 23*
147:*2, 4*
204:*11*
210:*23*
211:*10, 14*
250:*17*
251:*15*
377:*19* 406:*2*
**PRESENT**
4:*8* 88:*16*
203:*22* 204:*7*
211:*3* 247:*7*
251:*3* 267:*24*
269:*4* 274:*8*
276:*13* 284:*7,*
*11, 12, 17*
285:*6* 286:*11*
304:*6* 311:*9*
339:*8* 340:*10*
346:*16*

359:*20* 361:*4*
365:*10*
403:*24*
405:*17* 408:*19*
**presented**
291:*18* 352:*13*
**president**
99:*21, 22*
188:*11, 14*
433:*12, 19*
**press** 50:*18,*
*23* 51:*2* 249:*4*
**pressure**
216:*4* 298:*23*
436:*22*
**Presumably**
251:*17*
**pretty** 11:*22*
31:*15* 197:*19*
331:*3* 332:*23*
**previous**
44:*17* 334:*19*
433:*15*

**PREVIOUSLY**
6:*16* 7:*1*
16:*18* 26:*6*
36:*19* 38:*10*
50:*13* 51:*18*
70:*11, 12*
86:*3* 112:*18*
128:*19* 142:*7*
144:*2* 158:*4*
160:*3* 199:*22*
213:*19*
**price** 17:*5*
70:*6* 71:*14*
72:*14, 21*
73:*3* 234:*12*
384:*20*
**primarily**
215:*7* 336:*10*
**primary**
320:*13* 338:*3*
**prior** 33:*1*
99:*12* 148:*2*
167:*17*
177:*12* 342:*6*
376:*4* 381:*1*
424:*17*

priorities 14:7
priority 12:24
proactive
131:21 192:13
probable 39:6,
17, 18 40:6, 7,
14, 19, 20, 23
41:1, 3
249:22 321:1
probably 11:6
12:8 14:7
58:1 77:24
81:24 89:21
102:6 105:14,
18 113:1
154:12
179:11 202:7
252:7 368:22
problem
107:3 110:23
111:19
118:17 131:9
139:19, 22
140:1 193:8
196:2, 4, 8
197:14 311:6,
7, 13 312:14
313:7, 23
problematic
76:19
problems
82:3 337:23
413:14, 23
procedure
77:15 96:18
97:1 108:19
124:14 270:9
procedures
48:15 77:9,
20 79:17
82:9 83:6, 23
91:3, 6, 9
96:6, 12
113:7, 12
235:4 343:17
387:5, 10
414:16, 20
proceedings
438:4
Process 6:4
85:9 92:10

118:8 134:16,
23 138:4
160:18
170:12, 17, 18
172:1, 2, 12,
15, 20 173:7,
12, 15 174:2
177:6, 8, 15,
21 178:1, 18,
23 179:3
180:1, 13, 21
181:1, 24
183:11, 19
207:18, 22
208:1, 4, 22
209:2, 3
213:21 266:9
288:9, 19
295:15 307:5
311:9 397:5,
11 435:23
436:1, 4, 13
process/new
183:19
process/old
173:7
processed
46:8 47:15
49:15, 19
processes
76:24 207:16
208:20
processing
50:3 71:5, 7, 8
PROCTOR
2:1
procurement
118:8 179:7,
9 228:13, 17,
22 235:4
433:13
produced
20:16 128:21
producing
106:15
product 15:9
19:8, 19 20:4,
19 21:19
44:20 45:3
46:9, 11 47:2,
15, 21 48:8

49:16, 20
50:17, 22
51:20, 21
62:24 63:7,
18 64:6, 9, 13
65:24 66:1
68:10 70:1
100:5 108:17
115:12 116:9
118:1 123:14
125:23 130:6,
20 138:23
140:18
145:19
154:15 157:4,
10 168:8
169:2, 4, 7
172:21
177:13, 22
182:3 190:21
192:6 195:21
196:14 198:5,
14, 18, 20
199:2 200:2
203:21, 23
204:8 214:13,
21 215:12, 23
216:23 218:2,
16, 20 223:1,
8 225:8
230:18
231:19, 23, 24
235:10, 11, 15
240:12 241:6,
15 242:3, 8
243:4 246:5
250:3, 5
251:3, 4, 21
252:6, 15
253:7 254:8
256:9, 24
257:20 258:4,
11 260:17
261:16 262:6,
20 264:13, 22
265:12 267:5,
11 268:3, 5,
17 269:19
272:18
273:12, 13
274:1, 6, 12,

20, 22 276:1,
12, 14, 21, 24
278:1, 16
280:14, 22
281:5 283:3,
12 284:23
285:18 286:3,
20 290:6, 20,
21 291:14
292:11 293:6,
21 294:23
295:8, 15, 20
296:1, 6, 9, 12
297:5, 15, 19
298:12, 13, 17,
19 299:6, 7,
10, 13, 20
300:1, 6, 10,
21 302:14, 22,
23 306:17, 18
307:11, 21, 22
309:7 310:7
311:20
312:21 315:3,
16 316:16, 19
317:20 318:5
322:13
323:20, 21
327:13 328:1,
8, 10 329:18
338:6, 10, 16
339:2 340:15
345:20, 23
346:6 350:7,
18 356:19
357:16, 17, 22
358:2, 9, 21,
22 359:13, 18
364:15
372:21, 24
373:6 374:3,
12, 18, 24
375:11, 17, 22,
23 376:15
378:1 387:7
389:23
392:23
394:18
401:19
405:15 407:8
436:19 437:1

Production
8:7 386:18
413:24
PRODUCTS
1:5 9:12
18:19 21:17
25:5 33:2
47:16 48:12
50:4 63:12,
24 77:3
101:19
113:13
127:19 128:2
129:22
130:10, 18
132:2 150:10
168:10, 18
170:4 172:11,
17 175:19
188:1 191:6,
11, 17 194:3,
5 216:2
223:12, 13
224:8 226:7
229:14 230:3
234:3, 23
236:15 249:7,
13, 19 251:8,
12, 14, 20, 23
252:2, 3
254:1, 5
259:12
260:24 263:1,
4 264:7, 18
272:9 274:9
280:3, 7
282:23 283:8,
18 284:8
292:24
297:23 302:1
323:18
328:18 330:8
333:21
345:17 348:3
356:4 359:15
363:15 376:4,
10 390:12
392:20
394:23
397:22
398:14

410:*16, 24*
412:*12* 414:*5*
436:*20*
**Professional**
1:*19* 98:*3*
438:*15*
**profile** 137:*4*
436:*5*
**program** 89:*2*
90:*17, 21*
91:*3* 94:*6, 8*
**progress** 341:*9*
**project** 100:*8, 12*
**projects** 100:*8*
**promise** 96:*1*
**pronounce**
227:*15*
**proof** 241:*16*
374:*2*
**proper** 83:*22*
85:*2, 11, 12, 22* 114:*7*
115:*7* 117:*8*
320:*24*
**properly**
83:*16* 85:*1*
92:*1, 5* 93:*6, 10, 11*
**proponent**
324:*3*
**proposed**
172:*14*
173:*23* 174:*1*
**propounded**
441:*1*
**proprietary**
122:*5* 254:*20*
255:*11*
**protect** 13:*18*
**protecting**
83:*9*

**PROTECTIVE**
1:*10*
**protects** 82:*23*
**prove** 239:*23*
313:*23* 314:*1, 6*
**provide** 15:*12, 17* 16:*7*

124:*7* 178:*18*
420:*12* 421:*18*
**provided**
122:*11*
137:*15, 17*
208:*6* 253:*2*
265:*22* 266:*8*
315:*12*
402:*11*
424:*11* 431:*1*
**provides**
161:*3* 429:*16*
**providing**
17:*4* 98:*13*
220:*9* 243:*5*
253:*1* 261:*3*
266:*14*
340:*22, 24*
**PS** 421:*11*
**Public** 1:*20*
18:*1* 21:*10*
150:*4, 8*
273:*13* 382:*2*
427:*23*
433:*24* 434:*5*
441:*20*
**publication**
26:*20*
**publicly** 16:*23*
336:*3*
**published**
26:*16, 21*
31:*21* 55:*19*
**pull** 16:*17, 24*
23:*5* 26:*5*
36:*18* 38:*9*
44:*8* 45:*13*
51:*17* 60:*18*
61:*4* 66:*16*
70:*10* 86:*2*
97:*12* 120:*22*
170:*20* 263:*8*
290:*21*
348:*24* 354:*5*
367:*9*
**pulled** 54:*24*
**purchase**
69:*19* 181:*7, 9*
**purchased**
64:*16, 19*

**purchasing**
69:*18* 76:*12*
**pure** 157:*9*
200:*3, 8*
**purely** 44:*13*
**purity** 110:*10*
111:*18*
113:*15, 23*
114:*2* 115:*8, 24*
**purpose**
333:*16, 17*
430:*23*
**pursuant** 1:*17*
**purview** 382:*8*
**pushing**
239:*13*
268:*24* 269:*8*
**put** 11:*18*
14:*21* 19:*4*
50:*17, 22*
55:*9* 65:*22*
71:*18* 115:*15*
154:*7, 8*
155:*5* 188:*6*
194:*22* 346:*7*
350:*13*
353:*21* 355:*7*
370:*14* 410:*11*
**puts** 45:*23*
125:*15* 135:*21*
**putting** 56:*23*
128:*1* 323:*14*
409:*4*

**< Q >**
**Q&A** 51:*16*
**QA** 205:*17*
345:*18*
**qualification**
88:*23* 89:*1*
90:*17, 21*
91:*3* 94:*7*
96:*18* 389:*17*
**qualifications**
88:*20*
**qualified** 28:*5, 20* 29:*6*
90:*16* 93:*7*
318:*19* 319:*5*
**qualify** 90:*20*

**qualitative**
137:*3*
**Qualitatively**
27:*18*
**Quality** 5:*16*
17:*4, 5, 7, 10, 21* 18:*5, 11, 21* 19:*19, 20*
76:*1, 18*
88:*11, 15*
90:*4, 8*
108:*19, 23*
110:*10*
111:*18* 113:*8, 15, 23* 114:*1*
115:*8, 24*
118:*21*
119:*18*
129:*12* 146:*1, 3, 4* 149:*5, 8*
192:*23* 193:*7*
209:*4, 9*
214:*21*
215:*11, 19*
226:*11, 16*
227:*7, 17, 18, 19, 23* 228:*20*
229:*10* 231:*9*
235:*11* 238:*6*
246:*8, 15*
258:*4, 11*
282:*1, 4*
304:*5* 305:*13*
323:*16* 333:*5, 12* 338:*11, 21*
384:*16, 21*
386:*3, 16, 19*
387:*1, 5, 20*
389:*5, 14, 23*
391:*4* 394:*9*
395:*19* 414:*5, 10, 22* 415:*9, 10* 416:*5, 22*
424:*5* 425:*22*
**quality-based**
320:*13*
**quantifiable**
292:*19*
**quantify**
309:*24*
322:*14* 412:*17*

**quantitative**
137:*4*
**quantities**
47:*1* 141:*12*
248:*11*
336:*21* 339:*5*
344:*24*
**quantity** 218:*4*
**quarantine**
264:*8, 19*
271:*24* 272:*9*
273:*13*
276:*22* 290:*6*
295:*20*
345:*16* 365:*7*
366:*2* 436:*13, 15*
**quarantined**
290:*16* 296:*1, 3, 5, 8* 345:*20*
346:*2* 407:*8*
**quarantining**
307:*11*
**query** 175:*22*
177:*4*
**Question** 8:*10*
11:*12* 12:*1*
23:*2* 24:*23*
40:*2, 13, 17*
50:*20* 58:*24*
81:*2, 16* 87:*4*
94:*20* 106:*2, 23* 111:*13*
115:*4, 5*
125:*19*
126:*22*
141:*14* 143:*2*
148:*22*
149:*13*
168:*21* 172:*5*
176:*13, 21*
209:*18* 239:*3*
241:*23*
254:*13, 17*
267:*19*
276:*10*
280:*11*
299:*23*
306:*23* 311:*8*
319:*24*
322:*11*

325:*18*  327:*6,*
*9*, *17*  360:*5*
372:*10*
376:*20*, *21*
405:*21*
413:*19*  415:*4*
428:*3*, *5*
432:*17*
**questioning**
185:*9*  343:*9*
344:*2*, *7*
**questionnaire**
95:*11*
**questions**
118:*22*
177:*17*  182:*2*
354:*12*
417:*18*  435:*5,*
*11*  441:*1*
**quick**  44:*9*
45:*2*, *13*
120:*23*
124:*23*
196:*23*
348:*15*
390:*11*
418:*21*  435:*11*
**quickly**
264:*11*  323:*1*
329:*20*
**Quite**  75:*22*
123:*23*
308:*12*  413:*18*

**< R >**
**RAFFERTY**
2:*1*
**raise**  10:*8*
114:*21*
**raises**  311:*8*
**random**  168:*1*
**randomly**
166:*12*  378:*8*
**range**  211:*1*
**ranging**  339:*9*
**rats**  202:*18*
**raw**  154:*22*
158:*20*  159:*15*
**RBK/JS**  1:*6*

**reach**  122:*12*
124:*14*, *18*
142:*20*
**reached**
122:*18*  379:*7*
**reaching**
135:*9*  294:*20*
379:*20*
**reacted**  204:*24*
**reactive**
192:*13*
**read**  95:*5*, *6,*
*17*  155:*1*
176:*10*  177:*9*
206:*21*, *23*
439:*3*  441:*1*
**reader**  18:*10*
**reading**  90:*15*
96:*2*  175:*11*
**ready**  20:*21*
270:*18*  392:*5*
**real**  44:*8*
45:*2*, *12*
125:*20*
329:*20*
348:*15*  418:*21*
**realized**
150:*11*
**really**  11:*10*
17:*20*  18:*8*
19:*2*  27:*12*
28:*3*, *20*  29:*6,*
*17*  31:*4*  32:*8*
44:*20*  48:*21*
55:*1*  63:*22*
91:*18*  93:*18*
95:*21*  96:*20*
106:*2*  120:*23*
125:*17*  130:*9,*
*17*  132:*12*
141:*11*  179:*1*
189:*1*  196:*13*
199:*11*  201:*8*
214:*6*  215:*4*
218:*19*
226:*20*
237:*19*
245:*14*
271:*10*  273:*7*
276:*11*  291:*7*
294:*17*

295:*17*
303:*15*  305:*3*
312:*21*
318:*19*
321:*24*
322:*14*
323:*17*, *20*
336:*21*
337:*17*
359:*14*
363:*14*  379:*3*
382:*7*  390:*11*
391:*10*
395:*12*
412:*17*  425:*4*
427:*4*  433:*3*
435:*4*
**reask**  36:*14*
**reason**  48:*5*
122:*23*
151:*17*
174:*19*
230:*17*
261:*22*
267:*11*  281:*4*
318:*6*  327:*23*
439:*5*
**reasonable**
57:*13*  81:*9*
82:*19*  241:*19*
270:*14*  431:*16*
**reasonably**
56:*9*  59:*9*
**reasons**  403:*20*
**Recall**  6:*15*
25:*16*  26:*9*
31:*22*  37:*5*
38:*17*  43:*16*
44:*24*  51:*3*
54:*19*, *21*
58:*17*  60:*9*
61:*21*  62:*5*
69:*17*  74:*8*
77:*14*  88:*1*, *4*
89:*10*, *19*
108:*16*, *18*
112:*24*
118:*14*
119:*12*
129:*10*
140:*11*, *14*, *19*

144:*15*
145:*14*, *19*, *24*
146:*5*, *20*
147:*5*, *9*, *12*
148:*4*  152:*14*
160:*19*
167:*19*, *24*
172:*22*
177:*23*  187:*5*
188:*21*  194:*3,*
*4*  206:*19*
210:*2*  212:*2*
227:*10*  229:*5*
230:*17*
237:*24*
248:*22*  249:*2,*
*17*  250:*2*, *16*
252:*23*
261:*12*  272:*4*
274:*4*  286:*17*
294:*3*, *6*, *10,*
*20*  296:*20*
297:*19*  298:*5*
299:*2*, *8*, *12*
300:*11*, *16*
302:*5*, *11*, *18*
303:*8*, *10*
304:*16*  305:*1*
312:*5*  317:*20,*
*24*  321:*15*
330:*8*, *9*
335:*13*, *18*
340:*5*  345:*18*
347:*13*, *16*, *17*
352:*21*  353:*9,*
*18*  354:*17*
355:*4*, *13*, *14*
356:*12*  357:*5,*
*17*, *22*  364:*15*
375:*2*, *3*
381:*12*
388:*17*  391:*9*
393:*11*
406:*18*
410:*22*
412:*11*  416:*1*
417:*11*  418:*5*
421:*24*
425:*13*
435:*21*
436:*18*  437:*2*

**recalled**  22:*19,*
*21*  51:*20*, *21*
141:*16*, *24*
146:*11*  149:*7,*
*10*  210:*20*, *23*
249:*7*, *19*
250:*7*  251:*9,*
*15*, *18*  274:*1*
296:*12*
297:*10*, *15*, *24*
298:*12*, *24*
299:*6*, *7*, *24*
300:*2*, *7*, *19*
301:*14*
302:*22*
303:*11*
316:*19*
347:*23*
348:*12*, *14*
349:*21*  373:*2*
374:*23*  375:*8*
407:*1*
**recalling**
197:*10*  250:*5*
**recalls**  187:*15*
194:*11*
195:*13*  230:*9*
298:*7*  347:*20*
**recap**  125:*20*
**receipt**  439:*15*
**receive**  48:*16*
87:*5*, *9*
103:*21*, *24*
176:*24*  177:*10*
**received**
43:*10*  48:*14*
138:*8*  145:*4,*
*6*  146:*13*
149:*18*  177:*3,*
*7*  189:*17*
204:*21*  207:*1,*
*12*  306:*24*
309:*6*  364:*19*
397:*18*  436:*3*
**receiving**
32:*16*  104:*15*
147:*5*  197:*10*
402:*24*
417:*11*
423:*19*
427:*12*, *17*

428:*22*
430:*20*  431:*15*
**Receptor**  5:*10*
23:*14*
**recess**  65:*17*
125:*8*  185:*1*
271:*1*  347:*1*
434:*20*
**Recipients**
429:*2*
**recognize**
16:*19*  205:*1*
329:*11*  348:*24*
**recognized**
404:*9*
**recommendatio**
**n**  145:*18*
**recommended**
299:*9*
**record**  9:*3*
10:*3, 22*
11:*19*  65:*15,*
*20*  125:*6, 11*
184:*23*  185:*4*
270:*23*  271:*4*
346:*23*  347:*4*
367:*15*
369:*17, 22*
434:*18, 23*
435:*9, 13, 15*
437:*7, 9*
**recorded**
95:*16*
**records**  103:*16*
**red**  194:*15*
**reduce**  30:*18*
71:*23*
**reduced**  30:*8,*
*11*  31:*8*
**reduction**
71:*14*  72:*15*
73:*3*
**reevaluate**
211:*20*
**refer**  114:*15*
218:*1*  404:*23*
**reference**
116:*7*
**referenced**
120:*11, 17*

136:*23*
152:*16*  197:*6*
**references**
75:*16*
**referencing**
44:*18*  74:*19,*
*23*  75:*15*
121:*21*
148:*11*  180:*24*
**REFERRED**
6:*16*  7:*1*
159:*6*  170:*11*
174:*14*  197:*5*
233:*16, 18*
433:*15*
**referring**
56:*18*  139:*22*
195:*21*
207:*10*
249:*12*  291:*6*
339:*20*  421:*16*
**refers**  232:*19*
238:*20*
**regard**  379:*17*
**regarding**
101:*23*
129:*21*
148:*12*
172:*10*
176:*24*
177:*24*  192:*6*
194:*2*  207:*4*
315:*1*  318:*3*
334:*4*  415:*15*
**regardless**
272:*8*
**Registered**
1:*19*  438:*15*
**regular**  205:*20*
**regularly**
15:*24*
**regulation**
292:*24*
**regulations**
13:*9*  83:*14*
108:*24*
109:*10, 13*
114:*13*
186:*18*  187:*2,*
*14*

**regulator**
78:*7*  83:*6*
273:*19*
**regulators**
80:*4*  313:*17*
385:*8*
**regulator's**
114:*22*
**regulatory**
12:*18*  13:*11*
17:*13*  21:*9,*
*13*  22:*11*
91:*23*  98:*3,*
*13, 24*  99:*10,*
*20, 21*  100:*1,*
*4, 15, 16, 20*
101:*22, 23*
102:*10*
106:*18*
109:*13*
118:*16*
119:*10*  186:*2*
187:*23*
188:*15*
214:*22*  215:*4*
227:*22, 23*
228:*1, 23*
240:*2*  296:*11*
331:*22*
333:*11*  364:*4*
382:*11*
388:*10*  426:*1,*
*9*  430:*23*
**rehash**  368:*5*
**related**  25:*15*
75:*8*  95:*24*
231:*9*  298:*16*
387:*11*
413:*24*
428:*15*
429:*24*  433:*23*
**relating**
100:*17*
118:*23*  398:*23*
**relation**
115:*11*
303:*12*
345:*23*  391:*24*
**relationship**
107:*19*  108:*8*
423:*17*

**relative**  54:*3*
419:*17*
**relatively**
27:*5, 23*
29:*10*  53:*3, 8*
**relay**  106:*19*
107:*4*
**Release**  6:*8*
21:*22*  50:*18,*
*23*  51:*3*
153:*3*  194:*2*
199:*3*  241:*15*
248:*17*  249:*5*
264:*7, 13*
265:*12, 17, 23*
266:*4*  267:*4*
273:*12*
276:*22*  278:*1*
280:*14*
281:*16*
283:*24*
284:*22*  285:*6*
392:*5*  407:*8*
**released**
21:*10*  282:*8*
283:*11, 19*
284:*19, 21*
285:*10*  286:*2,*
*15, 20*  290:*7,*
*8*  338:*17*
372:*7*  392:*16*
**releases**  365:*7*
**releasing**
268:*5, 17*
270:*10*
283:*13*  284:*24*
**relevant**
103:*8*  105:*6*
191:*22*
193:*19*
216:*16*  430:*24*
**relied**  170:*2*
289:*4*  299:*24*
301:*14*
302:*21*  398:*22*
**relies**  257:*11*
265:*11*
**rely**  81:*7*
116:*4, 11*
131:*7, 8*
140:*4*  257:*16*

277:*6*  298:*22*
332:*8*  341:*2*
**relying**  58:*11*
79:*9, 21*
80:*18*  136:*21*
139:*7*  204:*14,*
*19*  209:*7*
212:*4*  214:*1*
241:*11*
289:*9*  402:*5*
411:*3*  412:*1*
**remain**  137:*2*
**remaining**
185:*8*
**remark**  176:*8*
**remarks**
173:*23*
**remember**
37:*10*  38:*15*
39:*14*  50:*24*
52:*14, 21*
60:*7*  66:*4*
68:*18, 19*
100:*22*  101:*3*
103:*2, 6*
104:*6*  115:*17*
122:*20*
125:*16*
129:*14*
141:*22*  145:*9*
150:*18*
167:*13*  168:*5,*
*7, 8*  170:*3, 10,*
*23*  172:*2*
175:*1*  179:*1*
189:*20*  194:*6,*
*7*  205:*3, 21*
207:*6*  233:*17*
238:*1*  256:*7,*
*15, 17*  271:*18*
274:*3, 4, 5*
275:*21*  276:*2*
281:*18*  291:*3*
297:*11*
303:*11*
305:*14, 18*
312:*9*  329:*12*
340:*4*  348:*18*
351:*14*
353:*22*  355:*2,*

*3*  357:7
358:*14*  368:2
370:*15, 18*
383:*17, 20*
400:*16*
415:*20*  417:5
418:9
**remembering**
37:7  170:7
**remind**  11:7
244:*12*
**remote**  1:*16*
2:*1*  3:*1*  9:9,
22
**remotely**  9:*19,
21*
**remove**  47:*18*
**removed**
49:*15, 19*
297:*15, 19*
**repeat**  40:*2*
50:*19*  58:*24*
87:*3*  111:*13*
140:*16*
280:*11*
327:*10, 22*
400:*24*
405:*21*  415:4
**rephrase**
139:*17*
165:*21*
299:22
359:*17*  385:*13*
**replicate**
150:*9*  396:*19*
**replicates**
401:*1*
**replies**  420:*8*
**reply**  419:*8*
**report**  89:5
107:*12*
381:*13, 16*
382:*23*  383:*1*
388:*2*  400:*11,
16*  415:*24*
**reported**
398:*13*
**Reporter**  1:*20*
10:*4*  438:*15,
24*

**reporting**
9:22  400:*10*
**reports**  80:*4*
114:*12*  381:*9*
382:*20*  415:22

**representations**
432:*6*
**Representing**
2:*20*  4:5
**reproduction**
438:22
**Request**  8:7
420:*14*
**requested**
104:7  129:*20*
252:*20*
341:*18*
382:*12, 19*
415:22
**requesting**
251:*24*
256:*20*  306:2
**require**  29:*12*
110:7
**required**
22:*11*  92:*19*
115:*14, 19*
154:22
209:*14*  394:*4*
395:*8*  422:5
431:*2*
**requirement**
78:8  393:*19*
**requirements**
13:*13, 15, 17*
18:*20*  101:*24*
**requires**  15:*23*
**research**
78:*24*  99:*1*
153:5, 7
182:*8, 12*
**residual**
419:*11*
420:*13*  421:5
**resolved**
164:*16*
**respond**  11:*12*
**responding**
149:*4*  195:*24*
196:*1*

**responds**
136:*4*  292:*12*
**response**  19:7
95:*16*  134:*20*
135:*18, 20*
137:*13*  138:5,
6
**responses**
11:*15*  114:*23*
**responsibilities**
113:7  139:*24*
186:*10*  389:*15*
**responsibility**
22:5  125:*22*
127:*11*
139:*16*
148:*24*  416:*10*
**responsible**
56:*22*  88:*15*
97:7  98:*10*
102:*8*  105:*21,
24*  106:5, *15*
190:*17, 20*
244:*16*
305:*19*
324:*23*  333:5
336:*10*  389:*4,
8*  414:*4*
**rest**  46:*14*
73:*24*  156:*2*
157:*17*
175:*13*  229:*6*
259:*16*
**result**  27:*20*
56:7  398:*15*
403:9
**Results**  5:*12*
59:*18, 23*
103:*21*  104:*1,
10*  136:*14, 19*
138:*4*  146:*16*
160:*16*  270:*2*
301:*22*  323:*4*
340:*19*  341:*1*
345:*12*
361:*21*
368:*16*
372:*17*
374:*19*
375:*16*
378:*18*  379:5

391:*19*  396:*2,
17*  397:*24*
398:*12*  399:*23*
**retention**
419:*18*
**retest**  398:*14*
403:*10*
**retested**
396:*17*  398:*11*
**return**  439:*13*
**returned**
95:*10*
**review**  57:*4*
80:7  82:*8*
118:5  120:*10*
174:*13*  291:*2*
**reviewed**  57:*2*
118:*10, 13*
120:*15*  381:*9,
15*
**reviewer**  105:*4*
**reviewing**
118:*20*
**revised**
170:*18*  172:*1,
3*  181:*1*
**right**  10:*8*
12:*3, 10, 24*
13:*10, 18, 22*
14:*21*  16:*4,
15*  18:*24*
19:*4, 20*
20:*13, 17*
21:*2, 14*  22:*6,
22*  23:*1*  24:*1,
10, 18, 22*
25:*7, 22*
26:*13, 18, 22*
27:*24*  28:*9,
24*  29:*4, 13,
21*  30:*14*
31:*1, 20, 23*
32:*4*  34:*6*
35:*18*  37:*12,
15, 19*  38:*12*
39:*22*  40:*9,
21*  41:*6, 20*
42:*19*  43:*6,
15, 20*  44:*3, 6,
12, 23*  45:*5,
14, 16, 24*

46:*6, 18*  49:*1,
10, 20*  50:*18*
51:*5, 13*  52:*8,
17*  53:*10, 13,
15*  54:*8, 17*
55:*4*  56:*2*
57:*3, 23*
58:*10, 13*
59:*5*  60:*8, 12,
22*  61:*2*  62:*2,
3, 9, 15, 24*
63:*7, 19, 24*
64:*8, 9, 16*
65:*3*  66:*14*
68:*2, 6, 11, 22*
69:*2, 16, 20*
70:*1, 21*
71:*19*  72:*15*
73:*5, 20*  74:*2,
19*  76:*12, 20*
77:*10*  78:*2*
80:*19*  81:*8*
82:*24*  83:*23*
84:*15*  85:*17*
86:*5, 10, 14*
88:*2, 8*  89:*9*
90:*14, 21, 24*
92:*6*  94:*14,
19, 24*  95:*20*
96:*13, 14, 19*
97:*2, 15*
98:*17*  99:*13,
17*  101:*5*
103:*10, 23*
106:*7*  107:*9*
108:*7, 14*
109:*2, 20*
110:*5, 10, 16,
23*  111:*19*
112:*3, 13*
113:*20*  114:*8*
115:*16*  116:*1,
6, 12, 19*
120:*6, 17, 18*
121:*21, 24*
122:*21*  123:*4*
125:*2, 24*
126:*4, 15, 24*
129:*5*  130:*10,
14, 20*  131:*6,
10*  133:*6*

Confidential Information Subject to Protective Order

134:4, 8, 13
135:11, 16, 22
136:9, 14
137:7, 18
138:14, 17, 24
139:5, 10
140:4, 13
141:17 142:6,
12, 13, 22
143:3, 11, 13,
17 144:1, 12,
16, 18 145:7,
13, 20 146:7,
14, 21 147:3,
13 148:11, 17,
21 149:11
150:14
151:11, 20, 23
152:1, 3, 21
153:14, 20, 23
154:1, 5
155:9, 15
156:5 157:10
158:2, 9
159:3, 7, 17
160:6, 19
161:4, 16
162:1, 8, 21
163:8, 16
164:2 165:4,
7, 24 166:12
167:5, 18, 21
169:8, 11, 15,
18, 22 170:2,
6 171:4, 11,
15, 20 173:12,
15 175:23
176:3, 9
177:2 181:10,
12, 15, 21, 23
182:19 183:9
184:20 185:6,
11, 13, 22
186:2, 6, 14,
17, 21 187:5,
15 188:8
189:17 190:3,
15, 18, 24
191:13
192:21
194:16 195:2,

5, 15 197:2
198:17
199:12, 18
200:3, 4
201:13, 14, 20
202:13
203:15, 19, 22
204:9, 15
205:9, 23
206:6, 10, 19
207:5, 19
208:7, 17
209:4, 12, 14,
19 210:3
211:15
212:14, 23
213:24
214:24
215:12, 24
216:4, 21
217:2 218:6,
23 219:1, 8,
16, 24 220:18,
19 221:21
223:1, 15, 22
226:1, 9, 12
227:8 229:1,
9 230:4
231:23 233:9,
22 234:8, 10,
17 237:7
238:7, 12, 15,
24 239:12, 15,
24 240:4, 8,
12 241:11, 16
242:2, 13, 18
243:3, 23
244:1, 17
245:5, 10, 21
246:21
247:22
248:23
249:19 250:8,
17, 20, 24
251:16, 21
254:15
256:10, 22
257:6, 12
258:11, 22
259:9, 14, 19
261:6, 12

262:2 263:9,
12, 15 264:24
265:11, 19, 20
269:9, 20
270:18 271:6,
9, 17, 22, 24
272:12 273:5,
14, 22 274:13,
23 275:9
277:8, 21, 23,
24 278:7
279:12, 20
286:16, 21
287:15
288:13, 14, 19
289:3 290:3,
11 291:14
292:9, 13
296:24
297:23
298:14 299:2
305:22 306:7,
12 308:13, 15
310:13, 15
311:15
313:21 314:2,
11 315:2, 4,
14 320:6
323:18
324:10 325:3,
20 326:2, 6,
19 329:15, 18
330:11, 16, 20,
23 331:4, 19
333:19 334:7
335:9, 15
336:6, 24
337:3, 23
339:13, 18
340:8 341:16,
20 342:1
343:10 345:7,
18 347:9, 13,
15, 19 348:3,
12, 15, 17, 21,
23 349:14
350:3, 5, 19
355:8, 13, 16,
18 356:19
357:6, 12, 17
358:9, 23

362:6 364:17
367:10, 21
368:7, 11, 18
369:12, 13
370:24 371:4,
17 372:1
373:7, 11, 17
374:2, 3
375:1 376:5,
13 377:9
378:1 380:20
381:8, 19, 20,
23 382:3, 24
383:6, 13
384:2, 3, 17,
24 385:4, 14,
23 386:2, 9,
12 390:2
391:4 392:10,
21 393:2
394:10, 17
395:4, 23, 24
396:22
397:11 398:9,
23 399:20, 24
400:11 403:2
407:8, 16
408:10 410:4,
13 411:20
414:8, 11
415:24
417:10 418:7,
13 419:12, 19
420:2, 24
423:5, 6, 18
424:1, 15, 22,
24 425:9
428:19 431:5,
14 432:12
433:18
434:15 435:2
**right-hand**
27:1 38:12
71:13 205:7
**risk** 19:11
39:8 72:6
240:6 241:5
324:10
**risks** 98:12
**RITONA** 4:9
9:4

**Rivera** 330:11,
20 331:19, 20,
24 332:9
333:4
**ROBERT** 1:9
**Robin** 1:19
10:4 438:15
**rocket** 203:1
**ROD** 219:7, 23

**RODIRIGUEZ**
4:13
**role** 13:24
97:11 187:1,
11 364:4
**ROSE** 3:6
**Ross** 3:9
**roughly** 12:14
46:24 185:20
213:7 287:18
355:15 357:13
**route** 137:1
196:19, 20
198:14 220:5
238:13 259:8,
13 280:1, 6
309:8 311:9
348:6 367:5
436:9
**routes** 238:11
436:7
**routine**
103:11
124:14
154:22 338:5
**routinely**
104:8 216:1
**row** 24:2
43:9 60:6
62:1, 17
64:20 66:8,
19 68:14, 24
161:12 162:10
**rows** 61:1
67:3 161:8
**rules** 13:9, 17
**rupee** 423:5
**rupees** 423:7,
8

**< S >**

**safe** 13:*21*
17:*16, 22*
18:*5, 14, 17*
19:*1, 3, 6, 8*
22:*6, 10* 25:*1*
56:*9* 59:*10*
110:*16* 126:*4,*
*23* 156:*12*
197:*1* 222:*16*
223:*1* 240:*12*
242:*4* 252:*15*
253:*7* 257:*20*
261:*16*
262:*20*
289:*15*
299:*14, 20*
300:*10* 301:*7*
303:*19*
306:*17*
307:*23* 309:*1*
315:*17*
**safety** 12:*23*
13:*3, 5* 14:*1,*
*6* 22:*3* 82:*23*
83:*9, 17*
126:*11, 20*
230:*24* 241:*1*
**sales** 75:*8*
229:*7, 11, 12*
230:*4, 9*
233:*8* 302:*5*
**salespeople**
73:*16* 75:*11*
193:*24* 232:*5*
**Samir** 147:*18*
149:*4*
**Samir/Corpora**
**te/Torrent**
147:*18*
**sample** 130:*1*
**samples** 79:*2*
104:*7* 251:*24*
252:*14, 20*
253:*1, 2*
294:*11* 315:*12*
**Sanjay** 37:*4,*
*10, 21* 51:*12*
74:*12* 75:*2, 3*
**SARA** 2:*4*
185:*7*
**sartan** 33:*1*

**satisfactory**
94:*10, 19, 24*
378:*17*
**save** 103:*15*
233:*21* 255:*1*
283:*23* 384:*6*
**saved** 285:*12*
286:*4*
**saving** 236:*7*
255:*7*
**saw** 31:*20*
39:*11* 87:*19*
89:*21* 101:*16*
207:*6* 273:*23*
275:*9* 352:*12*
355:*11* 370:*13*
**saying** 42:*1*
80:*13* 90:*19*
97:*4* 113:*18*
131:*23* 132:*1,*
*19* 134:*10*
135:*10, 13*
136:*2* 137:*16,*
*20* 138:*13*
146:*9* 173:*10*
176:*7* 177:*7*
219:*22* 238:*9*
242:*18*
245:*19*
249:*16*
253:*16*
256:*14, 17*
262:*16*
263:*24*
264:*11* 266:*9,*
*21* 275:*23*
276:*2* 281:*18*
292:*12*
309:*18* 326:*3,*
*9* 329:*17*
343:*16* 403:*7*
422:*14*
**says** 17:*2*
24:*2, 7, 10*
27:*3* 28:*18*
29:*5, 7, 16*
30:*7, 18*
31:*16* 39:*3*
42:*10, 15*
43:*14, 17*
45:*3, 15, 18,*

*21* 46:*16, 22*
56:*6* 59:*18*
60:*6, 10* 71:*6,*
*8, 12, 13*
72:*19* 74:*13*
86:*18* 88:*21*
89:*12, 22*
90:*15, 18, 23*
91:*1, 7* 92:*14*
94:*4, 15* 95:*9*
96:*16* 98:*1, 9*
100:*15* 113:*4,*
*9* 120:*2, 9, 13,*
*14* 121:*9, 10*
134:*24*
135:*21* 136:*7,*
*24* 137:*14, 19*
138:*15*
142:*13, 15*
145:*2* 147:*18*
148:*8, 14*
154:*15, 16, 19*
155:*20*
157:*15*
158:*17, 19*
159:*15*
160:*21* 161:*2*
165:*17* 171:*1,*
*6* 172:*9*
173:*21, 23*
175:*21* 177:*9*
178:*17*
179:*23*
180:*20* 181:*5*
182:*4* 194:*1,*
*10, 11* 195:*13*
196:*22*
199:*21*
200:*24*
205:*16*
208:*16, 24*
209:*6* 217:*22*
219:*6, 13*
220:*4* 229:*11*
232:*6* 233:*8*
241:*17*
243:*16, 22*
244:*20* 245:*6,*
*20* 249:*20*
263:*14*
288:*13, 20*

315:*2* 326:*7*
328:*23*
333:*16* 339:*8*
341:*17*
345:*16*
347:*12, 15, 17*
368:*6* 386:*13*
390:*15*
418:*23*
420:*11, 20*
423:*2* 424:*15,*
*19* 425:*20*
427:*9* 428:*22*
430:*20* 431:*15*
**scenario**
279:*10* 321:*2*
**scenarios**
84:*20*
**scheme** 325:*11*
**science**
188:*12* 416:*4*
422:*20, 23*
430:*10*
**Sciences** 98:*19*
**scientific**
99:*23, 24*
100:*2* 188:*16*
391:*19* 392:*21*
**scientifically**
113:*11*
**scientist** 98:*2*
**scientists**
226:*16*
**scope** 431:*17*
**scratch** 150:*3*
**screaming**
164:*22*
**screen** 180:*6*
205:*15*
243:*20* 271:*10*
**scroll** 348:*14*
418:*20*
**second** 19:*5*
23:*11* 57:*14*
63:*16* 67:*4*
71:*13* 72:*6,*
*10, 13, 14*
86:*21* 113:*3*
116:*14*
142:*13*
175:*21*

208:*15*
217:*18* 232:*4*
237:*5* 242:*24*
261:*22*
263:*10* 305:*9*
306:*12*
314:*23*
323:*12*
367:*18* 381:*6*
389:*20*
391:*15*
417:*16* 418:*2*
434:*15* 436:*10*
**section** 36:*23*
118:*21*
135:*19*
144:*20*
158:*23*
181:*16, 17, 18*
**see** 18:*3*
23:*23* 24:*4, 7,*
*9, 12* 26:*11,*
*16* 27:*6* 30:*9*
36:*23, 24*
37:*1, 3, 11*
38:*5, 11, 19*
39:*9* 42:*9, 14,*
*16, 24* 43:*2,*
*11* 44:*10*
45:*1, 4, 14*
46:*15* 51:*4, 9,*
*15* 52:*4* 55:*8*
56:*10, 16, 17*
58:*20* 59:*2,*
*17, 19* 60:*4,*
*20* 61:*6, 12,*
*17* 62:*7*
63:*17* 64:*20,*
*22* 66:*10, 11,*
*21, 22* 67:*4, 7,*
*8, 18* 68:*5, 24*
69:*4* 70:*9, 10,*
*14, 15, 20*
71:*4, 9, 15*
72:*13* 73:*2,*
*10, 12* 74:*15*
86:*5, 7, 17, 21*
88:*14* 89:*2*
91:*6* 92:*16,*
*17* 94:*11*
95:*18* 98:*14*

Confidential Information Subject to Protective Order

101:8  106:3
112:20
113:15  114:5,
18  117:11, 12,
16, 18  119:24
121:12  129:1,
23  134:2
135:4, 6
137:13
138:20
141:21  142:9,
12, 17  143:20
144:5, 7, 9, 20
145:15
147:24
153:19, 24
154:18, 23
155:19  156:8
157:2, 4, 6, 14,
18  158:7, 16,
19, 21, 24
159:2, 5, 12
160:5, 13, 24
161:9, 15
162:3, 5, 12,
13, 20  163:2,
3, 4  165:23
171:17, 19
173:17  174:3
175:4, 6, 7, 10
178:19  180:2,
7, 20, 22
181:14, 20
189:15, 16
193:20  194:1,
8, 9, 13  195:2,
3  197:13
199:9  204:6
205:6, 8, 15
206:3  208:5
209:4  212:3
217:19
226:24  227:3,
5  229:2, 14,
19  232:1
233:9, 10, 12
237:3  243:14
244:22  245:1
248:21
249:16  250:1
258:17  259:9

264:8, 9
268:4  271:9
285:24
293:12  305:9,
20  306:4
307:18
314:24
328:22
330:10, 14
347:8  348:12
349:13
357:10
368:16, 18
369:24  371:1,
10, 13  379:8
381:18
386:13
387:16, 18
390:12, 14
395:23
396:21  401:4,
5  403:19, 21
409:23  410:3
414:22
418:11, 21, 22
419:4, 12
420:7, 11, 15
421:10, 14, 16
422:12, 15
423:9, 10, 24
424:5  427:14
433:11  434:7
436:9, 10
**seeing**  38:15
51:1  168:7
274:3, 4
400:16  406:6
416:1
**seek**  303:17
304:1  373:16
416:11
**Seeking**
373:20
**seen**  26:8
74:7, 8  87:22,
24  97:14
104:19
112:22  113:1
135:2  148:3,
5  172:21
208:13  289:1

339:14, 21
340:2, 18
360:16
374:11
381:13  388:2
400:5  408:6
**sees**  122:8
**Sekhar**
228:11, 12
**selection**  100:6
**self-completed**
95:11
**sell**  48:4
102:22  109:1
112:12  114:2
116:18, 23
168:19
191:11  195:3
209:21
267:11
268:23  290:3
321:7  336:5,
16  357:16
**selling**  108:23
192:23
209:17  218:4
222:11
231:19  242:3,
9  307:6, 13
335:8, 19
337:1, 2, 8
355:22  356:3
411:11
**sells**  13:21
107:3, 7
109:8  126:4
**send**  80:16
92:24  105:9,
12  144:6
252:14
298:13
305:21  378:8
**sending**  91:24
294:11
**sends**  104:20,
23
**Senior**  98:10
**sense**  17:11
53:11  58:10
63:23  82:18

84:13  91:22
93:1
**sent**  36:24
37:3, 11
38:18  51:8,
12  57:2
70:15  101:11
103:9  105:2
120:5  122:10
129:1, 3
144:7  189:22
261:5, 6
304:10
305:10
314:24
323:12
329:16
330:11
331:18
349:17  378:1
**sentence**  17:2
18:3  27:17
28:6  29:2
30:6  41:24
56:6, 13, 16
74:13  90:22
91:1  142:15
192:3  243:16
398:9  403:6
430:19
**sentences**
326:23
**Sentry**  2:18
**separate**
168:24  169:4
389:16
**September**
154:2  349:18
351:3  353:13
**sequence**
50:24  142:3
194:7  312:10
**series**  172:11
**seriously**
35:10  147:3
**Services**  9:5
**set**  17:12
24:18  36:11
139:11  225:5
311:24  312:3
372:21

**sets**  23:21
109:22  253:2
**seven**  335:20
**seventh**  68:1
**Shah**  418:8,
10  422:13
**shaking**  11:17
**share**  102:13
103:17
122:15  145:3
255:10
333:17  334:4,
16  341:20
427:22  428:9
431:3
**shared**  103:13
124:6  252:11
**sharing**
261:20
262:24  275:7
334:7, 14
**Sharma**  37:4
51:12
**sheet**  183:13,
15  184:1
439:6, 9, 11,
14  441:1
**shelf**  378:7
**shelves**  297:16
**Sheth**  228:15
418:8
**shift**  69:11
97:10  140:8
167:11
**shock**  288:21
**short**  278:15
308:13, 14
**shortages**
318:4  437:1
**show**  26:24
30:4  55:11
63:16  65:23
66:6  74:6
115:22
167:22  168:2,
6  172:7
223:7  286:1
291:19
374:19  433:9
**showed**  54:23

Confidential Information Subject to Protective Order

showing 68:8
163:9 364:2
419:1
shown 168:15,
16 366:17
367:3
shows 47:3
167:23
sic 356:16
Siddhaye
229:4
side 19:5
27:1 30:6
71:10, 13
95:9 181:14
263:8
sides 339:9
sign 105:18
421:12, 20
422:5 439:8
signature
205:24
signed 433:10,
13
significance
331:8
Significant
98:5 114:22
123:8 174:10
significantly
43:19 47:6
60:11 378:22
signing 439:10
signs 421:11
433:19
similar 27:19
94:3 107:19
192:6 252:9
351:18 400:6
simple 81:5
115:5
simply 212:4
404:9
single 184:6
216:7 244:24
245:19
263:24 277:9
313:6
singularly
241:6

Sipra 152:2
155:7 158:15
sir 135:12
sit 431:17
site 87:11, 21
88:16, 22
95:13 96:4
386:1 395:3
sites 79:2
377:24
390:22, 24
situated
164:15 369:15
situation 15:5
16:9 19:10
77:6 91:19
124:16 127:6,
18 135:24
140:24
196:15
246:10 276:8
277:14, 18
279:4 309:13
313:14
328:11 415:16
situations
104:3 292:20
338:5 399:13
409:12
six 11:5
161:8 308:13
slightly 308:19
slower 160:10
small 52:7, 12,
16 53:22
54:2 131:3,
16 133:12
141:12
198:11 199:4
248:10
284:16
293:15 339:4
344:24
smaller 53:19,
20
Solco 250:10
251:11
253:15 254:2
sold 20:11
112:9 183:12
230:13, 19

232:6 280:22
336:12 410:17
sole 266:19
solely 103:3
190:19
solo 157:10
158:8 169:7
175:5
solutions
98:14
solvents 135:4
137:11
387:14
419:11
420:13 421:5
somebody
63:24 79:7
80:16 81:7
92:24 96:24
102:4 184:11
252:2 377:5
somewhat
18:18 25:12
96:21
soon 243:17,
21 310:14, 21
321:13
372:22 421:13
sooner 193:12
sorry 21:19
23:8 40:2, 15
50:19 59:1,
16 81:16
87:3 111:3, 8,
12 123:22
140:15 142:5
145:9 152:10
154:24 164:4
167:24 172:4
176:18
190:10
203:15
205:14
209:18
212:20
219:20
236:20, 24
243:19
246:13
249:15
263:17

271:20
280:11 288:3
304:1 315:7
325:18 327:7,
18 329:19, 24
354:10
356:23
367:13
369:14, 17, 21
382:16
401:24 403:4
405:20
413:19 415:3
417:17, 22
420:10 424:7,
9 425:5
427:5 428:2
431:12
432:16 433:6
sort 93:17
sound 113:11
173:7 335:15
sounds 99:8
164:21 170:8
174:12
184:18 185:10
source 71:14
72:6, 10, 13,
14 73:5
116:13
196:24
402:15 428:11
sources 57:13
70:5 72:9
80:24 104:11
234:4 266:17
323:3 339:23
373:24 402:12
sourcing
412:6, 10, 13,
15
South 2:4
space 439:6
Spain 190:5
speak 11:10
18:9 32:8
93:18 111:5
214:6 218:19
303:23 304:3
305:3 358:3

speaking 9:24
49:24 362:3
spec 144:24
species 27:5
specific 34:12
48:16 55:9
69:9 77:14
91:19 96:7
105:19
114:15
124:10
125:18
175:15
190:12
197:23 204:1
223:5 225:5,
7, 8 253:24
254:8 287:1
302:1 303:13
306:3 322:15
328:10, 12, 17
342:12, 16, 18
355:15
356:12 367:2
388:17
399:13 436:6
Specifically
22:24 24:21
33:12 36:4
38:17 43:16
50:7, 8, 10
51:1 58:7, 18
62:17 88:5
90:3 96:9
97:8 112:24
115:10, 12
147:7 148:4
152:8, 15
158:20
159:16
166:18, 21
172:22
189:21 197:8
198:1 205:4
212:2 225:21
226:20
231:24
260:24
304:11 305:1,
18 316:15
319:14

Confidential Information Subject to Protective Order

329:13
335:18  339:4
340:5  348:8
349:2  353:18
355:5  358:1
361:20  368:3
381:12
387:11  388:2
389:13
391:24
396:14
412:11  416:2
**specification**
117:24  392:2,
3, 7, 9  403:17
**specifications**
22:13  240:17
242:10
283:20  372:6
**specifics**
107:17
122:14
141:21
238:21
295:18
336:11  345:11
**specify**  295:14
**spectrometry**
150:13  224:4
**speculate**
359:14  361:14
**speculation**
285:21
**spent**  186:15
**spoken**  298:19
**sporadically**
166:11
**spreadsheet**
43:5  181:24
**stability**
182:11
**STACY**  2:8
**stacy@bartonb
urrows.com**
2:10
**stage**  198:13
344:23  345:2
**standard**
48:10  109:23
118:7  124:18
209:2  279:2

311:24
409:11
414:16  433:5
**standards**
17:12  18:21
21:9, 13
22:14  26:2
36:10  77:4
110:9, 23
111:17, 23
112:13, 14
113:14, 21
114:2, 8
115:24  126:9
186:23
235:16  312:4
338:12  392:15
**standpoint**
44:14  53:11
91:17, 22
132:8  139:16
358:13
**stands**  26:15
181:7  182:15
**start**  158:12
181:20
188:11  189:5
193:17
212:24  227:4
229:17  245:4,
23  264:1
354:8, 11
403:4  417:15,
18  435:24
**started**  32:16
33:2  69:15,
17  89:10
141:3  412:6,
13
**Starting**  95:8
150:3  206:24
313:16  418:2
**starts**  128:23
199:11
**state**  10:22
267:22
360:15  439:5
**stated**  31:4
58:17  59:8
90:18  91:4
94:13  96:6,

19  206:15
295:19  350:4
377:2  379:2
430:14
**statement**
20:9  193:4
241:23
243:18
257:24
311:11
321:20
323:22  326:3
327:6, 21, 22
339:1  362:11
376:20, 24
429:9
**statements**
212:5  242:12
244:4, 10
256:18  262:3
275:24  282:6
**STATES**  1:1
9:14  109:1
137:1  192:12
**stating**  325:8
**status**  182:4
204:12  307:10
**stay**  187:13
236:19
**stays**  321:19
322:19
**STENOGRAP
HER**  10:7
128:12
**stenographic**
10:3  438:6
**step**  72:7
271:14  277:7
431:19
**steps**  35:17
92:7, 8
117:22
158:18
159:14
192:18, 22
247:18  263:3
431:24
**stock**  218:3
360:17
**stocks**  160:22

**stop**  155:8
231:23  298:18
**story**  199:11
**straight**  362:3
**strange**  192:3
**stranger**  186:4
**strategic**  98:4
**strategies**
99:10
**strategy**  98:24
99:22, 24
100:2  188:15
234:3  430:10
**Street**  2:4
3:16
**strength**
110:10
111:17
113:15, 22
114:1  115:8,
23
**strict**  59:14
**strike**  25:18
196:6  335:7
352:5  426:11
**String**  5:18,
20, 23  6:1, 2,
6, 8  121:2
133:17
172:24  178:8
179:16  189:9
255:24
**strong**  324:3
**strongly**  17:3
**structure**
351:18
**structured**
82:6  139:15,
20  331:11
**studies**  27:3
39:5, 6
**study**  201:16
**stuff**  132:4
136:3  146:21
156:2  158:21
173:7  182:3
**stumbled**
400:6
**SUBJECT**
1:10  71:4
144:14

160:11  315:1
330:6  418:11
439:10
**submission**
115:22  116:6,
17  118:20
153:20, 24
155:6  157:3
158:6  169:24
**submissions**
120:11
**submit**  115:14,
19  168:22
174:10  245:5
**submitted**
151:22
167:13, 14, 24
169:6, 7, 10,
17  171:8, 15
173:11
174:17
177:16  182:17
**Subscribed**
441:11
**subsequently**
290:7
**subset**  100:9
**substance**
441:1
**subtleties**
428:15
**successful**  98:6
**successfully**
376:4
**Sue**  134:7
136:1  138:2
**Sue's**  134:20
**sufficient**
147:8  242:13
256:19  262:4
275:24  282:6,
15
**suggest**
264:18  324:16
**suggested**
146:23
**suggesting**
277:15
**suggestion**
147:2, 4, 13

Confidential Information Subject to Protective Order

suggestions 105:13 281:12
suggests 274:12
suitable 211:8 308:5
Suite 2:4, 8, 18 3:9, 16 4:3
Sumit 237:23
summarize 117:21
summarizes 383:1
supervise 81:12, 19, 21
supervises 108:2, 7
supervision 438:24
supplied 160:17 180:1
supplier 80:8 88:19 90:17, 20 104:4 117:19, 20 120:20 132:17 135:24 150:20 196:23, 24 234:6 383:23 392:19
suppliers 80:10 124:7 277:6, 11 388:4 389:5 414:17
supplier's 117:18
supplies 190:2
supply 183:20 209:21 221:5 228:4, 5, 8, 13, 17, 21 229:7 244:18 245:3, 10, 22 263:15 264:1 412:1
supplying 372:12 383:12 413:3

SUPPORT 8:1 99:2 166:11 318:9
supporting 153:5
supposed 102:15
sure 11:8, 23 13:8, 14, 20 21:8, 12 22:12 26:14, 19 33:8 40:23 41:1 53:16 56:21 65:8 66:2 73:2 74:23 76:9 77:3, 5 80:5 90:3, 5, 12 92:5, 19 93:22 94:8 97:8 106:23 108:7 111:8 117:3 119:12 120:20 123:12 125:1 130:3 132:3 133:8, 11 135:14 138:12 139:17, 21 143:5 159:8 161:22 163:14 167:22 175:11 176:15 189:3 190:11 195:20 197:5 208:11 220:14 232:19 235:9, 15 238:20 240:11 242:8 243:4 263:11, 12 270:20, 21 271:11 282:13 298:6 304:10 309:1 311:23 313:2 314:6 315:21 325:7 328:16

336:1 339:20 346:20, 21 350:12 351:5 353:7 354:3 355:20 367:11 374:2 387:12 389:13 390:6 394:8 400:17 401:23 409:10, 20 412:24 418:9, 18 421:4 425:4 436:13
surprise 432:20 433:21 434:7
surveys 78:23
Susan 100:23
Sushil 129:4 142:11, 14 417:2, 5
swear 10:5, 9
switch 345:14 381:5
switched 300:19 301:5, 15 302:24
switching 302:7
sworn 9:21 10:17 441:11
synthesis 137:2 196:20 198:14 220:5 238:11, 14 259:8, 13 280:2, 6 309:9 311:10 348:6 367:6 436:8, 10
synthesized 134:15
system 386:15 387:1, 5, 21, 24 388:13 414:22 415:9, 10 416:23
Systems 386:18 414:11

< T >
tab 51:18
Table 42:9, 10 45:21 46:10 47:13 162:2, 4, 10, 12 163:3, 5
tables 340:7 352:13
tablet 45:7 47:22
tablets 48:3, 6 157:6, 11 168:17 171:9, 11 173:21 175:6 176:5 177:4 182:10 232:7, 14 328:13 342:13, 17, 18
tabs 232:6, 7, 12
take 19:12 35:17 42:6 45:2, 12 65:7 69:12 92:12 124:22 148:9 164:13 192:22 193:16 197:12 206:20 215:11, 23 216:1 218:11 237:19 269:9 270:18 273:19 278:24 279:2 282:23 288:11 312:15 322:5 329:1 330:24 346:19 381:4 386:6 422:17 423:1, 21 434:16 436:15
taken 1:17 11:16 35:10 65:17 92:9 125:8 147:3,

23 185:1 197:23 211:15 230:8 234:14 247:18 271:1 295:18 313:4 347:1 434:20 438:6
takes 52:16 150:2 321:17 322:17 378:12
talk 69:13, 22 97:11 106:7 134:17 140:9 188:5, 20 190:1 199:6 215:21 217:13 225:3 233:7 237:21 243:15 293:18 297:7 358:2 377:23 381:5 424:23 428:20
talked 116:1 158:15 190:21 207:17 297:9 355:2 383:15 436:20
talking 30:4 84:20 95:18 130:5 136:20 168:9, 11 188:22 197:2 217:21 227:5 229:2, 10, 18 230:23 231:1 233:15 236:6 238:4, 9 244:16 246:19, 20 254:18, 24 255:6 256:9 257:5 258:17 361:19 398:6, 8 436:18
talks 96:11
Tarak 418:4
targeting

100:*6*

**TEA** 170:*12*

**teach** 186:*22*

**team** 13:*14*
72:*4* 75:*8*
78:22 98:24
100:7, *19*
102:*13*
105:*15*
106:*14*
197:*20* 228:*4*
246:*8* 276:*6*
310:*19*
331:*22*
333:*11*
395:*20, 21*

**teams** 102:*23*

**TECH** 4:*10*
23:7, *10* 370:*4*

**technical** 15:*8*
105:*13*

**tell** 63:*1* 71:*2*
98:*21* 125:*17*
146:*4* 257:*19*
258:*3* 306:*2,*
*10* 326:*20, 24*
369:*9* 388:*11*
411:*2, 10*
426:*13, 22*

**telling** 75:*11*
125:*14*
130:*16*
132:*10*
134:22 163:*6*
181:*2* 206:*24*
208:*3* 214:*19*
222:*15*
239:*12, 21*
242:*16*
243:*23*
256:*12, 23*
260:*10* 261:*9*
262:*3, 5, 19*
264:*23* 266:*4*
269:*18, 24*
277:22 282:*5,*
*13* 287:*21*
288:*12*
291:*24*
292:*14, 18*
306:*16*

315:*10*
323:*11, 16*
325:*2* 326:*5*
350:*1, 17*
353:*1* 363:*13*
392:*18*
397:22 432:*10*

**tells** 29:*3*
41:*18* 288:*16*
293:*1* 339:*7*
398:*9* 427:*8*

**Ten** 65:*9, 13*
125:*3* 331:*15*
434:*16*

**tend** 82:*8*
254:*7*

**ten-minute**
270:*19*

**tens** 336:*16*

**term** 18:*18*
52:*21* 123:*11*

**terminated**
347:*17*

**terms** 54:*3*
188:*21*
307:*11* 358:*6*

**territory**
430:*24*

**tertiary** 123:*4,*
*7, 17*

**test** 47:*22*
48:*4, 16* 79:*2*
104:*14*
113:*12*
125:22 128:*1,*
*3* 130:*20*
131:*16* 132:*1*
133:*2, 5*
138:*12, 23*
139:*5* 140:*3,*
*7, 10, 13, 18, 20*
141:*4, 16*
142:*17, 22*
143:*12, 16, 22*
148:*24*
149:*16, 21*
150:*5, 9*
151:*16* 152:*7*
159:*23*
160:*16*
163:*24*

165:*10, 22*
197:*12*
203:*20, 23*
204:*6, 7, 11*
210:*10*
218:*11, 17*
219:*1, 3*
223:*12, 13, 16,*
*18* 224:*22, 23*
225:*3, 4*
226:*11* 236:*9*
238:*16*
239:*10, 15*
246:*4* 251:*2,*
*20, 22* 252:*5,*
*10, 16* 255:*17*
256:*13, 24*
260:*16, 23*
267:*18*
268:*11, 16*
269:*7, 19*
273:*6* 274:*17,*
*20* 276:*1, 12,*
*14, 24* 278:*2,*
*9* 280:*5, 15,*
*20* 281:*4*
282:*7, 9*
284:*16* 293:*6,*
*21* 294:*23*
304:*5* 307:*17,*
*22* 308:*24*
309:*11, 17*
314:*12*
315:*14, 15*
317:*11, 15, 19*
321:*18*
323:*21*
329:*18*
333:*21* 335:*3*
338:*10, 16*
339:*4* 340:*18*
341:*22*
343:*24* 344:*1*
350:*7* 356:*17*
360:*2* 363:*7*
372:*24* 374:*3,*
*12, 18, 24*
375:*5, 22*
377:*1, 18, 23*
378:*7* 380:*16*
401:*19*

420:*15, 23*
421:*5*

**tested** 21:*18*
42:*15* 46:*4*
103:*3* 130:*3*
135:*5, 15, 22*
136:*3, 5, 6, 9,*
*13* 137:*21*
139:*14*
144:*21*
155:*12, 13, 15*
164:*1* 165:*11*
166:*7* 198:*6,*
*17* 209:*1*
211:*1, 24*
218:*21*
221:*11*
235:*20* 247:*5*
253:*6* 264:*22*
268:*3* 270:*9*
274:*2, 6*
284:*11*
294:*22*
338:*20, 21*
339:*2* 342:*17*
358:*20*
359:*18* 360:*6*
361:*7* 363:*16,*
*24* 365:*18*
366:*7* 368:*19*
375:*24* 376:*3,*
*15* 377:*9*
394:*22*
403:*24* 405:*15*

**testified** 10:*17*

**testimony**
10:*9* 188:*24*

**testing** 21:*14*
48:*3, 5, 8, 13,*
*20* 52:*1*
63:*23* 64:*6*
79:*22, 23*
102:*21, 24*
103:*7, 8, 12,*
*21, 24* 104:*1,*
*5, 16, 17, 22*
117:*24*
125:*14*
127:22 128:*7*
130:*13* 131:*1,*
*22* 138:*2, 8*

140:*9* 145:*6*
146:*14*
151:*11*
152:*11* 153:*1,*
*13, 16* 154:*21,*
*22* 155:*20*
156:*14*
157:*18* 158:*1,*
*19* 159:*14, 15*
197:*19* 199:*2,*
*7* 214:*7, 12*
218:*18*
223:*22* 224:*7,*
*14, 18* 225:*15*
226:*6* 230:*24*
236:*14*
238:*21*
243:*11*
246:*20*
247:*12* 251:*8,*
*11, 24* 252:*2,*
*3, 11* 256:*9*
266:*18*
301:*21*
304:*13*
306:*18* 308:*6*
314:*17*
322:*18* 323:*5*
326:*6* 334:*5*
338:*5* 341:*3,*
*12* 345:*3*
353:*3, 12*
363:*1* 371:*10*
372:*6* 375:*10*
376:*9* 377:*24*
381:*1* 388:*7,*
*12* 394:*18*
400:*24* 401:*3,*
*7, 17* 404:*10*
419:*12* 420:*1*
436:*1*

**tests** 155:*13*
159:*10*
165:*18*
326:*21*
340:*23*
343:*10* 378:*9*
392:*4* 416:*5*
421:*6*

**Teva** 4:*5, 6*

250:*13*  251:*11*
**Texas**  3:*10*
**text**  28:*22*
72:*19*  175:*13*
258:*20*  259:*16*
**Thank**  111:*10*
165:*2*  175:*20*
184:*19*  237:*1*
288:*4*  330:*1*
354:*20*
367:*19, 22*
370:*3*  417:*23*
435:*2*
**theoretical**
84:*19, 20*
279:*3, 10*
361:*15*  362:*4*
**Theoretically**
408:*14*
**theory**  362:*4*
**therapeutic**
98:*8*
**thing**  31:*16*
46:*15*  61:*10*
74:*6*  113:*9*
144:*3*  155:*1*
164:*15*
167:*11*
175:*17*
183:*24*
192:*17*
277:*21, 23, 24*
278:*7*  389:*20*
**things**  11:*8*
21:*14*  30:*1*
33:*18*  36:*6*
79:*3*  80:*5*
82:*9*  83:*15*
100:*14*
101:*17*
102:*16*
105:*19*  110:*9,
15*  113:*6, 19*
132:*13*
135:*15*  156:*3,
4*  168:*19*
182:*5*  227:*24*
254:*6*  258:*8*
263:*20*
304:*16, 18*
307:*12*  322:*1*

325:*12*  343:*2*
399:*16*  400:*5*
401:*23*
416:*11*  431:*4*
437:*2*
**think**  18:*4*
25:*11*  34:*18*
40:*13*  44:*14*
53:*10, 12*
57:*5, 16*
70:*10*  74:*23*
82:*18*  87:*20*
90:*7*  91:*24*
95:*4*  100:*24*
102:*18*  104:*6*
114:*9*  123:*19*
124:*17*
132:*18*  146:*5*
170:*8*  174:*14*
175:*2*  180:*5*
181:*5*  184:*1*
198:*7, 12*
207:*9*  233:*18*
237:*22*
257:*24*  267:*2*
268:*2*  271:*21*
272:*24*
275:*15*
278:*22*
285:*16*
289:*22*
296:*11*
306:*23*  309:*5*
311:*22*
312:*19*  314:*7*
315:*21*
316:*20*  322:*3,
10*  323:*1*
324:*18*
326:*14*  328:*5,
8*  332:*22*
335:*16*  342:*6*
344:*6*  352:*11*
356:*21*
362:*20*
374:*17*  375:*3*
386:*23*
389:*15*
395:*18*  407:*2*
433:*14*  436:*11*

**third**  24:*5*
27:*2*  79:*7*
89:*17*  94:*9*
144:*4*  237:*5*
314:*23*
324:*24*
325:*12*
341:*17*  391:*16*
**third-party**
88:*22, 24*
89:*1, 6*  90:*1*
94:*7*  95:*12*
**thirty**  439:*15*
**thought**  55:*18*
58:*21*  59:*3*
132:*11*  420:*11*
**thousand**
236:*8*
**three**  55:*10,
23*  56:*3*
142:*4*  160:*18*
168:*1*  171:*20*
172:*17*
173:*18*
217:*22*
220:*20*  221:*4,
20, 22, 24*
222:*11, 21*
250:*21*  251:*2*
252:*6*  273:*24*
297:*10*  305:*2*
364:*16*
387:*17*
396:*23*
419:*16*  430:*18*
**threshold**
24:*17*  36:*15*
44:*12*  58:*21*
60:*22*  61:*20*
62:*3, 11, 14,
18, 19*  65:*2*
68:*16, 17*
285:*1*  286:*6*
291:*13*  292:*2*
313:*6*  319:*1*
348:*17, 20*
352:*7, 8*
361:*10*  365:*21*
**thresholds**
62:*21*

**Thursday**
1:*13*  258:*19*
**time**  9:*7*
11:*22*  25:*14*
37:*7*  54:*18*
55:*14*  58:*12*
61:*23*  62:*22*
65:*1, 17*  75:*4*
91:*23*  97:*6*
99:*5*  100:*23,
24*  112:*15*
124:*10*  125:*8*
126:*10*  129:*9,
11, 15, 17*
132:*19*
139:*16*  140:*6,
11, 14, 19*
150:*1, 2*
154:*13*
156:*15*
161:*23*  164:*8*
166:*5, 21*
167:*4, 15*
174:*13, 23*
185:*1, 13*
186:*11, 15*
188:*6, 17, 21*
196:*16*  198:*7,
16, 18*  199:*1*
202:*11*  204:*2*
211:*2, 11*
212:*13*  214:*2*
220:*10*
230:*21*
232:*20*
235:*17*
240:*18*  252:*9,
21*  259:*21*
260:*5, 12, 15,
22*  261:*22*
264:*8*  266:*16*
267:*10*  271:*1,
23*  272:*10, 22*
273:*24*
274:*10, 19*
275:*3, 22*
278:*21*
279:*24*
280:*23*  281:*3*
283:*8, 18*
284:*6, 18*

285:*5*  289:*12,
20*  293:*13*
298:*8*  300:*6*
301:*23*  305:*5*
308:*15*
309:*10*
316:*16*  322:*4*
324:*10, 14, 24*
325:*12*  329:*8*
330:*13*  337:*9*
339:*3*  340:*9*
347:*1*  351:*2*
352:*1, 22*
355:*22*  356:*4,
6, 16, 24*
357:*15, 21*
358:*18*  360:*1,
18*  361:*21*
365:*2, 14*
366:*14*  372:*6*
373:*14*
374:*22, 23*
375:*4, 18*
377:*16*  378:*6,
13*  383:*11*
387:*22*  391:*2*
393:*2, 6*
399:*21*
403:*18*
406:*24*  407:*6*
409:*24*
411:*12, 23*
419:*18*
434:*20*  435:*3*
**Timeline**  6:*15*
141:*5, 21*
188:*23, 24*
198:*13*
271:*12*
323:*15*  354:*1,
5, 17*  358:*13*
**timelines**
219:*1*  230:*24*
**times**  11:*3*
44:*5, 11*
45:*23*  46:*5,
21*  54:*17*
57:*21*  60:*21*
61:*6, 11, 16*
62:*3, 14, 18,
19*  65:*2*

Confidential Information Subject to Protective Order

66:*14* 67:*1*
68:*16*, *17*
69:*5*, *6* 104:*6*
122:*12* 152:*3*
154:*10*
161:*19* 162:*7*,
*16*, *23* 199:*1*
277:*11*
284:*24* 286:*6*
291:*12* 292:*2*
301:*16* 313:*5*
319:*1* 373:*17*
435:*20* 436:*21*
**timewise** 134:*1*
**timing** 25:*11*
51:*2* 132:*8*
174:*8* 207:*23*
324:*2*
**title** 64:*4*
194:*11*, *20*
195:*20*
288:*13*
347:*11* 423:*9*
**titled** 181:*24*
**titles** 12:*21*
99:*19*
**today** 9:*16*
10:*4* 12:*5*
22:*18* 25:*22*
99:*5* 148:*2*
168:*12*
170:*23*
207:*17* 292:*1*
323:*13*
339:*14*, *21*
368:*1*, *4*
374:*11* 388:*5*
435:*5*, *20*
436:*21*
**Today's** 9:*6*
**told** 22:*4*
28:*8* 32:*1*
56:*3* 70:*23*
75:*14* 113:*20*,
*24* 115:*13*
130:*12* 139:*3*
146:*12*
148:*23* 155:*4*
157:*23* 165:*5*
244:*8* 298:*18*
300:*2*, *9*

353:*23* 384:*3*
392:*24*
404:*22* 425:*9*
**tomorrow**
129:*21* 150:*10*
**tone** 319:*21*
**top** 14:*6*
36:*23* 59:*17*
63:*4* 70:*14*
73:*9* 86:*12*
88:*8* 89:*19*
98:*1* 119:*24*
138:*6* 141:*22*
154:*1* 155:*20*
157:*3*, *15*
158:*6*, *14*
159:*12* 160:*4*
161:*11* 170:*8*
181:*16*, *18*
264:*6* 368:*6*
381:*20* 418:*21*
**topic** 350:*24*
388:*9*
**topics** 139:*2*
**Torrent** 2:*15*
5:*8* 6:*15*
12:*9* 13:*4*, *7*,
*8*, *21* 14:*11*
16:*15*, *18*, *20*
17:*3*, *6* 18:*5*,
*19* 20:*12*, *18*,
*24* 22:*3*, *4*
23:*15*, *19*
26:*6* 32:*1*
36:*19* 37:*14*,
*17*, *18*, *21*, *22*,
*24* 38:*10*, *11*,
*22* 39:*16*
48:*8*, *13*, *15*,
*19* 50:*13*, *16*,
*21* 51:*12*, *18*
52:*2* 54:*5*, *16*
56:*20* 57:*11*
58:*11* 59:*3*,
*16*, *23* 63:*17*,
*23* 64:*9*, *16*
67:*6*, *14* 68:*1*
69:*14*, *23*, *24*
70:*11*, *12*, *17*,
*24* 71:*18*, *21*
73:*11*, *23*

74:*2* 76:*19*
77:*3*, *14*, *23*
78:*14* 79:*6*, *7*,
*9* 81:*5* 84:*14*
86:*3* 87:*1*, *6*
89:*17*, *24*
90:*1*, *19* 91:*5*,
*8*, *10* 93:*9*, *22*
94:*17* 96:*8*,
*12* 97:*2*, *6*, *13*,
*20* 99:*13*, *16*
100:*9* 101:*6*,
*19* 102:*3*
104:*13*, *16*, *17*,
*20*, *23* 105:*9*
106:*17* 107:*3*,
*5*, *7* 108:*1*, *2*,
*15* 109:*8*, *9*
110:*21*
111:*15*, *22*
112:*12*, *14*, *18*
114:*6* 115:*6*,
*14* 116:*4*, *11*,
*18*, *22* 117:*2*,
*17* 118:*2*, *4*,
*13*, *17* 119:*1*,
*4*, *9*, *16*, *20*
120:*24* 121:*4*
122:*3*, *18*
123:*15*, *18*
125:*15*, *21*
126:*4*, *15*, *21*,
*23* 127:*5*, *8*,
*10*, *24* 128:*6*,
*8*, *19* 129:*4*
130:*14*, *16*, *19*
132:*3*, *20*
133:*4*, *6*, *14*,
*19* 134:*4*, *7*
135:*8*, *9*
136:*4*, *8*, *13*,
*20* 137:*14*, *20*,
*21* 138:*2*, *10*,
*11*, *12*, *21*, *22*
139:*4*, *7*, *11*,
*18*, *20* 140:*3*,
*4*, *10*, *12*, *15*, *17*,
*19* 141:*16*
142:*7*, *19*, *20*
143:*12*, *16*, *22*
144:*3* 145:*5*,

*18*, *23* 147:*13*,
*21* 148:*8*
149:*15*, *20*, *24*
151:*9*, *23*
153:*18*
154:*13*
156:*17*, *21*
158:*5* 159:*22*
160:*4*, *17*
167:*14* 169:*5*
170:*1*, *21*, *24*
172:*8* 173:*2*
177:*20* 178:*6*,
*10* 179:*13*, *18*
180:*11*, *16*
188:*6*, *7*, *18*
189:*2*, *7*, *11*
190:*2*, *16*
191:*1*, *9*, *23*
193:*21* 196:*3*,
*4* 197:*12*
198:*4* 199:*9*,
*12* 202:*11*
203:*20* 204:*4*,
*6*, *14*, *24*
205:*6*, *7*, *23*
206:*10*, *13*
207:*21* 208:*6*,
*18* 209:*7*, *16*,
*24* 210:*3*, *9*,
*11*, *19* 211:*2*,
*23* 212:*4*, *21*,
*23* 213:*9*
214:*7*, *11*
217:*22* 218:*5*,
*8*, *21* 219:*2*,
*23* 220:*9*, *19*
222:*1* 225:*23*
226:*9*, *13*
230:*2*, *21*, *23*
231:*5*, *15*, *19*,
*22* 232:*2*
233:*16*, *20*
234:*9*, *12*
235:*19* 236:*6*,
*24* 239:*3*
240:*9* 241:*13*
243:*10*, *24*
244:*9* 246:*21*
247:*6*, *8*
248:*15*, *17*

252:*12*, *14*
253:*4*, *11*, *15*
254:*3* 255:*15*,
*16*, *22* 256:*2*
257:*11*, *20*
258:*3* 259:*7*,
*12*, *23* 261:*14*
263:*22* 264:*2*
265:*20*, *22*, *23*
268:*3*, *15*
269:*9*, *18*
271:*13*, *15*, *23*
272:*6*, *10*, *16*
273:*11*, *18*
274:*11*, *14*, *18*
275:*3*, *10*
276:*20*, *23*
277:*24* 278:*6*,
*7*, *15* 279:*20*
283:*23*
286:*15*, *20*
287:*9*, *20*
288:*3* 289:*14*
290:*3*, *21*
291:*21*
292:*10*, *11*
293:*5*, *20*
294:*10*, *20*
295:*7*, *24*
296:*5*, *12*, *23*
297:*5* 298:*11*,
*14*, *16* 299:*13*
300:*1* 301:*5*,
*6*, *15* 302:*7*,
*24* 303:*7*, *16*,
*24* 304:*4*, *18*
305:*8* 306:*17*
307:*5* 313:*8*
314:*22*
315:*15*
316:*16*, *18*
317:*6* 320:*5*
321:*5*, *11*, *17*
322:*6*, *18*, *19*
323:*4*, *19*
325:*2*, *13*, *20*
327:*1*, *23*
329:*24*
330:*16*, *19*
331:*18*
333:*20* 334:*8*,

9, 15  335:7
337:2, 11
339:7  341:4,
10  342:17
344:22
345:19  347:7,
18, 20  348:1,
5, 8, 11, 16
349:5, 9, 21
350:1, 6, 17
351:9  353:1,
2, 11  354:15,
17, 24  355:12,
22  356:6, 17
357:11, 15, 21
358:7, 20
360:7  361:3
362:24  363:6,
14, 17  364:19,
20  365:6, 8,
18  367:12, 21
368:10  370:2,
5, 14  371:4
372:11, 20
373:5  374:22,
23  375:8
376:24  377:7,
14  378:1, 22
379:7, 19
380:6, 12
381:2, 7, 15
383:12, 16
384:3  385:13,
19, 22  386:2
389:4, 8
390:7  391:11
392:24
393:11, 17
395:10
397:10, 14, 18,
22  398:22
399:21
400:17
401:15, 18
402:4  405:14,
23  406:6
407:6, 14, 23
408:17  409:4,
15  410:15, 17
411:11  412:1
414:8, 14, 20

415:7, 15
416:15  417:9,
22  418:7, 12,
16, 18  419:6,
10, 18, 24
420:8, 23
421:18, 19
422:3, 4, 13,
19  423:3, 18
425:20  426:3,
12, 21, 24
427:20  428:8,
10  429:8, 17
430:21  431:3,
18  432:10, 21,
24  433:22
434:4, 9
435:21
**Torrent-based**
214:18  244:14
**TORRENT-
MDL2875-
00003433**
5:22  156:20
**TORRENT-
MDL2875-
00005067**  6:8
189:10
**TORRENT-
MDL2875-
00009022**
5:17  119:19
**TORRENT-
MDL2875-
00010178**
5:18  121:3
**TORRENT-
MDL2875-
00010187**
5:20  133:18
**TORRENT-
MDL2875-
00030454**  6:4
179:17
**TORRENT-
MDL-2875-
00072916**
5:14  67:13
**TORRENT-
MDL2875-**

**00085415**
5:23  173:1
**TORRENT-
MDL2875-
00090464**  6:6
180:15
**TORRENT-
MDL2875-
00131255**
6:12  287:8
**TORRENT-
MDL2875-
00156990**  6:2
178:9
**TORRENT-
MDL2875-
00504801**
6:11  256:1
**TORRENT-
MDL2875-
006044834**
6:14  349:8
**torrentpharma.
com** 38:2
**torrentpharma.
us** 38:3
**Torrent's**
12:24  16:22
18:2  20:17,
22  42:8
62:23  63:7
65:24  66:1
69:7  94:22
116:17, 22
124:14
126:14  130:6
169:24
193:24
222:15
240:21
247:20
258:10  272:9
274:12
290:20
294:13, 23
296:24
300:10, 20
301:17  302:5,
14  307:21
315:3  316:6,
23  327:12

328:1  333:6
334:21
337:23  340:3,
10, 15  341:24
348:2, 23
351:4  359:9,
18, 20  362:5,
13, 20  363:16
366:7, 20
371:7  390:1
411:3, 19, 22
413:3, 14, 22
420:14
**total**  233:8
**toxic**  35:5
**toxicologist**
27:13  28:4
33:24  34:14,
16  201:10
313:15  318:18
**TPL**  67:24
69:1  345:18
368:16  374:20
**trace**  51:22
52:4, 6, 7
54:3, 6, 13
288:8, 17
291:6, 12
292:1, 7, 13
293:3, 7, 22
**Tracking**  6:6
180:14, 21
182:1  183:18
**trail**  148:12
**train**  91:5
92:20  93:2,
10  94:5, 17
96:9
**trained**  85:1
91:2  92:1, 5,
15  93:11
96:4, 24
320:23
**training**  85:16,
22  88:23
91:8  92:13
96:11  97:7
**trains**  93:22
**transcript**
11:16  438:8,
22  439:16, 17

**transcription**
441:1
**transfer**
142:16  307:17
**translates**
126:10
**transmitting**
260:11, 14
**TRAURIG**  4:2
**treat**  216:3
**trend**  396:3,
13
**trial**  286:1
**tried**  124:4
**triple**  44:2
**Trivedi**  88:10
90:15, 18
91:1, 4  92:14
94:4, 13  96:3,
6, 17, 19
**true**  39:21
50:6, 9  103:1,
4  146:16
242:18
256:15
264:23  281:2
402:20
**truly**  324:9
**trust**  242:17
332:6  409:5
**trusted**  332:1
**truth**  10:11,
12, 13  125:18
**try**  30:12, 21
122:13
124:18
131:15
141:10  143:5
164:14
227:14
238:22
275:18
277:16
280:19
309:11
341:13  430:19
**trying**  82:12
131:19  132:3
133:5, 7, 8
150:7  219:2
272:10, 16

276:*11*
277:*21*
312:*24* 314:*1,
6, 7* 315:*8*
326:*15*
341:*11* 342:*8*
344:*22*
369:*14* 374:*7*
380:*14*
**tumors** 202:*18*
**tumours** 27:*4*
**Turn** 178:*14*
**turned** 202:*15*
**turning** 423:*23*
**Twenty-five**
201:*18*
**twice** 162:*11,
12*
**two** 23:*3*
46:*15* 51:*19*
95:*17* 175:*15*
176:*14* 206:*2,
4, 7* 207:*15*
208:*19* 213:*9*
227:*23* 238:*6*
288:*3* 308:*9,
12, 19, 21*
316:*4, 10*
321:*24*
323:*19*
331:*19* 342:*5*
346:*6* 349:*20,
24* 377:*22*
401:*23*
408:*18*
423:*15, 24*
436:*7*
**tying** 40:*14*
**type** 34:*1*
56:*23* 77:*17*
90:*6* 119:*6*
123:*13*
127:*17*
158:*18*
159:*14*
174:*15* 248:*7*
313:*13* 343:*2*
**types** 21:*22*
34:*11* 36:*11*
78:*23* 114:*10*
117:*17* 124:*8*

153:*7* 171:*20*
173:*18* 182:*9*
187:*2* 279:*16*
389:*6*
**typically** 85:*7*
87:*19* 101:*13*
102:*11*
105:*23*
118:*19* 119:*5*
124:*17*
182:*15*
211:*18*
255:*10*
332:*20*
378:*12* 383:*2*
387:*4*

**< U >**
**U.S** 13:*13*
20:*12* 37:*15,
22* 38:*3*
73:*13, 16*
74:*2* 75:*3, 8,
9, 11* 87:*13*
100:*11, 16, 17*
101:*6, 24*
102:*2, 4, 9, 17,
20* 103:*10*
104:*13, 20*
107:*8, 13, 24*
108:*15* 109:*9*
118:*13* 119:*1,
5, 9* 133:*5*
134:*8* 135:*8*
138:*10, 21*
139:*4, 13, 19*
140:*3* 142:*20*
145:*5* 181:*15,
16, 19* 183:*12,
16* 188:*3*
190:*19, 23*
191:*6, 12*
192:*7* 193:*24*
198:*5, 18*
206:*14, 19*
207:*21* 209:*9*
214:*18*
218:*16* 226:*7*
228:*3, 7*
229:*8* 244:*14*
259:*12*

331:*23*
333:*10*
336:*10, 13*
358:*4, 6, 8*
381:*22* 431:*5*
**U.S.'s** 143:*12*
**U.S.-specific**
105:*5*
**uh-huhs** 11:*17*
**uh-uhs** 11:*16*
**ULMER** 3:*15*
**ultimate**
240:*11*
**ultimately**
116:*17*
190:*16*
209:*13* 230:*4,
13* 241:*9*
257:*19* 258:*2*
333:*5* 413:*22*
**unaware**
378:*11*
**unclear** 251:*8*
401:*2*
**underlined**
144:*20*
**underneath**
171:*6*
**understand**
13:*16* 18:*4*
24:*16* 39:*18*
40:*13* 41:*9*
46:*9* 91:*21*
106:*23*
108:*21*
109:*16*
114:*10*
122:*14* 123:*6*
172:*4* 189:*1*
196:*13*
215:*10* 239:*1*
240:*8* 248:*8*
257:*10, 18*
274:*15*
276:*11*
277:*20* 279:*9,
12* 282:*4, 17*
284:*22* 285:*9*
286:*2* 297:*14*
302:*20*
309:*12* 319:*8,

*17* 320:*16*
321:*4* 324:*9*
328:*10*
337:*22* 338:*9*
342:*8* 343:*14*
344:*10, 11, 15*
346:*15*
372:*11*
375:*21* 376:*2*
402:*1* 411:*18*
413:*13, 18*
431:*14, 18*
433:*5*
**understanding**
15:*7* 40:*16*
41:*13* 44:*16*
201:*22* 204:*5*
271:*11*
343:*21* 423:*12*
**understood**
16:*3* 32:*3*
128:*6* 130:*19*
281:*15*
**undetermined**
403:*20*
**unethical**
39:*20*
**unexpected**
51:*23*
**unfortunately**
95:*23*
**unidentified**
271:*20*
**unit** 108:*19*
113:*8* 389:*14*
**UNITED** 1:*1*
9:*14* 109:*1*
192:*11*
**units** 389:*3*
**unknown**
199:*14, 22*
237:*16*
403:*16* 405:*1*
436:*5*
**unnecessary**
437:*2*
**unprocessed**
47:*2*
**unsafe** 323:*20*
**unusual**

378:*15*
**update** 102:*16*
**updating**
102:*9*
**upper** 160:*6*
**upwards** 46:*17*
**urgent** 315:*2,
3, 9* 422:*14*
**USA** 2:*21*
4:*6* 190:*16,
18* 191:*1, 9,
23* 193:*21*
197:*12*
204:*14*
206:*10*
209:*16* 210:*1*
253:*4* 257:*12*
**use** 17:*7*
20:*20* 64:*14*
77:*2* 89:*24*
127:*16*
154:*20*
172:*18* 174:*1*
177:*6, 15, 18,
20* 182:*10, 16*
188:*22, 23*
192:*7* 202:*17*
222:*16*
226:*11*
259:*13*
300:*11*
342:*12, 16*
392:*16* 416:*4*
430:*21* 431:*16*
**useful** 192:*8*
399:*11, 12*
407:*3, 6*
**users** 298:*1*
301:*5*
**uses** 33:*3*
**USP** 95:*15*
134:*15*
155:*21* 156:*9*
158:*8, 24*
171:*3* 390:*15*
**usual** 304:*17,
19*
**utilized**
213:*22* 291:*21*
**utilizing**
212:*10*

402:13, 16
413:10
utmost 126:14

< V >
vague 18:18
34:22 35:2
vaguely
197:21 224:1
valid 401:7
403:10
validate 219:7,
13 264:23
277:1
validated
244:1 267:3
270:8 343:18
validity 401:3,
17
VALSARTAN
1:3 5:10 6:4
9:11 20:11
22:18 24:2,
21 38:6 42:8
43:1, 15
44:22 45:5, 7,
14 47:4
48:24 49:1, 2,
5, 8 50:16, 22
51:16 59:18,
22 62:24
63:7 64:5, 8
69:15, 20
71:9, 12, 18
89:5, 8, 18
95:15 103:1
115:15 118:4
121:15
129:22
134:12, 15
141:15, 23
144:15
148:11, 13
150:14 152:7,
15 154:17
156:9, 14
157:6, 9, 10,
12, 16 158:1,
8, 24 159:3,
19, 23 160:12
167:13

168:12, 15, 17,
21 169:7, 11,
14 170:13
171:3, 8, 20
172:10
173:19, 21
175:5, 17
177:1, 22
178:18
179:24
180:13, 21
183:11
190:17
191:21 195:3
196:8 197:11
198:18
203:22 206:6,
19 207:2, 5
209:10
210:10, 11, 20
211:14, 24
213:11 222:3,
12, 15 223:16
224:8 231:14
232:2 237:11
239:4 245:11,
22 247:6, 8,
21 248:23
250:8, 16
251:1 256:14
261:11 264:7,
12 265:24
271:17
272:12, 18
274:2 277:2
279:12, 17, 20
281:16
283:14, 24
284:24
285:10 286:4,
15 288:13, 18
289:14 290:3,
10 294:13
296:24
297:10 298:1,
22 299:24
300:20 301:4,
5, 6, 14, 15, 17
302:7, 14, 21
303:8, 18
307:6 308:23,

24 313:5
315:2 316:6,
19, 24 318:13,
24 320:18
321:19 322:5,
19 330:7
333:6 334:21
335:8 336:6
337:2, 3
340:3, 11
341:24
345:20 346:7
347:21 348:2,
11, 16, 23
349:21 350:3
351:4, 10
353:2, 13
355:1, 13, 23
356:8 357:6,
16 359:9, 18,
21 360:7
362:5, 13, 20
363:1 364:22
365:7, 10
366:21
372:12 375:8,
9 383:12
390:1, 7, 15,
18 396:21, 23
398:8, 11
399:24
403:24 405:9,
17 406:18
407:1, 24
408:20
410:13, 15, 17
411:3, 11
413:4 418:12
426:24
valsartan/hydr

ochlorothiazide
169:18
171:19 173:20
valsartan-
containing
194:3, 5
229:14 356:3
valsartan's
71:23 167:15

174:20
value 409:20
values 339:9
340:6
variations
168:20
169:21 401:1
varies 117:19
variety 30:1
99:2, 3
various 12:18
99:19 104:11
152:2 154:10
252:21 269:1
332:15
339:23 387:6
392:4 419:16
vendor 48:2
81:21 89:1
90:6 91:2, 3
92:10, 15
94:6, 7 96:5,
17 135:21, 22
136:5 242:13,
14, 15 256:18
262:4 385:24
386:20
389:17 393:7
395:3, 20
406:10 414:9
415:8 416:4,
16, 22
vendors
385:18 393:1,
20 394:10
411:20, 22
413:14
vendor's
90:17, 20
verbal 11:15,
18
verified 90:16
96:17 97:1
136:14 222:2
243:17
verified/validat
ed 243:21
verify 90:20
94:6 104:8
137:5 138:4,
7 246:5

256:14
260:17
275:19 277:9
278:16 280:6
281:4 294:12
363:2 386:3
verifying
88:24 91:9
Verma 214:16
217:21
218:24
244:11, 12
version 96:21
versions
347:21
versus 63:12
90:1 178:1
421:6
vet 388:3
vetting 77:1,
17 80:7
92:10 414:17
viable 98:14
vice 99:21, 22
188:11, 14
433:12, 19
VICINAGE
1:2
video 9:9
65:15, 20
125:5, 11
184:23 185:4
270:23 271:4
346:23 347:4
434:18, 23
437:7, 8, 9
Videoconferenc
e 1:18
VIDEOGRAP
HER 4:9 9:2,
4 65:14, 19
111:2, 10
125:4, 10
164:7 184:22
185:3 270:22
271:3 346:22
347:3 434:17,
22 435:16
437:6
Videotaped

Confidential Information Subject to Protective Order

1:16
**VIDHI** 4:11
**Vijay** 205:12
**Vine** 3:16
**Vineet** 228:7
**violates** 110:4
**visit** 77:19
78:9
**Vitae** 5:15
97:20
**voluntary**
114:20
**Vora** 305:17
**VP** 99:23
100:14
388:10
422:20, 23
430:10

**< W >**
**wait** 262:17
268:15
276:14, 17, 23
278:1, 14
280:14
281:16 282:8
**waited** 285:10
380:6, 12
**waiting**
259:15 263:4
**walk** 160:10
204:23 205:5
206:22 271:13
**want** 10:8
15:12 35:23
36:15 42:6
45:13 46:13
60:5 65:7
66:6, 7 71:5
72:12, 14
82:13, 22
83:4 92:12
100:13
120:14
122:10 131:6,
8 134:19
167:10
168:18 182:1
187:4 188:5
190:1 191:12
193:6 199:7,

16 202:3
217:8, 12
227:4, 5
237:19 242:2
243:3, 15
248:14
252:15 253:6
263:7, 11
271:10, 13
297:7 328:9
346:19 354:8
361:23
367:11
373:15 394:8
416:14 433:8
435:2
**wanted** 70:7
71:22 131:9
146:20
147:12
223:15
283:23
385:23 386:2
406:24
**wanting** 198:9
242:8
**wants** 135:14
**warehouses**
218:6, 9, 11
**warned** 404:16
**warning**
406:12
**warranty**
432:7
**Washington**
3:4
**water** 56:7
**way** 18:9
31:3 43:4
46:9, 16
47:12 66:3
82:13, 21, 23
107:12 110:4
128:20
139:11, 14, 19
140:7 176:10
188:12 192:4
194:23 219:3
223:11
260:16
293:21

322:15 326:9
331:11
343:17
373:21 374:2
383:7 395:2
426:2 436:6
**ways** 99:3
394:14, 17
**web** 16:20
25:13
**WebEx** 330:7
**website** 16:23
18:1, 2 23:6
**websites** 23:21
**week** 144:11
258:19
305:22 307:4,
20 309:15, 23
**weeks** 206:3,
4, 7 213:9
221:20, 22, 24
222:11, 21
316:5, 10
323:19
341:22, 23
346:6 349:20,
24
**well** 13:5
29:8 31:22
34:16 37:19
48:13 54:5,
15 74:2 77:6
83:6 87:15
100:4 104:10
113:18 134:7
160:16, 23
163:16
175:19 188:4
190:23
200:18
206:17
208:15 215:9
219:22
222:23 225:3
227:20
228:22
243:14
244:19
246:18 260:8
261:4 266:17
282:3 285:23

298:10
299:22
311:12 312:3
325:11
327:20
328:20
331:18
341:13
342:15 362:2
368:5 382:10
385:12
389:18 419:6
427:7
**well-informed**
14:20
**went** 93:17
283:2
**we're** 11:9, 14
22:17 24:1, 3
36:20 38:8
41:8 42:7
49:6 50:14
61:4 66:8
70:4 84:19
85:7 124:6
128:12
133:24
134:17
138:13
157:21 161:6
168:11
175:16, 17
188:20 189:5
193:17 199:6
204:23
212:22
217:21
226:23
228:19
236:18
237:20
239:22 242:9
243:1 256:6
263:2, 3, 4
266:20
272:23
275:16
286:13
293:18 295:7
305:8, 10
307:13

309:23 314:6,
7 320:12
323:14
328:16 347:6
348:15 354:4,
6 362:3
367:4, 11
368:6 369:12,
14 370:1
371:9 381:5
386:8 398:6,
7 424:8, 13
434:15
**WERNER**
2:15
**we've** 46:3
96:7 104:19
116:1 132:20
136:2 162:19
190:21
195:24 201:9
228:21 232:4
238:5 239:24
244:15
269:18
306:24 325:1
339:21
340:18
367:24 368:3
374:11
377:21
423:18 436:20
**whichever**
105:21
**window** 155:1
**withholding**
433:22 434:4
**WITNESS**
5:2 8:4 9:20
10:6, 14 14:5,
15, 24 15:17
16:12 17:10,
19 18:8, 17
19:23 20:8
21:5, 17 22:9
25:10 26:1
27:12 28:3,
12 29:16, 24
30:17 31:2,
15 32:7, 15
33:7, 22

Confidential Information Subject to Protective Order

34:21  35:14,
21  36:3  40:1,
12  41:12, 23
43:23  47:10
49:23  52:11,
20  53:7  54:2,
11  55:7, 22
57:9  58:5, 16
59:8  60:15
63:10  64:3
70:4  72:3, 18
74:22  76:5,
15, 23  77:13
78:5, 18
79:14  80:22
81:15  82:17
83:3, 13  84:2,
10, 18  85:6,
20  90:11
91:14  92:4
93:5, 14
106:22
107:16  108:6
109:5  110:13,
19  111:12, 22
112:6  117:7
123:22  124:3
125:1  126:7,
18  127:3, 15
128:16
130:23
131:13  132:7
140:23
141:20  143:1,
4  150:17
151:5, 14
152:13
165:15  166:3,
17  167:8
170:16
176:18  183:6
186:9  187:8,
18  190:10
191:16  192:2,
16  193:3, 12
194:19  195:9,
19  196:12
197:17
198:23  200:7,
15, 23  201:7
202:6, 21

203:5, 13
204:18
206:13
208:10
210:15  211:7,
18  212:8, 17
213:14  214:5
215:3, 15
216:12  217:3,
11  218:15
219:12, 19
220:3, 13, 24
221:8, 16
222:6, 19
223:4  224:1,
17  225:2, 20
226:4, 19
229:22  230:7,
16  231:4, 18
232:10, 18
233:3  234:1
235:2, 14
236:1, 12
237:14
238:19  239:7,
18  240:15, 24
241:22  242:7,
21  243:8
244:6  245:14
247:1, 11
248:1  249:10
250:20  251:7
252:19
253:10, 21
254:16  255:6
257:15, 23
258:7, 14
260:3, 21
261:19  262:9,
23  264:16
265:3, 15
266:3, 13
267:8  268:9,
21  269:12, 23
270:21  272:3,
21  273:17
275:2, 15
276:5, 17
277:5  278:5,
20  279:15, 23
280:10, 18

281:8, 21
282:12, 22
283:7, 17
284:5, 15
285:4, 15
286:9, 24
288:5, 24
289:8, 18
290:14  291:1,
17  292:5, 17
293:10  294:2,
16  295:2, 12
297:3  298:4
299:5, 17
300:5, 14
301:1, 10, 20
302:10, 17
303:3, 22
304:9, 22
306:22  307:9
308:3, 18
309:4, 22
310:10, 18
311:19  312:8,
19  313:11
314:5  315:7,
20  316:9
317:3, 14, 23
318:17  319:4,
13  320:1, 9,
22  321:11, 23
322:9, 23
324:1, 13
325:6, 17
326:14  327:5,
16  328:5
329:5  330:3
331:7  332:4,
12  333:2, 9
334:1, 13, 24
335:12, 24
336:9, 20
337:6, 16
338:2, 15, 24
339:19
340:14  341:8
342:4, 23
343:13  344:5,
20  345:8
346:11, 21
350:11, 22

351:13, 24
352:11, 20
353:6, 17
356:2, 11
357:20
358:12  359:2,
12, 24  360:12
361:1, 13
362:10  363:5,
21  364:9
365:1, 13, 24
366:13  367:1
369:6  370:17
371:20  372:4,
16  373:20
374:6, 16
375:14  376:8,
19  377:12
378:5  379:1,
13  380:1, 11,
23  382:6, 18
383:20
384:10, 20
385:7, 17
386:23
388:16  389:1,
12  390:5
391:7  392:13
393:5, 16
394:2, 13, 22
395:7  396:6
397:17  398:4,
18  399:2, 10
400:3, 14
401:11, 22
402:8, 19
404:6, 13, 20
405:4, 12, 20
406:5, 15, 21
407:11  408:3,
13, 23  409:8,
19  410:7, 21
411:7, 15
412:5, 23
413:8, 17
414:3, 14
415:2, 13
416:8, 20
420:5, 19
421:3, 23
425:3, 12

426:7, 18
427:3  428:2,
14  429:12
430:3, 13
431:9, 23
432:16  433:3
434:3  435:7
439:1

**witnessing**
81:6

**word**  17:1, 7
18:11  22:11
28:24  33:3,
10  34:9, 18
35:4, 5  40:6
41:1, 3  52:4
54:6, 13
81:19  85:21
108:8  117:8
127:16  191:4
195:4  207:12
330:24

**worded**  192:4
194:24

**wording**
194:23  271:19

**words**  95:17
328:21, 24
341:2  422:2

**work**  12:10
37:21  70:17
73:17, 21
99:7  100:12
124:24
187:19
188:12
190:16  254:4
275:18
309:10
328:17
330:12
341:14  342:9

**worked**  12:13
13:3  16:15
34:4  37:14
73:22  88:12
99:13, 16
128:5  151:22
185:19
331:21
332:13  333:10

Confidential Information Subject to Protective Order

**working** 79:7
85:8 98:19
100:24 101:1
133:9 141:7
182:11
185:15
214:22
227:11 239:9
246:8 248:4
274:15 278:7
280:19
310:19
313:18 374:7,
10 380:14
**works** 37:24
65:11 129:4,
12 134:3
186:5
**World** 26:21
39:11 42:3
52:15, 22
190:3 225:24
377:8
**worried** 281:3
**worse** 95:6
**worth** 76:12
174:13
**write** 353:24
**writes** 207:14
**writeup** 137:1
**writing** 196:1
424:17
**written** 31:5,
17 54:18
89:6 148:18
201:7 205:8
**wrong** 191:10
200:12 314:2,
7 392:10
404:17

**< Y >**
**Yang** 89:7
96:4, 19, 23
**Yeah** 23:2
33:7 38:4
40:5 75:7
88:4 90:11
91:14 93:14
102:13, 19
106:22

111:15
122:20
135:23
140:17 152:4
164:17, 20
179:11 180:4
185:20
186:12
188:14 200:9
213:4 216:3
219:19 257:12
259:15 271:8
297:12 312:9
314:16 315:9
330:3 343:15
348:18
354:14 357:8,
10, 24 364:11
369:14 382:6
383:14 396:6
413:17 415:2
418:24 419:2
420:19
422:23
423:23 425:3,
12 436:17
**year** 167:14
232:15, 19
336:17 386:8
**years** 34:6
37:6 55:11,
23 71:17
73:23 98:1
99:17 142:4
160:19 168:1
186:1 188:7
201:18
224:21
225:16 305:2
313:6 335:20
337:3, 13, 18
364:16
410:18 412:2,
16
**yellow** 56:15
**York** 2:13
**Yup** 329:23
367:17

**< Z >**

**ZHP** 69:16,
18, 20, 23
74:19, 24
75:15, 16
89:9, 11
95:15, 19, 24
118:11
121:11
122:10, 19, 24
135:3, 22
136:5, 21
137:7, 16
157:14
158:14 170:3
171:2 178:19,
24 195:15
196:17 197:2,
4, 7 199:15,
18 204:15
206:5 207:3,
12 208:6, 18
209:8 212:5,
10, 13 213:1,
16 214:1
220:9, 16
221:20
233:16, 21
235:21
237:10
242:14, 15, 17
243:1 256:14,
18 259:6, 18,
24 260:6, 15,
18 261:10
262:4 264:23
266:17
271:16
274:11, 21
275:7, 11, 24
282:6 287:15,
16, 21 288:16
289:4, 9
305:23 306:7
307:5 309:18
314:1, 6
316:5, 11
348:1, 4
354:24 381:6,
10 383:5, 12,
16, 22 385:1,
3, 22 386:4

387:22
388:11 389:9,
21, 24 390:6
391:3, 17, 24
393:1, 12
397:14
398:13, 22
399:21, 22
400:23 401:7,
16 402:5, 11
404:1, 8, 16,
22 405:6
406:10
407:15, 21
408:17 410:3
411:20 412:1,
7, 10, 15
413:4, 10
414:9, 21
415:8, 23
416:4, 16
418:16, 21
419:7, 19
420:1, 7, 14,
23 421:10, 18
422:19
423:20 424:1
426:3 432:4,
9, 12, 22 434:9
**ZHP's** 96:10
116:11 118:3
119:10
120:16
121:14, 21
123:3, 16
135:10
136:14, 23
170:2 244:4
381:15 388:6
395:11
407:15
409:16 415:9
419:7
**zinc** 179:24
**Zoom** 1:17
4:1 36:22
42:9 63:15
70:14 74:5
354:7, 9 420:9

# Exhibit 96

REDACTED

Confidential Information - Subject to Protective Order

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
2                    CAMDEN VICINAGE
                      -   -   -
3
   IN RE:  VALSARTAN,      :  MDL NO. 2875
4  LOSARTAN, AND           :
   IRBESARTAN PRODUCTS      :  CIVIL NO.
5  LIABILITY LITIGATION     :  19-2875
   _____ :  (RBK/JS)
6                           :
   THIS DOCUMENT APPLIES    :  HON. ROBERT
7  TO ALL CASES             :  B. KUGLER
8         - CONFIDENTIAL INFORMATION -
            SUBJECT TO PROTECTIVE ORDER
9
                     VOLUME I
10
                      -   -   -
11
                   June 4, 2021
12
                      -   -   -
13
14          Videotaped remote deposition of
   SUSHIL JAISWAL, Ph.D., taken pursuant to
15 notice, was held via Zoom
   Videoconference, beginning at 3:32 p.m.,
16 India Standard Time, on the above date,
   before Michelle L. Gray, a Registered
17 Professional Reporter, Certified
   Shorthand Reporter, Certified Realtime
18 Reporter, and Notary Public.
19
                      -   -   -
20
21       GOLKOW LITIGATION SERVICES
      877.370.3377 ph │ 917.591.5672 fax
22            deps@golkow.com
23
24

Page 2

1  ZOOM APPEARANCES:
2
3  LEVIN PAPANTONIO RAFFERTY PROCTOR
   BUCHANAN, O'BRIEN, BARR, MOUGEY, PA
   BY:  MADELINE PENDLEY, ESQ.
4       DANIEL NIGH, ESQ.
        SARA PAPANTONIO, ESQ.
5  316 South Baylen Street, Suite 600
   Pensacola, Florida 32502
6  (888) 435-7001
   mpendley@levinlaw.com
7  dnigh@levinlaw.com
   spapantonio@levinlaw.com
8  Representing the Plaintiffs
9
10 PRETI FLAHERTY, LLP
   BY:  JOHN J. CRONAN, III, ESQ.
   One City Center
11 Portland, Maine 04101
   (207) 791-3000
12 jcronan@preti.com
   Representing the Plaintiffs
13
14 WAGNER REESE, LLP
   BY:  JEFF GIBSON, ESQ.
15 201 N. Illinois Street
   16th Floor – South Tower
16 Indianapolis, Indiana 46204
   (866) 957-6614
17 Jgibson@wagnerreese.com
   Representing the Plaintiffs
18
19 THE LAW OFFICES OF GEORGE A. BARTON, P.C.
   BY:  STACY A. BURROWS, ESQ.
20 7227 Metcalf Avenue
   Suite 301
21 Overland Park, Kansas 66204
   (913)563-6253
22 stacy@georgebartonlaw.com
   Representing the Plaintiffs
23
24

Page 3

1  ZOOM APPEARANCES:  (Cont'd.)
2
3  KIRKLAND & ELLIS, LLP
   BY:  ALEXIA RENEE BRANCATO, ESQ.
        BRITTNEY NAGLE, ESQ.
4  601 Lexington Avenue
   New York, New York 10022
5  (212) 909-3341
   alexia.brancato@kirkland.com
6  Brittney.nagle@kirkland.com
   Representing the Defendant, Torrent
7  Pharmaceuticals
8
9  DUANE MORRIS, LLP
   BY:  KELLY A. BONNER, ESQ.
10 30 South 17th Street
   Philadelphia, PA 19103
11 (215) 979-1158
   kabonner@duanemorris.com
12 Representing the Defendants, Zhejiang
   Huahai Pharmaceutical Co, Ltd., Prinston
13 Pharmaceutical Inc., Huahai U.S., Inc.,
   and Solco Healthcare US, LLC
14
15 GREENBERG TRAURIG, LLP
   BY:  GEROND J. LAWRENCE, ESQ.
   Terminus 200
16 3333 Piedmont Road, NE
   Suite 2500
17 Atlanta, Georgia 30305
   (678) 553-2287
18 Lawrenceg@gtlaw.com
   Representing the Defendants, Teva
19 Pharmaceutical Industries, Ltd., Teva
   Pharmaceuticals USA, Inc., Actavis LLC,
20 and Actavis Pharma, Inc.
21
22
23
24

Page 4

1  ZOOM APPEARANCES:  (Cont'd.)
2
3  CIPRIANI & WERNER, P.C.
   BY:  AMANDA RUGGIERI, ESQ.
   450 Sentry Parkway, Suite 200
4  Blue Bell, Pennsylvania 19422
   (610) 567-0700
5  Aruggieri@c-wlaw.com
   Representing the Defendant, Aurobindo
6  Pharma, USA, Inc. and Aurolife Pharma,
   LLC
7
8  ALSO PRESENT:
9
10
   VIDEOTAPE TECHNICIAN:
11 Ray Moore
12
   LITIGATION TECHNICIAN:
13 Jeff Martin
14
15 Lauren Massey - Paralegal
   (Levin Papantonio)
16 Nidhi Mehta
   (Torrent)
17
18 Vidhi Kotak
   (Torrent)
19
20
21
22
23
24

Page 5

1           - - -
2         I N D E X
          - - -
3
4
5  Testimony of:
        SUSHIL JAISWAL, Ph.D.
6
7  By Ms. Pendley          11
   By Mr. Nigh            283
8
9
10
11        - - -
12      E X H I B I T S
          - - -
13
14
15 NO.        DESCRIPTION            PAGE
16 Torrent-214  LinkedIn resume of   13
             Sushil Jaiswal
17
   Torrent-215  Curriculum vitae of
18             Sushil Jaiswal      18
19 Torrent-216  TORRENT-MDL2875      25
              -00181466
20             Site Master File
              Formulation
21
22 Torrent-217  TORRENT-MDL2875      55
              -00523103
23             EMA CHMP Guideline
              On the limits of
24             Genotoxic Impurities

Page 6

E X H I B I T S

NO.        DESCRIPTION        PAGE

Torrent-218  E-mail thread,        120
8/28/2018, Subject
Note wrt Valsartan
Matter-urgent,
TORRENT-MDL2875-
00516411 - 14

Torrent-219  E-mail thread,        166
9/25/2015, Subject
Audit report
Valsartan-Huahai
TORRENT-MDL2875
-00124209 - 11

Torrent-220  E-mail thread,        263
7/19/2018, Subject
Valsartan - Route of
Synthesis Inquiry,
TORRENT-MDL2875-
00072607 - 608

Torrent-221  TORRENT-MDL2875-        266
00208351
Torrent spreadsheet

Torrent-222  ZHP Deviation        321
Investigation Report
ZHP00496533 - 667

Page 8

P R E V I O U S L Y   M A R K E D
E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE

Torrent-13  E-mail thread,        110
8/18/2018, Subject
Valsartan recall
discussion needed
TORRENT-MDL2875-00072713
- 16

Torrent-16  TORRENT-MDL2875        95
-00523126
Archived e-mail thread,
8/27/2018, Subject
Notification - valsartan
-no genotoxic impurity
potential-Huahai

Torrent-23  E-mail thread,        253
7/18/2018, Subject
Valsartan,
TORRENT-MDL2875
-00072542 - 44

Torrent-77  FDA Updates        80
and Press Announcements
on Angiotensin II
Receptor Blocker (ARB)
Recalls (Valsartan,
Losartan, and Irbesartan)

Torrent-79  Excel spreadsheet        270
of finished good
batches manufactured
with Huahai API

Page 7

P R E V I O U S L Y   M A R K E D
E X H I B I T S

NO.        DESCRIPTION        PAGE

Torrent-2  TORRENT-MDL2875-        33
00511583-
Concise International
Chemical Assessment
Document 38,
N-Nitrosodimethylamine

Torrent-3  E-mail thread,        63
8/18/2018, Subject
Valsartan recall
discussion needed
TORRENT-MDL2875-
00190370 - 372

Torrent-4  TORRENT-MDL2875-        61
00190373 - 377
Health Hazard Evaluation

Torrent-7  E-mail thread,        145
12/20/2006, Subject API
processing, TORRENT
-MDL-2875-00436416

Torrent-8  E-mail thread,        146
1/5/2015, Subject
Wal-Mart - Re: Cost of
valsartan, TORRENT
-MDL2875-00005763 - 64

Torrent-12  E-mail thread,        103
8/13/2018, Subject
FDA request regarding
valsartan-URGENT
TORRENT-MDL2875-00100455
- 56

Page 9

P R E V I O U S L Y   M A R K E D
E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE

Torrent-81  TORRENT-MDL2875        161
-00009022
FDA Office of
Generic Drugs, Quality
Deficiency-Minor

Torrent-83  E-mail thread,        201
4/16/2014, Subject
CMC amendment AVH
tablets, TORRENT-MDL2875
-00010187 - 88

Torrent-212A TORRENT-MDL2875        76
-00133890
Valsartan, Impact
assessment of NDEA

Torrent-212B TORRENT-MDL2875        64
-00366172
Valsartan, Impact
assessment of NDMA

Confidential Information Subject to Protective Order

```
 1                - - -
 2        DEPOSITION SUPPORT INDEX
 3                - - -
 4
 5  Direction to Witness Not to Answer
 6  PAGE   LINE
    None.
 7
 8  Request for Production of Documents
 9  PAGE   LINE
    None.
10
11  Stipulations
12  PAGE   LINE
    None.
13
14  Questions Marked
15  PAGE   LINE
    250    16
16
17
18
19
20
21
22
23
24
```

```
 1             - - -
 2        THE VIDEOGRAPHER:  We are
 3  now on the record.
 4        Today's date is June 4th,
 5  and the time is approximately 6:02
 6  a.m. (3:32 p.m. India Standard
 7  Time.)
 8        This begins the deposition
 9  of Sushil Jaiswal in the matter of
10  Valsartan, Irbesartan Products
11  Liability Litigation.
12        Counsel will be noted on the
13  stenographic record.
14        Will the court reporter
15  please swear in the witness.
16             - - -
17        ... SUSHIL JAISWAL, Ph.D.,
18  having been first duly sworn, was
19  examined and testified as follows:
20             - - -
21        EXAMINATION
22             - - -
23  BY MS. PENDLEY:
24     Q.   Good afternoon, Mr. Jaiswal.
```

```
 1     A.   Good afternoon.
 2     Q.   Have you ever been deposed
 3  before?
 4     A.   Can you repeat, ma'am.
 5     Q.   Yes.  Have you ever been
 6  deposed before?
 7     A.   No.  This is first time.
 8     Q.   Okay.  So I'll go over some
 9  of the kind of ground rules with you to
10  make sure we're on the same page.  So
11  basically all we're going to be doing is
12  asking you some questions.
13        And as you saw there's a
14  court reporter here today.  So she's
15  going typing out everything I say and
16  everything you say.
17        So it's really important
18  that we don't interrupt each other.  So
19  let me get my full question out before
20  you respond, and I'll let you answer as
21  well.  Okay?
22     A.   Sure.
23     Q.   Okay.  And also, be sure to
24  give verbal responses, you know, an
```

```
 1  actual "yes," or "no," something that she
 2  can actually put on the record.  You
 3  can't just nod or shake your head.  Does
 4  that make sense?
 5     A.   Yes.
 6     Q.   All right.  And do you
 7  understand that you're under oath here
 8  today?
 9     A.   Yes.
10     Q.   The last thing is, if your
11  attorney objects, you know, she'll say
12  something like "objection."  Let her get
13  through the objection, but you can still
14  answer the question.  Okay?
15     A.   Okay.
16     Q.   All right.
17        MS. PENDLEY:  So I want to
18  pull up LP 25.
19        (Document marked for
20        identification as Exhibit
21        Torrent-214.)
22  BY MS. PENDLEY:
23     Q.   We're going to take a look
24  at your deposition notice, okay.
```

Confidential Information Subject to Protective Order

Page 14

¹           MS. PENDLEY:  This is going
²     to be marked Torrent Exhibit 214.
³ BY MS. PENDLEY:
⁴     Q.   Mr. Jaiswal, have you seen
⁵ this before?
⁶     A.   No.
⁷     Q.   I want to direct you to
⁸ Page 5, if you would.  It lists out some
⁹ topics that we're going to discuss today.
¹⁰ So as you can see these topics are about
¹¹ testing valsartan API and finished dose.
¹²           Are you prepared to talk
¹³ about topics like this today?
¹⁴     A.   Yeah, I'm prepared for this.
¹⁵     Q.   Okay.  If you go to the next
¹⁶ page, you can see topics about quality
¹⁷ assurance and quality control activities.
¹⁸           Are you prepared to talk
¹⁹ about these?
²⁰     A.   Yes, I'm prepared.
²¹     Q.   Okay.  And then the last one
²² is about process development, changes to
²³ manufacturing process of valsartan API.
²⁴           Are you prepared to talk

Page 15

¹ about this today?
²     A.   Yes.
³           MS. PENDLEY:  We can take
⁴     this exhibit down.
⁵ BY MS. PENDLEY:
⁶     Q.   Okay.  Mr. Jaiswal how long
⁷ did you prepare for this deposition
⁸ today?
⁹     A.   Maybe since last week or so.
¹⁰     Q.   Okay.  Did you review any
¹¹ documents to prepare for your deposition?
¹²     A.   Not really that much, but I
¹³ tried to recollect, thinking what had
¹⁴ been happened in the last two years about
¹⁵ this history that started since 2018.
¹⁶ And it was helpful in meeting, like what
¹⁷ kind of data being discussed that is
¹⁸ being investigated.
¹⁹     Q.   Okay.  About how much time
²⁰ did you spend meeting with your
²¹ attorneys?
²²     A.   I'm not quite understanding
²³ your question.
²⁴     Q.   Okay.  How much time did you

Page 16

¹ spend meeting with your attorneys?
²     A.   Okay.  I had three sessions
³ with my attorneys.  And it's meeting from
⁴ almost -- from four hour to six hours.
⁵     Q.   Four to six hours each time
⁶ or total?
⁷           THE WITNESS:  IT, can you
⁸     see that?
⁹           Just a moment.  I need IT, a
¹⁰     lot of people happening in here.
¹¹           MS. PENDLEY:  No problem.
¹²     Can we go off the record.
¹³           THE VIDEOGRAPHER:  The time
¹⁴     is now 6:07 a.m. (3:38 p.m. India
¹⁵     Time).  We're going off the
¹⁶     record.
¹⁷           (Brief pause.)
¹⁸           THE VIDEOGRAPHER:  The time
¹⁹     is now 6:08 a.m. (3:38 p.m. India
²⁰     Time).  We're back on the record.
²¹ BY MS. PENDLEY:
²²     Q.   So you just told me that you
²³ met with your attorneys for four to
²⁴ six hours.  Was that for each of the

Page 17

¹ three sessions or was that four to
² six hours total?
³     A.   No, it's for each session.
⁴     Q.   Okay.  Sounds good.  Who
⁵ other than your attorneys did you meet
⁶ with to prepare for today?
⁷     A.   Apart from that, definitely
⁸ a few of my team members, with whom I
⁹ discussed what has happened in the last
¹⁰ two years, those things had been
¹¹ discussed, few of the team member.
¹²     Q.   Okay.  Who did you meet
¹³ with?  Do you remember?
¹⁴     A.   Oh yes.  One is Maitrayee
¹⁵ Mukherji and Kalpesh Patel and Tripti
¹⁶ Ghandi and Priti Shah.  They were the
¹⁷ four of them.
¹⁸     Q.   Did you guys exchange
¹⁹ e-mails as well?
²⁰     A.   Because of this deposition?
²¹     Q.   Yes.
²²     A.   Yes, I think one or two
²³ e-mail.  Not related to the information.
²⁴ But to tell them that we wanted to meet

Confidential Information Subject to Protective Order

Page 18

1  for this discussion, that kind mail.
2      Q.   All right.  So I want to
3  switch gears a little bit.  Let's look at
4  LP 1527.
5          (Document marked for
6  identification as Exhibit
7  Torrent-215.)
8          MS. PENDLEY:  This will be
9  marked as Torrent Exhibit 215.
10         MS. BRANCATO:  Sorry,
11 Madeline, I don't mean to
12 interrupt you.  But last time you
13 put an exhibit up, there was
14 nothing in the chat or in the
15 link.
16         Are you planning on putting
17 them there for us to download?
18         MS. PENDLEY:  The trial tech
19 should be doing it.
20         MS. BRANCATO:  Okay.
21 There's nothing yet.
22         TRIAL TECH:  Yeah, hold on,
23 I'll get it.
24         MS. PENDLEY:  Thanks, Jeff.

Page 19

1      THE WITNESS:  By going to
2  the chat box, this is requiring
3  login information.
4      MS. BRANCATO:  It's not the
5  link that's in the chat, Sushil.
6  Here.  I'll put the exhibit link
7  or Jeff, would you mind putting
8  the right exhibit link into the
9  chat so Sushil can navigate,
10 please.
11     Sushil, do you see two
12 documents in the chat now?  The
13 first document is the one you want
14 to look at right now.
15     THE WITNESS:  Actually, by
16 opening the chat box -- just a
17 moment.
18     I think I need to take IT
19 help here.
20     MS. PENDLEY:  Let's go off
21 the record for just a second.
22     THE VIDEOGRAPHER:  The time
23 is now 6:12 a.m. (3:42 p.m. India
24 Time).  We're going off the

Page 20

1  record.
2      (Brief pause.)
3      THE VIDEOGRAPHER:  The time
4  is now 6:13 a.m. (3:43 p.m. India
5  Time).  We're back on the record.
6  BY MS. PENDLEY:
7      Q.   Okay.  Mr. Jaiswal, can you
8  see the document now?
9      A.   Yes.
10     Q.   Okay.  And you mentioned
11 this is your CV, right?
12     A.   Yeah.
13     Q.   Is this your most up-to-date
14 CV?
15     A.   Yes.
16     Q.   I want to look at Page 3.
17 Top of Page 3 here it says that you used
18 to work for Torrent Pharmaceuticals in
19 1996 and 1997.
20     Do you see that?
21     A.   Yeah.
22     Q.   Okay.  What was your job
23 back when you initially worked at Torrent
24 back in 1996?

Page 21

1      A.   During this period I joined
2  this company as an executive.  And I was
3  in a PC lab.  That is known as a process
4  control laboratory.  And I was doing a
5  kind of like small scale laboratory
6  trials for some of the product groups.
7      Q.   Okay.  Why did you leave
8  Torrent in '97?
9      A.   Yeah, this is what is my
10 responsibilities.  And then I worked
11 almost for one year in that position.
12 And I left and joined some other
13 operation.
14     Q.   Okay.  Let's go to Page 2.
15 We're kind of working backwards here up
16 towards the front.
17     Okay.  We can see that you
18 worked at another company for a while.
19 And then you worked at Aurobindo.
20     A.   Yeah.
21     Q.   And then you worked at
22 Macleods Pharmaceuticals, right?
23     A.   Yes.
24     Q.   And your position at

Confidential Information Subject to Protective Order

Page 22

¹ Macleods was the vice president,
² executive vice president, is that right?
³     A.    Say while leaving that
⁴ organization, I was president of
⁵ the organization.  And then I resigned
⁶ from there and I joined Torrent.
⁷     Q.    All right.  Why did you want
⁸ to resign from Macleods Pharmaceuticals?
⁹     A.    Pardon?
¹⁰     Q.    Why did you resign from
¹¹ Macleods?
¹²     A.    Okay.  Basically a location
¹³ preference.  I wanted move out of Mumbai
¹⁴ and definitely a better job profile.
¹⁵     Q.    Okay.
¹⁶     A.    To be able leave and sign up
¹⁷ to Torrent.
¹⁸     Q.    Okay.  And then you worked
¹⁹ at Torrent Pharmaceuticals Limited since
²⁰ July 2017 to present, right?
²¹     A.    Yeah.
²²     Q.    Okay.  And Torrent
²³ Pharmaceuticals Limited, that is Torrent
²⁴ that's in India; is that right?

Page 23

¹     A.    Yes, it's India.
²     Q.    And then Torrent has, I
³ don't know if the right term is branch or
⁴ division in the U.S. as well, right?
⁵     A.    Yes, that's correct.
⁶     Q.    So in your role as executive
⁷ directors of quality as listed on this
⁸ CV, do you communicate with Torrent U.S.?
⁹     A.    Yes, I do communicate with
¹⁰ the U.S. team.
¹¹     Q.    Okay.  Do you communicate
¹² directly with the FDA?
¹³     A.    No, not with FDA.  Because
¹⁴ for that we have a U.S. rep and they do.
¹⁵     Q.    Okay.  So if Torrent India
¹⁶ wants to get information to the FDA, they
¹⁷ give it to Torrent's U.S. agent, and they
¹⁸ pass it along; is that right?
¹⁹     A.    Yeah.
²⁰     Q.    Okay.  So right above this
²¹ chart where you list out where you work,
²² you see the last kind of bullet point
²³ that's marked with a check.  "Management
²⁴ of reference standard, working standard,

Page 24

¹ and characterization of impurities."
²         Do you see that?
³     A.    Yeah.
⁴     Q.    Okay.  So you have
⁵ experience in identifying impurities in
⁶ pharmaceuticals; is that fair?
⁷     A.    The meaning of this is that
⁸ the pharmaceutical analysis requires a
⁹ standardization of the working standard.
¹⁰ And the known impurities are standards
¹¹ which is to be used in the analysis.
¹² This is for that reference.
¹³     Q.    Have you published any
¹⁴ studies -- actually, have you a study
¹⁵ about anything before?
¹⁶     A.    So during my Ph.D. I did
¹⁷ some research work and it has been
¹⁸ published.
¹⁹     Q.    Okay.  Have you published
²⁰ any studies about identifying genotoxic
²¹ impurities in pharmaceuticals?
²²     A.    No.
²³         MS. PENDLEY:  I want to look
²⁴ at LP 196.  This will be marked as

Page 25

¹ Torrent Exhibit 216.
²         (Document marked for
³ identification as Exhibit
⁴ Torrent-216.)
⁵         THE WITNESS:  1396?
⁶         MS. PENDLEY:  Yes.
⁷         (Whereupon, a discussion was
⁸ held off the stenographic record.)
⁹         MS. PENDLEY:  If we can pull
¹⁰ up LP 1396 whenever we get
¹¹ situated.  All right.  If we can
¹² go to the next page.
¹³ BY MS. PENDLEY:
¹⁴     Q.    Mr. Jaiswal, you let me know
¹⁵ when you can see this on your end.  It
¹⁶ should be on your screen in Zoom.  If you
¹⁷ want to pull it up in the chat room.
¹⁸     A.    Yeah, I can see this.
¹⁹     Q.    For the record this is
²⁰ TORRENT-MDL2875-00181466.

Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Page 30

Page 31

21   MS. PENDLEY: Okay. All
22   right. You can take this one
23   down.
24   BY MS. PENDLEY:

Page 32

1       Q.   Okay. Mr. Jaiswal, you
2   understand that we're here today because
3   Torrent's valsartan product was
4   contaminated with nitrosamines, right?
5       A.   Can you repeat that
6   question?
7       Q.   Yeah. You understand that
8   we are here today to talk about Torrent's
9   valsartan product being contaminated with
10   nitrosamines, right?
11       A.   So we are here to discuss
12   that -- this topic.
13       Q.   Okay.
14       A.   Yes, I'm aware.
15       Q.   And you understand that
16   those nitrosamines specifically were NDMA
17   and NDEA, right?
18       A.   Yeah.
19       Q.   So how were you personally
20   notified of the contamination? Do you
21   remember?
22       A.   Yes. In fact, we got a
23   communication from committee. And they
24   notified us that they basically got a

Page 33

1   notification from our API supplier.
2       Q.   Okay. And your API supplier
3   was ZHP; is that correct?
4       A.   Yes, ZHP.
5       MS. PENDLEY: Okay. I want
6   to look at LP 1102.
7       For the record this has been
8   previously marked as Torrent
9   Exhibit 2.
10       THE WITNESS: This is file
11   1102?
12       MS. PENDLEY: Yes.
13       (Document previously marked
14   for identification as Exhibit
15   Torrent-2.)
16   BY MS. PENDLEY:
17       Q.   Do you see the cover page in
18   the document?
19       A.   Yes.
20       Q.   All right. We can see, if
21   you look at the bottom of the page, this
22   is a document that's published by the
23   World Health Organization in 2002.
24       Do you see that?

Page 34

1    A.   Yeah.
2    Q.   And we see the document is
3 called n-nitrosodimethylamine.
4        That's NDMA, right?
5    A.   Mm-hmm.
6    Q.   Is that a yes?  I'm sorry.
7    A.   Yes.
8    Q.   Okay.  Have you ever seen
9 this document before?
10    A.   No.
11    Q.   All right.  I want to walk
12 you through a couple of things.  If we
13 can go to Page 4.
14    A.   Page 4?
15    Q.   Yep.  And they're marked at
16 the bottom.  It will be the actual number
17 4, not Roman Numeral IV.
18    A.   Yeah.  I'm on Page 4.
19    Q.   Okay.  If you could look at,
20 there's a bunch of information on this
21 page.  I want to focus on the right-hand
22 side, third paragraph down.  It says,
23 "Based upon laboratory studies in which
24 tumors have been induced in all species

Page 35

1 examined at relatively low doses, NDMA is
2 clearly carcinogenic."
3        Do you see that?
4    A.   If you referring to Page 4,
5 I'm not -- Page 4 is on here -- just a
6 moment.
7    Q.   Okay.
8    A.   Just a moment.  Yeah, I'm on
9 Page 4 now.
10    Q.   All right.  Looking at that
11 paragraph, it says, "Based upon
12 laboratory studies in which tumors have
13 been induced in all species examined at
14 relatively low doses, NDMA is clearly
15 carcinogenic."
16        Are you with me?
17    A.   Yes, reading here.
18    Q.   Yes.  So what does
19 carcinogenic mean?
20    A.   Carcinogenic is like a
21 definition of the compound that leads to
22 carcinogenicity.
23    Q.   Okay.  Does that mean it can
24 cause cancer?

Page 36

1    A.   I'm not really sure.
2    Q.   Okay.  Can we agree that the
3 word carcinogenic means can cause cancer,
4 yes or no?
5    A.   See, it all depends upon at
6 what level, what is the potency, what is
7 the dose.  There are so many factors
8 there that a compound, if it is being
9 categorized into this category, is not
10 ultimately is being -- causing a cancer.
11        It has a lot of other
12 related topics and internal analysis that
13 is not known.  We cannot be claiming that
14 as basically causing a cancer.
15    Q.   Okay.  I understand what
16 you're saying.  Can we agree that the
17 word "carcinogenic" means can cause
18 cancer?
19    A.   Yeah.  That is true.  I
20 agree with that.
21    Q.   All right.  Let's look at
22 the bottom of this paragraph where it
23 says, "Qualitatively the metabolism of
24 NDMA appears to be similar in humans and

Page 37

1 animals.  As a result it is considered
2 highly likely that NDMA is carcinogenic
3 to humans, potentially at relatively low
4 levels of exposure."
5        Do you see that?
6    A.   Yeah, I read that.
7    Q.   So this sentence says, NDMA
8 can cause cancer to humans.
9        Do you agree with that?
10        MS. BRANCATO:  Objection to
11 form and foundation.  Outside the
12 scope.
13        THE WITNESS:  So it's
14 definitely -- I never gone through
15 this report.  I never participated
16 in this kind of studies, or what
17 kind of studies it is.
18        But definitely based upon
19 that limitation, I cannot comment
20 on that.  This is technical.
21 BY MS. PENDLEY:
22    Q.   Okay.  Just taking the
23 document for what it says, can we agree
24 that this document says NDMA can cause

Confidential Information Subject to Protective Order

Page 38

1 cancer to humans?
2        MS. BRANCATO:  Same
3 objections.
4        THE WITNESS:  This is what
5 I'm indicating.  That document,
6 yes, I'm able to read it.  But I'm
7 not able to comment on it whether
8 it is right or wrong, because I'm
9 not the right person, because I
10 wouldn't know the studies being
11 done, what is involved, and that's
12 why I'm not able to comment on
13 that aspect.
14 BY MS. PENDLEY:
15    Q.   One second.  Mr. Jaiswal,
16 I'm looking at your 30(b)(6) notice.  And
17 one of your topics that you told me that
18 you were prepared to discuss today is,
19 "Torrent's evaluation and knowledge of
20 the health risks of nitrosamines,
21 including NDMA and NDEA."
22    A.   Yeah.
23    Q.   So I'm asking you today
24 about the health risks of NDMA in this

Page 39

1 study, okay.
2        MS. BRANCATO:  Objection to
3 form.  The topic is Torrent's
4 knowledge.  He's already testified
5 that he's never read that study
6 before.
7        Do you want to ask him about
8 Torrent's knowledge of the health
9 risks?  He's ready to talk about
10 that.
11        MS. PENDLEY:  Okay.
12 BY MS. PENDLEY:
13    Q.   So Torrent has never
14 reviewed the World Health Organization
15 document on NDMA?
16 Mr. Jaiswal?
17    A.   Yeah.
18    Q.   So are you saying that
19 Torrent has never reviewed the World
20 Health Organization document on NDMA?
21    A.   No.
22    Q.   Okay.  I want to ask you one
23 more time to clarify for the record.  Has
24 Torrent reviewed the World Health

Page 40

1 Organization document on NDMA?
2    A.   No.
3    Q.   Okay.  I want to ask you
4 about a couple of words in here from a
5 common sense perspective.  And you can
6 just tell me whether you know this
7 information or not.
8        So that last sentence we
9 were looking at in this document that
10 says, "Qualitatively, the metabolism of
11 NDMA appears to be similar in humans and
12 animals.  As a result it is considered
13 highly likely that NDMA is carcinogenic,
14 potentially at relatively low levels of
15 exposure."
16        Can we agree that low levels
17 of exposure means not very much NDMA
18 exposure?
19    A.   It is not quantified here.
20 And say the low level, high level, minute
21 level, cannot be justified on this.  It
22 is not being quantified.
23    Q.   Okay.  What does the word
24 "low" mean to you?

Page 41

1    A.   That is not indicated.  I
2 cannot be able to comment on it, low
3 means how much low, because I was not
4 involved in the study, what kind of
5 detection level they had, what kind of
6 studies they had done.  It's difficult to
7 comment what the low means, what it
8 communicates.
9    Q.   Okay.  Let's look at the
10 next page and see if this helps a little
11 bit.  On Page 5, paragraph on the
12 left-hand side at the top, the last
13 sentence says, "NDMA is a genotoxic
14 carcinogen, and exposure should be
15 reduced to the extent possible."
16        Do you see that?
17    A.   Yes.
18    Q.   So this says we should limit
19 people's exposure to NDMA, right?
20        MS. BRANCATO:  Objection to
21 form.  Foundation.  Outside the
22 scope.
23        THE WITNESS:  This is --
24 link is being given here but

Confidential Information Subject to Protective Order

Page 42

1  definitely I'm not able to comment
2  that whether it is -- how much it
3  is, but I never be part of this
4  kind of study.  That's why I'm not
5  able to comment on this topic.
6  BY MS. PENDLEY:
7     Q.   Okay.  You mentioned that
8  you don't know if this is right or wrong.
9        Do you think the World
10 Health Organization is wrong about their
11 assessment on NDMA?
12       MS. BRANCATO:  Same
13 objections.
14       THE WITNESS:  I'm not saying
15 that on the study, because I was
16 not involved in such kind of
17 studies, I'm not able to comment
18 on this topic.
19 BY MS. PENDLEY:
20    Q.   Okay.  You do know -- you
21 know, we looked at the date that this was
22 published before we went through the
23 actual text.  It was published in 2002.
24 That is well before valsartan is

Page 43

1  recalled, correct?
2        MS. BRANCATO:  Objection to
3     form.
4  BY MS. PENDLEY:
5     Q.   You can answer.
6     A.   Can I understand your
7  question once again?
8     Q.   Yes.  This document was
9  published in 2002.  Do you remember
10 looking at that?
11    A.   Yeah.
12    Q.   2002 is well before 2018
13 when the drug was recalled, right?
14    A.   Yeah.
15    Q.   Okay.  So this information
16 was at least accessible by Torrent at the
17 time of the recall?
18       MS. BRANCATO:  Objection to
19    form and foundation.
20 BY MS. PENDLEY:
21    Q.   Right?
22    A.   On this topic, maybe several
23 have in India, but this is not me, to the
24 best of my knowledge, we never accessed

Page 44

1  this document.
2     Q.   Well, if you look at the
3  very first page here, the page before the
4  cover page at the top, it says, "Document
5  produced in native format."
6        At the very bottom of that
7  page there's a little string of numbers
8  that start with TORRENT-MDL2875.
9        So what that means is we
10 actually got this document from Torrent.
11 So somebody at Torrent has seen this at
12 some point.
13       MS. BRANCATO:  Is there a
14    question pending?
15       MS. PENDLEY:  Yeah.
16 BY MS. PENDLEY:
17    Q.   Correct?
18       MS. BRANCATO:  Objection to
19    form and foundation.
20 BY MS. PENDLEY:
21    Q.   You can still answer.
22    A.   I'm not able to -- can I see
23 this document fully?
24    Q.   If you want to.  What I'm

Page 45

1  trying to direct your attention to is
2  just that it has what's called a Bates
3  stamp at the bottom.  That just means
4  that we got it from you guys.
5        So somebody at Torrent had
6  this saved in their computer or sent in
7  an e-mail at some point.
8        Do you see that?
9     A.   Can I -- can you share this
10 on the chat box so that I'm able to see
11 this document?
12    Q.   The -- are you trying to
13 find the whole document again or just the
14 page that I'm talking about?
15    A.   No, the page that you are
16 talking about.
17    Q.   Okay.  Yep, it should be the
18 document that you had pulled up from the
19 chat before.  And it's just the very
20 first page.
21    A.   That is 1102?
22    Q.   Yes.
23    A.   Okay.  Torrent is written
24 here at the very bottom.

Confidential Information Subject to Protective Order

---

Page 46

1    Q.   Okay.  So whether somebody
2  at Torrent reviewed this or not, this is
3  something that Torrent could have
4  reviewed at some point, right?
5         MS. BRANCATO:  Object to
6     form and foundation.
7         Go ahead, Sushil.
8         THE WITNESS:  Okay.  You
9     see, the pharmaceutical people do
10    review big -- so many documents
11    and if somebody has seen this
12    document, is not in my knowledge.
13 BY MS. PENDLEY:
14    Q.   Okay.  What I'm trying to
15 get at is, when Torrent was told that
16 NDMA was in their drug, they could have
17 looked at documents like this to figure
18 out how dangerous NDMA was, right?
19    A.   So whatever, like, post
20 discovery of the impurity, whatever work
21 is being required to be done required to
22 be report, everything is being done
23 appropriately.
24    Q.   Okay.  This information that

---

Page 47

1  was published in 2002 was accessible to
2  Torrent prior to the recall.  We can
3  agree?
4         MS. BRANCATO:  Objection to
5     form and foundation.
6  BY MS. PENDLEY:
7     Q.   You can answer.
8     A.   Not really.  I'm -- still
9  I'm indicating that this is a very
10 general distribution likely is being
11 presented.  But I've never seen this
12 document.
13    Q.   Okay.  I understand that you
14 haven't seen it.  But it was published in
15 2002, right?
16    A.   Yeah.
17    Q.   And then the recall was in
18 2018, right?
19    A.   Yeah.
20    Q.   So this is something that
21 could have been reviewed by Torrent if
22 they wanted to review it; is that fair?
23         MS. BRANCATO:  Same
24    objections.

---

Page 48

1  BY MS. PENDLEY:
2     Q.   You can answer.
3     A.   See, it's still -- my
4  argument is very limited to that aspect.
5  This studies might be done on some
6  understanding, but how much of this was
7  relevant I'm not aware of it.  Whatever
8  it is scientifically needed to be in
9  investigation, that every scientific
10 database is being divulged at the time of
11 investigation.
12    Q.   Okay.  So am I correct in
13 understanding you said whatever
14 scientifically needed in an
15 investigations being divulged at the time
16 of the investigation.  Is that what you
17 said?
18    A.   Yeah.
19    Q.   Okay.  So whatever
20 information needs to be reviewed was
21 reviewed by Torrent?
22    A.   Yes.
23    Q.   But as the executive
24 director of quality at Torrent you had

---

Page 49

1  not seen this document before; that's
2  right?
3     A.   Yeah.
4     Q.   Okay.  I want to ask you
5  about what one word means.  We've seen
6  the word "genotoxic" a couple times
7  today.  What does that word mean?
8     A.   Can you repeat your
9  question?
10    Q.   Yeah.  What does genotoxic
11 mean?
12    A.   I think I already indicated
13 that could be compounds which is being
14 identified that is inducing the
15 genotoxicity in the body.
16    Q.   So you said a genotoxic
17 compound is what's inducing genotoxicity
18 in the body.  What does that mean?
19    A.   Yeah.
20    Q.   What does genotoxicity in
21 the body mean?
22    A.   That is basically -- that is
23 a kind of -- see, this is a certain kind
24 of -- this is a like -- a kind of

---

Confidential Information Subject to Protective Order

Page 50

¹ compound that is inducing this maybe
² genotoxicity in the body.  This is what I
³ -- this is my understanding of this kind
⁴ of form.
⁵     Q.   Okay.  You're using the word
⁶ to define a word.  So I'm having a hard
⁷ time understanding what it means.  Can
⁸ you explain genotoxicity in some other
⁹ way?
¹⁰     A.   Okay.  So like ultimately
¹¹ every compound has some threshold, for
¹² this -- until -- unless that dose form is
¹³ not there in the body, it not impacting
¹⁴ you.  Like that's what that
¹⁵ categorization molecule is one part.  But
¹⁶ the threshold limit and beyond that, once
¹⁷ it is going, is impacting you in an
¹⁸ adverse way, is the second part.
¹⁹          This is the category of the
²⁰ compound.  And once it has gone beyond
²¹ that threshold level, this may cause you
²² a kind of impact to you.  This is what is
²³ my understanding of this category.  And
²⁴ these are carcinogenic.

Page 51

¹     Q.   So genotoxic is
² carcinogenic.  Is that what you're
³ saying?
⁴     A.   Yes.
⁵     Q.   Okay.  Can we agree that
⁶ genotoxic compounds over a certain level
⁷ in pharmaceutical drugs should be taken
⁸ very seriously?
⁹          MS. BRANCATO:  Objection to
¹⁰ form.
¹¹ BY MS. PENDLEY:
¹²     Q.   You can answer.
¹³     A.   If you are -- I think this
¹⁴ is what I had answered, that for every
¹⁵ compound, there's a -- some threshold
¹⁶ limit.  And not only the threshold limit,
¹⁷ beyond that the length of the treatment
¹⁸ and several other conditions are
¹⁹ associated with the patient.
²⁰          And dose altogether,
²¹ combining together, only a physician can
²² say that -- what is the impact of that
²³ threshold on the human body.
²⁴     Q.   Okay.  Let me clarify this a

Page 52

¹ little bit.  So ideally, you would not
² have genotoxic compounds in a drug.  Is
³ that fair?
⁴          MS. BRANCATO:  Objection to
⁵ form and foundation.
⁶ BY MS. PENDLEY:
⁷     Q.   You can answer.
⁸     A.   Yeah.  Your question is
⁹ ideally supposed to be free from
¹⁰ genotoxic.
¹¹     Q.   Okay.  So if you see there
¹² is a genotoxic compound in a drug, that
¹³ should be investigated; is that fair?
¹⁴     A.   You are correct.
¹⁵     Q.   Because as you mentioned,
¹⁶ genotoxic compounds are dangerous above
¹⁷ threshold levels, so is it fair that the
¹⁸ company would need to find out whether or
¹⁹ not the genotoxic compound exceeds those
²⁰ levels?
²¹          MS. BRANCATO:  Objection to
²² form.
²³ BY MS. PENDLEY:
²⁴     Q.   You can answer.

Page 53

¹     A.   No, I'm not able to
² understood your question.
³     Q.   Okay.  You told me earlier
⁴ that genotoxic compounds are a problem if
⁵ they exceed a certain threshold level.
⁶ Do you remember that?
⁷     A.   Yeah.
⁸     Q.   Okay.  So part of what you
⁹ would want to investigate is whether or
¹⁰ not that genotoxic compound exceeds those
¹¹ threshold levels in the drug; is that
¹² fair?
¹³     A.   Like, in a drug, for a drug
¹⁴ substance, if genotoxic compound is not
¹⁵ identified, there is a guidance or place
¹⁶ to basically identify them and then to
¹⁷ devise a method.  It was always there.
¹⁸     Q.   Okay.  So I'm going to
¹⁹ clarify a little bit.  Would it be
²⁰ important to investigate to make sure the
²¹ genotoxic compound is not over a certain
²² threshold level in a drug?
²³          MS. BRANCATO:  Objection to
²⁴ form.

Confidential Information Subject to Protective Order

Page 54

<sup>1</sup>        THE WITNESS:  Yes.
<sup>2</sup> BY MS. PENDLEY:
<sup>3</sup>    Q.   Okay.  As you told me
<sup>4</sup> earlier, if a genotoxic compound is
<sup>5</sup> present and over the threshold limits,
<sup>6</sup> that's when it can cause health effects;
<sup>7</sup> is that right?
<sup>8</sup>        MS. BRANCATO:  Objection to
<sup>9</sup>    form.
<sup>10</sup>        THE WITNESS:  That is what I
<sup>11</sup>    indicated, but it depends upon so
<sup>12</sup>    many other factors.
<sup>13</sup> BY MS. PENDLEY:
<sup>14</sup>    Q.   Right. Okay.  But it's
<sup>15</sup> important to know whether or not
<sup>16</sup> genotoxic compounds are present at those
<sup>17</sup> threshold levels, right?  Do you need me
<sup>18</sup> to repeat the question?
<sup>19</sup>    A.   Yeah.
<sup>20</sup>    Q.   Okay. It's important to
<sup>21</sup> know whether or not genotoxic compounds
<sup>22</sup> are present in a drug above the threshold
<sup>23</sup> levels, right?
<sup>24</sup>    A.   Yes.

Page 55

<sup>1</sup>    Q.   Okay.
<sup>2</sup>        MS. PENDLEY:  Let's look at
<sup>3</sup>    LP 1072.
<sup>4</sup>        (Document marked for
<sup>5</sup>    identification as Exhibit
<sup>6</sup>    Torrent-217.)
<sup>7</sup>        MS. PENDLEY:  This is going
<sup>8</sup>    to be marked Torrent Exhibit 217.
<sup>9</sup>        Can we just look at the
<sup>10</sup>    first page.
<sup>11</sup> BY MS. PENDLEY:
<sup>12</sup>    Q.   Mr. Jaiswal we see at the
<sup>13</sup> top of this document, it says the
<sup>14</sup> European Medicines Agency.
<sup>15</sup>        Do you see that?
<sup>16</sup>    A.   Yes.
<sup>17</sup>    Q.   Okay.  And a little further
<sup>18</sup> to the right it says June 2006.  So this
<sup>19</sup> document was published in 2006.
<sup>20</sup>        The title of it, do you see,
<sup>21</sup> "Guideline on the limits of genotoxic
<sup>22</sup> impurities"?
<sup>23</sup>    A.   Yeah.
<sup>24</sup>    Q.   All right.  We're not going

Page 56

<sup>1</sup> to spend a lot of time on this.  But I
<sup>2</sup> want to go to the fourth page in, I
<sup>3</sup> believe.  They don't have page numbers:
<sup>4</sup> It starts with Number 4, "Toxicological
<sup>5</sup> background," at the top of the page.
<sup>6</sup>        If we can look at that first
<sup>7</sup> paragraph.  This says, "According to
<sup>8</sup> current regulatory practice, it is
<sup>9</sup> assumed that in vivo genotoxic compounds
<sup>10</sup> have the potential to damage DNA at any
<sup>11</sup> level of exposure and that such damage
<sup>12</sup> may lead or contribute to tumor
<sup>13</sup> development."
<sup>14</sup>        Do you see that?
<sup>15</sup>    A.   Yeah.
<sup>16</sup>    Q.   Okay.  So you told me
<sup>17</sup> earlier NDMA is a genotoxic compound,
<sup>18</sup> right?
<sup>19</sup>    A.   Yeah.
<sup>20</sup>    Q.   Okay.  So we can read this
<sup>21</sup> in as NDMA has the potential to damage
<sup>22</sup> DNA at any level of exposure?
<sup>23</sup>        MS. BRANCATO:  Objection to
<sup>24</sup>    form.  Foundation.  Outside the

Page 57

<sup>1</sup>    scope.
<sup>2</sup> BY MS. PENDLEY:
<sup>3</sup>    Q.   Do you see that?
<sup>4</sup>    A.   Yeah, I see that.  Yeah.
<sup>5</sup>    Q.   Okay.  Then it says, "Such
<sup>6</sup> damage may lead or contribute to tumor
<sup>7</sup> development."
<sup>8</sup>        Do you see that?
<sup>9</sup>        MS. BRANCATO:  Objection.
<sup>10</sup> BY MS. PENDLEY:
<sup>11</sup>    Q.   Do you see that part,
<sup>12</sup> Mr. Jaiswal?
<sup>13</sup>    A.   Yes.
<sup>14</sup>    Q.   Okay.  Then it goes on to
<sup>15</sup> say, "Thus, for genotoxic carcinogens, it
<sup>16</sup> is prudent to assume that there is no
<sup>17</sup> discernable threshold and that any level
<sup>18</sup> of exposure carries a risk."
<sup>19</sup>        Do you see that?
<sup>20</sup>    A.   Yeah.
<sup>21</sup>    Q.   Okay.  And like we said,
<sup>22</sup> NDMA is genotoxic, so we can read this in
<sup>23</sup> as for NDMA, it is prudent to assume
<sup>24</sup> there's no discernable threshold and that

Page 58

1 any level exposure carries a risk, right?
2       MS. BRANCATO:  Objection to
3 form.  Foundation.  Outside the
4 scope.
5 BY MS. PENDLEY:
6    Q.    You can answer.
7    A.    This is a guidance which
8 is -- must be based upon some studies,
9 and may be each genotoxic compounds is to
10 be behaving very differently.  But this
11 is a very general statement given here on
12 the genotoxic compound.  And what kind of
13 format background distributed on these
14 studies, on this guidance, I'm not able
15 to offer.
16    Q.    Okay.  But we can see that
17 it says, "For genotoxic carcinogens, it's
18 prudent to assume that there's no
19 discernable threshold and any level of
20 exposure carries a risk."
21       Right?
22    A.    Yeah.
23    Q.    Okay.  Now, had you ever
24 seen this document before from the

Page 59

1 European Medicines Agency?
2    A.    Yes, I've seen it.
3    Q.    You have, okay.
4       Have you ever reviewed this
5 document as it pertains to your job, to
6 get more information or anything like
7 that?
8    A.    I don't remember the access.
9 But yes, I'm aware of this document.
10       MS. PENDLEY:  Okay.  If we
11 can look at LP 1065.
12       MS. BRANCATO:  Sushil, just
13 remember to keep your voice up so
14 that Michelle can hear you.
15       THE WITNESS:  Okay.  Fine.
16       (Document previously marked
17 for identification as Exhibit
18 Torrent-4.)
19       MS. PENDLEY:  For the record
20 LP 1065 is previously marked as
21 Torrent Exhibit 4.
22       THE WITNESS:  This is 1065?
23       MS. PENDLEY:  Yes.
24 BY MS. PENDLEY:

Page 60

1    Q.    You can see at the top here,
2 one in the upper right-hand corner,
3 Torrent Pharma.  This is a Torrent
4 document, right?
5    A.    Getting downloaded.
6    Q.    Okay.  Just let me know when
7 you're ready.  Okay.
8       You got it?
9    A.    Yes.
10    Q.    Great.  Upper right-hand
11 corner, we see Torrent Pharma.  So this
12 is a Torrent document, right?
13    A.    Yes.
14    Q.    We see, "Health hazard
15 evaluation."  And underneath it says,
16 "Amlodipine/valsartan/
17 hydrochlorothiazide."
18       This is a health hazard
19 evaluation for valsartan, right?
20    A.    Yeah.
21    Q.    All right.  Have you ever
22 seen this document before?
23    A.    This is prepared by
24 different team.  That's why I'm not able

Page 61

1 to -- very sure whether I've seen this
2 document.
3    Q.    Okay.  Let's do something
4 else real quick.
5       MS. PENDLEY:  Let's do LP
6 1064.
7       (Document previously marked
8 for identification as Exhibit
9 Torrent-3.)
10       MS. PENDLEY:  Previously
11 marked as Torrent Exhibit 3.
12 BY MS. PENDLEY:
13    Q.    All right.  So this is an
14 e-mail that this document was actually
15 attached to.  So we can see that it was
16 sent August 18th, 2018, up at the top.
17    A.    Just a moment.
18    Q.    Okay.
19    A.    Yeah.
20    Q.    Okay.  And then if you look
21 down it's obviously sent to a bunch of
22 people.  But right -- it's close to the
23 word subject on the left-hand side, we
24 see your e-mail address there, right?

Confidential Information Subject to Protective Order

Page 62

1    A.   Yeah.
2    Q.   Okay.  So the attachment
3 that we see is, "HHE
4 valsartan/amlodipine/hydrochlorothiazide
5 medical assessment."
6    A.   Yes, it is true.
7    Q.   Okay.  So the 1065 we looked
8 at was sent to you at some point, right?
9    A.   Yeah.
10    Q.   Okay.  And that's okay.  I
11 know it was a long time ago.  But I
12 wanted to make that clear for the record.
13 So if we can pull up 1065 again.  I want
14 to go to Page 3 of 5.
15         I want to look at the part
16 where it says, "Effect in animals."
17         That first little paragraph
18 says, "NDMA has been found to increase
19 the occurrence of cancer in animal
20 studies.  Based on the animal studies
21 NDMA is considered a probable human
22 carcinogen, or a chemical that can
23 increase the risk of cancer in humans."
24         Do you see that?

Page 63

1    A.   Yeah.
2    Q.   Okay.  So Torrent at the
3 time of the recall understood that NDMA
4 was a chemical that could increase the
5 risk of cancer in humans, right?
6    A.   Yeah.
7    Q.   Okay.  We'll talk about this
8 more in a minute.  But down at the bottom
9 of the page it says risk assessment.  And
10 it says, "Consuming up to 96 nanograms of
11 NDMA per day is considered reasonably
12 safe for human ingestion."
13         That is the FDA limit,
14 right?
15    A.   Yeah.
16    Q.   Okay.
17         MS. PENDLEY:  Can we take a
18 five-minute break.  Is that good
19 with you?
20         THE WITNESS:  That's fine.
21         THE VIDEOGRAPHER:  The time
22 is now 7:03 a.m.  (4:33 p.m. India
23 Time).  We're going off the
24 record.

Page 64

1         (Short break.)
2         THE VIDEOGRAPHER:  The time
3 is now 7:11 a.m.  (4:41 p.m. India
4 Time).  We're back on the record.
5         MS. PENDLEY:  I want to look
6 at LP 1247.
7         (Document previously marked
8 for identification as Exhibit
9 Torrent-212-B.)
10         MS. PENDLEY:  For the
11 record, this has already been
12 marked as Torrent Exhibit 212-B.
13 BY MS. PENDLEY:
14    Q.   Okay.  Do you see this first
15 page?
16    A.   Yeah.
17    Q.   All right.  Again, we see
18 the Torrent Pharma logo at the top.  We
19 see it's called "Valsartan Impact
20 Assessment of NDMA."
21         Do you see that?
22    A.   Yes.
23    Q.   Have you seen this document
24 before?

Page 65

1    A.   I need to see the content,
2 and then I will tell you.
3    Q.   Okay.  You can flip through
4 it a little bit.
5    A.   Just getting downloaded.
6 Yes, I've seen this.
7    Q.   Okay.  If we could go to the
8 third page.  It's marked as Page 2 of 7.
9         This is going to give us a
10 little bit of background on why we're
11 here today.  So we see at the top it
12 says, "Valsartan API is being used for
13 manufacturing of finished products.  And
14 these finished products are being
15 supplied to U.S. market as per market
16 requirements."
17         Do you see that?
18    A.   Yeah.
19    Q.   And then it goes on to list
20 the different products that valsartan API
21 is used in.  And it looks like there are
22 four.
23    A.   Yes.
24    Q.   Is that correct?

Confidential Information Subject to Protective Order

1    A.   Yes.

2    Q.   Okay.  At the bottom of this
3  page, we see, where it says note, and the
4  little asterisk.  "Torrent has submitted
5  a withdrawal application to the FDA for
6  valsartan/hydrochlorothiazide in
7  November 2018," right?

8    A.   Mm-hmm.

9    Q.   Is that a yes?

10    A.   Yes.

11    Q.   Sorry, it's just for the
12  record.

13         So the three products that
14  we're left with at this point is solo
15  valsartan, valsartan/amlodipine and
16  valsartan/amlodipine/hydrochlorothiazide.
17  Right?

18         MS. BRANCATO:  Object to the
19    form.

20         THE WITNESS:  Yes.

21  BY MS. PENDLEY:

22    Q.   Okay.  We can go to the next
23  page, where it says, "Evaluation
24  methodology."

1         It says, "Valsartan API is
2  being supplied by ZHP," and it gives the
3  DMF Number 23491.

4         Do you see that?

5    A.   Yeah.  Yes.

6    Q.   Okay.  Underneath in the
7  background of API process it says, "ZHP
8  used following two different API
9  manufacturing process for manufacturing
10  valsartan API."

11         Do you see where it says old
12  and new process?

13    A.   Yes.  C code and D code.

14    Q.   Okay.  Perfect.

15         Did you know that ZHP was
16  using two different processes?

17         MS. BRANCATO:  Object to the
18    form.

19         THE WITNESS:  Yes.

20  BY MS. PENDLEY:

21    Q.   Okay.  And it's my
22  understanding that Torrent, for the U.S.
23  product of valsartan, only ever used the
24  old manufacturing process; is that right?

1  Or do you know?

2         Go ahead.  I didn't hear
3  your answer.

4    A.   Your question is that we
5  were using only the old process API?

6    Q.   Yes.

7    A.   That is correct.

8    Q.   Okay.  We see the old
9  process is C code batches, and we'll talk
10  about that in a second.

11         Further down it says, "ZHP
12  supplied old process C batches to
13  Torrent."  Okay, great.

14         If we look at the next page.
15  This says, "Evaluation done by API
16  manufacturer" -- which would be ZHP,
17  right?

18    A.   Yeah.

19    Q.   It says, "Torrent
20  Pharmaceuticals Limited as a drug product
21  manufacturer asked ZHP for evaluation of
22  NDMA in their API lots."

23         So ZHP conducted their own
24  testing on their API product, right?

1    A.   Yeah, correct.

2    Q.   Okay.  At least for some
3  batches, we see here, but it looks like
4  there's eight separate batches, right?

5    A.   Yeah, correct.

6    Q.   So under results of NDMA, we
7  see that the first one is 63.4 parts per
8  million.  And this is in the API,
9  correct?

10    A.   This is in API.

11    Q.   Not in the finished dose?

12    A.   Not the finished dose, yeah,
13  correct.

14    Q.   Okay.  And you're aware that
15  the FDA limit for NDMA is .3 parts per
16  million, right?

17    A.   When we were doing this
18  evaluation, that limit was not known.

19    Q.   Okay.  But now the limit is
20  .3 parts per million, right?

21    A.   Yeah, that is correct.

22    Q.   Okay.  And so we see the
23  next row, 62.2, the next, 68.4.  We can
24  see that these are all above 50 parts per

Confidential Information Subject to Protective Order

Page 70

1 million, right?
2     A.   Yeah, parts per million.
3     Q.   So all of these are close to
4 200 times over the FDA limit for NDMA,
5 right?
6         MS. BRANCATO:  Objection to
7     form.
8         THE WITNESS:  That limit
9     which is being given for -- and
10    that is for the dosage form, not
11    the API.  And this is the
12    compilation of the limit of the
13    values for the API.
14 BY MS. PENDLEY:
15    Q.   Okay.  Well, does the FDA
16 have a limit for API only?
17    A.   The FDA limit .3 is for the
18 finished dose form.
19    Q.   Okay.  So how much NDMA is
20 allowed to be in the API?
21        MS. BRANCATO:  Objection to
22    foundation.
23 BY MS. PENDLEY:
24    Q.   You can answer.

Page 71

1     A.   No, I'm not really aware of
2 that, what it -- like, at that time, in
3 fact, there was no limit there because at
4 that time this was a discovery.  And then
5 -- neither for the API nor for the
6 finished dose.
7     Q.   Okay.  But based on what we
8 know now, we know that the limit for
9 finished dose is .3 parts per million,
10 right?
11    A.   Yeah.
12    Q.   Okay.  And we know that the
13 API ultimately gets put into the finished
14 dose product, right?
15    A.   Yeah.  Correct.
16    Q.   So the API really shouldn't
17 have more than .3 parts per million in it
18 neither, right?
19    A.   Yeah, correct.
20    Q.   Okay.  So each of these are
21 over almost 200 times the FDA limit for
22 the .3 parts per million, right?
23    A.   Yeah.  These are above those
24 limits which is -- we consider today --

Page 72

1     Q.   Okay.
2     A.   -- that is above the limits.
3     Q.   All right.  Let's look at
4 the next page.  This chart here at the
5 top, it says, "Details of representative
6 API lots analyzed are summarized below."
7         So this chart says these are
8 batches that went to the U.S., right?
9 Under the market column, on the far left.
10        Do you see that?
11    A.   Yeah, you're referring to
12 the first column -- first?
13    Q.   Yeah.
14    A.   Yeah.
15    Q.   Okay.  And then we see that
16 it says a couple columns over, it says --
17 the sixth column from the left.  It says,
18 "Number of FG batches manufactured using
19 API lots."
20        FG is finished goods; is
21 that right?
22    A.   FG is finished goods, yeah.
23 That's correct.
24    Q.   It says there's 119 finished

Page 73

1 dose batches using the API lots, right?
2     A.   Correct.
3     Q.   Okay.  And then the next
4 column says, "Number of API lots tested,"
5 29, right?
6     A.   Yeah.  Correct.
7     Q.   And then the next column
8 finished goods batches manufactured by
9 tested API lots is 119.  So is this
10 saying that there are 29 API lots used in
11 the 119 finished good batches?
12    A.   You are correct.
13    Q.   Okay.  Great.  Now I want to
14 look at the chart below.
15        So in this first row here
16 again, if you can scroll through it a
17 little bit.  It looks like it lists all
18 29 API batches for us, and then the
19 testing levels for NDMA.
20        Do you see that?
21    A.   Yeah.
22    Q.   Okay.  So I just want to
23 start with the first one and have you
24 walk us through this.

Confidential Information Subject to Protective Order

Page 74

¹ So we can see this first row
² it gives us the Torrent number for it and
³ then the C5069 is the ZHP batch number,
⁴ right?
⁵     A.   Yeah, correct.
⁶     Q.   Okay.  And then the results
⁷ for NDMA in this batch in particular are
⁸ 12.32 parts per million; is that right?
⁹     A.   You're correct.
¹⁰     Q.   Okay.  I have a couple
¹¹ questions about the way ZHP numbers their
¹² batches.  So you told me that the C5069
¹³ means it's old process, right?
¹⁴     A.   Yeah, C is the old process.
¹⁵     Q.   Okay.  So any C batch is an
¹⁶ old process batch, right, no matter the
¹⁷ number?
¹⁸     A.   Yes.  C is the old process.
¹⁹     Q.   Okay.  And then it has 14
²⁰ right here.  So is 14 the year that this
²¹ batch was manufactured?
²²     MS. BRANCATO:  Objection.
²³     Foundation.
²⁴     THE WITNESS:  I'm not sure,

Page 75

¹ because this is a ZHP batch
² numbering system.  I'm not really
³ aware if that 14 stands for 2014
⁴ or something else.
⁵ BY MS. PENDLEY:
⁶     Q.   Okay.  So you don't know how
⁷ ZHP comes up with its batch number at
⁸ all?
⁹     A.   Yeah.
¹⁰     Q.   Okay.  Do you know what the
¹¹ shelf life is for ZHP's valsartan API?
¹²     A.   I don't remember at this
¹³ point in time.
¹⁴     Q.   Okay.  What's the shelf life
¹⁵ for Torrent's finished dose valsartan?
¹⁶ Do you know?
¹⁷     A.   That is something you can
¹⁸ check.  I'm not remembering this, what is
¹⁹ the shelf -- because there are three
²⁰ products involved.  And my understanding,
²¹ I have to check the shelf life.
²²     MS. BRANCATO:  Sushil, just
²³     keep your voice up, please.
²⁴     THE WITNESS:  Yeah.

Page 76

¹ BY MS. PENDLEY:
²     Q.   Okay.  So you were a little
³ bit hard to hear.  But did you say that
⁴ you don't remember the shelf life for
⁵ finished dose?
⁶     A.   Because it's three products
⁷ and two combination.  I really don't
⁸ remember the shelf life.
⁹     Q.   Okay.  That's fine.  All
¹⁰ right.  So what I'd like to do is I want
¹¹ to compare this chart to a chart that's
¹² in LP 1537.
¹³     MS. PENDLEY:  So can we pull
¹⁴     1537 up as well and look at both.
¹⁵     (Document previously marked
¹⁶     for identification as Exhibit
¹⁷     Torrent 212-A.)
¹⁸     THE WITNESS:  15 -- can you
¹⁹     repeat?
²⁰     MS. PENDLEY:  Yeah, 1537.
²¹     I believe it's
²² Exhibit 212-A.
²³     THE WITNESS:  Yes, one
²⁴     second.  Impact assessment.  NDEA.

Page 77

¹ BY MS. PENDLEY:
²     Q.   Okay.  So basically, the
³ first couple pages of the new document,
⁴ 1537, it's all the same summary as we
⁵ just looked at in the NDMA document.  And
⁶ I'd like to go to Page 4 of 6 in 1537.
⁷     Okay.  You see it's got that
⁸ other chart that we looked at saying
⁹ there's 119 batches, 29 API batches, and
¹⁰ so on.  It's the same setup.  Okay?
¹¹     A.   Correct.
¹²     Q.   Okay.  What is the FDA limit
¹³ for NDEA parts per million?  Do you
¹⁴ remember that?
¹⁵     A.   I suppose this NDEA be
¹⁶ evaluated post recalling all the batches
¹⁷ from the market.
¹⁸     Q.   Yes, it is.  And you know
¹⁹ that the FDA limit for NDEA for valsartan
²⁰ is .083 parts per million, right?
²¹     A.   Yeah, but I don't remember.
²² But yes, when we did this analysis at
²³ that time, I think there was no maybe
²⁴ limit by FDA, but we had our internal LOA

Confidential Information Subject to Protective Order

Page 78

¹ level established.
²     Q.   Okay.  But you know the
³ limit now is .083 parts per million,
⁴ right?
⁵     A.   For valsartan specific, I'm
⁶ not sure.  But yes, I understand the
⁷ limit being is published by FDA.  Because
⁸ now valsartan is not the product with us.
⁹ And that will -- and the new limit, I'm
¹⁰ not really -- the numbering of it,
¹¹ weren't aware of it.
¹²     Q.   You said valsartan is not
¹³ the product with us.  What does that
¹⁴ mean?
¹⁵     A.   We stopped manufacturing of
¹⁶ this product since then.  Since then
¹⁷ we're not manufacturing this product
¹⁸ anymore.
¹⁹     Q.   Okay.  So we see that these
²⁰ documents both list the Torrent batch
²¹ numbers and ZHP batch numbers.  And they
²² actually go in the same order.  So they
²³ both start with the ARI11B0019.
²⁴     Do you see that?

Page 79

¹     A.   Yeah.  This is internal rec
² number.
³     Q.   Okay.  So looking at 1457.
⁴ We can see that that batch, like you told
⁵ me has 12.3 parts per million of NDMA,
⁶ right?
⁷     A.   Mm-hmm.
⁸     Q.   Is that a yes?
⁹     A.   Yes.
¹⁰     Q.   Okay.  And then we can see
¹¹ that that same batch, looking at 1537,
¹² has 7.89 parts per million for NDEA,
¹³ right?
¹⁴     A.   Yeah.
¹⁵     Q.   And so what I'd like to do,
¹⁶ if we could, for the trial tech is pull
¹⁷ the calculator so we can see how this
¹⁸ relates to the FDA limit.
¹⁹     A.   For valsartan is listed
²⁰ here, I'm not able to comment what the
²¹ correct limit, because I don't remember
²² that.
²³     Q.   Okay.  I'll show it to you.
²⁴     MS. PENDLEY:  So while we're

Page 80

¹ working on the calculator, if we
² can pull up LP 1469.
³     (Document previously marked
⁴ for identification as Exhibit
⁵ Torrent-77.)
⁶     MS. PENDLEY:  It'll be
⁷ marked as Exhibit 218.
⁸     THE WITNESS:  1537?
⁹     MS. PENDLEY:  1469.  This
¹⁰ exhibit has actually been
¹¹ premarked as Torrent Exhibit 77.
¹²     TRIAL TECH:  Did you say
¹³ calculator?
¹⁴     MS. PENDLEY:  Yes, please.
¹⁵ If you have got a little
¹⁶ calculator function on your
¹⁷ computer.
¹⁸     Can you pull up LP 1469 for
¹⁹ us real quick, and then we'll come
²⁰ back to this.
²¹ BY MS. PENDLEY:
²²     Q.   Mr. Jaiswal, do you see this
²³ document?
²⁴     Mr. Jaiswal, do you see this

Page 81

¹ document?
²     A.   Yes, I see this document.
³     Q.   Okay.  Sorry.
⁴     So we can see here it says,
⁵ "Interim limits for NDMA, NDEA," and
⁶ other nitrosamines.
⁷     Do you see that?
⁸     A.   Yes.
⁹     Q.   Okay.  And then it says
¹⁰ valsartan on the left-hand side.  Two
¹¹ columns over, "Acceptable intake for
¹² NDMA," nanograms per day is 96.
¹³     Do you see that?
¹⁴     A.   Yeah.
¹⁵     Q.   The parts per million is .3,
¹⁶ right?
¹⁷     A.   Yeah.  It's true.
¹⁸     Q.   So the FDA limit for parts
¹⁹ per million of NDMA for valsartan is
²⁰ .3 parts per million.  You can agree?
²¹     A.   Yes.  This is the FDA, I
²² think, publication.
²³     Q.   Okay.  A couple columns over
²⁴ it says acceptable intake for NDEA in

Confidential Information Subject to Protective Order

Page 82

1 parts per million is .083, right?
2     A.   Yeah.
3     Q.   Okay.  So now that we
4 understand the FDA limits, let's go back
5 to 1537 and 1247.
6         MS. PENDLEY:  Is it possible
7     to use the calculator?
8         (Whereupon, a discussion was
9     held off the stenographic record.)
10        MS. PENDLEY:  Okay, great.
11 BY MS. PENDLEY:
12    Q.   So what I want to do is for
13 1247, the NDMA levels, I want to divide
14 12.32 by .3.
15        TRIAL TECH:  Say it one more
16    time.  Sorry.
17        MS. PENDLEY:  You could do
18    12.32 divided by .3.
19 BY MS. PENDLEY:
20    Q.   We can see that this batch
21 has 41 times the FDA limit of NDMA in it,
22 right?
23    A.   Yeah.  That's correct.
24    Q.   Okay.  And then looking at

Page 83

1 1537.
2         MS. PENDLEY:  To the trial
3     tech, if I could have you put in
4     7.89.
5         7.89, please, divided by
6     .083.
7 BY MS. PENDLEY:
8     Q.   So we can see that the same
9 batch has over 95 times the FDA limit of
10 NDEA, right?
11    A.   So that is correct.  But
12 according to me, for NDEA and NDMA, for
13 other impurities, now the current
14 computation is .3; is that correct?  Can
15 I check back on this topic?
16    Q.   Are you asking if the
17 impurity for NDEA and NDMA is .3?
18    A.   Yeah.
19    Q.   We just looked at the FDA
20 limit for NDEA.
21        Do you remember that?
22    A.   Yeah.
23    Q.   And it was .083.
24    A.   Okay.  Fine.

Page 84

1     Q.   Okay.  So this is over 95
2 times the FDA limit for NDEA, right?
3     A.   Yeah, that is correct.
4     Q.   Okay.  So now we're going to
5 look at the next batch.  We're going to
6 look at the Document 1247.
7         MR. PENDLEY:  And to the
8     trial tech, if you can put in that
9     number.  12.88.
10        You've got the 12.88 divided
11    by .03.  .3, I mean.  Sorry.  I
12    misspoke.
13        THE WITNESS:  .3, yeah.
14        MS. PENDLEY:  12.88 divided
15    by .3.
16 BY MS. PENDLEY:
17    Q.   We can see the second batch
18 has 42 times the FDA limit of NDMA,
19 right?
20    A.   And we recalled all these
21 batches.
22    Q.   Okay.  Yes, you did, because
23 they all contained more than the FDA
24 limit of NDMA, right?

Page 85

1     A.   Well, at that time, we were
2 not knowing the limit.  But we still,
3 because it is being identified with these
4 impurities, that's why.
5     Q.   Okay.  We'll talk about that
6 in just a second because I'm going to
7 show you the date this document is from.
8 But for the sake of the trial tech, we're
9 going to move through a couple of these
10 before I make him take all this down.
11        So we've got 42 times the
12 limit of NDMA in this second batch,
13 right?
14    A.   Yeah.
15    Q.   Okay.  And looking at 1537,
16 that same batch for NDEA.  7.12 divided
17 by .083.
18        So about 85 times the FDA
19 limit of NDEA, right?
20    A.   Mm-hmm.  Yes.
21    Q.   Okay.  In the same batch.
22        Now we're going to skip down
23 some.  We're not going to do this for
24 every row.

Confidential Information Subject to Protective Order

Page 86

1    MS. PENDLEY:  Let's look at
2 Row 15 on the 1247 document.  And
3 it'll be on the next page of 1537.
4 BY MS. PENDLEY:
5    Q.   Okay.  So let's do 65.29
6 divided by .3.
7        So we can see that this
8 batch is 217 times the FDA limit for
9 NDMA, right?
10   A.   Yeah.
11   Q.   All right.  Looking at Row
12 15 on 1537, let's do 6.02 divided by
13 .083.
14       So this batch also has over
15 72 times the FDA limit of NDEA, right?
16   A.   Yeah.  Correct.
17   Q.   Okay.  Let's do Row 20 on
18 1247.
19       MS. PENDLEY:  So if you can
20 put in -- it's going to be on the
21 next page.  If you can put in
22 125.03 divided by .3.
23 BY MS. PENDLEY:
24   Q.   So this batch has 416 times

Page 87

1 the FDA limit of NDMA, right?
2    A.   Yeah, correct.
3    Q.   Okay.  Then we see several
4 of these all the way down.  The next one
5 has 116, 116, 111, 108.
6        Do you see all of those?
7        Do you see that column,
8 Mr. Jaiswal, the results of NDMA on 1247?
9    A.   Yes.
10   Q.   Okay.  And so all of those
11 that are in the hundreds are roughly 300
12 times the FDA limit for NDMA, right?
13       MS. BRANCATO:  Objection to
14 form.
15 BY MS. PENDLEY:
16   Q.   Right?
17       Mr. Jaiswal, do you see what
18 I'm talking about?
19   A.   Yeah.  This like -- like, if
20 we can see the current limits.
21   Q.   So my question is, we can
22 see all of those batches that have over
23 100 parts per million of NDMA, those are
24 all roughly over 300 times over the FDA

Page 88

1 limit, right?
2    MS. BRANCATO:  Same
3 objection.
4 BY MS. PENDLEY:
5    Q.   Right?
6    A.   Yeah, it's correct against
7 the current limits.
8    Q.   What do you mean by that?
9    A.   Because these limits were
10 not known that moment of time.  But if we
11 consider the current limits, which has
12 been published by FDA, yes, right.
13   Q.   Okay.  So what these
14 documents show us is that all of these
15 batches in 1247 have more than .3 parts
16 per million for NDMA, right?
17   A.   In every batch, I think
18 there's a different level of
19 observations, and from which API, how
20 many batches are manufactured, there's a
21 difference upon that.  And that's why
22 this data is here, which is -- we
23 identified.
24   Q.   Okay.  Let me ask the

Page 89

1 question again.  So this document lists
2 all 29 API batches that were used, right?
3    A.   Yes, correct.
4    Q.   And every single one of them
5 contains more than .3 parts per million
6 of NDMA, right?
7    A.   Yeah, correct.
8    Q.   Okay.  So every single one
9 of the API batches is over the FDA
10 threshold limit; is that fair?
11   A.   Correct.
12   Q.   Okay.  And for NDEA, most of
13 these are over the .083 parts per
14 million, right?
15   A.   Yes.
16       MS. BRANCATO:  Object to the
17 form.
18 BY MS. PENDLEY:
19   Q.   So then most of these are
20 over the threshold for NDEA as well?
21       MS. BRANCATO:  Same
22 objection.
23 BY MS. PENDLEY:
24   Q.   Right?

Page 90

1    Is that right?
2        A.   Yeah.  Again, I'm indicating
3    that, yes, if we consider the current
4    limits, yes -- considering the current
5    limit, yes, it is above the threshold
6    limit.
7        Q.   Okay.  You do realize that
8    these threshold levels from the FDA were
9    able to be calculated for NDMA and NDEA
10   by following the ICH M7 guidelines,
11   correct?
12       MS. BRANCATO:  Objection to
13       form and foundation.
14   BY MS. PENDLEY:
15       Q.   You can answer.
16       A.   I'm not really sure about
17   it, because this is a different
18   department who does this calculation.
19   I'm not really sure.
20       Q.   Okay.  But you were the head
21   of quality at the time of this recall,
22   correct?
23       A.   Yes.
24       Q.   Okay.  So you were involved

Page 91

1    with the decision to recall this drug,
2    correct?
3        A.   Yes.
4        Q.   And so in order to decide
5    whether or not to recall, you would need
6    to know whether or not the NDMA exceeds
7    the FDA threshold, right?
8        MS. BRANCATO:  Objection to
9        form.
10       THE WITNESS:  That's
11       correct.
12       Our decision is not based
13       upon that aspect.  Our decision
14       was based upon because the
15       impurities being identified, which
16       was not earlier known, and that's
17       why we are taking the decision to
18       recall all the batches.
19   BY MS. PENDLEY:
20       Q.   So you're saying that you
21   guys made the decision to recall solely
22   based on the presence of NDMA; is that
23   right?
24       A.   Yeah.  Because when we

Page 92

1    recall, we have not tested for that NDEA.
2    We were not knowing about the NDEA.
3        Q.   Okay.  So focusing just on
4    NDMA, did you recall as soon as you knew
5    NDMA was present?  Is that what you're
6    saying?
7        A.   No.
8        MS. BRANCATO:  Objection to
9        form.
10       THE WITNESS:  As soon as we
11       identified and quantified the
12       impurities, we recalled the
13       batches.
14   BY MS. PENDLEY:
15       Q.   Okay.  Right.  So once you
16   knew that NDMA was over that threshold,
17   you recalled the drug, right?
18       MS. BRANCATO:  Objection to
19       form.  Mischaracterizes testimony.
20   BY MS. PENDLEY:
21       Q.   You can answer.
22       A.   Until -- unless we were not
23   having quantifiable data, at that time we
24   are not taking recall.  As soon as we got

Page 93

1    the quantifiable data, we initiated
2    recall.
3        Q.   Okay.  Do you understand
4    where that FDA threshold limit came from
5    or how it was calculated?
6        A.   Yes.
7        Q.   Okay.
8        A.   We became aware of it.
9        Q.   Okay.  So you know that it
10   was based on calculations found in ICH M7
11   guidelines, right?
12       A.   How FDA calculated, I'm not
13   sure.  But yes, this is the guidance
14   available and it is being used to
15   calculate that.
16       Q.   Okay.  And you know that the
17   ICH M7 guidelines were published before
18   any company recalled its valsartan,
19   correct?
20       A.   Yeah, M7 guideline.
21       Q.   Okay.  As far as you're
22   aware, all the lots that were within the
23   expiration date of Torrent's valsartan
24   was ultimately recalled, right?

Confidential Information - Subject to Protective Order

Page 94

1    A.   Yes.
2    Q.   Okay.  And Torrent started
3 selling valsartan in approximately 2015;
4 is that right?
5    A.   Your question is what?
6 Since when we are selling this medicines?
7    Q.   Yes.  I'm asking when did
8 Torrent start selling valsartan in the
9 U.S.?  Was that 2015?
10    A.   I'm not sure, but maybe from
11 that time or maybe from before that time.
12 I'm not really --
13    Q.   Okay.  Okay.  So at least
14 2015; is that fair?
15    A.   Yeah.
16    Q.   Okay.  Torrent, like you
17 told me earlier, only ever used the old
18 process for API, right?
19    A.   Yes.
20    Q.   Never switched to new
21 process, right?
22    A.   Yeah, we never used the new
23 process.
24    Q.   Okay.  No other major

Page 95

1 manufacturing was changed to the API
2 process, as far as you're aware, right?
3    A.   No.  Can you repeat your
4 question?
5    Q.   Yeah.  So aside from the
6 new/old process issue, no other
7 significant manufacturing process change
8 was made to valsartan API in the U.S.?
9    MS. BRANCATO:  Objection.
10    Foundation.
11    THE WITNESS:  See, I'm not
12    able to comment on this, because
13    this is a ZHP process, and they
14    have only notified for this
15    change.
16 BY MS. PENDLEY:
17    Q.   Okay, great.  They have only
18 notified for this change.  You're not
19 aware of anything else?
20    A.   No.
21    Q.   Okay.  That's what I'm
22 trying to get at.  Perfect.
23    MS. PENDLEY:  So if we could
24    look at LP 1078.

Page 96

1    (Document previously marked
2 for identification as Exhibit
3 Torrent-16.)
4    THE COURT REPORTER:
5 Previously marked, Madeline?
6    MS. PENDLEY:  Yep, as
7 Torrent-16.
8 BY MS. PENDLEY:
9    Q.   If we can go to the first
10 page.
11    Mr. Jaiswal, can you see
12 this on your end?
13    A.   Yes, I see this.  This is
14 EMEA --
15    MS. BRANCATO:  Whatever is
16 on the screen is incorrect.
17    MS. PENDLEY:  You are right.
18 It is not.  We're going to look at
19 1078, and it's Bates Number
20 TORRENT-MDL2875-00523126.
21 Perfect.
22 BY MS. PENDLEY:
23    Q.   Okay.  So we can see that
24 this is an e-mail.

Page 97

1    A.   Yes.
2    Q.   And looking at the top here,
3 it doesn't look like it was sent to you.
4 We can see the date is August 27th, 2018.
5    Do you see that?
6    A.   Yes.
7    Q.   All right.  I want to go to
8 the next page.  So this says, "Please
9 find NDMA result found in below old
10 process batches from Huahai."
11    Okay.  And then it goes on
12 to say, "Please find the batches test
13 results as well as a list of batches
14 supplied to Torrent with old process from
15 2015."
16    Do you see that?
17    A.   Just a moment.  Which
18 statement you are referring to?
19    Q.   Just that sentence right
20 there above the first chart on the second
21 page of the document.
22    A.   Yeah.
23    Q.   Okay.  So this first chart
24 that says "API stocks available" lists

Confidential Information Subject to Protective Order

1  ZHP's batch numbers and then a ppm of
2  NDMA.
3         Do you see that?
4     A.   Yeah, I see that.
5     Q.   All right.  And then the
6  second chart provides a list of lot
7  numbers from 2015.
8         Do you see that?
9     A.   Yes, I see that.
10    Q.   All right.  So I want to
11 look at both of these charts.  Looking at
12 the chart that's lot numbers from 2015,
13 six up from the bottom, we see the batch
14 that is C5069-15-049M.
15        Do you see that one?
16    A.   Can you repeat the number,
17 ma'am?
18    Q.   Yeah, it's -- basically they
19 all start the same way.  It ends in 049M.
20    A.   Yeah.
21    Q.   Okay.  And we see that
22 number again in the API stocks available
23 chart.
24    A.   Okay.

1     Q.   Four down from the top.  So
2  we can see that that batch has 56.5 parts
3  per million of NDMA in it, right?
4     A.   It is identified, yeah.
5     Q.   Okay.  So that's a batch
6  from 2015 that has 56.5 parts per million
7  of NDMA in it?
8     A.   Yeah.
9     Q.   Okay.  The next one under
10 that, we've got the one that ends in 050.
11 And we see it end in the API chart,
12 right?
13    A.   Yeah.  Correct.
14    Q.   56.2 parts per million of
15 NDMA, right?
16    A.   Yeah.
17    Q.   The next one is in both
18 charts ending in 051M at 56.4 parts per
19 million of NDMA.
20    A.   Yeah.  56.4.
21    Q.   Okay.  The next one, same
22 batch.  The next one in both charts
23 ending in 052 has 51 parts per million of
24 NDMA.

1     A.   Yeah, correct.
2     Q.   And the next ends in 53,
3  same both charts.  It has 63.1 parts per
4  million of NDMA.
5     A.   Yeah, correct.
6     Q.   Okay.  And then the top
7  three, ending in 038, 039, 041, on the
8  next page of the chart, but we can see
9  they all have 63.4, 62.2 and 68.4 parts
10 per million of NDMA, right?
11    A.   Okay.
12    Q.   So once again, all of these
13 are higher than the .3 parts per million
14 FDA threshold, right?
15    A.   Yeah.
16    Q.   And these were all batches
17 manufactured or at least in Torrent's
18 possession in 2015, right?
19        MS. BRANCATO:  Objection to
20 form.
21        THE WITNESS:  Yeah.
22 BY MS. PENDLEY:
23    Q.   Okay.  So we can see the
24 contamination goes back to at least 2015;

1  is that fair?
2         MS. BRANCATO:  Same
3     objection.
4         THE WITNESS:  These --
5  BY MS. PENDLEY:
6     Q.   Go ahead.  You can answer.
7     A.   So these are the, like,
8  batch numbers and lot numbers given.  And
9  these are the -- with the reference to
10 the old process.  And, say, based upon
11 the finished product expiry, versus which
12 lots is being used, once this has been
13 identified, we started tracking for all
14 the batches which are within the shelf
15 life, which API lots is being used.
16        And we were -- we started
17 collecting the data so that the
18 appropriate action would be taken up.
19        So this is in that sense,
20 these batch data of -- details of
21 impurities is being requested.
22    Q.   Okay.  No, I understand
23 that.  My question is a little bit more
24 simpler.  It's just, yes, these batches

Page 102

¹ are from 2015, correct?
²     A.   Because the date of
³ manufacturing not in here, so that's why
⁴ I'm not able to really comment on which
⁵ date of manufacturing these batches were
⁶ produced.  And that's why I say I'm not
⁷ able to really comment on that, whether
⁸ this is for 2015 or '16 or '17.
⁹     Q.   Okay.  My mistake.  I
¹⁰ understand what you're saying.  So we can
¹¹ agree at least the API batch is from
¹² 2015?
¹³     MS. BRANCATO:  Same
¹⁴   objection.
¹⁵     THE WITNESS:  This is from
¹⁶   the 2015 onward.  But there may be
¹⁷   batches that were being supplied
¹⁸   in 2016, '17, '18 also, because we
¹⁹   requested this information in
²⁰   2018.
²¹ BY MS. PENDLEY:
²²     Q.   Okay.  Got it.  We're going
²³ to talk about testing a little bit now.
²⁴     We can agree Torrent did not

Page 103

¹ know how to test for nitrosamines at the
² time of the recall, right?
³     MS. BRANCATO:  Objection to
⁴   form.
⁵ BY MS. PENDLEY:
⁶     Q.   You can answer.
⁷     A.   At the time of recall, we
⁸ were -- we have tested the API lots.  And
⁹ that's why I say, yes, we were unknown at
¹⁰ this time.
¹¹     Q.   Okay.
¹²     MS. PENDLEY:  Let's take a
¹³   look at LP 682, previously marked
¹⁴   as Torrent Exhibit 12.
¹⁵     (Document previously marked
¹⁶   for identification as Exhibit
¹⁷   Torrent-12.)
¹⁸ BY MS. PENDLEY:
¹⁹     Q.   This is an e-mail.  The
²⁰ first e-mail is actually at the back, so
²¹ if we can start on Page 2.
²²     A.   This mail is not legible.
²³ Just a moment.  Let me -- it's in the
²⁴ chat.  Just a moment.  I'm going to see.

Page 104

¹     MS. PENDLEY:  Okay.  Can we
² go off the record for a second.
³     THE VIDEOGRAPHER:  The time
⁴   is now 7:56 a.m.
⁵     Do you still want to go off,
⁶   Counsel?
⁷     MS. PENDLEY:  Did he come
⁸   back?
⁹     THE WITNESS:  Yeah, yeah.
¹⁰     MS. BRANCATO:  Yeah, the
¹¹   problem is -- Sushil, the
¹²   documents should be in the chat
¹³   available for you to download.
¹⁴     THE WITNESS:  Okay.  Sure.
¹⁵   Sorry.
¹⁶ BY MS. PENDLEY:
¹⁷     Q.   That's okay.
¹⁸     A.   This is 682 now?
¹⁹     Q.   Yes.  Let me know when you
²⁰ have it.
²¹     A.   Yeah.
²²     Q.   We'll go to Page 2.
²³     A.   Yeah.
²⁴     Q.   Okay.  We can see this

Page 105

¹ starts with an e-mail from Dawn Chitty.
² Do you know who that is?
³     A.   Yeah, I know.
⁴     Q.   Who is she?
⁵     A.   Hello?
⁶     Q.   Can you hear me?
⁷     A.   Yeah.
⁸     Q.   Okay.  Who is Dawn Chitty?
⁹     A.   Dawn, she was our U.S.
¹⁰ regulatory lead.  And she was responsible
¹¹ for taking care of U.S. regulatory as
¹² well as she was also communicating with
¹³ FDA on behalf of Torrent.
¹⁴     Q.   Okay.  Did you communicate
¹⁵ with Dawn Chitty regularly?
¹⁶     A.   Not regularly, but yeah,
¹⁷ whenever -- like what demands, but
¹⁸ otherwise my team members, they used to
¹⁹ be in contact with Dawn Chitty.
²⁰     Q.   Okay.  So we can see she
²¹ sends this e-mail to you.  You're one of
²² the e-mail addresses listed there.
²³     A.   Yeah.
²⁴     Q.   The date is August 11, 2018.

Confidential Information - Subject to Protective Order

Page 106

1    Do you see that?
2    A.   Yes.
3    Q.   So this is after Torrent was
4  aware their drug contained NDMA, right?
5    A.   This is 11th August.
6    Q.   Yes, which is after Torrent
7  learned their drug was contaminated,
8  right?
9         MS. BRANCATO:  Objection to
10  form.
11  BY MS. PENDLEY:
12    Q.   You can answer.
13    A.   No, I'm trying to correlate
14  the dates versus when the method was
15  already -- at this time, I don't remember
16  the dates, on which date our method was
17  ready.
18    Q.   Okay.  At this point, on
19  August 11, 2018, we see at the bottom of
20  this paragraph that Dawn Chitty sends to
21  you, "Also, have we been able to develop
22  or transfer a method to test for NDMA?"
23       Right?
24    A.   Yeah.

Page 107

1    Q.   So at least on August 11th,
2  Torrent did not yet know how to test for
3  NDMA?
4         MS. BRANCATO:  Objection to
5  form.
6  BY MS. PENDLEY:
7    Q.   Right?
8         MS. BRANCATO:  Same
9  objection.
10  BY MS. PENDLEY:
11    Q.   You can answer.
12    A.   Yeah, just I'm trying to
13  read the mail actually.
14    Q.   Okay.
15    A.   This I need to confirm the
16  dates, because she is just putting a
17  question mark.  She's asking this,
18  whether we have a method developed or not
19  by this time.
20    Q.   Okay.  I'll show you another
21  document with the dates in just a second.
22  We can see, though, that on August 11th,
23  Dawn Chitty is asking, "Do we have a test
24  for NDMA," right?

Page 108

1    A.   She is asking whether the
2  method is developed or not, kind of
3  question mark.
4    Q.   Right.  Okay.  And then we
5  can see the response to her right above
6  it.
7        In about the middle of this
8  it says, "The method development to test
9  for NDMA is under progress."  Right?
10    A.   Yeah.
11    Q.   Okay.  So under progress
12  means it's not finalized yet?
13    A.   So I'm not sure whether
14  development is over and validation is
15  going on, because the analytical method,
16  development and validation, these are the
17  two aspects to be developed by this time,
18  whether we have developed a method and it
19  was under validation.  So this I need to
20  really check.
21    Q.   Okay.  But either way, even
22  if it's still in the validation process,
23  it's not totally ready, right?
24         MS. BRANCATO:  Objection to

Page 109

1  form.
2        THE WITNESS:  I cannot -- I
3    don't check the date.  I'm not
4    able to comment on this.
5  BY MS. PENDLEY:
6    Q.   I'm not asking you about the
7  date.  I'm asking you about "under
8  progress."  So if it says the test is
9  under progress, it means it's not fully
10  developed, right?
11         MS. BRANCATO:  Objection to
12    form.
13         THE WITNESS:  That's why I
14    say, if it is being developed,
15    then in the sense development is
16    completed.  Then we know the
17    know-how.  And then it requires a
18    validation.
19  BY MS. PENDLEY:
20    Q.   So even if it still
21  requires validation, it's under progress,
22  it has not been validated yet; is that
23  fair?
24         MS. BRANCATO:  Same

Confidential Information - Subject to Protective Order



Page 110

¹  objection.
²  BY MS. PENDLEY:
³      Q.   You can answer.
⁴      A.   This implies that, yes,
⁵  maybe development is over or validation
⁶  is ongoing.  And the method transfer is
⁷  only possible once you complete the
⁸  validation.
⁹      Q.   You said the method transfer
¹⁰ is only possible once you complete the
¹¹ validation; is that right?
¹²     A.   Yeah.
¹³         MS. PENDLEY:  Okay.  Let's
¹⁴     look at LP 1039 previously marked
¹⁵     Torrent 13.
¹⁶         (Document previously marked
¹⁷     for identification as Exhibit
¹⁸     Torrent-13.)
¹⁹ BY MS. PENDLEY:
²⁰     Q.   Let me know when you have
²¹ it.
²²     A.   1039?
²³     Q.   Yep.

111

Confidential Information Subject to Protective Order

Page 114



Confidential Information Subject to Protective Order



Page 118

<sup>22</sup> indicating that C batch was contaminated.
<sup>23</sup>     Q.   Okay.  I can show you.  One
<sup>24</sup> second.

Page 120

<sup>1</sup>          MS. PENDLEY:  Let's look at
<sup>2</sup> LP 45 really quick.
<sup>3</sup>          (Document marked for
<sup>4</sup> identification as Exhibit
<sup>5</sup> Torrent-218.)
<sup>6</sup>          MS. PENDLEY:  It will be
<sup>7</sup> marked Exhibit 218.  This is
<sup>8</sup> TORRENT-MDL2875-00516411.
<sup>9</sup>          MS. BRANCATO:  Sushil, do
<sup>10</sup> you see it in the chat?
<sup>11</sup>          THE WITNESS:  Yes, one
<sup>12</sup> moment.  I'm just downloading it.
<sup>13</sup> BY MS. PENDLEY:
<sup>14</sup>      Q.   If you want to go to page
<sup>15</sup> 34, we'll look at this in more detail in
<sup>16</sup> just a second.  Just to pull that date
<sup>17</sup> for you?
<sup>18</sup>      A.   Just a moment.  It's being
<sup>19</sup> downloaded.
<sup>20</sup>      Q.   Okay.  Let me know when
<sup>21</sup> you're ready.
<sup>22</sup>      A.   Yeah.
<sup>23</sup>      Q.   All right.  Page 3.
<sup>24</sup>      A.   Page 3.

Page 121

<sup>1</sup>      Q.   Yes, sir.
<sup>2</sup>      A.   Yeah, Page 3.
<sup>3</sup>      Q.   Okay.  And so about midway
<sup>4</sup> through the page, it's that fourth little
<sup>5</sup> sentence up from the bottom -- third
<sup>6</sup> little sentence up from the bottom.
<sup>7</sup>      A.   Mm-hmm.
<sup>8</sup>      Q.   It says, "Further, the API
<sup>9</sup> manufacturer communicated on August 3rd
<sup>10</sup> that some batches of old process contain
<sup>11</sup> this impurity."
<sup>12</sup>          Do you see that?
<sup>13</sup>      A.   Just a moment.  That is on
<sup>14</sup> which date?  Yes, that's correct.
<sup>15</sup>      Q.   All right.  So the e-mail
<sup>16</sup> that we just looked at was from
<sup>17</sup> August 18th, right?
<sup>18</sup>      A.   This is for 28th August.
<sup>19</sup>      Q.   Yes.  This e-mail is from
<sup>20</sup> August 28th.  The one that we were just
<sup>21</sup> looking at from your boss was from
<sup>22</sup> August 11th, right -- August 18th?
<sup>23</sup>      A.   Yeah.  By 28th of August, we
<sup>24</sup> were aware of it, that C lots are

Confidential Information Subject to Protective Order

1  contaminated.  But when that written --
2  what earlier mail that you're referring
3  to, on that day it was not.
4      Q.   Well, no, so this e-mail
5  that actually you typed, if you want to
6  look at Page 1, bottom of the page, we
7  see it's from you, right?
8      A.   Yeah.
9      Q.   Okay.  So you're listing out
10  a timeline of what y'all had been doing
11  with ZHP, right?
12      A.   Just a moment.
13          Yes, this mail is of 28th of
14  August.
15      Q.   Right.  In your e-mail you
16  say the API manufacturer communicated on
17  August 3rd that some batches of old
18  process contained the impurity.
19          Do you see that?
20      A.   Just a moment.
21      Q.   It's on Page 3.
22      A.   Yeah.  It is correct.
23      Q.   Okay.  So that means on
24  August 3rd, Torrent was aware their C

1  batches contained the impurity, right?
2      A.   Yes.  Torrent was aware.
3  But I was not aware of it.
4      Q.   Okay.  That's fine.  Torrent
5  was aware on August 3rd, we can agree?
6      A.   Agreed.
7      Q.   Okay.  But you're saying you
8  as head of quality were not informed of
9  this?
10      A.   Yeah, because on 3rd of
11  August, the mail has came to our
12  procurement department.
13          MS. BRANCATO:  I'm sorry.
14      Madeline, we're just going to have
15      to pause here.
16          Mahesh Agrawal is a lawyer
17      at Torrent.  And so I believe this
18      e-mail should be privileged.  And
19      so we're going to claw this back.
20      We'll send you a letter and priv
21      log for it.
22          If we can take it off the
23      screen, Jeff.  That would be
24      great.  Thank you.

1          MS. PENDLEY:  One second.
2  Let's go off the record for a
3  second.
4          THE VIDEOGRAPHER:  The time
5  now is 8:16 a.m.  We're going off
6  the record.
7          (Short break.)
8          THE VIDEOGRAPHER:  The time
9  is now 8:21 a.m.  We're back on
10  the record.
11          MR. NIGH:  This is Daniel
12  Nigh, for the record, representing
13  plaintiffs.
14          Before we took a brief break
15  for technical issues, there was a
16  request to claw back this document
17  that's been marked as Torrent
18  Exhibit 218.
19          I wanted to note for the
20  record this has been used
21  previously in several depositions.
22  This is the first time that
23  there's been a clawback request.
24          My first question to Lexi

1  is, who is the lawyer that you're
2  referring to that would make this
3  document privileged?
4          MS. BRANCATO:  Mahesh
5  Agrawal is an attorney at Torrent.
6  What was the previous exhibit
7  number?  218.
8          MR. NIGH:  Exhibit 218.
9          MS. BRANCATO:  I see.  So
10  it's just 218.  There are no other
11  exhibit numbers.
12          MR. NIGH:  I can't represent
13  there are other exhibit numbers.
14  But I know it's Exhibit 218.
15          MS. BRANCATO:  Got it.
16  Okay.  Well, I think we can
17  address this via letter or via
18  e-mail later.
19          MR. NIGH:  Well, I think we
20  need to address it now because we
21  intend to use it now.  So I'm
22  trying to see -- again, I didn't
23  hear the name.
24          Who was the lawyer that you

Confidential Information Subject to Protective Order

Page 126

1  said, the Torrent lawyer.
2      MS. BRANCATO:  Mahesh
3  Agrawal.  What depositions was
4  this used at previously?
5      MR. NIGH:  Do you guys know?
6      MS. PENDLEY:  Dawn Chitty
7  and Rivera.
8      MR. NIGH:  At least.  At the
9  point our argument will be, as we
10 look at the text of this
11 information, it troubles plaintiff
12 counsel to suggest that this
13 communication would be
14 communication that is the type of
15 communication that would be
16 privileged communication.
17     We would also suggest that
18 by looking at this communication,
19 we would wonder whether or not
20 attorneys have marked other
21 documents privileged, similarly to
22 this document, seeing as how we
23 look at the text of the
24 information, we do not believe

Page 127

1  that this is confidential
2  information or information that
3  would rise to that standard.
4      Additionally, we believe
5  that this has been used at
6  multiple depositions.  This
7  confidentiality has been waived at
8  this time.
9      Also, we believe that it is
10 untimely, that in the middle of a
11 deposition while we're questioning
12 on the document, that there is a
13 request to clawback the document.
14     We believe that we should be
15 able to go forward on this
16 document at this time, and we'll
17 await defense argument.
18     MS. BRANCATO:  I'm not
19 planning on responding to every
20 point that was raised in that
21 argument.
22     Our position is that the
23 document is privileged, and my
24 suggestion is that we move on from

Page 128

1  this document for now, and while
2  you continue to question the
3  witness, we can look into where
4  this document was used previously,
5  the exhibit numbers, whether in
6  fact it was used previously, and
7  then we can talk about it on our
8  next break or later today or
9  during the two remaining days of
10 deposition.
11     MR. NIGH:  I would disagree
12 with that.  And I would still say
13 that that frustrates and
14 prejudices our attempt to lay
15 foundations we prepared for this
16 deposition.
17     Trying to go out of order,
18 this is simply -- this has a lot
19 of foundational questions that
20 give us the timeline of events
21 that are going to set up the rest
22 of the deposition.
23     So counsel's suggestion that
24 we come back to it really would

Page 129

1  put things out of order.  And
2  we've waited this time.  And we
3  should be able to proceed forward.
4      If counsel instructs the
5  witness not to answer questions
6  regarding this document, we will
7  be seeking sanctions in regards to
8  the prejudice that we had in
9  disrupting the deposition of this
10 important 30(b)(6) witness.
11     MS. BRANCATO:  Obviously, we
12 disagree that there's any
13 prejudice to pausing on this one
14 document and coming back to it
15 later in the remaining two days of
16 testimony, and that there are
17 additionally thousands of other
18 documents that you can use to
19 establish the timeline.
20     Regardless, to avoid the
21 dispute and to avoid wasting your
22 time on the record, we can go off
23 the record now and we can assess
24 the privilege now, if that's the

Page 130

1    issue.
2         MR. NIGH:  We'd like to
3    continue to go on the record since
4    there is a request for a clawback
5    made on the record.
6         In addition, whether or not
7    there are other documents that
8    could be pieced together to make a
9    timeline, we have prepped for this
10   deposition, we are using a
11   document that has been used in
12   multiple other depositions, it has
13   clearly prejudiced our attempt to
14   be able to lay out the foundation
15   of questions as we desired to lay
16   them out.
17        So we don't have time to go
18   back to try to set up other
19   documents that are going to lay
20   the foundation in terms of key
21   dates.
22        This is the document that we
23   choose to use.  It's been used in
24   multiple other depositions.  And

Page 131

1    in the middle of -- in the middle
2    of the deposition, there has been
3    an interruption, a request to claw
4    back a document that has been used
5    multiple times.
6         And it does prejudice our
7    attempt to in the order in which
8    we seek to lay a foundation for
9    this deposition.
10        MS. BRANCATO:  I'm trying to
11   cut through this and stop wasting
12   your time so that you can use your
13   deposition time effectively.  If
14   you allow us to go off the record
15   and give us 15 minutes to
16   investigate whether or not we want
17   to claw this document back and
18   your representation that it's been
19   previously used, we can move
20   through this quickly.  And I can
21   give you an answer in 15 minutes.
22        MR. NIGH:  Okay.  Let's do
23   this.  Let go ahead and take a
24   break.  We'll take a 15-minute

Page 132

1    break and we'll come back and
2    restart the deposition.
3         THE VIDEOGRAPHER:  The time
4    is now 8:26 a.m.  We're going off
5    the record.
6         (Short break.)
7         THE VIDEOGRAPHER:  The time
8    is now 8:49 a.m.  (6:09 p.m. India
9    Time).  We are back on the record.
10        MR. NIGH:  This is Daniel
11   Nigh for the plaintiffs.  I wanted
12   to retract one statement that I
13   said, that this document has been
14   used in previous depositions.
15        We're not sure that it has
16   been.  So I'm going to retract
17   that part of the argument.
18        However, as looking at the
19   document, we believe that there's
20   none of this information that is
21   confidential in nature which would
22   be the most important thing in
23   determining whether or not it's a
24   privileged document.

Page 133

1         It certainly has us question
2    other privilege designations if
3    that's the determination that has
4    been made by defense lawyer as
5    said previously, because there is
6    a lawyer on the document, that it
7    would be privileged.
8         Even in looking at the
9    document, frankly argues -- it is
10   that -- it suits -- it is the
11   witness's recollection of dates
12   where he lays out a chronology of
13   events.
14        And here today, he has
15   mentioned multiple times that he
16   doesn't remember.  Even though
17   he's been designated as a 30(b)(6)
18   witness, he doesn't remember
19   several of these dates.
20        So we're attempting to use
21   this e-mail from his own writing
22   to refresh his recollection of
23   these dates.
24        Frankly, we believe there's

Page 134

nothing confidential in terms of
the chronology of events that he's
given.
    In addition, I would also
relate that the very first part of
the e-mail chain that is from
Mahesh Agrawal, the defense
lawyers are stating is the lawyer
that would make this information
privileged, the document states,
even there, from him, it says,
"This refers to our telecon
August 18th. We await the note on
the matter for taking it up with
the lawyer."
    And so obviously there's
another lawyer involved that they
are looking to pass information on
to.
    But he even refers this to
"with the lawyer." So again, I
believe that even this claimed
lawyer is not even referring to
himself as a lawyer.

Page 135

    I would also mention that,
again, the information is not
confidential in nature. But I'd
also mention that the title of
this person, the Mahesh Agrawal,
just looking at the title, VP of
legal compliance and company
secretary, so frankly is more of a
business lawyer, wears the hat,
but still conducting business, an
and I believe that would be a
clear exception to the lawyer
privilege information.
    So there's multiple reasons
as to why this document would not
be privileged.
    And in addition, we believe
that the clawback procedure has
not been appropriately followed.
    At this point, it cannot
just be defendants say we're
clawing back, you take down a
document. There's a procedure to
follow. We intend to proceed

Page 136

forward.
    If defendants want to
instruct the witness not to
answer, they can do so on their
own dime. But we will certify the
question thereafter.
    MS. BRANCATO: Okay. That
was quite a bit.
    So first of all, Mahesh is
the lawyer at Torrent. The fact
that he may do business law does
not mean that he doesn't provide
legal advice and get asked for
legal advice at Torrent. That's
still all privileged.
    So we object to any
representation that Mahesh's
documents may not be privileged
because he happens to also be
involved in the business or do
business law.
    Regardless, for this
particular document we will
withdraw the clawback request and

Page 137

allow questioning on it.
    MR. NIGH: Thank you.
BY MS. PENDLEY:
    Q.   Okay. So Mr. Jaiswal,
before this break, we were looking at LP
45. We're going to pick up there. Okay.
    A.   Yeah. Sure.
    Q.   And on Page 3. So you
remember this is an e-mail that you typed
out, right?
    A.   Yeah. Which -- Torrent 2,
3, which number do I need to open?
    Q.   LP 45. It's Torrent-218.
    A.   Torrent-218.
    Q.   Yep.
    A.   Yeah.
    Q.   All right. So looking at
the third page, back where we were
earlier, midway through the page where it
says, "Further, API manufacturer
communicated on 3rd August" -- do you see
that?
    A.   Yes.
    Q.   So you say, "The API

Confidential Information Subject to Protective Order



Page 138

¹ manufacturer communicated on August 3rd
² that some batches of old process also
³ contains this impurity, right?
⁴     A.   Yes.
⁵     Q.   So August 3rd is when ZHP
⁶ notified Torrent that NDMA was in
⁷ valsartan old process, right?
⁸     A.   Yeah.  That's correct.
⁹     Q.   Okay.  So we're going to go
¹⁰ back to LP 1039, Torrent-13.

Confidential Information Subject to Protective Order

Page 142

10    Q.   Okay, great.  So I want to
11 shift gears just a little bit.
12         So you are aware that when
13 Torrent first developed valsartan, they
14 wanted to find a cheap API supplier,
15 right?
16         MS. BRANCATO:  Objection to
17    form and foundation and outside
18    the scope of the 30(b)(6).
19         You can answer in your
20    personal capacity, if you know.
21 BY MS. PENDLEY:
22    Q.   You can answer.
23    A.   Now, which mail are you
24 referring?

Page 143

1    Q.   I'll show you something.
2         MS. PENDLEY:  Let look at LP
3    1047.
4         (Document previously marked
5    for identification as Exhibit
6    Torrent-7.)
7 BY MS. PENDLEY:
8    Q.   Mr. Jaiswal, you mentioned
9 to me that you started at Torrent in
10 2017, right?
11    A.   Yes.
12    Q.   Okay.  This e-mail, do you
13 have it pulled up yet?
14    A.   This is in the exhibits?
15         THE VIDEOGRAPHER:  The same
16    link that I just sent to you, it
17    should be in there if you refresh.
18         THE WITNESS:  218.
19 BY MS. PENDLEY:
20    Q.   It should be Torrent-7.
21    A.   Torrent-7.
22    Q.   Yeah.
23    A.   Sorry.
24    Q.   You're fine.

Page 144

1    A.   Just a moment.
2         Torrent-7.
3    Q.   Okay.  You got it?
4         Okay.  So we can see that
5 this e-mail is from 2006.
6         Do you see that at the top?
7    A.   Yeah.  2006, May.
8    Q.   Okay.  And this is way
9 before you started working there, right?
10    A.   Yeah.
11    Q.   All right.  We can see that
12 this is sent to people with a
13 TorrentPharma.com e-mail address?
14    A.   Mm-hmm.
15    Q.   Is that a yes?
16    A.   Yes.
17    Q.   Okay.  And so those would be
18 people that work at Torrent Pharma
19 Limited in India, right?
20    A.   Yes.
21    Q.   Okay.  So in this e-mail, if
22 we scoot down a little bit, we can see
23 the e-mail says, "API processing."
24         And then in this chart it

Page 145

1 says valsartan, and across from that, it
2 says, "Develop a second source with
3 60 percent price reduction."
4         Right?
5    A.   Yeah.
6    Q.   I know you're not a sales
7 guy.  But this says that they want to
8 develop a second source of API that's
9 60 percent cheaper, right?
10         MS. BRANCATO:  Objection to
11    foundation.  Form.  And outside
12    the scope of the 30(b)(6).
13         THE WITNESS:  Like costing,
14    I'm not able to comment about that
15    because pricing and costing is
16    all -- depends on what volume --
17    they buy what volume they
18    manufacture.
19 BY MS. PENDLEY:
20    Q.   Okay.  I understand that.
21 We can see the word "reduction" there,
22 right?
23    A.   Yeah.
24    Q.   And reduction means, you

Confidential Information Subject to Protective Order

Page 146

¹ know, less; is that fair?

²     A.   Yeah.  Reduction means less.

³     Q.   Okay.  So this just says

⁴ develop a second source, you know, that's

⁵ 60 percent less expensive; is that fair?

⁶        MS. BRANCATO:  Same

⁷ objections.

⁸        THE WITNESS:  Yeah.  Written

⁹ in that mail.

¹⁰ BY MS. PENDLEY:

¹¹     Q.   Okay.  This 2006.  That's

¹² years before Torrent's valsartan went on

¹³ the market, right?

¹⁴     A.   This is year 2006.  Maybe by

¹⁵ that time we have not been in the market.

¹⁶        MS. PENDLEY:  Okay.  Let's

¹⁷ look at LP 1088.

¹⁸        (Document marked for

¹⁹ identification as Exhibit

²⁰ Torrent-8.)

²¹        MS. PENDLEY:  I think this

²² is previously marked as Torrent-8.

²³        THE WITNESS:  Torrent-8?

²⁴        MS. PENDLEY:  Yes, sir.

Page 147

¹ BY MS. PENDLEY:



Confidential Information - Subject to Protective Order

Page 150



Confidential Information Subject to Protective Order



Page 154

Page 156

21    Q.    All right.  Now, you are
22  familiar with gas chromatography, right?
23    A.    Yes.
24    Q.    Okay.  This is going to be

Page 157

1  probably really, really simple.  So just
2  bear with me.
3            A chromatogram shows little
4  peaks, right, for different ingredients?
5    A.    So it depends upon, say you
6  are talking about gas chromatography?
7    Q.    Yes.
8    A.    In gas chromatography, yes,
9  definitely you're getting different peaks
10  and -- for the different compounds, it's
11  going to form a kind of format that you
12  have selected, a kind of map, the columns
13  you have in the process, and which kind
14  of substance you are analyzing.
15    Q.    Okay.
16    A.    It is -- like every -- every
17  compound is going to give a peak into the
18  chromatograms.
19    Q.    Okay.
20    A.    Yeah.  So it's --
21    Q.    So in order to figure out
22  everything that -- every compound that's
23  in a drug, for example, each compound
24  would have a little peak.  Is that what

Page 158

¹ you're saying?  If it showed up --
²     A.  No.
³     Q.  -- on the test?
⁴     A.  No.  If you allow me to
⁵ elaborate a little bit.
⁶     To assess -- you have a
⁷ compound.  And if you have ten different
⁸ components, like all ten components is
⁹ not going to be eluted be on the same
¹⁰ chromatogram.  Depends the method of
¹¹ analysis, the choice of column, and
¹² different conditions and programs which
¹³ you feed in the gas chromatogram.
¹⁴     Q.  Okay.
¹⁵     A.  It's not going to --
¹⁶ immediately going give a kind of peak
¹⁷ into the chromatogram.
¹⁸     Q.  Okay.  So you have to adjust
¹⁹ the test you're conducting, you know,
²⁰ depending on what you're looking for?
²¹     A.  It is not a test method.  It
²² is a development.  Like you have this
²³ target development for which kind of
²⁴ analysis you are developing the method,

Page 159

¹ and what is your target profile.
²     And based upon that
³ chromatographic method is being
⁴ developed, and then it is being
⁵ validated.
⁶     Q.  Okay.  So let's say you are
⁷ conducting residual solvent testing,
⁸ you're trying to see what kind of
⁹ solvents are present?
¹⁰     A.  So it is not like that.
¹¹ Because solvents are maybe for 100 --
¹² more than 100 or more of that kind.
¹³     But you, to be able to do in
¹⁴ that fashion, the method is being
¹⁵ developed knowing a process,
¹⁶ understanding, like say the DMF -- API
¹⁷ manufacturer is using, say, suppose,
¹⁸ Solvent A in Stage 1, Solvent B in Stage
¹⁹ 2 and Solvent C in Stage 3.
²⁰     Based upon that knowledge,
²¹ basically they develop a method to
²² understand what is the A, B, and C
²³ residual portion in the final API.
²⁴     The method is designed by

Page 160

¹ the DMF holder, in that sense, so you are
² able to read A, B, and C in your drug
³ substance.
⁴     Q.  Okay.  So what happens if
⁵ you're testing your drug and you notice
⁶ there's a little peak that you guys
⁷ didn't think would be there?
⁸     MS. BRANCATO:  Objection to
⁹     form.
¹⁰ BY MS. PENDLEY:
¹¹     Q.  Would you investigate it?
¹²     MS. BRANCATO:  Same
¹³     objection.
¹⁴ BY MS. PENDLEY:
¹⁵     Q.  You can answer.
¹⁶     A.  Okay.  So like, say -- for,
¹⁷ say, for the chromatography, there is a
¹⁸ set rule of the Pharmacopeia.  And
¹⁹ Pharmacopeia defines that create a kind
²⁰ of regulatory practices and limits for
²¹ that.  And everything is being governed
²² by that.
²³     If you have, like, a
²⁴ secondary peak, then if it is -- there's

Page 161

¹ some threshold.  It has to be integrated.
² It has to be reported.  And if it is
³ within that some specification, then it
⁴ is fine.  If it is not, then it has to be
⁵ detected.  It has to be investigated.
⁶     Q.  Okay.  And then once you see
⁷ all those peaks, you guys typically label
⁸ each one, saying what they are; is that
⁹ right?
¹⁰     A.  Yeah.  If those are out of
¹¹ specification, then basically -- you
¹² basically discuss with your DMF holder
¹³ and then it become an exercise where
¹⁴ you're investigating these aspects.
¹⁵     MS. PENDLEY:  Okay.  So I
¹⁶ want to look at LP 1393 with you,
¹⁷ which has been previously marked
¹⁸ as Torrent-81.
¹⁹     (Document previously marked
²⁰ for identification as Exhibit
²¹ Torrent-81)
²²     THE WITNESS:  Just a moment.
²³ Which one?
²⁴     MS. PENDLEY:  Torrent-81.

Confidential Information Subject to Protective Order

Page 162

¹ BY MS. PENDLEY:
²      Q.    Just let me know when you
³ have it?
⁴      A.    Just a moment.  It's getting
⁵ downloaded.
⁶          Yeah, I'm able to see that.
⁷      Q.    Okay.  So in the upper
⁸ left-hand corner we can see this is from
⁹ December 30th, 2010.  So, again, long
¹⁰ before you started at Torrent, right?
¹¹      A.    Yeah, this is a 2010
¹² deficiency letter.
¹³      Q.    Okay.  Have you ever seen
¹⁴ this before?
¹⁵      A.    No.  Because this is for
¹⁶ 2010, and this might be at the time of
¹⁷ assessment of -- I have not seen it.
¹⁸      Q.    Okay.  Got it.  So we can
¹⁹ see that this is from the FDA to Torrent
²⁰ Pharmaceuticals, specifically to Dawn
²¹ Chitty, right?
²²      A.    Yeah.
²³      Q.    All right.  And in the
²⁴ middle of the page, it says, "The

Page 163

¹ Division of Chemistry has completed its
² review and identified deficiencies."
³ Right?
⁴      A.    Is it on the first page?
⁵      Q.    Yes.
⁶      A.    Yeah.
⁷      Q.    Okay.  So let's go to the
⁸ next page and see what the deficiencies
⁹ are.  We can see under A, it says
¹⁰ deficiencies, and number one it says,
¹¹ "Drug Master File 23491 was reviewed and
¹² found to be deficient."
¹³          Do you see that?
¹⁴      A.    Yeah.
¹⁵      Q.    So that Drug Master File
¹⁶ 23491, that's ZHP's DMF that you told me
¹⁷ about earlier, right?
¹⁸          MS. BRANCATO:  Objection to
¹⁹      foundation.
²⁰          THE WITNESS:  Yeah.
²¹ BY MS. PENDLEY:
²²      Q.    Okay.  If you look at Number
²³ 8 this list, it goes on to say, "In
²⁴ validation report for dissolution

Page 164

¹ testing, the list of chromatograms show
² mostly the main peak, amlodipine;
³ however, in some chromatograms there are
⁴ unmarked peaks."
⁵          Do you see that?
⁶      A.    Yeah, I see that.
⁷      Q.    You told me earlier when you
⁸ guys are doing testing, you label every
⁹ peak, right?
¹⁰          MS. BRANCATO:  Objection to
¹¹      form.
¹²          THE WITNESS:  For gas
¹³      chromatography, and this is -- we
¹⁴      are talking about the dissolution
¹⁵      testing.
¹⁶ BY MS. PENDLEY:
¹⁷      Q.    Okay.  So this is a
¹⁸ different kind of test?
¹⁹      A.    Yeah, yeah, it is absolutely
²⁰ different kind of test.
²¹      Q.    Is it still important to
²² label peaks in any kind of test, or is
²³ that just gas chromatography?
²⁴      A.    No.  Once you are doing an

Page 165

¹ impurity testing or that kind of testing,
² then you do that kind of assessment.
³          This is principally going by
⁴ the chromatography practices, which is
⁵ well defined activity within the
⁶ chromatography -- within the USP and
⁷ within the guidance.
⁸          So then for the -- for the
⁹ dissolution test, this is fine, but for
¹⁰ the impurity testing, we need to identify
¹¹ the impurities that could be going beyond
¹² some threshold.
¹³      Q.    Okay, great.  This is very
¹⁴ helpful.  Thank you.
¹⁵          Did anybody at Torrent, as
¹⁶ far as you're aware, follow up with ZHP
¹⁷ about this deficiency?
¹⁸      A.    See, as indicated earlier
¹⁹ also, this is the process, and the DMF --
²⁰ like agency always sending the deficiency
²¹ to the DMF holder, and DMF holder is
²² normally, they respond to the queries.
²³          And in 2010, whether they
²⁴ have shared this deficiencies with us or

Page 166

¹ not, I'm really not aware of it.
²        Q.   Okay.  So if ZHP got a
³ deficiency because their valsartan
⁴ formation had the tendency to form
⁵ tertiary amines, you wouldn't have seen
⁶ that?
⁷        A.   No.
⁸        MS. PENDLEY:  Okay.  Let's
⁹ look at LP 1535.
¹⁰        (Document marked for
¹¹ identification as Exhibit
¹² Torrent-219.)
¹³        MS. PENDLEY:  It's
¹⁴ TORRENT-MDL2875-00124209.
¹⁵ And it will be marked as
¹⁶ Torrent Exhibit 219.
¹⁷        THE WITNESS:  Just a moment.
¹⁸ BY MS. PENDLEY:
¹⁹        Q.   Just let me know when you've
²⁰ got it.
²¹        Do you see the e-mail?
²²        A.   Yes, I see this e-mail.
²³        Q.   Okay.  We can see that this
²⁴ e-mail -- I want to start with the second

Page 167

¹ e-mail down.  It is from Jenny Yang.  And
² it's from September 23rd, 2015.
³        Do you see that?  Do you see
⁴ that date?
⁵        A.   Yeah.  Yeah.
⁶ September 23rd, yeah.
⁷        Q.   Okay.  And Jenny Yang is one
⁸ of the inspectors that Torrent uses,
⁹ correct?
¹⁰        A.   Jenny -- this was in 2015.
¹¹        MS. BRANCATO:  Objection.
¹² Foundation.
¹³        THE WITNESS:  I'm not sure
¹⁴ whether he was third party.  I'm
¹⁵ not aware of this 2015 aspect.
¹⁶ BY MS. PENDLEY:
¹⁷        Q.   Okay.  Do you know who Jenny
¹⁸ Yang is at all?
¹⁹        A.   Jenny -- he's a -- I think a
²⁰ third party auditor, and he does the
²¹ audit on behalf of Torrent.
²²        Q.   Okay, great.  So let's look
²³ at what Jenny says about ZHP.  We can see
²⁴ the subject line is audit report

Page 168

¹ valsartan Huahai, right?
²        Do you see that?
³        A.   Just a moment, I'm reading.
⁴        Q.   Okay.  Do you see the
⁵ subject line that says audit report?
⁶        A.   I have gone through, yeah.
⁷        Q.   I'm sorry.  Is that yes?
⁸        A.   Yeah, I've gone through the
⁹ mail.
¹⁰        Q.   Okay, perfect.  So let's
¹¹ start at Jenny Yang e-mail.  It says,
¹² "The people from this manufacturer is too
¹³ much protective of their system."
¹⁴        Do you see that?
¹⁵        A.   Yeah, I read it.
¹⁶        Q.   Okay.  And so this
¹⁷ manufacturer will be referencing Huahai
¹⁸ or ZHP?
¹⁹        MS. BRANCATO:  Objection.
²⁰ Foundation.
²¹ BY MS. PENDLEY:
²²        Q.   Right?
²³        A.   I'm not sure there, I think,
²⁴ about which manufacturer.  Just a moment.

Page 169

¹        Q.   Well, the subject line says
² valsartan Huahai.
³        A.   Huahai, yeah.
⁴        Q.   So we are talking about ZHP,
⁵ right?
⁶        MS. BRANCATO:  Objection to
⁷ foundation.
⁸        THE WITNESS:  I'm not sure
⁹ if Huahai is a supplier.  But it
¹⁰ is written as audit report
¹¹ valsartan Huahai.
¹² BY MS. PENDLEY:
¹³        Q.   And Huahai is ZHP, right?
¹⁴ Is that right?
¹⁵        A.   I'm trying to really
¹⁶ understand why they write Huahai and not
¹⁷ ZHP.  But I'm really unsure about it.
¹⁸        Q.   Okay.  You as the head of
¹⁹ quality never heard ZHP referenced as
²⁰ Huahai?
²¹        A.   No.  We have referenced this
²² sometimes that Huahai and ZHP has been
²³ written in that way.
²⁴        Q.   Okay.

Confidential Information Subject to Protective Order

Page 170

1        A.   But in 2015, this mail is
2   related to ZHP or something else, I'm not
3   confirming that.  That is only reason.
4        But I do agree we write
5   Huahai and ZHP.
6        Q.   So you do know Huahai and
7   ZHP.  Do you know them to be the same
8   thing?  Is that what you're saying?
9        A.   I am not really sure about
10   that 2015 audit report.
11        Q.   All right.  Well, what other
12   company involved with the production of
13   valsartan would be referenced as Huahai?
14        A.   So maybe during the process,
15   maybe sometimes we looked into the
16   suppliers.  And this may be a supplier
17   program and something like that.  But I'm
18   not really sure about it.
19        Q.   Okay.  Well, you're the head
20   of quality.  Shouldn't you know all the
21   different suppliers that are being used
22   to manufacture valsartan?
23        MS. BRANCATO:  Objection to
24   form.

Page 171

1        THE WITNESS:  So can I
2        understand your question once
3        again?
4   BY MS. PENDLEY:
5        Q.   Yes.  You as the head of
6   quality, it's your job to know all the
7   manufacturers involved in the production
8   of valsartan, right?
9        A.   So whatever that
10   manufacturers I'm using on the commercial
11   basis, I'm aware of the API supplier.
12        Q.   Okay.  And you're not aware
13   of any other supplier involved in
14   valsartan production that goes by Huahai,
15   right?
16        A.   Since last three years,
17   four years, what I've seen, ZHP is our
18   supplier for valsartan.
19        Q.   Okay, great.  This document,
20   Jenny Yang is saying the people from
21   Huahai is too much protective of their
22   system.
23        Do you see that?
24        A.   Yeah.  I see that.

Page 172

1        Q.   Protective as in secretive,
2   right?
3        MS. BRANCATO:  Objection to
4        form and foundation.
5   BY MS. PENDLEY:
6        Q.   You can answer.
7        A.   So what I see is it is the
8   manufacturer is too much protective of
9   their system.  And if anything beyond,
10   I'm not sure.
11        Q.   All right.  They go on to
12   say, "I'm actually not satisfied with
13   most of their reply, but I think you need
14   to receive the conclusion early so I send
15   the conclusion first."
16        Okay.
17        She goes on to say, "Anyway,
18   I send another e-mail to them inform them
19   that their CAPA are not acceptable."
20        What does CAPA stand for?
21        A.   Again?
22        Q.   CAPA is corrective and
23   preventive action?
24        A.   CAPA is corrective and

Page 173

1   preventive action.
2        Q.   Okay.  So Jenny Yang is
3   saying Huahai's CAPA is not acceptable in
4   2015, right?
5        A.   Yeah.  They have written and
6   that's what I think they were discussing
7   with supplier to do more to -- basically
8   when they write CAPAs.
9        Q.   Okay.  Under that, she goes
10   on to say, "Some of their concepts were
11   totally wrong..."
12        Do you see that?
13        A.   Yes.
14        Q.   ...making some of Huahai's
15   concepts that she evaluated are totally
16   wrong.
17        MS. BRANCATO:  Objection.
18        Foundation.
19   BY MS. PENDLEY:
20        Q.   Have you ever seen this
21   before?
22        A.   This mail?
23        Q.   Yes.
24        A.   No, this mail I'm looking

Confidential Information Subject to Protective Order

¹ for the first time.
²       Q.   Okay.  So you had never seen
³ that some of ZHP's concepts are totally
⁴ wrong and not patient care?
⁵       A.   I have not seen this mail.
⁶       Q.   Okay.
⁷       A.   This is 2015.  And
⁸ definitely I have not gone through this
⁹ mail at any time.
¹⁰      Q.   So it says, "ZHP's concepts
¹¹ are not concerned with patient care."
¹² That's what the inspector is telling you
¹³ guys, right?
¹⁴      A.   Yeah, it is written here.
¹⁵      Q.   Okay.  She says, "For
¹⁶ example, they just performed the
¹⁷ completely cleaning of the dryer after
¹⁸ 100 batches."  It goes on to say, "They
¹⁹ have no idea about degradation."
²⁰      Do you see that?
²¹      A.   Yeah, it is written here.
²²      Q.   So ZHP has no idea about
²³ degradation?
²⁴          MS. BRANCATO:  Objection to

¹ foundation.
² BY MS. PENDLEY:
³       Q.   Right?
⁴          MS. BRANCATO:  Same
⁵ objection.
⁶ BY MS. PENDLEY:
⁷       Q.   Right?  That's what it says?
⁸       A.   So it is written here, "They
⁹ have no idea about degradation."
¹⁰      Q.   Okay.  And degradation, that
¹¹ means like the way something breaks down,
¹² right?
¹³      A.   Yes, is based on --
¹⁴      Q.   Okay.  Is degradation an
¹⁵ important principle to understand in the
¹⁶ pharmaceutical industry?
¹⁷      A.   You're correct.
¹⁸      Q.   Okay.  And so they are
¹⁹ telling you that ZHP does not understand
²⁰ degradation, which is an important
²¹ principle in the pharmaceutical industry,
²² right?
²³          MS. BRANCATO:  Objection to
²⁴      form and foundation.

¹ BY MS. PENDLEY:
²       Q.   Right?
³          MS. BRANCATO:  Same
⁴      objection.
⁵ BY MS. PENDLEY:
⁶       Q.   You can answer.
⁷       A.   See, what I read here is
⁸ written in e-mail.  "They have no idea
⁹ about degradation."  That's correct.
¹⁰      Q.   All right.  Now, as head of
¹¹ quality, you would want to know about
¹² that, wouldn't you?
¹³      A.   So vendor qualification
¹⁴ program is always an ongoing process.
¹⁵ And this is not the last audit report we
¹⁶ have.  And definitely, we have a much
¹⁷ more -- more -- this is in 2015.  But
¹⁸ what other CAPAs they have taken, and
¹⁹ what corrections they have done after
²⁰ several audit is being done with this
²¹ vendor.
²²      Q.   Okay.  And we'll walk
²³ through some of those a little bit later.
²⁴ But at this point, as the head of

¹ quality, would you not want to know that
² you are using an API supplier that at
³ least used to have no idea about
⁴ degradation?
⁵       A.   This is 2015 status.  And
⁶ the status is always dynamic, it changes.
⁷ Then based upon the current inspection
⁸ reports, what is dealt with with the
⁹ right aspect, is not of that aspect.
¹⁰      Q.   Right.  But they
¹¹ manufactured valsartan API for you in
¹² 2015, did they not?
¹³      A.   Yeah.
¹⁴      Q.   Okay.  So in 2015 while
¹⁵ they're making API for you, they have no
¹⁶ idea about degradation, right?
¹⁷          MS. BRANCATO:  Objection.
¹⁸      Foundation.
¹⁹ BY MS. PENDLEY:
²⁰      Q.   Right?  Mr. Jaiswal, did you
²¹ hear my question?
²²      A.   Yeah, I'm trying to really
²³ understand it.  But what I am able to
²⁴ understand here is that they have

Confidential Information Subject to Protective Order

Page 178

¹ indicated they have no idea about the
² degradation and they're saying that the
³ product comply with the specification.
⁴         So the compliance to the
⁵ specification is always -- see, there is
⁶ a certain specification, and every batch
⁷ of every lot needs to be tested to meet
⁸ that specification level.
⁹         That cannot be without --
¹⁰ without doing that, you cannot be
¹¹ indicating that it is meeting the
¹² specification or not meeting the
¹³ specification.
¹⁴     Q.    Okay.  I want to back up for
¹⁵ just a second.  You know that in
¹⁶ September 2015, Torrent product with
¹⁷ valsartan API from ZHP had already made
¹⁸ its way into the U.S., right?
¹⁹     A.    With ZHP, yes, our supplier,
²⁰ and yes, we were using their API.
²¹     Q.    Okay.  And you're not aware
²² of a follow-up report to this e-mail that
²³ says, you know, never mind, we're
²⁴ changing our assessment, ZHP understands

Page 179

¹ degradation now, right?
²     A.    Which portion of the mail
³ you are referring?
⁴     Q.    The part that we're looking
⁵ at, where she says they have no idea
⁶ about degradation.  You have no
⁷ information, no report, no update from
⁸ this that says never mind, ZHP
⁹ understands degradation now, right?
¹⁰     A.    Then follow-up of these
¹¹ findings, there must be a follow-up
¹² corrective action.  And with that,
¹³ definitely they must have been in
¹⁴ compliance to it.  And anyway we always
¹⁵ test every batch of API which is being
¹⁶ supplied to them to the specification.
¹⁷     Q.    You mentioned that there
¹⁸ must be a follow-up.  Well, you would
¹⁹ hope so, right, but you can't confirm
²⁰ that you've seen one, right?
²¹     A.    That is what I indicated.
²² This is not the last report.  After this
²³ also there must be several audits
²⁴ happening.  And if there is an issue with

Page 180

¹ the supplier, it cannot be qualified.
²         When vendor is qualified in
³ the sense that it has met all the
⁴ required requirements and is meeting with
⁵ the correct specification and guidelines.
⁶     Q.    Okay.  I'm not asking about
⁷ testing that Torrent was doing or
⁸ anything like that.
⁹         I'm just asking, this e-mail
¹⁰ says ZHP has no idea about degradation.
¹¹         Did you see any follow-up
¹² information to confirm that that has
¹³ changed?
¹⁴     A.    That I need to really look
¹⁵ into, because I am not -- I've seen this
¹⁶ mail first time.  And that's why whether
¹⁷ any follow-up is to be seen, I need to
¹⁸ see that.
¹⁹     Q.    Right.  So you're the head
²⁰ of quality, right?
²¹     A.    Yeah.
²²     Q.    Right.  And you told me
²³ earlier that you were definitely involved
²⁴ in selecting API manufacturers, right?

Page 181

¹     A.    That's not in 2015.
²     Q.    Right.  No, but you told me
³ that is part of your job.
⁴     A.    Yeah.  Agreed.  Correct.
⁵     Q.    Okay.  You told me that you
⁶ are involved in quality of the drugs as
⁷ well, right?
⁸     A.    Yeah.  It is correct.
⁹     Q.    And so you as head of
¹⁰ quality have never seen this document
¹¹ that says your API manufacturer has no
¹² idea about degradation, right?
¹³     A.    Yeah.  This is what I'm
¹⁴ indicating.  This is a 2015 status.  And
¹⁵ after this report, the API supplier is
¹⁶ qualified.
¹⁷     Q.    You would hope, right?  It's
¹⁸ your hope that ZHP is qualified later,
¹⁹ right?
²⁰     A.    No.
²¹         MS. BRANCATO:  Objection to
²² form.
²³         THE WITNESS:  No.  It's --
²⁴ we have, like, audit done after

Page 182

1 this also. And those audit
2 reports are indicating that vendor
3 is qualified.
4 BY MS. PENDLEY:
5    Q.   You are aware that in 2015
6 Torrent was relying on a statement from
7 ZHP about genotoxic impurities, do you
8 remember that?
9    A.   Can you repeat the question?
10    Q.   Yeah.  Do you remember
11 receiving, or are you aware that Torrent
12 received a genotoxicity statement from
13 ZHP in 2015?
14    A.   Yeah.  As a part of
15 declaration, yes.
16    Q.   Right.  And that declaration
17 said there are no genotoxic impurities in
18 valsartan API, right?
19    A.   From the ZHP declaration?
20    Q.   Yes.
21    A.   There is the declaration.  I
22 have seen it.
23    Q.   Okay.  And in that same year
24 you got that declaration from ZHP saying

Page 183

1 there's nothing genotoxic in this drug,
2 your inspector tells you they have no
3 idea about degradation, right?
4    A.   So, I --
5    Q.   Yes or no?  Same year,
6 right?
7    A.   No.  I will give a little
8 bit of aspect here.
9       Saying that -- for the
10 degradation, and genotoxic impurities is
11 not a degradation.  Those are the process
12 impurities all of this.
13    Q.   Right.  But it also says
14 that they just claim their product
15 complies with specification.  So the same
16 year that you learned this company just
17 claims their product complies with
18 specification, you're relying on their
19 statement that there's no genotoxic
20 impurities in your drug; is that right?
21    A.   See if I'm correctly
22 understanding.  But each and every lot is
23 being tested for -- for the agreed upon
24 specification.  And every lot is being

Page 184

1 qualified to those specification.
2       As far as genotoxic alerts
3 is concerned, it is always being a part
4 of DMF and it will always being a part of
5 assessment as being a risk being
6 submitted in the DMF.
7       And we always rely on that
8 declaration, which is being submitted to
9 agency as well as for us, because
10 declaration is a part of DMF, and we
11 always rely on that.
12    Q.   Okay.  So that was
13 interesting, but what I'm asking is, you
14 rely on ZHP for the genotoxic
15 declaration, correct?
16    A.   Yeah.
17    Q.   You're relying on ZHP's
18 testing for the genotoxic declaration,
19 right?
20    A.   Yeah.  Agreed.
21    Q.   Yes.  The same company that
22 you were just told just claims their
23 product complies with testing, right?
24       MS. BRANCATO:  Objection to

Page 185

1 form.
2 BY MS. PENDLEY:
3    Q.   Is that right?
4    A.   Method of communicating,
5 these are two different chapters, the
6 degradation and the genotoxic results
7 impurities.  These are two different
8 aspects.
9    Q.   Okay.  I'm not asking about
10 degradation anymore.  I've switched
11 gears.  "They claim their product
12 complies with specifications."
13       This doesn't say which
14 specifications.  It just says
15 specifications, any and all
16 specifications, right?
17       MS. BRANCATO:  Objection to
18 form and foundation.
19       THE WITNESS:  I'm not sure
20 which specification.  But whenever
21 we say specification, it's always
22 a set of specification which is
23 being approved and regulated.
24 BY MS. PENDLEY:

Confidential Information Subject to Protective Order

Page 186

1  Q.   Right.  And as you can see
2  from this e-mail, nobody followed up to
3  ask, "Hey, Jenny, which specifications?"
4  Right?
5      MS. BRANCATO:  Objection to
6  foundation.
7      THE WITNESS:  Not sure if
8      any follow-up is being done on
9      this mail.
10 BY MS. PENDLEY:
11     Q.   Right.  The only reply that
12 we see here is just "FYI."  Right?
13     A.   Yeah, because he's the
14 person who has given it to one of the
15 team member, and this person is a kind of
16 secretary and he copied e-mail to the
17 quality team.
18     Q.   Okay.  And you mentioned
19 that each and every lot is being tested
20 by ZHP and Torrent.  Do you remember
21 that?
22     A.   Yes.
23     Q.   Okay.  Well, we know now
24 each and every lot was not being

Page 187

1  adequately tested for genotoxic
2  impurities.  We can agree?
3      MS. BRANCATO:  Objection to
4      form.
5      THE WITNESS:  I'm not
6      denying, because I have indicated
7      each and every lot has been tested
8      for agreed specification.  And
9      agreed specification, what I'm
10     talking about is the specification
11     which has been filed within the
12     ANDA which is as per the DMF.
13 BY MS. PENDLEY:
14     Q.   I'm asking specifically
15 about genotoxic impurities.
16     So we can agree each batch
17 was not being adequately tested for
18 genotoxic impurities, we can agree?
19     MS. BRANCATO:  Objection to
20     form.
21     THE WITNESS:  You are
22     indicating -- it is not a matter
23     of adequate testing because each
24     and every lot is being adequately

Page 188

1  tested for the specification which
2  is being approved within the ANDA.
3  BY MS. PENDLEY:
4      Q.   But not for genotoxic
5  impurities, right?
6      A.   Being tested for all the
7  specification as per the approved ANDA.
8      Q.   Okay.  But you know NDMA and
9  NDEA, two genotoxic impurities, were
10 found in valsartan's API, right?
11     A.   Yeah.
12     Q.   So it was obviously not
13 being tested adequately?
14     MS. BRANCATO:  Objection to
15     form.
16     THE WITNESS:  Because this
17     was not a part of a specification.
18 BY MS. PENDLEY:
19     Q.   But it should have been,
20 right?
21     MS. BRANCATO:  Objection to
22     form and foundation.
23 BY MS. PENDLEY:
24     Q.   Right?

Page 189

1      Okay.  Mr. Jaiswal, despite
2  this -- okay, my last question, it should
3  have -- genotoxic impurity testing should
4  have been part of the specification,
5  right?
6      MS. BRANCATO:  Objection to
7      form and foundation.
8  BY MS. PENDLEY:
9      Q.   Mr. Jaiswal, do you need me
10 to ask the question again?
11     A.   Yeah.
12     Q.   Okay.  We can agree that
13 genotoxic impurity testing should have
14 been part of the specification, right?
15     MS. BRANCATO:  Same
16     objections.
17     You can answer, Sushil.
18     THE WITNESS:  It is not part
19     of the specification, and it was
20     not like a discovery at that
21     moment of time.  It has never been
22     a part of the DMF.  It would be
23     a -- like a specification within
24     like in the DMF.

Confidential Information Subject to Protective Order

Page 190

¹ BY MS. PENDLEY:
² Q. Right. But it should have
³ been?
⁴ MS. BRANCATO: Same
⁵ objections.
⁶ BY MS. PENDLEY:
⁷ Q. Right?
⁸ A. This, according to me, this
⁹ is like DMF holder is to be able to
¹⁰ answer this. Like, I'm not able to
¹¹ answer this in that sense because I'm not
¹² aware of the manufacturing process of the
¹³ API and that's why whether this
¹⁴ impurities is -- possibility it was there
¹⁵ or not, that is difficult to conclude,
¹⁶ because to conclude that genotoxic
¹⁷ impurities was in the API, you're
¹⁸ supposed to know the complete detailed
¹⁹ manufacturing process, including all like
²⁰ process condition.
²¹ And without that, you cannot
²² be able to decide whether there is
²³ such -- which impurities to be part of
²⁴ the specification or which impurity is

Page 191

¹ not part of the specification.
² Q. Did you just read that from
³ something?
⁴ A. Pardon?
⁵ Q. Did you just read that from
⁶ something?
⁷ A. Which one?
⁸ Q. The answer that you just
⁹ gave?
¹⁰ A. No.
¹¹ Q. Okay. As the head of
¹² quality, you're telling me that you can't
¹³ answer whether or not genotoxic impurity
¹⁴ testing should have been part of the
¹⁵ specification?
¹⁶ A. So any --
¹⁷ MS. BRANCATO: Same
¹⁸ objection.
¹⁹ Go ahead, Sushil.
²⁰ THE WITNESS: It depends
²¹ upon the API manufacturing process
²² and based upon the production
²³ conditions, and say, there are --
²⁴ let me give you a little -- more

Page 192

¹ elaborate on this aspect of this
² topic.
³ The API manufacturer, they
⁴ manufacture the API in the
⁵ different stage of manufacturing
⁶ process, and we call it Stage, 1,
⁷ 2, 3, 4.
⁸ And throughout this process,
⁹ they basically clean and clean and
¹⁰ clean that substance. And within
¹¹ the DMF, within the closed part of
¹² DMF, within the restricted part of
¹³ DMF, this aspect, how they have
¹⁴ designed their experiment and how
¹⁵ they achieve this aspect.
¹⁶ And as an ANDA holder, we
¹⁷ never get that portion of the DMF.
¹⁸ The ANDA holder is not able to
¹⁹ understand whether -- which
²⁰ genotoxic impurities are supposed
²¹ to be part of the specification.
²² This is only to be decided
²³ by the API manufacturer, and once
²⁴ they give a declaration, based

Page 193

¹ upon that, ANDA holder is supposed
² to be making this as part of the
³ specification and making it a part
⁴ of ANDA.
⁵ THE VIDEOGRAPHER: Sorry to
⁶ interrupt, Counsel.
⁷ Mr. Jaiswal, could you
⁸ either pull your screen towards
⁹ you or move up a little bit just
¹⁰ so we can position your head a
¹¹ little better on the screen.
¹² THE WITNESS: Now are you
¹³ able to see me?
¹⁴ THE VIDEOGRAPHER: Yes,
¹⁵ that's better.
¹⁶ BY MS. PENDLEY:
¹⁷ Q. Okay. But as the finished
¹⁸ dose manufacturer, it's also Torrent's
¹⁹ duty to follow industry standards
²⁰ regarding genotoxic impurities, right?
²¹ A. Yes.
²² Q. Because you want to ensure
²³ those genotoxic impurities don't end up
²⁴ in your finished product, right?

Confidential Information Subject to Protective Order

Page 194

1    A.   So, like, genotoxic
2  impurities may be generated within the
3  API also, and in the formulation also
4  based on your manufacturing process.
5        You always assess whether
6  API which you are using and the
7  excipients which you're using is -- they
8  are basically generating any kind of
9  impurity.
10        And that assessment is with
11  the ANDA holder, and with the impurity
12  coming out of the API is always with the
13  DMF holder.
14        And that always is in the
15  closed part of the DMF.  And they give a
16  declaration and I think to us, to agency,
17  what are the genotoxic alerts possible in
18  their process and what is the mitigation
19  strategies they have.
20        And based upon that, we
21  always ensure to add those impurities in
22  our specification.
23    Q.   Okay.
24    A.   In this case --

Page 195

1    Q.   Let me back up a little bit
2  because my question was a little bit more
3  simple.
4        You want to make sure
5  genotoxic impurities don't end up in your
6  finished dose, yes or no?
7        MS. BRANCATO:  Objection to
8    form.
9  BY MS. PENDLEY:
10    Q.   You can answer.
11    A.   Can I have really --
12  understand your question once again.
13    Q.   As a finished dose
14  manufacturer, you don't want genotoxic
15  impurities in your finished dose, right?
16        MS. BRANCATO:  Same
17    objection.
18        THE WITNESS:  So it really
19    depends upon the overall
20    manufacturing process of API and
21    formulation together.  And if any
22    genotoxic impurity is there, then
23    you need to be having a control
24    strategy in place, which is part

Page 196

1  of ANDA at the time of filing.
2        And that is always being
3  discussed and assessed between the
4  FDA and API manufacturer and with
5  the ANDA holder.
6        But I'm not saying that
7  to -- like none of the product in
8  the globe is having, like, a
9  product that genotoxic alert is
10  not there.
11  BY MS. PENDLEY:
12    Q.   Okay.  My question was:  Do
13  you want genotoxic impurities in your
14  finished dose?
15        MS. BRANCATO:  Same
16    objection.
17        You can answer, Sushil.
18        THE WITNESS:  I think I
19    explained that it all depends on
20    the science, chemistry, what is
21    being used for the product.
22        And based upon that,
23    basically it is being concluded
24    whether the product is supposed to

Page 197

1  be some genotoxic alert and the
2  limits.
3        And that is what is the
4  guidance available with several
5  approach that limit -- you are
6  supposed to proceed with that.
7        So, like, I'm not saying
8  that to what question is being
9  asked, answering yes or no.
10        But definitely, this is my
11  answer, that it is a scientific
12  evaluation of the API
13  specification -- API process.  And
14  based on that, API impurities is
15  being agreed upon.  And based on
16  the declaration of the API
17  impurities, the formulation
18  manufacturer set up their own
19  specification and includes those
20  impurities and the specification.
21  BY MS. PENDLEY:
22    Q.   Okay.  You're saying it
23  depends, sometimes you do want genotoxic
24  impurities in your drug?

Page 198

1  MS. BRANCATO:  Objection to
2  form.
3  THE WITNESS:  I'm not saying
4  that I want genotoxic impurity in
5  the product.  What I'm trying to
6  say, it is a science.  It is a
7  chemistry.
8  BY MS. PENDLEY:
9  Q.   No, I understand that.  I
10  know --
11  MS. BRANCATO:  I'm sorry.
12  He's giving his answer.  Let him
13  finish.
14  MS. PENDLEY:  Okay.  It's
15  been a little bit narrative.  So
16  I'm just going to clarify my
17  question real quick.
18  BY MS. PENDLEY:
19  Q.   My question was:  As a
20  finished dose manufacturer, do you want
21  it in there?  Not is it going to show up,
22  not how did it get there.  Is it a good
23  thing to see a genotoxic impurity in your
24  drug as a finished dose manufacturer, yes

Page 199

1  or no?
2  MS. BRANCATO:  Objection to
3  form.
4  THE WITNESS:  And this is
5  what I'm indicating.  This is an
6  answer not in a yes and no.  I
7  can't answer based upon the real
8  sense of chemistry and limitation
9  of that aspect.
10  We have several product
11  molecule like a genotoxic impurity
12  is always be part of a
13  specification, as long as we
14  control.  And but still it is
15  going -- because the chemistry is
16  not -- the chemistry is not able
17  to have a free of those either
18  genotoxic alerts or from the Class
19  I, Class II solvents.
20  BY MS. PENDLEY:
21  Q.   Okay.  Let me switch gears a
22  little bit.
23  A.   I'm am sorry.  Whether I
24  like or don't like, but it is supposed to

Page 200

1  go by the chemistry.
2  Q.   Okay.  So despite all the
3  information that we talked about earlier,
4  that you have a cheap Chinese API
5  supplier who doesn't understand
6  degradation and says their test complies
7  with specification, Torrent continues to
8  rely on ZHP to test valsartan API,
9  correct?
10  MS. BRANCATO:  Objection to
11  form.
12  BY MS. PENDLEY:
13  Q.   You can answer.
14  A.   So I'll say, that is what --
15  if you really understand the overall
16  objective, the each and every lot, once
17  you receive at your -- and once you test
18  to the agreed specification, which
19  they -- agreed specification, I'm talking
20  about the specification which is within
21  the ANDA.  And once you are testing each
22  lot to those specification, you are
23  relying to the API manufacturer alone is
24  not there, because you are testing each

Page 201

1  and every lot in your own quality system.
2  MS. PENDLEY:  All right.
3  Let's look at LP 1394.
4  (Document previously marked
5  for identification as Exhibit
6  Torrent-83.)
7  MS. PENDLEY:  It is
8  previously marked as Torrent-83.
9  THE WITNESS:  83.  Just a
10  moment.
11  BY MS. PENDLEY:
12  Q.   Okay.  Whenever you've got
13  it pulled up, we can see that this is an
14  e-mail from 2014.
15  A.   Just a moment.
16  Q.   Okay.
17  A.   Yes.  Torrent-83.
18  Q.   Yep.
19  A.   Yes.
20  Q.   So again, this is before you
21  started working at Torrent, right?
22  A.   Yes.
23  Q.   Okay.  You mentioned to me
24  earlier the old process versus new

Confidential Information - Subject to Protective Order

Page 202

1  process stuff. And you said that Torrent
2  only ever used old process in valsartan
3  U.S. product, right?
4       A.   Yeah.
5       Q.   Okay. So this document, I
6  want to start in the middle of the page
7  where it's from Sue Perry. And we can
8  see she asks a question. And then it
9  looks like Brijesh Patel responds to her
10 in darker blue.
11       Do you see that?
12      A.   Yes.
13      Q.   Let's look at her e-mail.
14 She says, "Brijesh, I have some concerns
15 with this amendment."
16      A.   Can you repeat?
17      Hello?
18      Q.   Let's back up a little bit.
19 So the subject of this e-mail is "CMC
20 Amendment AVH tablets"?
21      A.   Yes.
22      Q.   And the AVH is amlodipine/
23 valsartan/hydrochlorothiazide, right?
24      A.   Yes.

Page 203

1       Q.   Okay. So there's obviously
2  been amendment submitted pertaining to
3  amlodipine/valsartan/hydrochlorothiazide.
4       A.   Okay.
5       Q.   This e-mail says -- Sue
6  Perry from Torrent U.S. is saying, "I
7  have some concerns with this amendment.
8  Of course I haven't seen their full DMF."
9       Okay. So the full DMF would
10 be referencing ZHP's DMF, right?
11      MS. BRANCATO:  Objection
12      foundation.
13      THE WITNESS:  So it is not
14      written here which number. Also
15      I'm not finding. But I zoom --
16      no, in the full mail, I'm not
17      finding the DMF reference also.
18 BY MS. PENDLEY:
19      Q.   Okay. But you just told me
20 that you didn't use any other API
21 supplier for valsartan aside from ZHP,
22 right, from the time that valsartan was
23 actually on the market?
24      A.   That is correct.

Page 204

1       Q.   She says, "I have concerns
2  with the DMF." But -- and she goes on to
3  say, "They have used different solvents,
4  but I seen nothing that indicates that
5  they tested for the DMF and MTBE and they
6  were not found." Do you see that?
7       A.   Just one moment. The first
8  query, "They have used different solvent
9  but I see nothing that indicates that
10 they tested for DMF and MTBE and they
11 were not found."
12      Please refer this... and
13 absence of new solvent as well as heavy
14 metal. Attached...
15      Okay. Yeah, so what is your
16 query here?
17      Q.   Okay. So Sue Perry is
18 asking Brijesh, "They," being ZHP, "have
19 used different solvents but I see nothing
20 that indicates they tested for DMF."
21 Right?
22      A.   Mm-hmm.
23      Q.   Is that a yes?
24      A.   Yes.

Page 205

1       Q.   Okay. And then we see
2  Brijesh answers her in that lighter blue
3  color that says, "Vendor has tested,"
4  right?
5       A.   Okay. So I think -- say --
6  can I -- can I really define -- or can I
7  explain some of the thing? Like whenever
8  we say that there's a specification which
9  is a part of the DMF and which is being
10 agreed between agency and DMF holder, it
11 is always being done based upon some
12 rationale.
13      And for the solvent, like,
14 whatever the process -- as I indicated
15 that solvents is being used in different
16 stage of manufacturing, and based upon
17 that distribution being devised.
18      Q.   Okay. I gotcha. My
19 question is just, it says, "Vendor has
20 tested." Right?
21      A.   Yeah.
22      Q.   And vendor would be ZHP, not
23 Torrent, right?
24      A.   Yeah, vendor is definitely

Confidential Information Subject to Protective Order

Page 206

1  not Torrent.
2     Q.   Okay.  So we can see that
3  Torrent is relying on this vendor for
4  that information that they're discussing,
5  right?
6     A.   Yeah.  Correct.
7     Q.   Okay.  Then that second
8  bullet, Sue Perry asks another question,
9  you know, talking about the route of
10  synthesis and intermediate remain the
11  same and there's no change in the
12  impurity profile.
13        She goes on to say like, I
14  agree -- I'm paraphrasing, obviously --
15  but please verify that the DMF
16  manufacturer has evaluated the impurity
17  profile.
18        Do you see that?
19     A.   Which question are you
20  referring to again?
21     Q.   The second bullet point, so
22  that whole thing is going to be Sue
23  Perry's question to Brijesh.
24        Do you see that?

Page 207

1     A.   I have gone through it, yes.
2     Q.   Okay.  And then the answer
3  once again is, "Yes, the DMF holder has
4  already provided confirmation for the
5  same."
6        Do you see that?
7     A.   Yeah.
8     Q.   Okay.  So the DMF holder
9  again is not Torrent, right?
10     A.   Yes.  It is not Torrent.
11     Q.   That would be ZHP, right?
12     A.   Though, ma'am, the DMF
13  number is not here.  So I'm not able to
14  conclude.  But maybe.  I'm not sure.
15     Q.   All right.  But it's not
16  Torrent.  So Torrent is relying on
17  somebody else for this information,
18  right?
19     A.   Correct.
20     Q.   Okay.
21        MS. PENDLEY: Okay.  Let's
22  go to LP 45.
23        MS. BRANCATO:  I don't know
24  if this is a good point to take a

Page 208

1  break.  But I think it's almost
2  8:00 p.m. in India.  So Sushil may
3  want to take a quick dinner break.
4        Sushil, what do you want to
5  do?
6        THE WITNESS: Yeah, I think
7  now it is almost 7:30 India time.
8        MS. BRANCATO:  Would you
9  like to take a break now or would
10  you like to keep going?
11        THE WITNESS: No, I think
12  we'll take a break, we'll have a
13  dinner, and then come back.
14        MS. BRANCATO:  Okay.  Let's
15  go off.  Is it okay if we go off
16  the record, Madeline?
17        MS. PENDLEY:  Yeah, let's do
18  like 45 minutes.
19        THE VIDEOGRAPHER:  The time
20  is now 9 -- 10 o'clock a.m.  (7:30
21  p.m. India Time.)  We're going off
22  the record.
23           - - -
24        (Whereupon, a dinner break

Page 209

1  was taken.)
2           - - -
3        THE VIDEOGRAPHER:  The time
4  is now 10:45 a.m.  (8:15 p.m.
5  India Time.)  We're back on the
6  record.
7  BY MS. PENDLEY:
8     Q.   Okay.  Mr. Jaiswal, I want
9  to look at LP 45 with you.  One second,
10  I'll give you the exhibit number.  Going
11  to be Torrent Exhibit 218.
12     A.   Yes, Torrent-218.
13        THE VIDEOGRAPHER:  Counsel,
14  it looks like we have a 218.  219?
15        MS. PENDLEY:  No, we're
16  going back to a document that
17  we've already used.
18        THE VIDEOGRAPHER:  I
19  apologize.
20        MS. PENDLEY:  No, you're
21  fine.
22  BY MS. PENDLEY:
23     Q.   I want to start at the
24  bottom of the first page.  We see this is

Page 210

1  an e-mail from you, right?
2      A.   Yeah.
3      Q.   Okay.  And you send this on
4  August 28th, 2018.  And you start by
5  saying, "The vendor," ZHP, "has provided
6  a declaration on October 9th, 2009, that
7  in their drug either doesn't have
8  genotoxic impurities or they are under
9  the levels."
10         Do you see that?
11     A.   Are you referring to the
12 mail?
13     Q.   I'm referring to -- yes, the
14 e-mail, that paragraph at the bottom of
15 the page.  I'm looking at the first
16 sentence.
17         Do you see that?
18     A.   Yeah, I'm just trying to
19 read the mail.  The mail you're referring
20 to the top mail or the bottom?
21     Q.   Yes, the paragraph at the
22 bottom.
23     A.   Yeah.
24     Q.   Okay.  So you say, ZHP gave

Page 211

1  you, Torrent, a declaration saying
2  there's no genotoxic impurities in the
3  drug, right?
4      A.   I'm trying to see that
5  portion of letter.
6      Q.   Do you see what I'm talking
7  about?
8      A.   Yeah, give me just a moment.
9          You're referring to the
10 first sentence?  "In 2013, API
11 manufacturer proposed an alternative
12 process, which is identified by the" --
13 and that is the sentence that you're
14 referring to me?
15     Q.   No.  Back up just a little
16 bit.  It's on the first page at the
17 bottom.  There's a paragraph.  And if you
18 need to not look at the document that
19 you've downloaded, just look at the Zoom
20 screen --
21     A.   Yeah.
22     Q.   -- the trial tech has the
23 document, and he's highlighting where we
24 are, if that helps.

Page 212

1          Do you see that?
2      A.   Yeah, I see it.
3      Q.   Okay.  So you're with me
4  now.  Bottom of Page 1.
5          Okay.  So Torrent didn't
6  actually test the API for genotoxic
7  impurities in 2009, right?
8      A.   Yeah, correct.
9      Q.   Okay.  Now in 2013 -- go to
10 the next page.  This is where you were
11 before.
12         It says the API manufacturer
13 changed their process and started using D
14 code that you told me about earlier,
15 right?
16     A.   Yeah.
17     Q.   Okay.  When they made the
18 process change, they again provided you a
19 similar declaration as they did in 2009,
20 right?
21     A.   Yeah.  And it is also
22 written, "API manufacturer provide the
23 declaration that the API is free from
24 genotoxic impurity and complies to ICH

Page 213

1  M7."
2      Q.   Right.  Okay.  So from 2009
3  to 2013, Torrent wasn't testing the API
4  for genotoxic impurities, right?
5      A.   Yeah.
6      Q.   Okay.  You mentioned 2015.
7  They gave you another genotoxic impurity
8  statement.
9          And at this point, 2015,
10 Torrent also was not testing the API for
11 genotoxic impurities, right?
12     A.   Yeah, because throughout
13 this process, the manufacturers had
14 already indicated that the API is free
15 from the genotoxic alerts.
16     Q.   Right.  Okay.  So if you
17 remember, we looked at this e-mail from
18 Jenny Yang before, right?  Do you
19 remember that?
20     A.   Yeah.
21     Q.   Okay.  And that was from
22 2015, right?
23     A.   Yes.  September 2015.
24     Q.   Okay.  Okay.  So despite

Confidential Information Subject to Protective Order

Page 214

1 learning that this company that's telling
2 you there's no genotoxic impurities in
3 your drug also has no idea about
4 degradation and stuff, you guys still
5 weren't testing the API, right?
6       MS. BRANCATO:  Objection to
7    form.
8       THE WITNESS:  I think I have
9    already clarified.  The genotoxic
10    impurity, the process impurity, is
11    based upon the chemistry.  And the
12    degradation product result is a
13    different aspect.
14       The degradation product is
15    always being monitored through the
16    testing method.  And for the
17    genotoxic impurity, if it is
18    there, it has to be -- for that,
19    method is to be there in place.
20       But this genotoxic alerts is
21    always being -- like, throughout
22    the DMF process, vendor has
23    already given a claim that it is
24    meeting the ICH M7 requirement.

Page 215

1 BY MS. PENDLEY:
2    Q.   Okay.  But despite learning
3 that your inspector had concerns about
4 your API manufacturer, you still did not
5 confirm the testing they were giving you
6 about genotoxic impurities; is that
7 right?
8       MS. BRANCATO:  Objection to
9    form.
10       THE WITNESS:  No, I think --
11    I think I'm not fully in
12    agreement, because those are the
13    findings what you have seen in
14    2015 report, the citation, those
15    are not relating to the genotoxic
16    part, they are relating to the
17    degradation impurities.  And
18    genotoxic impurity is not a
19    degradation impurity.
20 BY MS. PENDLEY:
21    Q.   Okay.  Right.  But Jenny
22 Yang told you guys that she has concerns
23 about ZHP, says they're not concerned
24 with patient safety, and they have no

Page 216

1 idea what they're doing when it comes to
2 cleaning of equipment.
3       Despite that information,
4 you guys were not testing ZHP's API for
5 genotoxic impurities, right?
6       MS. BRANCATO:  Objection to
7    form.
8       THE WITNESS:  So again, I
9    will -- I will answer the same
10    thing, that genotoxic impurities,
11    the process impurity is purely
12    within a chemistry evaluation.
13       And the degradation
14    impurities are always different
15    impurity.
16       So these two things are not
17    correlated, and what we have seen,
18    we have seen that it went.
19       What has happened after that
20    is not being seen here.
21       And we need to really look
22    into that as well, what corrective
23    actions they are taking up after
24    this.

Page 217

1 BY MS. PENDLEY:
2    Q.   And you also saw in that
3 2015 document that their corrective
4 actions were not sufficient in 2015,
5 right?
6       MS. BRANCATO:  Objection to
7    form.
8       THE WITNESS:  No, it's not
9    right because that is the mail
10    what we have seen is just sorted
11    out.  And after that, always when
12    they do their corrective actions,
13    and based upon that, vendor is to
14    be re-evaluated always.
15 BY MS. PENDLEY:
16    Q.   Okay.  I want to talk to you
17 about one more date.  Do you see the
18 June 20, 2018?  Second paragraph.  It
19 says the notification was received from
20 ZHP.
21       So this is when ZHP told
22 Torrent that a genotoxic impurity is in
23 valsartan, right?
24    A.   Yeah.  This is the first

Page 218

¹ notification.
² Q. Okay. Now you told me at
³ the beginning of this deposition that
⁴ genotoxic impurities in pharmaceutical
⁵ products should be taken very seriously,
⁶ right?
⁷ MS. BRANCATO: Objection to
⁸ form.
⁹ THE WITNESS: Right. And I
¹⁰ think I already indicated that a
¹¹ genotoxic alert within the product
¹² is to be always quantified, and
¹³ based upon that, we decide whether
¹⁴ the alert is to be -- to be taken
¹⁵ into that account, because every
¹⁶ genotoxic alert has some limits to
¹⁷ it.
¹⁸ BY MS. PENDLEY:
¹⁹ Q. Okay. Right. Just like you
²⁰ said, every genotoxic alert should be
²¹ investigated, so that it can be
²² quantified, right?
²³ MS. BRANCATO: Objection to
²⁴ form.

Page 219

¹ THE WITNESS: I think that
² there's a different way around.
³ Every genotoxic alert is to be
⁴ investigated, what is the
⁵ quantification of it.
⁶ The only notification -- the
⁷ notification that it has a
⁸ genotoxic alert is not sufficient.
⁹ You're supposed to know what
¹⁰ genotoxic alert and then what is
¹¹ the quantification and what is the
¹² limit.
¹³ BY MS. PENDLEY:
¹⁴ Q. Okay. So Torrent gets a
¹⁵ notification there is a genotoxic
¹⁶ impurity in their drug, but they don't
¹⁷ have to investigate it yet because you
¹⁸ don't know how much?
¹⁹ A. No. Because the analysis,
²⁰ the first thing that you're supposed to
²¹ know, the specification, what are like
²² the which genotoxic alert this is,
²³ because there's thousands of impurities.
²⁴ Q. Right.

Page 220

¹ A. And unless you don't know
² that, you cannot be assigning a level to
³ it. But back to the assessment of which
⁴ API it is -- or which genotoxic alert it
⁵ is, it is always to be done by the person
⁶ who is owning the process. And it is
⁷ definitely the DMF holder.
⁸ Q. So you're saying it's up to
⁹ ZHP to figure out which genotoxic
¹⁰ impurity is in the drug that you're
¹¹ selling, right?
¹² A. No. They are supposed to
¹³ tell us which genotoxic impurity is
¹⁴ there, in the API.
¹⁵ Q. Right, in the drug that
¹⁶ you're selling, right?
¹⁷ A. No. We are selling the drug
¹⁸ product. So we need to know what
¹⁹ impurity in the drug substance from the
²⁰ API manufacturer.
²¹ Q. Right. Okay. What if ZHP
²² can't figure it out? Would Torrent test
²³ it then?
²⁴ MS. BRANCATO: Objection to

Page 221

¹ form.
² THE WITNESS: No. I'm not
³ able to understood your question.
⁴ BY MS. PENDLEY:
⁵ Q. Okay. So you, as the head
⁶ of quality, are telling me API
⁷ manufacturer learns there is a genotoxic
⁸ impurity in the API that you use in your
⁹ finished dose, right? You're telling me,
¹⁰ Torrent would not test the API to help
¹¹ figure out what the genotoxic impurity
¹² was?
¹³ MS. BRANCATO: Objection.
¹⁴ Form.
¹⁵ THE WITNESS: No, I think
¹⁶ this is not, like, my argument --
¹⁷ my agreement to that. Like, any
¹⁸ manufacturer, I'm not saying that
¹⁹ in company -- any manufacturer is
²⁰ to test that until unless it is
²¹ not known which impurity it is.
²² The only genotoxic alert is
²³ a very generic name, category.
²⁴ You're supposed to know the

Page 222

1 real compound, what it is.
2        And without that, you cannot
3 devise your testing method.
4 Without that, you cannot be
5 devising a limits to it.
6        You cannot apply ICH M7
7 without knowing that.
8 BY MS. PENDLEY:
9    Q.   So it's ZHP's job to figure
10 out which genotoxic impurity is in the
11 API?
12        MS. BRANCATO:  Objection to
13 form.
14 BY MS. PENDLEY:
15    Q.   Right?
16    A.   I'm not able to understood
17 your question.
18    Q.   What you're telling me is
19 it's ZHP's job to figure out which
20 genotoxic impurity is in the API?
21        MS. BRANCATO:  Same
22 objection.
23        THE WITNESS:  Definitely I'm
24 not saying that is a ZHP job.  But

Page 223

1 ultimately the knowledge of the
2 chemistry lies with the DMF
3 holder.
4 BY MS. PENDLEY:
5    Q.   All right.  So what you've
6 just told me is -- you're kind of going
7 around and around a little bit.  So let's
8 start over.
9        You've told me that Torrent
10 can't test until ZHP tells them what they
11 are testing for.  And I'm asking, is it
12 ZHP's job to figure out the impurity.
13 And then you say no.
14        So whose job is it to figure
15 out which impurity is in the API?
16    A.   I'm not saying it is not
17 ZHP's job.  What I'm saying, the DMF
18 holder is knowing the chemistry.  And he
19 only is able to assign that aspect, what
20 is the impurity in their drug substance.
21    Q.   Okay.  So only ZHP can
22 identify the genotoxic impurity because
23 they know the chemistry?
24        Okay.  So until ZHP tells

Page 224

1 Torrent --
2        THE COURT REPORTER:  I
3 didn't get a verbal answer.  I'm
4 sorry.  He shook his head.  He
5 only shook his head, though.
6 There was no verbal.
7 BY MS. PENDLEY:
8    Q.   Okay.  So the question that
9 I asked was only ZHP can identify the
10 genotoxic impurity because they know the
11 chemistry.
12        You can answer, Mr. Jaiswal.
13    A.   The chemistry in the sense
14 that I'm talking about the manufacturing
15 process of the valsartan, because as a
16 drug substance -- drug product
17 manufacturer, we were not knowing how the
18 API is being manufactured, what are the
19 temperature condition, what are the other
20 conditions.  It is knowledge that only
21 DMF holder.
22        And that's right.  It is
23 basically their assessment.  They're able
24 to only figure out what is the impurity

Page 225

1 in the drug substance.
2    Q.   So you are waiting on ZHP to
3 identify the impurity, right, because
4 they know the chemistry?
5    A.   Yeah, because they know the
6 chemistry.
7    Q.   Okay.  So from the time ZHP
8 tells you guys there is a genotoxic
9 impurity in their drug, it is only about
10 a week until ZHP tells them that
11 genotoxic impurity is NDMA.
12        Does that sound about right?
13    A.   Yeah, I think.  I'm not sure
14 about the date, but yes, they indicated
15 after some time it is NDMA.
16    Q.   Okay.  So in the meantime,
17 from the time that you learned there's a
18 genotoxic impurity in the API, to the
19 time that you find out what the impurity
20 is, what if anything is Torrent doing to
21 get control of this situation?
22    A.   Like, if I'm able to
23 understand your question, you're
24 indicating that, when they are giving the

Confidential Information Subject to Protective Order

Page 226

1 first indication that there is some
2 genotoxic impurity in API, and when they
3 are giving the second information that
4 this is the, like, NDMA impurity, what is
5 being done in between?
6         This is what is question?
7     Q.   Yes.
8     A.   Yeah, because this
9 information, the piece of information
10 they have indicated, the first
11 information that was basically -- that
12 indicated that it is only a genotoxic
13 alert, you are not even knowing which
14 impurity it is.  And that also, on the
15 precaution ground, all the supplies is
16 being put under hold.
17     Q.   Okay.  So valsartan product
18 is on hold between the 20th and the 26th?
19     A.   Yes.
20     Q.   Okay.  Is it being tested by
21 Torrent at this point for genotoxic
22 impurities?
23     A.   Because we are not knowing
24 which impurity, yeah.

Page 227

1     Q.   All right.
2     A.   So no.
3     Q.   That's okay.  Okay.  Okay.
4 And when they finally did tell you what
5 was in the valsartan, ZHP told Torrent
6 NDMA is only in the new process, that's
7 what they initially told you guys, right?
8     A.   Yeah.
9     Q.   All right.  That would mean
10 there's no NDMA in the old process,
11 right?
12     A.   Mm-hmm.
13     Q.   Is that a yes?
14     A.   Yes.
15     Q.   Which is what Torrent was
16 using, right, only old process?
17     A.   Yeah.
18     Q.   So at this point, Torrent
19 thinks its product is not contaminated
20 with NDMA; is that fair?
21     A.   Yeah, once they indicated
22 that it is only a new ROS, and the old
23 process is not impacted, yes, it's fair
24 to believe that is -- old process is not

Page 228

1 impacted.
2     Q.   Okay.  So based on this
3 information from ZHP, Torrent gets their
4 product, old process valsartan, put back
5 on the market, right?
6         MS. BRANCATO:  Objection to
7     form.
8         THE WITNESS:  We
9     communicated with the FDA and we
10     have given a complete information
11     to FDA as well, indicating that
12     the DMF holder has indicated the
13     new ROS is only impacted, and
14     there is no impact on the old
15     process.
16         And with this information we
17     basically requested FDA also to
18     give us their advice, go back to
19     market, or we can hold.
20         And FDA, they have given us
21     a clarity and clearance to go to
22     the market with the old process
23     batches.
24 BY MS. PENDLEY:

Page 229

1     Q.   Okay.  So to simplify that a
2 little bit.  Yes, after ZHP told you your
3 product wasn't implicated, you got it put
4 back on the market, right?
5     A.   Yeah.  But I cannot be like
6 leaving those in between assessment
7 because that is important because the
8 regulator is always supposed to be taken
9 into account while doing -- while you're
10 dealing with such kind of situation.  You
11 have to take advice of your regulator as
12 well before it is called.
13     Q.   Okay.  So you took
14 information that ZHP gave you, and you
15 gave it to the FDA.  And they let you put
16 your product back on the market, right?
17     A.   Not only the information
18 sharing.  It is a kind of discussion
19 happened.  It is just not information.
20 It is basically inform, and then
21 basically we have taken a clearance from
22 them.
23         So it is -- information is
24 one-sided information.  And once we see

Confidential Information Subject to Protective Order

Page 230

¹ that, we inform them and taken their
² consensus and approval to proceed with
³ the market.
⁴     Q.   Sure.  The information that
⁵ was exchanged was ZHP told us there's
⁶ nothing in here, the FDA says okay,
⁷ sounds good, and it gets back on the
⁸ market, right?
⁹     A.   Yes.
¹⁰         MS. BRANCATO:  Objection to
¹¹     form.
¹² BY MS. PENDLEY:
¹³     Q.   Okay.  And that information
¹⁴ was based on testing that ZHP had
¹⁵ conducted, right?
¹⁶     A.   This information is based
¹⁷ upon the ZHP declaration to us.  And
¹⁸ once -- I firmly believe that ZHP, once
¹⁹ this declaration giving to us, the same
²⁰ declaration, they must be giving to FDA
²¹ as well as a DMF holder.
²²     Q.   To confirm, Torrent did not
²³ test their product at this point for
²⁴ genotoxic impurities, right?

Page 231

¹         MS. BRANCATO:  Objection to
²     form.
³         THE WITNESS:  As already
⁴     indicated, till this time, we were
⁵     not given the name of the
⁶     impurity.
⁷ BY MS. PENDLEY:
⁸     Q.   Well, no, let me back up
⁹ because you already told me by this time
¹⁰ you did know the name of the impurity.
¹¹ ZHP told you there's nothing in the old
¹² process.  And you guys did not test it to
¹³ confirm that, correct?
¹⁴     A.   In the old process?
¹⁵     Q.   Right.  You did not test to
¹⁶ confirm there's no NDMA in the old
¹⁷ process before putting it on the market?
¹⁸     A.   Yeah, because the DMF holder
¹⁹ has given a declaration to you, and it is
²⁰ basically -- I mean, I'm telling you that
²¹ the genotoxic alerts, being a process
²² impurity of the API, it is always a DMF
²³ holder has to give a declaration and give
²⁴ us a clarity whether the API has a

Page 232

¹ process impurity in it or not.
²     Q.   I know.  I understand that
³ you want to say all that.  But the answer
⁴ to my question is just no, we didn't test
⁵ the product before putting it on the
⁶ market, right?
⁷         MS. BRANCATO:  Objection to
⁸     form.
⁹         THE WITNESS:  This --
¹⁰ BY MS. PENDLEY:
¹¹     Q.   Not as to why.  But to
¹² clarify, you didn't test it, Torrent did
¹³ not test it?
¹⁴         MS. BRANCATO:  Same
¹⁵     objection.
¹⁶         THE WITNESS:  So there are
¹⁷     few answers.  I cannot be giving
¹⁸     you mainly yes or no.
¹⁹         With yes, I'll also give you
²⁰     justification.
²¹         And no, I will also give you
²²     my justification.
²³ BY MS. PENDLEY:
²⁴     Q.   Okay.  No, it wasn't tested

Page 233

¹ by Torrent, right?
²         MS. BRANCATO:  Same
³     objection.
⁴ BY MS. PENDLEY:
⁵     Q.   You can answer.
⁶     A.   So this is what again I
⁷ indicated.  Being a process impurity,
⁸ being a genotoxic alert coming up with
⁹ the API, the DMF holder declaration was
¹⁰ important.
¹¹     Q.   Okay.  You understand that
¹² once Torrent's finished dose valsartan
¹³ product went back on the market, that
¹⁴ means people could start taking it again,
¹⁵ right?
¹⁶         MS. BRANCATO:  Objection to
¹⁷     form.
¹⁸         THE WITNESS:  See, because
¹⁹     once we see it is -- we are given
²⁰     clearance to go to the market, I
²¹     am not sure what is being sold and
²²     who is taking it because that I
²³     cannot see.
²⁴ BY MS. PENDLEY:

Confidential Information Subject to Protective Order

Page 234

1    Q.  Okay.  Let me rephrase.  If
2  it's on the market, it's not off the
3  market, right?  It had not yet been
4  recalled?
5    A.  Yeah, yeah, not recalled.
6    Q.  Okay.  So people can still
7  buy it?
8    A.  Definitely, but I'm not able
9  to comment on that whether people were
10 buying it or people were not buying it.
11   Q.  Okay.  I know that.  They
12 were able to buy it, is the question, I
13 guess.  Okay?
14      So -- okay.  At this point,
15 Torrent knows that the genotoxic impurity
16 is NDMA.  So why not just develop a test
17 before releasing it back to the market?
18   A.  I think API manufacturer has
19 very clearly indicated that NDMA
20 impurities there in the new process.
21   Q.  Right.  But they were wrong,
22 weren't they?
23   A.  Pardon?
24   Q.  ZHP was wrong about NDMA not

Page 235

1  being in old process, right?
2    A.  Yeah.  That is the follow-up
3  and incremental information.
4    Q.  Right.  And so looking back,
5  at the time, you guys knew what the
6  impurity was, and you knew it was in some
7  form of valsartan API.  Why couldn't you
8  have just developed a test before putting
9  it back on the market?
10   A.  This is what I already
11 indicated.  Because the DMF holder has
12 given it with clarity the D process, the
13 new ROS is impacted, and C process is
14 free from this impurity.
15   Q.  All right.  Did anything
16 prevent you from deciding to develop a
17 test, because there's some rule that says
18 no, no, finished dose manufacturers can't
19 test for genotoxic impurities?
20      MS. BRANCATO:  Objection to
21 form.
22      THE WITNESS:  This
23 assessment, whether this impurity
24 is there in the -- your API, is --

Page 236

1  the API is a very scientifically
2  assessment of the route of
3  synthesis process.
4      And based upon that, only
5  somebody who declare that whether
6  my API has this impurity or not,
7  this information, that route of
8  synthesis is only -- only
9  available to ZHP.
10 BY MS. PENDLEY:
11   Q.  Well, let me get some more
12 info on something, because we actually at
13 the beginning of this deposition looked
14 at testing levels by Torrent of ZHP's API
15 for NDMA.
16      Do you remember that?
17   A.  Yeah.
18   Q.  So Torrent was clearly able
19 to develop a test for NDMA at some point.
20 You would agree?
21   A.  Yeah.  That's correct.
22   Q.  Okay.  So what prevented
23 them from developing that test back in
24 June of 2018 before they put the drug

Page 237

1  back on the market?
2    A.  So the development of these
3  methods needs a lot of time, resources,
4  and knowledge from the DMF holder.
5  And --
6    Q.  Okay.  So it takes a lot of
7  time --
8      MS. BRANCATO:  Madeline, I'm
9  sorry.  You've interrupted him,
10 like, three times in a row.  So
11 please let him finish his answer.
12      MS. PENDLEY:  I'm trying to
13 guide him back to the point of my
14 question, save some time.
15 BY MS. PENDLEY:
16   Q.  How long would it take to
17 develop a test like that?
18   A.  This is what I'm coming
19 into.  You cannot be developing a method
20 of your own, in general, because you need
21 to always ensure that your method is
22 always aligned to the DMF manufacturer --
23 the DMF holder method.
24      And that is what our series

Confidential Information Subject to Protective Order

Page 238

1  with DMF holder that is supposed to share
2  all the methods, all the related
3  information so that we will follow the
4  same method which the DMF holder is doing
5  and is supposed to submit to agency as
6  well.
7          And as an ANDA holder,
8  because we give it over to the agency to
9  assess the DMF, we're supposed to follow
10  the same analytical method which the DMF
11  holder is using.
12          So this is the first
13  principle I'm supposed to follow while --
14  while using any analytical method.
15      Q.   So you're saying that
16  Torrent Pharmaceuticals, that produces
17  hundreds of different drugs, sells them
18  all over the world, is not capable of
19  coming up with a test for a carcinogen
20  without relying on the DMF holder?
21          MS. BRANCATO:  Objection to
22      form.
23          THE WITNESS:  So my answer
24      is not at all connected to this.

Page 239

1          So we also manufacture several
2      APIs, and we develop several
3      methods and we do develop methods.
4          But the rule is I need to
5      follow the DMF method, which is in
6      the DMF, and I need to follow
7      that.
8  BY MS. PENDLEY:
9      Q.   Okay.  We can agree there's
10  no law or rule that says you as the
11  finished dose manufacturer has to use the
12  same test as the DMF holder, right?
13      A.   That is always the first
14  preference.
15      Q.   Right.  It's a preference,
16  but it's not a requirement, right?
17      A.   Yeah, it's correct.
18      Q.   Okay.  So if you wanted to,
19  you could have started developing your
20  own method, could you not?
21      A.   You can -- you can develop
22  it.  I'm not denying that.  But it is
23  always -- not only the development
24  method, then basically to the equivalency

Page 240

1  between two method, because you cannot
2  have your own method without doing the
3  equivalency with the DMF method until and
4  unless you don't have a DMF method at
5  all.  You may not be able to develop a
6  current method as well.
7          You're supposed to know
8  whether -- which technique they are
9  using, if they are using a GC, and if I'm
10  bringing it on HPLC, then I cannot be
11  able to do equivalency between two
12  method.
13      Q.   I --
14      A.   And this is what FDA -- this
15  is what FDA has published, several method
16  related to genotoxic alerts, and at the
17  bottom, every time they write, if you
18  have a different method, you need to
19  prove the equivalency with the FDA method
20  as well.
21      Q.   Okay.  Got it.  But like you
22  told me, it is a preference to rely on
23  the DMF holder, right?
24      A.   Pardon?

Page 241

1      Q.   Like you just told me, it is
2  not a requirement, but rather a
3  preference to rely on the DMF holder for
4  this test?
5      A.   So I'm really going back to
6  my statement.  I very clearly indicated
7  that it's always a preferred one --
8      Q.   Right.
9      A.   -- because we are supposed
10  to prove the equivalency with the DMF
11  method until and unless -- until and
12  unless the DMF holder is --
13      Q.   Why can't Torrent --
14          MS. BRANCATO:  Madeline,
15      please stop interrupting the
16      witness.  That's improper.  And
17      he's allowed to finish his
18      responses.  And then you can ask
19      him questions.
20          MS. PENDLEY:  Okay.  You had
21      paused.  And so I thought he was
22      finished.  It's just a
23      miscommunication.
24          MS. BRANCATO:  A

Confidential Information Subject to Protective Order

Page 242

1 miscommunication that's happened
2 now at least five times in a row.
3        MR. NIGH:  Just going to be
4 clear that he trails off.  We've
5 been talking about him trailing
6 off and his volume.  We can see on
7 the video that that happens.  And
8 there's pauses and it picks it up.
9        They're trying to do the
10 best they can if that happens.  So
11 the constant interruption to say
12 that she's interrupting is just
13 improper.
14        Let her ask her questions
15 instead of laying an improper
16 record.  We have a video of this
17 where we can see it.
18        MS. BRANCATO:  I would ask
19 that she allow my witness to
20 finish his answers.  And I will
21 allow her to finish her questions.
22 BY MS. PENDLEY:
23    Q.   Okay.  So who at Torrent, if
24 you know, was tasked with developing a

Page 243

1 method to test for NDMA and NDEA?
2    A.   So we have our analytical
3 development team and basically they have
4 the primary responsibility to develop the
5 analytical method.
6    Q.   All right.  Who oversees the
7 analytical development team?
8    A.   Who?
9    Q.   Yes.  Do you know who
10 oversees that team?
11    A.   So analytical development
12 team comes under there's the analytical
13 development head.  It is known as Nilesh
14 and he basically is responsible for
15 development of analytical method.
16    Q.   Are you involved in
17 overseeing the analytical development
18 team?
19    A.   No.
20    Q.   Do they report to anybody in
21 the quality department?
22    A.   No.  Analytical development
23 team, they're not reporting to the
24 quality department.

Page 244

1    Q.   Okay.  So you have nothing
2 to do with the development of the tests
3 for NDMA or NDEA?
4        MS. BRANCATO:  Objection to
5 form.
6        THE WITNESS:  The
7 development team reports to
8 somebody else, not to me.
9 BY MS. PENDLEY:
10    Q.   Okay.  So how long did it
11 ultimately take Torrent to come up with
12 this test for NDMA and NDEA?  Well, let's
13 do NDMA first.  How long did it take
14 Torrent to come up with a test for NDMA?
15    A.   So this NDMA impurity was
16 not common before this discovery.  And
17 for the development of any test method,
18 you need a impurity in hand in order to
19 develop a method.
20        And once this impurity has
21 not been in the Pharmacopeia, the
22 Pharmacopeia as well was not developed.
23        Well, that's why first you
24 have to synthesize the impurity before

Page 245

1 you go ahead and develop the analytical
2 method.
3    Q.   Okay.  So like three weeks,
4 four weeks?  What are we talking?
5    A.   So for this method, we took
6 almost, to me, according to me, the
7 synthesis of impurity and development is
8 I think somewhere around five weeks.
9    Q.   All right.  So it took you
10 five weeks to develop the test.  How much
11 does it cost to run a test like that?
12    A.   Cost of?
13    Q.   Did it cost you anything?
14    A.   No, I'm not able to I think
15 tell you that because I'm not aware of
16 the cost, what is the cost.
17    Q.   Okay.  So we're going to
18 back up, back at the time Torrent was
19 informed NDMA is in valsartan product, it
20 would have taken you guys about five
21 weeks to come up with that test, right?
22    A.   Yes, I'm telling you the
23 approximate number, five weeks.
24    Q.   Right.  So why didn't

Confidential Information Subject to Protective Order

Page 246

1 Torrent just keep the product off the
2 market until that test was developed?
3     A.   So this is decisionmaking
4 process, I will repeat -- tell you it is
5 based on the declaration, what you
6 receive from the DMF holder.  And that is
7 what the DMF holder had very clearly
8 indicated, that the C code API is free
9 from this impurity.
10     Q.   Okay.  So before you are
11 going to expose your patients with a drug
12 with a carcinogen in it, Torrent did not
13 bother to test it, right?
14         MS. BRANCATO:  Objection to
15     form.
16         THE WITNESS:  I don't
17     understand your question.
18 BY MS. PENDLEY:
19     Q.   Before Torrent exposes its
20 patients to a drug with a carcinogen in
21 it, it did not bother to test it before
22 putting it back on the market, right?
23         MS. BRANCATO:  Same
24     objection.

Page 247

1         THE WITNESS:  No, I think
2     really, I'm not able to answer
3     this question because I think it
4     is not really likely indicated.
5 BY MS. PENDLEY:
6     Q.   Okay.  We just walked
7 through that every batch, all 119
8 batches, were contaminated with NDMA.  Do
9 you remember that?
10     A.   Yeah.  We have seen that
11 data.
12     Q.   Right.  And we confirmed
13 that NDMA is a carcinogen, right?
14     A.   I think we agree this was
15 discussed as well.
16     Q.   Right.  And so before
17 putting all of those batches back on the
18 market, just to confirm, Torrent did not
19 test it for NDMA, yes?
20     A.   As I've indicated, Torrent
21 has the obligation to test the product as
22 per the approved ANDA, and we tested the
23 product to that compliance.
24     Q.   That's not what I asked.

Page 248

1     A.   I'm answering the same
2 question.
3     Q.   Did Torrent test for NDMA,
4 yes or no?
5         MS. BRANCATO:  Objection to
6     form.
7 BY MS. PENDLEY:
8     Q.   What was the first part of
9 your answer?
10     A.   This wasn't part of the
11 specification.
12     Q.   So no, right?
13     A.   See, I'm indicating this was
14 not part of the specification, and
15 product is being tested fully to that
16 specification, whatever is available.
17     Q.   Okay.  So can we agree that
18 nothing would have prevented Torrent from
19 just holding onto the product until they
20 confirmed there's no NDMA in it?
21     A.   But there is a reason to
22 believe that the DMF holder has given a
23 declaration, the API is free from
24 impurity, then there's no reason to test

Page 249

1 it.  There's no reason to hold it, until
2 and unless it was not cleared, we hold
3 every batch.
4     Q.   Okay.  My question was,
5 nothing would have prevented Torrent from
6 just holding onto it until they confirmed
7 there is no NDMA through testing the
8 drug?
9     A.   That is a common thing, say,
10 when -- on the first notification, on
11 26th, when they are not indicated
12 which -- whether C code or D code is
13 impacted.  They give a generalized
14 statement, Torrent held every batch into
15 the market.
16         The D -- indicated that C
17 code is not impacted, then only we gone
18 back into the market.  But that
19 definitely, Torrent actions was very,
20 very, like, proactive, very right,
21 looking to the data which is being
22 provided by the DMF holder.
23     Q.   Okay.  Well, let me back up,
24 because it obviously wasn't very right.

Page 250

1  There was NDMA in that product you put
2  back on the market, right?
3      A.   Again, that is in terms of
4  the analytical development.
5      Q.   I feel like we're still not
6  getting an answer to the question that
7  I'm asking.  Did anything prevent
8  Torrent, any rule, any law, your boss
9  telling you not to, did anything prevent
10  Torrent from just holding onto the
11  product until they, Torrent, confirmed
12  there is no NDMA in C batches?
13      A.   See this is what I'm
14  indicating, I cannot be holding anything
15  where my DMF holder has very clearly
16  indicated that this API which I'm using
17  in the product is free from the genotoxic
18  alert which they have identified in D
19  ROS.
20          MS. PENDLEY:  Okay.  We're
21      going to move to certify the
22      question as nonresponsive.
23          MS. BRANCATO:  Objection.
24  BY MS. PENDLEY:

Page 251

1      Q.   You mentioned that it took
2  about five weeks to develop this test.
3  Okay.  So if Torrent had held their
4  product, they had held their C batches,
5  it would not be on the market for about
6  five weeks, right?
7      A.   No, I'm not able to
8  understood your question.
9      Q.   Okay.  If Torrent continued
10  to hold their product, it's obviously not
11  on the market, right?  Let's start there.
12      A.   Yeah, okay.
13      Q.   Okay.  And all that time
14  that Torrent is holding their product off
15  of the market, they can't sell it, right?
16      A.   Ma'am, I'm not really able
17  to understand your question.  I'm so
18  sorry, but I'm not able to understand
19  your question.
20      Q.   Torrent was ready to put its
21  product back on the market so it didn't
22  continue to lose money, correct?
23          MS. BRANCATO:  Objection to
24      form and foundation.  Outside the

Page 252

1  scope of the 30(b)(6).
2  BY MS. PENDLEY:
3      Q.   You can answer.
4      A.   So like, see, in the
5  decisionmaking process, I'm holding those
6  decisions.  I never see -- and I have
7  indicated every time we have this
8  discussion, I was not knowing that.
9          But this is purely technical
10  call based upon the assessment of the
11  database, based on the assessment of the
12  DMF holder, what declaration they have
13  given.
14      Q.   So the decision to put the
15  product back on the market had nothing to
16  do with the money y'all would lose in the
17  meantime?
18          MS. BRANCATO:  Objection to
19      form and foundation.  Outside the
20      scope.
21  BY MS. PENDLEY:
22      Q.   You can answer.
23      A.   So as I indicated, once --
24  I'm not owner in the business.  I'm not

Page 253

1  involved in the commerce.  Then
2  definitely, I'm not able to tell you --
3  that kind of aspect is being involved in
4  the decisionmaking process.
5          MS. PENDLEY:  All right.
6      Let's see about that.  Let's look
7      at LP 1096.
8          THE WITNESS:  Which one?
9          MS. PENDLEY:  LP 1096.  I'll
10      let you know the exhibit number in
11      one second.
12          (Document marked for
13      identification as Exhibit
14      Torrent-23.)
15  BY MS. PENDLEY:
16      Q.   Torrent-23.
17      A.   Torrent-23 is not there in
18  the list.
19          THE VIDEOGRAPHER:  You might
20      have to refresh.  I just added it.
21          THE WITNESS:  Just a moment.
22      Yeah.
23  BY MS. PENDLEY:
24      Q.   Okay.  So looking at the

Page 254

1 first page -- do you see the first page?
2     A.   Just a moment.  Okay.
3     Q.   Right.  So looking at the
4 first page, let's start with the e-mail
5 from Dawn Chitty kind of towards the
6 bottom.
7         It's from Tuesday, July 17,
8 2018.  It says, "The FDA is expecting
9 that we're going to prove there's no NDMA
10 in the API batches that we've used."
11         Do you see that?
12     A.   Which mail are you referring
13 to?
14     Q.   It's the third little set of
15 e-mails on the first page.
16     A.   It is on the first page?
17     Q.   Yep.
18     A.   That is on the 18th of July.
19     Q.   17th.  Yeah.
20     A.   Okay.
21     Q.   All right.  She says, "FDA
22 is expecting that we're going to prove
23 there's no NDMA in the API batches that
24 we've used."  Right?

Page 255

1         Do you see that?
2     A.   Yeah.
3     Q.   Okay.  She goes on to say,
4 the statements from the vendor are not
5 sufficient.
6     A.   Yeah.
7     Q.   The vendor is ZHP, right?
8     A.   Just a moment.  Yeah, I have
9 read through it.
10     Q.   Okay.  So the FDA at least
11 at this point expected that Torrent would
12 prove there's no NDMA in the API, right?
13     A.   No.  Can you repeat your
14 question?
15     Q.   At this point, according to
16 Dawn Chitty, the FDA is expecting that
17 Torrent is going to prove there is no
18 NDMA in the API, right?
19     A.   Yes.
20     Q.   "The statements from the
21 vendor are not sufficient."  Meaning
22 those declaration ZHP gave you are not
23 sufficient.
24         MS. BRANCATO:  Objection to

Page 256

1 form.
2         THE WITNESS:  This is said
3 in the mail.  This mail has, like
4 it is nothing like that -- there's
5 some communication happen between
6 the FDA and Dawn Chitty.  And
7 based upon that fact, she is
8 writing this mail.
9         It is her own assessment.
10 It has nothing to do with FDA,
11 because with FDA, we are giving
12 all the details to them.  And
13 based upon that, FDA has only
14 given us a clearance to go back to
15 the market.
16 BY MS. PENDLEY:
17     Q.   Okay.  You told me at the
18 beginning of this depo the way Torrent
19 communicates with the FDA is through
20 their U.S. representative, right?
21     A.   Yeah, it's true.
22     Q.   Dawn Chitty, right?
23     A.   Correct.
24     Q.   Dawn Chitty, your U.S.

Page 257

1 representative whose job it is to
2 communicate with the FDA, is saying the
3 FDA is expecting that we prove there's no
4 NDMA in the API, right?
5     A.   Yeah, that is the first
6 statement, is very correct.  The second
7 writing, I'm not sure, I'm not sure what
8 we need to do.  This is now assumption.
9     Q.   Okay.  Let's look at the
10 next e-mail.  It is to directly you, so
11 you can give me your thoughts.  It says,
12 "Sushil, Dawn and I will call you
13 tomorrow to discuss this topic.  All
14 customers have been backordered and every
15 single day counts as our
16 failure-to-supply penalties will start
17 kicking in."
18     A.   Which mail are you referring
19 to?
20     Q.   The one above Dawn Chitty.
21     A.   Right above the Dawn Chitty.
22     Q.   Yep.  Just moving towards
23 the top of the page.
24     A.   That one has Arunesh mail.

Confidential Information Subject to Protective Order

Page 258

¹      Q.   Right.  And he sends it to
² you.
³      A.   Mm-hmm.
⁴      Q.   Yes.  And so the e-mail
⁵ says, "Sushil" -- do you see this part?
⁶      A.   Yes.  It's Arunesh on that
⁷ mail.  Yeah, sure.
⁸      Q.   They say, "All customers
⁹ have been back ordered and every single
¹⁰ day counts."  Right?
¹¹      A.   Yeah.
¹²      Q.   It goes on to say, "As our
¹³ failure-to-supply penalties will start
¹⁴ kicking in."
¹⁵      A.   Yeah.
¹⁶      Q.   So Torrent is going to have
¹⁷ to start paying penalties if it doesn't
¹⁸ get their stuff back on the market,
¹⁹ right?
²⁰      MS. BRANCATO:  Objection.
²¹      Foundation.
²²      THE WITNESS:  Maybe.  I'm
²³      not really sure.  But yes, it's
²⁴      been written in the mail.

Page 259

¹ BY MS. PENDLEY:
²      Q.   Do you remember this
³ conversation?
⁴      A.   Yeah, I remember this
⁵ conversation.
⁶      Q.   Okay.  So you remember being
⁷ informed that Torrent was going to have
⁸ to pay supply penalties if they didn't
⁹ put valsartan back on the market, right?
¹⁰      A.   See, this is -- this is the
¹¹ assessment of the market situation they
¹² have given.
¹³      Q.   Right.  It was given to you,
¹⁴ right?
¹⁵      A.   Yeah, it's true.
¹⁶      Q.   And you make decisions about
¹⁷ whether or not the drug goes back on the
¹⁸ market?
¹⁹      A.   Yeah, but that has no impact
²⁰ on the decisionmaking process.  Your
²¹ decision is always based upon the
²² science.  And that -- this isn't --
²³ you're not taking -- that's why I
²⁴ indicated, it is not a one-way

Page 260

¹ decisionmaking process.  We release the
² batches to the market.
³      The agreed piece of
⁴ information is being provided to the
⁵ regulator.  And once the regulator is
⁶ convinced, then only we go to the market.
⁷ But it has nothing to do with whether the
⁸ market is dry or whatever the case may
⁹ be.
¹⁰      Q.   I mean, you would hope not.
¹¹ You would hope it would be based on the
¹² science and not the money.  But here we
¹³ see they want to set up a call with you
¹⁴ to discuss the failure-to-supply
¹⁵ penalties, right?
¹⁶      MS. BRANCATO:  Objection to
¹⁷      form.
¹⁸      THE WITNESS:  Yeah, agreed.
¹⁹      So and the mail communication, I'm
²⁰      not saying that it is not written.
²¹      But the decisionmaking
²²      process is always based upon
²³      science and that is what I
²⁴      indicated.  If it is a one-sided

Page 261

¹ decision made without consulting
² agencies, if some decision being
³ taken, it's different.
⁴      But here that is what I've
⁵ indicated, going back to the
⁶ market call is being taken into
⁷ consultation with agency, whatever
⁸ the database they were needing to
⁹ basically give that call is being
¹⁰ provided.  And then only we gone
¹¹ back to the market.
¹² BY MS. PENDLEY:
¹³      Q.   Do you remember how much
¹⁴ these penalties were for?
¹⁵      A.   Pardon?
¹⁶      Q.   Do you remember how much the
¹⁷ supply penalties were for?
¹⁸      A.   I'm not sure.
¹⁹      Q.   Okay.  So you're saying that
²⁰ the supply penalties didn't factor into
²¹ the decision to put the drug back on the
²² market.  But if you look at the date,
²³ it's July 18, 2018, Torrent put their
²⁴ product back on the market the next day,

Confidential Information Subject to Protective Order

Page 262

1 right?
2          MS. BRANCATO:  Objection to
3    form and foundation.
4          THE WITNESS:  No.  You're
5    referring to some other mail?
6 BY MS. PENDLEY:
7    Q.   Do you remember the day
8 Torrent put their product back on the
9 market?
10    A.   I remember on which date FDA
11 has given me clearance to go back on the
12 market.
13    Q.   What day was that?
14    A.   That date, I think it was --
15 it is on the 18th of July.
16    Q.   What's the date of this
17 e-mail?
18    A.   No, can you repeat?
19    Q.   Yeah.  What is the date of
20 this e-mail about supply penalties?
21    A.   That is 18th.
22    Q.   Mm-hmm.  July 18th?
23    A.   Yeah.
24    Q.   Same day y'all get the drugs

Page 263

1 put back on the market?
2    A.   Yeah, yeah.  But that is
3 independent of this mail.
4    Q.   Okay.  All right.  Let's --
5          MS. PENDLEY:  Okay.  Let's
6    look at LP 1302.
7          (Document marked for
8    identification as Exhibit
9    Torrent-220.)
10          MS. PENDLEY:  This will be
11    Torrent Exhibit 220.
12          THE WITNESS:  Yeah.
13 BY MS. PENDLEY:
14    Q.   Let me know when you've got
15 it.  Do you see the e-mail?
16    A.   Yeah.
17    Q.   All right.  If you will go
18 down to the bottom of the first page.
19 It's from Dawn Chitty.  She says, "We've
20 been given permission to release the
21 batches that are quarantined currently."
22 Right?
23    A.   Just a moment.  Yeah.
24    Q.   All right.  Let's go up to

Page 264

1 the top e-mail from Dawn Chitty.
2    A.   That is 18th of July mail?
3    Q.   The 19th.  But it's the
4 first e-mail at the top of the page.
5    A.   Okay.
6    Q.   So Dawn Chitty says, "I've
7 not discussed the testing with them
8 further."  She's referencing the FDA if
9 you want to look around.  It says, "Right
10 now, they're obviously okay without
11 testing of the C batches."  It goes on to
12 say, "Internally, I think it's important
13 to have this information to head off
14 potential liability."
15          Do you see that?
16    A.   Yeah.  Yeah.
17    Q.   Okay.  So Dawn Chitty --
18 Dawn Chitty thinks you guys need to
19 figure out the testing method to head off
20 potential liability, right?
21          MS. BRANCATO:  Objection to
22    foundation.
23 BY MS. PENDLEY:
24    Q.   You can answer.

Page 265

1    A.   Just -- I'm going through
2 the mail content.  Give me just minute.
3    Q.   Okay.
4    A.   She's raising a very valid
5 aspect here.  So this is what she is
6 writing, that we need to continue to put
7 our efforts into reports and developing a
8 method.  And we're supposed to be
9 ensuring that we are able to develop a
10 method and test even the D lot, because
11 the D lot is being used for the market.
12 This is what she has written.
13    Q.   Right.  But you can agree,
14 she doesn't say all that.  She says we
15 need this information to head off
16 potential liability, right?
17    A.   So frankly speaking, the
18 mail say ultimately, if you look really
19 into the subject of the mail, it is route
20 of synthesis inquiry.  It is not
21 called -- this mail is not being written
22 for any commercial purpose.  This is for
23 the discussion of the technical aspect.
24          And if we look into the

Confidential Information Subject to Protective Order

Page 266

¹ technical aspect of the mail it says it
² is all about developing a method and
³ analyzing the batches and the rest.  This
⁴ is what is just a discussion between the
⁵ group.
⁶      Q.   Okay.  I'm just asking what
⁷ Dawn Chitty says right there.  It says,
⁸ "We have to have this information to head
⁹ off potential liability," right?
¹⁰      A.   Yeah, it's written, and I'm
¹¹ not denying.  But for me, the aspect of
¹² the mail is this.
¹³      Q.   Okay.  I'm going to shift
¹⁴ gears and do one more thing with you.
¹⁵      MS. PENDLEY:  If we can pull
¹⁶ up LP 1240.
¹⁷      (Document marked for
¹⁸ identification as Exhibit
¹⁹ Torrent-221.)
²⁰      MS. PENDLEY:  Which will be
²¹ Torrent Exhibit 221.
²²      And the Bates number is
²³ TORRENT-MDL2875-00208351.

²⁴      A.   Can I print this?  Because



Page 267

Page 269

¹ on expanding this it can become easy.
² And can you give me two minutes?  So
³ that -- I'm printing it.
⁴      THE WITNESS:  Can you print
⁵ this immediately?
⁶      MS. PENDLEY:  Yeah, we'll go
⁷ off the record and let you print
⁸ it.
⁹      THE VIDEOGRAPHER:  The time
¹⁰ now is 11:43 a.m.  We're going off
¹¹ the record.
¹² (Short break.)
¹³      THE VIDEOGRAPHER:  The time
¹⁴ is now 11:47 a.m.  We're back on
¹⁵ the record.

Confidential Information Subject to Protective Order

---

Page 270

███ ██ █████, great. We've
³ got that.
⁴         MS. PENDLEY: Let's pull up
⁵ LP 1218.
⁶         THE WITNESS: The
⁷ investigation?
⁸         (Document marked for
⁹ identification as Exhibit
¹⁰ Torrent-79.)
¹¹         MS. PENDLEY: LP 1218 has
¹² been already marked as Torrent-79.
¹³         To the trial tech, if we
¹⁴ could, I would like to kind of
¹⁵ keep the chart from 1240 up while
¹⁶ we look at 1218, if that's
¹⁷ possible.
¹⁸         THE WITNESS: The document
¹⁹ is loading.
²⁰         MS. PENDLEY: Okay. Hang
²¹ on. We're waiting on the trial
²² tech.
²³         THE WITNESS: Okay.
²⁴         MS. PENDLEY: Okay, great.

---

Page 271

¹ BY MS. PENDLEY:
²     Q.   So in LP 1218, if we could
³ look at Row 74. Thankfully these rows
⁴ are numbered. And it's going to be based
⁵ on the number that's actually typed in
⁶ the document, not the Excel line. Here
⁷ we go. Okay. So Row 74, we can see that
⁸ batch number again, the BV65D002.
⁹         MS. PENDLEY: We can go back
¹⁰ down to Row 74 in 1218. The row
¹¹ 74 that's actually typed onto the
¹² document, please.
¹³         MS. BRANCATO: Madeline, is
¹⁴ this -- is LP 1218 an exhibit
¹⁵ that's been entered.
¹⁶         MS. PENDLEY: Yeah.
¹⁷ Torrent-79. It's been previously
¹⁸ marked.
¹⁹         MS. BRANCATO: Got it.
²⁰ Thank you.
²¹ BY MS. PENDLEY:
²²     Q.   Okay. So what we're doing,
²³ we're looking at the batch number that's
²⁴ listed in LP 1240. We're finding it on

---

Page 272

¹ LP 1218, and it's on Row 74. We see that
² batch again, BV65D002.
³         Do you see that,
⁴ Mr. Jaiswal?
⁵     A.   Yeah, which is yellow
⁶ highlighted.
⁷     Q.   Okay. And you see that same
⁸ number again in the spreadsheet below it?
⁹     A.   No, I'm not able to see that
¹⁰ in the spreadsheet. Again, yeah, it is
¹¹ there, but for our purposes here, I'm not
¹² able to see that.
¹³     Q.   So that's the same batch
¹⁴ that's listed above. If it's small, I
¹⁵ apologize. And then it gives us --
¹⁶         MS. PENDLEY: I'll let him
¹⁷ get situated. Okay. Let's just
¹⁸ highlight the whole row, 74.
¹⁹ We'll work with that.
²⁰ BY MS. PENDLEY:
²¹     Q.   We see in LP 1218 there's
²² the same batch number that's listed in LP
²³ 1240, the column that says "NDMA result
²⁴ TPL."

---

Page 273

¹         Do you see that?
²     A.   19.8?
³     Q.   Yes. So that means this
⁴ batch has 19.8 parts per million of NDMA
⁵ in it, right?
⁶     A.   Mm-hmm, yeah.
⁷     Q.   Okay. This document, as you
⁸ can see in that title line at the top of
⁹ the spreadsheet, it says "Detailed of
¹⁰ finished good batches." So this is 19.8
¹¹ parts per million in the finished dose
¹² right?
¹³     A.   The NDMA, the result is API
¹⁴ result.
¹⁵     Q.   This is the API result?
¹⁶     A.   Yeah.
¹⁷     Q.   Okay. The document says
¹⁸ detailed finished good batches at the
¹⁹ top. You're saying this is testing the
²⁰ API?
²¹     A.   I'm not really able to have
²² a look at this data. Just a moment. The
²³ 74 number row?
²⁴     Q.   Yep.

Confidential Information Subject to Protective Order

Page 274

1    A.   Amlo and valsartan
2  10-milligram and 60-milligram tablet,
3  batch number 002.  And the API which is
4  being used is the batch number 264.  And
5  the manufacturer batch number is 047N,
6  has the impurity, 19.8; is that correct?
7        Q.   Yes.  That's exactly what
8  I'm looking at.
9        A.   Okay.
10       Q.   Okay.  So 19.8.  That's over
11 the FDA threshold of .3 parts per
12 million, right?
13       A.   Yeah, yeah.  Okay.
14       MS. PENDLEY:  Then, let's go
15 to -- we're going to look at LP
16    1240 again.
17 BY MS. PENDLEY:
18       Q.   We're just going to go back
19 and forth between these two documents for
20 a minute, okay?
21       Looking at LP 1240, I want
22 to look at batch BV77D013 which happens
23 to be under the one that we just looked
24 at, Row 6.

Page 275

1        A.   Yeah.  This is the what you
2  indicated the batch, yeah.
3        Q.   Do you see that batch in Row
4  6, BV77D013?
5        A.   Yeah.  This is different
6  batch number, yeah.
7        Q.   We also see that it says,
8  "QC delayed," which is quality control,
9  right?
10       A.   Yeah.
11       Q.   And then in the next cell,
12 we see, "The sample was received dated on
13 January 24, 2018, and OOS observed in RS
14 test."
15       So OOS is out of
16 specification, right?
17       A.   Yeah.
18       Q.   And again, RS is residual
19 solvent, right?
20       A.   Not necessarily residual
21 solvent.  This may be a related
22 substance.
23       Q.   So it may be a related
24 substance test, not a residual solvent

Page 276

1  test?
2        A.   Yeah.
3        Q.   Okay.  You told me on the
4  other batch it was residual solvents.
5  You think this one is different?
6        A.   No.  Basically, the -- only
7  it says RS test, so I'm not sure if it is
8  related substance or is it residual
9  solvent.
10       Q.   Okay.  So we don't know
11 which one it is?
12       A.   No.
13       Q.   Okay.  Then it was released
14 in March, right?
15       A.   Just a moment.  Sorry.  It's
16 actually heavily raining outside, so they
17 are closing the window.
18       Q.   Okay.  No, you're fine?
19       A.   I'm so sorry.  It's very
20 heavy rains outside.
21       Q.   No, you're okay.  All right.
22 One second.  So if we look at LP 1218,
23 Row 88 by what's numbered on the
24 document.  We once again see that same

Page 277

1  batch that we just looked at, the
2  BV77D013.
3        Do you see it?
4        A.   Yeah.
5        Q.   Okay.  And once again, it
6  has 19.8 parts per million of NDMA,
7  correct?
8        A.   The same lot of API.
9        Q.   Right.  So that finished
10 good batch is also contaminated, right?
11       A.   Yeah.
12       Q.   Okay.  So we can see that a
13 batch that had been tested in January of
14 2018 ultimately contained NDMA, right?
15       MS. BRANCATO:  Objection to
16    form.
17       Go ahead, Sushil.
18       THE WITNESS:  This -- the 47
19    batch, it looks like it was going
20    to 03 batches.
21 BY MS. PENDLEY:
22       Q.   What do you mean the 47
23 batch, the API batch?
24       A.   Yeah.

Confidential Information Subject to Protective Order

Page 278

1    Q.   Okay.  Right.  So that API
2   batch was used in this batch, and this
3   was tested in January, right?
4        MS. BRANCATO:  Objection to
5   form.
6        THE WITNESS:  The full data
7   is not --
8   BY MS. PENDLEY:
9    Q.   I'm sorry, you broke up.
10    A.   -- is refer to -- the sample
11   was received in --
12        (Audio interruption.)
13        MS. BRANCATO:  It's probably
14   the storm.  Sushil, hang on.
15        Can you start your answer
16   over?  I think the storm is
17   interfering with the internet a
18   bit.
19        THE WITNESS:  I think, yes,
20   I'm getting an "internet is
21   unstable."
22        MS. BRANCATO:  I can hear
23   you now if you want to try again.
24   BY MS. PENDLEY:

Page 279

1    Q.   What was your answer?  I'm
2   sorry.
3    A.   I'm just trying to
4   understand the data.  So, yes, the 47
5   batch of API is maybe used in more than
6   one batch.  This is why I'm trying --
7    Q.   Right.  No, you're right.
8   It definitely is used for more than one
9   batch.  You'll see it couple times on
10   this spreadsheet.
11    A.   Okay.
12    Q.   Okay.  We're seeing the
13   finished dose batch is what got an out of
14   spec observation back in January, right?
15    A.   Yeah.
16        MS. BRANCATO:  Objection to
17   form.
18   BY MS. PENDLEY:
19    Q.   Okay.  We'll look at one
20   more from LP 1240.  It's Row 10.
21   BV84D010.
22        Same thing, we see that the
23   sample was received in January.  Out of
24   trend observed in RS test.

Page 280

1        Do you see that?
2    A.   Yeah.  I'm looking at that
3   but I'm not able to understand what is
4   the conclusion is being drawn out of it.
5    Q.   You're not able to
6   understand the conclusion that's being
7   drawn on the out of spec testing?  Is
8   that what you're asking?
9    A.   Yeah, these are -- these are
10   out-of-specification results.  Then there
11   must be further investigation to
12   understand what are the reason or purpose
13   of specification.
14    Q.   Right.
15    A.   And the two drugs in the
16   same product, the impurity may be because
17   of -- for the amlodipine as well.
18    Q.   Right.  Okay.  We actually
19   tried to find the reason for the out of
20   spec or out of trend result in the
21   production, and we couldn't find one.  So
22   this is all we have.
23    A.   Yeah, but looking into this,
24   I cannot be able to tell you that,

Page 281

1   whether it is OOT or OOS, that it's
2   because of which reason, because there is
3   -- there are two APIs here, the valsartan
4   as well as the amlodipine.
5        And amlodipine is also a
6   very -- like another molecule.  So this
7   result may be for any of the API.  It is
8   not necessarily it is because of the
9   valsartan or because of the amlodipine.
10   We need to really look into the database.
11    Q.   Okay.  I understand that.
12   But what we can see right here is this
13   batch did get out of trend in an
14   observation of an RS test, right?
15    A.   Yeah, exactly.  Because
16   which reason, what is the investigation
17   is not known from this data.
18    Q.   Got it.  All right.  So
19   let's look at LP 1218 one more time.  And
20   then Row 101.  We see this batch again.
21   And we see that it also, you know, used
22   the same API batch.  And it also has
23   19.8 parts per million of NDMA, right?
24    A.   Yeah.  But until and unless

Confidential Information Subject to Protective Order

Page 282

1 we don't look into that investigation, I
2 cannot be commenting on that why this OOS
3 and OOT is there, because there are two
4 drug components, amlodipine and
5 valsartan.  And until and unless we don't
6 look into the report, we cannot determine
7 why this OOS or OOT data was, so.
8      Q.   I got it.  We'll talk about
9 that a little more later.
10      Okay.
11      MS. PENDLEY:  Can we take a
12 quick break.  I think we're going
13 to switch questioners soon.
14      THE VIDEOGRAPHER:  The
15 time -- I'm sorry.  Go ahead,
16 Counsel.
17      MS. PENDLEY:  No, you're
18 good.  Just ten minutes.
19      THE VIDEOGRAPHER:  The time
20 now is 12:02 p.m.  We're going off
21 the record.
22      (Short break.)
23      THE VIDEOGRAPHER:  The time
24 is now 12:14 p.m.  We're back on

Page 283

1      the record.
2      MR. NIGH:  Mr. Jaiswal?
3      THE WITNESS:  Hi.
4      MR. NIGH:  Okay.  I don't
5 see him on the video.  It didn't
6 pop up.  Mr. Jaiswal, can you say
7 something again?
8      THE WITNESS:  Are you able
9 to see me on the video?
10      MR. NIGH:  There we go.
11 Yeah, absolutely.
12      - - -
13      EXAMINATION
14      - - -
15 BY MR. NIGH:
16      Q.   So Mr. Jaiswal let me
17 introduce myself.  My name is Daniel
18 Nigh.  I represent the plaintiffs in this
19 litigation.  Good evening.
20      A.   Good evening.
21      Q.   We've been going for some
22 time.  Here in a little bit we'll break
23 for the night and we'll come back and do
24 some more questioning.  But before we do

Page 284

1 that I want to ask you some questions
2 before the break for the night for you.
3      Okay.  I first want to talk
4 about just the technology itself, not the
5 method, just the technology.
6      That GC-MS, that stands for
7 gas chromatography mass spectometry,
8 right?
9      A.   Yeah.
10      Q.   And LC-MS, that stands for
11 liquid chromatography mass spectometry,
12 right?
13      A.   Yeah.
14      Q.   And GC-MS is technology that
15 has been commonly used since the 1980s,
16 correct?
17      A.   Since when it is being used,
18 I'm not really sure, but it is quite old
19 technology.
20      Q.   In fact, GC-MS was commonly
21 used in the pharmaceutical industry since
22 the 1980s, correct?
23      A.   Since when it is being used,
24 I'm not sure.  But yes, it is old

Page 285

1 technology and is being used in the
2 industry since long time.
3      Q.   Okay.  And LC-MS is
4 technology that has been commonly used
5 since the 1990s, correct?
6      A.   Again, I will tell you that
7 for LC-MS also is being old technology,
8 and it is being used very regularly.  But
9 from which year, I'm not quite sure.
10      Q.   And LC-MS was commonly used
11 in the pharmaceutical industry since the
12 1990s, correct?
13      A.   Is being used in the Pharma
14 industry since long time.
15      Q.   Okay.
16      A.   Which yeah, I'm not sure.
17      Q.   As opposed to which year,
18 you know that GC-MS and LC-MS have been
19 used for decades, correct?
20      A.   Yeah, that's correct.
21      Q.   You understand that
22 scientific literature studies have
23 detected nanograms of NDMA and NDEA and
24 other nitrosamines since the 1980s and

Page 286

1 1990s using GC-MS and LC-MS, correct?
2     A.   I'm not aware of it.
3     Q.   You're not aware of studies
4 that actually detect NDMA and/or NDEA,
5 either in medications or in other
6 applications using GC-MS and LC-MS?
7     A.   I'm aware of it, that these
8 technique is being used for analysis of
9 GC-MS and LC-MS.  Recently it has been
10 used to analyze NDMA and NDEA.  But since
11 how long it is being used, I'm not sure
12 about it.
13     Q.   Are you aware that it's been
14 used for decades, that they've been able
15 to detect to the level of nanograms of
16 NDMA and NDEA utilizing GC-MS and LC-MS?
17     A.   So again, these techniques I
18 do agree is a decade-old technologies and
19 is being used for different kind of
20 analysis and characterization, but how
21 long it is being used, since how long it
22 has been used for NDEA and NDMA, I'm not
23 really sure.
24     Q.   Do you realize that many of

Page 287

1 the literature studies that detect NDMA
2 and NDEA utilizing GC-MS and/or LC-MS,
3 that they also describe the method and
4 validation process for detecting NDMA and
5 NDEA in those studies?
6          MS. BRANCATO:  Objection to
7     form.
8          THE WITNESS:  I've not gone
9     through such kind of database.
10 BY MR. NIGH:
11     Q.   Are you aware of any
12 studies?  Have you ever taken a look
13 yourself at any of these studies that
14 describe the method and the validation
15 process as to how they were able to
16 detect NDMA and NDEA in nanograms --
17     A.   See --
18     Q.   -- utilizing --
19     A.   No --
20     Q.   -- GC-MS and LC-MS?
21          MS. BRANCATO:  Sushil, let
22     Daniel finish his question and
23     then you can give your answer.
24          THE WITNESS:  Okay.  Very

Page 288

1 good.
2          So I've seen like as method
3 which is being published by FDA
4 using these techniques.
5 Definitely I have found through
6 those methods.
7 BY MR. NIGH:
8     Q.   You're aware of the FDA
9 having published these techniques decades
10 ago?
11          MS. BRANCATO:  Objection to
12     form.
13          THE WITNESS:  These -- they
14     have published methods post on
15     this discovery.  And they have
16     published several methods,
17     recently, in 2018-'19 and I've
18     seen --
19 BY MR. NIGH:
20     Q.   I see.  I'm actually -- I
21 think you're speaking about after there
22 was a discovery of NDEA and/or NDMA in
23 valsartan, then the FDA started to
24 publish these techniques.  So I'm

Page 289

1 speaking before that, just the technology
2 and method, that there were actually
3 methods described in scientific
4 literature studies that show how they
5 detected and quantified NDMA and NDEA
6 utilizing gas chromatography and liquid
7 chromatography.
8          Are you aware of that?
9     A.   No, I'm not aware of it.
10 But the gas chromatography is different
11 from the gas chromatography mass
12 spectroscopy, because it is a --
13 different altogether.
14     Q.   Yeah, let me be real clear.
15 I understand your answer to say gas
16 chromatography is different from gas
17 chromatography mass spectometry.  I'm
18 speaking solely to gas chromatography
19 mass spectometry, the coupling of the
20 two, okay, that has been around for
21 decades, gas chromatography mass
22 spectometry.
23     A.   I've not seen it.  I have
24 not gone through such literature.

Confidential Information Subject to Protective Order

Page 290

1    Q.   Okay.  You haven't seen the
2  literature where they describe methods as
3  to how they use gas chromatography mass
4  spectrometry, and/or liquid chromatography
5  mass spectrometry to be able to identify
6  and quantify to the level of nanograms
7  the amount of NDMA and NDEA that they are
8  seeking to research?  You haven't seen
9  that?
10    A.   For NDEA and NDMA, I have
11  not seen it.
12    Q.   So you wouldn't be able to
13  speak then, if you haven't reviewed those
14  studies, you wouldn't be able to speak as
15  to how long those methods have been
16  around for, correct?
17    A.   See, these techniques is
18  being used for some other purposes.  So
19  this is not the only use of the
20  technology.  This technology is being
21  used for several other purpose also
22  within the pharma industry, and that's
23  why I'm indicating that these techniques
24  being used since long time in pharma

Page 291

1  industry.
2    Q.   Are you aware of the
3  potential for medicines to nitrosate, or
4  nitrosation?  Have you ever heard of
5  that?
6    A.   This is chemistry.  So
7  basically I'm a quality person.  So
8  really I need to really check this with
9  my chemistry people, who is really
10  supporting the chemistry.
11    Q.   Are you aware that back in
12  the 1970s and 1980s they had concerns
13  that with drugs like cimetidine and
14  ranitidine, that they had the potential
15  to nitrosate, meaning they could break
16  down into NDMA, NDEA, or other
17  nitrosamines inside of the body?
18        MS. BRANCATO:  Objection to
19  form.
20  BY MR. NIGH:
21    Q.   In the 1970s and 1980s?
22    A.   No, I have not seen it.
23    Q.   You wouldn't be aware of the
24  scientific literature studies and/or

Page 292

1  studies carried out by those
2  pharmaceutical industries where they were
3  actually utilizing GC-MS and LC-MS to
4  detect how much NDMA, NDEA, and other
5  nitrosamines were breaking down inside
6  the body as a result of use of the drug?
7    A.   This what you are talking
8  about is basically a clinical portion of
9  the, like, science, pharmaceutical
10  science.  You talk about the blood plasma
11  analysis.  And this is all about a very
12  different field altogether.
13        So you're talking about the
14  plasma analysis and identifying those
15  levels in the plasma.  And you're talking
16  about those studies.  Yeah, basically I'm
17  not sure.
18    Q.   And are you also aware that
19  they would also -- they would also be
20  able to test the amount of NDMA and/or
21  NDEA inside of the drug itself back in
22  the 1980s using gas chromatography mass
23  spectometry?
24    A.   I have not seen it.

Page 293

1    Q.   Okay.  So when
2  pharmaceutical companies want to use new
3  testing methods, they will commonly apply
4  to the FDA to be able to use these
5  testing methods for day-to-day
6  activities, correct?
7    A.   So if I'm understanding your
8  question correctly, you're indicating
9  that method which is being developed for
10  day-to-day analysis using this technique?
11    Q.   The question is when
12  pharmaceutical companies want to use new
13  testing methods, they will commonly apply
14  to the FDA to be able to use these
15  testing methods for day-to-day
16  activities, correct?
17    A.   So I think no, I'm not very
18  in agreement, because whenever I'm
19  devising an new test method, if it is a
20  new product, then basically there's a new
21  ANDA submission.
22        But if is existing product,
23  then it has to go through that
24  verification application.

Page 294

1    Q.   The verification application
2 is precisely what I'm asking here.  So
3 let me ask the question again using that
4 wording.
5          Pharmaceutical companies --
6 when pharmaceutical companies want to use
7 new testing methods, they will commonly
8 apply utilizing a verification
9 application to the FDA to be able to use
10 these testing methods for day-to-day
11 activities, correct?
12          MS. BRANCATO:  Objection to
13     form and foundation.
14          THE WITNESS:  No.  I think
15     I'm still not in very great
16     agreement with this statement.
17          See, like, the method is
18     being devised and designed based
19     upon your set of requirement and
20     once it is being designed and
21     devised, that method is to be, if
22     it is a non-pharmacopeia, it is to
23     be validated and submitted to the
24     agency as a part of your ANDA

Page 295

1     supplement.
2 BY MR. NIGH:
3    Q.   Torrent could have made an
4 application to the FDA to use one of the
5 many methods discussed in scientific
6 literature for detection of NDMA and
7 NDEA, correct?
8          MS. BRANCATO:  Objection to
9     form and foundation.
10          THE WITNESS:  Can you repeat
11     your question?
12 BY MR. NIGH:
13    Q.   Torrent could have made an
14 application to the FDA to use one of the
15 many methods discussed in scientific
16 literature for the detection of NDMA and
17 NDEA, correct?
18          MS. BRANCATO:  Same
19     objections.
20          THE WITNESS:  I'm not sure
21     about it.
22 BY MR. NIGH:
23    Q.   Prior to August of 2018,
24 Torrent never made an application to the

Page 296

1 FDA to use any of the methods discussed
2 in scientific literature for the
3 detection of NDMA and NDEA, correct?
4          MS. BRANCATO:  Objection.
5     Foundation.
6 BY MR. NIGH:
7    Q.   You can answer.
8 Mr. Jaiswal?
9    A.   Yeah.
10    Q.   You can answer that
11 question.
12    A.   Yeah, you're indicating
13 whether we proposed to FDA for
14 utilization of this technique for
15 analysis of NDEA and NDMA before 2018?
16    Q.   No, I'm asking you a
17 question.  Prior to August of 2018,
18 Torrent never made an application to the
19 FDA to use any of the methods discussed
20 in scientific literature for the
21 detection of NDMA and NDEA, correct?
22          MS. BRANCATO:  Same
23     objection.
24          THE WITNESS:  No, but

Page 297

1     this -- I'm not able to
2     understand, because why I need to
3     make application if ANDA has not
4     required that in those supplements
5     or those changes?
6 BY MR. NIGH:
7    Q.   We'll talk about that later.
8 But my question is, prior to August 2018,
9 Torrent never made an application to the
10 FDA to use any of the methods discussed
11 in scientific literature for the
12 detection of NDMA and NDEA, correct?
13          MS. BRANCATO:  Same
14     objection.
15          THE WITNESS:  Again, I'm
16     indicating because my
17     specifications are not naming
18     these impurities and that -- no
19     need to approach FDA for this
20     purpose.
21          (Audio interference.)
22          THE COURT REPORTER:  The
23     audio cut out on that answer.
24 BY MR. NIGH:

Page 298

1  Q.  Mr. Jaiswal, could you give
2 that answer again.  I think you cut out
3 in the middle of your answer.
4         THE WITNESS:  Hello.
5         MS. BRANCATO:  Sushil?
6         THE WITNESS:  Yes.
7         MS. BRANCATO:  Can you hear
8     us?
9         THE WITNESS:  Yes.
10        MS. BRANCATO:  Okay.  Can
11    you give that last answer again?
12        THE WITNESS:  Which last
13    answer?
14 BY MR. NIGH:
15    Q.  Let me ask the question
16 again.  You cut out in the middle of your
17 answer the last time.
18        So I said we'll talk about
19 the -- you had mentioned why you would
20 need to do that, make an application if
21 ANDA -- it's not required in those
22 supplements or changes, talking about why
23 you do the testing.
24        My question is -- we'll talk

Page 299

1 about that later.  But my question is,
2 prior to August of 2018, Torrent never
3 made an application to the FDA to use any
4 of the methods discussed in scientific
5 literature for the detection of NDMA and
6 NDEA, correct?
7    A.  Yeah, in my product, this
8 NDMA and NDEA was not part of the
9 specification.  And that's why it was not
10 needed to approach the FDA.
11    Q.  So is it your testimony that
12 if it's not included in the ANDA, then
13 there is never a scenario where you would
14 need to make an application to the FDA to
15 amend an ANDA?
16        MS. BRANCATO:  Objection to
17    form.
18 BY MR. NIGH:
19    Q.  You can answer.
20    A.  So once you have approved
21 ANDA in place, and based upon your
22 lifecycle assessment and management, if
23 you have a situation where you need to
24 change your -- either your specification,

Page 300

1 you change -- or amend your specification
2 or you change your --
3         (Audio interference.)
4         (Whereupon, a discussion was
5     held off the stenographic record.)
6         THE WITNESS:  The internet
7     is not working very strong because
8     there is very heavy rains outside.
9         This started and that
10    sometimes, there is some
11    disturbance in the internet and
12    quality of the internet.
13 BY MR. NIGH:
14    Q.  Okay.  Let me pick up where
15 we were, because you had said that based
16 upon lifecycle -- based upon lifecycle
17 assessment and management, if you have a
18 situation where you need to change your
19 either specification or amend or
20 change -- and that's kind of where the
21 audio blipped.
22        So can you pick up on that
23 answer or restate that answer from the
24 beginning?

Page 301

1    A.  For that, if you
2 supported -- if that needed an addition
3 of new method, test method, then
4 basically you design that method, develop
5 that method, validate it, and then submit
6 this to agency as a supplement.  And that
7 supplement may be for any category that
8 meets the requirement.
9    Q.  The lifecycle assessment and
10 management, that's -- you have to
11 continue to follow your drug throughout
12 the lifecycle of the drug, correct?
13        MS. BRANCATO:  Objection to
14    form and foundation.  Outside the
15    scope.
16        You can answer in your
17    personal capacity.
18 BY MR. NIGH:
19    Q.  Mr. Jaiswal, you can answer.
20    A.  Yeah, this aspect is
21 basically handled by the
22 pharmacovigilance group.  And if you --
23 if you are asking me more detail about
24 it, I may not be able to answer it.

Confidential Information Subject to Protective Order

Page 302

1   Q.   I simply asked, because you
2   answered it in your answer, where you
3   said based upon your lifecycle assessment
4   and management.  That's why I asked the
5   question.
6         So in your answer, you
7   stated based upon your lifecycle
8   assessment and management, if you have a
9   situation where you need to change -- do
10  you recall giving that answer, that part
11  of the answer?
12  A.   Yeah, that is correct, but
13  then --
14  Q.   I -- sorry.  Go ahead.
15  A.   If it is that situation,
16  then basically you are developing a
17  method and validating and you are
18  submitting it to agency.
19  Q.   So in order to understand
20  your answer on the "based upon your
21  lifecycle assessment and management," or
22  to understand your words that you just
23  gave to me, I'm asking you, lifecycle
24  assessment and management, that means

Page 303

1   that you have to continue to follow your
2   drug even after you get initial approval,
3   correct?
4         MS. BRANCATO:  Objection to
5   form.
6         THE WITNESS:  What I've
7   explained, the supplement filing
8   is always postapproval.  Once --
9   I'm indicating that the supplement
10  if is to be filed that applies to
11  the situation, a postapproval
12  changes.
13  BY MR. NIGH:
14  Q.   If you become aware of
15  certain circumstances or issues or there
16  are some changes or any safety issues
17  that are implicated during the lifecycle
18  assessment and management of the product,
19  you can make updates or applications to
20  the FDA to amend the ANDAs, correct?
21  A.   I think I'm not very clear
22  on this topic.
23  Q.   Well, you keep answering --
24  your answers in response to my question

Page 304

1   are, did you ever make an application to
2   the FDA for new testing methods, and your
3   answer comes back, well, we did it
4   according to the specifications in the
5   ANDA.
6         It's not been my question.
7   But now I'm going to go with you.  Okay.
8   And my question is going to be, yes, I
9   understand that you have ANDA
10  requirements.  Okay.  But when you become
11  aware of some safety implication and/or
12  some potential changes, you, as Torrent,
13  have the power and authority to file an
14  amended ANDA application that allows or
15  gives you the ability to use these new
16  testing methods that I'm speaking about,
17  correct?
18         MS. BRANCATO:  Objection.
19  Outside the scope of the 30(b)(6).
20         You can answer.
21         THE WITNESS:  Can I answer?
22         MS. BRANCATO:  Yep.
23  BY MR. NIGH:
24  Q.   Yes.

Page 305

1   A.   See, once you talk about the
2   safety, the safety is a very different
3   aspect altogether.  And once I'm talking
4   about the testing method that comes into
5   the quality.  The safety is basically a
6   very different aspect altogether.  Once
7   you bring a safety aspect into the
8   discussion, you become a different field
9   altogether.
10         That is basically a -- that
11  is a kind of a safety and medical team
12  handles it.  So this is what I indicated.
13  It becomes a very different area of
14  discussion altogether.
15  Q.   When you become aware of
16  some quality implication, and/or some
17  potential changes, you as Torrent have
18  the power and authority to file an
19  amended ANDA application that allows you
20  to give you the ability to use these new
21  testing methods to assess the quality of
22  that product, correct?
23         MS. BRANCATO:  Objection to
24  foundation.  Outside the scope.

Confidential Information Subject to Protective Order

Page 306

1   You can answer.
2 BY MR. NIGH:
3   Q.   Mr. Jaiswal, when your
4 attorney makes an objection, you can
5 still answer.  Okay?
6   A.   Okay.  If your specification
7 and analytical methods needs any kind of
8 amendment, yes, we do a validation and we
9 do file a supplement to the agency.
10   Q.   Okay.  In addition
11 pharmaceutical companies can use new
12 testing methods even without specific FDA
13 approval for that specific testing
14 method, as long as they are also using
15 the approved testing methods already
16 approved by the FDA in the ANDA as well,
17 correct?
18       MS. BRANCATO:  Objection to
19     form.
20       THE WITNESS:  So I'm not in
21     agreement.  Whenever we use the
22     method for any of the testing, it
23     is always an approved method.  And
24     whenever we are developing a new

Page 307

1     method, basically we file a
2     supplement and we get this
3     approved by the agency.
4 BY MR. NIGH:
5   Q.   You're aware that before
6 approval of an ANDA and/or DMF, Torrent
7 could have used any of the methods
8 discussed in the scientific literature
9 for the detection of NDMA and/or NDEA,
10 correct?
11       MS. BRANCATO:  Objection to
12     form.  Foundation.  And outside
13     the scope.
14       THE WITNESS:  I'm not really
15     sure about this testing method.
16 BY MR. NIGH:
17   Q.   I heard you talk about the
18 synthetic chemistry analysis on multiple
19 occasions with Ms. Pendley.
20       Do you remember that?
21   A.   Synthetic chemistry?
22   Q.   Yes.  Do you know what
23 synthetic chemistry means?
24   A.   Yeah, I know.  But it is not

Page 308

1 my area, synthetic chemistry is
2 definitely a different department we have
3 who is taking care of the synthetic
4 chemistry.
5       MR. NIGH:  Let's pull up LP
6     1527, your resumé.
7       This was previously marked
8     as Exhibit 215, used earlier
9     today.
10 BY MR. NIGH:
11   Q.   Mr. Jaiswal, this is your
12 resumé.  I'm going to turn your attention
13 to Page 3 of your resumé, professional
14 qualifications.
15   A.   I'm just trying to open it.
16   Q.   Okay.
17   A.   Torrent -- which number?
18   Q.   Page 3.  Page 3.  Do you see
19 that there?
20       MS. BRANCATO:  He's asking
21     the exhibit number.
22 BY MR. NIGH:
23   Q.   The exhibit number -- the
24 exhibit number is 215.  It's also up on

Page 309

1 the screen here, your resume.
2   A.   215.
3   Q.   215 yes.  215.
4   A.   215.
5   Q.   Let's look at your
6 qualifications, professional
7 qualifications.  It appears that you've
8 got a master's in science degree in 1992.
9 Do you see that?
10   A.   Yeah.
11   Q.   And that was for applied
12 chemistry, correct?
13   A.   Correct.
14   Q.   And then in 2021 -- that's
15 this year, right?
16   A.   Yeah.
17   Q.   You got your Ph.D.?
18   A.   Yes.
19   Q.   Congrats.
20   A.   Thank you.
21   Q.   And so do you go by
22 Dr. Jaiswal or Mr. Jaiswal?
23   A.   Now, it is Dr. Jaiswal, but
24 I allow to be called as Mr. Jaiswal only.

Confidential Information Subject to Protective Order

Page 310

1    Q.   Oh, you only want to be
2  called Mr. Jaiswal?
3    A.   Yeah, I'm really okay with
4  that.
5    Q.   Okay.  All right.  Okay.
6  Well, here you got your Ph.D.  It was for
7  chemistry, method development and
8  validation.
9       Do you see that?
10    A.   Yes.
11    Q.   What does that mean?
12    A.   Basically this involves an
13  analytical method development for some of
14  the molecules and those method is being
15  developed, validated and is being taken
16  for the publication.
17    Q.   Okay.  And you had mentioned
18  that you had published articles as part
19  of your Ph.D.  Do you remember that,
20  journal scientific articles?
21    A.   Yes.
22    Q.   When did you publish those
23  articles?
24    A.   I suppose it is somewhere in

Page 311

1  that -- between 2015, 2017.
2    Q.   Between 2015 and 2017?
3    A.   Yes.
4    Q.   I want to see if I've got
5  this right.  So while you were the head
6  of quality at Torrent, you held a
7  master's in science, but you didn't have
8  a Ph.D. at that time yet, right?
9    A.   Yes.  When I joined this
10  organization, I was a master of science.
11    Q.   Okay.  Now, what does --
12  chemical synthesis, what does that mean?
13    A.   So because I'm not basically
14  a chemical person, so I'm not able to
15  give that definition to you.
16       But chemical synthesis is
17  once you are -- like there are several
18  reactions.  And based upon those
19  reactions, if you synthesize something,
20  it would be a synthetic chemistry.
21    Q.   Okay.  Let me see if I have
22  this right.  When you're doing a chemical
23  synthetic analysis, you are looking at
24  your starting material with the ultimate

Page 312

1  goal of what your ending byproduct --
2  your ending product is going to be,
3  correct?
4       MS. BRANCATO:  Objection to
5    form and foundation.
6       THE WITNESS:  I think I'm
7    not able to really understood your
8    question.
9  BY MR. NIGH:
10    Q.   I'm sorry.  You said that
11  you weren't able to understand my
12  question?
13    A.   Yeah.
14    Q.   When you're doing -- do you
15  know -- have you heard of a chemical
16  synthetic analysis?
17    A.   Chemical synthetic analysis?
18  No.
19    Q.   Have you -- earlier you
20  responded to Madeline, Ms. Pendley, that
21  when you do the chemistry -- do you
22  remember saying, when you do the
23  chemistry?
24       MS. BRANCATO:  Objection to

Page 313

1    form.
2       THE WITNESS:  You are
3    referring to what topic?  Because
4    what I had indicated that I think
5    what I'm referring to by
6    identification of the impurity, a
7    chemical, like how the API is
8    being synthesized, that ROS is to
9    be reviewed, and then it needs to
10    be basically identified, whatever
11    the process impurity, whatever
12    the degradation impurity.  That was
13    the discussion topic.
14  BY MR. NIGH:
15    Q.   Okay.  So when you're doing
16  the chemistry, that's another way of when
17  you're doing the synthetic chemistry
18  analysis or synthetic chemical analysis,
19  where you're trying to look at your
20  starting product, what your ultimate goal
21  for end product is, and then all of the
22  potential byproducts, correct?
23    A.   Yeah, but this is what I
24  explained, but this is always being done

Page 314

¹ by the chemistry team who is basically
² synthesizing a product, and they always
³ have a -- like, they are the expert on
⁴ those topic.
⁵      Q.   Right.  But the chemistry
⁶ team at Torrent never came to you as the
⁷ head of quality and said, "Hey, we can
⁸ see when we look at the chemical
⁹ synthetic process as to how our valsartan
¹⁰ is being made that there's the potential
¹¹ for NDMA and NDEA being formed"?  Right,
¹² your chemistry teacher -- your chemistry
¹³ team never informed you of that, correct?
¹⁴      A.   So I will tell you that as
¹⁵ a -- like whenever we receive an open
¹⁶ part of the DMF, it is always being
¹⁷ reviewed by the chemistry team.  Now the
¹⁸ information which is being given within
¹⁹ the open part of DMF is always limited.
²⁰      And with the knowledge or
²¹ with the information which is being
²² given, it is not always possible to
²³ really identify the level of impurities
²⁴ indicated in the API.

Page 315

¹      And that is why this
² assessment is to be done by the DMF
³ holder, because they only know what is
⁴ the whole chemistry scheme, what are the
⁵ process parameter, and how it is being
⁶ synthesized.
⁷      Q.   That was a very long answer.
⁸ But I'm going to go ahead and try to
⁹ tweak this as we discuss.
¹⁰      When looking at synthetic
¹¹ chemical analysis to understand what
¹² impurities or contaminants could make its
¹³ way into the drugs, it's important to
¹⁴ fully understand the ingredients that are
¹⁵ being used in the drug, correct?
¹⁶      A.   No.  I think, say, why --
¹⁷ you know that what are the ingredient,
¹⁸ the alone ingredient, the key starting
¹⁹ material, is not the only way to identify
²⁰ the impurity.
²¹      What you need, you need the
²² reagent, solvents, residual conditions,
²³ the special -- which has being given by
²⁴ the test so manufacturing process, you

Page 316

¹ are supposed to know the KSM.  You're
² supposed to know how KSM is being
³ synthesized, what are the impurities
⁴ coming into the KSM, and how it is being
⁵ mitigated into the process.
⁶      All these information is
⁷ always with the DMF holder.  It's never
⁸ being with the ANDA holder.
⁹      Q.   I appreciate that you gave
¹⁰ me a lot of the factors that go into a
¹¹ chemical synthetic analysis.  I
¹² understand that you have a lot of
¹³ information on this now.
¹⁴      What I'm asking is, just
¹⁵ simply the one part that, as one part of
¹⁶ a complete synthetic chemical analysis,
¹⁷ it's important to understand what
¹⁸ impurities or contaminants could make its
¹⁹ way into the ingredients that you're
²⁰ using in making the drug, correct?
²¹      A.   So to understand, like,
²² impurity profile generated out of any
²³ chemical scheme, this is what I think
²⁴ your question is.

Page 317

¹      And I'm again emphasizing
² that to do that job, you need the
³ complete chemistry involved.  That means
⁴ the incoming -- your key starting
⁵ material, your KSM, your solvents, the
⁶ catalyst, the temperature, the pressure.
⁷      And above that there's a lot
⁸ of testing being done while developing an
⁹ API.  There are a lot of process studies
¹⁰ being done.  What kind of order design of
¹¹ the process is to get rid of those
¹² impurity that is being identified.
¹³      So these -- all database is
¹⁴ always and always being restricted in the
¹⁵ restricted part of the DMF and is never
¹⁶ being with the ANDA holder.
¹⁷      And with that -- with that,
¹⁸ I wanted to tell you that those
¹⁹ information, my chemistry team is looking
²⁰ into, they may not be able to identify
²¹ the potential on those synthesis.
²²      Q.   We're going to talk about
²³ the always being restricted to the DMF in
²⁴ a minute.  Okay.  But I want to come back

Confidential Information Subject to Protective Order

Page 318

¹ to some other parts of this question
² first.
³         The synthetic -- a complete
⁴ synthetic chemical analysis is only as
⁵ good as the variables it considers,
⁶ correct?
⁷         MS. BRANCATO:  Objection to
⁸     form.
⁹         THE WITNESS:  No.  Not quite
¹⁰     sure about that.
¹¹ BY MR. NIGH:
¹²     Q.    Meaning if variables are
¹³ missed in the synthetic chemical
¹⁴ analysis, then the analysis may miss
¹⁵ impurities or contaminants that could be
¹⁶ formed, correct?
¹⁷     A.    No, I think I'm not able to
¹⁸ answer this based upon this limited
¹⁹ portion.  I think I need a little bit
²⁰ more elaboration in the question to
²¹ answer it correctly.
²²     Q.    If you don't understand that
²³ there are impurities or contaminants in
²⁴ the ingredients themselves, then the

Page 319

¹ synthetic chemical analysis will also
² possibly miss these impurities or
³ contaminants, correct?
⁴     A.    This, you're talking for the
⁵ API synthesis?
⁶     Q.    I'm talking about just a
⁷ general synthetic chemical analysis.
⁸ Chemical synthesis 101.
⁹         If you don't understand that
¹⁰ there are impurities or contaminants in
¹¹ the ingredients themselves, then the
¹² synthetic chemical analysis will also
¹³ miss these impurities or contaminants,
¹⁴ correct?
¹⁵     A.    No, I think I'm not able to
¹⁶ answer that, because I think this is to
¹⁷ be purely answered by some person who is
¹⁸ handling the chemistry day in, day out.
¹⁹     Q.    Well, you're designated for
²⁰ the topics that we have you designated
²¹ for on 30(b)(6).  I think it will speak
²² for itself.
²³         Had Torrent understood that
²⁴ the recycled solvents containing NDMA and

Page 320

¹ NDEA -- I'm sorry.  Strike that.
²         Had Torrent understood that
³ the valsartan API that they were getting
⁴ from ZHP contained NDMA and NDEA, then
⁵ they would have also understood in their
⁶ synthetic chemical analysis that the
⁷ valsartan API made -- or the valsartan
⁸ that Torrent is making in terms of
⁹ finished product made with valsartan ZHP
¹⁰ API would also have potentially NDMA and
¹¹ NDEA, correct?
¹²         MS. BRANCATO:  Objection to
¹³     form.
¹⁴ BY MR. NIGH:
¹⁵     Q.    You can answer.  Anytime
¹⁶ your attorney objects, she hasn't the
¹⁷ instructed you not to answer.
¹⁸     A.    No, I'm really trying to
¹⁹ analyze your question, because it is too
²⁰ much away from quality.  I'm really
²¹ trying to analyze it, to -- how to answer
²² your question.  So like --
²³     Q.    Let me simplify it.
²⁴         Had Torrent understood that

Page 321

¹ the valsartan ZHP API that they were
² getting contained NDMA and NDEA, then
³ they would have also been able to
⁴ understand in their synthetic chemical
⁵ analysis on Torrent making the finished
⁶ product that the finished product would
⁷ be capable of having NDMA and NDEA,
⁸ correct?
⁹     A.    As I said, my specification
¹⁰ for the finished product and for the
¹¹ API --
¹²         MR. NIGH:  Take a look at LP
¹³     1516.  This will be marked as
¹⁴     Exhibit 222.
¹⁵     (Document marked for
¹⁶     identification as Exhibit
¹⁷     Torrent-222.)
¹⁸ BY MR. NIGH:



Confidential Information Subject to Protective Order

Page 322

1      A.   Getting downloaded.
2      Q.   I'm sorry.  Did you say it's
3 getting downloaded?
4      A.   Yeah, it's getting
5 downloaded.  Because of poor internet
6 quality, it is taking time.
7      Q.   Okay.  Do you have it now?
8      A.   No, I think it's taking too
9 much.
10          MR. NIGH:  Let's go off the
11 record.
12          THE VIDEOGRAPHER:  The time
13 is now 12:56 p.m.  We're going off
14 the record.
15          (Brief pause.)
16          THE VIDEOGRAPHER:  The time
17 is now 1 o'clock p.m.  We are back
18 on the record.
19 BY MR. NIGH:
20      Q.   Okay.  This document is
21 marked as Torrent Exhibit 222.



Page 323

Confidential Information - Subject to Protective Order

Page 326



Confidential Information Subject to Protective Order

Page 330



Confidential Information - Subject to Protective Order

Page 334



Confidential Information Subject to Protective Order

Page 338



Confidential Information Subject to Protective Order



Page 342

Confidential Information Subject to Protective Order



Page 346

Page 349

13    Q.   Okay.  Mr. Jaiswal, I
14  believe it's almost midnight your time.
15  Would now be a good time for you to take
16  a break for the day?
17    A.   I'm okay, fine.
18    Q.   You'd like to take a break
19  for the day?
20    A.   That's fine.  Thank you.
21    MR. NIGH:  Okay.  Let's go
22  ahead and take a break for the day
23  and we'll resume in the morning.
24  Okay.

1    THE WITNESS:  Thank you.
2  Thank you, everyone.
3    MR. NIGH:  Thank you, sir.
4    THE VIDEOGRAPHER:  The time
5  now is 1:26 p.m.  This concludes
6  today's deposition.  We're going
7  off the record.
8    (Excused.)
9    (Adjourned approximately
10  1:26 p.m. eastern standard time.
11  (11:06 p.m. India standard time.)
12    *****
13
14
15
16
17
18
19
20
21
22
23
24

Page 350

1
2      CERTIFICATE
3
4
5          I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.
7
           It was requested before
8  completion of the deposition that the
   witness, SUSHIL JAISWAL, Ph.D., have the
9  opportunity to read and sign the
   deposition transcript.
10
11
12
           _____
13         MICHELLE L. GRAY,
           A Registered Professional
           Reporter, Certified Shorthand
14         Reporter, Certified Realtime
           Reporter and Notary Public
15         Dated:  June 8, 2021
16
17
18          (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24

Page 351

1      INSTRUCTIONS TO WITNESS
2
3          Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8          After doing so, please sign
9  the errata sheet and date it.
10          You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14          It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 352

1      - - - - - -
       E R R A T A
2      - - - - - -
3
4  PAGE  LINE  CHANGE
5  _____  _____  _____
6     REASON:  _____
7  _____  _____  _____
8     REASON:  _____
9  _____  _____  _____
10    REASON:  _____
11  _____  _____  _____
12    REASON:  _____
13  _____  _____  _____
14    REASON:  _____
15  _____  _____  _____
16    REASON:  _____
17  _____  _____  _____
18    REASON:  _____
19  _____  _____  _____
20    REASON:  _____
21  _____  _____  _____
22    REASON:  _____
23  _____  _____  _____
24    REASON:  _____

Page 353

1
2      ACKNOWLEDGMENT OF DEPONENT
3
4          I,_____, do
5  hereby certify that I have read the
6  foregoing pages, 1 - 354, and that the
7  same is a correct transcription of the
8  answers given by me to the questions
9  therein propounded, except for the
10  corrections or changes in form or
11  substance, if any, noted in the attached
12  Errata Sheet.
13
14
15  _____
16  SUSHIL JAISWAL, Ph.D.          DATE
17
18
19  Subscribed and sworn
   to before me this
20  _____ day of _____, 20_____.
21  My commission expires:_____
22
23  _____
   Notary Public
24

Confidential Information Subject to Protective Order

Page 354

1        LAWYER'S NOTES
2   PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____

## WORD INDEX

**< 0 >**
**00009022** 9:7
**00010187** 9:12
**00072542** 8:16
**00072607** 6:15
**00124209** 6:12
**00133890** 9:13
**00181466** 5:19
**00190370** 7:12
**00190373** 7:14
**002** 274:3
**00208351** 6:17
**00366172** 9:16
**00511583** 7:7
**00516411** 6:8
**00523103** 5:22
**00523126** 8:11
**03** 84:11
277:20
**038** 100:7
**039** 100:7
**041** 100:7
**04101** 2:11
**047N** 274:5
**049M** 98:19
**050** 99:10
**051M** 99:18
**052** 99:23
**083** 77:20
78:3 82:1
83:6, 23
85:17 86:13
89:13

**< 1 >**
**1** 122:6
140:13, 23
141:2 159:18
192:6 212:4
322:17 353:6
**1/5/2015** 7:18
**1:26** 349:5, 10
**10** 208:20
279:20
**10:45** 209:4
**100** 87:23
141:8 159:11,

**12** 174:18
**10022** 3:4
**101** 281:20
319:8
**103** 7:21
**1039** 110:14,
22 138:10
**1047** 143:3
**1064** 61:6
**1065** 59:11,
20, 22 62:7, 13
**1072** 55:3
**1078** 95:24
96:19
**108** 87:5
**1088** 146:17
**1096** 253:7, 9
**10-milligram**
274:2
**11** 5:5 6:12
105:24 106:19
**11:06** 349:11
**11:43** 269:10
**11:47** 269:14
**110** 8:7
**1102** 33:6, 11
45:21
**111** 87:5
**116** 87:5
**119** 72:24
73:9, 11 77:9
141:21 142:6
247:7
**11th** 106:5
107:1, 22
113:13, 22
121:22
**12** 103:14
**12.3** 79:5
**12.32** 74:8
82:14, 18
**12.88** 84:9, 10,
14
**12/20/2006**
7:16
**12:02** 282:20
**12:14** 282:24
**12:56** 322:13
**120** 6:6
**1218** 270:5,
11, 16 271:2,

**10, 14** 272:1,
21 276:22
281:19
**1240** 266:16
270:15
271:24
272:23
274:16, 21
279:20
**1247** 64:6
82:5, 13 84:6
86:2, 18 87:8
88:15
**125.03** 86:22
**13** 5:16
110:15
**1302** 263:6
**1393** 161:16
**1394** 201:3
**1396** 25:5, 10
**14** 6:8 74:19,
20 75:3
**145** 7:14
**1457** 79:3
**146** 7:18
**1469** 80:2, 9,
18
**15** 76:18
86:2, 12
131:15, 21
139:24
140:20 141:7
142:2
**1516** 321:13
**1527** 18:4
308:6
**1535** 166:9
**1537** 76:12,
14, 20 77:4, 6
79:11 80:8
82:5 83:1
85:15 86:3, 12
**15-minute**
131:24
**16** 8:9 10:15
102:8
**161** 9:7
**166** 6:8
**16th** 2:15
**17** 102:8, 18
254:7

**17th** 3:9
112:3 254:19
**18** 5:18
102:18 115:6
119:17 261:23
**18th** 61:16
115:8 119:9
121:17, 22
134:13
138:22, 24
139:15
254:18
262:15, 21, 22
264:2
**19.8** 273:2, 4,
10 274:6, 10
277:6 281:23
**19103** 3:10
**19-2875** 1:5
**19422** 4:4
**196** 24:24
**1970s** 291:12,
21 339:22
**1980s** 284:15,
22 285:24
291:12, 21
292:22 327:23
**1990s** 285:5,
12 286:1
327:23
**1992** 309:8
**1996** 20:19, 24
**1997** 20:19
**19th** 264:3

**< 2 >**
**2** 21:14 33:9
65:8 103:21
104:22
114:13
137:11
138:13
140:12, 13
159:19 192:7
**20** 86:17
112:3 217:18
353:20
**200** 3:15 4:3
70:4 71:21

**2002** 33:23
42:23 43:9,
12 47:1, 15
**2006** 55:18,
19 144:5, 7
146:11, 14
**2009** 210:6
212:7, 19
213:2 334:13
**201** 2:15 9:10
**2010** 162:9,
11, 16 165:23
**2013** 211:10
212:9 213:3
334:14
**2014** 75:3
201:14
**2015** 94:3, 9,
14 97:15
98:7, 12 99:6
100:18, 24
102:1, 8, 12,
16 147:3
148:13
149:16 167:2,
10, 15 170:1,
10 173:4
174:7 176:17
177:5, 12, 14
178:16 181:1,
14 182:5, 13
213:6, 9, 22,
23 215:14
217:3, 4
311:1, 2
326:10 327:8
334:14
343:21
344:20 345:8,
23 346:20, 22
347:5, 21
**2016** 102:18
**2017** 22:20
143:10 311:1,
2
**2018** 15:15
43:12 47:18
61:16 66:7
97:4 102:20
105:24
106:19 111:7

113:*3, 7, 13*
115:*7* 119:*9,*
*17* 210:*4*
217:*18*
236:*24* 254:*8*
261:*23* 267:*8*
268:*12, 22*
275:*13*
277:*14*
295:*23*
296:*15, 17*
297:*8* 299:*2*
323:*21* 324:*2*
344:*21* 345:*9,*
*24* 346:*21, 23*
347:*6, 22*
**2018-'19**
288:*17*
**2021** 1:*8*
309:*14* 350:*15*
**207** 2:*11*
**20th** 226:*18*
**212** 3:*5*
**212-A** 76:*17,*
*22*
**212-B** 64:*12*
**214** 14:*2*
**215** 3:*10*
18:*9* 308:*8,*
*24* 309:*2, 3, 4*
**216** 25:*1*
**217** 55:*8* 86:*8*
**218** 80:*7*
120:*7* 124:*18*
125:*7, 8, 10,*
*14* 143:*18*
209:*11, 14*
**219** 166:*16*
209:*14*
**21st** 113:*7*
**220** 263:*11*
**221** 266:*21*
**222** 321:*14,*
*23* 322:*21*
**23491** 67:*3*
163:*11, 16*
**23rd** 167:*2, 6*
**24** 275:*13*
**25** 5:*19* 13:*18*
**250** 10:*15*

**2500** 3:*16*
**253** 8:*13*
**26** 111:*7*
113:*3* 268:*12,*
*21*
**26/6** 115:*10*
138:*18*
**26/6/2018**
112:*1, 7, 13*
**263** 6:*13*
**264** 274:*4*
**266** 6:*15*
**26th** 111:*10*
113:*23* 114:*3,*
*5, 7, 10*
115:*11, 20*
226:*18* 249:*11*
**27** 26:*14*
27:*13* 323:*21*
**270** 8:*21*
**27th** 97:*4*
324:*2*
**283** 5:*5*
**2875** 1:*2*
**28th** 121:*18,*
*20, 23* 122:*13*
210:*4*
**29** 73:*5, 10,*
*18* 77:*9* 89:*2*

**< 3 >**
**3** 20:*16, 17*
61:*11* 62:*14*
69:*15, 20*
70:*17* 71:*9,*
*17, 22* 81:*15,*
*20* 82:*14, 18*
83:*14, 17*
84:*11, 13, 15*
86:*6, 22*
88:*15* 89:*5*
100:*13* 111:*1*
112:*11*
120:*23, 24*
121:*2* 122:*21*
137:*8, 12*
159:*19* 192:*7*
274:*11*
308:*13, 18*
**3.34** 329:*4*

**3:32** 1:*15*
11:*6*
**3:38** 16:*14, 19*
**3:42** 19:*23*
**3:43** 20:*4*
**30** 3:*9* 351:*16*
**30(b)(6** 29:*7*
38:*16* 129:*10*
133:*17*
142:*18*
145:*12* 252:*1*
304:*19*
319:*21* 337:*10*
**300** 87:*11, 24*
**301** 2:*20*
**30305** 3:*17*
**30th** 162:*9*
**316** 2:*5*
**321** 6:*17*
**32502** 2:*5*
**33** 7:*4*
**3333** 3:*16*
**34** 120:*15*
**354** 353:*6*
**372** 7:*12*
**377** 7:*14*
**38** 7:*8*
**3rd** 121:*9*
122:*17, 24*
123:*5, 10*
137:*21* 138:*1,*
*5* 139:*1*

**< 4 >**
**4** 1:*8* 34:*13,*
*14, 17, 18*
35:*4, 5, 9*
56:*4* 59:*21*
77:*6* 192:*7*
**4/16/2014** 9:*10*
**4:33** 63:*22*
**4:41** 64:*3*
**41** 82:*21*
**416** 86:*24*
**42** 84:*18*
85:*11*
**435-7001** 2:*6*
**44** 8:*16*
**45** 120:*2*
137:*6, 13*

207:*22*
208:*18* 209:*9*
**450** 4:*3*
**46204** 2:*16*
**47** 277:*18, 22*
279:*4*
**4th** 11:*4*

**< 5 >**
**5** 14:*8* 26:*14,*
*16* 27:*13*
41:*11* 62:*14*
**50** 69:*24*
**51** 99:*23*
**53** 100:*2*
**544** 324:*14, 17*
**55** 5:*20*
**553-2287** 3:*17*
**56** 7:*23*
**56.2** 99:*14*
**56.4** 99:*18, 20*
**56.5** 99:*2, 6*
**567-0700** 4:*4*
**585** 328:*21*
**588** 331:*14*

**< 6 >**
**6** 77:*6*
274:*24* 275:*4*
**6.02** 86:*12*
**6:02** 11:*5*
**6:07** 16:*14*
**6:08** 16:*19*
**6:09** 132:*8*
**6:12** 19:*23*
**6:13** 20:*4*
**60** 145:*3, 9*
146:*5*
**600** 2:*5*
**601** 3:*4*
**608** 6:*15*
**60-milligram**
274:*2*
**61** 7:*12*
**610** 4:*4*
**62.2** 69:*23*
100:*9*
**63** 7:*10*
**63.1** 100:*3*
**63.4** 69:*7*

100:*9*
**64** 7:*20* 9:*16*
**65.29** 86:*5*
**66204** 2:*21*
**667** 6:*19*
**678** 3:*17*
**68.4** 69:*23*
100:*9*
**682** 103:*13*
104:*18*

**< 7 >**
**7** 65:*8*
**7.12** 85:*16*
**7.89** 79:*12*
83:*4, 5*
**7/18/2018** 8:*15*
**7/19/2018** 6:*13*
**7:03** 63:*22*
**7:11** 64:*3*
**7:30** 208:*7, 20*
**7:56** 104:*4*
**72** 86:*15*
**7227** 2:*20*
**74** 271:*3, 7,*
*10, 11* 272:*1,*
*18* 273:*23*
**76** 9:*13*
**77** 80:*11*
**791-3000** 2:*11*

**< 8 >**
**8** 163:*23*
350:*15*
**8/13/2018** 7:*21*
**8/18/2018**
7:*10* 8:*7*
**8/27/2018** 8:*12*
**8/28/2018** 6:*6*
**8:00** 208:*2*
**8:15** 209:*4*
**8:16** 124:*5*
**8:21** 124:*9*
**8:26** 132:*4*
**8:49** 132:*8*
**80** 8:*16*
**83** 201:*9*
**85** 85:*18*
**866** 2:*16*
**877.370.3377**
1:*21*

Confidential Information Subject to Protective Order

**88**  9:12
276:23
**888**  2:6

**< 9 >**
**9**  208:20
**9/25/2015**  6:10
**909-334**  3:5
**913)563-6253**
2:21
**917.591.5672**
1:21
**95**  8:9  83:9
84:1
**957-6614**  2:16
**96**  63:10
81:12
**97**  21:8
**979-1158**  3:10
**9th**  210:6

**< A >**
**a.m**  11:6
16:14, 19
19:23  20:4
63:22  64:3
104:4  124:5,
9  132:4, 8
208:20  209:4
269:10, 14
**ability**  304:15
305:20
**able**  22:16
28:23  29:23
31:9  38:6, 7,
12  41:2  42:1,
5, 17  44:22
45:10  53:1
58:14  60:24
79:20  90:9
95:12  102:4,
7  106:21
109:4  112:23
113:20  118:6
127:15  129:3
130:14  142:3
145:14
154:13
159:13  160:2
162:6  177:23
190:9, 10, 22

192:18
193:13
199:16
207:13  221:3
222:16
223:19
224:23
225:22  234:8,
12  236:18
240:5, 11
245:14  247:2
251:7, 16, 18
253:2  265:9
272:9, 12
273:21  280:3,
5, 24  283:8
286:14
287:15  290:5,
12, 14  292:20
293:4, 14
294:9  297:1
301:24
311:14  312:7,
11  317:20
318:17
319:15  321:3
323:23
327:21
328:17
334:22
336:21
345:14  347:16
**absence**
204:13
**absolutely**
164:19  283:11
**Acceptable**
81:11, 24
172:19  173:3
**access**  59:8
**accessed**  43:24
**accessible**
43:16  47:1
**account**
218:15  229:9
**accurate**  31:3
351:20
**achieve**  27:6
192:15

**acid**  325:24
326:21, 24
333:5, 11
**ACKNOWLE
DGMENT**
353:2
**Actavis**  3:19,
20
**action**  101:18
115:13
172:23  173:1
179:12
**actions**
216:23  217:4,
12  249:19
**activities**
14:17  293:6,
16  294:11
**activity**  165:5
**actual**  13:1
34:16  42:23
**add**  31:9
194:21
**added**  253:20
**addition**
130:6  134:4
135:17  301:2
306:10
**Additionally**
127:4  129:17
**address**  61:24
125:17, 20
144:13
**addresses**
105:22
**adequate**
187:23
**adequately**
187:1, 17, 24
188:13
**Adjourned**
349:9
**adjust**  158:18
**adverse**  50:18
348:12
**advice**  136:13,
14  228:18
229:11
**afternoon**
11:24  12:1
**agencies**  261:2

**Agency**  55:14
59:1  155:13,
21, 22  156:3
165:20  184:9
194:16
205:10  238:5,
8  261:7
294:24  301:6
302:18  306:9
307:3  341:20
342:6, 18, 24
**agent**  23:17
**ago**  62:11
288:10
**Agrawal**
123:16  125:5
126:3  134:7
135:5
**agree**  28:19
29:2, 18
30:12  36:2,
16, 20  37:9,
23  40:16
47:3  51:5
81:20  102:11,
24  123:5
149:9  170:4
187:2, 16, 18
189:12
206:14
236:20  239:9
247:14
248:17
265:13  286:18
**Agreed**  123:6
181:4  183:23
184:20  187:8,
9  197:15
200:18, 19
205:10  260:3,
18
**agreement**
215:12
221:17
293:18
294:16  306:21
**ahead**  46:7
68:2  101:6
131:23
191:19  245:1
277:17

**282**:15
302:14  315:8
348:22
**alert**  196:9
197:1  218:11,
14, 16, 20
219:3, 8, 10,
22  220:4
221:22
226:13  233:8
250:18
**alerts**  184:2
194:17
199:18
213:15
214:20
231:21  240:16
**ALEXIA**  3:3
**alexia.brancato
@kirkland.com**
3:5
**aligned**  237:22
**allow**  131:14
137:1  158:4
242:19, 21
309:24
**allowed**  70:20
154:18  155:6
241:17
**allows**  304:14
305:19
**alternative**
211:11
**altogether**
29:15  51:20
289:13
292:12  305:3,
6, 9, 14
**AMANDA**  4:3
**amend**  299:15
300:1, 19
303:20
**amended**
304:14  305:19
**amendment**
202:15, 20
203:2, 7
306:8  341:19
342:19
344:17, 18, 24

**amendment_A VH** 9:*11*

**amine** 339:*24*

**amines** 166:*5* 339:*18*

**Amlo** 274:*1*

**amlodipine** 164:*2* 202:*22* 280:*17* 281:*4, 5, 9* 282:*4*

**Amlodipine/val sartan** 60:*16* 269:*17*

**amlodipine/valsartan/hydrochlorothiazide** 203:*3*

**amount** 290:*7* 292:*20* 332:*17*

**analysis** 24:*8, 11* 36:*12* 77:*22* 158:*11, 24* 219:*19* 286:*8, 20* 292:*11, 14* 293:*10* 296:*15* 307:*18* 311:*23* 312:*16, 17* 313:*18* 315:*11* 316:*11, 16* 318:*4, 14* 319:*1, 7, 12* 320:*6* 321:*5* 329:*19, 21* 330:*1* 334:*3* 335:*19* 346:*13, 16, 19, 22*

**analytical** 108:*15* 238:*10, 14* 243:*2, 5, 7, 11, 12, 15, 17, 22* 245:*1* 250:*4* 306:*7* 310:*13* 340:*5*

**analyze** 118:*6, 10, 12* 119:*5*

**analyzed** 72:*6*

**analyzing** 157:*14* 266:*3*

**and/or** 286:*4* 287:*2* 288:*22* 290:*4* 291:*24* 292:*20* 304:*11* 305:*16* 307:*6, 9* 350:*21*

**ANDA** 153:*22* 155:*17* 156:*7, 9, 10, 16* 187:*12* 188:*2, 7* 192:*16, 18* 193:*1, 4* 194:*11* 196:*1, 5* 200:*21* 238:*7* 247:*22* 293:*21* 294:*24* 297:*3* 298:*21* 299:*12, 15, 21* 304:*5, 9, 14* 305:*19* 306:*16* 307:*6* 316:*8* 317:*16* 341:*22* 342:*2, 23* 344:*17* 346:*13* 348:*9*

**ANDAs** 303:*20*

**Angiotensin** 8:*18*

**animal** 62:*19, 20*

**animals** 37:*1* 40:*12* 62:*16*

**Announcements** 8:*18*

**Answer** 10:*5* 12:*20* 13:*14* 29:*8, 11* 30:*10, 18* 43:*5* 44:*21* 47:*7* 48:*2* 51:*12* 52:*7, 24* 58:*6* 68:*3* 70:*24* 90:*15*

92:*21* 101:*6* 103:*6* 106:*12* 107:*11* 110:*3* 116:*11* 117:*2* 129:*5* 131:*21* 136:*4* 142:*19, 22* 149:*14* 150:*4* 151:*20* 160:*15* 172:*6* 176:*6* 189:*17* 190:*10, 11* 191:*8, 13* 195:*10* 196:*17* 197:*11* 198:*12* 199:*6, 7* 200:*13* 207:*2* 216:*9* 224:*3, 12* 232:*3* 233:*5* 237:*11* 238:*23* 247:*2* 248:*9* 250:*6* 252:*3, 22* 264:*24* 278:*15* 279:*1* 287:*23* 289:*15* 296:*7, 10* 297:*23* 298:*2, 3, 11, 13, 17* 299:*19* 300:*23* 301:*16, 19, 24* 302:*2, 6, 10, 11, 20* 304:*3, 20, 21* 306:*1, 5* 315:*7* 318:*18, 21* 319:*16* 320:*15, 17, 21* 337:*12, 23* 339:*6* 341:*11* 342:*16* 347:*16* 348:*3, 4*

**answered** 51:*14* 302:*2* 319:*17*

**answering** 197:*9* 248:*1* 303:*23* 341:*14*

**answers** 205:*2* 232:*17* 242:*20* 303:*24* 353:*8*

**anybody** 150:*22* 154:*4* 165:*15* 243:*20* 328:*11* 334:*22*

**anymore** 78:*18* 185:*10*

**Anytime** 320:*15* 332:*23*

**Anyway** 172:*17* 179:*14*

**Apart** 17:*7*

**API** 7:*16* 8:*22* 14:*11, 23* 33:*1, 2* 65:*12, 20* 67:*1, 7, 8, 10* 68:*5, 15, 22, 24* 69:*8, 10* 70:*11, 13, 16, 20* 71:*5, 13, 16* 72:*6, 19* 73:*1, 4, 9, 10, 18* 75:*11* 77:*9* 88:*19* 89:*2, 9* 94:*18* 95:*1, 8* 97:*24* 98:*22* 99:*11* 101:*15* 102:*11* 103:*8* 111:*7, 12* 113:*4* 115:*17* 121:*8* 122:*16* 137:*20, 24* 142:*14* 144:*23* 145:*8* 148:*10, 13, 24* 149:*8* 150:*18* 151:*3* 152:*2, 14, 19* 153:*2, 16* 155:*3* 159:*16, 23* 171:*11* 177:*2, 11, 15* 178:*17, 20* 179:*15* 180:*24* 181:*11, 15*

182:*18* 188:*10* 190:*13, 17* 191:*21* 192:*3, 4, 23* 194:*3, 6, 12* 195:*20* 196:*4* 197:*12, 13, 14, 16* 200:*4, 8, 23* 203:*20* 211:*10* 212:*6, 12, 22, 23* 213:*3, 10, 14* 214:*5* 215:*4* 216:*4* 220:*4, 14, 20* 221:*6, 8, 10* 222:*11, 20* 223:*15* 224:*18* 225:*18* 226:*2* 231:*22, 24* 233:*9* 234:*18* 235:*7, 24* 236:*1, 6, 14* 246:*8* 248:*23* 250:*16* 254:*10, 23* 255:*12, 18* 257:*4* 273:*13, 15, 20* 274:*3* 277:*8, 23* 278:*1* 279:*5* 281:*7, 22* 313:*7* 314:*24* 317:*9* 319:*5* 320:*3, 7, 10* 321:*1, 11* 323:*16* 337:*21* 341:*1* 343:*15*

**APIs** 151:*12* 152:*16* 239:*2* 281:*3*

**apologize** 209:*19* 272:*15*

**APPEARANCES** 2:*1* 3:*1* 4:*1*

**appears** 36:*24* 40:*11* 309:*7*

Confidential Information Subject to Protective Order

**application**
66:5  293:24
294:1, 9
295:4, 14, 24
296:18  297:3,
9  298:20
299:3, 14
304:1, 14
305:19
**applications**
286:6  303:19
**applied**  309:11
**APPLIES**  1:6
303:10
**apply**  222:6
293:3, 13
294:8  350:19
**appreciate**
316:9
**approach**
197:5  297:19
299:10
**appropriate**
101:18
342:22  351:6
**appropriately**
46:23  135:19
**approval**
230:2  303:2
306:13  307:6
**approved**
185:23  188:2,
7  247:22
299:20
306:15, 16, 23
307:3  346:12
348:8, 11
**approximate**
245:23
**approximately**
11:5  94:3
349:9
**ARB**  8:19
**Archived**  8:11
**area**  29:12
30:3, 20
31:10  305:13
308:1
**argues**  133:9
**argument**
48:4  126:9

127:17, 21
132:17  221:16
**ARI11B0019**
78:23
**articles**
310:18, 20, 23
**Aruggieri@c-
wlaw.com**  4:5
**Arunesh**
257:24  258:6
**aside**  95:5
203:21
**asked**  68:21
113:8  136:13
197:9  224:9
247:24  302:1,
4
**asking**  12:12
38:23  83:16
94:7  107:17,
23  108:1
109:6, 7
115:23  116:6,
10  118:1, 13
139:12, 16
141:11  180:6,
9  184:13
185:9  187:14
204:18
223:11  250:7
266:6  280:8
294:2  296:16
301:23
302:23
308:20
316:14
337:22  340:17
**asks**  139:8
141:6  202:8
206:8
**aspect**  38:13
48:4  91:13
149:17
153:11
167:15  177:9
183:8  192:1,
13, 15  199:9
214:13
223:19  253:3
265:5, 23
266:1, 11

301:20  305:3,
6, 7
**aspects**
108:17
161:14  185:8
**assess**  29:24
129:23  158:6
194:5  238:9
305:21
**assessed**
156:9  196:3
**Assessment**
7:8  9:14, 17
42:11  62:5
63:9  64:20
76:24  156:7,
8  162:17
165:2  178:24
184:5  194:10
220:3  224:23
229:6  235:23
236:2  252:10,
11  256:9
259:11
299:22
300:17  301:9
302:3, 8, 21,
24  303:18
315:2
**assign**  223:19
**assigning**
220:2
**associated**
51:19
**assume**  57:16,
23  58:18
347:14
**assumed**  56:9
**assumption**
149:18  257:8
338:12, 15
**assurance**
14:17
**asterisk**  66:4
**Atlanta**  3:17
**attached**
61:15  204:14
351:12  353:11
**attachment**
62:2

**attempt**
128:14
130:13  131:7
**attempting**
133:20
**attending**
151:8
**attention**  45:1
308:12
**attorney**
13:11  125:5
306:4  320:16
351:16
**attorneys**
15:21  16:1, 3,
23  17:5
126:20
**Audio**  278:12
297:21, 23
300:3, 21
**Audit**  6:10
167:21, 24
168:5  169:10
170:10
176:15, 20
181:24  182:1
**auditor**  167:20
**audits**  179:23
**August**  61:16
97:4  105:24
106:5, 19
107:1, 22
112:3  113:13,
22  115:6, 8
119:9, 17, 18
121:9, 17, 18,
20, 22, 23
122:14, 17, 24
123:5, 11
134:13
137:21  138:1,
5, 22, 24
139:1, 15
210:4  295:23
296:17  297:8
299:2  323:21
324:2
**Aurobindo**
4:5  21:19
**Aurolife**  4:6

**authority**
304:13  305:18
**available**
93:14  97:24
98:22  104:13
154:7  197:4
236:9  248:16
328:14  334:8,
21
**Avenue**  2:20
3:4
**AVH**  202:20,
22
**avoid**  129:20,
21
**await**  127:17
134:13
**aware**  32:14
48:7  59:9
69:14  71:1
75:3  78:11
93:8, 22  95:2,
19  106:4
118:24  119:2
121:24
122:24  123:2,
3, 5  142:12
151:10  152:1
165:16  166:1
167:15
171:11, 12
178:21  182:5,
11  190:12
245:15  286:2,
3, 7, 13
287:11  288:8
289:8, 9
291:2, 11, 23
292:18
303:14
304:11
305:15  307:5
330:7  339:15
340:5, 23
341:7  343:19
344:16  345:9,
24  347:6
**azide**  333:15

**< B >**

Confidential Information Subject to Protective Order

**back** 16:*20*
20:*5, 23, 24*
64:*4* 80:*20*
82:*4* 83:*15*
100:*24*
103:*20* 104:*8*
123:*19* 124:*9,*
*16* 128:*24*
129:*14*
130:*18* 131:*4,*
*17* 132:*1, 9*
135:*22*
137:*18*
138:*10, 11, 17*
178:*14* 195:*1*
202:*18*
208:*13* 209:*5,*
*16* 211:*15*
220:*3* 228:*4,*
*18* 229:*4, 16*
230:*7* 231:*8*
233:*13*
234:*17* 235:*4,*
*9* 236:*23*
237:*1, 13*
241:*5* 245:*18*
246:*22*
247:*17*
249:*18, 23*
250:*2* 251:*21*
252:*15*
256:*14* 258:*9,*
*18* 259:*9, 17*
261:*5, 11, 21,*
*24* 262:*8, 11*
263:*1* 269:*14*
271:*9* 274:*18*
279:*14*
282:*24*
283:*23*
291:*11*
292:*21* 304:*3*
317:*24*
322:*17* 323:*5*
339:*21*
340:*19* 347:*1*
**background**
56:*5* 58:*13*
65:*10* 67:*7*
111:*2, 22*
112:*16, 19*

**backordered**
257:*14*
**backwards**
21:*15*
**bad** 342:*13*
**BARR** 2:*3*
**BARTON**
2:*19*
**based** 28:*4, 14*
34:*23* 35:*11*
37:*18* 58:*8*
62:*20* 71:*7*
91:*12, 14, 22*
93:*10* 101:*10*
140:*18* 159:*2,*
*20* 175:*13*
177:*7* 191:*22*
192:*24* 194:*4,*
*20* 196:*22*
197:*14, 15*
199:*7* 205:*11,*
*16* 214:*11*
217:*13*
218:*13* 228:*2*
230:*14, 16*
236:*4* 246:*5*
252:*10, 11*
256:*7, 13*
259:*21*
260:*11, 22*
271:*4* 294:*18*
299:*21*
300:*15, 16*
302:*3, 7, 20*
311:*18*
318:*18* 342:*21*
**basically**
12:*11* 22:*12*
32:*24* 36:*14*
49:*22* 53:*16*
77:*2* 98:*18*
116:*8, 15*
139:*18* 153:*9*
159:*21*
161:*11, 12*
173:*7* 192:*9*
194:*8* 196:*23*
224:*23*
226:*11*
228:*17*
229:*20, 21*

231:*20*
239:*24* 243:*3,*
*14* 261:*9*
269:*21* 276:*6*
291:*7* 292:*8,*
*16* 293:*20*
301:*4, 21*
302:*16* 305:*5,*
*10* 307:*1*
310:*12*
311:*13*
313:*10* 314:*1*
339:*10* 341:*18*
**basis** 171:*11*
**batch** 74:*3, 7,*
*15, 16, 21*
75:*1, 7* 78:*20,*
*21* 79:*4, 11*
82:*20* 83:*9*
84:*5, 17*
85:*12, 16, 21*
86:*8, 14, 24*
88:*17* 98:*1,*
*13* 99:*2, 5, 22*
101:*8, 20*
102:*11*
115:*16*
119:*22*
141:*17, 23*
178:*6* 179:*15*
187:*16* 247:*7*
249:*3, 14*
267:*6* 271:*8,*
*23* 272:*2, 13,*
*22* 273:*4*
274:*3, 4, 5, 22*
275:*2, 3, 6*
276:*4* 277:*1,*
*10, 13, 19, 23*
278:*2* 279:*5,*
*6, 9, 13*
281:*13, 20, 22*
**batches** 8:*22*
68:*9, 12* 69:*3,*
*4* 72:*8, 18*
73:*1, 8, 11, 18*
74:*12* 77:*9,*
*16* 84:*21*
87:*22* 88:*15,*
*20* 89:*2, 9*
91:*18* 92:*13*

97:*10, 12, 13*
100:*16*
101:*14, 24*
102:*5, 17*
113:*9* 115:*14,*
*21* 116:*3*
118:*3, 14, 18*
119:*2, 10*
121:*10*
122:*17* 123:*1*
138:*2* 139:*10,*
*24* 140:*20*
141:*8, 21, 22*
142:*2, 7, 8, 9*
174:*18*
228:*23* 247:*8,*
*17* 250:*12*
251:*4* 254:*10,*
*23* 260:*2*
263:*21*
264:*11* 266:*3*
273:*10, 18*
277:*20* 348:*9*
**Bates** 45:*2*
96:*19* 266:*22*
324:*14, 17*
328:*20* 331:*14*
**Baylen** 2:*5*
**bear** 157:*2*
**beginning**
1:*15* 218:*3*
236:*13*
256:*18*
300:*24* 327:*23*
**begins** 11:*8*
**behalf** 105:*13*
167:*21*
**behaving**
58:*10*
**believe** 56:*3*
76:*21* 123:*17*
126:*24* 127:*4,*
*9, 14* 132:*19*
133:*24*
134:*22*
135:*11, 17*
227:*24*
230:*18*
248:*22* 348:*14*
**Bell** 4:*4*

**best** 43:*24*
242:*10*
**better** 22:*14*
193:*11, 15*
340:*11*
**beyond** 50:*16,*
*20* 51:*17*
165:*11* 172:*9*
342:*10*
**big** 46:*10*
**bit** 18:*3*
41:*11* 52:*1*
53:*19* 65:*4,*
*10* 73:*17*
76:*3* 101:*23*
102:*23* 136:*8*
142:*11*
144:*22* 158:*5*
176:*23* 183:*8*
193:*9* 195:*1,*
*2* 198:*15*
199:*22*
202:*18*
211:*16* 223:*7*
229:*2* 278:*18*
283:*22*
318:*19* 340:*10*
**blipped** 300:*21*
**Blocker** 8:*19*
**blood** 292:*10*
**blow** 323:*2*
324:*22* 329:*1,*
*5, 12* 331:*15*
**Blue** 4:*4*
202:*10* 205:*2*
**body** 49:*15,*
*18, 21* 50:*2,*
*13* 51:*23*
291:*17* 292:*6*
**bold** 331:*22,*
*24*
**BONNER** 3:*9*
**boss** 114:*24*
117:*14* 118:*2*
121:*21* 250:*8*
**bother** 246:*13,*
*21*
**bottom** 33:*21*
34:*16* 36:*22*
44:*6* 45:*3, 24*
63:*8* 66:*2*

98:*13*  106:*19*
121:5, *6*
122:*6*  140:*12*
147:7  209:*24*
210:*14, 20, 22*
211:*17*  212:*4*
240:*17*  254:*6*
263:*18*
324:*16, 23*
328:*20*  340:*12*
**box**  19:*2, 16*
45:*10*
**BRANCATO**
3:*3*  18:*10, 20*
19:*4*  27:*24*
28:*21*  29:*5,*
*20*  30:*7, 15*
31:*4, 17*
37:*10*  38:*2*
39:*2*  41:*20*
42:*12*  43:*2,*
*18*  44:*13, 18*
46:*5*  47:*4, 23*
51:*9*  52:*4, 21*
53:*23*  54:*8*
56:*23*  57:*9*
58:*2*  59:*12*
66:*18*  67:*17*
70:*6, 21*
74:*22*  75:*22*
87:*13*  88:*2*
89:*16, 21*
90:*12*  91:*8*
92:*8, 18*  95:*9*
96:*15*  100:*19*
101:*2*  102:*13*
103:*3*  104:*10*
106:*9*  107:*4,*
*8*  108:*24*
109:*11, 24*
111:*13*
113:*16*
116:*13, 23*
117:*17*
118:*20*
119:*12*  120:*9*
123:*13*  125:*4,*
*9, 15*  126:*2*
127:*18*
129:*11*
131:*10*  136:*7*

142:*16*
145:*10*  146:*6*
148:*15*
149:*10*  150:*1,*
*13*  151:*5, 16*
152:*4*  153:*4,*
*24*  160:*8, 12*
163:*18*
164:*10*
167:*11*
168:*19*  169:*6*
170:*23*  172:*3*
173:*17*
174:*24*  175:*4,*
*23*  176:*3*
177:*17*
181:*21*
184:*24*
185:*17*  186:*5*
187:*3, 19*
188:*14, 21*
189:*6, 15*
190:*4*  191:*17*
195:*7, 16*
196:*15*  198:*1,*
*11*  199:*2*
200:*10*
203:*11*
207:*23*  208:*8,*
*14*  214:*6*
215:*8*  216:*6*
217:*6*  218:*7,*
*23*  220:*24*
221:*13*
222:*12, 21*
228:*6*  230:*10*
231:*1*  232:*7,*
*14*  233:*2, 16*
235:*20*  237:*8*
238:*21*
241:*14, 24*
242:*18*  244:*4*
246:*14, 23*
248:*5*  250:*23*
251:*23*
252:*18*
255:*24*
258:*20*
260:*16*  262:*2*
264:*21*
271:*13, 19*

277:*15*  278:*4,*
*13, 22*  279:*16*
287:*6, 21*
288:*11*
291:*18*
294:*12*  295:*8,*
*18*  296:*4, 22*
297:*13*  298:*5,*
*7, 10*  299:*16*
301:*13*  303:*4*
304:*18, 22*
305:*23*
306:*18*
307:*11*
308:*20*  312:*4,*
*24*  318:*7*
320:*12*
327:*10*  334:*5*
335:*9, 22*
337:*8*  339:*2*
341:*9*  346:*5*
347:*11, 23*
**branch**  23:*3*
**break**  63:*18*
64:*1*  124:*7,*
*14*  128:*8*
131:*24*  132:*1,*
*6*  137:*5*
208:*1, 3, 9, 12,*
*24*  269:*12*
282:*12, 22*
283:*22*  284:*2*
291:*15*
348:*16, 18, 22*
**breaking**
292:*5*
**breaks**  175:*11*
**Brief**  16:*17*
20:*2*  124:*14*
322:*15*
**Brijesh**  202:*9,*
*14*  204:*18*
205:*2*  206:*23*
**bring**  305:*7*
**bringing**
240:*10*
**BRITTNEY**
3:*3*
**Brittney.nagle**

@kirkland.com
3:*6*
**broke**  278:*9*
**BUCHANAN**
2:*3*
**bullet**  23:*22*
26:*24*  111:*19,*
*23*  112:*1*
113:*7*  206:*8,*
*21*
**bunch**  34:*20*
61:*21*
**BURROWS**
2:*19*
**business**
135:*9, 10*
136:*11, 20, 21*
147:*12, 14*
252:*24*
**buy**  145:*17*
234:*7, 12*
**buying**  234:*10*
**BV65D002**
267:*19, 21, 22*
271:*8*  272:*2*
**BV77D013**
274:*22*  275:*4*
277:*2*
**BV84D010**
279:*21*
**byproduct**
312:*1*  334:*4*
**byproducts**
313:*22*  326:*6*

< C >
**C5069**  74:*3, 12*
**C5069-5-**
**049M**  98:*14*
**calculate**
93:*15*
**calculated**
90:*9*  93:*5, 12*
**calculation**
90:*18*
**calculations**
93:*10*
**calculator**
79:*17*  80:*1,*
*13, 16*  82:*7*

**call**  192:*6*
252:*10*
257:*12*
260:*13*  261:*6,*
*9*  335:*4*
**called**  34:*3*
45:*2*  64:*19*
153:*15*
229:*12*
265:*21*
309:*24*  310:*2*
**CAMDEN**  1:*2*
**cancer**  35:*24*
36:*3, 10, 14,*
*18*  37:*8*  38:*1*
62:*19, 23*  63:*5*
**CAPA**  172:*19,*
*20, 22, 24*
173:*3*
**capable**
238:*18*  321:*7*
**capacity**  29:*9*
142:*20*  301:*17*
**CAPAs**  173:*8*
176:*18*
**carcinogen**
41:*14*  62:*22*
238:*19*
246:*12, 20*
247:*13*
**carcinogenic**
35:*2, 15, 19,*
*20*  36:*3, 17*
37:*2*  40:*13*
50:*24*  51:*2*
**carcinogenicity**
35:*22*
**carcinogens**
57:*15*  58:*17*
**care**  105:*11*
174:*4, 11*
308:*3*
**carefully**
351:*4*
**carried**  292:*1*
**carries**  57:*18*
58:*1, 20*
**case**  194:*24*
260:*8*
**CASES**  1:*7*
**catalyst**  317:*6*

categorization 50:15
categorized 36:9
category 36:9 50:19, 23 221:23 301:7
cause 35:24 36:3, 17 37:8, 24 50:21 54:6
causing 36:10, 14
cell 268:11 275:11
Center 2:10
century 327:23
certain 49:23 51:6 53:5, 21 178:6 303:15 336:5
certainly 133:1
CERTIFICATE 350:2
certification 350:18
Certified 1:17 350:13, 14
certify 136:5 250:21 350:5 353:5
certifying 350:22
chain 134:6 148:1
change 95:7, 15, 18 206:11 212:18 299:24 300:1, 2, 18, 20 302:9 341:19, 22 342:5, 17 343:4 344:7 345:4 346:22 352:4
changed 95:1 180:13 212:13
changes 14:22 177:6 297:5 298:22

303:12, 16
304:12
305:17
340:24 341:2, 7, 17, 24
343:20, 24
344:4, 10
345:10 346:1, 15 347:7
351:11 353:10
changing 178:24 344:18
chapter 155:1
chapters 185:5
characterization 24:1 286:20
chart 23:21 72:4, 7 73:14 76:11 77:8 97:20, 23 98:6, 12, 23 99:11 100:8 142:6 144:24 270:15 324:23 329:3, 10 331:18 332:1
charts 98:11 99:18, 22 100:3
chat 18:14 19:2, 5, 9, 12, 16 25:17 45:10, 19 103:24 104:12 112:23 120:10
cheap 142:14 151:3, 15 200:4
cheaper 145:9 148:10 149:8
check 23:23 75:18, 21 83:15 108:20 109:3 291:8 344:24
Chemical 7:8 62:22 63:4 311:12, 14, 16, 22 312:15, 17

313:7, 18
314:8 315:11
316:11, 16, 23
318:4, 13
319:1, 7, 8, 12
320:6 321:4
326:4 329:19, 20, 22 330:1
chemicals 337:2
Chemistry 163:1 196:20 198:7 199:8, 15, 16 200:1 214:11 216:12 223:2, 18, 23 224:11, 13 225:4, 6 291:6, 9, 10 307:18, 21, 23 308:1, 4 309:12 310:7 311:20 312:21, 23 313:16, 17 314:1, 5, 12, 17 315:4 317:3, 19 319:18 326:9, 13 327:2, 7, 21, 24 333:9 334:2, 9, 14 335:19
Chinese 148:10 149:3, 5, 8, 20 151:3 200:4
Chip 147:17, 19
Chitty 105:1, 8, 15, 19 106:20 107:23 126:6 162:21 254:5 255:16 256:6, 22, 24 257:20, 21 263:19 264:1, 6, 17, 18 266:7
CHMP 5:22

choice 158:11
choose 130:23
chooses 154:20
choosing 152:19
chromatogram 157:3 158:10, 13, 17
chromatograms 157:18 164:1, 3
chromatographic 159:3
chromatography 156:22 157:6, 8 160:17 164:13, 23 165:4, 6 284:7, 11 289:6, 7, 10, 11, 16, 17, 18, 21 290:3, 4 292:22
chronology 133:12 134:2
cimetidine 291:13
CIPRIANI 4:1
circumstances 303:15
citation 215:14
City 2:10
CIVIL 1:4
claim 183:14 185:11 214:23
claimed 134:22
claiming 36:13
claims 183:17 184:22
clarification 342:9
clarified 214:9
clarify 39:23 51:24 53:19 198:16 232:12
clarity 116:16 228:21 231:24 235:12

class 155:4 199:18, 19
claw 123:19 124:16 131:3, 17
clawback 124:23 127:13 130:4 135:18 136:24
clawing 135:22
clean 192:9, 10
cleaning 174:17 216:2
clear 62:12 135:12 149:21, 22 242:4 289:14 303:21 334:20
clearance 228:21 229:21 233:20 256:14 262:11
clear-cut 342:16
cleared 249:2
clearly 35:2, 14 130:13 234:19 236:18 241:6 246:7 250:15
clinical 292:8
close 61:22 70:3
closed 192:11 194:15
closing 276:17
CMC 9:11 202:19
code 67:13 68:9 212:14 246:8 249:12, 17
collecting 101:17
color 205:3
column 72:9, 12, 17 73:4, 7 87:7 158:11 267:7, 9, 11,

13, 16 268:5,
10 272:23
**columns**
72:16 81:11,
23 157:12
**combination**
76:7 269:17
**combine**
331:5, 6
333:11
**combining**
51:21
**come** 80:19
104:7 128:24
132:1 208:13
244:11, 14
245:21
283:23 317:24
**comes** 75:7
216:1 243:12
304:3 305:4
**coming**
129:14
194:12 233:8
237:18
238:19 316:4
340:18
342:12 345:19
**comment**
29:23 37:19
38:7, 12 41:2,
7 42:1, 5, 17
79:20 95:12
102:4, 7
109:4 145:14
234:9
**commenting**
282:2
**commerce**
253:1
**commercial**
171:10 265:22
**commercials**
151:9
**commission**
353:21
**committed**
27:6
**committee**
32:23

**common** 40:5
244:16 249:9
**commonly**
284:15, 20
285:4, 10
293:3, 13
294:7
**communicate**
23:8, 9, 11
105:14 257:2
**communicated**
121:9 122:16
137:21 138:1
228:9
**communicates**
41:8 256:19
**communicating**
105:12 185:4
**communication**
32:23 126:13,
14, 15, 16, 18
256:5 260:19
**companies**
30:13 31:15
293:2, 12
294:5, 6
306:11
**company** 21:2,
18 31:2
52:18 93:18
114:22 135:7
149:4, 6
170:12
183:16
184:21 214:1
221:19
**compare** 76:11
**competitive**
148:11
**compilation**
70:12
**complete**
110:7, 10
190:18
228:10
316:16 317:3
318:3 328:14
334:2, 8, 20
335:19

337:13, 16
338:16
**completed**
109:16 163:1
**completely**
174:17
**completion**
350:8
**compliance**
135:7 178:4
179:14 247:23
**complies**
183:15, 17
184:23
185:12 200:6
212:24
**comply** 178:3
**component**
331:12
**components**
158:8 282:4
**compound**
35:21 36:8
49:17 50:1,
11, 20 51:15
52:12, 19
53:10, 14, 21
54:4 56:17
58:12 157:17,
22, 23 158:7
222:1
**compounds**
49:13 51:6
52:2, 16 53:4
54:16, 21
56:9 58:9
157:10
**computation**
83:14
**computer**
45:6 80:17
**concepts**
173:10, 15
174:3, 10
**concerned**
174:11 184:3
215:23
**concerns**
202:14 203:7
204:1 215:3,

22 291:12
**Concise** 7:7
**conclude**
115:14
190:15, 16
207:14 328:17
**concluded**
141:17 196:23
**concludes**
349:5
**conclusion**
172:14, 15
280:4, 6
**condition**
190:20 224:19
**conditions**
51:18 158:12
191:23
224:20 315:22
**conducted**
68:23 230:15
**conducting**
135:10
158:19 159:7
**CONFIDENTI
AL** 1:8 127:1
132:21 134:1
135:3
**confidentiality**
127:7
**confirm**
107:15
179:19
180:12 215:5
230:22
231:13, 16
247:18
**confirmation**
207:4
**confirmed**
247:12
248:20 249:6
250:11
**confirming**
170:3
**Congrats**
309:19
**connected**
238:24
**consensus**
230:2

**consider**
71:24 88:11
90:3
**considered**
37:1 40:12
62:21 63:11
154:8
**considering**
90:4
**considers**
318:5
**constant**
242:11
**consultation**
261:7
**consulting**
261:1
**Consuming**
63:10
**contact** 105:19
**contain** 121:10
**contained**
84:23 106:4
122:18 123:1
139:5 277:14
320:4 321:2
324:7 343:14
**containing**
319:24
**contains** 89:5
138:3 154:23
**contaminants**
315:12
316:18
318:15, 23
319:3, 10, 13
345:12 346:3
347:9
**contaminated**
32:4, 9 106:7
119:10, 22
122:1 139:8
141:13
227:19 247:8
277:10
**contamination**
32:20 100:24
**Cont'd** 3:1
4:1 8:3 9:3
**content** 65:1
265:2

**context** 27:23
342:7, 15
**continue**
128:2  130:3
251:22  265:6
301:11  303:1
**continued**
251:9  339:22
**continues**
200:7
**contribute**
56:12  57:6
**control** 14:17
21:4  195:23
199:14
225:21  268:8,
9  275:8
350:21
**conversation**
117:7  259:3, 5
**conversations**
152:13
**conveying**
116:4
**convinced**
260:6
**copied** 186:16
**corner** 25:24
26:15  60:2,
11  162:8
323:4  324:16
328:20
**correct** 23:5
26:8  29:4
33:3  43:1
44:17  48:12
52:14  65:24
68:7  69:1, 5,
9, 13, 21
71:15, 19
72:23  73:2, 6,
12  74:5, 9
77:11  79:21
82:23  83:11,
14  84:3
86:16  87:2
88:6  89:3, 7,
11  90:11, 22
91:2, 11
93:19  99:13
100:1, 5

102:1  113:5
114:12
115:24  116:5,
9  121:14
122:22  138:8
141:19
150:21
154:16
156:20  167:9
175:17  176:9
180:5  181:4,
8  184:15
200:9  203:24
206:6  207:19
212:8  231:13
236:21
239:17
251:22
256:23  257:6
274:6  277:7
284:16, 22
285:5, 12, 19,
20  286:1
290:16  293:6,
16  294:11
295:7, 17
296:3, 21
297:12  299:6
301:12
302:12  303:3,
20  304:17
305:22
306:17
307:10
309:12, 13
312:3  313:22
314:13
315:15
316:20  318:6,
16  319:3, 14
320:11  321:8,
24  323:13, 17
326:6, 10, 21,
22, 24  327:1,
5, 9  328:1, 5,
12  329:19, 21
330:24  331:3,
9, 10  333:2, 3,
7, 16, 17, 22, 23
334:4, 23
337:7  341:8

343:13, 17, 23
344:22
345:13  346:4,
23  347:10
353:7
**corrections**
176:19  351:5,
7  353:10
**corrective**
172:22, 24
179:12
216:22  217:3,
12
**correctly**
154:13
155:12  156:3
183:21  293:8
318:21
**correlate**
106:13
**correlated**
216:17
**Cost** 7:19
148:5  149:24
150:5  151:12
152:15, 16
245:11, 12, 13,
16
**costing**
145:13, 15
153:11
**costs** 148:10
**Counsel** 11:12
104:6  126:12
129:4  193:6
209:13  282:16
**counsel's**
128:23
**countries** 28:8
**country** 28:5,
16
**counts** 257:15
258:10
**couple** 34:12
40:4  49:6
72:16  74:10
77:3  81:23
85:9  115:3
279:9
**coupling**

289:19
**course** 203:8
**COURT** 1:1
11:14  12:14
96:4  224:2
297:22  351:20
**cover** 25:22
33:17  44:4
106:16  109:3,
7  111:15
**create** 160:19
**CRONAN**
2:10
**current** 56:8
83:13  87:20
88:7, 11  90:3,
4  177:7  240:6
**currently**
263:21
**Curriculum**
5:16
**curtain** 335:5,
6, 8
**customers**
257:14  258:8
**cut** 131:11
297:23  298:2,
16
**CV** 20:11, 14
23:8

**< D >**
**damage** 56:10,
11, 21  57:6
**dangerous**
46:18  52:16
**DANIEL** 2:4
124:11
132:10
283:17  287:22
**darker** 202:10
**data** 15:17
88:22  92:23
93:1  101:17,
20  247:11
249:21
273:22  278:6
279:4  281:17
282:7
**database**
48:10  252:11
261:8  281:10

287:9  317:13
344:3
**date** 1:16
11:4  42:21
85:7  93:23
97:4  102:2, 5
105:24
106:16  109:3,
7  111:15
119:14, 19, 20
120:16
121:14  167:4
217:17
225:14
261:22
262:10, 14, 16,
19  269:22
323:19, 21, 23
324:1  351:9
353:16
**dated** 112:2
268:12
269:24
275:12  350:15
**dates** 106:14,
16  107:16, 21
111:3  130:21
133:11, 19, 23
**Dawn** 105:1,
8, 9, 15, 19
106:20
107:23  126:6
162:20  254:5
255:16  256:6,
22, 24  257:12,
20, 21  263:19
264:1, 6, 17,
18  266:7
**day** 63:11
81:12  122:3
257:15
258:10
261:24  262:7,
13, 24  319:18
348:16, 19, 22
353:20
**days** 128:9
129:15  351:16
**day-to-day**
293:5, 10, 15

294:*10*
**dealing** 229:*10*
**dealt** 177:*8*
**decade-old**
286:*18*
**decades**
285:*19*
286:*14* 288:*9*
289:*21*
**December**
162:*9*
**decide** 91:*4*
190:*22* 218:*13*
**decided**
192:*22*
**deciding**
235:*16*
**decision** 91:*1,*
*12, 13, 17, 21*
252:*14*
259:*21* 261:*1,*
*2, 21*

**decisionmaking**
246:*3* 252:*5*
253:*4* 259:*20*
260:*1, 21*
**decisions**
252:*6* 259:*16*
**declaration**
155:*2* 182:*15,*
*16, 19, 21, 24*
184:*8, 10, 15,*
*18* 192:*24*
194:*16*
197:*16* 210:*6*
211:*1* 212:*19,*
*23* 230:*17, 19,*
*20* 231:*19, 23*
233:*9* 246:*5*
248:*23*
252:*12* 255:*22*
**declare** 236:*5*
**decompose**
326:*15*
**decomposition**
325:*9*
**deemed**
351:*19*
**Defendant** 3:*6*
4:*5*

**Defendants**
3:*11, 18*
135:*21* 136:*2*
**defense**
127:*17* 133:*4*
134:*7*
**deficiencies**
156:*1* 163:*2,*
*8, 10* 165:*24*
**deficiency**
156:*5, 11, 18*
162:*12*
165:*17, 20*
166:*3*
**Deficiency-**
**Minor** 9:*9*
**deficient**
163:*12*
**define** 50:*6*
205:*6*
**defined** 28:*11,*
*13* 165:*5*
**defines** 160:*19*
**definitely**
17:*7* 22:*14*
37:*14, 18*
42:*1* 116:*17*
142:*1* 152:*20,*
*22* 153:*1*
157:*9* 174:*8*
176:*16*
179:*13*
180:*23*
197:*10*
205:*24* 220:*7*
222:*23* 234:*8*
249:*19* 253:*2*
279:*8* 288:*5*
308:*2* 338:*15*
339:*7* 344:*1*
**definition**
35:*21* 311:*15*
**degradation**
174:*19, 23*
175:*9, 10, 14,*
*20* 176:*9*
177:*4, 16*
178:*2* 179:*1,*
*6, 9* 180:*10*
181:*12* 183:*3,*
*10, 11* 185:*6,*

*10* 200:*6*
214:*4, 12, 14*
215:*17, 19*
216:*13*
313:*12* 340:*18*
**degree** 309:*8*
**delayed** 268:*6*
269:*24* 275:*8*
**demands**
105:*17*
**denying** 187:*6*
239:*22* 266:*11*
**department**
90:*18* 123:*12*
243:*21, 24*
308:*2*
**depending**
158:*20*
**depends** 36:*5*
54:*11* 145:*16*
151:*22* 157:*5*
158:*10*
191:*20*
195:*19*
196:*19* 197:*23*
**depo** 256:*18*
**DEPONENT**
353:*2*
**deposed** 12:*2,*
*6*
**deposing**
351:*16*
**deposition**
1:*14* 10:*2*
11:*8* 13:*24*
15:*7, 11*
17:*20* 127:*11*
128:*10, 16, 22*
129:*9* 130:*10*
131:*2, 9, 13*
132:*2* 218:*3*
236:*13* 349:*6*
350:*6, 8, 9*
351:*3, 13, 17,*
*19*
**depositions**
124:*21* 126:*3*
127:*6* 130:*12,*
*24* 132:*14*
**deps@golkow.c**
**om** 1:*22*

**describe**
287:*3, 14*
290:*2*
**described**
289:*3*
**DESCRIPTIO**
**N** 5:*15* 6:*5*
7:*4* 8:*6* 9:*6*
**design** 301:*4*
317:*10*
**designated**
133:*17*
319:*19, 20*
**designations**
133:*2*
**designed**
159:*24*
192:*14*
294:*18, 20*
**desired** 130:*15*
**despite** 189:*1*
200:*2* 213:*24*
215:*2* 216:*3*
**detail** 120:*15*
301:*23*
**detailed**
190:*18* 273:*9,*
*18*
**Details** 72:*5*
101:*20* 256:*12*
**detect** 286:*4,*
*15* 287:*1, 16*
292:*4*
**detected**
161:*5* 285:*23*
289:*5*
**detecting**
287:*4*
**detection** 41:*5*
295:*6, 16*
296:*3, 21*
297:*12* 299:*5*
307:*9*
**determination**
133:*3*
**determine**
282:*6*
**determining**
132:*23*
**develop**
106:*21*

140:*18* 145:*2,*
*8* 146:*4*
159:*21*
234:*16*
235:*16*
236:*19*
237:*17* 239:*2,*
*3, 21* 240:*5*
243:*4* 244:*19*
245:*1, 10*
251:*2* 265:*9*
301:*4*
**developed**
107:*18* 108:*2,*
*17, 18* 109:*10,*
*14* 142:*13*
159:*4, 15*
235:*8* 244:*22*
246:*2* 293:*9*
310:*15*
**developing**
158:*24*
236:*23*
237:*19*
239:*19*
242:*24* 265:*7*
266:*2* 302:*16*
306:*24* 317:*8*
**development**
14:*22* 56:*12*
57:*7* 108:*8,*
*14, 16* 109:*15*
110:*5* 117:*22*
158:*22, 23*
237:*2* 239:*23*
243:*3, 7, 11,*
*13, 15, 17, 22*
244:*2, 7, 17*
245:*7* 250:*4*
310:*7, 13*
**Deviation**
6:*17* 321:*20*
322:*23* 323:*8*
**devise** 53:*17*
222:*3*
**devised**
205:*17*
294:*18, 21*
**devising**
222:*5* 293:*19*

diethylamine
333:1
difference
30:21 88:21
different
28:17 29:14
60:24 65:20
67:8, 16
88:18 90:17
155:4, 5
157:4, 9, 10
158:7, 12
164:18, 20
170:21 185:5,
7 192:5
204:3, 8, 19
205:15
214:13
216:14 219:2
238:17
240:18 261:3
275:5 276:5
286:19
289:10, 13, 16
292:12 305:2,
6, 8, 13 308:2
differently
58:10
difficult 41:6
190:15
dime 136:5
dimethylamine
325:10
326:16, 23
332:18
dimethylforma
mide 325:6
dinner 208:3,
13, 24
direct 14:7
45:1 350:21
Direction
10:5 152:18
directly 23:12
257:10
director 48:24
114:21, 23
directors 23:7
disagree
128:11 129:12

discernable
57:17, 24
58:19
discovery
46:20 71:4
189:20
244:16
288:15, 22
discuss 14:9
32:11 38:18
161:12
257:13
260:14 315:9
discussed
15:17 17:9,
11 196:3
247:15 264:7
295:5, 15
296:1, 19
297:10 299:4
307:8
discussing
173:6 206:4
discussion
7:11 8:8
18:1 25:7
82:8 147:21
229:18 252:8
265:23 266:4
300:4 305:8,
14 313:13
342:8
displaying
112:22
dispute 129:21
disrupting
129:9
dissolution
163:24
164:14 165:9
distributed
58:13
distribution
47:10 205:17
DISTRICT
1:1
disturbance
300:11 345:15
divide 82:13
divided 82:18
83:5 84:10,

14 85:16
86:6, 12, 22
division 23:4
163:1
divulged
48:10, 15
DMF 67:3
153:15, 18, 22
154:5, 6, 7, 8,
9, 11, 14, 21, 23
155:8, 11, 14,
15, 16, 20
156:4, 6, 11,
12, 14 159:16
160:1 161:12
163:16
165:19, 21
184:4, 6, 10
187:12
189:22, 24
190:9 192:11,
12, 13, 17
194:13, 15
203:8, 9, 10,
17 204:2, 5,
10, 20 205:9,
10 206:15
207:3, 8, 12
214:22 220:7
223:2, 17
224:21
228:12
230:21
231:18, 22
233:9 235:11
237:4, 22, 23
238:1, 4, 9, 10,
20 239:5, 6,
12 240:3, 4,
23 241:3, 10,
12 246:6, 7
248:22
249:22
250:15
252:12 307:6
314:16, 19
315:2 316:7
317:15, 23
325:2 326:3,
5, 14, 15
328:6, 22

335:3, 5
336:9, 11, 13,
18, 19 338:21
341:16, 19, 24
342:17, 19
344:11, 18, 24
DNA 56:10, 22
dnigh@levinla
w.com 2:7
DOCUMENT
1:6 7:8
13:19 18:5
19:13 20:8
25:2, 22 26:9
33:13, 18, 22
34:2, 9 37:23,
24 38:5
39:15, 20
40:1, 9 43:8
44:1, 4, 10, 23
45:11, 13, 18
46:12 47:12
49:1 55:4, 13,
19 58:24
59:5, 9, 16
60:4, 12, 22
61:2, 7, 14
64:7, 23
76:15 77:3, 5
80:3, 23 81:1,
2 84:6 85:7
86:2 89:1
96:1 97:21
103:15
107:21
110:16
114:14 120:3
124:16 125:3
126:22
127:12, 13, 16,
23 128:1, 4
129:6, 14
130:11, 22
131:4, 17
132:13, 19, 24
133:6, 9
134:10
135:15, 23
136:23 143:4
146:18
161:19

166:10
171:19
181:10 201:4
202:5 209:16
211:18, 23
217:3 253:12
263:7 266:17
270:8, 18
271:6, 12
273:7, 17
276:24
321:15
322:20
323:13 324:7
Documents
10:8 15:11
19:12 46:10,
17 78:20
88:14 104:12
126:21
129:18 130:7,
19 136:18
274:19
doing 12:11
18:19 21:4
69:17 122:10
164:8, 24
178:10 180:7
216:1 225:20
229:9 238:4
240:2 271:22
311:22
312:14
313:15, 17
326:12 336:1
346:20
347:20 351:8
dosage 70:10
dose 14:11
36:7 50:12
51:20 69:11,
12 70:18
71:6, 9, 14
73:1 75:15
76:5 193:18
195:6, 13, 15
196:14
198:20, 24
221:9 233:12
235:18

239:*11*
273:*11*  279:*13*
**doses**  35:*1, 14*
**download**
18:*17*  104:*13*
**downloaded**
60:5  65:5
120:*19*  162:5
211:*19*  267:4
322:*1, 3, 5*
**downloading**
120:*12*  267:*1*
**Dr**  309:*22, 23*
**drawn**  280:*4,
7*
**drug**  29:*3, 19*
43:*13*  46:*16*
52:*2, 12*
53:*11, 13, 22*
54:*22*  68:*20*
91:*1*  92:*17*
106:*4, 7*
153:*18, 20*
157:*23*  160:*2,
5*  163:*11, 15*
183:*1, 20*
197:*24*
198:*24*  210:7
211:*3*  214:*3*
219:*16*
220:*10, 15, 17,
19*  223:*20*
224:*16*  225:*1,
9*  236:*24*
246:*11, 20*
249:*8*  259:*17*
261:*21*  282:4
292:*6, 21*
301:*11, 12*
303:*2*  315:*15*
316:*20*  334:*18*
**Drugs**  9:*8*
30:*6*  51:7
181:*6*  238:*17*
262:*24*
280:*15*
291:*13*  315:*13*
**dry**  260:*8*
**dryer**  174:*17*
**DUANE**  3:7
**due**  269:*24*

**duly**  11:*18*
350:5
**duty**  193:*19*
**dynamic**  177:6

< E >
**earlier**  53:*3*
54:*4*  56:*17*
91:*16*  94:*17*
111:*4*  113:*12*
122:*2*  137:*19*
138:*13*
141:*16*  142:6
163:*17*  164:7
165:*18*
180:*23*  200:*3*
201:*24*
212:*14*  308:*8*
312:*19*  333:*8,
9*  340:*16*
**early**  172:*14*
**eastern**  349:*10*
**easy**  269:*1*
**Effect**  62:*16*
**effectively**
131:*13*
**effects**  54:6
**efforts**  265:7
**eight**  69:*4*
**either**  108:*21*
114:*11*  193:*8*
199:*17*  210:7
286:5  299:*24*
300:*19*
**elaborate**
158:5  192:*1*
341:*15*
**elaboration**
318:*20*
**ELLIS**  3:*1*
**eluted**  158:*9*
**EMA**  5:*22*
**E-mail**  6:*6, 8,
13*  7:*10, 14,
18, 21*  8:*7, 11,
13*  9:*10*
17:*23*  45:7
61:*14, 24*
96:*24*  103:*19,
20*  105:*1, 21,
22*  111:5

112:5  113:*12*
115:3, 9
116:*20*  117:6
119:*19*
121:*15, 19*
122:*4, 15*
123:*18*
125:*18*
133:*21*  134:6
137:*9*  138:*12,
17, 21*  139:*3,
15*  143:*12*
144:*5, 13, 21,
23*  147:*2, 8*
149:*23*
150:*23*
166:*21, 22, 24*
167:*1*  168:*11*
172:*18*  176:*8*
178:*22*  180:*9*
186:*2, 16*
201:*14*
202:*13, 19*
203:5  210:*1,
14*  213:*17*
254:*4*  257:*10*
258:*4*  262:*17,
20*  263:*15*
264:*1, 4*
**e-mailing**
148:*3*
**e-mails**  17:*19*
254:*15*
**EMEA**  96:*14*
**emphasizing**
317:*1*
**employed**
150:*10*
**employee**
150:7
**employees**
27:*4*
**employing**
341:*4*
**ended**  141:*20*
**ends**  98:*19*
99:*10*  100:*2*
**ensure**  156:*13*
193:*22*
194:*21*  237:*21*

**ensuring**  265:*9*
**entered**  271:*15*
**equation**
327:*18*
**equipment**
216:*2*
**equivalency**
239:*24*  240:*3,
11, 19*  241:*10*
**errata**  351:*6,
9, 12, 15*
353:*12*
**ESQ**  2:*3, 4,
10, 14, 19*  3:*3,
9, 15*  4:*3*
**establish**
129:*19*
**established**
78:*1*
**ET3NHCl**
330:*11, 20*
**Europe**  141:5
**European**
55:*14*  59:*1*
**evaluated**
77:*16*  173:*15*
206:*16*
**Evaluation**
7:*14*  38:*19*
60:*15, 19*
66:*23*  68:*15,
21*  69:*18*
197:*12*  216:*12*
**evening**
283:*19, 20*
**events**  128:*20*
133:*13*  134:*2*
**exactly**  274:7
281:*15*
**EXAMINATIO
N**  11:*21*
283:*13*
**examined**
11:*19*  35:*1, 13*
**example**
157:*23*  174:*16*
**exceed**  53:5
**exceeds**  52:*19*
53:*10*  91:6
**Excel**  8:*21*
271:6

**excellence**
27:6
**exception**
135:*12*
**excess**  333:*15*
**exchange**
17:*18*
**exchanged**
230:5
**excipients**
194:7
**Excused**  349:*8*
**executive**  21:*2*
22:*2*  23:6
48:*23*
**exercise**
161:*13*
**Exhibit**  13:*20*
14:*2*  15:*4*
18:*6, 9, 13*
19:*6, 8*  25:*1,
3*  33:*9, 14*
55:*5, 8*  59:*17,
21*  61:*8, 11*
64:*8, 12*
76:*16, 22*
80:*4, 7, 10, 11*
96:*2*  103:*14,
16*  110:*17*
120:*4, 7*
124:*18*  125:*6,
8, 11, 13, 14*
128:5  143:5
146:*19*
161:*20*
166:*11, 16*
201:5  209:*10,
11*  253:*10, 13*
263:*8, 11*
266:*18, 21*
270:*9*  271:*14*
308:*8, 21, 23,
24*  321:*14, 16,
23*  322:*21*
**exhibits**
143:*14*
**existing**
293:*22*
**expanding**
269:*1*

expect 30:5 345:10 346:1 347:7
expected 116:20 117:15 255:11
expecting 254:8, 22 255:16 257:3
expensive 146:5
experience 24:5
experiment 192:14
expert 314:3
expiration 93:23
expired 141:17
expires 353:21
expiry 101:11
explain 50:8 205:7
explained 196:19 303:7 313:24
expose 246:11
exposes 246:19
exposure 37:4 40:15, 17, 18 41:14, 19 56:11, 22 57:18 58:1, 20
extent 41:15

< F >
facility 26:6
fact 32:22 71:3 128:6 136:10 256:7 284:20
factor 261:20
factors 36:7 54:12 316:10
fail 351:18
failure-to-supply 257:16 258:13 260:14
fair 24:6 47:22 52:3, 13, 17 53:12

89:10 94:14 101:1 109:23 146:1, 5 227:20, 23
familiar 156:22
familiarized 324:9
far 72:9 93:21 95:2 165:16 184:2 340:22
fashion 159:14
fax 1:21
FDA 7:22 8:16 9:8 23:12, 13, 16 27:20 63:13 66:5 69:15 70:4, 15, 17 71:21 77:12, 19, 24 78:7 79:18 81:18, 21 82:4, 21 83:9, 19 84:2, 18, 23 85:18 86:8, 15 87:1, 12, 24 88:12 89:9 90:8 91:7 93:4, 12 100:14 105:13 113:8 116:4 118:11, 15, 17, 24 139:17 140:1 162:19 196:4 228:9, 11, 17, 20 229:15 230:6, 20 240:14, 15, 19 254:8, 21 255:10, 16 256:6, 10, 11, 13, 19 257:2, 3 262:10 264:8 274:11 288:3, 8, 23 293:4, 14 294:9 295:4, 14 296:1, 13, 19 297:10, 19

299:3, 10, 14 303:20 304:2 306:12, 16
feed 158:13
feel 250:5
FG 72:18, 20, 22
field 292:12 305:8
fifth 267:6, 18
figure 46:17 116:12, 21 139:13 157:21 220:9, 22 221:11 222:9, 19 223:12, 14 224:24 264:19 332:14
figured 116:7 117:15
File 5:20 26:5 33:10 153:19, 20 163:11, 15 304:13 305:18 306:9 307:1
filed 187:11 303:10
filing 196:1 303:7
final 159:23
finalized 108:12
finally 227:4
find 45:13 52:18 97:9, 12 116:2 118:2, 14 139:9 142:14 156:5 225:19 280:19, 21
finding 203:15, 17 271:24
findings 179:11 215:13
Fine 59:15 63:20 76:9 83:24 117:8

123:4 143:24 148:2 161:4 165:9 209:21 276:18 348:17, 20
finish 198:13 237:11 241:17 242:20, 21 287:22
finished 8:21 14:11 65:13, 14 69:11, 12 70:18 71:6, 9, 13 72:20, 22, 24 73:8, 11 75:15 76:5 101:11 193:17, 24 195:6, 13, 15 196:14 198:20, 24 221:9 233:12 235:18 239:11 241:22 273:10, 11, 18 277:9 279:13 320:9 321:5, 6, 10
firm 27:2, 4
firmly 230:18
first 11:18 12:7 19:13 44:3 45:20 55:10 56:6 62:17 64:14 69:7 72:12 73:15, 23 74:1 77:3 96:9 97:20, 23 103:20 111:19, 21 124:22, 24 134:5 136:9 142:13 147:7 156:14 163:4 172:15 174:1 180:16 204:7 209:24 210:15

211:10, 16 217:24 219:20 226:1, 10 238:12 239:13 244:13, 23 248:8 249:10 254:1, 4, 15, 16 257:5 263:18 264:4 284:3 318:2 324:13 343:21
five 140:2 242:2 245:8, 10, 20, 23 251:2, 6
five-minute 63:18
FLAHERTY 2:8
flip 65:3
Floor 2:15
Florida 2:5
focus 34:21
focusing 92:3 347:3
follow 135:24 165:16 193:19 238:3, 9, 13 239:5, 6 301:11 303:1 335:6
followed 135:19 186:2
following 67:8 90:10
follows 11:19 333:19
follow-up 178:22 179:10, 11, 18 180:11, 17 186:8 235:2
foregoing 350:18 353:6
form 28:22 29:6 37:11 39:3 41:21 43:3, 19 44:19 46:6 47:5 50:4, 12

Confidential Information Subject to Protective Order

51:*10*  52:*5,*
*22*  53:*24*
  54:*9*  56:*24*
58:*3*  66:*19*
67:*18*  70:*7,*
*10, 18*  87:*14*
89:*17*  90:*13*
91:*9*  92:*9, 19*
100:*20*  103:*4*
106:*10*  107:*5*
109:*1, 12*
111:*14*
113:*17*
116:*14, 24*
117:*18*
118:*21*
119:*13*
142:*17*
145:*11*
148:*16*
149:*11*  150:*2*
151:*6, 17*
152:*5*  153:*5*
154:*1*  157:*11*
160:*9*  164:*11*
166:*4*  170:*24*
172:*4*  175:*24*
181:*22*  185:*1,*
*18*  187:*4, 20*
188:*15, 22*
189:*7*  195:*8*
198:*2*  199:*3*
200:*11*  214:*7*
215:*9*  216:*7*
217:*7*  218:*8,*
*24*  221:*1, 14*
222:*13*  228:*7*
230:*11*  231:*2*
232:*8*  233:*17*
235:*7, 21*
238:*22*  244:*5*
246:*15*  248:*6*
251:*24*
252:*19*  256:*1*
260:*17*  262:*3*
277:*16*  278:*5*
279:*17*  287:*7*
288:*12*
291:*19*
294:*13*  295:*9*
299:*17*

301:*14*  303:*5*
306:*19*
307:*12*  312:*5*
313:*1*  318:*8*
320:*13*
326:*24*
327:*11*  334:*6*
335:*10*  339:*3*
340:*2*  341:*10*
346:*6*  347:*12,*
*24*  353:*10*
**format** 44:*5*
58:*13*  157:*11*
**formation**
166:*4*  328:*17,*
*23*  329:*2*
331:*17*  332:*6,*
*13*  335:*20*
339:*15, 17*
**formed**
314:*11*
318:*16*  333:*11*
**forming** 330:*5*
333:*21*
**formulate**
334:*18*
**Formulation**
5:*20*  194:*3*
195:*21*  197:*17*
**forth** 274:*19*
**forward**
127:*15*  129:*3*
136:*1*
**found** 62:*18*
93:*10*  97:*9*
139:*24*
140:*19*
156:*11*
163:*12*
188:*10*  204:*6,*
*11*  288:*5*
**Foundation**
28:*1*  37:*11*
41:*21*  43:*19*
44:*19*  46:*6*
47:*5*  52:*5*
56:*24*  58:*3*
70:*22*  74:*23*
90:*13*  95:*10*
116:*24*
117:*18*

130:*14, 20*
131:*8*  142:*17*
145:*11*
148:*16*
149:*11*
150:*14*
151:*17*
163:*19*
167:*12*
168:*20*  169:*7*
172:*4*  173:*18*
175:*1, 24*
177:*18*
185:*18*  186:*6*
188:*22*  189:*7*
203:*12*
251:*24*
252:*19*
258:*21*  262:*3*
264:*22*
294:*13*  295:*9*
296:*5*  301:*14*
305:*24*
307:*12*  312:*5*
327:*11*
335:*23*  337:*9*
339:*3*
**foundational**
128:*19*
**foundations**
128:*15*
**four**  16:*4, 5,*
*23*  17:*1, 17*
65:*22*  99:*1*
171:*17*  245:*4*
331:*23*
**fourth**  56:*2*
121:*4*
**frankly**  133:*9,*
*24*  135:*8*
265:*17*
**free**  52:*9*
155:*3*  199:*17*
212:*23*
213:*14*
235:*14*  246:*8*
248:*23*  250:*17*
**front**  21:*16*
321:*19*  322:*22*
**frustrates**
128:*13*

**full**  12:*19*
203:*8, 9, 16*
278:*6*  328:*4*
**fully**  44:*23*
109:*9*  215:*11*
248:*15*  315:*14*
**function**
29:*14*  31:*11*
80:*16*  153:*8*
**further**  55:*17*
68:*11*  121:*8*
137:*20*  264:*8*
280:*11*
**FYI**  186:*12*

**< G >**
**gas**  156:*22*
157:*6, 8*
158:*13*
164:*12, 23*
284:*7*  289:*6,*
*10, 11, 15, 16,*
*18, 21*  290:*3*
292:*22*
**GC**  240:*9*
**GC-MS**  284:*6,*
*14, 20*  285:*18*
286:*1, 6, 9, 16*
287:*2, 20*
292:*3*
**gears**  18:*3*
142:*11*
185:*11*
199:*21*  266:*14*
**Gegenheimer**
147:*17*
**general**  28:*3*
47:*10*  58:*11*
237:*20*  319:*7*
**generalized**
249:*13*
**generally**
29:*18*  31:*1*
**generated**
194:*2*  316:*22*
**generating**
194:*8*
**Generic**  9:*8*
221:*23*
**Genotoxic**
5:*23*  8:*13*

24:*20*  41:*13*
49:*6, 10, 16*
51:*1, 6*  52:*2,*
*10, 12, 16, 19*
53:*4, 10, 14,*
*21*  54:*4, 16,*
*21*  55:*21*
56:*9, 17*
57:*15, 22*
58:*9, 12, 17*
113:*4*  182:*7,*
*17*  183:*1, 10,*
*19*  184:*2, 14,*
*18*  185:*6*
187:*1, 15, 18*
188:*4, 9*
189:*3, 13*
190:*16*
191:*13*
192:*20*
193:*20, 23*
194:*1, 17*
195:*5, 14, 22*
196:*9, 13*
197:*1, 23*
198:*4, 23*
199:*11, 18*
210:*8*  211:*2*
212:*6, 24*
213:*4, 7, 11,*
*15*  214:*2, 9,*
*17, 20*  215:*6,*
*15, 18*  216:*5,*
*10*  217:*22*
218:*4, 11, 16,*
*20*  219:*3, 8,*
*10, 15, 22*
220:*4, 9, 13*
221:*7, 11, 22*
222:*10, 20*
223:*22*
224:*10*  225:*8,*
*11, 18*  226:*2,*
*12, 21*  230:*24*
231:*21*  233:*8*
234:*15*
235:*19*
240:*16*  250:*17*
**genotoxicity**
49:*15, 17, 20*
50:*2, 8*  182:*12*

**GEORGE**
2:*19*
**Georgia** 3:*17*
**GEROND**
3:*15*
**Getting** 60:*5*
65:*5* 157:*9*
162:*4* 250:*6*
278:*20* 320:*3*
321:*2* 322:*1,*
*3, 4*
**Ghandi** 17:*16*
**GIBSON** 2:*14*
**give** 12:*24*
23:*17* 65:*9*
128:*20*
131:*15, 21*
157:*17*
158:*16* 183:*7*
191:*24*
192:*24*
194:*15*
209:*10* 211:*8*
228:*18*
231:*23*
232:*19, 21*
238:*8* 249:*13*
257:*11* 261:*9*
265:*2* 268:*1*
269:*2* 287:*23*
298:*1, 11*
305:*20* 311:*15*
**given** 41:*24*
58:*11* 70:*9*
101:*8* 112:*24*
116:*16* 134:*3*
154:*10*
186:*14*
214:*23*
228:*10, 20*
231:*5, 19*
233:*19*
235:*12*
248:*22*
252:*13*
256:*14*
259:*12, 13*
262:*11*
263:*20*
314:*18, 22*
315:*23*

337:*13, 16*
350:*6* 353:*8*
**gives** 31:*2*
67:*2* 74:*2*
272:*15* 304:*15*
**giving** 198:*12*
215:*5* 225:*24*
226:*3* 230:*19,*
*20* 232:*17*
256:*11*
302:*10* 327:*15*
**global** 27:*8,*
*17, 19* 28:*6*
**globe** 196:*8*
**go** 12:*8*
14:*15* 16:*12*
19:*20* 21:*14*
25:*12* 26:*13*
34:*13* 46:*7*
56:*2* 62:*14*
65:*7* 66:*22*
68:*2* 77:*6*
78:*22* 82:*4*
96:*9* 97:*7*
101:*6* 104:*2,*
*5, 22* 112:*9*
114:*13*
117:*20*
120:*14* 124:*2*
127:*15*
128:*17*
129:*22* 130:*3,*
*17* 131:*14, 23*
138:*9, 11, 17*
163:*7* 172:*11*
191:*19* 200:*1*
207:*22*
208:*15* 212:*9*
228:*18, 21*
233:*20* 245:*1*
256:*14* 260:*6*
262:*11*
263:*17, 24*
269:*6* 271:*7,*
*9* 274:*14, 18*
277:*17*
282:*15*
283:*10*
293:*23*
302:*14* 304:*7*
309:*21* 315:*8*

316:*10*
322:*10* 326:*2*
331:*13, 23*
348:*21*
**goal** 312:*1*
313:*20*
**goes** 57:*14*
65:*19* 97:*11*
100:*24* 116:*1*
140:*13*
155:*16*
163:*23*
171:*14*
172:*17* 173:*9*
174:*18* 204:*2*
206:*13* 255:*3*
258:*12*
259:*17* 264:*11*
**going** 12:*11,*
*15* 13:*23*
14:*1, 9* 16:*15*
19:*1, 24*
50:*17* 53:*18*
55:*7, 24*
63:*23* 65:*9*
84:*4, 5* 85:*6,*
*9, 22, 23*
86:*20* 96:*18*
102:*22*
103:*24*
108:*15* 111:*2*
117:*5* 123:*14,*
*19* 124:*5*
128:*21*
130:*19* 132:*4,*
*16* 137:*6*
138:*9, 11*
156:*24*
157:*11, 17*
158:*9, 15, 16*
165:*3, 11*
198:*16, 21*
199:*15*
206:*22*
208:*10, 21*
209:*10, 16*
223:*6* 241:*5*
242:*3* 245:*17*
246:*11*
250:*21* 254:*9,*
*22* 255:*17*

258:*16* 259:*7*
261:*5* 265:*1*
266:*13*
269:*10* 271:*4*
274:*15, 18*
277:*19*
282:*12, 20*
283:*21* 304:*7,*
*8* 308:*12*
312:*2* 315:*8*
317:*22*
322:*13* 324:*5,*
*17* 337:*24*
338:*21*
344:*14* 349:*6*
**GOLKOW**
1:*21*
**good** 8:*21*
11:*24* 12:*1*
17:*4* 63:*18*
73:*11* 198:*22*
207:*24* 230:*7*
268:*3* 273:*10,*
*18* 277:*10*
282:*18*
283:*19, 20*
288:*1* 318:*5*
329:*16* 332:*2*
339:*14* 348:*15*
**goods** 72:*20,*
*22* 73:*8*
**gotcha** 205:*18*
**governed**
160:*21*
**Gray** 1:*16*
350:*12*
**Great** 60:*10*
68:*13* 73:*13*
82:*10* 95:*17*
113:*1* 123:*24*
142:*10*
165:*13*
167:*22*
171:*19* 270:*2,*
*24* 294:*15*
324:*20*
**GREENBERG**
3:*13*
**ground** 12:*9*
226:*15*

**group** 148:*4*
266:*5* 301:*22*
**groups** 21:*6*
**guess** 234:*13*
327:*17*
**guidance**
53:*15* 58:*7,*
*14* 93:*13*
165:*7* 197:*4*
**guide** 237:*13*
**Guideline**
5:*22* 28:*5*
55:*21* 93:*20*
**guidelines**
90:*10* 93:*11,*
*17* 180:*5*
**Gupta** 147:*8*
150:*9*
**guy** 145:*7*
**guys** 17:*18*
45:*4* 91:*21*
112:*5* 116:*21*
126:*5* 139:*20*
140:*24* 141:*7,*
*16* 160:*6*
161:*7* 164:*8*
174:*13* 214:*4*
215:*22* 216:*4*
225:*8* 227:*7*
231:*12* 235:*5*
245:*20* 264:*18*

**< H >**
**hand** 244:*18*
**handled**
301:*21*
**handles**
305:*12*
**handling**
319:*18*
**Hang** 270:*20*
278:*14*
**happen** 256:*5*
**happened**
15:*14* 17:*9*
216:*19*
229:*19* 242:*1*
**happening**
16:*10* 179:*24*
**happens**
136:*19* 160:*4*

Confidential Information Subject to Protective Order

242:7, 10
274:22
**hard** 29:13
50:6 76:3
**hat** 135:9
**Hazard** 7:14
60:14, 18
**HCl** 325:18
**head** 13:3
90:20 119:8
123:8 147:12,
14 151:24
152:9 169:18
170:19 171:5
176:10, 24
180:19 181:9
191:11
193:10 221:5
224:4, 5
243:13
264:13, 19
265:15 266:8
311:5 314:7
324:10
340:10 348:2
**Health** 7:14
33:23 38:20,
24 39:8, 14,
20, 24 42:10
54:6 60:14, 18
**Healthcare**
3:13
**hear** 59:14
68:2 76:3
105:6 117:3
125:23
177:21
278:22 298:7
345:14
**heard** 117:10
169:19 291:4
307:17 312:15
**heavily** 276:16
**heavy** 204:13
276:20 300:8
**held** 1:15
25:8 82:9
249:14 251:3,
4 300:5 311:6
**Hello** 105:5
202:17 298:4

**help** 19:19
221:10
**helpful** 15:16
165:14 346:18
**helps** 41:10
211:24
**Hey** 186:3
314:7
**HHE** 62:3
**Hi** 283:3
**high** 40:20
**higher** 100:13
**highlight**
272:18
330:10 332:7
**highlighted**
112:9, 21
267:20, 23
272:6 324:2
**highlighting**
211:23
**highly** 37:2
40:13
**history** 15:15
**HNO2** 325:20,
22
**hold** 18:22
226:16, 18
228:19 249:1,
2 251:10
**holder** 155:15,
17 156:6, 7,
10, 12, 14
160:1 161:12
165:21 190:9
192:16, 18
193:1 194:11,
13 196:5
205:10 207:3,
8 220:7
223:3, 18
224:21
228:12
230:21
231:18, 23
233:9 235:11
237:4, 23
238:1, 4, 7, 11,
20 239:12
240:23 241:3,
12 246:6, 7

248:22
249:22
250:15
252:12 315:3
316:7, 8
317:16
341:16, 22
342:2, 17
**holding**
248:19 249:6
250:10, 14
251:14 252:5
**HON** 1:6
**honest** 30:14
31:15
**hope** 179:19
181:17, 18
260:10, 11
**hour** 16:4
**hours** 16:4, 5,
24 17:2
**HPLC** 240:10
**Huahai** 3:12
8:22 97:10
119:21 168:1,
17 169:2, 3, 9,
11, 13, 16, 20,
22 170:5, 6,
13 171:14, 21
323:1
**Huahai's**
173:3, 14
**human** 51:23
62:21 63:12
**humans** 36:24
37:3, 8 38:1
40:11 62:23
63:5
**hundreds**
87:11 238:17
**hydrochloride**
325:18
326:20 328:9
330:23 331:2,
7 332:18, 19,
24 333:1, 2,
12 336:16
**hydrochlorothi
azide** 60:17

< I >

**ICH** 90:10
93:10, 17
212:24
214:24 222:6
**idea** 151:15
174:19, 22
175:9 176:8
177:3, 16
178:1 179:5
180:10
181:12 183:3
214:3 216:1
**ideally** 52:1, 9
**identification**
13:20 18:6
25:3 33:14
55:5 59:17
61:8 64:8
76:16 80:4
96:2 103:16
110:17 120:4
143:5 146:19
161:20
166:11 201:5
253:13 263:8
266:18 270:9
313:6 321:16
**identified**
49:14 53:15
85:3 88:23
91:15 92:11
99:4 101:13
163:2 211:12
250:18
313:10 317:12
**identify** 53:16
118:7 165:10
223:22 224:9
225:3 290:5
314:23
315:19 317:20
**identifying**
24:5, 20
292:14
**II** 8:18
199:19
**III** 2:10
**Illinois** 2:15
**immediately**
158:16 269:5

**Impact** 9:14,
17 50:22
51:22 64:19
76:24 228:14
259:19
**impacted**
227:23 228:1,
13 235:13
249:13, 17
**impacting**
50:13, 17
**imperative**
351:14
**implicated**
229:3 303:17
**implication**
304:11 305:16
**implies** 110:4
**important**
12:17 53:20
54:15, 20
129:10
132:22
164:21
175:15, 20
229:7 233:10
264:12
315:13 316:17
**improper**
241:16
242:13, 15
**Impurities**
5:23 24:1, 5,
10, 21 55:22
83:13 85:4
91:15 92:12
101:21 155:2
165:11 182:7,
17 183:10, 12,
20 185:7
187:2, 15, 18
188:5, 9
190:14, 17, 23
192:20
193:20, 23
194:2, 21
195:5, 15
196:13
197:14, 17, 20,
24 210:8
211:2 212:7

213:*4*, *11*
214:*2*  215:*6*,
*17*  216:*5*, *10*,
*14*  218:*4*
219:*23*
226:*22*
230:*24*
234:*20*
235:*19*
297:*18*
314:*23*
315:*12*  316:*3*,
*18*  318:*15*, *23*
319:*2*, *10*, *13*
345:*12*  346:*2*
347:*9*, *21*
**impurity**  8:*13*
46:*20*  83:*17*
111:*11*  112:*6*
113:*4*  114:*2*
121:*11*
122:*18*  123:*1*
138:*3*  165:*1*,
*10*  189:*3*, *13*
190:*24*
191:*13*  194:*9*,
*11*  195:*22*
198:*4*, *23*
199:*11*
206:*12*, *16*
212:*24*  213:7
214:*10*, *17*
215:*18*, *19*
216:*11*, *15*
217:*22*
219:*16*
220:*10*, *13*, *19*
221:*8*, *11*, *21*
222:*10*, *20*
223:*12*, *15*, *20*,
*22*  224:*10*, *24*
225:*3*, *9*, *11*,
*18*, *19*  226:*2*,
*4*, *14*, *24*
231:*6*, *10*, *22*
232:*1*  233:*7*
234:*15*  235:*6*,
*14*, *23*  236:*6*
244:*15*, *18*, *20*,
*24*  245:*7*
246:*9*  248:*24*

274:*6*  280:*16*
313:*6*, *11*, *12*
315:*20*
316:*22*
317:*12*  346:*22*
**included**
299:*12*
**includes**
27:*19*  197:*19*
**including**
38:*21*  190:*19*
331:*18*, *21*
**incoming**
317:*4*
**incorrect**
96:*16*
**increase**
62:*18*, *23*  63:*4*
**incremental**
235:*3*
**independent**
263:*3*
**INDEX**  10:*2*
**India**  1:*16*
11:*6*  16:*14*,
*19*  19:*23*
20:*4*  22:*24*
23:*1*, *15*
26:*11*  43:*23*
63:*22*  64:*3*
132:*8*  144:*19*
154:*5*  208:*2*,
*7*, *21*  209:*5*
349:*11*
**Indiana**  2:*16*
**Indianapolis**
2:*16*
**indicated**  41:*1*
49:*12*  54:*11*
165:*18*  178:*1*
179:*21*  187:*6*
205:*14*
213:*14*
218:*10*
225:*14*
226:*10*, *12*
227:*21*
228:*12*  231:*4*
233:*7*  234:*19*
235:*11*  241:*6*
246:*8*  247:*4*,

*20*  249:*11*, *16*
250:*16*  252:*7*,
*23*  259:*24*
260:*24*  261:*5*
275:*2*  305:*12*
313:*4*  314:*24*
346:*8*  348:*6*
**indicates**
204:*4*, *9*, *20*
**indicating**
31:*7*  38:*5*
47:*9*  90:*2*
119:*22*  155:*3*
178:*11*
181:*14*  182:*2*
187:*22*  199:*5*
225:*24*
228:*11*
248:*13*
250:*14*
290:*23*  293:*8*
296:*12*
297:*16*  303:*9*
327:*5*  328:*4*,
*13*  338:*11*
346:*14*
**indication**
226:*1*
**indicator**
336:*2*
**Indrad**  26:*4*, *6*
**induced**  34:*24*
35:*13*
**inducing**
49:*14*, *17*  50:*1*
**Industries**
3:*19*  292:*2*
**industry**
175:*16*, *21*
193:*19*
284:*21*  285:*2*,
*11*, *14*  290:*22*
291:*1*
**info**  236:*12*
**inform**  172:*18*
229:*20*  230:*1*
**INFORMATIO
N**  1:*8*  17:*23*
19:*3*  23:*16*
26:*22*  31:*3*
34:*20*  40:*7*

43:*15*  46:*24*
48:*20*  59:*6*
102:*19*
126:*11*, *24*
127:*2*  132:*20*
134:*9*, *18*
135:*2*, *13*
179:*7*  180:*12*
200:*3*  206:*4*
207:*17*  216:*3*
226:*3*, *9*, *11*
228:*3*, *10*, *16*
229:*14*, *17*, *19*,
*23*, *24*  230:*4*,
*13*, *16*  235:*3*
236:*7*  238:*3*
260:*4*  264:*13*
265:*15*  266:*8*
314:*18*, *21*
316:*6*, *13*
317:*19*  324:*6*,
*9*  330:*4*
**informed**
123:*8*  155:*19*
245:*19*  259:*7*
314:*13*
**ingestion**
63:*12*
**ingredient**
315:*17*, *18*
**ingredients**
157:*4*  315:*14*
316:*19*
318:*24*
319:*11*
334:*17*  335:*18*
**initial**  303:*2*
**initially**  20:*23*
227:*7*
**initiated**  93:*1*
**Inquiry**  6:*14*
265:*20*
**inside**  291:*17*
292:*5*, *21*
333:*21*
**insignia**
322:*24*  323:*7*
**inspection**
177:*7*

**inspector**
174:*12*  183:*2*
215:*3*
**inspectors**
167:*8*
**instruct**  136:*3*
**instructed**
320:*17*
**INSTRUCTIO
NS**  351:*1*
**instructs**  129:*4*
**intake**  81:*11*,
*24*
**integrated**
161:*1*
**intend**  125:*21*
135:*24*
**interesting**
184:*13*
**interference**
297:*21*  300:*3*
**interfering**
278:*17*
**Interim**  81:*5*
**intermediate**
206:*10*
**internal**  36:*12*
77:*24*  79:*1*
**Internally**
264:*12*
**International**
7:*7*
**internet**
278:*17*, *20*
300:*6*, *11*, *12*
322:*5*
**interrupt**
12:*18*  18:*12*
193:*6*
**interrupted**
237:*9*
**interrupting**
241:*15*  242:*12*
**interruption**
131:*3*  242:*11*
278:*12*
**intimating**
341:*18*
**introduce**
283:*17*

investigate
53:9, 20
131:16
160:11  219:17
investigated
15:18  52:13
161:5  218:21
219:4
investigating
161:14
Investigation
6:19  48:9, 11,
16  270:1, 7
280:11
281:16  282:1
321:21  322:23
investigations
48:15
involved
38:11  41:4
42:16  75:20
90:24  134:17
136:20
152:13  153:1
170:12  171:7,
13  180:23
181:6  243:16
253:1, 3  317:3
involves
310:12

IRBESARTAN
1:4  8:20
11:10
issue  95:6
117:16
118:18  130:1
141:4  154:22
155:8, 19
179:24  268:20
issues  115:14,
21  116:3
118:4, 15
124:15
139:10  152:2
155:10, 14
303:15, 16
It'll  80:6  86:3
its  29:19
75:7  93:18
119:10  163:1

178:18
227:19
246:19
251:20
315:12
316:18  324:10
IV  34:17

< J >
JAISWAL
1:14  5:5, 16,
18  11:9, 17,
24  14:4  15:6
20:7  25:14
32:1  38:15
39:16  55:12
57:12  80:22,
24  87:8, 17
96:11  112:17
117:3  137:4
143:8  177:20
189:1, 9
193:7  209:8
224:12  272:4
283:2, 6, 16
296:8  298:1
301:19  306:3
308:11
309:22, 23, 24
310:2  329:8,
20  340:9
348:13  350:8
353:16
January
268:12
275:13
277:13  278:3
279:14, 23
jcronan@preti.
com  2:12
JEFF  2:14
4:13  18:24
19:7  123:23
Jenny  167:1,
7, 10, 17, 19, 23
168:11
171:20  173:2
186:3  213:18
215:21
JERSEY  1:1

Jgibson@wagn
erreese.com
2:17
Jim  147:18
Jinesh  139:21
140:5, 8
job  20:22
22:14  59:5
171:6  181:3
222:9, 19, 24
223:12, 14, 17
257:1  317:2
JOHN  2:10
joined  21:1,
12  22:6  311:9
journal  310:20
judgment
334:23
July  22:20
113:7  254:7,
18  261:23
262:15, 22
264:2
June  1:8
11:4  55:18
111:7, 10
113:3, 23
114:3, 5, 7, 10
115:11, 20
217:18
236:24  350:15
justification
232:20, 22
justified  40:21

< K >
kabonner@dua
nemorris.com
3:11
Kalpesh  17:15
Kansas  2:21
keep  59:13
75:23  208:10
246:1  270:15
303:23
keeps  337:22
KELLY  3:9
147:16, 19
Kelly's  147:23
kept  340:18

key  130:20
315:18  317:4
331:12
kicking
257:17  258:14
kind  12:9
15:17  18:1
21:5, 15
23:22  25:22
37:16, 17
41:4, 5  42:4,
16  49:23, 24
50:3, 22
58:12  108:2
147:20, 22
157:11, 12, 13
158:16, 23
159:8, 12
160:19
164:18, 20, 22
165:1, 2
186:15  194:8
223:6  229:10,
18  253:3
254:5  270:14
286:19  287:9
300:20
305:11  306:7
317:10  334:22
kinds  155:5
KIRKLAND
3:1
knew  92:4, 16
118:18  235:5,
6  333:24
334:16
know  12:24
13:11  23:3
25:14  38:10
40:6  42:8, 20,
21  54:15, 21
60:6  62:11
67:15  68:1
71:8, 12  75:6,
10, 16  77:18
78:2  91:6
93:9, 16
103:1  104:19
105:2, 3
107:2  109:16
110:20  117:9,

10  119:9
120:20
125:14  126:5
140:17
141:12
142:20  145:6
146:1, 4
147:9, 10, 16,
18, 19, 20
153:14  155:5
158:19  162:2
166:19
167:17  170:6,
7, 20  171:6
176:11  177:1
178:15, 23
186:23  188:8
190:18
198:10  206:9
207:23  219:9,
18, 21  220:1,
18  221:24
223:23
224:10  225:4,
5  231:10
232:2  234:11
240:7  242:24
243:9  253:10
263:14
276:10
281:21
285:18
307:22, 24
312:15  315:3,
17  316:1, 2
324:8  325:13,
21  326:13, 14,
18, 20  327:20,
22  328:6, 7,
11  330:2, 20
331:11
334:13
335:17  336:6
337:2, 5, 19
341:6
know-how
109:17
knowing  85:2
92:2  139:7
159:15  222:7
223:18

224:*17*
226:*13, 23*
252:*8*  338:*4*
**knowledge**
38:*19*  39:*4, 8*
43:*24*  46:*12*
159:*20*  223:*1*
224:*20*  237:*4*
314:*20*
339:*21*  343:*4*
345:*3*
**known**  21:*3*
24:*10*  36:*13*
69:*18*  88:*10*
91:*16*  221:*21*
243:*13*
281:*17*  328:*3*
**knows**  234:*15*
**Kotak**  4:*16*
**KSM**  316:*1, 2,
4*  317:*5*
**KUGLER**  1:*7*

**< L >**
**lab**  21:*3*
**label**  161:*7*
164:*8, 22*
**laboratory**
21:*4, 5*  34:*23*
35:*12*
**large**  330:*2*
**Lauren**  4:*13*
**LAW**  2:*19*
136:*11, 21*
239:*10*  250:*8*
**LAWRENCE**
3:*15*
**Lawrencege@g**
**tlaw.com**  3:*18*
**lawyer**  123:*16*
125:*1, 24*
126:*1*  133:*4,
6*  134:*8, 15,
17, 21, 23, 24*
135:*9, 12*
136:*10*
**lawyers**  134:*8*
**LAWYER'S**
354:*1*

**lay**  128:*14*
130:*14, 15, 19*
131:*8*
**laying**  242:*15*
**lays**  133:*12*
**LC-MS**
284:*10*  285:*3,
7, 10, 18*
286:*1, 6, 9, 16*
287:*2, 20*
292:*3*
**lead**  56:*12*
57:*6*  105:*10*
**leads**  35:*21*
**learned**  106:*7*
183:*16*  225:*17*
**learning**
214:*1*  215:*2*
**learns**  221:*7*
**leave**  21:*7*
22:*16*
**leaving**  22:*3*
229:*6*
**left**  21:*12*
66:*14*  72:*9,
17*  323:*4*
325:*3*
**left-hand**
41:*12*  61:*23*
81:*10*  162:*8*
**legal**  135:*7*
136:*13, 14*
**legible**  103:*22*
**length**  51:*17*
**letter**  123:*20*
125:*17*
162:*12*  211:*5*
**level**  36:*6*
40:*20, 21*
41:*5*  50:*21*
51:*6*  53:*5, 15,
22*  56:*11, 22*
57:*17*  58:*1,
19*  78:*1*
88:*18*  178:*8*
220:*2*  286:*15*
290:*6*  314:*23*
**levels**  37:*4*
40:*14, 16*
52:*17, 20*
53:*11*  54:*17,

23*  73:*19*
82:*13*  90:*8*
210:*9*  236:*14*
292:*15*
**LEVIN**  2:*1*
4:*15*
**Lexi**  124:*24*
**Lexington**  3:*4*
**LIABILITY**
1:*5*  11:*11*
264:*14, 20*
265:*16*  266:*9*
**lies**  223:*2*
**life**  75:*11, 14,
21*  76:*4, 8*
101:*15*
**lifecycle**
299:*22*
300:*16*  301:*9,
12*  302:*3, 7,
21, 23*  303:*17*
**lighter**  205:*2*
**limit**  41:*18*
50:*16*  51:*16*
63:*13*  69:*15,
18, 19*  70:*4, 8,
12, 16, 17*
71:*3, 8, 21*
77:*12, 19, 24*
78:*3, 7, 9*
79:*18, 21*
81:*18*  82:*21*
83:*9, 20*  84:*2,
18, 24*  85:*2,
12, 19*  86:*8,
15*  87:*1, 12*
88:*1*  89:*10*
90:*5, 6*  93:*4*
197:*5*  219:*12*
**limitation**
37:*19*  199:*8*
**Limited**  22:*19,
23*  26:*4, 11*
27:*5*  48:*4*
68:*20*  114:*17*
144:*19*
314:*19*  318:*18*
**limits**  5:*23*
54:*5*  55:*21*
71:*24*  72:*2*
81:*5*  82:*4*

87:*20*  88:*7, 9,
11*  90:*4*
160:*20*  197:*2*
218:*16*  222:*5*
**LINE**  10:*6, 9,
12, 15*  111:*24*
148:*5, 8*
167:*24*  168:*5*
169:*1*  271:*6*
273:*8*  352:*4*
354:*2*
**link**  18:*15*
19:*5, 6, 8*
41:*24*  143:*16*
**LinkedIn**  5:*16*
**liquid**  284:*11*
289:*6*  290:*4*
**list**  23:*21*
65:*19*  78:*20*
97:*13*  98:*6*
113:*8*  163:*23*
164:*1*  253:*18*
**listed**  23:*7*
79:*19*  105:*22*
271:*24*
272:*14, 22*
**listing**  122:*9*
**lists**  14:*8*
73:*17*  89:*1*
97:*24*
**literature**
285:*22*  287:*1*
289:*4, 24*
290:*2*  291:*24*
295:*6, 16*
296:*2, 20*
297:*11*  299:*5*
307:*8*  339:*16,
23*  340:*3*
**LITIGATION**
1:*5, 21*  4:*11*
11:*11*  283:*19*
**little**  18:*3*
41:*10*  44:*7*
52:*1*  53:*19*
55:*17*  62:*17*
65:*4, 10*  66:*4*
73:*17*  76:*2*
80:*15*  101:*23*
102:*23*  121:*4,
6*  142:*11*

144:*22*  157:*3,
24*  158:*5*
160:*6*  176:*23*
183:*7*  191:*24*
193:*9, 11*
195:*1, 2*
198:*15*
199:*22*
202:*18*
211:*15*  223:*7*
229:*2*  254:*14*
282:*9*  283:*22*
318:*19*  340:*10*
**LLC**  3:*13, 19*
4:*6*
**LLP**  2:*8, 14*
3:*1, 7, 13*
**LOA**  77:*24*
**loading**  270:*19*
**location**  22:*12*
**log**  123:*21*
**login**  19:*3*
**logo**  25:*23*
64:*18*
**long**  15:*6*
62:*11*  162:*9*
199:*13*
237:*16*
244:*10, 13*
285:*2, 14*
286:*11, 21*
290:*15, 24*
306:*14*  315:*7*
327:*20*  334:*16*
**look**  13:*23*
18:*3*  19:*14*
20:*16*  24:*23*
27:*2*  33:*6, 21*
34:*19*  36:*21*
41:*9*  44:*2*
55:*2, 9*  56:*6*
59:*11*  61:*20*
62:*15*  64:*5*
68:*14*  72:*3*
73:*14*  76:*14*
84:*5, 6*  86:*1*
95:*24*  96:*18*
97:*3*  98:*11*
103:*13*
110:*14*  120:*1,
15*  122:*6*

Confidential Information - Subject to Protective Order

126:*10, 23*
128:*3* 138:*19*
139:*23* 143:*2*
146:*17*
161:*16*
163:*22* 166:*9*
167:*22*
180:*14* 201:*3*
202:*13* 209:*9*
211:*18, 19*
216:*21* 253:*6*
257:*9* 261:*22*
263:*6* 264:*9*
265:*18, 24*
267:*5, 7, 18,
24* 270:*16*
271:*3* 273:*22*
274:*15, 22*
276:*22*
279:*19*
281:*10, 19*
282:*1, 6*
287:*12* 309:*5*
313:*19* 314:*8*
321:*12*
324:*13*
328:*19* 344:*3*
**looked** 42:*21*
46:*17* 62:*7*
77:*5, 8* 83:*19*
113:*13*
121:*16* 142:*5*
170:*15*
213:*17*
236:*13*
274:*23* 277:*1*
338:*17*
**Looking**
35:*10* 38:*16*
40:*9* 43:*10*
79:*3, 11*
82:*24* 85:*15*
86:*11* 97:*2*
98:*11* 112:*14,
15, 17, 20, 21,
24* 121:*21*
126:*18*
132:*18* 133:*8*
134:*18* 135:*6*
137:*5, 17*
140:*10*

158:*20*
173:*24* 179:*4*
210:*15* 235:*4*
249:*21*
253:*24* 254:*3*
271:*23* 274:*8,
21* 280:*2, 23*
311:*23*
315:*10*
317:*19* 325:*2*
**looks** 65:*21*
69:*3* 73:*17*
202:*9* 209:*14*
277:*19*
**LOSARTAN**
1:*4* 8:*20*
**lose** 251:*22*
252:*16*
**losing** 340:*11*
**lot** 16:*10*
36:*11* 56:*1*
98:*6, 12*
101:*8* 128:*18*
178:*7* 183:*22,
24* 186:*19, 24*
187:*7, 24*
200:*16, 22*
201:*1* 237:*3,
6* 265:*10, 11*
268:*2* 277:*8*
316:*10, 12*
317:*7, 9*
342:*11, 12*
345:*19* 346:*9,
20* 348:*7*
**lots** 68:*22*
72:*6, 19* 73:*1,
4, 9, 10* 93:*22*
101:*12, 15*
103:*8* 121:*24*
**low** 35:*1, 14*
37:*3* 40:*14,
16, 20, 24*
41:*2, 3, 7*
**LP** 13:*18*
18:*4* 24:*24*
25:*10* 33:*6*
55:*3* 59:*11,
20* 61:*5* 64:*6*
76:*12* 80:*2,
18* 95:*24*

103:*13*
110:*14* 120:*2*
137:*5, 13*
138:*10* 143:*2*
146:*17*
161:*16* 166:*9*
201:*3* 207:*22*
209:*9* 253:*7,
9* 263:*6*
266:*16* 270:*5,
11* 271:*2, 14,
24* 272:*1, 21,
22* 274:*15, 21*
276:*22*
279:*20*
281:*19* 308:*5*
321:*12*

**< M >**
**M7** 90:*10*
93:*10, 17, 20*
213:*1* 214:*24*
222:*6*
**ma'am** 12:*4*
98:*17* 152:*7*
207:*12* 251:*16*
**Macleods**
21:*22* 22:*1, 8,
11*
**MADELINE**
2:*3* 18:*11*
96:*5* 123:*14*
208:*16* 237:*8*
241:*14*
271:*13* 312:*20*
**Mahesh**
123:*16* 125:*4*
126:*2* 134:*7*
135:*5* 136:*9*
**Mahesh's**
136:*17*
**mail** 18:*1*
103:*22*
107:*13*
111:*16* 112:*2*
117:*20* 122:*2,
13* 123:*11*
142:*23* 146:*9*
148:*18* 168:*9*
170:*1* 173:*22,
24* 174:*5, 9*

179:*2* 180:*16*
186:*9* 203:*16*
210:*12, 19, 20*
217:*9* 254:*12*
256:*3, 8*
257:*18, 24*
258:*7, 24*
260:*19* 262:*5*
263:*3* 264:*2*
265:*2, 18, 19,
21* 266:*1, 12*
**main** 164:*2*
**Maine** 2:*11*
**Maitrayee**
17:*14*
**major** 94:*24*
**making**
173:*14*
177:*15* 193:*2,
3* 316:*20*
320:*8* 321:*5*
337:*20*
341:*17* 342:*4*
344:*19*
**Management**
23:*23* 26:*21*
30:*22* 299:*22*
300:*17*
301:*10* 302:*4,
8, 21, 24*
303:*18*
**manufacture**
145:*18*
170:*22* 192:*4*
239:*1*
**manufactured**
8:*22* 72:*18*
73:*8* 74:*21*
88:*20* 100:*17*
177:*11* 224:*18*
**manufacturer**
68:*16, 21*
111:*7* 121:*9*
122:*16*
137:*20* 138:*1*
159:*17*
168:*12, 17, 24*
172:*8* 181:*11*
192:*3, 23*
193:*18*
195:*14* 196:*4*

197:*18*
198:*20, 24*
200:*23*
206:*16*
211:*11*
212:*12, 22*
215:*4* 220:*20*
221:*7, 18, 19*
224:*17*
234:*18*
237:*22*
239:*11* 274:*5*
323:*15*
**manufacturers**
171:*7, 10*
180:*24*
213:*13* 235:*18*
**manufacturing**
14:*23* 65:*13*
67:*9, 24*
78:*15, 17*
95:*1, 7* 102:*3,
5* 151:*23*
190:*12, 19*
191:*21* 192:*5*
194:*4* 195:*20*
205:*16*
224:*14*
315:*24* 336:*7*
338:*5* 340:*24*
341:*3*
**map** 157:*12*
**March** 268:*21*
276:*14*
**mark** 107:*17*
108:*3*
**Marked** 10:*14*
13:*19* 14:*2*
18:*5, 9* 23:*23*
24:*24* 25:*2*
26:*14* 33:*8,
13* 34:*15*
55:*4, 8* 59:*16,
20* 61:*7, 11*
64:*7, 12* 65:*8*
76:*15* 80:*3, 7*
96:*1, 5*
103:*13, 15*
110:*14, 16*
120:*3, 7*
124:*17*

126:20 143:4
146:18, 22
161:17, 19
166:10, 15
201:4, 8
253:12 263:7
266:17 270:8,
12 271:18
308:7 321:13,
15 322:21
**market** 65:15
72:9 77:17
141:23
146:13, 15
148:23 149:1
203:23 228:5,
19, 22 229:4,
16 230:3, 8
231:17 232:6
233:13, 20
234:2, 3, 17
235:9 237:1
246:2, 22
247:18
249:15, 18
250:2 251:5,
11, 15, 21
252:15
256:15
258:18 259:9,
11, 18 260:2,
6, 8 261:6, 11,
22, 24 262:9,
12 263:1
265:11 343:22
**Martin** 4:13
**mass** 284:7,
11 289:11, 17,
19, 21 290:3,
5 292:22
**Massey** 4:13
**Master** 5:20
26:5 153:18,
20 163:11, 15
311:10
**master's**
309:8 311:7
**material**
311:24
315:19 317:5

**materials**
334:1
**matter** 11:9
74:16 134:14
187:22
**Matter-urgent**
6:7
**McCorkle**
147:17
**MDL** 1:2
**MDL2875-
00005763** 7:20
**MDL2875-
00436416** 7:17
**mean** 18:11
27:23 35:19,
23 40:24
49:7, 11, 18,
21 78:14
84:11 88:8
136:12 227:9
231:20
260:10 268:7
277:22
310:11
311:12
336:12 344:15
**meaning** 24:7
255:21
291:15 318:12
**means** 28:20
36:3, 17
40:17 41:3, 7
44:9 45:3
49:5 50:7
74:13 108:12
109:9 114:9
122:23
145:24 146:2
149:15
175:11
233:14 273:3
302:24
307:23 317:3
350:20
**mechanism**
329:2 331:17
332:6, 13
333:19
**medical** 62:5
305:11

**medications**
286:5
**Medicines**
55:14 59:1
94:6 291:3
**meet** 17:5, 12,
24 28:18
178:7
**meeting** 15:16,
20 16:1, 3
178:11, 12
180:4 214:24
**meetings**
151:8
**meets** 301:8
**Mehta** 4:16
**member**
17:11 186:15
**members** 17:8
105:18
**mention**
135:1, 4
**mentioned**
20:10 42:7
52:15 133:15
143:8 179:17
186:18
201:23 213:6
251:1 298:19
310:17
**mentions**
27:16
**met** 16:23
180:3
**metabolism**
36:23 40:10
**metal** 204:14
**Metcalf** 2:20
**method** 53:17
106:14, 16, 22
107:18 108:2,
8, 15, 18
110:6, 9
117:22 118:8,
10, 11 140:18,
19 158:10, 21,
24 159:3, 14,
21, 24 185:4
214:16, 19
222:3 237:19,
21, 23 238:4,

10, 14 239:5,
20, 24 240:1,
2, 3, 4, 6, 12, 15,
18, 19 241:11
243:1, 5, 15
244:17, 19
245:2, 5
264:19 265:8,
10 266:2
284:5 287:3,
14 288:2
289:2 293:9,
19 294:17, 21
301:3, 4, 5
302:17 305:4
306:14, 22, 23
307:1, 15
310:7, 13, 14
**methodology**
66:24
**methods**
237:3 238:2
239:3 288:6,
14, 16 289:3
290:2, 15
293:3, 5, 13,
15 294:7, 10
295:5, 15
296:1, 19
297:10 299:4
304:2, 16
305:21 306:7,
12, 15 307:7
**Michelle** 1:16
59:14 350:12
**middle** 26:20
27:14 108:7
114:15
127:10 131:1
162:24 202:6
298:3, 16
330:14
**midnight**
348:14
**midway**
112:12 121:3
137:19
**million** 69:8,
16, 20 70:1, 2
71:9, 17, 22
74:8 77:13,

20 78:3 79:5,
12 81:15, 19,
20 82:1
87:23 88:16
89:5, 14 99:3,
6, 14, 19, 23
100:4, 10, 13
273:4, 11
274:12 277:6
281:23
**mind** 19:7
178:23 179:8
**minor** 325:9
**minute** 40:20
63:8 265:2
274:20 317:24
**minutes**
131:15, 21
208:18 269:2
282:18
**Mischaracteriz
es** 92:19
**miscommunica
tion** 241:23
242:1
**missed** 318:13
**misspoke**
84:12
**mistake** 102:9
**mitigated**
316:5
**mitigation**
194:18
**Mm-hmm**
34:5 66:8
79:7 85:20
121:7 144:14
204:22
227:12 258:3
262:22 273:6
325:4 330:15
**molecule**
50:15 199:11
281:6
**molecules**
310:14
**moment** 16:9
19:17 35:6, 8
61:17 88:10
97:17 103:23,
24 117:23

120:*12, 18*
121:*13*
122:*12, 20*
140:*4*  144:*1*
161:*22*  162:*4*
166:*17*  168:*3,
24*  189:*21*
201:*10, 15*
204:*7*  211:*8*
253:*21*  254:*2*
255:*8*  263:*23*
268:*1*  273:*22*
276:*15*  345:*19*
**money**  251:*22*
252:*16*
260:*12*  338:*21*
**monitored**
214:*15*
**Moore**  4:*11*
**morning**
348:*23*
**MORRIS**  3:*7*
**MOUGEY**  2:*3*
**move**  22:*13*
85:*9*  127:*24*
131:*19*  193:*9*
250:*21*
**moving**  257:*22*
**mpendley@levi
nlaw.com**  2:*6*
**MTBE**  204:*5,
10*
**Mukherji**
17:*15*
**multiple**
127:*6*  130:*12,
24*  131:*5*
133:*15*
135:*14*  307:*18*
**Mumbai**  22:*13*

**< N >**
**NAGLE**  3:*3*
**name**  125:*23*
147:*20*
221:*23*  231:*5,
10*  283:*17*
**naming**  297:*17*
**NaNO2**  325:*13*
**nanograms**
63:*10*  81:*12*

285:*23*
286:*15*
287:*16*  290:*6*
**narrative**
198:*15*
**native**  44:*5*
**nature**  132:*21*
135:*3*
**navigate**  19:*9*
**NDEA**  9:*14*
32:*17*  38:*21*
76:*24*  77:*13,
15, 19*  79:*12*
81:*5, 24*
83:*10, 12, 17,
20*  84:*2*
85:*16, 19*
86:*15*  89:*12,
20*  90:*9*  92:*1,
2*  188:*9*
243:*1*  244:*3,
12*  285:*23*
286:*4, 10, 16,
22*  287:*2, 5,
16*  288:*22*
289:*5*  290:*7,
10*  291:*16*
292:*4, 21*
295:*7, 17*
296:*3, 15, 21*
297:*12*  299:*6,
8*  307:*9*
314:*11*  320:*1,
4, 11*  321:*2, 7*
329:*2*  330:*5*
331:*16*  332:*5,
6, 13*  333:*21*
334:*3*  335:*21*
**NDMA**  9:*17*
32:*16*  34:*4*
35:*1, 14*
36:*24*  37:*2, 7,
24*  38:*21, 24*
39:*15, 20*
40:*1, 11, 13,
17*  41:*13, 19*
42:*11*  46:*16,
18*  56:*17, 21*
57:*22, 23*
62:*18, 21*
63:*3, 11*

64:*20*  68:*22*
69:*6, 15*  70:*4,
19*  73:*19*
74:*7*  77:*5*
79:*5*  81:*5, 12,
19*  82:*13, 21*
83:*12, 17*
84:*18, 24*
85:*12*  86:*9*
87:*1, 8, 12, 23*
88:*16*  89:*6*
90:*9*  91:*6, 22*
92:*4, 5, 16*
97:*9*  98:*2*
99:*3, 7, 15, 19,
24*  100:*4, 10*
106:*4, 22*
107:*3, 24*
108:*9*  114:*6,
8, 11*  119:*11*
138:*6*  139:*5*
188:*8*  225:*11,
15*  226:*4*
227:*6, 10, 20*
231:*16*
234:*16, 19, 24*
236:*15, 19*
243:*1*  244:*3,
12, 13, 14, 15*
245:*19*  247:*8,
13, 19*  248:*3,
20*  249:*7*
250:*1, 12*
254:*9, 23*
255:*12, 18*
257:*4*  272:*23*
273:*4, 13*
277:*6, 14*
281:*23*
285:*23*  286:*4,
10, 16, 22*
287:*1, 4, 16*
288:*22*  289:*5*
290:*7, 10*
291:*16*  292:*4,
20*  295:*6, 16*
296:*3, 15, 21*
297:*12*  299:*5,
8*  307:*9*
314:*11*
319:*24*  320:*4,*

*10*  321:*2, 7*
326:*5, 24*
328:*17*
331:*17*  335:*20*
**NE**  3:*16*
**necessarily**
275:*20*  281:*8*
**necessary**
351:*4*
**need**  16:*9*
19:*18*  52:*18*
54:*17*  65:*1*
91:*5*  107:*15*
108:*19*  118:*8*
125:*20*
137:*12*  141:*8*
156:*13*
165:*10*
172:*13*
180:*14, 17*
189:*9*  195:*23*
211:*18*
216:*21*
220:*18*
237:*20*  239:*4,
6*  240:*18*
244:*18*  257:*8*
264:*18*  265:*6,
15*  281:*10*
291:*8*  297:*2,
19*  298:*20*
299:*14, 23*
300:*18*  302:*9*
315:*21*  317:*2*
318:*19*
329:*12*
338:*20*  344:*3,
23*  347:*14*
348:*3*
**needed**  7:*11*
8:*8*  48:*8, 14*
299:*10*  301:*2*
**needing**  261:*8*
**needs**  48:*20*
178:*7*  237:*3*
306:*7*  313:*9*
**negotiate**
338:*24*
**neither**  71:*5,
18*  118:*23*

**never**  29:*24*
37:*14, 15*
39:*5, 13, 19*
42:*3*  43:*24*
47:*11*  94:*20,
22*  147:*20*
151:*8*  152:*12*
154:*9*  169:*19*
174:*2*  178:*23*
179:*8*  181:*10*
189:*21*
192:*17*  252:*6*
295:*24*
296:*18*  297:*9*
299:*2, 13*
314:*6, 13*
316:*7*  317:*15*
344:*20*
**NEW**  1:*1*  3:*4*
67:*12*  77:*3*
78:*9*  94:*20,
22*  201:*24*
204:*13*  227:*6,
22*  228:*13*
234:*20*
235:*13*  267:*8*
293:*2, 12, 19,
20*  294:*7*
301:*3*  304:*2,
15*  305:*20*
306:*11, 24*
326:*8*
**new/old**  95:*6*
**Nidhi**  4:*16*
**NIGH**  2:*4*
5:*5*  124:*11,
12*  125:*8, 12,
19*  126:*5, 8*
128:*11*  130:*2*
131:*22*
132:*10, 11*
137:*2*  242:*3*
283:*2, 4, 10,
15, 18*  287:*10*
288:*7, 19*
291:*20*  295:*2,
12, 22*  296:*6*
297:*6, 24*
298:*14*
299:*18*
300:*13*

301:*18*
303:*13*
304:*23* 306:*2*
307:*4, 16*
308:*5, 10, 22*
312:*9* 313:*14*
318:*11*
320:*14*
321:*12, 18*
322:*10, 19*
323:*2, 6*
324:*18, 21*
327:*16*
328:*24* 329:*6, 12, 17* 330:*10, 12* 331:*15*
332:*4, 7, 9*
334:*11*
335:*11* 336:*3*
337:*17*
339:*13*
340:*14* 343:*1*
346:*17*
347:*17* 348:*1, 21* 349:*3*
**night** 283:*23*
284:*2*
**Nilesh** 243:*13*
**nitrite** 325:*16*
326:*19* 328:*8*
331:*8* 333:*12, 16* 336:*15, 21*
337:*20* 338:*4, 9*
**nitrosamine**
339:*17*
**nitrosamines**
32:*4, 10, 16*
38:*20* 81:*6*
103:*1* 285:*24*
291:*17* 292:*5*
340:*1*
**nitrosate**
291:*3, 15*
**nitrosation**
291:*4*
**nitrous**
325:*24*
326:*21, 24*
333:*5, 10*

N-
**Nitrosodimethy**
**lamine** 7:*9*
34:*3*
**nod** 13:*3*
**nodding** 348:*2*
**noise** 342:*12*
345:*19*
**non-**
**pharmacopeia**
294:*22*
**nonresponsive**
250:*22*
**normally**
165:*22*
**Notary** 1:*18*
350:*14* 353:*23*
**Note** 6:*7*
66:*3* 124:*19*
134:*13*
**noted** 11:*12*
351:*11* 353:*11*
**NOTES** 354:*1*
**notice** 1:*15*
13:*24* 38:*16*
160:*5*
**Notification**
8:*12* 33:*1*
111:*6* 119:*21*
217:*19* 218:*1*
219:*6, 7, 15*
249:*10*
341:*21* 342:*1,*
20 344:*2, 6*
345:*1*
**notified** 32:*20,*
24 95:*14, 18*
111:*11* 112:*6*
113:*3, 14*
138:*6* 139:*4*
155:*9, 15*
156:*12* 342:*5*
**notifies** 114:*1*
342:*20*
**notify** 156:*5,*
6, 10 344:*4, 10*
**notifying**
342:*18*
**November**
66:*7*

**number** 26:*15,*
16 34:*16*
56:*4* 67:*3*
72:*18* 73:*4*
74:*2, 3, 17*
75:*7* 79:*2*
84:*9* 96:*19*
98:*16, 22*
125:*7* 137:*12*
149:*17*
163:*10, 22*
203:*14*
207:*13*
209:*10*
245:*23*
253:*10*
266:*22* 267:*8*
271:*5, 8, 23*
272:*8, 22*
273:*23* 274:*3,*
4, 5 275:*6*
308:*17, 21, 23,*
24 324:*14, 17*
328:*20* 331:*14*
**numbered**
271:*4* 276:*23*
**numbering**
75:*2* 78:*10*
**numbers** 44:*7*
56:*3* 74:*11*
78:*21* 98:*1, 7,*
12 101:*8*
125:*11, 13*
128:*5*
**Numeral**
34:*17*

**< O >**
**oath** 13:*7*
**Object** 46:*5*
66:*18* 67:*17*
89:*16* 136:*16*
**objection**
13:*12, 13*
27:*24* 28:*21*
29:*5* 37:*10*
39:*2* 41:*20*
43:*2, 18*
44:*18* 47:*4*
51:*9* 52:*4, 21*
53:*23* 54:*8*

56:*23* 57:*9*
58:*2* 70:*6, 21*
74:*22* 87:*13*
88:*3* 89:*22*
90:*12* 91:*8*
92:*8, 18* 95:*9*
100:*19* 101:*3*
102:*14* 103:*3*
106:*9* 107:*4,*
9 108:*24*
109:*11* 110:*1*
111:*13*
113:*16*
116:*13, 23*
117:*17*
118:*20*
119:*12*
142:*16*
145:*10*
148:*15*
149:*10* 150:*1,*
13 151:*5, 16*
152:*4* 153:*4,*
24 160:*8, 13*
163:*18*
164:*10*
167:*11*
168:*19* 169:*6*
170:*23* 172:*3*
173:*17*
174:*24* 175:*5,*
23 176:*4*
177:*17*
181:*21*
184:*24*
185:*17* 186:*5*
187:*3, 19*
188:*14, 21*
189:*6* 191:*18*
195:*7, 17*
196:*16* 198:*1*
199:*2* 200:*10*
203:*11* 214:*6*
215:*8* 216:*6*
217:*6* 218:*7,*
23 220:*24*
221:*13*
222:*12, 22*
228:*6* 230:*10*
231:*1* 232:*7,*
15 233:*3, 16*

235:*20*
238:*21* 244:*4*
246:*14, 24*
248:*5* 250:*23*
251:*23*
252:*18*
255:*24*
258:*20*
260:*16* 262:*2*
264:*21*
277:*15* 278:*4*
279:*16* 287:*6*
288:*11*
291:*18*
294:*12* 295:*8*
296:*4, 23*
297:*14*
299:*16*
301:*13* 303:*4*
304:*18*
305:*23* 306:*4,*
18 307:*11*
312:*4, 24*
318:*7* 320:*12*
327:*10* 334:*5*
335:*9, 22*
337:*8* 339:*2*
341:*9* 346:*5*
347:*11, 23*
**objections**
29:*21* 30:*8,*
16 31:*5, 18*
38:*3* 42:*13*
47:*24* 146:*7*
189:*16* 190:*5*
295:*19*
**objective**
200:*16*
**objects** 13:*11*
320:*16*
**obligation**
247:*21*
**O'BRIEN** 2:*3*
**observation**
279:*14* 281:*14*
**observations**
88:*19*
**observed**
268:*13*
269:*23*
275:*13* 279:*24*

Confidential Information Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| **obviously** | 20 55:1, 17 | 116:6, 10, 19 | 2, 12 191:11 | 15 268:15, 19 |
| 61:21 129:11 | 56:16, 20 | 117:8, 13 | 193:17 | 270:2, 20, 23, |
| 134:16 | 57:5, 14, 21 | 118:1 119:23 | 194:23 | 24 271:7, 22 |
| 188:12 203:1 | 58:16, 23 | 120:20 121:3 | 196:12 | 272:7, 17 |
| 206:14 | 59:3, 10, 15 | 122:9, 23 | 197:22 | 273:7, 17 |
| 249:24 | 60:6, 7 61:3, | 123:4, 7 | 198:14 | 274:9, 10, 13, |
| 251:10 264:10 | 18, 20 62:2, 7, | 125:16 | 199:21 200:2 | 20 276:3, 10, |
| **occasions** | 10 63:2, 7, 16 | 131:22 136:7 | 201:12, 16, 23 | 13, 18, 21 |
| 307:19 | 64:14 65:3, 7 | 137:4, 6 | 202:5 203:1, | 277:5, 12 |
| **occurrence** | 66:2, 22 67:6, | 138:9, 16, 21 | 4, 9, 19 | 278:1 279:11, |
| 62:19 | 14, 21 68:8, | 139:7, 16, 20 | 204:15, 17 | 12, 19 280:18 |
| **o'clock** | 13 69:2, 14, | 140:16, 23 | 205:1, 5, 18 | 281:11 |
| 208:20 322:17 | 19, 22 70:15, | 141:6 142:1, | 206:2, 7 | 282:10 283:4 |
| **October** 210:6 | 19 71:7, 12, | 5, 10 143:12 | 207:2, 8, 20, | 284:3 285:3, |
| **offer** 58:15 | 20 72:1, 15 | 144:3, 4, 8, 17, | 21 208:14, 15 | 15 287:24 |
| **Office** 9:8 | 73:3, 13, 22 | 21 145:20 | 209:8 210:3, | 289:20 290:1 |
| **OFFICES** | 74:6, 10, 15, | 146:3, 11, 16 | 24 212:3, 5, 9, | 293:1 298:10 |
| 2:19 | 19 75:6, 10, | 147:15, 22 | 17 213:2, 6, | 300:14 304:7, |
| **Oh** 17:14 | 14 76:2, 9 | 148:2, 13, 21 | 16, 21, 24 | 10 306:5, 6, |
| 310:1 | 77:2, 7, 10, 12 | 149:3, 7 | 215:2, 21 | 10 308:16 |
| **Okay** 12:8, 21, | 78:2, 19 79:3, | 150:6, 18, 22 | 217:16 218:2, | 310:3, 5, 17 |
| 23 13:14, 15, | 10, 23 81:3, 9, | 151:14 | 19 219:14 | 311:11, 21 |
| 24 14:15, 21 | 23 82:3, 10, | 152:17, 24 | 220:21 221:5 | 313:15 |
| 15:6, 10, 19, | 24 83:24 | 153:13, 18 | 223:21, 24 | 317:24 322:7, |
| 24 16:2 17:4, | 84:1, 4, 22 | 154:4, 12, 17 | 224:8 225:7, | 20 323:9, 14 |
| 12 18:20 | 85:5, 15, 21 | 155:7, 18, 24 | 16 226:17, 20 | 324:4, 5, 11, |
| 20:7, 10, 22 | 86:5, 17 87:3, | 156:17, 24 | 227:3 228:2 | 12 325:1 |
| 21:7, 14, 17 | 10 88:13, 24 | 157:15, 19 | 229:1, 13 | 326:12 |
| 22:12, 15, 18, | 89:8, 12 90:7, | 158:14, 18 | 230:6, 13 | 329:15, 24 |
| 22 23:11, 15, | 20, 24 92:3, | 159:6 160:4, | 232:24 | 330:8, 19 |
| 20 24:4, 19 | 15 93:3, 7, 9, | 16 161:6, 15 | 233:11 234:1, | 331:13 |
| 25:21 26:9, | 16, 21 94:2, | 162:7, 13, 18 | 6, 11, 13, 14 | 334:12, 24 |
| 13, 19 27:15, | 13, 16, 24 | 163:7, 22 | 236:22 237:6 | 335:5 336:4, |
| 22 28:13, 19 | 95:17, 21 | 164:17 | 239:9, 18 | 22 339:20 |
| 29:2, 16 30:5, | 96:23 97:11, | 165:13 166:2, | 240:21 | 340:7, 22 |
| 12 31:13, 21 | 23 98:21, 24 | 8, 23 167:7, | 241:20 | 343:4, 6, 7, 18 |
| 32:1, 13 33:2, | 99:5, 9, 21 | 17, 22 168:4, | 242:23 244:1, | 344:12 |
| 5 34:8, 19 | 100:6, 11, 23 | 10, 16 169:18, | 10 245:3, 17 | 345:21 347:1 |
| 35:7, 23 36:2, | 101:22 102:9, | 24 170:19 | 246:10 247:6 | 348:13, 17, 21, |
| 15 37:22 | 22 103:11 | 171:12, 19 | 248:17 249:4, | 24 |
| 39:1, 11, 22 | 104:1, 14, 17, | 172:16 173:2, | 23 250:20 | **old** 67:11, 24 |
| 40:3, 23 41:9 | 24 105:8, 14, | 9 174:2, 6, 15 | 251:3, 9, 12, | 68:5, 8, 12 |
| 42:7, 20 | 20 106:18 | 175:10, 14, 18 | 13 253:24 | 74:13, 14, 16, |
| 43:15 45:17, | 107:14, 20 | 176:22 | 254:2, 20 | 18 94:17 |
| 23 46:1, 8, 14, | 108:4, 11, 21 | 177:14 | 255:3, 10 | 97:9, 14 |
| 24 47:13 | 109:20 | 178:14, 21 | 256:17 257:9 | 101:10 |
| 48:12, 19 | 110:13 | 180:6 181:5 | 259:6 261:19 | 115:17 117:7 |
| 49:4 50:5, 10 | 111:10 | 182:23 | 263:4, 5 | 121:10 |
| 51:5, 24 | 112:11 113:1, | 184:12 185:9 | 264:5, 10, 17 | 122:17 138:2, |
| 52:11 53:3, 8, | 6, 12 114:1, 9, | 186:18, 23 | 265:3 266:6, | 7 139:5, 7 |
| 18 54:3, 14, | 13 115:2, 9 | 188:8 189:1, | 13 267:3, 14, | 201:24 202:2 |

227:*10, 16, 22, 24* 228:*4, 14, 22* 231:*11, 14, 16* 235:*1* 284:*18, 24* 285:7 343:6
**once** 28:*6, 7* 43:*7* 50:*16, 20* 92:*15* 100:*12* 101:*12* 110:*7, 10* 150:*23* 161:*6* 164:*24* 171:*2* 192:*23* 195:*12* 200:*16, 17, 21* 207:*3* 227:*21* 229:*24* 230:*18* 233:*12, 19* 244:*20* 252:*23* 260:*5* 276:*24* 277:*5* 294:*20* 299:*20* 303:*8* 305:*1, 3, 6* 311:*17* 337:*12* 339:7
**one-sided** 229:*24* 260:*24*
**one-way** 259:*24*
**ongoing** 110:*6* 176:*14*
**onward** 102:*16*
**OOS** 275:*13, 15* 281:*1* 282:*2, 7*
**OOT** 268:*12, 14* 269:*23* 281:*1* 282:*3, 7*
**open** 112:*23* 137:*12* 154:*8, 10, 22* 308:*15* 314:*15, 19*
**opening** 19:*16*
**operation** 21:*13* 29:*13*
**opinion** 31:*14, 20*

**opportunity** 350:*9*
**opposed** 285:*17*
**ORDER** 1:*8* 78:*22* 91:*4* 128:*17* 129:*1* 131:*7* 157:*21* 244:*18* 302:*19* 317:*10*
**ordered** 258:*9*
**organization** 22:*4, 5* 33:*23* 39:*14, 20* 40:*1* 42:*10* 311:*10*
**original** 351:*15*
**out-of-specification** 280:*10*
**Outside** 29:*6* 37:*11* 41:*21* 56:*24* 58:*3* 142:*17* 145:*11* 149:*11* 151:*17* 251:*24* 252:*19* 276:*16, 20* 300:*8* 301:*14* 304:*19* 305:*24* 307:*12* 337:*9* 339:*3*
**overall** 195:*19* 200:*15*
**Overland** 2:*21*
**overseeing** 243:*17*
**oversees** 243:*6, 10*
**owner** 252:*24*
**owning** 220:*6*

**< P >**
**P.C** 2:*19* 4:*1*
**p.m** 1:*15* 11:*6* 16:*14, 19* 19:*23*

20:*4* 63:*22* 64:*3* 132:*8* 208:*2, 21* 209:*4* 282:*20, 24* 322:*13, 17* 349:*5, 10, 11*
**PA** 2:*3* 3:*10*
**PAGE** 5:*15* 6:*5* 7:*4* 8:*6* 9:*6* 10:*6, 9, 12, 15* 12:*10* 14:*8, 16* 20:*16, 17* 21:*14* 25:*12, 22* 26:*14, 16, 20* 27:*11, 13, 14* 33:*17, 21* 34:*13, 14, 18, 21* 35:*4, 5, 9* 41:*10, 11* 44:*3, 4, 7* 45:*14, 15, 20* 55:*10* 56:*2, 3, 5* 62:*14* 63:*9* 64:*15* 65:*8* 66:*3, 23* 68:*14* 72:*4* 77:*6* 86:*3, 21* 96:*10* 97:*8, 21* 100:*8* 103:*21* 104:*22* 111:*1* 112:*11, 12, 18* 114:*13, 14, 15* 120:*14, 23, 24* 121:*2, 4* 122:*6, 21* 137:*8, 18, 19* 138:*13* 140:*12, 13, 23* 141:*2* 147:*7* 162:*24* 163:*4, 8* 202:*6* 209:*24* 210:*15* 211:*16* 212:*4, 10* 254:*1, 4, 15, 16* 257:*23* 263:*18* 264:*4* 308:*13, 18*

324:*15* 352:*4* 354:*2*
**pages** 77:*3* 353:*6*

**PAPANTONIO** 2:*1, 4* 4:*15*
**paper** 326:*13* 327:*24* 334:*15*
**paragraph** 34:*22* 35:*11* 36:*22* 41:*11* 56:*7* 62:*17* 106:*20* 210:*14, 21* 211:*17* 217:*18*
**Paralegal** 4:*13*
**parameter** 315:*5*
**paraphrasing** 206:*14*
**Pardon** 22:*9* 191:*4* 234:*23* 240:*24* 261:*15*
**Park** 2:*21*
**Parkway** 4:*3*
**part** 30:*22, 23* 42:*3* 50:*15, 18* 53:*8* 57:*11* 62:*15* 132:*17* 134:*5* 139:*23* 140:*11, 15* 152:*23* 154:*8, 9, 10, 13, 23* 179:*4* 181:*3* 182:*14* 184:*3, 4, 10* 188:*17* 189:*4, 14, 18, 22* 190:*23* 191:*1, 14* 192:*11, 12, 21* 193:*2, 3* 194:*15* 195:*24* 199:*12* 205:*9* 215:*16* 248:*8, 10, 14* 258:*5* 294:*24* 299:*8* 302:*10* 310:*18*

314:*16, 19* 316:*15* 317:*15* 329:*14* 330:*1, 2* 332:*20* 335:*3* 336:*8* 347:*4, 19*
**participated** 37:*15*
**particular** 28:*14* 74:*7* 136:*23*
**parts** 69:*7, 15, 20, 24* 70:*2* 71:*9, 17, 22* 74:*8* 77:*13, 20* 78:*3* 79:*5, 12* 81:*15, 18, 20* 82:*1* 87:*23* 88:*15* 89:*5, 13* 99:*2, 6, 14, 18, 23* 100:*3, 9, 13* 154:*17, 21* 273:*4, 11* 274:*11* 277:*6* 281:*23* 318:*1* 336:*13*
**party** 167:*14, 20*
**pass** 23:*18* 134:*18*
**Patel** 17:*15* 202:*9*
**patient** 51:*19* 174:*4, 11* 215:*24*
**patients** 29:*19* 30:*14* 31:*2, 16* 246:*11, 20*
**pause** 16:*17* 20:*2* 123:*15* 322:*15*
**paused** 241:*21*
**pauses** 242:*8*
**pausing** 129:*13*
**pay** 259:*8*
**paying** 258:*17*
**PC** 21:*3*

Confidential Information Subject to Protective Order

peak 157:17,
24 158:16
160:6, 24
164:2, 9
peaks 157:4, 9
161:7 164:4,
22
penalties
257:16
258:13, 17
259:8 260:15
261:14, 17, 20
262:20
pending 44:14
PENDLEY
2:3 5:5
11:23 13:17,
22 14:1, 3
15:3, 5 16:11,
21 18:8, 18,
24 19:20
20:6 24:23
25:6, 9, 13
28:12 29:1,
10 30:4, 9, 17
31:12, 21, 24
33:5, 12, 16
37:21 38:14
39:11, 12
42:6, 19 43:4,
20 44:15, 16,
20 46:13
47:6 48:1
51:11 52:6,
23 54:2, 13
55:2, 7, 11
57:2, 10 58:5
59:10, 19, 23,
24 61:5, 10,
12 63:17
64:5, 10, 13
66:21 67:20
70:14, 23
75:5 76:1, 13,
20 77:1
79:24 80:6, 9,
14, 21 82:6,
10, 11, 17, 19
83:2, 7 84:7,
14, 16 86:1, 4,
19, 23 87:15

88:4 89:18,
23 90:14
91:19 92:14,
20 95:16, 23
96:6, 8, 17, 22
100:22 101:5
102:21 103:5,
12, 18 104:1,
7, 16 106:11
107:6, 10
109:5, 19
110:2, 13, 19
111:18
113:18
116:18 117:1,
24 119:6, 16
120:1, 6, 13
124:1 126:6
137:3 142:21
143:2, 7, 19
145:19
146:10, 16, 21,
24 147:1
148:20
149:13 150:3,
17 151:13, 19
152:8 153:12
154:3 160:10,
14 161:15, 24
162:1 163:21
164:16 166:8,
13, 18 167:16
168:21
169:12 171:4
172:5 173:19
175:2, 6
176:1, 5
177:19 182:4
185:2, 24
186:10
187:13 188:3,
18, 23 189:8
190:1, 6
193:16 195:9
196:11
197:21 198:8,
14, 18 199:20
200:12 201:2,
7, 11 203:18
207:21
208:17 209:7,

15, 20, 22
215:1, 20
217:1, 15
218:18
219:13 221:4
222:8, 14
223:4 224:7
228:24
230:12 231:7
232:10, 23
233:4, 24
236:10
237:12, 15
239:8 241:20
242:22 244:9
246:18 247:5
248:7 250:20,
24 252:2, 21
253:5, 9, 15,
23 256:16
259:1 261:12
262:6 263:5,
10, 13 264:23
266:15, 20
267:2 269:6,
19 270:4, 11,
20, 24 271:1,
9, 16, 21
272:16, 20
274:14, 17
277:21 278:8,
24 279:18
282:11, 17
307:19
312:20
340:17 343:10
Pennsylvania
4:4
Pensacola 2:5
people 16:10
46:9 61:22
115:4 144:12,
18 148:4
168:12
171:20
233:14 234:6,
9, 10 291:9
people's 41:19
percent 145:3,
9 146:5

Perfect 67:14
95:22 96:21
114:4 168:10
performed
174:16
period 21:1
permission
263:20
Perry 202:7
203:6 204:17
206:8
Perry's 206:23
person 38:9
135:5 147:21
186:14, 15
220:5 291:7
311:14
319:17 327:3
personal 29:9
142:20 301:17
personally
32:19
perspective
40:5
pertaining
152:2, 13
203:2
pertains 59:5
ph 1:21
Ph.D 1:14
5:5 11:17
24:16 309:17
310:6, 19
311:8 350:8
353:16
Pharma 3:20
4:6 25:23
26:10 60:3,
11 64:18
144:18
285:13
290:22, 24

Pharmaceutical
3:12, 19 24:8
30:13 31:14
46:9 51:7
175:16, 21
218:4 284:21
285:11 292:2,
9 293:2, 12

294:5, 6
306:11 323:1
Pharmaceutical
s 3:7, 19
20:18 21:22
22:8, 19, 23
24:6, 21 26:4
27:5 68:20
162:20 238:16
Pharmacopeia
160:18, 19
244:21, 22
pharmacovigila
nce 301:22
Philadelphia
3:10
physician
51:21
pick 137:6
300:14, 22
picks 154:17
242:8
piece 226:9
260:3
pieced 130:8
Piedmont 3:16
place 118:8
195:24
214:19
299:21 331:9
344:6, 9
plaintiff
126:11
Plaintiffs 2:8,
12, 17, 22
124:13
132:11 283:18
planning
18:16 127:19
plasma
292:10, 14, 15
please 11:15
19:10 75:23
80:14 83:5
97:8, 12
204:12
206:15
237:11
241:15
271:12

Confidential Information Subject to Protective Order

345:20  351:3,
8

point  23:22
26:24  31:8
44:12  45:7
46:4  62:8
66:14  75:13
106:18
111:19, 23
112:1  113:7
118:19  126:9
127:20
135:20
139:17
155:22
176:24
206:21
207:24  213:9
226:21
227:18
230:23
234:14
236:19
237:13
255:11, 15

policy  26:23
27:1, 4

poor  322:5

pop  283:6

portion
112:21  153:9
154:6  159:23
179:2  192:17
211:5  292:8
318:19

Portland  2:11

position  21:11,
24  127:22
193:10  340:10

possession
100:18

possibility
190:14

possible  41:15
82:6  110:7,
10  119:4
194:17
270:17
314:22
328:18  334:10

possibly  319:2

post  46:19
77:16  288:14

postapproval
303:8, 11

potency  36:6

potential
56:10, 21
264:14, 20
265:16  266:9
291:3, 14
304:12
305:17
313:22
314:10
317:21  326:6,
15, 21  331:10
334:3  335:20
339:17  340:1

potential-
Huahai  8:13

potentially
37:3  40:14
320:10

power  304:13
305:18

ppm  98:1

practice  56:8

practices
160:20  165:4

precaution
226:15

precisely
294:2

preference
22:13  239:14,
15  240:22
241:3

preferred
241:7

prejudice
129:8, 13
131:6

prejudiced
130:13

prejudices
128:14

premarked
80:11

prep  323:20
324:1

prepare  15:7,
11  17:6

prepared
14:12, 14, 18,
20, 24  38:18
60:23  128:15

prepped  130:9

presence  91:22

PRESENT
4:8  22:20
54:5, 16, 22
92:5  159:9

presented
47:11

president
22:1, 2, 4

Press  8:18

pressure  317:6

presumption
338:15

PRETI  2:8

prevent
235:16  250:7,
9

prevented
236:22
248:18  249:5

preventive
172:23  173:1

previous
125:6  132:14

previously
33:8, 13
59:16, 20
61:7, 10  64:7
76:15  80:3
96:1, 5
103:13, 15
110:14, 16
124:21  126:4
128:4, 6
131:19  133:5
143:4  146:22
161:17, 19
201:4, 8
271:17  308:7

price  145:3

pricing
145:15  151:11

primary  243:4

principally
165:3

principle
175:15, 21
238:13

Prinston  3:12

print  268:24
269:4, 7

printing  269:3

prior  47:2
114:9  295:23
296:17  297:8
299:2

Priti  17:16

priv  123:20

privilege
129:24  133:2
135:13

privileged
123:18  125:3
126:16, 21
127:23
132:24  133:7
134:10
135:16
136:15, 18

proactive
249:20

probable
62:21

probably
156:17  157:1
278:13

problem
16:11  53:4
104:11  119:3
345:16

procedure
135:18, 23
155:1

proceed  129:3
135:24  197:6
230:2

process  14:22,
23  21:3  67:7,
9, 12, 24  68:5,
9, 12  74:13,
14, 16, 18
94:18, 21, 23
95:2, 6, 7, 13
97:10, 14

101:10
108:22
115:17
121:10
122:18  138:2,
7  139:5, 8
156:8, 9
157:13
159:15
165:19
170:14
176:14
183:11
190:12, 19, 20
191:21  192:6,
8  194:4, 18
195:20
197:13
201:24  202:1,
2  205:14
211:12
212:13, 18
213:13
214:10, 22
216:11  220:6
224:15  227:6,
10, 16, 23, 24
228:4, 15, 22
231:12, 14, 17,
21  232:1
233:7  234:20
235:1, 12, 13
236:3  246:4
252:5  253:4
259:20  260:1,
22  287:4, 15
313:11  314:9
315:5, 24
316:5  317:9,
11  326:4
327:22
328:10  330:5,
17  331:3
333:10, 20
336:7  338:5
340:19  341:1,
3, 13, 17
342:3, 17, 19
343:3, 5, 7, 11,
15, 19  344:5,
7, 9, 14, 19, 23

345:6, 8, 23
347:2, 4, 5
**processes**
67:16
**processing**
7:16  144:23
**PROCTOR**
2:1
**procurement**
123:12
**produced**
26:7  44:5
102:6
**produces**
238:16
**product**  21:6
30:1, 2  32:3,
9  67:23
68:20, 24
71:14  78:8,
13, 16, 17
101:11
148:22
150:12, 16, 20
178:3, 16
183:14, 17
184:23
185:11
193:24  196:7,
9, 21, 24
198:5  199:10
202:3  214:12,
14  218:11
220:18
224:16
226:17
227:19  228:4
229:3, 16
230:23  232:5
233:13
245:19  246:1
247:21, 23
248:15, 19
250:1, 11, 17
251:4, 10, 14,
21  252:15
261:24  262:8
269:18
280:16
293:20, 22
299:7  303:18

305:22  312:2
313:20, 21
314:2  320:9
321:6, 10
323:17
336:23  337:1
338:20, 22
341:4, 8
343:22, 23
344:21
**Production**
10:8  170:12
171:7, 14
191:22  280:21
**PRODUCTS**
1:4  11:10
27:8, 17
65:13, 14, 20
66:13  75:20
76:6  218:5
337:5
**Professional**
1:17  308:13
309:6  350:13
**profile**  22:14
159:1  206:12,
17  316:22
345:11  346:2
347:8
**program**
152:21  153:7
170:17  176:14
**programs**
158:12
**progress**
108:9, 11
109:8, 9, 21
**proposed**
211:11  296:13
**propounded**
353:9

**PROTECTIVE**
1:8  168:13
171:21  172:1,
8
**prove**  240:19
241:10  254:9,
22  255:12, 17
257:3

**provide**  29:19
136:12  212:22
**provided**
207:4  210:5
212:18
249:22  260:4
261:10
**provides**  98:6
**providing**
341:21
**prudent**  57:16,
23  58:18
**Public**  1:18
350:14  353:23
**publication**
81:22  310:16
**publish**
288:24  310:22
**published**
24:13, 18, 19
33:22  42:22,
23  43:9  47:1,
14  55:19
78:7  88:12
93:17  118:11
240:15  288:3,
9, 14, 16
310:18
**pull**  13:18
25:9, 17
62:13  76:13
79:16  80:2,
18  120:16
193:8  266:15
270:4  308:5
323:5
**pulled**  45:18
143:13  201:13
**purchase**
337:1, 4
338:19, 22
**purchased**
336:23
**purely**  216:11
252:9  319:17
**purpose**
265:22
280:12
290:21  297:20
**purposes**

272:11  290:18
**pursuant**  1:14
**put**  13:2
18:13  19:6
71:13  83:3
84:8  86:20,
21  129:1
226:16  228:4
229:3, 15
236:24  250:1
251:20
252:14  259:9
261:21, 23
262:8  263:1
265:6  338:21
343:21
**putting**  18:16
19:7  107:16
231:17  232:5
235:8  246:22
247:17

**< Q >**
**QC**  268:6, 7
275:8
**qualification**
152:21  153:7,
10  176:13
**qualifications**
308:14  309:6,
7
**qualified**
180:1, 2
181:16, 18
182:3  184:1
**Qualitatively**
36:23  40:10
**Quality**  9:8
14:16, 17
23:7  26:20,
23  27:1, 3, 7,
8, 17, 22  28:3,
10, 13, 20
29:17  30:22
48:24  90:21
119:8  123:8
152:1, 10, 14
153:8, 9
169:19
170:20  171:6
176:11  177:1

180:20  181:6,
10  186:17
191:12  201:1
221:6  243:21,
24  268:7, 9
275:8  291:7
300:12  305:5,
16, 21  311:6
314:7  320:20
322:6  324:10
**quantifiable**
92:23  93:1
**quantification**
219:5, 11
**quantified**
40:19, 22
92:11  218:12,
22  289:5
**quantify**  290:6
**quarantined**
263:21
**quenching**
333:15
**queries**
155:16
156:15  165:22
**query**  204:8,
16
**question**
12:19  13:14
15:23  28:24
30:20  32:6
43:7  44:14
49:9  52:8
53:2  54:18
68:4  87:21
89:1  94:5
95:4  101:23
107:17  108:3
113:21  117:4,
10  124:24
128:2  133:1
136:6  142:4
155:12  171:2
177:21  182:9
189:2, 10
195:2, 12
196:12  197:8
198:17, 19
202:8  205:19
206:8, 19, 23

Confidential Information Subject to Protective Order

221:3  222:17
224:8  225:23
226:6  232:4
234:12
237:14
246:17  247:3
248:2  249:4
250:6, 22
251:8, 17, 19
255:14
287:22  293:8,
11  294:3
295:11
296:11, 17
297:8  298:15,
24  299:1
302:5  303:24
304:6, 8
312:8, 12
316:24  318:1,
20  320:19, 22
327:18
337:22  338:9
339:14
341:12  343:3
347:2, 16
**questioners**
282:13
**questioning**
127:11  137:1
283:24
**Questions**
10:14  12:12
74:11  111:4
128:19  129:5
130:15
241:19
242:14, 21
284:1  324:6
353:8
**quick**  61:4
80:19  120:2
198:17  208:3
282:12
**quickly**  131:20
**quite**  15:22
117:7  136:8
284:18  285:9
318:9

**< R >**

**RAFFERTY**
2:1
**raining**  276:16
**rains**  276:20
300:8
**raised**  127:20
**raising**  265:4
**ranitidine**
291:14
**rationale**
205:12
**Ray**  4:11
**RBK/JS**  1:5
**react**  326:23
333:5
**reaction**
333:18
**reactions**
311:18, 19
331:8, 10
**read**  37:6
38:6  39:5
56:20  57:22
107:13  117:9
160:2  168:15
176:7  191:2,
5  210:19
255:9  327:14
350:9  351:3
353:5
**reading**  35:17
116:19  168:3
**ready**  39:9
60:7  106:17
108:23
120:21  251:20
**reagent**  315:22
**reagents**  339:9
**real**  61:4
80:19  198:17
199:7  222:1
289:14
**realize**  90:7
286:24  338:8
**really**  12:17
15:12  36:1
47:8  71:1, 16
75:2  76:7
78:10  90:16,
19  94:12
102:4, 7

108:20  120:2
128:24
151:21  157:1
166:1  169:15,
17  170:9, 18
177:22
180:14
195:11, 18
200:15  205:6
216:21  241:5
247:2, 4
251:16
258:23
265:18
273:21
281:10
284:18
286:23  291:8,
9  307:14
310:3  312:7
314:23
320:18, 20
339:5  343:3
**Realtime**  1:17
350:14
**reason**  170:3
248:21, 24
249:1  280:12,
19  281:2, 16
351:5  352:6,
8, 10, 12, 14, 16,
18, 20, 22, 24
**reasonably**
63:11
**reasons**  135:14
**rec**  79:1
**recall**  7:11
8:8  43:17
47:2, 17  63:3
90:21  91:1, 5,
18, 21  92:1, 4,
24  93:2
103:2, 7
139:24  140:1,
20  141:16
302:10
343:23  344:21
**recalled**  43:1,
13  84:20
92:12, 17
93:18, 24

141:8, 24
142:7, 9
234:4, 5
**recalling**  77:16
**Recalls**  8:19
**receipt**  269:22
351:17
**receive**
172:14
200:17  246:6
314:15
**received**
111:6  182:12
217:19
268:11
275:12
278:11  279:23
**receiving**
182:11  341:2
346:9
**Receptor**  8:19
**recollect**
15:13  117:6
**recollection**
133:11, 22
**record**  11:3,
13  13:2
16:12, 16, 20
19:21  20:1, 5
25:8, 19  33:7
39:23  59:19
62:12  63:24
64:4, 11
66:12  82:9
104:2  124:2,
6, 10, 12, 20
129:22, 23
130:3, 5
131:14  132:5,
9  208:16, 22
209:6  242:16
269:7, 11, 15
282:21  283:1
300:5  322:11,
14, 18  349:7
350:6
**recycled**
319:24
**reduced**  41:15

**reduction**
145:3, 21, 24
146:2
**REESE**  2:14
**re-evaluated**
217:14
**refer**  204:12
278:10
**reference**
23:24  24:12
101:9  203:17
**referenced**
169:19, 21
170:13
**referencing**
27:12  149:8
168:17
203:10  264:8
**referred**  343:6
**referring**  35:4
72:11  97:18
111:17
119:15  122:2
125:2  134:23
140:9, 14
142:24  179:3
206:20
210:11, 13, 19
211:9, 14
254:12
257:18  262:5
267:10  313:3,
5  329:8
**refers**  134:12,
20
**refresh**
133:22
143:17  253:20
**regarding**
7:22  129:6
150:11
155:14  193:20
**Regardless**
129:20  136:22
**regards**  129:7
**Registered**
1:16  350:13
**regularly**
105:15, 16
285:8

Confidential Information Subject to Protective Order

**regulated**
185:*23*
**regulation**
28:*14*
**regulator**
229:*8, 11*
260:*5*
**regulatory**
56:*8*  105:*10,
11*  155:*8, 13,
16, 19*  160:*20*
**relate**  134:*5*
**related**  17:*23*
36:*12*  151:*9*
155:*1*  170:*2*
238:*2*  240:*16*
275:*21, 23*
276:*8*
**relates**  79:*18*
**relating**
215:*15, 16*
**relatively**
35:*1, 14*  37:*3*
40:*14*
**release**  260:*1*
263:*20*
**released**
268:*21*
269:*24*  276:*13*
**releasing**
234:*17*
**relevant**  48:*7*
**rely**  184:*7, 11,
14*  200:*8*
240:*22*  241:*3*
**relying**  182:*6*
183:*18*
184:*17*
200:*23*  206:*3*
207:*16*  238:*20*
**remain**  206:*10*
**remaining**
128:*9*  129:*15*
**remember**
17:*13*  32:*21*
43:*9*  53:*6*
59:*8, 13*
75:*12*  76:*4, 8*
77:*14, 21*
79:*21*  83:*21*
106:*15*

133:*16, 18*
137:*9*  142:*5*
182:*8, 10*
186:*20*
213:*17, 19*
236:*16*  247:*9*
259:*2, 4, 6*
261:*13, 16*
262:*7, 10*
307:*20*
310:*19*
312:*22*
340:*20, 21*
**remembering**
75:*18*
**remote**  1:*14*
**RENEE**  3:*3*
**rep**  23:*14*
**repeat**  12:*4*
32:*5*  49:*8*
54:*18*  76:*19*
95:*3*  98:*16*
152:*6*  154:*19*
182:*9*  202:*16*
246:*4*  255:*13*
262:*18*  295:*10*
**rephrase**
234:*1*
**reply**  172:*13*
186:*11*
**report**  6:*10,
19*  37:*15*
46:*22*  163:*24*
167:*24*  168:*5*
169:*10*
170:*10*
176:*15*
178:*22*  179:*7,
22*  181:*15*
215:*14*
243:*20*  282:*6*
321:*21*
322:*23*  323:*8*
**reported**  161:*2*
**Reporter**  1:*17,
18*  11:*14*
12:*14*  96:*4*
224:*2*  297:*22*
350:*13, 14, 22*
**reporting**
243:*23*

**reports**  177:*8*
182:*2*  244:*7*
265:*7*
**represent**
125:*12*  283:*18*
**representation**
131:*18*  136:*17*
**representative**
72:*5*  256:*20*
257:*1*
**Representing**
2:*8, 12, 17, 22*
3:*6, 11, 18*
4:*5*  124:*12*
**reproduction**
350:*20*
**request**  7:*22*
10:*8*  124:*16,
23*  127:*13*
130:*4*  131:*3*
136:*24*
**requested**
101:*21*
102:*19*
228:*17*  350:*6*
**required**
46:*21*  180:*4*
297:*4*  298:*21*
**requirement**
28:*7, 8, 15, 17*
214:*24*
239:*16*  241:*2*
294:*19*  301:*8*
**requirements**
27:*9, 18, 19*
65:*16*  180:*4*
304:*10*
**requires**  24:*8*
109:*17, 21*
**requiring**  19:*2*
**research**
24:*17*  290:*8*
**residual**  159:*7,
23*  268:*17, 20*
275:*18, 20, 24*
276:*4, 8*
315:*22*  338:*14*
**resign**  22:*8, 10*
**resigned**  22:*5*
**resources**

237:*3*
**respect**  344:*2*
**respective**
28:*5*
**respond**  12:*20*
165:*22*
**responded**
312:*20*
**responding**
127:*19*
156:*14, 15*
**responds**
139:*22*
140:*24*  202:*9*
**response**
108:*5*  140:*11,
17*  303:*24*
**responses**
12:*24*  241:*18*
**responsibilities**
21:*10*
**responsibility**
243:*4*
**responsible**
105:*10*  243:*14*
**rest**  128:*21*
266:*3*  328:*10*
**restart**  132:*2*
**restate**  300:*23*
**restricted**
154:*9*  192:*12*
317:*14, 15, 23*
335:*2*
**result**  37:*1*
40:*12*  97:*9*
214:*12*
268:*21*
272:*23*
273:*13, 14, 15*
280:*20*  281:*7*
292:*6*
**results**  69:*6*
74:*6*  87:*8*
97:*13*  113:*9*
185:*6*  280:*10*
**resume**  5:*16*
309:*1*  348:*23*
**resumé**  308:*6,
12, 13*
**retained**
269:*22*

**retract**  132:*12,
16*
**return**  351:*15*
**review**  15:*10*
46:*10*  47:*22*
154:*5*  163:*2*
342:*22*
**reviewed**
39:*14, 19, 24*
46:*2, 4*  47:*21*
48:*20, 21*
59:*4*  154:*11*
163:*11*
290:*13*  313:*9*
314:*17*
**reviewing**
117:*14*  156:*4*
344:*17*
**revised**  28:*4*
**rid**  317:*11*
**right**  13:*6, 16*
18:*2*  19:*8, 14*
20:*11*  21:*22*
22:*2, 7, 20, 24*
23:*3, 4, 18, 20*
25:*11*  26:*7,
11, 19*  27:*16,
20*  31:*22*
32:*4, 10, 17*
33:*20*  34:*4,
11*  35:*10*
36:*21*  38:*8, 9*
41:*19*  42:*8*
43:*13, 21*
46:*4, 18*
47:*15, 18*
49:*2*  54:*7, 14,
17, 23*  55:*18,
24*  56:*18*
58:*1, 21*  60:*4,
12, 19, 21*
61:*13, 22, 24*
62:*8*  63:*5, 14*
64:*17*  66:*7,
17*  67:*24*
68:*17, 24*
69:*4, 16, 20*
70:*1, 5*  71:*10,
14, 18, 22*
72:*3, 8, 21*
73:*1, 5*  74:*4,*

Confidential Information Subject to Protective Order

8, 13, 16, 20
76:10  77:20
78:4  79:6, 13
81:16  82:1,
22  83:10
84:2, 19, 24
85:13, 19
86:9, 11, 15
87:1, 12, 16
88:1, 5, 12, 16
89:2, 6, 14, 24
90:1  91:7, 23
92:15, 17
93:11, 24
94:4, 18, 21
95:2  96:17
97:7, 19  98:5,
10  99:3, 12,
15  100:10, 14,
18  103:2
106:4, 8, 23
107:7, 24
108:4, 5, 9, 23
109:10
110:11, 24
111:12, 20
113:4, 10, 15,
19  114:6, 11
115:4, 11, 17,
21  116:8, 21
117:16
118:17, 19
120:23
121:15, 17, 22
122:7, 11, 15
123:1  137:10,
17  138:3, 7,
22  139:1, 5,
10, 13, 22
141:9, 13, 18,
21  142:2, 15
143:10  144:9,
11, 19  145:4,
9, 22  146:13
148:3, 8, 11,
14, 24  149:4,
24  150:8, 20
153:3, 16, 19,
23  154:15
156:21, 22
157:4  161:9

162:10, 21, 23
163:3, 17
164:9  168:1,
22  169:5, 13,
14  170:11
171:8, 15
172:2, 11
173:4  174:13
175:3, 7, 12,
22  176:2, 10
177:9, 10, 16,
20  178:18
179:1, 9, 19,
20  180:19, 20,
22, 24  181:2,
7, 12, 17, 19
182:16, 18
183:3, 6, 13,
20  184:19, 23
185:3, 16
186:1, 4, 11,
12  188:5, 10,
20, 24  189:5,
14  190:2, 7
193:20, 24
195:15  201:2,
21  202:3, 23
203:10, 22
204:21  205:4,
20, 23  206:5
207:9, 11, 15,
18  210:1
211:3  212:7,
15, 20  213:2,
4, 11, 16, 18, 22
214:5  215:7,
21  216:5
217:5, 9, 23
218:6, 9, 19,
22  219:24
220:11, 15, 16,
21  221:9
222:15  223:5
224:22  225:3,
12  227:1, 7, 9,
11, 16  228:5
229:4, 16
230:8, 15, 24
231:15  232:6
233:1, 15
234:3, 21

235:1, 4, 15
239:12, 15, 16
240:23  241:8
243:6  245:9,
21, 24  246:13,
22  247:12, 13,
16  248:12
249:20, 24
250:2  251:6,
11, 15  253:5
254:3, 21, 24
255:7, 12, 18
256:20, 22
257:4, 21
258:1, 10, 19
259:9, 13, 14
260:15  262:1
263:4, 17, 22,
24  264:9, 20
265:13, 16
266:7, 9
267:12, 13
268:10, 14
273:5, 12
274:12  275:9,
16, 19  276:14,
21  277:9, 10,
14  278:1, 3
279:7, 14
280:14, 18
281:12, 14, 18,
23  284:8, 12
309:15  310:5
311:5, 8, 22
314:5, 11
323:8  324:16
325:6  326:16
328:2, 20
329:10
330:17
333:12
334:15, 18, 19
335:13, 21
336:9, 24
337:3, 4
338:2, 7, 19,
24  339:1
341:4  343:12,
16  344:19
347:22  348:5

right-hand
25:24  26:15
34:21  60:2, 10
rise  127:3
risk  57:18
58:1, 20
62:23  63:5, 9
184:5
risks  38:20,
24  39:9
Rivera  126:7
Road  3:16
ROBERT  1:6
role  23:6
147:23
Roman  34:17
room  25:17
ROS  227:22
228:13
235:13
250:19  313:8
roughly  87:11,
24
Route  6:14
206:9  236:2,
7  265:19
row  69:23
73:15  74:1
85:24  86:2,
11, 17  237:10
242:2  267:6
271:3, 7, 10
272:1, 18
273:23
274:24  275:3
276:23
279:20  281:20
rows  271:3
RS  268:13, 16
269:23
275:13, 18
276:7  279:24
281:14
RUGGIERI
4:3
rule  160:18
235:17  239:4,
10  250:8
rules  12:9
run  245:11

< S >
safe  28:20
29:3, 19  30:6
63:12
Safety  29:12,
14, 16  30:1
215:24
303:16
304:11  305:2,
5, 7, 11
sake  85:8
sales  145:6
Samir  114:20
138:18  139:8
140:24  141:6
Samir/corporat
e/Torrent
114:16
Sample
268:11
269:22
275:12
278:10  279:23
sanctions
129:7
Sanjay  147:8
148:3  150:9
SARA  2:4
satisfied
172:12
save  237:14
saved  45:6
saw  12:13
217:2  344:20
saying  28:15
36:16  39:18
42:14  51:3
73:10  77:8
91:20  92:6
102:10
115:19  123:7
152:10
156:19  158:1
161:8  170:8
171:20  173:3
178:2  182:24
183:9  196:6
197:7, 22
198:3  203:6
210:5  211:1

Confidential Information Subject to Protective Order

220:8  221:18
222:24
223:16, 17
238:15  257:2
260:20
261:19
273:19
312:22  336:5
338:7, 10
344:13
**says**  20:17
26:20  27:3
34:22  35:11
36:23  37:7,
23, 24  40:10
41:13, 18
44:4  55:13,
18  56:7  57:5
58:17  60:15
62:16, 18
63:9, 10
65:12  66:3,
23  67:1, 7, 11
68:11, 15, 19
72:5, 7, 16, 17,
24  73:4  81:4,
9, 24  97:8, 24
108:8  109:8
111:1, 5, 22
112:5, 18
113:7  115:10
118:2  121:8
134:11
137:20
138:18
139:23
140:17
144:23  145:1,
2, 7  146:3
148:9  149:7
162:24  163:9,
10  167:23
168:5, 11
169:1  174:10,
15  175:7
178:23  179:5,
8  180:10
181:11
183:13
185:14  200:6
202:14  203:5

204:1  205:3,
19  212:12
215:23
217:19  230:6
235:17
239:10  254:8,
21  257:11
258:5  263:19
264:6, 9
265:14  266:1,
7  267:8
268:11
272:23  273:9,
17  275:7
276:7  321:20
323:20
332:12, 17
333:4, 14
344:18
**scale**  21:5
**scenario**
299:13
**scheme**  315:4
316:23  327:2,
14  328:3, 14
329:23  334:8,
21  335:1
336:2  337:14,
16  338:16
**science**
196:20  198:6
259:22
260:12, 23
292:9, 10
309:8  311:7,
10
**scientific**  48:9
197:11
285:22  289:3
291:24  295:5,
15  296:2, 20
297:11  299:4
307:8  310:20
339:23
**scientifically**
48:8, 14  236:1
**scientist**  334:9
340:5
**scoot**  144:22
**scope**  29:6
30:3, 20

37:12  41:22
57:1  58:4
142:18
145:12
149:12
151:18  252:1,
20  301:15
304:19
305:24
307:13  337:9
339:4
**screen**  25:16
96:16  123:23
193:8, 11
211:20  309:1
324:3  340:12
**scroll**  73:16
147:6
**second**  19:21
26:24  38:15
50:18  68:10
76:24  84:17
85:6, 12
97:20  98:6
104:2  107:21
111:24
119:24
120:16  124:1,
3  145:2, 8
146:4  148:8
166:24
178:15  206:7,
21  209:9
217:18  226:3
253:11  257:6
276:22
**secondary**
160:24
**secret**  338:1
**secretary**
135:8  186:16
**secretive**  172:1
**section**  111:16
112:10, 16, 18
331:16
**see**  14:10, 16
16:8  19:11
20:8, 20
21:17  23:22
24:2  25:15,
18, 21, 23

26:1, 3  27:10
28:6  33:17,
20, 24  34:2
35:3  36:5
37:5  41:10,
16  44:22
45:8, 10  46:9
48:3  49:23
52:11  55:12,
15, 20  56:14
57:3, 4, 8, 11,
19  58:16
60:1, 11, 14
61:15, 24
62:3, 24
64:14, 17, 19,
21  65:1, 11,
17  66:3  67:4,
11  68:8  69:3,
7, 22, 24
72:10, 15
73:20  74:1
77:7  78:19,
24  79:4, 10,
17  80:22, 24
81:2, 4, 7, 13
82:20  83:8
84:17  86:7
87:3, 6, 7, 17,
20, 22  95:11
96:11, 13, 23
97:4, 5, 16
98:3, 4, 8, 9,
13, 15, 21
99:2, 11
100:8, 23
103:24
104:24
105:20  106:1,
19  107:22
108:5  111:1,
8  112:8, 14
113:2  114:18
115:7, 20
120:10
121:12  122:7,
19  125:9, 22
137:21  140:3,
16, 21  141:1
144:4, 6, 11,
22  145:21

147:4, 7
148:3, 6
154:13, 18, 21
155:10
156:18  159:8
161:6  162:6,
8, 19  163:8, 9,
13  164:5, 6
165:18
166:21, 22, 23
167:3, 23
168:2, 4, 14
171:23, 24
172:7  173:12
174:20  176:7
178:5  180:11,
18  183:21
186:1, 12
193:13
198:23
201:13  202:8,
11  204:6, 9,
19  205:1
206:2, 18, 24
207:6  209:24
210:10, 17
211:4, 6
212:1, 2
217:17
229:24
233:18, 19, 23
242:6, 17
248:13
250:13  252:4,
6  253:6
254:1, 11
255:1  258:5
259:10
260:13
263:15
264:15
267:15  268:5,
19, 23  271:7
272:1, 3, 7, 9,
12, 21  273:1,
8  275:3, 7, 12
276:24  277:3,
12  279:9, 22
280:1  281:12,
20, 21  283:5,
9  287:17

288:*20*
290:*17*
294:*17*  305:*1*
308:*18*  309:*9*
310:*9*  311:*4,*
*21*  314:*8*
321:*20, 22*
322:*24*  323:*7,*
*9, 12, 19, 20, 22,*
*23*  324:*1*
325:*2, 8, 11*
328:*9*  329:*7,*
*10, 18*  330:*13*
331:*8*  332:*2,*
*5, 10, 15, 20*
333:*6, 10, 20*
334:*3*  335:*7,*
*13, 15, 20*
336:*8, 12, 13,*
*14, 17, 18, 21,*
*24*  338:*6, 18,*
*20*  339:*7*
343:*24*
345:*11*  346:*1*
347:*8*
**seeing**  126:*22*
279:*12*
346:*21*
347:*18, 20*
**seek**  131:*8*
**seeking**  129:*7*
290:*8*
**seen**  14:*4*
34:*8*  44:*11*
46:*11*  47:*11,*
*14*  49:*1, 5*
58:*24*  59:*2*
60:*22*  61:*1*
64:*23*  65:*6*
140:*22*
162:*13, 17*
166:*5*  171:*17*
173:*20*  174:*2,*
*5*  179:*20*
180:*15, 17*
181:*10*
182:*22*  203:*8*
204:*4*  215:*13*
216:*17, 18, 20*
217:*10*
247:*10*  288:*2,*

*18*  289:*23*
290:*1, 8, 11*
291:*22*
292:*24*  327:*3*
330:*3, 9*
340:*2*  344:*6*
**selected**
157:*12*
**selecting**
180:*24*
**selection**  153:*2*
**sell**  251:*15*
**selling**  94:*3, 6,*
*8*  220:*11, 16,*
*17*
**sells**  29:*3*
238:*17*
**send**  123:*20*
172:*14, 18*
210:*3*  342:*1*
**sending**
165:*20*
**sends**  105:*21*
106:*20*  115:*2,*
*6*  258:*1*
**sense**  13:*4*
28:*9*  40:*5*
101:*19*
109:*15*  160:*1*
180:*3*  190:*11*
199:*8*  224:*13*
**sent**  45:*6*
61:*16, 21*
62:*8*  97:*3*
138:*22*  139:*3*
143:*16*
144:*12*  150:*7*
**sentence**  37:*7*
40:*8*  41:*13*
97:*19*  121:*5,*
*6*  210:*16*
211:*10, 13*
**Sentry**  4:*3*
**separate**
29:*17*  69:*4*
**separately**
156:*13*
**September**
167:*2, 6*
178:*16*  213:*23*

**series**  237:*24*
267:*8*
**seriously**  51:*8*
218:*5*
**SERVICES**
1:*21*
**session**  17:*3*
**sessions**  16:*2*
17:*1*
**set**  128:*21*
130:*18*
160:*18*
185:*22*
197:*18*
254:*14*
260:*13*  294:*19*
**setup**  77:*10*
**SG**  148:*9*
**Shah**  17:*16*
139:*21*
**shake**  13:*3*
**share**  45:*9*
238:*1*  338:*16*
**shared**  165:*24*
336:*20*
**sharing**  229:*18*
**sheet**  351:*7, 9,*
*12, 15*  353:*12*
**shelf**  75:*11,*
*14, 19, 21*
76:*4, 8*  101:*14*
**she'll**  13:*11*
**shift**  142:*11*
266:*13*
**shook**  224:*4, 5*
**Short**  64:*1*
124:*7*  132:*6*
269:*12*  282:*22*
**Shorthand**
1:*17*  350:*13*
**show**  79:*23*
85:*7*  88:*14*
107:*20*
119:*23*  143:*1*
150:*23*  164:*1*
198:*21*  289:*4*
324:*17*
**showed**  158:*1*
**showing**
326:*2*  333:*20*

346:*19*  348:*11*
**shown**  332:*13*
**shows**  157:*3*
322:*22*
323:*21*  329:*1*
330:*4*  333:*18*
339:*23*
**side**  34:*22*
41:*12*  61:*23*
81:*10*  325:*3*
**sign**  22:*16*
350:*9*  351:*8*
**significant**
95:*7*  340:*24*
345:*4*  346:*15,*
*21*
**signing**  351:*10*
**similar**  36:*24*
40:*11*  212:*19*
345:*11*  346:*2*
347:*8, 20*
**similarly**
126:*21*
**simple**  157:*1*
195:*3*
**simpler**  101:*24*
**simplify**  229:*1*
320:*23*
**simply**  128:*18*
302:*1*  316:*15*
**single**  89:*4, 8*
257:*15*  258:*9*
**sir**  121:*1*
138:*15*  141:*3*
146:*24*
340:*13*  349:*3*
**sit**  345:*2*
**Site**  5:*20*  26:*4*
**situated**  25:*11*
272:*17*
**situation**
225:*21*
229:*10*
259:*11*
299:*23*
300:*18*  302:*9,*
*15*  303:*11*
**six**  16:*4, 5, 24*
17:*2*  98:*13*
**sixth**  72:*17*
**skip**  85:*22*

**small**  21:*5*
272:*14*
**Sodium**
325:*16*
326:*19*  328:*8*
331:*7*  333:*11,*
*15*  336:*15, 20*
337:*20*  338:*4,*
*9*
**Solco**  3:*13*
**sold**  233:*21*
341:*6*  343:*11*
**solely**  91:*21*
289:*18*
**solo**  66:*14*
**solvent**  159:*7,*
*18, 19*  204:*8,*
*13*  205:*13*
268:*17*
275:*19, 21, 24*
276:*9*
**solvents**  155:*4*
159:*9, 11*
199:*19*  204:*3,*
*19*  205:*15*
268:*20*  276:*4*
315:*22*  317:*5*
319:*24*  338:*14*
**somebody**
44:*11*  45:*5*
46:*1, 11*
207:*17*  236:*5*
244:*8*  327:*20*
328:*3, 16*
**soon**  92:*4, 10,*
*24*  282:*13*
**sooner**  139:*13*
**Sorry**  18:*10*
34:*6*  66:*11*
81:*3*  82:*16*
84:*11*  104:*15*
123:*13*  140:*7*
143:*23*  168:*7*
193:*5*  198:*11*
199:*23*  224:*4*
237:*9*  251:*18*
276:*15, 19*
278:*9*  279:*2*
282:*15*
302:*14*
312:*10*  320:*1*

322:2  340:9
342:11, 13
**sorted**  217:10
**sound**  225:12
**Sounds**  17:4
230:7
**source**  145:2,
8  146:4
**South**  2:5, 15
3:9
**space**  351:6
**spapantonio@l
evinlaw.com**
2:7
**speak**  290:13,
14  319:21
**speaking**
265:17
288:21  289:1,
18  304:16
**spec**  279:14
280:7, 20
**special**  315:23
**species**  34:24
35:13
**specific**  78:5
267:6  306:12,
13
**specifically**
32:16  162:20
187:14
**specification**
154:24  161:3,
11  178:3, 5, 6,
8, 12, 13
179:16  180:5
183:15, 18, 24
184:1  185:20,
21, 22  187:8,
9, 10  188:1, 7,
17  189:4, 14,
19, 23  190:24
191:1, 15
192:21  193:3
194:22
197:13, 19, 20
199:13  200:7,
18, 19, 20, 22
205:8  219:21
248:11, 14, 16
275:16

280:13  299:9,
24  300:1, 19
306:6  321:9
346:12  348:8,
10, 11
**specifications**
185:12, 14, 15,
16  186:3
297:17  304:4
**spectometry**
284:7, 11
289:17, 19, 22
290:4, 5
292:23
**spectroscopy**
289:12
**spectrum**
345:13  346:3
347:10, 21
**spend**  15:20
16:1  56:1
**spreadsheet**
6:17  8:21
272:8, 10
273:9  279:10
**STACY**  2:19
**stacy@georgeb
artonlaw.com**
2:22
**Stage**  159:18,
19  192:5, 6
205:16
**stamp**  45:3
**stand**  172:20
325:20  330:22
**Standard**
1:16  11:6
23:24  24:9
127:3  154:24
349:10, 11

**standardization**
24:9
**standards**
24:10  27:7
193:19
**stands**  75:3
284:6, 10
325:14, 21
330:20

**start**  44:8
73:23  78:23
94:8  98:19
103:21
110:24
166:24
168:11  202:6
209:23  210:4
223:8  233:14
251:11  254:4
257:16
258:13, 17
278:15
**started**  15:15
94:2  101:13,
16  143:9
144:9  150:23
162:10
201:21
212:13
239:19
288:23  300:9
**starting**
311:24
313:20
315:18  317:4
**starts**  27:1
56:4  105:1
112:1  140:12
**state**  351:5
**stated**  302:7
**statement**
58:11  97:18
132:12  182:6,
12  183:19
213:8  241:6
249:14  257:6
294:16
**statements**
255:4, 20
**STATES**  1:1
134:10
**stating**  134:8
**status**  177:5,
6  181:14
**stenographic**
11:13  25:8
82:9  300:5
**Stipulations**
10:11

**stocks**  97:24
98:22
**stop**  131:11
241:15
**stopped**  78:15
**storm**  278:14,
16  342:13
**strategies**
194:19
**strategy**
195:24
**Street**  2:5, 15
3:9
**Strike**  320:1
**string**  44:7
**strong**  300:7
**studies**  24:14,
20  34:23
35:12  37:16,
17  38:10
41:6  42:17
48:5  58:8, 14
62:20  285:22
286:3  287:1,
5, 12, 13
289:4  290:14
291:24  292:1,
16  317:9
**study**  24:14
39:1, 5  41:4
42:4, 15
**stuff**  202:1
214:4  258:18
**SUBJECT**
1:8  6:6, 10,
13  7:10, 16,
18, 21  8:7, 12,
15  9:10
61:23  148:4
167:24  168:5
169:1  202:19
265:19  351:10
**submission**
153:22  293:21
**submit**  238:5
301:5
**submitted**
26:10  66:4
153:15  184:6,
8  203:2
294:23  342:24

**submitting**
302:18
**Subscribed**
353:19
**substance**
53:14  157:14
160:3  192:10
220:19
223:20
224:16  225:1
275:22, 24
276:8  353:11
**Sue**  202:7
203:5  204:17
206:8, 22
**sufficient**
217:4  219:8
255:5, 21, 23
**suggest**
126:12, 17
**suggestion**
127:24  128:23
**Suite**  2:5, 20
3:16  4:3
**suits**  133:10
**summarized**
72:6
**summary**  77:4
**supervision**
152:22  350:22
**supplement**
295:1  301:6,
7  303:7, 9
306:9  307:2
342:23
**supplements**
297:4  298:22
**supplied**
65:15  67:2
68:12  97:14
102:17  179:16
**supplier**  33:1,
2  142:14
148:14, 18, 24
149:19, 20
150:19  151:4
152:3, 14, 19
153:2  169:9
170:16
171:11, 13, 18
173:7  177:2

Confidential Information Subject to Protective Order

178:*19*  180:*1*
181:*15*  200:*5*
203:*21*  346:*10*
**suppliers**
170:*16, 21*
**supplies**
226:*15*
**supply**  27:*7*
148:*1*  152:*16*
259:*8*  261:*17,*
*20*  262:*20*
**SUPPORT**
10:*2*
**supported**
301:*2*
**supporting**
291:*10*
**suppose**  77:*15*
159:*17*  310:*24*
**supposed**  52:*9*
190:*18*
192:*20*  193:*1*
196:*24*  197:*6*
199:*24*  219:*9,*
*20*  220:*12*
221:*24*  229:*8*
238:*1, 5, 9, 13*
240:*7*  241:*9*
265:*8*  316:*1, 2*
**sure**  12:*10, 22,*
*23*  36:*1*
53:*20*  61:*1*
74:*24*  78:*6*
90:*16, 19*
93:*13*  94:*10*
104:*14*
108:*13*
118:*22*  119:*1,*
*20*  132:*15*
137:*7*  147:*24*
148:*17*
151:*21*
167:*13*
168:*23*  169:*8*
170:*9, 18*
172:*10*
185:*19*  186:*7*
195:*4*  207:*14*
225:*13*  230:*4*
233:*21*  257:*7*
258:*7, 23*

261:*18*  276:*7*
284:*18, 24*
285:*9, 16*
286:*11, 23*
292:*17*
295:*20*
307:*15*
318:*10*
326:*11*
327:*12*
335:*24*
337:*12*  339:*6*
**SUSHIL**  1:*14*
5:*5, 16, 18*
11:*9, 17*  19:*5,*
*9, 11*  46:*7*
59:*12*  75:*22*
104:*11*  120:*9*
189:*17*
191:*19*
196:*17*  208:*2,*
*4*  257:*12*
258:*5*  277:*17*
278:*14*
287:*21*  298:*5*
350:*8*  353:*16*
**swear**  11:*15*
**switch**  18:*3*
199:*21*  282:*13*
**switched**
94:*20*  185:*10*
**sworn**  11:*18*
350:*5*  353:*19*
**Synthesis**
6:*14*  206:*10*
236:*3, 8*
245:*7*  265:*20*
311:*12, 16*
317:*21*  319:*5,*
*8*
**synthesize**
244:*24*  311:*19*
**synthesized**
313:*8*  315:*6*
316:*3*
**synthesizing**
314:*2*
**synthetic**
307:*18, 21, 23*
308:*1, 3*
311:*20, 23*

312:*16, 17*
313:*17, 18*
314:*9*  315:*10*
316:*11, 16*
318:*3, 4, 13*
319:*1, 7, 12*
320:*6*  321:*4*
326:*4*  327:*1,*
*7, 22*  328:*10*
329:*19, 21*
330:*1*  333:*9*
334:*2, 21*
335:*19*
337:*14*  338:*16*
**system**  26:*21*
75:*2*  168:*13*
171:*22*  172:*9*
201:*1*

**< T >**
**tablet**  274:*2*
**tablets**  9:*11*
202:*20*
**take**  13:*23*
15:*3*  19:*18*
30:*6*  31:*22*
63:*17*  85:*10*
103:*12*
115:*13*  117:*9*
123:*22*
131:*23, 24*
135:*22*
138:*19*
207:*24*  208:*3,*
*9, 12*  229:*11*
237:*16*
244:*11, 13*
282:*11*
321:*12*
324:*13, 19*
327:*17*
328:*19*  331:*9*
348:*15, 18, 22*
**taken**  1:*14*
51:*7*  101:*18*
176:*18*  209:*1*
218:*5, 14*
229:*8, 21*
230:*1*  245:*20*
261:*3, 6*

287:*12*  310:*15*
**takes**  237:*6*
**talk**  14:*12, 18,*
*24*  28:*7*  32:*8*
39:*9*  63:*7*
68:*9*  85:*5*
102:*23*  111:*2*
128:*7*  217:*16*
282:*8*  284:*3*
292:*10*  297:*7*
298:*18, 24*
305:*1*  307:*17*
317:*22*  343:*5*
**talked**  200:*3*
328:*22*  333:*8*
343:*9*
**talking**  45:*14,*
*16*  87:*18*
112:*4*  138:*12*
148:*19*
149:*18, 19*
156:*8*  157:*6*
164:*14*  169:*4*
187:*10*
200:*19*  206:*9*
211:*6*  224:*14*
242:*5*  245:*4*
292:*7, 13, 15*
298:*22*  305:*3*
319:*4, 6*
344:*13*
**talks**  339:*16*
**target**  158:*23*
159:*1*
**tasked**  242:*24*
**TEA**  330:*5,*
*17*  331:*3*
**teacher**  314:*12*
**team**  17:*8, 11*
23:*10*  60:*24*
105:*18*
186:*15, 17*
243:*3, 7, 10,*
*12, 18, 23*
244:*7*  305:*11*
314:*1, 6, 13,*
*17*  317:*19*
**tech**  18:*18, 22*
79:*16*  80:*12*
82:*15*  83:*3*
84:*8*  85:*8*

211:*22*
267:*23*
270:*13, 22*
323:*3*  324:*19*
**technical**
37:*20*  124:*15*
252:*9*  265:*23*
266:*1*
**TECHNICIAN**
4:*8, 11*
**technique**
240:*8*  286:*8*
293:*10*  296:*14*
**techniques**
286:*17*  288:*4,*
*9, 24*  290:*17,*
*23*
**technologies**
286:*18*
**technology**
284:*4, 5, 14,*
*19*  285:*1, 4, 7*
289:*1*  290:*20*
**telecon**  134:*12*
**tell**  17:*24*
40:*6*  65:*2*
220:*13*  227:*4*
245:*15*  246:*4*
253:*2*  280:*24*
285:*6*  314:*14*
317:*18*  337:*24*
**telling**  118:*16*
174:*12*
175:*19*
191:*12*  214:*1*
221:*6, 9*
222:*18*
231:*20*
245:*22*  250:*9*
335:*14*
**tells**  183:*2*
223:*10, 24*
225:*8, 10*
**temperature**
224:*19*  317:*6*
**ten**  158:*7, 8*
282:*18*
**tend**  344:*9*
**tendency**
166:*4*

Confidential Information Subject to Protective Order

term 23:3
Terminus 3:15
terms 30:1
130:20 134:1
250:3 320:8
343:19
345:11 346:2
347:8, 19
tertiary 166:5
339:18, 24
test 97:12
103:1 106:22
107:2, 23
108:8 109:8
114:6, 8, 10
154:24 158:3,
19, 21 164:18,
20, 22 165:9
179:15 200:6,
8, 17 212:6
220:22
221:10, 20
223:10
230:23
231:12, 15
232:4, 12, 13
234:16 235:8,
17, 19 236:19,
23 237:17
238:19
239:12 241:4
243:1 244:12,
14, 17 245:10,
11, 21 246:2,
13, 21 247:19,
21 248:3, 24
251:2 265:10
268:13, 16, 17,
20 269:23
275:14, 24
276:1, 7
279:24
281:14
292:20
293:19 301:3
315:24
tested 73:4, 9
92:1 103:8
178:7 183:23
186:19 187:1,
7, 17 188:1, 6,

13 204:5, 10,
20 205:3, 20
226:20
232:24
247:22
248:15
277:13 278:3
346:11 348:10
testified 11:19
39:4
Testimony
5:3 92:19
119:7 129:16
299:11
343:10 350:6
testing 14:11
68:24 73:19
102:23 113:9
140:19 159:7
160:5 164:1,
8, 15 165:1,
10 180:7
184:18, 23
187:23 189:3,
13 191:14
200:21, 24
213:3, 10
214:5, 16
215:5 216:4
222:3 223:11
230:14
236:14 249:7
264:7, 11, 19
273:19 280:7
293:3, 5, 13,
15 294:7, 10
298:23 304:2,
16 305:4, 21
306:12, 13, 15,
22 307:15
317:8 346:8
347:3, 19
348:7
tests 244:2
Teva 3:18, 19
text 42:23
126:10, 23
331:19
Thank 123:24
137:2 165:14
271:20

309:20
329:15
340:13
348:20 349:1,
2, 3
Thankfully
271:3
Thanks 18:24
thing 13:10
132:22
154:14 170:8
198:23 205:7
206:22
216:10
219:20 249:9
266:14
279:22 329:5,
15
things 17:10
34:12 129:1
149:16
216:16 336:6
347:14
think 17:22
19:18 42:9
49:12 51:13
77:23 81:22
88:17 125:16,
19 139:21
146:21
147:24 160:7
167:19
168:23
172:13 173:6
194:16
196:18 205:5
208:1, 6, 11
214:8 215:10,
11 218:10
219:1 221:15
225:13
234:18 245:8,
14 247:1, 3,
14 262:14
264:12 276:5
278:16, 19
282:12
288:21
293:17
294:14 298:2
303:21 312:6

313:4 315:16
316:23
318:17, 19
319:15, 16, 21
322:8 335:14
336:4, 20
342:11 343:2,
10 345:18, 19
347:2, 13
thinking 15:13
thinks 227:19
264:18
third 34:22
65:8 121:5
137:18
167:14, 20
254:14
267:11, 13
thirty 351:16
thought
241:21
thoughts
257:11
thousands
129:17
219:23 339:8
thread 6:6, 8,
13 7:10, 14,
18, 21 8:7, 11,
13 9:10
three 16:2
17:1 66:13
75:19 76:6
100:7 140:17
171:16
237:10 245:3
threshold
50:11, 16, 21
51:15, 16, 23
52:17 53:5,
11, 22 54:5,
17, 22 57:17,
24 58:19
89:10, 20
90:5, 8 91:7
92:16 93:4
100:14 161:1
165:12 274:11
till 231:4
Time 1:16
11:5, 7 12:7

15:19, 24
16:5, 13, 15,
18, 20 18:12
19:22, 24
20:3, 5 39:23
43:17 48:10,
15 50:7 56:1
62:11 63:3,
21, 23 64:2, 4
71:2, 4 75:13
77:23 82:16
85:1 88:10
90:21 92:23
94:11 103:2,
7, 10 104:3
106:15
107:19
108:17 114:4
117:9, 23
118:10, 23
124:4, 8, 22
127:8, 16
129:2, 22
130:17
131:12, 13
132:3, 7, 9
146:15
148:22
162:16 174:1,
9 180:16
189:21 196:1
203:22 208:7,
19, 21 209:3,
5 225:7, 15,
17, 19 231:4,
9 235:5
237:3, 7, 14
240:17
245:18
251:13 252:7
269:9, 13
281:19
282:15, 19, 23
283:22 285:2,
14 290:24
298:17 311:8
322:6, 12, 16
344:8 345:13
346:4 347:10
348:14, 15
349:4, 10, 11

timeline
122:*10*
128:*20*
129:*19*  130:*9*
times  49:*6*
70:*4*  71:*21*
82:*21*  83:*9*
84:*2, 18*
85:*11, 18*
86:*8, 15, 24*
87:*12, 24*
131:*5*  133:*15*
237:*10*  242:*2*
279:*9*  334:*16*
title  55:*20*
135:*4, 6*
273:*8*  331:*21*
today  12:*14*
13:*8*  14:*9, 13*
15:*1, 8*  17:*6*
32:*2, 8*  38:*18,
23*  49:*7*
65:*11*  71:*24*
119:*7*  128:*8*
133:*14*  308:*9*
330:*4, 8*  345:*2*
Today's  11:*4*
349:*6*
told  16:*22*
38:*17*  46:*15*
53:*3*  54:*3*
56:*16*  74:*12*
79:*4*  94:*17*
115:*16*  140:*1*
141:*16*
149:*23*  150:*6*
151:*2*  163:*16*
164:*7*  180:*22*
181:*2, 5*
184:*22*
203:*19*
212:*14*
215:*22*
217:*21*  218:*2*
223:*6, 9*
227:*5, 7*
229:*2*  230:*5*
231:*9, 11*
240:*22*  241:*1*
256:*17*  276:*3*

toluene
330:*14, 16*
336:*15*
tomorrow
257:*13*
Top  20:*17*
41:*12*  44:*4*
55:*13*  56:*5*
60:*1*  61:*16*
64:*18*  65:*11*
72:*5*  97:*2*
99:*1*  100:*6*
140:*13*  144:*6*
210:*20*
257:*23*  264:*1,
4*  273:*8, 19*
topic  32:*12*
39:*3*  42:*5, 18*
43:*22*  83:*15*
116:*17*  192:*2*
257:*13*
303:*22*  313:*3,
13*  314:*4*
334:*20*  342:*9*
topics  14:*9,
10, 13, 16*
36:*12*  38:*17*
319:*20*
Torrent  3:*6*
4:*16, 18*  6:*17*
7:*16, 19*  14:*2*
18:*9*  20:*18,
23*  21:*8*  22:*6,
17, 19, 22, 23*
23:*2, 8, 15*
25:*1, 23*  26:*3,
10*  27:*5*  29:*3,
18*  30:*13*
33:*8*  39:*13,
19, 24*  43:*16*
44:*10, 11*
45:*5, 23*  46:*2,
3, 15*  47:*2, 21*
48:*21, 24*
55:*8*  59:*21*
60:*3, 11, 12*
61:*11*  63:*2*
64:*12, 18*
66:*4*  67:*22*
68:*13, 19*
74:*2*  76:*17*

78:*20*  80:*11*
94:*2, 8, 16*
97:*14*  102:*24*
103:*14*
105:*13*  106:*3,
6*  107:*2*
110:*15*  113:*2,
15*  114:*2, 5*
116:*7, 12*
117:*15*  119:*9*
122:*24*  123:*2,
4, 17*  124:*17*
125:*5*  126:*1*
136:*10, 14*
137:*11*  138:*6*
139:*4*  142:*13*
143:*9*  144:*18*
147:*23*
150:*24*
153:*21*  154:*5,
11*  155:*9, 24*
162:*10, 19*
165:*15*
166:*16*  167:*8,
21*  178:*16*
180:*7*  182:*6,
11*  186:*20*
200:*7*  201:*21*
202:*1*  203:*6*
205:*23*  206:*1,
3*  207:*9, 10,
16*  209:*11*
211:*1*  212:*5*
213:*3, 10*
217:*22*
219:*14*
220:*22*
221:*10*  223:*9*
224:*1*  225:*20*
226:*21*  227:*5,
15, 18*  228:*3*
230:*22*
232:*12*  233:*1*
234:*15*
236:*14, 18*
238:*16*
241:*13*
242:*23*
244:*11, 14*
245:*18*  246:*1,
12, 19*  247:*18,

20*  248:*3, 18*
249:*5, 14, 19*
250:*8, 10, 11*
251:*3, 9, 14,
20*  255:*11, 17*
256:*18*
258:*16*  259:*7*
261:*23*  262:*8*
263:*11*
266:*21*  295:*3,
13, 24*  296:*18*
297:*9*  299:*2*
304:*12*
305:*17*  307:*6*
308:*17*  311:*6*
314:*6*  319:*23*
320:*2, 8, 24*
321:*5*  322:*21*
336:*6, 13*
343:*21, 22*
Torrent-12
7:*21*  103:*17*
Torrent-13
8:*7*  110:*18*
138:*10, 14*
Torrent-16
8:*9*  96:*3, 7*
Torrent-2  7:*4*
33:*15*
Torrent-212A
9:*13*
Torrent-212B
9:*16*
Torrent-212-B
64:*9*
Torrent-214
5:*16*  13:*21*
Torrent-215
5:*16*  18:*7*
Torrent-216
5:*19*  25:*4*
Torrent-217
5:*20*  55:*6*
Torrent-218
6:*6*  120:*5*
137:*13, 14*
209:*12*
Torrent-219
6:*8*  166:*12*
Torrent-220
6:*13*  263:*9*

Torrent-221
6:*15*  266:*19*
Torrent-222
6:*17*  321:*17*
Torrent-23
8:*13*  253:*14,
16, 17*
Torrent-3
7:*10*  61:*9*
Torrent-4
7:*12*  59:*18*
Torrent-7
7:*14*  143:*6,
20, 21*  144:*2*
Torrent-77
8:*16*  80:*5*
Torrent-79
8:*21*  270:*10,
12*  271:*17*
Torrent-8
7:*18*  146:*20,
22, 23*
Torrent-81
9:*7*  161:*18,
21, 24*
Torrent-83
9:*10*  201:*6, 8,
17*
TORRENT-
MDL2875
5:*19, 20*  6:*8,
11, 15*  7:*4, 12*
8:*9, 16*  9:*7,
11, 13, 16*  44:*8*
TORRENT-
MDL2875-
00072713  8:*9*
TORRENT-
MDL2875-
00100455  7:*23*
TORRENT-
MDL2875-
00124209
166:*14*
TORRENT-
MDL2875-
00181466
25:*20*
TORRENT-
MDL2875-

00208351
266:23
TORRENT-
MDL2875-
00516411
120:8
TORRENT-
MDL2875-
00523126
96:20
TorrentPharm
a.com  144:13
Torrent's
23:17  32:3, 8
38:19  39:3, 8
75:15  93:23
100:17
146:12
193:18  233:12
total  16:6
17:2  113:8
335:1
totally  108:23
173:11, 15
174:3
Tower  2:15
Toxicological
56:4
toxins  155:6
TPL  272:24
Trace  332:17
tracking
101:13
trailing  242:5
trails  242:4
transcript
350:9, 19
351:17, 19
transcription
353:7
transfer
106:22  110:6,
9
TRAURIG
3:13
treatment
51:17
trend  268:14
279:24
280:20
281:13  348:12

trial  18:18, 22
79:16  80:12
82:15  83:2
84:8  85:8
211:22
267:23
270:13, 21
324:18
trials  21:6
tried  15:13
280:19
triethylamine
330:22  331:1,
6, 7  332:19,
23  333:2
Tripti  17:15
troubles
126:11
true  30:11
36:19  62:6
81:17  256:21
259:15
336:12, 14
350:6
try  130:18
278:23  315:8
trying  45:1,
12  46:14
95:22  106:13
107:12
125:22
128:17
131:10  159:8
169:15
177:22  198:5
210:18  211:4
237:12  242:9
279:3, 6
308:15
313:19
320:18, 21
Tuesday  254:7
tumor  56:12
57:6
tumors  34:24
35:12
turn  308:12
tweak  315:9
two  15:14
17:10, 22
19:11  67:8,

16  76:7
81:10  108:17
128:9  129:15
149:15, 17
185:5, 7
188:9  216:16
240:1, 11
269:2  274:19
280:15  281:3
282:3  289:20
type  126:14
141:4
typed  122:5
137:9  271:5,
11
typically  161:7
typing  12:15

< U >
U.S  3:12
23:4, 8, 10, 14,
17  65:15
67:22  72:8
94:9  95:8
105:9, 11
147:13, 14
148:22  149:1
150:7, 10, 11,
19  178:18
202:3  203:6
256:20, 24
341:7  343:12,
15
ultimate
311:24  313:20
ultimately
36:10  50:10
71:13  93:24
141:15  223:1
244:11
265:18
277:14  341:6
underneath
26:21  60:15
67:6
understand
13:7  29:16
30:24  32:2, 7,
15  36:15
43:6  47:13
78:6  82:4

93:3  101:22
102:10
113:21
145:20
154:12
159:22
169:16  171:2
175:15, 19
177:23, 24
192:19
195:12  198:9
200:5, 15
225:23  232:2
233:11
246:17
251:17, 18
279:4  280:3,
6, 12  281:11
285:21
289:15  297:2
302:19, 22
304:9  312:11
315:11, 14
316:12, 17, 21
318:22  319:9
321:4  337:15
340:15  342:4
344:12
understanding
15:22  48:6,
13  50:3, 7, 23
67:22  75:20
155:12  156:3
159:16
183:22  293:7
understands
178:24  179:9
understood
28:24  53:2
63:3  142:4
221:3  222:16
251:8  312:7
319:23  320:2,
5, 24  327:4
332:22
UNITED  1:1
unknown
103:9
unmarked
164:4

unstable
278:21
unsure  169:17
untimely
127:10
update  179:7
Updates  8:16
303:19
upper  26:15
60:2, 10
162:7  323:4
up-to-date
20:13
USA  3:19  4:6
use  82:7
125:21
129:18
130:23
131:12
133:20
203:20  221:8
239:11  290:3,
19  292:6
293:2, 4, 12,
14  294:6, 9
295:4, 14
296:1, 19
297:10  299:3
304:15
305:20
306:11, 21
326:3  330:19
uses  167:8
USP  165:6
utilization
296:14
utilizing
286:16  287:2,
18  289:6
292:3  294:8
330:9

< V >
valid  265:4
validate  301:5
validated
109:22  159:5
294:23  310:15
validating
302:17

validation
108:14, 16, 19,
22  109:18, 21
110:5, 8, 11
163:24  287:4,
14  306:8
310:8
VALSARTAN
1:2  6:7, 14
7:11, 19  8:8,
12, 15, 19
9:14, 17
11:10  14:11,
23  26:7  32:3,
9  42:24
60:19  64:19
65:12, 20
66:15  67:1,
10, 23  75:11,
15  77:19
78:5, 8, 12
79:19  81:10,
19  93:18, 23
94:3, 8  95:8
111:6, 12
138:7  142:13
145:1  146:12
148:5, 21
149:24  150:5,
12, 16, 19
153:16  166:3
168:1  169:2,
11  170:13, 22
171:8, 14, 18
177:11
178:17
182:18  200:8
202:2  203:21,
22  217:23
224:15
226:17  227:5
228:4  233:12
235:7  245:19
259:9  274:1
281:3, 9
282:5  288:23
314:9  320:3,
7, 9  321:1
323:17  330:6
333:22
337:21

339:15  341:1,
5  343:14, 15
valsartan/amlo
dipine  66:15
valsartan/amlo
dipine/hydroch
lorothiazide
62:4  66:16
valsartan/hydr

ochlorothiazide
66:6  202:23
Valsartan-
Huahai  6:11
valsartan's
188:10
valsartan-
URGENT
7:22
value  31:9
values  70:13
variables
318:5, 12
vendor
152:20  153:6,
10  176:13, 21
180:2  182:2
205:3, 19, 22,
24  206:3
210:5  214:22
217:13  255:4,
7, 21
verbal  12:24
224:3, 6  348:4
verification
293:24  294:1,
8
verify  206:15
versus  101:11
106:14  201:24
vice  22:1, 2
VICINAGE
1:2
video  242:7,
16  283:5, 9
Videoconferenc
e  1:15
VIDEOGRAP
HER  11:2
16:13, 18
19:22  20:3

63:21  64:2
104:3  124:4,
8  132:3, 7
143:15  193:5,
14  208:19
209:3, 13, 18
253:19  269:9,
13  282:14, 19,
23  322:12, 16
340:8  349:4
VIDEOTAPE
4:8
Videotaped
1:14
Vidhi  4:16
view  31:8
155:22, 23
vitae  5:16
vivo  56:9
voice  59:13
75:23
VOLUME
1:8  145:16,
17  151:22
242:6
VP  135:6

< W >
WAGNER
2:14
wait  345:18
waited  129:2
waiting  225:2
270:21
waived  127:7
walk  34:11
73:24  176:22
walked  247:6
Wal-Mart
7:19
want  13:17
14:7  18:2
19:13  20:16
22:7  24:23
25:17  26:13
27:2  31:1
33:5  34:11,
21  39:7, 22
40:3  44:24
49:4  53:9
56:2  62:13,

15  64:5
73:13, 22
76:10  82:12,
13  97:7
98:10  104:5
120:14  122:5
131:16  136:2
142:10  145:7
161:16
166:24
176:11  177:1
178:14
193:22  195:4,
14  196:13
197:23  198:4,
20  202:6
208:3, 4
209:8, 23
217:16  232:3
260:13  264:9
267:5, 18, 22
274:21
278:23  284:1,
3  293:2, 12
294:6  310:1
311:4  317:24
324:8, 22
330:10
336:24  337:1,
19  340:15
343:5
wanted  17:24
22:13  47:22
62:12  124:19
132:11
142:14
239:18  317:18
wants  23:16
wasting
129:21  131:11
way  28:11
50:9, 18
74:11  87:4
98:19  108:21
144:8  169:23
175:11
178:18  219:2
256:18
313:16
315:13, 19
316:19

324:10  329:3,
13  330:21
331:19, 20, 24
344:19
wears  135:9
week  15:9
225:10
weeks  140:18
245:3, 4, 8, 10,
21, 23  251:2, 6
well  12:21
17:19  23:4
42:24  43:12
44:2  70:15
76:14  85:1
89:20  97:13
105:12  122:4
125:16, 19
148:21
149:22  165:5
169:1  170:11,
19  179:18
181:7  184:9
186:23
204:13
216:22
228:11
229:12
230:21  231:8
236:11  238:6
240:6, 20
244:12, 22, 23
247:15
249:23
280:17  281:4
303:23  304:3
306:16  310:6
319:19  323:3
324:3, 19
326:10
331:20, 21
338:3  342:6
347:18
went  42:22
72:8  146:12
216:18
233:13  347:3
we're  12:10,
11  13:23
14:9  16:15,
20  19:24

Confidential Information Subject to Protective Order

20:5 21:15
32:2 55:24
63:23 64:4
65:10 66:14
78:17 79:24
84:4, 5 85:8,
22, 23 96:18
102:22 111:2
123:14, 19
124:5, 9
127:11 132:4,
15 133:20
135:21 137:6
138:9, 11
149:18
178:23 179:4
208:21 209:5,
15 238:9
245:17 250:5,
20 254:9, 22
265:8 269:10,
14 270:21
271:22, 23, 24
274:15, 18
279:12
282:12, 20, 24
317:22
322:13 325:1
337:24
340:11
344:18, 19
349:6
**WERNER** 4:1
**We've** 49:5
85:11 99:10
129:2 209:17
242:4 254:10,
24 263:19
270:2 283:21
**window**
276:17
**withdraw**
136:24
**withdrawal**
66:5
**Witness** 10:5
11:15 16:7
19:1, 15 25:5
28:2, 23
29:22 31:6,
19 33:10

37:13 38:4
41:23 42:14
46:8 54:1, 10
59:15, 22
63:20 66:20
67:19 70:8
74:24 75:24
76:18, 23
80:8 84:13
91:10 92:10
95:11 100:21
101:4 102:15
104:9, 14
109:2, 13
111:15
116:15
117:19
118:22
119:14
120:11 128:3
129:5, 10
133:18 136:3
143:18
145:13 146:8,
23 148:17
150:15 151:7
152:6 153:6
154:2 161:22
163:20
164:12
166:17
167:13 169:8
171:1 181:23
185:19 186:7
187:5, 21
188:16
189:18
191:20
193:12
195:18
196:18 198:3
199:4 201:9
203:13 208:6,
11 214:8
215:10 216:8
217:8 218:9
219:1 221:2,
15 222:23
228:8 231:3
232:9, 16
233:18

235:22
238:23
241:16
242:19 244:6
246:16 247:1
253:8, 21
256:2 258:22
260:18 262:4
263:12
266:24 269:4,
16 270:6, 18,
23 277:18
278:6, 19
283:3, 8
287:8, 24
288:13
294:14
295:10, 20
296:24
297:15 298:4,
6, 9, 12 300:6
303:6 304:21
306:20
307:14 312:6
313:2 318:9
327:12 334:7
335:24
337:11 339:5
341:11 346:7
347:13 349:1
350:5, 6, 8
351:1
**witness's**
133:11
**wonder** 126:19
**word** 36:3, 17
40:23 49:5, 6,
7 50:5, 6
61:23 145:21
**wording** 294:4
**words** 40:4
302:22 335:12
**work** 20:18
23:21 24:17
30:3, 21 31:1
46:20 144:18
272:19
**worked** 20:23
21:10, 18, 19,
21 22:18

**working**
21:15 23:24
24:9 80:1
144:9 201:21
300:7
**World** 33:23
39:14, 19, 24
42:9 238:18
**write** 169:16
170:4 173:8
240:17
**writing**
133:21 256:8
257:7 265:6
**written** 28:10
45:23 117:21
122:1 139:14
146:8 169:10,
23 173:5
174:14, 21
175:8 176:8
203:14
212:22
258:24
260:20
265:12, 21
266:10
**wrong** 38:8
42:8, 10
173:11, 16
174:4 234:21,
24
**wrt** 6:7

**< Y >**
**y'all** 111:10
122:10
252:16 262:24
**y'all's** 26:22
**Yang** 167:1, 7,
18 168:11
171:20 173:2
213:18 215:22
**Yeah** 14:14
18:22 20:12,
21 21:9, 20
22:21 23:19
24:3 25:18
26:2, 18
27:11, 21
30:11, 19

32:7, 18 34:1,
18 35:8
36:19 37:6
38:22 39:17
43:11, 14
44:15 47:16,
19 48:18
49:3, 10, 19
52:8 53:7
54:19 55:23
56:15, 19
57:4, 20
58:22 60:20
61:19 62:1, 9
63:1, 6, 15
64:16 65:18
67:5 68:18
69:1, 5, 12, 21
70:2 71:11,
15, 19, 23
72:11, 13, 14,
22 73:6, 21
74:5, 14 75:9,
24 76:20
77:21 79:1,
14 81:14, 17
82:2, 23
83:18, 22
84:3, 13
85:14 86:10,
16 87:2, 19
88:6 89:7
90:2 91:24
93:20 94:15,
22 95:5
97:22 98:4,
18, 20 99:4, 8,
13, 16, 20
100:1, 5, 15,
21 104:9, 10,
21, 23 105:3,
7, 16, 23
106:24
107:12
108:10
110:12 111:9
112:13
113:24
114:12, 19
115:1, 12, 22,
24 117:5, 12

Confidential Information Subject to Protective Order

118:5  120:22
121:2, 23
122:8, 22
123:10  137:7,
11, 16  138:8,
20  139:2, 14,
19  140:14
141:5, 10
142:8  143:22
144:7, 10
145:5, 23
146:2, 8
147:10  148:7
149:5  150:16
152:11
154:16
156:20
157:20
161:10  162:6,
11, 22  163:6,
14, 20  164:6,
19  167:5, 6
168:6, 8, 15
169:3  171:24
173:5  174:14,
21  177:13, 22
180:21  181:4,
8, 13  182:10,
14  184:16, 20
186:13
188:11
189:11  202:4
204:15
205:21, 24
206:6  207:7
208:6, 17
210:2, 18, 23
211:8, 21
212:2, 8, 16,
21  213:5, 12,
20  217:24
225:5, 13
226:8, 24
227:8, 17, 21
229:5  231:18
234:5  235:2
236:17, 21
239:17
247:10
251:12
253:22

254:19  255:2,
6, 8  256:21
257:5  258:7,
11, 15  259:4,
15, 19  260:18
262:19, 23
263:2, 12, 16,
23  264:16
266:10
267:17, 24
268:4, 18
269:6  271:16
272:5, 10
273:6, 16
274:13  275:1,
2, 5, 6, 10, 17
276:2  277:4,
11, 24  279:15
280:2, 9, 23
281:15, 24
283:11  284:9,
13  285:16, 20
289:14
292:16  296:9,
12  299:7
301:20
302:12
307:24
309:10, 16
310:3  312:13
313:23  322:4
324:24  325:4,
12, 15, 17, 19,
23  326:1, 7,
17  329:4, 9,
14  330:7, 18
331:4, 11
332:11, 16, 21
333:3, 13, 17
335:15
336:10
337:18
340:21  343:8
345:20
**year**  21:11
74:20  146:14
182:23  183:5,
16  285:9, 17
309:15

**years**  15:14
17:10  146:12
171:16, 17
**yellow**  272:5
332:8
**Yep**  34:15
45:17  96:6
110:23
137:15
201:18
254:17
257:22
269:20
273:24  304:22
**York**  3:4

**< Z >**
**zero**  339:10
**Zhejiang**  3:11
322:24
**ZHP**  6:17
33:3, 4  67:2,
7, 15  68:11,
16, 21, 23
74:3, 11  75:1,
7  78:21
95:13  111:7
112:6  113:3,
14  114:1
122:11  138:5
139:4  148:14,
23  149:2, 3, 5,
9, 19  150:20
151:15
153:14
154:18, 20
155:24
165:16  166:2
167:23
168:18  169:4,
13, 17, 19, 22
170:2, 5, 7
171:17
174:22
175:19
178:17, 19, 24
179:8  180:10
181:18  182:7,
13, 19, 24
184:14
186:20  200:8

203:21
204:18
205:22
207:11  210:5,
24  215:23
217:20, 21
220:9, 21
222:24
223:10, 21, 24
224:9  225:2,
7, 10  227:5
228:3  229:2,
14  230:5, 14,
17, 18  231:11
234:24  236:9
255:7, 22
320:4, 9
321:1  322:24
323:4, 13, 15
327:8, 13, 17
335:13, 15, 17
336:1  341:3
**ZHP00496533**
6:19
**ZHP's**  75:11
98:1  154:5
155:8, 20
163:16  174:3,
10  184:17
203:10  216:4
222:9, 19
223:12, 17
236:14
**Zoom**  1:15
2:1  3:1  4:1
25:16  203:15
211:19

# Exhibit 97

REDACTED

Confidential Information - Subject to Protective Order

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
 2                    CAMDEN VICINAGE
 3    ------------------------------|
                                    |
 4    IN RE: VALSARTAN, LOSARTAN,   | Hon. Robert B. Kugler
      AND IRBESARTAN PRODUCTS       |
 5    LIABILITY LITIGATION          | Civ. No. 19-2875(RBK)
                                    |
 6    This Document Relates to:     |
      All Actions.                  |
 7                                  |
      ------------------------------|
 8
 9          CONFIDENTIAL INFORMATION - SUBJECT TO
                    PROTECTIVE ORDER
10            Monday, September 27, 2021
11                     - - -
12         This is the Remote Videotaped Deposition of
13    Humana Pharmacy, Inc.'s Corporate Representative,
14    CESAR CEDENO, pursuant to Fed. R. Civ. P. 30(b)(6),
15    commencing at 9:02 a.m., on the above date, before
16    Susan D. Wasilewski, Registered Professional
17    Reporter, Certified Realtime Reporter, Certified
18    Manager of Reporting Services, Certified Realtime
19    Captioner, and Florida Professional Reporter.
20                     - - -
21             GOLKOW LITIGATION SERVICES
22         877.370.3377 ph | 917.591.5672 fax
23                 deps@golkow.com
24
25
```

Page 2

```
 1   APPEARANCES VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:
 2
 3   GOLDENBERG LAW, PLLC
       BY:  MARLENE GOLDENBERG, ESQUIRE
 4       mjgoldenberg@goldenberglaw.com
       ETHAN ADAMS, ESQUIRE
 5       eadams@goldenberglaw.com
       800 Lasalle Avenue, Suite 2150
 6     Minneapolis, Minnesota 55402
       Phone: (800) 504-0281
 7
 8
 9
     FALKENBERG IVES, LLP
10     BY:  KIRSTIN B. IVES, ESQUIRE
         kbi@falkenbergives.com
11     230 West Monroe Street, Suite 2220
       Chicago, Illinois 60606
12     Phone: (312) 566.4808
       Representing Defendant Humana
13
14
15
     CROWELL & MORING LLP
16     BY:  JOHN E. DAVIS, ESQUIRE
         jdavis@crowell.com
17     590 Madison Avenue, 20th Floor
       New York, New York 10022
18     Phone: (212) 895-4204
       Representing Defendant Cardinal Health
19
20
21
     DORSEY & WHITNEY LLP
22     BY:  ROXANNA V. GONZALEZ, ESQUIRE
         gonzalez.roxanna@dorsey.com
23     50 South Sixth Street, Suite 1500
       Minneapolis, Minnesota  55402-1498
24     Phone: (612) 492-6518
       Representing Defendant OptumRx
25
```

Page 4

```
 1   APPEARANCES VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:
 2
 3   CIPRIANI & WERNER, P.C.
       BY:  AMANDA RUGGIERI, ESQUIRE
 4       aruggieri@c-wlaw.com
       450 Sentry Parkway, Suite 200
 5     Blue Bell, Pennsylvania 19422
       Phone: (610) 567-0700
 6     Representing the Defendants, Aurobindo
       Pharma, USA, Inc., and Aurolife Pharma, LLC
 7
 8
 9
     PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
10     BY: JASON M. REEFER, ESQUIRE
         jmr@pietragallo.com
11     One Oxford Centre, 38th Floor
       Pittsburgh, Pennsylvania 15219
12     Phone: (412) 263-1840
       Representing Defendant Mylan Pharmaceuticals, Inc.
13
14
15
16   ALSO PRESENT VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:
17     JUDY DIAZ, Videographer
18     LEAH TAYLOR MATTSEN, Goldenberg Law
19     HALLE KNUTSON, Goldenberg Law
20     BEATRIZ JARMILO, Humana
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:
 2
 3   GREENBERG TRAURIG, LLP
       BY:  TIFFANY M. ANDRAS, ESQUIRE
 4       andrast@gtlaw.com
       77 West Wacker Drive, Suite 3100
 5     Chicago, Illinois 60601
       Phone: (312) 456-8400
 6     Representing Defendants Teva Pharmaceutical
       Industries, Ltd., Teva Pharmaceuticals USA, Inc.,
 7     Actavis LLC, and Actavis Pharma, Inc.
 8
 9
10   DUANE MORRIS LLP
       BY:  GREGORY D. HERROLD, ESQUIRE
11       gdherrold@duanemorris.com
       1940 Route 70 East, Suite 100
12     Cherry Hill, NJ 08003-2171
       Phone: (856) 874-4225
13     Representing Defendant s Zhejiang Huahai
       Pharmaceutical Co, Ltd., Prinston Pharmaceutical,
14     Inc., Huahai U.S., Inc., and Solco Healthcare US, LLC
15
16
17   DUANE MORRIS LLP
       BY:  JUSTIN M. L. STERN, ESQUIRE
18       jmlstern@duanemorris.com
       1875 NW Corporate Boulevard, Suite 300
19     Boca Raton, Florida 33431-8561
       Phone: (561) 962-2107
20     Representing Defendant Walmart Inc.
21
22
23
24
25
```

Page 5

```
 1            - - -
 2          I N D E X
 3            - - -
 4   Testimony of:  CESAR CEDENO          PAGE
 5     DIRECT EXAMINATION BY MS. GOLDENBERG.......... 8
 6
 7
 8          E X H I B I T S
 9          (Attached to transcript)
10   HUMANA PHARMACY, INC.'s DEPOSITION EXHIBITS      PAGE
11   Exhibit 1    Plaintiffs' Notice of Videotaped      10
               Deposition to Humana Pharmacy, Inc.
12             Pursuant to Fed. R. Civ. P.
               30(b)(6)
13
14   Exhibit 2    FDA Updates and Press Announcements  19
               on Angiotensin II Receptor Blocker
15             (ARB) Recalls (Valsartan, Losartan,
               and Irbesartan
16   Exhibit 3    Title 21 — Food and Drugs          23
               § 351 - Adulterated Drugs and
17             Devices
18   Exhibit 4    Title 21 — Food and Drugs          26
               § 331 - Prohibited Acts
19
     Exhibit 5    Pharmaceutical Purchasing Agreement  32
20             ABC-MDL2875-00000687 through 727
21   Exhibit 6    Guidance for Inventory HP1          44
               Operations Associates
22             HUM001416 and 001417
23   Exhibit 7    Sample Prescription Information       49
               HUMO001092 through 1183
24
25
```

Page 6

```
 1        E X H I B I T S
 2      (Attached to transcript)
 3  HUMANA PHARMACY, INC., DEPOSITION EXHIBITS   PAGE
 4  Exhibit 8   Anda Purchase History for Humana     59
              Pharmacy, Inc., Between Jan 1, 2013
 5            and Dec 31, 2019
              HUMO000150 through 163
 6
    Exhibit 9   Transaction History Log          68
 7            Date Range: 2012-01-01 to
              2020-08-11
 8            HUM000990
 9  Exhibit 10   NDC Package Code and Purchase Order   69
              Documents
10            HUM000164 through 283
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1                  - - -
 2        THE VIDEOGRAPHER:  We're now on the record.
 3  My name is Judy Diaz.  I'm a legal videographer
 4  for Golkow Litigation Services.  Today's date is
 5  September 27th, 2021, and the time is 9:02 a.m.
 6        This remote video deposition is being held
 7  in the matter of Valsartan, Losartan, and
 8  Irbesartan Products Liability Litigation MDL.
 9        The deponent is the Cesar Cedeno.
10        All parties to this deposition are appearing
11  remotely and have agreed to the witness being
12  sworn in remotely.  Due to the nature of remote
13  reporting, please pause briefly before speaking
14  to ensure all parties are heard completely.
15        Will counsel please identify themselves.
16        MS. GOLDENBERG:  This is Marlene Goldenberg
17  on behalf of the Plaintiffs and the PSC.
18        MS. IVES:  And Kirstin Ives, I-v-e-s, on
19  behalf of Humana Pharmacy, Inc., and Mr. Cedeno.
20        THE VIDEOGRAPHER:  The court reporter is
21  Susan Wasilewski and will now swear in the
22  witness.
23        THE COURT REPORTER:  Would you raise your
24  right hand?
25        Do you solemnly swear or affirm the
```

Page 8

```
 1  testimony you're about to give will be the truth,
 2  the whole truth, and nothing but the truth?
 3        THE WITNESS:  I do.
 4        THE COURT REPORTER:  Thank you.
 5        CESAR CEDENO, called as a witness by the
 6  Plaintiffs, having been first duly sworn, testified
 7  as follows:
 8           DIRECT EXAMINATION
 9  BY MS. GOLDENBERG:
10     Q.  All right.  Good morning, Mr. Cedeno.  We
11  met briefly off the record but, again, my name is
12  Marlene Goldenberg and I'm going to be taking your
13  deposition today.  All right?
14     A.  Good morning.
15     Q.  And before we get started, I notice there's
16  a little delay in your sound.  I'm wondering if you
17  can move your computer a little bit closer so that
18  the court reporter has an easier time hearing you.
19     A.  I'm using the microphone in the room, so
20  I'll try to move that closer to me.
21     Q.  All right.  And if the court reporter has a
22  problem, I assume she'll tell us, but your voice is
23  a little soft, so I just want to make sure we all
24  can hear you this morning.
25        So why don't we start with the basics.  Can
```

Page 9

```
 1  you state your full name for the record, please?
 2     A.  Yes.  Cesar Cedeno.
 3     Q.  All right.  And you are here to testify
 4  today on behalf of Humana.  You understand that?
 5     A.  I do.
 6     Q.  And you also understand that your testimony
 7  is binding on the company?
 8     A.  I do.
 9        MS. GOLDENBERG:  All right.  So why don't we
10  bring up the deposition notice, which is Number
11  39, please; and we'll mark this as Humana
12  Exhibit 1.  It should be Number 39.
13        MS. MATTSEN:  I'm sorry.  For some reason,
14  it only goes up to 29.
15        MS. GOLDENBERG:  Let's go off for one
16  second.
17        MS. MATTSEN:  Okay.  Sorry.  Okay.
18        THE VIDEOGRAPHER:  The time right now is
19  9:06 a.m.  We're off the record.
20        (Recess from 9:06 a.m. until 9:11 a.m.)
21        THE VIDEOGRAPHER:  The time right now is
22  9:11 a.m.  We're back on the record.
23        MS. GOLDENBERG:  All right.  I appreciate
24  your indulgence in our fixing some technical
25  issues.  We're back on the record, and we're now
```

Page 10

1   going to pull up Tab 39, and this will be the
2   deposition notice, and this will be Humana
3   Exhibit 1.
4       (Humana - Cedeno Exhibit 1 was marked for
5   identification.)
6   BY MS. GOLDENBERG:
7   Q.   Mr. Cedeno, as we've discussed, you are here
8   today to discuss certain topics and -- or to testify
9   on behalf of certain topics on behalf of Humana as
10  they relate to the brick-and-mortar pharmacy
11  locations; is that correct?
12  A.   That's correct.
13  Q.   All right.  And my understanding from your
14  counsel is that specifically, that includes
15  Topics --
16      MS. GOLDENBERG:  If we could scroll down to
17  where the topics are listed.
18  Q.   That includes Topics 3, 4, 6, 7, 9, 10, and
19  12 as they relate to the brick-and-mortar locations.
20  That's correct?
21  A.   Read the numbers again.  3, 6, you said?
22  Q.   3, 4, 6, 7, 9, 10, and 12.  Your counsel is
23  mouthing, if that helps.
24  A.   Yeah, that's correct.  That's correct.
25  Thank you.

Page 11

1   Q.   Okay.  That's the only time I'm going to let
2   her answer a question for you.
3       MS. GOLDENBERG:  But I appreciate your help
4   on that one.
5   Q.   Okay.  And so my understanding is that
6   Humana has -- today at least, has roughly 35, 36
7   brick-and-mortar locations; is that correct?
8   A.   I believe it's 45.
9   Q.   45.  See, I counted wrong last night.  Okay.
10  And those 45 locations are scattered around the
11  country, right?
12  A.   Correct.
13  Q.   All right.  And what percentage of Humana's
14  business or of its pharmacy business is comprised by
15  those 45 brick-and-mortar locations?
16  A.   I do not know that.  I know that we are
17  called a rounding error, so I don't think it's a
18  lot.
19  Q.   Okay.  I think that says everything we need
20  to know.  And so suffice it to say, this as very
21  small percentage of Humana's business, correct?
22  A.   (No audible response.)
23  Q.   Okay.  So let's just talk about some basic
24  terminology that we're going to use today.  We
25  understand that valsartan actually was sold in a

Page 12

1   number of different forms.  There was valsartan on
2   its own.  There was valsartan plus amlodipine,
3   valsartan plus hydrochlorothiazide, or HCTZ, but the
4   main ingredient we care about for this case is
5   valsartan.
6       You understand that?
7   A.   Yes, I do.
8   Q.   In other words, we're not here to talk about
9   any issues with amlodipine or HCTZ, correct?
10  A.   Correct.
11  Q.   Okay.  So I'm going to ask you questions
12  today about valsartan, and when I use that term, I
13  need to apply it to all three different formulations
14  of valsartan that was sold by Humana.
15      Is that fair?
16  A.   Yes.
17  Q.   Okay.  That will save us all a lot of air.
18  If you feel like there's a need to distinguish
19  between the forms, I'm going to rely on you to tell
20  me that, but, otherwise, I'm going to assume that
21  your answers apply to all three.
22      Is that reasonable?
23  A.   Yes.
24  Q.   Okay.  So you understand that the reason
25  that we're here today is because Humana sold

Page 13

1   valsartan medications that were contaminated with
2   unsafe levels of nitrosamines; is that correct?
3       MR. Reefer:  Object to form.
4       MS. IVES:  Object to form.
5       You can go ahead and answer.
6       THE WITNESS:  Oh, okay.
7   A.   Ask the question again.  Sorry.
8   Q.   You understand that the reason we're here
9   today is to talk about valsartan medications that
10  Humana sold that contained unsafe levels of
11  nitrosamines, right?
12      MR. HERROLD:  Object to form, foundation.
13      MR. REEFER:  Object to form.
14      THE WITNESS:  (Garbled audio.)
15      MS. IVES:  Unless I instruct you not to
16  answer --
17      THE WITNESS:  Got it.
18      MS. IVES:  -- you can answer --
19      THE WITNESS:  Okay.
20      MS. IVES:  -- once everyone is done
21  objecting.
22  A.   Yes, I understand.
23  Q.   Okay.  And I should note there might be some
24  objections to my questions today.  As your attorney
25  just indicated, unless someone instructs you not to

Confidential Information Subject to Protective Order

Page 14

1 answer the question, you can go ahead -- wait for
2 them to make the objection, and then move forward
3 with your answer. The attorneys will deal with the
4 objections at another time when you don't have to
5 sit through it. All right?
6   A. (No audible response.)
7   Q. And I didn't hear your answer come through
8 on that.
9   A. I said yes.
10   Q. Okay.
11       (Discussion off the record.)
12       MS. GOLDENBERG: Is there a way that we can
13 have one attorney making the objections on behalf
14 of everyone?
15       MR. REEFER: I think that's fine, Marlene.
16 The problem is -- this is Jason Reefer on behalf
17 of Mylan Pharmaceuticals. The problem is I don't
18 necessarily know if anybody else is going to
19 voice the objection that I intend to voice, so
20 I'm not sure there's an easy solution without us
21 all being in the same room like the old days.
22       MS. GOLDENBERG: Didn't bring your -- you
23 didn't bring your mind-reading devices with you
24 today? All right. Well, let --
25       MR. REEFER: No, ma'am.

Page 15

1       MS. GOLDENBERG: Let's do this. If we can
2 all do our best to have one attorney object;
3 otherwise, if you want to object, maybe for the
4 court reporter's sake, you can be on camera.
5       MR. REEFER: Oh, I don't think that will
6 benefit anybody but, okay, I understand.
7       MS. GOLDENBERG: Well, I'll leave it up to
8 the court reporter.
9       THE COURT REPORTER: If I don't catch who
10 says it, I'm just going to call it "Defense
11 Counsel," if that's okay.
12       MR. REEFER: That's fine with me if it's
13 fine with Marlene. I think -- if I'm not
14 mistaken, I think there's some rule in one of the
15 PTOs that an objection to one is objection to
16 all, so...
17       MS. GOLDENBERG: I believe that is what the
18 pretrial order says, so as long as it's on behalf
19 of everyone, that's fine.
20       MR. REEFER: Okay. Thank you.
21       THE COURT REPORTER: Thank you. I
22 appreciate that.
23       MS. GOLDENBERG: All right. Are we good to
24 go forward? I take that as a yes.
25 BY MS. GOLDENBERG:

Page 16

1   Q. All right. Mr. Cedeno, do you have an
2 understanding that NDMA and NDEA belong to a class
3 of n-nitroso compounds called nitrosamines?
4   A. Yes, I understand that.
5   Q. And what is your general understanding of
6 what a nitrosamine is?
7       MS. IVES: Objection; outside --
8       MR. REEFER: Object to --
9       MS. IVES: -- the scope.
10       You can answer to the extent you know.
11   A. The only thing I know is that it's been
12 grouped in with potentially hazardous effects,
13 cancer-causing agents.
14   Q. Cancer-causing agents, you said?
15   A. Yes, that's what I said.
16   Q. All right. Suffice it to say no patient
17 wants to buy a drug with cancer-causing agents in
18 it, right?
19   A. I -- well, I would not think anyone would
20 like it, yeah, correct.
21   Q. All right. When was the first time that
22 Humana found out that its medication -- or that its
23 valsartan medications contained nitrosamines?
24       MS. IVES: Objection; form and foundation.
25   A. I don't have any documents in front of me,

Page 17

1 but if you'd like to refresh my memory, that would
2 be fine.
3   Q. This isn't something that you prepared to
4 answer today?
5   A. Not a specific date.
6   Q. All right. How did Humana find out that
7 its -- some of its valsartan medications were
8 contaminated with nitrosamines?
9   A. Well, I'll speak of normal course of
10 business. When there is a recall or anything that
11 requires us to pay attention to something like this,
12 it would be sent to us from the retail pharmacy part
13 of Humana, it would be sent to us from our
14 professional practice, which I believe Nathan
15 Hunnell can probably give a little bit more detail
16 as to how their process works.
17       My understanding is that they get
18 information from the FDA and/or our distributors
19 when something is recalled.
20   Q. Do you have any specific knowledge about
21 whether Humana found out from a publically available
22 FDA recall notice or whether they were contacted by
23 a distributor or a manufacturer of the drug first?
24   A. In this case, I have no idea which one came
25 first.

Page 18

1    Q.  Who would be the point person at Humana who
2  would generally get that information?
3    A.  So normally our professional practice group.
4  Nathan Hunnell with Humana is one of the pharmacists
5  that are in our professional practice group.  They
6  receive that information, disseminate it out to the
7  different groups that potentially have impacted
8  patients.  Current state, someone else, but back
9  then, it would have been Nathan Hunnell.
10    Q.  All right.  And Humana is also aware that
11  not all of the valsartan available in the United
12  States was recalled for nitrosamine contamination,
13  right?
14    MS. ANDRAS:  This is Tiffany Andras for
15  Teva, and I just want to lodge an objection to
16  the use of the word "contaminant" --
17  "contamination," a continuing objection to any
18  question that characterizes it that way on the
19  basis of foundation.
20    MS. GOLDENBERG:  And obviously we disagree,
21  but sure.
22    A.  I don't -- I don't recall every single one,
23  but I'm pretty confident that it's -- it was not
24  every single manufacturer of valsartan --
25    Q.  Does Humana continue --

Page 19

1    A.  -- (garbled audio) --
2    Q.  I'm sorry.  Did Humana -- does Humana
3  continue to sell valsartan in the United States
4  today?
5    A.  I don't -- I don't know of all of Humana's
6  business, but in retail pharmacy, I don't believe we
7  are dispensing any at this moment.
8    Q.  You're not dispensing any valsartan today?
9    A.  Not to my knowledge.
10    Q.  Okay.  You're aware, though, that it is
11  possible to manufacture valsartan without NDMA in
12  it, correct?
13    MR. REEFER:  Object to form, foundation.
14    MS. IVES:  Objection; outside the scope of
15  the designated topics.
16    You can answer if you know of your personal
17  knowledge.
18    MR. REEFER:  Object to form and foundation.
19    A.  I can assume.  I don't know.  I don't -- I
20  don't work in manufacturing, so I don't know.
21    Q.  All right.
22    MS. GOLDENBERG:  Why don't we pull up Tab
23  40, please, which will be Humana Exhibit 2.
24    (Humana - Cedeno Exhibit 2 was marked for
25  identification.)

Page 20

1  BY MS. GOLDENBERG:
2    Q.  So, Mr. Cedeno.  What I have in front of you
3  is a multipage document.  It is a printout of the
4  FDA's sartan recall update list that appears on its
5  website.
6    Have you seen this document before?
7    A.  Probably.  It looks very familiar.
8    Q.  All right.  This is something that Humana
9  would be monitoring in the regular course of its
10  business?
11    A.  I would assume so.  Again, that's
12  professional practice, not a -- not something I
13  would do on a normal course of business.
14    Q.  All right.  It would be important for
15  someone at Humana to be monitoring this, though, to
16  make sure that the medications Humana was selling
17  were safe, right?
18    A.  Absolutely.  We definitely don't want to
19  dispense anything that's unsafe.
20    Q.  Right.  Okay.  So why don't we --
21    MS. GOLDENBERG:  Leah, if you can run a
22  Control F for the word "interim" and get down to
23  the part where they actually talk about the
24  levels.  There we go.  So if you can -- we need
25  to get to the part with the table.  All right.

Page 21

1  So it should be Page 8.  There we go.
2    Q.  Are you aware that the FDA has imposed
3  interim acceptable limits for various levels of
4  nitrosamines in valsartan?
5    MR. REEFER:  Object to form and foundation.
6    MS. IVES:  Objection, it's, again, outside
7  the scope of what he's been called to testify on
8  on behalf of Humana.
9    If you would know in your personal capacity,
10  you can answer.
11    A.  I do not know.
12    Q.  Okay.  Do you have an understanding that the
13  reason that a number of medications were recalled
14  was because the levels in the pills exceeded these
15  interim thresholds right in front of you for
16  different levels of nitrosamines?
17    MR. REEFER:  Object to form and foundation.
18    A.  Yeah, I can see on the graph in front of me
19  that there's an acceptable intake of NDMAs on this
20  chart.
21    Q.  And Humana understands that the reason that
22  various valsartan medications were recalled was
23  because the levels exceeded the levels that you have
24  in front of you, right?
25    MR. REEFER:  Same objection.

Confidential Information Subject to Protective Order

Page 22

1   A.  Yes, that was the reason for the recall.
2       MS. GOLDENBERG:  All right.  We can take
3   that one down.
4   Q.  Does Humana also understand that the
5   valsartan recall resulted from a variety of quality
6   issues that the manufacturers had on their end?
7       MS. IVES:  Objection; form.
8       MR. REEFER:  Object; foundation.
9   A.  Again, to my knowledge, it's the amount of
10  NDMA in the formations that -- in the formulation
11  that caused the recall.  I don't -- I don't know
12  specifically about the manufacturing practices.
13  Q.  All right.  We can put that exhibit back up
14  if you want, but Humana presumably would have read
15  all of those FDA press releases about the basis for
16  the recall, correct?
17  A.  Yes, correct.
18  Q.  All right.  And those public press releases
19  that were put out by the various manufacturers, in
20  conjunction with the FDA, explain that the NDMA
21  contamination resulted either from synthesis
22  problems in the active pharmaceutical ingredient or,
23  in other cases, the use of recovered solvents.  Does
24  Humana understand that?
25  A.  Yes.  If that's what was in the press

Page 23

1   release, yes, it's understood.
2   Q.  All right.  And Humana also understands that
3   those are quality issues at the manufacturer's
4   level, right?
5       MS. IVES:  Objection to form.
6   A.  Yeah, if it comes from the manufacturer,
7   that is something that the manufacturer would have
8   to, I guess, work through, right?  It essentially
9   would be a quality issue.
10  Q.  Right.
11      MS. GOLDENBERG:  All right.  Let's put up
12  Tab 41.  This will be Exhibit 3.
13      (Humana - Cedeno Exhibit 3 was marked for
14  identification.)
15  BY MS. GOLDENBERG:
16  Q.  And while we're doing that, you've heard the
17  term "adulteration," correct?
18  A.  Yes.
19  Q.  All right.  What is your understanding of
20  what that means?
21  A.  So essentially, it's something that was, I
22  guess, altered in a way, changed in a way that it
23  wasn't intended to be.
24  Q.  All right.  And so if we look at what you
25  have in front of you, this is 21 U.S.C. Section 351

Page 24

1   which contains the official definition of
2   adulterated drugs and devices.
3       Do you see that?
4   A.  I do.
5   Q.  And this is a statute that Humana would want
6   to make sure it was familiar with, right?
7       MS. IVES:  Objection; outside the scope of
8   what he's here to testify about today.
9       You can answer to the extent you know.
10  A.  The profession of pharmacy follows this,
11  yes, so I assume that Humana would follow it, too,
12  as well.  I'm pretty confident that we do follow all
13  the -- all the rules and regulations.
14  Q.  All right.  Now, if we look at the beginning
15  of Section 351, it says:  A drug or device shall be
16  deemed to be adulterated...
17      And then it gives a bunch of different
18  subsections after that.  Do you see that?
19  A.  I do.
20  Q.  All right.  And so if we look at Subsection
21  (b) --
22      MS. GOLDENBERG:  And maybe we can blow that
23  up because it looks pretty small to me, if we
24  could just zoom in on that part.
25  Q.  All right.  So you'll see that the very

Page 25

1   beginning of the sentence under Subsection (b) says:
2   If it purports to be or is represented as a drug the
3   name of which is recognized in an official
4   compendium and its strength differs from or its
5   quality or purity falls below the standard set forth
6   in such compendium.
7       Do you see that?
8   A.  I do.
9   Q.  And as we just discussed, the valsartan
10  recalls were a subject of a quality issue, correct?
11      MS. IVES:  Objection; form.
12  A.  We did say that.
13  Q.  All right.  And if a drug isn't meeting
14  quality standards, then under this definition, it
15  would be an adulterated drug, right?
16      MR. REEFER:  Object to the form, foundation,
17  calls for a legal conclusion.
18      MS. IVES:  Objection to form, foundation.
19  A.  Based on this definition, yes.
20  Q.  All right.  And a -- if a drug is
21  adulterated, it's not something Humana would want to
22  be selling, which is why they recalled the
23  valsartan, right?
24      MR. REEFER:  Object to form, foundation.
25      MS. IVES:  Objection to form.  Objection to

Confidential Information Subject to Protective Order

---

Page 26

```
 1   form.
 2      A.  We do not want to be dispensing anything
 3   that's adulterated, that's correct.
 4         MS. GOLDENBERG:  All right.  So we can take
 5   that one down.
 6      Q.  And you're aware as well that some of the
 7   manufacturers recalled all of the valsartan that
 8   they made in the United States, and that includes
 9   manufacturers like Zhejiang Huahai Pharmaceuticals,
10   right?
11         MR. HERROLD:  Object to the form.
12      A.  I do -- I do know that our professional
13   practice had sent updates to which ones were
14   recalled.  So as the recall kind of expanded, we
15   received more and more information about the
16   manufacturers.
17         I don't know about all manufacturers.  I
18   know that the ones that we have purchased were the
19   ones that we were given.  So I don't know the
20   full -- full -- I guess the full scope of all the
21   recalls.
22      Q.  Okay.  And we can come back to that later?
23         MS. GOLDENBERG:  Why don't we put up Tab 43.
24   This will be Exhibit 4.
25         (Humana - Cedeno Exhibit 4 was marked for
```

Page 27

```
 1   identification.)
 2   BY MS. GOLDENBERG:
 3      Q.  And what you can see here on the right-hand
 4   side, this is 21 U.S.C. Section 331, titled
 5   Prohibited acts.
 6         Do you see that?
 7      A.  I do.
 8      Q.  Thankfully, we don't have to get too far
 9   into this section, but at the very beginning it
10   says:  The following acts and causing thereof are
11   prohibited.
12         And under Section (a) it says:  The
13   introduction or delivery for introduction into
14   interstate commerce any food, drug, or device -- or
15   device, tobacco product, or cosmetic that is
16   adulterated or misbranded.
17         Do you see that?
18      A.  I do.
19      Q.  If we put that in plain English, it's
20   unlawful to sell a drug that is adulterated,
21   correct?
22         MR. REEFER:  Calls for a legal conclusion.
23         MS. IVES:  Objection, form and foundation.
24      A.  That's my interpretation.
25      Q.  All right.  And so, again, one of the
```

Page 28

```
 1   reasons that Humana recalled its valsartan is
 2   because they can't sell drugs that are adulterated,
 3   like valsartan that's contaminated with NDMA, right?
 4         MR. REEFER:  Objection to form, foundation.
 5         MS. IVES:  Objection.  Objection to form.
 6      A.  Yes.  Our recall pulls everything we did --
 7   or informed the retail pharmacies of the reasons for
 8   the recall, and we immediately stopped selling those
 9   products.
10      Q.  Right.  Because you couldn't sell a product
11   that had unsafe levels of nitrosamines, right?
12         MR. REEFER:  Object to form, foundation.
13      A.  In this situation -- in this recall, yes.
14      Q.  Right.  Because to do so would actually be
15   unlawful under US law, right?
16         MR. REEFER:  Same objection.
17         MS. IVES:  Objection; form, foundation,
18   outside the scope of this witness's designated
19   topics.
20         You can answer to the extent you have
21   personal knowledge.
22      A.  My personal knowledge would say that's my
23   understanding.
24      Q.  All right.  And if something can't be sold,
25   then it's really not worth anything, right?
```

Page 29

```
 1         MR. REEFER:  Object to form, foundation.
 2         MS. IVES:  Object to form, foundation, and
 3   outside the cope.
 4         You can answer in your personal capacity.
 5      A.  I don't understand the question.
 6      Q.  Sure.  Not the best question, so let's break
 7   it down a little bit.
 8         Humana's a business, right?
 9      A.  Correct.  Okay.
10      Q.  And as a business, Humana is there to sell
11   products that will make the business money, right?
12      A.  Well, we are a for-profit business, so, yes,
13   I'm following --
14      Q.  Right.
15      A.  -- you so far.
16      Q.  All right.  And so if Humana is in
17   possession of some valsartan pills that are
18   contaminated with NDMA that can't be sold, they're
19   not worth anything because they can't be sold for
20   any money -- any money, right?
21         MS. IVES:  Objection; form, foundation, and
22   outside the scope of the designated topics.
23         You can answer to your personal knowledge.
24      A.  Very tricky answer.  I guess I'll do the
25   best I can personally.
```

---

**Page 30**

1     So we don't make a lot of money selling
2 pharmaceuticals. We make -- it's better for us to
3 take care of a patient as a whole. So long-term,
4 keeping patient's blood pressure, in this case, down
5 is better for the plan than it is selling a
6 prescription.
7     So yes and no I guess you could say is the
8 answer to your question. It's not -- even selling
9 the product is not worth anything to us on the
10 pharmacy side, period, but long-term, it's better
11 for the plan if a patient is on a medication that is
12 potentially life-lengthening, lifesaving.
13     So in this case, it would not be beneficial
14 for Humana to dispense a product that is recalled
15 because that goes against what they're trying to do
16 in keeping a patient healthy.
17     Does that make sense?
18   Q. It does. So there's a -- there's the
19 holistic approach, but what I'm asking about right
20 now is just the monetary value of that single pill
21 that might be sold, and even if it's not going to
22 make Humana millions of dollars on one pill, each
23 pill has a monetary value assigned to it, right?
24   A. That would --
25   Q. For every pill that Humana would sell,

**Page 31**

1 whatever that monetary value is, is what they would
2 make off of the pill, right?
3   A. Sometimes you lose money, but, yes.
4   Q. But that pill isn't worth anything if it's
5 contaminated with nitrosamines, right?
6     MS. IVES: Objection; form, foundation,
7 outside the scope.
8   A. So it would not benefit Humana or the
9 patient to dispense that pill.
10   Q. Right. Because you can't, right? We just
11 talked about that. It's illegal?
12   A. We wouldn't, right.
13     MR. REEFER: Calls for a legal conclusion.
14   Q. Right. And so something you can't sell
15 isn't worth anything, right?
16     MR. REEFER: Same objection.
17     MS. ANDRAS: Objection. Tiffany Andras.
18 Asked, answered. You've asked the question three
19 different, four different times, Marlene.
20   A. It wouldn't be worth anything, if that's
21 what you're asking.
22   Q. Okay.
23   A. Yeah.
24   Q. Thanks.
25     MS. GOLDENBERG: We can take this one down.

**Page 32**

1   Q. Over the years Humana purchased valsartan
2 from a number of different suppliers; is that right?
3   A. Humana Retail Pharmacies?
4   Q. Yes.
5   A. To my knowledge, we only get it from
6 Amerisource in retail pharmacy.
7   Q. Okay. All right. I'll tell you in the
8 documents -- the contracts that I've seen with the
9 sellers of the pills don't distinguish between the
10 retail pharmacy and the rest of Humana, but if your
11 testimony is that the retail pharmacy only got the
12 drug from AmerisourceBergen, we can focus on that
13 for today. Is that accurate?
14   A. That's accurate to the best of my knowledge,
15 yes.
16   Q. Okay. When was the first time that Humana
17 Retail Pharmacy began purchasing valsartan from
18 AmerisourceBergen?
19   A. I have no idea.
20     MS. GOLDENBERG: All right. Well, why don't
21 we pull up Exhibit 2, and we'll see if this will
22 help get us through this part. I'm sorry. This
23 is Tab 2. It will be Exhibit 5.
24     (Humana - Cedeno Exhibit 5 was marked for
25 identification.)

**Page 33**

1 BY MS. GOLDENBERG:
2   Q. All right. So what you have in front of you
3 is --



25     When you have looked at purchasing

---

Confidential Information Subject to Protective Order

Page 34

1  agreements previously, do they typically mention all
2  the medications that are being purchased?
3      A.  I have never looked at a purchasing
4  agreement for pharmaceuticals ever in my career.
5      Q.  All right.  That's not something that you
6  looked at to prepare for today?
7      A.  I potentially flipped through, but it's not
8  part of my normal business or ever has been.  I kind
9  of probably just breezed through it, to be honest.

██ ████████████████████
██ ████████████████████████████
██ █████████████████████████████████████
██ ███████████████████
██ ████ ██████████
██ ██████████
██ █████████████████████████████
██ █████████████████████████████
██ ███████████████████████
██ ███████████████████████████████
██ █████████████████████
██ ████████████████████████

Page 35

██ ████
██ ████████████████████████
██ █████████████████████████████████
██ ██████████████████████████████████████
██ █████████████████████████████████
██ ████████████████████

8          And we'll stop there.  What is product
9  pedigree?
10     A.  To my understanding, since I don't do
11 purchasing -- and this is something that's probably
12 going to go way back to my previous roles in
13 different organizations, a pedigree is basically --
14 shows you that it comes from a manufacturer to a
15 supplier to the pharmacy, so essentially a chain of
16 custody of -- certification, if you will, and that's
17 just to the best of my knowledge.  Again, I don't --
18 I don't work with purchasing or supplying, so that's
19 a definition I was told.  It may be hearsay.  I
20 don't know.
21     Q.  All right.  Well, I'll leave the objections
22 to your counsel, but -- all right.
23         So to the best of your understanding,
24 pedigree refers to chain of custody; is that right?
25     A.  That's the best of my knowledge, yes.

Page 36

1      MS. GOLDENBERG:  Okay.  Why don't we go down
2  to Page 19, please.
3      MS. IVES:  And, Ms. Goldenberg, just to --
4  just to be clear, Dan Brais is going to be the
5  one that's more familiar with these purchasing
6  questions.  So if you have specific questions, if
7  Mr. Cedeno doesn't know, since he hasn't seen
8  this, he would be the best person to ask
9  tomorrow.
10     MS. GOLDENBERG:  Okay.  If you're telling me
11 he's going to be able to answer the questions, we
12 will skip over this exhibit.
13     MS. IVES:  Yes, exactly.  So Mr. Cedeno can
14 talk about the fact that the stores order the
15 drugs, but the actual purchasing and purchasing
16 agreements would fall under Dan's testimony
17 tomorrow.
18     MS. GOLDENBERG:  Got it.  That's helpful.
19 Thank you.
20     All right.  So why don't we take this one
21 down and -- let's see.
22     Q.  Mr. Cedeno, are you prepared today to talk
23 about the information that Humana pharmacy tracked
24 when it purchased drugs?
25     A.  What do you mean, tracked?  Tracked what?

Page 37

1      Q.  That's fair.  It wasn't totally a clear
2  question.  Let's start this section and see how we
3  do, and you tell me if this is you or it should be
4  somebody else.
5          When Humana purchases drugs from
6  AmerisourceBergen, tell me, is it provided with, for
7  example, the NDC code affiliated with each of those
8  drugs?
9      A.  When we purchase medications from
10 AmerisourceBergen, we do see the NDC code, yes.
11     Q.  All right.  And when you say you see it, in
12 what way is that information provided to you, and in
13 what way is it kept by Humana?
14     A.  So it is -- so once we -- our ordering
15 comes -- starts from our retail locations directly
16 into the Amerisource order website.  On that
17 website, we are given information about NDC.
18         Once we purchase that item, and it comes to
19 us, we have invoices with NDCs on it.  Once we
20 dispense a product, our system keeps track of the
21 NDC that's being dispensed to the patient.
22     Q.  All right.  So let's just back up a little
23 bit.  You said the pharmacies each place their own
24 orders through the Amerisource portal?
25     A.  That's correct.

Confidential Information Subject to Protective Order

Page 38

1  Q. All right. Are those orders tracked at all
2  on the Humana side in a centrally located database?
3  A. Not to my knowledge.
4  Q. Okay. Are those orders tracked by a
5  centrally located Humana billing department
6  anywhere?
7  A. I don't know about that, either. I know
8  that all the records are for in stores. The stores
9  keep their own records of what they purchase.
10  Q. Okay. And so each individual store would be
11  responsible for maintaining purchase records,
12  invoices, et cetera, from AmerisourceBergen; is that
13  right?
14  A. Correct.
15  Q. Okay. So we've covered the NDC code. That
16  information is kept, right?
17  A. NDC code? And the -- yes, it's kept in the
18  stores --
19  Q. What about -- what about the lot or batch
20  number of valsartan, is that something that's
21  tracked?
22  A. That's not tracked.
23  Q. Okay. So let's say that Amerisource -- that
24  AmerisourceBergen sold Humana Retail Pharmacy seven
25  batches of valsartan, for example. Would those

Page 39

1  individual batches be segregated at Humana's
2  premises, or are they all combined into a single
3  bin?
4  A. It could all be combined in the -- on the
5  shelf together and not in a bin, but in the shelf
6  together.
7  Q. So in other words, does Humana have the
8  ability to determine what lot or batch of valsartan
9  any individual pill on its shelves came from?
10  A. Outside of looking at the manufacturer
11  bottle, not at this time.
12  Q. Okay. And so we discussed this earlier,
13  that there were some manufacturers that recalled all
14  of their valsartan. Are you also aware that there
15  are some manufacturers that only recalled some of
16  its valsartan, like Aurobindo, for example?
17  A. Yes. I'm aware that some -- that the lots
18  were expanded into certain manufacturers all lots
19  and all batches, and some were just certain select
20  ones, yes.
21  Q. If Humana did not have the ability to
22  distinguish between lot and batch numbers for the
23  pills that were in its possession, Humana also
24  wouldn't be in a position to determine which pills
25  were and were not contaminated from a manufacturer

Page 40

1  like Aurobindo, right?
2  A. Once it's been dispensed to the patient,
3  that's correct. Once it's -- while it's still in
4  the pharmacy, it is in its manufacturer bottle, so
5  then it can be determined, but again, once it's
6  dispensed to the patient, then no, we would not be
7  able to distinguish.
8  Q. And so the safest thing for Humana to do at
9  that point would be to assume that all of the
10  dispensed medication was contaminated for recall
11  purposes, right?
12  MR. REEFER: Object to form; foundation.
13  A. When we do -- when we have a recall, and we
14  do not have information on lot, batch, or expiration
15  date, we operate under the assumption that all is
16  affected, and we contact all those patients.
17  Q. And the reason that you have to operate on
18  that assumption is because there's no way to
19  guarantee which pills are safe and which ones are
20  not, right?
21  MR. REEFER: Object to form; foundation.
22  A. Again, we operate under the assumption that
23  potentially every single dispense of that particular
24  NDC is potentially affected by the recall. So we
25  would -- we would contact all those patients because

Page 41

1  there is no way to determine if it is or not.
2  Q. All right. So we've talked about lot and
3  batch number. I assume that expiration date is
4  something that is tracked, correct?
5  A. So the original manufacturer expiration date
6  is not tracked, either.
7  Q. How are expiration dates tracked on Humana
8  medications, or how are they set, I guess?
9  A. So let me go back and explain that a little
10  further, maybe to give some context.
11  So if the manufacturer's bottle indicates
12  that the expiration date is less than one year from
13  the date that we are dispensing that product, at
14  that point, we update the label to indicate the
15  actual expiration date.
16  If the expiration date of the manufacturer's
17  bottle is greater than one year, then our system
18  automatically gives it a one-year expiration date
19  from the date of dispense. So if it was dispensed
20  today, and the expiration date of the product was in
21  2025, it would say 9/27/2022 as the expiration date
22  even though we have essentially until 2025.
23  Does that make sense.
24  Q. It does. Why is that the policy?
25  A. It's a standard practice across all the

Confidential Information Subject to Protective Order

Page 42

1  different pharmacies I've ever worked for ever, is
2  they always give a one-year expiration date on
3  dispensed product.
4  Q.  Okay.  Does Humana track the manufacture
5  date of the valsartan pills?
6  A.  Not to my knowledge.
7  Q.  Okay.  Does it track the name of the
8  manufacturer?
9  A.  I'm sorry.  You said the name?
10  Q.  Yes.
11  A.  We track the NDC, and the NDC would point
12  back to the manufacturer's name, but I don't think
13  we have a -- potentially, I guess, they could bounce
14  information off by using NDC and manufacturer name
15  associated with NDC, but I don't know -- you know
16  what?  Let me take that back.
17  So once we dispense a product, our labels do
18  indicate that it was -- which NDC it is, and I
19  believe it shows the name of the manufacturer, too,
20  as well.  So somewhere -- somewhere in some report
21  I'm sure there is an -- associated with the NDC
22  going back to the name.
23  Q.  Okay.  At any rate --
24  A.  Yeah.
25  Q.  That's a fair point.  At any rate, Humana

Page 43

1  would have the ability to pull that data to
2  determine which valsartan pills at least correlated
3  to which NDC or to which manufacturer; is that fair?
4  A.  That's fair.  That's correct.
5  Q.  All right.  When Humana purchases drugs --
6  let's make it specific.  When Humana purchases
7  valsartan from AmerisourceBergen, did those pills
8  come in bulk packs, or were they prebottled?
9  A.  They come in the -- in the manufacturer
10  bottle.  Maybe if you describe to me what's -- what
11  do you mean by the two different -- because, to me,
12  it's the same thing, what you -- what you asked me.
13  The two options mean the same thing to me.  I don't
14  know.  Maybe I'm --
15  Q.  That's all right.  It wasn't a very good
16  question.  Let me ask it this way.
17  Does it come packaged exactly in the way
18  that it would be dispensed to the consumer, or does
19  it come in a large bottle that allows a pharmacist
20  to put it in bottles in smaller quantities when
21  they're purchased by consumers?
22  A.  Both.  Sometimes the pharmacy order in
23  quantities of 30s or 90s, which, in most cases, it's
24  a one -- once a day -- so it would be, like, a
25  three-month or a one-month supply, and sometimes

Page 44

1  they order in large, you know, 1000-count bottles,
2  too, 500-count bottles, you know, as well.  So yes
3  to both.  Yes to all, all of the above.
4  Q.  All right.  So it would be fair to say that
5  for anything that came in the package that was
6  dispensed exactly as it came to the consumer, those
7  batches would be -- you could track the manufacturer
8  of those bottles, right?
9  A.  We could track the manufacturers of all the
10  bottles by NDC.
11  Q.  Right.  Okay.  Fair enough.  And you can
12  track all of them packaged either way by
13  manufacturer or NDC code because the NDC code traces
14  back to the manufacturer, right?
15  A.  NDC code tracks back to the manufacturer,
16  correct.
17  MS. GOLDENBERG:  Okay.  Why don't we pull up
18  Tab 37, please, and this will be Exhibit 6.
19  (Humana - Cedeno Exhibit 6 was marked for
20  identification.)
21  BY MS. GOLDENBERG:
22  Q.  All right.  So what you have in front of
23  you, if we scroll down to the bottom of this first
24  page -- sorry, is there a Bates number on this one
25  that shows up?  There we go.  This is HUM001416,

Page 45

1  just for the record.
2  And if we go up to the top of this page,
3  you'll see that this is a document that is supposed
4  to provide inventory for HP1 operations.
5  Can you tell me what HP1 operations is?
6  A.  It's not retail pharmacy.  That's -- I don't
7  know.  I'm going to make an assumption that's Humana
8  pharmacy mail operations, but that's not us.
9  Q.  Got it.  Okay.  Well, let's just go through
10  these fields, and you can tell me if they're the
11  same on the retail pharmacy side.  Okay?
12  You'll see here that under -- there's a
13  bunch of acronyms, and there's a bunch of
14  descriptions if we scroll down a little bit on this
15  first page here.  There we go.
16  So as we've talked about, NDC code is the
17  National Drug Code, and that is something that the
18  retail pharmacies track, correct?
19  A.  That's correct.
20  Q.  Okay.  We talked about the lot number.  That
21  is not something that is tracked at the retail
22  level, correct?
23  A.  That's correct.
24  Q.  All right.  There's a bunch of other fields
25  on here, UOU, LDU.  Are you familiar with these

Page 46

1 terms?
2    A.  I know what unit of use is.  Well, I know
3 what unit of use is for a different company.  I
4 don't know what unit of use is for Humana.  How
5 about that?
6    Q.  Okay.  What does it mean generally?
7    A.  So in -- so in my past experiences, when you
8 are setting up the locations of a -- of a pharmacy
9 and what goes in what areas, unit of use is
10 something that would just -- you would grab
11 something that's prefilled to the correct amount.
12       Let's just say if it was 90 pills or
13 something, and it's in a 90-pill bottle, then it's
14 easy to grab that and label it and send it out
15 without having to do too much more.  In other words,
16 you don't have to count out of -- out of a bottle of
17 1,000, you don't -- I don't have to count out 90
18 because it's already prepacked at that 90 level.
19       Again, that's my understanding for other
20 organizations, not for Humana, so that's my
21 assumption.
22    Q.  All right.  Are you familiar in -- for
23 Humana's purposes with any of the other terms in
24 this table here?
25    A.  No.

Page 47

1    Q.  Okay.  Let's take this one down.
2       All right.  So let's talk about the recall a
3 little bit.  You said that you don't recall exactly
4 who told you about the recall.  How did you
5 personally find out about it?
6    A.  So our recall process back then, very
7 similar to how it is today, someone from
8 professional practice will e-mail the associate
9 directors of retail pharmacy, explaining the recall
10 and explaining our steps.
11       So essentially it would come to us via
12 e-mail, and then from there, we have a -- steps that
13 we take on our side to ensure that we are in
14 compliance with that.
15    Q.  All right.  Did you have any personal
16 contact with representatives of AmerisourceBergen
17 concerning the valsartan recall?
18    A.  No.
19    Q.  Okay.  Did Humana Retail Pharmacy have any
20 contact with -- well, let -- yeah.  Let's just start
21 this at a general level.  Did anyone at Humana
22 Retail Pharmacy have any contact with anyone at
23 AmerisourceBergen concerning the recall?
24    A.  To my knowledge, no.
25    Q.  Okay.  So that was all done through the

Page 48

1 parent company?
2    A.  So -- so I would assume so.  I don't -- I
3 don't know.  No.  I guess you're -- are you asking
4 me if someone from -- if someone from Humana had a
5 conversation with someone from Amerisource?  Is that
6 what you're asking me, about this recall?
7    Q.  Well, so Humana has designated three
8 witnesses to testify about the subjects in our
9 30(b)(6) notice.  What I'm trying to figure out is
10 which of you -- which of the three of you is the
11 right person to talk about this recall.
12    A.  Got it.  In regards to conversations between
13 Humana and Amerisource, not it, not me.
14    Q.  Okay.
15       MS. GOLDENBERG:  I hope, then, that when we
16 get to one of the other two, someone is going to
17 say that that's me.  Is that fair, Kirstin?  Yes?
18       MS. IVES:  Yeah, that's fine, but I would --
19 I would say Mr. Cedeno might be able to talk
20 about the interaction post-recall, not when the
21 recall started, but, you know, to the extent --
22 returns and things like that from the store
23 level, that might be within his wheelhouse.
24       MS. GOLDENBERG:  All right.  So we'll get to
25 that part.  Let's see.  And -- well, strike that.

Page 49

1       You know, why don't we take a five-minute
2 break.  In light of what we've gotten so far, I
3 think I can cut down a lot of what I was going to
4 ask today, and so this will give me some time to
5 do a little consolidation.
6       THE VIDEOGRAPHER:  The time right now is
7 9:57 a.m.  We're off the record.
8    (Recess from 9:57 a.m. until 10:11 a.m.)
9       THE VIDEOGRAPHER:  The time right now is
10 10:11 a.m.  We're back on the record.
11       MS. GOLDENBERG:  All right.  So why don't we
12 pull up Tab 44, then, please, and this will be
13 Exhibit 7.
14       (Humana - Cedeno Exhibit 7 was marked for
15 identification.)
16 BY MS. GOLDENBERG:
17    Q.  All right.  Mr. Cedeno, it's my
18 understanding that every patient who gets a -- or
19 who filled a prescription of valsartan with Humana
20 pharmacy received a patient insert with that
21 prescription; is that right?
22    A.  That's correct.
23    Q.  And with that patient insert, it was --
24 well, can you tell me how that was generated?
25    A.  So the ones we use in retail pharmacy is

Confidential Information Subject to Protective Order

| Page 50 | Page 52 |
|---|---|

Page 50

1  very similar to the one that you have showing.  It's
2  not the exact same one.  That's a mail order one.
3  However, it is generated through the dispensing
4  system in retail pharmacy.
5      So we use a system called QS1 as our
6  dispensing system.  It handles everything from our
7  inventory and dispensing, integration with
8  Surescripts so that we receive the prescriptions
9  electronically from the providers and so forth.
10     It's my understanding that within that
11 system, they have a link -- they link the most
12 up-to-date information of the medication so that
13 when, let's say, in this case, valsartan was
14 dispensed, then a patient information on valsartan
15 would print out with it, too, as well.  It's
16 actually on the same leaflet for us in retail
17 pharmacy.
18     Q.  All right.  And so all the Humana entities
19 would coordinate so that patients would receive the
20 same information in their package insert, right?
21     A.  We get the -- we get the information from
22 the same place, so, yes.
23     Q.  Okay.  And when you say you get the
24 information from the same place, is that the
25 FDA-approved label?

Page 51

1      A.  I believe so.  I don't know -- I don't
2  know -- I guess we'd have to defer to the systems
3  that we use.  In this case, for retail pharmacy, QS1
4  would gather that information for us and spit the
5  label out, so to speak, once something is prepared
6  for that particular product.
7      Q.  All right.  Suffice it to say, QS1 would
8  have been the system that was used to generate the
9  patient insert for all valsartan prescriptions the
10 whole time that they were being sold, correct?
11     A.  In the retail pharmacy, yes.
12     Q.  Okay.  And also that system would have spit
13 out the exact same patient insert to every patient
14 who purchased valsartan no matter where they lived,
15 right?
16     A.  In retail pharmacy, yes.
17     Q.  So a patient in Minnesota gets the same
18 package insert as a patient in Mississippi, for
19 example, right?
20     A.  If we had retail pharmacy locations in those
21 states, yes, but we don't, but I get where you're
22 going.
23     Q.  Fair enough.  I guess I managed to choose
24 the two where you don't have them, but every retail
25 pharmacy would give every patient the same package

Page 52

1  insert for valsartan, correct?
2      A.  That's correct, yes.
3      Q.  I won't take it personally that you're not
4  in Minnesota.
5      And so let's just scroll down on this a
6  little bit.  You'll see here on the top of the page
7  that the generic name listed is valsartan tablets,
8  right?
9      A.  Yes.
10     Q.  Okay.  Let's scroll down a little bit here
11 and you'll see that this says:  Important
12 information from your Humana -- Humana pharmacy
13 team.
14     And we'll keep scrolling down.  All right.
15 Now, here, it looks like this is a -- I don't know
16 if this was a sample or if this was for an actual
17 patient, but it says their date of birth is
18 2/10/1000.
19     So can I assume that this is a template?
20     A.  I think it's a safe assumption.
21     Q.  Okay.  Nobody who was born in 1000 is still
22 alive today, right?
23     A.  Yeah.  No.
24     Q.  All right.  So let's scroll down a little
25 bit so we can see the bottom half of this page, and

Page 53

1  what you'll see here is that you've got the name of
2  the dispensed drug, and then you have some
3  information that says --
4      MS. GOLDENBERG:  Stop scrolling.
5      Q.  At the top of this page it says:  You have a
6  right to know about the proper use of your
7  medication and its effects.  Written information
8  about this medicine has been provided to you.
9      Do you see that?
10     A.  Yes.
11     Q.  And when it says that, the written
12 information that's being provided to the patient is
13 exactly what's printed in a leaflet like this,
14 right?
15     A.  That's correct.
16     Q.  Is there any other information that Humana
17 Retail Pharmacy would provide to patients outside of
18 this package insert?
19     A.  For valsartan or for any drug?
20     Q.  For valsartan.
21     A.  No.
22     Q.  Okay.  And so everything that would have
23 been provided to patients about valsartan would be
24 in this document and nowhere else, right?
25     A.  Correct.

1  Q. Okay. In this document -- you can take a
2  look at the whole thing if you want, but my
3  understanding is that there are no mentions of
4  nitrosamines; is that right?
5  A. Looking at the page in front of me right
6  now, I would say there's no information right there
7  on --
8  MS. GOLDENBERG: All right. And just to --
9  A. -- nitrosamines.
10  MS. GOLDENBERG: Just to make this easy,
11  Leah, if you can pull up a Control F on this and
12  type in the word "nitrosamine," please.
13  Q. We'll see how long this takes. I'll
14  represent to you I did this off the record and got
15  no results. Okay.
16  A. I would think -- I would think there's no
17  information there. So, yeah, it says zero.
18  Q. There we go.
19  MS. GOLDENBERG: And if we do the same thing
20  with the word "NDMA."
21  A. I would assume it's not in there, either.
22  Q. Okay. So that one turned around real quick.
23  So suffice it to say, the package insert
24  given to patients about valsartan had no mention of
25  nitrosamines or NDMA in it, right?

1  A. That's correct.
2  Q. Okay.
3  MS. GOLDENBERG: You can take that document
4  down, please.
5  Q. Let's talk a little bit about Topic 7, which
6  is your retention, sequestration, return, or
7  destruction of the valsartan drugs after their
8  recall.
9  What steps did Humana Retail Pharmacy take
10  to retain or return recalled valsartan?
11  A. So if we received notification from
12  Amerisource to return back to them, then we followed
13  that. If not, then we have a separate process where
14  we would -- we would quarantine whichever
15  medications were indicated in the recall so that
16  they are not dispensed to any other patients, and
17  then we would follow another process where we would
18  send it to a reverse distributor for destruction.
19  Q. Okay. And specifically with valsartan, what
20  happened here?
21  A. To my knowledge, a majority, if not all,
22  were sent back to Amerisource.
23  Q. All right. Does Humana Retail Pharmacy
24  currently have any recalled valsartan in its
25  possession?

1  A. No.
2  Q. I'm sorry. That was no?
3  A. Correct, it was no. No.
4  Q. Okay. Sorry. You cut out there for a
5  minute.
6  And when Humana sent out a recall notice to
7  its customers, what did it direct its customers to
8  do with their recalled valsartan?
9  A. When Humana Retail Pharmacy received the
10  recall notice, we called every single customer who
11  had been indicated in our records of receiving that
12  particular NDC. We asked them to bring it back
13  because we figured -- once we had the information
14  from our professional practices to which alternate
15  therapies we recommend switching them over to.
16  Yeah.
17  Q. Got it. And just to piggyback on to
18  something you just said, the recall at the Humana
19  level was done on an NDC level basis, right?
20  A. That's correct, yes.
21  Q. Okay.
22  A. We don't -- we don't -- we don't track lots
23  or batches, since we -- so we just went strictly on
24  NDCs.
25  Q. All right. And you also mentioned that

1  Humana Retail Pharmacy no longer has any valsartan
2  in its possession. Did all of it get sent back to
3  AmerisourceBergen, or was some of it destroyed?
4  A. I believe a majority was sent back to
5  Amerisource. I can probably say there's a couple
6  one-offs that got sent back to PharmaLink, who's our
7  reverse distributor for destruction.
8  Q. Okay. Did Humana Retail Pharmacy request
9  any credits or refunds from AmerisourceBergen for
10  returning the recalled valsartan?
11  A. I believe Dan, tomorrow, can probably talk
12  about that. I don't -- I don't know.
13  Q. Okay.
14  MS. GOLDENBERG: And, Kirstin, is that
15  right, that he's going to be the right person to
16  ask about this?
17  MS. IVES: Yeah. Nathan may actually know a
18  little bit about that, too.
19  MS. GOLDENBERG: Okay. As long as you tell
20  me there's someone, then we can skip over that
21  today.
22  BY MS. GOLDENBERG:
23  Q. And let me see if I can short-circuit some
24  of this questioning.
25  Are you the right person to talk to about

Confidential Information Subject to Protective Order

1  any credits or refunds in any capacity whatsoever?
2    A.  Probably not.  I can tell you that we do get
3  credits and refunds.  I can't tell you specifically
4  if we requested it.  I know that when we send back
5  things to Amerisource, we get credits for them.  So
6  I don't know if that helps.  Is that helpful at all?
7    Q.  Let me ask it this way.  If Humana Retail
8  Pharmacy wanted to know if it had received credits
9  or refunds, is there a report that Humana could run
10 that would be drug-specific that would tell you
11 that?
12   A.  Maybe in accounting.  I know stores -- when
13 they receive credit for something, the stores get a
14 notice or a credit memo that they keep in their
15 store records.  So whenever they do send something
16 back to Amerisource, they get a record saying, yes,
17 here's the dollar amount you were credited for for
18 the quantity you sent back.  Again, that's kept in
19 the store level, so each individual store would
20 maintain their own.
21   Q.  Okay.  So the data exists.  You just don't
22 know the intricacies of it today.  Is that fair?
23   A.  That's fair.
24     MS. GOLDENBERG:  Okay.  All right.  Why
25 don't we pull up Tab 16, please, and this will be

1  Exhibit 8.
2      (Humana - Cedeno Exhibit 8 was marked for
3  identification.)
4      MS. GOLDENBERG:  All right.  Let's scroll
5  down to the bottom of the first page so we can
6  get the Bates number, and you'll see this is
7  HUM000150.
8      Let's scroll back up to the top of this
9  page, please.
10 BY MS. GOLDENBERG:
11   Q.  You'll see that this is a report generated
12 by a company called Anda.  Are you familiar with
13 Anda?
14   A.  Yes.
15   Q.  Okay.  And what is that?
16   A.  Anda is our probably tertiary distributor of
17 generic products.
18   Q.  And would Anda be a distributor that would
19 be used by the retail pharmacy wing of Humana?
20   A.  Yeah.  Again, it would be, like our
21 tertiary.  So if we -- normally it would be
22 Amerisource, and then we would probably go to
23 Cardinal, and then we would probably go to Anda, and
24 then probably to Solco, if Amerisource was unable to
25 get a product.

1      It's easier for -- it's easier for us to
2  order from Amerisource because our systems are --
3  they talk to each other better, if that makes sense.
4  So in regards to not getting a nasty e-mail from
5  accounting, it's better to go through Amerisource
6  than anyone else.
7    Q.  Okay.  So what I'm trying to figure out is,
8  are you the right person to ask about or if -- it
9  looks like -- since you testified earlier that all
10 of the retail pharmacy product came from
11 Amerisource, would it be fair to assume that this is
12 product that went to the other parts of the Humana
13 pharmacy?
14   A.  Looking at the address, I believe that's one
15 of our Humana Retail Pharmacies.  It's not the one
16 that I supervise, so it looks like that would come
17 to a Humana Retail Pharmacy.
18   Q.  Okay.  So this -- so you're the right person
19 for this document then?
20   A.  Probably.  Out of the three of us, yes.
21   Q.  So I just want to walk through the
22 information here and confirm that this is all
23 accurate.  This should be pretty quick.
24     Customer number, would those various numbers
25 there refer to the different retail pharmacies?

1    A.  Those numbers don't look familiar to me.  I
2  don't -- I don't -- I don't know.
3    Q.  Okay.  Customer name, Humana --
4    A.  I would --
5    Q.  Sorry.  Go ahead.
6    A.  No.  I would assume that it probably is an
7  indication of different retail pharmacies.  We do
8  have different customer numbers, I guess you could
9  say, in between whether it's Amerisource or Anda or
10 Cardinal or anyone else.
11   Q.  All right.  You'll see, if you look at some
12 of the numbers, for example, the number 308002
13 appears multiple times on this first page.  So would
14 it be safe to assume that all of those orders are
15 for all one retail pharmacy in a certain location?
16   A.  That would be my assumption.
17   Q.  Okay.  We then have different customers, and
18 all of them, at least on this page, appear to be the
19 same, except Humana Medical Plan, Inc. is listed
20 once.  What is Humana Medical Plan, Inc.?
21   A.  I don't know.  I know that when we -- I know
22 that, let's say -- so I'm not too familiar with
23 Anda, to be -- to be honest.  However, in
24 Amerisource, we have different names for all of our
25 pharmacies, and sometimes they're just named Humana,

Page 62

1  and sometimes they're named, you know, various
2  different names.  Whoever sets up the accounts for
3  us picks and chooses whatever name they want to use.
4    Q.  Sure.  All right.  Let's go to -- so it
5  looks like this a report that was generated for
6  Humana by Anda; is that right?
7    A.  That's what it looks like to me.
8    Q.  Okay.  And it covers the time period January
9  1st, 2013 to December 31st, 2019, right?
10   A.  That's correct.
11   Q.  All right.  You said based on the billing
12 address, you assume that this is a retail pharmacy.
13 Can you tell from what you've seen so far whether
14 this would cover multiple retail pharmacies or if
15 this just covers a specific one?
16   A.  It's interesting because it has -- it has
17 that address there as one of our pharmacies in
18 Plantation, Florida, but it has a different customer
19 number there, so I don't -- I don't know.
20   Q.  All right.  Either way, if Humana Retail
21 Pharmacy wanted to know -- or wanted to generate a
22 report with all of the valsartan that it had
23 purchased from Anda, is that something that could be
24 done on the Humana side, either in the aggregate or
25 on a pharmacy-by-pharmacy level?

Page 63

1    A.  Each individual pharmacy would have purchase
2  invoices, I guess, from Anda if they did purchase
3  from Anda, so, yes, they could.
4      From an aggregate level, probably.  I don't
5  know.  I'm -- that's not my area.
6    Q.  Sure.  And that would also be true for other
7  distributors, like AmerisourceBergen, right?
8  They -- each individual pharmacy would have records
9  that showed what valsartan was purchased?
10   A.  Yes, correct.
11   Q.  And as we discussed, that would have at
12 least, at minimum, the NDC information for those
13 drugs, right?
14   A.  That's correct.
15   Q.  All right.  Let's go to the next page of
16 this document.  Oh, sorry.  Let's go to Page 14.
17     So this is the last page here, and you can
18 see that there's a table, and it says Units_Net and
19 Net_Sales_Amount.
20     Do you see that?
21   A.  Yes.
22   Q.  Now, the Net_Sales_Amount is redacted, but
23 under Units_Net there are a series of numbers there,
24 and I'm just wondering if you can tell me if those
25 are numbers of pills, numbers of packages, or what

Page 64

1  those numbers refer to.
2    A.  I don't know.  There's no other, like,
3  description next to that.  It just says Units_Net.
4  I would assume the number 24, the first number,
5  refers to number of bottles since I've never seen
6  a -- valsartan coming -- coming from a manufacturer
7  with a 24 in a bottle.  It's usually 30, 90, 100,
8  500, 1,000.
9    Q.  And when you say bottles, are those the bulk
10 bottles from the manufacturer or the individually
11 packaged bottles?
12   A.  Again, to me, that makes -- that's the same
13 statement.  So an individually packed bottle from
14 the manufacturer would come in a 30, 60 -- sorry --
15 30, 90, 100, 500, 1,000 count prepackaged from the
16 manufacturer.
17   Q.  I've got to get better at asking this.  When
18 it says 24 units, is that 24 very large bottles that
19 the pharmacy would then repackage into smaller
20 bottles that go to the consumer, or are those 24
21 bottles filled with 30, 60, or 90 that are not
22 touched by the pharmacy and sold directly to the
23 consumer?
24   A.  They could be any of those.  It doesn't --
25 it doesn't give me a description as to the four --

Page 65

1  the four different things, the four different
2  numbers, 24, 431, 350, and 2.4 million.
3    Q.  Okay.  Now, there's 2 million -- there's a
4  roughly 2.4 million number at the bottom there.
5      Do you see that?
6    A.  Yes.
7    Q.  Do you have an understanding of what that
8  refers to?
9    A.  No.
10   Q.  Okay.  Let's go to Page 3, and what we see
11 here is we have the item generic name and the brand.
12     Do you see that?
13   A.  Yes.
14   Q.  All right.  And by the way, valsartan is the
15 generic version of Diovan, correct?
16   A.  That's correct.
17   Q.  All right.  And you would agree that it's
18 important for patients or customers of Humana to
19 understand that the generic drugs they're getting
20 were supposed to be the same, at least from a
21 therapeutic standpoint, as the reference listed drug
22 or the brand name drug, right?
23   A.  Ask that again.  I'm sorry.
24   Q.  It was a long question.
25     You agree that patients who purchase generic

Confidential Information Subject to Protective Order

Page 66

1  drugs from Humana would want to be sure that the
2  drugs they were getting were therapeutic equivalents
3  of the brand name drug, right?
4      MR. REEFER: Same objection.
5      A.  Sometimes the providers just write
6  valsartan. They don't -- they don't say -- you
7  know, give the generic of Diovan HCT, so, yes -- yes
8  and no. I mean, something that's been a generic for
9  so long a time, a lot of time the providers, whether
10 that's a physician or a nurse practitioner or a
11 physician assistant, they will just write the
12 generic name for it, period, without really saying
13 it.
14      So it depends -- I guess it depends on each
15 patient's specific case, if they had that
16 conversation with their provider saying, "Yes, I'm
17 going to write you a prescription for Diovan HCT,"
18 versus "I'm going to give you a prescription for
19 valsartan." So it doesn't matter, I guess. It does
20 matter. I don't know.
21     Q.  Let me ask it in a different way.
22     A generic version of a drug is supposed to
23 be therapeutically equivalent to a brand name drug,
24 right?
25     MR. REEFER: Object to form.

Page 67

1      A.  Yes. Correct.
2      MR. REEFER: Foundation.
3      Q.  All right. And so if a patient either was
4  written a prescription for or is given a substitute
5  for the brand name of Diovan, any patient filling a
6  prescription for valsartan is going to have an
7  expectation, and reasonably so, that the drug is
8  going to work just as well as Diovan, right?
9      MR. REEFER: Object to form and foundation.
10     A.  Yes, correct.
11     Q.  Okay. All right. So on Page 3 here, it
12 looks like, again, the NDC code is tracked, and
13 there's a subject header for Form.
14     Do you know what that refers to?
15     A.  It looks like tablet, TB for tablet.
16     Q.  Ah, I see. Okay. Let's go to Page 5, and
17 here, as we've discussed, the name of the
18 manufacturer of the drug does look like it's
19 tracked, right?
20     A.  Yes, it looks like it.
21     Q.  And so we know from looking at this page
22 that, at a minimum, we understand Humana Retail
23 Pharmacy purchased drugs that were manufactured by
24 Aurobindo, Teva, and Solco, correct?
25     A.  Correct.

Page 68

1      MS. GOLDENBERG: Okay. We can take this one
2  down.
3      And let's put up Tab 38, which will be
4  Exhibit 9.
5      (Humana - Cedeno Exhibit 9 was marked for
6  identification.)
7      MS. GOLDENBERG: For the record, this is
8  HUM000990.
9  BY MS. GOLDENBERG:
10     Q.  And you'll see that is the title Humana
11 Transaction History Log.
12     Do you see that?
13     A.  Yes, I do.
14     Q.  All right. Is this a report that might be
15 generated by the retail pharmacy?
16     A.  It does not look like one, no.
17     Q.  Okay. So this is something I should ask one
18 of your colleagues about?
19     A.  Yes.
20     MS. GOLDENBERG: Okay. Kirstin, you agree
21 with that?
22     MS. IVES: Yes. Mr. Hunnell.
23     MS. GOLDENBERG: Okay. All right. Let's
24 take this one down, then, and let's put up Tab
25 17, which will be Exhibit 10.

Page 69

1      (Humana - Cedeno Exhibit 10 was marked for
2  identification.)
3  BY MS. GOLDENBERG:
4      Q.  Tab 17 -- so this is another spreadsheet
5  here, and you'll see that at the top, we've got the
6  NDC code information written three different ways.
7  And if we go down to the next page -- oh, no.
8  Sorry. Let's go to the last page.
9      All right. So here we have a number of
10 other suppliers that are listed, and all of these
11 appear to be suppliers of valsartan that -- well,
12 I'll just leave it there.
13     Does that look right to you?
14     MR. REEFER: Object to form and foundation.
15     A.  It looks like it to me, yes.
16     Q.  Okay. And so we can see here that Humana
17 purchased drugs that were made by Actavis,
18 Aurobindo, Mylan, and Teva, correct?
19     MR. REEFER: Same objection.
20     A.  If that's a supplier, I would assume so,
21 yes. This is -- this is probably -- I'm not so sure
22 this includes Humana Retail Pharmacy or not, since
23 we don't -- we don't go directly to the manufacturer
24 to purchase. We usually just go through Amerisource
25 or, like we saw before, through Anda or through

Confidential Information Subject to Protective Order

Page 70

1  Cardinal.
2      So a direct buy from the manufacturer would
3  not be something that retail pharmacy does.  So I'm
4  not too sure, again, if it's -- it includes retail
5  pharmacy, but that's what it appears like to me,
6  that the supplier was directly those listed.
7      Q.  Okay.  Do you have an understanding of what
8  SmartSource or Bellco is?
9      A.  Yeah.  Bellco is also another supplier.  As
10 you can see, it's owned by Amerisource, ABC.
11     Q.  Right.
12     A.  And we do get some -- we do get some
13 generics from there from time to time.  It's very
14 rare in Humana Retail Pharmacy that we go through
15 that, but it's there as an option for us.
16     Q.  Okay.  It was something that Humana Retail
17 Pharmacy used, though?
18     A.  For valsartan?
19     Q.  Yes.
20     A.  If it shows up on this list, potentially,
21 yes.  I don't -- I don't -- without looking at
22 anything that shows my purchase order from Bellco, I
23 couldn't be 100 percent confident.
24     Q.  All right.  Either way, whether Humana
25 Retail Pharmacy went directly through

Page 71

1  AmerisourceBergen or went through Bellco, the data
2  about what was purchased would still exist at every
3  retail pharmacy, correct?
4      A.  Each individual pharmacy would have their
5  records of where they purchased from, so whether it
6  came from Amerisource or Bellco or Anda, yes.
7      Q.  All right.  Let's go to Page 4, and this may
8  be a better question for your colleagues, but I want
9  to just run it past you and you can let me know.
10 There's information here about warehouse use or
11 warehouse.
12     Do you see that?
13     A.  I do, yes.
14     Q.  All right.  Is this information about where
15 the product is warehoused something that would
16 concern Humana Retail Pharmacy, or is this a
17 question better posed to one of your colleagues?
18     A.  Probably one of my colleagues.
19     Q.  Okay.
20     MS. IVES:  And, Marlene, this a Dan question
21 for tomorrow.  These are the -- the purchasing
22 records would fall under his department.
23     MS. GOLDENBERG:  All right.  So let's take
24 this one down.  We'll save that for him.
25     Q.  Let's talk about credits or refunds for

Page 72

1  consumers who had recalled valsartan.  Did Humana
2  provide any credits or refunds to those consumers?
3      A.  Yes.  To my knowledge, when -- and we took
4  back -- medications that were recalled, we find them
5  an alternate product to give, and once we do that,
6  we figure out a way to give them the credit back for
7  it, you know.
8      We cannot, I guess, double bill for
9  something.  We would have to reverse one of the
10 claims and then credit that forward to the new copay
11 that came forward.  So if there was a copay, there
12 was a dollar amount credit moved forward to cover
13 the new replacement, if that makes sense.
14     Q.  I think so.  Let's just break it down a
15 little bit and walk me through the actual
16 documentation process for this.
17     So a patient comes back, brings in their
18 recalled valsartan.  What does someone at Humana do
19 with that?
20     A.  Someone in Humana Retail Pharmacy would --
21 had that out -- either had the outbound call to the
22 patient saying, "Mr. or Mrs. So-and-So," you know --
23 and they had a verbiage that we -- that we
24 recommended to them about the -- about the recall.
25     Once the patient brought back that -- let's

Page 73

1  say valsartan in this case, and we decided to you,
2  know, talk to their provider and move them to a
3  different product, we would say, you know, "Bring
4  back your valsartan."  We would reverse that claim
5  to the insurance company or to the PBM.
6      Once that claim was reversed, we would then
7  reprocess the new prescription, and whatever that
8  copay was for that, we would take the copay that
9  they paid for the previous valsartan product and
10 credit that towards the copay of the new product.
11     So if it was in the same tier, let's just
12 say, and let's just say the patient had a $5 copay,
13 we would take that $5 and credit it towards the new
14 $5 copay so the patient is not out-of-pocket for
15 anything.  However, Humana does lose the
16 reimbursement for the -- for the first product, if
17 that makes sense.
18     Q.  Okay.  And is that something that's done
19 only if the product is returned?
20     A.  Yes.
21     Q.  Okay.  And if the product is returned and
22 someone transfers that copay amount over to the next
23 drug, is that something that would be reflected in a
24 record somewhere at Humana Retail Pharmacy?
25     A.  Inconsistently, yes.  So if there was --

Confidential Information Subject to Protective Order

Page 74

1  if -- we do have a place that we leave patient notes
2  within our QS1 system, and if the pharmacist said,
3  "Mrs. Smith brought in her valsartan and I credited
4  that towards her new lisinopril prescription," let's
5  just say, then that would pop up, but it wasn't a
6  standard practice back then for us to do.
7     Q.  Well, so I'm sure we all have accountants
8  that we work with, and if an accountant finds a
9  penny missing, they're going to be upset, right?
10    A.  Good question.  So there -- we usually write
11 a handwritten note saying this was -- we're very
12 complicated -- a very handwritten note and then
13 place it in with our -- with our -- with our end of
14 day point of sale reports back to accounting.  So
15 they do see that.  It's a handwritten note, so, I
16 mean, very official.
17    Q.  And what does the accountant do with those
18 handwritten notes?
19    A.  I don't know.  That's accounting.
20    Q.  All right.
21    A.  I -- I'm going to operate under the
22 assumption that they say, okay, this $5 was used
23 towards this $5 and that's why that checks out, so
24 there's a checks and balances, but, again, it's a
25 handwritten note, so I'm not too sure how deep they

Page 75

1  dive in for $5.  I'm assuming, it's accounting, that
2  every penny does count, so I'm going to assume that
3  they do that check.
4     Q.  All right.  And, you know, if Humana ever
5  were to get audited, every penny has to be accounted
6  for as well, right?
7     A.  That's correct.  That's correct.  Good
8  answer -- good question.
9     Q.  Okay.  And to make sure that that is
10 properly accounted for, presumably the accounting
11 department is entering in some note that reflects
12 that handwritten note in -- at least on their side
13 of things, right?
14    A.  That's my assumption, yes.
15    Q.  Okay.  So at least at the accounting level,
16 there would be a record of credits that would be
17 given to consumers, right?
18    A.  Yes.
19    Q.  Okay.  Let's talk about third-party payers
20 for a minute.  Did Humana Retail Pharmacy issue any
21 credits or refunds in response to any requests for a
22 credit or a refund by a third-party payer for
23 valsartan?
24    A.  I don't recall.
25    Q.  Okay.  Is one of your colleagues a better

Page 76

1  person to ask about that?
2     A.  Maybe.  Not me.  I don't -- let me think.
3  From a third-party payer?  Possibly.  I don't know.
4  I'm sorry.
5     Q.  Okay.  Well, let's talk about -- let's just
6  talk about the data itself.  If a third-party payer
7  had come to Humana Retail Pharmacy and requested a
8  credit or refund, where would that be documented?
9     A.  I don't know.
10    Q.  Would it be documented?
11    A.  I would assume so.  If someone comes to us
12 looking for money, I'm sure it's documented
13 somewhere.
14    Q.  All right.  And if that money is actually
15 given out, would that be documented by the
16 accounting department?
17    A.  I would assume so, yes.
18    Q.  Okay.  And would that documentation break
19 down exactly what the credit or refund was for?
20    A.  I would assume so, yes.
21    Q.  Okay.  And do you have an understanding of
22 what the parameters were for issuing credits or
23 refunds for recalled valsartan?
24    A.  No.
25    Q.  Okay.  And I guess I should have asked that.

Page 77

1  Let me break that question down.
2     Do you have an understanding of what the
3  parameters were for giving credits or refunds to
4  consumers who purchased recalled valsartan?
5     A.  If a consumer asked for a refund because of
6  a recalled product, then we give the credit back to
7  the patient as long as they -- when they bring back
8  the -- you know, the recalled product.
9     Q.  Okay.  So the parameters are, if you bring
10 it back, you get the credit or refund; if you don't,
11 then you don't get the credit or refund.  Is that
12 right?
13    A.  To my knowledge, yes, that's -- yeah.
14    Q.  Okay.  And for third-party payers, you -- do
15 you have an understanding of what the parameters
16 were for issuing credits or refunds for recalled
17 valsartan?
18       MS. GOLDENBERG:  Bless you, Kirstin.
19    A.  No, I don't.
20    Q.  Okay.  But either way, Humana Retail
21 Pharmacy does maintain, in its ordinary course of
22 business, records of credit or refunds given out and
23 the reasons for those, right?
24    A.  Correct.
25    Q.  Okay.  And does the data generally reflect

Confidential Information Subject to Protective Order

Page 78

1  who received the credit or refund?
2      A.  I don't think so.  So if I -- okay.  Let
3  me -- here's why I don't know.  If a patient's
4  representative comes back to ask for the refund, I
5  don't -- there's no way for us to keep track of who
6  that patient representative was.  It would be, I
7  guess, credited to the patient's account.  Does that
8  make sense?
9      Q.  Yeah.  Okay.  So if it's credited to the
10  patient's account, then there is a record of which
11  patient received a credit or refund, right?
12     A.  That's my understanding, yes.
13     Q.  Okay.  And the credit or refund record would
14  also show the amount of the credit or refund, right,
15  because you already said your accounting department
16  wants to know that?
17     A.  Yes.
18     Q.  Okay.  And would it also reflect the date
19  that the credit or refund was processed?
20     A.  Yes.
21     Q.  Okay.  All right.  So let's just talk names
22  for a little bit and see if you can give me the
23  information on who the right people are at the
24  company to ask some follow-up questions if we ever
25  have them.

Page 79

1          Who or what person or department at the
2  company on the retail side was primarily responsible
3  for the purchase of valsartan?
4      A.  On the retail side?  Each individual
5  pharmacist in charge for that location would be
6  responsible for the purchase of their valsartan
7  products.
8      Q.  Okay.  So it's the lead pharmacist at each
9  of the retail pharmacies?
10     A.  Yes, unless they are on vacation, and then
11  it would be someone who is covering for them, but,
12  yes.
13     Q.  I suppose those are allowed sometimes,
14  aren't they?
15          Who was responsible for inventory
16  maintenance, receiving and distributing the
17  valsartan on the retail side?
18     A.  Each individual pharmacist and pharmacy
19  technician in each individual location is
20  responsible for maintaining their inventory.
21     Q.  Okay.  And -- all right.  If anybody on the
22  retail side had questions about the valsartan
23  recall, who would be responsible for making those
24  inquiries?
25     A.  So if someone had a question about a recall,

Page 80

1  they would ask their associate director.  So in my
2  area, they would ask me, and if I did not know or I
3  needed clarification, I would ask our professional
4  practice team and they would either have the answer
5  or find the answer for us.
6      Q.  Okay.  Who at the -- on the retail side of
7  the company would be responsible for making sure
8  that each of the brick-and-mortar locations knew
9  about the valsartan recall?
10     A.  So each associate director would send the
11  information out to their teams, and then we would
12  follow up to ensure that they've completed the steps
13  that we've asked them to do.
14         MS. GOLDENBERG:  All right.  Why don't we
15  take five or ten minutes.  I'm just going to
16  review my notes.  I think I'm almost done.
17         THE VIDEOGRAPHER:  The time right now is
18  10:51 a.m.  We're off the record.
19     (Recess from 10:51 a.m. until 11:00 a.m.)
20         THE VIDEOGRAPHER:  The time right now is
21  11:00 a.m.  We're back on the record.
22         MS. GOLDENBERG:  All right.  Mr. Cedeno, I
23  have no further questions.  I appreciate your
24  time today.
25         THE WITNESS:  Thank you.

Page 81

1          THE VIDEOGRAPHER:  The time right now is
2  11:00 a.m.  We're off the record.
3      (Whereupon, the deposition concluded at
4  11:00 a.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 82

C E R T I F I C A T E

1
2     I, Susan D. Wasilewski, Registered
3  Professional Reporter, Certified Realtime Reporter,
4  Certified Manager of Reporting Services, Certified
5  Realtime Captioner, and Florida Professional
6  Reporter, hereby certify that the witness named
7  herein appeared via Remote Counsel/Zoom technology
8  on Monday, September 27, 2021, and was duly sworn.
9     I FURTHER CERTIFY that I was authorized to
10 and did stenographically report the examination of
11 the witness named herein; that a review of the
12 transcript was requested; and that the foregoing
13 transcript is a true record of my stenographic
14 notes.
15    I FURTHER CERTIFY that I am not related to
16 or an employee of any of the parties, nor am I
17 related to or an employee of any of the parties'
18 attorneys or counsel connected with this action, nor
19 am I financially interested in the outcome of this
20 action.
21    WITNESS my hand this 12th of October, 2021.
22
23 _____
24 Susan D. Wasilewski, RPR, CRR, CMRS, CRC, FPR
25

Page 83

INSTRUCTIONS TO WITNESS

1
2
3
4     Please read your deposition over carefully
5  and make any necessary corrections.  You should
6  state the reason in the appropriate space on the
7  errata sheet for any corrections that are made.
8
9     After doing so, please sign the errata sheet
10 and date it.  It will be attached to your
11 deposition.
12
13    It is imperative that you return the
14 original errata sheet to the deposing attorney
15 within thirty (30) days of receipt of the deposition
16 transcript by you.  If you fail to do so, the
17 deposition transcript may be deemed to be accurate
18 and may be used in court.
19
20
21
22
23
24
25

Page 84

1     - - - - - -
2     E R R A T A
3     - - - - - -
4  PAGE   LINE   CHANGE
5  ____  ____  _____
6  REASON: _____
7  ____  ____  _____
8  REASON: _____
9  ____  ____  _____
10 REASON: _____
11 ____  ____  _____
12 REASON: _____
13 ____  ____  _____
14 REASON: _____
15 ____  ____  _____
16 REASON: _____
17 ____  ____  _____
18 REASON: _____
19 ____  ____  _____
20 REASON: _____
21 ____  ____  _____
22 REASON: _____
23 ____  ____  _____
24 REASON: _____
25

Page 85

ACKNOWLEDGMENT OF DEPONENT

1
2
3     I, _____, do hereby
4  acknowledge that I have read the foregoing pages, 1
5  through 84, and that the same is a correct
6  transcription of the answers given by me to the
7  questions therein propounded, except for the
8  corrections or changes in form or substance, if any,
9  noted in the attached Errata Sheet.
10
11
12 _____   _____
13 CESAR CEDENO                     DATE
14 Corporate Representative for
15 Humana Pharmacy, Inc.
16
17
18
19
20 Subscribed and sworn to before me this
21 ____ day of _____, 20___.
22 My Commission expires: _____
23
24 _____
25    Notary Public

**WORD**
**INDEX**

**< $ >**
**$5**  73:*12, 13,*
*14*  74:*22, 23*
*75:1*

**< § >**
**§**  5:*16, 18*

**< 0 >**
**08003-2171**
*3:12*

**< 1 >**
**1**  5:*11*  6:*4*
*9:12*  10:*3, 4*
*85:4*
**1,000**  46:*17*
*64:8, 15*
**10**  5:*11*  6:*9*
*10:18, 22*
*68:25*  69:*1*
**10:11**  49:*8, 10*
**10:51**  80:*18,*
*19*
**100**  3:*11*
*64:7, 15*  70:*23*
**1000**  52:*21*
**1000-count**
*44:1*
**10022**  2:*17*
**11:00**  80:*19,*
*21*  81:*2, 4*
**1183**  5:*23*
**12**  10:*19, 22*
**12th**  82:*21*
**14**  63:*16*
**1417**  5:*22*
**1500**  2:*23*
**15219**  4:*11*
**16**  58:*25*
**163**  6:*5*
**17**  68:*25*  69:*4*
**1875**  3:*18*
**19**  5:*12*  36:*2*
**19-2875(RBK**
*1:5*
**1940**  3:*11*
**19422**  4:*5*

**< 2 >**
**2**  5:*12*  19:*23,*
*24*  32:*21, 23*
*33:6*  65:*3*
**2.4**  65:*2, 4*
**2/10/1000**
*52:18*
**20**  85:*21*
**200**  4:*4*
**2010**  33:*11*
**2011**  33:*15,*
*17*  34:*21*
**2012-01-01**  6:*7*
**2013**  6:*4*  62:*9*
**2019**  6:*5*  62:*9*
**2020-08-11**  6:*7*
**2021**  1:*10*
*7:5*  82:*8, 21*
**2025**  41:*21, 22*
**20th**  2:*17*
*33:11*
**21**  5:*16, 18*
*23:25*  27:*4*
**212**  2:*18*
**2150**  2:*5*
**2220**  2:*11*
**23**  5:*16*
**230**  2:*11*
**24**  64:*4, 7, 18,*
*20*  65:*2*
**26**  5:*18*
**263-1840**  4:*12*
**27**  1:*10*  82:*8*
**27th**  7:*5*
**283**  6:*10*
**29**  9:*14*

**< 3 >**
**3**  5:*16*  10:*18,*
*21, 22*  23:*12,*
*13*  65:*10*
*67:11*
**30**  64:*7, 14,*
*15, 21*  83:*15*
**30(b)(6**  1:*14*
*5:12*  48:*9*
**300**  3:*18*

**308002**  61:*12*
**30s**  43:*23*
**31**  6:*5*
**3100**  3:*4*
**312**  2:*12*  3:*5*
**31st**  62:*9*
**32**  5:*18*
**331**  5:*18*  27:*4*
**33431-8561**
*3:19*
**35**  11:*6*
**350**  65:*2*
**351**  5:*16*
*23:25*  24:*15*
**36**  11:*6*
**37**  44:*18*
**38**  68:*3*
**38th**  4:*11*
**39**  9:*11, 12*
*10:1*

**< 4 >**
**4**  5:*18*  10:*18,*
*22*  26:*24, 25*
*71:7*
**40**  19:*23*
**41**  23:*12*
**412**  4:*12*
**41-page**  33:*6*
**43**  26:*23*
**431**  65:*2*
**44**  5:*21*  49:*12*
**45**  11:*8, 9, 10,*
*15*
**450**  4:*4*
**456-8400**  3:*5*
**49**  5:*23*
**492-6518**  2:*24*

**< 5 >**
**5**  5:*18*  32:*23,*
*24*  67:*16*
**50**  2:*23*
**500**  64:*8, 15*
**500-count**  44:*2*
**504-0281**  2:*6*
**55402**  2:*6*
**55402-1498**
*2:23*
**561**  3:*19*

**566.4808**  2:*12*
**567-0700**  4:*5*
**59**  6:*4*
**590**  2:*17*

**< 6 >**
**6**  5:*21*  10:*18,*
*21, 22*  44:*18,*
*19*
**60**  64:*14, 21*
**60601**  3:*5*
**60606**  2:*11*
**610**  4:*5*
**612**  2:*24*
**68**  6:*5*
**69**  6:*9*

**< 7 >**
**7**  5:*23*  10:*18,*
*22*  34:*25*
*49:13, 14*  55:*5*
**70**  3:*11*
**727**  5:*20*
**77**  3:*4*

**< 8 >**
**8**  5:*5*  6:*4*
*21:1*  59:*1, 2*
**800**  2:*5, 6*
**84**  85:*5*
**856**  3:*12*
**874-4225**  3:*12*
**877.370.3377**
*1:22*
**895-4204**  2:*18*

**< 9 >**
**9**  6:*5*  10:*18,*
*22*  68:*4, 5*
**9/27/2022**
*41:21*
**9:02**  1:*15*  7:*5*
**9:06**  9:*19, 20*
**9:11**  9:*20, 22*
**9:57**  49:*7, 8*
**90**  46:*12, 17,*
*18*  64:*7, 15, 21*
**90-pill**  46:*13*
**90s**  43:*23*
**917.591.5672**

**1:22*
**962-2107**  3:*19*

**< A >**
**a.m**  1:*15*  7:*5*
*9:19, 20, 22*
*49:7, 8, 10*
*80:18, 19, 21*
*81:2, 4*
**ABC**  70:*10*
**ABC-**
**MDL2875-**
**00000687**  5:*20*
**ABC-**
**MDL2875-**
**0000087**  33:*8*
**ability**  39:*8,*
*21*  43:*1*
**able**  35:*5*
*36:11*  40:*7*
*48:19*
**Absolutely**
*20:18*
**acceptable**
*21:3, 19*
**account**  78:*7,*
*10*
**accountant**
*74:8, 17*
**accountants**
*74:7*
**accounted**
*75:5, 10*
**accounting**
*58:12*  60:*5*
*74:14, 19*
*75:1, 10, 15*
*76:16*  78:*15*
**accounts**  62:*2*
**accurate**
*32:13, 14*
*60:23*  83:*17*
**acknowledge**
*85:4*
**ACKNOWLE**
**DGMENT**
*85:1*
**acronyms**
*45:13*
**Actavis**  3:*7*
*69:17*

action 82:*18,*
*20*
Actions 1:*6*
active 22:*22*
Acts 5:*18*
*27:5, 10*
actual 36:*15*
*41:15 52:16*
*72:15*
ADAMS 2:*4*
address 60:*14*
*62:12, 17*
Adulterated
*5:16 24:2, 16*
*25:15, 21*
*26:3 27:16,*
*20 28:2*
adulteration
*23:17*
affiliated 37:*7*
affirm 7:*25*
agents 16:*13,*
*14, 17*
aggregate
*62:24 63:4*
agree 65:*17,*
*25 68:20*
agreed 7:*11*
Agreement
*5:18 33:10,*
*18 34:4, 12, 22*
agreements
*34:1 36:16*
Ah 67:*16*
ahead 13:*5*
*14:1 61:5*
air 12:*17*
ALFANO 4:*6*
alive 52:*22*
allowed 79:*13*
allows 43:*19*
altered 23:*22*
alternate
*56:14 72:5*
AMANDA 4:*3*
Amerisource
*32:6 37:16,*
*24 38:23*
*48:5, 13*
*55:12, 22*
*57:5 58:5, 16*

59:*22, 24*
*60:2, 5, 11*
*61:9, 24*
*69:24 70:10*
*71:6*
AmerisourceBe
rgen 32:*12, 18*
*34:13, 19, 23*
*35:4 37:6, 10*
*38:12, 24*
*43:7 47:16,*
*23 57:3, 9*
*63:7 71:1*
amlodipine
*12:2, 9*
amount 22:*9*
*46:11 58:17*
*72:12 73:22*
*78:14*
and/or 17:*18*
Anda 6:*4*
*59:12, 13, 16,*
*18, 23 61:9,*
*23 62:6, 23*
*63:2, 3 69:25*
*71:6*
ANDRAS 3:*3*
*18:14 31:17*
andrast@gtlaw
.com 3:*4*
Angiotensin
*5:14*
Announcement
s 5:*12*
answer 11:*2*
*13:5, 16, 18*
*14:1, 3, 7*
*16:10 17:4*
*19:16 21:10*
*24:9 28:20*
*29:4, 23, 24*
*30:8 36:11*
*75:8 80:4, 5*
answered
*31:18*
answers 12:*21*
*85:6*
anybody
*14:18 15:6*
*79:21*

appear 61:*18*
*69:11*
APPEARANC
ES 2:*1* 3:*1*
*4:1*
appeared 82:*7*
appearing
*7:10*
appears 20:*4*
*61:13 70:5*
apply 12:*13,*
*21*
appreciate
*9:23 11:3*
*15:22 80:23*
approach
*30:19*
appropriate
*83:6*
ARB 5:*14*
area 63:*5*
*80:2*
areas 46:*9*
aruggieri@c-
wlaw.com 4:*4*
Asked 31:*18*
*43:12 56:12*
*76:25 77:5*
*80:13*
asking 30:*19*
*31:21 48:3, 6*
*64:17*
assigned 30:*23*
assistant 66:*11*
associate 47:*8*
*80:1, 10*
associated
*35:5, 6 42:15,*
*21*
Associates
*5:21*
assume 8:*22*
*12:20 19:19*
*20:11 24:11*
*40:9 41:3*
*48:2 52:19*
*54:21 60:11*
*61:6, 14*
*62:12 64:4*
*69:20 75:2*

76:*11, 17, 20*
assuming 75:*1*
assumption
*40:15, 18, 22*
*45:7 46:21*
*52:20 61:16*
*74:22 75:14*
Attached 5:*9*
*6:2 83:10*
*85:9*
attention
*17:11*
attorney
*13:24 14:13*
*15:2 83:14*
attorneys
*14:3 82:18*
audible 11:*22*
*14:6*
audio 13:*14*
*19:1*
audited 75:*5*
Aurobindo
*4:6 39:16*
*40:1 67:24*
*69:18*
Aurolife 4:*6*
authorized
*82:9*
automatically
*41:18*
available
*17:21 18:11*
Avenue 2:*5, 17*
aware 18:*10*
*19:10 21:2*
*26:6 39:14, 17*

< B >
back 9:*22, 25*
*18:8 22:13*
*26:22 35:12*
*37:22 41:9*
*42:12, 16, 22*
*44:14, 15*
*47:6 49:10*
*55:12, 22*
*56:12 57:2, 4,*
*6 58:4, 16, 18*
*59:8 72:4, 6,*
*17, 25 73:4*

74:*6, 14* 77:*6,*
*7, 10* 78:*4*
*80:21*
balances 74:*24*
Based 25:*19*
*62:11*
basic 11:*23*
basically 35:*13*
basics 8:*25*
basis 18:*19*
*22:15 56:19*
batch 38:*19*
*39:8, 22*
*40:14 41:3*
batches 38:*25*
*39:1, 19 44:7*
*56:23*
Bates 44:*24*
*59:6*
BEATRIZ
*4:20*
began 32:*17*
*34:18*
beginning
*24:14 25:1*
*27:9*
behalf 7:*17,*
*19 9:4 10:9*
*14:13, 16*
*15:18 21:8*
believe 11:*8*
*15:17 17:14*
*19:6 42:19*
*51:1 57:4, 11*
*60:14*
Bell 4:*5*
Bellco 70:*8, 9,*
*22 71:1, 6*
belong 16:*2*
beneficial
*30:13*
benefit 15:*6*
*31:8*
best 15:*2*
*29:6, 25*
*32:14 35:17,*
*23, 25 36:8*
better 30:*2, 5,*
*10 60:3, 5*
*64:17 71:8,*

17 75:25
bill 72:8
billing 38:5
62:11
bin 39:3, 5
binding 9:7
birth 52:17
bit 8:17
17:15 29:7
35:1 37:23
45:14 47:3
52:6, 10, 25
55:5 57:18
72:15 78:22
Bless 77:18
Blocker 5:14
blood 30:4
blow 24:22
Blue 4:5
Boca 3:19
born 52:21
BOSICK 4:6
bottle 39:11
40:4 41:11,
17 43:10, 19
46:13, 16
64:7, 13
bottles 43:20
44:1, 2, 8, 10
64:5, 9, 10, 11,
18, 20, 21
bottom 44:23
52:25 59:5
65:4
Boulevard
3:18
bounce 42:13
Brais 36:4
brand 65:11,
22 66:3, 23
67:5
break 29:6
49:2 72:14
76:18 77:1
breezed 34:9
brick-and-
mortar 10:10,
19 11:7, 15
80:8
briefly 7:13
8:11

bring 9:10
14:22, 23
56:12 73:3
77:7, 9
brings 72:17
brought 72:25
74:3
bulk 43:8
64:9
bunch 24:17
45:13, 24
business
11:14, 21
17:10 19:6
20:10, 13
29:8, 10, 11,
12 34:8 77:22
buy 16:17
70:2

< C >
call 15:10
72:21
called 8:5
11:17 16:3
21:7 50:5
56:10 59:12
calls 25:17
27:22 31:13
CAMDEN 1:2
camera 15:4
cancer-causing
16:13, 14, 17
capacity 21:9
29:4 58:1
Captioner
1:19 82:5
Cardinal 2:18
59:23 61:10
70:1
care 12:4
30:3
career 34:4
carefully 83:4
case 12:4
17:24 30:4,
13 34:11
35:3 50:13
51:3 66:15
73:1

cases 22:23
43:23
catch 15:9
caused 22:11
causing 27:10
CEDENO
1:14 5:4 7:9,
19 8:5, 10
9:2 10:4, 7
16:1 19:24
20:2 23:13
26:25 32:24
36:7, 13, 22
44:19 48:19
49:14, 17
59:2 68:5
69:1 80:22
85:13
centrally 38:2,
5
Centre 4:11
certain 10:8,
9 39:18, 19
61:15
certification
35:16
Certified 1:17,
18 82:3, 4
certify 82:6, 9,
15
CESAR 1:14
5:4 7:9 8:5
9:2 85:13
cetera 38:12
chain 35:15,
24
CHANGE
84:4
changed 23:22
changes 85:8
characterizes
18:18
charge 79:5
chart 21:20
check 75:3
checks 74:23,
24
Cherry 3:12
Chicago 2:11
3:5

choose 51:23
chooses 62:3
CIPRIANI 4:3
Civ 1:5, 14
5:12
claim 73:4, 6
claims 72:10
clarification
80:3
class 16:2
clear 36:4
37:1
closer 8:17, 20
CMRS 82:24
Code 6:9
37:7, 10
38:15, 17
44:13, 15
45:16, 17
67:12 69:6
colleagues
68:18 71:8,
17, 18 75:25
combined
39:2, 4
come 14:7
26:22 43:8, 9,
17, 19 47:11
60:16 64:14
76:7
comes 23:6
35:14 37:15,
18 72:17
76:11 78:4
coming 64:6
commencing
1:15
commerce
27:14
Commission
85:22
company 9:7
46:3 48:1
59:12 73:5
78:24 79:2
80:7
compendium
25:4, 6
completed
80:12

completely
7:14
compliance
47:14
complicated
74:12
compounds
16:3
comprised
11:14
computer 8:17
concern 71:16
concerning
47:17, 23
concluded
81:3
conclusion
25:17 27:22
31:13
confident
18:23 24:12
70:23
CONFIDENTI
AL 1:9
confirm 60:22
conjunction
22:20
connected
82:18
consolidation
49:5
consumer
43:18 44:6
64:20, 23 77:5
consumers
43:21 72:1, 2
75:17 77:4
contact 40:16,
25 47:16, 20,
22
contacted
17:22
contained
13:10 16:23
contains 24:1
contaminant
18:16
contaminated
13:1 17:8
28:3 29:18

31:5  39:25
40:10
**contamination**
18:12, 17
22:21
**context**  41:10
**continue**
18:25  19:3
**continuing**
18:17
**contract**  33:23
**contracts**  32:8
**Control**  20:22
54:11
**conversation**
48:5  66:16
**conversations**
48:12
**coordinate**
50:19
**copay**  72:10,
11  73:8, 10,
12, 14, 22
**cope**  29:3
**Corporate**
1:13  3:18
85:14
**correct**  10:11,
12, 20, 24
11:7, 12, 21
12:9, 10  13:2
16:20  19:12
22:16, 17
23:17  25:10
26:3  27:21
29:9  37:25
38:14  40:3
41:4  43:4
44:16  45:18,
19, 22, 23
46:11  49:22
51:10  52:1, 2
53:15, 25
55:1  56:3, 20
62:10  63:10,
14  65:15, 16
67:1, 10, 24,
25  69:18
71:3  75:7
77:24  85:5

**corrections**
83:5, 7  85:8
**correlated**
43:2
**cosmetic**  27:15
**counsel**  7:15
10:14, 22
15:11  35:22
82:18
**COUNSEL/ZO**
**OM**  2:1  3:1
4:1, 16  82:7
**count**  46:16,
17  64:15  75:2
**counted**  11:9
**country**  11:11
**couple**  57:5
**course**  17:9
20:9, 13  77:21
**COURT**  1:1
7:20, 23  8:4,
18, 21  15:4, 8,
9, 21  83:18
**cover**  62:14
72:12
**covered**  38:15
**covering**  79:11
**covers**  62:8, 15
**CRC**  82:24
**credit**  58:13,
14  72:6, 10,
12  73:10, 13
75:22  76:8,
19  77:6, 10,
11, 22  78:1,
11, 13, 14, 19
**credited**  58:5,
17  74:3  78:7,
9
**credits**  57:9
58:1, 3, 8
71:25  72:2
75:16, 21
76:22  77:3, 16
**CROWELL**
2:12
**CRR**  82:24
**Current**  18:8
**currently**
55:24

**custody**  35:16,
24
**customer**
56:10  60:24
61:3, 8  62:18
**customers**
56:7  61:17
65:18
**cut**  49:3  56:4

**< D >**
**Dan**  36:4
57:11  71:20
**Dan's**  36:16
**data**  43:1
58:21  71:1
76:6  77:25
**database**  38:2
**date**  1:15  6:7
7:4  17:5
33:14, 17
34:21  40:15
41:3, 5, 12, 13,
15, 16, 18, 19,
20, 21  42:2, 5
52:17  78:18
83:10  85:13
**dated**  33:10
**dates**  41:7
**DAVIS**  2:16
**day**  43:24
74:14  85:21
**days**  14:21
83:15
**deal**  14:3
**Dec**  6:5
**December**
33:11  62:9
**decided**  73:1
**deemed**  24:16
83:17
**deep**  74:25
**Defendant**
2:12, 18, 24
3:13, 20  4:12
**Defendants**
3:6  4:6
**Defense**  15:10
**defer**  51:2
**definitely**
20:18

**definition**
24:1  25:14,
19  35:19
**delay**  8:16
**delivery**  27:13
**department**
38:5  71:22
75:11  76:16
78:15  79:1
**depends**  66:14
**deponent**  7:9
85:1
**deposing**
83:14
**Deposition**
1:12  5:10, 11
6:3  7:6, 10
8:13  9:10
10:2  81:3
83:4, 11, 15, 17
**deps@golkow.c**
**om**  1:23
**describe**  43:10
**description**
64:3, 25
**descriptions**
45:14
**designated**
19:15  28:18
29:22  48:7
**destroyed**  57:3
**destruction**
55:7, 18  57:7
**detail**  17:15
**determine**
39:8, 24  41:1
43:2
**determined**
40:5
**device**  24:15
27:14, 15
**Devices**  5:17
14:23  24:2
**DIAZ**  4:17
7:3
**different**  12:1,
13  18:7
21:16  24:17
31:19  32:2
35:13  42:1
43:11  46:3

**definition**
60:25  61:7, 8,
17, 24  62:2,
18  65:1
66:21  69:6
73:3
**differs**  25:4
**Diovan**  65:15
66:7, 17  67:5,
8
**DIRECT**  5:5
8:8  56:7  70:2
**directly**  37:15
64:22  69:23
70:6, 25
**director**  80:1,
10
**directors**  47:9
**disagree**  18:20
**discuss**  10:8
**discussed**
10:7  25:9
39:12  63:11
67:17
**Discussion**
14:11
**dispense**
20:19  30:14
31:9  37:20
40:23  41:19
42:17
**dispensed**
37:21  40:2, 6,
10  41:19
42:3  43:18
44:6  50:14
53:2  55:16
**dispensing**
19:7, 8  26:2
41:13  50:3, 6,
7
**disseminate**
18:6
**distinguish**
12:18  32:9
39:22  40:7
**distributing**
79:16
**distributor**
17:23  55:18
57:7  59:16, 18

Confidential Information Subject to Protective Order

distributors
17:18 63:7
DISTRICT
1:1
dive 75:1
Document 1:6
20:3, 6 33:6
34:11 45:3
53:24 54:1
55:3 60:19
63:16
documentation
35:6 72:16
76:18
documented
76:8, 10, 12, 15
Documents
6:9 16:25
32:8
doing 23:16
83:9
dollar 58:17
72:12
dollars 30:22
DORSEY 2:18
double 72:8
Drive 3:4
drug 16:17
17:23 24:15
25:2, 13, 15,
20 27:14, 20
32:12 45:17
53:2, 19
65:21, 22
66:3, 22, 23
67:7, 18 73:23
Drugs 5:16,
18 24:2 28:2
36:15, 24
37:5, 8 43:5
55:7 63:13
65:19 66:1, 2
67:23 69:17
drug-specific
58:10
DUANE 3:10,
17
Due 7:12
duly 8:6 82:8

< E >

eadams@golde
nberglaw.com
2:5
earlier 39:12
60:9
easier 8:18
60:1
East 3:11
easy 14:20
46:14 54:10
effective
33:14, 17
effects 16:12
53:7
either 22:21
33:21 38:7
41:6 44:12
54:21 62:20,
24 67:3
70:24 72:21
77:20 80:4
electronically
50:9
e-mail 47:8,
12 60:4
employee
82:16, 17
English 27:19
ensure 7:14
47:13 80:12
entering 75:11
entities 50:18
equivalent
66:23
equivalents
66:2
errata 83:7, 9,
14 85:9
error 11:17
ESQUIRE
2:3, 4, 10, 16,
22 3:3, 10, 17
4:3, 10
essentially
23:8, 21
35:15 41:22
47:11
et 38:12
ETHAN 2:4
exact 50:2
51:13

exactly 36:13
43:17 44:6
47:3 53:13
76:19
EXAMINATIO
N 5:5 8:8
82:10
example 37:7
38:25 39:16
51:19 61:12
exceeded
21:14, 23
Exhibit 5:11,
12, 16, 18, 21,
23 6:4, 5, 9
9:12 10:3, 4
19:23, 24
22:13 23:12,
13 26:24, 25
32:21, 23, 24
33:5 36:12
44:18, 19
49:13, 14
59:1, 2 68:4,
5, 25 69:1
EXHIBITS
5:10 6:3
exist 71:2
exists 58:21
expanded
26:14 39:18
expectation
67:7
experiences
46:7
expiration
40:14 41:3, 5,
7, 12, 15, 16, 18,
20, 21 42:2
expires 85:22
explain 22:20
41:9
explaining
47:9, 10
extent 16:10
24:9 28:20
48:21

< F >
fact 36:14
fail 83:16

fair 12:15
33:21 37:1
42:25 43:3, 4
44:4, 11
48:17 51:23
58:22, 23
60:11
FALKENBER
G 2:6
fall 36:16
71:22
falls 25:5
familiar 20:7
24:6 36:5
45:25 46:22
59:12 61:1, 22
far 27:8
29:15 49:2
62:13
fax 1:22
FDA 5:12
17:18, 22
21:2 22:15, 20
FDA-approved
50:25
FDA's 20:4
Fed 1:14 5:12
feel 12:18
fields 45:10,
24
figure 48:9
60:7 72:6
figured 56:13
filled 49:19
64:21
filling 67:5
financially
82:19
find 17:6
47:5 72:4
80:5
finds 74:8
fine 14:15
15:12, 13, 19
17:2 48:18
first 8:6
16:21 17:23,
25 32:16
33:11 34:14
44:23 45:15

59:5 61:13
64:4 73:16
five 80:15
five-minute
49:1
fixing 9:24
flipped 34:7
Floor 2:17
4:11
Florida 1:19
3:19 62:18
82:5
focus 32:12
follow 24:11,
12 55:17
80:12
followed 55:12
following
27:10 29:13
follows 8:7
24:10
follow-up
78:24
Food 5:16, 18
27:14
foregoing
82:12 85:4
form 13:3, 4,
12, 13 16:24
19:13, 18
21:5, 17 22:7
23:5 25:11,
16, 18, 24, 25
26:1, 11
27:23 28:4, 5,
12, 17 29:1, 2,
21 31:6
40:12, 21
66:25 67:9,
13 69:14 85:8
formations
22:10
forms 12:1, 19
formulation
22:10
formulations
12:13
for-profit
29:12
forth 25:5
50:9

**forward** 14:*2*
15:*24* 72:*10,*
*11, 12*
**found** 16:*22*
17:*21*
**foundation**
13:*12* 16:*24*
18:*19* 19:*13,*
*18* 21:5, *17*
22:8 25:*16,*
*18, 24* 27:*23*
28:*4, 12, 17*
29:*1, 2, 21*
31:6 40:*12,*
*21* 67:*2, 9*
69:*14*
**four** 31:*19*
64:*25* 65:*1*
**FPR** 82:*24*
**front** 16:*25*
20:*2* 21:*15,*
*18, 24* 23:*25*
33:*2* 44:*22*
54:5
**full** 9:*1* 26:*20*
**further** 41:*10*
80:*23* 82:*9, 15*

**< G >**
**Garbled**
13:*14* 19:*1*
**gather** 51:*4*
**gdherrold@du**
**anemorris.com**
3:*11*
**general** 16:5
47:*21*
**generally** 18:*2*
46:6 77:*25*
**generate** 51:*8*
62:*21*
**generated**
49:*24* 50:*3*
59:*11* 62:5
68:*15*
**generic** 52:*7*
59:*17* 65:*11,*
*15, 19, 25*
66:*7, 8, 12, 22*
**generics** 70:*13*

**getting** 60:*4*
65:*19* 66:*2*
**give** 8:*1*
17:*15* 41:*10*
42:*2* 49:*4*
51:*25* 64:*25*
66:*7, 18* 72:5,
*6* 77:*6* 78:*22*
**given** 26:*19*
37:*17* 54:*24*
67:*4* 75:*17*
76:*15* 77:*22*
85:6
**gives** 24:*17*
41:*18*
**giving** 77:*3*
**go** 9:*15* 13:5
14:*1* 15:*24*
20:*24* 21:*1*
33:*7* 34:*25*
35:*12* 36:*1*
41:9 44:*25*
45:*2, 9, 15*
54:*18* 59:*22,*
*23* 60:5 61:5
62:*4* 63:*15,*
*16* 64:*20*
65:*10* 67:*16*
69:*7, 8, 23, 24*
70:*14* 71:*7*
**goes** 9:*14*
30:*15* 46:9
**going** 8:*12*
10:*1* 11:*1, 24*
12:*11, 19, 20*
14:*18* 15:*10*
30:*21* 35:*12*
36:*4, 11*
42:*22* 45:*7*
48:*16* 49:*3*
51:*22* 57:*15*
66:*17, 18*
67:*6, 8* 74:*9,*
*21* 75:*2* 80:*15*
**GOLDENBER**
**G** 2:*3* 4:*18,*
*19* 5:*5* 7:*16*
8:*9, 12* 9:*9,*
*15, 23* 10:*6,*
*16* 11:*3*
14:*12, 22*

15:*1, 7, 17, 23,*
*25* 18:*20*
19:*22* 20:*1,*
*21* 22:*2*
23:*11, 15*
24:*22* 26:*4,*
*23* 27:*2*
31:*25* 32:*20*
33:*1, 4, 13*
36:*1, 3, 10, 18*
44:*17, 21*
48:*15, 24*
49:*11, 16*
53:*4* 54:*8, 10,*
*19* 55:*3*
57:*14, 19, 22*
58:*24* 59:*4,*
*10* 68:*1, 7, 9,*
*20, 23* 69:*3*
71:*23* 77:*18*
80:*14, 22*
**GOLKOW**
1:*21* 7:*4*
**GONZALEZ**
2:*22*
**gonzalez.roxan**
**na@dorsey.co**
**m** 2:*22*
**Good** 8:*10, 14*
15:*23* 43:*15*
74:*10* 75:*7, 8*
**GORDON** 4:*6*
**gotten** 49:*2*
**grab** 46:*10, 14*
**graph** 21:*18*
**greater** 41:*17*
**GREENBERG**
3:*3*
**GREGORY**
3:*10*
**group** 18:*3, 5*
**grouped** 16:*12*
**groups** 18:*7*
**guarantee**
40:*19*
**guess** 23:*8, 22*
26:*20* 29:*24*
30:*7* 41:*8*
42:*13* 48:*3*
51:*2, 23* 61:*8*
63:*2* 66:*14,*

*19* 72:*8*
76:*25* 78:*7*
**Guidance** 5:*21*

**< H >**
**half** 52:*25*
**HALLE** 4:*19*
**hand** 7:*24*
82:*21*
**handles** 50:*6*
**handwritten**
74:*11, 12, 15,*
*18, 25* 75:*12*
**happened**
55:*20*
**hazardous**
16:*12*
**HCT** 66:*7, 17*
**HCTZ** 12:*3, 9*
**header** 67:*13*
**Health** 2:*18*
**Healthcare**
3:*14*
**healthy** 30:*16*
**hear** 8:*24*
14:*7*
**heard** 7:*14*
23:*16*
**hearing** 8:*18*
**hearsay** 35:*19*
**held** 7:6
**help** 11:*3*
32:*22*
**helpful** 36:*18*
58:6
**helps** 10:*23*
58:6
**HERROLD**
3:*10* 13:*12*
26:*11*
**Hill** 3:*12*
**History** 6:*4, 5*
68:*11*
**holistic** 30:*19*
**Hon** 1:*4*
**honest** 34:*9*
61:*23*
**hope** 48:*15*
**HP1** 5:*21*
45:*4, 5*

**Huahai** 3:*13,*
*14* 26:*9*
**HUM000150**
59:*7*
**HUM000164**
6:*10*
**HUM000990**
6:*8* 68:*8*
**HUM001416**
5:*22* 44:*25*
**Humana** 1:*13*
2:*12* 4:*20*
5:*10, 11* 6:*3,*
*4* 7:*19* 9:*4,*
*11* 10:*2, 4, 9*
11:6 12:*14,*
*25* 13:*10*
16:*22* 17:*6,*
*13, 21* 18:*1, 4,*
*10, 25* 19:*2,*
*23, 24* 20:*8,*
*15, 16* 21:*8,*
*21* 22:*4, 14,*
*24* 23:*2, 13*
24:5, *11*
25:*21* 26:*25*
28:*1* 29:*10,*
*16* 30:*14, 22,*
*25* 31:*8* 32:*1,*
*3, 10, 16, 24*
34:*13, 22*
35:*3* 36:*23*
37:*5, 13* 38:*2,*
*5, 24* 39:*7, 21,*
*23* 40:*8* 41:*7*
42:*4, 25* 43:*5,*
*6* 44:*19* 45:*7*
46:*4, 20*
47:*19, 21*
48:*4, 7, 13*
49:*14, 19*
50:*18* 52:*12*
53:*16* 55:*9,*
*23* 56:*6, 9, 18*
57:*1, 8* 58:*7,*
*9* 59:*2, 19*
60:*12, 15, 17*
61:*3, 19, 20,*
*25* 62:*6, 20,*
*24* 65:*18*
66:*1* 67:*22*

Confidential Information Subject to Protective Order

68:5, 10  69:1, 16, 22  70:14, 16, 24  71:16  72:1, 18, 20  73:15, 24  75:4, 20  76:7  77:20  85:15

**Humana's** 11:13, 21  19:5  29:8  39:1  46:23

**HUMO000150** 6:5

**HUMO001092** 5:23

**Hunnell** 17:15  18:4, 9  68:22

**hydrochlorothi azide** 12:3

**< I >**
**idea** 17:24  32:19

**identification** 10:5  19:25  23:14  27:1  32:25  44:20  49:15  59:3  68:6  69:2

**identify** 7:15

**II** 5:14

**illegal** 31:11

**Illinois** 2:11  3:5

**immediately** 28:8

**impacted** 18:7

**imperative** 83:13

**important** 20:14  52:11  65:18

**imposed** 21:2

**Inc.'s** 1:13  5:10

**includes** 10:14, 18  26:8  69:22  70:4

**Inconsistently** 73:25

**indicate** 41:14  42:18

**indicated** 13:25  55:15  56:11

**indicates** 41:11

**indication** 61:7

**individual** 38:10  39:1, 9  58:19  63:1, 8  71:4  79:4, 18, 19

**individually** 64:10, 13

**indulgence** 9:24

**Industries** 3:6

**INFORMATIO N** 1:9  5:23  17:18  18:2, 6  26:15  35:4  36:23  37:12, 17  38:16  40:14  42:14  50:12, 14, 20, 21, 24  51:4  52:12  53:3, 7, 12, 16  54:6, 17  56:13  60:22  63:12  69:6  71:10, 14  78:23  80:11

**informed** 28:7

**ingredient** 12:4  22:22

**inquiries** 79:24

**insert** 49:20, 23  50:20  51:9, 13, 18  52:1  53:18  54:23

**instruct** 13:15

**INSTRUCTIO NS** 83:1

**instructs** 13:25

**insurance** 73:5

**intake** 21:19

**integration** 50:7

**intend** 14:19

**intended** 23:23

**interaction** 48:20

**interested** 82:19

**interesting** 62:16

**interim** 20:22  21:3, 15

**interpretation** 27:24

**interstate** 27:14

**intricacies** 58:22

**introduction** 27:13

**Inventory** 5:21  45:4  50:7  79:15, 20

**invoices** 37:19  38:12  63:2

**IRBESARTAN** 1:4  5:15  7:8

**issue** 23:9  25:10  75:20

**issues** 9:25  12:9  22:6  23:3

**issuing** 76:22  77:16

**item** 37:18  65:11

**its** 11:14  12:2  16:22  17:7  20:4, 9  25:4  28:1  39:9, 16, 23  40:4  53:7  55:24  56:7  57:2  77:21

**IVES** 2:6, 10  7:18  13:4, 15, 18, 20  16:7, 9, 24  19:14  21:6  22:7  23:5  24:7

25:11, 18, 25  27:23  28:5, 17  29:2, 21  31:6  36:3, 13  48:18  57:17  68:22  71:20

**I-v-e-s** 7:18

**< J >**
**Jan** 6:4

**January** 62:8

**JARMILO** 4:20

**JASON** 4:10  14:16

**jdavis@crowell .com** 2:16

**JERSEY** 1:1

**jmlstern@duan emorris.com** 3:18

**jmr@pietragall o.com** 4:10

**JOHN** 2:16

**JUDY** 4:17  7:3

**JUSTIN** 3:17

**< K >**
**kbi@falkenber gives.com** 2:10

**keep** 38:9  52:14  58:14  78:5

**keeping** 30:4, 16

**keeps** 37:20

**kept** 37:13  38:16, 17  58:18

**kind** 26:14  34:8

**KIRSTIN** 2:10  7:18  48:17  57:14  68:20  77:18

**knew** 80:8

**know** 11:16, 20  14:18  16:10, 11  19:5, 16, 19,

20  21:9, 11  22:11  24:9  26:12, 17, 18, 19  35:20  36:7  38:7  42:15  43:14  44:1, 2  45:7  46:2, 4  48:3, 21  49:1  51:1, 2  52:15  53:6  57:12, 17  58:4, 6, 8, 12, 22  61:2, 21  62:1, 19, 21  63:5  64:2  66:7, 20  67:14, 21  71:9  72:7, 22  73:2, 3  74:19  75:4  76:3, 9  77:8  78:3, 16  80:2

**knowledge** 17:20  19:9, 17  22:9  28:21, 22  29:23  32:5, 14  35:17, 25  38:3  42:6  47:24  55:21  72:3  77:13

**KNUTSON** 4:19

**Kugler** 1:4

**< L >**
**label** 41:14  46:14  50:25  51:5

**labels** 42:17

**large** 43:19  44:1  64:18

**Lasalle** 2:5

**LAW** 2:3  4:18, 19  28:15

**LDU** 45:25

**lead** 79:8

**leaflet** 50:16  53:13

**LEAH** 4:18  20:21  54:11

Confidential Information Subject to Protective Order

leave 15:7
35:21 69:12
74:1
legal 7:3
25:17 27:22
31:13
level 23:4
45:22 46:18
47:21 48:23
56:19 58:19
62:25 63:4
75:15
levels 13:2, 10
20:24 21:3,
14, 16, 23
28:11
LIABILITY
1:5 7:8
life-
lengthening
30:12
lifesaving
30:12
light 49:2
limits 21:3
LINE 84:4
link 50:11
lisinopril 74:4
list 20:4
70:20
listed 10:17
52:7 61:19
65:21 69:10
70:6
LITIGATION
1:5, 21 7:4, 8
little 8:16, 17,
23 17:15
29:7 35:1
37:22 41:9
45:14 47:3
49:5 52:6, 10,
24 55:5
57:18 72:15
78:22
lived 51:14
LLC 3:7, 14
4:6
LLP 2:6, 12,
18 3:3, 10, 17

4:6
located 38:2, 5
location 61:15
79:5, 19
locations
10:11, 19
11:7, 10, 15
37:15 46:8
51:20 80:8
lodge 18:15
Log 6:5 68:11
long 15:18
54:13 57:19
65:24 66:9
77:7
longer 57:1
long-term
30:3, 10
look 23:24
24:14, 20
54:2 61:1, 11
67:18 68:16
69:13
looked 33:25
34:3, 6
looking 39:10
54:5 60:14
67:21 70:21
76:12
looks 20:7
24:23 52:15
60:9, 16 62:5,
7 67:12, 15,
20 69:15
LOSARTAN
1:4 5:14 7:7
lose 31:3
73:15
lot 11:18
12:17 30:1
38:19 39:8,
22 40:14
41:2 45:20
49:3 66:9
lots 39:17, 18
56:22

< M >
ma'am 14:25
Madison 2:17

mail 45:8
50:2
main 12:4
maintain
58:20 77:21
maintaining
38:11 79:20
maintenance
79:16
majority
55:21 57:4
making 14:13
79:23 80:7
managed
51:23
Manager 1:18
82:4
manufacture
19:11 42:4
manufactured
67:23
manufacturer
17:23 18:24
23:6, 7 35:14
39:10, 25
40:4 41:5
42:8, 14, 19
43:3, 9 44:7,
13, 14, 15
64:6, 10, 14,
16 67:18
69:23 70:2
manufacturers
22:6, 19 26:7,
9, 16, 17
39:13, 15, 18
44:9

manufacturer's
23:3 41:11,
16 42:12
manufacturing
19:20 22:12
mark 9:11
marked 10:4
19:24 23:13
26:25 32:24
44:19 49:14
59:2 68:5
69:1

MARLENE
2:3 7:16
8:12 14:15
15:13 31:19
71:20
matter 7:7
51:14 66:19,
20
MATTSEN
4:18 9:13, 17
MDL 7:8
mean 36:25
43:11, 13
46:6 66:8
74:16
means 23:20
Medical 61:19,
20
medication
16:22 30:11
33:23 40:10
50:12 53:7
medications
13:1, 9 16:23
17:7 20:16
21:13, 22
34:2 37:9
41:8 55:15
72:4
medicine 53:8
meeting 25:13
memo 58:14
memory 17:1
34:17, 21
mention 34:1
54:24
mentioned
33:24 56:25
mentions 54:3
met 8:11
microphone
8:19
million 65:2,
3, 4
millions 30:22
mind-reading
14:23
minimum
63:12 67:22
Minneapolis
2:6, 23

Minnesota
2:6, 23 51:17
52:4
minute 56:5
75:20
minutes 80:15
misbranded
27:16
missing 74:9
Mississippi
51:18
mistaken
15:14
mjgoldenberg
@goldenbergla
w.com 2:4
moment 19:7
Monday 1:10
82:8
monetary
30:20, 23 31:1
money 29:11,
20 30:1 31:3
76:12, 14
monitoring
20:9, 15
Monroe 2:11
MORING
2:12
morning 8:10,
14, 24
MORRIS
3:10, 17
mouthing
10:23
move 8:17, 20
14:2 73:2
moved 72:12
multipage
20:3
multiple
61:13 62:14
Mylan 4:12
14:17 69:18

< N >
name 7:3
8:11 9:1
25:3 42:7, 9,
12, 14, 19, 22
52:7 53:1

61:3 62:3
65:11, 22
66:3, 12, 23
67:5, 17
**named** 61:25
62:1 82:6, 11
**names** 61:24
62:2 78:21
**nasty** 60:4
**Nathan** 17:14
18:4, 9 57:17
**National** 45:17
**nature** 7:12
**NDC** 6:9
37:7, 10, 17,
21 38:15, 17
40:24 42:11,
14, 15, 18, 21
43:3 44:10,
13, 15 45:16
56:12, 19
63:12 67:12
69:6
**NDCs** 37:19
56:24
**NDEA** 16:2
**NDMA** 16:2
19:11 22:10,
20 28:3
29:18 54:20,
25
**NDMAs** 21:19
**necessarily**
14:18
**necessary** 83:5
**need** 11:19
12:13, 18
20:24
**needed** 80:3
**Net_Sales_Amo
unt** 63:19, 22
**never** 34:3
64:5
**NEW** 1:1
2:17 72:10,
13 73:7, 10,
13 74:4
**night** 11:9
**nitrosamine**
16:6 18:12
54:12

**nitrosamines**
13:2, 11 16:3,
23 17:8 21:4,
16 28:11
31:5 54:4, 9,
25
**NJ** 3:12
**n-nitroso** 16:3
**normal** 17:9
20:13 34:8
**normally** 18:3
59:21
**Notary** 85:24
**note** 13:23
74:11, 12, 15,
25 75:11, 12
**noted** 85:9
**notes** 74:1, 18
80:16 82:14
**Notice** 5:11
8:15 9:10
10:2 17:22
48:9 56:6, 10
58:14
**notification**
55:11
**Number** 9:10,
12 12:1
21:13 32:2
38:20 41:3
44:24 45:20
59:6 60:24
61:12 62:19
64:4, 5 65:4
69:9
**numbers**
10:21 39:22
60:24 61:1, 8,
12 63:23, 25
64:1 65:2
**nurse** 66:10
**NW** 3:18

**< O >**
**Object** 13:3, 4,
12, 13 15:2, 3
16:8 19:13,
18 21:5, 17
22:8 25:16,
24 26:11
28:12 29:1, 2

40:12, 21
66:25 67:9
69:14
**objecting**
13:21
**objection** 14:2,
19 15:15
16:7, 24
18:15, 17
19:14 21:6,
25 22:7 23:5
24:7 25:11,
18, 25 27:23
28:4, 5, 16, 17
29:21 31:6,
16, 17 66:4
69:19
**objections**
13:24 14:4,
13 35:21
**obviously**
18:20
**October** 82:21
**official** 24:1
25:3 74:16
**Oh** 13:6 15:5
63:16 69:7
**Okay** 9:17
11:1, 5, 9, 19,
23 12:11, 17,
24 13:6, 19,
23 14:10
15:6, 11, 20
19:10 20:20
21:12 26:22
29:9 31:22
32:7, 16
34:10 36:1,
10 38:4, 10,
15, 23 39:12
42:4, 7, 23
44:11, 17
45:9, 11, 20
46:6 47:1, 19,
25 48:14
50:23 51:12
52:10, 21
53:22 54:1,
15, 22 55:2,
19 56:4, 21
57:8, 13, 19

58:21, 24
59:15 60:7,
18, 21 61:3,
17 62:8 65:3,
10 67:11, 16
68:1, 17, 20,
23 69:16
70:7, 16
71:19 73:18,
21 74:22
75:9, 15, 19,
25 76:5, 18,
21, 25 77:9,
14, 20, 25
78:2, 9, 13, 18,
21 79:8, 21
80:6
**old** 14:21
**once** 13:20
37:14, 18, 19
40:2, 3, 5
42:17 43:24
51:5 56:13
61:20 72:5,
25 73:6
**one-month**
43:25
**one-offs** 57:6
**ones** 26:13, 18,
19 39:20
40:19 49:25
**one-year**
41:18 42:2
**operate** 40:15,
17, 22 74:21
**Operations**
5:21 45:4, 5, 8
**option** 70:15
**options** 43:13
**OptumRx**
2:24
**ORDER** 1:9
6:9 15:18
36:14 37:16
43:22 44:1
50:2 60:2
70:22
**ordering** 37:14
**orders** 37:24
38:1, 4 61:14

**ordinary**
77:21
**organizations**
35:13 46:20
**original** 41:5
83:14
**outbound**
72:21
**outcome** 82:19
**out-of-pocket**
73:14
**outside** 16:7
19:14 21:6
24:7 28:18
29:3, 22 31:7
39:10 53:17
**owned** 70:10
**Oxford** 4:11

**< P >**
**P.C** 4:3
**Package** 6:9
44:5 50:20
51:18, 25
53:18 54:23
**packaged**
43:17 44:12
64:11
**packages**
63:25
**packed** 64:13
**packs** 43:8
**PAGE** 5:4, 10
6:3 21:1
34:25 36:2
44:24 45:2,
15 52:6, 25
53:5 54:5
59:5, 9 61:13,
18 63:15, 16,
17 65:10
67:11, 16, 21
69:7, 8 71:7
84:4
**pages** 85:4
**paid** 73:9
**paragraph**
33:11 34:14
**parameters**
76:22 77:3, 9,

Confidential Information Subject to Protective Order

**15**
**parent** 48:*1*
**Parkway** 4:*4*
**part** 17:*12*
20:*23, 25*
24:*24* 32:*22*
34:*8* 48:*25*
**particular**
40:*23* 51:*6*
56:*12*
**parties** 7:*10,*
*14* 82:*16, 17*
**parts** 60:*12*
**patient** 16:*16*
30:*3, 11, 16*
31:*9* 37:*21*
40:*2, 6* 49:*18,*
*20, 23* 50:*14*
51:*9, 13, 17,*
*18, 25* 52:*17*
53:*12* 67:*3, 5*
72:*17, 22, 25*
73:*12, 14*
74:*1* 77:*7*
78:*6, 11*
**patients** 18:*8*
40:*16, 25*
50:*19* 53:*17,*
*23* 54:*24*
55:*16* 65:*18,*
*25*
**patient's** 30:*4*
66:*15* 78:*3, 7,*
*10*
**pause** 7:*13*
**pay** 17:*11*
**payer** 75:*22*
76:*3, 6*
**payers** 75:*19*
77:*14*
**PBM** 73:*5*
**pedigree** 35:*6,*
*9, 13, 24*
**pedigrees** 35:*5*
**Pennsylvania**
4:*5, 11*
**penny** 74:*9*
75:*2, 5*
**people** 78:*23*
**percent** 70:*23*

**percentage**
11:*13, 21*
**period** 30:*10*
62:*8* 66:*12*
**person** 18:*1*
36:*8* 48:*11*
57:*15, 25*
60:*8, 18* 76:*1*
79:*1*
**personal**
19:*16* 21:*9*
28:*21, 22*
29:*4, 23* 47:*15*
**personally**
29:*25* 47:*5*
52:*3*
**ph** 1:*22*
**Pharma** 3:*7*
4:*6*

**Pharmaceutical**
3:*6, 13* 5:*18*
22:*22* 33:*9, 18*
**Pharmaceutical
s** 3:*6* 4:*12*
14:*17* 26:*9*
30:*2* 34:*4*
**pharmacies**
28:*7* 32:*3*
37:*23* 42:*1*
45:*18* 60:*15,*
*25* 61:*7, 25*
62:*14, 17* 79:*9*
**pharmacist**
43:*19* 74:*2*
79:*5, 8, 18*
**pharmacists**
18:*4*
**Pharmacy**
1:*13* 5:*10, 11*
6:*3, 4* 7:*19*
10:*10* 11:*14*
17:*12* 19:*6*
24:*10* 30:*10*
32:*6, 10, 11,*
*17* 34:*18*
35:*15* 36:*23*
38:*24* 40:*4*
43:*22* 45:*6, 8,*
*11* 46:*8* 47:*9,*
*19, 22* 49:*20,*

*25* 50:*4, 17*
51:*3, 11, 16,*
*20, 25* 52:*12*
53:*17* 55:*9,*
*23* 56:*9* 57:*1,*
*8* 58:*8* 59:*19*
60:*10, 13, 17*
61:*15* 62:*12,*
*21* 63:*1, 8*
64:*19, 22*
67:*23* 68:*15*
69:*22* 70:*3, 5,*
*14, 17, 25*
71:*3, 4, 16*
72:*20* 73:*24*
75:*20* 76:*7*
77:*21* 79:*18*
85:*15*
**pharmacy-by-
pharmacy**
62:*25*
**PharmaLink**
57:*6*
**Phone** 2:*6, 12,*
*18, 24* 3:*5, 12,*
*19* 4:*5, 12*
**physician**
66:*10, 11*
**picks** 62:*3*
**PIETRAGALL
O** 4:*6*
**piggyback**
56:*17*
**pill** 30:*20, 22,*
*23, 25* 31:*2, 4,*
*9* 39:*9*
**pills** 21:*14*
29:*17* 32:*9*
39:*23, 24*
40:*19* 42:*5*
43:*2, 7* 46:*12*
63:*25*
**Pittsburgh**
4:*11*
**place** 37:*23*
50:*22, 24*
74:*1, 13*
**plain** 27:*19*
**Plaintiffs** 5:*11*
7:*17* 8:*6*

**plan** 30:*5, 11*
61:*19, 20*
**Plantation**
62:*18*
**please** 7:*13,*
*15* 9:*1, 11*
19:*23* 36:*2*
44:*18* 49:*12*
54:*12* 55:*4*
58:*25* 59:*9*
83:*4, 9*
**PLLC** 2:*3*
**plus** 12:*2, 3*
**point** 18:*1*
40:*9* 41:*14*
42:*11, 25*
74:*14*
**policy** 41:*24*
**pop** 74:*5*
**portal** 37:*24*
**posed** 71:*17*
**position** 39:*24*
**possession**
29:*17* 39:*23*
55:*25* 57:*2*
**possible** 19:*11*
**Possibly** 76:*3*
**post-recall**
48:*20*
**potentially**
16:*12* 18:*7*
30:*12* 34:*7*
40:*23, 24*
42:*13* 70:*20*
**practice** 17:*14*
18:*3, 5* 20:*12*
26:*13* 41:*25*
47:*8* 74:*6*
80:*4*
**practices**
22:*12* 56:*14*
**practitioner**
66:*10*
**prebottled**
43:*8*
**prefilled** 46:*11*
**premises** 39:*2*
**prepackaged**
64:*15*
**prepacked**

46:*18*
**prepare** 34:*6*
**prepared** 17:*3*
36:*22* 51:*5*
**Prescription**
5:*23* 30:*6*
49:*19, 21*
66:*17, 18*
67:*4, 6* 73:*7*
74:*4*
**prescriptions**
50:*8* 51:*9*
**PRESENT**
4:*16*
**Press** 5:*12*
22:*15, 18, 25*
**pressure** 30:*4*
**presumably**
22:*14* 75:*10*
**pretrial** 15:*18*
**pretty** 18:*23*
24:*12, 23*
60:*23*
**previous**
35:*12* 73:*9*
**previously**
34:*1*
**primarily** 79:*2*
**Prinston** 3:*13*
**print** 50:*15*
**printed** 53:*13*
**printout** 20:*3*
**probably**
17:*15* 20:*7*
34:*9* 35:*11*
57:*5, 11* 58:*2*
59:*16, 22, 23,*
*24* 60:*20*
61:*6* 63:*4*
69:*21* 71:*18*
**problem** 8:*22*
14:*16, 17*
**problems**
22:*22*
**process** 17:*16*
47:*6* 55:*13,*
*17* 72:*16*
**processed**
78:*19*
**produced**
34:*11*

Confidential Information Subject to Protective Order

product 27:15
28:10 30:9,
14 35:5, 7, 8
37:20 41:13,
20 42:3, 17
51:6 59:25
60:10, 12
71:15 72:5
73:3, 9, 10, 16,
19, 21 77:6, 8
PRODUCTS
1:4 7:8 28:9
29:11 59:17
79:7
profession
24:10
Professional
1:16, 19
17:14 18:3, 5
20:12 26:12
47:8 56:14
80:3 82:3, 5
Prohibited
5:18 27:5, 11
proper 53:6
properly 75:10
propounded
85:7

PROTECTIVE
1:9
provide 35:4,
6 45:4 53:17
72:2
provided 37:6,
12 53:8, 12, 23
provider
66:16 73:2
providers
50:9 66:5, 9
PSC 7:17
PTOs 15:15
public 22:18
85:24
publically
17:21
pull 10:1
19:22 32:21
43:1 44:17
49:12 54:11

58:25
pulls 28:6
Purchase 6:4,
9 37:9, 18
38:9, 11 63:1,
2 65:25
69:24 70:22
79:3, 6
purchased
26:18 32:1
34:2, 24 35:7
36:24 43:21
51:14 62:23
63:9 67:23
69:17 71:2, 5
77:4
purchases
37:5 43:5, 6
Purchasing
5:18 32:17
33:9, 18, 25
34:3, 12, 18
35:11, 18
36:5, 15 71:21
purity 25:5
purports 25:2
purposes
40:11 46:23
pursuant 1:14
5:12
put 22:13, 19
23:11 26:23
27:19 43:20
68:3, 24

< Q >
QS1 50:5
51:3, 7 74:2
quality 22:5
23:3, 9 25:5,
10, 14
quantities
43:20, 23
quantity 58:18
quarantine
55:14
question 11:2
13:7 14:1
18:18 29:5, 6
30:8 31:18
37:2 43:16

65:24 71:8,
17, 20 74:10
75:8 77:1
79:25
questioning
57:24
questions
12:11 13:24
36:6, 11
78:24 79:22
80:23 85:7
quick 54:22
60:23

< R >
raise 7:23
Range 6:7
rare 70:14
RASPANTI
4:6
rate 42:23, 25
Raton 3:19
Read 10:21
22:14 83:4
85:4
real 54:22
really 28:25
66:12
Realtime 1:17,
18 82:3, 5
reason 9:13
12:24 13:8
21:13, 21
22:1 40:17
83:6 84:6, 8,
10, 12, 14, 16,
18, 20, 22, 24
reasonable
12:22 35:2
reasonably
67:7
reasons 28:1,
7 77:23
recall 17:10,
22 18:22
20:4 22:1, 5,
11, 16 26:14
28:6, 8, 13
40:10, 13, 24
47:2, 3, 4, 6, 9,
17, 23 48:6,

11, 21 55:8,
15 56:6, 10,
18 72:24
75:24 79:23,
25 80:9
recalled 17:19
18:12 21:13,
22 25:22
26:7, 14 28:1
30:14 39:13,
15 55:10, 24
56:8 57:10
72:1, 4, 18
76:23 77:4, 6,
8, 16
Recalls 5:14
25:10 26:21
receipt 83:15
receive 18:6
50:8, 19 58:13
received
26:15 49:20
55:11 56:9
58:8 78:1, 11
receiving
56:11 79:16
Receptor 5:14
Recess 9:20
49:8 80:19
recognized
25:3
recommend
56:15
recommended
72:24
record 7:2
8:11 9:1, 19,
22, 25 14:11
33:7 45:1
49:7, 10
54:14 58:16
68:7 73:24
75:16 78:10,
13 80:18, 21
81:2 82:13
records 38:8,
9, 11 56:11
58:15 63:8
71:5, 22 77:22
recovered

22:23
redacted 63:22
REEFER
4:10 13:3, 13
14:15, 16, 25
15:5, 12, 20
16:8 19:13,
18 21:5, 17,
25 22:8
25:16, 24
27:22 28:4,
12, 16 29:1
31:13, 16
40:12, 21
66:4, 25 67:2,
9 69:14, 19
refer 60:25
64:1
reference
65:21
refers 35:24
64:5 65:8
67:14
reflect 77:25
78:18
reflected 73:23
reflects 75:11
refresh 17:1
34:17
refreshes
34:21
refund 75:22
76:8, 19 77:5,
10, 11 78:1, 4,
11, 13, 14, 19
refunds 57:9
58:1, 3, 9
71:25 72:2
75:21 76:23
77:3, 16, 22
regards 48:12
60:4
Registered
1:16 82:2
regular 20:9
regulations
24:13

reimbursement
73:16

**relate** 10:*10*, *19*
**related** 82:*15*, *17*
**Relates** 1:*6*
**release** 23:*1*
**releases** 22:*15*, *18*
**rely** 12:*19*
**Remote** 1:*12* 2:*1* 3:*1* 4:*1*, *16* 7:*6*, *12* 82:*7*
**remotely** 7:*11*, *12*
**repackage** 64:*19*
**replacement** 72:*13*
**report** 42:*20* 58:*9* 59:*11* 62:*5*, *22* 68:*14* 82:*10*
**Reporter** 1:*17*, *19* 7:*20*, *23* 8:*4*, *18*, *21* 15:*8*, *9*, *21* 82:*3*, *6*
**reporter's** 15:*4*
**Reporting** 1:*18* 7:*13* 82:*4*
**reports** 74:*14*
**represent** 34:*10* 54:*14*
**Representative** 1:*13* 78:*4*, *6* 85:*14*
**representatives** 47:*16*
**represented** 25:*2*
**Representing** 2:*12*, *18*, *24* 3:*6*, *13*, *20* 4:*6*, *12*
**reprocess** 73:*7*
**request** 35:*3* 57:*8*

**requested** 58:*4* 76:*7* 82:*12*
**requests** 75:*21*
**requires** 17:*11*
**response** 11:*22* 14:*6* 75:*21*
**responsible** 38:*11* 79:*2*, *6*, *15*, *20*, *23* 80:*7*
**rest** 32:*10*
**resulted** 22:*5*, *21*
**results** 54:*15*
**retail** 17:*12* 19:*6* 28:*7* 32:*3*, *6*, *10*, *11*, *17* 34:*18* 37:*15* 38:*24* 45:*6*, *11*, *18*, *21* 47:*9*, *19*, *22* 49:*25* 50:*4*, *16* 51:*3*, *11*, *16*, *20*, *24* 53:*17* 55:*9*, *23* 56:*9* 57:*1*, *8* 58:*7* 59:*19* 60:*10*, *15*, *17*, *25* 61:*7*, *15* 62:*12*, *14*, *20* 67:*22* 68:*15* 69:*22* 70:*3*, *4*, *14*, *16*, *25* 71:*3*, *16* 72:*20* 73:*24* 75:*20* 76:*7* 77:*20* 79:*2*, *4*, *9*, *17*, *22* 80:*6*
**retain** 55:*10*
**retention** 55:*6*
**return** 55:*6*, *10*, *12* 83:*13*
**returned** 73:*19*, *21*
**returning** 57:*10*
**returns** 48:*22*
**reverse** 55:*18* 57:*7* 72:*9*

73:*4*
**reversed** 73:*6*
**review** 80:*16* 82:*11*
**right** 7:*24* 8:*10*, *13*, *21* 9:*3*, *9*, *18*, *21*, *23* 10:*13* 11:*11*, *13* 13:*11* 14:*5*, *24* 15:*23* 16:*1*, *16*, *18*, *21* 17:*6* 18:*10*, *13* 19:*21* 20:*8*, *14*, *17*, *20*, *25* 21:*15*, *24* 22:*2*, *13*, *18* 23:*2*, *4*, *8*, *10*, *11*, *19*, *24* 24:*6*, *14*, *20*, *25* 25:*13*, *15*, *20*, *23* 26:*4*, *10* 27:*25* 28:*3*, *10*, *11*, *14*, *15*, *24*, *25* 29:*8*, *11*, *14*, *16*, *20* 30:*19*, *23* 31:*2*, *5*, *10*, *12*, *14*, *15* 32:*2*, *7*, *20* 33:*2*, *4*, *7* 34:*5*, *17*, *25* 35:*21*, *22*, *24* 36:*20* 37:*11*, *22* 38:*1*, *13*, *16* 40:*1*, *11*, *20* 41:*2* 43:*5*, *15* 44:*4*, *8*, *11*, *14*, *22* 45:*24* 46:*22* 47:*2*, *15* 48:*11*, *24* 49:*6*, *9*, *11*, *17*, *21* 50:*18*, *20* 51:*7*, *15*, *19* 52:*8*, *14*, *22*, *24* 53:*6*, *14*, *24* 54:*4*, *5*, *6*, *8*, *25* 55:*23* 56:*19*, *25* 57:*15*, *25*

58:*24* 59:*4* 60:*8*, *18* 61:*11* 62:*4*, *6*, *9*, *11*, *20* 63:*7*, *13*, *15* 65:*14*, *17*, *22* 66:*3*, *24* 67:*3*, *8*, *11*, *19* 68:*14*, *23* 69:*9*, *13* 70:*11*, *24* 71:*7*, *14*, *23* 74:*9*, *20* 75:*4*, *6*, *13*, *17* 76:*14* 77:*12*, *23* 78:*11*, *14*, *21*, *23* 79:*21* 80:*14*, *17*, *20*, *22* 81:*1*
**right-hand** 27:*3*
**Robert** 1:*4*
**roles** 35:*12*
**room** 8:*19* 14:*21*
**roughly** 11:*6* 65:*4*
**rounding** 11:*17*
**Route** 3:*11*
**ROXANNA** 2:*22*
**RPR** 82:*24*
**RUGGIERI** 4:*3*
**rule** 15:*14*
**rules** 24:*13*
**run** 20:*21* 58:*9* 71:*9*

**< S >**
**safe** 20:*17* 40:*19* 52:*20* 61:*14*
**safest** 40:*8*
**sake** 15:*4*
**sale** 74:*14*
**Sample** 5:*23* 52:*16*
**sartan** 20:*4*
**save** 12:*17*

71:*24*
**saw** 69:*25*
**saying** 58:*16* 66:*12*, *16* 72:*22* 74:*11*
**says** 11:*19* 15:*10*, *18* 24:*15* 25:*1* 27:*10*, *12* 33:*19* 35:*2* 52:*11*, *17* 53:*3*, *5*, *11* 54:*17* 63:*18* 64:*3*, *18*
**scattered** 11:*10*
**scope** 16:*9* 19:*14* 21:*7* 24:*7* 26:*20* 28:*18* 29:*22* 31:*7*
**scroll** 10:*16* 35:*1* 44:*23* 45:*14* 52:*5*, *10*, *24* 59:*4*, *8*
**scrolling** 33:*13* 52:*14* 53:*4*
**second** 9:*16*
**Section** 23:*25* 24:*15* 27:*4*, *9*, *12* 35:*2* 37:*2*
**See** 11:*9* 21:*18* 24:*3*, *18*, *25* 25:*7* 27:*3*, *6*, *17* 32:*21* 33:*4*, *10*, *16*, *17*, *19*, *21*, *23* 34:*12*, *13*, *15* 35:*1* 36:*21* 37:*2*, *10*, *11* 45:*3*, *12* 48:*25* 52:*6*, *11*, *25* 53:*1*, *9* 54:*13* 57:*23* 59:*6*, *11* 61:*11* 63:*18*, *20* 65:*5*, *10*, *12* 67:*16* 68:*10*, *12* 69:*5*, *16*

70:10  71:12
74:15  78:22
seen  20:6
32:8  36:7
62:13  64:5
segregated
39:1
select  39:19
sell  19:3
27:20  28:2,
10  29:10
30:25  31:14
sellers  32:9
selling  20:16
25:22  28:8
30:1, 5, 8
send  46:14
55:18  58:4,
15  80:10
sense  30:17
41:23  60:3
72:13  73:17
78:8
sent  17:12, 13
26:13  55:22
56:6  57:2, 4,
6  58:18
sentence  25:1
Sentry  4:4
separate  55:13
September
1:10  7:5  82:8
sequestration
55:6
series  63:23
Services  1:18,
21  7:4  82:4
set  25:5  41:8
sets  62:2
setting  46:8
seven  38:24
sheet  83:7, 9,
14  85:9
shelf  39:5
she'll  8:22
shelves  39:9
short-circuit
57:23
show  78:14
showed  63:9
showing  50:1

shows  35:14
42:19  44:25
70:20, 22
side  27:4
30:10  38:2
45:11  47:13
62:24  75:12
79:2, 4, 17, 22
80:6
sign  83:9
similar  47:7
50:1
single  18:22,
24  30:20
39:2  40:23
56:10
sit  14:5
situation  28:13
Sixth  2:23
skip  36:12
57:20
small  11:21
24:23
smaller  43:20
64:19
SmartSource
70:8
Smith  74:3
So-and-So
72:22
soft  8:23
Solco  3:14
59:24  67:24
sold  11:25
12:14, 25
13:10  28:24
29:18, 19
30:21  38:24
51:10  64:22
solemnly  7:25
solution  14:20
solvents  22:23
somebody
37:4
sorry  9:13, 17
13:7  19:2
32:22  42:9
44:24  56:2, 4
61:5  63:16
64:14  65:23

69:8  76:4
sound  8:16
South  2:23
space  83:6
speak  17:9
51:5
speaking  7:13
specific  17:5,
20  33:23
36:6  43:6
62:15  66:15
specifically
10:14  22:12
55:19  58:3
spit  51:4, 12
spreadsheet
69:4
standard  25:5
41:25  74:6
standards
25:14
standpoint
65:21
start  8:25
37:2  47:20
started  8:15
48:21
starts  37:15
state  9:1
18:8  83:6
statement
64:13
STATES  1:1
18:12  19:3
26:8  51:21
statute  24:5
stenographic
82:13
stenographicall
y  82:10
steps  47:10,
12  55:9  80:12
STERN  3:17
stop  33:13
35:8  53:4
stopped  28:8
store  38:10
48:22  58:15,
19

stores  36:14
38:8, 18
58:12, 13
Street  2:11, 23
strength  25:4
strictly  56:23
strike  48:25
SUBJECT
1:9  25:10
67:13
subjects  48:8
Subscribed
85:20
Subsection
24:20  25:1
subsections
24:18
substance  85:8
substitute  67:4
suffice  11:20
16:16  51:7
54:23
Suite  2:5, 11,
23  3:4, 11, 18
4:4
supervise
60:16
supplier  35:3,
7, 15  69:20
70:6, 9
suppliers  32:2
69:10, 11
supply  43:25
supplying
35:18
suppose  79:13
supposed  45:3
65:20  66:22
sure  8:23
14:20  18:21
20:16  24:6
29:6  42:21
62:4  63:6
66:1  69:21
70:4  74:7, 25
75:9  76:12
80:7
Surescripts
50:8
Susan  1:16

7:21  82:2, 24
swear  7:21, 25
switching
56:15
sworn  7:12
8:6  82:8
85:20
synthesis
22:21
system  37:20
41:17  50:4, 5,
6, 11  51:8, 12
74:2
systems  51:2
60:2

< T >
Tab  10:1
19:22  23:12
26:23  32:23
33:6  44:18
49:12  58:25
68:3, 24  69:4
table  20:25
46:24  63:18
tablet  67:15
tablets  52:7
take  15:24
22:2  26:4
30:3  31:25
36:20  42:16
47:1, 13  49:1
52:3  54:1
55:3, 9  68:1,
24  71:23
73:8, 13  80:15
takes  54:13
talk  11:23
12:8  13:9
20:23  36:14,
22  47:2
48:11, 19
55:5  57:11,
25  60:3
71:25  73:2
75:19  76:5, 6
78:21
talked  31:11
41:2  45:16, 20
TAYLOR

Confidential Information Subject to Protective Order

4:18
TB 67:15
team 52:13
80:4
teams 80:11
technical 9:24
technician
79:19
TECHNOLOG
Y 2:1 3:1
4:1, 16 82:7
tell 8:22
12:19 32:7
33:22 34:23
37:3, 6 45:5,
10 49:24
57:19 58:2, 3,
10 62:13
63:24
telling 36:10
template 52:19
ten 80:15
term 12:12
23:17
terminology
11:24
terms 46:1, 23
tertiary 59:16,
21
testified 8:6
60:9
testify 9:3
10:8 21:7
24:8 48:8
Testimony
5:4 8:1 9:6
32:11 36:16
Teva 3:6
18:15 67:24
69:18
Thank 8:4
10:25 15:20,
21 36:19
80:25
Thankfully
27:8
Thanks 31:24
therapeutic
65:21 66:2
therapeutically
66:23

therapies
56:15
thereof 27:10
thing 16:11
40:8 43:12,
13 54:2, 19
things 48:22
58:5 65:1
75:13
think 11:17,
19 14:15
15:5, 13, 14
16:19 33:5
42:12 49:3
52:20 54:16
72:14 76:2
78:2 80:16
third-party
75:19, 22
76:3, 6 77:14
thirty 83:15
three 12:13,
21 31:18
48:7, 10
60:20 69:6
three-month
43:25
thresholds
21:15
tier 73:11
TIFFANY 3:3
18:14 31:17
time 7:5 8:18
9:18, 21 11:1
14:4 16:21
32:16 39:11
49:4, 6, 9
51:10 62:8
66:9 70:13
80:17, 20, 24
81:1
times 31:19
61:13
Title 5:16, 18
68:10
titled 27:4
tobacco 27:15
today 8:13
9:4 10:8
11:6, 24
12:12, 25

13:9, 24
14:24 17:4
19:4, 8 24:8
32:13 34:6
36:22 41:20
47:7 49:4
52:22 57:21
58:22 80:24
Today's 7:4
told 35:19
47:4
tomorrow
36:9, 17
57:11 71:21
top 45:2 52:6
53:5 59:8
69:5
Topic 55:5
topics 10:8, 9,
15, 17, 18
19:15 28:19
29:22
totally 37:1
touched 64:22
traces 44:13
track 37:20
42:4, 7, 11
44:7, 9, 12
45:18 56:22
78:5
tracked 36:23,
25 38:1, 4, 21,
22 41:4, 6, 7
45:21 67:12,
19
tracks 44:15
Transaction
6:5 68:11
transcript 5:9
6:2 82:12, 13
83:16, 17
transcription
85:6
transfers
73:22
TRAURIG 3:3
tricky 29:24
true 63:6
82:13
truth 8:1, 2
try 8:20

trying 30:15
48:9 60:7
turned 54:22
two 43:11, 13
48:16 51:24
type 54:12
typically 34:1

< U >
U.S 3:14
U.S.C 23:25
27:4
unable 59:24
understand
9:4, 6 11:25
12:6, 24 13:8,
22 15:6 16:4
22:4, 24 29:5
65:19 67:22
understanding
10:13 11:5
16:2, 5 17:17
21:12 23:19
28:23 35:10,
23 46:19
49:18 50:10
54:3 65:7
70:7 76:21
77:2, 15 78:12
understands
21:21 23:2
understood
23:1
unit 46:2, 3, 4,
9
UNITED 1:1
18:11 19:3
26:8
units 64:18
Units_Net
63:18, 23 64:3
unlawful
27:20 28:15
unsafe 13:2,
10 20:19
28:11
UOU 45:25
update 20:4
41:14
Updates 5:12

26:13
upset 74:9
up-to-date
50:12
USA 3:6 4:6
use 11:24
12:12 18:16
22:23 46:2, 3,
4, 9 49:25
50:5 51:3
53:6 62:3
71:10
usually 64:7
69:24 74:10

< V >
vacation 79:10
VALSARTAN
1:4 5:14 7:7
11:25 12:1, 2,
3, 5, 12, 14
13:1, 9 16:23
17:7 18:11,
24 19:3, 8, 11
21:4, 22 22:5
25:9, 23 26:7
28:1, 3 29:17
32:1, 17
33:19 34:19
38:20, 25
39:8, 14, 16
42:5 43:2, 7
47:17 49:19
50:13, 14
51:9, 14 52:1,
7 53:19, 20,
23 54:24
55:7, 10, 19,
24 56:8 57:1,
10 62:22
63:9 64:6
65:14 66:6,
19 67:6
69:11 70:18
72:1, 18 73:1,
4, 9 74:3
75:23 76:23
77:4, 17 79:3,
6, 17, 22 80:9
value 30:20,

Confidential Information Subject to Protective Order

23  31:*1*

**variety**  22:*5*

**various**  21:*3,*
22  22:*19*
60:*24*  62:*1*

**verbiage**  72:*23*

**version**  65:*15*
66:*22*

**versus**  66:*18*

**VICINAGE**
1:*2*

**video**  7:*6*

**Videographer**
4:*17*  7:*2, 3,*
20  9:*18, 21*
49:*6, 9*  80:*17,*
20  81:*1*

**Videotaped**
1:*12*  5:*11*

**voice**  8:*22*
14:*19*

**< W >**

**Wacker**  3:*4*

**wait**  14:*1*

**walk**  60:*21*
72:*15*

**Walmart**  3:*20*

**want**  8:*23*
15:*3*  18:*15*
20:*18*  22:*14*
24:*5*  25:*21*
26:*2*  54:*2*
60:*21*  62:*3*
66:*1*  71:*8*

**wanted**  58:*8*
62:*21*

**wants**  16:*17*
78:*16*

**warehouse**
71:*10, 11*

**warehoused**
71:*15*

**Wasilewski**
1:*16*  7:*21*
82:*2, 24*

**way**  14:*12*
18:*18*  23:*22*
35:*12*  37:*12,*
13  40:*18*
41:*1*  43:*16,*

17  44:*12*
58:*7*  62:*20*
65:*14*  66:*21*
70:*24*  72:*6*
77:*20*  78:*5*

**ways**  69:*6*

**website**  20:*5*
37:*16, 17*

**Well**  14:*24*
15:*7*  16:*19*
17:*9*  24:*12*
26:*6*  29:*12*
32:*20*  35:*21*
42:*20*  44:*2*
45:*9*  46:*2*
47:*20*  48:*7,*
25  49:*24*
50:*15*  67:*8*
69:*11*  74:*7*
75:*6*  76:*5*

**went**  56:*23*
60:*12*  70:*25*
71:*1*

**We're**  7:*2*
9:*19, 22, 25*
11:*24*  12:*8,*
25  13:*8*
23:*16*  49:*7,*
10  74:*11*
80:*18, 21*  81:*2*

**WERNER**  4:*3*

**West**  2:*11*  3:*4*

**we've**  10:*7*
38:*15*  41:*2*
45:*16*  49:*2*
67:*17*  69:*5*
80:*13*

**whatsoever**
58:*1*

**wheelhouse**
48:*23*

**whichever**
55:*14*

**WHITNEY**
2:*18*

**wing**  59:*19*

**witness**  7:*11,*
22  8:*3, 5*
13:*6, 14, 17,*
19  80:*25*

82:*6, 11, 21*
83:*1*

**witnesses**  48:*8*

**witness's**
28:*18*

**wondering**
8:*16*  63:*24*

**word**  18:*16*
20:*22*  54:*12,*
20

**words**  12:*8*
39:*7*  46:*15*

**work**  19:*20*
23:*8*  35:*18*
67:*8*  74:*8*

**worked**  42:*1*

**works**  17:*16*

**worth**  28:*25*
29:*19*  30:*9*
31:*4, 15, 20*

**write**  66:*5, 11,*
17  74:*10*

**Written**  53:*7,*
11  67:*4*  69:*6*

**wrong**  11:*9*
33:*5*

**< Y >**

**Yeah**  10:*24*
16:*20*  21:*18*
23:*6*  31:*23*
33:*5, 17*
42:*24*  47:*20*
48:*18*  52:*23*
54:*17*  56:*16*
57:*17*  59:*20*
70:*9*  77:*13*
78:*9*

**year**  41:*12, 17*

**years**  32:*1*

**York**  2:*17*

**< Z >**

**zero**  54:*17*

**Zhejiang**  3:*13*
26:*9*

**zoom**  24:*24*

# Exhibit 98

REDACTED

Confidential Information - Subject to Protective Order

```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
 2                   CAMDEN VICINAGE
                      -  -  -
 3
    IN RE:  VALSARTAN,      :  MDL NO. 2875
 4  LOSARTAN, AND          :
    IRBESARTAN PRODUCTS     :  CIVIL NO.
 5  LIABILITY LITIGATION    :  19-2875
    _____ :  (RBK/JS)
 6                          :
    THIS DOCUMENT APPLIES   :  HON. ROBERT
 7  TO ALL CASES            :  B. KUGLER
 8          - CONFIDENTIAL INFORMATION -
             SUBJECT TO PROTECTIVE ORDER
 9
                     VOLUME I
10
                      -  -  -
11
                  April 27, 2021
12
                      -  -  -
13
14          Videotaped remote deposition of
    S. WAYNE TALTON, taken pursuant to
15  notice, was held via Zoom
    Videoconference, beginning at 9:13 a.m.,
16  EST, on the above date, before Michelle
    L. Gray, a Registered Professional
17  Reporter, Certified Shorthand Reporter,
    Certified Realtime Reporter, and Notary
18  Public.
19
                      -  -  -
20
21       GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
22              deps@golkow.com
23
24
```

Confidential Information - Subject to Protective Order

Page 2

ZOOM APPEARANCES:

GOLOMB & HONIK P.C.
BY: RUBEN HONIK, ESQ.
1835 Market Street
Suite 2900
Philadelphia, Pennsylvania 19102
(215) 327-9166
ruben@honiklaw.com
Representing the Plaintiffs

SLACK DAVIS SANGER, LLP
BY: JOHN R. DAVIS, ESQ.
6001 Bold Ruler Way
Suite 100
Austin, Texas 78746
(512) 795-8686
jdavis@slackdavis.com
Representing the Plaintiffs

KANNER & WHITELEY, LLC
BY: LAYNE HILTON, ESQ.
701 Camp Street
New Orleans, Louisiana 70130
(504) 524-5777
l.hilton@kanner-law.com
Representing the Plaintiffs

Page 3

ZOOM APPEARANCES: (Cont'd.)

PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
BY: CLEM C. TRISCHLER, ESQ.
BY: FRANK H. STOY, ESQ.
One Oxford Centre, 38th Floor
Pittsburgh, Pennsylvania 15219
(412) 263-1840
cct@pietragallo.com
fhs@pietragallo.com
Representing the Defendant, Mylan
Pharmaceuticals, Inc.

CIPRIANI & WERNER, P.C.
BY: CAITLIN E. LAWLOR, ESQ.
450 Sentry Parkway, Suite 200
Blue Bell, Pennsylvania 19422
(610) 567-0700
Clawlor@c-wlaw.com
Representing the Defendants, Aurobindo
Pharma, USA, Inc. and Aurolife Pharma,
LLC

GREENBERG TRAURIG, LLP
BY: STEVEN M. HARKINS, ESQ.
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, Georgia 30305
(678) 553-2312
harkinss@gtlaw.com
Representing the Defendants, Teva
Pharmaceutical Industries, Ltd., Teva
Pharmaceuticals USA, Inc., Actavis LLC,
and Actavis Pharma, Inc.

Page 4

ZOOM APPEARANCES: (Cont'd.)

DUANE MORRIS, LLP
BY: COLEEN W. HILL, ESQ.
30 South 17th Street
Philadelphia, Pennsylvania 19103
(215) 979-1164
cwhill@duanemorris.com
Representing the Defendants, Zhejiang
Huahai Pharmaceutical Co, Ltd., Prinston
Pharmaceutical Inc., Huahai U.S., Inc.,
and Solco Healthcare US, LLC

BARNES & THORNBURG, LLP
BY: JOHN HEINZ, ESQ.
11 S. Meridian Street
Indianapolis, Indiana 46204
(317) 231-6491
John.heinz@btlaw.com
Representing CVS Pharmacy, Inc., and Rite
Aid Corporation

FALKENBERG IVES, LLP
BY: MEGAN A. ZMICK, ESQ.
230 W. Monroe Street, Suite 2220
Chicago, Illinois 60606
(312) 566-4808
Maz@falkenbergives.com
Representing the Defendant, Humana

CROWELL & MORING, LLP
BY: MIMI S. DENNIS, ESQ.
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
(202) 624-2774
mdennis@crowell.com
Representing the Defendants, Cardinal
Health, Inc.

Page 5

ZOOM APPEARANCES: (Cont'd.)

NORTON ROSE FULBRIGHT US LLP
BY: ELLIE NORRIS, ESQ.
2200 Rose Avenue, Suite 3600
Dallas, Texas 75201
(214) 855-8000
ellie.norris@nortonrosefulbright.com
Representing the Defendant, McKesson
Corporation

ULMER BERNE, LLP
BY: JEFFREY D. GEOPPINGER, ESQ.
600 Vine Street
Suite 2800
Cincinnati, Ohio 45202
(513) 698-5114
jgeoppinger@ulmer.com
Representing the Defendant,
AmerisourceBergen Corporation

ALSO PRESENT:

VIDEOTAPE TECHNICIAN:
Kristalyn Duran

Bradley Matta, Esq.
Elana Williams, Esq.
(Mylan - Viatris)

Beth Questad - Paralegal
(Slack Davis)

Page 6

I N D E X

- - -

Testimony of:
S. WAYNE TALTON
By Mr. Honik          13

E X H I B I T S

- - -

NO.          DESCRIPTION          PAGE

Mylan
PL-Talton-1  Curriculum Vitae     22
             S. Wayne Talton

Mylan
PL-Talton-2  Addendum IV to       109
             Valsartan Development
             Report
             Matrix Lab
             PD Lab, Unit-3

Mylan
PL-Talton-3  Valsartan            140
             Development Report
             Addendum I
             Matrix

Page 7

E X H I B I T S (Cont'd.)

- - -

NO.          DESCRIPTION          PAGE

Mylan
PL-Talton-4  CHMP                 191
             Guideline on the
             Limits of Genotoxic
             Impurities
             1/2007 - 1/2018

Mylan
PL-Talton-5  E-mail Thread        235
             4/1/15
             Subject, Valsartan ROS
             MYLAN-MDL2875-00494035-37

Mylan
PL-Talton-6  Drug Master File     241
             Valsartan USP
             3.2.S.2
             Manufacturing Process
             Development

Mylan
PL-Talton-7  Letter, FDA to       256
             Mylan
             DMFDLAPI Information
             Request
             MYLAN-MDL2875-00552465

Mylan
PL-Talton-8  Drug Master File     285
             3.2.S.2
             MYLAN-MDL2875-00894827

Page 8

E X H I B I T S (Cont'd.)

- - -

NO.          DESCRIPTION          PAGE

Mylan
PL-Talton-9  Guidance for Industry  303
             Drug Substance Chemistry
             Manufacturing and Controls
             Information

Page 9

P R E V I O U S L Y   M A R K E D
E X H I B I T S

- - -

NO.          DESCRIPTION          PAGE

Mylan
PL-Gomas-2   E-mail Thread        391
             11/5/19
             Subject, WL Response
             MYLAN-MDL2875-00611854-55

Mylan
PL-Gomas-3   Observations         400
             MYLAN-MDL2875-00611856

Mylan
PL-Glover-30 E-mail Thread        298
             3/20/19
             Subject, Backup for
             FDA Call
             MYLAN-MDL287500347222

Mylan
PL-Glover-31 Investigation of     298
             Lantech
             MYLAN-MDL287500347223-24

Mylan
PL-Owens-7   Cover Letter for     332
             Response to Information
             Request Letter
             8/13/18
             MYLAN-MDL2875-00345657

Mylan
Owens-9      E-mail Thread        331
             7/23/18
             Subject, Reg Justification
             Report for NDMA
             MYLAN-MDL2875-00830087

Confidential Information Subject to Protective Order

Page 10

```
 1              - - -
 2    P R E V I O U S L Y   M A R K E D
 3    E X H I B I T S (Cont'd.)
 4              - - -
 5  NO.        DESCRIPTION        PAGE
 6  Mylan
 7  PL-Owens-10  Evaluation of       332
 8              Products Manufactured in
              Mylan Regarding NDMA
 9              MYLAN-MDL2875-00830088-93
10  Mylan
11  PL-Snider-15 Summary of          253
              Manufacturing
12              Changes
              Annual Report
13              12/2018
              MYLAN-MDL2875-00895110
14  Mylan
15  PL-Snider-18 Mylan Laboratories  377
              Warning Letter
16              320-20-06 Response
              11/29/19
17              (No Bates)
18  Mylan
    PL-Snider-19 Impurities PDF      151
19              3.2.S.3.2
              MYLAN-MDL2875-00894833
20  Mylan
21  PL-Snider-20 DMF Amendment       253
              7/31/10
22              MYLAN-MDL2875-00894783
23
24
```

Page 11

```
 1              - - -
 2    DEPOSITION SUPPORT INDEX
 3              - - -
 4
 5  Direction to Witness Not to Answer
 6  PAGE   LINE
    None.
 7
 8  Request for Production of Documents
 9  PAGE   LINE
    None.
10
11  Stipulations
12  PAGE   LINE
    None.
13
14  Questions Marked
15  PAGE   LINE
    None.
16
17
18
19
20
21
22
23
24
```

Page 12

```
 1              - - -
 2        THE VIDEOGRAPHER:   We are
 3  now on the record.  My name is
 4  Kristalyn Duran, videographer for
 5  Golkow Litigation Services.
 6        Today's date is April 27,
 7  2021, and the time is 9:13 a.m.
 8        This deposition is being
 9  held by remote Zoom in the matter
10  of Valsartan, Losartan, and
11  Irbesartan Products Liability
12  litigation.
13        The deponent today is Wayne
14  Talton.
15        All parties to this
16  deposition are appearing remotely
17  and have agreed to the witness
18  being sworn in remotely.
19        All appearances are noted on
20  the stenographic record.
21        Will the court reporter
22  please administer the oath.
23
24
```

Page 13

```
 1              - - -
 2        ... S. WAYNE TALTON, having
 3  been first duly sworn, was
 4  examined and testified as follows:
 5              - - -
 6        EXAMINATION
 7              - - -
 8  BY MR. HONIK:
 9     Q.   Sir, good morning to you.
10  Can you hear my voice?
11     A.   Yes, I can.
12     Q.   And can you see my image?
13     A.   Yes, I can.
14     Q.   I heard Mr. Trischler and
15  others refer to you as Talton.  Is that
16  the correct pronunciation of your last
17  name?
18     A.   It's actually Talton.  But
19  I'll answer to either.
20     Q.   Okay.  I appreciate that.
21        MR. TRISCHLER:  My
22  apologies.
23  BY MR. HONIK:
24     Q.   Having spent a lifetime of
```

Confidential Information Subject to Protective Order

Page 14

1 having my own last name mispronounced.  I
2 appreciate where you're coming from,
3 Mr. Talton.
4         So as I think I said, my
5 name is Ruben Honik, and I'm one of the
6 plaintiffs' lawyers in this litigation
7 involving valsartan.
8         I don't know what screen
9 you're looking at.  But there are
10 multiple lawyers present today in
11 connection with your testimony that
12 you're going to offer under oath.
13         A number of them represent
14 the plaintiffs' group, like myself.  And
15 there are a great many defense lawyers
16 who represent some of the other
17 defendants in this lawsuit.
18         Do you understand that?
19     A.   Yes.
20     Q.   And I take it that you
21 understand that the oath that was just
22 administered and accepted by you, is the
23 same that you would give in a court of
24 law if you were giving testimony there;

Page 15

1 is that correct?
2     A.   Yes.
3     Q.   And in fact, have you given
4 testimony under oath before today?
5     A.   Yes, I have.
6     Q.   Have you done so in the
7 setting of a deposition like this one?
8     A.   This is the first virtual
9 deposition that I've done.  But I've done
10 many face-to-face.
11     Q.   And apart from any live
12 depositions that you may have given in
13 the past, have you given testimony under
14 oath in any other settings, such as a
15 courtroom or a legislative body or
16 anything like that?
17     A.   Yes, a couple of occasions.
18     Q.   And what instances or
19 occasions were those?
20     A.   I testified in a court
21 appearance related to a tax issue that
22 Mylan was undergoing a couple of years
23 ago.  And then I've also appeared in
24 court for a deposition for a P-IV

Page 16

1 litigation.
2     Q.   I'm sorry.  For what kind of
3 litigation?
4     A.   A Paragraph IV patent
5 certification litigation.
6     Q.   Yep.
7     A.   Patent challenge.
8     Q.   Now, you used the word
9 deposition and court.  Was it one or the
10 other?  Were you in court?
11     A.   Yes, I've appeared in court
12 twice.
13     Q.   Okay.  The first was the tax
14 issue.  And the second was the patent
15 issue, correct?
16     A.   Reverse order but those were
17 the two instances.
18     Q.   Appreciate that.
19         And then the rest of the
20 occasions in which you've given testimony
21 under oath have been in depositions, and
22 every instance before today, live and in
23 person; is that correct?
24     A.   That's correct.

Page 17

1     Q.   And what kind of depositions
2 or what kind of matters did you give
3 testimony in a deposition setting prior
4 to today?
5     A.   Patent litigation.
6     Q.   In every instance?
7     A.   Yes.
8     Q.   And is that part of the
9 scope of your responsibility at Mylan or
10 perhaps now at Viatris, to support the
11 company in patent litigation by
12 testimony?
13     A.   If necessary based on my
14 current role.
15     Q.   And I don't want to belabor
16 the point, but how many instances did you
17 give deposition testimony in patent
18 related matters?
19     A.   I haven't counted them.  But
20 it's probably close to 50 over my 20-year
21 career.
22     Q.   And apart from the two court
23 appearances that you made and what sounds
24 like dozens of depositions that you've

Confidential Information Subject to Protective Order

Page 18

¹ given, have you supplied testimony under
² oath in any other setting at any other
³ time before today?
⁴     A.   No.
⁵     Q.   So Mr. Talton, the rules
⁶ today are substantially the same, I
⁷ promise you, relating to the previous
⁸ depositions that you've given with a
⁹ couple of rules that I want to emphasize
¹⁰ before we start as a matter of
¹¹ housekeeping.
¹²         I hear you when you say this
¹³ is your first remote or virtual
¹⁴ deposition that you've taken.
¹⁵         And what that has meant for
¹⁶ those of us who have taken a great many
¹⁷ of these now, is that it's even more
¹⁸ important than ordinary to wait for the
¹⁹ speaker to complete his or her words or
²⁰ statement before you supply an answer.
²¹ Do you understand that?
²²     A.   Yes.
²³     Q.   And the reason for that is
²⁴ there's a bit of a delay on the computer

Page 19

¹ through the internet.  And we want to
² ensure that our court reporter can hear
³ and then take down everything what each
⁴ of us says verbatim.  Do you understand
⁵ that?
⁶     A.   Yes.
⁷     Q.   Now, that holds equally
⁸ true, Mr. Talton, when Mr. Trischler,
⁹ your very fine lawyer, places an
¹⁰ objection on the record.
¹¹         So I want you to just
¹² hesitate for maybe a second or so after a
¹³ question has been posed.  And if you hear
¹⁴ him speaking up, it's to protect the
¹⁵ record by placing an objection of some
¹⁶ sort on the record.
¹⁷         The rules require that we do
¹⁸ so in an abbreviated fashion, so it
¹⁹ shouldn't take very long.  But allow him
²⁰ to complete that before you begin to
²¹ supply an answer.
²²         Can you do that for me as
²³ well?
²⁴     A.   Yes.

Page 20

¹     Q.   Another paramount rule,
² Mr. Talton, is if I ask a question of you
³ which for any reason you haven't either
⁴ heard or understood, I'd instruct you not
⁵ to answer it in favor of asking me to
⁶ repeat or rephrase it so that you can
⁷ understand it.  Can you do that for me?
⁸     A.   Yes.
⁹     Q.   And if you do supply an
¹⁰ answer, I will assume that you've
¹¹ understood the question and are supplying
¹² your best answer under oath.  Is that
¹³ fair?
¹⁴     A.   Yes.
¹⁵     Q.   I've got quite a bit of
¹⁶ ground to cover with you.  But I promise
¹⁷ to try to do it as expeditiously and
¹⁸ succinctly as possible.
¹⁹         I want to assure you that
²⁰ this is not an endurance test for you.  I
²¹ typically try to break for at least five
²² or 10 minutes every hour.  And of course
²³ we'll take a midday break at some point
²⁴ for lunch.

Page 21

¹         But if you need to break for
² any reason at any time, you simply need
³ to let me know that.  And once we've got
⁴ your response to any pending questions,
⁵ we can go on and take a break.  Is that
⁶ okay with you?
⁷     A.   Yes, that's fine.
⁸     Q.   Now, before we begin in
⁹ Earnest, I understand from Mr. Trischler
¹⁰ that we're waiting for some copying of
¹¹ records.  Am I to understand that you've
¹² got no records in front of you?
¹³     A.   Not at this time.
¹⁴     Q.   With your permission, I'm
¹⁵ going -- I've got your CV in front of me.
¹⁶ And I suspect even without looking at it
¹⁷ you probably have a pretty good handle on
¹⁸ its contents.  Perhaps as I'm questioning
¹⁹ you, it will be placed in front of you.
²⁰ But that's going to be Exhibit Talton-1
²¹ when it arrives.
²²         And with your permission I
²³ would like to ask you some questions
²⁴ about your background.  May I do that?

Confidential Information Subject to Protective Order

Page 22

1      A.   Yes.
2           (Document marked for
3      identification as Exhibit
4      PL-Talton-1.)
5  BY MR. HONIK:
6      Q.   In the -- well, let me note
7  that it states that you live in
8  Morgantown, West Virginia.  Is that still
9  correct?
10     A.   Yes.
11     Q.   And do you work in
12 Morgantown as well?
13     A.   Yes.  I'm working remotely
14 now.   But I have an office in
15 Morgantown.
16     Q.   Are you currently employed
17 by Viatris?
18     A.   Yes.
19     Q.   And prior to that, of
20 course, you were employed by Mylan?
21     A.   That's correct.
22     Q.   And you've been exclusively
23 employed by Mylan since 2001; is that
24 correct?

Page 23

1      A.   That's correct.
2      Q.   And I gather you've held a
3  variety of positions within the
4  regulatory affairs department throughout
5  those years; is that correct?
6      A.   Yes.
7      Q.   And outside of the
8  regulatory affairs department, you've had
9  no other formal titles or positions,
10 correct?
11     A.   My entire career at Mylan
12 has been in regulatory affairs.
13     Q.   Thank you.
14          Now, the resumé that I have
15 has a summary at the beginning of it
16 after your contact information, which
17 reads as follows?
18          "A results-oriented
19 regulatory affairs professional with over
20 32 years of diverse development and
21 regulatory affairs experience within the
22 pharmaceutical industry."
23          Let me stop there.
24          Are those words that you

Page 24

1  wrote?
2      A.   Yeah.
3      Q.   Okay.  And as of whenever
4  this document was created, your CV, it
5  indicates that you had 32 years of
6  experience.  But judging by the years on
7  this resumé, it appears this resumé may
8  be as much as eight years old, do you
9  know; is that correct?
10     A.   That's very possible.  I
11 supplied my current CV.  I haven't
12 updated it in some time.
13     Q.   Okay.  So is it correct that
14 perhaps as of today you've been a
15 regulatory affairs professional for
16 actually 40 years?  Would that be fair?
17     A.   I joined regulatory affairs
18 in 1991 at GSK.  I've been in a
19 regulatory affairs role since 1991.
20     Q.   Now, in the clause that I
21 read to you, you talk about diverse
22 development and regulatory affairs
23 experience.  What do you mean by the
24 development -- use of the word

Page 25

1  "development" in that clause?
2      A.   While at -- my first
3  employment out of college was at
4  Burroughs Wellcome, which later became
5  GSK.  I worked in quality as well as
6  chemical development for a number of
7  years.
8      Q.   And in fact, your formal
9  education, at least so far as your CV
10 reflects, is that you possess both a BS
11 and a master's in chemistry; is that
12 correct?
13     A.   That is correct.
14     Q.   And you got your master's of
15 science in chemistry in 1989 is that
16 correct?
17     A.   That's correct.
18     Q.   And judging both by the fact
19 that you obtained it at East Carolina
20 University and the accent that I detect,
21 are you from the Carolinas or the south?
22     A.   Yes, I am.
23     Q.   Where do hail you from?
24     A.   A little town called

Page 26

¹ Princeton, which is like southeast of
² Raleigh.
³      Q.   Okay.  And I gather when you
⁴ started out -- well, certainly at Mylan,
⁵ you moved a little further north, did you
⁶ not?
⁷      A.   Yes.  I moved from Raleigh
⁸ to Morgantown, West Virginia then.
⁹      Q.   Now, in the summary of
¹⁰ your -- on your CV, you go onto say that
¹¹ your experience was in new drug
¹² development, generic drug development,
¹³ biological drug products, and consumer
¹⁴ health products.  Is that correct?
¹⁵      A.   That's correct.
¹⁶      Q.   So --
¹⁷         MR. TRISCHLER:  Ruben, the
¹⁸      documents -- Ruben, the documents
¹⁹      just arrived.
²⁰         So I was going to invite,
²¹      Mr. Talton, that you can look at
²²      the document if you need to, to
²³      respond to some of counsel's
²⁴      questions.

Page 27

¹         MR. HONIK:  Sure.  That's a
²      great idea.
³ BY MR. HONIK:
⁴      Q.   And if you wouldn't mind
⁵ placing what we're going to mark
⁶ Talton-1, your CV, place that in front of
⁷ you, sir.
⁸      A.   I got it.
⁹      Q.   Very good.  So just as a
¹⁰ point of orientation, in the summary it
¹¹ says that you've got over 32 years of
¹² experience.  Is this the most current and
¹³ up-to-date CV for you?
¹⁴      A.   It's the most recent one
¹⁵ that I've prepared.  I haven't updated it
¹⁶ in a number of years.
¹⁷      Q.   Okay.  So but -- so that I'm
¹⁸ clear, is this the most up-to-date
¹⁹ currently available CV for you?
²⁰      A.   Yes.
²¹      Q.   And did you prepare it in
²² its entirety?
²³      A.   Yes.
²⁴      Q.   Okay.  And by that I mean,

Page 28

¹ did you have any assistance in preparing
² any parts of it.  I don't mean typing it,
³ but I mean the content.
⁴      A.   No, I prepared it.
⁵      Q.   Thank you.  So before you
⁶ got the document in front of you now
⁷ marked Exhibit 1, we were talking about
⁸ your experience with new drug development
⁹ and generic drug development.
¹⁰         So that I have a working
¹¹ definition of that, as you understand it,
¹² what is new drug and generic drug
¹³ development as you define it?
¹⁴      A.   New drug development is new
¹⁵ chemical entities or new therapies that
¹⁶ are not previously approved, where
¹⁷ generic drug development is a development
¹⁸ of a similar product as reference
¹⁹ product, as a generic drug.
²⁰      Q.   Understood.  And the term or
²¹ word "development" in each of those
²² phrases, does that refer to the R&D and
²³ the prelaunch regulatory matters that go
²⁴ into the development and then

Page 29

¹ commercialization of those drugs?
²      A.   In general, yes.
³      Q.   And we'll look at it in a
⁴ second or so.  But it looks like you've
⁵ had experience in the chemistry lab side
⁶ as well as the regulatory affairs side in
⁷ connection with pharmaceutical
⁸ operations, correct?
⁹      A.   Very early in my career,
¹⁰ yes.
¹¹      Q.   Okay.  And we'll get to that
¹² in a minute.  But I gather in your job as
¹³ head of global regulatory affairs
¹⁴ presently you've become acquainted with
¹⁵ the process development side of the
¹⁶ regulatory scheme for introducing both
¹⁷ new and generic drugs, correct?
¹⁸      A.   Could you clarify what you
¹⁹ mean by process development?
²⁰      Q.   Sure.  Before either new
²¹ drugs or generic drugs launch
²² commercially, it's true, is it not, that
²³ process chemists prepare processes that
²⁴ go part and parcel into the filings with

Confidential Information - Subject to Protective Order

Page 30

¹ regulators; isn't that right?
²     A.    Yes.  Drug applications,
³ there's a description of how products are
⁴ manufactured.
⁵     Q.    And those descriptions by
⁶ process development professionals, also
⁷ go into DMFs, do they not?
⁸     A.    There is a description of
⁹ the manufacturing processes within a drug
¹⁰ master file, yes.
¹¹     Q.    And all I'm getting at, at
¹² this very preliminary stage, is that over
¹³ the many years of your experience, you've
¹⁴ come to understand the workings of how
¹⁵ those professionals prepare submissions
¹⁶ that you in turn use in the regulatory
¹⁷ affairs department with filings with
¹⁸ regulators; is that correct?
¹⁹     A.    Yes.  I have a general
²⁰ understanding of what constitutes a drug
²¹ application, what goes into them from a
²² regulatory perspective.
²³     Q.    And I gather in regulatory
²⁴ affairs that you collaborate with other

Page 31

¹ units or divisions of your pharmaceutical
² company in order to comply with and
³ create submissions for regulators,
⁴ correct?
⁵     A.    There's multiple functions
⁶ that provide source documents that go
⁷ into a registration.  So we do work with
⁸ a variety of different functions to
⁹ collect those source documents.
¹⁰     Q.    And can you identify the
¹¹ sources that you're referring to here
¹² that you collaborate with?
¹³     A.    Well, research and
¹⁴ development, process development,
¹⁵ quality, manufacturing operations, the
¹⁶ legal department, labeling team, et
¹⁷ cetera.
¹⁸     Q.    And I gather you've been
¹⁹ collaborating with each of these areas or
²⁰ sections of the company in the many years
²¹ that you've been a regulatory affairs
²² professional, correct?
²³     A.    Yes.
²⁴     Q.    And each of them serve a

Page 32

¹ separate and sometimes distinct function
² in helping you to do your job as a
³ regulatory affairs professional, correct?
⁴     A.    We rely upon a variety of
⁵ functions in order to collect the
⁶ necessary documents to compile a
⁷ registration.
⁸     Q.    You indicate in your CV,
⁹ marked Exhibit 1, that you are certified
¹⁰ as a regulatory affairs -- or have a
¹¹ regulatory affairs certification; is that
¹² correct?
¹³     A.    Yes.
¹⁴     Q.    And apparently you obtained
¹⁵ that in 1995; is that correct?
¹⁶     A.    That's correct.
¹⁷     Q.    Have you been recertified
¹⁸ since that year?
¹⁹     A.    It's -- it's a renewal, so
²⁰ every two to three years you have to get
²¹ recertified.
²²     Q.    Right.  I understand.
²³ Excuse me.  I didn't mean to speak over
²⁴ you.

Page 33

¹     A.    The answer is yes, I
² maintain that certification.
³     Q.    So you have been recertified
⁴ by RAC within the last three years?
⁵     A.    It's a continuous
⁶ certification that you maintain.
⁷     Q.    It is my understanding --
⁸     A.    Can I explain?
⁹     Q.    Sure, you can.
¹⁰     A.    So the initial -- the
¹¹ original certification is based on
¹² completing a test -- test examination.
¹³ And to maintain that certification, you
¹⁴ have to continuously participate in
¹⁵ conferences, meetings, to continue to
¹⁶ earn points toward maintaining your
¹⁷ certification.  So you're not
¹⁸ recertified.  You simply maintain that
¹⁹ through continuing education credits.
²⁰     Q.    Okay.  Now, according to
²¹ this CV, sir, you are defined as the head
²² of global regulatory affairs.  Is that
²³ still your title and designation as a
²⁴ Viatris employee?

Confidential Information Subject to Protective Order

Page 34

1    A.   Yes, at this time.

2    Q.   What do you mean by "at this

3 time"?  Is it about to change?

4    A.   Well, we're undergoing

5 continuous reorganization right now.  So

6 my current manager is head of global

7 regulatory affairs and product safety.

8 So there's no guarantee my title might

9 not evolve as we continue our

10 reorganization.

11    Q.   Is your current, what you

12 define as manager, which straddles both

13 regulatory affairs and safety, an Upjohn

14 person or a Mylan person?

15    A.   A legacy Mylan.

16    Q.   And what's the name of that

17 manager?

18    A.   Andrea Miller.

19    Q.   And how long has she been

20 your manager straddling both regulatory

21 affairs and product safety?

22    A.   She was named as part of the

23 Viatris introduction in November.  But

24 she's been in and out of her regulatory

Page 35

1 roles over the years during my 20 years

2 at Mylan.  So she's been my manager

3 previously.

4    Q.   That's -- I may have asked

5 the question somewhat poorly.  But prior

6 to merger or acquisition in late 2020,

7 was Ms. Miller a manager of yours for

8 some period of time?

9    A.   Yes.

10    Q.   And for how long prior to

11 2020 would that have been?

12    A.   I would estimate maybe three

13 to four years.  Because she was head of

14 regulatory affairs and research and

15 development.

16    Q.   When did her role or title

17 shift to include product safety?

18    A.   In November of 2020 when

19 Viatris was formed.

20    Q.   I don't want to dwell

21 unnecessarily on this, but what does

22 product safety as a unit or division do

23 that's different, for example, from

24 regulatory affairs or R&D?

Page 36

1    A.   Product safety and risk

2 management team, also known as PSRM, they

3 do adverse event reporting, so they do

4 case management, they prepare periodic

5 safety reports that go to the various

6 health authorities.  And they're also key

7 in managing any risk management REMS

8 programs that we might have that are

9 approved as a condition for approval for

10 generic products.

11    Q.   Understood.  Who ran PSRM

12 for Mylan back before the merger or

13 acquisition in late '20?

14    A.   Globally it's Balwant Heer.

15 And then we also have regional heads.

16    Q.   And prior to November 2020,

17 were you a direct report to Ms. Miller?

18    A.   Yes.

19    Q.   And I gather you've been the

20 head of global regulatory affairs,

21 according to your CV, since 2016; is that

22 correct?

23    A.   Yes.

24    Q.   I want to understand some of

Page 37

1 the phrases that you employ in describing

2 your job as head of global regulatory

3 affairs.

4        In the first bullet there,

5 you indicate that you partner with

6 business to deliver new products and

7 maintain regulatory compliance.  You've

8 spoken a bit about that.  And you go on

9 to refer to established product

10 portfolio.  What does that phrase mean?

11    A.   The established product

12 portfolio, is that your question?

13    Q.   That's my question, sir?

14    A.   That's the approved products

15 or products that have already undergone

16 review and approval by a health

17 authority.

18    Q.   Understood.  The next and

19 final bullet refers to your strategic

20 leadership and comprehensive direction of

21 government regulatory requirements for

22 product introduction.

23        And I believe the

24 distinction that you're drawing there is

Confidential Information Subject to Protective Order

Page 38

¹ that that would refer to products before
² they become established portfolio
³ products, correct?
⁴     A.   Yes.  That covers both the
⁵ registration and approval.
⁶     Q.   And just as a point of
⁷ reference for myself.  Among the various
⁸ sources of collaboration that you
⁹ identified for me earlier, you'll
¹⁰ remember legal, labeling, R&D and the
¹¹ like, which of those sources or divisions
¹² or units do you collaborate with in
¹³ product introduction specifically?
¹⁴     A.   We would interact with all
¹⁵ of those functions in order to compile a
¹⁶ registration to seek approval from a
¹⁷ health authority.
¹⁸     Q.   Understood.
¹⁹         Then the next phrase that
²⁰ you refer to in your description here is
²¹ commercialization.
²²         Tell me the definition of
²³ that, as you've used the word?
²⁴     A.   That just refers to, you

Page 39

¹ know, after obtaining the product
² approval, providing support as necessary,
³ to support a launch of a product.
⁴     Q.   Okay.
⁵     A.   Commercialization.
⁶     Q.   And would that include both
⁷ the launch and the actual sales functions
⁸ of getting it into the marketplace?
⁹     A.   No.  Regulatory works to
¹⁰ obtain the approvals, but once a product
¹¹ is approved, we have no role in the
¹² actual execution of launching a product
¹³ or selling our product.
¹⁴     Q.   Understood.  You go on to
¹⁵ refer to regulatory knowledge to ensure
¹⁶ compliance, which I understand, and
¹⁷ regulatory intelligence.
¹⁸         What does that phrase mean,
¹⁹ "regulatory intelligence"?
²⁰     A.   What I mean by that is we
²¹ closely monitor the change in regulatory
²² environment.  When new guidances are
²³ issued, new regulations come in place,
²⁴ new requirements, we try to stay abreast

Page 40

¹ of those to make sure that we're
² constantly, you know, continuing to
³ improve the quality of our applications
⁴ and meeting the health authority
⁵ expectation.
⁶     Q.   You agree that that
⁷ requirement has been a presence in your
⁸ job the whole time that you've worked at
⁹ Mylan in regulatory affairs?
¹⁰     A.   Yes.  In order to be an
¹¹ effective regulatory professional it's
¹² important to know the requirements in
¹³ your various markets.
¹⁴     Q.   You then go on to say, "and
¹⁵ create opportunities in a highly
¹⁶ regulated environment."
¹⁷         Unpacking that a bit.  What
¹⁸ do you mean by create opportunities in
¹⁹ that phrase?
²⁰     A.   Supporting the business,
²¹ supporting the R&D, support the
²² registration of new products to help
²³ bring those new products to market.
²⁴     Q.   Who has been the head of R&D

Page 41

¹ for the period of time that you've worked
² at Mylan in regulatory affairs?
³     A.   It's varied over my 20 years
⁴ at Mylan.  It was Walt Owens for a while.
⁵ Andrea Miller held the role for a while.
⁶ Dan Snider was over R&D for a while.  So
⁷ it's changed throughout my 20 years.  But
⁸ those are the three most recent leaders.
⁹     Q.   Again, I don't want to dwell
¹⁰ very long on it.  Is R&D, is that
¹¹ department sort of broken into the
¹² different subdepartments or units that
¹³ perform different functions within R&D?
¹⁴         MR. TRISCHLER:  Objection to
¹⁵     the extent that it's beyond the
¹⁶     scope of the designation.
¹⁷         You can answer to the extent
¹⁸     you know.
¹⁹         THE WITNESS:  When I refer
²⁰     to R&D, that would include
²¹     analytical sciences, process
²²     development, you know, toxicology,
²³     et cetera.
²⁴ BY MR. HONIK:

Confidential Information Subject to Protective Order

Page 42

1  Q.  Thank you.  I appreciate
2  that.
3         Is toxicology subsumed
4  within the R&D department or are they a
5  standalone department at Mylan during
6  your tenure?
7     A.  It's a global -- it's a
8  global function.
9     Q.  Okay.  And then finally your
10 description here refers of course to the
11 highly regulated environment.  What do
12 you understand the purpose of that highly
13 regulated environment?  Why is it highly
14 regulated?
15        MR. TRISCHLER:  Objection to
16     the form.
17        THE WITNESS:  In order to
18     pursue the approval of a
19     pharmaceutical product in the U.S.
20     or any other market, there are
21     very specific requirements,
22     guidelines, regulations that --
23     that you have to follow in order
24     to do that.  That's what I mean by

Page 43

1  highly regulated.
2  BY MR. HONIK:
3     Q.  And do you know the
4  underlying purpose for the highly
5  regulated nature of the environment in
6  which you work?
7     A.  It is to ensure that we meet
8  the standards of the requirements of the
9  various health authorities around the
10 globe.
11    Q.  Okay.  And do you have any
12 understanding of the reason why it's
13 highly regulated in order to meet or
14 satisfy the requirements of those
15 regulators?  What is the underlying
16 purpose, if you understand it?
17        MR. TRISCHLER:  Objection to
18     form.
19        THE WITNESS:  There's
20     regulations and requirements that
21     you have to meet in order to
22     market these types of products.
23        So it is regulatory's role
24     to ensure that when we file the

Page 44

1  registration, that we are meeting
2  the expectations of those local
3  health authorities.
4  BY MR. HONIK:
5     Q.  Let me ask the question this
6  way and then I'll move on.  Do you have
7  any understanding that the environment is
8  highly regulated by the regulators with
9  which and with whom you interact day in
10 and week out and month out in order to
11 protect consumers who purchase and
12 consume the drugs that your company
13 makes?
14        MR. TRISCHLER:  Objection to
15     form.
16        THE WITNESS:  I mean, the
17     expectation that we produce
18     quality products that are -- that
19     are consumed by the general
20     public.  It is a public health
21     role.
22 BY MR. HONIK:
23    Q.  Okay.  And do you,
24 therefore, understand that the underlying

Page 45

1  reason for having a highly regulated
2  environment in which you operate is at
3  the end of the day, to protect those
4  consumers to whom you sell drugs?
5        MR. TRISCHLER:  Objection to
6     form.
7        Objection.  Asked and
8     answered.
9        THE WITNESS:  To ensure the
10     quality of the products that we
11     produce in accordance with how
12     they are approved by the local
13     health authorities based on the
14     various requirements across the
15     globe.
16 BY MR. HONIK:
17    Q.  You then describe the job
18 that you held from 2014 to 2016 on your
19 CV as head of global regulatory science
20 and operations.
21        Do you see that?
22    A.  Yes.
23    Q.  Can you first tell me the
24 difference between global regulatory

Confidential Information Subject to Protective Order

Page 46

¹ affairs and global regulatory science and
² operations?
³      A.   Yeah.  So global regulatory
⁴ affairs is more of the overarching role,
⁵ which includes regulatory science,
⁶ regional regulatory teams and operations,
⁷ which is the mechanics of which we
⁸ execute, publish, produce submissions.
⁹           During 2014 to 2016, my role
¹⁰ was not the overarching global head.  But
¹¹ more specific on the reg science teams,
¹² the teams that prepare generic drug
¹³ submissions, and operations which is the
¹⁴ team that actually prepares our
¹⁵ electronic submissions and archives and
¹⁶ publishes and transmits those.
¹⁷      Q.   Is it fair to say that
¹⁸ global regulatory science and operations
¹⁹ is subsumed structurally within global
²⁰ regulatory affairs?
²¹      A.   Yes.  Those are subfunctions
²² within global regulatory affairs.
²³      Q.   And can you identify other
²⁴ sub functions that you supervise or

Page 47

¹ oversee as global regulatory affairs
² head?
³      A.   We also have a regulatory
⁴ policy team, which gets back to sort of
⁵ the regulatory intelligence area.  We
⁶ have a team that monitors the regulatory
⁷ environments to ensure that we're
⁸ monitoring that and continuously meeting
⁹ the new expectation.
¹⁰      Q.   Okay.  So if I've noted them
¹¹ correctly, I know that you identified
¹² regulation or reg policy, which relates
¹³ to intelligence.
¹⁴           You've identified and
¹⁵ defined reg science and operations or
¹⁶ operating -- operations.
¹⁷           Are there any other, as you
¹⁸ called it, subfunctions within regulatory
¹⁹ affairs that you supervise or oversee?
²⁰      A.   The other major group would
²¹ be our regional regulatory team.  So
²² based on -- we have a European regulatory
²³ affairs team, emerging markets, Japan,
²⁴ Australia, and New Zealand.

Page 48

¹      Q.   So are regional reg teams
² related more to geography than any
³ specific subfunction?
⁴      A.   They are broken down by the
⁵ markets that they support.  So they are
⁶ regionally located.  But their role is to
⁷ support registrations in those specific
⁸ markets.
⁹      Q.   Understood.  And as head of
¹⁰ global reg affairs, do you oversee all of
¹¹ the regional reg teams?
¹²      A.   Currently, yes.
¹³      Q.   And that's been the case
¹⁴ since 2016?
¹⁵      A.   Yes.
¹⁶      Q.   And does that function
¹⁷ require you to familiarize yourself with
¹⁸ the various regulatory structures and
¹⁹ architecture of the different regions in
²⁰ which Mylan sells drugs?
²¹      A.   Only at a very high level.
²² I have very strong regional and country
²³ managers, and I rely upon them to
²⁴ understand their market and run those --

Page 49

¹ those regional teams.
²      Q.   Sure.  But from a management
³ standpoint, you're nonetheless the head
⁴ structurally over these various regional
⁵ reg teams, correct?
⁶      A.   I am the people manager.
⁷ But I expect my leaders to understand
⁸ their markets and run their businesses
⁹ locally.
¹⁰      Q.   Understood.  And part of how
¹¹ that happens is that your regional reg
¹² teams, in the various geographic markets
¹³ that you serve and are regulated by
¹⁴ become acquainted with the regulatory
¹⁵ schemes, rules, and regulations of the
¹⁶ respective markets that they operate in,
¹⁷ correct?
¹⁸      A.   The regional leaders, that's
¹⁹ their role is to understand the local and
²⁰ regional markets.  So I rely upon them to
²¹ do that.
²²      Q.   I understand.  And let me
²³ ask it this way, and I'll move on.  By
²⁴ way of example, you've got a regional reg

Page 50

¹ team that operates in Europe and is
² regulated by EMEA, correct?
³     A.   Yes.  And various local
⁴ country health authorities.
⁵     Q.   Correct.  And I gather from
⁶ your previous answers, that those
⁷ managers who are people that you in turn
⁸ manage, they're the ones that have to
⁹ become intimately acquainted with the
¹⁰ regulatory schemes of those various
¹¹ countries or European market in order to
¹² discharge their functions, correct?
¹³     A.   I would consider them the
¹⁴ local subject matter experts in those
¹⁵ markets, yes.
¹⁶     Q.   And do you consider yourself
¹⁷ a local market expert in U.S. FDA
¹⁸ regulatory scheme?
¹⁹         MR. TRISCHLER:  Objection to
²⁰ the form.
²¹         THE WITNESS:  I have been
²² working in the U.S. regulatory
²³ environment pretty much my entire
²⁴ career.  So I do have my years of

Page 51

¹     experience in this market.
² BY MR. HONIK:
³     Q.   Okay.  And it's not unfair
⁴ to say that you are an expert in FDA
⁵ regulation, correct?
⁶         MR. TRISCHLER:  Objection to
⁷ the form.
⁸         THE WITNESS:  I mean, I feel
⁹ like I'm somewhat familiar with
¹⁰ the requirements in the U.S.
¹¹ I mean, whether or not I'd
¹² call myself an expert is
¹³ debatable.
¹⁴ BY MR. HONIK:
¹⁵     Q.   At one point you served as
¹⁶ vice president -- it's actually listed
¹⁷ forward slash head of global regulatory
¹⁸ affairs/operations at Mylan.  That was
¹⁹ from 2009 to '14.
²⁰     Tell me about that job and
²¹ how it differed from the two we've
²² already looked at.
²³     A.   In that role it was very
²⁴ specific to operations, which is the

Page 52

¹ function I described previously.  It's
² the team that prepares submissions,
³ publishes submissions, transmits those,
⁴ more the executional function in
⁵ regulatory affairs.
⁶     Q.   Okay.  And in that job, you
⁷ were based in Morgantown as well?
⁸     A.   Yes.
⁹     Q.   In describing that
¹⁰ particular job from 2009 to '14, you
¹¹ write that you partnered closely with R&D
¹² development teams to develop and prepare
¹³ high quality submissions for worldwide
¹⁴ registration.  Do you see that sentence?
¹⁵     A.   Yes.
¹⁶     Q.   We've talked a tiny bit
¹⁷ about this.  But can you be more specific
¹⁸ in telling me the way in which you
¹⁹ partner closely with R&D development
²⁰ teams?
²¹     A.   When preparing a new drug
²² submission that requires multiple
²³ component-type documents, we worked very
²⁴ closely with the research and development

Page 53

¹ team that did the development work for
² the product to obtain those source
³ documents to support the registration.
⁴     Q.   And I apologize in advance
⁵ if I use the wrong phrases, because
⁶ you're the professional in reg affairs,
⁷ and not me.
⁸         But is it the R&D
⁹ development teams that basically create
¹⁰ the molecule that goes on to become the
¹¹ subject of a submission and hopefully
¹² approval by the regulatory agency?
¹³     A.   I wouldn't use the term
¹⁴ "create the molecule."  Our primary
¹⁵ business generally was drug generic
¹⁶ development.  So the molecule was already
¹⁷ established.
¹⁸     Q.   Right.
¹⁹     A.   But R&D would manage the
²⁰ development of a formulation that we
²¹ could register as a generic.
²²     Q.   And that would lead to the
²³ preparation and submission of an
²⁴ abbreviated new drug application in order

Confidential Information Subject to Protective Order

Page 54

1 to get approvals, correct?
2     A.    In the U.S., yes.
3     Q.    Right.  And unless I
4 indicate otherwise, I'm referring
5 specifically to the U.S. FDA.
6         So by way of a follow-up
7 question, would an example of a close
8 partnering or collaboration with R&D in
9 the development for a submission, might
10 an example of that be processes that the
11 R&D team prepares that are then relied
12 upon by reg affairs in submitting the
13 application?  Is that an example?
14     A.    As I previously testified, a
15 dossier or registration is a compilation
16 of a variety of documents that are
17 required.  And regulatory affairs, we
18 source those documents from the various
19 functions that are responsible for
20 preparing the documentation, which would
21 include, you know, development-type
22 documents.
23     Q.    And just, this is as much
24 for my own edification as anything.  Is

Page 55

1 an example of that a development team's
2 setting out the process by which a
3 generic drug is manufactured?
4     A.    A description of the
5 manufacturing process for an active
6 ingredient and a finished dosage form are
7 included in a drug registration.
8     Q.    And I gather over the many
9 years that you've supervised that work
10 specifically and now as head of global
11 reg affairs, you've certainly seen many
12 examples of that, and you're familiar
13 with submissions of that sort, right?
14     A.    I don't supervise that
15 function.
16         As I mentioned previously,
17 in regulatory affairs, we're not
18 responsible for those documents.  We
19 collect those source documents from the
20 various functions and compile them into a
21 dossier.
22         You indicated that I would
23 manage that function, and that's not the
24 case.

Page 56

1     Q.    I take the distinction.
2         So in reg affairs,
3 particularly as the head, and in
4 management, you collect those source
5 documents and then employ them as
6 appropriate in the submission; is that
7 fair?
8     A.    We collect them from the
9 various departments who are responsible
10 for those documents.  And we put them
11 into the submission to meet the local
12 health authority requirement.
13     Q.    Okay.  And we may have
14 occasion to get into this in some detail
15 later.  But at a high level, when you
16 collect those documents as part of the
17 dossier and prepare for submission, to
18 what extent, if any, does regulatory
19 affairs edit or change the content of the
20 submissions that you collect from these
21 other units?
22     A.    We rely upon those teams to
23 provide us current documentation that
24 meets the local health authority

Page 57

1 requirement.  So those, is really more of
2 a compilation, making sure that it meets
3 the local health authority requirements
4 and that they are formatted properly for
5 the registration.
6     Q.    Okay.
7     A.    We rely upon the scientists
8 who are preparing those documents to
9 provide those to regulatory in complete
10 form.
11     Q.    So is that another way of
12 saying in more plain language that you
13 don't change the science in regulatory
14 affairs; you're really collecting and
15 compiling it and ensuring that it meets
16 the format in which you're required to
17 submit it.  Is that fair?
18     A.    I would describe it as
19 regulatory is more of custodians.  So our
20 job is to compile the dossier.  And we
21 work with those teams to collect the
22 necessary documents.  But we're not
23 responsible for the science in those
24 documents.

Confidential Information Subject to Protective Order

Page 58

1    Q.   And by turn, that means that
2  you don't change the science when you get
3  it from those teams, correct?
4    A.   We rely upon those teams to
5  provide us with complete, well supported
6  science documents.
7    Q.   What does the phrase -- or
8  phrase, yeah -- route of synthesis for a
9  molecule mean to you?
10      MR. TRISCHLER:  Objection to
11    the form and foundation.
12      THE WITNESS:  Route of
13    synthesis to me means the
14    description of the manufacturing
15    process by which an active
16    pharmaceutical ingredient is
17    manufactured.
18  BY MR. HONIK:
19    Q.   And that comports with my
20  own understanding.  Thank you.
21      Do you rely in regulatory
22  affairs on one or more of the R&D
23  development teams to give you a
24  description of a route of synthesis for a

Page 59

1  molecule to assist you in your submission
2  to the regulator?
3    A.   Not directly from R&D.  In
4  most cases for generic drug application,
5  we refer to a drug master file.  So as an
6  applicant for a generic drug product we
7  don't have access to those details.
8    Q.   Let me unpack that a little
9  bit.  When you say that you don't have
10  access to those details, what do you mean
11  and what don't you have access to?
12    A.   A drug master file describes
13  how an active pharmaceutical ingredient
14  is manufactured.  That is typically
15  maintained or put into what we call drug
16  master file in the U.S.  That's a
17  confidential document.  As an applicant
18  for a generic drug product, we would
19  obtain a letter of authorization from
20  that DMF holder to allow FDA to review
21  that confidential information on our
22  behalf.
23      But as an applicant, we
24  don't -- we don't have access to the full

Page 60

1  drug master file.
2    Q.   Okay.  And as -- are you
3  presupposing in the case of valsartan,
4  that Mylan didn't create the DMF for
5  valsartan?
6    A.   In the case of valsartan,
7  the drug master file is held by Mylan
8  Laboratories Limited which is a
9  subsidiary of Mylan.
10    Q.   And what's your familiarity
11  with the DMF application submitted by
12  Mylan for valsartan?
13    A.   I'm sorry.  Could you repeat
14  that?
15    Q.   Sure.  Was Mylan an
16  applicant in submitting a DMF to the U.S.
17  FDA for valsartan?
18    A.   Mylan Laboratories Limited,
19  yes.
20    Q.   And are you familiar with
21  MLL's preparation for and submission of
22  the DMF to the U.S. FDA?
23    A.   Yes.  I am aware that they
24  prepared a drug master file and they

Page 61

1  provided us a letter of reference, a
2  letter of authorization to that drug
3  master file as the applicant for
4  valsartan tablets.
5    Q.   And were you -- at the time
6  that occurred, what was your role at
7  Mylan?  I know you were there.
8    A.   I don't recall when the drug
9  master file was actually submitted.  I
10  would have to go back and look at the
11  date that the DMF was filed to match it
12  up to what position I had at that time.
13  I don't recall.
14    Q.   Fair enough.  Regardless of
15  your position at the time -- and that's
16  not consequential right at this very
17  moment -- what do you remember your role,
18  if any, being at the time in the
19  submission of that DMF application?
20    A.   I was most likely in my
21  North America role or my global role for
22  overseeing the various regional teams as
23  we described previously.
24    Q.   And so can you give me a

Confidential Information Subject to Protective Order

Page 62

¹ kind of high level description of the
² various moving parts at Mylan?   And by
³ that I refer to all the entities that may
⁴ have been involved in the submission of
⁵ that DMF.
⁶         How did the presubmission
⁷ and then the actual submission take
⁸ place?  Tell me the parts that came
⁹ together to be able to do that.
¹⁰        A.   Well, we've already talked
¹¹ about two sort of separate submissions.
¹² There's the drug master file submission
¹³ that describes the method of manufacture
¹⁴ for a specific active pharmaceutical
¹⁵ ingredient.
¹⁶        In the case of valsartan,
¹⁷ that was prepared by Mylan Laboratories
¹⁸ Limited in India.
¹⁹        As applicant for Mylan
²⁰ Pharm's filed ANDA -- excuse me -- for
²¹ valsartan tablets, we obtained a letter
²² of authorization to that drug master file
²³ to put into our ANDA.
²⁴        In other words, we don't

Page 63

¹ include the details of that DMF in our
² ANDA because we rely upon the
³ confidential DMF document to support
⁴ that.
⁵        Q.   Okay.  I understand that.
⁶ Let's break those up for a moment and let
⁷ me ask some more detailed questions.  I
⁸ want to focus on the DMF part of what you
⁹ just said to me.
¹⁰        And you indicated that, of
¹¹ course, that submission was by MLL.  And
¹² it describes the method of manufacturing,
¹³ in this case, the API, correct?
¹⁴        A.   Yes.  The drug master file.
¹⁵        Q.   And tell me, if you could,
¹⁶ in some detail, it will be helpful for me
¹⁷ going forward for you today -- with you
¹⁸ today, the various parts of Mylan's
¹⁹ organizations, in any of its units, in
²⁰ any of its subsidiaries or divisions that
²¹ come together to collaborate in order to
²² submit that DMF?
²³        A.   The way you've asked that
²⁴ question, it's difficult to answer.

Page 64

¹        But generally the drug
² master file team is a separate business
³ unit, per se.  So there's an API business
⁴ that was part of Matrix, which Mylan
⁵ obtained in mid 2000s.
⁶        So that's an API business
⁷ where they hold a variety of drug master
⁸ files that are made available to products
⁹ that might be pursued by Mylan.  They
¹⁰ also supply APIs to other -- other third
¹¹ parties that may also be registering
¹² products throughout the world.
¹³        Q.   Okay.  I totally understand
¹⁴ that.  I understand there's an API team.
¹⁵ And I understand that there was an
¹⁶ acquisition of an entity called Matrix in
¹⁷ the mid 2000s.
¹⁸        But you were, I think,
¹⁹ telling me the various teams that may
²⁰ have roles in preparing and then
²¹ submitting the DMF, in this case on
²² behalf of MLL.
²³        Apart from the API team,
²⁴ which you've described to me and their

Page 65

¹ function, what other teams or units at
² any entity in Mylan participates in the
³ preparation of that DMF for submission?
⁴        A.   It's primarily managed
⁵ within that API science team as a
⁶ deliverable.  But because the -- because
⁷ the facility is a foreign-located
⁸ facility, we are required in the U.S. to
⁹ have a U.S. agent.  So in other words,
¹⁰ someone that can liaise with FDA on their
¹¹ behalf.
¹²        Q.   And do you recall who that
¹³ U.S. agent was in the case of the DMF
¹⁴ submission by MLL for valsartan?
¹⁵        A.   I don't know if it changed
¹⁶ over time.  Our current U.S. agent is
¹⁷ Michael Plastina.  Before that, they
¹⁸ had -- they had a third party doing their
¹⁹ drug -- their U.S. agent work.
²⁰        Q.   They do that?  Thank you.
²¹ That --
²²        A.   I don't recall who that was.
²³        Q.   That's helpful.
²⁴        And what is the role from a

Page 66

¹ regulatory affairs or legal standpoint of
² that U.S. agent?   In what way are they
³ liaising?
⁴       A.   It's really just a conduit,
⁵ you know, to the local health authority.
⁶       A U.S. agent is required
⁷ just to facilitate communications,
⁸ written communications, telephone calls,
⁹ on the same time zone.   But that U.S.
¹⁰ agent relies entirely upon the DMF holder
¹¹ for the DMF content and the science
¹² behind that.
¹³       Q.   Now, you did refer to the
¹⁴ API team that used to be Matrix, it was
¹⁵ acquired by Mylan, as a science team, did
¹⁶ you not?
¹⁷       A.   I did just because it fits
¹⁸ into what we call regulatory science
¹⁹ teams, which we talked about previously.
²⁰       Q.   Okay.   And by that, in the
²¹ case of this API science team and the DMF
²² submission for valsartan, those would be
²³ the science or R&D professionals that,
²⁴ among other things, would lay out the

Page 67

¹ method and manufacturing process for the
² API, correct?
³       A.   That came with a
⁴ responsibility for preparing the
⁵ documentation and doing the work to
⁶ support the preparation of a drug master
⁷ file.
⁸       Q.   And in that submission or in
⁹ those documents would be a description of
¹⁰ the manufacturing process, correct?
¹¹       A.   That is included in the drug
¹² master file, yes.
¹³       Q.   And is the route of
¹⁴ synthesis also described in those
¹⁵ documents?
¹⁶       A.   Yes.
¹⁷       Q.   And if I've now understood
¹⁸ the structure, your role in regulatory
¹⁹ affairs is -- and I'm not minimizing
²⁰ it -- is to collect their work product
²¹ and format it into your submission, in
²² this case for the DMF, correct?
²³       A.   Yes, in general.   Again,
²⁴ we're sort of a custodian.   We don't own

Page 68

¹ the science.   We don't own the
² documentation.   But we help to manage it
³ and make sure that we present it properly
⁴ in the various markets based on what
⁵ those requirements might be.
⁶       Q.   Wait.   Let me unpack that a
⁷ little bit, because when you say that you
⁸ don't own it, does that imply that you
⁹ don't change the science?   You just
¹⁰ ensure that it's formatted in an
¹¹ appropriate way given the demands of the
¹² regulatory scheme?
¹³       A.   Yeah, regulatory affairs do
¹⁴ not change the science.   We rely upon the
¹⁵ scientists to provide us with completed
¹⁶ documentation.   So the answer to your
¹⁷ question is no, regulatory affairs
¹⁸ doesn't change the science.
¹⁹       Q.   And does that imply as well
²⁰ that you don't change the scientific
²¹ description of the manufacturing process?
²²       A.   That's correct.   That's a
²³ deliverable that comes to us based on our
²⁴ market.   Regulatory affairs doesn't

Page 69

¹ change that.   We rely upon the
²       Q.   Thank you.   I appreciate
³ your answer.
⁴             Between 2007 and 2009 you
⁵ apparently served as vice president for
⁶ regulatory affairs or North America.
⁷             Do you see that?
⁸       A.   Yeah.
⁹       Q.   And in the first bullet, you
¹⁰ say that you oversaw the day-to-day
¹¹ operations.
¹²             How is that oversight
¹³ different than the kind of head
¹⁴ responsibilities that you currently have?
¹⁵       A.   That role was specifically
¹⁶ for North America, which was U.S. and
¹⁷ Canada.
¹⁸       Q.   Okay.
¹⁹       A.   So not a global role, but a
²⁰ regional role.
²¹       Q.   Okay.   And apart from the
²² geographic difference, should I take any
²³ particular meaning to your description of
²⁴ oversight as being on a day-to-day

Confidential Information Subject to Protective Order

Page 70

1 operational basis?  Is that different
2 than your current responsibility?
3        A.   I mean, generally it's the
4 same sort of activity, but it was more
5 localized versus global.  A much smaller
6 number of people, smaller portfolio.  It
7 was limited to what was happening in
8 North America, not across the globe.
9        Q.   I totally get that.
10       So would it be fair to say
11 that your current job involves oversight
12 of the day-to-day operations of
13 regulatory affairs globally?
14       A.   Yes, in general.  But as I
15 testified previously, I have very strong
16 leaders across the globe that I rely upon
17 them to manage their local day-to-day
18 teams and operations.  I'm a people
19 manager when it gets to outside the U.S.
20       Q.   Totally understand your
21 answer.  Thank you.
22       Now, and I think we've
23 discussed this, but you started at Mylan
24 in 2001, correct?

Page 71

1        A.   Yeah.
2        Q.   And prior to that, you had
3 similar regulatory affairs positions at
4 GSK.  And before that I guess when it was
5 Burroughs Wellcome, correct?
6        A.   Yes.  I had a variety of
7 roles while -- during my tenure at GSK.
8        Q.   I see for a short period of
9 time you were a consultant of some sort
10 with an entity called ClinTrials Research
11 Inc.?
12       A.   That's correct.
13       Q.   What is that entity and what
14 did you do for that?
15       A.   ClinTrials Research Inc. was
16 a clinical research organization.  So I
17 was providing regulatory consulting
18 essentially for persons interested in
19 registering products in the U.S.
20       Q.   And where were they located,
21 where were you located at that time?
22       A.   Resource Triangle Park in
23 North Carolina.
24       Q.   Your job -- is it pronounced

Page 72

1 Parexel?  Am I pronouncing that
2 correctly?
3        A.   Parexel.
4        Q.   Parexel in worldwide
5 regulatory affairs as a senior
6 consultant.  Is that -- was that somewhat
7 a more junior job in regulatory affairs,
8 similar nonetheless, to the one that you
9 hold now?
10       A.   It wasn't the same level
11 responsibility.  Again, it was similar to
12 my work at ClinTrials.  Parexel was also
13 a clinical research organization.  So
14 companies would hire them to help them
15 make registration.  So I provided
16 regulatory consulting services based on
17 my experience.
18       Q.   Understood.  Among the
19 descriptors of that position, you say
20 that you conduct current good
21 manufacturing practices audits.
22       Do you see that?
23       A.   Yes.
24       Q.   So I take it that you became

Page 73

1 acquainted with cGMP requirements and
2 guidelines in discharging that job
3 function, correct?
4        A.   I was aware at that time of
5 the current practices and I participated
6 in a couple of audits, but I would not
7 consider myself an expert in that area.
8        Q.   Fair enough.  From '98
9 forward, what was the extent of your
10 involvement with cGMP?
11       A.   None really.
12       Q.   Did you maintain or continue
13 to maintain at Mylan at least some level
14 of familiarity, if not expertise, in cGMP
15 and how it interacts or interfaces with
16 regulatory affairs?
17       MR. TRISCHLER:  Objection to
18 the form.
19       THE WITNESS:  When you're
20 referring to cGMPs, you're talking
21 about operations locally at our
22 facilities establishments.
23 Regulatory affairs relies upon
24 other teams to manage those

Confidential Information Subject to Protective Order

Page 74

1      day-to-day operations.
2            In the case of Mylan and
3      Viatris, we rely upon quality to
4      oversee that area.
5   BY MR. HONIK:
6      Q.   Do you in reg affairs,
7   nonetheless collaborate with the quality
8   area as it concerns cGMP?
9      A.   They may consult with us, if
10  something comes up during an audit that
11  has an overlay with regulatory affairs.
12           But in general, quality
13  managers, manage the compliance at their
14  site without regulatory intervention.
15     Q.   Understood.  And then at
16  some point before you got into regulatory
17  affairs, you worked as a chemist or a
18  scientist, correct?
19     A.   Yes.  When I first entered
20  the industry, I was in a science role.
21     Q.   And if I'm looking at this
22  correctly, you did that actually while
23  you were still in college and graduate
24  school, correct?

Page 75

1      A.   Yes.  I started my first job
2   after obtaining my bachelor's degree and
3   I pursued my master's while working
4   full-time.
5      Q.   That was what was then
6   Burroughs Wellcome, correct?
7      A.   That's correct.
8      Q.   And for well over six years,
9   you were in something called the chemical
10  development lab there, correct?
11     A.   Yes.
12     Q.   And your job was as a
13  development scientist, correct?
14     A.   That was my job title, yes.
15     Q.   And among the things that
16  you described doing was developed
17  chemical processes for transfer from
18  laboratory scale to production scale.
19  Correct?
20     A.   Yes.  That was the role that
21  I was in.
22     Q.   And that type of work is now
23  work that, if I've understood you
24  correctly, you now compile as a

Page 76

1   regulatory affairs professional from the
2   relevant teams at Mylan, correct?
3      A.   Yeah, we obtained anything
4   dealing with the development or the
5   method of manufacture for an API, we
6   obtain that source documentation from
7   those functions that are responsible for
8   us.
9      Q.   Correct.  And all I'm doing
10  is underscoring the fact that presently
11  as head of regulatory affairs, that's
12  among the deliverables that you collect,
13  that's what you've told me, to help
14  regulatory affairs prepare submissions to
15  the FDA among others, correct?
16     A.   That's correct.
17     Q.   And all I'm getting at is
18  back in '85 to '91, you were on the other
19  side of that, helping to collect
20  scientifically the processes and the
21  other data necessary to support, among
22  others, the regulatory affairs function
23  of submitting applications, correct?
24     A.   In that specific role, yes,

Page 77

1   that was to facilitate the scale up of
2   processes, API processes from a lab scale
3   to a production scale.
4      Q.   Okay.  And all I'm getting
5   at, sir, is that you've now had
6   experience in your professional life on
7   both sides of that equation, that is to
8   say, the science which is now a
9   collectable to you as a regulatory
10  affairs professional at Mylan, correct?
11     A.   I mean.
12           MR. TRISCHLER:  Objection to
13  form.
14           THE WITNESS:  I have worked
15  in both quality and development,
16  and regulatory affairs was part of
17  my career.
18           But you know, I think this
19  was very important to note that
20  this was very early in my career.
21  It's been a long time since I've
22  been directly involved with
23  bench-type science.
24  BY MR. HONIK:

Page 78

1    Q.   I promise you today that I
2  will not ask you any bench-type questions
3  about chemistry.  Okay?
4    A.   Okay.
5    Q.   Sir, you understand that
6  you're here today to give testimony under
7  oath as a representative of Mylan in
8  certain areas, correct?
9    A.   Yes.
10    Q.   And have you had occasion
11  before today to review the topics about
12  which I'm going to question you today?
13    A.   Yeah.
14    Q.   And generally speaking, you
15  understand, do you not, that I'm going to
16  question you about communications Mylan
17  had with its regulators full stop,
18  correct?
19    A.   Yes.
20    Q.   And you understand that I'm
21  going to question you about Mylan's
22  filings with regulatory authorities
23  including the FDA, all of which is
24  concerning valsartan API, correct?

Page 79

1    A.   Yes.
2    Q.   Do you understand as well,
3  that you're going to be questioned today
4  under oath about Mylan's communications
5  with finished dose customers and
6  downstream customers?
7    MR. TRISCHLER:  Objection to
8    form.
9  BY MR. HONIK:
10    Q.   You can answer.
11    A.   Yes.  I understand that was
12  one of the topics.
13    Q.   All right.  So let's take
14  them in reverse order.  Again, I don't
15  want to dwell on this, but I do want to
16  have a framework understanding from you,
17  sir.
18       What did you do to prepare
19  the area that I'm going to question you
20  about concerning Mylan's communications
21  with finished dose customers and
22  downstream customers?
23    MR. TRISCHLER:  Objection to
24    the form.  The witness hasn't been

Page 80

1  designated on the breadth of the
2  scope as represented by counsel.
3       But you can answer what
4  you've done.
5       THE WITNESS:  Obviously as
6  I've described to you today, my
7  role in regulatory affairs.  Those
8  sort of communications were not my
9  day-to-day responsibilities.
10       But in preparation for
11  today, I have familiarized myself
12  with -- with the -- with those
13  communications so that I could
14  testify today.
15  BY MR. HONIK:
16    Q.   I understand.  And you have
17  been designated by the company on those
18  topics.
19       My question to you, sir, is
20  what did you do to prepare to answer
21  questions in that area?  What documents
22  did you look at?  What did you do?
23    A.   I met with both internal and
24  external counsel here on a few occasions.

Page 81

1  Also reviewed documentation in
2  preparation for today's deposition.
3       And spoke to the person
4  responsible for, you know, overseeing the
5  recalls within the Mylan quality network.
6    Q.   Who oversaw the recall for
7  Mylan?
8    A.   I spoke to Deva.  I'm sorry.
9  I forget his last name.  I forget his
10  last name.
11    Q.   Okay.  When did you speak to
12  Deva?
13    A.   Yesterday.
14    Q.   Was that the only occasion
15  that you spoke to Deva?
16    A.   Yes.
17    Q.   What is Deva's title or role
18  at the company?
19    A.   I don't know that without
20  looking it up, sorry.
21    Q.   Okay.  Where is Deva based?
22    A.   He was in India, when we
23  spoke with him yesterday.
24    Q.   When you say we, who

Page 82

1 participated in the conversation?
2     A.   Counsel that's represented
3 here today.
4     Q.   Okay.  I don't want to know
5 what they said to you and you said to
6 them.  But what did you learn from Deva?
7     A.   Since this was an area that
8 was outside of my day-to-day activities,
9 he described the overall framework for
10 recalls, how -- how the process works and
11 who they would have communicated with.
12     Q.   Okay.  And you mentioned
13 having reviewed documents in connection
14 with these topic areas.  As a Mylan
15 designee, what did you look at?
16     A.   Specifically the recall
17 notices that indicate the valsartan
18 tablets.
19     Q.   Okay.  Anything other than
20 the recall notices?
21     A.   Not for this topic, no.
22     Q.   But I gather from your
23 answer that you looked at other documents
24 concerning the other topics; is that

Page 83

1 correct?
2     A.   Yes.  I looked at other
3 documents including health authority
4 communications.
5     Q.   And how were those documents
6 compiled?  Is that something that you
7 undertook to look for, secure, and
8 review?  Or were they provided to you or
9 both?
10     A.   They were provided to me.
11     Q.   Would that be true in every
12 instance?  That is to say, every document
13 that you looked at in preparation for
14 your designated testimony today was
15 provided to you by counsel; is that
16 correct?
17     A.   Yes.
18     Q.   And just before moving on,
19 as a result of looking at any of those
20 documents, did you undertake any search
21 of additional documents on your own to
22 further prepare you or enlighten you for
23 your testimony?
24     A.   No, I did not.

Page 84

1     Q.   So stated otherwise, there's
2 no document that you used to prepare for
3 your testimony as a designee today that
4 wasn't provided to you directly by
5 counsel, correct?
6     A.   That's correct.
7     Q.   So we've talked a little bit
8 about the documents that you looked at in
9 connection with the recall areas of
10 testimony.
11     Tell me, in terms of the
12 communication with regulators, and
13 filings and the like, what documents you
14 looked at categorically.
15     A.   Could you repeat that?  Are
16 you talking about health authority
17 communications specifically?
18     Q.   I'm happy to clear it up.
19     What categories of documents
20 did you look at in connection with the
21 areas of testimony that you're here to
22 give in terms of communication with
23 regulators and filings?
24     A.   It was primarily

Page 85

1 communications to and from the various
2 health authorities.  So information
3 requests, our responses to those, et
4 cetera.
5     Q.   When you say health
6 authorities, you mean the U.S. FDA, as
7 well as their counterparts globally?
8     A.   Yes.  I focused primarily on
9 the U.S., which seemed to be the most
10 relevant, but I'm somewhat familiar with
11 other communications that may have
12 occurred.
13     Q.   Okay.  And to that end you
14 looked at documents that were to or from
15 Mylan entities and foreign health
16 authorities, correct?
17     A.   Those were among some of the
18 documents that I looked at.
19     Q.   Are there any other
20 categories of documents on any other
21 topics that you've been designated on
22 that you've looked at that you haven't
23 already told me about?
24     A.   No.

Confidential Information Subject to Protective Order

Page 86

¹    Q.   It may be useful -- hold on.
² I'm having a little tech problem.
³         It may be useful for you and
⁴ I to have some basic understanding as we
⁵ move through my questioning today about
⁶ the understanding that Mylan eventually
⁷ had about the root cause presence of NDEA
⁸ and NDMA in its valsartan product.
⁹         The question that I have for
¹⁰ you is, do you have some understanding of
¹¹ what the root cause was?
¹²         MR. TRISCHLER:  Objection to
¹³    the extent that it's beyond the
¹⁴    scope.
¹⁵         You can answer to the extent
¹⁶    that you have personal knowledge.
¹⁷         THE WITNESS:  I recall
¹⁸    seeing some documentation that
¹⁹    talked about -- that identified
²⁰    the potential root cause.
²¹ BY MR. HONIK:
²²    Q.   And what was the root cause
²³ that you saw?
²⁴    A.   Following the investigation,

Page 87

¹ there was a conclusion that there may
² have been some carryover of impurities in
³ one of the recovered solvents that was
⁴ used in the API synthesis.
⁵    Q.   And you know more
⁶ particularly in what way the use of
⁷ recovered solvent produced the
⁸ carryover -- what you described as the
⁹ carryover impurity?
¹⁰         MR. TRISCHLER:  Same
¹¹    objection to the extent that it's
¹²    beyond the scope.
¹³         THE WITNESS:  I don't have
¹⁴    that detailed level of knowledge.
¹⁵    All I know is, you know, what was
¹⁶    referred to in the documentation.
¹⁷ BY MR. HONIK:
¹⁸    Q.   And what did you look at
¹⁹ that revealed to you this knowledge about
²⁰ the root cause?
²¹    A.   As I previously testified,
²² it was described within communications
²³ that were made to health authorities
²⁴ following --

Page 88

¹    Q.   Of this -- I'm sorry.  I
² spoke over you.  What did you say?
³    A.   I was just saying following
⁴ the investigation that was disclosed to
⁵ health authorities in response to their
⁶ queries.
⁷    Q.   So you're referring to
⁸ communications between Mylan in
⁹ describing root cause to health
¹⁰ authorities; is that correct?
¹¹    A.   Yes.
¹²    Q.   And as a chemist, and as
¹³ someone who has worked in the various
¹⁴ areas including regulatory affairs, as
¹⁵ you've now described to me, did you
¹⁶ understand in anymore detail how the
¹⁷ presence of the carryover impurities got
¹⁸ where they got?
¹⁹    A.   No, I'm not familiar by the
²⁰ process of which solvents were recovered.
²¹ So I'm not going to be able to comment on
²² details around that.
²³    Q.   Well, in the course of
²⁴ preparing for your testimony as a

Page 89

¹ designee, did you see any documents or
² review any documents that revealed the
³ recovery process?
⁴    A.   Not in detail, no.
⁵    Q.   Well, at any level of
⁶ detail, even high level of detail?
⁷    A.   Well, I already described
⁸ what I saw was descriptions made to
⁹ health authorities following the
¹⁰ investigation as to where the potential
¹¹ impurities could have been introduced.
¹²



---

**Page 90**

██████████████████

BY MR. HONIK:

Q.   Okay.  And when you say that, are you saying that as head of regulatory affairs, you compiled that scientific data and then communicated it to the FDA, is that what you mean?

A.   I didn't compile any data.

As I previously testified, our role in regulatory affairs is to take source documents from the scientists that are responsible for that.  And then delivering it to the various health authorities to be responsive to their request.

Q.   Yeah, I don't want to be unduly semantical because this will take -- this will be a very long day if we do.

All I'm really asking you, sir, is this, as a head of global regulatory affairs at Mylan, did you collect the scientific data that reflected the statement that I just read

---

**Page 91**

to you about the presence of azides and triethylamine and then incorporate it in a communication to the U.S. FDA, yes or no?

MR. TRISCHLER:  Objection to form.

THE WITNESS:  We collected responses, proposed responses and data from the scientist responsible.  And then put that into proper format to present to the various health authorities.

BY MR. HONIK:

Q.   Correct.  And in doing so, you were reviewing, on Mylan's behalf, to your regulators at the FDA what the root cause analysis was that your scientists arrived at; isn't that correct?

A.   We shared the information that was a deliverable from the science teams to the health authorities for them to interpret how they wish.

Q.   Correct.  The FDA and others are left to their own devices to

---

**Page 92**

interpret what Mylan supplied.

All I'm asking is, sir, is if it isn't true that in regulatory affairs, and as the head of it for Mylan, you collected the statements of your scientists in describing the root cause presence of NDEA and NDMA to the FDA, yes or no?

A.   We served as a liaison to the health authority.  So as a deliverable from the science team, we would collect that information, put it in the proper format, and then send it to the health authority to respond to their requests.



---

**Page 93**

Q.   And if I've understood your general testimony to this point, in using or describing the regulatory affairs function as simply liaison, you're passing along what Mylan scientists are telling you to the FDA, correct?

A.   Yes.  We trust our scientists to provide us with true and accurate information.

Q.   And when you say that you trust your scientists to provide true and correct information, among the things that you in regulatory affairs do not ever do, is to change their scientific views or opinions in the collectibles; is that fair?

A.   That's not our role.

Q.   Okay.  Is there any role at Mylan that exists to your knowledge, that

---

Confidential Information Subject to Protective Order

Page 94

¹ has ever existed, which allows someone to
² overrule or change the scientific
³ collectibles that you've described?
⁴         MR. TRISCHLER:  Objection to
⁵     form.
⁶         THE WITNESS:  In regulatory
⁷     affairs we assumed that the
⁸     deliverable we get has already
⁹     been completed and reviewed by
¹⁰     whatever management might be
¹¹     needed.
¹²         So we trust that complete
¹³     information once we receive it.
¹⁴ BY MR. HONIK:
¹⁵     Q.   And you mentioned by name
¹⁶ earlier in your testimony Walt Owens as
¹⁷ having a prominent role on the R&D side,
¹⁸ correct?
¹⁹     A.   Early on.  I think during
²⁰ this time period, he was in quality.  But
²¹ he was in R&D for some period of time.
²²

Page 95



Page 96



⁵ BY MR. HONIK:
⁶     Q.   Okay.  And more importantly,
⁷ do you remember seeing statements like
⁸ that reflecting Mylan's scientific views
⁹ on the root cause analysis of the
¹⁰ presence of these carryover impurities
¹¹ which were then employed by you, the
¹² royal you, in regulatory affairs in
¹³ communicating with the FDA, yes or no?
¹⁴     A.   As I mentioned before, we
¹⁵ received the responses from the
¹⁶ scientists and then we would have shared
¹⁷ that with the health authorities in
¹⁸ response to their queries.
¹⁹     Q.   I totally understand that.
²⁰ But what I want to learn from you in the
²¹ course of preparing for today, as a
²² designee for Mylan and the companies, the
²³ various entities, if you didn't come to
²⁴ understand what the Mylan scientists had

Page 97

¹ conveyed to the health authorities in the
² manner in which I've described to you by
³ quoting Dr. Owens and some other
⁴ documents from Mylan, yes or no?
⁵         MR. TRISCHLER:  Objection to
⁶     form.  Objection.  Asked and
⁷     answered.
⁸         THE WITNESS:  I have no
⁹     reason not to believe the
¹⁰     statements that you've described
¹¹     to me by Walt Owens.
¹² BY MR. HONIK:
¹³     Q.   And more importantly they
¹⁴ were reflective of the documents that
¹⁵ ultimately were submitted to the FDA in
¹⁶ explaining from Mylan's scientific
¹⁷ standpoint how these carryover impurities
¹⁸ came to be present in valsartan, correct?
¹⁹         MR. TRISCHLER:  Objection to
²⁰     form.
²¹         THE WITNESS:  We can refer
²²     to the documentation that was
²³     submitted to the health authority,
²⁴     that would contain a summary of

Confidential Information Subject to Protective Order

Page 98

1    the investigation once it was
2    completed.
3  BY MR. HONIK:
4    Q.   I totally get that.  And
5  these are high level preparatory
6  framework-type questions, Mr. Talton.
7            And all I'm trying to
8  understand is, did your understanding of
9  the root cause, as you and I have now
10 been discussing for a few minutes, help
11 to inform and create knowledge for you in
12 preparing for the various topics that
13 you're here to give testimony about?
14   A.   When you first asked the
15 question, I explained to you that my
16 understanding was at the conclusion of
17 the investigation, it was a result of the
18 use of recovered solvents.
19           So that is my baseline
20 understanding, and is consistent with
21 what Walt Owens has described.
22   Q.   Okay.  I appreciate that.
23 And did that also help to inform the
24 balance of your preparation for the

Page 99

1  topics today?
2            MR. TRISCHLER:  Objection to
3      form.
4            THE WITNESS:  That's just a
5      baseline understanding.  And then
6      I looked at documentation to and
7      from health authorities to support
8      and to get prepared.
9  BY MR. HONIK:
10   Q.   Okay.  And in sort of plain
11 English, and then we'll move on, in order
12 to be able to testify today on Mylan's
13 behalf, did you acquire a personal and
14 satisfactory understanding of how NDEA
15 and NDMA got into the valsartan that
16 Mylan sold?  Do you have any doubts about
17 how that happened in your mind
18 chemically?
19           MR. TRISCHLER:  Objection to
20     form.
21           THE WITNESS:  As I stated
22     previously, I relied upon the
23     scientists to make that
24     conclusion.  So I have no reason

Page 100

1    not to believe what they
2    concluded.
3  BY MR. HONIK:
4    Q.   Okay.  And you've accepted
5  the truths of those scientific inputs
6  from Mylan's scientists to help prepare
7  yourself for testimony today, correct?
8    A.   Yes.  I relied upon the
9  scientists to provide me with information
10 that was -- that could be used to support
11 a response to health authorities.
12   Q.   Thank you.  That's very
13 helpful.
14           MR. HONIK:  We've been going
15     a little over an hour, why don't
16     we take five or 10 minutes, Clem,
17     and Mr. Talton and we'll resume
18     them.
19           Let's go off the record.
20           THE VIDEOGRAPHER:  Okay.
21     The time is 10:39 a.m.  Off the
22     record.
23           (Short break.)
24           THE VIDEOGRAPHER:  The time

Page 101

1    is now 10:51 a.m.  Back on the
2    record.
3  BY MR. HONIK:
4    Q.   Mr. Talton, welcome back.
5            Are you comfortable and
6  ready to proceed?
7    A.   Yes.
8    Q.   Before I move into the real
9  substance of my examination of you today.
10 I want to make sure that the record is
11 clear on one thing, which we alluded to
12 and make clear.
13           You understand yourself to
14 be a designee today, and testifying under
15 oath on behalf of the following Mylan
16 entries:  One, Mylan Laboratories
17 Limited; is that correct?
18   A.   Yeah.
19   Q.   Two, Mylan N.V., correct?
20   A.   Yes.
21   Q.   As well as Mylan
22 Pharmaceuticals Inc.; is that correct?
23   A.   Yes.
24   Q.   And the preparation that you

Confidential Information Subject to Protective Order

---

Page 102

¹ described to me earlier before we broke
² considered each of the entities for whom
³ you are designated to testify, correct?
⁴     A.   Yes.  When I say Mylan, I
⁵ mean Mylan the entity.
⁶     Q.   All of the entities,
⁷ correct?
⁸     A.   Correct.
⁹     Q.   Sir, do you have in front of
¹⁰ you the collection of documents that we
¹¹ sent over and I think would have been
¹² hard copied for you?
¹³         MR. TRISCHLER:  Well, it's
¹⁴     not -- there's a lot of Styrofoam,
¹⁵     and computers between him and the
¹⁶     documents, but they're within --
¹⁷     they're within arm's reach but
¹⁸     they are not in front of him.
¹⁹         MR. HONIK:  I appreciate
²⁰     that.
²¹ BY MR. HONIK:
²²     Q.   Mr. Talton, just a little
²³ bit of housekeeping, because Mr. Davis,
²⁴ my associate, has been conducting most of

---

Page 103

¹ the Mylan depositions to date.
²         But the convention that
³ we're using to put documents in front of
⁴ witnesses is as follows:
⁵         There are documents that
⁶ have been tabbed that have not previously
⁷ been used which will be marked anew for
⁸ today as plaintiff Talton, and then we'll
⁹ assign a number.
¹⁰     Do you understand that?
¹¹     A.   Yes.
¹²     Q.   And then as to previously
¹³ used documents, that is documents
¹⁴ employed in earlier depositions of Mylan
¹⁵ representatives, we'll refer to them by
¹⁶ our previously marked exhibit names and
¹⁷ numbers.
¹⁸         Do you understand that?
¹⁹     A.   Yes.
²⁰     Q.   Okay.  And we have Mr. Davis
²¹ here, who is going to be our doc jockey
²² if we have any problems so that we can
²³ end up with an appropriate index of the
²⁴ documents used today.

---

Page 104

¹         Earlier you and I talked a
² little bit about Matrix.  Do you remember
³ that?
⁴     A.   Yes.
⁵     Q.   And Matrix was a company
⁶ acquired by Mylan, as you told me, in the
⁷ mid 2000s, and among other things, had a
⁸ process development lab; is that correct?
⁹     A.   When we acquired Matrix,
¹⁰ their primary business was API business,
¹¹ although they had started work in the
¹² finished dosage form area.
¹³     Q.   And that existed in what was
¹⁴ known as Unit 3 in Jedimettla India?
¹⁵     A.   I don't recall the specific
¹⁶ locations, but I know they do have -- did
¹⁷ have a Unit 3 in their network.
¹⁸     Q.   And at the time that Mylan
¹⁹ was going about getting ready to submit
²⁰ its ANDA and DMF in connection with
²¹ valsartan, do you recall that Matrix did
²² some process development work that helped
²³ support those submissions?
²⁴         MR. TRISCHLER:  Objection to

---

Page 105

¹     form.  To the extent that it's
²     beyond the scope.
³         THE WITNESS:  I wouldn't be
⁴     able to be aware of the specifics
⁵     of what they did.  Generally that
⁶     type of work to be required in
⁷     order to prepare a drug master
⁸     file.
⁹ BY MR. HONIK:
¹⁰     Q.   Right.  Inasmuch as your job
¹¹ drug 2009 and 2014 was to serve as vice
¹² president, head of global regulatory
¹³ affairs operations for Mylan, you oversaw
¹⁴ and actually partnered closely with the
¹⁵ R&D development teams including the one
¹⁶ at Matrix, did you not?
¹⁷     A.   It would have been one of
¹⁸ the functions that we would have
¹⁹ interacted with in order to obtain source
²⁰ documents for registration.
²¹     Q.   Precisely.  And in fact, in
²² your CV that we looked at and marked
²³ Exhibit 1, you said specifically, and I
²⁴ quote, you partnered closely with R&D

---

Confidential Information Subject to Protective Order

Page 106

1 development teams to develop and prepare
2 high quality submissions for worldwide
3 registration, correct?
4      A.   Yes.  I've testified to
5 that.
6      Q.   Right.  And I'm now bringing
7 it in a more granular way to ask you
8 whether it isn't true that the regulatory
9 affairs operations, including yourself in
10 those years, in 2010, relied upon
11 collectibles from Matrix Labs Limited in
12 India?
13          MR. TRISCHLER:  Objection to
14      form.
15          THE WITNESS:  Matrix would
16      have been one of the entities that
17      we may have received a source
18      document to support a
19      registration, if that's what
20      you're asking me.
21 BY MR. HONIK:
22      Q.   I am.  And indeed, Matrix
23 supplied a source document in connection
24 with a submission for registration for

Page 107

1 valsartan; isn't that right?
2      A.   It's my understanding they
3 filed a drug master file covering the
4 manufacture of valsartan active
5 pharmaceutical ingredient.
6      Q.   And the work product from
7 Matrix was relied upon as a collectible
8 which was then submitted by Mylan
9 regulatory affairs, correct?
10      A.   As I previously testified,
11 when referring to a drug master file in
12 an application, you're provided a letter
13 of authorization.  So you don't actually
14 submit the drug master file as a
15 deliverable.  It's a letter of
16 authorization to have access to the DMF.
17      Q.   Okay.  Do you -- well, let
18 me ask the question differently.
19          In preparation for today,
20 did you look at any of the work product
21 or collectibles as you've been using the
22 term, from Matrix, as it concerns
23 valsartan?
24      A.   I saw documentation to and

Page 108

1 from FDA with respect to information
2 requests that were received in connection
3 with the drug master file.
4      Q.   Okay.  But more specifically
5 in preparation for your testimony today,
6 did you or did you not look at source
7 work that became collectibles in or about
8 2010 that Mylan relied upon from Matrix
9 in connection with the DMF?
10      A.   No, I did not look at the
11 drug master file.  I looked at
12 correspondence with the health authority.
13      Q.   Fair enough.  Why don't
14 we -- why don't you turn to, and put in
15 front of you Tab 8, which is an Addendum
16 4 to the valsartan development report
17 prepared by Matrix, which we'll file --
18 excuse me -- which we'll mark as
19 Plaintiff Talton Exhibit 1.
20          MR. TRISCHLER:  I thought
21      the CV was Number 1.
22          MR. DAVIS: Ruben, I marked
23      the CV as 1.  So 2.
24          MR. HONIK:  My bad.  Number

Page 109

1      2.
2          (Document marked for
3      identification as Exhibit
4      PL-Talton-2.)
5 BY MR. HONIK:
6      Q.   Sir, just to orient you to
7 this document -- you have it in hand, do
8 you?
9      A.   Yes, I do.
10      Q.   The first page, the cover
11 page, is headed Addendum IV to valsartan
12 development report.
13          You have that in front of
14 you?
15      A.   Yeah.
16      Q.   And at the upper left it's
17 got the heading that conveys Matrix, a
18 Mylan company, Laboratories Limited, Unit
19 3 Jedimetlla.
20          Do you see that, sir?
21      A.   Yeah.
22      Q.   And then to the right of
23 that, it say Matrix Laboratories Limited
24 PD, for process development, Lab Unit 3.

Page 110

1    Did I read that correctly?
2    A.   Yes.
3    Q.   Are you familiar with that
4 lab and unit as part of the Mylan
5 company?
6    A.   I know it's one of the
7 facilities within our manufacturing
8 network.
9    Q.   Okay.  And is it one of the
10 facilities that you, from time to time
11 collaborate with in order to get the kind
12 of collectibles that you've referred to
13 so far in your testimony for submissions
14 to health authorities?
15    A.   I wouldn't interact directly
16 with the facility, per se.  The person
17 responsible for the drug master file area
18 would be the person that I would most
19 likely reach out to.
20    Q.   Okay.  So there's an
21 intermediary.  But nonetheless, this
22 would be among the Mylan facilities that
23 could, from time to time, provide
24 scientific information incorporated in a

Page 111

1 submission or filing to a health
2 authority, correct?
3    A.   Yes.
4    Q.   Now, to orient you to the
5 document, it's agreed it's very poorly
6 paginated, but do you see the faint page
7 markings, 01 ending in 70, being the last
8 page?
9    A.   Yes.
10    Q.   To be sure, I'm not going to
11 take you through the entire document.
12 But I do want to go through and ask you
13 some questions about specific pages.  Are
14 you with me?
15    A.   Yes.
16    Q.   So if we turn to the second
17 page, marked 02, we see a continuation of
18 the Matrix designee, a Mylan company.  It
19 refers again to Addendum IV, to the
20 valsartan development report.
21    Let me ask you, if I could.
22 What is a valsartan development report?
23    MR. TRISCHLER:  Objection to
24    form.

Page 112

1    THE WITNESS:  I would assume
2    it would be a report that would
3    describe the development of the
4    API.
5 BY MR. HONIK:
6    Q.   And when you use the phrase
7 or term development of the API, what do
8 you mean?
9    A.   Development of the
10 manufacturing process for a specific
11 molecule.
12    Q.   Okay.  And by development of
13 the specific process, you are talking
14 about what colloquially be referred to as
15 the chemistry recipe for manufacturing,
16 in this case valsartan API, correct?
17    MR. TRISCHLER:  Objection to
18    form.
19    THE WITNESS:  I would
20    probably refer to a synthetic
21    process, not a recipe.
22 BY MR. HONIK:
23    Q.   Thank you.  I appreciate
24 that.  I'll use that term in place of it.

Page 113

1    So this document reflects
2 Mylan's internal description of the
3 synthetic process of the valsartan API,
4 correct?
5    MR. TRISCHLER:  Objection to
6    form.  Scope.
7    THE WITNESS:  That would be
8    part of it.  I mean, the
9    development report is more
10    comprehensive than just the
11    synthesis.  But the synthesis
12    would be included.
13 BY MR. HONIK:
14    Q.   No doubt.  And indeed, this
15 document marked Exhibit 2 is simply
16 Addendum IV, correct?
17    A.   That's how it's labeled.
18    Q.   And presumptively, there are
19 a variety of addenda to the report that
20 reflect different aspects of the
21 synthesis process and other elements,
22 correct?
23    A.   I'm not familiar with the
24 other addendums.

Page 114

1    Q.   Okay.  Fair enough.  But
2  we're looking at Addendum IV.  And if we
3  look together at Page 2, we see that the
4  relevant signoffs and dates are all in
5  2010, in fact December.
6        Do you see that?
7        MR. TRISCHLER:  Objection to
8    form.
9        THE WITNESS:  It does appear
10    that each of the signatures
11    occurred in late 2010.
12 BY MR. HONIK:
13    Q.   And I presume at Mylan, this
14 signoff page here, in the front of the
15 addendum of Exhibit 2, are by the various
16 managers, if you will, who are designated
17 to review, approve, and then signoff on
18 this development report; isn't that
19 right?
20        MR. TRISCHLER:  Objection to
21    form and scope.
22        THE WITNESS:  Yeah, I'm not
23    sure of the responsibilities.
24 BY MR. HONIK:

Page 115

1    Q.   Okay.  But if we look
2  together on Page 2, the designation of
3  the people at Mylan, signing off on it,
4  include, among others, the head of
5  quality, correct?
6    A.   Yes.
7    Q.   And somebody known as the
8  AVP of the -- I presume that's process
9  development lab.  Do you know what that
10 is, AVP of the process development lab?
11    A.   No, I do not.  Assistant
12 vice president I would assume.  But I'm
13 not sure.
14    Q.   That's my assumption as
15 well.  And then we've got somebody at the
16 process development lab with the title or
17 acronym DGM.  Is that general manager?
18        MR. TRISCHLER:  Objection to
19    form.
20        THE WITNESS:  I don't know.
21    I can't speculate as to what those
22    acronyms or abbreviations mean.
23 BY MR. HONIK:
24    Q.   That's fine.  And let me

Page 116

1  just say if you don't know the answer to
2  one of my questions or it calls for rank
3  speculation, it's perfectly fine for you
4  to tell me that you don't know or you'd
5  be speculating.  Okay?
6    A.   Yep.
7    Q.   We have someone identified
8  as the assistant manager of the process
9  development lab who signed off on this,
10 correct?
11        MR. TRISCHLER:  Objection to
12    form.
13        THE WITNESS:  There is a
14    signature by someone by that name
15    and designation.
16 BY MR. HONIK:
17    Q.   And similarly, there's
18 somebody designated as an officer of the
19 production development lab who similarly
20 signed off in December of 2010, correct?
21    A.   There is someone that signed
22 off as representing officer of PDL.
23    Q.   Okay.  And is it -- is it a
24 fair assumption on my part when we look

Page 117

1  at the contents of this document, having
2  seen the signoff page on Page 2 together,
3  that each of the aforementioned designees
4  on behalf of Mylan reviewed and signed
5  off on the contents?
6        MR. TRISCHLER:  Objection.
7    Beyond the scope.
8        THE WITNESS:  I don't know
9    the process by which they used to
10    review and signoff on documents.
11        So again, I would be
12    speculating to answer that
13    question.
14 BY MR. HONIK:
15    Q.   Well, the way I phrase the
16 question is, do you have some other
17 understanding of what these signoffs
18 mean, other than these folks looked at
19 the content of this development report
20 and signed their names to it in December
21 of 2010?
22        MR. TRISCHLER:  Objection.
23    Beyond the scope.  Objection.
24    Asked and answered.

Confidential Information Subject to Protective Order

Page 118

1       THE WITNESS:  I don't know
2   what their representation is or
3   signature means on this.  That's
4   out -- outside of my knowledge of
5   what their documentation practices
6   were at the time.
7   BY MR. HONIK:
8       Q.   Did you have a different
9   deductive assumption about it than mine,
10  that they reviewed and signed off on
11  this?
12      MR. TRISCHLER:  Objection.
13  Calls for speculation.
14      You already told him not to
15  speculate and asked him to tell
16  you if he was.  And he did.  And
17  you're just asking him a third
18  time.
19      Objection.  Asked and
20  answered.
21  BY MR. HONIK:
22      Q.   You can answer.
23      A.   As I previously testified,
24  signatures represent.  So I can't

Page 119

1   speculate as to what their documentation
2   practices would have been at the time.
3       Q.   I get that you don't know
4   what the review protocols or practice is.
5   But my question as phrased is this, sir,
6   and then I'll move on.
7       My deduction is simply that
8   in some way or another, these folks
9   looked at the report, reviewed it and
10  signed off.
11      Is that an unfair deduction
12  to make?
13      MR. TRISCHLER:  Objection to
14  form.
15      Objection.  Beyond the
16  scope.
17      Objection.  Asked and
18  answered.
19      THE WITNESS:  The answer is
20  I don't know what their
21  documentation practices were.  So
22  I can't speculate as to what their
23  signatures represent or mean.
24  BY MR. HONIK:

Page 120

1       Q.   Well, have you seen a
2   development report other than this one,
3   before today, in your many years as
4   the -- as a regulatory affairs
5   professional at Mylan?
6       A.   These are not the type of
7   reports that I routinely receive or
8   review.
9       Q.   Okay.  My question is have
10  you nonetheless seen some form of a
11  development report in connection with
12  your work as a regulatory affairs
13  professional at Mylan?
14      A.   I've seen a variety of
15  documents that were signed off as a
16  deliverable that were provided to us.
17      Q.   That's precisely my
18  question.  And although the physical
19  appearance of the signoff page may be
20  different from submission to submission
21  or collectible to collectible, you've
22  nonetheless had decades of experience of
23  reports coming to your desk as a
24  regulatory affairs senior professional at

Page 121

1   Mylan in which some underling has
2   reviewed and signed off on whatever the
3   submission is.  You've seen that, have
4   you not?
5       A.   We receive multiple
6   documents that have signatures on them.
7       Q.   Okay.  And when you receive
8   them, do they imply to you that somebody
9   in the sort of chain of authority has
10  reviewed it at Mylan and has signed off
11  on them?
12      A.   I don't question what their
13  signature means.  What I'm looking for is
14  a deliverable.  And if it's delivered to
15  regulatory affairs, then we assume it's a
16  technically complete document and
17  suitable for submission into an
18  application.
19      Q.   What is a technically
20  complete document?
21      A.   Something that's complete.
22  Ready for submission to a health
23  authority.
24      Q.   And does that include review

Confidential Information Subject to Protective Order

Page 122

1 and signoff by a responsible designee?
2     A.   It may.
3     Q.   Okay.  So you've had the
4 experience of having a submission to you
5 which is technically complete for a
6 document which includes a signoff; is
7 that correct?
8     A.   I have already answered
9 that.  We receive a variety of documents
10 that may contain signatures for inclusion
11 into a regulatory filing.
12     Q.   And does Exhibit 2 look like
13 such a document, that is to say, reviewed
14 and signed off by someone at Mylan as to
15 its contents?  Does this look like that?
16     A.   You're asking a question
17 that I can't answer, because it depends
18 on what their documentation practices are
19 locally at that time in 2010, and what
20 each of their signatures represents.
21        I don't know that.  I'm not
22 familiar with that.  So I'm not going to
23 be able to answer that question.
24     Q.   I'll ask it one more way,

Page 123

1 and then we'll move on.
2        What could this possibly
3 mean in your experience, sir, other than
4 the aforementioned designees reviewed the
5 contents of this development report and
6 then signed off their approval?  What
7 could it mean other than that?
8        MR. TRISCHLER:  Objection.
9     Asked and answered.
10        THE WITNESS:  I can't answer
11     the question because I don't know
12     what their documentation practices
13     were at the time.
14 BY MR. HONIK:
15     Q.   I understand.  But based on
16 your experience, having received, as
17 you've told me, technically completed
18 documents, which in some instances
19 included signoffs, for my edification,
20 Mr. Talton, what could this possibly mean
21 other than these designees reviewed the
22 contents and signed off their approval to
23 it, other than that?
24        MR. TRISCHLER:  Objection.

Page 124

1     Asked and answered.
2        THE WITNESS:  I can't
3     speculate as to what their
4     signatures mean, because I'm not
5     familiar with the documentation
6     practices in 2010.
7 BY MR. HONIK:
8     Q.   Turn, if you will, to
9 Page 6.  This is a section marked 3.0.
10 And it's titled "detailed laboratory
11 process."
12        Do you see that?
13     A.   Yes.
14     Q.   And this is Mylan process
15 development scientists identifying the
16 raw materials that go into valsartan API,
17 correct?
18        MR. TRISCHLER:  Objection to
19     form.
20        Objection.  Beyond the
21     scope.
22        THE WITNESS:  It appears to
23     be a list of raw materials which
24     are used to manufacture a specific

Page 125

1     step within the synthesis maybe.
2        Again, I haven't seen this
3     document before.
4 BY MR. HONIK:
5     Q.   Right.  And the step within
6 the synthesis that you're referring to is
7 valsartan API, right?
8     A.   On Page 6 it talks about
9 VLN-1, which in my interpretation would
10 be the intermediate, not the API.
11     Q.   Okay.  VLN is a process code
12 that refers to one of two steps in the
13 manufacture of valsartan API, right?
14     A.   I don't know.  I have not
15 reviewed the drug master file so I'm not
16 familiar with this document.
17     Q.   Well, let me take a step
18 back, Mr. Talton.  I'm a little
19 surprised.
20        Are you not aware as a
21 designee of Mylan today that VLN was one
22 of the process codes for valsartan that
23 was sold in the United States of America?
24        MR. TRISCHLER:  Object to

Page 126

1 the form of the question.
2 I'm not sure that your
3 surprise is relevant to anything.
4 Objection to form.
5 Argumentative.
6 THE WITNESS: I'm aware that
7 we have a drug master file that
8 was prepared by MLL which
9 contained multiple processes in it
10 over its lifecycle.
11 BY MR. HONIK:
12 Q. Right. And one of my -- and
13 my question is, is not one of the process
14 codes that was used by Mylan to create
15 valsartan API, and valsartan finished
16 dose, VLN?
17 A. I would not be able to
18 answer that question without looking at
19 the actual drug master file that we were
20 authorized to reference.
21 Q. Okay. Sitting here today,
22 you don't know that VLN is one of the
23 process codes for recalled valsartan in
24 the United States? Is that your

Page 127

1 testimony?
2 A. My testimony is there was
3 multiple processes, in my understanding,
4 in the drug master file. So I'm not
5 familiar with every -- every potential
6 process that might have been registered.
7 Q. Okay. Do you know if VLN
8 was one of them that was registered?
9 A. Not without looking at the
10 original drug master file and seeing what
11 processes were described within it.
12 Q. Do you know if VST was one
13 of the process codes that was registered
14 for valsartan?
15 A. I am familiar with seeing
16 reference to VST, because that was
17 described in some of our documentation as
18 part of our investigation.
19 Q. So is your answer yes, that
20 VST corresponds to a valsartan code?
21 A. Yes. I'm familiar. I saw
22 documentation that made reference to a
23 VST process and VAA process. But I don't
24 recall VLN.

Page 128

1 Q. Okay. Nonetheless, if we
2 return to Page 6 of Exhibit 2, you agree
3 that this entire document relates to a
4 valsartan development report. And as you
5 pointed out to me, this is but one step
6 in it, correct?
7 A. That's my interpretation
8 from looking at this document for the
9 very first time.
10 Q. And among the steps and raw
11 materials identified on Page 6 of
12 Exhibit 2 is triethylamine.
13 Do you see that?
14 A. That is one of the raw
15 materials listed.
16 Q. And there is a parenthetical
17 reference with the letters F/R and that
18 stands for fresh and recovered, correct?
19 MR. TRISCHLER: Objection to
20 form.
21 THE WITNESS: I don't know.
22 BY MR. HONIK:
23 Q. You don't know what F and R
24 means in that context?

Page 129

1 A. No, I do not.



Confidential Information Subject to Protective Order



Confidential Information - Subject to Protective Order



Page 134

Page 135

Page 136

Page 137

6    BY MR. HONIK:
7        Q.    Turn, if you will, to Page
8    21.  Before we move from this document,
9    do you see this heading, 4.0, critical
10   process parameters and additional
11   studies?
12       A.    Yes.
13       Q.    Are you familiar with what
14   those terms refer to or mean?
15       A.    Not in context with an API
16   product development report, no.
17       Q.    Okay.  Do you see the first
18   sentence below that heading where it
19   refers to critical process parameters and
20   risk assessments?
21           Do you see that?
22       A.    Yes.
23       Q.    Can you tell me your
24   understanding of what those terms mean?

Confidential Information - Subject to Protective Order

Page 138

1    A.   I'm not familiar with the
2 process by which they followed in order
3 to develop and prepare a drug master
4 file.  So I can't comment on what that
5 means.
6    Q.   Okay.  Did you have any
7 understanding of a critical process
8 parameters refers to in any context in
9 which you've discharged your job
10 responsibilities?
11         MR. TRISCHLER:  Objection to
12     form.
13         THE WITNESS:  My
14     interpretation or assumption would
15     be that it describes process
16     parameters that are used that are
17     considered important or critical
18     to the manufacturer.
19 BY MR. HONIK:
20    Q.   Thank you.
21         How about the term "risk
22 assessment," or "assessments" plural?
23 What definition do you apply to that?
24    A.   I can't speculate as to what

Page 139

1 risk assessment means in the context of
2 this document, because again this is
3 outside the scope of any document that I
4 routinely look at in my role.
5    Q.   Right.  So I'm not asking
6 you the question in context -- in the
7 context of this document, per se,
8 Exhibit 2.
9         But in your many years as
10 both a chemist and a regulatory affairs
11 professional, what does the term "risk
12 assessment" or "assessments" mean to you?
13    A.   Personally?  I'm not sure
14 what the scope of the question here is.
15    Q.   I'm asking if you understand
16 what risk assessment means.
17    A.   Well, risk assessment can
18 mean a lot of different things.  It
19 depends on the context about which it's
20 written.
21    Q.   Okay.  How about in
22 connection with a development report such
23 as this?
24         MR. TRISCHLER:  Objection.

Page 140

1 Beyond the scope.
2         THE WITNESS:  I've already
3     testified that I -- I can't answer
4     that in context with this
5     document.
6         MR. HONIK:  Let's mark as
7     Talton Exhibit 3, Addendum Tab 7,
8     or Tab 7.
9         (Document marked for
10     identification as Exhibit
11     PL-Talton-3.)
12 BY MR. HONIK:
13    Q.   Do you have that in front of
14 you, Mr. Talton?
15    A.   Yes.
16    Q.   You see, do you not, this is
17 another section of the same valsartan
18 development report prepared by Matrix.
19         Do you see that generally?
20    A.   Yes.  It's labeled valsartan
21 development report, Addendum 1.
22    Q.   Right.  So this was yet
23 another addendum to the same larger
24 development report prepared by Mylan's

Page 141

1 scientists, correct?
2    A.   It is not possible to say
3 this is the same addendum that goes with
4 that one, because it's not paginated or
5 otherwise referenced.  But I would assume
6 that it is.
7    Q.   Okay.  And that's because
8 it's called valsartan development report
9 and if you turn to the second page of the
10 document, Exhibit 3, you see that it's
11 signed off on by three designees of Mylan
12 in 2009, right?
13         MR. TRISCHLER:  Objection to
14     form.
15         THE WITNESS:  The document
16     does contain three signatures and
17     it was signed off in 2009.
18 BY MR. HONIK:
19    Q.   Right, by Mylan scientists
20 in connection with this valsartan
21 development report, correct?
22         MR. TRISCHLER:  Objection to
23     form.  Foundation.
24         THE WITNESS:  It's a Matrix

Confidential Information - Subject to Protective Order

Page 142

1  report.  So, yes, I would assume
2  they would be Matrix employees.
3  BY MR. HONIK:
4      Q.   And to be clear, they're
5  Mylan employees, right?
6          MR. TRISCHLER:  Objection to
7  form.
8          THE WITNESS:  Matrix would
9      have been part of the Mylan
10     network in 2009.
11  BY MR. HONIK:
12     Q.   Right.  And that means that
13  these were Mylan process development
14  chemists working for Mylan in connection
15  with the development or synthesis of
16  valsartan, correct?
17     A.   I'm not sure I can say
18  definitively that they are development
19  scientists.  But their roles or
20  designations are described here.
21     Q.   And importantly, they were
22  doing this at the behest and direction of
23  Mylan, correct?
24         MR. TRISCHLER:  Objection to

Page 143

1  form.
2          THE WITNESS:  I can't -- I
3      can't definitively say that it was
4      done at the direction of Mylan.  I
5      mean, Matrix had an API business
6      at the time that we acquired them.
7      This is part of their ongoing
8      routine business.
9  BY MR. HONIK:
10     Q.   Do you have a moment's
11  doubt, Mr. Talton, that this valsartan
12  development report done by Matrix
13  scientists was done at the behest of
14  Mylan?  Do you have any doubt about
15  that?
16         MR. TRISCHLER:  Objection.
17     Beyond the scope.
18         THE WITNESS:  There's no way
19     I can know that specifically.
20         Like I said, they had an API
21     business.  They developed APIs
22     for -- for sale, not just for use
23     in Mylan products, but for other
24     customers as well.  There's

Page 144

1  multiple APIs they have that Mylan
2  doesn't even utilize.
3  BY MR. HONIK:
4      Q.   Turn to Page 7 of this
5  document, Exhibit 3.  It's headed
6  Section 4, "Detailed Laboratory Process."
7          Do you see that?
8      A.   Yeah.
9      Q.   As much as the signoffs are
10  in 2009, just to frame the timeline here,
11  Mylan's ANDA approval for valsartan
12  occurred in 2012, right?
13     A.   I'd have to go back and look
14  at the specific date.  I'm sorry.  I
15  don't recall.
16     Q.   But in preparation for
17  today, you know that there were actually
18  three ANDA-approved valsartan products.
19  Two were combination, and one was
20  straight or pure valsartan, correct?
21     A.   Yes, I'm aware of three
22  approval Mylan ANDAs that contained
23  valsartan.
24     Q.   And would you disagree that

Page 145

1  the earliest of those would have occurred
2  in September of 2012?
3      A.   I didn't go back and look at
4  the approval so I didn't memorize the
5  approval dates for the applications.
6  That time frame sounds about right, but I
7  would have confirm the approval to answer
8  your question specifically.
9      Q.   And at a high level,
10  regulatory affairs in connection with
11  submissions for that ANDA, is collecting,
12  among other things, development reports
13  just like this one, correct?
14         MR. TRISCHLER:  Objection to
15     form.  Misstates testimony.
16         THE WITNESS:  You know, as a
17     previously testified, a drug
18     master file is a separate --
19     separate registration that's
20     confidential.
21         So as an applicant for
22     valsartan tablets or one of
23     combination products, Mylan forms
24     would have included a letter of

Confidential Information - Subject to Protective Order

Page 146

1    authorization that would have
2    allowed FDA to review the drug
3    master file on our behalf.
4        So we would not have had
5    access or reviewed this
6    documentation in preparation of
7    our ANDA.
8 BY MR. HONIK:
9    Q.   And I haven't asked you that
10 really, Mr. Talton.
11       All I'm asking is if it
12 isn't true that part of the process to
13 get to market by Mylan and sell
14 valsartan, that there were two tracks:
15 Collection of materials to submit for the
16 ANDA, and separately a DMF, correct?
17    A.   Yes, there was a drug master
18 file that we referred to, and then
19 there's other documents to support the
20 manufacture of the finished dosage form.
21    Q.   And among the documents that
22 are relied upon to support those
23 submissions would be a development report
24 like the one we're looking at here,

Page 147

1 right?
2    A.   Most likely, yes.  But these
3 are not the type of documents that we
4 would typically see in regulatory
5 affairs.
6    Q.   Well, I didn't ask you
7 whether you'd see it typically or
8 otherwise in regulatory affairs, simply
9 that this type of development report is
10 routinely developed and relied upon at
11 Mylan for one or both of those track
12 submissions, right?
13       MR. TRISCHLER:  Objection to
14    form.
15       THE WITNESS:  This is the
16    type of report that would most
17    likely be prepared in preparation
18    of a drug master file.  But
19    previously you had asked me was
20    this the type of document that we
21    would have collected.
22       So I was trying to answer
23    your specific question by saying
24    no, this is not the type of source

Page 148

1    document that we would normally
2    collect within regulatory affairs
3    to prepare an ANDA.
4 BY MR. HONIK:
5

Page 149

Page 150



24      MR. HONIK:  Let's call up

Page 151

1      another exhibit.
2          This has been previously
3      marked as Snider-19.
4          (Previously marked
5      PL-Snider-19.)
6          MR. TRISCHLER:  Hey, Ruben,
7      were those -- was that among the
8      stack that was sent.  Because I
9      didn't bring in any prior exhibits
10      unless it was sent this morning.
11          MR. HONIK:  Maybe John can
12      answer whether the previously
13      marked exhibits were part of any
14      link.
15          MR. DAVIS:  Yes, they would
16      have been.  Which one are you
17      referring to?
18          MR. HONIK:  Snider-19.
19          MR. TRISCHLER:  Okay.  I
20      think I found -- I think I found
21      them.
22          Ruben, the prior agreement
23      that we've had, we've not been
24      looking at any of these exhibits

Page 152

1      before you call them out.
2          But in flipping through them
3      now, there's different -- there's
4      Gomas exhibits, Snider exhibits.
5          Do you mind if I have Frank
6      separate them so we can move this
7      a little quicker as we go through.
8          I won't show any of them to
9      the witness before you call them
10      out.
11          MR. HONIK:  I think that
12      makes perfect sense.  Why don't we
13      go off the video record and allow
14      you a little time to do that.
15          MR. TRISCHLER:  Okay.
16          THE VIDEOGRAPHER:  The time
17      is 11:37 a.m.  Off the record.
18          (Short break.)
19          THE VIDEOGRAPHER:  The time
20      now is 11:42 a.m.  Back on the
21      record.
22 BY MR. HONIK:
23      Q.    So Mr. Talton, I know we
24 went off the record to pull some

Page 153

1      documents including the next one that I'd
2      like to review with you, which is
3      Snider-19.  And I presume that you have
4      it in front of you.
5          But what I'm hoping as well
6      that documents that we've already marked
7      and used are within arm's reach of you or
8      someone who can hand it to you.
9          And before we leave
10      Exhibit 3, which is the development
11      report that we had been looking at, I
12      just want to ask you a couple of quick
13      questions, okay?
14          Do you have that back in
15      front of you, Exhibit 3?
16          A.    Yeah.
17          Q.    So we looked together, and I
18      understand that you're not familiar
19      personally with this document, you're
20      seeing it for the first time.  We've
21      nonetheless established that it was
22      prepared by Matrix chemists at the
23      direction of Mylan.
24          But on Page 16, the process



Page 154

¹ for recovery of o-xylene, we looked at
² that together, correct?
³      A.   Yes.  We referred to Page 16
⁴ previously.

Page 155

Page 156

⁵ BY MR. HONIK:
⁶      Q.   Precisely.  Thank you for
⁷ clarifying that.  So if we turn now to
⁸ Snider-19.  Do you have that document in
⁹ front of you?
¹⁰      A.   Yes.
¹¹           MR. HONIK:  And for the
¹² record, we're going to mark this
¹³ Talton Exhibit 4, I think we're up
¹⁴ to --
¹⁵           MR. DAVIS:  Ruben, let's not
¹⁶ re-mark per our procedure.
¹⁷           MR. HONIK:  The convention
¹⁸ is that we're going to call it
¹⁹ Snider-19.
²⁰ BY MR. HONIK:
²¹      Q.   If we look at it together
²² Mr. Talton, on marked Page 1, which is
²³ actually Page 2 of the Exhibit Snider-19,
²⁴ you see that it's part of the drug master

Page 157

¹ file, correct?
²      A.   Yes, it appears to be a
³ section in the drug master file for
⁴ valsartan.
⁵      Q.   Correct.  And specifically
⁶ it's Section 3.2.S.3.
⁷           Do you see that?
⁸      A.   Yes.  3.2.S.3.2.
⁹      Q.   And the entirety of the
¹⁰ exhibit, Snider-19, is 83 pages.  The
¹¹ second page being Page 1 and the last
¹² page being Page 82.  Do you have it that
¹³ way?
¹⁴      A.   Yes.
¹⁵      Q.   Did you look at any part of
¹⁶ this in preparation for your testimony
¹⁷ today?
¹⁸      A.   No, I did not review the
¹⁹ drug master file.
²⁰      Q.   I don't mean to be
²¹ impertinent.  But is there a reason that
²² you didn't look at the DMF for valsartan
²³ in preparation for your designated
²⁴ testimony today?

Page 158

1   A.   It's not something that I
2 would routinely review as the normal
3 course of my business, nor did I think it
4 was necessary in order to testify today.
5   Q.   Okay.  Is that a conclusion
6 that you arrived at on your own?
7   A.   Yes.
8   Q.   Okay.  Did you not think
9 that the elements of the valsartan DMF
10 would not have some relationship or
11 import to any of the topics that you've
12 been designated to testify about?
13   A.   As I've testified on several
14 occasions this is a scientific document
15 compiled by scientists.  And the
16 investigation made reference to the drug
17 master file, but I was prepared to talk
18 about communications with and to and from
19 the health authorities, not the content
20 of the specific DMF.
21   Q.   Well, to my thinking
22 Mr. Talton, and that begs the question
23 whether you think the scientific
24 impressions in the DMF, or otherwise, by

Page 159

1 Mylan scientists impacted the
2 communications with regulators.  Yes or
3 no?
4      MR. TRISCHLER:  Objection to
5   form.
6      THE WITNESS:  Could you
7   repeat that question?
8 BY MR. HONIK:
9   Q.   Yeah.  I'm just
10 understanding whether you came to believe
11 in preparation for today whether the
12 views of Mylan's scientists in the DMF
13 and otherwise, would have any impact to
14 any of the topics that you're designated
15 to give testimony on?
16      MR. TRISCHLER:  Objection to
17   form.
18      THE WITNESS:  Communications
19   from the scientists to the health
20   authority, I was involved with,
21   which is what I'm prepared to
22   testify about, but not the
23   contents of the specific document
24   which we don't see in the normal

Page 160

1 course of business.
2 BY MR. HONIK:
3   Q.   Right.  I take your point
4 that in the normal course of business you
5 might not see it.
6      But today you're outside
7 your normal course of business, because
8 you've been designated by Mylan to answer
9 questions on a number of topics including
10 communications with regulators.
11      And so the question, and
12 then I'll move on, is, did you not think
13 that acquainting yourself with the DMF
14 would help inform your answers today?
15   A.   Any communication with the
16 health authority would have been directly
17 in communication with the health
18 authority, not the content of the DMF.
19 The DMF is a still document.  It's not an
20 interactive document.
21   Q.   Did anyone tell you not to
22 review the DMF in this case?
23   A.   No.
24   Q.   So if we look at Snider-19,

Page 161

1 we've already established you recognize
2 this as a particular section of the 2013
3 DMF submitted by Mylan Labs, right?
4   A.   It appears to be a section
5 from the drug master file for valsartan.
6   Q.   And this -- and I think
7 you've told me this, but you've never
8 seen prior to today any part of the 2013
9 DMF submission; is that correct?
10      MR. TRISCHLER:  Objection.
11   Asked and answered.
12      THE WITNESS:  I have not
13   reviewed the drug master file for
14   valsartan prior to today.
15 BY MR. HONIK:
16   Q.   Okay.  Do you see how this
17 section that we're looking at, commencing
18 on Page 1 which is Page 2 of the exhibit,
19 is entitled impurities?
20   A.   Yes.
21   Q.   And the very first sentence
22 under that heading reads, "The possible
23 impurities of valsartan were synthesized
24 in R&D."

Confidential Information - Subject to Protective Order

Page 162

1    Can you tell me what that
2  means?
3    A.   My interpretation would be
4  that the impurities were synthesized in
5  order to characterize them.
6    Q.   Okay.  And does that entail
7  looking into possible impurities, that
8  is, looking at the process chemistry and
9  determining whether impurities are
10  present or could be present?
11    A.   I would interpret this as a
12  list of the potential impurities in the
13  API.
14    Q.   Okay.  And do you know
15  whether that undertaking by scientists to
16  any degree involves risk assessment?
17    A.   I don't know.
18    MR. TRISCHLER:  Objection.
19    Beyond the scope.
20    THE WITNESS:  I don't know.
21    I'm not familiar with the
22    processes they followed --
23  BY MR. HONIK:
24    Q.   Okay.

Page 163

1    A.   -- to develop APIs.
2    Q.   Do you see how on this page
3  that we're looking at together category
4  or Item IV is genotoxic impurities?
5    MR. TRISCHLER:  Objection to
6    form.
7    THE WITNESS:  I do see a
8    reference to that on this page.
9  BY MR. HONIK:
10    Q.   Do you know what a genotoxic
11  impurity is?
12    MR. TRISCHLER:  Objection to
13    form.  Beyond the scope.
14    THE WITNESS:  I'm not a
15    toxicologist.
16  BY MR. HONIK:
17    Q.   Okay.  I know you're not a
18  toxicologist.  The question is, as
19  someone with a master's in chemistry, who
20  worked in chemistry, and has for nearly
21  40 years been a regulatory affairs
22  professional at the highest level at
23  Mylan, do you or do you not have a
24  working definition in your mind of what a

Page 164

1  genotoxic impurity is?
2    MR. TRISCHLER:  Objection to
3    form.
4    THE WITNESS:  I mean in
5    general, but I'm not a
6    pharmacologist or a toxicologist.
7    So I really can't describe it in
8    detail.
9  BY MR. HONIK:
10    Q.   Point taken.  Neither am I.
11    Do you -- what is your
12  definition of a genotoxic impurity?
13    A.   A potential impurity that
14  could have a serious adverse effect
15  long-term.
16    Q.   Okay.  On human health?
17    A.   Well, whatever species.
18  Yes, if a human is taking the drug
19  potentially, yeah.
20    Q.   Right.  And if an animal
21  took it, another animal, it would
22  implicate animal health, correct?
23    A.   Yeah, it's a health -- it's
24  a health consequence.  It's a health --

Page 165

1    Q.   Precisely.  It's a health
2  consequence.
3    Is NDEA a genotoxic
4  impurity?
5    MR. TRISCHLER:  Objection.
6    Beyond the scope.
7    THE WITNESS:  Based on --
8    based on the investigation that
9    was concluded and the health
10    authority inquiries, it was
11    referred to as a genotoxic
12    impurity, if I recall.
13  BY MR. HONIK:
14    Q.   And similarly, is NDMA a
15  genotoxic impurity?
16    MR. TRISCHLER:  Objection.
17    Beyond the scope.
18    THE WITNESS:  I think based
19    on the inquiries from the various
20    health authorities they were --
21    they were bucketed under the
22    category of nitrosamines which
23    would include both of those
24    compounds.

Confidential Information - Subject to Protective Order

Page 166

BY MR. HONIK:

 1  Q.   Thank you.  So if we turn
 2  together to the last page of Snider-19
 3  which is Page 82.  Do you see at the top,
 4  kind of a grid -- or it's not a graph,
 5  it's a grid with certain batch numbers
 6  and azide content.
 7       But then if you look at
 8  language below that, do you see the
 9  paragraph that begins, "Other than sodium
10  azide?"
11  A.   I'm on the wrong page.
12  Because there's a page number with
13  exhibit and then -- there's two page
14  numbers.
15       Could you clarify which
16  page?
17  Q.   I'm referring to the very
18  last page of Snider-19.  And at the lower
19  right-hand corner it's referred to as
20  Page 82.
21  A.   Okay.  I'm there now.  Thank
22  you.
23  Q.   Is that also the last page

Page 167

 1  of your document Snider-19?
 2  A.   It is.  When you said 19, I
 3  thought you meant Page 19.  That's -- my
 4  apologies.
 5  Q.   No problem.  And just to
 6  back up or frame the question.
 7       Regardless of your personal
 8  interaction or regulatory affairs'
 9  interaction with DMF, this is the DMF
10  that Mylan sent in to the FDA, right?
11  A.   Mylan Laboratories sent in,
12  yes.
13  Q.   Okay.  So the contents of
14  this submission are statements conveyed
15  from Mylan to the U.S. Food and Drug
16  Administration, correct?
17  A.   Yeah.  It's a regulatory
18  document that's submitted to the health
19  authority, yes.
20  Q.   And the contents are
21  statements that are being conveyed in
22  this case by Mylan to the U.S. FDA,
23  correct?
24  A.   The document is being

Page 168

 1  submitted to the FDA, yes.
 2  Q.   Okay.  And so if we look in
 3  the middle of Page 82 of Snider-19, the
 4  exhibit so marked previously, do you see
 5  the language that begins, "Other than
 6  sodium azide."
 7       Do you see that paragraph?
 8       MR. TRISCHLER:  Objection to
 9  form.
10       THE WITNESS:  Yes.
11  BY MR. HONIK:
12  Q.   I'm going to read that.  It
13  reads, and I quote:  "Other than sodium
14  azide, none of the intermediates or other
15  input materials or other process-related
16  impurities is with structural features
17  indicative of genotoxic characteristics.
18  Neither are they capable of giving rise
19  to such side reactions resulting in
20  products with genotoxic potential."
21       Did I read that correctly?
22       MR. TRISCHLER:  Objection to
23  form.
24       THE WITNESS:  That's what's

Page 169

 1  written on this page.
 2  BY MR. HONIK:
 3  Q.   And is not Mylan conveying
 4  in this DMF submitted to the FDA that
 5  valsartan has no genotoxic
 6  characteristics, nor is it capable of
 7  giving rise to genotoxic potential.
 8  Isn't that what Mylan is conveying?
 9       MR. TRISCHLER:  Objection to
10  form.
11       THE WITNESS:  Based on the
12       information available at the time,
13       that was the statement that was
14       included in the drug master file.
15  BY MR. HONIK:
16  Q.   Precisely.  That's all I'm
17  getting at, this confirms that Mylan is
18  confirming to the FDA in 2013, by the
19  submission of this document, that there
20  are no genotoxic impurities, nor can
21  there be any genotoxic impurity potential
22  in valsartan, correct?
23       MR. TRISCHLER:  Objection to
24  form.

Confidential Information - Subject to Protective Order

1    THE WITNESS:  That paragraph
2  that you read to me, if within
3  the submission, that's based on
4  information available at the time.
5  BY MR. HONIK:
6    Q.   And to the extent that
7  there's any doubt in what I just asked
8  you and you confirmed, the next paragraph
9  does that because it says, and I quote:
10  "It is, therefore, concluded that the
11  input materials" -- do you see the term
12  "input materials"?
13    A.   Yes.
14    Q.   And that includes raw
15  materials, right?
16    MR. TRISCHLER:  Objection to
17  form.
18    THE WITNESS:  I would assume
19  that would mean any material used
20  in the process.
21  BY MR. HONIK:
22    Q.   It goes on to state:
23  "Intermediates and other process-related
24  and degradant impurities in valsartan are

1  neither genotoxic nor do they contribute
2  genotoxic characteristics to the drug
3  substance."
4    Do you see that sentence?
5    A.   Yes.
6    Q.   And at least the plain
7  reading I attached to it, Mr. Talton, and
8  you can tell me if you agree, is Mylan
9  conveying to the FDA that there's nothing
10  in valsartan that's either genotoxic or
11  can contribute to genotoxic
12  characteristics to that drug, correct?
13    MR. TRISCHLER:  Objection to
14  form.
15    THE WITNESS:  Those two
16  paragraphs are contained within
17  this section, and was true and
18  accurate information at that time.
19  BY MR. HONIK:
20    Q.   And the paragraph that we're
21  looking at together concludes -- it goes
22  beyond the statement and says, "Hence,
23  Mylan/valsartan complies with the, quote,
24  guideline on the limits of genotoxic

1  impurities.  And then gives a cite to a
2  very specific document from the EMEA from
3  2006."
4    Do you see that?
5    MR. TRISCHLER:  Objection to
6  form.
7    THE WITNESS:  Yeah.  I see a
8  reference to the European guidance
9  document.
10  BY MR. HONIK:
11    Q.   And do you agree that what
12  that punctuates and underscores, is Mylan
13  saying to the U.S. FDA, not only doesn't
14  valsartan have any genotoxic
15  characteristics or is it capable of
16  producing such characteristics, but we,
17  Mylan, are in compliance with the
18  specific guideline issued by the EMEA.
19  Isn't that what that says?
20    MR. TRISCHLER:  Objection to
21  form.
22    THE WITNESS:  Those
23  statements are included in this,
24  and those were true and accurate

1  at the time this document was
2  prepared.
3  BY MR. HONIK:
4    Q.   Agreed.  But more
5  importantly, you agree that it
6  specifically refers to Mylan's
7  compliance -- that's Mylan's words,
8  comply -- with a specific guideline on
9  the limits of genotoxic impurities issued
10  by the European counterpart to the FDA,
11  correct?
12    A.   There's a reference to that
13  statement and yes, that was true and
14  accurate at the time the document was
15  prepared.
16    Q.   Okay.  And by reference, you
17  mean the reliance of compliance that's
18  attested to here by Mylan, correct?
19    A.   It refers to a guidance
20  document that we complied with based on
21  the knowledge that we had available at
22  the time the statement was written.
23    Q.   Precisely.  And your use of
24  the word compliance means that Mylan

Confidential Information - Subject to Protective Order

Page 174

1 followed it and, therefore, complied with
2 the guideline, correct?  Is that what you
3 mean?
4      A.   I would say that we strive
5 to follow all guidances that are
6 available when we're preparing regulatory
7 submission.
8      Q.   That's helpful to know.
9      A.   When we file regulatory
10 documents, we strive to comply with the
11 regulations or requirements that are in
12 place.
13      Q.   Let me ask you something.
14           Who at Mylan would have
15 written the language that we're looking
16 at together?
17      A.   I don't know.
18      Q.   Well, what department or
19 departments, plural, collaborate to
20 produce the DMF and file it on behalf of
21 Mylan?
22      A.   This would have been a
23 document that came out of the API
24 regulatory science team that prepared the

Page 175

1 drug master file for submission.
2      Q.   And do they rely upon Mylan
3 scientists for some of the contents of
4 that submission?
5      A.   This is a scientific
6 document, so I would say yes in general.
7      Q.   And specifically and
8 undoubtedly, the API team that prepared
9 and submitted this on Mylan's behalf,
10 relied upon the work of Matrix that we've
11 looked at in the two previous exhibits,
12 did it not?
13           MR. TRISCHLER:  Objection to
14      form.  Objection.  Calls for
15      speculation.
16           THE WITNESS:  Could you
17      repeat that question?
18 BY MR. HONIK:
19      Q.   Sure.  I'll restate it.
20           It seems plain to me, and
21 you correct me if I'm wrong, Mr. Talton,
22 that the folks that you've now described
23 to me at Mylan, that worked to prepare
24 this DMF submission on behalf of Mylan,

Page 176

1 relying as they have, according to your
2 testimony, on science, had to have relied
3 to some extent or another on the Matrix
4 work that we looked at in the two
5 previous development reports, did it not?
6           MR. TRISCHLER:  Same
7      objection.
8           THE WITNESS:  It's not
9      possible to answer that question
10      because I'm not involved or have
11      knowledge of how they prepared
12      their documents.  And I'm not
13      familiar with their practices.  So
14      I can't comment on that
15      specifically.
16 BY MR. HONIK:
17      Q.   Do you have any doubt that
18 the valsartan development report that we
19 addressed together and you acknowledged,
20 was a detailed development report that
21 reflected the manufacturing processes
22 including that for recovered solvent,
23 informed the development of the DMF and
24 its submission on Mylan's behalf, have

Page 177

1 you any doubt of that?
2           MR. TRISCHLER:  Objection to
3      the form.
4           Objection to the extent that
5      it calls for speculation.
6           Objection.  Asked and
7      answered.
8           THE WITNESS:  I'm not
9      familiar with the practice, the
10      documentation practices that
11      Matrix had at the time these
12      documents were prepared.
13           So I can't answer your
14      question specifically.
15 BY MR. HONIK:
16      Q.   Well, you were designated on
17 Topic 35 which is Mylan's filings with
18 regulatory authorities including the FDA
19 regarding manufacturing process changes
20 for Mylan's valsartan API drug master
21 filings.
22           Are you aware of that?
23      A.   Yeah.
24      Q.   And are you telling me that

Confidential Information - Subject to Protective Order

Page 178

1  in your preparations, you didn't conclude
2  that the development reports that we
3  looked at from Mylan's own lab was not
4  apart of the DMF filing?
5      A.   I already testified I did
6  not review the drug master file in
7  preparation for today's deposition.
8      Q.   Right.  You didn't review
9  the DMFs at all, right?
10     MR. TRISCHLER:  Ruben, you
11     didn't give him a chance to finish
12     his answer.  I'd like to have him
13     have an opportunity --
14 BY MR. HONIK:
15     Q.   I just wanted to get an
16 answer.  Finish your answer.
17     A.   It's the same answer I've
18 given multiple times now.
19         I'm not familiar with the
20 documentation practices used at Matrix at
21 the time that they prepared these drug
22 master files.
23         You're asking me questions
24 about what documents were relied upon.  I

Page 179

1  can't answer those because I'm not
2  familiar with those practices.  So I
3  would only be speculating if I tried to
4  answer them.  And you don't think it's
5  appropriate to do that.
6      Q.   I'm not sure it would call
7  for speculation, but I take your point.
8         And here is my question:
9         How is it that you are the
10 designee with your experience, sir,
11 recognizing that you were going to be
12 asked about Mylan's filings, including
13 the DMF, and you didn't review the DMF at
14 all?  How is that possible?
15     MR. TRISCHLER:  Objection.
16     Asked and answered.
17     Argumentative.
18     THE WITNESS:  I am aware
19     that a drug master file was filed,
20     and I'm here to testify to that
21     effect.
22         I've also shared with you,
23     as an applicant of an ANDA in the
24     U.S. market how we interact with

Page 180

1      that DMF holder.
2          I'm prepared to talk about
3      that.
4  BY MR. HONIK:
5      Q.   Okay.  Can you tell me who
6  at Mylan or Viatris today could answer my
7  questions about how the drug master
8  filings were prepared, what went into
9  them and who was collaborated with to
10 prepare and submit them?  Who would I
11 ask, if not you?
12     A.   You would have to speak to
13 the API regulatory science team that
14 actually prepares the DMF.
15     Q.   Okay.  And do you know the
16 identity of the persons who would have
17 been responsible at that office, the API
18 regulatory people?  Who would that be?
19     A.   I don't know who
20 specifically.  My leader on that team is
21 Imtiyaz Basade.  But I don't know who on
22 his team would have prepared the
23 submission.
24     Q.   What's the name of the

Page 181

1  individual you identified?
2      A.   Imtiyaz Basade.
3      Q.   Basade?  B-A-S-A-D-E?
4      A.   Yes.
5      Q.   And when you referred --
6  it's a him, right?
7      A.   Yes.
8      Q.   When you referred to him as
9  being on your team, was he on your team
10 in 2013 when the DMF was finalized and
11 submitted on Mylan's behalf?
12     A.   He would have been part of
13 the Matrix -- legacy Matrix and Mylan
14 team.  But in 2013, I was in a North
15 America role, I believe.
16     Q.   Okay.
17     A.   So it wasn't a direct report
18 back then.
19     Q.   I understand.  But you're
20 saying that he did the work with his
21 team.  But the submission was done to the
22 U.S. FDA, correct?
23     A.   Through him, through that
24 team.  Not through me.

Page 182

1    Q.   Okay.  And who vets it?
2  Where does it go after Basade and his
3  team works on it?  How does that work?
4    A.   Well, we've already talked
5  about that earlier today, but they
6  prepare the drug master file, and then
7  because they are a foreign facility, they
8  utilize a U.S. agent in order to send
9  that into FDA.
10    Q.   So does it undergo review at
11  any point and at any place after Basade
12  finishes with it?
13    A.   It comes as a deliverable
14  from him for submission.
15    Q.   It comes as a deliverable
16  for whom as a submission?
17    A.   To the U.S. agent.
18    Q.   Okay.  And who does that
19  agent work for?
20    A.   I don't recall who was in
21  place in 2013.  They had a U.S. agent
22  that was a third-party vendor.  We
23  established an internal U.S. agent,
24  probably about five years ago.

Page 183

1    Q.   And that's -- I have his
2  name.  I've seen it a million times.
3  Plastina something like that?
4    A.   Michael Plastina, right.
5    Q.   Plastina.  And if in fact,
6  it was Mr. Plastina, for whom did he work
7  at the time?
8    A.   He was part of the North
9  America regulatory affairs team.  So they
10  would have reported into the North
11  America head at that time.
12    Q.   So let's assume in 2013 when
13  this DMF that we're looking at together,
14  Snider-19, the part that we're looking at
15  in this exhibit, was created by the
16  Basade team and delivered to
17  Mr. Plastina.
18        Let's assume Plastina was in
19  place in 2013.  Who -- when Plastina gets
20  it, what does he do with it?
21        MR. TRISCHLER:  Objection to
22  form, because it assumes facts not
23  in evidence.
24        I think the witness already

Page 184

1  testified that he wasn't in place
2  at that time.
3        MR. HONIK:  Please don't --
4  look, I've been restrained in
5  asking you not to speak an
6  objection.  Don't do that, please,
7  Clem.
8  BY MR. HONIK:
9    Q.   Can you answer my question,
10  sir?
11        MR. TRISCHLER:  I'm just
12  stating the basis for the
13  objection, Ruben, because the
14  witness answered.
15        MR. HONIK:  You're doing a
16  great deal more -- excuse me.
17        You're doing a great deal
18  more than stating the basis.  You
19  don't need to do that,
20  respectfully.  Stop.
21  BY MR. HONIK:
22    Q.   Can you answer the pending
23  question, sir?
24    A.   Maybe you could repeat it.

Page 185

1  I don't recall --
2    Q.   It's a simple question.
3        After Basade's team prepares
4  the DMF, according to you, and it gets
5  sent to the agent, what does Plastina do
6  with it assuming he was the one to
7  receive it on Mylan's behalf?
8        MR. TRISCHLER:  Objection to
9  the form.
10        THE WITNESS:  The U.S. agent
11  responsibilities are not
12  extensive.  They're primarily to
13  serve as a contact person for the
14  U.S. FDA in case there's questions
15  or follow-up.
16        He would most likely sign
17  the cover letter for the
18  submission and then transmit it
19  electronically to the health
20  authority.
21  BY MR. HONIK:
22    Q.   Okay.  So am I correct based
23  on your description that after Basade's
24  team at API prepares the DMF with its

Confidential Information - Subject to Protective Order

Page 186

¹ scientific inputs, that there's no
² substantive review after it leaves his
³ hand and his team's hand?
⁴      A.   Yeah, it's delivered to the
⁵ U.S. agent as a complete document ready
⁶ for submission.
⁷      Q.   And who -- before it reaches
⁸ Plastina's hands, apart from the Basade
⁹ team, as you've already described, if
¹⁰ anyone looks at it or formats it or does
¹¹ anything with it?
¹²      A.   I'm not familiar with how
¹³ the preparation of the DMF occurs or who
¹⁴ is involved in the review process.  All I
¹⁵ can tell you is it comes to the U.S.
¹⁶ agent as a complete deliverable for
¹⁷ transmission to FDA.
¹⁸      Q.   And suffice it to say,
¹⁹ despite being designated on Topic 35,
²⁰ which involves the DMF, you did nothing
²¹ before today to learn how this particular
²² DMF was prepared, who prepared it, and
²³ what inputs from Mylan divisions were
²⁴ incorporated, correct?

Page 187

¹      MR. TRISCHLER:  Objection to
² form.
³      THE WITNESS:  I've already
⁴ explained to you that the API drug
⁵ master files, which team prepares
⁶ it, who manages the team and how
⁷ the U.S. agency relationship
⁸ works, how they communicate with
⁹ the FDA.  I've described all that
¹⁰ to you.
¹¹ BY MR. HONIK:
¹²      Q.   I know you have.  But my
¹³ question is, inasmuch as you didn't look
¹⁴ at the DMF itself, you're also unable to
¹⁵ tell me who provided inputs in its
¹⁶ creation, correct?
¹⁷      MR. TRISCHLER:  Objection.
¹⁸ Misstates testimony.
¹⁹      THE WITNESS:  It's a
²⁰ deliverable from that regulatory
²¹ science team.
²² BY MR. HONIK:
²³      Q.   You can't tell me how it was
²⁴ put together though, right?

Page 188

¹      MR. TRISCHLER:  Objection to
² form.  Asked and answered.
³      THE WITNESS:  The drug
⁴ master file is prepared by that
⁵ team and delivered to the U.S.
⁶ agent for submission as a complete
⁷ and ready-to-file submission.
⁸ BY MR. HONIK:
⁹      Q.   But in this specific
¹⁰ instance, the valsartan DMF that we
¹¹ looked at in Snider-19, which was
¹² prepared and submitted by Mylan in 2013,
¹³ you have no knowledge today that you can
¹⁴ offer about its specific contents, do
¹⁵ you?
¹⁶      MR. TRISCHLER:  Objection to
¹⁷ form.  Asked and answered.
¹⁸      THE WITNESS:  I have not
¹⁹ reviewed the drug master file in
²⁰ detail before today.
²¹      I can tell you what a DMF is
²² and how it's used in connection
²³ with filing an ANDA, which I have
²⁴ described.

Page 189

¹ BY MR. HONIK:
²      Q.   Are you capable of telling
³ me why in Snider Exhibit 19 Mylan stated
⁴ that it complied with the guideline on
⁵ the limits of genotoxic impurities, an
⁶ EMEA document from 2006?
⁷      MR. TRISCHLER:  Objection.
⁸ Beyond the scope.
⁹      THE WITNESS:  I already
¹⁰ stated that based on the
¹¹ information available at that
¹² time, that was a true and accurate
¹³ statement.
¹⁴ BY MR. HONIK:
¹⁵      Q.   I know it's true and
¹⁶ accurate.  My question is, do you know
¹⁷ and can you tell me why that statement of
¹⁸ compliance and the choice to refer
¹⁹ specifically to that document, was put in
²⁰ the DMF on behalf of Mylan?
²¹      MR. TRISCHLER:  Objection.
²² Beyond the scope.
²³      THE WITNESS:  I've already
²⁴ previously described that it is

Confidential Information — Subject to Protective Order

Page 190

our regular practice to comply and meet all the regulatory guidance and requirements that are in place at the time of filing.

So that document was referred to because we were indicating that we were in compliance with that, just as we are with all guidances or regulations.

We strive to meet the health authorities' expectations in every case.

BY MR. HONIK:

Q.   When your regulatory affairs unit has a submission to U.S. FDA or any health authority around the globe, are you required to be truthful and honest in the submissions and the statements of compliance that you make in those documents?

A.   Yes.

Q.   And would that be equally true for a submission of a DMF?

Page 191

A.   Yes.  We strive to provide accurate information that is compliant with the regulations and guidance documents that are in place at the time of the filing.

Q.   Thank you.  Can you place Tab 4 in front of you.

MR. HONIK:  And believe we're going to call this -- to is it just Exhibit 4 that we're up to or five?

MR. DAVIS:  We are on Exhibit 4.  Tab 4 will be Exhibit 4.

MR. HONIK:  Thank you.

(Document marked for identification as Exhibit PL-Talton-4.)

BY MR. HONIK:

Q.   Sir, do you have Exhibit 4 in front of you?

A.   Yes, I do.

Q.   Can you confirm for the record this is the guideline on the

Page 192

limits of genotoxic impurities issued by the EMEA, the European counterpart to the FDA in 2006 that's specifically referred to in Snider-19 that Mylan claims compliance with?

A.   Just give me a second to crosscheck the references.

Q.   Yes, sir.

A.   Yes.  It appears to be the reference that was made in the previous exhibit.

Q.   Have you ever seen Exhibit 4 before, the EMEA document?

A.   I don't recall reviewing this before, no.

Q.   Do you know whether anyone in your regulatory affairs department routinely compiles guidelines like the one in Exhibit 4?

A.   We don't have a repository of guidelines that are in place.

As I mentioned before, this is why we're structured to have regional leaders across the globe who are

Page 193

responsible for monitoring the local and regional requirements.

And as I previously stated, it's our practice to strive to meet all those requirements that are in place at the time that we make our filing.

Q.   Right.  And it's true that Mylan has had for many years a regional department that seeks to comply with the European Medicines Agency, correct?

A.   We have a European regional team, yes, if that's your question.

Q.   So even today, if you were sitting at your office in Morgantown, you could call up or communicate with one of your European team members and ask them for any EMEA guidelines that ever existed on the topic such as genotoxic impurity, couldn't you?

A.   I mean, I could make an inquiry if I wanted to have access to something or I could also be resourceful and look it up myself.

Q.   Correct.  And that's the

Page 194

1 very point I'm making is that you or
2 someone at your direction, either in the
3 global office of regulatory affairs or in
4 the team that you oversee in interacting
5 with Europe, have access to Exhibit 4,
6 correct?
7       A.   If this is -- if this is a
8 public and current guidance, then it
9 would be made available to anyone that
10 sought it.
11      Q.   Well, in fact it's not
12 current.  If you look at Page 1 of
13 Exhibit 4, it says, "This document was
14 valid from 1 January 2007 to 31 January
15 2018.  And it's since been superseded."
16      Do you see that?
17      MR. TRISCHLER:  Objection to
18   form.
19      THE WITNESS:  Yes, I see
20   that statement.
21 BY MR. HONIK:
22      Q.   And all that means is that
23 this was a valid guideline from 2007 to
24 2018 during the months and days

Page 195

1 indicated, right?
2       MR. TRISCHLER:  Objection to
3   form.
4       THE WITNESS:  That would
5   be -- that appears to be the
6   effective date of the guidance,
7   but as I previously testified,
8   guidance and regulations continue
9   to evolve and change.
10      So it's not unusual for a
11   guidance document to go through
12   updates and versioning --
13 BY MR. HONIK:
14      Q.   No question?
15      A.   -- over time.
16      Q.   No question.
17      But specifically, in
18 Snider-19, Mylan said that it complied as
19 of the DMF submission in 2013 with this
20 very guidance, right?
21      A.   That's what's stated in that
22 document, and that was true and accurate
23 at the time that it was written.
24      Q.   Correct.  This guidance,

Page 196

1 which was in force and effect in 2013, is
2 the same guidance that's cited in the
3 2013 Mylan DMF submission, correct?
4       A.   I've already crosschecked
5 the references and confirmed it.  They
6 are referencing the same document.
7       Q.   And the guideline itself is
8 headed or titled ""Guideline on the
9 Limits of Genotoxic Impurities," correct?
10      A.   That's what's stated on the
11 document.
12      Q.   And this was prepared by the
13 European counterpart to the FDA.  And
14 specifically it's committee for medicinal
15 products for human use, correct?
16      A.   That's on the cover page.
17      Q.   And if you turn with me
18 Mr. Talton to Page 6 of 8, I want to
19 direct your attention to a few sections
20 there.
21      A.   Okay.  I'm on Page 6.
22      Q.   The second paragraph that
23 begins with the words, "Some structural
24 groups."

Page 197

1       Do you see that?
2       A.   Yes.
3       Q.   Have you ever seen that
4 reference before, and in particular to a
5 published medical article by Cheeseman in
6 1999 and Kroes in 2004?  Have you ever
7 seen that before?
8       MR. TRISCHLER:  Objection.
9   Beyond the scope.
10      THE WITNESS:  No, I'm not
11   familiar with that literature
12   article.
13 BY MR. HONIK:
14      Q.   This section of the
15 guideline, which Mylan claims to have
16 complied with says, "Some structural
17 groups were identified to be of such high
18 potency that intakes even below the TTC
19 would be associated with a high
20 probability of a significant carcinogenic
21 risk."
22      And then it cites the two
23 articles.
24      Do you see that?

Confidential Information - Subject to Protective Order

Page 198

1      A.   Yeah.
2           MR. TRISCHLER:  Objection to
3   form.
4           THE WITNESS:  Sorry.
5   BY MR. HONIK:
6      Q.   Do you see the next sentence
7   which reads, and I quote: "This group of
8   high potency genotoxic carcinogens
9   comprises aflatoxin-like-, N-nitroso-,
10  and azoxy-compounds that have to be
11  excluded from the TTC approach."
12          Did I read that correctly?
13          MR. TRISCHLER:  Objection to
14  form.
15          THE WITNESS:  That's what it
16  states on this document.
17  BY MR. HONIK:
18     Q.   And among the listed
19  carcinogens, genotoxic carcinogens of
20  high potency and concern in this
21  guideline are n-nitrosos.
22          Do you see that?
23          MR. TRISCHLER:  Objection to
24  form.

Page 199

1           THE WITNESS:  Yes, I see
2   reference to n-nitroso.
3   BY MR. HONIK:
4      Q.   And that refers to
5   nitrosamines, correct?
6           MR. TRISCHLER:  Objection to
7   form.
8           THE WITNESS:  I can make
9   that assumption.
10  BY MR. HONIK:
11     Q.   And you've already told me
12  that both NDEA and NDMA were the
13  nitrosamines of concern that were the
14  impurities found to be in valsartan.  You
15  told me that, right?
16          MR. TRISCHLER:  Objection to
17  form.
18          THE WITNESS:  Based on the
19  investigation and the feedback
20  from the health authorities, those
21  were the two nitrosamine compounds
22  identified of concern.
23  BY MR. HONIK:
24     Q.   Based on Mylan's own root

Page 200

1   cause analysis, correct?
2           MR. TRISCHLER:  Objection.
3   Asked and answered.
4           THE WITNESS:  Based on --
5   based on a conclusion of the
6   investigation we had concluded
7   that those impurities may be
8   present.
9   BY MR. HONIK:
10     Q.   And the "we" in your
11  statement, the we in your answers, the
12  "we" is Mylan, right?
13     A.   Yes.
14     Q.   And this 2006 guideline
15  which Mylan claims to have complied with,
16  identifies specifically nitrosamines as
17  one of a number of genotoxic carcinogens
18  of concern in this guideline on limiting
19  such impurities, correct?
20          MR. TRISCHLER:  Objection to
21  form.
22          THE WITNESS:  There is a
23  reference to the compounds in
24  those documents.

Page 201

1   BY MR. HONIK:
2      Q.   And this document is a
3   guideline, correct?
4           MR. TRISCHLER:  Objection to
5   form.  Beyond the scope.
6           THE WITNESS:  It's labeled
7   guideline.
8   BY MR. HONIK:
9      Q.   And you've already told me
10  numerous times that Mylan, through its
11  regulatory affairs efforts, which you
12  lead globally, adhere to guidelines as
13  best and as closely as you can, correct?
14          MR. TRISCHLER:  Objection to
15  form.  Asked and answered.
16          THE WITNESS:  As I mentioned
17  before, at the time that we make
18  our filings, we take into
19  consideration all guidelines and
20  regulations and we strive to meet
21  those health authority
22  expectations.
23  BY MR. HONIK:
24     Q.   Understood.  But very

Confidential Information Subject to Protective Order

1  specifically in Snider-19, we saw that
2  Mylan specifically cited compliance with
3  this guideline that we're now looking at,
4  correct?
5       MR. TRISCHLER:  Objection.
6  Asked and answered a half dozen
7  times.
8       Go ahead.
9       THE WITNESS:  Yes.  We
10 crosschecked our reference to the
11 documents and Snider-19 is the
12 same as the doc -- as this
13 exhibit.
14 BY MR. HONIK:
15     Q.   And if you turn --
16     A.   And as I previously
17 testified, that was a true and accurate
18 statement at the time it was written
19 based on the information we had
20 available.
21     Q.   I accept that.
22       So if you turn to the
23 previous page in Exhibit 4, namely Page 5
24 of 8, do you see the Section 5.2.1,

1  Pharmaceutical Assessment?
2       A.   Yes.
3       Q.   The prefatory sentence says,
4  "A specific discussion as part of the
5  overall discussion on impurities should
6  be provided in the application with
7  regard to impurities with potential
8  genotoxicity."
9       Did I read that correctly?
10       MR. TRISCHLER:  Objection to
11 form.
12       THE WITNESS:  That's what
13 the sentence -- sentence states.
14 BY MR. HONIK:
15     Q.   And in connection with
16 Mylan's submission of its DMF for
17 valsartan, that's the application that's
18 referenced in that prefatory language,
19 right?
20       MR. TRISCHLER:  Objection.
21 Asked and answered.
22       THE WITNESS:  I'm sorry,
23 what?
24       Could you ask that again?

1  BY MR. HONIK:
2       Q.   Sure.
3         What this sentence implies
4  is that when a pharmaceutical company is
5  making an assessment and a submission and
6  an application, you've got to concern
7  yourself with impurities with potential
8  genotoxicity, right?
9       MR. TRISCHLER:  Objection.
10 Beyond the scope.
11       THE WITNESS:  That's a
12 typical element within any drug
13 master file in any ANDA, yes.
14 BY MR. HONIK:
15     Q.   Agreed.  And if you look
16 with me in the next paragraph, the second
17 sentence, it reads and I quote, "The
18 applicant, like Mylan in its DMF, should
19 highlight within the chemical process and
20 impurity profile of active substance all
21 chemical substances used as reagents or
22 present as intermediates or side products
23 known as genotoxic and/or carcinogenic,
24 e.g., alkylating agents."

1       Did I read that correctly?
2       MR. TRISCHLER:  Objection to
3  form.
4       THE WITNESS:  That's the
5  sentence in this document.
6  BY MR. HONIK:
7       Q.   And the plain meaning of
8  that is that in the case of Mylan and its
9  DMF application, it's supposed to
10 identify, among other things, alkylating
11 agents that have a propensity for
12 genotoxic or carcinogenic
13 characteristics, correct?
14       MR. TRISCHLER:  Objection to
15 form.  Beyond the scope.
16       THE WITNESS:  That sentence
17 is contained within this document.
18 BY MR. HONIK:
19     Q.   Okay.  And it says, "More
20 generally, reacting substances and
21 substances which show 'alerting
22 structure' in terms of genotoxicity which
23 are not shared with the active substance
24 should be considered" -- and then there's

Confidential Information Subject to Protective Order

Page 206

¹ a cite -- and it concludes in that
² paragraph with, "Potential alternatives
³ which do not lead to genotoxic residues
⁴ in the final product should be used if
⁵ available."
⁶          Did I read that correctly?
⁷          MR. TRISCHLER:  Objection to
⁸     form.
⁹          THE WITNESS:  That's what
¹⁰     the paragraph states.
¹¹ BY MR. HONIK:
¹²     Q.   And do you understand the
¹³ language that we just -- I just read and
¹⁴ we looked at together, is guiding the
¹⁵ applicant, in this case, Mylan, where
¹⁶ it's possible to remove a genotoxic agent
¹⁷ or one capable of a genotoxic or
¹⁸ carcinogenic characteristic, to remove it
¹⁹ in favor of an alternative process.
²⁰ Do you understand that?
²¹     A.   My -- my interpretation of
²² the document is just saying if there is
²³ an alternative it should be considered,
²⁴ if you have knowledge that you have the

Page 207

¹ potential to form such an impurity.
²     Q.   Exactly.  In plain English,
³ it's suggesting the obvious, which is if
⁴ there is a way to manufacture the drug
⁵ without a carcinogenic potential, you
⁶ should do so, correct?
⁷          MR. TRISCHLER:  Objection.
⁸     Beyond the scope.
⁹          THE WITNESS:  A manufacturer
¹⁰     would not normally try to
¹¹     introduce a process that would --
¹²     that would intentionally produce
¹³     these toxic impurities.
¹⁴ BY MR. HONIK:
¹⁵     Q.   Absolutely.  And where
¹⁶ there's an alternative, where you can
¹⁷ more readily guarantee that you are not
¹⁸ going to have a carcinogenic reaction,
¹⁹ then that's what you do, right?
²⁰     A.   This guideline is saying if
²¹ you have knowledge that your process may
²² produce such an impurity, then you should
²³ consider an alternative to that.  That's
²⁴ the spirit of the guidance as I interpret

Page 208

¹ it.
²     Q.   That's right.  In order to
³ have an alternative, you have to have
⁴ knowledge of it, correct?
⁵     A.   Yes, you have to have
⁶ knowledge that your process produced such
⁷ an impurity.
⁸     Q.   Right.  So let's sort of
⁹ bring it home to the valsartan process.
¹⁰          What this is implying is
¹¹ that if you can make valsartan without
¹² introducing a carcinogen, you should do
¹³ it that way, instead of using a process
¹⁴ or a material or ingredient or encourage
¹⁵ a reaction that could produce a
¹⁶ carcinogen, correct?
¹⁷          MR. TRISCHLER:  Objection to
¹⁸     the form.  Objection, beyond the
¹⁹     scope.
²⁰          THE WITNESS:  An applicant
²¹     wouldn't introduce an impurity
²²     yet, if they have knowledge that
²³     they are introducing it.
²⁴ BY MR. HONIK:

Page 209

¹     Q.   Okay.  And you told me
² earlier in your testimony this morning,
³ Mr. Talton, that you were aware of the
⁴ process code VAA?
⁵     A.   Yes.
⁶     Q.   And you know, don't you,
⁷ even though you didn't look at it, you
⁸ know from a regulatory standpoint, the
⁹ DMF for the VAA process, which is a
¹⁰ valsartan code, was submitted to the U.S.
¹¹ regulators in November of 2017, right?
¹²     A.   I don't remember the -- I
¹³ don't remember the specific date.  But
¹⁴ I'm aware that they had multiple
¹⁵ processes within the drug master file.
¹⁶     Q.   But importantly, you recall
¹⁷ that the VAA process in terms of its DMF
¹⁸ goes back to 2017, right?
¹⁹     A.   Yes.
²⁰



Confidential Information Subject to Protective Order



Page 210

Page 211

7  Q.  To be sure.  But the
8 specific reason that Mylan employed the
9 VAA and we'll look at this later, in a
10 lot of documents, was to remove any
11 potential for a genotoxic impurity,
12 that's why VAA was developed, to
13 eliminate the triethylamine responsible
14 for causing the NDEA and NDMA and in
15 place of it, using sodium bicarbonate in
16 the recovery process, isn't that right?
17       MR. TRISCHLER:  Objection to
18       form.  Misstates evidence.
19       Objection to the extent it's
20       beyond the scope.
21       THE WITNESS:  I don't know
22       why the VAA process was developed.
23       I don't have that knowledge.
24 BY MR. HONIK:

Page 212

1       Q.  Okay.  Well, maybe we'll
2 look at that together and we'll enlighten
3 you further.
4       But assuming, as I'm asking
5 you to, that the VAA process eliminated
6 the potential for a genotoxic impurity by
7 replacing the ingredients that I just
8 identified in 2017, that was therefore an
9 alternative process to create valsartan,
10 wasn't it?
11       MR. TRISCHLER:  Objection to
12       form.  Beyond the scope.
13       THE WITNESS:  As I
14       previously testified, there was
15       multiple alternatives within the
16       drug master file which is not
17       unusual to have multiple processes
18       that are available for the various
19       markets.
20 BY MR. HONIK:
21       Q.  Right.  Now you're just
22 repeating yourself.
23       My question is this, sir.
24 If, as -- as it appears, Mylan had, at

Page 213

1 its disposal, no later than 2017, a
2 process that would eliminate the
3 potential for a genotoxic impurity, why
4 didn't it employ that alternative in all
5 of its production of valsartan?
6       MR. TRISCHLER:  Objection to
7       the argument -- argumentative
8       predicate.
9       There's a lot of repeating
10       going on here today.
11       Objection to the extent it
12       goes beyond the scope of the
13       designation.
14       THE WITNESS:  As I
15       previously mentioned, there is
16       multiple processes that can be
17       within a drug master file.
18       At the time the VAA process
19       was developed or put in the DMF,
20       there was no knowledge that --
21       that the current process may have
22       introduced these impurities.
23       So there would have been no
24       compelling reason to switch to a

Confidential Information - Subject to Protective Order

Page 214

1  different process, when your
2  current process was acceptable.
3  BY MR. HONIK:
4  Q.   You agree that Mylan,
5  despite having the VAA DMF approved in
6  2017, continued to sell in the U.S.
7  market the VLN and VST codes, right?
8  MR. TRISCHLER:  Objection to
9  form.
10  THE WITNESS:  I don't recall
11  the specific timelines around
12  those processes and when they were
13  supplied to the U.S. market, so
14  I'm not going to answer that
15  question.
16  BY MR. HONIK:
17  Q.   But you know that there was
18  a recall of the VLN and VST code
19  valsartan that occurred in late 2018,
20  correct?
21  A.   Yes.  I'm aware of the
22  recall.
23  Q.   Why did Mylan continue to
24  sell VLN and VST valsartan to Americans

Page 215

1  after it had at its disposal the VAA
2  process which was approved in 2017 and
3  remove the genotoxic potential from the
4  process?
5  MR. TRISCHLER:  Objection.
6  Beyond the scope.
7  THE WITNESS:  It was not
8  until late 2018 that we were aware
9  of the problem.
10  BY MR. HONIK:
11  Q.   You see the next paragraph
12  in this section of the Exhibit 4, it
13  says, "A justification needs to be
14  provided that no viable alternative
15  exists, including alternative routes of
16  synthesis."
17  Do you see the use of the
18  term "routes of synthesis"?
19  A.   Yes.
20  Q.   You told me that's the
21  manufacturing process, correct?
22  A.   That will be my
23  interpretation.
24  Q.   And then it says, "Or

Page 216

1  formulations, different starting
2  materials.  This might for instance
3  include cases where the structure, which
4  is responsible for the genotoxic and/or
5  carcinogenic potential is equivalent to
6  that needed in chemical synthesis, for
7  example, alkylation reactions."
8  Do you see that?
9  MR. TRISCHLER:  Objection to
10  form.
11  THE WITNESS:  That's what's
12  stated in the document.
13  BY MR. HONIK:
14  Q.   Mylan's own root cause
15  analysis determined that there was an
16  alkylation reaction that was responsible
17  for the presence of the nitrosamine
18  impurities, right?
19  MR. TRISCHLER:  Objection.
20  Now you're just repeating
21  yourself.  Objection, asked and
22  answered.
23  THE WITNESS:  As a -- as a
24  base of an investigation that

Page 217

1  wasn't completed until late 2018,
2  there was no knowledge that the --
3  the other process was creating or
4  giving rise to these impurities.
5  So there would have been no reason
6  to change your manufacturing
7  process.
8  BY MR. HONIK:
9  Q.   Meaning it was unavoidable,
10  right?
11  A.   Excuse me?
12  Q.   Do you see the next
13  paragraph?  "If a genotoxic impurity is
14  considered to be unavoidable in a drug
15  substance, technical efforts, for example
16  purification steps, should be undertaken
17  to reduce the content of the genotoxic
18  residues in the final product in
19  compliance with safety needs or to a
20  level as low as reasonably practicable.
21  Data on chemical stability of reactive
22  intermediates, reactants, and other
23  components should be included in this
24  assessment."

Confidential Information Subject to Protective Order

1    Did I read that correctly?
2    MR. TRISCHLER:  Objection to
3  form.
4    THE WITNESS:  That's stated
5  in this document.
6  BY MR. HONIK:
7    Q.   In what way did Mylan comply
8  with this directive and guideline, the
9  technical efforts should be undertaken to
10  reduce the content of genotoxic residue
11  in valsartan?
12    MR. TRISCHLER:  Objection.
13  Beyond the scope.
14    THE WITNESS:  It's not
15  possible for me to answer that.
16    But all I can tell you is
17  once we became aware, based on
18  scientific evidence, we took the
19  appropriate action.
20  BY MR. HONIK:
21    Q.   Are you aware that sodium
22  nitrite is mutagenic?
23    MR. TRISCHLER:  Objection.
24  Objection.  Incomplete

1  hypothetical.  Objection, beyond
2  the scope.
3    THE WITNESS:  No.
4  BY MR. HONIK:
5    Q.   No, you're not aware?
6    A.   No.
7    Q.   What did Mylan do to comply
8  with the three paragraphs that we just
9  read in Exhibit 4 in Section 5.2.1,
10  Pharmaceutical Assessment, that led it to
11  claim compliance in its DMF submission to
12  the FDA?
13    MR. TRISCHLER:  Objection.
14  Beyond the scope.
15    THE WITNESS:  I can't
16  specifically talk about the
17  process development report and the
18  conclusions made.
19    But based on the -- based on
20  when that was written and based on
21  knowledge of the process, that was
22  a true and accurate statement.
23  BY MR. HONIK:
24    Q.   Well, I'm not sure how your

1  answer responds to my question, sir.
2    What I asked you was, in
3  what way did Mylan comply with 5.2.1 of
4  the guideline we're looking at marked
5  Exhibit 4, which it specifically cited
6  compliance with in its DMF application
7  for valsartan?
8    MR. TRISCHLER:  Objection to
9  form.  Beyond the scope.
10    THE WITNESS:  And I did
11  answer your question.  Based --
12  when that statement was written,
13  based on the knowledge of the
14  process at that time, it was true
15  and accurate.  So they did comply
16  with this section.
17  BY MR. HONIK:
18    Q.   Well, it seems to me you're
19  citing a tautology.  You're saying there
20  was compliance based on some knowledge at
21  the time.
22    My question is specific.  In
23  what specific way was compliance with
24  5.2.1 executed by Mylan?

1    MR. TRISCHLER:  Objection to
2  form.
3  BY MR. HONIK:
4    Q.   What did it -- what did it
5  do to determine whether there was an
6  appropriate alternative to introducing
7  genotoxic impurities?
8    MR. TRISCHLER:  Objection to
9  the form.  Argumentative.
10  Objection.  Beyond the scope of
11  the designation.
12    THE WITNESS:  That's outside
13  my knowledge.  You're asking a
14  question about the development
15  process and I don't have that
16  level of knowledge.
17    MR. HONIK:  Would you
18  place what's been --
19    MR. TRISCHLER:  Ruben,
20  before you go to another document,
21  it's about 12:45.  I would like to
22  give the witness a lunch break if
23  we can.
24    MR. HONIK:  Okay.  Let me --

Confidential Information Subject to Protective Order

Page 222

1  let me just evaluate what I have
2  here.
3       All right.  This is as good
4  a time as any to take it.  How
5  long would you like?
6       MR. TRISCHLER:  45 minutes?
7       MR. HONIK:  Sure, that's
8  fine.  So we're talking 1:30?
9       MR. TRISCHLER:  Sure.
10      THE VIDEOGRAPHER:  The time
11  is 12:43 p.m.  We are going off
12  the record.
13           - - -
14      (Whereupon, a luncheon
15  recess was taken.)
16           - - -
17      THE VIDEOGRAPHER:  The time
18  is now 1:31 p.m.  Back on the
19  record.
20  BY MR. HONIK:
21      Q.   Mr. Talton, you ready to
22  proceed?
23      A.   Yes.
24      Q.   Okay, good.

Page 223

1       Before we broke for lunch,
2  you may recall, we were talking about
3  whether or not sodium nitrite was
4  recognized by you as a mutagenic, and I
5  thought you told me you didn't know,
6  right?
7      A.   That's correct.
8      Q.   Inasmuch as you're a
9  designee of Mylan, do you know whether
10  Mylan is or was ever aware that sodium
11  nitrite is a mutagenic?
12      MR. TRISCHLER:  Objection to
13  the extent it's beyond the scope
14  of the designation.
15      MR. HONIK:  May I inquire --
16  I'm having this continued
17  interruption.
18      In what way do you believe
19  that Topic 35, which pertains to
20  Mylan's filings, including its
21  drug master files, and I accept
22  that this particular witness
23  that's been proffered hasn't even
24  looked at the DMF. But to the

Page 224

1  extent that there are processes,
2  agents, process -- chemical
3  processes that are reflected in
4  the DMFs, and to the extent one or
5  more of them are mutagenic, how is
6  this not within the topic?
7       Just tell me and I'll try to
8  correct my questioning.
9       MR. TRISCHLER:  He's not
10  been designated to talk -- the
11  question that you just asked,
12  Ruben, was Mylan's opinion on
13  whether a different compound was
14  mutagenic.  He's not --
15      MR. HONIK:  No, I haven't
16  asked any -- I
17      MR. TRISCHLER:  If you ask
18  me -- if you ask me to clarify,
19  can I have an opportunity, a
20  position, can I have an
21  opportunity to do it?
22      MR. HONIK:  Do whatever you
23  want.
24      MR. TRISCHLER:  The question

Page 225

1  was, did Mylan have an opinion as
2  to whether a given compound, I
3  think you said sodium nitrite, is
4  mutagenic.  He's not a
5  toxicologist.  He's not been
6  designated on those topics.
7       I don't view Question 35
8  relates specifically to
9  communications regarding
10  manufacturing process changes to
11  include a designation of this
12  witness to talk about what
13  compounds are mutagenic or what
14  compounds are not mutagenic.
15      It's far beyond the scope of
16  the designation.  You can disagree
17  if you want.
18      I haven't restricted him
19  from answering the question in his
20  personal capacity.  But he's
21  certainly not been designated to
22  speak on issues relating to
23  toxicology which I interpret the
24  question to cover.

Confidential Information - Subject to Protective Order

Page 226

1    MR. HONIK:  Are you done?
2    MR. TRISCHLER:  For the
3  moment.
4    MR. HONIK:  Thank you.
5  BY MR. HONIK:
6    Q.   Sir, do you have a
7  definition of mutagenic or mutagen?
8    MR. TRISCHLER:  Objection.
9  Beyond the scope.
10    THE WITNESS:  No.  I mean
11  I've heard the terms.  There's a
12  classification of different types
13  of impurities.  But I don't have
14  personal or innate knowledge of
15  what that means.
16  BY MR. HONIK:
17    Q.   So we have been talking
18  though at some considerable length about
19  the representation of compliance that
20  Mylan made in a filing with the FDA in
21  which it claimed compliance with a
22  European FDA guideline.
23    Remember we were talking
24  about that at some considerable length?

Page 227

1    A.   Yes, I do recall that
2  conversation.
3    Q.   And in the plainest English
4  I can think of, the obligation under that
5  guideline was, Number 1, to identify any
6  potentiality for carcinogenicity in the
7  process that is being submitted in an
8  application, correct?
9    MR. TRISCHLER:  Objection to
10  form.
11    THE WITNESS:  I mean there
12  is a reference in that report
13  to -- to stay in compliance with a
14  European guideline.
15  BY MR. HONIK:
16    Q.   And the purpose of it is so
17  that the company like Mylan would
18  identify whether it was dealing with a
19  potential carcinogen and any alternatives
20  to using materials that could produce a
21  carcinogenic effect.  Isn't that the
22  whole point of that guideline, sir?
23    MR. TRISCHLER:  Objection to
24  the form.

Page 228

1    THE WITNESS:  And as -- as
2  we talked about before, the
3  science team that prepares the
4  drug master file made that
5  statement which was true and
6  accurate at the time, and I rely
7  upon them to make those
8  statements.
9    I don't have the innate
10  knowledge to -- to challenge that
11  or not believe it.
12  BY MR. HONIK:
13    Q.   And that's what we're
14  examining together, that I'm asking you
15  questions about under oath, because Mylan
16  claimed in its 2013 DMF to the FDA, a
17  topic on which you are designated, that
18  there was no carcinogenic potential.
19  Isn't that what it claimed?
20    A.   And we have -- and I have
21  stated that --
22    Q.   I just want to know if you
23  recognize that that statement was claimed
24  by Mylan.

Page 229

1    A.   That statement appears in
2  that DMF as being in compliance with the
3  European guidance based on the
4  information that was available when they
5  wrote that statement.
6    Q.   And the claim itself is that
7  there was nothing in valsartan that was a
8  carcinogenic impurity or even capable of
9  producing a carcinogenic impurity,
10  correct?
11    MR. TRISCHLER:  Objection to
12  form.
13    THE WITNESS:  It states
14  compliance with a European
15  guidance document.
16  BY MR. HONIK:
17    Q.   And the guidance document
18  requires an applicant like Mylan to
19  identify any carcinogen or carcinogenic
20  potential, correct?
21    MR. TRISCHLER:  Objection to
22  form.  Objection.  Beyond the
23  scope.
24    THE WITNESS:  That's the

Confidential Information Subject to Protective Order

Page 230

1  overall subject of the document,
2  but again, it would be up to the
3  scientists to do the necessary
4  work to support that guidance and
5  to make that certification.
6       That's outside the scope of
7  my role.
8  BY MR. HONIK:
9       Q.   And do you understand that a
10  mutagen or a mutagenic agent is one that
11  permanently changes genetic material,
12  usually DNA?
13       MR. TRISCHLER:  Objection to
14  the form.  Objection, beyond the
15  scope.
16       THE WITNESS:  I only have a
17  very general understanding of the
18  different types -- there's a
19  variety of impurities that -- that
20  are in all APIs and finished
21  dosage forms, and we're required
22  to establish specifications and
23  qualify those.  But I'm not -- I'm
24  not a biology major.  I'm not a

Page 231

1  toxicologist, so I really don't
2  have any personal knowledge of the
3  mechanisms by which impurities
4  may -- what impact they may have.
5  BY MR. HONIK:
6       Q.   Do you understand that --
7  that mutagens can cause cancer and that,
8  therefore, they are carcinogens?
9       MR. TRISCHLER:  Objection to
10  form.  Incomplete hypothetical.
11  Objection.  Beyond the scope.
12       THE WITNESS:  On my personal
13  knowledge, I have that general
14  understanding.  But I'm not going
15  to be able to speak in any details
16  of how that happens or how that
17  works.
18  BY MR. HONIK:
19       Q.   Did you do anything,
20  whatever, Mr. Talton, to determine
21  whether or not Mylan, the company you've
22  worked for for over 20 years, believed
23  that sodium nitrite, which it used in the
24  valsartan process, was a mutagen?  Did

Page 232

1  you do anything to research that?
2       MR. TRISCHLER:  Objection to
3  the form.  Beyond the scope.
4       THE WITNESS:  As I -- as I
5  previously testified, we get
6  source documents from a variety of
7  disciplines.
8       And -- and the drug master
9  files is one of those
10  deliverables.  And I rely upon the
11  scientists to make those decisions
12  and claims.  That's not something
13  I would typically challenge.
14  BY MR. HONIK:
15       Q.   Under the guidelines that we
16  looked at together that Mylan claimed
17  compliance with in its filing of its DMF
18  in 2013 with the FDA, do you agree that
19  if there was a mutagenic agent in the
20  process for API valsartan, that it needed
21  to be disclosed?
22       MR. TRISCHLER:  Objection to
23  form.  Incomplete hypothetical.
24  Objection.  Beyond the scope.

Page 233

1       THE WITNESS:  I mean as part
2  of your -- your submission, if you
3  have knowledge, shouldn't you have
4  to -- you have -- you would be
5  expected to disclose that if you
6  have personal knowledge of
7  something.
8  BY MR. HONIK:
9       Q.   Correct.  And to translate
10  that into the context in which I'm asking
11  you, if one or another of the scientists
12  at Mylan knew that there was a mutagenic
13  agent in the process that went into the
14  development and manufacture of API for
15  valsartan, it would need to be disclosed
16  and highlighted under the European
17  guideline, right?
18       MR. TRISCHLER:  Same
19  objection.
20       THE WITNESS:  Again, you're
21  asking me for -- for details
22  around what conclusions the
23  scientists may -- may draw.  And I
24  don't have -- I don't have

Confidential Information Subject to Protective Order

Page 234

1  knowledge of that.
2  BY MR. HONIK:
3      Q.   No, sir.  I'm not asking you
4  that at all.
5          I'm asking you if it's true
6  that if there is a mutagenic agent, a
7  chemical agent in the valsartan API
8  process that Mylan's own lab people
9  identified, that under the guidance that
10 we looked at, that Mylan claimed
11 compliance with, it would not only need
12 to identify that agent, but highlight it
13 as a potential genotoxic impurity, yes or
14 no?
15         MR. TRISCHLER:  Objection to
16 the form.  Objection.  Incomplete
17 hypothetical.  Objection.  Beyond
18 the scope.
19         THE WITNESS:  They made
20 certification with compliance with
21 that guideline.  So based on their
22 understanding and knowledge of the
23 process, that's a certification
24 they made.  I rely upon that as a

Page 235

1  regulatory affairs professional to
2  be true and accurate.
3          MR. HONIK:  Let's pull up a
4  document that we'll mark as
5  Talton, I think we're up to 5, is
6  it?
7          (Document marked for
8  identification as Exhibit
9  PL-Talton-5.)
10         MR. DAVIS:  That's right.
11 And I'll share my screen on this
12 one.
13         MR. HONIK:  Yeah.
14 BY MR. HONIK:
15     Q.   So this hasn't been sent to
16 you, Mr. Talton, so we'll just bring it
17 up on the screen.  It's just an e-mail
18 thread.
19         And let me for the record
20 identify what will be marked as Talton-5.
21 This is an e-mail thread from the Unit 3
22 development lab control in India employed
23 by Mylan concerning, among other things,
24 sodium nitrite.

Page 236

1          I presume you've never seen
2  this e-mail thread, Mr. Talton?
3      A.   I don't recall seeing this
4  one specifically.
5          MR. TRISCHLER:  Ruben, can
6  you scroll down so I can get a
7  Bates number, please.
8          MR. HONIK:  Sure.  You can
9  scroll.  But for the record, it's
10 Bates numbers 494035, 36, and 37.
11         MR. TRISCHLER:  Thank you.
12 BY MR. HONIK:
13     Q.   And it's an exchange
14 between, among others, Prakash Shenvi and
15 Shambhu Shastri.  Do you recognize any of
16 those names?
17     A.   No, I don't.
18     Q.   Okay.  If we look at the
19 thread from January 24th -- this is 2015.
20 And -- do you nonetheless recognize this
21 as an internal communication at Mylan?
22         MR. TRISCHLER:  Objection to
23 the form.
24 BY MR. HONIK:

Page 237

1      Q.   You see it refers to
2  valsartan and the steps for processing
3  valsartan.  Do you see it?
4      A.   Yes, I'm looking at it.  I
5  don't see reference to a Mylan e-mail or
6  anything.  But I don't recognize any of
7  the names on the distribution list.
8      Q.   Well, do you see at the
9  bottom of Page 2 it says PD lab for VAS
10 code?  Does that refresh your memory that
11 this is Mylan?
12         Do you see on Page 1 at the
13 top at 4/1/2015 you've got all of these
14 e-mail addresses ending in Mylan.in, do
15 you see that?
16     A.   Yes, I see that now.  It
17 wasn't on the page that I was looking at
18 previously.  But yes, it does look like
19 an internal Mylan communication.
20     Q.   Thank you.
21         And if you look with me at
22 Page 2, which is Bates stamped ending in
23 4036, the thread of the e-mail dated
24 January 24, 2015, at 4:17 p.m., there are

Confidential Information Subject to Protective Order

---

Page 238

1 five sections in Roman numbering.  Under
2 Section II it says in this Mylan internal
3 communication, "In the proposed
4 process" -- and we're talking about
5 valsartan now  -- "in the proposed
6 process sodium nitrite is used in
7 Stage II."
8           And you and I both talked
9 about how there are a couple of stages in
10 the manufacturing process.
11           -- "which is mutagenic."
12           Did I read that correctly?
13      A.   That's what is stated in
14 this e-mail.
15      Q.   Okay.  And you don't have
16 any -- any doubt that the process
17 development folks at Mylan were aware, at
18 least as far back as 2015, and possibly
19 earlier, that the answer to my question
20 that you were unable to answer is sodium
21 nitrite is, in fact, mutagenic, correct?
22           MR. TRISCHLER:  Objection to
23      form.  Objection.  Beyond the
24      scope.

Page 239

1           THE WITNESS:  All I can
2      comment is this person made that
3      statement, but I can't confirm or
4      deny that.
5 BY MR. HONIK:
6      Q.   Mm-hmm.  And do you agree
7 that if process development employees at
8 Mylan were aware that sodium nitrite
9 which was introduced in the manufacturing
10 process was mutagenic and in turn could
11 be carcinogenic, that under the
12 guidelines you and I have been talking
13 about and that Mylan certified compliance
14 with, it had an obligation to identify
15 sodium nitrite, particularly in the
16 environment in which it was used, as one
17 capable of genotoxic effect.  Isn't that
18 right?
19           MR. TRISCHLER:  Objection.
20      Asked and answered.  Objection.
21      Beyond the scope.
22           THE WITNESS:  Yeah, they
23      certified compliance with that
24      guidance, so that's -- that's

Page 240

1      based on their internal
2      development and assessment.
3           You know, so I just -- all I
4      can -- all I can interpret is
5      what's here in front of me, and
6      that's a statement they made.
7 BY MR. HONIK:
8      Q.   Nobody in the DMF submitted
9 by Mylan that we've looked at thus far
10 identified sodium nitrite or any agents
11 as having a genotoxic capacity, right?
12           MR. TRISCHLER:  Objection to
13      form and foundation.
14           THE WITNESS:  I don't know.
15 BY MR. HONIK:
16      Q.   I've asked you a very simple
17 question.
18           In the materials you and I
19 have looked at thus far, did you see
20 Mylan make a statement in those filings,
21 and you're the designee for the filings,
22 highlighting the fact that sodium nitrite
23 was used and that sodium nitrite is a
24 mutagenic with a genotoxic impurity

Page 241

1 potential.  Did you see that anywhere?
2           MR. TRISCHLER:  Same
3      objection.
4           THE WITNESS:  I don't recall
5      seeing a reference to that
6      previously today.
7 BY MR. HONIK:
8      Q.   Thank you.
9           MR. HONIK:  Let's bring up
10      Tab 3.  And I guess we're up to
11      what, 6.
12           (Document marked for
13      identification as Exhibit
14      PL-Talton-6.)
15 BY MR. HONIK:
16      Q.   Do you have that in front of
17 you, Mr. Talton?
18           MR. TRISCHLER:  No, we're
19      still looking for it.
20           He has it now, Ruben.
21           MR. HONIK:  Thank you.
22 BY MR. HONIK:
23      Q.   As I stated, this is Tab 3,
24 I think we're up to Exhibit 6, sir.

Confidential Information - Subject to Protective Order

Page 242

1    It is essentially a ten-page
2  document.  The first page is just the
3  metadata page that reveals native format
4  information, and then there are nine
5  pages.
6         And you'll see that this is
7  part of the 2013 DMF from Mylan.  Do you
8  see it?
9      A.   Yeah.
10      Q.   And this particular section
11  is 3.2.S.2.  Do you see that?
12      A.   Yeah.
13      Q.   And once again, this
14  pertains to the manufacturing process
15  development that was submitted by Mylan's
16  own process development scientists in
17  support of the DMFs approval by the U.S.
18  FDA, correct?
19      A.   Yes, this appears to be a
20  section from that drug master file.
21      Q.   Right.  And just to be
22  certain about this, you didn't review
23  this either before today, right?
24      A.   No.

Page 243

1      Q.   And you're literally looking
2  at this DMF section for the first time
3  concerning valsartan?
4      A.   Yes.
5      Q.   If you turn to the last
6  page, the one that is paginated 9.  Do
7  you have that in front of you?
8      A.   Yes.
9      Q.   Do you see in the middle
10  there's a heading marked Risk Assessment?
11      A.   Yes.
12      Q.   And then there are a number
13  of statements in that statement including
14  the one that begins with the words, "The
15  synthetic process is critically
16  evaluated."
17         Do you see that?
18      A.   Yeah.
19      Q.   And we talked about this a
20  little bit.  But contextually it's
21  important to go back to this.
22         What does the term or
23  concept "critically evaluated" mean in
24  connection with the synthetic process?

Page 244

1         MR. TRISCHLER:  Objection to
2  form.
3         THE WITNESS:  The term "risk
4  assessment"?
5  BY MR. HONIK:
6      Q.   Correct.
7      A.   I'm sorry, what was your
8  question?
9      Q.   Well, the question was,
10  what's the definition of critically
11  evaluated, and I think you answered it.
12  It refers to a risk assessment, right?
13         MR. TRISCHLER:  Objection to
14  form.
15         THE WITNESS:  All I can
16         state is what's interpreted here
17         and they describe what they did as
18         part of their assessment.
19  BY MR. HONIK:
20      Q.   Right.  A critical
21  evaluation is a risk assessment, in this
22  context, for impurities, right?
23      A.   Impurities are covered in
24  this subsection, but it's not only

Page 245

1  related to impurities.
2      Q.   Correct.  In this section it
3  is about impurities, correct?
4      A.   No.  This section talks
5  about product drying temperature.  They
6  talk about some of the additions,
7  maintenance, dealt with temperature and
8  impurities.  So it's comprehensive.
9      Q.   Agreed.  The section we're
10  focused on at the moment, however, deals
11  with impurity profile, right?
12         MR. TRISCHLER:  Objection to
13  form.  I think he's looking at a
14  different section than you are,
15  Ruben.
16         THE WITNESS:  I'm on Page 9
17  under Risk Assessment.  And he
18  asked me does this section deal
19  with impurities.
20         And based on my look at this
21  section, there is a part of that
22  that is dealing with impurities.
23  But there's also additional risk
24  assessment part of the evaluation,

Confidential Information - Subject to Protective Order

Page 246

1  which includes process parameters,
2  et cetera.
3  BY MR. HONIK:
4      Q.   Right.  And maybe I didn't
5  make myself clear.  I wanted you to look
6  at the sentence that reads as follows:
7          "The synthetic process is
8  critically evaluated for impurity profile
9  and the following impurities were
10 synthesized in R&D."
11         Do you see that sentence?
12     A.   Yes.
13     Q.   And that section of this
14 heading, Risk Assessment, deals
15 specifically with a statement by Mylan,
16 which it conveyed to the FDA in its DMF
17 filing, of the impurities that were
18 synthesized in its research and
19 development lab, correct?
20     A.   It just lists the
21 impurities, that they were -- they were
22 obvious potential impurities and they
23 described them here, those impurities
24 that --

Page 247

1      Q.   You recognize the three
2  listed impurities as related substance
3  impurities, correct?
4      A.   I mean, many times the word
5  related compound, related substance,
6  impurity, those are used interchangeably.
7  So I can't say exclusively I would refer
8  to them as related substance.
9      Q.   And you agree that Mylan did
10 not list n-nitrosos or any nitrosamines,
11 correct?
12     A.   They don't appear on this
13 page.
14     Q.   Okay.  And you and I looked
15 at how the guidelines require identifying
16 n-nitrosos or nitrosamines as potential
17 genotoxic impurities, correct?
18         MR. TRISCHLER:  Objection to
19     form.
20         THE WITNESS:  There was a --
21     there was a compliance statement
22     with respect to that guidance.
23         But this -- my understanding
24     is this would have been true and

Page 248

1  accurate at the time that this
2  document was written.
3  BY MR. HONIK:
4      Q.   Do you agree that if Mylan
5  either knew or could have known that its
6  valsartan process, and specifically with
7  respect to the treatment of recovered
8  solvents, had the potential for causing a
9  nitrosamine to develop, that it was
10 obligated to reveal it?
11         MR. TRISCHLER:  Objection to
12     the form.  Objection.  Asked and
13     answered.  Objection.  Beyond the
14     scope of the designation.
15         THE WITNESS:  And based on
16     the inquiries from the regulators
17     and our investigations, that was
18     unknown until 2018.
19 BY MR. HONIK:
20     Q.   Right.  So your answer isn't
21 responsive to my question.
22         My question is this:
23         If Mylan knew, that is, had
24 actual knowledge, or could have known,

Page 249

1  that a nitrosamine could be produced in
2  the recovered solvent process, that it
3  had an obligation to reveal it.
4          MR. TRISCHLER:  Same
5      objection.
6          THE WITNESS:  You're asking
7      a hypothetical.
8          And what I'm telling you is
9      at the time this document was
10     written, there was no knowledge of
11     that, otherwise they would have
12     disclosed it.
13 BY MR. HONIK:
14     Q.   I accept that that's your
15 sworn testimony, sir.  I accept that.
16         If, on the other hand, Mylan
17 could have known that a nitrosamine was
18 capable of being produced in the
19 recovered solvent process that it itself
20 described in its own internal lab
21 documents, did it have an obligation
22 under the guidelines, as you understand
23 them as head of global regulatory
24 affairs, to reveal it?

Confidential Information — Subject to Protective Order

Page 250

1    MR. TRISCHLER: Objection to
2 the form. Objection. Asked and
3 answered.
4    THE WITNESS: There was no
5 knowledge of that.
6 BY MR. HONIK:
7    Q.   Sir, I'm going to continue
8 to ask this question until you give me an
9 answer, other than there was no
10 knowledge.
11    I'm asking you whether --
12 I'm asking you, sir, respectfully to tell
13 me whether if it was knowable by Mylan
14 that the recovered solvent process using
15 the materials that we've been looking at
16 all morning and afternoon was capable of
17 producing the genotoxic impurity that we
18 now know was in there, did it have an
19 obligation to reveal it?
20    MR. TRISCHLER: And I'd ask
21 respectfully that you have the
22 courtesy to do what you said you
23 were going to do at the outset of
24 the deposition, which is to give

Page 251

1 the witness an opportunity to
2 finish his answer before you
3 interrupted him.
4    I'll object to the question
5 as being argumentative and asked
6 and answered and beyond the scope.
7    If you can answer it again,
8 go ahead.
9    THE WITNESS: I don't know
10 how to answer the question, other
11 than the way I've answered it
12 every other time it's been asked.
13    There was no knowledge that
14 such an impurity was being formed.
15 If they had that knowledge, they
16 would have disclosed that and
17 wouldn't have certified compliance
18 to the guidance.
19    You're asking a
20 hypothetical. I can't answer a
21 hypothetical.
22 BY MR. HONIK:
23    Q.   So you've said that if the
24 knowledge was capable of being known,

Page 252

1 that there was an obligation to reveal
2 it, correct?
3    MR. TRISCHLER: Objection to
4 form.
5    THE WITNESS: No, that's not
6 what I said. You misstated --
7 BY MR. HONIK:
8    Q.   You said that there was no
9 actual knowledge, but that if it was
10 known -- and that's all I'm getting at.
11 If it was known or knowable, there was an
12 obligation to reveal it, correct?
13    MR. TRISCHLER: Objection.
14 Argumentative. Objection. Asked
15 and answered. Go ahead.
16    THE WITNESS: Based on our
17 investigation it was unknown in
18 2018. So at the time this
19 document was written, there was
20 nothing to disclose other than
21 these impurities listed within
22 this document.
23 BY MR. HONIK:
24    Q.   Sir, let's look at -- let's

Page 253

1 take a look at previously marked Exhibits
2 Snider-20 and 15. 20 and 15.
3    (Previously marked
4 PL-Snider-15 and PL-Snider-20.)
5    MR. TRISCHLER: I don't seem
6 to have anything marked Snider-20
7 and 15 unless you are looking at
8 different numbers.
9    Can you describe the
10 documents, Ruben, and see if it's
11 the same thing as --
12    MR. HONIK: Let's go off the
13 video record, please.
14    THE VIDEOGRAPHER: The time
15 is 1:58 p.m. Going off the
16 record.
17    (Short break.)
18    THE VIDEOGRAPHER: The time
19 is now 2:02 p.m. Back on the
20 record.
21 BY MR. HONIK:
22    Q.   So first, thank you for your
23 patience. The document that I'm going to
24 use has previously been marked as

Confidential Information Subject to Protective Order

Page 254

1 Snider-20, and I understand you don't
2 have a hardcopy of it in front of you.
3 But there are just certain parts of it
4 that I'll share with you.
5         And for the benefit of the
6 record, the document was produced to us
7 in native format.  It's Bates stamped
8 MYLAN-MDL2875-0055 --
9         MR. TRISCHLER:  Ruben, we
10    can't hear you on this end.
11        MR. HONIK:  You can't hear
12    me right now?
13        MR. TRISCHLER:  Now I can.
14        MR. HONIK:  All right.
15        MR. TRISCHLER:  We didn't
16    hear your question.
17        I said now we can, we
18    couldn't hear the question.
19        MR. HONIK:  Okay.  I was
20    just simply identifying for the
21    record the document.
22 BY MR. HONIK:
23    Q.   Let me start over.
24        The document in question has

Page 255

1 actually previously been filed -- just
2 marked -- as Snider Exhibit 15 --
3        MR. DAVIS:  Oh, hang on,
4    Ruben, I thought you wanted 20
5    which is what I have up.
6        MR. HONIK:  Why don't you do
7    20.  15 is the attachment.
8        MR. DAVIS:  So you want --
9    do you want Plaintiff-Snider-20 or
10    15?
11        MR. HONIK:  15, please.
12        MR. DAVIS:  Okay.  We might
13    have to go off the record again
14    till I find this.  I'm sorry.
15        THE VIDEOGRAPHER:  The time
16    is 2:04 p.m.  Off the record.
17        (Short break.)
18        THE VIDEOGRAPHER:  The time
19    is now 2:10 p.m.  Back on the
20    record.
21 BY MR. HONIK:
22    Q.   Mr. Talton, first thing's
23 first, can you hear me?
24    A.   Yes.

Page 256

1        MR. HONIK:  And, Clem, can
2    you hear me?
3        MR. TRISCHLER:  Yes.
4        MR. HONIK:  That's a start.
5 BY MR. HONIK:
6    Q.   So I apologize for the
7 confusion.  I think the confusion lays in
8 the fact that we may or may not have
9 previously marked this document.  So at
10 the risk of stepping out of convention
11 we're just going to mark it anew.  And
12 we're going to give it -- Exhibit 6, I
13 think, we're up to.
14        MR. HONIK:  Is that right,
15    Michelle?
16        MR. DAVIS:  Exhibit 7.
17        MR. HONIK:  I beg your
18    pardon.  Exhibit 7.  Talton-7.
19        (Document marked for
20        identification as Exhibit
21        PL-Talton-7.)
22 BY MR. HONIK:
23    Q.   And, Mr. Talton, we're going
24 to screen share here.  It's a very long

Page 257

1 document, in excess of 90 pages.  And
2 suffice it to say I'm only going to show
3 you or contextualize for you one or two
4 pages, not to worry about all hundred of
5 them.
6        The first page, as a lot of
7 these documents are, Mr. Talton, describe
8 or reveal the native format.  So it tells
9 us what the file name is and its
10 creation, and you can see it's called
11 Valsartan Response to FDA Query, and it's
12 a 2018 pdf.
13        And for the benefit of your
14 counsel more than anyone, it's Bates
15 stamped 00552465.
16        So if we turn to the first
17 page of the document, you'll see,
18 Mr. Talton, it's a letter to Mylan
19 Laboratories Limited care of its agent
20 who you identified by name earlier, and
21 that's Michael Plastina.
22        I think they've got Wyoming
23 instead of West Virginia.  But that's
24 where he is in Morgantown.

Page 258

1    And you'll see, as I'm sure
2 you've seen in many other instances in
3 your job, it concerns, in this case, the
4 drug master file, the DMF for valsartan,
5 and it contains questions that the FDA is
6 posing to Mylan through its agent Michael
7 Plastina.
8    Do you see this form letter?
9    A.   Yes.
10   Q.   And you've seen letters like
11 this before, have you not?
12   A.   Yes.  Getting requests for
13 information from FDA is a very common
14 practice.
15   Q.   And among the common
16 practices is to ask for information
17 concerning a company's DMF filing, drug
18 master file, right?
19   A.   Yes.
20   Q.   And given the date of this
21 letter, in the summer of 2018, I think
22 you can see that, and you will see in a
23 moment more clearly, that it pertained to
24 the FDA's investigation concerning the

Page 259

1 recall of sartan drugs.  Are you aware of
2 that?
3    A.   Yes, I am aware of a recall
4 of valsartan containing products in 2018.
5    Q.   Fair enough.
6    So if we turn together,
7 deeper into the document to Page 1 of 14.
8 It's actually paginated that way at the
9 lower right.
10   Okay.  So here is 1 of 14.
11   And here is a question that
12 the FDA posed to Mylan in the summer of
13 2018, July.
14   It says, and I quote at
15 Number 1, "The Agency has tested samples
16 from three batches of your API and found
17 they contained NDEA.  Based on the
18 information provided in your DMF" --
19 that's what we've been looking at
20 together -- "the components that form
21 NDEA do not seem to be present in your
22 process.  We have the following
23 questions/requests:"
24   Do you see that, sir?

Page 260

1    MR. TRISCHLER:  Just
2 objecting to the form and
3 predicates that I think are not
4 factually accurate.
5    But go ahead.
6    MR. HONIK:  I'm at a loss to
7 understand your objection.  All I
8 did was the sentence and asked if
9 I read it correctly.
10   MR. TRISCHLER:  Okay.  We
11 have -- you represented that this
12 was a July 2018 inquiry.  I'm
13 looking at the top of the document
14 and it references November 13,
15 2018.
16   Neither I, nor the witness,
17 have had an opportunity to see the
18 whole document, given the nature
19 of how it's being presented,
20 Ruben.
21   And all I'm doing is
22 objecting to the predicate
23 statement that you've made
24 regarding this response letter

Page 261

1 having been submitted in June or
2 July.
3    I don't think that's -- that
4 does not appear to be the case.
5    That's the nature of my
6 objection.
7    MR. HONIK:  The question is
8 did I read the sentence correctly.
9    MR. TRISCHLER:  That wasn't
10 the entire question, but go ahead.
11 BY MR. HONIK:
12   Q.   Mr. Talton, the question is
13 to you, not your lawyer.  Did I read the
14 sentence correctly?
15   A.   Yes.
16   Q.   And do you understand the
17 sentence to be an inquiry from the FDA to
18 Mylan, whether it occurred in November or
19 July of 2018, regardless of the date, do
20 you recognize it as a question that the
21 FDA had for Mylan?
22   A.   Yes, I recognize it as an
23 inquiry that we received from FDA in
24 November of 2018 asking us to provide a

Page 262

1 response to this comment.
2       Q.   And the question they asked
3 was, having tested three batches of its
4 API and finding NDEA, FDA can't figure
5 out where that would have come from, the
6 NDEA, based on what Mylan revealed in its
7 DMF and could it please provide a
8 description of some plausible mechanism
9 for how the impurity got in there.
10      Isn't that right?
11          MR. TRISCHLER:  Objection to
12      form.
13          THE WITNESS:  Based on this
14      statement they are just asking us
15      to provide a plausible mechanism
16      of how that impurity might be
17      found in our drug substance.
18 BY MR. HONIK:
19      Q.   Correct.  But contextually
20 it said, the FDA said, that they couldn't
21 figure it out based on the DMF that Mylan
22 had filed with the FDA.  Isn't that also
23 what it says?
24          MR. TRISCHLER:  Objection to

Page 263

1      form.
2          THE WITNESS:  The comment
3      from FDA was based on the
4      information provided in the DMF.
5          The components that form
6      NDEA do not seem to be present in
7      your process.
8 BY MR. HONIK:
9      Q.   That's right.
10      A.   That's what FDA --
11      Q.   They're saying they couldn't
12 figure out, based on what Mylan revealed
13 in its DMF, how NDEA could have plausibly
14 gotten into the valsartan.  Isn't that
15 what they were saying?
16          MR. TRISCHLER:  Objection to
17      form.  Objection.  Asked and
18      answered.
19          THE WITNESS:  Based on the
20      comment as written here, they are
21      just stating for us to help them
22      understand how that might be
23      possible.
24 BY MR. HONIK:

Page 264

1      Q.   Correct.  Because they
2 couldn't figure it out on their own based
3 on Mylan's submission of its DMF to the
4 federal drug agency, right?
5          MR. TRISCHLER:  Objection to
6      form.  Objection.  Asked and
7      answered.
8          THE WITNESS:  "Based on the
9      information provided in your drug
10      master file, the components that
11      form NDEA do not seem to be
12      present in your process."
13 BY MR. HONIK:
14      Q.   Right.
15      A.   That's what FDA stated.
16      Q.   Right.  So they are now
17 asking Mylan to provide some plausible
18 mechanism for why this impurity is being
19 found in your drug substance.  That's
20 what the question is, right?
21      A.   Yes.  They're asking us to
22 help them understand how that might
23 happen.
24      Q.   Correct.  Because they

Page 265

1 couldn't figure it out based on the DMF,
2 right?
3          MR. TRISCHLER:  Objection to
4      form.  Objection.  Asked and
5      answered.
6          THE WITNESS:  All I can --
7      all I can state is what's written
8      in the letter from FDA, which I've
9      said two times already.
10          Based on the information in
11      your DMF, the components that form
12      do not seem to be present.  Help
13      us understand this.
14 BY MR. HONIK:
15      Q.   And so as latest, as you
16 pointed out, November of 2018, the
17 regulatory agency that you interact with
18 and that Mylan has an obligation to
19 comply with, couldn't understand how NDEA
20 got in there and it was asking Mylan to
21 describe how it could have happened,
22 right?
23      A.   They are asking us to
24 provide a plausible mechanism for why

Confidential Information Subject to Protective Order

Page 266

1 that impurity might be found in our drug
2 substance.
3      Q.   Correct.  And it was asking
4 Mylan in November of 2018 that very
5 question, right?
6      A.   It appears that this -- that
7 query came in a correspondence dated
8 November 13, 2018.
9      Q.   Okay.  And the response is
10 below.
11           Did you or someone at your
12 direction in regulatory affairs prepare
13 this response?
14      A.   I did not prepare this
15 response.  As I previously testified, an
16 inquiry into the drug master file holder
17 would be communicated to the DMF holder
18 and then they would provide the written
19 responses to provide back to what the
20 agent for submission.
21      Q.   Okay.  Can I unpack that a
22 little bit and understand what you mean?
23           Do you mean to say that
24 Michael Plastina gets the question and

Page 267

1 then gives it to someone to answer, is
2 that what you mean?
3      A.   I previously described the
4 U.S. agent role for drug master files.
5 So FDA requires you have a U.S. agent if
6 you are a foreign -- if you're located in
7 a foreign country.
8           So Michael would be the
9 recipient of the communication.  He in
10 turn would send it or disseminate the
11 information to the API science team who
12 prepares and maintains the drug master
13 file.
14      Q.   And the API science team
15 is -- are the Mylan employees in India
16 who are responsible for manufacturing the
17 API; is that correct?
18      A.   It's the regulatory science
19 team.  So it's the team led by Imtiyaz
20 Basade that I referred to earlier.
21      Q.   So you are -- you are the
22 senior manager of the regulatory science
23 team, aren't you?
24      A.   The regulatory science teams

Page 268

1 do report into me, yes.
2      Q.   Okay.  So a team that you
3 have managerial responsibility for gets
4 this question and they are the ones that
5 supply the response, correct?
6      A.   Yes, the scientists.
7      Q.   Okay.  And you mentioned one
8 scientist by name, and I apologize to you
9 because I couldn't hear you quite well.
10           Could you tell me the name
11 of the scientist that you named that got
12 this inquiry?
13      A.   Well, it would have came --
14 it would have came to the U.S. agent
15 Michael Plastina, and he in turn would
16 have sent it to the DMF team.  That team
17 is led by Imtiyaz Basade.
18      Q.   Okay.  And Basade is a
19 report to you, right?
20      A.   He is.  As -- as I talked
21 about earlier he has a dual role.  He has
22 API science, as well as emerging markets
23 from a regional perspective.
24      Q.   Are there any intermediate

Page 269

1 reports between Basade and you?
2      A.   He has a dual management, so
3 he reports to me as well as to the R&D
4 head.
5      Q.   And who is that as of late
6 2018?
7      A.   I can't remember.
8 Apologies.
9      Q.   Okay.  So Plastina gets the
10 question, the letter, sends it to your
11 direct report Basade, and then Basade and
12 any of his underlings undertake to
13 prepare a response.  Is that correct so
14 far?
15      A.   Well, Imtiyaz who leads the
16 API science team would work with R&D to
17 prepare the response.
18      Q.   Okay.  And you don't
19 remember either the head of the R&D at
20 the time or anyone that might have worked
21 on this response?
22      A.   Not specifically in India,
23 no.
24      Q.   Okay.  Who in addition to

Page 270

1 the R&D team would Basade have worked
2 with?
3        A.    I don't know.  You'd have to
4 ask Imtiyaz that.
5        Q.    And I think you
6 identified -- I don't know if it's a
7 separate team, but I think you referred
8 to a DMF team, didn't you?
9        A.    Well, Imtiyaz leads the team
10 that prepares the DMF.
11        Q.    I apologize, but I'm having
12 a hard time understanding you.  Who --
13        A.    From a volume perspective or
14 I'm not being clear in my explanation?
15        Q.    Both from a volume
16 perspective and you're saying the proper
17 names quickly, and I apologize, with your
18 accent I'm having trouble making out the
19 name.
20            Who is in charge of the DMF
21 team?
22        A.    Imtiyaz Basade.
23        Q.    Okay.  So Basade heads up
24 the DMF team.  And you don't know the

Page 271

1 name of the R&D head at the time; is that
2 right?
3        A.    He would have worked with
4 the local R&D in India.  No, I do not
5 know who that was in 2018.
6        Q.    Okay.  So procedurally,
7 Basade gets it as the head of DMF who is
8 a direct report of yours, works with the
9 local R&D head and together they prepared
10 the response that we see here in exhibit
11 whatever we're up to, right?
12        A.    They will work together to
13 prepare the response, yes.
14        Q.    And when that response is
15 finalized, who sees it next?
16        A.    Once the submission was
17 finalized it would go back to Michael
18 Plastina to submit to FDA.
19        Q.    Okay.  Does anybody in
20 global regulatory affairs, that is to say
21 your office, review the response prepared
22 by Basade and any R&D people he consults?
23        A.    No.
24        Q.    Why is it kept strictly with

Page 272

1 the folks at the DMF and local R&D?
2        A.    Well, we talked about that
3 earlier today, but a drug master file by
4 nature is a confidential document.  And
5 as I mentioned before, this is a separate
6 business.  So I won't even see this type
7 of communication because it would go to
8 the U.S. agent, then to the DMF team,
9 back to the agent and then to the FDA.
10        Q.    And am I correct --
11        A.    We only incorporate -- can I
12 finish?  We only incorporate the content
13 of the drug master file through a letter
14 of authorization.  We don't actually
15 submit the drug master file in our
16 applications.
17        Q.    And is it correct that in
18 preparation for today, and despite the
19 separation that you've now described to
20 me a number of times, you nonetheless
21 didn't look at any of these documents in
22 preparation for your testimony, correct?
23        A.    No, I never said that.  I
24 said I didn't review the DMF in its

Page 273

1 entirety.  But communications to and from
2 the agencies I did take a look at.
3        Q.    Okay.  Did your review
4 include communications to and from the
5 FDA like the document we're looking at?
6 Have you seen this before?
7        A.    Yes, in preparation for
8 today's testimony, yes, I reviewed this.
9        Q.    Okay.  So let me back up a
10 step here.
11            MR. HONIK:  So, John, what
12        is the name -- the number of this
13        exhibit?
14            MR. DAVIS:  Exhibit 7.
15 BY MR. HONIK:
16        Q.    You've seen Exhibit 7 before
17 today?
18        A.    Yes.
19        Q.    Okay.  And you looked at it
20 specifically to prepare for today; is
21 that right?
22        A.    Yes.
23        Q.    Why did you look at this
24 document to prepare for today?

Confidential Information - Subject to Protective Order

Page 274

1    A.   It was my understanding that
2 I was designated to speak on
3 communications with FDA with respect to
4 these filings.
5         This is a communication
6 directly to the FDA.
7    Q.   Okay.  And when you saw the
8 question here, and you saw the response,
9 did it trigger in you any interest in
10 looking at the DMF which is the subject
11 of the FDA's question?
12    A.   No.
13    Q.   When you read the question
14 in preparation for today, did you
15 understand that the FDA was unable to
16 determine, by looking at Mylan's DMF,
17 what in the process could have produced
18 the NDEA?  Did you understand that when
19 you first read it in preparation for
20 today?
21         MR. TRISCHLER:  Objection.
22 Asked and answered.
23         THE WITNESS:  We've already
24 been through this.  But all I can

Page 275

1    tell you is what's -- what's
2    stated here is the FDA asked us to
3    help them understand how that
4    might be possible.
5 BY MR. HONIK:
6    Q.   And in the response Mylan
7 says that triethylamine is used as a base
8 in Stage I of the process for valsartan
9 VST.  Do you see that?
10    A.   Yes.
11    Q.   And I think you told me
12 earlier in your sworn testimony that you
13 didn't remember VST as a code for
14 valsartan.  Does this refresh your
15 recollection?
16         MR. TRISCHLER:  Objection to
17 the form.
18         THE WITNESS:  No.  I
19 acknowledge that I recognize the
20 VST.  It was VDL or some other
21 code that I was not familiar with.
22 BY MR. HONIK:
23    Q.   Fair enough.
24



Page 276

Page 277

Confidential Information – Subject to Protective Order

Page 278



Page 280

¹ think there was a determination
² that that would be the appropriate
³ process to use going forward
⁴ because it wouldn't give rise to
⁵ the impurity, based on the
⁶ conclusion of the investigation.
⁷ BY MR. HONIK:
⁸     Q.   That's exactly what I asked
⁹ you, sir.
¹⁰     I asked you whether you
¹¹ didn't come to realize by review of
¹² documents before today's testimony that
¹³ the VAA process did not introduce NDEA
¹⁴ and that Mylan was going exclusively with
¹⁵ that process.
¹⁶     You've now confirmed that
¹⁷ you were aware of that, correct?
¹⁸     A.   That was part of the
¹⁹ investigation which I have acknowledged
²⁰ that I have reviewed.
²¹     Q.   And that's all I want to
²² establish.
²³     Sitting here today, you know
²⁴ that VAA was a process that didn't

Page 279

¹ BY MR. HONIK:
²     Q.   Well, when you prepared for
³ today, did you see anything that
⁴ indicated to you that VAA replaced the
⁵ VST because VAA doesn't produce
⁶ nitrosamines?
⁷     A.   That was an alternate
⁸ process that was developed at some point.
⁹ For what reason, I don't know.  I'm not
¹⁰ the right person to answer that.
¹¹     But to answer this specific
¹² question from FDA, they were putting it
¹³ in context to explain the differences.
¹⁴     Q.   Right.  You haven't answered
¹⁵ my question, sir.
¹⁶     My question is, did you see
¹⁷ anything in preparation for today which
¹⁸ confirmed to you the VAA process did not
¹⁹ introduce any nitrosamines into
²⁰ valsartan?
²¹     MR. TRISCHLER:  Objection to
²² form.  Vague as to time.
²³     THE WITNESS:  I mean,
²⁴ following the investigation, I

Page 281

¹ introduce NDEA and that's exclusively
² what Mylan would be using to produce
³ valsartan, correct?
⁴     MR. TRISCHLER:  Objection to
⁵ form.
⁶     THE WITNESS:  Following the
⁷ conclusion of the investigation,
⁸ Mylan did move to the VAA process
⁹ as a way to remediate the issue.
¹⁰ BY MR. HONIK:
¹¹     Q.   And the response that we're
¹² looking at in Exhibit 7 confirms that
¹³ that process code, that process
¹⁴ manufacturing was available as of
¹⁵ November 2017, correct?
¹⁶     MR. TRISCHLER:  Objection to
¹⁷ form.
¹⁸     THE WITNESS:  This states
¹⁹ when the amendment was filed.  But
²⁰ that was -- we did not have
²¹ knowledge at that time there was
²² an issue with the VST process.  So
²³ that's why you have to look at it
²⁴ in complete context.

Page 282

BY MR. HONIK:

Q.   Mylan had an approved DMF as of 2017 for the VAA process code, correct?

MR. TRISCHLER:  Objection to form.

THE WITNESS:  Can you repeat that, please?

BY MR. HONIK:

Q.   Mylan had an approved DMF by the United States Food and Drug Administration in 2017 for VAA, which is a process for valsartan that does not introduce NDEA, correct?

MR. TRISCHLER:  Same objections.

THE WITNESS:  First of all, I need to clarify, drug master files are not approved.  Okay?  They are reviewed in context with an applicant's submission.

They are never reviewed -- they are never approved.

BY MR. HONIK:

Page 283

Q.   Okay.  Mylan as of 2017 had a fully reviewed DMF by the FDA which sent no rejections, which it can do, right?  DMFs can be rejected, correct?

A.   They can be found deficient, yes.

Q.   Okay.  Have there been any deficiencies to your knowledge as head of regulatory affairs of the 2017 VAA DMF that Mylan filed?

A.   I'd have to go look in -- back and look at the DMF correspondence subsequent to that amendment.  I don't -- don't know sitting here today.

Q.   Okay.  Sitting here today, you don't know of any, do you?

A.   Like I said, I'd have to go back and look at the regulatory record in order to answer your question.

Q.   But suffice it to say, as of 2017, Mylan had available to it a process code, that is, a way to manufacture valsartan, that would be free of nitrosamines, correct?

Page 284

A.   There was an alternate process registered, but we also talked about earlier that it is not unusual to have multiple processes within a single DMF because this -- this material was supplied to various markets, including the U.S., but in other markets as well.

Q.   Why did not -- why did not Mylan reveal the alternate process, which is free of nitrosamines, to the FDA before November 2018?

MR. TRISCHLER:  Objection to form.

THE WITNESS:  There was no knowledge -- until the investigation was completed, there was no knowledge there was an issue with the current process.

And just because a drug master file contains multiple processes does not mean that you can use it in the manufacture of your finished dosage form.

MR. HONIK:  Let's take a

Page 285

look at Tab 6, please.

(Document marked for identification as Exhibit PL-Talton-8.)

MR. HONIK:  We're going to mark that as Talton Exhibit 8.

MR. TRISCHLER:  I found it. Sorry.

BY MR. HONIK:

Q.   Do you see that this document is also part of the drug master file, again 3.2.S.2.

Do you see that?

A.   Yes.

Q.   If you can turn to the very first page which is the native format information.  You see it's a document generated in June of 2013.

Do you see that?

A.   Yes.

Q.   If you turn with me to the page that's actually numbered Number 4, lower right-hand corner.  This is the part of the drug master file on valsartan

Confidential Information - Subject to Protective Order



Page 286

¹ submitted by Mylan that provides the
² process description.
³       Do you see that?
⁴     A.   Yes.
⁵     Q.    And here it breaks out in a
⁶ way you weren't able to discern earlier,
⁷ that F and R are for fresh and recovered.
⁸ Do you see that?
⁹     A.   Yes.  It's clear on this
¹⁰ text.
¹¹     Q.   Okay.  And so you'd agree
¹² that when we saw F and R before, that it
¹³ meant fresh and recovered, right?
¹⁴       MR. TRISCHLER:  Objection to
¹⁵     form.
¹⁶       THE WITNESS:  I would assume
¹⁷     that's what those mean.
¹⁸ BY MR. HONIK:
¹⁹

Page 288

Page 287

Page 289

Confidential Information Subject to Protective Order

Page 290



Page 292

the form. Objection. Asked and
answered.

THE WITNESS: There -- there
was no knowledge that there was an
issue or concern with the process
as registered.
BY MR. HONIK:

Q. Well, that's a conclusion.
I'm not at the conclusion. I'm asking
you simply if the guidance requires that
if there is a solution, a process,
anything, any part of the manufacturing
process that has the potential for
introducing a genotoxic impurity, that it
has to be first identified. And if
there's an alternative, to turn to the
alternative in place of the genotoxic
potential. Isn't that the guideline
standard?

MR. TRISCHLER: Objection.
Asked and answered.

THE WITNESS: As I
previously testified, there was no
requirement to specify how

Page 291

BY MR. HONIK:

Q. Okay. And the guidance that
the European FDA counterpart gave Mylan,
which Mylan claimed compliance with to
the U.S. FDA, specifically says, no
matter the agent, no matter the
intermediary, no matter what it is, if
you're using it in your process to make
an API, to make a finished dose, and it
has the potential to be a genotoxic
impurity, that it has to be identified,
and indeed if there is an alternative,
you have to use the alternative, didn't
we see that together?

MR. TRISCHLER: Objection to

Page 293

recovered solvents might be used
in a drug master file.

For a drug master file in
the U.S., you just have to
register the specifications by
which a solvent must adhere to,
prior to use.
BY MR. HONIK:

Q. But if the recovery process
introduces materials, intermediates,
agents of any sort that have a genotoxic
potential, either known or knowable under
the guideline we looked at, that has to
be identified, isn't that correct?

MR. TRISCHLER: Objection.
Asked and answered.

THE WITNESS: There was no
such knowledge that existed.
BY MR. HONIK:

Q. Sir, I'm not asking --

A. Whether you -- can I
complete my sentence, please? Can I
complete my answer?

Q. I'd rather you not because

Confidential Information - Subject to Protective Order

Page 294

¹ you're just repeating yourself.
²            Instead, I want to point out
³ to you that I'm not asking how the
⁴ guidelines --
⁵            MR. TRISCHLER:  The witness
⁶ is -- this is -- this is rude.
⁷            THE WITNESS:  There's a
⁸ fundamental --
⁹            MR. TRISCHLER:  He has a
¹⁰ fundamental right to finish his
¹¹ answer.  You've told him that, and
¹² now you're refusing to permit him
¹³ to do it.  You are complaining
¹⁴ about repeating.  I could complain
¹⁵ about a question being asked 42
¹⁶ times in this deposition.
¹⁷            MR. HONIK:  Let me assure
¹⁸ you --
¹⁹            MR. TRISCHLER:  Let the
²⁰ witness -- let the witness answer
²¹ the question, please.  That's what
²² he's always asked.
²³            MR. HONIK:  Let me assure
²⁴ you -- let me assure you of

Page 295

¹ something.  If you want to pause
² the deposition and get Judge
³ Vanaskie on the line or present to
⁴ him this video and the last eight
⁵ or ten questions or any grouping
⁶ of eight or ten questions, we can
⁷ do that.
⁸            But the witness respectfully
⁹ is not being responsive to my
¹⁰ question.  And the repetition is
¹¹ not occurring from me for no
¹² reason.  It's occurring because
¹³ the witness isn't responding to
¹⁴ the pending question.
¹⁵            Now, as a point of
¹⁶ clarification to Mr. Talton to
¹⁷ help him, help all of us, I'm
¹⁸ pointing out that I'm not asking
¹⁹ how the guideline applies in this
²⁰ case to Mylan.
²¹ BY MR. HONIK:
²²      Q.   I'm merely asking if the
²³ guideline in your reading, Mr. Talton,
²⁴ doesn't require someone who claims

Page 296

¹ compliance with the guideline to identify
² any agent, any intermediary, any part of
³ the process that has a genetic impurity
⁴ potential to be identified, the answer to
⁵ which is yes, no, or you don't know?
⁶            MR. TRISCHLER:  Ruben, I
⁷ don't -- I don't need you to help
⁸ the witness.  I need you to allow
⁹ the witness to answer the
¹⁰ question question.
¹¹            MR. HONIK:  I've reframed --
¹²            MR. TRISCHLER:  I'm
¹³ responding to --
¹⁴            MR. HONIK:  I have reframed
¹⁵ the question --
¹⁶            MR. TRISCHLER:  I'm
¹⁷ responding to your speech as I'm
¹⁸ entitled to.
¹⁹            MR. HONIK:  I have reframed
²⁰ the question.  I don't want you to
²¹ interrupt.  There's a new pending
²² question.
²³            If you have an objection,
²⁴ simply state it.

Page 297

¹            MR. TRISCHLER:  I'm
² objecting that the question has
³ been asked and answered.
⁴            MR. HONIK:  It's noted.
⁵ BY MR. HONIK:
⁶      Q.   Answer the question,
⁷ Mr. Talton.
⁸      A.   If one had knowledge of that
⁹ in that time period, yes, it would need
¹⁰ to be disclosed.  But we had no knowledge
¹¹ of that type of impurity at that point in
¹² time based on the investigation.
¹³            And the point I wanted to
¹⁴ make earlier, which I think is relevant
¹⁵ for you to understand with respect to
¹⁶ drug master files, when solvents are
¹⁷ used, whether they are fresh or
¹⁸ recovered, in the U.S. you are required
¹⁹ to register those specifications.
²⁰            But whether it's virgin or
²¹ recycled, you still have to adhere to the
²² same quality standard.  I think that's
²³ important to know.
²⁴      Q.   That's your answer, is that

Confidential Information - Subject to Protective Order

Page 298

¹ your complete answer?
² A. Yes.
³ Q. Thank you.
⁴ MR. HONIK: Let's bring up
⁵ Glover previously marked
⁶ Exhibits 30 and 31, please.
⁷ (Previously marked
⁸ PL-Glover-30 and PL-Glover-31.)
⁹ BY MR. HONIK:
¹⁰ Q. Do you have those in front
¹¹ of you, sir?
¹² A. Not yet.
¹³ MR. TRISCHLER: The witness
¹⁴ now has those documents, Ruben.
¹⁵ BY MR. HONIK:
¹⁶ Q. Do you see Glover-30 is an
¹⁷ e-mail exchange between Dr. Gomas and
¹⁸ Dr. Owens in the first instance,
¹⁹ March 20, 2019?
²⁰ A. Yes.
²¹ Q. And you see the attachments
²² in the upper part of the e-mail thread,
²³ refers to a valsartan FDA doc.
²⁴ A. I see reference to that

Page 299

¹ attachment.
² Q. And so Glover-31 is that
³ attachment. It was used with Dr. Glover,
⁴ Mr. Glover.
⁵ And you see that it pertains
⁶ to an investigation at Lantech. Do you
⁷ see that?
⁸ A. Yes.
⁹ Q. And there are a series of
¹⁰ questions and responses beginning on the
¹¹ first of the two pages that comprise
¹² Glover-31.
¹³ If you turn to the second
¹⁴ page. The last of the questions,
¹⁵ Number 4, reads: "Were they removed from
¹⁶ our DMFs if ever" -- "if they were ever
¹⁷ included?"
¹⁸ And the response here is,
¹⁹ "Since solvent recovery processes are not
²⁰ part of any of our API DMFs, Lantech is
²¹ not part of any of our DMF submissions."
²² Do you see that?
²³ A. Yes.
²⁴ Q. So this is a statement you

Page 300

¹ made to me previously, which is
² confirming that the solvent recovery
³ process, although known to Mylan
⁴ employees at Matrix, were not made part
⁵ of any submission of the DMF to the FDA,
⁶ correct?
⁷ A. Based on the guidelines in
⁸ place at the time, there was no
⁹ requirement to disclose solvent recovery
¹⁰ centers.
¹¹

Page 301

¹

Confidential Information – Subject to Protective Order

Page 302

[REDACTED]

10    Q.    Well, you agree that the FDA
11 wanted to know in 2018, right?
12    A.    Wanted to know what?
13    Q.    It wanted to know how it was
14 possible based on the DMF submission by
15 Mylan, how NDEA could have gotten in
16 there?
17        MR. TRISCHLER:  Objection.
18    Asked and answered.
19        THE WITNESS:  They sent us
20    an inquiry and asked us to help
21    them understand how that could
22    have happened.
23 BY MR. HONIK:
24    Q.    Correct.  And had Mylan

Page 303

1 revealed the recovery process earlier,
2 the FDA would have never asked that
3 question because it would have known,
4 correct?
5        MR. TRISCHLER:  Objection to
6    form.  Calls for speculation.
7        THE WITNESS:  That's not
8    possible to answer that question.
9        As I mentioned before, when
10    all this -- when this issue arose,
11    it resulted in an investigation.
12    It wasn't until the completion of
13    that investigation where it was
14    determined what the root cause
15    was.
16        And once the root cause was
17    determined, we took the
18    appropriate action.
19        MR. HONIK:  Let's take a
20    look at Tab 13, please.
21        (Document marked for
22    identification as Exhibit
23    PL-Talton-9.)
24        MR. TRISCHLER:  Can we take

Page 304

1 a restroom break when you're done
2 with this document?
3        MR. HONIK:  Yeah.  I may, in
4    fact, not ask any questions about
5    this.  So if you have a minute or
6    two for a couple predicates, we'll
7    take a break, okay?
8        MR. TRISCHLER:  Yeah, that's
9    fine.  Whenever you're done with
10    it.
11 BY MR. HONIK:
12    Q.    Mr. Talton, are you familiar
13 or have you been familiar either through
14 your considerable job experience or
15 preparation for today, with 21 C.F.R.
16 Section 211.1 which has to do with cGMP
17 standards for pharmaceuticals?
18        I'm not referring to the
19 document, sir.
20    A.    Valsartan, my area of
21 responsibility.  But I'm aware that
22 pharmaceutical products are required to
23 be manufactured in compliance with
24 current good manufacturing practice.

Page 305

1    Q.    And do you know as a general
2 proposition that there is a specific Code
3 of Federal Regulation, namely at 21
4 Section 211 that speaks to that and deals
5 with that?
6    A.    That sounds right.  I don't
7 have that C.F.R. reference to memory,
8 but...
9    Q.    And just as almost an aside,
10 are you aware that that C.F.R. dealing
11 with current good manufacturing process
12 standards applies to both human and
13 animal drugs?
14    A.    It is my understanding it
15 applies generally to all pharmaceutical
16 products.
17    Q.    Okay.  But specifically it
18 applies, in the context, somewhat
19 ironically, to both animal and human
20 drugs, correct?  I mean you said it when
21 you said all pharmaceutical products,
22 right?
23    A.    Yes.  Brand, generic, yes.
24 Products consumed for pharmaceutical use.

Page 306

1    Q.    Consumed either by humans or
2  animals, correct?
3    A.    There are separate
4  regulations for animal drugs.  We don't
5  really manufacture animal drugs.
6         MR. HONIK:  Okay.  Why don't
7  we take our break now.
8         THE VIDEOGRAPHER:  Okay.
9  The time is 2:57 p.m.  Off the
10 record.
11        (Short break.)
12        THE VIDEOGRAPHER:  The time
13 is now 3:05 p.m.  Back on the
14 record.
15 BY MR. HONIK:
16    Q.    So, Mr. Talton, when we
17 broke, we were looking -- starting to
18 look at exhibit -- this is 8, I believe.
19        MR. HONIK:  Are we up to 8?
20        MR. DAVIS:  This is
21 Exhibit 9.
22        MR. HONIK:  Thank you.
23 BY MR. HONIK:
24    Q.    Which is the Guidance for

Page 307

1  Industry, Drug Substance, Chemistry,
2  Manufacturing, and Controls Information.
3         Do you see that?
4    A.    Yes.
5    Q.    And you see it's dated
6  August 6, 2010, this guidance?
7    A.    Yes.
8    Q.    And as the name implies,
9  it's a guidance dealing with
10 manufacturing and controls information
11 and the need to impart that to
12 regulators, correct?
13    A.    I would characterize that as
14 a summary of the information that should
15 be included to describe the drug
16 substance in a regulatory application.
17    Q.    That's an even better
18 description.  And thank you for that.
19        So if you look with me at
20 Page Number 10, there are specific
21 guidelines enumerated here.
22        And again, this goes back to
23 2010.  The section is Number 2.  This is
24 part of Section B.  Let me just frame it

Page 308

1  with that, if I may.
2         If you go back to Page 7 --
3  I'm sorry, I misspoke.  If you go back to
4  Page 9, the preceding page, it says,
5  "Description of Manufacturing Process and
6  Process Controls."
7         Do you see that?
8    A.    Yes.
9    Q.    And it actually gives in
10 parens, the section of the DMF, I think
11 it corresponds to the DMF section where
12 that would come in, namely S.2.2.  Do you
13 see that?
14    A.    Yes.
15    Q.    And we've looked at -- we've
16 looked at numerous examples of sections
17 of the DMF corresponding to that section,
18 correct?
19    A.    We have referred to various
20 drug substance sections this morning.
21    Q.    And this section deals, in
22 fact, with descriptions of manufacturing
23 process and process controls, correct?
24    A.    Yes, that's the title of

Page 309

1  this section.
2    Q.    So if we look then at
3  Page 10 at Subpart two, it gives a rather
4  detailed guidelines and guidance to what
5  goes into the description and how it
6  should be described.  Specifically it
7  says, "Any process controls that are
8  considered critical process controls
9  should be highlighted."
10        Do you see where it says
11 that?
12    A.    Yes.
13    Q.    And then the bullet points
14 that come after that are specific
15 examples or detailed description of the
16 manufacturing process and process
17 controls that should be included.  Do you
18 see that?
19    A.    Yes.
20    Q.    And by the way, and I
21 apologize, I don't know that I asked you.
22 Did you say you've seen this guidance
23 before?
24    A.    I'm familiar with this

Page 310

1 guidance.
2 Q. Okay. And as head of -- as
3 global head of regulatory affairs, I mean
4 this would be one of the source documents
5 that provide guidance to Mylan in
6 complying with its obligations, correct?
7 A. It's one of many that we
8 might refer to.
9 Q. To be sure, there are any
10 number of guidances that may impact and
11 be followed, but this is one of them to
12 be sure, correct?
13 A. Yes, this -- this
14 memorializes the FDA's expectations of
15 what would be included in the drug master
16 file for a drug substance.
17 Q. That's perfect.
18     So if we look at the bullet
19 points together to be sure they want and
20 guide that there is a detailed
21 description of each manufacturing step,
22 correct?
23 A. The document states that.
24 Q. Starting materials and

Page 311

1 intermediate used in each step need to be
2 specified, correct?
3 A. That's stated as well.
4 Q. Solvents, reagents, and
5 auxiliary materials used in each step
6 with chemical or biological names and
7 quantities specified should be included
8 as well, correct?
9 A. That's also listed here.
10



Page 312

15 BY MR. HONIK:
16 Q. Okay. Maybe we'll some
17 other guidance that is clearer than this
18 one.
19     And then it goes on to
20 identify in quite detail the various
21 processes, for example, involving
22 combining intermediate or drug substance
23 batches, dilutants, and so forth. Do you
24 see that?

Page 313

1 A. Yes.
2 Q. If you turn with me to
3 Page 15. Any conceivable question about
4 whether recovery processes should be
5 included in a DMF or not is really
6 answered on this page.
7     Do you see the Subpart C,
8 Recovery?
9 A. Yes.
10 Q. And it says, and I quote,
11 "The use of recovered solvents and
12 recycling of filtrates to recover
13 reactants, intermediates, or drug
14 substance, including for the purpose of
15 producing or isolating additional
16 crystals, should be described in S.2.2,"
17 correct?
18 A. That's what's stated here.
19 Q. And, in fact, it says,
20 "Recovery operations should be adequately
21 controlled so impurity levels do not
22 increase over time."
23     Doesn't it say that?
24 A. It does state that.

Confidential Information - Subject to Protective Order

Page 314

1    Q.   And it's clear, sir, in
2  preparation for today that you can't
3  point to a single instance in which Mylan
4  revealed in its DMF to the FDA any aspect
5  of the recovered solvent process used in
6  valsartan API, correct?
7         MR. TRISCHLER:  Objection.
8     Asked and answered.
9         THE WITNESS:  It's not a
10    requirement here.  And what they are
11    putting here, and we did disclose
12    in the drug master file that
13    recovered solvents were being
14    used, we actually specified that.
15    So we did -- we did meet this
16    guidance.
17  BY MR. HONIK:
18



Page 315



4    Q.   And that would reflect a
5  detailed description of the recovered
6  solvent process that your own chemists
7  identified as part of how you'd produce
8  valsartan, correct?
9    A.   I can tell you what the
10  interpretation of this and how it applies
11  to the U.S. drug master files.
12       It's asking that you -- if
13  you use recovered solvents, you need to
14  specify that, which we did in the drug
15  master file.
16       You have to include the
17  quality standard by which it must meet,
18  which we did.
19       So when you say described in
20  your application, it was described in our
21  DMF that we used recovered solvents.
22    Q.   Mylan listed the fact that
23  recovered solvent was used, but it didn't
24  describe how it recovered it.  You agree

Page 316

1  with that statement, don't you?
2         MR. TRISCHLER:  Objection to
3     the form.  Asked and answered.
4         THE WITNESS:  We disclosed
5     that recovered solvents was used,
6     but we did not describe in detail
7     in the DMF of how they were
8     recovered.
9  BY MR. HONIK:
10    Q.   Thank you.
11    A.   Nor was it a requirement --
12  nor is it a requirement to do so.
13    Q.   You see the guideline which
14  guides industry to describe the process,
15  correct?
16    A.   Yes.  And it's a guideline,
17  which does not mean -- it's not a
18  regulation.  It's a guideline.
19       And I'm telling you based on
20  my experience and understanding, is
21  routinely during this time, you did not
22  have to include the details of a recovery
23  process in a drug master file.
24    Q.   Can you tell me under what

Page 317

1  circumstances Mylan is permitted to
2  ignore a guideline?
3    A.   I would argue no guideline
4  has been ignored.  We did disclose that
5  recovered solvents were being used.  It
6  was described in the drug master file.
7  Just not the details of the recovery
8  process, which is not an expectation.
9    Q.   Do you see the next
10  paragraph, sir, that says, "Recovered
11  solvents can be used with or without
12  further processing to improve the quality
13  of the solvent as long as the quality of
14  the recovered solvent is appropriate for
15  its intended use.
16       The use of recovered
17  solvents, including the point at which
18  they might be used in the process, should
19  be included in the description of the
20  manufacturing process?"
21       Did I read that correctly?
22    A.   You did.  And that's exactly
23  what the DMF does.  It describes the
24  solvent.  It discloses that it's

Confidential – Information Subject to Protective Order

---

Page 318

1 recovered. It discloses what quality
2 standard it's intended to meet. And it's
3 described in the manufacturing process
4 that's used. So I don't know where the
5 disconnect is.
6     Q.    "Information should be
7 provided on whether (1) any processing is
8 done to improve the quality of the
9 recovered solvent with a brief
10 description of the process, for example,
11 distillation."
12
13
[REDACTED]
18     Q.    Agreed.
19         It also -- the guidance also
20 says, "Appropriate specifications for
21 recovered solvents should be included in
22 S.2.3."
23         That wasn't done by Mylan,
24 was it?

---

Page 319

1         MR. TRISCHLER: Objection to
2 form.
3         THE WITNESS: No, it was
4 done.
5         In fact, we talked about
6 this earlier, whether a solvent is
7 recovered or virgin, it has to
8 meet the same quality standard and
9 we complied with that.
10 BY MR. HONIK:
11     Q.    None of the specifications
12 for that were revealed however, correct?
13         MR. TRISCHLER: Objection to
14 form.
15         THE WITNESS: The
16 specifications for your solvents
17 would be included in the drug
18 master file.
19 BY MR. HONIK:
20     Q.    Sir, what does the term
21 "appropriate specifications" mean to you
22 in that sentence?
23     A.    The quality standard by
24 which that material must meet before you

---

Page 320

1 use it.
2     Q.    And what in the DMF reveals
3 those specs?
4     A.    The drug master file should
5 contain a specification or a list of
6 acceptance criteria that the solvent
7 should comply with before it's released
8 for use.
9     Q.    Mr. Talton, because the DMF,
10 according to you while listing the use of
11 recovered solvent nonetheless doesn't
12 describe the actual process, it's true
13 that the FDA was unaware, as we've seen,
14 about the way in which the recovery
15 occurred until they had to ask Mylan in
16 2018; is that correct?
17         MR. TRISCHLER: Objection to
18 form.
19         THE WITNESS: Based on what
20 I've seen, the process by which
21 the solvent was recovered was not
22 specifically described.
23         But remember a drug master
24 file is submitted to the FDA for

---

Page 321

1 review. So there was a technical
2 review of the application done in
3 context with our abbreviated new
4 drug application, and FDA found it
5 acceptable.
6 BY MR. HONIK:
7     Q.    Didn't you tell me earlier
8 that they don't accept it, that they only
9 point out deficiencies?
10     A.    Nope, that's not what I
11 said. I said FDA doesn't approve a drug
12 master file. But they review it in
13 connection with an abbreviated new drug
14 application.
15     Q.    Yeah. And my question is
16 simply this. And I take your points,
17 namely that use of recovered solvent was
18 identified, just like that, without any
19 further description of the manner in
20 which that process would occur, because
21 Mylan wasn't obligated to. That's your
22 essential point, right?
23     A.    The essential point it was
24 not a regulatory requirement to describe

---

Confidential Information - Subject to Protective Order

Page 322

1  that in detail in the drug master file at
2  that time.
3      Q.   And, therefore, Mylan
4  didn't.  And my question, therefore, is
5  the first time that Mylan revealed it to
6  the FDA was when Mylan was -- when FDA
7  was scratching its head to figure out how
8  NDEA could get in there.  And for the
9  first time you revealed the recovery
10  process, in 2018, correct?
11      MR. TRISCHLER:  Objection to
12      form.
13      THE WITNESS:  No.  We had --
14      we had disclosed that we had used
15      recovered solvents.  It wasn't
16      until following completion of the
17      investigation where the root cause
18      was determined.
19  BY MR. HONIK:
20      Q.   I'm asking a very simple
21  timeline question.
22      When the DMF was submitted
23  in 2013, you and I both agree that Mylan
24  said we may use recovered solvent or

Page 323

1  fresh solvent.  Full stop.  Isn't that
2  correct?
3      A.   Both of those options were
4  disclosed in the drug master file.
5      Q.   And apart from disclosing
6  that you may use either fresh or
7  recovered solvent, the process by which
8  recovery would occur, the ingredients
9  used to recover it were not disclosed in
10  the DMF because, according to you, Mylan
11  wasn't required to; isn't that right?
12      A.   It wasn't required to be
13  described in detail.  And as I said, the
14  drug master file was reviewed and
15  technically accepted by FDA as is.
16      Q.   What's the difference
17  between "approved" or -- and "accepted"
18  as you're using those terms?
19      A.   When a drug master file is
20  submitted to the FDA, they do a
21  completeness assessment to ensure that
22  the application is complete and has all
23  the required components.
24      Then they deem it available

Page 324

1  for reference.  In other words, as an
2  ANDA applicant, you are now authorized to
3  refer to that DMF because it has
4  undergone a preliminary assessment and
5  determined to be complete.
6      As part of the official ANDA
7  review, the DMF now will get reviewed in
8  great detail to make sure that it's
9  suitable for use in your dosage form.
10      Q.   But the fact remains that
11  there was nothing in the way of approval
12  by the FDA of the submitted DMF by Mylan,
13  there was no approval, correct?
14      A.   FDA refers to the drug
15  master file in parallel with review of
16  the ANDA.  So that -- the DMF and the
17  ANDA constitutes the review.
18      Q.   But no approval is ever
19  forthcoming, that's what you told me
20  earlier, right?
21      A.   No approval of a DMF, per
22  se, but approval of an ANDA.
23

Page 325

1
14  BY MR. HONIK:
15      Q.   I want to go back for a
16  minute if I may to Exhibit 7.  I think
17  you have that there.  That is the DMF
18  that we've been speaking of, or more
19  specifically, questions that were posed
20  through Mr. Plastina regarding the DMF.
21      Do you have that exhibit,
22  Mr. Talton?
23      A.   Just a second.
24      Q.   Sure.

Confidential Information - Subject to Protective Order

Page 326

1    MR. TRISCHLER:  Is Exhibit 7
2  the document you put up on the
3  screen, Ruben?
4    MR. HONIK:  I think you are
5  right.  So you don't have a
6  hardcopy, right?
7    MR. DAVIS:  I can reshare.
8    MR. HONIK:  No, let's --
9  let's -- Mr. Talton, I apologize,
10  I thought you had a copy.  But
11  that's fine.
12    We can go back quickly to
13  one section of it, and that would
14  be Page 4 of 14 that comprised the
15  inquiry from the FDA.
16  BY MR. HONIK:
17    Q.   And just to contextualize
18  the question for you, Mr. Talton.  You'll
19  recall this was -- this was the letter
20  sent to Mr. Plastina on the DMF for
21  valsartan and the questions that Mylan
22  was asked to respond to.  And you
23  indicated that it would have gone by
24  definition to Mr. Basade and his group.

Page 327

1    Do you remember talking
2  about that?
3    A.   Yes.
4    Q.   And Mr. Trischler took out
5  some pains to point out my error in
6  referring to it as having occurred in
7  July, when in fact it occurred in
8  November of 2018.  Do you remember that?
9    A.   Yeah.
10





Page 330

[redacted]

Page 331

20  BY MR. HONIK:
21      Q.   Let's turn to previously
22  marked Owens Exhibit 9.
23          (Previously marked
24      Exhibit PL-Owens-7, PL-Owens-9,

Page 332

1          PL-Owens-10.)
2  BY MR. HONIK:
3      Q.   Do you have that in front of
4  you, Mr. Talton?
5      A.   Just a second.
6      Q.   I'm going to place 9 and 10
7  in front of you --
8          THE WITNESS:  Do I have
9      Owens-9?
10         MR. TRISCHLER:  I don't
11     think you have them yet.
12         MR. HONIK:  While you are
13     fetching them, maybe get 9, 10 and
14     7 please.  Owens.
15         THE WITNESS:  Okay.  I have
16     7.
17  BY MR. HONIK:
18     Q.   Okay.  I'm going to start
19  with 9.  Let me know when you have that.
20     A.   I have 9.
21     Q.   Okay.  Do you have 10 as
22  well?
23     A.   I do now, yes.
24     Q.   You see that previously

Page 333

1  marked Plaintiffs Owens Exhibit 9 is an
2  e-mail from a Baburao Konudula to
3  Mr. Abbineni.
4          Do you see that?
5      A.   Yeah.
6      Q.   And the subject is
7  justification report for NDMA.  And it
8  refers to an attachment called
9  Justification Report For NDMA Impurity in
10 Sartans.
11         Do you see that?
12     A.   Yes.
13     Q.   And in the body of this
14 transmittal, the e-mail being July 23,
15 2018, you see that the transmitter of the
16 attachment, namely the report, indicates
17 it's a draft.
18         Do you see that?
19     A.   Yeah.
20     Q.   So if we have a draft report
21 concerning NDMA impurity in sartan, did
22 you review either this e-mail or
23 Plaintiffs -- excuse me, Owens
24 Exhibit 10, which is the attachment,

Confidential Information - Subject to Protective Order

Page 334

1  before today?
2      A.   No, I don't recall seeing
3  this document.
4      Q.   If you look with me at
5  Owens-10 which is the very attachment
6  that the e-mail refers, it's entitled
7  Evaluation of Products Manufactured in
8  Mylan Regarding NDMA.
9          Do you see that, sir?
10     A.   Yes.
11     Q.   And if you turn to the first
12 page after that, in the report at the top
13 you'll see Table 1?
14     A.   I see it.
15     Q.   And in the draft report,
16 immediately following the table which
17 lists the sartan drug, and the chart
18 which reveals use of sodium nitrite
19 quenching in the presence of the product,
20 et cetera, do you see the asterisk at the
21 bottom of the table?
22     A.   Yes.
23 ████████████████████████████████████

Page 335

1  ████████████████████████████████████
2  ██████████
3  ██
4      Q.   Do you know who authored
5  this?
6      A.   No, I do not.
7      Q.   In Owens-9 it says, "Draft
8  report was prepared and sent to Naveen
9  for review."
10         Do you know who Naveen is?
11     A.   No, I do not.
12     Q.   And in the e-mail thread
13 immediately before that, Anjireddy Unit 2
14 is writing to Anjireddy Emani, do you
15 know either of those individuals?
16     A.   No, I do not.
17     Q.   Okay.  But nonetheless, you
18 see where in both parts of the e-mail
19 thread it refers to this report as a
20 draft, right?
21     A.   Yeah.
22     Q.   Do you have any way of
23 knowing whether this report goes to
24 regulatory affairs, someone in your

Page 336

1  office?
2      A.   I'm not aware of having this
3  come to regulatory before.
4      Q.   Given the date of July 2018,
5  you were aware at regulatory affairs, as
6  Mylan was, of the recalls that were
7  starting and the problems associated with
8  the presence of nitrosamines in ARBs,
9  correct?
10     A.   I think it was around July
11 when the issue first surfaced, yes.
12     Q.   And suffice to say, you in
13 your office in regulatory affairs began
14 to, A, be aware, and B, observe activity
15 at Mylan to try to identify whether
16 nitrosamines were a problem and what
17 their source might be in your valsartan,
18 correct?
19     A.   We became of the inquiry,
20 but it wasn't until the investigation was
21 more advanced or we began to get
22 inquiries from health authorities that
23 regulatory affairs was more involved or
24 more aware.

Page 337

1      Q.   Well, I get that statement.
2  And we can unpack that a little bit as we
3  go along.
4          But suffice to say, it was
5  not a secret, even as early as July 2018
6  that there were recalls occurring with
7  your competitors, Mylan's competitors in
8  this segment of the market, namely ARBs,
9  and sartans to be in particular,
10 revealing the presence of nitrosamines,
11 correct?
12     A.   Regard -- concerning the
13 presence of NDMA specifically.  That was
14 the initial inquiry.
15     Q.   Absolutely.  And this is
16 evidence that there was some evaluation
17 of Mylan's own products, vis-à-vis the
18 presence of NDMA in its products,
19 correct?
20     A.   Of course, that was the
21 right thing to do.  The issue arose and
22 we began an investigation with the
23 appropriate steps to take.
24     Q.   I agree, paying attention in



Page 338

¹ July was the right thing to do.
²

Confidential Information – Subject to Protective Order



**Page 342**

**Page 343**

BY MR. HONIK:

4  Q.  Okay.  So that was the draft
5  report in July 2018 that was exchanged
6  internally at Mylan.  And if you look
7  with me at previously marked Owens
8  Exhibit 7, you'll see that the native
9  format information confirms that this is
10  a document named Valsartan Nitroso
11  Impurity Comment Response, and it's dated
12  13 August 2018.
13      Do you see that?
14      A.  Yes.
15      Q.  And you see that when you
16  turn to the first page, it's on Mylan
17  letterhead, with the Chestnut Ridge Road,
18  Morgantown, West Virginia, address.  Do
19  you see that?
20      A.  Yes.
21      Q.  And it's referred to as a
22  cover letter for a response to
23  information request letter.  Do you see
24  that?

**Page 344**

1      A.  Yeah.
2      Q.  That confirms, does it not,
3  that this is Mylan specifically
4  responding to a request for information
5  from the FDA, correct?
6      A.  That's what it appears to
7  be.
8      Q.  And it's sent to the FDA at
9  their Beltsville, Maryland, address and
10  it's officially signed by Michael
11  Plastina, who you've established through
12  your testimony is the agent on behalf of
13  MLL for valsartan DMF, right?
14      A.  That's correct.
15      Q.  Now, have you seen this
16  response before today?
17      A.  Yes.
18      Q.  And did you look at it in
19  preparation for today's testimony?
20      A.  I mean I perused it.  I
21  didn't read every -- every question,
22  every response.
23      Q.  No, I get that.  And I
24  apologize.

**Page 345**

1      All I want to make clear is,
2  did you see it in the ordinary course of
3  your work or employment or specific to
4  your preparation for today or both?
5      A.  Specific to the preparation
6  for today.  As I mentioned previously,
7  drug master file communications are
8  directly from MLL to FDA through the
9  agent and not something I would review in
10  the normal course of business.
11      Q.  So you saw this document and
12  the responses on behalf of Mylan for the
13  first time in connection with today?
14      A.  In preparation for the
15  deposition.
16      Q.  Yeah.  How much before today
17  did you first see this document?
18      A.  The preparation took place
19  over the last two weeks, so within the
20  last couple of weeks.
21      Q.  Can you turn to the part of
22  the response that begins with a front
23  page called Annexure-2?  You have to flip
24  about two-thirds or so the way through

Page 346

¹ the document.  You'll come to something
² that says, "Annexure-2."
³        Do you have that?
⁴     A.   Not yet.  Just a second.
⁵     Q.   Sure.
⁶     A.   Okay.
⁷     Q.   Do you remember reading the
⁸ Annexure-2 in this response from Mylan to
⁹ the FDA?
¹⁰     A.   Not in great detail, no.
¹¹     Q.   Do you see, if you turn to
¹² the next page which is called Page 1 of
¹³ 5.  At the top it says, "Mylan's response
¹⁴ to impurity NDMA in valsartan drug
¹⁵ substance."
¹⁶        Do you see that?
¹⁷     A.   Yes.
¹⁸     Q.   And it says, and I quote,
¹⁹ "Mylan agrees that NDMA can be formed
²⁰ during the formation of the tetrazole
²¹ ring by reaction of dimethylamine which
²² may be present as an impurity or
²³ degradant in the solvent,
²⁴ dimethylformamide, DMF, and sodium

Page 347

¹ nitrite under acidic conditions where
² nitrous acid is formed."
³        Do you see that?
⁴     A.   Yes.
⁵     Q.   So that's an acknowledgement
⁶ of what essentially turned out to be the
⁷ root cause investigation revealing the
⁸ manner in which nitrosamine got into the
⁹ valsartan, correct?
¹⁰        MR. TRISCHLER:  Objection to
¹¹        form.
¹²        THE WITNESS:  At this point
¹³        in time it was probably ongoing
¹⁴        investigation by both Mylan as
¹⁵        well as the health authority.
¹⁶ BY MR. HONIK:
¹⁷     Q.   All right.  I agree with
¹⁸ that.  But all I'm really asking you,
¹⁹ sir, is what we just -- what I just read
²⁰ to you and you heard and acknowledged my
²¹ reading, that's the actual description of
²² what ended up being the cause of the
²³ nitrosamine, right?
²⁴     A.   No.  This paragraph you just

Page 348

¹ read is specific to NDMA.  So Mylan was
² rationalizing how that potentially could
³ be formed based on the chemistry.
⁴     Q.   Right.  And this is -- this
⁵ is a description of the chemistry that
⁶ could lead to the formation of NDMA,
⁷ correct?
⁸     A.   That appears to be what is
⁹ described here.
¹⁰     Q.   And it says that you need
¹¹ sodium nitrite under acidic conditions
¹² thereby forming nitric acid.  And then
¹³ there's a further reaction with, in this
¹⁴ case dimethylamine, which produces NDMA.
¹⁵

Page 349

¹⁹ BY MR. HONIK:
²⁰     Q.   Correct.  And this, this
²¹ sentence, long sentence that we just
²² read, so I can move on, is just a
²³ descriptor of the chemical reactions
²⁴ which in this case produces NDMA.  And



Page 350

1 I'm just establishing that ultimately the
2 root cause analysis by Mylan revealed
3 similarly that that reaction in the
4 presence of triethylamine produces NDEA,
5 correct?
6          MR. TRISCHLER:  Objection to
7 form and scope.
8          THE WITNESS:  As part of the
9 overall investigation which was
10 active and ongoing at this time.
11 BY MR. HONIK:
12     Q.   That's true.
13

22 BY MR. HONIK:
23     Q.   Thank you.
24          As we saw in the draft

Page 351

1 response, the drafter of the response was
2 quite clear in pointing out that sodium
3 nitrite is, in fact, used in the recovery
4 process.
5          Do you remember that
6 asterisk?
7     A.   Yes, I remember the --
8          MR. TRISCHLER:  Objection to
9 form.
10          THE WITNESS:  Yes, I
11 remember seeing the asterisk.
12 BY MR. HONIK:
13     Q.   If you look down to the
14 middle of this page, 1 of 5, in the
15 official response Mylan proffered to the
16 FDA, underneath the chemical diagramming
17 it says, and I quote, "Mylan does not use
18 dimethylamine or its source nitrous acid
19 or its source as reagents/solvents in the
20 manufacture of intermediate of valsartan
21 CMVEH."
22          Do you see that?
23     A.   Yes.
24     Q.   "Or further stages of

Page 352

1 valsartan manufacturing process.  Hence
2 the formation of NDMA in valsartan
3 manufactured by Mylan is ruled out."
4          Did I read that correctly?
5     A.   That's what it states in the
6 document.
7     Q.   That's not a true statement,
8 is it?
9     A.   At the time this document
10 was written, yes, it was a true
11 statement.
12

Page 353

1

Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information - Subject to Protective Order

Page 362

BY MR. HONIK:

Q.   Sir, your -- if I'm taking your testimony correctly, what you're really saying is that Mylan claims that the nitrosamine problem was not foreseeable, right?

MR. TRISCHLER:  Objection to form.  Objection.  Beyond the scope.

THE WITNESS:  I can't comment as to whether it was foreseeable or not.  I know there was an extensive investigation. We were as responsive as we could be, and worked very diligently to get to the root cause so that we could take the appropriate corrective actions.

Page 363

BY MR. HONIK:

Q.   Sir, respectfully we just read a formal response as late as August of 2018 from Mylan saying that there's no way NDMA could occur from your process. Didn't we see that together?

A.   That's what as the date of this document is true, based on the information we had available to us at the time.

Q.   And you said to me, not even implicitly, you've said to me expressly that it was not foreseeable by Mylan that a nitrosamine problem could affect your valsartan, isn't that what you've said to me all day under oath?

MR. TRISCHLER:  Objection to the form.  Objection.  It's beyond the scope.

THE WITNESS:  I don't think we talked about foreseeable.  Or we've been looking at documents, and I've been trying to answer those as responsively as I can.

Page 364

BY MR. HONIK:

Q.   Fair enough.  So I'll ask you this question then, as head of regulatory affairs.

Was it foreseeable at any point based on anything you've seen thus far today or in your preparation for today for Mylan to know that nitrosamines were capable of being produced?

MR. TRISCHLER:  Objection to the form.  Objection.  No foundation with this witness. Objection that it's beyond the scope.

THE WITNESS:  That would be up to our scientific development staff to determine that.  There's no way I can predict what was foreseeable.

BY MR. HONIK:

Q.   If it was foreseeable as regulatory affairs head, would you have had to reveal it to the FDA?

MR. TRISCHLER:  Objection to

Page 365

form.

THE WITNESS:  That's another hypothetical and we've gone over this a number of times as well, in that we rely upon the science, scientists to provide us with complete information that we can put in our registration, and I rely on that as being truthful and accurate.

BY MR. HONIK:

Q.   But we saw together how Mylan claimed compliance with the European guideline that says you are obliged to call out carcinogens and genotoxic impurities.  Do you remember seeing that?

MR. TRISCHLER:  Objection to the form.  Misstates and mischaracterizes the document.

But you can answer the question if you can, not -- notwithstanding the fact it's already been asked and answered

Confidential Information - Subject to Protective Order

Page 366

1 multiple times.
2       THE WITNESS: We did look at
3 a European guidance document on
4 genotoxic impurities this morning
5 if that's what you're referring
6 to.
7 BY MR. HONIK:
8       Q.   That's right.
9            And in it we saw how, if
10 there was even a potential to generate a
11 genotoxic impurity, it has to be
12 identified to the regulator, isn't that
13 what we saw together?
14       MR. TRISCHLER: Object to
15 the form. Beyond the scope.
16       THE WITNESS: And Mylan
17 claimed certification to that,
18 compliance with that guidance
19 based on the information we had
20 available.
21       So, again, it was a true and
22 accurate statement at the time it
23 was written.
24 BY MR. HONIK:

Page 367

1       Q.   But here is the question
2 that I'm trying to ask you.
3            Does not the guidance
4 require in this case Mylan, like any
5 other pharmaceutical company attempting
6 to comply with that guidance, to foresee
7 a genetic impurity, isn't there a
8 requirement of foreseeability?
9       MR. TRISCHLER: Objection to
10 the form.
11       THE WITNESS: We made the
12 certification, so obviously we
13 didn't have a foreseeable
14 knowledge or we would have made
15 the claim.
16 BY MR. HONIK:
17       Q.   Exactly. You would have
18 revealed it if it were foreseeable,
19 that's my question; isn't that right?
20       A.   You're asking the wrong
21 person this question. You're asking
22 about development process, prediction of
23 impurities. I'm a recipient of
24 conclusions coming from those

Page 368

1 departments. I cannot answer that
2 question.
3       Q.   Sure.
4       A.   You need to talk about --
5 you need to speak to the people who were
6 responsible for developing the API and
7 what process they used to determine the
8 impurity profile.
9       Q.   I'm asking you in the
10 context of the person communicating with
11 your regulator. And the question in that
12 frame, sir, is, are you not obliged if
13 you can foresee a genetic -- a genotoxic
14 impurity to reveal that potential to your
15 regulator, yes or no?
16       MR. TRISCHLER: Objection.
17 Asked and answered.
18       THE WITNESS: That's part of
19 the development process. And so
20 if the conclusion is there's no
21 formation, then we rely upon that
22 and we communicate that to the
23 regulator.
24 BY MR. HONIK:

Page 369

1       Q.   Sir, is your answer yes, it
2 is an obligation of us if our scientists
3 tell us, is that your answer?
4       A.   My answer is I can't answer
5 your question because the question that
6 you're asking is a development type
7 question. The person responsible for the
8 development of APIs would be better
9 suited to answer that question. I don't
10 know the details of what process they go
11 through to determine what potential
12 impurities might be present.
13       Q.   If -- if Mylan's development
14 process professionals, the chemists who
15 develop the process could look at the
16 chemistry and foresee the potential for a
17 genotoxic impurity from the use of
18 certain chemicals at the same time, is
19 not there an obligation on the one hand
20 to reveal it to you and on the other hand
21 for you to reveal it to the FDA?
22       MR. TRISCHLER: Objection,
23 asked and answered.
24       THE WITNESS: Again, you're

Page 370

1 asking a development question,
2 what is the process by which APIs
3 were developed and how they go
4 about establishing impurity
5 profiles.
6         I can't comment on that.  I
7 don't know that process.  I'm not
8 familiar with it.
9 BY MR. HONIK:
10        Q.   Sir, I'm asking a
11 communication question about you as the
12 regulator -- regulation affairs person
13 and whether, if you had information from
14 your development people that it was
15 foreseeable that there could be a
16 genotoxic impurity, that you as the
17 regulatory head would have been obliged
18 to reveal that in turn to the FDA, that's
19 my question?
20        MR. TRISCHLER:  Same
21 objection.
22        THE WITNESS:  We rely upon
23 the scientists to provide us with
24 a comprehensive summary and a drug

Page 371

1 master file, controls, et cetera,
2 we rely upon that in regulatory.
3         So I rely on the scientists
4 to provide me with the right
5 information, then I share that
6 with the agency.
7 BY MR. HONIK:
8        Q.   And if the scientists had
9 conveyed to you that it was foreseeable
10 that you could have the creation of
11 nitrosamines through the recovery
12 process, would you then have been obliged
13 to share that with the FDA?
14        A.   Again, you're asking a
15 hypothetical.  You know, they are
16 responsible for putting together the drug
17 master file, determining what the
18 impurity profile is.  I rely upon their
19 conclusions, and that's what I
20 communicate to the health authorities.
21        Q.   Agreed.
22        A.   And if there's a question
23 about that, then that goes back to the
24 scientists to address, as you can see by

Page 372

1 the evidence of the communications back
2 and forth to the health authorities.
3        Q.   If -- if you had been told
4 that there was a foreseeable possibility
5 that nitrosamines could be formed under
6 the European guidance that Mylan claimed
7 compliance with, would not Mylan have
8 been obliged to reveal that fact and
9 indeed to pursue an alternative if it was
10 available?
11        MR. TRISCHLER:  Objection.
12 Asked and answered.
13        THE WITNESS:  You are asking
14 a hypothetical.  I'm not aware of
15 any foreseeable activity around
16 that.
17        Again, I rely upon what we
18 receive from the scientists.
19 You're asking -- you're asking
20 this question to the wrong person.
21 I don't know how to say that any
22 further.
23        You're asking a fundamental
24 API development question, not a

Page 373

1 regulatory question.
2 BY MR. HONIK:
3

Page 374



---

Page 375

1
2
BY MR. HONIK:
4    Q.   You're not responding to my
5  question, but we're going to take a
6  five-minute break.
7    A.   I disagree, but...
8        THE VIDEOGRAPHER:  The time
9  is 4:09 p.m.  We're off the
10  record.
11        (Short break.)
12        THE VIDEOGRAPHER:  The time
13  is now 4:19 p.m.  Back on the
14  record.
15  BY MR. HONIK:
16    Q.   Now, Mr. Talton, before we
17  took a break, we were talking about
18  whether or not it was foreseeable that
19  nitrosamines could be a problem based on
20  the development and process development
21  information that was known to Mylan.
22        Do you remember we were
23  talking about that?
24    A.   Yes.

---

Page 376

1    Q.   I recognize that we kind of
2  went round and round about it, and I
3  certainly don't mean to annoy you.  But
4  this is an important area and I do want
5  to pursue it a little further with some
6  additional documents.
7        So I just want to frame for
8  you some additional information that I'm
9  going to place in front of you on this
10  point of what was knowable or foreseeable
11  in terms of the problem that was so
12  clearly identified in 2018.
13        Are you with me so far?
14        MR. TRISCHLER:  Objection.
15  Objection to the form.  I don't
16  think there's a question pending.
17        MR. HONIK:  There is not.
18  I'm just asking if he understands
19  this little predicate or
20  background that I'm offering which
21  I'm hoping will make the next
22  series of questions a little bit
23  more digestible.
24  BY MR. HONIK:

---

Page 377

1    Q.   Do you understand me so far?
2    A.   Yes.  I'm fine.  But if it's
3  related to the development process,
4  you're -- I'm not the right person to be
5  asking those questions.  But you can
6  certainly ask what you wish.
7    Q.   Thank you.
8        So I want to call up a
9  previously marked exhibit Snider-18,
10  which for the record is a warning letter
11  that was issued, 29, November, 2019, from
12  the FDA to Mylan with certain
13  observations that were called out.
14        (Previously marked
15  PL-Snider-18.)
16  BY MR. HONIK:
17    Q.   Sir, this is a confidential
18  Mylan document produced to us.  Appears
19  to be 17 pages, and as I mentioned it is
20  a warning letter and the contents of a
21  warning letter from the FDA.
22        Is this something you've
23  seen before today?
24    A.   Yes, I'm aware of the

---

Page 378

¹ receipt of this warning letter.
²     Q.   Okay.  And did you become
³ aware of it in realtime back in 2019 or
⁴ did you see it for the first time in
⁵ preparation for today or both?
⁶     A.   Both.
⁷     Q.   Are you aware of Mylan
⁸ having engaged an outside consultant by
⁹ the name of Lachman?
¹⁰     A.   Yes, I'm aware that we've
¹¹ used them periodically on supporters for
¹² a variety of matters.
¹³     Q.   And how far back has Mylan
¹⁴ been relying upon or using Lachman as a
¹⁵ consultant?
¹⁶     A.   That I can't answer.  I can
¹⁷ tell you from a regulatory perspective
¹⁸ we've used them on occasion throughout my
¹⁹ 20 years at Mylan, but I can't comment as
²⁰ to how much quality may have used them.
²¹     Q.   Understood.  And just based
²² on your knowledge, how far back would you
²³ say there's been a professional
²⁴ relationship between Mylan and Lachman,

Page 379

¹ that is how long have you been using
² them, how far back?
³     A.   As I stated, I'm aware that
⁴ we've used them at least on and off the
⁵ last 20 years of my tenure at Mylan.
⁶     Q.   Okay.
⁷     A.   But again, I can't comment
⁸ about quality's utilization of them.
⁹     Q.   Beyond acknowledging that
¹⁰ not only did you rely on them in
¹¹ regulatory, but development may have used
¹² them as well, correct?
¹³     MR. TRISCHLER:  Objection to
¹⁴     form, foundation.
¹⁵     THE WITNESS:  I wouldn't
¹⁶     know whether or not they consulted
¹⁷     with them or not.
¹⁸ BY MR. HONIK:
¹⁹     Q.   Okay.  But suffice to say,
²⁰ you have known about them and used them
²¹ as consultants, correct?
²²     A.   Yes.  We've used them on
²³ occasion for regulatory consulting and
²⁴ I'm aware that quality uses them on

Page 380

¹ occasion to help with inspections.
²     Q.   Okay.  And when you say
³ "quality uses them," do you know in what
⁴ context or for what purpose they use
⁵ them?
⁶     A.   No, that would be a quality
⁷ engagement and I'm not familiar with
⁸ those engagements.
⁹     Q.   And tell me in a little more
¹⁰ detail how you from time to time would
¹¹ come to rely on Lachman, you in
¹² regulatory.
¹³     A.   Maybe for a specific
¹⁴ regulatory sort of strategy question or,
¹⁵ you know, maybe something that we needed
¹⁶ their assistance in filing a citizens
¹⁷ petition to help petition the FDA for a
¹⁸ certain action.  Things like that.
¹⁹     Q.   Okay.  And you are aware
²⁰ that the scope of their consultancy
²¹ expertise extends to both quality issues
²² as well as regulatory issues?
²³     A.   Yes, I'm aware that they at
²⁴ least offer those two types of services.

Page 381

¹     Q.   Okay.  And when you've had
² occasion to use them, have you had direct
³ or personal contact with them yourself?
⁴     A.   I have interacted with Bob
⁵ Pollock, who is the Lachman
⁶ representative directly on a couple of
⁷ occasions, but it's been a long time
⁸ since I've interacted directly with him.
⁹     Q.   And would you mind spelling
¹⁰ Bob's last name for me?  I didn't quite
¹¹ catch it.
¹²     A.   Pollock, P-O-L-L-O-C-K.
¹³     Q.   Thank you.  I appreciate it.
¹⁴     Turning your attention to
¹⁵ Exhibit Snider 18 previously marked, on
¹⁶ Page 1 you see the observation from the
¹⁷ FDA which says, "Failure to have adequate
¹⁸ written procedures for the receipt,
¹⁹ identification, testing and handling of
²⁰ raw materials."
²¹     Do you see that?
²²     A.   Yes.
²³     Q.   And you see how in that
²⁴ first paragraph there in that long first

Confidential Information Subject to Protective Order

Page 382

1 sentence it talks about contamination and
2 cross-contamination with nitrosamine
3 impurities such as NDMA and NDEA.
4        Do you see that?
5    A.   Yes.
6    Q.   And then the sentence that I
7 want to focus in on is the one that says,
8 "Your firm," meaning Mylan, "had not
9 anticipated the presence of NDMA or NDEA
10 impurities based on your assessment of
11 the API manufacturing process."
12        Do you see that?
13    A.   Yes, I see that sentence.
14    Q.   And I take it to mean
15 that -- that the FDA was expecting you to
16 anticipate that presence if it was
17 anticipatable.
18        Do you read that the same
19 way?
20        MR. TRISCHLER:  Objection to
21    form.
22        THE WITNESS:  That's a --
23    that's an observation from a field
24    inspector and that would be their

Page 383

1    opinion of what they observed
2    during the inspection.
3 BY MR. HONIK:
4    Q.   To be sure.
5        But the sentence I think
6 fairly suggests that at least the FDA was
7 wondering if it wasn't, in fact,
8 foreseeable by your company, Mylan, to
9 anticipate the presence of those
10 impurities, again, based on assessing the
11 manufacturing process.  Is that a fair
12 read of that sentence and opinion?
13        MR. TRISCHLER:  Objection --
14    excuse me.
15        Objection to the form.
16        THE WITNESS:  That was the
17    opinion of that investigator that
18    we had not anticipated the
19    presence.
20 BY MR. HONIK:
21    Q.   And it suggests to me, and
22 you tell me if you agree, that at least
23 in the opinion of that investigator, it
24 should have been foreseeable?

Page 384

1        MR. TRISCHLER:  Objection to
2    form.
3        THE WITNESS:  I can't make
4    that conclusion from that
5    statement.
6 BY MR. HONIK:
7    Q.   Okay.  Fair enough.
8        If you turn the page with me
9 to the very next page, we've got Mylan's
10 response, right?
11    A.   Yeah.
12    Q.   And the response, as I read
13 it now really is what you've been telling
14 me for the last 20 minutes or more, and
15 that is, "At the time Mylan's
16 applications for valsartan products were
17 approved, the potential for the formation
18 of nitrosamine impurities was not known."
19        That's what you've been
20 telling me for the last hour or so,
21 right?
22    A.   Yes, essentially.
23    Q.   And in fact, the point is
24 punctuated by the next sentence that

Page 385

1 says, "Until NDMA was first detected in
2 valsartan produced by another API
3 manufacturer in 2018, the entire
4 pharmaceutical industry and regulators
5 had not anticipated the potential for
6 formation of nitrosamines in ARBs."
7        Do you see that?
8    A.   That's what's stated here,
9 yes.
10    Q.   And so Mylan's response here
11 doubles down on the "it didn't know," by
12 saying, "and nobody else knew," right?
13        MR. TRISCHLER:  Objection to
14    form.
15        THE WITNESS:  I can only
16    take the document for what's
17    written here, and, you know, we
18    read the sentence.
19 BY MR. HONIK:
20    Q.   I know.  But the meaning I
21 draw from this, and you tell me if I'm
22 incorrect, which is, as I stated, Mylan
23 couldn't foresee and didn't know, nor did
24 anybody else in the industry and

Confidential Information - Subject to Protective Order

---

Page 386

¹ regulators until 2018.  Isn't that what
² it conveys?
³        MR. TRISCHLER:  Objection to
⁴    the form.
⁵        THE WITNESS:  It's -- I mean
⁶    we can read the sentence.  What it
⁷    states is until NDMA was first
⁸    detected produced by another
⁹    manufacturer, the industry and
¹⁰    regulators had not anticipated the
¹¹    potential for formation.
¹² BY MR. HONIK:
¹³    Q.   In ARB --
¹⁴    A.    And I have to take that for
¹⁵ what it's worth.  I didn't write this
¹⁶ document, I'm not qualified to interpret
¹⁷ it.
¹⁸    Q.    Right.  But you agree with
¹⁹ me that this is a communication with the
²⁰ FDA, right?
²¹    A.    It's a communication with
²² the FDA's office of compliance.  This
²³ communication would be managed through
²⁴ our quality department, not regulatory

---

Page 387

¹ affairs.
²    Q.    Regardless, you're here to
³ talk about communications between Mylan
⁴ and the FDA, correct?
⁵    A.    That is correct.  I just
⁶ wanted you to understand the context of
⁷ this is a quality document --
⁸    Q.    I do.
⁹    A.    -- and a quality response.
¹⁰ Not a regulatory affairs one.
¹¹    Q.    I understand that.  But you
¹² were the one put up for this topic.  And
¹³ I understand from you that you did some
¹⁴ preparation to understand some of the
¹⁵ quality related issues that impact this
¹⁶ area of questioning.  Did you not?
¹⁷    A.    Yes, I'm not saying we can't
¹⁸ talk about the document.  I was trying to
¹⁹ help you understand that this is a
²⁰ quality production, not a regulatory
²¹ affairs one.
²²    Q.    Regardless of what area of
²³ the company it came from, this is a
²⁴ communication from Mylan that conveys to

---

Page 388

¹ the FDA that it did not know, it could
² not foresee the NDMA problem, nor did
³ anyone in the industry or among
⁴ regulators until 2018 with respect to the
⁵ risk of nitrosamines appearing in ARBs or
⁶ sartans.  Isn't that what this conveys?
⁷        MR. TRISCHLER:  Objection to
⁸    form.  Objection.  Asked and
⁹    answered.
¹⁰        THE WITNESS:  We've read
¹¹    those two sentences so...
¹²        We can read the sentences
¹³    again --
¹⁴ BY MR. HONIK:
¹⁵    Q.    I don't want to do that.  I
¹⁶ want you to tell me if you agree with the
¹⁷ meaning I take from it.
¹⁸        MR. TRISCHLER:  Object to
¹⁹    the form.
²⁰        THE WITNESS:  It's not
²¹    appropriate for me to interpret
²²    this.  I mean I think we need to
²³    read the document for what it
²⁴    states.

---

Page 389

¹ BY MR. HONIK:
²    Q.    Sir, it is appropriate for
³ me to ask you your interpretation of it
⁴ because this is a communication from your
⁵ company Mylan to the FDA on an important
⁶ observation in connection with a warning
⁷ letter.
⁸        You're here today as a
⁹ designated representative for Mylan about
¹⁰ those communications.
¹¹        So yes, I am asking you if
¹² the mean -- the plain meaning to me of
¹³ these sentences, which is that Mylan
¹⁴ didn't know, Mylan couldn't foresee, nor
¹⁵ did anyone in the industry, have any idea
¹⁶ about the potential for nitrosamines in
¹⁷ ARBs, sartans, as of 2018.  Isn't that
¹⁸ the -- isn't that what this says?
¹⁹        MR. TRISCHLER:  Objection to
²⁰    form.
²¹        THE WITNESS:  It's similar
²²    to that, but you're using
²³    different words than what's stated
²⁴    here.  So I think for the record

---

Confidential Information - Subject to Protective Order

---

Page 390

we need to state what's here.

And they are talking about the potential for formation, and that we had not anticipated the potential for formation.

BY MR. HONIK:

Q.  Well, that's a good point.

A.  You're adding more words than that.

Q.  That's a fair point.  So this goes even further and says the potential wasn't knowable, right?

A.  The word "potential" appears in this sentence, yes.

Q.  And Mylan is denying that there was even a potential for knowing that nitrosamines could be a problem with sartans, right?

MR. TRISCHLER:  Objection to form.

THE WITNESS:  It states that the potential for the formation of nitrosamine impurities was not known.  That's what it states.

---

Page 391

BY MR. HONIK:

Q.  It was not known and not knowable by Mylan, right?

A.  The document states that the potential for formation was not known.

Q.  And so says Mylan, right?

A.  That's our statement.

Q.  Right.  So take a look with me now at Gomas-10.

Previously marked PL-Gomas-2.)

MR. DAVIS:  Gomas-2, Ruben?

MR. HONIK:  I misspoke.  Gomas-2.

BY MR. HONIK:

Q.  We saw together how in Snider-18 the warning letter response, that was issued 29 November, 2019, right?

A.  Yes.

Q.  And before that date, did you know that Mylan through its quality people had in fact consulted your experts and consultants at Lachman?

A.  No, I was not aware of that.

---

Page 392

Q.  Okay.  You didn't become aware of that consultation that Mylan had with Lachman in answering the FDA warning letter prior to today?  In other words, you didn't look at any of this stuff in your preparation?

A.  I recall seeing the warning letter.  I don't recall seeing this specific e-mail.  Again, the warning letter is a document observation issued to quality.

Quality is responsible for preparing the responses to those comments.  Quality was responsible for engaging any external consultants they felt necessary.  So I wouldn't have personal knowledge or business knowledge of those interactions.

Q.  You agree that Mylan has a duty of honesty in preparing responses to warning letters from the FDA, right?

A.  Yes.  We will provide truthful and accurate information.

Q.  And if you -- if Mylan had

---

Page 393

acquired information from any source in this instance that revealed that it was foreseeable and knowable that nitrosamine impurities could occur in the process as it used it, it would have been obliged to reveal that in response to this warning letter; isn't that right?

MR. TRISCHLER:  Objection to form.

THE WITNESS:  I mean whatever information was shared -- I mean, whatever information was provided should have been shared within the warning letter response.

BY MR. HONIK:

Q.  Agreed.  Whatever information was shared with Mylan should have been reported in the response, correct?

A.  Again, you're asking me -- you're asking me for the decisions made by another function to prepare the response.  So I can't speculate as to

---

Confidential Information - Subject to Protective Order

Page 394

¹ what they knew, when they knew it, et
² cetera.
³      Q.   No, sir, I'm not asking --
⁴ respectfully I'm not asking you any of
⁵ that.
⁶           I'm asking you as a Mylan
⁷ designee on this topic, communications
⁸ with the FDA, whether it isn't true that
⁹ the company needed to be truthful and
¹⁰ forthcoming based on whatever it learned
¹¹ before preparing this formal response,
¹² yes or no?
¹³           MR. TRISCHLER:  Objection to
¹⁴      form.  Objection.  Asked and
¹⁵      answered.
¹⁶           THE WITNESS:  I don't have
¹⁷      any reason to believe that the
¹⁸      response to the warning letter was
¹⁹      not truthful and accurate.
²⁰ BY MR. HONIK:
²¹      Q.   I understand and you may yet
²² have a reason to think that.
²³           But before we get there, do
²⁴ you agree that if the company came into

Page 395

¹ possession of information from some
² source, a reliable source, that revealed
³ that nitrosamine impurities was indeed
⁴ known and knowable and a potential, that
⁵ it should have revealed it to the FDA,
⁶ yes or no?
⁷           MR. TRISCHLER:  Objection to
⁸      the form.
⁹           THE WITNESS:  That's --
¹⁰      that's not a yes-or-no question,
¹¹      because I don't -- the author of
¹² the document, I don't know what
¹³      information they may have had at
¹⁴      the time they wrote the document.
¹⁵           So you're asking me to
¹⁶      speculate what they knew or didn't
¹⁷      know before they made that
¹⁸      response.  I can't do that.
¹⁹ BY MR. HONIK:
²⁰      Q.   All right.  Well, let's
²¹ unpack that proposition a little further.
²²           So if you look at Gomas-2,
²³ sir.  Do you have that in front of you?
²⁴      A.   I do.

Page 396

¹      Q.   So you see it's from
² Mr. Gomas to Mr. Glover.  You know them
³ both, right?
⁴      A.   Yes, I do.
⁵      Q.   And the attachment refer --
⁶ the subject is warning letter response,
⁷ WL response.  Do you see that?
⁸      A.   Yes.
⁹      Q.   And you see the date of it
¹⁰ is just four days before Mylan actually
¹¹ submitted its formal written response to
¹² the FDA warning letter, correct?
¹³      A.   Yes, it appears to have
¹⁴ preceded it just a few days.
¹⁵      Q.   And Dr. Gomas wrote to
¹⁶ Mr. Glover and said, "we have reviewed
¹⁷ this and have few comments.  Thank you
¹⁸ for sharing the inputs from Lachman."
¹⁹           So you were aware that the
²⁰ folks at quality and Dr. Gomas and
²¹ Mr. Glover were working on behalf of
²² Mylan to prepare a response to this
²³ warning letter and the inquiry that we
²⁴ looked at a moment ago, right?

Page 397

¹      A.   No, I wasn't aware of who
² quality may have been using to prepare
³ the response.
⁴      Q.   No, I know that.
⁵      A.   I was aware -- I was aware
⁶ that we had observations and I know that
⁷ there was a need to respond to those.
⁸ But who quality consulted with, I had no
⁹ knowledge of that.
¹⁰      Q.   Right.  My question is, you
¹¹ know it now, right?
¹²      A.   Based on this e-mail
¹³ exchange we're looking at, it appears
¹⁴ that they have engaged Lachman to review
¹⁵ the draft.
¹⁶      Q.   That's right.  It does
¹⁷ appear that they engaged and obtained
¹⁸ inputs from Lachman, because that's what
¹⁹ Dr. Gomas said to Mr. Glover on
²⁰ November 25, 2019; isn't that right?
²¹           MR. TRISCHLER:  Objection to
²²      form.
²³           THE WITNESS:  Based on this
²⁴      e-mail exchange, that's what it

Page 398

```
 1      appears to say.
 2  BY MR. HONIK:
 3      Q.   And, in fact, it refers to
 4  an attachment which is titled Warning
 5  Letter Mylan Comments By Aloka.
 6          Do you see that?
 7      A.   Yes.
 8      Q.   And just two days before
 9  that, if you look down at the e-mail
10  thread, you've got Mr. Glover writing to
11  Frances Zipp, lo and behold at Lachman
12  Consultants.
13          Do you see that?
14          MR. TRISCHLER:  Objection to
15      form.
16          THE WITNESS:  Frances Zipp
17      is an employee of Lachman.
18  BY MR. HONIK:
19      Q.   Well, in fact, Frances Zipp
20  is the president and CEO of Lachman,
21  isn't that what it says?
22      A.   That appears to be her
23  title, yes.
24
```



Confidential Information - Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Page 422



9 BY MR. HONIK:
10      Q.   Did Mylan ever supplement or
11 amend or edit its response to
12 Observation 1 of the warning letter from
13 June 20th?
14      A.   I don't know what further
15 communications, if any, quality had with
16 the office of compliance.
17      Q.   Well, when you were
18 preparing for today, inasmuch as you
19 reviewed this material, have you seen a
20 single piece of paper or document or
21 spoken to anybody that suggests that the
22 response that said Mylan didn't know
23 about the possibility of NDMA or
24 nitrosamines forming and the industry

Page 423

1 didn't know, was that ever corrected to
2 reflect the truth, which is that it was
3 well known as your consultant said?
4        MR. TRISCHLER:  Objection to
5    the form.  Argumentative.
6    Objection.  Misstates the record.
7        THE WITNESS:  I didn't speak
8    to anyone after reviewing these
9    documents, no.
10       And like I said before, this
11   is a direct communication between
12   quality and FDA.
13       So if there were subsequent
14   communications whether verbal or
15   written, I may not even be aware
16   of those.
17 BY MR. HONIK:
18      Q.   Okay.  But suffice to say in
19 preparation for today, you haven't seen
20 anything that amended the response to
21 Observation 1 from the warning letter of
22 June 2020, right?
23      A.   I'm not aware of anything,
24 but I haven't asked that question.  So I

Page 424

1 don't know.
2      Q.   All right.
3        MR. HONIK:  Why don't we go
4    off the video record, please.
5        THE VIDEOGRAPHER:  The time
6    is 5:01 p.m.  Off the record.
7        (Short break.)
8        MR. HONIK:  Both counsel
9    agree that we are done for the
10   day.  We're going resume at
11   9:00 a.m. tomorrow.
12       MR. TRISCHLER:  Sure.
13   (Excused.)
14       (Adjourned at approximately
15   5:01 p.m.)
16
17
18
19
20
21
22
23
24

Page 425

1
2        CERTIFICATE
3
4
5        I HEREBY CERTIFY that the
witness was duly sworn by me and that the
6 deposition is a true record of the
testimony given by the witness.
7
        It was requested before
8 completion of the deposition that the
witness, S. WAYNE TALTON, have the
9 opportunity to read and sign the
deposition transcript.
10
11
12
_____
MICHELLE L. GRAY,
13 A Registered Professional
Reporter, Certified Shorthand
14 Reporter, Certified Realtime
Reporter and Notary Public
15 Dated:  April 30, 2021
16
17
18       (The foregoing certification
19 of this transcript does not apply to any
20 reproduction of the same by any means,
21 unless under the direct control and/or
22 supervision of the certifying reporter.)
23
24

Confidential Information - Subject to Protective Order

Page 426

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 428

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 429, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
S. WAYNE TALTON            DATE

Subscribed and sworn
to before me this
_____ day of _____, 20____.
My commission expires:_____

_____
Notary Public

Page 427

- - - - -
E R R A T A
- - - - -

PAGE  LINE  CHANGE

_____ _____ _____
REASON:  _____
_____ _____ _____
REASON:  _____
_____ _____ _____
REASON:  _____
_____ _____ _____
REASON:  _____
_____ _____ _____
REASON:  _____
_____ _____ _____
REASON:  _____
_____ _____ _____
REASON:  _____
_____ _____ _____
REASON:  _____
_____ _____ _____
REASON:  _____

Page 429

LAWYER'S NOTES
PAGE  LINE
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____

# Exhibit 99

REDACTED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

- - -

IN RE:  VALSARTAN,      :  MDL NO. 2875
LOSARTAN, AND           :
IRBESARTAN PRODUCTS     :  CIVIL NO.
LIABILITY LITIGATION    :  19-2875
_____ :  (RBK/JS)
                         :
THIS DOCUMENT APPLIES   :  HON. ROBERT
TO ALL CASES            :  B. KUGLER

- CONFIDENTIAL INFORMATION -
SUBJECT TO PROTECTIVE ORDER

VOLUME III

- - -

April 16, 2021

- - -

        Continued videotaped remote
deposition of RICHARD DEREK GLOVER, taken
pursuant to notice, was held via Zoom
Videoconference, beginning at 9:26 a.m.,
EST, on the above date, before Michelle
L. Gray, a Registered Professional
Reporter, Certified Shorthand Reporter,
Certified Realtime Reporter, and Notary
Public.

- - -

        GOLKOW LITIGATION SERVICES
     877.370.3377 ph | 917.591.5672 fax
            deps@golkow.com

Page 627

ZOOM APPEARANCES:

SLACK DAVIS SANGER, LLP
BY: JOHN R. DAVIS, ESQ.
6001 Bold Ruler Way
Suite 100
Austin, Texas 78746
(512) 795-8686
jdavis@slackdavis.com
Representing the Plaintiffs

KANNER & WHITELEY, LLC
BY: DAVID J. STANOCH, ESQ.
LAYNE HILTON, ESQ.
701 Camp Street
New Orleans, Louisiana 70130
(504) 524-5777
d.stanoch@kanner-law.com
l.hilton@kanner-law.com
Representing the Plaintiffs

GOLOMB & HONIK P.C.
BY: RUBEN HONIK, ESQ.
1835 Market Street
Suite 2900
Philadelphia, Pennsylvania 19102
(215) 327-9166
ruben@honiklaw.com
Representing the Plaintiffs

GOLDENBERG LAW, PLLC
BY: BEN STELLPFLUG, ESQ.
800 LaSalle Avenue
Suite 2150
Minneapolis, Minnesota 55402
(612) 436-5028
bstellpflug@goldenberglaw.com
Representing the Plaintiffs

Page 628

ZOOM APPEARANCES:  (Cont'd.)

PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
BY: CLEM C. TRISCHLER, ESQ.
    JASON M. REEFER, ESQ.
    MELISSA B. CATELLO, ESQ.
One Oxford Centre, 38th Floor
Pittsburgh, Pennsylvania 15219
(412) 263-1840
cct@pietragallo.com
jmr@pietragallo.com
mbc@pietragallow.com
Representing the Defendant, Mylan
Pharmaceuticals, Inc.

DUANE MORRIS, LLP
BY: KELLY A. BONNER, ESQ.
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1158
kabonner@duanemorris.com
Representing the Defendants, Zhejiang
Huahai Pharmaceutical Co, Ltd., Prinston
Pharmaceutical Inc., Huahai U.S., Inc.,
and Solco Healthcare US, LLC.

GREENBERG TRAURIG, LLP
BY: BRIAN RUBENSTEIN, ESQ.
1717 Arch Street
Philadelphia, Pennsylvania 19103
(215) 988-7800
rubensteinb@gtlaw.com
Representing the Defendants, Teva
Pharmaceutical Industries, Ltd., Teva
Pharmaceuticals USA, Inc., Actavis LLC,
and Actavis Pharma, Inc.

Page 629

ZOOM APPEARANCES:  (Cont'd.)

FALKENBERG IVES, LLP
BY: MEGAN A. ZMICK, ESQ.
230 W. Monroe Street, Suite 2220
Chicago, Illinois 60606
(312) 566.4808
Maz@falkenbergives.com
Representing the Defendant, Humana

NORTON ROSE FULBRIGHT, US, LLP
BY: ELLIE NORRIS, ESQ.
    JACLYN GALLIAN, ESQ.
2200 Rose Avenue, Suite 3600
Dallas, Texas 75201
(214) 855-8000
ellie.norris@nortonrosefulbright.com
jaclyn.gallian@nortonrosefulbright.com
Representing the Defendant, McKesson
Corporation

CROWELL & MORING, LLP
BY: MIMI S. DENNIS, ESQ.
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
(202) 624-2774
mdennis@crowell.com
Representing the Defendant, Cardinal
Health, Inc.

CIPRIANI & WERNER, P.C.
BY: CAITLIN E. LAWLOR, ESQ.
450 Sentry Parkway, Suite 200
Blue Bell, Pennsylvania 19422
(610) 567-0700
Clawlor@c-wlaw.com
Representing the Defendants, Aurobindo
Pharma, USA, Inc. and Aurolife Pharma,
LLC

Page 630

ZOOM APPEARANCES:  (Cont'd.)

ALSO PRESENT:

VIDEOTAPE TECHNICIAN:
Kayleigh Duran

Bradley Matta, Esq.
(Mylan)

Beth Questad - Paralegal
(Slack Davis)

Page 631

I N D E X

- - -

Testimony of:
    RICHARD DEREK GLOVER
By Mr. Davis         638

- - -

E X H I B I T S

- - -

NO.       DESCRIPTION        PAGE
Mylan
PL-Glover-70 Patient Information   646
    Valsartan Tablets
    USP
    MYLAN-MDL2875-00035696-01
Mylan
PL-Glover-71 Way Back Machine    650
    Mylan Website Resources
    2/13/14

Mylan
PL-Glover-72 Way Back Machine    651
    Mylan Website
    Why Generics?
    2/13/14

Page 632

E X H I B I T S (Cont'd.)
- - -
NO.       DESCRIPTION        PAGE
Mylan
PL-Glover-73 Way Back Machine    657
    Mylan Website
    Our Mylan Is Your
    Mylan
    2/13/14

Mylan
PL-Glover-74 E-mail Thread    671
    5/20/20
    Subject, Discussion on
    Nitrosamine General
    Advice Letter
    MYLAN-MDL2875-00264918-19

Mylan
PL-Glover-75 General Advice    672
    Letter
    2/13/20
    MYLAN-MDL2875-00264920

Mylan
PL-Glover-76 AmerisourceBergen    686
    Exhibit A
    Continuing Guaranty
    And Indemnification
    Agreement
    ABC-MDL2875-00000248

Mylan
PL-Glover-77 Walgreens/    696
    AmerisourceBergen
    Pharmaceutical
    Purchase and Distribution
    Agreement
    Execution Copy
    WALGREENS0000782-14

Page 633

E X H I B I T S (Cont'd.)

NO.       DESCRIPTION        PAGE
Mylan
PL-Glover-78 Sam's Club General    700
    Merchandise Supplier
    Agreement
    WALMART0000597-07
Mylan
PL-Glover-79 PowerPoint    703
    Prescription Product
    Supplier Requirements
    WALMART0000001
Mylan
PL-Glover-80 E-mail Thread    730
    12/26/18
    Subject, Information
    MYLAN-MDL2875-00460527-28
Mylan
PL-Glover-81 EU Referral Under    732
    Article 31
    MYLAN-MDL2875-00460529-31
Mylan
PL-Glover-82 Mylan Technical/    743
    Quality Agreement
    Mylan & Cantech
    MYLAN-MDL2875-00698731
Mylan
PL-Glover-83 E-mail Thread    752
    11/30/18
    MYLAN-MDL2875-00702457
    -001-11

Page 634

E X H I B I T S (Cont'd.)
- - -
NO.       DESCRIPTION        PAGE
Mylan
PL-Glover-84 E-mail Thread    759
    12/6/14
    Subject, Inquiry
    To Valsartan from PMDA
    MYLAN-MDL2875-00255224-27

Confidential Information - Subject to Protective Order

Page 635

- - -

PREVIOUSLY MARKED
EXHIBITS

- - -

NO.        DESCRIPTION        PAGE
Mylan
PL-Glover-2  Amended Notice        662
Of Deposition

Mylan
PL-Glover-54 Warning Letter        668
320-20-06
11/5/19
MYLAN-MDL2875-00345711

Page 636

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
PAGE   LINE
None.

Request for Production of Documents
PAGE   LINE
None.

Stipulations
PAGE   LINE
None.

Questions Marked
PAGE   LINE
None.

Page 637

- - -

THE VIDEOGRAPHER:  We are now on the record.

My name is Kayleigh Duran, a videographer for Golkow Litigation Services.

Today's date is April 16th, 2021, and the time is 9:26 a.m.

This deposition is being held by remote Zoom in the matter of Valsartan, Losartan, and Irbesartan Products Liability Litigation.

The deponent today is Derek Glover, Volume III.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.

All appearances are noted on the stenographic record and the witness has been previously sworn in.

- - -

Page 638

... RICHARD DEREK GLOVER, having been previously sworn, was examined and testified as follows:

- - -

THE VIDEOGRAPHER:  Counsel, you may proceed.

- - -

CONTINUED EXAMINATION

- - -

BY MR. DAVIS:

Q.   Good morning, Mr. Glover. How are you today?

A.   Good morning.  I'm fine. Thank you.

Q.   Good.  Good.  So it's been a while since we talked last, so I wanted to sort of get filled in on who you talked to and met with since our last session, which I believe was March 12th.

So between March 12th and today, have you met with counsel at all regarding preparing for today's deposition?

A.   I have.

Confidential Information Subject to Protective Order

---

Page 639

1    Q.   About how many times?
2    A.   I attended two of Dr. Gomas'
3 prep sessions for about an hour, and then
4 I met yesterday with counsel for a couple
5 of hours.
6    Q.   Okay.  So two separate
7 sessions for Dr. Gomas, each lasting
8 about an hour?
9    A.   Well, his sessions were
10 longer, but I was only able to attend for
11 about an hour.
12    Q.   Okay.  And counsel was
13 present the entire time during those prep
14 sessions with Dr. Gomas?
15    A.   Yeah.
16    Q.   Okay.  And then you said how
17 long -- the meeting yesterday with
18 counsel, how long did that take?
19    A.   It was a couple hours, two
20 or three hours.
21    Q.   Okay.  Did you review
22 documents in this last meeting?
23    A.   We did.
24    Q.   About how many documents?

---

Page 640

1    A.   A handful.
2    Q.   Were they previously marked
3 exhibits?  Did they have yellow stickers
4 on them?
5    A.   I don't know.  They were
6 being presented electronically on a
7 screen.
8    Q.   Okay.  How about -- aside
9 from the prep sessions for Dr. Gomas and
10 for yourself for today, did you meet with
11 anyone else at all regarding your
12 testimony today?
13    A.   No.
14    Q.   Okay.  Have you -- did you
15 endeavor to do more work to prepare
16 yourself for the 30(b)(6) topic that
17 you're testifying on?
18    A.   No, not really.
19    Q.   Okay.  I'm going to start
20 with a set of three or four topics that
21 we haven't touched on yet.  Those are
22 Topics 36 through 39, which relate
23 generally to Mylan's oral and written
24 communications to API customers, finished

---

Page 641

1 dose customers, other downstream entities
2 regarding Mylan's products, the quality,
3 purity, contamination issues, et cetera,
4 relating to Mylan's API and finished dose
5 products.
6         Are you familiar with those
7 topics?
8    A.   Generally, yes.
9    Q.   Okay.  What did you do to
10 prepare yourself to testify on those
11 topics in particular?
12    A.   I think I can only think of
13 maybe seeing a few e-mails throughout
14 prep sessions, but other than that,
15 nothing.
16    Q.   Okay.  Are you familiar that
17 Mylan has three ANDA applications
18 approved relating to valsartan products?
19    A.   Yes.
20    Q.   Okay.  And just for
21 reference, those would be amlodipine
22 valsartan with ANDA Number 090483,
23 correct?
24    A.   That sounds right.

---

Page 642

1    Q.   Okay.  And then valsartan
2 HCTZ, which is ANDA Number 078020?
3    A.   I believe you.  I don't have
4 the ANDA numbers memorized.  But yes, the
5 product name sounds right.
6    Q.   Okay.  And then finally
7 valsartan, plain valsartan, ANDA 090866,
8 does that sound right to you?
9    A.   It does.
10    Q.   Okay.  So for every
11 valsartan-containing pill that was sold
12 in the U.S., Mylan sold those pills
13 pursuant to one of those three ANDAs,
14 correct?
15    A.   Yes.
16    Q.   And I guess the converse of
17 that is Mylan didn't sell any products
18 that contained valsartan not pursuant to
19 any one of those three approved ANDAs,
20 correct?
21    A.   Not to my knowledge, no.
22    Q.   Okay.  And when Mylan sold
23 valsartan-containing products in the U.S.
24 pursuant to those ANDAs, it always

---

Page 643

¹ referred to those products by their
² approved generic names, correct?
³         And what I mean by that is
⁴ amlodipine valsartan, valsartan HCTZ, or
⁵ valsartan, correct?
⁶     A.   I believe so, yes.
⁷     Q.   Okay.  And those products
⁸ were labeled in the FDA-approved manner
⁹ as approved in the respective ANDA
¹⁰ application?
¹¹     A.   Yes.
¹²     Q.   And that includes
¹³ distribution of package inserts and
¹⁴ patient information leaflets?
¹⁵     A.   Whatever is approved in the
¹⁶ application, yes.
¹⁷     Q.   Okay.  Are you familiar with
¹⁸ the package insert for any of the three
¹⁹ valsartan ANDAs?
²⁰     A.   No.
²¹     Q.   Have you ever looked at it?
²²     A.   I have not.
²³     Q.   Okay.  What about the
²⁴ patient information leaflet?

Page 644

¹     A.   I don't believe I've looked
² at it.
³     Q.   Okay.  Are you familiar with
⁴ what a patient information leaflet is
⁵ generally?
⁶     A.   Yes.
⁷     Q.   Okay.  What is it?
⁸     A.   My understanding is the
⁹ patient leaflet is a list of instructions
¹⁰ or warnings or just general facts about
¹¹ the drug.
¹²     Q.   And it's directed at the
¹³ patient, correct?
¹⁴     A.   Yes.
¹⁵     Q.   Okay.  And drafted by Mylan?
¹⁶     A.   I would assume.  I'm not
¹⁷ a -- some expert on the topic, but I
¹⁸ believe we write it in conjunction with
¹⁹ the health authority.  I think it's part
²⁰ of the label package that gets reviewed
²¹ by FDA.
²²     Q.   Correct.  But Mylan submits
²³ its draft patient information leaflet to
²⁴ the FDA for approval, correct?

Page 645

¹     A.   Yeah.  I think the only
² thing that I wouldn't want to mislead in
³ the sense that I think labeling as a
⁴ whole has sort of a brand influence as
⁵ well.
⁶         So when FDA reviews it, they
⁷ generally reflect on the brand content
⁸ and then tries to match as much of that
⁹ information as they can with the brand
¹⁰ product.
¹¹     Q.   Okay.  Nevertheless, Mylan,
¹² you know, with what you said is, you
¹³ know, included in that, Mylan does submit
¹⁴ a Mylan package insert and a Mylan
¹⁵ patient information leaflet for its
¹⁶ valsartan-containing products as part of
¹⁷ those ANDA applications, correct?
¹⁸         MR. TRISCHLER:  Objection.
¹⁹ Asked and answered.
²⁰         Objection beyond the scope.
²¹         Objection.  Lack of
²² foundation.
²³         THE WITNESS:  Yeah, as I
²⁴ mentioned, I think Mylan would

Page 646

¹ issue the first draft and then it
² is routinely back and forth with
³ FDA as FDA pushes the language
⁴ towards continuity with the brand
⁵ product.
⁶         MR. DAVIS:  I'm marking Tab
⁷ 89 as Exhibit, I believe, 70.  I
⁸ think we're starting at 70.
⁹         (Document marked for
¹⁰ identification as Exhibit
¹¹ PL-Glover-70.)
¹²         THE WITNESS:  Okay.
¹³         MR. DAVIS:  Does this --
¹⁴         MR. TRISCHLER:  He has
¹⁵ the -- he has the document, John.
¹⁶         MR. DAVIS:  Okay.  Sure.
¹⁷ BY MR. DAVIS:
¹⁸     Q.   Taking a quick look at it.
¹⁹ It's six pages.  Do you see that it says
²⁰ "Patient Information" at the top of the
²¹ first substantive page?
²²     A.   Yes.
²³     Q.   Okay.  And do you see that
²⁴ Mylan's logo and sort of some

Confidential Information - Subject to Protective Order

Page 647

1 document-identifying information is on
2 the last page at the end?
3     A.   Yes.
4     Q.   Does this look to you to be
5 the Mylan patient information leaflet for
6 valsartan?
7     A.   It looks like it, yes.
8     Q.   Okay.  Take a look at the
9 bottom of Page 5, "What Are the
10 Ingredients in Valsartan Tablets?"
11     A.   Okay.
12     Q.   It says, "Active ingredient
13 valsartan."
14     Do you see that?
15     A.   Yes.
16     Q.   And then it lists a number
17 of inactive ingredients as well?
18     A.   Yes.
19     Q.   And would you agree with me
20 that nitrosamines are listed nowhere in
21 this patient information leaflet,
22 including this "What Are the Ingredients
23 in Valsartan Tablets?" section?
24     MR. TRISCHLER:  Objection.

Page 648

1     Beyond the scope.
2     THE WITNESS:  It does not
3     say that or any other impurity
4     names, nor would it.
5 BY MR. DAVIS:
6     Q.   Okay.  Would you agree that
7 nitrosamines are technically an active
8 ingredient?
9     MR. TRISCHLER:  Objection to
10     form.
11     THE WITNESS:  No.
12 BY MR. DAVIS:
13     Q.   They have an effect on
14 people's bodies, correct, when they
15 ingest them?
16     MR. TRISCHLER:  Objection.
17     Foundation.  Objection.  Beyond
18     the scope.
19     THE WITNESS:  I'm not
20     qualified to answer on whether
21     nitrosamine has an effect or at
22     what levels.  I'm not a
23     toxicologist.
24 BY MR. DAVIS:

Page 649

1     Q.   Okay.  Would you agree that
2 nitrosamines are not listed in the
3 package insert for any of Mylan's
4 valsartan-containing products?
5     MR. TRISCHLER:  Objection.
6     Foundation.
7     Objection.  Beyond the
8     scope.
9     THE WITNESS:  I haven't
10     reviewed all the documents.  I
11     would wager that it's not listed.
12     It's not common to list any -- any
13     impurities of any type in
14     products.  That's not part of the
15     labeling process.
16 BY MR. DAVIS:
17     Q.   Right.  And you would also
18 agree that nitrosamines are nowhere in
19 any of the labeling information for
20 Mylan's valsartan-containing products,
21 right?
22     MR. TRISCHLER:  Same
23     objections.
24     THE WITNESS:  Again, I'm not

Page 650

1     a regulatory expert, but I don't
2     believe so.
3 BY MR. DAVIS:
4     Q.   Okay.
5     MR. DAVIS:  I'm marking Tab
6     104 as Exhibit 71.
7     (Document marked for
8     identification as Exhibit
9     PL-Glover-71.)
10     MR. TRISCHLER:  He has the
11     document, John.
12 BY MR. DAVIS:
13     Q.   I'll represent to you this
14 is a screen shot of Mylan's website from,
15 I guess, somewhere between 2014 and 2015.
16     Are you familiar with the
17 Way Back Machine, Mr. Glover?
18     A.   No, I'm not.
19     Q.   Okay.  It's essentially an
20 internet archive where it goes through
21 and collects websites as they exist at a
22 period of time.  It's like a time capsule
23 for the internet, basically.
24     So this is Mylan's website.

Confidential Information - Subject to Protective Order

Page 651

1  As you can see, the URL is
2  mylan.com.
3       Do you see that up in the
4  top there on Page 1?
5       A.   Yes.
6       Q.   Okay.  And then you'll see a
7  resource section for patients.
8       Do you see that?
9       A.   I do.
10      Q.   Okay.  And then on the
11 second page, tracking down from patients,
12 you'll see that there's three links, one
13 says, "Why generics?"  One says, "Mylan
14 quality," and one says, "Health
15 information."
16      Do you see that?
17      A.   Yes.
18      Q.   Okay.
19      MR. DAVIS:  I'm going to
20 mark Tab 105 as Exhibit 72.
21      (Document marked for
22      identification as Exhibit
23      PL-Glover-72.)
24      THE WITNESS:  Okay.  I have

Page 652

1     it.
2  BY MR. DAVIS:
3       Q.   Okay.  You'll see that the
4  header on this is, "Why generic?"
5       This is the link under the,
6  "Why generics?" tab under Patient
7  Resources we saw on Exhibit 71.
8       Does that look correct to
9  you?
10      A.   Yes.
11      Q.   Okay.  So would you agree
12 that Exhibit 72 is a consistent statement
13 that Mylan is directing to consumers,
14 i.e., patients of Mylan's product?
15      A.   Yes.
16      Q.   Okay.  If you go down to the
17 second page, you'll see a section on
18 bioequivalence.
19      Do you see that?
20      A.   I see the word
21 "bioequivalence," yes.
22      Q.   To the right of that --
23      A.   I see at the top of the page
24 also -- you're talking about the very top

Page 653

1  of the page?
2       Q.   Yes, sir, I am.  So you'll
3  see there's a section on bioequivalence
4  and then some text that Mylan puts in
5  there, "To gain FDA approval," and then
6  it goes on.
7       Do you see that?
8       A.   Yes.
9       Q.   Okay.  Mylan says there
10 that, "Bioequivalence means generic and
11 brand name medicines are the same in the
12 following ways," and then it lists some
13 ways that they are the same, correct?
14      A.   Yes.
15      Q.   Okay.  And that includes --
16 you know, the first thing they list is
17 active ingredient, correct?
18      A.   Yes.
19      Q.   Okay.  Expected safety and
20 efficacy is another one?
21      A.   Yep.
22      Q.   Okay.  And FDA evaluation of
23 manufacturing facilities, correct?
24      A.   Yep.

Page 654

1       Q.   Okay.  So what is this?  Is
2  Mylan trying to convey here that Mylan's
3  generic products are indeed bioequivalent
4  to their brand counterparts?
5       MR. TRISCHLER:  Objection to
6  form.  Beyond the scope.
7       THE WITNESS:  I don't know
8       exactly what the intention of the
9       web page is.  I didn't build it.
10      I wasn't a part of it.
11 BY MR. DAVIS:
12      Q.   Well, you would agree that
13 this is a communication from Mylan
14 directed at patients of Mylan's product,
15 correct?
16      A.   Appears to be, yes.
17      Q.   Okay.  And you're designated
18 on that topic, are you not?
19      MR. TRISCHLER:  No, he's not
20      designated on every communication
21      from Mylan to patients concerning
22      any subject under the universe.
23      It is a misstatement of the
24      scope of the designation, which is

Page 655

1 why I objected to the scope of the
2 question.
3 MR. DAVIS: Well, Topic 38,
4 Clem, says Mylan's oral and
5 written statements to consumers
6 with regard to contents and purity
7 of Mylan's API.
8 MR. TRISCHLER: I don't see
9 anything in here that has to do
10 with Mylan's valsartan API, John,
11 which is why I objected to the
12 scope.
13 MR. DAVIS: Okay. Well, I
14 disagree with that, but we can --
15 MR. TRISCHLER: Well, show
16 me where the word "valsartan"
17 appears in Exhibit 71?
18 MR. DAVIS: Does this --
19 BY MR. DAVIS:
20 Q. Mr. Glover, is Mylan
21 attempting to except valsartan from what
22 it's conveying here to consumers about
23 its product being bioequivalent to their
24 reference-listed drug brand counterparts?

Page 656

1 MR. TRISCHLER: Objection to
2 form.
3 Objection. Beyond the
4 scope.
5 THE WITNESS: Again, I
6 didn't build the web page. I have
7 no idea what the scope or extent
8 of the statement is on the web
9 page.
10 BY MR. DAVIS:
11 Q. It doesn't say -- the text
12 here on Exhibit 72 does not say, "With
13 the exception of valsartan API, generic
14 medicines must be bioequivalent," does
15 it?
16 MR. TRISCHLER: Objection to
17 the form.
18 Objection. Beyond the scope
19 of the designation.
20 You can answer if you can.
21 THE WITNESS: It doesn't say
22 what you said, no.
23 MR. DAVIS: I'm going to
24 mark Tab 106 as Exhibit 73.

Page 657

1 (Document marked for
2 identification as Exhibit
3 PL-Glover-73.)
4 MR. TRISCHLER: Was there a
5 72, John?
6 MR. DAVIS: Yeah, that
7 was -- that was the last one we
8 looked at, the bioequivalence one,
9 Tab 105.
10 MR. TRISCHLER: Oh, I'm
11 sorry. I'm sorry.
12 THE WITNESS: Okay.
13 BY MR. DAVIS:
14 Q. Mr. Glover, you'll see,
15 again, this is from the Way Back Machine,
16 mylan.com.
17 The first couple of pages
18 are some hyperlinks to videos. And then
19 you'll see on Page 3 where the text
20 starts, and it says -- starts with,
21 "Mylan quality."
22 Do you see that?
23 A. I'm sorry. Are we still on
24 Page 1? I got lost.

Page 658

1 Q. I'm sorry. Yeah, so Page 1
2 and 2 and 3 appear to be some hyperlinks
3 to videos that are reflected in this
4 printout of the website.
5 And then you'll see a Page 3
6 where substantive text starts with,
7 "Mylan quality."
8 Do you see that?
9 A. Yes, I do.
10 Q. Okay. And if you refer back
11 to Exhibit 71, you'll see, again, that
12 that's a hyperlink under the Patient
13 Resource portion of Mylan's website as it
14 existed at this time, correct?
15 A. I believe you.
16 Q. Okay. And so would you
17 agree that, again, this Exhibit 73 is a
18 resource directed at patients regarding
19 Mylan quality?
20 MR. TRISCHLER: Objection to
21 the form.
22 Objection. Beyond the
23 scope.
24 THE WITNESS: My guess is

Confidential Information - Subject to Protective Order

Page 659

1  that it's available to anybody who
2  wants to read it.
3  BY MR. DAVIS:
4  Q.  Okay.  You'll see a quote
5  from Robert Corey there.  Who is Robert
6  Corey?
7  A.  He's the executive chairman
8  of the board.
9  Q.  Does he still serve in that
10 role?
11 A.  I'm not exactly sure.  I
12 know he's chairman of the board, but he
13 may have another title also.
14 Q.  Okay.  He says there, "We
15 have one global quality standard because
16 we know where our priorities are.  It all
17 starts and ends with you."
18 Do you read the "you" there
19 as being the patient?
20 MR. TRISCHLER:  Objection to
21 form.
22 Objection.  Beyond the
23 scope.
24 THE WITNESS:  I'd be purely

Page 660

1  speculating.  I'm guessing it's
2  anyone who's reading the message.
3  BY MR. DAVIS:
4  Q.  Okay.  And that message, as
5  you testified, was directed towards
6  patients as a patient resource, correct?
7  MR. TRISCHLER:  Objection.
8  Misstates testimony.
9  THE WITNESS:  I think it's
10 everyone who reads it.  So
11 patients are a part of that pool.
12 I'm guessing there's more than
13 just patients that read.
14 BY MR. DAVIS:
15 Q.  Well, sure.  As you saw,
16 this particular page falls -- or fell
17 under the Patient Resource section of
18 Mylan's website as it existed at the
19 time, correct?
20 A.  It does, but I don't -- I'm
21 guessing.  Again, I didn't build the web
22 page.  But I'm sure you don't have to
23 prove you're a patient to go to click on
24 the link.  So I'm guessing anyone who

Page 661

1  wants to read it, can read it.
2  Q.  Okay.  And you'll see to the
3  right there, there's a little cut-out
4  paragraph, "Why generics?"  And it says,
5  "Low cost and high quality."
6  Do you see that?
7  A.  Yes.
8  Q.  Okay.  What does high
9  quality mean to you?
10 A.  High quality means that it
11 meets all the standards of
12 pharmaceuticals within its intended
13 marketplace according to the health
14 authorities.
15 Q.  Okay.  Did Mylan at all
16 relevant times, prior to the recall, hold
17 out the valsartan-containing products as
18 being non-adulterated and in compliance
19 with the FDCA requirements?
20 MR. TRISCHLER:  Objection to
21 the form.  Objection to the extent
22 that it calls for a conclusion of
23 law.
24 MR. DAVIS:  I'm asking what

Page 662

1  Mylan held out, not whether in
2  fact that was the case.
3  THE WITNESS:  That didn't
4  come out to me in your question.
5  Can you explain that to me?
6  BY MR. DAVIS:
7  Q.  Sure.  As you saw, you --
8  yeah, sorry to cut you off there.  I
9  didn't mean to do that.
10 I'm referring -- these
11 questions are in the context of Topics 36
12 through 39.  Do you have those in front
13 of you?
14 A.  No.
15 Q.  Let me go back to --
16 MR. DAVIS:  I'm going to
17 publish on my screen Plaintiff
18 Glover-2.
19 (Previously marked
20 PL-Glover-2.)
21 BY MR. DAVIS:
22 Q.  Do you see this, Mr. Glover?
23 A.  Yeah.
24 Q.  Do you recognize this from

Confidential Information - Subject to Protective Order

1 the first day of your deposition?  It's
2 your -- the amended deposition notice.
3      A.   Yes.
4      Q.   Okay.  Do you see Topics 36
5 through 39 there?
6      A.   Okay.  Yes.
7      Q.   Okay.  And these are the
8 topics that you testified earlier you
9 didn't really do anything to prepare for?
10          MR. TRISCHLER:  Objection to
11     the form.  Misstates testimony.
12          THE WITNESS:  I believe I
13     said I read a few e-mails.
14 BY MR. DAVIS:
15     Q.   And that was it, correct?
16     A.   Yes.
17     Q.   Okay.  What were those
18 e-mails?
19     A.   I don't have them memorized.
20     Q.   Okay.  Who were they -- do
21 you recall who the e-mails were from and
22 to?
23     A.   I don't.
24     Q.   Okay.  How about when they

1 were written, do you remember that?
2      A.   I don't.  It was various
3 years.
4      Q.   Okay.  Pre-recall e-mails or
5 post-recall e-mails?
6      A.   Both.
7      Q.   Okay.  So do you see here
8 that you're designated for, you know,
9 "Mylan's oral and written communications
10 to its API customers or other downstream
11 entities, including wholesalers,
12 retailers, consumers, third-party payors,
13 regarding quality, purity, or
14 contamination issues related to Mylan
15 API"?
16     A.   I do, yes.
17     Q.   And then same thing for
18 finished dose customers, 37?
19     A.   Yes.
20     Q.   And then 38 is sort of all
21 inclusive.  "Mylan's oral and written
22 statements to finished dose
23 manufacturers, wholesalers, retailers,
24 and consumers with regard to the contents

1 and purity of Mylan's valsartan API"?
2      A.   Yes.
3      Q.   Okay.  And 39 is the same
4 thing for finished dose?
5      A.   Yes.
6          MR. TRISCHLER:  Just let the
7     record be clear -- I may have
8     missed it, John, but when you read
9     36 and 37, I think you may have
10    left out the word "valsartan."  I
11    don't know whether that was
12    intentional or inadvertent, or
13    maybe I just didn't hear it.
14         But I just wanted to be
15    clear that's what the designation
16    related to.
17         MR. DAVIS:  Sure, yes, and
18    that's fine.  Although, you know,
19    I'll say that, you know, to the
20    extent that, you know, valsartan
21    is included in a more generalized
22    statement about Mylan's products,
23    you know, that that's something
24    that's fair game, in my opinion,

1 for corporate designee testimony
2 under these topics.
3          MR. TRISCHLER:  And I've not
4     prevented you from asking any
5     question.  But I disagree -- we
6     may disagree as to what the scope
7     of the designation is.
8          MR. DAVIS:  Okay.
9 BY MR. DAVIS:
10     Q.   Okay.  So back to my
11 question, Mr. Glover.  Did Mylan at all
12 times prior to recall hold out its
13 valsartan API and finished dose as being
14 non-adulterated, for example?
15         MR. TRISCHLER:  Objection to
16    form.  Objection to the extent
17    that it calls for a legal opinion
18    or conclusion.
19         You may answer.
20         THE WITNESS:  I don't know
21    what "hold out" means, and I'm not
22    really qualified to answer that
23    question.
24         Mylan manufactured its

Confidential Information Subject to Protective Order

1    product in accordance with the
2    registered specs and methods.  And
3    that was our mission throughout
4    the time that you're referring.
5    BY MR. DAVIS:
6    Q.    Did Mylan make any oral or
7    written statements to any of the
8    following finished dose manufacturers,
9    wholesalers, retailers, or consumers that
10   its products were either adulterated or
11   not-adulterated for valsartan API or
12   finished dose?
13   A.    I'm not aware of any
14   statements in either direction regarding
15   those words, no.
16   Q.    What about the same question
17   with regard to Mylan's API and finished
18   dose valsartan being manufactured in
19   compliance with cGMPs?
20   A.    In compliance with cGMPs,
21   I'm not sure either.  Yeah, I'm not sure.
22   Q.    Does Mylan think an
23   adulterated product can be, quote, "high
24   quality"?

1    MR. TRISCHLER:  Objection to
2    the form.  Argumentative.
3    THE WITNESS:  Again, I'm not
4    qualified to even define
5    adulteration.  I'm not a policy
6    lawyer or regulatory lawyer.
7    BY MR. DAVIS:
8    Q.    Well, the FDA has told Mylan
9    that its valsartan API and finished dose
10   is adulterated if it contains
11   nitrosamines, correct?
12   MR. TRISCHLER:  Objection to
13   the form.
14   THE WITNESS:  I'm not aware
15   of that either.  I'm not aware
16   that statement was made.
17   BY MR. DAVIS:
18   Q.    Do you have Plaintiff
19   Glover-54 in front of you?
20   (Previously marked
21   PL-Glover-54.)
22   MR. DAVIS:  Clem, that was
23   in the documents that I sent over
24   this morning.

1    I can publish it as well.
2    Either way.
3    MR. TRISCHLER:  No, if you
4    give -- if you give me a minute, I
5    can get it.
6    Exhibit 54?
7    MR. DAVIS:  Plaintiff Glover
8    Exhibit 54.
9    BY MR. DAVIS:
10   Q.    Do you recall this being the
11   Unit 8 warning letter dated November 5,
12   2019, Mr. Glover?
13   A.    Yes, I do.
14   Q.    And you would agree, would
15   you not, that Unit 8 is still under
16   "official action indicated" status,
17   correct?
18   A.    They are.
19   Q.    Okay.  And do you see on the
20   first page, the cover letter, the
21   paragraph that reads, "Because your
22   methods, facilities, or controls for
23   manufacturing, processing, packing, or
24   holding do not conform to cGMP, your API

1    are adulterated"?
2    Do you see that?
3    A.    I do.  Yeah, I see it.
4    Q.    Okay.  Does that remind you
5    that the FDA has determined that Mylan's
6    API coming from Unit 8 is adulterated?
7    MR. TRISCHLER:  Objection to
8    form.
9    THE WITNESS:  It reminds me
10   FDA took that position.
11   It doesn't mean we agree
12   with it, and it doesn't mean that
13   there isn't ongoing discussions
14   with FDA regarding everything in
15   this warning letter.
16   So -- but, yeah, it reminds
17   me that FDA did write this.
18   BY MR. DAVIS:
19   Q.    Okay.  And it's the FDA's
20   determination that matters, correct, not
21   what Mylan disagrees or agrees with on
22   determinations of whether a product is
23   adulterated under the regs, correct?
24   MR. TRISCHLER:  Objection to

Confidential Information - Subject to Protective Order

Page 671

```
 1      form.
 2           THE WITNESS:  I'm not a
 3      regulatory lawyer.  I'm not
 4      exactly sure who has final say.  I
 5      know the Department of Justice
 6      also gets involved in these
 7      situations in certain
 8      circumstances.
 9  BY MR. DAVIS:
10      Q.   Has DOJ gotten involved in
11  this Unit 8 situation?
12      A.   Not at this point, no.
13      Q.   Are you familiar with an FDA
14  general advice letter saying that if
15  nitrosamines are detected above the
16  interim threshold, that that
17  automatically means the product is
18  adulterated?
19      A.   I'm not familiar with it,
20  no.
21           MR. DAVIS:  I'm marking
22      Tab 310 as Exhibit 74.
23           (Document marked for
24      identification as Exhibit
```

Page 672

```
 1      PL-Glover-74.)
 2           THE WITNESS:  Okay.  I have
 3      it.
 4  BY MR. DAVIS:
 5      Q.   You'll see that this is an
 6  e-mail among a number of individuals at
 7  Mylan, including several that report to
 8  you, including for example, Dr. Gomas.
 9           Do you see him on there?
10      A.   I do.
11      Q.   Okay.  And the attachment
12  is, "Nitrosamine general advice letter,
13  February 2020.pdf."
14           Do you see that?
15      A.   I see a reference to it,
16  yes.
17           MR. DAVIS:  Okay.  I am
18      marking Tab 311 as Exhibit 75.
19           (Document marked for
20      identification as Exhibit
21      PL-Glover-75.)
22           THE WITNESS:  I have it.
23  BY MR. DAVIS:
24      Q.   Is this a letter that you've
```

Page 673

```
 1  seen before?
 2      A.   It looks vaguely familiar,
 3  yes.
 4      Q.   Okay.  Do you see on the
 5  third page -- or actually, really,
 6  it's -- if you use the numbering in the
 7  top left, it'll be Page 2 of the letter.
 8      A.   Okay.
 9      Q.   And Then the second-to-last
10  paragraph, it reads, "If n-nitrosamines
11  are detected in a drug product above the
12  ADI in any distributed batch of DP within
13  the labeled expiration date, the drug is
14  considered to be adulterated and may also
15  be misbranded under Sections 501 and 502
16  of the FDCA respectively."
17           Do you see that?
18      A.   Yes.
19      Q.   Okay.  Does that remind you
20  that the FDA's position is that if
21  nitrosamines are present in drug product
22  above the acceptable daily intake interim
23  limits, that the FDA considers that drug
24  product to be adulterated?
```

Page 674

```
 1           MR. TRISCHLER:  Objection to
 2      form.  Vague as to time.
 3           THE WITNESS:  I understand
 4      that as of February 20th or
 5      whenever this was issued, they
 6      took this position, yes, I
 7      understand that's their position
 8      now.
 9  BY MR. DAVIS:
10      Q.   Do you have any reason to
11  believe that was not the FDA's position
12  in 2018 when it first learned of
13  nitrosamine contamination in valsartan
14  API and finished dose product?
15      A.   Well, prior to that point,
16  they hadn't established any limits or
17  expectations, and the established limits
18  are what we release product against.
19  These are new limits established after
20  the investigations were completed.  And
21  now they've established a new criteria
22  for distribution.
23      Q.   Recalls happened back in
24  2018, did they not?
```

Confidential Information - Subject to Protective Order

Page 675

1   A.   Yes.
2       Q.   And the FDA insisted on
3   those recalls happening, correct?
4       A.   No.  FDA doesn't insist
5   recalls.  FDA works with the industry,
6   and the industry takes voluntary action.
7       Q.   Are you --
8       A.   They don't have jurisdiction
9   to demand recalls.  They can do seizures.
10      Q.   Are you familiar with any
11  FDA communications with Mylan around late
12  2018 where the FDA conveyed an
13  expectation that Mylan would recall its
14  valsartan API and finished dose for
15  nitrosamine contamination?
16      A.   I mean, they're allowed to
17  do that.  But they don't demand recalls.
18  They work with the industry and make
19  suggestions.  But the industry takes
20  voluntary action as recall.  And that's
21  what we did.  We did a voluntary recall.
22      Q.   Correct.  And so had Mylan
23  not done a voluntary recall, you don't
24  know whether the FDA would have invoked a

Page 676

1   seizure authority, do you?
2       A.   I do not.
3       Q.   Thank you.  So I think
4   before we went off on that little
5   diversion, I was asking whether -- and
6   again, this relates to Topics 38 and 39,
7   whether Mylan conveyed to finished dose
8   manufacturers, wholesalers, retailers or
9   consumers that its valsartan API or
10  finished dose products were not
11  adulterated?
12      A.   Yeah, again, my answer --
13          MR. TRISCHLER:  Objection.
14      Asked and answered.
15          THE WITNESS:  -- is the
16      same.
17          I'm not aware of any
18      communications with those types of
19      words in them from -- from our
20      company.
21  BY MR. DAVIS:
22      Q.   And is your answer the same,
23  that you're not aware for any
24  communications that Mylan's valsartan API

Page 677

1   and finished dose were manufactured under
2   cGMPs sufficient to assure the quality of
3   the product?
4       A.   Again, I'm not certain of
5   any public statements or, you know, any
6   issuance of any statements like that, no.
7       Q.   Is there something
8   inconsistent in your mind about saying
9   that a product is high quality,
10  meaning -- that that same product that's
11  high quality could also be adulterated?
12          MR. TRISCHLER:  Objection to
13      form.  Argumentative.
14          Objection to the extent that
15      it calls for a legal conclusion
16      and opinion.
17          You can answer if you can.
18          THE WITNESS:  No, I don't
19      find anything contradictory about
20      what you just said.  I don't know
21      how you even put that together.
22  BY MR. DAVIS:
23      Q.   I guess -- let me rephrase
24  the question.

Page 678

1       Can a product be both -- can
2   Mylan's valsartan API or finished dose be
3   both high quality and adulterated at the
4   same time?
5           MR. TRISCHLER:  Objection to
6       form.
7           THE WITNESS:  Adulteration
8       is not a definition that I define.
9       I'm not a lawyer.  I'm not a
10      regulator.
11          High quality is probably
12      something that is more
13      generalized.
14          And so it's certainly
15      possible that a product can be
16      high quality one day and by the
17      FDA's definition, adulterated the
18      next.
19          So that's as good as I can
20      give it to you.
21  BY MR. DAVIS:
22      Q.   How about, can Mylan's
23  valsartan API and finished dose be both
24  high quality and not manufactured under

Confidential Information Subject to Protective Order

Page 679

¹ cGMP controls sufficient to assure the
² quality of the product?
³         MR. TRISCHLER:  Objection to
⁴    the form.  Vague.
⁵         Objection.  Incomplete
⁶    hypothetical.
⁷         Objection.  Beyond the scope
⁸    because it has nothing to do with
⁹    anything.
¹⁰ BY MR. DAVIS:
¹¹    Q.  You can answer the question,
¹² Mr. Glover.
¹³    A.  Yeah.  I mean, there's
¹⁴ really no answer to it.  I mean, not
¹⁵ manufactured under GMP conditions is so
¹⁶ incredibly vague, that it's as varied as
¹⁷ the impression of the people that would
¹⁸ make that statement, whether it's
¹⁹ inspectors, regulators, auditors.
²⁰         And so you can absolutely be
²¹ high quality and have someone have an
²² opinion about your GMP compliance status.
²³ That happens every day for every company
²⁴ across the world.

Page 680

¹    Q.  Well, not just someone
² having an opinion in the case of
³ valsartan API manufactured at Unit 8.
⁴ Unit 8 received a warning letter after
⁵ two inspections, and it's still under
⁶ "official action indicated" status,
⁷ correct?
⁸         MR. TRISCHLER:  Objection to
⁹    the form.
¹⁰         Asked and answered about 62
¹¹    times over the course of Day 3 of
¹² this deposition.
¹³         But if you want to answer
¹⁴    again whether there's -- whether
¹⁵    "official action indicated" is the
¹⁶    status of Unit 8 --
¹⁷         THE WITNESS:  Right.
¹⁸         MR. TRISCHLER:  -- please
¹⁹    let's do it again.
²⁰         THE WITNESS:  Unit 8 is
²¹    under OAI status at this point.
²²    FDA's 483s and warning
²³    letters reflect their opinion of
²⁴    conditions they found in the

Page 681

¹    facility.
²         It doesn't necessarily
³    reflect what we agree and
⁴    certainly doesn't mean that our
⁵    products aren't high quality.
⁶ BY MR. DAVIS:
⁷    Q.  It reflects the FDA's
⁸ position of cGMP deviations at Unit 8,
⁹ correct?
¹⁰         MR. TRISCHLER:  Objection
¹¹    to -- objection to form.
¹²         Objection.  Asked and
¹³    answered.
¹⁴         THE WITNESS:  Yeah, again,
¹⁵    it reflects certain opinions of
¹⁶    certain people.
¹⁷ BY MR. DAVIS:
¹⁸    Q.  It reflects the opinions of
¹⁹ the agency, correct?
²⁰         MR. TRISCHLER:  Objection.
²¹         THE WITNESS:  People within
²²    the agency.  I mean, look, I don't
²³    know how many times I have to tell
²⁴    you.  I don't necessarily agree

Page 682

¹    with the FDA's, you know, position
² on certain topics.
³         And so, yeah, if you're
⁴    asking me if FDA issued a warning
⁵    letter for Unit 8, yes, they did.
⁶         Are they under OAI status?
⁷    Yes, they are.
⁸         If you're asking me more
⁹    about their opinion, you should
¹⁰    call them.
¹¹ BY MR. DAVIS:
¹²    Q.  Well, right.  And I'm trying
¹³ to get at -- those are agency actions,
¹⁴ correct, not actions of some individual
¹⁵ acting on their own directives within
¹⁶ the agency.  Those are official FDA
¹⁷ agency actions that have been taken,
¹⁸ correct?
¹⁹    A.  That's not necessarily true
²⁰ though.  I mean, they begin an end with
²¹ an individual's opinion.  And so I'm not
²² going to spend an exhaustive amount of
²³ time describing the operation within the
²⁴ agency.  It doesn't really matter.

Confidential Information – Subject to Protective Order

Page 683

1    I can validate for you that
2  Unit 8 is -- has received a warning
3  letter and is under OAI status.
4    I can't tell you what FDA's
5  opinion is.
6    Q.   Okay.  But it's not, you
7  know, John Doe at the FDA who personally
8  decides that, you know, Mylan Unit 8 is
9  OAI, and that's his personal opinion.
10   When Mylan's Unit 8 is
11 listed as OAI, that's an official agency
12 action that's being taken, correct?
13   MR. TRISCHLER:  Objection.
14   THE WITNESS:  It is.
15   MR. TRISCHLER:  Asked and
16   answered.
17   THE WITNESS:  And it also
18   establishes that Unit 8 can
19   continue to distribute all of its
20   product in the United States.
21   So if FDA really had a major
22   concern, they wouldn't be allowing
23   the product to come through the
24   customs border.

Page 684

1    So I don't think it's fair
2  to equate warning letter or OAI
3  status with some type of, you
4  know, grand concern about the
5  quality of the products.
6    It's the process of
7  regulation.  It's the way FDA
8  communicates opportunities to
9  enhance certain procedures.
10 BY MR. DAVIS:
11   Q.   Well, didn't you just tell
12 me I'd have to go talk to someone at the
13 FDA to get their personal opinions on
14 this stuff?  And now you're saying -- now
15 you're drawing conclusions about what is
16 in their minds, are you not?
17   A.   I'm not.  I'm stating facts.
18 I'm giving you the fact that FDA has not
19 placed an import ban on Unit 8.
20   Q.   They have not yet, have
21 they?
22   A.   Yet?  Is that a question?
23 No, FDA has not issued an import ban.
24   Q.   Okay.  And that's yet,

Page 685

1  because Mylan is still, in the FDA's
2  designation, is OAI, meaning that Mylan's
3  Unit 8 has not resolved the agency's
4  objections to the GMP conditions there,
5  correct?
6    MR. TRISCHLER:  Objection to
7    the form.  Misstates facts.
8    Mischaracterizes evidence.
9    You can answer again.
10   THE WITNESS:  Yeah, again, I
11   think from our position, we
12   believe we have satisfied the
13   FDA's concerns and we've provided
14   that information to them.
15 BY MR. DAVIS:
16   Q.   Are you familiar with what,
17 if anything, Mylan conveys directly to
18 wholesalers or other direct purchasers of
19 Mylan's valsartan API and finished dose
20 regarding the contents and purity of
21 valsartan API or finished dose?
22   A.   Do you mean as far as
23 official communication?  No, I'm not
24 aware of what materials are provided.

Page 686

1  I'm not across that, no.
2    Q.   Okay.  Let's take an
3  example.
4    MR. DAVIS:  I'm marking Tab
5    309 as Exhibit 76.
6    (Document marked for
7    identification as Exhibit
8    PL-Glover-76.)
9    THE WITNESS:  Okay.  I have
10   it.
11 BY MR. DAVIS:

Confidential Information - Subject to Protective Order



Confidential Information - Subject to Protective Order

Page 691



Page 695

Page 697

¹  it.

²  BY MR. DAVIS:

18    MR. DAVIS:  I'm going to

19  mark Exhibit 312 -- sorry, Tab 312

20  as Exhibit 77.

21    (Document marked for

22  identification as Exhibit

23  PL-Glover-77.)

24    THE WITNESS:  Okay.  I have

Confidential Information - Subject to Protective Order

Page 699



Confidential Information - Subject to Protective Order



Page 703

15    MR. DAVIS:  I'm going to
16  mark Tab 314 as Exhibit 79.
17      (Document marked for
18  identification as Exhibit
19  PL-Glover-79.)
20      THE WITNESS:  I have it.
21  BY MR. DAVIS:



Page 707

2     MR. DAVIS:  Okay.  We've
3  been going about an hour, Clem.
4  Do you want to take a break?
5     MR. TRISCHLER:  Whenever you
6  want to, John.
7     MR. DAVIS:  Okay.  That's
8  fine.  Let's take a break.  I've
9  got a -- I'm going to transition
10  to a new topic.  We can go off the
11  record.
12     THE VIDEOGRAPHER:  Okay.
13  The time is 10:45 a.m.  Off
14  record.
15     (Short break.)
16     THE VIDEOGRAPHER:  The time
17  is 11:02 a.m.. back on record.
18  BY MR. DAVIS:
19     Q.   Okay.  Mr. Glover, we've
20  been talking about Topics 36, 37, 38, and
21  39 of the notice.  I'm just going to
22  share my screen one more time with
23  Plaintiff Glover-2.
24     And I'll just go through

Page 710

1  each of them.  For 36, Mylan's oral and
2  written communications with its valsartan
3  API customers including vertically
4  integrated facilities or other downstream
5  entities, regarding the quality, purity,
6  or contamination issues related to Mylan
7  API."
8     What documents have you
9  reviewed that fall within that topic?
10     MR. TRISCHLER:  Objection.
11  Asked and answered.
12     THE WITNESS:  Right, so, I
13  mean, I predominately remember
14  looking at e-mails.
15     So, you know, I know this
16  topic has come up numerous times
17  throughout preparation, but I
18  don't have a lot of memorized
19  content about what we were
20  actually reviewing.
21     So -- but the e-mail is what
22  I remember as one of the best
23  examples of this type of
24  communication.

Confidential Information - Subject to Protective Order

Page 711

BY MR. DAVIS:
     Q.   Okay.  What are you -- what oral or written communications are you aware of that fit within Topic 36?
          MR. TRISCHLER:  Same objection.  Asked and answered.
          THE WITNESS:  I don't have them memorized.  I just know I've had many e-mails put in front of me that tend to fall in this category.  So that's what I'm aware of.  I just don't have them memorized.
BY MR. DAVIS:
     Q.   Okay.  Well, your testimony earlier was that it was a couple of e-mails.  Is it now many e-mails?
     A.   I'm sorry.  It's more than one, and less than, you know, 50.  I don't know.  When you asked me the question earlier, I think you -- I at least understood you to be talking about something maybe a little more narrow in scope.

Page 712

          Now that you showed me the scope of this, with like five subparts or four subparts, it's a group of e-mails.  I can't say exactly how big it is, but that was the general topic, as this topic kept coming up.
     Q.   And you can't tell me who the e-mails were from or to?
     A.   No.  I really don't have like a memorized list of e-mails in my head.  I'm sure they will be familiar when you pull them up.  But I think it was a variety of different customers, people, internal people.
          Most of the names are not familiar to me, which is probably one of the main reasons that I don't have them memorized is they tend to be people from the India facility.
     Q.   So these were internal e-mails mostly?
     A.   A lot of them are, yes.
     Q.   Okay.
     A.   There are some external as

Page 713

well.
     Q.   For the external ones, do you recall whether they were directed to wholesalers, retailers, consumers, TPPs, finished dose manufacturers?
     A.   No.  I feel like it was generally customers, you know, so people that were purchasing the API.
     Q.   So finished dose manufacturers, mostly?
     A.   That makes sense, yeah.
     Q.   Okay.  Is the answer the same for 37, which is -- the only difference being it relates to Mylan's finished dose?
     A.   Yes.  Yeah.  Same answer.
     Q.   Okay.  Did you ask anyone at Mylan to say, hey, what have we communicated regarding our API or finished dose to wholesalers, retailers, consumers or TPPs?
     A.   I mean, when I looked for documents or information to support this discovery, I was really looking for

Page 714

mainly things that I could find on valsartan and nitrosamines.
          So I don't know that I intentionally went out there and tried to find communication or e-mails.  I assumed that others were sort of doing that search.
          Again, I wasn't in this capacity back in 2018.  And so there wouldn't be anywhere near as much, if any, of that type of communication that I would have had personally.
     Q.   Have you ever --
     A.   So I wouldn't have been able to find that.
     Q.   Sorry, I didn't mean to cut you off there.  You said that you relied on other people?
     A.   Yes.
     Q.   Okay.  Have you ever, in your time at Mylan, been involved directly with oral and written communications with finished dose facilities that are external to Mylan,

Confidential Information - Subject to Protective Order

Page 715

1 wholesalers, retailers, consumers, or
2 TPPs?
3        A.   It's extremely unusual.
4             Many, many years ago it's
5 possible that I would have gotten on the
6 phone with a customer to talk about an
7 ongoing investigation -- or I shouldn't
8 say a customer.  I should say a supplier.
9             That was usually something
10 that -- if we had an ongoing
11 investigation from an incoming supply and
12 I wanted to get on the phone to talk to
13 them directly, on very, very rare
14 occasions, I would do that.  That would
15 be verbal or oral.  It's incredibly
16 unusual.  I can't remember a time where I
17 would have written to a customer.
18       Q.   Okay.  And you said you --
19 for 36 and 37, you didn't specifically go
20 ask anyone at Mylan to provide you with,
21 you know, what was communicated orally or
22 in written format for any of the entities
23 listed in Topics 36 or 37, correct?
24       A.   That's correct.

Page 716

1             MR. TRISCHLER:  Excuse me.
2       Sorry.
3 BY MR. DAVIS:
4       Q.   And is it the same thing for
5 38 and 39?  You did not in fact go ask
6 anyone for oral or written statements to
7 any of those listed people or entities
8 with regard to the contents or purity of
9 finished dose or API for valsartan?
10      A.   Correct.
11      Q.   Okay.  Who, if you did -- if
12 you had gone and asked someone, who would
13 you have asked for that information?
14            MR. TRISCHLER:  Object to
15      the form.
16            THE WITNESS:  I really don't
17      know who handles that.  I wouldn't
18      even know where to begin.  I would
19      probably have asked counsel to,
20      you know, tell me who they are
21      already working with, is how I
22      would have started.
23 BY MR. DAVIS:
24      Q.   Okay.  You don't even know

Page 717

1 what department you would go to?
2       A.   Yeah, again, I don't really
3 know who handles the interface with the
4 customer.
5             I don't know the commercial
6 operations world that well to be able to
7 tell you.  I really don't know.
8       Q.   Okay.  But you mentioned
9 commercial operations.  Is that where you
10 think those people who would have this
11 information would be?
12      A.   Yeah.  I mean, the people
13 that worked -- I think we talked about,
14 you know, somebody like Joe Duda before.
15 And so he's -- you know, that's the type
16 of area that, you know, you would
17 probably begin to ask questions about to
18 find out who actually faces the customer.
19 I really don't know who those people are.
20      Q.   And do you know whether --
21 you might have said this already.
22            Do you know whether Joe Duda
23 is an employee of Mylan still or not?
24      A.   I'm not sure.  Yeah, I'm not

Page 718

1 sure.
2       Q.   Did you -- were you
3 surprised to see that you were designated
4 on these topics?
5             MR. TRISCHLER:  Objection to
6      form.
7             THE WITNESS:  No, only
8      because it says valsartan and so I
9      assume that valsartan and
10     nitrosamines, that those documents
11     would be, you know, covered.
12            And we did cover many, or,
13     you know, several of those e-mail
14     communications.  So that doesn't
15     seem --
16 BY MR. DAVIS:
17      Q.   Did you -- and I'm going to
18 ask you to limit your answer to this
19 question to yes or no.  But did you ask
20 counsel in preparation for this what
21 these topics meant or were asking for?
22            MR. TRISCHLER:  Objection.
23     I think you just asked him to
24     tell -- I think you just asked for

Confidential Information - Subject to Protective Order

Page 719

1  him to disclose a privileged
2  communication.
3       MR. DAVIS:  No.  I asked --
4       MR. TRISCHLER:  You asked --
5  you asked him -- what -- you asked
6  what questions he asked of counsel
7  to help prepare him for this
8  deposition.
9       MR. DAVIS:  Well, let me
10  ask --
11       MR. TRISCHLER:  I believe
12  that's privileged.
13       MR. DAVIS:  Let me ask it a
14  different way.
15  BY MR. DAVIS:
16       Q.   Did you -- you said that
17  your interpretation of these was based on
18  valsartan and nitrosamines, correct?
19  That's what you just testified?
20       A.   Correct.
21       Q.   Okay.  But nowhere in any of
22  these -- let's take 38 and 39 for
23  example.
24       Nowhere in Topics 38 or 39

Page 721

1       Q.   Sure.  You know, you've
2  referred, I believe, to finished dose
3  manufacturers that are external as
4  customers, correct?  Would you agree that
5  those are customers of Mylan for API?
6       A.   Yes.

Page 720

1  is contamination or nitrosamine
2  contamination mentioned at all, right?
3       MR. TRISCHLER:  Objection to
4  form.
5       THE WITNESS:  I see the word
6  "purity."  And so I just assumed
7  that the word purity is also
8  inferring that this is valsartan
9  API and the situation related to
10  nitrosamine.
11  BY MR. DAVIS:
12       Q.   And my follow-on question
13  is -- and again, yes or no, did you have
14  any conversations with counsel regarding
15  what these 36 through 39 actually meant?
16  Just yes or no.
17       A.   We had a discussion about
18  each one of these items.
19       Q.   Are you aware of any
20  presentations that were made to finished
21  dose manufacturers regarding the contents
22  or purity of Mylan's API for valsartan?
23       A.   What do you mean by
24  presentation?

Confidential Information Subject to Protective Order



Page 723

Page 725

1    information than others.  And so
2    you've shown me enough documents
3    in the past hour and a half that
4    I'm at least aware that they seem
5    to be somewhat interested in
6    getting some information about
7    the, you know, the supplier of the
8    products.
9         But I'm not very familiar
10   with that.
11 BY MR. DAVIS:
12       Q.   Okay.  And are you at least
13 familiar enough that wholesalers tend to
14 buy directly from the manufacturer?
15       A.   Yeah, I am aware.  Yeah, I'm
16 sorry.  Yeah.
17       Q.   And as we saw, for example,
18 that -- when that contractual
19 relationship for Mylan to supply its
20 product to a wholesaler is entered into,
21 that comes with some documents that are
22 signed, correct?
23          MR. TRISCHLER:  Objection to
24    the form.

Page 726

1          Objection.  Beyond the
2    scope.
3          THE WITNESS:  Yeah, I would
4    be completely assuming or
5    speculating that there is.  But I
6    think you've shown me at least
7    one.
8 BY MR. DAVIS:
9       Q.   And so in order to secure
10 that business from wholesalers -- because
11 they are customers of Mylan as well,
12 right?  They purchase product from Mylan?
13       A.   Yes.
14       Q.   Okay.  Are you familiar with
15 what Mylan conveyed to wholesalers
16 regarding the contents and purity of its
17 valsartan API or finished dose?
18       A.   I am not, no.
19       Q.   Okay.  Who would I speak to
20 to get more information about that?
21       A.   Again, I have no idea who
22 that would be.
23       Q.   Okay.  Are you familiar that
24 some retailers also source directly from

9        Q.   Okay.  What about
10 wholesalers?  What's your understanding
11 of how Mylan interacts with wholesalers
12 for generic pharmaceutical products?
13          MR. TRISCHLER:  Objection to
14    form.
15          Objection.  Beyond the
16    scope.
17          THE WITNESS:  Yeah, I'm not
18 super familiar with the
19 relationship management side of
20 wholesalers.
21       I know there's a variety of
22 different, you know, dynamics that
23 are at play there.
24       Some wholesalers want more

Confidential Information - Subject to Protective Order

Page 727

1  manufacturers?
2      A.   Yeah.
3      Q.   Okay.  And is your answer
4  the same for them, you're not familiar
5  with what was conveyed to them?
6      A.   That's correct.
7      Q.   Okay.  And how about
8  consumers, did you -- I believe you said
9  that you had not looked at the patient
10  information leaflet that I showed you
11  which was Exhibit 70, correct?
12      A.   I had not reviewed it.  I
13  was familiar that they exist, though.
14      Q.   Okay.  And did you review
15  any communications that Mylan had with
16  consumers regarding the contents and
17  purity of Mylan's valsartan API or
18  finished dose?
19      A.   I'm not sure.
20      Q.   What about quality or
21  contamination issues of Mylan's API or
22  finished dose, 36 and 37, for consumers?
23      A.   For consumers?  I would have
24  reviewed the -- at minimum, I'm sure I

Page 728

1  saw the recall notice.
2      Q.   Okay.  Any -- can you recall
3  anything else?
4      A.   I'm not sure.
5      Q.   Would you agree that
6  consumers are, you know, the ultimate,
7  you know, beneficiary of receiving
8  quality pharmaceutical products?  They're
9  the ones who ingest them, right?
10      MR. TRISCHLER:  Objection to
11  form.
12      THE WITNESS:  Yeah.
13  BY MR. DAVIS:
14      Q.   Sorry.  You can answer,
15  Mr. Glover.
16      A.   I answered yes.
17      Q.   Thank you.  Do you recall --
18  I can't remember if this was Day 1 or Day
19  2 of the deposition.  We were talking
20  about process validation for recovered
21  solvent processes.
22      Do you recall that
23  discussion?
24      A.   Yeah.

Page 729

1      Q.   Okay.  And I believe you
2  told me that process validation documents
3  for those processes would sit at the
4  supplier; is that correct?
5      A.   I think you have to be more
6  specific.  Can you say that --
7      Q.   Sure.  I can even -- I can
8  even quote you back to you.  You said the
9  process validation for recovery would
10  likely sit at the service provider
11  itself.  And then for Unit 8, Lantech was
12  the name of the company that was the
13  service provider.
14      Do you recall telling me
15  that?
16      A.   I'm sure we were -- sorry.
17      I'm sure we were speaking
18  about a very specific unit operation
19  validation.
20      So if, in fact, there was a
21  process validation that was performed
22  specific to the recovery itself with no
23  other context, then yes they would do it
24  at their site.

Page 730

1      Q.   Okay.  And you said that
2  those documents would live at the site?
3      A.   I was speculating, but, yes,
4  I would assume that if they existed,
5  they'd live at the site.
6      MR. DAVIS:  I'm marking Tab
7  305 as Exhibit 80.
8      (Document marked for
9  identification as Exhibit
10  PL-Glover-80.)
11      THE WITNESS:  Okay.
12  BY MR. DAVIS:



24      Q.   Okay.  And he's e-mailing

Confidential Information - Subject to Protective Order



Page 731

¹ that to several individuals at Mylan,
² correct?
³      A.   Yep.
⁴      Q.   Okay.  The EDQM is what
⁵ again?
⁶      A.   They're a European health
⁷ authority.  I won't be able to tell you
⁸ specifically.  I get them confused with
⁹ EMA all the time.  But they're either an
¹⁰ outsource or contract group that does
¹¹ inspections for EMA, or there's some
¹² relationship between EMA and EDQM.
¹³      Q.   Are they like a sub-agency
¹⁴ within EMA or --
¹⁵      A.   That's how I've always
¹⁶ understood it.  Well, I don't know that
¹⁷ they are actually a part of EMA.  I think
¹⁸ the EMA just uses them to perform
¹⁹ inspections.  But again, don't quote me.
²⁰ I'm not exactly sure.
²¹      Q.   Okay.  Do you know --
²²      A.   Or they represent the health
²³ authority.  Yeah.
²⁴      Q.   Okay.  Understood.

Page 732

¹      MR. DAVIS:  I'm going to
² mark Tab 306 as Exhibit 81, which
³ is the attachment.
⁴      (Document marked for
⁵ identification as Exhibit
⁶ PL-Glover-81.)
⁷      THE WITNESS:  Okay.
⁸ BY MR. DAVIS:

Confidential Information - Subject to Protective Order

Page 735



Confidential Information -- Subject to Protective Order



Page 739

Page 741

1    THE VIDEOGRAPHER:  The time
2  is 11:41 a.m.  Back on record.
3    MR. DAVIS:  Michelle, can
4  you read back the last question
5  and answer.  I lost my place.
6    (Whereupon, the court
7  reporter read back the requested
8  portion of testimony.)
9  BY MR. DAVIS:
10    Q.   You said you assumed that it
11  was acceptable based on the
12  specification, correct?
13    A.   That was the established
14  acceptance criteria, right.
15    Q.   That's -- you're referring
16  to the specification there?
17    A.   Yeah.

15    (Zoom freeze.)
16    (Whereupon, a discussion was
17  held off the record.)
18    MS. HILTON:  Let's go off
19  the record.  I'm going to see
20  what's going on for John.
21    THE VIDEOGRAPHER:  Okay.
22  The time is 11:37 a.m.  Off
23  record.
24    (Short break.)

Confidential Information - Subject to Protective Order



Page 743

14  process.  I'm not sure.
15      Q.    Okay.
16          MR. DAVIS:  I'm marking Tab
17  307 as Exhibit 82.
18          (Document marked for
19  identification as Exhibit
20  PL-Glover-82.)
21          THE WITNESS:  Okay.
22  BY MR. DAVIS:

Confidential Information - Subject to Protective Order

Page 747



Confidential Information - Subject to Protective Order



Page 751

Page 753

¹ subject of which appears to be in
² Japanese.
³         Do you see that?
⁴     A.   Yes.
⁵     Q.   Okay.  I'm going to direct
⁶ you to -- you'll see in the bottom right
⁷ corner there's a Bates number, and then
⁸ there's an underscore, and then there's
⁹ three numbers after the underscore.  I'm
¹⁰ going to direct you to 007.
¹¹     A.   Okay.
¹²     Q.   Do you see that the full
¹³ e-mail on that page is from Sandra
¹⁴ Blondell to Dr. Gomas and Jyothi
¹⁵ Abbineni, among others?
¹⁶     A.   Yes.
¹⁷     Q.   Do you know who is an Sandra
¹⁸ Blondell is?
¹⁹     A.   She's the head of quality
²⁰ for Australia, New Zealand.  I think she
²¹ has Japan as well.
²²     Q.   Okay.  And so she reports up
²³ to you as the global head of quality,
²⁴ correct?

Page 754

¹     A.   She reports to Dr. Gomas, I
² believe or Patrick -- well, it's
³ Dr. Gomas, I think.
⁴     Q.   Who then reports to you,
⁵ correct?
⁶     A.   Correct.
⁷     Q.   Okay.  So Ms. Blondell is
⁸ within your chain of command, so to
⁹ speak?
¹⁰     A.   Yes.
¹¹     Q.   Okay.  Do you see where she
¹² says -- and this is November 21st, 2018.
¹³ She says, "For example we saw" -- "For
¹⁴ example, in valsartan we saw that NDEA
¹⁵ was BDL for the Japan batches due to
¹⁶ additional purification."
¹⁷         Do you see that?
¹⁸     A.   I do.
¹⁹     Q.   What is she saying there?
²⁰     MR. TRISCHLER:  Objection.
²¹ Excuse me.
²²         Objection.  Beyond the
²³ scope.
²⁴         Objection to form.

¹⁰     MR. DAVIS:  I'm going to
¹¹ mark Tab 301 as Exhibit 83.
¹²     (Document marked for
¹³ identification as Exhibit
¹⁴ PL-Glover-83.)
¹⁵     MR. TRISCHLER:  John, can
¹⁶ you repeat that, please?  I'm
¹⁷ sorry.
¹⁸     MR. DAVIS:  Tab 301, which
¹⁹ is Exhibit 83 that I've just
²⁰ marked.
²¹     THE WITNESS:  Okay.
²² BY MR. DAVIS:
²³     Q.   You'll see that this is a
²⁴ relatively lengthy e-mail chain, the

Confidential Information -- Subject to Protective Order

1    THE WITNESS:  I'm sorry.  I
2  don't understand the question.
3    Are you asking me what BDL
4  stands for, or are you asking me
5  something else.
6  BY MR. DAVIS:
7    Q.   Well, sure.  Let's start
8  there.  What does BDL mean?
9    A.   I think it means below
10  detection limit.
11    Q.   Okay.  Was it true that VSJ
12  batches of valsartan for Japan were below
13  detection limits for NDEA?
14    MR. TRISCHLER:  Objection to
15  form.
16    Objection.  Beyond the
17  scope.
18    THE WITNESS:  Yeah, I don't
19  have the Japanese data memorized,
20  and I don't know what context this
21  e-mail was written within.
22  BY MR. DAVIS:

1  got a court conference on another
2  case at 12:30, and I just want to
3  take five or ten minutes to get
4  ready for that.
5    MR. DAVIS:  Yeah, we can --
6  do you want to break right now?
7    MR. TRISCHLER:  No, we can
8  go for another 10, 15 minutes.  I
9  just wanted to alert you that I
10  would like to stop at 12:15.
11    MR. DAVIS:  Sure.  That
12  sounds good.  I'll just finish
13  this topic up, and then we can
14  stop.
15    MR. TRISCHLER:  That's why I
16  was telling you, so that you could
17  maybe plan a little bit.  But I
18  appreciate it.
19  BY MR. DAVIS:
20    Q.   Going to Page 005 -- well,
21  really 4 and 5 of this Exhibit 83.
22  You'll see an e-mail from -- and reply
23  from Mr. Abbineni?
24    A.   Yeah.

19    MR. TRISCHLER:  Hey, John.
20    MR. DAVIS:  Yeah.
21    MR. TRISCHLER:  Can we take
22  a lunch break -- I neglected to
23  raise this earlier.  Can we take a
24  lunch break around 12:15?  I've

Confidential Information – Subject to Protective Order



Page 759

9      MR. DAVIS:  I'm going to
10   mark Tab 302 as Exhibit 84.
11       (Document marked for
12   identification as Exhibit
13   PL-Glover-84.)
14  BY MR. DAVIS:
15      Q.   You'll see that the date of
16  this e-mail is December 6th -- the date
17  of the top e-mail is December 6, 2014.
18      A.   Yeah.
19      Q.   Okay.  The subject is "Re:
20  Inquiry to valsartan from PMDA."  The
21  PMDA is, I think as we discussed, the
22  Japanese regulator, correct?
23      A.   Correct.
24      Q.   Question 4 asks:  "Please

8      MR. DAVIS:  Okay.  We can --
9   we could -- actually this would be
10  a good time to actually take our
11  lunch break, Clem.  We can go
12  right now.
13      We can go off the record.
14      THE VIDEOGRAPHER:  Okay.
15  The time is 12:07 p.m.  Off
16  record.
17      (Short break.)
18      THE VIDEOGRAPHER:  The time
19  is 12:21 p.m.  Back on record.
20      MR. DAVIS:  Okay.  For the
21  record, we're going to be stopping
22  the deposition for the day.  We've
23  been on the record for two hours
24  and 22 minutes to this point.

Page 760

1  explain whether recovered solvent is
2  reused or not."
3       And the answer, which is
4  grayed out a little bit -- I can -- I'll
5  read the full thing in case your copy
6  isn't clear.

Page 762

1       And the witness has left due
2  to a family emergency, and we will
3  resume the deposition on another
4  day.
5       Is that okay with you,
6  Jason?  You're on mute, Jason.
7       Let the record reflect that
8  Jason is nodding yes.
9       MR. REEFER:  Yeah.  Now can
10  you hear me?
11      MR. DAVIS:  Yes, I can hear
12  you.
13      MR. REEFER:  Yeah, I was
14  just concurring, John, and
15  extending my gratitude for
16  understanding the situation
17  Mr. Glover is dealing with.
18      MR. DAVIS:  Yes, absolutely.
19  And send my best to him and his
20  family.
21      MR. REEFER:  I will pass it
22  along.  Thanks, John.
23      MR. DAVIS:  Thank you.  We
24  can go off the record now.

Confidential Information - Subject to Protective Order

Page 763

1    THE VIDEOGRAPHER:  Okay.
2  The time is 12:22 p.m.  Off
3  record.
4        (Excused.)
5        (Deposition adjourned at
6  approximately 12:22 p.m., EST.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 764

1
2        CERTIFICATE
3
4
5        I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.
7
        It was requested before
8  completion of the deposition that the
   witness, RICHARD DEREK GLOVER, have the
9  opportunity to read and sign the
   deposition transcript.
10
11
12
        _____
13  MICHELLE L. GRAY,
   A Registered Professional
14  Reporter, Certified Shorthand
   Reporter, Certified Realtime
15  Reporter and Notary Public
   Dated:  April 20, 2021
16
17
18        (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24

Page 765

1
2    INSTRUCTIONS TO WITNESS
3
4        Please read your deposition
   over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8        After doing so, please sign
9  the errata sheet and date it.
10        You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14        It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 766

1        - - - - - -
         E R R A T A
2        - - - - - -
3
4  PAGE  LINE  CHANGE
5  _____ _____ _____
6    REASON: _____
7  _____ _____ _____
8    REASON: _____
9  _____ _____ _____
10   REASON: _____
11  _____ _____ _____
12   REASON: _____
13  _____ _____ _____
14   REASON: _____
15  _____ _____ _____
16   REASON: _____
17  _____ _____ _____
18   REASON: _____
19  _____ _____ _____
20   REASON: _____
21  _____ _____ _____
22   REASON: _____
23  _____ _____ _____
24   REASON: _____

Confidential Information - Subject to Protective Order

Page 767

1
2     ACKNOWLEDGMENT OF DEPONENT
3
4         I,_____, do
5  hereby certify that I have read the
6  foregoing pages, 626 - 768, and that the
7  same is a correct transcription of the
8  answers given by me to the questions
9  therein propounded, except for the
10 corrections or changes in form or
11 substance, if any, noted in the attached
12 Errata Sheet.
13
14
15 _____
16 RICHARD DEREK GLOVER          DATE
17
18
19 Subscribed and sworn
   to before me this
20 _____ day of _____, 20_____.
21 My commission expires:_____
22
   _____
23 Notary Public
24

Page 768

1        LAWYER'S NOTES
2  PAGE  LINE
3  _____  _____  _____
4  _____  _____  _____
5  _____  _____  _____
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17 _____  _____  _____
18 _____  _____  _____
19 _____  _____  _____
20 _____  _____  _____
21 _____  _____  _____
22 _____  _____  _____
23 _____  _____  _____
24 _____  _____  _____

Confidential Information - Subject to Protective Order

**WORD INDEX**

**< 0 >**
**001-11**  633:23
**005**  757:20
758:7, 9
**007**  753:10
**078020**  642:2
**090483**  641:22
**090866**  642:7

**< 1 >**
**1**  651:4
657:24  658:1
728:18  745:8
**1.9**  746:8
**10**  757:8
**10:45**  709:13
**100**  627:4
756:18
**1001**  629:14
**104**  650:6
**105**  651:20
657:9
**106**  656:24
**11/30/18**
633:22
**11/5/19**  635:11
**11:02**  709:17
**11:37**  740:22
**11:41**  741:2
**12**  698:7
**12/26/18**
633:13
**12/6/14**  634:7
**12:07**  761:15
**12:15**  756:24
757:10
**12:21**  761:19
**12:22**  763:2, 6
**12:30**  757:2
**12th**  638:19,
20
**13**  701:3
748:13
**13(d**  702:12
**15**  757:8
**15219**  628:5
**16**  626:8

**16th**  637:7
**1717**  628:17
**17th**  628:11
**18**  697:20
**1835**  627:14
**19**  739:22
**19102**  627:15
**19103**  628:11,
17
**19-2875**  626:5
**19422**  629:19

**< 2 >**
**2**  658:2
673:7  695:19
728:19  746:2
751:3
**2/13/14**
631:18, 21
632:8
**2/13/20**  632:15
**20**  764:15
767:20
**200**  629:19
**20004**  629:14
**2014**  650:15
759:17
760:19  761:1
**2015**  650:15
**2017**  745:19,
23  746:4
**2018**  674:12,
24  675:12
714:9  739:22
754:12
**2019**  669:12
**202**  629:15
**2020.pdf**
672:13
**2021**  626:8
637:8  764:15
**2023**  697:24
**20th**  674:4
**21**  698:4
699:13
**214**  629:9
**215**  627:15
628:12, 18
**2150**  627:19
**21st**  754:12

**22**  761:24
**2200**  629:8
**2220**  629:3
**230**  629:3
**263-1840**
628:6
**27**  745:9
746:6  748:13
**2875**  626:2
**2900**  627:14

**< 3 >**
**3**  657:19
658:2, 5
680:11
695:20  701:3
734:2  746:6
**30**  628:11
765:16
**30(b)(6**  640:16
**301**  752:11, 18
**302**  759:10
**305**  730:7
**306**  732:2
**307**  743:17
**309**  686:5
**31**  633:16
697:24
**310**  671:22
**311**  672:18
**312**  629:4
696:19
**313**  700:7
**314**  703:16
**320-20-06**
635:10
**327-9166**
627:15
**36**  640:22
662:11  663:4
665:9  691:20
709:20  710:1
711:4  715:19,
23  720:15
727:22
**3600**  629:8
**37**  664:18
665:9  709:20
713:13
715:19, 23
727:22

**38**  655:3
664:20  676:6
709:20  716:5
719:22, 24
**38th**  628:5
**39**  640:22
662:12  663:5
665:3  676:6
691:20
709:21  716:5
719:22, 24
720:15

**< 4 >**
**4**  757:21
759:24
**412**  628:6
**436-5028**
627:20
**450**  629:19
**483s**  680:22

**< 5 >**
**5**  647:9
669:11
757:21  758:2
**5/20/20**  632:10
**50**  711:19
**501**  673:15
**502**  673:15
**504**  627:10
**512**  627:5
**524-5777**
627:10
**54**  669:6, 8
**55402**  627:20
**566.4808**
629:4
**567-0700**
629:20

**< 6 >**
**6**  759:17
**6001**  627:3
**60606**  629:4
**610**  629:20
**612**  627:20
**62**  680:10
**624-2774**
629:15

**626**  767:6
**638**  631:6
**646**  631:14
**650**  631:17
**651**  631:20
**657**  632:6
**662**  635:7
**668**  635:10
**671**  632:10
**672**  632:14
**686**  632:17
**696**  632:21
**6th**  759:16

**< 7 >**
**70**  646:7, 8
727:11
**700**  633:6
**701**  627:9
**70130**  627:9
**703**  633:9
**71**  650:6
652:7  655:17
658:11
**72**  651:20
652:12
656:12  657:5
**73**  656:24
658:17
**730**  633:13
**732**  633:16
**74**  671:22
**743**  633:18
**75**  672:18
**752**  633:21
**75201**  629:9
**759**  634:6
**76**  686:5
695:12
**768**  767:6
**77**  696:20
**78**  700:7
703:13
**78746**  627:4
**79**  703:16
**795-8686**
627:5

**< 8 >**
**8**  669:11, 15
670:6  671:11

680:3, 4, 16,
20  681:8
682:5  683:2,
8, 10, 18
684:19  685:3
704:8, 13
723:24  724:1,
4  729:11
760:9
**80**  730:7, 15
732:18, 22
**800**  627:19
**81**  732:2
**82**  743:17
**83**  752:11, 19
757:21
**84**  759:10
**855-8000**
629:9
**877.370.3377**
626:21
**89**  646:7

**< 9 >**
**9**  704:16
**9.3.3**  750:10
**9.3.7**  748:18
**9.3.8**  749:7
**9.3.9**  749:19
750:4
**9:26**  626:15
637:8
**917.591.5672**
626:21
**979-1158**
628:12
**988-7800**
628:18

**< A >**
**a.m**  626:15
637:8  709:13,
17  740:22
741:2
**Abbineni**
753:15  757:23
**ABC-**
**MDL2875-**
**00000248**
632:19
**ABDC**  698:17

**able**  639:10
714:14  717:6
731:7
**absolutely**
679:20  762:18
**acceptable**
673:22
740:13  741:11
**acceptance**
738:7  740:8
741:14
**accurate**
756:18  765:20
**acetate**  758:23
**ACKNOWLE**
**DGMENT**
767:2
**Act**  688:19
**Actavis**  628:20
**acting**  682:15
**action**  669:16
675:6, 20
680:6, 15
683:12
**actions**
682:13, 14, 17
**Active**  647:12
648:7  653:17
**activity**  734:6
737:13
**actual**  693:24
**addition**
698:17
**additional**
737:16
754:16  756:2,
9  758:3, 15
**ADI**  673:12
**adjourned**
763:5
**adopted**
734:13
**adulterated**
667:10, 23
668:10  670:1,
6, 23  671:18
673:14, 24
676:11
677:11  678:3,
17  688:14
689:2  690:7

**691**:3, 7
694:5  702:14
**adulteration**
668:5  678:7
**Advice**  632:12,
14  671:14
672:12
**affiliated**
688:11
**affiliates**
697:13
**agency**  681:19,
22  682:13, 16,
17, 24  683:11
**agency's**  685:3
**ago**  715:4
736:17
**agree**  647:19
648:6  649:1,
18  652:11
654:12
658:17
669:14
670:11  681:3,
24  688:6
689:21  692:2
693:18  695:1
721:4  728:5
**agreed**  637:18
698:1  738:1, 9
**agreeing**  689:1
**Agreement**
632:19, 23
633:7, 19
687:4, 15
688:23
691:15
694:14
696:10, 12
697:6, 11, 23
700:2, 16
702:18  703:8,
12  723:14, 15
743:24
744:15  745:22
**agrees**  670:21
**ahead**  693:4, 6
**alert**  757:9
**ALFANO**
628:1
**alleged**  694:4

**allowed**
675:16
**allowing**
683:22
**Amended**
635:7  663:2
**America**
687:1  708:14
**AmerisourceBe**
**rgen**  632:17,
21  686:14
687:5  688:6,
13, 24  692:3
693:19
694:13  695:1,
13  697:4, 12
**AmerisourceBe**
**rgen's**  696:1
**amlodipine**
641:21  643:4
**amount**
682:22
**analysis**
721:20, 23
737:22
**and/or**  764:21
**ANDA**  641:17,
22  642:2, 4, 7
643:9  645:17
742:16
**ANDAs**
642:13, 19, 24
643:19
**Answer**  636:5
648:20
656:20
666:19, 22
676:12, 22
677:17
679:11, 14
680:13  685:9
689:12
690:10, 12
693:7  699:18
705:17  706:2
707:17
708:17
713:12, 16
718:18  727:3
728:14  741:5

**749**:13  760:3,
24
**answered**
645:19
676:14
680:10
681:13
683:16
701:23
710:11  711:6
728:16
734:21
742:24  747:24
**answers**  767:8
**anybody**  659:1
**API**  640:24
641:4  655:7,
10  656:13
664:10, 15
665:1  666:13
667:11, 17
668:9  669:24
670:6  674:14
675:14  676:9,
24  678:2, 23
680:3  685:19,
21  702:21
705:13, 24
707:19  710:3,
7  713:8, 19
716:9  720:9,
22  721:5, 8,
11, 17  722:5,
13  723:9, 16
724:3  726:17
727:17, 21
734:19
735:13
747:22  760:9
**appear**  658:2
**APPEARANC**
**ES**  627:1
628:1  629:1
630:1  637:20
**appearing**
637:17
**Appears**
654:16
655:17
732:13  753:1

Confidential Information - Subject to Protective Order

applicable
688:*16*  694:*1,
7*  701:*13*
706:*10*
application
643:*10, 16*
applications
641:*17*  645:*17*
applied
735:*19*  744:*17*
APPLIES
626:*6*
apply  764:*19*
appreciate
757:*18*
appropriate
765:*6*
appropriately
749:*21*  750:*7*
approval
644:*24*  653:*5*
704:*17*  707:*7*
742:*15*
approve
748:*20*
approved
641:*18*
642:*19*  643:*2,
9, 15*  734:*8*
735:*18*  742:*2,
4*  749:*2*
750:*12*
approving
742:*13*
approximately
763:*6*
April  626:*8*
637:*7*  764:*15*
Arch  628:*17*
archive  650:*20*
area  692:*11*
708:*16*  717:*16*
Argumentative
668:*2*  677:*13*
739:*20*
arrowhead
734:*5*
Article  633:*16*
ascertain
742:*15*
aside  640:*8*

Asked  645:*19*
676:*14*
680:*10*
681:*12*
683:*15*  703:*1*
705:*11*
708:*19*
710:*11*  711:*6,
20*  716:*12, 13,
19*  718:*23, 24*
719:*3, 4, 5, 6*
734:*21*
742:*24*  743:*5*
747:*24*  750:*24*
asking  661:*24*
666:*4*  676:*5*
682:*4, 8*
690:*5, 6*
693:*11*  699:*4*
718:*21*  755:*3,
4*
asks  689:*7*
759:*24*
ASRao@Lante
chPharma.com
730:*16*
asserted  694:*1*
assign  698:*18*
Assignment
698:*12*
associated
740:*6*
assume
644:*16*  718:*9*
723:*10*  730:*4*
738:*23*  749:*12*
assumed
714:*5*  720:*6*
740:*12*  741:*10*
assuming
707:*16*  726:*4*
744:*9*  758:*9*
assure  677:*2*
679:*1*
attached
765:*12*  767:*11*
attachment
672:*11*
730:*20*  732:*3,
18*

attempting
655:*21*
attend  639:*10*
attended  639:*2*
attention
692:*21*
attorney
765:*16*
audit  723:*16,
24*  724:*6*
auditors
679:*19*
August  697:*24*
Aurobindo
629:*21*
Aurolife
629:*21*
Austin  627:*4*
Australia
753:*20*
authorities
661:*14*
authority
644:*19*  676:*1*
731:*7, 23*
Authorize
749:*7*
authorized
749:*14*
automatically
671:*17*
available
659:*1*  734:*11*
Avenue
627:*19*  629:*8,
14*
aware  667:*13*
668:*14, 15*
676:*17, 23*
685:*24*  711:*4,
12*  720:*19*
721:*14*  725:*4,
15*  735:*1*
748:*2*  756:*14*

**< B >**
Back  631:*17,
20*  632:*6*
646:*2*  650:*17*
657:*15*
658:*10*

662:*15*
666:*10*
674:*23*
709:*17*  714:*9*
722:*21*  729:*8*
741:*2, 4, 7*
761:*19*
ban  684:*19, 23*
base  735:*2*
based  719:*17*
740:*9, 13*
741:*11*
basically
650:*23*
basis  698:*19*
batch  673:*12*
722:*1*
batches
737:*15*
754:*15*
755:*12*  756:*2*
Bates  703:*22*
753:*7*
BDL  754:*15*
755:*3, 8*
beginning
626:*15*  691:*24*
begins  730:*15*
begun  723:*4*
behalf  687:*5*
688:*9*  694:*3*
believe  638:*19*
642:*3*  643:*6*
644:*1, 18*
646:*7*  650:*2*
658:*15*
663:*12*
674:*11*
685:*12*  697:*6*
703:*23*
719:*11*  721:*2*
727:*8*  729:*1*
746:*1, 5*  754:*2*
Bell  629:*19*
BEN  627:*18*
beneficiary
728:*7*
best  710:*22*
762:*19*
Beth  630:*7*
better  758:*16*

beyond
645:*20*  648:*1,
17*  649:*7*
654:*6*  656:*3,
18*  658:*22*
659:*22*  679:*7*
687:*9, 19*
689:*10*
690:*20*
694:*18*  696:*7,
15*  700:*4*
702:*8*  703:*3*
705:*16*
724:*15*  726:*1*
748:*9*  751:*12*
754:*22*
755:*16*  759:*6*
760:*21*
big  712:*4*
bioequivalence
652:*18, 21*
653:*3, 10*
657:*8*
bioequivalent
654:*3*  655:*23*
656:*14*
bit  757:*17*
760:*4*
blacked-out
697:*16*
Blondell
753:*14, 18*
754:*7*
Blue  629:*19*
board  659:*8,
12*
bodies  648:*14*
body  695:*9*
Bold  627:*3*
BONNER
628:*10*
border  683:*24*
BOSICK
628:*1*
bottom  647:*9*
686:*17*
730:*13*
732:*21*  740:*7*
753:*6*
Bradley  630:*5*

**brand** 645:*4, 7, 9* 646:*4* 653:*11* 654:*4* 655:*24*
**break** 709:*4, 8, 15* 740:*24* 756:*22, 24* 757:*6* 761:*11, 17*
**BRIAN** 628:*16*
**briefly** 751:*1*
bstellpflug@gol denberglaw.co m 627:*21*
**build** 654:*9* 656:*6* 660:*21*
**built** 737:*20*
**bullet** 706:*8* 734:*5*
**bullets** 707:*11*
**business** 723:*2, 3* 726:*10*
**buy** 725:*14*

< C >
**CAITLIN** 629:*18*
**call** 682:*10* 693:*14* 737:*22*
**called** 697:*7* 738:*4, 10*
**calling** 694:*23*
**calls** 661:*22* 666:*17* 677:*15*
**CAMDEN** 626:*2*
**Camp** 627:*9*
**capable** 746:*14*
**capacity** 714:*9*
**capitalized** 698:*23* 701:*12, 20* 702:*4*
**capsule** 650:*22*
**capture** 737:*13*
**Cardinal** 629:*16*

**carefully** 765:*4*
**case** 662:*2* 680:*2* 757:*2* 760:*5*
**CASES** 626:*7*
**category** 711:*11*
**CATELLO** 628:*4*
**caveat** 723:*4, 6*
cct@pietragallo .com 628:*6*
**Centre** 628:*5*
**certain** 671:*7* 677:*4* 681:*15, 16* 682:*2* 684:*9*
**certainly** 678:*14* 681:*4* 736:*4*
**certificate** 721:*19, 23* 764:*2*
**certification** 764:*18*
**Certified** 626:*17* 764:*13, 14*
**CERTIFY** 764:*5* 767:*5*
**certifying** 764:*22*
**cetera** 641:*3* 702:*15*
**cGMP** 669:*24* 679:*1* 681:*8*
**cGMPs** 667:*19, 20* 677:*2*
**chain** 707:*21* 730:*14* 752:*24* 754:*8*
**chairman** 659:*7, 12*
**challenged** 750:*7*
**challenging** 749:*21*
**CHANGE** 766:*4*

**changes** 765:*11* 767:*10*
**changing** 737:*9*
**chemical** 736:*8*
**chemicals** 739:*14*
**chemistry** 734:*12* 735:*23*
**Chicago** 629:*4*
**choose** 721:*10*
**chop** 688:*1*

**chronologically** 722:*3*
**CIPRIANI** 629:*18*
**circumstances** 671:*8*
**CIVIL** 626:*4*
**claims** 692:*5* 695:*2* 698:*20*
**Clawlor@c-wlaw.com** 629:*20*
**clear** 665:*7, 15* 760:*6, 13*
**CLEM** 628:*3* 655:*4* 668:*22* 699:*16* 709:*3* 761:*11*
**click** 660:*23*
**Club** 633:*6* 700:*15*
**CMU** 748:*22*
**code** 751:*2, 8, 9* 759:*4*
**collecting** 747:*20*
**collection** 746:*10* 747:*3*
**collectively** 740:*4*
**collects** 650:*21*
**column** 733:*23*
**come** 662:*4* 683:*23* 710:*16*
**comes** 725:*21* 736:*19, 23, 24* 738:*11*

**coming** 670:*6* 712:*6* 740:*11*
**command** 754:*8*
**commercial** 686:*24* 708:*15* 717:*5, 9* 723:*2, 3* 746:*12*
**commission** 767:*21*
**common** 649:*12* 745:*4*
**commonly** 737:*12*
**communicated** 713:*19* 715:*21*
**communicates** 684:*8*
**communication** 654:*13, 20* 685:*23* 710:*24* 714:*5, 11* 719:*2*
**communications** 640:*24* 664:*9* 675:*11* 676:*18, 24* 710:*2* 711:*3* 714:*23* 718:*14* 722:*8* 727:*15* 735:*6*
**companies** 688:*11* 745:*4*
**company** 676:*20* 679:*23* 686:*23* 697:*13* 705:*5* 708:*9, 12* 729:*12* 733:*5*
**completed** 674:*20*
**completely** 726:*4*
**completion** 764:*8*
**compliance** 661:*18* 667:*19, 20*

**679:*22* 694:*6* 701:*11**
**comply** 701:*12*
**comprehensive** 740:*1*
**concern** 683:*22* 684:*4*
**concerning** 654:*21*
**concerns** 685:*13*
**conclusion** 661:*22* 666:*18* 677:*15*
**conclusions** 684:*15*
**concurring** 762:*14*
**conditions** 679:*15* 680:*24* 685:*4*
**conference** 757:*1*
**CONFIDENTI AL** 626:*8*
**confirmation** 760:*7*
**conform** 669:*24*
**confused** 706:*19* 731:*8*
**conjunction** 644:*18*
**connected** 695:*5, 21*
**considered** 673:*14*
**considers** 673:*23*
**consistent** 652:*12* 744:*20*
**consistently** 746:*15*
**consumers** 652:*13* 655:*5, 22* 664:*12, 24* 667:*9* 676:*9* 713:*4, 21* 715:*1* 727:*8, 16, 22, 23* 728:*6*

Confidential Information Subject to Protective Order

contained 642:18
containing 733:8
contains 668:10 730:20
contamination 641:3 664:14 674:13 675:15 710:6 720:1, 2 727:21
Cont'd 628:1 629:1 630:1 632:2 633:2 634:2
contemplated 736:17
content 645:7 691:9 710:19 721:16
contents 655:6 664:24 685:20 689:23 690:16, 24 691:4 702:20 716:8 720:21 722:12 726:16 727:16
context 662:11 729:23 733:1 755:20 761:7
contexts 744:16
continue 683:19 701:11
Continued 626:14 638:8 707:8
continues 692:6 758:18
Continuing 632:18 687:3 695:14
continuity 646:4
contract 722:4 723:7 731:10

contractual 725:18
contradictory 677:19
contravention 694:7
control 764:21
controls 669:22 679:1 737:17
conversations 720:14
converse 642:16
conversely 705:21 708:23
convey 654:2
conveyed 675:12 676:7 726:15 727:5
conveying 655:22 722:11
conveys 685:17
Copy 632:23 697:20 760:5, 14
Corey 659:5, 6
corner 753:7
corporate 666:1
Corporation 629:11 688:7 692:4 697:12
correct 641:23 642:14, 20 643:2, 5 644:13, 22, 24 645:17 648:14 652:8 653:13, 17, 23 654:15 658:14 660:6, 19 663:15 668:11 669:17 670:20, 23 675:3, 22 680:7 681:9, 19 682:14, 18

683:12 685:5 687:16 689:2 693:20 708:20, 21 709:1 715:23, 24 716:10 719:18, 20 721:4, 8 723:9 725:22 727:6, 11 729:4 731:2 739:13, 17 741:12 742:5, 9, 10, 13 745:8 746:4 747:6, 9 749:17, 18 750:13 753:24 754:5, 6 759:22, 23
corrections 765:5, 7 767:10
correctly 692:9
Cosmetics 688:19
cost 661:5
Counsel 638:5, 21 639:4, 12, 18 695:6, 22 696:2 716:19 718:20 719:6 720:14
counterfeit 702:14
counterparts 654:4 655:24
couple 639:4, 19 657:17 691:21 706:21 711:16
course 680:11
COURT 626:1 722:20 741:6 757:1 765:20
covenants 698:8

cover 669:20 718:12
covered 718:11
criteria 674:21 738:6 740:8 741:14
CROWELL 629:13
crystallization 758:15
crystallized 758:19
customer 715:6, 8, 17 717:4, 18 721:8, 18, 22 733:24 734:13
customers 640:24 641:1 664:10, 18 710:3 712:13 713:7 721:4, 5 726:11 734:9
customs 683:24
cut 662:8 692:18, 23 714:16
cut-out 661:3

< D >
D.C 629:14
d.stanoch@kan ner-law.com 627:10
daily 673:22
Dallas 629:9
damages 692:5 695:2
data 746:11 747:3, 21 755:19
date 626:16 637:7 673:13 759:15, 16 765:9 767:16
dated 669:11 764:15
DAVID 627:8

DAVIS 627:1, 3 630:9 631:6 638:10 646:6, 13, 16, 17 648:5, 12, 24 649:16 650:3, 5, 12 651:19 652:2 654:11 655:3, 13, 18, 19 656:10, 23 657:6, 13 659:3 660:3, 14 661:24 662:6, 16, 21 663:14 665:17 666:8, 9 667:5 668:7, 17, 22 669:7, 9 670:18 671:9, 21 672:4, 17, 23 674:9 676:21 677:22 678:21 679:10 681:6, 17 682:11 684:10 685:15 686:4, 11 687:13, 22 689:18 690:13 691:1 692:16 693:5 694:21 696:8, 18 697:2 699:16, 17 700:6, 13 702:2, 11 703:9, 15, 21 705:19 706:24 709:2, 7, 18 711:1, 14 716:3, 23 718:16 719:3, 9, 13, 15 720:11 722:17 723:5 725:11 726:8 728:13 730:6, 12 732:1, 8

734:*23*
739:*11*  741:*3,
9*  743:*7, 16,
22*  748:*4, 12*
751:*17*
752:*10, 18, 22*
755:*6, 22*
756:*20*  757:*5,
11, 19*  759:*9,
14*  761:*8, 20*
762:*11, 18, 23*
**day**  663:*1*
678:*16*
679:*23*
680:*11*
728:*18*  746:*2*
751:*3*  761:*22*
762:*4*  767:*20*
**days**  765:*16*
**deal**  706:*5*
**dealing**  762:*17*
**decade**  736:*17*
**December**
759:*16, 17*
**decides**  683:*8*
**dedicated**
751:*16*
**deemed**
765:*19*
**defend**  692:*2*
693:*18*  695:*1*
698:*21*
**Defendant**
628:*8*  629:*5,
11, 16*
**Defendants**
628:*13, 19*
629:*21*
**define**  668:*4*
678:*8*
**defines**  688:*12*
**definitely**
738:*23*
**definition**
678:*8, 17*
691:*7*  746:*7*
**delivered**
688:*9*  694:*3*
**delivering**
746:*15*

**delivery**
688:*14*
**demand**  675:*9,
17*  696:*11*
**demands**
700:*1*  703:*11*
**DENNIS**
629:*13*
**Department**
671:*5*  717:*1*
**deponent**
637:*14*  767:*2*
**deposing**
765:*16*
**deposition**
626:*14*  635:*8*
636:*2*  637:*9,
17*  638:*23*
663:*1, 2*
680:*12*
689:*11*  719:*8*
728:*19*  751:*4*
761:*22*  762:*3*
763:*5*  764:*6,
8, 9*  765:*3, 13,
17, 19*
**deps@golkow.c
om**  626:*22*
**DEREK**
626:*14*  631:*5*
637:*14*  638:*1*
764:*8*  767:*16*
**describing**
682:*23*
**DESCRIPTIO
N**  631:*13*
632:*5*  633:*5*
634:*5*  635:*6*
**design**  746:*12,
22*  747:*4, 19*
750:*18*
**designated**
654:*17, 20*
664:*8*  699:*10*
718:*3*
**designation**
654:*24*
656:*19*
665:*15*  666:*7*
685:*2*
**designee**  666:*1*

**detailed**
751:*24*
**details**  733:*9*
**detected**
671:*15*  673:*11*
**detection**
755:*10, 13*
756:*1*
**determination**
670:*20*
**determinations**
670:*22*
**determined**
670:*5*  694:*5*
736:*12*
**develop**
741:*20*
**developing**
738:*24*
**development**
737:*21, 23*
738:*12, 19*
739:*5*  742:*7,
19*  743:*3, 9,
13*  746:*20*
750:*17*
**deviations**
681:*8*
**difference**
713:*14*  751:*8,
19*
**differences**
752:*2*
**different**
706:*21*
712:*13*
719:*14*  724:*22*
**direct**  685:*18*
692:*20*  753:*5,
10*  764:*21*
**directed**
644:*12*
654:*14*
658:*18*  660:*5*
691:*9*  713:*3*
**directing**
652:*13*
**Direction**
636:*5*  667:*14*
**directives**
682:*15*

**directly**
685:*17*
714:*22*
715:*13*
725:*14*  726:*24*
**disagree**
655:*14*  666:*5,
6*  689:*20*
**disagrees**
670:*21*
**disclaimers**
698:*8*
**disclose**  719:*1*
**disclosed**
733:*24*
**disclosure**
704:*21*  705:*1*
**discovery**
713:*24*
**discuss**  699:*10*
**discussed**
751:*1*  759:*21*
**Discussion**
632:*11*
720:*17*
728:*23*  740:*16*
**discussions**
670:*13*
**distribute**
683:*19*
**distributed**
673:*12*  761:*5*
**Distribution**
632:*22*
643:*13*
674:*22*  697:*5*
701:*14*  705:*7*
**DISTRICT**
626:*1*
**diversion**
676:*5*
**divisions**
688:*11*
**divvied**  748:*15*
**DMF**  737:*12*
742:*16*
**DOCUMENT**
626:*6*  646:*9,
15*  650:*7, 11*
651:*21*  657:*1*
671:*23*

672:*19*  686:*6,
13*  689:*8*
690:*4*  692:*11*
693:*2*  695:*9,
15*  696:*21*
699:*5*  700:*8*
703:*2, 17, 24*
704:*3*  730:*8*
732:*4*  743:*18*
745:*1, 14*
752:*12*  759:*11*
**document-
identifying**
647:*1*
**Documents**
636:*8*  639:*22,
24*  649:*10*
668:*23*  710:*8*
713:*23*
718:*10*
723:*12*  724:*2*
725:*2, 21*
729:*2*  730:*2*
744:*12*
750:*16*  760:*12*
**Doe**  683:*7*
**doing**  699:*3, 5*
714:*6*  736:*7,
8*  737:*2*  765:*8*
**DOJ**  671:*10*
**door**  740:*12*
**dose**  641:*1, 4*
664:*18, 22*
665:*4*  666:*13*
667:*8, 12, 18*
668:*9*  674:*14*
675:*14*  676:*7,
10*  677:*1*
678:*2, 23*
685:*19, 21*
689:*24*
690:*17*
702:*22*
705:*14, 24*
707:*20*  713:*5,
9, 15, 20*
714:*23*  716:*9*
720:*21*  721:*2*
726:*17*
727:*18, 22*

Confidential Information Subject to Protective Order

downstream
641:1  664:10
710:4
DP  673:12
Dr  639:2, 7,
14  640:9
672:8  753:14
754:1, 3
draft  644:23
646:1  732:14
drafted
644:15  745:2,
15
drawing
684:15
drug  644:11
655:24
673:11, 13, 21,
23  688:18
689:1  697:12
706:9
drugs  688:7
DUANE
628:10
Duda  686:18,
20  700:22
708:8  717:14,
22
due  754:15
756:2  762:1
duly  764:5
Duran  630:5
637:4
dynamics
724:22

< E >
earlier  663:8
711:16, 21
756:23
EDQM
730:21  731:4,
12  732:11, 21
733:2
effect  648:13,
21
efficacy
653:20
either  667:10,
14, 21  668:15
669:2  708:2

731:9  747:1
748:6
electronically
640:6
eliminates
756:15
ELLIE  629:7
ellie.norris@no
rtonrosefulbrig
ht.com  629:10
EMA  731:9,
11, 12, 14, 17,
18
E-mail  632:10
633:13, 21
634:6  672:6
710:21
718:13
730:14
732:21
752:24
753:13
755:21
757:22
759:16, 17
e-mailing
730:24
e-mails
641:13
663:13, 18, 21
664:4, 5
691:21, 22
710:14  711:9,
17  712:3, 8,
10, 21  714:5
emergency
762:2
employee
717:23
endeavor
640:15
ends  659:17
enforcement
707:12, 22
enhance  684:9
entered  725:20
entering  722:4
entire  639:13
744:18

entities  641:1
664:11  710:5
715:22  716:7
equate  684:2
errata  765:6,
9, 12, 15
767:12
ESQ  627:3, 8,
13, 18  628:3,
4, 10, 16
629:3, 7, 8, 13,
18  630:5
essentially
650:19
EST  626:16
763:6
established
674:16, 17, 19,
21  736:13
737:19  738:2,
9  740:9, 14
741:13
establishes
683:18  746:13
establishment
706:9
establishments
706:23
et  641:3
702:15
ethyl  758:23
EU  633:16
European
731:6
evaluating
747:21
evaluation
653:22  736:9
746:11  747:3
Eventually
736:10
evidence
685:8  746:14
exactly  654:8
659:11  671:4
686:21  712:4
731:20
756:17  758:13
EXAMINATIO
N  638:8

examined
638:3
example
666:14  672:8
686:3  688:24
699:24
719:23  721:7,
16  722:9
723:23, 24
725:17
734:24
742:18
754:13, 14
examples
710:23
exception
656:13
Excuse  689:4
716:1  754:21
Excused  763:4
executed  738:5
Execution
632:23
executive
659:7
exhaustive
682:22
Exhibit
632:17  646:7,
10  650:6, 8
651:20, 22
652:7, 12
655:17
656:12, 24
657:2  658:11,
17  669:6, 8
671:22, 24
672:18, 20
686:5, 7
695:12
696:19, 20, 22
700:7, 9
703:13, 16, 18
727:11  730:7,
9, 15  732:2, 5,
18, 22  743:17,
19  752:11, 13,
19  757:21
759:10, 12
exhibits  640:3

exist  650:21
727:13  737:2
750:16
existed  658:14
660:18  730:4
745:23
expectation
675:13
expectations
674:17
Expected
653:19  742:19
expenses
695:5, 21
expert  644:17
650:1
expiration
673:13
expires  767:21
explain  662:5
760:1
extending
762:15
extensive
739:24
extent  656:7
661:21
665:20
666:16
677:14  689:6,
13  699:2
702:24  705:16
external
712:24  713:2
714:24  721:3
extra  758:13
extremely
715:3

< F >
faces  717:18
facilities
653:23
669:22  705:3,
4, 12, 23
706:10
707:20  710:4
714:24
facility  681:1
704:20, 24

Confidential Information - Subject to Protective Order

707:*12*
712:*19* 723:*16*
**fact** 662:*2*
684:*18*
697:*11*
699:*13* 716:*5*
729:*20*
742:*12* 749:*2*
**facts** 644:*10*
684:*17* 685:*7*
**fail** 765:*18*
**failure** 736:*11*
**fair** 665:*24*
684:*1*
**FALKENBER
G** 629:*1*
**fall** 710:*9*
711:*10*
**falls** 660:*16*
**familiar** 641:*6,
16* 643:*17*
644:*3* 650:*16*
671:*13, 19*
673:*2* 675:*10*
685:*16*
699:*23*
712:*11, 16*
724:*18* 725:*9,
13* 726:*14, 23*
727:*4, 13*
741:*22* 743:*6,
13* 744:*6, 12*
747:*1* 751:*18*
**family** 762:*2,
20*
**far** 685:*22*
735:*22*
**fax** 626:*21*
**FDA** 644:*21,
24* 645:*6*
646:*3* 653:*5,
22* 668:*8*
670:*5, 10, 14,
17* 671:*13*
673:*23* 675:*2,
4, 5, 11, 12, 24*
682:*4, 16*
683:*7, 21*
684:*7, 13, 18,
23* 706:*9*

742:*2, 4, 9, 11,
14* 743:*11*
**FDA-approved**
643:*8*
**FDA's** 670:*19*
673:*20*
674:*11*
678:*17*
680:*22* 681:*7*
682:*1* 683:*4*
685:*1, 13*
**FDCA** 661:*19*
673:*16* 688:*19*
**FDI** 706:*10*
707:*2*
**fearful** 690:*9*
**February**
672:*13* 674:*4*
**federal**
688:*16, 18*
**feel** 687:*24*
713:*6*
**fees** 695:*6, 22*
696:*2*
**fell** 660:*16*
**filled** 638:*17*
**final** 671:*4*
758:*3*
**finally** 642:*6*
**find** 677:*19*
714:*1, 5, 15*
717:*18*
730:*20*
732:*16* 744:*19*
**fine** 638:*13*
665:*18* 709:*8*
**finish** 757:*12*
**finished**
640:*24* 641:*4*
664:*18, 22*
665:*4* 666:*13*
667:*8, 12, 17*
668:*9* 674:*14*
675:*14* 676:*7,
10* 677:*1*
678:*2, 23*
685:*19, 21*
689:*24*
690:*17*
702:*21*
705:*14, 24*

707:*20* 713:*5,
9, 15, 20*
714:*23* 716:*9*
720:*20* 721:*2*
726:*17*
727:*18, 22*
735:*20*
**first** 646:*1, 21*
653:*16*
657:*17* 663:*1*
669:*20*
674:*12*
687:*24*
697:*10*
700:*18* 704:*2*
736:*19, 23*
737:*1, 21, 23*
738:*11* 745:*2,
15* 749:*17*
**fit** 711:*4*
**five** 712:*2*
757:*3*
**Flip** 746:*6*
**Floor** 628:*5*
**following**
653:*12* 667:*8*
693:*20*
722:*16* 733:*3*
758:*2*
**follow-on**
720:*12*
**follows** 638:*3*
**Food** 688:*18*
**foregoing**
764:*18* 767:*6*
**form** 648:*10*
654:*6* 656:*2,
17* 658:*21*
659:*21*
661:*21*
663:*11*
666:*16* 668:*2,
13* 670:*8*
671:*1* 674:*2*
677:*13* 678:*6*
679:*4* 680:*9*
681:*11* 685:*7*
687:*8, 18*
689:*5* 690:*2,
19* 694:*17*
696:*4, 14*

699:*2* 702:*7,
24* 706:*13*
716:*15* 718:*6*
720:*4* 724:*14*
725:*24*
728:*11* 739:*7*
751:*13, 22*
754:*24*
755:*15* 767:*10*
**format** 715:*22*
721:*22* 744:*6,
21*
**formation**
734:*10*
**forth** 646:*2*
**found** 680:*24*
**foundation**
645:*22*
648:*17* 649:*6*
**four** 640:*20*
712:*3* 733:*18*
**free** 687:*24*
**freeze** 740:*15*
**front** 662:*12*
668:*19* 711:*9*
723:*18*
**front-end**
724:*8*
**FULBRIGHT**
629:*7*
**full** 687:*24*
694:*6* 753:*12*
760:*5*
**further** 698:*4*
760:*12*

**< G >**
**gain** 653:*5*
**GALLIAN**
629:*8*
**game** 665:*24*
**General**
632:*11, 14*
633:*6* 644:*10*
671:*14*
672:*12*
692:*11, 19*
700:*15* 712:*5*
756:*11*
**generalized**
665:*21* 678:*13*

**generally**
640:*23* 641:*8*
644:*5* 645:*7*
713:*7* 746:*23*
752:*3, 9*
**generate**
736:*21*
**generated**
739:*17*
**generating**
737:*5* 743:*10*
**generic** 643:*2*
652:*4* 653:*10*
654:*3* 656:*13*
724:*12*
**Generics**
631:*21*
651:*13* 652:*6*
661:*4*
**genuine**
702:*13*
**germane**
739:*10, 13*
**getting** 725:*6*
744:*24*
**give** 669:*4*
678:*20* 690:*9,
11, 12* 693:*2*
695:*10*
**given** 730:*21*
732:*21*
760:*24* 764:*6*
767:*8*
**giving** 684:*18*
**global** 659:*15*
753:*23*
**GLOVER**
626:*14* 631:*5*
637:*15* 638:*1,
11* 650:*17*
655:*20*
657:*14*
662:*22*
666:*11* 669:*7,
12* 679:*12*
693:*6* 699:*18*
709:*19*
728:*15*
762:*17* 764:*8*
767:*16*

Confidential Information Subject to Protective Order

Glover-2 662:18 709:23
Glover-54 668:19
GMP 679:15, 22 685:4
go 652:16 660:23 662:15 684:12 693:4, 6 698:4 704:16 709:10, 24 715:19 716:5 717:1 721:10 740:18 744:21 748:13 757:8 761:11, 13 762:24
goes 650:20 653:6
going 640:19 651:19 656:23 662:16 682:22 687:23 688:1 690:11 696:18 697:17 698:3 699:14 700:6 703:15 707:17 709:3, 9, 21 718:17 722:14 732:1 740:19, 20 752:10 753:5, 10 757:20 759:9 761:21
GOLDENBERG 627:18
GOLKOW 626:21 637:5
GOLOMB 627:13
Gomas 639:2, 7, 14 640:9 672:8 753:14 754:1, 3

Good 638:11, 13, 15 678:19 757:12 761:10
goods 735:20
GORDON 628:1
gotten 671:10 715:5
government 706:22
grand 684:4
gratitude 762:15
Gray 626:16 764:12
grayed 760:4
GREENBERG 628:16
group 712:3 731:10
guarantee 687:3 688:23 689:1, 16 691:14 695:14 700:2 703:7
guarantors 688:12 692:1 693:17 694:4, 24
Guaranty 632:18
guess 642:16 650:15 658:24 677:23 691:8 697:18 744:23
guesses 708:5
guessing 660:1, 12, 21, 24 706:5

< H >
half 725:3
handful 640:1 691:22
handles 708:4 716:17 717:3
happen 723:18
happened 674:23 724:8

happening 675:3 737:7
happens 679:23 737:23
hard 722:15
harmless 692:4 693:19
HCTZ 642:2 643:4
head 706:16 712:11 753:19, 23
header 652:4 686:14 704:11, 18 745:7
Health 629:16 644:19 651:14 661:13 731:6, 22
Healthcare 628:14
hear 665:13 762:10, 11
held 626:15 637:10 662:1 735:6 740:17
help 719:7
hey 713:18 756:19
high 661:5, 8, 10 667:23 677:9, 11 678:3, 11, 16, 24 679:21 681:5
HILTON 627:8 740:18
history 707:13, 22
hold 661:16 666:12, 21 692:3 693:19
holding 669:24
HON 626:6
HONIK 627:13
hour 639:3, 8, 11 709:3 725:3

hours 639:5, 19, 20 699:13 761:23
Huahai 628:13, 14
Humana 629:5
hyperlink 658:12
hyperlinks 657:18 658:2
hypothetical 679:6

< I >
i.e 652:14
idea 656:7 689:16 726:21 759:1
identification 646:10 650:8 651:22 657:2 671:24 672:20 686:7 696:22 700:9 703:18 730:9 732:5 743:19 752:13 759:12
identified 739:23 740:2, 4
identify 706:22
III 626:8 637:15
Illinois 629:4
imperative 765:14
import 684:19, 23
important 739:3
impossible 745:5
impression 679:17
improper 693:3
impurities 649:13 734:11 736:16

739:18, 23 756:16
impurity 648:3 752:5
inactive 647:17
inadvertent 665:12
included 645:13 665:21 704:24
includes 643:12 653:15 705:2
including 647:22 664:11 672:7, 8 688:17 695:5, 22 710:3 733:19 749:21
inclusive 664:21
incoming 715:11
Incomplete 679:5
inconsistent 677:8
incorrect 690:12
incredibly 679:16 715:15
Indemnification 632:18 687:4 691:15 698:9 700:2
indemnify 692:3 693:18
indemnity 698:13, 21
INDEX 636:2
India 712:19
indicate 745:1
indicated 669:16 680:6, 15
individual 682:14 686:17 732:19

Confidential Information Subject to Protective Order

individuals
672:6  724:1
731:1
individual's
682:21
Industries
628:19
industry
675:5, 6, 18,
19  744:19
inferring
720:8
influence
645:4
INFORMATIO
N  626:8
631:14
633:14
643:14, 24
644:4, 23
645:9, 15
646:20  647:1,
5, 21  649:19
651:15
685:14
707:13, 23
713:23
716:13
717:11
721:21
722:11
723:21  725:1,
6  726:20
727:10
730:22  733:4
734:10, 16
735:7  736:3
ingest  648:15
728:9
ingredient
647:12  648:8
653:17
Ingredients
647:10, 17, 22
input  738:24
745:16
inputs  736:8
Inquiry  634:7
759:20
insert  643:18

645:14  649:3
inserts  643:13
insist  675:4
insisted  675:2
inspection
707:13, 22
inspections
680:5  731:11,
19
inspectors
679:19
instance  745:2
instructions
644:9  765:1
intake  673:22
integrated
710:4
intended
661:12
intent  737:17
intention
654:8
intentional
665:12
intentionally
714:4
interacted
739:15
interaction
750:22
interactions
706:6  708:4
interacts
724:11
interested
688:4  725:5
interface
717:3
interim
671:16  673:22
internal
712:14, 20
internet
650:20, 23
interpret
690:6  703:2
interpretation
689:7  693:1
719:17

investigation
715:7, 11
740:1
investigations
674:20
invoked
675:24  694:13
involved
671:6, 10
705:23
714:21  738:18
involving
699:8

IRBESARTAN
626:4  637:12
issuance  677:6
issue  646:1
issued  674:5
682:4  684:23
issues  641:3
664:14  710:6
727:21
items  720:18
iterative
737:15, 16
it'll  673:7
its  644:23
645:15
655:23
661:12
664:10
666:12, 24
667:10  668:9
675:13  676:9
683:19
688:10  689:1
697:13
702:21  710:2
725:19  726:16
IVES  629:1

< J >
JACLYN
629:8
Jaclyn.gallian
@nortonroseful
bright.com
629:10
Japan  751:2
753:21

754:15
755:12  756:2
Japanese
751:16  753:2
755:19
756:12  759:22
JASON  628:4
762:6, 8
jdavis@slackda
vis.com  627:5
JERSEY
626:1
jmr@pietragall
o.com  628:7
Joe  700:22
708:7  717:14,
22
JOHN  627:3
646:15
650:11
655:10  657:5
665:8  683:7
709:6  740:20
752:15
756:19
762:14, 22
Joseph  686:18
jumps  704:13
jurisdiction
675:8
Justice  671:5
Jyothi  753:14

< K >
kabonner@dua
nemorris.com
628:12
KANNER
627:6
Kayleigh
630:5  637:4
KELLY
628:10
kept  712:6
761:5
kill  699:14
kind  691:14
696:11  700:1
735:5
know  640:5
645:12, 13

653:16  654:7
659:12, 16
664:8  665:11,
18, 19, 20, 23
666:20  671:5
675:24  677:5,
20  681:23
682:1  683:7,
8  684:4
686:23  691:6,
11  694:12, 20
695:24  696:5,
9, 17  700:5
701:18  702:4
703:10, 14
705:11, 18, 20
706:1, 2, 17
707:17, 18, 24
708:1, 18, 22
710:15  711:8,
19, 20  713:7
714:3  715:21
716:17, 18, 20,
24  717:3, 5, 7,
14, 15, 16, 19,
20, 22  718:11,
13  721:1
722:7, 9
723:7, 11, 19,
23  724:5, 21,
22  725:7
728:6, 7
731:16, 21
734:16, 22
735:1, 5, 8
736:2  738:21,
22  739:3, 9
740:5  741:23
742:1, 14
743:2, 4, 12
745:21, 24
747:8, 10, 13,
14, 18  748:3,
5, 11  749:1,
13  750:2, 6, 9
753:17
755:20  756:8,
11  759:2, 8
760:11  761:3,
6

Confidential Information - Subject to Protective Order

knowledge 642:*21*
known 733:*9* 736:*16*
KUGLER 626:*7*

< L >
l.hilton@kanner-law.com 627:*11*
label 644:*20*
labeled 643:*8* 673:*13*
labeling 645:*3* 649:*15, 19* 705:*6*
Lack 645:*21*
language 646:*3*
Lantech 633:*19* 729:*11* 732:*10, 19* 733:*2, 15* 734:*6, 17* 735:*1, 10, 13* 737:*2* 738:*18, 23* 739:*16* 742:*18, 21* 743:*2* 744:*1* 745:*22* 746:*2* 747:*2, 15* 748:*15, 23* 749:*2, 16, 23* 750:*3, 7*
LaSalle 627:*19*
lasting 639:*7*
late 675:*11*
LAW 627:*18* 661:*23*
LAWLOR 629:*18*
laws 688:*17* 694:*1, 8* 701:*12, 18, 19*
lawyer 668:*6* 671:*3* 678:*9* 689:*15* 690:*8* 691:*5, 12* 703:*6*

LAWYER'S 768:*1*
LAYNE 627:*8*
leader 686:*24*
leaf 744:*8*
leaflet 643:*24* 644:*4, 9, 23* 645:*15* 647:*5, 21* 727:*10*
leaflets 643:*14*
learned 674:*12*
left 665:*10* 673:*7* 762:*1*
legal 666:*17* 677:*15* 689:*8* 690:*4* 691:*6* 693:*1* 703:*2*
legalese 688:*2* 692:*18, 23*
lengthy 752:*24*
Letter 632:*12, 14* 635:*10* 669:*11, 20* 670:*15* 671:*14* 672:*12, 24* 673:*7* 680:*4* 682:*5* 683:*3* 684:*2* 698:*11*
letterhead 732:*15*
letters 680:*23*
levels 648:*22*
liabilities 692:*5* 695:*2*
LIABILITY 626:*5* 637:*12*
lies 748:*22* 749:*9, 23*
limit 718:*18* 752:*5* 755:*10*
limited 691:*8*
limits 673:*23* 674:*16, 17, 19* 735:*19* 740:*14* 755:*13* 756:*1*
LINE 636:*6, 9, 12, 15* 694:*23* 695:*19* 740:*7*

766:*4* 768:*2*
lines 752:*8*
link 652:*5* 660:*24*
links 651:*12*
list 644:*9* 649:*12* 653:*16* 712:*10* 733:*4* 748:*14*
listed 647:*20* 649:*2, 11* 683:*11* 697:*11* 700:*23* 715:*23* 716:*7*
lists 647:*16* 653:*12* 693:*21* 758:*4*
LITIGATION 626:*5, 21* 637:*5, 13* 694:*15* 696:*2*
little 661:*3* 676:*4* 711:*23* 732:*16* 757:*17* 760:*4*
live 730:*2, 5*
LLC 627:*6* 628:*14, 20* 629:*22*
LLP 627:*1* 628:*3, 10, 16* 629:*1, 7, 13*
local 688:*16*
logo 646:*24*
long 639:*17, 18*
longer 639:*10* 752:*6* 756:*13*
look 646:*18* 647:*4, 8* 652:*8* 681:*22* 689:*19* 690:*3* 697:*18* 737:*8* 739:*21* 744:*4*
looked 643:*21* 644:*1* 657:*8* 691:*14* 713:*22* 727:*9* 732:*22*

looking 697:*19*
710:*14* 713:*24* 736:*7* 745:*6* 747:*12*
looks 647:*7* 673:*2*
LOSARTAN 626:*4* 637:*11*
loss 692:*5*
losses 695:*2*
lost 657:*24* 741:*5*
lot 710:*18* 712:*22* 737:*14*
Louisiana 627:*9*
Low 661:*5*
lunch 756:*22, 24* 761:*11*

< M >
Machine 631:*17, 20* 632:*6* 650:*17* 657:*15*
main 712:*17*
major 683:*21*
making 702:*19* 721:*15*
management 724:*19*
manner 643:*8*
manufacture 701:*13* 705:*23* 733:*8*
manufactured 666:*24* 667:*18* 677:*1* 678:*24* 679:*15* 680:*3* 724:*3*
manufacturer 725:*14* 748:*19*
manufacturers 664:*23* 667:*8* 676:*8* 698:*22* 713:*5, 10* 720:*21* 721:*3* 727:*1*

manufacturing 653:*23*
669:*23* 705:*5, 13* 734:*18* 735:*4* 739:*15* 742:*22* 749:*20* 750:*3, 12* 760:*9*
March 638:*19, 20*
mark 651:*20* 656:*24* 696:*19* 700:*7* 703:*16* 732:*2* 752:*11* 759:*10*
Marked 636:*14* 640:*2* 646:*9* 650:*7* 651:*21* 657:*1* 662:*19* 668:*20* 671:*23* 672:*19* 686:*6* 696:*21* 700:*8* 703:*17* 730:*8* 732:*4* 743:*18* 752:*12, 20* 759:*11*
Market 627:*14* 751:*16, 20*
marketplace 661:*13*
marking 646:*6* 650:*5* 671:*21* 672:*18* 686:*4* 730:*6* 743:*16*
match 645:*8*
material 758:*16*
materials 685:*24* 733:*5, 6, 10* 734:*8*
Matta 630:*5*
matter 637:*10* 682:*24* 742:*16*
matters 670:*20*

Confidential Information Subject to Protective Order

Maz@falkenbergives.com 629:5
mbc@pietragallow.com 628:7
McKesson 629:11
mdennis@crowell.com 629:15
MDL 626:2
mean 643:3 661:9 662:9 670:11, 12 675:16 679:13, 14 681:4, 22 682:20 685:22 689:17 708:7 710:13 713:22 714:16 717:12 720:23 721:20 744:17 747:10 755:8
meaning 677:10 685:2
meaninglessly 699:15
means 653:10 661:10 666:21 671:17 689:17 747:7 755:9 764:20
meant 718:21 720:15
medicines 653:11 656:14
medium 721:21 758:20
meet 640:10 736:13 737:18
meeting 639:17, 22
meetings 722:10
meets 661:11

MEGAN 629:3
MELISSA 628:4
memorized 642:4 663:19 710:18 711:8, 13 712:10, 18 755:19
mentioned 645:24 717:8 720:2
Merchandise 633:7 700:15 701:10, 15 702:3, 5, 21
merchandise/products 688:8
message 660:2, 4
met 638:18, 21 639:4
methods 667:2 669:22 738:8
Michelle 626:16 722:17 741:3 764:12
middle 733:18
MIMI 629:13
mind 677:8 722:18
minds 684:16
minimum 727:24
Minneapolis 627:20
Minnesota 627:20
minute 669:4 699:15
minutes 744:4 757:3, 8 761:24
misbranded 673:15 688:15 694:5 702:15
Mischaracteriz

es 685:8
mislead 645:2
missed 665:8
mission 667:3
misspeak 707:3
misstatement 654:23
Misstates 660:8 663:11 685:7
Monroe 629:3
MORING 629:13
morning 638:11, 13 668:24
MORRIS 628:10
move 722:2
mute 762:6
mutually 698:1
Mylan 628:8 630:7 631:14, 17, 18, 20 632:6, 7, 8, 12, 15, 19 633:6, 9, 11, 14, 18, 19, 21 634:6 635:7, 8 641:17 642:12, 17, 22 644:15, 22 645:11, 13, 14, 24 647:5 651:13 652:13 653:4, 9 654:2, 13, 21 655:20 657:21 658:7, 19 661:15 662:1 664:14 666:11, 24 667:6, 22 668:8 670:21 672:7 675:11, 13, 22 676:7 683:8 685:1, 17 686:17 687:5 688:22,

24 692:2 696:1, 12 699:7, 8 700:1, 19 701:9 702:19 703:11 705:11, 20, 21 707:18 708:23 710:6 713:18 714:21, 24 715:20 717:23 721:5, 15 722:5, 6, 10 723:9 724:11 725:19 726:11, 12, 15 727:15 731:1 733:19 734:17 742:22 743:8, 9, 11, 24 744:23 745:2, 7, 12, 14 747:2 748:6, 16 749:9, 13 759:3 760:17
mylan.com 651:2 657:16
MYLAN-MDL2875-00035696-01 631:16
MYLAN-MDL2875-00255224-27 634:8
MYLAN-MDL2875-00264918-19 632:12
MYLAN-MDL2875-00264920 632:15
MYLAN-MDL2875-00345711 635:11

MYLAN-MDL2875-00460527-28 633:14
MYLAN-MDL2875-00460529-31 633:17
MYLAN-MDL2875-00698731 633:20
MYLAN-MDL2875-00702457 633:22
Mylan's 640:23 641:2, 4 646:24 649:3, 20 650:14, 24 652:14 654:2, 14 655:4, 7, 10 658:13 660:18 664:9, 21 665:1, 22 667:17 670:5 676:24 678:2, 22 683:10 685:2, 19 689:24 690:17 694:13 710:1 713:14 720:22 721:8, 17 722:12 727:17, 21 750:11

< N >
name 637:4 642:5 653:11 687:11 700:19 708:7 729:12
named 686:18
names 643:2 648:4 712:15
narrow 711:23
NDEA 754:14

755:13  756:1
**near**  714:10
**necessarily**
681:2, 24
682:19
**necessary**
765:4
**need**  695:17
760:12
**neglected**
756:22
**never**  691:17
**Nevertheless**
645:11
**NEW**  626:1
627:9  674:19,
21  704:17
707:7  709:10
753:20
**Nitrosamine**
632:11
648:21
672:12
674:13
675:15  720:1,
10  734:11
739:18  756:15
**nitrosamines**
647:20  648:7
649:2, 18
668:11
671:15
673:21  714:2
718:10  719:18
**n-nitrosamines**
673:10
**nodding**  762:8
**non-
adulterated**
661:18  666:14
**nonexclusive**
698:19
**normal**  723:1,
17
**NORRIS**
629:7
**North**  686:24
708:14
**NORTON**
629:7

**not-
adulterated**
667:11
**Notary**
626:17
764:14  767:23
**noted**  637:20
765:11  767:11
**NOTES**  768:1
**notice**  626:15
635:7  663:2
709:21  728:1
**November**
669:11  754:12
**Number**
641:22  642:2
647:16  672:6
697:16  701:1
703:23
706:11
732:10  753:7
**numbering**
673:6
**numbers**
642:4  706:21
753:9
**numerous**
710:16
**NW**  629:14

**< O >**
**OAI**  680:21
682:6  683:3,
9, 11  684:2
685:2
**Object**  716:14
**objected**
655:1, 11
**Objection**
645:18, 20, 21
647:24  648:9,
16, 17  649:5,
7  654:5
656:1, 3, 16,
18  658:20, 22
659:20, 22
660:7  661:20,
21  663:10
666:15, 16
668:1, 12
670:7, 24

674:1  676:13
677:12, 14
678:5  679:3,
5, 7  680:8
681:10, 11, 12,
20  683:13
685:6  687:7,
9, 17, 19
689:5, 6, 9
690:1, 18, 20
694:16, 18
696:3, 6, 13,
15  699:1
700:3  701:22
702:6, 8, 23
703:3  705:15
706:12
710:10  711:6
718:5, 22
720:3  724:13,
15  725:23
726:1  728:10
734:20  739:6,
19  742:23
747:23  748:8
751:11, 13
754:20, 22, 24
755:14, 16
759:5  760:20
**objections**
649:23  685:4
751:22
**obligations**
694:14  698:14
**obtain**  758:16
**obviously**
708:8  723:7
**occasions**
715:14
**occurred**
724:6
**official**  669:16
680:6, 15
682:16
683:11
685:23  691:6
723:3
**Oh**  657:10
704:10  744:9
745:3

**Okay**  639:6,
12, 16, 21
640:8, 14, 19
641:9, 16, 20
642:1, 6, 10,
22  643:7, 17,
23  644:3, 7,
15  645:11
646:12, 16, 23
647:8, 11
648:6  649:1
650:4, 19
651:6, 10, 18,
24  652:3, 11,
16  653:9, 15,
19, 22  654:1,
17  655:13
657:12
658:10, 16
659:4, 14
660:4  661:2,
8, 15  663:4, 6,
7, 17, 20, 24
664:4, 7
665:3  666:8,
10  669:19
670:4, 19
672:2, 11, 17
673:4, 8, 19
683:6  684:24
686:2, 9, 12
687:2, 14
688:22
691:13, 19, 23
693:23
695:16, 24
696:24  697:3,
9, 14, 21, 22
698:3, 5, 11
700:6, 11, 18
701:24
702:12
703:10
704:12, 19
705:10  707:1,
4, 16  708:17
709:2, 7, 12,
19  711:2, 15
712:23
713:12, 17
714:20

715:18
716:11, 24
717:8  719:21
721:14
723:22  724:9
725:12
726:14, 19, 23
727:3, 7, 14
728:2  729:1
730:1, 11, 19,
24  731:4, 21,
24  732:7, 23,
24  733:14, 17
734:2, 24
735:9  738:17
739:2  740:21
741:18, 24
742:7  743:15,
21  744:5, 9,
10, 23  745:18
746:6, 19, 24
748:13  749:1,
6, 12  750:2, 6
752:21  753:5,
11, 22  754:7,
11  755:11, 23
758:11, 18
759:2, 19
760:16  761:8,
14, 20  762:5
763:1
**once**  737:24
739:22  758:19
**one-page**
686:13  695:13
**ones**  713:2
728:9
**ongoing**
670:13  715:7,
10
**operation**
682:23
729:18  758:15
**operations**
705:3  708:15
717:6, 9
**opinion**
665:24
666:17
677:16
679:22  680:2,

Confidential Information - Subject to Protective Order

23  682:9, 21
683:5, 9
**opinions**
681:15, 18
684:13
**opportunities**
684:8
**opportunity**
764:9
**oral**  640:23
655:4  664:9,
21  667:6
710:1  711:3
714:22
715:15  716:6
722:8
**orally**  715:21
**ORDER**
626:8  726:9
739:4
**organogram**
708:12
**original**
765:15
**originally**
737:11
**originated**
733:7
**Orleans**  627:9
**outsource**
731:10
**owned**  705:4
**Oxford**  628:5
**o-xylene**
733:19
735:12
738:20
739:17
741:21
742:20  747:5,
21  749:4
759:3

**< P >**
**P.C**  627:13
629:18
**p.m**  761:15,
19  763:2, 6
**PA**  628:11
**package**
643:13, 18

644:20
645:14  649:3
**packaging**
705:6
**packing**
669:23
**PAGE**  631:13
632:5  633:5
634:5  635:6
636:6, 9, 12,
15  646:21
647:2, 9
651:4, 11
652:17, 23
653:1  654:9
656:6, 9
657:19, 24
658:1, 5
660:16, 22
669:20  673:5,
7  687:12
697:20  698:4
700:19  701:3
704:3, 7, 11,
13, 16  707:6
734:2  745:8,
19  746:6
748:13
753:13
757:20  758:2,
6  766:4  768:2
**pages**  646:19
657:17
697:16  701:2
767:6
**paper**  697:19
**paragraph**
661:4  669:21
673:10  688:1
692:1, 15
693:9  694:23
695:17, 19
697:10  734:4
**Paralegal**
630:7
**parent**  734:18
735:3  739:4,
14  742:21
**parenthetical**
695:4, 20

**Parkway**
629:19
**part**  644:19
645:16
649:14
654:10
660:11
688:22
731:17  736:6
738:22  743:2
745:17
**particular**
641:11
660:16  751:19
**parties**  637:16
697:10
**pass**  762:21
**Patient**
631:14
643:14, 24
644:4, 9, 13,
23  645:15
646:20  647:5,
21  652:6
658:12
659:19  660:6,
17, 23  727:9
**patients**  651:7,
11  652:14
654:14, 21
658:18  660:6,
11, 13
**Patrick**  754:2
**paying**  696:1
**payors**  664:12
**Pennsylvania**
627:15  628:5,
17  629:14, 19
**people**  679:17
681:16, 21
704:15
712:14, 18
713:7  714:18
716:7  717:10,
12, 19  737:14
**people's**
648:14
**percent**  756:18
**perform**
723:15  731:18

**performed**
729:21
**period**  650:22
**personal**
683:9  684:13
**personally**
683:7  714:12
**ph**  626:21
**Pharma**
628:20  629:21

**Pharmaceutical**
628:13, 14, 19
632:22  697:5
724:12  728:8
**Pharmaceutical
s**  628:8, 20
661:12  687:6
700:20  734:7
**phase**  737:21
738:11, 12, 19
743:9  746:20
747:11  750:18
**Philadelphia**
627:15
628:11, 17
**phone**  715:6,
12
**PIETRAGALL
O**  628:1
**pill**  642:11
**pills**  642:12
**Pittsburgh**
628:5
**place**  737:17
740:10  741:5
749:17
**placed**  684:19
**plain**  642:7
**Plaintiff**
662:17
668:18  669:7
709:23
**Plaintiffs**
627:6, 11, 16,
21
**plan**  757:17
**planning**
706:17
**play**  724:23

**please**  680:18
730:20
752:16
759:24
760:11  765:3,
8
**PL-Glover-2**
635:7  662:20
**PL-Glover-54**
635:10  668:21
**PL-Glover-70**
631:14  646:11
**PL-Glover-71**
631:17  650:9
**PL-Glover-72**
631:20  651:23
**PL-Glover-73**
632:6  657:3
**PL-Glover-74**
632:10  672:1
**PL-Glover-75**
632:14  672:21
**PL-Glover-76**
632:17  686:8
**PL-Glover-77**
632:21  696:23
**PL-Glover-78**
633:6  700:10
**PL-Glover-79**
633:9  703:19
**PL-Glover-80**
633:13  730:10
**PL-Glover-81**
633:16  732:6
**PL-Glover-82**
633:18  743:20
**PL-Glover-83**
633:21  752:14
**PL-Glover-84**
634:6  759:13
**PLLC**  627:18
**PMDA**  634:8
759:20, 21
**point**  671:12
674:15
680:21
686:23
692:19  724:7
761:24
**pointing**

692:*12*
policy  668:*5*
pool  660:*11*
portion
 658:*13*  688:*3*
 693:*14*
 722:*22*  741:*8*
position
 670:*10*
 673:*20*  674:*6,*
 *7, 11*  681:*8*
 682:*1*  685:*11*
possible
 678:*15*  715:*5*
possibly  691:*9*
post-recall
 664:*5*
PowerPoint
 633:*9*
predominately
 710:*13*
prep  639:*3,*
 *13*  640:*9*
 641:*14*
preparation
 710:*17*
 718:*20*  750:*22*
prepare
 640:*15*
 641:*10*  663:*9*
 719:*7*  748:*19*
prepared
 749:*2*
preparing
 638:*22*  691:*20*
Pre-recall
 664:*4*
Prescription
 633:*9*  704:*4, 7*
PRESENT
 630:*1*  639:*13*
 673:*21*
presentation
 720:*24*  721:*21*
presentations
 720:*20*
 721:*15*  722:*9*
presented
 640:*6*
pretty  723:*17*
 744:*5, 12, 22*

prevented
 666:*4*
previous
 704:*10*
previously
 637:*22*  638:*2*
 640:*2*  662:*19*
 668:*20*
Prinston
 628:*13*
printed  760:*14*
printout  658:*4*
prior  661:*16*
 666:*12*
 674:*15*  722:*2,*
 *3*  737:*2, 4*
 738:*11*  743:*9*
 745:*23*
priorities
 659:*16*
privileged
 719:*1, 12*
probably
 678:*11*  708:*9*
 712:*16*
 716:*19*  717:*17*
procedures
 684:*9*  738:*8*
proceed  638:*6*
process
 649:*15*  684:*6*
 728:*20*  729:*2,*
 *9, 21*  733:*7,*
 *10*  734:*7, 12,*
 *18*  735:*4, 11,*
 *12, 14, 15, 17*
 736:*1, 5, 6, 10,*
 *13, 20*  737:*2,*
 *3, 18*  738:*4,*
 *20*  739:*1, 4,*
 *15*  740:*5*
 742:*20, 22*
 743:*3, 14*
 746:*7, 11, 14,*
 *22*  747:*4, 12,*
 *14, 19*  748:*20*
 749:*3, 7, 14,*
 *20, 22*  750:*4,*
 *8, 13*  751:*15,*
 *20*  752:*1*

756:*12*  758:*4*
 760:*9*
processes
 728:*21*  729:*3*
 737:*16*  750:*19*
processing
 669:*23*
produced
 699:*7*  704:*15*
Product  633:*9*
 642:*5*  645:*10*
 646:*5*  652:*14*
 654:*14*
 655:*23*  667:*1,*
 *23*  670:*22*
 671:*17*
 673:*11, 21, 24*
 674:*14, 18*
 677:*3, 9, 10*
 678:*1, 15*
 679:*2*  683:*20,*
 *23*  691:*3*
 698:*23*
 702:*22*  704:*4,*
 *7*  725:*20*
 726:*12*  761:*5*
Production
 636:*8*  746:*13*
PRODUCTS
 626:*4*  637:*12*
 641:*2, 5, 18*
 642:*17, 23*
 643:*1, 7*
 645:*16*  649:*4,*
 *14, 20*  654:*3*
 661:*17*
 665:*22*
 667:*10*
 676:*10*  681:*5*
 684:*5*  689:*2*
 694:*2*  698:*22*
 724:*12*  725:*8*
 728:*8*  746:*16*
 758:*2, 5*
Professional
 626:*16*  764:*13*
prohibited
 688:*15*
propounded
 767:*9*

PROTECTIVE
 626:*8*
protocols
 748:*20*  749:*3,*
 *8, 15*
prove  660:*23*
 737:*18*
provide  705:*5*
 715:*20*  733:*1,*
 *3*  750:*12*
provided
 685:*13, 24*
 705:*21*
 707:*19*
 708:*23*  733:*6*
 734:*9*  735:*14*
provider
 729:*10, 13*
 746:*3*
Public  626:*18*
 677:*5*  764:*14*
 767:*23*
publish
 662:*17*  669:*1*
pull  712:*12*
Purchase
 632:*22*  697:*5*
 726:*12*
purchasers
 685:*18*
purchasing
 713:*8*
purely  659:*24*
purification
 752:*7*  754:*16*
 756:*3, 9, 13,*
 *14*  758:*3, 14*
purity  641:*3*
 655:*6*  664:*13*
 665:*1*  685:*20*
 689:*23*
 690:*16, 24*
 691:*4, 10*
 702:*21*  710:*5*
 716:*8*  720:*6,*
 *7, 22*  721:*17*
 722:*12*
 726:*16*  727:*17*
purpose
 735:*24*

pursuant
 626:*15*
 642:*13, 18, 24*
pushes  646:*3*
put  677:*21*
 711:*9*
puts  653:*4*

< Q >
QA  760:*7*
qualification
 737:*13*  738:*2*
qualified
 648:*20*
 666:*22*  668:*4*
 690:*11*
Quality
 633:*19*  641:*2*
 651:*14*
 657:*21*  658:*7,*
 *19*  659:*15*
 661:*5, 9, 10*
 664:*13*
 667:*24*  677:*2,*
 *9, 11*  678:*3,*
 *11, 16, 24*
 679:*2, 21*
 681:*5*  684:*5*
 710:*5*  723:*14*
 727:*20*  728:*8*
 743:*24*
 744:*15*
 745:*22*
 746:*15*
 753:*19, 23*
 758:*16*
queries  732:*11*
Questad  630:*7*
question
 655:*2*  662:*4*
 666:*5, 11, 23*
 667:*16*
 677:*24*
 679:*11*
 684:*22*
 699:*19*  706:*3,*
 *15*  707:*5*
 711:*21*
 718:*19*
 720:*12*
 722:*18, 24*

Confidential Information Subject to Protective Order

735:9  741:4,
18  748:6
755:2  758:12
759:24
**Questions**
636:14
662:11  699:4
717:17  719:6
743:4  767:8
**quick**  646:18
**quickly**  744:22
**quite**  744:20
**quote**  659:4
667:23  729:8
731:19

**< R >**
**R&D**  748:11
750:15, 22
**raise**  756:23
**rare**  715:13
**RASPANTI**
628:3
**RBK/JS**  626:5
**reactions**
740:2, 3
**read**  659:2, 18
660:13  661:1
663:13  665:8
687:23, 24
692:9  693:12
699:20
722:21  741:4,
7  760:5, 15
764:9  765:3
767:5
**reading**  660:2
699:5
**reads**  660:10
669:21  673:10
**ready**  757:4
**really**  640:18
663:9  666:22
673:5  679:14
682:24
683:21  706:4,
14  708:3
712:9  713:24
716:16  717:2,
7, 19  734:3

743:1, 5
757:21
**Realtime**
626:17  764:14
**reason**  674:10
765:5  766:6,
8, 10, 12, 14, 16,
18, 20, 22, 24
**reasons**  712:17
**recall**  661:16
663:21
666:12
669:10
675:13, 20, 21,
23  708:11
713:3  728:1,
2, 17, 22
729:14  751:5
**Recalls**
674:23  675:3,
5, 9, 17
**receipt**  765:17
**received**
680:4  683:2
**receives**
721:23
**receiving**
728:7
**recognize**
662:24
**record**  637:3,
21  665:7
703:22
709:11, 14, 17
740:17, 19, 23
741:2  761:13,
16, 19, 21, 23
762:7, 24
763:3  764:6
**recover**  739:16
**recovered**
728:20
735:11
738:19, 20
740:10
741:21
742:20  746:3
747:4, 21
749:4  750:18,
19  759:3

760:1, 8, 10,
17  761:2
**recovers**  733:5
**recovery**
729:9, 22
733:7  734:8
735:17  737:3
739:1  740:5
**redacted**
697:16  701:2
**REEFER**
628:4  762:9,
13, 21
**refer**  658:10
**reference**
641:21
672:15  695:12
**reference-
listed**  655:24
**references**
688:18
**Referral**
633:16
**referred**
643:1  701:19
702:5  721:2
746:21
**referring**
662:10  667:4
692:1  693:8,
10  738:14
741:15
746:20  756:9
758:24
**reflect**  645:7
680:23  681:3
762:7
**reflected**
658:3  703:24
**reflects**  681:7,
15, 18
**regard**  655:6
664:24
667:17
689:23
690:16
694:15
702:20
707:19  716:8
**regarding**
638:22

640:11  641:2
658:18
664:13
667:14
670:14
685:20
705:12, 22
710:5  713:19
720:14, 21
726:16
727:16
734:10  750:17
**Regardless**
732:17  755:23
**Registered**
626:16  667:2
735:18  764:13
**registration**
706:9
**regs**  670:23
**regulation**
684:7
**regulator**
678:10  759:22
**regulators**
679:19
**regulatory**
650:1  668:6
671:3  689:15
690:8  691:12
703:6  706:16
707:12, 21
**rejection**
742:15
**relate**  640:22
**related**
664:14
665:16  705:7
710:6  720:9
721:16  734:12
**relates**  676:6
713:14
**relating**  641:4,
18
**relationship**
724:19
725:19  731:12
**relatively**
752:24
**release**  674:18

**relevant**
661:16  739:9
**reliability**
735:17  736:12
**reliably**
737:18
**relied**  714:17
**rely**  742:11
**remember**
664:1  710:13,
22  715:16
728:18
**remind**  670:4
673:19  760:16
**reminds**
670:9, 16
**remote**
626:14  637:10
**remotely**
637:17, 19
**repeat**  722:15
752:16
**repeating**
722:18
**rephrase**
677:23
**reply**  757:22
**report**  672:7
747:15
**Reporter**
626:17
722:21  741:7
764:13, 14, 22
**reports**
748:21  749:3,
8, 15  753:22
754:1, 4
**represent**
650:13  731:22

**representations**
698:8, 13, 19
701:3, 8
**Representing**
627:6, 11, 16,
21  628:8, 13,
19  629:5, 11,
16, 21
**reproduction**
764:20

Confidential Information Subject to Protective Order

**Request** 636:8 760:7

**requested** 722:21 741:7 764:6

**requesting** 733:2

**require** 708:20

**Requirements** 633:11 661:19 704:5

**requires** 706:8

**reserve** 707:4

**resolved** 685:3

**resource** 651:7 658:13, 18 660:6, 17

**Resources** 631:18 652:7

**respectfully** 689:19

**respective** 643:9 696:12

**respectively** 673:16

**response** 730:21 732:20 733:15 760:10

**responses** 732:11

**responsibilities** 748:14

**responsibility** 748:22 749:9, 22 750:11

**results** 721:24

**resume** 762:3

**retailers** 664:12, 23 667:9 676:8 713:4, 20 715:1 726:24

**return** 765:15

**reused** 760:2

**review** 639:21 691:21 727:14 744:24

**reviewed** 644:20 649:10 710:9

723:12, 20 727:12, 24 742:1, 4

**reviewing** 710:20 732:9

**reviews** 645:6

**RICHARD** 626:14 631:5 638:1 764:8 767:16

**right** 641:24 642:5, 8 649:17, 21 652:22 661:3 680:17 682:12 694:24 695:12 710:12 720:2 723:8 726:12 728:9 739:18 741:14 742:6 753:6 757:6 761:12

**rights** 698:20

**ring** 733:23

**risk** 736:9 737:22 740:6 756:15

**ROBERT** 626:6 659:5

**role** 659:10

**ROSE** 629:7, 8

**routinely** 646:2

**rows** 733:18

**RUBEN** 627:13

**ruben@honikla w.com** 627:16

**RUBENSTEIN** 628:16

**rubensteinb@g tlaw.com** 628:18

**Ruler** 627:3

**running** 737:15

**< S >**

**safety** 653:19

**sale** 701:14

**Sam's** 633:6 700:15

**Sandra** 753:13, 17

**SANGER** 627:1

**sartan** 733:10

**sartans** 733:8

**satisfied** 685:12

**saw** 652:7 660:15 662:7 708:7 725:17 728:1 732:18 754:13, 14 755:24

**saying** 671:14 677:8 684:14 722:24 730:19 754:19 755:24

**says** 646:19 647:12 651:13, 14 653:9 655:4 657:20 659:14 661:4 688:5 693:24 694:24 695:4, 20 697:23 698:7, 17 700:17, 19 703:8 707:7, 12 718:8 733:4 734:4, 6 746:10 748:19, 21 749:7, 20 750:10 754:12, 13 758:2, 14

**scientific** 746:13

**scope** 645:20 648:1, 18 649:8 654:6, 24 655:1, 12 656:4, 7, 18 658:23

659:23 666:6 679:7 687:10, 20 689:10 690:21 694:19 696:7, 16 700:4 702:9 703:4 705:17 711:24 712:2 724:16 726:2 748:9 751:12, 22 754:23 755:17 759:6 760:21

**screen** 640:7 650:14 662:17 709:22

**scroll** 697:18

**search** 714:7

**second** 651:11 652:17 691:24 694:22 695:19 734:5 744:7

**second-to-last** 673:9 734:4

**section** 647:23 651:7 652:17 653:3 660:17 693:7 695:10 698:6 701:3 748:18

**Sections** 673:15

**secure** 726:9

**see** 646:19, 23 647:14 651:1, 3, 6, 8, 12, 16 652:3, 17, 19, 20, 23 653:3, 7 655:8 657:14, 19, 22 658:5, 8, 11 659:4 661:2, 6 662:22 663:4 664:7 669:19 670:2, 3 672:5, 9, 14, 15 673:4, 17 686:12, 16

687:2, 11 688:20 691:23, 24 692:7, 10, 13, 14, 21 693:7, 9, 16, 23 694:9, 22 695:7, 16, 23 697:3, 9, 15, 22 698:6, 15, 24 699:20, 22 700:14, 21 701:1, 5, 7, 16 702:12, 16, 17 704:2, 6, 11, 17, 20, 22 705:8 706:7 707:6, 9, 14 718:3 720:5 730:13, 17 732:9, 12 733:1, 12, 14, 17, 22 734:1, 3, 14 740:19 745:8, 18 746:1, 7, 17 748:14, 18, 24 749:10, 24 752:23 753:3, 6, 12 754:11, 17 756:4, 6 757:22 758:1, 11, 17, 21 759:15

**seeing** 641:13

**seen** 673:1 691:13, 17 743:23 744:16 747:14

**seizure** 676:1

**seizures** 675:9

**sell** 642:17

**send** 762:19

**sense** 645:3 713:11

**sent** 668:23

**sentence** 688:3 692:19 693:17

**Sentry** 629:19

separate 639:6

serve 659:9

service 723:13
729:10, 13

SERVICES
626:21 637:6
705:7

session 638:19

sessions 639:3,
7, 9, 14 640:9
641:14

set 640:20

shaped 734:5

share 709:22

shared 735:7
736:3, 4
742:21

sheet 765:7, 9,
12, 15 767:12

shipment
688:14 689:3
721:19

shipped 688:9

Short 709:15
740:24 761:17

Shorthand
626:17 764:13

shot 650:14

show 655:15

showed 712:1
727:10

shown 725:2
726:6

side 724:19
740:2

sign 764:9
765:8

signatory
687:14

signed 686:16
723:8 725:22
732:15 745:19

signing 687:3
702:18 765:10

similar
696:10 745:21

sir 653:2
689:13

sit 729:3, 10

site 729:24
730:2, 5

situation
671:11 720:9
762:16

situations
671:7

six 646:19

SLACK 627:1
630:9

slightly 752:4

Solco 628:14

sold 642:11,
12, 22 694:2

solvent
728:21 735:3,
12 738:20
740:10 746:3
758:20 760:1

solvents
750:18, 19
760:8, 10, 18
761:2

somebody
717:14

somewhat
725:5

sorry 657:11,
23 658:1
662:8 693:11,
13 695:11
696:19 702:1
711:18
714:16 716:2
722:16
725:16
728:14
729:16
736:22
752:17 755:1
758:8

sort 638:17
645:4 646:24
664:20 714:6
734:5 736:7
744:14
745:12
746:19
750:17 752:6

sound 642:8

sounds 641:24
642:5 757:12
760:24

source 721:11
722:5 723:8
726:24

sourcing
701:13

South 628:11

space 765:6

speak 726:19
754:9

speaking
729:17

specific 729:6,
18, 22 734:9
751:24

specifically
715:19
723:12 731:8
750:23

specification
736:20, 21
737:1, 5
738:12
741:12, 16, 20
742:3, 13
743:10

specifications
736:14
737:19, 20
738:1

specs 667:2
738:8

speculate
747:16

speculating
660:1 724:7
726:5 730:3

speculation
736:15, 18

spend 682:22

stage 746:12,
22 747:4, 20
758:4

standard
659:15 690:5

standards
661:11

stands 755:4

STANOCH
627:8

start 640:19
708:9 755:7

started
716:22 722:24

starting 646:8

starts 657:20
658:6 659:17
693:17

state 688:16
765:5

statement
652:12 656:8
665:22
668:16
679:18
689:22
690:15
702:19 756:18

statements
655:5 664:22
667:7, 14
677:5, 6 716:6

STATES
626:1 683:20
706:8

stating 684:17

status 669:16
679:22 680:6,
16, 21 682:6
683:3 684:3

STELLPFLUG
627:18

stenographic
637:21

step 752:7
756:13, 15

steps 758:14

stickers 640:3

Stipulations
636:11

stop 757:10,
14

stopping
761:21

storage 705:6

Street 627:9,
14 628:11, 17
629:3

stuff 684:14
693:20 708:19

sub-agency
731:13

subcontracted
705:2

SUBJECT
626:8 632:11
633:14 634:7
654:22 753:1
759:19 765:10

submit 645:13

submits
644:22

submitted
737:12 742:9
743:11

subparts
712:2, 3

Subscribed
767:19

Subsection
693:24 694:9

subsidiary
688:10

substance
767:11

substantive
646:21 658:6
704:3

success 736:11

sufficient
677:2 679:1

suggestions
675:19

Suite 627:4,
14, 19 629:3,
8, 19

summarizes
721:24

super 724:18

supervision
764:22

supplied 694:3

Supplier
633:7, 11
700:16, 19
701:9, 10
704:4, 17
707:7 715:8
725:7 729:4

suppliers
704:7

supply 707:21
715:11 725:19

**SUPPORT**
636:2  713:23

**supposed**
737:4

**Sure**  646:16
659:11
660:15, 22
662:7  665:17
667:21  671:4
686:21
692:17
695:18
704:13  706:4,
15  708:4
712:11
717:24  718:1
721:1  727:19,
24  728:4
729:7, 16, 17
731:20
736:24
743:14  744:2
748:2  749:16
755:7  756:17
757:11  759:7
761:3

**surprised**
718:3

**sworn**  637:19,
22  638:2
764:5  767:19

**< T >**
**Tab**  646:6
650:5  651:20
652:6  656:24
657:9  671:22
672:18  686:4
696:19  700:7
703:16  730:6
732:2  743:16
752:11, 18
759:10

**Tablets**
631:15
647:10, 23

**take**  639:18
647:8  686:2
704:14  709:4,
8  719:22
742:17  744:3

**taken**  626:14
682:17  683:12

**takes**  675:6, 19

**talk**  684:12
706:18  708:2,
6  715:6, 12
722:3  737:14

**talked**  638:16,
18  717:13

**talking**
652:24
709:20
711:22
728:19  735:22

**Technical**
633:18
723:14
743:23
744:15  745:22

**technically**
648:7

**TECHNICIAN**
630:1

**tell**  681:23
683:4  684:11
712:7  716:20
717:7  718:24
731:7  744:4
745:3, 5, 11

**telling**  729:14
757:16

**template**
744:14  745:13

**templates**
744:18  745:4

**ten**  757:3

**tend**  711:10
712:18
725:13  744:20

**term**  697:23
738:3

**terminology**
737:8  738:16

**terms**  707:21
724:1  747:2,
20

**tested**  740:11

**testified**  638:3
660:5  663:8
719:19

**testify**  641:10

**testifying**
640:17

**Testimony**
631:3  640:12
660:8  663:11
666:1  711:15
722:22  741:8
764:6

**testing**  721:24

**tests**  735:19

**tetrazole**
733:9, 23

**Teva**  628:19
721:7, 15
722:4, 11
723:8, 15, 23
724:2

**Texas**  627:4
629:9

**text**  653:4
656:11
657:19  658:6

**Thank**  638:14
676:3  699:16
704:12
728:17  762:23

**Thanks**  762:22

**therewith**
695:5, 21

**thing**  645:2
653:16
664:17  665:4
716:4  760:5,
23

**things**  714:1
723:17  744:7

**think**  641:12
644:19  645:1,
3, 24  646:8
660:9  665:9
667:22  676:3
684:1  685:11
691:2  706:11,
20  711:21
712:12
717:10, 13
718:23, 24

**title**  659:13
686:22

**titled**  687:15

**today**  637:14
638:12, 21
640:10, 12

**Today's**  637:7
638:22  738:15

**told**  668:8
729:2

**top**  646:20
651:4  652:23,
24  673:7
758:1, 6, 8
759:17

**topic**  640:16
644:17
654:18  655:3
709:10  710:9,
16  711:4
712:5  750:23
757:13

**topics**  640:20,
22  641:7, 11
662:11  663:4,
8  666:2
676:6  682:2
691:20
709:20
715:23  718:4,
21  719:24

**touched**
640:21

**toxicologist**
648:23

**TPPs**  713:4,
21  715:2

**tracking**
651:11

**traditionally**
738:4

**transcript**
764:9, 19
765:17, 19

**transcription**
767:7

**transfer**
698:18

**transition**
709:9

**721**:18, 22
722:23  726:6
729:5  731:17
738:10  740:3
744:13
750:24  751:1,
3  753:20
754:3  755:9
759:21

**third**  673:5

**third-party**
664:12

**thirty**  765:16

**Thread**
632:10
633:13, 21
634:6

**three**  639:20
640:20
641:17
642:13, 19
643:18
651:12
737:15, 16
753:9

**threshold**
671:16

**tighter**  752:5

**time**  637:8
639:13
650:22
658:14
660:19  667:4
674:2  678:4
682:23
686:23
688:13  689:3
699:12
709:13, 16, 22
714:21
715:16
722:15  731:9
737:9, 11
740:22  741:1
761:10, 15, 18
763:2

**times**  639:1
661:16
666:12
680:11
681:23  710:16

**756**:21, 23
757:3  761:10

TRAURIG
628:16
tried 714:4
tries 645:8
triethylamine
735:2
TRISCHLER
628:3 645:18
646:14
647:24 648:9,
16 649:5, 22
650:10 654:5,
19 655:8, 15
656:1, 16
657:4, 10
658:20
659:20 660:7
661:20
663:10 665:6
666:3, 15
668:1, 12
669:3 670:7,
24 674:1
676:13
677:12 678:5
679:3 680:8,
18 681:10, 20
683:13, 15
685:6 687:7,
17 689:4
690:1, 18
692:8, 22
694:16 696:3,
13 699:1
700:3 701:22
702:6, 23
705:15
706:12 709:5
710:10 711:5
716:1, 14
718:5, 22
719:4, 11
720:3 724:13
725:23
728:10
734:20 739:6,
19 742:23
747:23 748:8
751:11, 21
752:15
754:20

755:14
756:19, 21
757:7, 15
759:5 760:20
true 682:19
755:11 764:6
try 688:1
trying 654:2
682:12
692:18, 20, 23,
24 693:13
turn 734:2
turned 739:12
two 639:2, 6,
19 680:5
761:23
type 649:13
684:3 710:23
714:11
717:15
723:14, 16
types 676:18
706:6 744:6
typically
723:13

< U >
U.S 628:14
642:12, 23
751:20
ultimate 728:6
underscore
753:8, 9
undersigned
688:5, 10
understand
674:3, 7
699:11 755:2
understanding
644:8 724:10
751:7, 10, 15
752:1, 3
762:16
understood
711:22
731:16, 24
752:9
undisclosed
734:13
Unit 669:11,
15 670:6

671:11 680:3,
4, 16, 20
681:8 682:5
683:2, 8, 10,
18 684:19
685:3 723:24
724:1, 4
729:11, 18
760:9
UNITED
626:1 683:20
universe
654:22
unsigned
732:14
unusual 715:3,
16 732:16
upstream
735:23
urgently 733:3
URL 651:1
USA 628:20
629:21
usage 760:8
use 673:6
738:3
uses 706:22
731:18
USP 631:15
usually 715:9
744:21

< V >
VAA 733:20
Vague 674:2
679:4, 16
vaguely 673:2
validate 683:1
735:16 749:20
validated
750:3
validation
728:20 729:2,
9, 19, 21
735:11, 15
736:1, 5, 7, 11,
20 737:3, 6,
10 738:5, 7
746:8 747:15
748:20 749:3,
8, 14

VALSARTAN
626:2 631:15
634:8 637:11
641:18, 22
642:1, 7, 18
643:4, 5, 19
647:6, 10, 13,
23 655:10, 16,
21 656:13
665:1, 10, 20
666:13
667:11, 18
668:9 674:13
675:14 676:9,
24 678:2, 23
680:3 685:19,
21 690:17
702:21
705:13, 24
707:20 710:2
714:2 716:9
718:8, 9
719:18 720:8,
22 721:17
722:5, 13
724:3 726:17
727:17
734:19
735:13
737:11
741:21 746:3
747:5, 22
749:4 750:20
751:2, 8, 9
754:14
755:12, 24
758:4, 19
759:4, 20
760:8, 11, 18
valsartan-
containing
642:11, 23
645:16 649:4,
20 661:17
varied 679:16
variety
712:13 724:21
various 664:2
736:8
verbal 715:15
versus 751:20

vertically
710:3
VICINAGE
626:2
Videoconferenc
e 626:15
VIDEOGRAP
HER 637:2, 5
638:5 709:12,
16 740:21
741:1 761:14,
18 763:1
videos 657:18
658:3
VIDEOTAPE
630:1
videotaped
626:14
violation 694:1
virtue 694:2
VLN 733:20
734:18 735:3
VOLUME
626:8 637:15
voluntary
675:6, 20, 21,
23
VSJ 733:20
751:2, 8, 15
755:11 759:3
760:9, 11, 18
VST 733:20
734:19 735:3
751:9, 20

< W >
wager 649:11
Walgreen
697:4, 13
698:18
Walgreens
632:21 699:24
WALGREENS
0000782-14
632:24
Walmart
700:15
702:20
703:11
705:11, 22

706:8  707:23
708:18
**WALMART00**
**00001**  633:11
**WALMART00**
**00597-07**
633:8
**WALMART-1**
704:1
**want**  645:2
680:13
706:18  707:3
709:4, 6
724:24  744:3
757:2, 6
**wanted**
638:16
665:14
693:14
715:12  757:9
**wants**  659:2
661:1
**Warning**
635:10
669:11
670:15  680:4,
22  682:4
683:2  684:2
**warnings**
644:10
**Warranties**
698:7, 12, 20
701:4, 8
**Washington**
629:14
**wasting**
699:12
**Way**  627:3
631:17, 20
632:6  650:17
657:15  669:2
684:7  719:14
**ways**  653:12,
13
**web**  654:9
656:6, 8
660:21
**Website**
631:18, 20
632:7  650:14,

24  658:4, 13
660:18
**websites**
650:21
**Well**  639:9
645:5  647:17
654:12  655:3,
13, 15  660:15
668:8  669:1
674:15  680:1
682:12
684:11
689:19
690:14
711:15  713:1
717:6  719:9
721:18
726:11
731:16  734:3
735:9  736:19
739:12  745:7
753:21  754:2
755:7, 23
757:20
**went**  676:4
714:4  739:24
**we're**  646:8
699:12  761:21
**WERNER**
629:18
**we've**  685:13
709:2, 19
761:22
**whatsoever**
692:6  695:3
**WHITELEY**
627:6
**wholesaler**
689:22
690:15
696:10  725:20
**wholesalers**
664:11, 23
667:9  676:8
685:18  713:4,
20  715:1
724:10, 11, 20,
24  725:13
726:10, 15
**wholly**  693:3

**Witness**  636:5
637:18, 22
645:23
646:12  648:2,
11, 19  649:9,
24  651:24
654:7  656:5,
21  657:12
658:24
659:24  660:9
662:3  663:12
666:20  668:3,
14  670:9
671:2  672:2,
22  674:3
676:15
677:18  678:7
680:17, 20
681:14, 21
683:14, 17
685:10  686:9
687:11, 21
689:14  690:3,
22  692:14
694:20  696:5,
17, 24  699:9
700:5, 11
702:1, 10
703:1, 5, 20
705:18
706:14
710:12  711:7
716:16  718:7
720:5  722:23
724:17  726:3
728:12
730:11  732:7
734:22  739:8,
21  743:1, 21
748:1, 10
751:14, 23
752:21  755:1,
18  759:7
760:22  762:1
764:5, 6, 8
765:1
**word**  652:20
655:16
665:10  691:7
720:5, 7
737:10

**words**  667:15
676:19  690:7
693:22  704:6
**work**  640:15
675:18  739:5
741:19, 20, 23
742:8, 12, 19
748:11
**worked**
708:12  717:13
**working**
716:21
**works**  675:5
686:22  708:8
**world**  679:24
717:6
**write**  644:18
670:17
**writes**  756:4, 6
**written**
640:23  655:5
664:1, 9, 21
667:7  689:21,
22  690:15
702:19  710:2
711:3  714:22
715:17, 22
716:6  722:8
755:21

**< Y >**
**Yeah**  639:15
645:1, 23
657:6  658:1
662:8, 23
667:21  670:3,
16  676:12
679:13
681:14  682:3
685:10  690:3
693:9  695:18
700:24  706:4
707:24
713:11, 16
717:2, 12, 24
723:10, 19
724:17
725:15, 16
726:3  727:2
728:12, 24
731:23

733:16, 21
735:5  736:24
739:21  740:3
741:17, 22
745:10  746:9
747:10
748:17  751:6,
23  755:18
756:20  757:5,
24  759:18
760:15, 22
762:9, 13
**years**  664:3
715:4  746:4
**yellow**  640:3
**Yep**  653:21,
24  698:16
704:12
730:23  731:3
734:15  746:18
**yesterday**
639:4, 17

**< Z >**
**Zealand**
753:20
**Zhejiang**
628:13
**ZMICK**  629:3
**Zoom**  626:15
627:1  628:1
629:1  630:1
637:10  740:15

# Exhibit 100

REDACTED

Confidential Information - Subject to Protective Order

1        IN THE UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF NEW JERSEY

2                    -  -  -

3   IN RE:  VALSARTAN, LOSARTAN,  : MDL No. 2875

4   AND IRBESARTAN PRODUCTS        : HON ROBERT B. KUGLER

5   LIABILITY LITIGATION           : CIVIL NO. 19-2875 (RBK/JS)

6   _____

7   THIS DOCUMENT APPLIES TO ALL  :

8   CASES                          :

9                    -  -  -

                APRIL 15, 2021

10                   VOLUME II

                     -  -  -

11        - CONFIDENTIAL INFORMATION -

12        SUBJECT TO PROTECTIVE ORDER

13             Continued Remote Videotaped

14   Deposition, taken via Zoom, of DANIEL

15   BARRETO, commencing at 8:33 a.m., on the

16   above date, before Amanda Maslynsky-Miller,

17   Certified Realtime Reporter and Notary

18   Public in and for the Commonwealth of

19   Pennsylvania.

20

21                    -  -  -

22

23        GOLKOW LITIGATION SERVICES

       877.370.3377 ph | 917.591.5672 fax

24            deps@golkow.com

Page 421

APPEARANCES:

KANNER & WHITELEY, LLC
BY: DAVID J. STANOCH, ESQUIRE
BY: CONLEE S. WHITELEY, ESQUIRE
BY: LAYNE HILTON, ESQUIRE
701 Camp Street
New Orleans, Louisiana 70130
(504) 524-5777
D.Stanoch@kanner-law.com
C.whiteley@kanner-law.com
L.hilton@kanner-law.com
Representing the Plaintiffs

GREENBERG TRAURIG, LLP
BY: VICTORIA DAVIS LOCKARD, ESQUIRE
BY: STEVEN M. HARKINS, ESQUIRE
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, Georgia 30305
(678) 553-2100
Lockardv@gtlaw.com
Harkinss@gtlaw.com
Representing the Defendants, Teva
Pharmaceutical Industries, Ltd.,
Teva Pharmaceuticals USA, Inc.,
Actavis LLC, and Actavis Pharma, Inc.

CIPRIANI & WERNER, P.C.
BY: ERIN C. THOMPSON, ESQUIRE
450 Sentry Parkway
Suite 200
Blue Bell, Pennsylvania 19422
(610) 567-0700
ethompson@c-wlaw.com
Representing the Defendants,
Aurobindo Pharma, USA, Inc., and
Aurolife Pharma, LLC

Page 422

APPEARANCES:  (Continued)

DUANE MORRIS, LLP
BY: JESSICA PRISELAC, ESQUIRE
600 Grant Street
Suite 5010
Pittsburgh, Pennsylvania 15219
(215) 979-1159
JPriselac@duanemorris.com
Representing the Defendants,
Zhejiang Huahai Pharmaceutical Co,
Ltd., Prinston Pharmaceutical
Inc., Huahai U.S., Inc., and
Solco Healthcare US, LLC.

FALKENBERG IVES, LLP
BY: MEGAN A. ZMICK, ESQUIRE
230 West Monroe Street
Suite 2220
Chicago, Illinois 60606
(312) 566.4808
Maz@falkenbergives.com
Representing the Defendant,
Humana

PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
BY: MELISSA B. CATELLO, ESQUIRE
One Oxford Centre, 38th Floor
Pittsburgh, Pennsylvania 15219
(412) 263-1840
MBC@Pietragallo.com
 - and -
BY: JOHN W. KETTERING, ESQUIRE
7 West State Street, Suite 100
Sharon, Pennsylvania 16146
(724) 981-1397
JK@Pietragallo.com
Representing the Defendant,
Mylan Pharmaceuticals, Inc.

Page 423

APPEARANCES: (Continued)

ALSO PRESENT:

Kristalyn Duran, Videographer

David Marck, Teva Pharmaceuticals USA, Inc.

Rachel Gallagher, Teva Pharmaceuticals USA, Inc.

                   - - -

Page 424

                   - - -
                I N D E X
                   - - -

Testimony of:  DANIEL BARRETO

  By Mr. Stanoch              429, 769
  By Ms. Lockard              685

             E X H I B I T S
                   - - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Teva-162 | TEVA-MDL2875-00950663-0706 Risk Assessment for the Use of Valsartan | 470 |
| Teva-163 | TEVA-MDL2875-00000875 Test Specification and Certificate of Analysis | 505 |
| Teva-164 | TEVA-MDL2875-00020116 Test Specification and Certification of Analysis | 510 |
| Teva-165 | TEVA-MDL2875-00015517 Test Specification and Certificate of Analysis | 515 |
| Teva-166 | TEVA-MDL2875-00242568-2678 GAP Analysis, Addition of Dupnista as an Alternative Manufacturing Site for Valsartan Tablets | 519 |

Page 425

```
 1            - - -
 2       E X H I B I T S
 3            - - -
 4
 5  NO.      DESCRIPTION      PAGE
 6  Teva-167   TEVA-MDL2875-00020279
             3/24/16 Quality Agreement   556
 7  Teva-168   TEVA-MDL2875-00020213
             Technical Agreement Between
 8           Actavis Group and
             Zhejiang Huahai        560
 9
10  Teva-169   TEVA-MDL2875-00020214
             Amendment to Quality
11           Agreement            562
12  Teva-170   TEVA-MDL2875-00020212
             Quality Agreement for
13           Active Pharmaceutical
             Ingredient           563
14  Teva-171   TEVA-MDL2875-00022589-2592
             10/23/18 E-mail, Schwartz
15           to Barreto           568
16  Teva-172   TEVA-MDL2875-00024488-4492
             11/13/19 E-mail, Barreto
17           to Drape             575
18  Teva-173   TEVA-MDL2875-00024041-4045
             3/27/19 E-mail, Vanderweeen
19           to Barreto           579
20  Teva-174   TEVA-MDL2875-00495893-5896
             3/27/19 E-mail, Vanderweeen
21           to Barreto           586
22  Teva-175   TEVA-MDL2875-00065014-5016
             8/20/18 Letter, Truemper
23           to Herber            605
24
```

Page 426

```
 1            - - -
 2       E X H I B I T S
 3            - - -
 4
 5  NO.      DESCRIPTION      PAGE
 6  Teva-176   No Bates
             8/8/19 Letter, Singh to
 7           Priester             611
 8  Teva-177   TEVA-MDL2875-00014826-4827
             1/4/19 E-mail, Dellarese
 9           to Truemper          618
10  Teva-178   TEVA-MDL2875-00014763
             1/1/19 E-mail, Ora Pharm1
11           Recalls to Truemper  621
12  Teva-179   TEVA-MDL2875-00717000-7014
             11/27/19 E-mail, Singh to
13           Nase                 635
14  Teva-180   TEVA-MDL2875-00071287-1303
             9/29/19 E-mail, Etzioni to
15           Fluch                651
16  Teva-181   TEVA-MDL2875-00060028-0034
             10/30/18 E-mail, Sawyer to
17           Barreto              735
18  Teva-182   TEVA-MDL2875-00060028-0034
             10/30/18 E-mail, Sawyer to
19           Barreto              781
20  Teva-183   TEVA-MDL2875-00917708-7715
             Test Result Report   792
21
22
23
24
```

Page 427

```
 1            - - -
 2       DEPOSITION SUPPORT INDEX
 3            - - -
 4
 5  Direction to Witness Not to Answer
 6  Page Line    Page Line    Page Line
 7  None
 8
 9
10  Request for Production of Documents
11  Page  Line    Page Line    Page Line
12  646    8
13
14
15  Stipulations
16  Page Line    Page Line    Page Line
17  428    1
18
19
20  Question Marked
21  Page Line    Page Line    Page Line
22  None
23
24
```

Page 428

```
 1            - - -
 2       (It is hereby stipulated and
 3   agreed by and among counsel that
 4   sealing, filing and certification
 5   are waived; and that all
 6   objections, except as to the form
 7   of the question, will be reserved
 8   until the time of trial.)
 9            - - -
10       VIDEO TECHNICIAN:  We are
11   now on the record.  My name is
12   Kristalyn Duran, a videographer
13   for Golkow Litigation Services.
14   Today's date is April 15th, 2021,
15   and the time is 8:33 a.m.
16       This is a video deposition
17   of Daniel Barreto, Volume 2.
18       Counsel, you may proceed.
19            - - -
20       DANIEL BARRETO, after having
21   been previously duly sworn, was
22   further examined and testified as
23   follows:
24            - - -
```

Confidential Information - Subject to Protective Order

Page 429

EXAMINATION
- - -
BY MR. STANOCH:
    Q.   Thank you.  Good morning,
Mr. Barreto, welcome back.
    A.   Good morning, counsel.
    Q.   You understand you're still
under oath from yesterday?
    A.   I do.
    Q.   Great.  And just a yes or
no, did you talk to your counsel, between
the end of yesterday's deposition session
and today, about your testimony so far?
    A.   Yes.
    Q.   Did you talk to anyone else
besides in-house or outside counsel for
Teva about your testimony so far?
    A.   No.
    Q.   Did you review any documents
since we ended last night and this
morning?
    A.   Yes.
    Q.   How many documents did you
review?

Page 430

    A.   I browsed through, probably,
ten, fifteen documents just to refresh my
memory.
    Q.   Were those documents you had
already coming into yesterday's
deposition?
    A.   No, sir.
    Q.   These were new documents
that were just made available to you last
night?
    A.   Yes, sir.
    Q.   And they were made available
to you by your counsel?
    A.   Yes, sir.
    Q.   About how much time did you
spend looking at those documents?
    A.   Ten to fifteen minutes.
    MS. LOCKARD:  And just for
    the record, some of that includes
    what we discussed producing to you
    this morning.
    MR. STANOCH:  Thank you, Ms.
    Lockard.
BY MR. STANOCH:

Page 431

    Q.   Mr. Barreto, yesterday we
talked a little bit about risk
assessments and test results that Teva
generated concerning the ZHP and Mylan
valsartan API.
        Do you recall that
generally?
    A.   Yes, sir.
    Q.   I'm just going to put in
front of you what's been previously
marked as Teva-16.
    A.   Let me go to -- are you --
counsel, are you going to share that so
that I can upload it?
    Q.   I'm happy to share my
screen, if that -- if you thought that
was smoother yesterday.
    A.   It worked.  But I think
looking at the document just gives me the
ability to sort of look at some sections
that allow me to better, you know, make
myself more acquainted with it.
    Q.   That's fine.  So what I'll
do, sir --

Page 432

        MR. STANOCH:  Go ahead,
    Victoria.
        MS. LOCKARD:  I'm sorry.  We
    don't have the link anymore on the
    chat.
        So, Amanda, are you able to
    add that?
        COURT REPORTER:  Certainly.
        THE WITNESS:  Thank you,
    counsel.
BY MR. STANOCH:
    Q.   What I'll do, Mr. Barreto,
is I'll share my screen initially to make
sure you're looking at the same thing and
then you can peruse the copy you have,
okay?
    A.   That sounds fine.
    Q.   This document was previously
marked in another deposition as Teva-16.
        It's a July 18, 2019, e-mail
from Mr. Sawyer to you and others, and
it's copying a number of final Teva
reports, and they're listed here; the
risk assessment of Teva for the ZHP

Confidential Information - Subject to Protective Order

Page 433

¹ valsartan API, the risk assessment for
² the Mylan valsartan API, and then Teva's
³ analytical drug substance and drug
⁴ product testing results for the --
⁵          A.    Yes.
⁶          Q.    Do you see that?
⁷          A.    Yes, sir.
⁸          Q.    And these are -- these
⁹ appear just to be final, signed copies of
¹⁰ the reports.  We looked at maybe other
¹¹ drafts or iterations yesterday.
¹²          You're familiar with these
¹³ reports, correct?
¹⁴          A.    Yes.  Yes, I am.
¹⁵          Q.    For example, I'm looking at
¹⁶ the first one, which is Teva's risk
¹⁷ assessment concerning the ZHP valsartan
¹⁸ API, right?
¹⁹          A.    Yes, sir.
²⁰          Q.    And this appears to be the
²¹ final version of that?
²²          A.    Yes, sir.
²³          Q.    And you reviewed this before
²⁴ it was finalized and signed off on by

Page 434

¹ Teva?
²          A.    I did.
³          Q.    And a similar question here
⁴ for the risk assessment for the Mylan
⁵ valsartan API, sir.
⁶          A.    That is correct.
⁷          Q.    This appears to be the final
⁸ version of Teva's risk assessment for
⁹ that API, correct?
¹⁰          A.    That is correct.
¹¹          Q.    And you reviewed this prior
¹² to its sign-off and approval?
¹³          A.    I did.
¹⁴          Q.    And finally is the Teva
¹⁵ valsartan analytical drug substance and
¹⁶ drug product testing results sourced from
¹⁷ ZHP.
¹⁸          Do you see that?
¹⁹          A.    Yes, I do.
²⁰          Q.    Again, this appears to be
²¹ the final version of that?
²²          A.    That is correct.
²³          Q.    Right.  And you were
²⁴ familiar with this document when it was

Page 435

¹ prepared and finalized?
²          A.    I am.
³          Q.    In fact, I think you
⁴ approved this; that's your signature,
⁵ correct, for July 18th --
⁶          A.    That is correct.  That is my
⁷ signature.
⁸          Q.    July 18th, 2019, right?
⁹          A.    That is correct.
¹⁰          Q.    And we looked at a slightly
¹¹ different version of this one yesterday
¹² regarding the results of Teva's testing
¹³ of valsartan API from ZHP.
¹⁴          Do you recall that?
¹⁵          A.    Yes.



Page 436

Confidential Information - Subject to Protective Order

Page 437

10    Q.    And are you aware of a
11 similar document that was prepared like
12 this for the Mylan valsartan API that
13 Teva was sourcing?
14    A.    I believe we may have put
15 something together, yes.
16    Q.    And I know -- I know that
17 there were test -- we talked yesterday
18 that Teva did eventually conduct testing
19 of the Mylan valsartan API, right?
20    A.    Certainly we did, yes.
21    Q.    And I believe we discussed
22 how those results, in some form or
23 fashion, were shared, ultimately, with
24 the FDA as well, right?

Page 438

1    A.    Yes, they were.
2    Q.    Right.  And whatever those
3 results are, they are as reflected in the
4 communication to the FDA; is that fair?
5    A.    That is correct.
6    Q.    And just sitting here today,
7 do you have a memory, one way or the
8 other, of whether, you know, a sort of
9 formal document, it was sort of like this
10 layout, was prepared by Teva for the
11 Mylan valsartan API as well?
12    A.    I believe we did something
13 similar to that.
14    Q.    And we talked about this
15 yesterday, that, ultimately, Teva's own
16 testing revealed there was NDEA in Mylan
17 valsartan API batches, correct?
18    A.    That is correct.
19    Q.    And I believe we also
20 discussed that Teva's own testing
21 eventually revealed that NDMA was also in
22 at least some of the Mylan valsartan API
23 batches, correct?
24    A.    I believe so.

Page 439

1    Q.    And prior to that testing,
2 Mylan had told Teva that the formation of
3 NDMA was not possible via the Mylan
4 valsartan API manufacturing process,
5 right?
6    A.    And they documented this
7 through an assessment that we requested
8 them to perform.  We reviewed that
9 assessment from them.
10    And at the time when the
11 assessment was reviewed, based on the
12 information that we had with respect to
13 how this impurity could be formed, we
14 concluded that that assessment was
15 reasonable and sound.
16    Q.    But, ultimately, Teva's own
17 testing revealed that there was some NDMA
18 detected in Mylan's valsartan API,
19 correct?
20    A.    And that testing, yes,
21 confirmed that.  So, therefore, the
22 initial assessment that was done needed
23 additional support through the process of
24 testing, which was done.

Page 440

1    Q.    Can you tell me why all of
2 the valsartan API batches that Teva
3 sourced from Mylan did not contain NDMA
4 under the FDA interim limit of 0.3 PPM?
5    A.    Can you repeat the question,
6 please?
7    Q.    Sure.
8    Can you tell me why all of
9 the valsartan API batches that Teva
10 sourced from Mylan were not under the FDA
11 interim limit for NDMA of 0.3 PPM?
12    A.    I'm trying to remember at
13 this point.
14    I know we had the issue with
15 the cross-contamination coming from the
16 solvents for the NDEA issue.  So if I
17 recall, I think it was also an issue of
18 contamination versus an issue of the
19 manufacturing process itself.
20    Q.    Can you tell me why all of
21 the valsartan API batches that Teva
22 sourced from Mylan were not under the
23 interim FDA limit of 0.08 PPM for NDEA?
24    A.    My understanding, based on

Confidential Information - Subject to Protective Order

Page 441

¹ the investigation, was that there was a
² cross-contamination issue coming from the
³ o-xylene solvent.
⁴      Q.   And with respect to the
⁵ Mylan valsartan API, as part of the Teva
⁶ risk assessment that's in this collection
⁷ of documents here, that issue concerning
⁸ cross-contamination from the o-xylene
⁹ solvent was identified as one of the
¹⁰ reasons why Teva concluded that it
¹¹ would -- it would, until further notice,
¹² not source valsartan API from Mylan?
¹³      A.   What is your question,
¹⁴ counsel?  My apologies.
¹⁵      Q.   The issue that you noted
¹⁶ with the o-xylene contamination for the
¹⁷ Mylan API, right --
¹⁸      A.   Right.
¹⁹      Q.   -- are you with me?
²⁰      That issue, Teva ultimately
²¹ determined, contributed to an
²² unacceptable risk which led to Teva,
²³ until further notice, not sourcing
²⁴ valsartan API from Mylan?

Page 442

¹      And I can refer you to the
² risk assessment.
³      A.   Yes.  I think it is, based
⁴ on our assessment, we needed to
⁵ understand the extent to which the use of
⁶ the solvent across a number of batches
⁷ would have, you know -- we were looking
⁸ at impact.
⁹      So we were trying to
¹⁰ understand, what is the extent of this
¹¹ cross-contamination?  So this is
¹² something that needed further
¹³ investigation from us and we needed to
¹⁴ make sure that we had that information.
¹⁵      So, for us, it was important
¹⁶ to have more information as to how many
¹⁷ batches were actually implicated.
¹⁸      Q.   Ultimately, in Teva's risk
¹⁹ assessment that we're looking at here,
²⁰ Teva concluded that it discontinued
²¹ sourcing valsartan and valsartan
²² intermediates from Mylan for all markets
²³ due to an unacceptable level of risk,
²⁴ correct?

Page 443

¹      A.   That is correct.
²      Q.   So it wasn't just a certain
³ batch or a certain lot of API from Mylan,
⁴ because of the risk of
⁵ cross-contamination that Teva
⁶ investigated that was happening at Mylan,
⁷ it discontinued, at this time, at least,
⁸ of this report, sourcing any valsartan
⁹ API because of the unacceptable level of
¹⁰ risk?
¹¹      A.   So from our perspective, as
¹² I indicated to you, when you have an
¹³ issue like this where you find
¹⁴ cross-contamination, in this case, from
¹⁵ solvents, it's not that easy to sort of,
¹⁶ let's say, conclude that this is
¹⁷ isolated, so X number of batches.
¹⁸      So the fence, as we call it
¹⁹ in this industry, is something you still
²⁰ have to establish.  So we did not have
²¹ the fence, and we needed to get more
²² information.
²³      Q.   As part of Teva's
²⁴ investigation into the contamination

Page 444

¹ issue with the Mylan valsartan API, did
² Teva have any communications with the
³ company that was providing the solvent to
⁴ Mylan?
⁵      A.   Not to my knowledge.
⁶      Q.   A moment ago you mentioned
⁷ that it's not too easy to determine, when
⁸ you have an issue like this,
⁹ cross-contamination from the solvent with
¹⁰ Mylan.
¹¹      Is that because there's no
¹² assurance that all of the drugs do not
¹³ contain the nitrosamine contaminant?
¹⁴      A.   No.  It's because you want
¹⁵ to understand, from a technical
¹⁶ perspective, you know, where are the
¹⁷ solvents used.  So o-xylene may be used
¹⁸ in one process but not in others.
¹⁹      So we really wanted to
²⁰ understand how we could assess and get a
²¹ better picture as to, first, when did
²² this cross-contamination happen, under
²³ what circumstances and whether or not
²⁴ this, let's say, cross-contaminated

Confidential Information - Subject to Protective Order

Page 445

1 o-xylene was used, when -- so there's
2 more information that you want to get in
3 a responsible fashion.
4        Because you know, first,
5 that you have to get this information for
6 yourself, you have to be comfortable
7 it's a very comprehensive investigation.
8 And you also know that in the process of
9 explaining, if you -- if you, let's say,
10 do not recall certain batches, you still
11 have to provide an explanation to the
12 regulators as to how you came to that
13 conclusion.
14      Q.   This is one of the reasons
15 why good documentation is important at an
16 API manufacturer, right?
17      A.   Good documentation is
18 necessary for every single one of the
19 activities that -- so this is a good
20 reason.
21        But it's also a good reason
22 for every single activity that is
23 assessed.
24      Q.   And that includes, for

Page 446

1 example, the manufacture of API, yes?
2      A.   That includes, yes, the
3 manufacture of the API, that is included,
4 yes.
5      Q.   That includes Teva's own
6 testing of incoming API from a vendor?
7      A.   That is correct.
8      Q.   And that includes an API
9 vendor's own sourcing of solvents or
10 other intermediates from another third
11 party?
12      A.   I would expect that that
13 would be the case.
14      Q.   And this is why it's
15 important for manufacturers to audit
16 their suppliers to make sure they have
17 all the necessary documentation?
18      A.   That is correct.  And that's
19 why we have that process for auditing.
20 And we ascertain, to the best of our
21 abilities, that any data that is
22 generated, any documentation, is -- is
23 trustworthy.
24      Q.   Does Teva know what Mylan's

Page 447

1 process was for auditing its own
2 suppliers?
3      A.   In general, I'm sure we do
4 know, because we do know our own process.
5 But this is not an area where we do
6 not -- we will necessarily delve into,
7 because that's -- that is mostly their
8 responsibility.
9      Q.   And the -- turning to the
10 risk assessment that Teva performed
11 concerning the valsartan API from ZHP
12 now.
13        Again, it was Teva's
14 conclusion -- and feel free to look at
15 the document -- that it was an
16 unacceptable risk because of the
17 potential for the nitrosamine impurities
18 that could arise during the manufacturing
19 process, right?
20      A.   That is correct.
21      Q.   And we talked about this a
22 little bit yesterday.
23        Part of that was the use of
24 certain solvents at certain stages of the

Page 448

1 manufacturing process, the process known
2 as the zinc chloride process?
3      A.   The use of solvents is a
4 common practice as part of this process,
5 yes.
6      Q.   I mean, I was focusing
7 specifically on almost the root cause
8 with the nitrosamine contamination for
9 the valsartan API from ZHP.
10        Do you remember talking
11 about that a little bit yesterday?
12      A.   I do -- I do remember
13 talking about that.  And about the root
14 cause, yes, sir.
15      Q.   Right.  And I'm happy to
16 flip through the risk assessment, but my
17 understanding was the root cause had to
18 do with the use of solvents, you know,
19 reacting with another -- another chemical
20 at a certain stage of ZHP's manufacturing
21 process?
22      A.   That would not be correct --
23      Q.   Why don't -- tell me.  Tell
24 me, then, what --

Confidential Information - Subject to Protective Order

1    A.   Yes.  So from the assessment
2  that we did of the investigation --
3  solvents are commonly used now.  In this
4  case, DMF has a certain -- traces that
5  are -- or degradants that are generated,
6  one of them being the DEA.
7          So what happens is that
8  these small traces which are, I would
9  say, secondary to the principal
10  manufacturing process, these are the
11  traces that, when they are combined with
12  nitrous acid, those are the ones
13  triggering the formation of the -- of the
14  impurity.
15          So when you look at the
16  manufacturing process at ZHP, it's not
17  the use of the solvents themselves that
18  trigger the formation of the impurities.
19  That's my point.
20    Q.   Right.  The solvents in and
21  of themselves were not what Teva
22  identified as a root cause issue; it was
23  the reaction of the traces of the solvent
24  with another chemical substance?

1    A.   Not traces of the solvent.
2  But traces of degradants that are formed
3  within that process.  And these are very
4  small traces.
5          So diethylamine is -- let's
6  call it a by-product of, let's say, that
7  reaction that takes place.  But it's
8  not -- it's not a solvent itself.  It's
9  just a by-product that comes into -- it's
10  formed during that manufacturing process
11  at trace levels.
12    Q.   Absent the DMF that was
13  being used, was it Teva's assessment that
14  the nitrosamine impurities could form?
15    A.   Besides the DMF, no.
16    Q.   Right.  And I think we
17  talked about it a little yesterday, ZHP
18  undertook to do something called the zinc
19  chloride optimized process, correct?
20    A.   That is correct.  And what
21  they -- what they did is that they did
22  further investigation and they confirmed
23  that when you do the quenching at the
24  next step, and you execute what is called

1  a separate quenching, you're able to
2  pretty much separate and create a barrier
3  between the product and the aqueous layer
4  where the -- you know, these impurities
5  could be present.
6          And that would allow them to
7  ensure that the product would be free
8  from -- let's say, relatively free,
9  because I don't want to say that -- I
10  don't want to use the term -- I'm using
11  the term "free" freely here.  No pun
12  intended.
13          So -- but the theory is
14  in -- and their testing shows that when
15  they do that separate quenching, you're
16  able to segregate the opportunity for
17  these NDMAs -- NDMA to be in the product.
18    Q.   And I take your
19  qualification with freely, because when
20  Teva and ZHP were talking, in the fall of
21  2018, I've seen a number of documents
22  where ZHP says, you know, the nitrosamine
23  cannot form anymore when you're doing the
24  quenching separately, but then I think

1  some of Teva's audit work suggested that
2  there still might be some amount of NDMA
3  being generated.
4          Do you recall that?
5    A.   I do.  But I think, again,
6  it's -- the important thing here is these
7  manufacturing processes are very complex,
8  industrial.  So even the separation of
9  layers, it's not a perfect science.
10          So that's why I think
11  that -- the concept is that there was a
12  solution that would create a product that
13  would be within specifications.  And I
14  think that's what they meant to say.
15    Q.   Right.  In my -- one of my
16  points and something, you know, people
17  might ask is, ZHP never told Teva about
18  the nitrosamine contamination until late
19  June 2018, right?
20    A.   And from our understanding,
21  we didn't have any reasons to believe
22  that -- based on our audit and based on
23  the testing they had performed and based
24  on the testing we had performed of their

1 product, we had no reason to believe that
2 there were nitrosamines in the product.
3     Q.   And a couple of months later
4 Teva audited ZHP in September of 2018,
5 right?
6     A.   Yes, I believe so.
7     Q.   And ZHP told Teva, hey, we
8 have an optimized process now, NDMA can't
9 be formed anymore, right?
10     A.   I have to look at the
11 details.  What -- I think what they said
12 is they had an optimized process where
13 they could separate the NDMA from the
14 product.
15     Q.   Right.  And then when Teva
16 took a look at that in the context of its
17 fall 2018 audit, it still found some
18 traces of NDMA in the valsartan API,
19 right?
20     A.   That may have been the case.
21         And it goes back to what I
22 was saying, it's not a perfect process,
23 so I -- in my experience, it's very
24 difficult for anybody in this industry to

1 make a claim that something is going to
2 be totally free from traces of
3 nitrosamines.
4     Q.   Would that be the same for
5 any chemical that might be in a product,
6 that might be hard to --
7     A.   Theoretically --
8 theoretically speaking, based on what we
9 know, there's always -- theoretically
10 speaking, there's always an opportunity,
11 whether it's coming from, I don't know,
12 different sources, water, theoretically
13 speaking, I don't think it can be ruled
14 out.
15         And I think it would be the
16 smart thing not to assume that you don't
17 want to look into those things.
18     Q.   Right.  That's what Teva was
19 doing in the fall of 2018, right?  That
20 even though ZHP was saying, hey, we have
21 an optimized process now, NDMA can't
22 form, Teva was doing the smart thing at
23 that time and verifying that to see if
24 that was, in fact, the case; is that

1 fair?
2     A.   I think that the knowledge
3 that we all gained gave us the
4 opportunity to take a more proactive
5 approach.
6         And even still in September
7 '18, we're still looking into whether or
8 not we still needed to learn more things.
9 So I think that what we did was the right
10 thing, because, obviously, this is, as we
11 said, an evolving process.  So we kept
12 learning as we went.
13     Q.   In the fall of 2018, Teva
14 just didn't take ZHP's word for it that
15 NDMA is completely removed from the new
16 optimized process, it sought to verify
17 that itself, correct?
18     A.   Absolutely.  And we felt
19 that it was important to do that because,
20 again, we wanted to make sure that
21 whatever we needed to do to bring this
22 problem to -- also, with the
23 understanding that the regulatory
24 authorities, DDQM, FDA, were also

1 operating toward the same end.
2         So we were looking not only
3 at our own perspective on how to deal
4 with this issue, but also taking into
5 consideration what the health authorities
6 were doing.
7     Q.   You recall some testimony
8 yesterday about whether ZHP ever informed
9 Teva, or specifically legacy Actavis at
10 the time, of ZHP's process change from
11 the TEA process to the zinc chloride
12 process?
13     A.   I do recall that, yes.
14     Q.   Right.  And we looked at an
15 e-mail you wrote in July 2018 in which
16 you stated that ZHP never informed Teva,
17 but you subsequently came to believe that
18 might have -- you might have been
19 mistaken when you drafted that e-mail,
20 right?
21     A.   At the moment when they -- I
22 drafted that e-mail, I did not have the
23 information.  And, you know, you get
24 input from different people, and

Confidential Information — Subject to Protective Order

Page 457

1 that's -- that was the input I received.
2 So we stood corrected.
3          In fact, you know,
4 there's -- there's significant
5 information, including the Teva, you
6 know, amendment to the ANDA in 2013,
7 where the reason for that amendment is
8 that there was a zinc chloride process
9 for the API, and we submitted it at
10 CBE 30.
11     Q.   Right.  You did mention
12 that.  And I am going to put that in
13 front of you to make sure I have the
14 right one that you're thinking of.
15          One moment, sir.
16     A.   Yes, sir.  Thank you.  What
17 exhibit number will that be?
18          MR. STANOCH:  I have not
19     done it yet.
20          THE WITNESS:  Okay.  Thanks.
21     My apologies.
22 BY MR. STANOCH:
23     Q.   Sir, this is a document
24 that's been previously marked as Teva

Page 458

1 Exhibit-2.
2     A.   Yes.
3     Q.   It's a September 9, 2014,
4 CBE letter from Watson, which is, I
5 guess, eventually Actavis, which
6 eventually was part of Teva?
7     A.   That is correct.
8     Q.   And was this one of the
9 submissions that you were referring to a
10 moment ago?
11     A.   That is correct.
12     Q.   And there is -- there is
13 another one for -- a different ANDA for a
14 slightly different valsartan product
15 that --
16     A.   Yes, that is correct.
17          See, I think it's the
18 amlodipine, yeah, and then this one is --
19 because these are combination products.
20     Q.   Right.  And I'll just put
21 that, just so you have it, I'll put
22 that -- this was previously marked as
23 Teva Exhibit-3.
24     A.   Thank you.

Page 459

1     Q.   Do you see that one, too,
2 that's the other one you were thinking
3 of?
4     A.   Let me look at it, sir.
5     Q.   Sure.
6     A.   I was looking at the first
7 one.
8          That would be 003, correct?
9     Q.   And do you recall --
10     A.   Yes.
11     Q.   These are the two
12 submissions you were thinking about in
13 terms of whether or not ZHP had told
14 Teva, or legacy Teva -- or a legacy
15 entity that Teva acquired about the
16 process change from the TEA process to
17 the zinc chloride process, right?
18     A.   That is correct, counsel.
19     Q.   And, again, can you refresh
20 my memory of when you think you saw these
21 two letters?
22     A.   I saw these during my
23 initial review of the documentation that
24 I received.

Page 460

1          These are -- all preceded my
2 time, so this is part of the package of
3 documentation that I have been able to
4 see.
5     Q.   Got it.
6          You first saw these letters
7 in preparation for this deposition, not
8 when you were actually at Teva, is what
9 you're saying?
10     A.   That -- what I'm trying to
11 say is that the discussion about whether
12 or not Teva had been informed, this is
13 something that I -- came about during
14 the -- further during the process at the
15 company.
16          But the actual, you know,
17 review of these documents, as part of
18 this process, yes, is during my review
19 process for this discussion.
20     Q.   Thank you.
21          And I think the statements
22 are almost the same, so I don't -- I'll
23 just look at one of the letters, but --
24 I'll look at Exhibit-3.  But I'm happy to

Page 461

1  look at either of them.
2      A.    That's fine.  I'm on
3  Exhibit-3.  That will be fine.
4      Q.    Great.  And the letter notes
5  to the FDA about minor to moderate
6  modifications were made to ZHP's DMF,
7  right?
8      A.    That is correct.
9      Q.    And then it goes on to list
10 or summarize what some of the -- what the
11 minor to moderate changes are, right?
12     A.    Correct.



Confidential Information - Subject to Protective Order

Page 465

7    Q.   Right.  Sitting here today,
8  you don't know what testing might have
9  been done by ZHP to determine whether or
10 not DMF and MTBE had, in fact, been
11 completely removed?
12    A.   Right.  But what I do know
13 is that in the process, based on my
14 experience, of determining the
15 specifications that you would establish
16 for your finished product, those
17 specifications are based on the
18 expectation that you have, based on your
19 studies and your experiments and your
20 process controls, that these
21 specifications have to be challenged
22 because you expect, for instance, for
23 residual solvents, methanol, ethenol,
24 they expect that there's a possibility

Page 466

1  that there could be some residual levels
2  of those.
3         So, again, I'm only speaking
4  from my experience.  I may be
5  speculating.  But based on my experience
6  in this industry, all I'm saying is it
7  would be good to see the extent to which
8  these solvents are checked as an
9  in-process -- if an in-process check is
10 performed for ensuring that the previous
11 step, whatever that is, removed those
12 impurities in the way they were supposed
13 to -- sorry, those solvents the way they
14 were supposed to be.
15    Q.   You don't know at all what
16 Watson, Actavis, however you want to
17 label the entity, did itself to see
18 whether there was an in-process check
19 concerning DMF and MTBE, right?
20    A.   I do know that we pursued
21 the -- all the testing that was necessary
22 to ensure that the product fulfilled the
23 specifications.
24    Q.   Right.  But the

Page 467

1  specification we're looking at does not
2  have any specification test for DMF and
3  MTBE, right?
4     A.   That is correct.  But
5  that's -- those specifications were
6  neither set by the regulatory
7  authorities.  And they also do an
8  assessment of the manufacturing process.
9     Q.   Well, the regulatory
10 authority is not doing any testing
11 itself; you're not aware of that with
12 respect to ZHP's valsartan API, are you?
13    A.   But the regulatory
14 authorities do have an important process,
15 both DDQM, FDA, and also the USB, in the
16 design of the analytical test method.
17 That -- those specifications are founded
18 on what they understand are the
19 conditions under which the products are
20 manufactured.
21    Q.   You understand that DMF
22 changes of minor or moderate does not
23 require prior FDA approval for it to be
24 instituted, correct?

Page 468

1     A.   Could you repeat the
2  question?
3     Q.   You understand that a minor
4  to moderate modification to a DMF does
5  not require prior approval from the FDA
6  before it's instituted, correct?
7     A.   That is correct.
8     Q.   And you were talking about
9  the stage in which the solvent was used.
10        Does the usage of a solvent
11 towards the end of the manufacturing
12 process change your testimony regarding
13 in-process checks for solvents such as
14 DMF and MTBE?
15    A.   Not necessarily.  As I
16 indicated to you, the -- the end of the
17 process could be defined still --
18 there -- there may be two or three steps
19 or four steps before, and that still may
20 be considered part of the end of the
21 process, because, let's say, it's that
22 stage of the manufacturing process where,
23 you know, now you have a better defined
24 molecule that you want to call, let's

Page 469

1 say, the crude active ingredient for
2 instance, and you still don't have a
3 finished product.
4      Q.    Well, here ZHP had a
5 four-step process, and they're saying at
6 Step 4, right, that's the last step, the
7 solvents were being added, right?
8      A.    It's not as simple as that.
9           And, again, I would have to
10 refresh myself with what do they mean by
11 one step.  One step could actually have a
12 number of activities associated with it.
13           So it's not as simple as
14 just saying a step means one action.  It
15 could mean a number of actions that take
16 place within that step.
17      Q.    You don't know what, if
18 anything, Watson and Actavis did at the
19 time to ensure or verify that DMF and
20 MTBE were being removed completely during
21 the valsartan manufacturing process,
22 correct?
23           MS. LOCKARD:  Objection.
24      Asked and answered.

Page 470

1           THE WITNESS:  What I do --
2      what I do know is that there were
3      a number of assessments done and
4      there were a lot of test
5      activities that were performed and
6      risk assessments that were
7      performed.
8           So those risk assessments
9      and those testing activities are
10      actually designed to directly and
11      indirectly confirm that the
12      expectation that we have for the
13      product are met.
14 BY MR. STANOCH:
15      Q.    Let's look at one of those
16 risk assessments, okay.
17           MR. STANOCH:  I'm going to
18      mark the next Teva exhibit, which
19      should be --
20           THE WITNESS:  Yes, sir.
21           MR. STANOCH:  I believe
22      we're up to 162.
23           - - -
24           (Whereupon, Exhibit

Page 471

1      Teva-162,
2      TEVA-MDL2875-00950663-0706, Risk
3      Assessment for the Use of
4      Valsartan, was marked for
5      identification.)
6           - - -
7           THE WITNESS:  Allow me a
8      second.
9           Yes, sir.
10 BY MR. STANOCH:
11      Q.    So this appears to be a risk
12 assessment for the use of valsartan
13 sourced from a new dedicated workshop.
14 And it's Bates ending 950663.
15           Do you see this?
16      A.    Yes, sir.

Page 472

Confidential Information - Subject to Protective Order

Page 473

[REDACTED]

8    Q.   Can you tell me or identify
9 for me any risk assessment performed by
10 Actavis, or another legacy entity that
11 was acquired by Teva, that solely looked
12 at the valsartan API manufacturing
13 process for the zinc chloride procedure?
14    A.   I'm sure -- I'm sure there
15 is that document.  I don't have it in
16 front of me right now.
17    Q.   Well, have you seen that
18 document?
19    A.   I may have seen that
20 document.
21    Q.   But you can't tell me at all
22 what it looks like, what it says, when
23 it's dated?  Can you tell me anything
24 about it?

Page 474

1    A.   I believe -- I believe I've
2 seen a risk assessment document.  But I
3 am trying to remember now what it would
4 look like.  I believe I have seen it,
5 yes.
6    Q.   And who drafted it?
7    A.   That must have been, if I
8 recall well, it was a cross-functional
9 activity started with the R&D
10 organization.
11    Q.   And does that document spell
12 out what testing, if any, that Actavis
13 did for DMF and MTBE in the valsartan API
14 that ZHP was making under the zinc
15 chloride process?
16    A.   I do not think that was
17 included.  I don't remember.  But I do
18 not think that was included.
19    Q.   And let's go look through
20 this assessment a little bit, sir.
21      If you flip to the --
22    A.   Yes.
23    Q.   -- the first page, it's Page
24 2 of 6, Bates ending 664.

Page 475

1    A.   Okay.  I'm here, okay.  So 2
2 of 6, and which paragraph are you looking
3 at?
4    Q.   I'm just looking at the risk
5 identification section.
6      Do you see that, sir?
7    A.   Yes, I see it.
8    Q.   And this -- it talks about
9 the CEP being updated and the main
10 changes.
11      And you see the bullets
12 there for the changes being discussed?
13    A.   I do.
14    Q.   And these are all changes to
15 the valsartan API that was being made by
16 ZHP and purchased by Actavis, right?
17    A.   Correct.
18    Q.   And these are the same, if
19 not -- these are -- strike that.



Page 476

[REDACTED]

11    Q.   That's right.
12      Actavis's own risk
13 assessment on whether or not DMF and MTBE
14 were being purged consistently was coming
15 from what ZHP told Actavis, right?
16    A.   That is correct.
17    Q.   You're not aware of Actavis
18 doing anything itself to ensure that DMF
19 and MTBE were, in fact, being purged
20 consistently, are you?
21    A.   I -- specifically about
22 testing, no.  But, obviously, we did
23 review the process validation activities
24 associated with that change.  That was

Page 477

¹ provided to Actavis at the time.
² So the data that was
³ generated -- as I told you before, the
⁴ data that was generated gave Actavis the
⁵ confidence that the process validation
⁶ activities removed these two solvents.
⁷ Q. All of that data that
⁸ Actavis relied on came from ZHP, correct?
⁹ A. That is correct. And
¹⁰ that's -- that's normal. You would not
¹¹ necessarily double check everything that
¹² API or another contractor gives you.
¹³ You look at the data, you
¹⁴ look at the -- let's say the protocol
¹⁵ that was developed, the approach that was
¹⁶ established. You look at the raw data
¹⁷ that was generated. You would look at
¹⁸ the finish -- and then you would make
¹⁹ your decision.
²⁰ Q. This sentence -- this
²¹ paragraph also continues, In addition,
²² the batch size will be scaled up within
²³ tenfold (twofold) at the third dedicated
²⁴ workshop.

Page 478

¹ Do you see that?
² A. Yeah, I do.
³ Q. What does that mean?
⁴ A. That means that the size of
⁵ the batch would be increased.



²⁴ Q. Did Actavis ask ZHP to see

Page 479

¹ the new residual solvent testing results
² for DMF and MTBE at the commercial scale?
³ A. I don't have that
⁴ information.
⁵ But I do know that Actavis
⁶ received information from CHP that would
⁷ allow Actavis to come to a conclusion as
⁸ to whether or not, you know, the
⁹ information that was given was sufficient
¹⁰ for them not to pursue any further
¹¹ information.
¹² Q. Whatever information ZHP
¹³ gave to Actavis concerned ZHP's testing
¹⁴ at the lab scale, correct?
¹⁵ A. I would not necessarily say
¹⁶ that. I'm sure that -- as part of the
¹⁷ evaluation process, we would have looked
¹⁸ at the process validation activities,
¹⁹ because that's important.
²⁰ And per my understanding,
²¹ this process was actually already used
²² for other markets. So it is my
²³ understanding that ZHP will have
²⁴ generated more information on this

Page 480

¹ process.
² Q. You're not aware of any test
³ results that ZHP provided to Actavis at
⁴ this time concerning commercial scale
⁵ valsartan API, are you?
⁶ A. I'm -- specifically not.
⁷ But I am aware of the fact that Actavis
⁸ reviewed the process validation
⁹ activities, which would include that type
¹⁰ of testing.
¹¹ Q. But you don't know whether
¹² or not that testing occurred or if it was
¹³ shared with Actavis, do you?
¹⁴ MS. LOCKARD: Object to
¹⁵ form. Asked and answered.
¹⁶ THE WITNESS: As I indicated
¹⁷ to you, that information was
¹⁸ evaluated by Actavis.
¹⁹ BY MR. STANOCH:
²⁰ Q. Where is it evaluated in
²¹ this risk assessment, sir?
²² A. It's part -- as part of the
²³ process -- it's not necessarily in the
²⁴ risk assessment. The risk assessment is

Confidential Information - Subject to Protective Order

Page 481

1 a summary.
2          But as I indicated to you,
3 the change was notified and Actavis took
4 the necessary actions to request the
5 information that would help Actavis to
6 make a decision that this was a minor
7 change.
8          In order to -- in order to
9 make that decision, you have to have the
10 data. You cannot say it's minor without
11 the data. That's my point.
12     Q.   First of all, you don't
13 know, one way or the other, whether
14 Actavis requested this or if ZHP gave it
15 to them, number one, right?
16     A.   That is part of the process.
17 In order to make a submission to the FDA,
18 the -- Actavis has to obtain this
19 information. This information is
20 requested. This is -- it's part of the
21 process.
22     Q.   And all that information
23 that Actavis, in turn, used to respond to
24 the FDA was from ZHP, right?

Page 482

1     A.   It is from ZHP, correct.
2     Q.   Right. And looking at --
3 looking at both the letters that Actavis
4 sent to the FDA about the change and this
5 Actavis risk assessment about the change,
6 there's no mention of any independent
7 testing that Actavis did itself to
8 confirm that DMF and MTBE is completely
9 removed during the process, correct?
10     A.   Correct. And neither is any
11 follow-up from the FDA, in terms of the
12 submission, which is also part of the
13 review process, where FDA is requesting
14 Actavis to pursue any additional work.
15          So the submission that we
16 made to FDA was deemed to be acceptable.
17     Q.   Well, it's on Actavis to be
18 accurate when it submits things to the
19 FDA, right?
20     A.   That is correct.
21          But it's also the
22 responsibility, and we see this whenever
23 there is what seems to be a deficiency in
24 terms of information, it is routine for

Page 483

1 the FDA to return the submission back to
2 us and to request additional information.
3 This is routine.
4     Q.   Well, this was a CBE, sir;
5 that's going to take effect no matter
6 what. The FDA doesn't have to do
7 anything, correct?
8     A.   That's not correct. FDA may
9 change a CBE to a prior approval
10 supplement. So it may do or may not do
11 nothing.
12          But FDA does have the
13 opportunity and the ability to review.
14 And they do review.
15          So the fact that FDA did not
16 take an action is an indication to us
17 that FDA understood that the information
18 we had provided was sufficient.
19     Q.   You don't know what the FDA
20 thought when they looked at the Actavis
21 submissions, do you?
22          MS. LOCKARD: Objection.
23 Objection. Argumentative.
24          THE WITNESS: But I do know

Page 484

1 that if FDA does not submit any
2 objection, that means that FDA's
3 review is acceptable, to us.
4 BY MR. STANOCH:
5     Q.   So you're telling me unless
6 the FDA affirmatively says there's a
7 problem, that everything is okay and
8 there is no problem; is that what you're
9 telling me under oath?
10     A.   That is not -- that is not
11 correct.
12     Q.   I agree. That isn't
13 correct, right.
14          Just because the FDA doesn't
15 take an action doesn't mean there's
16 something wrong, correct?
17     A.   Let me explain.
18     Q.   Answer my question, then you
19 can explain.
20          MS. LOCKARD: Hold on.
21          MR. STANOCH: He can answer
22 my question and then explain, Ms.
23 Lockard.
24          MS. LOCKARD: I'm going to

Confidential Information - Subject to Protective Order

Page 485

object to this argumentative
nature.  This is just not
appropriate.  You can make your
points without arguing with him,
please.
        MR. STANOCH:  I disagree
it's arguing.  He can answer the
question and then explain his
answer.
        Ms. Miller, would you mind
reading it back?
            - - -
        (Whereupon, the court
reporter read the following part
of the record:
        "Question:  I agree.  That
isn't correct, right.
        "Just because the FDA
doesn't take an action doesn't
mean there's something wrong,
correct?")
            - - -
        THE WITNESS:  The answer
that I'm giving to you, counsel,

Page 486

is that we perform our own
self-regulated action to perform a
risk assessment, to look at the
data, to evaluate the data, and to
determine the extent to which we
need to do more or less with
respect to a submission like this
one.
        We reviewed the data from
ZHP.  We came to the conclusion
that this was a minor to moderate
change.  We submitted this
document to the FDA, and we did,
on our side, what we felt and what
we understood was necessary to
make a proper submission.
        And what I'm saying is that
FDA has two options.  One is to
respond saying, we disagree with
your assessment, we would like to
have more information.  Or, they
may just not say anything about it
because they find that the work
that we did was acceptable.

Page 487

BY MR. STANOCH:
    Q.   Did Actavis's submissions to
the FDA indicate that the information
being provided was derived from ZHP and
not from Actavis itself?
    A.    And I'm saying that we have
a combination of information that comes
from Actavis and ZHP to make the
submission. It's not just that. So --
    Q.   I'm going to keep asking,
sir, and your counsel can object.  It's a
simple question.
        Did Actavis's submission to
the FDA indicate that the information
provided was derived from ZHP and not
from Actavis?
        MS. LOCKARD:  Objection.
Asked and answered.
        MR. STANOCH:  You can
answer.
        THE WITNESS:  The answer --
the answer that we have is that in
the process of doing this
evaluation, we obtained

Page 488

information from ZHP that we found
to be acceptable, reliable and
trustworthy.
        We analyzed that
information, we validated and
verified that information.  Once
we go through that process, we're
comfortable to, basically, take
ownership for the fact that that
information is correct and it's
proper to be submitted to the FDA.
BY MR. STANOCH:
    Q.   So the answer is no, that
you do not see where, in the submission
to the FDA, Actavis indicated that the
information provided was derived from ZHP
and not from testing being done by
Actavis?
        MS. LOCKARD:  Objection.
Asked and answered.
        THE WITNESS:  The answer is
that we submitted information to
the FDA that we felt -- that we
took ownership for it, whether it

Confidential Information Subject to Protective Order

Page 489

1    came from ZHP or from other
2    sources.
3 BY MR. STANOCH:
4    Q.   Show me in the submissions
5 to the FDA by Actavis where Actavis says,
6 this information about the complete
7 removal of DMF and MTBE was from our
8 testing, not ZHP's.
9    A.   Counsel, I find that to be
10 irrelevant.  I'm sorry.
11    But the responsibility to
12 determine, that comes from the API
13 supplier, they did their job, and our
14 responsibility was to review and
15 validate.  And we did.
16    MR. STANOCH:  Ms. Lockard, I
17 don't want to have to, for
18 something like this, on day two --
19 I'll just get Special Master
20 Vanaskie on the phone.  Because if
21 it's a simple question of where
22 something is in a letter or not,
23 and if he can't answer that, I
24 think that's inappropriate.

Page 490

1    And now he's claiming my
2 questions are not relevant.  So
3 I'd like you to direct your client
4 to answer the questions.
5    MS. LOCKARD:  Let's just
6 take a break for a moment, okay.
7 I don't -- I'm happy to get
8 Vanaskie on the phone, that
9 doesn't scare me one bit.
10    But I think we can probably
11 get around this without bothering
12 Judge Vanaskie.
13    So if I understand your
14 question, you're just simply
15 asking my the document
16 specifically state that Actavis
17 told FDA that the testing was done
18 by ZHP and not Actavis?
19    Are you just asking what the
20 document says?
21    MR. STANOCH:  Yes.
22    First of all, I'm not trying
23 to threaten or scare you, number
24 one.  I'm just trying to move this

Page 491

1    along for everyone.
2    Number two, yes, that's what
3 I've asked four different ways.
4 If you'd like a break to talk to
5 your witness, that would be great.
6    MS. LOCKARD:  Yeah.  We've
7 been going about an hour anyway.
8 Let's just take a break, and we'll
9 come back.
10    MR. STANOCH:  Okay.  Sounds
11 good.
12    THE WITNESS:  Thank you,
13 counsel.
14    MR. STANOCH:  Thank you.
15    VIDEO TECHNICIAN:  The time
16 is now 9:34 a.m.  We are going off
17 the record.
18    - - -
19    (Whereupon, a brief recess
20 was taken.)
21    - - -
22    VIDEO TECHNICIAN:  The time
23 is now 9:47 a.m.  Back on the
24 record.

Page 492

1 BY MR. STANOCH:
2    Q.   Mr. Barreto, did Actavis
3 inform the FDA, in its CBE submissions,
4 Teva Exhibits-2 and 3, that the
5 information it was relying on concerning
6 the removal of DMF and MTBE came from ZHP
7 or itself?
8    A.   So, counsel, the document is
9 clear.  It speaks for itself.  It shows
10 that that information is not included.
11    Q.   Thank you.
12    Turning back to the Actavis
13 risk assessment that we had been looking
14 at, sir.
15    A.   Yes, sir.
16    Q.   If you could turn to the
17 page ending --
18    A.   Exhibit -- which exhibit,
19 please?
20    Q.   I think this was --
21    A.   2 or 3?
22    Q.   This is the -- this is the
23 newest one, sir, is it -- I think it's --
24 is it 161?

Confidential Information - Subject to Protective Order

Page 493

¹ A. Okay. Yes. Yes, sir.
² Q. And if you can flip to the
³ page Bates ending 0690.
⁴ A. My -- okay. Counsel, can
⁵ you clarify what document we're looking
⁶ at? Because this is a string of e-mails.
⁷ Q. Okay. Give me one moment,
⁸ sir. I probably have the wrong number.
⁹ A. No problem.
¹⁰ Q. I'm looking at this
¹¹ document, the
¹² A. Just allow me to go back to
¹³ Zoom.
¹⁴ Oh, yes, sir.
¹⁵ Q. And you can look on the
¹⁶ screen, that might be more expedient, but
¹⁷ it's your choice.
¹⁸ I was turning to this page
¹⁹ specifically.
²⁰ A. Yes.
²¹ Q. And this appears -- this is
²² a part of the information that's attached
²³ to the Actavis risk assessment concerning
²⁴ the ZHP process change for the valsartan

Page 494

¹ API, right?
² A. Yes, sir.
³ Q. And this is a change request
⁴ form from ZHP, yes?
⁵ A. That is correct.



²⁴ Q. Are you aware of anything

Page 495

¹ Actavis did to independently verify for
² itself, such as by testing, whether DMF
³ and MTBE were being purged consistently
⁴ as minimal from the zinc chloride process
⁵ at ZHP?
⁶ A. No. As far as I know, no
⁷ testing was done. Because, more than
⁸ likely, this was deemed not to be
⁹ necessary at the time.
¹⁰ MS. LOCKARD: Right. And
¹¹ objection. Asked and answered.
¹² BY MR. STANOCH:
¹³ Q. You don't know, one way or
¹⁴ the other, though, why no testing by
¹⁵ Actavis itself was done at the time, do
¹⁶ you?
¹⁷ A. Specifically, no.
¹⁸ Well, based on -- based on
¹⁹ the information that was reviewed, I can
²⁰ understand and see why there was no need
²¹ for the testing to be done.
²² Q. For example --
²³ A. Based on --
²⁴ Q. I'm sorry. Go ahead.

Page 496

¹ A. No, no. I mean, based on my
² experience, counsel.
³ Q. For example, there's five
⁴ Actavis employees listed on this -- as
⁵ writing, reviewing and approving this
⁶ report, right?
⁷ Do you see that on the first
⁸ page?
⁹ A. Yes.
¹⁰ Q. Right. In preparation for
¹¹ today's deposition, you never talked to
¹² any of these folks, right?
¹³ A. No. I have not talked to
¹⁴ any one of them, no.
¹⁵ Q. And in preparation for
¹⁶ today's deposition, did you talk to
¹⁷ anyone who was at Actavis at the time of
¹⁸ this report who said whether or not and
¹⁹ why Actavis did or did not do its own
²⁰ testing for DMF and MTBE in the valsartan
²¹ API zinc chloride process from ZHP?
²² A. No, I have not.
²³ Q. And if we turn, then, to
²⁴ another page here, sir.

Confidential Information - Subject to Protective Order

Page 497

1    This is another -- it's a
2  change notification form from ZHP, which
3  is part of the backup information to the
4  Actavis risk assessment, right?
5    A.  Yes.
6    Q.  And among other things, this
7  change notification mentions that there's
8  a third dedicated workshop being applied
9  for valsartan commercial production,
10  right?
11    A.  Yes.
12    Q.  And it also mentions, This
13  copy of workshop and the scaling up has
14  not changed the manufacturing process.
15  The change does not adversely affect the
16  reproducibility of the process and the
17  specification of the final substance
18  remains the same.
19    Did I read that correctly?
20    A.  You did.
21    Q.  Are you aware of any
22  independent testing or review by Actavis
23  to confirm that the scaling up did not
24  change the manufacturing process for the

Page 498

1  valsartan that ZHP was now going to start
2  making using the zinc chloride process?
3    A.  That would have been the
4  testing that was performed in accordance
5  with the USB requirements.  So there was
6  extensive testing that was done.
7    That testing was included in
8  the process verification work that
9  Actavis did on the impact of the API on
10  the manufacturing process of the finished
11  product.
12    So the testing that was
13  conducted was in accordance with what was
14  established at the time.
15    Q.  Where in this risk
16  assessment does it mention the testing
17  that Actavis did to ensure that the
18  scale-up of the manufacturing process did
19  not adversely affect the product or the
20  final substance?
21    A.  I'm sorry, can you repeat
22  the question?
23    Q.  Yes, sir.
24    Where in this risk

Page 499

1  assessment does it say that Actavis
2  confirmed for itself that the scale-up
3  did not change the manufacturing process,
4  reproducibility of the process, or
5  specification of the final substance via
6  the zinc chloride process at ZHP?
7    A.  Well, you were speaking
8  about the scale-up.
9    And whether they were scaled
10  up or not, all the testing that was done
11  on the scale-up process was confirmed to
12  indicate that the product was meeting our
13  specifications.
14    Q.  So there's no testing about
15  the scale-up process specifically in
16  connection with this risk assessment;
17  you're saying that it would have just
18  been the specification testing that
19  Actavis would be doing on incoming
20  batches after the scale-up occurred?
21    A.  The scaled-up process is now
22  the manufacturing process, therefore,
23  that's what's going to be challenged.
24  And it was.

Page 500

1    Q.  Was there any reference to
2  any independent testing or review by
3  Actavis in its risk assessment report
4  about whether it independently verified
5  whether the scale-up of the process did
6  not adversely affect reproducibility or
7  the specification of the final substance?
8    A.  It may not have explicitly
9  stated that in that way.  But the
10  approach of the process was to look at
11  this new manufacturing process as the
12  process that we were going to challenge.
13  And we did.
14    MR. STANOCH:  One moment,
15  sir, I'm just going to pull up
16  another exhibit.
17  BY MR. STANOCH:
18    Q.  In terms of -- sticking with
19  the same page we were looking at where
20  ZHP said the change does not adversely
21  affect the reproducibility of the
22  process, what's your understanding of
23  "reproducibility" in this context?
24    A.  So can you be a little more

Page 501

1 specific?  Because I want to be able to
2 answer your question.
3      Q.   Sure.
4           I'm looking at the change
5 notification from ZHP.
6      A.   Yep.
7      Q.   And it says, This copy of
8 workshop and the scaling up has not
9 changed the manufacturing process.
10      A.   Yes.
11      Q.   The change does not
12 adversely affect the reproducibility of
13 the process.
14      A.   Right.
15      Q.   And I'm asking your
16 understanding of what reproducibility
17 of --
18      A.   Yeah.
19      Q.   -- the process means in that
20 context.
21      A.   Understood.
22           So any process that is
23 implemented on a commercial basis goes
24 through certain stages of, you know, like

Page 502

1 what you said, you know, laboratory and
2 then scaled up at different levels until
3 it reaches the process validation stage.
4           So the process validation
5 process is intended to confirm that that
6 manufacturing process operates on a
7 consistent basis.  So it's a way to
8 demonstrate now that you are confirming
9 the process itself, not -- you are
10 challenging the product, but you're also
11 challenging the process.
12           So reproducibility means
13 that so long as the process is operated
14 from one batch to the next in accordance
15 with that -- those settings and
16 conditions that were implemented, you
17 should be able to have a product that
18 will meet the specifications.
19      Q.   I see.  Thank you.
20           And is reproducibility a
21 goal of good manufacturing practices?
22      A.   Absolutely, yes.
23      Q.   And that's true for Teva's
24 own manufacturing and GMP compliance as

Page 503

1 well as the manufacturing and GMP
2 compliance of its vendors; is that fair?
3      A.   That is true for every API
4 that is manufactured and every finished
5 product that is manufactured, yes.
6 Absence of process validation would
7 render that product unacceptable.
8      Q.   Failure to ensure
9 reproducibility as well would suggest the
10 product is not compliant with GMP; is
11 that fair?
12      A.   Not necessarily.  I think
13 there are instances where certain things
14 happen that show that a batch, here and
15 there, is not necessarily reproducible,
16 but then those instances have to be
17 investigated.  So it's not a straight
18 yes-or-no answer.
19      Q.   It's a continuum, you're
20 saying?
21      A.   That is correct.
22      Q.   Right.  And that -- whether
23 or not a given instance may be a one-off
24 or a systemic reproducibility issue is

Page 504

1 something you would expect a manufacturer
2 to investigate to ensure consistency with
3 GMP?
4      A.   That is correct.
5           Counsel, can you just allow
6 me to put the phone on mute, I'll stay
7 on, just to clear my throat.
8      Q.   Take a moment, sir.
9      A.   Thank you, counsel.
10      Q.   Not a problem.
11           You mentioned a number of
12 times today and yesterday test
13 specifications.
14           Is there a test
15 specification certificate of analysis
16 that, say, the Malta facility would use
17 to test incoming API?
18      A.   So every -- every incoming
19 API that is purchased by a facility
20 brings with it a certificate of analysis.
21           And that certificate of
22 analysis will detail all the
23 specifications and test results that were
24 obtained and whether or not those tests

Page 505

¹ passed.
²        Obviously, a non-passing
³ test, I would not expect it in a
⁴ certificate of analysis, because that
⁵ product should not have made it to the
⁶ customer, in general.
⁷        MR. STANOCH:  I'm going to
⁸    mark the next exhibit, sir.  This
⁹    is Teva-163.
¹⁰        -  -  -
¹¹        (Whereupon, Exhibit
¹²    Teva-163, TEVA-MDL2875-00000875,
¹³    Test Specification and Certificate
¹⁴    of Analysis, was marked for
¹⁵    identification.)
¹⁶        -  -  -
¹⁷        THE WITNESS:  Allow me to
¹⁸    get there.
¹⁹ BY MR. STANOCH:
²⁰    Q.    Sure.  Tell me when it's on
²¹ your screen.
²²        MR. STANOCH:  In the
²³    meantime, I'll note for the record
²⁴    it's Bates ending 0875.

Page 506

¹        THE WITNESS:  Yes, I am
²    looking at it.
³ BY MR. STANOCH:
⁴    Q.    This appears to be Arrow
⁵ Pharm, Malta, test specification and
⁶ certificate of analysis for valsartan.
⁷        Do you see that?
⁸    A.    Yes.
⁹    Q.    And this one is prepared,
¹⁰ checked and approved and is dated
¹¹ September 5th, 2012?
¹²    A.    Yes.
¹³    Q.    This would relate to -- and
¹⁴ it says manufacturer of the valsartan is
¹⁵ Zhejiang Huahai, right?
¹⁶    A.    Correct.



Confidential Information - Subject to Protective Order

Page 509

[illegible]

Page 511

1    Q.    And this one, again, is
2    about valsartan API coming from ZHP,
3    right?
4    A.    Yes.
5    Q.    And this one looks like it's
6    prepared, checked and approved July 4th,
7    2014?
8    A.    I'm going to -- I'm looking
9    at that in a second.
10    Q.    Sure.
11    A.    Allow me.
12        That is correct.
13    Q.    And these would be the tests
14    that Actavis in the Malta facility was
15    doing on the incoming valsartan API from
16    ZHP as of July 4th, 2014, right?
17    A.    That is correct, sir.
18    Q.    And, again, there's a number
19    of tests and methods and specifications
20    on the ensuing pages, yes?
21    A.    Correct.

Page 510

1        MR. STANOCH:  I'm going to
2    mark another exhibit, sir.
3        THE WITNESS:  Yes.
4        MR. STANOCH:  One moment.
5        This is Teva-164.  Just tell
6    me when you have it in front of
7    you.
8        In the meantime, I'll state
9    for the record it's Bates ending
10    20116.
11            - - -
12        (Whereupon, Exhibit
13    Teva-164, TEVA-MDL2875-00020116,
14    Test Specification and
15    Certification of Analysis, was
16    marked for identification.)
17            - - -
18        THE WITNESS:  Yes, sir.
19 BY MR. STANOCH:
20    Q.    And this appears to be a
21    very similar test specifications and
22    certificate of analysis for Arrow, the
23    Malta facility, yes?
24    A.    Yes.

Page 512

21        MS. LOCKARD:  Object to the
22    form.  Inconsistent with the
23    documents and the evidence.
24        MR. STANOCH:  You can refer



Confidential Information - Subject to Protective Order

Page 513

1    to other documents.
2          THE WITNESS:  I assume that
3    would be correct.
4    BY MR. STANOCH:
5          Q.    And I'll put another
6    exhibit, sir, that might be even more
7    clear for you in a moment, right now,
8    okay.
9          A.    Yes.  Because it's not that
10   explicit in the document.
11         Q.    We looked at, earlier, the
12   CBE letters, right, and they were -- they
13   were submitted to the FDA.
14         Do you have them in front of
15   you?
16         A.    I have to locate them, sir.
17         Q.    Okay.  Just so we're on the
18   same page.
19         MS. LOCKARD:  I believe
20   those were Exhibit-2 and 3.
21         THE WITNESS:  Yeah, I'm
22   looking at Exhibit-2.  That would
23   be September 2014.
24   BY MR. STANOCH:

Page 514

1          Q.    Got it.  And the other one
2    is January 2015.
3          A.    I have to look at it.
4          Q.    To your knowledge, the
5    Actavis Malta facility, did it start
6    using valsartan API from ZHP made under
7    the zinc chloride process before it
8    submitted the CBE letters or only after
9    the letters were submitted and the time
10   to object by the FDA expired?
11         A.    So from a regulatory
12   perspective, you cannot ship a product
13   that has not been approved by the FDA.
14   So, a current submission.
15         So you can use the new
16   material to engage in process validation
17   activities and to generate all the
18   information that is necessary.  You can
19   even generate inventory, if that's what
20   you find to be necessary.
21         So that material, can it be
22   used?  Yes, internally.  Yes.  Can it be
23   distributed?  No.
24         Q.    Understood.

Page 515

1          MR. STANOCH:  I'm going to
2    mark another document, sir.
3          Teva-165.
4          THE WITNESS:  Let me go
5    there.
6          MR. STANOCH:  For the
7    record, I'll state it's Bates
8    ending 15517.
9          - - -
10         (Whereupon, Exhibit
11   Teva-165, TEVA-MDL2875-00015517,
12   Test Specification and Certificate
13   of Analysis, was marked for
14   identification.)
15         - - -
16   BY MR. STANOCH:
17         Q.    And, sir, this appears to be
18   another Malta facility test specification
19   and certificate of analysis?
20         A.    Yes.

Page 516

10         Q.    So it's fair to say at this
11   point Actavis could have, and likely was
12   selling finished-dose valsartan to the
13   United States that contained ZHP
14   valsartan API made under the zinc
15   chloride process?
16         A.    Correct.

Confidential Information - Subject to Protective Order

Page 517



22    Q.    Whether or not it was
23    required by the regulators, it's correct
24    that Actavis was not testing for DMF and

Page 518

1    MTBE when it received valsartan API from
2    ZHP, correct?
3        A.    That is correct.
4            Now, it said here that this
5    is a canceled document. I don't know if
6    that document is still applicable. So I
7    don't know if that's the document we
8    should be looking at.
9        Q.    Well, are you aware that the
10   Malta facility was in the process of
11   transferring its production of
12   finished-dose valsartan to the Dupnitsa,
13   Bulgaria, facility?
14           Do you recall that?
15       A.    I believe so.
16       Q.    And, essentially, what it
17   was, was that Dupnitsa was going to start
18   receiving the valsartan API and making
19   the finished-dose valsartan for the U.S.
20   market instead of Malta; is that right?
21       A.    That would have been the
22   case.
23       Q.    Right. And in order to do
24   that, Dupnitsa would have to use the same

Page 519

1    methods that the Malta facility was using
2    to make the finished-dose valsartan,
3    right?
4        A.    That is correct.
5        Q.    Right. And, generally
6    speaking, there has to be a method
7    transfer, I believe it's called, correct?
8        A.    It is a -- that is correct,
9    it's called method transfer.
10       Q.    And that's to ensure that
11   the new facility will be doing the same
12   things as the facility previous?
13       A.    That is correct.
14       Q.    So there is --
15           MR. STANOCH: I'm going to
16   mark the next exhibit, sir.
17           THE WITNESS: Yes.
18           MR. STANOCH: This will --
19   give me one moment. This is
20   Teva-166.
21               - - -
22           (Whereupon, Exhibit
23   Teva-166,
24   TEVA-MDL2875-00242568-2678, GAP

Page 520

1        Analysis, Addition of Dupnista as
2        an Alternative Manufacturing Site
3        for Valsartan Tablets, was marked
4        for identification.)
5               - - -
6           MR. STANOCH: I'll state for
7    the record it's Bates ending
8    242568.
9           THE WITNESS: Okay.
10   BY MR. STANOCH:



24       Q.    And do you recall when all

Confidential Information - Subject to Protective Order



Page 521

1  of this -- all of this was being prepared
2  at Teva, the transfer?
3      A.   I'm sorry?  Say that again.
4      Q.   Do you recall -- do you
5  recall when this transfer was supposed to
6  take place?
7      A.   I don't remember exactly,
8  no.
9      Q.   And I'll just say, there are
10 a number of documents about the
11 preparation for this from late 2017
12 through the first half of 2018.
13         Does that time period sound
14 about right to you?
15     A.   Yes.
16     Q.   And do you know whether --
17 if you recall, do you know whether the
18 method was transferred from Malta to
19 Dupnitsa?

Page 522

Page 523

6      Q.   And if you scroll to -- one
7  moment while I get the page for you, sir.
8      A.   Oh, yes.
9          MS. LOCKARD:  I'm sorry,
10 what are we doing?
11         MR. STANOCH:  I'm looking
12 for the page to direct the
13 witness, counsel.  My apologies.
14         MS. LOCKARD:  No worries.
15 We're still on 166?
16         MR. STANOCH:  Yes, we are.
17 BY MR. STANOCH:
18     Q.   Mr. Barreto, if you flip to
19 the page that's Bates number ending
20 242580.
21     A.   What would be the heading,
22 counsel?
23     Q.   It's going to be the
24 Parameter Number 11, residual solvents GC

Page 524

1  on the left.
2      A.   Okay.  Let me look for it.
3      Q.   And I can -- I will share my
4  screen so you can see what I'm looking
5  at, and then you can find it.
6      A.   I actually found it.
7      Q.   Okay.  You're quicker than I
8  am, sir.
9      A.   Thank you.
22     Q.   Again, GC, that's the gas
23 chromatography testing?
24     A.   That is correct, sir.

Confidential Information – Subject to Protective Order



Page 525

Page 526

Page 527

Page 528

5    Q.    Were you aware that other
6    Teva facilities were testing valsartan
7    API for DMF?
8        A.    I don't think so.
9        Q.    Okay.  Is there a standard
10   operating procedure in place at Teva to
11   ensure that testing of the residual
12   solvents of a valsartan API at one
13   facility would also be done at another
14   sister facility of Teva's?
15       MS. LOCKARD:  Objection to
16   the question and the phrase
17   "sister facility."
18       THE WITNESS:  I am aware
19   that wherever valsartan API and
20   valsartan finished product is to
21   be received, in the case of the
22   API used, and the manufacturer in
23   the case of the finished product,
24   the specifications that have to be

Confidential Information - Subject to Protective Order

Page 529

1  complied with are the
2  specifications that have been
3  submitted with the ANDA.
4  BY MR. STANOCH:
5  Q.   If one Teva facility was
6  testing valsartan API for DMF because of
7  its potential to contribute to a
8  genotoxic impurity, don't you think
9  that's important information that should
10 have been shared with other Teva
11 facilities that were also receiving and
12 testing valsartan API?
13        MS. LOCKARD:  Objection.
14     Vague.
15        THE WITNESS:  I am -- I do
16     not know if you're speaking about
17     a theoretical situation or an
18     actual situation.
19 BY MR. STANOCH:
20 Q.   Well, let's say -- let's say
21 if one Teva facility is actually testing
22 valsartan API for DMF because of its
23 potential to contribute to a genotoxic
24 impurity, wouldn't it be best practice to

Page 530

1  have other Teva facilities also sourcing
2  valsartan API to do the same thing?
3        MS. LOCKARD:  Objection.
4     Form.  Vague.
5        If you have a document that
6     you want to specifically direct
7     him to and ask him about it, that
8     would be helpful to resolve my
9     objection.
10       MR. STANOCH:  Go ahead, sir.
11       THE WITNESS:  Again, I'd
12    like to make the distinction
13    between a theoretical situation
14    and an actual situation.
15       And at this point I'm not
16    able to -- I mean, I could speak
17    on a theoretical basis, but I just
18    want to make sure that I can
19    answer as accurate as possible.
20 BY MR. STANOCH:
21 Q.   That's fair.
22       Let's talk from a process --
23 a standard operating procedure or process
24 standpoint, okay.

Page 531

1        Did Teva have a process in
2  place to ensure that if one facility was
3  testing valsartan API for DMF because of
4  potential genotoxic risk, that other
5  facilities would be notified of that?
6        A.   I think we have to take this
7  on a case-by-case basis.  Let's assume
8  for a moment, and this is all
9  theoretical, counsel, that one site is
10 doing a specific local investigation for
11 whatever reason, you -- under normal
12 conditions, the sharing would be more on
13 the findings of that investigation, which
14 would follow a process whereby you would
15 raise what we call an NTM and then that
16 NTM would be assessed.
17        So there may be instances
18 where somebody might have said, let's
19 test this, and the outcome of that
20 testing was -- resulted in nothing.  So
21 that's why I'm saying that -- I'm trying
22 to understand what the scenario -- if
23 it's a real scenario that we're working
24 with or if it's -- if you're asking me a

Page 532

1  theoretical question.
2        Q.   I appreciate that.
3        Again, the question was
4  focused on whether Teva had a standard
5  operating procedure to ensure sharing of
6  information about testing something like
7  DMF, because of genotoxic potential, in a
8  valsartan API at one facility versus
9  another.
10       MS. LOCKARD:  But my
11    objection still stands.  Because
12    you're not specifying if this is
13    facility-to-facility comparison
14    for a facility that makes the drug
15    for distribution in the U.S. under
16    the FDA regulations, are you
17    comparing the facility that's
18    got -- governed by an entirely
19    different regulatory scheme and,
20    you know, regulatory submission.
21    I mean, that's my problem with the
22    question.
23       MR. STANOCH:  I'm asking the
24    witness, who is designated on

Confidential Information Subject to Protective Order

Page 533

¹ SOPs, if he's aware of an SOP that
² would cover the sharing of
³ information about testing for DMF
⁴ because of genotoxic impurity in
⁵ valsartan API at one Teva facility
⁶ with other Teva facilities.
⁷        If he doesn't know if such a
⁸ policy exists or can't say, he can
⁹ say that.
¹⁰        THE WITNESS:  Counsel, I'll
¹¹ answer your question.
¹² BY MR. STANOCH:
¹³    Q.    Thank you.
¹⁴    A.    As I indicated to you, if,
¹⁵ in the process of performing a local
¹⁶ investigation, a site concludes that its
¹⁷ finding with respect to a product
¹⁸ manufacture at the site that is also
¹⁹ manufactured at another site, the
²⁰ procedures in place indicate that you
²¹ would escalate this type of information
²² through what is called the NTM process.
²³        So there is a process in
²⁴ place whereby that type of information,

Page 534

¹ if it were to -- if it needed to be
² escalated, that escalation would lead
³ to -- the NTM process would lead to the
⁴ dissemination of that discussion with the
⁵ affected sites.  So the process is in
⁶ place, yes.
⁷    Q.    And when you say "NTM," what
⁸ does that mean?
⁹    A.    Notification to management.
¹⁰ So it's a notification -- it's an
¹¹ escalation process.
¹²    Q.    Got it.
¹³        So the Teva process or
¹⁴ procedure on notifications to management
¹⁵ would be applicable in this instance that
¹⁶ we've been talking about?
¹⁷    A.    If the discussion of the
¹⁸ issue is raised to the point that it
¹⁹ needs to be escalated.  So it has to meet
²⁰ certain criteria.  Not everything that is
²¹ assessed is escalated.  That's what I'm
²² trying to say.
²³    Q.    Understood.  And so the
²⁴ procedure we would be looking at is the

Page 535

¹ notification to management procedure, and
² then whether or not those criteria would
³ be met would be something one would
⁴ evaluate?
⁵    A.    That is correct.
⁶    Q.    Would you expect Teva to
⁷ receive, from its API vendors, copies of
⁸ FDA Form 483s from FDA inspections of
⁹ that vendor?
¹⁰    A.    My expectation would be if
¹¹ those FDA 483 observations are directly
¹² or somewhat indirectly linked to the
¹³ product that we have been supplied, I
¹⁴ would expect them to share that
¹⁵ information with us in order for us to do
¹⁶ our own assessment.  So yes.
¹⁷    Q.    So if the FDA issued a Form
¹⁸ 483 to ZHP that touched on valsartan API,
¹⁹ it would have been Teva's expectation to
²⁰ receive at least notice of that from ZHP?
²¹    A.    Correct.
²²    Q.    And then Teva could take its
²³ own steps as -- its own procedures about
²⁴ what to do by way of follow up?

Page 536

¹    A.    Now, keep in mind -- I'd
² like to clarify.
³        The site that is receiving
⁴ the FDA 483 has options to describe the
⁵ situation to us, not necessarily to share
⁶ a copy of the 483.  There are other
⁷ factors involved.
⁸        So they might say, you know,
⁹ with respect to your product, this is
¹⁰ what the areas -- so I just want to
¹¹ clarify that it's not as simple as them
¹² sharing an FDA 483 with us, because that
¹³ may contain, also, information for other
¹⁴ clients that they don't want to divulge.
¹⁵        So there's a policy around
¹⁶ that, you know, in general.
¹⁷    Q.    I understand.
¹⁸        And it may be that an API
¹⁹ supplier that receives a Form 483,
²⁰ instead of sharing the whole 483 with
²¹ Teva, it may redact it, or it may simply
²² give another type of communication
²³ without attaching it to Teva; that would
²⁴ be Teva's expectation?

Page 537

1    A.    That is correct.
2    Q.    I understand.
3          But the fact that the FDA
4    issued the Form 483, if it touched on a
5    product that Teva was purchasing, it
6    would still be the expectation of Teva to
7    learn about that, right?
8    A.    In general, yes.
9    Q.    And are you aware of whether
10   or not ZHP ever informed Teva about an
11   FDA 483 issued to it in connection with a
12   2017 FDA inspection of the Chuannan site?
13   A.    I believe we knew about it.
14   Q.    Do you recall whether Teva
15   learned about it before or after June
16   2018?
17   A.    I believe it was before June
18   2018, because we keep track of all the
19   inspections.
20   Q.    And what is it that makes
21   you think that you received -- that Teva
22   received a notice of that, prior to June
23   2018, from ZHP?
24   A.    Because through the vendor

Page 538

1    quality program, we are in constant
2    communication with suppliers.  So we know
3    when they are being inspected.  That
4    information is shared.
5    Q.    And who would have gotten
6    that communication from ZHP about the FDA
7    483 from the 2017 FDA inspection?
8    A.    That would have been, more
9    than likely, our supply chain group along
10   with that communication coming down to
11   the quality group that works with vendor
12   quality.
13   Q.    Do you recall whether that
14   Form 483 that the FDA issued to ZHP in
15   2017, whether it related in any way to
16   valsartan API or not?
17   A.    I think there was -- there
18   may have been some reference to it.  I
19   don't recall well now.  But I think there
20   was some reference to it.
21   Q.    Did Teva do anything in
22   response to the FDA Form 483 observations
23   from its 2017 inspection in its own
24   audits of ZHP in May of 2018?

Page 539

1    A.    I don't specifically recall,
2    but I don't think that there was a need
3    to do anything because the findings from
4    the inspection did not require anything
5    for Teva to do.
6    Q.    Do you understand that the
7    FDA's Form 483 from its 2017 inspection
8    of ZHP touched on unknown peaks in
9    chromatograms for valsartan API?
10   A.    I do.
11   Q.    And Teva didn't address that
12   specifically in its audit of ZHP in May
13   2018, did it?
14   A.    It may have looked at it,
15   and it may not have concluded that this
16   was anything that was of relevance.
17         The finding of unknown
18   peaks, especially in API facilities, it's
19   quite a common situation.  So when you
20   find these peaks, what we also -- what we
21   do is we actually look at the extent to
22   which the investigations that were
23   performed were adequate in terms of the
24   root cause analysis.

Page 540

1          So unknown peaks is pretty
2    routine.  So the fact that you have
3    unknown peaks, that does not necessarily
4    translate into an interpretation that you
5    may or may not have, let's say,
6    nitrosamines.
7    Q.    Right.  Well, the fact that
8    there are unknown peaks, you would expect
9    that there would be an investigation into
10   the cause of that, correct?
11   A.    And there was, yes, based on
12   our knowledge.
13   Q.    Right.  Well -- but when the
14   FDA inspection happened of ZHP in 2017
15   and Teva was at the same ZHP facility in
16   May 2018, there's no mention of those FDA
17   findings about the unknown peaks in the
18   valsartan API in Teva's audit report, is
19   there?
20   A.    There may not have been.  I
21   don't recall now the specifics of what --
22   but that does not necessarily mean that
23   we would follow up on every one of the
24   observations made by the FDA.

Confidential Information Subject to Protective Order

Page 541

1       Keep in mind that ZHP
2  submitted a response to the FDA, and that
3  response seems to have been found
4  acceptable to the FDA.
5       So when it comes, again, to
6  the type of audits that we do, our focus
7  is going to be based on a number of
8  different, let's say, priorities that we
9  have with respect to what we're going to
10 look at.
11      So the fact that we may not
12 have followed up, that does not mean that
13 it was because we, let's say, didn't find
14 that to be necessary.  If it was just --
15 in my opinion, based on my knowledge,
16 unknown peaks is not necessarily a reason
17 to be overly cautious about, you know,
18 the assessment of a supplier.
19      MS. LOCKARD:  I just want to
20      say, too, just out of basic
21      fairness.  If you're going to ask
22      him about findings in the May 2018
23      audit, I'd like him to be able to
24      look at that document.

Page 542

1       I mean, we've confirmed that
2  it's not intended to be a memory
3  test.
4       So do you have that
5  available to pull up?
6       MR. STANOCH:  I'll ask my
7  questions, and you can ask him
8  questions.  He testified already.
9  It's fine.
10      MS. LOCKARD:  Excuse me,
11 then.  I'm objecting to you asking
12 him questions about documents that
13 you're not willing to show him.
14      MR. STANOCH:  I didn't say
15 that.  The witness didn't ask for
16 it.  Your objection is noted.
17 BY MR. STANOCH:
18      Q.   Mr. Barreto, are you aware
19 of any specific follow-up that Teva did
20 with ZHP, prior to June 2018, about
21 unknown peaks in valsartan API
22 chromatograms that the FDA had identified
23 in its 2017 inspection?
24      MS. LOCKARD:  And just

Page 543

1  because of that cutoff, if you
2  need to look at any documents, you
3  can.
4       THE WITNESS: I'd like to
5  look at it, if that's possible,
6  counsel.
7       But my recollection of that
8  is that the auditors would look at
9  issues that they will deem in the
10 field to be any issues that they
11 want to cover.
12      But I think what -- but I
13 also want to clarify that the fact
14 that FDA had some observations
15 with respect to unknown peaks in
16 that there was a response, that
17 does not necessarily trigger the
18 need for our auditors to pursue
19 the FDA inspection.
20 BY MR. STANOCH:
21      Q.   Is it Teva's policy not to
22 follow up with its API vendors on all
23 observations in FDA 483s of that vendor?
24      A.   I have to look at the

Page 544

1  policy, if you want to share it with me.
2       But the policy, it's a
3  guidance document that still lets the
4  auditor make a decision as to where he or
5  she wants -- or they want to go in the
6  performance of their audit.
7       So it is -- it is -- it is a
8  recommendation that people look at
9  observations, but that does not
10 necessarily mean they have to do it.
11      Q.   Do you recall, as head of
12 quality in 2018, instructing any Teva
13 auditors to follow up at ZHP about the
14 unknown chromatogram peaks in valsartan
15 API that the FDA had identified at ZHP?
16      A.   I don't remember doing that.
17 But I do remember, once the issue was
18 discovered, we put together a series of
19 instructions to the auditors on
20 activities they needed to pursue.
21      Q.   That was after June 2018,
22 before the for-cause audit in the fall;
23 is that correct?
24      A.   That is correct.

Confidential Information Subject to Protective Order

---

Page 545

1    MR. STANOCH:  One moment,
2  sir, while I try to get an
3  exhibit.
4    THE WITNESS:  Yes.
5    MR. STANOCH:  This was
6  previously marked as Teva-61, sir.
7  One moment while I try to publish
8  it to you.
9    THE WITNESS:  Yes.  Thank
10  you.
11    MR. STANOCH:  Amanda, what
12  did I just say, that it was
13  previously marked Teva Exhibit-61?
14    COURT REPORTER:  Correct.
15    MR. STANOCH:  Thank you.
16  Sorry, I have to manually number
17  these.  So I don't want to make a
18  mistake.  Thank you.
19  BY MR. STANOCH:
20    Q.    Sir, let me know when you
21  see it.
22    MR. STANOCH:  I'll just
23  state, meanwhile, for the record,
24  Exhibit Teva-61 was previously

---

Page 546

1  marked.  It's Bates number ending
2  118147.
3    THE WITNESS:  Let me refresh
4  here to see if I can see it.
5  BY MR. STANOCH:
6    Q.    Sure.
7    A.    Okay.  I see 61 here.
8    Yes.
9    Q.    You're familiar with this
10  document, sir?
11    A.    Yes.
12    Q.    Right.  This is the audit
13  report from Teva's audit of ZHP's site
14  that was making valsartan API.  The audit
15  date was May 21 through May 25, 2018?
16    A.    Correct.
17    Q.    Teva had auditors on the
18  ground at ZHP mere weeks before it found
19  out about the nitrosamine contamination
20  issue, right?
21    A.    Yes.
22    Q.    Do you know if the
23  nitrosamine contamination issue was
24  discussed at all during Teva's audit of

---

Page 547

1  ZHP in May 2018?
2    A.    I'm sure that was not the
3  case.
4    Q.    And you can -- you can look
5  through the document, sir, but I'm not
6  seeing any reference to -- strike that.
7    Sir, you can look through
8  the document, I'm not seeing reference to
9  any discussion between the Teva auditors
10  and ZHP, during this audit, about the FDA
11  Form 483.
12    You can take a moment to
13  look through it, and I'm doing a word
14  search --
15    A.    Yeah.  I'm looking for it.
16  But, again, the auditors -- the purpose
17  of the audit is for the auditors to take
18  a look at the state of compliance of a
19  site at the time when the audit is
20  performed.
21    So it is good information to
22  have findings from the FDA, if the
23  auditor deems those to be good for them
24  to follow up.

---

Page 548

1    But the core -- the core
2  objective of the audit is for that
3  auditor to determine the state of
4  compliance of that site in May 2018,
5  based on the evaluations that they do of,
6  you know, incoming materials, in-process
7  control activities, the manufacturing
8  process, cleaning activities, OOSs that
9  would be applicable to be reviewed
10  because they are based on our product,
11  any deviations that are associated with
12  the production of our product.
13    So -- so the fact that they
14  may or may not have covered, in this
15  case -- and I'm still looking -- it does
16  not mean that the audit is less relevant
17  for the purpose of determining the
18  compliance of that site.
19    MS. LOCKARD:  And just for
20  completion of the record, there is
21  reference to the May 2018
22  inspection.
23    MR. STANOCH:  Well, counsel,
24  are you going to testify now?  I

---

Confidential Information - Subject to Protective Order

Page 549

just --

MS. LOCKARD:  No, but I --

MR. STANOCH:  -- told the witness he can look at the document.

MS. LOCKARD:  Excuse me.

MR. STANOCH:  That's improper.  That's improper, Ms. Lockard.

MS. LOCKARD:  You -- it's improper for you to tell him you just searched the document and you found nothing.

I haven't told him anything.  All I'm saying is if you're not using the correct search terms, you're not going to find it.

MR. STANOCH:  What search term are you using, counsel?

MS. LOCKARD:  If you want to get to the truth, that's one thing.  That's what we're here for.  If you want to mislead him and tell him it's not in here

Page 550

because you did not find it searching --

MR. STANOCH:  I told him to look at the document and tell me where it mentions 483 observations from the FDA.  I told him to do that and said take your time.

I don't appreciate what you're doing, counsel, in testifying.

THE WITNESS:  Counsel, I'm looking at Section 1.3, where it makes reference to those inspections.  And I've seen this before, and it's typical.

But I think that what I thought you were asking us -- me to look at, counsel, was whether or not there was a follow-up.

So there is discussion about it.  But I don't necessarily -- I mean, in the browsing that I've done of this extensive document, if they look at these, you know,

Page 551

follow-up to the observations, I don't think that was the case.

And what I'm saying to you is, if it was not the case -- and it may have been, I need to look -- review the document completely.

If it was not the case, that does not necessarily mean that the objectives of the audit were not met.

BY MR. STANOCH:

Q.  Sir, I understand completely.  And you and I were on the same page.  Your counsel was not.

If you want more time to look at this document to double check or double confirm what you just said, go ahead.  But, otherwise, I'm ready to move on.  So you tell me, sir.

A.  Just allow me a second to go through.

Q.  Sure.

A.  Thank you, counsel.

Page 552

Q.  Take your time, as much as you need, sir.

A.  Thank you, I appreciate it.  I'm almost done.

Q.  That's fine.  Take your time, sir.

A.  Thank you.

So I couldn't find any specific references.  Now, this is also a redacted document, so it could have been that the auditors may have covered something in those documents -- in those redacted areas associated with impurities.

I cannot tell you because I'm not privy to that information at this point.

Q.  That's fair.

You understand, though, that I didn't make those redactions, Teva did, right?

A.  Yes.

Q.  Thank you.

MR. STANOCH:  Why don't we

Page 553

1  go off the record for a couple of
2  minutes?
3       THE WITNESS:  Okay.
4       VIDEO TECHNICIAN:  The time
5  is now 10:54 a.m.  Going off the
6  record.
7            - - -
8       (Whereupon, a brief recess
9  was taken.)
10           - - -
11      VIDEO TECHNICIAN:  The time
12  is now 11:14 a.m.  Back on the
13  record.
14 BY MR. STANOCH:
15      Q.   Mr. Barreto, did Teva have a
16 policy, prior to July 2018, to ensure
17 that Teva's API suppliers complied with
18 their obligations to send notification of
19 adverse regulatory inspections to Teva?
20      A.   I would have to check on
21 that.  I don't recall.  I would have to
22 check on that, counsel.
23      Q.   You're not sure?
24      A.   I'm not sure.

Page 554

1      Q.   Did Teva have a policy,
2  prior to July 2018, requiring Teva's own
3  auditors to follow up with API suppliers
4  about FDA inspections of those suppliers?
5      A.   Prior to 2017, I don't
6  recall that policy.
7            But, again, but, routinely,
8  auditors would make that decision based
9  on the finding for the audit.
10      Q.   I might have misspoke or
11 maybe you misheard.  My question was
12 about July 2018.
13           So I'm just going to say it
14 again, and you can say your answer, okay.
15           Did Teva have a policy,
16 prior to July 2018, requiring Teva's own
17 auditors to follow up with API suppliers
18 about FDA inspections of those suppliers?
19      A.   And the answer is, I don't
20 recall if that policy exists.
21           However, the practice would
22 be for auditors to look into whether or
23 not they need to follow up on those
24 audits.

Page 555

1      Q.   Did Teva have a policy,
2  prior to July 2018, to conduct its own
3  due diligence to ascertain whether Teva's
4  API suppliers had received any adverse
5  regulatory findings such as FDA 483s?
6      A.   I know that prior to 2017 we
7  had the processes in place, regulatory
8  intelligence activities, whereby any
9  inspections generated and the findings of
10 those inspections would be collected and
11 disseminated across the organization.
12      Q.   And, again, I think you said
13 2017.
14           So is it the same answer for
15 prior to July 2018?
16      A.   I think so, yes.
17      Q.   For example, did Teva have a
18 policy or practice, prior to July 2018,
19 to regularly review the FDA's public
20 website for regulatory findings about a
21 Teva API supplier?
22      A.   Certainly the practice was
23 there.  And one of the reasons for that
24 is that in the development of corporate

Page 556

1  standards, we are constantly looking at
2  any trends or new expectation from the
3  agency.
4       MR. STANOCH:  One moment,
5  I'm just going to put a new
6  exhibit in front of you, sir.
7       THE WITNESS:  Yes.
8  BY MR. STANOCH:
9       Q.   Yesterday we talked about
10 quality agreements, and I think you said
11 you had seen one or more agreements
12 between a legacy Actavis entity and ZHP,
13 correct?
14      A.   I think I said that, yes.
15      Q.   And I just want to put a
16 couple of documents in front of you for
17 you to confirm whether or not they would
18 be the operative agreements, okay?
19      A.   That would be okay.
20      MR. STANOCH:  So this will
21 be Teva-167.
22           - - -
23      (Whereupon, Exhibit
24 Teva-167, TEVA-MDL2875-00020279,

Page 557

1          3/24/16 Quality Agreement, was
2      marked for identification.)
3                - - -
4  BY MR. STANOCH:
5      Q.   Tell me when you have it.
6      A.   I'm opening it as we speak.
7          MR. STANOCH:  Bates ending
8  20279, for the record.
9          THE WITNESS:  That is
10  correct.
11  BY MR. STANOCH:
12      Q.   And this appears to be a
13  quality agreement for active
14  pharmaceutical ingredient, date of issue,
15  March 24th, 2016?
16      A.   Yes.
17      Q.   It appears to be between an
18  Actavis entity in Iceland and ZHP,
19  correct?
20      A.   That is correct.
21      Q.   And as far as you know, was
22  this the operative agreement between
23  Actavis and ZHP, at least as of the date
24  of this agreement being signed?

Page 558

1          The signatures, you can look
2  at on Page 14, which are in March and
3  April of 2016.
4      A.   So that would be the
5  agreement between that organization
6  within Actavis and ZHP.
7      Q.   And among the APIs that were
8  subject to this agreement, are those
9  listed in Appendix 2?
10          And you can go through, but
11  I'll tell you that Row Number 48
12  identifies valsartan, if you want to look
13  at that and confirm.
14      A.   Allow me for a second,
15  please.
16          Yes, sir.  Number 48.
17      Q.   Thank you.
18          And it's your
19  understanding -- well, would it be your
20  understanding that this is the
21  agreement -- well, strike that.
22          Once Actavis was integrated
23  into Teva, do you know if there was a new
24  agreement that superceded any legacy

Page 559

1  Actavis agreement with ZHP for the
2  procurement of API?
3      A.   I'm not so sure that the
4  superceding would necessarily happen
5  immediately.  Quality agreements remain,
6  you know, for as long as there's the
7  relationship between the organizations,
8  independent of whether or not that
9  organization belongs to another one.
10          So quality agreements do not
11  necessarily have, like, an expiration
12  date.  So I would say that quality
13  agreement, more than likely, was the --
14  was in effect.
15      Q.   Got it.
16          And there's no trick here,
17  sir.  I'm happy to tell you I haven't
18  found an agreement between legacy Actavis
19  and ZHP that's postdated this one.
20          I guess my question is, are
21  you aware of any quality agreement
22  between legacy Actavis or Teva, for that
23  matter, and ZHP that postdates this
24  agreement?

Page 560

1      A.   I would say, again, I
2  couldn't see the need -- so long as that
3  agreement remains in effect, I would not
4  see a need for another agreement to be in
5  place.
6          MR. STANOCH:  I'm going to
7  mark the next exhibit, sir.
8          THE WITNESS:  Yes.
9          MR. STANOCH:  168.  Bates
10  ending 20213.
11                - - -
12          (Whereupon, Exhibit
13  Teva-168, TEVA-MDL2875-00020213,
14  Technical Agreement Between
15  Actavis Group and Zhejiang Huahai,
16  was marked for identification.)
17                - - -
18  BY MR. STANOCH:
19      Q.   You can take -- you can take
20  time to look at it.
21          But in the meantime, I'll
22  state it appears to be a technical
23  agreement between an Actavis entity and
24  ZHP.  This one is dated June 15th, 2012,

Confidential Information – Subject to Protective Order

Page 561

1 so a few years earlier than the one we
2 just looked at.
3          But take a moment and just
4 confirm all that for me.
5      A.   Yes, I'm looking at it.
6      Q.   This appears to be the
7 agreement between a legacy Actavis entity
8 and ZHP, effective in 2012 through the
9 effects of the more recent agreement that
10 we just looked at in the previous
11 exhibit; is that fair?
12      A.   That's fair.
13          And I think what I'd like to
14 clarify, if possible, if we could go back
15 to the previous document.
16      Q.   Sure.
17      A.   This one says, Revision 2.
18          So, therefore, there was a
19 Revision 1 and, perhaps, a Revision Zero,
20 the original document.
21          So what happens is that
22 these documents are updated on a certain
23 basis, whenever it's necessary.  So I
24 think that's the case here, counsel.

Page 562

1      Q.   I'm fine -- I'm fine with
2 your answer, sir, and don't need to go
3 back.
4          But if you want to go back
5 to the last exhibit to look at it, feel
6 free and tell me.
7      A.   Yeah, I'm doing that.
8          So, yeah, yep.  This one,
9 again, there may have been changes in
10 terms of the way in which -- this one
11 says Version 1.0.  So there -- we would
12 have to look at the history.
13      Q.   And then there is --
14          MR. STANOCH:  I'm going to
15 mark another exhibit, 169.  For
16 the record, it's Bates ending
17 20214.
18              - - -
19          (Whereupon, Exhibit
20 Teva-169, TEVA-MDL2875-00020214,
21 Amendment to Quality Agreement,
22 was marked for identification.)
23              - - -
24 BY MR. STANOCH:

Page 563

1      Q.   And you can look at it, sir,
2 but it appears to be an amendment to the
3 quality agreement from 2012 between
4 Actavis and ZHP.
5      A.   Correct.  Correct.
6      Q.   And, again, in this one,
7 under manufacturing, it lists one of the
8 APIs subject to the agreement -- that
9 agreement, as valsartan, right?
10      A.   That's what the document
11 says, yes.
12          MR. STANOCH:  I'm going to
13 mark another exhibit, sir.
14              - - -
15          (Whereupon, Exhibit
16 Teva-170, TEVA-MDL2875-00020212,
17 Quality Agreement for Active
18 Pharmaceutical Ingredient, was
19 marked for identification.)
20              - - -
21          MR. STANOCH:  This one will
22 be Teva Exhibit-170, Bates ending
23 20212.
24          THE WITNESS:  Allow me to

Page 564

1 upload it, please.
2          Yes, sir.
3 BY MR. STANOCH:
4      Q.   And this appears to be a
5 quality agreement for active
6 pharmaceutical ingredient between Arrow
7 Pharm, Malta, and Zhejiang Huahai,
8 correct?
9      A.   That is correct.
10      Q.   And it looks as if it's
11 dated by both parties; ZHP signing May
12 28th, 2011, and Arrow Labs signing June
13 10th, 2011.
14          Do you see that?
15      A.   I'm looking at that.
16          Yes, sir.

Confidential Information - Subject to Protective Order

Page 565

1 sites are doing is that they are reacting
2 to, one, perhaps, expectations from their
3 regulators; or, number two --
4         MS. LOCKARD:  I want to make
5     sure you're not speculating.
6         And I don't want to, you
7     know, coach him or anything like
8     that.  But I want to make sure
9     that we establish -- these are not
10    agreements that relate to multiple
11    facilities.  And we represented
12    this to counsel that these are the
13    four that were applicable to the
14    facility with the ZHP API, was
15    used, okay?

Page 567

11        Q.   I'll rephrase.
12        Both -- for the Malta
13 facility, both the Malta agreement with
14 ZHP, as well as the broader Iceland
15 agreement with ZHP, would both be
16 applicable to the Malta facility's
17 purchase of valsartan API from ZHP?
18        A.   The quality agreement for
19 Malta would be applicable to Malta, and
20 the Icelandic quality agreement from
21 Iceland would be applicable to Iceland.
22        Q.   Thank you.
23        MR. STANOCH:  One moment
24     while I pull up the next exhibit,

Page 566

1     wanted to give you.
2 BY MR. STANOCH:
3     Q.   I appreciate that.  And I
4 appreciate your counsel's clarification.
5 I think we're all on the same page.
6     And I guess -- well, we know
7 that the Malta facility in Hal Far, that
8 was the one producing valsartan finished
9 dose for the U.S. market that was using
10 ZHP valsartan API, right?
11        A.   That is correct.  For Malta.
12 For that relationship between Malta and
13 ZHP.

Page 568

1 sir.
2         THE WITNESS:  Yes.
3         MR. STANOCH:  The next
4 exhibit, sir, Teva-171.  Bates
5 ending 22589.
6         THE WITNESS:  Yes, sir.
7         - - -
8         (Whereupon, Exhibit
9     Teva-171,
10    TEVA-MDL2875-00022589-2592,
11    10/23/18 E-mail, Schwartz to
12    Barreto, was marked for
13    identification.)
14        - - -
15 BY MR. STANOCH:
16    Q.   Do you have it in front of
17 you?
18    A.   I do.
19    Q.   Great.  It appears to be an
20 e-mail chain with the topmost message
21 from Orit Schwartz, dated October 23rd,
22 2018, to yourself, a Claire Lyons and
23 copying Corey Sawyer, correct?
24    A.   That is correct.

Confidential Information ~ Subject to Protective Order



Page 569

1   Q.   Do you recall being part of
2   this e-mail chain?
3   A.   Yes, sir.
4   Q.   And who is Orit Schwartz?

23   A.   Allow me to read the string.
24   Q.   Please.  Take your time and

Page 570

1   then answer the question.
2   A.   Thank you.
3   Q.   No problem.

23   Q.   Do you remember, at the
24   time, which way, on October 23rd, you

Page 571

1   were counseling the company should go on
2   that issue?
3   A.   I -- if I recall well, we
4   were looking for the most expedient way
5   to perform testing that would allow us to
6   get the information that was more related
7   to valsartan nitrosamines versus, you
8   know, other testing.
9        Because what we wanted to do
10  was to make sure that we could use the
11  focus of resources on performing the test
12  that was more targeted.
13       So, more than likely, what
14  we were looking for, and that would have
15  been my recommendation, and I'm sure that
16  was it, was we are in the middle of this
17  situation, we need information around the
18  nitrosamines.
19       So, you know, full
20  specification testing may not be
21  necessarily, you know, the best use of
22  our resources.  Because not all testing
23  would lead us to get the information that
24  we want.

Page 572

1   Q.   Got it.
2        It looks like there was at
3   least a discussion that you and -- it's
4   Ms. Schwartz, is it?
5   A.   Correct.
6   Q.   It looks like there is --
7   from this e-mail, there was a discussion
8   involving at least you and Ms. Schwartz
9   about whether Teva can test less than all
10  future incoming batches of the sartan
11  APIs, right?
12  A.   Yes.
13       And the reason for that, a
14  responsibility she had was to establish
15  where is it that we could find additional
16  resources to do testing.  So it was
17  important for us to make sure that if we
18  found those resources, then we would then
19  ask those resources to perform the
20  testing that would give us the best
21  information.



Page 573

Page 574

rs to discuss, you know, our strategy.

Page 575

13    A.   That's correct.
14        MR. STANOCH:  I'm going to
15   hand you another exhibit, sir.
16        THE WITNESS:  Yes, sir.
17        MR. STANOCH:  One moment,
18   please.  This is Teva-172, sir.
19   Bates ending 24488.
20            - - -
21        (Whereupon, Exhibit
22   Teva-172,
23   TEVA-MDL2875-00024488-4492,
24   11/13/19 E-mail, Barreto to Drape,

Page 576

1    was marked for identification.)
2            - - -
3        THE WITNESS:  Allow me to
4    refresh and upload it.
5   BY MR. STANOCH:
6        Q.   Sure.  Let me know when you
7    have it and when you've had a moment to
8    review it.
9        A.   I have it.
10        MR. STANOCH:  While you
11   review it, I'll state for the
12   record that it appears to be an
13   e-mail from you, dated November
14   13th, 2019, to Mr. Drape and
15   others; subject, Nitrosamine news.
16   BY MR. STANOCH:
17        Q.   When you're ready, tell me
18   if that's right.
19        A.   That is correct.  That's the
20   e-mail.
21        Q.   You recall this e-mail
22   chain, right?
23        A.   Yes, I do.
24        Q.   And it looks like one of

Page 577

¹ your colleagues was forwarding a
² third-party communication that included a
³ report about Mylan's valsartan API and
⁴ nitrosamine impurities?
⁵        A.    Yes.
⁶        Q.    And then Eric Drape wrote,
⁷ We did a better job than Mylan.
⁸            Do you see that?
⁹        A.    That is correct.
¹⁰       Q.    And then you wrote back,
¹¹ Totally agree.  None of the observations
¹² at any of the sites rose to that level of
¹³ concern.
¹⁴           Do you see that?
¹⁵       A.    That's correct.
¹⁶       Q.    What were you agreeing
¹⁷ with -- strike that.
¹⁸           Why were you agreeing with
¹⁹ Mr. Drape that we -- which I assume is
²⁰ Teva -- did a better job than Mylan?
²¹       A.    Allow me to read it.
²² Because I think I know the answer --
²³       Q.    Sure.
²⁴       A.    -- but allow me to refresh

Page 578

¹ my memory.
²        Q.    Please.
³        A.    If I recall this very well,
⁴ what Mr. Drape was saying -- the word
⁵ "we," I think what he was referring to
⁶ was more the fact that ZHP, it appears,
⁷ did a much better job at whatever he was
⁸ referring to at the time, based on the
⁹ input from, you know, the third party.
¹⁰           And I'm saying that I
¹¹ totally agree, meaning that none of the
¹² observations at any of the sites rose to
¹³ that level of concern.
¹⁴           So it could have been, now
¹⁵ that I'm sorry, now that I'm
¹⁶ looking at this, I think -- sorry, I'd
¹⁷ like to correct myself.
¹⁸       Q.    Please, go ahead.
¹⁹       A.    I think -- I think he was
²⁰ referring to us at Teva, in terms of the
²¹ work that we did at our own facilities,
²² meaning API facilities.  So this would be
²³ the scope of this discussion.
²⁴       Q.    The sentiments between you

Page 579

¹ and Mr. Drape were that Teva had done a
² better job with the nitrosamine issues in
³ valsartan API than Mylan, as reported in
⁴ the news stories below?
⁵        A.    Based on the input from that
⁶ story, that is correct.
⁷        Q.    Stand by.
⁸            Ultimately, Teva still
⁹ recalled all of its valsartan product
¹⁰ that contained Mylan's valsartan API,
¹¹ right?
¹²       A.    Yes, we did.
¹³       Q.    And Teva did not identify
¹⁴ the NDMA or NDEA contamination in that
¹⁵ Mylan valsartan API prior to November
¹⁶ 2018, right?
¹⁷       A.    No, we did not.
¹⁸       Q.    But you still believe that
¹⁹ Teva did a better job than Mylan?
²⁰           MS. LOCKARD:  Objection to
²¹ form.
²²           MR. STANOCH:  Withdrawn.
²³           Teva-173, sir.
²⁴              - - -

Page 580

¹            (Whereupon, Exhibit
²        Teva-173,
³        TEVA-MDL2875-00024041-4045,
⁴        3/27/19 E-mail, Vanderweeen to
⁵        Barreto, was marked for
⁶        identification.)
⁷              - - -
⁸            THE WITNESS:  Yes, just give
⁹ me a moment.
¹⁰           MR. STANOCH:  For the
¹¹ record, this is be Bates 24041.
¹²           THE WITNESS:  Yes, sir.
¹³ BY MR. STANOCH:
¹⁴       Q.    This appears to be an e-mail
¹⁵ chain, topmost message from Birk
¹⁶ Vanderweeen, March 27, 2019, to yourself
¹⁷ and others, regarding FDA decision on
¹⁸ sartans?
¹⁹       A.    That's correct.
²⁰       Q.    Do you recall being part of
²¹ this e-mail chain?
²²       A.    I do.
²³       Q.    It looks like this e-mail
²⁴ chain is discussing whether or not Teva

Page 581

1 can release valsartan finished products
2 that might not meet the FDA's interim
3 limits in other countries; is that right?
4     A.   Allow me to read it quickly.
5     Q.   Sure.
6     A.   Yes.
7          What is your question,
8 counsel?
9     Q.   I think my question was, it
10 appears that Teva was discussing whether
11 or not it could sell valsartan
12 finished-dose products in other countries
13 when that product might contain NDMA
14 that's above the FDA interim limits?
15    A.   Yes.  And the concern at the
16 time was to ensure that we could supply
17 medication to the patient based on the
18 specific expectations that would be set
19 by the specific countries.
20         So these are countries that
21 would be countries other than the
22 European countries, so in the U.S. and
23 Canada.  So every -- every country has
24 its own -- had its own expectation for

Page 582

1 how they would fulfill patient needs.
2          And this could be whether we
3 could use other sartan products, for
4 instance, irbesartan or losartan, to
5 still fulfill that expectation from a
6 patient perspective.
7          So the concept around this
8 was, we know what we know with respect to
9 each specific country's requirements or
10 limitations or conditions, can we still,
11 on a risk-based approach, provide
12 medication that fulfills the expectations
13 of the patients in specific countries
14 with the understanding that the
15 regulatory bodies in those countries
16 would accept those products.
17    Q.   So is it correct that Teva
18 sold valsartan finished dose in other
19 countries besides the United States that
20 they were not able to sell in the United
21 States because the nitrosamine levels
22 might have been above the FDA's interim
23 limits?
24         MS. LOCKARD:  Objection.

Page 583

1 This is outside the scope of the
2 notice of deposition as it relates
3 to product that was not sold in
4 the United States.  It's also
5 outside of the court's discovery
6 order.
7          MR. STANOCH:  You can
8 answer.
9          MS. LOCKARD:  And it calls
10 for speculation.
11         THE WITNESS:  Do you want me
12 to answer the question?
13         MS. LOCKARD:  If you can.
14         THE WITNESS:  The answer to
15 the question is that we sold, in
16 other countries, products that
17 were deemed to be acceptable, in
18 the middle of the situation, by
19 those other countries.
20         So there was a discussion
21 with each specific country with
22 respect to whether or not we could
23 be allowed to sell these products.
24         So the concern was to ensure

Page 584

1 that we could fulfill patient
2 need.
3 BY MR. STANOCH:
4     Q.   Again, so a valsartan
5 product that had nitrosamines above the
6 FDA interim limits was sold by Teva in
7 certain foreign countries; is that right?
8          MS. LOCKARD:  Objection.
9 Same objections I just stated.
10         MR. STANOCH:  You can
11 answer.
12         THE WITNESS:  The answer is
13 that in discussions with the
14 regulatory authorities of specific
15 countries, given that the
16 situation changed from country to
17 country, and each country had set
18 its own interim limits, wherever
19 specific limits that were
20 acceptable to those countries
21 applied for certain batches, after
22 discussion with those countries,
23 we would supply those countries
24 with product that would fulfill

Page 585

1    those expectations.
2  BY MR. STANOCH:
3      Q.   So even though Teva couldn't
4  sell product with certain nitrosamine
5  levels in the United States, it tried to
6  find countries in which it could sell
7  that product, and did, in fact, do so,
8  right?
9          MS. LOCKARD:  Objection.
10     Misstates the evidence.
11         THE WITNESS:  I continue to
12     indicate that the release of
13     product to other countries is
14     independent from the release of
15     product to the United States,
16     because the expectations set by
17     those countries for those products
18     is what we were expected to
19     fulfill, based on the
20     understanding that each country
21     was looking at a patient
22     risk/benefit ratio for their
23     specific patients.
24         MR. STANOCH:  I'm going to

Page 586

1    mark another exhibit, sir.
2          Exhibit-174.  Bates ending
3    495893.
4              -  -  -
5          (Whereupon, Exhibit
6    Teva-174,
7    TEVA-MDL2875-00495893-5896,
8    3/27/19 E-mail, Vanderweeen to
9    Barreto, was marked for
10   identification.)
11             -  -  -
12         THE WITNESS:  Allow me to
13   upload it, and I'll be there with
14   you.
15         Yes, counsel.
16  BY MR. STANOCH:
17     Q.   This appears to be an e-mail
18  chain, topmost message from Birk
19  Vanderweeen again, March 27, 2019, to
20  you, Mr. Sawyer, Mr. Drape; is that
21  right?
22     A.   That is correct.
23     Q.   And you can review it, but
24  when you're done reviewing it, the

Page 587

1  question is, again, this relates to
2  Teva's discussions about where it can
3  sell valsartan products that might be
4  over certain nitrosamine levels in one
5  country but not others.
6          MS. LOCKARD:  Objection to
7      the form of the question.  It's
8      outside the scope of the notice of
9      the deposition.  And it's outside
10     of the court discovery order to
11     the extent it involves product not
12     sold in the United States.
13         THE WITNESS:  I think
14     counsel is -- are you waiting on
15     me?
16  BY MR. STANOCH:
17     Q.   I was waiting on you to
18  answer the question after you had a
19  moment to review the document.
20     A.   My apologies.
21     Q.   No problem.
22     A.   So I continued to reaffirm
23  that the shipment of product, at the time
24  of this discussion, as this issue was --

Page 588

1  evolved, would only occur after
2  discussions with the specific regulatory
3  authorities, based on whatever allowance
4  we could get from them.
5          The same actually applied in
6  the United States where, you know, there
7  were instances where the FDA put that
8  interim specification to allow certain
9  product to be -- certain lots to be
10 shipped to the United States, even though
11 the FDA knew that there were certain --
12 so this is an evolving process.
13         And that interim
14 specification was established as a
15 tolerance to allow for certain product
16 containing -- so it's not like we did
17 this for other countries and not to the
18 United States.  The FDA provided that
19 tolerance level that would bring that
20 patient that -- a risk/benefit ratio for
21 the patient.
22     Q.   And there's also reference
23 in here that there is no case at the
24 moment to bring back valsartan from

Confidential Information - Subject to Protective Order

Page 589

Huahai.

Do you see that in Mr. Sharvas's e-mail of March 25th, 2019?

A.   Just a moment.  Same e-mail?

Q.   It was the March 29th, 2019, 9:29 p.m., message on the second page, the bottom.

A.   Yes, okay.  Let me go there.

And what is the question, counsel?

Q.   Is it correct, to your understanding, that as of March 2019, Teva still could not sell product using ZHP's valsartan API in the United States because of the continuing nitrosamine issues?

A.   Let me read it again.

That may have been the case. Again, because of the situation where we were dealing with the impurity specification, the interim specifications.  So, of course, we had very strong discussions as to whether or not we would be able to -- with the

Page 590

information that we had about the valsartan batches, whether we had any product that could fulfill those expectations.  That was the discussion.

MR. STANOCH:  Why don't we take a quick break?

THE WITNESS:  Yes, counsel.

VIDEO TECHNICIAN:  The time is 11:57 a.m.  Going off the record.

- - -

(Whereupon, a luncheon recess was taken.)

- - -

VIDEO TECHNICIAN:  The time is now 1:22 p.m.  Back on the record.

BY MR. STANOCH:

Q.   Welcome back, Mr. Barreto.

Other than being part of the Teva group who worked on the preparation of the valsartan recall notices that Teva issued, did you have any direct communications, oral or written, with any

Page 591

of Teva's valsartan finished-dose customers in the U.S.?

A.   I would not have direct communication with finished drug customers.  That would be somebody else's responsibility.

Q.   For instance, you would not know about whether communications from a wholesaler, such as McKesson, and Teva occurred concerning the recalls, other than maybe the recall notice; is that fair?

A.   That is fair.  I would not have any knowledge of that type of interaction.

Q.   And would that be fair for any wholesaler customer of Teva, not just McKesson?

A.   That is correct.

Q.   How about communications with retail pharmacies; did you have any direct communications, oral or written, with retail pharmacies concerning Teva's valsartan finished dose?

Page 592

A.   No.

Q.   Okay.  And that's not something you prepared to discuss today, correct?

A.   No.

Q.   And you did not prepare to discuss today specific communications, if any, that Teva had with wholesaler customers concerning Teva's valsartan finished dose; is that fair?

A.   That's -- yeah.  That would be out of my scope of responsibility.

Q.   Are you aware of any communications from one of Teva's customers to Teva about the nitrosamines in valsartan API or valsartan finished dose?

A.   If that communication came down to the quality organization, yes.

Q.   Are you aware of any such communications sitting here today?

A.   I may have been.  I don't recall, but I may have been.

Q.   In preparation for today's

Confidential Information - Subject to Protective Order

Page 593

¹ deposition, did you review communications
² from wholesalers to Teva about
³ nitrosamine contamination of finished
⁴ dose or API valsartan?
⁵      A.   No.
⁶      Q.   Is it fair to say you're not
⁷ prepared today to talk about the content
⁸ of communications, if any, between
⁹ wholesaler customers of Teva that might
¹⁰ have related to nitrosamine contamination
¹¹ in finished-dose valsartan or valsartan
¹² API?
¹³      A.   I would not be prepared for
¹⁴ that.
¹⁵           MS. LOCKARD:  And just for
¹⁶      the record, now that we're on the
¹⁷      record, as counsel discussed, we
¹⁸      will be -- we've cross-designated
¹⁹      another witness for these topics
²⁰      as well.
²¹           MR. STANOCH:  Thank you, Ms.
²²      Lockard.
²³ BY MR. STANOCH:
²⁴      Q.   Sir, when was the first

Page 594

¹ time, if you know, that Teva informed its
² customers about the potential nitrosamine
³ impurity in either valsartan finished
⁴ dose or valsartan API?
⁵      A.   That would be pretty much
⁶ immediately after -- I would say it was
⁷ in reasonable time after we had performed
⁸ an investigation.
⁹           The reason for that is that
¹⁰ as soon as the information becomes -- as
¹¹ soon as it becomes known that there is an
¹² issue, our supply chain and customer
¹³ relationship personnel would
¹⁴ immediately -- if you put the product on
¹⁵ hold, the question will be asked, why is
¹⁶ the product on hold.
¹⁷           There is -- there is already
¹⁸ some kind of an understanding within the
¹⁹ industry that when a product is on hold,
²⁰ something is wrong.
²¹           So I'm assuming that the
²² immediate hold was that -- triggered that
²³ type of communication within the supply
²⁴ chain organization.

Page 595

¹      Q.   Is it your understanding
² that that communication would have
³ occurred at or shortly after the date of
⁴ the July 3rd, 2018, field alert to the
⁵ FDA that we saw earlier?
⁶      A.   I'm sure it must have been
⁷ more or less right around that same time.
⁸      Q.   And you weren't personally
⁹ responsible for ensuring all of Teva's
¹⁰ customers received notification about the
¹¹ issue, were you?
¹²      A.   We have a process in place
¹³ whereby, once a decision is made to
¹⁴ initiate a recall, communication is
¹⁵ prepared to inform our customers.  We --
¹⁶ you know, again, also working through FDA
¹⁷ to inform all of the affected parties.
¹⁸      Q.   Is it correct that Teva also
¹⁹ informed, at or after July 3rd, 2018,
²⁰ U.S. retail pharmacies about the
²¹ nitrosamine impurity issue?
²²      A.   I would -- I assume that
²³ that communication went as far as the
²⁴ recall process.

Page 596

¹      Q.   And are you familiar with
² the details of how Teva identifies the
³ pharmacies to receive those notices and
⁴ how they are sent, or is that someone
⁵ else?
⁶      A.   That would be someone else
⁷ in terms of the specifics.
⁸      Q.   Generally, you understand
⁹ that usually does and did happen here, to
¹⁰ some extent, right?
¹¹      A.   That is correct.
¹²      Q.   You're just not prepared to
¹³ testify today about the specifics and
¹⁴ detail of how Teva identified the
¹⁵ pharmacies to receive notification,
¹⁶ specifically when and how they received
¹⁷ the notification, fair?
¹⁸      A.   That is correct.
¹⁹           And there is a process we
²⁰ have -- a process for the recall
²¹ activities where we have a company that's
²² called Inmar.
²³           And Inmar is the one that
²⁴ manages these recalls.  They are the ones

Page 597

¹ that have their own processes as to who
² to send these notifications to.
³      Q.   To your knowledge, did Teva
⁴ ever disclose to its U.S. customers,
⁵ prior to July 3rd, 2018, that any of
⁶ Teva's finished-dose valsartan products
⁷ might contain nitrosamine impurities?
⁸      A.   I would -- I would doubt
⁹ that.
¹⁰      Q.   To your knowledge, did Teva
¹¹ ever disclose to its customers that some
¹² of the valsartan API that Teva sourced
¹³ for its finished-dose valsartan might
¹⁴ have contained nitrosamine impurities?
¹⁵      MS. LOCKARD:  Don't
¹⁶ speculate.
¹⁷      THE WITNESS:  I think the --
¹⁸ counsel, could you be more
¹⁹ specific on your question, please?
²⁰ BY MR. STANOCH:
²¹      Q.   Sure.
²²      Prior to July 3rd, 2018, did
²³ Teva ever disclose to its U.S. customers
²⁴ that valsartan API that Teva was sourcing

Page 598

¹ for finished-dose valsartan might contain
² nitrosamine impurities?
³      A.   Based on the process that we
⁴ have, I don't see how we could have
⁵ communicated something that we were still
⁶ trying to assess.
⁷      Q.   Prior to July 3rd, 2018, did
⁸ Teva ever disclose to its U.S. customers
⁹ that valsartan API used in Teva's
¹⁰ valsartan finished dose was manufactured
¹¹ using recovered solvents?
¹²      A.   We had no information prior
¹³ to that date that would lead us to make
¹⁴ that type of conclusion --
¹⁵      Q.   Do you know --
¹⁶      A.   -- or statement.
¹⁷      Q.   Prior to July 3rd, 2018, did
¹⁸ Teva ever disclose to any U.S. retail
¹⁹ pharmacy or consumer that Teva's
²⁰ valsartan finished-dose products might
²¹ contain nitrosamine impurities?
²²      A.   No, because we didn't have
²³ information to that effect to communicate
²⁴ to those customers.

Page 599

¹      Q.   Prior to July 3rd, 2018, to
² your knowledge, did Teva ever disclose to
³ any U.S. retail pharmacies or consumers
⁴ that valsartan API that Teva was sourcing
⁵ for its finished-dose valsartan might
⁶ contain nitrosamine impurities?
⁷      A.   It is the same response.
⁸ It's a no.
⁹      Q.   Prior to July 3rd, 2018, did
¹⁰ Teva ever disclose to any U.S. retail
¹¹ pharmacies or consumers that valsartan
¹² API Teva was sourcing for its
¹³ finished-dose valsartan was manufactured
¹⁴ using recovered solvents?
¹⁵      A.   No.
¹⁶      Q.   To your knowledge, do
¹⁷ nitrosamines appear on the FDA approved
¹⁸ labels for any of Teva's finished-dose
¹⁹ valsartan products?
²⁰      A.   You mean today?
²¹      Q.   First, today, yes.
²²      A.   I don't work for the
²³ organization at this point, so I think
²⁴ that's a question that Binsol should be

Page 600

¹ in a better position to answer.
²      Q.   Did -- strike that.
³      Do nitrosamines appear --
⁴ strike that.
⁵      Do nitrosamines appear on
⁶ the FDA-approved labels for any Teva
⁷ finished-dose products that you know of,
⁸ regardless of time period?
⁹      A.   No.
¹⁰      Q.   Prior to July 3rd, 2018, did
¹¹ nitrosamines appear on any FDA-approved
¹² label for Teva's finished-dose valsartan
¹³ products?
¹⁴      A.   No.
¹⁵      Q.   To your knowledge, did Teva
¹⁶ represent to U.S. customers, prior to
¹⁷ July 3rd, 2018, that all of its valsartan
¹⁸ finished-dose product had met the purity
¹⁹ and quality characteristics which the
²⁰ product purported to have?
²¹      A.   Yes.
²²      Q.   Prior to July 3rd, 2018, did
²³ Teva represent to U.S. retail pharmacies
²⁴ and consumers that all of Teva's

Confidential Information - Subject to Protective Order

Page 601

¹ valsartan finished-dose product had met
² the purity and quality characteristics
³ the product was purported to have?
⁴      A.   Through its labeling and
⁵ through its availability, yes.
⁶      Q.   We -- I'll ask the question
⁷ first.
⁸           Are you aware of any
⁹ communications from any wholesaler or
¹⁰ retail pharmacy asking Teva for copies of
¹¹ any testing results concerning Teva's
¹² finished-dose valsartan or the valsartan
¹³ API used to make it?
¹⁴      A.   You mean today or at the
¹⁵ time?
¹⁶      Q.   Ever.
¹⁷      A.   Well, today, I don't know,
¹⁸ because I am not a part of Teva.
¹⁹           There may have been a
²⁰ question, but I am -- I am not certain to
²¹ say yes or no.
²²      Q.   Is it fair to say you're not
²³ prepared to testify today, on behalf of
²⁴ Teva, about any specific requests from

Page 602

¹ wholesalers or U.S. pharmacies for
² testing results, audits, regulatory
³ agency findings relating to finished-dose
⁴ valsartan or valsartan API?
⁵      A.   That would be correct.
⁶      MS. LOCKARD:  And, again, as
⁷ we've said, Teva has designated
⁸ another witness to cover those
⁹ communications.
¹⁰      MR. STANOCH:  Thank you,
¹¹ counsel.
¹² BY MR. STANOCH:
¹³      Q.   Mr. Barreto, I believe you
¹⁴ testified there was a third party that
¹⁵ worked with Teva to implement the recalls
¹⁶ of Teva's finished dose in the United
¹⁷ States?
¹⁸      A.   That is correct.
¹⁹      Q.   Can you just tell me that
²⁰ entity again?
²¹      A.   The name of the company is
²² Inmar, I-N-M-A-R, if I spelled it
²³ correctly.
²⁴      Q.   And can you tell me the

Page 603

¹ details of how the recall of Teva's
² finished-dose valsartan product in the
³ U.S. worked?
⁴      A.   So the process is that once
⁵ we decide that a recall is going to be
⁶ implemented, the first thing that we do
⁷ is we contact the U.S. Food and Drug
⁸ Administration to let them know of our
⁹ decision to recall.
¹⁰           There is a communication
¹¹ between -- a number of communications
¹² between the FDA and us with respect to,
¹³ for instance, the content of the recall
¹⁴ letter and potentially about, you know,
¹⁵ other types of communication.
¹⁶           Once this is approved, the
¹⁷ Teva group then gives the go-ahead to
¹⁸ Inmar to then proceed with the process of
¹⁹ implementing the recall.
²⁰      Q.   And you're aware that Teva
²¹ had provided the FDA regular written
²² reports concerning the status of Teva's
²³ recall efforts?
²⁴      A.   Yes, I am aware.

Page 604

¹      Q.   Did you have any involvement
² in the preparation of those reports to
³ the FDA?
⁴      A.   Yes.
⁵      Q.   You did.  Okay.
⁶           Tell me what your --
⁷      A.   So there were several times
⁸ when, you know, there were discussions as
⁹ to the extent to which -- you know, the
¹⁰ communication that was being prepared to
¹¹ be sent to the FDA fulfilled, you know,
¹² our external expectations on clarity, you
¹³ know, detailed description of the
¹⁴ discussions.  Yep.
¹⁵      Q.   Did you have
¹⁶ responsibilities for identifying the
¹⁷ logistical data for the drug product that
¹⁸ was being sequestered and held?
¹⁹      A.   There is a group within the
²⁰ quality organization that does that.
²¹      Q.   So it sounds like you were
²² involved in, maybe, the communications to
²³ the FDA about Teva's recall process, but
²⁴ you weren't involved in the underlying

Page 605

1 detail of identifying the status of all
2 the product, where it is, where it's
3 going, et cetera?
4     A.   In general, I was aware.
5 But the detailed part is handled by
6 another group.
7     Q.   One moment, please.
8     A.   Yes.
9     Q.   Who was it in the Teva other
10 group, as you mentioned, who was
11 responsible for the detail for the recall
12 data?
13     A.   So for, you know, like,
14 daily activities and the details, David
15 Bonilla is one of these individuals and
16 the other is Constance Truemper.
17        MR. STANOCH:  I don't have
18     the prior exhibit, so I'll mark it
19     for now as Teva-175 and change it
20     later.
21          - - -
22        (Whereupon, Exhibit
23     Teva-175,
24     TEVA-MDL2875-00065014-5016,

Page 606

1     8/20/18 Letter, Truemper to
2     Herber, was marked for
3     identification.)
4          - - -
5        MR. STANOCH:  Sir, that's
6     Bates ending 65014.
7        THE WITNESS:  I'm opening
8     it.
9        Yes, sir.
10 BY MR. STANOCH:
11     Q.   You're familiar with this
12 document?
13     A.   Yes, I am.
14     Q.   And this appears to be an
15 August 20, 2018, letter from Ms. Connie
16 Truemper, at Teva, to the FDA.
17        And it says it's a first
18 monthly status report on the voluntary
19 recall of valsartan product; is that
20 right?
21     A.   That is correct.
22     Q.   And this was the first such
23 report that you're aware of, I assume?
24     A.   This would be the first

Page 607

1 update, yes.
2     Q.   And were you involved in the
3 preparation of this letter to the FDA?
4     A.   I may have looked at it.
5 But this is something that she would --
6 she would have prepared herself.  I may
7 just have been copied on it.
8     Q.   And the second and third
9 pages is data of recall status.
10        Do you know how any of this
11 information was put together for these
12 two pages?
13     A.   So this would be information
14 that would be, again, collected from
15 interaction between Ms. Truemper and
16 Inmar.
17     Q.   Got it.
18        You're not familiar with the
19 detail of how the data reflected in these
20 two pages appended to the letter to the
21 FDA, how they were generated; is that
22 fair?
23     A.   No, no.  That's fair.
24     Q.   In the cover of the letter

Page 608

1 it mentions that the return stocks were
2 being handled by the third-party vendor
3 Inmar, right?  You see that in the second
4 paragraph?
5     A.   Correct.  I do.
6     Q.   That was the vendor you
7 mentioned before, right?
8     A.   That's correct.
9     Q.   And it says, Teva
10 Pharmaceuticals, USA, Inc., will ensure
11 destruction of these returned goods via
12 incineration.
13        Do you see that?
14     A.   I see that.
15     Q.   So in August 2018, Teva was
16 telling the FDA that it was going to
17 destroy returned valsartan finished-dose
18 product via incineration, correct?
19     A.   That is correct.
20     Q.   That was Teva's standard
21 process, was it not, to destroy returned
22 product that had been recalled?
23     A.   Under routine, you know,
24 recall conditions, this is what we would

Confidential Information - Subject to Protective Order

Page 609

¹ do.  But in this case, those lots were
² not destroyed.
³        Q.    How do you know lots -- no
⁴ lots of valsartan finished-dose product
⁵ was destroyed?
⁶        A.    We put a hold, as a company,
⁷ on -- at the advice of counsel not to
⁸ destroy them.
⁹            So at the time this was
¹⁰ written, that was the, again, like, the
¹¹ routine language.  Nevertheless, I have
¹² confirmed that no destruction
¹³ certificates have been generated and that
¹⁴ every single lot of valsartan, it is --
¹⁵ it is still on hold.
¹⁶        Q.    That's finished-dose
¹⁷ valsartan product for the United States
¹⁸ market, right?
¹⁹        A.    That is correct.
²⁰        Q.    And when did Teva put a hold
²¹ on the destruction of recalled valsartan
²² finished-dose product?
²³        A.    That was -- I want to say
²⁴ that was just right around the -- maybe

Page 610

¹ two weeks, maybe, a couple of weeks
² before, you know, we started the process
³ of initiating the recall.
⁴            So that was a legal hold,
⁵ and that legal hold was communicated to
⁶ the entire company.
⁷        Q.    You're --
⁸        A.    I'm -- and I'm guesstimating
⁹ the date.  I don't have the document in
¹⁰ front of me.
¹¹        Q.    Why don't -- I don't have it
¹² either.
¹³            So if you can tell me more
¹⁴ detail in terms of timing, maybe by
¹⁵ reference to other events we've
¹⁶ discussed.
¹⁷            What's your best guess as to
¹⁸ when that legal hold went into effect?
¹⁹        A.    I would have to get that
²⁰ information for you.  I don't -- don't
²¹ have it with me right now.  So my
²² apologies.
²³        Q.    You agree that this exhibit
²⁴ we're looking at here, this August 20th,

Page 611

¹ 2018, letter to the FDA from Teva makes
² no mention of a legal hold on the
³ destruction of finished-dose valsartan,
⁴ yes?
⁵        A.    That is correct.
⁶            But, again, with respect to
⁷ the timing, I don't recall now if it was
⁸ before or after.
⁹            But the hold that was placed
¹⁰ to ensure that every lot of valsartan
¹¹ that was recalled from the United States
¹² is now on hold, still on hold.
¹³        Q.    And all of those lots are
¹⁴ sequestered at an Inmar facility?
¹⁵        A.    That's my understanding,
¹⁶ yes.
¹⁷            MR. STANOCH:  Here is the
¹⁸ next exhibit.  Again, it was
¹⁹ previously marked, I don't have
²⁰ the number.  It's now Teva-176.
²¹            -  -  -
²²            (Whereupon, Exhibit
²³ Teva-176, No Bates, 8/8/19 Letter,
²⁴ Singh to Priester, was marked for

Page 612

¹      identification.)
²            -  -  -
³            THE WITNESS:  Just let me
⁴      open it.
⁵            Yes, sir.
⁶ BY MR. STANOCH:
⁷        Q.    And this is an August 8th,
⁸ 2019, letter from Teva to the FDA
⁹ concerning the status of its recall
¹⁰ efforts; is that right?
¹¹        A.    Yes, that's correct.
¹²        Q.    This one says it's the
¹³ seventh monthly status report, correct?
¹⁴        A.    Let me go through it for a
¹⁵ second.
¹⁶        Q.    Sure.
¹⁷        A.    Yes, that's correct.
¹⁸        Q.    And this one mentions, in
¹⁹ the last paragraph, that Teva initiated a
²⁰ legal hold on destroying ARB drug
²¹ products that are recalled due to
²² nitrosamine impurities.
²³            Do you see that?  Last
²⁴ paragraph.

Confidential Information - Subject to Protective Order

Page 613

1    A.   I'm looking at it.
2         Yes.
3    Q.   And we went over this with
4  Ms. Elizabeth Gray, another Teva
5  designee, that this appeared to be the
6  first of these regular monthly status
7  reports to the FDA that mentioned Teva's
8  legal hold on the valsartan product.
9         Is that consistent with your
10 understanding as well?
11   A.   It probably is.  I would
12 have to look at the previous monthly
13 updates.
14        But I can assure you, as I
15 indicated before, that that legal hold
16 was present probably around the first
17 time that we said that we needed to do a
18 recall and to preserve -- and to preserve
19 the product.
20   Q.   But sitting here today, you
21 can't tell me the date of that legal
22 hold; is that right?
23   A.   I would have to -- I want to
24 say -- I can't -- I will not speculate.

Page 614

1    Q.   That's fair.

[redacted]

15   Q.   Are you aware of any --
16        MS. LOCKARD:  Let me just
17 object to the extent the question
18 calls for speculation.  And the
19 decision -- the legal hold was a
20 legal determination.  So this is
21 not something that Mr. Barreto was
22 responsible for responding to
23 under the notice.
24        MR. STANOCH:  I mean, Topic

Page 615

1  48, counsel, is Teva's product
2  recall and the retention of
3  recalled or sequestered valsartan
4  finished dose.
5         So, I mean, if you want to
6  tell me someone else will talk
7  about it, that's fine.  But
8  otherwise --
9         MS. LOCKARD:  Right.  And
10 he's talked about the retention of
11 the medication.
12        But you're asking about the
13 legal hold notice that was issued
14 by the legal department.
15        MR. STANOCH:  Which is the
16 basis of the retention or
17 sequestering of the product.  And
18 he testified he doesn't know the
19 date of it.  So I'm trying to
20 understand who it went to -- the
21 facts of who it went to and when.
22        MS. LOCKARD:  Well, he's
23 not -- he's not -- I don't believe
24 that's within the notice, in terms

Page 616

1  of recipients of all the
2  litigation hold.
3         And, you know, I object to
4  that as being outside of the
5  scope.
6         MR. STANOCH:  Okay.  It's
7  noted.
8  BY MR. STANOCH:
9    Q.   Mr. Barreto, are you aware
10 of specific communication from Teva to
11 Inmar instructing Inmar not to destroy
12 valsartan finished-dose product that was
13 being recalled because of the nitrosamine
14 impurities?
15   A.   I am not specifically aware
16 of that.  That would have been Mrs.
17 Truemper.
18        But the legal notice was
19 specific enough to state that the product
20 couldn't be destroyed.  So as part of her
21 responsibilities, she would have
22 communicated with them to -- because
23 there is no destruction without Teva's
24 authorization anyway.  So it would not

Page 617

1 happen unless Teva authorized it.
2        Q.    You're not aware of any
3 communication informing Inmar not to
4 destroy the recalled valsartan
5 finished-dose product?
6        A.    Not specifically -- not
7 specifically at this moment.
8             But I am speaking about the
9 process of how it works.
10       Q.    And do you know why Teva did
11 not inform the FDA that it initiated a
12 legal hold on the destruction of
13 valsartan finished-dose product that was
14 being recalled until August 2019?
15       A.    This process is an internal
16 process.  And it makes no difference --
17 in terms of, in my opinion, based on my
18 experience, with respect to notification
19 to the FDA.
20            The responsibility with
21 respect to the management of the product
22 resides with Teva.  Teva -- it was an
23 issue of timing.  Teva eventually
24 notified the FDA.  So, to me, that still

Page 618

1 fulfills, let's say, an information
2 notice to the FDA.
3        Q.    Are you aware of Teva
4 contacting the FDA, at various times,
5 asking or suggesting that -- strike that.
6             Are you aware that Teva
7 contacted the FDA multiple times about
8 destroying recalled valsartan
9 finished-dose product?
10       A.    There may have been some
11 communications with respect to that.
12 Again, within the routine process which,
13 obviously, later on, was clarified
14 through the advertisement of the legal
15 hold.
16       Q.    For instance, take a look at
17 this next exhibit.
18            MR. STANOCH:  Stand by.
19 I'll introduce it here as
20 Teva-177.  It's Bates 14826.
21            THE WITNESS:  Yes.
22            - - -
23            (Whereupon, Exhibit
24 Teva-177,

Page 619

1        TEVA-MDL2875-00014826-4827, 1/4/19
2        E-mail, Dellarese to Truemper, was
3        marked for identification.)
4            - - -
5 BY MR. STANOCH:
6        Q.    And, here, this appears to
7 be an e-mail between Teva personnel and
8 the FDA, right, concerning the
9 destruction of Teva's recalled valsartan
10 product; is that right?
11       A.    Yes.

Page 620

24       Q.    Do you know whether or not

Confidential Information - Subject to Protective Order

Page 621

¹ Ms. Truemper ever received a notice of
² the legal hold on the destruction of
³ valsartan recalled product?
⁴        MS. LOCKARD:  Objection.
⁵    Outside the scope of his testimony
⁶    under the notice.  Calls for
⁷    speculation.
⁸        THE WITNESS:  I don't know.
⁹        MR. STANOCH:  I'm going to
¹⁰    mark another exhibit, sir.
¹¹    Teva-178.  It might have been
¹²    marked earlier, but this is Bates
¹³    ending 14763.
¹⁴           - - -
¹⁵        (Whereupon, Exhibit
¹⁶    Teva-178, TEVA-MDL2875-00014763,
¹⁷    1/1/19 E-mail, Ora Pharm1 Recalls
¹⁸    to Truemper, was marked for
¹⁹    identification.)
²⁰           - - -
²¹ BY MR. STANOCH:
²²    Q.   Do you have that, sir?
²³    A.   I do.
²⁴    Q.   This is an e-mail chain now

Page 622

¹ from March 30th and April 1st of 2019,
² between Ms. Truemper, and copying a Usha
³ Singh, to the FDA.
⁴        Do you see that?
⁵    A.   I see that.
⁶    Q.   And Usha Singh, that was
⁷ another Teva employee, right?
⁸    A.   That is correct.

Page 623

⁴        MS. LOCKARD:  Objection to
⁵    form.  Asked and answered.
⁶        THE WITNESS:  The reason why
⁷    I believe she's doing this is
⁸    because, again, that oversight,
⁹    for whatever reason, and I cannot
¹⁰    speculate on, is still there.
¹¹        The legal hold is still in
¹²    place.  And every lot that was
¹³    recalled was -- is still on hold.
¹⁴ BY MR. STANOCH:
¹⁵    Q.   And this time Ms. Truemper's
¹⁶ message is copied to Usha Singh at Teva,
¹⁷ right?
¹⁸    A.   Yes.
¹⁹    Q.   And Usha Singh doesn't reply
²⁰ anywhere on the thread to say, hey, we
²¹ should not destroy it because of the
²² litigation hold; is that right?
²³    A.   The reason why, I think, is
²⁴ Usha is -- works under Connie at that

Page 624

¹ point -- I'm sorry, under David, and they
² are basically colleagues.  She was
³ relatively new within the organization.
⁴        So I think -- this is really
⁵ about an oversight by the -- this
⁶ employee.  And that's how I characterize
⁷ it.
⁸    Q.   So now we have two employees
⁹ at Teva who -- with an oversight not
¹⁰ realizing there's a legal hold in place;
¹¹ Ms. Truemper herself, right, as well as
¹² Ms. Usha Singh, correct?
¹³        MS. LOCKARD:  Object to the
¹⁴    form of the question.  It
¹⁵    misstates the testimony.
¹⁶        There's no indication that
¹⁷    these witnesses did not know there
¹⁸    was a legal hold in place.
¹⁹        MR. STANOCH:  You don't need
²⁰    to testify, counsel.  He said it
²¹    was an oversight.  I'm asking him
²²    to confirm his testimony.
²³        Go ahead, Mr. Barreto.
²⁴        THE WITNESS:  I still insist

Confidential Information - Subject to Protective Order

---

Page 625

1  that this is an oversight.  I'm
2  not saying that they didn't know,
3  but for whatever reason, you know,
4  they -- they were just following
5  the standard process without
6  really realizing that this was a
7  unique and distinct case.
8        That's what I'm trying to
9  say, counsel.
10 BY MR. STANOCH:
11     Q.   Did Teva not have a process
12 in place to suspend the normal process
13 for destruction of recalled product in
14 this instance, given that you believe
15 there was a legal hold in place?
16     A.   This is an unusual
17 situation, the one that we are facing.
18        So a process by itself, it's
19 just based on instructions and guidance,
20 and that's how we were working.  There
21 was no -- again, the legal -- the
22 objectives of the legal hold remain in
23 place.
24     Q.   So you're not aware of any

Page 626

1  policy at Teva that would have ensured
2  that employees such as Ms. Truemper and
3  Mr. Singh received notification not to
4  destroy recalled valsartan product,
5  correct?
6        MS. LOCKARD:  Objection to
7  the form of the question.  I think
8  you're getting outside the bounds
9  of the notice.  And you're asking
10 him about policies with respect to
11 issuing legal holds, which is not
12 in his department.
13       MR. STANOCH:  Go ahead, sir,
14 you can answer.
15       THE WITNESS:  So the legal
16 hold was given to everybody who
17 needed to know about it.  And that
18 is the process that was in place.
19       And, again, as I indicated
20 to you, this is a very unusual,
21 very evolving situation.  So the
22 best way that I can characterize
23 what Ms. Truemper was doing, she
24 was trying to sort of follow the

Page 627

1  administrative steps that are also
2  with every recall, as an
3  oversight, without realizing that
4  that's not what was expected for
5  this case.
6        The reason I am very
7  comfortable about this is the fact
8  that the objectives of the legal
9  hold have been maintained from day
10 one.
11 BY MR. STANOCH:
12     Q.   That's based on your belief
13 that no valsartan finished dose was
14 destroyed in the U.S., right?
15     A.   That's based on my
16 knowledge.
17     Q.   Right.  Right.  So you're
18 saying no harm, no foul, Ms. Truemper and
19 Ms. Singh, they might have been trying to
20 get it destroyed, but it didn't happen
21 anyway, so no big deal?
22       MS. LOCKARD:  Objection to
23 the form of the question.  It's
24 argumentative.  No one said

Page 628

1  anything about harm or foul or
2  that they were trying to get it
3  destroyed.
4  BY MR. STANOCH:
5     Q.   Well, how would you
6  characterize the e-mails from Ms.
7  Truemper to the FDA where she's asking if
8  Teva can destroy the recalled valsartan
9  products, Mr. Barreto?
10    A.   The way that I would
11 characterize it is she was trying to
12 follow procedure, without really
13 realizing that, in this specific case,
14 that procedure was not totally
15 applicable.
16    Q.   Right.  And what procedure
17 at Teva --
18       MS. LOCKARD:  Objection.
19       MR. STANOCH:  Go ahead.  I'm
20 sorry.
21       MS. LOCKARD:  Objection to
22 the question calling for
23 speculation.  Don't speculate
24 about what Ms. Truemper thought or

Confidential Information - Subject to Protective Order

Page 629

1  assumed.
2      MR. STANOCH:  Are you done
3  coaching the witness, counsel?
4      MS. LOCKARD:  No, I'm done
5  making my objection.  Are you done
6  arguing and badgering him about
7  somebody else's e-mail?
8      MR. STANOCH:  I strongly --
9  strongly disagree and resent that
10  accusation, counsel.  He's
11  designated on the Topic 48, on the
12  retention and sequestering of
13  valsartan finished-dose products.
14      There's an e-mail talking
15  here, of Teva, about the
16  destruction of those products.
17  I'm going to keep asking him the
18  questions.  I think it's within
19  the scope of the notice.
20      MS. LOCKARD:  Let's take a
21  break, then.  You can continue
22  after the break.
23      VIDEO TECHNICIAN:  The time
24  is now 1:59 p.m.  Going off the

Page 630

1  record.
2      MR. STANOCH:  I didn't agree
3  to that break, by the way,
4  Victoria.
5      I don't understand -- if
6  you're going to have someone -- I
7  asked you at the beginning of
8  this, if you're going to have
9  somebody else talk about this,
10  great.  And you said, no, he's
11  ready to talk about it.
12      So I'm asking him.  And then
13  when you don't like a question,
14  you say it's outside the scope and
15  it's speculative and he doesn't
16  know and why are you asking him,
17  you should ask Constance.
18      What do you want me to do?
19      MS. LOCKARD:  I've asked for
20  a break.  I'd like to go off the
21  record for a moment.
22      MR. STANOCH:  Well, we're
23  off already.  We already got that.
24  You got your break.

Page 631

1      I'm asking you, you know --
2      MS. LOCKARD:  No, we're not.
3  The record is still going.  I'm
4  watching --
5      COURT REPORTER:  That's
6  because I wasn't sure what you
7  wanted me to do.  Because I heard
8  David say, I don't want to go off,
9  and she went off.
10      MR. STANOCH:  Let's go off
11  the record now.
12          - - -
13      (Whereupon, a brief recess
14  was taken.)
15          - - -
16      VIDEO TECHNICIAN:  The time
17  is now 2:06 p.m.  Back on the
18  record.
19  BY MR. STANOCH:
20      Q.   Mr. Barreto, in preparation
21  for today's deposition, did you speak to
22  Ms. Connie Truemper?
23      A.   No.
24      Q.   In preparation for today's

Page 632

1  deposition, did you speak to Usha Singh?
2      A.   No.
3      Q.   So you really can't testify
4  as to why they were telling the FDA -- or
5  asking the FDA for permission to destroy
6  valsartan product that had been recalled,
7  because you didn't talk to them; is that
8  fair?
9      A.   But I did speak with Mr.
10  Bonilla.
11      Q.   You did?
12      A.   Yes, sir.
13      Q.   Okay.  When did you talk to
14  Mr. Bonilla?
15      A.   It must have been a few days
16  ago.
17      Q.   And what did you talk about
18  with Mr. Bonilla?
19      MS. LOCKARD:  Was counsel
20  present?
21      THE WITNESS:  That was with
22  counsel present.
23      It was -- it was to ensure
24  that we could confirm that the

Confidential Information - Subject to Protective Order

Page 633

1  instructions that were set for the
2  legal hold had been not only
3  implemented but that they had been
4  communicated to Inmar.
5  BY MR. STANOCH:
6      Q.   Is the sole basis for your
7  testimony today about whether recalled
8  valsartan product was destroyed or not
9  based on information you received from
10  Mr. David Bonilla?
11     A.   Based on the confirmation
12  that I received from Mr. Bonilla, yes.
13     Q.   One moment, please.
14         Did anyone else, other than
15  counsel, provide you any information to
16  inform you about whether valsartan
17  product recalled in the United States was
18  destroyed?
19     A.   What's the question?
20     Q.   Did anyone else, other than
21  your counsel or Mr. Bonilla, provide you
22  information about whether or not recalled
23  valsartan product was destroyed or not?
24     A.   No.

Page 634

1      Q.   And earlier I believe you
2  said that there is no certificates of
3  destruction issued in connection with
4  valsartan product that had been recalled;
5  is that right?
6      A.   That is correct.
7      Q.   And what's a certificate of
8  destruction?
9      A.   A -- once the product is
10  destroyed, a certificate of destruction
11  is generated to document that that
12  article is no longer in existence and
13  it's been destroyed.
14     Q.   Did you review any records
15  regarding whether or not valsartan
16  recalled product was destroyed?
17     A.   There would be --
18         MS. LOCKARD:  Objection to
19  the form of the question.  It's
20  confusing, because you're asking
21  him about documents that don't
22  exist.
23         He can explain.
24         THE WITNESS:  And that's

Page 635

1  exactly what I was going to say,
2  that I have not reviewed any
3  certificate of destruction because
4  none exists and there's nothing to
5  review.
6  BY MR. STANOCH:
7      Q.   In preparation for your
8  deposition today, did you undertake to
9  investigate whether any certificates of
10  destruction exist for valsartan
11  finished-dose product?
12     A.   That was part of the
13  discussion we had with Mr. Bonilla.
14         MR. STANOCH:  I'm going to
15  mark the next exhibit.  Did that
16  go through or not?  I'll try it
17  again.
18         THE WITNESS:  What's the
19  number, counsel?
20         MR. STANOCH:  Teva-179, sir.
21             - - -
22         (Whereupon, Exhibit
23  Teva-179,
24  TEVA-MDL2875-00717000-7014,

Page 636

1  11/27/19 E-mail, Singh to Nase,
2  was marked for identification.)
3             - - -
4         MS. LOCKARD:  179.
5         THE WITNESS:  Yes, sir.
6  BY MR. STANOCH:
7      Q.   What's the -- what's the
8  Bates number you see on the first page
9  there, sir?
10     A.   What's the question?
11     Q.   What's the Bates number in
12  the lower right on the first page you
13  see, sir?
14         I'm just making sure I'm
15  looking at the same thing as you.
16     A.   This is an e-mail from --
17  it's 11/27/2019, 6:45:10 p.m.
18     Q.   Got it.
19         Have you seen this before?
20     A.   No.
21     Q.   So let's scroll to the
22  attachments here, if you will.
23     A.   Yes, sir.
24     Q.   And I can share my screen if

Confidential Information – Subject to Protective Order



Page 637

¹ necessary.
²        But I'm going to -- I'll
³ share my screen, I think it will move it
⁴ along for you, sir.  Give me one second.
⁵        Okay.  Go to this page,
⁶ please, bearing Bates 717006.
⁷    A.   Unfortunately, I'm looking
⁸ at it sideways, so it's very difficult
⁹ for me to --
¹⁰   Q.   I know, I have the same
¹¹ issue.  Let me see if I can rotate it for
¹² you.  No.
¹³   A.   I tried that yesterday,
¹⁴ counsel.
¹⁵   Q.   I know, I remember, sir.
¹⁶ Here we go.
¹⁷        Is this better for you?
¹⁸   A.   Yes, sir.
¹⁹   Q.   Very good.  Okay.

Page 638

Page 639

Page 640

Confidential Information - Subject to Protective Order



Page 641

Page 642

18    Q.    And you agree that that's
19    several months after the nitrosamine
20    issues were brought to Teva's attention
21    in late June or early July of 2018,
22    correct?
23    A.    Except that I think that you
24    are talking about product that was in our

Page 643

1    distribution center that was not
2    distributed to customers within the
3    United States versus the product that was
4    recalled that was actually retrieved and
5    placed on hold.
6         So I think that is the
7    difference that maybe we need to discuss
8    in this case.
9    Q.    Well, so the distinction
10    you're making is that -- is, what, that
11    this specific valsartan product in the
12    U.S. that was destroyed was not recalled,
13    therefore, it was not subject to the
14    litigation hold?
15    A.    That this is not part of the
16    material that was retrieved from the
17    distribution -- the distribution chain
18    versus material that was placed on hold
19    which was not distributed.
20    Q.    So because the material had
21    not been returned to Teva from a
22    customer, Teva had it on hand, it was
23    okay for Teva to destroy it, you think?
24    A.    I have to look at what the

Page 644

1    specifics of the hold were to ensure
2    that.  I need to look at the specifics to
3    give you an answer.
4    Q.    I don't have the hold
5    because it wasn't produced to me.
6         So, Mr. Barreto, is -- Mr.
7    Barreto, is there anything you can tell
8    me about the litigation hold, about
9    whether it applied to only recalled
10    finished-dose valsartan product that was
11    returned by a customer, a third party, to
12    Teva, or if it also included
13    finished-dose valsartan product that Teva
14    also had on hand in its own inventory at
15    the time?
16         MS. LOCKARD:  I'm just going
17    to object to the extent that
18    you're getting into the legal hold
19    notice.  And I think that's a
20    legal question as to how it should
21    be interpreted.
22         I'm not sure he's the right
23    person to answer that particular
24    question.

Page 645

1    MR. STANOCH:  You can
2  answer, sir.
3    THE WITNESS:  I would have
4  to look at the legal hold to see
5  the extent to which I could answer
6  the question.
7    Because the legal hold -- I
8  have to look at that specific
9  request with respect to product.
10  And I don't have it in front of me
11  right now, counsel.
12    MR. STANOCH:  Counsel, we're
13  going to request the legal hold,
14  because the witness says he can't
15  testify about the details of the
16  retention and potential
17  destruction of the product, per
18  Topic 48, without the legal hold.
19    MS. LOCKARD:  No, that's not
20  what the witness said.  And we can
21  address this off the record for
22  this witness.
23    But I disagree that that's
24  what he said.  He testified to

Page 646

1    you -- he's testified he's done
2  the investigation, he's spoken
3  with the right people, he's looked
4  through the documents.  And so
5  he's prepared on the topic.
6  BY MR. STANOCH:
7    Q.   Mr. Barreto, can you --
8    MR. STANOCH:  Ms. Lockard, I
9  disagree, we're requesting any
10  holds that were in place for
11  valsartan product, number one.
12  BY MR. STANOCH:
13    Q.   Number two, Mr. Barreto, can
14  you tell me, sitting here today, whether
15  Teva issued any legal hold that covered
16  valsartan finished-dose product in the
17  U.S. that was already in Teva's
18  possession at the time it instituted the
19  recalls?
20    MS. LOCKARD:  Objection.
21  Asked and answered.
22    THE WITNESS:  The best
23  recollection that I have is that
24  any product that was returned from

Page 647

1  distribution needed to be the
2  subject of the legal hold.  That
3  is the responsibility for which we
4  implemented the assurance that
5  that was the case.  And this is
6  where we placed a focus.
7    I don't know if there was
8  any -- I don't recall if there was
9  any specific guidance with respect
10  to product that was not
11  distributed.
12    But everything that the
13  legal hold said that needed to be
14  recalled -- sorry, to -- withheld
15  from material that was recalled,
16  all of that material is on hold.
17  BY MR. STANOCH:
18    Q.   Can you tell me, sitting
19  here today, whether Teva ever issued a
20  legal hold on valsartan finished product
21  in the U.S. that Teva had in its own
22  possession at the time of the recalls?
23    A.   I don't recall.
24    Q.   Okay.  And how would you

Page 648

1  refresh your memory as to whether or not
2  that was the case or not?
3    A.   As I indicated, I would
4  probably need to take a look at the legal
5  hold and verify that section with respect
6  to product on hold.
7    Q.   Did Teva's legal hold extend
8  to valsartan API that was used to produce
9  Teva's valsartan finished-dose product
10  sold in the United States?
11    A.   The legal hold, as I recall,
12  it applied to product that was
13  distributed and that was returned.
14    I do not think that there
15  was any discussion about API.
16    Q.   So you're not aware of
17  whether or not Teva ever put a hold on
18  valsartan API it had at one of its
19  manufacturing facilities that made
20  valsartan finished dose for the U.S.,
21  right?
22    A.   I'd like to clarify.
23    There is a distinction
24  between putting a hold -- and I'm aware

Page 649

1 that holds were placed -- versus
2 destruction.  And there is a distinction
3 between a legal hold and a routine hold.
4          API that was considered to
5 be unacceptable was placed on hold, and
6 that API is not in Inmar's location
7 because that's not the product that was
8 subject to the recall and the legal hold
9 that was placed by the legal department.
10     Q.   So valsartan API that was
11 at, say, the Malta facility, which was
12 intended to be used for U.S.
13 finished-dose product, that was not
14 subject to a legal hold?
15     A.   I cannot conclusively state
16 that it was not.  But if you ask me for
17 my professional opinion, the answer would
18 be that I suspect that it was not placed
19 on legal hold.
20     Q.   And, similarly, do you know
21 whether or not a legal hold was placed on
22 valsartan API that was on site at Teva's
23 Jerusalem facility that manufactured
24 valsartan finished-dose product for the

Page 650

1 U.S.?
2     A.   The procedures that were
3 implemented were to hold and eventually
4 to dispose of that material.  I don't
5 recall that there was a legal hold
6 necessary for those -- that type of
7 product.
8          MS. LOCKARD:  I don't want
9     you to speculate.  And if we need
10     to take a break to run this down,
11     I'm happy to do that.  This is not
12     a memory contest.
13          If you're going to be
14     designated on the topic, I want to
15     make sure you have the information
16     you need.
17          THE WITNESS:  Yes.  Because
18     I am -- I am speculating at this
19     time, no question about it.
20 BY MR. STANOCH:
21     Q.   So do you know whether any
22 valsartan API was destroyed from any Teva
23 facility after July 3rd, 2018?
24     A.   I don't have that

Page 651

1 information.  So I don't know.
2     Q.   Did you look into that to
3 prepare for today's deposition?
4     A.   No.
5          MR. STANOCH:  I'm going to
6     mark the next exhibit, Teva-180.
7              - - -
8          (Whereupon, Exhibit
9     Teva-180,
10     TEVA-MDL2875-00071287-1303,
11     9/29/19 E-mail, Etzioni to Fluch,
12     was marked for identification.)
13              - - -
14 BY MR. STANOCH:
15     Q.   Tell me when you're there,
16 sir.
17     A.   Yes.  One moment.
18          Yes.
19     Q.   This is an e-mail chain
20 between multiple Teva employees,
21 including Dana Etzioni, Joerg Fluch, Jens
22 Nassall and Dalia Reuven, topmost message
23 dated September 29th, 2019, correct?
24     A.   Yes.

Page 652

1     Q.   And if you flip to the
2 original message in the thread, it's
3 actually from someone at Mylan to the
4 Teva folks that I just named; is that
5 right?
6     A.   Yes.
7     Q.   And it's talking about Mylan
8 is -- Mylan was supplying valsartan API
9 to the Teva Jerusalem facility, correct?
10     A.   Yes.

Confidential Information - Subject to Protective Order

Page 653

[redacted]

Page 654

[redacted]

6   Q.   And then a little --
7   A.   And that's not something
8 that would be considered abnormal.
9      There are -- in this case --
10 I'm sure that there were different
11 reasons.  So long as the product was
12 classified as being rejected and it was
13 secured in the warehouse, the timing for
14 the destruction is more a case where --
15 you know, in this case, there was no
16 specific reason for the timing other than
17 it was held, perhaps, even for further
18 investigation, number one; number two,
19 you still have to have that agreement
20 with the supplier as to how that API is
21 going to be disposed of; is it going to
22 be returned, is it going to be destroyed,
23 and all of this requires a lot of
24 activities.

Page 655

1   Q.   Right.  Well, first of all,
2 we established yesterday, we can't find
3 an agreement between Teva Jerusalem and
4 Mylan, so we don't know if there was an
5 agreement that covered this situation,
6 right?
7   A.   I'm sure there is an
8 understanding in the supply agreement
9 between Teva -- with respect to the
10 return of product.  There is an
11 agreement.
12   Q.   Well, you testified
13 yesterday that you could not locate a
14 quality technical agreement?
15   A.   But I'm saying that there's
16 a difference between a technical
17 agreement and a supply agreement.
18   Q.   Understood.  I appreciate
19 that distinction.
20      Did you see a supply
21 agreement between Teva and Mylan in
22 preparation for today's deposition?
23   A.   No, I did not.
24   Q.   Are you aware of any such

Page 656

1 one outside of this deposition?
2   A.   I'm sure there is a supply
3 agreement in place.
4   Q.   Have you seen it?
5   A.   No, sir.
6   Q.   Has anyone ever told you
7 affirmatively, we have one with them in
8 place?
9   A.   No.  Again, I'm speculating.
10 But it is customary to have this type of
11 agreement between two companies.
12   Q.   And I'm flipping to the page
13 ending 1297.  Mr. Etzioni, at Teva,
14 writes that the total quantity is 16 MT.
15      Do you see that?
16   A.   Just one second.  I have to
17 go back to the document.  My apologies.
18      Yes.
19   Q.   Actually, hold that page.
20      Before we get to it, you
21 said you thought there was no good reason
22 to hold this rejected Mylan valsartan
23 API.
24      Well, isn't one reason to

Confidential Information - Subject to Protective Order

Page 657

1 test that valsartan API to determine the
2 concentrations of nitrosamines in it?
3      A.   In the process of -- to
4 receive these samples, there are samples
5 that are -- these products, there are
6 samples that are maintained.
7           So whether testing is
8 needed, there's always samples that are
9 available for that type of testing.
10     Q.   Well, I can't test product
11 that's been destroyed; is that fair?
12     A.   You can test samples of
13 product that has been destroyed.
14     Q.   If samples exist?
15     A.   It is part of the procedure
16 that research samples are maintained of
17 product that is received.
18     Q.   Right.  And I'm sure in your
19 preparation you saw a number of e-mails
20 regarding the availability or
21 nonavailability of samples of various
22 valsartan API, right?
23     A.   I'm sorry, repeat the
24 question.

Page 658

1      Q.   I'm sure in your preparation
2 for today's deposition you saw, as I
3 have, various e-mails expressing concern
4 within Teva about the availability or
5 nonavailability of valsartan API samples
6 for testing?
7      A.   That would be more in terms
8 of availability at specific locations and
9 making sure that samples from other
10 locations are -- so this is more of a
11 logistical issue rather than availability
12 of samples themselves.



Page 659



Page 660



7      Q.   And, again, then there's
8 another bunch of these e-mails that go on
9 throughout July, right?
10          Again, you haven't seen any
11 mention so far of any legal hold, do you?
12     A.   Again, in this case, as I
13 recall, the expectation of the legal
14 hold, any material that was received from
15 the market through the recall process is
16 the material that needed to be preserved.
17 That's the -- my understanding.
18          If there were other
19 requirements, I would have to double
20 check that at this point.  And I don't
21 have access to that document.
22     Q.   And then let's flip to the
23 page ending 292.  Tell me when you're
24 there.

Confidential Information Subject to Protective Order

---

Page 661

1    A.   What date would that be,
2  counsel?
3    Q.   August 20th, 2019, from Dana
4  Etzioni.  It's at the bottom of page
5  ending 292, sir.
6    A.   I've got it here, yes.

23        MS. LOCKARD:  Objection.
24  Misstates the document.

---

Page 662

1  BY MR. STANOCH:
2    Q.   And this is approximately a
3  year now after the first status report we
4  saw Teva sent to the FDA in August 2018
5  about its recall efforts in the U.S.
6  market, correct?
7        MS. LOCKARD:  Objection.
8  Asked and answered.
9        THE WITNESS:  So I have
10  indicated to you, in my opinion,
11  these are -- now we are discussing
12  two distinct processes.
13        As I said to you before, the
14  legal hold is intended to ensure
15  that any recalled product that was
16  retrieved from distribution within
17  the U.S. needed to be placed on
18  the legal hold.  That's what we
19  did.
20  BY MR. STANOCH:
21    Q.   Is it your testimony that
22  Teva did not issue a legal hold on
23  valsartan API that was used and intended
24  to be sold as part of the finished-dose

---

Page 663

1  valsartan in the U.S. market?
2        MS. LOCKARD:  Objection.
3  Calls for speculation based on
4  earlier question and answer.
5        THE WITNESS:  It is my
6  statement that what I recall is
7  that the legal hold was intended
8  to ensure that any recalled
9  product that was returned would be
10  preserved.
11        I don't recall if there were
12  specifics, even though I doubt it.
13  But I would need to confirm this
14  by reviewing, once again, the
15  legal hold.
16  BY MR. STANOCH:
17    Q.   Understood.
18        If you'd flip, then, to the
19  Page 1291, sir.
20    A.   Yes.
21    Q.   And the bottom e-mail there
22  is again from Dana Etzioni, dated
23  September 8th, 2019.
24        Do you see that?

---

Page 664

1    A.   Yes, sir.
2    Q.   And this is to Joerg Fluch,
3  also at Teva, right?
4    A.   Yes.
5    Q.   And Dana Etzioni --
6  actually, do you know if Dana Etzioni is
7  male or female?
8    A.   I don't know.
9    Q.   That's fine.



---

Page 665

1    Q.   And if you go a few more
2  pages to page ending 1289, there's
3  another e-mail from Dana Etzioni,
4  September 20th, 2019.



19    A.   And, in my opinion, all of
20  these actions that were taken were proper
21  and correct.
22    Q.   You're not a lawyer, sir,
23  right?
24    A.   I am making a quality

Page 666

1  decision for which I'm speaking about
2  processes and procedures within the
3  routine process.
4    Q.   And is there any process at
5  Teva for suspending the normal
6  destruction of rejected product in the
7  instance of a litigation involving the
8  company and the very product that is
9  subject to destruction?
10    MS. LOCKARD:  Objection.
11  That asks for a legal conclusion.
12  You can't argue with him for not
13  being a lawyer and then ask him
14  legal questions.
15    MR. STANOCH:  I'm not asking
16  for his legal opinion, counsel.
17  He's talking about processes and
18  procedures.  And he's designated
19  on processes and procedures.  And
20  he can answer it to the extent he
21  knows.
22    THE WITNESS:  In the course
23  of any investigation, if there is
24  a need for -- so I'm speaking of a

Page 667

1  practice rather than a process,
2  because these are decisions that
3  are made on a case-by-case basis.
4    If there is a need to place
5  certain product on hold because
6  you are in the process of
7  performing an investigation, that
8  is what we're going to do.
9  BY MR. STANOCH:
10    Q.   The question specifically,
11  sir, was about a policy.
12    And from your experience as
13  a quality executive at Teva, are you
14  aware of any policy at Teva that would
15  ensure that normal destruction of
16  rejected API product would be suspended,
17  pending a legal hold, involving the same
18  valsartan API subject to that destruction
19  process?
20    MS. LOCKARD:  Objection.
21  Again, it's outside the scope of
22  his notice.  You're asking him
23  about legal policies with respect
24  to legal hold.

Page 668

1    MR. STANOCH:  Go ahead, sir.
2    THE WITNESS:  From a quality
3  perspective, it is the practice
4  and the process where, if there is
5  a need to withhold product because
6  we need to do further
7  investigation and further testing
8  on it, that would be a decision
9  that would be made at the
10  discretion of the -- so there is
11  no specific -- this being a
12  case-by-case decision that has to
13  be made, there's no specific
14  instruction that would contemplate
15  every possible scenario where you
16  would -- so this is -- this is one
17  where you apply practice,
18  experience and knowledge.
19  BY MR. STANOCH:
20    Q.   Are you aware of any
21  communications within Teva to the Malta
22  and Jerusalem facilities instructing them
23  not to destroy valsartan API?
24    A.   I'm not aware of that.

Confidential Information - Subject to Protective Order



**Page 669**

1    Q.   And, finally, if you look at
2  the first page of this document, sir, the
3  top e-mail from Dana Etzioni, September
4  29th, 2019.
5        She's confirming to other
6  Teva employees that both KFS and JLM have
7  now completed the destruction of
8  material, right?
9    A.   That is correct.
10   Q.   And JLM is the Teva
11 Jerusalem facility that sourced Mylan
12 valsartan API for finished dose for the
13 U.S. market, right?
14   A.   That is correct.
15   Q.   And just so we know, KFS,
16 that's another Teva facility in Israel?
17   A.   That stands for Kefar Sava
18 in Israel.

**Page 670**

2    Q.   Do you know if valsartan API
3  sourced from ZHP and Mylan by Teva was
4  destroyed at any other Teva facility
5  besides the two referenced in this
6  exhibit?
7    A.   I don't have those details
8  at this moment.
9    Q.   Okay.  The Teva -- Teva
10 Jerusalem sourcing of the Mylan valsartan
11 API, was it your understanding, from a
12 quality standpoint, that the product
13 should go directly to the Jerusalem
14 facility?
15   A.   Can you explain --
16       MS. LOCKARD:  Objection.
17 Vague.
18       THE WITNESS:  Can you
19 explain your question?  I didn't
20 understand it.
21 BY MR. STANOCH:
22   Q.   Sure.

**Page 671**

18   Q.   Okay.  Do you know whether
19 or not the valsartan API from Mylan that
20 ended up at Teva's Jerusalem facility
21 ever went to a different Teva facility
22 first?
23   A.   I would have to remember the
24 details.  But there is a possibility,

**Page 672**

1  yes.
2    Q.   You just don't recall that
3  one way or the other?
4    A.   I don't recall.  But there's
5  a possibility.
6    Q.   If that did happen, you
7  would expect that it would be documented
8  in both facilities' paperwork; is that
9  right?
10   A.   Absolutely.
11   Q.   And that would be required
12 to be kept by GMP?
13   A.   Absolutely.
14   Q.   Didn't you testify earlier
15 that there was an issue of potential
16 cross-contamination insofar as there was
17 NDMA and NDEA present in Mylan valsartan
18 API?
19   A.   I spoke about NDEA.
20   Q.   How about NDMA?
21   A.   I think that the
22 investigation spoke about some potential
23 cross-contamination.  I need to go back,
24 because it's more specific about NDEA

Page 673

1  than it is about NDMA.
2      Q.   From a quality perspective,
3  would -- wouldn't Teva require API from
4  Mylan in order to investigate the extent
5  to which the cross-contamination might
6  have occurred?
7      A.   In the course of the
8  performance of an investigation, we may
9  or may not require it.  It all depends
10  on -- it's really, again, a case-by-case
11  basis.
12          If the information generated
13  by Mylan was sufficient for us to
14  continue with our own investigation, then
15  that would be the case.
16      Q.   So why is it appropriate,
17  from a quality standpoint, for Teva to
18  incinerate some valsartan API prior to
19  fully assessing the extent and nature of
20  potential cross-contamination?
21      A.   Because, as I've stated, at
22  that point, there is a conclusion as to
23  what the problem is, what the situation
24  is, what actions we needed to take.

Page 674

1          So in terms of
2  investigation, there is a consistent
3  amount of information as to what's
4  happened and what corrective actions need
5  to be taken.  So the preservation of that
6  material would not necessarily add more
7  than what we already know.
8      Q.   But Jerusalem, we saw,
9  destroyed 16 million -- metric tons of
10  Mylan valsartan API and there's no
11  indication, is there, if that API was
12  ever tested; isn't that right?
13          MS. LOCKARD:  Objection to
14      form.  It misstates the document.
15      Speculation.
16          THE WITNESS:  Any material
17      that was received by Teva was
18      tested in accordance with the Teva
19      specifications.
20          If, in the middle of the
21      investigation, samples were
22      tested -- I need to go into the
23      details.  But, as I said, samples
24      are preserved of every incoming

Page 675

1  material.  So there is sample
2  material to test from, even if
3  material is destroyed.
4  BY MR. STANOCH:
5      Q.   Do you know, one way or the
6  other, sitting here today, whether there
7  was sufficient samples at Teva's
8  Jerusalem facility such that 16 metric
9  tons of Mylan valsartan API could be
10  destroyed?
11      A.   The procedures are in place
12  at every site for the preservation of
13  research samples for every product that
14  is received.
15      Q.   You don't know whether those
16  procedures were being followed at Teva
17  Jerusalem vis-à-vis the Mylan valsartan
18  API, though, do you?
19      A.   The--
20          MS. LOCKARD:  Objection.
21      Form.  Speculation.
22          THE WITNESS:  The sites are
23      responsible for implementing those
24      procedures.  And our, you know,

Page 676

1      internal audit programs have not
2      revealed any problems with that
3      process.
4  BY MR. STANOCH:
5      Q.   In preparation for today's
6  deposition, did you look into whether
7  there was adequate samples of valsartan
8  API on hand at Temple's -- Teva's
9  Jerusalem facility?
10      A.   In preparation for this
11  discussion, no, I did not look into that.
12      Q.   Do you know, one way or the
13  other, whether there was sufficient
14  samples at Teva's Jerusalem facility of
15  the 16 metric tons of Mylan valsartan API
16  that was destroyed?
17          MS. LOCKARD:  Objection.
18      I'm going to say outside of the
19      scope of the notice.  We have
20      designated someone else on the
21      testing issue.
22          MR. STANOCH:  You can answer
23      to your own knowledge if you need
24      to.

Confidential Information - Subject to Protective Order

Page 677

1    THE WITNESS:  I think Binsol
2  would be in a much better position
3  to tell you exactly what the
4  situation is today.
5 BY MR. STANOCH:
6    Q.   You don't know, one way or
7  the other, whether there was sufficient
8  samples at Teva Jerusalem's facility such
9  that 16 metric tons of Mylan valsartan
10  API could be destroyed, right?
11    A.   I explained to you that
12  samples that are received are tested,
13  samples are maintained.  So those
14  procedures are in place.
15    Q.   Right.  But you said that
16  you don't know whether or not those
17  procedures were followed at Teva
18  Jerusalem vis-à-vis the Mylan valsartan
19  API, right?
20    A.   That's not what I said.
21  That's not what I said.
22    What I said was that our
23  internal audit processes have not
24  indicated that those procedures are not

Page 678

1  being followed.
2    Q.   And Teva Jerusalem's
3  incoming testing specifications didn't
4  catch the NDMA and NDEA for years, right?
5    A.   The analytical test methods
6  that were used at Teva Jerusalem were
7  designed to fulfill the specifications
8  set by the regulators.
9    Q.   Can you tell me whether or
10  not there exists adequate samples at Teva
11  Jerusalem of the Mylan valsartan API that
12  Teva incinerated?
13    A.   Let me clarify something,
14  that Teva Jerusalem does not -- facility,
15  does not exist anymore.
16    So your question is one that
17  needs to be answered by somebody who now
18  knows where is it that samples and
19  documents and material from the Teva
20  Jerusalem facility are located.  So I'm
21  not able to speak about that.
22    Q.   That's a fair point, sir.
23    Do you know where any
24  valsartan API samples are today that

Page 679

1  might have been at Teva's Jerusalem
2  facility?
3    A.   I do not know.  I don't work
4  for the company anymore.  So they could
5  have been sent to whatever facilities the
6  company decided to send them to.
7    Q.   You have no knowledge, one
8  way or the other, about that, right?
9    A.   Not -- not today.
10    Q.   Right.  And you did not look
11  into that to prepare for today's
12  deposition, right?
13    A.   I did not.  Mr. Binsol would
14  be in a much better position.
15    MS. LOCKARD:  Again,
16  objection.  This question is
17  outside the scope.  The retention
18  of the API is outside of the scope
19  of the notice.
20    And the testing is outside
21  the scope of the notice and what
22  he was designated for.
23 BY MR. STANOCH:
24    Q.   And because the Teva

Page 680

1  Jerusalem facility no longer exists
2  today, as you stated, you don't know, one
3  way or the other, what the status or
4  sufficiency of any valsartan API samples
5  might have been vis-à-vis the Mylan
6  valsartan API that was incinerated by
7  Teva?
8    A.   What I'm stating --
9    MS. LOCKARD:  Objection.
10  Vague.
11    THE WITNESS:  What I'm
12  stating is that any discussions
13  about where Teva materials in
14  Jerusalem, where -- where they
15  have gone and what sort of process
16  is in place for managing those
17  materials.  This is something that
18  is outside of my knowledge at this
19  point.
20 BY MR. STANOCH:
21    Q.   You don't know what
22  valsartan API samples were kept at Teva
23  Jerusalem at the time nor which -- nor
24  what samples may exist today, fair?

Confidential Information - Subject to Protective Order

Page 681

1 MS. LOCKARD: Objection.
2 Asked and answered. Outside the
3 scope of the deposition notice for
4 Mr. Barreto.
5 THE WITNESS: I indicated to
6 you that there are procedures in
7 place for the receipt and
8 preservation of samples of
9 products that are received.
10 BY MR. STANOCH:
11 Q. And you have no information,
12 one way or the other, what the samples
13 were that were retained at Teva Jerusalem
14 of valsartan API or where they may be
15 today, correct?
16 MS. LOCKARD: Objection.
17 Asked and answered.
18 THE WITNESS: Today, I have
19 no knowledge of where any
20 materials preserved are located
21 from the former Teva Jerusalem
22 facility.
23 BY MR. STANOCH:
24 Q. Do you know anything about

Page 682

1 the number of valsartan API samples that
2 had been kept at Teva Jerusalem prior to
3 its closure?
4 MS. LOCKARD: Objection.
5 Outside the scope of his
6 deposition notice.
7 THE WITNESS: In terms of
8 the expectation, the answer is
9 that the procedures in place call
10 for every lot to -- that is
11 shipped to be -- to be sampled and
12 to be preserved.
13 BY MR. STANOCH:
14 Q. But you didn't look into
15 whether or not those procedures were
16 followed, did you?
17 A. As I have indicated to you,
18 the internal procedures that we have in
19 place do not indicate that those
20 procedures -- the processes for auditing
21 and supervising and monitoring, do not
22 indicate that those procedures have not
23 been followed.
24 Q. If you're going to say

Page 683

1 auditing, sir, the audits only happen
2 very periodically, don't they?
3 A. The audit process is not the
4 only way to ascertain whether or not a
5 site is in compliance. There is a
6 concept of, you know, quality assurance
7 organization that does, also, its own
8 internal -- local internal audits. So --
9 and there's quality councils. There's
10 all forms of supervision and monitoring.
11 Q. Sitting here today, can you
12 tell me whether Teva's Jerusalem facility
13 had samples of every Mylan valsartan API
14 lot that was incinerated?
15 MS. LOCKARD: Objection.
16 Outside the scope of this
17 witness's deposition notice.
18 THE WITNESS: As I indicated
19 to you, there are procedures in
20 place that dictate the collection
21 and preservation of samples of
22 APIs received.
23 BY MR. STANOCH:
24 Q. Right. And can you tell me

Page 684

1 from which Mylan valsartan API lots all
2 the samples that might have been on hand
3 at Teva Jerusalem came from?
4 A. That is information I don't
5 have at my disposal at this moment.
6 MS. LOCKARD: And objection.
7 It's outside the 30(b)(6)
8 deposition notice.
9 MR. STANOCH: All right.
10 Why don't we take a break?
11 THE WITNESS: Okay.
12 VIDEO TECHNICIAN: The time
13 is now 2:53 p.m. We are going off
14 the record.
15 - - -
16 (Whereupon, a brief recess
17 was taken.)
18 - - -
19 VIDEO TECHNICIAN: The time
20 is now 3:11 p.m. Back on the
21 record.
22 MR. STANOCH: Mr. Barreto,
23 thank you for your time today and
24 yesterday. I appreciate it. I

Confidential Information Subject to Protective Order

Page 685

1  have no further questions at this
2  time.
3      I'll reserve my remaining
4  time for re-cross.  I'll pass it
5  to Ms. Lockard.  Thank you.
6      THE WITNESS:  I appreciate
7  the opportunity to work with you.
8      MS. LOCKARD:  Let me ask, I
9  assume nobody -- none of the other
10 parties have questions, at this
11 point, of Mr. Barreto?
12     Okay.  How much time do --
13 have we been on the record?
14     VIDEO TECHNICIAN:  Today?
15 Four hours and 16 minutes.
16     MS. LOCKARD:  Today, four
17 hours and 16 minutes?
18     VIDEO TECHNICIAN:  Yes.
19     MS. LOCKARD:  Okay.
20     All right.
21       - - -
22       EXAMINATION
23       - - -
24 BY MS. LOCKARD:

Page 686

1      Q.   All right.  Mr. Barreto,
2  just for the record, I'm Victoria
3  Lockard, your counsel and counsel for
4  Teva, as you're aware.  And I'm going to
5  follow up on some questions here.
6      A.   Okay.  Thank you.
7      Q.   So I'm going to jump around
8  and take you all the way back to some of
9  the discussions from yesterday as well.
10     A.   Okay.
11     Q.   Let me just ask you for
12 clarification.
13         Is it -- do you have an
14 understanding as to whether Teva has any
15 valsartan product currently on the market
16 in the United States?
17     A.   There is no product.
18     MR. STANOCH:  Objection to
19 form.
20     Go ahead.
21 BY MS. LOCKARD:
22     Q.   So do you have any
23 understanding as to whether or not there
24 are any -- there is any valsartan

Page 687

1  labeling that is being used in the United
2  States, FDA-approved labeling?
3      A.   No.
4      Q.   That's not being used
5  currently; is that correct?
6      A.   Correct.
7      Q.   And as a generic
8  manufacturer, do you have any
9  understanding regarding compliance
10 with -- of a generic, compliance with the
11 labeling of the reference branded drug?
12     A.   There is compliance.
13     Q.   But do you -- why is there
14 compliance, in terms of the generic
15 being -- and having to match the
16 referenced drug?
17     A.   Can you clarify the
18 question, please?
19     Q.   That was a bad question.
20         So is it -- does it -- does Teva, from
21 your perspective in quality, if you
22 understand this, Teva, does it generate
23 its own -- and did it generate its own
24 labeling language for the valsartan

Page 688

1  product when it was on the U.S. market?
2      A.   That is correct.
3      Q.   Does it -- did the Teva
4  generic brand labeling conform to the
5  branded -- reference listed branded
6  drug's labeling?
7      A.   That is correct.
8      MR. STANOCH:  Objection to
9  form.
10 BY MS. LOCKARD:
11     Q.   And are you aware of any
12 requirement for a generic manufacturer
13 that their labeling must conform to the
14 branded referenced listed drug?
15     MR. STANOCH:  Objection.
16 Sorry.  Objection to form.
17     THE WITNESS:  The
18 expectations are that the generic
19 drug product must comply with the
20 labeling requirements for -- to
21 generate product.
22 BY MS. LOCKARD:
23     Q.   And in quality, and you're
24 in quality, did you have any involvement

Page 689

¹ in terms of input on what the language of
² the labeling would be for a generic drug
³ like valsartan?
⁴      A.   No.
⁵      Q.   Whose responsibility was
⁶ that?
⁷      A.   That would be -- that would
⁸ be mostly the regulatory organization.
⁹      Q.   Earlier today -- and do you
¹⁰ have access to your exhibits?
¹¹      A.   Yes.
¹²      Q.   If I can direct you, you
¹³ were asked about Exhibits-173 and 174,
¹⁴ which were e-mail discussions with
¹⁵ respect to sales of other sartans in
¹⁶ other countries.
¹⁷      A.   Do you want me to open 173
¹⁸ first?
¹⁹      Q.   Sure.  Go ahead and pull up
²⁰ 173.
²¹      A.   Okay.  Yes.
²²      Q.   Did these e-mails, 173 or
²³ 174, did these e-mails suggest that Teva
²⁴ was diverting product it could not sell

Page 690

¹ in the U.S. to other countries?
²      A.   No.
³      Q.   Does this -- do the e-mails
⁴ indicate that Teva was selling valsartan
⁵ to other countries after it stopped
⁶ selling on the United States market?
⁷      A.   The proposal of the e-mail
⁸ was to look for sartan solutions, not
⁹ necessarily valsartan, that could be used
¹⁰ to fulfill the expectations that we had
¹¹ for risk/benefit access of patients to
¹² medication.
¹³      Q.   And -- okay.  So when you
¹⁴ say "sartan solutions," what do you mean
¹⁵ by that?
¹⁶      A.   There are different types of
¹⁷ drugs within the sartan category.  You've
¹⁸ got losartan in this case; you've got
¹⁹ irbesartan; and there are other sartans
²⁰ that could represent alternative
²¹ solutions to meet the needs of patient
²² access.
²³      Q.   And if you look at the
²⁴ bottom of the e-mail, I believe 173, what

Page 691

¹ started this discussion, it looks like
² there was reference to an article.
³      Do you see that?
⁴      A.   Yes, I do.
⁵      Q.   Do you have an understanding
⁶ of what that article said or what it
⁷ conveyed?
⁸      A.   That is -- that is correct.
⁹ It's -- the concern is about the extent
¹⁰ to which our actions, whatever they were
¹¹ going to be, would impact on drug
¹² shortage -- on the drug shortage
¹³ situation.
¹⁴      Q.   And so there was a
¹⁵ discussion about the use of losartan?
¹⁶      A.   That is correct.
¹⁷      Q.   Was that one of the sartan
¹⁸ solutions that was being discussed?
¹⁹      A.   That is correct.
²⁰      Q.   And ultimately, it looks
²¹ like, Mr. Vanderween asks for your
²² impression with regard to use of losartan
²³ or other sartans in other markets aside
²⁴ from the U.S.?

Page 692

¹      A.   Correct.  So we were looking
² for whatever best solution would fulfill
³ expectations of patient access.
⁴      Q.   And do you see your response
⁵ on Exhibit Number 173?
⁶      A.   You're speaking about March
⁷ 27th at 2026 at the top?
⁸      Q.   My computer just froze.
⁹      Yes. So I'm looking at the
¹⁰ March 27th, 2019, e-mail that is at 2026.
¹¹      A.   Correct.
¹²      Q.   And if you follow along, it
¹³ says, I think the specific country
¹⁴ colleagues can work this out with their
¹⁵ respective authorities.  Every authority
¹⁶ has its own perspective on how to deal
¹⁷ with patient access and patient safety.
¹⁸      Do you see that?
¹⁹      A.   That is correct.  I see it.
²⁰      Q.   What did you mean by those
²¹ statements?
²²      A.   The meaning of the statement
²³ is that it was our responsibility to
²⁴ ensure that we could provide to the

Confidential Information Subject to Protective Order

1 authorities options that they would have
2 to consider in terms of ensuring that
3 they could have the ability to provide
4 their patient population, knowing that no
5 access was also a safety issue, an
6 important one.
7         In the end, the objective
8 was that it was the regulatory authority
9 of each country with which we discussed,
10 the one that would make the decision as
11 to whether or not a product could be
12 allowed for use in their respective
13 jurisdiction.
14     Q.   So did Teva, then,
15 coordinate with the regulatory
16 authorities in each of these countries in
17 order to reach a conclusion about whether
18 or not other sartans could continue to be
19 marketed in countries like Chile?
20     A.   That is correct, we did.
21     Q.   And, to your knowledge, did
22 Teva ever distribute or sell any sartan
23 product that was in excess of any
24 requirements, limitation or regulations

1 for nitrosamine levels in any country?
2         MR. STANOCH:  Objection to
3     form.
4         THE WITNESS:  No.
5 BY MS. LOCKARD:
6     Q.   You briefly, way back,
7 yesterday, early in the day, you
8 mentioned that you had worked for the
9 FDA, correct?
10     A.   That is correct.
11     Q.   When did you work for the
12 FDA?
13     A.   I started in 1977.  I spent
14 19 and-a-half years with the agency.  And
15 so I was a drug specialist or consumer
16 safety officer working with the
17 inspection of complex operations,
18 manufacturing operations in the
19 pharmaceutical industry.
20     Q.   So what did your roles
21 entail during that almost 20 years you
22 worked for the FDA?
23     A.   My roles included being an
24 analyst.  I was a consumer safety officer

1 or investigator.  I was a supervisor of
2 investigators.  I worked several -- under
3 several conditions in the headquarters
4 organization assisting with policies.  I
5 worked with the ICH process on their
6 special projects.  I did international
7 inspections.  And I also did criminal
8 investigations for the agency.
9     Q.   And in your experience with
10 the FDA, did you have occasion to receive
11 and review field alerts?
12     A.   Yes, I did.
13     Q.   And did you have an
14 occasion, with your experience at FDA, to
15 receive and review health hazard
16 assessments?
17     A.   Yes, I did.
18     Q.   And did you, in your
19 experience at FDA, have occasion to
20 review or to prepare 483s?
21     A.   I did.
22     Q.   And same with respect to
23 EIRs, in connection with your work at
24 FDA, were part of your involvement -- did

1 that also involve preparing or reviewing
2 EIRs and responses thereto?
3     A.   I did.
4     Q.   Okay.  So did you rely on
5 any of your FDA experience when you were
6 at Teva in order to fulfill your role as
7 the head of quality at Teva?
8     A.   I had the FDA experience
9 looking at the regulations as a regulator
10 and then, obviously, from my years of
11 experience in the industry, applying the
12 regulations in a practical manner.
13     Q.   And, to your knowledge, is
14 that, in fact, one of the reasons why you
15 were hired at Teva, because of this long
16 history with the FDA and ability to
17 understand those processes?
18         MR. STANOCH:  Objection to
19     form.
20         THE WITNESS:  As I
21     understand it, that was a critical
22     factor in my selection.
23 BY MS. LOCKARD:
24     Q.   Your expertise does not

Page 697

1 include toxicology?
2     A.   I'm not a toxicologist.
3     Q.   Did Teva have a toxicologist
4 on board to review issues related to
5 genotoxic impurities?
6     A.   That would be correct.
7     Q.   Who was the toxicologist?
8     A.   That would be Rafi Nudelman.
9     Q.   And did you work with Rafi
10 Nudelman in connection with the
11 nitrosamines issue?
12     A.   On many occasions, that's
13 what we did; we coordinated, yes.
14     Q.   And you were asked some
15 questions about carcinogenicity or
16 potency of a mutagenic carcinogen and
17 questions of that nature.
18         Do you recall those from
19 yesterday?
20     A.   I do.
21     Q.   And are those areas within
22 your expertise?
23     A.   They are not.
24     Q.   Are these areas in which you

Page 698

1 would defer?
2     A.   I would defer any
3 conclusions or assessments that would be
4 made in that area to Dr. Nudelman.
5     Q.   You were asked about why the
6 word "potent" appears in some documents
7 but not in others, and specifically why
8 it doesn't appear in the recall notice.
9         Do you recall that?
10     A.   I do.
11     Q.   And was it your decision --
12 your decision not to include the word
13 "potent" in the recall?
14     A.   In preparation of the recall
15 notice, we put the information that we
16 felt that was important to present to the
17 FDA.  I had no specific considerations in
18 the selection of words, only to put the
19 facts together the best way I knew it.
20 Yes.
21     Q.   Okay.  So you were involved
22 in crafting of that recall notice, along
23 with others at Teva --
24     A.   Correct.

Page 699

1     Q.   -- is that right?
2         But was it -- was it a
3 specific decision of yours to omit the
4 word "potent"?
5     A.   No.
6     Q.   Do you recall any effort at
7 Teva to hide the word "potent" from the
8 recall notice?
9     A.   No.
10     Q.   Do you recall any
11 discussions specifically about whether or
12 not potent should be in or out of the
13 recall notice?
14     A.   No.
15     Q.   Was the word "potent," was
16 it necessary in order to convey the class
17 or the level of the recall?
18         MR. STANOCH:  Objection to
19     form.
20         THE WITNESS:  In my opinion,
21     and based on my experience, what
22     we wanted to put together was a
23     statement that would reflect the
24     facts of the case as we knew them

Page 700

1 at the time.  And that's what we
2     did.
3 BY MS. LOCKARD:
4     Q.   And was -- did FDA have any
5 input into the recall notice?
6     A.   Yes.  They actually perform
7 a review.  And in that review they would
8 propose that we put certain words,
9 certain terms.  And whatever
10 recommendations they make, we
11 incorporate.
12     Q.   Did FDA make any
13 recommendations to include the word
14 "potent"?
15     A.   No, they did not.
16     Q.   If -- from your experience
17 at FDA, if FDA had wanted the word
18 "potent" to be included, what options
19 could they do --
20     A.   They would have included
21 that as part of their recommendation.
22     Q.   You were asked some
23 questions about a Mylan product hold for
24 the finished dose that was made with the

Page 701

1  Mylan API. I believe that was yesterday.
2       Do you recall?
3       A.   I recall that question, yes.
4       Q.   And what is your
5  understanding about whether or not the
6  Mylan API valsartan was put on hold at
7  any point in time?
8       A.   So the reason for the
9  putting of -- hold of the Mylan product
10  at the time we knew about the ZHP
11  situation, was intended as a conservative
12  approach to immediately assess the extent
13  to which, you know, we needed to turn
14  that immediate recall into a more --
15  let's say into a longer hold. And that
16  was not the case.
17       Q.   Okay. So what was Teva's
18  justification for releasing the Mylan API
19  product --
20       MR. STANOCH: Objection to
21       form.
22       THE WITNESS: Again, at the
23       time when we placed the product on
24       hold, we didn't have any reason to

Page 702

1       put it on hold other than the
2       issue that was associated with
3       ZHP. There was no direct link.
4       So when we removed it, we
5       did it based on the fact that at
6       the time, we did not have any
7       specific information that would
8       indicate that there was any
9       problem with the Mylan product.
10  BY MS. LOCKARD:
11       Q.   Okay. And, you know, is
12  there -- would there be any benefit to
13  patients' interest in releasing that
14  product from hold?
15       MR. STANOCH: Objection
16       to --
17       THE WITNESS: Absolutely.
18       MR. STANOCH: Objection to
19       form.
20  BY MS. LOCKARD:
21       Q.   What was the interest -- how
22  could that benefit patients, to release
23  product from the hold in this situation?
24       MR. STANOCH: Same

Page 703

1  objection.
2       THE WITNESS: So, the ZHP
3       hold, with the understanding that
4       this was going to cause a
5       significant drug shortage, was
6       sufficient reason for us, then, to
7       consider other options that we had
8       at hand.
9       And at the time, we had no
10       reasons to believe that the Mylan
11       product needed to be placed on
12       hold. So at that point, we felt
13       that it was important to continue
14       distributing product to ensure
15       patient access to medication.
16       VIDEO TECHNICIAN: The time
17       is 3:29 p.m. Going off the
18       record.
19       - - -
20       (Whereupon, a brief recess
21       was taken.)
22       - - -
23       VIDEO TECHNICIAN: The the
24       time is now 3:32 p.m. Back on the

Page 704

1       record.
2  BY MS. LOCKARD:
3       Q.   So before the break, I was
4  asking you about the reasons why Teva
5  would not -- the reasons why Teva would
6  release the Mylan product from its hold.
7       And so you had mentioned
8  that the -- you were balancing the
9  shortage concern in an instance.
10       What do you mean by -- what
11  did you mean by that?
12       A.   So in every consideration
13  when you put product on hold, one of the
14  expectations that regulators have is,
15  what is going to be the impact of that
16  action that you're going to take?
17       So we are well aware of the
18  regulatory expectations. So we're
19  looking for two things. One is the --
20  not creating a drug shortage situation
21  that would -- could put patients' access
22  to the medication at risk. And then, of
23  course, making sure that there is patient
24  access itself, because -- because of a

Page 705

1 potential safety issue for the patient if
2 the medication is not available.
3       So it was -- it was one of
4 those decisions where you have to look
5 for that balance, with the understanding
6 that, in the end, what you're seeking is
7 to ensure patients' access and safety.
8       Q.   And at the time that that
9 hold was released, was there any testing
10 or evidence that Mylan's API was --
11 contained the nitrosamine impurity?
12       MR. STANOCH:  Objection.
13       THE WITNESS:  That is --
14    that was at a time when the only
15    knowledge that we had of any
16    contamination issue or impurity
17    present in API, such as valsartan,
18    was related only to the ZHP.  We
19    had no reason to believe, at that
20    point, that not only Mylan, but
21    any other distributors of product,
22    would have the same situation.
23       So from our perspective, we
24    didn't have any reasons to put the

Page 706

1    product on hold.
2 BY MS. LOCKARD:
3       Q.   Okay.  And let me ask that
4 question just slightly different.
5       Did Teva have any
6 information, from Mylan or otherwise,
7 when Teva released the hold that
8 indicated the product -- the API
9 contained nitrosamines impurities?
10       MR. STANOCH:  Objection to
11    form.
12       THE WITNESS:  No.
13       MR. STANOCH:  Mr. Barreto,
14    I'm just going to ask that you
15    wait ten seconds to let me object
16    if I need to.  Thank you.
17       THE WITNESS:  Thank you.  My
18    apologies, counsel.
19 BY MS. LOCKARD:
20       Q.   Okay.  So you were asked
21 yesterday, I believe, about the reduced
22 testing program at the Jerusalem site.
23       Do you recall that?
24       A.   Yes.

Page 707

1       Q.   And is the -- was the
2 reduced testing program -- is that a
3 reduction in frequency or the kinds of
4 tests or something else?
5       A.   The reduced testing program
6 involves the frequency with which you
7 implement the testing activities that are
8 required for an API in this case.
9       And that is justified by the
10 established history of reliability of
11 that API performance.
12       Q.   Did the fact that that API
13 was on a reduced testing schedule -- in
14 your root cause analysis, did you
15 determine that the reduced testing
16 program in any way contributed to the
17 nitrosamine presence?
18       MR. STANOCH:  Objection to
19    form.
20       THE WITNESS:  No.
21 BY MS. LOCKARD:
22       Q.   And did -- in your analysis
23 and investigation, did -- was there any
24 conclusion that that reduced testing

Page 708

1 program in any way delayed or prevented
2 the detection of the nitrosamine issue?
3       MR. STANOCH:  Objection to
4    form.
5       THE WITNESS:  No, because
6    the test method that was used for
7    both reduced testing and, let's
8    say, batch-after-batch testing was
9    the same one.
10       And that analytical test
11    method would not allow the company
12    to detect the impurities that
13    would have -- that would be
14    detected.  You need a different
15    analytical test method to achieve
16    that.
17 BY MS. LOCKARD:
18       Q.   So would the -- would the
19 outcome or the timeline for the discovery
20 of nitrosamines, would that have been any
21 different if that API supply had not been
22 on a reduced testing program?
23       MR. STANOCH:  Objection to
24    form.

Confidential Information Subject to Protective Order

---

Page 709

1      THE WITNESS:  The outcome
2   would not have changed in the end,
3   because whether you did reduced
4   testing or full testing, you would
5   not have been able to detect this
6   impurity.
7   BY MS. LOCKARD:
8      Q.   So you were also shown some
9   EIRs regarding observations found at the
10  Teva facility where valsartan was
11  manufactured in Jerusalem.
12      Do you recall those
13  documents?
14      A.   Yes, yes.
15      Q.   And from your review of
16  those -- had you reviewed those prior to
17  your deposition?
18      A.   Yes.
19      Q.   And do any of those EIRs or
20  483s from Teva's Jerusalem facility, did
21  they involve nitrosamines?
22      A.   No.
23      Q.   Did any of those EIRs or
24  483s involve any impurity -- or the

---

Page 710

1   detection or failure to detect any
2   impurity in valsartan?
3      MR. STANOCH:  Objection to
4   form.
5      THE WITNESS:  No.
6   BY MS. LOCKARD:
7      Q.   All right.  There was -- let
8   me ask you this:  In response to a 483,
9   is it typically Teva's practice to issue
10  a formal response back to the FDA?
11      A.   It is a practice.
12      Q.   And with respect to EIRs, is
13  Teva's practice to, likewise, respond to
14  those EIRs to the FDA?
15      A.   The EIR is the outcome of a
16  process whereby, if a 483 was issued and
17  a response was submitted, the EIR comes
18  later on, after you have not only
19  received the 483 but also after you have
20  provided a response to -- to the FDA.
21      Q.   And that was probably a poor
22  question on my part.
23      But the EIR from the FDA,
24  does that typically address whether or

---

Page 711

1   not the issues raised in the 483s have
2   been resolved?
3      A.   Yes.
4      May I correct?  Two things,
5   whether they were resolved because we
6   resolved them during inspection or we
7   submitted corrective actions -- evidence
8   of corrective actions of completion prior
9   to the issuance of the EIR, or whether we
10  made a commitment to corrective actions
11  that the agency understands those
12  corrective actions would be acceptable.
13      Q.   And does Teva have policies
14  that require that process to be done,
15  meaning they have to implement corrective
16  actions in response to a 483?
17      A.   Yes.
18      Q.   And did you see -- in terms
19  of the issues that were discussed in the
20  483s or EIRs that you were shown for
21  Teva, do you have any reason to think
22  that Teva would not have corrected any
23  observations that were noted?
24      MR. STANOCH:  Objection to

---

Page 712

1   form.
2      THE WITNESS:  No.
3   BY MS. LOCKARD:
4      Q.   You were also shown the 2016
5   internal audit of the Jerusalem facility
6   by Teva.
7      Do you recall that?
8      A.   I do.
9      Q.   And if you need to look at
10  those documents, I have the exhibit list.
11  I can direct you if you need to.
12      But so did Teva have a
13  program for internal auditing of its own
14  facilities?
15      A.   Teva has a program for
16  what's called self-inspection, which
17  means that the facilities do their own
18  internal audit.  And then there's a
19  corporate audit program where corporate
20  auditors go to each facility to perform
21  the audit, a GMP audit.
22      Q.   Okay.  So in this instance,
23  for the 2016 audit of the Jerusalem
24  facility, was that a corporate audit that

---

Confidential Information Subject to Protective Order

---

Page 713

1 was performed?
2      A.    That was a corporate audit,
3 yes.
4      Q.    And what are the purposes of
5 such corporate audits?
6      A.    Every corporate audit is
7 part of the process whereby companies
8 pursue what I called self-regulation.
9           So what that means is that
10 the audit is intended for the companies
11 to find their own deficiencies, to then
12 identify corrective actions for those
13 deficiencies, and to improve the state of
14 compliance of the facilities to that
15 corrective action program.
16      Q.    And in this instance, do you
17 believe that Teva initiated the
18 corrective actions in response to the
19 findings in the 2016 audit?
20      A.    Yes.
21           MR. STANOCH:  Objection to
22 form.
23           THE WITNESS:  Sorry,
24 counsel.

---

Page 714

1 BY MS. LOCKARD:
2      Q.    Is there any reason to think
3 that any of those issues that were
4 discovered remained unaddressed or
5 uncorrected?
6      A.    No.
7      Q.    Have you seen or learned
8 anything that would indicate to you that
9 the issues addressed in the 2016
10 corporate audit had any impact on Teva's
11 ability to detect nitrosamines in
12 valsartan API?
13           MR. STANOCH:  Objection to
14 form.
15           THE WITNESS:  No.
16           And, again, the reason for
17 that is that the analytical test
18 methods that were used to evaluate
19 the quality profile of the APIs
20 were test methods that would not
21 allow you to detect those
22 impurities.
23 BY MS. LOCKARD:
24      Q.    Okay.  And so were there any

---

Page 715

1 applicable pharmaceutical regulations,
2 standards or limits related to
3 nitrosamines prior to 2018?
4      A.    No.  Nor were there any
5 guidance from any regulatory authorities.
6      Q.    And you were asked about
7 capabilities that Teva may have had to
8 perform testing to identify nitrosamines.
9           Do you recall that line of
10 questioning?
11      A.    I do.
12      Q.    And did Teva have a
13 methodology, prior to 2018, for
14 identifying nitrosamines?
15      A.    No.
16      Q.    And in order to develop the
17 testing, what does Teva, or others in the
18 industry, need to do before they can
19 implement such testing?
20      A.    As I indicated yesterday,
21 you need to identify the right piece of
22 equipment that you would use for the
23 testing.  And then you would need to
24 develop an analytical test method that

---

Page 716

1 would allow you to have that method
2 implemented.
3           But in the end, that
4 analytical test method has to be a
5 validated test method.  So it has to
6 fulfill specific expectations for what a
7 validated test method is.
8      Q.    What do you mean by
9 validation of the test method?
10      A.    So there are a number of
11 factors that are considered, like
12 reproducibility, repeatability -- I'm
13 trying to remember now the other terms
14 that were used -- robustness, that sort
15 of a factor, that you have to demonstrate
16 that the method can fulfill those
17 expectations.
18      Q.    So did -- so now there is
19 one or more methodologies for detection
20 of NDMA, correct?
21      A.    Can you repeat the question?
22 My apologies.
23      Q.    Sure.
24           There -- currently there are

---

Confidential Information - Subject to Protective Order

1 one or more methodologies for detection
2 of NDMA --
3      A.   That is correct.
4      Q.   And the methodology for NDEA
5 has also been developed?
6      A.   That is correct.
7      Q.   Okay.  And are those the
8 same methodologies, to your knowledge?
9      A.   To my knowledge, that may
10 not be the case.  Each -- and this is
11 where a little bit of the complexity
12 comes up.
13           If you have a test method
14 for NDMA for tablets, finished drug
15 product, that test method may or may not
16 be applicable to an API.  You may -- you
17 may have the need to adjust that method
18 to make it applicable to the API or vice
19 versa.
20           The same for NDEA.  Your
21 NDMA method may not be automatically
22 suitable for you to test for NDEA.  So
23 you have to demonstrate -- and you could
24 probably do it, but you still have to

1 demonstrate that that's the case.
2      Q.   Okay.  So are you saying
3 that if you have a methodology for NDMA,
4 that does not necessarily mean that
5 methodology would work for NDEA?
6      A.   That is correct.
7      Q.   And does the methodology
8 differ depending on the process or --
9 either the process or the root cause for
10 the presence of the nitrosamines?
11      A.   That is correct.
12      Q.   You were also asked about
13 Teva's various facilities having the
14 presence of a gas chromatography machine.
15           Do you remember that?
16      A.   I do.
17      Q.   And are there different
18 kinds of gas chromatography machines?
19      A.   That is correct.  And, you
20 know, you've got GC-MS, and then you've
21 got GC with -- for which you may
22 different detectors, like, yesterday
23 counsel talked about NP detector.
24           So not all sites would have

1 the same capabilities.  And that was part
2 of the discussion we were having.
3      Q.   So as you sit here today, do
4 you know whether the GC machines that
5 Teva had, prior to 2018, had the
6 detection capabilities to detect
7 nitrosamine, either NDMA or NDEA?
8           MR. STANOCH:  Objection to
9      form.
10           THE WITNESS:  Mr. Binsol
11      will speak a little bit more about
12      that, on the details.
13           But that was part of the
14      strategic approach that we were
15      taking, trying to identify whether
16      the different facilities had all
17      the capabilities that were
18      necessary for us to implement the
19      test -- the analytical test
20      methods.
21 BY MS. LOCKARD:
22      Q.   You had one comment
23 yesterday, just briefly, about FDA
24 advising that patients continue to take

1 their medications.
2           Do you recall that?
3      A.   I do.
4      Q.   Why was that noteworthy to
5 you?
6      A.   It was important because
7 it's part of that process, where even
8 when the -- we -- FDA was telling us to
9 advise -- giving us advice on the recall
10 activity, the advice was that patients
11 needed to still have a discussion with
12 their healthcare professionals and
13 pharmacists to ensure that the safety of
14 the patient, from access to the
15 medication, could be ascertained.
16           So my take on this is that
17 FDA understood that this was a very
18 important and critical point where
19 patient safety and the risk/benefit ratio
20 had to be taken into consideration.
21      Q.   To your knowledge, did any
22 of the recalled valsartan that was for
23 sale in the United States fail to meet
24 applicable specifications at the time?

Page 721

1          MR. STANOCH:  Objection to
2     form.  Vague.
3          THE WITNESS:  Yes.
4  BY MS. LOCKARD:
5     Q.    So while we understand the
6  criticism here is that Teva and others
7  did not identify nitrosamines,
8  notwithstanding that, did the recall of
9  valsartan meet its applicable
10 specifications?
11         MR. STANOCH:  Objection to
12    form.
13         THE WITNESS:  Can you
14    clarify the question, please?
15 BY MS. LOCKARD:
16    Q.   I can.
17         Despite the -- despite the
18 absence of any knowledge regarding the
19 presence of nitrosamines in the valsartan
20 used for the U.S. market, did the Teva
21 valsartan meet its applicable
22 specification at all times?
23    A.   Understood.
24         MR. STANOCH:  Objection to

Page 722

1     form.  It was asked and answered.
2          THE WITNESS:  Yes.  They met
3     the established specification,
4     correct.
5  BY MS. LOCKARD:
6     Q.   Okay.  Why, in your view,
7  was the industry caught by surprise by
8  this nitrosamine issue?
9          MR. STANOCH:  Objection to
10    form.  Leading.
11         MS. LOCKARD:  What is
12    leading about that?
13         MR. STANOCH:  It lacks
14    foundation, counsel.  He never
15    testified to any surprise.  This
16    wasn't even part of the scope of
17    the topics.
18         MS. LOCKARD:  His topic
19    includes --
20         MR. STANOCH:  You can't put
21    "why" in front of the question --
22    a leading question and convert it
23    to a direct question, counsel.  I
24    object.

Page 723

1  BY MS. LOCKARD:
2     Q.   Was the industry caught by
3  surprise by nitrosamines, Mr. Barreto?
4          MR. STANOCH:  Objection to
5     form.  Lacks foundation.
6          THE WITNESS:  I think that
7     there was -- it was very clear in
8     the message that the regulators
9     generated that this impurity was
10    unexpected.  And if something is
11    unexpected and all of the sudden
12    is present, then of course, this
13    is a surprise.
14         And what makes it a surprise
15    is that, first, when you look at
16    the ZHP, I mean, you are --
17    situation -- you're talking about,
18    you know, traces of diethylamine
19    coming in contact with nitrous
20    acid.  This is something that was
21    not predicted.  So if it was not
22    predicted, of course you're going
23    to be surprised.
24 BY MS. LOCKARD:

Page 724

1     Q.   So why was the industry
2  caught by surprise by the nitrosamine
3  issue?
4     A.   From my perspective, there
5  was no FDA guidance around this.  So the
6  regulators, you know, and not only in the
7  U.S. but in Europe and other countries,
8  no -- there's no indication anywhere in
9  any guidance, in any regulation,
10 including the Pharmacopeia, that we
11 needed to test for something that was not
12 expected to be there.
13         So I think that it was not
14 just the industry, but regulators did not
15 know about this either.
16    Q.   Okay.  You were asked a lot
17 of questions about the timing of the
18 field alert that was submitted initially
19 on July 3rd, 2018.
20         Do you recall that?
21    A.   Yes.
22    Q.   And what is the purpose of
23 the field alert?
24    A.   As I indicated yesterday,

Page 725

¹ the purpose of a field alert is to
² provide a signal to the regulatory agency
³ that the filer of the field alert report
⁴ has an indication that a product that is
⁵ in distribution within the United States
⁶ may be the subject of a quality or safety
⁷ issue.
⁸        Q.    So the -- not just any
⁹ quality issue rises to the level of a
¹⁰ field alert, correct?
¹¹        A.    That is correct.
¹²        Q.    And so what is the criteria
¹³ for a reportable event, as it would apply
¹⁴ in this case?
¹⁵        A.    So it -- it should be one
¹⁶ that gives the regulators the -- the
¹⁷ perspective that, in our opinion, based
¹⁸ on the initial findings that we have
¹⁹ made, that there may be a potential
²⁰ action against product on the market.
²¹        And it is in our best
²² interest to let the regulators know so
²³ that they are advised.
²⁴        Q.    Under the regulations, does

Page 726

¹ it need to be a significant quality
² issue?
³        MR. STANOCH:  Objection.
⁴        THE WITNESS:  It is -- it is
⁵        my opinion that not all issues
⁶        rise to that level.  So
⁷        significant, meaning, again, that
⁸        there is a potential impact on
⁹        quality and safety, and that
¹⁰        that's a suspicion.
¹¹ BY MS. LOCKARD:
¹²        Q.    And in order for it to rise
¹³ to a reportable event, does it have to be
¹⁴ one that impacts product in distribution?
¹⁵        A.    That is correct.
¹⁶        Q.    Who at Teva makes the
¹⁷ decision as to whether information
¹⁸ received from a supplier would meet the
¹⁹ criteria for a reportable event?
²⁰        A.    That would be the quality
²¹ organization at the different sites, and
²² then that discussion is escalated at the
²³ corporate level.  And then that
²⁴ submission is made to the FDA.

Page 727

¹        Q.    Okay.  So is the decision
² one of quality or regulatory, or is it
³ both?
⁴        A.    It is a quality decision.
⁵ It is a quality decision.
⁶        You may have input from
⁷ other organizations, like regulatory.
⁸ But at the end, it's a quality decision.
⁹        Q.    Okay.  When did Teva --
¹⁰ Teva's quality department make the
¹¹ determination that a reportable event had
¹² occurred?
¹³        A.    That was on June 28th, 2018.
¹⁴        Q.    How many business days later
¹⁵ did Teva report that to the FDA?
¹⁶        A.    So that was on a Thursday.
¹⁷ So -- and, again, there's always
¹⁸ discussions around this, counsel.
¹⁹        But Thursday would be the
²⁰ first day, Friday would be the second
²¹ day, Monday would be the third day.  But,
²² again, there's discussions.  Because --
²³ so they say, well, you received it on the
²⁴ 28th, the 29th is the first day, then et

Page 728

¹ cetera.
²        But the important thing is
³ that, you know, from an FDA perspective,
⁴ from my experience, the most important
⁵ thing for the FDA is not whether or not
⁶ you submitted it within three days or
⁷ four days or five days, it's the extent
⁸ to which you are able to demonstrate that
⁹ you are submitting a report that is
¹⁰ worthy of their review and their
¹¹ reaction, if necessary.
¹²        Q.    To your knowledge, did the
¹³ FDA ever complain to Teva about the
¹⁴ timing of the report?
¹⁵        A.    Not in this case, and
¹⁶ very -- I would say, no, not in this
¹⁷ case.
¹⁸        Q.    If FDA have a problem with
¹⁹ the timing of the report, what --
²⁰ ultimately, what can they do?
²¹        A.    You know, during the course
²² of inspections, one of the activities
²³ that the FDA looks at is the performance
²⁴ of the field alert -- field alert

Page 729

¹ program.
²        So, for instance, yeah, a
³ timely submission may be one of the --
⁴ those criteria.  And they could cite you
⁵ for that type of observation, whether
⁶ it's an isolated situation or a systemic.
⁷ Obviously, a systemic situation is
⁸ something that they would be very
⁹ concerned with, not necessarily with an
¹⁰ isolated situation.
¹¹        But then they also are
¹² interested -- they are also interested in
¹³ whether or not the proper investigation
¹⁴ was submitted and whether or not we --
¹⁵ you know, we update the FDA with routine
¹⁶ updates on the progress and closure of
¹⁷ the investigation.
¹⁸     Q.   Did FDA ever cite Teva for
¹⁹ any system failures, or otherwise, with
²⁰ respect to their compliance of the field
²¹ alert program?
²²     A.   No.
²³     Q.   Did FDA ever take any issue
²⁴ or issue any adverse findings with

Page 730

¹ respect to how Teva handled the
² investigation into the root cause of the
³ nitrosamine?
⁴     A.   No.
⁵     Q.   To your knowledge, did FDA
⁶ ever complain to Teva about any aspect of
⁷ Teva's root cause evaluation of the
⁸ nitrosamine issues?
⁹     A.   No.
¹⁰     Q.   You were asked if you
¹¹ oversaw SOPs, and I think you said yes.
¹²        But can -- are you able to
¹³ clarify, is that you oversaw the SOPs for
¹⁴ quality --
¹⁵     A.   Yes.
¹⁶     Q.   -- is that right?
¹⁷     A.   That is correct.
¹⁸     Q.   Okay.  And you did not --
¹⁹ did you have any involvement in SOPs for
²⁰ the legal department?
²¹     A.   No.
²²     Q.   Did you oversee or have
²³ involvement in SOPs for the regulatory
²⁴ department?

Page 731

¹     A.   No.
²     Q.   You were asked about one
³ policy, which was Exhibit-135, if you
⁴ want to pull that up.
⁵        It was the outsourced
⁶ activities contract manufacture and
⁷ analysis document.
⁸     A.   I do remember that -- that
⁹ policy.
¹⁰     Q.   In connection with the
¹¹ supply of valsartan API to Teva, was ZHP
¹² considered a contract manufacturer?
¹³     A.   No.
¹⁴     Q.   Does the Exhibit-135,
¹⁵ involving contract manufacture, apply to
¹⁶ the valsartan API relationship between
¹⁷ Teva and ZHP?
¹⁸        MR. STANOCH:  Objection to
¹⁹     form.
²⁰        THE WITNESS:  It would apply
²¹     as an API supplier.
²² BY MS. LOCKARD:
²³     Q.   Okay.  The document itself
²⁴ applies to -- and if you need to pull it

Page 732

¹ up -- it applies to contract
² manufacturers, correct?
³     A.   Yes.
⁴     Q.   And ZHP, I think you said,
⁵ was not a contract manufacturer; it was
⁶ an API supplier?
⁷     A.   It is an API supplier, not a
⁸ contract manufacturer, within the
⁹ definition of what the contract
¹⁰ manufacturer is.
¹¹     Q.   Okay.  So would Exhibit-135
¹² have -- regarding contract manufacturer
¹³ have applied to the valsartan API
¹⁴ relationship between Teva and ZHP?
¹⁵        MR. STANOCH:  Objection.
¹⁶        THE WITNESS:  No.
¹⁷ BY MS. LOCKARD:
¹⁸     Q.   And the same question for
¹⁹ Mylan, was Mylan considered a contract
²⁰ manufacturer?
²¹     A.   No.
²²     Q.   So would Exhibit-135,
²³ governing contract manufacturers, have
²⁴ applied to the Mylan/Teva relationship?

Page 733

1    A.   No.
2    Q.   You were asked about change
3 control processes yesterday.
4       Do you recall that?
5    A.   Yes.
6    Q.   And does Teva have a process
7 for evaluating change -- process changes
8 of its suppliers?
9    A.   Yes.
10   Q.   And have you reviewed any
11 documents with respect to the change
12 control process Teva went through for the
13 ZHP process change in 2012?
14   A.   Yes.
15   Q.   Okay.
16      MS. LOCKARD:  So, Steve
17   Harkins, do you have Bates number
18   0950662 available to pull up as an
19   exhibit?
20      MR. HARKINS:  It should be
21   in the chat, everybody.
22      MS. LOCKARD:  So you're not
23   able to drop it into the exhibits
24   that --

Page 734

1       MR. HARKINS:  No.  We
2   discussed on the break, I'm not
3   able to put it in there.  But if
4   you open the chat, you can open a
5   native copy of it on your laptop.
6   MS. LOCKARD:  I cannot.
7   It's not letting me open it.
8      MR. STANOCH:  I've done it,
9   Mr. Harkins.  Thank you.
10      MS. WHITELEY:  I was able to
11   open it, but I had to try twice.
12 BY MS. LOCKARD:
13   Q.   Can you identify this
14 document for us, Mr. Barreto?
15   A.   I'm not able to see it.
16   Q.   Oh, you're not able to open
17 it?
18   A.   Do I need to go in the chat?
19   Q.   Yes.  See if you can open
20 it.
21   A.   What document would that be?
22 Number 180?
23   Q.   Do you have your chat
24 function open, because he wasn't able

Page 735

1 to --
2    A.   My apologies, counsel.
3    Q.   He wasn't able to -- it
4 looks like you got it.
5       - - -
6       (Whereupon, Exhibit
7    Teva-181,
8    TEVA-MDL2875-00060028-0034,
9    10/30/18 E-mail, Sawyer to
10   Barreto, as marked for
11   identification.)
12      - - -
13      THE WITNESS:  Yes.
14 BY MS. LOCKARD:
15   Q.   Okay.  And you are -- you
16 are aware that ZHP notified Teva
17 regarding the 2012/2013 time period
18 process change, correct?
19   A.   Right.  My apologies.  This
20 document is not that, the one I'm looking
21 at.  My apologies.
22   Q.   Hold on.  Let's see if I can
23 pull it up.
24   A.   Oh, okay.  Let me see if

Page 736

1 this is it, counsel.
2       I have it, counsel.  I have
3 it now.
4    Q.   Let me see what you're
5 looking at.
6    A.   Sorry.  My apologies.
7    Q.   Okay.  Just for the record,
8 and to ensure that you have it, so on the
9 first page of that document you see the
10 Bates number at the bottom, 0950662?
11   A.   Yes.
12   Q.   What is this that we are
13 looking at?
14   A.   This is -- this is the
15 change control document that is started
16 to proceed with all the activities that
17 would be necessary to implement a change.
18   Q.   Okay.  And so does this --
19 when you say "procedures," do you mean
20 this was -- is this a record of what Teva
21 was doing to evaluate the change?
22   A.   It's a record that initiates
23 the process and gets the process going,
24 in terms of all the things that have to

Confidential Information Subject to Protective Order

Page 737

¹ be done to ensure that you can support
² that a change control was implemented
³ correctly.
⁴     Q.   Okay.  And you had
⁵ mentioned, when you were reviewing the
⁶ CBE 30, that there was some evaluation
⁷ with regard to the different steps that
⁸ were identified and that it was
⁹ identified as a minor to moderate change?
¹⁰     A.   Correct.
¹¹     Q.   And is this document -- does
¹² this show the process by which the
¹³ evaluation was initiated to try to reach
¹⁴ those conclusions?
¹⁵     A.   That is correct.
¹⁶     Q.   Okay.  Is the change control
¹⁷ process that's reflected in this
¹⁸ document, is that something that the
¹⁹ quality team would do, typically?
²⁰     A.   That is correct.  And, of
²¹ course, with input into the change
²² control activities by the different
²³ members of the organization.
²⁴     Q.   So did Teva take reasonable

Page 738

¹ measures to evaluate the change that was
² submitted by ZHP consistent with its
³ change control process?
⁴         MR. STANOCH:  Objection to
⁵     form.
⁶         THE WITNESS:  It is my
⁷     opinion, based on the review that
⁸     I've done of the change, that a
⁹     significant number of activities
¹⁰     were conducted, in that the
¹¹     process is documented.
¹²         There was a -- for instance,
¹³     an impact assessment, QA review;
¹⁴     and every stage, when every
¹⁵     activity was done, there was
¹⁶     documentation as to who was
¹⁷     supposed to do what, all the way
¹⁸     until the change completion
¹⁹     allowed the regulatory group to
²⁰     eventually file the ANDA
²¹     supplement.
²² BY MS. LOCKARD:
²³     Q.   So you were asked about the
²⁴ CBE 30s and the ANDA supplement.  And I

Page 739

¹ believe those were Exhibits-2 and 3 --
²     A.   Yes.
³     Q.   -- if you want to pull those
⁴ up.
⁵         And, you know, you
⁶ established that -- or testified that
⁷ Teva did not do its own independent
⁸ testing of the DMF and MTBE solvents.
⁹     A.   DMF and MTBE solvents,
¹⁰ correct.
¹¹     Q.   Did I misstate that?  Okay.
¹²         So let me ask you, why did
¹³ Teva not do testing on the solvents?
¹⁴     A.   As I indicated to Counsel
¹⁵ Stanoch, FDA had -- I'm sorry, Teva had
¹⁶ performed this change control process and
¹⁷ performed a number of assessments and
¹⁸ risk assessments and investigations,
¹⁹ testing activities that let Teva conclude
²⁰ that the new product was fulfilling the
²¹ expectations set by the regulators.
²²     Q.   Are you aware of any
²³ regulations or FDA guidances that would
²⁴ prohibit Teva from relying on the

Page 740

¹ supplier's testing of the supplier's
² solvents?
³     A.   No.
⁴     Q.   And is there -- is there
⁵ anything inconsistent with what Teva did,
⁶ in relying on the supplier and the
⁷ supplier's testing, anything inconsistent
⁸ with industry standards or practices
⁹ based on your experience?
¹⁰         MR. STANOCH:  Objection to
¹¹     form.
¹²         THE WITNESS:  I do not see
¹³     any inconsistency.
¹⁴         Once again, the purpose of
¹⁵     the challenges that Teva was doing
¹⁶     was to confirm that the quality
¹⁷     attributes of the -- let's call it
¹⁸     the revised version of the API,
¹⁹     fulfilled the original
²⁰     expectations set for the original
²¹     version of the API.
²² BY MS. LOCKARD:
²³     Q.   And was it necessary or
²⁴ required by any guidance, rule,

Confidential Information - Subject to Protective Order

Page 741

¹ regulation or industry standard that Teva
² disclose to the FDA that the testing was
³ done by the supplier and not the
⁴ finished-dose maker?
⁵          MR. STANOCH:  Objection to
⁶     form.
⁷          THE WITNESS:  No, no.
⁸ BY MS. LOCKARD:
⁹     Q.   And was there any effort at
¹⁰ Teva to try to hide the fact of who did
¹¹ the testing --
¹²          MR. STANOCH:  Objection to
¹³     form.
¹⁴ BY MS. LOCKARD:
¹⁵     Q.   -- when it reported to the
¹⁶ FDA?
¹⁷          MR. STANOCH:  Objecting to
¹⁸     form.
¹⁹          THE WITNESS:  No.
²⁰ BY MS. LOCKARD:
²¹     Q.   Was, to your knowledge,
²² anybody at Teva -- or have you seen any
²³ evidence that anybody at Teva was trying
²⁴ to mislead the FDA into thinking they did

Page 742

¹ their own testing?
²          MR. STANOCH:  Objection to
³     form.
⁴          THE WITNESS:  No.
⁵ BY MS. LOCKARD:
⁶     Q.   Is there any reason to think
⁷ that if Teva had done its own testing,
⁸ that those -- that testing would have
⁹ shown anything different than what ZHP's
¹⁰ testing showed?
¹¹          MR. STANOCH:  Objection to
¹²     form.
¹³          THE WITNESS:  No.  And if
¹⁴     the testing had shown anything
¹⁵     different, then there would have
¹⁶     been a discussion between Teva and
¹⁷     the supplier.
¹⁸ BY MS. LOCKARD:
¹⁹     Q.   But based on your
²⁰ understanding today, is there any reason
²¹ to think that if Teva had done the same
²² test, Teva would have come up with a
²³ different result than ZHP?
²⁴     A.   No.

Page 743

¹          MR. STANOCH:  Objection.
² BY MS. LOCKARD:
³     Q.   You were shown a document,
⁴ Exhibit-165.
⁵          And you mentioned, when you
⁶ were reviewing that document, that there
⁷ was watermark across it that said,
⁸ Canceled document.
⁹          Do you remember that?
¹⁰     A.   I do.
¹¹     Q.   What does a canceled
¹² document watermark mean to you?
¹³     A.   It means that that document
¹⁴ is no longer an official document.
¹⁵ Therefore, it's one that no longer
¹⁶ represents, you know, the official
¹⁷ statements that would be made with
¹⁸ respect to the purpose of that document.
¹⁹     Q.   Okay.  You were also asked
²⁰ about the audit report from May 2018, the
²¹ audit of ZHP.
²²     A.   Yes.
²³     Q.   And I believe that -- I
²⁴ don't have the exhibit in front of me,

Page 744

¹ but if you need to look at it, it's
² Exhibit-61, I believe.
³     A.   Allow me to go there for a
⁴ second, please.
⁵          Yes.
⁶     Q.   And you were asked, you
⁷ know, is there a reference to -- a
⁸ specific reference to the auditor
⁹ reviewing the 483 with the supplier.
¹⁰          Do you recall that?
¹¹     A.   That is correct.  Yes, I do.
¹²     Q.   And you said there is no
¹³ specific reference to that.  There was a
¹⁴ discussion on the record where, you know,
¹⁵ I took issue with the questioning, and
¹⁶ opposing counsel took issue with my
¹⁷ response.
¹⁸          But I had said, if you're
¹⁹ searching for 483, you're not going to
²⁰ find it, correct?
²¹     A.   That is correct.
²²     Q.   Is there a reference in here
²³ anywhere to the inspection -- the FDA
²⁴ inspection that was done that resulted in

Confidential Information - Subject to Protective Order

Page 745

1 the 483?
2    A.   Yes.
3    Q.   Okay.  And is there any
4 reference in the document to the EIR,
5 which would have followed the 483?
6    A.   That is correct.
7         If you go to the end of the
8 document, on Page 62 of 62 -- my
9 apologies.  Let me find it.
10        That would be Page 59 of 62.
11 The auditor, as part of the attachments
12 that he or she collected, makes reference
13 in their Attachment 1 to the U.S. Food
14 and Drug Administration EIR cover letter,
15 Chuannan site, 2017/05.
16    Q.   And this is listed in the
17 attachment that has, essentially, an
18 index of material?
19    A.   That is correct.
20    Q.   And from your experience,
21 what does that signify about the items
22 that were listed on that index?
23    A.   Correct.  What that -- what
24 that tells to me is that the auditor

Page 746

1 asked to have evidence that the FDA had
2 conducted that inspection, and the
3 evidence would have been in the form of
4 the EIR that would have been released.
5         The auditor was given a copy
6 of the cover letter.  In this instance,
7 the cover letter would have indicated
8 that the 2017 inspection was considered
9 an acceptable inspection, in spite of the
10 observations that were issued.
11    Q.   So from the reference --
12         MR. STANOCH:  I'm sorry,
13    excuse me.  I can't -- I've lost
14    my volume.  I can't hear any of
15    you.  Can we go off the record for
16    two seconds?
17         MS. LOCKARD:  Sure.
18         VIDEO TECHNICIAN:  The time
19    is 4:16 p.m.  Going off the
20    record.
21              - - -
22         (Whereupon, a brief recess
23    was taken.)
24              - - -

Page 747

1         VIDEO TECHNICIAN:  The time
2    is now 4:16 p.m.  Going back on
3    the record.
4 BY MS. LOCKARD:
5    Q.   So from review of what you
6 just described, what conclusion can you
7 draw about whether the auditor was aware
8 of the 483 and discussed the issues in
9 the 483?
10    A.   That the --
11         MR. STANOCH:  Objection to
12    form.
13         THE WITNESS:  From my
14    perspective, the auditor asked for
15    any -- for the first and foremost
16    important evidence that the
17    previous inspection was
18    successful, which is the copy of
19    the EIR.  What the company did is
20    that they gave the auditor Page 1,
21    which is the cover letter.
22         And that cover letter would
23    indicate that the inspection was
24    found acceptable and that the

Page 748

1    corrective actions that were
2    implemented were adequate, as far
3    as the FDA is concerned.
4 BY MS. LOCKARD:
5    Q.   Okay.  You can put that
6 exhibit away.
7         As part of the quality team,
8 was it expected that you, Mr. Barreto,
9 would review and weigh in on the HHA that
10 Dr. Liu was overseeing?
11    A.   It is customary, and, again,
12 based on my experience, that, you know,
13 the HHA will be prepared by the medical
14 organization and that different
15 individuals that have an interest in
16 the -- in the description of the HHA
17 would look at it, review it, and provide
18 recommendations, which is what I did.
19    Q.   So is it unusual for someone
20 in the quality department to make
21 suggestions to the HHA?
22    A.   No.
23         MR. STANOCH:  Objection to
24    form.

Confidential Information Subject to Protective Order

Page 749

BY MS. LOCKARD:

Q. Are there others from other departments that might weigh in on the HHA, regulatory or others?

A. Yes. There's nothing in the regulation or in practice that would prevent that review to take place.

Q. And so, you know, we went through some suggestions that you had made for the document.

Were your revisions to the language incorporated?

A. Yes.

Q. Did Dr. Liu, who was responsible for finalizing the report, to your knowledge, did he agree with your suggestions?

A. The only way that he would put that into the HHA would be if he agreed.

Q. And so did he sign off on the final HHA, which incorporated your suggestions?

A. Yes, he did.

Page 750

Q. And did Dr. Liu, or anyone, ever indicate to you that they were uncomfortable with the language you had proposed?

A. No.

Q. Is that -- the language that you had proposed, is that the kind of language that you had been familiar with and seen in your experience at the FDA, for 20 years, looking at HHAs?

MR. STANOCH: Objection to form.

THE WITNESS: Again, it's based on the input that we had from different regulatory authorities, in terms of what the issue represented.

So what we wanted to convey in that recommendation we were making was the facts as we know them at the time.

BY MS. LOCKARD:

Q. But when you approached an HHA in this instance, or another, do you

Page 751

harken back to your days at the FDA in terms of the filter that you use to evaluate and make recommendations or improvements to that HHA?

MR. STANOCH: Objection to form.

THE WITNESS: Yes, I do.

BY MS. LOCKARD:

Q. You were asked a few times about the absence of a quality agreement with Mylan.

Do you recall that?

A. I do.

Q. Does Teva have a quality agreement with every supplier of ingredients in its products?

A. I would say that more than likely that's not the case, because there are different reasons why that is not going to happen.

Q. And what are some of the reasons that that might not be able to be achieved?

A. So --

Page 752

MR. STANOCH: Objection.

THE WITNESS: -- as I had indicated -- sorry, counsel.

MR. STANOCH: It's okay.

THE WITNESS: It's a -- it's a mutual agreement and understanding. So we set the expectation for ourselves, meaning Teva, but we still have to persuade and convince the other organization that we would like for them to enter into that agreement.

BY MS. LOCKARD:

Q. And does the absence of a quality agreement with the supplier in any way limit your ability to perform those quality functions that you would expect to be described in a quality agreement?

MR. STANOCH: Objection to form.

THE WITNESS: No.

BY MS. LOCKARD:

Page 753

1    Q.   And if you'll pull up the
2  quality agreements, that were produced
3  and used in your deposition, with ZHP --
4  I think if you pull up 167, Exhibit-167,
5  that was the first.
6    A.   Yes, counsel.
7    Q.   And had you reviewed these
8  quality agreements, 167 through 170, in
9  preparation for your deposition?
10   A.   I have browsed through them,
11 yes.
12   Q.   Are these -- the ZHP quality
13 agreement, did they appear to be typical
14 of the type of quality agreements that
15 Teva would have if -- when -- if and when
16 it did enter into quality agreements?
17       MR. STANOCH:  Objection to
18   form.
19       THE WITNESS:  That is
20   correct.
21 BY MS. LOCKARD:
22   Q.   If Teva had a Mylan quality
23 agreement, is it fair to assume that it
24 would have looked something like these?

Page 754

1        MR. STANOCH:  Objection to
2    form.  Lacks foundation.  Calls
3    for speculation.
4        Go ahead.
5  BY MS. LOCKARD:
6    Q.   Well, Mr. Barreto, you've
7  seen quality agreements with suppliers
8  before, correct?
9    A.   I have to tell you that the
10 language and the expectations set by
11 almost any quality agreement that is
12 within this industry will address the
13 issues that are described here.
14   Q.   Yeah.  And so what are some
15 of the issues that are described?
16       You know, what -- let me
17 ask, what is the -- what are the
18 provisions, generally speaking, of a
19 quality agreement?
20   A.   So they set the conditions
21 under which certain communications will
22 take place.  So that indicated -- and
23 then how the relationship between the two
24 organizations will -- so, for instance,

Page 755

1  for audit, the quality agreements say
2  that ZHP will allow -- shall allow
3  Actavis to conduct a facility site
4  compliance audit.
5        This is what the quality
6  agreement says.  But I think, to go to
7  the relationship with Mylan, we do
8  perform routine quality audits of the
9  Mylan facility, for instance.
10       With respect to
11 investigations, you know, Section 10.1
12 says that ZHP shall be responsible for
13 and use commercially reasonable efforts
14 to investigate a test that fails to meet
15 the specifications.  This is the same
16 expectation that is set for Mylan, not
17 only by the quality agreement but also by
18 the regulations.
19       So what the quality
20 agreement does is that it just sets a
21 number of understandings between --
22 between the two organizations.
23   Q.   And that's my point.  I'm
24 not trying to represent that a Mylan

Page 756

1  quality agreement would look exactly like
2  this one.
3        But we're accused of not
4  having a quality agreement with Mylan.
5  So I would like to get your guidance on
6  what we would have expected to see in a
7  quality agreement with Mylan.
8        MR. STANOCH:  Objection.
9    What's the question?  Are you
10   asking him what we would have seen
11   in a nonexistent agreement?
12       Objection.  Vague.
13 BY MS. LOCKARD:
14   Q.   What provisions would you
15 expect to see in a typical quality
16 agreement with a supplier like Mylan?
17   A.   With respect to Mylan, I
18 would say that a quality agreement, more
19 or less similar to what we have for ZHP,
20 would be -- would be that type of
21 agreement.
22   Q.   And so would the -- for
23 example, the responsibilities that are
24 listed out in the ZHP agreement, would

Confidential Information Subject to Protective Order

---

Page 757

¹ those generally be the same types of
² responsibilities that would be listed in
³ a Mylan agreement?
⁴        A.    That is correct.
⁵            MR. STANOCH:  Objection to
⁶    form.  Calls for speculation.
⁷    Lacks foundation.  Vague and
⁸    ambiguous.
⁹            Go ahead.
¹⁰ BY MS. LOCKARD:
¹¹        Q.    Well, are you familiar with
¹² supply -- quality supply agreements --
¹³ quality agreements with suppliers, Mr.
¹⁴ Barreto?
¹⁵        A.    Can you repeat the question?
¹⁶        Q.    Are you familiar with
¹⁷ quality agreements with suppliers?
¹⁸        A.    Yes.
¹⁹        Q.    So this is -- this is not a
²⁰ foreign document to you, correct?
²¹            MR. STANOCH:  Objection to
²²    form.
²³            THE WITNESS:  Yes.
²⁴ BY MS. LOCKARD:

---

Page 758

¹        Q.    Did you -- did you ever have
² occasion to review quality supply --
³ excuse me, quality agreements with
⁴ suppliers when you were at FDA?
⁵        A.    Yes.
⁶        Q.    And so are they fairly
⁷ standard in terms of the types of general
⁸ provisions they govern?
⁹            MR. STANOCH:  Objection to
¹⁰    form.
¹¹            THE WITNESS:  As I indicated
¹²    to you, counsel, when I look at
¹³    this supplier quality agreement,
¹⁴    it is a typical example of what a
¹⁵    quality agreement would look like,
¹⁶    in this case, for an API
¹⁷    organization.
¹⁸            If I looked at the quality
¹⁹    agreement for a finished drug
²⁰    product, there would be certain
²¹    things that would be somewhat
²²    different.  But the expectations
²³    in general would be relatively
²⁴    similar.

---

Page 759

¹ BY MS. LOCKARD:
²        Q.    And despite not having this
³ piece of paper setting out these types of
⁴ responsibilities and expectations, did
⁵ Teva endeavor to follow the same
⁶ responsibilities, expectations, you know,
⁷ audit roles that are described in a
⁸ typical quality agreement like you see
⁹ with ZHP or like you've seen in other
¹⁰ instances in your experience?
¹¹            MR. STANOCH:  Objection to
¹²    form.
¹³            THE WITNESS:  The type of
¹⁴    information that we needed to
¹⁵    obtain from Mylan to come to a
¹⁶    conclusion on, for instance,
¹⁷    during audits, on the state of
¹⁸    their facilities, if during audits
¹⁹    we issued observations, they would
²⁰    implement corrective actions the
²¹    same way that they would be
²²    implemented under the expectations
²³    of the quality agreement.
²⁴            The -- if -- if an

---

Page 760

¹    investigation is generated, they
²    communicated that information to
³    us the same way it would have been
⁴    communicated through a quality
⁵    agreement.
⁶            Any follow-up interactions
⁷    between Mylan and us were followed
⁸    the same way they would have
⁹    achieved through a quality
¹⁰    agreement.
¹¹            So the absence -- in my
¹²    opinion, based on my
¹³    responsibility, the absence of a
¹⁴    quality agreement does not
¹⁵    necessarily imply that a company
¹⁶    is not able to manage, supervise,
¹⁷    monitor, interact with a supplier
¹⁸    of service or a product.
¹⁹ BY MS. LOCKARD:
²⁰        Q.    So would you expect there to
²¹ be anything new or different in the piece
²² of paper that is the quality agreement
²³ that Teva and Mylan were not already
²⁴ doing in practice?

---

Confidential Information - Subject to Protective Order

Page 761

1    MR. STANOCH:  Objection to
2  form.  Calls for speculation.
3  Vague and ambiguous.  Lacks
4  foundation.
5    Go ahead, sir.
6    THE WITNESS:  My expectation
7  is that the absence of -- my
8  perspective on this is that the
9  absence of a quality agreement
10 does not prevent the company from
11 achieving its objectives of
12 managing, supervising, monitoring
13 and interacting with a supplier in
14 any way, shape or form.
15 BY MS. LOCKARD:
16   Q.   If there had been a quality
17 agreement in place with Mylan, do you
18 have any opinion as to how the outcome or
19 the timeline would have been different
20 than it was in the absence of such a
21 written piece of paper?
22   MR. STANOCH:  Objection to
23 form.
24   THE WITNESS:  It is my

Page 762

1  opinion that under the
2  circumstances that we were
3  operating, the outcome of the
4  investigation and the closure of
5  the issues at Mylan were not any
6  different than what we achieved
7  through our interactions with ZHP.
8  BY MS. LOCKARD:
9    Q.   Well, did any failure to
10 have a quality agreement with Mylan lead
11 to the failure to detect the nitrosamines
12 in the Mylan API?
13   MR. STANOCH:  Objection to
14 form.
15   THE WITNESS:  No.  No.
16 BY MS. LOCKARD:
17   Q.   And did your root cause
18 analysis at Teva, in evaluating the
19 nitrosamine issue in the Mylan API, did
20 it list as a root cause failure to have a
21 quality agreement with Mylan?
22   A.   No.
23   Q.   So in your view, what
24 difference would it have made in the

Page 763

1  course of these events if Teva had had a
2  quality agreement with Mylan?
3    MR. STANOCH:  Objection to
4  form.
5    THE WITNESS:  From my
6  perspective, I don't see any
7  significant difference.  As I have
8  indicated, a quality agreement is
9  a good tool to have.
10   But in this case, the
11 absence of it does not necessarily
12 represent that that would make a
13 significant difference in
14 achieving the objectives that we
15 would have to manage, supervise,
16 monitor and track with a supplier
17 of an API.
18   I'd like to ask for a
19 five-minute recess, if that's
20 okay.
21   MS. LOCKARD:  Sure.  That's
22 fine.  And I'm getting close to
23 the end, so I'll just review my
24 notes and see.  I'll probably have

Page 764

1  a few more questions for you.
2  Let's just do that.
3    Is that all right with
4  everybody?
5    MR. STANOCH:  Yes.
6    THE WITNESS:  Counsel, would
7  you agree to that?  I appreciate
8  that.
9    MR. STANOCH:  Of course.
10   THE WITNESS:  Thank you.
11   VIDEO TECHNICIAN:  The time
12 is 4:32 p.m.  Going off the
13 record.
14     - - -
15   (Whereupon, a brief recess
16 was taken.)
17     - - -
18   VIDEO TECHNICIAN:  The time
19 is now 4:39 p.m.  Back on the
20 record.
21 BY MS. LOCKARD:
22   Q.   Mr. Barreto, if you can turn
23 to Exhibit-172.
24   This was an e-mail from Eric

Confidential Information - Subject to Protective Order

Page 765

¹ Drape regarding the comment about, we did
² better than Mylan.
³     A.    Yes.
⁴     Q.    Do you have that pulled up?
⁵     A.    Yes.
⁶     Q.    When he was saying "we did
⁷ better than Mylan," what is your
⁸ understanding or impression of who he was
⁹ talking about?
¹⁰     A.    I think, based on the
¹¹ individuals that were cited in the
¹² e-mail, meaning John Mason, Noa Anker,
¹³ myself, the communication is about the
¹⁴ fact that, you know, in terms of
¹⁵ addressing the different issues
¹⁶ associated with the nitrosamines, that
¹⁷ we, the TAPI organization, had done a
¹⁸ better -- a great job at managing, you
¹⁹ know, these issues.
²⁰     Q.    And so you were -- in your
²¹ role, did you provide quality guidance
²² for both Teva and the subsidiary API
²³ supplier TAPI?
²⁴     A.    That is correct.

Page 766

¹     Q.    So who -- the other two
² individuals on that e-mail, are they with
³ TAPI?
⁴     A.    Correct.
⁵     Q.    So, then, to answer the
⁶ question as to who "we" is, is it your
⁷ impression that "we" is Teva or TAPI?
⁸         MR. STANOCH:  Objection to
⁹     form.
¹⁰         THE WITNESS:  From my
¹¹     perspective, it -- it was around
¹²     TAPI.
¹³ BY MS. LOCKARD:
¹⁴     Q.    And -- well, strike that.
¹⁵         So, you know, you've been
¹⁶ here for two full days now, Mr. Barreto,
¹⁷ and you've been examined with a lot of
¹⁸ documents and questions.
¹⁹         Have you heard or seen
²⁰ anything in the last two days to shake
²¹ your confidence that Teva acted promptly
²² and appropriately in response to trying
²³ to investigate and address the
²⁴ nitrosamine issue?

Page 767

¹         MR. STANOCH:  Objection to
²     form.
³         THE WITNESS:  No.
⁴ BY MS. LOCKARD:
⁵     Q.    And is that your feeling
⁶ with respect to how Teva responded, that
⁷ they responded promptly and responsibly?
⁸         MR. STANOCH:  Objection to
⁹     form.
¹⁰         THE WITNESS:  Yes.
¹¹ BY MS. LOCKARD:
¹²     Q.    Overall, were you
¹³ comfortable, as the head of quality, with
¹⁴ how Teva responded?
¹⁵         MR. STANOCH:  Objection to
¹⁶     form.
¹⁷         THE WITNESS:  Yes.
¹⁸ BY MS. LOCKARD:
¹⁹     Q.    Okay.  Can you explain that?
²⁰     A.    When you look at the -- this
²¹ issue, how it first came up and how it
²² evolved in a way that it had such a
²³ significant impact on -- from a global
²⁴ perspective, on patients' access to

Page 768

¹ medication and the way in which we
² interacted with our API suppliers, the
³ way we interacted with the regulators,
⁴ the way we interacted, you know,
⁵ internally within Teva and the way in
⁶ which we assembled an important
⁷ organization that handles a product that
⁸ extended above and beyond, close to a
⁹ year or more, I mean, this was -- this
¹⁰ was an incredible process.
¹¹         Where -- the thing that
¹² characterized the process is, we moved in
¹³ a very expedient way, in terms of the
¹⁴ actions that we took.  As the issues
¹⁵ evolved, we were able to manage and to
¹⁶ maintain the organization's focus on what
¹⁷ was most important, which is, one,
¹⁸ removing product that needed to be
¹⁹ removed, and then looking for ways to
²⁰ provide an access to patients, a product
²¹ that we could provide, and then in the
²² end, looking for and working with our
²³ suppliers on the solution, which is to
²⁴ ensure that our suppliers would be in a

Page 769

1 good position to have the right
2 manufacturing process in place that would
3 allow us, then, to eventually resume
4 operations, both delivering product that
5 would meet the -- now, this new set of
6 specifications and expectations for the
7 entire world.
8        MS. LOCKARD:  I think those
9    are all the questions I have for
10    you, unless there are additional
11    issues that are raised by opposing
12    counsel's questions.
13        So just bear with us for a
14    few moments, and we'll see if we
15    can wrap this up.
16        MR. STANOCH:  Mr. Barreto,
17    I'm going to have to ask you a few
18    more questions.  Thanks again for
19    your patience today.
20        - - -
21        EXAMINATION
22        - - -
23 BY MR. STANOCH:
24    Q.   You don't -- do not think

Page 770

1 that a quality agreement is simply a
2 piece of paper, do you?
3    A.   What I do believe is that a
4 quality agreement is one way of achieving
5 the objectives that -- the quality
6 agreement is one of a number of elements
7 that we use to provide an infrastructure
8 for, as I said, the management and
9 supervision and oversight.
10        What I'm trying to say,
11 counsel, is that it is a good idea to
12 have a quality agreement.  I'm not saying
13 that.  But the opposite is not -- does
14 not mean that the absence of a quality
15 agreement prevents an organization from
16 achieving its objectives.
17        There are hundreds of
18 organizations today where there is no
19 quality agreement in place, and we still,
20 across the globe, ensure that we, you
21 know, manage our quality and compliance
22 activities in spite of the absence of
23 quality agreements under certain
24 instances.

Page 771

1        I -- as I indicated to you,
2 I would not accept an operation of a
3 contract manufacturing activity where
4 there was an absence of a quality
5 agreement, because that -- in that case,
6 the quality agreement enforces
7 expectations that the supplier of the
8 contract services must fulfill as if I
9 was fulfilling those.
10    Q.   Quality agreements are
11 important enough that the FDA thinks it
12 should review them, correct?
13    A.   Excuse me?
14    Q.   Quality agreements are
15 important enough that the FDA believes
16 they should review them, correct?
17    A.   When those quality
18 agreements are present and they ask for
19 them and they are present, then they look
20 for a way to ensure that the expectations
21 set by the two organizations are
22 maintained.
23    Q.   You said when you were at
24 the FDA you reviewed quality agreements,

Page 772

1 right?
2    A.   I did.  I did.
3    Q.   Right.  And you're aware,
4 I'm sure, that the FDA has guidance for
5 the industry on quality agreements;
6 you're aware of that, right?
7    A.   Of course.
8    Q.   Right.  And that guidance,
9 which came out years after your departure
10 from the FDA, you're aware that it talks
11 about the importance of quality
12 agreements, correct?
13    A.   That is correct.
14    Q.   And that having a quality
15 agreement is an important piece in
16 ensuring GMP compliance, correct?
17    A.   That is correct.
18        But I'm also aware that the
19 absence of a quality agreement does not
20 automatically imply that the company will
21 receive a 483 for not having one.
22    Q.   And you also agree, as we
23 saw yesterday, that the quality
24 agreements are important enough that Teva

Page 773

¹ has an entire SOP about it, correct?
²       A.   Yes.  And I indicated to you
³ that, when I looked at that policy, the
⁴ focus on contract manufacturing is really
⁵ the most important part.
⁶       Because for the other
⁷ activities, if a supplier refuses to do a
⁸ quality agreement with me, that does not
⁹ necessarily mean that I'm not going to
¹⁰ use that supplier, because that's not in
¹¹ the regulations.
¹²       Q.   Is API the most important
¹³ aspect of a finished-dose product?
¹⁴       A.   It's --
¹⁵       MS. LOCKARD:  Objection.
¹⁶   Vague.
¹⁷       THE WITNESS:  It's one of
¹⁸   the important elements of the
¹⁹   final finished drug product.  It's
²⁰   important from the standpoint that
²¹   it provides a therapeutic value.
²² BY MR. STANOCH:
²³       Q.   Absolutely.  In fact,
²⁴ because of that, it's the most important

Page 774

¹ ingredient in a finished-product drug,
² wouldn't you say?
³       MS. LOCKARD:  Objection.
⁴   Vague.
⁵       THE WITNESS:  The way in
⁶   which that API now is processed is
⁷   what makes it important.
⁸       It's -- so what I'm trying
⁹   to say is that there are different
¹⁰   activities within the management
¹¹   and processing of that API that
¹²   make it important.
¹³ BY MR. STANOCH:
¹⁴       Q.   So what's more important to
¹⁵ you, the processing of the API or the API
¹⁶ itself?
¹⁷       A.   They are both equally
¹⁸ important to me.
¹⁹       Q.   Right.  And you want to make
²⁰ sure that anyone who is doing that
²¹ manufacturing of that API do it in a
²² consistent, cGMP-compliant methodology to
²³ ensure that the product is of the quality
²⁴ and purity and strength that it's

Page 775

¹ supposed to have, correct?
²       A.   Yes.  And my perspective on
³ this is that the absence of the quality
⁴ agreement does not prevent a
⁵ manufacturing company from achieving the
⁶ objectives of ensuring that an API
⁷ supplied is going to fulfill the
⁸ expectations of the specifications set or
⁹ the manufacturing conditions under which
¹⁰ that API is manufactured.
¹¹       Q.   You would agree, though,
¹² it's certainly much easier to achieve
¹³ those objectives with a quality
¹⁴ agreement, correct?
¹⁵       MS. LOCKARD:  Objection to
¹⁶   form.
¹⁷       THE WITNESS:  I've seen it
¹⁸   in different ways, counsel.
¹⁹       So in some cases, you have
²⁰   the quality agreement and
²¹   organizations are not able to --
²²   and I'm not talking about Teva,
²³   I'm talking about from my
²⁴   experience.

Page 776

¹       The enforcement of the -- of
²   the quality agreement is,
³   basically, nil.  So I think that,
⁴   again, even the generation of a
⁵   quality agreement is one element
⁶   of the process.
⁷       There are other activities
⁸   that take place that actually are
⁹   able to, with or without a quality
¹⁰   agreement, ensure that a company
¹¹   is compliant with regulations.
¹² BY MR. STANOCH:
¹³       Q.   Your counsel asked you some
¹⁴ questions about the -- a method that had
¹⁵ to be developed to test for nitrosamines.
¹⁶       Do you recall that
¹⁷ generally?
¹⁸       A.   Could you repeat the
¹⁹ question?
²⁰       Q.   Your counsel asked you some
²¹ questions about methods used to test API.
²²       A.   Yes.
²³       Q.   And I might have misspoke, I
²⁴ think maybe the context -- and you can

Page 777

1  correct me if I'm wrong -- but it might
2  have been about the methods that would be
3  used to measure the specifications of
4  API?
5       A.   And, counsel, I'm sorry, so
6  what is the question?
7       Q.   I'm just asking you, I think
8  you -- you tell me.
9            Did you testify that it's
10 important to have a validated method
11 before --
12      A.   Yes.
13      Q.   Yes, right?  Okay.  Thank
14 you for helping.
15           MS. LOCKARD:  Hold on.  Let
16 him finish the question.
17           THE WITNESS:  I apologize.
18 BY MR. STANOCH:
19      Q.   Sure.  Right.
20           Mr. Barreto, you recall
21 testifying on the importance of having a
22 validated method, correct?
23      A.   Yes.
24      Q.   And refresh us, what was the

Page 778

1  context of that?
2       A.   The context of that is that
3  in order for us to identify -- for us to
4  test a product under the regulated
5  conditions, you must have a validated,
6  analytical test method in place to do
7  that to comply with regulations.
8       Q.   And I think you were
9  inferring that Teva couldn't do testing
10 sooner than it did, of Mylan or ZHP
11 valsartan API, because it had to validate
12 a method first; is that right?
13      A.   What I'm saying is that in
14 order -- one of the standards -- and I
15 had a lot to do with that, from my
16 perspective, and given the nature of this
17 new issue, one of the expectations that I
18 had, and we all embraced, was that in
19 order for us to be in a position to
20 deliver information, data, that was
21 reliable to FDA, and other regulatory
22 organizations, I wanted to ensure that
23 the analytical test method was validated.
24           You are working with very

Page 779

1  small levels of these impurities.  You
2  really need to make sure that you're able
3  to have a method that is very precise in
4  order to deliver the right, reliable
5  data.
6       Q.   You didn't share the same
7  view at the time when all of these recall
8  issues hit in the second half of 2018,
9  correct?
10           MS. LOCKARD:  Objection.
11 Vague.
12           THE WITNESS:  The -- what we
13 did is that with the information
14 we had, with information that we
15 received, regardless of that --
16 the status of the method that was
17 used, we proceeded to engage in
18 the recall.
19           So for us, the important
20 thing was the action that we took.
21 And we were not questioning -- if
22 they said that it was 59 PPMs, we
23 were not in the basis of saying,
24 oh, maybe your analytical test

Page 780

1  method is wrong, it should have
2  been less.
3            So we took that and we said
4  filate it.  And we decided to
5  proceed with the recall action.
6  That's what we did.
7            MR. STANOCH:  I'm going to
8  mark Teva --
9            THE WITNESS:  That's
10 still --
11           MR. STANOCH:  I'm sorry,
12 sir, are you done?
13           THE WITNESS:  I'm sorry.
14 That still does not change my
15 expectation that the analytical
16 test method that I'm going to use
17 to provide data to the regulators
18 to defend -- especially to defend
19 product that is in distribution,
20 has to be validated.
21           MR. STANOCH:  I'm marking
22 the next exhibit, Bates ending
23 60028.
24                - - -



Page 781

1    (Whereupon, Exhibit
2    Teva-182, TEVA-MDL2875-00060028-0034,
3    10/30/18 E-mail, Sawyer to
4    Barreto, was marked for
5    identification.)
6        - - -
7  BY MR. STANOCH:
8    Q.  Do you see that?
9    A.  Just give me one second,
10  counsel.
11    Q.  Tell me when you're ready.
12    A.  What is the number?
13    MR. STANOCH:  Is that 181?
14    MS. LOCKARD:  I think it
15  should be 182.
16  BY MR. STANOCH:
17    Q.  It's an e-mail chain.
18      Do you see that, sir?
19    A.  Yes, sir.
20    Q.  The topmost message is from
21  Corey Sawyer to you dated October 30th,
22  2018, subject, U.S. samples for testing.
23      Do you see that?
24    A.  Yes, sir.

Page 782

1    Q.  And do you recall this
2  e-mail chain?
3    A.  Yes, sir.
18    Q.  Right.  So --
19    A.  And I can explain.  I can
20  explain what --
21    Q.  Well, let me ask my
22  questions -- then you can explain --
23  first, sir, thank you.  That's how this
24  works.

Page 783

1    A.  Thank you.

Page 784

8      MS. LOCKARD:  Objection.
9  Form.  Misstates the testimony.
10      THE WITNESS:  Could I --
11      MS. LOCKARD:  You can
12  explain.
13      THE WITNESS:  I'd like to
14  explain, counsel.
15      MS. LOCKARD:  Answer the
16  question, and then you can.
17      THE WITNESS:  In this
18  specific case, the samples that we
19  were going to test were on product
20  that was already recalled.
21      So for -- from a regulatory
22  perspective, we were not
23  generating a validated test method
24  to release product, which is one

1  of the core concepts of what we
2  do.
3       In this case, the FDA is
4  asking us to quickly do a certain
5  amount of work to deliver that
6  information to them.
7       In my opinion, the risk of
8  running those samples with a
9  nonvalidated test method did not
10  equate to the risk of running a
11  nonvalidated test method to
12  release product.
13       So in this case, I did not
14  see the need for us to run a
15  validated test method, in light of
16  the urgency that was set by the
17  agency for us to submit certain
18  data on product that was already
19  recalled and retrieved, counsel.
20  BY MR. STANOCH:
21       Q.   And you're not aware of Teva
22  ever telling the FDA that it ran its test
23  samples -- or strike that.
24       You're not aware of whether

1  Teva told the FDA that it generated test
2  results on a method that had not yet been
3  validated, correct?
4       A.   I would have to look at the
5  next string of e-mails.  If you have
6  them, I'll be more than glad to discuss
7  it with you.
8       Q.   Do you recall whether
9  validation was done concurrently with the
10  testing?
11       A.   I'm sorry, can you repeat
12  the question?
13       Q.   Do you recall whether the
14  validation was done concurrently with the
15  actual testing?
16       A.   I don't recall.  I would say
17  that probably not.
18       Q.   You can put that aside.
19       Sir, you mentioned, with
20  your counsel's questions, that the Teva
21  audit of ZHP from May 2018, that they --
22  that they saw the U.S. FDA EIR cover
23  letter concerning the -- that ZHP site,
24  right?

1       A.   That is correct.
2       Q.   Right.  There's no
3  indication here that the Teva auditors
4  saw the actual Form 483s, the
5  observations in the Form 483s, or
6  anything behind the cover letter; is that
7  correct?
8       A.   The report does not speak
9  about that.
10       Q.   It doesn't, right.
11       And, in fact, the cover
12  letter is simply going to be the
13  formality letter, right, you know this
14  from your years at the FDA, where they
15  simply say, we've completed our
16  investigation, right?
17       A.   It will also say that we
18  have found that your corrective actions
19  are acceptable, and now you're classified
20  as an accepted, acceptable company.
21       Q.   Right.  And because Teva
22  apparently only had the cover letter,
23  they don't -- didn't actually get copies
24  of what the FDA 483 observations were,

1  what the corrective actions were from
2  ZHP, and any response by the FDA to them;
3  is that right?
4       MS. LOCKARD:  Objection.
5       Calls for speculation.
6       THE WITNESS:  The report
7       does not speak about that one way
8       or the other.
9  BY MR. STANOCH:
10       Q.   Do you have any reason to
11  believe, sitting here today, that Teva's
12  auditors, when they went to ZHP in May of
13  2018, had access to and reviewed the
14  FDA's Form 483 observations from its 2017
15  inspection?
16       A.   I don't know what the
17  auditor did.  So I am not willing to
18  speculate.
19       But I do know that the
20  auditor was persuaded that if the
21  corrective actions were acceptable to the
22  FDA, based on the classification given to
23  the inspection, then the auditor
24  proceeded to pursue a comprehensive audit

Confidential Information Subject to Protective Order

Page 789

¹ of those areas that the auditor had, you
² know, planned to cover.
³     Q.   Right.  But we don't know
⁴ that those areas were the same as those
⁵ focused on by the FDA from its 483,
⁶ right?
⁷     A.   No.
⁸     Q.   Right.  And earlier with
⁹ your counsel you, I think, testified that
¹⁰ nitrosamines were a surprise; is that
¹¹ right?
¹²     A.   That is correct.
¹³     Q.   You've been in the industry
¹⁴ for quite some time.
¹⁵         Nitrosamines are not a new
¹⁶ compound; is that right?
¹⁷     A.   That is correct.
¹⁸     Q.   Right.  The knowledge -- the
¹⁹ industry knowledge about nitrosamines,
²⁰ that goes back decades; is that fair to
²¹ say?
²²         MS. LOCKARD:  Objection.
²³ Form.
²⁴         THE WITNESS:  From what I've

Page 790

¹     read, the nitrosamines are known
²     to be in water, in foods, in
³     meats.  The discussion -- and I
⁴     have not found -- as far as the
⁵     overall investigation process that
⁶     we performed, I did not find
⁷     anything anywhere that would
⁸     indicate to us that, in the pharma
⁹     industry, we had seen this type of
¹⁰     issue in any product that I'm
¹¹     aware of.
¹² BY MR. STANOCH:
¹³     Q.   Is that right?
¹⁴         Did you -- what did you do,
¹⁵ as part of that investigation, to see
¹⁶ whether Teva had analyzed potential
¹⁷ nitrosamine contamination in any other
¹⁸ product?
¹⁹     A.   No, what I'm saying is --
²⁰ what I said is that I looked at
²¹ literature, I looked for guidance
²² documents in the different regulatory
²³ websites of the different regulatory
²⁴ bodies, I mean, including Canada.

Page 791

¹         And we didn't see anything
² that would indicate a problem -- I mean,
³ the entire organization was aware of the
⁴ issues that we had with valsartan.  There
⁵ was no input from anybody, from anywhere,
⁶ that would indicate that, you know,
⁷ anybody was aware of this issue.
⁸         And there was widespread
⁹ communication about this.
¹⁰     Q.   And I think you said
¹¹ something to the effect of, there's no
¹² way to detect nitrosamines at a low
¹³ enough level at the time, a method had to
¹⁴ be developed.
¹⁵         Is that what your testimony
¹⁶ was?
¹⁷     A.   That is correct.
¹⁸     Q.   Okay.
¹⁹         MR. STANOCH:  I'm going
²⁰ to -- I'm going to mark the next
²¹ exhibit, sir.
²²         THE WITNESS:  Yes, sir.
²³         MR. STANOCH:  Which number
²⁴ should this be, Ms. Miller?

Page 792

¹         MS. LOCKARD:  183.
²         COURT REPORTER:  Correct,
³ 183.
⁴         MR. STANOCH:  Thank you,
⁵ all.
⁶         - - -
⁷     (Whereupon, Exhibit
⁸ Teva-183,
⁹ TEVA-MDL2875-00917708-7715, Test
¹⁰ Result Report, was marked for
¹¹ identification.)
¹²         - - -
¹³         THE WITNESS:  It's still
¹⁴ uploading, a couple of seconds.
¹⁵         Yes.
¹⁶ BY MR. STANOCH:
¹⁷     Q.   Do you have that document in
¹⁸ front of you, sir?
¹⁹     A.   Yes, sir.
²⁰     Q.   This appears to be a test
²¹ result report, dated July 2, 2014, from
²² Toxikon.
²³         Do you see that?
²⁴     A.   Yes, sir.

Confidential Information ~ Subject to Protective Order



Page 793

1  Q.   And the sponsor of that --
2  of this test is listed as Teva
3  Pharmaceutical Industries; is that
4  correct?
5      A.   Yes, sir.
6      Q.   And, in fact, they give an
7  address in Kfar Sava, Israel.
8          That's the city where
9  there's a Teva manufacturing facility we
10 talked about earlier, right?
11     A.   Correct.

Page 795

9  BY MR. STANOCH:
10     Q.   And do you recall anyone
11 doing any investigation at Teva, in the
12 summer of 2018, to see what other tests
13 the company had developed that could
14 detect nitrosamines in the past?
15     A.   But this is not a test that
16 the company developed.  This is a test
17 result report for a test that was
18 performed by an external company on
19 behalf of Teva for a specific issue --
20     Q.   You're right.
21     A.   -- counsel.
22     Q.   You're right.  This is three
23 years -- this is three or four years
24 prior, done by a third party sponsored by

Page 794

Page 796

1  Teva, correct?
2      A.   That is correct.
3      Q.   Do you remember talking to
4  anyone in the R&D departments at Teva
5  about whether they had experience with
6  genotoxic impurities in nitrosamines?
7      A.   Our team was working with
8  the person from the R&D department to
9  look for, again, doing assessments.
10         They were helping us -- I
11 personally did not.  But individuals from
12 within the organization were engaging
13 with the R&D department for different
14 activities, looking at route of
15 synthesis, looking at analytic test
16 methods, anything that we could get from
17 the R&D department.
18     Q.   Are you aware that as early
19 as March 2014, colleagues in the R&D
20 department in Iceland were using methods
21 to detect genotoxic impurities in API
22 substances?
23     A.   Can you show me the record,
24 counsel?

Confidential Information – Subject to Protective Order

Page 797

1    Q.   Do you recall any
2  conversations about that, to begin with?
3    A.   No, no.
4    Q.   Do you recall ever hearing
5  about an article authored by Müller?
6    A.   Yes.
7    Q.   Do you recall an article
8  that's entitled, A Rationale for
9  Determining Testing and Controlling
10 Specific Impurities in Pharmaceuticals
11 That Possess Potential for Genotoxicity?
12   A.   I do recall that.
13        Would you like to share that
14 document with me, please?
15   Q.   Sure.  My only question is,
16 do you recall looking at that document in
17 the summer of 2018?
18   A.   I recall looking at that
19 document at some point in time, yes.
20   Q.   Well, the specific question,
21 though, is, when did you look at it
22 first, sir?
23   A.   I don't remember right now.
24 But I also looked at it recently.

Page 798

1    Q.   Right.  You looked at it to
2  prepare for today's deposition, because I
3  used it with Mr. Carlson's deposition,
4  right?
5    A.   That is correct.
6        MS. LOCKARD:  Object to
7    form.  That's not why he looked at
8    it.
9  BY MR. STANOCH:
10   Q.   Did you look -- you don't
11 recall, one way or the other, if you ever
12 saw this document while you were actually
13 employed at Teva between 2017 and 2019;
14 is that fair?
15   A.   I don't recall if I saw it
16 at that time.  But I am well aware of
17 that document.
18   Q.   Okay.  And your counsel made
19 a number of references about your FDA
20 experience.  And I agree that you
21 certainly did work at the FDA after you
22 got your Bachelor of Science.
23        But you left the FDA when,
24 1996?

Page 799

1    A.   I left the FDA in '96.  I
2  was there since 1977.
3    Q.   So you left the FDA before
4  the FDA Modernization Act of 1997,
5  correct?
6    A.   That is correct.
7    Q.   You left the FDA before the
8  Food and Drug Administration Amendments
9  Act of 2007, correct?
10   A.   Yes.
11   Q.   You left the FDA before the
12 Food and Drug Administration Safety and
13 Innovation Act of 2012, correct?
14   A.   Yes.
15   Q.   And, quite obviously, any
16 other FDA statutory enactments or
17 regulations, you had left the FDA by
18 '96 -- strike that.
19        You left the FDA prior to
20 any other statutory enactments from the
21 FDA from 1997 forward?
22   A.   Except that in the different
23 positions that I have had, I have had to
24 become, myself, aware, knowledgeable and

Page 800

1  comfortable with all of those regulations
2  and laws that you're discussing.
3    Q.   Sure.  Right.  In terms of
4  working in the private sector, your
5  consulting work, right?
6    A.   Correct.
7    Q.   Right.  But you were not
8  asked, after 1996, to enforce any of
9  those laws anymore, right?
10   A.   That is correct.
11   Q.   Because you were no longer
12 at the FDA?
13   A.   That is correct.
14   Q.   You had no obligations to
15 enforce the 1997, 2007 or 2012 laws that
16 I referenced, because you had left the
17 FDA by the time they were instituted,
18 right?
19        MS. LOCKARD:  Objection.
20    Asked and answered.
21        THE WITNESS:  Not within the
22    FDA.  But, obviously, all of those
23    regulations have to be now
24    implemented at the different

Confidential Information - Subject to Protective Order

Page 801

1   facilities where I had
2   responsibility.
3       So I would not enforce it
4   externally -- as a member of the
5   FDA, but I would enforce it as a
6   member of the quality and
7   compliance organization in the
8   different companies that I worked
9   for.
10      MR. STANOCH:  Give me a
11  moment, please.
12      THE WITNESS:  Yes.
13      MR. STANOCH:  You know what,
14  no further questions.  Reserve
15  time if necessary.
16      MS. LOCKARD:  No questions
17  from my end.  The deposition is
18  concluded.  Thank you.
19      THE WITNESS:  Thank you,
20  everybody.  I appreciate it.
21      MR. STANOCH:  Mr. Barreto,
22  thank you so much for your
23  patience over these last two days
24  and appearing remotely.  I

Page 802

1   appreciate it.
2       THE WITNESS:  My pleasure.
3       MS. LOCKARD:  He will read
4   and sign.  So I think we've agreed
5   that at least Teva witnesses can
6   perform the errata by -- you know,
7   remotely --
8       MR. STANOCH:  No objection.
9       MS. LOCKARD:  -- by
10  notarization.  Okay.  I'm losing
11  my train of memory here.  But,
12  yeah, okay.
13      VIDEO TECHNICIAN:  The time
14  is now 5:12 p.m.  Going off the
15  record.
16              - - -
17      (Whereupon, the deposition
18  concluded at 5:12 p.m.)
19              - - -
20
21
22
23
24

Page 803

1
2
3   CERTIFICATE
4   I, Amanda Maslynsky-Miller, Certified
    Realtime Reporter, do hereby certify that
    prior to the commencement of the examination,
5   DANIEL BARRETO, was remotely sworn by me to
    testify to the truth, the whole truth and
6   nothing but the truth.
7
    I DO FURTHER CERTIFY that the foregoing is a
8   verbatim transcript of the testimony as taken
    stenographically by me at the time, place and
9   on the date hereinbefore set forth, to the
    best of my ability.
10
11  I DO FURTHER CERTIFY that I am neither a
    relative nor employee nor attorney nor
12  counsel of any of the parties to this action,
    and that I am neither a relative nor employee
13  of such attorney or counsel, and that I am
    not financially interested in the action.
14
15
16  _____
    Amanda Miller
17  Certified Realtime Reporter
    Dated: April 19, 2021
18
19
    (The foregoing certification of this
20  transcript does not apply to any reproduction
    of the same by any means, unless under the
21  direct control and/or supervision of the
    certifying reporter.)
22
23
24

Page 804

1   INSTRUCTIONS TO WITNESS
2
3       Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8       After doing so, please sign
9   the errata sheet and date it.
10      You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14      It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Confidential Information — Subject to Protective Order

Page 805

1

------
E R R A T A
------

2

3  PAGE  LINE  CHANGE/REASON

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 807

1  LAWYER'S NOTES

2  PAGE  LINE

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 806

1  ACKNOWLEDGMENT OF DEPONENT

2

3  I,_____, do hereby certify that I have read the foregoing pages,  1 - 383, and that the

4  same is a correct transcription of the answers given by me to the questions

5  therein propounded, except for the corrections or changes in form or

6  substance, if any, noted in the attached Errata Sheet.

7

8  _____

DANIEL BARRETO            DATE

9

10

Subscribed and sworn

11  to before me this _____ day of _____, 20____.

12

My commission expires:_____

13

14  _____

Notary Public

15

16

17

18

19

20

21

22

23

24

**WORD
INDEX**

**< 0 >**
**0.08** 440:*23*
**0.3** 435:*23*
436:*7, 17, 21*
437:*4* 440:*4,
11*
**001** 793:*21*
**003** 459:*8*
**005** 793:*21*
**0690** 493:*3*
**0875** 505:*24*
**0950662**
733:*18* 736:*10*

**< 1 >**
**1** 427:*17*
561:*19*
745:*13*
747:*20* 806:*3*
**1.0** 562:*11*
**1.3** 550:*12*
**1/1/19** 426:*10*
621:*17*
**1/4/19** 426:*8*
619:*1*
**1:22** 590:*16*
**1:59** 629:*24*
**10.1** 755:*11*
**10/23/18**
425:*14* 568:*11*
**10/30/18**
426:*16, 18*
735:*9* 781:*3*
**10:54** 553:*5*
**100** 422:*21*
**10th** 564:*13*
**11** 523:*24*
**11/13/19**
425:*16* 575:*24*
**11/27/19**
426:*12* 636:*1*
**11/27/2019**
636:*17*
**11:14** 553:*12*
**11:57** 590:*9*
**118147** 546:*2*
**121** 435:*19*

**1289** 665:*2*
**1291** 663:*19*
**1297** 656:*13*
658:*14*
**13** 507:*5*
511:*22* 516:*24*
**13th** 576:*14*
**14** 558:*2*
**14763** 621:*13*
**14826** 618:*20*
**15** 420:*9*
**15219** 422:*5,
18*
**15517** 515:*8*
**15th** 428:*14*
560:*24*
**16** 656:*14*
658:*16, 18, 22*
674:*9* 675:*8*
676:*15* 677:*9*
685:*15, 17*
**16,000** 640:*7*
**160** 520:*14*
**161** 492:*24*
**16146** 422:*21*
**162** 470:*22*
**166** 523:*15*
**167** 753:*4, 8*
**168** 560:*9*
**169** 562:*15*
**16th** 659:*12*
**170** 753:*8*
**173** 689:*17,
20, 22* 690:*24*
692:*5*
**174** 689:*13, 23*
**179** 636:*4*
**18** 432:*20*
455:*7*
**180** 734:*22*
**181** 781:*13*
**182** 781:*15*
**183** 792:*1, 3*
**18th** 435:*5, 8*
516:*2*
**19** 694:*14*
803:*17*
**19-2875** 420:*5*
**19422** 421:*21*
**1977** 694:*13*
799:*2*

**1996** 798:*24*
800:*8*
**1997** 799:*4,
21* 800:*15*
**1st** 622:*1*

**< 2 >**
**2** 428:*17*
474:*24* 475:*1*
492:*21* 558:*9*
561:*17* 792:*21*
**2,444** 640:*6*
**2:06** 631:*17*
**2:53** 684:*13*
**20** 606:*15*
694:*21*
750:*10* 806:*11*
**200** 421:*11, 20*
**2007** 799:*9*
800:*15*
**2011** 564:*12,
13*
**20116** 510:*10*
**2012** 506:*11*
508:*21* 509:*4,
19* 560:*24*
561:*8* 563:*3*
733:*13*
799:*13* 800:*15*
**2012/2013**
735:*17*
**2013** 457:*6*
**2014** 458:*3*
511:*7, 16*
513:*23*
792:*21*
794:*20* 796:*19*
**2015** 514:*2*
**2016** 557:*15*
558:*3* 712:*4,
23* 713:*19*
714:*9*
**2017** 516:*3*
521:*11*
537:*12* 538:*7,
15, 23* 539:*7*
540:*14*
542:*23* 554:*5*
555:*6, 13*
746:*8* 788:*14*
798:*13*

**2017/05**
745:*15*
**2018** 451:*21*
452:*19* 453:*4,
17* 454:*19*
455:*13*
456:*15*
521:*12*
537:*16, 18, 23*
538:*24*
539:*13*
540:*16*
541:*22*
542:*20*
544:*12, 21*
546:*15* 547:*1*
548:*4, 21*
553:*16* 554:*2,
12, 16* 555:*2,
15, 18* 568:*22*
579:*16* 595:*4,
19* 597:*5, 22*
598:*7, 17*
599:*1, 9*
600:*10, 17, 22*
606:*15*
608:*15* 611:*1*
642:*21*
650:*23* 662:*4*
715:*3, 13*
719:*5* 724:*19*
727:*13*
743:*20* 779:*8*
781:*22*
782:*12*
786:*21*
788:*13*
795:*12* 797:*17*
**2019** 432:*20*
435:*8* 576:*14*
580:*16*
586:*19* 589:*3,
5, 12* 612:*8*
617:*14*
619:*13* 622:*1,
11, 16, 21*
642:*15*
651:*23*
653:*11, 19*
659:*12* 661:*3,
16* 663:*23*

**664:*20* 665:*4,
13, 16* 669:*4*
692:*10* 798:*13*
**2021** 420:*9*
428:*14* 803:*17*
**20212** 563:*23*
**20213** 560:*10*
**20214** 562:*17*
**2026** 692:*7, 10*
**20279** 557:*8*
**20th** 610:*24*
661:*3, 16*
665:*4, 13, 15*
**21** 546:*15*
**215** 422:*5*
**2220** 422:*12*
**22589** 568:*5*
**230** 422:*11*
**23rd** 568:*21*
570:*24*
**24041** 580:*11*
**242568** 520:*8*
**242580** 523:*20*
**242736**
640:*14, 19*
**24488** 575:*19*
**24th** 557:*15*
**25** 546:*15*
**2500** 421:*12*
**25th** 589:*3*
**263-1840**
422:*19*
**27** 580:*16*
586:*19*
**27th** 692:*7, 10*
**2875** 420:*3*
**28th** 564:*12*
727:*13, 24*
**292** 660:*23*
661:*5*
**29th** 589:*5*
651:*23* 669:*4*
727:*24*

**< 3 >**
**3** 462:*5*
492:*4, 21*
513:*20*
653:*18* 739:*1*
**3/24/16** 425:*6*
557:*1*

Confidential Information - Subject to Protective Order

**3/27/19**
425:*18, 20*
580:*4* 586:*8*
**3:11** 684:*20*
**3:29** 703:*17*
**3:32** 703:*24*
**30** 457:*10*
737:*6* 804:*16*
**30(b)(6** 684:*7*
**30305** 421:*13*
**30s** 738:*24*
**30th** 622:*1, 10*
781:*21* 782:*12*
**312** 422:*13*
**320** 520:*14*
**3333** 421:*12*
**383** 806:*3*
**38th** 422:*18*
**3rd** 595:*4, 19*
597:*5, 22*
598:*7, 17*
599:*1, 9*
600:*10, 17, 22*
650:*23*
653:*11* 724:*19*

**< 4 >**
**4** 462:*5* 469:*6*
**4:16** 746:*19*
747:*2*
**4:32** 764:*12*
**4:39** 764:*19*
**40** 520:*14*
**412** 422:*19*
**428** 427:*17*
**429** 424:*6*
**450** 421:*20*
**470** 424:*13*
**48** 558:*11, 16*
615:*1* 629:*11*
645:*18*
**483** 535:*11,*
*18* 536:*4, 6,*
*12, 19, 20*
537:*4, 11*
538:*7, 14, 22*
539:*7* 547:*11*
550:*5* 710:*8,*
*16, 19* 711:*16*
744:*9, 19*
745:*1, 5*

**747:**8, 9*
772:*21*
787:*24*
788:*14* 789:*5*
**483s** 535:*8*
543:*23* 555:*5*
695:*20*
709:*20, 24*
711:*1, 2*
787:*4, 5*
**495893** 586:*3*
**4th** 511:*6, 16*
619:*13* 642:*15*

**< 5 >**
**5:12** 802:*14,*
*18*
**5010** 422:*4*
**504** 421:*5*
**505** 424:*15*
**510** 424:*17*
**515** 424:*19*
**519** 424:*22*
**524-5777**
421:*5*
**553-2100**
421:*13*
**556** 425:*6*
**560** 425:*8*
**562** 425:*10*
**563** 425:*13*
**566.4808**
422:*13*
**567-0700**
421:*21*
**568** 425:*15*
**575** 425:*17*
**579** 425:*19*
**586** 425:*21*
**59** 745:*10*
779:*22*
**5th** 506:*11*

**< 6 >**
**6** 474:*24*
475:*2*
**6:45:10** 636:*17*
**600** 422:*4*
**60028** 780:*23*
**605** 425:*23*

**60606** 422:*12*
**61** 546:*7*
**610** 421:*21*
**611** 426:*6*
**618** 426:*8*
**62** 745:*8, 10*
**621** 426:*10*
**635** 426:*12*
**646** 427:*12*
**65014** 606:*6*
**651** 426:*14*
**664** 474:*24*
**678** 421:*13*
**685** 424:*6*

**< 7 >**
**7** 422:*21*
**701** 421:*4*
**70130** 421:*5*
**717006** 637:*6*
**724** 422:*22*
**735** 426:*16*
**7679A** 526:*14*
**769** 424:*6*
**781** 426:*18*
**7890A** 526:*10*
**792** 426:*20*

**< 8 >**
**8** 427:*12*
**8/20/18**
425:*22* 606:*1*
**8/8/19** 426:*6*
611:*23*
**8:33** 420:*15*
428:*15*
**80** 520:*14*
**877.370.3377**
420:*23*
**8th** 612:*7*
663:*23* 664:*20*

**< 9 >**
**9** 458:*3*
**9/29/19**
426:*14* 651:*11*
**9:29** 589:*6*
**9:34** 491:*16*
**9:47** 491:*23*
**917.591.5672**

**420:**23*
**950663** 471:*14*
**96** 799:*1, 18*
**979-1159**
422:*5*
**981-1397**
422:*22*

**< A >**
**a.m** 420:*15*
428:*15*
491:*16, 23*
553:*5, 12*
590:*9*
**abilities**
446:*21*
**ability** 431:*20*
472:*2* 483:*13*
693:*3* 696:*16*
714:*11*
752:*17* 803:*9*
**able** 432:*6*
451:*1, 16*
460:*3* 478:*22*
501:*1* 502:*17*
522:*8* 527:*12*
530:*16*
541:*23*
573:*23*
582:*20*
589:*24* 671:*9*
678:*21* 709:*5*
728:*8* 730:*12*
733:*23* 734:*3,*
*10, 15, 16, 24*
735:*3* 751:*22*
760:*16*
768:*15*
775:*21* 776:*9*
779:*2*
**abnormal**
654:*8*
**Absence**
503:*6* 721:*18*
751:*10*
752:*15*
760:*11, 13*
761:*7, 9, 20*
763:*11*
770:*14, 22*

**771:**4* 772:*19*
775:*3*
**Absent** 450:*12*
**Absolutely**
455:*18*
502:*22*
672:*10, 13*
702:*17* 773:*23*
**accept** 582:*16*
641:*16* 771:*2*
**acceptable**
436:*6, 17*
482:*16* 484:*3*
486:*24* 488:*2*
541:*4* 583:*17*
584:*20*
711:*12* 746:*9*
747:*24*
787:*19, 20*
788:*21*
**accepted**
787:*20*
**access** 660:*21*
689:*10*
690:*11, 22*
692:*3, 17*
693:*5* 703:*15*
704:*21, 24*
705:*7* 720:*14*
767:*24*
768:*20* 788:*13*
**accurate**
482:*18*
530:*19* 804:*20*
**accusation**
629:*10*
**accused** 756:*3*
**acetate**
464:*11* 508:*6*
512:*8* 517:*10*
525:*3, 15*
**achieve**
708:*15* 775:*12*
**achieved**
751:*23* 760:*9*
762:*6*
**achieving**
761:*11*
763:*14* 770:*4,*
*16* 775:*5*

Confidential Information - Subject to Protective Order

**acid** 449:12
723:20
**ACKNOWLE**
**DGMENT**
806:1
**acquainted**
431:22
**acquired**
459:15  473:11
**Act** 799:4, 9,
13
**Actavis**
421:16  425:8
456:9  458:5
463:4  464:1
466:16
469:18
471:18
473:10
474:12
475:16
476:15, 17
477:1, 4, 8
478:24  479:5,
7, 13  480:3, 7,
13, 18  481:3,
5, 14, 18, 23
482:3, 5, 7, 14,
17  483:20
487:5, 8, 16
488:15, 18
489:5  490:16,
18  492:2, 12
493:23
494:18  495:1,
15  496:4, 17,
19  497:4, 22
498:9, 17
499:1, 19
500:3  507:10
508:4  511:14
512:11  514:5
516:6, 11, 20
517:9, 17, 24
556:12
557:18, 23
558:6, 22
559:1, 18, 22
560:15, 23
561:7  563:4
564:19

566:19, 20
567:3  755:3
**Actavis's**
476:12  487:2,
13  509:20
**acted**  766:21
**action** 469:14
483:16
484:15
485:19  486:2
704:16
713:15
725:20
779:20  780:5
803:12, 13
**actions**
469:15  481:4
665:20
673:24  674:4
691:10  711:7,
8, 10, 12, 16
713:12, 18
748:1  759:20
768:14
787:18  788:1,
21
**Active** 425:12
469:1  557:13
563:17  564:5
**activities**
445:19
469:12  470:5,
9  472:7, 9
473:7  476:23
477:6  479:18
480:9  514:17
522:5  544:20
548:7, 8
555:8  596:21
605:14
654:24  707:7
728:22  731:6
736:16
737:22  738:9
739:19
770:22  773:7
774:10  776:7
796:14
**activity**
445:22  474:9
522:16

720:10
738:15  771:3
**actual** 460:16
529:18
530:14
786:15  787:4
**add** 432:7
462:23  674:6
**added** 469:7
**Addition**
424:21
477:21  520:1,
12
**additional**
439:23
482:14  483:2
572:15  769:10
**address**
539:11  638:4
645:21
710:24
754:12
766:23  793:7
**addressed**
714:9
**addressing**
765:15
**adequate**
539:23  676:7
678:10  748:2
**adjust**  717:17

**Administration**
603:8  745:14
799:8, 12
**administrative**
522:16  627:1
**adverse**
553:19  555:4
729:24
**adversely**
497:15
498:19  500:6,
20  501:12
**advertisement**
618:14
**advice** 609:7
720:9, 10
**advise**  720:9
**advised**  725:23

**advising**
719:24
**affect** 497:15
498:19  500:6,
21  501:12
**affirmatively**
484:6  656:7
**agencies**
573:1  574:2
**agency** 556:3
602:3  694:14
695:8  711:11
725:2  785:17
**Agilent** 526:9,
14
**ago** 444:6
458:10  632:16
**agree** 484:12
485:16
577:11
578:11
610:23  630:2
642:18
749:16  764:7
772:22
775:11  784:6
794:20  795:3
798:20
**agreed** 428:3
749:20
783:14  802:4
**agreeing**
577:16, 18
**Agreement**
425:6, 7, 10,
12  557:1, 13,
22, 24  558:5,
8, 21, 24
559:1, 13, 18,
21, 24  560:3,
4, 14, 23
561:7, 9
562:21  563:3,
8, 9, 17  564:5,
18  566:18
567:2, 3, 6, 9,
13, 15, 18, 20
641:17
654:19  655:3,
5, 8, 11, 14, 17,
21  656:3, 11

751:10, 15
752:6, 13, 16,
20  753:13, 23
754:11, 19
755:6, 17, 20
756:1, 4, 7, 11,
16, 18, 21, 24
757:3  758:13,
15, 19  759:8,
23  760:5, 10,
14, 22  761:9,
17  762:10, 21
763:2, 8
770:1, 4, 6, 12,
15, 19  771:5,
6  772:15, 19
773:8  775:4,
14, 20  776:2,
5, 10
**agreements**
556:10, 11, 18
559:5, 10
564:19, 21
565:10
566:20  753:2,
8, 14, 16
754:7  755:1
757:12, 13, 17
758:3  770:23
771:10, 14, 18,
24  772:5, 12,
24
**ahead** 432:1
495:24
530:10
551:19
578:18
624:23
626:13
628:19  642:8
668:1  686:20
689:19  754:4
757:9  764:5
**alert** 595:4
654:2  724:18,
23  725:1, 3,
10  728:24
729:21
**alerts** 695:11
**ALFANO**

Confidential Information - Subject to Protective Order

422:*14*
**align** 564:*18*
**allow** 431:*21*
451:*6* 471:*7,*
*23* 473:*2*
479:*7* 493:*12*
504:*5* 505:*17*
511:*11*
551:*21*
558:*14*
563:*24*
569:*23* 571:*5*
575:*5, 6*
576:*3* 577:*21,*
*24* 581:*4*
586:*12* 588:*8,*
*15* 708:*11*
714:*21* 716:*1*
744:*3* 755:*2*
769:*3*
**allowance**
588:*3*
**allowed** 465:*2*
478:*23*
583:*23*
693:*12* 738:*19*
**Alternative**
424:*21* 520:*2,*
*13* 690:*20*
**Amanda**
420:*16* 432:*6*
545:*11* 803:*1,*
*16*
**ambiguous**
757:*8* 761:*3*
**Amendment**
425:*10* 457:*6,*
*7* 562:*21*
563:*2*
**Amendments**
799:*8*
**amlodipine**
458:*18*
**amount** 452:*2*
659:*6* 674:*3*
785:*5*
**Analysis**
424:*15, 17, 19,*
*21* 463:*10*
478:*8* 504:*15,*
*20, 22* 505:*4,*

*14* 506:*6*
510:*15, 22*
515:*13, 19*
520:*1, 12*
522:*22* 526:*3,*
*17* 539:*24*
707:*14, 22*
731:*7* 762:*18*
**analyst** 694:*24*
**analytic**
796:*15*
**analytical**
433:*3* 434:*15*
436:*13*
467:*16* 678:*5*
708:*10, 15*
714:*17*
715:*24* 716:*4*
719:*19* 778:*6,*
*23* 779:*24*
780:*15* 795:*7*
**analyzed**
488:*4* 790:*16*
**analyzing**
508:*23*
**and/or** 803:*21*
**ANDA** 457:*6*
458:*13* 529:*3*
738:*20, 24*
**and-a-half**
694:*14*
**Anker** 765:*12*
**Answer** 427:*5*
484:*18, 21*
485:*7, 9, 23*
487:*20, 21, 22*
488:*13, 21*
489:*23* 490:*4*
501:*2* 503:*18*
530:*19*
533:*11*
554:*14, 19*
555:*14* 562:*2*
570:*1* 574:*12*
577:*22* 583:*8,*
*12, 14* 584:*11,*
*12* 587:*18*
600:*1* 626:*14*
644:*3, 23*
645:*2, 5*
649:*17* 663:*4*

666:*20*
676:*22* 682:*8*
766:*5* 784:*15*
**answered**
469:*24*
480:*15*
487:*18*
488:*20*
495:*11* 623:*5*
646:*21* 662:*8*
678:*17* 681:*2,*
*17* 722:*1*
800:*20*
**answers** 806:*4*
**anybody**
453:*24*
741:*22, 23*
791:*5, 7*
**anymore**
432:*4* 451:*23*
453:*9* 678:*15*
679:*4* 800:*9*
**anyway** 491:*7*
616:*24* 627:*21*
**API** 431:*5*
433:*1, 2, 18*
434:*5, 9*
435:*13* 436:*3,*
*5, 12, 14*
437:*2, 6, 12,*
*19* 438:*11, 17,*
*22* 439:*4, 18*
440:*2, 9, 21*
441:*5, 12, 17,*
*24* 443:*3, 9*
444:*1* 445:*16*
446:*1, 3, 6, 8*
447:*11* 448:*9*
453:*18* 457:*9*
462:*20*
463:*11, 19*
467:*12* 472:*9,*
*13, 20, 23*
473:*2, 12*
474:*13*
475:*15*
477:*12* 480:*5*
489:*12* 494:*1*
496:*21* 498:*9*
503:*3* 504:*17,*
*19* 506:*19*

507:*12, 17*
508:*2, 23*
509:*6, 21*
511:*2, 15*
512:*13* 514:*6*
515:*22*
516:*14, 21*
517:*19* 518:*1,*
*18* 524:*13*
525:*10* 527:*4,*
*5, 19* 528:*7,*
*12, 19, 22*
529:*6, 12, 22*
530:*2* 531:*3*
532:*8* 533:*5*
535:*7, 18*
536:*18*
538:*16* 539:*9,*
*18* 540:*18*
542:*21*
543:*22*
544:*15*
546:*14*
553:*17* 554:*3,*
*17* 555:*4, 21*
559:*2* 565:*14*
566:*10*
567:*17* 574:*4*
575:*10, 12*
577:*3* 578:*22*
579:*3, 10, 15*
589:*14*
592:*16* 593:*4,*
*12* 594:*4*
597:*12, 24*
598:*9* 599:*4,*
*12* 601:*13*
602:*4* 648:*8,*
*15, 18* 649:*4,*
*6, 10, 22*
650:*22* 652:*8*
653:*1, 5, 15,*
*21* 654:*20*
656:*23* 657:*1,*
*22* 658:*5, 24*
659:*19* 660:*4*
661:*19*
662:*23*
664:*23*
667:*16, 18*
668:*23*

669:*12* 670:*2,*
*11, 23* 671:*16,*
*19* 672:*18*
673:*3, 18*
674:*10, 11*
675:*9, 18*
676:*8, 15*
677:*10, 19*
678:*11, 24*
679:*18* 680:*4,*
*6, 22* 681:*14*
682:*1* 683:*13*
684:*1* 701:*1,*
*6, 18* 705:*10,*
*17* 706:*8*
707:*8, 11, 12*
708:*21*
714:*12*
717:*16, 18*
731:*11, 16, 21*
732:*6, 7, 13*
740:*18, 21*
758:*16*
762:*12, 19*
763:*17*
765:*22* 768:*2*
773:*12* 774:*6,*
*11, 15, 21*
775:*6, 10*
776:*21* 777:*4*
778:*11* 796:*21*
**APIs** 558:*7*
563:*8* 569:*14*
572:*11*
573:*21* 574:*8*
575:*3* 683:*22*
714:*19*
**apologies**
441:*14*
457:*21*
523:*13*
587:*20*
610:*22*
656:*17*
706:*18*
716:*22* 735:*2,*
*19, 21* 736:*6*
745:*9*
**apologize**
777:*17*

apparently
787:22
appear 433:9
462:13, 19
463:6 599:17
600:3, 5, 11
698:8 753:13
Appearance
507:1
APPEARANC
ES 421:1
422:1 423:1
appeared
613:5
appearing
801:24
appears
433:20 434:7,
20 435:17
471:11
493:21 506:4
510:20
515:17
520:11
557:12, 17
560:22 561:6
563:2 564:4
568:19
576:12 578:6
580:14
581:10
586:17
606:14 619:6
698:6 792:20
appended
607:20
Appendix
558:9
applicable
518:6 534:15
548:9 565:13
567:16, 19, 21
628:15 715:1
717:16, 18
720:24 721:9,
21
applied 497:8
527:12
584:21 588:5
644:9 648:12
732:13, 24

APPLIES
420:7 731:24
732:1
apply 668:17
725:13
731:15, 20
803:20
applying
696:11
appreciate
532:2 550:8
552:3 566:3,
4 655:18
684:24 685:6
764:7 801:20
802:1
approach
455:5 477:15
500:10
573:24 575:6,
9 582:11
701:12 719:14
approached
750:23
appropriate
485:3 673:16
804:6
appropriately
520:21 766:22
approval
434:12
467:23 468:5
483:9 509:9
641:15
approved
435:4 506:10
509:8 511:6
514:13 516:2
599:17 603:16
approving
496:5
approximately
662:2
APRIL 420:9
428:14 516:2
558:3 622:1
642:15 803:17
aqueous 451:3
ARB 612:20
area 447:5
698:4

areas 536:10
552:13
697:21, 24
789:1, 4
argue 666:12
arguing 485:4,
7 629:6
Argumentative
483:23 485:1
627:24
arrange
659:22
arrangement
574:6
arrived 574:6
Arrow 506:4
510:22 526:4
564:6, 12
article 634:12
691:2, 6
797:5, 7
ascertain
446:20 555:3
683:4
ascertained
720:15
aside 691:23
786:18
Asked 469:24
480:15
487:18
488:20 491:3
495:11
594:15 623:5
630:7, 19
646:21 660:3,
5 662:8
681:2, 17
689:13
697:14 698:5
700:22
706:20 715:6
718:12 722:1
724:16
730:10 731:2
733:2 738:23
743:19 744:6
746:1 747:14
751:9 776:13,
20 800:8, 20

asking 487:10
490:15, 19
501:15
531:24
532:23
542:11
550:17
569:11
574:20, 21
575:1, 5
601:10
615:12 618:5
619:14, 20
622:11, 16, 19
624:21 626:9
628:7 629:17
630:12, 16
631:1 632:5
634:20
653:19
666:15
667:22 704:4
756:10 777:7
785:4
asks 666:11
691:21
aspect 730:6
773:13
assembled
768:6
assess 444:20
598:6 701:12
assessed
445:23
531:16 534:21
assessing
673:19
Assessment
424:13
432:24 433:1,
17 434:4, 8
439:7, 9, 11,
14, 22 441:6
442:2, 4, 19
447:10
448:16 449:1
450:13 467:8
471:3, 12, 19
472:1, 7, 12,
18 473:9
474:2, 20

476:13
480:21, 24
482:5 486:3,
20 492:13
493:23 497:4
498:16 499:1,
16 500:3
528:1 535:16
541:18
738:13 794:11
assessments
431:3 470:3,
6, 8, 16
695:16 698:3
739:17, 18
796:9
assisting 695:4
associated
469:12 472:8,
9 476:24
548:11
552:13 702:2
765:16
assume
454:16 513:2
531:7 577:19
595:22
606:23 685:9
753:23
assumed 629:1
assuming
594:21
assurance
444:12 647:4
683:6
assure 613:14
Atlanta 421:13
attached
493:22
659:18
804:12 806:6
attaching
536:23
Attachment
745:13, 17
attachments
636:22 745:11
attention
642:20

Confidential Information Subject to Protective Order

attorney
803:11, 13
804:16
attributes
740:17
audit  446:15
452:1, 22
453:17
539:12
540:18
541:23  544:6,
22  546:12, 13,
14, 24  547:10,
17, 19  548:2,
16  551:10
554:9  676:1
677:23  683:3
712:5, 18, 19,
21, 23, 24
713:2, 6, 10,
19  714:10
743:20, 21
755:1, 4
759:7  786:21
788:24
audited  453:4
auditing
446:19  447:1
682:20  683:1
712:13
auditor  544:4
547:23  548:3
744:8  745:11,
24  746:5
747:7, 14, 20
788:17, 20, 23
789:1
auditors
543:8, 18
544:13, 19
546:17  547:9,
16, 17  552:11
554:3, 8, 17,
22  712:20
787:3  788:12
audits  538:24
541:6  554:24
602:2  683:1,
8  713:5
755:8  759:17,
18

August
606:15
608:15
610:24  612:7
617:14  661:3,
16  662:4
Aurobindo
421:23
Aurolife
421:23
authored
797:5
authorities
455:24  456:5
467:7, 14
528:3  564:22
584:14  588:3
692:15  693:1,
16  715:5
750:16
authority
467:10
692:15  693:8
authorization
616:24
619:15  622:12
authorized
617:1
authorizing
659:18
automatically
717:21  772:20
availability
601:5  657:20
658:4, 8, 11
available
430:9, 12
542:5  657:9
705:2  733:18
aware  437:10
463:3  467:11
476:17  480:2,
7  494:24
497:21  518:9
528:5, 18
533:1  537:9
542:18
559:21
592:13, 20
601:8  603:20,
24  605:4

606:23
614:15  616:9,
15  617:2
618:3, 6
625:24
648:16, 24
655:24
667:14
668:20, 24
686:4  688:11
704:17
735:16
739:22  747:7
772:3, 6, 10,
18  785:21, 24
790:11  791:3,
7  793:24
794:3  796:18
798:16  799:24

< B >
Bachelor
798:22
back  429:5
453:21  483:1
485:11  491:9,
23  492:12
493:12
553:12
561:14  562:3,
4  573:11
574:22
577:10
588:24
590:16, 19
631:17  642:1
653:5  656:17
658:13
672:23
684:20  686:8
694:6  703:24
710:10  747:2
751:1  764:19
782:5  789:20
back-and-forth
573:11
backpedal
784:7
backup  497:3
bad  687:19

badgering
629:6
balance  705:5
balancing
704:8
BARRETO
420:15  424:3
425:15, 16, 19,
21  426:16, 18
428:17, 20
429:5  431:1
432:12  492:2
523:18
542:18
553:15
568:12
575:24  580:5
586:9  590:19
602:13
614:21  616:9
624:23  628:9
631:20  644:6,
7  646:7, 13
681:4  684:22
685:11  686:1
706:13  723:3
734:14
735:10  748:8
754:6  757:14
764:22
766:16
769:16
777:20  781:4
801:21  803:5
806:8
barrier  451:2
based  439:11
440:24  442:3
452:22, 23
454:8  465:13,
17, 18  466:5
478:20
495:18, 23
496:1  522:10
540:11  541:7,
15  548:5, 10
554:8  578:8
579:5  581:17
585:19  588:3
598:3  617:17
625:19

627:12, 15
633:9, 11
663:3  699:21
702:5  725:17
738:7  740:9
742:19
748:12
750:14
760:12
765:10
788:22  794:11
basic  541:20
basically
472:24  488:8
624:2  776:3
basis  501:23
502:7  530:17
531:7  561:23
573:9  615:16
633:6  667:3
673:11  779:23
batch  443:3
461:18, 19
477:22  478:5,
11  502:14
503:14
batch-after-
batch  708:8
batches
435:20
438:17, 23
440:2, 9, 21
442:6, 17
443:17
445:10
478:19
499:20
569:14, 17
572:10  573:3,
20  574:8
575:10, 12
584:21  590:2
Bates  426:3
471:14
474:24  493:3
505:24  510:9
515:7  520:7
523:19  546:1
557:7  560:9
562:16
563:22  568:4

Confidential Information Subject to Protective Order

575:*19*
580:*11*  586:*2*
606:*6*  611:*23*
618:*20*
621:*12*  636:*8,
11*  637:*6*
733:*17*
736:*10*  780:*22*
**bear** 769:*13*
**bearing** 637:*6*
**beginning**
573:*15*  630:*7*
**behalf** 601:*23*
619:*14*  795:*19*
**belief** 627:*12*
**believe** 437:*14,
21*  438:*12, 19,
24*  452:*21*
453:*1, 6*
456:*17*
470:*21*  474:*1,
4*  478:*7*
513:*19*
518:*15*  519:*7*
537:*13, 17*
566:*14*
579:*18*
602:*13*
615:*23*
620:*22*  623:*7*
625:*14*  634:*1*
690:*24*  701:*1*
703:*10*
705:*19*
706:*21*
713:*17*  739:*1*
743:*23*  744:*2*
770:*3*  783:*20*
788:*11*
**believes**
771:*15*
**Bell** 421:*21*
**belongs** 559:*9*
**benefit** 702:*12,
22*
**best** 446:*20*
529:*24*
571:*21*
572:*20*  575:*7*
610:*17*
626:*22*

646:*22*  692:*2*
698:*19*
725:*21*  803:*9*
**better** 431:*21*
444:*21*
468:*23*  577:*7,
20*  578:*7*
579:*2, 19*
600:*1*  637:*17*
677:*2*  679:*14*
765:*2, 7, 18*
**beyond** 768:*8*
**big** 627:*21*
**bigger** 478:*12*
**bill** 639:*23*
640:*10, 24*
641:*24*
**Binsol** 599:*24*
677:*1*  679:*13*
719:*10*
**Birk** 580:*15*
586:*18*
**bit** 431:*2*
447:*22*
448:*11*
474:*20*  490:*9*
717:*11*  719:*11*
**BLL** 637:*21*
**Blue** 421:*21*
**board** 697:*4*
**bodies** 582:*15*
790:*24*
**Bonilla**
605:*15*
614:*13*
632:*10, 14, 18*
633:*10, 12, 21*
635:*13*
**BOSICK**
422:*14*
**bothering**
490:*11*
**bottom** 589:*7*
661:*4*  663:*21*
690:*24*  736:*10*
**bounds** 626:*8*
**Box** 507:*5*
516:*23, 24*
**brand** 688:*4*

**branded**
687:*11*  688:*5,
14*
**break** 490:*6*
491:*4, 8*
590:*6*  629:*21,
22*  630:*3, 20,
24*  650:*10*
684:*10*  704:*3*
734:*2*
**brief** 491:*19*
553:*8*  631:*13*
684:*16*
703:*20*
746:*22*  764:*15*
**briefly** 694:*6*
719:*23*
**bring** 455:*21*
588:*19, 24*
**brings** 504:*20*
**broader** 567:*3,
14*
**brought**
642:*20*
**browsed**
430:*1*  753:*10*
**browsing**
550:*22*
**Bulgaria**
518:*13*
**bullet** 461:*13,
17*
**bullets** 475:*11*
476:*1*
**bunch** 660:*8*
**business**
727:*14*
**by-product**
450:*6, 9*

**< C >**
**C.whiteley@ka**
**nner-law.com**
421:*6*
**CA/US** 507:*21*
**call** 443:*18*
450:*6*  468:*24*
531:*15*  682:*9*
740:*17*
**called** 450:*18,
24*  519:*7, 9*

533:*22*
596:*22*
712:*16*  713:*8*
794:*6*
**calling** 628:*22*
**calls** 583:*9*
614:*18*  621:*6*
642:*6*  663:*3*
754:*2*  757:*6*
761:*2*  788:*5*
**Camp** 421:*4*
**Canada**
507:*24*  508:*4*
512:*6*  517:*8*
581:*23*  790:*24*
**canceled**
518:*5*  743:*8,
11*
**capabilities**
715:*7*  719:*1,
6, 17*
**capable**
508:*22*  793:*20*
**carcinogen**
697:*16*
**carcinogenicity**
697:*15*
**carefully**
804:*4*
**Carlson's**
798:*3*
**case** 443:*14*
446:*13*  449:*4*
453:*20*
454:*24*
518:*22*
528:*21, 23*
547:*3*  548:*15*
551:*2, 4, 8*
561:*24*
564:*24*
588:*23*
589:*18*  609:*1*
625:*7*  627:*5*
628:*13*  643:*8*
647:*5*  648:*2*
654:*9, 14, 15*
658:*20*
660:*12*
673:*15*
690:*18*

699:*24*
701:*16*  707:*8*
717:*10*  718:*1*
725:*14*
728:*15, 17*
751:*18*
758:*16*
763:*10*  771:*5*
784:*18*  785:*3,
13*
**case-by-case**
531:*7*  667:*3*
668:*12*  673:*10*
**CASES** 420:*8*
775:*19*
**catch** 678:*4*
**category**
690:*17*
**CATELLO**
422:*17*
**caught** 722:*7*
723:*2*  724:*2*
**cause** 448:*7,
14, 17*  449:*22*
539:*24*
540:*10*  703:*4*
707:*14*  718:*9*
730:*2, 7*
762:*17, 20*
**cautious**
541:*17*
**CBE** 457:*10*
458:*4*  475:*21*
483:*4, 9*
492:*3*  513:*12*
514:*8*  516:*7*
737:*6*  738:*24*
**center** 643:*1*
**Centre** 422:*18*
**CEP** 475:*9*
**certain** 443:*2,
3*  445:*10*
447:*24*
448:*20*  449:*4*
501:*24*
503:*13*
527:*10*
534:*20*
561:*22*  584:*7,
21*  585:*4*
587:*4*  588:*8,*

9, 11, 15
601:20  667:5
671:10  700:8,
9  754:21
758:20
770:23  785:4,
17
**Certainly**
432:8  437:20
555:22  638:6
775:12
794:21  798:21
**Certificate**
424:15, 19
463:10
504:15, 20, 21
505:4, 13
506:6  510:22
515:12, 19
634:7, 10
635:3  641:23
659:23  803:1
**certificates**
609:13  634:2
635:9
**Certification**
424:17  428:4
510:15  641:4,
7  642:14
803:17
**Certified**
420:17  803:1,
17
**certify**  803:4,
6, 11  806:3
**certifying**
803:21
**cetera**  605:3
728:1
**cGMP-
compliant**
774:22
**chain**  538:9
568:20  569:2
576:22
580:15, 21, 24
586:18
594:12, 24
620:17
621:24
643:17

651:19
781:17  782:2
**Chalfont**
638:1
**challenge**
500:12
**challenged**
465:21  499:23
**challenges**
472:23  740:15
**challenging**
502:10, 11
574:5
**change**
456:10
459:16
468:12  472:2
476:3, 24
481:3, 7
482:4, 5
483:9  486:12
493:24  494:3
497:2, 7, 15,
24  499:3
500:20  501:4,
11  512:17
516:8  527:11
605:19  733:2,
7, 11, 13
735:18
736:15, 17, 21
737:2, 9, 16,
21  738:1, 3, 8,
18  739:16
780:14
**CHANGE/RE
ASON**  805:3
**changed**
497:14  501:9
527:17, 20
584:16  709:2
**changes**
461:11  462:2
467:22
475:10, 12, 14
562:9  733:7
804:11  806:5
**characteristics**
600:19  601:2

**characterize**
624:6  626:22
628:6, 11
**characterized**
768:12
**chat**  432:5
733:21  734:4,
18, 23
**check**  466:9,
18  477:11
551:17
553:20, 22
652:14  660:20
**checked**  466:8
506:10  511:6
641:8
**checks**  464:21
468:13
**chemical**
448:19
449:24  454:5
**Chester**  638:9
**Chicago**
422:12
**Chile**  693:19
**chloride**
448:2  450:19
456:11  457:8
459:17
463:16, 20
472:14
473:13
474:15  476:4
478:8  494:8,
19  495:4
496:21  498:2
499:6  512:18
514:7  516:15
527:21
**choice**  493:17
**CHP**  479:6
**chromatogram**
544:14
**chromatogram
s**  539:9
542:22

**chromatograph**
526:9, 18
527:2, 3

**chromatograph
y**  508:17, 22
509:2  512:3
517:5  524:23
718:14, 18
**chromatograph
y-mass**  794:22
**Chuannan**
537:12  745:15
**CIPRIANI**
421:19
**circumstances**
444:23  762:2
**cite**  729:4, 18
**cited**  765:11
**city**  793:8
**CIVIL**  420:5
**claim**  454:1
619:22
**claiming**  490:1
**Claire**  568:22
**clarification**
566:4  569:12,
22  570:5
686:12
**clarified**
618:13
**clarify**  493:5
536:2, 11
543:13
561:14
648:22
678:13
687:17
721:14  730:13
**clarity**  604:12
**class**  699:16
**classification**
788:22
**classified**
654:12  787:19
**cleaning**  548:8
**clear**  492:9
504:7  513:7
723:7
**client**  490:3
**clients**  536:14
**close**  763:22
768:8
**closure**  682:3

729:16  762:4
**coach**  565:7
**coaching**
629:3
**colleagues**
577:1  624:2
692:14  796:19
**collected**
555:10
607:14  745:12
**collection**
441:6  683:20
**column**  508:10
**combination**
458:19  487:7
**combined**
449:11
**combustion**
641:14
**come**  479:7
491:9  570:17
574:2  742:22
759:15  795:8
**comes**  450:9
487:7  489:12
541:5  710:17
717:12
**comfortable**
445:6  488:8
627:7  767:13
800:1
**coming**  430:5
440:15  441:2
454:11
476:14
507:12  508:2
511:2  527:6
538:10  723:19

**commencement**
803:4
**commencing**
420:15
**comment**
719:22  765:1
**comments**
526:1  641:11
**commercial**
479:2  480:4
497:9  501:23

Confidential Information - Subject to Protective Order

commercially
755:13
commission
806:11
commitment
711:10  783:23
common
448:4  539:19
commonly
449:3
Commonwealt
h  420:18
communicate
598:23
communicated
598:5  610:5
616:22  633:4
760:2, 4

communication
438:4  536:22
538:2, 6, 10
577:2  591:4
592:18
594:23  595:2,
14, 23  603:10,
15  604:10
614:11, 12
616:10  617:3
653:10
765:13  791:9
communication
s  444:2
590:24  591:8,
20, 22  592:7,
14, 21  593:1,
8  601:9
602:9  603:11
604:22
618:11
668:21  754:21
companies
656:11  713:7,
10  801:8
company
444:3  460:15
472:21  571:1
596:21
602:21  609:6
610:6  665:9,
17  666:8

679:4, 6
708:11
747:19
760:15
761:10
772:20  775:5
776:10
787:20
795:13, 16, 18
company's
522:6
comparative
526:3
comparing
532:17
comparison
526:23  532:13
complain
728:13  730:6
complete
489:6
completed
664:11, 16, 22
665:14  669:7
787:15
completely
455:15
462:11, 18
463:6  465:11
469:20  482:8
551:7, 14
completion
548:20  711:8
738:18
complex
452:7  694:17
complexity
717:11
compliance
502:24  503:2
547:18  548:4,
18  569:8
683:5  687:9,
10, 12, 14
713:14
729:20  755:4
770:21
772:16  801:7
compliant
503:10  776:11

complied
529:1  553:17
comply
517:15
688:19  778:7
component
652:13
compound
789:16
comprehensive
445:7  788:24
computer
692:8
concentrations
657:2
concept
452:11  582:7
683:6
concepts  785:1
concern
577:13
578:13
581:15
583:24  658:3
691:9  704:9
concerned
479:13  729:9
748:3
concerning
431:4  433:17
441:7  447:11
466:19  480:4
492:5  493:23
591:10, 23
592:9  601:11
603:22  612:9
619:8  654:2
786:23
conclude
443:16  739:19
concluded
439:14
441:10
442:20
539:15
801:18  802:18
concludes
533:16
conclusion
435:16  436:2,
19  445:13

447:14  479:7
486:10
598:14
666:11
673:22
693:17
707:24  747:6
759:16  793:17
conclusions
698:3  737:14
795:8
conclusively
649:15
concurrently
786:9, 14
conditions
467:19
502:16
527:10, 13
531:12
582:10
608:24
641:15  695:3
754:20  775:9
778:5
conduct
437:18  555:2
755:3
conducted
498:13
738:10  746:2
confidence
477:5  766:21
CONFIDENTI
AL  420:11
confirm  463:5
470:11  482:8
497:23  502:5
551:18
556:17
558:13  561:4
624:22
632:24
652:16
653:14, 19
660:3  663:13
740:16
confirmation
633:11
confirmed
439:21

450:22  476:6
494:10  499:2,
11  542:1
609:12
confirming
502:8  664:21
669:5
conform
688:4, 13
confusing
634:20
CONLEE
421:3
connection
499:16
537:11  634:3
695:23
697:10  731:10
Connie
606:15
614:12
623:24  631:22
conservative
701:11
consider
693:2  703:7
consideration
456:5  704:12
720:20
considerations
698:17
considered
468:20  649:4
654:8  716:11
731:12
732:19  746:8
consistency
504:2
consistent
502:7  525:7
613:9  674:2
738:2  774:22
consistently
476:6, 14, 20
494:11, 20
495:3
Constance
605:16  630:17
constant  538:1
constantly
556:1

consulting
800:5
consumer
598:19
694:15, 24
consumers
599:3, 11
600:24
contact  603:7
723:19
contacted
618:7
contacting
618:4
contain  437:8
440:3  444:13
536:13
581:13  597:7
598:1, 21
599:6
contained
437:1, 3
516:13
579:10
597:14
705:11  706:9
container
794:8, 9
containing
588:16
contaminant
444:13
contaminated
659:1  661:20
contamination
440:18
441:16
443:24  448:8
452:18
546:19, 23
579:14  593:3,
10  705:16
790:17
contemplate
668:14
content  593:7
603:13
contents  476:2
contest  650:12
context
453:16

500:23
501:20
776:24  778:1,
2
continue
585:11
629:21
673:14
693:18
703:13  719:24
Continued
420:13  422:1
423:1  587:22
continues
477:21
continuing
589:15
continuum
503:19
contract
731:6, 12, 15
732:1, 5, 8, 9,
12, 19, 23
771:3, 8  773:4
contractor
477:12
contractual
566:16
contribute
529:7, 23
contributed
441:21  707:16
control
464:21  548:7
733:3, 12
736:15  737:2,
16, 22  738:3
739:16  803:21
Controlling
797:9
controls
465:20
conversations
797:2
convert  722:22
convey  699:16
750:18
conveyed
691:7
convince
752:10

coordinate
693:15
coordinated
697:13
copied  607:7
623:16
copies  433:9
535:7  601:10
787:23
copy  432:15
497:13  501:7
536:6  734:5
746:5  747:18
copying
432:22
568:23  622:2
core  548:1
785:1
Corey  568:23
781:21
corporate
555:24
712:19, 24
713:2, 5, 6
714:10  726:23
correct
433:13  434:6,
9, 10, 22
435:5, 6, 9, 24
436:17, 23
438:5, 17, 18,
23  439:19
442:24  443:1
446:7, 18
447:20
448:22
450:19, 20
455:17  458:7,
11, 16  459:8,
18  461:8, 12,
16, 19, 20, 24
462:7, 16
463:17, 22
464:3, 11, 12,
16  467:4, 24
468:6, 7
469:22
475:17
476:16  477:8,
9  478:6
479:14  482:1,

9, 10, 20
483:7, 8
484:11, 13, 16
485:17, 21
488:10  494:5,
14, 23  503:21
504:4  506:16,
20, 24  507:8,
14, 20, 23
508:6, 7, 10,
11, 19  509:13,
24  511:12, 17,
21  512:4, 9,
10, 14, 15
513:3  516:3,
4, 9, 16, 22
517:2, 6, 11,
12, 19, 23
518:2, 3
519:4, 7, 8, 13
520:23  523:5
524:18, 21, 24
525:5, 12, 16,
17, 19, 20
526:6, 15, 23
527:7, 16, 21
535:5, 21
537:1  540:10
544:23, 24
545:14
546:16
549:16
556:13
557:10, 19, 20
563:5  564:8,
9  566:11, 15
568:23, 24
572:5  575:4,
13  576:19
577:9, 15
578:17  579:6
580:19
582:17
586:22
589:11
591:19  592:4
595:18
596:11, 18
602:5, 18
606:21  608:5,
8, 18, 19

609:19  611:5
612:11, 13, 17
619:19  622:8,
14, 18, 22
624:12  626:5
634:6  638:20,
21  639:1, 6,
17  640:4, 5,
14, 15  641:1,
2, 6, 9, 18, 19
642:11, 22
651:23  652:9
653:2, 8, 22
654:4  662:6
664:24
665:10, 21
669:9, 14
681:15  687:5,
6  688:2, 7
691:8, 16, 19
692:1, 11, 19
693:20  694:9,
10  697:6
698:24  711:4
716:20  717:3,
6  718:6, 11,
19  722:4
725:10, 11
726:15
730:17  732:2
735:18
737:10, 15, 20
739:10
744:11, 20, 21
745:6, 19, 23
753:20  754:8
757:4, 20
765:24  766:4
771:12, 16
772:12, 13, 16,
17  773:1
775:1, 14
777:1, 22
779:9  782:10,
17  783:7, 19
784:2  786:3
787:1, 7
789:12, 17
791:17  792:2
793:4, 11, 14
794:24  796:1,

2  798:5
799:5, 6, 9, 13
800:6, 10, 13
806:4
**corrected**
457:2  711:22
**corrections**
804:5, 7  806:5
**corrective**
674:4  711:7,
8, 10, 12, 15
713:12, 15, 18
748:1  759:20
787:18  788:1,
21
**correctly**
497:19
602:23  737:3
**corresponds**
640:23
**cost**  653:14, 20
**councils**  683:9
**counsel**  428:3,
18  429:6, 11,
16  430:13
431:13
432:10
441:14
459:18
485:24
487:11  489:9
491:13  492:8
493:4  496:2
504:5, 9
523:13, 22
531:9  533:10
543:6  548:23
549:19  550:9,
11, 18  551:15,
24  553:22
561:24
565:12, 17
566:15  570:4
581:8  586:15
587:14
589:10  590:7
593:17
597:18
602:11  609:7
615:1  624:20
625:9  629:3,

10  632:19, 22
633:15, 21
635:19
637:14
645:11, 12
661:2  666:16
686:3  706:18
713:24
718:23
722:14, 23
727:18  735:2
736:1, 2
739:14
744:16  752:3
753:6  758:12
764:6  770:11
775:18
776:13, 20
777:5  781:10
783:9  784:14
785:19  789:9
795:21
796:24
798:18
803:12, 13
**counseling**
571:1
**counsel's**
566:4  769:12
786:20
**countries**
581:3, 12, 19,
20, 21, 22
582:13, 15, 19
583:16, 19
584:7, 15, 20,
22, 23  585:6,
13, 17  588:17
689:16  690:1,
5  693:16, 19
724:7
**country**
581:23
583:21
584:16, 17
585:20  587:5
692:13  693:9
694:1
**country's**
582:9

**couple**  453:3
553:1  556:16
610:1  622:20
639:4  792:14
**course**  589:22
666:22  673:7
704:23
723:12, 22
728:21
737:21  763:1
764:9  772:7
**COURT**
420:1  432:8
485:13
545:14
587:10  631:5
792:2  804:20
**court's**  583:5
**Covanta**  638:7
**cover**  533:2
543:11  602:8
607:24
745:14  746:6,
7  747:21, 22
786:22  787:6,
11, 22  789:2
**covered**
548:14
552:11
646:15  655:5
**crafting**
698:22
**create**  451:2
452:12  471:18
**creating**
704:20
**criminal**  695:7
**criteria**
534:20  535:2
725:12
726:19  729:4
**critical**
696:21  720:18
**criticism**  721:6
**cross-
contaminated**
444:24
**cross-
contamination**
440:15  441:2,
8  442:11

443:5, 14
444:9, 22
672:16, 23
673:5, 20
**cross-
designated**
593:18
**cross-
functional**
474:8
**crude**  469:1
**crystallization**
462:12
**current**  514:14
**currently**
686:15  687:5
716:24
**customary**
656:10  748:11
**customer**
505:6  591:17
594:12
638:11, 16
639:19  640:3
643:22  644:11
**customers**
591:2, 5
592:9, 15
593:9  594:2
595:10, 15
597:4, 11, 23
598:8, 24
600:16  643:2
**customs**
652:13
**cutoff**  543:1

< D >
**D.Stanoch@ka**
**nner-law.com**
421:6
**daily**  605:14
**Dalia**  651:22
**Dan**  569:15
**Dana**  651:21
661:3, 17
663:22  664:5,
6, 10, 20
665:3, 5  669:3
**DANIEL**
420:14  424:3

428:17, 20
803:5  806:8
**data**  446:21
477:2, 4, 7, 13,
16  481:10, 11
486:4, 9
604:17
605:12  607:9,
19  778:20
779:5  780:17
785:18
**date**  420:16
428:14
546:15
557:14, 23
559:12  595:3
598:13  610:9
613:21
615:19
639:16
642:12  661:1
803:9  804:9
806:8
**dated**  473:23
506:10  516:2
560:24
564:11
568:21
576:13
642:15
651:23
663:22
781:21
792:21  803:17
**dates**  642:12
**DAVID**  421:3
423:1  605:14
614:13  624:1
631:8  633:10
**DAVIS**  421:10
**day**  489:18
627:9  654:1
694:7  727:20,
21, 24  806:11
**days**  632:15
727:14  728:6,
7  751:1
766:16, 20
801:23  804:16
**DDQM**

Confidential Information Subject to Protective Order

455:24 467:15
DEA 449:6
deal 456:3
627:21 692:16
dealing 574:1
589:20
decades
789:20
decide 603:5
decided 679:6
780:4
decision
477:19 481:6,
9 544:4
554:8 573:18
580:17
595:13 603:9
614:19 666:1
668:8, 12
693:10
698:11, 12
699:3 726:17
727:1, 4, 5, 8
decisions
667:2 705:4
dedicated
461:14
471:13
477:23 497:8
deem 543:9
deemed
482:16 495:8
509:17
583:17 804:19
deems 547:23
Deepak
653:11
659:11 661:8
default 437:9
defend 780:18
Defendant
422:14, 23
Defendants
421:15, 22
422:6
defer 698:1, 2
deficiencies
713:11, 13
deficiency
482:23

defined
468:17, 23
definition
732:9
degradants
449:5 450:2
Delaware
638:7
delayed 708:1
deliver 778:20
779:4 785:5
delivered
641:13
delivering
769:4
Dellarese
426:8 619:2
delve 447:6
demonstrate
502:8 716:15
717:23 718:1
728:8
department
615:14
626:12 649:9
727:10
730:20, 24
748:20 796:8,
13, 17, 20
departments
749:3 796:4
departure
772:9
depending
507:17 718:8
depends 673:9
DEPONENT
806:1
deposing
804:16
Deposition
420:14 427:2
428:16
429:12 430:6
432:19 460:7
496:11, 16
583:2 587:9
593:1 631:21
632:1 635:8
651:3 655:22
656:1 658:2

676:6 679:12
681:3 682:6
683:17 684:8
709:17 753:3,
9 798:2, 3
801:17
802:17 804:3,
13, 17, 19
deps@golkow.c
om 420:24
derived 487:4,
15 488:16
describe 536:4
described
641:12 747:6
752:19
754:13, 15
759:7
DESCRIPTIO
N 424:10
425:3 426:3
604:13 748:16
design 467:16
designated
532:24 602:7
629:11
650:14
666:18
676:20 679:22
designed
463:1 470:10
678:7
designee 613:5
desired 659:17
Despite
721:17 759:2
destroy
608:17, 21
609:8 614:14
616:11 617:4
619:21
622:12, 24
623:21 626:4
628:8 632:5
643:23 653:6,
20 658:22
668:23
destroyed
609:2, 5
616:20
619:24

620:15
627:14, 20
628:3 633:8,
18, 23 634:10,
13, 16 643:12
650:22
654:22
657:11, 13
661:21
664:14 670:4
674:9 675:3,
10 676:16
677:10
destroying
612:20 618:8
619:15
destruction
608:11
609:12, 21
611:3 616:23
617:12 619:9
620:19 621:2
625:13
629:16 634:3,
8, 10 635:3,
10 641:4, 8,
24 642:15
645:17 649:2
652:24
653:14
654:14 659:7,
23 661:10, 18
664:12, 22
665:9, 15, 17
666:6, 9
667:15, 18
669:7
detail 504:22
596:14 605:1,
11 607:19
610:14
detailed
604:13 605:5
details 453:11
464:19 596:2
603:1 605:14
645:15 670:7
671:24
674:23 719:12
detect 708:12
709:5 710:1

714:11, 21
719:6 762:11
791:12
795:14 796:21
detected
439:18 708:14
detection
708:2 710:1
716:19 717:1
719:6 793:20
794:5
detector
718:23
detectors
718:22
determination
614:20 727:11
determine
444:7 465:9
471:21 486:5
489:12 548:3
570:14 657:1
707:15
determined
441:21
determining
465:14
548:17 797:9
develop
715:16, 24
developed
477:15 717:5
776:15
791:14
795:13, 16
development
555:24 793:13
deviations
548:11
dictate 683:20
dictated
525:21
diethylamine
450:5 723:18
differ 718:8
difference
527:8 617:16
643:7 655:16
762:24 763:7,
13

**different**
435:*11*
454:*12*
456:*24*
458:*13, 14*
478:*20* 491:*3*
502:*2* 507:*15*
532:*19* 541:*8*
564:*22, 23*
570:*15*
654:*10*
671:*21*
690:*16* 706:*4*
708:*14, 21*
718:*17, 22*
719:*16*
726:*21* 737:*7,*
*22* 742:*9, 15,*
*23* 748:*14*
750:*15*
751:*19*
758:*22*
760:*21*
761:*19* 762:*6*
765:*15* 774:*9*
775:*18*
790:*22, 23*
796:*13*
799:*22*
800:*24* 801:*8*
**difficult**
453:*24* 573:*8*
637:*8*
**diligence**
520:*18* 555:*3*
**direct** 490:*3*
523:*12* 530:*6*
590:*23* 591:*3,*
*22* 689:*12*
702:*3* 712:*11*
722:*23* 803:*21*
**Direction**
427:*5*
**directly**
470:*10*
535:*11*
670:*13* 671:*5*
**disagree**
485:*6* 486:*19*
629:*9* 645:*23*
646:*9*

**disclose** 597:*4,*
*11, 23* 598:*8,*
*18* 599:*2, 10*
741:*2*
**discontinued**
442:*20* 443:*7*
**discovered**
544:*18* 714:*4*
**discovery**
583:*5* 587:*10*
708:*19*
**discretion**
668:*10*
**discuss**
574:*23* 592:*3,*
*7* 643:*7* 786:*6*
**discussed**
430:*20*
437:*21*
438:*20*
475:*12*
509:*17*
546:*24*
569:*15*
574:*14*
593:*17*
610:*16* 659:*7*
691:*18* 693:*9*
711:*19* 734:*2*
747:*8*
**discussing**
580:*24*
581:*10*
652:*24*
662:*11* 800:*2*
**discussion**
460:*11, 19*
534:*4, 17*
547:*9* 550:*20*
572:*3, 7*
573:*5, 15*
578:*23*
583:*20*
584:*22*
587:*24* 590:*4*
635:*13*
648:*15*
676:*11* 691:*1,*
*15* 719:*2*
720:*11*
726:*22*

742:*16*
744:*14* 790:*3*
**discussions**
584:*13* 587:*2*
588:*2* 589:*23*
604:*8, 14*
680:*12* 686:*9*
689:*14*
699:*11*
727:*18, 22*
**disposal**
641:*17* 684:*5*
**dispose** 650:*4*
**disposed**
654:*21*
**disseminated**
555:*11*
**dissemination**
534:*4*
**distinct** 625:*7*
662:*12*
**distinction**
530:*12* 643:*9*
648:*23* 649:*2*
655:*19*
**distribute**
693:*22*
**distributed**
514:*23* 643:*2,*
*19* 647:*11*
648:*13*
**distributing**
703:*14*
**distribution**
532:*15* 643:*1,*
*17* 647:*1*
662:*16* 725:*5*
726:*14* 780:*19*
**distributors**
705:*21*
**DISTRICT**
420:*1*
**diverting**
689:*24*
**divulge** 536:*14*
**DMF** 449:*4*
450:*12, 15*
461:*6* 462:*4,*
*9, 18* 463:*5*
464:*14* 465:*1,*
*10* 466:*19*

467:*2, 21*
468:*4, 14*
469:*19*
471:*21*
474:*13* 476:*4,*
*13, 18* 479:*2*
482:*8* 489:*7*
492:*6* 494:*8,*
*18* 495:*2*
496:*20*
509:*13, 23*
512:*12*
517:*17, 24*
525:*11, 19*
528:*7* 529:*6,*
*22* 531:*3*
532:*7* 533:*3*
739:*8, 9*
**DOCUMENT**
420:*7* 431:*19*
432:*18*
434:*24*
437:*11* 438:*9*
447:*15*
457:*23* 462:*6*
471:*17, 19*
473:*15, 18, 20*
474:*2, 11*
486:*13*
490:*15, 20*
492:*8* 493:*5,*
*11* 513:*10*
515:*2* 518:*5,*
*6, 7* 530:*5*
541:*24* 544:*3*
546:*10* 547:*5,*
*8* 549:*5, 12*
550:*4, 23*
551:*6, 17*
552:*10*
561:*15, 20*
563:*10*
587:*19*
606:*12* 610:*9*
634:*11*
639:*23*
640:*17*
656:*17* 659:*4,*
*5, 10* 660:*21*
661:*24*
664:*13* 665:*8*

669:*2* 674:*14*
731:*7, 23*
734:*14, 21*
735:*20* 736:*9,*
*15* 737:*11, 18*
743:*3, 6, 8, 12,*
*13, 14, 18*
745:*4, 8*
749:*10*
757:*20*
792:*17*
797:*14, 16, 19*
798:*12, 17*
**documentary**
521:*23*
**documentation**
445:*15, 17*
446:*17, 22*
459:*23* 460:*3*
738:*16*
**documented**
439:*6* 671:*15*
672:*7* 738:*11*
**Documents**
427:*10*
429:*19, 23*
430:*2, 4, 8, 16*
441:*7* 451:*21*
460:*17*
512:*23* 513:*1*
521:*10*
542:*12* 543:*2*
552:*12*
556:*16*
561:*22*
634:*21* 646:*4*
661:*12*
678:*19* 698:*6*
709:*13*
712:*10*
733:*11*
766:*18* 790:*22*
**doing** 451:*23*
454:*19, 22*
456:*6* 467:*10*
476:*18*
487:*23*
499:*19*
511:*15*
519:*11*
523:*10*

Confidential Information Subject to Protective Order

524:*12*
531:*10*
544:*16*
547:*13* 550:*9*
562:*7* 565:*1*
570:*18* 623:*7*
626:*23*
736:*21*
740:*15*
760:*24*
774:*20*
795:*11* 796:*9*
804:*8*
**dose** 566:*9*
582:*18*
591:*24*
592:*10, 17*
593:*4* 594:*4*
598:*10*
602:*16* 615:*4*
627:*13*
648:*20*
669:*12* 700:*24*
**double** 477:*11*
551:*17, 18*
660:*19*
**doubt** 597:*8*
663:*12*
**Dr** 698:*4*
748:*10*
749:*14* 750:*1*
**drafted**
456:*19, 22*
474:*6*
**drafts** 433:*11*
**Drape** 425:*17*
575:*24*
576:*14* 577:*6,
19* 578:*4*
579:*1* 586:*20*
765:*1*
**draw** 747:*7*
**drop** 733:*23*
**drug** 433:*3*
434:*15, 16*
435:*19* 437:*7*
462:*10, 14*
463:*7* 464:*22*
472:*3* 473:*3,
7* 532:*14*
591:*4* 603:*7*

604:*17*
612:*20*
687:*11, 16*
688:*14, 19*
689:*2* 691:*11,
12* 694:*15*
703:*5* 704:*20*
717:*14*
745:*14*
758:*19*
773:*19* 774:*1*
794:*18* 799:*8,
12*
**drugs** 444:*12*
690:*17*
**drug's** 688:*6*
**DUANE** 422:*3*
**due** 442:*23*
520:*18* 555:*3*
612:*21* 652:*12*
**duly** 428:*21*
**Dupnista**
424:*21* 520:*1*
**Dupnitsa**
518:*12, 17, 24*
520:*12, 22*
521:*19*
524:*15*
525:*14* 526:*4,
8, 22* 527:*5*
**Duran** 423:*1*
428:*12*
**duty** 652:*13*

< E >
**earlier** 513:*11*
561:*1* 595:*5*
621:*12* 634:*1*
663:*4* 672:*14*
689:*9* 789:*8*
793:*10*
**early** 642:*21*
694:*7* 796:*18*
**easier** 775:*12*
**easy** 443:*15*
444:*7*
**effect** 483:*5*
559:*14* 560:*3*
567:*2, 4*
598:*23*

610:*18* 791:*11*
**effective** 561:*8*
**effects** 561:*9*
**effort** 699:*6*
741:*9*
**efforts** 603:*23*
612:*10* 662:*5*
755:*13*
**EIR** 710:*15,
17, 23* 711:*9*
745:*4, 14*
746:*4* 747:*19*
786:*22*
**EIRs** 695:*23*
696:*2* 709:*9,
19, 23* 710:*12,
14* 711:*20*
**either** 461:*1*
594:*3* 610:*12*
718:*9* 719:*7*
724:*15*
**element** 776:*5*
**elements**
770:*6* 773:*18*
**Elizabeth**
613:*4*
**else's** 591:*5*
629:*7*
**E-mail** 425:*14,
16, 18, 20*
426:*8, 10, 12,
14, 16, 18*
432:*20*
456:*15, 19, 22*
568:*11, 20*
569:*2* 572:*7,
22* 575:*24*
576:*13, 20, 21*
580:*4, 14, 21,
23* 586:*8, 17*
589:*3, 4*
619:*2, 7*
620:*16*
621:*17, 24*
629:*7, 14*
636:*1, 16*
651:*11, 19*
653:*13*
659:*11*
663:*21* 665:*3*
669:*3* 689:*14*

690:*7, 24*
692:*10* 735:*9*
764:*24*
765:*12* 766:*2*
781:*3, 17*
782:*2*
**e-mailing**
569:*10* 661:*8*
782:*12*
**e-mails** 493:*6*
628:*6* 657:*19*
658:*3* 660:*8*
689:*22, 23*
690:*3* 786:*5*
**embraced**
778:*18*
**employed**
798:*13*
**employee**
622:*7* 624:*6*
803:*11, 12*
**employees**
496:*4* 614:*10*
624:*8* 626:*2*
651:*20* 669:*6*
**enactments**
799:*16, 20*
**endeavor**
759:*5*
**ended** 429:*20*
671:*20*
**enforce** 800:*8,
15* 801:*3, 5*
**enforcement**
776:*1*
**enforces** 771:*6*
**engage** 514:*16*
522:*4* 779:*17*
**engaging**
796:*12*
**ensuing**
506:*23*
511:*20* 516:*17*
**ensure** 451:*7*
466:*22*
469:*19* 473:*1*
476:*18*
498:*17* 503:*8*
504:*2* 519:*10*
520:*18*
521:*23*

527:*11*
528:*11* 531:*2*
532:*5* 553:*16*
581:*16*
583:*24*
608:*10*
611:*10*
632:*23* 644:*1*
662:*14* 663:*8*
667:*15*
692:*24*
703:*14* 705:*7*
720:*13* 736:*8*
737:*1* 768:*24*
770:*20*
771:*20*
774:*23*
776:*10* 778:*22*
**ensured** 626:*1*
**ensuring**
466:*10* 595:*9*
693:*2* 772:*16*
775:*6*
**entail** 694:*21*
**enter** 752:*12*
753:*16*
**entire** 610:*6*
769:*7* 773:*1*
791:*3*
**entirely**
532:*18*
**entitled** 797:*8*
**entity** 459:*15*
466:*17*
473:*10*
556:*12*
557:*18*
560:*23* 561:*7*
566:*19* 567:*3*
602:*20*
**equally** 774:*17*
**equate** 785:*10*
**equipment**
508:*22* 509:*1*
526:*8* 527:*9*
715:*22*
**Eric** 577:*6*
764:*24*
**ERIN** 421:*19*

errata 802:6
804:6, 9, 12,
15 806:6
escalate
533:21
escalated
534:2, 19, 21
726:22
escalation
534:2, 11
especially
539:18 780:18
ESQUIRE
421:3, 4, 10,
11, 19 422:3,
11, 17, 20
essentially
518:16 574:1
745:17
establish
443:20
465:15 565:9
572:14
established
472:5 477:16
498:14
588:14 655:2
707:10 722:3
739:6
et 605:3
727:24
ethanol
464:10 508:6
512:8 517:10
525:2, 3, 15
ethenol 465:23
ethompson@c-
wlaw.com
421:22
ethyl 464:10
508:5 512:8
517:10 525:15
Etzioni
426:14
651:11, 21
656:13
658:15 661:4,
8, 17 663:22
664:5, 6, 10,
20 665:3, 5

669:3
Europe 724:7
European
581:22 670:1
evaluate
486:4 535:4
714:18
736:21 738:1
751:3
evaluated
480:18, 20
evaluating
733:7 762:18
evaluation
465:3 473:1
479:17
487:24 730:7
737:6, 13
evaluations
548:5
event 619:16
671:13
725:13
726:13, 19
727:11
events 610:15
763:1
eventually
437:18
438:21 458:5,
6 617:23
650:3 738:20
769:3
everybody
626:16
733:21 764:4
801:20
evidence
512:23
585:10
705:10 711:7
741:23 746:1,
3 747:16
evolved 588:1
767:22 768:15
evolving
455:11
573:16
588:12 626:21

exactly 521:7
635:1 677:3
756:1
EXAMINATIO
N 429:1
685:22
769:21 803:4
examine
793:18
examined
428:22 766:17
example
433:15 446:1
461:14
495:22 496:3
507:21
555:17 567:1
756:23 758:14
exceptions
671:10
excess 693:23
exclusion
641:11
Excuse
542:10 549:6
746:13 758:3
771:13
execute 450:24
executive
667:13
exhibit 457:17
470:18, 24
492:18
500:16 505:8,
11 510:2, 12
513:6 515:10
519:16, 22
545:3, 24
556:6, 23
560:7, 12
561:11 562:5,
15, 19 563:13,
15 567:24
568:4, 8
575:15, 21
580:1 586:1,
5 605:18, 22
610:23
611:18, 22
618:17, 23
621:10, 15

635:15, 22
651:6, 8
670:6 692:5
712:10
733:19 735:6
743:24 748:6
780:22 781:1
791:21 792:7
Exhibit-135
731:3, 14
732:11, 22
Exhibit-165
743:4
Exhibit-167
753:4
Exhibit-170
563:22
Exhibit-172
764:23
Exhibit-174
586:2
Exhibit-2
458:1 513:20,
22
Exhibit-3
458:23
460:24 461:3
Exhibit-61
545:13 744:2
exhibits
564:20
566:21
689:10 733:23
Exhibits-173
689:13
Exhibits-2
492:4 739:1
exist 634:22
635:10
657:14
678:15 680:24
existence
634:12
existing
463:15
exists 533:8
554:20 635:4
678:10 680:1
expect 446:12
465:22, 24
504:1 505:3

535:6, 14
540:8 672:7
752:19
756:15 760:20
expectation
465:18
470:12
535:10, 19
536:24 537:6
556:2 573:7
581:24 582:5
660:13 682:8
752:8 755:16
761:6 780:15
expectations
473:4 564:23
565:2, 22
581:18
582:12 585:1,
16 590:4
604:12
688:18
690:10 692:3
704:14, 18
716:6, 17
739:21
740:20
754:10
758:22 759:4,
6, 22 769:6
771:7, 20
775:8 778:17
expected
436:4, 15
437:5 585:18
627:4 724:12
748:8 756:6
expedient
493:16 571:4
768:13
experience
453:23
465:14 466:4,
5 496:2
617:18
667:12
668:18 695:9,
14, 19 696:5,
8, 11 699:21
700:16 728:4
740:9 745:20

748:*12*  750:*9*
759:*10*
775:*24*  796:*5*
798:*20*
**experiments**
465:*19*
**expertise**
696:*24*  697:*22*
**expiration**
559:*11*  639:*16*
**expired**
514:*10*  783:*17*
**expires**  806:*11*
**explain**
464:*17*
484:*17, 19, 22*
485:*8*  564:*17*
634:*23*
670:*15, 19*
767:*19*
782:*19, 20, 22*
783:*9*  784:*12,*
*14*
**explained**
677:*11*
**explaining**
445:*9*
**explanation**
445:*11*  565:*24*
**explicit**  513:*10*
**explicitly**
500:*8*
**expressing**
658:*3*
**extend**  648:*7*
**extended**
768:*8*
**extensive**
498:*6*  550:*23*
**extent**  442:*5,*
*10*  466:*7*
486:*5*  539:*21*
570:*14*
587:*11*
596:*10*  604:*9*
614:*17*
644:*17*  645:*5*
666:*20*  673:*4,*
*19*  691:*9*
701:*12*  728:*7*

**external**
604:*12*  795:*18*
**externally**
801:*4*
**extractable**
794:*12*

< F >
**facilitate**
476:*5*  494:*9*
**facilities**
528:*6*  529:*11*
530:*1*  531:*5*
533:*6*  539:*18*
565:*11*
578:*21, 22*
648:*19*
668:*22*  672:*8*
679:*5*  712:*14,*
*17*  713:*14*
718:*13*
719:*16*
759:*18*  801:*1*
**facility**  504:*16,*
*19*  507:*11*
510:*23*
511:*14*  514:*5*
515:*18, 23*
518:*10, 13*
519:*1, 11, 12*
520:*19*
528:*13, 14, 17*
529:*5, 21*
531:*2*  532:*8,*
*14, 17*  533:*5*
540:*15*
565:*14*  566:*7*
567:*13*
611:*14*
649:*11, 23*
650:*23*  652:*9*
653:*22*  665:*7*
669:*11, 16*
670:*4, 14*
671:*4, 20, 21*
675:*8*  676:*9,*
*14*  677:*8*
678:*14, 20*
679:*2*  680:*1*
681:*22*
683:*12*

709:*10, 20*
712:*5, 20, 24*
755:*3, 9*  793:*9*
**facility's**
506:*18*  567:*16*
**facility-to-
facility**  532:*13*
**facing**  573:*6*
625:*17*
**fact**  435:*3*
454:*24*  457:*3*
465:*10*
476:*19*  480:*7*
483:*15*  488:*9*
525:*24*  537:*3*
540:*2, 7*
541:*11*
543:*13*
548:*13*
570:*13*  578:*6*
585:*7*  620:*12*
627:*7*  696:*14*
702:*5*  707:*12*
741:*10*
765:*14*
773:*23*
787:*11*  793:*6*
**factor**  696:*22*
716:*15*
**factors**  536:*7*
716:*11*
**facts**  615:*21*
698:*19*
699:*24*  750:*20*
**fail**  720:*23*
804:*18*
**fails**  755:*14*
**Failure**  503:*8*
710:*1*  762:*9,*
*11, 20*
**failures**  729:*19*
**fair**  438:*4*
455:*1*  503:*2,*
*11*  506:*23*
507:*3, 19*
516:*10*  523:*3*
530:*21*
552:*18*
561:*11, 12*
591:*12, 13, 16*
592:*10*  593:*6*

596:*17*
601:*22*
607:*22, 23*
614:*1*  632:*8*
657:*11*
678:*22*
680:*24*
753:*23*
789:*20*  798:*14*
**fairly**  516:*5*
758:*6*
**fairness**
541:*21*
**FALKENBER
G**  422:*8*
**fall**  451:*20*
453:*17*
454:*19*
455:*13*  544:*22*
**familiar**
433:*12*
434:*24*  546:*9*
596:*1*  606:*11*
607:*18*  638:*3*
750:*8*  757:*11,*
*16*
**far**  429:*13, 17*
495:*6*  557:*21*
566:*7*  595:*23*
660:*11*  748:*2*
790:*4*
**fashion**
437:*23*  445:*3*
522:*11*
**fax**  420:*23*
**FDA**  435:*22*
436:*6, 16*
437:*3, 24*
438:*4*  440:*4,*
*10, 23*  455:*24*
461:*5*  467:*15,*
*23*  468:*5*
475:*22*
481:*17, 24*
482:*4, 11, 13,*
*16, 19*  483:*1,*
*6, 8, 12, 15, 17,*
*19*  484:*1, 6,*
*14*  485:*18*
486:*13, 18*
487:*3, 14*

488:*11, 15, 23*
489:*5*  490:*17*
492:*3*  513:*13*
514:*10, 13*
516:*7*  532:*16*
535:*8, 11, 17*
536:*4, 12*
537:*3, 11, 12*
538:*6, 7, 14,*
*22*  540:*14, 16,*
*24*  541:*2, 4*
542:*22*
543:*14, 19, 23*
544:*15*
547:*10, 22*
550:*6*  554:*4,*
*18*  555:*5*
580:*17*
581:*14*  584:*6*
588:*7, 11, 18*
595:*5, 16*
599:*17*
603:*12, 21*
604:*3, 11, 23*
606:*16*  607:*3,*
*21*  608:*16*
611:*1*  612:*8*
613:*7*  617:*11,*
*19, 24*  618:*2,*
*4, 7*  619:*8, 14,*
*21*  620:*17*
622:*3, 11, 24*
623:*2*  628:*7*
632:*4, 5*
662:*4*  694:*9,*
*12, 22*  695:*10,*
*14, 19, 24*
696:*5, 8, 16*
698:*17*  700:*4,*
*12, 17*  710:*10,*
*14, 20, 23*
719:*23*  720:*8,*
*17*  724:*5*
726:*24*
727:*15*  728:*3,*
*5, 13, 18, 23*
729:*15, 18, 23*
730:*5*  739:*15,*
*23*  741:*2, 16,*
*24*  744:*23*
746:*1*  748:*3*

750:9 751:1
758:4 771:11,
15, 24 772:4,
10 778:21
782:8 783:21
784:7 785:3,
22 786:1, 22
787:14, 24
788:2, 22
789:5 798:19,
21, 23 799:1,
3, 4, 7, 11, 16,
17, 19, 21
800:12, 17, 22
801:5
**FDA-approved**
600:6, 11
687:2
**FDA's** 484:2
539:7 555:19
581:2 582:22
788:14
**feed** 641:13,
20
**feel** 447:14
562:5
**feeling** 767:5
**felt** 455:18
486:14
488:23
698:16 703:12
**female** 664:7
**fence** 443:18,
21
**field** 543:10
595:4 654:1
695:11
724:18, 23
725:1, 3, 10
728:24 729:20
**fifteen** 430:2,
17
**filate** 780:4
**file** 738:20
**filer** 725:3
**filing** 428:4
**filled** 641:3
**filter** 751:2
**final** 432:22
433:9, 21
434:7, 21

462:14 463:7
464:22
497:17
498:20 499:5
500:7 573:18
749:22 773:19
**finalized**
433:24 435:1
665:7
**finalizing**
749:15
**finally** 434:14
669:1
**financially**
803:13
**find** 443:13
486:23 489:9
514:20 524:5
539:20
541:13
549:17 550:1
552:8 572:15
585:6 655:2
659:17
713:11
744:20 745:9
790:6
**finding**
533:17
539:17 554:9
**findings**
478:21
531:13 539:3
540:17
541:22
547:22 555:5,
9, 20 602:3
713:19
725:18 729:24
**fine** 431:23
432:17 461:2,
3 542:9
552:5 562:1
615:7 664:9
763:22
**finish** 477:18
777:16
**finished** 437:7
465:4, 16
469:3 472:2,
8 473:3, 7

498:10 503:4
520:20
528:20, 23
566:8 581:1
582:18 591:4,
24 592:10, 16
593:3 594:3
598:10
602:16 615:4
627:13
647:20
648:20
661:13
669:12
700:24
717:14
758:19
773:19 794:18
**finished-dose**
516:12
518:12, 19
519:2 524:16
581:12 591:1
593:11 597:6,
13 598:1, 20
599:5, 13, 18
600:7, 12, 18
601:1, 12
602:3 603:2
608:17 609:4,
16, 22 611:3
616:12 617:5,
13 618:9
629:13
635:11 639:5
642:3 644:10,
13 646:16
648:9 649:13,
24 662:24
669:20 671:1
741:4 773:13
**finished-drug**
437:1
**finished-
product**
435:21 774:1
**first** 433:16
444:21 445:4
459:6 460:6
461:13
474:23

481:12
490:22 496:7
521:12
527:23
593:24
599:21 601:7
603:6 606:17,
22, 24 613:6,
16 636:8, 12
654:3 655:1
662:3 669:2
671:22
689:18
723:15
727:20, 24
736:9 747:15
753:5 767:21
778:12
782:23 797:22
**five** 496:3
728:7
**five-minute**
763:19
**flip** 448:16
464:4 474:21
493:2 523:3,
18 652:1
660:22 663:18
**flipping**
656:12
**Floor** 422:18
**Fluch** 426:14
651:11, 21
653:12
659:16 664:2,
21
**focus** 472:6
541:6 571:11
647:6 768:16
773:4
**focused** 472:1,
12 473:6
532:4 570:22
789:5
**focusing** 448:6
652:4
**follow** 464:2
531:14
535:24
540:23

543:22
544:13
547:24 554:3,
17, 23 626:24
628:12 686:5
692:12 759:5
**followed**
541:12
675:16
677:17 678:1
682:16, 23
745:5 760:7
**following**
485:14 620:6
625:4 641:11
664:15
**follows** 428:23
**follow-up**
482:11
542:19
550:19 551:1
653:10 760:6
**Food** 603:7
745:13 799:8,
12
**foods** 790:2
**for-cause**
544:22
**foregoing**
803:6, 17
806:3
**foreign** 584:7
757:20
**foremost**
747:15
**form** 428:6
437:22
450:14
451:23
454:22
480:15 494:4
497:2 512:22
530:4 535:8,
17 536:19
537:4 538:14,
22 539:7
547:11
579:21 587:7
623:5 624:14
626:7 627:23
634:19 659:4

674:*14*
675:*21*
686:*19* 688:*9, 16* 694:*3*
696:*19*
699:*19*
701:*21*
702:*19*
706:*11*
707:*19* 708:*4, 24* 710:*4*
712:*1* 713:*22*
714:*14* 719:*9*
721:*2, 12*
722:*1, 10*
723:*5* 731:*19*
738:*5* 740:*11*
741:*6, 13, 18*
742:*3, 12*
746:*3* 747:*12*
748:*24*
750:*12* 751:*6*
752:*22*
753:*18* 754:*2*
757:*6, 22*
758:*10*
759:*12* 761:*2, 14, 23* 762:*14*
763:*4* 766:*9*
767:*2, 9, 16*
775:*16* 784:*9*
787:*4, 5*
788:*14*
789:*23* 795:*2*
798:*7* 806:*5*
**formal** 438:*9*
522:*16* 710:*10*
**formality**
787:*13*
**formation**
439:*2* 449:*13, 18*
**formed**
439:*13* 450:*2, 10* 453:*9*
**former** 681:*21*
**forming**
462:*11*
**forms** 683:*10*
**forth** 506:*21*
782:*6* 803:*9*

**forward**
799:*21*
**forwarding**
577:*1*
**foul** 627:*18*
628:*1*
**found** 453:*17*
488:*1* 524:*6*
541:*3* 546:*18*
549:*13*
559:*18*
572:*18* 709:*9*
747:*24*
787:*18* 790:*4*
**foundation**
722:*14* 723:*5*
754:*2* 757:*7*
761:*4*
**founded**
467:*17*
**four** 468:*19*
491:*3* 525:*2*
565:*13*
685:*15, 16*
728:*7* 795:*23*
**four-step**
469:*5*
**free** 447:*14*
451:*7, 8, 11*
454:*2* 562:*6*
**freely** 451:*11, 19*
**frequency**
707:*3, 6*
**Friday** 727:*20*
**front** 431:*10*
457:*13*
473:*16* 510:*6*
513:*14* 556:*6, 16* 568:*16*
610:*10*
645:*10*
722:*21*
743:*24* 792:*18*
**froze** 692:*8*
**fulfill** 473:*3*
582:*1, 5*
584:*1, 24*
585:*19* 590:*3*
678:*7* 690:*10*
692:*2* 696:*6*

716:*6, 16*
771:*8* 775:*7*
**fulfilled**
466:*22*
604:*11* 740:*19*
**fulfilling**
739:*20* 771:*9*
**fulfills** 582:*12*
618:*1*
**full** 475:*24*
478:*11*
569:*12*
570:*18*
571:*19* 573:*2, 19* 574:*20, 22*
709:*4* 766:*16*
**fully** 471:*21*
574:*4* 673:*19*
**function**
734:*24*
**functions**
752:*18*
**further**
428:*22*
441:*11, 23*
442:*12*
450:*22*
460:*14*
479:*10* 639:*3*
653:*9, 13*
654:*17* 668:*6, 7* 685:*1*
801:*14* 803:*6, 11*
**future** 569:*13, 16* 572:*10*
573:*20* 574:*8*

**< G >**
**gained** 455:*3*
**Gallagher**
423:*1*
**GAP** 424:*21*
519:*24*
520:*12* 522:*22*
**gas** 508:*17, 22*
509:*1* 512:*3*
517:*5* 524:*22*
526:*9, 18*
527:*2* 718:*14, 18*

**GC** 508:*14*
523:*24*
524:*20, 22*
718:*21* 719:*4*
**GC-MS**
718:*20*
**general** 447:*3*
505:*6* 536:*16*
537:*8* 605:*4*
758:*7, 23*
**generally**
431:*7* 519:*5*
596:*8* 754:*18*
757:*1* 776:*17*
**generate**
436:*15, 20*
514:*17, 19*
687:*22, 23*
688:*21*
**generated**
431:*4* 436:*4*
446:*22* 449:*5*
452:*3* 477:*3, 4, 17* 479:*24*
555:*9* 607:*21*
609:*13*
634:*11*
673:*12* 723:*9*
760:*1* 786:*1*
**generating**
784:*23*
**generation**
776:*4*
**generic** 687:*7, 10, 14* 688:*4, 12, 18* 689:*2*
**genotoxic**
529:*8, 23*
531:*4* 532:*7*
533:*4* 697:*5*
796:*6, 21*
**Genotoxicity**
797:*11*
**Georgia**
421:*13*
**getting** 626:*8*
644:*18*
665:*16* 763:*22*
**Give** 493:*7*
519:*19*
536:*22* 566:*1*

572:*20* 580:*8*
637:*4* 644:*3*
781:*9* 793:*6*
801:*10*
**given** 479:*9*
503:*23* 527:*8*
570:*15*
584:*15*
625:*14*
626:*16* 746:*5*
778:*16*
788:*22* 806:*4*
**gives** 431:*19*
477:*12*
603:*17* 725:*16*
**giving** 485:*24*
720:*9*
**glad** 786:*6*
**global** 767:*23*
**globe** 770:*20*
**GMP** 502:*24*
503:*1, 10*
504:*3* 672:*12*
712:*21* 772:*16*
**go** 431:*12*
432:*1* 474:*19*
478:*15* 488:*7*
493:*12*
495:*24* 515:*4*
516:*23*
530:*10* 544:*5*
551:*18, 21*
553:*1* 558:*10*
561:*14* 562:*2, 4* 571:*1*
573:*23*
578:*18* 589:*8*
612:*14* 614:*8*
624:*23*
626:*13*
628:*19*
630:*20* 631:*8, 10* 635:*16*
637:*5, 16*
639:*18*
640:*16* 642:*8*
656:*17*
658:*13* 660:*8*
665:*1* 668:*1*
670:*13*
672:*23*

Confidential Information - Subject to Protective Order

674:22
686:20
689:19
712:20
734:18  744:3
745:7  746:15
754:4  755:6
757:9  761:5
**go-ahead**
603:17
**goal** 502:21
**goes** 453:21
461:9  462:8
478:11
501:23
526:16  642:1
789:20
**going** 431:9,
13  436:20
454:1  457:12
470:17
472:14
478:12, 14, 18
483:5  484:24
487:10  491:7,
16  498:1
499:23
500:12, 15
505:7  507:18
508:3, 5
510:1  511:8
515:1  518:17
519:15  522:7
523:23
525:14, 18
541:7, 9, 21
548:24
549:17  553:5
554:13  556:5
560:6  562:14
563:12
565:17
573:11
574:22
575:14
585:24  590:9
603:5  605:3
608:16  621:9
629:17, 24
630:6, 8
631:3  635:1,

14  637:2
644:16
645:13
650:13  651:5
653:20
654:21, 22
659:10  667:8
676:18
682:24
684:13  686:4,
7  691:11
703:4, 17
704:15, 16
706:14
723:22
736:23
744:19
746:19  747:2
751:20
764:12
769:17  773:9
775:7  780:7,
16  782:5
784:19
787:12
791:19, 20
802:14
**GOLKOW**
420:23  428:13
**Good** 429:4, 6
445:15, 17, 19,
21  466:7
491:11
502:21
547:21, 23
637:19
656:21  763:9
769:1  770:11
**goods** 608:11
652:15, 18, 19
659:21
**GORDON**
422:14
**gotten** 538:5
**govern** 758:8
**governed**
532:18
**governing**
732:23
**Grant** 422:4
**Gray** 613:4

**Great** 429:10
461:4  491:5
568:19
630:10  765:18
**GREENBERG**
421:10
**ground** 546:18
**Group** 425:8
538:9, 11
560:15  569:6
590:21
603:17
604:19  605:6,
10  738:19
**guess** 458:5
463:24
559:20  566:6
610:17  639:15
**guesstimating**
610:8
**guidance**
544:3  625:19
647:9  715:5
724:5, 9
740:24  756:5
765:21  772:4,
8  790:21
**guidances**
739:23

**< H >**
**Hal** 566:7
**half** 521:12
779:8
**hand** 575:8,
15  643:22
644:14  676:8
684:2  703:8
**handled** 605:5
608:2  730:1
**handles** 768:7
**happen**
444:22
503:14  559:4
596:9  617:1
627:20  672:6
683:1  751:20
**happened**
540:14  674:4
**happening**
443:6  783:5

**happens**
449:7  561:21
671:13, 15
**happy** 431:15
448:15
460:24  490:7
559:17  650:11
**hard** 454:6
**harken** 751:1
**HARKINS**
421:11
733:17, 20
734:1, 9
**Harkinss@gtla
w.com** 421:14
**harm** 627:18
628:1
**hazard** 695:15
**head** 544:11
696:7  767:13
**heading**
508:14  523:21
**headquarters**
695:3
**HeadSpace**
526:13
**health** 456:5
695:15
**Healthcare**
422:8  720:12
**hear** 746:14
**heard** 631:7
766:19
**hearing** 797:4
**held** 604:18
654:17
**help** 481:5
**helpful** 530:8
**helping**
777:14  796:10
**Herber**
425:23  606:2
**hereinbefore**
803:9
**hey** 453:7
454:20  623:20
**HHA** 748:9,
13, 16, 21
749:4, 19, 22
750:24  751:4

**HHAs** 750:10
**Hi** 664:10
**hide** 699:7
741:10
**HILTON**
421:4
**hired** 696:15
**history**
562:12
696:16  707:10
**hit** 779:8
**Hold** 484:20
594:15, 16, 19,
22  609:6, 15,
20  610:4, 5,
18  611:2, 9,
12  612:20
613:8, 15, 22
614:3, 19
615:13  616:2
617:12
618:15
619:23  620:9,
14, 19  621:2
623:2, 11, 13,
22  624:10, 18
625:15, 22
626:16  627:9
633:2  643:5,
14, 18  644:1,
4, 8, 18  645:4,
7, 13, 18
646:15  647:2,
13, 16, 20
648:5, 6, 7, 11,
17, 24  649:3,
5, 8, 14, 19, 21
650:3, 5
656:19, 22
660:11, 14
662:14, 18, 22
663:7, 15
667:5, 17, 24
700:23  701:6,
9, 15, 24
702:1, 14, 23
703:3, 12
704:6, 13
705:9  706:1,
7  735:22
777:15

**holds** 626:*11*
646:*10* 649:*1*
**HON** 420:*4*
**hour** 491:*7*
**hours** 685:*15*,
*17*
**Huahai** 422:*7*,
*8* 425:*8*
506:*15*
560:*15* 564:*7*
589:*1*
**Humana**
422:*14*
**hundreds**
770:*17*

< I >
**Iceland**
557:*18*
567:*14*, *21*
796:*20*
**Icelandic**
567:*20*
**ICH** 695:*5*
**idea** 770:*11*
**identification**
471:*5* 475:*5*
505:*15* 507:*1*
510:*16*
515:*14* 520:*4*
557:*2* 560:*16*
562:*22*
563:*19*
568:*13* 576:*1*
580:*6* 586:*10*
606:*3* 612:*1*
619:*3* 621:*19*
636:*2* 651:*12*
735:*11* 781:*5*
792:*11*
**identified**
441:*9* 449:*22*
522:*22*
542:*22*
544:*15*
596:*14* 737:*8*,
*9*
**identifies**
558:*12* 596:*2*
638:*18*

**identify** 473:*8*
579:*13*
713:*12* 715:*8*,
*21* 719:*15*
721:*7* 734:*13*
778:*3*
**identifying**
604:*16* 605:*1*
715:*14*
**II** 420:*10*
**Illinois** 422:*12*
**immediate**
594:*22* 701:*14*
**immediately**
559:*5* 594:*6*,
*14* 701:*12*
**impact** 442:*8*
472:*1* 498:*9*
691:*11*
704:*15*
714:*10* 726:*8*
738:*13* 767:*23*
**impacts**
726:*14*
**imperative**
804:*14*
**implement**
522:*9* 602:*15*
707:*7* 711:*15*
715:*19*
719:*18*
736:*17* 759:*20*
**implemented**
501:*23*
502:*16* 603:*6*
633:*3* 647:*4*
650:*3* 716:*2*
737:*2* 748:*2*
759:*22* 800:*24*
**implementing**
603:*19* 675:*23*
**implicated**
442:*17*
**imply** 760:*15*
772:*20*
**importance**
772:*11*
777:*21* 783:*3*
**important**
442:*15*
445:*15*

446:*15* 452:*6*
455:*19*
467:*14*
479:*19* 529:*9*
572:*17*
620:*11* 693:*6*
698:*16*
703:*13* 720:*6*,
*18* 728:*2*, *4*
747:*16* 768:*6*,
*17* 771:*11*, *15*
772:*15*, *24*
773:*5*, *12*, *18*,
*20*, *24* 774:*7*,
*12*, *14*, *18*
777:*10* 779:*19*
**impression**
691:*22* 765:*8*
766:*7*
**improper**
549:*8*, *11*
**improve**
713:*13*
**improvements**
751:*4*
**impurities**
447:*17*
449:*18*
450:*14* 451:*4*
466:*12*
552:*14* 577:*4*
597:*7*, *14*
598:*2*, *21*
599:*6* 612:*22*
616:*14* 697:*5*
706:*9* 708:*12*
714:*22* 779:*1*
796:*6*, *21*
797:*10*
**impurity**
439:*13*
449:*14* 529:*8*,
*24* 533:*4*
589:*20* 594:*3*
595:*21*
705:*11*, *16*
709:*6*, *24*
710:*2* 723:*9*
**inappropriate**
489:*24*

**incinerate**
652:*17*, *18*
660:*4* 673:*18*
**incinerated**
659:*21*
678:*12* 680:*6*
683:*14*
**incineration**
608:*12*, *18*
652:*15* 659:*19*
**incinerator**
641:*21*
**include** 476:*3*
480:*9* 509:*22*
697:*1* 698:*12*
700:*13*
**included**
446:*3* 474:*17*,
*18* 492:*10*
498:*7* 577:*2*
644:*12*
694:*23*
700:*18*, *20*
**includes**
430:*19*
445:*24* 446:*2*,
*5*, *8* 512:*7*
722:*19*
**including**
457:*5* 651:*21*
724:*10* 790:*24*
**incoming**
446:*6* 499:*19*
504:*17*, *18*
506:*18*
509:*21*
511:*15*
524:*12*
525:*10*
527:*19* 548:*6*
569:*14*, *16*
572:*10* 573:*2*,
*20* 574:*8*
575:*3*, *10*, *11*
674:*24* 678:*3*
**inconsistency**
740:*13*
**Inconsistent**
512:*22* 740:*5*,
*7*

**incorporate**
700:*11*
**incorporated**
749:*12*, *22*
**increase**
478:*22*
**increased**
478:*5*
**incredible**
768:*10*
**independent**
482:*6* 497:*22*
500:*2* 559:*8*
585:*14* 739:*7*
**independently**
495:*1* 500:*4*
**INDEX** 427:*2*
745:*18*, *22*
**indicate**
436:*13* 487:*3*,
*14* 499:*12*
527:*24*
533:*20*
585:*12*
682:*19*, *22*
690:*4* 702:*8*
714:*8* 747:*23*
750:*2* 790:*8*
791:*2*, *6*
**indicated**
443:*12*
468:*16*
480:*16* 481:*2*
488:*15*
521:*20*
533:*14*
613:*15*
626:*19* 648:*3*
662:*10*
677:*24* 681:*5*
682:*17*
683:*18* 706:*8*
715:*20*
724:*24*
739:*14* 746:*7*
752:*3* 754:*22*
758:*11* 763:*8*
771:*1* 773:*2*
**indication**
483:*16*
624:*16*

674:*11* 724:*8*
725:*4* 787:*3*
**indirectly**
470:*11* 535:*12*
**individual**
564:*24*
**individuals**
605:*15*
748:*15*
765:*11* 766:*2*
796:*11*
**industrial**
452:*8*
**Industries**
421:*15* 793:*3*
**industry**
443:*19*
453:*24* 466:*6*
594:*19*
694:*19*
696:*11*
715:*18* 722:*7*
723:*2* 724:*1,*
*14* 740:*8*
741:*1* 754:*12*
772:*5* 789:*13,*
*19* 790:*9*
**inferring**
778:*9*
**inform** 492:*3*
595:*15, 17*
617:*11* 633:*16*
**INFORMATIO**
**N** 420:*11*
439:*12*
442:*14, 16*
443:*22* 445:*2,*
*5* 456:*23*
457:*5* 479:*4,*
*6, 9, 11, 12, 24*
480:*17* 481:*5,*
*19, 22* 482:*24*
483:*2, 17*
486:*21* 487:*3,*
*7, 14* 488:*1, 5,*
*6, 10, 16, 22*
489:*6* 492:*5,*
*10* 493:*22*
495:*19* 497:*3*
514:*18* 529:*9*
532:*6* 533:*3,*

*21, 24* 535:*15*
536:*13* 538:*4*
547:*21*
552:*16* 571:*6,*
*17, 23* 572:*21*
573:*9* 575:*7*
590:*1* 594:*10*
598:*12, 23*
607:*11, 13*
610:*20* 618:*1*
633:*9, 15, 22*
650:*15* 651:*1*
673:*12* 674:*3*
681:*11* 684:*4*
698:*15* 702:*7*
706:*6* 726:*17*
759:*14* 760:*2*
778:*20*
779:*13, 14*
785:*6*
**informed**
456:*8, 16*
460:*12*
537:*10* 594:*1*
595:*19*
**informing**
617:*3*
**infrastructure**
770:*7*
**Ingredient**
425:*13* 469:*1*
557:*14*
563:*18* 564:*6*
774:*1*
**ingredients**
462:*23* 751:*16*
**in-house**
429:*16*
**initial** 436:*6,*
*16* 439:*22*
459:*23* 472:*4*
725:*18*
**initially**
432:*13* 724:*18*
**initiate** 595:*14*
**initiated**
612:*19*
617:*11*
661:*10*
713:*17* 737:*13*

**initiates**
736:*22*
**initiating**
610:*3*
**Inmar** 596:*22,*
*23* 602:*22*
603:*18*
607:*16* 608:*3*
611:*14* 614:*8,*
*11* 616:*11*
617:*3* 633:*4*
**I-N-M-A-R**
602:*22*
**Inmar's** 649:*6*
**Innovation**
799:*13*
**in-process**
464:*20* 465:*1*
466:*9, 18*
468:*13*
471:*20* 548:*6*
**input** 456:*24*
457:*1* 578:*9*
579:*5* 689:*1*
700:*5* 727:*6*
737:*21*
750:*14* 791:*5*
**insist** 624:*24*
**insofar**
435:*18* 672:*16*
**inspected**
538:*3*
**inspection**
537:*12* 538:*7,*
*23* 539:*4, 7*
540:*14*
542:*23*
543:*19*
548:*22*
694:*17* 711:*6*
744:*23, 24*
746:*2, 8, 9*
747:*17, 23*
788:*15, 23*
**inspections**
535:*8* 537:*19*
550:*14*
553:*19* 554:*4,*
*18* 555:*9, 10*
695:*7* 728:*22*

**instance**
465:*22* 469:*2*
503:*23*
534:*15* 582:*4*
591:*7* 603:*13*
618:*16*
625:*14* 666:*7*
704:*9* 712:*22*
713:*16* 729:*2*
738:*12* 746:*6*
750:*24*
754:*24* 755:*9*
759:*16*
**instances**
503:*13, 16*
531:*17* 588:*7*
759:*10* 770:*24*
**instituted**
467:*24* 468:*6*
646:*18* 800:*17*
**instructing**
544:*12*
616:*11* 668:*22*
**instruction**
642:*10* 668:*14*
**instructions**
544:*19*
625:*19* 633:*1*
804:*1*
**integrated**
558:*22*
**intelligence**
555:*8*
**intended**
451:*12* 502:*5*
508:*3* 512:*6*
517:*7* 542:*2*
649:*12*
662:*14, 23*
663:*7* 701:*11*
713:*10*
**intent** 472:*17*
**interact**
760:*17*
**interacted**
768:*2, 3, 4*
**interacting**
761:*13*
**interaction**
591:*15* 607:*15*

**interactions**
760:*6* 762:*7*
**interest**
702:*13, 21*
725:*22* 748:*15*
**interested**
729:*12* 803:*13*
**interim**
435:*22* 436:*6,*
*16* 437:*3*
440:*4, 11, 23*
581:*2, 14*
582:*22* 584:*6,*
*18* 588:*8, 13*
589:*21*
**intermediates**
442:*22* 446:*10*
**internal**
617:*15* 676:*1*
677:*23*
682:*18* 683:*8*
712:*5, 13, 18*
**internally**
514:*22* 768:*5*
**international**
695:*6*
**interpretation**
540:*4*
**interpreted**
644:*21*
**introduce**
618:*19*
**inventory**
514:*19* 644:*14*
**investigate**
504:*2* 635:*9*
673:*4* 755:*14*
766:*23*
**investigated**
443:*6* 503:*17*
**investigation**
441:*1* 442:*13*
443:*24* 445:*7*
449:*2* 450:*22*
531:*10, 13*
533:*16* 540:*9*
594:*8* 646:*2*
654:*18*
666:*23* 667:*7*
668:*7* 672:*22*
673:*8, 14*

674:2, 21
707:23
729:13, 17
730:2  760:1
762:4  787:16
790:5, 15
795:11
**investigations**
539:22  695:8
739:18  755:11
**investigator**
695:1
**investigators**
695:2
**involve**  696:1
709:21, 24
**involved**
536:7  604:22,
24  607:2
614:6  652:14
698:21
**involvement**
604:1  688:24
695:24
730:19, 23
**involves**
587:11  707:6
**involving**
572:8  666:7
667:17  731:15

**IRBESARTAN**
420:4  582:4
690:19
**irrelevant**
489:10
**isolated**
443:17  729:6,
10
**Israel**  659:19
661:11
669:16, 18
793:7
**issuance**  711:9
**issue**  440:14,
16, 17, 18
441:2, 7, 15,
20  443:13
444:1, 8
449:22  456:4
503:24

534:18
544:17
546:20, 23
557:14  571:2
575:8  587:24
594:12
595:11, 21
617:23
637:11
658:11
662:22
672:15
676:21  693:5
697:11  702:2
705:1, 16
708:2  710:9
722:8  724:3
725:7, 9
726:2  729:23,
24  744:15, 16
750:17
762:19
766:24
767:21
778:17
790:10  791:7
794:2  795:19
**issued**  535:17
537:4, 11
538:14
590:23
615:13  634:3
646:15
647:19  654:2
710:16
746:10  759:19
**issues**  543:9,
10  574:2
579:2  589:16
642:20  654:3
697:4  711:1,
19  714:3, 9
726:5  730:8
747:8  754:13,
15  762:5
765:15, 19
768:14
769:11  779:8
791:4
**issuing**  626:11

**item**  638:19
639:4
**items**  745:21
**iterations**
433:11
**its**  434:12
447:1  453:16
478:8  492:3
496:19  500:3
503:2  509:5
516:7  518:11
529:7, 22
533:16  535:7,
22, 23  538:23
539:7, 12
542:23
543:22  555:2
565:19  567:9
579:9  581:24
584:18  594:1
597:4, 11, 13,
23  598:8
599:5, 12
600:17  601:4,
5  612:9
644:14
647:21
648:18  662:5
682:3  683:7
687:23
692:16  704:6
712:13  721:9,
21  733:8
738:2  739:7
742:7  751:16
761:11
770:16
785:22
788:14  789:5
795:8
**IVES**  422:8

**< J >**
**January**
514:2  619:13
622:16
**Jens**  651:21
665:6
**JERSEY**
420:1

**Jerusalem**
649:23  652:9,
20  653:15, 21
655:3  664:11,
22  665:7, 14
668:22
669:11
670:10, 13, 24
671:4, 20
674:8  675:8,
17  676:9, 14
677:18  678:6,
11, 14, 20
679:1  680:1,
14, 23  681:13,
21  682:2
683:12  684:3
706:22
709:11, 20
712:5, 23
**Jerusalem's**
677:8  678:2
**JESSICA**
422:3
JK@Pietragall
o.com  422:22
**JLM**  669:6, 10
**job**  489:13
577:7, 20
578:7  579:2,
19  765:18
**Joerg**  651:21
653:12
659:15  664:2,
11, 21
**JOHN**  422:20
765:12
**Joyce**  783:21
JPriselac@dua
nemorris.com
422:6
**Judge**  490:12
**July**  432:20
435:5, 8
456:15  511:6,
16  553:16
554:2, 12, 16
555:2, 15, 18
595:4, 19
597:5, 22
598:7, 17

599:1, 9
600:10, 17, 22
642:21
650:23
653:11, 18
659:11  660:9
724:19  792:21
**jump**  686:7
**June**  452:19
537:15, 17, 22
542:20
544:21
560:24
564:12
642:21  727:13
**jurisdiction**
693:13
**justification**
701:18
**justified**  707:9
**justify**  478:22

**< K >**
**KANNER**
421:1
**keep**  487:10
536:1  537:18
541:1  629:17
**Kefar**  669:17,
20
**kept**  455:11
672:12
680:22  682:2
**KETTERING**
422:20
**Kfar**  652:20
793:7
**KFS**  664:13
669:6, 15
**Khanna**
653:11
659:11  661:8
**kind**  570:21
594:18  750:7
**kinds**  707:3
718:18
**knew**  537:13
588:11
698:19
699:24  701:10

Confidential Information Subject to Protective Order

know 431:*21*
437:*16* 438:*8*
440:*14* 442:7
444:*16* 445:*4,
8* 446:*24*
447:4 448:*18*
451:*4, 22*
452:*16* 454:*9,
11* 456:*23*
457:3, 6
460:*16*
464:*23* 465:*8,
12* 466:*15, 20*
468:*23*
469:*17* 470:2
479:*5, 8*
480:*11*
481:*13*
483:*19, 24*
495:*6, 13*
501:*24* 502:*1*
518:*5, 7*
521:*16, 17*
529:*16*
532:*20* 533:7
536:*8, 16*
538:2 541:*17*
545:*20*
546:*22* 548:6
550:*24* 555:6
557:*21*
558:*23* 559:6
565:7 566:6
571:*8, 19, 21*
574:*23* 576:6
577:*22* 578:9
582:*8* 588:6
591:*8* 594:*1*
595:*16*
598:*15* 600:7
601:*17* 603:*8,
14* 604:*8, 9,
11, 13* 605:*13*
607:*10*
608:*23* 609:3
610:2 614:2
615:*18* 616:3
617:*10*
620:*24* 621:*8*
622:*23*
624:*17* 625:*2,*

3 626:*17*
630:*16* 631:*1*
637:*10, 15*
647:7 649:*20*
650:*21* 651:*1*
654:*15* 655:4
664:*6, 8*
669:*15, 19*
670:2 671:*18*
674:7 675:*5,
15, 24* 676:*12*
677:*6, 16*
678:*23* 679:3
680:*2, 21*
681:*24* 683:6
701:*13*
702:*11*
718:*20* 719:4
723:*18* 724:*6,
15* 725:*22*
728:*3, 21*
729:*15* 739:*5*
743:*16* 744:*7,
14* 748:*12*
749:*8* 750:*20*
754:*16*
755:*11* 759:6
765:*14, 19*
766:*15* 768:4
770:*21*
787:*13*
788:*16, 19*
789:*2, 3*
791:6 801:*13*
802:6
**knowing** 693:*4*
**knowledge**
444:5 455:2
514:4 540:*12*
541:*15*
591:*14* 597:*3,
10* 599:*2, 16*
600:*15*
627:*16*
668:*18*
676:*23* 679:7
680:*18*
681:*19*
693:*21*
696:*13*
705:*15* 717:*8,*

9 720:*21*
721:*18*
728:*12* 730:*5*
741:*21*
749:*16*
789:*18, 19*
**knowledgeable**
799:*24*
**known** 448:*1*
594:*11* 790:*1*
**knows** 666:*21*
678:*18*
**Koller-Dette**
572:*24*
**Kristalyn**
423:*1* 428:*12*
**KUGLER**
420:*4*

**< L >**
**L.hilton@kann**
**er-law.com**
421:7
**lab** 478:*18*
479:*14*
**label** 466:*17*
600:*12*
**labeling** 601:*4*
687:*1, 2, 11,
24* 688:*4, 6,
13, 20* 689:*2*
**labels** 599:*18*
600:6
**laboratory**
478:*16* 502:*1*
522:*12* 795:*5,
6*
**Labs** 564:*12*
**lacks** 722:*13*
723:5 754:2
757:7 761:3
**lading** 639:*23*
640:*10, 24*
642:*1*
**language**
609:*11*
687:*24* 689:*1*
749:*12* 750:*3,
6, 8* 754:*10*
**laptop** 734:*5*

**late** 452:*18*
521:*11* 642:*21*
**laws** 800:*2, 9,
15*
**lawyer** 665:*22*
666:*13*
**LAWYER'S**
807:*1*
**layer** 451:*3*
**layers** 452:*9*
**LAYNE** 421:*4*
**layout** 438:*10*
**LC-MS**
793:*14, 19*
**lead** 534:*2, 3*
571:*23*
598:*13* 762:*10*
**Leading**
722:*10, 12, 22*
**learn** 455:*8*
537:7
**learned**
537:*15* 714:7
**learning**
455:*12*
**led** 441:*22*
**left** 524:*1*
798:*23* 799:*1,
3, 7, 11, 17, 19*
800:*16*
**legacy** 456:*9*
459:*14*
473:*10*
556:*12*
558:*24*
559:*18, 22*
561:7
**legal** 610:*4, 5,
18* 611:2
612:*20* 613:*8,
15, 21* 614:*2,
19, 20* 615:*13,
14* 616:*18*
617:*12*
618:*14*
619:*23* 620:*9,
18* 621:2
623:*11*
624:*10, 18*
625:*15, 21, 22*
626:*11, 15*

627:*8* 633:2
644:*18, 20*
645:*4, 7, 13,
18* 646:*15*
647:*2, 13, 20*
648:*4, 7, 11*
649:*3, 8, 9, 14,
19, 21* 650:*5*
660:*11, 13*
662:*14, 18, 22*
663:*7, 15*
666:*11, 14, 16*
667:*17, 23, 24*
730:*20*
**less-than-full**
574:7 575:2
**lets** 544:3
**Letter** 425:*22*
426:6 458:*4*
461:*4* 489:*22*
603:*14* 606:*1,
15* 607:*3, 20,
24* 611:*1, 23*
612:*8* 659:*18*
745:*14* 746:*6,
7* 747:*21, 22*
786:*23* 787:*6,
12, 13, 22*
**letters** 459:*21*
460:*6, 23*
475:*22* 482:*3*
513:*12* 514:*8,
9* 516:7
**letting** 734:7
**level** 442:*23*
443:9 577:*12*
578:*13*
588:*19*
699:*17* 725:9
726:*6, 23*
791:*13*
**levels** 436:*5,
16* 437:9
450:*11* 466:*1*
502:2 508:9
582:*21* 585:5
587:*4* 694:*1*
779:*1*
**LIABILITY**
420:*5*
**light** 785:*15*

Confidential Information Subject to Protective Order

likewise 710:13

limit 435:23 436:7, 17, 21 437:4 440:4, 11, 23 752:17

limitation 693:24

limitations 582:10

limits 525:1 581:3, 14 582:23 584:6, 18, 19 715:2

Line 427:6, 11, 16, 21 715:9 805:3 807:2

link 432:4 702:3

linked 535:12

liquid 794:22

list 461:9 712:10 762:20

listed 432:23 464:10 496:4 525:1 558:9 638:12 688:5, 14 745:16, 22 756:24 757:2 793:2

listing 464:13

lists 463:18 507:9, 15 563:7 639:5

literature 790:21

LITIGATION 420:5, 23 428:13 616:2 623:3, 22 643:14 644:8 666:7

little 431:2 447:22 448:11 450:17 474:20 500:24 654:6 717:11 719:11

Liu 748:10

749:14 750:1

live 783:5

LLC 421:1, 16, 23 422:8

LLP 421:10 422:3, 8, 17

local 531:10 533:15 565:22 683:8

locate 513:16 655:13

located 678:20 681:20

location 649:6

locations 652:19 658:8, 10

LOCKARD 421:10 424:6 430:18, 23 432:3 469:23 480:14 483:22 484:20, 23, 24 487:17 488:19 489:16 490:5 491:6 495:10 512:21 513:19 523:9, 14 528:15 529:13 530:3 532:10 541:19 542:10, 24 548:19 549:2, 6, 9, 10, 20 565:4 574:9 579:20 582:24 583:9, 13 584:8 585:9 587:6 593:15, 22 597:15 602:6 614:16 615:9, 22 621:4 623:4 624:13 626:6 627:22 628:18, 21 629:4, 20 630:19 631:2

632:19

634:18 636:4 642:5 644:16 645:19 646:8, 20 650:8 659:3 661:23 662:7 663:2 666:10 667:20 670:16 674:13 675:20 676:17 679:15 680:9 681:1, 16 682:4 683:15 684:6 685:5, 8, 16, 19, 24 686:3, 21 688:10, 22 694:5 696:23 700:3 702:10, 20 704:2 706:2, 19 707:21 708:17 709:7 710:6 712:3 714:1, 23 719:21 721:4, 15 722:5, 11, 18 723:1, 24 726:11 731:22 732:17 733:16, 22 734:6, 12 735:14 738:22 740:22 741:8, 14, 20 742:5, 18 743:2 746:17 747:4 748:4 749:1 750:22 751:8 752:14, 24 753:21 754:5 756:13 757:10, 24 759:1 760:19 761:15 762:8, 16 763:21

764:21

766:13 767:4, 11, 18 769:8 773:15 774:3 775:15 777:15 779:10 781:14 784:8, 11, 15 788:4 789:22 792:1 795:1 798:6 800:19 801:16 802:3, 9

Lockardv@gtlaw.com 421:14

logistical 604:17 658:11

long 502:13 521:21 559:6 560:2 654:11 696:15

longer 569:9 634:12 680:1 701:15 743:14, 15 800:11

look 431:20 447:14 449:15 453:10, 16 454:17 459:4 460:23, 24 461:1 463:9 464:18 465:6 470:15 474:4, 19 477:13, 14, 16, 17 486:3 493:15 500:10 514:3 524:2 539:21 541:10, 24 543:2, 5, 8, 24 544:8 547:4, 7, 13, 18 549:4 550:4, 18, 24 551:6, 17 554:22 558:1, 12 560:20 562:5, 12 563:1

572:23

613:12

618:16

638:22

639:18

643:24 644:2 645:4, 8 648:4 651:2 669:1 676:6, 11 679:10 682:14 690:8, 23 705:4 712:9 723:15 744:1 748:17 756:1 758:12, 15 767:20 771:19 786:4 793:16 796:9 797:21 798:10

looked 433:10 435:10, 18 456:14 473:11 479:17 483:20 513:11 539:14 561:2, 10 572:23 607:4 646:3 753:24 758:18 773:3 790:20, 21 797:24 798:1, 7

looking 430:16 431:19 432:14 433:15 436:10 442:7, 19 455:7 456:2 459:6 464:8 467:1 475:2, 4 482:2, 3 492:13 493:5, 10 500:19 501:4 506:2 511:8 513:22 518:8 523:11 524:4 534:24

547:*15*
548:*15*
550:*12*  556:*1*
561:*5*  564:*15*
571:*4, 14*
578:*16*
585:*21*
610:*24*  613:*1*
636:*15*  637:*7*
658:*14*  692:*1,*
*9*  696:*9*
704:*19*
735:*20*  736:*5,*
*13*  750:*10*
768:*19, 22*
794:*13*
796:*14, 15*
797:*16, 18*
**looks**  473:*22*
507:*10*
508:*12*  511:*5*
516:*1*  527:*14*
564:*10*  572:*2,*
*6*  576:*24*
580:*23*
639:*15*  660:*2*
691:*1, 20*
728:*23*  735:*4*
**LOSARTAN**
420:*3*  582:*4*
690:*18*
691:*15, 22*
**losing**  802:*10*
**lost**  746:*13*
**lot**  443:*3*
470:*4*  609:*14*
611:*10*
620:*13*
623:*12*
639:*12*
654:*23*
682:*10*
683:*14*
724:*16*
766:*17*  778:*15*
**lots**  435:*21*
436:*5*  437:*1*
588:*9*  609:*1,*
*3, 4*  611:*13*
684:*1*

**Louisiana**
421:*5*
**low**  791:*12*
**lower**  636:*12*
**luncheon**
590:*12*
**Lyons**  568:*22*

**< M >**
**machine**
718:*14*
**machines**
718:*18*  719:*4*
**main**  475:*9*
**maintain**
768:*16*
**maintained**
627:*9*  657:*6,*
*16*  677:*13*
771:*22*
**maker**  741:*4*
**making**
474:*14*  498:*2*
518:*18*
520:*20*
546:*14*
622:*23*  629:*5*
636:*14*
643:*10*  658:*9*
665:*24*
704:*23*  750:*20*
**male**  664:*7*
**Malta**  504:*16*
506:*5, 18*
507:*11*
508:*21*
510:*23*
511:*14*  514:*5*
515:*18, 22*
518:*10, 20*
519:*1*  520:*19*
521:*18*
524:*12*  525:*4,*
*8*  526:*4, 21*
527:*3*  564:*7*
566:*7, 11, 12,*
*17, 19*  567:*1,*
*12, 13, 16, 19*
649:*11*  668:*21*
**Malta's**  507:*13*

**manage**
760:*16*
763:*15*
768:*15*  770:*21*
**management**
534:*9, 14*
535:*1*  617:*21*
770:*8*  774:*10*
**manages**
596:*24*
**managing**
680:*16*
761:*12*  765:*18*
**manifest**
640:*11, 18, 22,*
*23*  642:*1, 14*
**manner**
696:*12*
**manually**
545:*16*
**manufacture**
446:*1, 3*
533:*18*  731:*6,*
*15*
**manufactured**
467:*20*  503:*4,*
*5*  533:*19*
598:*10*
599:*13*
649:*23*
709:*11*  775:*10*
**manufacturer**
445:*16*  504:*1*
506:*14*
528:*22*  687:*8*
688:*12*
731:*12*  732:*5,*
*8, 10, 12, 20*
**manufacturers**
446:*15*  732:*2,*
*23*
**Manufacturing**
424:*22*  436:*3,*
*14*  437:*6*
439:*4*  440:*19*
447:*18*  448:*1,*
*20*  449:*10, 16*
450:*10*  452:*7*
462:*20, 23*
464:*18*  465:*6*
467:*8*  468:*11,*

*22*  469:*21*
473:*12*
497:*14, 24*
498:*10, 18*
499:*3, 22*
500:*11*  501:*9*
502:*6, 21, 24*
503:*1*  520:*2,*
*13*  548:*7*
563:*7*  648:*19*
694:*18*  769:*2*
771:*3*  773:*4*
774:*21*  775:*5,*
*9*  793:*9*
794:*15*
**March**  557:*15*
558:*2*  580:*16*
586:*19*  589:*3,*
*5, 12*  622:*1,*
*10, 20*  692:*6,*
*10*  796:*19*
**Marck**  423:*1*
**mark**  470:*18*
505:*8*  510:*2*
515:*2*  519:*16*
560:*7*  562:*15*
563:*13*  586:*1*
605:*18*
621:*10*
635:*15*
642:*14*  651:*6*
780:*8*  791:*20*
**Marked**
427:*20*
431:*11*
432:*19*
457:*24*
458:*22*  471:*4*
505:*14*
510:*16*
515:*13*  520:*3*
545:*6, 13*
546:*1*  557:*2*
560:*16*
562:*22*
563:*19*
568:*12*  576:*1*
580:*5*  586:*9*
606:*2*  611:*19,*
*24*  619:*3*
621:*12, 18*

636:*2*  651:*12*
735:*10*  781:*4*
792:*10*
**market**
507:*17, 22*
518:*20*  566:*9*
609:*18*
660:*15*  662:*6*
663:*1*  669:*13*
686:*15*  688:*1*
690:*6*  721:*20*
725:*20*
**marketed**
693:*19*
**markets**
442:*22*
479:*22*
669:*19*  670:*1*
691:*23*
**marking**
780:*21*
**Maslynsky-**
**Miller**  420:*16*
803:*1*
**Mason**  765:*12*
**Master**  489:*19*
**match**  687:*15*
**material**
514:*16, 21*
643:*16, 18, 20*
647:*15, 16*
650:*4*  660:*14,*
*16*  661:*11*
664:*14*  669:*8*
674:*6, 16*
675:*1, 2, 3*
678:*19*  745:*18*
**materials**
461:*23*  548:*6*
680:*13, 17*
681:*20*  794:*8,*
*9*
**matter**  483:*5*
559:*23*
**Maz@falkenbe**
**rgives.com**
422:*13*
**MBC@Pietrag**
**allo.com**
422:*19*

McKesson
591:9, 18
**MDBE** 464:15
**MDL** 420:3
**mean** 448:6
469:10, 15
478:3   484:15
485:20   496:1
530:16
532:21   534:8
540:22
541:12   542:1
544:10
548:16
550:22   551:9
599:20
601:14
614:24   615:5
690:14
692:20
704:10, 11
716:8   718:4
723:16
736:19
743:12   768:9
770:14   773:9
790:24   791:2
**meaning**
570:19
578:11, 22
692:22
711:15   726:7
752:8   765:12
**means** 462:17
469:14   478:4
484:2   501:19
502:12
507:22
712:17   713:9
743:13   803:20
**meant** 452:14
**measure**
777:3   794:23
**measures**
738:1
**meats** 790:3
**media** 794:9
**medical**
748:13
**medication**
581:17

582:12
615:11
690:12
703:15
704:22   705:2
720:15   768:1
**medications**
720:1
**meet** 502:18
534:19   581:2
690:21
720:23   721:9,
21   726:18
755:14   769:5
**meeting**
499:12
**MEGAN**
422:11
**MELISSA**
422:17
**member**
801:4, 6
**members**
614:5   737:23
**memory**
430:3   438:7
459:20   542:2
578:1   648:1
650:12
669:23, 24
802:11
**mention**
457:11   482:6
498:16
540:16   611:2
620:18   660:11
**mentioned**
444:6   504:11
605:10   608:7
613:7   694:8
704:7   737:5
743:5   786:19
**mentions**
462:1   476:1
497:7, 12
550:5   608:1
612:18
**merchandise**
619:16
**mere** 546:18

**message**
568:20
569:11
580:15
586:18   589:6
614:7   619:12
622:10
623:16
651:22   652:2
723:8   781:20
**met** 470:13
535:3   551:11
600:18   601:1
722:2
**methanol**
464:10
465:23   508:5
512:8   517:10
525:2, 15
**method**
467:16   517:5
519:6, 9
521:18, 22, 24
522:3, 6, 7, 10,
14, 17, 18
525:13, 22
526:2   527:12
708:6, 11, 15
715:24   716:1,
4, 5, 7, 9, 16
717:13, 15, 17,
21   776:14
777:10, 22
778:6, 12, 23
779:3, 16
780:1, 16
782:14   783:3,
7, 22   784:5,
23   785:9, 11,
15   786:2
791:13
793:20   795:8
**methodologies**
716:19   717:1,
8
**methodology**
715:13   717:4
718:3, 5, 7
774:22
**methods**
506:22

511:19   519:1
520:18
522:23
524:11   678:5
714:18, 20
719:20
776:21   777:2
796:16, 20
**metric** 658:18,
23   674:9
675:8   676:15
677:9
**middle** 571:16
574:16
583:18   674:20
**Miller** 485:10
791:24   803:16
**milligrams**
520:15
**million** 436:7
658:23   674:9
**mind** 485:10
536:1   541:1
**minimal**
476:7   494:11,
21   495:4
**minor** 461:5,
11   462:2
467:22   468:3
481:6, 10
486:11   737:9
**minutes**
430:17   553:2
685:15, 17
**Mischcharacteriz
es** 574:10
**misheard**
554:11
**mislead**
549:23   741:24
**misspoke**
554:10   776:23
**misstate**
739:11
**Misstates**
585:10
624:15   659:4
661:24
674:14   784:9
795:2

**mistake**
545:18
**mistaken**
456:19
**mitigated**
570:21
**moderate**
461:5, 11
467:22   468:4
486:11   737:9
**Modernization**
799:4
**modification**
468:4   523:2
**modifications**
461:6
**modify** 528:4
**molecule**
468:24
**moment**
444:6   456:21
457:15
458:10   490:6
493:7   500:14
504:8   510:4
513:7   519:19
523:7   531:8
545:1, 7
547:12   556:4
561:3   567:23
575:17   576:7
580:9   587:19
588:24   589:4
605:7   617:7
630:21
633:13
651:17   670:8
684:5   801:11
**moments**
769:14
**Monday**
727:21
**monitor**
760:17   763:16
**monitoring**
682:21
683:10   761:12
**Monroe**
422:11
**monthly**
606:18

612:13  613:6,
12
**months**  453:3
622:20  642:19
**morning**
429:4, 6, 21
430:21
**MORRIS**
422:3
**move**  490:24
551:19  637:3
**moved**  768:12
**MT**  656:14
658:16
**MTBE**  462:5,
9, 18  463:5
465:1, 10
466:19  467:3
468:14
469:20
471:21
474:13  476:4,
13, 19  479:2
482:8  489:7
492:6  494:9,
18  495:3
496:20
509:13, 23
512:12
517:17  518:1
525:11, 19
739:8, 9
**Müller**  797:5
**multiple**
565:10  618:7
622:24  651:20
**mutagenic**
697:16
**mute**  504:6
**mutual**  752:6
**Mylan**  422:23
431:4  433:2
434:4  437:12,
19  438:11, 16,
22  439:2, 3
440:3, 10, 22
441:5, 12, 17,
24  442:22
443:3, 6
444:1, 4, 10
577:7, 20

579:3, 15, 19
652:3, 7, 8, 12,
23  653:1, 5,
18, 21  655:4,
21  656:22
658:22, 24
660:3, 5
661:8, 17, 19
664:23
669:11  670:3,
10, 23  671:4,
19  672:17
673:4, 13
674:10  675:9,
17  676:15
677:9, 18
678:11  680:5
683:13  684:1
700:23  701:1,
6, 9, 18  702:9
703:10  704:6
705:20  706:6
732:19
751:11
753:22  755:7,
9, 16, 24
756:4, 7, 16,
17  757:3
759:15  760:7,
23  761:17
762:5, 10, 12,
19, 21  763:2
765:2, 7
778:10
**Mylan/Teva**
732:24
**Mylan's**
439:18
446:24  577:3
579:10
653:11  705:10

**< N >**
**name**  428:11
602:21
**named**  652:4
**Nase**  426:12
636:1
**Nassal**  665:6
**Nassall**  651:22
**native**  734:5

**nature**  485:2
673:19
697:17  778:16
**NDEA**  438:16
440:16, 23
579:14
672:17, 19, 24
678:4  717:4,
20, 22  718:5
719:7
**NDMA**
435:23  436:4,
7, 15, 21
437:3  438:21
439:3, 17
440:3, 11
451:17  452:2
453:8, 13, 18
454:21
455:15
579:14
581:13
672:17, 20
673:1  678:4
716:20  717:2,
14, 21  718:3
719:7
**NDMAs**
451:17
**NE**  421:12
**necessarily**
447:6  468:15
477:11
479:15
480:23
503:12, 15
536:5  540:3,
22  541:16
543:17
544:10
550:21  551:9
559:4, 11
571:21  674:6
690:9  718:4
729:9  760:15
763:11  773:9
**necessary**
445:18
446:17  465:4
466:21  481:4
486:15  495:9

509:18
514:18, 20
541:14
561:23  637:1
650:6  665:16
699:16
719:18
728:11
736:17
740:23
801:15  804:4
**need**  486:6
495:20  539:2
543:2, 18
551:5  552:2
554:23  560:2,
4  562:2
571:17  584:2
624:19  643:7
644:2  648:4
650:9, 16
663:13
666:24  667:4
668:5, 6
672:23  674:4,
22  676:23
706:16
708:14  712:9,
11  715:18, 21,
23  717:17
726:1  731:24
734:18  744:1
779:2  782:14
784:4  785:14
**needed**
439:22  442:4,
12, 13  443:21
455:8, 21
528:1  534:1
544:20
570:16
613:17
626:17  647:1,
13  657:8
660:16
662:17
673:24
701:13
703:11
720:11

724:11
759:14  768:18
**needs**  523:2
534:19  567:7
582:1  678:17
690:21
**neither**  467:6
482:10
803:11, 12
**never**  452:17
456:16
496:11
527:17  722:14
**Nevertheless**
609:11
**NEW**  420:1
421:5  430:8
455:15
471:13
472:19, 24
476:3  479:1
494:7  500:11
509:9  514:15
519:11
521:24
527:13  556:2,
5  558:23
624:3  659:20
739:20
760:21  769:5
778:17  789:15
**newest**  492:23
**news**  576:15
579:4
**night**  429:20
430:10
**nil**  776:3
**nitrosamine**
444:13
447:17  448:8
450:14
451:22
452:18
546:19, 23
576:15  577:4
579:2  582:21
585:4  587:4
589:15  593:3,
10  594:2
595:21  597:7,
14  598:2, 21

599:6 612:22
616:13
642:19 654:3
694:1 705:11
707:17 708:2
719:7 722:8
724:2 730:3,
8 762:19
766:24
790:17 794:2,
18
**nitrosamines**
453:2 454:3
540:6 571:7,
18 584:5
592:15
599:17 600:3,
5, 11 657:2
659:2 661:20
697:11 706:9
708:20
709:21
714:11 715:3,
8, 14 718:10
721:7, 19
723:3 762:11
765:16
776:15
789:10, 15, 19
790:1 791:12
793:19 794:6,
14, 24 795:14
796:6
**nitrous**
449:12 723:19
**NMT** 436:17
**N-**
**nitrosamines**
793:13
**Noa** 765:12
**nonavailability**
657:21 658:5
**nonexistent**
756:11
**nonfunctional**
461:22
**nonhazardous**
640:17 642:13
**non-passing**
505:2

**nonrefundable**
652:13
**nonvalidated**
785:9, 11
**normal**
477:10
531:11
625:12 666:5
667:15
**notarization**
802:10
**Notary**
420:17 806:14
**note** 505:23
782:13
**noted** 441:15
542:16 616:7
711:23
804:11 806:6
**notes** 461:4
523:1 526:1,
8 763:24
783:20 807:1
**noteworthy**
720:4
**notice** 441:11,
23 535:20
537:22 583:2
587:8 591:11
614:23
615:13, 24
616:18 618:2
621:1, 6
626:9 629:19
644:19
667:22
676:19
679:19, 21
681:3 682:6
683:17 684:8
698:8, 15, 22
699:8, 13
700:5
**notices** 590:22
596:3
**notification**
497:2, 7
501:5 534:9,
10 535:1
553:18
595:10

596:15, 17
617:18 626:3
**notifications**
534:14 597:2
**notified** 481:3
531:5 617:24
735:16
**notwithstandin**
**g** 721:8
**November**
576:13 579:15
**NP** 718:23
**NTM** 531:15,
16 533:22
534:3, 7
**Nudelman**
697:8, 10
698:4
**number**
432:22 442:6
443:17
451:21
457:17
469:12, 15
470:3 478:19
481:15
490:23 491:2
493:8 504:11
506:21 507:2
511:18
516:18
521:10 522:4
523:19, 24
526:12 541:7
545:16 546:1
558:11, 16
565:3 570:15
603:11
611:20
635:19 636:8,
11 639:9, 12,
19 640:3, 11,
18, 22, 23
646:11, 13
654:18
657:19 682:1
692:5 716:10
733:17
734:22
736:10 738:9
739:17

755:21 770:6
781:12
791:23 798:19
**numbers**
527:10

**< O >**
**oath** 429:8
484:9
**Object** 480:14
485:1 487:11
512:21
514:10
614:17 616:3
624:13
644:17
706:15
722:24 798:6
**objecting**
542:11 741:17
**Objection**
469:23
483:22, 23
484:2 487:17
488:19
495:11
528:15
529:13 530:3,
9 532:11
542:16 574:9
579:20
582:24 584:8
585:9 587:6
621:4 623:4
626:6 627:22
628:18, 21
629:5 634:18
642:5 646:20
659:3 661:23
662:7 663:2
666:10
667:20
670:16
674:13
675:20
676:17
679:16 680:9
681:1, 16
682:4 683:15
684:6 686:18
688:8, 15, 16

694:2 696:18
699:18
701:20
702:15, 18
703:1 705:12
706:10
707:18 708:3,
23 710:3
711:24
713:21
714:13 719:8
721:1, 11, 24
722:9 723:4
726:3 731:18
732:15 738:4
740:10 741:5,
12 742:2, 11
743:1 747:11
748:23
750:11 751:5
752:1, 21
753:17 754:1
756:8, 12
757:5, 21
758:9 759:11
761:1, 22
762:13 763:3
766:8 767:1,
8, 15 773:15
774:3 775:15
779:10 784:8
788:4 789:22
795:1 800:19
802:8
**objections**
428:6 584:9
**objective**
548:2 693:7
**objectives**
551:10
567:10
625:22 627:8
761:11
763:14 770:5,
16 775:6, 13
**obligations**
553:18 800:14
**observation**
729:5
**observations**
535:11

538:*22*
540:*24*
543:*14, 23*
544:*9*  550:*5*
551:*1*  577:*11*
578:*12*  709:*9*
711:*23*
746:*10*
759:*19*  787:*5,
24*  788:*14*
**obtain**  481:*18*
759:*15*
**obtained**
487:*24*  504:*24*
**obviously**
455:*10*
476:*22*  505:*2*
618:*13*
696:*10*  729:*7*
799:*15*  800:*22*
**occasion**
695:*10, 14, 19*
758:*2*
**occasions**
697:*12*
**occur**  588:*1*
**occurred**
480:*12*
499:*20*
591:*10*  595:*3*
673:*6*  727:*12*
**October**
568:*21*
570:*24*
781:*21*  782:*11*
**officer**  694:*16,
24*
**official**  743:*14,
16*
**Oh**  493:*14*
523:*8*  734:*16*
735:*24*  779:*24*
**okay**  432:*16*
457:*20*
470:*16*  475:*1*
484:*7*  490:*6*
491:*10*  493:*1,
4, 7*  513:*8, 17*
520:*9*  524:*2,
7*  528:*9*
530:*24*  546:*7*

553:*3*  554:*14*
556:*18, 19*
565:*15*  589:*8*
592:*2*  604:*5*
616:*6*  632:*13*
637:*5, 19*
643:*23*
647:*24*  670:*9*
671:*18*
684:*11*
685:*12, 19*
686:*6, 10*
689:*21*
690:*13*  696:*4*
698:*21*
701:*17*
702:*11*  706:*3,
20*  712:*22*
714:*24*  717:*7*
718:*2*  722:*6*
724:*16*  727:*1,
9*  730:*18*
731:*23*
732:*11*
733:*15*
735:*15, 24*
736:*7, 18*
737:*4, 16*
739:*11*
743:*19*  745:*3*
748:*5*  752:*4*
763:*20*
767:*19*
777:*13*
791:*18*
798:*18*
802:*10, 12*
**old**  659:*20*
**omit**  699:*3*
**once**  462:*20*
478:*10*  488:*6*
524:*15*
544:*17*
558:*22*
595:*13*  603:*4,
16*  634:*9*
659:*21*
661:*13*
663:*14*  740:*14*
**one-off**  503:*23*

**ones**  449:*12*
475:*21*  596:*24*
**OOSs**  548:*8*
**open**  612:*4*
689:*17*  734:*4,
7, 11, 16, 19, 24*
**opening**  557:*6*
606:*7*
**operated**
502:*13*
**operates**  502:*6*
**operating**
456:*1*  528:*10*
530:*23*  532:*5*
762:*3*
**operation**
671:*8, 9*  771:*2*
**operations**
694:*17, 18*
769:*4*
**operative**
556:*18*
557:*22*  566:*18*
**opinion**
541:*15*
617:*17*
649:*17*
662:*10*
665:*19*
666:*16*
699:*20*
725:*17*  726:*5*
738:*7*  760:*12*
761:*18*  762:*1*
785:*7*
**opportunity**
451:*16*
454:*10*  455:*4*
483:*13*  685:*7*
**opposing**
744:*16*  769:*11*
**opposite**
770:*13*
**optimized**
450:*19*  453:*8,
12*  454:*21*
455:*16*  476:*5*
494:*9*
**options**
486:*18*  536:*4*

693:*1*  700:*18*
703:*7*
**Ora**  426:*10*
621:*17*
**oral**  590:*24*
591:*22*
**ORDER**
420:*12*  481:*8,
17*  518:*23*
535:*15*  583:*6*
587:*10*  620:*9*
640:*3*  673:*4*
693:*17*  696:*6*
699:*16*
715:*16*
726:*12*  778:*3,
14, 19*  779:*4*
**organization**
474:*10*
555:*11*  558:*5*
559:*9*  565:*18*
569:*8*  592:*19*
594:*24*
599:*23*
604:*20*  614:*5*
624:*3*  683:*7*
689:*8*  695:*4*
726:*21*
737:*23*
748:*14*
752:*11*
758:*17*
765:*17*  768:*7*
770:*15*  791:*3*
796:*12*  801:*7*
**organizations**
559:*7*  727:*7*
754:*24*
755:*22*
770:*18*
771:*21*
775:*21*  778:*22*
**organization's**
768:*16*
**original**
461:*19*
525:*22*
561:*20*
619:*12*  622:*9*
652:*2*  740:*19,
20*  804:*15*

**Orit**  568:*21*
569:*4, 6*
**Orleans**  421:*5*
**outcome**
531:*19*
708:*19*  709:*1*
710:*15*
761:*18*  762:*3*
**outside**
429:*16*  583:*1,
5*  587:*8, 9*
616:*4*  621:*5*
626:*8*  630:*14*
656:*1*  667:*21*
676:*18*
679:*17, 18, 20*
680:*18*  681:*2*
682:*5*  683:*16*
684:*7*
**outsourced**
731:*5*
**overall**  573:*5*
767:*12*  790:*5*
**overlap**  567:*1,
8*
**overly**  541:*17*
**oversaw**
730:*11, 13*
**oversee**  730:*22*
**overseeing**
748:*10*
**oversight**
620:*8, 22*
623:*8*  624:*5,
9, 21*  625:*1*
627:*3*  770:*9*
**ownership**
488:*9, 24*
**Oxford**  422:*18*
**o-xylene**
441:*3, 8, 16*
444:*17*  445:*1*

**< P >**
**P.C**  421:*19*
**p.m**  589:*6*
590:*16*
629:*24*
631:*17*
636:*17*
684:*13, 20*

703:*17*, *24*
746:*19*  747:*2*
764:*12*, *19*
802:*14*, *18*
**PA**  638:*2*, *9*
**package**  460:*2*
**packages**
640:*6*
**packaging**
794:*8*
**packing**
637:*21*  642:*2*
**PAGE**  424:*10*
425:*3*  426:*3*
427:*6*, *11*, *16*,
*21*  464:*5*
474:*23*
492:*17*  493:*3*,
*18*  496:*8*, *24*
500:*19*
513:*18*  523:*7*,
*12*, *19*  526:*17*
551:*15*  558:*2*
566:*5*  589:*6*
636:*8*, *12*
637:*5*, *20*
656:*12*, *19*
658:*14*
659:*10*
660:*23*  661:*4*
663:*19*  665:*2*
669:*2*  736:*9*
745:*8*, *10*
747:*20*  805:*3*
807:*2*
**pages**  506:*23*
511:*20*
516:*18*  607:*9*,
*12*, *20*  665:*2*
806:*3*
**paper**  759:*3*
760:*22*
761:*21*  770:*2*
**paperwork**
665:*17*  672:*8*
**paragraph**
462:*8*  475:*2*
476:*1*  477:*21*
608:*4*  612:*19*,
*24*

**Parameter**
523:*24*
**parameters**
463:*18*
526:*18*, *19*
527:*2*
**Parkway**
421:*20*
**part**  441:*5*
443:*23*
447:*23*  448:*4*
458:*6*  460:*2*,
*17*  468:*20*
479:*16*
480:*22*
481:*16*, *20*
482:*12*
485:*14*
493:*22*  497:*3*
520:*17*
525:*21*  569:*1*,
*7*  570:*9*
573:*5*  580:*20*
590:*20*
601:*18*  605:*5*
616:*20*
620:*23*
635:*12*
643:*15*
657:*15*
662:*24*
695:*24*
700:*21*
710:*22*  713:*7*
719:*1*, *13*
720:*7*  722:*16*
745:*11*  748:*7*
773:*5*  790:*15*
**particular**
644:*23*
**parties**  564:*11*
595:*17*
685:*10*  803:*12*
**parts**  436:*7*
**party**  446:*11*
578:*9*  602:*14*
644:*11*  795:*24*
**pass**  685:*4*
**passed**  505:*1*
**patience**
769:*19*  801:*23*

**patient**
581:*17*  582:*1*,
*6*  584:*1*
585:*21*
588:*20*, *21*
690:*21*  692:*3*,
*17*  693:*4*
703:*15*
704:*23*  705:*1*
720:*14*, *19*
**patients**
582:*13*
585:*23*
690:*11*
702:*13*, *22*
704:*21*  705:*7*
719:*24*
720:*10*
767:*24*  768:*20*
**peaks**  539:*8*,
*18*, *20*  540:*1*,
*3*, *8*, *17*
541:*16*
542:*21*
543:*15*  544:*14*
**pending**
667:*17*
**Pennsylvania**
420:*19*
421:*21*  422:*5*,
*18*, *21*
**people**  452:*16*
456:*24*  544:*8*
646:*3*
**perfect**  452:*9*
453:*22*
**perform**
439:*8*  472:*3*
486:*1*, *2*
569:*12*  571:*5*
572:*19*
573:*19*  671:*9*
700:*6*  712:*20*
715:*8*  752:*17*
755:*8*  795:*5*
802:*6*
**performance**
544:*6*  673:*8*
707:*11*  728:*23*
**performed**
447:*10*

452:*23*, *24*
466:*10*  470:*5*,
*7*  473:*9*
498:*4*  539:*23*
547:*20*
570:*16*  594:*7*
713:*1*  739:*16*,
*17*  790:*6*
795:*18*
**performing**
533:*15*
571:*11*  667:*7*
**period**  521:*13*
600:*8*  735:*17*
**periodically**
683:*2*
**permission**
619:*21*  632:*5*
**person**  644:*23*
652:*12*  796:*8*
**personally**
595:*8*  796:*11*
**personnel**
594:*13*  619:*7*
**perspective**
443:*11*
444:*16*  456:*3*
514:*12*  522:*3*
566:*17*  567:*5*
582:*6*  668:*3*
673:*2*  687:*21*
692:*16*
705:*23*  724:*4*
725:*17*  728:*3*
747:*14*  761:*8*
763:*6*  766:*11*
767:*24*  775:*2*
778:*16*  784:*22*
**persuade**
752:*10*
**persuaded**
788:*20*
**peruse**  432:*15*
**ph**  420:*23*
**Pharm**  506:*5*
564:*7*
**Pharm1**
426:*10*  621:*17*
**Pharma**
421:*16*, *23*
790:*8*

**Pharmaceutical**
421:*15*  422:*7*
425:*12*
557:*14*
563:*18*  564:*6*
638:*1*  694:*19*
715:*1*  793:*3*
**Pharmaceutical
s**  421:*16*
422:*23*  423:*1*
608:*10*  797:*10*
**pharmacies**
591:*21*, *23*
595:*20*  596:*3*,
*15*  599:*3*, *11*
600:*23*  602:*1*
**pharmacists**
720:*13*
**Pharmacopeia**
724:*10*
**pharmacy**
598:*19*  601:*10*
**phone**  489:*20*
490:*8*  504:*6*
**phrase**  528:*16*
**picked**  640:*7*
**picture**  444:*21*
**piece**  509:*1*
715:*21*  759:*3*
760:*21*
761:*21*  770:*2*
772:*15*
**pieces**  527:*9*
**Piedmont**
421:*12*
**PIETRAGALL
O**  422:*14*
**Pittsburgh**
422:*5*, *18*
**place**  436:*15*
450:*7*  469:*16*
512:*19*  521:*6*
522:*19*
528:*10*  531:*2*
533:*20*, *24*
534:*6*  555:*7*
560:*5*  595:*12*
619:*23*
620:*10*, *19*
623:*2*, *12*

624:*10, 18*
625:*12, 15, 23*
626:*18*
646:*10*  656:*3,*
*8*  667:*4*
675:*11*
677:*14*
680:*16*  681:*7*
682:*9, 19*
683:*20*  749:*7*
754:*22*
761:*17*  769:*2*
770:*19*  776:*8*
778:*6*  803:*8*
**placed**  611:*9*
643:*5, 18*
647:*6*  649:*1,*
*5, 9, 18, 21*
662:*17*
701:*23*  703:*11*
**Plaintiffs**
421:*7*
**planned**  789:*2*
**please**  440:*6*
485:*5*  492:*19*
558:*15*  564:*1*
569:*24*
575:*18*  578:*2,*
*18*  597:*19*
605:*7*  633:*13*
637:*6*  652:*16*
653:*14*
659:*17*
687:*18*
721:*14*  744:*4*
797:*14*
801:*11*  804:*3,*
*8*
**pleasure**  802:*2*
**Pliva**  652:*19*
659:*19*
**PO**  638:*12, 16*
**point**  440:*13*
449:*19*
464:*24*
481:*11*
516:*11*
530:*15*
534:*18*
552:*17*
599:*23*  620:*4,*

*8*  624:*1*
660:*20*
673:*22*
678:*22*
680:*19*
685:*11*  701:*7*
703:*12*
705:*20*
720:*18*
755:*23*  797:*19*
**points**  452:*16*
485:*4*
**policies**
626:*10*
667:*23*  695:*4*
711:*13*
**policy**  533:*8*
536:*15*
543:*21*  544:*1,*
*2*  553:*16*
554:*1, 6, 15,*
*20*  555:*1, 18*
626:*1*  667:*11,*
*14*  671:*14*
731:*3, 9*  773:*3*
**poor**  710:*21*
**population**
693:*4*
**position**  573:*8*
600:*1*  677:*2*
679:*14*  769:*1*
778:*19*
**positions**
799:*23*
**Possess**  797:*11*
**possession**
646:*18*
647:*22*  653:*2*
**possibility**
465:*24*
652:*15*
671:*24*  672:*5*
**possible**  439:*3*
464:*22*
530:*19*  543:*5*
561:*14*
652:*17*  668:*15*
**postdated**
559:*19*
**postdates**
559:*23*

**potency**
697:*16*
**potent**  698:*6,*
*13*  699:*4, 7,*
*12, 15*  700:*14,*
*18*
**potential**
447:*17*  529:*7,*
*23*  531:*4*
532:*7*  594:*2*
645:*16*
672:*15, 22*
673:*20*  705:*1*
725:*19*  726:*8*
790:*16*  797:*11*
**potentially**
603:*14*
**pounds**  640:*7*
**PPM**  435:*23*
436:*17, 21*
437:*4*  440:*4,*
*11, 23*
**PPMs**  779:*22*
**practical**
696:*12*
**practice**  448:*4*
529:*24*
554:*21*
555:*18, 22*
667:*1*  668:*3,*
*17*  671:*12*
710:*9, 11, 13*
749:*6*  760:*24*
**practices**
502:*21*  740:*8*
**preceded**
460:*1*
**precise**  779:*3*
**predicted**
723:*21, 22*
**preparation**
460:*7*  496:*10,*
*15*  521:*11*
590:*21*
592:*24*  604:*2*
607:*3*  631:*20,*
*24*  635:*7*
655:*22*
657:*19*  658:*1*
676:*5, 10*
698:*14*  753:*9*

**prepare**  592:*6*
651:*3*  679:*11*
695:*20*  798:*2*
**prepared**
435:*1*  437:*11*
438:*10*  506:*9*
511:*6*  516:*2*
521:*1*  592:*3*
593:*7, 13*
595:*15*
596:*12*
601:*23*
604:*10*  607:*6*
646:*5*  748:*13*
**preparing**
696:*1*
**presence**
707:*17*
718:*10, 14*
721:*19*
793:*19*
794:*13, 17, 23*
**PRESENT**
423:*1*  451:*5*
613:*16*
632:*20, 22*
672:*17*
698:*16*
705:*17*
723:*12*
771:*18, 19*
**preservation**
674:*5*  675:*12*
681:*8*  683:*21*
**preserve**
613:*18*
**preserved**
660:*16*
663:*10*
674:*24*
681:*20*  682:*12*
**presumptively**
659:*1*  661:*19*
**pretty**  451:*2*
540:*1*  594:*5*
**prevent**  749:*7*
761:*10*  775:*4*
**prevented**
708:*1*
**prevents**
770:*15*

**previous**
466:*10*
519:*12*
561:*10, 15*
613:*12*  747:*17*
**previously**
428:*21*
431:*10*
432:*18*
457:*24*
458:*22*  545:*6,*
*13, 24*  611:*19*
**Priester**  426:*6*
611:*24*
**principal**
449:*9*
**Prinston**  422:*7*
**prior**  434:*11*
439:*1*  462:*10*
464:*21*
467:*23*  468:*5*
483:*9*  537:*22*
542:*20*
553:*16*  554:*2,*
*5, 16*  555:*2, 6,*
*15, 18*  564:*20*
566:*21*
579:*15*  597:*5,*
*22*  598:*7, 12,*
*17*  599:*1, 9*
600:*10, 16, 22*
605:*18*
673:*18*  682:*2*
709:*16*  711:*8*
715:*3, 13*
719:*5*  794:*1*
795:*24*
799:*19*  803:*4*
**priorities**
541:*8*
**PRISELAC**
422:*3*
**private**  800:*4*
**privy**  552:*16*
**proactive**
455:*4*
**probably**
430:*1*  490:*10*
493:*8*  613:*11,*
*16*  620:*5*
648:*4*  710:*21*

717:*24*
763:*24*  786:*17*
**problem**
455:*22*  484:*7,
8*  493:*9*
504:*10*
532:*21*  570:*3*
587:*21*
673:*23*  702:*9*
728:*18*  791:*2*
**problems**
676:*2*
**procedure**
473:*13*
528:*10*
530:*23*  532:*5*
534:*14, 24*
535:*1*  620:*7*
628:*12, 14, 16*
657:*15*
**procedures**
533:*20*
535:*23*  650:*2*
666:*2, 18, 19*
675:*11, 16, 24*
677:*14, 17, 24*
681:*6*  682:*9,
15, 18, 20, 22*
683:*19*  736:*19*
**proceed**
428:*18*
603:*18*
619:*15*
736:*16*  780:*5*
**proceeded**
779:*17*  788:*24*
**process**  436:*3,
14, 18, 20*
437:*7*  439:*4,
23*  440:*19*
444:*18*  445:*8*
446:*19*  447:*1,
4, 19*  448:*1, 2,
4, 21*  449:*10,
16*  450:*3, 10,
19*  453:*8, 12,
22*  454:*21*
455:*11, 16*
456:*10, 11, 12*
457:*8*  459:*16,
17*  460:*14, 18,

19*  462:*5, 21,
22*  463:*1, 15,
16, 21*  464:*19*
465:*6, 13, 20*
467:*8, 14*
468:*12, 17, 21,
22*  469:*5, 21*
472:*15, 17*
473:*1, 13*
474:*15*  476:*5,
7, 10, 23*
477:*5*  478:*9,
14, 21*  479:*17,
18, 21*  480:*1,
8, 23*  481:*16,
21*  482:*9, 13*
487:*23*  488:*7*
493:*24*
494:*10, 11, 19,
21*  495:*4*
496:*21*
497:*14, 16, 24*
498:*2, 8, 10,
18*  499:*3, 4, 6,
11, 15, 21, 22*
500:*5, 10, 11,
12, 22*  501:*9,
13, 19, 22*
502:*3, 4, 5, 6,
9, 11, 13*
503:*6*  509:*5,
9, 12*  512:*17,
18*  514:*7, 16*
516:*8, 15*
518:*10*
522:*18*
527:*21*
530:*22, 23*
531:*1, 14*
533:*15, 22, 23*
534:*3, 5, 11,
13*  548:*8*
588:*12*
595:*12, 24*
596:*19, 20*
598:*3*  603:*4,
18*  604:*23*
608:*21*  610:*2*
614:*6*  617:*9,
15, 16*  618:*12*
625:*5, 11, 12,

18*  626:*18*
657:*3*  659:*20*
660:*15*
661:*11, 13, 18,
21*  666:*3, 4*
667:*1, 6, 19*
668:*4*  671:*3*
676:*3*  680:*15*
683:*3*  695:*5*
710:*16*
711:*14*  713:*7*
718:*8, 9*
720:*7*  733:*6,
7, 12, 13*
735:*18*
736:*23*
737:*12, 17*
738:*3, 11*
739:*16*
768:*10, 12*
769:*2*  776:*6*
790:*5*  794:*15*
**processed**
774:*6*
**processes**
452:*7*  555:*7*
597:*1*  662:*12*
666:*2, 17, 19*
677:*23*
682:*20*
696:*17*  733:*3*
**processing**
774:*11, 15*
**procurement**
559:*2*
**produce**  648:*8*
**produced**
644:*5*  753:*2*
**producing**
430:*20*  566:*8*
**product**  433:*4*
434:*16*  437:*1*
451:*3, 7, 17*
452:*12*  453:*1,
2, 14*  454:*5*
458:*14*  465:*4,
16*  466:*22*
469:*3*  470:*13*
472:*3, 8, 24*
473:*3, 5, 7*
498:*11, 19*

499:*12*
502:*10, 17*
503:*5, 7, 10*
505:*5*  508:*3*
512:*6*  514:*12*
517:*7*  520:*21*
528:*20, 23*
533:*17*
535:*13*  536:*9*
537:*5*  548:*10,
12*  579:*9*
581:*13*  583:*3*
584:*5, 24*
585:*4, 7, 13,
15*  587:*11, 23*
588:*9, 15*
589:*13*  590:*3*
594:*14, 16, 19*
600:*18, 20*
601:*1, 3*
603:*2*  604:*17*
605:*2*  606:*19*
608:*18, 22*
609:*4, 17, 22*
613:*8, 19*
614:*14*  615:*1,
17*  616:*12, 19*
617:*5, 13, 21*
618:*9*  619:*10,
22*  620:*20*
621:*3*  622:*13*
623:*1*  625:*13*
626:*4*  632:*6*
633:*8, 17, 23*
634:*4, 9, 16*
635:*11*
638:*19*  639:*5,
13*  642:*3, 10,
24*  643:*3, 11*
644:*10, 13*
645:*9, 17*
646:*11, 16, 24*
647:*10, 20*
648:*6, 9, 12*
649:*7, 13, 24*
650:*7*  654:*11*
655:*10*
657:*10, 13, 17*
662:*15*  663:*9*
666:*6, 8*
667:*5, 16*

668:*5*  670:*12*
671:*1, 3*
675:*13*
686:*15, 17*
688:*1, 19, 21*
689:*24*
693:*11, 23*
700:*23*  701:*9,
19, 23*  702:*9,
14, 23*  703:*11,
14*  704:*6, 13*
705:*21*  706:*1,
8*  717:*15*
725:*4, 20*
726:*14*
739:*20*
758:*20*
760:*18*  768:*7,
18, 20*  769:*4*
773:*13, 19*
774:*23*  778:*4*
780:*19*
784:*19, 24*
785:*12, 18*
790:*10, 18*
794:*19*
**Production**
427:*10*
478:*11*  497:*9*
518:*11*
524:*16*  548:*12*
**PRODUCTS**
420:*4*  437:*8*
458:*19*
463:*14*
467:*19*  581:*1,
12*  582:*3, 16*
583:*16, 23*
585:*17*  587:*3*
597:*6*  598:*20*
599:*19*  600:*7,
13*  612:*21*
628:*9*  629:*13,
16*  638:*24*
657:*5*  669:*21*
681:*9*  751:*16*
**professional**
649:*17*
**professionals**
720:*12*
**profile**  714:*19*

program
538:1  706:22
707:2, 5, 16
708:1, 22
712:13, 15, 19
713:15  729:1,
21
programs
676:1
progress
729:16
prohibit
739:24
projects  695:6
promptly
766:21  767:7
proper  486:16
488:11
665:20  729:13
proposal  690:7
propose
573:13  700:8
proposed
463:15  750:4,
7
propounded
806:5

PROTECTIVE
420:12
protocol
477:14
provide
445:11  570:5
573:8  582:11
633:15, 21
692:24  693:3
725:2  748:17
765:21
768:20, 21
770:7  780:17
783:23
provided
477:1  480:3
483:18  487:4,
15  488:16
588:18
603:21
641:16  710:20
provides
773:21

providing
444:3
provisions
754:18
756:14  758:8
Public  420:18
555:19  806:14
publish  545:7
pull  500:15
542:5  567:24
689:19  731:4,
24  733:18
735:23  739:3
753:1, 4
pulled  765:4
pun  451:11
purchase
567:17
purchased
475:16
504:19  670:24
purchasing
512:13  537:5
purged  476:6,
14, 19  494:10,
20  495:3
purification
462:13
purity  435:22
600:18  601:2
774:24
purported
600:20  601:3
purpose
547:16
548:17
724:22  725:1
740:14  743:18
purposes
566:23  713:4
pursue  479:10
482:14
543:18
544:20
574:15  713:8
788:24
pursued
466:20
put  431:9
437:14
457:12

458:20, 21
504:6  513:5
544:18  556:5,
15  573:7
588:7  594:14
607:11  609:6,
20  648:17
698:15, 18
699:22  700:8
701:6  702:1
704:13, 21
705:24
722:20  734:3
748:5  749:19
786:18
putting  569:5
648:24  701:9

< Q >
QA  738:13
qualification
451:19
Quality  425:6,
10, 12  538:1,
11, 12  544:12
556:10  557:1,
13  559:5, 10,
12, 21  562:21
563:3, 17
564:5  567:6,
18, 20  569:8
592:19
600:19  601:2
604:20
655:14
665:24
667:13  668:2
670:12  671:2
673:2, 17
683:6, 9
687:21
688:23, 24
696:7  714:19
725:6, 9
726:1, 9, 20
727:2, 4, 5, 8,
10  730:14
737:19
740:16  748:7,
20  751:10, 14
752:16, 18, 19

753:2, 8, 12,
14, 16, 22
754:7, 11, 19
755:1, 5, 8, 17,
19  756:1, 4, 7,
15, 18  757:12,
13, 17  758:2,
3, 13, 15, 18
759:8, 23
760:4, 9, 14,
22  761:9, 16
762:10, 21
763:2, 8
765:21
767:13  770:1,
4, 5, 12, 14, 19,
21, 23  771:4,
6, 10, 14, 17, 24
772:5, 11, 14,
19, 23  773:8
774:23  775:3,
13, 20  776:2,
5, 9  801:6
quantity
639:9  656:14
658:16
quenching
450:23  451:1,
15, 24
Question
427:20  428:7
434:3  440:5
441:13  468:2
484:18, 22
485:8, 16
487:12
489:21
490:14
498:22  501:2
528:16  532:1,
3, 22  533:11
554:11
559:20  570:1
581:7, 9
583:12, 15
587:1, 7, 18
589:9  594:15
597:19
599:24  601:6,
20  614:17
624:14  626:7

627:23
628:22
630:13
633:19
634:19
636:10
644:20, 24
645:6  650:19
657:24  663:4
667:10
670:19
678:16
679:16
687:18, 19
701:3  706:4
710:22
716:21
721:14
722:21, 22, 23
732:18  756:9
757:15  766:6
776:19  777:6,
16  784:16
786:12
797:15, 20
questioning
570:10
715:10
744:15  779:21
questions
490:2, 4
542:7, 8, 12
629:18
666:14  685:1,
10  686:5
697:15, 17
700:23
724:17  764:1
766:18  769:9,
12, 18  776:14,
21  782:22
786:20
801:14, 16
806:4
quick  590:6
quicker  524:7
quickly  581:4
785:4
quite  539:19
789:14  799:15

Confidential Information Subject to Protective Order

**< R >**
**R&D** 474:*9*
796:*4, 8, 13,*
*17, 19*
**Rachel** 423:*1*
**Rafi** 697:*8, 9*
**raise** 531:*15*
**raised** 534:*18*
711:*1* 769:*11*
**ran** 785:*22*
**RASPANTI**
422:*17*
**ratio** 585:*22*
588:*20* 720:*19*
**rationale**
783:*24* 797:*8*
**rationalization**
783:*11*
**raw** 461:*22*
477:*16*
**RBK/JS** 420:*5*
**reach** 693:*17*
737:*13*
**reaches** 502:*3*
**reacting**
448:*19* 565:*1*
**reaction**
449:*23* 450:*7*
728:*11*
**read** 485:*14*
494:*13, 14*
497:*19*
569:*23*
577:*21* 581:*4*
589:*17*
652:*21*
659:*24*
661:*14*
664:*17*
782:*16* 784:*1*
790:*1* 802:*3*
804:*3* 806:*3*
**reading**
485:*11*
**ready** 551:*19*
576:*17*
630:*11* 781:*11*
**reaffirm**
587:*22*

**reagent** 476:*3*
494:*8*
**real** 531:*23*
**realizing**
624:*10* 625:*6*
627:*3* 628:*13*
**really** 444:*19*
624:*4* 625:*6*
628:*12* 632:*3*
673:*10* 773:*4*
779:*2*
**Realtime**
420:*17* 803:*4,*
*17*
**reason** 445:*20,*
*21* 453:*1*
457:*7* 531:*11*
541:*16*
572:*13* 594:*9*
623:*6, 9, 23*
625:*3* 627:*6*
654:*16*
656:*21, 24*
701:*8, 24*
703:*6* 705:*19*
711:*21* 714:*2,*
*16* 742:*6, 20*
788:*10* 804:*5*
**reasonable**
439:*15* 594:*7*
737:*24* 755:*13*
**reasons**
441:*10*
445:*14*
452:*21*
555:*23*
654:*11*
696:*14*
703:*10* 704:*4,*
*5* 705:*24*
751:*19, 22*
**recall** 431:*6*
435:*14*
440:*17*
445:*10* 452:*4*
456:*7, 13*
459:*9* 463:*8*
474:*8* 518:*14*
520:*24* 521:*4,*
*5, 17* 537:*14*
538:*13, 19*

539:*1* 540:*21*
544:*11*
553:*21* 554:*6,*
*20* 569:*1*
570:*10, 12*
571:*3* 573:*22*
576:*21* 578:*3*
580:*20*
590:*22*
591:*11*
592:*23*
595:*14, 24*
596:*20* 603:*1,*
*5, 9, 13, 19, 23*
604:*23*
605:*11*
606:*19* 607:*9*
608:*24* 610:*3*
611:*7* 612:*9*
613:*18* 615:*2*
619:*17* 627:*2*
647:*8, 23*
648:*11* 649:*8*
650:*5* 660:*13,*
*15* 662:*5*
663:*6, 11*
672:*2, 4*
697:*18* 698:*8,*
*9, 13, 14, 22*
699:*6, 8, 10,*
*13, 17* 700:*5*
701:*2, 3, 14*
706:*23*
709:*12* 712:*7*
715:*9* 720:*2,*
*9* 721:*8*
724:*20* 733:*4*
744:*10*
751:*12*
776:*16*
777:*20* 779:*7,*
*18* 780:*5*
782:*1* 786:*8,*
*13, 16* 795:*10*
797:*1, 4, 7, 12,*
*16, 18* 798:*11,*
*15*
**recalled** 579:*9*
608:*22*
609:*21*
611:*11*

612:*21* 615:*3*
616:*13* 617:*4,*
*14* 618:*8*
619:*9, 16, 21*
620:*13, 20*
621:*3* 622:*12*
623:*13*
625:*13* 626:*4*
628:*8* 632:*6*
633:*7, 17, 22*
634:*4, 16*
638:*24* 639:*6*
643:*4, 12*
644:*9* 647:*14,*
*15* 662:*15*
663:*8* 720:*22*
783:*16*
784:*20* 785:*19*
**Recalls**
426:*10*
591:*10*
596:*24*
602:*15*
621:*17*
646:*19* 647:*22*
**receipt** 507:*13*
681:*7* 804:*17*
**receive** 535:*7,*
*20* 596:*3, 15*
657:*4* 695:*10,*
*15* 772:*21*
**received**
457:*1* 459:*24*
479:*6* 516:*20*
517:*18* 518:*1*
528:*2, 21*
537:*21, 22*
555:*4* 569:*14*
595:*10*
596:*16* 621:*1*
626:*3* 633:*9,*
*12* 641:*12*
657:*17*
660:*14*
674:*17*
675:*14*
677:*12* 681:*9*
683:*22*
710:*19*
726:*18*
727:*23* 779:*15*

**receives**
536:*19*
**receiving**
472:*20*
518:*18* 522:*8*
529:*11* 536:*3*
**recess** 491:*19*
553:*8* 590:*13*
631:*13*
684:*16*
703:*20*
746:*22*
763:*19* 764:*15*
**recipients**
616:*1*
**recollection**
543:*7* 646:*23*
**recommendatio**
**n** 544:*8*
571:*15*
700:*21* 750:*19*
**recommendatio**
**ns** 700:*10, 13*
748:*18* 751:*3*
**record** 428:*11*
430:*19*
485:*15*
491:*17, 24*
505:*23* 510:*9*
515:*7* 520:*7*
545:*23*
548:*20* 553:*1,*
*6, 13* 557:*8*
562:*16* 570:*5*
576:*12*
580:*11*
590:*10, 17*
593:*16, 17*
630:*1, 21*
631:*3, 11, 18*
645:*21*
684:*14, 21*
685:*13* 686:*2*
703:*18* 704:*1*
736:*7, 20, 22*
744:*14*
746:*15, 20*
747:*3* 764:*13,*
*20* 795:*2*
796:*23* 802:*15*
**records** 634:*14*

**recovered**
598:*11*  599:*14*
**re-cross**  685:*4*
**redact**  536:*21*
**redacted**
552:*10, 13*
**redactions**
552:*20*
**reduced**
706:*21*  707:*2,
5, 13, 15, 24*
708:*7, 22*
709:*3*
**reduction**
707:*3*
**refer**  442:*1*
512:*24*
**reference**
500:*1*  538:*18,
20*  547:*6, 8*
548:*21*
550:*13*
588:*22*
610:*15*
687:*11*  688:*5*
691:*2*  744:*7,
8, 13, 22*
745:*4, 12*
746:*11*
**referenced**
670:*5*  687:*16*
688:*14*  800:*16*
**references**
552:*9*  798:*19*
**referencing**
435:*19*
**referring**
458:*9*  570:*6*
578:*5, 8, 20*
**reflect**  699:*23*
**reflected**
438:*3*  607:*19*
737:*17*
**refresh**  430:*2*
459:*19*
469:*10*  546:*3*
576:*4*  577:*24*
648:*1*  669:*22,
24*  777:*24*
**refuses**  773:*7*

**regard**  691:*22*
737:*7*
**regarding**
435:*12*
468:*12*
580:*17*
634:*15*
657:*20*  687:*9*
709:*9*  721:*18*
732:*12*
735:*17*  765:*1*
**regardless**
600:*8*  779:*15*
**regular**
603:*21*  613:*6*
**regularly**
555:*19*
**regulated**
778:*4*
**regulation**
724:*9*  741:*1*
749:*6*
**regulations**
532:*16*
693:*24*  696:*9,
12*  715:*1*
725:*24*
739:*23*
755:*18*
773:*11*
776:*11*  778:*7*
799:*17*  800:*1,
23*
**regulator**
696:*9*
**regulators**
445:*12*
517:*14, 21, 23*
565:*3*  573:*12*
574:*19, 21, 23*
678:*8*  704:*14*
723:*8*  724:*6,
14*  725:*16, 22*
739:*21*  768:*3*
780:*17*
**regulatory**
455:*23*  467:*6,
9, 13*  514:*11*
528:*3*  532:*19,
20*  553:*19*
555:*5, 7, 20*

564:*22*
582:*15*
584:*14*  588:*2*
602:*2*  689:*8*
693:*8, 15*
704:*18*  715:*5*
725:*2*  727:*2,
7*  730:*23*
738:*19*  749:*4*
750:*15*
778:*21*
784:*21*
790:*22, 23*
**rejected**
652:*19*
654:*12*
656:*22*  666:*6*
667:*16*
**relate**  506:*13,
17*  565:*10*
**related**
516:*19*
538:*15*  571:*6*
593:*10*  697:*4*
705:*18*  715:*2*
794:*17*
**relates**  515:*21*
524:*10*  583:*2*
587:*1*
**relating**  602:*3*
**relationship**
559:*7*  565:*20*
566:*12*
594:*13*
731:*16*
732:*14, 24*
754:*23*  755:*7*
**relative**
803:*11, 12*
**relatively**
451:*8*  624:*3*
758:*23*
**release**  581:*1*
585:*12, 14*
702:*22*  704:*6*
784:*24*  785:*12*
**released**
705:*9*  706:*7*
746:*4*
**releasing**
701:*18*  702:*13*

**relevance**
539:*16*
**relevant**
490:*2*  548:*16*
**reliability**
707:*10*
**reliable**  488:*2*
778:*21*  779:*4*
**relied**  477:*8*
**rely**  696:*4*
**relying**  492:*5*
739:*24*  740:*6*
**remain**  559:*5*
625:*22*
**remained**
714:*4*
**remaining**
685:*3*
**remains**
497:*18*  560:*3*
**remember**
440:*12*
448:*10, 12*
474:*3, 17*
521:*7*  544:*16,
17*  570:*23*
637:*15*
671:*23*
716:*13*
718:*15*  731:*8*
743:*9*  796:*3*
797:*23*
**Remote**
420:*13*
**remotely**
801:*24*  802:*7*
803:*5*
**removal**
489:*7*  492:*6*
**removed**
455:*15*
462:*11, 19*
463:*2, 6*
465:*11*
466:*11*
469:*20*
471:*22*  477:*6*
482:*9*  702:*4*
768:*19*
**removing**

768:*18*
**render**  503:*7*
**repeat**  436:*9*
440:*5*  468:*1*
498:*21*
657:*23*
716:*21*
757:*15*
776:*18*  786:*11*
**repeatability**
716:*12*
**rephrase**
567:*11*
**replacement**
461:*22*
**reply**  623:*19*
**Report**
426:*20*  443:*8*
496:*6, 18*
500:*3*  540:*18*
546:*13*  577:*3*
606:*18, 23*
612:*13*  662:*3*
725:*3*  727:*15*
728:*9, 14, 19*
743:*20*
749:*15*  787:*8*
788:*6*  792:*10,
21*  795:*17*
**reportable**
725:*13*
726:*13, 19*
727:*11*
**reported**
569:*7*  579:*3*
665:*13*  741:*15*
**Reporter**
420:*17*  432:*8*
485:*14*
545:*14*  631:*5*
792:*2*  803:*4,
17, 21*
**reports**
432:*23*
433:*10, 13*
603:*22*  604:*2*
613:*7*
**represent**
600:*16, 23*
690:*20*
755:*24*  763:*12*

Confidential Information - Subject to Protective Order

represented 565:*11* 750:*17*
**Representing** 421:*7, 15, 22* 422:*6, 14, 23*
**represents** 743:*16*
**reproducibility** 497:*16* 499:*4* 500:*6, 21, 23* 501:*12, 16* 502:*12, 20* 503:*9, 24* 716:*12*
**reproducible** 503:*15*
**reproduction** 803:*20*
**Request** 427:*10* 481:*4* 483:*2* 494:*3* 528:*2* 645:*9, 13* 659:*22* 782:*8*
**requested** 439:*7* 481:*14, 20* 664:*13* 795:*4*
**requesting** 482:*13* 646:*9*
**requests** 601:*24* 622:*24*
**require** 467:*23* 468:*5* 539:*4* 671:*14* 673:*3, 9* 711:*14*
**required** 517:*20, 23* 527:*23* 570:*20* 661:*12* 665:*8* 672:*11* 707:*8* 740:*24*
**requirement** 688:*12*
**requirements** 498:*5* 582:*9* 660:*19* 688:*20* 693:*24*

**requires** 654:*23*
**requiring** 554:*2, 16* 573:*1*
**research** 657:*16* 675:*13*
**resent** 629:*9*
**reserve** 685:*3* 801:*14*
**reserved** 428:*7*
**resides** 617:*22*
**residual** 464:*6, 14* 465:*23* 466:*1* 479:*1* 507:*6, 9* 508:*13, 23* 509:*12, 22* 511:*23* 512:*2, 5* 516:*24* 517:*3* 523:*24* 524:*11, 14, 20* 526:*1* 527:*18* 528:*11*
**resolve** 530:*8*
**resolved** 711:*2, 5, 6*
**resources** 571:*11, 22* 572:*16, 18, 19*
**respect** 439:*12* 441:*4* 467:*12* 486:*7* 533:*17* 536:*9* 541:*9* 543:*15* 575:*8* 582:*8* 583:*22* 603:*12* 611:*6* 617:*18, 21* 618:*11* 620:*9* 626:*10* 645:*9* 647:*9* 648:*5* 655:*9* 667:*23* 689:*15* 695:*22* 710:*12* 729:*20* 730:*1* 733:*11* 743:*18* 755:*10* 756:*17* 767:*6*

**respective** 692:*15* 693:*12*
**respond** 481:*23* 486:*19* 710:*13*
**responded** 767:*6, 7, 14*
**responding** 614:*22*
**responds** 783:*13*
**response** 538:*22* 541:*2, 3* 543:*16* 570:*8* 599:*7* 692:*4* 710:*8, 10, 17, 20* 711:*16* 713:*18* 744:*17* 766:*22* 782:*8* 783:*21* 788:*2*
**responses** 696:*2*
**responsibilities** 604:*16* 616:*21* 756:*23* 757:*2* 759:*4, 6*
**responsibility** 447:*8* 482:*22* 489:*11, 14* 572:*14* 591:*6* 592:*12* 617:*20* 647:*3* 689:*5* 692:*23* 760:*13* 801:*2*
**responsible** 445:*3* 595:*9* 605:*11* 614:*22* 675:*23* 749:*15* 755:*12*
**responsibly** 767:*7*
**Result** 426:*20* 742:*23* 792:*10, 21* 795:*17*
**resulted** 531:*20* 744:*24*

**results** 431:*3* 433:*4* 434:*16* 435:*12, 20, 22* 436:*13* 437:*22* 438:*3* 479:*1* 480:*3* 504:*23* 601:*11* 602:*2* 786:*2*
**resume** 769:*3*
**retail** 591:*21, 23* 595:*20* 598:*18* 599:*3, 10* 600:*23* 601:*10*
**retained** 681:*13*
**retention** 615:*2, 10, 16* 629:*12* 645:*16* 679:*17*
**retract** 783:*23*
**retrieved** 643:*4, 16* 662:*16* 785:*19*
**return** 483:*1* 608:*1* 655:*10* 804:*15*
**returned** 608:*11, 17, 21* 643:*21* 644:*11* 646:*24* 648:*13* 654:*22* 663:*9*
**Reuven** 651:*22*
**revealed** 438:*16, 21* 439:*17* 676:*2*
**review** 429:*19, 24* 459:*23* 460:*17, 18* 476:*23* 482:*13* 483:*13, 14* 484:*3* 489:*14* 497:*22* 500:*2* 506:*18* 551:*6* 555:*19* 576:*8, 11* 586:*23* 587:*19* 593:*1*

634:*14* 635:*5* 695:*11, 15, 20* 697:*4* 700:*7* 709:*15* 728:*10* 738:*7, 13* 747:*5* 748:*9, 17* 749:*7* 758:*2* 763:*23* 771:*12, 16*
**reviewed** 433:*23* 434:*11* 439:*8, 11* 480:*8* 486:*9* 495:*19* 548:*9* 635:*2* 709:*16* 733:*10* 753:*7* 771:*24* 788:*13*
**reviewing** 496:*5* 586:*24* 663:*14* 696:*1* 737:*5* 743:*6* 744:*9*
**revised** 472:*19* 740:*18*
**Revision** 561:*17, 19*
**revisions** 749:*11*
**right** 433:*18* 434:*23* 435:*8, 23* 436:*8, 22* 437:*4, 19, 24* 438:*2* 439:*5* 441:*17, 18* 445:*16* 447:*19* 448:*15* 449:*20* 450:*16* 452:*15, 19* 453:*5, 9, 15, 19* 454:*18, 19* 455:*9* 456:*14, 20* 457:*11, 14* 458:*20* 459:*17* 461:*7, 11* 462:*21* 463:*11* 464:*9* 465:*7, 12*

Confidential Information - Subject to Protective Order

466:19, 24
467:3  469:6, 7  473:16
475:16, 22, 24
476:11, 15
478:13
481:15, 24
482:2, 19
484:13
485:17  494:1, 13, 15, 22
495:10  496:6, 10, 12  497:4, 10  501:14
503:22
506:15
507:13  508:9, 18  509:6, 10
511:3, 16
512:19  513:7, 12  516:8, 21
517:1, 5
518:20, 23
519:3, 5
520:15, 22
521:14
524:17, 20
525:11, 24
526:5, 22
527:1  537:7
540:7, 13
546:12, 20
552:21  563:9
566:10, 14, 21, 24  567:4
572:11  575:3
576:18, 22
579:11, 16
581:3  584:7
585:8  586:21
595:7  596:10
606:20  608:3, 7  609:18, 24
610:21
612:10
613:22  615:9
619:8, 10, 18
620:20  622:7, 13, 17, 21
623:3, 17, 22
624:11

627:14, 17
628:16  634:5
636:12  638:4, 16, 22  639:8, 19, 24  640:2, 16  641:21
642:3, 16
644:22
645:11  646:3
648:21  652:5, 21  655:1, 6
657:18, 22
658:16, 19, 21, 23  659:2, 9, 24  660:9
661:14  664:3, 17, 19, 23
665:12, 18, 23
669:8, 13
672:9  674:12
677:10, 15, 19
678:4  679:8, 10, 12  683:24
684:9  685:20
686:1  699:1
710:7  715:21
730:16
735:19  764:3
769:1  772:1, 3, 6, 8  774:19
777:13, 19
778:12  779:4
782:4, 9, 16, 18  783:4
784:1, 3
786:24  787:2, 10, 13, 16, 21
788:3  789:3, 6, 8, 11, 16, 18
790:13
793:10
795:20, 22
797:23  798:1, 4  800:3, 5, 7, 9, 18
**rise**  726:6, 12
**rises**  725:9
**Risk**  424:13
431:2  432:24
433:1, 16
434:4, 8

441:6, 22
442:2, 18, 23
443:4, 10
447:10, 16
448:16  470:6, 8, 16  471:2, 11  472:17
473:9  474:2
475:4  476:12
480:21, 24
482:5  486:3
492:13
493:23  497:4
498:15, 24
499:16  500:3
531:4  704:22
739:18  785:7, 10
**risk/benefit**
585:22
588:20
690:11  720:19
**risk-based**
582:11
**Road**  421:12
**ROBERT**
420:4
**robustness**
716:14
**role**  696:6
765:21
**roles**  694:20, 23  759:7
**root**  448:7, 13, 17  449:22
539:24
707:14  718:9
730:2, 7
762:17, 20
**rose**  577:12
578:12
**rotate**  637:11
**route**  796:14
**routine**
482:24  483:3
540:2  608:23
609:11
618:12  649:3
666:3  671:6
729:15  755:8

**routinely**
554:7
**Row**  558:11
**rubber**  794:6, 14
**rule**  740:24
**ruled**  454:13
**run**  650:10
785:14
**running**  785:8, 10

< S >
**Saba**  652:20
**safety**  692:17
693:5  694:16, 24  705:1, 7
720:13, 19
725:6  726:9
799:12
**sale**  720:23
**sales**  689:15
**sample**  675:1
**sampled**
682:11
**sampler**
526:14
**samples**  657:4, 6, 8, 12, 14, 16, 21  658:5, 9, 12  674:21, 23
675:7, 13
676:7, 14
677:8, 12, 13
678:10, 18, 24
680:4, 22, 24
681:8, 12
682:1  683:13, 21  684:2
781:22
783:16
784:18  785:8, 23
**sartan**  572:10
573:20  575:3
582:3  590:8, 14, 17  691:17
693:22
**sartans**
580:18
689:15

690:19
691:23  693:18
**Sava**  669:17, 20  793:7
**saw**  459:20, 22  460:6
475:21  525:7, 9  564:19
566:21  595:5
622:17
640:24  642:2
657:19  658:2
662:4  674:8
772:23
786:22  787:4
798:12, 15
**Sawyer**
426:16, 18
432:21
568:23
586:20  735:9
781:3, 21
782:6, 12
783:13  784:4
**saying**  453:22
454:20  460:9
466:6  469:5, 14  472:13, 16
478:7, 10
486:17, 19
487:6  499:17
503:20
531:21
549:15  551:3
573:1, 12
578:4, 10
625:2  627:18
655:15
659:17  661:9
718:2  765:6
770:12
778:13
779:23  783:5
784:6  790:19
794:16
**says**  451:22
462:7  473:22
484:6  489:5
490:20  501:7
506:14
508:13

524:*19*
561:*17*
562:*11*
563:*11*
606:*17*  608:*9*
612:*12*  640:*6,*
*14*  641:*4, 10*
645:*14*
652:*11, 12*
658:*16*  659:*6*
692:*13*  755:*6,*
*12*  783:*15*
**scale**  478:*9*
479:*2, 14*
480:*4*
**scaled**  461:*18*
477:*22*  499:*9*
502:*2*
**scaled-up**
499:*21*
**scale-up**
478:*16, 18*
498:*18*  499:*2,*
*8, 11, 15, 20*
500:*5*
**scaling**  497:*13,*
*23*  501:*8*
**scare**  490:*9, 23*
**scenario**
531:*22, 23*
668:*15*
**schedule**
707:*13*
**scheme**  532:*19*
**Schwartz**
425:*14*
568:*11, 21*
569:*4, 6*
570:*6*  572:*4, 8*
**science**  452:*9*
798:*22*
**scope**  578:*23*
583:*1*  587:*8*
592:*12*  616:*5*
621:*5*  629:*19*
630:*14*
667:*21*
676:*19*
679:*17, 18, 21*
681:*3*  682:*5*
683:*16*  722:*16*

**screen**  431:*16*
432:*13*
493:*16*
505:*21*  524:*4*
636:*24*  637:*3*
**scroll**  511:*22*
523:*6*  636:*21*
**sealing**  428:*4*
**search**  547:*17*
549:*16, 18*
**searched**
549:*12*
**searching**
550:*2*  744:*19*
**Second**
461:*17*  471:*8,*
*23*  509:*15*
511:*9*  551:*21*
558:*14*  589:*6*
607:*8*  608:*3*
612:*15*  637:*4*
656:*16*
659:*13*
727:*20*  744:*4*
779:*8*  781:*9*
**secondary**
449:*9*
**seconds**
706:*15*
746:*16*  792:*14*
**section**  475:*5*
550:*12*  648:*5*
755:*11*
**sections**
431:*20*
**sector**  800:*4*
**secured**
654:*13*
**see**  433:*6*
434:*18*
454:*23*
458:*17*  459:*1*
460:*4*  464:*7*
466:*7, 17*
471:*15*  475:*6,*
*7, 11*  476:*8*
478:*1, 24*
482:*22*
488:*14*
495:*20*  496:*7*
502:*19*  506:*7*

507:*7*  508:*15*
512:*1*  516:*18*
524:*4*  526:*11,*
*12*  545:*21*
546:*4, 7*
560:*2, 4*
564:*14*
569:*18*  577:*8,*
*14*  589:*2*
598:*4*  608:*3,*
*13, 14*  612:*23*
622:*4, 5*
636:*8, 13*
637:*11, 22*
638:*8, 13, 18*
639:*10, 12, 22*
640:*8, 9, 12,*
*20*  641:*5*
642:*9*  645:*4*
653:*16*
655:*20*
656:*15*
658:*15*
663:*24*  691:*3*
692:*4, 18, 19*
711:*18*
734:*15, 19*
735:*22, 24*
736:*4, 9*
740:*12*  756:*6,*
*15*  759:*8*
763:*6, 24*
769:*14*  781:*8,*
*18, 23*  782:*4,*
*5*  783:*18*
785:*14*
790:*15*  791:*1*
792:*23*
793:*17, 22*
794:*16*  795:*12*
**seeing**  547:*6, 8*
**seeking**
569:*22*  705:*6*
**seen**  451:*21*
473:*17, 19*
474:*2, 4*
527:*17*
550:*14*
556:*11*
636:*19*  656:*4*
660:*10*  714:*7*

741:*22*  750:*9*
754:*7*  756:*10*
759:*9*  766:*19*
775:*17*  790:*9*
**segregate**
451:*16*
**selection**
696:*22*  698:*16*
**self-inspection**
712:*16*
**self-regulated**
486:*2*
**self-regulation**
713:*8*
**sell**  581:*11*
582:*20*
583:*23*  585:*4,*
*6*  587:*3*
589:*13*
689:*24*  693:*22*
**selling**  516:*12*
669:*20*  690:*4,*
*6*
**send**  553:*18*
597:*2*  661:*12*
679:*6*
**sending**
522:*11*
**sense**  782:*15*
783:*6*  784:*5*
**sent**  482:*4*
596:*4*  604:*11*
662:*4*  665:*8*
671:*7*  679:*5*
782:*13*
**sentence**
477:*20*
**sentiments**
578:*24*
**Sentry**  421:*20*
**separate**
451:*1, 2, 15*
453:*13*
**separately**
451:*24*
**separation**
452:*8*
**September**
453:*4*  455:*6*
458:*3*  506:*11*
508:*21*  509:*4*

513:*23*
651:*23*
663:*23*
664:*20*  665:*4,*
*12, 15*  669:*3*
**sequestered**
604:*18*
611:*14*  615:*3*
**sequestering**
615:*17*  629:*12*
**series**  544:*18*
**service**  760:*18*
**SERVICES**
420:*23*
428:*13*  771:*8*
**session**  429:*12*
**set**  467:*6*
517:*14*  528:*4*
567:*6*  581:*18*
584:*17*
585:*16*  633:*1*
678:*8*  739:*21*
740:*20*  752:*7*
754:*10, 20*
755:*16*  769:*5*
771:*21*  775:*8*
785:*16*  803:*9*
**sets**  506:*21*
507:*16*  755:*20*
**setting**  759:*3*
**settings**  502:*15*
**seventh**  612:*13*
**shake**  766:*20*
**shape**  761:*14*
**share**  431:*13,*
*15*  432:*13*
524:*3*  535:*14*
536:*5*  544:*1*
636:*24*  637:*3*
779:*6*  797:*13*
**shared**  437:*23*
480:*13*
529:*10*  538:*4*
**sharing**
531:*12*  532:*5*
533:*2*  536:*12,*
*20*
**Sharon**  422:*21*
**Sharvas's**
589:*3*

Confidential Information Subject to Protective Order

**sheet** 804:*7, 9, 12, 15* 806:*6*
**ship** 514:*12*
**shipment** 587:*23*
**shipped** 588:*10* 637:*24* 638:*7* 639:*8* 671:*3* 682:*11*
**shipping** 653:*5*
**shoot** 641:*13, 20*
**shortage** 691:*12* 703:*5* 704:*9, 20*
**shortly** 595:*3* 664:*16*
**Show** 489:*4* 503:*14* 542:*13* 737:*12* 796:*23*
**showed** 435:*21* 742:*10*
**shown** 709:*8* 711:*20* 712:*4* 742:*9, 14* 743:*3*
**shows** 451:*14* 492:*9* 526:*17, 20* 794:*21*
**side** 486:*14*
**sideways** 637:*8*
**sign** 749:*21* 802:*4* 804:*8*
**signal** 725:*2*
**signature** 435:*4, 7*
**signatures** 558:*1*
**signed** 433:*9, 24* 557:*24* 664:*13* 665:*9*
**significant** 457:*4* 703:*5* 726:*1, 7* 738:*9* 763:*7, 13* 767:*23*
**signify** 745:*21*

**signing** 564:*11, 12* 804:*10*
**sign-off** 434:*12*
**similar** 434:*3* 437:*11* 438:*13* 475:*20, 23* 510:*21* 756:*19* 758:*24*
**similarly** 649:*20*
**simple** 469:*8, 13* 487:*12* 489:*21* 536:*11*
**simply** 490:*14* 536:*21* 770:*1* 787:*12, 15*
**Singh** 426:*6, 12* 611:*24* 622:*3, 6* 623:*16, 19* 624:*12* 626:*3* 627:*19* 632:*1* 636:*1*
**single** 445:*18, 22* 609:*14* 620:*12*
**sir** 430:*7, 11, 14* 431:*8, 24* 433:*7, 19, 22* 434:*5* 448:*14* 457:*15, 16, 23* 459:*4* 463:*12* 470:*20* 471:*9, 16* 474:*20* 475:*6* 480:*21* 483:*4* 487:*11* 492:*14, 15, 23* 493:*1, 8, 11, 14* 494:*2* 496:*24* 498:*23* 500:*15* 504:*8* 505:*8* 508:*7* 510:*2, 18* 511:*17* 513:*6, 16* 515:*2, 17* 519:*16* 523:*7* 524:*8, 24* 530:*10* 545:*2,*

*6, 20* 546:*10* 547:*5, 7* 551:*13, 20* 552:*2, 6* 556:*6* 558:*16* 559:*17* 560:*7* 562:*2* 563:*1, 13* 564:*2, 16* 568:*1, 4, 6* 569:*3, 19* 570:*10* 575:*15, 16, 18* 579:*23* 580:*12* 586:*1* 593:*24* 606:*5, 9* 612:*5* 621:*10, 22* 626:*13* 632:*12* 635:*20* 636:*5, 9, 13, 23* 637:*4, 15, 18, 23* 639:*11* 640:*1, 17, 21* 645:*2* 651:*16* 656:*5* 658:*14* 659:*14* 660:*1* 661:*5* 663:*19* 664:*1* 665:*22* 667:*11* 668:*1* 669:*2* 678:*22* 683:*1* 761:*5* 780:*12* 781:*18, 19, 24* 782:*3, 23* 784:*2* 786:*19* 791:*21, 22* 792:*18, 19, 24* 793:*5* 797:*22*
**sister** 528:*14, 17* 671:*8*
**sit** 719:*3*
**Site** 424:*22* 520:*2, 13* 521:*24* 522:*8* 531:*9* 533:*16, 18, 19* 536:*3* 537:*12* 546:*13* 547:*19* 548:*4, 18* 569:*15*

649:*22* 665:*14* 675:*12* 683:*5* 706:*22* 745:*15* 755:*3* 786:*23*
**sites** 526:*5* 534:*5* 565:*1* 577:*12* 578:*12* 659:*20* 675:*22* 718:*24* 726:*21*
**sitting** 438:*6* 465:*7* 592:*21* 613:*20* 646:*14* 647:*18* 675:*6* 683:*11* 788:*11*
**situation** 529:*17, 18* 530:*13, 14* 536:*5* 539:*19* 569:*20* 571:*17* 573:*16* 574:*16* 583:*18* 584:*16* 589:*19* 625:*17* 626:*21* 655:*5* 673:*23* 677:*4* 691:*13* 701:*11* 702:*23* 704:*20* 705:*22* 723:*17* 729:*6, 7, 10*
**size** 461:*18, 19* 477:*22* 478:*4*
**sizes** 478:*12, 20*
**slightly** 435:*10* 458:*14* 706:*4*
**slip** 637:*21* 642:*2*

**small** 449:*8* 450:*4* 779:*1*
**smart** 454:*16, 22*
**smoother** 431:*17*
**Solco** 422:*8*
**sold** 582:*18* 583:*3, 15* 584:*6* 587:*12* 648:*10* 662:*24*
**sole** 633:*6*
**solely** 473:*11*
**solution** 452:*12* 692:*2* 768:*23*
**solutions** 690:*8, 14, 21* 691:*18*
**solvent** 441:*3, 9* 442:*6* 444:*3, 9* 449:*23* 450:*1, 8* 464:*14* 468:*9, 10* 479:*1* 508:*13* 509:*12, 22* 512:*5* 524:*11, 14* 526:*2*
**solvents** 440:*16* 443:*15* 444:*17* 446:*9* 447:*24* 448:*3, 18* 449:*3, 17, 20* 462:*4, 9, 18, 24* 464:*6, 9* 465:*3, 23* 466:*8, 13* 468:*13* 469:*7* 476:*4* 477:*6* 494:*8, 20* 507:*6, 10, 16* 508:*23* 511:*23* 512:*3* 516:*24* 517:*4, 9* 523:*24* 524:*20* 525:*2* 527:*18* 528:*12* 598:*11*

599:*14*  739:*8,*
*9, 13*  740:*2*
**somebody**
531:*18*  591:*5*
629:*7*  630:*9*
678:*17*
**Somewhat**
475:*23*
535:*12*  758:*21*
**soon**  594:*10,*
*11*
**sooner**  778:*10*
**SOP**  533:*1*
*773:1*
**SOPs**  533:*1*
730:*11, 13, 19,*
*23*
**sorry**  432:*3*
466:*13*
489:*10*
495:*24*
498:*21*  521:*3*
523:*9*  545:*16*
578:*15, 16*
624:*1*  628:*20*
647:*14*
657:*23*
688:*16*
713:*23*  736:*6*
739:*15*
746:*12*  752:*3*
777:*5*  780:*11,*
*13*  786:*11*
**sort**  431:*20*
438:*8, 9*
443:*15*  523:*3*
626:*24*
680:*15*  716:*14*
**sought**  455:*16*
**sound**  521:*13*
**sounds**  432:*17*
491:*10*  604:*21*
**source**  441:*12*
**sourced**
434:*16*  440:*3,*
*10, 22*  471:*13*
515:*22*
597:*12*
669:*11*  670:*3*
**sources**
454:*12*  489:*2*

**sourcing**
437:*13*
441:*23*
442:*21*  443:*8*
446:*9*  530:*1*
597:*24*  599:*4,*
*12*  670:*10*
**space**  804:*6*
**speak**  530:*16*
557:*6*  620:*1*
631:*21*  632:*1,*
*9*  678:*21*
719:*11*  787:*8*
788:*7*
**speaking**
454:*8, 10, 13*
466:*3*  499:*7*
519:*6*  529:*16*
617:*8*  666:*1,*
*24*  692:*6*
754:*18*
**speaks**  492:*9*
**Special**
489:*19*  695:*6*
**specialist**
694:*15*
**specific**  501:*1*
531:*10*
542:*19*  552:*9*
565:*19*
566:*17, 22, 23*
567:*6*  581:*18,*
*19*  582:*9, 13*
583:*21*
584:*14, 19*
585:*23*  588:*2*
592:*7*  597:*19*
601:*24*
616:*10, 19*
628:*13*
643:*11*  645:*8*
647:*9*  654:*16*
658:*8*  668:*11,*
*13*  672:*24*
692:*13*
698:*17*  699:*3*
702:*7*  716:*6*
744:*8, 13*
784:*18*
794:*10*

795:*19*
797:*10, 20*
**specifically**
448:*7*  456:*9*
476:*21*  480:*6*
490:*16*
493:*19*
495:*17*
499:*15*  530:*6*
539:*1, 12*
596:*16*
616:*15*  617:*6,*
*7*  667:*10*
698:*7*  699:*11*
794:*5*
**Specification**
424:*15, 17, 19*
467:*1, 2*
497:*17*  499:*5,*
*18*  500:*7*
504:*15*
505:*13*  506:*5*
509:*20*
510:*14*
515:*12, 18*
528:*4*  569:*13*
570:*19*
571:*20*
573:*19*  574:*7*
575:*2*  588:*8,*
*14*  589:*21*
721:*22*  722:*3*
**specifications**
452:*13*
463:*14, 24*
465:*15, 17, 21*
466:*23*  467:*5,*
*17*  472:*4*
499:*13*
502:*18*
504:*13, 23*
506:*22*  508:*8*
510:*21*
511:*19*
516:*19*
517:*14*  525:*8*
528:*24*  529:*2*
589:*22*
674:*19*  678:*3,*
*7*  720:*24*
721:*10*

755:*15*  769:*6*
775:*8*  777:*3*
**specifics**
540:*21*  596:*7,*
*13*  644:*1, 2*
663:*12*
**specifying**
532:*12*
**spectometry**
794:*23*
**speculate**
597:*16*
613:*24*
623:*10*
628:*23*  650:*9*
788:*18*
**speculating**
464:*23*  466:*5*
565:*5*  650:*18*
656:*9*
**speculation**
583:*10*
614:*18*  621:*7*
628:*23*  642:*6*
663:*3*  674:*15*
675:*21*  754:*3*
757:*6*  761:*2*
788:*5*
**speculative**
630:*15*
**spell**  474:*11*
**spelled**  602:*22*
**spend**  430:*16*
**spent**  694:*13*
**spite**  746:*9*
770:*22*
**spoke**  672:*19,*
*22*
**spoken**  646:*2*
**sponsor**  793:*1*
**sponsored**
793:*18*  794:*1,*
*21*  795:*24*
**stage**  448:*20*
468:*9, 22*
502:*3*  738:*14*
**stages**  447:*24*
501:*24*
**Stand**  579:*7*
618:*18*

**standard**
528:*9*  530:*23*
532:*4*  608:*20*
620:*7*  625:*5*
741:*1*  758:*7*
**standards**
556:*1*  715:*2*
740:*8*  778:*14*
**standpoint**
522:*15*
530:*24*
670:*12*  671:*2*
673:*17*  773:*20*
**stands**  532:*11*
669:*17*
**STANOCH**
421:*3*  424:*6*
429:*3*  430:*22,*
*24*  432:*1, 11*
457:*18, 22*
470:*14, 17, 21*
471:*10*
480:*19*  484:*4,*
*21*  485:*6*
487:*1, 19*
488:*12*  489:*3,*
*16*  490:*21*
491:*10, 14*
492:*1*  495:*12*
500:*14, 17*
505:*7, 19, 22*
506:*3*  510:*1,*
*4, 19*  512:*24*
513:*4, 24*
515:*1, 6, 16*
519:*15, 18*
520:*6, 10*
523:*11, 16, 17*
529:*4, 19*
530:*10, 20*
532:*23*
533:*12*  542:*6,*
*14, 17*  543:*20*
545:*1, 5, 11,*
*15, 19, 22*
546:*5*  548:*23*
549:*3, 7, 18*
550:*3*  551:*12*
552:*24*
553:*14*  556:*4,*
*8, 20*  557:*4, 7,*

11  560:6, 9,
18  562:14, 24
563:12, 21
564:3  566:2
567:23  568:3,
15  574:11, 18
575:14, 17
576:5, 10, 16
579:22
580:10, 13
583:7  584:3,
10  585:2, 24
586:16
587:16  590:5,
18  593:21, 23
597:20
602:10, 12
605:17  606:5,
10  611:17
612:6  614:24
615:15  616:6,
8  618:18
619:5  621:9,
21  623:14
624:19
625:10
626:13
627:11  628:4,
19  629:2, 8
630:2, 22
631:10, 19
633:5  635:6,
14, 20  636:6
642:7  645:1,
12  646:6, 8,
12  647:17
650:20  651:5,
14  659:8
662:1, 20
663:16
666:15  667:9
668:1, 19
670:21  675:4
676:4, 22
677:5  679:23
680:20
681:10, 23
682:13
683:23  684:9,
22  686:18
688:8, 15

694:2  696:18
699:18
701:20
702:15, 18, 24
705:12
706:10, 13
707:18  708:3,
23  710:3
711:24
713:21
714:13  719:8
721:1, 11, 24
722:9, 13, 20
723:4  726:3
731:18
732:15  734:8
738:4  739:15
740:10  741:5,
12, 17  742:2,
11  743:1
746:12
747:11
748:23
750:11  751:5
752:1, 4, 21
753:17  754:1
756:8  757:5,
21  758:9
759:11  761:1,
22  762:13
763:3  764:5,
9  766:8
767:1, 8, 15
769:16, 23
773:22
774:13
776:12
777:18  780:7,
11, 21  781:7,
13, 16  785:20
788:9  790:12
791:19, 23
792:4, 16
795:9  798:9
801:10, 13, 21
802:8
**start**  498:1
514:5  518:17
**started**  474:9
610:2  691:1
694:13  736:15

**State**  422:21
490:16  510:8
515:7  520:6
545:23
547:18  548:3
560:22
576:11
616:19
649:15
713:13
759:17  804:5
**stated**  456:16
500:9  584:9
673:21  680:2
**statement**
598:16  663:6
692:22  699:23
**statements**
460:21
692:21  743:17
**STATES**
420:1  508:4
516:13  517:8
582:19, 21
583:4  585:5,
15  587:12
588:6, 10, 18
589:14
602:17
609:17
611:11
633:17  643:3
648:10
686:16  687:2
690:6  720:23
725:5
**stating**  494:7
680:8, 12
**status**  603:22
605:1  606:18
607:9  612:9,
13  613:6
662:3  680:3
779:16
**statutory**
799:16, 20
**stay**  504:6
**stenographicall**
**y**  803:8
**step**  450:24
466:11  469:6,

11, 14, 16
478:15
**Steps**  462:5,
13  468:18, 19
535:23  627:1
737:7
**Steve**  733:16
**STEVEN**
421:11
**sticking**
500:18
**stipulated**
428:2
**Stipulations**
427:15
**stocks**  608:1
**stood**  436:21
457:2
**stopped**  690:5
**stopper**  794:7,
14
**stories**  579:4
**story**  579:6
**straight**
503:17
**strategic**
719:14
**strategy**
569:15
570:17
574:14, 24
**Street**  421:4
422:4, 11, 21
**strength**
774:24
**strike**  475:19
527:15  547:6
558:21
577:17  600:2,
4  618:5
766:14
785:23  799:18
**string**  493:6
569:23  786:5
**strong**  589:23
**strongly**
629:8, 9
**studies**  465:19
**study**  794:12
**SUBJECT**
420:12

472:22, 24
558:8  563:8
576:15
619:16
643:13  647:2
649:8, 14
666:9  667:18
725:6  781:22
804:10
**submission**
473:5  481:17
482:12, 15
483:1  486:7,
16  487:9, 13
488:14
514:14
532:20
726:24  729:3
**submissions**
458:9  459:12
483:21  487:2
489:4  492:3
**submit**  484:1
785:17
**submits**
482:18
**submitted**
457:9  475:22
486:12
488:11, 22
513:13  514:8,
9  516:7
529:3  541:2
710:17  711:7
724:18  728:6
729:14  738:2
**submitting**
728:9
**Subscribed**
806:8
**subsequent**
462:12
**subsequently**
456:17
**subsidiary**
765:22
**substance**
433:3  434:15
435:19
449:24
462:10, 14

463:7  464:22
497:17
498:20  499:5
500:7  806:6
**substances**
796:22
**successful**
525:13  747:18
**successfully**
526:2
**sudden**  723:11
**sufficiency**
680:4
**sufficient**
471:20  479:9
483:18
673:13  675:7
676:13  677:7
703:6
**suggest**  503:9
508:20  689:23
**suggested**
452:1
**suggesting**
574:3  618:5
653:6
**suggestions**
748:21  749:9,
17, 23
**suitable**
717:22
**Suite**  421:12,
20  422:4, 12,
21
**summarize**
461:10
**summary**
481:1
**summer**
795:12  797:17
**superceded**
558:24
**superceding**
559:4
**supervise**
760:16  763:15
**supervising**
682:21  761:12
**supervision**
683:10  770:9
803:21

**supervisor**
695:1
**supplement**
483:10
738:21, 24
**supplemental**
641:17
**supplied**
535:13  775:7
**supplier**
489:13
536:19
541:18
555:21
654:20
726:18
731:21  732:6,
7  740:6
741:3  742:17
744:9  751:15
752:16
756:16
758:13
760:17
761:13
763:16
765:23  771:7
773:7, 10
**suppliers**
446:16  447:2
538:2  553:17
554:3, 4, 17,
18  555:4
733:8  754:7
757:13, 17
758:4  768:2,
23, 24
**supplier's**
740:1, 7
**supply**  538:9
581:16
584:23
594:12, 23
655:8, 17, 20
656:2  708:21
731:11
757:12  758:2
**supplying**
652:8

**SUPPORT**
427:2  439:23
737:1
**supposed**
466:12, 14
521:5  738:17
775:1
**sure**  432:14
436:11  440:7
442:14
446:16  447:3
455:20
457:13  459:5
471:24
473:14
479:16  501:3
505:20
511:10  522:8
530:18  546:6
547:2  551:23
553:23, 24
559:3  561:16
565:5, 8
570:7  571:10,
15  572:17
576:6  577:23
581:5  595:6
597:21
612:16  631:6
636:14
644:22
650:15
654:10  655:7
656:2  657:18
658:1, 9
664:15
670:22
689:19
704:23
716:23
746:17
763:21  772:4
774:20
777:19  779:2
797:15  800:3
**surprise**
722:7, 15
723:3, 13, 14
724:2  789:10
**surprised**

723:23
**suspect**  649:18
**suspend**
625:12
**suspended**
667:16
**suspending**
666:5
**suspicion**
726:10
**sworn**  428:21
803:5  806:8
**synthesis**
796:15
**system**  729:19
**systemic**
503:24  729:6,
7

**< T >**
**table**  463:10
**Tablets**
424:22  520:3,
14  717:14
**take**  451:18
455:4, 14
469:15  483:5,
16  484:15
485:19  488:8
490:6  491:8
504:8  521:6
522:19  531:6
535:22
547:12, 17
550:7  552:1,
5  560:19
561:3  569:24
590:6  618:16
629:20  648:4
650:10
673:24
684:10  686:8
704:16
719:24
720:16
729:23
737:24  749:7
754:22  776:8
**taken**  420:14
491:20
512:19  553:9

590:13
631:14
665:20  674:5
684:17
703:21
720:20
746:23
764:16  803:8
**takes**  450:7
524:15
**talk**  429:11,
15  491:4
496:16
530:22  593:7
615:6  630:9,
11  632:7, 13,
17
**talked**  431:2
437:17
438:14
447:21
450:17
496:11, 13
556:9  615:10
718:23  793:10
**talking**
448:10, 13
451:20  468:8
534:16
629:14
642:24  652:7
666:17
669:23
723:17  765:9
775:22, 23
796:3
**talks**  462:4
475:8  772:10
793:12
**TAPI**  765:17,
23  766:3, 7, 12
**targeted**
570:22
571:12
573:24
574:15  575:10
**TEA**  456:11
459:16
463:15, 20
509:5  512:18
527:20

Confidential Information - Subject to Protective Order

team 737:*19*
748:*7* 782:*13*
796:*7*
**Technical**
425:*7* 444:*15*
522:*2* 560:*14,*
*22* 655:*14, 16*
**TECHNICIAN**
428:*10*
491:*15, 22*
553:*4, 11*
590:*8, 15*
629:*23*
631:*16*
684:*12, 19*
685:*14, 18*
703:*16, 23*
746:*18* 747:*1*
764:*11, 18*
802:*13*
**Technologies**
526:*9*
**tell** 440:*1, 8,*
*20* 448:*23*
473:*8, 21, 23*
505:*20* 510:*5*
549:*11, 24*
550:*4* 551:*20*
552:*15* 557:*5*
558:*11*
559:*17* 562:*6*
576:*17*
602:*19, 24*
604:*6* 610:*13*
613:*21* 615:*6*
644:*7* 646:*14*
647:*18*
651:*15*
660:*23* 677:*3*
678:*9* 683:*12,*
*24* 754:*9*
777:*8* 781:*11*
794:*4*
**telling** 484:*5,*
*9* 494:*17*
608:*16*
614:*13* 623:*1*
632:*4* 661:*17*
720:*8* 783:*2*
784:*3* 785:*22*
**tells** 745:*24*

**Temple's**
676:*8*
**ten** 430:*2, 17*
478:*12* 706:*15*
**tenfold**
461:*18* 477:*23*
**term** 451:*10,*
*11* 549:*19*
**Terminus**
421:*11*
**terms** 459:*13*
482:*11, 24*
500:*18* 526:*7*
539:*23*
549:*16*
562:*10*
565:*22*
578:*20* 596:*7*
610:*14*
615:*24*
617:*17* 658:*7*
674:*1* 682:*7*
687:*14* 689:*1*
693:*2* 700:*9*
711:*18*
716:*13*
736:*24*
750:*16* 751:*2*
758:*7* 765:*14*
768:*13* 800:*3*
**Test** 424:*15,*
*17, 19* 426:*20*
431:*3* 436:*13*
437:*17* 465:*1*
467:*2, 16*
470:*4* 478:*9*
480:*2* 504:*12,*
*14, 17, 23*
505:*3, 13*
506:*5* 507:*11*
508:*5* 509:*12*
510:*14, 21*
515:*12, 18*
521:*21* 522:*5,*
*10, 13, 17*
525:*8, 14, 22*
531:*19* 542:*3*
571:*11* 572:*9*
574:*3* 657:*1,*
*10, 12* 675:*2*
678:*5* 708:*6,*

10, 15 714:*17,*
*20* 715:*24*
716:*4, 5, 7, 9*
717:*13, 15, 22*
719:*19*
724:*11*
742:*22*
755:*14*
776:*15, 21*
778:*4, 6, 23*
779:*24*
780:*16*
782:*14* 783:*6*
784:*5, 19, 23*
785:*9, 11, 15,*
*22* 786:*1*
792:*9, 20*
793:*2, 13, 17,*
*24* 794:*22*
795:*5, 15, 16,*
*17* 796:*15*
**tested** 435:*20*
437:*2* 507:*16*
517:*9* 674:*12,*
*18, 22* 677:*12*
**testified**
428:*22* 542:*8*
602:*14*
615:*18*
645:*24* 646:*1*
655:*12*
722:*15* 739:*6*
789:*9*
**testify** 548:*24*
596:*13*
601:*23*
624:*20* 632:*3*
645:*15*
672:*14* 777:*9*
803:*5*
**testifying**
550:*10* 777:*21*
**Testimony**
424:*3* 429:*13,*
*17* 456:*7*
468:*12*
574:*10* 621:*5*
624:*15, 22*
633:*7* 662:*21*
784:*9* 791:*15*
803:*8*

testing 433:*4*
434:*16*
435:*12*
437:*18*
438:*16, 20*
439:*1, 17, 20,*
*24* 446:*6*
451:*14*
452:*23, 24*
463:*3* 464:*5,*
*14* 465:*8*
466:*21*
467:*10* 470:*9*
471:*20*
474:*12*
476:*22*
478:*16* 479:*1,*
*13* 480:*10, 12*
482:*7* 488:*17*
489:*8* 490:*17*
495:*2, 7, 14,*
*21* 496:*20*
497:*22* 498:*4,*
*6, 7, 12, 16*
499:*10, 14, 18*
500:*2* 508:*13*
509:*20, 22*
511:*24* 512:*3,*
*6, 12* 516:*20*
517:*4, 17, 24*
520:*20*
524:*11, 14, 23*
525:*4, 10, 19*
527:*3, 18*
528:*6, 11*
529:*6, 12, 21*
531:*3, 20*
532:*6* 533:*3*
569:*13*
570:*19, 21*
571:*5, 8, 20,*
*22* 572:*16, 20*
573:*2, 19*
574:*7, 15, 20,*
*22* 575:*2, 10,*
*11* 601:*11*
602:*2* 657:*7,*
*9* 658:*6*
668:*7* 676:*21*
678:*3* 679:*20*
705:*9* 706:*22*

707:*2, 5, 7, 13,*
*15, 24* 708:*7,*
*8, 22* 709:*4*
715:*8, 17, 19,*
*23* 739:*8, 13,*
*19* 740:*1, 7*
741:*2, 11*
742:*1, 7, 8, 10,*
*14* 778:*9*
781:*22* 782:*7*
786:*10, 15*
795:*4, 6* 797:*9*
**tests** 463:*19*
504:*24*
506:*22*
511:*13, 19*
516:*18*
522:*23*
570:*16, 20*
671:*10* 707:*4*
795:*12*
**Teva** 421:*15,*
*16* 423:*1*
429:*17* 431:*3*
432:*22, 24*
434:*1, 14*
436:*3* 437:*2,*
*13, 18* 438:*10*
439:*2* 440:*2,*
*9, 21* 441:*5,*
*10, 20, 22*
442:*20* 443:*5*
444:*2* 446:*24*
447:*10*
449:*21*
451:*20*
452:*17* 453:*4,*
*7, 15* 454:*18,*
*22* 455:*13*
456:*9, 16*
457:*5, 24*
458:*6, 23*
459:*14, 15*
460:*8, 12*
464:*1* 470:*18*
473:*11* 492:*4*
521:*2* 527:*17*
528:*6, 10*
529:*5, 10, 21*
530:*1* 531:*1*
532:*4* 533:*5,*

6 534:13
535:6, 22
536:21, 23
537:5, 6, 10,
14, 21 538:21
539:5, 11
540:15
542:19
544:12
545:13
546:17 547:9
552:20
553:15, 19
554:1, 15
555:1, 17, 21
558:23
559:22
563:22 569:9
572:9 573:18
574:3 577:20
578:20 579:1,
8, 13, 19
580:24
581:10
582:17 584:6
585:3 589:13
590:21, 22
591:9, 17
592:8, 15
593:2, 9
594:1 595:18
596:2, 14
597:3, 10, 12,
23, 24 598:8,
18 599:2, 4,
10, 12 600:6,
15, 23 601:10,
18, 24 602:7,
15 603:17, 20
605:9 606:16
608:9, 15
609:20 611:1
612:8, 19
613:4 614:10
616:10 617:1,
10, 22, 23
618:3, 6
619:7, 14
622:7, 23
623:16 624:9
625:11 626:1

628:8, 17
629:15
637:24
643:21, 22, 23
644:12, 13
646:15
647:19, 21
648:17
650:22
651:20 652:4,
9, 17, 23
653:6, 13, 19,
20 655:3, 9,
21 656:13
658:4, 21
659:16, 17, 18
660:2, 3
662:4, 22
664:3, 22
665:6, 7, 13
666:5 667:13,
14 668:21
669:6, 10, 16
670:3, 4, 9, 24
671:4, 21
673:3, 17
674:17, 18
675:16 677:8,
17 678:2, 6,
10, 12, 14, 19
679:24 680:7,
13, 22 681:13,
21 682:2
684:3 686:4,
14 687:20, 22
688:3 689:23
690:4 693:14,
22 696:6, 7,
15 697:3
698:23 699:7
704:4, 5
706:5, 7
709:10
711:13, 21, 22
712:6, 12, 15
713:17 715:7,
12, 17 719:5
721:6, 20
726:16 727:9,
15 728:13
729:18 730:1,

6 731:11, 17
732:14 733:6,
12 735:16
736:20
737:24 739:7,
13, 15, 19, 24
740:5, 15
741:1, 10, 22,
23 742:7, 16,
21, 22 751:14
752:9 753:15,
22 759:5
760:23
762:18 763:1
765:22 766:7,
21 767:6, 14
768:5 772:24
775:22 778:9
780:8 785:21
786:1, 20
787:3, 21
790:16 793:2,
9, 18 794:1,
21 795:4, 11,
19 796:1, 4
798:13 802:5
**Teva-16**
431:11 432:19
**Teva-162**
424:10 471:1
**Teva-163**
424:13 505:9,
12
**Teva-164**
424:15 510:5,
13
**Teva-165**
424:17 515:3,
11
**Teva-166**
424:19
519:20, 23
**Teva-167**
425:3 556:21,
24
**Teva-168**
425:7 560:13
**Teva-169**
425:8 562:20
**Teva-170**
425:10 563:16

**Teva-171**
425:14 568:4,
9
**Teva-172**
425:16
575:18, 22
**Teva-173**
425:18
579:23 580:2
**Teva-174**
425:20 586:6
**Teva-175**
425:22
605:19, 23
**Teva-176**
426:3 611:20,
23
**Teva-177**
426:6 618:20,
24
**Teva-178**
426:8 621:11,
16
**Teva-179**
426:10
635:20, 23
**Teva-180**
426:12 651:6,
9
**Teva-181**
426:14 735:7
**Teva-182**
426:16 781:2
**Teva-183**
426:18 792:8
**Teva-61** 545:6,
24
**TEVA-
MDL2875-
00000875**
424:13 505:12
**TEVA-
MDL2875-
00014763**
426:8 621:16
**TEVA-
MDL2875-
00014826-4827**
426:6 619:1
**TEVA-
MDL2875-**

**00015517**
424:17 515:11
**TEVA-
MDL2875-
00020116**
424:15 510:13
**TEVA-
MDL2875-
00020212**
425:10 563:16
**TEVA-
MDL2875-
00020213**
425:7 560:13
**TEVA-
MDL2875-
00020214**
425:8 562:20
**TEVA-
MDL2875-
00020279**
425:3 556:24
**TEVA-
MDL2875-
00022589-2592**
425:14 568:10
**TEVA-
MDL2875-
00024041-4045**
425:18 580:3
**TEVA-
MDL2875-
00024488-4492**
425:16 575:23
**TEVA-
MDL2875-
00060028-0034**
426:14, 16
735:8 781:2
**TEVA-
MDL2875-
00065014-5016**
425:22 605:24
**TEVA-
MDL2875-
00071287-1303**
426:12 651:10
**TEVA-
MDL2875-
00242568-2678**
424:19 519:24

**TEVA-MDL2875-00495893-5896** 425:20  586:7
**TEVA-MDL2875-00717000-7014** 426:10  635:24
**TEVA-MDL2875-00917708-7715** 426:18  792:9
**TEVA-MDL2875-00950663-0706** 424:10  471:2
**Teva's** 433:2, 16  434:8
435:12  436:1, 19  438:15, 20
439:16
442:18
443:23  446:5
447:13
450:13  452:1
502:23
520:17
528:14
535:19
536:24
540:18
543:21
546:13, 24
553:17  554:2, 16  555:3
587:2  591:1, 23  592:9, 14
595:9  597:6
598:9, 19
599:18
600:12, 24
601:11
602:16  603:1, 22  604:23
608:20  613:7
615:1  616:23
619:9  642:20
646:17  648:7, 9  649:22
653:1  661:17
664:20, 21

671:14, 20
675:7  676:8, 14  679:1
683:12
701:17
709:20  710:9, 13  714:10
718:13
727:10  730:7
788:11
**Thank** 429:4
430:22  432:9
457:16
458:24
460:20
491:12, 14
492:11
494:16
502:19  504:9
508:1  522:20
524:9  533:13
545:9, 15, 18
551:24  552:3, 7, 23  558:17
567:22  570:2
593:21
602:10
684:23  685:5
686:6  706:16, 17  734:9
764:10
777:13
782:23  783:1
792:4  801:18, 19, 22
**Thanks** 457:20  769:18
**theoretical** 529:17
530:13, 17
531:9  532:1
**Theoretically** 454:7, 8, 9, 12
**theory** 451:13
**therapeutic** 773:21
**thereto** 696:2
**thing** 432:14
452:6  454:16, 22  455:10
530:2  549:22

603:6  620:11
636:15  728:2, 5  768:11
779:20
**things** 454:17
455:8  476:2
482:18  494:7
497:6  503:13
507:2  519:12
522:21
704:19  711:4
736:24  758:21
**think** 431:18
435:3  440:17
442:3  450:16
451:24  452:5, 10, 14  453:11
454:13, 15
455:2, 9
458:17
459:20
460:21
471:18
474:16, 18
489:24
490:10
492:20, 23
503:12  509:4
528:8  529:8
531:6  537:21
538:17, 19
539:2  543:12
550:16  551:2
555:12, 16
556:10, 14
561:13, 24
564:23  566:5
572:22
573:23
577:22  578:5, 16, 19  581:9
587:13
597:17
599:23  620:3
623:23  624:4
626:7  629:18
637:3  642:23
643:6, 23
644:19
648:14
672:21  677:1

692:13
711:21  714:2
723:6  724:13
730:11  732:4
742:6, 21
753:4  755:6
765:10  769:8, 24  776:3, 24
777:7  778:8
781:14
783:15  789:9
791:10  802:4
**thinking** 457:14  459:2, 12  620:2, 6
741:24
**thinks** 771:11
**third** 446:10
461:21
477:23  497:8
578:9  602:14
607:8  644:11
727:21  795:24
**third-party** 577:2  608:2
**thirty** 804:16
**THOMPSON** 421:19
**thought** 431:16
483:20
550:17
628:24  656:21
**thread** 623:20
652:2
**threaten** 490:23
**three** 468:18
728:6  795:22, 23
**throat** 504:7
**Thursday** 727:16, 19
**time** 428:8, 15
430:15
436:22
439:10  443:7
454:23
456:10  460:2
463:5, 24
469:19  477:1

480:4  491:15, 22  495:9, 15
496:17
498:14  509:3, 10, 19  512:11, 16  514:9
517:18
521:13  525:4
547:19  550:7
551:16  552:1, 6  553:4, 11
560:20  567:3
569:5, 24
570:24  578:8
581:16
587:23  590:8, 15  594:1, 7
595:7  600:8
601:15  609:9
613:17
623:15
629:23
631:16
644:15
646:18
647:22
650:19
652:24
680:23
684:12, 19, 23
685:2, 4, 12
700:1  701:7, 10, 23  702:6
703:9, 16, 24
705:8, 14
720:24
735:17
746:18  747:1
750:21
764:11, 18
779:7  783:4
789:14
791:13
794:12
797:19
798:16
800:17
801:15
802:13  803:8
**timeline** 708:19  761:19

Confidential Information Subject to Protective Order

**timely** 573:9
729:3
**times** 478:12
504:12 604:7
618:4, 7
721:22 751:9
**timing** 610:14
611:7 617:23
654:13, 16
724:17
728:14, 19
**TNW1027125**
639:20
**TNW7125**
638:15 639:4
640:4
**today** 429:13
438:6 465:7
504:12
569:16 592:3,
7, 21 593:7
596:13
599:20, 21
601:14, 17, 23
613:20 633:7
635:8 646:14
647:19 675:6
677:4 678:24
679:9 680:2,
24 681:15, 18
683:11
684:23
685:14, 16
689:9 719:3
742:20
769:19
770:18 788:11
**Today's**
428:14
496:11, 16
592:24
631:21, 24
651:3 655:22
658:2 676:5
679:11 798:2
**told** 439:2
452:17 453:7
459:13
476:15 477:3
490:17 549:3,

14 550:3, 6
656:6 786:1
**tolerance**
588:15, 19
**toluene**
464:11 508:6
512:9 517:11
525:3, 16
**tons** 658:18,
23 674:9
675:9 676:15
677:9
**tool** 763:9
**top** 669:3
692:7
**Topic** 614:24
629:11
645:18 646:5
650:14 722:18
**topics** 593:19
722:17
**topmost**
568:20
569:11
580:15
586:18
651:22 781:20
**total** 656:14
658:16
**totally** 454:2
577:11
578:11 628:14
**touched**
535:18 537:4
539:8
**toxicologist**
697:2, 3, 7
**toxicology**
697:1
**Toxikon**
792:22
**trace** 450:11
**traces** 449:4,
8, 11, 23
450:1, 2, 4
453:18 454:2
723:18
**track** 537:18
763:16
**train** 802:11

**transcript**
803:8, 20
804:17, 19
**transcription**
806:4
**transfer** 519:7,
9 521:2, 5, 22,
23 522:4, 9,
14 525:14
**transferred**
520:21
521:18
522:24 523:1
525:23 526:3
527:11
**transferring**
518:11
**translate**
540:4
**transport**
640:18
**transportation**
642:13
**TRAURIG**
421:10
**trends** 556:2
**trial** 428:8
**trick** 559:16
**tried** 585:5
637:13
**trigger** 449:18
543:17
**triggered**
594:22
**triggering**
449:13
**true** 502:23
503:3
**Truemper**
425:22 426:8,
10 605:16
606:1, 16
607:15
616:17 619:2,
13, 20 620:17
621:1, 18
622:2, 10
624:11 626:2,
23 627:18
628:7, 24
631:22

**Truemper's**
623:15
**trustworthy**
446:23 488:3
**truth** 549:21
803:5, 6
**try** 545:2, 7
635:16
734:11
737:13
741:10 784:7
**trying** 440:12
442:9 460:10
474:3 490:22,
24 531:21
534:22
565:23
570:13 598:6
615:19 620:4
625:8 626:24
627:19 628:2,
11 716:13
719:15
741:23
755:24
766:22
770:10 774:8
**turn** 481:23
492:16
496:23
701:13 764:22
**turning** 447:9
492:12 493:18
**twice** 734:11
**two** 459:11,
21 468:18
477:6 486:18
489:18 491:2
507:15 516:6
527:9 565:3
566:20
607:12, 20
610:1 624:8
646:13
654:18
656:11
662:12 670:5
704:19 711:4
746:16
754:23
755:22 766:1,

16, 20 771:21
801:23
**twofold** 477:23
**type** 471:17
480:9 533:21,
24 536:22
541:6 591:14
594:23
598:14 650:6
656:10 657:9
671:11 729:5
753:14
756:20
759:13 790:9
795:7
**types** 522:23
603:15
690:16 757:1
758:7 759:3
**typical** 464:20
550:15
753:13
756:15
758:14 759:8
**typically**
710:9, 24
737:19

**< U >**
**U.S** 422:8
507:22 512:7
518:19
532:15 566:9
581:22 591:2
595:20 597:4,
23 598:8, 18
599:3, 10
600:16, 23
602:1 603:3,
7 627:14
643:12
646:17
647:21
648:20
649:12 650:1
662:5, 17
663:1 669:13
688:1 690:1
691:24
721:20 724:7

Confidential Information Subject to Protective Order

745:*13*
781:*22*  786:*22*
**ultimately**
437:*23*
438:*15*
439:*16*
441:*20*
442:*18*
507:*18*
573:*17*  574:*5*
579:*8*  691:*20*
728:*20*
**unacceptable**
437:*8*  441:*22*
442:*23*  443:*9*
447:*16*  503:*7*
649:*5*
**unaddressed**
714:*4*
**uncomfortable**
750:*3*
**uncorrected**
714:*5*
**underlying**
604:*24*
**understand**
429:*7*  442:*5,
10*  444:*15, 20*
467:*18, 21*
468:*3*  490:*13*
495:*20*
531:*22*
536:*17*  537:*2*
539:*6*  551:*13*
552:*19*  596:*8*
615:*20*  620:*5*
630:*5*  670:*20*
687:*22*
696:*17, 21*
721:*5*
**understanding**
440:*24*
448:*17*
452:*20*
455:*23*
479:*20, 23*
500:*22*
501:*16*
558:*19, 20*
565:*20*
582:*14*

585:*20*
589:*12*
594:*18*  595:*1*
611:*15*
613:*10*  655:*8*
660:*17*
670:*11*
686:*14, 23*
687:*9*  691:*5*
701:*5*  703:*3*
705:*5*  742:*20*
752:*7*  765:*8*

**understandings**
567:*7*  755:*21*
**understands**
521:*24*  711:*11*
**understood**
483:*17*
486:*15*
501:*21*
514:*24*
534:*23*
655:*18*
663:*17*
720:*17*  721:*23*
**undertake**
635:*8*
**undertook**
450:*18*
**unexpected**
723:*10, 11*
**Unfortunately**
637:*7*
**unique**  625:*7*
**UNITED**
420:*1*  508:*4*
516:*13*  517:*8*
582:*19, 20*
583:*4*  585:*5,
15*  587:*12*
588:*6, 10, 18*
589:*14*
602:*16*
609:*17*
611:*11*
633:*17*  643:*3*
648:*10*
686:*16*  687:*1*
690:*6*  720:*23*
725:*5*

**units**  639:*9*
641:*14*
**unknown**
539:*8, 17*
540:*1, 3, 8, 17*
541:*16*
542:*21*
543:*15*  544:*14*
**unusual**
625:*16*
626:*20*  748:*19*
**update**  607:*1*
661:*9*  729:*15*
**updated**
475:*9*  561:*22*
**updates**
613:*13*  729:*16*
**updating**
665:*5*
**upload**  431:*14*
564:*1*  576:*4*
586:*13*
**uploading**
792:*14*
**urgency**
785:*16*
**USA**  421:*16,
23*  423:*1*
608:*10*  638:*1*
**usable**  439:*15*
**usage**  468:*10*
**USB**  467:*15*
498:*5*  521:*21*
522:*5, 13, 17*
**Use**  424:*13*
442:*5*  447:*23*
448:*3, 18*
449:*17*
451:*10*  462:*4*
471:*3, 12*
473:*2*  504:*16*
514:*15*
518:*24*  567:*8*
571:*10, 21*
575:*5*  582:*3*
691:*15, 22*
693:*12*
715:*22*  751:*2*
755:*13*  770:*7*
773:*10*  780:*16*
**uses**  795:*7*

**Usha**  622:*2, 6*
623:*16, 19, 24*
624:*12*  632:*1*
**usually**
522:*19*  596:*9*

**< V >**
**Vague**  529:*14*
530:*4*  670:*17*
680:*10*  721:*2*
756:*12*  757:*7*
761:*3*  773:*16*
774:*4*  779:*11*
**valid**  783:*6*
**validate**
489:*15*  778:*11*
**validated**
488:*5*  716:*5,
7*  777:*10, 22*
778:*5, 23*
780:*20*
782:*14*  783:*3,
22*  784:*4, 23*
785:*15*  786:*3*
**validation**
476:*7, 10, 23*
477:*5*  479:*18*
480:*8*  494:*12,
21*  502:*3, 4*
503:*6*  514:*16*
716:*9*  786:*9,
14*
**Valley**  638:*7*
**VALSARTAN**
420:*3*  424:*13,
22*  431:*5*
433:*1, 2, 17*
434:*5, 15*
435:*13*  436:*3,
5, 14*  437:*2,
12, 19*  438:*11,
17, 22*  439:*4,
18*  440:*2, 9,
21*  441:*5, 12,
24*  442:*21*
443:*8*  444:*1*
447:*11*  448:*9*
453:*18*
458:*14*
461:*15*
462:*20*

463:*11, 19*
467:*12*
469:*21*  471:*4,
12*  472:*13*
473:*12*
474:*13*
475:*15*  480:*5*
493:*24*
496:*20*  497:*9*
498:*1*  506:*6,
14, 19*  507:*12*
508:*2*  509:*6,
21*  511:*2, 15*
512:*13*  514:*6*
515:*22*
516:*12, 14*
517:*19*  518:*1,
12, 18, 19*
519:*2*  520:*3,
14, 20*  524:*13,
17*  525:*10*
527:*4, 5, 19*
528:*6, 12, 19,
20*  529:*6, 12,
22*  530:*2*
531:*3*  532:*8*
533:*5*  535:*18*
538:*16*  539:*9*
540:*18*
542:*21*
544:*14*
546:*14*
558:*12*  563:*9*
566:*8, 10*
567:*17*  571:*7*
574:*4*  575:*11*
577:*3*  579:*3,
9, 10, 15*
581:*1, 11*
582:*18*  584:*4*
587:*3*  588:*24*
589:*14*  590:*2,
22*  591:*1, 24*
592:*9, 16*
593:*4, 11*
594:*3, 4*
597:*6, 12, 13,
24*  598:*1, 9,
10, 20*  599:*4,
5, 11, 13, 19*
600:*12, 17*

Confidential Information - Subject to Protective Order

601:*1, 12*
602:*4*  603:*2*
606:*19*
608:*17*  609:*4, 14, 17, 21*
611:*3, 10*
613:*8*  615:*3*
616:*12*  617:*4, 13*  618:*8*
619:*9, 22*
620:*13, 20*
621:*3*  622:*13*
623:*1*  626:*4*
627:*13*  628:*8*
629:*13*  632:*6*
633:*8, 16, 23*
634:*4, 15*
635:*10*
638:*19, 24*
639:*5*  642:*2, 10*  643:*11*
644:*10, 13*
646:*11, 16*
647:*20*  648:*8, 9, 18, 20*
649:*10, 22, 24*
650:*22*  652:*8*
653:*1, 15, 21*
656:*22*  657:*1, 22*  658:*5, 24*
660:*4*  661:*18*
662:*23*  663:*1*
664:*23*
667:*18*
668:*23*
669:*12, 21*
670:*2, 10, 23*
671:*1, 19*
672:*17*
673:*18*
674:*10*  675:*9, 17*  676:*7, 15*
677:*9, 18*
678:*11, 24*
680:*4, 6, 22*
681:*14*  682:*1*
683:*13*  684:*1*
686:*15, 24*
687:*24*  689:*3*
690:*4, 9*
701:*6*  705:*17*

709:*10*  710:*2*
714:*12*
720:*22*  721:*9, 19, 21*  731:*11, 16*  732:*13*
778:*11*  782:*8*
791:*4*
**value**  773:*21*
**Vanaskie**
489:*20*  490:*8, 12*
**Vanderweeen**
425:*18, 20*
580:*4, 16*
586:*8, 19*
691:*21*
**various**
463:*19*  525:*8*
618:*4*  657:*21*
658:*3*  718:*13*
**vendor**  446:*6*
535:*9*  537:*24*
538:*11*
543:*23*  608:*2, 6*
**vendors**  503:*2*
535:*7*  543:*22*
**vendor's**  446:*9*
**verbatim**
803:*8*
**verification**
498:*8*  522:*18*
**verified**  488:*6*
500:*4*
**verify**  455:*16*
469:*19*  495:*1*
648:*5*
**verifying**
454:*23*
**versa**  717:*19*
**version**
433:*21*  434:*8, 21*  435:*11*
472:*19*
562:*11*
740:*18, 21*
**versus**  440:*18*
532:*8*  571:*7*
643:*3, 18*
649:*1*
**vice**  717:*18*

**VICTORIA**
421:*10*  432:*2*
630:*4*  686:*2*
**VIDEO**
428:*10, 16*
491:*15, 22*
553:*4, 11*
590:*8, 15*
629:*23*
631:*16*
684:*12, 19*
685:*14, 18*
703:*16, 23*
746:*18*  747:*1*
764:*11, 18*
802:*13*
**Videographer**
423:*1*  428:*12*
**Videotaped**
420:*13*
**view**  722:*6*
762:*23*  779:*7*
**vis-à-vis**
675:*17*
677:*18*  680:*5*
**VOLUME**
420:*10*
428:*17*  746:*14*
**voluntary**
606:*18*

**< W >**
**wait**  706:*15*
**waiting**
587:*14, 17*
664:*12*
**waived**  428:*5*
**want**  444:*14*
445:*2*  451:*9, 10*  454:*17*
466:*16*
468:*24*
472:*22*
489:*17*  501:*1*
530:*6, 18*
536:*10, 14*
541:*19*
543:*11, 13*
544:*1, 5*
545:*17*
549:*20, 23*

551:*16*
556:*15*
558:*12*  562:*4*
565:*4, 6, 8*
571:*24*
583:*11*
609:*23*
613:*23*  615:*5*
630:*18*  631:*8*
650:*8, 14*
652:*18*
689:*17*  731:*4*
739:*3*  774:*19*
**wanted**
444:*19*
455:*20*  566:*1*
571:*9*  631:*7*
699:*22*
700:*17*
750:*18*  778:*22*
**wants**  544:*5*
**warehouse**
654:*13*
**waste**  640:*18*
641:*12, 17*
642:*13*
**wastes**  641:*16*
**watching**
631:*4*
**water**  454:*12*
790:*2*
**watermark**
743:*7, 12*
**Watson**  458:*4*
463:*4*  464:*1*
466:*16*
469:*18*  471:*18*
**way**  438:*7*
466:*12, 13*
481:*13*
495:*13*  500:*9*
502:*7*  522:*10*
535:*24*
538:*15*
562:*10*
570:*24*  571:*4*
626:*22*
628:*10*  630:*3*
672:*3*  675:*5*
676:*12*  677:*6*
679:*8*  680:*3*

681:*12*  683:*4*
686:*8*  694:*6*
698:*19*
707:*16*  708:*1*
738:*17*
749:*18*
752:*17*
759:*21*  760:*3, 8*  761:*14*
767:*22*  768:*1, 3, 4, 5, 13*
770:*4*  771:*20*
774:*5*  788:*7*
791:*12*  798:*11*
**ways**  491:*3*
768:*19*  775:*18*
**website**  555:*20*
**websites**
790:*23*
**weeks**  546:*18*
610:*1*
**weigh**  748:*9*
749:*3*
**weight**  640:*7*
**welcome**
429:*5*  590:*19*
**well**  437:*24*
438:*11*  464:*2*
467:*9*  469:*4*
473:*17*  474:*8*
482:*17*  483:*4*
495:*18*  499:*7*
503:*1, 9*
509:*14*  518:*9*
529:*20*
538:*19*  540:*7, 13*  548:*23*
558:*19, 21*
566:*6, 19*
567:*14*  571:*3*
573:*22*  578:*3*
593:*20*
601:*17*
613:*10*
615:*22*
624:*11*  628:*5*
630:*22*  643:*9*
655:*1, 12*
656:*24*
657:*10*  686:*9*
704:*17*

727:23  754:6
757:11  762:9
766:14
782:21
797:20  798:16
went  455:12
595:23
610:18  613:3
614:3, 4
615:20, 21
631:9  671:21
733:12  749:8
788:12
we're  442:19
455:7  467:1
470:22  488:7
493:5  513:17
523:15
531:23  541:9
549:22  566:5
575:5  593:16
610:24
630:22  631:2
645:12  646:9
667:8  704:18
756:3
WERNER
421:19
West  422:11,
21
We've  491:6
527:17
534:16  542:1
573:14
593:18  602:7
610:15
787:15  802:4
WHITELEY
421:1, 3
734:10
wholesaler
591:9, 17
592:8  593:9
601:9
wholesalers
593:2  602:1
widespread
614:7  791:8
willing  542:13
788:17

Withdrawn
579:22
withheld
647:14
withhold
668:5
Witness  427:5
432:9  457:20
470:1, 20
471:7  480:16
483:24
485:23
487:21
488:21  491:5,
12  505:17
506:1  510:3,
18  513:2, 21
515:4  519:17
520:9  523:13
528:18
529:15
530:11
532:24
533:10
542:15  543:4
545:4, 9
546:3  549:4
550:11  553:3
556:7  557:9
560:8  563:24
565:16  568:2,
6  574:13
575:16  576:3
580:8, 12
583:11, 14
584:12
585:11
586:12
587:13  590:7
593:19
597:17  602:8
606:7  612:3
618:21  621:8
623:6  624:24
626:15  629:3
632:21
634:24
635:18  636:5
645:3, 14, 20,
22  646:22
650:17  659:5

662:9  663:5
666:22  668:2
670:18
674:16
675:22  677:1
680:11  681:5,
18  682:7
683:18
684:11  685:6
688:17  694:4
696:20
699:20
701:22
702:17  703:2
705:13
706:12, 17
707:20  708:5
709:1  710:5
712:2  713:23
714:15
719:10  721:3,
13  722:2
723:6  726:4
731:20
732:16
735:13  738:6
740:12  741:7,
19  742:4, 13
747:13
750:13  751:7
752:2, 5, 23
753:19
757:23
758:11
759:13  761:6,
24  762:15
763:5  764:6,
10  766:10
767:3, 10, 17
773:17  774:5
775:17
777:17
779:12  780:9,
13  784:10, 13,
17  788:6
789:24
791:22
792:13  795:3
800:21
801:12, 19
802:2  804:1

witnesses
624:17  802:5
witness's
683:17
wonder  782:13
word  436:10
455:14
547:13  567:8
578:4  698:6,
12  699:4, 7,
15  700:13, 17
words  698:18
700:8
work  452:1
478:17
482:14
486:23  498:8
527:23
578:21
599:22  679:3
685:7  692:14
694:11
695:23  697:9
718:5  785:5
798:21  800:5
worked
431:18
590:21
602:15  603:3
694:8, 22
695:2, 5  801:8
working
531:23  569:6
574:17
595:16
625:20
658:21
694:16
768:22
778:24  796:7
800:4
works  538:11
617:9  623:24
782:24
workshop
461:14
471:13
477:24  497:8,
13  501:8
world  769:7

worries  523:14
worthy  728:10
wrap  769:15
writes  653:12
656:14
659:15  664:10
writing  496:5
569:21
written
590:24
591:22
603:21
609:10  761:21
wrong  478:6
484:16
485:20  493:8
594:20  777:1
780:1
wrote  456:15
577:6, 10
783:21

< Y >
yeah  458:18
478:2  491:6
501:18  509:1
513:21
547:15  562:7,
8  592:11
729:2  754:14
802:12
year  654:1
662:3  768:9
years  516:6
561:1  678:4
694:14, 21
696:10
750:10  772:9
787:14  794:1
795:23
Yep  501:6
562:8  604:14
yes-or-no
503:18
yesterday
429:8  431:1,
17  433:11
435:11, 18
437:17
438:15
447:22

Confidential Information - Subject to Protective Order

448:*11*
450:*17*  456:*8*
504:*12*  556:*9*
637:*13*  655:*2,*
*13*  684:*24*
686:*9*  694:*7*
697:*19*  701:*1*
706:*21*
715:*20*
718:*22*
719:*23*
724:*24*  733:*3*
772:*23*
**yesterday's**
429:*12*  430:*5*

**< Z >**
**Zero**  561:*19*
**Zhejiang**
422:*7*  425:*8*
506:*15*
560:*15*  564:*7*
**ZHP**  431:*4*
432:*24*
433:*17*
434:*17*
435:*13*  436:*2,*
*14*  447:*11*
448:*9*  449:*16*
450:*17*
451:*20, 22*
452:*17*  453:*4,*
*7*  454:*20*
456:*8, 16*
459:*13*
462:*21*  465:*9*
469:*4*  472:*13*
474:*14*
475:*16*
476:*10, 15*
477:*8*  478:*24*
479:*12, 23*
480:*3*  481:*14,*
*24*  482:*1*
486:*10*  487:*4,*
*8, 15*  488:*1,*
*16*  489:*1*
490:*18*  492:*6*
493:*24*  494:*4,*
*6, 17*  495:*5*
496:*21*  497:*2*

498:*1*  499:*6*
500:*20*  501:*5*
506:*19*
507:*12*  508:*3*
509:*4, 11, 21*
511:*2, 16*
512:*13, 17*
514:*6*  515:*23*
516:*13, 21*
517:*19*  518:*2*
524:*13*
525:*10*  527:*6,*
*19, 20, 24*
535:*18, 20*
537:*10, 23*
538:*6, 14, 24*
539:*8, 12*
540:*14, 15*
541:*1*  542:*20*
544:*13, 15*
546:*18*  547:*1,*
*10*  556:*12*
557:*18, 23*
558:*6*  559:*1,*
*19, 23*  560:*24*
561:*8*  563:*4*
564:*11*
565:*14, 21*
566:*10, 13, 18,*
*19*  567:*14, 15,*
*17*  578:*6*
654:*3*  670:*3*
701:*10*  702:*3*
703:*2*  705:*18*
723:*16*
731:*11, 17*
732:*4, 14*
733:*13*
735:*16*  738:*2*
742:*23*
743:*21*  753:*3,*
*12*  755:*2, 12*
756:*19, 24*
759:*9*  762:*7*
778:*10*
786:*21, 23*
788:*2, 12*
794:*2*
**ZHP's**  448:*20*
455:*14*
456:*10*  461:*6*

467:*12*  478:*8*
479:*13*  489:*8*
546:*13*
589:*14*  742:*9*
**zinc**  448:*2*
450:*18*
456:*11*  457:*8*
459:*17*
463:*16, 20*
472:*14*
473:*13*
474:*14*  476:*3*
478:*8*  494:*8,*
*19*  495:*4*
496:*21*  498:*2*
499:*6*  512:*18*
514:*7*  516:*14*
527:*20*
**ZMICK**
422:*11*
**Zoom**  420:*14*
493:*13*