# Exhibit 205

Confidential Information - Subject to Protective Order

1        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW JERSEY
2                  CAMDEN VICINAGE

3                    -   -   -

    IN RE:  VALSARTAN,     :  MDL NO. 2875
4   LOSARTAN, AND          :
    IRBESARTAN PRODUCTS     :  CIVIL NO.
5   LIABILITY LITIGATION    :  19-2875
    _____  :  (RBK/JS)
6                           :
    THIS DOCUMENT APPLIES   :  HON. ROBERT
7   TO ALL CASES            :  B. KUGLER
8         - CONFIDENTIAL INFORMATION -
           SUBJECT TO PROTECTIVE ORDER
9

10                   -   -   -

11            February 22, 2022
12                   -   -   -

13

14        Videotaped remote deposition of
    KARLA V. BALLMAN, Ph.D., taken pursuant
15  to notice, was held via Zoom
    Videoconference, beginning at 9:10 a.m.,
16  EST, on the above date, before Michelle
    L. Gray, a Registered Professional
17  Reporter, Certified Shorthand Reporter,
    Certified Realtime Reporter, and Notary
18  Public.

19

                     -   -   -
20

21        GOLKOW LITIGATION SERVICES
         877.370.3377 ph| 917.591.5672
22            deps@golkow.com

23

24

Confidential - Information Subject to Protective Order

Page 2

ZOOM APPEARANCES:

LEVIN PAPANTONIO RAFFERTY PROCTOR
BUCHANAN, O'BRIEN, BARR, MOUGEY, PA
BY:  DANIEL NIGH, ESQ.
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
(888) 435-7001
dnigh@levinlaw.com
Representing the Plaintiffs

MAZIE SLATER KATZ & FREEMAN, LLC
BY:  ADAM SLATER, ESQ.
103 Eisenhower Parkway, 2nd Floor
Roseland, New Jersey 07068
(973) 228-9898
aslater@mazieslater.com
Representing the Plaintiffs

HOLLIS LAW FIRM, PA
BY:  BRETT VAUGHN, ESQ.
8101 College Boulevard, Suite 260
Overland Park, Kansas 66210
(913) 385-5400
brett@hollislawfirm.com
Representing the Plaintiffs

KANNER & WHITELEY, LLC
BY:  LAYNE HILTON, ESQ.
701 Camp Street
New Orleans, Louisiana  70130
(504) 524-5777
l.hilton@kanner-law.com
Representing the Plaintiffs

MIGLIACCIO & RATHOD, LLC
BY:  MARK PATRONELLA, ESQ.
412 H Street NE Suite 302
Washington, DC 20002
(202) 470-3520
Representing the Plaintiffs

Page 3

ZOOM APPEARANCES:  (Cont'd.)

PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
BY:  FRANK H. STOY, ESQ.
One Oxford Centre
38th Floor
Pittsburgh, Pennsylvania 15219
(412) 263-1840
fhs@pietragallo.com
Representing the Defendant, Mylan N.V.,
Mylan Pharmaceuticals Inc., and Mylan
Laboratories Limited

BARNES & THORNBURG, LLP
BY:  KARA KAPKE, ESQ.
11 S. Meridian Street
Indianapolis, Indiana 46204
(317) 231-6491
kara.kapke@btlaw.com
Representing CVS Pharmacy, Inc., and Rite
Aid Corporation

HINSHAW & CULBERTSON, LLP
BY:  GEOFFREY M. COAN, ESQ.
53 State Street, 27th Floor
Boston, Massachusetts  02109
(617) 213-7047
Gcoan@hinshawlaw.com
Representing the Defendant, ScieGen
Pharmaceuticals, Inc.

BUCHANAN INGERSOLL ROONEY
BY:  CHRISTOPHER B. HENRY, ESQ.
Carillon Tower
227 West Trade Street, Suite 600
Charlotte, North Carolina 28202
(704) 444-3475
Christopher.henry@bipc.com
Representing the Defendant, Albertson's
LLC

Page 4

ZOOM APPEARANCES:  (Cont'd.)

GREENBERG TRAURIG, LLP
BY:  STEVEN M. HARKINS, ESQ.
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
(678) 553-2312
harkinss@gtlaw.com

     - and -

WALSH PIZZI O'REILLY FALANGA
BY:  CHRISTINE I. GANNON, ESQ.
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, New Jersey 07102
(973) 757-1017
Cgannon@walsh.law
Representing the Defendants, Teva
Pharmaceutical Industries, Ltd., Teva
Pharmaceuticals USA, Inc., Actavis LLC,
and Actavis Pharma, Inc.

FALKENBERG IVES, LLP
BY:  MEGAN A. ZMICK, ESQ.
230 W. Monroe Street, Suite 2220
Chicago, Illinois 60606
(312) 566.4808
Maz@falkenbergives.com
Representing the Defendant, Humana

HILL WALLACK LLP
BY:  WILLIAM P. MURTHA, JR., ESQ.
21 Roszel Road
Princeton, New Jersey 08543
(609) 452-1888
Wmurtha@hillwallack.com
Representing the Defendant, Hetero, USA,
Inc., Hetero Labs

Page 5

ZOOM APPEARANCES:  (Cont'd.)

ALSO PRESENT:

VIDEOTAPE TECHNICIAN:
Bill Geigert

LITIGATION TECHNICIAN:
Jeff Martin

Lauren Massey - Paralegal
(Levin Papantonio

Jacqueline Suggs - Paralegal
(Ulmer Berne)

Page 6

- - -

# I N D E X

- - -

Testimony of:

KARLA V. BALLMAN, Ph.D.

By Mr. Nigh            10

- - -

# E X H I B I T S

- - -

NO.        DESCRIPTION        PAGE

Ballman-1    Notice of Videotaped   15
             Oral Deposition

Ballman-2    Defendants' Responses  17
             And Objections to
             Plaintiffs' Notice of
             Videotaped Deposition
             Of Karla V. Ballman, Ph.D.

Ballman-3    Invoices, 1/28/22     27
             Karla Ballman Ph.D.

Ballman-4    Expert Report of      30
             Karla V. Ballman, Ph.D.
             1/12/22

Page 7

- - -

# E X H I B I T S (Cont'd.)

- - -

NO.        DESCRIPTION        PAGE

Ballman-5    Excel Spreadsheet    118

Ballman-6    Expert Report        154
             Of Dr. Madigan
             7/7/21

Page 8

- - -

# DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
PAGE   LINE
None.

Request for Production of Documents
PAGE   LINE
None.

Stipulations
PAGE   LINE
None.

Questions Marked
PAGE   LINE
None.

Page 9

- - -

THE VIDEOGRAPHER:  Good
morning.  We are now on the
record.

My name is Bill Geigert.
I'm a videographer for Golkow
Litigation Services.

Today's date is February 22,
2022, and the time is 9:10 a.m.

This remote video deposition
is being held in the matter of
Valsartan, Losartan, and
Irbesartan Products Liability
Litigation.

For the United States,
District Court for the New Jersey
of New Jersey.

The deponent is Dr. Karla
Ballman.

All parties to this
deposition are appearing remotely
and have agreed to the witness
being sworn in remotely.

Due to the nature of remote

Confidential Information - Subject to Protective Order

---

Page 10

reporting, please pause briefly
before speaking, to ensure all
parties are heard completely.
        All counsel will be noted on
the stenographic record.
        The court reporter is
Michelle Gray, and she will now
swear in the witness.
                - - -
        ... KARLA V. BALLMAN, Ph.D.,
having been first duly sworn, was
examined and testified as follows:
                - - -
        EXAMINATION
                - - -
BY MR. NIGH:
    Q.   Good morning, Doctor.  Can
you please state and spell your last
name?
    A.   Good morning.  My name is
Karla Ballman.  Last name is
B-A-L-L-M-A-N.
    Q.   Good morning.  My name is
Daniel Nigh, and I represent the

Page 11

plaintiffs in the valsartan MDL
litigation.
        Where are you currently
located?
    A.   We currently are in the
offices of Duane Morris in New York City.
    Q.   Okay.  And do you have
anybody else in the room with you?
    A.   Yes, I do.  I have counsel
for the defense, Mr. Frank Stoy.
    Q.   Okay.  Anyone else?
    A.   No.
    Q.   Other than laptops, do you
have any other electronics in the room
with you?
    A.   I have a calculator.
    Q.   Okay.  And other than the
calculator and laptops, any other
electronics?
    A.   I do not.
    Q.   Okay.  Could you please tell
me what you did to prepare for your
deposition today?
    A.   To prepare for today, I

Page 12

reviewed the expert reports of
Drs. Panigrahy and Madigan, as well as my
own expert report, and then I met with
defense counsel.
    Q.   Okay.  And how many --
when -- how many times did you meet with
defense counsel in preparation for your
deposition?
    A.   I think once or twice via
phone, and in person one -- yesterday.
    Q.   And which attorneys did you
meet with?
    A.   With Dr. Frank Stoy and --
I'm terrible at names.  So perhaps he can
help me out.  Jason -- Mr. Jason --
    Q.   Reefer?
    A.   Yes.
    Q.   Okay.  Now, I will tell you
that during the deposition, just one of
the ground rules is obviously your
attorney can't help you answer questions
during the deposition.
        So he did a very good job.
As you were staring him down, he didn't

Page 13

give you any indication on the answer.
That was good.
        A couple other ground rules
is, this is not an endurance test.  If
you feel like you need a break at any
time, just let me know.  And then also if
you don't understand one of my questions,
you know, just let me know.
        If you answer the question,
I'm going to assume that you understood
the question.  Is that fair?
    A.   Yes.
    Q.   Okay.  And you said you met
with Frank Stoy and Jason Reefer.
        Are there any other
attorneys that you met with or spoke with
over the phone?
    A.   There have been others on
the phone.  But I cannot recall their
names at this time.
    Q.   Okay.  What documents do you
have with you in the room today?
    A.   I have a clean copy of my
expert report, and that is the only

Confidential Information - Subject to Protective Order

Page 14

1  document that I have with me.
2       Q.   And you said clean copy.  I
3  think that means that there's no
4  highlights, tabs, or handwriting on that
5  document, correct?
6       A.   That is correct.
7       Q.   And Dr. Ballman, just a
8  couple quick questions about your
9  qualifications.  You're not a
10 toxicologist, correct?
11      A.   Correct.
12      Q.   And before you started
13 looking at this litigation, you've never
14 published on nitrosamines previously,
15 correct?
16      A.   As much as I'm aware, I have
17 not.
18      Q.   And you don't ever recall
19 giving any lectures, presentations,
20 things of that nature in regards to
21 nitrosamines before you started looking
22 at this in this litigation, correct?
23      A.   That is correct.
24          MR. NIGH:  Okay.  Let's pull

Page 15

1      up LP 1769.  This is the
2      deposition notice.  We'll mark
3      this as Exhibit 1.
4          (Document marked for
5          identification as Exhibit
6          Ballman-1.)
7  BY MR. NIGH:
8       Q.   And I want to make sure that
9  you're able to see that document, both as
10 it comes up on the screen live, plus I
11 believe that you should also be receiving
12 a document to where if you want to, you
13 know, navigate through the pages
14 independently, you can do that as well.
15 So I believe that -- let's
16 see if I have this right.  It looks like
17 you're looking at a laptop that we can
18 see on the screen.  Is that where you can
19 navigate through the document, as you
20 want to navigate it?
21      A.   You know, I think in theory.
22 Right now, it just says there's no files
23 in here.  Do I need to download?
24          MR. STOY:  If you hit

Page 16

1      refresh, it should show up and
2      you'll be able to download it.
3          THE WITNESS:  Okay.  Thank
4      you.
5          Yes, I have it on the laptop
6      as well as seeing it on the
7      screen.
8  BY MR. NIGH:
9       Q.   Okay.  And the one that
10 you're seeing on the screen is -- you
11 know, I'll direct the trial tech to move
12 through it to kind of orient you on where
13 I'm asking you questions in the document.
14         So first, if we can
15 highlight the notice to take videotaped
16 oral deposition.
17         Doctor, do you see this?
18 This is a notice for deposition?
19      A.   Yes, I see that.
20      Q.   And you can see your name,
21 the third line where it says, of
22 Dr. Karla Ballman, on February 22nd, '22.
23         Do you see that?
24      A.   Yes.

Page 17

1       Q.   Now, before today, have you
2  seen this deposition notice?
3       A.   I believe I have.
4       Q.   Okay.  Let's take a look at
5  the third page.  It's titled Exhibit A
6  and document requests.
7          Do you see this here?
8       A.   I do.
9       Q.   And it asks for a list of
10 documents.  Do you believe that you
11 provided all responsive documents to us?
12      A.   Yes, I believe I have.
13         MR. NIGH:  Okay.  Let's
14 take -- let's pull that down.
15 Let's take a look at LP 1797.
16         (Document marked for
17         identification as Exhibit
18         Ballman-2.)
19 BY MR. NIGH:
20      Q.   I'll represent to you this
21 is the defendant's responses and
22 objections to your notice.  It will
23 probably take a few seconds after I call
24 it up to land in your folder.

Confidential Information - Subject to Protective Order

Page 18

1      TRIAL TECH:  You may need to
2  refresh.
3      THE WITNESS:  Okay.
4  BY MR. NIGH:
5      Q.   Okay.  And this is -- do you
6  see where it's titled "Defendant's
7  Responses and Objections to Plaintiffs'
8  Notice of Videotaped Deposition of Karla
9  Ballman"?
10     A.   Yes.
11     Q.   Okay.  And let's turn to
12  Page 2.  Sorry, Page 3, Request 2.
13         Now, Request 2 ask for any
14  notes, written or electronic, reflecting
15  consulting or litigation work that has
16  not been documented in invoices.
17         Doctor, as you were
18  reviewing -- as you were reviewing
19  studies or other documents or the master
20  complaint, did you take notes anywhere in
21  terms of, you know, jotting down your
22  thoughts in regards to those studies or
23  the complaint or the response that you
24  reviewed?

Page 19

1      MR. STOY:  Object to the
2  form.
3      THE WITNESS:  I only took
4  notes that were part of my
5  ultimate report.  So I put notes
6  in the report.
7  BY MR. NIGH:
8      Q.   Okay.  Let's take a look at
9  Page 4.  At the bottom you can see it
10  says, copy -- well, let me ask you
11  something.
12         When you would review the
13  scientific studies, would you make
14  highlights or underline certain things in
15  the studies themselves?
16     A.   No, I did not.
17     Q.   Okay.  Number 4 -- Page 4,
18  Number 5 says, "Copies of any documents
19  or articles relied upon for the opinions
20  set forth in the report served, if not
21  listed."
22         And we will see that
23  Appendix B attached to your report, you
24  have a list of materials relied upon.

Page 20

1      I believe that you've
2  produced us all of those documents,
3  correct?
4      A.   Yes.  That was my
5  understanding.
6      Q.   And now Number 6 says,
7  "Copies of any documents or articles
8  reviewed in connection with reports
9  served, whether or not listed in the
10  report or attachments thereto."
11         We don't have any additional
12  documents that were produced to us.  So
13  were there no additional documents that
14  you considered as you were undertaking
15  your expert opinion in this work?
16     A.   So can I ask for
17  clarification?
18     Q.   Yes.
19     A.   May I ask -- so if I
20  reviewed some of the articles that were
21  in the expert reports, were those not
22  supplied?
23     Q.   I don't have any additional
24  articles that were supplied.  So which

Page 21

1  articles do you believe that you reviewed
2  that were part of the expert reports?
3      A.   Well, I thought they were
4  given under things considered.  But...
5      Q.   Are there additional
6  documents that you're thinking that you
7  reviewed?
8      A.   Not that I relied on --
9  well, yes.  It was my understanding that
10  there's also a list of materials
11  considered that concluded all the things
12  cited in the expert reports, because I
13  did look at those studies.
14     Q.   Well, which of those studies
15  did you look at?
16     A.   Off the top of my head,
17  I -- I couldn't list them all with
18  complete accuracy.
19     Q.   I appreciate that because,
20  you know, Dr. Panigrahy's report has
21  almost 600 cites in it, as you'll
22  probably recall.
23     A.   It was more Dr. Madigan's
24  report, not Dr. Panigrahy's.

Confidential Information - Subject to Protective Order

Page 22

1    Q.   So you don't recall
2 reviewing any additional cited documents
3 from Dr. Panigrahy's report, correct?
4    A.   Correct, not other than
5 what's listed in my Exhibit B and what
6 were in Dr. Madigan's report.
7    Q.   I see.
8        MR. NIGH:  Okay.  We can go
9    ahead and take this down.
10       Actually, let's go ahead and
11   put that back up.  We're going to
12   go back to LP 1797.
13 BY MR. NIGH:
14   Q.   Doctor, I'm going to turn to
15 Page 6.  Just ask you about some of your
16 prior testimony.
17       You'll see it at the top of
18 Page 6.  It says, "By way of further
19 response, Dr. Ballman has testified to
20 the following matters in the past four
21 years."  And it gives three bullet
22 points.
23       Do you see that?
24   A.   I do.

Page 23

1    Q.   Okay.  So you've testified
2 in Viagra and Cialis case, the talc
3 powder case, and BTG International
4 Limited cases?
5    A.   Yes.
6    Q.   And in each of those, did
7 you provide deposition testimony?
8    A.   Yes.  I testified twice in
9 the patent case, which is the third
10 bullet, I believe.  And for the Canadian
11 courts, I was not deposed.  So I was
12 deposed a total of three times.
13   Q.   I'm sorry.  When you said
14 the Canadian courts, what do you mean by
15 that?
16   A.   So there was -- the case was
17 held in the U.S. courts, and then there
18 was an analogous case in the Canadian
19 courts.
20   Q.   I see.  So you testified in
21 the Canadian courts -- the Canadian case?
22   A.   I did.
23   Q.   Okay.  When you said
24 testified in the Canadian case, do you

Page 24

1 mean a trial?
2    A.   I mean a trial.
3    Q.   And did you also testify at
4 trial in the U.S. case?
5    A.   I did.
6    Q.   Okay.  And then you gave a
7 deposition a total of one time in that
8 case as well, correct?
9    A.   That's correct.
10   Q.   Okay.  And for the Johnson &
11 Johnson, did you give deposition in the
12 talc case?
13   A.   I did.
14   Q.   Okay.  Did you ever provide
15 any live testimony in any hearing or
16 trial?
17   A.   I did not, no.
18   Q.   For Viagra and Cialis, did
19 you provide a deposition in that case?
20   A.   Yes.
21   Q.   And did you ever give any
22 live testimony, either in a hearing or a
23 trial?
24   A.   No.

Page 25

1    Q.   No?  Okay.
2    A.   Sorry, I didn't mean to
3 interrupt you.
4    Q.   Every now and then, I have a
5 little bit of a longer pause, so it's
6 okay.
7        Other than these three
8 cases, have you provided testimony in any
9 other cases in the last four years?
10   A.   No.
11   Q.   Okay.  Now, other than the
12 last four years, have you given any
13 depositions or trial testimony in any
14 other cases before the last four years?
15       MR. STOY:  Object --
16       THE WITNESS:  No.
17       MR. STOY:  -- to the form.
18       Go ahead.
19       THE WITNESS:  No.
20 BY MR. NIGH:
21   Q.   Were you ever an expert in
22 any case other than these three cases?
23       MR. STOY:  Object to the
24   form.

Page 26

1          And Dr. Ballman, let me just
2    caution you with respect to your
3    response and ask you to limit it
4    to a disclosed testifying expert
5    and to not disclose any matters
6    where you may be consulting but
7    are not disclosed to testify.
8          THE WITNESS:  These are the
9    only three matters in which I have
10   been a disclosed expert witness.
11   BY MR. NIGH:
12   Q.   Okay.  For the Viagra/Cialis
13   case, were you retained on behalf of the
14   defendants?
15   A.   Yes.
16   Q.   For the Johnson & Johnson
17   talc case, were you retained on behalf of
18   the defendants?
19   A.   Yes.
20   Q.   And for the BTG
21   International Limited case, who retained
22   you?
23        A.   The manufacturers of
24   abiraterone, and I cannot remember off

Page 27

1    the top of my head.  It might have been
2    Janssen Oncology.
3    Q.   Okay.  So in all of these
4    cases you have been retained and provided
5    testimony on behalf of pharmaceutical
6    companies; is that correct?
7    A.   Yes.  Yes.
8    Q.   And are there any other
9    litigations where you've been retained on
10   behalf of pharmaceutical companies?  I'm
11   not asking you for which litigations, but
12   are there any others in which you've been
13   retained?
14        A.   No.
15   Q.   Other than those three
16   litigations and this valsartan
17   litigation, have you provided an expert
18   report in any other litigation?
19        A.   No.
20        MR. NIGH:  Okay.  We can go
21   ahead and take this down.  Let
22   take a look at LP 1796.
23        (Document marked for
24   identification as Exhibit

Page 28

1    Ballman-3.)
2         MR. NIGH:  We'll mark this
3    as Exhibit 3.
4    BY MR. NIGH:
5    Q.   And Doctor, is this your
6    invoice for work that you billed on
7    behalf of the valsartan litigation?
8    A.   Yes.
9    Q.   Okay.  And did you initially
10   meet with the legal team on November 29,
11   2021?
12   A.   For this particular expert
13   report, yes.
14   Q.   When did you first meet with
15   any of the lawyers for the valsartan
16   litigation?
17   A.   Off of the top of my head, I
18   do not remember an exact date.  But I
19   think I was contacted maybe late 2020 or
20   early 2021 and retained at that point in
21   terms of signing a letter of agreement.
22   Q.   Did you do any work from the
23   date that you signed that retainer
24   agreement until November 29th, 2021?

Page 29

1    A.   I did not.
2    Q.   Okay.  So no other work on
3    valsartan in any capacity before
4    November 29th, 2021?
5    A.   That's correct.
6    Q.   Okay.  And if you turn the
7    page, we can see that you spent a total
8    of 41 and a half hours; is that correct?
9    A.   Yes.
10   Q.   And your total charge as of
11   January 12th, 2021, would be $16,600?
12   A.   Yes.
13   Q.   Now, how many hours have you
14   spent on valsartan after January 12,
15   2021, approximately?
16   A.   I'd say approximately
17   between 15 to 20 hours.
18   Q.   And that would be -- part of
19   that time would be preparing for the
20   deposition?
21   A.   That is correct.
22        MR. NIGH:  Okay.  Let's go
23   ahead and take that down.
24        Let's mark your expert

Confidential Information Subject to Protective Order

Page 30

1    report as Exhibit 4.
2         (Document marked for
3    identification as Exhibit
4    Ballman-4.)
5         MR. NIGH:  That's LP 1768.
6  BY MR. NIGH:
7    Q.   Doctor, when you were
8  initially contacted -- strike that.
9  Start over.
10        Doctor, when you were asked
11  to do -- to write an expert report, what
12  was the task that you were asked to do?
13   A.   So I was asked to determine
14  whether there is evidence that supports
15  the use of proposed thresholds that were
16  based upon the expert reports of
17  Drs. Panigrahy and Madigan, and then also
18  to try to try to determine how the
19  thresholds were derived.
20   Q.   And did you have difficulty
21  determining how the thresholds were
22  derived?
23        MR. STOY:  Object to the
24    form of the question.

Page 31

1         You can answer.
2         THE WITNESS:  I am not sure
3    what you mean by difficulty.
4         I mean, I tried various
5    different things to try to
6    determine how the thresholds were
7    derived.  But there was no
8    explanation as to how the
9    thresholds were derived.
10        So that's why I had to try
11   many different ways of trying to
12   come up with those thresholds.
13  BY MR. NIGH:
14   Q.   Now, when you said the
15  thresholds, do you mean the LCEs
16  calculated by Madigan and Panigrahy, or
17  do you mean the thresholds as described
18  in the medical monitoring complaint?
19   A.   I mean the thresholds as
20  described in the medical monitoring
21  complaint.
22   Q.   When you looked at the LCEs
23  as calculated by Dr. Madigan, did you
24  understand how he was calculating those

Page 32

1  LCEs?
2    A.   Yes.  I was able to
3  reproduce the numbers that he calculated
4  and, yes.
5    Q.   And you didn't -- your
6  report doesn't list any criticisms of how
7  he calculated those LCEs, correct?
8    A.   I did not find any problems
9  with the math that he did, no.
10   Q.   Okay.  And were you able to
11  see how Dr. Panigrahy calculated the
12  LCEs?
13   A.   Again, given his explanation
14  of the formula he used and the values
15  that he used in the formulas, I too was
16  able to match the numbers that he
17  ultimately produced.
18   Q.   Now, both Panigrahy and
19  Madigan had some different approaches as
20  to how they calculated LCE -- their LCEs,
21  correct?
22        MR. STOY:  Object to the
23    form.
24        You can answer.

Page 33

1         THE WITNESS:  I'm not sure
2    if their approach is different.  I
3    think they used different values.
4  BY MR. NIGH:
5    Q.   Okay.  So for example, in
6  calculating LCEs for Hidajat, Dr. Madigan
7  didn't give any adjustment for the amount
8  that would actually be inhaled versus
9  exhaled, correct?
10   A.   That is correct.  He did not
11  make an adjustment for the amount that
12  might be exhaled.
13   Q.   And Dr. Panigrahy did make
14  an adjustment for that, correct?
15   A.   Yes, he did make an
16  adjustment for that.
17   Q.   And the ages that they used
18  in terms of the amount of years that they
19  would be ingesting NDMA, the ages they
20  used were different between the two,
21  correct?
22   A.   I -- so I'm not able to
23  answer that without looking at their
24  reports.  I know they both used some

Confidential Information - Subject to Protective Order

Page 34

¹ ages, and they described how they used
² those ages.  So this may be one of those
³ values that I mentioned differed between
⁴ the two experts.
⁵     Q.   Have you ever calculated
⁶ lifetime cumulative exposures in your
⁷ work?
⁸     A.   My work has never called for
⁹ a calculation of lifetime cumulative
¹⁰ exposures because that number in the
¹¹ research I do in cancer research is not
¹² really a meaningful number.  So no.
¹³     Q.   Now, have you ever reviewed
¹⁴ toxicologists' opinions where they
¹⁵ calculate LCEs, or lifetime cumulative
¹⁶ exposures?
¹⁷     A.   I have not.
¹⁸     Q.   So this would be the first
¹⁹ time that you're looking at lifetime
²⁰ cumulative exposures?
²¹     MR. STOY:  Object to the
²² form of the question.
²³     THE WITNESS:  It is the
²⁴ first time that I was doing a

Page 35

¹     calculation of lifetime cumulative
²     exposures.  I am not sure if it's
³     the first time I've ever seen the
⁴     concept or read a paper with them.
⁵ BY MR. NIGH:
⁶     Q.   Are you aware that, in
⁷ calculating lifetime cumulative
⁸ exposures, it's common -- lifetime
⁹ cumulative exposures in diet that it's
¹⁰ common not to include the adolescent
¹¹ years or childhood years in calculating
¹² LCEs?
¹³     MR. STOY:  Object to the
¹⁴ form.
¹⁵     THE WITNESS:  That is
¹⁶ outside the scope of my charge.
¹⁷ But to my knowledge, I do not know
¹⁸ whether or not the childhood years
¹⁹ are included or not within those
²⁰ exposures.  I would think it would
²¹ depend upon what the individual is
²² being exposed to.
²³ BY MR. NIGH:
²⁴     Q.   Do you have -- when you

Page 36

¹ undertook your task of looking at LCEs,
² did you ever look at anything in terms of
³ how much NDMA infants, children, and
⁴ adolescents are being exposed to compared
⁵ to adults?
⁶     MR. STOY:  Object to the
⁷ form.  Scope.
⁸     THE WITNESS:  Again, that is
⁹ outside the scope of what I was
¹⁰ asked to do.
¹¹     I was asked to review the
¹² lifetime cumulative thresholds
¹³ that were in the medical
¹⁴ monitoring plan and then determine
¹⁵ whether or not there is evidence
¹⁶ to support the use of those
¹⁷ thresholds, and then to determine
¹⁸ how those thresholds might have
¹⁹ been derived given the information
²⁰ in the two expert reports of
²¹ Dr. Panigrahy and Madigan.
²² BY MR. NIGH:
²³     Q.   So you wouldn't have any
²⁴ understanding that the lifetime

Page 37

¹ cumulative exposures that Madigan and
² Panigrahy calculated are conservative
³ because they include the years for their
⁴ adolescent years and childhood years,
⁵ correct?  You have no opinion on that?
⁶     MR. STOY:  Object to the
⁷ form.
⁸     THE WITNESS:  Again, that
⁹ was outside my scope.  I just took
¹⁰ the numbers, because it was
¹¹ referenced in the medical
¹² monitoring report that it was
¹³ based upon the information in
¹⁴ those two expert reports.
¹⁵     Within those two expert
¹⁶ reports, I do not recall a
¹⁷ discussion as to whether or not it
¹⁸ was a conservative approach to
¹⁹ include the infant and adolescent
²⁰ years.
²¹ BY MR. NIGH:
²²     Q.   So you would have no opinion
²³ on that, correct?
²⁴     A.   Again, I -- outside the

Confidential Information - Subject to Protective Order

Page 38

1 scope of what I was asked to do.  So at
2 this point I would have to do some
3 research as to when those should be or
4 should not be included, so I cannot
5 render an opinion right now.
6     Q.   Doctor, your opinions of the
7 program are based on your review of
8 Madigan and Panigrahy's LCEs, correct?
9     A.   They are based upon the
10 expert reports in which both expert
11 reports did have a component that
12 calculated LCEs.
13     Q.   So in reaching your
14 opinions, it would be important for you
15 to understand Madigan and Panigrahy's
16 opinions in order to form your opinions
17 that criticize the plaintiffs' proposed
18 medical monitoring program, correct?
19          MR. STOY:  Object to the
20 form.
21          THE WITNESS:  I'm sorry.
22 I'm trying to digest that
23 question.  I'm not sure what I'm
24 being asked.

Page 39

1          Nowhere in their report did
2 I see them calculate lifetime
3 cumulative thresholds or a
4 discussion of that.
5          The only place that I did
6 see that was in the medical
7 monitoring document.
8 BY MR. NIGH:
9     Q.   I'm trying to understand --
10 I'm simply asking you that in order to
11 form your opinions that criticize the
12 plaintiffs' proposed medical monitoring
13 program, it would be important for you to
14 understand Madigan and Panigrahy's
15 opinions, correct?
16          MR. STOY:  Object to the
17 form.  Asked and answered.
18          THE WITNESS:  I'm not sure.
19 Opinions to what?
20          I think it's important to
21 understand, you know, what they
22 stated and their conclusions,
23 which I believe I do, to some
24 extent, as well as how they

Page 40

1 generated their lifetime
2 cumulative exposures, which I
3 mentioned I was able to replicate.
4 BY MR. NIGH:
5     Q.   On the task that you were
6 set out, when you just said that you were
7 asked to determine whether there's
8 evidence that supports the use of the
9 proposed thresholds based upon the expert
10 reports of Dr. Panigrahy and Madigan.
11          So your task was to see if
12 there's support and the basis of it is
13 the expert reports of Dr. Panigrahy and
14 Madigan, correct?
15          MR. STOY:  Object to the
16 form.
17          THE WITNESS:  I did use
18 those expert reports, because they
19 were cited by the medical
20 monitoring plan as the basis for
21 trying to see if there's evidence
22 to be able to propose lifetime
23 cumulative thresholds.
24 BY MR. NIGH:

Page 41

1     Q.   So it would be important for
2 you, as you formulate your opinions, to
3 understand the opinions of Dr. Panigrahy
4 and Madigan, correct?
5          MR. STOY:  Objection to
6 form.  Asked and answered.
7          THE WITNESS:  Again, I'm not
8 sure -- I do understand their
9 conclusion.  But I don't think it
10 necessitates me to agree
11 necessarily with their
12 conclusions.
13 BY MR. NIGH:
14     Q.   And if you misunderstood the
15 opinions of Dr. Panigrahy and Madigan,
16 then that could be problematic for your
17 criticisms, correct?
18          MR. STOY:  Objection to
19 form.  Incomplete hypothetical.
20          THE WITNESS:  I do not
21 believe I misunderstood their
22 conclusions.
23 BY MR. NIGH:
24     Q.   I didn't ask you if --

Confidential Information Subject to Protective Order

Page 42

¹ whether or not you believe you
² misunderstood their conclusions.
³        I asked you, if you
⁴ misunderstood the opinions of Dr. Madigan
⁵ and Panigrahy, then that could be
⁶ problematic for your criticisms, correct?
⁷        MR. STOY:  Same objection.
⁸        THE WITNESS:  I believe it
⁹    depends.  So how might I miss --
¹⁰    I'm not sure how I might
¹¹    misunderstand in a way that might
¹²    affect what I had done.
¹³        I think there could be
¹⁴    different -- different types of
¹⁵    misunderstanding that might lead
¹⁶    to different things.  So I'm just
¹⁷    not sure how to answer that.
¹⁸ BY MR. NIGH:
¹⁹    Q.   I used the word "could"
²⁰ intentionally in my question.  And I want
²¹ to focus on that again.
²²        I asked you if you
²³ misunderstood the opinions of Dr. Madigan
²⁴ and Panigrahy, then that could be

Page 43

¹ problematic for your criticisms, correct?
²        MR. STOY:  Same objection.
³        THE WITNESS:  Again, it's
⁴    very hard to answer that
⁵    hypothetical without understanding
⁶    in what manner I may have
⁷    misunderstood their conclusions.
⁸        I think that the answer
⁹    depends on the type of
¹⁰    misunderstanding.
¹¹ BY MR. NIGH:
¹²    Q.   Do you believe that you
¹³ could completely misunderstand their
¹⁴ opinions and your conclusions and
¹⁵ criticisms would still be accurate?
¹⁶        MR. STOY:  Objection to
¹⁷    form.  Incomplete hypothetical.
¹⁸        THE WITNESS:  I'm sorry.
¹⁹    Can you repeat that question
²⁰    again?  I just want to make sure I
²¹    heard it.
²² BY MR. NIGH:
²³    Q.   Do you believe that you can
²⁴ completely misunderstand the opinions by

Page 44

¹ Dr. Panigrahy and Dr. Madigan, and your
² conclusions and criticisms would still be
³ accurate?
⁴        A.   Again, I -- I would need to
⁵ know what completely misunderstands
⁶ means.
⁷        As I stated, I do not
⁸ believe I misunderstood their
⁹ conclusions.  As to their opinions, they
¹⁰ may have had opinions that throughout
¹¹ that weren't in their conclusions.
¹²        I just -- that's just too
¹³ broad for me to answer.  I'm sorry.
¹⁴    Q.   But we can agree that
¹⁵ Dr. Panigrahy and Dr. Madigan's opinions
¹⁶ form the basis -- or form a basis of your
¹⁷ opinions, correct?
¹⁸        MR. STOY:  Object to the
¹⁹    form.
²⁰        Go ahead.
²¹        THE WITNESS:  No, I don't
²²    think that's true.  I don't think
²³    it's based on their opinions.
²⁴        I think it's based on their

Page 45

¹    complete reports and the
²    information that is in the
³    reports, that -- because the
⁴    medical monitoring plan just cited
⁵    that that was the basis.
⁶        It did not state that their
⁷    opinions was the basis for
⁸    deriving the stated lifetime
⁹    cumulative thresholds.
¹⁰ BY MR. NIGH:
¹¹    Q.   So you believe that
¹² Dr. Panigrahy and Dr. Madigan's complete
¹³ reports and the information in those
¹⁴ reports would form part of the basis of
¹⁵ your opinions and criticisms?
¹⁶        A.   Within the scope of what I
¹⁷ was asked to do, was to determine whether
¹⁸ there is evidence that supports the use
¹⁹ of the proposed thresholds based upon the
²⁰ expert reports.  So I did use those
²¹ expert reports to look to see if I felt
²² there was evidence to support a proposed
²³ lifetime cumulative threshold.
²⁴    Q.   So in order to examine

Confidential Information Subject to Protective Order

Page 46

¹ whether or not there is evidence to
² support a proposed lifetime cumulative
³ threshold, it would have been necessary
⁴ for you to review and understand
⁵ Dr. Panigrahy and Dr. Madigan's reports,
⁶ correct?
⁷          MR. STOY:  Object to the
⁸     form.
⁹          THE WITNESS:  Yes, it
¹⁰     would -- it would require me --
¹¹     and I did review their reports,
¹²     and I believe I did understand
¹³     what they were saying.
¹⁴ BY MR. NIGH:
¹⁵     Q.    Now, some of the work that
¹⁶ you undertook were calculations, correct?
¹⁷     A.    Correct.
¹⁸     Q.    And if you are missing
¹⁹ certain steps in a calculation, then your
²⁰ ultimate answer would be incorrect, or
²¹ could be incorrect, correct?
²²          MR. STOY:  Objection.
²³     Incomplete hypothetical.
²⁴     Go ahead.

Page 47

¹          THE WITNESS:  The
²     calculations I undertook was to
³     try to replicate the proposed
⁴     thresholds in the medical
⁵     monitoring plan.
⁶          And there was no information
⁷     really provided within those
⁸     plans, other than that they relied
⁹     upon the expert reports.
¹⁰          So I had no steps to follow.
¹¹ BY MR. NIGH:
¹²     Q.    Now, let's take a look at
¹³ Page 14 of your report.
¹⁴          MR. NIGH:  And that first
¹⁵     full paragraph, if we can put that
¹⁶     up on the screen, that first full
¹⁷     paragraph.
¹⁸ BY MR. NIGH:
¹⁹     Q.    It says, "In the absence of
²⁰ clearly specified" --
²¹          MR. NIGH:  We can go down.
²²     It's not on the screen here.
²³ BY MR. NIGH:
²⁴     Q.    "In the absence of clearly

Page 48

¹ specified values, I tried to determine
² the impurity amounts for NDMA and NDEA in
³ 320-milligram of valsartan using the LCEs
⁴ in Dr. Madigan's report and the time
⁵ thresholds proposed for each manufacturer
⁶ proposed by the plaintiffs."
⁷          Do you see that?
⁸     A.    Yes.
⁹     Q.    And you believe that this
¹⁰ was part of the task that you were asked
¹¹ to perform by defense counsel, correct?
¹²     A.    Yes.  I was asked to try to
¹³ determine how the proposed thresholds in
¹⁴ the medical monitoring plan were derived.
¹⁵     Q.    And next you said, "I would
¹⁶ note at the outset that any statistical
¹⁷ methodology requiring a reviewer to back
¹⁸ into the data in this manner -- that is,
¹⁹ to use the outcomes to try to determine
²⁰ the inputs -- is at best incomplete and
²¹ likely invalid."
²²          What do you mean by that
²³ sentence?
²⁴     A.    I mean that's not a

Page 49

¹ scientifically sound method to do
² something.  What would be scientifically
³ sound is if a threshold is proposed, that
⁴ it's very clear what was used in order to
⁵ come up with the threshold so someone
⁶ else could replicate the work easily in
⁷ terms of what formula was used, in terms
⁸ of what inputs were used, and so forth.
⁹          And so what I mean is within
¹⁰ the medical monitoring report, there are
¹¹ just thresholds proposed with a citation
¹² that says, "This is based upon the expert
¹³ reports of Dr. Panigrahy and Dr.
¹⁴ Madigan," in whom's reports did not
¹⁵ propose a lifetime cumulative threshold.
¹⁶          And so there were many
¹⁷ assumptions missing in the derivation of
¹⁸ those thresholds.  And so if there's
¹⁹ missing assumptions, one has to try to
²⁰ make guesses, and that's not a very
²¹ scientific method.
²²     Q.    So the task that you were
²³ asked to carry out would not have been a
²⁴ very scientific method because you're

Confidential Information - Subject to Protective Order

1 having to back into the data?
2           MR. STOY:  Object to the
3      form.  Misstates testimony.
4           THE WITNESS:  No.  What I
5      was saying was that the medical
6      monitoring report that proposed
7      the thresholds did not provide a
8      scientific basis for how those
9      thresholds were proposed, other
10     than saying that they relied upon
11     the expert reports of
12     Dr. Panigrahy and Dr. Madigan.
13          And within those reports,
14     there are no lifetime cumulative
15     thresholds proposed, nor is there
16     a discussion of how those might be
17     derived.
18 BY MR. NIGH:
19     Q.   Yeah, but you were asked to
20 try and recreate or to do the math as to
21 how those lifetime cumulative thresholds
22 were proposed, correct?
23     A.   I was asked in the sense
24 that perhaps, you know, their -- I don't

1 believe -- I was asked as an expert to
2 review those expert reports to see if
3 there was some methodology proposed on
4 how those were derived.
5      Q.   So you were a reviewer,
6 correct?
7           MR. STOY:  Object to the
8      form.
9           THE WITNESS:  No.  I'm an
10     expert.
11          I, you know, I -- this is
12     basically a classification
13     problem.
14          It's classifying people as
15     to those at an increased risk for
16     cancer and those not at increased
17     risk for cancer.  And I have done
18     several classification studies
19     within cancer.
20          And so I took the approach
21     of, you know, what I would expect
22     to see in order to have scientific
23     evidence in support of the
24     lifetime cumulative thresholds.

1 BY MR. NIGH:
2      Q.   When you attempted to
3 calculate these thresholds, did you also
4 find that it was difficult for you to do
5 so because you were having to back into
6 the data in that manner?
7      A.   I found it was difficult to
8 do so, because it was essentially one
9 equation and two unknowns.  And that is
10 just something that cannot be solved.
11     Q.   Now, when you said one
12 equation and two unknowns, did you come
13 up with two unknowns because you couldn't
14 figure out how to reach those LCEs from
15 valsartan -- from the valsartan pills
16 in -- the NDMA and/or NDEA in the
17 valsartan pills?
18          MR. STOY:  Object to the
19     form.
20          THE WITNESS:  So I -- as I
21     mentioned, I was able to reproduce
22     the LCEs that are proposed or that
23     are mentioned in both the expert
24     reports, because those are clearly

1 stated as to, you know, the length
2      of exposure, the amount of
3      impurity within the valsartan, and
4      you know, the necessary things in
5      order to come up with the lifetime
6      cumulative exposure.
7           I did do that.
8 BY MR. NIGH:
9      Q.   So you didn't have any
10 criticisms of how Madigan or Panigrahy
11 calculated their LCEs, correct?
12          MR. STOY:  Objection.  Asked
13     and answered.
14          Go ahead.
15          THE WITNESS:  I believe I
16     did answer that before.  And I
17     said that, given what they said
18     they used and the equation they
19     used, I was able to match the
20     numbers that they produced.
21 BY MR. NIGH:
22     Q.   I see.
23          Now, in terms of trying to
24 understand how three months of ZHP -- or

Page 54

¹ products -- or valsartan pills that used
² ZHP API, were you able to understand how
³ that could reach increased risk of
⁴ gastric cancer?
⁵        MR. STOY:  Object to the
⁶    form.
⁷        THE WITNESS:  So I do not
⁸    believe that -- there's an
⁹    assumption in there that I'm
¹⁰   having a hard time with, in that I
¹¹   don't believe there's been
¹²   evidence that any sort of exposure
¹³   to any level of impurity within
¹⁴   valsartan leads to an increased
¹⁵   risk of gastric cancer.
¹⁶        So beyond that, then it's
¹⁷   hard to answer the rest of it.
¹⁸ BY MR. NIGH:
¹⁹    Q.   I'm sorry.  You don't
²⁰ believe there's been evidence that any
²¹ sort of exposure to any level of impurity
²² within valsartan leads to an increased
²³ risk of gastric cancer?
²⁴    A.   I believe that there has

Page 55

¹ been associations observed in
² observational studies of an association
³ between levels of impurities within
⁴ valsartan and increased gastric cancer,
⁵ but that's not causal.  And so all I can
⁶ say is there have been published
⁷ associations.
⁸    Q.   Did you review
⁹ Dr. Panigrahy's report where he gives the
¹⁰ opinion that ingestion of NDMA in
¹¹ valsartan pills causes or is capable of
¹² causing gastric cancer?
¹³        MR. STOY:  Objection.
¹⁴    Scope.
¹⁵        THE WITNESS:  Yeah, I was
¹⁶    not asked to opine upon the
¹⁷    causation question.  So that is
¹⁸    outside my scope.
¹⁹ BY MR. NIGH:
²⁰    Q.   Okay.  You gave the answer
²¹ in terms of an assumption.  You don't
²² believe there's been any evidence that
²³ any sort of exposure to any level of
²⁴ impurity within valsartan leads to an

Page 56

¹ increased risk of gastric cancer.
²        And you reviewed
³ Dr. Panigrahy's report, correct?
⁴    A.   Yes.
⁵    Q.   So Dr. Panigrahy provides
⁶ that evidence, or at least that opinion,
⁷ expert opinion, correct?
⁸        MR. STOY:  Object to the
⁹    form.
¹⁰        THE WITNESS:  You know, I
¹¹    don't have Dr. Panigrahy's report
¹²    in front of me.
¹³        You know, he may have opined
¹⁴    that the trace impurities within
¹⁵    valsartan caused gastric cancer.
¹⁶        And if he did so, I do not
¹⁷    agree with that conclusion.
¹⁸ BY MR. NIGH:
¹⁹    Q.   Where did you see the word
²⁰ "trace impurities" anywhere?
²¹    A.   I did not see it anywhere.
²² But that -- I mean, there are impurities
²³ within valsartan, and that's not the bulk
²⁴ of what's in valsartan.  So that's why I

Page 57

¹ called it a trace.
²    Q.   Do you believe that having
³ NDMA that's over 200 times the acceptable
⁴ levels set by the FDA are trace?
⁵        MR. STOY:  Objection to
⁶    form.  Objection.  Beyond the
⁷    scope of her report.
⁸        THE WITNESS:  So I'm not a
⁹    regulator.  And so -- and it's
¹⁰    beyond -- again, I didn't look at
¹¹    sort of causation.
¹²        But having said that, I know
¹³    that the level set by the FDA is a
¹⁴    theoretical level, and it's based
¹⁵    upon a level under which they
¹⁶    believe it is safe.
¹⁷        That does not imply that
¹⁸    anything -- you know, that levels
¹⁹    above that number are unsafe.  And
²⁰    they did not set a threshold for
²¹    what they believe to be an unsafe
²²    level.
²³        They've only set a threshold
²⁴    for what they believe to be a safe

Confidential Information Subject to Protective Order

Page 58

1  level, not necessarily based on
2  scientific evidence -- there is no
3  evidence in humans -- but based
4  upon sort of assumptions they made
5  in doing their calculation, which
6  is in their right to do as a
7  regulator.
8  BY MR. NIGH:
9      Q.  Have you reviewed FDA
10 documents where they state that there
11 should be no NDMA in medications?
12     MR. STOY:  Objection.
13 Beyond the scope.
14     THE WITNESS:  Again, that's
15 beyond the scope of what I was
16 asked to do.  So I did not review
17 those -- any FDA documents that --
18 with that statement in it, as far
19 as I'm aware.
20 BY MR. NIGH:
21     Q.  When you said they did not
22 set a threshold for what they believed to
23 be an unsafe level, why do you believe
24 that the FDA then asked all the

Page 59

1  medication that's over 96 nanograms of
2  NDMA to be recalled?
3      MR. STOY:  Objection.  Form.
4  Calls for speculation.  Beyond the
5  scope.
6      THE WITNESS:  Yeah, again
7  I'm not a regulator.  And I don't
8  know what fed into FDA's decisions
9  to do or not to do something.
10     All I know is that the level
11 they decided to set is a level
12 that they felt that anything below
13 that would be safe.
14 BY MR. NIGH:
15     Q.  Now, you said that they
16 didn't say anything about levels above it
17 being unsafe.
18     But they did ask for all
19 that medication to be recalled.  So you
20 don't equate a recall with unsafe?
21     MR. STOY:  Objection.  Form.
22 Scope.
23     THE WITNESS:  Again, I'm not
24 a regulator.  All I can say is

Page 60

1  that, you know, they made the
2  decision.  They set the level.
3  And they set a level that under
4  which they knew it would be safe.
5      And they did not set a level
6  above which it would be unsafe.
7      And I believe that as
8  regulators, they just want to make
9  sure that, you know, there's clear
10 evidence that it is safe, but it
11 doesn't mean that anything above
12 it is unsafe.
13 BY MR. NIGH:
14     Q.  What do you mean by trace?
15 You said trace levels of NDMA.  What do
16 you mean by trace?  What's your
17 definition?
18     A.  My definition is, if it
19 makes up a very, very small amount of
20 what the bulk is of the object.
21     I know that's very
22 imprecise, and so -- and I know lawyers
23 like precise language.  And so that's
24 just the way that I was using trace.  No

Page 61

1  technical definition.
2      Q.  Okay.  Did you review any
3  documents that discussed how NDMA and
4  NDEA are carcinogenic at very low levels?
5      MR. STOY:  Object to the
6  form.  Misstates the record.
7  Beyond the scope.
8      THE WITNESS:  The only
9  documents that I think discuss
10 that may have been the expert
11 reports, and it was levels within
12 animals.
13     I don't think there's been
14 any data within humans as to what
15 the impact is of low levels of
16 NDMA.
17 BY MR. NIGH:
18     Q.  Did you review the WHO 2002
19 document on NDMA?
20     A.  I did not.
21     Q.  But you did review dietary
22 studies that discuss increased risk of
23 cancer at higher levels of NDMA
24 ingestion, correct?

Confidential Information - Subject to Protective Order

Page 62

1    MR. STOY:  Object to the
2 form.
3    THE WITNESS:  I did review
4 some dietary studies that showed
5 an association with -- some
6 studies showed an association with
7 increasing levels of NDMA and
8 increased cancer risk.  They just
9 showed an association.
10 BY MR. NIGH:
11    Q.    And they showed an
12 association at trace levels, correct?
13    MR. STOY:  Object to the
14 form.
15    THE WITNESS:  Again, I don't
16 have a technical definition of
17 trace levels.
18    So -- and it was in diet.
19    I just don't know.
20 BY MR. NIGH:
21    Q.   Now, using your definition
22 for trace levels in valsartan, a very
23 small amount of the product, the amount
24 of NDMA that was in food, the nanograms

Page 63

1 would be a very small percentage of the
2 food, correct?  So they would be trace?
3    MR. STOY:  Objection to form
4 and scope.
5    THE WITNESS:  Yeah, again,
6 that -- it's outside the scope of
7 what I was asked to do.
8    But as I said, there was an
9 association.  And the amounts, as
10 you stated, are probably, you
11 know, quite small compared to the
12 bulk of the foodstuffs that people
13 have ingested.
14    However, none of these
15 studies establish causation.  So
16 the increased risk with higher
17 levels of NDMA in these studies
18 well could be because maybe
19 obesity, that people that are more
20 obese, eat more.  And we know that
21 obesity is associated with many
22 cancers.
23    So there's many confounding
24 factors.

Page 64

1    There is an association, but
2 that's all I can say.
3 BY MR. NIGH:
4    Q.   Before we start going down
5 that rabbit tunnel, you didn't do
6 anything to review the epidemiology in
7 this case and make any causation
8 opinions, correct?
9    A.    Reviewing the epidemiology
10 as a whole in terms of coming up with a
11 causation opinion, I did not do.
12    That would require me to do
13 a full literature search.
14    All I did was looked at the
15 studies that were cited by Dr. Panigrahy
16 and Dr. Madigan that had to do with human
17 studies.
18    Q.    And it's rare that an
19 individual study will say that one thing
20 causes another, correct?
21    MR. STOY:  Object to the
22 form.
23    THE WITNESS:  I think it
24 depends.  You know, it depends.

Page 65

1    If you're doing it in
2 animals, because you can do a
3 randomized trial, you can say that
4 yes, in this study, the animals
5 that were randomized to agent X
6 had a higher level of tumor
7 formation than the animals
8 randomized to control.
9    So in that situation I think
10 they would say that the agent X
11 causes cancer in animals.
12 BY MR. NIGH:
13    Q.   It's rare that an individual
14 human epidemiology study will say that
15 one thing causes another, correct?
16    A.    Again, I think it just
17 depends upon what is being addressed.
18    And again, if you -- I live
19 in the world of clinical trials.  And I
20 believe that, you know, we do make
21 conclusions based on one study as to
22 whether or not a drug benefits a patient
23 or not.
24    Q.   In all of your studies that

Confidential Information - Subject to Protective Order

Page 66

1 you've published -- how many studies have
2 you published?  Can you give an estimate?
3      A.   Oh, I don't know.  Somewhere
4 over 225.
5      Q.   In all of your studies that
6 you published, are there any human
7 studies where you -- where you or the
8 study gave the opinion that one substance
9 causes an increased -- one substance
10 causes an adverse event?
11           MR. STOY:  Object to the
12      form.
13           THE WITNESS:  Again, I do
14      many clinical trials.  But I have
15      to say -- and we've actually
16      studied this -- that adverse
17      events are quite tricky.
18           And so we would say that, in
19      a clinical trial, that, you know,
20      one arm had a higher adverse event
21      rate than the other arm.  And if
22      it was a randomized trial and
23      blinded -- because if it's not
24      blinded, there are biases in there

Page 67

1      because physicians know what drugs
2      the people are getting, and so
3      they might be more inclined to
4      call an adverse event something
5      that they think is more toxic than
6      something else.
7           So, you know, we do make the
8      observation that in the control
9      arm, if it were placebo
10      controlled, compared to the
11      treatment arm, if the treatment
12      arm has a higher adverse event
13      rate, we would say that higher
14      rate is due to the treatment.
15           But again, that would have
16      to be a double-blind
17      placebo-controlled trial.
18 BY MR. NIGH:
19      Q.   So for you to make that
20 opinion in an individual study, that
21 treatment causes an adverse event, you
22 would want it to be a clinical trial and
23 a double-blinded clinical trial, correct?
24      A.   That is one instance in

Page 68

1 which one would be able to make such a
2 conclusion.
3      Q.   In all of the human
4 epidemiology studies, not the clinical
5 trial studies, that you published -- you
6 have published some epidemiology studies
7 that are not clinical trials, correct?
8      A.   Correct.
9      Q.   In all of the epidemiology
10 studies that you've published, was there
11 ever an opinion that one agent or
12 treatment causes an adverse event?
13           MR. STOY:  Object to the
14      form.
15           THE WITNESS:  I'm sorry.
16      What I'm trying to think of is --
17      I'm trying to think if I've ever
18      done a study where the primary
19      endpoint was an adverse event.
20           I found many studies that
21      establish associations, and some
22      of them could be an association
23      with an adverse event.
24 BY MR. NIGH:

Page 69

1      Q.   Can you think of a single
2 epidemiology study that you reviewed
3 where there was opinion that one agent or
4 treatment caused an adverse event, not
5 just association, but caused?
6           MR. STOY:  Object to the
7      form.
8           THE WITNESS:  So in my work,
9      and why I'm pausing to some
10      extent, is I had been an associate
11      editor and then an deputy editor
12      for the Journal of Clinical
13      Oncology.
14           In that role, over the years
15      I probably have reviewed and
16      evaluated thousands of studies.
17           I cannot say with certainty
18      that I have not seen such a study
19      that has made that conclusion.
20 BY MR. NIGH:
21      Q.   But you can't think of a
22 single study that has made that
23 conclusion, correct?
24      A.   Sitting right here, right

Page 70

1 now in front of you, I can't come up with
2 much of anything.  But no, I cannot come
3 up with a -- I cannot point to study X
4 right now.
5     Q.   And that's because causal
6 opinions in a single epidemiology study
7 are rarely reached, correct?
8         MR. STOY:  Object to the
9     form.
10        THE WITNESS:  Again, this is
11     going outside the scope of what I
12     was asked to do.
13        I was not asked to speak on
14     causation.  But when one tries to
15     establish causation based on
16     observational studies -- and I'm
17     not sure if you mean that.  Again,
18     clinical trials, yes, you can make
19     such a conclusion, as I've said.
20        And I don't know if those
21     fall under epidemiology studies or
22     not, in -- I don't know.
23 BY MR. NIGH:
24     Q.   Let me rephrase my question.

Page 71

1         And that's because causal
2 opinions in a single observational study
3 are rarely reached, correct?
4     A.   Again, I was not asked to
5 speak on causation.  But if I did a
6 causal analyses, yes, I would not base my
7 opinion, one way or the other, on the
8 conclusion of a single study, whether the
9 study concluded X causes Y or not.
10     Q.   That's not my question.
11     I'm asking you about a
12 single observational study, not you
13 looking at a single observational study,
14 okay.
15        So my question is:  In a
16 single observational study, the study
17 authors rarely reach causal opinions,
18 correct?
19        MR. STOY:  Object to the
20     form.
21        Objection.  Asked and
22     answered.
23        THE WITNESS:  Again, I don't
24     know what you mean by rarely.

Page 72

1         You know, I think many
2 studies at the end, the editors
3 would not allow, if just an
4 association were established --
5 well, if it were an observe --
6 depends upon the study design and
7 how well it was done.
8         If it was not a very good
9 study, meaning there was lots of
10 confounding in it, then yes, one
11 would not be able to conclude at
12 the end of the study that X causes
13 Y, just due to the residual
14 confounding in the study design.
15 BY MR. NIGH:
16     Q.   Can you think of a single
17 observational study where the study
18 authors reached a causal opinion in the
19 study?
20        MR. STOY:  Objection to
21     form.  Asked and answered.
22        THE WITNESS:  You know,
23     again, sitting here right now, I
24     cannot say yes, it was a study

Page 73

1 done by, you know, Dr. X and Dr. Y
2 on such as topic.  No, I cannot.
3        MR. STOY:  Daniel, we've
4     been going a little over an hour,
5     let me know whenever there's a
6     good time to take a short break.
7        MR. NIGH:  I think we can
8     take a break now.  Ten minutes.
9        THE VIDEOGRAPHER:  Off the
10     record.  10:15.
11        (Short break.)
12        THE VIDEOGRAPHER:  We are
13     back on the record at 10:27 a.m.
14 BY MR. NIGH:
15     Q.   Doctor, let's go ahead and
16 take a look at appendix B, your materials
17 relied upon list.  This is part of your
18 expert report.  I think that's Exhibit 4.
19        MR. NIGH:  We don't need to
20     put it up on the screen.
21 BY MR. NIGH:
22     Q.   And so as I run through
23 this, I want to make sure that I have
24 this accurate.

Page 74

1 You reviewed the medical
2 monitoring class action complaint,
3 correct?
4 A. Yes.
5 Q. And then you reviewed the
6 plaintiffs' memorandum of law in support
7 of the medical monitoring, correct?
8 A. Yes.
9 Q. And then you reviewed the
10 expert reports of Dr. Panigrahy and Dr.
11 Madigan, correct?
12 A. Yes.
13 Q. And did you review
14 Dr. Panigrahy's entire report or just
15 parts of his report?
16 A. I reviewed his entire
17 report.
18 Q. And did you review
19 Dr. Panigrahy's deposition testimony?
20 A. Yes.
21 Q. Did you review his whole
22 deposition transcript?
23 A. I believe I did read through
24 it, scan through it.

Page 75

1 Q. And how about Dr. Madigan's
2 deposition testimony? Did you review
3 that?
4 A. Yes.
5 Q. Did you review his whole
6 transcript?
7 A. Yes, I scanned through it at
8 least.
9 Q. And then it also looks here
10 as if you have data. And you can see a
11 bunch of Bates numbers, APL-MDL2875, on
12 down, and TEVA.
13 Would those be valsartan
14 testing results by defendants?
15 A. Yes.
16 Q. So those would be in
17 spreadsheets or other documents that
18 demonstrate the amount of NDMA or NDEA in
19 API or finished products that the
20 defendants tested, correct?
21 A. Yes.
22 Q. And then on the next page,
23 you have this link to U.S. Food and Drug
24 Administration laboratory analysis of

Page 76

1 valsartan products.
2 That would be where the FDA
3 listed their testing results of valsartan
4 finished product, correct?
5 A. I believe so. I don't
6 remember offhand exactly what was there,
7 but since it says the FDA, I presume it
8 is the FDA testing results.
9 Q. And then you also reviewed
10 some studies, correct?
11 A. Yes.
12 Q. Those would have included
13 the Goodman study, correct?
14 A. Yes.
15 Q. And the Hidajat study?
16 A. Yes.
17 Q. And the Loh study?
18 A. Yes.
19 Q. And the Song study?
20 A. Yes.
21 Q. And the Snodin study?
22 A. Yes.
23 Q. And the Zheng study,
24 correct?

Page 77

1 A. Yes.
2 Q. And that Zheng study, that's
3 the Zheng study in regards to pancreatic
4 cancer, and in there they listed results
5 related to NDMA, correct?
6 A. Yes.
7 Q. Did you look for any
8 additional studies that have been
9 published since the time that Madigan and
10 Panigrahy gave their opinions?
11 A. I did not. That was beyond
12 the scope of what I was asked to do.
13 Q. Okay. So you wouldn't be
14 aware of whether or not there's any other
15 studies that show increased risk of liver
16 cancer in terms of additional amounts of
17 NDEA in a person's diet, correct?
18 MR. STOY: Objection. Form.
19 Scope.
20 THE WITNESS: So again, I
21 did not do a literature review.
22 And did you say NDEA --
23 BY MR. NIGH:
24 Q. Yes.

Confidential Information - Subject to Protective Order

Page 78

1    A.   -- or ND --
2        Okay.  So, yeah, that was
3  beyond the scope of what I was asked to
4  do.
5        And so I am not aware of any
6  other studies that were performed looking
7  at any association between NDEA and
8  increased cancer risk.
9    Q.   And other than the studies
10  listed here and any other studies that
11  may have been listed in Dr. Madigan's
12  expert report, you did not rely upon any
13  other studies or consider other documents
14  in forming your opinions, correct?
15        MR. STOY:  Object to the
16    form.
17        THE WITNESS:  Yeah, I
18    believe I did not consider any
19    other documents beyond those that
20    are in the list of documents
21    considered as well as in Appendix
22    B here.
23  BY MR. NIGH:
24    Q.   You just said other than

Page 79

1  those in the list of documents
2  considered.  What are you referring to?
3    A.   Yeah, I may have
4  misremembered.
5        I thought that there was
6  also a list of documents considered,
7  which included things like, you know, all
8  the studies in the Madigan report.
9        And maybe I'm
10  mis-remembering from what counsel had
11  told me.
12    Q.   Okay.  So other than the
13  studies listed in Madigan's report, and
14  the studies that you relied upon here in
15  Appendix B, there wouldn't be any
16  other -- anything else in a list of
17  materials considered, correct?
18        MR. STOY:  Object to the
19    form.
20        THE WITNESS:  To the best of
21    my knowledge, from what I can
22    remember, I think that is correct.
23  BY MR. NIGH:
24    Q.   Okay.  And to the best of

Page 80

1  your knowledge, it would be this list of
2  materials relied upon and the additional
3  studies cited in Madigan's report that
4  you would have considered, correct?
5    A.   To the best of my knowledge,
6  I believe that is correct.
7    Q.   Now, Dr. Ballman, do you
8  have any experience setting up a medical
9  monitoring program?
10        MR. STOY:  Objection.
11    Scope.
12        THE WITNESS:  I was not
13    asked to have set -- to evaluate
14    that, but I do not have any
15    experience setting up a medical
16    monitoring program.
17  BY MR. NIGH:
18    Q.   Do you have any experience
19  administering a medical monitoring
20  program?
21    A.   I do not have any experience
22  administering a medical monitoring
23  program.
24    Q.   Before you offered your

Page 81

1  opinion here today, have you had any
2  litigation experience with medical
3  monitoring?
4    A.   I have not, no.
5    Q.   Do you know of any medical
6  monitoring programs that have been
7  approved by courts?
8    A.   That's outside of my
9  expertise.  I am not aware of any
10  monitoring programs that have been
11  approved by courts, so no.
12    Q.   Are you aware of any medical
13  monitoring programs in the United States?
14        MR. STOY:  Object to the
15    form.
16        Is your question ever?
17        MR. NIGH:  Yeah.
18        THE WITNESS:  And now I'm
19    struggling a bit, because I'm not
20    exactly sure if there is a
21    technical definition of a medical
22    monitoring program.
23        I am aware of screening
24    programs that are endorsed by

Confidential Information - Subject to Protective Order

Page 82

1   various medical associations, such
2   as the recommendation for one to
3   undergo lung cancer screening and
4   things like that.
5   BY MR. NIGH:
6       Q.   When you say screening
7   programs, what do you mean by that?
8       A.   What I mean is that these
9   are programs that are meant to screen
10  individuals who are considered to be at
11  high risk for developing cancer.
12      Q.   Are you aware of any
13  programs where -- for screening, where
14  people were exposed to substances?
15          MR. STOY:  Object to the
16  form.
17          THE WITNESS:  The lung
18  cancer screening program is based
19  upon people being exposed to
20  cigarette smoke, which I believe
21  is a substance.
22  BY MR. NIGH:
23      Q.   Okay.  Other than the --
24  other than for smoking, are you aware of

Page 83

1   any programs where people -- for
2   screening where people were exposed to
3   substances or carcinogens?
4       A.   So again, this is outside of
5   my area of expertise.  So off the top of
6   my head, I can't -- I can't name one,
7   because this is beyond what I do.
8       Q.   I understand.  So other than
9   smoking, it's your answer that you're not
10  aware of any other programs where people
11  are being screened that were exposed to
12  substances or carcinogens?
13          MR. STOY:  Object to the
14  form.
15          THE WITNESS:  Again, I -- I
16  mean, another thing that comes to
17  mind is I believe that people that
18  were exposed to radiation, there
19  were screening programs set up for
20  them at the end of World War II.
21          There may be other
22  substances, I just am not
23  personally aware of them.  It's
24  outside of my realm of expertise

Page 84

1   or what I do.
2   BY MR. NIGH:
3       Q.   Okay.  Doctor, I want to
4   turn your attention to Page 7 of your
5   expert report.  Actually, the bottom of
6   Page 6.
7           You write, "Even assuming,
8   however, that plaintiffs" -- that's where
9   I'm reading from.
10          "Even assuming however the
11  plaintiffs can obtain and utilize
12  pharmacy records in the manner described,
13  what they cannot do from the information
14  provided is identify whether the proposed
15  class members in fact consumed the
16  prescribed valsartan, and if so, whether
17  the consumed valsartan contained NDMA
18  and/or NDEA."
19          Do you see that?
20      A.   Yes.
21      Q.   And I'm going to start with
22  the "whether the proposed class members
23  in fact consumed their prescribed
24  valsartan."

Page 85

1           Is it your opinion that
2   there is no sufficient way for plaintiffs
3   to establish that proposed class members
4   consumed their prescribed valsartan?
5       A.   So that statement is based
6   upon my experience in clinical trials
7   where we monitor patients quite closely
8   for adherence.  And even in those
9   situations, it's pretty hard to ensure
10  that people took the medications that
11  they were prescribed to take.  So that's
12  the basis of that comment.
13      Q.   Well, in your experience in
14  clinical trials where you're monitoring
15  patients, how are you able to even
16  determine adherence?
17      A.   So in those situations,
18  patients oftentimes are asked to give --
19  to keep a drug log where they log in when
20  they have taken something.
21          But again, we have to take
22  it on faith that if they logged it in
23  that they truly did take it.
24          In some instances, we also

Confidential Information Subject to Protective Order

Page 86

¹ monitor pill counts where they are asked
² to bring in their pill bottles at each
³ visit, and the pills are counted to make
⁴ sure that, you know, they -- the correct
⁵ amount is -- had been consumed.
⁶        And then we just ask
⁷ patients and assume that they would be
⁸ truthful in telling us if they actually
⁹ adhered to the regimen.
¹⁰      Q.   Now, when you ask patients,
¹¹ why would you assume that they would be
¹² truthful in telling you that they
¹³ actually adhered to the regimen?
¹⁴      A.   We don't know for sure, but
¹⁵ I mean, as you said it's very hard to
¹⁶ determine if someone has taken medication
¹⁷ or is adherent.  But that's the best we
¹⁸ can do is to assume that people are going
¹⁹ to be truthful, like they are when they
²⁰ go to the doctor and ask how much alcohol
²¹ they've consumed, that they will just
²² give us the right -- the truthful answer.
²³      Q.   Do you know how plaintiffs
²⁴ could establish the proposed class

Page 87

¹ members consumed their prescribed
² valsartan?
³      A.   That's beyond the scope of
⁴ what I was asked to do.  So I -- off the
⁵ top of my head, I have no opinion or
⁶ thoughts as to how they might determine
⁷ that.
⁸      Q.   The next part of your
⁹ statement says, "Whether the consumed
¹⁰ valsartan contained NDMA and/or NDEA."
¹¹        Do you see that?
¹²      A.   Yes.
¹³      Q.   And then you go on to state,
¹⁴ "The NDC code does not identify the lot
¹⁵ number of the prescription.  Not all lots
¹⁶ of valsartan were recalled, and not all
¹⁷ tested lots from the same manufacturer
¹⁸ contain the same levels of detected NDMA
¹⁹ or NDEA."
²⁰        I'm going to focus your
²¹ attention to the first parts of this
²² statement, that whether the consumed
²³ valsartan contained NDMA and/or NDEA and
²⁴ your concerns that the NDC does not

Page 88

¹ identify the lot number of the
² prescription, and not all lots of
³ valsartan were recalled.
⁴        We'll deal with the
⁵ variation of the manufacturer later.
⁶ Okay?
⁷      A.   Okay.
⁸      Q.   Is it your opinion that for
⁹ valsartan pills made with ZHP API, that
¹⁰ not all the lots of valsartan were
¹¹ recalled?
¹²        MR. STOY:  Objection.
¹³ Beyond the scope.
¹⁴        THE WITNESS:  That is beyond
¹⁵ the scope of what I was asked to
¹⁶ do.
¹⁷        I do not know, nor can I
¹⁸ form an opinion, as to whether or
¹⁹ not all the lots were recalled.
²⁰ BY MR. NIGH:
²¹      Q.   Well, your statement
²² actually says, "Not all lots of valsartan
²³ were recalled."
²⁴        So now I'm asking you for

Page 89

¹ valsartan made with ZHP API, do you have
² no opinion for valsartan made with ZHP
³ API?
⁴      A.   I have no opinion with
⁵ respect to that.  It's beyond the scope
⁶ of what I was asked to do.
⁷      Q.   Is that your opinion for
⁸ valsartan pills made with Mylan API?
⁹      A.   Again, I cannot sort of
¹⁰ point to any manufacturer and say that,
¹¹ you know, their particular lots were not
¹² recalled.
¹³        However, I am aware that
¹⁴ lots were recalled in a staggered manner.
¹⁵ And so at some time --
¹⁶      Q.   How are you aware that lots
¹⁷ were recalled in a staggered manner?
¹⁸      A.   I think probably through
¹⁹ discussion with --
²⁰        MR. STOY:  I do want to just
²¹ caution you, Doctor, not to reveal
²² the content of any discussions
²³ that you had with counsel for the
²⁴ defendants.

Confidential Information Subject to Protective Order

---

Page 90

1 　　　　But keeping that in mind,
2 　　you can continue answering the
3 　　question.
4 BY MR. NIGH:
5 　　Q.　How are you aware that lots
6 were recalled in a staggered manner?
7 　　A.　I believe it was in -- I
8 don't know what I can say and not say
9 that doesn't violate privilege
10 information.
11 　　Q.　Let me ask you this way.
12 Other than through discussions with
13 counsel, are you aware that lots were
14 recalled in a staggered manner any
15 other -- from any other independent
16 source?
17 　　A.　No.
18 　　Q.　Is it your opinion that not
19 all lots of valsartan were recalled for
20 Hetero, for valsartan that was made with
21 Hetero API?
22 　　A.　Again, I cannot answer that
23 with certainty.
24 　　　　As I mentioned I do not know

---

Page 91

1 which manufacturers' lots were completely
2 recalled and which were not.
3 　　Q.　Which finished dose
4 manufacturers used ZHP API for their
5 valsartan finished pills?
6 　　MR. STOY:　Objection.
7 Beyond the scope.
8 　　THE WITNESS:　That is beyond
9 　　the scope of my expertise, and I
10 　　cannot answer that because I just
11 　　do not know.
12 BY MR. NIGH:
13 　　Q.　So to be clear, when you're
14 mentioning that not all lots of valsartan
15 were recalled and the NDC does not
16 identify the lot number of the
17 prescription and your criticism as to
18 whether the consumed valsartan contained
19 NDMA and/or NDEA impurity, you don't know
20 which finished dose manufacturers used
21 ZHP API for valsartan finished pills?
22 　　A.　I personally do not know.
23 　　　　It's my understanding that
24 the NDC codes list the manufacturer as

---

Page 92

1 well as what the agents are that are in
2 the product, as well as what the size is
3 in terms of how the product was
4 distributed.　And there are no lot
5 numbers in that information.
6 　　Q.　Do you know how many lot
7 numbers make up an NDC code?
8 　　A.　That's beyond my area of
9 expertise.
10 　　Q.　Do you know how many batches
11 make up an NDC code?
12 　　A.　Again, that is beyond the
13 area of my expertise, no.
14 　　Q.　Which finished dose
15 manufacturers use Mylan API for valsartan
16 finished pills?
17 　　A.　Again, that's beyond the
18 area of my expertise.
19 　　　　I do not know.
20 　　Q.　Which finished dose
21 manufacturer use Hetero valsartan API for
22 valsartan finished pills?
23 　　A.　I do not know.　Beyond the
24 area of my expertise.

---

Page 93

1 　　Q.　Which finished dose
2 manufacturer used Aurobindo API for
3 valsartan finished pills?
4 　　A.　I do not know.　It's beyond
5 the area of my expertise.
6 　　Q.　For valsartan pills made
7 with ZHP API, have you seen any testing
8 demonstrating that no NDMA was found in
9 any lots?
10 　　MR. STOY:　Objection.
11 Scope.
12 　　THE WITNESS:　And again, can
13 　　you repeat the question?　Because
14 　　there were a lot of, like,
15 　　qualifications or -- just please
16 　　repeat the question.
17 BY MR. NIGH:
18 　　Q.　Sure.　Sure for valsartan
19 pills made with ZHP API, have you seen
20 any testing demonstrating that no NDMA
21 was found in those pills?
22 　　MR. STOY:　Same objection.
23 　　THE WITNESS:　Again, that
24 　　was beyond the scope of what I was

---

Confidential Information Subject to Protective Order

Page 94

1  asked to do.
2      I was given a bunch of
3  testing information, but I did not
4  pour over it carefully.
5      We could look at the
6  spreadsheet to see if that indeed
7  is the case.  But off of the top
8  of my head, I'm unable to answer
9  that question.
10  BY MR. NIGH:
11      Q.   For valsartan pills made
12  with ZHP API, have you seen any testing
13  demonstrating that no NDMA could be
14  detected in those pills?
15      MR. STOY:  Objection.  Asked
16  and answered.
17      MR. NIGH:  It's a different
18  question.
19      THE WITNESS:  Was the
20  question -- did you say NDMA or
21  NDEA?
22  BY MR. NIGH:
23      Q.   NDMA each time.  Let me ask
24  it again.

Page 95

1      For valsartan pills made
2  with ZHP API, have you seen any testing
3  demonstrating that no NDMA could be
4  detected in those pills?
5      A.   Yeah, I'm sorry.  I thought
6  that was the previous question, so I
7  guess I'm confused.
8      But, again, you know, I
9  cannot say with certainty unless I look
10  at the testing material that was provided
11  to me, and assuming that the testing
12  material provided to me is all the
13  testing information that's available.
14      Q.   But as you sit here, you
15  have -- you did review some testing,
16  correct?
17      A.   Yes.  I looked at those
18  documents.  But I do not recall which
19  manufacturer, which API, which whatever,
20  had levels, did not have levels, and so
21  forth.
22      I know there are some that
23  did not have detectable levels.  But
24  again, off the top of my head, I cannot

Page 96

1  answer as to which manufacturer.
2      Q.   Well, for valsartan pills
3  made with ZHP API, have you seen any
4  testing demonstrating that any pills had
5  less than 96 nanograms of NDMA?
6      A.   Again, since I cannot answer
7  the previous questions because I cannot
8  remember what was in those spreadsheets,
9  I cannot answer that question.
10      Q.   For valsartan pills made
11  with ZHP API, have you seen any testing
12  demonstrating that any pills did not have
13  at least thousands or tens of thousands
14  of nanograms of NDMA?
15      MR. STOY:  Objection to
16  form.  Scope.
17      THE WITNESS:  You know,
18  again, this is beyond the scope of
19  what I was asked to do.
20      I did look at spreadsheets.
21  I do not recall the levels that
22  were reported in there.
23      And so I cannot answer that
24  question.

Page 97

1  BY MR. NIGH:
2      Q.   For valsartan pills made
3  with ZHP API, have you reviewed any
4  information that demonstrates that there
5  were some lots that were not recalled?
6      A.   Again, that's beyond the
7  scope of my expertise and what I was
8  asked to do.  So I do not know for that
9  particular manufacturer whether there
10  were some lots that were not recalled.
11      Q.   So when you give the opinion
12  that not all lots of valsartan were
13  recalled, you wouldn't know if that's
14  true for specifically for ZHP, correct?
15      MR. STOY:  Object to the
16  form.
17      THE WITNESS:  Right now,
18  sitting here without looking at
19  the information provided and not
20  understanding whether I was
21  provided all the information, I
22  could not answer that question.
23  Yes.
24  BY MR. NIGH:

Confidential Information Subject to Protective Order

Page 98

1    Q.   For valsartan pills made
2  with Mylan API, have you seen any testing
3  demonstrating that no NDEA was found in
4  those pills?
5         MR. STOY:  Objection.  Form.
6  Scope.
7         THE WITNESS:  Again, this is
8     a similar answer to as before.
9         I do not recall, sitting
10    here without looking at the
11    information, as to whether or not
12    I saw any lots that did not --
13    that were recalled or not recalled
14    or what the level of impurity was
15    measured with respect to NDEA for
16    Mylan.  I just -- I just can't
17    answer that.
18  BY MR. NIGH:
19    Q.   For valsartan pills made
20  with Mylan API, have you seen any testing
21  demonstrating that any pills had less
22  than 26.5 nanograms of NDEA?
23    A.   Again --
24         MR. STOY:  Same objection as

Page 99

1    before.
2         Sorry.
3         THE WITNESS:  Sorry.
4         Again, this is beyond my
5    scope.
6         And as I have been saying, I
7    cannot say with certainty whether
8    or not there were any lots of the
9    tested information provided to me
10    that were under the stated level.
11         I do not even know if I was
12    provided all the testing
13    information.
14  BY MR. NIGH:
15    Q.   For valsartan pills made
16  with Mylan API, have you reviewed any
17  information that demonstrates that there
18  were some lots of unexpired medication
19  that were not recalled?
20    A.   Beyond my area of expertise.
21  And I cannot answer that.
22    Q.   So when you give the opinion
23  that not all lots of valsartan were
24  recalled, what are you referring to?

Page 100

1    A.   Again, it's my
2  understanding -- and you went through a
3  list of some, that there were cases that
4  some lots of valsartan were not recalled
5  for certain manufacturers.
6         I cannot say which
7  manufacturers at this time.  I don't know
8  that.
9    Q.   So when you say not all lots
10  of valsartan were recalled, you don't
11  know for which manufacturers that
12  statement would be true?
13    A.   Sitting here right now, no,
14  I do not.
15    Q.   When you make the opinion
16  that whether the consumed valsartan
17  contained NDMA and/or NDEA impurity, you
18  wouldn't know as to which manufacturers
19  that opinion would apply to, correct?
20         MR. STOY:  Object to the
21    form.
22         THE WITNESS:  Again, this is
23    outside my area of expertise.  And
24    I did not review all the testing

Page 101

1    literature, nor the recall
2    information on these agents.
3         And so I could not tell you
4    at this point which lots may have
5    or may not have contained the
6    impurities.
7  BY MR. NIGH:
8    Q.   Now, if every lot from a
9  manufacturer that they tested has NDMA
10  and/or NDEA, then your statement that the
11  NDC does not identify the lot number of
12  the prescription would not matter,
13  correct?
14         MR. STOY:  Object to the
15    form.  Incomplete hypothetical.
16    Beyond the scope.
17         THE WITNESS:  So I'm trying
18    to see if I get the assumption
19    right.
20         So if I assume there is a
21    manufacturer for which all the
22    lots were recalled for that
23    particular manufacturer, and over
24    a given time period and so forth,

Confidential Information - Subject to Protective Order

Page 102

¹ then I guess the lot number would
² not matter for that particular
³ manufacturer, assuming that it has
⁴ been shown that all the lots were
⁵ contaminated.
⁶ BY MR. NIGH:
⁷      Q.   Now, I want to draw your
⁸ attention to the next part of your
⁹ statement where it says, "Not all tested
¹⁰ lots from the same manufacturer contain
¹¹ the same levels of detected NDMA or
¹² NDEA."
¹³           Do you see that?
¹⁴      A.   Yes.
¹⁵      Q.   Now, are you aware that
¹⁶ approved medical monitoring programs
¹⁷ commonly have potential varying levels of
¹⁸ individual exposure?
¹⁹           MR. STOY:  Object to the
²⁰      form.
²¹           THE WITNESS:  Medical
²²      monitoring plans are outside the
²³      scope of my expertise.  And I do
²⁴      not know necessarily how medical

Page 103

¹      monitoring plans are formed.  And
²      that was outside of what I was
³      looked at to do.
⁴ BY MR. NIGH:
⁵      Q.   Can you think of any
⁶ approved medical monitoring programs
⁷ where class members have potential --
⁸ where class members exposed to substances
⁹ did not have potential varying levels of
¹⁰ individual exposure?
¹¹           MR. STOY:  Objection to
¹²      form.  Scope.  Calls for a legal
¹³      conclusion.
¹⁴           THE WITNESS:  Again, that's
¹⁵      outside the area of my expertise.
¹⁶           And I do not know the
¹⁷      medical monitoring literature.  So
¹⁸      I, off the top of my head, cannot
¹⁹      give you a specific instance.
²⁰ BY MR. NIGH:
²¹      Q.   In your report, you never
²² undertook any attempt to calculate means,
²³ medians, midpoints, or ranges of the
²⁴ amounts of NDMA or NDEA found for each

Page 104

¹ manufacturer, correct?
²      A.   That was beyond the scope of
³ what I was asked to do.  And so I -- I
⁴ didn't see any reason to calculate those.
⁵           I did review some ranges
⁶ that were provided.  I did see some
⁷ median values sometimes that were
⁸ provided.
⁹           Did I calculate those?  I
¹⁰ did not, because I did not have the
¹¹ necessary data in order to do that.
¹²      Q.   In your expert report, you
¹³ did not attempt to assess what the means,
¹⁴ medians, midpoints, or ranges of NDMA
¹⁵ and/or NDEA exposure were for each NDC
¹⁶ code, correct?
¹⁷      A.   I do not have the necessary
¹⁸ data in order to do such calculations.
¹⁹ So I did not do such calculations.
²⁰      Q.   And when you say that you
²¹ did not have the necessary data, you mean
²² that you were not provided with the
²³ documents that could have allowed you to
²⁴ do that calculation?

Page 105

¹      A.   Could you repeat what the
² actual calculation was again?
³      Q.   No, I'll strike that
⁴ question.
⁵           I next want to draw your
⁶ attention to Page 8 where you state,
⁷ "Plaintiffs assumed similar levels of
⁸ impurities in API products and finished
⁹ dose product."
¹⁰           Do you see that?
¹¹      A.   I'm sorry.  Could you direct
¹² my attention more where on the page?
¹³      Q.   Page 8, Number 5.  We put it
¹⁴ on the screen here too.
¹⁵      A.   Okay.
¹⁶      Q.   Your opinion was that --
¹⁷      A.   Yes.
¹⁸      Q.   -- "Plaintiffs assume
¹⁹ similar levels of impurities in API
²⁰ product and finished dose product."
²¹           Do you see that?
²²      A.   Yes, I do.
²³      Q.   Now, how do you -- how did
²⁴ you come up with the assumption that

Page 106

1 plaintiffs are assuming that?
2      A.   So that assumption came
3 because I, again, looked at the lifetime
4 cumulative thresholds that were proposed
5 in the medical monitoring plan.  And the
6 information provided in that plan as to
7 what provided the scientific basis for
8 coming up with those thresholds would be
9 found in the Panigrahy and -- I'll strike
10 that.
11      Q.   I'm sorry.  I don't know
12 what you were striking.  The whole
13 answer?
14      A.   I'm starting my answer over.
15 So yes, if I could strike the whole
16 thing, that would be great.
17      Q.   Let me ask my question
18 again.  And then if you need some time to
19 think about it, that's fine.
20      Now, how did you come up
21 with the assumption that plaintiffs are
22 assuming similar levels of impurities in
23 API product and finished dose product?
24      A.   I would have to look at the

Page 107

1 medical monitoring report, because in
2 Table 1, I -- I assumed that -- on the
3 basis of what was in the APIs.  And I'm
4 not sure if that came from the actual
5 medical monitoring proposal or not.
6      Q.   Did you review the
7 deposition transcripts where Madigan
8 and/or Panigrahy were presented with the
9 finished product testing levels and
10 answered questions in regards to finish
11 product testing levels as demonstrated by
12 the FDA?
13      A.   I've stated that I have read
14 their depositions, but I do not, off the
15 top of my head, recall instances of
16 questions and answers regarding the
17 finished products.
18      Q.   Why is it that you feel that
19 plaintiffs would have to assume values
20 from the valsartan API as opposed to just
21 the FDA's finished testing levels?
22      A.   Could you please ask the
23 question again?
24      Q.   Why is it that you believe

Page 108

1 that plaintiffs would have to assume
2 values from the valsartan API as opposed
3 to just relying on the FDA's finished
4 dose testing levels?
5      A.   I don't think I assumed that
6 they would have to use the API.
7      As I said, I would need to
8 look at the medical monitoring proposal
9 to see what they actually used.
10      I do not think that I
11 assumed that they needed to use the API
12 versus needed to use the FDA levels in a
13 finished product.
14      Q.   Well, if plaintiffs used the
15 FDA's finished testing -- the FDA's
16 finished product testing levels, then
17 this statement about the plaintiffs
18 assuming similar levels of impurities in
19 API product as finished dose product
20 would be irrelevant, correct?
21      MR. STOY:  Objection to
22 form.  Argumentative.
23      THE WITNESS:  Again, I'm
24 saying I don't know off the top of

Page 109

1      my head what the plaintiffs
2      assumed without checking what is
3      in the medical monitoring plan,
4      which off of the top of my head
5      right now, I cannot recall what
6      they proposed.
7 BY MR. NIGH:
8      Q.   When you make the statement
9 that plaintiffs assume no variability of
10 NDMA and/or NDEA impurity levels for the
11 same manufacturer, what is the basis for
12 that statement?
13      A.   When I looked at the testing
14 data that was provided to me, I saw
15 variability between the different lots.
16 So that means that there was variability
17 within the manufacturer.
18      Q.   Okay.  So if there's
19 variability within a manufacturer, why is
20 it your -- why is it your opinion that
21 the plaintiffs assume no variability in
22 NDMA and/or NDEA impurity levels for the
23 same manufacturer?
24      A.   Because when I looked at the

Confidential Information Subject to Protective Order

Page 110

¹ medical monitoring report proposal and
² looked at the lifetime cumulative
³ thresholds that were proposed, they were
⁴ only proposed on the basis of a
⁵ manufacturer, and they were not on the
⁶ basis of a manufacturer and lot number.
⁷      Q.   Did you consider any other
⁸ assumptions that the plaintiffs may have
⁹ made in terms of assessing variability as
¹⁰ opposed to plaintiffs assuming no
¹¹ variability in NDMA and/or NDEA impurity
¹² levels for the same manufacturer?
¹³           MR. STOY:  Object to the
¹⁴ form.
¹⁵           THE WITNESS:  That was
¹⁶ beyond the scope of what I was
¹⁷ asked to do.
¹⁸           I was just trying to, the
¹⁹ second part of my charge was to
²⁰ try to -- well, the first part in
²¹ general is to understand if there
²² is evidence to support the use of
²³ the proposed thresholds.  And
²⁴ there was only one threshold given

Page 111

¹      per each manufacturer.
²           And so the simplest
³ assumption to make, Occam's Razor,
⁴ is that -- to assume that within a
⁵ manufacturer, there is no
⁶ variability; otherwise, there
⁷ would be thresholds on the basis
⁸ of the lot numbers.
⁹ BY MR. NIGH:
¹⁰      Q.   You just said that would be
¹¹ the simplest assumption.  But you didn't
¹² make any other potential assumptions as
¹³ to what the plaintiffs may have assumed
¹⁴ in terms of variability with NDMA and/or
¹⁵ NDEA impurity levels for the same
¹⁶ manufacturer, correct?
¹⁷           MR. STOY:  Object to the
¹⁸ form.
¹⁹           THE WITNESS:  So again, you
²⁰ know, in science, if one proposes
²¹ a threshold, and to be
²² scientifically rigorous, it should
²³ be pretty clear as to what the
²⁴ basis is of that threshold.

Page 112

¹           And so I don't think it's my
² responsibility to make other
³ assumptions that are necessary in
⁴ order to explain why the
⁵ plaintiffs decided to use one
⁶ threshold per manufacturer.
⁷           And I did say what
⁸ assumption I assumed in order for
⁹ those thresholds to be valid.
¹⁰ BY MR. NIGH:
¹¹      Q.   So when you give the
¹² statement, "Plaintiffs assume no
¹³ variability in NDMA and/or NDEA impurity
¹⁴ levels for the same manufacturer, you
¹⁵ actually mean that you assumed that
¹⁶ plaintiffs assumed no variability in NDMA
¹⁷ and/or NDEA impurity levels for the same
¹⁸ manufacturer, correct?
¹⁹           MR. STOY:  Object to the
²⁰ form.
²¹           THE WITNESS:  So on the
²² basis that there was one threshold
²³ per manufacturer, the assumption
²⁴ is that there would be no

Page 113

¹      variability within the
² manufacturer.
³ BY MR. NIGH:
⁴      Q.   That's the assumption that
⁵ you made, correct?
⁶      A.   I don't know what other
⁷ assumption to make for those thresholds
⁸ to make sense, because if someone took a
⁹ lot that had no NDMA in it, let's say
¹⁰ from one of the manufacturers for the
¹¹ given length of time that's stated as
¹² part of the threshold, that threshold
¹³ wouldn't make sense versus someone that
¹⁴ took a lot, that had an immense amount.
¹⁵           So I just don't know what
¹⁶ other assumption could have been made.
¹⁷           And I welcome -- yeah.
¹⁸      Q.   Now, you say that because if
¹⁹ someone took a lot that had no NDMA in
²⁰ it.
²¹           But my understanding is you
²² don't have any knowledge, as you sit here
²³ today, as to which manufacturers that
²⁴ would be true for, correct?

Confidential Information - Subject to Protective Order

Page 114

1    A.   I have no --
2    Q.   Or impossible?
3         MR. STOY:  Object to the
4    form.
5         THE WITNESS:  As I sit here
6    today, that is correct.  I cannot
7    name manufacturers for which that
8    might be the case.
9         But I believe there are
10   manufacturers for which there was
11   no NDMA detected in the -- in
12   their product.
13 BY MR. NIGH:
14   Q.   Okay.  I want to turn your
15   attention -- we're going to stay on
16   Page 8.
17        And in reading your opinion,
18   you state for Number 5, you state, "The
19   thresholds in Table 1 further implicitly
20   assume the levels of impurity and effects
21   of valsartan API are the same as what
22   would be found in the finished dose
23   products, which is the valsartan tablet
24   that is consumed by an individual."

Page 115

1         You later put, "Reviewing
2    the manufacturers' testing data, it is
3    clear this is not the case.  For example,
4    for Aurobindo valsartan 320-milligram
5    lot, packing batch number" -- and you
6    give a batch number -- "the amount of
7    NDEA detected in the API batch was 0.96
8    micrograms, and the amount detected in
9    the corresponding finished product batch
10   was .048 micrograms, which is a twofold
11   reduction in the level of impurity."
12        Do you see that?
13   A.   Yes.
14   Q.   And then you say, "This is
15   not an isolated case, but in general,
16   there appear to be lower levels of
17   impurity in the finished product tablet
18   that would be consumed compared to the
19   API."
20        Do you see that?
21   A.   Yes.
22   Q.   And then below, you list
23   testing documents.
24        Do you see that?

Page 116

1    A.   Yes.
2    Q.   Now, other than --
3    A.   Sorry.  Clarification,
4    please.
5         Do you mean the footnote?
6    Q.   Yes.
7    A.   Yes.
8    Q.   It's actually Footnote 9,
9    not Footnote 8.
10        Right?  Is it Footnote 9?
11   A.   Yes, I believe so.
12   Q.   And so other than for
13   Aurobindo, do you know if there are any
14   other manufacturers where you're seeing a
15   lower amount of NDEA that's generally
16   detected in the finished dose batch
17   compared to the API batch?
18   A.   Without being able to look
19   at those documents at this time, I cannot
20   state with certainty what any other
21   manufacturer might be.
22   Q.   So you only hold this
23   opinion for Aurobindo at this time?
24        MR. STOY:  Object to the

Page 117

1    form.  Misstates testimony.
2         THE WITNESS:  That's not
3    what I said.
4         I said without being able to
5    review the documents that are
6    cited, off the top of my head I
7    cannot, with certainty, give you
8    another example.
9    BY MR. NIGH:
10   Q.   Your wording says, "This is
11   not an isolated case, but in general
12   there appear to be lower levels of
13   impurity in the finished product tablet
14   that will be consumed compared to the
15   API."
16        Do you see that?
17   A.   Yes.
18   Q.   Other than Aurobindo, which
19   other manufacturers do you believe this
20   statement to be true for?
21   A.   As I stated, that without
22   being able to -- and I'm happy to review
23   all of those spreadsheets, if you want.
24        I'm not able to name if

Confidential Information - Subject to Protective Order

---

1 there's another case where this is true.
2         MR. NIGH:  Okay.  Let's take
3     a look at LP 1779.
4         (Document marked for
5     identification as Exhibit
6     Ballman-5.)
7 BY MR. NIGH:
8     Q.    I'm going to show you some
9 testing numbers for Mylan.
10        MR. NIGH:  This will be
11    marked Exhibit 5.
12 BY MR. NIGH:
13    Q.    And you have cited here
14 testing levels for Mylan in your expert
15 report, correct?
16    A.    Yes, that's part of the
17 Footnote 9.
18    Q.    And that Footnote 9 --
19        MR. NIGH:  Hold on.  If we
20    can go back to that first
21    paragraph, that first -- you just
22    had it on the screen.
23 BY MR. NIGH:
24    Q.    This is the slip sheet for

---

1 this document.  Do you see it says
2 MYLAN-MDL2875-00895544?
3     A.    Yeah, I'm waiting for it to
4 come into my documents here.  Sorry.
5     Q.    No problem.  Let me know
6 when you have that.
7     A.    Okay.  It just came up.
8     Q.    Do you see that Bates number
9 at the bottom right corner?
10    A.    Yes, I see that.
11    Q.    And then if we take a look
12 at the spreadsheet, turning to the next
13 page.  Now, it's pretty small here, but
14 if you can take a look at -- hold on one
15 second.
16        MR. NIGH:  There should be
17    an Excel version of this that you
18    can use, not this PDF.  It looks
19    like it's cutting off some of the
20    columns we need.
21        TRIAL TECH:  Okay.  One
22    second, I'll check it.
23        MR. NIGH:  I want to make
24    sure that the witness has the

---

1 Excel spreadsheet as well.
2         TRIAL TECH:  Spreadsheet is
3     in the shared file.
4         THE WITNESS:  I see it.
5         MR. STOY:  Just for the
6     record, we are replacing the PDF
7     with the Excel version as
8     Exhibit 5?
9         TRIAL TECH:  I did, yes.
10        MR. STOY:  Okay.
11        TRIAL TECH:  Waiting for it
12    to load.  One second.
13 BY MR. NIGH:
14    Q.    Let's go, again, if you can,
15 NDMA content ppm finished dosage.  You
16 can see it's Column I.
17        Do you see that?
18    A.    Yes.
19    Q.    And do you see Column K,
20 which is NDEA content ppm API?
21    A.    Yes.
22    Q.    Now, that would be -- those
23 two are referring to the parts per
24 million of NDEA in Mylan either in the

---

1 API product or in the finished dose
2 product.
3         Do you see that?
4         MR. STOY:  Object to the
5     form.
6         THE WITNESS:  Yes, I believe
7     that's the case.  I'm comparing I,
8     which is the finished dosage, to
9     K, which is the API.
10 BY MR. NIGH:
11    Q.    Right.  And the opinion that
12 you gave and cited to this document, was
13 that this is not an isolated case, but in
14 general, there appears to be lower levels
15 of impurity in the finished products,
16 compared to the API, right?
17    A.    In general, there appears to
18 be lower levels of the impurity in the
19 finished -- in general, yes, that's what
20 I see there.
21    Q.    Okay.  Well, let's take a
22 look at this spreadsheet.
23        You see Row 28, we can see
24 the first test result on this spreadsheet

---

Confidential Information - Subject to Protective Order

Page 122

1  in terms of order of rows.
2          The first one, .35 in Column
3  I.
4          Do you see that?
5      A.   Yes.
6      Q.   Now, Column K, it says, "Yet
7  to be analyzed."
8          Do you see that?
9      A.   Yes.
10     Q.   So we wouldn't be able to
11 make that comparison for this row,
12 correct?
13     A.   Yes.
14     Q.   Now, let's scroll down to
15 the next test result for -- in Column I
16 for NDEA content in the finished dose.
17         Do you see it shows
18 .46 parts per million?
19     A.   Yes.
20     Q.   And then in Column K, in the
21 API, it says .28, correct?
22     A.   Yes, I see that.
23     Q.   So for this result, it's
24 actually the reverse of what you had in

Page 123

1  your report.  It's actually that the
2  amount of NDEA in the finished product is
3  actually higher than the amount of NDEA
4  in the API, correct?
5      A.   I do not think my statement
6  as stated precludes this from happening.
7  It says in general.  It does not say for
8  every case.
9      Q.   Okay.  Well, this first one
10 it didn't happen, right?  There's more
11 NDEA in the finished product than in the
12 API, correct?
13     A.   Yes.
14     Q.   In Line 48, the second row
15 that we can see a comparison, there is
16 more -- .41, that's higher than .29,
17 correct?
18     A.   Yes.
19     Q.   So this is a second instance
20 of where there's actually more NDEA in
21 the finished products than the API,
22 correct?
23     A.   Yes, that's correct.
24         Are we going to go through

Page 124

1  all the testing to make sure that the "in
2  general" statement -- because this is
3  just one spreadsheet.  I mean, I know
4  like, on Line 60 --
5      Q.   We're going to go through a
6  lot of them.  We'll see the cumulative.
7      A.   Okay.
8      Q.   So the second one, more in
9  the --
10         MR. NIGH:  Let's go ahead
11         and highlight each of those, the
12         .41 versus the .29.  Highlight
13         yellow.  Highlight yellow.  Yep.
14         Row 46, yellow and yellow.
15 BY MR. NIGH:
16     Q.   Again, those highlights
17 demonstrate thus far that the amount of
18 NDEA in the finished product is actually
19 higher than the amount of NDEA in the
20 API, correct?
21     A.   Yes, that is correct.  But
22 why are we skipping over the NDMA?
23     Q.   Because for right now -- for
24 Mylan, is Mylan more of an NDEA

Page 125

1  contamination problem or more of an NDMA
2  contamination problem?
3      A.   That's beyond -- I couldn't
4  say with certainty what more of a problem
5  is.
6          But for that statement, I
7  did not say that I was focusing on what
8  was more of a problem for an individual.
9          And if we look at NDMA,
10 there are instances where that statement
11 I provided is true.
12     Q.   Do you think Number 46, that
13 even for NDMA, that BQL is lower than
14 .01?
15     A.   I am not sure what BQL is.
16     Q.   Okay.  So for all of the --
17 so far that we can see on the screen, all
18 of the NDMAs suggest BQL for finished
19 product.  So you don't actually know how
20 much NDMA is in the finished product,
21 correct?
22     A.   Again, I'm not sure what BQL
23 is.
24         There is a BDL which may

Confidential Information Subject to Protective Order

---

Page 126

¹ mean below detection level on Line 56.
² And we can see that it's below -- 57 --
³ below detection in the finished product,
⁴ but there is some detected in the API.
⁵        Q.    Is that --
⁶        A.    So I mean, we can go
⁷ through --
⁸        Q.    Is that how -- we will go
⁹ through this.
¹⁰        Is that how you -- what you
¹¹ just explained to me, is that how --
¹² would that formulate part of the basis of
¹³ your statement that there appear to be
¹⁴ lower levels of impurity in the finished
¹⁵ product compared to the API, because you
¹⁶ see a BDL in one line and you see a .01
¹⁷ in the other?
¹⁸        MR. STOY:  Object to the
¹⁹    form.
²⁰        THE WITNESS:  So again, I'm
²¹    not sure exactly what BDL is, but
²²    usually it means below detection
²³    level.
²⁴        So that means that it cannot

---

Page 127

¹    be detected, whereas if a number
²    was given, it was detected.
³        So a number that's given
⁴    that was detected would be higher
⁵    than something that could not be
⁶    detected.
⁷ BY MR. NIGH:
⁸        Q.    Okay.  So that's your
⁹ opinion, is that if a number that was
¹⁰ given is detected, then that number would
¹¹ be higher than something that could not
¹² be detected, according to this
¹³ spreadsheet, right?
¹⁴        A.    Again, that's outside of my
¹⁵ expertise.  And I'm not saying with
¹⁶ certainty that that could be correct.
¹⁷        Q.    I'm trying to understand the
¹⁸ basis of your opinion, that there appear
¹⁹ to be lower levels of impurity in the
²⁰ finished product compared to the API.
²¹        Would this be one of the
²² bases of your opinions?  If it says BDL
²³ in one column, and the other column it
²⁴ says .01, then you would say that the BDL

---

Page 128

¹ is lower than the .01?
²        A.    So when I read this, I
³ may -- I'm not sure if I was sloppy or
⁴ not.  And I was referring to the
⁵ manufacturer for the specific example I
⁶ gave, or if really I meant everything.
⁷        I could have meant
⁸ everything, but then we'll have to go
⁹ through and look at all the documents
¹⁰ that I was provided to debate as to
¹¹ whether or not it holds in general.
¹²        I agree that there are
¹³ instances where the finished product has
¹⁴ a higher level than does the API.  I
¹⁵ agree that there are instances of that.
¹⁶        Q.    My question was, would this
¹⁷ be one of the bases of your opinion where
¹⁸ it says -- of your opinion that there are
¹⁹ lower levels of API -- or lower levels of
²⁰ impurity in the finished product compared
²¹ to the API?  Would this be one of the
²² bases of your opinion where it says BDL
²³ in one column, and in the other column
²⁴ .01, and so that you would confer that to

---

Page 129

¹ mean that the BDL is lower than the .01?
²        A.    Again, without being able to
³ review exactly what BDL means and what
⁴ that lower level -- if it is below
⁵ detection level, what that threshold is,
⁶ I cannot say with certainty at this
⁷ point, without doing a bit more looking
⁸ at these documents.
⁹        Q.    This is the spreadsheet that
¹⁰ you reviewed.  This is what is attached.
¹¹        Are you able to look at this
¹² spreadsheet and give any indication as to
¹³ whether or not BDL is actually lower than
¹⁴ .01?
¹⁵        A.    Again, you know, right now,
¹⁶ it was a while since I looked at this.
¹⁷ And as you are aware, there are many,
¹⁸ many spreadsheets with many, many
¹⁹ different numbers.  And in fact, it takes
²⁰ a while to even understand what each
²¹ column is without careful reading.
²²        And, therefore, at this
²³ time, I cannot state -- I cannot answer
²⁴ that question.

---

Confidential Information Subject to Protective Order

Page 130

1    Q.   Now, you did say below --
2  BDL stands for below detection level,
3  correct?
4    A.   Again, I said that was --
5  that's what I'm assuming right now.  But
6  I would have to check to make sure that
7  assumption is correct.
8    Q.   Do you know what the
9  detection level is for this spreadsheet?
10    A.   I believe I also stated that
11  I would have to take some time to look
12  and see what the threshold is for the
13  lower level of detection.  So I do not --
14  with certainty, at this time, can state
15  what it is.
16    Q.   Do you see that anywhere on
17  this spreadsheet where it says what the
18  detection level is?
19    A.   Again, I was given more than
20  just this one spreadsheet.
21    You know, I just -- on this
22  spreadsheet right here, this page, I do
23  not see a definition of BDL.
24    Q.   Okay.  Let's go back to NDEA

Page 131

1  again.  And let's keep going down.  I
2  think you probably looked at more
3  columns.
4    Can you see that 49, do you
5  see it's .41 compared to .29?  Again,
6  there's more NDEA in the finished product
7  than in the API?
8    A.   Which line?
9    Q.   Line 49.
10    MR. NIGH:  Let's go ahead
11  and highlight this too.
12    THE WITNESS:  Yes.  For
13  those, that is correct.
14  BY MR. NIGH:
15    Q.   And the next one, 53, line
16  53.  Do you see it says .16 compared to
17  .16.
18    MR. NIGH:  Let's highlight
19  that.
20  BY MR. NIGH:
21    Q.   That also does not support
22  that there's more NDEA in the API than in
23  the finished product, correct?
24    A.   You're correct for that one,

Page 132

1  yes.
2    Q.   54.  Do you see .29, there's
3  more NDEA in the finished product than in
4  the API?
5    A.   Yes.
6    Q.   55.  Do you see there's more
7  NDEA in the finished product than in the
8  API?
9    A.   Yes.
10    Q.   56, do you see there's more
11  NDEA in the finished product than in the
12  API?
13    A.   Yes.
14    Q.   57, do you see there's more
15  NDEA in the finished product than in the
16  API?
17    A.   Yes.
18    Q.   58, do you see there's more
19  NDEA in the finished product than in the
20  API?
21    A.   Yes.
22    Q.   59, do you see there's more
23  NDEA in the finished product than in the
24  API?

Page 133

1    A.   Yes.
2    Q.   Now, can you look at this
3  spreadsheet as a whole and see that it's
4  actually the inverse for this
5  spreadsheet, that most of the products
6  tested here for Mylan had more NDEA in
7  the finished product than in the API?
8    MR. STOY:  Object to the
9  form.
10    THE WITNESS:  You know,
11  again, this is a very small
12  snippet that you had selected.
13  And I would like to look at all
14  the testing for the other NDMA of
15  all the spreadsheets that I looked
16  at.
17    I did not say this was
18  Mylan-specific.
19    In addition, I need to
20  understand what BQL -- I need to
21  refresh my memory -- and BDL is
22  for NDMA, because it may not apply
23  to NDMA.
24  BY MR. NIGH:

Confidential Information Subject to Protective Order

Page 134

1    Q.   My question is, this is --
2  my question is, can you look at this
3  spreadsheet as a whole and see that it's
4  the actually the inverse for this
5  spreadsheet, that most of the products
6  tested here for Mylan had more NDEA in
7  the finished product than in the API?
8        I'm not asking about other
9  spreadsheets right now.  I'll go to them
10 later.  But do you see that for this
11 spreadsheet?
12       MR. STOY:  Object to form.
13 Asked and answered.
14       THE WITNESS:  Yeah, I
15 think -- you know, again, I'm just
16 going to say the same thing.
17       I mean, you know, as I
18 said -- and I haven't gone
19 through -- we haven't gone through
20 every single number.  We haven't
21 tabulated it up.
22       And this is just one small
23 snippet of all the data that were
24 provided in terms of testing.

Page 135

1  We're not analyzing what's going
2  on with NDMA.
3        But yes, for the small cases
4  that you have pointed out in this
5  spreadsheet -- we didn't even go
6  through the whole thing -- I do
7  agree that in this case for that
8  small snippet, it appears that
9  in -- the finished product, has a
10 higher NDM -- no, NDEA than does
11 the API.
12 BY MR. NIGH:
13       Q.   I asked you for this
14 spreadsheet.  You can look at the whole
15 spreadsheet.  Not just what I've
16 highlighted.  There's not that many rows.
17 So you can actually look at it, I think,
18 as a statistician and see that for most
19 of the rows, more of the rows, there's
20 higher amounts of NDEA in the finished
21 products than in the API, correct?
22       MR. STOY:  Objection to the
23 form.
24       THE WITNESS:  I guess where

Page 136

1  I'm struggling is, you are
2  challenging my "in general."
3        And we're just looking at a
4  small snippet of data where it
5  appears not to hold for the in
6  general.
7        And I'm saying that I need
8  to look at everything, including
9  the NDMA, since I did not call out
10 NDEA just in, you know, specific.
11       I mean, I did for the
12 example, but that wasn't my
13 intent.  That was true for NDMA --
14 sorry.
15       I would have to look at all
16 the testing data and -- yes.  I
17 would have to look at all the
18 testing data, and I'd have to
19 understand what BQL means and BDL
20 means in order -- you know, in
21 order to answer that in general.
22       But the snippet you showed
23 me right here on this spreadsheet,
24 I do agree that the NDEA in the

Page 137

1  finished product is higher than in
2  the API.
3  BY MR. NIGH:
4        Q.   Okay.  Let me ask my
5  question again.  My question does not ask
6  anything about your general statement
7  right now.  I'm just asking about this
8  spreadsheet.  You can review this
9  spreadsheet.  It's not many rows.
10       MR. NIGH:  Let's scroll
11 down.  Scroll down.  Let's keep
12 scrolling.
13 BY MR. NIGH:
14       Q.   There's only 122 rows.  And
15 most of the rows don't even have testing
16 for NDEA in the finished product,
17 correct?
18       A.   I'm not sure what blanks
19 mean.
20       Q.   What do you think they meant
21 when you reviewed these testing data?
22       A.   Again, I would have to go
23 through and review all the documents that
24 I was given in general to understand what

Confidential Information - Subject to Protective Order

---

Page 138

1 exactly they meant.
2        You're right.  They could
3 mean that they weren't tested.
4        Q.   For those rows where you see
5 testing levels for finished product
6 versus testing levels for API on this
7 Mylan spreadsheet, most of the rows
8 actually demonstrate that there's higher
9 amounts of NDEA in the finished products
10 than there is in the API, correct?
11        MR. STOY:  Objection.  Asked
12 and answered.
13        Go ahead.
14        MR. NIGH:  It's not
15 answered.
16        THE WITNESS:  For the small
17 preselected thing that I did not
18 select, I agree with what you are
19 showing me here are instances
20 where more of the finished
21 product -- I'm sorry -- the
22 finished product contains higher
23 levels of NDEA than does the API.
24 BY MR. NIGH:

---

Page 139

1        Q.   Let's go back to your expert
2 report.
3        MR. STOY:  Daniel, before we
4 move on, would this be a decent
5 time to take a five-minute break?
6        MR. NIGH:  Give me about
7 five minutes, and I think we'll be
8 at a good breaking spot.
9        MR. STOY:  Okay.
10 BY MR. NIGH:
11        Q.   Let's look at Page 9 of your
12 expert report.
13        MR. NIGH:  If we can put
14 that up on the screen again.  It's
15 Exhibit 5.
16        THE WITNESS:  Yes, I'm
17 there.  I'm sorry.
18        MR. NIGH:  I just wanted to
19 put it up on the screen.
20        THE WITNESS:  Oh.
21        MR. NIGH:  If we can blow up
22 Footnote 9.  And also from the
23 expert report, if we can blow up
24 that sentence that says, "This is

---

Page 140

1 not an isolated case, but in
2 general there appear to be lower
3 levels of impurity in the finished
4 product tablet that will be
5 consumed compared to the API."
6        Can you blow that up as
7 well.
8        TRIAL TECH:  Yeah, if you
9 can just guide me to --
10        MR. NIGH:  It's at the top
11 of Page 9.  And then you see the
12 Footnote 9.  Yep.
13 BY MR. NIGH:
14        Q.   And so your footnote says,
15 "See example."  And that's your examples
16 for supporting this statement, correct?
17        A.   Yes, I believe I'm just
18 listing all the testing data.
19        Q.   Now, for Mylan, do you see
20 any other documents other than
21 MYLAN-MDL2875-00895544?
22        A.   I don't see any other
23 document that has Mylan in the title.  So
24 I'm not sure if some of the other -- I

---

Page 141

1 don't know these titles intimately so as
2 to what manufacturer they are referring
3 to.
4        But if you say that's the
5 only Mylan, I will take that.
6        Q.   Well, I'm asking you.
7        And let's go to Appendix B.
8 And you can see under data of Appendix B
9 for materials that you relied upon, it
10 again only has that same Mylan Bates
11 number, correct?
12        A.   Yes.  That's the only --
13 only thing with Mylan in the title.
14        Q.   Well, as far as you recall,
15 you are not aware of any other -- for
16 Mylan, any other documents that you would
17 have reviewed upon that you can base the
18 statement that this is not an isolated
19 case, but in general there appear to be
20 lower levels of impurity in the finished
21 products compared to the API?
22        MR. STOY:  Object to the
23 form.
24        THE WITNESS:  So I don't

---

Confidential Information Subject to Protective Order

---

Page 142

believe my statement said that this is true for one particular manufacturer.

I think the footnote is referring to everything.

And we haven't gone through, like, the one where I pulled the actual example from, to look the at the differences there. We haven't looked at the NDMA differences.

But I believe that may be the only Mylan testing document that I have.

BY MR. NIGH:

Q.   So for Mylan, it would not be true that there appear to be lower levels of impurity in the finished product compared to the API, correct?

MR. STOY:  Object to the form.

THE WITNESS:  Again, I cannot state that with certainty because there are other tabs in

---

Page 143

that spreadsheet that we should go through. We haven't gone through the NDMA.

So I cannot state that with certainty.

The only thing that I can state is the numbers we went through together for NDMA -- or NDEA, that statement does not hold.

BY MR. NIGH:

Q.   When you say the numbers that we went through together, do you mean that whole spreadsheet we looked at? Because I scrolled all the way down to Row 120. And I asked you about that whole spreadsheet.

Isn't it generally true that the levels of NDEA were higher in the finished products than in the API?  Do you remember that?

A.   Yes, for that spreadsheet. But there are other spreadsheets in that document as well.

---

Page 144

Q.   Did you see that for those other spreadsheets, that they actually don't give you the comparison between those two except for a couple of rows?

A.   But there are ND -- yes, for NDEA.

Q.   NDEA.  Right.

If you look at Tab 2, let's -- do you have that document, Tab 2 --

A.   Yeah, I have -- yes.

Q.   -- of what's been marked as Exhibit 5?

A.   Yes.

Q.   You can see Tab 2, that's titled valsartan HCTZ, right?

A.   Yes.

Q.   And you can see that for Tab 2, there is not a single test result for NDEA content, correct, in Column I?

MR. NIGH:  Can we scroll all the way down.

THE WITNESS:  Wait.  I'm sorry, say your statement again.

---

Page 145

BY MR. NIGH:

Q.   In Tab 2, which is the -- you said there are different tabs.  So we're going through them now.  You can see for valsartan HCTZ there is not a single test result in Column I, so we can't make the comparison, correct?

A.   Are we talking about NDMA? Because that's Column I.

Q.   My apologies.  Column J.

A.   Yeah, there are no numbers in that column.

Q.   And for the third spreadsheet, we can scroll through and we can see that there are very few where the comparison can actually be made, where there are test results for Column I -- I mean, test results for Column I and test results for Column K, correct?

A.   Okay.  So I am scrolling down.

My understanding, and I'm sorry I'm not able to freeze the titles of the columns.  But Column I is the

---

Confidential Information Subject to Protective Order

Page 146

1  finished product.  Column K is the API.
2  And when there are instances, there are
3  many instances in which there are no
4  numbers to compare.
5       But when there are, like on
6  220, it appears that the finished product
7  has a lower amount than the API.
8    Q.   This comparison can only be
9  made in two spots in this entire
10 spreadsheet, correct, where you have
11 testing for NDEA in the finished product
12 and testing for NDEA in the API?
13   A.   Yeah, I found one.
14   Q.   Okay.  A few rows down.
15   A.   Yeah, I'm sorry.  I believe
16 you said that there are two.  I only
17 found one.
18   Q.   Okay.  Whether it's one or
19 two, it's the same statement, is that
20 there's really not much evidence in all
21 of these spreadsheets from Mylan that
22 there's more NDEA in the finished -- in
23 the API than there is in the finished
24 product, correct?

Page 147

1      MR. STOY:  Object to the
2    form.
3      THE WITNESS:  So again, you
4    know, I agree that the numbers
5    being reviewed right now for the
6    comparison for just on these
7    spreadsheets, which are Mylan for
8    NDEA, more often the finished
9    product had a higher dose than did
10   the API.
11 BY MR. NIGH:
12   Q.   Okay.  Now we've talked
13 about Mylan having higher amounts of NDEA
14 in the finished products than in the API.
15     And you gave some examples
16 of Aurobindo having higher amounts of
17 NDEA in the API than in the finished
18 products.
19     But other than Mylan and
20 Aurobindo, do you have an opinion
21 specific to manufacturer as to which
22 manufacturers had higher amounts of NDEA
23 and/or NDMA in their finished products
24 versus their API, or vice versa, higher

Page 148

1  amounts in their API versus their
2  finished products?
3    A.   Without --
4      MR. STOY:  Object to the
5    form.
6      I'm sorry.  Go ahead.
7      THE WITNESS:  Without going
8    through this exercise, which I
9    thought we were going to do, for
10   all the spreadsheets, at this time
11   I cannot call out, like, which
12   particular manufacturers this may
13   or may not be true for, as well as
14   for NDMA in getting definitions of
15   those quantities, which right now
16   I do not know what they are, off
17   of the top of my head.
18     So if we want to -- let's
19   continue and go through, we can
20   answer that, because I thought you
21   said that we were going to go
22   through more spreadsheets.
23 BY MR. NIGH:
24   Q.   When we -- or when you made

Page 149

1  the statement -- tried to analyze that
2  there's more NDMA and/or NDEA in the API
3  than in the finished products, did you
4  tabulate and take a count as to looking
5  at all the spreadsheets collectively and
6  seeing if that statement were true?
7    A.   I did not, like, do a
8  precise count.  It was just looking at
9  the values, from what I remember.
10     And I don't think it changes
11 my conclusion that the implicit
12 assumption that the level of impurity in
13 the valsartan API formulation is the same
14 as the finished product.
15     And we also did not get into
16 the fact that there is one lifetime
17 cumulative threshold per manufacturer,
18 and it doesn't say if it's for NDMA or
19 NDEA.
20   Q.   My question was very -- much
21 more limited.  I didn't talk about the
22 things that we didn't ask.
23     I'm only asking, when you
24 made the statement, that statement that

Confidential Information Subject to Protective Order

Page 150

1 this is not an isolated case, but in
2 general there appear to be lower levels
3 of impurity in the finished product
4 compared to the API, and you cited some
5 examples for Aurobindo, did you actually
6 compare the other finished dose product
7 testing results for the other
8 manufacturers compared to their API
9 levels?
10      A.   I cannot recall at this time
11 which ones I compared.
12           I did not do -- I do -- can
13 say that I did not do an explicit
14 enumeration of the -- which -- how many
15 times it was greater or how many times it
16 was less.  It was more just looking at
17 them and seeing that, you know, more
18 often than not, it appeared to be the
19 case.
20      Q.   Specifically for Mylan, is
21 it your opinion that there appear to be
22 lower levels of impurity in the finished
23 product compared to the API?
24      A.   I cannot answer that for

Page 151

1 Mylan, because we have not gone through
2 the NDMA data.
3      Q.   Specifically for ZHP, is it
4 your opinion that there appear to be
5 lower levels of impurity in the finished
6 product compared to the API?
7      A.   If we can go through those
8 spreadsheets right now, I can answer that
9 definitively.  Right now, I cannot
10 remember off the top of my head if that
11 is true or not.
12      Q.   I'm trying to understand
13 what your opinion is.
14           Is it your opinion that you
15 don't have an opinion specifically for
16 ZHP?
17           MR. STOY:  Object to the
18      form.  Misstates her testimony.
19           THE WITNESS:  Again, I'm
20      saying I cannot state with
21      certainty what I feel for a
22      particular manufacturer.  And I
23      would have to go through and look
24      at the data to be able to say with

Page 152

1 certainty for a particular
2 manufacturer, because I looked at
3 many, many spreadsheets as to
4 whether or not that's the case.
5 BY MR. NIGH:
6      Q.   Okay.  Well, we don't have
7 to go through every spreadsheet right
8 now.
9           I can assume that you've
10 reviewed those spreadsheets.
11           I'm asking you, in terms of
12 your opinion, is it your opinion that for
13 ZHP, there appear to be lower levels of
14 impurity in the finished product compared
15 to the API?
16      A.   And I'm saying that my
17 opinion was based on all the testing data
18 that I looked at, and I cannot make -- I
19 cannot tell you with certainty for a
20 particular manufacturer if that is true.
21      Q.   So you don't have that
22 opinion for ZHP, correct?
23      A.   My opinion is based upon
24 looking across all the testing data of

Page 153

1 all the manufacturers.  And so I cannot
2 say -- I cannot say without looking at
3 the individual manufacturers what my
4 opinion is for an individual.
5      Q.   For Hetero, is it your
6 opinion that for Hetero, there appear to
7 be lower levels of impurity in the
8 finished product compared to the API?
9      A.   As I stated, my opinion was
10 based upon looking at all the testing
11 data across all the manufacturers, so I
12 cannot at this time without reviewing the
13 data tell you with certainty what I would
14 say for Hetero in isolation.
15           MR. NIGH:  Let's go ahead
16      and take a break.
17           THE VIDEOGRAPHER:  Off the
18      record at 11:53 a.m.
19           (Short break.)
20           THE VIDEOGRAPHER:  We are
21      back on the record at 12:10 p.m.
22 BY MR. NIGH:
23      Q.   Doctor, I want to turn you
24 to Page 10 of your expert report.

Confidential Information Subject to Protective Order

Page 154

1    I want to direct you to the
2 attention -- to the following statement:
3 It says, "If one employs the LCE
4 definition proposed by Dr. Madigan to the
5 occupational exposure studies, the LCE
6 would use the lower bound of NDMA daily
7 level in the highest group."
8    Do you see that?
9    A.   Yes.
10   Q.   Is it your understanding
11 that Dr. Madigan -- Dr. Madigan's
12 definition of LCE for the dietary studies
13 was that he would use the lower bound of
14 NDMA daily level in the highest group?
15   A.   From what I remember, that
16 is the case.  We can go ahead and look at
17 his report, and I can point out where I
18 think I took that from.
19    MR. NIGH:  Let's go ahead
20   and attach that as an exhibit.
21    (Document marked for
22   identification as Exhibit
23   Ballman-6.)
24    MR. NIGH:  We can pull this

Page 155

1    document down.  This will be LP
2   1558.  It will be marked as
3   Exhibit 6.
4 BY MR. NIGH:
5   Q.   This is Dr. Madigan's expert
6 report.
7    Do you have this document as
8 well, Doctor?
9   A.   Yeah, I just see it now.
10   Q.   Okay.  Where in
11 Dr. Madigan's report do you believe that
12 he gives the definition for LCE for
13 dietary studies to mean that he would use
14 the lower bound of NDMA daily level in
15 the highest group?
16   A.   So if you go to Page 3,
17 Paragraph Number 8, on the -- I believe
18 it's the second-to-last sentence.  "For
19 each study I compute the mean lifetime
20 cumulative exposure as the average number
21 of days from birth to study end
22 multiplied by the lower bound of the NDMA
23 or NDEA daily level in the highest
24 group."

Page 156

1   Q.   Did Dr. Madigan compute any
2 other LCEs that you can see in this?
3   A.   Can you say that again,
4 please?
5   Q.   Did Dr. Madigan compute any
6 other LCEs for dietary studies other than
7 the lower bound of NDMA daily or NDEA
8 daily level in the highest group?
9   A.   So I believe if we go to his
10 table, Number 1, there are instances
11 where he notes that it's also significant
12 for the second quintile, first quintile,
13 and gives LCEs for those.  But that's an
14 exception from his original rule, is how
15 I took it.
16   Q.   Okay.  If we -- when you see
17 at the bottom, Page 7, you can see all
18 these asterisks.
19    Do you see that?
20   A.   Yes.
21    MR. NIGH:  Let's blow those
22   up.
23 BY MR. NIGH:
24   Q.   Those are other LCE that

Page 157

1 he's calculated, right?
2   A.   Yes.  I believe that's what
3 I said.
4   Q.   What do you think he's
5 referring to when he puts for the first
6 asterisk here, "LCE equals
7 3,506 micrograms"?  What do you think --
8   A.   So that --
9   Q.   -- that LCE is?  What does
10 that mean?
11    MR. STOY:  Object to the
12   form.
13    THE WITNESS:  So I'm pretty
14   sure I matched it.
15    What he did is he deviated
16   from his general rule of using the
17   highest group, and he did it for
18   the second quintile, because he
19   observed that that was
20   statistically significant even at
21   that level.
22    So he computed an LCE in
23   that case using the lower bound of
24   the second quintile.

Confidential Information Subject to Protective Order

Page 158

BY MR. NIGH:
Q.   So it's your belief that his definitions fully encompassed -- his definition of LCE is simply the average number of days from birth to study end multiplied by lower bound of NDMA or NDEA daily level in the highest group, as seen on Page 3?
A.   That's what he states for each study, that's how he computed a mean lifetime cumulative exposure.
I would take that as a definition.  That's how statisticians sort of define what they do.
Q.   Do you see Page 7, that for every single one of the dietary studies, he gives a base dose microgram and then an LCE microgram?
Do you see that?
A.   Yes.
Q.   And it says base high dose microgram and then LCE microgram.
Do you see that?
A.   Yes.  Yes.

Page 159

Q.   So for each study, he did calculate the LCE for the base high dose microgram for each study, correct?
A.   Yes, he calculated an LCE, as we see in that column.  Every column has a number.
Q.   But then, in addition -- so he followed his instruction on Page 8, where he says, "For each study I compute the mean lifetime cumulative exposure as the average number of days from birth to study."
So he did that for each study.  He followed that instruction, correct?
A.   Yes.
Q.   But he also calculated LCEs for lower quintiles, quartiles, or tertiles, correct?
A.   Yes.  But that wasn't his definition of how he was going to calculate an LCE.  This is a deviation from that.  And he doesn't note that.
Q.   Can't you see that in his

Page 160

statement in eight that it's not actually a definition of LCE, but rather what he's doing, the steps he's taking?
MR. STOY:  Object to the form.  Mischaracterization.
THE WITNESS:  So again, as a statistician reading this, knowing that it's written by another statistician, he -- to me, he is defining what he -- what an LCE is.
And that was his definition on Page 3.
However, in some instances, when a lower quintile comparison had a statistically significant result, and usually only in those instances does he deviate from that general definition.
BY MR. NIGH:
Q.   Okay.  Do you not see how that could be read that -- as not just a general definition, but rather a step that he took?

Page 161

MR. STOY:  Object to the form.
BY MR. NIGH:
Q.   In Number 8?
A.   That's not how I would read it, is all I'm saying.
In my opinion, that is what he meant by a definition, and then he made some deviations from it.
Q.   Yeah, but I'm asking you, can't you see, as you read it now that I'm pointing it out, that that could be just him explaining a step, not actually defining what LCE means?
MR. STOY:  Objection.  Form.  Asked and answered.
THE WITNESS:  Again, it says, "For each study I compute the mean lifetime cumulative exposure as."
To me, for each study, this was the definition that he was going to apply for what the LCE is.

Confidential Information Subject to Protective Order

Page 162

1    Having said that, he did
2 make some deviations, and in
3 instances where he found a
4 statistically -- or the report had
5 a statistically significant
6 association at lower levels, he
7 then deviated from this
8 definition.
9 BY MR. NIGH:
10    Q.    Did you review his testimony
11 when he discussed what an LCE is and
12 defined it in deposition?
13    A.    I did review his testimony.
14 I do not know how he defined LCE in his
15 deposition, offhand.  I don't know.
16    Q.    So you wouldn't know that he
17 actually didn't define LCE as only -- as
18 being for the highest group?
19    MR. STOY:  Object to the
20 form.
21    THE WITNESS:  Again, I was
22 asked to review his expert report
23 as the basis for the computed
24 lifetime cumulative thresholds.

Page 163

1    And it referred to his expert
2 report.
3    It did not refer to his
4 testimony.  So if he changed the
5 definition, I used the definition
6 in the expert report as what I was
7 asked to do.
8    MR. NIGH:  Let's pull up
9 Page 3 again where you've got
10 this -- where you believe there is
11 a definition of LCE.  Let's pull
12 that up.
13 BY MR. NIGH:
14    Q.    When you see, "For each
15 study I compute the mean lifetime
16 cumulative exposure" --
17    MR. NIGH:  And let's
18 underline the word "as."  No,
19 don't highlight that please.  Just
20 underline the word "as."
21    And underline the word "in,"
22 the highest group, the word "in."
23 Right before "the highest group,"
24 the word "in."

Page 164

1 BY MR. NIGH:
2    Q.    Okay.  Do you see those two
3 words, "as" and the word "in"?
4    A.    Yes.
5    Q.    How do you know that the
6 definition doesn't end before the word
7 "in"?
8    A.    Because that would be very
9 strange, because this is how one makes
10 the definition.
11    It's the entire thing.  It
12 says "in the highest group."
13    So one would read that as a
14 statistician that he's taking what the
15 bound is, the lower bound for the highest
16 group, as that's what he's going to use
17 in his computation for the LCE.
18    Q.    So when you see that there's
19 the words LCE for all these other
20 quartiles, how does that fit in with this
21 definition?
22    A.    Say that again, please.
23    Q.    When you see the words LCE,
24 like we saw all the asterisks and all the

Page 165

1 other LCEs, how does that fit in with
2 this definition?
3    A.    A deviation from this
4 definition, as I stated.
5    Q.    So that's the way in which
6 you would interpret it, is a deviation,
7 as opposed to the definition of LCE
8 simply being the average number of days
9 from birth to study end multiplied by the
10 lower bound of NDMA or NDEA, hard stop?
11    A.    Yeah, because it would have
12 to be in what.
13    Because that would be
14 ambiguous.
15    Q.    Okay.
16    A.    There are many lower bounds.
17    Q.    Well, nonetheless, you can
18 see that for each of the lower bounds --
19 there are many lower bounds, and that's
20 where we're going to go to Page 7.
21    MR. STOY:  Is there a
22 question pending?
23    MR. NIGH:  No, I'm going to
24 go to Page 7 here.

Confidential Information Subject to Protective Order

Page 166

¹ BY MR. NIGH:
²     Q.   So there are -- as you say,
³ there are many lower bounds, correct?
⁴     A.   Well, what I meant is when
⁵ one chunks the data into groups such as
⁶ tertiles, quartiles, or quintiles as was
⁷ done in the underlying studies, what
⁸ Dr. Madigan was doing was to be clear as
⁹ to which lower bound he was using of
¹⁰ which group, because there are numerous
¹¹ groups.  And he says the highest group in
¹² that definition.
¹³     Q.   Okay.  That's how you've
¹⁴ chosen to define it.  I think we looked
¹⁵ at that on the screen.  That's how you
¹⁶ chose to define it, as the "in," correct?
¹⁷     A.   As a -- yes.
¹⁸     MR. STOY:  Object to the
¹⁹ form.
²⁰     Hang on.  Object to the
²¹ form.
²²     Go ahead.
²³     THE WITNESS:  As a
²⁴ statistician, who -- who reads,

Page 167

¹ you know, stuff from other
² statisticians, I don't believe
³ it's just how I would interpret
⁴ that.
⁵     I believe any other
⁶ statistical expert would also
⁷ interpret it that way.
⁸ BY MR. NIGH:
⁹     Q.   But you didn't review his
¹⁰ testimony to see how he actually
¹¹ interpreted LCEs, correct?
¹²     A.   Again, it --
¹³     MR. STOY:  Object to the
¹⁴ form.
¹⁵     I'm sorry.  Go ahead.
¹⁶     THE WITNESS:  Again, I was
¹⁷ asked to look at -- again, in the
¹⁸ medical monitoring plan, the
¹⁹ definition or the basis for the
²⁰ stated lifetime cumulative
²¹ thresholds refers to the expert
²² report of Dr. Madigan.  It does
²³ not refer to his deposition
²⁴ transcription.

Page 168

¹     Therefore, that is what I
² used, because I was asked to see
³ how those lifetime cumulative
⁴ thresholds, what evidence there is
⁵ for those by looking at the expert
⁶ reports -- by -- I'm sorry.
⁷     I was asked to -- evidence
⁸ for those, and the medical
⁹ monitoring plan referred to those
¹⁰ expert reports.
¹¹ BY MR. NIGH:
¹²     Q.   Okay.  Nonetheless, he uses
¹³ the letters "LCE" for lower quartiles,
¹⁴ quintiles, or tertiles, not just the
¹⁵ highest tertile, for both the dietary
¹⁶ studies and the occupational exposure
¹⁷ studies, correct?
¹⁸     A.   So he uses the highest
¹⁹ group, not highest tertiles.  So if the
²⁰ groups were in tertiles, then it would be
²¹ the highest tertiles.  If the groups were
²² in quintiles, it would be the highest
²³ quintiles, so the highest group.
²⁴     Q.   No, he actually puts the

Page 169

¹ letters "LCE" when referring to lower
² groups both in dietary studies and the
³ Hidajat study, correct?
⁴     A.   He uses that -- those
⁵ letters, that is correct.  And I'm saying
⁶ he's deviating from his general
⁷ definition of how he computed the LCE.
⁸     Q.   Okay.  You've decided to
⁹ make that determination blind to anything
¹⁰ that he had clarified in his deposition
¹¹ testimony, correct?
¹²     MR. STOY:  Objection.
¹³ Argumentative.
¹⁴     THE WITNESS:  So again, I
¹⁵ was asked to look at the medical
¹⁶ monitoring plan and the proposed
¹⁷ LCTs.  And when I looked at that,
¹⁸ the -- for evidence to support
¹⁹ those LCTs, and when I looked at
²⁰ the medical monitoring part, it
²¹ says based on the expert reports.
²² It did not say based on a
²³ deposition transcription.
²⁴ BY MR. NIGH:

Confidential Information Subject to Protective Order

Page 170

```
 1      Q.   So you -- even though you
 2  reviewed Dr. Madigan's testimony, you
 3  didn't feel it was important to see how
 4  he defined LCEs in his deposition
 5  testimony because of that, right?
 6      MR. STOY:  Object to form.
 7  Misstates her testimony.
 8      THE WITNESS:  Again, I was
 9  charged with looking at the
10  medical monitoring plan, looking
11  at what the proposed LCTs were and
12  determining whether or not there
13  was evidence to support those.
14      What was referred to with
15  how those LCTs were derived, the
16  only things that were cited were
17  the expert reports of
18  Dr. Panigrahy, as well as Dr.
19  Madigan.
20      It did not say as well as
21  their testimony.
22  BY MR. NIGH:
23      Q.   I understand that statement.
24  So you took that statement to believe,
```

Page 171

```
 1  then, that you did not have to consider
 2  Dr. Madigan's clarifications in his
 3  deposition testimony; is that accurate?
 4      MR. STOY:  Form objection.
 5      THE WITNESS:  So I would
 6  have to see if there were
 7  clarifications, because off of the
 8  top of my head, I don't remember
 9  his testimony.
10      And again, that -- his
11  testimony was not cited in what
12  the basis were for coming up with
13  the LCTs.
14  BY MR. NIGH:
15      Q.   You keep coming up -- coming
16  back to his testimony not cited for the
17  basis for his coming up with the LCTs.  I
18  keep asking you about the deposition
19  testimony.
20      It sounds to me like you're
21  saying because it's not cited in Kaplan's
22  report -- is that what you're referring
23  to?
24      MR. STOY:  Object to the
```

Page 172

```
 1  form of the question.
 2      Go ahead.
 3      THE WITNESS:  What I was
 4  saying was, it was not cited in
 5  the medical monitoring plan for
 6  the basis of forming the LCTs.
 7  BY MR. NIGH:
 8      Q.   Okay.  Since it's not cited
 9  in the medical monitoring plan for the
10  basis of forming LCTs, is that the reason
11  you would not look at the deposition
12  testimony?
13      MR. STOY:  Object to the
14  form.
15      THE WITNESS:  So I believe I
16  stated that I had looked at the
17  deposition testimony.
18      And I think I've also stated
19  that I don't recall him changing
20  the definition of the LCE or
21  clarifying it.  He could may well
22  have.
23      But again, I didn't think it
24  was relevant because that was not
```

Page 173

```
 1  cited as the basis for determining
 2  the LCTs in the medical monitoring
 3  report.
 4  BY MR. NIGH:
 5      Q.   I want to see if I have your
 6  testimony accurate.
 7      So if he -- you reviewed the
 8  Madigan deposition testimony, correct?
 9      A.   Yes.
10      Q.   So if he clarified his
11  definition of LCEs in that testimony, is
12  it your testimony that you would think
13  that's not relevant because that was not
14  cited as the basis for determining the
15  LCTs in the medical monitoring report?
16      A.   Again, I don't know how he
17  clarified or if he clarified in the
18  deposition.  I cannot remember in his
19  testimony whether he clarified or changed
20  the definition of an LCE.
21      And secondly, I'm not sure
22  when the medical monitoring report was
23  derived or created in respect to whether
24  or not there was a clarification made as
```

Confidential Information – Subject to Protective Order

Page 174

¹ to what an LCE is.
²     Q.   That doesn't answer my
³ question.
⁴         You raised multiple times
⁵ that Madigan's deposition testimony was
⁶ not cited in the medical monitoring
⁷ report.  You raised that multiple times,
⁸ right?
⁹     A.   Yes, that's correct.
¹⁰     Q.   I'm trying to understand why
¹¹ that's -- why that's important to you.
¹²         If he didn't -- if -- so
¹³ here's my question.
¹⁴         If he clarified his
¹⁵ definition of LCEs in his deposition
¹⁶ testimony, is it your testimony that you
¹⁷ would think that's not relevant because
¹⁸ that was not cited as the basis for
¹⁹ determining the LCTs in the medical
²⁰ monitoring report?
²¹         MR. STOY:  Object to the
²² form.
²³         THE WITNESS:  So my response
²⁴ is, is that I was asked to look at

Page 175

¹     what evidence there is for the
²     LCTs.
³         So when I looked at the
⁴     medical monitoring report to see
⁵     how the LCTs were derived, the
⁶     only statement in there that was
⁷     relevant was that it's on the
⁸     basis of Dr. Madigan's and
⁹     Dr. Panigrahy's expert reports.
¹⁰         I do not know when the
¹¹     medical monitoring plan was
¹²     devised, if it was devised after,
¹³     and I don't even know if Dr.
¹⁴     Madigan changed his definition of
¹⁵     LCE in his -- because I'm
¹⁶     surprised that it's not changed in
¹⁷     the actual expert -- expert
¹⁸     report.
¹⁹         So I just don't know the
²⁰     timing of that.  So again, that's
²¹     why I went off of what was cited
²²     as the basis for the LCT, which
²³     was the actual expert report.
²⁴ BY MR. NIGH:

Page 176

¹     Q.   So you didn't consider
² Dr. Madigan's testimony at all when
³ look -- deposition testimony at all when
⁴ looking to see what the definition of LCE
⁵ is in his expert report?
⁶     A.   You know, not that I can
⁷ remember.  I went off of what was cited
⁸ as the basis for coming up with the LCTs
⁹ within the medical monitoring report,
¹⁰ because I was told to look for evidence
¹¹ for the basis of that.
¹²         The only evidence given was
¹³ that this was based upon his expert
¹⁴ report, and it did not say that it was
¹⁵ based upon that and his testimony.
¹⁶     Q.   Okay.  I want to draw your
¹⁷ attention to Page 10 of your report.
¹⁸         The very last sentence you
¹⁹ put, "It cannot be assumed that studies
²⁰ relating to NDMA can be used to assess
²¹ hazard or risk with respect to NDEA.
²² Indeed, genotoxicity and carcinogenicity
²³ vary greatly within the class of
²⁴ impurities known as nitrosamines, with

Page 177

¹ some, such as those found in cigarette
² smoke, designated by IARC as Class I and
³ others falling in lower classifications."
⁴         Do you see that?
⁵     A.   Yes.
⁶     Q.   When you're making the
⁷ statement that it cannot be assumed that
⁸ studies related to NDMA can be used to
⁹ assess hazard or risk with respect to
¹⁰ NDEA, what documents are you relying upon
¹¹ for that statement?
¹²     A.   I am not relying on any
¹³ specific document.
¹⁴     Q.   What expertise do you have
¹⁵ in terms of understanding the
¹⁶ similarities between NDMA and NDEA?
¹⁷     A.   That is outside my level of
¹⁸ expertise.  All I note is that I do know
¹⁹ that there are nitrosamines found in
²⁰ cigarette smoke that are in a different
²¹ class from nitro -- from other agents in
²² that class.  That's the extent of my
²³ knowledge.
²⁴     Q.   Why would other agents in

Confidential Information - Subject to Protective Order

Page 178

1 that class play upon your understanding
2 as to whether or not NDMA and NDEA are
3 similar?
4     A.   Because they're agents
5 within that class.
6     Q.   Did you look at the
7 similarities between NDMA and NDEA at
8 all?
9         MR. STOY:  Object to the
10     form.
11         THE WITNESS:  Similarities
12     with respect to what?  Other than
13     being in the same class, that's
14     about the extent of it.
15 BY MR. NIGH:
16     Q.   So the only statement that
17 you have for suggesting that ND -- you
18 cannot assume that studies relating to
19 NDMA can be used to assess hazard or risk
20 with respect to NDEA is simply because
21 they're in the same class?
22         MR. STOY:  Object to the
23     form.
24         Go ahead.

Page 179

1         THE WITNESS:  No.  My -- my
2     point there is, is nitrosamines
3     include many different agents.
4         And we know that one is that
5     found in cigarette smoke, which is
6     designated by IARC as a Class I.
7         We know that NDMA and NDEA
8     are not classified as Class I; so,
9     therefore, you cannot just assume
10     blankety that anything in the
11     class of nitrosamines are
12     identical and can be treated the
13     same way with respect to their
14     hazard.
15 BY MR. NIGH:
16     Q.   Is it your belief that any
17 expert that's treating NDMA and/or -- or
18 NDMA and NDEA similarly, simply because
19 they are in the same class of
20 nitrosamines?
21     A.   I'm sorry.  Could you
22 rephrase that?  I thought you were going
23 on.  Sorry.
24     Q.   Is it your belief that any

Page 180

1 expert is treating NDMA and NDEA
2 similarly, simply because they're in the
3 same class of nitrosamines?
4     A.   I do not know.
5     Q.   What is this criticism
6 referring to?  I mean, who's giving
7 testimony that NDMA and NDEA are similar
8 or that the studies related to NDMA can
9 be used to assess hazard or risk with
10 respect to NDEA simply because they're in
11 the same class of nitrosamines?  Who
12 gives that testimony?
13     A.   So if you look at the entire
14 paragraph, that wasn't my intent.
15         My intent is that there is
16 only a single study on NDEA.  And
17 therefore, one cannot make any sort of
18 statement of causality on the basis of
19 one study.
20         And the only other
21 implication might be that one would say,
22 well, we have all these studies on NDMA
23 where we have shown -- or have observed
24 some associations across studies;

Page 181

1 therefore, the same would hold for NDEA.
2         That was my point, that one
3 cannot do that.
4     Q.   And you're saying --
5     A.   There was one study on NDEA.
6     Q.   And the only criticism that
7 you can come up with as to why you can't
8 look at those similarities is because
9 NDMA and NDEA are in the same class, and
10 simply being in the same class, you can't
11 look at similarities between those
12 because they're in the same class?
13         MR. STOY:  Object to the
14     form.
15         THE WITNESS:  Again, I'm
16     saying that with respect to the
17     associations, and if one is
18     looking at a causality-type
19     question, one cannot infer from
20     the multiple NDMA studies that one
21     would see similar -- similar
22     results if there were more than
23     one NDEA, just because they're in
24     the same class.

Confidential Information Subject to Protective Order

Page 182

BY MR. NIGH:
Q.   Okay.  Well, I'm going to --
other than just because they're in the
same class, I'm going to ask you, with
respect to the associations, and if one
is looking at a causality-type question,
one can infer from the multiple NDMA
studies that one would see similar
results if there were more than one NDEA
study, correct?
A.   No, I disagree with that.
That was my point.
Q.   But the only thing that
you're disagreeing with is because they
are in the same class.
Are there other reasons that
you might be able to infer studies on one
carcinogen that's very similar to another
carcinogen, other than it being in the
same class?
MR. STOY:  Objection to the
form.
Also objection to the extent
that it's beyond the scope.

Page 183

THE WITNESS:  Yeah, this is
beyond the scope of my expertise.
All I'm pointing out is I
know -- and I know from other
agents in other classes of drugs
that get tested in cancer, that
one, just because they're in the
same class, one cannot treat one
agent as acting the same as
another agent until there is
evidence to support that.
And I -- there may be
evidence to support that, but I
just said you need -- I mean, you
just can't assume it.  That's all
I said.
BY MR. NIGH:
Q.   What do you believe that the
evidence is to support it?  Have you
looked for it or looked at it in any way?
MR. STOY:  Objection.
Beyond the scope.
THE WITNESS:  It's just
beyond the -- because, again, that

Page 184

is beyond my scope, because I was
not asked to look at the
similarities or dissimilarities.
All I'm saying is that there
is only one study done in NDEA,
and one cannot infer from what one
might infer from the multiple
studies in NDMA, that the same
would hold for NDEA just because
they're in the same class.  That's
what I stated.
BY MR. NIGH:
Q.   Are you aware that there are
entire sections dedicated to multiple of
plaintiffs' expert reports are
dedicated to showing the similarities
between NDMA and NDEA?  Are you aware of
that at all?
MR. STOY:  Object to the
form.
THE WITNESS:  I am not aware
of this.  And again, this is
beyond my scope.
All I observed is you just

Page 185

can't make that inference from
what you found in NDMA to what
might happen in NDEA, just because
they're in the same class.
And it's good that there are
other experts that can weigh in on
that.
BY MR. NIGH:
Q.   So since you are unaware
that there are entire sections dedicated
in multiple plaintiffs' expert reports to
showing the similarities between NDMA and
NDEA, you did not look at those
underlying data at all or those
underlying studies demonstrating those
similarities, correct?
MR. STOY:  Objection.
Scope.
THE WITNESS:  That's beyond
the scope of what I was asked to
do.  And I did not look at those.
BY MR. NIGH:
Q.   You next state, "Even
assuming studies concerning NDMA have

Confidential Information Subject to Protective Order

Page 186

¹ some bearing on the risk associated with
² NDEA, given the variability in the
³ reported NDMA LCE values in the dietary
⁴ studies found to be statistically
⁵ significant, it is likely that there
⁶ would be similar variability in the NDEA
⁷ levels, had more studies measured NDEA."
⁸        Do you see that?
⁹        A.   Yes, I do.
¹⁰        Q.   So you believe that if
¹¹ another study were to come out and look
¹² at increased risk of various types of
¹³ cancers versus the NDEA that they're
¹⁴ getting in their diet, that it would be
¹⁵ likely there would be similar variability
¹⁶ in the NDEA levels, had more studies
¹⁷ measured NDEA; is that accurate?
¹⁸        A.   I believe so.  What I was
¹⁹ saying there is that the NDMA studies
²⁰ have a lot of variability.  And that
²¹ variability is due to the fact that
²² they're observational studies and there's
²³ all sorts of confounding, which makes the
²⁴ values very variable.

Page 187

¹        And the NDEA study that was
² done was also an observational dietary
³ study.  And if similar studies of the
⁴ same design came out, it's very likely,
⁵ just due to that residual confounding in
⁶ the study design of the observational
⁷ nature, that there would be similar
⁸ variability in the NDEA observed
⁹ associations.
¹⁰        It has to do with study
¹¹ design.
¹²        Q.   I want to draw your
¹³ attention to Page 14 in the expert
¹⁴ report.
¹⁵        And here you put at the
¹⁶ bottom of the page, "To illustrate how
¹⁷ calculations were performed, I step
¹⁸ through it for ZHP API and gastric
¹⁹ cancer."
²⁰        And then you give two steps.
²¹ "To get the daily amount, divide
²² 1,962 micrograms by 91.3 days.  To get
²³ the ppm, multiply the daily amount by
²⁴ 1,000 nanogram per microgram and divide

Page 188

¹ by 320."
²        Do you see that?
³        A.   Yes.
⁴        Q.   Did you perform any other
⁵ steps for that calculation?
⁶        A.   Not for the number that's in
⁷ Table 3 that is the number of 21.5 and
⁸ then the number beneath it, which is 67.2
⁹ parts per million.  That's how I got that
¹⁰ number.
¹¹        Q.   Now, that number, the 21.5,
¹² that's coming from the gastric cancer
¹³ dietary study, correct?
¹⁴        A.   Sorry.  Say that -- it's
¹⁵ coming from the LCE computed by
¹⁶ Dr. Madigan for the gastric -- for
¹⁷ gastric.
¹⁸        MR. NIGH:  Can we actually
¹⁹     blow up the footnotes right below
²⁰     the star, the one and the two with
²¹     the chart.
²² BY MR. NIGH:
²³        Q.   You footnote it.  You say
²⁴ gastric, Footnote 1, and it says from

Page 189

¹ dietary exposure studies.
²        Do you see that?
³        A.   Yes.
⁴        Q.   So as you were --
⁵        A.   And then there's an
⁶ asterisk -- sorry.  Go ahead.
⁷        Q.   So as you were looking at
⁸ the --
⁹        MR. NIGH:  Well, keep that
¹⁰     up there, please.
¹¹ BY MR. NIGH:
¹²        Q.   As you were looking at
¹³ these, you would see that, first off, the
¹⁴ gastric LCE is coming from the dietary
¹⁵ exposure studies, correct?
¹⁶        A.   From Dr. Madigan's
¹⁷ calculation of the LCE based upon the
¹⁸ dietary gastric studies.
¹⁹        Q.   Okay.  And so that would be
²⁰ true for gastric, lung, esophageal and
²¹ rectal, correct?
²²        A.   Yes.
²³        Q.   And then for all, you're
²⁴ getting that from Hidajat, correct?

Confidential Information Subject to Protective Order

Page 190

1    A.   From the occupational
2 exposure studies, yes.  And also the
3 LCE -- sorry, the LCE as computed by
4 Dr. Madigan based upon the occupational
5 study.
6    Q.   So when you see gastric,
7 lung, esophageal, and rectal, those would
8 all be from dietary studies, correct?
9    A.   They're the LCEs computed
10 from dietary studies, correct, as
11 computed by Dr. Madigan.
12    Q.   Now, you also looked at some
13 of those underlying dietary studies,
14 correct?
15    A.   I looked at them, yes.
16    Q.   Did you recognize that
17 what's occurring in the dietary study is
18 you're measuring, first, people's NDMA in
19 the highest quartile, versus NDMA in the
20 lower quartile -- the lowest quartile and
21 seeing whether or not there are increased
22 risk of cancer as there increased
23 consumptions of NDMA?
24        MR. STOY:  Object to the

Page 191

1 form.
2        THE WITNESS:  There's a lot
3 of studies there.  And I cannot
4 say with any sort of certainty
5 that the studies all use the same
6 methodology.
7        So, you know, in some cases
8 that may be true.  But I'd have to
9 look again at each of the studies
10 to see sort of exactly what they
11 were reporting.
12 BY MR. NIGH:
13    Q.   So as you sit here today,
14 you're not sure as to whether or not
15 those studies are measuring the highest
16 group versus the lowest group or the
17 second highest group versus the lowest
18 group or the third highest group versus
19 the lowest group?
20        MR. STOY:  Form objection.
21        THE WITNESS:  That is
22 correct, because it doesn't matter
23 for this table, because I took the
24 LCE as computed from Dr. -- by

Page 192

1 Dr. Madigan, who stated in his
2 general definition, he took the
3 lower bound of the highest group,
4 multiplied by whatever the median
5 age was, and so forth, to come up
6 with the 1,962.
7        All I'm noting there is they
8 were based on dietary studies,
9 because -- that's it.
10        So I did not go in and look
11 at each sort of gastric and see
12 exactly what they were comparing.
13 Dr. Madigan had done that.
14 BY MR. NIGH:
15    Q.   I understand.  But each of
16 the dietary studies, they're measuring
17 higher amounts of -- people with higher
18 amounts of NDMA compared to people with
19 lower amounts of NDMA in the diet,
20 correct?
21    A.   Again, I'd have to look at
22 each study to confirm that that is the
23 case.
24        Off the top of my head, I

Page 193

1 just can't tell you what methodology was
2 used in each of the studies.
3    Q.   At any point in your
4 calculations, did you ever consider the
5 background NDMA for the lowest quartile
6 amount of NDMA that people would be
7 getting in their diets?
8    A.   I used the LCE as computed
9 by Dr. Madigan.  And if he did not
10 consider that or if that was not
11 considered in the studies upon which he
12 based his LCE, then the answer would be
13 no.  It's whatever was considered in
14 those studies.
15    Q.   Now, you're saying --
16    A.   And I did not do -- sorry.
17 Go ahead.
18    Q.   You've given me an if.  If
19 it's not considered in those studies,
20 then the answer would be no.
21        My question is not an if,
22 then.
23        My question is, at any point
24 in your calculations did you ever

Confidential Information - Subject to Protective Order

Page 194

¹ consider the background NDMA for the low
² quartile amount of people -- or the low
³ quartile amount of NDMA that people would
⁴ be getting in their diet?
⁵         MR. STOY:  Objection.  Asked
⁶ and answered.
⁷         THE WITNESS:  So I'm not
⁸ sure why I would do that.  Because
⁹ again, for the LCTs, I was asked
¹⁰ to determine if there was evidence
¹¹ to support the proposed LCTs in
¹² the medical monitoring report.
¹³         And the only evidence that
¹⁴ was cited in that report for the
¹⁵ basis of those were referring to
¹⁶ the expert reports of Dr. Madigan
¹⁷ and Panigrahy.
¹⁸         So I took what Dr. Madigan
¹⁹ did, as you see there, his LCEs.
²⁰         And again, as I stated, if
²¹ he did not consider the
²² background, I certainly did not,
²³ because that would have gone above
²⁴ and beyond what I was asked to do.

Page 195

¹ BY MR. NIGH:
²         Q.   Did you see that this is
³ explicitly mentioned in Dr. Panigrahy's
⁴ expert report, the same issue that I'm
⁵ discussing with you right now, that
⁶ people will have a background amount of
⁷ NDMA, and that this needs to be -- in
⁸ their diet, and that this needs to be
⁹ considered, as to whether or not people
¹⁰ are reaching LCEs or lifetime cumulative
¹¹ exposures?
¹²         MR. STOY:  Form objection.
¹³         THE WITNESS:  I do recall
¹⁴     that he mentioned background
¹⁵     levels.
¹⁶         But in his LCE calculations,
¹⁷     he also did not provide any sort
¹⁸     of how -- he did not incorporate
¹⁹     that in his calculation as well.
²⁰ BY MR. NIGH:
²¹         Q.   So because he didn't
²² actually spell out the amount of NDMA
²³ that would be considered for background
²⁴ amount of NDMA, you didn't include that

Page 196

¹ in your calculations as you were trying
² to arrive to how do we reach these
³ thresholds?
⁴         MR. STOY:  Objection.
⁵ Misstates her testimony.
⁶         THE WITNESS:  So again, let
⁷ me go through.
⁸         So again, I was asked if
⁹ there is evidence for the basis of
¹⁰ the LCTs that are stated in the
¹¹ medical monitoring plan.
¹²         And the plan says that the
¹³ basis for the LCTs are what is
¹⁴ reported in Dr. Panigrahy's and
¹⁵ Dr. Madigan's reports.
¹⁶         In those reports, I do
¹⁷ not -- I just use the numbers that
¹⁸ they used.  So I was not -- I was
¹⁹ not developing the LCTs.
²⁰         And therefore, I don't think
²¹ it would be upon me to account for
²² any background exposure levels
²³ because, again, that was not
²⁴ accounted for in the expert

Page 197

¹     reports.
² BY MR. NIGH:
³         Q.   So to be clear, in all your
⁴ calculations that you did, you never
⁵ included background amount of NDMA or
⁶ NDEA in your calculations whatsoever,
⁷ correct?
⁸         A.   Again, that is correct,
⁹ because in the expert reports, which was
¹⁰ the basis for the stated LCT levels in
¹¹ the medical monitoring report, they did
¹² not correct for that background
¹³ information.
¹⁴         So I would have been going
¹⁵ beyond what was in those expert reports
¹⁶ and adding my own to come up with the
¹⁷ LCTs, which were not my LCTs.  I was not
¹⁸ asked to compute an LCT, a new one or
¹⁹ derive one.
²⁰         Q.   So even though Panigrahy
²¹ mentions that the LCE that he has
²² calculated also doesn't take into account
²³ the threshold exposure to NDMA that a
²⁴ valsartan patient has because of diet,

Confidential Information Subject to Protective Order

Page 198

you also would not have included that in
your calculation?

A.   Again, I was not asked to
come up with LCTs.  I was asked to say,
is there evidence for the actual LCTs
that were proposed in the medical
monitoring plan.  The only basis and
information given that I could find in
that plan for the basis of how those LCTs
were derived was a citation to the expert
reports of Dr. Panigrahy and Dr. Madigan.

And in those expert reports,
I did not -- even though it may have been
mentioned that there may be background
NDMA or NDEA exposure, nowhere in those
reports was there a calculation done that
adjusted for those.

I was not deriving the LCTs
de novo.  That was not what I was asked
to do.  So I did not incorporate
background -- or the background levels
because the experts had not done that.

Q.   Now, I want to see if I have
this accurate.  Even though the experts

Page 199

specifically state how much NDMA -- or
even though -- sorry, strike that.

I want to see if I have this
accurate.  Even though Dr. Panigrahy
specifically states how much NDMA people
would have as a background amount, and
his LCEs also demonstrate for what age he
would have calculated, you didn't do that
calculation yourself in trying to see how
these LCTs were calculated because you
didn't see that specific calculation in
Dr. Panigrahy's report?

MR. STOY:  Objection.  Asked
and answered at least ten times.
You can answer it again.

MR. NIGH:  It's actually
not.

THE WITNESS:  That is --

BY MR. NIGH:

Q.   So you can answer.

A.   That is correct.  That is
correct.  Dr. Panigrahy notes that there
would be some background NDEA -- NDMA
and/or NDEA exposure.  But he did not

Page 200

include that in his calculated LCE
levels.

And I should also state that
in those expert reports, nowhere is there
a calculation of an LCT.

So there -- it's just not
transparent as to how those LCTs were
calculated.

So I don't think it's upon
me to come up with a new definition of
LCT that goes beyond what the experts
provided, which was just LCEs.

Q.   Did you consider
Dr. Madigan's testimony at all when he
mentioned that you would also have to
consider the background amount of NDMA
that people were getting in their diet
when looking at whether or not people are
reaching LCEs?

MR. STOY:  Form objection.

THE WITNESS:  So this goes
back to the similar response as
before, that, again, all I had to
go on was what was cited in the

Page 201

medical monitoring plan for how
the LCTs were derived because it
wasn't transparently stated in
there, like, here's the formula,
this is what we did, here's the
evidence, other than citing the
expert reports.

So I went to the expert
reports to try to figure out how
to -- you know, if it was clear
from there, in an easy transparent
way of coming up with those LCT
levels.

So I don't know if
Dr. Madigan in his expert report
even mentioned background NDMA or
NDEA exposures with respect to his
LCEs.

MR. NIGH:  I think now is a
good time to take a lunch break.

MR. STOY:  Okay, great.

THE VIDEOGRAPHER:  Off the
record.  12:59.

- - -

Confidential Information - Subject to Protective Order

Page 202

1      (Whereupon a luncheon recess
2  was taken.)
3          - - -
4      THE VIDEOGRAPHER:  We are
5  back on the record at 1:44 p.m.
6          - - -
7      EXAMINATION
8          - - -
9  BY MR. NIGH:
10     Q.   Doctor, I'm looking at Page
11 15 of your expert report.  I'm going to
12 ask you some questions here.
13     A.   Okay.
14     Q.   So specifically, you give
15 the statement, "Comparing these values to
16 the level of impurity cited in
17 Dr. Panigrahy's report, there is no match
18 except for ZHP API, but only for gastric
19 cancer if we take the average of the
20 midpoints for ZHP, which is approximately
21 66.4 ppm."
22     How do you -- how did you
23 figure that the midpoint -- if you take
24 the average of the midpoints for ZHP that

Page 203

1  you would reach those levels for gastric
2  cancer?
3      A.   So, you know, I was trying
4  to see if I could come up with the
5  numbers in any way.  So I was trying
6  various other sort of combinations that
7  were suggested in the past as to whether
8  I looked at sort of midpoints or averages
9  or things like that.
10     So that was just the thing
11 that came sort of closest to the number
12 in the table above.
13     Q.   So you looked at the levels
14 reported in Dr. Panigrahy's report to
15 make this statement?
16     A.   At this time, I'm not sure
17 if I did the midpoints from that report
18 or some other report.  And I see that I
19 do not cite it there.
20     But it looks like I took it
21 from his report.
22     Q.   Did you also look at the
23 underlying document to confirm that that
24 document indeed showed those ranges for

Page 204

1  ZHP API?
2      A.   I'm sorry.  Could you
3  specify which document?
4      Q.   Whichever document that
5  Dr. Panigrahy was citing for that --
6  those values?
7      A.   I don't remember at this
8  point if I actually looked at the
9  document from where he took those values
10 or not.
11     Q.   On the table above, it shows
12 cancers, and it shows gastric cancer,
13 lung, esophageal, rectal, and all.
14     Do you see that?
15     A.   In Table 3?
16     Q.   Table 3, correct.
17     A.   Yep.  Yes.
18     Q.   And in fact, actually the
19 two, that refers to -- under all, that
20 refers to occupational exposure studies,
21 correct?
22     A.   That is correct.
23     Q.   Now, when you put the words
24 "all" there in this chart, are you

Page 205

1  referring to all the cancers other than
2  gastric, lung, esophageal, and rectal?
3      A.   I'd have to look at the
4  occupational exposure study or
5  Dr. Madigan's report.
6      So I got that from Number
7  34 -- or Paragraph 34 in Dr. Madigan's
8  report, per Hidajat.  I'm not sure if I'm
9  pronouncing the name right.
10     Cumulative exposure greater
11 than 75 -- that number, 7,514
12 statistically significant increases one's
13 risk of developing the following cancers.
14     So what I meant by all are
15 bladder, lung, stomach, multiple myeloma,
16 esophageal, prostate.  Even though it
17 says prostate twice, I presume he meant
18 one of those times to be pancreas.
19     Q.   Okay.  And so when you're
20 looking at all, you're referring to each
21 of those individual cancers increased
22 risk seen in the Hidajat study, correct?
23     A.   Yes.  That's my
24 understanding of what Dr. Madigan is

Confidential Information - Subject to Protective Order

Page 206

1 saying there, that at that level, each of
2 those individual cancers had an
3 association with the corresponding cancer
4 at that level.
5     Q.   In your -- in terms of
6 looking at whether or not there is an
7 increased risk of all cancer, did you see
8 any studies that actually looked --
9 lumped all cancers together to see if
10 there was an increase in the risk of all
11 cancer, you know, for people taking NDMA
12 versus -- or for people having higher
13 amounts of NDMA versus people having
14 exposure to lower amounts of NDMA?
15     A.   Off the top of my head, I
16 cannot say with certainty whether any of
17 those manuscripts just did a calculation
18 for any type of cancer and then broke it
19 into the individual cancers, but that's
20 not what I meant by "all" there.
21         MR. NIGH:  All right.  I
22 don't have any further questions.
23 Thank you, Doctor.
24         MR. STOY:  Okay.  Daniel,

Page 207

1 let's take five minutes and we'll
2 come back on.
3         MR. NIGH:  Sounds good.
4         THE VIDEOGRAPHER:  Off the
5 record.  1:52.
6         (Short break.)
7         THE VIDEOGRAPHER:  We are
8 back on the record at 1:57 p.m.
9         MR. STOY:  Okay.
10 Dr. Ballman, I don't have any
11 questions for you.
12         We will read and sign.
13         And I believe that concludes
14 the deposition.
15         MR. NIGH:  Thank you for
16 your time, Dr. Ballman.
17 Appreciate it.
18         THE WITNESS:  Nice to meet
19 you, Mr. Nigh.
20         MR. NIGH:  You too.
21         THE VIDEOGRAPHER:  That
22 concludes today's deposition.  The
23 time is 1:57 p.m.
24

Page 208

1         *********
2         (Excused.)
3         (Deposition concluded at
4 approximately 1:59 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 209

1
2         CERTIFICATE
3
4
5         I HEREBY CERTIFY that the
witness was duly sworn by me and that the
6 deposition is a true record of the
testimony given by the witness.
7
8         It was requested before
completion of the deposition that the
witness, KARLA V. BALLMAN, Ph.D., have
9 the opportunity to read and sign the
deposition transcript.
10
11
12
_____
13 MICHELLE L. GRAY,
A Registered Professional
Reporter, Certified Shorthand
14 Reporter, Certified Realtime
Reporter and Notary Public
15 Dated:  February 24, 2022
16
17
18         (The foregoing certification
19 of this transcript does not apply to any
20 reproduction of the same by any means,
21 unless under the direct control and/or
22 supervision of the certifying reporter.)
23
24

Page 210

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 212

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 213, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____

KARLA V. BALLMAN, Ph.D.        DATE

Subscribed and sworn
to before me this
_____ day of _____, 20____.
My commission expires:_____

_____

Notary Public

Page 211

- - - - -
E R R A T A
- - - - -

PAGE  LINE  CHANGE
_____ ____  _____
REASON: _____
_____ ____  _____
REASON: _____
_____ ____  _____
REASON: _____
_____ ____  _____
REASON: _____
_____ ____  _____
REASON: _____
_____ ____  _____
REASON: _____
_____ ____  _____
REASON: _____
_____ ____  _____
REASON: _____
_____ ____  _____
REASON: _____

Page 213

LAWYER'S NOTES
PAGE  LINE
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____

Confidential Information - Subject to Protective Order

**WORD INDEX**

< $ >
**$16,600**  29:*11*

< 0 >
**0.96**  115:*7*
**01**  125:*14*
  126:*16*
  127:*24*  128:*1,
24*  129:*1, 14*
**02109**  3:*15*
**048**  115:*10*
**07068**  2:*9*
**07102**  4:*9*
**08543**  4:*20*

< 1 >
**1**  15:*3*  107:*2*
  114:*19*
  156:*10*
  188:*24*  212:*6*
**1,000**  187:*24*
**1,962**  187:*22*
  192:*6*
**1/12/22**  6:*22*
**1/28/22**  6:*18*
**1:44**  202:*5*
**1:52**  207:*5*
**1:57**  207:*8, 23*
**1:59**  208:*4*
**10**  6:*5*
  153:*24*  176:*17*
**10:15**  73:*10*
**10:27**  73:*13*
**100**  4:*9*
**103**  2:*8*
**11**  3:*10*
**11:53**  153:*18*
**118**  7:*6*
**12**  29:*14*
**12:10**  153:*21*
**12:59**  201:*23*
**120**  143:*16*
**122**  137:*14*
**12th**  29:*11*
**14**  47:*13*
  187:*13*
**15**  6:*15*

29:*17*  202:*11*
**15219**  3:*5*
**154**  7:*7*
**1558**  155:*2*
**15th**  4:*9*
**16**  131:*16, 17*
**17**  6:*15*
**1768**  30:*5*
**1769**  15:*1*
**1779**  118:*3*
**1796**  27:*22*
**1797**  17:*15*
  22:*12*
**19-2875**  1:*5*

< 2 >
**2**  18:*12, 13*
  144:*8, 10, 15,
19*  145:*2*
**20**  29:*17*
  212:*20*
**200**  4:*3*  57:*3*
**20002**  2:*22*
**2002**  61:*18*
**202**  2:*23*
**2020**  28:*19*
**2021**  28:*11,
20, 24*  29:*4,
11, 15*
**2022**  1:*11*
  9:*9*  209:*15*
**21**  4:*19*
**21.5**  188:*7, 11*
**213**  212:*6*
**213-7047**  3:*16*
**22**  1:*11*  9:*8*
  16:*22*
**220**  146:*6*
**2220**  4:*15*
**225**  66:*4*
**227**  3:*20*
**228-9898**  2:*9*
**22nd**  16:*22*
**230**  4:*15*
**231-6491**  3:*11*
**24**  209:*15*
**2500**  4:*4*
**26.5**  98:*22*
**260**  2:*13*
**263-1840**  3:*5*

**27**  6:*18*
**27th**  3:*15*
**28**  121:*23*
  122:*21*
**28202**  3:*21*
**2875**  1:*2*
**29**  28:*10*
  123:*16*
  124:*12*  131:*5*
  132:*2*
**29th**  28:*24*
  29:*4*
**2nd**  2:*8*

< 3 >
**3**  18:*12*  28:*3*
  155:*16*  158:*8*
  160:*13*  163:*9*
  188:*7*  204:*15,
16*
**3,506**  157:*7*
**30**  6:*21*
  210:*16*
**302**  2:*22*
**30305**  4:*4*
**312**  4:*16*
**316**  2:*4*
**317**  3:*11*
**320**  188:*1*
**320-milligram**
  48:*3*  115:*4*
**32502**  2:*4*
**3333**  4:*4*
**34**  205:*7*
**35**  122:*2*
**385-5400**  2:*14*
**38th**  3:*4*

< 4 >
**4**  19:*9, 17*
  30:*1*  73:*18*
**41**  29:*8*
  123:*16*
  124:*12*  131:*5*
**412**  2:*22*  3:*5*
**435-7001**  2:*5*
**444-3475**  3:*21*
**452-1888**  4:*20*
**46**  122:*18*
  124:*14*  125:*12*

**46204**  3:*10*
**470-3520**  2:*23*
**48**  123:*14*
**49**  131:*4, 9*

< 5 >
**5**  19:*18*
  105:*13*
  114:*18*
  118:*11*  120:*8*
  139:*15*  144:*13*
**504**  2:*18*
**524-5777**  2:*18*
**53**  3:*15*
  131:*15, 16*
**54**  132:*2*
**55**  132:*6*
**553-2312**  4:*5*
**56**  126:*1*
  132:*10*
**566.4808**  4:*16*
**57**  126:*2*
  132:*14*
**58**  132:*18*
**59**  132:*22*

< 6 >
**6**  20:*6*  22:*15,
18*  84:*6*  155:*3*
**60**  124:*4*
**600**  2:*4*  3:*20*
  21:*21*
**60606**  4:*15*
**609**  4:*20*
**617**  3:*16*
**66.4**  202:*21*
**66210**  2:*13*
**67.2**  188:*8*
**678**  4:*5*

< 7 >
**7**  84:*4*
  156:*17*
  158:*15*
  165:*20, 24*
**7,514**  205:*11*
**7/7/21**  7:*8*
**701**  2:*17*
**70130**  2:*18*
**704**  3:*21*

**75**  205:*11*
**757-1017**  4:*10*

< 8 >
**8**  105:*6, 13*
  114:*16*  116:*9*
  155:*17*  159:*8*
  161:*4*
**8101**  2:*13*
**877.370.3377**
  1:*21*
**888**  2:*5*

< 9 >
**9**  116:*8, 10*
  118:*17, 18*
  139:*11, 22*
  140:*11, 12*
**9:10**  1:*15*  9:*9*
**91.3**  187:*22*
**913**  2:*14*
**917.591.5672**
  1:*21*
**96**  59:*1*  96:*5*
**973**  2:*9*  4:*10*

< A >
**a.m**  1:*15*  9:*9*
  73:*13*  153:*18*
**abiraterone**
  26:*24*
**able**  15:*9*
  16:*2*  32:*2, 10,
16*  33:*22*
  40:*3, 22*
  52:*21*  53:*19*
  54:*2*  68:*1*
  72:*11*  85:*15*
  116:*18*  117:*4,
22, 24*  122:*10*
  129:*2, 11*
  145:*23*
  151:*24*  182:*17*
**absence**  47:*19,
24*
**acceptable**
  57:*3*
**account**
  196:*21*  197:*22*
**accounted**
  196:*24*

Confidential Information - Subject to Protective Order

accuracy
21:18
accurate
43:15  44:3
73:24  171:3
173:6  186:17
198:24  199:4
210:20
ACKNOWLE
DGMENT
212:2
Actavis  4:12
acting  183:9
action  74:2
actual  105:2
107:4  142:8
175:17, 23
198:5
ADAM  2:8
adding  197:16
addition
133:19  159:7
additional
20:11, 13, 23
21:5  22:2
77:8, 16  80:2
addressed
65:17
adhered  86:9,
13
adherence
85:8, 16
adherent
86:17
adjusted
198:17
adjustment
33:7, 11, 14, 16
administering
80:19, 22

Administration
75:24
adolescent
35:10  37:4, 19
adolescents
36:4
adults  36:5
adverse  66:10,
16, 20  67:4,

12, 21  68:12,
19, 23  69:4
affect  42:12
age  192:5
199:7
agent  65:5, 10
68:11  69:3
183:9, 10
agents  92:1
101:2  177:21,
24  178:4
179:3  183:5
ages  33:17, 19
34:1, 2
agree  41:10
44:14  56:17
128:12, 15
135:7  136:24
138:18  147:4
agreed  9:22
agreement
28:21, 24
ahead  22:9,
10  25:18
27:21  29:23
44:20  46:24
53:14  73:15
124:10
131:10
138:13  148:6
153:15
154:16, 19
166:22
167:15  172:2
178:24  189:6
193:17
Aid  3:12
Albertson's
3:22
alcohol  86:20
ALFANO  3:1
allow  72:3
allowed
104:23
ambiguous
165:14
amount  33:7,
11, 18  53:2
60:19  62:23
75:18  86:5
113:14  115:6,

8  116:15
123:2, 3
124:17, 19
146:7  187:21,
23  193:6
194:2, 3
195:6, 22, 24
197:5  199:6
200:16
amounts  48:2
63:9  77:16
103:24
135:20  138:9
147:13, 16, 22
148:1  192:17,
18, 19  206:13,
14
analogous
23:18
analyses  71:6
analysis  75:24
analyze  149:1
analyzed
122:7
analyzing
135:1
and/or  52:16
84:18  87:10,
23  91:19
100:17
101:10
104:15  107:8
109:10, 22
110:11
111:14
112:13, 17
147:23  149:2
179:17
199:24  209:21
animals  61:12
65:2, 4, 7, 11
Answer  8:5
12:21  13:1, 9
31:1  32:24
33:23  42:17
43:4, 8  44:13
46:20  53:16
54:17  55:20
83:9  86:22
90:22  91:10
94:8  96:1, 6,

9, 23  97:22
98:8, 17
99:21  106:13,
14  129:23
136:21
148:20
150:24  151:8
174:2  193:12,
20  199:15, 20
answered
39:17  41:6
53:13  71:22
72:21  94:16
107:10
134:13
138:12, 15
161:16  194:6
199:14
answering
90:2
answers
107:16  212:8
anybody  11:8
API  54:2
75:19  88:9
89:1, 3, 8
90:21  91:4,
21  92:15, 21
93:2, 7, 19
94:12  95:2,
19  96:3, 11
97:3  98:2, 20
99:16  105:8,
19  106:23
107:20  108:2,
6, 11, 19
114:21  115:7,
19  116:17
117:15
120:20  121:1,
9, 16  122:21
123:4, 12, 21
124:20  126:4,
15  127:20
128:14, 19, 21
131:7, 22
132:4, 8, 12,
16, 20, 24
133:7  134:7
135:11, 21
137:2  138:6,

10, 23  140:5
141:21
142:19
143:20  146:1,
7, 12, 23
147:10, 14, 17,
24  148:1
149:2, 13
150:4, 8, 23
151:6  152:15
153:8  187:18
202:18  204:1
APIs  107:3
APL-
MDL2875
75:11
apologies
145:10
appear
115:16
117:12
126:13
127:18  140:2
141:19
142:17  150:2,
21  151:4
152:13  153:6
APPEARANC
ES  2:1  3:1
4:1  5:1
appeared
150:18
appearing
9:21
appears
121:14, 17
135:8  136:5
146:6
Appendix
19:23  73:16
78:21  79:15
141:7, 8
APPLIES  1:6
apply  100:19
133:22
161:23  209:19
appreciate
21:19  207:17
approach
33:2  37:18
51:20

Confidential Information Subject to Protective Order

approaches
32:19
appropriate
210:6
approved
81:7, 11
102:16 103:6
approximately
29:15, 16
202:20 208:4
area 83:5
92:8, 13, 18,
24 93:5
99:20 100:23
103:15
Argumentative
108:22 169:13
arm 66:20, 21
67:9, 11, 12
arrive 196:2
articles 19:19
20:7, 20, 24
21:1
asked 30:10,
12, 13 36:10,
11 38:1, 24
39:17 40:7
41:6 42:3, 22
45:17 48:10,
12 49:23
50:19, 23
51:1 53:12
55:16 58:16,
24 63:7
70:12, 13
71:4, 21
72:21 77:12
78:3 80:13
85:18 86:1
87:4 88:15
89:6 94:1, 15
96:19 97:8
104:3 110:17
134:13
135:13
138:11
143:16
161:16
162:22 163:7
167:17 168:2,
7 169:15

174:24 184:2
185:20 194:5,
9, 24 196:8
197:18 198:3,
4, 19 199:13
asking 16:13
27:11 39:10
71:11 88:24
134:8 137:7
141:6 149:23
152:11
161:10 171:18
asks 17:9
aslater@mazies
later.com 2:10
assess 104:13
176:20 177:9
178:19 180:9
assessing
110:9
associate
69:10
associated
63:21 186:1
association
55:2 62:5, 6,
9, 12 63:9
64:1 68:22
69:5 72:4
78:7 162:6
206:3
associations
55:1, 7 68:21
82:1 180:24
181:17 182:5
187:9
assume 13:10
86:7, 11, 18
101:20
105:18
107:19 108:1
109:9, 21
111:4 112:12
114:20 152:9
178:18 179:9
183:15
assumed
105:7 107:2
108:5, 11
109:2 111:13

112:8, 15, 16
176:19 177:7
assuming
84:7, 10
95:11 102:3
106:1, 22
108:18
110:10 130:5
185:24
assumption
54:9 55:21
101:18
105:24 106:2,
21 111:3, 11
112:8, 23
113:4, 7, 16
130:7 149:12
assumptions
49:17, 19
58:4 110:8
111:12 112:3
asterisk 157:6
189:6
asterisks
156:18 164:24
Atlanta 4:4
attach 154:20
attached
19:23 129:10
210:12 212:11
attachments
20:10
attempt
103:22 104:13
attempted
52:2
attention 84:4
87:21 102:8
105:6, 12
114:15 154:2
176:17 187:13
attorney
12:21 210:16
attorneys
12:11 13:16
Aurobindo
93:2 115:4
116:13, 23
117:18
147:16, 20
150:5

authors 71:17
72:18
available
95:13
average
155:20 158:4
159:11 165:8
202:19, 24
averages 203:8
aware 14:16
35:6 58:19
77:14 78:5
81:9, 12, 23
82:12, 24
83:10, 23
89:13, 16
90:5, 13
102:15
129:17
141:15
184:13, 17, 21

< B >
back 22:11,
12 48:17
50:1 52:5
73:13 118:20
130:24 139:1
153:21
171:16
200:22 202:5
207:2, 8
background
193:5 194:1,
22 195:6, 14,
23 196:22
197:5, 12
198:14, 21
199:6, 23
200:16 201:16
BALLMAN
1:14 6:5, 18,
20, 21 9:19
10:10, 21
14:7 16:22
18:9 22:19
26:1 80:7
207:10, 16
209:8 212:16
B-A-L-L-M-A-
N 10:22

Ballman-1
6:15 15:6
Ballman-2
6:15 17:18
Ballman-3
6:18 28:1
Ballman-4
6:21 30:4
Ballman-5 7:6
118:6
Ballman-6 7:7
154:23
BARNES 3:9
BARR 2:3
base 71:6
141:17
158:17, 21
159:2
based 30:16
37:13 38:7, 9
40:9 44:23,
24 45:19
49:12 57:14
58:1, 3 65:21
70:15 82:18
85:5 152:17,
23 153:10
169:21, 22
176:13, 15
189:17 190:4
192:8 193:12
bases 127:22
128:17, 22
basically 51:12
basis 40:12,
20 44:16
45:5, 7, 14
50:8 85:12
106:7 107:3
109:11 110:4,
6 111:7, 24
112:22
126:12
127:18
162:23
167:19
171:12, 17
172:6, 10
173:1, 14
174:18 175:8,
22 176:8, 11

180:*18*
194:*15*  196:*9,
13*  197:*10*
198:*7, 9*
**batch**  115:5, *6,
7, 9*  116:*16, 17*
**batches**  92:*10*
**Bates**  75:*11*
119:*8*  141:*10*
**Baylen**  2:*4*
**BDL**  125:*24*
126:*16, 21*
127:*22, 24*
128:*22*  129:*1,
3, 13*  130:2,
*23*  133:*21*
136:*19*
**bearing**  186:*1*
**beginning**  1:*15*
**behalf**  26:*13,
17*  27:5, *10*
28:*7*
**belief**  158:*2*
179:*16, 24*
**believe**  15:*11,
15*  17:*3, 10,
12*  20:1  21:*1*
23:*10*  39:*23*
41:*21*  42:*1, 8*
43:*12, 23*
44:*8*  45:*11*
46:*12*  48:*9*
51:*1*  53:*15*
54:*8, 11, 20,
24*  55:*22*
57:2, *16, 21,
24*  58:*23*
60:*7*  65:*20*
74:*23*  76:*5*
78:*18*  80:*6*
82:*20*  83:*17*
90:*7*  107:*24*
114:*9*  116:*11*
117:*19*  121:*6*
130:*10*
140:*17*  142:*1,
12*  146:*15*
155:*11, 17*
156:*9*  157:*2*
163:*10*  167:*2,
5*  170:*24*

172:*15*
183:*18*
186:*10, 18*
207:*13*
**believed**  58:*22*
**beneath**  188:*8*
**benefits**  65:*22*
**Berne**  5:*10*
**best**  48:*20*
79:*20, 24*
80:*5*  86:*17*
**beyond**  54:*16*
57:6, *10*
58:*13, 15*
59:*4*  61:*7*
77:*11*  78:*3,
19*  83:*7*  87:*3*
88:*13, 14*
89:*5*  91:*7, 8*
92:*8, 12, 17,
23*  93:*4, 24*
96:*18*  97:*6*
99:*4, 20*
101:*16*  104:*2*
110:*16*  125:*3*
182:*24*  183:*2,
22, 24*  184:*1,
23*  185:*19*
194:*24*
197:*15*  200:*11*
**biases**  66:*24*
**Bill**  5:*4*  9:*5*
**billed**  28:*6*
**birth**  155:*21*
158:*5*  159:*11*
165:*9*
**bit**  25:*5*
81:*19*  129:*7*
**bladder**
205:*15*
**blanketly**
179:*10*
**blanks**  137:*18*
**blind**  169:*9*
**blinded**  66:*23,
24*
**blow**  139:*21,
23*  140:*6*
156:*21*  188:*19*
**BOSICK**  3:*1*

**Boston**  3:*15*
**bottles**  86:*2*
**bottom**  19:*9*
84:5  119:*9*
156:*17*  187:*16*
**Boulevard**
2:*13*
**bound**  154:*6,
13*  155:*14, 22*
156:*7*  157:*23*
158:*6*  164:*15*
165:*10*  166:*9*
192:*3*
**bounds**
165:*16, 18, 19*
166:*3*
**BQL**  125:*13,
15, 18, 22*
133:*20*  136:*19*
**break**  13:*5*
73:6, *8, 11*
139:*5*  153:*16,
19*  201:*20*
207:*6*
**breaking**
139:*8*
**BRETT**  2:*12*
brett@hollisla
wfirm.com
2:*14*
**briefly**  10:*1*
**bring**  86:*2*
**broad**  44:*13*
**broke**  206:*18*
**BTG**  23:*3*
26:*20*
**BUCHANAN**
2:3  3:*19*
**bulk**  56:*23*
60:*20*  63:*12*
**bullet**  22:*21*
23:*10*
**bunch**  75:*11*
94:*2*

**< C >**
**calculate**
34:*15*  39:*2*
52:*3*  103:*22*
104:*4, 9*
159:*2, 22*

**calculated**
31:*16, 23*
32:*3, 7, 11, 20*
34:*5*  37:*2*
38:*12*  53:*11*
157:*1*  159:*4,
17*  197:*22*
199:*8, 10*
200:*1, 8*
**calculating**
31:*24*  33:*6*
35:*7, 11*
**calculation**
34:*9*  35:*1*
46:*19*  58:*5*
104:*24*  105:*2*
188:*5*  189:*17*
195:*19*  198:*2,
16*  199:*9, 11*
200:*5*  206:*17*
**calculations**
46:*16*  47:*2*
104:*18, 19*
187:*17*  193:*4,
24*  195:*16*
196:*1*  197:*4, 6*
**calculator**
11:*16, 18*
**call**  17:*23*
67:*4*  136:*9*
148:*11*
**called**  34:*8*
57:*1*
**Calls**  59:*4*
103:*12*
**CAMDEN**  1:*2*
**Camp**  2:*17*
**Canadian**
23:*10, 14, 18,
21, 24*
**cancer**  34:*11*
51:*16, 17, 19*
54:*4, 15, 23*
55:*4, 12*  56:*1,
15*  61:*23*
62:*8*  65:*11*
77:*4, 16*  78:*8*
82:*3, 11, 18*
183:*6*  187:*19*
188:*12*
190:*22*

202:*19*  203:*2*
204:*12*  206:*3,
7, 11, 18*
**cancers**  63:*22*
186:*13*
204:*12*  205:*1,
13, 21*  206:*2,
9, 19*
**capable**  55:*11*
**capacity**  29:*3*
**carcinogen**
182:*18, 19*
**carcinogenic**
61:*4*
**carcinogenicity**
176:*22*
**carcinogens**
83:*3, 12*
**careful**  129:*21*
**carefully**  94:*4*
210:*4*
**Carillon**  3:*20*
**Carolina**  3:*21*
**carry**  49:*23*
**case**  23:*2, 3, 9,
16, 18, 21, 24*
24:*4, 8, 12, 19*
25:*22*  26:*13,
17, 21*  64:*7*
94:*7*  114:*8*
115:*3, 15*
117:*11*  118:*1*
121:*7, 13*
123:*8*  135:*7*
140:*1*  141:*19*
150:*1, 19*
152:*4*  154:*16*
157:*23*  192:*23*
**CASES**  1:*7*
23:*4*  25:*8, 9,
14, 22*  27:*4*
100:*3*  135:*3*
191:*7*
**causal**  55:*5*
70:*5*  71:*1, 6,
17*  72:*18*
**causality**
180:*18*
**causality-type**
181:*18*  182:*6*

Confidential Information - Subject to Protective Order

causation
55:17  57:11
63:15  64:7,
11  70:14, 15
71:5
caused  56:15
69:4, 5
causes  55:11
64:20  65:11,
15  66:9, 10
67:21  68:12
71:9  72:12
causing  55:12
caution  26:2
89:21
Center  4:8
Centre  3:4
certain  19:14
46:19  100:5
certainly
194:22
certainty
69:17  90:23
95:9  99:7
116:20  117:7
125:4  127:16
129:6  130:14
142:23  143:5
151:21  152:1,
19  153:13
191:4  206:16
CERTIFICAT
E  209:2
certification
209:18
Certified  1:17
209:13, 14
CERTIFY
209:5  212:5
certifying
209:22
Cgannon@wals
h.law  4:10
challenging
136:2
CHANGE
211:4
changed
163:4  173:19
175:14, 16

changes
149:10
210:11  212:10
changing
172:19
charge  29:10
35:16  110:19
charged  170:9
Charlotte  3:21
chart  188:21
204:24
check  119:22
130:6
checking
109:2
Chicago  4:15
childhood
35:11, 18  37:4
children  36:3
chose  166:16
chosen  166:14
CHRISTINE
4:8
CHRISTOPHE
R  3:19
Christopher.he
nry@bipc.com
3:22
chunks  166:5
Cialis  23:2
24:18
cigarette
82:20  177:1,
20  179:5
citation  49:11
198:10
cite  203:19
cited  21:12
22:2  40:19
45:4  64:15
80:3  117:6
118:13
121:12  150:4
170:16
171:11, 16, 21
172:4, 8
173:1, 14
174:6, 18
175:21  176:7
194:14

200:24  202:16
cites  21:21
citing  201:6
204:5
City  11:6
CIVIL  1:4
clarification
20:17  116:3
173:24
clarifications
171:2, 7
clarified
169:10
173:10, 17, 19
174:14
clarifying
172:21
class  74:2
84:15, 22
85:3  86:24
103:7, 8
176:23  177:2,
21, 22  178:1,
5, 13, 21
179:6, 8, 11,
19  180:3, 11
181:9, 10, 12,
24  182:4, 15,
20  183:8
184:10  185:4
classes  183:5
classification
51:12, 18
classifications
177:3
classified
179:8
classifying
51:14
clean  13:23
14:2
clear  49:4
60:9  91:13
111:23  115:3
166:8  197:3
201:10
clearly  47:20,
24  52:24
clinical  65:19
66:14, 19
67:22, 23

68:4, 7  69:12
70:18  85:6, 14
closely  85:7
closest  203:11
COAN  3:14
code  87:14
92:7, 11
104:16
codes  91:24
collectively
149:5
College  2:13
Column
120:16, 19
122:2, 6, 15,
20  127:23
128:23
129:21
144:20  145:6,
9, 10, 12, 17, 18,
19, 24  146:1
159:5
columns
119:20  131:3
145:24
combinations
203:6
come  31:12
49:5  52:12
53:5  70:1, 2
105:24
106:20  119:4
181:7  186:11
192:5  197:16
198:4  200:10
203:4  207:2
comes  15:10
83:16
coming  64:10
106:8  171:12,
15, 17  176:8
188:12, 15
189:14  201:12
comment
85:12
commission
212:21
common  35:8,
10
commonly
102:17

companies
27:6, 10
compare
146:4  150:6
compared
36:4  63:11
67:10  115:18
116:17
117:14
121:16
126:15
127:20
128:20  131:5,
16  140:5
141:21
142:19  150:4,
8, 11, 23
151:6  152:14
153:8  192:18
comparing
121:7  192:12
202:15
comparison
122:11
123:15  144:3
145:7, 16
146:8  147:6
160:15
complaint
18:20, 23
31:18, 21  74:2
complete
21:18  45:1, 12
completely
10:3  43:13,
24  44:5  91:1
completion
209:8
component
38:11
computation
164:17
compute
155:19  156:1,
5  159:9
161:18
163:15  197:18
computed
157:22
158:10
162:23  169:7

Confidential Information - Subject to Protective Order

188:15 190:3, 9, 11 191:24 193:8
**concept** 35:4
**concerning** 185:24
**concerns** 87:24
**conclude** 72:11
**concluded** 21:11 71:9 208:3
**concludes** 207:13, 22
**conclusion** 41:9 56:17 68:2 69:19, 23 70:19 71:8 103:13 149:11
**conclusions** 39:22 41:12, 22 42:2 43:7, 14 44:2, 9, 11 65:21
**confer** 128:24
**CONFIDENTIAL** 1:8
**confirm** 192:22 203:23
**confounding** 63:23 72:10, 14 186:23 187:5
**confused** 95:7
**connection** 20:8
**conservative** 37:2, 18
**consider** 78:13, 18 110:7 171:1 176:1 193:4, 10 194:1, 21 200:23, 16
**considered** 20:14 21:4, 11 78:21 79:2, 6, 17 80:4 82:10

193:11, 13, 19 195:9, 23
**consulting** 18:15 26:6
**consumed** 84:15, 17, 23 85:4 86:5, 21 87:1, 9, 22 91:18 100:16 114:24 115:18 117:14 140:5
**consumptions** 190:23
**contacted** 28:19 30:8
**contain** 87:18 102:10
**contained** 84:17 87:10, 23 91:18 100:17 101:5
**contains** 138:22
**contaminated** 102:5
**contamination** 125:1, 2
**Cont'd** 3:1 4:1 5:1 7:2
**content** 89:22 120:15, 20 122:16 144:20
**continue** 90:2 148:19
**control** 65:8 67:8 209:21
**controlled** 67:10
**Copies** 19:18 20:7
**copy** 13:23 14:2 19:10
**corner** 119:9
**Corporation** 3:12
**correct** 14:5, 6, 10, 11, 15, 22, 23 20:3 22:3, 4 24:8, 9 27:6 29:5, 8,

21 32:7, 21 33:9, 10, 14, 21 37:5, 23 38:8, 18 39:15 40:14 41:4, 17 42:6 43:1 44:17 46:6, 16, 17, 21 48:11 50:22 51:6 53:11 56:3, 7 61:24 62:12 63:2 64:8, 20 65:15 67:23 68:7, 8 69:23 70:7 71:3, 18 74:3, 7, 11 75:20 76:4, 10, 13, 24 77:5, 17 78:14 79:17, 22 80:4, 6 86:4 95:16 97:14 100:19 101:13 104:1, 16 108:20 111:16 112:18 113:5, 24 114:6 118:15 122:12, 21 123:4, 12, 17, 22, 23 124:20, 21 125:21 127:16 130:3, 7 131:13, 23, 24 135:21 137:17 138:10 140:16 141:11 142:19 144:20 145:7, 19 146:10, 24 152:22 159:3, 15, 19 166:3, 16 167:11 168:17 169:3, 5, 11 173:8 174:9 182:10 185:16

188:13 189:15, 21, 24 190:8, 10, 14 191:22 192:20 197:7, 8, 12 199:21, 22 204:16, 21, 22 205:22 212:7
**corrections** 210:5, 7 212:10
**corresponding** 115:9 206:3
**counsel** 10:4 11:9 12:4, 7 48:11 79:10 89:23 90:13
**count** 149:4, 8
**counted** 86:3
**counts** 86:1
**couple** 13:3 14:8 144:4
**COURT** 1:1 9:16 10:6 210:20
**courts** 23:11, 14, 17, 19, 21 81:7, 11
**created** 173:23
**criticism** 91:17 180:5 181:6
**criticisms** 32:6 41:17 42:6 43:1, 15 44:2 45:15 53:10
**criticize** 38:17 39:11
**CULBERTSON** 3:14
**cumulative** 34:6, 9, 15, 20 35:1, 7, 9 36:12 37:1 39:3 40:2, 23 45:9, 23 46:2 49:15 50:14, 21 51:24 53:6 106:4

110:2 124:6 149:17 155:20 158:11 159:10 161:19 162:24 163:16 167:20 168:3 195:10 205:10
**currently** 11:3, 5
**cutting** 119:19
**CVS** 3:12

**< D >**
**daily** 154:6, 14 155:14, 23 156:7, 8 158:7 187:21, 23
**DANIEL** 2:3 10:24 73:3 139:3 206:24
**data** 48:18 50:1 52:6 61:14 75:10 104:11, 18, 21 109:14 115:2 134:23 136:4, 16, 18 137:21 140:18 141:8 151:2, 24 152:17, 24 153:11, 13 166:5 185:14
**date** 1:16 9:8 28:18, 23 210:9 212:16
**Dated** 209:15
**day** 212:20
**days** 155:21 158:5 159:11 165:8 187:22 210:16
**DC** 2:22
**de** 198:19
**deal** 88:4
**debate** 128:10
**decent** 139:4

decided 59:*11*
112:*5* 169:*8*
decision 60:*2*
decisions 59:*8*
dedicated
184:*14, 16*
185:*10*
deemed
210:*19*
Defendant 3:*6,*
*17, 22* 4:*17, 21*
Defendants
4:*11* 6:*15*
26:*14, 18*
75:*14, 20*
89:*24*
defendant's
17:*21* 18:*6*
defense 11:*10*
12:*4, 7* 48:*11*
define 158:*14*
162:*17*
166:*14, 16*
defined
162:*12, 14*
170:*4*
defining
160:*10* 161:*14*
definition
60:*17, 18*
61:*1* 62:*16,*
*21* 81:*21*
130:*23* 154:*4,*
*12* 155:*12*
158:*4, 13*
159:*21* 160:*2,*
*12, 19, 23*
161:*8, 22*
162:*8* 163:*5,*
*11* 164:*6, 10,*
*21* 165:*2, 4, 7*
166:*12*
167:*19* 169:*7*
172:*20*
173:*11, 20*
174:*15*
175:*14* 176:*4*
192:*2* 200:*10*
definitions
148:*14* 158:*3*

definitively
151:*9*
demonstrate
75:*18* 124:*17*
138:*8* 199:*7*
demonstrated
107:*11*
demonstrates
97:*4* 99:*17*
demonstrating
93:*8, 20*
94:*13* 95:*3*
96:*4, 12* 98:*3,*
*21* 185:*15*
depend 35:*21*
depends 42:*9*
43:*9* 64:*24*
65:*17* 72:*6*
deponent 9:*18*
212:*2*
deposed 23:*11,*
*12*
deposing
210:*16*
deposition
1:*14* 6:*15, 18*
8:*2* 9:*10, 21*
11:*23* 12:*8,*
*19, 22* 15:*2*
16:*16, 18*
17:*2* 18:*8*
23:*7* 24:*7, 11,*
*19* 29:*20*
74:*19, 22*
75:*2* 107:*7*
162:*12, 15*
167:*23*
169:*10, 23*
170:*4* 171:*3,*
*18* 172:*11, 17*
173:*8, 18*
174:*5, 15*
176:*3* 207:*14,*
*22* 208:*3*
209:*6, 8, 9*
210:*3, 13, 17,*
*19*
depositions
25:*13* 107:*14*
deps@golkow.c

om 1:*22*
deputy 69:*11*
derivation
49:*17*
derive 197:*19*
derived 30:*19,*
*22* 31:*7, 9*
36:*19* 48:*14*
50:*17* 51:*4*
170:*15*
173:*23* 175:*5*
198:*10* 201:*2*
deriving 45:*8*
198:*18*
described
31:*17, 20*
34:*1* 84:*12*
DESCRIPTIO
N 6:*14* 7:*5*
design 72:*6,*
*14* 187:*4, 6, 11*
designated
177:*2* 179:*6*
detectable
95:*23*
detected
87:*18* 94:*14*
95:*4* 102:*11*
114:*11* 115:*7,*
*8* 116:*16*
126:*4* 127:*1,*
*2, 4, 6, 10, 12*
detection
126:*1, 3, 22*
129:*5* 130:*2,*
*9, 13, 18*
determination
169:*9*
determine
30:*13, 18*
31:*6* 36:*14,*
*17* 40:*7*
45:*17* 48:*1,*
*13, 19* 85:*16*
86:*16* 87:*6*
194:*10*
determining
30:*21* 170:*12*
173:*1, 14*
174:*19*

developing
82:*11* 196:*19*
205:*13*
deviate 160:*18*
deviated
157:*15* 162:*7*
deviating
169:*6*
deviation
159:*22* 165:*3,*
*6*
deviations
161:*9* 162:*2*
devised 175:*12*
diet 35:*9*
62:*18* 77:*17*
186:*14*
192:*19* 194:*4*
195:*8* 197:*24*
200:*17*
dietary 61:*21*
62:*4* 154:*12*
155:*13* 156:*6*
158:*16*
168:*15* 169:*2*
186:*3* 187:*2*
188:*13* 189:*1,*
*14, 18* 190:*8,*
*10, 13, 17*
192:*8, 16*
diets 193:*7*
differed 34:*3*
differences
142:*9, 11*
different 31:*5,*
*11* 32:*19*
33:*2, 3, 20*
42:*14, 16*
94:*17* 109:*15*
129:*19* 145:*3*
177:*20* 179:*3*
difficult 52:*4,*
*7*
difficulty
30:*20* 31:*3*
digest 38:*22*
direct 16:*11*
105:*11* 154:*1*
209:*21*
Direction 8:*5*

disagree
182:*11*
disagreeing
182:*14*
disclose 26:*5*
disclosed 26:*4,*
*7, 10*
discuss 61:*9,*
*22*
discussed
61:*3* 162:*11*
discussing
195:*5*
discussion
37:*17* 39:*4*
50:*16* 89:*19*
discussions
89:*22* 90:*12*
dissimilarities
184:*3*
distributed
92:*4*
DISTRICT
1:*1* 9:*16*
divide 187:*21,*
*24*
dnigh@levinla
w.com 2:*5*
Doctor 10:*17*
16:*17* 18:*17*
22:*14* 28:*5*
30:*7, 10* 38:*6*
73:*15* 84:*3*
86:*20* 89:*21*
153:*23* 155:*8*
202:*10* 206:*23*
DOCUMENT
1:*6* 14:*1, 5*
15:*4, 9, 12, 19*
16:*13* 17:*6,*
*16* 27:*23*
30:*2* 39:*7*
61:*19* 118:*4*
119:*1* 121:*12*
140:*23*
142:*13*
143:*24* 144:*9*
154:*21* 155:*1,*
*7* 177:*13*
203:*23, 24*
204:*3, 4, 9*

Confidential Information - Subject to Protective Order

documented 18:16
Documents 8:8 13:21 17:10, 11 18:19 19:18 20:2, 7, 12, 13 21:6 22:2 58:10, 17 61:3, 9 75:17 78:13, 19, 20 79:1, 6 95:18 104:23 115:23 116:19 117:5 119:4 128:9 129:8 137:23 140:20 141:16 177:10
doing 34:24 58:5 65:1 129:7 160:3 166:8 210:8
dosage 120:15 121:8
dose 91:3, 20 92:14, 20 93:1 105:9, 20 106:23 108:4, 19 114:22 116:16 121:1 122:16 147:9 150:6 158:17, 21 159:2
double-blind 67:16
double-blinded 67:23
download 15:23 16:2
Dr 7:7 9:18 12:13 14:7 16:22 21:20, 23, 24 22:3, 6, 19 26:1 31:23 32:11 33:6, 13 36:21 40:10, 13 41:3, 15 42:4, 23 44:1,

15 45:12 46:5 48:4 49:13 50:12 55:9 56:3, 5, 11 64:15, 16 73:1 74:10, 14, 19 75:1 78:11 80:7 154:4, 11 155:5, 11 156:1, 5 166:8 167:22 170:2, 18 171:2 175:8, 9, 13 176:2 188:16 189:16 190:4, 11 191:24 192:1, 13 193:9 194:16, 18 195:3 196:14, 15 198:11 199:4, 12, 22 200:14 201:15 202:17 203:14 204:5 205:5, 7, 24 207:10, 16
draw 102:7 105:5 176:16 187:12
Drs 12:2 30:17
drug 65:22 75:23 85:19
drugs 67:1 183:5
Duane 11:6
Due 9:24 67:14 72:13 186:21 187:5
duly 10:11 209:5

< E >
early 28:20
easily 49:6
easy 201:11
eat 63:20

editor 69:11
editors 72:2
effects 114:20
eight 160:1
Eisenhower 2:8
either 24:22 120:24
electronic 18:14
electronics 11:14, 19
employs 154:3
encompassed 158:3
endorsed 81:24
endpoint 68:19
endurance 13:4
ensure 10:2 85:9
entire 74:14, 16 146:9 164:11 180:13 184:14 185:10
enumeration 150:14
epidemiology 64:6, 9 65:14 68:4, 6, 9 69:2 70:6, 21
equals 157:6
equate 59:20
equation 52:9, 12 53:18
errata 210:6, 9, 12, 15 212:12
esophageal 189:20 190:7 204:13 205:2, 16
ESQ 2:3, 8, 12, 17, 21 3:3, 9, 14, 19 4:3, 8, 14, 19
essentially

52:8
EST 1:16
establish 63:15 68:21 70:15 85:3 86:24
established 72:4
estimate 66:2
evaluate 80:13
evaluated 69:16
event 66:10, 20 67:4, 12, 21 68:12, 19, 23 69:4
events 66:17
evidence 30:14 36:15 40:8, 21 45:18, 22 46:1 51:23 54:12, 20 55:22 56:6 58:2, 3 60:10 110:22 146:20 168:4, 7 169:18 170:13 175:1 176:10, 12 183:11, 13, 19 194:10, 13 196:9 198:5 201:6
exact 28:18
exactly 76:6 81:20 126:21 129:3 138:1 191:10 192:12
EXAMINATIO N 10:14 202:7
examine 45:24
examined 10:12
example 33:5 115:3 117:8 128:5 136:12 140:15 142:8

examples 140:15 147:15 150:5
Excel 7:6 119:17 120:1, 7
exception 156:14
Excused 208:2
exercise 148:8
exhaled 33:9, 12
Exhibit 15:3, 5 17:5, 17 22:5 27:24 28:3 30:1, 3 73:18 118:5, 11 120:23 139:15 144:13 154:20, 22 155:3
expect 51:21
experience 80:8, 15, 18, 21 81:2 85:6, 13
Expert 6:21 7:7 12:1, 3 13:24 20:15, 21 21:2, 12 25:21 26:4, 10 27:17 28:12 29:24 30:11, 16 36:20 37:14, 15 38:10 40:9, 13, 18 45:20, 21 47:9 49:12 50:11 51:1, 2, 10 52:23 56:7 61:10 73:18 74:10 78:12 84:5 104:12 118:14 139:1, 12, 23 153:24 155:5 162:22 163:1, 6 167:6, 21

Confidential Information - Subject to Protective Order

168:5, 10
169:21
170:17  175:9, 17, 23  176:5, 13  179:17
180:1  184:15
185:11
187:13
194:16  195:4
196:24  197:9, 15  198:10, 12
200:4  201:7, 8, 15  202:11
**expertise**  81:9
83:5, 24  91:9
92:9, 13, 18, 24  93:5  97:7
99:20  100:23
102:23
103:15
127:15
177:14, 18
183:2
**experts**  34:4
185:6  198:22, 24  200:11
**expires**  212:21
**explain**  112:4
**explained**
126:11
**explaining**
161:13
**explanation**
31:8  32:13
**explicit**  150:13
**explicitly**
195:3
**exposed**  35:22
36:4  82:14, 19  83:2, 11, 18  103:8
**exposure**  53:2, 6  54:12, 21
55:23  102:18
103:10
104:15  154:5
155:20
158:11
159:10
161:20
163:16

168:16  189:1, 15  190:2
196:22
197:23
198:15
199:24
204:20  205:4, 10  206:14
**exposures**
34:6, 10, 16, 20  35:2, 8, 9, 20  37:17  40:2
195:11  201:17
**extent**  39:24
69:10  177:22
178:14  182:23

< F >
**fact**  84:15, 23
129:19
149:16
186:21  204:18
**factors**  63:24
**fail**  210:18
**fair**  13:11
**faith**  85:22
**FALANGA**
4:5
**FALKENBER
G**  4:14
**fall**  70:21
**falling**  177:3
**far**  58:18
124:17
125:17  141:14
**FDA**  57:4, 13
58:9, 17, 24
76:2, 7, 8
107:12  108:12
**FDA's**  59:8
107:21  108:3, 15
**February**
1:11  9:8
16:22  209:15
**fed**  59:8
**feel**  13:5
107:18
151:21  170:3
**felt**  45:21
59:12

**fhs@pietragall o.com**  3:6
**figure**  52:14
201:9  202:23
**file**  120:3
**files**  15:22
**find**  32:8
52:4  198:8
**fine**  106:19
**finish**  107:10
**finished**  75:19
76:4  91:3, 5, 20, 21  92:14, 16, 20, 22
93:1, 3  105:8, 20  106:23
107:9, 17, 21
108:3, 13, 15, 16, 19  114:22
115:9, 17
116:16
117:13
120:15  121:1, 8, 15, 19
122:16  123:2, 11, 21  124:18
125:18, 20
126:3, 14
127:20
128:13, 20
131:6, 23
132:3, 7, 11, 15, 19, 23
133:7  134:7
135:9, 20
137:1, 16
138:5, 9, 20, 22  140:3
141:20
142:18
143:20  146:1, 6, 11, 22, 23
147:8, 14, 17, 23  148:2
149:3, 14
150:3, 6, 22
151:5  152:14
153:8
**FIRM**  2:12
**first**  10:11
16:14  28:14

34:18, 24
35:3  47:14, 16  87:21
110:20
118:20, 21
121:24  122:2
123:9  156:12
157:5  189:13
190:18
**fit**  164:20
165:1
**five**  139:7
207:1
**five-minute**
139:5
**Floor**  2:8  3:4, 15  4:9
**Florida**  2:4
**focus**  42:21
87:20
**focusing**  125:7
**folder**  17:24
**follow**  47:10
**followed**
159:8, 24
**following**
22:20  154:2
205:13
**follows**  10:12
**food**  62:24
63:2  75:23
**foodstuffs**
63:12
**footnote**
116:5, 8, 9, 10
118:17, 18
139:22
140:12, 14
142:4  188:23, 24
**footnotes**
188:19
**foregoing**
209:18  212:6
**form**  19:2
25:17, 24
30:24  32:23
34:22  35:14
36:7  37:7
38:16, 20
39:11, 17

40:16  41:6, 19  43:17
44:16, 19
45:14  46:8
50:3  51:8
52:19  54:6
56:9  57:6
59:3, 21  61:6
62:2, 14  63:3
64:22  66:12
68:14  69:7
70:9  71:20
72:21  77:18
78:16  79:19
81:15  82:16
83:14  88:18
96:16  97:16
98:5  100:21
101:15
102:20
103:12
108:22
110:14
111:18
112:20  114:4
117:1  121:5
126:19  133:9
134:12
135:23
141:23
142:21  147:2
148:5  151:18
157:12  160:5
161:2, 15
162:20
166:19, 21
167:14  170:6
171:4  172:1, 14  174:22
178:10, 23
181:14
182:22
184:20  191:1, 20  195:12
200:20  212:10
**formation**
65:7
**formed**  103:1
**forming**  78:14
172:6, 10

Confidential Information - Subject to Protective Order

formula 32:14
49:7 201:4
formulas
32:15
formulate
41:2 126:12
formulation
149:13
forth 19:20
49:8 95:21
101:24 192:5
found 52:7
68:20 93:8,
21 98:3
103:24 106:9
114:22
146:13, 17
162:3 177:1,
19 179:5
185:2 186:4
four 22:20
25:9, 12, 14
FRANK 3:3
11:10 12:13
13:14
FREEMAN
2:6
freeze 145:23
front 56:12
70:1
full 47:15, 16
64:13
fully 158:3
further 22:18
114:19 206:22

< G >
GANNON 4:8
gastric 54:4,
15, 23 55:4,
12 56:1, 15
187:18
188:12, 16, 17,
24 189:14, 18,
20 190:6
192:11
202:18 203:1
204:12 205:2
Gateway 4:8

Gcoan@hinsha
wlaw.com
3:16
Geigert 5:4
9:5
general
110:21
115:15
117:11
121:14, 17, 19
123:7 124:2
128:11 136:2,
6, 21 137:6,
24 140:2
141:19 150:2
157:16
160:19, 23
169:6 192:2
generally
116:15 143:18
generated 40:1
genotoxicity
176:22
GEOFFREY
3:14
Georgia 4:4
getting 67:2
148:14
186:14
189:24 193:7
194:4 200:17
give 13:1
24:11, 21
33:7 66:2
85:18 86:22
97:11 99:22
103:19
112:11 115:6
117:7 129:12
139:6 144:3
187:20 202:14
given 21:4
25:12 32:13
36:19 53:17
94:2 101:24
110:24
113:11 127:2,
3, 10 130:19
137:24
176:12 186:2

193:18 198:8
209:6 212:8
gives 22:21
55:9 155:12
156:13
158:17 180:12
giving 14:19
180:6
go 22:8, 10,
12 25:18
27:20 29:22
44:20 46:24
47:21 53:14
73:15 86:20
87:13 118:20
120:14
123:24 124:5,
10 126:6, 8
128:8 130:24
131:10 134:9
135:5 137:22
138:13 139:1
141:7 143:1
148:6, 19, 21
151:7, 23
152:7 153:15
154:16, 19
155:16 156:9
165:20, 24
166:22
167:15 172:2
178:24 189:6
192:10
193:17 196:7
200:24
goes 200:11,
21
going 13:10
22:11, 14
64:4 70:11
73:4 84:21
86:18 87:20
114:15 118:8
123:24 124:5
131:1 134:16
135:1 145:4
148:7, 9, 21
159:21
161:23
164:16
165:20, 23

179:22 182:2,
4 197:14
202:11
GOLKOW
1:21 9:6
Good 9:2
10:17, 20, 23
12:23 13:2
72:8 73:6
139:8 185:5
201:20 207:3
Goodman
76:13
GORDON 3:1
Gray 1:16
10:7 209:12
great 106:16
201:21
greater
150:15 205:10
greatly 176:23
GREENBERG
4:1
ground 12:20
13:3
group 154:7,
14 155:15, 24
156:8 157:17
158:7 162:18
163:22, 23
164:12, 16
166:10, 11
168:19, 23
191:16, 17, 18,
19 192:3
groups 166:5,
11 168:20, 21
169:2
guess 95:7
102:1 135:24
guesses 49:20
guide 140:9

< H >
half 29:8
handwriting
14:4
Hang 166:20
happen
123:10 185:3

happening
123:6
happy 117:22
hard 43:4
54:10, 17
85:9 86:15
165:10
HARKINS 4:3
harkinss@gtla
w.com 4:5
hazard
176:21 177:9
178:19
179:14 180:9
HCTZ 144:16
145:5
head 21:16
27:1 28:17
83:6 87:5
94:8 95:24
103:18
107:15 109:1,
4 117:6
148:17
151:10 171:8
192:24 206:15
heard 10:3
43:21
hearing 24:15,
22
held 1:15
9:11 23:17
help 12:15, 21
HENRY 3:19
Hetero 4:21,
22 90:20, 21
92:21 153:5,
6, 14
Hidajat 33:6
76:15 169:3
189:24 205:8,
22
high 82:11
158:21 159:2
higher 61:23
63:16 65:6
66:20 67:12,
13 123:3, 16
124:19 127:4,
11 128:14
135:10, 20

Confidential Information - Subject to Protective Order

137:1  138:8, 22  143:19  147:9, 13, 16, 22, 24  192:17  206:12

**highest**  154:7, 14  155:15, 23  156:8  157:17  158:7  162:18  163:22, 23  164:12, 15  166:11  168:15, 18, 19, 21, 22, 23  190:19  191:15, 17, 18  192:3

**highlight**  16:15  124:11, 12, 13  131:11, 18  163:19

**highlighted**  135:16

**highlights**  14:4  19:14  124:16

**HILL**  4:17

**HILTON**  2:17

**HINSHAW**  3:14

**hit**  15:24

**hold**  116:22  118:19  119:14  136:5  143:10  181:1  184:9

**holds**  128:11

**HOLLIS**  2:12

**HON**  1:6

**hour**  73:4

**hours**  29:8, 13, 17

**human**  64:16  65:14  66:6  68:3

**Humana**  4:17

**humans**  58:3  61:14

**hypothetical**  41:19  43:5,

17  46:23  101:15

**< I >**

**IARC**  177:2  179:6

**identical**  179:12

**identification**  15:5  17:17  27:24  30:3  118:5  154:22

**identify**  84:14  87:14  88:1  91:16  101:11

**II**  83:20

**Illinois**  4:15

**illustrate**  187:16

**immense**  113:14

**impact**  61:15

**imperative**  210:14

**implication**  180:21

**implicit**  149:11

**implicitly**  114:19

**imply**  57:17

**important**  38:14  39:13, 20  41:1  170:3  174:11

**impossible**  114:2

**imprecise**  60:22

**impurities**  55:3  56:14, 20, 22  101:6  105:8, 19  106:22  108:18  176:24

**impurity**  48:2  53:3  54:13, 21  55:24  91:19  98:14  100:17  109:10, 22

110:11  111:15  112:13, 17  114:20  115:11, 17  117:13  121:15, 18  126:14  127:19  128:20  140:3  141:20  142:18  149:12  150:3, 22  151:5  152:14  153:7  202:16

**inclined**  67:3

**include**  35:10  37:3, 19  179:3  195:24  200:1

**included**  35:19  38:4  76:12  79:7  197:5  198:1

**including**  136:8

**Incomplete**  41:19  43:17  46:23  48:20  101:15

**incorporate**  195:18  198:20

**incorrect**  46:20, 21

**increase**  206:10

**increased**  51:15, 16  54:3, 14, 22  55:4  56:1  61:22  62:8  63:16  66:9  77:15  78:8  186:12  190:21, 22  205:21  206:7

**increases**  205:12

**increasing**  62:7

**independent**  90:15

**independently**  15:14

**INDEX**  8:2

**Indiana**  3:10

**Indianapolis**  3:10

**indication**  13:1  129:12

**individual**  35:21  64:19  65:13  67:20  102:18  103:10  114:24  125:8  153:3, 4  205:21  206:2, 19

**individuals**  82:10

**Industries**  4:11

**infant**  37:19

**infants**  35:3

**infer**  181:19  182:7, 17  184:6, 7

**inference**  185:1

**INFORMATIO N**  1:8  36:19  37:13  45:2, 13  47:6  84:13  90:10  92:5  94:3  95:13  97:4, 19, 21  98:11  99:9, 13, 17  101:2  106:6  197:13  198:8

**INGERSOLL**  3:19

**ingested**  63:13

**ingesting**  33:19

**ingestion**  55:10  61:24

**inhaled**  33:8

**initially**  28:9  30:8

**inputs**  48:20  49:8

**instance**  67:24  103:19  123:19

**instances**  85:24  107:15  125:10  128:13, 15  138:19  146:2, 3  156:10  160:14, 18  162:3

**instruction**  159:8, 14

**INSTRUCTIO NS**  210:1

**intent**  136:13  180:14, 15

**intentionally**  42:20

**International**  23:3  26:21

**interpret**  165:6  167:3, 7

**interpreted**  167:11

**interrupt**  25:3

**intimately**  141:1

**invalid**  48:21

**inverse**  133:4  134:4

**invoice**  28:6

**Invoices**  6:18  18:16

**IRBESARTAN**  1:4  9:13

**irrelevant**  108:20

**isolated**  115:15  117:11  121:13  140:1  141:18  150:1

**isolation**  153:14

**issue**  195:4

**IVES**  4:14

**< J >**
**Jacqueline**
5:*10*
**Janssen** 27:*2*
**January**
29:*11, 14*
**Jason** 12:*15*
13:*14*
**Jeff** 5:*6*
**JERSEY** 1:*1*
2:*9* 4:*9, 20*
9:*16, 17*
job 12:*23*
**Johnson**
24:*10, 11*
26:*16*
jotting 18:*21*
**Journal** 69:*12*
**JR** 4:*19*

**< K >**
**KANNER**
2:*15*
**Kansas** 2:*13*
**KAPKE** 3:*9*
**Kaplan's**
171:*21*
**KARA** 3:*9*
**kara.kapke@bt**
**law.com** 3:*11*
**KARLA** 1:*14*
6:*5, 18, 20, 21*
9:*18* 10:*10,*
*21* 16:*22*
18:*8* 209:*8*
212:*16*
**KATZ** 2:*6*
keep 85:*19*
131:*1* 137:*11*
171:*15, 18*
189:*9*
keeping 90:*1*
kind 16:*12*
knew 60:*4*
know 13:*6, 8*
15:*13, 21*
16:*11* 18:*21*
21:*20* 33:*24*
35:*17* 39:*21*
44:*5* 50:*24*

51:*11, 21*
53:*1, 4* 56:*10,*
*13* 57:*12, 18*
59:*8, 10* 60:*1,*
*9, 21, 22*
62:*19* 63:*11,*
*20* 64:*24*
65:*20* 66:*3,*
*19* 67:*1, 7*
70:*20, 22*
71:*24* 72:*1,*
*22* 73:*1, 5*
79:*7* 81:*5*
86:*4, 14, 23*
88:*17* 89:*11*
90:*8, 24*
91:*11, 19, 22*
92:*6, 10, 19,*
*23* 93:*4* 95:*8,*
*22* 96:*17*
97:*8, 13*
99:*11* 100:*7,*
*11, 18* 102:*24*
103:*16*
106:*11*
108:*24*
111:*20* 113:*6,*
*15* 116:*13*
119:*5* 124:*3*
125:*19*
129:*15* 130:*8,*
*21* 133:*10*
134:*15, 17*
136:*10, 20*
141:*1* 147:*4*
148:*16*
150:*17*
162:*14, 15, 16*
164:*5* 167:*1*
173:*16*
175:*10, 13, 19*
176:*6* 177:*18*
179:*4, 7*
180:*4* 183:*4*
191:*7* 201:*10,*
*14* 203:*3*
206:*11*
knowing 160:*7*
knowledge
35:*17* 79:*21*

80:*1, 5*
113:*22* 177:*23*
known 176:*24*
**KUGLER** 1:*7*

**< L >**
**l.hilton@kanne**
**r-law.com**
2:*19*
**Laboratories**
3:*7*
laboratory
75:*24*
**Labs** 4:*22*
land 17:*24*
language
60:*23*
laptop 15:*17*
16:*5*
laptops 11:*13,*
*18*
late 28:*19*
**Lauren** 5:*8*
**LAW** 2:*12*
74:*6*
lawyers 28:*15*
60:*22*
**LAWYER'S**
213:*1*
**LAYNE** 2:*17*
**LCE** 32:*20*
154:*3, 5, 12*
155:*12*
156:*24* 157:*6,*
*9, 22* 158:*4,*
*18, 22* 159:*2,*
*4, 22* 160:*2,*
*10* 161:*14, 23*
162:*11, 14, 17*
163:*11*
164:*17, 19, 23*
165:*7* 168:*13*
169:*1, 7*
172:*20*
173:*20* 174:*1*
175:*15* 176:*4*
186:*3* 188:*15*
189:*14, 17*
190:*3* 191:*24*
193:*8, 12*

195:*16*
197:*21* 200:*1*
**LCEs** 31:*15,*
*22* 32:*1, 7, 12,*
*20* 33:*6*
34:*15* 35:*12*
36:*1* 38:*8, 12*
48:*3* 52:*14,*
*22* 53:*11*
156:*2, 6, 13*
159:*17* 165:*1*
167:*11* 170:*4*
173:*11*
174:*15* 190:*9*
194:*19*
195:*10* 199:*7*
200:*12, 19*
201:*18*
**LCT** 175:*22*
197:*10, 18*
200:*5, 11*
201:*12*
**LCTs** 169:*17,*
*19* 170:*11, 15*
171:*13, 17*
172:*6, 10*
173:*2, 15*
174:*19* 175:*2,*
*5* 176:*8*
194:*9, 11*
196:*10, 13, 19*
197:*17* 198:*4,*
*5, 9, 18*
199:*10* 200:*7*
201:*2*
lead 42:*15*
leads 54:*14,*
*22* 55:*24*
lectures 14:*19*
legal 28:*10*
103:*12*
length 53:*1*
113:*11*
letter 28:*21*
letters 168:*13*
169:*1, 5*
level 54:*13, 21*
55:*23* 57:*13,*
*14, 15, 22*
58:*1, 23*
59:*10, 11*

60:*2, 3, 5*
65:*6* 98:*14*
99:*10* 115:*11*
126:*1, 23*
128:*14* 129:*4,*
*5* 130:*2, 9, 13,*
*18* 149:*12*
154:*7, 14*
155:*14, 23*
156:*8* 157:*21*
158:*7* 177:*17*
202:*16* 206:*1,*
*4*
levels 55:*3*
57:*4, 18*
59:*16* 60:*15*
61:*4, 11, 15,*
*23* 62:*7, 12,*
*17, 22* 63:*17*
87:*18* 95:*20,*
*23* 96:*21*
102:*11, 17*
103:*9* 105:*7,*
*19* 106:*22*
107:*9, 11, 21*
108:*4, 12, 16,*
*18* 109:*10, 21*
110:*12*
111:*15*
112:*14, 17*
114:*20*
115:*16*
117:*12*
118:*14*
121:*14, 18*
126:*14*
127:*19*
128:*19* 138:*5,*
*6, 23* 140:*3*
141:*20*
142:*18*
143:*19* 150:*2,*
*9, 22* 151:*5*
152:*13* 153:*7*
162:*6* 186:*7,*
*16* 195:*15*
196:*22*
197:*10*
198:*21* 200:*2*
201:*13* 203:*1,*
*13*

Confidential Information Subject to Protective Order

**LEVIN** 2:1 5:8

**LIABILITY** 1:5 9:13

**lifetime** 34:6, 9, 15, 19 35:1, 7, 8 36:12, 24 39:2 40:1, 22 45:8, 23 46:2 49:15 50:14, 21 51:24 53:5 106:3 110:2 149:16 155:19 158:11 159:10 161:19 162:24 163:15 167:20 168:3 195:10

**limit** 26:3

**Limited** 3:7 23:4 26:21 149:21

**LINE** 8:6, 9, 12, 15 16:21 123:14 124:4 126:1, 16 131:8, 9, 15 211:4 213:2

**link** 75:23

**list** 17:9 19:24 21:10, 17 32:6 73:17 78:20 79:1, 6, 16 80:1 91:24 100:3 115:22

**listed** 19:21 20:9 22:5 76:3 77:4 78:10, 11 79:13

**listing** 140:18

**literature** 64:13 77:21 101:1 103:17

**LITIGATION** 1:5, 21 5:6 9:7, 14 11:2

14:13, 22 18:15 27:17, 18 28:7, 16 81:2

**litigations** 27:9, 11, 16

**little** 25:5 73:4

**live** 15:10 24:15, 22 65:18

**liver** 77:15

**LLC** 2:6, 15, 21 3:23 4:12

**LLP** 3:3, 9, 14 4:1, 14, 17

**load** 120:12

**located** 11:4

**log** 85:19

**logged** 85:22

**Loh** 76:17

**longer** 25:5

**look** 17:4, 15 19:8 21:13, 15 27:22 36:2 45:21 47:12 57:10 73:16 77:7 94:5 95:9 96:20 106:24 108:8 116:18 118:3 119:11, 14 121:22 125:9 128:9 129:11 130:11 133:2, 13 134:2 135:14, 17 136:8, 15, 17 139:11 142:8 144:8 151:23 154:16 167:17 169:15 172:11 174:24 176:3, 10 178:6 180:13 181:8, 11 184:2 185:13, 21 186:11 191:9

192:10, 21 203:22 205:3

**looked** 31:22 64:14 95:17 103:3 106:3 109:13, 24 110:2 129:16 131:2 133:15 142:10 143:14 152:2, 18 166:14 169:17, 19 172:16 175:3 183:20 190:12, 15 203:8, 13 204:8 206:8

**looking** 14:13, 21 15:17 33:23 34:19 36:1 71:13 78:6 97:18 98:10 129:7 136:3 149:4, 8 150:16 152:24 153:2, 10 168:5 170:9, 10 176:4 181:18 182:6 189:7, 12 200:18 202:10 205:20 206:6

**looks** 15:16 75:9 119:18 203:20

**LOSARTAN** 1:4 9:12

**lot** 87:14 88:1 91:16 92:4, 6 93:14 101:8, 11 102:1 110:6 111:8 113:9, 14, 19 115:5 124:6 186:20 191:2

**lots** 72:9 87:15, 17 88:2, 10, 19, 22 89:11, 14,

16 90:5, 13, 19 91:1, 14 93:9 97:5, 10, 12 98:12 99:8, 18, 23 100:4, 9 101:4, 22 102:4, 10 109:15

**Louisiana** 2:18

**low** 61:4, 15 194:1, 2

**lower** 115:16 116:15 117:12 121:14, 18 125:13 126:14 127:19 128:1, 19 129:1, 4, 13 130:13 140:2 141:20 142:17 146:7 150:2, 22 151:5 152:13 153:7 154:6, 13 155:14, 22 156:7 157:23 158:6 159:18 160:15 162:6 164:15 165:10, 16, 18, 19 166:3, 9 168:13 169:1 177:3 190:20 192:3, 19 206:14

**lowest** 190:20 191:16, 17, 19 193:5

**LP** 15:1 17:15 22:12 27:22 30:5 118:3 155:1

**lumped** 206:9

**lunch** 201:20

**luncheon** 202:1

**lung** 82:3, 17 189:20 190:7

204:13 205:2, 15

**< M >**

**Madigan** 7:7 12:2 30:17 31:16, 23 32:19 33:6 36:21 37:1 38:8, 15 39:14 40:10, 14 41:4, 15 42:4, 23 44:1 49:14 50:12 53:10 64:16 74:11 77:9 79:8 107:7 154:4, 11 156:1, 5 166:8 167:22 170:19 173:8 175:14 188:16 190:4, 11 192:1, 13 193:9 194:16, 18 198:11 201:15 205:24

**Madigan's** 21:23 22:6 44:15 45:12 46:5 48:4 75:1 78:11 79:13 80:3 154:11 155:5, 11 170:2 171:2 174:5 175:8 176:2 189:16 196:15 200:14 205:5, 7

**making** 177:6

**manner** 43:6 48:18 52:6 84:12 89:14, 17 90:6, 14

**manufacturer** 48:5 87:17 88:5 89:10 91:24 92:21 93:2 95:19

Confidential Information - Subject to Protective Order

96:*1*  97:*9*
101:*9, 21, 23*
102:*3, 10*
104:*1*  109:*11,
17, 19, 23*
110:*5, 6, 12*
111:*1, 5, 16*
112:*6, 14, 18,
23*  113:*2*
116:*21*  128:*5*
141:*2*  142:*3*
147:*21*
149:*17*
151:*22*  152:*2,
20*
**manufacturers**
26:*23*  91:*1, 4,
20*  92:*15*
100:*5, 7, 11,
18*  113:*10, 23*
114:*7, 10*
115:*2*  116:*14*
117:*19*
147:*22*
148:*12*  150:*8*
153:*1, 3, 11*
**manuscripts**
206:*17*
**MARK**  2:*21*
15:*2*  28:*2*
29:*24*
**Marked**  8:*14*
15:*4*  17:*16*
27:*23*  30:*2*
118:*4, 11*
144:*12*
154:*21*  155:*2*
**Martin**  5:*6*
**Massachusetts**
3:*15*
**Massey**  5:*8*
**master**  18:*19*
**match**  32:*16*
53:*19*  202:*17*
**matched**
157:*14*
**material**
95:*10, 12*
**materials**
19:*24*  21:*10*

73:*16*  79:*17*
80:*2*  141:*9*
**math**  32:*9*
50:*20*
**matter**  9:*11*
101:*12*  102:*2*
191:*22*
**matters**  22:*20*
26:*5, 9*
**Maz@falkenbe
rgives.com**
4:*16*
**MAZIE**  2:*6*
**MDL**  1:*2*
11:*1*
**mean**  23:*14*
24:*1, 2*  25:*2*
31:*3, 4, 15, 17,
19*  48:*22, 24*
49:*9*  56:*22*
60:*11, 14, 16*
70:*17*  71:*24*
82:*7, 8*  83:*16*
86:*15*  104:*21*
112:*15*  116:*5*
124:*3*  126:*1,
6*  129:*1*
134:*17*
136:*11*
137:*19*  138:*3*
143:*14*
145:*18*
155:*13, 19*
157:*10*
158:*10*
159:*10*
161:*19*
163:*15*  180:*6*
183:*14*
**meaning**  72:*9*
**meaningful**
34:*12*
**means**  14:*3*
44:*6*  103:*22*
104:*13*
109:*16*
126:*22, 24*
129:*3*  136:*19,
20*  161:*14*
209:*20*

**meant**  82:*9*
128:*6, 7*
137:*20*  138:*1*
161:*8*  166:*4*
205:*14, 17*
206:*20*
**measured**
98:*15*  186:*7,
17*
**measuring**
190:*18*
191:*15*  192:*16*
**median**  104:*7*
192:*4*
**medians**
103:*23*  104:*14*
**medical**  31:*18,
20*  36:*13*
37:*11*  38:*18*
39:*6, 12*
40:*19*  45:*4*
47:*4*  48:*14*
49:*10*  50:*5*
74:*1, 7*  80:*8,
15, 19, 22*
81:*2, 5, 12, 21*
82:*1*  102:*16,
21, 24*  103:*6,
17*  106:*5*
107:*1, 5*
108:*8*  109:*3*
110:*1*  167:*18*
168:*8*  169:*15,
20*  170:*10*
172:*5, 9*
173:*2, 15, 22*
174:*6, 19*
175:*4, 11*
176:*9*  194:*12*
196:*11*
197:*11*  198:*6*
201:*1*
**medication**
59:*1, 19*
86:*16*  99:*18*
**medications**
58:*11*  85:*10*
**meet**  12:*6, 12*
28:*10, 14*
207:*18*
**MEGAN**  4:*14*

**members**
84:*15, 22*
85:*3*  87:*1*
103:*7, 8*
**memorandum**
74:*6*
**memory**
133:*21*
**mentioned**
34:*3*  40:*3*
52:*21, 23*
90:*24*  195:*3,
14*  198:*14*
200:*15*  201:*16*
**mentioning**
91:*14*
**mentions**
197:*21*
**Meridian**  3:*10*
**met**  12:*3*
13:*13, 16*
**method**  49:*1,
21, 24*
**methodology**
48:*17*  51:*3*
191:*6*  193:*1*
**Michelle**  1:*16*
10:*7*  209:*12*
**microgram**
158:*17, 18, 22*
159:*3*  187:*24*
**micrograms**
115:*8, 10*
157:*7*  187:*22*
**midpoint**
202:*23*
**midpoints**
103:*23*
104:*14*
202:*20, 24*
203:*8, 17*
**MIGLIACCIO**
2:*21*
**million**
120:*24*
122:*18*  188:*9*
**mind**  83:*17*
90:*1*
**minutes**  73:*8*
139:*7*  207:*1*

**Mischaracteriz
ation**  160:*5*
**misremembere
d**  79:*4*
**mis-
remembering**
79:*10*
**missing**  46:*18*
49:*17, 19*
**Misstates**
50:*3*  61:*6*
117:*1*  151:*18*
170:*7*  196:*5*
**misunderstand**
42:*11*  43:*13,
24*
**misunderstandi
ng**  42:*15*
43:*10*
**misunderstand
s**  44:*5*
**misunderstood**
41:*14, 21*
42:*2, 4, 23*
43:*7*  44:*8*
**monitor**  85:*7*
86:*1*
**monitoring**
31:*18, 20*
36:*14*  37:*12*
38:*18*  39:*7,
12*  40:*20*
45:*4*  47:*5*
48:*14*  49:*10*
50:*6*  74:*2, 7*
80:*9, 16, 19,
22*  81:*3, 6, 10,
13, 22*  85:*14*
102:*16, 22*
103:*1, 6, 17*
106:*5*  107:*1,
5*  108:*8*
109:*3*  110:*1*
167:*18*  168:*9*
169:*16, 20*
170:*10*  172:*5,
9*  173:*2, 15,
22*  174:*6, 20*
175:*4, 11*
176:*9*  194:*12*
196:*11*

197:*11* 198:*7*
201:*1*
**Monroe** 4:*15*
**months** 53:*24*
**morning** 9:*3*
10:*17, 20, 23*
**Morris** 11:*6*
**MOUGEY** 2:*3*
**move** 16:*11*
139:*4*
**Mulberry** 4:*9*
**multiple**
174:*4, 7*
181:*20* 182:*7*
184:*7, 14*
185:*11* 205:*15*
**multiplied**
155:*22* 158:*6*
165:*9* 192:*4*
**multiply**
187:*23*
**MURTHA**
4:*19*
**myeloma**
205:*15*
**Mylan** 3:*6, 7*
89:*8* 92:*15*
98:*2, 16, 20*
99:*16* 118:*9,*
*14* 120:*24*
124:*24* 133:*6*
134:*6* 138:*7*
140:*19, 23*
141:*5, 10, 13,*
*16* 142:*13, 16*
146:*21* 147:*7,*
*13, 19* 150:*20*
151:*1*
**MYLAN-**
**MDL2875-**
**00895544**
119:*2* 140:*21*
**Mylan-specific**
133:*18*

**< N >**
**N.V** 3:*6*
**name** 9:*5*
10:*19, 20, 21,*
*23* 16:*20*

83:*6* 114:*7*
117:*24* 205:*9*
**names** 12:*14*
13:*20*
**nanogram**
187:*24*
**nanograms**
59:*1* 62:*24*
96:*5, 14* 98:*22*
**nature** 9:*24*
14:*20* 187:*7*
**navigate**
15:*13, 19, 20*
**ND** 78:*1*
144:*5* 178:*17*
**NDC** 87:*14,*
*24* 91:*15, 24*
92:*7, 11*
101:*11* 104:*15*
**NDEA** 48:*2*
52:*16* 61:*4*
75:*18* 77:*17,*
*22* 78:*7*
84:*18* 87:*10,*
*19, 23* 91:*19*
94:*21* 98:*3,*
*15, 22* 100:*17*
101:*10*
102:*12*
103:*24*
104:*15*
109:*10, 22*
110:*11*
111:*15*
112:*13, 17*
115:*7* 116:*15*
120:*20, 24*
122:*16* 123:*2,*
*3, 11, 20*
124:*18, 19, 24*
130:*24* 131:*6,*
*22* 132:*3, 7,*
*11, 15, 19, 23*
133:*6* 134:*6*
135:*10, 20*
136:*10, 24*
137:*16* 138:*9,*
*23* 143:*9, 19*
144:*6, 7, 20*
146:*11, 12, 22*
147:*8, 13, 17,*

22 149:*2, 19*
155:*23* 156:*7*
158:*6* 165:*10*
176:*21*
177:*10, 16*
178:*2, 7, 20*
179:*7, 18*
180:*1, 7, 10,*
*16* 181:*1, 5, 9,*
*23* 182:*9*
184:*5, 9, 17*
185:*3, 13*
186:*2, 6, 7, 13,*
*16, 17* 187:*1,*
*8* 197:*6*
198:*15*
199:*23, 24*
201:*17*
**NDM** 135:*10*
**NDMA** 33:*19*
36:*3* 48:*2*
52:*16* 55:*10*
57:*3* 58:*11*
59:*2* 60:*15*
61:*3, 16, 19,*
*23* 62:*7, 24*
63:*17* 75:*18*
77:*5* 84:*17*
87:*10, 18, 23*
91:*19* 93:*8,*
*20* 94:*13, 20,*
*23* 95:*3* 96:*5,*
*14* 100:*17*
101:*9* 102:*11*
103:*24*
104:*14*
109:*10, 22*
110:*11*
111:*14*
112:*13, 16*
113:*9, 19*
114:*11*
120:*15*
124:*22* 125:*1,*
*9, 13, 20*
133:*14, 22, 23*
135:*2* 136:*9,*
*13* 142:*10*
143:*3, 8*
145:*8* 147:*23*
148:*14* 149:*2,*

18 151:*2*
154:*6, 14*
155:*14, 22*
156:*7* 158:*6*
165:*10*
176:*20* 177:*8,*
*16* 178:*2, 7,*
*19* 179:*7, 17,*
*18* 180:*1, 7, 8,*
*22* 181:*9, 20*
182:*7* 184:*8,*
*17* 185:*2, 12,*
*24* 186:*3, 19*
190:*18, 19, 23*
192:*18, 19*
193:*5, 6*
194:*1, 3*
195:*7, 22, 24*
197:*5, 23*
198:*15* 199:*1,*
*5, 23* 200:*16*
201:*16*
206:*11, 13, 14*
**NDMAs**
125:*18*
**NE** 2:*22* 4:*4*
**necessarily**
41:*11* 58:*1*
102:*24*
**necessary**
46:*3* 53:*4*
104:*11, 17, 21*
112:*3* 210:*4*
**necessitates**
41:*10*
**need** 13:*5*
15:*23* 18:*1*
44:*4* 73:*19*
106:*18* 108:*7*
119:*20*
133:*19, 20*
136:*7* 183:*14*
**needed**
108:*11, 12*
**needs** 195:*7, 8*
**never** 14:*13*
34:*8* 103:*21*
197:*4*
**NEW** 1:*1* 2:*9,*
*18* 4:*9, 20*

9:*16, 17* 11:*6*
197:*18* 200:*10*
**Newark** 4:*9*
**Nice** 207:*18*
**NIGH** 2:*3*
6:*5* 10:*16, 24*
14:*24* 15:*7*
16:*8* 17:*13,*
*19* 18:*4* 19:*7*
22:*8, 13*
25:*20* 26:*11*
27:*20* 28:*2, 4*
29:*22* 30:*5, 6*
31:*13* 33:*4*
35:*5, 23*
36:*22* 37:*21*
39:*8* 40:*4, 24*
41:*13, 23*
42:*18* 43:*11,*
*22* 45:*10*
46:*14* 47:*11,*
*14, 18, 21, 23*
50:*18* 52:*1*
53:*8, 21*
54:*18* 55:*19*
56:*18* 58:*8,*
*20* 59:*14*
60:*13* 61:*17*
62:*10, 20*
64:*3* 65:*12*
67:*18* 68:*24*
69:*20* 70:*23*
72:*15* 73:*7,*
*14, 19, 21*
77:*23* 78:*23*
79:*23* 80:*17*
81:*17* 82:*5,*
*22* 84:*2*
88:*20* 90:*4*
91:*12* 93:*17*
94:*10, 17, 22*
97:*1, 24*
98:*18* 99:*14*
101:*7* 102:*6*
103:*4, 20*
109:*7* 111:*9*
112:*10* 113:*3*
114:*13* 117:*9*
118:*2, 7, 10,*
*12, 19, 23*
119:*16, 23*

Confidential Information - Subject to Protective Order

120:*13*
121:*10*
124:*10, 15*
127:7  131:*10, 14, 18, 20*
133:*24*
135:*12*  137:*3, 10, 13*  138:*14, 24*  139:*6, 10, 13, 18, 21*
140:*10, 13*
142:*15*
143:*11*
144:*21*  145:*1*
147:*11*
148:*23*  152:*5*
153:*15, 22*
154:*19, 24*
155:*4*  156:*21, 23*  158:*1*
160:*20*  161:*3*
162:*9*  163:*8, 13, 17*  164:*1*
165:*23*  166:*1*
167:*8*  168:*11*
169:*24*
170:*22*
171:*14*  172:7
173:*4*  175:*24*
178:*15*
179:*15*  182:*1*
183:*17*
184:*12*  185:*8, 22*  188:*18, 22*
189:*9, 11*
191:*12*
192:*14*  195:*1, 20*  197:*2*
199:*16, 19*
201:*19*  202:*9*
206:*21*  207:*3, 15, 19, 20*
**nitro**  177:*21*
**nitrosamines**
*14:14, 21*
*176:24*
*177:19*  179:*2, 11, 20*  180:*3, 11*
**North**  3:*21*

**Notary**  1:*17*
*209:14*  212:*23*
**note**  48:*16*
*159:23*  177:*18*
*210:11*  212:*11*
**notes**  18:*14, 20*  19:*4, 5*
*156:11*
*199:22*  213:*1*
**notice**  1:*15*
*6:15, 17*  15:*2*
*16:15, 18*
*17:2, 22*  18:*8*
**noting**  192:7
**November**
*28:10, 24*  29:*4*
**novo**  198:*19*
**Number**
*19:17, 18*
*20:6*  34:*10, 12*  57:*19*
*87:15*  88:*1*
*91:16*  101:*11*
*102:1*  105:*13*
*110:6*  114:*18*
*115:5, 6*
*119:8*  125:*12*
*127:1, 3, 9, 10*
*134:20*
*141:11*
*155:17, 20*
*156:10*  158:*5*
*159:6, 11*
*161:4*  165:*8*
*188:6, 7, 8, 10, 11*  203:*11*
*205:6, 11*
**numbers**  32:*3, 16*  37:*10*
*53:20*  75:*11*
*92:5, 7*  111:*8*
*118:9*  129:*19*
*143:7, 12*
*145:11*  146:*4*
*147:4*  196:*17*
*203:5*
**numerous**
*166:10*

**< O >**
**obese**  63:*20*
**obesity**  63:*19, 21*
**Object**  19:*1*
*25:15, 23*
*30:23*  32:*22*
*34:21*  35:*13*
*36:6*  37:*6*
*38:19*  39:*16*
*40:15*  44:*18*
*46:7*  50:*2*
*51:7*  52:*18*
*54:5*  56:*8*
*60:20*  61:*5*
*62:1, 13*
*64:21*  66:*11*
*68:13*  69:*6*
*70:8*  71:*19*
*78:15*  79:*18*
*81:14*  82:*15*
*83:13*  97:*15*
*100:20*
*101:14*
*102:19*
*110:13*
*111:17*
*112:19*  114:*3*
*116:24*  121:*4*
*126:18*  133:*8*
*134:12*
*141:22*
*142:20*  147:*1*
*148:4*  151:*17*
*157:11*  160:*4*
*161:1*  162:*19*
*166:18, 20*
*167:13*  170:*6*
*171:24*
*172:13*
*174:21*  178:*9, 22*  181:*13*
*184:19*  190:*24*
**Objection**
*41:5, 18*  42:*7*
*43:2, 16*
*46:22*  53:*12*
*55:13*  57:*5, 6*
*58:12*  59:*3, 21*  63:*3*
*71:21*  72:*20*

*77:18*  80:*10*
*88:12*  91:*6*
*93:10, 22*
*94:15*  96:*15*
*98:5, 24*
*103:11*
*108:21*
*135:22*
*138:11*
*161:15*
*169:12*  171:*4*
*182:21, 23*
*183:21*
*185:17*
*191:20*  194:*5*
*195:12*  196:*4*
*199:13*  200:*20*
**Objections**
*6:17*  17:*22*
*18:7*
**O'BRIEN**  2:*3*
**observation**
*67:8*
**observational**
*55:2*  70:*16*
*71:2, 12, 13, 16*  72:*17*
*186:22*  187:*2, 6*
**observe**  72:*5*
**observed**  55:*1*
*157:19*
*180:23*
*184:24*  187:*8*
**obtain**  84:*11*
**obviously**
*12:20*
**Occam's**  111:*3*
**occupational**
*154:5*  168:*16*
*190:1, 4*
*204:20*  205:*4*
**occurring**
*190:17*
**offered**  80:*24*
**offhand**  76:*6*
*162:15*
**offices**  11:*6*
**oftentimes**
*85:18*

**Oh**  66:*3*
*139:20*
**Okay**  11:7, *11, 17, 21*  12:*5, 18*  13:*13, 21*
*14:24*  16:*3, 9*
*17:4, 13*  18:*3, 5, 11*  19:*8, 17*
*22:8*  23:*1, 23*
*24:6, 10, 14*
*25:1, 6, 11*
*26:12*  27:*3, 20*  28:9  29:*2, 6, 22*  32:*10*
*33:5*  55:*20*
*61:2*  71:*14*
*77:13*  78:*2*
*79:12, 24*
*82:23*  84:*3*
*88:6, 7*
*105:15*
*109:18*
*114:14*  118:*2*
*119:7, 21*
*120:10*
*121:21*  123:*9*
*124:7*  125:*16*
*127:8*  130:*24*
*137:4*  139:*9*
*145:20*
*146:14, 18*
*147:12*  152:*6*
*155:10*
*156:16*
*160:21*  164:*2*
*165:15*
*166:13*
*168:12*  169:*8*
*172:8*  176:*16*
*182:2*  189:*19*
*201:21*
*202:13*
*205:19*
*206:24*  207:*9*
**once**  12:*9*
**Oncology**
*27:2*  69:*13*
**ones**  150:*11*
**one's**  205:*12*
**opine**  55:*16*
**opined**  56:*13*

Confidential Information Subject to Protective Order

opinion 20:*15*
37:*5, 22* 38:*5*
55:*10* 56:*6, 7*
64:*11* 66:*8*
67:*20* 68:*11*
69:*3* 71:*7*
72:*18* 81:*1*
85:*1* 87:*5*
88:*8, 18* 89:*2,
4, 7* 90:*18*
97:*11* 99:*22*
100:*15, 19*
105:*16*
109:*20*
114:*17*
116:*23*
121:*11* 127:*9,
18* 128:*17, 18,
22* 147:*20*
150:*21* 151:*4,
13, 14, 15*
152:*12, 17, 22,
23* 153:*4, 6, 9*
161:*7*
opinions
19:*19* 34:*14*
38:*6, 14, 16*
39:*11, 15, 19*
41:*2, 3, 15*
42:*4, 23*
43:*14, 24*
44:*9, 10, 15,
17, 23* 45:*7,
15* 64:*8* 70:*6*
71:*2, 17*
77:*10* 78:*14*
127:*22*
opportunity
209:*9*
opposed
107:*20* 108:*2*
110:*10* 165:*7*
Oral 6:*15*
16:*16*
ORDER 1:*8*
38:*16* 39:*10*
45:*24* 49:*4*
51:*22* 53:*5*
104:*11, 18*
112:*4, 8*

122:*1* 136:*20,
21*
O'REILLY
4:*5*
orient 16:*12*
original
156:*14* 210:*15*
Orleans 2:*18*
outcomes
48:*19*
outset 48:*16*
outside 35:*16*
36:*9* 37:*9, 24*
55:*18* 63:*6*
70:*11* 81:*8*
83:*4, 24*
100:*23*
102:*22* 103:*2,
15* 127:*14*
177:*17*
Overland 2:*13*
Oxford 3:*4*

< P >
p.m 153:*21*
202:*5* 207:*8,
23* 208:*4*
PA 2:*3, 12*
packing 115:*5*
PAGE 6:*14*
7:*5* 8:*6, 9, 12,
15* 17:*5*
18:*12* 19:*9,
17* 22:*15, 18*
29:*7* 47:*13*
75:*22* 84:*4, 6*
105:*6, 12, 13*
114:*16*
119:*13*
130:*22*
139:*11*
140:*11*
153:*24*
155:*16*
156:*17* 158:*8,
15* 159:*8*
160:*13* 163:*9*
165:*20, 24*
176:*17*
187:*13, 16*

202:*10* 211:*4*
213:*2*
pages 15:*13*
212:*6*
pancreas
205:*18*
pancreatic
77:*3*
Panigrahy
12:*2* 30:*17*
31:*16* 32:*11,
18* 33:*13*
36:*21* 37:*2*
40:*10, 13*
41:*3, 15* 42:*5,
24* 44:*1, 15*
45:*12* 46:*5*
49:*13* 50:*12*
53:*10* 56:*5*
64:*15* 74:*10*
77:*10* 106:*9*
107:*8* 170:*18*
194:*17*
197:*20*
198:*11* 199:*4,
22* 204:*5*
Panigrahy's
21:*20, 24*
22:*3* 38:*8, 15*
39:*14* 55:*9*
56:*3, 11*
74:*14, 19*
175:*9* 195:*3*
196:*14*
199:*12*
202:*17* 203:*14*

PAPANTONIO
2:*1* 5:*8*
paper 35:*4*
paragraph
47:*15, 17*
118:*21*
155:*17*
180:*14* 205:*7*
Paralegal 5:*8,
10*
Park 2:*13*
Parkway 2:*8*
part 19:*4*
21:*2* 29:*18*

45:*14* 48:*10*
73:*17* 87:*8*
102:*8* 110:*19,
20* 113:*12*
118:*16*
126:*12* 169:*20*
particular
28:*12* 89:*11*
97:*9* 101:*23*
102:*2* 142:*2*
148:*12*
151:*22* 152:*1,
20*
parties 9:*20*
10:*3*
parts 74:*15*
87:*21* 120:*23*
122:*18* 188:*9*
patent 23:*9*
patient 65:*22*
197:*24*
patients 85:*7,
15, 18* 86:*7, 10*
PATRONELL
A 2:*21*
pause 10:*1*
25:*5*
pausing 69:*9*
PDF 119:*18*
120:*6*
pending
165:*22*
Pennsylvania
3:*5*
Pensacola 2:*4*
people 51:*14*
63:*12, 19*
67:*2* 82:*14,
19* 83:*1, 2, 10,
17* 85:*10*
86:*18* 192:*17,
18* 193:*6*
194:*2, 3*
195:*6, 9*
199:*5* 200:*17,
18* 206:*11, 12,
13*
people's
190:*18*
percentage
63:*1*

perform
48:*11* 188:*4*
performed
78:*6* 187:*17*
period 101:*24*
person 12:*10*
personally
83:*23* 91:*22*
person's 77:*17*
ph 1:*21*
Ph.D 1:*14*
6:*5, 18, 20, 21*
10:*10* 209:*8*
212:*16*
Pharma 4:*12*

Pharmaceutical
4:*11* 27:*5, 10*
Pharmaceutical
s 3:*7, 17* 4:*12*
Pharmacy
3:*12* 84:*12*
phone 12:*10*
13:*17, 19*
physicians
67:*1*
Piedmont 4:*4*
PIETRAGALL
O 3:*1*
pill 86:*1, 2*
pills 52:*15, 17*
54:*1* 55:*11*
86:*3* 88:*9*
89:*8* 91:*5, 21*
92:*16, 22*
93:*3, 6, 19, 21*
94:*11, 14*
95:*1, 4* 96:*2,
4, 10, 12* 97:*2*
98:*1, 4, 19, 21*
99:*15*
Pittsburgh 3:*5*
PIZZI 4:*5*
place 39:*5*
placebo 67:*9*
placebo-
controlled
67:*17*
Plaintiffs 2:*6,
10, 15, 19, 23*
6:*17* 11:*1*

Confidential Information - Subject to Protective Order

18:7 38:17 39:12 48:6 74:6 84:8, 11 85:2 86:23 105:7, 18 106:1, 21 107:19 108:1, 14, 17 109:1, 9, 21 110:8, 10 111:13 112:5, 12, 16 184:15 185:11

**plan** 36:14 40:20 45:4 47:5 48:14 106:5, 6 109:3 167:18 168:9 169:16 170:10 172:5, 9 175:11 196:11, 12 198:7, 9 201:1

**plans** 47:8 102:22 103:1

**play** 178:1

**please** 10:1, 18 11:21 93:15 107:22 116:4 156:4 163:19 164:22 189:10 210:3, 8

**plus** 15:10

**point** 28:20 38:2 70:3 89:10 101:4 129:7 154:17 179:2 181:2 182:12 193:3, 23 204:8

**pointed** 135:4

**pointing** 161:12 183:3

**points** 22:22

**potential** 102:17 103:7, 9 111:12

**pour** 94:4

**powder** 23:3

**ppm** 120:15, 20 187:23 202:21

**precise** 60:23 149:8

**precludes** 123:6

**preparation** 12:7

**prepare** 11:22, 24

**preparing** 29:19

**prescribed** 84:16, 23 85:4, 11 87:1

**prescription** 87:15 88:2 91:17 101:12

**preselected** 138:17

**PRESENT** 5:1

**presentations** 14:19

**presented** 107:8

**presume** 76:7 205:17

**pretty** 85:9 111:23 119:13 157:13

**previous** 95:6 96:7

**previously** 14:14

**primary** 68:18

**Princeton** 4:20

**prior** 22:16

**privilege** 90:9

**probably** 17:23 21:22 63:10 69:15 89:18 131:2

**problem** 51:13 119:5 125:1, 2, 4, 8

**problematic** 41:16 42:6 43:1

**problems** 32:8

**PROCTOR** 2:1

**produced** 20:2, 12 32:17 53:20

**product** 62:23 76:4 92:2, 3 105:9, 20 106:23 107:9, 11 108:13, 16, 19 114:12 115:9, 17 117:13 121:1, 2 123:2, 11 124:18 125:19, 20 126:3, 15 127:20 128:13, 20 131:6, 23 132:3, 7, 11, 15, 19, 23 133:7 134:7 135:9 137:1, 16 138:5, 21, 22 140:4 142:19 146:1, 6, 11, 24 147:9 149:14 150:3, 6, 23 151:6 152:14 153:8

**Production** 8:8

**PRODUCTS** 1:4 9:13 54:1 75:19 76:1 105:8 107:17 114:23 121:15 123:21 133:5 134:5 135:21 138:9 141:21 143:20 147:14, 18, 23 148:2 149:3

**Professional** 1:16 209:13

**program** 38:7, 18 39:13

80:9, 16, 20, 23 81:22 82:18

**programs** 81:6, 10, 13, 24 82:7, 9, 13 83:1, 10, 19 102:16 103:6

**pronouncing** 205:9

**proposal** 107:5 108:8 110:1

**propose** 40:22 49:15

**proposed** 30:15 38:17 39:12 40:9 45:19, 22 46:2 47:3 48:5, 6, 13 49:3, 11 50:6, 9, 15, 22 51:3 52:22 84:14, 22 85:3 86:24 106:4 109:6 110:3, 4, 23 154:4 169:16 170:11 194:11 198:6

**proposes** 111:20

**propounded** 212:9

**prostate** 205:16, 17

**PROTECTIVE** 1:8

**provide** 23:7 24:14, 19 50:7 195:17

**provided** 17:11 25:8 27:4, 17 47:7 84:14 95:10, 12 97:19, 21 99:9, 12 104:6, 8, 22 106:6, 7

109:14 125:11 128:10 134:24 200:12

**provides** 56:5

**Public** 1:18 209:14 212:23

**published** 14:14 55:6 66:1, 2, 6 68:5, 6, 10 77:9

**pull** 14:24 17:14 154:24 163:8, 11

**pulled** 142:7

**pursuant** 1:14

**put** 19:5 22:11 47:15 73:20 105:13 115:1 139:13, 19 176:19 187:15 204:23

**puts** 157:5 168:24

**< Q >**

**qualifications** 14:9 93:15

**quantities** 148:15

**quartile** 190:19, 20 193:5 194:2, 3

**quartiles** 159:18 164:20 166:6 168:13

**question** 13:9, 11 30:24 34:22 38:23 42:20 43:19 55:17 70:24 71:10, 15 81:16 90:3 93:13, 16 94:9, 18, 20 95:6 96:9, 24 97:22 105:4 106:17 107:23

128:*16*
129:*24* 134:*1,*
*2* 137:*5*
149:*20*
165:*22* 172:*1*
174:*3, 13*
181:*19* 182:*6*
193:*21, 23*
**Questions**
8:*14* 12:*21*
13:*7* 14:*8*
16:*13* 96:*7*
107:*10, 16*
202:*12*
206:*22*
207:*11* 212:*8*
**quick** 14:*8*
**quintile**
156:*12*
157:*18, 24*
160:*15*
**quintiles**
159:*18* 166:*6*
168:*14, 22, 23*
**quite** 63:*11*
66:*17* 85:*7*

**< R >**
**rabbit** 64:*5*
**radiation**
83:*18*
**RAFFERTY**
2:*1*
**raised** 174:*4, 7*
**randomized**
65:*3, 5, 8*
66:*22*
**ranges** 103:*23*
104:*5, 14*
203:*24*
**rare** 64:*18*
65:*13*
**rarely** 70:*7*
71:*3, 17, 24*
**RASPANTI**
3:*3*
**rate** 66:*21*
67:*13, 14*
**RATHOD**
2:*21*

**Razor** 111:*3*
**RBK/JS** 1:*5*
**reach** 52:*14*
54:*3* 71:*17*
196:*2* 203:*1*
**reached** 70:*7*
71:*3* 72:*18*
**reaching**
38:*13* 195:*10*
200:*19*
**read** 35:*4*
74:*23* 107:*13*
128:*2* 160:*22*
161:*5, 11*
164:*13*
207:*12* 209:*9*
210:*3* 212:*5*
**reading** 84:*9*
114:*17*
129:*21* 160:*7*
**reads** 166:*24*
**really** 34:*12*
47:*7* 128:*6*
146:*20*
**realm** 83:*24*
**Realtime** 1:*17*
209:*14*
**reason** 104:*4*
172:*10* 210:*5*
211:*6, 8, 10,*
*12, 14, 16, 18,*
*20, 22, 24*
**reasons** 182:*16*
**recall** 13:*19*
14:*18* 21:*22*
22:*1* 37:*16*
59:*20* 95:*18*
96:*21* 98:*9*
101:*1* 107:*15*
109:*5* 141:*14*
150:*10*
172:*19* 195:*13*
**recalled** 59:*2,*
*19* 87:*16*
88:*3, 11, 19,*
*23* 89:*12, 14,*
*17* 90:*6, 14,*
*19* 91:*2, 15*
97:*5, 10, 13*
98:*13* 99:*19,*

*24* 100:*4, 10*
101:*22*
**receipt** 210:*17*
**receiving**
15:*11*
**recess** 202:*1*
**recognize**
190:*16*
**recommendatio**
**n** 82:*2*
**record** 9:*4*
10:*5* 61:*6*
73:*10, 13*
120:*6* 153:*18,*
*21* 201:*23*
202:*5* 207:*5,*
*8* 209:*6*
**records** 84:*12*
**recreate** 50:*20*
**rectal** 189:*21*
190:*7* 204:*13*
205:*2*
**reduction**
115:*11*
**Reefer** 12:*16*
13:*14*
**refer** 163:*3*
167:*23*
**referenced**
37:*11*
**referred**
163:*1* 168:*9*
170:*14*
**referring** 79:*2*
99:*24* 120:*23*
128:*4* 141:*2*
142:*5* 157:*5*
169:*1* 171:*22*
180:*6* 194:*15*
205:*1, 20*
**refers** 167:*21*
204:*19, 20*
**reflecting**
18:*14*
**refresh** 16:*1*
18:*2* 133:*21*
**regarding**
107:*16*
**regards** 14:*20*
18:*22* 77:*3*
107:*10*

**regimen** 86:*9,*
*13*
**Registered**
1:*16* 209:*13*
**regulator**
57:*9* 58:*7*
59:*7, 24*
**regulators**
60:*8*
**related** 77:*5*
177:*8* 180:*8*
**relating**
176:*20* 178:*18*
**relevant**
172:*24*
173:*13*
174:*17* 175:*7*
**relied** 19:*19,*
*24* 21:*8* 47:*8*
50:*10* 73:*17*
79:*14* 80:*2*
141:*9*
**rely** 78:*12*
**relying** 108:*3*
177:*10, 12*
**remember**
26:*24* 28:*18*
76:*6* 79:*22*
96:*8* 143:*21*
149:*9* 151:*10*
154:*15* 171:*8*
173:*18* 176:*7*
204:*7*
**remote** 1:*14*
9:*10, 24*
**remotely** 9:*21,*
*23*
**render** 38:*5*
**repeat** 43:*19*
93:*13, 16*
105:*1*
**rephrase**
70:*24* 179:*22*
**replacing**
120:*6*
**replicate** 40:*3*
47:*3* 49:*6*
**Report** 6:*21*
7:*7* 12:*3*
13:*24* 19:*5, 6,*
*20, 23* 20:*10*

21:*20, 24*
22:*3, 6* 27:*18*
28:*13* 30:*1,*
*11* 32:*6*
37:*12* 39:*1*
47:*13* 48:*4*
49:*10* 50:*6*
55:*9* 56:*3, 11*
57:*7* 73:*18*
74:*14, 15, 17*
78:*12* 79:*8,*
*13* 80:*3* 84:*5*
103:*21*
104:*12* 107:*1*
110:*1* 118:*15*
123:*1* 139:*2,*
*12, 23* 153:*24*
154:*17* 155:*6,*
*11* 162:*4, 22*
163:*2, 6*
167:*22*
171:*22* 173:*3,*
*15, 22* 174:*7,*
*20* 175:*4, 18,*
*23* 176:*5, 9,*
*14, 17* 187:*14*
194:*12, 14*
195:*4* 197:*11*
199:*12*
201:*15*
202:*11, 17*
203:*14, 17, 18,*
*21* 205:*5, 8*
**reported**
96:*22* 186:*3*
196:*14* 203:*14*
**Reporter** 1:*17*
10:*6* 209:*13,*
*14, 22*
**reporting**
10:*1* 191:*11*
**reports** 12:*1*
20:*8, 21* 21:*2,*
*12* 30:*16*
33:*24* 36:*20*
37:*14, 16*
38:*10, 11*
40:*10, 13, 18*
45:*1, 3, 13, 14,*
*20, 21* 46:*5,*
*11* 47:*9*

49:*13, 14*
50:*11, 13*
51:*2*  52:*24*
61:*11*  74:*10*
168:*6, 10*
169:*21*
170:*17*  175:*9*
184:*15*
185:*11*
194:*16*
196:*15, 16*
197:*1, 9, 15*
198:*11, 12, 16*
200:*4*  201:*7, 9*
**represent**
10:*24*  17:*20*
**Representing**
2:*6, 10, 15, 19,
23*  3:*6, 12, 17,
22*  4:*11, 17, 21*
**reproduce**
32:*3*  52:*21*
**reproduction**
209:*20*
**Request**  8:*8*
18:*12, 13*
**requested**
209:*6*
**requests**  17:*6*
**require**  46:*10*
64:*12*
**requiring**
48:*17*
**research**
34:*11*  38:*3*
**residual**  72:*13*
187:*5*
**respect**  26:*2*
89:*5*  98:*15*
173:*23*
176:*21*  177:*9*
178:*12, 20*
179:*13*
180:*10*
181:*16*  182:*5*
201:*17*
**response**
18:*23*  22:*19*
26:*3*  174:*23*
200:*22*

**Responses**
6:*15*  17:*21*
18:*7*
**responsibility**
112:*2*
**responsive**
17:*11*
**rest**  54:*17*
**result**  121:*24*
122:*15, 23*
144:*19*  145:*6*
160:*17*
**results**  75:*14*
76:*3, 8*  77:*4*
145:*17, 18, 19*
150:*7*  181:*22*
182:*9*
**retained**
26:*13, 17, 21*
27:*4, 9, 13*
28:*20*
**retainer**  28:*23*
**return**  210:*15*
**reveal**  89:*21*
**reverse**  122:*24*
**review**  19:*12*
36:*11*  38:*7*
46:*4, 11*  51:*2*
55:*8*  58:*16*
61:*2, 18, 21*
62:*3*  64:*6*
74:*13, 18, 21*
75:*2, 5*  77:*21*
95:*15*  100:*24*
104:*5*  107:*6*
117:*5, 22*
129:*3*  137:*8,
23*  162:*10, 13,
22*  167:*9*
**reviewed**  12:*1*
18:*24*  20:*8,
20*  21:*1, 7*
34:*13*  56:*2*
58:*9*  69:*2, 15*
74:*1, 5, 9, 16*
76:*9*  97:*3*
99:*16*  129:*10*
137:*21*
141:*17*  147:*5*
152:*10*  170:*2*
173:*7*

**reviewer**
48:*17*  51:*5*
**reviewing**
18:*18*  22:*2*
64:*9*  115:*1*
153:*12*
**right**  15:*16,
22*  38:*5*  58:*6*
69:*24*  70:*4*
72:*23*  86:*22*
97:*17*  100:*13*
101:*19*  109:*5*
116:*10*  119:*9*
121:*11, 16*
123:*10*
124:*23*
127:*13*
129:*15*  130:*5,
22*  134:*9*
136:*23*  137:*7*
138:*2*  144:*7,
16*  147:*5*
148:*15*  151:*8,
9*  152:*7*
157:*1*  163:*23*
170:*5*  174:*8*
188:*19*  195:*5*
205:*9*  206:*21*
**rigorous**
111:*22*
**risk**  51:*15, 17*
54:*3, 15, 23*
56:*1*  61:*22*
62:*8*  63:*16*
77:*15*  78:*8*
82:*11*  176:*21*
177:*9*  178:*19*
180:*9*  186:*1,
12*  190:*22*
205:*13, 22*
206:*7, 10*
**Rite**  3:*12*
**Road**  4:*4, 19*
**ROBERT**  1:*6*
**role**  69:*14*
**room**  11:*8, 14*
13:*22*
**ROONEY**
3:*19*
**Roseland**  2:*9*
**Roszel**  4:*19*

**Row**  121:*23*
122:*11*
123:*14*
124:*14*  143:*16*
**rows**  122:*1*
135:*16, 19*
137:*9, 14, 15*
138:*4, 7*
144:*4*  146:*14*
**rule**  156:*14*
157:*16*
**rules**  12:*20*
13:*3*
**run**  73:*22*

**< S >**
**safe**  57:*16, 24*
59:*13*  60:*4, 10*
**saw**  98:*12*
109:*14*  164:*24*
**saying**  46:*13*
50:*5, 10*  99:*6*
108:*24*
127:*15*  136:*7*
151:*20*
152:*16*  161:*6*
169:*5*  171:*21*
172:*4*  181:*4,
16*  184:*4*
186:*19*
193:*15*  206:*1*
**says**  15:*22*
16:*21*  19:*10,
18*  20:*6*
22:*18*  47:*19*
49:*12*  76:*7*
87:*9*  88:*22*
102:*9*  117:*10*
119:*1*  122:*6,
21*  123:*7*
127:*22, 24*
128:*18, 22*
130:*17*
131:*16*
139:*24*
140:*14*  154:*3*
158:*21*  159:*9*
161:*18*
164:*12*
166:*11*
169:*21*

188:*24*
196:*12*  205:*17*
**scan**  74:*24*
**scanned**  75:*7*
**ScieGen**  3:*17*
**science**  111:*20*
**scientific**
19:*13*  49:*21,
24*  50:*8*
51:*22*  58:*2*
106:*7*
**scientifically**
49:*1, 2*  111:*22*
**scope**  35:*16*
36:*7, 9*  37:*9*
38:*1*  45:*16*
55:*14, 18*
57:*7*  58:*13,
15*  59:*5, 22*
61:*7*  63:*4, 6*
70:*11*  77:*12,
19*  78:*3*
80:*11*  87:*3*
88:*13, 15*
89:*5*  91:*7, 9*
93:*11, 24*
96:*16, 18*
97:*7*  98:*6*
99:*5*  101:*16*
102:*23*
103:*12*  104:*2*
110:*16*
182:*24*  183:*2,
22*  184:*1, 23*
185:*18, 20*
**screen**  15:*10,
18*  16:*7, 10*
47:*16, 22*
73:*20*  82:*9*
105:*14*
118:*22*
125:*17*
139:*14, 19*
166:*15*
**screened**  83:*11*
**screening**
81:*23*  82:*3, 6,
13, 18*  83:*2, 19*
**scroll**  122:*14*
137:*10, 11*
144:*21*  145:*14*

Confidential Information – Subject to Protective Order

scrolled
143:15
scrolling
137:12  145:20
search  64:13
second  110:19
119:15, 22
120:12
123:14, 19
124:8  156:12
157:18, 24
191:17
secondly
173:21
seconds  17:23
second-to-last
155:18
sections
184:14  185:10
see  15:9, 16,
18  16:17, 19,
20, 23  17:7
18:6  19:9, 22
22:7, 17, 23
23:20  29:17
32:11  39:2, 6
40:11, 21
45:21  48:7
51:2, 22
53:22  56:19,
21  75:10
84:19  87:11
94:6  101:18
102:13  104:4,
6  105:10, 21
108:9  115:12,
20, 24  117:16
119:1, 8, 10
120:4, 16, 17,
19  121:3, 20,
23  122:4, 8,
17, 22  123:15
124:6  125:17
126:2, 16
130:12, 16, 23
131:4, 5, 16
132:2, 6, 10,
14, 18, 22
133:3  134:3,
10  135:18
138:4  140:11,

15, 19, 22
141:8  144:1,
15, 18  145:5,
15  154:8
155:9  156:2,
16, 17, 19
158:15, 19, 23
159:5, 24
160:21
161:11
163:14  164:2,
18, 23  165:18
167:10  168:2
170:3  171:6
173:5  175:4
176:4  177:4
181:21  182:8
186:8  188:2
189:2, 13
190:6  191:10
192:11
194:19  195:2
198:23  199:3,
9, 11  203:4,
18  204:14
206:7, 9
seeing  16:6,
10  116:14
149:6  150:17
190:21
seen  17:2
35:3  69:18
93:7, 19
94:12  95:2
96:3, 11  98:2,
20  158:7
205:22
select  138:18
selected
133:12
sense  50:23
113:8, 13
sentence
48:23  139:24
155:18  176:18
served  19:20
20:9
SERVICES
1:21  9:7
set  19:20
40:6  57:4, 13,

20, 23  58:22
59:11  60:2, 3,
5  80:13  83:19
setting  80:8,
15
shared  120:3
sheet  118:24
210:7, 9, 12,
15  212:12
short  73:6, 11
153:19  207:6
Shorthand
1:17  209:13
show  16:1
77:15  118:8
showed  62:4,
6, 9, 11
136:22  203:24
showing
138:19
184:16  185:12
shown  102:4
180:23
shows  122:17
204:11, 12
sign  207:12
209:9  210:8
signed  28:23
significant
156:11
157:20
160:16  162:5
186:5  205:12
signing  28:21
210:10
similar  98:8
105:7, 19
106:22
108:18  178:3
180:7  181:21
182:8, 18
186:6, 15
187:3, 7
200:22
similarities
177:16  178:7,
11  181:8, 11
184:3, 16
185:12, 16
similarly
179:18  180:2

simplest
111:2, 11
simply  39:10
158:4  165:8
178:20
179:18  180:2,
10  181:10
single  69:1, 22
70:6  71:2, 8,
12, 13, 16
72:16  134:20
144:19  145:6
158:16  180:16
sit  95:14
113:22  114:5
191:13
Sitting  69:24
72:23  97:18
98:9  100:13
situation  65:9
situations
85:9, 17
size  92:2
skipping
124:22
SLATER  2:6,
8
slip  118:24
sloppy  128:3
small  60:19
62:23  63:1,
11  119:13
133:11
134:22  135:3,
8  136:4
138:16
smoke  82:20
177:2, 20
179:5
smoking
82:24  83:9
snippet
133:12
134:23  135:8
136:4, 22
Snodin  76:21
solved  52:10
Song  76:19
Sorry  18:12
23:13  25:2
38:21  43:18

44:13  54:19
68:15  95:5
99:2, 3
105:11
106:11  116:3
119:4  136:14
138:21
139:17
144:24
145:23
146:15  148:6
167:15  168:6
179:21, 23
188:14  189:6
190:3  193:16
199:2  204:2
sort  54:12, 21
55:23  57:11
58:4  89:9
158:14
180:17  191:4,
10  192:11
195:17  203:6,
8, 11
sorts  186:23
sound  49:1, 3
sounds  171:20
207:3
source  90:16
South  2:4
space  210:6
speak  70:13
71:5
speaking  10:2
specific
103:19  128:5
136:10
147:21
177:13  199:11
specifically
97:14  150:20
151:3, 15
199:1, 5
202:14
specified
47:20  48:1
specify  204:3
speculation
59:4
spell  10:18

Confidential Information Subject to Protective Order

195:*22*

**spent** 29:*7, 14*

**spoke** 13:*16*

**spot** 139:*8*

**spots** 146:*9*

**Spreadsheet** 7:*6* 94:*6* 119:*12* 120:*1, 2* 121:*22, 24* 124:*3* 127:*13* 129:*9, 12* 130:*9, 17, 20, 22* 133:*3, 5* 134:*3, 5, 11* 135:*5, 14, 15* 136:*23* 137:*8, 9* 138:*7* 143:*1, 14, 17, 22* 145:*14* 146:*10* 152:*7*

**spreadsheets** 75:*17* 96:*8, 20* 117:*23* 129:*18* 133:*15* 134:*9* 143:*23* 144:*2* 146:*21* 147:*7* 148:*10, 22* 149:*5* 151:*8* 152:*3, 10*

**staggered** 89:*14, 17* 90:*6, 14*

**stands** 130:*2*

**star** 188:*20*

**staring** 12:*24*

**Start** 30:*9* 64:*4* 84:*21*

**started** 14:*12, 21*

**starting** 106:*14*

**State** 3:*15* 10:*18* 45:*6* 58:*10* 87:*13* 105:*6* 114:*18* 116:*20* 129:*23* 130:*14* 142:*23* 143:*4, 7* 151:*20*

185:*23* 199:*1* 200:*3* 210:*5*

**stated** 39:*22* 44:*7* 45:*8* 53:*1* 63:*10* 99:*10* 107:*13* 113:*11* 117:*21* 123:*6* 130:*10* 153:*9* 165:*4* 167:*20* 172:*16, 18* 184:*11* 192:*1* 194:*20* 196:*10* 197:*10* 201:*3*

**statement** 58:*18* 85:*5* 87:*9, 22* 88:*21* 100:*12* 101:*10* 102:*9* 108:*17* 109:*8, 12* 112:*12* 117:*20* 123:*5* 124:*2* 125:*6, 10* 126:*13* 137:*6* 140:*16* 141:*18* 142:*1* 143:*9* 144:*24* 146:*19* 149:*1, 6, 24* 154:*2* 160:*1* 170:*23, 24* 175:*6* 177:*7, 11* 178:*16* 180:*18* 202:*15* 203:*15*

**STATES** 1:*1* 9:*15* 81:*13* 158:*9* 199:*5*

**statistical** 48:*16* 167:*6*

**statistically** 157:*20* 160:*16* 162:*4, 5* 186:*4* 205:*12*

**statistician** 135:*18* 160:*7, 9* 164:*14* 166:*24*

**statisticians** 158:*13* 167:*2*

**stay** 114:*15*

**stenographic** 10:*5*

**step** 160:*23* 161:*13* 187:*17*

**steps** 46:*19* 47:*10* 160:*3* 187:*20* 188:*5*

**STEVEN** 4:*3*

**Stipulations** 8:*11*

**stomach** 205:*15*

**stop** 165:*10*

**STOY** 3:*3* 11:*10* 12:*13* 13:*14* 15:*24* 19:*1* 25:*15, 17, 23* 30:*23* 32:*22* 34:*21* 35:*13* 36:*6* 37:*6* 38:*19* 39:*16* 40:*15* 41:*5, 18* 42:*7* 43:*2, 16* 44:*18* 46:*7, 22* 50:*2* 51:*7* 52:*18* 53:*12* 54:*5* 55:*13* 56:*8* 57:*5* 58:*12* 59:*3, 21* 61:*5* 62:*1, 13* 63:*3* 64:*21* 66:*11* 68:*13* 69:*6* 70:*8* 71:*19* 72:*20* 73:*3* 77:*18* 78:*15* 79:*18* 80:*10* 81:*14* 82:*15* 83:*13* 88:*12* 89:*20* 91:*6* 93:*10, 22* 94:*15* 96:*15* 97:*15* 98:*5, 24* 100:*20* 101:*14* 102:*19* 103:*11*

108:*21* 110:*13* 111:*17* 112:*19* 114:*3* 116:*24* 120:*5, 10* 121:*4* 126:*18* 133:*8* 134:*12* 135:*22* 138:*11* 139:*3, 9* 141:*22* 142:*20* 147:*1* 148:*4* 151:*17* 157:*11* 160:*4* 161:*1, 15* 162:*19* 165:*21* 166:*18* 167:*13* 169:*12* 170:*6* 171:*4, 24* 172:*13* 174:*21* 178:*9, 22* 181:*13* 182:*21* 183:*21* 184:*19* 185:*17* 190:*24* 191:*20* 194:*5* 195:*12* 196:*4* 199:*13* 200:*20* 201:*21* 206:*24* 207:*9*

**strange** 164:*9*

**Street** 2:*4, 17, 22* 3:*10, 15, 20* 4:*9, 15*

**strike** 30:*8* 105:*3* 106:*9, 15* 199:*2*

**striking** 106:*12*

**struggling** 81:*19* 136:*1*

**studied** 66:*16*

**studies** 18:*19, 22* 19:*13, 15* 21:*13, 14* 51:*18* 55:*2*

61:*22* 62:*4, 6* 63:*15, 17* 64:*15, 17* 65:*24* 66:*1, 5, 7* 68:*4, 5, 6, 10, 20* 69:*16* 70:*16, 21* 72:*2* 76:*10* 77:*8, 15* 78:*6, 9, 10, 13* 79:*8, 13, 14* 80:*3* 154:*5, 12* 155:*13* 156:*6* 158:*16* 166:*7* 168:*16, 17* 169:*2* 176:*19* 177:*8* 178:*18* 180:*8, 22, 24* 181:*20* 182:*8, 17* 184:*8* 185:*15, 24* 186:*4, 7, 16, 19, 22* 187:*3* 189:*1, 15, 18* 190:*2, 8, 10, 13* 191:*3, 5, 9, 15* 192:*8, 16* 193:*2, 11, 14, 19* 204:*20* 206:*8*

**study** 64:*19* 65:*4, 14, 21* 66:*8* 67:*20* 68:*18* 69:*2, 18, 22* 70:*3, 6* 71:*2, 8, 9, 12, 13, 16* 72:*6, 9, 12, 14, 17, 19, 24* 76:*13, 15, 17, 19, 21, 23* 77:*2, 3* 155:*19, 21* 158:*5, 10* 159:*1, 3, 9, 12, 14* 161:*18, 21* 163:*15* 165:*9* 169:*3* 180:*16, 19* 181:*5* 182:*10* 184:*5* 186:*11* 187:*1, 3, 6, 10*

Confidential Information Subject to Protective Order

188:*13* 190:*5,*
*17* 192:*22*
205:*4, 22*
**stuff** 167:*1*
**SUBJECT**
1:*8* 210:*10*
**Subscribed**
212:*19*
**substance**
66:*8, 9* 82:*21*
212:*11*
**substances**
82:*14* 83:*3,*
*12, 22* 103:*8*
**sufficient** 85:*2*
**suggest** 125:*18*
**suggested**
203:*7*
**suggesting**
178:*17*
**Suggs** 5:*10*
**Suite** 2:*4, 13,*
*22* 3:*20* 4:*4,*
*15*
**supervision**
209:*22*
**supplied**
20:*22, 24*
**SUPPORT**
8:*2* 36:*16*
40:*12* 45:*22*
46:*2* 51:*23*
74:*6* 110:*22*
131:*21*
169:*18*
170:*13*
183:*11, 13, 19*
194:*11*
**supporting**
140:*16*
**supports**
30:*14* 40:*8*
45:*18*
**sure** 15:*8*
31:*2* 33:*1*
35:*2* 38:*23*
39:*18* 41:*8*
42:*10, 17*
43:*20* 60:*9*
70:*17* 73:*23*
81:*20* 86:*4,*

*14* 93:*18*
107:*4* 119:*24*
124:*1* 125:*15,*
*22* 126:*21*
128:*3* 130:*6*
137:*18*
140:*24*
157:*14*
173:*21*
191:*14* 194:*8*
203:*16* 205:*8*
**surprised**
175:*16*
**swear** 10:*8*
**sworn** 9:*23*
10:*11* 209:*5*
212:*19*

**< T >**
**Tab** 144:*8, 10,*
*15, 19* 145:*2*
**Table** 107:*2*
114:*19*
156:*10* 188:*7*
191:*23*
203:*12*
204:*11, 15, 16*
**tablet** 114:*23*
115:*17*
117:*13* 140:*4*
**tabs** 14:*4*
142:*24* 145:*3*
**tabulate** 149:*4*
**tabulated**
134:*21*
**take** 16:*15*
17:*4, 14, 15,*
*23* 18:*20*
19:*8* 22:*9*
27:*21, 22*
29:*23* 47:*12*
73:*6, 8, 16*
85:*11, 21, 23*
118:*2* 119:*11,*
*14* 121:*21*
130:*11* 139:*5*
141:*5* 149:*4*
153:*16*
158:*12*
197:*22*
201:*20*

202:*19, 23*
207:*1*
**taken** 1:*14*
85:*20* 86:*16*
202:*2*
**takes** 129:*19*
**talc** 23:*2*
24:*12* 26:*17*
**talk** 149:*21*
**talked** 147:*12*
**talking** 145:*8*
**task** 30:*12*
36:*1* 40:*5, 11*
48:*10* 49:*22*
**team** 28:*10*
**tech** 16:*11*
18:*1* 119:*21*
120:*2, 9, 11*
140:*8*
**technical** 61:*1*
62:*16* 81:*21*
**TECHNICIAN**
5:*4, 6*
**tell** 11:*21*
12:*18* 101:*3*
152:*19*
153:*13* 193:*1*
**telling** 86:*8, 12*
**Ten** 73:*8*
199:*14*
**tens** 96:*13*
**Terminus** 4:*3*
**terms** 18:*21*
28:*21* 33:*18*
36:*2* 49:*7*
53:*23* 55:*21*
64:*10* 77:*16*
92:*3* 110:*9*
111:*14* 122:*1*
134:*24*
152:*11*
177:*15* 206:*5*
**terrible** 12:*14*
**tertile** 168:*15*
**tertiles** 159:*19*
166:*6* 168:*14,*
*19, 20, 21*
**test** 13:*4*
121:*24*
122:*15*

144:*19* 145:*6,*
*17, 18*
**tested** 75:*20*
87:*17* 99:*9*
101:*9* 102:*9*
133:*6* 134:*6*
138:*3* 183:*6*
**testified** 10:*12*
22:*19* 23:*1, 8,*
*20, 24*
**testify** 24:*3*
26:*7*
**testifying** 26:*4*
**Testimony**
6:*3* 22:*16*
23:*7* 24:*15,*
*22* 25:*8, 13*
27:*5* 50:*3*
74:*19* 75:*2*
117:*1* 151:*18*
162:*10, 13*
163:*4* 167:*10*
169:*11* 170:*2,*
*5, 7, 21* 171:*3,*
*9, 11, 16, 19*
172:*12, 17*
173:*6, 8, 11,*
*12, 19* 174:*5,*
*16* 176:*2, 3,*
*15* 180:*7, 12*
196:*5* 200:*14*
209:*6*
**testing** 75:*14*
76:*3, 8* 93:*7,*
*20* 94:*3, 12*
95:*2, 10, 11,*
*13, 15* 96:*4,*
*11* 98:*2, 20*
99:*12* 100:*24*
107:*9, 11, 21*
108:*4, 15, 16*
109:*13* 115:*2,*
*23* 118:*9, 14*
124:*1* 133:*14*
134:*24*
136:*16, 18*
137:*15, 21*
138:*5, 6*
140:*18*
142:*13*
146:*11, 12*

150:*7* 152:*17,*
*24* 153:*10*
**Teva** 4:*11*
75:*12*
**Thank** 16:*3*
206:*23* 207:*15*
**theoretical**
57:*14*
**theory** 15:*21*
**thereto** 20:*10*
**thing** 64:*19*
65:*15* 83:*16*
106:*16*
134:*16* 135:*6*
138:*17*
141:*13* 143:*6*
164:*11*
182:*13* 203:*10*
**things** 14:*20*
19:*14* 21:*4,*
*11* 31:*5*
42:*16* 53:*4*
79:*7* 82:*4*
149:*22*
170:*16* 203:*9*
**think** 12:*9*
14:*3* 15:*21*
28:*19* 33:*3*
35:*20* 39:*20*
41:*9* 42:*13*
43:*8* 44:*22,*
*24* 61:*9, 13*
64:*23* 65:*9,*
*16* 67:*5*
68:*16, 17*
69:*1, 21* 72:*1,*
*16* 73:*7, 18*
79:*22* 89:*18*
103:*5* 106:*19*
108:*5, 10*
112:*1* 123:*5*
125:*12* 131:*2*
134:*15*
135:*17*
137:*20* 139:*7*
142:*4* 149:*10*
154:*18* 157:*4,*
*7* 166:*14*
172:*18, 23*
173:*12*
174:*17*

Confidential Information Subject to Protective Order

196:20 200:9
201:19
**thinking** 21:6
**third** 16:21
17:5 23:9
145:13 191:18
**thirty** 210:16

**THORNBURG**
3:9
**thought** 21:3
79:5 95:5
148:9, 20
179:22
**thoughts**
18:22 87:6
**thousands**
69:16 96:13
**Three** 4:8
22:21 23:12
25:7, 22 26:9
27:15 53:24
**threshold**
45:23 46:3
49:3, 5, 15
57:20, 23
58:22 110:24
111:21, 24
112:6, 22
113:12 129:5
130:12
149:17 197:23
**thresholds**
30:15, 19, 21
31:6, 9, 12, 15,
17, 19 36:12,
17, 18 39:3
40:9, 23 45:9,
19 47:4 48:5,
13 49:11, 18
50:7, 9, 15, 21
51:24 52:3
106:4, 8
110:3, 23
111:7 112:9
113:7 114:19
162:24
167:21 168:4
196:3
**time** 9:9 13:6,
20 24:7

29:19 34:19,
24 35:3 48:4
54:10 73:6
77:9 89:15
94:23 100:7
101:24
106:18
113:11
116:19, 23
129:23
130:11, 14
139:5 148:10
150:10
153:12
201:20
203:16
207:16, 23
**times** 12:6
23:12 57:3
150:15 174:4,
7 199:14
205:18
**timing** 175:20
**title** 140:23
141:13
**titled** 17:5
18:6 144:16
**titles** 141:1
145:23
**today** 11:23,
24 13:22
17:1 81:1
113:23 114:6
191:13
**Today's** 9:8
207:22
**told** 79:11
176:10
**top** 21:16
22:17 27:1
28:17 83:5
87:5 94:7
95:24 103:18
107:15
108:24 109:4
117:6 140:10
148:17
151:10 171:8
192:24 206:15
**topic** 73:2

**total** 23:12
24:7 29:7, 10
**Tower** 3:20
**toxic** 67:5
**toxicologist**
14:10
**toxicologists**
34:14
**trace** 56:14,
20 57:1, 4
60:14, 15, 16,
24 62:12, 17,
22 63:2
**Trade** 3:20
**transcript**
74:22 75:6
209:9, 19
210:17, 19
**transcription**
167:24
169:23 212:7
**transcripts**
107:7
**transparent**
200:7 201:11
**transparently**
201:3
**TRAURIG** 4:1
**treat** 183:8
**treated** 179:12
**treating**
179:17 180:1
**treatment**
67:11, 14, 21
68:12 69:4
**trial** 16:11
18:1 24:1, 2,
4, 16, 23
25:13 65:3
66:19, 22
67:17, 22, 23
68:5 119:21
120:2, 9, 11
140:8
**trials** 65:19
66:14 68:7
70:18 85:6, 14
**tricky** 66:17
**tried** 31:4
48:1 149:1
**tries** 70:14

**true** 44:22
97:14 100:12
113:24
117:20 118:1
125:11
136:13 142:2,
17 143:18
148:13 149:6
151:11
152:20
189:20 191:8
209:6
**truly** 85:23
**truthful** 86:8,
12, 19, 22
**try** 30:18
31:5, 10 47:3
48:12, 19
49:19 50:20
110:20 201:9
**trying** 31:11
38:22 39:9
40:21 53:23
68:16, 17
101:17
110:18
127:17
151:12
174:10 196:1
199:9 203:3, 5
**tumor** 65:6
**tunnel** 64:5
**turn** 18:11
22:14 29:6
84:4 114:14
153:23
**turning** 119:12
**twice** 12:9
23:8 205:17
**two** 33:20
34:4 36:20
37:14, 15
52:9, 12, 13
120:23 144:4
146:9, 16, 19
164:2 187:20
188:20 204:19
**twofold** 115:10
**type** 43:9
206:18

**types** 42:14
186:12

**< U >**
**U.S** 23:17
24:4 75:23
**Ulmer** 5:10
**ultimate** 19:5
46:20
**ultimately**
32:17
**unable** 94:8
**unaware** 185:9
**undergo** 82:3
**underline**
19:14 163:18,
20, 21
**underlying**
166:7 185:14,
15 190:13
203:23
**understand**
13:7 31:24
38:15 39:9,
14, 21 41:3, 8
46:4, 12
53:24 54:2
83:8 110:21
127:17
129:20
133:20
136:19
137:24
151:12
170:23
174:10 192:15
**understanding**
20:5 21:9
36:24 43:5
91:23 97:20
100:2 113:21
145:22
154:10
177:15 178:1
205:24
**understood**
13:10
**undertaking**
20:14

Confidential Information Subject to Protective Order

**undertook**
36:*1*  46:*16*
47:*2*  103:*22*
**unexpired**
99:*18*
**UNITED**  1:*1*
9:*15*  81:*13*
**unknowns**
52:*9, 12, 13*
**unsafe**  57:*19,*
*21*  58:*23*
59:*17, 20*
60:*6, 12*
**USA**  4:*12, 21*
**use**  30:*15*
36:*16*  40:*8,*
*17*  45:*18, 20*
48:*19*  92:*15,*
*21*  108:*6, 11,*
*12*  110:*22*
112:*5*  119:*18*
154:*6, 13*
155:*13*
164:*16*  191:*5*
196:*17*
**uses**  168:*12,*
*18*  169:*4*
**usually**
126:*22*  160:*17*
**utilize**  84:*11*

**< V >**
**valid**  112:*9*
**VALSARTAN**
1:*2*  9:*12*
11:*1*  27:*16*
28:*7, 15*  29:*3,*
*14*  48:*3*
52:*15, 17*
53:*3*  54:*1, 14,*
*22*  55:*4, 11,*
*24*  56:*15, 23,*
*24*  62:*22*
75:*13*  76:*1, 3*
84:*16, 17, 24*
85:*4*  87:*2, 10,*
*16, 23*  88:*3, 9,*
*10, 22*  89:*1, 2,*
*8*  90:*19, 20*
91:*5, 14, 18,*
*21*  92:*15, 21,*

*22*  93:*3, 6, 18*
94:*11*  95:*1*
96:*2, 10*  97:*2,*
*12*  98:*1, 19*
99:*15, 23*
100:*4, 10, 16*
107:*20*  108:*2*
114:*21, 23*
115:*4*  144:*16*
145:*5*  149:*13*
197:*24*
**values**  32:*14*
33:*3*  34:*3*
48:*1*  104:*7*
107:*19*  108:*2*
149:*9*  186:*3,*
*24*  202:*15*
204:*6, 9*
**variability**
109:*9, 15, 16,*
*19, 21*  110:*9,*
*11*  111:*6, 14*
112:*13, 16*
113:*1*  186:*2,*
*6, 15, 20, 21*
187:*8*
**variable**
186:*24*
**variation**  88:*5*
**various**  31:*4*
82:*1*  186:*12*
203:*6*
**vary**  176:*23*
**varying**
102:*17*  103:*9*
**VAUGHN**
2:*12*
**versa**  147:*24*
**version**
119:*17*  120:*7*
**versus**  33:*8*
108:*12*
113:*13*
124:*12*  138:*6*
147:*24*  148:*1*
186:*13*
190:*19*
191:*16, 17, 18*
206:*12, 13*
**Viagra**  23:*2*
24:*18*

**Viagra/Cialis**
26:*12*
**vice**  147:*24*
**VICINAGE**
1:*2*
**video**  9:*10*
**Videoconferenc
e**  1:*15*
**VIDEOGRAP
HER**  9:*2, 6*
73:*9, 12*
153:*17, 20*
201:*22*  202:*4*
207:*4, 7, 21*
**VIDEOTAPE**
5:*4*
**Videotaped**
1:*14*  6:*15, 18*
16:*15*  18:*8*
**violate**  90:*9*
**visit**  86:*3*

**< W >**
**Wait**  144:*23*
**waiting**  119:*3*
120:*11*
**WALLACK**
4:*17*
**WALSH**  4:*5*
**want**  15:*8, 12,*
*20*  42:*20*
43:*20*  60:*8*
67:*22*  73:*23*
84:*3*  89:*20*
102:*7*  105:*5*
114:*14*
117:*23*
119:*23*
148:*18*
153:*23*  154:*1*
173:*5*  176:*16*
187:*12*
198:*23*  199:*3*
**wanted**  139:*18*
**War**  83:*20*
**Washington**
2:*22*
**way**  22:*18*
42:*11*  60:*24*
71:*7*  85:*2*
90:*11*  143:*15*

144:*22*  165:*5*
167:*7*  179:*13*
183:*20*
201:*12*  203:*5*
**ways**  31:*11*
**weigh**  185:*6*
**welcome**
113:*17*
**well**  12:*2*
15:*14*  16:*6*
19:*10*  21:*3, 9,*
*14*  24:*8*
39:*24*  63:*18*
72:*5, 7*  78:*21*
85:*13*  88:*21*
92:*1, 2*  96:*2*
108:*14*
110:*20*  120:*1*
121:*21*  123:*9*
140:*7*  141:*6,*
*14*  143:*24*
148:*13*  152:*6*
155:*8*  165:*17*
166:*4*  170:*18,*
*20*  172:*21*
180:*22*  182:*2*
189:*9*  195:*19*
**went**  100:*2*
143:*7, 13*
175:*21*  176:*7*
201:*8*
**We're**  22:*11*
114:*15*  124:*5*
135:*1*  136:*3*
145:*4*  165:*20*
**West**  3:*20*
**we've**  66:*15*
73:*3*  147:*12*
**whatsoever**
197:*6*
**Whichever**
204:*4*
**WHITELEY**
2:*15*
**whom's**  49:*14*
**WILLIAM**
4:*19*
**Witness**  8:*5*
9:*22*  10:*8*
16:*3*  18:*3*
19:*3*  25:*16,*

*19*  26:*8, 10*
31:*2*  33:*1*
34:*23*  35:*15*
36:*8*  37:*8*
38:*21*  39:*18*
40:*17*  41:*7,*
*20*  42:*8*  43:*3,*
*18*  44:*21*
46:*9*  47:*1*
50:*4*  51:*9*
52:*20*  53:*15*
54:*7*  55:*15*
56:*10*  57:*8*
58:*14*  59:*6,*
*23*  61:*8*  62:*3,*
*15*  63:*5*
64:*23*  66:*13*
68:*15*  69:*8*
70:*10*  71:*23*
72:*22*  77:*20*
78:*17*  79:*20*
80:*12*  81:*18*
82:*17*  83:*15*
88:*14*  91:*8*
93:*12, 23*
94:*19*  96:*17*
97:*17*  98:*7*
99:*3*  100:*22*
101:*17*
102:*21*
103:*14*
108:*23*
110:*15*
111:*19*
112:*21*  114:*5*
117:*2*  119:*24*
120:*4*  121:*6*
126:*20*
131:*12*
133:*10*
134:*14*
135:*24*
138:*16*
139:*16, 20*
141:*24*
142:*22*
144:*23*  147:*3*
148:*7*  151:*19*
157:*13*  160:*6*
161:*17*
162:*21*

Confidential Information Subject to Protective Order

166:*23*
167:*16*
169:*14*  170:*8*
171:*5*  172:*3, 15*  174:*23*
178:*11*  179:*1*
181:*15*  183:*1, 23*  184:*21*
185:*19*  191:*2, 21*  194:*7*
195:*13*  196:*6*
199:*18*
200:*21*
207:*18*  209:*5, 6, 8*  210:*1*
**Wmurtha@hill wallack.com**
4:*21*
**word**  42:*19*
56:*19*  163:*18, 20, 21, 22, 24*
164:*3, 6*
**wording**
117:*10*
**words**  164:*3, 19, 23*  204:*23*
**work**  18:*15*
20:*15*  28:*6, 22*  29:*2*  34:*7, 8*  46:*15*  49:*6*
69:*8*
**world**  65:*19*
83:*20*
**write**  30:*11*
84:*7*
**written**  18:*14*
160:*8*

**< Y >**
**Yeah**  50:*19*
55:*15*  59:*6*
63:*5*  78:*2, 17*
79:*3*  81:*17*
95:*5*  113:*17*
119:*3*  134:*14*
140:*8*  144:*11*
145:*11*
146:*13, 15*
155:*9*  161:*10*
165:*11*  183:*1*

**years**  22:*21*
25:*9, 12, 14*
33:*18*  35:*11, 18*  37:*3, 4, 20*
69:*14*
**yellow**  124:*13, 14*
**Yep**  124:*13*
140:*12*  204:*17*
**yesterday**
12:*10*
**York**  11:*6*

**< Z >**
**Zheng**  76:*23*
77:*2, 3*
**ZHP**  53:*24*
54:*2*  88:*9*
89:*1, 2*  91:*4, 21*  93:*7, 19*
94:*12*  95:*2*
96:*3, 11*  97:*3, 14*  151:*3, 16*
152:*13, 22*
187:*18*
202:*18, 20, 24*
204:*1*
**ZMICK**  4:*14*
**Zoom**  1:*15*
2:*1*  3:*1*  4:*1*
5:*1*

# Exhibit 206

REDACTED

Confidential Information - Subject to Protective Order

```
 1              UNITED STATES DISTRICT COURT

                  DISTRICT OF NEW JERSEY

 2

 3    IN RE:  VALSARTAN,              )

      LOSARTAN, AND IRBESARTAN       )

 4    PRODUCTS LIABILITY             )

      LITIGATION                     )

 5    _____    )  MDL NO. 2875

                                     )  HON. ROBERT B. KUGLER

 6    THIS DOCUMENT RELATES TO       )

      ALL CASES                      )

 7                                   )

 8

 9         CONFIDENTIAL INFORMATION - SUBJECT TO

10                   PROTECTIVE ORDER

11

12    VIDEOTAPED DEPOSITION OF:

13    MICHAEL BOTTORFF, PHARM.D.

14    Taken on behalf of the Plaintiffs

15    March 25, 2022

16

17

18

19

20

21

22

23

24

25
```

Confidential Information - Subject to Protective Order

Page 2

1 REMOTE APPEARANCES:
2 For the Plaintiffs:
3   C. BRETT VAUGHN, ESQ.
    Hollis Law Firm
4   8101 College Boulevard
    Suite 260
5   Overland Park, Kansas 66210
6 For the Defendants, Teva Pharmaceutical
  Industries, Ltd., Teva Pharmaceuticals
7 SA, Inc., Actavis LLC, and Actavis Pharma, Inc.:
    STEPHEN T. FOWLER, ESQ.
8   Greenberg Traurig, LLP
    2101 L Street, N.W.
9   Suite 1000
    Washington, D.C. 20037
10  202.331.3100
    Fowlerst@gtlaw.com
11
12 Also Present Remotely:
13   Alice Springer
     Bailey Hughes
     Christine Gannon
14   Daniela Tenjidor
     Geoffrey Coan
15   George Williamson
     Gerord Lawrence
16   Iris Simpson
     Ken Dzikowski
17   Marlene J. Goldenberg
     Melissa Catello
18   Melisha Valenzuela
     William Murtha
19   Phillip Todd - Videographer
20
21
22
23
24
25

Page 3

I N D E X
Page/Line
THE WITNESS: MICHAEL BOTTORFF, PHARM.D.

EXAMINATION BY MR. VAUGHN            8    9
EXAMINATION BY MR. FOWLER          241   25
EXAMINATION BY MR. VAUGHN

INDEX OF EXHIBITS
Exhibits      Description         Page/Line
Exhibit 1   Class Action Expert Report   10   11
Exhibit 2   General Causation Report     10   21
Exhibit 3   Invoices                     33   25
Exhibit 4   2011 FDA Guidance for        95    3
            Submission of Summary
            Bioequivalence Data for
            ANDAs
Exhibit 5   FDA's 2021 Draft Guidance    97    3
Exhibit 6   Notice of Deposition        107   11
Exhibit 7   Document Teva-MDL           112   20
            2875-00808468
Exhibit 8   Document Hetero_USA         124   14
            000029545
Exhibit 9   Document Hetero_USA         129   18
            000005016
Exhibit 10  Document Torrent-MDL        142   25
            287500003049
Exhibit 11  Document Torrent-MDL        145   21
            2875-00003054

Page 4

Exhibit 12  Document Torrent-MDL        145   25
            2875-00259489
Exhibit 13  Document                    149   21
            RO-MDL-2875-0061940
Exhibit 14  Document                    158    2
            RO-MDL-2875-0004639
Exhibit 15  RO-MDL- 2875-0026534        165    7
Exhibit 16  Document                    168   21
            RO-MDL-2875-0080263
Exhibit 17  Document                    175    1
            Mylan-MDL-2875-00001448
Exhibit 18  Document Mylan-MDL          175    5
            2875-00031265
Exhibit 19  "PRACS Cetero Bankruptcy"   176    2
            Article
Exhibit 20  FDA letter to Cetero        177    5
            Research
Exhibit 21  "Teva and Cipla will have   182   21
            ANDAs Withdrawn" Article
Exhibit 22  Document Teva-MDL           185   14
            2875-00003105
Exhibit 23  Document Teva-MDL           187   13
            2875-00003194
Exhibit 24  Document Teva-MDL           189    8
            2875-00268983
Exhibit 25  Document Teva- MDL          191   18
            00102393
Exhibit 26  Document ZHP 01453143       197   23
Exhibit 27  Document Princeton 00179194 199   19
Exhibit 28  Document Princeton 00134669 202   16
Exhibit 29  Document Princeton 00369303 207   14

Page 5

Exhibit 30  Document Princeton 00153602 210   13
Exhibit 31  EMA Press Release regarding 217   20
            GVK Biosciences
Exhibit 32  Document ZHP 00378002       220   17
Exhibit 33  Document Teva-MDL           226   11
            2875-00117673
Exhibit 34  Document Bottorff 0001      230   23
Exhibit 35  Defendants' Responses and   242    7
            Objections to Plaintiffs'
            Notice of Videotaped Oral
            Deposition Michael
            Bottorff, Pharm.D
Exhibit 36  Curriculum Vitae            242   16
Exhibit 37  21 CFR 314.3 Definitions    244   14
Exhibit 38  Materials Considered List   260    9
Exhibit 39  Flash Drive of Dr.          260   23
            Bottorff's Materials
            Considered (late-filed)

Page 6

1      The videotaped deposition of
2  MICHAEL BOTTORFF, PHARM.D., was taken by
3  counsel for the Plaintiffs, on March 25,
4  2022, commencing at 9:39 a.m. Eastern,
5  via remote proceedings, for all purposes
6  under the Tennessee Rules of Civil
7  Procedure.
8      The formalities as to notice,
9  caption, certificate, et cetera, are not
10  waived.  All objections, except as to
11  the form of the questions, are reserved
12  to the hearing.
13      It is agreed that Carissa L.
14  Boone, being a Notary Public and Court
15  Reporter, may swear the witness, and
16  that the reading and signing of the
17  completed deposition by the witness are
18  not waived.
19
20
21          *   *   *
22
23
24
25

Page 7

1      THE VIDEOGRAPHER:  Good morning.
2  We are now on the record.  My name is
3  Phillip Todd.  I am the videographer for
4  Golkow Litigation Services.
5      Today's date is March 25th, 2022,
6  and the time is 9:39 a.m. Eastern.
7      This remote video deposition is
8  being held in the matter of Valsartan,
9  Losartan and Irbesartan Products
10  Liability Litigation in the United
11  States District Court, District of New
12  Jersey.
13      The deponent is Dr. Michael
14  Bottorff.
15      All parties in this deposition
16  are appearing remotely and have agreed
17  to the witness being sworn in remotely.
18      Due to the nature of remote
19  reporting, please pause briefly before
20  speaking to ensure all parties are heard
21  completely.
22      Counsel will be noted on the
23  stenographic record.
24      The court reporter, Carissa
25  Boone, will now swear in the witness.

Page 8

1      MICHAEL BOTTORFF, PHARM.D.
2  having been first duly sworn, was examined
3  testified as follows:
4      THE VIDEOGRAPHER:  I'm sorry, I
5  did not hear anything from the witness.
6      I'm sorry, I did not hear
7  anything from the witness.
8      THE WITNESS:  I said "I do."
9          EXAMINATION
10  BY MR. VAUGHN:
11      Q.   All right, Dr. Bottorff.  My name
12  is Brett Vaughn.  You remember I took your
13  deposition about six months ago in the general
14  causation stage of the personal injury cases,
15  correct?
16      A.   I do remember you, yes.
17      Q.   And you've now submitted an
18  expert report for the class action side of this
19  litigation?
20      A.   Correct.
21      Q.   And did you use your general
22  causation expert report as the base of your class
23  action expert report?
24      A.   There was some overlap in what
25  seemed to be some of the issues between the class

Page 9

1  action and the general causation, so there were
2  some elements that are similar in both.
3      Q.   And is this meant to supercede
4  your general causation expert report?
5      MR. FOWLER:  Objection, form.
6      THE WITNESS:  Not to supercede.
7  As -- as part of my academic career,
8  whenever there's a -- a literature
9  search and evaluation, a -- a process
10  that you go through, you review and add
11  information to what you already know.
12  So it's not meant to replace previous
13  information, if that's what the question
14  was.
15  BY MR. VAUGHN:
16      Q.   And so what content did you add
17  to this expert report?
18      A.   I think the biggest addition is
19  the bioequivalence description assessment and
20  analysis and a section on the process of
21  pharmacokinetic accumulation.  And then a -- a
22  third area was a -- a section where I comment on
23  the -- the need for medical monitoring.
24      Q.   And you said that the purpose of
25  this was not to replace previous information.

Confidential Information - Subject to Protective Order

Page 10

1  Were there changes actually made, though, to your
2  general causation opinions in here?
3         MR. FOWLER:  Objection, form.
4         THE WITNESS:  I don't recall
5     making any changes to my previous report
6     in this report.
7         MR. VAUGHN:  Melisha, can we go
8     ahead and pull up the class action
9     expert report he submitted?
10        And that will be Exhibit 1.
11        (Exhibit 1 was marked.)
12 BY MR. VAUGHN:
13     Q.    And, Mr. Bottorff, is this
14 your -- the expert report you submitted for the
15 class action in this litigation?
16     A.    Yes, it is.
17        MR. VAUGHN:  And, Melisha, can we
18     split-screen that with his general
19     causation report?
20        And let's mark that as Exhibit 2.
21        (Exhibit 2 was marked.)
22 BY MR. VAUGHN:
23     Q.    Now, turning --
24        MR. VAUGHN:  On the class action
25     expert report, can we please go to page

Page 11

1     7, Melisha?  And on the general
2     causation report, can we go to page 6.
3  BY MR. VAUGHN:
4     Q.    Okay.  So on the right-hand side,
5  you see on your general causation report,
6  you -- line 114, that entire paragraph, you note:
7  "When ZHP became aware of the nitrosamine
8  impurities, ZHP tested certain of its inactive
9  ingredient -- active pharmaceutical ingredient
10 batches and determined that the levels of NDMA
11 range from 3.4 parts per million to 120 parts per
12 million"?
13        Do you see that, Dr. Bottorff?
14     A.    Yes.  Is that what you
15 highlighted in yellow?
16     Q.    Correct.
17        And then it -- looking at your
18 class action expert report page 7, line 140, you
19 see that it's now been changed to the FDA testing
20 and any mention of ZHP's testing has been dropped
21 from your expert report?
22        MR. FOWLER:  Objection to form,
23     "changed."
24        Go ahead, Doctor.
25        THE WITNESS:  I see where you're

Page 12

1     highlighting in blue.  Or now yellow.
2  BY MR. VAUGHN:
3     Q.    Do you have your class action
4  expert report with you?
5     A.    Yes.
6     Q.    Can you find anywhere in your
7  class action expert report where -- where it still
8  discusses ZHP's internal nitrosamine testing on
9  their API?
10     A.    Yeah, I don't -- I don't see it.
11     Q.    Are you the one that removed that
12 from your expert report?
13     A.    I probably was, since I wrote
14 this myself.
15     Q.    Why did you remove that from your
16 expert report?
17        MR. FOWLER:  Objection to form,
18     "remove."
19        Go ahead, Doctor.
20        THE WITNESS:  I can't tell you
21     right now why I did not include the same
22     wording.  The -- the following
23     information, which is the -- the FDA
24     values, I believe they are identical.
25 BY MR. VAUGHN:

Page 13

1     Q.    But ZHP's values are higher than
2  the FDA's values, aren't they?
3         MR. FOWLER:  Objection.
4         THE WITNESS:  If I went back and
5     calculated.  (Technical interference)
6     probably do that.  But I think --
7  BY MR. VAUGHN:
8     Q.    But --
9     A.    -- they are higher.
10        MR. VAUGHN:  All right.  Melisha,
11     can we go to page 22 on the class action
12     report now?  And let's compare that to
13     page 21 of the general causation report.
14        All right.  And I'm looking at
15     line 364 where it says:  "Presence of
16     trace amounts of NDMA/NDEA on the
17     general causation report," Melisha.  The
18     one on the right.  Line 364.  Yeah.
19 BY MR. VAUGHN:
20     Q.    And then -- you see that, Doctor,
21 line 364, where you note the -- the amounts being
22 trace amounts?
23     A.    Yes.
24     Q.    Okay.  And can we compare that,
25 then, to your class action expert report on page

Confidential Information - Subject to Protective Order

---

**Page 14**

1  22, line 374?  It now says:  "Presence of NDMA and
2  NDEA," the words "trace amounts" have been dropped
3  from your expert report, correct?
4      A.    They're not there.
5      Q.    Are you the one that removed
6  those words?
7      A.    I wrote this, so I must have.
8      Q.    Why did you remove those words
9  from your expert report?
10     A.    I have no particular reason.
11         MR. VAUGHN:  All right.  Melisha,
12     let's go to page 45 of this class action
13     expert report.  And let's compare that
14     to page 25 of his general causation
15     expert report.
16  BY MR. VAUGHN:
17     Q.    In the general causation expert
18  report on that line 439, the sentence that reads:
19  "The concern over the detection of these
20  impurities is that the international agency for
21  research on cancer, IARC, has categorized
22  nitrosamines as a probable human carcinogen based
23  on annual studies primarily involving rats."
24         Do you see that in your general
25  causation report, Mr. Bottorff?

---

**Page 15**

1      A.    I do.
2      Q.    Okay.  Now looking at your class
3  action expert report line 724, that entire
4  sentence is no longer in your expert report, is
5  it?
6      A.    No.
7      Q.    And did you remove that language
8  from your expert report as well?
9      A.    It's not there, so it got
10  removed.  But it wasn't removed for any particular
11  reason that I can give you.
12     Q.    And you're the one that removed
13  that language?
14     A.    I wrote this, so it would have
15  been me.
16     Q.    And there's no particular reason
17  you removed the language about nitrosamines being
18  probable human carcinogens?
19         MR. FOWLER:  Objection, form.
20         Other than the scope of the
21     report?
22         THE WITNESS:  And so, no,
23     I -- I'm -- I'm the one, if it came out,
24     that took it out.  And there was no
25     particular reason for that.

---

**Page 16**

1         MR. VAUGHN:  Let's go to page 47
2     of his class action report, and let's
3     compare that to page 27 of his general
4     causation expert report.
5  BY MR. VAUGHN:
6      Q.    And on your general causation
7  expert report, I'm looking at the lines 473 and
8  474.  So it ends with:  "The carcinogens produced"
9  at 473.
10         Do you see where I'm looking at,
11  Mr. Bottorff?
12     A.    Yes.
13     Q.    And so now if you look at the
14  class action expert report Line No. 749, you've
15  now inserted a heading "NDE" -- "NDMA and NDEA and
16  valsartan will not reach systemic circulation."
17         Do you see that, Dr. Bottorff?
18     A.    I do.
19     Q.    Why was that added to your expert
20  report?
21         MR. FOWLER:  Objection to form,
22     "added."
23         THE WITNESS:  I guess I was
24     trying to -- doing what I would call
25     sort of format form, outline form, sort

---

**Page 17**

1     of identify areas in this second report
2     that I would have sections on.  So it
3     was a -- working from an outline to the
4     report.
5  BY MR. VAUGHN:
6      Q.    And does NDMA or NDEA reaching
7  systemic circulation have anything to do with
8  bioequivalency studies?
9      A.    The presence of NDMA and NDEA in
10  valsartan, are you asking if that would have an
11  effect on valsartan's bioequivalence?
12     Q.    Correct.  Does NDMA or NDEA being
13  in valsartan and the NDMA or NDEA reaching
14  systemic circulation, does that have any impact on
15  valsartan bioequivalency studies?
16         MR. FOWLER:  Objection:  Form,
17     compound.
18         THE WITNESS:  First, I'm -- I'm
19     trying to speak real loud to make sure
20     that you can hear.  So if it seems like
21     I'm yelling, it's not in an -- an
22     aggressive kind of response.
23  BY MR. VAUGHN:
24     Q.    I appreciate it and your -- your
25  level is actually pretty good.

---

Confidential Information – Subject to Protective Order

Page 18

1  A.    Okay.  I -- I just didn't want it
2  to come across as -- but I wanted to be sure I got
3  heard.
4            No, I do not believe that the
5  presence of NDMA or NDEA in valsartan has anything
6  to do with valsartan's bioequivalence.
7      Q.    And it reaching systemic
8  circulation -- scratch that.
9            And NDMA or NDEA reaching
10 systemic circulation has nothing to do with the
11 bioequivalency studies for valsartan, correct?
12           MR. FOWLER:  Objection:  Form,
13      lack of foundation, facts not in
14      evidence.
15           THE WITNESS:  Because I conclude
16      that they would not reach the systemic
17      circulation, then, again, my best answer
18      to your question is that they have no
19      effect on valsartan's bioequivalence.
20 BY MR. VAUGHN:
21     Q.    The opinion that NDMA and NDEA in
22 valsartan will not reach systemic circulation is
23 in relation to your general causation opinions,
24 correct?
25           MR. FOWLER:  Objection:  Form,

Page 19

1      mischaracterizes.
2            THE WITNESS:  I think it's, as I
3      said earlier, that there is some overlap
4      in some of the issues between general
5      causation and this part of the
6      litigation, as I understood it, and the
7      concept of -- of first pass metabolism
8      is one of those areas of overlap between
9      the two reports.
10 BY MR. VAUGHN:
11     Q.    How does first pass metabolism of
12 NDMA or NDEA impact the bioequivalence studies of
13 valsartan?
14     A.    It does not.
15           MR. VAUGHN:  Melisha, let's go to
16      page 48 of his class action expert
17      report.  Let's compare that to page 28
18      of his general causation expert report.
19      Looking at line 486 of his general
20      causation report where it says:
21      "Minimizing exposure to other tissues
22      and organs..."
23 BY MR. VAUGHN:
24     Q.    And the full sentence reads:
25 "Smaller oral doses are metabolized in the liver

Page 20

1  almost completely, minimizing exposure to other
2  tissues and organs."
3            Do you see that in your prior
4  report, Dr. Bottorff?
5      A.    I do.
6      Q.    All right.  And let's compare
7  that to the sentence that starts on lines 761 of
8  your class action expert report that reads:  "Oral
9  doses at the levels detected in generic valsartan
10 at issue in this litigation are metabolized in the
11 liver almost completely, preventing exposure to
12 other tissues and organs."
13           Did I read that correctly,
14 Dr. Bottorff?
15     A.    Yes.
16     Q.    What changes did you make in that
17 sentence from your general causation expert report
18 to your class action expert report?
19     A.    I don't feel that I made any
20 substantial changes at all.
21     Q.    Okay.  Do you see in the general
22 causation report you used the word "minimizing
23 exposure to other tissues and organs"?  The word
24 "minimizing"?
25     A.    Yes.

Page 21

1      Q.    And do you see that that's been
2  changed to the word "preventing"?  It now says:
3  "...preventing exposure to other tissues and
4  organs."
5            Do you see that?
6      A.    I do.
7      Q.    Do you not think there's much of
8  a difference between "minimizing" and
9  "preventing"?
10           MR. FOWLER:  Objection,
11      argumentative.
12           THE WITNESS:  Conceptually, what
13      those two sentence [sic] were -- I think
14      mean the same thing about -- because of
15      first pass metabolism, that you minimize
16      exposure, you prevent exposure, you
17      minimize/eliminate risk, and I think
18      they're -- they're just a reflection of
19      the fact that I did not just simply cut
20      and paste from my previous report
21      into -- into this report.  I -- I sat
22      down and wrote it de novo with the same
23      knowledge base and information.
24 BY MR. VAUGHN:
25     Q.    And this sentence that you

Confidential Information - Subject to Protective Order

1 changed has nothing to do with the bioequivalency
2 studies, correct?
3        A.    Correct.
4             MR. VAUGHN:  Let's go to page 52
5        of his class action expert report,
6        Melisha.  And let's compare that to page
7        62 of his general causation expert
8        report.
9 BY MR. VAUGHN:
10       Q.    All right.  In looking at the
11 class action expert report, line 830, do you see
12 where you note that:  "DNA repair mechanisms in
13 humans can be as much as ten times higher than
14 rats"?
15       A.    Yes.
16       Q.    Okay.  And looking at your
17 general causation expert report, do you see that
18 language anywhere?
19       A.    Not in the page that -- that you
20 have in front of me.
21       Q.    Do -- do you have your general
22 causation expert report?
23       A.    I can probably get a hard copy
24 because we have a printer here, but I don't have
25 it sitting right in front of me.

1        Q.    Okay.  You can also download it
2 from the exhibit share file, if you would like to.
3             All right.  Dr. Bottorff, if you
4 could, could you review your general expert report
5 and see if anywhere in that report you gave the
6 opinion that DNA repair mechanisms in humans can
7 be as much as ten times higher than rats?
8             MR. VAUGHN:  And let's go ahead
9        and go off the record while he's
10       reviewing this document.
11            THE VIDEOGRAPHER:  The time is
12       now 9:59 a.m.  We are off the record.
13            (Brief recess observed.)
14            THE VIDEOGRAPHER:  10:06 a.m.,
15       we're back on the record.
16 BY MR. VAUGHN:
17       Q.    All right.  Dr. Bottorff, now
18 that you've had time to review your general
19 causation expert report, did you find anywhere
20 within that report that you gave the opinion that
21 DNA repair mechanisms in humans can be as much as
22 ten times higher than rats?
23       A.    No, I -- I didn't find it.
24 And -- and what I was looking for and what I
25 thought I had in there -- and it may still be in

1 there; I just didn't have enough time to find
2 it -- is I thought I made a statement somewhere in
3 the report that said that the metabolism of -- of
4 NDMA in the liver was occurring in the organ that
5 had the highest capacity to metabolize it.
6             And that -- that may be in there
7 somewhere if I go line-by-line and try to find it.
8 So I may not have quantified it in the original
9 report, and I quantified it here from a statement
10 made in -- in one of the PEG articles.
11       Q.    Does quantifying the DNA repair
12 mechanisms in humans compared to rats have
13 anything to do with your class action opinions?
14       A.    Yes.
15       Q.    I'm sorry?  I didn't hear that
16 answer.
17       A.    Sorry.  Yes.
18       Q.    What does it have to -- what
19 does -- scratch that.
20             What do DNA repair mechanisms in
21 humans have to do with your class action expert
22 report?
23       A.    The issue of medical monitoring.
24       Q.    And how does that relate to
25 medical monitoring?

1        A.    Based on first pass metabolism
2 and limiting exposure of NDMA and NDEA to the
3 liver, which has the best capability for DNA
4 repair mechanisms, would mean that there's no
5 exposure enough to downstream organs to justify
6 medical monitoring, based on these principles of
7 both first pass metabolism and DNA repair.
8        Q.    So would it be fair to say that
9 the DNA repair mechanisms relate to your class
10 action expert report because you don't believe
11 that nitrosamines can increase the risk of cancer
12 in humans?
13            MR. FOWLER:  Objection, form.
14            THE WITNESS:  Yes.  And that's
15       consistent with what I concluded in my
16       original report, and it's a portion of
17       what I continue to conclude in this
18       expert report.
19 BY MR. VAUGHN:
20       Q.    And so you would agree that's a
21 general causation expert opinion, the DNA repair
22 mechanisms in humans?
23            MR. FOWLER:  Objection:  Form,
24       mischaracterizing.
25            THE WITNESS:  I would agree that

Page 26

1     it has relevance to both the general
2     causation issue in my original report
3     and to the medical monitoring issue that
4     I addressed in this report.
5   BY MR. VAUGHN:
6       Q.    And when we went off the record
7   for you to review your general causation expert
8   report and Mr. Fowler went off the screen, did he
9   discuss any part of your testimony with you?
10      A.    No.  None at all.
11          MR. VAUGHN:  All right.  Melisha,
12      can we go just to his class action
13      expert report, which is Exhibit 1.  And
14      let's go to page 50 and look at line
15      802.
16   BY MR. VAUGHN:
17      Q.    Doctor, in this paragraph, you're
18   discussing the half-life of NDMA, correct?
19      A.    Correct.
20      Q.    And in your opinion, what is the
21   half-life of NDMA in humans?
22      A.    It's estimated to be about 13
23   minutes.
24      Q.    And what are you basing that
25   estimation on?

Page 27

1       A.    I'm using the clearance values
2   from one of the Gombar papers.
3       Q.    Did you find the Gombar paper to
4   be reliable?
5          MR. FOWLER:  Objection, form.
6          THE WITNESS:  In some respects.
7   BY MR. VAUGHN:
8       Q.    What is half-life?
9       A.    The time it takes for a compound
10   amount to be cut in half.
11      Q.    What do you mean "cut in half"?
12      A.    Drop by 50 percent.
13      Q.    Is that after it's been ingested?
14      A.    No.  These diag- -- these numbers
15   came from the intravenous data from Gombar, which
16   is the part that I don't have any problem with at
17   all.
18      Q.    But the half-life is in relation
19   to the substance being inside the body, correct?
20      A.    And in this case, getting there
21   by giving it IV.
22      Q.    And so that would mean after 13
23   minutes, if no metabolism is taking place of the
24   NDMA, half of it will have disappeared?
25          MR. FOWLER:  Objection, form.

Page 28

1          THE WITNESS:  It is as a result
2   of metabolism, and to a certain degree,
3   distribution after IV administration
4   that would result in taking 13 minutes
5   in the estimate in humans, and anywhere
6   between 4 and 26 minutes in other animal
7   species who received IV dosing, for that
8   original concentration to be cut in
9   half, and in that same amount of time,
10      for that concentration to be cut in
11      half.
12   BY MR. VAUGHN:
13      Q.    So let me make sure I
14   understand --
15      A.    -- and approximately --
16      Q.    I apologize.
17      A.    Sorry, go ahead.
18      Q.    I'm sorry if I cut you off --
19          MR. FOWLER:  Let's not --
20   BY MR. VAUGHN:
21      Q.    -- with the delay.
22          MR. FOWLER:  -- do that.  Yeah.
23   BY MR. VAUGHN:
24      Q.    It -- it was not intentional.
25      A.    Yeah, so I'll -- I'll finish, and

Page 29

1   then we can take that question.
2          So literally what it amounts to
3   is whatever that original concentration is after
4   you give it intravenously, the half-life -- let's
5   take a round number of ten minutes.  It would take
6   ten minutes for that concentration to be cut in
7   half.  In ten more minutes, that would be cut in
8   half.  And by the time you got to five of those,
9   you can't detect the drug anymore.  So a general
10   pharmacology rule is five half-lives and the drug
11   is essentially completely gone.
12      Q.    So did I understand you correctly
13   that if NDMA is given intravenously to a human,
14   it's going to take approximately 13 minutes for it
15   to decrease by half?
16      A.    An estimate from the Gombar data
17   would predict that, if you were to give it IV.
18      Q.    And do you agree with that
19   estimate in Gombar?
20      A.    I think it's actually a pretty
21   good estimate.
22      Q.    Would it matter how much of a
23   dose is given IV?  Will that impact the half-life
24   at all?
25      A.    It could.

Confidential Information - Subject to Protective Order

Page 30

1    Q.   How so?
2    A.   If -- if a smaller dose is given
3  that is in the range of what we call linear
4  pharmacokinetics, you'll get a -- half-life
5  value.  And if -- if it's a process that can be
6  saturated and you give a multiple higher dose,
7  then you would saturate elimination and you would
8  get a measured longer half-life.
9    Q.   And in the Gombar study where you
10 drew this 13-minute half-life, was it saturated or
11 not?
12   A.   Gombar used his nonsaturated IV
13 dose to calculate and then estimate what he
14 thought it would be in humans.
15   Q.   And so in a nonsaturated IV dose
16 in humans, NDMA would take 13 minutes to reduce
17 the amount in half?
18   A.   That is an estimate from the
19 Gombar data.
20   Q.   Doctor, do you know how long it
21 takes for the blood to do a full circulation in
22 the human body?
23   A.   Off the top of my head, I -- I
24 don't.  I know I used to know that.  And sometimes
25 you'll see that expressed as how many cycles per

Page 31

1  day or how man- -- how long it takes for one
2  cycle.  So I know that's available information,
3  but I don't have it off the top of my head.
4    Q.   Do you have an estimate, even?
5    A.   I know blood volume is
6  approximately 5 liters.  Typical cardiac output is
7  about 3 to 4 liters per minute.  So it -- it
8  shouldn't take long.  Less than ten minutes, maybe
9  20 minutes.  I can't verify that.
10   Q.   I mean, if -- if cardiac output
11 is around 4 liters and blood volume is around 5
12 liters, wouldn't you think that it goes all the
13 way around the body in about a minute?
14   A.   Yeah, I don't think that's the
15 case, though.
16   Q.   Okay.  You think it might be less
17 than 13 minutes, though?
18   A.   I --
19        MR. FOWLER:  Objection,
20    we're -- we're -- calls for speculation.
21    He's answered this.
22        THE WITNESS:  I really don't
23    know.  I'd have to look it up, because
24    it's been a while since I've had to use
25    that information.

Page 32

1  BY MR. VAUGHN:
2    Q.   If the blood can go all the way
3  around the human body multiple times in 13
4  minutes, the NDMA would be crossing the liver
5  multiple times, wouldn't it?
6        MR. FOWLER:  Objection:  Form,
7    lack of foundation, facts not in
8    evidence, incomplete hypothetical.
9        THE WITNESS:  The -- the best
10    answer I can give you in a conceptual is
11    that when a drug is given IV, whether
12    it's NDMA or, you know, a -- an
13    FDA-approved drug, giving it in the IV
14    route, it does eventually, if it is
15    metabolized in the liver, pass through
16    the liver as part of its route of
17    elimination.
18 BY MR. VAUGHN:
19   Q.   If the liver is able to fully
20 metabolize NDMA and systemic circulation takes
21 less than five minutes, you wouldn't expect the
22 half-life to be 13 minutes, would you?
23   A.   The issue that I have in being
24 able to answer it to the best of my ability is
25 that I'm not sure the first part of the question

Page 33

1  is accurate.  I think I would need to establish
2  how long it takes.
3        But remember the liver only gets
4  part of -- of cardiac output.  Part of cardiac
5  output goes to other organs as well.
6    Q.   All right.  Sitting here today,
7  though, you have no idea how long it actually
8  takes for the blood to go around the human body,
9  do you?
10   A.   No.  I -- I -- as of right now, I
11 don't.  I know the value if I were to -- to look
12 it up, but I don't have it in front of me.
13   Q.   And that's not something you've
14 looked into in forming your opinions for either of
15 your expert reports that you've submitted in this
16 litigation, correct?
17   A.   Correct.  And -- and nor do I
18 know the relevance that have any impact on my
19 opinions anyway.
20        MR. VAUGHN:  All right.  Melisha,
21    let's go to his invoices.
22        And this will be Exhibit 3.  It
23    is a composite exhibit of all of the
24    invoices that were produced.
25        (Exhibit 3 was marked.)

Confidential Information — Subject to Protective Order

---

Page 34

1    MR. VAUGHN:  All right.  Let's go
2  to page 3.
3  BY MR. VAUGHN:
4    Q.    All right.  Doctor, and do you
5  see that you submitted a bill for eight hours of
6  deposition time on September 1st, 2021?
7    A.    That should probably be November.
8  So that's a typo.
9    Q.    Why should that be November?
10    A.    Based on the in- -- sorry?
11    Q.    Why should that be November?
12    A.    Oh, no.  That -- is that the date
13  that we did the previous deposition?
14    Q.    Well, we actually did the
15  previous deposition on September 16th, which you
16  also billed for.
17    MR. VAUGHN:  Melisha, if you want
18  to go to page 5 on his invoices.
19  BY MR. VAUGHN:
20    Q.    Now we have another bill for
21  $4,000 for an eight-hour deposition on September
22  16th, 2021 also in Knoxville and the same start
23  and end time.
24    A.    Yes.  I understand now what
25  happened.  I sent an invoice to GT for the date of

---

Page 35

1  the deposition, not knowing that that's not who
2  should have received the invoice.  So this invoice
3  that I sent to GT was never paid.
4    The other invoice was sent
5  to -- I don't know which law firm, but they are
6  the one who eventually paid that invoice.  So I
7  was not paid twice for that deposition.
8    Q.    Why is there a date inaccuracy of
9  it being September 1st on page 3 of your invoice?
10    A.    Because I'm not very good at
11  sometimes having the correct date on there.
12    MR. VAUGHN:  All right.  Can we
13  go to the next page, Melisha, page 4.
14  BY MR. VAUGHN:
15    Q.    And on September 1st, on this
16  bill, you also billed three-and-a-half hours for
17  reviewing Lagana's deposition and conference call
18  with counsel, correct?
19    A.    Correct.
20    Q.    Is that what you actually did
21  then on September 1st instead of the deposition?
22    A.    Yes, because we just previously
23  established that that was not the date of the
24  deposition.
25    Q.    Okay.  And then looking at

---

Page 36

1  September 16th, which was the date of the actual
2  deposition, you also billed two-and-a-half hours
3  for reviewing articles in advance of the
4  deposition.  So that's just the morning of the
5  deposition you're billing?
6    A.    Correct.
7    Q.    Okay.  And then the next one on
8  October 6th, you note that you:  "Preview/find
9  Wang article for inclusion and articles
10  considered."
11    What does that mean?
12    A.    That I looked at those articles
13  to see if I wanted to include them in my articles
14  for consideration.
15    Q.    That was after you submitted your
16  expert report and after you sat for deposition,
17  correct?
18    A.    Correct.
19    MR. VAUGHN:  Let's go to page 7,
20  Melisha.
21  BY MR. VAUGHN:
22    Q.    All right, Doctor.  Is this where
23  you started working actually on your class action
24  expert report?
25    A.    Correct.

---

Page 37

1    Q.    And throughout this I note names
2  Steve Fowler, Ken -- I'm not even going to try and
3  pronounce that last name -- T. Harper.  Are these
4  all GT attorneys?
5    A.    Yes.
6    Q.    And is Greenberg Traurig, is that
7  the law firm you were working with in generating
8  this class action expert report?
9    A.    Yes.
10    Q.    Is that the only law firm that
11  you were working with?
12    A.    Yes.
13    Q.    And you were providing opinions
14  on bioequivalency studies of all of the Defendants
15  in this litigation, correct?
16    A.    Yes.  All that I received
17  information on.
18    Q.    And GT, Greenberg Traurig, was
19  the one responsible for giving you documents for
20  each Defendant?
21    MR. FOWLER:  Objection, form.
22    THE WITNESS:  Yes.
23    Every -- every document from
24  manufacturers on ANDAs and
25  bioequivalence studies that I received,

---

Confidential Information - Subject to Protective Order

Page 38

1    that came through GT.  I did not deal
2    with any of the companies directly.
3  BY MR. VAUGHN:
4        Q.    Or any of the other law firms?
5        A.    Or any other law firms.
6        Q.    And so if there were additional
7  documents that you wanted to review, Greenberg
8  Traurig attorneys would have been who you went to?
9        A.    Yes.
10        Q.    Were there documents that you
11  specifically asked to see, or is it just documents
12  that Greenberg Traurig gave you?
13        A.    I asked GT to send me, from as
14  many of the manufacturers as they could,
15  bioequivalence studies that were used to file
16  and -- and received approval for their ANDAs.
17  And -- and then it was out of my hands what I
18  received at that point.  It was up to the
19  companies to find and send me those reports
20  through GT.
21        Q.    And so you would have expected
22  that all of the bioequivalency studies were given
23  to you, correct?
24        A.    I don't expect that.  I didn't
25  know what I was going to get.  I just evaluated

Page 39

1  what I did get.
2        Q.    So I note typically on this you
3  note that you're reviewing ANDA files for
4  bioequivalency data.  Why is it the ANDA files
5  that you're reviewing to find the bioequivalency
6  data?
7        A.    It's -- the part of the ANDA
8  submission process is to include the -- the BE
9  data.  So I would often get a file that had 50,
10  60, 70 folders in it, and I had to sift through
11  those and find the ones that actually had the
12  bioequivalence data in there.
13            So there's data on analytical,
14  the case report forms on all the volunteers who
15  were in the studies, what their lab values were,
16  their physical exam results.  I mean, there was a
17  lot of information that's included, and it was
18  just the BE data that I was interested in sifting
19  through and finding.
20        Q.    Each of those ANDAs are several
21  thousands of pages, correct?
22        A.    Correct.
23        Q.    And when you said --
24        A.    Just to add -- I'm sorry.  Just
25  to add and see if it helps.  For some of the

Page 40

1  manufacturers, instead of several thousand pages,
2  I only received the BE data only, and so I didn't
3  have to sift through for some of the situations a
4  lot more information than necessary for what I was
5  doing.
6        Q.    Do you recall for which companies
7  that was?
8        A.    Not off the top of my head, no.
9        Q.    A second ago you testified that
10  the submission process is to include the BE data.
11  By that, do you mean that the company is supposed
12  to submit all of their bioequivalency data and
13  studies with their ANDA?
14        A.    I believe that to be the case.
15        Q.    And that's why you thought it was
16  appropriate just to review the ANDA for their
17  bioequivalence data, correct?
18        A.    Well, or the bioequivalence data,
19  if that's all they sent me.  I -- it was the
20  bioequivalence data that I was most interested in.
21        Q.    And when you're talking about the
22  data, did you actually review the underlying data
23  or did you just review the final report?
24        A.    It depends on the format that it
25  came to me.  There was often a lot of underlying

Page 41

1  data.  There were bioequivalence data in humans.
2  A lot of that had subject-by-subject what their
3  individual values were.  Then it had summary data
4  on top of that.  It just depended on the format in
5  which I received it.
6        Q.    And did you look into the testing
7  methods that were employed in the different
8  bioequivalence studies?
9        A.    In some of the more extensive
10  files that I received, there were testing data.
11        Q.    And -- and for which
12  manufacturers did you have the more extensive
13  data?
14        A.    Again, I'd have to go back
15  and -- and look at my files to make that kind of
16  accurate answer.
17        Q.    Was it a majority or a minority
18  of the Defendants that you had extensive data on?
19        A.    I'd say it was about half.  So
20  when you look in my report to see which BE studies
21  I included, I'd say about half of those came from
22  looking at a lot of extensive information, and
23  some were a little bit more targeted towards just
24  the bioequivalence data.
25            MR. VAUGHN:  Melisha, let's go to

Confidential Information - Subject to Protective Order

Page 42

1    the first page of those invoices again.
2  BY MR. VAUGHN:
3        Q.    And I just want to run through
4  the billing amount, total billing amounts, Doctor.
5            So this first invoice was
6  $26,000, correct?
7        A.    Correct.
8            MR. VAUGHN:  And second invoice,
9    Melisha, page 2.
10  BY MR. VAUGHN:
11        Q.    This was $42,250, correct,
12  Doctor?
13        A.    Correct.
14        Q.    And the third invoice was $4,000,
15  correct?
16        A.    Yes, but that may be the one that
17  did not get paid because I sent it to the wrong
18  firm for payment.
19        Q.    And do you recall what firm you
20  sent that to?
21        A.    I sent it to GT, and they sent it
22  to whatever firm was responsible for that.
23        Q.    Then the next invoice is $35,500,
24  correct?
25        A.    Correct.

Page 43

1        Q.    And the next invoice is $4,000?
2        A.    Again, that may be the overlap
3  with the other one.  So both of those did not get
4  paid.  One did; one didn't.
5        Q.    Okay.  And the next invoice is
6  for $5,000?
7        A.    Correct.
8        Q.    And the next invoice is for
9  $41,000?
10        A.    Correct.
11        Q.    And your final invoice is for
12  $46,084, correct?
13        A.    Correct.
14        Q.    And my math shows that all those
15  together is $204,000.  If we drop that other
16  4,000, we're at $200,000.  Does that sound about
17  correct to you, Doctor?
18        A.    That sounds right.
19        Q.    And have they paid all of those
20  invoices to date?
21        A.    Yes.
22        Q.    And do you have additional time
23  that you have not billed, that is not reflected in
24  this billing?
25        A.    No, I'm sorry.  I'm sorry.  The

Page 44

1  one you're on right now.
2        Q.    Yeah, the last one?
3        A.    I have not -- I have not been
4  paid for that one.
5        Q.    Okay.  And then do you have
6  outstanding time that you have not billed?
7        A.    Yes.  Between the end of last
8  week and up until today, I've not billed for that.
9        Q.    And approximately how much time
10  is that?
11        A.    Approximately, I'm going to say,
12  30 hours.
13        Q.    And what were you doing during
14  those 30 hours?
15        A.    Reviewing my report, reviewing
16  deposition transcripts of some of the Plaintiff
17  experts in this phase of the litigation,
18  rereviewing some of the articles that I thought
19  were most important to my conclusions.
20            I think that's the majority of
21  the work.
22        Q.    How many meetings have you had
23  with counsel in preposit- -- preparation for this
24  deposition?
25        A.    We met yesterday here in Atlanta,

Page 45

1  and we had three remote sessions between the end
2  of last week and the first part of this week.
3        Q.    When you say "we," is that all
4  Greenberg Traurig attorneys?
5        A.    Yes.
6        Q.    Approximately how many hours
7  would you say those meetings were in total?
8        A.    Maybe 16, 18 hours.
9        Q.    And do you not charge Greenberg
10  Traurig more money for when you take a deposition
11  versus when you're just writing an expert report?
12        A.    No, I don't charge differently.
13        Q.    Let's go ahead and take a five,
14  ten-minute break.
15            MR. VAUGHN:  Is that okay, Steve?
16            MR. FOWLER:  Five minutes would
17  be good.  But yeah, go ahead.
18            MR. VAUGHN:  Sounds great.
19            Can we get a breakout room?
20            THE VIDEOGRAPHER:  Yes.
21            The time is now 10:35 a.m.  We're
22  now off the record.
23            (Brief recess observed.)
24            THE VIDEOGRAPHER:  The time is
25  10:43.  We're back on the record.

1    MR. VAUGHN: All right, Melisha,
2  can we go back to Exhibit 1,
3  Dr. Bottorff's class action expert
4  report? And let's go to page 30.
5  BY MR. VAUGHN:
6    Q.    And, Doctor, is this where you
7  begin discussing these bioequivalency studies of
8  the various Defendants?
9    A.    Yes.
10    Q.    All right. This first one that
11  you note is for Teva valsartan, and it's ANDA
12  090642, correct?
13    A.    Correct.
14    Q.    And those studies, you note, were
15  conducted in 2004, correct?
16    A.    Correct.
17    Q.    In your opinion, was Teva's
18  valsartan contaminated with nitrosamines in 2004?
19    A.    I don't believe so, but I don't
20  know for sure.
21    Q.    Is that something you asked
22  counsel?
23    A.    No.
24    Q.    Is that something you looked into
25  in any way at all?

1    A.    No.
2    Q.    If Teva's valsartan in 2004 was
3  not contaminated with nitrosamines, how does this
4  study support that nitrosamines won't impact the
5  bioequivalency of valsartan?
6    A.    In this particular case, I was
7  wanting to be thorough and include as many of the
8  bioequivalence studies as I could get and not
9  leave those out that -- for whatever reason or any
10  other reason. So I asked for all of them. And
11  every one of them that I got, I included in this
12  report.
13    Q.    In the body of your expert
14  report, you included every single bioequivalency
15  study that was provided to you by Greenberg
16  Traurig?
17    A.    That was provided to them by the
18  companies who were requested to send it to me,
19  yes.
20    Q.    And so you would agree, though,
21  that if, in 2004, Teva's valsartan was not
22  contaminated with nitrosamines, this
23  bioequivalency study does not tell you if
24  nitrosamines will impact the bioequivalency of
25  valsartan, correct?

1    MR. FOWLER: Objection to form.
2    THE WITNESS: Again, I don't know
3  if it was or wasn't, because
4  I've -- I've not traced company
5  documents about that kind of thing.
6  BY MR. VAUGHN:
7    Q.    Right. I understand that
8  you're -- you do not know, Dr. Bottorff, but if
9  it's an "if-then" question. If it was not
10  contaminated, then this would not tell you
11  anything about if nitrosamines impact valsartan's
12  bioequivalence, correct?
13    A.    In and of itself, no.
14    Q.    Going down to line 496, you have
15  a sentence that reads: "The AUC and Cmax values
16  are expressed as geometric means rather than the
17  more common arithmetic means, since the
18  pharmacokinetic data are usually more log-normal
19  distributed, such that geometrics means giving
20  more accurate description of the central tendency
21  of the data."
22    Can you explain what that means
23  to me, Dr. Bottorff?
24    A.    I -- I can as much as neither you
25  or I are not statisticians. But this is the

1  common way in which all of these bioequivalence
2  studies are conducted. It's expected in -- from
3  the FDA when these are submitted that they're
4  analyzed in that fashion. And it's done for the
5  reason that I list here, which has to do with how
6  the data are distributed across normal volunteers.
7    A lot of statistics are done
8  assuming that a negative value could be the same
9  as a positive value, which would lead to that
10  normal distribution in statistics. But when you
11  give a drug and measure AUC, it can only go up.
12  It can't go down. So that's part of this unequal
13  distribution that leads to this format of
14  demonstrating the central tendency using the --the
15  log-normal data.
16    I can describe how it's done, if
17  you want to know.
18    Q.    You're not a statistician, are
19  you, Dr. Bottorff?
20    A.    No, but I've had classes in
21  statistics and I've actually taught classes in
22  biostatistics.
23    Q.    What is your prior experience
24  with bioequivalency studies?
25    A.    My first bioequivalence study

Confidential Information - Subject to Protective Order

Page 50

1  experience was when I was a -- a -- a trainee in
2  my residency at the University of Kentucky, and I
3  worked in a unit that conducted these kind of
4  bioequivalence studies.  And I've done some of my
5  own bioavailability studies where the conduct of
6  the trial is essentially the same.
7      Q.    What does geometrics mean?  What
8  does that mean?
9      A.    Yeah.  An arithmetic mean is you
10 take -- let's say we are have three numbers, A, B,
11 and C.  You take A plus B plus C, and then you
12 divide by three and that's the arithmetic means.
13 The geometrics mean is you multiply A times B
14 times C, and then you take the cube root of that
15 number.
16     Q.    And why does the geometric mean
17 then give a more accurate description of the
18 central tendency data?
19     A.    Well, that's where it gets beyond
20 my statistical understanding, other than it's
21 what's expected to be done in these kind of
22 studies, is they use the geometric instead of the
23 arithmetic mean.
24     Q.    Are you familiar with the term
25 "harmonic mean"?

Page 51

1      A.    Yes.  There are -- there are
2  multiple ways of -- of displaying central
3  tendency.  That's another one.
4      Q.    What is a harmonic mean?
5      A.    I've never used it, so I can't
6  define it for you off the top of my head.
7      Q.    What about a least squares mean?
8      A.    That's really part of these as
9  well, is because the FDA expects you, when you do
10 a comparison from drug A to drug B, to not give
11 everybody drug A first and drug B second.  Some
12 people will get drug B first and drug A second.
13 And so you put that into a regression model along
14 with the means, and the regression model that
15 gives you the least difference, which is the least
16 squares fit to the data, are how you determine the
17 actual values that are going to be reported.  So
18 it's part of the regression model.
19     Q.    What did you mean by "you put
20 that into a regression model along with means and
21 the regression model that gives you the least
22 difference"?  What do you mean by "the model that
23 gives you the least difference"?
24     A.    Yeah.  The -- the best way I can
25 describe it is if -- if you have average blood

Page 52

1  level versus time data that go sort of up and
2  down, and you try to find the model that draws the
3  best fit through that data, each data point that's
4  not on that line -- as there's a difference
5  between the point and the line that's calculated.
6  And then the line is refit, the line is refit, and
7  you take the square of that difference between the
8  points in the line, and then you select the model
9  that gives you the least squares difference
10 between the predicted values and the observed
11 values.
12     Q.    Is there a difference between
13 least square means and geometric least square
14 means?
15     A.    No.  I think that's a different
16 way of wording the same process that's done in
17 bioequivalence studies.
18     Q.    And what's going to give a more
19 accurate description of the central tendency of
20 data, a geometric mean or a geometric least
21 squares mean?
22     A.    It's the same thing.
23     Q.    Oh, those are interchangeable as
24 well?
25     A.    Those -- those are

Page 53

1  interchangeable.
2      Q.    Thank you.
3          MR. VAUGHN:  All right.  Let's go
4  to page 31 of his expert report now.
5          And looking down at the paragraph that
6  starts on line 508.
7  BY MR. VAUGHN:
8      Q.    I like that you line number your
9  expert report, by the way.  It makes it much
10 easier to go through.
11         So this is the Princeton ANDA for
12 the valsartan 320 milligram, ANDA 204821, correct,
13 Doctor?
14     A.    Correct.
15     Q.    And the two studies that were
16 done here, there was a fasting study, H237-11.
17         What is a fasting study?
18     A.    Typically the FDA requires, when
19 you do these studies, to do one study in -- where
20 you dose in the morning after an overnight fast so
21 there's no food in the stomach, and then you
22 repeat the study with food in the stomach
23 to -- like after a standard breakfast kind of meal
24 to see if there's any effect of food altering the
25 bioavailability or the bioequivalence.

Page 54

1  Q.  And you note that these studies
2  were done in March and April of 2012.  Did you
3  look into the manufacturing date of the product
4  that was actually tested in these bioequivalency
5  studies?
6  A.  I -- I didn't for a -- point of
7  record, but most of the files that I received,
8  there was a section you could go to and it would
9  talk about the date of actual production of what
10 was going to be called the test product, and they
11 even had the date of production of the -- of the
12 reference Diovan.  And they would even often have
13 what the testing results on those individual
14 products were.
15        You know, if it said it had
16 320 milligrams, did it have 320 or right around
17 there?  So those were often included in the
18 records that I reviewed.
19 Q.  Do you recall approximately how
20 much earlier most of the manufacturing dates were
21 than study dates?  Several months?
22 A.  A few months.  These are usually
23 batches that are not so large, because they want
24 to prove that they can demonstrate bioequivalence
25 with them before they go into more larger scale

Page 55

1  production.
2  Q.  Do any additional tests related
3  to bioequivalency have to be done when a company
4  scales up production?
5  A.  I know there are times.  The
6  majority of these, the FDA requires the in-human
7  bioequivalence study to be done on the largest
8  tablet size that you're going to market.  That's
9  why these are almost always in the 320 milligram
10 dosage.  And then you're allowed to do in vitro
11 dissolution testing with the smaller doses.
12        So even though the bioequivalence
13 study might have been done with the 320, the ANDA
14 got approved for 40, 80, 160, as well as the 320.
15 And that was often done based on dissolution
16 testing.  So when you upscale, you can often
17 demonstrate bioequivalence using the dissolution
18 testing rather than repeat your human trial at
19 that point.
20 Q.  And do you know if Princeton's
21 valsartan was contaminated prior to March of 2012?
22 A.  I don't specifically know that.
23 Q.  And, again, if Princeton's
24 valsartan was not contaminated with nitrosamines
25 at the time of this study, then this -- these

Page 56

1  studies on bioequivalency don't tell you anything
2  on if nitrosamines impact valsartan's
3  bioequivalency, correct?
4  A.  Not by itself.
5  Q.  And what do you mean by "not by
6  itself"?
7  A.  Well, this report -- and I'm sure
8  we're going to keep going through it -- is going
9  to be leading to other bioequivalence studies with
10 some of the combination products where I
11 demonstrate that the addition into a valsartan
12 tablet of milligram quantities of other compounds
13 that do not have overlapping metabolic or
14 distribution pathways do not also alter the
15 bioequivalence.  And so to me, it doesn't -- if it
16 is or isn't in there, it's not going to alter the
17 bioequivalence pattern.
18 Q.  About line 513, you discuss
19 Hetero Labs' ANDA 203311 and Studies
20 10-VIN -- V-I-N -- -337 and Study 330-VALS-2011,
21 and you note that these studies were conducted in
22 February and July of 2011, correct?
23 A.  Correct.
24 Q.  And do you know if Hetero Labs'
25 valsartan was contaminated with nitrosamines in

Page 57

1  2011?
2  A.  Again, I don't.  It -- it's my
3  understanding that some of these generic
4  manufacturers were making their drug with a
5  process that may have had nitrosamines in it and
6  they didn't know it.  So I can't tell you with
7  each company where that was and when that
8  happened.  I -- I'm somewhat certain that some of
9  these did and it wasn't known, but it still didn't
10 alter the bioequivalence.
11 Q.  And so is it your testimony today
12 that Hetero Labs' valsartan might have been
13 contaminated with nitrosamines dating back to at
14 least 2011?
15 A.  It is my testimony that I don't
16 know which companies may have had it, but that I'm
17 suspicion [sic] -- my suspicion is that some did,
18 and I don't know which.
19 Q.  All right.  Go to page 32, line
20 517.  You are now discussing a Torrent
21 Pharmaceuticals' ANDA 202728 with Studies
22 PK-09-100 and Study PK-09-103.  These are on
23 valsartan 320 milligrams, and you note that the
24 studies were done in July of 2010, correct?
25 A.  Yes.

Page 58

1    Q.    And Torrent's valsartan, is it
2 your opinion that it was contaminated with
3 nitrosamines back in 2010?
4    A.    It is my opinion that I don't
5 know if it was or not.
6    Q.    And if Torrent's valsartan was
7 not contaminated with nitrosamines back in 2010,
8 these bioequivalency studies don't tell you
9 anything in relation to if nitrosamines impact the
10 bioequivalency of valsartan, correct?
11    A.    And, again, as I said before, not
12 in and of themselves.  But as we keep working
13 through this, you'll see one of the premises about
14 having combination products with more than
15 valsartan, like hydrochlorothiazide in
16 six-and-a-half -- or six-and-a-quarter up to 25
17 milligrams, amlodipine 5 or 10 milligrams, having
18 no effect on the bioequivalence of -- of valsartan
19 because of a lack of overlapping metabolic
20 pathways.
21    And so as I've -- I've
22 demonstrated in both reports, the lack of an
23 overlapping metabolic pathway between the
24 nitrosamines and valsartan, that there would be no
25 reason, and in fact there couldn't be any reason,

Page 59

1 to have that have any effect on the bioequivalence
2 of valsartan.
3    Q.    What were the two combination
4 drugs that you just mentioned?  Amlodipine and
5 what was it?
6    A.    Hydrochlorothiazide.  Those are
7 the components of the brand name Exforge or
8 Exforge HCT.
9    Q.    Are either of those drug
10 genotoxic -- genotoxins?
11    A.    No.
12    Q.    Are nitrosamines genotoxins?
13    A.    In animals, yes, depending on the
14 exposure level.
15    Q.    All right.  On the PK-09-103
16 Study, on that far right-hand column, it says:
17 "90 percent C.I."
18    What does the C.I. mean?
19    A.    It's a confidence interval.  The
20 90 percent confidence interval around that value
21 in the column before it, which is the percentage
22 similarity between the brand name and the test
23 product.  So it's a -- an -- the average value
24 with the 90 percent confidence limits around that
25 value.  And these are to -- these confidence

Page 60

1 limits are to demonstrate that they remained
2 within the FDA guidelines of the confidence limits
3 being allowed to be as low as 80 percent or as
4 high as 125 percent.
5    Q.    So does that mean that --
6    A.    That would be for the A- -- I'm
7 sorry.  Whether that be for the AUC value or the
8 Cmax value.
9    Q.    And so does that mean that 10
10 percent of the population is allowed to fall
11 outside of the 80 percent to 125 percent range?
12    A.    No, that's not what it means.
13    Q.    Can you explain further?
14    A.    Sure.  What it means is that if
15 you were to redo this experiment 100 times, 90
16 times you would still get values that are between
17 that range of upper and lower limit.  So it's more
18 of a statistical value than a what-happened-
19 to-a-patient value.
20    Q.    I understand now.  I appreciate
21 that clarification.
22    And so on the PK-09-103, it's
23 getting up to 123.65 percent, and that's okay
24 because it's less than 125, correct?
25    A.    Correct.  That's the upper limit

Page 61

1 of the FDA's guidelines for demonstrating
2 bioequivalence.
3    MR. VAUGHN:  Let's go to page 33,
4 Melisha.
5 BY MR. VAUGHN:
6    Q.    All right.  Line 537 and 538, you
7 note that: "HCTZ" -- and what's HCTZ?
8    A.    Hydrochlorothiazide.
9    Q.    Is it okay if I refer to it as
10 HCTZ in the deposition?
11    A.    For me it is.
12    Q.    Appreciate it.
13    You note that: "HCTZ is
14 primarily eliminated through the kidney," correct?
15    A.    Correct.
16    Q.    And then you say: "Therefore,
17 HCTZ would have no pharmacokinetic or
18 pharmacodynamic overlap with valsartan or NDMA or
19 NDEA," correct?
20    A.    Correct.
21    Q.    And why is that?
22    A.    Well, there's multiple parts to
23 that question.  I previously demonstrated how
24 valsartan is absorbed, taken up into the liver,
25 excreted in bile and has a mild cytochrome P450

Confidential Information - Subject to Protective Order

---

Page 62

1  pathway of elimination.  None of those are shared
2  by Hydrochlorothiazide.  None of those are shared
3  by NDMA or NDEA.
4          And I guess I should add that's
5  the pharmacokinetic reason for no overlap.  The
6  pharmacodynamic reason is that -- that gets to
7  their mechanism of action.  How does
8  Hydrochlorothiazide lower blood pressure?  Not the
9  same way that valsartan does.  So there's no
10 overlap between their -- their blood pressure
11 effects.  So that would be a lack of a
12 pharmacodynamic-shared mechanism.
13         Q.    And so is part of the reason that
14 there's no overlap is they're being metabolized in
15 different organs?
16         A.    Well, that's part of it.  Part of
17 it can be you're metabolized in the same organ but
18 by a different pathway.  You would still then have
19 no overlap.
20         Q.    And NDMA is metabolized, in your
21 opinion, in the liver, correct?
22         A.    And how it's given and how much
23 dose is -- is given.
24         Q.    The NDMA that has been
25 contaminated in valsartan, it's your opinion that

---

Page 63

1  it's metabolized in the liver, correct?
2          A.    When ingested orally, yes.
3          Q.    And valsartan itself is also
4  metabolized in the liver, correct?
5          A.    By a different metabolic pathway
6  entirely.
7          Q.    And is that the P450 pathway that
8  you were just mentioning?
9          A.    Well, there's a P450 pathway for
10 NDMA that's separate and distinct from the minor
11 P450 pathway with valsartan.
12         Q.    But they're both metabolized
13 through a P450 pathway, correct?
14         A.    Correct, but a separate and
15 distinct different P450 pathway.
16         Q.    And then line 545 you note that:
17 "Amlodipine is primarily hepatically metabolized."
18         And that means metabolized by the
19 liver as well, correct?
20         A.    Yes.
21         Q.    And -- I'm --
22         A.    Again, by a distinct metabolic
23 pathway called 3A4.
24         Q.    P450, 3A4?
25         A.    Yes.

---

Page 64

1          Q.    And is --
2          A.    Different from valsartan,
3  separate from NDMA.
4          Q.    Thank you.  You knew my next
5  question.
6          Now, I don't see that you gave an
7  opinion like you did with HCTZ that it would have
8  no pharmakinetic [sic] or pharmadynamic [sic]
9  overlap with valsartan or NDMA/NDEA.
10         Is that also your opinion,
11 though, with amlodipine?
12         A.    Yes.  I -- I say the same thing
13 in the next sentence, but in a slightly different
14 way, because there's no identified mechanism of
15 drug interaction or no overlapping route of
16 metabolism.
17         Q.    Can liver cirrhosis impact the
18 metabolism of any of these drugs?
19         A.    Not in a predictable fashion.
20         Q.    What do you mean by that?
21         A.    Well, there are probably maybe as
22 many as 100 or 150 different cytochrome P450
23 pathways.  Some of them have been studied for
24 alterations in cirrhosis; some have not.  Most do
25 not show a change in their metabolic capability in

---

Page 65

1  cirrhosis.
2          Q.    So liver damage could impact the
3  metabolism of these drugs?
4          MR. FOWLER:  Object to form.
5          THE WITNESS:  It's probably been
6  studied and there's other types of liver
7  damage from cirrhosis, so it can't be
8  yes/no.  You have to look at the type of
9  liver damage and the specific P450
10 pathway to see what's actually been
11 demonstrated or shown not to have an
12 effect.  But it can't be done as a
13 blanket statement.
14 BY MR. VAUGHN:
15         Q.    Do you have an opinion as to what
16 type of liver damage would impact the metabolism
17 of any of these drugs the most?
18         MR. FOWLER:  Objection:  Form,
19 foundation.
20         THE WITNESS:  I don't.  As I said
21 before, it's not something you can say
22 in a blanket yes/no format.  So you'd
23 have to literally look at each pathway
24 and the multiple different types of
25 hepatic disease to see what's been done

---

Confidential Information - Subject to Protective Order

Page 66

1 and what's not been done.
2          MR. VAUGHN:  Let's go to page 34,
3     Melisha.
4 BY MR. VAUGHN:
5     Q.    And at 559, we're now at the
6 section on Exforge.  What is Exforge?
7     A.    That's the brand name of the
8 combination product of valsartan and amlodipine
9 made by Novartis.
10     Q.    Okay.  So when one of the
11 companies is doing their bioequivalency studies on
12 valsartan plus amlodipine, they do it in
13 comparison to Exforge?
14     A.    Correct.
15     Q.    And line 562, you are now
16 discussing Aurobindo's ANDA 206512, and within
17 that, their Study No. 368-12 and 369-12.  And you
18 note that these were done in October of 2013,
19 correct?
20     A.    Correct.
21     Q.    And you don't recall the date of
22 manufacture of the generic pills that were being
23 tested, do you?
24     A.    No.  Again, they would have been
25 within some, usually few months time frame, but I

Page 67

1 don't know.
2     Q.    Okay.  So is it your opinion that
3 Aurobindo's valsartan was contaminated with
4 nitrosamines prior to October of 2013?
5     A.    It is my testimony that I do not
6 know, but that it may that have had.  And that if it
7 did, it didn't alter the bioequivalence anyway.
8     Q.    And if it -- if that that -- scratch
9 that.
10          And if Aurobindo's valsartan was
11 not contaminated with nitrosamines during this
12 time, then these bioequivalency studies don't tell
13 you anything as to if nitrosamines will impact the
14 bioequivalence of valsartan plus amlodipine,
15 correct?
16     A.    Well, no, not necessarily
17 correct.  Because, again, in microgram quantities,
18 without any overlapping mechanism for an
19 interaction, there's no reason to expect that
20 there would be any impact at all.
21     Q.    But if this study is testing
22 pills without any nitrosamines in it, how does
23 that add anything?  How does that support your
24 opinion that the nitrosamines aren't going to
25 impact the bioequivalence?

Page 68

1     A.    Again, it -- it can't.  There's
2 no mechanism for it to do such.  This, again,
3 study in and of itself is demonstrating that by
4 showing that you still get all the valsartan
5 you're supposed to get, even when amlodipine is
6 present, because it doesn't share a metabolic
7 pathway.
8     Q.    Did you even need to look at any
9 of these bioequivalence studies, as you had
10 already determined that there's no way that
11 nitrosamines can impact the bioequivalency of the
12 drugs?
13     A.    Well, the -- the process that I
14 went through was not starting with that.  I first
15 had to go through the metabolic pathways of these
16 various components and then look at the
17 bioequivalence studies and then draw my conclusion
18 at the end of that, not on the front end of that.
19     Q.    And you think that studies done
20 without nitrosamines can tell you if nitrosamines
21 are going to impact the bioequivalency?
22          MR. FOWLER:  Objection:  Form,
23     mischaracterizes.
24          THE WITNESS:  Again, I think in
25     answering that previously, I -- I said

Page 69

1     that not in and of themselves.  You have
2     to look at the whole picture.  And part
3     of the whole picture is valsartan's
4     bioequivalence is retained in the
5     presence of other compounds, that I had
6     to see the data for, before I could draw
7     that conclusion.
8          And then also understanding that
9     some of these probably had nitrates in
10     them, even as far back as -- as when
11     these bioequivalence studies were done.
12 BY MR. VAUGHN:
13     Q.    You just testified that you have
14 to look at the whole picture.  What do you mean by
15 "the whole picture"?
16     A.    Look at all the compounds
17 involved, their metabolic pathways, the
18 bioequivalence studies.
19     Q.    All of the bioequivalency
20 studies?
21     A.    All that I received, which
22 supported my contention and the -- all of the
23 metabolic pathways of all the compounds involved.
24     Q.    If there were other
25 bioequivalence studies that you did not receive,

Page 70

1  you wouldn't have the whole picture, would you?
2      A.   I wouldn't have any more
3  information than what I've already put in my
4  report, but I think there's adequate information
5  in my report to make my conclusions.
6      Q.   If there were bioequivalency
7  studies that -- scratch that.
8           If some of the generic
9  manufacturers conducted bioequivalency studies on
10 their valsartan and they failed the bioequivalency
11 studies, you would then ex- -- you would have
12 expected the Defense attorneys would have given
13 you that information, correct?
14     A.   And they did.
15     Q.   How do you know they did?
16     A.   I saw one bioequivalence study
17 that the average AUC value and the average Cmax
18 value, you know, the two primary determinates of
19 rate and extent of absorption, were within the
20 FDA's requirements, but the confidence limits
21 exceeded the requirements.
22     Q.   What do you mean by "exceeded"?
23     A.   So I did see a study --
24     Q.   Sorry, continue.
25     A.   So I did see -- I did see a study

Page 71

1  that failed the FDA's bioequivalence standards and
2  the company did a root cause analysis -- I don't
3  remember which one it was right now -- and found
4  that it was a -- a change in the size of the
5  microparticles when they did the tableting, and so
6  they went back and reformulated the tablet and
7  redid a bioequivalence study -- and its one of the
8  ones that's in here -- that then met the FDA
9  standards after the reformulation.
10     Q.   You don't recall what company
11 that is?
12     A.   I don't.  I'd have to go back and
13 look through all those files again.
14     Q.   Do you know what -- if they're
15 API?
16     A.   Again, I -- I don't know off the
17 top of my head whether they made their own or
18 whether they purchased it.
19     Q.   You don't know if they were
20 getting their API from ZHP?
21     A.   I don't, off the top of my head.
22     Q.   And do you happen to know if
23 wherever they were getting their API from sent
24 them the same API later on that they passed their
25 bioequivalency study with?

Page 72

1      A.   I seem to recall that they were
2  using the same API.  It was more the tableting
3  process that needed to be revised.
4      Q.   Was it the size of the granules
5  of the valsartan API that was causing the
6  bioequivalence studies to fail?
7      A.   No.  It was the size of the
8  particles that are used as part of the tableting
9  process.  So, yes, valsartan was in that particle,
10 and I don't know whether there was NDMA in there
11 or not.  But based on the internal report for that
12 company, it had nothing to do with the API; it was
13 the tableting process.
14     Q.   What are you basing that on,
15 the -- it's the tableting process and not the API?
16     A.   Their own internal root cause
17 analysis.
18     Q.   But you can't point me to which
19 Defendant you're discussing or the document that
20 you're relying on?
21     A.   I could.  It might take me two or
22 three hours to sift through the files.
23     Q.   That's okay.  I think we'll
24 probably get to it later.
25         MR. VAUGHN:  Let's go to page 36,

Page 73

1      Melisha, and start on line 586.
2  BY MR. VAUGHN:
3      Q.   All right.  We're talking about
4  Torrent's ANDA 202377.  And so this would, again,
5  be the valsartan plus amlodipine, correct?
6      A.   Yes.
7      Q.   And the bioequivalency studies
8  within this ANDA is PK-09-192, PK-09-193 and
9  PK-10-023, and you note that these were conducted
10 between May and July of 2010, correct?
11     A.   Yes.
12     Q.   Is it your opinion that Torrent's
13 valsartan was contaminated with nitrosamines in
14 May of 2010?
15     A.   Again, it may have been.  I -- I
16 do not know.
17     Q.   And so, again, if Torrent's
18 valsartan was not contaminated with nitrosamines
19 in 2010, then these studies don't actually tell
20 you anything specifically on if nitrosamines
21 impact the bioequivalence of valsartan plus
22 amlodipine, correct?
23     A.   Again, not in and of itself,
24 but -- but if it did contain it, then it does tell
25 you that.

Page 74

1    Q.   But you have no idea if Torrent's
2  valsartan was contaminated back in 2010 with
3  nitrosamines, do you?
4         MR. FOWLER:  Asked and answered.
5         THE WITNESS:  I -- I do not know.
6  BY MR. VAUGHN:
7    Q.   Do you know what the purpose was
8  of them doing two fasting studies at different
9  milligrams?
10   A.   I -- I don't.  I don't recall
11 seeing why that selection was made.  Again, I know
12 they're required by the FDA to do the highest
13 dose.  I don't know why they chose the 160 in
14 addition, so I -- I really don't know.  I
15 certainly don't recall seeing in the documents I
16 had access to, that it was explained.
17   Q.   Is there any reason why on the
18 fed study the bioequivalency range is on the low
19 end and on the fasting studies it's on the high
20 end?
21        MR. FOWLER:  Objection to form.
22        THE WITNESS:  I do believe that
23   it's been reported that there's a small
24   reduction in systemic exposure to
25   valsartan when taken with food compared

Page 75

1    to not being taken with food.  But then
2    it's in the package label that
3    the -- that small reduction is of -- not
4    of any clinical significance.  And so
5    patients in the package labels are
6    instructed that they can take it with or
7    without food and it won't alter the
8    ultimate response to the drug.
9  BY MR. VAUGHN:
10   Q.   That small reduction in systemic
11 exposure to valsartan when taken with food, that
12 should be the same for the brand name and the
13 generic, correct?
14   A.   Yes.
15   Q.   Then why is the generic low on
16 the fed studies but high on the fasting studies?
17        MR. FOWLER:  Objection, form.
18        THE WITNESS:  I don't think it's
19   only because of whether it's fed or not
20   fed.  I think tablet performance, if you
21   go back and look through some of these,
22   some manufacturers, even in a fasting
23   state, their AUCs are a little higher
24   than Diovan and some are a little lower
25   than Diovan.  So it -- it's not purely

Page 76

1    only capable of being different because
2    of a function of being fed or not.
3  BY MR. VAUGHN:
4    Q.   Do you -- in relation to
5  valsartan, do you have an opinion if fasting or
6  fed bioequivalence studies are harder to pass?
7    A.   I have no opinion that they're
8  any harder to pass.
9         MR. VAUGHN:  All right.  Page 37.
10 BY MR. VAUGHN:
11   Q.   All right.  In the Comparison
12 part now is Diovan HCT.  Is HCT the same as HCTZ?
13   A.   Yes.  Novartis, in their branded
14 name, they don't use all four letters.  They just
15 use three of them.  Whereas in the generic
16 pharmacology vernacular, we always use the four
17 letters of HCTZ.
18   Q.   Okay.  And so this section is now
19 on the combination of valsartan plus HCTZ pills,
20 correct?
21   A.   Correct.
22   Q.   And this is Aurobindo ANDA 202519
23 that you're discussing in this paragraph, correct?
24   A.   Yes.
25   Q.   And the studies within that ANDA

Page 77

1    are 304-09 and 305-09.  And you note that those
2  were conducted -- well, actually, you don't know
3  what year those were conducted, do you?
4    A.   Yeah, I don't know why I didn't
5  put that in there.  I tried to be consistent
6  in -- in including the actual dates.  And so I
7  don't know if I received only a summary report
8  that didn't have them.
9         What I could do, though, is go to
10 the FDA's website and put in the ANDA number, and
11 you can get from the website the date that the FDA
12 approved the ANDA.  So I did have that.
13   Q.   Based on Aurobindo's naming
14 structure of their studies, does that -09 indicate
15 anything to you?
16   A.   I can't say that I paid attention
17 to whether that was a 09, like 2009 study or not,
18 so I don't know for sure.  It may have been the
19 ninth production product or -- you know, I have no
20 idea.
21   Q.   Or a 2009 manufacturing date of
22 the product?
23   A.   Could have been.
24   Q.   Well, let's just assume, then,
25 that this was done in 2010.  If this was done in

Page 78

1 2010, do you have an opinion as to if Aurobindo's
2 valsartan was contaminated with nitrosamines?
3        A.    I don't know.  It may have.
4        Q.    And if the ANDA wasn't approved
5 until March of 2013, the studies were definitely
6 done in advance of that, correct?
7        A.    They were definitely done in
8 advance of 2013, yes.  For sure.
9        Q.    And the manufacturing date of the
10 valsartan would have been even earlier than the
11 bioequivalency studies, correct?
12        A.    By some, usually, a few months
13 time frame.
14        Q.    And so you're unaware if the
15 product tested in these bioequivalency studies was
16 contaminated with nitrosamines, correct?
17        MR. FOWLER:  Asked and answered.
18        THE WITNESS:  Correct, I'm
19        unaware of that.  They may have been.
20 BY MR. VAUGHN:
21        Q.    And if Aurobindo's valsartan was
22 not contaminated with nitrosamines at the time
23 that these studies were being conducted, these
24 bioequivalency studies don't actually tell you
25 anything on if nitrosamines impact the

Page 79

1 bioequivalency of the valsartan plus HCTZ,
2 correct?
3        A.    And, again -- and the same if
4 they do.
5        But without an overlapping
6 mechanism, it doesn't matter whether it's in there
7 or not.
8        Q.    And so none of these studies that
9 we've looked at actually matter to you, do they,
10 because you don't know if any of them have
11 nitrosamines in the drug product?
12        MR. FOWLER:  Objection to form.
13        THE WITNESS:  No, that's not what
14        I said about them not mattering.  I'm
15        saying whether NDMA was in there or not
16        doesn't matter because the
17        bioequivalence would be retained.
18 BY MR. VAUGHN:
19        Q.    So in your expert opinion, it
20 doesn't matter if the study is using a drug
21 product with nitrosamines in order to figure out
22 if nitrosamines impact the bioequivalency of the
23 drug?
24        A.    It is my expert opinion that
25 whether they were in there or not would not affect

Page 80

1 the bioequivalence.  And -- and if I recall from
2 having read one of Plaintiff expert's depositions,
3 Dr. Najafi, I believe, I think he said the same
4 thing.  It didn't matter whether it was in there
5 or not; it wouldn't have affected the
6 bioequivalence.
7        Q.    If there are bioequivalency
8 studies that were conducted on valsartan that was
9 known to be contaminated, would you want to review
10 those studies?
11        A.    Of course if I had them, I would
12 review them.
13        Q.    Would you give more weight to the
14 studies that had no nitrosamines impurities in
15 them versus ones that did have nitrosamines
16 impurities in them?
17        A.    No, because they're not going to
18 show any difference, so it wouldn't have any
19 difference to me at all.  Wouldn't change my
20 conclusion, it would only support my conclusion.
21        Q.    And so without looking at the
22 studies, you can already determine that they're
23 not going to show any difference?
24        A.    To the best of our scientific
25 capability through mechanisms whereby there would

Page 81

1 be an effect on bioequivalence, and those
2 mechanisms do not exist.
3        MR. VAUGHN:  All right.  Go on to
4        page 38.
5 BY MR. VAUGHN:
6        Q.    All right.  And you're now
7 discussing at line 613 Princeton ANDA 206083.  And
8 again, this is for valsartan plus HCTZ, correct,
9 Doctor?
10        A.    Yes.
11        Q.    And within the ANDA you note
12 bioequivalence studies H052-12 and H053-12, and
13 you note that these were both done in 2012,
14 correct?
15        A.    Yes.
16        Q.    And do you have any opinion on if
17 Princeton's valsartan plus HCTZ was
18 contaminat- -- contaminated with nitrosamines in
19 2012?
20        A.    I don't personally know that.
21 They may have been.
22        Q.    And if Princeton's valsartan was
23 not contaminated with nitrosamines in 2012, these
24 studies don't actually tell you if nitrosamines
25 are going to impact the bioequivalency of

Page 82

1 Princeton's valsartan plus HCTZ, correct?
2    A.    Correct, in that -- in and of
3 itself.  But, again, with the presence of
4 milligram quantities compared to NDMA microgram
5 quantities, without overlapping mechanisms, it
6 adds to the body of -- of my knowledge that
7 there's no reason to expect that NDMA would have
8 any effect on bioequivalence at all.
9    Q.    Okay.  And in the paragraph
10 starting at line 622, you are discussing ANDA
11 091654, which is for Torrent's valsartan plus
12 HCTZ, correct?
13    A.    Yes.
14    Q.    And then you note Studies
15 PK-09-23 and PK-09-024, and you note that these
16 bioequivalency studies were conducted in March of
17 2009, correct?
18    A.    Yes.
19    Q.    And do you have any opinion if
20 Torrent's generic valsartan plus HCTZ was
21 contaminated with nitrosamines back in 2009?
22    A.    I do not know.  It may have been.
23    Q.    And if Torrent's valsartan plus
24 HCTZ was not contaminated with nitrosamines back
25 in 2009, then these bioequivalence studies don't

Page 83

1 actually tell you anything on if nitrosamines
2 impact the bioequivalence of valsartan plus HCTZ,
3 correct?
4    A.    Correct, to a certain degree.
5 But, without the overlapping mechanisms and
6 the fact that it may have had it in there, then
7 I -- I don't think this is changing my conclusion
8 at all.
9        MR. VAUGHN:  Page 39.
10 BY MR. VAUGHN:
11    Q.    All right.  Paragraph starting
12 line 626, you note Mylan data on bioequivalency
13 studies comparing generic valsartan/HCTZ to
14 Diovan/HCT, but you don't reference an ANDA on
15 this one.
16        Is there a reason for that?
17    A.    It was either not identified in
18 the files that I received or that I could not find
19 it directly at the FDA website to put a specific
20 ANDA number in.
21    Q.    What do you mean by "not
22 identified in the files" you received?
23    A.    As I said before, some of these
24 files I received were very lengthy and very
25 comprehensive, and some of them I received were:

Page 84

1 Here's our bioequivalence result for Diovan/HCT
2 versus our equivalent product.
3        And so it -- I may have in some
4 cases had a much more limited amount of
5 information that came with the file that had the
6 BE data in it.
7    Q.    And so for some of the files, you
8 were not able to review all the data, correct?
9    A.    I was able to review the relevant
10 bioequivalence data, yes.
11    Q.    And the Mylan studies, that you
12 were discussing in this paragraph, you note were
13 conducted in May of 2005, correct?
14    A.    Yes, I did have that information.
15    Q.    And did you have any information
16 on if Mylan's valsartan plus HCTZ was contaminated
17 with nitrosamines back in 2005?
18    A.    I have no knowledge of that.  It
19 may have been.
20    Q.    Your opinion today is that
21 Mylan's valsartan might have been contaminated
22 going all the way back to 2005?
23    A.    Do not know.
24    Q.    And if Mylan's valsartan plus
25 HCTZ was not contaminated back in 2005, then these

Page 85

1 bioequivalence studies don't actually tell you
2 anything on if nitrosamines impact the
3 bioequivalence of valsartan plus HCTZ, correct?
4    A.    They indirectly do, as I -- as
5 I've stated before, because milligram quantities
6 of HCTZ without an overlapping mechanism do not
7 alter valsartan.  So there would be no reason to
8 expect that microgram quantities of NDMA or NDEA,
9 without overlapping mechanisms, would have any
10 effect on the bioequivalence.
11        So I -- I don't change my
12 conclusion at all.
13    Q.    Does that meet FDA guidance, that
14 just if there's not a known overlapping mechanism,
15 that you don't need to do bioequivalency studies?
16        MR. FOWLER:  Objection:  Form,
17 foundation.
18        THE WITNESS:  The FDA requires
19        the bioequivalence studies irrespective
20        of whether they do or do not have
21        impurities in them.
22 BY MR. VAUGHN:
23    Q.    If a drug has a different
24 chemical in it, even if it's an excipient, does
25 the FDA require additional bioequivalency studies?

Page 86

1      MR. FOWLER: Objection, form.
2      THE WITNESS: Make sure I'm
3   understanding. Are you asking if two
4   products have different excipients of
5   the same active ingredient, would it
6   require a bioequivalence study?
7 BY MR. VAUGHN:
8      Q.   Yeah. If a generic drug that
9 already passed bioequivalency studies added a new
10 excipient, would the FDA require additional
11 bioequivalency studies?
12     A.   Probably not in humans. They,
13 again, would probably be allowed to do a
14 dissolution study that showed the same release
15 characteristics.
16     Q.   What are you basing that on?
17     A.   Basing it on the FDA guidance for
18 bioequivalence testing.
19     Q.   Which FDA guidance on
20 bioequivalence testing?
21     A.   Probably the one that I referred
22 to in my report.
23     Q.   Do you know which year that one
24 is?
25     A.   I don't. I know they released a

Page 87

1 new one maybe last year, but I don't think there
2 was substantial changes in it.
3      Q.   Did you disagree with anything in
4 the FDA's guidance?
5      MR. FOWLER: Objection, form.
6      THE WITNESS: I'd have to see
7   what you're referring to.
8 BY MR. VAUGHN:
9      Q.   As you're sitting here today, do
10 you recall disagreeing with any of the FDA's
11 guidance on bioequivalency studies?
12     A.   As I sit here today, I do not
13 recall that. But I don't know what you're
14 referring to. It's -- I -- it's so vague, I
15 can't -- I can't really answer your question.
16     Q.   Are you giving any regulatory
17 opinions in this litigation?
18     A.   I'm giving no regulatory opinions
19 in this case. I think there are other people that
20 have been asked to provide opinions that are much
21 more qualified than I on that.
22     Q.   At the bottom of page 39, we are
23 now in the section regarding valsartan plus
24 amlodipine plus HCTZ, correct?
25     A.   Yes.

Page 88

1      Q.   And their reference drug is,
2 again, Exforge HCT?
3      A.   Yes. So this is a -- a
4 three-drug combination now.
5      Q.   Does Exforge HCT have amlodipine
6 in it?
7      A.   Yes.
8      Q.   And is Exforge HCT what was also
9 being compared to on the generic valsartan plus
10 HCTZ but not amlodipine?
11     A.   Valsartan plus amlodipine alone
12 would be equivalent to the Exforge. Valsartan
13 plus HCTZ would be equivalent to Diovan/HCT. And
14 then valsartan plus amlodipine plus
15 hydrochlorothiazide would be equivalent to the
16 Exforge HCT.
17     Q.   Understood. Thank you for that
18 clarification.
19          And so that last paragraph on
20 page 39, you are discussing Teva's ANDA 2004354,
21 valsartan plus amlodipine plus HCTZ, correct?
22     A.   Yes.
23     Q.   And I don't see that you
24 identified the studies in this ANDA. Do you see
25 if you did, Doctor?

Page 89

1      A.   I don't see a specific study
2 number.
3      Q.   Is there a reason for that?
4      A.   It -- it wouldn't have been an
5 oversight on my part, so it must not have been
6 that the actual study number was provided in the
7 materials I was given to review or that I asked
8 for to review.
9      Q.   And if the Defendants had that
10 information, you would have expected that they
11 would have given it to you, correct?
12     A.   Yes. I'm sure they had it, and
13 it wasn't in the materials that I received.
14     Q.   You were sure that the Defense
15 attorneys had it, but they did not give it to you?
16     MR. FOWLER: Objection, form. He
17 didn't say that.
18     THE WITNESS: Yeah, what -- what
19 I meant to -- to mean is that the file
20 that came through Defense lawyers to me
21 from Teva, Teva must not have provided
22 it in what was sent to them to give to
23 me. So I had no direct contact with
24 Teva.
25 BY MR. VAUGHN:

Confidential Information Subject to Protective Order

Page 90

1    Q.   And these studies done in Teva's
2  ANDA 200435, they were conducted in 2009, correct?
3    A.   Yes, I did have that information.
4    Q.   And do you have an opinion on if
5  Teva's valsartan was contaminated with
6  nitrosamines back in 2009?
7    A.   I don't know if it was or not.
8    Q.   And therefore, if it was not
9  contaminated with nitrosamines back in 2009, these
10  studies don't tell us anything on if nitrosamines
11  impact the bioequivalency of Teva's valsartan plus
12  amlodipine plus HCTZ, correct?
13    A.   Incorrect.  Again, this is
14  an -- an even more extreme example of making my
15  point.  You now have three drugs in milligram
16  quantities that don't have overlapping mechanisms
17  of metabolism that show no altered bioequivalence.
18    Q.   And it's your opinion that that
19  supports that nitrosamines can't alter the
20  bioequivalency of these drugs?
21    A.   The absence of an overlapping
22  mechanism of metabolism or distribution,
23  absolutely, I believe that.
24    Q.   Did you discuss any other
25  bioequivalency studies in your expert report,

Page 91

1  other than the ones that we have covered?
2    A.   I'm assuming you went through
3  every one that -- I haven't going back to -- to do
4  a head count, but I'm assuming it's every one.  So
5  I have no additional ones that I had access to.
6    Q.   And all of the ones that we
7  reviewed, none of them were you aware if
8  nitrosamines were in the drug product, correct?
9    MR. FOWLER:  Asked and answered.
10    THE WITNESS:  I don't believe
11    that I -- I don't know, but I'm under
12    the impression that some of them did.
13  BY MR. VAUGHN:
14    Q.   Which ones are you under the
15  impression had nitrosamines in them when they were
16  conducting the bioequivalency studies?
17    MR. FOWLER:  Objection, asked and
18    answered.
19    THE WITNESS:  I -- I don't know
20    which ones, but I'm under the impression
21    that some did.
22  BY MR. VAUGHN:
23    Q.   Do the --
24    A.   I'm even under the
25  impression -- I'm sorry.

Page 92

1    I'm even under the impression
2  that some of the Diovan may have had nitrosamines
3  in them as well.  Again, I don't think it alters
4  my conclusion at all because it would have no
5  impact on the bioequivalence studies.
6    Q.   Did the Defense attorneys tell
7  you to assume that some of the generic valsartan
8  that was studied in these bioequivalency studies
9  were contaminated with nitrosamines?
10    A.   Defense attorneys did not tell me
11  to assume anything.  They have access to
12  information through other depositions and things
13  that I'm not aware of, but they did tell me that
14  there was the likelihood that some of these
15  generics contained NDMA even before ZHP identified
16  that it had NDMA.
17    Q.   How far back did the Defense
18  attorneys tell you that the contamination likely
19  goes?
20    A.   I was not given a time frame.  I
21  do not know that.
22    Q.   And so when you testify --
23    A.   I think it was --
24    Q.   Sorry, go ahead.
25    A.   Yeah.  I think I was going to say

Page 93

1  that, again, in -- in reading Dr. Najafi's
2  deposition, I think he was the one that concluded
3  or -- or stated that even Diovan had some NDMA in
4  it.  And so I'm saying it doesn't matter.  The
5  bioequivalence, and therefore the systemic
6  exposure, and therefore the systemic effect of
7  generic valsartan products are completely
8  independent of whether there is or isn't NDMA in
9  there or whether it was in the branded products or
10  not.
11    Q.   Earlier you testified that you
12  were under the impression they had nitrosamines in
13  them when they were [sic] conducted the
14  bioequivalence studies.  How are you under that
15  impression?
16    MR. FOWLER:  Objection:  Form,
17    vague.
18    THE WITNESS:  Again, I'm -- I'm
19    under the impression from discussions
20    I've had with counsel that there were
21    some generic manufacturers that have
22    identified that they might have had NDMA
23    even at the time that some of these
24    bioequivalence studies were conducted.
25  BY MR. VAUGHN:

Confidential Information Subject to Protective Order

Page 94

1  Q.  Did you refute --
2  A.  And it --
3  Q.  Sorry.
4  A.  -- doesn't matter.  No.  I was
5  just going to say it doesn't matter, because it's
6  not going to have any effect on the bioequivalence
7  anyway.
8  Q.  Did you review any documents that
9  indicated that any of the drug products tested in
10  these bioequivalency studies were actually
11  contaminated with nitrosamines?
12  A.  I have -- I have seen no such
13  documents, no.
14  MR. VAUGHN:  Why don't we go off
15  the record.
16  THE VIDEOGRAPHER:  The time is
17  now 11:53 a.m.  We are off the record.
18  (Lunch recess observed.)
19  THE VIDEOGRAPHER:  The time is
20  12:38 p.m.  We're back on the record.
21  BY MR. VAUGHN:
22  Q.  Welcome back, Dr. Bottorff.
23  MR. VAUGHN:  Melisha, can we pull
24  up the 2011 FDA Guidance for Submission
25  of Summary Bioequivalence Data for

Page 95

1  ANDAs?
2  And this will be Exhibit 4.
3  (Exhibit 4 was marked.)
4  BY MR. VAUGHN:
5  Q.  All right.  Have you reviewed
6  this document previously, Dr. Bottorff?
7  A.  Yes, I have.
8  MR. VAUGHN:  Melisha, can we go
9  to PDF page 4?  It's page 1 at the
10  bottom of the document.
11  BY MR. VAUGHN:
12  Q.  All right.  I'm looking at line
13  19.  Actually, it starts on line 18.  Do you see,
14  Doctor, where it says:  "FDA's final rule on
15  requirements for submission of bioequivalence data
16  requires an ANDA applicant to submit data from all
17  bioequivalence studies the applicant conducts on a
18  drug product formulation submitted for approval,
19  including studies that do not demonstrate that the
20  generic product meets the current bioequivalence
21  stamp criteria"?
22  A.  I see that.
23  Q.  And at the top of this document,
24  it does say that the document contains nonbinding
25  recommendations, but the sentence I just read has

Page 96

1  a citation down to the Final Rule:  "Requirements
2  for submission of bioequivalence data that was
3  published in the Federal Register on January 16th,
4  2009," correct?
5  A.  Correct.
6  Q.  And do you agree that an ANDA
7  applicant should submit all of their
8  bioequivalency studies, even studies which failed?
9  MR. FOWLER:  Objection:  Calling
10  for a regulatory opinion, outside the
11  scope.
12  THE WITNESS:  I can sit here and
13  read that the same as you can, but,
14  again, I -- I don't have opinions
15  on -- on regulatory issues.
16  BY MR. VAUGHN:
17  Q.  And so you also don't have an
18  opinion on if they're supposed to submit failed
19  bioequivalency studies that happened after the
20  submission of their ANDA?
21  MR. FOWLER:  Same objection.
22  THE WITNESS:  Yeah.  Again, I
23  have no opinion on that.
24  MR. VAUGHN:  All right.  Melisha,
25  let's go to the -- the FDA's 2021 Draft

Page 97

1  Guidance now.
2  And this will be Exhibit 5.
3  (Exhibit 5 was marked.)
4  BY MR. VAUGHN:
5  Q.  Doctor, is this the 2021 Guidance
6  that you were referencing earlier in this
7  deposition?
8  A.  Yes.  It's the one that I said
9  I'd also seen.  It existed in a -- in a draft
10  format.
11  MR. VAUGHN:  Go to PDF page 8,
12  Melisha.  It's going to be page 5 at the
13  bottom.  And it might be PDF page 9.
14  MR. FOWLER:  So let me just have
15  a running objection to the relevance of
16  this 2021 Guidance to this case, so I
17  don't interrupt you.
18  BY MR. VAUGHN:
19  Q.  All right.  Doctor, on line 147
20  where it says:  "If a drug product is intended for
21  use in both sexes, the applicant should include
22  similar proportions of males and females in the
23  study or provide a justification supporting the
24  use of a single-sex population."
25  Why is that?

Confidential Information Subject to Protective Order

1    MR. FOWLER:  Objection, calls for
2  a regulatory opinion.
3    Go ahead, to the extent you can
4  answer.
5    THE WITNESS:  Yeah, I -- I don't
6  know why, but I know it's done.  On my
7  CV, I don't know if it was noted or not,
8  but I've been added to a National
9  Investigational Review Board for a
10  company called Advarra.  And we review
11  Phase 1 protocols on a weekly basis from
12  a variety of pharmaceutical companies,
13  and I can tell you that the vast
14  majority of them have about an equal
15  number of males and females.
16    Provided, there's all kinds of
17  stipulations about making sure that it's
18  females either of nonchild-bearing
19  potential or who have some of the -- the
20  highest level of -- of pregnancy
21  prevention techniques in place.
22  BY MR. VAUGHN:
23    Q.   And designing a bioequivalency
24  study like this with -- using both sexes, is that
25  something that's new as of 2021, or does that date

1  back before 2021?
2    A.   I, again, can't tell you when
3  that started, but I know it's being practiced as
4  of today.  Since I've been on that IRB, I've seen
5  numerous trials come through that are practicing
6  this standard.
7    Q.   And you testified that you've
8  done bioequivalency studies dating all the way
9  back to college, correct?
10    A.   Yes.
11    Q.   And in those bioequivalency
12  studies, was there a fairly equal number of males
13  and females in the studies?
14    A.   There were not.  And that was,
15  like, 1982-1983.  So it was a fair number of years
16  ago.
17    Q.   And do you have any idea when
18  that started to change, that they were
19  recommending to use equal numbers of male and
20  females in the study?
21    MR. FOWLER:  Asked and answered.
22    THE WITNESS:  I -- I do not.
23  BY MR. VAUGHN:
24    Q.   And you do not know why that's
25  recommended?

1    A.   I'm not sure.  I -- I really
2  don't know.  Maybe to broaden the populations of
3  people that get exposed to the early phases of
4  drug development.
5    Q.   In a drug like valsartan, it is
6  given to both males and females, correct?
7    A.   Well, if the females aren't
8  pregnant.  There's a Black Box Warning:  Do not
9  give it to pregnant females.
10    Q.   And so is that one reason that
11  you'd want to have both sexes in your studies, is
12  so you understand how it works in both males and
13  females?
14    MR. FOWLER:  Form.
15    THE WITNESS:  Again, I don't know
16  what led to a change, and I don't know
17  when the change occurred.
18  BY MR. VAUGHN:
19    Q.   Line 153, it notes:  "If a drug
20  product is prom- -- predominantly intended for the
21  use in the elderly, the applicant should include
22  as many subjects as possible at or above age 60."
23    Do you know why that's
24  recommended?
25    A.   I'm assuming for what it actually

1  says in that sentence, if it's predominantly
2  intended to be used in the elderly.
3    Q.   Do elderly metabolize drugs
4  differently than young people?
5    A.   Again, much like the previous
6  question about cirrhosis, it's -- it's not a
7  given.  There are many, many studies that I've
8  seen over the years of my career where the
9  pharmacokinetics, and therefore the bioequivalence
10  of a drug, were not altered just by being older.
11  It's more likely the pharmacodynamics that change,
12  sensitivity to the heart rate adjustments
13  or -- it's more the pharmacodynamic end points
14  that change with -- with aging, not so much the
15  pharmacokinetic end point.  Sometimes.  Sometimes
16  it does.  It's not a blanket statement
17  that -- that fits all.
18    Q.   So it sometimes does.
19    Would that be a reason you'd want
20  to actually test it in the population the drug is
21  being given to?
22    A.   Well, I mean, that's one reason.
23    Q.   Can you give me additional
24  reasons?
25    A.   Well, maybe, like I said, because

Confidential Information Subject to Protective Order

Page 102

1 they're sensitive, and so you might want to do
2 studies with lower doses, if you didn't do
3 bioequivalence studies with lower doses before.
4          Q.    In your opinion, what's the
5 average age of a valsartan user?
6          MR. FOWLER:  Objection:  Form
7 speculation.
8          THE WITNESS:  I -- I could not
9     even come close to what the right answer
10    would be, but I can tell you when you
11    look at the FDA-approved indications for
12    hypertension, heart failure and
13    postmyocardial infarction, those are not
14    going to be 18-year-olds, 20-year-olds,
15    25-year-olds.  They're going to be 50-,
16    60-, 70-year-olds.
17 BY MR. VAUGHN:
18          Q.    And then looking at line 169, it
19 reads:  "In such situations, applicant should
20 attempt to enroll patients for whom the drug is
21 intended to treat and whose disease process and
22 treatments are stable for the duration of the
23 study."
24          Do you see that, Doctor?
25          A.    Yes.

Page 103

1          Q.    Do you agree with that statement?
2          A.    Well, not in isolation without
3 the sentence before it.  Because in some
4 situations, the drug has a safety consideration
5 that would preclude its use in healthy subjects.
6 So I'm thinking -- what jumps out at me at that
7 point are new cancer drugs.
8          Q.    Would --
9          A.    You would only want to test those
10 in patients with stable cancer.
11          Q.    Thank you for that clarification.
12          Now, when it applies to
13 valsartan, would there be any reason why it should
14 not be tested in the patient population it's
15 intended to treat?
16          MR. FOWLER:  Objection:  Form,
17 mischaracterizing.
18          THE WITNESS:  And I -- I don't
19    think -- again, I think this starts
20    getting into a realm of -- of
21    regulatory, but I don't think the
22    companies who did bioequivalence testing
23    in younger, healthy, normal volunteers
24    was anything other than what the FDA
25    expected to see.

Page 104

1 BY MR. VAUGHN:
2          Q.    And you see the next line, it
3 says:  "Investigational New Drug Application may
4 be required for certain products (such as
5 cytotoxic products.)"  And then it cites to 21 CFR
6 312.2(c).
7          Do you see that, Doctor?
8          A.    Yes.
9          Q.    Were you aware of that?
10          A.    Well, I've previously read this,
11 but -- so, yes, I was aware of it.
12          Q.    What is an Investigational New
13 Drug Application?
14          A.    That's for a drug that's never
15 been given to humans, and so you're looking to get
16 approval to start testing in humans.
17          Q.    Is valsartan cytotoxic?
18          A.    No.
19          Q.    Is NDMA cytotoxic?
20          MR. FOWLER:  Form.
21          THE WITNESS:  I -- I don't
22    believe so, in what the definition of
23    cytotoxic is, to my recollection.  I
24    think of cytotoxic as either antibiotics
25    that are cytotoxic to an organism or

Page 105

1     cancer drugs that are cytotoxic to
2     cancer cells.
3 BY MR. VAUGHN:
4          Q.    What is your definition of
5 cytotoxicity?
6          A.    It's a drug that kills cells.
7 And we're talking here about active ingredient, so
8 it's an active ingredient whose intent for use is
9 cytotoxicity.
10          MR. VAUGHN:  All right.  If we
11    can go to page 22 at the bottom,
12    Melisha.  I'm not sure what PDF page it
13    is.
14 BY MR. VAUGHN:
15          Q.    All right.  I'm looking at the
16 line 846, Handling of Outliers.  Doctor, you see
17 this first sentence says:  "Applicant should not
18 remove data from the statistical analysis of
19 bioequivalency studies solely because that data
20 are identified as statistical outliers."
21          Do you agree with that statement?
22          A.    Well, yes, it's in the FDA
23 document.
24          Q.    And you agree that a manufacturer
25 shouldn't remove statistical outliers even before

Confidential Information Subject to Protective Order

Page 106

1 2021, right?
2      A.     Again, the way in which the data
3 are handled can vary.  Some of this is relating to
4 the fact that some patients or subjects will later
5 to [sic] be found to have some reason for it, and
6 some of that could be biologic.  I mean, I don't
7 know the details behind it.  Starts getting into a
8 statistical handling of the data.
9            That's not really what I -- what
10 I've done.
11      Q.     You have not done a statistical
12 handling of the data of any of these
13 bioequivalency studies?
14      A.     The kind that are down below in
15 870, I have, but not removal of outliers, I've
16 not.
17      Q.     Did you notice in any of the
18 bioequivalency studies that you reviewed that the
19 manufacturer removed outliers?
20      A.     Never saw any reference to that
21 at all.
22      Q.     Then going to line 854, it notes
23 that: "Data from redosing studies are not
24 considered as evidence to support removal of
25 outlier data from the statistical analysis.  Note

Page 107

1 that all subject data should be submitted and
2 potential outliers flagged with appropriate
3 documentation as part of the submission."
4            And you agree with that as well,
5 correct, Doctor?
6      A.     Yes, it's -- it's in their
7 document.
8            MR. VAUGHN:  Let's pull up the
9      depo notice, Melisha.
10           It's going to be Exhibit 6.
11           (Exhibit 6 was marked.)
12 BY MR. VAUGHN:
13      Q.     Have you seen this document
14 before, Dr. Bottorff?
15      A.     Yes, I have seen it.
16      Q.     When was this document given to
17 you?
18      A.     I believe it was forwarded the
19 day -- well, I don't know in relation to when it
20 was received by -- by GT, but I received it in an
21 e-mail probably earlier this week.
22      Q.     And did you help GT in responding
23 to this document request?
24      A.     We went through it line-by-line
25 or -- or paragraph-by-paragraph, and I was asked

Page 108

1 what I had in relation to these document requests,
2 and I either provided answers or what was
3 requested.
4      Q.     Approximately how many documents
5 did you send to GT in relation to this document
6 request?
7            MR. FOWLER:  Objection:  Form,
8      vague, time frame.
9            THE WITNESS:  Well, I mean, if
10     you want to go through one-by-one....
11     But in No. 1, I did not send invoices
12     because they had them already.
13 BY MR. VAUGHN:
14      Q.     Oh, Doctor, I just mean in total,
15 if that helps you.  Just cuts the time up.
16           MR. VAUGHN:  What's your
17     objection?
18           MR. FOWLER:  You said -- you mean
19     in total.  You mean a total of documents
20     in re- -- sent in response to all 15
21     requests?  I don't understand --
22           MR. VAUGHN:  Yeah, that's exactly
23     what I'm asking.  Yeah.  Out of all the
24     documents requested --
25           MR. FOWLER:  As opposed to

Page 109

1 counting?
2            MR. VAUGHN:  -- in this document,
3      I asked him approximately, how many he
4      sent to GT.
5            THE WITNESS:  I'm running down to
6      see.  I have my recollection in my head,
7      but I wanted to look at each of the
8      points to make sure that I didn't miss
9      something.  But the only thing that I
10     had that I could give were the notes
11     that I was under the impression were
12     sent to you.
13           I had no PowerPoints.  I had no
14     tables and charts.  I had no books.  Any
15     of the other things that were requested
16     here, I didn't have any- -- anything to
17     provide.
18 BY MR. VAUGHN:
19      Q.     Your notes were produced to us.
20 I do appreciate you getting those to the Defense
21 attorneys.  And it was both the notes for the
22 general causation expert report you did and the
23 class action expert report you did.
24           Had you previously given GT's
25 Defense attorneys your notes for the general

Confidential Information Subject to Protective Order

---

Page 110

1  causation expert report?

2      A.    Yes, I had.

3      Q.    And when was that?

4      A.    I'm assuming in response to the

5  exact same kind of document prior to the

6  deposition for -- for the general causation.

7          MR. FOWLER:  They were provided

8      to you at the time of the general

9      causation deposition, Mr. Vaughn.

10         MR. VAUGHN:  Did I say they

11     weren't?

12         MR. FOWLER:  Your question

13     suggested otherwise, but I just want to

14     be clear on this record.

15  BY MR. VAUGHN:

16     Q.    Doctor, are you aware that the

17  Defense produced 16,632 documents 48 hours ago for

18  your reliance materials?

19     A.    No.  The -- when you combine my

20  reliance materials from the first phase of

21  litigation in this phase, there's a lot of -- a

22  lot of articles that have been looked at and read

23  and a lot of multipage documents, like the

24  Guidance for Industry that we looked at a while

25  ago.  So did I do a head count of those?  No, I

---

Page 111

1  didn't.

2      Q.    And I'm not talking about pages.

3  I mean documents.  They produced 16,632 documents.

4  You think you have reviewed somewhere close to

5  16,000 documents in relation to this litigation?

6      A.    Whatever was sent to you were

7  things that I reviewed.  Some in more detail than

8  others.

9      Q.    And how was that determined that

10  you had reviewed those documents?

11         MR. FOWLER:  Form.

12         I don't understand the question.

13         THE WITNESS:  I'm not sure I do

14     either, other than if they were

15     documents that -- that I told attorneys

16     that I had looked at or sent to them in

17     a PDF form, along with I read

18     depositions of -- of Plaintiffs'

19     and -- and Defense experts.  I read

20     reports from Plaintiff and -- and

21     Defense experts.  I'm not sure what to

22     tell you other than we didn't just, you

23     know, randomly select things and throw

24     them on there just to make a number look

25     unbelievable.

---

Page 112

1  BY MR. VAUGHN:

2      Q.    And 16,632 sounds kind of

3  unbelievable, doesn't it?

4          MR. FOWLER:  Form.

5          THE WITNESS:  Not to me, if

6      that's what's on there.  I didn't count

7      them.

8  BY MR. VAUGHN:

9      Q.    And so you believe that you've

10  identified or sent 16,000 documents to the Defense

11  attorneys?

12         MR. FOWLER:  Mischaracterizing.

13         THE WITNESS:  Again, what got

14     sent to you, I have a copy of.  I

15     haven't counted the files.  I mean, I

16     don't -- I don't know.

17         MR. VAUGHN:  Melisha, let's pull

[redacted]

---

Page 113

1          All right.  Doctor, have you ever

2  seen this document before?

3      A.    Can you scroll down, please?

4      Q.    Yeah.  And you can also download

5  it if you would like to review the entire

6  document, Dr. Bottorff.

7      A.    I'm sorry.  They're -- they're

8  printing it.

9      Q.    Okay.  Let's go ahead and go off

10  the record, and you just let us know when you're

11  finished reviewing it.

12         MR. FOWLER:  Please, no.

13     It -- it's right here.  It's right here.

14     We don't need to go off the record.

15         MR. VAUGHN:  Oh, okay.  I thought

16     you might want time to review it.

17         MR. FOWLER:  He'll still need

18     time to review the document.  It's eight

19     pages, just looking through it, to

20     answer your question.

21         THE WITNESS:  I'm looking for a

22     date.

23  BY MR. VAUGHN:

24     Q.    I can let you know that there is

25  no date on this document, but the metadata

---



Page 114

Page 116

14   BY MR. VAUGHN:
15       Q.    Well, setting this document
16   aside, do you agree that an ANDA that includes
17   unreliable data developed at a tainted facility is
18   not and never was substantially complete?
19           MR. FOWLER:  Objection.  You're
20       calling for a regulatory opinion.
21       You've already asked the doctor if he
22       has those.
23           THE WITNESS:  Yeah, that looks
24       like a regulatory thing that I'm not
25       offering opinions on.  I don't know what

Page 115

Page 117

1    constitutes, in the FDA's mind, a
2    tainted facility and -- and what level
3    of taint they're talking about and what
4    should happen as a result of that.
5    I -- I'm -- I'm not offering any
6    opinions on those.
7            MR. VAUGHN:  All right, Melisha
8        let's go to page 3.  Two pages later.
9    BY MR. VAUGHN:

Confidential Information Subject to Protective Order



Page 118

¹⁷ BY MR. VAUGHN:
¹⁸     Q.    So, Doctor, if a bioequivalency
¹⁹ study is -- if the manufacturer is deleting the
²⁰ failed test results and retesting the samples
²¹ until it achieves the results it sought, would you
²² consider those bioequivalence studies to be
²³ legitimate?
²⁴         MR. FOWLER:  Objection, form.
²⁵         THE WITNESS:  Again, this

Page 119

¹     is -- this is all regulatory.  I have no
²     opinion on the regulatory.
³ BY MR. VAUGHN:
⁴     Q.    Did you not evaluate the
⁵ legitimacy of the bioequivalency studies that you
⁶ opined on?
⁷     A.    Yes, and they had approved ANDAs.
⁸ So they're in a different ball park than what this
⁹ is.
¹⁰     Q.    Did you evaluate the underlying
¹¹ studies of the bioequivalency studies to see if
¹² any -- scratch that.
¹³         Did you evaluate the underlying
¹⁴ data of the bioequivalency studies to see if
¹⁵ failed testing was deleted and retested until it
¹⁶ got an accurate result and then submitted the
¹⁷ accurate results to the FDA?
¹⁸     A.    Again, as I testified this
¹⁹ morning, I only saw one instance of what was a
²⁰ failed test result, and it was included.  My only
²¹ exposure to that was what I testified to this
²² morning.
²³     Q.    So you've seen one failed test
²⁴ result.  Have you seen any indication of companies
²⁵ retesting samples until they get a different

Page 120

¹ result?
²     A.    Other than what you just handed
³ me, no.
⁴     Q.    And if the companies in this
⁵ litigation were doing that with their
⁶ bioequivalency studies, would you consider those
⁷ studies to be illegitimate?
⁸         MR. FOWLER:  Objection:  Form,
⁹ outside the scope.
¹⁰         THE WITNESS:  Again, that's a
¹¹ regulatory, and -- and I have no
¹² evidence that that occurred or didn't
¹³ occur, either way.
¹⁴ BY MR. VAUGHN:
¹⁵     Q.    Not from a regulatory side, from
¹⁶ a just statistics side from when it comes to a
¹⁷ bioequivalency study and the legitimacy of it.  Do
¹⁸ you consider a bioequivalency study legitimate if
¹⁹ they retested the samples until they got the
²⁰ desired results?
²¹         MR. FOWLER:  Objection:  Form,
²² scope, incomplete hypothetical.
²³         THE WITNESS:  Again, the one
²⁴ instance that I saw, there was a failed
²⁵ bioavailability study.  They

Page 121

¹ reformulated and passed, and I saw both
² examples.  There was no attempt -- you
³ know, no sixth time or ten-time attempt
⁴ or multiple attempts.  It was a one-time
⁵ reformulation, and it led to an approved
⁶ ANDA.
⁷         MR. VAUGHN:  Let's go to page 5,
⁸ Melisha.
⁹ BY MR. VAUGHN:

Confidential Information Subject to Protective Order



Page 122

BY MR. VAUGHN:

Q.   Did you look into where the bioequivalency studies were done for the various manufacturers?

A.   Yes.  Most of the time that -- that location was -- was provided in the summary reports, or in some cases in the individual patient, what they call Case Report forms, where -- all of their height and weight and lab values and, you know, side-effect monitoring.  You know, all that was done on a form that was specific for the facility that conducted the bioequivalence study.

Q.   Do you recall any of the facilities that conducted the bioequivalency studies?

A.   Not specifically.  I -- I can tell you that there were some that were in India, and I do recall that there was one in North Dakota.

Q.   Do you recall if either of those companies or facilities had been cited for data

Page 123

integrity violations?

A.   I have no idea.

Q.   Did you not look into that in forming your opinions in this report?

A.   I did not look into that.  Again, these -- these were approved ANDAs.  So whatever the FDA determined from the sites where those data were submitted, the FDA approved that.

Q.   And the FDA can only base their decision off of what was provided to them in the ANDA, correct?

A.   I'm assuming so.

Q.   And if there are data integrity issues in the submission, how is the FDA supposed to identify that?

MR. FOWLER:  Objection:  Form, incomplete hypothetical.

THE WITNESS:  Again, I think it starts spilling into regulatory, what the FDA uses as information to decide what they will do next.  But I think if they invalidated an ANDA, they would pull the drug.

BY MR. VAUGHN:

Q.   And so if there's shown that

Page 124

there are data integrity issues with the studies submitted in the company's ANDA and the FDA becomes aware of it, they can pull the ANDA, correct?

MR. FOWLER:  Objection:  Form, scope, regulatory opinion.

THE WITNESS:  Again, I -- I think it's a regulatory opinion, so I can only conjecture.  But that would -- that would be what would make sense to me.

Page 125

Confidential Information Subject to Protective Order



Confidential Information - Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information for Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order





Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Page 162

Page 164

Page 163

Page 165

4        MR. VAUGHN:  Let's go to RO-MDL-
5    2875-0026534.

Confidential Information Subject to Protective Order





Confidential Information Subject to Protective Order



Page 174

Page 176

1    This will be Exhibit 19.

2    (Exhibit 19 was marked.)

3    MR. VAUGHN:  And if we can scroll

4  down a little bit -- it's about

5  two-thirds of the way down.

6  BY MR. VAUGHN:

7    Q.    Doctor, do you see where it says:

8  The pieces of the company, left after bankruptcy,

9  did business as PRACS and returned to the home and

10  the home of one of the legacy companies that had

11  formed Cetero, C-e-t-e-r-o.

12    Have you ever heard of Cetero

13  before?

14    A.    I'm not sure.

15    Q.    If I represent to you that Cetero

16  is who acquired PRACS, do you have any reason to

17  disagree with that?

18    A.    No I have no reason to disagree

19  with that.  Like I said, I thought they were

20  bought out or relocated or something.  But that's

21  about all I knew.

22    MR. FOWLER:  Let me object to

23  relevance of this document and line of

24  questioning.

25    MR. VAUGHN:  I'll make it

Page 175

Page 177

1  relevant real quick for you.

2    Let's go to the FD- -- the FDA

3  letter to Cetero Research, Melisha.

4    This will be Exhibit 20.

5    (Exhibit 20 was marked.)

6  BY MR. VAUGHN:

7    Q.    All right.  Doctor, you see this

8  is a letter from the FDA to Cetero Research?

9    A.    I see that.

10    MR. FOWLER:  I'm going to object

11  to the document and any hearsay

12  contained in the document.

13  BY MR. VAUGHN:

14    Q.    Have you ever seen this document

15  before, Doctor?

16    A.    No.

17    Q.    All right.  That first paragraph

18  towards the bottom, do you see where it says:  FDA

19  investigators have identified significant

20  violations of the bioavailability and

21  bioequivalence requirements of Title 21 Code of

22  Federal Regulations Part 320?

23    A.    I see that.

24    Q.    Do you see where the FDA goes on

25  to say that these violations include widespread

Page 178

1 falsification of dates and times in laboratory
2 records and subject sample extractions and the
3 apparent manipulation of equilibrium samples to
4 meet predetermined accepted criteria?
5         MR. FOWLER: Objection: Hearsay,
6     relevance to anything we're talking
7     about here.
8         THE WITNESS: Yeah, I see that.
9         MR. VAUGHN: All right. Let's go
10    to the next page, Melisha. All right.
11    Second paragraph, the last sentence.
12 BY MR. VAUGHN:
13    Q.   Do you see where the FDA says:
14 "The Complainant was aware that many of the
15 chemists were manipulating and falsifying data
16 associated with the samples being used within
17 various projects"?
18        MR. FOWLER: Hearsay. A double
19    layer of hearsay.
20        THE WITNESS: I see that.
21        MR. VAUGHN: Let's go to page 5,
22    Melisha.
23 BY MR. VAUGHN:
24    Q.   All right. That first paragraph
25 under No. 2, do you see where they are -- the FDA

Page 179

1 notes that there were frequent alterations in
2 laboratory records that occurred over a four-year
3 period from April 1st, 2005 through June 15th,
4 2009?
5         MR. FOWLER: Objection: Facts
6     not in evidence, hearsay.
7         THE WITNESS: I see it.
8 BY MR. VAUGHN:
9    Q.   And do you recall the previous
10 bioequivalency studies that we looked at from
11 Mylan were within this date range?
12    A.   They were within that date range.
13    Q.   And the company conducting their
14 bioequivalency studies is the company that the FDA
15 is saying has frequent alterations in their
16 laboratory records?
17        MR. FOWLER: Objection: Form,
18    hearsay, facts not in evidence.
19        THE WITNESS: Yeah, I don't see
20    which studies it applies to, but I see
21    that.
22 BY MR. VAUGHN:
23    Q.   All right.
24        MR. VAUGHN: Let's go down to the
25    fourth paragraph, three lines up from

Page 180

1 the bottom.
2 BY MR. VAUGHN:
3    Q.   Do you see where the FDA says
4 that this calls into question the validity of all
5 of the information documented on your AP sheets
6 including study results that were used as a basis
7 for NDAs and ANDAs submitted to the FDA?
8         MR. FOWLER: Form, relevance,
9     hearsay.
10        THE WITNESS: I mean, yes, I see
11    that.
12        MR. VAUGHN: And let's go to the
13    next page, Melisha.
14 BY MR. VAUGHN:
15    Q.   And under the heading
16 Manipulation of Samples, do you see where it says:
17 "FDA has determined that your firm manipulated
18 test samples in order to meet predetermined
19 acceptance criteria"?
20        MR. FOWLER: Form, lack of
21    foundation, facts not in evidence,
22    relevance.
23        THE WITNESS: I see that.
24        MR. VAUGHN: And let's go to
25    page 10, Melisha.

Page 181

1 BY MR. VAUGHN:
2    Q.   And do you see where the FDA, on
3 the second paragraph, notes they have significant
4 concerns of all data relevant to FDA-regulated
5 research?
6    A.   At the Houston facility, yes.
7    Q.   And --
8    A.   My recollection is we talked
9 about Minneapolis and North Dakota, not Houston.
10    Q.   So it's your opinion that just
11 the Houston office was manipulating data for this
12 company?
13        MR. FOWLER: Objection: Form,
14    mischaracterizing, lack of foundation,
15    facts not in evidence.
16        THE WITNESS: It's not my
17    testimony. It's what's in the letter
18    that you just provided me.
19        MR. VAUGHN: And let's go to
20    page 11, Melisha.
21 BY MR. VAUGHN:
22    Q.   And this was signed by the FDA's
23 Chief of Bioequivalence Investigations branch,
24 correct?
25    A.   Well, I don't see a signature,

Page 182

1  but....
2       Q.    The name and the position of the
3  person at the end of the letter is the FDA's Chief
4  of Bioequivalence Investigations branch, correct?
5            MR. FOWLER:  Object to the
6       mischaracterization of that being a
7       signature.
8            MR. VAUGHN:  Oh, you're right.
9  BY MR. VAUGHN:
10      Q.    Signature is the Office of
11  Scientific Investigations and Office of Compliance
12  for the Centers of Drug Evaluation and Research,
13  U.S. FDA, Food & Drug Administration, correct?
14      A.    Yes, I see the -- the listing of
15  those people's names and their positions there.
16           MR. VAUGHN:  All right, Melisha,
17      let's go to Teva ANDAs Withdrawn over
18      Cetero Data document.  Let's go to the
19      second page.
20           This will be Exhibit 21.
21           (Exhibit 21 was marked.)
22  BY MR. VAUGHN:
23      Q.    That top paragraph, Doctor, do
24  you see where it says:  After a six-year effort,
25  the U.S. FDA has run out of patience with Watson

Page 183

1  Laboratories and InvaGen Pharmaceuticals and is
2  moving to withdraw approval of two of their pr- --
3  abbreviated new drug applications because the
4  firms failed to conduct additional bioequivalence
5  studies for the products the companies' ANDAs were
6  supported by, bioequivalence studies conducted at
7  Cetero Research?
8            MR. FOWLER:  Objection:  Hearsay,
9       lack of foundation, facts not in
10      evidence, relevance.
11           THE WITNESS:  I see that.
12  BY MR. VAUGHN:
13      Q.    Are you aware that Watson is now
14  Teva?
15      A.    I'm aware that -- now how
16  to -- how to -- how to word who's what, but I
17  think they either bought Watson or incorporated
18  Watson or something.
19           Which -- which ANDAs were
20  withdrawn?  Were they the ones I'm talking about
21  or other ANDAs?
22      Q.    They're ANDAs that used the same
23  contract research organization to do their
24  bioequivalency studies.
25      A.    Well, again, the -- the data that

Page 184

1  you showed me was concerned about the Houston
2  facility.  The ANDAs that I cited were done in
3  North Dakota and Minneapolis, No. 1; and then
4  secondly, it looks like the ANDAs that were
5  withdrawn were not the ones that I reported in --
6  in my report.
7            So I think if the FDA had had a
8  problem with those in those other facilities, then
9  they would have withdrawn those like they did
10  these.
11      Q.    And you see here it took the FDA
12  six years before they withdrew it, correct?
13           MR. FOWLER:  Form.
14           THE WITNESS:  I -- I mean,
15      whatever it says, that's what it says,
16      but I'm saying it didn't involve the
17      ANDAs that I reported on.
18  BY MR. VAUGHN:
19      Q.    But it did involve the contract
20  research organization that did the studies for the
21  ANDAs you reported on, correct?
22      A.    Correct.  Except not in the
23  facility that was cited.  In the other facilities
24  that was not cited.
25      Q.    My headset just made a noise that

Page 185

1  it's low on batteries.
2            MR. VAUGHN:  Can we go off the
3       record real quick, just take a
4       five-minute break?
5            THE VIDEOGRAPHER:  The time is
6       now 2:45 p.m.  We're off the record.
7            (Brief recess observed.)
8            THE VIDEOGRAPHER:  The time is
9       2:53 p.m.  We're back on the record.
10           MR. VAUGHN:  All right, Melisha,
11      can we now pull up

Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



14      Q.    Okay.  All right.

Confidential Information Subject to Protective Order





15   Q.   Thank you, Doctor.

Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Page 214

Page 216

Page 215

Page 217

16      MR. VAUGHN:  All right, Melisha,
17  let's go to EMA Press Release regarding
18  GVK Biosciences.
19      This will be Exhibit 31.
20      (Exhibit 31 was marked.)
21      MR. FOWLER:  Let me just lodge an
22  objection to the EMA exhibit having
23  nothing to do with products sold in the
24  U.S.; relevance and hearsay.
25      Go ahead.

Confidential Information Subject to Protective Order

Page 218

1  BY MR. VAUGHN:
2      Q.   Doctor, have you ever seen this
3  May 22nd, 2015 notice by the EMA?
4      A.   No.
5      Q.   Do you see where the EMA is
6  suspending medications over flawed studies done by
7  GVK Biosciences in India?
8      A.   I do see that.  I -- I also see
9  later: "There's no evidence of harm or lack of
10 effectiveness of any of the medicines linked to
11 studies conducted by GVK."
12     Q.   Were nitrosamines impurities in
13 valsartan known in 2015?
14     A.   I don't know.
15     Q.   The third paragraph, do you see
16 where EMA is discussing that GVK Biosciences
17 manipulated data regarding generic medications
18 over a period of the last five years?
19         MR. FOWLER:  Objection to form,
20     hearsay, lack of foundation, facts not
21     in evidence.
22         THE WITNESS:  Which page are we
23     on?
24 BY MR. VAUGHN:
25     Q.   On the first page, third

Page 219

1  paragraph.
2      A.   Three?  Yeah, I see that.
3      Q.   And the EMA then goes on to say:
4  "Their systemic nature and extended period of time
5  during which they took place and the number of
6  members of staff involved cast doubt on the
7  integrity of the conduct of trials at the site
8  generally, and on the reliability of data
9  generated."
10         Did I read that correctly,
11 Doctor?
12         MR. FOWLER:  Objection:  Hearsay,
13     lack of foundation, facts not in
14     evidence, and relevance to medicines not
15     sold in the U.S.
16 BY MR. VAUGHN:
17     Q.   Now, Doctor, GVK Biosciences in
18 India was doing bioequivalency studies for these
19 companies that were selling in the U.S., correct?
20         MR. FOWLER:  Objection:  Form,
21     foundation, facts not in evidence.
22         THE WITNESS:  Yes, we did see
23     that in some previous documentation that
24     -- that we reviewed.
25 BY MR. VAUGHN:

Page 220

1      Q.   And GVK Biosciences was doing
2  those bioequivalency tests for Defendants in this
3  litigation over the time period referenced in this
4  letter, correct?  Over the last five years, as of
5  2015, e-mails; so between 2010 and 2015, correct?
6          MR. FOWLER:  Objection:  Form,
7      foundation.
8          THE WITNESS:  Yes.  But, again,
9      you know, they go on to say:  "There's
10     no evidence of harm or lack of
11     effectiveness, and patients should
12     continue to take their medicines as
13     prescribed."

Page 221



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order

Page 230



20        MR. VAUGHN:  All right.  Melisha,
21   let's pull up Bottorff 0001.
22        This will be Exhibit 33 [sic].
23        (Exhibit 34 was marked.)
24        THE VIDEOGRAPHER:  34, Counsel.
25        MR. VAUGHN:  34, thank you.

Page 231

1   BY MR. VAUGHN:
2        Q.    Doctor, are the -- these the
3   notes you took in preparation for your general
4   causation expert report?
5        A.    Yes.
6        MR. VAUGHN:  Melisha, can we go
7        to 11?  All right, C?  Do you see where
8        that's at, Melisha?  Yeah, paragraph.
9   BY MR. VAUGHN:
10        Q.    Doctor, what does the last
11   sentence of your notes say on that paragraph?
12        A.    "New active ingredient does not
13   equate to an int- -- contaminant."  This is not my
14   statement.  These are -- in this section of my
15   report, I was making notes on what was in the
16   original filing.  So it's a regurgitation of what
17   someone else who filed the -- the causation
18   lawsuit.  This isn't me making a statement.  It's
19   me regurgitating what was put by someone else in
20   the original lawsuit filed.
21        I even cite page 124, I think, in
22   that paragraph just above.  In the same paragraph,
23   but just above there.  So this isn't me.  This is
24   me quoting what was in the document I reviewed.
25        Q.    Okay.  And what about further

Page 232

1   down right below the very bottom where you note:
2   "FDA inactive ingredients database does not
3   involve contaminants which are covered under
4   chemical hazards," is that from a complaint?
5        A.    At this point, to put it into
6   context, I was talking about the FDA definition of
7   inactive versus an active ingredient, like I was
8   referring to a few minutes ago, where the active
9   ingredient is a drug product intended to furnish a
10   pharmacologic activity in the diagnosis, cure,
11   medication, treatment or prevention of disease.
12        Then there is an inactive
13   ingredient database.  And the FDA's inactive
14   ingredient database are for things like
15   excipients, methyl cellulose, mannitol, you know,
16   things that are used in the tableting process.  So
17   that inactive ingredient database does not include
18   contaminants.  That's under Chemical Hazards in
19   their database.
20        Q.    And why are you taking notes on
21   contaminants?
22        A.    Because the section of the report
23   or the original suit that was filed kept calling
24   the -- the valsartan products unapproved because
25   of the president [sic] -- presence of a

Page 233

1   contaminant.  So I was making notes about what the
2   FDA's definitions are in response to that portion
3   of the filing.
4        Q.    Is NDMA or NDEA chemical hazards?
5        A.    I don't know if they're under the
6   Chemical Database or not, but they're clearly
7   considered an impurity.
8        Q.    Are NDMA and NDEA chemicals?
9        A.    Chemicals.
10        Q.    What does the word "hazardous"
11   mean to you?
12        A.    Causing hazard.
13        Q.    What does "hazard" mean to you?
14        A.    Some form of hazard.  It's a very
15   broad definition.
16        Q.    So it's your position -- go
17   ahead.
18        A.    I'm sorry.  Just in my reports, I
19   never disagreed with the IARC definition of NDMA,
20   or NDEA for that matter, being a probable human
21   carcinogen, which is exactly the category that
22   they're listed in.  I've never disagreed with that
23   at all.  What I've always contended in both
24   reports, that it's an issue of how much and in
25   what form of intake.

Page 234

1    Q.   You don't disagree with the IARC
2  definition that NDMA or NDEA are probable human
3  carcinogens, but you dropped it from the second
4  version of your expert report?
5    A.   I dropped --
6    Q.   Is it --
7    A.   -- saying that I don't believe --
8  that I don't believe they are able to cause human
9  carcinogenesis in the route of administration and
10 at the doses or exposure levels that we're talking
11 about.
12   Q.   Is it -- in your opinion about
13 the drugs -- that when drugs are approved but that
14 they are contaminated -- scratch that.
15        Is it your position that a drug
16 is only contaminated when it reaches an unsafe
17 level of impurity or contaminant?
18        MR. FOWLER:  Objection to form.
19   You're outside the scope of the class
20   certification report, Counsel.  I'm
21   letting this go a little bit, but you're
22   -- you're far afield.
23        You need the question again,
24   Doctor?
25        THE WITNESS:  Yeah, if I'm

Page 235

1  expected to answer it, I would like to
2  hear the question again.
3        MR. VAUGHN:  Court Reporter?
4        THE COURT REPORTER:  Yes?
5        MR. VAUGHN:  I can reask it.
6        THE COURT REPORTER:  It's okay.
7  I can --
8        MR. FOWLER:  We'll hear -- we'll
9  hear it from the court reporter, please.
10       Go ahead.
11       THE COURT REPORTER:  Okay.
12       (The previous question was read
13  into the record as follows:  "You don't
14  disagree with the IARC definition that
15  NDMA or NDEA are probable human
16  carcinogens, but you dropped it from the
17  second version of your expert report?")
18       THE WITNESS:  And so, no, there
19  was no intent by, quote/unquote,
20  dropping it from my second report, which
21  was implying that it was done
22  intentionally, which it was not.  So I
23  still agree with the IARC classification
24  of being probable human carcinogens.  I
25  have -- I have no reason to disagree

Page 236

1  with that.
2        My point is in humans, I don't
3  believe they're carcinogenic in the
4  manner in which they are taken, which is
5  oral, at the levels of exposure, which
6  are in the low microgram quantities.
7  BY MR. VAUGHN:
8    Q.   And is it your position, then,
9  that the contamination has to reach an unsafe
10 level before it's actually considered a
11 contamination?
12       MR. FOWLER:  Objection, beyond
13   the scope of this report, Counsel.
14       Can you make any proffer how that
15   possibly relates to the class
16   certification report that he has filed,
17   or am I just missing something?
18  BY MR. VAUGHN:
19   Q.   Doctor, do you think these drugs
20 have any value?
21   A.   What I believe, which is in the
22 -- the rather lengthy Bioequivalence section of my
23 report, is that the bioequivalence, due to the
24 presence of NDEA or NDMA, is not altered and,
25 therefore, they produce the intended therapeutic

Page 237

1  benefit, whether it was lowering blood pressure or
2  managing heart failure or in a post-MI situation.
3        So, no, I don't believe they had
4  any loss of their therapeutic benefit.
5    Q.   Are you aware of it being illegal
6  to sell a drug with an unsafe level of
7  nitrosamines in them?
8        MR. FOWLER:  Objection to form.
9   By the very question, it called for a
10   legal conclusion.
11       MR. VAUGHN:  Please quit
12   interrupting.  You're -- you're coaching
13   him.  You've been coaching him the
14   entire deposition.
15       MR. FOWLER:  No, I'm not.
16       MR. VAUGHN:  These are improper
17   depositions.  We're going to reserve our
18   right for sanctions.
19       MR. FOWLER:  So the Court has
20   asked for specificity in objections,
21   which I've provided, and it's a proper
22   objection.  Asking him if something is
23   illegal asks for a legal conclusion.
24       MR. VAUGHN:  Do you not recall
25   the Court sanctioning you guys because

Confidential Information Subject to Protective Order

Page 238

1  you were objecting to "the document
2  speaks for itself" previously, which has
3  been one of your objections in this
4  deposition?  Do you recall that,
5  Counselor?
6         MR. FOWLER:  I'm not testifying,
7  Counsel.  Move on.
8  BY MR. VAUGHN:
9      Q.    Doctor, are you aware that it
10 would be illegal to sell a drug with unsafe levels
11 of nitrosamines in them in the United States?
12        MR. FOWLER:  Objection, form.
13        THE WITNESS:  And -- and my
14        answer is no, I do not have any opinion
15        on what becomes legal or illegal.  I
16        have no legal opinions in this case.
17 BY MR. VAUGHN:
18     Q.    If it would be illegal to sell
19 something in the United States, does it really
20 have any value?
21        MR. FOWLER:  Form.
22        THE WITNESS:  Again, I have no
23        opinions on legality.  My opinions were
24        on whether the bioequivalence was
25        violated by the presence of the

Page 239

1  impurities, and I do not believe that
2  and I believe they maintain their
3  therapeutic expected response.
4  BY MR. VAUGHN:
5      Q.    Based purely off of
6  bioequivalency studies that you reviewed that did
7  not involve nitrosamines in the drug product?
8      A.    I believe in answering that
9  question a few times before, I said that there's a
10 likelihood that some of the products did have
11 nitrosamine in them.  And if they did, it still
12 wouldn't have affected their bioequivalence, and
13 therefore their therapeutic response.
14     Q.    And you have no document to cite
15 to that they were likely contaminated at that
16 time?
17     A.    I have no document.  I've -- I've
18 previously stated that.
19     Q.    Do you have an understanding of
20 what it means for a drug to be adulterated?
21        MR. FOWLER:  Objection: Form,
22        outside the scope of this general --
23        this class action report.
24        THE WITNESS:  I have a -- basic
25        understanding because of my pharmacy

Page 240

1  training and background, but my
2  understanding of adulteration are
3  impurities that are outside the
4  manufacturing process, so during storage
5  or some other nonmanufacturing process
6  that results in adulteration.
7  BY MR. VAUGHN:
8      Q.    Transportation of the drug
9  product count, if it got contaminated during
10 transportation?
11     A.    I think that probably would fit
12 under that adulterated category, because it's not
13 part of the manufacturing process.
14     Q.    And do you know if any of the
15 Defendants are claiming that their product got
16 contaminated during transportation?
17     A.    Never seen such materials or
18 documentation.
19     Q.    Are you aware that if a drug is
20 contaminated, it's considered adulterated?
21        MR. FOWLER:  You're asking for a
22        regulatory opinion.  It's outside the
23        scope of this report.
24        THE WITNESS:  Yeah.  Again, I --
25        I don't have regulatory input.  That's

Page 241

1  -- that's not the nature of my report.
2  BY MR. VAUGHN:
3      Q.    As a pharmacist, do you have an
4  understanding that an adulterated drug is not
5  supposed to be sold to U.S. consumers?
6         MR. FOWLER:  Objection to form.
7         Again, outside the scope of the class
8         cert report and opinions therein.
9         THE WITNESS:  Again,
10        adulteration, I don't know is what we're
11        talking about here, but pharmacists
12        would not dispense a known adulterated
13        product.
14 BY MR. VAUGHN:
15     Q.    I have no further questions at
16 this time.
17        MR. FOWLER:  We'll take a few
18        minutes, and I've got some redirect.
19        Let's take ten.
20        THE VIDEOGRAPHER:  The time is
21        now 4:13 p.m.  We're off the record.
22        (Brief recess observed.)
23        THE VIDEOGRAPHER:  The time is
24        4:26 p.m.  We're back on the record.
25        EXAMINATION

Confidential Information Subject to Protective Order

Page 242

1 BY MR. FOWLER:
2    Q.    Dr. Bottorff, I'd like to show
3 you what I'm marking as Bottorff Exhibit 35.  And
4 -- which is Defendants' Responses and Objections
5 to Plaintiffs' Notice of Videotaped Oral
6 Deposition Michael Bottorff, Pharm.D.
7         (Exhibit 35 was marked.)
8 BY MR. FOWLER:
9    Q.    Handing you that.  Have you seen
10 that document before?
11   A.    Yes.
12   Q.    You've reviewed that with us?
13   A.    I did.
14   Q.    Okay.  Let me mark as Exhibit 36
15 your Curriculum Vitae, Doctor.
16        (Exhibit 36 was marked.)
17 BY MR. FOWLER:
18   Q.    Can you tell us whether that is
19 your -- your current CV?
20   A.    Yes.
21        MR. VAUGHN:  Real quick, Counsel.
22 Are these in the -- the folder for me to
23 access?
24        MR. FOWLER:  I believe so.
25        (Discussion off the record.)

Page 243

1         MR. FOWLER:  Oh, I see what he's
2 doing.  Sorry, Counsel.  I didn't
3 understand my -- my colleague.  He's --
4 he's load- -- loading those up.
5 BY MR. FOWLER:
6    Q.    Is that -- continuing on 36,
7 Doctor.
8         Does that CV include your more
9 recent appointment to what you referred to as the
10 IRB?
11   A.    Yeah, the Advarra IRB is on here.
12   Q.    Doctor, you were asked early on
13 in the deposition about your experience with
14 bioequivalency studies, and I believe you only got
15 as far as maybe in your first year of residency at
16 the University of Kentucky, or maybe undergrad.
17        Have you had other experience
18 working with, conducting, bioequivalency studies?
19   A.    Yeah.  When I first started
20 faculty at the University of Tennessee, that would
21 have been 1983, I was probably involved in and
22 analyzed and published maybe a dozen
23 pharmacokinetic-based bioavailability studies with
24 a variety of cardiovascular drugs.  And so those
25 are all publications that are -- that are in my

Page 244

1 CV.  So it went -- it went beyond just me being
2 involved in some bioequivalence studies in around
3 1982 or 1983, but probably the next ten years, I
4 did maybe a dozen more of those kinds of studies.
5    Q.    Doctor, do you recall some
6 questions towards the end of -- of the questioning
7 today with -- where you mentioned definitions of
8 FDA concerning active ingredients and inactive
9 ingredients.
10        Do you recall those questions?
11   A.    I do.
12   Q.    Let me mark Exhibit 37.  This is
13 21 CFR 314.3 Definitions.
14        (Exhibit 37 was marked.)
15 BY MR. FOWLER:
16   Q.    And if you'd take a look at that,
17 Doctor, and I'd ask you:  Does that document
18 contain FDA's definitions of those active
19 ingredient, inactive, things like that?
20   A.    Yeah.  This has -- I mean, it's
21 the -- it's the Code of Federal Regulations 314,
22 so they're in here.
23   Q.    Can you locate the Active
24 Ingredient definition and read it for the record,
25 please?

Page 245

1    A.    Let's see.  "Active ingredient is
2 any component that is intended to furnish
3 pharmacologic activities or other direct effect of
4 the diagnosis, cure, mitigation, treatment, or
5 prevention of disease, or to affect the structure
6 of function of the body in man or -- or animals,"
7 if it's veterinary products.
8         "The term includes those
9 components that may undergo chemical change in the
10 manufacture of the drug product and be present in
11 the drug product in a modified form intended to
12 furnish the specified activity or effect."
13        So it's an intended act or
14 ingredient.
15   Q.    Thank you.
16        And can you read Inactive
17 Ingredient, please?
18        MR. VAUGHN:  Steve?  Steve, I'm
19 still not seeing this document in the
20 exhibit folder.  I've refreshed it
21 several times.
22        MR. FOWLER:  Tim's working
23 vigorously.
24        MR. VAUGHN:  He's working on
25 dropping it in, is that what you said?

Confidential Information Subject to Protective Order

Page 246

1   MR. FOWLER:  Yeah.  He's working
2   on it.  I threw him a curve ball.
3   Sorry.
4   MR. VAUGHN:  All right.
5   MR. FOWLER:  He wasn't ready for
6   that one.
7   MR. VAUGHN:  Not a problem.
8   BY MR. FOWLER:
9   Q.   Doctor, can you find the
10  definition of Inactive Ingredient in that CFR
11  document?
12  A.   Yes.  That's on page --
13  Q.   They're alphabetical, aren't
14  they?
15  A.   Yeah.  That's on page 5 of 11 in
16  that document.  It's any component other than the
17  active ingredient.
18  Q.   Is that what it says?
19  A.   That's what it --
20  Q.   Can you read it verbatim?
21  A.   "Inactive ingredient is any
22  component other than active ingredient."
23  So that would cover contaminants,
24  impurities, excipients, or whatever.
25  Q.   It refers to specifically the

Page 247

1   components, doesn't it?
2   A.   Yes.
3   Q.   Can you read the definition for a
4   Component?
5   MR. VAUGHN:  May the record
6   reflect as the Defense counsel
7   repeatedly objected to any type of
8   regulatory questions or opinions and now
9   is solely focussed on regulatory
10  questions.
11  THE WITNESS:  "Component is any
12  ingredient intended for use in the
13  manufacture of a drug product, including
14  those that may not appear in such drug
15  product."
16  So that could be a lot of
17  excipients and those kinds of things.
18  BY MR. FOWLER:
19  Q.   Thank you.
20  Doctor, have you seen anything in
21  the documents that -- that Plaintiffs' counsel has
22  shown you today with regard to the ANDAs or the
23  bioavailability studies that change -- change any
24  of your opinions in this case?
25  A.   No.  And -- and I don't think

Page 248

1   it's uncommon when companies are making generic
2   products, sometimes on the first run, to have
3   something that ends up not being bioequivalent and
4   requires going back to the drawing board and
5   altering particle size or some other component of
6   the formulation until they -- until they get the
7   product that is going to be bioequivalent that
8   would then be FDA approved, the ANDAs approved,
9   and then it's allowed to be given to patients as
10  an AB-rated generic drug.
11  That's not, I don't believe,
12  uncommon.  I don't have statistics on that, but I
13  think it's unrealistic to expect them to get it
14  right on the first time every single time.  And
15  those are -- as long as those are disclosed to the
16  FDA that we made this change and now we want this
17  approved, and then the FDA approves it.  And so
18  all the ANDAs that I -- I included in my report
19  were FDA reviewed, approved, AB-rated and allowed
20  to be generically substituted for a brand name
21  valsartan product.
22  Q.   Did any of the BE documents, even
23  including the failed ones that counsel showed you,
24  did any of those show that the valsartan's
25  bioequivalence was affected by the presence of

Page 249

1   other compounds, whether they be, you know,
2   amlodipine, HCTZ or the combination thereof?
3   A.   Yeah, again, we don't know which
4   did or didn't have NDMA, but inclusion of the
5   combination products was demonstrated to support a
6   scientific conclusion that without an overlapping
7   either metabolism or drug distribution system,
8   that those compounds in with valsartan, even in
9   milligram quantities, much less microgram
10  quantities, would not be expected to have any
11  altering effect on the bioequivalence, and
12  therefore the therapeutic response to valsartan.
13  Q.   Regard to -- I'm showing you what
14  was marked as Exhibit 19.  This, I'll refer to it
15  as the bankruptcy document with regard to PRACS.
16  Is there any mention of valsartan or valsartan
17  testing anywhere in that document?
18  A.   No.
19  Q.   With regard to the -- with regard
20  to Exhibit 20, Doctor, do you recall the -- the
21  questions concerning Cetero's bioequivalence data
22  and FDA's investigation of that?
23  I'm showing you 20 -- Exhibit 20.
24  Do you recall those questions, the questions on
25  the document?

Confidential Information Subject to Protective Order

Page 250

1    A.    Yes.
2    Q.    Can you turn to the second page
3  and identify what are the drugs that those ANDAs
4  of reference in that Exhibit 20, what are those
5  drugs?
6    A.    Federal Register Notices on
7  October 28th.  "The agency is proposing to
8  withdraw Watson's Oxycodone/ibuprofen ANDA and
9  InvaGen's Trandologril (phonetic) ANDA."
10    Q.    Is there anything in that
11  document that suggests FDA was critical of any
12  testing of the valsartan bioequivalence, if any
13  was done at all that -- by that company at that
14  location?
15    A.    No mention of valsartan at all.
16    Q.    Doctor, can you explain why it is
17  that you spent the time reviewing the BE data from
18  each of the various generic manufacturers for the
19  various drugs, whether it's valsartan by itself or
20  in combination?  What was the im- -- what was the
21  importance?  What was -- why did you review those
22  -- that data, and how did it factor into your
23  opinion?
24        MR. VAUGHN:  Object to the form.
25        THE WITNESS:  Again, from a pure

Page 251

1  scientific standpoint, if two compounds
2  that are known to be in the same tablet,
3  let's say, have the chance to interfere
4  with each other altering the effect of
5  certainly the intended compound, in this
6  case valsartan, then I wrote a -- a
7  fairly lengthy section in my report
8  about what are the different mechanisms
9  whereby there would be an interruption
10  of the valsartan effectiveness.  It had
11  to be its absorption, it had to be its
12  metabolism, it had to be its hepatic
13  distribution, or its effect at the
14  angiotensin II receptor site.
15        And there's no mechanism whereby
16  NDMA or NDEA can do that.  There's no
17  mechanism whereby hydrochlorothiazide,
18  which is in there, can do that.  And
19  there is no mechanism where amlodipine
20  does that.  So none of those substances
21  have any mechanisms to alter either the
22  kinetics or the therapeutic response to
23  valsartan.
24  BY MR. FOWLER:
25    Q.    You were shown -- let me, for

Page 252

1  example, hand you Exhibit 14 -- hand you
2  Exhibit 14 (tendering) -- and direct your
3  attention to the table showing the BE results.
4        Let me know when you're there.
5    A.    I'm there.
6    Q.    The BE results were outside of
7  the 80 to -- is it 120 is the FDA range?
8    A.    125.
9    Q.    When they are -- when the BE
10  results as reflected there in Exhibit 14 were
11  outside the range, do you attribute any of that to
12  any presence of NDMA or NDEA?
13    A.    No.  Again, this is usually due
14  to some type of tableting issue and -- and
15  particle size.  So it's -- it's -- I would not
16  attribute it to NDEA or NDMA at all.
17    Q.    Based on your understanding of
18  the science of the bioequivalence study process,
19  can you explain what reformulation does and how
20  that would translate to different results of the
21  BE studies?
22        MR. VAUGHN:  Object to the form.
23        THE WITNESS:  Yeah, again, this
24        starts getting into a pharmaceutics
25        process that's a little bit -- I've had

Page 253

1  a little bit of training in that and --
2  and understanding and have read some
3  articles throughout the years.
4        But it's mostly involving the --
5  the tableting, the particle size, the
6  pressure with which you compress the
7  tablet, the film coating, the things
8  that result in the tablet disintegrating
9  and then releasing the active
10  ingredient.
11        And so it's -- it's more of a
12  pharmaceutics development, tinkering
13  that you do with your products to get
14  the intended dissolution and then
15  ultimate bioequivalence that you're
16  looking for.
17  BY MR. FOWLER:
18    Q.    Does the fact that some of the
19  studies, the BE studies you were shown by counsel,
20  were studies under 100 percent males and 100
21  percent Asian males, does that have any impact on
22  -- first of all, on the validity of the BE
23  results?
24    A.    No.  Again, the FDA allowed those
25  studies to be done and approves the ANDAs in the

Confidential Information Subject to Protective Order

Page 254

1  face of those.  And remember, what you're doing
2  with the bioequivalence study in the same person
3  is comparing test product with reference products.
4          And then you take it to another
5  person and you test, test product versus reference
6  product.  And the fact that that, both times, was
7  in a male or that they weighed 60 kilograms, if
8  you then take that same release characteristic to
9  a female or a person that weighs 78 kilos or a
10  person that's 39 instead of 29, you're still
11  within that same person going to see the -- the
12  approvable release characteristics in that --
13  between those two products.  It'll retain its
14  bioequivalence.
15      Q.    Do the test subjects or the test
16  methodology of the BE studies, that you were
17  shown, impact your opinion with regard to the
18  presence of NDMA and its impact, if any, on
19  bioequivalence?
20      A.    I think it's --
21          MR. VAUGHN:  Object to form.
22          THE WITNESS:  -- a similar
23  question worded slightly -- I'm sorry,
24  go ahead.
25          MR. VAUGHN:  I -- object to form.

Page 255

1          You're good.
2          THE WITNESS:  Okay.  I think it's
3  a similar question asked a slightly
4  different way, and -- and as I've stated
5  multiple times today -- and it's in my
6  report -- the presence of NDMA and NDEA,
7  there's no mechanism, no scientific
8  rationale beyond how they could alter
9  the bioequivalence of any of the
10  valsartan products.
11  BY MR. FOWLER:
12      Q.    Would that be true for either
13  gender or any race, in your opinion?
14      A.    Yeah, that's -- would be
15  independent of those issues.
16      Q.    Early in the deposition, there
17  were questions about the circulation of -- of
18  blood.
19          Do you recall those questions?
20      A.    Uh-huh.  Yes.  Sorry.
21      Q.    And does -- how, if at all, does
22  the blood circulation play a role in your opinions
23  in this case with regard to the NDMA and -- and
24  the valsartan?
25          MR. VAUGHN:  Object to form.

Page 256

1          THE WITNESS:  In -- in the
2  context that we were talking about at
3  that time, we were talking about the
4  ability to measure an elimination
5  half-life and how that's affected by
6  blood flow, liver blood flow.  You can
7  only measure that if there's drug in the
8  blood.  And with NDMA at the amounts
9  that we're talking about, that has to be
10  given intravenously, and then you can
11  measure the decline in blood because it
12  started there and you watch it go down.
13  And some of that blood flow goes to the
14  liver, some goes to the heart, some goes
15  to the lungs, you know, whatever.
16          That issue doesn't apply when you
17  talk about giving low doses of these
18  high-clearance drugs in an oral format
19  that don't reach the systemic
20  circulation.  You can't measure a
21  half-life in a situation where there's
22  no measurable drug there to begin with.
23  BY MR. FOWLER:
24      Q.    Doctor, directing your attention
25  to your report.  Do you have that in front of you?

Page 257

1      A.    I do.
2      Q.    Has counsel asked you about all
3  of your opinions in your report today?
4      A.    Pretty much focussed on -- on
5  bioequivalence, I would say.
6      Q.    Do you have -- turning your
7  attention to page 52.  Do you see a Summary of
8  Opinions and Conclusions section?
9      A.    Yes.
10      Q.    Would you please read both of
11  those points on page 52 going over to 53 to the
12  third point, please?
13      A.    Okay.  There are three main
14  points that I addressed in -- in my report, and
15  they're -- they're summarized on the end of page
16  52 and at the beginning of page 53.
17          The first is relevant to what we
18  had a lot of questions on today, and it basically
19  is that the presence of NDMA and NDEA in valsartan
20  could not have had any effect on the kinetics,
21  dynamics, bioavailability or bioequivalence of
22  valsartan generic products because there's --
23      Q.    Just please -- just read your --
24  read from your paragraph, please.
25      A.    Oh, read it verbatim?

Confidential Information Subject to Protective Order

Page 258

1    Q.    Yes, sir.

2    A.    I'm sorry.

3    Q.    You were doing fine.

4    A.    "The compounds do not share any

5    known pharmacokinetic or pharmacodynamic

6    mechanism.  The presence of active intended

7    ingredients with valsartan, such as

8    hydrochlorothiazide or amlodipine, also did not

9    alter valsartan bioequivalence for the same

10   reasons, so there is no overlapping

11   pharmacokinetic process.  Thus, there is no

12   conceivable way for NDMA or NDEA, merely by being

13   present, to alter the bioequivalence of valsartan,

14   and thus its therapeutic response and efficacy."

15   Q.    Thank you.  And you have another

16   opinion?

17   A.    And my second opinion gets back

18   to this concept of first pass metabolism.  "The

19   levels of NDMA or NDEA that the FDA has detected

20   in affected valsartan tablets, when these are

21   taken on a daily basis, would not exceed the

22   liver's capacity to metabolize the NDMA or the

23   NDEA contained in those tablets in a first pass

24   metabolism process.  And according-" --

25   "accordingly, NDMA or NDEA is unlikely to reach

Page 259

1    the systemic circulation or other organ systems

2    outside of the liver; therefore, there is no

3    scientific basis to assume that there is any

4    increased risk to other organ systems which

5    support the medical monitoring that is proposed by

6    Plaintiffs' expert Dr. Kaplan."

7    Q.    Thank you.

8    And on the -- on the next page,

9    do you have another opinion?

10   A.    I have another opinion, and --

11   and this was more of a mathematical.  "Based on

12   the known pharmacokinetic principles of

13   accumulation, the daily exposure" -- which in this

14   case is usually every 24 hours -- "to NDMA or NDEA

15   would not accumulate, given the known elimination

16   half-life of these compounds, which are in" --

17   "measured in minutes."

18   So to give something that's gone

19   in three to five half-lives, of a five- to

20   ten-minute elimination rate, there's no way, given

21   that once every 24 hours, could lead to any type

22   of accumulation at all.

23   Q.    Do you hold those opinions to a

24   reasonable degree of medical -- of scientific

25   certainty?

Page 260

1    A.    Yes.

2    Q.    We also marked to --

3    MR. FOWLER:  I think we're up to

4    Exhibit 37 [sic], Counsel.

5    BY MR. FOWLER:

6    Q.    -- simply the list of materials

7    considered that was provided to you.  I just

8    wanted to mark that as an exhibit.

9    (Exhibit 38 was marked.)

10   BY MR. FOWLER:

11   Q.    Doctor, do you recognize that as

12   your Materials Considered list?

13   A.    Yes.

14   Q.    And then Exhibit 38 [sic] is --

15   MR. FOWLER:  Counsel, I'm holding

16   up the flash drive of Dr. Bottorff's

17   Materials Considered.  So we're going to

18   send this to the court reporter as we've

19   done in other depositions and be copied

20   that way.

21   This is Exhibit 38 [sic].  Madam

22   Court Reporter, we'll mail that to you.

23   (Late-filed Exhibit 39 was

24   marked.)

25   BY MR. FOWLER:

Page 261

1    Q.    If you'll indulge us for a

2    moment, I may be about finished.

3    My much more attentive colleague

4    has pointed out that the Materials Considered is

5    38 and the flash drive should be 39, so we'll just

6    fix that.

7    And with that, I'll -- I'll -- I

8    have no further questions.

9    Thank you very much, Doctor.

10   MR. FOWLER:  Counsel.

11   MR. VAUGHN:  Can you just give me

12   five minutes to consult with my

13   cocounsel?  I'll be right back.  We'll

14   be real quick.

15   THE VIDEOGRAPHER:  Shall we go

16   off the record?

17   MR. VAUGHN:  Please.

18   THE VIDEOGRAPHER:  The time is

19   4:51 p.m.  We're off the record.

20   (Brief recess observed.)

21   THE VIDEOGRAPHER:  4:56 p.m.,

22   we're back on the record.

23   EXAMINATION

24   BY MR. VAUGHN:

25   Q.    Dr. Bottorff, do all of your

Confidential Information Subject to Protective Order

Page 262

1 opinions contained within your class action expert
2 report apply equally to all potential class
3 members?
4      A.    I'm not sure exactly what that
5 question means.  What -- what -- what does that
6 mean exactly so I can better answer it?
7      Q.    Which part of the question are
8 you having trouble with?
9      A.    Well, maybe start with the
10 definition of the class members.  Are they the
11 people who have filed, like, claims or....
12      Q.    I -- I understand now, Doctor.
13           Do all of your opinions contained
14 within your class action expert report apply
15 equally to all of the Defendants?
16      A.    Again, I don't know if I had
17 bioequivalence data on -- well, from every
18 Defendant, but I -- I think it does because of the
19 reasons behind it.  It doesn't matter that NDMA
20 may have been in there or not.  It wouldn't affect
21 the bioequivalence.  So I guess I would say yes.
22      Q.    As a pharmacist, if you are in
23 possession of an adulterated drug, would you
24 return that adulterated drug to a manufacturer, or
25 would you just throw it away?

Page 263

1           MR. FOWLER:  Objection: Form,
2      scope.
3           THE WITNESS:  I've never been in
4      that position of -- in -- in that type
5      of practice.  I guess I would follow
6      whatever my -- my company's policy was.
7      But I don't -- I don't know what that
8      is.  I don't know what that would be.
9 BY MR. VAUGHN:
10      Q.    Would you be afraid of
11 contaminating the groundwater if you're just
12 throwing away drugs that are contaminated with
13 carcinogens?
14           MR. FOWLER:  Objection, outside
15      the scope of my redirect completely.
16           MR. VAUGHN:  Your redirect had
17      him answer quest- -- testifying on every
18      single one of his opinions.  You
19      completely opened the scope up.
20           THE WITNESS:  Well, what I can
21      answer is that that's not how in
22      pharmacies that we get rid of drugs
23      anymore.  There are drug take-back
24      programs that almost every pharmacy runs
25      periodically, and there's some

Page 264

1 destruction process that is not flushing
2      them down the toilet.  So that's just
3      not how it happens these days.
4 BY MR. VAUGHN:
5      Q.    All right.  Regardless, you
6 wouldn't be able to sell the contaminated drugs,
7 correct?
8           MR. FOWLER:  Objection: Form,
9      outside the scope of his report and his
10      testimony and the redirect.
11           THE WITNESS:  Yeah, I -- again,
12      in -- in your hypothetical, you would
13      have to know that something was
14      adulterated, so I don't -- I don't know
15      what that process is.
16 BY MR. VAUGHN:
17      Q.    As a pharmacist, if the FDA would
18 not let you sell a drug to the U.S. public, what
19 would you do?  Would you be able to get your money
20 back from the manufacturer?
21           MR. FOWLER:  Objection, form.
22      This is outside the scope of his
23      entire report, of his testimony, and
24      outside of my redirect.  Nothing about
25      The redirect opened up questions for

Page 265

1      what a pharmacist is going to sell,
2      Counsel.
3           MR. VAUGHN:  He -- he submitted
4      an expert report in a class action
5      saying this stuff is worth money.
6           MR. FOWLER:  You should have
7      asked him about that in your case in
8      chief here on -- on direct.  You're
9      going back, for whatever reason.  It's
10      outside the scope, and I would have
11      objected to it in the first place.
12           MR. VAUGHN:  You did object to it
13      a bunch in the first place and then you
14      were coaching the witness before and
15      then you opened everything back up by
16      having him read every one of his
17      opinions.  You opened the scope.
18           MR. FOWLER:  I'm not going to
19      argue with you, Counsel.  The words
20      "sell the drugs" was nowhere in his
21      opinions.
22 BY MR. FOWLER:
23      Q.    If you can't sell a drug --
24           (Unintelligible overlapping.)
25 BY MR. VAUGHN:

Confidential Information Subject to Protective Order

Page 266

1      Q.    -- Doctor, does it have any
2  value?
3           MR. FOWLER:  I'm sorry, I spoke
4  over you, Counsel.  Please state that
5  again.
6           THE WITNESS:  Or I -- I never
7  answered the previous question.
8           MR. FOWLER:  He withdrew.
9           THE WITNESS:  Oh, okay.
10          MR. FOWLER:  So a new question.
11          Go ahead.
12  BY MR. VAUGHN:
13     Q.    Would you like to answer the
14  previous -- would you like to answer the previous
15  question, Doctor?
16     A.    If you would like me to.
17     Q.    So as a pharmacist, if the FDA
18  will not allow you to sell a drug to the U.S.
19  public, would you be able to get your money back
20  from the manufacturer?
21          MR. FOWLER:  Same objection.
22          THE WITNESS:  And I would say
23  that I've never been in the situation to
24  understand how that works.  That's not
25  my -- my academic career has been

Page 267

1  working in hospitals with cardiology
2  patients and cardiologists, and I've
3  never worked in that environment, so I
4  -- I had no experience with that at all.
5  BY MR. VAUGHN:
6      Q.    If you can't sell the drug,
7  Doctor, does the drug have any value?
8           MR. FOWLER:  Form,
9  incomprehensible.
10          THE WITNESS:  Again, I -- I mean,
11  in a hypothetical, if you can't sell it,
12  then obviously you can't sell it, so....
13  BY MR. VAUGHN:
14     Q.    Absolutely.
15     A.    So I would say, yeah, if you
16  can't sell it -- so it doesn't have value if you
17  can't sell it.
18          MR. VAUGHN:  I have no further
19  questions.
20          MR. FOWLER:  He'll read.
21          MR. VAUGHN:  Thanks for your time
22  again, Dr. Bottorff.
23          MR. FOWLER:  Nothing further.
24          THE VIDEOGRAPHER:  The time is
25  5:02 p.m.  This concludes today's

Page 268

1  testimony from Dr. Michael Bottorff.
2           We are now off the record.
3           FURTHER DEPONENT SAITH NOT.
4           (Proceedings concluded at 4:02
5  p.m. Eastern.)

Page 269

1           REPORTER'S CERTIFICATE
2           I certify that the witness in the
3  foregoing deposition, MICHAEL BOTTORFF, PHARM.D.,
4  was by me duly sworn to testify in the within
5  entitled cause; that the said deposition was
6  taken at the time and place therein named; that
7  the testimony of said witness was reported by me,
8  a Shorthand Reporter and Notary Public of the
9  State of Tennessee authorized to administer oaths
10  and affirmations, and said testimony, Pages 7
11  through 258 thereafter transcribed into
12  typewriting.
13          I further certify that I am not of counsel
14  or attorney for either or any of the parties to
15  said deposition, nor in any way interested in the
16  outcome of the cause named in said deposition.
17          IN WITNESS WHEREOF, I have hereunto set my
18  hand this 4th day of April 2022.
19
20
21
22
23
24  _____
    Carissa L. Boone, LCR No. 382
25  My License Expires:  6/30/2022

Confidential Information - Subject to Protective Order

Page 270

```
 1           E R R A T A
 2
          I, MICHAEL BOTTORFF, PHARM.D., having
 3  read the foregoing deposition, Pages 7 through
    268, taken March 25, 2022, do hereby certify said
 4  testimony is a true and accurate transcript, with
    the following changes (if any):
 5
 6  PAGE LINE  CHANGE          REASON
 7  ____ ____  _____  _____
 8  ____ ____  _____  _____
 9  ____ ____  _____  _____
10  ____ ____  _____  _____
11  ____ ____  _____  _____
12  ____ ____  _____  _____
13  ____ ____  _____  _____
14  ____ ____  _____  _____
15  ____ ____  _____  _____
16  ____ ____  _____  _____
17  ____ ____  _____  _____
18  ____ ____  _____  _____
19  ____ ____  _____  _____
20  _____
         MICHAEL BOTTORFF, PHARM.D.
21
22
23  _____
    Notary Public
24
    My Commission Expires: _____
25
```

**WORD**
**INDEX**

**< $ >**
**$200,000**
43:16
**$204,000**
43:15
**$26,000** 42:6
**$35,500** 42:23
**$4,000** 34:21
42:14 43:1
**$41,000** 43:9
**$42,250** 42:11
**$46,084** 43:12
**$5,000** 43:6

**< 0 >**
**000005016**
3:21 129:16
**000029545**
3:19 124:12
**0001** 5:6
230:21
**00134669**
4:20 202:14
**00153602** 5:1
210:11
**00179194**
4:20 199:17
**00369303**
4:20 207:12
**00378002** 5:2
220:15
**01453143**
4:20 197:21
**023** 196:11
**09** 77:14, 17
**090642** 46:12
**09-103** 145:2
**091654** 82:11

**< 1 >**
**1** 3:10 4:8
10:10, 11
26:13 46:2
95:9 98:11
108:11 138:6
142:13 146:5,
16 159:10
164:18

166:14 184:3
194:5 203:2
225:5
**1/2** 130:11
**1:48** 149:11
**1:57** 149:14
**10** 3:10, 11,
22 58:17
60:9 134:4
142:24, 25
180:25 200:12
**10:06** 23:14
**10:35** 45:21
**10:43** 45:25
**100** 60:15
64:22 129:2,
5 161:10
168:5, 6
170:21 198:4
253:20
**1000** 2:9
**107** 3:14
**10-VIN** 56:20
**10-VIN-337**
129:21
**11** 3:10, 14,
22 5:2
145:19, 21
181:20 231:7
246:15
**11,500** 140:12
**11:53** 94:17
**112** 3:14
**114** 11:6
**11th** 211:9
**12** 4:1
145:24, 25
151:25 161:8
**12,000** 140:4
**12,100** 140:5
**12:38** 94:20
**120** 11:11
252:7
**123.65** 60:23
**124** 3:19
231:21
**125** 60:4, 11,
24 252:8
**129** 3:19
**13** 4:1, 17
5:1 26:22

**27:22** 28:4
29:14 30:16
31:17 32:3,
22 149:20, 21
**13016** 148:24
**13195** 148:9
**1340** 139:6
**136.16** 148:15
**1370** 139:6
**13-minute**
30:10
**14** 3:19 4:4,
14, 20 5:11
158:1, 2
252:1, 2, 10
**140** 11:18
**142** 3:22
**145** 3:22 4:1
**147** 97:19
**149** 4:1
**15** 4:4
108:20 165:6,
7
**150** 64:22
**153** 100:19
**158** 4:4
**15th** 114:21
179:3
**16** 4:4, 20
5:10 45:8
134:25 136:5
146:6 168:20,
21
**16,000** 111:5
112:10
**16,400** 136:3
**16,632** 110:17
111:3 112:2
**160** 55:14
74:13
**165** 4:4
**168** 4:4
**169** 102:18
**16th** 34:15, 22
36:1 96:3
**17** 4:8 5:2
174:25 175:1
196:4
**175** 4:8
**176** 4:11
**177** 4:11

**18** 3:19 4:8,
20 45:8
95:13 147:14
150:3 175:4, 5
**182** 4:14
**185** 4:14
**187** 4:17
**189** 4:17
**18-year-olds**
102:14
**19** 4:11, 20
95:13 176:1,
2 249:14
**191** 4:20
**197** 4:20
**1980s** 216:25
**1982** 244:3
**1982-1983**
99:15
**1983** 243:21
244:3
**199** 4:20
**1990s** 217:1
**1st** 34:6 35:9,
15, 21 114:1
179:3

**< 2 >**
**2** 3:11 4:4,
11 10:20, 21
42:9 125:4
142:16
143:12
146:17
170:19
178:25 186:6
202:24 203:7
**2:45** 185:6
**2:53** 185:9
**20** 3:14 4:11
5:2 31:9
127:11 133:3
141:14 177:4,
5 249:20, 23
250:4
**20037** 2:9
**2004** 46:15,
18 47:2, 21
190:23
**200435** 90:2

**185:17** 187:7
**2004354** 88:20
**2005** 84:13,
17, 22, 25
174:1 175:20
179:3
**2009** 77:17,
21 82:17, 21,
25 90:2, 6, 9
96:4 179:4
186:20 190:23
**2010** 57:24
58:3, 7 73:10,
14, 19 74:2
77:25 78:1
220:5
**2011** 3:13
56:22 57:1,
14 94:24
**2012** 54:2
55:21 81:13,
19, 23 190:19
**2013** 66:18
67:4 78:5, 8
**2014** 114:1
**2015** 173:3
202:19
205:21 211:7
217:3 218:3,
13 220:5
**2016** 205:20
**2017** 196:6,
17, 20, 22
**2018** 192:16
195:18 225:5
**202** 4:20
**202.331.3100**
2:10
**2021** 3:14
34:6, 22
96:25 97:5,
16 98:25
99:1 106:1
**2022** 1:15
6:4 7:5
269:18 270:3
**202377** 73:4
**202519** 76:22
**202728** 57:21
**203311** 56:19
**204821** 53:12

Confidential Information Subject to Protective Order

**206083**  81:7 202:20 207:24  208:3
**206180**
169:19  170:6, 8
**206512**  66:16
**207**  4:20
**20-year-olds**
102:14
**21**  3:11, 22 4:1, 4, 14 5:11  13:13 104:5  177:21 182:20, 21 244:13
**210**  5:1
**2101**  2:8
**2160**  139:5
**217**  5:2
**22**  4:14 13:11  14:1 105:11 185:13, 14
**220**  5:2
**226**  5:2
**22nd**  218:3
**23**  4:17, 20 5:6, 13 187:12, 13
**230**  5:6
**24**  4:17 141:16  189:7, 8  259:14, 21
**241**  3:4
**242**  5:7, 10
**244**  5:11
**25**  1:15  3:4, 12, 22  4:1, 20 6:3  14:14 58:16  133:3 191:17, 18 270:3
**258**  269:11
**25th**  7:5
**25-year-old**
151:13
**25-year-olds**
102:15
**26**  4:20  28:6 197:22, 23

**260**  2:4  5:12, 13
**268**  270:3
**26-and-a-half**
151:7
**26-year-olds**
151:8
**27**  4:20  16:3 138:7  199:18, 19
**273-09**  158:14
**28**  4:20 19:17  138:24 165:25 202:15, 16
**280**  139:8
**286**  139:7
**2875**  1:5
**287500003049**
3:22  142:23
**2875-00003054**
3:24
**2875-00003105**
4:16
**2875-00003194**
4:17  187:11
**2875-00031265**
4:10  175:3
**2875-00102393**
4:20  191:16
**2875-00117673**
5:5  226:9
**2875-00259489**
4:1  145:23
**2875-0026534**
4:4  165:5
**2875-00268983**
4:19  189:6
**2875-00808468**
3:18  112:18
**28th**  250:7
**29**  4:20 127:10 207:13, 14 254:10
**29-year-old**
127:11

< 3 >
**3**  3:12, 13, 14 31:7  33:22,

**25**  34:2  35:9 117:8  140:21 141:11, 18 142:18 148:13 158:11 159:22 170:25 202:24  203:20
**3.4**  11:11
**30**  5:1  44:12, 14  46:4 125:4  145:15 167:9  210:12, 13
**304-09**  77:1 150:6
**3049**  143:10
**305-09**  77:1
**31**  5:2  53:4 217:19, 20
**312.2(c**  104:6
**314**  244:21
**314.3**  5:11 244:13
**32**  5:2  57:19 143:21  145:5 220:16, 17
**320**  53:12 54:16  55:9, 13, 14  57:23 125:2, 19 159:15 161:24  162:1 177:22  199:12
**320/25**  201:16
**326**  151:2
**33**  3:12  5:2 61:3  144:12 226:10, 11 230:22
**330-VALS-2011**  56:20
**337**  56:20
**338**  151:25 152:1
**338-11**  169:7
**34**  5:6  66:2 154:8  165:17 167:5  230:23,

**24, 25**
**3410**  139:2
**35**  5:7  242:3, 7
**3520**  139:2
**36**  5:10 72:25  242:14, 16  243:6
**364**  13:15, 18, 21
**368-12**  66:17 165:14
**369-12**  66:17 167:4
**37**  5:11  76:9 133:1  136:5 150:9  244:12, 14  260:4
**374**  14:1
**38**  5:12  81:4 198:7  200:5 202:21 204:13  260:9, 14, 21  261:5
**382**  269:24
**39**  5:13  83:9 87:22  88:20 174:11 175:12 185:22  186:1 187:6  254:10 260:23  261:5
**3A4**  63:23, 24
**3rd**  211:7

< 4 >
**4**  3:13  28:6 31:7, 11 35:13  95:2, 3, 9  140:21 141:18 142:13  171:8 191:8  192:18 204:9
**4,000**  43:16
**4/16**  195:18
**4:02**  268:4
**4:13**  241:21
**4:26**  241:24
**4:51**  261:19

**4:56**  261:21
**40**  55:14
**41**  200:17 203:22
**42**  154:9
**439**  14:18
**45**  14:12
**451**  173:21
**454**  165:10
**46**  146:5, 17
**47**  16:1  199:2
**473**  16:7, 9
**474**  16:8
**48**  19:16 110:17  144:21
**4800**  130:23
**486**  19:19
**49**  144:22
**496**  48:14
**4th**  226:6 269:18

< 5 >
**5**  3:14  4:8, 11  31:6, 11 34:18  58:17 97:2, 3, 12 121:7  141:18 146:19, 25 178:21  246:15
**5:02**  267:25
**50**  26:14 27:12  39:9 102:15  143:14
**508**  53:6
**513**  56:18
**517**  57:20
**52**  22:4 131:24  257:7, 11, 16
**53**  257:11, 16
**537**  61:6
**538**  61:6
**545**  63:16
**559**  66:5
**56**  147:18
**562**  66:15
**57.97**  150:19
**586**  73:1
**5th**  226:6

**< 6 >**
**6** 3:*14* 11:*2*
107:*10, 11*
172:*16* 221:*4*
**6/30/2022**
269:*25*
**60** 39:*10*
100:*22*
102:*16* 254:*7*
**604** 213:*3*
**613** 81:*7*
**62** 22:*7*
128:*9, 10*
144:*14, 16*
145:*17*
**622** 82:*10*
**626** 83:*12*
**63** 126:*9*
166:*2*
**63-and-a-half**
167:*11*
**6600** 130:*23*
**66210** 2:*5*
**664** 140:*17*
141:*1*
**674** 140:*18*
**6999** 165:*9*
**6th** 36:*8*

**< 7 >**
**7** 3:*14* 4:*4*
5:*7* 11:*1, 18*
36:*19* 112:*19,*
*20* 175:*7*
269:*10* 270:*3*
**70** 39:*10*
**70-year-olds**
102:*16*
**724** 15:*3*
**72-hour** 133:*3*
**74** 130:*10*
**749** 16:*14*
**761** 20:*7*
**78** 254:*9*
**79** 126:*9*
**79.2** 160:*23*
**79.9** 161:*17*

**< 8 >**

**8** 3:*4, 19*
4:*17* 97:*11*
124:*13, 14*
160:*24* 199:*2*
**8,000** 166:*21*
**80** 55:*14*
60:*3, 11*
150:*24* 160:*1,*
*6, 23* 161:*13*
252:*7*
**802** 26:*15*
**8101** 2:*4*
**8200** 135:*25*
136:*2*
**830** 22:*11*
**841** 156:*8*
**846** 105:*16*
**854** 106:*22*
**870** 106:*15*
**88** 161:*10*
**8th** 205:*19*

**< 9 >**
**9** 3:*4, 19*
5:*12* 97:*13*
129:*17, 18*
130:*10*
**9:39** 6:*4* 7:*6*
**9:59** 23:*12*
**90** 59:*17, 20,*
*24* 60:*15*
148:*8* 150:*24*
159:*25* 199:*9*
**90-something**
139:*3, 24*
**95** 3:*13* 139:*7*
**9600** 130:*23*
**97** 3:*14* 139:*7*
**9702** 166:*18*
**98** 139:*16, 24*
**99** 160:*25*

**< A >**
**a.m** 6:*4* 7:*6*
23:*12, 14*
45:*21* 94:*17*
**abbreviated**
183:*3*
**ability** 32:*24*
203:*18* 256:*4*

**able** 32:*19, 24*
84:*8, 9*
125:*24* 214:*3*
215:*21* 234:*8*
264:*6, 19*
266:*19*
**abnormal**
141:*22* 157:*21*
**abnormally**
140:*24*
**AB-rated**
248:*10, 19*
**absence** 90:*21*
197:*12*
**absolutely**
90:*23* 164:*4*
210:*24*
212:*18*
224:*13* 267:*14*
**absorbed**
61:*24*
**absorption**
70:*19* 251:*11*
**academia**
227:*4*
**academic** 9:*7*
266:*25*
**acceptable**
134:*13* 171:*11*
**acceptance**
159:*19*
180:*19* 201:*1*
227:*2*
**accepted** 178:*4*
**access** 74:*16*
91:*5* 92:*11*
242:*23*
**accumulate**
259:*15*
**accumulation**
9:*21* 259:*13,*
*22*
**accuracy**
203:*4*
**accurate** 33:*1*
41:*16* 48:*20*
50:*17* 52:*19*
119:*16, 17*
270:*4*
**accurately**
209:*9*

**achieved**
117:*15*
**achieves**
118:*21*
**acquired**
176:*16* 191:*23*
**acquisition**
206:*10*
**acronyms**
152:*9*
**act** 245:*13*
**Actavis** 2:*7*
191:*21*
**Action** 3:*10*
8:*18, 23* 9:*1*
10:*8, 15, 24*
11:*18* 12:*3, 7*
13:*11, 25*
14:*12* 15:*3*
16:*2, 14*
19:*16* 20:*8,*
*18* 22:*5, 11*
24:*13, 21*
25:*10* 26:*12*
36:*23* 37:*8*
46:*3* 62:*7*
109:*23*
114:*22*
155:*16*
239:*23* 262:*1,*
*14* 265:*4*
**active** 11:*9*
86:*5* 105:*7, 8*
228:*7, 9, 11,*
*13, 17, 25*
229:*10, 17, 21*
230:*4* 231:*12*
232:*7, 8*
244:*8, 18, 23*
245:*1* 246:*17,*
*22* 253:*9*
258:*6*
**activities**
245:*3*
**activity**
232:*10* 245:*12*
**actual** 36:*1*
51:*17* 54:*9*
77:*6* 89:*6*
126:*12* 140:*4,*
*7*

**add** 9:*10, 16*
39:*24, 25*
62:*4* 67:*23*
118:*14* 127:*1*
167:*18*
**added** 16:*19,*
*22* 86:*9* 98:*8*
**addition** 9:*18*
56:*11* 74:*14*
**additional**
38:*6* 43:*22*
55:*2* 85:*25*
86:*10* 91:*5*
101:*23*
162:*15* 183:*4*
**address** 205:*2*
**addressed**
26:*4* 205:*3,*
*16* 257:*14*
**adds** 82:*6*
**adequate** 70:*4*
**adequately**
205:*16*
**adjustments**
101:*12*
**administer**
269:*9*
**administration**
28:*3* 182:*13*
234:*9*
**adulterated**
239:*20*
240:*12, 20*
241:*4, 12*
262:*23, 24*
264:*14*
**adulteration**
230:*16* 240:*2,*
*6* 241:*10*
**advance** 36:*3*
78:*6, 8* 196:*12*
**Advarra**
98:*10* 227:*5*
243:*11*
**adverse** 152:*6*
157:*20, 21*
**advising**
222:*13*
**affect** 79:*25*
147:*25*
173:*10*

Confidential Information Subject to Protective Order

222:22  223:5
224:6  245:5
262:20
**affirmations**
269:10
**afield**  234:22
**afraid**  263:10
**age**  100:22
102:5  126:2,
6  127:9
144:11
145:13  151:5,
15, 19  165:23
167:8
**agency**  14:20
250:7
**ages**  125:20
**aggressive**
17:22
**aging**  101:14
**ago**  8:13
40:9  99:16
110:17, 25
163:18  227:9
232:8
**agree**  25:20,
25  29:18
47:20  96:6
103:1  105:21,
24  107:4
115:22
116:16
117:16
121:17  126:1
128:10  224:4,
10, 13, 14
227:14  235:23
**agreed**  6:13
7:16
**ahead**  10:8
11:24  12:19
23:8  28:17
45:13, 17
92:24  98:3
113:9  118:9
158:25  197:7
204:25
217:25  223:9
233:17
235:10

**254**:24  266:11
**Alice**  2:10
**allow**  266:18
**allowed**  55:10
60:3, 10
86:13  226:16
248:9, 19
253:24
**allowing**
226:21
**allows**  202:5
**aloud**  161:19
199:8  201:10
209:14
**alphabetical**
246:13
**alter**  56:14,
16  57:10
67:7  75:7
85:7  90:19
203:18
251:21  255:8
258:9, 13
**alteration**
151:17
**alterations**
64:24  179:1,
15
**altered**  90:17
101:10  236:24
**altering**  53:24
248:5  249:11
251:4
**alters**  92:3
**Americans**
129:12  144:9
150:15
**America's**
114:24
**amlodipine**
58:17  59:4
63:17  64:11
66:8, 12
67:14  68:5
73:5, 22
87:24  88:5,
10, 11, 14, 21
90:12  170:12
171:24  172:5
173:11  249:2
251:19  258:8

**amlodipine/vals**
**artan/HCTZ**
186:18
**amount**  27:10
28:9  30:17
42:4  84:4
135:11, 15, 21
153:14  194:25
**amounts**
13:16, 21, 22
14:2  29:2
42:4  223:12
224:16  256:8
**analgesic**
228:24
**analysis**  9:20
71:2  72:17
105:18
106:25
132:10
137:13
175:16  195:9
209:3, 19
**Analyst**  213:7
215:6
**analytical**
39:13  130:17,
25  133:21
139:22
142:18  172:4,
10, 18, 20
173:10
188:20  189:3
211:22
**analyze**  216:13
**analyzed**  49:4
206:5  212:23
243:22
**ANDA**  39:3, 4,
7  40:13, 16
46:11  53:11,
12  55:13
56:19  57:21
66:16  73:4, 8
76:22, 25
77:10, 12
78:4  81:7, 11
82:10  83:14,
20  88:20, 24
90:2  95:16
96:6, 20

114:7, 17, 22,
23  115:12, 19
116:16
117:18  121:6,
14  123:11, 22
124:2, 3, 17,
18  168:14
169:18, 23
170:4, 10, 11
171:15
185:17, 19, 22
186:3  187:6
202:12, 19
205:14, 23
206:18, 19, 20
207:8, 24
208:2, 10, 13
209:25  210:2,
3  250:8, 9
**ANDAs**  3:14
4:14  37:24
38:16  39:20
95:1  119:7
123:6  159:2
170:14  180:7
182:17  183:5,
19, 21, 22
184:2, 4, 17,
21  196:8
247:22  248:8,
18  250:3
253:25
**angiotensin**
251:14
**animal**  28:6
**animals**  59:13
245:6
**annual**  14:23
**answer**  18:17
24:16  32:10,
24  41:16
87:15  98:4
102:9  113:20
134:8  141:7
151:13
195:15  204:3,
7  205:2
235:1  238:14
262:6  263:17,
21  266:13, 14

**answered**
31:21  74:4
78:17  91:9,
18  99:21
137:3  224:23
229:19  230:9
266:7
**answering**
68:25  239:8
**answers**  108:2
**antibiotics**
104:24
**anymore**  29:9
161:7  263:23
**anyway**  33:19
67:7  94:7
**AP**  180:5
**API**  12:9
71:15, 20, 23,
24  72:2, 5, 12,
15  147:25
194:18  195:3
223:3  227:18
**apologies**
143:9  146:18
**apologize**
28:16  124:18
140:8  152:1
166:20
185:21
192:14  196:1
200:12
**apparent**
154:20  178:3
**appear**
209:17  247:14
**APPEARANC**
**ES**  2:1
**appearing**
7:16
**appears**
204:15
**apples**  128:16
**applicant**
95:16, 17
96:7  97:21
100:21
102:19  105:17
**Application**
104:3, 13

Confidential Information Subject to Protective Order

applications
183:*3*
applies
103:*12* 179:*20*
apply 256:*16*
262:*2, 14*
appointment
243:*9*
appreciate
17:*24* 60:*20*
61:*12* 109:*20*
approach
227:*15*
appropriate
40:*16* 107:*2*
162:*22*
approvable
254:*12*
approval
38:*16* 95:*18*
104:*16*
168:*15* 183:*2*
206:*18* 227:*2*
approve
114:*17, 22*
115:*12*
171:*19* 202:*8*
210:*2*
approved
55:*14* 77:*12*
78:*4* 119:*7*
121:*5* 123:*6,*
*8* 151:*21*
159:*2* 163:*8*
171:*15*
202:*12*
205:*15, 19, 23*
206:*20* 207:*8*
208:*10, 13*
210:*1, 3, 9*
234:*13* 248:*8,*
*17, 19*
approves
248:*17* 253:*25*
approximately
28:*15* 29:*14*
31:*6* 44:*9, 11*
45:*6* 54:*19*
108:*4* 109:*3*
216:*22*

April 54:*2*
179:*3* 205:*21*
269:*18*
area 9:*22*
132:*9* 161:*4*
216:*18*
areas 17:*1*
19:*8*
arena 130:*25*
argue 265:*19*
argumentative
21:*11*
arithmetic
48:*17* 50:*9,*
*12, 23*
Article 4:*11,*
*14* 36:*9*
articles 24:*10*
36:*3, 9, 12, 13*
44:*18* 110:*22*
253:*3*
Asian 129:*7*
144:*7* 145:*10*
166:*8, 10, 16*
167:*16* 168:*5*
253:*21*
Asians 150:*12*
aside 116:*16*
asked 38:*11,*
*13* 46:*21*
47:*10* 74:*4*
78:*17* 87:*20*
89:*7* 91:*9, 17*
99:*21* 107:*25*
109:*3* 115:*15*
116:*21* 137:*3*
163:*2, 5, 19*
194:*9* 203:*25*
224:*23*
229:*19* 230:*9*
237:*20*
243:*12* 255:*3*
257:*2* 265:*7*
asking 17:*10*
86:*3* 108:*23*
114:*20* 115:*4*
116:*7, 8*
121:*21*
204:*24* 205:*1*
224:*9* 237:*22*

240:*21*
asks 237:*23*
assay 136:*20,*
*22* 137:*7*
138:*4, 14*
assessment
9:*19*
associated
178:*16*
assume 77:*24*
92:*7, 11*
190:*5* 259:*3*
assuming
49:*8* 91:*2, 4*
100:*25* 110:*4*
115:*4* 123:*12*
142:*12*
164:*23* 165:*1*
166:*14*
198:*18* 205:*15*
assumption
165:*3*
Atlanta 44:*25*
attached
146:*21* 211:*13*
attachment
112:*24*
191:*10*
202:*24* 211:*16*
Attachments
191:*4*
attempt
102:*20* 121:*2,*
*3* 164:*7*
attempts 121:*4*
attending
153:*4*
attention
77:*16* 164:*22*
252:*3* 256:*24*
257:*7*
attentive 261:*3*
attorney
269:*14*
attorneys
37:*4* 38:*8*
45:*4* 70:*12*
89:*15* 92:*6,*
*10, 18* 109:*21,*
*25* 111:*15*

112:*11* 162:*5,*
*9* 169:*24*
attribute
252:*11, 16*
AUC 48:*15*
49:*11* 60:*7*
70:*17* 161:*14*
200:*23* 201:*4*
202:*2*
AUCi 203:*9*
AUCs 75:*23*
AUCt 203:*9*
audible 195:*24*
audio 143:*3*
AUL 135:*5*
Aurobindo
76:*22* 161:*25*
169:*2, 18*
170:*15*
Aurobindo's
66:*16* 67:*3,*
*10* 77:*13*
78:*1, 21* 173:*5*
authorized
269:*9*
automated
215:*10* 216:*6,*
*14, 15, 19, 21,*
*23* 217:*1, 11*
automating
217:*14*
available 31:*2*
193:*10, 24*
222:*24*
average 51:*25*
59:*23* 70:*17*
102:*5* 127:*9*
128:*7, 11, 15,*
*19* 134:*3, 6*
144:*11, 13*
145:*13, 16*
150:*18, 22*
151:*4* 161:*3,*
*8* 165:*23*
166:*1* 167:*7,*
*10*
aware 11:*7*
91:*7* 92:*13*
104:*9, 11*
110:*16* 124:*3*
132:*6* 178:*14*

183:*13, 15*
191:*23*
195:*18*
196:*15*
197:*15*
214:*22* 237:*5*
238:*9* 240:*19*
axis 216:*11*

< B >
BA 209:*2, 19*
back 13:*4*
23:*15* 41:*14*
45:*25* 46:*2*
57:*13* 58:*3, 7*
69:*10* 71:*6,*
*12* 74:*2*
75:*21* 82:*21,*
*24* 84:*17, 22,*
*25* 90:*6, 9*
91:*3* 92:*17*
94:*20, 22*
99:*1, 9*
135:*19, 25*
136:*14*
140:*11*
149:*14* 158:*7,*
*20* 159:*10, 21*
162:*23*
164:*17* 185:*9*
196:*8* 208:*16*
213:*23* 214:*3,*
*13* 215:*20*
241:*24* 248:*4*
258:*17*
261:*13, 22*
264:*20* 265:*9,*
*15* 266:*19*
background
240:*1*
backgrounds
125:*20*
Bailey 2:*13*
ball 119:*8*
246:*2*
Bankruptcy
4:*11* 175:*24*
176:*8* 249:*15*
barely 155:*6*
161:*13*

base 8:22 21:23 123:9
based 14:22 25:1, 6 34:10 55:15 72:11 77:13 129:5 161:23 199:9 206:22 225:10 239:5 252:17 259:11
baseline 206:8
basic 239:24
basically 257:18
basing 26:24 72:14 86:16, 17 216:4
basis 98:11 180:6 258:21 259:3
batch 130:21 142:19
batches 11:10 54:23 221:11, 15
Bates 163:16 165:9 166:18 173:21 213:3
batteries 185:1
BE-1881-17 192:6
BE-330-VALS-2011 124:21
beginning 257:16
behalf 1:14
believe 12:24 18:4 25:10 40:14 46:19 74:22 80:3 90:23 91:10 104:22 107:18 112:9 125:4, 10 130:6 134:7 142:24 146:11 149:19 150:4 158:9 168:25 193:6 195:20 200:10 234:7,

8 236:3, 21 237:3 239:1, 2, 8 242:24 243:14 248:11
believes 223:4
bell 144:2 198:4
benefit 237:1, 4
best 18:17 25:3 32:9, 24 51:24 52:3 80:24 138:21
bet 155:4
better 195:14 262:6
beyond 50:19 236:12 244:1 255:8
bi 221:11
big 135:17, 18 208:24 210:7
biggest 9:18
bile 61:25
bill 34:5, 20 35:16
billed 34:16 35:16 36:2 43:23 44:6, 8
billing 36:5 42:4 43:24
Bio 146:13 193:3, 4 198:15 199:22
bioavailability 50:5 53:25 120:25 125:11, 23 148:1, 5 177:20 227:6 243:23 247:23 257:21
Bioequivalence 3:14 9:19 17:11 18:6, 19 37:25 38:15 39:12 40:18, 20 41:1, 24 47:8 49:1, 25 50:4 52:17 53:25

54:24 55:7, 12, 17 56:9, 15, 17 57:10 58:18 59:1 61:2 67:7 68:17 69:4, 11, 18 70:16 71:1, 7 79:17 80:1, 6 81:1 82:8 84:1, 10 85:10, 19 86:6, 18, 20 90:17 92:5 93:5, 24 94:6, 25 95:15, 17, 20 96:2 101:9 102:3 103:22 118:22 122:16 125:2 127:1, 4, 18, 22 128:17 152:23 159:4 162:16, 23 163:6 167:20 170:20 172:21 177:21 181:23 182:4 183:6 193:5 195:9 201:3 204:19 208:14 209:22 210:3 221:11, 17 224:18 226:16, 19 236:22, 23 238:24 239:12 244:2 248:25 249:11, 21 250:12 252:18 253:15 254:2, 14, 19 255:9 257:5, 21 258:9, 13 262:17, 21
bioequivalency 17:8, 15

18:11 19:12 22:1 37:14 38:22 39:4, 5 40:12, 17 41:8 46:7 47:5, 14, 23, 24 48:12 49:24 54:4 55:3 56:1, 3 58:8, 10 66:11 67:12, 14, 25 68:9, 11, 21 69:19, 25 70:6, 9, 10 71:25 72:6 73:7, 21 74:18 76:6 78:11, 15, 24 79:1, 22 80:7 81:12, 25 82:16, 25 83:2, 12 85:1, 3, 15, 25 86:9, 11 87:11 90:11, 20, 25 91:16 92:8 93:14 94:10 96:8, 19 98:23 99:8, 11 105:19 106:13, 18 118:7, 18 119:5, 11, 14 120:6, 17, 18 122:6, 18 129:4, 11, 23 132:14 143:21 145:5 147:7, 21 148:25 151:5 159:14, 18 160:3, 11 171:2, 9, 22 174:10 175:11 179:10, 14 183:4, 24 186:11 190:8 192:9 195:3 196:23 198:19

200:22, 25 204:11 208:21 209:6 219:18 220:2 221:25 224:12, 20 225:16 226:22 239:6 243:14, 18
bioequivalent 161:25 172:9 189:16 192:22 199:13 201:12, 18 248:3, 7
biologic 106:6
Biosciences 5:2 204:10 217:18 218:7, 16 219:17 220:1
biostatistics 49:22
bit 41:23 114:14 143:5 176:4 200:1 211:13 234:21 252:25 253:1
Black 100:8
blanket 65:13, 22 101:16
Blessy 169:2
blood 30:21 31:5, 11 32:2 33:8 51:25 62:8, 10 237:1 255:18, 22 256:6, 8, 11, 13
blue 12:1
Board 98:9 248:4
body 27:19 30:22 31:13 32:3 33:8 47:13 82:6 150:19, 22 188:15 245:6
books 109:14

Confidential Information Subject to Protective Order

**Boone** 6:14
7:25 269:24
**bottom** 87:22
95:10 97:13
105:11
114:15
140:21
141:13
144:23 146:4,
16 161:20
177:18 180:1
186:1 189:13
200:3 207:20
208:19 210:5
213:25 232:1
**BOTTORFF**
1:13 3:3 5:6,
9 6:2 7:14
8:1, 11 10:13
11:13 14:25
16:11, 17
20:4, 14 23:3,
17 48:8, 23
49:19 94:22
95:6 107:14
113:6 230:21
242:2, 3, 6
261:25
267:22 268:1
269:3 270:1,
20
**Bottorff's**
5:13 46:3
118:13 260:16
**bought**
174:19, 21
176:20 183:17
**Boulevard** 2:4
**bound** 149:3
**Box** 100:8
157:10
**boxes** 157:12
**BPL-13-598**
169:7
**branch**
181:23 182:4
**brand** 59:7,
22 66:7
75:12 133:4
248:20

**branded**
76:13 93:9
**break** 45:14
185:4
**breakfast**
53:23
**breakout**
45:19
**BRETT** 2:3
8:12
**Brief** 23:13
45:23 114:4
149:12 185:7
241:22 261:20
**briefly** 7:19
**bring** 164:21
214:3
**bringing**
214:13
**broad** 135:12
233:15
**broaden** 100:2
**broke** 132:23
**bullet** 121:11
156:10, 15, 19,
20, 23 157:1
**bunch** 265:13
**buried** 164:13
**business**
174:17 176:9
**buy** 194:17

**< C >**
**C.I** 59:17, 18
**calculate**
30:13
**calculated**
13:5 52:5
**calculating**
160:21
**calculator**
138:23
**call** 16:24
30:3 35:17
122:11 220:21
**called** 54:10
63:23 98:10
137:12
157:20
215:25 221:7
237:9

**Calling** 96:9
116:20
223:12 232:23
**calls** 31:20
98:1 117:21
180:4 205:10
**Canada**
188:21
**cancer** 14:21
25:11 103:7,
10 105:1, 2
**capability**
25:3 64:25
80:25
**capable** 76:1
**capacity** 24:5
258:22
**caption** 6:9
**carcinogen**
14:22 233:21
**carcinogenesis**
234:9
**carcinogenic**
236:3
**carcinogens**
15:18 16:8
227:22 234:3
235:16, 24
263:13
**cardiac** 31:6,
10 33:4
**cardiologists**
267:2
**cardiology**
267:1
**cardiovascular**
243:24
**career** 9:7
101:8 266:25
**Carissa** 6:13
7:24 269:24
**case** 27:20
31:15 39:14
40:14 47:6
87:19 97:16
122:11
153:17 155:4
166:22
238:16
247:24 251:6

255:23
259:14 265:7
**CASES** 1:6
8:14 84:4
122:10
**cast** 219:6
**categorized**
14:21
**category**
233:21 240:12
**Catello** 2:17
**Causation**
3:11 8:14, 22
9:1, 4 10:2,
19 11:2, 5
13:13, 17
14:14, 17, 25
16:4, 6 18:23
19:5, 18, 20
20:17, 22
22:7, 17, 22
23:19 25:21
26:2, 7
109:22 110:1,
6, 9 231:4, 17
**cause** 71:2
72:16 125:16
160:11 234:8
269:5, 16
**causes** 125:16,
18 153:23
**causing** 72:5
172:2 233:12
**CC** 135:5
**C-C** 136:12
**cells** 105:2, 6
**cellulose**
232:15
**Centers**
182:12
**central** 48:20
49:14 50:18
51:2 52:19
**cert** 241:8
**certain** 11:8
28:2 57:8
83:4 104:4
168:6
**certainly**
74:15 251:5

**certainty**
259:25
**certificate** 6:9
269:1
**certification**
234:20 236:16
**certify** 269:2,
13 270:3
**cetera** 6:9
**Cetero** 4:11
175:24
176:11, 12, 15
177:3, 8
182:18 183:7
186:10
187:16, 25
188:5, 7, 10,
12, 24
**C-e-t-e-r-o**
176:11
**Cetero's**
249:21
**CFR** 5:11
104:5 244:13
246:10
**chain** 162:20,
24
**chained**
131:12
**chains** 163:20
**chance** 251:3
**change** 64:25
71:4 80:19
85:11 99:18
100:16, 17
101:11, 14
167:24, 25
245:9 247:23
248:16 270:6
**changed**
11:19, 23
21:2 22:1
**changes** 10:1,
5 20:16, 20
87:2 152:20
270:4
**changing** 83:7
160:10, 16
**characteristic**
195:13 254:8

Confidential Information Subject to Protective Order

characteristics
86:15  254:12
characterization
n  223:7
charge  45:9,
12
chart  159:24
charts  109:14
check  157:10,
13  172:14
193:9
checked
157:13
chemical
85:24  232:4,
18  233:4, 6
245:9
chemicals
233:8, 9
chemists
178:15
Chief  181:23
182:3  265:8
China  199:12
Chinese  223:2,
20  224:5, 10
choose  131:19
choosing
223:16
chose  74:13
142:3
chosen  222:23
chra  171:3
Christine  2:13
chromatogram
216:17
chromatograph
s  216:1
chromatograph
y  171:3
cigars  164:8
Cipla  4:14
circulation
16:16  17:7,
14  18:8, 10,
17, 22  30:21
32:20  255:17,
22  256:20
259:1

cirrhosis
64:17, 24
65:1, 7  101:6
citation  96:1
204:15
cite  167:5
171:23
174:11
185:19, 22
188:10, 14
198:8, 10
200:5  204:13
231:21  239:14
cited  122:25
125:4  129:23
143:21  145:5
150:8  165:16
175:11  184:2,
23, 24  189:2
cites  104:5
Civil  6:6
claiming
240:15
claims  262:11
clarification
60:21  88:18
103:11
clarify  115:5
Class  3:10
8:18, 22, 25
10:8, 15, 24
11:18  12:3, 7
13:11, 25
14:12  15:2
16:2, 14
19:16  20:8,
18  22:5, 11
24:13, 21
25:9  26:12
36:23  37:8
46:3  109:23
234:19
236:15
239:23  241:7
262:1, 2, 10,
14  265:4
classes  49:20,
21
classification
235:23

classify  230:6,
10, 13
clear  110:14
clearance  27:1
clearly  207:3
233:6
clerical  206:19
clinical  75:4
209:2, 19
close  102:9
111:4  150:22
160:5  164:8
167:1  198:6
closest  134:8
Cmax  48:15
60:8  70:17
148:8  203:9
coaching
237:12, 13
265:14
Coan  2:14
coarseness
195:3
coarser
194:11, 18
197:10
coarsest  193:9,
23
coating  253:7
cocounsel
261:13
Code  177:21
244:21
colleague
243:3  261:3
collected
130:15  212:9
College  2:4
99:9
colloquy
141:6  222:5
column  59:16,
21  137:24, 25
138:1, 7
139:12
141:11  142:7
161:4
columns
138:8  203:18
combination
56:10  58:14

59:3  66:8
76:19  88:4
249:2, 5
250:20
combine
110:19  161:14
combo  194:10
come  18:2
99:5  102:9
162:23  216:12
comes  120:16
135:13, 25
212:10  216:6,
9, 10
coming  143:7
215:23  216:16
command
163:21
commencing
6:4
comment  9:22
116:4  194:11,
17
commented
126:13  169:16
Commission
270:23
common
48:17  49:1
155:7  157:17

communication
162:20  214:10
companies
38:2, 19  40:6
47:18  57:16
66:11  98:12
103:22
119:24  120:4
122:25
162:17  163:9
166:9  176:10
183:5  219:19
225:21, 24
226:21  248:1
company
40:11  48:4
55:3  57:7
71:2, 10
72:12  98:10
114:7  117:16

118:3  133:15,
25  162:10
176:8  179:13,
14  181:12
188:4  191:21
198:21
206:16  221:7,
8, 22  223:2,
20, 21, 25
224:11, 15
226:18
227:11  229:6
250:13
company's
124:2  224:5
263:6
compare
13:12, 24
14:13  16:3
19:17  20:6
22:6
compared
24:12  74:25
82:4  88:9
comparing
83:13  128:16
138:8  254:3
comparison
51:10  66:13
76:11
competent
227:20
competing
215:11
Complainant
178:14
complaint
232:4
complete
115:21
116:18
117:19
121:16  214:6,
19
completed
6:17  153:22
completely
7:21  20:1, 11
29:11  93:7
263:15, 19

Confidential Information Subject to Protective Order

Compliance 182:*11*

complies 186:*24*

component 245:*2* 246:*16, 22* 247:*4, 11* 248:*5*

components 59:*7* 68:*16* 245:*9* 247:*1*

composite 33:*23*

compound 17:*17* 27:*9* 251:*5*

compounds 56:*12* 69:*5, 16, 23* 249:*1, 8* 251:*1* 258:*4* 259:*16*

comprehensive 83:*25*

compress 253:*6*

computer 212:*5, 20* 215:*7*

conceivable 258:*12*

concentration 28:*8, 10* 29:*3, 6* 130:*23* 136:*9* 142:*9, 14*

concentrations 141:*21*

concept 19:*7* 258:*18*

concepts 131:*13*

conceptual 32:*10*

Conceptually 21:*12*

concern 14:*19* 151:*19*

concerned 184:*1*

concerning 244:*8* 249:*21*

concerns 181:*4* 205:*23* 227:*12*

conclude 18:*15* 25:*17*

concluded 25:*15* 93:*2* 268:*4*

concludes 267:*25*

conclusion 68:*17* 69:*7* 80:*20* 83:*7* 85:*12* 92:*4* 147:*24* 161:*19* 199:*8* 201:*10, 13, 21* 237:*10, 23* 249:*6*

conclusions 44:*19* 70:*5* 114:*20* 116:*12* 122:*2* 257:*8*

conditions 115:*13* 147:*22* 162:*2*

conduct 50:*5* 183:*4* 204:*18* 209:*6, 22* 219:*7* 226:*18*

conducted 46:*15* 49:*2* 50:*3* 56:*21* 70:*9* 73:*9* 77:*2, 3* 78:*23* 80:*8* 82:*16* 84:*13* 90:*2* 93:*13, 24* 121:*12* 122:*15, 18* 183:*6* 203:*21* 204:*12* 208:*21* 218:*11* 227:*7*

conducting 91:*16* 132:*14* 179:*13* 243:*18*

conducts 95:*17*

conference 35:*17*

confidence 59:*19, 20, 24, 25* 60:*2* 70:*20* 148:*9* 149:*4* 159:*25* 161:*12* 199:*10*

confident 114:*17*

CONFIDENTI AL 1:*9*

confirm 196:*19* 221:*13, 14*

confirmed 196:*16*

conflict 227:*12*

confused 164:*20*

conjecture 124:*9* 196:*14*

consequences 210:*7*

consider 118:*22* 120:*6, 18*

consideration 36:*14* 103:*4*

Considered 5:*12, 14* 36:*10* 106:*24* 126:*22* 233:*7* 236:*10* 240:*20* 260:*7, 12, 17* 261:*4*

consistency 196:*10*

consistent 25:*15* 77:*5* 188:*2*

constitutes 117:*1* 230:*16*

construct 212:*7*

constructs 135:*16*

consult 261:*12*

consumers 241:*5*

contact 89:*23*

contain 73:*24* 244:*18*

contained 92:*15* 127:*3* 133:*20* 177:*12* 258:*23* 262:*1, 13*

contains 95:*24* 146:*6*

contaminant 230:*14* 231:*13* 233:*1* 234:*17*

contaminants 232:*3, 18, 21* 246:*23*

contaminat 81:*18*

contaminated 46:*18* 47:*3, 22* 48:*10* 55:*21, 24* 56:*25* 57:*13* 58:*2, 7* 62:*25* 67:*3, 11* 73:*13, 18* 74:*2* 78:*2, 16, 22* 80:*9* 81:*18, 23* 82:*21, 24* 84:*16, 21, 25* 90:*5, 9* 92:*9* 94:*11* 173:*6* 196:*16, 21, 25* 223:*3, 22* 224:*11, 21* 234:*14, 16* 239:*15* 240:*9, 16, 20* 263:*12* 264:*6*

contaminating 263:*11*

contamination 92:*18* 225:*18* 230:*17* 236:*9, 11*

contended 233:*23*

content 9:*16* 168:*9*

contention 69:*22*

contest 134:*14*

context 116:*6* 232:*6* 256:*2*

continue 25:*17* 70:*24* 153:*1* 220:*12* 221:*13* 222:*14*

continuing 243:*6*

continuously 216:*9*

contract 183:*23* 184:*19* 186:*10* 188:*6* 198:*18* 227:*7*

contributor 195:*12*

control 130:*21, 23* 131:*21* 133:*10, 21* 134:*3, 10* 142:*2*

copied 213:*8* 260:*19*

copies 214:*23*

copy 22:*23* 112:*14* 213:*12*

corner 144:*25* 150:*5* 165:*13* 167:*3* 198:*15* 199:*22* 200:*4*

correct 8:*15, 20* 11:*16* 14:*3* 17:*12* 18:*11, 24* 22:*2, 3* 26:*18, 19* 27:*19* 33:*16, 17* 35:*11, 18, 19* 36:*6, 17, 18, 25* 37:*15* 38:*23* 39:*21, 22* 40:*17* 42:*6, 7, 11, 13, 15, 24, 25* 43:*7, 10, 12, 13, 17* 46:*12,*

Confidential Information Subject to Protective Order

13, 15, 16
47:25  48:12
53:12, 14
56:3, 22, 23
57:24  58:10
60:24, 25
61:14, 15, 19,
20  62:21
63:1, 4, 13, 14,
19  66:14, 19,
20  67:15, 17
70:13  73:5,
10, 22  75:13
76:20, 21, 23
78:6, 11, 16,
18  79:2  81:8,
14  82:1, 2, 12,
17  83:3, 4
84:8, 13  85:3
87:24  88:21
89:11  90:2,
12  91:8  96:4,
5  99:9  100:6
107:5  123:11
124:4  125:5
126:6  129:24
133:1  134:8
137:1  140:16,
22  143:11, 22
144:7, 10
145:6, 11, 12
147:7, 11, 12,
18, 21  148:1,
11  149:1, 4
150:9, 10, 13,
14, 16, 20
153:7  155:10
158:23
159:16, 19, 20
160:4, 9, 12
162:6  164:3
165:2, 17, 18
168:4  170:16
173:4  175:17,
18, 20, 21
181:24  182:4,
13  184:12, 21,
22  186:4, 19
190:1, 4
200:6  201:1,
25  202:21

203:25
206:24  211:8
213:20  217:3,
6  219:19
220:4, 5
225:19  264:7
**correctly**
20:13  29:12
164:12
201:20, 22
219:10

**correspondence**
204:16, 21
205:6, 7, 20
**correspondences** 204:16
**corresponds**
135:15
**cosigned**
226:16
**cost** 215:12
**counsel** 6:3
7:22  35:18
44:23  46:22
93:20  115:4
118:10
162:21  209:7
230:24
234:20
236:13  238:7
242:21  243:2
247:6, 21
248:23
253:19  257:2
260:4, 15
261:10  265:2,
19  266:4
269:13
**Counselor**
238:5
**count** 91:4
110:25  112:6
240:9
**counted**
112:15
**counting** 109:1
**couple** 195:23
**course** 80:11
**COURT** 1:1
6:14  7:11, 24

116:13  235:3,
4, 6, 9, 11
237:19, 25
260:18, 22
**cover** 246:23
**covered** 91:1
232:3
**credentials**
208:4, 7
**CRI** 187:24
**criteria** 95:21
133:20
159:19  178:4
180:19  202:6
**critical** 250:11
**cross-
contamination**
229:8
**crossing** 32:4
**cube** 50:14
**cure** 232:10
245:4
**current** 95:20
200:17  242:19
**Curriculum**
5:10  242:15
**curve** 132:10
135:20  136:8
161:4  246:2
**curves** 130:22
**cut** 21:19
27:10, 11
28:8, 10, 18
29:6, 7
**cuts** 108:15
**CV** 98:7
242:19  243:8
244:1
**cycle** 31:2
**cycles** 30:25
**cytochrome**
61:25  64:22
**cytotoxic**
104:5, 17, 19,
23, 24, 25
105:1
**cytotoxicity**
105:5, 9

< D >
**D.C** 2:9

**daily** 258:21
259:13
**Dakota**
122:23  174:3,
14  175:14
181:9  184:3
187:9  188:20
**damage** 65:2,
7, 9, 16
153:11  155:3
**Daniela** 2:14
**Data** 3:14
27:15  29:16
30:19  39:4, 6,
9, 12, 13, 18
40:2, 10, 12,
17, 18, 20, 22
41:1, 3, 10, 13,
18, 24  48:18,
21  49:6, 15
50:18  51:16
52:1, 3, 20
69:6  83:12
84:6, 8, 10
94:25  95:15,
16  96:2
105:18, 19
106:2, 8, 12,
23, 25  107:1
115:19
116:17
117:17
119:14
121:13
122:25  123:7,
13  124:1
150:12
160:10, 16, 21
162:16, 23
163:6  168:14
170:10, 22
172:12, 15
175:16
178:15  181:4,
11  182:18
183:25  191:2
203:4  206:24
208:4, 7, 14
210:4  212:16
213:8, 12, 15,
18  214:24

215:14, 24
218:17  219:8
221:25
249:21
250:17, 22
262:17
**database**
216:19  232:2,
13, 14, 17, 19
233:6
**date** 7:5
34:12, 25
35:8, 11, 23
36:1  43:20
54:3, 9, 11
66:21  77:11,
21  78:9
98:25  113:22,
25  114:2
166:12
173:24
179:11, 12
186:20
192:13, 15, 16
196:18
**dates** 54:20,
21  77:6
178:1  197:19
**dating** 57:13
99:8
**day** 31:1
107:19
154:11, 18
269:18
**days** 264:3
**de** 21:22
**deadline** 226:6
**deal** 38:1
223:15
**decide** 123:20
204:2, 5
**decided**
171:18  204:4
**deciding**
223:16
**decision**
123:10  162:9
171:18  222:10
**decline** 256:11
**decrease** 29:15
**deeper** 195:6

**Defendant**
37:*20* 72:*19*
262:*18*
**Defendants**
2:*6* 5:*7*
37:*14* 41:*18*
46:*8* 89:*9*
112:*23* 114:*1*
146:*8* 220:*2*
240:*15* 242:*4*
262:*15*
**defending**
189:*25* 190:*2*
**Defense** 70:*12*
89:*14*, 20
92:*6*, 10, 17
109:*20*, 25
110:*17*
111:*19*, 21
112:*10* 162:*5*,
8  163:*17*
169:*23* 199:*5*
224:*19*
225:*18*, 20, 21
247:*6*
**Deficiencies**
169:*6* 208:*12*
**define** 51:*6*
**defined** 142:*20*
**definitely**
78:*5*, 7
157:*11* 209:*1*,
18
**definition**
104:*22* 105:*4*
228:*16*
229:*24* 230:*1*
232:*6* 233:*15*,
19  234:*2*
235:*14*
244:*24*
246:*10* 247:*3*
262:*10*
**Definitions**
5:*11* 233:*2*
244:*7*, 13, 18
**degree** 28:*2*
83:*4* 155:*3*
259:*24*
**delay** 28:*21*

**deleted**
117:*13* 119:*15*
**deleting** 118:*1*,
19
**Demographic**
150:*11*
**demonstrate**
54:*24* 55:*17*
56:*11* 60:*1*
95:*19*
**demonstrated**
58:*22* 61:*23*
65:*11* 249:*5*
**demonstrating**
49:*14* 61:*1*
68:*3*
**denoted**
146:*16* 170:*18*
**depended** 41:*4*
**depending**
59:*13*
**depends** 40:*24*
**depo** 107:*9*
**deponent** 7:*13*
268:*3*
**DEPOSITION**
1:*12* 3:*14*
5:*8* 6:*1*, 17
7:*7*, 15  8:*13*
34:*6*, 13, 15,
21  35:*1*, 7, 17,
21, 24  36:*2*, 4,
5, 16  44:*16*,
24  45:*10*
61:*10* 93:*2*
97:*7* 110:*6*, 9
125:*9* 237:*14*
238:*4* 242:*6*
243:*13*
255:*16* 269:*3*,
5, 15, 16  270:*3*
**depositions**
80:*2* 92:*12*
111:*18*
237:*17* 260:*19*
**Derek** 210:*6*
**describe**
49:*16* 51:*25*
**described**
133:*22*

**Description**
3:*9* 9:*19*
48:*20* 50:*17*
52:*19*
**designing**
98:*23*
**desired** 120:*20*
**destruction**
264:*1*
**detail** 111:*7*
168:*15*
**details** 106:*7*
116:*7* 132:*12*
134:*11*, 20
202:*10*
**detect** 29:*9*
**detected** 20:*9*
200:*18* 258:*19*
**detection**
14:*19* 135:*14*
137:*6*
**detector**
152:*17*
**determinates**
70:*18*
**determine**
51:*16* 80:*22*
201:*3*
**determined**
11:*10* 68:*10*
111:*9* 123:*7*
180:*17* 228:*14*
**developed**
115:*20* 116:*17*
**development**
100:*4* 253:*12*
**diag** 27:*14*
**diagnosis**
232:*10* 245:*4*
**difference**
21:*8* 51:*15*,
22, 23  52:*4*, 7,
9, 12  80:*18*,
19, 23  160:*23*
**differences**
139:*9*
**different** 41:*7*
52:*15* 62:*15*,
18  63:*5*, 15
64:*2*, 13, 22
65:*24* 74:*8*

76:*1* 85:*23*
86:*4* 119:*8*,
25  160:*22*
188:*4* 251:*8*
252:*20* 255:*4*
**differently**
45:*12* 101:*4*
**diligence**
154:*14*
**dilute** 131:*17*
135:*24* 136:*23*
**diluted** 131:*7*
135:*1*
**Dilution**
130:*11*, 18
131:*2* 135:*4*
136:*25*
140:*11*, 12
**Diovan** 54:*12*
75:*24*, 25
76:*12* 92:*2*
93:*3* 162:*1*
163:*7* 199:*14*
201:*18* 225:*6*
**Diovan/HCT**
83:*14* 84:*1*
88:*13*
**direct** 89:*23*
245:*3* 252:*2*
265:*8*
**directing**
256:*24*
**directly** 38:*2*
83:*19* 130:*16*
**disagree** 87:*3*
121:*25* 157:*5*,
8  176:*17*, 18
234:*1* 235:*14*,
25
**disagreed**
233:*19*, 22
**disagreeing**
87:*10*
**disappeared**
27:*24* 207:*5*
**disclosed**
164:*12* 248:*15*
**disclosure**
148:*5*

**discuss** 26:*9*
56:*18* 90:*24*
169:*9* 192:*8*
**discussed**
170:*14* 190:*24*
**discusses** 12:*8*
**discussing**
26:*18* 46:*7*
57:*20* 66:*16*
72:*19* 76:*23*
81:*7* 82:*10*
84:*12* 88:*20*
202:*20*
204:*10*
218:*16* 221:*7*
**Discussion**
242:*25*
**discussions**
93:*19*
**disease** 65:*25*
102:*21*
157:*22*
228:*19*
229:*14*, 23
232:*11* 245:*5*
**disintegrating**
253:*8*
**dispense**
241:*12*
**displaying**
51:*2*
**dissolution**
55:*11*, 15, 17
86:*14* 253:*14*
**distinct** 63:*10*,
15, 22
**distributed**
48:*19* 49:*6*
**distribution**
28:*3* 49:*10*,
13  56:*14*
90:*22* 249:*7*
251:*13*
**DISTRICT**
1:*1* 7:*11*
**divide** 50:*12*
**DNA** 22:*12*
23:*6*, 21
24:*11*, 20
25:*3*, 7, 9, 21
**Doc** 115:*7*

Confidential Information – Subject to Protective Order

**Doctor** 11:*24*
12:*19*  13:*20*
26:*17*  30:*20*
34:*4*  36:*22*
42:*4, 12*
43:*17*  46:*6*
53:*13*  81:*9*
88:*25*  95:*14*
97:5, *19*
102:*24*  104:*7*
105:*16*  107:5
108:*14*
110:*16*  113:*1*
115:7  116:*21*
118:*18*
121:*18*
124:*16*  125:3
126:*11*
128:*25*
129:*22*
130:*12*  132:*2*
134:*24*  138:*3*
140:*2*  141:*7*
142:*21*
143:*17*  145:*4*
146:*4*  147:5
148:*20*
149:*23*  151:*4*
152:*4*  156:*11*
158:5  160:*3*
165:*12*  167:*4*
168:*23*
173:*17, 25*
175:*9*  176:*7*
177:*7, 15*
182:*23*
185:*16, 21*
186:*9, 17*
187:*18*
189:*10*
190:*21*
191:*20*
195:*17*
196:*15*  197:*7,*
*25*  199:*7, 15,*
*21*  200:*3, 16*
201:*9*  202:*21*
203:*12*
207:*17, 23*
209:*13*
210:*16, 21*

213:5  214:*2*
218:*2*  219:*11,*
*17*  220:*20*
221:*6*  228:*6,*
*21*  231:*2, 10*
234:*24*
236:*19*  238:*9*
242:*15*  243:*7,*
*12*  244:5, *17*
246:*9*  247:*20*
249:*20*
250:*16*
256:*24*
260:*11*  261:*9*
262:*12*  266:*1,*
*15*  267:*7*
**DOCUMENT**
1:*6*  3:*14, 19,*
*22*  4:*1, 4, 8,*
*14, 17, 20*  5:*1,*
*2, 6*  23:*10*
37:*23*  72:*19*
95:*6, 10, 23,*
*24*  105:*23*
107:*7, 13, 16,*
*23*  108:*1, 5*
109:*2*  110:5
113:*2, 6, 18,*
*25*  114:5, *10,*
*19*  115:*8, 11*
116:*15*
118:*12*  122:*1*
124:*25*  125:*7*
126:*12, 14, 17*
130:*1, 6*
136:*14*
138:*11, 15*
143:*24*  145:*1*
146:5, *7, 9*
149:*24*
156:*13*  158:*4*
162:*12*
163:*11*
164:*16*
165:*19*
166:*21*
168:*24*
175:*23*
176:*23*
177:*11, 12, 14*
182:*18*

186:*23, 25*
188:*12, 15*
189:*11*  191:5
192:*2*  198:*1,*
*25*  199:*2, 3, 4*
200:*8*  202:*4*
206:*9*  207:*16*
210:*15*  211:*1*
220:*19*  221:*1,*
*20*  226:*24*
231:*24*  238:*1*
239:*14, 17*
242:*10*
244:*17*
245:*19*
246:*11, 16*
249:*15, 17, 25*
250:*11*
**documentation**
107:*3*  159:*3*
168:*13*
172:*14*
203:*14*  210:*2*
212:*7*  219:*23*
240:*18*
**documented**
180:5  206:*11*
**documents**
37:*19*  38:*7,*
*10, 11*  48:5
74:*15*  94:*8,*
*13*  108:*4, 19,*
*24*  110:*17, 23*
111:*3, 5, 10,*
*15*  112:*10*
116:*11*  127:*3*
164:*19*
188:*11*  190:*7*
205:*8*  206:*9*
214:*13*  226:*1*
247:*21*  248:*22*
**doing**  16:*24*
40:5  44:*13*
66:*11*  74:*8*
117:*17*  120:5
136:*4*  137:*21*
139:*10*
154:*14*
219:*18*  220:*1*
243:*2*  254:*1*

258:*3*
**dosage**  55:*10*
**dose**  29:*23*
30:*2, 6, 13, 15*
53:*20*  62:*23*
74:*13*  141:*11,*
*14, 16*  155:*9*
**doses**  19:*25*
20:*9*  55:*11*
102:*2, 3*
234:*10*  256:*17*
**dosing**  28:*7*
**double**  178:*18*
**doubt**  210:*17*
219:*6*
**download**
23:*1*  113:*4*
**downstream**
25:5
**dozen**  243:*22*
244:*4*
**Dr**  5:*13*  7:*13*
8:*11*  11:*13*
16:*17*  20:*4,*
*14*  23:*3, 17*
46:*3*  48:*8, 23*
49:*19*  80:*3*
93:*1*  94:*22*
95:*6*  107:*14*
113:*6*  118:*12*
242:*2*  259:*6*
260:*16*
261:*25*
267:*22*  268:*1*
**Draft**  3:*14*
96:*25*  97:*9*
**draw**  68:*17*
69:*6*
**drawing**  248:*4*
**drawn**  132:*19*
133:*3*
**draws**  52:*2*
**drew**  30:*10*
**drift**  206:*8*
**Drive**  5:*13*
260:*16*  261:5
**Drop**  27:*12*
43:*15*
**dropped**
11:*20*  14:*2*

132:*23*  234:*3,*
*5*  235:*16*
**dropping**
235:*20*  245:*25*
**drug**  29:*9, 10*
32:*11, 13*
49:*11*  51:*10,*
*11, 12*  57:*4*
59:*9*  64:*15*
75:*8*  79:*11,*
*20, 23*  85:*23*
86:*8*  88:*1*
91:*8*  94:*9*
95:*18*  97:*20*
100:*4, 5, 19*
101:*10, 20*
102:*20*  103:*4*
104:*3, 13, 14*
105:*6*  123:*23*
127:*19, 22*
135:*16*
155:*12, 15*
156:*12, 16*
157:*4, 7*
161:*7*  171:*24*
182:*12, 13*
183:*3*  186:*18*
227:*11, 20*
228:*14*  232:*9*
234:*15*  237:*6*
238:*10*  239:*7,*
*20*  240:*8, 19*
241:*4*  245:*10,*
*11*  247:*13, 14*
248:*10*  249:*7*
256:*7, 22*
262:*23, 24*
263:*23*
264:*18*
265:*23*
266:*18*  267:*6,*
*7*
**drugmakers**
226:*17*
**drugs**  59:*4*
64:*18*  65:*3,*
*17*  68:*12*
90:*15, 20*
101:*3*  103:*7*
105:*1*  222:*15*
226:*17*

227:21
234:13
236:19
243:24 250:3,
5, 19 256:18
263:12, 22
264:6 265:20
**Due** 7:18
154:5, 14
171:3, 10
172:18
236:23 252:13
**duly** 8:2
269:4
**duplicate**
133:6, 9
**duration**
102:22
**dynamics**
257:21
**Dzikowski**
2:16

**< E >**
**earlier** 19:3
54:20 78:10
93:11 97:6
107:21
145:20 148:3
158:8 166:23
225:15
**early** 100:3
152:17
216:25 226:4
243:12 255:16
**easier** 53:10
**easily** 152:16
**Eastern** 6:4
7:6 268:5
**easy** 208:5
**editorial** 223:8
**effect** 17:11
18:19 53:24
58:18 59:1
65:12 81:1
82:8 85:10
93:6 94:6
152:18 161:6
212:2 224:17
230:3 245:3,
12 249:11

251:4, 13
257:20
**effectively**
121:14
**effectiveness**
218:10
220:11 251:10
**effects** 62:11
**efficacy**
258:14
**effort** 182:24
**eight** 34:5
113:18
**eighth** 137:25
**eight-hour**
34:21
**either** 33:14
59:9 83:17
98:18 104:24
108:2 111:14
120:13
122:24
134:15
160:12
169:21
183:17 225:6,
8 249:7
251:21
255:12 269:14
**EKGs** 166:24
**elderly** 100:21
101:2, 3
**electronic**
213:12, 18
214:12, 14, 23
215:15, 22
216:2, 19
**electronically**
212:9 216:21
**elements** 9:2
**elevated**
152:24 153:10
**elevation**
157:6
**eliminated**
61:14
**elimination**
30:7 32:17
62:1 256:4
259:15, 20

**EMA** 5:2
217:17, 22
218:3, 5, 16
219:3
**e-mail** 107:21
112:22
114:12
146:22 169:1
189:13, 14
190:17 191:1
192:15, 16, 20
194:8 195:17
202:18, 25
207:20, 21, 23
208:1, 19, 24
210:5, 19, 21
211:6 212:25
213:1, 2, 6
214:10 217:2
**e-mailing**
190:18
**e-mails**
195:22
211:21 220:5
**employed**
41:7 130:11
131:3 134:13
**ended** 136:7
137:5 205:14
225:22, 23
**ends** 16:8
136:2 165:9
166:18 196:4
213:3 248:3
**enroll** 102:20
**ensure** 7:20
**entire** 11:6
15:3 113:5
197:6 209:14
237:14 264:23
**entirely** 63:6
**entitled**
175:23 269:5
**environment**
267:3
**equal** 98:14
99:12, 19
138:4
**equally** 262:2,
15
**equate** 231:13

**equilibrium**
178:3
**equipment**
131:12
**equivalent**
84:2 88:12,
13, 15
**errors** 206:10
**ESQ** 2:3, 7
**essentially**
29:11 50:6
139:23
152:21 212:22
**establish** 33:1
**established**
35:23
**estimate** 28:5
29:16, 19, 21
30:13, 18 31:4
**estimated**
26:22
**estimation**
26:25
**et** 6:9
**evaluate**
119:4, 10, 13
203:19
212:12 222:9
**evaluated**
38:25 153:3
**evaluation** 9:9
182:12 225:11
**event** 114:21
152:6 153:21
157:20, 21
**eventually**
32:14 35:6
207:8
**everybody**
51:11
**evidence**
18:14 32:8
106:24 114:9
120:12
164:14 179:6,
18 180:21
181:15
183:10 214:8
218:9, 21
219:14, 21

220:10 226:25
**evident** 202:7
**ex** 70:11
**exact** 110:5
126:17 155:19
**exactly**
108:22 144:4
217:15
233:21 262:4,
6
**exam** 39:16
**EXAMINATIO
N** 3:4, 5 8:9
241:25 261:23
**examined** 8:2
**example**
90:14 206:10
252:1
**examples**
121:2 166:22
**exams** 166:24
**exceed** 258:21
**exceeded**
70:21, 22
136:7
**excipient**
85:24 86:10
**excipients**
86:4 232:15
246:24 247:17
**excluding**
202:5
**excreted** 61:25
**excuse** 187:22
**Exforge** 59:7,
8 66:6, 13
88:2, 5, 8, 12,
16 163:7, 8
**Exhibit** 3:10,
11, 12, 13, 14,
19, 22 4:1, 4,
8, 11, 14, 17, 20
5:1, 2, 6, 7, 10,
11, 12, 13
10:10, 11, 20,
21 23:2
26:13 33:22,
23, 25 46:2
95:2, 3 97:2,
3 107:10, 11
112:19, 20

Confidential Information Subject to Protective Order

124:*13, 14*
129:*17, 18*
142:*24, 25*
145:*18, 21, 24,
25*  149:*19, 21*
158:*1, 2*
165:*6, 7*
168:*20, 21*
174:*25*  175:*1,
4, 5*  176:*1, 2*
177:*4, 5*
182:*20, 21*
185:*13, 14*
187:*12, 13*
189:*7, 8*
191:*17, 18*
197:*22, 23*
199:*18, 19*
202:*15, 16*
207:*13, 14*
210:*12, 13*
217:*19, 20, 22*
220:*16, 17*
226:*10, 11*
230:*22, 23*
242:*3, 7, 14,
16*  244:*12, 14*
245:*20*
249:*14, 20, 23*
250:*4*  252:*1,
2, 10*  260:*4, 8,
9, 14, 21, 23*
**EXHIBITS**
3:*8, 9*
**exist**  81:*2*
207:*4*
**existed**  97:*9*
**exists**  134:*19*
**expect**  32:*21*
38:*24*  67:*19*
82:*7*  85:*8*
141:*20*  248:*13*
**expected**
38:*21*  49:*2*
50:*21*  70:*12*
89:*10*  103:*25*
235:*1*  239:*3*
249:*10*
**expects**  51:*9*
**experience**
49:*23*  50:*1*

243:*13, 17*
267:*4*
**experiment**
60:*15*
**Expert**  3:*10*
8:*18, 22, 23*
9:*4, 17*  10:*9,
14, 25*  11:*18*
12:*4, 7, 12, 16*
13:*25*  14:*3, 9,
13, 15, 17*
15:*3, 4, 8*
16:*4, 7, 14, 19*
19:*16, 18*
20:*8, 17, 18*
22:*5, 7, 11, 17,
22*  23:*4, 19*
24:*21*  25:*10,
18, 21*  26:*7,
13*  33:*15*
36:*16, 24*
37:*8*  45:*11*
46:*3*  47:*13*
53:*4, 9*  79:*19,
24*  90:*25*
109:*22, 23*
110:*1*  125:*5*
126:*13*
143:*22*  145:*6*
150:*9*  158:*15*
164:*2*  165:*17*
167:*5*  169:*10,
15*  170:*15*
171:*23*
174:*11*
175:*12*
185:*20, 22*
188:*8, 11, 15*
190:*22, 24*
192:*9*  198:*7*
200:*5*  202:*21*
203:*15*
204:*13*  226:*2*
231:*4*  234:*4*
235:*17*  259:*6*
262:*1, 14*
265:*4*
**expertise**
195:*7, 8*
**experts**  44:*17*

111:*19, 21*
**expert's**  80:*2*
**Expires**
269:*25*  270:*23*
**explain**  48:*22*
60:*13*  125:*15*
250:*16*  252:*19*
**explained**
74:*16*
**export**  11:*21*
**exposed**  100:*3*
**exposure**
19:*21*  20:*1,
11, 23*  21:*3,
16*  25:*2, 5*
59:*14*  74:*24*
75:*11*  93:*6*
119:*21*
234:*10*  236:*5*
259:*13*
**expressed**
30:*25*  48:*16*
**extended**
219:*4*
**extensive**  41:*9,
12, 18, 22*
**extent**  70:*19*
98:*3*
**extractions**
178:*2*
**extreme**  90:*14*

**< F >**
**face**  254:*1*
**facilities**
122:*18, 25*
184:*8, 23*
**facility**  115:*20*
116:*17*  117:*2*
121:*12*
122:*15*  181:*6*
184:*2, 23*
187:*9*  188:*20,
21*  189:*2*
227:*10*
**fact**  21:*19*
58:*25*  83:*6*
106:*4*  168:*7*
227:*8*  253:*18*
254:*6*

**factor**  130:*18*
131:*2*  250:*22*
**factors**  126:*4,
6*  130:*11*
**facts**  18:*13*
32:*7*  114:*8*
179:*5, 18*
180:*21*
181:*15*  183:*9*
218:*20*
219:*13, 21*
226:*25*
**faculty**  243:*20*
**fail**  72:*6*
160:*12*  172:*3*
200:*21*
**failed**  70:*10*
71:*1*  96:*8, 18*
118:*20*
119:*15, 20, 23*
120:*24*  147:*6,
20*  148:*5, 10,
16, 25*  158:*7*
159:*3, 18*
160:*3*  164:*5*
183:*4*  190:*8*
193:*3*  205:*6*
225:*16*  248:*23*
**failing**  117:*13*
118:*1*  148:*19*
**fails**  160:*8*
161:*1*  164:*8*
**failure**  102:*12*
127:*24*
142:*19*  172:*8,
9*  193:*18*
197:*9*  206:*6,
7, 9, 22*  237:*2*
**fair**  25:*8*
99:*15*
**fairly**  99:*12*
251:*7*
**fairness**
162:*18*
**fall**  60:*10*
**falsification**
178:*1*
**falsifying**
178:*15*
**familiar**  50:*24*
116:*5, 6*

144:*1*  145:*7*
150:*1*  187:*4*
191:*20*
192:*11*  198:*2,
5*  215:*8*  221:*8*
**familiar-
looking**  145:*9*
**far**  59:*16*
69:*10*  92:*17*
125:*25*  130:*6*
142:*7*  234:*22*
243:*15*
**Fargo**  187:*9*
188:*20*
**fashion**  49:*4*
64:*19*
**fast**  53:*20*
**fasted**  189:*18*
**fasting**  53:*16,
17*  74:*8, 19*
75:*16, 22*
76:*5*  147:*6,
18, 22*  148:*13,
21*  159:*18*
162:*2*  169:*6*
170:*20*  171:*1,
8*  172:*17*
203:*21*
**FD**  177:*2*
**FDA**  3:*13*
4:*11*  11:*19*
12:*23*  49:*3*
51:*9*  53:*18*
55:*6*  60:*2*
71:*8*  74:*12*
77:*11*  83:*19*
85:*13, 18, 25*
86:*10, 17, 19*
94:*24*  103:*24*
105:*22*  114:*6,
17, 21*  115:*2*
119:*17*  123:*7,
8, 9, 14, 20*
124:*2*  127:*21*
128:*4*  151:*20*
164:*12, 15, 24*
166:*12*
167:*23*
168:*14*  169:*2*
170:*19*
171:*17, 18*

177:2, 8, 18, 24  178:13, 25  179:14  180:3, 7, 17  181:2  182:13, 25  184:7, 11  202:5, 8, 12, 19  203:3, 8, 21  204:10  205:4, 17, 19, 23  206:2, 17  207:6, 7, 10  209:1, 4, 21  210:1  227:3  228:15  230:1, 16  232:2, 6  244:8  248:8, 16, 17, 19  250:11  252:7  253:24  258:19  264:17  266:17

**FDA-approved**  32:13  102:11

**FDA-regulated**  181:4

**FDA's**  3:14  13:2  61:1  70:20  71:1  77:10  87:4, 10  95:14  96:25  117:1  181:22  182:3  202:25  232:13  233:2  244:18  249:22

**February**  56:22  205:19

**fed**  74:18  75:16, 19, 20  76:2, 6  170:20  171:1, 9  172:17  187:17

**Federal**  96:3  177:22  244:21  250:6

**feel**  20:19  140:14  169:16

**felt**  139:18

**female**  254:9

**females**  97:22  98:15, 18  99:13, 20  100:6, 7, 9, 13  129:3  144:9  150:15  166:6, 14  167:21, 23

**fentanyl**  228:20, 23, 25  229:7, 9, 10

**fifth**  137:24

**figure**  79:21  163:14

**file**  23:2  38:15  39:9  84:5  89:19  130:6  204:16, 21  205:7  213:18  220:22

**filed**  116:12  231:17, 20  232:23  236:16  262:11

**files**  39:3, 4  41:10, 15  54:7  71:13  72:22  83:18, 22, 24  84:7  112:15  126:25

**filing**  231:16  233:3

**film**  253:7

**final**  40:23  43:11  95:14  96:1

**find**  12:6  23:19, 23  24:1, 7  27:3  38:19  39:5, 11  52:2  83:18  141:22  154:19  155:4, 5  162:22  246:9

**finding**  39:19  154:13  155:21

**finish**  157:18  164:3

**findings**  157:6

**fine**  258:3

**finish**  28:25

**finished**  113:11  261:2

**fir**  204:23

**Firm**  2:3  35:5  37:7, 10  42:18, 19, 22  180:17  205:5

**firms**  38:4, 5  183:4

**first**  8:2  17:18  19:7, 11  21:15  25:1, 7  32:25  42:1, 5  45:2  46:10  49:25  51:11, 12  68:14  105:17  110:20  115:17  130:10, 18  133:16  138:7  143:12  146:13  149:25  157:1  159:14  164:7, 11, 20  177:17  178:24  196:22  208:17, 24  211:6, 24  213:24  218:25  226:5  243:15, 19  248:2, 14  253:22  257:17  258:18, 23  265:11, 13

**fit**  51:16  52:3  240:11

**fits**  101:17

**five**  29:8, 10  32:21  45:13, 16  140:21  141:19  218:18  220:4  259:19  261:12

**five-minute**  185:4

**five-page**  199:3

**fix**  261:6

**fixed**  143:4

**flagged**  107:2

**Flash**  5:13  260:16  261:5

**flawed**  218:6

**floor**  132:24

**flow**  256:6, 13

**flushing**  264:1

**focussed**  247:9  257:4

**folder**  242:22  245:20

**folders**  39:10

**follow**  263:5

**followed**  214:5

**following**  12:22  206:5  270:4

**follows**  8:3  235:13

**follow-up**  154:3, 15  201:4

**food**  53:21, 22, 24  74:25  75:1, 7, 11  182:13

**force**  117:11

**foregoing**  269:3  270:3

**forget**  152:12

**form**  6:11  9:5  10:3  11:22  12:17  15:19  16:21, 25  17:16  18:12, 25  25:13, 23  27:5, 25  32:6  37:21  48:1  65:4, 18  68:22  74:21  75:17  79:12  85:16  86:1  87:5  89:16  93:16  100:14

**five-minute** ... 102:6  103:16  104:20  108:7  111:11, 17  112:4  115:24  117:20  118:24  120:8, 21  122:14  123:16  124:5  127:14  128:13  137:2  151:10  153:12, 24  160:13  163:12  171:13  179:17  180:8, 20  181:13  184:13  190:9  205:9  208:8  212:7, 17  214:15, 25  215:15, 17  217:12  218:19  219:20  220:6  222:16  223:6, 23  224:22  227:23  229:2, 11  230:8  233:14, 25  234:18  237:8  238:12, 21  239:21  241:6  245:11  250:24  252:22  254:21, 25  255:25  263:1  264:8, 21  267:8

**formalities**  6:8

**format**  16:25  40:24  41:4  49:13  65:22  97:10  144:2  145:9  214:12, 14  215:22  256:18

**formed**  176:11

**forming**  33:14  123:4

forms 39:*14*
122:*12* 155:*5*
166:*23*
formulation
95:*18* 148:*4*
192:*21*
195:*11*
199:*11, 13*
201:*11, 15, 18*
248:*6*
forward 213:*2*
forwarded
107:*18* 208:*2*
found 71:*3*
106:*5* 147:*25*
foundation
18:*13* 32:*7*
65:*19* 85:*17*
180:*21*
181:*14* 183:*9*
190:*10*
206:*13*
213:*10*
218:*20*
219:*13, 21*
220:*7* 226:*25*
four 76:*14, 16*
138:*10* 140:*20*
fourth 117:*11*
150:*18*
156:*14, 19*
179:*25*
four-year
179:*2*
FOWLER 2:*7*
3:*4* 9:*5* 10:*3*
11:*22* 12:*17*
13:*3* 15:*19*
16:*21* 17:*16*
18:*12, 25*
21:*10* 25:*13,*
*23* 26:*8* 27:*5,*
*25* 28:*19, 22*
31:*19* 32:*6*
37:*2, 21*
45:*16* 48:*1*
65:*4, 18*
68:*22* 74:*4,*
*21* 75:*17*
78:*17* 79:*12*
85:*16* 86:*1*

87:*5* 89:*16*
91:*9, 17*
93:*16* 96:*9,*
*21* 97:*14*
98:*1* 99:*21*
100:*14* 102:*6*
103:*16*
104:*20* 108:*7,*
*18, 25* 110:*7,*
*12* 111:*11*
112:*4, 12*
113:*12, 17*
114:*8* 115:*3,*
*24* 116:*2, 19*
117:*20* 118:*8,*
*10, 24* 120:*8,*
*21* 121:*19*
123:*16* 124:*5*
127:*14*
128:*13* 137:*2*
138:*15* 141:*5*
151:*10*
153:*12, 24*
160:*13*
163:*12*
171:*13*
176:*22*
177:*10* 178:*5,*
*18* 179:*5, 17*
180:*8, 20*
181:*13* 182:*5*
183:*8* 184:*13*
190:*9* 194:*19*
197:*1* 205:*9*
206:*12, 25*
208:*8* 209:*7*
210:*20*
212:*17* 213:*9*
214:*15, 25*
215:*17* 217:*7,*
*12, 21* 218:*19*
219:*12, 20*
220:*6* 221:*19*
222:*4, 16*
223:*6, 23*
224:*22*
226:*23*
227:*23* 229:*2,*
*11, 19* 230:*8*
234:*18* 235:*8*
236:*12* 237:*8,*

15, 19 238:*6,*
*12, 21* 239:*21*
240:*21* 241:*6,*
*17* 242:*1, 8,*
*17, 24* 243:*1,*
*5* 244:*15*
245:*22* 246:*1,*
*5, 8* 247:*18*
251:*24*
253:*17*
255:*11*
256:*23* 260:*3,*
*5, 10, 15, 25*
261:*10* 263:*1,*
*14* 264:*8, 21*
265:*6, 18, 22*
266:*3, 8, 10,*
*21* 267:*8, 20,*
*23*
Fowlerst@gtla
w.com 2:*10*
frame 66:*25*
78:*13* 92:*20*
108:*8* 124:*24*
163:*20*
225:*22, 25*
free 140:*14*
169:*16*
186:*22* 210:*22*
frequent
179:*1, 15*
front 22:*20,*
*25* 33:*12*
68:*18* 189:*14*
229:*25* 256:*25*
full 19:*24*
30:*21*
fully 32:*19*
function 76:*2*
152:*11* 245:*6*
furnish 232:*9*
245:*2, 12*
further 60:*13*
118:*11*
150:*17*
155:*14*
172:*22*
231:*25*
241:*15* 261:*8*
267:*18, 23*

268:*3* 269:*13*

< G >
Gador 221:*7,*
*10, 17, 25*
222:*13*
Gannon 2:*13*
GC 212:*4*
gender 255:*13*
General 3:*11*
8:*13, 21* 9:*1,*
*4* 10:*2, 18*
11:*1, 5* 13:*13,*
*17* 14:*14, 17,*
*24* 16:*3, 6*
18:*23* 19:*4,*
*18, 19* 20:*17,*
*21* 22:*7, 17,*
*21* 23:*4, 18*
25:*21* 26:*1, 7*
29:*9* 109:*22,*
*25* 110:*6, 8*
231:*3* 239:*22*
generally
151:*16* 219:*8*
generated
219:*9*
generating
37:*7*
generic 20:*9*
57:*3* 66:*22*
70:*8* 75:*13,*
*15* 76:*15*
82:*20* 83:*13*
86:*8* 88:*9*
92:*7* 93:*7, 21*
95:*20* 133:*4*
163:*8* 218:*17*
226:*17*
227:*21* 248:*1,*
*10* 250:*18*
257:*22*
generically
248:*20*
generics
92:*15* 114:*24*
225:*7*
genotoxic
59:*10*
genotoxins

59:*10, 12*
Geoffrey 2:*14*
geometric
48:*16* 50:*16,*
*22* 52:*13, 20*
geometrics
48:*19* 50:*7, 13*
George 2:*15*
Gerond 2:*15*
getting 27:*20*
60:*23* 71:*20,*
*23* 103:*20*
106:*7* 109:*20*
139:*23*
166:*25* 195:*5*
205:*15* 212:*6,*
*8* 227:*6, 7*
230:*15* 252:*24*
give 15:*11*
29:*4, 17* 30:*6*
32:*10* 49:*11*
50:*17* 51:*10*
52:*18* 80:*13*
89:*15, 22*
100:*9* 101:*23*
109:*10*
125:*19* 140:*4*
186:*4* 190:*7*
195:*15*
224:*19*
225:*18*
259:*18* 261:*11*
given 29:*13,*
*23* 30:*2*
32:*11* 38:*22*
62:*22, 23*
70:*12* 89:*7,*
*11* 92:*20*
100:*6* 101:*7,*
*21* 104:*15*
107:*16*
109:*24*
126:*14*
141:*11, 15, 16*
162:*17*
211:*19* 248:*9*
256:*10*
259:*15, 20*
gives 51:*15,*
*21, 23* 52:*9*
142:*9*

**giving** 27:21
32:13 37:19
48:19 87:16,
18 128:1
256:17
**glazed** 132:7
**glossary**
136:15
**glutamic-**
**oxaloacetic**
152:11
**go** 9:10 10:7,
25 11:2, 24
12:19 13:11
14:12 16:1
19:15 22:4
23:8, 9 24:7
26:12, 14
28:17 32:2
33:8, 21 34:1,
18 35:13
36:19 41:14,
25 45:13, 17
46:2, 4 49:11,
12 52:1 53:3,
10 54:8, 25
57:19 61:3
66:2 68:15
71:12 72:25
75:21 77:9
81:3 92:24
94:14 95:8
96:25 97:11
98:3 105:11
108:10
112:24 113:9,
14 114:15, 18
115:16, 17
117:8 118:9
121:7 126:8
128:22
129:15 130:9
131:23
133:16
134:21
136:14 137:9,
18 138:25
139:9 142:13,
23 143:12, 14
144:20, 22
145:23 148:7,

12 149:9
150:3, 11
151:1, 23
156:7 157:24
158:10, 20, 25
159:21, 24
162:20
164:17 165:4,
8 166:3, 18
167:1, 12
168:18 169:4,
11 170:25
173:13, 14, 20,
22 174:5
175:6, 23
177:2 178:9,
21 179:24
180:12, 24
181:19
182:17, 18
185:2 186:6,
14 187:11, 15
189:5, 13
191:7 192:18,
24 194:5
196:8 197:7,
21 198:25
199:17, 24
200:12 201:6
202:13, 23
204:25
205:24
207:11, 19
208:16, 23
210:11, 18, 25
211:24
212:24
213:23 214:7
217:17, 25
220:9, 24
221:4 222:2
223:9, 16
226:8 231:6
233:16
234:21
235:10
254:24
256:12
261:15 266:11
**God** 139:9

**goes** 31:12
33:5 92:19
152:25 153:2
177:24 219:3
230:1 256:13,
14
**going** 29:14
37:2 38:25
44:11 48:14
51:17 52:18
54:10 55:8
56:8, 16
67:24 68:21
80:17, 23
81:25 84:22
91:3 92:25
94:5, 6 97:12
102:14, 15
106:22
107:10
131:17
137:22
177:10
194:16 209:8
223:5 224:6,
12 237:17
248:4, 7
254:11
257:11
260:17 265:1,
9, 18
**Goldenberg**
2:17
**Golkow** 7:4
**Gombar** 27:2,
3, 15 29:16,
19 30:9, 12, 19
**Good** 7:1
17:25 29:21
35:10 45:17
211:15 255:1
**Government**
226:15
**grade** 193:9
197:10
**grades** 193:24
194:11, 18
**granules** 72:4
**graph** 203:8
212:22 216:6

**Graphs.doc**
191:5
**great** 45:18
**Greenberg**
2:8 37:6, 18
38:7, 12 45:4,
9 47:15
189:25 190:3,
6
**grounds**
118:15
**groundwater**
263:11
**groups** 128:15
**GS** 205:5
**GT** 34:25
35:3 37:4, 18
38:1, 13, 20
42:21 107:20,
22 108:5
109:4 162:20
**GT's** 109:24
**guess** 16:23
62:4 160:18
193:21
262:21 263:5
**guessing** 155:5
**Guidance**
3:13, 14
85:13 86:17,
19 87:4, 11
94:24 97:1, 5,
16 110:24
**guidelines**
60:2 61:1
228:16
**guys** 138:18
237:25
**GVK** 5:2
198:15
199:22
204:10 205:5
208:5, 21
211:8 213:8
214:4, 6, 18
217:5, 18
218:7, 11, 16
219:17 220:1

< H >

**H052-12**
81:12 198:8
200:4 204:11
206:4
**H053-12**
81:12 204:12
206:5
**H219-12**
203:22
**H237-11** 53:16
**H522-10**
198:4, 11
**half** 27:10, 11,
24 28:9, 11
29:7, 8, 15
30:17 41:19,
21 214:4, 16
**half-life** 26:18,
21 27:8, 18
29:4, 23 30:4,
8, 10 32:22
256:5, 21
259:16
**half-lives**
29:10 259:19
**hand** 216:13
252:1 269:18
**handed** 120:2
**Handing** 242:9
**handle** 131:7,
15
**handled** 106:3
131:4
**Handling**
105:16 106:8,
12
**hands** 38:17
**happen** 71:22
117:4 131:6
**happened**
34:25 57:8
96:19 128:4
171:20 214:9
225:2
**happens** 264:3
**happy** 161:17
**hard** 22:23
**harder** 76:6, 8
114:14
**harm** 218:9
220:10

Confidential Information Subject to Protective Order

harmonic
50:*25*  51:*4*
**Harper**  37:*3*
**hazard**
233:*12, 13, 14*
**hazardous**
233:*10*
**hazards**  232:*4,
18*  233:*4*
**HCT**  59:*8*
76:*12*  88:*2, 5,
8, 16*  201:*19*
**HCTZ**  61:*7,
10, 13, 17*
64:*7*  76:*12,
17, 19*  79:*1*
81:*8, 17*  82:*1,
12, 20, 24*
83:*2*  84:*16,
25*  85:*3, 6*
87:*24*  88:*10,
13, 21*  90:*12*
163:*8*  170:*12*
171:*24*  249:*2*
**head**  30:*23*
31:*3*  40:*8*
51:*6*  71:*17,
21*  91:*4*
109:*6*  110:*25*
126:*20*  211:*13*
**headache**
156:*21*
**heading**  16:*15*
180:*15*
**headset**  184:*25*
**healthy**  103:*5,
23*
**hear**  8:*5, 6*
17:*20*  24:*15*
235:*2, 8, 9*
**heard**  7:*20*
18:*3*  176:*12*
191:*22, 25*
198:*20*  221:*22*
**hearing**  6:*12*
**hearsay**
177:*11*  178:*5,
18, 19*  179:*6,
18*  180:*9*
183:*8*  194:*19*
205:*10*

206:*12, 25*
217:*7, 24*
218:*20*
219:*12*  226:*24*
**heart**  101:*12*
102:*12*
127:*24*  237:*2*
256:*14*
**height**  122:*12*
**held**  7:*8*
**Helena**  211:*10*
**He'll**  113:*17*
267:*20*
**help**  107:*22*
**helpful**  169:*19*
**helps**  39:*25*
108:*15*
**hepatic**  65:*25*
251:*12*
**hepatically**
63:*17*
**hereunto**
269:*17*
**Hetero**  56:*19,
24*  57:*12*
129:*23*
**Hetero_USA**
3:*19*  124:*12*
129:*16*
**HH**  193:*9, 11,
13*  194:*12*
**high**  60:*4*
74:*19*  75:*16*
140:*25*  211:*8*
**high-clearance**
256:*18*
**higher**  13:*1, 9*
22:*13*  23:*7,
22*  30:*6*
75:*23*  135:*19*
138:*13*
141:*21*  149:*2*
**highest**  24:*5*
74:*12*  98:*20*
223:*21*
**highlighted**
11:*15*
**highlighting**
12:*1*
**hold**  259:*23*
**holding**  260:*15*

holidays
226:*3, 5*
**Hollis**  2:*3*
**home**  176:*10*
**HON**  1:*5*
**honest**  162:*13*
**hook**  212:*4*
**hooked**  212:*20*
**hope**  125:*21*
**hoping**  204:*3*
**hormonal**
152:*20*
**hospitals**
267:*1*
**hours**  34:*5*
35:*16*  36:*2*
44:*12, 14*
45:*6, 8*  72:*22*
110:*17*
136:*10*
141:*16, 19, 20*
259:*14, 21*
**Houston**
181:*6, 9, 11*
184:*1*  189:*2*
**HPLC**  131:*9*
**HTZ**  201:*16*
**Huahai**  194:*9,
13, 16*  199:*12*
211:*11*
**huge**  139:*8*
**Hughes**  2:*13*
**huh**  224:*7*
**human**  14:*22*
15:*18*  29:*13*
30:*22*  32:*3*
33:*8*  55:*18*
233:*20*  234:*2,
8*  235:*15, 24*
**humans**  22:*13*
23:*6, 21*
24:*12, 21*
25:*12, 22*
26:*21*  28:*5*
30:*14, 16*
41:*1*  86:*12*
104:*15, 16*
221:*12*  222:*8,
15*  236:*2*

hundreds
132:*18*
154:*23*  155:*1*
**HVLC**  135:*14*
**hydrochlorothi**
**azide**  58:*15*
59:*6*  61:*8*
62:*2, 8*  88:*15*
251:*17*  258:*8*
**hypertension**
102:*12*
**hypertensive**
127:*23*
**hypothetical**
32:*8*  120:*22*
123:*17*
264:*12*  267:*11*

**< I >**
**IARC**  14:*21*
233:*19*  234:*1*
235:*14, 23*
**idea**  33:*7*
74:*1*  77:*20*
99:*17*  123:*2*
208:*10*  222:*25*
**identical**
12:*24*  139:*6*
**identically**
131:*5, 7*
**identifiable**
125:*25*
**identified**
64:*14*  83:*17,
22*  88:*24*
92:*15*  93:*22*
105:*20*
112:*10*  177:*19*
**identify**  17:*1*
123:*15*
125:*24*
203:*22*  250:*3*
**if-then**  48:*9*
**II**  251:*14*
**ill**  163:*24*
**illegal**  237:*5,
23*  238:*10, 15,
18*
**illegitimate**
120:*7*
**im**  250:*20*

immunologic
155:*20*
**impact**  17:*14*
19:*12*  29:*23*
33:*18*  47:*4,
24*  48:*11*
56:*2*  58:*9*
64:*17*  65:*2,
16*  67:*13, 20,
25*  68:*11, 21*
73:*21*  78:*25*
79:*22*  81:*25*
83:*2*  85:*2*
90:*11*  92:*5*
195:*3*  224:*12*
225:*9*  253:*21*
254:*17, 18*
**implies**  215:*23*
**implying**
235:*21*
**Importance**
211:*8*  250:*21*
**important**
44:*19*  127:*19*
194:*2*  195:*12*
**impossible**
206:*23*
**impression**
91:*12, 15, 20,
25*  92:*1*
93:*12, 15, 19*
109:*11*
**improper**
138:*17*
171:*10*  237:*16*
**impurities**
11:*8*  14:*20*
80:*14, 16*
85:*21*  197:*13,
16*  218:*12*
223:*12*  224:*1*
228:*10*  239:*1*
240:*3*  246:*24*
**impurity**
222:*22*
229:*13*  230:*2,
11, 18, 19*
233:*7*  234:*17*
**inaccuracy**
35:*8*

inactive 11:8 230:7 232:2, 7, 12, 13, 17 244:8, 19 245:16 246:10, 21
include 12:21 36:13 39:8 40:10 47:7 97:21 100:21 127:3 166:13 177:25 200:20 201:23 232:17 243:8
included 39:17 41:21 47:11, 14 54:17 119:20 126:18 127:2 166:6 203:24 248:18
includes 115:19 116:16 245:8
including 77:6 95:19 180:6 200:15 247:13 248:23
inclusion 36:9 249:4
incompetent 226:17
incomplete 32:8 120:22 123:17
incomprehensible 267:9
incorporated 183:17 201:17
Incorrect 90:13 140:17
increase 25:11 152:21 155:17 157:19
increased 148:15 149:4 152:16 156:11 259:4
ind 148:18

independent 93:8 227:17 255:15
INDEX 3:8
India 122:21 128:21 129:10 166:15 167:19 168:4, 7 204:11 206:3 218:7 219:18
indicate 77:14 148:18 153:11 155:2 189:15
indicated 94:9 168:16
indicates 114:1 142:11 196:5 198:17
indication 114:9 119:24
indications 102:11
indirectly 85:4
individual 41:3 54:13 122:11 196:9
individuals 148:14
indulge 261:1
Industries 2:6
Industry 110:24 216:23
infarction 102:13
infection 154:7 155:17, 19, 22
infections 152:20
infinity 161:5 201:4
inflammation 155:18, 24, 25 156:1
inflammatory 156:4
info 208:2

INFORMATION 1:9 9:11, 13, 25 12:23 21:23 31:2, 25 37:17 39:17 40:4 41:22 70:3, 4, 13 84:5, 14, 15 89:10 90:3 92:12 123:20 180:5 222:20
ingested 27:13 63:2
ingredient 11:9 86:5 105:7, 8 228:11, 13, 17 229:1, 10, 18, 21 230:4, 7 231:12 232:7, 9, 13, 14, 17 244:19, 24 245:1, 14, 17 246:10, 17, 21, 22 247:12 253:10
ingredients 193:18 228:8, 9 232:2 244:8, 9 258:7
in-human 55:6
initial 147:13 209:4, 20
inject 131:19 211:23 212:1
injecting 130:16
injection 216:10
injury 8:14
input 240:25
inserted 16:15
inside 27:19
inspected 207:6
inspection 206:7 207:3
instance 119:19

120:24 140:15, 23
instances 117:13
Institute 173:18
instructed 75:6
instrument 212:8
instrumental 170:22
instrumentation 212:14
instruments 212:5
int 231:13
intake 233:25
integrity 121:13 123:1, 13 124:1 219:7
intended 97:20 100:20 101:2 102:21 103:15 215:9 228:11, 12, 18 229:14, 21 232:9 236:25 245:2, 11, 13 247:12 251:5 253:14 258:6
intent 105:8 163:24 228:14 235:19
intentional 28:24 185:24
intentionally 235:22
interaction 64:15 67:19
interchangeable 52:23 53:1
interest 227:13
interested 39:18 40:20 269:15
interfere 251:3
interference 13:5

internal 12:8 72:11, 16 187:25 188:5
internally 222:9
international 14:20 226:13
interpret 194:15 212:16
interrupt 97:17
interrupting 237:12
interruption 251:9
intersubject 125:10, 16 126:1
interval 59:19, 20 148:9 149:4 159:25
intervals 199:10
intraday 203:4
intravenous 27:15
intravenously 29:4, 13 256:10
InvaGen 183:1
InvaGen's 250:9
invalid 204:19, 20
invalidated 123:22
invalidating 206:19
investigation 249:22
Investigational 98:9 104:3, 12
Investigations 181:23 182:4, 11
investigators 168:9 177:19
invoice 34:25 35:2, 4, 6, 9 42:5, 8, 14, 23 43:1, 5, 8, 11

Confidential Information Subject to Protective Order

**Invoices** 3:*12*
33:*21, 24*
34:*18* 42:*1*
43:*20* 108:*11*
**involve**
184:*16, 19*
232:*3* 239:*7*
**involved**
69:*17, 23*
219:*6* 221:*15*
223:*25*
243:*21* 244:*2*
**involving**
14:*23* 253:*4*
**IRB** 99:*4*
227:*5* 243:*10,*
*11*

**IRBESARTAN**
1:*3* 7:*9*
**Iris** 2:*16*
**irrespective**
85:*19*
**isolated**
152:*21*
**isolation** 103:*2*
**issue** 20:*10*
24:*23* 26:*2, 3*
32:*23* 148:*4*
163:*25*
172:*20, 21*
207:*7* 212:*14*
233:*24*
252:*14* 256:*16*
**issues** 8:*25*
19:*4* 96:*15*
123:*14* 124:*1*
195:*11* 206:*5*
209:*4, 21*
255:*15*
**It'll** 254:*13*
**its** 11:*8*
32:*16* 71:*7*
103:*5* 209:*5,*
*22* 251:*11, 12,*
*13* 254:*13, 18*
*258:14*
**IV** 27:*21*
28:*3, 7* 29:*17,*
*23* 30:*12, 15*

32:*11, 13*

**< J >**
**January** 96:*3*
226:*5, 6*
**JERSEY** 1:*1*
7:*12*
**Johns** 169:*2*
**journal** 134:*17*
**July** 56:*22*
57:*24* 73:*10*
195:*20*
**jumps** 103:*6*
**June** 179:*3*
**justification**
97:*23* 141:*24*
**justify** 25:*5*

**< K >**
**Kansas** 2:*5*
**Kaplan** 259:*6*
**keep** 56:*8*
58:*12*
**Ken** 2:*16*
37:*2*
**Kentucky**
50:*2* 243:*16*
**kept** 163:*22*
164:*13*
208:*13* 232:*23*
**kidney** 61:*14*
**killers** 208:*12*
**kills** 105:*6*
**kilograms**
128:*9, 11*
144:*16*
150:*19* 254:*7*
**kilos** 145:*17*
166:*2* 167:*11*
254:*9*
**kind** 17:*22*
41:*15* 48:*5*
50:*3, 21*
53:*23* 106:*14*
110:*5* 112:*2*
152:*23*
154:*13*
164:*22*
197:*19* 212:*14*

**kinds** 98:*16*
152:*17* 168:*1*
244:*4* 247:*17*
**kinetics**
251:*22* 257:*20*
**knew** 64:*4*
176:*21*
**know** 9:*11*
30:*20, 24*
31:*2, 5, 23*
32:*12* 33:*11,*
*18* 35:*5*
38:*25* 46:*20*
48:*2, 8* 49:*17*
54:*15* 55:*5,*
*20, 22* 56:*24*
57:*6, 16, 18*
58:*5* 67:*1, 6*
70:*15, 18*
71:*14, 16, 19,*
*22* 72:*10*
73:*16* 74:*5, 7,*
*11, 13, 14*
77:*2, 4, 7, 18,*
*19* 78:*3*
79:*10* 81:*20*
82:*22* 84:*23*
86:*23, 25*
87:*13* 90:*7*
91:*11, 19*
92:*21* 98:*6, 7*
99:*3, 24*
100:*2, 15, 16,*
*23* 106:*7*
107:*19*
111:*23*
112:*16*
113:*10, 24*
115:*14* 116:*7,*
*25* 117:*24*
121:*3, 24*
122:*13, 14*
125:*18, 22*
126:*12*
131:*14*
132:*12*
133:*19*
134:*11, 19*
135:*6, 12*
138:*12, 18*
139:*1, 5, 20*

141:*17* 142:*1,*
*4, 10, 19*
145:*19* 152:*8*
154:*9* 156:*2,*
*3* 159:*7*
161:*17* 163:*4,*
*5, 21* 164:*13*
166:*10, 12*
167:*18, 19, 21,*
*24* 168:*1, 2,*
*10* 169:*25*
171:*16, 20*
173:*5, 8, 9, 10,*
*17* 174:*22*
187:*21, 23*
188:*22, 23*
191:*2* 193:*11,*
*14, 15, 19, 22*
194:*16, 20*
195:*1* 196:*5,*
*11, 24* 197:*8*
198:*17, 23*
202:*6, 10*
204:*7, 8*
205:*2, 13, 14*
208:*6* 210:*25*
211:*16, 24*
213:*17*
215:*10, 11, 13*
216:*24*
217:*15*
218:*14* 220:*9,*
*24* 223:*10*
224:*25* 225:*1*
228:*20*
232:*15* 233:*5*
240:*14*
241:*10* 249:*1,*
*3* 252:*4*
256:*15*
262:*16* 263:*7,*
*8* 264:*13, 14*
**knowing** 35:*1*
**knowledge**
21:*23* 82:*6*
84:*18* 139:*18*
142:*5* 197:*18*
**known** 57:*9*
80:*9* 85:*14*
125:*18*
135:*11, 21*

202:*11*
218:*13*
225:*17*
241:*12* 251:*2*
258:*5* 259:*12,*
*15*
**Knoxville**
34:*22*
**Korea** 226:*14*
227:*5*
**KUGLER** 1:*5*

**< L >**
**lab** 39:*15*
122:*13*
132:*23* 152:*6,*
*22* 157:*20*
**label** 75:*2*
**labels** 75:*5*
**Laboratories**
183:*1*
**laboratory**
178:*1* 179:*2,*
*16*
**Labs** 56:*19,*
*24* 57:*12*
**lack** 18:*13*
32:*7* 58:*19,*
*22* 62:*11*
180:*20*
181:*14* 183:*9*
218:*9, 20*
219:*13*
220:*10* 226:*24*
**Lagana's**
35:*17*
**laid** 144:*3*
**lang** 208:*25*
**language** 15:*7,*
*13, 17* 22:*18*
208:*25*
**languages**
209:*17*
**large** 54:*23*
130:*5* 166:*20*
206:*8*
**larger** 54:*25*
141:*2, 4, 17*
**largest** 55:*7*
**late-filed** 5:*14*
260:*23*

Confidential Information Subject to Protective Order

Laval 188:*21, 25*
Law 2:*3* 35:*5* 37:*7, 10* 38:*4, 5*
Lawrence 2:*15*
lawsuit 231:*18, 20*
lawyers 89:*20*
layer 178:*19*
LC 212:*4* 215:*20*
LCR 269:*24*
lead 49:*9* 116:*11* 259:*21*
leading 56:*9*
leads 49:*13*
leave 47:*9*
led 100:*16* 121:*5* 193:*18* 206:*17*
left 129:*20* 143:*17* 176:*8*
left-hand 144:*25* 200:*4*
legacy 176:*10*
legal 237:*10, 23* 238:*15, 16*
legality 238:*23*
legitimacy 119:*5* 120:*17*
legitimate 118:*23* 120:*18*
lengthy 83:*24* 236:*22* 251:*7*
letter 4:*11* 173:*2* 177:*3, 8* 181:*17* 182:*3* 209:*1, 5, 17, 21* 220:*4*
letters 76:*14, 17*
letting 234:*21*
level 17:*25* 52:*1* 59:*14* 98:*20* 117:*2* 157:*19* 223:*21* 234:*17* 236:*10* 237:*6*

levels 11:*10* 20:*9* 153:*10* 155:*17* 234:*10* 236:*5* 238:*10* 258:*19*
LIABILITY 1:*4* 7:*10*
License 269:*25*
likelihood 92:*14* 239:*10*
limit 60:*17, 25* 135:*5, 20* 136:*8, 16, 20, 21, 22* 137:*6* 142:*15, 17* 148:*14* 155:*6* 161:*12, 13* 203:*5*
limited 84:*4*
limiting 25:*2*
limits 59:*24* 60:*1, 2* 70:*20* 153:*3, 6* 201:*1*
line 11:*6, 18* 13:*15, 18, 21* 14:*1, 18* 15:*3* 16:*14* 19:*19* 22:*11* 26:*14* 48:*14* 52:*4, 5, 6, 8* 53:*6, 8* 56:*18* 57:*19* 61:*6* 63:*16* 66:*15* 73:*1* 81:*7* 82:*10* 83:*12* 95:*12, 13* 97:*19* 100:*19* 102:*18* 104:*2* 105:*16* 106:*22* 135:*17* 140:*19* 150:*18* 156:*14, 19* 159:*17* 176:*23* 192:*6, 21* 197:*2, 6* 213:*6* 270:*6*
linear 30:*3*
line-by-line 24:*7* 107:*24*

lines 16:*7* 20:*7* 179:*25*
linked 218:*10*
List 5:*12* 49:*5* 126:*22, 24* 142:*13* 260:*6, 12*
listed 175:*14* 233:*22*
listing 182:*14*
literally 29:*2* 65:*23*
literature 9:*8*
liters 31:*6, 7, 11, 12*
LITIGATION 1:*4* 7:*4, 10* 8:*19* 10:*15* 19:*6* 20:*10* 33:*16* 37:*15* 44:*17* 87:*17* 110:*21* 111:*5* 120:*5* 220:*3*
little 41:*23* 75:*23, 24* 114:*14* 143:*5* 176:*4* 199:*25* 234:*21* 252:*25* 253:*1*
liver 19:*25* 20:*11* 24:*4* 25:*3* 32:*4, 15, 16, 19* 33:*3* 61:*24* 62:*21* 63:*1, 4, 19* 64:*17* 65:*2, 6, 9, 16* 152:*11, 18* 153:*11* 155:*3, 24* 156:*1, 2* 157:*22* 256:*6, 14* 259:*2*
liver's 258:*22*
LLC 2:*7*
LLP 2:*8*
LM 148:*8*
load 243:*4*
loading 243:*4*
locate 221:*24* 244:*23*

location 122:*9* 250:*14*
lodge 217:*21*
log 199:*10*
log-normal 48:*18* 49:*15*
long 30:*20* 31:*1, 8* 33:*2, 7* 155:*13* 216:*11* 225:*4* 227:*3* 248:*15*
longer 15:*4* 30:*8*
look 16:*13* 26:*14* 31:*23* 33:*11* 41:*6, 15, 20* 54:*3* 65:*8, 23* 68:*8, 16* 69:*2, 14, 16* 71:*13* 75:*21* 102:*11* 109:*7* 111:*24* 122:*5* 123:*3, 5* 128:*19* 138:*12* 139:*10* 140:*14* 144:*4* 145:*7* 172:*10* 186:*22* 192:*11* 196:*9* 209:*16* 244:*16*
looked 33:*14* 36:*12* 46:*24* 79:*9* 110:*22, 24* 111:*16* 158:*8* 179:*10* 211:*11* 225:*15*
looking 11:*17* 13:*14* 15:*2* 16:*7, 10* 19:*19* 22:*10, 16* 23:*24* 35:*25* 41:*22* 53:*5* 80:*21* 95:*12* 102:*18* 104:*15* 105:*15* 113:*19, 21* 117:*10* 121:*10* 141:*12*

144:*24* 196:*23* 197:*11* 200:*14* 204:*22* 253:*16*
looks 115:*11, 18* 116:*23* 130:*20* 132:*11* 139:*14* 144:*1* 150:*1* 157:*13* 166:*22* 172:*4* 173:*15* 184:*4* 186:*12* 187:*3* 194:*21* 198:*2, 5* 212:*3, 13* 213:*16* 216:*7* 217:*13*
LOSARTAN 1:*3* 7:*9*
loss 237:*4*
lost 132:*15*
lot 39:*17* 40:*4, 25* 41:*2, 22* 49:*7* 110:*21, 22, 23* 126:*18* 133:*5* 168:*3, 15* 247:*16* 257:*18*
loud 17:*19*
louder 143:*2*
low 60:*3* 74:*18* 75:*15* 140:*24* 141:*12, 15* 185:*1* 236:*6* 256:*17*
lower 60:*17* 62:*8* 75:*24* 102:*2, 3* 138:*4, 9* 140:*16* 142:*14* 161:*13* 193:*3* 203:*5*
lowering 237:*1*
Lunch 94:*18*
lungs 256:*15*

< M >

Confidential Information Subject to Protective Order

ma 131:*15*
Ma'am 170:*2*
machine
130:*17, 19*
131:*19*
133:*14*
212:*10* 215:*20*
Madam
260:*21*
mail 260:*22*
main 257:*13*
maintain
205:*6* 214:*23*
239:*2*
majority
41:*17* 44:*20*
55:*6* 98:*14*
125:*17*
making 10:*5*
57:*4* 90:*14*
98:*17* 138:*21*
165:*3* 229:*6,
7* 231:*15, 18*
233:*1* 248:*1*
male 99:*19*
129:*1* 150:*12*
254:*7*
males 97:*22*
98:*15* 99:*12*
100:*6, 12*
144:*7* 145:*11*
166:*8, 10*
167:*15* 168:*6*
253:*20, 21*
man 31:*1*
245:*6*
managing
134:*18* 237:*2*
mandate
214:*23*
manipulated
180:*17* 218:*17*
manipulating
178:*15* 181:*11*
manipulation
178:*3* 180:*16*
manner 236:*4*
mannitol
232:*15*
manually
212:*23*

manufacture
66:*22* 245:*10*
247:*13*
manufactured
199:*12*
manufacturer
105:*24*
106:*19*
118:*19*
162:*21*
169:*17*
227:*18, 21*
228:*14*
262:*24*
264:*20* 266:*20*
manufacturers
37:*24* 38:*14*
40:*1* 41:*12*
57:*4* 70:*9*
75:*22* 93:*21*
122:*7* 250:*18*
manufacturing
54:*3, 20*
77:*21* 78:*9*
230:*18* 240:*4,
13*
March 1:*15*
6:*3* 7:*5* 54:*2*
55:*21* 78:*5*
82:*16* 270:*3*
mark 10:*20*
242:*14*
244:*12* 260:*8*
marked 10:*11,
21* 33:*25*
95:*3* 97:*3*
107:*11*
112:*20*
124:*14*
129:*18*
142:*25*
145:*21, 25*
149:*21* 158:*2*
165:*7* 168:*21*
175:*1, 5*
176:*2* 177:*5*
182:*21*
185:*14*
187:*13* 189:*8*
191:*18*
197:*23*

199:*19*
202:*16*
207:*14*
210:*13*
217:*20*
220:*17*
226:*11*
230:*23* 242:*7,
16* 244:*14*
249:*14* 260:*2,
9, 24*
market 55:*8*
163:*9* 190:*15*
195:*19* 227:*22*
marking 242:*3*
Marlene 2:*17*
mass 212:*4*
215:*20*
massive
223:*11*
massively
223:*3*
Materials
5:*12, 13* 89:*7,
13* 110:*18, 20*
118:*13*
126:*22, 24*
240:*17* 260:*6,
12, 17* 261:*4*
math 43:*14*
133:*5*
mathematical
259:*11*
matter 7:*8*
29:*22* 79:*6, 9,
16, 20* 80:*4*
93:*4* 94:*4, 5*
225:*10*
233:*20* 262:*19*
mattering
79:*14*
MDL 1:*5*
4:*20* 191:*16*
226:*9*
meal 53:*23*
meals 168:*9*
mean 21:*14*
25:*4* 27:*11,
22* 31:*10*
36:*11* 39:*16*
40:*11* 50:*7, 8,

9, 13, 16, 23, 25*
51:*4, 7, 19, 22*
52:*20, 21*
56:*5* 59:*18*
60:*5, 9* 64:*20*
69:*14* 70:*22*
83:*21* 89:*19*
101:*22* 106:*6*
108:*9, 14, 18,
19* 111:*3*
112:*15*
114:*14*
115:*14* 116:*3*
117:*25*
121:*23*
130:*12*
131:*20* 132:*7*
134:*9, 18*
137:*16*
138:*20* 139:*2,
6, 8, 10* 142:*1*
147:*17*
150:*24*
151:*11* 154:*7*
160:*19* 161:*2*
169:*22* 172:*6*
180:*10*
184:*14* 191:*5*
194:*15*
196:*12*
204:*18* 207:*4*
208:*6* 213:*16*
214:*11*
215:*14*
216:*15* 217:*8*
223:*24*
224:*14* 227:*1*
230:*2* 233:*11,
13* 244:*20*
262:*6* 267:*10*
meaning
204:*2* 208:*14*
meaningless
152:*22*
153:*17* 155:*15*
means 48:*16,
17, 19, 22*
50:*12* 51:*14,
20* 52:*13, 14*
60:*12, 14*
63:*18* 135:*7,

9 140:*10*
149:*8* 204:*20*
239:*20* 262:*5*
meant 9:*3, 12*
89:*19* 167:*25*
measurable
256:*22*
measure
49:*11* 130:*17*
154:*17* 161:*5,
7* 216:*11*
256:*4, 7, 11, 20*
measured
30:*8* 200:*24*
259:*17*
measures
216:*18*
measuring
130:*25*
mechanism
62:*7, 12*
64:*14* 67:*18*
68:*2* 79:*6*
85:*6, 14*
90:*22* 154:*22*
155:*16, 20*
251:*15, 17, 19*
255:*7* 258:*6*
mechanisms
22:*12* 23:*6,
21* 24:*12, 20*
25:*4, 9, 22*
80:*25* 81:*2*
82:*5* 83:*5*
85:*9* 90:*16*
251:*8, 21*
medical 9:*23*
24:*23, 25*
25:*6* 26:*3*
157:*9, 15*
259:*5, 24*
medication
153:*6* 232:*11*
medications
218:*6, 17*
medicines
218:*10*
219:*14* 220:*12*
meet 85:*13*
159:*18* 178:*4*
180:*18*

meetings 44:22 45:7
meets 95:20
Melisha 2:18 10:7, 17 11:1 13:10, 17 14:11 19:15 22:6 26:11 33:20 34:17 35:13 36:20 41:25 42:9 46:1 61:4 66:3 73:1 94:23 95:8 96:24 97:12 105:12 107:9 112:17 117:7 121:8 124:11 126:8 128:23 129:15 131:23 134:22 137:10, 19 142:22 143:15 144:19 145:2, 22 146:24 147:3 149:17 150:2 151:1, 24 156:7 157:24 158:10 159:11, 22 165:10 166:4, 17 167:1, 13 168:18 173:12, 21 174:6 175:2, 7, 22 177:3 178:10, 22 180:13, 25 181:20 182:16 185:10 186:7, 15 187:10 189:5 191:8, 15 192:17, 25 194:6 197:20 198:24 199:16, 25 200:11 201:7

202:13, 24 207:11, 20 208:17 210:10, 19 211:4 212:24 213:24 217:16 220:14 221:4 222:3 226:8 228:4 230:20 231:6, 8
Melissa 2:17
members 219:6 262:3, 10
memorized 169:13
mention 11:20 188:7 202:20 249:16 250:15
mentioned 59:4 127:16 194:2 244:7
mentioning 63:8
merely 258:12
met 44:25 71:8
metabolic 56:13 58:19, 23 63:5, 22 64:25 68:6, 15 69:17, 23
metabolism 19:7, 11 21:15 24:3 25:1, 7 27:23 28:2 64:16, 18 65:3, 16 90:17, 22 225:12, 13 249:7 251:12 258:18, 24
metabolize 24:5 32:20 101:3 258:22
metabolized 19:25 20:10 32:15 62:14,

17, 20 63:1, 4, 12, 17, 18
metadata 113:25
method 135:14 202:9
methodology 134:13 139:23 254:16
methods 41:7 225:11
methyl 232:15
MICHAEL 1:13 3:3 5:8 6:2 7:13 8:1 242:6 268:1 269:3 270:1, 20
microgram 67:17 82:4 85:8 197:12 223:13 236:6 249:9
microparticles 71:5
mid-December 226:4
midway 130:10
mild 61:25 157:19
milligram 53:12 55:9 56:12 82:4 85:5 90:15 161:24 201:16 249:9
milligrams 54:16 57:23 58:17 74:9 159:15
million 11:11, 12
mind 117:1
mine 154:18
minimize 21:15
minimize/eliminate 21:17

Minimizing 19:21 20:1, 22, 24 21:8
Minneapolis 181:9 184:3
Minnesota 174:13
minor 63:10
minority 41:17
minute 31:7, 13
minutes 26:23 27:23 28:4, 6 29:5, 6, 7, 14 30:16 31:8, 9, 17 32:4, 21, 22 45:16 141:14 232:8 241:18 259:17 261:12
mischaracterization 182:6
mischaracterizes 19:1 68:23
mischaracterizing 25:24 103:17 112:12 181:14
mishandled 132:23
misplaced 203:10
misplacing 203:17
missing 132:4 187:7 236:17
mistaken 226:4
mitigate 228:18
mitigation 245:4
mixed 185:25
model 51:13, 14, 18, 20, 21, 22 52:2, 8
modernization 212:14
modified 245:11
moment 261:2

money 45:10 264:19 265:5 266:19
monitor 157:9
monitoring 9:23 24:23, 25 25:6 26:3 122:13 157:16 259:5
months 8:13 54:21, 22 66:25 78:12 195:23 206:17
morning 7:1 36:4 53:20 119:19, 22
Move 238:7
moving 130:8 183:2
multipage 110:23
multiple 30:6 32:3, 5 51:2 61:22 65:24 121:4 132:19 255:5
multiply 50:13 136:1, 24
Murtha 2:18
muted 211:3
Mylan 83:12 84:11 175:12 179:11
Mylan-MDL 4:8 175:3
Mylan-MDL-2875-00001448 4:8 173:13
Mylan's 84:16, 21, 24

< N >
N.W 2:8
Najafi 80:3
Najafi's 93:1
name 7:2 8:11 37:3 59:7, 22 66:7 75:12 76:14

133:*4* 176:*9*
182:2 248:*20*
**named** 114:*7*
269:*6, 16*
**names** 37:*1*
168:8 182:*15*
**naming** 77:*13*
**narcotic**
228:*24*
**National** 98:*8*
**nature** 7:*18*
117:*25* 202:*9*
204:*14*
211:*20, 21*
219:*4* 241:*1*
**NDAs** 180:*7*
**NDE** 16:*15*
**NDEA** 14:*2*
16:*15* 17:6, *9,*
*12, 13* 18:5, *9,*
*21* 19:*12*
25:2 61:*19*
62:3 85:*8*
224:*17* 233:*4,*
*8, 20* 234:2
235:*15*
236:*24*
251:*16*
252:*12, 16*
255:6 257:*19*
258:*12, 19, 23,*
*25* 259:*14*
**NDMA** 11:*10*
14:*1* 16:*15*
17:6, *9, 12, 13*
18:5, *9, 21*
19:*12* 24:*4*
25:2 26:*18,*
*21* 27:*24*
29:*13* 30:*16*
32:*4, 12, 20*
61:*18* 62:*3,*
*20, 24* 63:*10*
64:3 72:*10*
79:*15* 82:*4, 7*
85:*8* 92:*15,*
*16* 93:*3, 8, 22*
104:*19*
221:*15* 224:*1,*
*5, 17* 233:*4, 8,*
*19* 234:2

235:*15*
236:*24* 249:*4*
251:*16*
252:*12, 16*
254:*18* 255:6,
*23* 256:*8*
257:*19*
258:*12, 19, 22,*
*25* 259:*14*
262:*19*
**NDMA/NDEA**
13:*16* 64:*9*
**near** 141:*18*
**necessarily**
67:*16* 127:*17*
172:*7, 8, 9, 13,*
*20*
**necessary**
40:*4* 168:*13*
172:*14* 210:*1*
**necessitated**
157:*15*
**need** 9:*23*
33:*1* 68:*8*
85:*15* 113:*14,*
*17* 127:*20*
139:*19*
161:*15* 208:*3*
210:*20*
213:*14, 19*
221:*12, 14*
234:*23*
**needed** 72:*3*
134:*16* 167:*25*
**needs** 131:*19*
213:7 214:*19*
**negative** 49:*8*
**neither** 48:*24*
**neutral** 209:*17*
**never** 35:*3*
51:5 104:*14*
106:*20*
115:*20*
116:*18*
158:*16*
171:*15*
233:*19, 22*
240:*17* 263:*3*
266:*6, 23*
267:*3*

**NEW** 1:*1*
7:*11* 86:*9*
87:*1* 98:*25*
103:7 104:*3,*
*12* 183:*3*
216:*10*
231:*12* 266:*10*
**News** 226:*14*
**next-to-last**
121:*10*
**ninth** 77:*19*
**nitrates** 69:*9*
**nitrosamine**
11:7 12:*8*
197:*16* 239:*11*
**nitrosamine-**
**contaminated**
222:*14*
**nitrosamines**
14:*22* 15:*17*
25:*11* 46:*18*
47:*3, 4, 22, 24*
48:*11* 55:*24*
56:*2, 25* 57:*5,*
*13* 58:*3, 7, 9,*
*24* 59:*12*
67:*4, 11, 13,*
*22, 24* 68:*11,*
*20* 73:*13, 18,*
*20* 74:3 78:*2,*
*16, 22, 25*
79:*11, 21, 22*
80:*14, 15*
81:*18, 23, 24*
82:*21, 24*
83:*1* 84:*17*
85:*2* 90:*6, 9,*
*10, 19* 91:*8,*
*15* 92:*2, 9*
93:*12* 94:*11*
156:*3* 173:*6*
196:*17, 22*
218:*12*
224:*21* 225:*1*
228:7 230:*6*
237:7 238:*11*
239:*7*
**noise** 184:*25*
**nonbinding**
95:*24*

**nonchild-**
**bearing** 98:*18*
**nonmanufactur**
**ing** 240:*5*
**nonsaturated**
30:*12, 15*
**normal** 49:*6,*
*10* 103:*23*
151:*21* 153:*3,*
*6* 154:*1, 4, 10,*
*16, 19* 155:*7*
**North** 114:*24*
122:*22* 174:*2,*
*14* 175:*13*
181:*9* 184:*3*
187:*9* 188:*20*
**Notary** 6:*14*
269:*8* 270:*23*
**note** 11:*6*
13:*21* 22:*12*
36:*8* 37:*1*
39:*2, 3* 46:*11,*
*14* 54:*1*
56:*21* 57:*23*
61:*7, 13*
63:*16* 66:*18*
73:*9* 77:*1*
81:*11, 13*
82:*14, 15*
83:*12* 84:*12*
106:*25*
118:*11*
203:*15* 205:*4*
232:*1*
**noted** 7:*22*
98:7 203:*21*
**notes** 100:*19*
106:*22*
109:*10, 19, 21,*
*25* 121:*11*
143:*18* 145:*2*
150:6 159:*17*
179:*1* 181:*3*
192:6 199:*2*
203:*3, 8*
221:*10* 231:*3,*
*11, 15* 232:*20*
233:*1*
**Notice** 3:*14*
5:8 6:*8*
106:*17* 107:*9*

162:*25*
203:*11* 218:*3*
242:*5*
**Notices** 250:*6*
**noting** 193:*2*
208:*20*
**Novartis** 66:*9*
76:*13* 162:*2*
**November**
34:*7, 9, 11*
**novo** 21:*22*
**number** 29:*5*
50:*15* 53:*8*
77:*10* 83:*20*
89:*2, 6* 98:*15*
99:*12, 15*
111:*24* 134:*5*
136:6 138:*24,*
*25* 140:*16*
141:*2, 4, 12,*
*15, 25* 142:*9,*
*10* 143:*14*
148:*9* 149:*2*
154:*5* 155:*4,*
*5* 163:*16*
169:*10* 170:*4*
187:*24, 25*
188:*1, 5*
195:*25* 196:*3*
198:*3* 213:*3*
219:*5*
**numbers**
27:*14* 50:*10*
99:*19* 139:*25*
141:*17*
169:*13* 186:*4*
187:7 188:*4*
**numeric**
170:*22*
**numerous**
99:*5*

< **O** >
**oaths** 269:*9*
**Object** 65:*4*
137:*2* 176:*22*
177:*10* 182:*5*
197:*1, 6*
205:*9* 208:*8*
209:*10* 222:*4*
223:6 224:*22*

Confidential Information Subject to Protective Order

230:8  250:24
252:22
254:21, 25
255:25  265:12
**objected**
247:7  265:11
**objecting**
238:1
**Objection**  9:5
10:3  11:22
12:17  13:3
15:19  16:21
17:16  18:12,
25  21:10
25:13, 23
27:5, 25
31:19  32:6
37:21  48:1
65:18  68:22
74:21  75:17
79:12  85:16
86:1  87:5
89:16  91:17
93:16  96:9,
21  97:15
98:1  102:6
103:16  108:7,
17  114:8
115:24
116:19
117:20
118:11, 14, 24
120:8, 21
121:19
123:16  124:5
138:18  141:5
151:10
153:12, 24
160:13
163:12
171:13  178:5
179:5, 17
181:13  183:8
190:9  194:19
206:12, 25
209:7  213:9
217:7, 22
218:19
219:12, 20
220:6  222:16
223:23

226:23
227:23  229:2
234:18
236:12  237:8,
22  238:12
239:21  241:6
263:1, 14
264:8, 21
266:21
**Objections**
5:7  6:10
237:20  238:3
242:4
**observe**  159:2
**observed**
23:13  45:23
52:10  94:18
149:12  185:7
206:6  241:22
261:20
**observing**
128:4
**obtained**  131:1
**obviously**
267:12
**occasionally**
154:18
**occur**  120:13
**occurred**
100:17
120:12  179:12
225:4
**occurring**  24:4
**October**  36:8
66:18  67:4
175:20  250:7
**offering**
116:25  117:5
**office**  181:11
182:10, 11
**officially**
209:4, 21
**Oh**  34:12
52:23  108:14
113:15  116:3
139:9  146:23
156:25  164:4
170:7  174:1,
22  182:8
187:21

188:16  243:1
257:25  266:9
**Okay**  11:4
13:24  15:2
18:1  20:21
22:16  23:1
31:16  35:25
36:7  43:5
44:5  45:15
60:23  61:9
66:10  67:2
72:23  76:18
82:9  113:9,
15  114:4
118:16  125:1
126:21
131:22
136:11, 17
137:17  141:8
146:12  150:2
158:18
161:23
163:16
169:20
186:13  187:5
191:14
198:12, 24
209:13  211:2
220:23, 25
221:2  231:25
235:6, 11
242:14  255:2
257:13  266:9
**old**  191:2
**older**  101:10
127:23
152:10  162:22
**once**  141:25
149:7  214:14
259:21
**one-by-one**
108:10
**one-dose**
155:11
**ones**  39:11
71:8  80:15
91:1, 5, 6, 14,
20  141:3
144:4  159:1
162:7  174:2

183:20  184:5
248:23
**one's**  141:1
**one-time**  121:4
**open**  213:19,
20
**opened**
263:19
264:25
265:15, 17
**opening**  130:3
**operation**
209:2, 19
**opined**  119:6
**opining**  228:1
**opinion**  18:21
23:6, 20
25:21  26:20
46:17  58:2, 4
62:21, 25
64:7, 10
65:15  67:2,
24  73:12
76:5, 7  78:1
79:19, 24
81:16  82:19
84:20  90:4,
18  96:10, 18,
23  98:2
102:4  114:25
116:9, 20
117:21  119:2
121:22  124:6,
8  128:2
133:24
134:12
150:21  156:5
181:10  195:2
215:4  224:5
228:6  234:12
238:14
240:22
250:23
254:17
255:13
258:16, 17
259:9, 10
**opinions**  10:2
18:23  24:13
33:14, 19
37:13  87:17,

18, 20  96:14
116:25  117:6
118:5  122:2
123:4  222:18
223:18
238:16, 23
241:8  247:8,
24  255:22
257:3, 8
259:23  262:1,
13  263:18
265:17, 21
**opposed**
108:25
**Oral**  5:8
19:25  20:8
236:5  242:5
256:18
**orally**  63:2
**ORDER**  1:10
79:21  180:18
203:22
**organ**  24:4
62:17  259:1, 4
**organism**
104:25
**organization**
183:23
184:20
186:11  188:6
198:19
**organizations**
227:8
**organized**
216:20
**organs**  19:22
20:2, 12, 23
21:4  25:5
33:5  62:15
**original**  24:8
25:16  26:2
28:8  29:3
133:25
137:25  138:4,
14  139:17
171:6  206:6,
24  231:16, 20
232:23
**outcome**
269:16

Confidential Information - Subject to Protective Order

outlier 106:*25*
200:*15, 18, 21*
201:*25* 202:*3,*
*10* 203:*23*
**Outliers**
105:*16, 20, 25*
106:*15, 19*
107:*2* 202:*5*
**outline** 16:*25*
17:*3*
**output** 31:*6,*
*10* 33:*4, 5*
**outside** 60:*11*
96:*10* 120:*9*
121:*19* 155:*6*
214:*25* 215:*3,*
*17* 222:*17*
227:*24*
234:*19*
239:*22* 240:*3,*
*22* 241:*7*
252:*6, 11*
259:*2* 263:*14*
264:*9, 22, 24*
265:*10*
**outsource**
226:*21*
**outstanding**
44:*6*
**overall** 161:*6*
**Overland** 2:*5*
**overlap** 8:*24*
19:*3, 8* 43:*2*
61:*18* 62:*5,*
*10, 14, 19* 64:*9*
**overlapping**
56:*13* 58:*19,*
*23* 64:*15*
67:*18* 79:*5*
82:*5* 83:*5*
85:*6, 9, 14*
90:*16, 21*
225:*13* 249:*6*
258:*10* 265:*24*
**overnight**
53:*20*
**oversight** 89:*5*
**owned** 131:*12*
227:*10*
**Oxycodone/ibu**

**profen** 250:*8*

**< P >**
**p.m** 94:*20*
149:*11, 14*
185:*6, 9*
241:*21, 24*
261:*19, 21*
267:*25* 268:*5*
**P450** 61:*25*
63:*7, 9, 11, 13,*
*15, 24* 64:*22*
65:*9*
**package** 75:*2,*
*5*
**page** 10:*25*
11:*2, 18*
13:*11, 13, 25*
14:*12, 14*
16:*1, 3* 19:*16,*
*17* 22:*4, 6, 19*
26:*14* 34:*2,*
*18* 35:*9, 13*
36:*19* 42:*1, 9*
46:*4* 53:*4*
57:*19* 61:*3*
66:*2* 72:*25*
76:*9* 81:*4*
83:*9* 87:*22*
88:*20* 95:*9*
97:*11, 12, 13*
105:*11, 12*
114:*16*
115:*17* 117:*8*
121:*7* 125:*4*
126:*9* 128:*23*
130:*9* 131:*24*
134:*22*
137:*10, 19*
140:*21*
142:*13*
143:*12, 14, 15,*
*21* 144:*21*
145:*5* 146:*2,*
*5, 15, 17, 19, 25*
148:*12*
149:*25* 150:*3,*
*9* 151:*2, 24*
156:*8* 158:*11*
159:*10, 22*
161:*20*

164:*11, 18*
165:*10, 17*
166:*4* 167:*5,*
*13* 173:*14, 22*
174:*6, 11*
175:*6, 12*
178:*10, 21*
180:*13, 25*
181:*20*
182:*19*
185:*22* 186:*6,*
*15* 187:*6, 15*
189:*14* 191:*7*
192:*18, 25*
194:*5* 198:*7,*
*25* 199:*1, 2,*
*25* 200:*5, 12*
201:*7* 202:*21,*
*23* 204:*13*
205:*25*
207:*20, 21*
208:*17*
210:*19*
212:*25* 213:*1,*
*24* 218:*22, 25*
221:*4* 222:*3*
231:*21*
246:*12, 15*
250:*2* 257:*7,*
*11, 15, 16*
259:*8* 270:*6*
**Page/Line** 3:*2,*
*9*
**page-by-page**
169:*12*
**pages** 39:*21*
40:*1* 111:*2*
112:*24*
113:*19* 117:*8*
138:*10*
144:*23* 146:*6*
151:*24, 25*
166:*21*
269:*10* 270:*3*
**paid** 35:*3, 6, 7*
42:*17* 43:*4,*
*19* 44:*4* 77:*16*
**paper** 27:*3*
212:*22* 216:*7,*
*16*
**papers** 27:*2*

**paragraph**
11:*6* 26:*17*
53:*5* 76:*23*
82:*9* 83:*11*
84:*12* 88:*19*
114:*15, 19*
115:*17*
117:*12* 152:*4*
159:*14* 169:*5*
170:*18*
177:*17*
178:*11, 24*
179:*25* 181:*3*
182:*23*
200:*15*
208:*24*
209:*14*
213:*25*
218:*15* 219:*1*
221:*6* 231:*8,*
*11, 22* 257:*24*
**paragraph-by-**
**paragraph**
107:*25*
**parameter**
152:*7*
**parameters**
199:*11*
**parent** 112:*22*
114:*12*
**parentheses**
136:*16*
**Park** 2:*5*
119:*8*
**part** 9:*7* 19:*5*
26:*9* 27:*16*
32:*16, 25*
33:*4* 39:*7*
45:*2* 49:*12*
51:*8, 18*
62:*13, 16*
69:*2* 72:*8*
76:*12* 89:*5*
107:*3* 118:*12*
124:*18*
127:*20*
136:*19* 148:*7*
177:*22* 194:*2*
195:*6* 226:*5*
240:*13* 262:*7*

**participant**
153:*19*
**participants**
127:*9* 129:*1,*
*7* 147:*18*
151:*5* 165:*23*
**particle** 72:*9*
147:*25* 159:*6*
194:*1* 195:*11*
248:*5* 252:*15*
253:*5*
**particles** 72:*8*
**particular**
14:*10* 15:*10,*
*16, 25* 47:*6*
197:*3*
**parties** 7:*15,*
*20* 269:*14*
**parts** 11:*11*
61:*22*
**party** 227:*17*
**pass** 19:*7, 11*
21:*15* 25:*1, 7*
32:*15* 76:*6, 8*
160:*12*
258:*18, 23*
**passed** 71:*24*
86:*9* 121:*1*
**paste** 21:*20*
**pathway**
58:*23* 62:*1,*
*18* 63:*5, 7, 9,*
*11, 13, 15, 23*
65:*10, 23* 68:*7*
**pathways**
56:*14* 58:*20*
64:*23* 68:*15*
69:*17, 23*
**patience**
182:*25*
**patient**
103:*14*
122:*11*
135:*19* 157:*22*
**patients** 75:*5*
102:*20*
103:*10* 106:*4*
127:*24*
130:*16*
132:*18*

Confidential Information Subject to Protective Order

220:*11*  248:*9*
267:*2*
**pattern**  56:*17*
121:*13*
**pause**  7:*19*
**payment**  42:*18*
**PDF**  95:*9*
97:*11, 13*
105:*12*
111:*17*
144:*21*
146:*17, 19*
147:*1*  150:*3*
212:*7*
**peak**  135:*13,*
*22*  136:*7, 9*
141:*19*
216:*10, 12, 18*
**peaks**  216:*17*
**peak's**  135:*17*
**PEG**  24:*10*
**people**  51:*12*
87:*19*  100:*3*
101:*4*  136:*6*
188:*22, 23*
195:*14*  262:*11*
**people's**
182:*15*
**percent**  27:*12*
59:*17, 20, 24*
60:*3, 4, 10, 11,*
*23*  129:*2, 5, 6*
134:*4*  139:*3,*
*7, 16, 24*
148:*8*  150:*24,*
*25*  159:*25*
160:*20, 23, 25*
161:*9*  168:*6*
170:*21*  198:*4*
199:*9*  253:*20,*
*21*
**percentage**
59:*21*  128:*25*
160:*11*
**performance**
75:*20*  130:*21*
**performed**
221:*12, 25*
**period**  133:*3*
179:*3*  218:*18*
219:*4*  220:*3*

**periodically**
263:*25*
**periods**  132:*20*
**person**  162:*22*
182:*3*  193:*13*
254:*2, 5, 9, 10,*
*11*
**personal**  8:*14*
**personally**
81:*20*
**PHARM.D**
1:*13*  3:*3*  5:*9*
6:*2*  8:*1*
242:*6*  269:*3*
270:*1, 20*
**Pharma**  2:*7*

**Pharmaceutical**
2:*6*  11:*9*
98:*12*  201:*17*
**Pharmaceutical
s**  2:*6*  57:*21*
**Pharmaceutics**
183:*1*  195:*6,*
*14*  252:*24*
253:*12*
**pharmacies**
263:*22*
**pharmacist**
241:*3*  262:*22*
264:*17*  265:*1*
266:*17*
**pharmacists**
241:*11*
**pharmacodyna
mic**  61:*18*
62:*6*  101:*13*
258:*5*
**pharmacodyna
mics**  101:*11*
**pharmacodyna
mic-shared**
62:*12*
**pharmacokinet
ic**  9:*21*  48:*18*
61:*17*  62:*5*
101:*15*
151:*18*  195:*9*
258:*5, 11*
259:*12*

**pharmacokinet
ic-based**
243:*23*
**pharmacokinet
ics**  30:*4*  101:*9*
**pharmacologic**
232:*10*  245:*3*
**pharmacology**
29:*10*  76:*16*
**pharmacy**
239:*25*  263:*24*
**pharmadynami
c**  64:*8*
**pharmakinetic**
64:*8*
**phase**  44:*17*
98:*11*  110:*20,*
*21*  226:*15*
**phases**  100:*3*
**Philadelphia**
174:*3*
**Phillip**  2:*19*
7:*3*
**phonetic**  250:*9*
**phrased**
209:*10*
**physical**
39:*16*  166:*24*
**physician**
153:*4*
**pick**  138:*23*
196:*1*
**picture**  69:*2,*
*3, 14, 15*  70:*1*
**pictures**
215:*25*
**pieces**  176:*8*
212:*21*
**pills**  66:*22*
67:*22*  76:*19*
**pilot**  147:*6, 13*
**PK**  145:*2*
199:*10*
**PK-09-024**
82:*15*
**PK-09-100**
57:*22*  143:*18*
**PK-09-103**
57:*22*  59:*15*
60:*22*

**PK-09-192**
73:*8*
**PK-09-193**
73:*8*
**PK-09-23**
82:*15*
**PK-10-023**
73:*9*
**place**  27:*23*
98:*21*  167:*25*
219:*5*  265:*11,*
*13*  269:*6*
**Plaintiff**
44:*16*  80:*2*
111:*20*
**Plaintiffs**  1:*14*
2:*2*  5:*7*  6:*3*
111:*18*  242:*5*
247:*21*  259:*6*
**planned**
226:*15*
**play**  126:*2*
255:*22*
**please**  7:*19*
10:*25*  113:*3,*
*12*  158:*23*
161:*22*
164:*18*
207:*21*  209:*8*
211:*13*  235:*9*
237:*11*
244:*25*
245:*17*
257:*10, 12, 23,*
*24*  261:*17*
266:*4*
**plus**  50:*11*
66:*12*  67:*14*
73:*5, 21*
76:*19*  79:*1*
81:*8, 17*  82:*1,*
*11, 20, 23*
83:*2*  84:*16,*
*24*  85:*3*
87:*23, 24*
88:*9, 11, 13,*
*14, 21*  90:*11,*
*12*  201:*16*
**point**  38:*18*
52:*3, 5*  54:*6*
55:*19*  72:*18*

90:*15*  101:*15*
103:*7*  121:*11*
138:*21*
156:*10, 15, 19,*
*20, 24*  157:*1*
163:*9*  171:*20*
173:*7*  200:*24*
202:*2*  214:*17*
216:*2*  232:*5*
236:*2*  257:*12*
**pointed**  261:*4*
**points**  52:*8*
101:*13*  109:*8*
160:*11*
257:*11, 14*
**policy**  263:*6*
**poor**  171:*3*
**popped**
188:*19*  220:*25*
**population**
60:*10*  97:*24*
101:*20*
103:*14*
127:*12*  147:*10*
**populations**
100:*2*
**portion**  25:*16*
233:*2*
**position**  182:*2*
233:*16*
234:*15*  236:*8*
263:*4*
**positions**
182:*15*
**positive**  49:*9*
**positive/trustfu
l**  209:*1, 18*
**possession**
163:*11*  262:*23*
**possible**
100:*22*  196:*7*
225:*5*
**possibly**
157:*10*  236:*15*
**postdoctoral**
131:*11*
**post-MI**  237:*2*

**postmyocardial**
102:*13*

Confidential Information - Subject to Protective Order

poststudy
152:6  153:5,
21  154:3
potential
98:19  107:2
262:2
powered  149:7
PowerPoints
109:13
pr  183:2
PRACS  4:11
173:18
174:13
175:15, 23
176:9, 16
249:15
P-R-A-C-S
173:18  175:16
practice
121:13  263:5
practiced  99:3
practicing
99:5
precision
203:4
preclude  103:5
predetermined
178:4  180:18
predict  29:17
predictable
64:19
predicted
52:10
predominantly
100:20  101:1
predose
142:15
preforms
222:8
pregnancy
98:20
pregnant
100:8, 9
premises
58:13
preparation
44:23  231:3
prepared
188:13
preposit  44:23

prescribed
220:13
Presence
13:15  14:1
17:9  18:5
69:5  82:3
197:11, 12
224:16
232:25
236:24
238:25
248:25
252:12
254:18  255:6
257:19  258:6
Present  2:10
68:6  245:10
258:13
presented
144:3
president
232:25
Press  5:2
217:17
pressure  62:8,
10  237:1
253:6
pretty  17:25
29:20  196:11
257:4
prevent  21:16
214:12
prevented
167:23
preventing
20:11  21:2, 3,
9
prevention
98:21  232:11
245:5
Preview/find
36:8
previous  9:12,
25  10:5
21:20  34:13,
15  101:5
144:14
151:13  179:9
188:18  212:2
219:23

235:12  266:7,
14
previously
35:22  61:23
68:25  95:6
104:10
109:24
146:10  159:5
168:24  189:2
194:2  238:2
239:18
primarily
14:23  61:14
63:17
primary  70:18
Princeton
4:20  5:1
53:11  81:7
199:17
201:16
202:14, 19
203:3  207:12
210:6, 11
213:7, 14
Princeton's
55:20, 23
81:17, 22  82:1
principles
25:6  259:12
printer  22:24
printing  113:8
printout
135:14
printouts
212:6, 8, 21
prior  20:3
49:23  55:21
67:4  110:5
164:1
priori  204:1, 4
privilege
112:23  114:13
probable
14:22  15:18
156:15  157:3
233:20  234:2
235:15, 24
probably
12:13  13:6
22:23  34:7
64:21  65:5

69:9  72:24
86:12, 13, 21
107:21
128:18  133:2
136:8  139:3
140:6, 10
143:2  154:9
155:11, 14
156:12  157:7,
9, 11, 14
164:9  173:9
191:25
198:12
213:19
215:24
240:11
243:21  244:3
problem
27:16  115:2
184:8  189:3
221:15
226:20  246:7
Procedure  6:7
203:23  204:1
proceedings
6:5  268:4
process  9:9,
20  30:5  39:8
40:10  52:16
57:5  68:13
72:3, 9, 13, 15
102:21
133:21
134:19
173:10  194:3
217:14
230:18
232:16  240:4,
5, 13  252:18,
25  258:11, 24
264:1, 15
processes
151:18  211:22
processing
171:10
produce
236:25
produced
16:8  33:24
109:19
110:17  111:3

112:25  114:1
146:7  162:5
163:17  199:4
product  54:3,
10  59:23
66:8  77:19,
22  78:15
79:11, 21
84:2  91:8
95:18, 20
97:20  100:20
161:25  162:1
164:8  172:8
194:10  197:3,
5  201:12
222:1  224:6,
11  229:22
232:9  239:7
240:9, 15
241:13
245:10, 11
247:13, 15
248:7, 21
254:3, 5, 6
production
54:9, 11  55:1,
4  77:19
PRODUCTS
1:4  7:9
54:14  56:10
58:14  86:4
93:7, 9  94:9
104:4, 5
163:8  183:5
215:12
217:23
223:22  225:6
232:24
239:10  245:7
248:2  249:5
253:13  254:3,
13  255:10
257:22
proffer  236:14
programs
263:24
Project  129:21
projects
178:17
prom  100:20

Confidential Information Subject to Protective Order

promises
214:6
pronounce
37:3
proof 155:14
proper 222:9
237:21
properly
206:9, 11
proportions
97:22
proposed
259:5
proposing
250:7

PROTECTIVE
1:10
protocol
174:9 175:10
188:1 203:24
204:1
protocols
98:11
prove 54:24
134:17 208:3
provide 87:20
97:23 109:17
172:23 203:4
provided
47:15, 17
89:6, 21
98:16 108:2
110:7 122:9
123:10
136:15
162:10
163:23
169:23
171:17
181:18 207:9
237:21 260:7
providing
37:13
Public 6:14
264:18
266:19 269:8
270:23
publication
134:15

publications
243:25
published
96:3 134:15
243:22
pull 10:8
94:23 107:8
112:17
123:23 124:3,
12 149:17
185:11 230:21
pulled 153:20
purchase
194:25
purchased
71:18
pure 250:25
purely 75:25
239:5
purpose 9:24
74:7
purposes 6:5
put 51:13, 19
70:3 77:5, 10
83:19 158:19
159:1 231:19
232:5

< Q >
qualification
142:15
qualified
87:21 195:14
quality
130:21, 22
131:20
133:10, 20
134:2, 10
142:2
quantification
203:5
quantified
24:8, 9 140:3
quantifying
24:11
quantities
56:12 67:17
82:4, 5 85:5,
8 90:16
223:13 236:6
249:9, 10

Quebec
188:21, 25
quest 263:17
question 9:13
18:18 29:1
32:25 48:9
61:23 64:5
87:15 101:6
110:12
111:12
113:20 115:5
151:14
160:22
172:13 180:4
195:15 204:8
209:11
234:23 235:2,
12 237:9
239:9 254:23
255:3 262:5,
7 266:7, 10, 15
Questioning
172:11
176:24 197:2
244:6
questions
6:11 172:10
206:16
211:12
241:15 244:6,
10 247:8, 10
249:21, 24
255:17, 19
257:18 261:8
264:25 267:19
quick 177:1
185:3 242:21
261:14
quit 237:11
quite 163:17
195:10
quote/unquote
235:19
quoting
231:24

< R >
R12-0904
189:19 190:7
race 126:2, 5

255:13
racial 125:20
raised 206:16
207:6
ran 134:16
Ranbaxy
114:7 115:13
117:13
random
138:24
randomly
111:23 212:1
range 11:11
30:3 60:11,
17 74:18
135:12 154:2,
4, 19 155:7
179:11, 12
252:7, 11
ranges 148:18
rate 70:19
101:12 259:20
rationale
255:8
rats 14:23
22:14 23:7,
22 24:12
raw 170:22
213:12 215:24
reach 16:16
18:16, 22
236:9 256:19
258:25
reaches 234:16
reaching 17:6,
13 18:7, 9
read 20:13
80:2 95:25
96:13 104:10
110:22
111:17, 19
115:10
117:23
121:24
124:23
161:19, 21
164:11 199:7
201:9, 20, 21
205:12
206:14 209:8,
13 210:20

211:2 215:16
217:8, 9
219:10 221:2
235:12
244:24
245:16
246:20 247:3
253:2 257:10,
23, 24, 25
265:16
267:20 270:3
reading 6:16
93:1 168:8
reads 14:18
19:24 20:8
48:15 102:19
208:1 222:8
ready 210:25
220:24 246:5
real 17:19
143:8 177:1
185:3 242:21
261:14
reality 164:7
realized 143:1
really 31:22
51:8 74:14
87:15 100:1
106:9 130:13
140:25 160:5
166:20
193:19
212:10 224:6
238:19
realm 103:20
reanalysis
137:22
reanalyzed
171:3, 10
172:18
reask 235:5
reason 14:10
15:11, 16, 25
47:9, 10 49:5
58:25 62:5, 6,
13 67:19
74:17 82:7
83:16 85:7
89:3 100:10
101:19, 22
103:13 106:5

Confidential Information Subject to Protective Order

116:*1, 4*
125:*24*  133:*8*
135:*4*  142:*4, 8, 13, 16, 18*
148:*10, 15, 24*
151:*16*
154:*20*  160:*2*
173:*10*
176:*16, 18*
197:*9*  235:*25*
265:*9*  270:*6*
**reasonable**
259:*24*
**reasons**
101:*24*  142:*8*
145:*8*  172:*24*
258:*10*  262:*19*
**reassay**
137:*25*  138:*3, 11, 13*  140:*16*
141:*25*
**recall**  10:*4*
40:*6*  42:*19*
54:*19*  66:*21*
71:*10*  72:*1*
74:*10, 15*
80:*1*  87:*10, 13*  114:*3*
122:*17, 22, 24*
125:*13*
137:*14*  179:*9*
189:*23*
195:*23*
221:*18*
225:*15*
237:*24*  238:*4*
244:*5, 10*
249:*20, 24*
255:*19*
**recalled**
195:*19*
**recalls**  225:*4*
**receive**  69:*25*
212:*11*
**received**  28:*7*
35:*2*  37:*16, 25*  38:*16, 18*
40:*2*  41:*5, 10*
54:*7*  69:*21*
77:*7*  83:*18, 22, 24, 25*

89:*13*  107:*20*
126:*17*  127:*1, 5*  144:*5*
158:*16*  159:*3*
164:*24*  172:*1*
210:*1*  227:*8*
**receiving**
225:*24*
**receptor**
251:*14*
**recess**  23:*13*
45:*23*  94:*18*
149:*12*  185:*7*
241:*22*  261:*20*
**recognize**
174:*13*  260:*11*
**recollection**
104:*23*  109:*6*
171:*25*
174:*23*  181:*8*
**recommendatio ns**  95:*25*
**recommended**
99:*25*  100:*24*
**recommending**
99:*19*  222:*11*
**record**  7:*2, 23*
23:*9, 12, 15*
26:*6*  45:*22, 25*  54:*7*
94:*15, 17, 20*
110:*14*
113:*10, 14*
145:*19*  149:*9, 11, 14*  174:*25*
185:*3, 6, 9*
199:*1*  235:*13*
241:*21, 24*
242:*25*
244:*24*  247:*5*
261:*16, 19, 22*
268:*2*
**records**  54:*18*
178:*2*  179:*2, 16*  214:*4, 7, 20*
**redid**  71:*7*
**redirect**
241:*18*
263:*15, 16*
264:*10, 24, 25*
**redo**  60:*15*

**redosing**
106:*23*  203:*21*
**reduce**  30:*16*
**reduction**
74:*24*  75:*3, 10*
**refer**  61:*9*
188:*2*  249:*14*
**reference**
54:*12*  83:*14*
88:*1*  106:*20*
124:*24*  161:*9*
162:*1*  199:*13*
201:*12, 18*
250:*4*  254:*3, 5*
**referenced**
187:*6*  190:*22*
220:*3*
**referencing**
97:*6*  193:*23*
196:*4*
**referred**
86:*21*  138:*9*
139:*13*  148:*3*
166:*23*  188:*3*
243:*9*
**referring**  87:*7, 14*  193:*7*
232:*8*
**refers**  246:*25*
**refit**  52:*6*
**reflect**  247:*6*
**reflected**
43:*23*  252:*10*
**reflection**
21:*18*
**reformulate**
161:*15*  164:*9*
**reformulated**
71:*6*  121:*1*
**reformulation**
71:*9*  121:*5*
252:*19*
**refreshed**
245:*20*
**refusal**  115:*12*
**refute**  94:*1*
**regard**  247:*22*
249:*13, 15, 19*
254:*17*  255:*23*
**regarded**
121:*15*

**regarding**  5:*2*
87:*23*  114:*6*
125:*11*  193:*9*
202:*19*  209:*2, 18*  217:*17*
218:*17*
**Regardless**
264:*5*
**Register**  96:*3*
250:*6*
**regression**
51:*13, 14, 18, 20, 21*
**regs**  230:*16*
**regulation**
167:*20, 22*
**Regulations**
177:*22*
214:*22*  244:*21*
**regulatory**
87:*16, 18*
96:*10, 15*
98:*2*  103:*21*
116:*20, 24*
117:*21*  118:*4, 5*  119:*1, 2*
120:*11, 15*
121:*21*
123:*19*  124:*6, 8*  128:*1*
226:*14*
240:*22, 25*
247:*8, 9*
**regurgitating**
231:*19*
**regurgitation**
231:*16*
**reinjected**
132:*3*
**rejected**
172:*18, 24*
**relate**  24:*24*
25:*9*
**related**  55:*2*
156:*12*  157:*7, 11, 14*  158:*7*
159:*5*  169:*6*
190:*7*  209:*5, 22*  211:*22*
228:*18*

**RELATES**
1:*6*  236:*15*
**relating**  106:*3*
**relation**  18:*23*
27:*18*  58:*9*
76:*4*  107:*19*
108:*1, 5*
111:*5*  137:*15*
141:*10*
156:*15*  157:*3*
**relative**  222:*21*
**relatively**
162:*25*
**Release**  5:*2*
86:*14*  195:*12*
217:*17*
227:*21*  254:*8, 12*
**released**
86:*25*  153:*23*
**releasing**
253:*9*
**relevance**
26:*1*  33:*18*
97:*15*  176:*23*
178:*6*  180:*8, 22*  183:*10*
217:*24*  219:*14*
**relevant**  84:*9*
177:*1*  181:*4*
257:*17*
**reliability**
219:*8*
**reliable**  27:*4*
**reliance**
110:*18, 20*
118:*13*
**relocated**
174:*20*  176:*20*
**relying**  72:*20*
226:*18*
**remained**  60:*1*
**remaining**
214:*7, 20*
**remarks**  147:*9*
**remember**
8:*12, 16*  33:*3*
71:*3*  168:*7*
254:*1*

**REMOTE** 2:*1* 6:*5* 7:*7, 18* 45:*1*
**Remotely** 2:*10* 7:*16, 17*
**removal** 106:*15, 24*
**remove** 12:*15, 18* 14:*8* 15:*7* 105:*18, 25*
**removed** 12:*11* 14:*5* 15:*10, 12, 17* 106:*19*
**repair** 22:*12* 23:*6, 21* 24:*11, 20* 25:*4, 7, 9, 21*
**repeat** 53:*22* 55:*18* 134:*1* 137:*13* 148:*13, 15, 21* 206:*8*
**repeated** 147:*16, 17*
**repeatedly** 247:*7*
**replace** 9:*12, 25*
**Report** 3:*10, 11* 8:*18, 22, 23* 9:*4, 17* 10:*5, 6, 9, 14, 19, 25* 11:*2, 5, 18, 21* 12:*4, 7, 12, 16* 13:*12, 13, 17, 25* 14:*3, 9, 13, 15, 18, 25* 15:*3, 4, 8, 21* 16:*2, 4, 7, 14, 20* 17:*1, 4* 19:*17, 18, 20* 20:*4, 8, 17, 18, 22* 21:*20, 21* 22:*5, 8, 11, 17, 22* 23:*4, 5, 19, 20* 24:*3, 9, 22* 25:*10, 16, 18* 26:*2, 4, 8, 13* 36:*16, 24* 37:*8* 39:*14*

40:*23* 41:*20* 44:*15* 45:*11* 46:*4* 47:*12, 14* 53:*4, 9* 56:*7* 70:*4, 5* 72:*11* 77:*7* 86:*22* 90:*25* 109:*22, 23* 110:*1* 122:*11* 123:*4* 124:*20, 21* 125:*5* 126:*14* 127:*2, 7* 139:*13* 143:*22* 145:*6* 150:*9* 155:*4* 158:*15* 162:*14* 164:*2, 24* 165:*2, 17* 166:*23* 167:*5* 169:*10, 15* 170:*15* 171:*23* 174:*11* 175:*12* 184:*6* 185:*20, 23* 186:*2* 187:*3, 23* 188:*8, 11, 15* 190:*22, 25* 192:*10* 196:*13* 198:*7* 200:*5* 202:*21* 203:*16* 204:*13* 205:*18* 212:*12* 224:*16* 226:*2, 6* 227:*24* 228:*2* 231:*4, 15* 232:*22* 234:*4, 20* 235:*17, 20* 236:*13, 16, 23* 239:*23* 240:*23* 241:*1, 8* 248:*18* 251:*7* 255:*6* 256:*25* 257:*3, 14* 262:*2, 14* 264:*9, 23* 265:*4*

**reported** 51:*17* 74:*23* 138:*2* 139:*15* 140:*13, 15, 18* 142:*8* 184:*5, 17, 21* 225:*23* 269:*7*
**Reporter** 6:*15* 7:*24* 235:*3, 4, 6, 9, 11* 260:*18, 22* 269:*8*
**REPORTER'S** 269:*1*
**reporting** 7:*19*
**reports** 19:*9* 33:*15* 38:*19* 58:*22* 111:*20* 122:*10* 127:*4* 206:*7, 23* 233:*18, 24*
**represent** 146:*6* 176:*15*
**representative** 127:*12*
**represented** 189:*24*
**represents** 190:*4*
**request** 107:*23* 108:*6* 162:*15* 208:*2* 225:*21*
**requested** 47:*18* 108:*3, 24* 109:*15* 167:*24* 226:*1*
**requesting** 166:*13*
**requests** 108:*1, 21*
**require** 85:*25* 86:*6, 10* 127:*21*
**required** 74:*12* 104:*4* 128:*5* 152:*22*
**requirements** 70:*20, 21* 95:*15* 96:*1* 177:*21*

**requires** 53:*18* 55:*6* 85:*18* 95:*16* 248:*4*
**rereviewing** 44:*18*
**rerun** 140:*17* 142:*3*
**Research** 4:*13* 14:*21* 177:*3, 8* 181:*5* 182:*12* 183:*7, 23* 184:*20* 186:*10* 187:*16* 188:*1*
**reserve** 237:*17*
**reserved** 6:*11*
**residency** 50:*2* 243:*15*
**respects** 27:*6*
**respond** 162:*18*
**responded** 205:*22*
**responding** 107:*22*
**response** 17:*22* 75:*8* 108:*20* 110:*4* 114:*20* 170:*22* 195:*24* 205:*13* 211:*11* 233:*2* 239:*3, 13* 249:*12* 251:*22* 258:*14*
**Responses** 5:*7* 242:*4*
**responsible** 37:*19* 42:*22*
**result** 28:*1, 4* 84:*1* 117:*4* 119:*16, 20, 24* 120:*1* 127:*2* 133:*13, 15, 16, 17* 136:*24* 140:*5, 7* 209:*25* 253:*8*
**results** 39:*16* 54:*13* 117:*14,*

15 118:*2, 20, 21* 119:*17*
120:*20*
133:*25* 134:*1*
138:*11, 13, 14*
140:*25*
147:*11*
156:*17, 18*
160:*1* 161:*23*
166:*24* 180:*6*
189:*15*
190:*24* 195:*4*
204:*20*
221:*16*
222:*22, 24*
223:*5* 227:*3*
240:*6* 252:*3, 6, 10, 20*
253:*23*
**retain** 206:*6, 22* 254:*13*
**retained** 69:*4* 79:*17*
**retested** 117:*14* 119:*15* 120:*19*
**retesting** 118:*20* 119:*25*
**return** 153:*6* 154:*10* 262:*24*
**returned** 176:*9*
**review** 9:*10* 23:*4, 18* 26:*7* 38:*7* 40:*16, 22, 23* 80:*9, 12* 84:*8, 9* 89:*7, 8* 94:*8* 98:*9, 10* 113:*5, 16, 18* 114:*4* 133:*23* 164:*5* 169:*15* 196:*8* 213:*8, 15* 220:*23* 250:*21*
**reviewed** 54:*18* 91:*7* 95:*5* 106:*18* 111:*4, 7, 10* 126:*21, 23* 134:*15* 164:*3*

Confidential Information Subject to Protective Order

189:*21*
219:*24*
231:*24* 239:*6*
242:*12* 248:*19*
**reviewer**
164:*22, 23*
**reviewers**
134:*17*
**reviewing**
23:*10* 35:*17*
36:*3* 39:*3, 5*
44:*15* 113:*11*
137:*14*
203:*12* 250:*17*
**reviews**
124:*25* 125:*7*
156:*13* 211:*1*
221:*1*
**revised** 72:*3*
**rid** 263:*22*
**right** 8:*11*
12:*21* 13:*10,*
*14, 18* 14:*11*
20:*6* 22:*10,*
*25* 23:*3, 17*
26:*11* 33:*6,*
*10, 20* 34:*1, 4*
35:*12* 36:*22*
43:*18* 44:*1*
46:*1, 10* 48:*7*
53:*3* 54:*16*
57:*19* 59:*15*
61:*6* 71:*3*
73:*3* 76:*9, 11*
81:*3, 6* 83:*11*
95:*5, 12*
96:*24* 97:*19*
102:*9* 105:*10,*
*15* 106:*1*
113:*1, 13*
115:*7, 16*
117:*7, 10*
124:*11, 19*
129:*14* 130:*9,*
*10* 132:*2*
142:*7, 22*
144:*18, 22*
145:*22*
146:*20*
149:*16* 152:*2*
157:*23* 159:*9*

160:*8* 161:*1*
165:*12, 22*
168:*17*
170:*18*
172:*22*
173:*12* 174:*7*
175:*2, 22*
177:*7, 17*
178:*9, 10, 24*
179:*23* 182:*8,*
*16* 185:*10, 16*
186:*17*
187:*10* 189:*4*
191:*14* 192:*5,*
*17* 194:*4*
197:*20, 25*
198:*14*
199:*16* 202:*1*
203:*2* 204:*9,*
*21* 210:*10*
213:*5, 24*
215:*6, 7*
217:*16*
220:*14* 221:*3,*
*17, 18* 223:*5*
230:*20* 231:*7*
232:*1* 237:*18*
246:*4* 248:*14*
261:*13* 264:*5*
**right-hand**
11:*4* 59:*16*
150:*5* 165:*13*
167:*3* 198:*14*
199:*22*
**rings** 144:*2*
198:*4*
**risk** 21:*17*
25:*11* 259:*4*
**ROBERT** 1:*5*
**role** 255:*22*
**rolls** 216:*9*
**RO-MDL** 4:*4*
165:*4*
**RO-MDL-
2875-0004639**
4:*4* 157:*25*
**RO-MDL-
2875-0061940**
4:*3* 149:*18*

**RO-MDL-
2875-0080263**
4:*7* 168:*19*
**room** 45:*19*
**root** 50:*14*
71:*2* 72:*16*
**round** 29:*5*
161:*17*
**route** 32:*14,*
*16* 64:*15*
234:*9*
**row** 159:*25*
**rule** 29:*10*
95:*14* 96:*1*
**Rules** 6:*6*
**run** 42:*3*
132:*8, 9*
133:*6, 18*
134:*5* 135:*11,*
*22* 136:*23*
182:*25* 206:*8*
248:*2*
**running** 97:*15*
109:*5* 133:*8*
**runs** 172:*18,*
*24* 216:*7*
263:*24*

< S >
**S50** 152:*5*
**SA** 2:*7*
**safety** 103:*4*
156:*17, 18*
**SAITH** 268:*3*
**sample**
131:*18*
132:*10, 22*
133:*14* 135:*4,*
*24* 141:*10*
142:*15*
171:*10* 178:*2*
211:*24*
**sample/second**
211:*25*
**samples**
117:*14*
118:*20*
119:*25*
120:*19*
130:*15* 131:*1,*
*3, 8, 15* 132:*3,*

*16, 19* 133:*3,*
*5* 134:*16, 25*
135:*11*
136:*21*
137:*13, 22*
142:*3* 171:*2,*
*6, 9* 172:*17,*
*25* 178:*3, 16*
180:*16, 18*
189:*1* 206:*4,*
*11* 211:*23*
**sanctioned**
138:*19*
**sanctioning**
237:*25*
**sanctions**
237:*18*
**sat** 21:*21*
36:*16*
**satisfaction**
205:*17*
**satisfactorily**
205:*22* 207:*9*
**saturate** 30:*7*
**saturated**
30:*6, 10*
**saw** 70:*16*
106:*20*
119:*19*
120:*24* 121:*1*
144:*14* 148:*3*
159:*5* 194:*2*
**saying** 79:*15*
93:*4* 179:*15*
184:*16*
188:*16* 206:*3*
208:*25* 217:*5*
234:*7* 265:*5*
**says** 13:*15*
14:*1* 19:*20*
21:*2* 59:*16*
95:*14* 97:*20*
101:*1* 104:*3*
105:*17*
114:*16*
115:*19*
117:*12* 125:*1*
130:*11* 134:*3*
135:*3* 140:*3*
142:*8* 144:*23*
146:*5, 13*

152:*5* 156:*15*
158:*13*
164:*21*
170:*19* 171:*1*
172:*16* 176:*7*
177:*18*
178:*13* 180:*3,*
*16* 182:*24*
184:*15*
185:*17*
189:*14*
190:*14* 191:*4*
192:*21* 193:*8*
194:*9* 198:*15*
200:*15, 17*
204:*23* 207:*3*
210:*6* 211:*11*
213:*7* 226:*15*
246:*18*
**scale** 54:*25*
**scales** 55:*4*
**scan** 212:*6*
**scanned**
214:*17* 216:*2*
**scanning**
214:*6, 19*
**science** 252:*18*
**scientific**
80:*24* 182:*11*
225:*10* 249:*6*
251:*1* 255:*7*
259:*3, 24*
**scope** 15:*20*
96:*11* 116:*2*
117:*21* 120:*9,*
*22* 121:*20*
124:*6* 127:*14*
153:*13* 215:*1,*
*3, 18* 222:*17*
227:*24*
234:*19*
236:*13*
239:*22*
240:*23* 241:*7*
263:*2, 15, 19*
264:*9, 22*
265:*10, 17*
**scratch** 18:*8*
24:*19* 67:*8*
70:*7* 119:*12*

Confidential Information Subject to Protective Order

153:*9*  192:*14*
222:*12*  234:*14*
**screen**  26:*8*
130:*4*
**scroll**  113:*3*
144:*21*  147:*2*
170:*3*  176:*3*
**search**  9:*9*
**second**  17:*1*
40:*9*  42:*8*
51:*11, 12*
115:*17*
124:*18*
133:*16*
138:*12*
139:*15*  140:*2*
146:*2*  152:*4*
156:*10, 14, 18,
20*  169:*4*
173:*14*
178:*11*  181:*3*
182:*19*
187:*15*  194:*8*
199:*25*
207:*19, 21*
211:*25*  213:*6*
221:*6*  222:*3*
234:*3*  235:*17,
20*  250:*2*
258:*17*
**Secondly**
166:*15*  184:*4*
**section**  9:*20,
22*  54:*8*  66:*6*
76:*18*  87:*23*
137:*12*  187:*3*
231:*14*
232:*22*
236:*22*  251:*7*
257:*8*
**sections**  17:*2*
**see**  11:*5, 13,
19, 25*  12:*10*
13:*20*  14:*24*
16:*10, 17*
20:*3, 21*  21:*1,
5*  22:*11, 17*
23:*5*  30:*25*
34:*5*  36:*13*
38:*11*  39:*25*
41:*20*  53:*24*

58:*13*  64:*6*
65:*10, 25*
69:*6*  70:*23,
25*  87:*6*
88:*23, 24*
89:*1*  95:*13,
22*  102:*24*
103:*25*  104:*2,
7*  105:*16*
109:*6*  114:*18*
119:*11, 14*
124:*16, 20*
128:*19*
129:*20*  131:*2*
132:*2, 10*
134:*24*  135:*2,
3*  136:*14*
137:*21*  139:*8*
140:*17*  141:*3*
142:*7*  143:*13,
17*  146:*4, 12*
147:*3, 5, 8*
148:*18, 22*
150:*18*  152:*5*
155:*7*  156:*11*
157:*1*  158:*13,
14*  159:*13, 25*
164:*6, 14*
165:*13*
166:*24*  167:*4*
168:*5*  169:*3,
5, 12, 14, 16, 20*
170:*19, 24*
171:*1, 7*
172:*16, 22*
173:*1, 2, 14*
174:*9*  175:*9,
13*  176:*7*
177:*7, 9, 18,
23, 24*  178:*8,
13, 20, 25*
179:*7, 19, 20*
180:*3, 10, 16,
23*  181:*2, 25*
182:*14, 24*
183:*11*
184:*11*
185:*16, 18*
186:*9, 17*
187:*18*
188:*16*

189:*14, 17, 18*
190:*14, 18*
191:*4, 12, 13*
192:*5, 20, 23*
194:*8*  198:*10,
13, 15*  199:*21*
200:*3, 16, 21*
203:*2, 8, 13,
20*  204:*9, 20*
206:*2*  207:*23,
25*  208:*1, 19,
22, 24*  210:*6,
8*  211:*10, 13*
213:*6*  214:*2*
217:*2, 4*
218:*5, 8, 15*
219:*2, 22*
222:*7*  226:*13*
231:*7*  243:*1*
245:*1*  254:*11*
257:*7*
**seeing**  74:*11,
15*  114:*3*
221:*19*  245:*19*
**seen**  94:*12*
97:*9*  99:*4*
101:*8*  107:*13,
15*  113:*2*
119:*23, 24*
126:*11*  130:*1*
137:*16*
143:*24*  146:*9*
149:*23, 25*
158:*4*  159:*7*
165:*19*
168:*23*
173:*19*  174:*2*
177:*14*
186:*25*
189:*10*
190:*11*  192:*2*
197:*25*
207:*16*
210:*15, 22*
214:*8*  218:*2*
220:*19*
221:*16, 21*
222:*20*
240:*17*  242:*9*
247:*20*
**seismic**  216:*8*

**seismograph**
216:*8*
**select**  52:*8*
111:*23*
**selection**  74:*11*
**sell**  226:*17*
237:*6*  238:*10,
18*  264:*6, 18*
265:*1, 20, 23*
266:*18*  267:*6,
11, 12, 16, 17*
**selling**  219:*19*
**send**  38:*13, 19*
47:*18*  108:*5,
11*  168:*14*
214:*7, 20*
215:*21*  260:*18*
**sending**
126:*25*
213:*17*  223:*3*
**sense**  124:*10*
196:*14*
**sensitive**
102:*1*  152:*15,
19*  153:*15*
**sensitivity**
101:*12*  130:*19*
**sent**  34:*25*
35:*3, 4*  40:*19*
42:*17, 20, 21*
71:*23*  89:*22*
108:*20*  109:*4,
12*  111:*6, 16*
112:*10, 14*
114:*6*  115:*2*
195:*17*
205:*20, 21*
211:*8*  223:*21*
**sentence**
14:*18*  15:*4*
19:*24*  20:*7,
17*  21:*13, 25*
48:*15*  64:*13*
95:*25*  101:*1*
103:*3*  105:*17*
115:*18*
117:*11*
121:*11*
164:*21*
178:*11*  222:*7*
231:*11*

**separate**
63:*10, 14*  64:*3*
**September**
34:*6, 15, 21*
35:*9, 15, 21*
36:*1*  174:*1*
**sequence**
157:*12*  211:*23*
**serum**  152:*11*
**Services**  7:*4*
**sessions**  45:*1*
**set**  137:*8*
269:*17*
**setting**  116:*15*
**seven**  141:*20*
**sexes**  97:*21*
98:*24*  100:*11*
**SGO**  152:*24*
**SGOT**  152:*7*
153:*9, 10, 23*
155:*17*
156:*12*  157:*6*
**SGPT**  152:*7*
153:*10*
**share**  23:*2*
68:*6*  258:*4*
**shared**  62:*1, 2*
220:*22*
**sheets**  180:*5*
**short**  162:*25*
225:*22*
**Shorthand**
269:*8*
**show**  64:*25*
80:*18, 23*
90:*17*  155:*3*
242:*2*  248:*24*
**showed**  86:*14*
184:*1*  248:*23*
**showing**  68:*4*
154:*15*
249:*13, 23*
252:*3*
**shown**  65:*11*
123:*25*
247:*22*
251:*25*
253:*19*  254:*17*
**shows**  43:*14*
**sic**  21:*13*
57:*17*  64:*8*

93:13  106:5
117:11
148:24  211:7
230:22
232:25  260:4,
14, 21
**side**  8:18
11:4  120:15,
16  130:3
**side-effect**
122:13
**sift**  39:10
40:3  72:22
**sifting**  39:18
**signaling**
156:1
**signature**
181:25  182:7,
10
**signed**  114:23
173:25
175:19  181:22
**significance**
75:4
**significant**
177:19  181:3
**signing**  6:16
**similar**  9:2
97:22  125:20,
21  152:14
254:22  255:3
**similarity**
59:22
**simply**  21:19
260:6
**Simpson**  2:16
**single**  47:14
138:5  248:14
263:18
**single-sex**
97:24
**sir**  258:1
**sit**  87:12
96:12
**site**  206:3, 7
207:3, 5
209:2, 19
219:7  251:14
**sites**  123:7
168:8  175:14

**sitting**  22:25
33:6  87:9
**situation**
237:2  256:21
266:23
**situations**
40:3  102:19
103:4
**six**  8:13
140:21
141:19
184:12  206:17
**six-and-a-half**
58:16
**six-and-a-**
**quarter**  58:16
**sixth**  121:3
**six-year**
182:24
**size**  55:8
71:4  72:4, 7
130:6  147:10,
25  159:6
194:1  195:12
248:5  252:15
253:5
**sizes**  125:21
**skip**  209:9
**slightly**  64:13
138:9  154:4
254:23  255:3
**small**  74:23
75:3, 10
147:10
**Smaller**  19:25
30:2  55:11
**smart**  163:13
**software**
212:9, 15, 20
213:7, 15, 19,
20  215:6, 9,
15  216:17
217:6
**sold**  197:4
217:23
219:15  241:5
**solely**  105:19
247:9
**somebody**
116:8  163:22
214:12

**somewhat**
57:8  212:1
225:22
**sorry**  8:4, 6
24:15, 17
28:17, 18
34:10  39:24
43:25  60:7
70:24  91:25
92:24  94:3
113:7  116:3
114:9  143:15
144:17
148:20
152:25  153:1
154:24, 25
157:1, 5
158:22
160:14  172:7
192:14  196:2
204:23  205:1,
5  211:20
213:1  224:8
233:18  243:2
246:3  254:23
255:20  258:2
266:3
**sort**  16:25
52:1  135:16
**sought**  117:15
118:21
**sound**  43:16
**sounds**  43:18
45:18  112:2
197:9
**source**  206:9
**speak**  17:19
**speaking**  7:20
143:2
**speaks**  138:15
238:2
**spec**  212:4
215:20
**species**  28:7
**specific**  65:9
83:19  89:1
118:7  122:15
126:14
**specifically**
38:11  55:22

73:20  122:20
132:25  246:25
**specification**
149:7
**specificity**
237:20
**specified**
245:12
**speculating**
213:21
**speculation**
31:20  102:7
205:10  207:1
**speeds**  212:11
**spent**  250:17
**spilling**  123:19
**spinning**
211:14
**split-screen**
10:18
**spoke**  266:3
**Springer**  2:10
**square**  52:7,
13
**squares**  51:7,
16  52:9, 21
**stable**  102:22
103:10
**staff**  219:6
**stage**  8:14
**stamp**  95:21
**stand**  136:12
152:9  193:11,
20  194:12
**standard**
53:23  99:6
130:22
133:10  134:3
135:20  136:8
161:9  201:5
202:3
**standards**
71:1, 9
130:21  131:21
**standpoint**
251:1
**stands**  193:16
**start**  34:22
73:1  104:16
195:5  262:9

**started**  36:23
99:3, 18
166:13
196:13
243:19  256:12
**starting**  68:14
82:10  83:11
194:18
**starts**  20:7
53:6  95:13
103:19  106:7
123:19
230:15  252:24
**state**  75:23
163:7  266:4
269:9
**stated**  85:5
93:3  239:18
255:4
**statement**
24:2, 9  65:13
101:16  103:1
105:21
115:23
121:17
231:14, 18
**STATES**  1:1
7:11  223:4,
22  238:11, 19
**statistical**
50:20  60:18
105:18, 20, 25
106:8, 11, 25
200:18  202:9
**statistician**
49:18
**statisticians**
48:25
**statistics**  49:7,
10, 21  120:16
248:12
**stenographic**
7:23
**STEPHEN**  2:7
**steps**  209:4, 20
**Steve**  37:2
45:15  245:18
**stipulations**
98:17
**stomach**

Confidential Information Subject to Protective Order

53:*21, 22*
**stop** 221:*14*
**storage** 240:*4*
**store** 131:*16*
**straight**
135:*17*
**Street** 2:*8*
116:*8*
**strengths**
193:*3*
**structure**
77:*14* 245:*5*
**studied** 64:*23*
65:*6* 92:*8*
127:*9*
**studies** 14:*23*
17:*8, 15*
18:*11* 19:*12*
22:*2* 37:*14,
25* 38:*15, 22*
39:*15* 40:*13*
41:*8, 20* 46:*7,
14* 47:*8* 49:*2,
24* 50:*4, 5, 22*
52:*17* 53:*15,
19* 54:*1, 5*
56:*1, 9, 19, 21*
57:*21, 24*
58:*8* 66:*11*
67:*12* 68:*9,
17, 19* 69:*11,
18, 20, 25*
70:*7, 9, 11*
72:*6* 73:*7, 19*
74:*8, 19*
75:*16* 76:*6,
25* 77:*14*
78:*5, 11, 15,
23, 24* 79:*8*
80:*8, 10, 14,
22* 81:*12, 24*
82:*14, 16, 25*
83:*13* 84:*11*
85:*1, 15, 19,
25* 86:*9, 11*
87:*11* 88:*24*
90:*1, 10, 25*
91:*16* 92:*5, 8*
93:*14, 24*
94:*10* 95:*17,
19* 96:*8, 19*

99:*8, 12, 13*
100:*11* 101:*7*
102:*2, 3*
105:*19*
106:*13, 18, 23*
118:*22* 119:*5,
11, 14* 120:*6,
7* 122:*6, 19*
124:*1* 132:*15,
18* 134:*16*
146:*13*
151:*20*
152:*17*
155:*12*
157:*18*
159:*14*
160:*12*
166:*13*
167:*20* 168:*1,
3* 169:*16*
170:*20, 21*
171:*2, 9, 23*
172:*17*
179:*10, 14, 20*
183:*5, 6, 24*
184:*20*
186:*11* 187:*6*
188:*3* 190:*21*
193:*5* 195:*10*
196:*10*
204:*11* 206:*4*
208:*21* 209:*6,
22* 211:*7*
218:*6, 11*
219:*18*
224:*20*
225:*16, 19*
227:*6* 239:*6*
243:*14, 18, 23*
244:*2, 4*
247:*23*
252:*21*
253:*19, 20, 25*
254:*16*
**study** 30:*9*
47:*4, 15, 23*
49:*25* 53:*16,
17, 19, 22*
54:*21* 55:*7,
13, 25* 56:*20*
57:*22* 59:*16*

66:*17* 67:*21*
68:*3* 70:*16,
23, 25* 71:*7,
25* 74:*18*
77:*17* 79:*20*
86:*6, 14* 89:*1,
6* 97:*23*
98:*24* 99:*20*
102:*23*
118:*19*
120:*17, 18, 25*
121:*12, 14, 15*
122:*16* 125:*2,
3* 126:*13*
127:*18, 22*
128:*17* 129:*4,
12, 23* 132:*25*
134:*25*
137:*15*
143:*13, 21*
144:*6* 145:*5,
14* 147:*6, 13,
17, 18* 148:*10,
13, 16, 21*
149:*3, 7*
150:*6, 8*
151:*6* 152:*23*
153:*20, 22*
156:*12, 16*
157:*3, 6, 7*
158:*7, 13*
159:*4, 18*
160:*2* 162:*3,
4* 165:*13, 16,
23, 24* 166:*7*
167:*4, 16*
168:*8* 169:*6,
10* 174:*10*
175:*11, 16*
180:*6* 186:*4,
20* 187:*7, 17,
24* 188:*4*
189:*18, 21*
190:*7* 192:*6,
9, 14* 193:*3, 4,
19* 195:*25*
196:*3, 6, 20,
23* 197:*3*
198:*19* 200:*4,
17* 203:*12, 19,
22, 24* 204:*1,*

19 205:*7*
206:*3, 6, 23*
227:*16*
252:*18* 254:*2*
**study-related**
204:*15* 205:*6*
**stuff** 197:*19*
265:*5*
**SUBJECT**
1:*9* 107:*1*
133:*2* 137:*1,
13* 138:*5, 7,
24* 152:*5*
178:*2* 192:*6*
200:*17*
203:*22*
206:*10* 211:*25*
**subject-by-**
**subject** 41:*2*
**subjects**
100:*22* 103:*5*
106:*4* 128:*8*
133:*1* 134:*25*
136:*5* 147:*14*
149:*3* 170:*23*
254:*15*
**Submission**
3:*13* 39:*8*
40:*10* 94:*24*
95:*15* 96:*2,
20* 107:*3*
123:*14*
**submit** 40:*12*
95:*16* 96:*7,
18* 170:*21*
171:*5*
**submitted**
8:*17* 10:*9, 14*
33:*15* 34:*5*
36:*15* 49:*3*
95:*18* 107:*1*
117:*17*
119:*16*
121:*14* 123:*8*
124:*2* 164:*15*
165:*2* 180:*7*
226:*2* 265:*3*
**submitting**
164:*2*
**substance**
27:*19*

**substances**
251:*20*
**substantial**
20:*20* 87:*2*
**substantially**
115:*21*
116:*18*
117:*18* 121:*16*
**substituted**
248:*20*
**suggested**
110:*13* 222:*9*
**suggests**
250:*11*
**suit** 232:*23*
**Suite** 2:*4, 9*
**summarized**
257:*15*
**Summary**
3:*13* 41:*3*
77:*7* 94:*25*
122:*10*
126:*18* 127:*7*
257:*7*
**supercede** 9:*3,
6*
**support** 47:*4*
67:*23* 80:*20*
106:*24* 249:*5*
259:*5*
**supported**
69:*22* 183:*6*
**supporting**
97:*23*
**supports** 90:*19*
**supposed**
40:*11* 68:*5*
96:*18* 123:*14*
131:*14, 16, 21*
241:*5*
**supposedly**
125:*21*
**sure** 17:*19*
18:*2* 28:*13*
32:*25* 46:*20*
56:*7* 60:*14*
77:*18* 78:*8*
86:*2* 89:*12,
14* 98:*17*
100:*1* 105:*12*
109:*8* 111:*13,*

*21* 124:*24* 130:*13* 133:*22* 136:*13* 155:*20* 156:*2* 158:*6* 173:*19* 175:*24* 176:*14* 196:*11* 198:*5* 208:*4* 209:*15* 210:*17* 227:*14* 262:*4*
**surprising** 132:*21*
**suspect** 173:*8*
**suspecting** 129:*9* 150:*1* 198:*3*
**suspending** 218:*6*
**suspicion** 57:*17* 128:*20* 130:*14*
**swallow** 161:*6*
**swear** 6:*15* 7:*25*
**switch** 216:*23*
**sworn** 7:*17* 8:*2* 269:*4*
**system** 134:*18* 226:*16* 249:*7*
**systemic** 16:*16* 17:*7, 14* 18:*7, 10, 16, 22* 32:*20* 74:*24* 75:*10* 93:*5, 6* 161:*6* 219:*4* 256:*19* 259:*1*
**systems** 259:*1, 4*

**< T >**
**table** 146:*13* 147:*3* 148:*17, 20, 22* 203:*9* 252:*3*
**tables** 109:*14* 144:*3*
**tablet** 55:*8* 56:*12* 71:*6*

75:*20* 159:*6* 193:*17* 195:*13* 251:*2* 253:*7, 8*
**tableting** 71:*5* 72:*2, 8, 13, 15* 194:*3* 232:*16* 252:*14* 253:*5*
**tablets** 159:*15* 161:*24* 201:*16* 258:*20, 23*
**taint** 117:*3*
**tainted** 115:*20* 116:*17* 117:*2* 121:*15*
**take** 29:*1, 5, 14* 30:*16* 31:*8* 45:*10, 13* 50:*10, 11, 14* 52:*7* 72:*21* 75:*6* 134:*3, 6* 136:*23* 138:*12* 151:*9* 185:*3* 210:*24* 220:*12, 23* 228:*3* 241:*17, 19* 244:*16* 254:*4, 8*
**take-back** 263:*23*
**Taken** 1:*14* 6:*2* 61:*24* 74:*25* 75:*1, 11* 236:*4* 258:*21* 269:*6* 270:*3*
**takes** 27:*9* 30:*21* 31:*1* 32:*20* 33:*2, 8* 114:*22* 127:*12* 162:*19*
**talk** 54:*9* 193:*5* 256:*17*
**talked** 125:*10* 181:*8*
**talking** 40:*21* 73:*3* 105:*7* 111:*2* 117:*3*

178:*6* 183:*20* 193:*23* 211:*17* 226:*14* 232:*6* 234:*10* 241:*11* 256:*2, 3, 9*
**talks** 156:*21*
**target** 228:*19*
**targeted** 41:*23*
**taught** 49:*21*
**tech** 216:*8*
**Technical** 13:*5*
**technique** 172:*5*
**techniques** 98:*21* 133:*21*
**tell** 12:*20* 47:*23* 48:*10* 56:*1* 57:*6* 58:*8* 67:*12* 68:*20* 73:*19, 24* 78:*24* 81:*24* 83:*1* 85:*1* 90:*10* 92:*6, 10, 13, 18* 98:*13* 99:*2* 102:*10* 111:*22* 122:*21* 126:*16, 19* 127:*5* 135:*8* 138:*21* 209:*3, 20* 242:*18*
**telling** 128:*3* 136:*21*
**temperature** 131:*16*
**ten** 22:*13* 23:*7, 22* 29:*5, 6, 7* 31:*8* 241:*19* 244:*3*
**tendency** 48:*20* 49:*14* 50:*18* 51:*3* 52:*19*
**tendering** 252:*2*
**Tenjidor** 2:*14*
**ten-minute** 45:*14* 259:*20*

**Tennessee** 6:*6* 243:*20* 269:*9*
**tens** 132:*19*
**tentative** 194:*9*
**tenth** 138:*1*
**ten-time** 121:*3*
**term** 50:*24* 245:*8*
**terminology** 152:*10*
**terms** 136:*15* 163:*1*
**test** 54:*10* 59:*22* 101:*20* 103:*9* 117:*14* 118:*1, 20* 119:*20, 23* 135:*22* 148:*6* 160:*3* 161:*25* 180:*18* 186:*18* 196:*25* 199:*11* 200:*22* 201:*11* 226:*16* 254:*3, 5, 15*
**tested** 11:*8* 54:*4* 66:*23* 78:*15* 94:*9* 103:*14* 117:*14*
**testified** 8:*3* 40:*9* 69:*13* 93:*11* 99:*7* 119:*18, 21* 151:*15* 166:*11*
**testify** 92:*22* 269:*4*
**testifying** 238:*6* 263:*17*
**testimony** 26:*9* 57:*11, 15* 67:*5* 181:*17* 264:*10, 23* 268:*1* 269:*7, 10* 270:*4*
**testing** 11:*19, 20* 12:*8* 41:*6, 10* 54:*13* 55:*11, 16, 18*

67:*21* 86:*18, 20* 103:*22* 104:*16* 119:*15* 129:*11* 133:*25* 134:*1* 152:*22* 164:*6* 222:*14* 249:*17* 250:*12*
**tests** 55:*2* 152:*11* 220:*2* 226:*19, 22*
**Teva** 2:*6* 4:*14, 20* 46:*11* 89:*21, 24* 114:*5, 23, 24* 115:*18* 121:*11* 147:*17* 182:*17* 183:*14* 185:*23* 186:*9* 187:*24* 188:*13* 189:*24* 190:*4, 18, 22, 25* 191:*10, 16, 24* 196:*8* 197:*4* 226:*9*
**Teva-MDL** 3:*14* 4:*14, 17* 5:*2* 112:*18* 187:*11* 189:*6*
**Teva-MDL-2875-00003105** 185:*12*
**Teva's** 46:*17* 47:*2, 21* 88:*20* 90:*1, 5, 11* 115:*12, 22* 196:*16, 21*
**Thank** 53:*2* 64:*4* 88:*17* 103:*11* 142:*21* 146:*23* 186:*2* 199:*15* 211:*4* 230:*25* 245:*15* 247:*19*

258:15 259:7
261:9
**Thanks** 267:21
**therapeutic**
236:25 237:4
239:3, 13
249:12
251:22 258:14
**thereof** 249:2
**thing** 21:14
48:5 52:22
64:12 80:4
109:9 116:24
167:19 216:8
**things** 92:12
109:15 111:7,
23 144:2
154:6 212:20
216:5 232:14,
16 244:19
247:17 253:7
**think** 9:18
13:6 19:2
21:7, 13, 17
29:20 31:12,
14, 16 33:1
44:20 52:15
68:19, 24
70:4 72:23
75:18, 20
80:3 83:7
87:1, 19 92:3,
23, 25 93:2
103:19, 21
104:24 111:4
115:1, 3
123:18, 21
124:7 135:6
136:15 137:4
139:21
144:15
150:17
155:13 159:4
161:16
162:11, 24
163:1, 10, 23
164:9, 20
170:10
171:11 172:2
174:12, 16, 17,
19 183:17

184:7 187:2,
8, 25 192:12
194:12 196:7
198:22
209:16 210:7
223:11, 24
224:15
226:20
227:20
228:15
229:24
230:17
231:21
236:19
240:11
247:25
248:13
254:20 255:2
260:3 262:18
**thinking**
103:6 198:8
**third** 9:22
42:14 114:15
115:18
133:17 134:6
141:13
156:23, 25
160:5 161:4
218:15, 25
257:12
**thorough** 47:7
168:11, 12
**thoroughness**
168:16
**thou** 140:25
**thought** 23:25
24:2 30:14
40:15 44:18
113:15
147:10 176:19
**thousand** 40:1
**thousands**
39:21 132:18,
19 140:25
155:2
**three** 45:1
50:10, 12
72:22 76:15
90:15 133:18
140:20 160:1
172:1 179:25

219:2 257:13
259:19
**three-and-a-
half** 35:16
**three-drug**
88:4
**three-quarters**
139:1
**threw** 246:2
**throw** 111:23
262:25
**throwing**
263:12
**time** 7:6
23:11, 18
24:1 27:9
28:9 29:8
34:6, 23
43:22 44:6, 9
45:21, 24
52:1 55:25
66:25 67:12
78:13, 22
92:20 93:23
94:16, 19
108:8, 15
110:8 113:16,
18 121:3
122:8 132:20
134:6 136:9
149:10, 13
155:13 157:4
161:6 162:17
163:9, 20
164:1 167:22
173:7 185:5,
8 187:16
197:5, 17
200:24 202:2
210:24
212:11
214:18
216:11 217:1
219:4 220:3,
23 221:18
225:17, 22, 25
239:16
241:16, 20, 23
248:14
250:17 256:3
261:18

267:21, 24
269:6
**times** 22:13
23:7, 22 32:3,
5 50:13, 14
55:5 60:15,
16 178:1
216:17 239:9
245:21 254:6
255:5
**timing** 141:10
163:25
**Tim's** 245:22
**tinkering**
253:12
**tissues** 19:21
20:2, 12, 23
21:3
**title** 124:23
177:21
**titled** 211:7
**to-a-patient**
60:19
**today** 33:6
44:8 57:11
84:20 87:9,
12 99:4
189:25 190:2
244:7 247:22
255:5 257:3,
18
**Today's** 7:5
267:25
**Todd** 2:19
7:3
**toilet** 264:2
**told** 111:15
**tone** 143:4
**top** 30:23
31:3 40:8
41:4 51:6
71:17, 21
95:23 124:16
126:20 127:8
129:20
143:14, 17
144:25
146:12 150:5
165:12 167:3
174:9 175:9
182:23

185:17
190:17 191:5
198:14
199:21
201:13
208:23 213:1,
2, 5
**Torrent** 57:20
143:20
**Torrent-MDL**
3:22 4:1
142:23 145:23
**Torrent-MDL-
2875-00003054**
144:20
**Torrent's**
58:1, 6 73:4,
12, 17 74:1
82:11, 20, 23
**total** 42:4
45:7 108:14,
19
**tough** 208:3
**trace** 13:16,
22 14:2
223:12
**traced** 48:4
**trainee** 50:1
**trainees**
131:11
**training** 240:1
253:1
**Trandologril**
250:9
**transaminase**
152:12
**transcribed**
269:11
**transcript**
270:4
**transcripts**
44:16
**transformed**
199:10
**translate**
252:20

**Transportation**
240:8, 10, 16
**Traurig** 2:8
37:6, 18 38:8,

Confidential Information - Subject to Protective Order

*12* 45:*4, 10*
47:*16* 189:*25*
190:*4, 6*
**treat** 102:*21*
103:*15*
228:*18*
229:*14, 15*
**treatment**
229:*22*
232:*11* 245:*4*
**treatments**
102:*22*
**trial** 50:*6*
55:*18* 154:*13*
221:*12, 13, 17*
222:*23* 224:*7,
9*
**trials** 99:*5*
196:*9* 219:*7*
224:*12*
**tried** 77:*5*
126:*24* 127:*2*
**triggered**
139:*20*
**triplicate**
133:*7, 9*
**trouble** 262:*8*
**true** 255:*12*
270:*4*
**try** 24:*7* 37:*2*
52:*2* 144:*21*
161:*17*
**trying** 16:*24*
17:*19* 220:*21*
229:*15*
**turn** 250:*2*
**turned** 154:*3*
**turning** 10:*23*
257:*6*
**twice** 35:*7*
**two** 19:*9*
21:*13* 53:*15*
59:*3* 70:*18*
72:*21* 74:*8*
86:*3* 112:*24*
117:*8* 132:*3*
134:*6* 135:*25*
136:*1, 10, 24*
138:*8* 140:*20*
151:*24* 152:*8*
175:*14* 183:*2*

196:*12*
204:*12*
221:*11* 227:*9*
251:*1* 254:*13*
**two-and-a-half**
36:*2*
**two-thirds**
176:*5*
**type** 65:*8, 16*
127:*22* 247:*7*
252:*14*
259:*21* 263:*4*
**types** 65:*6, 24*
**typewriting**
269:*12*
**Typical** 31:*6*
**typically** 39:*2*
53:*18* 136:*9*
**typo** 34:*8*

**< U >**
**U.S** 146:*14*
182:*13, 25*
197:*4* 217:*24*
219:*15, 19*
241:*5* 264:*18*
266:*18*
**Uh-huh**
255:*20*
**UL** 136:*16, 17,
19*
**ultimate** 75:*8*
253:*15*
**unable** 221:*24*
**unapproved**
232:*24*
**unaware**
78:*14, 19*
**unbelievable**
111:*25* 112:*3*
**uncommon**
154:*12*
155:*21*
164:*10* 248:*1,
12*
**undergo** 245:*9*
**undergrad**
243:*16*
**underlying**
40:*22, 25*
119:*10, 13*

**underneath**
203:*7*
**understand**
28:*14* 29:*12*
34:*24* 48:*7*
60:*20* 100:*12*
108:*21*
111:*12* 114:*5*
118:*1* 131:*13*
195:*11* 202:*3*
215:*9* 243:*3*
262:*12* 266:*24*
**understanding**
50:*20* 57:*3*
69:*8* 86:*3*
118:*3* 139:*18*
225:*3* 239:*19,
25* 240:*2*
241:*4* 252:*17*
253:*2*
**understood**
19:*6* 88:*17*
**undetected**
152:*19* 154:*6*
**unequal** 49:*12*
**unexpected**
228:*10*
**Unfortunately**
189:*15*
**Unintelligible**
265:*24*
**unintended**
229:*13*
230:*11, 17*
**unit** 50:*3*
**UNITED** 1:*1*
7:*10* 190:*15*
223:*4, 22*
238:*11, 19*
**University**
50:*2* 243:*16,
20*
**unknown**
136:*1*
**unnecessary**
126:*25*
**unrealistic**
248:*13*
**unrelated**
155:*15* 157:*10*

**unreliable**
115:*19* 116:*17*
**unsafe** 234:*16*
236:*9* 237:*6*
238:*10*
**unusual**
157:*18*
**upload** 130:*4*
**upper** 60:*17,
25* 135:*5, 20*
136:*7, 16, 19,
20, 22* 137:*6*
142:*17* 148:*8,
14* 149:*3*
155:*6*
**upscale** 55:*16*
**urgently**
221:*12, 14*
**USA** 190:*15*
201:*17*
**use** 8:*21*
31:*24* 50:*22*
76:*14, 15, 16*
97:*21, 24*
99:*19* 100:*21*
103:*5* 105:*8*
118:*14* 129:*3*
133:*25*
141:*25* 161:*3*
167:*15*
215:*12*
229:*23* 247:*12*
**user** 102:*5*
128:*12* 150:*23*
**uses** 123:*20*
**usual** 151:*20*
**usually** 48:*18*
54:*22* 66:*25*
78:*12* 133:*6*
252:*13* 259:*14*

**< V >**
**vague** 87:*14*
93:*17* 108:*8*
174:*23* 229:*3*
**Val** 191:*4*
**Valenzuela**
2:*18* 143:*9*
146:*18, 21*
211:*3*
**valid** 210:*4*

**validate**
139:*11*
**validated**
208:*15*
**validating**
139:*21*
**validity**
172:*11, 15*
180:*4* 253:*22*
**VALSARTAN**
1:*3* 7:*8*
16:*16* 17:*10,
13, 15* 18:*5,
11, 22* 19:*13*
20:*9* 46:*11,
18* 47:*2, 5, 21,
25* 53:*12*
55:*21, 24*
56:*11, 25*
57:*12, 23*
58:*1, 6, 10, 15,
18, 24* 59:*2*
61:*18, 24*
62:*9, 25* 63:*3,
11* 64:*2, 9*
66:*8, 12* 67:*3,
10, 14* 68:*4*
70:*10* 72:*5, 9*
73:*5, 13, 18,
21* 74:*2, 25*
75:*11* 76:*5,
19* 78:*2, 10,
21* 79:*1* 80:*8*
81:*8, 17, 22*
82:*1, 11, 20,
23* 83:*2*
84:*16, 21, 24*
85:*3, 7* 87:*23*
88:*9, 11, 12,
14, 21* 90:*5,
11* 92:*7* 93:*7*
100:*5* 102:*5*
103:*13*
104:*17* 114:*6,
22* 125:*1, 12*
127:*13*
128:*11*
130:*17, 25*
133:*14*
135:*11*
136:*10*

Confidential Information Subject to Protective Order

146:*13*
150:*22*  151:*9*
155:*12*
159:*15*
161:*24*  162:*1*
163:*6*  170:*12,*
*16*  171:*24*
173:*6*  189:*16*
190:*8*  192:*22*
193:*20*
195:*18*
196:*16, 21*
199:*11*
201:*15*
218:*13*  223:*3*
224:*2, 18, 20*
228:*7*  229:*7,*
*9, 15, 23*
230:*7*  232:*24*
248:*21*  249:*8,*
*12, 16*  250:*12,*
*15, 19*  251:*6,*
*10, 23*  255:*10,*
*24*  257:*19, 22*
258:*7, 9, 13, 20*
**valsartan/HCT**
**Z**  83:*13*
208:*2*  211:*12*
**valsartan/HTC**
170:*16*
**valsartan's**
17:*11*  18:*6,*
*19*  48:*11*
56:*2*  69:*3*
248:*24*
**value**  30:*5*
33:*11*  49:*8, 9*
59:*20, 23, 25*
60:*7, 8, 18, 19*
70:*17, 18*
135:*5, 19, 21*
141:*9*  142:*16*
161:*3, 8, 14*
236:*20*
238:*20*  266:*2*
267:*7, 16*
**values**  12:*24*
13:*1, 2*  27:*1*
39:*15*  41:*3*
48:*15*  51:*17*
52:*10, 11*

60:*16*  122:*13*
135:*12*  154:*8,*
*10*
**variability**
125:*11, 16, 23*
126:*1*
**variety**  98:*12*
243:*24*
**various**  46:*8*
68:*16*  122:*6*
178:*17*
250:*18, 19*
**vary**  106:*3*
**vast**  98:*13*
**VATZ-0545**
175:*10*
**VATZ-0546**
174:*10*
**VAUGHN**  2:*3*
3:*4, 5*  8:*10,*
*12*  9:*15*  10:*7,*
*12, 17, 22, 24*
11:*3*  12:*2, 25*
13:*7, 10, 19*
14:*11, 16*
16:*1, 5*  17:*5,*
*23*  18:*20*
19:*10, 15, 23*
21:*24*  22:*4, 9*
23:*8, 16*
25:*19*  26:*5,*
*11, 16*  27:*7*
28:*12, 20, 23*
32:*1, 18*
33:*20*  34:*1, 3,*
*17, 19*  35:*12,*
*14*  36:*19, 21*
38:*3*  41:*25*
42:*2, 8, 10*
45:*15, 18*
46:*1, 5*  48:*6*
53:*3, 7*  61:*3,*
*5*  65:*14*  66:*2,*
*4*  69:*12*
72:*25*  73:*2*
74:*6*  75:*9*
76:*3, 9, 10*
78:*20*  79:*18*
81:*3, 5*  83:*9,*
*10*  85:*22*
86:*7*  87:*8*

89:*25*  91:*13,*
*22*  93:*25*
94:*14, 21, 23*
95:*4, 8, 11*
96:*16, 24*
97:*4, 11, 18*
98:*22*  99:*23*
100:*18*
102:*17*  104:*1*
105:*3, 10, 14*
107:*8, 12*
108:*13, 16, 22*
109:*2, 18*
110:*9, 10, 15*
112:*1, 8, 17,*
*21*  113:*15, 23*
114:*11*  115:*6*
116:*14*  117:*7,*
*9*  118:*6, 9, 16,*
*17*  119:*3*
120:*14*  121:*7,*
*9*  122:*4*
123:*24*
124:*11, 15*
126:*8, 10*
127:*25*
128:*22, 24*
129:*15, 19*
131:*23*  132:*1*
134:*21, 23*
137:*9, 11, 18,*
*20*  138:*17*
140:*1*  141:*23*
142:*22*  143:*6,*
*11, 16*  144:*19*
145:*3, 18, 22*
146:*1, 3, 20,*
*23*  147:*2, 4*
149:*15, 17, 22*
150:*2, 7*
151:*1, 3, 23*
152:*3*  153:*18*
154:*21*  156:*7,*
*9*  157:*24*
158:*3, 10, 12,*
*20, 24*  159:*10,*
*12, 21, 23*
160:*17*
163:*15*
164:*25*  165:*4,*
*8, 11*  166:*3, 5,*

*17, 19, 25*
167:*2, 12, 14*
168:*18, 22*
170:*5*  171:*21*
173:*12, 16, 20,*
*23*  174:*5, 8,*
*24*  175:*2, 6, 8,*
*22*  176:*3, 6,*
*25*  177:*6, 13*
178:*9, 12, 21,*
*23*  179:*8, 22,*
*24*  180:*2, 12,*
*14, 24*  181:*1,*
*19, 21*  182:*8,*
*9, 16, 22*
183:*12*
184:*18*  185:*2,*
*10, 15*  186:*6,*
*8, 14, 16*
187:*10, 14*
189:*5, 9*
190:*13*  191:*7,*
*9, 15, 19*
192:*17, 19, 24*
193:*1*  194:*5,*
*7, 22*  197:*14,*
*20, 24*  198:*24*
199:*6, 16, 20,*
*24*  200:*2, 11,*
*13*  201:*6, 8*
202:*13, 17, 23*
203:*1*  205:*24*
206:*1, 21*
207:*11, 15, 19,*
*22*  208:*16, 18*
209:*12*
210:*10, 14, 18,*
*23*  211:*4, 5*
212:*24*  213:*4,*
*13, 23*  214:*1,*
*21*  215:*5*
216:*3*  217:*10,*
*16*  218:*1, 24*
219:*16, 25*
220:*14, 18*
221:*3, 5, 23*
222:*2, 6*
223:*1, 19*
224:*3*  225:*14*
226:*8, 12*
227:*19*  228:*3,*

*5*  229:*5, 16*
230:*5, 12, 20,*
*25*  231:*1, 6, 9*
235:*3, 5*
236:*7, 18*
237:*11, 16, 24*
238:*8, 17*
239:*4*  240:*7*
241:*2, 14*
242:*21*
245:*18, 24*
246:*4, 7*
247:*5*  250:*24*
252:*22*
254:*21, 25*
255:*25*
261:*11, 17, 24*
263:*9, 16*
264:*4, 16*
265:*3, 12, 25*
266:*12*  267:*5,*
*13, 18, 21*
**ver**  130:*5*
**verbatim**
246:*20*  257:*25*
**verification**
133:*11, 12*
**verify**  31:*9*
206:*24*
**vernacular**
76:*16*
**version**  234:*4*
235:*17*
**versus**  45:*11*
52:*1*  80:*15*
84:*2*  139:*2, 5*
232:*7*  254:*5*
**veterinary**
245:*7*
**vials**  132:*3*
**video**  7:*7*
**Videographer**
2:*19*  7:*1, 3*
8:*4*  23:*11, 14*
45:*20, 24*
94:*16, 19*
149:*10, 13*
185:*5, 8*
230:*24*
241:*20, 23*

Confidential Information Subject to Protective Order

261:*15, 18, 21*
267:*24*

**VIDEOTAPED**
1:*12* 5:*8* 6:*1*
242:*5*
**vigorously**
245:*23*
**V-I-N** 56:*20*
**violated**
238:*25*
**violations**
117:*12, 25*
121:*13* 123:*1*
177:*20, 25*
**viral** 152:*19*
154:*7* 155:*17,*
*19, 21*
**visit** 214:*18*
**Vitae** 5:*10*
242:*15*
**vitro** 55:*10*
**vivo** 206:*4*
**VLS** 193:*9, 15*
**voice** 143:*3*
**volume** 31:*5,*
*11* 131:*18*
194:*25*
**volumes**
194:*10, 21*
**volunteers**
39:*14* 49:*6*
103:*23* 151:*22*
**VP** 114:*24*

**< W >**
**Wait** 151:*25*
**waived** 6:*10,*
*18*
**Wang** 36:*9*
**want** 18:*1*
34:*17* 42:*3*
49:*17* 54:*23*
80:*9* 100:*11*
101:*19* 102:*1*
103:*9* 108:*10*
110:*13*
113:*16* 130:*9*
138:*11*
161:*21* 188:*2*
248:*16*

**wanted** 18:*2*
36:*13* 38:*7*
109:*7* 118:*11*
162:*15* 260:*8*
**wanting** 47:*7*
**wants** 194:*16*
**Warning**
100:*8* 209:*5,*
*21*
**Washington**
2:*9*
**watch** 256:*12*
**Watson**
182:*25*
183:*13, 17, 18*
**Watson's**
250:*8*
**way** 31:*13*
32:*2* 46:*25*
49:*1* 51:*24*
52:*16* 53:*9*
62:*9* 64:*14*
68:*10* 84:*22*
99:*8* 106:*2*
120:*13* 128:*6*
131:*18* 139:*2*
144:*2* 146:*7*
160:*15* 163:*7*
176:*5* 193:*4*
225:*8* 255:*4*
258:*12*
259:*20*
260:*20* 269:*15*
**ways** 51:*2*
**website** 77:*10,*
*11* 83:*19*
**week** 44:*8*
45:*2* 107:*21*
**weekly** 98:*11*
**weeks** 162:*16*
227:*9*
**weighed** 254:*7*
**weighs** 254:*9*
**weight** 80:*13*
122:*12* 126:*2,*
*5* 128:*8, 11,*
*15, 19* 144:*13*
145:*16*
150:*19, 22*
166:*1* 167:*10*

**Welcome**
94:*22*
**well** 15:*8*
33:*5* 34:*14*
40:*18* 50:*19*
51:*9* 52:*24*
55:*14* 56:*7*
61:*22* 62:*16*
63:*9, 19*
64:*21* 67:*16*
68:*13* 77:*2,*
*24* 92:*3*
100:*7* 101:*22,*
*25* 103:*2*
104:*10*
105:*22* 107:*4,*
*19* 108:*9*
114:*12*
115:*16*
116:*15*
118:*15*
124:*17*
136:*19* 138:*6,*
*25* 141:*9*
142:*13* 143:*8*
155:*25*
160:*18* 161:*2*
162:*8* 166:*11*
169:*25*
171:*14*
174:*16*
181:*25*
183:*25*
188:*12* 191:*1*
193:*21* 195:*5*
198:*4* 215:*14*
226:*21* 262:*9,*
*17* 263:*20*
**went** 13:*4*
26:*6, 8* 38:*8*
68:*14* 71:*6*
91:*2* 107:*24*
140:*11*
163:*21*
216:*18* 244:*1*
**we're** 23:*15*
31:*20* 43:*16*
45:*21, 25*
56:*8* 66:*5*
73:*3* 94:*20*
105:*7* 114:*16*

125:*20, 21*
149:*14* 178:*6*
185:*6, 9*
187:*7* 227:*6*
234:*10*
237:*17*
241:*10, 21, 24*
256:*9* 260:*3,*
*17* 261:*19, 22*
**we've** 79:*9*
223:*11* 260:*18*
**what-**
**happened**
60:*18*
**whatsoever**
142:*6*
**WHEREOF**
269:*17*
**widespread**
177:*25*
**willfully**
163:*22*
**William** 2:*18*
**Williamson**
2:*15*
**willing** 163:*22*
170:*1*
**withdraw**
183:*2* 250:*8*
**Withdrawn**
4:*14* 182:*17*
183:*20* 184:*5,*
*9*
**withdrew**
184:*12* 266:*8*
**withheld**
112:*23*
114:*13* 191:*10*
**WITNESS**
3:*3* 6:*15, 17*
7:*17, 25* 8:*5,*
*7, 8* 9:*6* 10:*4*
11:*25* 12:*20*
13:*4* 15:*22*
16:*23* 17:*18*
18:*15* 19:*2*
21:*12* 25:*14,*
*25* 27:*6* 28:*1*
31:*22* 32:*9*
37:*22* 48:*2*
65:*5, 20*

68:*24* 74:*5,*
*22* 75:*18*
78:*18* 79:*13*
85:*18* 86:*2*
87:*6* 89:*18*
91:*10, 19*
93:*18* 96:*12,*
*22* 98:*5*
99:*22* 100:*15*
102:*8* 103:*18*
104:*21* 108:*9*
109:*5* 111:*13*
112:*5, 13*
113:*21*
115:*25* 116:*3,*
*23* 117:*22*
118:*25*
120:*10, 23*
121:*23*
123:*18* 124:*7,*
*25* 125:*7*
127:*15*
128:*14* 137:*4*
138:*20* 141:*8*
143:*1* 146:*25*
151:*11*
153:*14, 25*
156:*13*
158:*22*
160:*14*
163:*13*
164:*17* 170:*2*
171:*14* 178:*8,*
*20* 179:*7, 19*
180:*10, 23*
181:*16*
183:*11*
184:*14*
186:*24*
190:*11*
194:*20* 197:*8*
205:*11*
206:*14* 207:*2*
208:*9* 211:*1*
212:*18*
213:*11*
214:*16* 215:*2,*
*19* 217:*8, 13*
218:*22*
219:*22* 220:*8*
221:*1, 21*

Confidential Information Subject to Protective Order

222:*19*
223:*10, 24*
224:*24*  227:*1,*
*25*  229:*4, 12,*
*20*  230:*10*
234:*25*
235:*18*
238:*13, 22*
239:*24*
240:*24*  241:*9*
247:*11*
250:*25*
252:*23*
254:*22*  255:*2*
256:*1*  263:*3,*
*20*  264:*11*
265:*14*  266:*6,*
*9, 22*  267:*10*
269:*2, 7, 17*
**word**  20:*22,*
*23*  21:*2*
*151:13*
*183:16*  233:*10*
**worded**
*160:15*  254:*23*
**wording**
*12:22*  52:*16*
**words**  14:*2, 6,*
*8*  209:*9*
*265:19*
**work**  44:*21*
*131:9, 11*
*188:22, 23*
*211:13*
**worked**  50:*3*
*267:3*
**working**  17:*3*
*36:23*  37:*7,*
*11*  58:*12*
*162:14*
*243:18*
*245:22, 24*
*246:1*  267:*1*
**works**  100:*12*
*266:24*
**worth**  265:*5*
**write**  187:*3*
**writing**  45:*11*
**wrong**  42:*17*

**wrote**  12:*13*
14:*7*  15:*14*
21:*22*  251:*6*

**< Y >**
**Yeah**  12:*10*
13:*18*  28:*22,*
*25*  31:*14*
44:*2*  45:*17*
50:*9*  51:*24*
77:*4*  86:*8*
89:*18*  92:*25*
96:*22*  98:*5*
108:*22, 23*
113:*4*  116:*23*
135:*2, 6, 10*
144:*23, 24*
148:*2*  150:*4,*
*25*  156:*18*
161:*12*
169:*20*  170:*9*
172:*19*
174:*12*  178:*8*
179:*19*
186:*13*
193:*21*
194:*20*  198:*9*
213:*3, 11*
215:*2*  219:*2*
222:*19*
223:*10*
224:*24*
227:*25*  231:*8*
234:*25*
240:*24*
243:*11, 19*
244:*20*  246:*1,*
*15*  249:*3*
252:*23*
255:*14*
264:*11*  267:*15*
**year**  77:*3*
86:*23*  87:*1*
190:*23*
195:*21*  243:*15*
**years**  99:*15*
101:*8*  132:*20*
145:*15*
184:*12*
196:*12*
212:*19*

218:*18*  220:*4*
244:*3*  253:*3*
**yelling**  17:*21*
**yellow**  11:*15*
*12:1*
**Yep**  132:*5*
186:*12*
**yes/no**  65:*8, 22*
**yesterday**
*44:25*
**young**  101:*4*
**younger**
*103:23*

**< Z >**
**zero**  161:*5*
200:*23*  201:*4*
202:*1*
**ZHP**  4:*20*
5:*2*  11:*7, 8*
71:*20*  92:*15*
197:*21*
220:*15*  222:*13*
**ZHP's**  11:*20*
12:*8*  13:*1*
221:*25*
**zoom**  131:*24*
143:*12*  145:*1*
146:*2*  199:*25*

Exhibit207

Confidential Information Subject to Protective Order

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   DISTRICT OF NEW JERSEY

 3                     CAMDEN DIVISION

 4

 5   IN RE: VALSARTAN              )

     LOSARTAN, AND IRBESARTAN     )

 6   PRODUCTS LIABILITY            )

     LITIGATION                    )

 7                                 )

                                   )  No.  2875

 8                                 )

                                   )  HON.  ROBERT B.  KUGLER

 9   This Document Relates to     )

     All Actions                   )

10                                 )

                                   )

11

12              CONFIDENTIAL INFORMATION

13           SUBJECT TO PROTECTIVE ORDER

14                      REMOTE

15                  VIDEO-RECORDED

16           EXPERT WITNESS TESTIMONY OF

17              DAVID C. CHAN, JR., M.D.

18

19         Thursday, March 3, 2022, 7:49 a.m.

20                    - - - -

21

22

23

24   REPORTED BY:  ELAINA BULDA-JONES, CSR 11720

25
```

Confidential Information Subject to Protective Order

Page 2

```
 1                    APPEARANCES
 2
 3   For the Plaintiffs:
 4       BY: LAYNE HILTON, ESQ.
         BY: DAVID STANOCH, ESQ.
 5       Kanner & Whiteley, LLC
         701 Camp Street
 6       New Orleans, Louisiana 70130
         504.524.5777
 7       D.Stanoch@kanner-law.com
         L.hilton@kanner-law.com
 8
         BY: NICHOLAS MIGLIACCIO, ESQ.
 9       BY: MARK PATRONELLA, ESQ.
         Migliaccio & Rathod LLP
10       412 H Street NE
         Washington, D.C. 20002
11       202.470.3520
         Nmigliaccio@classlawdc.com
12       Mpatronella@classlawdc.com
13       BY: RACHEL GEMAN, ESQ.
         Lieff Cabraser Heimann & Bernstein, LLP
14       250 Hudson Street, 8th Floor
         New York, New York 10013-1413
15       212.255.9500
         Rgeman@lchb.com
16
17
         For the Defendants Teva Pharmaceuticals USA, Inc.;
18       Teva Pharmaceutical Industries, Ltd; Actavis LLC;
         and Actavis Pharma, Inc.:
19
         BY: GLENN S. KERNER, ESQ.
20       BY: KATE M. WITTLAKE, ESQ.
         Greenberg Traurig LLP
21       One Vanderbilt Avenue
         New York, New York 10017
22       212.801.9306
         Kernerg@gtlaw.com
23       Wittlakek@gtlaw.com
24
25
```

Page 3

```
 1   For the Defendant Albertsons Pharmacy:
 2       BY: ASHLEY JONES, ESQ.
         Buchanan Ingersoll & Rooney, P.C.
 3       1700 K Street N.W., Suite 300
         Washington, D.C. 20006-3807
 4       202.452.7318
         Ashley.Jones@bipc.com
 5
 6
         For the Defendant CVS Pharmacy and Rite Aid:
 7
         BY: KARA KAPKE, ESQ.
 8       Barnes & Thornburg, LLP
         2029 Century Park East, Suite 300
 9       Los Angeles, California 90067
         310.284.3766
10       Kara.kapke@btlaw.com
11
12   For the Defendants CVS Pharmacy and Rite Aid:
13       BY: MITCHELL CHARCHALIS, ESQ.
         Barnes & Thornburg, LLP
14       2029 Century Park East, Suite 300
         Los Angeles, California 90067
15       310.284.3766
         Mcharchalis@btlaw.com
16
17
18   For the Defendant Mylan Laboratories:
19       BY: FRANK H. STOY, ESQ.
         BY: MELISSA B. CATELLO, ESQ.
20       Pietragallo Gordon Alfano
             Bosick & Raspanti, LLP
21       One Oxford Centre
         301 Grant Street, 38th Floor
22       Pittsburgh, Pennsylvania 15219
         412.263.4397
23       FHS@pietragallo.com
         MBC@pietragallo.com
24
25
```

Page 4

```
 1   For the Defendant Hetero Labs:
 2       BY: WILLIAM P. MURTHA, JR., ESQ.
         Hill Wallack LLP
 3       2 Bridge Avenue, Suite 211
         Red Bank, New Jersey 07701
 4       732.924.8171
         Wmurtha@hillwallack.com
 5
 6
         For the Defendants Zhejiang Huahai Pharmaceutical
 7       Co., Ltd; Prinston Pharmaceutical, Inc.; Huahai
         U.S., Inc.; and Solco Healthcare U.S., LLC
 8
         BY: ROBERT KUM, ESQ.
 9       BY: REBECCA BAZAN, ESQ.
         BY: DANA B. KLINGES, ESQ.
10       BY: ALYSON WALKER LOTMAN, ESQ.
         Duane Morris LLP
11       865 South Figueroa Street, Suite 3100
         Los Angeles, California 90017-5450
12       213.689.7424
         RKum@duanemorris.com
13       ReBazan@duanemorris.com
         Dklinges@duanemorris.com
14       Alotman@duanemorris.com
15
16   For the Defendant Sciengen Pharmaceuticals Inc.:
17       BY: GEOFFREY M. COAN, ESQ.
         Hinshaw & Culbertson LLP
18       53 State Street, 27th Floor
         Boston, Massachusetts 02109
19       617.213.7047
         Gcoan@hinshawlaw.com
20
21
22   Also present:
23       Joseph Mourgos, videographer
24
25
```

Page 5

```
 1               INDEX OF EXAMINATIONS
 2
 3   EXAMINATIONS                            PAGE
 4   MR. MIGLIACCIO                            8
 5   MS. HILTON                             246
 6   MR. STOY                               286
 7   MS. HILTON                             290
 8   MR. MIGLIACCIO                           291
 9
10
11
12                INDEX OF EXHIBITS
13   NO.            DESCRIPTION          PAGE
14   Chan Exhibit 1  Amended Notice to Take      11
                     Videotaped Oral Deposition
15
     Chan Exhibit 2  Expert Rebuttal Report of    41
16                   Dr. David Chan, M.D.,
                     January 12, 2022
17
     Chan Exhibit 3  Invoices, 16 pages           77
18
     Chan Exhibit 4  Expert Report of Professor   165
19                   Zirui Song, M.D., Ph.D., in
                     Support of Plaintiff's
20                   Motion for Class
                     Certification
21
     Chan Exhibit 5  Accuracy of Valuations of   205
22                   Surgical Procedures in the
                     Medicare Fee Schedule, David
23                   C. Chan, M.D., et al
24   Chan Exhibit 6  Valuations of Surgical       216
                     Procedures in the Medicare
25                   Fee Schedule, Chan, et al.
```

Confidential Information Subject to Protective Order

Page 6

1  Chan Exhibit 7   Industry Input in Policy   225
                    Making: Evidence from
2                   Medicare, David C. Chan and
                    Michael J Dickstein
3
    Chan Exhibit 8   4.4 Consumer Surplus   262
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1       THE VIDEOGRAPHER:  We are now on the
2  record.  My name is Joseph Mourgos.  I am a
3  videographer for Golkow Litigation Services.
4       Today's date is March 3rd, 2022, and the
5  time on the video monitor is 7:49 a.m. Pacific time.
6       This remote video deposition is being held
7  in the matter of Valsartan, Losartan and Irbesartan
8  Products Liability Litigation MDL Number 2875 for
9  the United States District Court, District of
10 New Jersey.
11      The deponent is Dr. David Chan.
12      All parties to this deposition are
13 appearing remotely and have agreed to the witness
14 being sworn in remotely.
15      Due to the nature of remote reporting,
16 please pause briefly before speaking to ensure all
17 parties are heard completely.
18      Counsel has been noted on the stenographic
19 record.
20      The court reporter is Elaina Bulda-Jones
21 and she will now administer the oath.
22      DAVID C. CHAN, JR., M.D.,
23 called as a witness by the Plaintiffs herein, being
24 first duly sworn by the Certified Shorthand Reporter
25 was thereupon examined and testified as is

Page 8

1  hereinafter set forth.
2       EXAMINATION
3  BY MR. MIGLIACCIO:
4      Q.  Good morning, Dr. Chan.  My name is Nick
5  Migliaccio.  I am one of the lawyers for the
6  plaintiffs in this case.  Thanks for taking time
7  with us this morning.
8       Could you state your full name for the
9  record, please.
10     A.  Sure.  Good morning.
11      My name is David Chimin Chan, Junior.
12     Q.  Okay.  And have you ever been deposed
13 before?
14     A.  Yes, I have.
15     Q.  Okay.  I'll go through some ground rules
16 even though you've been through it, but I'll -- I'll
17 just give them anyway.
18      You know, I'm going to ask you a series of
19 questions and I'm going to ask that you give me your
20 best answers to them and if you don't understand a
21 question, I'm going to ask that you tell me and I
22 can rephrase it; is that fair?
23     A.  Yes, thank you.
24     Q.  Great.
25      Are you taking any medication today that

Page 9

1  would impede your ability to recall events or
2  testify truthfully?
3      A.  No.
4      Q.  Okay.  This is not a marathon session.
5  You know, we're not going to try to go through the
6  whole thing in one -- one shot.  So if -- and I know
7  you're a doctor, so obviously, if you have an urgent
8  patient call, just tell us, you know, because we
9  want you to take care of your patients, you know.
10 We understand that.
11      So, you know, and we will take breaks, you
12 know, and if you need a break just ask for one and
13 as long as there's not a, you know, question
14 pending, that -- that's totally fine, fair?
15     A.  Yes, thank you.
16     Q.  In the other depositions that you had,
17 when were those depositions?
18     A.  I believe they were within the last year
19 or two.
20     Q.  Okay.  Got it.
21      And I -- you know, we're taking this
22 deposition remotely, obviously.
23      Do you have anybody else in the room with
24 you there?
25     A.  No.

Confidential Information Subject to Protective Order

**Page 10**

1    Q.  Do you have any documents with you?
2    A.  No.
3    Q.  Okay.  Great.
4        Did you see the deposition notice that we
5  sent over in this case?
6    A.  Are you referring to the most recent one
7  about a week -- within a week of this?
8    Q.  That's right.
9    A.  I believe I was forwarded either the
10  notice or some snippet of the notice.
11   Q.  Got it.
12       I'm going to try to share it with you, so
13  forgive me if I fumble with this technology because
14  I might.  But I'm going to do my best to put this
15  into your folder because we're going to have
16  exhibits, obviously.  And I'm going to -- I watched
17  the video, and we'll see if it works.  I should
18  have, perhaps, practiced this.
19       Okay.  I believe I put your deposition
20  notice in the marked exhibits folder.
21   A.  Okay.  Yep, I'm seeing it now.
22   Q.  Okay.  Great.
23       MR. MIGLIACCIO:  I want to mark that as
24  Exhibit 1.  I'm not quite sure how to do that but we
25  can address that.

**Page 11**

1        (Whereupon, Chan Exhibit 1 was marked for
2  identification.)
3  BY MR. MIGLIACCIO:
4    Q.  Is this the document that you saw?
5    A.  I don't think I saw the entire document.
6  I think I saw some of the questions and document
7  requests.
8    Q.  Okay.  I'm going to look.
9        So Exhibit A, which is on page 3, contains
10  document requests, right?
11   A.  Correct.
12   Q.  Okay.  Did you search for those documents
13  that were requested?
14   A.  To the extent that I had the relevant
15  documents.
16   Q.  Was there anything that you were not able
17  to find?
18   A.  No.
19   Q.  Okay.  Were there any documents that you
20  reviewed in forming your opinion that were not
21  included in the documents that you provided to your
22  lawyers and, you know, to us?
23   A.  Are you referring to the materials
24  considered list that informed my opinion in the
25  report?

**Page 12**

1    Q.  I'm referring to that, and I'm referring
2  to what we've asked for here in Exhibit A.
3    A.  Okay.
4    Q.  So in other words, if there's anything
5  that we've asked for here that maybe wasn't included
6  on the materials considered list or otherwise not
7  provided to -- to us.
8    A.  That would inform my opinions in the
9  report?
10   Q.  Correct.
11   A.  Okay.  So there was -- there's no other
12  document, specific document informing my opinions in
13  the report other than my expertise as a physician
14  and as a health economist.
15   Q.  Were there any documents or materials that
16  you reviewed in preparation for this deposition that
17  were not included in the materials that were
18  produced to us?
19   A.  No.
20   Q.  So you -- fair to say, then, you haven't
21  looked at anything other than the materials that
22  you've provided?
23   A.  The materials on the materials considered
24  list; is that right?  Yes.
25   Q.  And the materials that have been provided

**Page 13**

1  to us now?
2    A.  Correct.
3    Q.  Okay.  Were there any documents that you
4  wanted to review but you couldn't get or otherwise
5  were not provided?
6    A.  No.
7    Q.  Okay.  What did you do to prepare for your
8  deposition?
9    A.  What did I do to prepare for this
10  deposition in particular or what did I do during the
11  course of the case to form my opinions?
12   Q.  Just to prepare for this deposition in
13  particular.
14   A.  Okay.  I reviewed the report.  I reviewed
15  some of the other reports from Conti, Song, and
16  Kaplan.
17       I had phone calls with the lawyers, and I
18  had phone calls with Analysis Group.
19   Q.  Who is Analysis Group?
20   A.  Analysis Group is an economic consulting
21  firm.
22   Q.  And where -- where are they located?
23   A.  I believe they have a number of different
24  offices.  Most of the people that I worked with are
25  in the Boston office, but there are also people --

Page 14

1 there's one person that I worked with who's in the
2 Menlo Park office.
3     Q.  And when you said you had phone calls with
4 the Analysis Group who did you speak with at the
5 Analysis Group?
6     A.  The people that I was in most contact with
7 include several people.  So they include Jessica Lu,
8 Michaela Johnson, Brian Ellman, Richard Mortimer,
9 and Molly Frean.
10     Those were the people that I had the most
11 contact with.
12     Q.  So can you tell me who those people are
13 and we can ask -- I'll ask you about them later when
14 we go through your invoice.
15     But can you just briefly tell me who
16 those -- those individuals are?
17     A.  Sure.
18     MR. STOY:  Object to the form.
19     Go ahead.
20     THE WITNESS:  Do you -- could you be a
21 little bit more specific about what do you mean by
22 who they are?
23 BY MR. MIGLIACCIO:
24     Q.  Well, I know they work for the Analysis
25 Group.  You know, what is -- you know, what is their

Page 15

1 position and how -- what did they do in terms of
2 working with you?
3     MR. STOY:  Object to the form.
4     THE WITNESS:  So I can tell you that two
5 of them are partners.  Richard Mortimer and Brian
6 Ellman are partners.
7     Other members are managers or people that
8 I think are at the level below partners but have
9 quite a bit of experience and, you know, have
10 advanced degrees in economics or management.  Those
11 include Michaela Johnson and Jessica Lu.
12     Molly Frean is another analyst who has a
13 Ph.D. in health policy or health economics.
14     And I believe those are the people that I
15 mentioned that I interacted mostly with.
16 BY MR. MIGLIACCIO:
17     Q.  Any physicians in that group?
18     A.  No.
19     Q.  Okay.  Are you the only physician, then, I
20 guess, who worked on this report?
21     A.  Of the people that I mentioned, I'm the
22 only physician.  There could be other people at
23 Analysis Group that performed very -- that performed
24 a role that -- like a role to check the quality
25 control, the document, or look at the code, for

Page 16

1 example, that I don't know exactly who they are.
2     And I can't rule out that there might be
3 some physicians in that group.
4     Q.  Who -- who worked on your report?
5     A.  Who, for example, might have kind of
6 checked for typos or who might have been in the --
7 they have an extensive quality control process, I
8 believe, at Analysis Group, to, you know, check --
9 make sure that all the references that I've looked
10 at are in there, make sure that the document is free
11 of typos, make sure the code is free of errors, make
12 sure that stuff is kind of in the correct folders in
13 the -- in the code and in the input data and the
14 exhibits.
15     So there -- I would expect that there is a
16 fairly big team involved in that, just like there's
17 a team involved in my own research that is involved
18 in quality control.
19     Q.  Got it.
20     What did you, you know, read or review to
21 prepare for -- for today's deposition?
22     A.  I believe I mentioned I read my report.  I
23 read the reports of some of the other experts on the
24 plaintiffs' side, including Dr. Song, Dr. Kaplan,
25 and Dr. Conti.

Page 17

1     I reviewed some of the primary sources
2 that I relied upon in forming my opinion.  I believe
3 those are the main documents that I read in
4 preparation for this deposition.
5     Q.  And I think you told me you spoke with
6 lawyers, too?
7     A.  Correct.
8     Q.  Who -- who did you speak with?
9     A.  I don't remember all of the names of the
10 lawyers.  But I spoke to Frank Stoy, who's on this
11 call.  I spoke to Bob Kum.  K-U-M is his last name.
12 Glenn Kerner.  Kate Wittlake.
13     I believe those are -- those are the names
14 that I remember speaking to.
15     Q.  And how many sessions did you have
16 speaking to -- to the lawyers?
17     A.  In preparation for the deposition?
18     Q.  Yes.
19     A.  I don't remember exactly the number.  I
20 want to say something like four sessions, three to
21 four sessions.
22     Q.  How long did those sessions each take?
23     A.  I think that they could have been as short
24 as two hours or three hours, and they could have
25 also been longer, more like seven hours.  Around

Confidential Information Subject to Protective Order

Page 18

1 that ballpark.
2      Q.   You may have had one or more, like,
3 seven-hour sessions?
4      A.   Maybe one, correct, one or more.
5      Q.   All right.
6      A.   Seven-hour sessions.
7      Q.   Got it.  Got it.
8           What was discussed during those sessions?
9           MR. STOY:  I'm going to object and
10 instruct you not to answer.
11          That question, Dr. Chan, is -- that's
12 obviously covered by the privilege and work product
13 doctrine.
14          THE WITNESS:  Okay.
15          MR. MIGLIACCIO:  Let me rephrase that.
16     Q.   Which documents were discussed at those --
17 at those sessions?
18          MR. STOY:  And I'll just -- I'll just give
19 a limiting instruction, Dr. Chan.
20          If you know, you can answer the question
21 about particular documents, but I'd ask you not
22 to -- I'd instruct you not to disclose anything in
23 particular that was discussed about any documents.
24          THE WITNESS:  Okay.
25          MR. STOY:  With that instruction, you can

Page 19

1 answer.
2           THE WITNESS:  I would say that we
3 discussed all of the documents that I mentioned in
4 general in -- that I used in preparation for this
5 deposition, including my report, the reports of some
6 of the plaintiffs -- the plaintiff experts,
7 including Dr. Song, Dr. Conti, and Dr. Kaplan.
8           We also discussed some of the primary
9 source material, but I can't remember exactly which
10 ones that we discussed.
11 BY MR. MIGLIACCIO:
12     Q.   When you refer to "primary source
13 material," what do you mean?
14     A.   I mean the materials -- some of the
15 materials that I considered in forming my opinions
16 that are in my materials considered list.
17     Q.   Got it.
18          For the -- did you have preparation
19 sessions outside of speaking with the lawyers; in
20 other words, did you talk to people, those other
21 individuals at the Analysis Group to prepare?
22     A.   I had calls with the Analysis Group to
23 review my report, to review the analyses and the
24 data and the code underlying my report.
25          I also had -- yeah, I also had sessions to

Page 20

1 review the state of the data, like I believe I just
2 mentioned that, the state of the data underlying the
3 analyses in my report.
4           So yes, I did have calls with Analysis
5 Group for that purpose.
6      Q.   And those -- did you have any calls in
7 preparation for this deposition with the Analysis
8 Group?
9      A.   Yes, that -- that was just what I
10 mentioned.
11     Q.   Okay.  Okay.
12          That -- so that -- those calls were not --
13 okay.  I assume you also had calls with them when
14 you were finalizing the report?
15     A.   Correct.
16     Q.   But you were just telling me about calls
17 in preparation for the deposition?
18     A.   Right.
19     Q.   What -- so those calls were -- that --
20 that you had with them, were after the report has
21 been finalized, right?  Because I think the report's
22 dated January 12th.
23          When did you have those calls with the
24 Analysis Group that you just referenced?
25     A.   The calls -- those calls were in

Page 21

1 preparation for the deposition.  And they were in
2 the last two weeks.
3      Q.   Two weeks.
4           Were any of the lawyers on those calls?
5      A.   No.
6      Q.   Okay.  How many of those calls did you
7 have with the Analysis Group?
8      A.   Maybe two.
9      Q.   Two.  And how long were those sessions?
10     A.   I think they were less than four hours
11 each, maybe three hours each.
12     Q.   Got it.
13          Did you discuss -- and you said you were
14 discussing the state of the data, if I -- if you
15 could give me a little more background on that,
16 maybe -- I didn't mean to misstate what you said, so
17 do I have that right?
18     A.   Yes.
19          MR. STOY:  Hang on.
20          Before you answer, Dr. Chan, I'm going to
21 instruct you not to go into any more detail than
22 you've already provided regarding those discussions
23 with Analysis Group.
24          We'd object on the same basis as before
25 with respect to the work product.

Confidential Information Subject to Protective Order

Page 22

1  Nick, you know, I allowed him to give you
2  sort of a high level overview of, you know, the
3  discussion that might have occurred with Analysis
4  Group, but we're not going to go into any more
5  detail than that.
6  MR. MIGLIACCIO:  Well, Frank, I mean, I
7  think it's relevant to figure out if -- you know, if
8  the date has changed.  I mean, the report was
9  submitted on the 12th of January, and that's what
10 I'm trying to drive at here.
11 MR. STOY:  Well, you -- you can ask
12 Dr. Chan if the data has changed.  I think he can
13 answer that question.  But with respect to
14 particulars about discussions with Analysis Group,
15 my instruction's going to be not to answer those
16 questions.
17 MR. MIGLIACCIO:  All right.  I'll limit my
18 question for the time being to the -- to the data.
19 Q.  Did the data change at the time -- did any
20 data change from the time the report was finalized
21 until now?
22 A.  No, none of the data had changed.  None of
23 the analyses had changed.  It was purely to review
24 what I had already reviewed before.
25 Q.  Okay.  So there wasn't any new work, done,

Page 23

1  then, in other words?  That -- that's what I'm
2  trying to -- find out.  No subsequent analysis
3  has -- was completed?
4  A.  No, that's correct.
5  Q.  Okay.  Did you -- did you obtain -- how
6  did you get information about this case at the -- at
7  the beginning when you were -- when you started
8  working on it?
9  A.  Is your question about before I was
10 retained or after I was retained?
11 Q.  Well, how about -- why don't -- I'll ask
12 it this way.
13 Why don't you tell me when you were
14 retained and then we can take it from there.
15 A.  I believe I was retained around December
16 of last year.  It was a pretty short timeline,
17 but -- as I recall, but I don't remember the
18 exact -- when it exactly -- when I was exactly
19 retained, but I think it was around December of last
20 year.
21 Q.  And who -- who contacted you?
22 A.  My initial contact was Brian Ellman at the
23 Analysis Group.
24 Q.  Do you have a working relationship with
25 the Analysis Group or did you have a prior working

Page 24

1  relationship with them?
2  A.  I have worked with the Analysis Group on
3  other cases.
4  Q.  And how long have you worked with them on
5  other cases?
6  A.  I believe my first contact with the
7  Analysis Group was before the pandemic so I think
8  about two to three years.
9  Q.  Okay.  And I'll -- I'll get into those
10 other cases.
11 But I'll just ask you now, were those
12 other cases cases that you provided reports and/or
13 deposition testimony in?
14 MR. STOY:  And before you answer,
15 Dr. Chan, I just want to give you an instruction.
16 You can answer counsel's questions for now
17 with respect to cases where you have been identified
18 as a testifying expert.
19 But for any litigations or other matters
20 where you've been retained as a nontestifying
21 consultant and haven't been publicly disclosed, I
22 would instruct you to not reveal the nature of those
23 disclosures, the parties that retained you, any of
24 that information.
25 With that instruction, you can answer the

Page 25

1  question.
2  MR. MIGLIACCIO:  I'm -- I'm not asking for
3  any of that information.
4  Q.  I'm just asking for where you have
5  prepared a report, you know, that you've been
6  designated as an expert or if you testified at
7  deposition.
8  MR. STOY:  Thank you.
9  THE WITNESS:  Thank you.
10 I don't know exactly what is in the public
11 record and what is not.  I can tell you that I have
12 been deposed in some of these cases.
13 BY MR. MIGLIACCIO:
14 Q.  Where you have been working with the
15 Analysis Group?
16 A.  Correct.
17 Q.  Got it.  Okay.
18 So you said December, you think it was
19 around December of last year that you were hired?
20 A.  Correct.
21 Q.  Got it.
22 And you were contacted by -- I forget the
23 person's name -- can you -- somebody at the Analysis
24 Group, right?
25 A.  Right.  My initial contact was Brian

Page 26

1 Ellman at the Analysis Group.
2    Q.   Ellman.  Got it.
3        How was that contact initiated?
4    A.   I believe the first contact was by e-mail.
5    Q.   Okay.  And did you -- have you previously
6 worked with Mr. Ellman before?
7    A.   I had been in conversations with him on
8 another case that I was not retained on.  The cases
9 that I was retained on previously was with another
10 individual at Analysis Group as the main contact,
11 but I did know Brian from previous conversations.
12    Q.   Okay.  And how did you decide that you
13 would agree to -- to offer your opinion in this
14 case?
15        MR. STOY:  Object to the form.
16        Go ahead.
17        THE WITNESS:  Can you restate that
18 question?
19 BY MR. MIGLIACCIO:
20    Q.   Right.
21        How did you come to determine that you
22 would offer an opinion in this case?
23    A.   Is the question how did I come
24 determine -- come to determine that I would agree to
25 be involved in this case?

Page 27

1    Q.   That -- that's fair.  Yeah.
2    A.   Okay.  The initial conversation was with
3 Brian who told me some basic information about the
4 case.  He may have provided me the complaint in the
5 case.  Then I had a discussion with the lawyers
6 involved in the case.
7        I believe I spent some time thinking about
8 the questions involved in the case and what types of
9 questions I would want to answer if I were involved
10 in the case.
11        Then I believe I might have had a
12 subsequent discussion with the lawyers and then came
13 to the conclusion that this was a case that I would
14 agree to be involved in.
15    Q.   What -- what were you initially told about
16 the facts?  What facts were you provided initially?
17    A.   I believe I was mostly just provided legal
18 documents involved in the case.  The complaint
19 involved in the case.
20    Q.   And did there come a point where you asked
21 for other materials?
22    A.   I've only received legal documents from
23 the lawyers.  Analysis Group is -- is essentially
24 assisting me in my research so I kind of -- I
25 directed them to find materials to answer questions

Page 28

1 that I had related to the case.
2        So I received materials that I asked for
3 from Analysis Group.  And from the lawyers, I
4 believe I only received legal documents related to
5 the case.
6    Q.   Were you asked -- I mean, I have a copy of
7 your report here and we'll put it up and it's -- you
8 know, it's lengthy, right.  It's 88 pages or so.
9    A.   Yes.
10    Q.   Were you asked to render all of the
11 opinions that are within this report initially or
12 did the scope of your work evolve over -- over time?
13        MR. STOY:  Object to the form.
14        You can answer.
15        THE WITNESS:  Would you like to restate
16 your question?
17 BY MR. MIGLIACCIO:
18    Q.   Yeah.
19        Was -- were you asked to render all of the
20 opinions that are here in -- in this report that --
21 that you signed in January initially from -- from
22 the outset or were -- were you asked to do a
23 smaller subset of them at the outset that later
24 expanded?
25        MR. STOY:  Object to the form.

Page 29

1        You can answer.
2        THE WITNESS:  My assignment, are you
3 asking about the assignment of my case, my
4 assignment, whether my assignment was fixed from the
5 very beginning or whether my assignment expanded
6 over time?
7 BY MR. MIGLIACCIO:
8    Q.   You -- you can answer that question.  But
9 I may have some further questions for you.
10    A.   My initial assignment was on the claims
11 related to medical monitoring and that involved the
12 reports of Dr. Song and Dr. Kaplan.
13        I believe that at a later point in the case, as
14 I was writing my report, given my expertise as an
15 economist, I was asked to weigh in on the claim of
16 worthlessness by Dr. Conti.
17    Q.   Got it.
18        So that was not part of your initial
19 assignment when you -- when you first were retained?
20    A.   When I was first retained, I believe a lot
21 was in flux in the case.  I think there was nothing
22 set in stone, but my initial instructions were to
23 address the claim of medical monitoring.
24    Q.   What documents -- you said you received
25 legal documents at the outset from the lawyers.

Confidential Information Subject to Protective Order

---

Page 30

1    A.  Right.
2    Q.  Do you recall what those documents were
3  that you initially received?
4    A.  I received the complaint.  There was a
5  protective order I -- I believe I received.  And I
6  received reports from some of the plaintiff experts.
7  The ones that I can remember are the reports by
8  Dr. Song, Dr. Kaplan, and Dr. Conti.
9    Q.  Okay.  When you're talking about the
10  complaint, are you referring to the third amended
11  medical monitoring complaint?
12    A.  I don't remember exactly what the name of
13  the complaint was.  I only received one complaint.
14    Q.  Got it.
15      And that -- you've produced that to us, I
16  believe; is that -- is that right?
17    A.  I believe I have.
18    Q.  Okay.  And what documents did you -- I
19  think -- what documents did you ask Analysis Group
20  to gather for you after you received the legal
21  documents?
22      MR. STOY:  Object to the form.
23      Go ahead.
24      THE WITNESS:  I can't remember exactly
25  which documents.  I can tell you in general how my

---

Page 31

1  research process works if that would be helpful.
2  BY MR. MIGLIACCIO:
3    Q.  Yeah, let me -- I'll ask you another
4  question, then.  I'll -- I do -- I'll get into that.
5      I think you said, "I directed them to find
6  materials to answer questions that I had related to
7  the case."
8      What initial questions did you have
9  related to the case that you sought answers --
10  sought -- sought documents for?
11    A.  I can't remember all of the initial
12  questions.  I would say that my questions could be
13  organized in a way that very much reflects the
14  organization of my report.
15      So some of the questions were organized
16  into what are the various risks of cancer, what are
17  the -- what is the state of guidelines regarding
18  screening for cancer, what are the various
19  technologies that we use for screening cancer, what
20  are the various risks that are involved in screening
21  for cancer, what are the characteristics of various
22  screening tests, like the sensitivity and
23  specificity of those screening tests for cancer,
24  what are -- what are -- I guess this falls under the
25  guidelines for screening for cancer, but what are

---

Page 32

1  the considerations for various patients who might be
2  screened for cancer or who might already be screened
3  for cancer for other reasons.
4      So those were some of the questions that I
5  had initially.  I can't remember fully all of the
6  questions.  But those questions prompted requests
7  for documents in a way that is consistent with the
8  way that I do research.
9    Q.  So you had those questions and you
10  prompted requests for -- they prompted requests for
11  documents to Analysis Group to gather information on
12  those questions and provide them to you?
13    A.  Correct.
14    Q.  Got it.
15      And at Analysis Group, I think you told me
16  there were -- there may be some physicians, but did
17  you know of any physicians who were gathering that
18  information for you when you asked for it?
19      MR. STOY:  Object to the form.
20      THE WITNESS:  Would you like to restate
21  that question?
22  BY MR. MIGLIACCIO:
23    Q.  Yeah.
24      I think you testified that there may be
25  some physicians at Analysis Group originally, and I

---

Page 33

1  want to know who you directed these questions to and
2  who would be gathering the information to provide to
3  you and if you knew if those people were physicians?
4      MR. STOY:  Objection to form.
5      THE WITNESS:  As I mentioned, I primarily
6  dealt with the people that I named that I was
7  interacting with at Analysis Group.  There is likely
8  a support team to help those people, but those
9  people are very knowledgeable in healthcare, very
10  knowledgeable in health policy and would interface,
11  I think, well if there were a physician on the
12  health policy question like a screening guideline.
13      So I don't know if they were interfacing
14  with any physicians at Analysis Group.  They could
15  have been.
16  BY MR. MIGLIACCIO:
17    Q.  Got it.
18      What -- what arrangements did you come to
19  regarding your fee and -- and your fees in the --
20  for the report?
21      MR. STOY:  Object to the form.
22      THE WITNESS:  Can you restate that
23  question?
24  BY MR. MIGLIACCIO:
25    Q.  I mean, do you have an arrangement with

---

Confidential Information Subject to Protective Order

Page 34

1  respect to fees for -- for the report?
2      A.  Yes.
3      Q.  And what is that arrangement?
4      A.  The arrangement is that I am paid for my
5  own time at a rate of $850 an hour, as stated in my
6  report.  That is the arrangement that I have with
7  the lawyers in this case.
8          And I also am paid what's called
9  attribution, which is a percentage of the fees that
10 Analysis Group charges for the work in support of my
11 work.
12     Q.  Got it.
13         What is that percentage that you get for
14 attribution?
15     A.  Is that in my report?  I'm not sure --
16         THE WITNESS:  Is that privileged
17 information or is that...
18         MR. MIGLIACCIO:  I don't think that's
19 privileged.  I mean, I can talk with Frank about it,
20 but I think that directly goes to -- to what -- you
21 know, what his compensation is.
22         MR. STOY:  Yeah, you --
23         MR. MIGLIACCIO:  Frank, I --
24         MR. STOY:  You can answer that question,
25 Dr. Chan, if you know.

Page 35

1      THE WITNESS:  Okay.
2      20 percent.
3  BY MR. MIGLIACCIO:
4      Q.  20 percent.
5          So that -- so you receive 20 percent of
6  the fees that attribution -- that Analysis Group has
7  billed and recovered for this report, too?
8      A.  Correct.
9      Q.  Got it.
10         Is that reflected in a written agreement
11 anywhere?
12     A.  That's reflected in an agreement that I
13 have with the Analysis Group.
14     Q.  Do we have that agreement?  I -- I don't
15 recall seeing it.
16     A.  I don't know.
17         MR. MIGLIACCIO:  Frank, do you know?
18         MR. STOY:  I don't believe that is
19 something that we've produced.
20         MR. MIGLIACCIO:  Okay.  I'm going to just
21 mark for the record that I'm -- you know, we do want
22 to see it.  Prefer to see it today, if possible, so
23 we could -- you know, I think it's directly called
24 for by the -- by the Rules and by our request.
25         MR. STOY:  All right.  Well, I'm not sure

Page 36

1  about that, but that's something that we can talk
2  about off the record.
3          MR. MIGLIACCIO:  Sure.
4          MR. STOY:  Your request is noted.
5  BY MR. MIGLIACCIO:
6      Q.  Do your hourly rate -- does your hourly
7  rate change for deposition testimony, like do you
8  have a day rate for this or is it just -- just an
9  hourly rate?
10     A.  It's just the hourly rate.
11     Q.  Same rate.
12         Trial testimony, different rate, same
13 rate?
14     A.  I believe it's the same rate.
15     Q.  And file review, I mean, if -- do you
16 have -- is that a separate rate or is that the same,
17 too?
18     A.  Same rate for everything.
19     Q.  Okay.  So like fair to say, then, that you
20 only have this $850-an-hour rate for whatever you
21 do?
22     A.  Yes.
23     Q.  It's that simple.  Okay.  Got it.
24         Have you billed anything -- let me --
25 strike that.

Page 37

1          What percentage of your income, you know,
2  would you say comes from -- from your expert work?
3          MR. STOY:  And you can answer that
4  question but you don't have to answer -- you don't
5  have to elaborate about, you know, what your income
6  level is.
7          MR. MIGLIACCIO:  I'm not asking for that.
8      Q.  I'm -- yeah, I'm not asking you for that.
9  I understand.
10     A.  Right.  Right.
11         I'm not sure I can kind of give you a
12 precise figure here.  I can maybe tell you the
13 percent of my time that I spent, but you're asking
14 the percent of my income.
15     Q.  Right.  Right.
16         You could tell -- tell my time and --
17 I mean, you can think about the income question.  We
18 can come back to it later.  I understand it's -- you
19 might have to do some mental --
20     A.  Right.  Yeah.
21     Q.  -- mental arithmetic.
22     A.  I'm afraid that if I answer the income
23 question, you're going to back out my income.
24     Q.  I don't intend to back out your income.  I
25 just want to get -- I'm not trying to -- and this --

Confidential Information Subject to Protective Order

Page 38

1 I mean, I'm not trying to get at sensitive personal
2 information here.  That's not my goal.
3        I just want to see, you know, what you do
4 in terms of, you know, is this a big part of -- of
5 your life or is it a small part?  That's what I'm
6 trying to drive at.
7    A.  Uh-huh.  In terms of the hours that I
8 spend on my work, it's -- I would say it's a
9 relatively small part of my life.
10       If you're -- if you're asking whether this
11 is a small part of my life or a big part of my life,
12 I would say it's -- you know, I spend most of my
13 hours not working on litigation consulting.
14    Q.  If I could -- could you ballpark a
15 percentage of the percentage of your time spent on
16 litigation consulting?
17    A.  I'm sorry, say that again.
18    Q.  Could -- could you ballpark a percentage
19 of the time you spend working on litigation
20 consulting?
21    A.  Ballpark would be less than 20 percent.
22    Q.  Got it.  Got it.
23       I want to ask you some questions about
24 your -- your background.
25       I know, you know, you're a physician and

Page 39

1 an economist, you know, and you have multiple
2 degrees.  I -- you know, can you walk me through
3 your educational history and kind of what -- just
4 for starters.
5    A.  Sure.
6       Would you like to refer to the CV or would
7 you like me to just --
8    Q.  We can pull -- you can go -- you can just
9 go and -- because I can try to get the CV up.  I'm
10 sure I'll be able to, you know, once I figure out
11 this technology.  I'm not trying to hide it from
12 you.
13    A.  Sure.
14       My first degree that I post -- after
15 undergrad that I enrolled in was a medical degree at
16 UCLA.  In the middle of that medical degree, I
17 became quite interested in health policy and health
18 economics and I took two years off where I was a
19 Marshall Scholar in England and had two master's
20 degrees in health policy and health economics.
21       After coming back from that, I completed
22 medical school and started my residency program at
23 Brigham and Women's Hospital in Boston.
24       And I kind of knew that I wanted to do a
25 Ph.D. when I came back from England and I enrolled

Page 40

1 in the Ph.D. in economics at MIT after finishing my
2 residency in internal medicine.  I finished my Ph.D.
3 in economics in 2013.
4       And then I had my first job as a faculty
5 here at Stanford.
6    Q.  Got it.
7       So you started -- the -- the -- it sounds
8 like you -- you took time -- did you take time off
9 from medical school?  Do I have that straight or --
10    A.  It was a leave of absence from medical
11 school.  I would say about a third of my class took
12 some form of leave of absence to do some type of
13 research work or some type of fellowship in the
14 middle of med school and mine was to do economics
15 and health policy.
16    Q.  Got it.
17       I didn't mean that in a pejorative way to
18 say "time off."  I understand a leave of absence.
19       So -- and that's when you -- you became a
20 Marshall Scholar and went to -- to get those
21 degrees?
22    A.  Correct.
23    Q.  Got it.
24       And I think I have your CV up here now.
25 We can --

Page 41

1       MR. MIGLIACCIO:  I'd like to mark the
2 report and the attachments as Exhibit 2.
3       (Whereupon, Chan Exhibit 2 was marked for
4 identification.)
5 BY MR. MIGLIACCIO:
6    Q.  And I think it's up there now.
7    A.  Okay.  Yeah, I see it.
8    Q.  Yeah.  I see -- I think your CV is
9 Appendix A.
10    A.  Right.
11    Q.  Yeah.
12    A.  Great.
13    Q.  Yeah.  Great.
14       You -- I see.  So that -- and that -- I
15 see.  So you -- you start -- did you start medical
16 school directly after college?
17    A.  Correct.
18    Q.  Okay.  And then you took the leave of
19 absence to become a Marshall Scholar to go and get
20 these other degrees and then finish medical school?
21    A.  Correct.
22    Q.  Got it.
23       And then later, obtained your Ph.D. from
24 MIT?
25    A.  Correct.

Page 42

1  Q.  Got it.
2      What did you -- in terms of your career as
3  a physician, could you walk me through that?
4  A.  Sure.
5      My residency was in internal medicine.
6  This was at Brigham and Women's Hospital where I
7  spent quite a bit of time in primary care.  They
8  have a primary care track at -- in this residency
9  program.  So I spent quite a bit in outpatient
10 medicine.  But the average -- still the average
11 residency program is predominantly inpatient
12 medicine, but I spent a little bit more time than
13 the average resident in primary care.
14     I finished that residency in 2008 and
15 that's when I started the Ph.D. program in
16 economics.
17     During the first year of the Ph.D.
18 program, I did not have a steady clinical job.  I --
19 I worked as a physician as a -- what's called a --
20 well, it's a moonlighting position where you would
21 kind of put in -- I probably worked maybe 20 nights
22 that year or 30 nights that year where you kind of
23 worked at a hospital, at the Brigham in particular,
24 and I admitted patients at that hospital.
25     And then in my second year of the Ph.D.

Page 43

1  program, I had my first clinical job as an attending
2  physician at Beth Israel Deaconess Medical Center,
3  which you see there.
4      Actually, strike that.
5      That -- that was actually in the -- near
6  the beginning of the third year of my Ph.D. so I
7  think I continued to do moonlight -- you can see my
8  appointments at hospitals and affiliated
9  institutions on my CV.
10 Q.  Where -- can you just tell me that page
11 that is?
12 A.  This is A -- A-2.
13 Q.  A-2.  Okay.
14 A.  Yeah, so you could see that...
15 Q.  Yeah.
16 A.  Right.
17     So I had two positions.  I had two
18 positions before I was a staff physician at Beth
19 Israel Deaconess Medical Center.  I was a staff
20 physician at Brigham and Women's Hospital, but my
21 job there was mainly a moonlighting position.
22     And I also later that year, in 2008, was a
23 staff physician at McLean Hospital, which is a
24 hospital in the Massachusetts General Physicians
25 Organization.  Both of those jobs were moonlighting

Page 44

1  jobs.
2      And I had my first kind of staff job where
3  I was educating residents at Beth Israel Deaconess
4  Medical Center.  This was in 2010, starting in
5  November of 2010.  I had that job all the way until
6  I finished my Ph.D. in June of 2013.
7      And then after that I came here to
8  Palo Alto for an academic appointment at Stanford
9  where I was a staff physician in internal medicine
10 at the Palo Alto Veterans Affairs Health Care
11 System.
12 Q.  Got it.
13     So that first position at Brigham --
14 Brigham and Women's, you said that that had a
15 significant part of outpatient work?  Did I have
16 that straight?
17 A.  It had as much -- had more outpatient
18 exposure than the average internal medicine
19 residency program.
20 Q.  And how do you characterize that or
21 quantify that?
22 A.  You can quantify it by the number of
23 outpatient weeks that we have.  So the typical
24 internal medicine residency is structured in terms
25 of rotations.  You spend some rotations on various

Page 45

1  inpatient wards.  You spend some rotations in the
2  emergency department, and you spend some rotation
3  doing outpatient care.  And this residency program
4  that I did had more weeks on inpatient care than the
5  typical residency program.
6  Q.  Got it.
7      And did that change at some point where
8  you ended up spending more time like as typical
9  doing inpatient?
10 A.  Yes.  I -- so after residency you have to
11 choose what type of doctor you want to be.  You
12 could either go on to subspecialty fellowship and
13 become, you know, say, a cardiologist or infectious
14 disease doctor or you can remain within general
15 medicine.
16     And within general medicine there are
17 generally two types of jobs you could have.  One is
18 an outpatient job so you spend a hundred -- almost a
19 hundred percent of your time as an outpatient
20 doctor, increasingly so in the way medicine is
21 organized right now.
22     Or you could be an inpatient doctor and
23 spend close to a hundred percent of your time
24 clinically as an inpatient doctor.  And I chose the
25 latter.  So I'm what's called a hospitalist.

Page 46

1    Q.   Hospitalist.  Got it.  Got it.
2        Did you have any -- as a hospitalist, do
3  you have any specialties or is that -- hospitalist
4  is like a generalist; is that fair?
5    A.   Yes, a hospitalist by definition is a
6  general internist who does not have a subspecialty.
7    Q.   Okay.
8    A.   So internal medicine is their specialty
9  and they have no subspecialty.
10   Q.   Do you have any areas of interest takeaway
11 like a formal subspecialty?  Do you have any areas
12 of interest?  Do hospitalists have that?
13   A.   No.  Hospitalists are quite general.  We
14 see a variety of patients in the inpatient setting.
15       At Palo Alto VA, I see patients who are
16 general medicine patients.  I see oncology patients.
17 I see cardiology patients.  A wide variety of
18 patients who require hospitalization.
19   Q.   Got it.
20       And you've been at Palo Alto VA from 2013
21 to the present?
22   A.   Correct.
23   Q.   How -- how much time do you -- or have you
24 spent there on average, you know, in that period?
25   A.   Right.  I spend four weeks a year since I

Page 47

1  started there at -- in 2013.  There are some
2  hospitalists at Palo Alto VA that are full time and
3  I think the full time -- I would have to check but
4  oftentimes the full time -- a full-time hospitalist
5  might see less than -- might be on the wards for
6  less than half of the weeks of the year.  So there's
7  never a hospitalist that works all of the weeks of
8  the year.
9        It's quite an intense job, I would say,
10 and so it's not something like outpatient medicine
11 where in outpatient medicine you can be seeing
12 patients every week of the year.  In hospital
13 medicine, oftentimes a full-time person is half the
14 weeks of the year.
15       And for an academic hospitalist like me
16 that does research in addition to being a
17 hospitalist you can have a range from four weeks a
18 year to, I would say, as much as seven weeks a year,
19 eight weeks a year, within that range.
20   Q.   Got it.
21       Do you do those four weeks a year in a row
22 or do you split them up?
23   A.   I split them up.
24   Q.   Okay.  What is the period -- like the
25 split period that you take?  Is it a week or --

Page 48

1    A.   Yeah, it's determined by how the
2  hospitalists group decides to schedule rotations.
3  Before I believe this last year, or the last two
4  years, the rotations were two-week blocks.  So I
5  generally would work in two two-week blocks every
6  year.
7        Starting about a year or two ago, the
8  group decided to change it so that people would
9  generally work in one-week blocks.  And so now I
10 work four one-week blocks.
11   Q.   Got it.  Got it.
12       And has that been the same like from 2013
13 to the present?
14   A.   It has either been one-week blocks or
15 two-week blocks since 2013.
16   Q.   Yeah.  Got it.
17       Four weeks total?
18   A.   Four weeks total.
19   Q.   Got it.  Got it.
20       In your position in -- in Deaconess and
21 in -- the other hospitals back east, what was your
22 schedule there?
23       I mean, I -- that's kind of broad so
24 I'll -- I don't -- let's just start with Beth
25 Israel.

Page 49

1    A.   Beth Israel Deaconess, I think my -- I
2  don't know a hundred percent sure, but I believe my
3  schedule was six weeks a year back there.  And that
4  is a reflection of just the different hospitals have
5  different kind of norms in terms of what is the
6  number of weeks that academic physicians will work.
7  And so, as I mentioned, six weeks a year is kind of
8  within the range.
9    Q.   Got it.
10       What -- and what type of people would
11 you -- what would -- how would you describe the
12 patient population, you know, at Beth Israel
13 Deaconess that you saw?
14   A.   It was a fairly general patient
15 population.  I would see a number of different --
16 just the same as in Palo Alto VA, I would see
17 patients with a wide variety of internal medicine
18 complaints ranging from infectious disease to renal
19 to, you know, pulmonology, cardiology, oncology,
20 gastroenterology.
21       There -- there would be a number of
22 different inpatient conditions, that is typical of a
23 hospital medicine practice, that I would see there
24 at Beth Israel Deaconess Medical Center.
25   Q.   Okay.  Would you say there's a difference

Confidential Information Subject to Protective Order

Page 50

1  at the -- at a VA hospital, like, is the patient
2  population any different than at Beth Israel?
3      A.  The patient population at the VA is
4  predominantly male still.  I would say it's
5  90 percent -- my patients are 90 percent male.  At
6  Beth Israel Deaconess, we did not have that.  You
7  know, the most obvious kind of structural difference
8  is that the VA sees veterans and most veterans are
9  male.
10         You will also have veterans that tend to
11  be linked to certain wars.  So there's veterans of
12  the Vietnam era or veterans of kind of more recent,
13  Iraq and Afghanistan era.  So you'll have the age of
14  the veterans kind of coming in waves that are
15  related to wars as opposed to Beth Israel Deaconess
16  we didn't have them.
17      Q.  Got it.
18         So you see waves or bands of -- of age
19  ranges?
20      A.  Correct.
21      Q.  Got it.
22         The moonlighting job, can you tell me a
23  little bit more about what -- what that was?  I
24  mean, I -- I don't mean to say "job."  The
25  moonlighting schedule, is that better?  Schedule?

Page 51

1      A.  Sure.
2      Q.  Yeah.
3      A.  That was much more -- that was less --
4  that was a flexible -- the reason people have
5  moonlighting jobs is to allow for flexibility.  You
6  don't necessarily commit to a schedule a whole year
7  in advance, which is what I do now.  Nowadays, I
8  will say, what years I'm -- I will know which weeks
9  I'm going to be working a whole year in advance.
10         For the moonlighting job, generally, the
11  way that it works is that people sign up for shifts
12  and this signing up of shifts can happen maybe like
13  two weeks in advance or maybe a month in advance.
14  And generally, these would be for one-night shifts
15  or a shift maybe kind of lasting until the day but
16  not a whole week-shift as what I kind of currently
17  work on.
18      Q.  Got it.  Got it.
19         And did your duties vary as a -- you know,
20  a hospitalist in these -- across these positions or
21  were they similar, would you say?
22      A.  I would say they were quite similar
23  despite the fact that they're on different coasts.
24  Medicine I think is quite homogenous across
25  different medical centers.

Page 52

1         In Palo Alto VA, I solely work with
2  residents, whereas in Beth Israel Deaconess, there
3  was -- there were two different campuses, one in
4  which I worked with residents, the other in which I
5  kind of was more like a community doctor role where
6  I saw the patients alone and interacted directly
7  with the patients and the nurse and didn't have this
8  other group of doctors assisting me as I do now a
9  hundred percent.  That would be kind of the only
10  difference.  But in general, the jobs were quite
11  similar.
12      Q.  Got it.
13         What -- I think you've answered this, but
14  you don't have any specific oncology expertise, is
15  that fair, as a generalist?
16      MR. STOY:  Object to the form.
17      THE WITNESS:  I would say that I don't
18  have oncology subspecialty training.  I do see
19  oncology patients because oncology patients often
20  have medical problems, general medical problems.
21  They get infected.  They can get quite sick
22  ultimately in ways that a general internist will
23  deal with.
24         I do not make decisions in terms of
25  initiation of chemotherapy so if there is such a

Page 53

1  decision like that, I will work in consultation with
2  an oncologist.
3         The way that hospital medicine works is
4  that if it's a general medicine problem on an
5  oncology patient I can -- I have -- you know, I
6  handle that on my own.  Sometimes it makes sense to
7  consult subspecialty physicians like cardiologist,
8  oncologist to help in the management of a patient.
9  BY MR. MIGLIACCIO:
10      Q.  Got it.
11         And when you consult with an oncologist or
12  cardiologist to help with the management of a
13  patient who requires that, like how does the
14  relationship work between the -- the hospitalist and
15  that specialist?
16      A.  It's a collegial relationship.  I will ask
17  them to see the patient and render -- I think to use
18  legal terms, render their opinions, and they will
19  provide that information to me and ultimately -- it
20  depends on which hospital it is.
21         At the Palo Alto VA, I'm the -- what's
22  called the attending of record.  So I have --
23  ultimately the decision lies with me.  So if -- you
24  know, if you had to point to one decisionmaker, it
25  would be me.

Page 54

1     That said, I'm going to very much consider
2 what the oncologist or the cardiologist or the
3 nephrologist, you know, the various consultants will
4 kind of provide me. And that information will very
5 much influence what I do.
6     Q.   And these are for -- I think you said, and
7 I don't want to put words in your mouth, like this
8 is for a general medicine problems if the patient
9 has such a problem?
10    A.   Can you state that again?
11    Q.   You're consulting with a specialist if
12 that patient is in your care and they have a problem
13 that's not, you know, an oncology problem or a
14 cardiology problem or -- and -- am I getting this
15 wrong?
16    A.   If it's a general medicine problem, then
17 it's fully within my domain to --
18    Q.   Yeah.
19    A.   -- make a decision without any input from
20 a consultant.
21    Q.   Okay.
22    A.   If there is some type of specialized
23 knowledge beyond general medicine that would be
24 helpful in making my decision, then I might consult
25 them.

Page 55

1     The way that it works at Palo Alto VA is
2 that there is no oncology ward where an oncologist
3 is the attending of record so that means all
4 oncology patients will kind of, quote/unquote,
5 belong to me. I am the attending of record for all
6 oncology patients, and I'll be making -- I'm the
7 person -- I'm the single decisionmaker if you were
8 to name one.
9     If there is a specialized question that I
10 would like input on such as a chemotherapy regimen
11 or, you know, something that's specifically about
12 their cancer, then I will generally consult an
13 oncologist.
14    Q.   Got it.
15    And so you, as -- as -- in your position
16 at Palo Alto, then, if you have a patient who
17 presents with a cancer, that patient will be under
18 your care or will it -- or -- or jointly under your
19 care and jointly under the care of an oncologist?
20    A.   It's hard to define what we mean by
21 "jointly." I would say that some oncology patients
22 we will never consult an oncologist. Some, if their
23 condition is purely medical, for example, you might
24 be an oncology patient to have, like, cancer, you
25 are being treated for this cancer, but you come to

Page 56

1 the hospital for pneumonia. That patient I won't
2 consult an oncologist generally.
3     There are other patients where we need to
4 make a decision about changing a chemotherapy
5 regimen. Then I will consult the oncologist. But
6 while the patient is in the hospital, the patient is
7 under my care and the oncologist is secondary.
8     Q.   Okay. I think I understand.
9     If somebody -- for purposes of diagnosis
10 of a cancer and initial treatment plan, that would
11 be done by an oncologist?
12    A.   For purposes of the treatment plan, like
13 the chemotherapy plan, that would be primarily done
14 by the oncologist. They would have certainly the
15 biggest say in that, with the caveat that the
16 general internist and maybe even the primary care
17 doctor, you're going to try to take the patient's
18 wishes or the patient's preferences into
19 consideration. You have to also consider other
20 comorbidities that the patient has.
21    So it's not purely an oncology decision.
22 It's a holistic decision that's made by generalists
23 and oncologists.
24    With respect to diagnosing cancers, I
25 think that often happens by internist, general

Page 57

1 internists as opposed to oncologist. Oftentimes the
2 cancer is diagnosed initially by a patient who comes
3 in with a complaint and we find cancer. Then after
4 we find cancer, we refer the patient to an
5 oncologist. So I would say the diagnosis of cancer
6 often happens with generalists.
7     Q.   Have you diagnosed cancer before?
8     A.   Yes.
9     Q.   What -- what types of cancer have you
10 diagnosed?
11    A.   Almost all types of cancers, I would say.
12    Q.   What is metastatic cancer?
13    A.   Metastatic.
14    Q.   Metastatic, sorry.
15    A.   That is a cancer that has spread to a
16 distant site.
17    Q.   Is that type of cancer frequently
18 incurable?
19    MR. STOY:  Object to the form.
20    THE WITNESS:  I think it depends on the
21 type of cancer. There are some cancers such as
22 leukemia that are widespread. They are quite
23 treatable and quite curable.
24 BY MR. MIGLIACCIO:
25    Q.   What are the benefits of finding a cancer

Confidential Information Subject to Protective Order

Page 58

1 early?

2     MR. STOY: Object to the form.

3     Go ahead.

4     THE WITNESS: I think this -- yeah, this

5 gets to my report where there -- there could be

6 benefits and risks of pursuing a cancer early. When

7 you have an earlier cancer, it might be more

8 amenable to treatment in a sense that there's

9 less -- it has to -- I mean, yeah.

10     The cancer needs to be detectable, like if

11 the cancer is small enough where it's not

12 detectable, then you wouldn't generally operate on

13 it to remove it. You also wouldn't give

14 chemotherapy.

15     So there is, I think, still like an

16 optimal time to be thinking about when to detect

17 cancer. You don't want to be detecting cancer or

18 even try to detect cancer when it's just a few --

19 few cells. That would be infeasible.

20     And there -- there is also if -- you know,

21 the disease burden from cancer is quite advanced and

22 for certain cancers, if it's metastatic, it becomes

23 harder to -- the patient's life expectancy from

24 there is -- is lower and the odds of you

25 definitively sending that cancer into remission are

Page 59

1 lower as well.

2     So it's -- it's -- it's a balance. There

3 are -- there are risks and benefits of pursuing a

4 cancer early, and I think there is probable an

5 optimal time to be thinking about whether somebody

6 has cancer.

7     MR. STOY: Nick, I don't want to interrupt

8 you. If you've got -- you know, if this isn't a

9 good spot, but we have been going for a little over

10 an hour so, you know, whenever is a good time to

11 take a break.

12     MR. MIGLIACCIO: Sure. Why don't we just

13 take like five more minutes and then we can take a

14 break, if that's all right.

15     MR. STOY: That's fine.

16     MR. MIGLIACCIO: I know -- even on the

17 East Coast here we're close to lunch but we'll sort

18 that.

19     Q. Can we agree that it's generally

20 preferable to detect a cancer before it becomes

21 metastatic?

22     MR. STOY: Object to the form of the

23 question.

24     Go ahead.

25     THE WITNESS: Yeah, I think there are just

Page 60

1 a lot of considerations here.

2 BY MR. MIGLIACCIO:

3     Q. And I'm only asking about the benefits,

4 not the costs. I understand that -- that, you know,

5 and in your report you lay out your opinions. I

6 understand that, you know, but I'm not asking you

7 about the downsides. I'm only asking you about the

8 upsides.

9     MR. STOY: Same objection.

10     Go ahead.

11     THE WITNESS: Could you state that

12 question again?

13 BY MR. MIGLIACCIO:

14     Q. Yeah.

15     What -- what are the benefits, you know,

16 not -- not the drawbacks, not the costs, what are

17 the benefits of detecting a cancer before it becomes

18 metastatic?

19     A. It's really kind of hard for me to speak

20 generally on this. I think there are a number of

21 different types of cancer. This might differ across

22 different types of cancer.

23     Q. Sure. We can -- we can go through -- we

24 can go cancer by cancer.

25     Let's talk about, like, let's say,

Page 61

1 prostate cancer.

2     A. Uh-huh.

3     Q. Which is one example.

4     A. Okay.

5     Q. What -- what would be the benefits of --

6 of catching that before it becomes metastatic?

7     A. Even then, even if you focus on a specific

8 type of cancer, I think it depends on things that

9 are outside of cancer.

10     Potentially, if -- if -- you know, again,

11 this is a little bit hypothetical, but, you know, if

12 you have a patient with metastatic -- as I

13 mentioned, if you have a patient with metastatic

14 prostate cancer, it becomes harder to treat.

15     And this is kind of a very general

16 statement. As I mentioned, I am not, you know, an

17 oncologist.

18     When somebody comes into the hospital and

19 has a medical problem, I'm generally treating that

20 medical problem. I'm not making chemotherapy

21 decisions, so -- and I'm also not following cancer

22 patients long-term as well. I'm not directing --

23 chemotherapy is usually an outpatient regimen.

24     So, you know, I can speak to this in

25 general terms, but, you know, I think that there are

Page 62

1 just so many different factors to consider in --
2 there are -- it's -- it's a complicated decision
3 that requires, you know, more than just like an
4 inpatient hospitalization, which is what I deal
5 with.
6     Q.  Got it.
7         But we can agree that it's easier to
8 treat, then, before it becomes metastatic, a
9 prostate cancer?
10     MR. STOY:  Object to the form.
11     THE WITNESS:  Again, it depends, but I
12 would say that in many cases, in many cases, it is
13 treating a cancer that has not metastasized, or once
14 a cancer has metastasized, you would need more
15 systemic agents like chemotherapy as opposed to
16 surgery so it rules out certain therapeutic options.
17 And I can at least say that.
18     MR. MIGLIACCIO:  Why don't we -- we can
19 take a break now, a quick break, maybe just ten
20 minutes or so.  I know we need to figure out what
21 we're going to eat here.
22     MR. STOY:  Oh, no, that -- that's fine.
23 I'm more worried about Dr. Chan's lunch and he's
24 still a little ways away.
25     MR. MIGLIACCIO:  Yeah.

Page 63

1     MR. STOY:  So let's --
2     MR. MIGLIACCIO:  Right.
3     MR. STOY:  Let's come back at 12:10, does
4 that work, 12:10 Eastern time?
5     THE VIDEOGRAPHER:  All right.  We're off
6 the record at 9:01 a.m.
7     (Whereupon, a brief recess was taken.)
8     THE VIDEOGRAPHER:  We are back on the
9 record.  The time is 9:15 a.m. Pacific time.
10 BY MR. MIGLIACCIO:
11     Q.  Okay.  All right.
12         Dr. Chan, I want to ask you a few
13 questions about your prior -- the prior reports and
14 opinions or deposition testimony that you offered
15 in -- I think it looks like three other cases that
16 are listed on your CV.  I am on -- looking at it
17 right now, it looks like it's Appendix B.  Okay.
18         Can you tell me about those cases?  You
19 can start with just -- just from the top.
20     A.  I don't know how much I can reveal.
21     MR. STOY:  Yeah, before you -- before you
22 answer, Dr. Chan, I'll place an objection to the
23 form of the question, and I'll also just caution
24 you, I'm aware that there are protective orders in
25 place in those cases and I believe that there's a

Page 64

1 confidentiality order that governs any reports that
2 you might have authored in those cases.
3         So, you know, with that instruction to not
4 reveal any potentially confidential information
5 related to those other engagements, you can answer
6 the question to the extent you can.
7     THE WITNESS:  Right.  That leaves very
8 little room for me to discuss this.  I think I can
9 say that you can see the parties involved in each of
10 these cases, the dates of the case, and I was
11 retained as an expert on the defendants' side.  I
12 think I can say that.
13 BY MR. MIGLIACCIO:
14     Q.  Okay.  For each of those three cases?
15     A.  Correct.
16     Q.  Okay.  And those cases -- were those --
17 these are not whistleblower cases, are they?  Are
18 they -- were the cases themselves filed under seal?
19     A.  I don't think they're whistleblower cases.
20     Q.  Okay.  Can you tell me what you know about
21 the case, with the cases from what you know from the
22 publicly filed documents or complaints that were
23 filed in these cases?
24     A.  Are the complaints public?  Can I -- are
25 we certain that the complaints are public?

Page 65

1     Q.  Well, that's -- that's why I asked if they
2 were -- if they were filed under seal and that's,
3 you know, what I'm trying to find out.  They don't
4 appear to me to be whistleblower cases.  They appear
5 to be --
6     MR. STOY:  Yeah, again, I'll just -- I'll
7 put this -- I'll reference my prior instruction and
8 just say, I mean, I think it's okay to talk about
9 the case generally at a high level but just not to
10 reveal anything that, you know, would potentially be
11 confidential.  And if you -- if you're not able to
12 answer the question with that instruction, then so
13 be it.
14         But I just wanted to place that on the
15 record.
16     THE WITNESS:  Frank, would you instruct me
17 to -- because I just don't know the legal -- the
18 legal details, whether this is the -- the complaints
19 are under seal or not.  Am I allowed to discuss
20 the...
21     MR. STOY:  Yeah, I don't -- I don't know
22 if -- Nick, if these complaints were filed under
23 seal or -- or what is confidential or what isn't.  I
24 just know that there are confidentiality orders in
25 place and --

Page 66

1    MR. MIGLIACCIO:  Uh-huh.

2    MR. STOY:  -- you know, aspects of his

3  report and testimony would be confidential.

4    That is the limit of my knowledge so

5  that's why I put the instruction that I did on the

6  record.

7    MR. MIGLIACCIO:  Yeah, I understand that.

8  And, you know, I do know we asked for this

9  information, these transcripts, and I think you

10 objected to providing them.

11    I -- I think, you know, you could tell us

12 the general subject matter of the case.  I don't

13 think you would be breaching any confidential.

14 That -- that would be my request, that you tell us.

15    MR. STOY:  Yeah, I mean, I think he can

16 answer a question like, you know, what is -- what's

17 the product that was at issue in the case or

18 something like that.  But I just think, you know,

19 it's going to depend on the question.  And if the

20 question is a really broad one, then it's going to

21 be difficult for Dr. Chan to be able to provide an

22 answer.

23    THE WITNESS:  And I would only want to

24 reveal what's public information because I wouldn't

25 want to divulge anything that's under confidential

Page 67

1  order.  And I -- I just don't know what is under

2  confidential order or not.  Yeah, I mean...

3    MR. STOY:  Well, let's wait.  I don't

4  think there's a question pending right now,

5  Dr. Chan, so let's wait and -- wait for a question.

6  BY MR. MIGLIACCIO:

7    Q.  But I mean, there was -- I just wanted to

8  know what the general subject matter of the cases

9  are.  You know, what -- what are the cases about.

10 You can -- you can tell me what the product at issue

11 is.  That -- that's fine.

12    What -- what is the product at issue?

13    THE WITNESS:  Is that okay, Frank?

14    MR. STOY:  Yeah, I think -- I think you

15 can answer that question, if you know.

16    THE WITNESS:  Right.

17    The -- the product at issue in all three

18 of these cases are -- were products by Janssen

19 pharmaceutical or Johnson & Johnson.  They were two

20 specific opioid products produced by Janssen

21 Pharmaceuticals or Johnson & Johnson.

22 BY MR. MIGLIACCIO:

23    Q.  Not Janssen, Johnson & Johnson?

24    A.  They're -- I think -- my understanding is

25 that Janssen is a subsidiary of Johnson & Johnson.

Page 68

1    Q.  Okay.  These -- these are all -- these

2  were deposition -- these aren't trial testimony,

3  this is all deposition testimony?

4    A.  Correct.

5    Q.  Do you know -- and you were retained by

6  the defendants in these respective -- these three

7  cases?

8    A.  I was retained by Janssen Pharmaceuticals.

9  There are multiple defendants in this case.  And I

10 was retained by one of the defendants, which is

11 Janssen Pharmaceuticals.

12    Q.  Okay.  Did you -- was your opinion -- did

13 you rely upon your expertise as a medical doctor or

14 as an economist in -- in offering your opinion?

15    A.  Both.

16    MR. STOY:  Object to the form.

17 BY MR. MIGLIACCIO:

18    Q.  All right.  Have you -- has your testimony

19 been -- been challenged in any of these three cases?

20    A.  No.

21    Q.  Do you know what I mean when I say

22 "challenged"?

23    A.  I'm not a legal expert.  My understanding

24 of your question is that there was a movement by the

25 other side to strike my testimony or strike my

Page 69

1  expertise.

2    Q.  It's to exclude or strike it, yeah,

3  that -- that's my question, right.

4    A.  Right.

5    Q.  Yeah.  And so the answer to that was no?

6    A.  That's no.

7    Q.  Okay.  Did your testimony include any

8  opinion relating to healthcare spending or pricing?

9    MR. STOY:  Object to the form.

10    You can answer that question.

11    THE WITNESS:  It's hard for me to answer

12 that question.  It related to healthcare spending.

13 Not sure about pricing.

14 BY MR. MIGLIACCIO:

15    Q.  Healthcare spending.  Got it.

16    And when were you retained in these cases,

17 if you can recall?

18    A.  I believe my first contact was before the

19 pandemic so that would mean sometime in 2020,

20 earlier 2020.

21    Q.  And is your work being done in those cases

22 also with the Analysis Group?

23    A.  Yes.

24    Q.  Okay.  In all three of them?

25    A.  Yes.

Confidential Information Subject to Protective Order

Page 70

1    Q.  Okay.  Do you have -- what is your
2  relationship with the Analysis Group?  Are -- are
3  you a consultant?  Are you an owner?  Are you an
4  employee?  Could you just shed some light on that?
5        MR. STOY:  Object to the form.
6        THE WITNESS:  As I mentioned, I have a --
7  an agreement with the Analysis Group that is --
8  is -- basically allows me to use their services in
9  preparing work for or litigation consulting.  I'm
10  not an employee of Analysis Group.  I'm what's
11  called an affiliate of Analysis Group.  And I
12  believe that just means that I have worked with them
13  in the past and I have a working relationship with
14  Analysis Group.
15  BY MR. MIGLIACCIO:
16    Q.  Got it.
17        What was -- I think we -- we -- we
18  discussed this earlier, but what was the process
19  that you used -- I think you've -- you've answered
20  this.
21        Did your process for preparing your report
22  in this case differ for your process in preparing
23  any expert witness report in other cases?
24        MR. STOY:  Object to the form.
25        THE WITNESS:  Would you like to be more

Page 71

1  specific?
2  BY MR. MIGLIACCIO:
3    Q.  I think you told me about your process
4  this morning.  I'm not sure if you finished your
5  answer, if we finished that line of questioning.
6        But my question is, in the way that you
7  prepared this report, was this -- the way you
8  prepared this report, was it any different from --
9  from what you've done in -- in other cases,
10  including these three that we just looked at?
11        MR. STOY:  Object to the form.
12        You can answer.
13        THE WITNESS:  Different from what I
14  described earlier.  So I think you are referring to
15  my general process of reading the complaint,
16  thinking about the question, identifying lines of
17  inquiry that I would like more information or
18  analyses.
19        Are you referring -- if you're referring
20  to that, then that is my general process of thinking
21  through my opinions in a case of litigation
22  consulting.
23  BY MR. MIGLIACCIO:
24    Q.  Have you -- other than these three
25  reports -- or rather, prior testimony, have you

Page 72

1  offered opinions in any other litigation?
2    A.  No.
3    Q.  So -- so these three that you've been
4  deposed in that are listed on Appendix B, and this
5  case, this is the fourth case in total that you have
6  been retained for and offered expert opinions or --
7  or testimony?
8        I'm not asking for questions about -- I'm
9  not asking for any cases where you may be a
10  consulting expert.  I'm asking, you know, where
11  you've been disclosed and provided opinions or
12  deposition testimony.
13    A.  And could you clarify to me what you mean
14  by provided expert opinions?  Is this -- is this a
15  specific term meaning...
16    Q.  A report, like a report.
17    A.  A report.  Okay.
18    Q.  Yeah.
19    A.  Thank you.
20        MR. STOY:  Dr. Chan, my understanding is
21  he's limiting his question to cases where you've
22  been disclosed as a testifying expert, like in this
23  case, not any case that you might have been retained
24  as a consultant.
25        THE WITNESS:  Okay.

Page 73

1        So the answer is yes.  These -- these are
2  the only cases that I have been disclosed as an
3  expert.
4  BY MR. MIGLIACCIO:
5    Q.  Got it.
6        And -- and -- and the first one looks
7  like -- I mean, you've just started this, you've
8  just started working as a disclosed expert with
9  these four cases, including these three?
10    A.  By "just started working," you can see the
11  dates here --
12    Q.  Right.
13    A.  -- is that what you mean?
14    Q.  Yeah, that -- that's right.  I mean, so
15  you -- there's not an earlier part of your career
16  where you provided expert testimony or expert
17  reports in other cases?
18    A.  Correct.
19    Q.  Okay.  Got it.
20        I have -- in your report here you have a
21  list of materials relied upon.  Looks like that's
22  exhibit -- it's just Appendix C of your report.
23        Do you have that up there?
24    A.  Yes.
25    Q.  So you looked at the Consolidated Third

Page 74

1 Amended Medical Monitoring Class Action Complaint,
2 Plaintiffs' Memorandum of Law in support of their
3 motion for class certification, and the Third
4 Amended Consolidated Economic Loss Class Action
5 Complaint.
6     A.   Correct.
7     Q.   And I think you testified to this earlier
8 that you looked at Dr. Conti, Dr. Kaplan, and
9 Dr. Song's reports.
10        You also, I see here, looked at the report
11 of Dr. Panigrahy; is that right?
12     A.   I believe so, but I don't particularly
13 remember much about that report.
14     Q.   Okay.  And then are you aware that -- did
15 you ask to see any other expert reports?
16     A.   No.
17     Q.   No.
18        Did you -- are you aware that the
19 plaintiffs had put forward general causation expert
20 reports in this case?
21     A.   Not very aware that.
22     Q.   Are you aware that there were reports by
23 Dr. Etminan, Dr. Hecht, and Dr. Lagana?
24     A.   No, I don't know those names.
25     Q.   Are you aware of Dr. Daniel Catenacci?

Page 75

1     A.   No, I don't know who that is.
2     Q.   Dr. Janice Britt?
3     A.   No.
4     Q.   Have you ever heard of those names before?
5     A.   I've never heard those names before.
6     Q.   All right.  What was your recollection --
7 I mean, what is your recollection, as you sit here
8 today, of Dr. Panigrahy's report?
9     A.   I don't have much of a recollection at
10 all, actually.  I don't know who that person is.
11 I -- I might have seen that report, but I don't
12 remember anything about it.
13     Q.   Do you recall anything about the
14 depositions of Judson -- I'm just -- it says,
15 "Depositions and Declarations."
16     A.   Oh.
17     Q.   And it looks like there are one, two,
18 three, four -- seven of them listed there.
19     A.   Uh-huh.  I know some of their medical
20 conditions.  I know that they're specific named --
21 named -- named plaintiffs and so I know -- I know
22 their -- as I mention in my report, I know some of
23 their medical conditions.
24     Q.   Got it.
25        And then I see further below, "Data," you

Page 76

1 have various data listed, is that right, on the next
2 page?
3     A.   Uh-huh.
4     Q.   And I'm just going to refer you to the
5 "Medical Expenditure Panel Survey data."
6        Do you see that?
7     A.   Yes.
8     Q.   Who -- who gathered that data for you?
9     A.   I directed the Analysis Group to gather
10 that data, those data.
11     Q.   Who is your -- who did you interface with
12 with respect to getting that information?
13     A.   Almost all of my calls with the Analysis
14 Group involved the people that I mentioned earlier.
15 All of them.  Some of the calls did not include
16 Molly Frean.  But almost all of the calls involved
17 the other four people that I named, Brian Ellman,
18 Frank Mortimer -- Richard Mortimer, Jessica Lu, and
19 Michaela Johnson.  And I directed them as a group to
20 get those data.
21     Q.   Got it.
22        I want to look at your -- were there any
23 conclusions that you reached that did not make it
24 into your final report?
25     A.   No.

Page 77

1     Q.   And let -- let's look at your -- the
2 invoices.  I think I -- I will put -- pull those up
3 for you if we just bear with me for a moment.
4        Did I do it right?  Okay.  It should --
5 they should pop up in a few minutes -- or a few
6 seconds.
7        Let me know when you can see them.
8     A.   Yes, I can see them.
9        (Whereupon, Chan Exhibit 3 was marked for
10 identification.
11 BY MR. MIGLIACCIO:
12     Q.   Okay.  Great.
13        This is -- this is the invoice we were
14 provided with.
15     A.   Uh-huh.
16     Q.   And it's dated February 3rd, 2022.
17     A.   Right.
18     Q.   And it looks like it was "For professional
19 services rendered in connection with the above
20 referenced case for the period ending December 31,
21 2021."
22     A.   Uh-huh.
23     Q.   Are there any other invoices or did you
24 spend any other time on this report?
25        MR. STOY:  Object to -- object to the

Page 78

1  form. I think that's two different questions.
2       THE WITNESS: Okay. Yeah.
3  BY MR. MIGLIACCIO:
4       Q.  Yeah.  First, are there any other invoices
5  that haven't been --
6       A.  I have not yet submitted any other
7  invoices.
8       Q.  Okay.  Do you have -- do you have a plan
9  to submit another invoice?
10      A.  Yes.
11      Q.  Okay.  And what would be included in that
12 invoice aside from today's deposition or in
13 preparation for the deposition?
14      A.  I haven't prepared them yet.  Those would
15 be invoices for the months of January and for the
16 month of February.
17      Q.  Okay.  How much time -- so your report
18 looks like it's dated January 12th, right?
19      A.  Right.
20      Q.  Could you estimate how much time you spent
21 in the month of January on the report before it was
22 signed and submitted on the 12th?
23      A.  Off the top of my head, no.  I think it
24 was a significant amount of time given that we were
25 up against a deadline.  But off the top of my head,

Page 79

1  I can't tell you the number of hours.
2       Q.  Got it.  Got it.
3       So to -- to look, I'm looking at the
4  first -- or rather, the second page, page 2, and
5  there I think the people that you've referenced are
6  listed as professionals with their titles and their
7  hours and rates.
8       A.  Right.
9       Q.  Do you see that?
10      A.  I do.
11      MR. STOY:  Object to the form.
12 BY MR. MIGLIACCIO:
13      Q.  Can you tell me, you know, Mortimer,
14 R. Mortimer, what background that person has in
15 terms of degrees or qualifications?
16      A.  Richard Mortimer.  I believe he has a
17 Ph.D. in economics from Berkeley.  He's a principal,
18 which means a partner.  I don't know the difference
19 between a managing principal and a principal, but I
20 think, broadly speaking, they're -- they're like
21 partners at -- at AG.
22      Q.  Fink.  S. Fink?
23      A.  Stephen Fink is another partner.  He was
24 involved -- I -- now I remember he was involved in
25 early discussions in the case but not very much

Page 80

1  subsequently.  Off the top of my head, I don't know
2  what Ph.D. he has, but it's likely -- I believe he's
3  an economist.
4       Q.  Ellman, B. Ellman?
5       A.  Brian Ellman, I think he has an MBA.  I
6  don't remember exactly where the MBA is from.  He's
7  an economist and he's a principal.
8       Q.  M. Johnson?
9       A.  Michaela Johnson, my understanding is a
10 manager is below the level of a partner but is quite
11 experienced, has quite a bit of industry experience
12 as well as consulting experience.  She has an MBA
13 from MIT.
14      Q.  I. Karagodsky?
15      A.  I believe he was on maybe one call or two
16 calls.  I don't know him as well.
17      Q.  Do you know what qualifications he may
18 have?
19      A.  I don't know in particular.
20      Q.  Okay.
21      A.  I believe it's all -- I would expect that
22 all to be on their website if I wanted to look it
23 up.
24      Q.  Got it.
25      F.  Balestrieri?

Page 81

1       A.  F. Balestrieri was not on most of the
2  call -- I don't remember that person being on calls.
3       Q.  J. Bernard?
4       A.  I don't remember that person being on
5  calls.
6       Q.  And you don't know Balestrieri or Bernard,
7  their -- their qualifications?
8       A.  No.
9       Q.  J. Lu?
10      A.  Jessica Lu.
11      Q.  Yeah.
12      A.  Was on almost all the calls.  She has an
13 MBA from MIT.  And she's a manager.
14      Q.  S. Livingston?
15      A.  I don't know who that person is.
16      Q.  M. Frean?
17      A.  Right.  Molly Frean.  She has a Ph.D. from
18 University of Pennsylvania.
19      Q.  And did you work with her a lot on this?
20      A.  I would say less than Jessica and
21 Michaela, Brian, and -- she was less present than
22 those four but she was present on a few of the
23 calls.
24      Q.  A. Khan?
25      A.  I don't remember working with that person.

Page 82

1    Q.  And N. Mwonga?
2    A.  I don't remember working with that person
3  either.
4    Q.  T. Radtke?
5    A.  I don't remember working with that person.
6    Q.  Okay.
7       I. Tibrewal?
8    A.  And I don't remember working with that
9  person.
10    Q.  Got it.
11       Were there any other people that you
12  remember working with other than that -- that are --
13  that are listed here?
14    A.  No.
15    Q.  Okay.  Did you review this bill before it
16  was submitted?
17    A.  I submitted my hours, but I don't review
18  the hours of -- submitted by Analysis Group.
19    Q.  Got it.  All right.
20       I want to ask you some questions about the
21  scope of your opinions here in this case.
22       Were you -- or are you offering any
23  opinions on epidemiology or general causation?
24    A.  What do you mean by "general causation"?
25    Q.  Are you offering an opinion whether the

Page 83

1  contaminated valsartan at issue in this case, it can
2  cause cancer?
3    A.  I'm not rendering any opinions on whether
4  valsartan with nitrosamine impurities can cause
5  cancer.
6    Q.  Got it.
7       I want to direct you to paragraph 44 of
8  your -- of your report.
9    A.  Okay.
10    Q.  And what -- you state -- and -- "While
11  NDMA and NDEA exposure may be perceived as a
12  potential general cancer risk, it has not been
13  demonstrated as a risk with respect to any specific
14  type of cancer, nor has the presence of nitrosamines
15  in certain valsartan products been shown to present
16  a general or specific cancer risk."
17       Are you offering that opinion or are -- is
18  that -- or is that an assumption that you are
19  stating?
20       MR. STOY:  Object to the form.
21       You can answer.
22       THE WITNESS:  That's not a core opinion
23  that I'm offering.  That is something that I am
24  citing -- it's my understanding that I'm citing from
25  some literature that I reviewed but it's not central

Page 84

1  to my opinion.
2  BY MR. MIGLIACCIO:
3    Q.  And you're not offering that opinion
4  specifically?
5    A.  No.
6    Q.  Okay.  Fair to say you did not do anything
7  to review the epidemiology in this case or
8  investigate general causation?
9       MR. STOY:  Object to the form to the
10  extent it misstates his testimony.
11       Go ahead.
12       THE WITNESS:  I would say that I did
13  not -- it's not a core opinion of mine to comment on
14  general causation.  Epidemiology is relevant in
15  other ways, broadly speaking.
16       When you consider epidemiology as the
17  prevalence of other diseases or the characteristics
18  of people that take valsartan versus the people that
19  don't take valsartan, there are other elements of
20  epidemiology that are important for my opinion.
21  BY MR. MIGLIACCIO:
22    Q.  Let me -- let me give you more specific
23  question.
24       You didn't look at the question of -- you
25  didn't look at epidemiology with respect to the

Page 85

1  question of whether the contaminated valsartan can
2  cause cancer in this case?
3       MR. STOY:  Object to the form.
4       THE WITNESS:  In my report, there are some
5  sources that I reviewed about what other agencies
6  have said about the link between nitrosamines and
7  the potential for cancer.  But my core opinions do
8  not concern that.
9  BY MR. MIGLIACCIO:
10    Q.  Okay.  Did you review any dietary studies
11  that discussed increased risk of cancer at higher
12  levels of NDMA ingestion?
13    A.  Yes.
14    Q.  You did?
15    A.  Strike that.
16       I reviewed studies on the concentration of
17  NDMA and NDEA in various dietary sources.
18       I also reviewed sources that had
19  estimates, for example, from the FDA on the
20  potential risk of cancer given nitrosamines.
21    Q.  But you're not offering any opinions with
22  respect to those studies?
23    A.  No.
24    Q.  Okay.  When you say this isn't a core
25  opinion that you're offering, does that mean this is

Confidential Information Subject to Protective Order

Page 86

1 not an opinion that you would be testifying to at
2 trial if there was a trial in this case?
3        MR. STOY:  Object to the form.
4        THE WITNESS:  I wouldn't be testifying on
5 issues of general causation.
6 BY MR. MIGLIACCIO:
7    Q.  Got it.
8        I want to direct you to paragraph 68 of
9 your complaint -- of your -- I'm sorry, your -- your
10 report where you discuss the M-E-P-S data.
11    A.  The MEPS data.
12    Q.  Right.
13        Can you tell me what MEPS data is?
14    A.  Sure.  I think that paragraph actually
15 does a pretty good job of doing that.
16        MEPS is a data source that's collected by
17 survey.  It is a -- supposed to be a representative
18 survey of the U.S. population and it collects data
19 on healthcare utilization, healthcare -- health
20 insurance coverage.  It also has information on
21 patient diseases and demographics.  And it conducts
22 these surveys yearly.  Doesn't necessarily follow
23 the same people all the time, but it conducts a
24 representative survey over time on -- on -- on this
25 type of information.

Page 87

1    Q.  Who -- and who -- what organization
2 sponsors this or -- or, you know, collects the data?
3    A.  I believe it's the federal government.
4    Q.  Okay.  And you directed that this data be
5 pulled for -- for patients who took affected
6 valsartan and non-affected valsartan?
7    A.  As well as patients who don't take --
8    Q.  Valsartan at all.
9    A.  We wanted to compare that.
10        I believe there are three -- three sets of
11 patients:  patients who didn't take valsartan at
12 all, patients who took affected valsartan, patients
13 who took non-affected valsartan.
14    Q.  Was -- how big is this sample, you know,
15 what -- what percentage would you say it -- it
16 captured of the population?
17    A.  I can't -- I don't know exactly right now
18 but I know it's a representative sample and it's --
19 the survey design is -- is meant to, you know,
20 survey enough people so that it -- you know,
21 inferences can be made with reasonable certainty on
22 a representative sample of the U.S.
23    Q.  And I'm just looking at paragraph 68.
24        You state, "I found that the rate of
25 cancer and diabetes in the MEPS data for individuals

Page 88

1 who took affected valsartan" -- and when we're
2 talking about affected valsartan we're talking about
3 the valsartan at issue in this case, right, that has
4 the nitrosamine contamination in it, right?
5    A.  To be clear, affected valsartan is --
6 we -- we would have to define it by an NDC code.
7    Q.  Uh-huh.
8    A.  We don't know anything more than that.  We
9 don't know what the lot was that the patient took
10 the valsartan from.  As would be the case for many
11 of the patients in the proposed class.  But we know
12 the NDC number which means we know the manufacturer
13 of the valsartan.  And that's what --
14    Q.  So that's what you're -- that's what
15 you're talking about when you're talking about
16 affected valsartan?
17    A.  Right.  So the valsartan may or may not
18 have actually contained nitrosamines but it was from
19 a manufacturer as specified by the NDC code.
20    Q.  And you say 38 -- just to -- to continue
21 that sentence, "who took affected valsartan
22 (34.8 percent for diabetes, 20.2 percent for cancer)
23 was similar to the rate of individuals who took
24 non-affected valsartan (38.2 percent for diabetes
25 and 19.1 percent for cancer)."

Page 89

1    A.  Correct.
2    Q.  Could we agree that 20.2 percent is
3 greater than 19.1 percent?
4    A.  It depends on the -- the -- the number --
5 the number 20.2 and the number 19.1 in complete
6 isolation, if you were just to ask me which number
7 is greater, I would say 20.2.
8        But if you are doing a study on this you
9 would have to ask what the statistical significance
10 is between 20.2 and 19.1.  You would also have to
11 ask whether this is clinically significant given --
12 you know, this is not -- we're not using this as a
13 study of causation at all.
14        You know, you would have to -- you would
15 have to control for a number of different things in
16 order to kind of ask whether there's a clinically
17 and statistically meaningful relationship between
18 affected valsartan and cancer.  This is simply
19 descriptive.
20    Q.  You haven't done any of those things,
21 statistical study or clinical study on that, right?
22    A.  On -- on causation?
23    Q.  Yeah.  With respect to this paragraph.
24    A.  Correct.  The goal of this is not to ask
25 whether valsartan could cause cancer -- affected

Confidential Information Subject to Protective Order

Page 90

1  valsartan could cause cancer.
2      Q.  Got it.
3          Do you have any experience -- we talked, I
4  think at some length, about your -- you know, your
5  work as a hospitalist, as -- as a physician.
6          You know, do you have any experience
7  setting up a medical monitoring program?
8      A.  No.
9      MR. STOY:  Object to the form.
10         You can answer.
11         THE WITNESS:  Okay.
12         No.  By "medical monitoring" -- do you
13 want to be a little bit more specific, actually,
14 before I say --
15 BY MR. MIGLIACCIO:
16     Q.  Yeah.
17         Well, what experience do you have
18 monitoring at-risk patient populations?  I'll put it
19 that way.
20     A.  Patients at risk for -- for what?
21     Q.  For cancer.
22     A.  As a hospitalist, I don't have -- it's not
23 part of my job as a hospitalist to monitor at-risk
24 patient populations for diseases that have not yet
25 become known.

Page 91

1      Q.  Got it.
2          Have you -- have you done anything to
3  monitor at-risk patient populations for diseases
4  that have not become known?  Have you done that in
5  any other part of your work other than a
6  hospitalist, like, you know, as -- in -- in academia
7  or -- or elsewhere?
8      MR. STOY:  Object to the form.
9      THE WITNESS:  In academia, part of my
10 research agenda is on the process of making
11 diagnoses and part of that involves studying the
12 properties of diagnostic tests and the -- the kind
13 of human behavior that goes into the process of
14 making diagnosis.  So that would be related to this
15 idea of screening for diagnoses, identifying
16 diagnoses.  That -- that's -- I think that's all I
17 can say.
18         I've studied it from an academic
19 perspective that's interested in the process of
20 making diagnoses.
21 BY MR. MIGLIACCIO:
22     Q.  The process of making diagnoses, have they
23 related to cancers?
24     A.  They could certainly be applied to the
25 process of diagnosing cancers.

Page 92

1      Q.  They haven't specifically focused on that?
2      A.  They have not specifically focused on the
3  process of making cancer diagnoses.
4      Q.  What -- what -- and it sounds like it's a
5  pretty broad or general interest of yours.  Can you
6  explain a little bit more about, you know, are you
7  writing it -- that as an economist?  Like, what is
8  the -- like, can you give me some more meat on the
9  bone for that?
10         MR. STOY:  Object to the form.
11         THE WITNESS:  I'm writing about this as
12 both a clinician and an economist.  The -- I've
13 written economics papers on the process of making
14 diagnoses and how to understand kind of, you know,
15 various tradeoffs between overdiagnosis versus
16 underdiagnosis as well as the accuracy of the
17 diagnosis process.
18         Some -- some providers may make both more
19 Type I errors and Type II errors, and it's not a
20 tradeoff between those providers and other
21 providers.
22         So this economics literature is focused on
23 systems of care, provider behavior, and kind of
24 specific objects of diagnostic errors such as Type I
25 errors and Type II errors.

Page 93

1          I have applied this type of research for a
2  clinical audience as well.  I'm working on an
3  opinion piece in JAMA for a clinical audience that
4  talks about diagnostic efficiency, what makes for
5  diagnostic errors, and how can we improve the
6  quality of diagnoses.
7  BY MR. MIGLIACCIO:
8      Q.  These -- this research, is it fair to say,
9  has not focused on specific patient subpopulations
10 who are at risk for cancer?
11     A.  It has not specifically focused on that,
12 so -- population.  It has kind of viewed the process
13 of diagnoses more broadly.
14         But, you know, the diagnosis of cancer is
15 one of the major -- one of the -- one of the most
16 important kind of domains of diagnostic
17 decision-making.  I would say cancer is -- is quite
18 important in terms of diagnostic error,
19 misdiagnoses, and how we can improve our process of
20 making diagnoses.
21     Q.  Do you have -- I think -- now -- I think I
22 asked this one way.  I'll ask it another way.
23         Do you have any experience administering a
24 medical monitoring program --
25     A.  No.

Confidential Information Subject to Protective Order

Page 94

1    Q.  -- to monitor a group?
2         Before you offered your opinion here in
3  this case, have you had any litigation experience
4  with opining relating to -- offering an opinion with
5  respect to medical monitoring?
6    A.  With respect to medical monitoring for
7  patients at risk for cancer?
8    Q.  Yes.
9    A.  No.
10   Q.  Okay.  Any other aside from that narrow
11 group, anything broader?
12   A.  Some of my other opinions relate to
13 physician behavior.  And physician behavior -- an
14 important part of physician behavior is deciding
15 whether a certain treatment is appropriate for a
16 patient or deciding whether a certain test is
17 appropriate for a certain patient.  And that relates
18 to diagnoses, making diagnoses.
19   Q.  Okay.  Do you know of any medical
20 monitoring programs that have been, you know,
21 approved by courts?
22        MR. STOY:  Object to the form.
23        THE WITNESS:  I haven't researched which
24 medical monitoring programs have been approved by
25 courts.

Page 95

1  BY MR. MIGLIACCIO:
2    Q.  Got it.
3         Have you looked or researched into -- of
4  any medical monitoring programs in the United States
5  that are not approved by courts?  And I'm talking
6  about programs outside of the guidelines that you
7  reference in your report.
8        MR. STOY:  Object to form.
9        THE WITNESS:  Can you state that again,
10 please?
11 BY MR. MIGLIACCIO:
12   Q.  Yeah.
13        Have you looked at or researched any
14 medical monitoring programs in the United States
15 that -- that aren't court-approved, you know, like
16 there's the 9/11 medical monitoring program, is that
17 something you've looked at, ever?
18        MR. STOY:  Object to form.
19        THE WITNESS:  I can't recall whether I've
20 looked at that or not, whether I've looked at the
21 9/11 program.
22 BY MR. MIGLIACCIO:
23   Q.  For -- that -- that was just an example.
24 I mean, you know, there may be others.
25        But you can't recall any others?

Page 96

1    A.  No.
2    Q.  Okay.  I want to direct you to
3  paragraph 32 in your report.
4    A.  Okay.
5    Q.  Okay.  And I'm -- I'm going down toward
6  the -- I guess it's the one -- second -- the third
7  sentence where -- that begins, "In contrast."
8         And it says, "In contrast the screening
9  guidelines I discuss in this section refer to the
10 testing of an apparently healthy, asymptomatic
11 target population."
12   A.  Right.
13   Q.  Would you agree that the screening
14 guidelines that you have discussed in this report
15 are for the average risk population?
16   A.  I am not sure about that.  The
17 guidelines -- some of these guidelines are for
18 smokers, for example.  I don't know what you mean by
19 "average risk population."
20        I -- here, I say patients without
21 symptoms.
22   Q.  Aside from smokers -- smokers have a
23 special set of guidelines, right?
24   A.  Right.
25   Q.  I think you discussed them.  And maybe you

Page 97

1  might have discussed one other.  But smokers have --
2  they get low-dose CT scans.
3         What is the guideline for smokers again?
4    A.  I believe that's in my report in
5  Figure number 1.
6    Q.  Figure 1.  Okay.
7    A.  Yeah.  Would you like to turn to that?
8    Q.  Sure.
9    A.  Okay.  So for lung cancer, the USPSTF has
10 a recommendation of "B" for adults aged 50 to 80
11 with a 20 pack-year smoking history who currently
12 smoke or quits within the last 15 years.
13   Q.  And you reference the USPSTF; is that
14 right?
15   A.  Yes.  Uh-huh.
16   Q.  Who -- what organization is the USPSTF?
17   A.  The USPSTF is the U.S. Preventive Services
18 Task Force, and that is the main organization that
19 comes up with guidelines related to preventive
20 services.
21        My boss is a member of this task force.
22 It's a -- it's -- it's a high profile task force
23 that considers evidence on various -- various
24 population-based guidelines -- I'm sorry, various
25 population-based interventions that you could do

Page 98

1 or -- or -- or screening tests. And it issues
2 recommendations based on this evidence.
3     Q. Have you ever been a member of the USPS --
4 USPSTF?
5     A. No.
6     Q. Okay. The NCI, you referenced the
7 National Cancer Institute. What -- what does the
8 NCI do?
9     A. The National Cancer Institute is an
10 organization that is an authority on cancer,
11 various -- and in this -- and in this setting, the
12 NCI -- I refer to the NCI if it has any guidelines
13 with respect to screening of cancer.
14     Q. Are you familiar with the National
15 Comprehensive Cancer Network, or NCCN?
16     A. I've heard of that organization.
17     Q. Do -- what do you know about the NCCN?
18     A. I know that that organization also puts
19 out quality measures on cancer care. I'm not sure I
20 know very much more about the NCCN.
21     Q. Is it fair to say that the development and
22 treatment -- the development and establishment of
23 treatment guidelines for cancer has not been a focus
24 area of your research; is that fair to say?
25     MR. STOY: Object to the form.

Page 99

1     THE WITNESS: Could you say that again?
2 BY MR. MIGLIACCIO:
3     Q. That is it fair to say that the
4 development and establishment of treatment
5 guidelines for cancer has not been a focus of your
6 research?
7     A. The --
8     MR. STOY: Object to the form.
9     THE WITNESS: The development and -- of
10 cancer -- the development of cancer guidelines has
11 not been a focus of my research. I have focused on
12 other types of guidelines in my research.
13 BY MR. MIGLIACCIO:
14     Q. What other types of guidelines have you
15 focused on?
16     A. Specifically, I focused on guidelines for
17 the treatment of atrial fibrillation, which is --
18 you know, which are similar in ways that you are
19 developing guidelines based on evidence. There are
20 risks and benefits for recommending a certain course
21 of action for a broad set of patients. And in this
22 particular research, I'm interested in how providers
23 respond to guidelines.
24     Q. So could you -- could you direct me to any
25 papers you have on that subject?

Page 100

1     A. Yeah. Let's turn to the CV.
2     Q. Okay.
3     A. This is in -- under working paper number 2
4 on page A-2.
5     Q. A-2?
6     A. Yeah.
7     Q. Okay.
8     "Fixing Misallocation with Guidelines"?
9     A. Correct.
10     Q. "Awareness versus Adherence"?
11     A. Correct.
12     Q. Got it.
13     NBER, National Bureau of Economic
14 Research?
15     A. Exactly.
16     Q. And you have an appointment or -- with
17 that group right now?
18     A. I do. I have an affiliation with that
19 group.
20     Q. Okay. You've had that for a long time?
21     A. I've had -- well, it's something that you
22 need to be nominated and I guess approved for by
23 the -- this is something that I got in my first year
24 as a faculty. It's called -- it's in my CV under
25 "Faculty Research Fellow, National Bureau of

Page 101

1 Economic Research."
2     Q. Got it. Got it. Got it. Okay.
3     And this working paper was published in
4 July of last year?
5     A. That was the most recent version of the
6 paper, correct.
7     Q. Oh. Has -- it's changed over time? Have
8 there been --
9     A. Yeah, you can see previous versions of the
10 paper if you go to that website.
11     Q. Got it. Got it.
12     And have they all -- have they all related
13 to atrial fibrillation or have they -- those papers
14 changed their focus?
15     A. The -- the empirical focus of the paper
16 has been on atrial fibrillation throughout. The
17 paper of course is motivated much more broadly. It's
18 motivated about how do we form guidelines, how
19 do physicians respond to guidelines; if you're
20 trying to optimize outcomes for a patient
21 population, how should you best make use of
22 guidelines.
23     Q. Your coauthors, there are -- it looks like
24 one, two, three -- four other authors?
25     A. Right.

Confidential Information Subject to Protective Order

Page 102

1    Q.  Have they been the same authors on -- on
2  this series of papers over time or has it -- has it
3  changed?
4    A.  I believe it's been the same for -- ever
5  since we've had a working paper, it's been the same.
6    Q.  Are they physicians or economists or both?
7    A.  Both.
8    Q.  All right.  So all four are
9  physician/economists?
10   A.  Oh, sorry.  Two of them are -- three --
11  two of them economists.  Leila Agha and Jason
12  Abaluck are economists.  Daniel Singer is a
13  physician.  And Diana Zhu is a Ph.D. student in
14  economics.
15   Q.  Got it.
16       Have you contributed in any way to the
17  development of a USP -- P -- USPSTF guideline
18  relating to cancer?
19   A.  No.
20   Q.  Have you contributed to the evidence-based
21  reviews provided by the NCI as referenced in your
22  report, I think paragraph 35?
23   A.  Paragraph 35.
24   Q.  I mean, I'm not saying that you did.  I'm
25  just asking.  That -- that's my -- I think you --

Page 103

1  you discuss the evidence-based review that NCN
2  does -- NCI does?
3    A.  Uh-huh.
4        No, I have not.
5    Q.  Okay.  Do you consider yourself to be an
6  expert in the formulation of the derivation of the
7  original clinical guidelines in the screening for
8  cancers?
9    A.  The formulation or derivation?
10   Q.  Uh-huh.
11   A.  Could you clarify that?
12   Q.  Or the creation --
13   A.  Okay.  Do I --
14   Q.  -- of the clinical guidelines?
15   A.  Okay.  Sorry, could you restate the
16  question?
17   Q.  Yeah.
18   A.  Do I consider myself an expert in?
19   Q.  In the creation of clinical guidelines for
20  the screening of cancers?
21   A.  No.
22       MR. STOY:  Object to the form.
23       Go ahead.
24  BY MR. MIGLIACCIO:
25   Q.  Can we agree that it can take a long time

Page 104

1  to get screening procedures added to national
2  guidelines at USPSTF?
3        MR. STOY:  Object to the form.
4        THE WITNESS:  I don't know what I would
5  characterize as a long time.  I think it's --
6  there's a reason why we don't -- we require a
7  certain level of evidence in order to change a
8  guideline.  Because evidence is incremental and
9  because evidence can change we want to have a
10  certain level of certainty whenever we have a type
11  of guideline.
12       And as I discuss in my report, when the
13  guidelines are for screening, we have to be very
14  cognizant of the potential risks of screening.  And
15  that's why I think we would have just a higher bar
16  to -- to, you know, recommending a guideline for
17  a -- a new guideline for screening.
18  BY MR. MIGLIACCIO:
19   Q.  And for -- for example, you know, can we
20  agree that it took many years before low-dose CT
21  scans were added as a guideline for tobacco users?
22       MR. STOY:  Object to form.
23       THE WITNESS:  I don't know the particular
24  history of that.  Are you specifically referring to
25  low-dose CT scans as opposed to chest x-rays?

Page 105

1  BY MR. MIGLIACCIO:
2    Q.  Uh-huh.
3    A.  I would need to look into the history of
4  when low-dose CT scans were available.  And, you
5  know, there is a certain -- as I discuss in my
6  report, one of the considerations of using a certain
7  technology for screening is characterizing the
8  performance of that technology in terms of false
9  positives and false negatives as well as
10  characterizing any risk that may come from using
11  this new technology of a CT scan versus a chest
12  x-ray.  I would imagine even if it's low dose, there
13  would be much more radiation than the chest x-ray.
14   Q.  Can you -- there'd be more radiation from
15  a low-dose CT scan than a chest x-ray?
16   A.  Than a chest x-ray.  I would imagine that
17  a CT scan -- a usual CT scan has I think orders of
18  magnitude, more radiation than a single plain film
19  chest x-ray, and even if it's a low-dose CT scan I
20  would have to -- I would have to look at -- review
21  the evidence, but I think there would still be some
22  concern of higher radiation from a low-dose CT scan
23  than a chest x-ray.
24   Q.  But you're not offering that opinion here
25  and now?  You don't know the answer to that without

Page 106

1  reviewing the information?
2      A.  Correct.  I don't know in that specific
3  case.  But I would -- and what -- but what is
4  central to my opinions is that all of these
5  screening tests have potential risks both in terms
6  of false positives and false negatives so that's why
7  you need to understand the testing characteristics
8  for a certain screening procedure but also some of
9  these screening procedures have physical risks such
10 as radiation.
11     Q.  I will be going through more of your
12 report.  I think you -- so to -- I think you have --
13 you have stated in your report that certain
14 thresholds need to be met.
15         And I think that's what you're saying now
16 before a screening guideline is made; fair to say?
17     A.  Correct.
18     Q.  And I'll direct you to some portions of
19 your report on that in -- in a moment.
20         MR. STOY:  Nick, before we --
21         MR. MIGLIACCIO:  Yeah.
22         MR. STOY:  If you're about to jump to
23 another topic, we've been going a little over an
24 hour now.
25         MR. MIGLIACCIO:  Yes.

Page 107

1          MR. STOY:  Would this be a good time for a
2  quick break?
3          MR. MIGLIACCIO:  Yeah, I think so.  Why
4  don't we go on off the record and we can discuss how
5  long.
6          MR. STOY:  Okay.
7          THE VIDEOGRAPHER:  Off the record at
8  10:19 a.m. Pacific time.
9          (Whereupon, a brief recess was taken.)
10         THE VIDEOGRAPHER:  We are back on the
11 record.  The time is 10:44 a.m. Pacific time.
12 BY MR. MIGLIACCIO:
13     Q.  Okay.  Great.  All right.
14         Dr. Chan, I think we were talking before
15 the break about thresholds and I want to ask you
16 some questions about that.
17         I direct you to paragraph 16 of your
18 report.
19     A.  Okay.
20     Q.  Okay.  And I want to direct you to midway
21 through it, there's a sentence that says, "While
22 there are many risk factors for the nine types of
23 cancers identified by Plaintiffs in this case, a
24 high threshold must be met for a risk factor to be
25 incorporated into a guideline to screen populations

Page 108

1  of asymptomatic patients."
2          And then you say below, "In my opinion,
3  the evidence related to NDMA and NDEA in affected
4  valsartan fails to meet the bar required to use a
5  uniform screening process on a broad population of
6  asymptomatic patients."
7          Do you have a -- what do you mean by "a
8  high threshold must be met for a risk factor to be
9  incorporated into a guideline to screen
10 populations"?
11     A.  I believe there's another part of my
12 report that kind of elaborates on this threshold.
13     Q.  Okay.
14     A.  Right.  So I think paragraph 35 gets at
15 this here.  Here I talk about the USPSTF guidelines.
16 But I think it's -- it's broadly applicable to the
17 general framework we would need to consider a
18 threshold.
19         Would you like me to read the relevant
20 sentence?
21     Q.  Sure.
22     A.  "USPSTF recommendations are based on a
23 framework which considers questions such as whether
24 screening may reduce morbidity; whether sufficiently
25 sensitive and specific screening tests are

Page 109

1  available; whether early detection and treatment
2  makes a difference in morbidity; and what the
3  potential harms of screening and subsequent
4  screening-implied treatment may be."
5          So this sentence does not specifically
6  mention the agent in question, such as NDMA and
7  NDEA, but the agent in question and the potential
8  cancer type related to this agent bears on many of
9  these factors in this sentence such as whether a
10 screening may reduce morbidity.
11         The agent needs to be sufficiently
12 associated with cancer in the sense that we expect
13 sufficiently high number of patients associated with
14 this agent or this risk factor, for screening to
15 reduce morbidity.
16     Q.  And you're -- but you are not offering, as
17 we discussed, a general causation opinion here,
18 you're not offering an opinion on -- on what you've
19 just said?
20     A.  I'm not --
21         MR. STOY:  Object to the form.
22         Sorry, Doctor.
23         THE WITNESS:  It's not my assignment to
24 offer an opinion on causation, but as I mentioned
25 earlier, I refer to sources that have some estimate

Confidential Information Subject to Protective Order

1  of the associated -- a potential associated cancer
2  risk.
3      So, for example, in paragraph 88 of the
4  report, I cite a very conservative estimate, meaning
5  like a worst -- somewhat of a worst-case scenario
6  that the FDA has estimated that the highest dose of
7  valsartan, one additional cancer case may be
8  expected per 8,000 patients exposed to NDMA
9  containing valsartan.  And one additional cancer
10  case maybe expected per 18,000 patients exposed to
11  NDEA containing valsartan.
12      Q.  Yes.  And I -- yeah, I do -- I do see
13  that.
14      "The maximum exposure to NDMA from
15  affected valsartan is approximate" -- "of 29,498
16  micrograms is approximately 12 times the lifetime
17  acceptable intake, implying an excess cancer risk of
18  12 in 100,000 or approximately 1 in 8,000," right,
19  of paragraph 92?
20      A.  Yes.  I was reading paragraph 88 but part
21  of 92 also mentions.
22      Q.  I'm sorry, I think I said paragraph 93,
23  but I may have that wrong, I may have said --
24  given -- yeah, I was referring to paragraph 93.
25      A.  Okay.  Yep, I see that you're reading

1  paragraph 93.
2      Q.  Yeah.
3      A.  And I was reading from 88.
4      Q.  Is this 1 in 8,000 risk an acceptable
5  cancer risk to you as a physician?
6      MR. STOY:  Object to the form.
7      THE WITNESS:  I'm not sure what you mean.
8      MR. STOY:  I'm sorry.  I just want to add
9  an objection to the extent it's outside the scope
10  of -- of Dr. Chan's report.
11      Go ahead.  I'm sorry.
12      THE WITNESS:  Right.  I'm not sure what
13  you mean by "acceptable cancer risk," and I'm
14  commenting on this not as a physician per se, but in
15  my analysis of what organizations like the USPSTF
16  and NCI have -- what types of risk factors have made
17  it into a screening guideline.
18      So if you look at Figure 1 and Figure 2 of
19  my report, particularly Figure 2, there are a number
20  of different risk factors that are associated with
21  all of these nine cancers.  And in my report, I talk
22  about the magnitude of some of these risk factors.
23      Some of these risk factors are quite --
24  much higher than the 1 in 8,000 for NDMA and 1 in --
25  did I say 18,000 for NDEA.  And that is the basis of

1  my saying that the R or the threshold is quite high.
2      If you look at the risk factors that make
3  it into a screening guideline, as I read, there are
4  a number of different criteria that need to be met
5  and one of those criteria include a high risk of
6  cancer.
7  BY MR. MIGLIACCIO:
8      Q.  And is your opinion, is that 1 in 8,000 is
9  not a high risk of cancer?
10      A.  I think compared to some of the other
11  risks that I mention in my report it's much lower.
12      Q.  Where do you draw the line as a high risk
13  or low risk, what is the -- what is the numerical
14  threshold?  Do you have one?
15      A.  I'm not sure if I can say precisely where
16  it is, but I can say that 1 in 8,000 is an order or
17  two of magnitude lower than some of the other risks
18  that we have and many of these other risks don't
19  make it into broad population guidelines.
20      Q.  What other risks that we have are you
21  referring to?
22      A.  Yeah, it's in my report.  If I can refer
23  to that.
24      For example, radiation, I think is one
25  thing that I do mention in my report.

1      Yes, so I believe this is in figure --
2  this is in Figure 2 and paragraph 42 of my report.
3      The risk for lung cancer including one
4  first degree family member affects -- so family
5  history, you know, you have, like, a relative risk
6  of 2.59 -- 57.  You have radiation therapy at
7  relative risk of two.
8      And if you convert these to number of
9  people you would need to screen to get one cancer,
10  they would be much higher than the number that I
11  just cited for NDMA and NDEA.
12      The relative risk for lung cancer of 8
13  of -- of a 20- to 30-pack history of smoking is 8 --
14  8.2.  So that's substantially even higher than the
15  other relative risk that I just cited.
16      And if you convert these to number of
17  people you would need to screen to find one patient
18  with a -- who truly has the cancer they would be
19  much, much -- much lower than you would need for
20  NDMA and NDEA.
21      Q.  What is the type of -- of screening that's
22  done for lung cancer?
23      A.  I believe that's in my report.  That
24  should be in Figure 3.
25      So in Figure 3, there are a number of

Confidential Information Subject to Protective Order

Page 114

1 different potential options and the one that is
2 recommended is low-dose CT scan currently.
3     Q.  And as you testified earlier, that may
4 have a higher radiation dosage than a regular x-ray?
5     A.  Higher, correct.
6     Q.  Higher.  Got it.
7         So that there is, in your opinion, a
8 certain degree of risk that is associated with a
9 low-dose CT scan?
10     A.  Right.
11     Q.  Got it.
12         I see in paragraph 42, you cite to
13 epidemiology studies in footnotes 59 and 60.
14     A.  Uh-huh.
15     Q.  But you have not done so with respect to
16 NDMA, you have not looked at the -- right, at least
17 I don't see the citations for the -- for
18 epidemiology studies and relative risk associated
19 with NDMA.  Or if I am missing something you can
20 point it to me.
21         MR. STOY:  Object to the form.  Object to
22 the extent it mischaracterizes the report.
23         Go ahead.
24         THE WITNESS:  The report does cite the FDA
25 calculation for the number of additional cases of

Page 115

1 cancer potentially in -- you know, with the highest
2 dose of NDMA and NDEA.  And that I think can be
3 converted to a relative risk.  I'm not sure if in
4 the report we've done that, but it could be -- it
5 could certainly be converted to a relative risk.
6 BY MR. MIGLIACCIO:
7     Q.  Fair to say, though, the sole basis for
8 your opinion, then, on the -- I'll -- what I'll say
9 is your view that there's a low relative risk, and
10 you can tell me if I'm wrong about that, is the FDA
11 citation that you give here; is that fair?
12     A.  I don't think it's the sole basis.  There
13 are other sources that I do cite that are even --
14 that have a lower to potential -- other sources
15 don't demonstrate a risk of cancer in humans to --
16 you know, based on on NDMA or NDEA, and I believe
17 I've cited one of those sources.
18         So I think there's a range of potential
19 linkages between NDMA and NDEA to cancer, in
20 particular, valsartan -- affected valsartan to
21 cancer.  As I said earlier, causation is not, you
22 know, my -- my main area of focus here.
23         But the magnitude of any potential linkage
24 is relevant to my opinions and that's where I
25 believe the FDA estimate of the linkage is perhaps

Page 116

1 the most conservative in the sense that they are
2 considering the highest dose of NDMA and NDEA and
3 over a long period of time.
4     Q.  And you haven't looked at this, though, to
5 offer that opinion, you're -- this is like ancillary
6 to -- to your opinion?
7     A.  This is --
8         MR. STOY:  Object -- hang on, Doctor.
9         Object to the form of the question to the
10 extent it mischaracterizes.
11         Go ahead.
12         THE WITNESS:  I would characterize this as
13 this is an input into my opinion in the sense that
14 I've looked at a range of sources that have various
15 linkages between NDMA and affected valsartan to
16 cancer.  Some of which are no linkage.
17         And if I take the most conservative
18 estimate, meaning the highest risk, and compare that
19 to some of the other risks that I list in
20 paragraph 42 and Figure 2, that linkage between NDMA
21 and NDEA and kind of more importantly the linkage
22 between affected valsartan and cancer is low.
23 BY MR. MIGLIACCIO:
24     Q.  And, you know, to be clear, you have not
25 looked at any of the other plaintiffs' expert

Page 117

1 reports other than the ones we have discussed
2 already today?
3     A.  Correct.
4     Q.  So the threshold that you're identifying,
5 I see that you cite to paragraph 40 in -- you cite
6 in paragraph 35 to a study or an article in
7 footnote 47.
8         Do you see that?  By Vearrier and
9 Greenberg?
10     A.  Correct.
11     Q.  That -- that's the sole citation you have
12 for that -- that sentence that you read to me
13 earlier about what USPSTF recommendations are based
14 on, right?
15     A.  That is the only citation in that
16 footnote, but I don't think it's -- it's not really
17 the only source that I have for that statement.  In
18 fact, that might be a -- you know, this -- this
19 citation is about the implementation of medical
20 monitoring programs following potentially hazardous
21 exposures, a medical-legal perspective, this seems
22 like it's a comment -- it's a perspective in a
23 framework on how we should think about medical
24 monitoring programs.
25         But there -- if you read all of the USPSTF

Confidential Information Subject to Protective Order

1 recommendations, which are in separate cites, I
2 don't kind of list them as cites for that particular
3 sentence, but they could very well be related.  If
4 you read any of those USPSTF recommendations, they
5 do walk you through a way of thinking about this
6 framework.
7    Q.  So fair to say there is -- you don't
8 have -- or you're not offering a numerical
9 threshold -- or you're not offering an opinion that
10 there is a numerical threshold, but you just, you
11 know, add as to whether a monitoring program would
12 be appropriate?
13    A.  I think based on the sentence that I read
14 in paragraph 35, this is a multidimensional
15 consideration.  It can -- it depends on a number of
16 different considerations and therefore, if it
17 depends on all of these things, it shouldn't -- one
18 threshold, it wouldn't be a single scale or
19 threshold based on the risk of cancer.
20        That's one important consideration, but
21 there are other considerations that I just read from
22 that sentence.
23    Q.  Uh-huh.  So when you talk about threshold,
24 you say "a high threshold," you know, I think you
25 used that terminology maybe once, twice, three times

1 in the report.  That's -- what you're referring to
2 is this paragraph?
3    A.  What I -- yeah, when I say "threshold" I
4 don't mean a single number that is -- maps to the
5 risk of cancer.  What I mean is a decision-making
6 threshold that considers a number of different
7 factors and a lot of these factors are
8 individualized for a clinician to reach a
9 decision-making threshold for a given patient.
10        And there's a separate threshold that you
11 might make for a guideline to screen a population of
12 asymptomatic patients and this would also similarly
13 consider a number of different factors here that I
14 just read.
15    Q.  And that's -- that second threshold is the
16 one that I -- I was talking about.
17    A.  Right.
18    Q.  And that's what I think you're referring
19 to in your report for -- for the guidelines?
20    A.  Correct.
21    Q.  Going back to paragraph, I think 32, and I
22 think I asked you about the -- the types of -- the
23 screening guidelines that you have cited elsewhere
24 in your report and -- and you've referred to a broad
25 population of asymptomatic patients.

1        Does that mean a group of people who are
2 not at increased risk, excluding of course the
3 smokers that we've talked about?
4    A.  No.  I think by definition, any population
5 that you're going to specify screening for has to be
6 at increased risk.  What I mean by asymptomatic
7 means that they don't have symptoms.
8        So if you are talking about lung cancer,
9 they don't have a cough that you want to kind of
10 evaluate further.  If you're talking about colon
11 cancer they don't have abdominal pain.  They don't
12 have symptoms, but they could be at increased risk.
13    Q.  What are the increased risks that are --
14 that are found in the broad asymptomatic population?
15    A.  I believe that's in Figure 2.
16    Q.  Okay.
17    A.  Figure 2, I list the number of different
18 risk factors for each type of cancer in the last
19 column, Figure 2.
20    Q.  Colorectal.  And we've discussed this
21 already, colorectal and lung, there are these
22 additional screening guidelines for people at
23 increased risk, right?
24    A.  There are guidelines to screen certain
25 populations based on age in the setting of

1 colorectal cancer, and based on age and smoking
2 history in the setting of lung cancer.
3    Q.  Got it.
4        Those are used to define populations for
5 an asymptomatic testing but -- and in -- correct?
6    A.  I'm sorry?
7    Q.  I said those are used to define the
8 populations for asymptomatic testing?
9    A.  Those are used to -- correct.  Correct.
10    Q.  Would you agree that blood tests and stool
11 tests proposed by Dr. Kaplan are not highly
12 invasive?
13        MR. STOY:  Object to the form.
14        Go ahead.
15        THE WITNESS:  Do you want to define
16 "invasive"?
17 BY MR. MIGLIACCIO:
18    Q.  Yeah, I mean, I think you talk about the
19 risks that certain test -- tests may -- may have for
20 people.  And I think you said physical risks
21 earlier?
22    A.  Right.
23    Q.  I think you talk about risks.  Do blood
24 tests or stool tests present physical risks to
25 patients?

Confidential Information - Subject to Protective Order

1  A.  They don't -- you're right that they don't
2  present physical risks.  The physical risks would be
3  quite minor.  But they are not great tests.  And if
4  you look at Figure 3, you'll see that there's really
5  not a recommendation to use many blood tests in most
6  cases.
7       And even for stool tests, you know, a lot
8  of people have colonoscopies rather than fecal --
9  what are called blood -- you know, basically stool
10  tests for colon cancer.
11       So what I also talk about in my report is
12  not just the risk of a physical harm from the
13  screening procedure, it is the risk of getting a
14  false positive and false negative.
15       And if you use tests with lower
16  sensitivity or specificity to screen in a population
17  that is not at particularly high risk for the
18  cancer, you're at risk for getting false positives
19  and false negatives, and that can harm the patient.
20  There are ways in which that can set the patient
21  down a path that would be harmful.
22  Q.  You talk about scrutiny-dependant cancers.
23  I think in paragraph 53.
24  A.  Uh-huh.
25  Q.  And I think you reference four cancers:

1  prostate, breast, thyroid, and lung.
2       Do you see that?
3  A.  Yes.
4  Q.  Do you understand that there are nine
5  cancers that Dr. Kaplan has offered an opinion about
6  in this case?
7  A.  Yes.
8  Q.  Okay.  Are you offering the opinion that
9  the following cancers are what you'd call
10  scrutiny-dependent:  liver, stomach, colorectal,
11  intestinal, esophageal, bladder, pancreatic, and
12  blood?
13  A.  These -- what I cite as scrutiny-dependent
14  cancers in this paragraph are examples.  I haven't
15  ruled out the possibility that other cancers could
16  also be scrutiny-dependent.
17       Whether a cancer is scrutiny-dependant or
18  not depends on the technology that we have.  It may
19  not be scrutiny-dependant now but it could be
20  scrutiny-dependent later.  It depends on the -- of
21  course the nature of the cancer, but also the nature
22  of treatment that we have available for that cancer.
23       So what makes it scrutiny-dependent is
24  that our technology to detect the cancer, if we look
25  hard enough, has gotten better.  But our technology

1  to treat the cancer has not necessarily gotten
2  better.  And the underlying nature of the cancer
3  when it is, you know, newly detectable may not imply
4  anything toward quality of life or for life
5  expectancy.
6       So the definition of scrutiny-dependent
7  could change over time depending on the technology
8  to screen and the technology to treat.
9  Q.  Got it.
10       Do you have any evidence, though, or any
11  opinion right now that any of those seven cancers I
12  just detailed are scrutiny-dependent?
13  A.  I haven't thought hard enough -- haven't
14  thought about it long enough at this point.  I could
15  return to that at some later point but at this
16  moment of the deposition, I can't offer an opinion
17  on that.
18  Q.  Got it.
19       Is there any way for a physician to know
20  that a certain cancer when caught very early, let's
21  say prostate cancer, I'm just giving an example --
22  A.  Uh-huh.
23  Q.  -- you know if it's caught very early, if
24  it is going to be aggressive or if it is not going
25  to be aggressive?

1  A.  I think there are ways to have an educated
2  guess.  Not being an oncologist myself so I don't
3  consider myself an expert on prostate cancer, but
4  I'm -- know more about prostate cancer than the
5  average person.
6       There are ways where you could consider
7  epidemiology, what happens to the average patient
8  that you diagnose with prostate cancer with a given
9  PSA test, for example.  And is there variation when
10  you have a given PSA test.  That kind of -- and
11  reflects on the quality of the PSA test, which we
12  know to be not great.  When you have patients who
13  can have the same PSA test but have -- you know, a
14  test could be neither sensitive nor specific if like
15  the test -- knowing the test doesn't give you that
16  much information.
17       So, again, you can know the general
18  epidemiology of what happens for a patient with
19  these given characteristics and their diagnosis with
20  prostate cancer.  You could also ask what happens
21  when you have additional clinical information such
22  as the PSA test and what that means for the
23  possibilities of whether that cancer is going to be
24  aggressive or not.
25  Q.  But I think you said it would be an

Confidential Information Subject to Protective Order

1 educated guess, really, there's not a way to know
2 whether?
3    A.  We -- we --
4    Q.  -- it's aggressive or not?
5    A.  It's -- it's kind of a spectrum.  We
6 wouldn't know in general with certainty.  But we
7 would have an educated guess and sometimes we would
8 know more and sometimes we would know less.
9    Q.  Uh-huh.  So from the time, let's say, a
10 prostate cancer is -- it's diagnosed, right, by a --
11 by a biopsy, right?  Am I wrong about that?
12    A.  You know more -- you know the most about
13 it, yes, after you've actually taken tissue out and
14 you've kind of looked at that tissue with -- with
15 pathology.
16    Q.  Right.  That's -- is that when the
17 prostate cancer diagnosis is made or is it made
18 based on PSA levels?
19    A.  It would require tissue to diagnose
20 prostate cancer.
21    Q.  So if you do -- if you take a tissue
22 pathology of prostate cancer, can you know with the
23 result of that pathology report whether it's an
24 aggressive cancer or not?
25    A.  It would give you more information.  I --

1 again, that would depend on the characteristics of
2 the pathology test.  And the pathology test is
3 probably the best you can know up until that point
4 without kind of foresight into the future.
5        But I would have to review the
6 characteristics of the pathology test and the
7 epidemiology associated with different histologies
8 that you might find on the pathology test.
9    Q.  So fair to say that without foresight in
10 the future you're not going to know the answer, I
11 mean, and nobody has a crystal ball with that
12 foresight to know if -- if that particular tissue
13 biopsy represents an aggressive or less aggressive
14 form of prostate cancer?
15    A.  I think it's fair to say we don't know
16 with a hundred percent certainty.  But I -- I would
17 have to review the evidence to tell you how much
18 uncertainty there is with a tissue biopsy.
19    Q.  How much uncertainty as to?
20    A.  The aggressiveness of the cancer or the
21 life expectancy --
22    Q.  Got it.
23    A.  -- of the patient.
24    Q.  Got it.  Got it.
25        Is that something that you have done in

1 your -- I mean, have you studied tissue biopsies of
2 cancers or is this something that you're -- kind of
3 have more general expertise in?
4    A.  This is something as a hospitalist I'm
5 familiar with how patient care, the process of
6 patient care involves tissue biopsy in order to
7 prognosticate and in order to make treatment
8 decisions and in order to diagnose.
9    Q.  Got it.
10        It's not something that you do as -- on
11 a -- on a regular basis?
12    A.  I don't -- if you could clarify what you
13 mean by what I do, so I don't -- I'm not a
14 pathologist.  I'm a hospitalist.
15        As a hospitalist you do kind of make plans
16 to get a biopsy and do -- use the results of the
17 biopsy for decisions.  You often do this in concert
18 with other experts such as oncologists.  So I -- I'm
19 familiar with how they're used with the caveats that
20 I just told you.
21    Q.  Got it.
22        I think, you know, I've asked you and
23 you've told me now several times about, you know,
24 general causation or lack thereof with respect to
25 your opinion.

1        I want to ask you about the -- the -- the
2 threshold that the plaintiffs have placed in their
3 class definition.
4        Have you -- have you reviewed that
5 threshold, lifetime cumulative threshold that's in
6 the third amended complaint?
7        MR. STOY:  Object to the form.
8        THE WITNESS:  Have I reviewed the
9 threshold, is your question?
10 BY MR. MIGLIACCIO:
11    Q.  Yes.  Yep.
12    A.  I'm familiar with the statement of some
13 threshold in the acronym lifetime -- LCT, lifetime
14 cumulative threshold.
15    Q.  Got it.
16        Are you offering any opinions with respect
17 to that threshold?
18        MR. STOY:  Object to the form.
19 BY MR. MIGLIACCIO:
20    Q.  Or LCT?
21    A.  I'm offering opinions on whether that
22 threshold is feasible to assess.
23    Q.  In what -- in what way?
24    A.  In the sense that in my report I describe
25 a number of different sources of cancer, a number of

Confidential Information Subject to Protective Order

Page 130

1  different sources of nitrosamines, not just affected
2  valsartan, but potentially other drugs and other
3  dietary sources, and endogenous production of
4  nitrosamines.
5        And in my report an opinion of mine is
6  that it would be difficult to assess whether
7  somebody has passed the lifetime cumulative
8  threshold.  Aside from the question of whether the
9  lifetime cumulative threshold is actually a valid
10  concept.
11    Q.  Do you understand that the lifetime
12  cumulative threshold set forth by the plaintiffs
13  defines a risk or exposure floor?
14        MR. STOY:  Object to the form to the
15  extent it assumes facts not on the record.
16        Go ahead.
17        THE WITNESS:  Frank, I can barely hear
18  you.
19        MR. STOY:  I'm sorry.
20        I made an objection to form to the extent
21  it assumes facts not on the record.  I'll speak up.
22        THE WITNESS:  Okay.
23        And, Nick, can I hear you ask the question
24  again?
25

Page 131

1  BY MR. MIGLIACCIO:
2    Q.  Yes.
3        I mean, do you understand that the
4  lifetime cumulative threshold set forth by the
5  plaintiffs defines a risk or exposure floor, that
6  it's a floor?
7    A.  I'm not sure I understand that because,
8  again, I'm not an expert on causation.  But if it's
9  possible that nitrosamines don't cause cancer, then
10  I'm not sure how it would set a floor unless if the
11  floor includes zero.
12    Q.  Got it.
13        And if it's possible, let's just say
14  for -- hypothetically, for your purposes, I guess,
15  that nitrosamines do cause cancer and that the --
16  the threshold and the system, the scoring system set
17  forth by the plaintiffs details how much nitrosamine
18  is in a particular dosage, would -- then would you
19  understand that -- that it would set a floor?
20        MR. STOY:  Objection.  Incomplete
21  hypothetical.
22        Go ahead.
23        THE WITNESS:  I'm not sure how that would
24  be done.  If -- first you -- as you say, you would
25  need to say that nitrosamines do cause cancer.  If

Page 132

1  we haven't answered that yet, then I'm not sure how
2  we even know a lower bound on the -- on the causal
3  effect of nitrosamines on cancer.
4  BY MR. MIGLIACCIO:
5    Q.  I -- I was asking you to assume that.  But
6  that -- that's -- I'm asking you to make that
7  assumption.
8    A.  Okay.  Sure.
9    Q.  Yeah.
10        Then do you understand that it would set
11  a -- a floor, an -- a floor, a risk floor?
12        MR. STOY:  Same objections.
13        THE WITNESS:  Well, under the assumption
14  that we have a lower bound, then by construction it
15  does set a floor.
16  BY MR. MIGLIACCIO:
17    Q.  Got it.
18        How -- I want to ask you some questions
19  about pricing, which I -- I think you detailed
20  elsewhere in -- in your report.  I think you use an
21  example of Massachusetts General as one of the
22  hospitals.  I think Dr. Song might be associated
23  with Massachusetts General.
24    A.  We all love MGH.
25    Q.  Yeah.  Yeah, yeah.

Page 133

1        Do you know Dr. Song?
2    A.  I -- I do.
3    Q.  You do.  Yeah.
4    A.  Yeah.
5    Q.  Yeah, I can't imagine there are that many
6  MD-Ph.D. experts out there in the world.  Probably a
7  very small number, I guess.
8    A.  Yeah.  I think less than 20 probably.
9    Q.  Wow, wow, wow.
10        So my question about MGH, I mean, is it
11  fair to say that MGH has a -- has a lot of market
12  power?
13        MR. STOY:  Object to the form.
14        THE WITNESS:  I'm not sure exactly how I
15  would characterize it, but I know that MGH has been
16  involved in litigation regarding its market power.
17  BY MR. MIGLIACCIO:
18    Q.  Okay.  Did you have any involvement in
19  that?
20    A.  No.
21    Q.  Let me -- I mean, I think we've taken a
22  break.  I'm not -- I do want to go back to one of
23  the -- you know, I want to about explore a little
24  bit more this question of -- of your -- your
25  testimony in the -- in the -- in the opioid

Confidential Information Subject to Protective Order

Page 134

1  litigation.
2        You know, Frank can obviously object if --
3  as -- as necessary, but I did want to see if you
4  could testify more about, you know, the subject
5  about -- you know, the subject matter in a general
6  matter.
7        A.  More about what?  Sorry?
8        Q.  The subject matter of that litigation in
9  a -- in a general matter, if you could give us that
10  in -- in a general matter without divulging any
11  confidential information?
12        MR. STOY:  I -- I think the challenge
13  there, Nick, is with a question that broad he might
14  not be comfortable answering it because he's not
15  sure where those lines are, right.
16        MR. MIGLIACCIO:  Uh-huh.
17        MR. STOY:  A more specific question he
18  might be able to give you a specific answer.
19        MR. MIGLIACCIO:  Well, how -- let me try
20  to -- I'll try to narrower it down a little bit.
21        Q.  Can you tell us how the testimony in those
22  cases is similar to the testimony you're offering
23  here?
24        A.  Sort of -- like thematically, is that --
25  is that your question?

Page 135

1        Q.  Thematically or subject matter.  You know,
2  is the subject matter similar.  Both of those
3  questions, thematically and subject matter.
4        MR. STOY:  Dr. Chan, if you can ask -- if
5  you can answer that question from a high level, I
6  think it's okay.  So that would be my instruction to
7  you.
8        THE WITNESS:  From a high level, I am
9  relying on my expertise as an economist, as a
10  clinician, and as somebody who is familiar with
11  health policy.
12  BY MR. MIGLIACCIO:
13        Q.  Do -- can -- did those other cases, do
14  they involve class action claims?
15        A.  No.
16        Q.  There are transcripts of those
17  depositions, is that right, the ones that you
18  took -- that you gave?
19        THE WITNESS:  Sorry.  Go -- go ahead,
20  Frank.
21        MR. STOY:  No, you can answer that.  Go
22  ahead.
23        THE WITNESS:  I don't know if the
24  transcripts are public, in the public domain.
25        MR. STOY:  He just asked you if

Page 136

1  transcripts exist.
2        THE WITNESS:  Oh.
3  BY MR. MIGLIACCIO:
4        Q.  That's what I'm asking.
5        A.  Yeah.  Yeah, transcripts exist.
6        Q.  They do exist, okay.
7        And do you know, are they -- do you know
8  if they are marked confidential or not in their
9  entirety?
10        A.  I don't know.
11        Q.  Okay.  Got it.
12        Is that litigation currently ongoing?  Can
13  you answer that question?
14        A.  I am not sure.  I think so.
15        Q.  Okay.  I'm not -- I don't want to ask you
16  anything about it.  Just if it -- okay.  Okay.
17        So going back to -- to this question on,
18  you know, Massachusetts General's market power or --
19  or -- you know, is it fair to say that the prices in
20  one area of the country can, you know, differ in --
21  for instance, Massachusetts General may have high
22  prices, but if you go to rural western Massachusetts
23  the prices would be lower, of medical care, medical
24  services?
25        A.  It's fair to say that prices differ a lot

Page 137

1  across different hospitals and different payors.  I
2  am not sure if your prediction is true where
3  Massachusetts General would necessarily have higher
4  prices than western Massachusetts.
5        And I think part of the analyses that I
6  lay out is not just to show the average price of
7  Massachusetts General Hospital but that even within
8  the same hospital, there is wide variation across
9  different payors.
10        Q.  Uh-huh.  And you know about that wide
11  variation, right?  I mean, you -- you have data that
12  demonstrates it?
13        A.  Correct.
14        Q.  So is it fair to say that that variation
15  is knowable?
16        MR. STOY:  Object to the form.
17        THE WITNESS:  Some of the variation's
18  knowable.  With respect to this class, it's likely
19  that we might not know as researchers or as, you
20  know, using publicly available data, what the
21  relevant price would be for the members of the
22  class.
23  BY MR. MIGLIACCIO:
24        Q.  You're talking about the proposed class
25  here in this case?

Confidential Information Subject to Protective Order

Page 138

1   A.  Correct.

2   Q.  And you know -- I mean, you know, you
3   understand that this class has not been finally
4   certified yet, right?

5   A.  Correct.

6   Q.  So there -- it's not -- you know,
7   there's -- there is not yet a defined class and the
8   definition could potentially be different than the
9   way it is presently, correct?

10  A.  Correct.

11     The reason I answered the question that
12  way is because what we know about Massachusetts
13  General Hospital -- first of all, this is a recent
14  development within the year that we required
15  hospitals to be more transparent about their prices.
16  There is still uncertainty about whether there's
17  full transparency about the prices and furthermore,
18  we only know prices in the hospital setting.  We
19  don't know prices in the outpatient setting.  So
20  there is still big gaps in what we know.

21  Q.  Tell me about this recent development that
22  just happened with respect to -- that you just
23  referenced.

24  A.  I believe that in the last year or so the
25  government mandated hospitals to be more transparent

Page 139

1   with their prices and the reason it did that was
2   because it was well known that there was a lot of
3   intransparency in what prices would be if a patient
4   kind of walked into the emergency department at
5   Massachusetts General and got a procedure, there
6   could be tenfold, maybe even a hundredfold
7   difference in kind of prices depending on where they
8   went and what provider -- what insurer they had.

9      There was just huge amount of
10  intransparency and uncertainty from patients'
11  perspectives.  The government decided to make that a
12  priority and it started with hospitals, for
13  hospitals to make prices more transparent.

14  Q.  This was legislation, right, like federal
15  legislation?

16  A.  I don't know if it's legislation or an
17  executive order.

18  Q.  Okay.  And are you talking about -- I
19  mean, I've heard of something called surprise
20  billing.  Is that related to -- to what you're
21  talking about now?

22  A.  It's potentially -- it's related.  It's
23  not exactly the same.  Surprise billing is another
24  whole level of complexity where somebody can go to
25  the hospital and they could be in network for

Page 140

1   certain services but out of network for other
2   services because the hospital might employ different
3   people and they might not know what prices they're
4   going to get.

5      So I think surprise billing is
6   specifically about the question about whether
7   they're in -- whether they're in network or out of
8   network, and there could be huge differences in
9   prices faced that are unexpected by patients as a
10  result of that.

11  Q.  Got it.  Got it.

12     So you think that the government --
13  that -- that the government has started with
14  hospitals as -- as -- as a first priority, but it
15  may not have moved to outpatient procedures yet?

16  A.  It has not.  It has not moved to
17  outpatient procedures.

18  Q.  It has not.

19     And do you know when of if it will move to
20  outpatient procedures?

21  A.  I don't.  It's -- I was -- we, you know, I
22  don't think most people saw that the Trump
23  Administration would make price transparency a
24  priority and now we might have other priorities and
25  it's unclear.

Page 141

1      They've been intransparent for decades.
2   They suddenly became transparent in this one kind of
3   sector of the healthcare industry.  Who knows what's
4   going to happen in the future.

5   Q.  When did this happen, like when did the --
6   just January 1 of this year?

7   A.  Within the year, within 2020 -- or
8   actually, 2021.  I'm not -- I would have to review
9   the dates of this.

10  Q.  Sure.

11     And -- and you think it was an executive
12  order that did it?

13  A.  It -- it could have been an executive
14  order.

15  Q.  Okay.

16  A.  I'm not sure.

17  Q.  Got it.

18     Yeah, I -- I won't hold you to it.  We
19  could look at it and figure it out exactly if
20  necessary.

21  A.  Yes.

22  Q.  How does that change or -- your analysis
23  in your report or does it because since this sector
24  now has great -- great transparency?

25     MR. STOY:  Object to the form.

Page 142

1    THE WITNESS:  I -- I don't know if I'd
2 characterize it as great transparency.  Again,
3 it's -- it's a part of the healthcare -- it's a --
4 it's a sub -- subset of providers that work in
5 hospitals that are now required to disclose prices
6 with various insurers.  We don't know whether this
7 information is accurate yet.  It's only been out
8 there for a little while.
9    There is a vast majority -- there's a lot
10 of other places that patients get care, most of the
11 time in outpatient settings, that we still don't
12 know what those prices are.
13 BY MR. MIGLIACCIO:
14    Q.  Are you doing any research into this, like
15 is this part of your academic research?
16    A.  This is not -- it's not currently a part
17 of my research agenda.  It's certainly within my
18 scope of expertise, and I could become interested in
19 it at some later point.
20    Q.  Yeah.  Has -- have the -- has the first
21 dataset become available?
22    A.  They are available on the -- on -- I
23 believe they're -- they're required to make the
24 datasets available.  If you look at, for example,
25 figure -- where I have like the prices at

Page 143

1 Massachusetts General --
2    Q.  Uh-huh.
3    A.  -- there is a note that tells you where to
4 download those data.
5    Q.  Uh-huh.
6    A.  So Figure 8 is where you would look for
7 MGH.  And I would imagine that other hospitals have
8 other sites where you could download their data.
9    Q.  Got it.
10    So you got this from that -- from that
11 database?
12    A.  Correct.
13    Q.  That's where this came from.  Got it.
14    And had it relates to -- and so the --
15 the -- the CPT HCPS -- HP -- HCPCS code --
16    A.  You can call it -- you can call it
17 "hick-picks."
18    Q.  "Hick-picks"?  Did I say that right?
19    A.  Yes.
20    Q.  "Hick-picks."  Got it.  Okay.  Thanks.
21    Those codes, so these would be procedures
22 that were done inpatient; is that right?
23    A.  These are procedures --
24    Q.  Oh, outpatient.  Outpatient.  Sorry.
25    A.  Right.  They're outpatient but they're

Page 144

1 done by a hospital.  So it's, for example, a clinic
2 that is associated with MGH.
3    Q.  Okay.  So -- so I'm in Washington, D.C.
4 And I'm just going to, you know, give you a -- like
5 kind of an example of how it is here.
6    MedStar is a big hospital system in the
7 Washington, D.C. area.
8    A.  Uh-huh.
9    Q.  And if you go to a physician -- as an
10 outpatient, there are many physicians now, it seems
11 to me, that are like the MedStar, you know, office
12 of a certain specialty, but they're an outpatient
13 clinic.
14    Does Massachusetts General have outpatient
15 clinics that do things like urinalysis,
16 colonoscopies, et cetera?
17    A.  Yes.
18    Q.  Okay.  And they're like branded as
19 Massachusetts General, you know, GI specialists?
20 I'm giving a hypothetical, fictional example, but is
21 that a realistic sort of thing?
22    A.  That -- that possibility does -- does
23 exist where --
24    Q.  Okay.
25    A.  -- there's a clinic that is I believe

Page 145

1 owned by MGH and submits claims under the
2 Massachusetts General Hospital tax ID, there are
3 examples of that.
4    Q.  Okay.  And so the pricing of all these
5 clinics -- or of that particular hypothetical,
6 fictional, potentially, you know, fictional clinic,
7 would be transparent now in this matter?
8    MR. STOY:  Object to the form to the
9 extent it misstates his prior testimony.  Objection.
10 Incomplete hypothetical.
11    THE WITNESS:  You want to restate your
12 question?  You had a lot of fictional, hypothetical
13 in there.
14 BY MR. MIGLIACCIO:
15    Q.  Sure.
16    I mean, so let's say there's an MGH
17 outpatient clinic that does colonoscopies.  The
18 prices of those colonoscopies are now going to be
19 known?
20    MR. STOY:  Object to the form.  Same
21 objection.
22    THE WITNESS:  It's unclear whether we
23 actually do know the prices.
24    I also want to say that we -- I'm not sure
25 if we know all of the -- you know, it's -- it's

Confidential Information Subject to Protective Order

Page 146

1  helpful to circle back to this class, and I believe
2  the class are the patients here.
3        So we would be interested in what the
4  patients would pay, not necessarily the price that
5  the provider is getting.  I don't know if we know
6  all of the details of the insurance contract.  I
7  know that this price transparency, it could be
8  limited to just the price that the provider is
9  getting between the provider and the insurance
10  company.
11        It does not give you information on cost
12  sharing in this insurance contract between the
13  patient and the -- and -- and the insurer.  And as I
14  just mentioned, we don't know the quality of this
15  data yet.  These data yet.
16  BY MR. MIGLIACCIO:
17    Q.  But you've used it in your report, at
18  least in Figure 8?
19    A.  Yes.  Because we can see that even if the
20  quality was off, even if we didn't have the price
21  exactly right, it does show quite a bit of
22  variation.  And that variation is illustrative.
23  There's other sources of research out there even
24  before this price transparency.
25        This, you know, within the last year that

Page 147

1  has demonstrated large variation in prices for
2  insurer, within provider, kind of looking at the
3  intersection between providers and insurers.  It's
4  a -- it's a -- it's a research finding of five,
5  six years ago that there is huge variation in price
6  across different private insurers and private -- and
7  providers.
8    Q.  How -- do you know if there has been any
9  research done to determine whether the price --
10  pricing data is -- is inaccurate?
11        MR. STOY:  Object to the form.
12        THE WITNESS:  This is something that
13  people are currently looking at.  I think it's still
14  pretty new for us to know.
15  BY MR. MIGLIACCIO:
16    Q.  It's required by federal law, right, and
17  this is not something that's being done voluntary, I
18  imagine?
19    A.  That's right.  This new -- at least what I
20  just -- by it, what I just discussed about hospitals
21  publishing data on prices for various procedures and
22  various payors.
23    Q.  I'm looking at footnote 207 of your
24  report.  Can you --
25    A.  Okay.

Page 148

1    Q.  It's on page 69.
2    A.  Uh-huh.
3    Q.  Is that the announcement of this --
4  this -- this new transparency requirement?
5    A.  Possibly.  Although this is a little bit
6  earlier than I thought it would be.
7    Q.  Okay.  Yeah, that's why I was asking
8  because I don't know.
9    A.  It's possible.
10    Q.  All right.  Got it.  Okay.  I mean --
11  yeah.
12        Do you -- with respect to -- to the --
13  this issue that you just raised of pricing the --
14  the split between what the patient pays and what the
15  insurer pays, do you understand that Dr. Song's
16  report focuses on estimating total price, not just
17  the patient's share of the price?
18    A.  That was a little confusing to me, as I
19  understood the complaint to be the -- to be the cost
20  that the patient would bear, not total price.  But I
21  did notice that in Dr. Song's report he didn't delve
22  into issues of cost sharing.
23    Q.  So would -- would -- would it change your
24  opinion now if you understood that he is only
25  focusing on estimating the total price and not just

Page 149

1  the payment -- patient share of the price?
2    A.  I understand what he's doing, but my
3  understanding of the class is that we are interested
4  in what patients would bear.  So I was a bit
5  confused.  It seemed to me that that was an omission
6  in the analysis that he did.
7    Q.  Is it fair to say that the total price is
8  the more appropriate measure for the burden borne by
9  society for -- for testing?
10        MR. STOY:  Object to the form.
11        THE WITNESS:  I think that would be a much
12  more complicated question.  The burden borne by
13  society.  I don't think that total price is a good
14  measure of that either because that includes profits
15  by hospitals and like charges versus what they
16  actually get after negotiations.  There is just a
17  lot of additional complexity there.  I think burden
18  borne to society would have to be better defined.
19  BY MR. MIGLIACCIO:
20    Q.  All right.  I'll give you some -- just
21  some -- I'll set this up with some hypothetical
22  questions for you.
23        Let's say there is a person at risk of
24  developing cancer, you know, as a result of a
25  medication contaminated with a carcinogen, right.

Page 150

1  Let -- let's assume all those things are -- are
2  true.  There's somebody who took a -- you know,
3  ingested a carcinogen and they are at a risk -- a
4  higher risk of developing cancer.
5        Can -- do you follow that?
6    A.  Yes.
7    Q.  Okay.  Who in society should bear the
8  burden for screening that person for cancer risks?
9        MR. STOY:  Objection.  Incomplete
10 hypothetical.  Objection to the extent it calls for
11 a legal conclusion.
12       You can go ahead.
13       THE WITNESS:  Your question is who -- if
14 there is a pill that somebody ingested that puts
15 them at higher risk for cancer, who should be
16 responsible for bearing that burden?
17       I don't think that's within the scope of
18 my report.  I don't know if that's within my
19 expertise to say who should be responsible for that.
20 BY MR. MIGLIACCIO:
21   Q.  As a healthcare economist, what -- does
22 your research focus or include expertise on who
23 should pay what in -- in the healthcare system?
24       MR. STOY:  Object to the form.
25       THE WITNESS:  No.  By "should," do you

Page 151

1  mean some normative sense of who bears
2  responsibility, who should -- as an economist, I
3  think that would take a lot of careful thinking.  We
4  might have the tools to consider that but I wouldn't
5  have to think about it right off the bat
6  on this call.
7        We often -- it depends on contracts.  It
8  depends on the legal system.  We use -- we are quite
9  familiar with contracts and who does pay the burden
10 and we might compare different contracting
11 arrangements and compare which one is better in
12 terms of welfare for society.  But those would be
13 complicated analyses that would take deeper thought.
14 BY MR. MIGLIACCIO:
15   Q.  In the current regime we have in this
16 country for healthcare -- for healthcare generally,
17 who pays for healthcare for an -- an average person?
18 Maybe that -- maybe that's too difficult for you --
19 you know, a hypothetical person, let's give it a
20 hypothetical person.
21       MR. STOY:  Object to the form.
22       THE WITNESS:  Yeah.
23       MR. STOY:  Objection.  Incomplete
24 hypothetical.
25       (Whereupon, a brief discussion off the

Page 152

1  record.)
2        THE WITNESS:  I was -- I was starting the
3  shortest answer is that it's complicated.  It
4  depends on the person.  It changes year to year
5  depending on healthcare reform or not.  There are
6  just so many variables to consider here I don't
7  think I could give you an answer that would fit
8  within my seven hours probably.
9  BY MR. MIGLIACCIO:
10   Q.  Yeah.  Let me try to -- let me try to put
11 some specificity around this and see if we can fit
12 within the seven hours.
13       Medicare.  Who -- who -- who's eligible in
14 this country?
15   A.  Broadly speaking, there are two types of
16 people that are eligible for Medicare.  People that
17 are above 65 and people with some disability.  There
18 are also special populations such as people that
19 have renal failure and get dialysis.
20   Q.  Let's say somebody's over the age of 65,
21 right, they're eligible for Medicare.
22       Who pays for Medicare for that person who
23 is eligible for it?
24   A.  There are several levels to this.
25 Medicare is a government program so the government

Page 153

1  runs -- the government funds Medicare through
2  taxpayer dollars.  There are -- again, I could give
3  you a longer answer, but I think the shorter answer
4  is that it's a government-run program that is funded
5  by taxpayer dollars and administered by private
6  contractors.
7        So who pays, it could be like any of
8  those, it could be the taxpayers, it could be the
9  government, or it could be the private contractors
10 that administer Medicare in different jurisdictions.
11   Q.  Where does the money ultimately come from?
12       MR. STOY:  Object to the form.
13 BY MR. MIGLIACCIO:
14   Q.  For that person's healthcare?
15   A.  As I said, it -- you know, one way to
16 trace it back is, you know, taxpayers fund the
17 Medicare program.
18   Q.  Yeah.  Got it.
19       So if there is a person -- strike that.
20       I'll -- I'll ask it a different way.
21       Have you done any research into -- I think
22 you were -- you had talked about the research you've
23 done with diagnoses and trying -- and I don't want
24 to misstate it.  What was that research again?
25   A.  It was research on the diagnostic process,

Page 154

1  the -- yeah, I think I would just succinctly sum it
2  up as the research on the diagnostic process.
3      Q.   And then that related to Afib, right,
4  atrial fibrillation, or was that a different?
5      A.   The guidelines research is related to
6  atrial fibrillation.
7      Q.   Got it.
8           What are the --
9      A.   Go ahead.
10     Q.   What -- what are the risks associated with
11  some -- with -- with an individual or a patient
12  population who does not get timely treatment for
13  atrial fibrillation?
14         MR. STOY:  Object to the form.
15         THE WITNESS:  Your question was whether --
16  what are the risks for patients that don't get
17  timely treatment for atrial fibrillation.
18         I think this is actually -- so I was going
19  to say that my research on diagnoses is not
20  necessarily the research on atrial fibrillation.
21  The research on atrial fibrillation is my research
22  on guidelines.  Timeliness of diagnosis is not
23  really an issue with atrial fibrillation.
24         Atrial fibrillation's a chronic condition.
25  Most people have it, you know, by the time they're

Page 155

1  very old.  And the question here is how you should
2  treat atrial fibrillation, not whether you should
3  diagnose it or how do you diagnose it.
4  BY MR. MIGLIACCIO:
5      Q.   Got it.
6           The research you did on diagnoses, were
7  those for any particular disease?  Did they focus on
8  anything specific?
9      A.   The research is motivated very broadly.
10  The paper where I dig into a specific clinical
11  setting in depth is in the presentation of patients
12  in the emergency department with potential
13  pneumonia.
14     Q.   And what was your conclusion there?
15     A.   That there are real possibilities of
16  Type I and Type II error in the diagnosis process.
17  That there are questions about how many people we
18  should diagnose or not.
19         But more importantly, there are questions
20  about diagnostic accuracy.  You could diagnose the
21  same number of people but have a much higher
22  accuracy in doing so.  And that the diagnostic
23  process is not just a simple test like a chest x-ray
24  but it also involves human interpretation and
25  involves a system of care that could be prone to

Page 156

1  error.
2      Q.   Got it.
3           With respect to pricing, is it fair to say
4  that industry and government agencies use averages
5  for pricing certain things?  I'll say, for instance,
6  gasoline?
7           MR. STOY:  Object to the form.  Objection
8  beyond -- to the extent it's beyond the scope.
9           THE WITNESS:  Do you want to be more
10  specific about how they use the averages?
11  BY MR. MIGLIACCIO:
12     Q.   Well, even if there is variation in the
13  real world, I mean, doesn't -- can't you determine
14  the average price of gasoline?
15     A.   I think the question is whether the
16  average price of gasoline, in this case the average
17  price of a service used in screening, is the
18  relevant object.
19         Of course you can calculate an average but
20  the question you should ask is whether it's the
21  right average for the right patient population and
22  whether it's the only thing that matters.
23         Obviously, we -- we measure standard
24  deviation in variants in a lot of settings because
25  we care about variation.  So the question is not

Page 157

1  whether we can measure an average, but it's whether
2  that average is the right measure for what we want
3  to do.
4      Q.   Uh-huh.  You use averages in your own
5  work; isn't that fair to say?
6           MR. STOY:  Object to the form.
7           THE WITNESS:  Again, the question is what
8  average am I using.  You know, if you're using an
9  average in your research paper, you have to defend
10  that that's the right average, that that's the
11  average that we care about.  And you -- if you're
12  not, you should expect pushback from your peers
13  about whether you're using the right average or not.
14  BY MR. MIGLIACCIO:
15     Q.   Can you give me some examples of where
16  you've used an average and where you've had pushback
17  and where you've defended it?
18           MR. STOY:  Object to the form.  Objection.
19  Beyond the scope of his report.
20           THE WITNESS:  I can't remember the last
21  time I personally got pushback, but I could imagine
22  getting pushback if you are saying that you're
23  interested in one patient population and you're
24  giving the average for another patient population.
25

Page 158

BY MR. MIGLIACCIO:

1 BY MR. MIGLIACCIO:
2    Q.   Got it.
3       So like two distinct patient populations.
4 What would be an example of like one patient
5 population and an average for a different one?  Can
6 you -- can you give me one?
7    A.   Yes, I think in this case it would be the
8 average -- if you're using the average price -- the
9 private insurance price for some general patient
10 population that isn't well defined and you're
11 applying that to the patients that took at-issue
12 valsartan.  Those would be two different patient
13 populations.
14    Q.   I think you stated in your report that
15 the -- when you looked at some of the data, that you
16 saw the average age of a valsartan -- of somebody
17 who took one of the valsartan-containing drugs was
18 63 years old.
19       Do you remember that?
20    A.   Yes, I do.  I would have to look...
21    Q.   Yeah, I'll -- I see that.
22       MR. STOY:  And, Nick, while he's
23 looking --
24       MR. MIGLIACCIO:  Yeah.
25       MR. STOY:  -- we're coming up on noon

Page 159

1 Dr. Chan's time so just --
2       MR. MIGLIACCIO:  Yeah.
3       MR. STOY:  -- keep that in mind.
4       MR. MIGLIACCIO:  Sure.  Are you hungry,
5 Dr. Chan, if you want to eat something, please just
6 say the word because I was starving before and I
7 don't want you --
8       THE WITNESS:  I could -- I could certainly
9 eat, yeah.  I could definitely eat.
10       MR. MIGLIACCIO:  Please do.  We could
11 take -- we could take a break.
12       THE WITNESS:  Okay.
13       MR. MIGLIACCIO:  Yeah.
14       THE WITNESS:  You want to do 30 minutes?
15       MR. MIGLIACCIO:  That's fine with me.
16       MR. STOY:  Will that be okay with the
17 overall time constraints, Nick?
18       MR. MIGLIACCIO:  I think so.  I -- I
19 really -- I do.  And I'm -- because I think even
20 from now we have like five hours and I think --
21       MS. HILTON:  Can we go off the record?
22       THE VIDEOGRAPHER:  We're off the record at
23 11:56 a.m. Pacific time.
24       (Whereupon, a brief recess was taken.)
25       THE VIDEOGRAPHER:  We are back on the

Page 160

1 record.  The time is 12:36 p.m.
2 BY MR. MIGLIACCIO:
3    Q.   All right.  Dr. Chan, I want to ask you a
4 few questions.
5       I want to go back to paragraph 42 briefly
6 of your report.  And you have -- I think you detail
7 Figure 2 and discuss risk factors for specific
8 populations.
9    A.   Okay.
10    Q.   I think I'm going to read the last
11 sentence of paragraph 42 which states, "Even with
12 these substantial relative risks, again, only age
13 and smoking history are used to define the
14 population recommended for colorectal and lung
15 cancer screening."
16       Did you detail the relative risk of age
17 for colorectal cancer in this paragraph?
18    A.   Not in this in paragraph.  It might be
19 detailed somewhere else in the report, but I can't
20 find it right now.
21    Q.   Okay.  All right.
22       Yeah, well I couldn't find it either so,
23 you know, I -- if we have more time I might ask you
24 to look and see or at least tell me where it can be
25 found.

Page 161

1    A.   Yeah.
2    Q.   Because I did not see it myself.
3       But in the meantime, I will go back and
4 ask you some other questions.
5       We were talking, I think, before the break
6 about pricing of medical services and -- you know, I
7 want to ask you about Dr. Song.  If you would agree
8 that he's qualified to offer the opinions that he
9 has offered?
10       MR. STOY:  Object to the form.  Objection
11 to the extent it calls for a legal conclusion with
12 regard to qualifying Dr. Song as an expert.
13       THE WITNESS:  Yeah, I'm not sure if I can
14 qualify -- I'm qualified to assess whether he's
15 qualified.
16 BY MR. MIGLIACCIO:
17    Q.   Would you agree he's well respected in the
18 field?
19       MR. STOY:  Object to form.
20       THE WITNESS:  I'm -- I'm not sure how to
21 characterize that.  I know him.
22 BY MR. MIGLIACCIO:
23    Q.   Okay.  Have you ever cited his work in any
24 of your own publications?
25    A.   I'm not sure if I have.

Confidential Information Subject to Protective Order

1    Q.  Would you agree that the publications that
2  Dr. Song relied upon are well accepted and
3  peer-reviewed in his report?
4        MR. STOY:  Object to the form.
5        THE WITNESS:  I'm not sure -- can you
6  restate that again?
7  BY MR. MIGLIACCIO:
8    Q.  Yeah.
9        Would you agree that the publications that
10  Dr. Song relied upon in his report, and I know
11  you've reviewed it for purposes of yours, would you
12  agree that the publications that he relied upon are
13  well accepted and peer-reviewed?
14        MR. STOY:  Objection to form.
15        THE WITNESS:  I don't remember going over
16  his -- the sources that he relied upon in detail.
17  And I'm not sure how I would characterize whether a
18  publication is well accepted or not.
19  BY MR. MIGLIACCIO:
20    Q.  What do you recall of the -- of the
21  publications that Dr. Song relied upon?
22    A.  I don't recall much.  I would have to look
23  at his report again to refresh my memory.
24    Q.  Okay.  I can -- I think we have that.
25  Let's -- let's go get that.  Bear with me.  I can

1  try to pull that up for you.  I'm going to try to
2  make this work on my end.  So I won't -- I'll move
3  on to something while -- while I'm trying to do
4  that.
5        I'm going to ask you about some of -- of
6  your own publications.  And I think I -- we had
7  discussed before the break that it's -- the average
8  age of a valsartan user was 63 years old.  I think
9  we -- you -- that's what you detailed in your
10  report, right?
11    A.  Yeah, I would need to look at the relevant
12  paragraph, but that sounds right, yep.
13    Q.  Which paragraph was that?
14    A.  I see something in paragraph 65.  Is that
15  what you're referring to or...
16    Q.  I think that that is what I was referring
17  to.
18    A.  Okay.
19    Q.  It looks to me that you -- that that data
20  was based on data that you -- 63.3 years old, right?
21  And this data was pulled in 2018; is that right?
22    A.  Where do you see that it was pulled in
23  2018?
24    Q.  I'm going to believe that is what I have.
25  I'm going to try to find a citation for you.  I seem

1  to have lost it for the time being.
2        But would you agree with me that if --
3  that if the average age of a valsartan user is 63,
4  and for us, and here, that the class concludes
5  several years ago, in 2018, would you agree that
6  this class, the proposed class that we have defined,
7  the majority of the class would be -- would be on
8  Medicare?  Can you agree with that, if the age
9  was -- is 63 years old, the average age?
10        MR. STOY:  Objection.  Form.  Incomplete
11  hypothetical.
12        THE WITNESS:  I'm not sure if I can agree
13  with that.  I think we could probably look at that
14  in more detail.  But just based on these facts
15  alone, I'm not sure if that necessarily leads to
16  that conclusion.
17  BY MR. MIGLIACCIO:
18    Q.  What data did you rely upon to determine
19  that the average age of a valsartan user was
20  63.3 years old?
21    A.  I believe what is cited in that sentence
22  comes from another study.
23    Q.  Okay.
24    A.  In footnote number 87.
25    Q.  Uh-huh.

1    A.  And I think that would be -- it might have
2  been some summary statistics calculated in that
3  study.
4    Q.  Got it.
5        Do you know if that was a meta-analysis,
6  that study?
7    A.  It might have -- it likely drew from other
8  previous studies.
9    Q.  Got it.  Got it.
10        I'm going to show you, if I can now,
11  Dr. Song's report.  And hopefully I'll be able to
12  bring it into your folder here.
13        MR. MIGLIACCIO:  This will be Exhibit 4.
14        (Whereupon, Chan Exhibit 4 was marked for
15  identification.)
16  BY MR. MIGLIACCIO:
17    Q.  Once I rename it.
18    A.  Okay.
19    Q.  You should have it now, hopefully.
20    A.  Yes.
21    Q.  Okay.  So I had asked you about the
22  publications that he uses and used in his -- in
23  his -- in his report.  I wanted to know if they were
24  authoritative, well accepted or peer-reviewed, but I
25  want -- you know, I know you've looked at this in

Confidential Information Subject to Protective Order

Page 166

1 detail and it's, you know, fairly lengthy but I
2 wanted to ask you if anything here jumps out at you
3 as -- as being none of those things, any of the
4 sources he cites?
5     A.  Are you asking me to refer to the
6 materials relied upon for him?
7     Q.  Right.
8         MR. STOY:  I'm just going to put an
9 objection on the record to -- I mean, there's over a
10 hundred cites here, so...
11        THE WITNESS:  Yeah, I'm not sure if I'll
12 be able to look through this and pull out any
13 sources that don't meet those criteria.  There's
14 certainly some of these that are not peer-reviewed.
15        And I'm not sure what you mean by
16 authoritative and well accepted still.  It's
17 something could be very appropriate for one purpose
18 but not very appropriate for the purposes that we
19 require in this case.
20        We might have a -- an article that is very
21 appropriate when it describes the ratio of prices
22 between private insurance and Medicare for that
23 audience but would not be appropriate if we're
24 trying to apply it to this case.  So what you mean
25 by well accepted and authoritative is -- depends on

Page 167

1 what you're using it for.
2 BY MR. MIGLIACCIO:
3     Q.  Okay.  Let me restate my question.
4     A.  Okay.
5     Q.  You -- you -- you reviewed his report in
6 detail, right, in -- before you offered your
7 opinions?
8     A.  I reviewed his report.  I am not sure what
9 you mean by "in detail."  I have the hours that I
10 reported in terms of how long I spent on reading his
11 report.
12     Q.  You did not in your report that -- the
13 document that you've produced, you did not identify
14 any publications that Dr. Song relied upon that, in
15 your mind, were suspect, did you?
16        MR. STOY:  Objection.  Form.
17        THE WITNESS:  Not specific sources that I
18 thought were suspect.
19 BY MR. MIGLIACCIO:
20     Q.  Okay.
21     A.  But, again, some of these sources are fine
22 for one purpose but not fine for the purposes that
23 we need in this case and I think in my report I do
24 describe those.
25     Q.  Which sources, and can you point me to

Page 168

1 those specifically?
2     A.  I'm not sure which paragraph I mentioned
3 this.  But I think it gets to the point of averages
4 for a different patient population are not the
5 averages that we want here.  This has to do with
6 needing to know how various quantities that we care
7 about, such as prices or such as what services are
8 going to be used, how they might correlate with
9 patient characteristics in patients who might be in
10 a class, and whether those data to come up with
11 those averages even exists anywhere that anybody
12 could use to calculate the relevant average.
13     Q.  Can you direct me to that, to that portion
14 of your report?
15     A.  Sure.  Let's see.  Let me go back to my
16 report.  Now it's kind of hard -- which exhibit is
17 it, is my report?
18     Q.  Yeah, I'm sorry, I renamed them.  I
19 believe it's Exhibit 2.
20     A.  2.  Okay.  Let's see.
21        I think paragraph 100 speaks a little to
22 this.
23        When you say something is correlated with
24 something else, then you can't just calculate the
25 average of that something else without knowing what

Page 169

1 you're conditioning on in the first place.  So if
2 something is correlated that means the average that
3 you care about might change if you switch
4 populations.
5     Q.  And, again, you -- you -- you do know that
6 this population has not been determined with
7 finality, right?
8     A.  Right.  But I know that it would likely be
9 different than the sources that Dr. Song is relying
10 upon and I also think that it wouldn't be feasible
11 even to measure that with the data that we have.
12     Q.  Well, why do you think it would not be
13 feasible?
14     A.  Because the data have not been made
15 public.
16     Q.  Which data have not been made public?
17     A.  Many of the pricing data have not been
18 made public and how that correlates with individual
19 characteristics of patients that would determine
20 what services we need to recommend for the medical
21 monitoring program.  The cost sharing agreements in
22 these contracts are not public.  There are a number
23 of different components to evaluating spending that
24 would not be public.
25     Q.  Isn't it fair to say, though, that you

Confidential Information Subject to Protective Order

Page 170

1  know, the government knows how much it spends
2  annually on -- on Medicare?
3      A.  That, again, is an average.
4      Q.  Uh-huh.
5      A.  That's an overall -- that's an average for
6  how much it's spending for the entire population of
7  Medicare patients.  So there's two problems with
8  that.  Number one, there could be patients in the
9  class that are not Medicare patients.  And number
10 two, there are Medicare patients that aren't in our
11 class.
12     Q.  Right.  I -- but the government
13 nonetheless can determine how much it spends for
14 the -- for the whole population, right?  I mean,
15 that -- that is --
16     A.  Of patients --
17     Q.  -- that is --
18     A.  Of patients under Medicare.  But, again,
19 that's abstracting away from the possibility that we
20 care about cost sharing, which I'm still not clear
21 about if we're -- it depends on who, you know, my
22 understanding is that the class is any -- any
23 payments that the patients would have to make for
24 monitoring, not the payor.
25     So first, that's one issue.  And then

Page 171

1  another --
2      Q.  Where do you draw that -- I'm sorry,
3  Doctor, to interrupt you.
4      But where do you draw that -- how -- how
5  did you come across that assumption?  Where -- where
6  do you -- where do you draw that assumption from?
7      A.  I think that would be -- I think I
8  discussed this in my -- my assignment and my
9  understanding of the complaint.
10     Q.  Okay.
11     A.  Let's see.
12     So in paragraph 8, it says, "The proposed
13 medical monitoring class consists of individuals
14 'who consumed a sufficiently high Lifetime
15 Cumulative Threshold of NDMA, NDEA, or other
16 nitrosamine, in generic valsartan-containing drugs
17 manufactured by or for Defendants.'"
18     So the -- the class are the individuals
19 who consumed this.  It's not named that the
20 third-party payors are in that class.  This is in
21 contrast to the other class of economic loss where
22 the third-party payors are included in that class.
23     And that's in paragraph 9.
24     Q.  So that -- that is how you have reached
25 that conclusion, that is how you -- you have that

Page 172

1  assumption, right?
2      A.  That's my understanding of the complaint.
3      Q.  Did anybody provide that understanding to
4  you or did you just -- is that your understanding,
5  sitting here with your own interpretation?
6      A.  That's my understanding after having read
7  the complaint and bringing this up with the
8  attorneys involved in the case.
9      Q.  And if you read the beginning portion of
10 paragraph 8, "In regards to the proposed medical
11 monitoring class, I further understand that, among
12 the remedies requested, Plaintiffs seek" -- you
13 know, quote -- "'seek injunctive and monetary
14 relief, including creation of a fund to finance
15 independent medical monitoring services.'"
16     Where do you -- or do you see within that
17 language any implication with respect to cost
18 sharing?
19     A.  It just reads to -- it read to me that the
20 class for medical monitoring were patients, and
21 third-party payors were explicitly not included.
22 They were not named in that class.  And that is
23 contrast with the second class of economic loss
24 where third party payors are explicitly named.
25     Q.  So that's the basis for your -- for that

Page 173

1  assumption and that conclusion?
2      A.  Correct.
3      Q.  And you're not -- not a lawyer, right?
4      A.  No.
5      Q.  Okay.  And this -- this -- this assumption
6  was also provided to you, or in part, by counsel; is
7  that correct?
8      A.  That is --
9      MR. STOY:  Objection.  Asked -- hang on.
10     Objection.  Asked and answered.
11 Objection.  Form.  To the extent it misstates what
12 he previously testified to.
13     THE WITNESS:  Correct.  I previously said
14 that I read the complaint.
15     MR. STOY:  Go ahead.
16     THE WITNESS:  This distinction, I noticed
17 this distinction in the complaint, and I
18 discussed -- I discussed this idea with the lawyers
19 involved in this case.
20 BY MR. MIGLIACCIO:
21     Q.  I see.
22     And is it fair to say that if you -- how
23 many class action complaints have you read?
24     A.  This is my first one.
25     Q.  First one.  Got it.

Confidential Information Subject to Protective Order

Page 174

1    Is it fair to say that if you -- if this
2 assumption was incorrect with respect to cost
3 sharing that it would alter your opinions in some
4 fashion?
5    MR. STOY:  Object to the form.
6    THE WITNESS:  I don't know if you want to
7 clarify what you mean by "alter in some fashion,"
8 but there are -- there's a section in my report on
9 cost sharing.
10 BY MR. MIGLIACCIO:
11   Q.  Uh-huh.
12   A.  And that is under the assumption that we
13 are interested in what patients are paying.
14    If we are not interested in what patients
15 are paying and there is some other concept that is
16 not well defined, it would need to be defined first,
17 and it would likely -- it's possible that could lead
18 to other variation that's unaccounted for.
19   Q.  The question of variation of cost sharing,
20 if cost sharing wasn't an issue, there would be no
21 issue with respect to variation of cost sharing,
22 right?
23    MR. STOY:  Object to form.  Incomplete
24 hypothetical.
25    THE WITNESS:  I guess what I'm saying is

Page 175

1 that we need to specify what is the object that we
2 are interested in quantifying.  Even if there is no
3 cost sharing, there's a difference between charges
4 and difference between charges and costs and
5 ultimate amount that's reimbursed plus patient cost
6 sharing.
7    There's many different kind of optics that
8 we could be considering, and we would need to define
9 that first.  And some objects will entail other
10 sources of variation.
11 BY MR. MIGLIACCIO:
12   Q.  But cost sharing would no longer be a
13 source of variation if we're not talking about cost
14 sharing?
15   A.  You're saying but cost sharing would no
16 longer be of interest if we're not talking about
17 cost sharing?
18   Q.  No, would no longer be a source of
19 variation if -- if -- if it's not at issue in this
20 case?
21    MR. STOY:  Objection.  Incomplete
22 hypothetical.
23    Go ahead.
24    THE WITNESS:  If the assumption is that
25 cost sharing is not at issue, then we would not

Page 176

1 consider variation in cost sharing.
2 BY MR. MIGLIACCIO:
3    Q.  Got it.
4    Paragraph 117 in your report, you state
5 that -- let me know when you are there.
6    A.  I'm here.
7    Q.  Yep.  117.
8    A.  Yep.
9    Q.  Yep.  Okay.
10   A.  Yes.
11   Q.  I'm looking for where I -- you state in
12 the middle, "Given the substantial price variation
13 that I summarize above, there is no reason to
14 believe that the average prices experienced by a
15 proposed" -- "proposed class members is the same as
16 the average prices experience" -- "experience by the
17 nation as a whole."
18    I think you just said that earlier.
19   A.  Yeah.
20   Q.  Isn't it fair to say that you have not
21 made an effort to determine the extent to which you
22 say the average prices experienced by proposed class
23 members is the same as the average prices
24 experienced by the nation as a whole?  You haven't
25 tried to -- to determine that?

Page 177

1    A.  In the report I do say how patients that
2 take valsartan are different than patients who don't
3 take valsartan.  That is evidence in that direction.
4    But more broadly, in my report, I would
5 say that it would be infeasible to determine the
6 prices for patients in the class as -- for reasons I
7 just told you, including the unavailability of data.
8    Q.  Well, if we take the cost sharing out,
9 which we'll -- we placed aside for these
10 discussions, what other data do you contend is -- is
11 unavailable?
12   A.  Should we also define over what time span
13 this is going to be for?
14   Q.  What -- what time span a medical
15 monitoring program will be for?
16   A.  Right.
17   Q.  Well, I think we can define it within a
18 finite period of time.  We could say one year for --
19 for purposes of our discussion.
20   A.  So you --
21   Q.  I'm -- I'm just -- I'm giving you a
22 hypothetical to say could you determine that for --
23 for one year how much something would cost?
24    MR. STOY:  So you're not -- you're not --
25 that's not a stipulation, huh, Nick?

Confidential Information Subject to Protective Order

Page 178

1   MR. MIGLIACCIO:  No, that's a
2 hypothetical.  To aid in the calculations here.
3   THE WITNESS:  So we're not looking into
4 the future by very much.  We're going to restrict
5 patients only to those who have Medicare.
6 BY MR. MIGLIACCIO:
7 Q.  Uh-huh.
8 A.  And we know exactly whether screening is
9 appropriate for every single patient individually,
10 then we could calculate the prices for patients in
11 Medicare for this year.
12 Q.  Got it.
13   Have you made any effort -- you know,
14 since you -- you don't believe that the -- the
15 prices experienced by class members are the same as
16 the prices experienced nationwide, what efforts have
17 you made to determine how far off you believe them
18 to be?
19 A.  I think this is supported by a few
20 analyses in the report.  So it's supported by the
21 fact that patients who take valsartan are different
22 than patients who don't take valsartan.  It's
23 supported by the variation in price among patients
24 seeing the same provider, MGH.
25   It's supported by also variation in price

Page 179

1 that I -- that I show in other -- other exhibits
2 like figures -- Figure 9, "OptumHealth commercial
3 pricing," variation for the proposed procedures.
4   So if there's variation -- if there's no
5 variation then you would be much more confident that
6 the averages shouldn't differ between groups of
7 patients.  But if there's a lot of variation, that
8 tells you that there's a lot of scope for averages
9 for one population differing from averages for
10 another population.  And that, I think, is enough
11 evidence to show that you could be wildly off.
12 Q.  When you say "wildly off," like, can you
13 ballpark that percentage?
14 A.  Yeah, I mean, I think that's what some of
15 these figures do.  You could be off by a factor of
16 like 400 percent if -- especially if the class is
17 not a big class.
18   If the class is a subset of patients who
19 took at-issue valsartan, it's a small population
20 relative to the entire population.  And therefore,
21 you could be -- you could be in the 5th percentile
22 or in the 95th percentile and the difference between
23 the 5th and the 95th percentile for one given
24 provider is 400 percent.
25 Q.  How do you define like a -- "not a big

Page 180

1 class"?
2 A.  So, for example, 5th percentile means
3 5 percent of the population is -- is, you know, at
4 the 5th percentile or below.  Or 95th percentile is
5 5 percent of the population is at or above this
6 price.
7   So if you have a class that's 5 percent of
8 the population you could be as unlucky to get
9 something that's 400 percent off if you compare the
10 5th to the 95th percentile.
11 Q.  When we're talking about the size of the
12 class, how do you mean in terms of a small class, a
13 big class, what do you mean by that?
14 A.  So -- so kind of implicit in my previous
15 answer is you would ask how many people are in this
16 class and how many people are in the overall
17 population of the nation.  That's one way of asking
18 that.
19   Or if you are -- even if under the
20 assumption that all members of the class -- you were
21 able to measure prices for some bigger sub -- bigger
22 set of people that include everybody in this set,
23 included people in the class, which I don't think is
24 true, you could use that bigger population.
25   So in our previous example where we're

Page 181

1 only talking about the Medicare patients, we would
2 look at Medicare patients and we'd ask how big is
3 Medicare patients relative to the size of our class.
4 Q.  And what are your -- do you have
5 assumptions with respect to the size of the class
6 here?
7 A.  No.
8 Q.  You have no assumptions?
9 A.  No.
10 Q.  Okay.
11 A.  I mean, I -- I -- I have some intuition
12 that it's not going to be 50 percent of the U.S.
13 population.
14 Q.  But no assumption on -- on -- on the size,
15 the number, the -- the -- you know, how many people
16 other than that intuition?
17 A.  I haven't -- yeah, I haven't -- no.
18 Q.  Have you asked for that information?
19 A.  I so far have not asked for that
20 information, but I think that would be relevant for
21 moving forward.  I wouldn't -- you know, I would
22 reserve the right to look at that in the future.
23 Q.  Got it.
24   So for calculating the prices as we just
25 went through that hypothetical, in a limited

Confidential Information Subject to Protective Order

1  fashion, that we -- that we could calculate the
2  prices for -- for patients in Medicare for a year,
3  could you calculate that for two years?
4      A.  So I say in my report the farther into the
5  future that you get, the more uncertain this is
6  going to be.
7      Q.  Yeah.
8      A.  It's going to be more uncertain for
9  private insurance than for Medicare, but even within
10 Medicare, the Medicare budget changes every year,
11 the conversion factor between RVUs and dollars could
12 change and does change every year.
13     The geographic price indices between
14 different regions in the country, that changes.  It
15 could change quite drastically.  For example, Alaska
16 doubled in one year.
17     So the farther that you move out, even
18 within Medicare, there would be more uncertainty on
19 prices alone.
20     But I think the bigger point, this might
21 not be -- this is kind of a combination of both
22 Kaplan and Song, is that we can't evaluate the
23 overall spending for a medical monitoring program
24 only by asking about prices.  We have to ask what
25 are the services that are going to be rendered and

1  this -- there's a lot of uncertainty about what
2  those services would be the farther we move out.
3      Q.  So how would -- you know, would it be
4  possible to do two years if you knew what the
5  services are or the menu of service?
6      A.  I said it's -- it's possible, but it
7  becomes more uncertain.
8      Q.  Okay.
9      A.  Moving from one year to two years.
10     Q.  How about three years?
11     A.  More uncertain then.
12     Q.  Okay.  So your work in the NBER, do you
13 ever work on budgeting, working in the NBER?
14     A.  The government budget?
15     Q.  Or -- or have you ever dealt with
16 budgeting issues working in that capacity, in -- in
17 that --
18     A.  Can you clarify what you mean by
19 "budgeting issues"?
20     Q.  Where the government, the federal
21 government seeks to budget things out into the
22 future, right, isn't that typically how the federal
23 government works, they have a budget and it -- they
24 have amounts that -- that are -- that are set into
25 the future?

1      MR. STOY:  Object to the form.
2      THE WITNESS:  I'm familiar somewhat with
3  how the budget for Medicare has been set.
4  BY MR. MIGLIACCIO:
5      Q.  What -- what is your familiarity with
6  that?
7      A.  So there is some budgeting into the future
8  but this could be changed by Congress any given
9  year.
10     Q.  Uh-huh.  How -- tell me, how is it -- what
11 is your familiarity of how -- how does Medicare get
12 budgeted into the future?
13     A.  It's very complicated.  I know that a lot
14 of it has to do with politics.  I know that one
15 example of this is called a "doc fix" where in order
16 to have a balanced budget there was some promise to
17 eventually lower prices on medical spending for
18 physician services but every year or every couple of
19 years there'd be a delaying of this.
20     So I think there is quite a bit of
21 political influence on what the Medicare budget is.
22 It's not some formula that gets set by something
23 that's free of politics and is kind of -- you know,
24 is -- is -- let to run in some predetermined fashion.
25     Q.  How far out does the Medicare budget get

1  set; do you know?
2      A.  I think in -- as I said, in practice, it
3  could change in a year.
4      Q.  Uh-huh.
5      A.  So by definition it's not in practice set
6  in stone.
7      Q.  And is it determined annually, on an
8  annual basis?
9      A.  I think it could change at any point.
10     Q.  The government knows how much it spends on
11 Medicare for a given year, right?
12     MR. STOY:  Objection.  Asked and answered.
13     THE WITNESS:  For -- for a given year, I
14 believe the government could track down how much it
15 spent on Medicare.
16 BY MR. MIGLIACCIO:
17     Q.  Do you believe -- you know, is it your
18 opinion that for one price to be representative of
19 another, they would need to be the same?
20     A.  Say that again.
21     Q.  Is it your opinion that for one price to
22 be representative of another, they would need to be
23 the same?
24     A.  For one price to be representative of
25 another price, the two prices would have to be the

Confidential Information Subject to Protective Order

Page 186

1  same?
2      Q.  Yes.  That -- that's what I'm asking you.
3      A.  I'm not sure what I -- I'm not -- I'm not
4  sure I understand that question.  Sorry.
5      Q.  So if you were to -- if you were to
6  attempt to estimate the prices for a -- patient
7  population, would you -- you would look at
8  representative prices, right; is that something that
9  you would do?
10      MR. STOY:  Objection.  Incomplete
11  hypothetical.
12      THE WITNESS:  What do you mean by
13  "representative prices"?
14  BY MR. MIGLIACCIO:
15      Q.  You would look at average prices?
16      A.  Average prices.  I'm not sure -- yeah, I'm
17  not sure I understand, like -- ultimately, what we
18  want to do is to be able to quantify total spending.
19  I'm not sure what we mean by "average prices."
20      Like, is there some weighting to the
21  prices?  The average prices alone don't -- some
22  unweighted version of average prices is not going to
23  tell you how much we are going to spend in a medical
24  monitoring program.
25      Q.  I'm going to direct you to paragraph 117.

Page 187

1  You can tell me when you are there.
2      A.  Yes.
3      Q.  Yeah.  I mean, you discuss Dr. Song's
4  proposed estimates.
5      A.  Uh-huh.
6      Q.  Based on national averages and -- and you
7  say, "not average prices specific to members of the
8  proposed class."
9      A.  Uh-huh.
10      Q.  And you say, "Given the substantial price
11  variation that I summarize above, there is no reason
12  to believe that the average price" -- "prices
13  experienced by proposed class members is the same as
14  the average prices experience by the nation as a
15  whole."
16      A.  Uh-huh.
17      Q.  So my question to you is, that given that
18  you don't believe the prices experienced by class
19  members are the same as the prices --
20      A.  Uh-huh.
21      Q.  -- experienced nationwide, what efforts
22  have you made to determine how far off they are,
23  like how far off do they vary?
24      A.  I think as I said before, the analyses
25  that show that the class members -- or people that

Page 188

1  take valsartan are different than people who don't
2  take valsartan and that prices vary in several of
3  the analyses that I do within Optum or within MGH
4  suggests that they could vary quite a bit.
5      Q.  They could.  But -- but have you
6  determined that they do?
7      A.  I think my level of certainty is quite
8  high that they do vary.  I haven't seen any evidence
9  to suggest that they would be the same.
10      Q.  So how much do they vary?
11      A.  In order to -- in order to do this you
12  would have to first specify the class, right?
13      Q.  Right.  And the class has not yet been
14  determined.
15      A.  Right.
16      Q.  Class hasn't been certified.  So have
17  you --
18      A.  But I can tell you that --
19      MR. STOY:  Hang on, Dr. Chan.  I don't
20  think there was a question pending.
21  BY MR. MIGLIACCIO:
22      Q.  So have you determined, then, how much
23  they vary here?
24      MR. STOY:  Objection.  Asked and answered.
25      THE WITNESS:  If there's no class, then I

Page 189

1  wouldn't be able to -- and I think this is part of
2  the problem of -- of defining a class.  First you
3  would need to know who -- you would need to define
4  the class in order to ask whether it's feasible
5  to -- the class would of course have to be captured
6  by either a -- fully captured by Medicare data or
7  fully captured by sources of data that are publicly
8  available in order for you to ask how would the
9  prices differ for members of the class versus
10  other -- other patients.
11      What we can do is that we know that
12  patients who take valsartan are different than
13  patients who don't take valsartan.  That's a
14  starting point.  That would suggest that these
15  patients are -- there's no reason why you would
16  think that -- so patients who take valsartan have,
17  you know, hypertension.  They have heart failure.
18      And those by construction, like the fact
19  that they take valsartan implies certain medical
20  conditions that other patients don't have.  You
21  would expect that patients that have certain medical
22  conditions to have different forms of insurance.
23      And if you have different forms of
24  insurance, you would expect that the prices should
25  be different for those patients than for patients

Confidential Information Subject to Protective Order

Page 190

1  who don't take valsartan.
2  BY MR. MIGLIACCIO:
3      Q.  If we disregard the cost sharing, right,
4  that -- that -- that different forms of insurance
5  issue falls away, right?
6      A.  No.  If you are saying, you know, some
7  patients might be more likely to be covered under
8  the VA or some patients might be more likely to have
9  private insurance, again it all depends on what
10  object you really want to focus on.
11      Even if you disregard cost sharing and you
12  say it's the object of how much the insurance
13  company pays providers, which I'm not sure is
14  what -- it hasn't been specified exactly what the
15  object should be, but if that is the object, that
16  would depend on whether the patient has private
17  insurance or Medicare or is a patient at the VA.
18      Q.  But, again -- and -- and I -- I mean, I
19  think you've answered this, but I want to make sure
20  that I understand it.
21      You have not made any effort to determine
22  whether prices experienced -- whether the prices for
23  class members would vary by a certain percentage
24  from the national average prices?
25      A.  I just don't have the --

Page 191

1      MR. STOY:  Objection.
2      Hang on.
3      Objection.  Asked and answered.
4      Go ahead.
5      THE WITNESS:  I don't have the data to do
6  that.  You can -- you can demonstrate that patients
7  who take valsartan are different than patients who
8  don't, but I don't have all of their private
9  insurance prices that they are facing, like -- and I
10  don't think anybody has those data.
11  BY MR. MIGLIACCIO:
12      Q.  So -- so you -- you don't have an answer,
13  then.  You don't -- you -- you have not reached
14  the --
15      A.  Yeah.  And I think it's an opinion that
16  it's not really answerable unless you have much more
17  detailed data sources than are explicitly available.
18      Q.  Would you agree that Medicare prices are
19  available by geography at the state and local level?
20      A.  Medicare prices are available, yes,
21  Medicare prices are available if you know the and
22  provider type and if you know the geography and if
23  you know the service.
24      Q.  Do you -- do you think that the national
25  average prices are useful in your analysis?  Do you

Page 192

1  think there's -- I mean, you point to them.  Do you
2  think there's some -- are -- are they useful for --
3  for your -- for your opinion?
4      A.  I don't think they would -- they're enough
5  for us to estimate how much paying for medical
6  monitoring would be for this class.
7      Q.  But you used them to argue that -- or to
8  opine, rather, that -- that it -- that it can't be
9  estimated; is that right?
10      A.  In some of the stuff that you've read from
11  my report, I say that the national average price is
12  different from -- for the -- different than the
13  price that would be applicable for members of the
14  class.
15      Q.  And -- and you -- you don't have that
16  delta, you don't have that difference?
17      A.  I don't think anybody has that.  And I
18  don't think it would be feasible to calculate it
19  because you can't calculate the price.
20      Q.  Is it fair to say that you can get much
21  more locally accurate commercial-to-Medicare price
22  ratios by using data that show local variations in
23  these ratios?
24      MR. STOY:  Object to form.
25      THE WITNESS:  Can you restate that

Page 193

1  question?
2  BY MR. MIGLIACCIO:
3      Q.  Yeah.
4      Can you get much more locally accurate
5  commercial-to-Medicare price ratios by using data
6  that shows local variations in these ratios?
7      MR. STOY:  Object to form.
8      THE WITNESS:  I think my point is that you
9  actually don't observe the real ratios for many --
10  for -- in many settings and for many providers, for
11  many insurers.
12      We have, like, limited -- we have limited
13  data.  For example, Optum is from a specific class
14  of insurers.  We have hospital prices for certain
15  insurers.  But we don't have the data relevant that
16  we would need for the prices of this medical class.
17  So we wouldn't be able to calculate the ratios.
18  BY MR. MIGLIACCIO:
19      Q.  This is a general question as to whether
20  you can get more locally accurate
21  commercial-to-Medicare price ratios by using data
22  that shows local variation in these ratios?
23      A.  Do the data exist?  Is it available?
24      Q.  Would you agree to that, yes?
25      A.  I don't think the data are available.

Confidential Information Subject to Protective Order

1    Q.  You don't think -- you don't think that
2 there is data that allows you to get much more
3 locally accurate commercial-to-Medicare price
4 ratios, you don't think it exists?
5    A.  I think we could get data that are more
6 locally accurate than the data that Dr. Song relies
7 upon.  But I don't think we have data available to
8 get us what would be the relevant spending for a
9 medical monitoring program for this class that has
10 not yet been specified.
11    Q.  Tell me about the more accurate local
12 data.  Where does that data exist?  Where can you
13 get it?
14    A.  That is quite hypothetical.
15       I -- you know, I think -- what Dr. Song
16 relies upon is -- or at least in his report, is a --
17 to my understanding, it's a paper that measures
18 private insurance prices for some population of
19 patients that's aggregated and compares that with
20 Medicare prices.  So certainly you could do better
21 than that.
22       There are data on private insurance prices
23 that are incomplete.  So, you know, they're
24 incomplete.  They -- they -- they leave out
25 populations of patients.  They're only in certain

1 settings.
2       They may or may not have geographic
3 identifiers.  And if you have geographic
4 identifiers, then you could come up with something
5 that is more, in your words, local to a geography.
6 But geography is not the only variation that we need
7 to account for.
8    Q.  When you say certainly you can do better
9 than that, what -- in your last answer, what do you
10 mean by that and how much better could you do?
11    A.  What I mean is that in Dr. Song's
12 methodology he's using a ratio from a paper that is
13 not published for this purpose.  It's some average
14 ratio in some population of patients that is almost
15 certainly different than the population of patients
16 that we care about in this class.  And it's a single
17 ratio.
18       And if you wanted to get more granular,
19 you could look at different locations, if there are
20 geographic identifiers.  And that's what I mean by
21 you could do better.  If you wanted to have
22 something that accounted for geographic variation in
23 the ratios, you could use local prices from -- and
24 private insurance, but those prices would omit, you
25 know, classes of patients that I just mentioned and

1 so they wouldn't -- there would be shortcomings
2 there.
3       So -- so there -- there are different
4 dimensions in which prices vary.  Geography is one
5 of them.  And there are others that you might
6 actually be worse.  If you're focusing on, say,
7 Optum data, Optum data are only from a certain class
8 of private insurers.  So you might do worse if you
9 focus only on Optum data.
10    Q.  What would those shortcomings be?  Could
11 you quantify how big they would be?  How big -- how
12 big would we be from the truth?  Like, how far off?
13    A.  I can tell you that there's big variation.
14 If there's big variation that the potential
15 shortcomings could be as large as the variation.
16    Q.  Do you know how -- have you quantified how
17 large the variation could be?
18    A.  It's possible that the variation could be
19 as large as 400 percent.
20    Q.  What is the basis for that opinion?
21    A.  The basis of that opinion is that there's
22 variation between the 5th and the 95th percentile in
23 prices that is as large as 400 percent and if you
24 have a class that is the size that's small enough,
25 say, 5 percent of the population, then you could

1 have very unfortunate variation where it's -- you
2 get your 400 percent off.
3    Q.  Isn't it fair to say that most people
4 reside in the center of the histogram and not at the
5 tail ends, at the 5 percent or the 95th percentile?
6    A.  It depends on the population.
7       MR. STOY:  I was going to object to the
8 form.
9       THE WITNESS:  It depends on the
10 population.  If you say do most doctors reside in
11 the center of the overall U.S. population in terms
12 of income, the answer would be no.  Most doctors
13 reside in the top 5 percent.
14 BY MR. MIGLIACCIO:
15    Q.  Right.  And I'm not asking about income
16 but I -- you know, I appreciate that.
17       I'm asking about, you know, healthcare
18 spending or healthcare prices that people -- that
19 would be paid for a person.
20    A.  I think healthcare spending exhibits some
21 of the same properties as income.  So there are big
22 kind of skewed -- they're -- they are not normally
23 distributed actually, the healthcare spending.
24 They're obviously all positives so they're not
25 normally distributed.  They could be log-normally

Page 198

1 distributed. So there is a possibility that you
2 have skewed distributions and you could have
3 outliers.
4      This is well known, that certain regions
5 in the U.S. spend way more than others. There
6 are -- there are -- for example, McAllen, Texas,
7 versus San Antonio, Texas. So there could be -- you
8 could actually have a small population that is in
9 the tails of the distribution. The tails can be
10 quite large.
11     Q.  Do you have any reason to believe that
12 people who ingested contaminated valsartan are not
13 in the middle of the population?
14     A.  I don't have any reason to believe that
15 they are in the middle of the population because by
16 definition they have -- you know, first of all, we
17 would have to look at where -- who's in the class.
18      I mean -- so if you just say people who
19 take valsartan versus people who don't take
20 valsartan, that's a little bit easier and then you
21 could say are they similar to the average
22 population. I think probably not. They have heart
23 failure. They have hypertension.
24      Are they similar to some population maybe,
25 like you would have to work on specifying that

Page 199

1 population, but it's not clear to me how you would
2 specify that population that they're similar to.
3     Q.  And -- but you have not done this analysis
4 to determine where a population of people who
5 consumed valsartan-containing drugs, contaminated
6 valsartan, where they would fall, right?
7     A.  Again, I'm not sure if it's feasible to do
8 this analysis if you want to account for private
9 insurance prices and so forth.
10     Q.  But to answer my question, you haven't
11 done it?
12     A.  I have done an analysis to show how
13 patients who take valsartan are different than
14 patients who don't take valsartan.
15      I haven't done an analysis to show what
16 would the average price be for patients who take
17 valsartan compared to patients who don't take
18 valsartan, but I don't think an analysis could be
19 done if you want to account for private insurance
20 prices.
21     Q.  Fair to say that you would have a reason
22 to assume that a -- that -- that our proposed class
23 would be in the middle because that's where most
24 people are, right? Most people -- isn't that --
25 isn't there the -- most people do just fall into the

Page 200

1 center of the histogram chart --
2     A.  It depends on --
3     Q.  -- even though --
4     A.  It depends on the population you're
5 talking about. If you're comparing two populations,
6 there's no guarantee that the most -- by -- it
7 depends on the distribution. It depends on whether
8 you're talking about one or two populations. In
9 this case, we're talking about two populations.
10      So you're asking whether most people in
11 one population falls in the center of another
12 population. There's no reason to believe that.
13     Q.  But there's also no reason to believe they
14 reside in the tail ends, right?
15     A.  I think there's something that
16 distinguishes the population that takes valsartan.
17 They have heart failure. They have hypertension.
18 There is something that distinguishes them. And
19 I -- I don't know if most of the population has
20 heart failure. Probably most of the population
21 doesn't have heart failure.
22     Q.  Does not. So you're saying --
23     A.  Does not.
24     Q.  -- you have -- you don't think -- but do
25 you -- do you think the majority of the population

Page 201

1 that takes valsartan has heart failure?
2     A.  I would need to look further into that.
3     Q.  You're not offering that opinion here?
4     A.  I'm not offering that opinion. I'm just
5 offering the opinion that there are obvious
6 differences between people that take valsartan and
7 people who don't.
8      Some of this is in my report that
9 describes the characteristics of people who take
10 valsartan versus people who don't take valsartan.
11     Q.  How would heart failure impact Medicare
12 costs for -- for the screening services that
13 Dr. Kaplan has detailed in his report?
14     A.  Right. So as I mentioned in my report,
15 heart failure or just medical comorbidities would
16 impact whether somebody is a candidate for screening
17 or whether somebody has preferences that would make
18 screening make sense.
19      Heart failure is a disease for whom most
20 adults have a relatively limited life expectancy if
21 they have it. And given that, that would impact the
22 decision for whether somebody should be screened for
23 cancer.
24     Q.  So it would impact -- and your opinion is
25 it impacts the decision of whether screening would

Page 202

1  need to be done, but it doesn't impact the price,
2  the cost for a fixed service, right?
3      A.  Oh, I see.  For your -- your price --
4      Q.  Yeah.
5      Q.  Your question's about price?
6      Q.  Correct.
7      A.  If you have heart failure, that could
8  certainly -- and you don't have Medicare, that could
9  certainly impact the type of insurance that you
10  have.  If you're a sick patient with heart failure
11  versus a healthy patient without heart failure, and
12  you're choosing between private insurance plans, you
13  would pick a different insurance plan if you have
14  heart failure, likely.
15      Q.  Assuming the person is on Medicare?
16      A.  Assuming the person is not on Medicare.
17      Q.  That's your assumption, the person is not
18  on Medicare?
19      A.  Correct.
20      Q.  Got it.
21      But I mean, as we looked at, the average
22  age for a valsartan -- somebody who takes valsartan
23  was 63, right, that was with that -- that 63.3, and
24  the age of Medicare is 65, right?
25      A.  Right.  The -- the age --

Page 203

1      Q.  Eligibility.
2      A.  -- of Medicare eligibility is 65.  If the
3  average age is -- again, I think you asked this
4  question before.
5      If I know the average age is 63, can I say
6  that the majority of patients on valsartan is on
7  Medicare?  And I think I said that I wouldn't be
8  able to automatically reach that conclusion.  It
9  could be -- because you would need to know the
10  entire distribution.
11      Like, for example, if the distribution is
12  a normal distribution, and half the people are above
13  63 and half the people are below 63, you could have
14  close to half of the people not being on Medicare.
15  It all depends on the shape of the distribution, not
16  just the average of the distribution.
17      Q.  If -- if you take away the cost sharing
18  issue that we talked about at some length, right,
19  the fact that somebody may have heart failure or a
20  comorbidity shouldn't impact the cost for a fixed
21  service, right?
22      MR. STOY:  Object to the form.
23      THE WITNESS:  For -- I --
24  BY MR. MIGLIACCIO:
25      Q.  For a screening service.  I'm sorry to

Page 204

1  interrupt you.
2      A.  I think what I was saying earlier is that
3  patients may choose different insurance plans and
4  different insurance plans may have different prices.
5      Q.  And you -- have you done that analysis
6  here to determine what that -- what that
7  differential might be?
8      A.  For MGH in particular, I show that the
9  differential could be quite a bit.
10      Q.  Have you done it for any other hospital
11  system?
12      A.  No, but I think MGH is quite illustrative.
13      Q.  I want to show you some of your -- I think
14  some of your papers.
15      MR. STOY:  Hey, Nick, would this --
16      MR. MIGLIACCIO:  Yeah.
17      MR. STOY:  Would this be a good time to
18  take ten?
19      MR. MIGLIACCIO:  Sure.  Yeah, we can do
20  that.
21      THE VIDEOGRAPHER:  Okay.  We're off the
22  record.  The time is 1:41 p.m. Pacific time.
23      (Whereupon, a brief recess was taken.)
24      THE VIDEOGRAPHER:  We are back on the
25  record.  The time is 1:57 p.m. Pacific time.

Page 205

1  BY MR. MIGLIACCIO:
2      Q.  All right.  Dr. Chan, I want to ask you a
3  few questions about some of your own academic
4  publications.  And I'm going to move into the
5  exhibit -- the file of paper that you have submitted
6  to the New England Journal of Medicine.
7      Here we go.  I can do it.  All right.  I
8  thought I got -- was getting the hang of this.
9  Okay.
10      MR. MIGLIACCIO:  It will be Exhibit 5.
11      (Whereupon, Chan Exhibit 5 was marked for
12  identification.)
13      MR. MIGLIACCIO:  And it is a New England
14  Journal of Medicine document.
15      Q.  Let me know when you have a chance to see
16  it.
17      A.  It's open.
18      Q.  Okay.  Great.
19      So is it -- is it fair to say that you
20  have asserted in your own work the importance of a
21  common methodology when it comes to the pricing of
22  medical services?
23      MR. STOY:  Object to the form.
24      THE WITNESS:  Is there a -- part of this
25  article you'd like to draw my attention to?

Page 206

BY MR. MIGLIACCIO:

Q.  I'm asking you generally.  I mean, it's --
it's a nine-page article.  I'll ask you some
specifics, but I -- that's a general question.

A.  Can you ask that again?

Q.  Sure.
Is it fair to say that you have asserted
in your own work the importance of a common
methodology when it comes to the pricing of medical
services?

MR. STOY:  Object to the form.

THE WITNESS:  I'm not sure.  I...

BY MR. MIGLIACCIO:

Q.  In this paper, you discuss using median --
median time values in defining benchmarks versus
mean values.
Do you see that in the Discussion section?

A.  Uh-huh.

Q.  Then you go on to say that you use medians
as an alternative, right?

A.  Uh-huh.

Q.  And you write "average" or "on average"
roughly nine times in -- in this study, right?
I mean, you can look for it.

A.  Right, yep, 9 percent.  Is that right?

Page 207

Q.  No.  I said you used the word "average" --

A.  Oh.

Q.  -- throughout and -- throughout the --

A.  Oh, okay.

Q.  -- paper.

A.  Yeah.  I think -- yeah, go ahead.  Sorry.

Q.  Yeah.  And I do see that you -- that --
that 9 percent, is that the average that you --
you've reached ultimately?

A.  No, actually, that paragraph is an example
where...

Q.  I'm sorry, were you finishing --

A.  No, I'm -- I'm reading it.

Q.  Okay.

A.  Sorry.

Q.  Please, no, go ahead.  I didn't mean to --
don't mean to interrupt your reading.

A.  Yeah, I think that discussion is just
saying that there are different ways of -- different
moments in a distribution to consider.  Mean is one,
or average.  And the other one is median.  And they
just tell you different things.

Q.  Would you say this emphasis of averaging,
the importance of averaging across data points, is
it -- is it important in your research?  Do you do

Page 208

A.  I think this is similar to our previous
discussion about the use of averages in research.
It -- it's important to use the right averages.
In this case, you know, this is not a
paper just comparing one average with another
average.  It's a paper that is comparing the average
for a given procedure in a survey with an average in
a nationally representative data source that --
or -- sorry.
It's -- it's an average in a data source
that measures the time of how long this surgery
takes, called NSQIP, and we are asking whether these
two averages match up.  And this is actually a
research finding.  It's not -- it's not -- we're
actually asking whether the two averages for a given
procedure match up.  It's not -- it's not
predetermined that they would match up.
So it's -- it's kind of like -- it's a --
it's a -- it's a research inquiry to ask whether
using this average is representative of another
average.  And in this case, these two measures do
closely follow each other, but it's not a foregone
conclusion that they would.

Q.  But it's fair to say that, you know,

Page 209

whether -- whether it was right or wrong, right,
whether -- whether the -- whether they matched or
they didn't, it's a common methodology to average,
right?  You used a common methodology, a methodology
of averaging to determine if they -- if they would
match the national average, right?

MR. STOY:  Object to the form.

THE WITNESS:  I don't know what you mean
by common method -- I mean, I don't...

BY MR. MIGLIACCIO:

Q.  You used the methodology of averaging,
right?

A.  Not really.  I don't think that's what
we're doing here.

Q.  I thought you just told me that you were
determining -- you were looking at something
national versus another dataset --

A.  Uh-huh.

Q.  -- and to see if -- if they matched on
average?

A.  We were asking whether average times for a
given procedure matched average survey responses.
This is a research question.  It's not a common
methodology per se.  I'm not sure what you mean by
"common methodology."

Confidential Information Subject to Protective Order

Page 210

1    Q.  Well, you used -- I mean, you -- you did
2  these calculations to see if -- if -- if they would
3  match, right, that's what you did?
4    A.  That's maybe in one exhibit in this --
5  okay.  There are several exhibits in this -- in this
6  paper.
7        Exhibit 1, Figure 1, asks whether -- this
8  is kind of -- it's kind of most directly related to
9  what you're saying, which is the -- whether the
10 average time that we observe in one dataset matches
11 the average survey in another -- a survey response
12 for the time in another dataset.
13       Now, Figure 2 is doing something very
14 different, which is asking about discrepancy.
15 That's, you know -- and discrepancy that kind of
16 changes over time.  So that's not just comparing
17 averages.
18       Figure 3 is asking about the implications
19 of discrepancy on different surgical specialties
20 such as orthopedic surgery, urology, general
21 surgery, showing that these implications can be
22 large in terms of dollar terms.
23       For example, orthopedic surgery is paid
24 more than $150 million more than what it would get
25 if they had resorted to another measure.  And

Page 211

1  cardiothoracic surgery is paid about $125 million
2  less than it would have been paid if it kind of used
3  another measure.
4        And then Figure 4 is asking whether
5  discrepancies are kind of resolved with
6  re-evaluation.  So it's focusing on the
7  discrepancies.
8        So I don't think this paper, overall, is
9  only about comparing averages.  It's about -- it's
10 much more.
11   Q.  Got it.  I understand.
12       So -- and I appreciate that clarification.
13       But for -- for Figure 1, who did the
14 averaging work?  Was that something that you did or
15 your team did in -- in gathering -- in gathering the
16 dataset and averaging it?
17   A.  I don't know if I would characterize
18 Figure 1 as like a dataset of just doing averaging
19 work.  It's -- this work overall was done by me and
20 my research team.  Some of them are coauthors on
21 this paper.  Others are research assistants.
22   Q.  What was -- what did you do beyond just
23 averaging it?
24   A.  I would say that's just the first step.
25 We need a dataset with -- we chose these averages

Page 212

1  for this one particular exercise.  But as I said, we
2  also could do it in terms of medians instead of
3  averages.
4    Q.  Uh-huh.
5    A.  And in this exercise, it was a regression.
6  So after you have each individual observation, which
7  is a procedure, a surgical procedure is one
8  observation -- or a surgical procedure at a given
9  point in time is one observation.  We have many
10 observations of these.  Then we run a regression
11 that kind of fits a line on these points here.
12   Q.  When you say you could also use the
13 median, what did you do with respect to the median?
14   A.  So instead of using an average time from
15 the NSQIP data we could use the median time.  That's
16 just a different moment in the distribution.
17   Q.  Uh-huh.
18   A.  And so when we do that, I mention
19 discussion that we get a different result if we use
20 the median instead of the average.
21   Q.  Got it.
22       What was -- what's the difference?
23   A.  It's a 9 percent difference in this case.
24   Q.  Between the average and the median?
25   A.  Uh-huh.

Page 213

1    Q.  Got it.  Okay.
2        Who did that work in determining the
3  median information, was that you or --
4    A.  The same research team.
5    Q.  Got it.  Got it.
6        And that's a methodology that you -- that
7  you use frequently determining medians?
8    A.  Often.  Oftentimes the median is a better
9  measure.  If the distribution is skewed, you might
10 want to use the median instead of the average.
11   Q.  Got it.
12       Are there other measures other than median
13 and average that you use --
14   A.  Yes.
15   Q.  -- in analyzing datasets?
16   A.  Quantiles, like I -- like I mentioned in
17 the -- like I use in the report, there's like
18 95th percentile, 5th percentile.  There's a --
19 they're -- those are called quantiles.
20   Q.  Quantiles.
21   A.  And sometimes you kind of work with logs,
22 like log -- logarithmic transformation.  So you
23 might take a mean of the log instead of a -- just
24 the mean.  So you first take a log, logarithm, of
25 the value, then you take the mean.

Page 214

1  Q.  And you use that methodology as well in
2  your work as an economist, as a healthcare
3  economist?
4  A.  Yeah, I'm not sure if I'd call it a
5  methodology.  They're just different kind of ways
6  to -- ways to characterize distributions.
7  Obviously, the most comprehensive way is
8  just to show the entire distribution but you might
9  focus on various moments of the distribution.  You
10  can focus on quantiles and medians, on averages.
11  You might transform the distribution by first
12  applying a logarithm to it, then taking an average.
13  And that's quite different than just taking the
14  average of the underlying distribution.
15  So there are various kind of
16  transformations of the underlying data and there are
17  different ways to characterize distributions.
18  Q.  When you -- if you were to do that,
19  what -- what would -- what does it do to take the --
20  I think you said take a -- first apply a logarithm
21  to it and then take an average?
22  A.  Uh-huh.
23  Q.  What -- what -- can you explain that a
24  little bit more?
25  A.  Many distributions are skewed.  For

Page 215

1  example, income or spending, medical spending.  So
2  it would be quite fragile if you were to actually
3  take an average of the underlying distribution of
4  spending and it would be much more robust if you
5  took a logarithm.
6  What a logarithm does is it transforms a
7  variable that ranges from just above zero to a very
8  large number, to something that's much more well
9  behaved and symmetric -- potentially around zero, so
10  it transform -- it might transform something to a
11  more normal distribution.
12  And that's kind of -- earlier in my
13  deposition I mentioned something called a log-normal
14  distribution.
15  Q.  Uh-huh.
16  A.  That is something that only starts looking
17  like a normal distribution when you take a
18  logarithm.
19  Q.  Got it.
20  You used -- and used that methodology,
21  too, in -- in -- when you create averages?
22  A.  Yeah, again, I'm not sure if I would call
23  it methodology.  It's just a way of transforming --
24  it's -- it's a very basic mathematical operation to
25  transform data into something that more -- is more

Page 216

1  reliable.
2  Q.  Uh-huh.  Got it.  Got it.
3  Let me -- I want to show you something
4  else.  Bear with me.  Okay.
5  I just put in what we'll make as
6  Exhibit 6, which is your -- your national -- your
7  New England Journal of Medicine response letter.  It
8  should be coming up right quickly.
9  (Whereupon, Chan Exhibit 6 was marked for
10  identification.)
11  THE WITNESS:  Yes.
12  BY MR. MIGLIACCIO:
13  Q.  Let me know if you have that.
14  A.  I do.
15  Q.  Okay.  So this study received three formal
16  published critiques in the form of letters to the
17  editor, right?
18  A.  Uh-huh.
19  Q.  And you responded to those critiques,
20  correct?
21  A.  Yes.
22  Q.  Okay.  And I think -- is it fair to say
23  you acknowledged some limitations of the study
24  including some special cases where your methodology
25  was less applicable --

Page 217

1  A.  Uh-huh.
2  Q.  -- but you went on to defend the study by
3  arguing that, and I quote, "Our study goal was to
4  identify and characterize forms of inaccuracy in the
5  RUC's time estimates and develop a general approach
6  for obtaining better estimates.  The crux of that
7  approach is the use of large, longitudinal data
8  sources."
9  A.  Uh-huh.
10  Q.  And, "We welcome debate, reflection, and
11  refinements regarding the most appropriate data
12  sources and estimation techniques."
13  Did I read that correctly?
14  A.  Yes.
15  Q.  Is it fair to say that you were using
16  estimation techniques in your -- in -- in your
17  paper, in the underlying paper?
18  A.  Estimation techniques.
19  I'm just going to read this again.
20  Q.  Yeah, I want you to -- please take --
21  A.  Yeah.
22  Q.  Feel free.
23  A.  I believe this reply in the critiques are
24  almost entirely about multi-procedure -- cases where
25  more than one procedure is done at the same time; is

Page 218

1 that right? That's my interpretation of -- upon
2 re-reading the reply.
3 Q. Is it fair to say that you used estimation
4 techniques?
5 MR. STOY: Object to the form.
6 THE WITNESS: I'm not sure what you mean
7 by "estimation techniques."
8 BY MR. MIGLIACCIO:
9 Q. So I'm just going to read the last
10 sentence of your reply, which is, "We welcome
11 debate, reflection, and refinements regarding the
12 most appropriate data sources and estimation
13 techniques."
14 Do you see that?
15 A. Uh-huh.
16 Q. What did you mean by that?
17 A. I think I meant -- so the entire goal of
18 this -- this committee called the RUC, the relative
19 value scale update committee, is to form estimates
20 of certain things that are going to go into the
21 decision-making process of how much to price a
22 procedure for Medicare.
23 So they have a technique, which is to, you
24 know, use surveys and ask physicians how long they
25 spend on a given procedure. That's their estimation

Page 219

1 technique. And so this paper is about the accuracy
2 of their estimation technique and what's reflected
3 in another data source, in this case, the NSQIP.
4 So I'm not sure if I would say I use
5 estimation techniques or I'm commenting on how their
6 estimation technique compares with measures in
7 another data source.
8 Does that make sense?
9 Q. I -- I think so.
10 What -- what is the NSQIP?
11 A. This is the National Surgical Quality
12 Improvement Program data source that measures time
13 spent on various procedures.
14 Q. How does it do that?
15 A. That is a good question. I'm not
16 intimately knowledgeable about exactly all of the
17 mechanisms that are put in place. But it records
18 the time that a surgery -- a surgical procedure is
19 started and it records the time that the surgical
20 procedure is ended.
21 I would assume that this takes some type
22 of report by the surgeon in question to report the
23 starting and the ending time, and then once you have
24 those, you can -- you -- you measure the amount of
25 time a given procedure took. So here an estimation

Page 220

1 is about time.
2 Q. Uh-huh. Is it fair to say there's a --
3 there's variation in time that surgical procedures
4 take across different people --
5 A. Yes.
6 Q. -- of patient populations?
7 A. Yes.
8 Q. And what is the R -- the RUC? What --
9 what is the -- what is RUC seeking to do? What is
10 the purpose of RUC?
11 A. The purpose of the RUC is to make
12 recommendations to how Medicare might price services
13 in the Medicare physician fee schedule.
14 Q. Got it.
15 So there may be variations across patients
16 for patient populations that are reflected in NSQIP.
17 RUC seeks to price those services regardless of the
18 variations; is that fair?
19 A. Sometimes, you know, it might change.
20 This is -- you know, it's a good question. Like
21 sometimes, because things vary so much, you might
22 decide to have two different services instead of one
23 service.
24 Q. Uh-huh.
25 A. So it's --

Page 221

1 Q. But the same service, the same service,
2 same price, right?
3 A. But you could -- so how you define
4 services is completely -- it's a -- it's not set in
5 stone.
6 For example, colonoscopy has multiple
7 services associated with that, right, it's
8 colonoscopy with clipping. Sometimes you could,
9 like, define a service based on the patient that's
10 getting the service.
11 So when you say one service and it's very
12 different and there's only one price, that's not
13 entirely accurate because medical societies, the
14 AMA, you know, when they figure out how to design
15 CPT codes, they could actually specify different
16 services if those -- if that single service is
17 different enough in different cases.
18 Q. But there are certain codes, right, so --
19 so if you have -- and I understand that the service
20 could -- there might be different types of
21 colonoscopies. But let's talk about the one that --
22 I think you said colonoscopy with clipping, right?
23 That's one code, right?
24 A. I -- I would have to review the codes.
25 There -- there might be multiple codes.

Confidential Information Subject to Protective Order

---

Page 222

1    Q.  Okay.  Let's take -- let's hypothetically
2  take one, right, one code.  If that code is being
3  priced, the RUC seeks to -- to -- to impose a price
4  on that code regardless of whether there might be
5  variation of the time spent providing the service in
6  that particular code; is that fair?
7    A.  What I'm saying is that the American
8  Medical Association does not necessarily take that
9  as given.  The American Medical Association, which
10 houses both the RUC and the CPT committee, can
11 recommend that we have two different CPT codes and
12 not one CPT code.
13   Q.  Sure.  But in each CPT code there is one
14 price being paid; is that right?
15   A.  For a given CPT code in a given year and
16 given geography for a given type of provider,
17 Medicare pays one price.
18   Q.  Got it.
19       Regardless of the variation of the patient
20 population that receives that service or regardless
21 of whether the service might take longer in one
22 individual patient versus another?
23   A.  That I'm not a hundred percent sure.  I
24 know that there's a lot more nuance than even I am
25 aware of.

---

Page 223

1       For example, if Medicare is -- is paying a
2  teaching hospital or the hospital has like sicker
3  patients in a -- some type of disproportionate
4  service pool where the patients are underserved,
5  Medicare can still deviate from its fee schedule and
6  pay a higher price.  They can pay different prices,
7  even if...
8       So what I just told you is a very stylized
9  world where it's just the geography, the type of
10 provider, the year, and the service.  But largely
11 that's true for Medicare, but even -- even then,
12 there's a lot -- there's more nuance than I think
13 somebody who is steeped in Medicare would be able to
14 tell you.
15   Q.  When you say "largely that's true," you
16 know, what percentage -- you know, how true would
17 that be, you know, would you say 95 percent true,
18 99 percent true?  Do you have an estimate?
19   A.  I can't really give you a number right
20 now, no.
21   Q.  Does such a number exist somewhere?
22   A.  It should.  It should exist somewhere.
23 You can -- go ahead.
24   Q.  Sorry.
25   A.  I think you could do the analysis by

---

Page 224

1  looking at individual Medicare claims and asking to
2  what extent is the Medicare reimbursement fully
3  determined by the characteristics that I just told
4  you.
5    Q.  Is there a central -- is data kept on
6  deviation from the schedule?  Does that data exist?
7    A.  For Medicare?  Yes.
8    Q.  Uh-huh.  It does?
9    A.  Yes.
10   Q.  Okay.  And that data would be the data
11 that we would look at to determine, you know,
12 whether and what percentage there -- there may be a
13 deviation from the schedule on the whole?
14   A.  Right.  For -- for Medicare?  Yes.
15   Q.  Got it.
16       So for the Medicare prices, then, that we
17 just talked about, taking aside the deviation that
18 we don't -- haven't characterized, those prices are
19 knowable, right, depending on the geography, the
20 services provider -- you listed a few different
21 items, but those prices are knowable, right?
22       MR. STOY:  Object to the form.
23       THE WITNESS:  Aside from the deviations,
24 yeah.  For Medicare, yes.
25

---

Page 225

1  BY MR. MIGLIACCIO:
2    Q.  Got it.
3        Do you use Medicare data in your work?  Is
4  that -- is that information that you -- you use a
5  lot in your academic work?
6    A.  I use it to some extent.
7    Q.  What extent do you use it?
8    A.  It's hard for me to place a percentage on
9  it.  I would say nontrivial extent, probably not the
10 majority of my work.
11   Q.  What -- okay.
12       I'm going to show you another paper here.
13 Bear with me.
14       MR. MIGLIACCIO:  I'm going to name this
15 Exhibit 7.
16       (Whereupon, Chan Exhibit 7 was marked for
17 identification.)
18 BY MR. MIGLIACCIO:
19   Q.  And it is a paper that you published in --
20 let's see.  I'll tell you in a second.
21       That was published in -- can you see it
22 now -- Quarterly Journal of Economics?
23   A.  Uh-huh.
24   Q.  Okay.  Great.
25       I'll give you a chance to look at that.

---

Page 226

1    A.  Yep.
2    Q.  Okay.
3    A.  Uh-huh.
4    Q.  Okay.  This study, you focused on health
5  insurance prices, right?
6    A.  Study focuses on pricing recommendations
7  from the same company that I just described, the
8  RUC.
9    A.  Uh-huh.
10    A.  And it looks at Medicare prices.  It also
11  looks at private insurance prices.
12    Q.  Got it.
13      You use the term "average" eight times in
14  this paper.
15    A.  Uh-huh.
16    Q.  Is that right?
17    A.  I would need to check.  I don't have
18  any --
19    Q.  Yep.
20    A.  -- reason to dispute it.
21    Q.  Okay.
22    A.  Actually, I think --
23    Q.  More than that.
24    A.  It says 17 times.
25    Q.  Yeah, that's what I got, too.  Glad I'm

Page 227

1  wearing my reading glasses.  I can -- I can --
2    A.  Yeah.
3    Q.  I wasn't before.
4    A.  I say "median" twice.
5      I see -- say "standard deviation"
6  probably -- it's tucked with standardized so --
7  let's see.  There it is.  I say "standard deviation"
8  five times.
9      I say "variants" once.  "Covariants" once.
10  I say "variation" 32 times.
11    Q.  I see the standardized, too.  Let's --
12  let's look at that.
13      What did you do to standardize this in --
14  you said -- and I'm looking at Figure 3.  I think.
15    A.  Uh-huh.  Figure 3?
16    Q.  Yeah -- or actually, I'll look at where --
17  where you say on page -- I guess on page 1316.
18    A.  Uh-huh.
19    Q.  The bottom of the first paragraph,
20  "Finally, for interpretation, we standardize" -- and
21  I won't try to say that equation because I'll mess
22  it up -- "by subtracting the sample mean and
23  dividing by the sample standard deviation, and
24  denote this standardized measure."
25      What -- so tell us what you did with

Page 228

1  respect to standardizing.
2    A.  The standard -- the term "standardize"
3  means to do exactly that, you subtract the mean and
4  you divide by the standard deviation.  The mean is
5  the first moment and the standard deviation's the
6  second.  It's the square root of the second moment.
7  And the second moment is a measure of variation.
8    Q.  I see.
9      So what -- what is the -- you were a math
10  major, right, I think I saw that in your resumé.
11    A.  Yes.
12    Q.  I could see how that would come in handy
13  once you move into economics.
14      What is the benefit of standardizing the
15  dataset that you -- that you standardized here?  Why
16  did you do it?
17    A.  The primary benefit is that you can
18  then -- you become -- you make the scale of the
19  variation the same between two different variables.
20  So you're standardizing -- if you divide it by the
21  standard deviation, it means that you're not going
22  to have one data -- one set of observations that --
23  values that range from, say, zero to, like, 8,000
24  and another one that ranges from, like, 0.5 to 3.5.
25      Like it's -- when you standardize

Page 229

1  something, you make the distributions comparable by
2  having standard deviation by definition being zero.
3  If you divide by the standard deviation, the
4  distribution of the standardized variable is going
5  to have a standard deviation of one and a mean of
6  zero.  So you don't have to worry about what's
7  called the location of the variable, which is the
8  mean, and the variants of the variable because it's
9  all standardized to zero and 1.
10    Q.  Got it.
11      What was the dataset here that you were
12  working with?
13    A.  This one -- the thing that I'm
14  standardizing is quite an involved variable, which
15  is -- it's described in equation 4 there -- where
16  it's quite involved.
17      What I would need to know to do that, to
18  calculate that, is this -- first you would need to
19  know this little A -- okay.  So in order to -- to
20  know this you'd have to go to equation 3, which
21  tells you what this little A thing is.
22      This little A thing is -- okay.  And we're
23  actually having to go to equation 2.  I think.
24    Q.  Yeah, yeah, yeah.  And I have to go back
25  to -- yeah, yeah.  Okay.

Page 230

1    A.  Okay.  So I don't want to waste your time
2  here because it's going to be quite involved and I'm
3  not sure it's related to --
4    Q.  Yeah, yeah, let me -- let me try to -- let
5  me try to reframe my question.
6        When -- the dataset that you were working
7  with -- I think you say you -- you had three
8  datasets; is that right?  I'm -- I'm just trying to
9  see what -- what was the -- what were the datasets
10  that you were working with in this paper?
11    A.  Uh-huh.  Umm, I believe that it might be
12  in -- is that in the paper described?  There's a
13  Section III.A on page 1310 that talks about the data
14  that I'm using.
15    Q.  Yep.  Yep.  Three sources of data.
16    A.  Yeah.
17    Q.  RUC's liberations.  Yep.
18    A.  Yep.  So there -- there's -- roughly
19  speaking, I know each proposal -- this is about the
20  pricing decisions that the RUC makes, or the pricing
21  recommendations.
22        And so for each CPT code that gets priced,
23  I know who are the people that are on the proposal,
24  so it -- it's a political process in some ways where
25  if there's a CPT code that is done by cardiologists

Page 231

1  that needs to be priced, there will be a proposal
2  that's written by cardiologists and maybe having
3  other subspecialties or specialties on that
4  proposals.
5        So I'll know who are -- what are the
6  identity of the specialties on that proposal, what
7  are the identities of the specialties on this
8  committee called the RUC.  That's one dataset.
9        The other dataset is using Medicare
10  claims.
11        And I believe -- is there a third dataset
12  that is kind of using private sector prices.  So
13  that's not quite used in the equation that you
14  highlighted.  The equation that you highlighted uses
15  the first two datasets.
16    Q.  Got it.
17        But it sounds like -- I mean, you -- you
18  have created some averages.  You've used some
19  standard -- you've standardized certain datasets.
20        What other -- what other techniques did
21  you use with this data?
22    A.  Yeah, I mean, so there are several, right.
23  There's --
24    Q.  Yeah.
25    A.  If you look at equation 2, it's -- it's

Page 232

1  creating a share.  It's -- it's summing up a number
2  of quantities and dividing -- so there's a numerator
3  which is part of the denominator so this is creating
4  a fraction.  And when you have the fractions, I'm
5  creating a vector of fractions that's sum for one.
6  That's equation 3.
7        I'm calculating the Euclidean distance,
8  which is the -- kind of the sum of squares and you
9  take the square root of that and then once you have
10  that, then I'm taking the maximum operator in
11  equation 4 and then I'm taking an average of that.
12        So an average does play a role in this but
13  it's not the only operation that I'm doing here.
14    Q.  Right.  Right.
15        I mean, would you agree with me that --
16  that you do use averages to arrive at a measure of
17  central tendency in -- in your -- in your work?
18        MR. STOY:  Object to the form.
19        THE WITNESS:  Averages have a role here.
20  But as I said earlier in the deposition, it really
21  matters that you get the sample right.  If you take
22  an average of a different sample and try to apply
23  that to another sample, that would be invalid.
24        What I'm doing here is I'm describing --
25  I'm not trying to say that this is a representative

Page 233

1  of some other sample that is not the same.  I'm just
2  describing the sample that I have.  It's just a
3  descriptive thing.  I'm not saying that this should
4  apply for something out of sample.  This is just a
5  description of the sample that I'm talking about.
6  BY MR. MIGLIACCIO:
7    Q.  Is it fair to say that the use of averages
8  to make sense of real world data and formulate
9  useful parameters for policy decisions is a central
10  tool of healthcare economics research?
11        MR. STOY:  Object to the form.
12        THE WITNESS:  Averages are useful but if
13  you don't use them correctly, you could reach very
14  misleading conclusions.
15  BY MR. MIGLIACCIO:
16    Q.  So in this case, in this study, by
17  definition, taking averages across datasets sets,
18  they don't represent all data points exactly, right?
19  An average doesn't represent every single data point
20  exactly, it's an average; is that correct?
21    A.  By definition when you're calculating
22  average you're losing information, yes.
23    Q.  That -- and that's the whole point of
24  using an average, right?
25    A.  The point of using an average is most

Page 234

1  often to describe the dataset that you have -- to
2  describe the data that you have at hand.  It becomes
3  dangerous when you use that to extrapolate to
4  another dataset that you don't have or to use -- to
5  extrapolate to another thing that you're interested
6  in that is different.  That's kind of the point that
7  I'm trying to make.
8      Q.  So I'm going to show you one more, one
9  more paper here.  Let's see.  This paper here --
10     A.  Oh.  Let me just -- oh.
11     Q.  Yeah, no, I'm -- I'm still -- I'm going to
12  ask you just a few more questions about this one.
13     A.  Oh, okay.  This is Exhibit 1 or Exhibit 7?
14     Q.  This is still -- this is the same exhibit
15  we were just looking at, so --
16     A.  I just left it.  Okay.  So it's Exhibit 7.
17     Q.  Exhibit 7, yes.  Yep, yep, yep.  Yep.
18         So this paper, is it --
19         (Whereupon, a brief discussion off the
20  record.)
21  BY MR. MIGLIACCIO:
22     Q.  Is it fair to say that this paper is
23  concordant with lots of other studies showing a
24  strong relationship between Medicare and commercial
25  prices?

Page 235

1         MR. STOY:  Object to the form.
2         MR. KUM:  Madam Court Reporter, can you
3  read the question back to me.
4         (Whereupon, the reporter read the record
5  as follows:
6         "Question:  Is it fair to say that this
7  paper is concordant with lots of other studies
8  showing a strong relationship between Medicare and
9  commercial prices?")
10        MR. KUM:  Thank you.
11        THE WITNESS:  So I think we have to be
12  precise about the relationship here.  The figure
13  that talks about this relationship is in -- is
14  Figure 7 on page 1338.
15        And what it shows there is that it shows
16  various kind of slopes here.  Which means that,
17  generally speaking, when you have a procedure that
18  has a higher price in Medicare, you're going to have
19  a procedure that has a higher price in private
20  insurance, okay.
21        But you can see that this slope differs
22  between different types of procedures.  That's kind
23  of the main point of this figure, is that when a
24  procedure is priced by the RUC versus not or when
25  the procedure is priced in a case where the RUC and

Page 236

1  the proposing specialty have higher affiliation
2  versus lower affiliation, you can see a big
3  difference in the slope here.  Which means that the
4  relationship depends on that.
5         Second, is that I think for the purpose of
6  this case, we care not about kind of changes on
7  changes or the slope.  We care about the levels.  We
8  care about if private insurance is, say, 50 percent
9  higher or 20 percent higher or, you know, 10 percent
10  higher than -- than Medicare.  So it's the exact
11  magnitude.
12        So even if we had something that was
13  exactly concordant, meaning if we increased the
14  price in Medicare by 5 percent, the private
15  insurance price would be increased by 5 percent.
16        The level matters a lot when we're coming
17  up with the price of the medical monitoring program
18  or the spending that would be involved in the
19  medical monitoring program because it could be
20  50 percent higher or it could be 20 percent higher
21  uniformly and that could be a big difference in how
22  much we decide to -- you know, how much we're saying
23  that the medical monitoring program has to -- is
24  going to cost.
25        So if you look at this graph on panel A,

Page 237

1  for example, the scale on the Y axis goes from zero
2  to negative 4 logs.  Whereas the scale on the X axis
3  goes from negative 6 to zero.  That's huge in terms
4  of log terms.
5         Usually, when you talk about -- it's hard
6  to kind of interpret exactly, but when something is
7  0.5 logs higher that means it's generally 50 percent
8  higher.  So if -- if you just look at the scale, the
9  scale tells you the private insurance is much more
10  generous than Medicare.  And it could vary by a lot.
11  BY MR. MIGLIACCIO:
12     Q.  Is it fair to say that in many situations,
13  notably when the RUV (verbatim) update committee,
14  the RUC, changes Medicare prices there is a
15  consistent and strong relationship between Medicare
16  prices and commercial insurer prices?
17     A.  I think it depends.
18     Q.  What does it depend on?
19     A.  In this figure, what I'm showing you is
20  that it depends on the -- whether it comes from the
21  RUC.  There are many price changes that don't come
22  from the RUC.  And whether the RUC prices comes
23  from, like, a proposal process where the proposers
24  are more affiliated or less affiliated to the RUC.
25  And that's just one dimension in which it depends.

Confidential Information Subject to Protective Order

---

Page 238

1   Q.  Would you say it's fair that this paper
2 supports the use of Medicare as a way to predict or
3 estimate commercial prices, which may be --
4   A.  No.
5   Q.  -- imperfect but does offer an important
6 methodology; in other words, if you know Medicare
7 prices, you could use the existing academic
8 literature to estimate where commercial prices might
9 fall?
10   A.  I think it would be -- go ahead.
11      MR. STOY:  Object.  Object to the form of
12 the question.
13      Go ahead.
14      THE WITNESS:  That's -- that's not -- it
15 would not be fair to say that.
16 BY MR. MIGLIACCIO:
17   Q.  Why not?
18   A.  It, again, depends on the purpose that
19 you're trying to use it for.  If the purpose is to
20 estimate the spending that you would have for a
21 medical monitoring program you might be 50 percent
22 off or you might be a hundred percent off.
23   Q.  I'm -- I'm not asking you about estimating
24 anything for a medical monitoring program.  I'm
25 asking you -- this is an academic paper, right, this

Page 239

1 wasn't published for a particular purpose.  I'm
2 asking if that's a fair reading of your conclusion.
3   A.  Can you restate -- a fair reading --
4 again?
5   Q.  Yeah.
6      Is it fair to say in many situations,
7 notably, when the RUC changes prices, there is a
8 consistent and strong relationship between Medicare
9 prices and commercial insurer prices?
10   A.  It's fair to say that when the RUC changes
11 prices, you will see changes in the same direction
12 in private insurance in general.  This is talking
13 about changes on changes, not levels of prices.  For
14 the medical monitoring program you would need levels
15 of prices, not just changes.
16   Q.  The RUC sets the prices, though, does it
17 not?
18   A.  It recommends prices in some cases.
19   Q.  Okay.  In some cases.
20      Didn't -- we just talked about that in
21 relation to your last paper, didn't we?
22   A.  Correct.
23   Q.  That it recommends prices and -- but
24 for deviation at times, which we haven't quantified,
25 those are the prices that are paid, right?

Page 240

1   A.  The RUC recommends prices, then the
2 federal government decides whether to implement the
3 RUC's recommendations.
4   Q.  Okay.  How often -- so the RUC -- the
5 federal government decides and then what happens
6 after -- if the federal government decides to
7 implement them, then what -- what happens next?
8   A.  Then it goes into the Medicare Physician
9 Fee Schedule.
10   Q.  Got it.  Got it.
11      Is it fair to say that your findings here
12 in this paper -- and I'm not asking you about the
13 medical monitoring at issue in this case -- but just
14 generally, you know, if the findings here provide
15 another data point to support the known relationship
16 between Medicare and commercial prices?
17      MR. STOY:  Objection.  Form and scope.
18      THE WITNESS:  Can you restate the question
19 again?
20 BY MR. MIGLIACCIO:
21   Q.  Yeah.
22      Is it fair to say that your findings here
23 in this paper generally provide another data point
24 to support the known relationship between Medicare
25 and commercial prices?

Page 241

1   A.  It's fair to say that this study supports
2 a relationship between Medicare and commercial
3 prices.
4   Q.  Have other people recognized that
5 relationship?
6   A.  Yes.
7   Q.  Okay.  Who -- who else has recognized that
8 relationship?
9   A.  In the economic literature, I think the
10 paper that most people would cite to you is Clemens
11 and Gottlieb, which I believe I cite in this paper.
12   Q.  Uh-huh.  Tell me about that paper.  Was
13 that peer-reviewed?
14   A.  Yes.
15   Q.  Was this -- was this paper peer-reviewed?
16   A.  Yes.
17   Q.  Is the Clemens and Gottlieb paper known to
18 be reliable?
19   A.  You know, again, it depends on reliable
20 for what?
21   Q.  For the conclusion that there is a
22 relationship, a known relationship between Medicare
23 and commercial prices?
24   A.  Yes.
25   Q.  Okay.  And your paper here, is it reliable

Confidential Information Subject to Protective Order

Page 242

1  for that conclusion as well?
2      A.  My paper here is kind of -- adds
3  additional interpretation to that relationship.
4      Q.  And is it reliable for that additional
5  interpretation?
6      A.  I believe so.
7      Q.  Who is Michael J. Dickstein?
8      A.  He is a professor at NYU.
9      Q.  And you were coauthors on this paper?
10     A.  Correct.
11     Q.  Did you receive any comments on it or that
12 you responded to?  Was there any further
13 correspondence with respect to it?
14     A.  In the same way that the --
15         (Technical difficulties.)
16         (Whereupon a brief discussion off the
17 record.)
18         THE WITNESS:  Okay.  I asked, in the same
19 way that the New England Journal paper had
20 correspondence?
21 BY MR. MIGLIACCIO:
22     Q.  Yeah.
23     A.  No.
24     Q.  Okay.
25         MR. MIGLIACCIO:  Why don't we -- I don't

Page 243

1  know how long we've been going but why don't we take
2  a quick five-minute break and go off the record.
3         THE VIDEOGRAPHER:  Okay.  We're off the
4  record at 2:51 p.m. Pacific time.
5         (Whereupon, a brief recess was taken.)
6         THE VIDEOGRAPHER:  We are back on the
7  record at 3:03 p.m. Pacific time.
8  BY MR. MIGLIACCIO:
9      Q.  Okay.  All right.
10         Dr. Chan, just a few more questions before
11 I pass it to my colleague.  Really about the
12 creation of your report.
13         Did you personally write the whole report?
14     A.  I'm not sure what you mean by "personally
15 write," but yes, I did.  I -- I wrote the -- the
16 entire report is mine, and I wrote the report.
17     Q.  And with respect to the individuals that
18 helped you, did you screen them or vet them in any
19 fashion before you used their work?
20     A.  I have a working relationship with
21 Analysis Group, and I did get to work with the
22 people that I mentioned on the call to a pretty
23 close extent.  And I was able to evaluate the
24 quality of their work throughout as I prepared this
25 report.

Page 244

1      Q.  Did you ever meet with any of them?
2      A.  And what do you mean by "meet"?
3      Q.  Like in person.  I assume the answer would
4  be no, but I'm just curious.
5      A.  Yes, the answer is -- is no.  It was all
6  remote, by Zoom, by telephone.
7      Q.  Did you vet the data that -- that was
8  provided to you?  How -- you know, how did you
9  determine that the data that was provided to you was
10 accurate?
11     A.  I did take a look at the data.  I took a
12 look at the code that was used to produce the -- so
13 the -- basically the analytical process, which is
14 the raw data, the code, and the outputs and whether
15 the -- the outputs were consistent with my clinical
16 expertise and my knowledge of health policy.
17         So I evaluated the entire analytical
18 process from being aware of how the raw data looked
19 like, being aware of the analyses that were used to
20 process the data, and the outputs.
21     Q.  Did you -- have you been paid yet for --
22 for your time?
23     A.  I'm not sure if I've been paid for the
24 invoice that I submitted in January -- or, sorry,
25 for December.  That would be the only time that it

Page 245

1  would be paid because I have not submitted invoices
2  for January or February.
3      Q.  All right.  When you do get paid, do you
4  get paid your rate plus the attribution at the same
5  time?
6      A.  It's not always the same time.  I think
7  it's usually separate, if I -- if I remember
8  correctly.
9      Q.  How's -- how is it separate?
10     A.  I believe there are -- there's payment for
11 my time.
12     Q.  Uh-huh.
13     A.  As a deposit or a check.  I think in this
14 case, it's a deposit.  And there is a separate
15 payment for the attribution.
16     Q.  Got it.
17         And -- but are those made like
18 contemporaneously, is I guess what I'm asking?
19     A.  Not necessarily.  I think usually not.
20     Q.  How -- do you know when you would be paid
21 for the attribution?
22     A.  Not really.  It's kind of random.  I don't
23 quite understand the -- when the payments get made.
24     Q.  You get them at some point after you get
25 the -- your payments?

Confidential Information Subject to Protective Order

Page 246

1    A.  Potentially.  It's not always after.  I
2 don't understand the timing.
3    Q.  Got it.  Okay.
4       MR. MIGLIACCIO:  Well, look, I thank you,
5 you know, for your time, and I want to pass the
6 question -- questions over to Layne.
7       THE WITNESS:  Thank you very much.  Thank
8 you.
9             EXAMINATION
10 BY MS. HILTON:
11    Q.  Good afternoon, Doctor.  My name is Layne
12 Hilton and I am an attorney for the plaintiffs and
13 I'm going to be asking you about the portions of
14 your report that pertain to Dr. Conti's analysis.
15       Do you have an understanding of what the
16 term "medical benefit" means?
17    A.  I have an understanding of what it means
18 to me.  I'm not sure if it's a technical term, but
19 it -- to me it -- I do have an interpretation of
20 that term.
21    Q.  If I were to use the term "medical
22 benefit" to describe the activities of a commercial
23 health insurance plan that pertain to things like
24 doctors' appointments and tests and other sorts
25 of -- you know, all of the things that you basically

Page 247

1 have been discussing with my colleague all day,
2 would that be accurate that all of those activities
3 would fall under something called a medical benefit
4 of a commercial health insurance?
5    A.  So you're referring to benefits of a
6 commercial -- of a -- of a health insurance plan; is
7 that right?
8    Q.  Yes, I am.
9    A.  Okay.  That makes sense.
10    Q.  And -- so would you understand all of
11 those activities that you have been discussing all
12 day to be activities that fall under the medical
13 benefit of a commercial health insurance plan?
14    A.  Correct.
15    Q.  What is your understanding, then, of the
16 pharmacy benefit associated with a commercial health
17 insurance plan?
18    A.  So whereas medical benefit reimburses
19 care -- medical care, including such as office
20 visits or other medical services that are provided,
21 a pharmacy benefit would reimburse the cost of
22 drugs.
23    Q.  Now, I understand from your discussions
24 earlier today that you have provided expert
25 testimony in a variety of cases.  I'm going to ask

Page 248

1 you, without you having to specify which cases, if
2 in any of your previous expert testimony you
3 provided testimony about the pharmacy benefit.
4    A.  Yes.
5    Q.  And what aspects of the pharmacy benefit
6 have you previously testified about?
7    A.  I'm not sure what I can disclose other
8 than that I have testified on the structure of
9 pharmacy benefits in the healthcare landscape.
10    Q.  And are you -- are you referring to the
11 tiering structure of formularies?
12    A.  That's part of it.
13    Q.  Have you previously testified about the
14 pharmacy benefit as it relates to generic drugs?
15    A.  Some of my previous testimony does bear on
16 generics.
17    Q.  What aspects of the generic drug pharmacy
18 benefit have you previously testified about?
19    A.  I'm not sure if I could specify other than
20 that generic drugs are covered under pharmacy
21 benefits.  Sometimes pharmacy benefits will favor
22 one drug or another.  Cost considerations and
23 efficacy are some considerations.
24    Q.  Have you ever previously provided
25 testimony about the economic value of certain

Page 249

1 generic prescription drugs to consumers?
2    A.  No.
3    Q.  Have you ever previously testified about
4 the economic value of certain generic prescription
5 drugs to third party payors?
6    A.  I haven't testified on that, no.
7    Q.  Have you ever provided any testimony about
8 the costs of generic prescription drugs paid by
9 consumers at the pharmacy point of sale?
10    A.  I have not testified on that.
11    Q.  Have you ever previously testified about
12 the costs of generic prescription drugs paid by
13 third party payors at the pharmacy point of sale?
14    A.  I'm not sure.
15    Q.  Have you ever provided any testimony about
16 the generic drug approval process?
17    A.  Not directly.  It may have been touched
18 upon in the context of discussing generic drugs.
19    Q.  Have you ever provided any direct
20 testimony about the food and drug cosmetics act?
21    A.  No.
22    Q.  Have you ever provided any direct
23 testimony about the Drug Supply Chain Security Act?
24    A.  No.
25    Q.  In your academic life, as it were, have

Confidential Information Subject to Protective Order

Page 250

1  you ever conducted any research on the food and drug
2  cosmetics act?
3      A.  No.
4      Q.  Have you ever conducted any research on
5  the Drug Supply Chain Security Act?
6      A.  No.
7      Q.  Have you ever worked on any FDA task
8  forces related to the approval and regulation of
9  generic prescription drug products?
10     A.  No.
11     Q.  Have you ever worked as an advisor to the
12 FDA's Office of Generic Drugs?
13     A.  Not in that office, no.
14     Q.  Which office with the FDA have you worked
15 for?
16     A.  I believe that is in -- on my CV.  Under
17 Other Professional Positions on page A-2.
18     Q.  Yes, I see it.
19        It looks like you worked for the Center
20 for Devices and Radiological Health?
21     A.  Yes.
22     Q.  And also, you worked in the -- as the --
23 in the White House Office of Science and Technology
24 Policy; is that right?
25     A.  In the office of planning and analysis at

Page 251

1  the Center for Drug Evaluation and Research.
2      Q.  Great.
3         In the context of your work as a staff
4  fellow with the office of planning and analysis for
5  CDER, as I will shorten it to get us through this,
6  what -- what sort of activities did you engage in?
7      A.  In various policy analyses I worked with a
8  group of economists, mostly, who were in this
9  office.  I -- some of the issues that we analyzed
10 were ways to surveil for potential drug side effects
11 and potential safety -- kind of prescription drug
12 safety programs to -- to ensure that the drugs were
13 being safely used.
14     Q.  Did any of this work relate to potentially
15 counterfeit or illegitimate drugs?
16     A.  No.
17     Q.  Did any of this work with the FDA relate
18 to potentially adulterated or misbranded drugs?
19     A.  No.
20     Q.  Throughout your report, you use the term
21 "affected valsartan."
22        In your own words, how do you define
23 "affected valsartan"?
24     A.  I believe that's in paragraph 11 of my
25 report, "valsartan products that were recalled due

Page 252

1  to possible nitrosamine impurity."
2      Q.  So your term "affected valsartan" only
3  relates to the valsartan products which were
4  recalled; is that right?
5      A.  Which were eventually recalled, I believe.
6  I think that any valsartan -- valsartan that had the
7  possibility of a nitrosamine impurity -- again, I'm
8  not a -- I haven't read so much on the -- on the
9  exact sequence of events here, but I believe that
10 valsartan products that had the potential for
11 nitrosamine impurities were eventually recalled.
12     Q.  Are you aware that there were valsartan
13 products manufactured by the defendants in this
14 litigation that had expired by the time of the
15 recall and therefore were not part of the scope of
16 the recall?
17     A.  I'm not aware of that.  That wasn't
18 something that I looked into in great detail.
19     Q.  So your report makes no opinion or takes
20 no opinion about products manufactured by the
21 defendants which were expired and never recalled by
22 the FDA; is that right?
23        MR. STOY:  Object to the form.
24 Mischaracterizes testimony.
25        THE WITNESS:  Can you say that again?

Page 253

1  BY MS. HILTON:
2      Q.  Sure.  It's a confusing question.
3         Does -- do you -- do you have any opinion
4  about valsartan products that were manufactured by
5  the defendants but which expired before the FDA's
6  recall?
7      A.  Were these products ever used by patients?
8      Q.  They were.
9      A.  What do you mean by "expired"?  So they
10 were -- they -- they were expired in the patients'
11 hands or they were prescribed to patients after they
12 had expired?
13     Q.  So as I understand it, for some period of
14 time between 2012 and let's call it 2016 or 2017,
15 there were many valsartan products that bore unique
16 NDC codes that were dispensed to patients at the
17 point of sale that were manufactured by the
18 defendants in this litigation.
19        At the time of the FDA recall, many of
20 these products had expired and had already been
21 consumed by the patients and therefore, were not
22 within the scope of the FDA's recall list.
23        And so my question is -- you know, and
24 perhaps I can ask it a different way.
25        Did you expand your analysis to include

Page 254

1 those products which were not a part of the FDA's
2 recall list but were nevertheless manufactured by
3 the defendants, you know, from 2012 until 2018?
4      A.  So these include drugs that were actually
5 consumed by consumers before the recall, before it
6 was known that nitrosamine -- before that -- before
7 nitrosamine impurities were known; is that right?
8      Q.  Correct.
9      A.  I believe I do consider those drugs.
10      Q.  And how did you identify the NDC codes
11 associated with those drugs?
12      A.  I believe the NDC codes are linked to the
13 manufacturer of the drugs.  So we would look for
14 valsartan -- we have a list of -- in my report I
15 believe I do describe how we identified the NDC
16 codes.
17      So for -- this is kind of looking at
18 footnote 23.
19      It says, "For my analyses in this report,
20 I used the list of NDC's identified as recalled on
21 the FDA's website to determine 'affected valsartan'
22 products."
23      So these are -- this is something I'll
24 have to think about whether the NDC codes -- so the
25 NDC codes are specific for a manufacturer of a -- of

Page 255

1 this -- of this -- a manufacturer and a molecule
2 and -- so these are drugs that were eventually
3 recalled but even -- but these NDC codes would have
4 existed before the recall.
5      Q.  Correct.  And -- and this was actually an
6 attachment to Dr. Conti's report.  I was -- I guess
7 I was trying to determine if you used the same NDC
8 list that was used by Dr. Conti in her report or if
9 you used a different list.  It looks here like
10 instead you used the FDA recall list; is that right?
11      A.  To the best of my understanding right now,
12 yes, but we could check the two lists to -- to -- to
13 figure out whether they're the same or how they
14 differ.
15      Q.  Thank you.
16      For the purposes of your report related to
17 Dr. Conti, did counsel ask you to make any
18 assumptions in drafting this report?
19      A.  Not to my knowledge.
20      Q.  So counsel did not ask you to assume that
21 the affected valsartan was considered adulterated by
22 the FDA?
23      MR. STOY:  Object to the form.  Calls for
24 a legal conclusion.
25      THE WITNESS:  I'm not sure if that

Page 256

1 assumption is required.  I know I considered that
2 possibility, that affected valsartan contained
3 nitrosamine impurities and that there is even a
4 possibility of cancer risk due to these impurities.
5 BY MR. MIGLIACCIO:
6      Q.  So you assume that the affected valsartan
7 contains nitrosamine impurities and that there was a
8 possible cancer risk due to those impurities?
9      MR. STOY:  Objection.  Mischaracterizes
10 his testimony.
11      THE WITNESS:  I considered the possibility
12 that affected valsartan contained nitrosamine
13 impurities that could increase the risk of cancer
14 for some patients.
15 BY MR. MIGLIACCIO:
16      Q.  You didn't assume that the affected
17 valsartan was considered adulterated by the FDA?
18      MR. STOY:  Asked -- asked and answered.
19      THE WITNESS:  Can you restate that
20 question?
21 BY MS. HILTON:
22      Q.  I'll ask it a little bit more clearly.
23      Did you assume that the affected valsartan
24 was considered adulterated by the FDA?
25      MR. STOY:  Objection.  Asked and answered.

Page 257

1      THE WITNESS:  I did consider -- you can
2 see in my report that the FDA -- the actions of
3 FDA are considered in my report but they're not
4 central to my opinion of the value of valsartan.
5 BY MS. HILTON:
6      Q.  And looking at your report, you actually
7 never use the term "adulterated"; is that fair to
8 say?
9      A.  I believe I have -- I don't use that term.
10 I say valsartan with impurities.  I am not an expert
11 to tell the difference between the term of
12 "impurity" versus "adulterated."
13      Q.  So you're not providing any expert
14 testimony about adulteration generally; is that fair
15 to say?
16      A.  Adulteration versus impurity, I don't know
17 any difference between the words.
18      Q.  For the purposes of your report, did you
19 assume that the affected valsartan was manufactured
20 in compliance with all regulations, including
21 Current Good Manufacturing Practices?
22      A.  Can you ask that question again?
23      Q.  Sure.
24      For the purposes of your report, did you
25 assume that the affected valsartan was manufactured

Confidential Information Subject to Protective Order

Page 258

1 in compliance with all regulations, including
2 Current Good Manufacturing Practices?
3     A.  I don't think so.  And I don't think that
4 assumption is necessary for my opinions.
5     Q.  Why don't you think that assumption was
6 necessary for your analysis of Dr. Conti's report?
7     A.  Because for the claim of worth -- the
8 worth of valsartan, I am considering what does that
9 valsartan do.  I -- I'm considering the benefits of
10 valsartan in terms of blood pressure control and in
11 terms of treating heart failure.  And I'm
12 considering the possibility of a cancer risk.
13         Whether the valsartan was manufactured in
14 a certain way and whether it met certain
15 regulations, whether supply was allowed by the FDA
16 or not, that is not something that I considered
17 relevant for the assessment of worth.
18     Q.  You are aware, however, that Dr. Conti's
19 value and opinion about the value of the affected
20 valsartan hinges upon the fact that the valsartan
21 was considered adulterated because it was
22 manufactured in a way that did not comply with
23 Current Good Manufacturing Practices, correct?
24     A.  I'm aware of her opinion on that, yes.
25     Q.  So no aspect of your particular report

Page 259

1 directly addresses that opinion; is that fair to
2 say?
3         MR. STOY:  Object to the form.
4         THE WITNESS:  I think it's fair to say
5 that I don't agree with that framework of assessing
6 value.
7 BY MS. HILTON:
8     Q.  Before we get into your proposed framework
9 of value, let's make sure that I understand the sort
10 of limitations of your opinion as it relates to the
11 economic value of the prescription drugs.
12         You're not offering any opinions about the
13 data sources used by Dr. Conti in her calculation of
14 damages, correct?
15     A.  I'm not commenting on the data sources
16 because my primary opinion is at odds with her
17 framework.
18     Q.  You're likewise not offering any opinions
19 on pharmacy benefit structures and the cost paid by
20 consumers or TPPs at the point of sale for the
21 affected valsartan that was dispensed at the
22 pharmacy, correct?
23     A.  Can you restate that?
24     Q.  Sure.
25         Are you offering -- I'll put it more

Page 260

1 affirmatively.
2         Are you offering any opinions about the
3 pharmacy benefit structures and the cost paid by
4 consumers or TPPs at the point of sale for affected
5 valsartan?
6     A.  That information is not central to my
7 opinion.  Although the idea of costs and revenues
8 and profits to various parties is something within
9 economic -- my economic expertise.
10     Q.  But you're not offering any of those
11 opinions in this report for this purpose today?
12     A.  Correct.
13     Q.  Right?
14     A.  Correct.
15     Q.  In your -- are you offering any opinions
16 on a drug manufacturer's obligation to comply with
17 Current Good Manufacturing Practices?
18     A.  No.
19     Q.  Are you offering any opinions on contracts
20 which may impact the amount paid for affected by --
21 for affected valsartan by any TPP?
22     A.  No.
23     Q.  I would like to talk to you about getting
24 into the context of a report which I believe was
25 previously marked as Exhibit 2.

Page 261

1     A.  Uh-huh.
2     Q.  I'd like to talk to you about
3 paragraph 133 of your report, if you'd like to flip
4 there.
5     A.  Okay.
6     Q.  And in this paragraph you are discussing
7 the -- let's call it supply and demand framework of
8 Dr. Conti's opinion.
9     A.  Uh-huh.
10     Q.  And you write, starting in the middle of
11 that paragraph, "The implementation of her approach
12 relies on faulty reasoning.  Dr. Conti asserts that
13 'according to economic theory, for a consumer
14 product to have economic value, demand for the
15 product must exist and supply must be allowed to
16 meet demand.'  However, the demand curve alone
17 speaks to a product's economic value and is based on
18 each patient's and TPP's willingness to pay for a
19 drug."
20         Do you see that?
21     A.  Yes.
22     Q.  And then to support that economic theory
23 you cite to a -- let's call it a -- a chapter or a
24 textbook or some sort of treatise; is that right?
25     A.  Yes.

Confidential Information Subject to Protective Order

Page 262

1    MS. HILTON:  I am going to mark for the
2  record --and which -- what exhibit are we on?
3    THE WITNESS:  7.
4    MS. HILTON:  Yeah.  Exhibit 8, I think.
5    THE WITNESS:  Okay.
6    MS. HILTON:  I am going to mark as
7  Exhibit 8 this citation footnote 252.
8    (Whereupon, Chan Exhibit 8 was marked for
9  identification.)
10 BY MS. HILTON:
11   Q.  Okay.  Let me know when you have Exhibit 8
12 up.
13   A.  Yep.
14   Q.  Can you tell me what particular section of
15 this chapter you were using to support your opinion
16 that the demand curve alone speaks to a
17 pharmaceutical product's economic value and is based
18 on a patient/TPP's willingness to pay for a drug?
19   A.  Okay.  So in these pages, there is no
20 supply curve.  What we call consumer surplus is very
21 closely related to the economic value.  Consumer
22 surplus is the demand curve that lies above the
23 price.
24   Q.  Do you -- does this particular chapter
25 relate to pharmaceutical drug products?

Page 263

1    A.  This is an economic -- an economics
2  textbook which is quite general when we talk about
3  demand curves and supply curves.  This particular
4  chapter uses a very -- it uses any -- it uses just a
5  random example of rock concert tickets but the focus
6  is not about rock concert tickets.
7    Q.  Does this chapter in the discussion of the
8  consumer surplus presuppose that all of the items
9  that are subject to this consumer surplus analysis
10 are items that can legally be on the market?
11   A.  There's no presupposition of that.
12   Q.  So this would relate to anything, even
13 products that are illegal to sell on the market?
14   A.  It could have been illegal rock concert
15 tickets or it could be --
16   Q.  I'm sorry.
17   A.  -- or -- go ahead.
18   Q.  No, continue.
19   A.  They could have been illegal tickets.
20   Q.  Where does it say that it -- that the
21 tickets could have been illegal?
22   A.  It doesn't say it in the text, but if you
23 were to ask any economist -- well, I guess maybe if
24 you were to many economists -- Dr. Conti's an
25 economist -- it does not presuppose the legality.

Page 264

1  That's irrelevant.  It's only relevant in so far as
2  it affects consumer surplus or the demand curve.  It
3  doesn't depend on a supply curve.
4    Q.  If we look at the second page of this
5  particular PDF, it says, "To calculate the aggregate
6  consumer surplus in a market," does that not
7  indicate that there must be the product on the
8  market?
9    A.  You can also talk about consumer surplus
10 for a good that doesn't yet exist.  It does not
11 presuppose that there must be a market for it.  It
12 happens to say in the market, but that's not a
13 requirement.
14   Q.  Where in this particular chapter does it
15 indicate that it is not a requirement of the product
16 at issue for consumer surplus must not be in the
17 market?
18   A.  In this chapter there is no mention of a
19 supply curve.
20   Q.  So that is the basis for your statement --
21   A.  It doesn't require a supply curve.
22 Usually we do have a market and that's why this is
23 kind of the usual setting but when you're talking
24 about willingness to pay and when you're talking
25 about utility you don't need a market.

Page 265

1    Q.  Would you agree that the market for
2  concert tickets is very different than the highly
3  regulated market of prescription drugs?
4    A.  Yes, but this chapter is not about concert
5  tickets.  This chapter is a general economic
6  textbook on economics, on microeconomics, and this
7  chapter is about consumer surplus which applies to
8  both concert tickets and prescription drugs.
9    Q.  If we look at the next sentence of
10 paragraph 133 you go on to write -- I think this is
11 what you were alluding to before -- that sometimes
12 there could be a value for a product that is not yet
13 on the market.
14      You write, "Consider a pill that cures
15 cancer, there is no supply for such a pill as one
16 has not been invented yet, but it is certainly
17 possible to consider the patient and TPP's
18 willingness to pay for such a pill and the inherent
19 economic value such an innovation would provide."
20      Do you see that?
21   A.  Yes.
22   Q.  In this particular example of the
23 hypothetical pill that cures cancer, are you
24 assuming that the pill at issue has been
25 manufactured in compliance with good manufacturing

Page 266

1 practices?
2    A.  No.
3    Q.  So it is your opinion that consumers and
4 TPPs would be willing to pay for a pill that has not
5 been manufactured in compliance with good
6 manufacturing practices and could not assure that
7 it's safe?
8    A.  I think it's certainly possible.
9    Q.  You don't have any evidence to associate
10 that, correct?
11    A.  I think it's -- I would say it's common
12 sense.  You are pay -- you are willing to pay for
13 the benefits of a good.  If there is some
14 uncertainty about the benefits of the good, that's
15 why things like, you know, good manufacturing
16 processes, that's why those might be valuable, but
17 if -- in this hypothetical world where we already
18 knew that this pill would cure cancer, we wouldn't
19 have to know whether it was manufactured under good
20 manufacturing practices.
21    Q.  Do you believe that generic drug products
22 that are manufactured in such a way that the product
23 contains glass are valuable?
24    A.  That's a hypothetical question.  I think
25 it would depend on the circumstance.

Page 267

1    Q.  Are you -- have you ever heard of a
2 generic drug manufacturer named Ranbaxy?
3    A.  Can you restate that question?
4    Q.  Have you ever heard of a generic drug
5 manufacturer named Ranbaxy?
6    A.  I might have.  I don't recall right now.
7    Q.  If I were to tell you that Ranbaxy
8 manufactured generic products that contained
9 glass --
10        MR. STOY:  Are you --
11        (Whereupon, a brief discussion off the
12 record.)
13 BY MS. HILTON:
14    Q.  If I were to tell you that Ranbaxy
15 manufactured generic products that contained glass
16 and that this -- that these products had to be
17 recalled from the market, would it be your position
18 that these glass-contaminated generic products had
19 value?
20    A.  I don't know enough about this situation
21 to say anything.  It's possible that they could
22 still have value, but I don't know enough.
23    Q.  What would you need to know in order to
24 assess whether the drug had value or didn't have
25 value?

Page 268

1    A.  I would need to know the medical benefits
2 of taking that drug and the medical harms of taking
3 that drug.
4    Q.  Do you agree with Dr. Conti's conclusion
5 that there exists substantial asymmetry of
6 information about the safety and quality of
7 prescription drugs between the manufacturers of
8 those drugs and the patients who purchase and
9 consume those drugs?
10        MR. STOY:  I'll object to the extent it's
11 beyond the scope of Dr. Chan's analysis.
12        But you can answer.
13        THE WITNESS:  I don't have a particular
14 opinion on that.  I think it's possible.  But I
15 think it might depend.
16 BY MS. HILTON:
17    Q.  What would it depend on?
18    A.  Depends on what the product is.  It
19 depends on -- so you -- can -- can you just restate
20 the question?  It's asymmetric information between
21 the manufacturers of a drug and -- and who else?
22    Q.  And the patients who purchase and consume
23 those drugs.
24        MR. STOY:  Same objection.
25        THE WITNESS:  It really depend -- I mean,

Page 269

1 there are different types of asymmetric information,
2 right, the patient may have more information about
3 their medical condition than the manufacturer.  The
4 manufacturer might have more information about how
5 they manufactured the drug.  So the information is
6 not symmetric in different ways.
7 BY MS. HILTON:
8    Q.  Is that a topic of upon which you'll opine
9 in your report?
10    A.  I don't believe that's a central -- that's
11 a central element required for my opinions in the
12 report.  I think ultimately, at the end of the day,
13 the value of a drug is the medical benefit weighed
14 against any harms of the drug.
15    Q.  You describe that -- in the body of your
16 report that in order, as you see it, to calculate
17 the economic value of a product to a particular
18 plaintiff or patient, you would need to know
19 something you describe as the ex-ante value as well
20 as the ex-post value; is that right?
21    A.  In my report, I describe ex-ante value and
22 ex-post value.  I just -- I describe that because
23 there are different concepts.  There are different
24 concepts of value.  It depends on when you're asking
25 about value.

Confidential Information Subject to Protective Order

Page 270

1    And this is particularly important when
2  there's uncertainty about what actually is in the
3  drug.  Even before we knew that there might be
4  impurities in the valsartan drug, there is still an
5  ex-ante value that could account for the possibility
6  of this impurity.  And then after we find out about
7  the possibility of impurity in some of the lots, the
8  value of the drug could be updated in ex-post way.
9    Q.  You -- you testified that there was the --
10  that it was possible somebody might know about the
11  impurity at the time that they purchased the drug
12  and that would be a part of its ex-ante value?
13    A.  They might know about a possibility of
14  impurity.
15    Q.  What evidence did you review in this case
16  that demonstrated that any one particular patient
17  had any inkling that their valsartan might contain
18  carcinogens?
19    A.  So as one consideration -- one piece of
20  evidence that I -- I mention in the report is that
21  at one point we did know about impurities in
22  valsartan and the FDA recommended patients to
23  continue taking their valsartan.  That's one
24  specific -- that's one specific instance about --
25  about impurities specifically related to

Page 271

1  nitrosamines.
2    But my earlier statement was about the
3  general possibility that we may discover something
4  about a drug that we didn't know.  When you purchase
5  something, there's not a hundred percent certainty
6  about what that thing is in general.  And you may
7  discover something that nobody else -- nobody knew
8  about this thing that you purchased and it could
9  include the possibility of impurities in general.
10    Q.  I want to talk a little about your first
11  statement that the FDA made a statement that people
12  should continue to take their valsartan drugs.
13    You're aware that that statement was made
14  in August 2018, correct?
15    A.  Correct.
16    Q.  So at that point, all of the -- or most of
17  the manufacturers and the defendants in this case
18  had already recalled all of their product off the
19  market at the time that the FDA made this statement,
20  right?
21    MR. STOY:  Object to the form.
22    THE WITNESS:  I don't know the timeline.
23  Can you -- can you say that again?
24  BY MS. HILTON:
25    Q.  Yeah.

Page 272

1    As of August 2018, at the time that the
2  FDA made the statement you just referred to about
3  the possibility of nitrosamine contamination, many
4  of the defendants had started recalling all of their
5  products off the market; isn't that right?
6    A.  I don't know all the details but if what
7  you just said is true, then some of them did not
8  recall just yet.
9    Q.  But regardless, what the FDA said about
10  the drugs in August of 2018 would have no bearing
11  whatsoever on the ex-ante value of a drug purchased
12  from 2012 until June of 2018, right?
13    A.  That statement would have bearing for
14  people who purchased the drug after the statement.
15    Q.  So would not relate to any of the
16  purchases prior to August of 2018?
17    A.  I think it still relates to whether people
18  would purchase before that time in the sense that
19  that statement is talking about potential value.
20  It's talking about the medical benefits of taking
21  that drug and that would be in the consideration of
22  people who purchased it before.
23    What I was saying in the second part of my
24  response about the possibility of impurities is that
25  there's always the possibility that something --

Page 273

1  there might be something about that drug that you
2  don't know just yet and that's what I'm calling the
3  ex-ante value.
4    Q.  How does your opinion regarding the
5  ex-ante value of the affected valsartan change in
6  light of the fact that there was valsartan on the
7  market that did not contain nitrosamines?
8    A.  I did consider that.
9    Q.  How did you consider that?
10    A.  So when you're talking about a demand
11  curve, the demand curve incorporates other products
12  that are already in the market.
13    Q.  So is the ex-ante value of a valsartan
14  that did not contain nitrosamine manufactured by a
15  manufacturer that is not a defendant in this case
16  different than the ex-ante value of the affected
17  valsartan?
18    A.  Can you say that again?
19    Q.  Is the ex-ante value of the uncontaminated
20  valsartan manufactured by manufacturers who are not
21  defendants in this case different than the ex-ante
22  value of the affected valsartan at issue in this
23  litigation?
24    A.  And by ex-ante you mean before we knew
25  which manufacturers were associated with affected

Confidential Information Subject to Protective Order

Page 274

1 valsartan; is that right?

2    Q.   Correct.

3    A.   I can't say whether they're exactly the

4 same.  They could still differ.  I don't know the

5 other considerations that might differentiate

6 different manufacturers before it was known which

7 ones were linked to affected valsartan.

8    Q.   In your discussion of the ex-ante value of

9 affected valsartan, you delineated a list of factors

10 that you would look at to determine the value; is

11 that right?

12    A.   Can you point me to the paragraph that

13 you're talking about?

14    Q.   Sure.

15    134.

16    A.   Uh-huh.

17    Q.   From an economics perspective, how would

18 you go about incorporating these values and these

19 factors in a calculation to determine a prescription

20 drug's ex-ante value?

21    A.   That is not a core -- that's not a core

22 analysis that I did in this report, although I talk

23 about it.  The core opinion of this report is

24 whether we can say that affected valsartan is

25 worthless.

Page 275

1    Q.   So you have no opinion whatsoever on how

2 to actually go about calculating the ex-ante value

3 of the affected valsartan; is that right?

4    A.   I have some ideas --

5    MR. STOY:  Objection to form.

6    THE WITNESS:  -- but I don't know if

7 they're kind of -- if they're thought through at the

8 proper level that I would be willing to offer them

9 at this deposition.

10 BY MS. HILTON:

11    Q.   Have you ever conducted a mathematical

12 calculation of a generic prescription drug product's

13 ex-ante value before?

14    A.   I personally have not but I think that

15 there are several ways in which you could address

16 this.

17    Q.   What are those ways?

18    A.   So without having thought in great detail

19 for this deposition, there are ways to value what

20 consumers -- value consumers' utility in terms of

21 different health outcomes.  It would -- you can

22 incorporate the value of getting cancer with the

23 value of controlling hypertension.  The value of

24 treating heart failure.  There are methods to value

25 those things and if -- that's one way to kind of --

Page 276

1 to perhaps to get at these ex-ante values

2 incorporating any uncertainty.

3    There are possibly other ways to do this

4 that I haven't thought to to the level of detail

5 that I think it would require for this deposition.

6    Q.   Have you ever read any literature about

7 conducting the mathematical calculation for the

8 ex-ante value of a generic prescription drug?

9    A.   I'm aware of literature that -- that uses

10 the approach that I just described to you.  And that

11 approach could be applied to the value of a generic

12 prescription drugs.

13    Q.   Is that literature cited in your report?

14    A.   That's -- it's possibly cited in my

15 report.  I can't recall.  This is not a -- as I

16 said, my report primarily addresses the claim of

17 whether valsartan is worthless, not how one would

18 conduct an economic evaluation of the worth.

19    Q.   Well, you, yourself, have never actually

20 endeavored to conduct such a calculation or

21 evaluation of a generic prescription drug's ex-ante

22 value, correct?

23    A.   Specifically --

24    MR. STOY:  Asked and answered.

25    THE WITNESS:  Go ahead, Frank.

Page 277

1    MR. STOY:  I just objected to asked and

2 answered.

3    You can go ahead.

4    THE WITNESS:  That's a very specific

5 question that you asked, whether I endeavored to

6 calculate the ex-ante value before an information

7 revelation of a generic prescription drug.

8    It's hard for me to kind of answer whether

9 I have done cost-effectiveness analyses for analyses

10 of patient utility that could bear on that exact

11 specific question, but I have done economic analyses

12 that value different patient health outcomes and

13 weighed them against each other.

14 BY MS. HILTON:

15    Q.   So the answer is no, you haven't conducted

16 a mathematical calculation to determine the ex-ante

17 value of a prescription generic drug; is that right?

18    A.   It's possible that I have.  I just can't

19 remember.

20    Q.   After determining the ex-ante value of a

21 prescription drug, you write that in order to figure

22 out the -- I guess the injury to a particular

23 plaintiff you have to then ascertain the ex-post

24 value of that product.

25    What is your definition of ex-post value?

Page 278

1    A.  What I refer to here as ex-post value is
2  the value that you have after the information
3  revelation.
4       But I think it's important to note that
5  there are many different steps of information
6  revelation that could be possible.
7          There is information revelation that you
8  consumed a drug that could contain nitrosamines.
9  And there's further revelation of you may know
10 whether or not you had a lot that had nitrosamines
11 in it.  And then ultimately you would need to know
12 whether you suffered cancer as a result of
13 nitrosamines.  That could be an event later down the
14 road.  There are many different kind of points in
15 the timeline at which you might have different
16 values.
17   Q.  So is it fair to say there's no real
18 concrete way to actually calculate a -- the effect
19 of valsartan's ex-post value?
20   A.  No, it's not fair to say that.
21   Q.  Why not?
22   A.  There is a framework that you could
23 undertake -- and this is not something that I --
24 again, the key point of my report is that I'm
25 rejecting the idea that anybody who consumed

Page 279

1  affected valsartan had a value of zero.  That is the
2  key point that I'm saying.
3       But if you needed to calculate exactly
4  what somebody's ex-post value would be, as I
5  mentioned, there are methods to use health outcomes
6  and methods to incorporate uncertainty to arrive at
7  a willingness to pay.
8    Q.  Have you ever conducted a mathematical
9  calculation of a generic drug's ex-post value?
10   A.  I think my answer would be similar to your
11 question about whether I've conducted a mathematical
12 analysis to calculate the ex-ante value of a drug.
13 It's possible that I have.  I can't really comment
14 at this point.  The methods that you would use to do
15 such a thing I have done.
16   Q.  If we look at the second-to-last sentence
17 in paragraph 137, you were talking about risk
18 aversion in this paragraph, and you write, "Second,
19 any reduction in economic value depends on a
20 patient's level of risk aversion, which has been
21 shown to vary across individuals."
22       Do you see that?
23   A.  Uh-huh.  Yes.
24   Q.  When discussing risk aversion, isn't it
25 necessary that a person who is averting risk

Page 280

1  actually have knowledge of that risk?
2    A.  No.
3    Q.  Why not?
4    A.  A risk aversion does not require knowledge
5  of risk.  It tells you what -- what is the expected
6  utility of somebody given uncertainty in the future
7  and this person could have many different
8  realizations of whether they get something that's
9  an -- like an -- what would be called a negative
10 shock to their utility versus a positive shock to
11 their utility.
12       All they need to know in order to
13 calculate risk aversion is how that person's utility
14 varies across different states of the world.
15   Q.  So your testimony is that risk aversion
16 and the idea of risk does not require a person to
17 actually have knowledge of the risk; is that right?
18   A.  To measure risk aversion you don't need --
19 you don't -- you don't need to know the person's
20 knowledge.  It does not require a person's knowledge
21 of the risk to measure risk aversion.
22       In order to calculate somebody expected
23 value -- expected willingness to pay at a given
24 point in time you would need to know what are the
25 possible states of the world in the future and you

Page 281

1  would need to know the risk aversion but to know
2  their risk aversion you don't need patient knowledge
3  of various events in the future.
4    Q.  But you do agree that the additional risk
5  that nitrosamines in the affected valsartan could in
6  some instances reduce the economic value of the
7  drug, right?
8    A.  In some instances, yes.
9       MS. HILTON:  Can we go off the record.  I
10 may be close to finish and I just want to check in
11 with my colleagues.
12       THE VIDEOGRAPHER:  Okay.  We're off the
13 record at 4:03 p.m. Pacific time.
14       (Whereupon, a brief recess was taken.)
15       THE VIDEOGRAPHER:  We are back on the
16 record.  The time is 4:09 p.m. Pacific time.
17 BY MS. HILTON:
18   Q.  Dr. Chan, have you ever prescribed
19 valsartan to a patient?
20   A.  Yes.
21   Q.  How did you personally become aware of the
22 recall of the affected valsartan products?
23   A.  I became aware of the recall through this
24 case.
25   Q.  So prior to this case, you had no

Page 282

1  knowledge that the FDA had initiated an
2  unprecedented classwide recall of the affected
3  valsartan?
4       MR. STOY:  Object to the form.
5       THE WITNESS:  As a hospitalist, I don't
6  decide which valsartan, which -- specifically which
7  NDC gets delivered to a patient, gets dispensed to a
8  patient.  I write valsartan, the dose, the
9  frequency, and I don't concern myself with whether
10 it's branded or generic and if it's generic, which
11 type of valsartan it is.  So there's no reason for
12 me to pay attention to that.
13 BY MS. HILTON:
14      Q.  And do you not concern yourself with these
15 things because the generic is supposed to be the
16 same as the branded drug?
17      MR. STOY:  Object to the form.
18      THE WITNESS:  That's not the reason that I
19 don't pay attention to these things.  The reason
20 that I don't pay attention to these as a
21 hospitalist, personally as a clinician, is that I
22 don't determine which of these drugs, which NDC code
23 is going to be dispensed to a patient for whom I
24 prescribe valsartan.
25

Page 283

1  BY MS. HILTON:
2       Q.  Just generally, though, in your practice
3  as a physician do you have an expectation that the
4  generic products are the same as the branded
5  reference listed drugs?
6       MR. STOY:  Objection.  Beyond the scope of
7  his report.
8       You can answer.
9       THE WITNESS:  This is not a -- this is
10 not -- this is not within the scope of my report.
11 Would you like me to comment on -- I'm not sure.
12 BY MS. HILTON:
13      Q.  Yeah, I'm just asking you, as a physician,
14 you have that expectation that the generic drugs are
15 the same as the reference listed brand drugs?
16      MR. STOY:  Object to the form.
17      Go ahead.
18      THE WITNESS:  I think my main expectation
19 is that they should contain the same active
20 ingredient.  I know that there is a process by which
21 we might identify impurities in drugs and recall
22 drugs.  And that there is no guarantee that a
23 generic drug will be exactly the same as a branded
24 drug.
25

Page 284

1  BY MS. HILTON:
2       Q.  And at what point in your education did
3  you learn about the impurities that may be present
4  in generic drugs?
5       A.  I'm not sure if I remember the time in my
6  education.  But I think it's in some ways common
7  sense.  You know that generic drugs are made by
8  different manufacturers.  You know that they're not
9  exactly the same.  The requirement of generic drugs
10 is that they have the same active ingredient.  It's
11 not required that they're exactly the same.
12      And so it follows naturally that there
13 might be things that differ between generic drugs
14 and branded drugs and that we don't know all of
15 these, including the generic manufacturers at the
16 time, don't know all of these things at this point
17 and some of these things could be revealed later on.
18      Q.  Would it surprise you to know that one of
19 the generic manufacturers in this case had knowledge
20 that their valsartan contained nitrosamines a year
21 before they were actually recalled from the market?
22      MR. STOY:  Object to the form.  Beyond the
23 scope.  Mischaracterizes.
24      THE WITNESS:  I have no knowledge of that.
25      MR. STOY:  Mischaracterizes the evidence.

Page 285

1       Go ahead.
2       THE WITNESS:  I have no knowledge of that.
3  I'm not sure if I can comment on that.
4  BY MS. HILTON:
5       Q.  Okay.  Have you ever monitored any
6  patients for cancer?
7       A.  No, not -- let me just -- let me clarify.
8       I have in the past ordered screening tests
9  for cancer.  My current clinical responsibilities
10 does not primarily focus on screening for cancer as
11 a hospitalist.
12      Q.  What screening tests did you order for
13 cancer?
14      A.  In primary care you could order a number
15 of screening tests such as Pap smears or
16 colonoscopies.
17      Q.  Aside from the opinions that are contained
18 within your report, do you intend to offer any other
19 opinions in this litigation?
20      A.  I don't have any plans to do so right now.
21      MS. HILTON:  Thank you, Doctor.  I have no
22 further questions.
23      MR. STOY:  Thank you.
24      Let's go off the record.
25      THE VIDEOGRAPHER:  Off the record for the

Confidential Information Subject to Protective Order

Page 286

1  day or does anyone have anything else?
2      MR. STOY:  We may have some follow-up
3  questions.  I want to take ten minutes.
4      THE VIDEOGRAPHER:  No problem.
5  We're off the record at 4:15 p.m.
6      (Whereupon, a brief recess was taken.)
7      THE VIDEOGRAPHER:  We are back on the
8  record.  The time is 4:26 p.m. Pacific team.
9          EXAMINATION
10 BY MR. STOY:
11     Q.  All right.  Dr. Chan, good afternoon
12 again.  Welcome back.  I know it's been a long day
13 so I'm going to be brief but I do have a few
14 follow-up questions to ask you, okay?
15     A.  Okay.
16     Q.  My first question is, as a matter of
17 economics, can you explain the interplay between
18 price and value?
19     MS. HILTON:  Objection to form.
20 BY MR. STOY:
21     Q.  Go ahead.
22     A.  Sure.
23         Value relates to the utility that somebody
24 would get from a product and together this forms the
25 demand curve.  Price is something when you have a

Page 287

1  market and you have supply and where demand meets
2  supply that's where you have price.  So you can have
3  value even if there's no market and even if there's
4  no supply.
5      Q.  Are price and value considered
6  interchangeable terms in economics?
7      A.  No.
8      Q.  Is economic value the same thing as
9  equilibrium price?
10     A.  No.
11     Q.  In paragraph 44 of Dr. Conti's report, and
12 I believe it's maybe Exhibit 3, you can pull it up
13 if you want to, but I'm going to read a statement.
14         She says, and I quote, According to
15 economic theory, for a consumer product to have
16 economic value, demand for the product must exist
17 and supply must be allowed to meet demand.
18         Do you agree with that statement by
19 Dr. Conti regarding economic theory?
20     A.  No, I don't agree with that.  That is not
21 consistent with what I have described as economic
22 theory and the relationship between price and value.
23     Q.  Can a product have economic value even if
24 there is no equilibrium price in the market?
25     A.  Yes.

Page 288

1      Q.  Is willingness to pay the only thing to
2  consider in determining economic value?
3      A.  Yes.  Willingness to pay and economic
4  value are synonymous.
5      Q.  Dr. Chan, you were shown an article that
6  you had previously written in the New England
7  Journal of Medicine.  I believe it was Exhibit 5.
8          Do you remember that?
9      A.  Yes.
10     Q.  And then you were also shown some comments
11 that were received that were sent to the author.  I
12 believe that was Exhibit 6.
13         Do you remember that?
14     A.  Yes.
15     Q.  Is it uncommon for peer-reviewed
16 publications for the authors to be sent comments by
17 people?
18     A.  I don't know how common it is.  But in
19 this case, this was a comment that was a bit
20 ancillary to the main analysis and we acknowledged
21 the comment.  And the article itself, I think the
22 main points that we made in the article itself are
23 still valid.  The -- it's also -- it also bears
24 mentioning that the comment didn't really make a
25 point about averages versus other types of moments

Page 289

1  of a statistical distribution.
2      Q.  Did the New England Journal of Medicine
3  retract your article after those comments were
4  submitted?
5      A.  No.
6      Q.  Was the article ever retracted?
7      A.  No.
8      Q.  Now, I want you to go back to your report,
9  Dr. Chan.  And specifically, I want you to look at
10 paragraph 117.
11         Are you there?
12     A.  Okay.  Yep.
13     Q.  Do you recall earlier you were asked some
14 questions with regard to the use of averages?
15     A.  Yes.
16     Q.  Why is Dr. Song's use of averages in his
17 report inappropriate, in your opinion?
18     MS. HILTON:  Objection to form.
19     THE WITNESS:  And I want to clarify that
20 averages are not in and of themselves a bad thing.
21 It depends on how you're using the averages and as I
22 said during the deposition, which sample you're
23 getting the average from and what purpose you're
24 using the average for.
25         The problem with Dr. Song's use of an

Confidential Information Subject to Protective Order

Page 290

1 average from some publication that looks at another
2 population, probably a general population, comparing
3 private insurance prices and Medicare prices, is
4 that that average might not be applicable to the
5 class at hand, which by definition, would have had
6 to be patients who took valsartan. And it's
7 possible that that average could be wildly off.
8     MR. STOY: Okay. Thank you, Dr. Chan. I
9 have no further questions.
10     MS. HILTON: Can we go off the record for
11 a moment. I just want to confer.
12     THE VIDEOGRAPHER: Okay. We're off the
13 record at 4:32 p.m.
14     (Whereupon, a brief recess was taken.)
15     THE VIDEOGRAPHER: We are back on the
16 record at 4:35 p.m.
17              EXAMINATION
18 BY MS. HILTON:
19     Q. Doctor, Mr. Stoy asked you questions about
20 equilibrium price.
21       Do you remember that?
22     A. Yes.
23     Q. What's your definition of equilibrium
24 price?
25     A. Equilibrium price is where supply and

Page 291

1 demand meet in terms of price.
2     Q. And it's your testimony that a product can
3 have economic value even if there is no equilibrium
4 price in the market?
5     A. Yes.
6     MS. HILTON: I have no further questions.
7              EXAMINATION
8 BY MR. MIGLIACCIO:
9     Q. Doctor, I just have I think one. Maybe --
10 I thought it was one. We'll see.
11       You -- Mr. Stoy asked you questions about
12 averages in paragraph 117. And you testified
13 that -- that the average might not be applicable to
14 the class at hand and that it's possible that that
15 average could be wildly off, correct?
16     A. Correct.
17     Q. That was your testimony.
18       I just want to confirm you have not, in
19 fact, done any calculations to determine if the
20 average is not applicable to the class at hand or
21 that the average is, in fact, wildly off?
22     A. I think I said during the deposition that
23 I have evidence that it's likely that members of the
24 class will be different than the average population
25 and that there is scope for getting the average

Page 292

1 wrong if you just look at variation in prices, which
2 we have done in the report.
3     Q. You have not, in fact, done any
4 calculations, though, to determine if the averages
5 are wildly off or not applicable?
6     A. The other thing I think I've said in the
7 deposition is that I think it would be quite
8 difficult to actually calculate it so I don't think
9 anybody's done any calculations to show me something
10 about what that price would be other than what the
11 overall average is.
12     Q. Including you, you have not done?
13     A. Include me or --
14     Q. Okay.
15     A. -- anybody else among the plaintiffs'
16 side.
17     Q. Got it.
18     MR. MIGLIACCIO: I have no further
19 questions. Thank you, Doctor.
20     MR. STOY: Nothing further from us.
21     THE VIDEOGRAPHER: Okay. This marks the
22 end of today's testimony of Dr. David Chan.
23       We are off the record at 4:37 p.m. Pacific
24 time.
25     (Whereupon, the deposition was concluded

Page 293

1
2 at 4:37 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Confidential Information Subject to Protective Order

INSTRUCTIONS TO WITNESS

3    Please read your deposition over carefully
4 and make any necessary corrections.  You should
5 state the reason in the appropriate space on the
6 errata sheet for any corrections that are made.
7    After doing so, please sign the errata
8 sheet and date it.
9    You are signing same subject to the
10 changes you have noted on the errata sheet, which
11 will be attached to your deposition.
12    It is imperative that you return the
13 original errata sheet to the deposing attorney
14 within thirty (30) days of receipt of the deposition
15 transcript by you.  If you fail to do so, the
16 deposition transcript may be deemed to be accurate
17 and may be used in court.

ERRATA SHEET

3 PAGE   LINE   CHANGE
4 ____  ____ _____
5         REASON:_____
6 PAGE   LINE   CHANGE
7 ____  ____ _____
8         REASON:_____
9 PAGE   LINE   CHANGE
10 ____  ____ _____
11         REASON:_____
12 PAGE   LINE   CHANGE
13 ____  ____ _____
14         REASON:_____
15 PAGE   LINE   CHANGE
16 ____  ____ _____
17         REASON:_____
18 PAGE   LINE   CHANGE
19 ____  ____ _____
20         REASON:_____
21 PAGE   LINE   CHANGE
22 ____  ____ _____
23         REASON:_____

ACKNOWLEDGMENT OF DEPONENT

5    I,_____, do hereby certify
6 that I have read the foregoing pages, and that the
7 same is a correct transcription of the answers given
8 by me to the questions therein propounded, except
9 for the corrections or changes in form or substance,
10 if any, noted in the attached Errata Sheet.

13 _____   _____
14 DAVID C. CHAN, JR., M.D.         DATE

1 STATE OF CALIFORNIA  )
2 COUNTY OF YOLO       )
3    I, ELAINA BULDA-JONES, a Certified Shorthand
4 Reporter of the State of California, duly authorized
5 to administer oaths pursuant to Section 2025 of the
6 California Code of Civil Procedure, do hereby
7 certify that
8         DAVID C. CHAN, JR., M.D.,
9 the witness in the foregoing deposition, was by me
10 duly sworn to testify the truth, the whole truth and
11 nothing but the truth in the within-entitled cause;
12 that said testimony of said witness was reported by
13 me, a disinterested person, and was thereafter
14 transcribed under my direction into typewriting and
15 is a true and correct transcription of said
16 proceedings.
17    I further certify that I am not of counsel or
18 attorney for either or any of the parties in the
19 foregoing deposition and caption named, nor in any
20 way interested in the outcome of the cause named in
21 said deposition dated the 7th day of March, 2022.

25 ELAINA BULDA-JONES, CSR 11720

## WORD INDEX

**< $ >**
**$125** 211:*1*
**$150** 210:*24*
**$850** 34:*5*
**$850-an-hour** 36:*20*

**< 0 >**
**0.5** 228:*24* 237:*7*
**02109** 4:*18*
**07701** 4:*3*

**< 1 >**
**1** 5:*14* 10:*24* 11:*1* 97:*5, 6* 110:*18* 111:*4, 18, 24* 112:*8, 16* 141:*6* 210:*7* 211:*13, 18* 229:*9* 234:*13*
**1:41** 204:*22*
**1:57** 204:*25*
**10** 236:*9*
**10:19** 107:*8*
**10:44** 107:*11*
**100** 168:*21*
**100,000** 110:*18*
**10013-1413** 2:*14*
**10017** 2:*21*
**11** 5:*14* 251:*24*
**11:56** 159:*23*
**117** 176:*4, 7* 186:*25* 289:*10* 291:*12*
**11720** 1:*24* 297:*25*
**12** 5:*16* 110:*16, 18*
**12:10** 63:*3, 4*
**12:36** 160:*1*
**12th** 20:*22* 22:*9* 78:*18, 22*

**1310** 230:*13*
**1316** 227:*17*
**133** 261:*3* 265:*10*
**1338** 235:*14*
**134** 274:*15*
**137** 279:*17*
**15** 97:*12*
**15219** 3:*21*
**16** 5:*16* 107:*17*
**165** 5:*16*
**17** 226:*24*
**1700** 3:*3*
**18,000** 110:*10* 111:*25*
**19.1** 88:*25* 89:*3, 5, 10*

**< 2 >**
**2** 4:*3* 5:*14* 41:*2, 3* 79:*4* 100:*3* 111:*18, 19* 113:*2* 116:*20* 120:*15, 17, 19* 160:*7* 168:*19, 20* 210:*13* 229:*23* 231:*25* 260:*25*
**2.59** 113:*6*
**2:51** 243:*4*
**20** 35:*2, 4, 5* 38:*21* 42:*21* 97:*11* 113:*13* 133:*8* 236:*9, 20*
**20.2** 88:*22* 89:*2, 5, 7, 10*
**20002** 2:*10*
**20006-3807** 3:*3*
**2008** 42:*14* 43:*22*
**2010** 44:*4, 5*
**2012** 253:*14* 254:*3* 272:*12*
**2013** 40:*3* 44:*6* 46:*20* 47:*1* 48:*12, 15*

**2016** 253:*14*
**2017** 253:*14*
**2018** 163:*21, 23* 164:*5* 254:*3* 271:*14* 272:*1, 10, 12, 16*
**202.452.7318** 3:*4*
**202.470.3520** 2:*11*
**2020** 69:*19, 20* 141:*7*
**2021** 77:*21* 141:*8*
**2022** 1:*19* 5:*16* 7:*4* 77:*16* 297:*21*
**2025** 297:*5*
**2029** 3:*8, 14*
**205** 5:*20*
**207** 147:*23*
**211** 4:*3*
**212.255.9500** 2:*15*
**212.801.9306** 2:*22*
**213.689.7424** 4:*12*
**216** 5:*24*
**225** 6:*1*
**23** 254:*18*
**246** 5:*5*
**250** 2:*14*
**252** 262:*7*
**262** 6:*2*
**27th** 4:*18*
**286** 5:*6*
**2875** 1:*7* 7:*8*
**29,498** 110:*15*
**290** 5:*7*
**291** 5:*8*

**< 3 >**
**3** 1:*19* 5:*16* 11:*9* 77:*9* 113:*24, 25* 122:*4* 210:*18* 227:*14, 15* 229:*20* 232:*6*

**287**:*12*
**3.5** 228:*24*
**3:03** 243:*7*
**30** 42:*22* 159:*14* 294:*14*
**300** 3:*3, 8, 14*
**301** 3:*21*
**30-pack** 113:*13*
**31** 77:*20*
**310.284.3766** 3:*9, 15*
**3100** 4:*11*
**32** 96:*3* 119:*21* 227:*10*
**34.8** 88:*22*
**35** 102:*22, 23* 108:*14* 117:*6* 118:*14*
**38** 88:*20*
**38.2** 88:*24*
**38th** 3:*21*
**3rd** 7:*4* 77:*16*

**< 4 >**
**4** 5:*16* 165:*13, 14* 211:*4* 229:*15* 232:*11* 237:*2*
**4.4** 6:*2*
**4:03** 281:*13*
**4:09** 281:*16*
**4:15** 286:*5*
**4:26** 286:*8*
**4:32** 290:*13*
**4:35** 290:*16*
**4:37** 292:*23* 293:*1*
**40** 117:*5*
**400** 179:*16, 24* 180:*9* 196:*19, 23* 197:*2*
**41** 5:*14*
**412** 2:*10*
**412.263.4397** 3:*22*
**42** 113:*2* 114:*12* 116:*20* 160:*5, 11*

**44** 83:*7* 287:*11*
**47** 117:*7*

**< 5 >**
**5** 5:*20* 180:*3, 5, 7* 196:*25* 197:*5, 13* 205:*10, 11* 236:*14, 15* 288:*7*
**50** 97:*10* 181:*12* 236:*8, 20* 237:*7* 238:*21*
**504.524.5777** 2:*6*
**53** 4:*18* 122:*23*
**57** 113:*6*
**59** 114:*13*
**5th** 179:*21, 23* 180:*2, 4, 10* 196:*22* 213:*18*

**< 6 >**
**6** 5:*24* 216:*6, 9* 237:*3* 288:*12*
**60** 114:*13*
**617.213.7047** 4:*19*
**63** 158:*18* 163:*8* 164:*3, 9* 202:*23* 203:*5, 13*
**63.3** 163:*20* 164:*20* 202:*23*
**65** 152:*17, 20* 163:*14* 202:*24* 203:*2*
**68** 86:*8* 87:*23*
**69** 148:*1*

**< 7 >**
**7** 6:*1* 225:*15, 16* 234:*13, 16, 17* 235:*14* 262:*3*
**7:49** 1:*19* 7:*5*

Confidential Information Subject to Protective Order

**701** 2:5
**70130** 2:6
**732.924.8171**
4:4
**77** 5:16
**7th** 297:21

**< 8 >**
**8** 5:4  6:2
113:12, 13
143:6  146:18
171:12
172:10  262:4,
7, 8, 11
**8,000** 110:8,
18  111:4, 24
112:8, 16
228:23
**8.2** 113:14
**80** 97:10
**865** 4:11
**87** 164:24
**88** 28:8
110:3, 20
111:3
**8th** 2:14

**< 9 >**
**9** 171:23
179:2  206:25
207:8  212:23
**9/11** 95:16, 21
**9:01** 63:6
**9:15** 63:9
**90** 50:5
**90017-5450**
4:11
**90067** 3:9, 14
**92** 110:19, 21
**93** 110:22, 24
111:1
**95** 223:17
**95th** 179:22,
23  180:4, 10
196:22  197:5
213:18
**99** 223:18

**< A >**

**a.m** 1:19  7:5
63:6, 9  107:8,
11  159:23
**A-2** 43:12, 13
100:4, 5
250:17
**Abaluck**
102:12
**abdominal**
120:11
**ability** 9:1
**able** 11:16
39:10  65:11
66:21  134:18
165:11
166:12
180:21
186:18  189:1
193:17  203:8
223:13  243:23
**absence** 40:10,
12, 18  41:19
**abstracting**
170:19
**academia**
91:6, 9
**academic**
44:8  47:15
49:6  91:18
142:15  205:3
225:5  238:7,
25  249:25
**acceptable**
110:17  111:4,
13
**accepted**
162:2, 13, 18
165:24
166:16, 25
**account** 195:7
199:8, 19
270:5
**accounted**
195:22
**Accuracy**
5:20  92:16
155:20, 22
219:1
**accurate**
142:7  192:21
193:4, 20

194:3, 6, 11
221:13
244:10  247:2
294:16
**acknowledged**
216:23  288:20
**ACKNOWLE
DGMENT**
296:1
**acronym**
129:13
**act** 249:20, 23
250:2, 5
**Actavis** 2:18
**Action** 74:1, 4
99:21  135:14
173:23
**Actions** 1:9
257:2
**active** 283:19
284:10
**activities**
246:22  247:2,
11, 12  251:6
**add** 111:8
118:11
**added** 104:1,
21
**addition** 47:16
**additional**
110:7, 9
114:25
120:22
125:21
149:17  242:3,
4  281:4
**address** 10:25
29:23  275:15
**addresses**
259:1  276:16
**adds** 242:2
**Adherence**
100:10
**administer**
7:21  153:10
297:5
**administered**
153:5
**administering**
93:23

**Administration**
140:23
**admitted**
42:24
**adulterated**
251:18
255:21
256:17, 24
257:7, 12
258:21
**adulteration**
257:14, 16
**adults** 97:10
201:20
**advance** 51:7,
9, 13
**advanced**
15:10  58:21
**advisor** 250:11
**Affairs** 44:10
**affiliate** 70:11
**affiliated** 43:8
237:24
**affiliation**
100:18  236:1,
2
**affirmatively**
260:1
**Afghanistan**
50:13
**Afib** 154:3
**afraid** 37:22
**afternoon**
246:11  286:11
**AG** 79:21
**age** 50:13, 18
120:25  121:1
152:20
158:16
160:12, 16
163:8  164:3,
8, 9, 19
202:22, 24, 25
203:3, 5
**aged** 97:10
**agencies** 85:5
156:4
**agenda** 91:10
142:17

**agent** 109:6, 7,
8, 11, 14
**agents** 62:15
**aggregate**
264:5
**aggregated**
194:19
**aggressive**
124:24, 25
125:24  126:4,
24  127:13
**aggressiveness**
127:20
**Agha** 102:11
**ago** 48:7
147:5  164:5
**agree** 26:13,
24  27:14
59:19  62:7
89:2  96:13
103:25
104:20
121:10  161:7,
17  162:1, 9,
12  164:2, 5, 8,
12  191:18
193:24
232:15  259:5
265:1  268:4
281:4  287:18,
20
**agreed** 7:13
**agreement**
35:10, 12, 14
70:7
**agreements**
169:21
**ahead** 14:19
26:16  30:23
58:3  59:24
60:10  84:11
103:23
111:11
114:23
116:11
121:14
130:16
131:22
135:19, 22
150:12  154:9
173:15

175:23  191:4
207:6, 16
223:23
238:10, 13
263:17
276:25  277:3
283:17  285:1
286:21
**Aid**  3:4, 12
178:2
**al**  5:23, 25
**Alaska**  182:15
**Albertsons**  3:1
**Alfano**  3:19
**allow**  51:5
**allowed**  22:1
65:19  258:15
261:15  287:17
**allows**  70:8
194:2
**alluding**
265:11
**Alotman@dua**
**nemorris.com**
4:14
**alter**  174:3, 7
**alternative**
206:20
**Alto**  44:8, 10
46:15, 20
47:2  49:16
52:1  53:21
55:1, 16
**ALYSON**  4:10
**AMA**  221:14
**amenable**  58:8
**Amended**
5:14  30:10
74:1, 4  129:6
**American**
222:7, 9
**amount**  78:24
139:9  175:5
219:24  260:20
**amounts**
183:24
**analyses**
19:23  20:3
22:23  71:18
137:5  151:13
178:20

**187:**24  **188:**3
244:19  251:7
254:19  277:9,
11
**Analysis**
13:18, 19, 20
14:4, 5, 24
15:23  16:8
19:21, 22
20:4, 7, 24
21:7, 23  22:3,
14  23:2, 23,
25  24:2, 7
25:15, 23
26:1, 10
27:23  28:3
30:19  32:11,
15, 25  33:7,
14  34:10
35:6, 13
69:22  70:2, 7,
10, 11, 14
76:9, 13
82:18  111:15
141:22  149:6
191:25  199:3,
8, 12, 15, 18
204:5  223:25
243:21
246:14
250:25  251:4
253:25  258:6
263:9  268:11
274:22
279:12  288:20
**analyst**  15:12
**analytical**
244:13, 17
**analyzed**
251:9
**analyzing**
213:15
**ancillary**
116:5  288:20
**and/or**  24:12
**Angeles**  3:9,
14  4:11
**announcement**
148:3
**annual**  185:8

**annually**
170:2  185:7
**answer**  18:10,
20  19:1
21:20  22:13,
15  24:14, 16,
25  27:9, 25
28:14  29:1, 8
31:6  34:24
37:3, 4, 22
63:22  64:5
65:12  66:16,
22  67:15
69:5, 10, 11
71:5, 12  73:1
83:21  90:10
105:25
127:10
134:18  135:5,
21  136:13
152:3, 7
153:3  180:15
191:12  195:9
197:12
199:10  244:3,
5  268:12
277:8, 15
279:10  283:8
**answerable**
191:16
**answered**
52:13  70:19
132:1  138:11
173:10
185:12
188:24
190:19  191:3
256:18, 25
276:24  277:2
**answering**
134:14
**answers**  8:20
31:9  296:7
**Antonio**  198:7
**anybody**  9:23
168:11  172:3
191:10
192:17
278:25  292:15
**anybody's**

292:9
**anyway**  8:17
**apparently**
96:10
**appear**  65:4
**APPEARANC**
**ES**  2:1
**appearing**
7:13
**Appendix**
41:9  63:17
72:4  73:22
**applicable**
108:16
192:13
216:25  290:4
291:13, 20
292:5
**applied**  91:24
93:1  276:11
**applies**  265:7
**apply**  166:24
214:20
232:22  233:4
**applying**
158:11  214:12
**appointment**
44:8  100:16
**appointments**
43:8  246:24
**appreciate**
197:16  211:12
**approach**
217:5, 7
261:11
276:10, 11
**appropriate**
94:15, 17
118:12  149:8
166:17, 18, 21,
23  178:9
217:11
218:12  294:5
**approval**
249:16  250:8
**approved**
94:21, 24
95:5  100:22
**approximate**
110:15

**approximately**
110:16, 18
**area**  98:24
115:22
136:20  144:7
**areas**  46:10,
11
**argue**  192:7
**arguing**  217:3
**arithmetic**
37:21
**arrangement**
33:25  34:3, 4,
6
**arrangements**
33:18  151:11
**arrive**  232:16
279:6
**article**  117:6
166:20
205:25  206:3
288:5, 21, 22
289:3, 6
**ascertain**
277:23
**ASHLEY**  3:2
**Ashley.Jones@**
**bipc.com**  3:4
**aside**  78:12
94:10  96:22
130:8  177:9
224:17, 23
285:17
**asked**  12:2, 5
27:20  28:2, 6,
10, 19, 22
29:15  32:18
65:1  66:8
93:22  119:22
128:22
135:25
165:21  173:9,
10  181:18, 19
185:12
188:24  191:3
203:3  242:18
256:18, 25
276:24  277:1,
5  289:13
290:19  291:11

Confidential Information Subject to Protective Order

**asking** 25:2, 4
29:3  37:7, 8,
13  38:10
60:3, 6, 7
72:8, 9, 10
102:25  132:5,
6  136:4
148:7  166:5
180:17
182:24  186:2
197:15, 17
200:10  206:2
208:13, 16
209:21
210:14, 18
211:4  224:1
238:23, 25
239:2  240:12
245:18
246:13
269:24  283:13
**asks** 210:7
**aspect** 258:25
**aspects** 66:2
248:5, 17
**asserted**
205:20  206:7
**asserts** 261:12
**assess** 129:22
130:6  161:14
267:24
**assessing**
259:5
**assessment**
258:17
**assignment**
29:2, 3, 4, 5,
10, 19  109:23
171:8
**assistants**
211:21
**assisting**
27:24  52:8
**associate**
266:9
**associated**
109:12, 13
110:1  111:20
114:8, 18
127:7  132:22
144:2  154:10

221:7  247:16
254:11  273:25
**Association**
222:8, 9
**assume** 20:13
132:5  150:1
199:22
219:21  244:3
255:20  256:6,
16, 23  257:19,
25
**assumes**
130:15, 21
**Assuming**
202:15, 16
265:24
**assumption**
83:18  132:7,
13  171:5, 6
172:1  173:1,
5  174:2, 12
175:24
180:20
181:14
202:17  256:1
258:4, 5
**assumptions**
181:5, 8
255:18
**assure** 266:6
**asymmetric**
268:20  269:1
**asymmetry**
268:5
**asymptomatic**
96:10  108:1,
6  119:12, 25
120:6, 14
121:5, 8
**at-issue**
158:11  179:19
**atrial** 99:17
101:13, 16
154:4, 6, 13,
17, 20, 21, 23,
24  155:2
**at-risk** 90:18,
23  91:3
**attached**
294:11  296:10

**attachment**
255:6
**attachments**
41:2
**attempt** 186:6
**attending**
43:1  53:22
55:3, 5
**attention**
205:25
282:12, 19, 20
**attorney**
246:12
294:13  297:18
**attorneys**
172:8
**attribution**
34:9, 14  35:6
245:4, 15, 21
**audience** 93:2,
3  166:23
**August**
271:14  272:1,
10, 16
**author** 288:11
**authored** 64:2
**authoritative**
165:24
166:16, 25
**authority**
98:10
**authorized**
297:4
**authors**
101:24  102:1
288:16
**automatically**
203:8
**available**
105:4  109:1
123:22
137:20
142:21, 22, 24
189:8  191:17,
19, 20, 21
193:23, 25
194:7
**Avenue** 2:21
4:3
**average** 42:10,
13  44:18

46:24  96:15,
19  125:5, 7
137:6  151:17
156:14, 16, 19,
21  157:1, 2, 8,
9, 10, 11, 13, 16,
24  158:5, 8,
16  163:7
164:3, 9, 19
168:12, 25
169:2  170:3,
5  176:14, 16,
22, 23  186:15,
16, 19, 21, 22
187:7, 12, 14
190:24
191:25
192:11
195:13
198:21
199:16
202:21  203:3,
5, 16  206:22
207:1, 8, 21
208:6, 7, 8, 11,
21, 22  209:3,
6, 20, 21, 22
210:10, 11
212:14, 20, 24
213:10, 13
214:12, 14, 21
215:3  226:13
232:11, 12, 22
233:19, 20, 22,
24, 25  289:23,
24  290:1, 4, 7
291:13, 15, 20,
21, 24, 25
292:11
**averages**
156:4, 10
157:4  168:3,
5, 11  179:6, 8,
9  187:6
208:3, 4, 14,
16  210:17
211:9, 25
212:3  214:10
215:21
231:18
232:16, 19

233:7, 12, 17
288:25
289:14, 16, 20,
21  291:12
292:4
**averaging**
207:23, 24
209:5, 11
211:14, 16, 18,
23
**aversion**
279:18, 20, 24
280:4, 13, 15,
18, 21  281:1, 2
**averting**
279:25
**aware** 63:24
74:14, 18, 21,
22, 25  222:25
244:18, 19
252:12, 17
258:18, 24
271:13  276:9
281:21, 23
**Awareness**
100:10
**axis** 237:1, 2

< B >
**back** 37:18,
23, 24  39:21,
25  48:21
49:3  63:3, 8
107:10
119:21
133:22
136:17  146:1
153:16
159:25  160:5
161:3  168:15
204:24
229:24  235:3
243:6  281:15
286:7, 12
289:8  290:15
**background**
21:15  38:24
79:14
**bad** 289:20
**balance** 59:2

Confidential Information Subject to Protective Order

balanced 184:16
Balestrieri 80:25  81:1, 6
ball 127:11
ballpark 18:1  38:14, 18, 21  179:13
bands 50:18
Bank 4:3
bar 104:15  108:4
barely 130:17
Barnes 3:8, 13
based 98:2  99:19  108:22  115:16  117:13  118:13, 19  120:25  121:1  126:18  163:20  164:14  187:6  221:9  261:17  262:17
basic 27:3  215:24
basically 70:8  122:9  244:13  246:25
basis 21:24  111:25  115:7, 12  128:11  172:25  185:8  196:20, 21  264:20
bat 151:5
BAZAN 4:9
bear 77:3  148:20  149:4  150:7  162:25  216:4  225:13  248:15  277:10
bearing 150:16  272:10, 13
bears 109:8  151:1  288:23
beginning 23:7  29:5

43:6  172:9
begins 96:7
behaved 215:9
behavior 91:13  92:23  94:13, 14
believe 9:18  10:9, 19  13:23  15:14  16:8, 22  17:2, 13  20:1  23:15  24:6  26:4  27:7, 11, 17  28:4  29:13, 20  30:5, 16, 17  35:18  36:14  48:3  49:2  63:25  69:18  70:12  74:12  79:16  80:2, 15, 21  87:3, 10  97:4  102:4  108:11  113:1, 23  115:16, 25  120:15  138:24  142:23  144:25  146:1  163:24  164:21  168:19  176:14  178:14, 17  185:14, 17  187:12, 18  198:11, 14  200:12, 13  217:23  230:11  231:11  241:11  242:6  245:10  250:16  251:24  252:5, 9  254:9, 12, 15  257:9  260:24  266:21  269:10

287:12  288:7, 12
belong 55:5
benchmarks 206:15
benefit 228:14, 17  246:16, 22  247:3, 13, 16, 18, 21  248:3, 5, 14, 18  259:19  260:3  269:13
benefits 57:25  58:6  59:3  60:3, 15, 17  61:5  99:20  247:5  248:9, 21  258:9  266:13, 14  268:1  272:20
Berkeley 79:17
Bernard 81:3, 6
Bernstein 2:13
best 8:20  10:14  101:21  127:3  255:11
Beth 43:2, 18  44:3  48:24  49:1, 12, 24  50:2, 6, 15  52:2
better 50:25  123:25  124:2  149:18  151:11  194:20  195:8, 10, 21  213:8  217:6
beyond 54:23  156:8  157:19  211:22  268:11  283:6  284:22
big 16:16  38:4, 11  87:14  138:20  144:6  179:17, 25  180:13  181:2  196:11,

12, 13, 14  197:21  236:2, 21
bigger 180:21, 24  182:20
biggest 56:15
bill 82:15
billed 35:7  36:24
billing 139:20, 23  140:5
biopsies 128:1
biopsy 126:11  127:13, 18  128:6, 16, 17
bit 14:21  15:9  42:7, 9, 12  50:23  61:11  80:11  90:13  92:6  133:24  134:20  146:21  148:5  149:4  184:20  188:4  198:20  204:9  214:24  256:22  288:19
bladder 123:11
blocks 48:4, 5, 9, 10, 14, 15
blood 121:10, 23  122:5, 9  123:12  258:10
Bob 17:11
body 269:15
bone 92:9
bore 253:15
borne 149:8, 12, 18
Bosick 3:20
boss 97:21
Boston 4:18  13:25  39:23
bottom 227:19
bound 132:2, 14
brand 283:15
branded 144:18  282:10, 16

283:4, 23  284:14
breaching 66:13
break 9:12  59:11, 14  62:19  107:2, 15  133:22  159:11  161:5  163:7  243:2
breaks 9:11
breast 123:1
Brian 14:8  15:5  23:22  25:25  26:11  27:3  76:17  80:5  81:21
Bridge 4:3
brief 63:7  107:9  151:25  159:24  204:23  234:19  242:16  243:5  267:11  281:14  286:6, 13  290:14
briefly 7:16  14:15  160:5
Brigham 39:23  42:6, 23  43:20  44:13, 14
bring 165:12
bringing 172:7
Britt 75:2
broad 48:23  66:20  92:5  99:21  108:5  112:19  119:24  120:14  134:13
broader 94:11
broadly 79:20  84:15  93:13  101:17  108:16  152:15  155:9  177:4
Buchanan 3:2

Confidential Information Subject to Protective Order

**budget** 182:*10*
183:*14, 21, 23*
184:*3, 16, 21,*
*25*
**budgeted**
184:*12*
**budgeting**
183:*13, 16, 19*
184:*7*
**BULDA-**
**JONES** 1:*24*
7:*20* 297:*3, 25*
**burden** 58:*21*
149:*8, 12, 17*
150:*8, 16*
151:*9*
**Bureau**
100:*13, 25*

**< C >**
**Cabraser** 2:*13*
**calculate**
156:*19*
168:*12, 24*
178:*10* 182:*1,*
*3* 192:*18, 19*
193:*17*
229:*18* 264:*5*
269:*16* 277:*6*
278:*18* 279:*3,*
*12* 280:*13, 22*
292:*8*
**calculated**
165:*2*
**calculating**
181:*24* 232:*7*
233:*21* 275:*2*
**calculation**
114:*25*
259:*13*
274:*19*
275:*12* 276:*7,*
*20* 277:*16*
279:*9*
**calculations**
178:*2* 210:*2*
291:*19* 292:*4,*
*9*
**California** 3:*9,*
*14* 4:*11*
297:*1, 4, 6*

**call** 9:*8*
17:*11* 80:*15*
81:*2* 123:*9*
143:*16* 151:*6*
214:*4* 215:*22*
243:*22*
253:*14* 261:*7,*
*23* 262:*20*
**called** 7:*23*
34:*8* 35:*23*
42:*19* 45:*25*
53:*22* 70:*11*
100:*24* 122:*9*
139:*19*
184:*15*
208:*13*
213:*19*
215:*13*
218:*18* 229:*7*
231:*8* 247:*3*
280:*9*
**calling** 273:*2*
**calls** 13:*17, 18*
14:*3* 19:*22*
20:*4, 6, 12, 13,*
*16, 19, 23, 25*
21:*4, 6* 76:*13,*
*15, 16* 80:*16*
81:*2, 5, 12, 23*
150:*10*
161:*11* 255:*23*
**CAMDEN** 1:*3*
**Camp** 2:*5*
**campuses** 52:*3*
**cancer** 31:*16,*
*18, 19, 21, 23,*
*25* 32:*2, 3*
55:*12, 17, 24,*
*25* 56:*10*
57:*2, 3, 4, 5, 7,*
*9, 12, 15, 17, 21,*
*25* 58:*6, 7, 10,*
*11, 17, 18, 21,*
*25* 59:*4, 6, 20*
60:*17, 21, 22,*
*24* 61:*1, 8, 9,*
*14, 21* 62:*9,*
*13, 14* 83:*2, 5,*
*12, 14, 16*
85:*2, 7, 11, 20*
87:*25* 88:*22,*

*25* 89:*18, 25*
90:*1, 21* 92:*3*
93:*10, 14, 17*
94:*7* 97:*9*
98:*7, 9, 10, 13,*
*15, 19, 23*
99:*5, 10*
102:*18* 109:*8,*
*12* 110:*1, 7, 9,*
*17* 111:*5, 13*
112:*6, 9*
113:*3, 9, 12,*
*18, 22* 115:*1,*
*15, 19, 21*
116:*16, 22*
118:*19* 119:*5*
120:*8, 11, 18*
121:*1, 2*
122:*10, 18*
123:*17, 21, 22,*
*24* 124:*1, 2,*
*20, 21* 125:*3,*
*4, 8, 20, 23*
126:*10, 17, 20,*
*22, 24* 127:*14,*
*20* 129:*25*
131:*9, 15, 25*
132:*3* 149:*24*
150:*4, 8, 15*
160:*15, 17*
201:*23* 256:*4,*
*8, 13* 258:*12*
265:*15, 23*
266:*18*
275:*22*
278:*12* 285:*6,*
*9, 10, 13*
**cancers** 56:*24*
57:*11, 21*
58:*22* 91:*23,*
*25* 103:*8, 20*
107:*23*
111:*21*
122:*22, 25*
123:*5, 9, 14,*
*15* 124:*11*
128:*2*
**candidate**
201:*16*
**capacity**

183:*16*
**caption** 297:*19*
**captured**
87:*16* 189:*5,*
*6, 7*
**carcinogen**
149:*25* 150:*3*
**carcinogens**
270:*18*
**cardiologist**
45:*13* 53:*7,*
*12* 54:*2*
**cardiologists**
230:*25* 231:*2*
**cardiology**
46:*17* 49:*19*
54:*14*
**cardiothoracic**
211:*1*
**care** 9:*9* 42:*7,*
*8, 13* 44:*10*
45:*3, 4* 54:*12*
55:*18, 19*
56:*7, 16*
92:*23* 98:*19*
128:*5, 6*
136:*23*
142:*10*
155:*25*
156:*25*
157:*11* 168:*6*
169:*3* 170:*20*
195:*16* 236:*6,*
*7, 8* 247:*19*
285:*14*
**career** 42:*2*
73:*15*
**careful** 151:*3*
**carefully**
294:*3*
**case** 8:*6* 10:*5*
13:*11* 23:*6*
26:*8, 14, 22,*
*25* 27:*4, 5, 6,*
*8, 10, 13, 18, 19*
28:*1, 5* 29:*3,*
*13, 21* 31:*7, 9*
34:*7* 64:*10,*
*21* 65:*9*
66:*12, 17*
68:*9* 70:*22*

71:*21* 72:*5,*
*23* 74:*20*
77:*20* 79:*25*
82:*21* 83:*1*
84:*7* 85:*2*
86:*2* 88:*3, 10*
94:*3* 106:*3*
107:*23* 110:*7,*
*10* 123:*6*
137:*25*
156:*16* 158:*7*
166:*19, 24*
167:*23* 172:*8*
173:*19*
175:*20* 200:*9*
208:*5, 22*
212:*23* 219:*3*
233:*16*
235:*25* 236:*6*
240:*13*
245:*14*
270:*15*
271:*17*
273:*15, 21*
281:*24, 25*
284:*19* 288:*19*
**cases** 24:*3, 5,*
*10, 12, 17*
25:*12* 26:*8*
62:*12* 63:*15,*
*18, 25* 64:*2,*
*10, 14, 16, 17,*
*18, 19, 21, 23*
65:*4* 67:*8, 9,*
*18* 68:*7, 19*
69:*16, 21*
70:*23* 71:*9*
72:*9, 21* 73:*2,*
*9, 17* 114:*25*
122:*6* 134:*22*
135:*13*
216:*24*
217:*24*
221:*17*
239:*18, 19*
247:*25* 248:*1*
**catching** 61:*6*
**CATELLO**
3:*19*
**Catenacci**
74:*25*

**caught** 124:*20, 23*
**causal** 132:*2*
**causation** 74:*19* 82:*23, 24* 84:*8, 14* 86:*5* 89:*13, 22* 109:*17, 24* 115:*21* 128:*24* 131:*8*
**cause** 83:*2, 4* 85:*2* 89:*25* 90:*1* 131:*9, 15, 25* 297:*11, 20*
**caution** 63:*23*
**caveat** 56:*15*
**caveats** 128:*19*
**CDER** 251:*5*
**cells** 58:*19*
**Center** 43:*2, 19* 44:*4* 49:*24* 197:*4, 11* 200:*1, 11* 250:*19* 251:*1*
**centers** 51:*25*
**central** 83:*25* 106:*4* 224:*5* 232:*17* 233:*9* 257:*4* 260:*6* 269:*10, 11*
**Centre** 3:*20*
**Century** 3:*8, 14*
**certain** 50:*11* 58:*22* 62:*16* 64:*25* 83:*15* 94:*15, 16, 17* 99:*20* 104:*7, 10* 105:*5, 6* 106:*8, 13* 114:*8* 120:*24* 121:*19* 124:*20* 140:*1* 144:*12* 156:*5* 189:*19, 21* 190:*23* 193:*14* 194:*25* 196:*7* 198:*4* 218:*20* 221:*18*

231:*19* 248:*25* 249:*4* 258:*14*
**certainly** 56:*14* 91:*24* 115:*5* 142:*17* 159:*8* 166:*14* 194:*20* 195:*8, 15* 202:*8, 9* 265:*16* 266:*8*
**certainty** 87:*21* 104:*10* 126:*6* 127:*16* 188:*7* 271:*5*
**Certification** 5:*20* 74:*3*
**Certified** 7:*24* 138:*4* 188:*16* 297:*3*
**certify** 296:*5* 297:*7, 17*
**cetera** 144:*16*
**Chain** 249:*23* 250:*5*
**challenge** 134:*12*
**challenged** 68:*19, 22*
**CHAN** 1:*17* 5:*14, 16, 20, 23, 24, 25* 6:*1, 2* 7:*11, 22* 8:*4, 11* 11:*1* 18:*11, 19* 21:*20* 22:*12* 24:*15* 34:*25* 41:*3* 63:*12, 22* 66:*21* 67:*5* 72:*20* 77:*9* 107:*14* 135:*4* 159:*5* 160:*3* 165:*14* 188:*19* 205:*2, 11* 216:*9* 225:*16* 243:*10* 262:*8* 281:*18* 286:*11* 288:*5* 289:*9* 290:*8* 292:*22* 296:*14* 297:*8*

**chance** 205:*15* 225:*25*
**change** 22:*19, 20* 36:*7* 45:*7* 48:*8* 104:*7, 9* 124:*7* 141:*22* 148:*23* 169:*3* 182:*12, 15* 185:*3, 9* 220:*19* 273:*5* 295:*3, 6, 9, 12, 15, 18, 21*
**changed** 22:*8, 12, 22, 23* 101:*7, 14* 102:*3* 184:*8*
**changes** 152:*4* 182:*10, 14* 210:*16* 236:*6, 7* 237:*14, 21* 239:*7, 10, 11, 13, 15* 294:*10* 296:*9*
**changing** 56:*4*
**Chan's** 62:*23* 111:*10* 159:*1* 268:*11*
**chapter** 261:*23* 262:*15, 24* 263:*4, 7* 264:*14, 18* 265:*4, 5, 7*
**characteristics** 31:*21* 84:*17* 106:*7* 125:*19* 127:*1, 6* 168:*9* 169:*19* 201:*9* 224:*3*
**characterize** 44:*20* 104:*5* 116:*12* 133:*15* 142:*2* 161:*21* 162:*17* 211:*17* 214:*6, 17* 217:*4*
**characterized** 224:*18*
**characterizing** 105:*7, 10*

**CHARCHALIS** 3:*13*
**charges** 34:*10* 149:*15* 175:*3, 4*
**chart** 200:*1*
**check** 15:*24* 16:*8* 47:*3* 226:*17* 245:*13* 255:*12* 281:*10*
**checked** 16:*6*
**chemotherapy** 52:*25* 55:*10* 56:*4, 13* 58:*14* 61:*20, 23* 62:*15*
**chest** 104:*25* 105:*11, 13, 15, 16, 19, 23* 155:*23*
**Chimin** 8:*11*
**choose** 45:*11* 204:*3*
**choosing** 202:*12*
**chose** 45:*24* 211:*25*
**chronic** 154:*24*
**circle** 146:*1*
**circumstance** 266:*25*
**citation** 115:*11* 117:*11, 15, 19* 163:*25* 262:*7*
**citations** 114:*17*
**cite** 110:*4* 114:*12, 24* 115:*13* 117:*5* 123:*13* 241:*10, 11* 261:*23*
**cited** 113:*11, 15* 115:*17* 119:*23* 161:*23* 164:*21* 276:*13, 14*

**cites** 118:*1, 2* 166:*4, 10*
**citing** 83:*24*
**Civil** 297:*6*
**claim** 29:*15, 23* 258:*7* 276:*16*
**claims** 29:*10* 135:*14* 145:*1* 224:*1* 231:*10*
**clarification** 211:*12*
**clarify** 72:*13* 103:*11* 128:*12* 174:*7* 183:*18* 285:*7* 289:*19*
**Class** 5:*20* 40:*11* 74:*1, 3, 4* 88:*11* 129:*3* 135:*14* 137:*18, 22, 24* 138:*3, 7* 146:*1, 2* 149:*3* 164:*4, 6, 7* 168:*10* 170:*9, 11, 22* 171:*13, 18, 20, 21, 22* 172:*11, 20, 22, 23* 173:*23* 176:*15, 22* 177:*6* 178:*15* 179:*16, 17, 18* 180:*1, 7, 12, 13, 16, 20, 23* 181:*3, 5* 187:*8, 13, 18, 25* 188:*12, 13, 16, 25* 189:*2, 4, 5, 9* 190:*23* 192:*6, 14* 193:*13, 16* 194:*9* 195:*16* 196:*7, 24* 198:*17* 199:*22* 290:*5* 291:*14, 20, 24*
**classes** 195:*25*
**classwide** 282:*2*

clear 88:5
116:24
170:20 199:1
clearly 256:22
Clemens
241:10, 17
clinic 144:1,
13, 25 145:6,
17
clinical 42:18
43:1 89:21
93:2, 3 103:7,
14, 19 125:21
155:10
244:15 285:9
clinically
45:24 89:11,
16
clinician
92:12 119:8
135:10 282:21
clinics 144:15
145:5
clipping 221:8,
22
close 45:23
59:17 203:14
243:23 281:10
closely 208:23
262:21
COAN 4:17
Coast 59:17
coasts 51:23
coauthors
101:23
211:20 242:9
code 15:25
16:11, 13
19:24 88:6,
19 143:15
221:23 222:2,
4, 6, 12, 13, 15
230:22, 25
244:12, 14
282:22 297:6
codes 143:21
221:15, 18, 24,
25 222:11
253:16
254:10, 12, 16,
24, 25 255:3

cognizant
104:14
colleague
243:11 247:1
colleagues
281:11
collected 86:16
collects 86:18
87:2
college 41:16
collegial 53:16
colon 120:10
122:10
colonoscopies
122:8 144:16
145:17, 18
221:21 285:16
colonoscopy
221:6, 8, 22
Colorectal
120:20, 21
121:1 123:10
160:14, 17
column 120:19
combination
182:21
come 26:21,
23, 24 27:20
33:18 37:18
55:25 63:3
105:10
153:11
168:10 171:5
195:4 228:12
237:21
comes 37:2
57:2 61:18
97:19 164:22
205:21 206:9
237:20, 22
comfortable
134:14
coming 39:21
50:14 158:25
216:8 236:16
comment
84:13 117:22
279:13
283:11 285:3
288:19, 21, 24

commenting
111:14 219:5
259:15
comments
242:11
288:10, 16
289:3
commercial
179:2 234:24
235:9 237:16
238:3, 8
239:9 240:16,
25 241:2, 23
246:22 247:4,
6, 13, 16
commercial-to-
Medicare
192:21 193:5,
21 194:3
commit 51:6
committee
218:18, 19
222:10 231:8
237:13
common
205:21 206:8
209:3, 4, 9, 23,
25 266:11
284:6 288:18
community
52:5
comorbidities
56:20 201:15
comorbidity
203:20
company
146:10
190:13 226:7
comparable
229:1
compare 87:9
116:18
151:10, 11
180:9
compared
112:10 199:17
compares
194:19 219:6
comparing
200:5 208:6,

7 210:16
211:9 290:2
compensation
34:21
complaint
27:4, 18 30:4,
10, 11, 13
57:3 71:15
74:1, 5 86:9
129:6 148:19
171:9 172:2,
7 173:14, 17
complaints
49:18 64:22,
24, 25 65:18,
22 173:23
complete 89:5
completed
23:3 39:21
completely
7:17 221:4
complexity
139:24 149:17
compliance
257:20 258:1
265:25 266:5
complicated
62:2 149:12
151:13 152:3
184:13
comply
258:22 260:16
components
169:23
Comprehensive
98:15 214:7
concentration
85:16
concept
130:10 174:15
concepts
269:23, 24
concern 85:8
105:22 282:9,
14
concert
128:17 263:5,
6, 14 265:2, 4,
8

concluded
292:25
concludes
164:4
conclusion
27:13 150:11
155:14
161:11
164:16
171:25 173:1
203:8 208:24
239:2 241:21
242:1 255:24
268:4
conclusions
76:23 233:14
concordant
234:23 235:7
236:13
concrete
278:18
condition
55:23 154:24
269:3
conditioning
169:1
conditions
49:22 75:20,
23 189:20, 22
conduct
276:18, 20
conducted
250:1, 4
275:11
277:15 279:8,
11
conducting
276:7
conducts
86:21, 23
confer 290:11
confident
179:5
CONFIDENTI
AL 1:12 64:4
65:11, 23
66:3, 25 67:2
134:11 136:8
confidentiality
64:1 65:24
66:13

Confidential Information Subject to Protective Order

confirm
291:*18*
confused
149:*5*
confusing
148:*18*  253:*2*
Congress
184:*8*
connection
77:*19*
conservative
110:*4*  116:*1,*
*17*
consider  54:*1*
56:*19*  62:*1*
84:*16*  103:*5,*
*18*  108:*17*
119:*13*  125:*3,*
*6*  151:*4*
152:*6*  176:*1*
207:*20*  254:*9*
257:*1*  265:*14,*
*17*  273:*8, 9*
288:*2*
consideration
56:*19*  118:*15,*
*20*  270:*19*
272:*21*
considerations
32:*1*  60:*1*
105:*6*  118:*16,*
*21*  248:*22, 23*
274:*5*
considered
11:*24*  12:*6,*
*23*  19:*15, 16*
255:*21*  256:*1,*
*11, 17, 24*
257:*3*  258:*16,*
*21*  287:*5*
considering
116:*2*  175:*8*
258:*8, 9, 12*
considers
97:*23*  108:*23*
119:*6*
consistent
32:*7*  237:*15*
239:*8*  244:*15*
287:*21*

consists
171:*13*
Consolidated
73:*25*  74:*4*
constraints
159:*17*
construction
132:*14*  189:*18*
consult  53:*7,*
*11*  54:*24*
55:*12, 22*
56:*2, 5*
consultant
24:*21*  54:*20*
70:*3*  72:*24*
consultants
54:*3*
consultation
53:*1*
consulting
13:*20*  38:*13,*
*16, 20*  54:*11*
70:*9*  71:*22*
72:*10*  80:*12*
consume
268:*9, 22*
consumed
171:*14, 19*
199:*5*  253:*21*
254:*5*  278:*8,*
*25*
Consumer  6:*2*
261:*13*
262:*20, 21*
263:*8, 9*
264:*2, 6, 9, 16*
265:*7*  287:*15*
consumers
249:*1, 9*
254:*5*  259:*20*
260:*4*  266:*3*
275:*20*
contact  14:*6,*
*11*  23:*22*
24:*6*  25:*25*
26:*3, 4, 10*
69:*18*
contacted
23:*21*  25:*22*
contain
270:*17*  273:*7,*

*14*  278:*8*
283:*19*
contained
88:*18*  256:*2,*
*12*  267:*8, 15*
284:*20*  285:*17*
containing
110:*9, 11*
contains  11:*9*
256:*7*  266:*23*
contaminated
83:*1*  85:*1*
149:*25*
198:*12*  199:*5*
contamination
88:*4*  272:*3*
contemporaneo
usly  245:*18*
contend
177:*10*
context
249:*18*  251:*3*
260:*24*
Conti  13:*15*
16:*25*  19:*7*
29:*16*  30:*8*
74:*8*  255:*8,*
*17*  259:*13*
261:*12*  287:*19*
continue
88:*20*  263:*18*
270:*23*  271:*12*
continued  43:*7*
Conti's
246:*14*  255:*6*
258:*6, 18*
261:*8*  263:*24*
268:*4*  287:*11*
contract
146:*6, 12*
contracting
151:*10*
contractors
153:*6, 9*
contracts
151:*7, 9*
169:*22*  260:*19*
contrast  96:*7,*
*8*  171:*21*
172:*23*

contributed
102:*16, 20*
control  15:*25*
16:*7, 18*
89:*15*  258:*10*
controlling
275:*23*
conversation
27:*2*
conversations
26:*7, 11*
conversion
182:*11*
convert  113:*8,*
*16*
converted
115:*3, 5*
copy  28:*6*
core  83:*22*
84:*13*  85:*7,*
*24*  274:*21, 23*
Correct  11:*11*
12:*10*  13:*2*
16:*12*  17:*7*
18:*4*  20:*15*
23:*4*  25:*16,*
*20*  32:*13*
35:*8*  40:*22*
41:*17, 21, 25*
46:*22*  50:*20*
64:*15*  68:*4*
73:*18*  74:*6*
89:*1, 24*
100:*9, 11*
101:*6*  106:*2,*
*17*  114:*5*
117:*3, 10*
119:*20*  121:*5,*
*9*  137:*13*
138:*1, 5, 9, 10*
143:*12*  173:*2,*
*7, 13*  202:*6,*
*19*  216:*20*
233:*20*
239:*22*
242:*10*
247:*14*  254:*8*
255:*5*  258:*23*
259:*14, 22*
260:*12, 14*
266:*10*

271:*14, 15*
274:*2*  276:*22*
291:*15, 16*
296:*7*  297:*15*
corrections
294:*4, 6*  296:*9*
correctly
217:*13*
233:*13*  245:*8*
correlate
168:*8*
correlated
168:*23*  169:*2*
correlates
169:*18*
correspondence
242:*13, 20*
cosmetics
249:*20*  250:*2*
cost  146:*11*
148:*19, 22*
169:*21*
170:*20*
172:*17*  174:*2,*
*9, 19, 20, 21*
175:*3, 5, 12,*
*13, 15, 17, 25*
176:*1*  177:*8,*
*23*  190:*3, 11*
202:*2*  203:*17,*
*20*  236:*24*
247:*21*
248:*22*
259:*19*  260:*3*
cost-
effectiveness
277:*9*
costs  60:*4, 16*
175:*4*  201:*12*
249:*8, 12*
260:*7*
cough  120:*9*
Counsel  7:*18*
173:*6*  255:*17,*
*20*  297:*17*
counsel's
24:*16*
counterfeit
251:*15*

**country**
136:*20*
151:*16*
152:*14*  182:*14*
**COUNTY**
297:*2*
**couple**  184:*18*
**course**  13:*11*
99:*20*  101:*17*
120:*2*  123:*21*
156:*19*  189:*5*
**COURT**  1:*1*
7:*9, 20*  235:*2*
294:*17*
**court-
approved**
95:*15*
**courts**  94:*21,
25*  95:*5*
**Covariants**
227:*9*
**coverage**
86:*20*
**covered**  18:*12*
190:*7*  248:*20*
**CPT**  143:*15*
221:*15*
222:*10, 11, 12,
13, 15*  230:*22,
25*
**create**  215:*21*
**created**  231:*18*
**creating**
232:*1, 3, 5*
**creation**
103:*12, 19*
172:*14*  243:*12*
**criteria**  112:*4,
5*  166:*13*
**critiques**
216:*16, 19*
217:*23*
**crux**  217:*6*
**crystal**  127:*11*
**CSR**  1:*24*
297:*25*
**CT**  97:*2*
104:*20, 25*
105:*4, 11, 15,
17, 19, 22*
114:*2, 9*

**Culbertson**
4:*17*
**cumulative**
129:*5, 14*
130:*7, 9, 12*
131:*4*  171:*15*
**curable**  57:*23*
**cure**  266:*18*
**cures**  265:*14,
23*
**curious**  244:*4*
**current**
151:*15*
257:*21*  258:*2,
23*  260:*17*
285:*9*
**currently**
51:*16*  97:*11*
114:*2*  136:*12*
142:*16*  147:*13*
**curve**  261:*16*
262:*16, 20, 22*
264:*2, 3, 19,
21*  273:*11*
286:*25*
**curves**  263:*3*
**CV**  39:*6, 9*
40:*24*  41:*8*
43:*9*  63:*16*
100:*1, 24*
250:*16*
**CVS**  3:*4, 12*

**< D >**
**D.C**  2:*10*  3:*3*
144:*3, 7*
**D.Stanoch@ka
nner-law.com**
2:*7*
**damages**
259:*14*
**DANA**  4:*9*
**dangerous**
234:*3*
**Daniel**  74:*25*
102:*12*
**data**  16:*13*
19:*24*  20:*1, 2*
21:*14*  22:*12,
18, 19, 20, 22*
75:*25*  76:*1, 5,

8, 10, 20*
86:*10, 11, 13,
16, 18*  87:*2, 4,
25*  137:*11, 20*
143:*4, 8*
146:*15*
147:*10, 21*
158:*15*
163:*19, 20, 21*
164:*18*
168:*10*
169:*11, 14, 16,
17*  177:*7, 10*
189:*6, 7*
191:*5, 10, 17*
192:*22*  193:*5,
13, 15, 21, 23,
25*  194:*2, 5, 6,
7, 12, 22*
196:*7, 9*
207:*24*  208:*9,
11*  212:*15*
214:*16*
215:*25*  217:*7,
11*  218:*12*
219:*3, 7, 12*
224:*5, 6, 10*
225:*3*  228:*22*
230:*13, 15*
231:*21*  233:*8,
18, 19*  234:*2*
240:*15, 23*
244:*7, 9, 11,
14, 18, 20*
259:*13, 15*
**database**
143:*11*
**dataset**
142:*21*
209:*17*
210:*10, 12*
211:*16, 18, 25*
228:*15*
229:*11*  230:*6*
231:*8, 9, 11*
234:*1, 4*
**datasets**
142:*24*
213:*15*  230:*8,
9*  231:*15, 19*
233:*17*

**date**  7:*4*  22:*8*
294:*8*  296:*14*
**dated**  20:*22*
77:*16*  78:*18*
297:*21*
**dates**  64:*10*
73:*11*  141:*9*
**DAVID**  1:*17*
2:*4*  5:*16, 22*
6:*2*  7:*11, 22*
8:*11*  292:*22*
296:*14*  297:*8*
**day**  36:*8*
51:*15*  247:*1,
12*  269:*12*
286:*1, 12*
297:*21*
**days**  294:*14*
**Deaconess**
43:*2, 19*  44:*3*
48:*20*  49:*1,
13, 24*  50:*6,
15*  52:*2*
**deadline**  78:*25*
**deal**  52:*23*
62:*4*
**dealt**  33:*6*
183:*15*
**debate**  217:*10*
218:*11*
**decades**  141:*1*
**December**
23:*15, 19*
25:*18, 19*
77:*20*  244:*25*
**decide**  26:*12*
220:*22*
236:*22*  282:*6*
**decided**  48:*8*
139:*11*
**decides**  48:*2*
240:*2, 5, 6*
**deciding**
94:*14, 16*
**decision**  53:*1,
23*  54:*19, 24*
56:*4, 21, 22*
62:*2*  201:*22,
25*
**decisionmaker**
53:*24*  55:*7*

**decision-
making**  93:*17*
119:*5, 9*
218:*21*
**decisions**
52:*24*  61:*21*
128:*8, 17*
230:*20*  233:*9*
**Declarations**
75:*15*
**deemed**
294:*16*
**deeper**  151:*13*
**defend**  157:*9*
217:*2*
**Defendant**  3:*1,
4, 15*  4:*1, 16*
273:*15*
**Defendants**
2:*15*  3:*12*
4:*4*  64:*11*
68:*6, 9, 10*
171:*17*
252:*13, 21*
253:*5, 18*
254:*3*  271:*17*
272:*4*  273:*21*
**defended**
157:*17*
**define**  55:*20*
88:*6*  121:*4, 7,
15*  160:*13*
175:*8*  177:*12,
17*  179:*25*
189:*3*  221:*3,
9*  251:*22*
**defined**  138:*7*
149:*18*
158:*10*  164:*6*
174:*16*
**defines**
130:*13*  131:*5*
**defining**
189:*2*  206:*15*
**definitely**
159:*9*
**definition**
46:*5*  120:*4*
124:*6*  129:*3*
138:*8*  185:*5*
198:*16*  229:*2*

Confidential Information Subject to Protective Order

233:*17, 21*
277:*25* 290:*5, 23*
**definitively**
58:*25*
**degree** 39:*14, 15, 16* 113:*4*
114:*8*
**degrees** 15:*10*
39:*2, 20*
40:*21* 41:*20*
79:*15*
**delaying**
184:*19*
**delineated**
274:*9*
**delivered**
282:*7*
**delta** 192:*16*
**delve** 148:*21*
**demand** 261:*7, 14, 16* 262:*16, 22* 263:*3*
264:*2* 273:*10, 11* 286:*25*
287:*1, 16, 17*
291:*1*
**demographics**
86:*21*
**demonstrate**
115:*15* 191:*6*
**demonstrated**
83:*13* 147:*1*
270:*16*
**demonstrates**
137:*12*
**denominator**
232:*3*
**denote** 227:*24*
**department**
45:*2* 139:*4*
155:*12*
**depend** 66:*19*
127:*1* 190:*16*
237:*18* 264:*3*
266:*25*
268:*15, 17, 25*
**depending**
124:*7* 139:*7*
152:*5* 224:*19*

**depends**
53:*20* 57:*20*
61:*8* 62:*11*
89:*4* 118:*15, 17* 123:*18, 20*
151:*7, 8*
152:*4* 166:*25*
170:*21* 190:*9*
197:*6, 9*
200:*2, 4, 7*
203:*15* 236:*4*
237:*17, 20, 25*
238:*18*
241:*19*
268:*18, 19*
269:*24*
279:*19* 289:*21*
**deponent** 7:*11*
296:*1*
**deposed** 8:*12*
25:*12* 72:*4*
**deposing**
294:*13*
**deposit**
245:*13, 14*
**Deposition**
5:*14* 7:*6, 12*
9:*22* 10:*4, 19*
12:*16* 13:*8, 10, 12* 16:*21*
17:*4, 17* 19:*5*
20:*7, 17* 21:*1*
24:*13* 25:*7*
36:*7* 63:*14*
68:*2, 3* 72:*12*
78:*12, 13*
124:*16*
215:*13*
232:*20* 275:*9, 19* 276:*5*
289:*22*
291:*22* 292:*7, 25* 294:*3, 11, 14, 16* 297:*9, 19, 21*
**depositions**
9:*16, 17*
75:*14, 15*
135:*17*
**depth** 155:*11*

**derivation**
103:*6, 9*
**describe**
49:*11* 129:*24*
167:*24* 234:*1, 2* 246:*22*
254:*15*
269:*15, 19, 21, 22*
**described**
71:*14* 226:*7*
229:*15*
230:*12*
276:*10* 287:*21*
**describes**
166:*21* 201:*9*
**describing**
232:*24* 233:*2*
**DESCRIPTIO N** 5:*13* 233:*5*
**descriptive**
89:*19* 233:*3*
**design** 87:*19*
221:*14*
**designated**
25:*6*
**despite** 51:*23*
**detail** 21:*21*
22:*5* 160:*6, 16* 162:*16*
164:*14* 166:*1*
167:*6, 9*
252:*18*
275:*18* 276:*4*
**detailed**
124:*12*
132:*19*
160:*19* 163:*9*
191:*17* 201:*13*
**details** 65:*18*
131:*17* 146:*6*
272:*6*
**detect** 58:*16, 18* 59:*20*
123:*24*
**detectable**
58:*10, 12*
124:*3*
**detecting**
58:*17* 60:*17*

**detection**
109:*1*
**determine**
26:*21, 24*
147:*9* 156:*13*
164:*18*
169:*19*
170:*13*
176:*21, 25*
177:*5, 22*
178:*17*
187:*22*
190:*21* 199:*4*
204:*6* 209:*5*
224:*11* 244:*9*
254:*21* 255:*7*
274:*10, 19*
277:*16*
282:*22*
291:*19* 292:*4*
**determined**
48:*1* 169:*6*
185:*7* 188:*6, 14, 22* 224:*3*
**determining**
209:*16* 213:*2, 7* 277:*20*
288:*2*
**develop** 217:*5*
**developing**
99:*19* 149:*24*
150:*4*
**development**
98:*21, 22*
99:*4, 9, 10*
102:*17*
138:*14, 21*
**deviate** 223:*5*
**deviation**
156:*24* 224:*6, 13, 17* 227:*5, 7, 23* 228:*4, 21* 229:*2, 3, 5*
239:*24*
**deviations**
224:*23*
**deviation's**
228:*5*
**Devices** 250:*20*

**diabetes**
87:*25* 88:*22, 24*
**diagnose**
125:*8* 126:*19*
128:*8* 155:*3, 18, 20*
**diagnosed**
57:*2, 7, 10*
126:*10*
**diagnoses**
91:*11, 15, 16, 20, 22* 92:*3, 14* 93:*6, 13, 20* 94:*18*
153:*23*
154:*19* 155:*6*
**diagnosing**
56:*24* 91:*25*
**diagnosis** 56:*9*
57:*5* 91:*14*
92:*17* 93:*14*
125:*19*
126:*17*
154:*22* 155:*16*
**diagnostic**
91:*12* 92:*24*
93:*4, 5, 16, 18*
153:*25* 154:*2*
155:*20, 24*
**dialysis** 152:*19*
**Diana** 102:*13*
**Dickstein** 6:*2*
242:*7*
**dietary** 85:*10, 17* 130:*3*
**differ** 60:*21*
70:*22* 136:*20, 25* 179:*6*
189:*9* 255:*14*
274:*4* 284:*13*
**difference**
49:*25* 50:*7*
52:*10* 79:*18*
109:*2* 139:*7*
175:*3, 4*
179:*22*
192:*16*
212:*22, 23*
236:*3, 21*
257:*11, 17*

Confidential Information Subject to Protective Order

**differences**
140:8  201:6
**different**
13:23  36:12
49:4, 5, 15, 22
50:2  51:23,
25  52:3
60:21, 22
62:1  71:8, 13
78:1  89:15
111:20  112:4
114:1  118:16
119:6, 13
120:17  127:7
129:25  130:1
137:1, 9
138:8  140:2
147:6  151:10
153:10, 20
154:4  158:5,
12  168:4
169:9, 23
175:7  177:2
178:21
182:14  188:1
189:12, 22, 23,
25  190:4
191:7  192:12
195:15, 19
196:3  199:13
202:13  204:3,
4  207:19, 22
210:14, 19
212:16, 19
214:5, 13, 17
220:4, 22
221:12, 15, 17,
20  222:11
223:6  224:20
228:19
232:22  234:6
235:22
253:24  255:9
265:2  269:1,
6, 23  273:16,
21  274:6
275:21
277:12  278:5,
14, 15  280:7,
14  284:8
291:24

**differential**
204:7, 9
**differentiate**
274:5
**differing** 179:9
**differs** 235:21
**difficult** 66:21
130:6  151:18
292:8
**difficulties**
242:15
**dig** 155:10
**dimension**
237:25
**dimensions**
196:4
**direct** 83:7
86:8  96:2
99:24  106:18
107:17, 20
168:13
186:25
249:19, 22
**directed**
27:25  31:5
33:1  76:9, 19
87:4
**directing**
61:22
**direction**
177:3  239:11
297:14
**directly** 34:20
35:23  41:16
52:6  210:8
249:17  259:1
**disability**
152:17
**disclose** 18:22
142:5  248:7
**disclosed**
24:21  72:11,
22  73:2, 8
**disclosures**
24:23
**discover**
271:3, 7
**discrepancies**
211:5, 7
**discrepancy**
210:14, 15, 19

**discuss** 21:13
64:8  65:19
86:10  96:9
103:1  104:12
105:5  107:4
160:7  187:3
206:14
**discussed**
18:8, 16, 23
19:3, 8, 10
70:18  85:11
96:14, 25
97:1  109:17
117:1  120:20
147:20  163:7
171:8  173:18
**discussing**
21:14  247:1,
11  249:18
261:6  279:24
**discussion**
22:3  27:5, 12
151:25
177:19
206:17
207:18  208:3
212:19
234:19
242:16  263:7
267:11  274:8
**discussions**
21:22  22:14
79:25  177:10
247:23
**disease** 45:14
49:18  58:21
155:7  201:19
**diseases** 84:17
86:21  90:24
91:3
**disinterested**
297:13
**dispensed**
253:16
259:21  282:7,
23
**disproportionat
e** 223:3
**dispute** 226:20
**disregard**

190:3, 11
**distance** 232:7
**distant** 57:16
**distinct** 158:3
**distinction**
173:16, 17
**distinguishes**
200:16, 18
**distributed**
197:23, 25
198:1
**distribution**
198:9  200:7
203:10, 11, 12,
15, 16  207:20
212:16  213:9
214:8, 9, 11,
14, 17  215:3,
11, 14, 17
229:4  289:1
**distributions**
198:2  214:6,
25  229:1
**DISTRICT**
1:1, 2  7:9
**divide** 228:4,
20  229:3
**dividing**
227:23  232:2
**DIVISION** 1:3
**divulge** 66:25
**divulging**
134:10
Dklinges@dua
nemorris.com
4:13
**doc** 184:15
**doctor** 9:7
45:11, 14, 20,
22, 24  52:5
56:17  68:13
109:22  116:8
171:3  246:11
285:21
290:19  291:9
292:19
**doctors** 52:8
197:10, 12
246:24
**doctrine** 18:13

**Document** 1:9
11:4, 5, 6, 10
12:12  15:25
16:10  167:13
205:14
**documents**
10:1  11:12,
15, 19, 21
12:15  13:3
17:3  18:16,
21, 23  19:3
27:18, 22
28:4  29:24,
25  30:2, 18,
19, 21, 25
31:10  32:7,
11  64:22
**doing** 45:3, 9
86:15  89:8
142:14  149:2
155:22
209:14
210:13
211:18
232:13, 24
294:7
**dollar** 210:22
**dollars** 153:2,
5  182:11
**domain** 54:17
135:24
**domains** 93:16
**dosage** 114:4
131:18
**dose** 105:12
110:6  115:2
116:2  282:8
**doubled**
182:16
**download**
143:4, 8
**downsides**
60:7
**Dr** 5:16  7:11
8:4  16:24, 25
18:11, 19
19:7  21:20
22:12  24:15
29:12, 16
30:8  34:25
62:23  63:12,

Confidential Information Subject to Protective Order

22 66:21
67:5 72:20
74:8, 9, 11, 23,
25 75:2, 8
107:14
111:10
121:11 123:5
132:22 133:1
135:4 148:15,
21 159:1, 5
160:3 161:7,
12 162:2, 10,
21 165:11
167:14 169:9
187:3 188:19
194:6, 15
195:11
201:13 205:2
243:10
246:14 255:6,
8, 17 258:6,
18 259:13
261:8, 12
263:24 268:4,
11 281:18
286:11
287:11, 19
288:5 289:9,
16, 25 290:8
292:22
**drafting**
255:18
**drastically**
182:15
**draw** 112:12
171:2, 4, 6
205:25
**drawbacks**
60:16
**drew** 165:7
**drive** 22:10
38:6
**drug** 248:17,
22 249:16, 20,
23 250:1, 5, 9
251:1, 10, 11
260:16
261:19
262:18, 25
266:21 267:2,
4, 24 268:2, 3,

21 269:5, 13,
14 270:3, 4, 8,
11 271:4
272:11, 14, 21
273:1 275:12
276:8 277:7,
17, 21 278:8
279:12 281:7
282:16
283:23, 24
**drugs** 130:2
158:17
171:16 199:5
247:22
248:14, 20
249:1, 5, 8, 12,
18 250:12
251:12, 15, 18
254:4, 9, 11,
13 255:2
259:11 265:3,
8 268:7, 8, 9,
23 271:12
272:10
276:12
282:22 283:5,
14, 15, 21, 22
284:4, 7, 9, 13,
14
**drug's** 274:20
276:21 279:9
**Duane** 4:10
**Due** 7:15
251:25 256:4,
8
**duly** 7:24
297:4, 10
**duties** 51:19

< E >
**earlier** 58:7
69:20 70:18
71:14 73:15
74:7 76:14
109:25 114:3
115:21
117:13
121:21 148:6
176:18 204:2
215:12
232:20

247:24 271:2
289:13
**early** 58:1, 6
59:4 79:25
109:1 124:20,
23
**easier** 62:7
198:20
**East** 3:8, 14
48:21 59:17
**Eastern** 63:4
**eat** 62:21
159:5, 9
**economic**
13:20 74:4
100:13 101:1
171:21
172:23 241:9
248:25 249:4
259:11 260:9
261:13, 14, 17,
22 262:17, 21
263:1 265:5,
19 269:17
276:18
277:11
279:19 281:6
287:8, 15, 16,
19, 21, 23
288:2, 3 291:3
**economics**
15:10, 13
39:18, 20
40:1, 3, 14
42:16 79:17
92:13, 22
102:14
225:22
228:13
233:10 263:1
265:6 274:17
286:17 287:6
**economist**
12:14 29:15
39:1 68:14
80:3, 7 92:7,
12 135:9
150:21 151:2
214:2, 3
263:23, 25

**economists**
102:6, 11, 12
251:8 263:24
**editor** 216:17
**educated**
125:1 126:1, 7
**educating** 44:3
**education**
284:2, 6
**educational**
39:3
**effect** 132:3
278:18
**effects** 251:10
**efficacy**
248:23
**efficiency** 93:4
**effort** 176:21
178:13 190:21
**efforts** 178:16
187:21
**eight** 47:19
226:13
**either** 10:9
45:12 48:14
82:3 149:14
160:22 189:6
297:18
**elaborate** 37:5
**elaborates**
108:12
**ELAINA** 1:24
7:20 297:3, 25
**element**
269:11
**elements** 84:19
**Eligibility**
203:1, 2
**eligible**
152:13, 16, 21,
23
**Ellman** 14:8
15:6 23:22
26:1, 2, 6
76:17 80:4, 5
**e-mail** 26:4
**emergency**
45:2 139:4
155:12
**emphasis**
207:23

**empirical**
101:15
**employ** 140:2
**employee**
70:4, 10
**endeavored**
276:20 277:5
**ended** 45:8
219:20
**endogenous**
130:3
**ends** 197:5
200:14
**engage** 251:6
**engagements**
64:5
**England**
39:19, 25
205:6, 13
216:7 242:19
288:6 289:2
**enrolled**
39:15, 25
**ensure** 7:16
251:12
**entail** 175:9
**entire** 11:5
170:6 179:20
203:10 214:8
218:17
243:16 244:17
**entirely**
217:24 221:13
**entirety** 136:9
**epidemiology**
82:23 84:7,
14, 16, 20, 25
114:13, 18
125:7, 18
127:7
**equation**
227:21
229:15, 20, 23
231:13, 14, 25
232:6, 11
**equilibrium**
287:9, 24
290:20, 23, 25
291:3
**era** 50:12, 13

errata 294:6, 7, 10, 13 295:1 296:10
error 93:18 155:16 156:1
errors 16:11 92:19, 24, 25 93:5
esophageal 123:11
especially 179:16
ESQ 2:4, 7, 9, 13, 18, 20 3:2, 4, 13, 15, 19 4:2, 7, 9, 10, 17
essentially 27:23
establishment 98:22 99:4
estimate 78:20 109:25 110:4 115:25 116:18 186:6 192:5 223:18 238:3, 8, 20
estimated 110:6 192:9
estimates 85:19 187:4 217:5, 6 218:19
estimating 148:16, 25 238:23
estimation 217:12, 16, 18 218:3, 7, 12, 25 219:2, 5, 6, 25
et 5:23, 25 144:16
Etminan 74:23
Euclidean 232:7
evaluate 120:10 182:22 243:23
evaluated 244:17

evaluating 169:23
Evaluation 251:1 276:18, 21
event 278:13
events 9:1 252:9 281:3
eventually 184:17 252:5, 11 255:2
everybody 180:22
Evidence 6:1 97:23 98:2 99:19 104:7, 8, 9 105:21 108:3 124:10 127:17 177:3 179:11 188:8 266:9 270:15, 20 284:25 291:23
evidence-based 102:20 103:1
evolve 28:12
exact 23:18 236:10 252:9 277:10
exactly 16:1 17:19 19:9 23:18 25:10 30:12, 24 80:6 87:17 100:15 133:14 139:23 141:19 146:21 178:8 190:14 219:16 228:3 233:18, 20 236:13 237:6 274:3 279:3 283:23 284:9, 11
EXAMINATION 8:2 246:9 286:9 290:17 291:7

EXAMINATIONS 5:1, 3
examined 7:25
example 16:1, 5 55:23 61:3 85:19 95:23 96:18 104:19 110:3 112:24 124:21 125:9 132:21 142:24 144:1, 5, 20 158:4 180:2, 25 182:15 184:15 193:13 198:6 203:11 207:10 210:23 215:1 221:6 223:1 237:1 263:5 265:22
examples 123:14 145:3 157:15
ex-ante 269:19, 21 270:5, 12 272:11 273:3, 5, 13, 16, 19, 21, 24 274:8, 20 275:2, 13 276:1, 8, 21 277:6, 16, 20 279:12
excess 110:17
exclude 69:2
excluding 120:2
executive 139:17 141:11, 13
exercise 212:1, 5
Exhibit 5:14, 16, 20, 24 6:1, 2 10:24 11:1, 9 12:2 41:2, 3 73:22 77:9 165:13, 14 168:16, 19

205:5, 10, 11 210:4, 7 216:6, 9 225:15, 16 234:13, 14, 16, 17 260:25 262:2, 4, 7, 8, 11 287:12 288:7, 12
EXHIBITS 5:12 10:16, 20 16:14 179:1 197:20 210:5
exist 136:1, 5, 6 144:23 193:23 194:12 223:21, 22 224:6 261:15 264:10 287:16
existed 255:4
existing 238:7
exists 168:11 194:4 268:5
expand 253:25
expanded 28:24 29:5
expect 16:15 80:21 109:12 157:12 189:21, 24
expectancy 58:23 124:5 127:21 201:20
expectation 283:3, 14, 18
expected 110:8, 10 280:5, 22, 23
Expenditure 76:5
experience 15:9 80:11, 12 90:3, 6, 17 93:23 94:3 176:16 187:14
experienced 80:11 176:14, 22, 24 178:15,

16 187:13, 18, 21 190:22
EXPERT 1:16 5:14, 16 24:18 25:6 37:2 64:11 68:23 70:23 72:6, 10, 14, 22 73:3, 8, 16 74:15, 19 103:6, 18 116:25 125:3 131:8 161:12 247:24 248:2 257:10, 13
expertise 12:13 29:14 52:14 68:13 69:1 128:3 135:9 142:18 150:19, 22 244:16 260:9
experts 16:23 19:6 30:6 128:18 133:6
expired 252:14, 21 253:5, 9, 10, 12, 20
explain 92:6 214:23 286:17
explicitly 172:21, 24
explore 133:23
exposed 110:8, 10
ex-post 269:20, 22 270:8 277:23, 25 278:1, 19 279:4, 9
exposure 44:18 83:11 110:14 130:13 131:5
exposures 117:21
extensive 16:7
extent 11:14 64:6 84:10 111:9 114:22

Confidential Information Subject to Protective Order

116:*10*
130:*15, 20*
145:*9* 150:*10*
156:*8* 161:*11*
173:*11*
176:*21* 224:*2*
225:*6, 7, 3*
243:*23* 268:*10*
**extrapolate**
234:*3, 5*

**< F >**
**faced** 140:*9*
**facing** 191:*9*
**fact** 51:*23*
117:*18*
178:*21*
189:*18*
203:*19*
258:*20* 273:*6*
291:*19, 21*
292:*3*
**factor** 107:*24*
108:*8* 109:*14*
179:*15* 182:*11*
**factors** 62:*1*
107:*22* 109:*9*
111:*16, 20, 22,*
23 112:*2*
119:*7, 13*
120:*18* 160:*7*
274:*9, 19*
**facts** 27:*16*
130:*15, 21*
164:*14*
**faculty** 40:*4*
100:*24, 25*
**fail** 294:*15*
**fails** 108:*4*
**failure** 152:*19*
189:*17*
198:*23*
200:*17, 20, 21*
201:*1, 11, 15,*
19 202:*7, 10,*
11, 14 203:*19*
258:*11* 275:*24*
**fair** 8:*22*
9:*14* 12:*20*
27:*1* 36:*19*
46:*4* 52:*15*

84:*6* 93:*8*
98:*21, 24*
99:*3* 106:*16*
115:*7, 11*
118:*7* 127:*9,*
15 133:*11*
136:*19, 25*
137:*14* 149:*7*
156:*3* 157:*5*
169:*25*
173:*22* 174:*1*
176:*20*
192:*20* 197:*3*
199:*21*
205:*19* 206:*7*
208:*25*
216:*22*
217:*15* 218:*3*
220:*2, 18*
222:*6* 233:*7*
234:*22* 235:*6*
237:*12* 238:*1,*
15 239:*2, 3, 6,*
10 240:*11, 22*
241:*1* 257:*7,*
14 259:*1, 4*
278:*17, 20*
**fairly** 16:*16*
49:*14* 166:*1*
**fall** 199:*6, 25*
238:*9* 247:*3,*
12
**falls** 31:*24*
190:*5* 200:*11*
**false** 105:*8, 9*
106:*6* 122:*14,*
18, 19
**familiar** 98:*14*
128:*5, 19*
129:*12*
135:*10* 151:*9*
184:*2*
**familiarity**
184:*5, 11*
**family** 113:*4*
**far** 178:*17*
181:*19*
184:*25*
187:*22, 23*
196:*12* 264:*1*

**farther** 182:*4,*
17 183:*2*
**fashion** 174:*4,*
7 182:*1*
184:*24* 243:*19*
**faulty** 261:*12*
**favor** 248:*21*
**FDA** 85:*19*
110:*6* 114:*24*
115:*10, 25*
250:*7, 14*
251:*17*
252:*22*
253:*19*
255:*10, 22*
256:*17, 24*
257:*2, 3*
258:*15*
270:*22*
271:*11, 19*
272:*2, 9* 282:*1*
**FDA's** 250:*12*
253:*5, 22*
254:*1, 21*
**feasible**
129:*22*
169:*10, 13*
189:*4* 192:*18*
199:*7*
**February**
77:*16* 78:*16*
245:*2*
**fecal** 122:*8*
**federal** 87:*3*
139:*14*
147:*16*
183:*20, 22*
240:*2, 5, 6*
**Fee** 5:*22, 25*
33:*19* 220:*13*
223:*5* 240:*9*
**Feel** 217:*22*
**fees** 33:*19*
34:*1, 9* 35:*6*
**Fellow** 100:*25*
251:*4*
**fellowship**
40:*13* 45:*12*
**FHS@pietragal**
**lo.com** 3:*22*

**fibrillation**
99:*17* 101:*13,*
16 154:*4, 6,*
13, 17, 20, 21,
23 155:*2*
**fibrillation's**
154:*24*
**fictional**
144:*20* 145:*6,*
12
**field** 161:*18*
**Figueroa** 4:*11*
**figure** 22:*7*
37:*12* 39:*10*
62:*20* 97:*5, 6*
111:*18, 19*
113:*1, 2, 24,*
25 116:*20*
120:*15, 17, 19*
122:*4* 141:*19*
142:*25* 143:*6*
146:*18* 160:*7*
179:*2* 210:*7,*
13, 18 211:*4,*
13, 18 221:*14*
227:*14, 15*
235:*12, 14, 23*
237:*19*
255:*13* 277:*21*
**figures** 179:*2,*
15
**file** 36:*15*
205:*5*
**filed** 64:*18, 22,*
23 65:*2, 22*
**film** 105:*18*
**final** 76:*24*
**finality** 169:*7*
**finalized**
20:*21* 22:*20*
**finalizing**
20:*14*
**finally** 138:*3*
227:*20*
**finance** 172:*14*
**find** 11:*17*
23:*2* 27:*25*
31:*5* 57:*3, 4*
65:*3* 113:*17*
127:*8* 160:*20,*

22 163:*25*
270:*6*
**finding** 57:*25*
147:*4* 208:*15*
**findings**
240:*11, 14, 22*
**fine** 9:*14*
59:*15* 62:*22*
67:*11* 159:*15*
167:*21, 22*
**finish** 41:*20*
281:*10*
**finished** 40:*2*
42:*14* 44:*6*
71:*4, 5*
**finishing** 40:*1*
207:*12*
**finite** 177:*18*
**Fink** 79:*22, 23*
**firm** 13:*21*
**first** 7:*24*
24:*6* 26:*4*
29:*19, 20*
39:*14* 40:*4*
42:*17* 43:*1*
44:*2, 13*
69:*18* 73:*6*
78:*4* 79:*4*
100:*23* 113:*4*
131:*24*
138:*13*
140:*14*
142:*20* 169:*1*
170:*25*
173:*24, 25*
174:*16* 175:*9*
188:*12* 189:*2*
198:*16*
211:*24*
213:*24*
214:*11, 20*
227:*19* 228:*5*
229:*18*
231:*15*
271:*10* 286:*16*
**fit** 152:*7, 11*
**fits** 212:*11*
**five** 59:*13*
147:*4* 159:*20*
227:*8*

Confidential Information Subject to Protective Order

five-minute 243:2
fix 184:15
fixed 29:4 202:2 203:20
Fixing 100:8
flexibility 51:5
flexible 51:4
flip 261:3
Floor 2:14 3:21 4:18 130:13 131:5, 6, 10, 11, 19 132:11, 15
flux 29:21
focus 61:7 98:23 99:5, 11 101:14, 15 115:22 150:22 155:7 190:10 196:9 214:9, 10 263:5 285:10
focused 92:1, 2, 22 93:9, 11 99:11, 15, 16 226:4
focuses 148:16 226:6
focusing 148:25 196:6 211:6
folder 10:15, 20 165:12
folders 16:12
follow 86:22 150:5 208:23
following 61:21 117:20 123:9
follows 235:5 284:12
follow-up 286:2, 14
food 249:20 250:1
footnote 117:7, 16 147:23 164:24 254:18 262:7

footnotes 114:13
Force 97:18, 21, 22
forces 250:8
foregoing 296:6 297:9, 19
foregone 208:23
foresight 127:4, 9, 12
forget 25:22
forgive 10:13
form 13:11 14:18 15:3 26:15 28:13, 25 30:22 32:19 33:4, 21 40:12 52:16 57:19 58:2 59:22 62:10 63:23 68:16 69:9 70:5, 24 71:11 78:1 79:11 83:20 84:9 85:3 86:3 90:9 91:8 92:10 94:22 95:8, 18 98:25 99:8 101:18 103:22 104:3, 22 109:21 111:6 114:21 116:9 121:13 127:14 129:7, 18 130:14, 20 133:13 137:16 141:25 145:8, 20 147:11 149:10 150:24 151:21 153:12 154:14 156:7 157:6, 18 161:10, 19 162:4, 14

164:10
167:16
173:11 174:5, 23 184:1 192:24 193:7 197:8 203:22 205:23 206:11 209:7 216:16 218:5, 19 224:22 232:18 233:11 235:1 238:11 240:17 252:23 255:23 259:3 271:21 275:5 282:4, 17 283:16 284:22 286:19 289:18 296:9
formal 46:11 216:15
forming 11:20 17:2 19:15
forms 189:22, 23 190:4 217:4 286:24
formula 184:22
formularies 248:11
formulate 233:8
formulation 103:6, 9
forth 8:1 130:12 131:4, 17 199:9
forward 74:19 181:21
forwarded 10:9
found 87:24 120:14 160:25
four 17:20, 21 21:10 46:25 47:17, 21 48:10, 17, 18 73:9 75:18

76:17 81:22 101:24 102:8 122:25
fourth 72:5
fraction 232:4
fractions 232:4, 5
fragile 215:2
framework 108:17, 23 117:23 118:6 259:5, 8, 17 261:7 278:22
FRANK 3:15 17:10 22:6 34:19, 23 35:17 65:16 67:13 76:18 130:17 134:2 135:20 276:25
Frean 14:9 15:12 76:16 81:16, 17
free 16:10, 11 184:23 217:22
frequency 282:9
frequently 57:17 213:7
full 8:8 47:2, 3, 4 138:17
full-time 47:4, 13
fully 32:5 54:17 189:6, 7 224:2
fumble 10:13
fund 153:16 172:14
funded 153:4
funds 153:1
further 29:9 75:25 120:10 172:11 201:2 242:12 278:9 285:22 290:9 291:6 292:18, 20 297:17
furthermore 138:17

future 127:4, 10 141:4 178:4 181:22 182:5 183:22, 25 184:7, 12 280:6, 25 281:3

< G >
gaps 138:20
gasoline 156:6, 14, 16
gastroenterology 49:20
gather 30:20 32:11 76:9
gathered 76:8
gathering 32:17 33:2 211:15
Gcoan@hinshawlaw.com 4:19
GEMAN 2:13
general 19:4 30:25 43:24 45:14, 16 46:6, 13, 16 49:14 52:10, 20, 22 53:4 54:8, 16, 23 56:16, 25 61:15, 25 66:12 67:8 71:15, 20 74:19 82:23, 24 83:12, 16 84:8, 14 86:5 92:5 108:17 109:17 125:17 126:6 128:3, 24 132:21, 23 134:5, 9, 10 136:21 137:3, 7 138:13 139:5 143:1 144:14, 19 145:2 158:9 193:19 206:4 210:20 217:5

Confidential Information Subject to Protective Order

239:*12* 263:*2*
265:*5* 271:*3,*
*6, 9* 290:*2*
**generalist**
46:*4* 52:*15*
**generalists**
56:*22* 57:*6*
**generally**
45:*17* 48:*5, 9*
51:*10, 14*
55:*12* 56:*2*
58:*12* 59:*19*
60:*20* 61:*19*
65:*9* 151:*16*
206:*2* 235:*17*
237:*7* 240:*14,*
*23* 257:*14*
283:*2*
**General's**
136:*18*
**generic**
171:*16*
248:*14, 17, 20*
249:*1, 4, 8, 12,*
*16, 18* 250:*9,*
*12* 266:*21*
267:*2, 4, 8, 15,*
*18* 275:*12*
276:*8, 11, 21*
277:*7, 17*
279:*9* 282:*10,*
*15* 283:*4, 14,*
*23* 284:*4, 7, 9,*
*13, 15, 19*
**generics**
248:*16*
**generous**
237:*10*
**GEOFFREY**
4:*17*
**geographic**
182:*13* 195:*2,*
*3, 20, 22*
**geography**
191:*19, 22*
195:*5, 6*
196:*4* 222:*16*
223:*9* 224:*19*
**getting** 54:*14*
76:*12* 122:*13,*
*18* 146:*5, 9*

157:*22* 205:*8*
221:*10*
260:*23*
275:*22*
289:*23* 291:*25*
**GI** 144:*19*
**give** 8:*17, 19*
18:*18* 21:*15*
22:*1* 24:*15*
37:*11* 58:*13*
84:*22* 92:*8*
115:*11*
125:*15*
126:*25* 134:*9,*
*18* 144:*4*
146:*11*
149:*20*
151:*19* 152:*7*
153:*2* 157:*15*
158:*6* 223:*19*
225:*25*
**given** 29:*14*
78:*24* 85:*20*
89:*11* 110:*24*
119:*9* 125:*8,*
*10, 19* 176:*12*
179:*23* 184:*8*
185:*11, 13*
187:*10, 17*
201:*21* 208:*8,*
*16* 209:*22*
212:*8* 218:*25*
219:*25* 222:*9,*
*15, 16* 280:*6,*
*23* 296:*7*
**giving** 124:*21*
144:*20*
157:*24* 177:*21*
**Glad** 226:*25*
**glass** 266:*23*
267:*9, 15*
**glass-**
**contaminated**
267:*18*
**glasses** 227:*1*
**GLENN** 2:*18*
17:*12*
**go** 8:*15* 9:*5*
14:*14, 19*
21:*21* 22:*4*
26:*16* 30:*23*

39:*8, 9* 41:*19*
45:*12* 58:*3*
59:*24* 60:*10,*
*23, 24* 84:*11*
101:*10*
103:*23* 107:*4*
111:*11*
114:*23*
116:*11*
121:*14*
130:*16*
131:*22*
133:*22*
135:*19, 21*
136:*22*
139:*24* 144:*9*
150:*12* 154:*9*
159:*21* 160:*5*
161:*3* 162:*25*
168:*15*
173:*15*
175:*23* 191:*4*
205:*7* 206:*19*
207:*6, 16*
218:*20*
223:*23*
229:*20, 23, 24*
238:*10, 13*
243:*2* 263:*17*
265:*10*
274:*18* 275:*2*
276:*25* 277:*3*
281:*9* 283:*17*
285:*1, 24*
286:*21* 289:*8*
290:*10*
**goal** 38:*2*
89:*24* 217:*3*
218:*17*
**goes** 34:*20*
91:*13* 237:*1,*
*3* 240:*8*
**going** 8:*18, 19,*
*21* 9:*5* 10:*12,*
*14, 15, 16*
11:*8* 18:*9*
21:*20* 22:*4,*
*15* 35:*20*
37:*23* 51:*9*
54:*1* 56:*17*
59:*9* 62:*21*

66:*19, 20*
76:*4* 96:*5*
106:*11, 23*
119:*21* 120:*5*
124:*24*
125:*23*
127:*10*
136:*17* 140:*4*
141:*4* 144:*4*
145:*18*
154:*18*
160:*10*
162:*15* 163:*1,*
*5, 24, 25*
165:*10* 166:*8*
168:*8* 177:*13*
178:*4* 181:*12*
182:*6, 8, 25*
186:*22, 23, 25*
197:*7* 205:*4*
217:*19* 218:*9,*
*20* 225:*12, 14*
228:*21* 229:*4*
230:*2* 234:*8,*
*11* 235:*18*
236:*24* 243:*1*
246:*13*
247:*25* 262:*1,*
*6* 282:*23*
286:*13* 287:*13*
**Golkow** 7:*3*
**Good** 8:*4, 10*
59:*9, 10*
86:*15* 107:*1*
149:*13*
204:*17*
219:*15*
220:*20*
246:*11*
257:*21* 258:*2,*
*23* 260:*17*
264:*10*
265:*25* 266:*5,*
*13, 14, 15, 19*
286:*11*
**Gordon** 3:*19*
**gotten** 123:*25*
124:*1*
**Gottlieb**
241:*11, 17*

**government**
87:*3* 138:*25*
139:*11*
140:*12, 13*
152:*25* 153:*1,*
*9* 156:*4*
170:*1, 12*
183:*14, 20, 21,*
*23* 185:*10, 14*
240:*2, 5, 6*
**government-**
**run** 153:*4*
**governs** 64:*1*
**Grant** 3:*21*
**granular**
195:*18*
**graph** 236:*25*
**Great** 8:*24*
10:*3, 22*
41:*12, 13*
77:*12* 107:*13*
122:*3* 125:*12*
141:*24* 142:*2*
205:*18*
225:*24* 251:*2*
252:*18* 275:*18*
**greater** 89:*3, 7*
**Greenberg**
2:*20* 117:*9*
**ground** 8:*15*
**Group** 13:*18,*
*19, 20* 14:*4, 5,*
*25* 15:*17, 23*
16:*3, 8* 19:*21,*
*22* 20:*5, 8, 24*
21:*7, 23* 22:*4,*
*14* 23:*23, 25*
24:*2, 7* 25:*15,*
*24* 26:*1, 10*
27:*23* 28:*3*
30:*19* 32:*11,*
*15, 25* 33:*7,*
*14* 34:*10*
35:*6, 13* 48:*2,*
*8* 52:*8* 69:*22*
70:*2, 7, 10, 11,*
*14* 76:*9, 14,*
*19* 82:*18*
94:*1, 11*
100:*17, 19*

Confidential Information - Subject to Protective Order

120:*1* 243:*21* 251:*8*

**groups** 179:*6*

**guarantee** 200:*6* 283:*22*

**guess** 15:*20* 31:*24* 96:*6* 100:*22* 125:*2* 126:*1, 7* 131:*14* 133:*7* 174:*25* 227:*17* 245:*18* 255:*6* 263:*23* 277:*22*

**guideline** 33:*12* 97:*3* 102:*17* 104:*8, 11, 16, 17, 21* 106:*16* 107:*25* 108:*9* 111:*17* 112:*3* 119:*11*

**guidelines** 31:*17, 25* 95:*6* 96:*9, 14, 17, 23* 97:*19, 24* 98:*12, 23* 99:*5, 10, 12, 14, 16, 19, 23* 100:*8* 101:*18, 19, 22* 103:*7, 14, 19* 104:*2, 13* 108:*15* 112:*19* 119:*19, 23* 120:*22, 24* 154:*5, 22*

**< H >**

**half** 47:*6, 13* 203:*12, 13, 14*

**hand** 234:*2* 290:*5* 291:*14, 20*

**handle** 53:*6*

**hands** 253:*11*

**handy** 228:*12*

**Hang** 21:*19* 116:*8* 173:*9* 188:*19* 191:*2* 205:*8*

**happen** 51:*12* 141:*4, 5*

**happened** 138:*22*

**happens** 56:*25* 57:*6* 125:*7, 18, 20* 240:*5, 7* 264:*12*

**hard** 55:*20* 60:*19* 69:*11* 123:*25* 124:*13* 168:*16* 225:*8* 237:*5* 277:*8*

**harder** 58:*23* 61:*14*

**harm** 122:*12, 19*

**harmful** 122:*21*

**harms** 109:*3* 268:*2* 269:*14*

**hazardous** 117:*20*

**HCPCS** 143:*15*

**HCPS** 143:*15*

**head** 78:*23, 25* 80:*1*

**health** 12:*14* 15:*13* 33:*10, 12* 39:*17, 20* 40:*15* 44:*10* 86:*19* 135:*11* 226:*4* 244:*16* 246:*23* 247:*4, 6, 13, 16* 250:*20* 275:*21* 277:*12* 279:*5*

**Healthcare** 4:*7* 33:*9* 69:*8, 12, 15* 86:*19* 141:*3* 142:*3* 150:*21, 23* 151:*16, 17* 152:*5* 153:*14* 197:*17, 18, 20, 23* 214:*2* 233:*10* 248:*9*

**healthy** 96:*10* 202:*11*

**hear** 130:*17, 23*

**heard** 7:*17* 75:*4, 5* 98:*16* 139:*19* 267:*1, 4*

**heart** 189:*17* 198:*22* 200:*17, 20, 21* 201:*1, 11, 15, 19* 202:*7, 10, 11, 14* 203:*19* 258:*11* 275:*24*

**Hecht** 74:*23*

**Heimann** 2:*13*

**held** 7:*6*

**help** 33:*8* 53:*8, 12*

**helped** 243:*18*

**helpful** 31:*1* 54:*24* 146:*1*

**hereinafter** 8:*1*

**Hetero** 4:*1*

**Hey** 204:*15*

**hick-picks** 143:*17, 18, 20*

**hide** 39:*11*

**high** 22:*2* 65:*9* 97:*22* 107:*24* 108:*8* 109:*13* 112:*1, 5, 9, 12* 118:*24* 122:*17* 135:*5, 8* 136:*21* 171:*14* 188:*8*

**higher** 85:*11* 104:*15* 105:*22* 111:*24* 113:*10, 14* 114:*4, 5, 6* 137:*3* 150:*4, 15* 155:*21* 223:*6* 235:*18, 19* 236:*1, 9, 10, 20* 237:*7, 8*

**highest** 110:*6* 115:*1* 116:*2, 18*

**highlighted** 231:*14*

**highly** 121:*11* 265:*2*

**Hill** 4:*2*

**HILTON** 2:*4* 5:*5, 7* 159:*21* 246:*10, 12* 253:*1* 256:*21* 257:*5* 259:*7* 262:*1, 4, 6, 10* 267:*13* 268:*16* 269:*7* 271:*24* 275:*10* 277:*14* 281:*9, 17* 282:*13* 283:*1, 12* 284:*1* 285:*4, 21* 286:*19* 289:*18* 290:*10, 18* 291:*6*

**hinges** 258:*20*

**Hinshaw** 4:*17*

**hired** 25:*19*

**histogram** 197:*4* 200:*1*

**histologies** 127:*7*

**history** 39:*3* 97:*11* 104:*24* 105:*3* 113:*5, 13* 121:*2* 160:*13*

**hold** 141:*18*

**holistic** 56:*22*

**homogenous** 51:*24*

**HON** 1:*8*

**hopefully** 165:*11, 19*

**Hospital** 39:*23* 42:*6, 23, 24* 43:*20, 23, 24* 47:*12* 49:*23* 50:*1* 53:*3, 20* 56:*1,*

6 61:*18* 137:*7, 8* 138:*13, 18* 139:*25* 140:*2* 144:*1, 6* 145:*2* 193:*14* 204:*10* 223:*2*

**hospitalist** 45:*25* 46:*1, 2, 3, 5* 47:*4, 7, 15, 17* 51:*20* 53:*14* 90:*5, 22, 23* 91:*6* 128:*4, 14, 15* 282:*5, 21* 285:*11*

**hospitalists** 46:*12, 13* 47:*2* 48:*2*

**hospitalization** 46:*18* 62:*4*

**hospitals** 43:*8* 48:*21* 49:*4* 132:*22* 137:*1* 138:*15, 25* 139:*12, 13* 140:*14* 142:*5* 143:*7* 147:*20* 149:*15*

**hour** 34:*5* 59:*10* 106:*24*

**hourly** 36:*6, 9, 10*

**hours** 17:*24, 25* 21:*10, 11* 38:*7, 13* 79:*1, 7* 82:*17, 18* 152:*8, 12* 159:*20* 167:*9*

**House** 250:*23*

**houses** 222:*10*

**How's** 245:*9*

**HP** 143:*15*

**Huahai** 4:*4, 7*

**Hudson** 2:*14*

**huge** 139:*9* 140:*8* 147:*5* 237:*3*

**huh** 177:*25*

**human** 91:*13* 155:*24*

Confidential Information Subject to Protective Order

humans
115:15
hundred
45:18, 19, 23
49:2  52:9
127:16
166:10
222:23
238:22  271:5
hundredfold
139:6
hungry  159:4
hypertension
189:17
198:23
200:17  275:23
hypothetical
61:11  131:21
144:20  145:5,
10, 12  149:21
150:10
151:19, 20, 24
164:11
174:24
175:22
177:22  178:2
181:25
186:11
194:14
265:23
266:17, 24
hypothetically
131:14  222:1

< I >
ID  145:2
idea  91:15
173:18  260:7
278:25  280:16
ideas  275:4
identification
11:2  41:4
77:10  165:15
205:12
216:10
225:17  262:9
identified
24:17  107:23
254:15, 20
identifiers
195:3, 4, 20

identify
167:13  217:4
254:10  283:21
identifying
71:16  91:15
117:4
identities
231:7
identity  231:6
II  92:19, 25
155:16
III.A  230:13
illegal  263:13,
14, 19, 21
illegitimate
251:15
illustrative
146:22  204:12
imagine
105:12, 16
133:5  143:7
147:18  157:21
impact  201:11,
16, 21, 24
202:1, 9
203:20  260:20
impacts
201:25
impede  9:1
imperative
294:12
imperfect
238:5
implement
240:2, 7

implementation
117:19  261:11
implication
172:17
implications
210:18, 21
implicit
180:14
implies  189:19
imply  124:3
implying
110:17
importance
205:20  206:8
207:24

important
84:20  93:16,
18  94:14
118:20
207:25  208:4
238:5  270:1
278:4
importantly
116:21  155:19
impose  222:3
improve  93:5,
19
Improvement
219:12
impurities
83:4  252:11
254:7  256:3,
4, 7, 8, 13
257:10  270:4,
21, 25  271:9
272:24
283:21  284:3
impurity
252:1, 7
257:12, 16
270:6, 7, 11, 14
inaccuracy
217:4
inaccurate
147:10
inappropriate
289:17
include  14:7
15:11  69:7
76:15  112:5
150:22
180:22
253:25  254:4
271:9  292:13
included
11:21  12:5,
17  78:11
171:22
172:21  180:23
includes
131:11  149:14
including
16:24  19:5, 7
71:10  73:9
113:3  172:14
177:7  216:24

247:19
257:20  258:1
284:15  292:12
income  37:1,
5, 14, 17, 22, 23,
24  197:12, 15,
21  215:1
Incomplete
131:20
145:10  150:9
151:23
164:10
174:23
175:21
186:10
194:23, 24
incorporate
275:22  279:6
incorporated
107:25  108:9
incorporates
273:11
incorporating
274:18  276:2
incorrect
174:2
increase
256:13
increased
85:11  120:2,
6, 12, 13, 23
236:13, 15
increasingly
45:20
incremental
104:8
incurable
57:18
independent
172:15
INDEX  5:1, 12
indicate  264:7,
15
indices  182:13
individual
26:10  154:11
169:18  212:6
222:22  224:1
individualized
119:8

individually
178:9
individuals
14:16  19:21
87:25  88:23
171:13, 18
243:17  279:21
Industries
2:18
Industry  6:1
80:11  141:3
156:4
infeasible
58:19  177:5
infected  52:21
infectious
45:13  49:18
inferences
87:21
influence  54:5
184:21
inform  12:8
INFORMATIO
N  1:12  23:6
24:24  25:3
27:3  32:11,
18  33:2
34:17  38:2
53:19  54:4
64:4  66:9, 24
71:17  76:12
86:20, 25
106:1  125:16,
21  126:25
134:11  142:7
146:11
181:18, 20
213:3  225:4
233:22  260:6
268:6, 20
269:1, 2, 4, 5
277:6  278:2,
5, 7
informed
11:24
informing
12:12
Ingersoll  3:2
ingested
150:3, 14
198:12

Confidential Information Subject to Protective Order

ingestion 85:12
ingredient 283:20 284:10
inherent 265:18
initial 23:22 25:25 27:2 29:10, 18, 22 31:8, 11 56:10
initially 27:15, 16 28:11, 21 30:3 32:5 57:2
initiated 26:3 282:1
initiation 52:25
injunctive 172:13
injury 277:22
inkling 270:17
innovation 265:19
inpatient 42:11 45:1, 4, 9, 22, 24 46:14 49:22 62:4 143:22
Input 6:1 16:13 54:19 55:10 116:13
inquiry 71:17 208:20
instance 136:21 156:5 270:24
instances 281:6, 8
Institute 98:7, 9
institutions 43:9
instruct 18:10, 22 21:21 24:22 65:16
instruction 18:19, 25 24:15, 25 64:3 65:7, 12 66:5 135:6

instructions 29:22 294:1
instruction's 22:15
insurance 86:20 146:6, 9, 12 158:9 166:22 182:9 189:22, 24 190:4, 9, 12, 17 191:9 194:18, 22 195:24 199:9, 19 202:9, 12, 13 204:3, 4 226:5, 11 235:20 236:8, 15 237:9 239:12 246:23 247:4, 6, 13, 17 290:3
insurer 139:8 146:13 147:2 148:15 237:16 239:9
insurers 142:6 147:3, 6 193:11, 14, 15 196:8
intake 110:17
intend 37:24 285:18
intense 47:9
interacted 15:15 52:6
interacting 33:7
interchangeabl e 287:6
interest 46:10, 12 92:5 175:16
interested 39:17 91:19 99:22 142:18 146:3 149:3 157:23 174:13, 14 175:2 234:5 297:20

interface 33:10 76:11
interfacing 33:13
internal 40:2 42:5 44:9, 18, 24 46:8 49:17
internist 46:6 52:22 56:16, 25
internists 57:1
interplay 286:17
interpret 237:6
interpretation 155:24 172:5 218:1 227:20 242:3, 5 246:19
interrupt 59:7 171:3 204:1 207:17
intersection 147:3
interventions 97:25
intestinal 123:11
intimately 219:16
intransparency 139:3, 10
intransparent 141:1
intuition 181:11, 16
invalid 232:23
invasive 121:12, 16
invented 265:16
investigate 84:8
invoice 14:14 77:13 78:9, 12 244:24
Invoices 5:16 77:2, 23 78:4, 7, 15 245:1
involve 135:14

involved 16:16, 17 26:25 27:6, 8, 9, 14, 18, 19 29:11 31:20 64:9 76:14, 16 79:24 133:16 172:8 173:19 229:14, 16 230:2 236:18
involvement 133:18
involves 91:11 128:6 155:24, 25
Iraq 50:13

IRBESARTAN 1:5 7:7
irrelevant 264:1
isolation 89:6
Israel 43:2, 19 44:3 48:25 49:1, 12, 24 50:2, 6, 15 52:2
issue 66:17 67:10, 12, 17 83:1 88:3 148:13 154:23 170:25 174:20, 21 175:19, 25 190:5 203:18 240:13 264:16 265:24 273:22
issues 86:5 98:1 148:22 183:16, 19 251:9
items 224:21 263:8, 10
its 133:16 223:5 270:12

< J >

JAMA 93:3
Janice 75:2
Janssen 67:18, 20, 23, 25 68:8, 11
January 5:16 20:22 22:9 28:21 78:15, 18, 21 141:6 244:24 245:2
Jason 102:11
JERSEY 1:2 4:3 7:10
Jessica 14:7 15:11 76:18 81:10, 20
job 40:4 42:18 43:1, 21 44:2, 5 45:18 47:9 50:22, 24 51:10 86:15 90:23
jobs 43:25 44:1 45:17 51:5 52:10
Johnson 14:8 15:11 67:19, 21, 23, 25 76:19 80:8, 9
jointly 55:18, 19, 21
JONES 3:2
Joseph 4:19 7:2
Journal 205:6, 14 216:7 225:22 242:19 288:7 289:2
JR 1:17 4:2 7:22 296:14 297:8
Judson 75:14
July 101:4
jump 106:22
jumps 166:2
June 44:6 272:12
Junior 8:11

Confidential Information Subject to Protective Order

jurisdictions
153:*10*

< K >
Kanner  2:*5*
KAPKE  3:*4*
Kaplan  13:*16*
16:*24*  19:*7*
29:*12*  30:*8*
74:*8*  121:*11*
123:*5*  182:*22*
201:*13*
KARA  3:*4*
Kara.kapke@b
tlaw.com  3:*10*
Karagodsky
80:*14*
KATE  2:*20*
17:*12*
keep  159:*3*
kept  224:*5*
KERNER
2:*18*  17:*12*
Kernerg@gtla
w.com  2:*22*
key  278:*24*
279:*2*
Khan  81:*24*
kind  16:*5, 12*
27:*24*  37:*11*
39:*3, 24*
42:*21, 22*
44:*2*  48:*23*
49:*5, 7*  50:*7,
12, 14*  51:*15,
16*  52:*5, 9*
54:*4*  55:*4*
60:*19*  61:*15*
89:*16*  91:*12*
92:*14, 23*
93:*12, 16*
108:*12*
116:*21*  118:*2*
120:*9*  125:*10*
126:*5, 14*
127:*4*  128:*2,
15*  139:*4, 7*
141:*2*  144:*5*
147:*2*  168:*16*
175:*7*  180:*14*
182:*21*

184:*23*
197:*22*
208:*19*  210:*8,
15*  211:*2, 5*
212:*11*
213:*21*  214:*5,
15*  215:*12*
231:*12*  232:*8*
234:*6*  235:*16,
22*  236:*6*
237:*6*  242:*2*
245:*22*
251:*11*
254:*17*
264:*23*  275:*7,
25*  277:*8*
278:*14*
KLINGES  4:*9*
knew  33:*3*
39:*24*  183:*4*
266:*18*  270:*3*
271:*7*  273:*24*
know  8:*18*
9:*5, 6, 8, 9, 11,
12, 13, 21*
11:*22*  14:*24,
25*  15:*9*  16:*1,
8, 20*  18:*20*
22:*1, 2, 7*
25:*5, 10*
26:*11*  28:*8*
32:*17*  33:*1,
13*  34:*21, 25*
35:*16, 17, 21,
23*  37:*1, 5*
38:*3, 4, 12, 25*
39:*1, 2, 10*
45:*13*  46:*24*
49:*2, 12, 19*
50:*7*  51:*8, 19*
53:*5, 24*  54:*3,
13*  55:*11*
58:*20*  59:*8,
10, 16*  60:*4, 6,
15*  61:*10, 11,
16, 24, 25*
62:*3, 20*
63:*20*  64:*3,
20, 21*  65:*3,
10, 17, 21, 24*
66:*2, 8, 11, 16,*

18  67:*1, 8, 9,
15*  68:*5, 21*
72:*10*  74:*24*
75:*1, 10, 19,
20, 21, 22*
77:*7*  79:*13,
18*  80:*1, 16,
17, 19*  81:*6,
15*  87:*2, 14,
17, 18, 19, 20*
88:*8, 9, 11, 12*
89:*12, 14*
90:*4, 6*  91:*6*
92:*6, 14*
93:*14*  94:*19,
20*  95:*15, 24*
96:*18*  98:*17,
18, 20*  99:*18*
104:*4, 16, 19,
23*  105:*5, 25*
106:*2*  113:*5*
115:*1, 16, 22*
116:*24*
117:*18*
118:*11, 24*
122:*7, 9*
124:*3, 19, 23*
125:*4, 12, 13,
17*  126:*1, 6, 8,
12, 22*  127:*3,
10, 12, 15*
128:*22, 23*
132:*2*  133:*1,
15, 23*  134:*2,
4, 5*  135:*1, 23*
136:*7, 10, 18,
19, 20*  137:*10,
19, 20*  138:*2,
6, 12, 18, 19, 20*
139:*16*  140:*3,
19, 21*  142:*1,
6, 12*  144:*4,
11, 19*  145:*6,
23, 25*  146:*5,
7, 14, 25*
147:*8, 14*
148:*8*  149:*24*
150:*2, 18*
151:*19*
153:*15, 16*
154:*25*  157:*8*

160:*23*  161:*6,
21*  162:*10*
165:*5, 23, 25*
166:*1*  168:*6*
169:*5, 8*
170:*1, 21*
172:*13*  174:*6*
176:*5*  178:*8,
13*  180:*3*
181:*15, 21*
183:*3*  184:*13,
14, 23*  185:*1,
17*  189:*3, 11,
17*  190:*6*
191:*21, 22, 23*
194:*15, 23*
195:*25*
196:*16*
197:*16, 17*
198:*16*
200:*19*  203:*5,
9*  205:*15*
208:*5, 25*
209:*8*  210:*15*
211:*17*
216:*13*
218:*24*
220:*19, 20*
221:*14*
222:*24*
223:*16, 17*
224:*11*
229:*17, 19, 20*
230:*19, 23*
231:*5*  236:*9,
22*  238:*6*
240:*14*
241:*19*  243:*1*
244:*8*  245:*20*
246:*5, 25*
253:*23*  254:*3*
256:*1*  257:*16*
262:*11*
266:*15, 19*
267:*20, 22, 23*
268:*1*  269:*18*
270:*10, 13, 21*
271:*4, 22*
272:*6*  273:*2*
274:*4*  275:*6*
278:*9, 11*

280:*12, 19, 24*
281:*1*  283:*20*
284:*7, 8, 14,
16, 18*  286:*12*
288:*18*
knowable
137:*15, 18*
224:*19, 21*
knowing
125:*15*  168:*25*
knowledge
54:*23*  66:*4*
244:*16*
255:*19*  280:*1,
4, 17, 20*
281:*2*  282:*1*
284:*19, 24*
285:*2*
knowledgeable
33:*9, 10*
219:*16*
known  90:*25*
91:*4*  139:*2*
145:*19*  198:*4*
240:*15, 24*
241:*17, 22*
254:*6, 7*  274:*6*
knows  141:*3*
170:*1*  185:*10*
KUGLER  1:*8*
KUM  4:*7*
17:*11*  235:*2,
10*
K-U-M  17:*11*

< L >
L.hilton@kann
er-law.com
2:*7*
Laboratories
3:*15*
Labs  4:*1*
lack  128:*24*
Lagana  74:*23*
landscape
248:*9*
language
172:*17*
large  147:*1*
196:*15, 17, 19,
23*  198:*10*

Confidential Information Subject to Protective Order

210:22 215:8 217:7

**largely** 223:10, 15

**lasting** 51:15

**Law** 74:2 147:16

**lawyer** 173:3

**lawyers** 8:5 11:22 13:17 17:6, 10, 16 19:19 21:4 27:5, 12, 23 28:3 29:25 34:7 173:18

**lay** 60:5 137:6

**LAYNE** 2:4 246:6, 11

**LCT** 129:13, 20

**lead** 174:17

**leads** 164:15

**learn** 284:3

**leave** 40:10, 12, 18 41:18 194:24

**leaves** 64:7

**left** 234:16

**legal** 27:17, 22 28:4 29:25 30:20 53:18 65:17, 18 68:23 150:11 151:8 161:11 255:24

**legality** 263:25

**legally** 263:10

**legislation** 139:14, 15, 16

**Leila** 102:11

**length** 90:4 203:18

**lengthy** 28:8 166:1

**letter** 216:7

**letters** 216:16

**leukemia** 57:22

**level** 15:8 22:2 37:6

65:9 80:10 104:7, 10 135:5, 8 139:24 188:7 191:19 236:16 275:8 276:4 279:20

**levels** 85:12 126:18 152:24 236:7 239:13, 14

**LIABILITY** 1:6 7:8

**liberations** 230:17

**Lieff** 2:13

**lies** 53:23 262:22

**life** 38:5, 9, 11 58:23 124:4 127:21 201:20 249:25

**lifetime** 110:16 129:5, 13 130:7, 9, 11 131:4 171:14

**light** 70:4 273:6

**likewise** 259:18

**limit** 22:17 66:4

**limitations** 216:23 259:10

**limited** 146:8 181:25 193:12 201:20

**limiting** 18:19 72:21

**line** 71:5 112:12 212:11 295:3, 6, 9, 12, 15, 18, 21

**lines** 71:16 134:15

**link** 85:6

**linkage** 115:23, 25 116:16, 20, 21

**linkages** 115:19 116:15

**linked** 50:11 254:12 274:7

**list** 11:24 12:6, 24 19:16 73:21 116:19 118:2 120:17 253:22 254:2, 14, 20 255:8, 9, 10 274:9

**listed** 63:16 72:4 75:18 76:1 79:6 82:13 224:20 283:5, 15

**lists** 255:12

**literature** 83:25 92:22 238:8 241:9 276:6, 9, 13

**LITIGATION** 1:6 7:3, 8 38:13, 16, 19 70:9 71:21 72:1 94:3 133:16 134:1, 8 136:12 252:14 253:18 273:23 285:19

**litigations** 24:19

**little** 14:21 21:15 42:12 50:23 59:9 61:11 62:24 64:8 90:13 92:6 106:23 133:23 134:20 142:8 148:5, 18 168:21 198:20 214:24 229:19, 21, 22 256:22 271:10

**liver** 123:10

**Livingston** 81:14

**LLC** 2:5, 18 4:7

**LLP** 2:9, 13, 20 3:8, 13, 20 4:2, 10, 17

**local** 191:19 192:22 193:6, 22 194:11 195:5, 23

**locally** 192:21 193:4, 20 194:3, 6

**located** 13:22

**location** 229:7

**locations** 195:19

**log** 213:22, 23, 24 237:4

**logarithm** 213:24 214:12, 20 215:5, 6, 18

**logarithmic** 213:22

**log-normal** 215:13

**log-normally** 197:25

**logs** 213:21 237:2, 7

**long** 9:13 17:22 21:9 24:4 100:20 103:25 104:5 107:5 116:3 124:14 167:10 208:12 218:24 243:1 286:12

**longer** 17:25 153:3 175:12, 16, 18 222:21

**longitudinal** 217:7

**long-term** 61:22

**look** 11:8 15:25 76:22 77:1 79:3 80:22 84:24,

25 105:3, 20 111:18 112:2 122:4 123:24 141:19 142:24 143:6 158:20 160:24 162:22 163:11 164:13 166:12 181:2, 22 186:7, 15 195:19 198:17 201:2 206:24 224:11 225:25 227:12, 16 231:25 236:25 237:8 244:11, 12 246:4 254:13 264:4 265:9 274:10 279:16 289:9 292:1

**looked** 12:21 16:9 71:10 73:25 74:8, 10 95:3, 13, 17, 20 114:16 116:4, 14, 25 126:14 158:15 165:25 202:21 244:18 252:18

**looking** 63:16 79:3 87:23 147:2, 13, 23 158:23 176:11 178:3 209:16 215:16 224:1 227:14 234:15 254:17 257:6

**looks** 63:15, 17 73:6, 21 75:17 77:18 78:18 101:23

Confidential Information Subject to Protective Order

163:*19*
226:*10, 11*
250:*19*  255:*9*
290:*1*
**Los**  3:*9, 14*
4:*11*
**LOSARTAN**
1:*5*  7:*7*
**losing** 233:*22*
**Loss** 74:*4*
171:*21*  172:*23*
**lost**  164:*1*
**lot**  29:*20*
60:*1*  81:*19*
88:*9*  119:*7*
122:*7*  133:*11*
136:*25*  139:*2*
142:*9*  145:*12*
149:*17*  151:*3*
156:*24*  179:*7,*
*8*  183:*1*
184:*13*  208:*1*
222:*24*
223:*12*  225:*5*
236:*16*
237:*10*  278:*10*
**LOTMAN**
4:*10*
**lots**  234:*23*
235:*7*  270:*7*
**Louisiana**  2:*6*
**love**  132:*24*
**low**  105:*12*
112:*13*  115:*9*
116:*22*
**low-dose**  97:*2*
104:*20, 25*
105:*4, 15, 19,*
*22*  114:*2, 9*
**lower**  58:*24*
59:*1*  112:*11,*
*17*  113:*19*
115:*14*
122:*15*  132:*2,*
*14*  136:*23*
184:*17*  236:*2*
**Lu**  14:*7*
15:*11*  76:*18*
81:*9, 10*
**lunch**  59:*17*
62:*23*

**lung**  97:*9*
113:*3, 12, 22*
120:*8, 21*
121:*2*  123:*1*
160:*14*

**< M >**
**M.D**  1:*17*
5:*16, 19, 23*
7:*22*  296:*14*
297:*8*
**Madam**  235:*2*
**magnitude**
105:*18*
111:*22*
112:*17*
115:*23*  236:*11*
**main**  17:*3*
26:*10*  97:*18*
115:*22*
235:*23*
283:*18*
288:*20, 22*
**major**  93:*15*
228:*10*
**majority**
142:*9*  164:*7*
200:*25*  203:*6*
225:*10*
**Making**  6:*1*
54:*24*  55:*6*
61:*20*  91:*10,*
*14, 20, 22*
92:*3, 13*
93:*20*  94:*18*
**male**  50:*4, 5, 9*
**management**
15:*10*  53:*8, 12*
**manager**
80:*10*  81:*13*
**managers**  15:*7*
**managing**
79:*19*
**mandated**
138:*25*
**manufactured**
171:*17*
252:*13, 20*
253:*4, 17*
254:*2*  257:*19,*
*25*  258:*13, 22*

265:*25*  266:*5,*
*19, 22*  267:*8,*
*15*  269:*5*
273:*14, 20*
**manufacturer**
88:*12, 19*
254:*13, 25*
255:*1*  267:*2,*
*5*  269:*3, 4*
273:*15*
**manufacturers**
268:*7, 21*
271:*17*
273:*20, 25*
274:*6*  284:*8,*
*15, 19*

**manufacturer's**
260:*16*
**Manufacturing**
257:*21*  258:*2,*
*23*  260:*17*
265:*25*  266:*6,*
*15, 20*
**maps**  119:*4*
**marathon**  9:*4*
**March**  1:*19*
7:*4*  297:*21*
**MARK**  2:*9*
10:*23*  35:*21*
41:*1*  262:*1, 6*
**marked**  10:*20*
11:*1*  41:*3*
77:*9*  136:*8*
165:*14*
205:*11*  216:*9*
225:*16*
260:*25*  262:*8*
**market**
133:*11, 16*
136:*18*
263:*10, 13*
264:*6, 8, 11,*
*12, 17, 22, 25*
265:*1, 3, 13*
267:*17*
271:*19*  272:*5*
273:*7, 12*
284:*21*  287:*1,*
*3, 24*  291:*4*
**marks**  292:*21*

**Marshall**
39:*19*  40:*20*
41:*19*
**Massachusetts**
4:*18*  43:*24*
132:*21, 23*
136:*18, 21, 22*
137:*3, 4, 7*
138:*12*  139:*5*
143:*1*  144:*14,*
*19*  145:*2*
**master's**  39:*19*
**match**  208:*14,*
*17, 18*  209:*6*
210:*3*
**matched**
209:*2, 19, 22*
**matches**
210:*10*
**material**  19:*9,*
*13*
**materials**
11:*23*  12:*6,*
*15, 17, 21, 23,*
*25*  19:*14, 15,*
*16*  27:*21, 25*
28:*2*  31:*6*
73:*21*  166:*6*
**math**  228:*9*
**mathematical**
215:*24*
275:*11*  276:*7*
277:*16*  279:*8,*
*11*
**matter**  7:*7*
66:*12*  67:*8*
134:*5, 6, 8, 9,*
*10*  135:*1, 2, 3*
145:*7*  286:*16*
**matters**  24:*19*
156:*22*
232:*21*  236:*16*
**maximum**
110:*14*  232:*10*
**MBA**  80:*5, 6,*
*12*  81:*13*
**MBC@pietrag**
**allo.com**  3:*23*
**McAllen**  198:*6*

**Mcharchalis@**
**btlaw.com**
3:*15*
**McLean**  43:*23*
**MDL**  7:*8*
**MD-Ph.D**
133:*6*
**mean**  14:*21*
19:*13, 14*
21:*16*  22:*6, 8*
28:*6*  33:*25*
34:*19*  36:*15*
37:*17*  38:*1*
40:*17*  48:*23*
50:*24*  55:*20*
58:*9*  65:*8*
66:*15*  67:*2, 7*
68:*21*  69:*19*
72:*13*  73:*7,*
*13, 14*  75:*7*
82:*24*  85:*25*
95:*24*  96:*18*
102:*24*  108:*7*
111:*7, 13*
119:*4, 5*
120:*1, 6*
121:*18*
127:*11*  128:*1,*
*13*  131:*3*
133:*10, 21*
137:*11*  138:*2*
139:*19*
145:*16*
148:*10*  151:*1*
156:*13*  166:*9,*
*15, 24*  167:*9*
170:*14*  174:*7*
179:*14*
180:*12, 13*
181:*11*
183:*18*
186:*12, 19*
187:*3*  190:*18*
192:*1*  195:*10,*
*11, 20*  198:*18*
202:*21*  206:*2,*
*16, 24*  207:*16,*
*17, 20*  209:*8,*
*9, 24*  210:*1*
213:*23, 24, 25*
218:*6, 16*

Confidential Information Subject to Protective Order

227:22  228:3,
4  229:5, 8
231:17, 22
232:15
243:14  244:2
253:9  268:25
273:24
**meaning**
72:15  110:4
116:18  236:13
**meaningful**
89:17
**means**  55:3
70:12  79:18
88:12  120:7
125:22  169:2
180:2  228:3,
21  235:16
236:3  237:7
246:16, 17
**meant**  87:19
218:17
**measure**
149:8, 14
156:23  157:1,
2  169:11
180:21
210:25  211:3
213:9  219:24
227:24  228:7
232:16
280:18, 21
**measures**
98:19  194:17
208:12, 22
213:12  219:6,
12
**meat**  92:8
**mechanisms**
219:17
**med**  40:14
**median**
206:14, 15
207:21
212:13, 15, 20,
24  213:3, 8,
10, 12  227:4
**medians**
206:19  212:2
213:7  214:10

**medical**  29:11,
23  30:11
39:15, 16, 22
40:9, 10
41:15, 20
43:2, 19  44:4
49:24  51:25
52:20  55:23
61:19, 20
68:13  74:1
75:19, 23
76:5  90:7, 12
93:24  94:5, 6,
19, 24  95:4,
14, 16  117:19,
23  136:23
161:6  169:20
171:13
172:10, 15, 20
177:14
182:23
184:17
186:23
189:19, 21
192:5  193:16
194:9  201:15
205:22  206:9
215:1  221:13
222:8, 9
236:17, 19, 23
238:21, 24
239:14
240:13
246:16, 21
247:3, 12, 18,
19, 20  268:1,
2  269:3, 13
272:20
**medical-legal**
117:21
**Medicare**
5:22, 24  6:2
152:13, 16, 21,
22, 25  153:1,
10, 17  164:8
166:22  170:2,
7, 9, 10, 18
178:5, 11
181:1, 2, 3
182:2, 9, 10,
18  184:3, 11,

21, 25  185:11,
15  189:6
190:17
191:18, 20, 21
194:20
201:11  202:8,
15, 16, 18, 24
203:2, 7, 14
218:22
220:12, 13
222:17  223:1,
5, 11, 13
224:1, 2, 7, 14,
16, 24  225:3
226:10  231:9
234:24  235:8,
18  236:10, 14
237:10, 14, 15
238:2, 6
239:8  240:8,
16, 24  241:2,
22  290:3
**medication**
8:25  149:25
**medicine**  40:2
42:5, 10, 12
44:9, 18, 24
45:15, 16, 20
46:8, 16
47:10, 11, 13
49:17, 23
51:24  53:3, 4
54:8, 16, 23
205:6, 14
216:7  288:7
289:2
**MedStar**
144:6, 11
**meet**  108:4
166:13  244:1,
2  261:16
287:17  291:1
**meets**  287:1
**MELISSA**
3:19
**member**
97:21  98:3
113:4
**members**  15:7
137:21
176:15, 23

178:15
180:20  187:7,
13, 19, 25
189:9  190:23
192:13  291:23
**Memorandum**
74:2
**memory**
162:23
**Menlo**  14:2
**mental**  37:19,
21
**mention**
75:22  109:6
112:11, 25
212:18
264:18  270:20
**mentioned**
15:15, 21
16:22  19:3
20:2, 10  33:5
49:7  61:13,
16  70:6
76:14  109:24
146:14  168:2
195:25
201:14
213:16
215:13
243:22  279:5
**mentioning**
288:24
**mentions**
110:21
**menu**  183:5
**MEPS**  86:11,
13, 16  87:25
**M-E-P-S**
86:10
**mess**  227:21
**met**  106:14
107:24  108:8
112:4  258:14
**meta-analysis**
165:5
**metastasized**
62:13, 14
**metastatic**
57:12, 13, 14
58:22  59:21

60:18  61:6,
12, 13  62:8
**method**  209:9
**methodology**
195:12
205:21  206:9
209:3, 4, 11,
24, 25  213:6
214:1, 5
215:20, 23
216:24  238:6
**methods**
275:24  279:5,
6, 14
**MGH**  132:24
133:10, 11, 15
143:7  144:2
145:1, 16
178:24  188:3
204:8, 12
**Michael**  6:2
242:7
**Michaela**  14:8
15:11  76:19
80:9  81:21
**microeconomic
s**  265:6
**micrograms**
110:16
**middle**  39:16
40:14  176:12
198:13, 15
199:23  261:10
**midway**
107:20
**MIGLIACCIO**
2:7, 9  5:4, 8
8:3, 5  10:23
11:3  14:23
15:16  18:15
19:11  22:6,
17  25:2, 13
26:19  28:17
29:7  31:2
32:22  33:16,
24  34:18, 23
35:3, 17, 20
36:3, 5  37:7
41:1, 5  53:9
57:24  59:12,
16  60:2, 13

Confidential Information Subject to Protective Order

62:18, 25
63:2, 10
64:13  66:1, 7
67:6, 22
68:17  69:14
70:15  71:2,
23  73:4
77:11  78:3
79:12  84:2,
21  85:9  86:6
90:15  91:21
93:7  95:1, 11,
22  99:2, 13
103:24
104:18  105:1
106:21, 25
107:3, 12
112:7  115:6
116:23
121:17
129:10, 19
131:1  132:4,
16  133:17
134:16, 19
135:12  136:3
137:23
142:13
145:14
146:16
147:15
149:19
150:20
151:14  152:9
153:13  155:4
156:11
157:14  158:1,
24  159:2, 4,
10, 13, 15, 18
160:2  161:16,
22  162:7, 19
164:17
165:13, 16
167:2, 19
173:20
174:10
175:11  176:2
178:1, 6
184:4  185:16
186:14
188:21  190:2
191:11  193:2,

18  197:14
203:24
204:16, 19
205:1, 10, 13
206:1, 13
209:10
216:12  218:8
225:1, 14, 18
233:6, 15
234:21
237:11
238:16
240:20
242:21, 25
243:8  246:4
256:5, 15
291:8  292:18
million
210:24  211:1
mind  159:3
167:15
mine  40:14
84:13  130:5
243:16
minor  122:3
minutes  59:13
62:20  77:5
159:14  286:3
Misallocation
100:8
misbranded
251:18
mischaracteriz
es  114:22
116:10
252:24  256:9
284:23, 25
misdiagnoses
93:19
misleading
233:14
missing  114:19
misstate
21:16  153:24
misstates
84:10  145:9
173:11
MIT  40:1
41:24  80:13
81:13

MITCHELL
3:13
molecule
255:1
Molly  14:9
15:12  76:16
81:17
moment  77:3
106:19
124:16
212:16  228:5,
6, 7  290:11
moments
207:20  214:9
288:25
monetary
172:13
money  153:11
monitor  7:5
90:23  91:3
94:1
monitored
285:5
monitoring
29:11, 23
30:11  74:1
90:7, 12, 18
93:24  94:5, 6,
20, 24  95:4,
14, 16  117:20,
24  118:11
169:21
170:24
171:13
172:11, 15, 20
177:15
182:23
186:24  192:6
194:9  236:17,
19, 23  238:21,
24  239:14
240:13
month  51:13
78:16, 21
months  78:15
moonlight
43:7
moonlighting
42:20  43:21,
25  50:22, 25
51:5, 10

morbidity
108:24  109:2,
10, 15
morning  8:4,
7, 10  71:4
Morris  4:10
Mortimer
14:8  15:5
76:18  79:13,
14, 16
Motion  5:20
74:3
motivated
101:17, 18
155:9
Mourgos  4:19
7:2
mouth  54:7
move  140:19
163:2  182:17
183:2  205:4
228:13
moved  140:15,
16
movement
68:24
moving
181:21  183:9
Mpatronella@c
lasslawdc.com
2:12
multidimension
al  118:14
multiple  39:1
68:9  221:6, 25
multi-
procedure
217:24
MURTHA  4:2
Mwonga  82:1
Mylan  3:15

< N >
N.W  3:3
name  7:2  8:4,
8, 11  17:11
25:23  30:12
55:8  225:14
246:11
named  33:6
75:20, 21

76:17  171:19
172:22, 24
267:2, 5
297:19, 20
names  17:9,
13  74:24
75:4, 5
narrow  94:10
narrower
134:20
nation  176:17,
24  180:17
187:14
National  98:7,
9, 14  100:13,
25  104:1
187:6  190:24
191:24
192:11  209:6,
17  216:6
219:11
nationally
208:9
nationwide
178:16  187:21
naturally
284:12
nature  7:15
24:22  123:21
124:2
NBER  100:13
183:12, 13
NCCN  98:15,
17, 20
NCI  98:6, 8,
12  102:21
103:2  111:16
NCN  103:1
NDC  88:6, 12,
19  253:16
254:10, 12, 15,
24, 25  255:3,
7  282:7, 22
NDC's  254:20
NDEA  83:11
85:17  108:3
109:7  110:11
111:25
113:11, 20
115:2, 16, 19

Confidential Information Subject to Protective Order

116:*2, 21*
171:*15*
**NDMA** 83:*11*
85:*12, 17*
108:*3* 109:*6*
110:*8, 14*
111:*24*
113:*11, 20*
114:*16, 19*
115:*2, 16, 19*
116:*2, 15, 20*
171:*15*
**NE** 2:*10*
**near** 43:*5*
**necessarily**
51:*6* 86:*22*
124:*1* 137:*3*
146:*4* 154:*20*
164:*15* 222:*8*
245:*19*
**necessary**
134:*3* 141:*20*
258:*4, 6*
279:*25* 294:*4*
**need** 9:*12*
56:*3* 62:*14,*
*20* 100:*22*
105:*3* 106:*7,*
*14* 108:*17*
112:*4* 113:*9,*
*17, 19* 131:*25*
163:*11*
167:*23*
169:*20*
174:*16* 175:*1,*
*8* 185:*19, 22*
189:*3* 193:*16*
195:*6* 201:*2*
202:*1* 203:*9*
211:*25*
226:*17*
229:*17, 18*
239:*14*
264:*25*
267:*23* 268:*1*
269:*18*
278:*11*
280:*12, 18, 19,*
*24* 281:*1, 2*
**needed** 279:*3*
**needing** 168:*6*

**needs** 58:*10*
109:*11* 231:*1*
**negative**
122:*14* 237:*2,*
*3* 280:*9*
**negatives**
105:*9* 106:*6*
122:*19*
**negotiations**
149:*16*
**neither** 125:*14*
**nephrologist**
54:*3*
**Network**
98:*15* 139:*25*
140:*1, 7, 8*
**never** 47:*7*
55:*22* 75:*5*
252:*21* 257:*7*
276:*19*
**nevertheless**
254:*2*
**NEW** 1:*2* 2:*6,*
*14, 21* 4:*3*
7:*10* 22:*25*
104:*17*
105:*11*
147:*14, 19*
148:*4* 205:*6,*
*13* 216:*7*
242:*19* 288:*6*
289:*2*
**newly** 124:*3*
**NICHOLAS**
2:*7*
**Nick** 8:*4*
22:*1* 59:*7*
65:*22* 106:*20*
130:*23*
134:*13*
158:*22*
159:*17*
177:*25* 204:*15*
**nights** 42:*21,*
*22*
**nine** 107:*22*
111:*21* 123:*4*
206:*23*
**nine-page**
206:*3*

**nitrosamine**
83:*4* 88:*4*
131:*17*
171:*16* 252:*1,*
*7, 11* 254:*6, 7*
256:*3, 7, 12*
272:*3* 273:*14*
**nitrosamines**
83:*14* 85:*6,*
*20* 88:*18*
130:*1, 4*
131:*9, 15, 25*
132:*3* 271:*1*
273:*7* 278:*8,*
*10, 13* 281:*5*
284:*20*
**Nmigliaccio@cl**
**asslawdc.om**
*2:11*
**nominated**
100:*22*
**non-affected**
87:*6, 13* 88:*24*
**nontestifying**
24:*20*
**nontrivial**
225:*9*
**noon** 158:*25*
**normal**
203:*12*
215:*11, 17*
**normally**
197:*22, 25*
**normative**
151:*1*
**norms** 49:*5*
**notably**
237:*13* 239:*7*
**note** 143:*3*
278:*4*
**noted** 7:*18*
36:*4* 294:*10*
296:*10*
**Notice** 5:*14*
10:*4, 10, 20*
148:*21*
**noticed** 173:*16*
**November**
44:*5*
**Nowadays**
51:*7*

**NSQIP**
208:*13*
212:*15* 219:*3,*
*10* 220:*16*
**nuance**
222:*24* 223:*12*
**Number** 7:*8*
13:*23* 17:*19*
44:*22* 49:*6,*
*15, 21* 60:*20*
79:*1* 88:*12*
89:*4, 5, 6, 15*
97:*5* 100:*3*
109:*13*
111:*19* 112:*4*
113:*8, 10, 16,*
*25* 114:*25*
118:*15* 119:*4,*
*6, 13* 120:*17*
129:*25* 133:*7*
155:*21*
164:*24*
169:*22* 170:*8,*
*9* 181:*15*
215:*8* 223:*19,*
*21* 232:*1*
285:*14*
**numerator**
232:*2*
**numerical**
112:*13* 118:*8,*
*10*
**nurse** 52:*7*
**NYU** 242:*8*

**< O >**
**oath** 7:*21*
**oaths** 297:*5*
**Object** 14:*18*
15:*3* 18:*9*
21:*24* 26:*15*
28:*13, 25*
30:*22* 32:*19*
33:*21* 52:*16*
57:*19* 58:*2*
59:*22* 62:*10*
68:*16* 69:*9*
70:*5, 24*
71:*11* 77:*25*
79:*11* 83:*20*
84:*9* 85:*3*

86:*3* 90:*9*
91:*8* 92:*10*
94:*22* 95:*8,*
*18* 98:*25*
99:*8* 103:*22*
104:*3, 22*
109:*21* 111:*6*
114:*21* 116:*8,*
*9* 121:*13*
129:*7, 18*
130:*14*
133:*13* 134:*2*
137:*16*
141:*25* 145:*8,*
*20* 147:*11*
149:*10*
150:*24*
151:*21*
153:*12*
154:*14* 156:*7,*
*18* 157:*6, 18*
161:*10, 19*
162:*4* 174:*5,*
*23* 175:*1*
184:*1* 190:*10,*
*12, 15* 192:*24*
193:*7* 197:*7*
203:*22*
205:*23*
206:*11* 209:*7*
218:*5* 224:*22*
232:*18*
233:*11* 235:*1*
238:*11*
252:*23*
255:*23* 259:*3*
268:*10*
271:*21* 282:*4,*
*17* 283:*16*
284:*22*
**objected**
66:*11* 277:*1*
**Objection**
33:*4* 60:*9*
63:*22* 111:*9*
130:*20*
131:*20* 145:*9,*
*21* 150:*9, 10*
151:*23* 156:*7*
157:*18*
161:*10*

162:*14*
164:*10* 166:*9*
167:*16* 173:*9,
10, 11* 175:*21*
185:*12*
186:*10*
188:*24* 191:*1,
3* 240:*17*
256:*9, 25*
268:*24* 275:*5*
283:*6* 286:*19*
289:*18*
**objections**
132:*12*
**objects** 92:*24*
175:*9*
**obligation**
260:*16*
**observation**
212:*6, 8, 9*
**observations**
212:*10* 228:*22*
**observe** 193:*9*
210:*10*
**obtain** 23:*5*
**obtained** 41:*23*
**obtaining**
217:*6*
**obvious** 50:*7*
201:*5*
**obviously** 9:*7,
22* 10:*16*
18:*12* 134:*2*
156:*23*
197:*24* 214:*7*
**occurred** 22:*3*
**odds** 58:*24*
259:*16*
**offer** 26:*13,
22* 109:*24*
116:*5* 124:*16*
161:*8* 238:*5*
275:*8* 285:*18*
**offered** 63:*14*
72:*1, 6* 94:*2*
123:*5* 161:*9*
167:*6*
**offering** 68:*14*
82:*22, 25*
83:*17, 23*
84:*3* 85:*21,*

25  94:*4*
105:*24*
109:*16, 18*
118:*8, 9*
123:*8* 129:*16,
21* 134:*22*
201:*3, 4, 5*
259:*12, 18, 25*
260:*2, 10, 15,
19*
**office** 13:*25*
14:*2* 144:*11*
247:*19*
250:*12, 13, 14,
23, 25* 251:*4, 9*
**offices** 13:*24*
**oftentimes**
47:*4, 13* 57:*1*
213:*8*
**Oh** 62:*22*
75:*16* 101:*7*
102:*10* 136:*2*
143:*24* 202:*3*
207:*2, 4*
234:*10, 13*
**Okay** 8:*12, 15*
9:*4, 20* 10:*3,
19, 21, 22*
11:*8, 12, 19*
12:*3, 11* 13:*3,
7, 14* 15:*19*
18:*14, 24*
20:*11, 13*
21:*6* 22:*25*
23:*5* 24:*9*
25:*17* 26:*5,
12* 27:*2* 30:*9,
18* 35:*1, 20*
36:*19, 23*
41:*7, 18*
43:*13* 46:*7*
47:*24* 49:*25*
54:*21* 56:*8*
61:*4* 63:*11,
17* 64:*14, 16,
20* 65:*8*
67:*13* 68:*1,
12* 69:*7, 24*
70:*1* 72:*17,
25* 73:*19*
74:*14* 77:*4,*

12  78:*2, 8, 11,
17* 80:*20*
82:*6, 15* 83:*9*
84:*6* 85:*10,
24* 87:*4*
90:*11* 94:*10,
19* 96:*2, 4, 5*
97:*6, 9* 98:*6*
100:*2, 7, 20*
101:*2* 103:*5,
13, 15* 107:*6,
13, 19, 20*
108:*13*
110:*25*
120:*16* 123:*8*
130:*22* 132:*8*
133:*18* 135:*6*
136:*6, 11, 15,
16* 139:*18*
141:*15*
143:*20* 144:*3,
18, 24* 145:*4*
147:*25* 148:*7,
10* 150:*7*
159:*12, 16*
160:*9, 21*
161:*23*
162:*24*
163:*18*
164:*23*
165:*18, 21*
167:*3, 4, 20*
168:*20*
171:*10* 173:*5*
176:*9* 181:*10*
183:*8, 12*
204:*21* 205:*9,
18* 207:*4, 14*
210:*5* 213:*1*
216:*4, 15, 22*
222:*1* 224:*10*
225:*11, 24*
226:*2, 4, 21*
229:*19, 22, 25*
230:*1* 234:*13,
16* 235:*20*
239:*19* 240:*4*
241:*7, 25*
242:*18, 24*
243:*3, 9*
246:*3* 247:*9*

261:*5* 262:*5,
11, 19* 281:*12*
285:*5* 286:*14,
15* 289:*12*
290:*8, 12*
292:*14, 21*
**old** 155:*1*
158:*18* 163:*8,
20* 164:*9, 20*
**omission** 149:*5*
**omit** 195:*24*
**once** 39:*10*
62:*13* 118:*25*
165:*17*
219:*23* 227:*9*
228:*13* 232:*9*
**oncologist**
53:*2, 8, 11*
54:*2* 55:*2, 13,
19, 22* 56:*2, 5,
7, 11, 14* 57:*1,
5* 61:*17* 125:*2*
**oncologists**
56:*23* 128:*18*
**oncology**
46:*16* 49:*19*
52:*14, 18, 19*
53:*5* 54:*13*
55:*2, 4, 6, 21,
24* 56:*21*
**one-night**
51:*14*
**ones** 19:*10*
30:*7* 117:*1*
135:*17* 274:*7*
**one-week**
48:*9, 10, 14*
**ongoing**
136:*12*
**open** 205:*17*
**operate** 58:*12*
**operation**
215:*24* 232:*13*
**operator**
232:*10*
**opine** 192:*8*
269:*8*
**opining** 94:*4*
**opinion** 11:*20,
24* 17:*2*
26:*13, 22*

68:*12, 14*
69:*8* 82:*25*
83:*17, 22*
84:*1, 3, 13, 20*
85:*25* 86:*1*
93:*3* 94:*2, 4*
105:*24* 108:*2*
109:*17, 18, 24*
112:*8* 114:*7*
115:*8* 116:*5,
6, 13* 118:*9*
123:*5, 8*
124:*11, 16*
128:*25* 130:*5*
148:*24*
185:*18, 21*
191:*15* 192:*3*
196:*20, 21*
201:*3, 4, 5, 24*
252:*19, 20*
253:*3* 257:*4*
258:*19, 24*
259:*1, 10, 16*
260:*7* 261:*8*
262:*15* 266:*3*
268:*14* 273:*4*
274:*23* 275:*1*
289:*17*
**opinions** 12:*8,
12* 13:*11*
19:*15* 28:*11,
20* 53:*18*
60:*5* 63:*14*
71:*21* 72:*1, 6,
11, 14* 82:*21,
23* 83:*3* 85:*7,
21* 94:*12*
106:*4* 115:*24*
129:*16, 21*
161:*8* 167:*7*
174:*3* 258:*4*
259:*12, 18*
260:*2, 11, 15,
19* 269:*11*
285:*17, 19*
**opioid** 67:*20*
133:*25*
**opposed**
50:*15* 57:*1*
62:*15* 104:*25*
**optics** 175:*7*

Confidential Information Subject to Protective Order

optimal 58:16 59:5

optimize 101:20

options 62:16 114:1

Optum 188:3 193:13 196:7, 9

OptumHealth 179:2

Oral 5:14

ORDER 1:13 30:5 64:1 67:1, 2 89:16 104:7 112:16 128:6, 7, 8 139:17 141:12, 14 184:15 188:11 189:4, 8 229:19 267:23 269:16 277:21 280:12, 22 285:12, 14

ordered 285:8

orders 63:24 65:24 105:17

organization 31:14 43:25 87:1 97:16, 18 98:10, 16, 18

organizations 111:15

organized 31:13, 15 45:21

original 103:7 294:13

originally 32:25

Orleans 2:6

orthopedic 210:20, 23

outcome 297:20

outcomes 101:20

275:21 277:12 279:5

outliers 198:3

outpatient 42:9 44:15, 17, 23 45:3, 18, 19 47:10, 11 61:23 138:19 140:15, 17, 20 142:11 143:24, 25 144:10, 12, 14 145:17

outputs 244:14, 15, 20

outset 28:22, 23 29:25

outside 19:19 61:9 95:6 111:9

overall 159:17 170:5 180:16 182:23 197:11 211:8, 19 292:11

overdiagnosis 92:15

overview 22:2

owned 145:1

owner 70:3

Oxford 3:20

< P >

P.C 3:2

p.m 160:1 204:22, 25 243:4, 7 281:13, 16 286:5, 8 290:13, 16 292:23 293:1

Pacific 7:5 63:9 107:8, 11 159:23 204:22, 25 243:4, 7 281:13, 16 286:8 292:23

pack-year 97:11

PAGE 5:3, 13 11:9 43:10 76:2 79:4 100:4 148:1 227:17 230:13 235:14 250:17 264:4 295:3, 6, 9, 12, 15, 18, 21

pages 5:16 28:8 262:19 296:6

paid 34:4, 8 197:19 210:23 211:1, 2 222:14 239:25 244:21, 23 245:1, 3, 4, 20 249:8, 12 259:19 260:3, 20

pain 120:11

Palo 44:8, 10 46:15, 20 47:2 49:16 52:1 53:21 55:1, 16

pancreatic 123:11

pandemic 24:7 69:19

Panel 76:5 236:25

Panigrahy 74:11

Panigrahy's 75:8

Pap 285:15

paper 100:3 101:3, 6, 10, 15, 17 102:5 155:10 157:9 194:17 195:12 205:5 206:14 207:5 208:6, 7 210:6 211:8, 21 217:17 219:1 225:12,

19 226:14 230:10, 12 234:9, 18, 22 235:7 238:1, 25 239:21 240:12, 23 241:10, 11, 12, 15, 17, 25 242:2, 9, 19

papers 92:13 99:25 101:13 102:2 204:14

paragraph 83:7 86:8, 14 87:23 89:23 96:3 102:22, 23 107:17 108:14 110:3, 19, 20, 22, 24 111:1 113:2 114:12 116:20 117:5, 6 118:14 119:2, 21 122:23 123:14 160:5, 11, 17, 18 163:12, 13, 14 168:2, 21 171:12, 23 172:10 176:4 186:25 207:10 227:19 251:24 261:3, 6, 11 265:10 274:12 279:17, 18 287:11 289:10 291:12

parameters 233:9

Park 3:8, 14 14:2

part 29:18 38:4, 5, 9, 11 44:15 73:15 90:23 91:5, 9, 11 94:14 108:11 110:20 137:5

142:3, 15, 16 173:6 189:1 205:24 232:3 248:12 252:15 254:1 270:12 272:23

particular 13:10, 13 18:21, 23 42:23 80:19 99:22 104:23 115:20 118:2 127:12 131:18 145:5 155:7 204:8 212:1 222:6 239:1 258:25 262:14, 24 263:3 264:5, 14 265:22 268:13 269:17 270:16 277:22

particularly 74:12 111:19 122:17 270:1

particulars 22:14

parties 7:12, 17 24:23 64:9 260:8 297:18

partner 79:18, 23 80:10

partners 15:5, 6, 8 79:21

party 172:24 249:5, 13

pass 243:11 246:5

passed 130:7

path 122:21

pathologist 128:14

pathology 126:15, 22, 23 127:2, 6, 8

patient 9:8 49:12, 14 50:1, 3 53:5, 8, 13, 17 54:8,

Confidential Information Subject to Protective Order

12  55:16, 17, 24  56:1, 6, 20  57:2, 4  61:12, 13  86:21  88:9  90:18, 24  91:3  93:9  94:16, 17  101:20  113:17  119:9  122:19, 20  125:7, 18  127:23  128:5, 6  139:3  146:13  148:14, 20  149:1  154:11  156:21  157:23, 24  158:3, 4, 9, 12  168:4, 9  175:5  178:9  186:6  190:16, 17  202:10, 11  220:6, 16  221:9  222:19, 22  265:17  269:2, 18  270:16  277:10, 12  281:2, 19  282:7, 8, 23

**patient/TPP's** 262:18

**patients**  9:9  32:1  42:24  46:14, 15, 16, 17, 18  47:12  49:17  50:5  52:6, 7, 19  55:4, 6, 21  56:3  61:22  87:5, 7, 11, 12  88:11  90:20  94:7  96:20  99:21  108:1, 6  109:13  110:8, 10  119:12, 25  121:25  125:12  139:10  140:9

142:10  146:2, 4  149:4  154:16  155:11  158:11  168:9  169:19  170:7, 8, 9, 10, 16, 18, 23  172:20  174:13, 14  177:1, 2, 6  178:5, 10, 21, 22, 23  179:7, 18  181:1, 2, 3  182:2  189:10, 12, 13, 15, 16, 20, 21, 25  190:7, 8  191:6, 7  194:19, 25  195:14, 15, 25  199:13, 14, 16, 17  203:6  204:3  220:15  223:3, 4  253:7, 10, 11, 16, 21  256:14  268:8, 22  270:22  285:6  290:6

**patient's**  56:17, 18  58:23  148:17  261:18  279:20

**PATRONELLA**  2:9

**pause**  7:16

**pay**  146:4  150:23  151:9  223:6  261:18  262:18  264:24  265:18  266:4, 12  279:7  280:23  282:12, 19, 20  288:1, 3

**paying**  174:13, 15  192:5  223:1

**payment**  149:1  245:10, 15

**payments**  170:23  245:23, 25

**payor**  170:24

**payors**  137:1, 9  147:22  171:20, 22  172:21, 24  249:5, 13

**pays**  148:14, 15  151:17  152:22  153:7  190:13  222:17

**PDF**  264:5

**peer-reviewed**  162:3, 13  165:24  166:14  241:13, 15  288:15

**peers**  157:12

**pejorative**  40:17

**pending**  9:14  67:4  188:20

**Pennsylvania**  3:21  81:18

**people**  13:24, 25  14:6, 7, 10, 12  15:7, 14, 21, 22  19:20  33:3, 6, 8, 9  48:8  49:10  51:4, 11  76:14, 17  79:5  82:11  84:18  86:23  87:20  113:9, 17  120:1, 22  121:20  122:8  140:3, 22  147:13  152:16, 17, 18  154:25  155:17, 21  180:15, 16, 22, 23  181:15  187:25  188:1

197:3, 18  198:12, 18, 19  199:4, 24, 25  200:10  201:6, 7, 9, 10  203:12, 13, 14  220:4  230:23  241:4, 10  243:22  271:11  272:14, 17, 22  288:17

**perceived**  83:11

**percent**  35:2, 4, 5  37:13, 14  38:21  45:19, 23  49:2  50:5  52:9  88:22, 24, 25  89:2, 3  127:16  179:16, 24  180:3, 5, 7, 9  181:12  196:19, 23, 25  197:2, 5, 13  206:25  207:8  212:23  222:23  223:17, 18  236:8, 9, 14, 15, 20  237:7  238:21, 22  271:5

**percentage**  34:9, 13  37:1  38:15, 18  87:15  179:13  190:23  223:16  224:12  225:8

**percentile**  179:21, 22, 23  180:2, 4, 10  196:22  197:5  213:18

**performance**  105:8

**performed**  15:23

**period**  46:24  47:24, 25  77:20  116:3  177:18  253:13

**person**  14:1  47:13  55:7  75:10  79:14  81:2, 4, 15, 25  82:2, 5, 9  125:5  149:23  150:8  151:17, 19, 20  152:4, 22  153:19  197:19  202:15, 16, 17  244:3  279:25  280:7, 16  297:13

**personal**  38:1

**personally**  157:21  243:13, 14  275:14  281:21  282:21

**person's**  25:23  153:14  280:13, 19, 20

**perspective**  91:19  117:21, 22  274:17

**perspectives**  139:11

**pertain**  246:14, 23

**Ph.D**  5:19  15:13  39:25  40:1, 2  41:23  42:15, 17, 25  43:6  44:6  79:17  80:2  81:17  102:13

**Pharma**  2:18

**Pharmaceutical**  2:18  4:4, 7  67:19  262:17, 25

**Pharmaceuticals**  2:15  4:16  67:21  68:8, 11

Confidential Information Subject to Protective Order

**Pharmacy** 3:*1, 4, 12* 247:*16, 21* 248:*3, 5, 9, 14, 17, 20, 21* 249:*9, 13* 259:*19, 22* 260:*3*

**phone** 13:*17, 18* 14:*3*

**physical** 106:*9* 121:*20, 24* 122:*2, 12*

**physician** 12:*13* 15:*19, 22* 33:*11* 38:*25* 42:*3, 19* 43:*2, 18, 20, 23* 44:*9* 90:*5* 94:*13, 14* 102:*13* 111:*5, 14* 124:*19* 144:*9* 184:*18* 220:*13* 240:*8* 283:*3, 13*

**physician/econ omists** 102:*9*

**physicians** 15:*17* 16:*3* 32:*16, 17, 25* 33:*3, 14* 43:*24* 49:*6* 53:*7* 101:*19* 102:*6* 144:*10* 218:*24*

**pick** 202:*13*

**piece** 93:*3* 270:*19*

**Pietragallo** 3:*19*

**pill** 150:*14* 265:*14, 15, 18, 23, 24* 266:*4, 18*

**Pittsburgh** 3:*21*

**place** 63:*22, 25* 65:*14, 25* 169:*1* 219:*17* 225:*8*

**placed** 129:*2* 177:*9*

**places** 142:*10*

**plain** 105:*18*

**plaintiff** 19:*6* 30:*6* 269:*18* 277:*23*

**Plaintiffs** 2:*3* 7:*23* 8:*6* 16:*24* 19:*6* 74:*2, 19* 75:*21* 107:*23* 116:*25* 129:*2* 130:*12* 131:*5, 17* 172:*12* 246:*12* 292:*15*

**Plaintiff's** 5:*19*

**plan** 56:*10, 12, 13* 78:*8* 202:*13* 246:*23* 247:*6, 13, 17*

**planning** 250:*25* 251:*4*

**plans** 128:*15* 202:*12* 204:*3, 4* 285:*20*

**play** 232:*12*

**please** 7:*16* 8:*9* 95:*10* 159:*5, 10* 207:*16* 217:*20* 294:*3, 7*

**plus** 175:*5* 245:*4*

**pneumonia** 56:*1* 155:*13*

**point** 27:*20* 29:*13* 45:*7* 53:*24* 114:*20* 124:*14, 15* 127:*3* 142:*19* 167:*25* 168:*3* 182:*20* 185:*9* 189:*14* 192:*1* 193:*8* 212:*9* 233:*19, 23, 25* 234:*6* 235:*23* 240:*15, 23* 245:*24* 249:*9,*

13 253:*17* 259:*20* 260:*4* 270:*21* 271:*16* 274:*12* 278:*24* 279:*2, 14* 280:*24* 284:*2, 16* 288:*25*

**points** 207:*24* 212:*11* 233:*18* 278:*14* 288:*22*

**Policy** 6:*1* 15:*13* 33:*10, 12* 39:*17, 20* 40:*15* 135:*11* 233:*9* 244:*16* 250:*24* 251:*7*

**political** 184:*21* 230:*24*

**politics** 184:*14, 23*

**pool** 223:*4*

**pop** 77:*5*

**population** 49:*12, 15* 50:*2, 3* 86:*18* 87:*16* 93:*12* 96:*11, 15, 19* 101:*21* 108:*5* 112:*19* 119:*11, 25* 120:*4, 14* 122:*16* 154:*12* 156:*21* 157:*23, 24* 158:*5, 10* 160:*14* 168:*4* 169:*6* 170:*6, 14* 179:*9, 10, 19, 20* 180:*3, 5, 8, 17, 24* 181:*13* 186:*7* 194:*18* 195:*14, 15* 196:*25* 197:*6, 10, 11* 198:*8, 13, 15, 22, 24* 199:*1, 2, 4*

200:*4, 11, 12, 16, 19, 20, 25* 222:*20* 290:*2* 291:*24*

**population-based** 97:*24, 25*

**populations** 90:*18, 24* 91:*3* 107:*25* 108:*10* 120:*25* 121:*4, 8* 152:*18* 158:*3, 13* 160:*8* 169:*4* 194:*25* 200:*5, 8, 9* 220:*6, 16*

**portion** 168:*13* 172:*9*

**portions** 106:*18* 246:*13*

**position** 15:*1* 42:*20* 43:*21* 44:*13* 48:*20* 55:*15* 267:*17*

**positions** 43:*17, 18* 51:*20* 250:*17*

**positive** 122:*14* 280:*10*

**positives** 105:*9* 106:*6* 122:*18* 197:*24*

**possibilities** 125:*23* 155:*15*

**possibility** 123:*15* 144:*22* 170:*19* 198:*1* 252:*7* 256:*2, 4, 11* 258:*12* 270:*5, 7, 13* 271:*3, 9* 272:*3, 24, 25*

**possible** 35:*22* 131:*9, 13* 148:*9* 174:*17* 183:*4, 6* 196:*18* 252:*1* 256:*8* 265:*17* 266:*8* 267:*21*

268:*14* 270:*10* 277:*18* 278:*6* 279:*13* 280:*25* 290:*7* 291:*14*

**Possibly** 148:*5* 276:*3, 14*

**post** 39:*14*

**potential** 83:*12* 85:*7, 20* 104:*14* 106:*5* 109:*3, 7* 110:*1* 114:*1* 115:*14, 18, 23* 155:*12* 196:*14* 251:*10, 11* 252:*10* 272:*19*

**Potentially** 61:*10* 64:*4* 65:*10* 115:*1* 117:*20* 130:*2* 138:*8* 139:*22* 145:*6* 215:*9* 246:*1* 251:*14, 18*

**power** 133:*12, 16* 136:*18*

**practice** 49:*23* 185:*2, 5* 283:*2*

**practiced** 10:*18*

**Practices** 257:*21* 258:*2, 23* 260:*17* 266:*1, 6, 20*

**precise** 37:*12* 235:*12*

**precisely** 112:*15*

**predetermined** 184:*24* 208:*18*

**predict** 238:*2*

**prediction** 137:*2*

**predominantly** 42:*11* 50:*4*

**Prefer** 35:*22*

Confidential Information Subject to Protective Order

preferable
59:20
preferences
56:18  201:17
preparation
12:16  17:4,
17  19:4, 18
20:7, 17  21:1
78:13
prepare  13:7,
9, 12  16:21
19:21
prepared  25:5
71:7, 8  78:14
243:24
preparing
70:9, 21, 22
prescribe
282:24
prescribed
253:11  281:18
prescription
249:1, 4, 8, 12
250:9  251:11
259:11  265:3,
8  268:7
274:19
275:12  276:8,
12, 21  277:7,
17, 21
presence  83:14
present  4:19
46:21  48:13
81:21, 22
83:15  121:24
122:2  284:3
presentation
155:11
presently
138:9
presents  55:17
pressure
258:10
presuppose
263:8, 25
264:11
presupposition
263:11
pretty  23:16
86:15  92:5
147:14  243:22

prevalence
84:17
Preventive
97:17, 19
previous
26:11  101:9
165:8  180:14,
25  208:2
248:2, 15
previously
26:5, 9
173:12, 13
248:6, 13, 18,
24  249:3, 11
260:25  288:6
price  137:6,
21  140:23
146:4, 7, 8, 20,
24  147:5, 9
148:16, 17, 20,
25  149:1, 7,
13  156:14, 16,
17  158:8, 9
176:12
178:23, 25
180:6  182:13
185:18, 21, 24,
25  187:10, 12
192:11, 13, 19,
21  193:5, 21
194:3  199:16
202:1, 3, 5
218:21
220:12, 17
221:2, 12
222:3, 14, 17
223:6  235:18,
19  236:14, 15,
17  237:21
262:23
286:18, 25
287:2, 5, 9, 22,
24  290:20, 24,
25  291:1, 4
292:10
priced  222:3
230:22  231:1
235:24, 25
prices  136:19,
22, 23, 25
137:4  138:15,

17, 18, 19
139:1, 3, 7, 13
140:3, 9
142:5, 12, 25
145:18, 23
147:1, 21
166:21  168:7
176:14, 16, 22,
23  177:6
178:10, 15, 16
180:21
181:24  182:2,
19, 24  184:17
185:25  186:6,
8, 13, 15, 16, 19,
21, 22  187:7,
12, 14, 18, 19
188:2  189:9,
24  190:22, 24
191:9, 18, 20,
21, 25  193:14,
16  194:18, 20,
22  195:23, 24
196:4, 23
197:18  199:9,
20  204:4
223:6  224:16,
18, 21  226:5,
10, 11  231:12
234:25  235:9
237:14, 16, 22
238:3, 7, 8
239:7, 9, 11,
13, 15, 16, 18,
23, 25  240:1,
16, 25  241:3,
23  290:3
292:1
pricing  69:8,
13  132:19
145:4  147:10
148:13  156:3,
5  161:6
169:17  179:3
205:21  206:9
226:6  230:20
primarily
33:5  56:13
276:16  285:10
primary  17:1
19:8, 12  42:7,

8, 13  56:16
228:17
259:16  285:14
principal
79:17, 19  80:7
Prinston  4:7
prior  23:25
63:13  65:7
71:25  145:9
272:16  281:25
priorities
140:24
priority
139:12
140:14, 24
private  147:6
153:5, 9
158:9  166:22
182:9  190:9,
16  191:8
194:18, 22
195:24  196:8
199:8, 19
202:12
226:11
231:12
235:19  236:8,
14  237:9
239:12  290:3
privilege  18:12
privileged
34:16, 19
probable  59:4
probably
42:21  127:3
133:6, 8
152:8  164:13
198:22
200:20  225:9
227:6  290:2
problem  53:4
54:9, 12, 13,
14, 16  61:19,
20  189:2
286:4  289:25
problems
52:20  54:8
170:7
procedure
106:8  122:13
139:5  208:8,

17  209:22
212:7, 8
217:25
218:22, 25
219:18, 20, 25
235:17, 19, 24,
25  297:6
Procedures
5:22, 24
104:1  106:9
140:15, 17, 20
143:21, 23
147:21  179:3
219:13  220:3
235:22
proceedings
297:16
process  16:7
31:1  70:18,
21, 22  71:3,
15, 20  91:10,
13, 19, 22, 25
92:3, 13, 17
93:12, 19
108:5  128:5
153:25  154:2
155:16, 23
218:21
230:24
237:23
244:13, 18, 20
249:16  283:20
processes
266:16
produce
244:12
produced
12:18  30:15
35:19  67:20
167:13
product  18:12
21:25  66:17
67:10, 12, 17
261:14, 15
264:7, 15
265:12
266:22
268:18
269:17
271:18
277:24

Confidential Information Subject to Protective Order

286:*24*
287:*15, 16, 23*
291:*2*
**production**
130:*3*
**PRODUCTS**
1:*6*  7:*8*
67:*18, 20*
83:*15*  250:*9*
251:*25*  252:*3,*
*10, 13, 20*
253:*4, 7, 15,*
*20*  254:*1, 22*
262:*25*
263:*13*
266:*21*  267:*8,*
*15, 16, 18*
272:*5*  273:*11*
281:*22*  283:*4*
**product's**
261:*17*
262:*17*  275:*12*
**professional**
77:*18*  250:*17*
**professionals**
79:*6*
**Professor**
5:*16*  242:*8*
**profile**  97:*22*
**profits**  149:*14*
260:*8*
**prognosticate**
128:*7*
**program**
39:*22*  42:*9,*
*11, 15, 18*
43:*1*  44:*19*
45:*3, 5*  90:*7*
93:*24*  95:*16,*
*21*  118:*11*
152:*25*  153:*4,*
*17*  169:*21*
177:*15*
182:*23*
186:*24*  194:*9*
219:*12*
236:*17, 19, 23*
238:*21, 24*
239:*14*
**programs**
94:*20, 24*

95:*4, 6, 14*
117:*20, 24*
251:*12*
**promise**
184:*16*
**prompted**
32:*6, 10*
**prone**  155:*25*
**proper**  275:*8*
**properties**
91:*12*  197:*21*
**proposal**
230:*19, 23*
231:*1, 6*
237:*23*
**proposals**
231:*4*
**proposed**
88:*11*  121:*11*
137:*24*  164:*6*
171:*12*
172:*10*
176:*15, 22*
179:*3*  187:*4,*
*8, 13*  199:*22*
259:*8*
**proposers**
237:*23*
**proposing**
236:*1*
**propounded**
296:*8*
**prostate**  61:*1,*
*14*  62:*9*
123:*1*  124:*21*
125:*3, 4, 8, 20*
126:*10, 17, 20,*
*22*  127:*14*

**PROTECTIVE**
1:*13*  30:*5*
63:*24*
**provide**  32:*12*
33:*2*  53:*19*
54:*4*  66:*21*
172:*3*  240:*14,*
*23*  265:*19*
**provided**
11:*21*  12:*7,*
*22, 25*  13:*5*
21:*22*  24:*12*

27:*4, 16, 17*
72:*11, 14*
73:*16*  77:*14*
102:*21*  173:*6*
244:*8, 9*
247:*20, 24*
248:*3, 24*
249:*7, 15, 19,*
*22*
**provider**
92:*23*  139:*8*
146:*5, 8, 9*
147:*2*  178:*24*
179:*24*
191:*22*
222:*16*
223:*10*  224:*20*
**providers**
92:*18, 20, 21*
99:*22*  142:*4*
147:*3, 7*
190:*13*  193:*10*
**providing**
66:*10*  222:*5*
257:*13*
**PSA**  125:*9, 10,*
*11, 13, 22*
126:*18*
**public**  25:*10*
64:*24, 25*
66:*24*  135:*24*
169:*15, 16, 18,*
*22, 24*
**publication**
162:*18*  290:*1*
**publications**
161:*24*  162:*1,*
*9, 12, 21*
163:*6*  165:*22*
167:*14*  205:*4*
288:*16*
**publicly**  24:*21*
64:*22*  137:*20*
189:*7*  191:*17*
**published**
101:*3*  195:*13*
216:*16*
225:*19, 21*
239:*1*
**publishing**
147:*21*

**pull**  39:*8*
77:*2*  163:*1*
166:*12*  287:*12*
**pulled**  87:*5*
163:*21, 22*
**pulmonology**
49:*19*
**purchase**
268:*8, 22*
271:*4*  272:*18*
**purchased**
270:*11*  271:*8*
272:*11, 14, 22*
**purchases**
272:*16*
**purely**  22:*23*
55:*23*  56:*21*
**purpose**  20:*5*
166:*17*
167:*22*
195:*13*
220:*10, 11*
236:*5*  238:*18,*
*19*  239:*1*
260:*11*  289:*23*
**purposes**  56:*9,*
*12*  131:*14*
162:*11*
166:*18*
167:*22*
177:*19*
255:*16*
257:*18, 24*
**pursuant**
297:*5*
**pursuing**  58:*6*
59:*3*
**pushback**
157:*12, 16, 21,*
*22*
**put**  10:*14, 19*
28:*7*  42:*21*
54:*7*  65:*7*
66:*5*  74:*19*
77:*2*  90:*18*
152:*10*  166:*8*
216:*5*  219:*17*
259:*25*
**puts**  98:*18*
150:*14*

**< Q >**
**qualifications**
79:*15*  80:*17*
81:*7*
**qualified**
161:*8, 14, 15*
**qualify**  161:*14*
**qualifying**
161:*12*
**quality**  15:*24*
16:*7, 18*  93:*6*
98:*19*  124:*4*
125:*11*
146:*14, 20*
219:*11*
243:*24*  268:*6*
**quantified**
196:*16*  239:*24*
**quantify**
44:*21, 22*
186:*18*  196:*11*
**quantifying**
175:*2*
**Quantiles**
213:*16, 19, 20*
214:*10*
**quantities**
168:*6*  232:*2*
**Quarterly**
225:*22*
**question**  8:*21*
9:*13*  18:*11,*
*20*  22:*13, 18*
23:*9*  25:*1*
26:*18, 23*
28:*16*  29:*8*
31:*4*  32:*21*
33:*12, 23*
34:*24*  37:*4,*
*17, 23*  55:*9*
59:*23*  60:*12*
63:*23*  64:*6*
65:*12*  66:*16,*
*19, 20*  67:*4, 5,*
*15*  68:*24*
69:*3, 10, 12*
71:*6, 16*
72:*21*  84:*23,*
*24*  85:*1*
103:*16*  109:*6,*

7 116:9
129:9 130:8,
23 133:10, 24
134:13, 17, 25
135:5 136:13,
17 138:11
140:6 145:12
149:12
150:13
154:15 155:1
156:15, 20, 25
157:7 167:3
174:19 186:4
187:17
188:20 193:1,
19 199:10
203:4 206:4
209:23
219:15, 22
220:20 230:5
235:3, 6
238:12
240:18 246:6
253:2, 23
256:20
257:22
266:24 267:3
268:20 277:5,
11 279:11
286:16
**questioning**
71:5
**questions**
8:19 11:6
22:16 24:16
27:8, 9, 25
29:9 31:6, 8,
12, 15 32:4, 6,
9, 12 33:1
38:23 63:13
72:8 78:1
82:20 107:16
108:23
132:18 135:3
149:22
155:17, 19
160:4 161:4
205:3 234:12
243:10 246:6
285:22 286:3,
14 289:14

290:9, 19
291:6, 11
292:19 296:8
**question's**
202:5
**quick** 62:19
107:2 243:2
**quickly** 216:8
**quite** 10:24
15:9 39:17
42:7, 9 46:13
47:9 51:22,
24 52:10, 21
57:22, 23
58:21 80:10,
11 93:17
111:23 112:1
122:3 146:21
151:8 182:15
184:20 188:4,
7 194:14
198:10 204:9,
12 214:13
215:2 229:14,
16 230:2
231:13
245:23 263:2
292:7
**quits** 97:12
**quote** 172:13
217:3 287:14
**quote/unquote**
55:4

**< R >**
**RACHEL**
2:13
**radiation**
105:13, 14, 18,
22 106:10
112:24 113:6
114:4
**Radiological**
250:20
**Radtke** 82:4
**raised** 148:13
**Ranbaxy**
267:2, 5, 7, 14
**random**
245:22 263:5

**range** 47:17,
19 49:8
115:18
116:14 228:23
**ranges** 50:19
215:7 228:24
**ranging** 49:18
**Raspanti** 3:20
**rate** 34:5
36:6, 7, 8, 9,
10, 11, 12, 13,
14, 16, 18, 20
87:24 88:23
245:4
**rates** 79:7
**Rathod** 2:9
**ratio** 166:21
195:12, 14, 17
**ratios** 192:22,
23 193:5, 6, 9,
17, 21, 22
194:4 195:23
**raw** 244:14, 18
**reach** 119:8
203:8 233:13
**reached** 76:23
171:24
191:13 207:9
**read** 16:20, 22,
23 17:3
108:19 112:3
117:12, 25
118:4, 13, 21
119:14
160:10 172:6,
9, 19 173:14,
23 192:10
217:13, 19
218:9 235:3,
4 252:8
276:6 287:13
294:3 296:6
**reading** 71:15
110:20, 25
111:3 167:10
207:13, 17
227:1 239:2, 3
**reads** 172:19
**real** 155:15
156:13 193:9
233:8 278:17

**realistic**
144:21
**realizations**
280:8
**really** 60:19
66:20 117:16
122:4 126:1
154:23
159:19
190:10
191:16
209:13
223:19
232:20
243:11
245:22
268:25
279:13 288:24
**reason** 51:4
104:6 138:11
139:1 176:13
187:11
189:15
198:11, 14
199:21
200:12, 13
226:20
282:11, 18, 19
294:5 295:5,
8, 11, 14, 17, 20,
23
**reasonable**
87:21
**reasoning**
261:12
**reasons** 32:3
177:6
**ReBazan@dua
nemorris.com**
4:13
**REBECCA**
4:9
**Rebuttal** 5:14
**recall** 9:1
23:17 30:2
35:15 69:17
75:13 95:19,
25 162:20, 22
252:15, 16
253:6, 19, 22
254:2, 5

255:4, 10
267:6 272:8
276:15
281:22, 23
282:2 283:21
289:13
**recalled**
251:25 252:4,
5, 11, 21
254:20 255:3
267:17
271:18 284:21
**recalling** 272:4
**receipt** 294:14
**receive** 35:5
242:11
**received**
27:22 28:2, 4
29:24 30:3, 4,
5, 6, 13, 20
216:15 288:11
**receives**
222:20
**recess** 63:7
107:9 159:24
204:23 243:5
281:14 286:6
290:14
**recognized**
241:4, 7
**recollection**
75:6, 7, 9
**recommend**
169:20 222:11
**recommendatio
n** 97:10 122:5
**recommendatio
ns** 98:2
108:22
117:13 118:1,
4 220:12
226:6 230:21
240:3
**recommended**
114:2 160:14
270:22
**recommending**
99:20 104:16
**recommends**
239:18, 23
240:1

Confidential Information Subject to Protective Order

record 7:2, 19
8:9 25:11
35:21 36:2
53:22 55:3, 5
63:6, 9 65:15
66:6 107:4, 7,
11 130:15, 21
152:1 159:21,
22 160:1
166:9 204:22,
25 234:20
235:4 242:17
243:2, 4, 7
262:2 267:12
281:9, 13, 16
285:24, 25
286:5, 8
290:10, 13, 16
292:23
records
219:17, 19
recovered 35:7
Red 4:3
reduce 108:24
109:10, 15
281:6
reduction
279:19
re-evaluation
211:6
refer 19:12
39:6 57:4
76:4 96:9
98:12 109:25
112:22 166:5
278:1
reference
65:7 95:7
97:13 122:25
283:5, 15
referenced
20:24 77:20
79:5 98:6
102:21 138:23
references
16:9
referred
119:24 272:2
referring 10:6
11:23 12:1
30:10 71:14,

19 104:24
110:24
112:21 119:1,
18 163:15, 16
247:5 248:10
refinements
217:11 218:11
reflected
35:10, 12
219:2 220:16
reflection
49:4 217:10
218:11
reflects 31:13
125:11
reform 152:5
reframe 230:5
refresh 162:23
regard 161:12
289:14
regarding
21:22 31:17
33:19 133:16
217:11
218:11 273:4
287:19
regardless
220:17 222:4,
19, 20 272:9
regards
172:10
regime 151:15
regimen
55:10 56:5
61:23
regions
182:14 198:4
regression
212:5, 10
regular 114:4
128:11
regulated
265:3
regulation
250:8
regulations
257:20 258:1,
15
reimburse
247:21

reimbursed
175:5

reimbursement
224:2
reimburses
247:18
rejecting
278:25
relate 94:12
251:14, 17
262:25
263:12 272:15
related 28:1,
4 29:11 31:6,
9 50:15 64:5
69:12 91:14,
23 97:19
101:12 108:3
109:8 118:3
139:20, 22
154:3, 5
210:8 230:3
250:8 255:16
262:21 270:25
Relates 1:9
94:17 143:14
248:14 252:3
259:10
272:17 286:23
relating 69:8
94:4 102:18
relation
239:21
relationship
23:24 24:1
53:14, 16
70:2, 13
89:17 234:24
235:8, 12, 13
236:4 237:15
239:8 240:15,
24 241:2, 5, 8,
22 242:3
243:20 287:22
relative 113:5,
7, 12, 15
114:18 115:3,
5, 9 160:12,
16 179:20
181:3 218:18

relatively
38:9 201:20
relevant
11:14 22:7
84:14 108:19
115:24
137:21
156:18
163:11
168:12
181:20
193:15 194:8
258:17 264:1
reliable 216:1
241:18, 19, 25
242:4
relied 17:2
73:21 162:2,
10, 12, 16, 21
166:6 167:14
relief 172:14
relies 194:6,
16 261:12
rely 68:13
164:18
relying 135:9
169:9
remain 45:14
remedies
172:12
remember
17:9, 14, 19
19:9 23:17
30:7, 12, 24
31:11 32:5
74:13 75:12
79:24 80:6
81:2, 4, 25
82:2, 5, 8, 12
157:20
158:19
162:15 245:7
277:19 284:5
288:8, 13
290:21
remission
58:25
REMOTE
1:14 7:6, 15
244:6

remotely 7:13,
14 9:22
remove 58:13
renal 49:18
152:19
rename 165:17
renamed
168:18
render 28:10,
19 53:17, 18
rendered
77:19 182:25
rendering 83:3
rephrase 8:22
18:15
reply 217:23
218:2, 10
Report 5:14,
16 11:25
12:9, 13
13:14 15:20
16:4, 22 19:5,
23, 24 20:3,
14, 20 22:8,
20 25:5 28:7,
11, 20 29:14
31:14 33:20
34:1, 6, 15
35:7 41:2
58:5 60:5
66:3 70:21,
23 71:7, 8
72:16, 17
73:20, 22
74:10, 13
75:8, 11, 22
76:24 77:24
78:17, 21
83:8 85:4
86:10 95:7
96:3, 14 97:4
102:22
104:12 105:6
106:12, 13, 19
107:18
108:12 110:4
111:10, 19, 21
112:11, 22, 25
113:2, 23
114:22, 24
115:4 119:1,

19, 24  122:11
126:23
129:24  130:5
132:20
141:23
146:17
147:24
148:16, 21
150:18
157:19
158:14  160:6,
19  162:3, 10,
23  163:10
165:11, 23
167:5, 8, 11,
12, 23  168:14,
16, 17  174:8
176:4  177:1,
4  178:20
182:4  192:11
194:16  201:8,
13, 14  213:17
219:22
243:12, 13, 16,
25  246:14
251:20, 25
252:19
254:14, 19
255:6, 8, 16,
18  257:2, 3, 6,
18, 24  258:6,
25  260:11, 24
261:3  269:9,
12, 16, 21
270:20
274:22, 23
276:13, 15, 16
278:24  283:7,
10  285:18
287:11  289:8,
17  292:2
**REPORTED**
1:24  167:10
297:12
**reporter**  7:20,
24  235:2, 4
297:4
**reporting**  7:15
**reports**  13:15
16:23  19:5
24:12  29:12

30:6, 7  63:13
64:1  71:25
73:17  74:9,
15, 20, 22
117:1
**report's**  20:21
**represent**
233:18, 19
**representative**
86:17, 24
87:18, 22
185:18, 22, 24
186:8, 13
208:9, 21
232:25
**represents**
127:13
**request**  35:24
36:4  66:14
**requested**
11:13  172:12
**requests**  11:7,
10  32:6, 10
**require**  46:18
104:6  126:19
166:19
264:21  276:5
280:4, 16, 20
**required**
108:4  138:14
142:5, 23
147:16  256:1
269:11  284:11
**requirement**
148:4  264:13,
15  284:9
**requires**
53:13  62:3
**re-reading**
218:2
**research**
16:17  27:24
31:1  32:8
40:13  47:16
91:10  93:1, 8
98:24  99:6,
11, 12, 22
100:14, 25
101:1  142:14,
15, 17  146:23
147:4, 9

150:22
153:21, 22, 24,
25  154:2, 5,
19, 20, 21
155:6, 9
157:9  207:25
208:3, 15, 20
209:23
211:20, 21
213:4  233:10
250:1, 4  251:1
**researched**
94:23  95:3, 13
**researchers**
137:19
**reserve**  181:22
**reside**  197:4,
10, 13  200:14
**residency**
39:22  40:2
42:5, 8, 11, 14
44:19, 24
45:3, 5, 10
**resident**  42:13
**residents**  44:3
52:2, 4
**resolved**  211:5
**resorted**
210:25
**respect**  21:25
22:13  24:17
34:1  56:24
76:12  83:13
84:25  85:22
89:23  94:5, 6
98:13  114:15
128:24
129:16
137:18
138:22
148:12  156:3
172:17  174:2,
21  181:5
212:13  228:1
242:13  243:17
**respected**
161:17
**respective**
68:6
**respond**  99:23
101:19

**responded**
216:19  242:12
**response**
210:11  216:7
272:24
**responses**
209:22
**responsibilities**
285:9
**responsibility**
151:2
**responsible**
150:16, 19
**restate**  26:17
28:15  32:20
33:22  103:15
145:11  162:6
167:3  192:25
239:3  240:18
256:19
259:23  267:3
268:19
**restrict**  178:4
**result**  126:23
140:10
149:24
212:19  278:12
**results**  128:16
**resumé**  228:10
**retained**
23:10, 14, 15,
19  24:20, 23
26:8, 9  29:19,
20  64:11
68:5, 8, 10
69:16  72:6, 23
**retract**  289:3
**retracted**
289:6
**return**  124:15
294:12
**reveal**  24:22
63:20  64:4
65:10  66:24
**revealed**
284:17
**revelation**
277:7  278:3,
6, 7, 9
**revenues**
260:7

**review**  13:4
16:20  19:23
20:1  22:23
36:15  82:15,
17  84:7
85:10  103:1
105:20  127:5,
17  141:8
221:24  270:15
**reviewed**
11:20  12:16
13:14  17:1
22:24  83:25
85:5, 16, 18
129:4, 8
162:11  167:5,
8
**reviewing**
106:1
**reviews**  102:21
**Rgeman@lchb.
com**  2:15
**Richard**  14:8
15:5  76:18
79:16
**right**  10:8
11:10  12:24
18:5  20:18,
21  21:17
22:17  25:24,
25  26:20
28:8  30:1, 16
35:25  37:10,
15, 20  41:10
43:16  45:21
46:25  59:14
63:2, 5, 11, 17
64:7  67:4, 16
68:18  69:3, 4
73:12, 14
74:11  75:6
76:1  77:4, 17
78:18, 19
79:8  81:17
82:19  86:12
87:17  88:3, 4,
17  89:21
96:12, 23, 24
97:14  100:17
101:25  102:8
107:13

108:*14*
110:*18*
111:*12*
114:*10, 16*
117:*14*
119:*17*
120:*23*
121:*22*  122:*1*
124:*11*
126:*10, 11, 16*
134:*15*
135:*17*
137:*11*  138:*4*
139:*14*
143:*18, 22, 25*
146:*21*
147:*16, 19*
148:*10*
149:*20, 25*
151:*5*  152:*21*
154:*3*  156:*21*
157:*2, 10, 13*
160:*3, 20, 21*
163:*10, 12, 20,*
*21*  166:*7*
167:*6*  169:*7,*
*8*  170:*12, 14*
172:*1*  173:*3*
174:*22*
177:*16*
181:*22*
183:*22*
185:*11*  186:*8*
188:*12, 13, 15*
190:*3, 5*
192:*9*  197:*15*
199:*6, 24*
200:*14*
201:*14*  202:*2,*
*23, 24, 25*
203:*18, 21*
205:*2, 7*
206:*20, 23, 25*
208:*4*  209:*1,*
*4, 6, 12*  210:*3*
216:*8, 17*
218:*1*  221:*2,*
*7, 18, 22, 23*
222:*2, 14*
223:*19*
224:*14, 19, 21*

226:*5, 16*
228:*10*  230:*8*
231:*22*
232:*14, 21*
233:*18, 24*
238:*25*
239:*25*  243:*9*
245:*3*  247:*7*
250:*24*  252:*4,*
*22*  254:*7*
255:*10, 11*
260:*13*
261:*24*  267:*6*
269:*2, 20*
271:*20*  272:*5,*
*12*  274:*1, 11*
275:*3*  277:*17*
280:*17*  281:*7*
285:*20*  286:*11*
**risk**  83:*12, 13,*
*16*  85:*11, 20*
90:*20*  93:*10*
94:*7*  96:*15,*
*19*  105:*10*
107:*22, 24*
108:*8*  109:*14*
110:*2, 17*
111:*4, 5, 13,*
*16, 20, 22, 23*
112:*2, 5, 9, 12,*
*13*  113:*3, 5, 7,*
*12, 15*  114:*8,*
*18*  115:*3, 5, 9,*
*15*  116:*18*
118:*19*  119:*5*
120:*2, 6, 12,*
*18, 23*  122:*12,*
*13, 17, 18*
130:*13*  131:*5*
132:*11*
149:*23*  150:*3,*
*4, 15*  160:*7,*
*16*  256:*4, 8,*
*13*  258:*12*
279:*17, 20, 24,*
*25*  280:*1, 4, 5,*
*13, 15, 16, 17,*
*18, 21*  281:*1,*
*2, 4*
**risks**  31:*16,*
*20*  58:*6*  59:*3*

99:*20*  104:*14*
106:*5, 9*
112:*11, 17, 18,*
*20*  116:*19*
120:*13*
121:*19, 20, 23,*
*24*  122:*2*
150:*8*  154:*10,*
*16*  160:*12*
**Rite**  3:*4, 12*
**RKum@duane**
**morris.com**
*4:12*
**road**  278:*14*
**ROBERT**  1:*8*
*4:7*
**robust**  215:*4*
**rock**  263:*5, 6,*
*14*
**role**  15:*24*
52:*5*  232:*12,*
*19*
**room**  9:*23*
*64:8*
**Rooney**  3:*2*
**root**  228:*6*
*232:9*
**rotation**  45:*2*
**rotations**
*44:25*  45:*1*
*48:2, 4*
**roughly**
*206:23*  230:*18*
**row**  47:*21*
**RUC**  218:*18*
220:*8, 9, 10,*
*11, 17*  222:*3,*
*10*  226:*8*
230:*20*  231:*8*
235:*24, 25*
237:*14, 21, 22,*
*24*  239:*7, 10,*
*16*  240:*1, 4*
**RUC's**  217:*5*
230:*17*  240:*3*
**rule**  16:*2*
**ruled**  123:*15*
**rules**  8:*15*
35:*24*  62:*16*
**run**  184:*24*

212:*10*
**runs**  153:*1*
**rural**  136:*22*
**RUV**  237:*13*
**RVUs**  182:*11*

**< S >**
**safe**  266:*7*
**safely**  251:*13*
**safety**  251:*11,*
*12*  268:*6*
**sale**  249:*9, 13*
253:*17*
259:*20*  260:*4*
**sample**  87:*14,*
*18, 22*  227:*22,*
*23*  232:*21, 22,*
*23*  233:*1, 2, 4,*
*5*  289:*22*
**San**  198:*7*
**saw**  11:*4, 5, 6*
49:*13*  52:*6*
140:*22*
158:*16*  228:*10*
**saying**  102:*24*
106:*15*  112:*1*
157:*22*
174:*25*
175:*15*  190:*6*
200:*22*  204:*2*
207:*19*  210:*9*
222:*7*  233:*3*
236:*22*
272:*23*  279:*2*
**says**  75:*14*
96:*8*  107:*21*
171:*12*
226:*24*
254:*19*  264:*5*
287:*14*
**scale**  118:*18*
218:*19*
228:*18*  237:*1,*
*2, 8, 9*
**scan**  105:*11,*
*15, 17, 19, 22*
114:*2, 9*
**scans**  97:*2*
104:*21, 25*
105:*4*
**scenario**  110:*5*

**Schedule**  5:*22,*
*25*  48:*2, 22*
49:*3*  50:*25*
51:*6*  220:*13*
223:*5*  224:*6,*
*13*  240:*9*
**Scholar**  39:*19*
40:*20*  41:*19*
**school**  39:*22*
40:*9, 11, 14*
41:*16, 20*
**Science**  250:*23*
**Sciengen**  4:*16*
**scope**  28:*12*
82:*21*  111:*9*
142:*18*
150:*17*  156:*8*
157:*19*  179:*8*
240:*17*
252:*15*
253:*22*
268:*11*  283:*6,*
*10*  284:*23*
291:*25*
**scoring**  131:*16*
**screen**  107:*25*
108:*9*  113:*9,*
*17*  119:*11*
120:*24*
122:*16*  124:*8*
243:*18*
**screened**  32:*2*
201:*22*
**screening**
31:*18, 19, 20,*
*22, 23, 25*
33:*12*  91:*15*
96:*8, 13*  98:*1,*
*13*  103:*7, 20*
104:*1, 13, 14,*
*17*  105:*7*
106:*5, 8, 9, 16*
108:*5, 24, 25*
109:*3, 10, 14*
112:*3*  113:*21*
119:*23*  120:*5,*
*22*  122:*13*
150:*8*  156:*17*
160:*15*  178:*8*
201:*12, 16, 18,*
*25*  203:*25*

Confidential Information Subject to Protective Order

285:*8, 10, 12, 15*
**screening-**
**implied** 109:*4*
**scrutiny-**
**dependant**
122:*22*
123:*17, 19*
**scrutiny-**
**dependent**
123:*10, 13, 16, 20, 23* 124:*6, 12*
se 111:*14*
209:*24*
seal 64:*18*
65:2, *19, 23*
search 11:*12*
second 42:*25*
79:*4* 96:*6*
119:*15*
172:*23*
225:*20* 228:6, *7* 236:*5*
264:*4* 272:*23*
279:*18*
secondary
56:7
seconds 77:*6*
second-to-last
279:*16*
section 96:*9*
174:*8* 206:*17*
230:*13*
262:*14* 297:*5*
sector 141:*3, 23* 231:*12*
Security
249:*23* 250:*5*
see 10:*4, 17*
35:*22* 38:*3*
41:*7, 8, 14, 15*
43:3, *7, 14*
46:*14, 15, 16, 17* 47:*5*
49:*15, 16, 23*
50:*18* 52:*18*
53:*17* 64:*9*
73:*10* 74:*10, 15* 75:*25*
76:*6* 77:7, 8

79:*9* 101:*9*
110:*12, 25*
114:*12, 17*
117:5, *8*
122:*4* 123:*2*
134:*3* 146:*19*
152:*11*
158:*21*
160:*24* 161:*2*
163:*14, 22*
168:*15, 20*
171:*11*
172:*16*
173:*21* 202:*3*
205:*15*
206:*17* 207:*7*
209:*19* 210:*2*
218:*14*
225:*20, 21*
227:5, *7, 11*
228:*8, 12*
230:*9* 234:*9*
235:*21* 236:*2*
239:*11*
250:*18* 257:*2*
261:*20*
265:*20*
269:*16*
279:*22* 291:*10*
seeing 10:*21*
35:*15* 47:*11*
178:*24*
seek 172:*12, 13*
seeking 220:*9*
seeks 183:*21*
220:*17* 222:*3*
seen 75:*11*
188:*8*
sees 50:*8*
sell 263:*13*
sending 58:*25*
sense 53:*6*
58:*8* 109:*12*
116:*1, 13*
129:*24* 151:*1*
201:*18* 219:*8*
233:*8* 247:*9*
266:*12*
272:*18* 284:*7*

**sensitive** 38:*1*
108:*25* 125:*14*
**sensitivity**
31:*22* 122:*16*
**sent** 10:*5*
288:*11, 16*
**sentence**
88:*21* 96:*7*
107:*21*
108:*20* 109:*5, 9* 117:*12*
118:*3, 13, 22*
160:*11*
164:*21*
218:*10* 265:*9*
279:*16*
**separate**
36:*16* 118:*1*
119:*10* 245:*7, 9, 14*
**sequence**
252:*9*
**series** 8:*18*
102:*2*
**service** 156:*17*
183:*5* 191:*23*
202:*2* 203:*21, 25* 220:*23*
221:*1, 9, 10, 11, 16, 19*
222:*5, 20, 21*
223:*4, 10*
**Services** 7:*3*
70:*8* 77:*19*
97:*17, 20*
136:*24* 140:*1, 2* 161:*6*
168:*7* 169:*20*
172:*15*
182:*25* 183:*2, 5* 184:*18*
201:*12*
205:*22*
206:*10*
220:*12, 17, 22*
221:*4, 7, 16*
224:*20* 247:*20*
**session** 9:*4*
**sessions** 17:*15, 20, 21, 22*

18:*3, 6, 8, 17*
19:*19, 25* 21:*9*
**set** 8:*1* 29:*22*
96:*23* 99:*21*
122:*20*
130:*12* 131:*4, 10, 16, 19*
132:*10, 15*
149:*21*
180:*22*
183:*24* 184:*3, 22* 185:*1, 5*
221:*4* 228:*22*
**sets** 87:*10*
233:*17* 239:*16*
**setting** 46:*14*
90:*7* 98:*11*
120:*25* 121:*2*
138:*18, 19*
155:*11* 264:*23*
**settings**
142:*11*
156:*24*
193:*10* 195:*1*
**seven** 17:*25*
47:*18* 75:*18*
124:*11* 152:*8, 12*
**seven-hour**
18:*3, 6*
**shape** 203:*15*
**share** 10:*12*
148:*17* 149:*1*
232:*1*
**sharing**
146:*12*
148:*22*
169:*21*
170:*20*
172:*18* 174:*3, 9, 19, 20, 21*
175:*3, 6, 12, 14, 15, 17, 25*
176:*1* 177:*8*
190:*3, 11*
203:*17*
**shed** 70:*4*
**sheet** 294:*6, 8, 10, 13* 295:*1*
296:*10*
**shift** 51:*15*

**shifts** 51:*11, 12, 14*
**shock** 280:*10*
**short** 17:*23*
23:*16*
**shortcomings**
196:*1, 10, 15*
**shorten** 251:*5*
**shorter** 153:*3*
**shortest** 152:*3*
**Shorthand**
7:*24* 297:*3*
**shot** 9:*6*
**show** 137:*6*
146:*21*
165:*10* 179:*1, 11* 187:*25*
192:*22*
199:*12, 15*
204:*8, 13*
214:*8* 216:*3*
225:*12* 234:*8*
292:*9*
**showing**
210:*21*
234:*23* 235:*8*
237:*19*
**shown** 83:*15*
279:*21* 288:*5, 10*
**shows** 193:*6, 22* 235:*15*
**sick** 52:*21*
202:*10*
**sicker** 223:*2*
**side** 16:*24*
64:*11* 68:*25*
251:*10* 292:*16*
**sign** 51:*11*
294:*7*
**signed** 28:*21*
78:*22*
**significance**
89:*9*
**significant**
44:*15* 78:*24*
89:*11*
**signing** 51:*12*
294:*9*
**similar** 51:*21, 22* 52:*11*

Confidential Information Subject to Protective Order

88:23  99:18
134:22  135:2
198:21, 24
199:2  208:2
279:10
**similarly**
119:12
**simple**  36:23
155:23
**simply**  89:18
**Singer**  102:12
**single**  55:7
105:18
118:18  119:4
178:9  195:16
221:16  233:19
**sit**  75:7
**site**  57:16
**sites**  143:8
**sitting**  172:5
**situation**
267:20
**situations**
237:12  239:6
**six**  49:3, 7
147:5
**size**  180:11
181:3, 5, 14
196:24
**skewed**
197:22  198:2
213:9  214:25
**slope**  235:21
236:3, 7
**slopes**  235:16
**small**  38:5, 9,
11  58:11
133:7  179:19
180:12
196:24  198:8
**smaller**  28:23
**smears**  285:15
**smoke**  97:12
**smokers**
96:18, 22
97:1, 3  120:3
**smoking**
97:11  113:13
121:1  160:13
**snippet**  10:10

**societies**
221:13
**society**  149:9,
13, 18  150:7
151:12
**Solco**  4:7
**sole**  115:7, 12
117:11
**solely**  52:1
**somebody**
25:23  56:9
59:5  61:18
130:7  135:10
139:24  150:2,
14  158:16
201:16, 17, 22
202:22
203:19
223:13
270:10  280:6,
22  286:23
**somebody's**
152:20  279:4
**somewhat**
110:5  184:2
**Song**  5:19
13:15  16:24
19:7  29:12
30:8  132:22
133:1  161:7,
12  162:2, 10,
21  167:14
169:9  182:22
194:6, 15
**Song's**  74:9
148:15, 21
165:11  187:3
195:11
289:16, 25
**sorry**  38:17
57:14  86:9
97:24  102:10
103:15
109:22
110:22  111:8,
11  121:6
130:19  134:7
135:19
143:24
168:18  171:2
186:4  203:25

207:6, 12, 15
208:10
223:24
244:24  263:16
**sort**  22:2
59:17  134:24
144:21  251:6
259:9  261:24
**sorts**  246:24
**sought**  31:9,
10
**sounds**  40:7
92:4  163:12
231:17
**source**  19:9,
12  86:16
117:17
175:13, 18
208:9, 11
219:3, 7, 12
**sources**  17:1
85:5, 17, 18
109:25
115:13, 14, 17
116:14
129:25  130:1,
3  146:23
162:16  166:4,
13  167:17, 21,
25  169:9
175:10  189:7
191:17  217:8,
12  218:12
230:15
259:13, 15
**South**  4:11
**space**  294:5
**span**  177:12,
14
**speak**  14:4
17:8  60:19
61:24  130:21
**speaking**  7:16
17:14, 16
19:19  79:20
84:15  152:15
230:19  235:17
**speaks**  168:21
261:17  262:16
**special**  96:23
152:18  216:24

**specialist**
53:15  54:11
**specialists**
144:19
**specialized**
54:22  55:9
**specialties**
46:3  210:19
231:3, 6, 7
**specialty**  46:8
144:12  236:1
**specific**  12:12
14:21  52:14
61:7  67:20
71:1  72:15
75:20  83:13,
16  84:22
90:13  92:24
93:9  106:2
108:25
125:14
134:17, 18
155:8, 10
156:10  160:7,
13  167:17
187:7  193:13
254:25
270:24  277:4,
11
**specifically**
55:11  84:4
92:1, 2  93:11
99:16  104:24
109:5  140:6
168:1  270:25
276:23  282:6
289:9
**specificity**
31:23  122:16
152:11
**specifics**  206:4
**specified**
88:19  190:14
194:10
**specify**  120:5
175:1  188:12
199:2  221:15
248:1, 19
**specifying**
198:25

**spectrum**
126:5
**spend**  38:8,
12, 19  44:25
45:1, 2, 18, 23
46:25  77:24
186:23  198:5
218:25
**spending**  45:8
69:8, 12, 15
169:23  170:6
182:23
184:17
186:18  194:8
197:18, 20, 23
215:1, 4
236:18  238:20
**spends**  170:1,
13  185:10
**spent**  27:7
37:13  38:15
42:7, 9, 12
46:24  78:20
167:10
185:15
219:13  222:5
**split**  47:22, 23,
25  148:14
**spoke**  17:5, 10,
11
**sponsors**  87:2
**spot**  59:9
**spread**  57:15
**square**  228:6
232:9
**squares**  232:8
**staff**  43:18, 19,
23  44:2, 9
251:3
**standard**
156:23  227:5,
7, 23  228:2, 4,
5, 21  229:2, 3,
5  231:19
**standardize**
227:13, 20
228:2, 25
**standardized**
227:6, 11, 24
228:15  229:4,
9  231:19

Confidential Information Subject to Protective Order

standardizing 228:1, 14, 20 229:14
Stanford 40:5 44:8
STANOCH 2:4
start 41:15 48:24 63:19
started 23:7 39:22 40:7 42:15 47:1 73:7, 8, 10 139:12 140:13 219:19 272:4
starters 39:4
starting 44:4 48:7 152:2 189:14 219:23 261:10
starts 215:16
starving 159:6
State 4:18 8:8 20:1, 2 21:14 31:17 54:10 60:11 83:10 87:24 95:9 176:4, 11 191:19 294:5 297:1, 4
stated 34:5 106:13 158:14
statement 61:16 117:17 129:12 264:20 271:2, 11, 13, 19 272:2, 13, 14, 19 287:13, 18
STATES 1:1 7:9 95:4, 14 160:11 280:14, 25
stating 83:19
statistical 89:9, 21 289:1
statistically 89:17
statistics 165:2

steady 42:18
steeped 223:13
stenographic 7:18
step 211:24
Stephen 79:23
steps 278:5
stipulation 177:25
stomach 123:10
stone 29:22 185:6 221:5
stool 121:10, 24 122:7, 9
STOY 3:15 5:6 14:18 15:3 17:10 18:9, 18, 25 21:19 22:11 24:14 25:8 26:15 28:13, 25 30:22 32:19 33:4, 21 34:22, 24 35:18, 25 36:4 37:3 52:16 57:19 58:2 59:7, 15, 22 60:9 62:10, 22 63:1, 3, 21 65:6, 21 66:2, 15 67:3, 14 68:16 69:9 70:5, 24 71:11 72:20 77:25 79:11 83:20 84:9 85:3 86:3 90:9 91:8 92:10 94:22 95:8, 18 98:25 99:8 103:22 104:3, 22 106:20, 22 107:1, 6 109:21 111:6, 8 114:21 116:8 121:13 129:7, 18

130:14, 19
131:20
132:12
133:13
134:12, 17
135:4, 21, 25
137:16
141:25 145:8, 20 147:11
149:10 150:9, 24 151:21, 23
153:12
154:14 156:7
157:6, 18
158:22, 25
159:3, 16
161:10, 19
162:4, 14
164:10 166:8
167:16 173:9, 15 174:5, 23
175:21
177:24 184:1
185:12
186:10
188:19, 24
191:1 192:24
193:7 197:7
203:22
204:15, 17
205:23
206:11 209:7
218:5 224:22
232:18
233:11 235:1
238:11
240:17
252:23
255:23 256:9, 18, 25 259:3
267:10
268:10, 24
271:21 275:5
276:24 277:1
282:4, 17
283:6, 16
284:22, 25
285:23 286:2, 10, 20 290:8, 19 291:11
292:20

straight 40:9 44:16
Street 2:5, 10, 14 3:3, 21 4:11, 18
strike 36:25 43:4 68:25 69:2 85:15 153:19
strong 234:24 235:8 237:15 239:8
structural 50:7
structure 248:8, 11
structured 44:24
structures 259:19 260:3
student 102:13
studied 91:18 128:1
studies 85:10, 16, 22 114:13, 18 165:8 234:23 235:7
study 89:8, 13, 21 117:6 164:22 165:3, 6 206:23 216:15, 23 217:2, 3 226:4, 6 233:16 241:1
studying 91:11
stuff 16:12 192:10
stylized 223:8
sub 142:4 180:21
SUBJECT 1:13 66:12 67:8 99:25 134:4, 5, 8 135:1, 2, 3 263:9 294:9
submit 78:9
submits 145:1
submitted 22:9 78:6, 22

82:16, 17, 24 205:5 244:24 245:1 289:4
subpopulations 93:9
subsequent 23:2 27:12 109:3
subsequently 80:1
subset 28:23 142:4 179:18
subsidiary 67:25
subspecialties 231:3
subspecialty 45:12 46:6, 9, 11 52:18 53:7
substance 296:9
substantial 160:12 176:12 187:10 268:5
substantially 113:14
subtract 228:3
subtracting 227:22
succinctly 154:1
suddenly 141:2
suffered 278:12
sufficiently 108:24 109:11, 13 171:14
suggest 188:9 189:14
suggests 188:4
Suite 3:3, 8, 14 4:3, 11
sum 154:1 232:5, 8
summarize 176:13 187:11
summary 165:2

Confidential Information Subject to Protective Order

summing 232:1
Supply 249:23 250:5 258:15 261:7, 15 262:20 263:3 264:3, 19, 21 265:15 287:1, 2, 4, 17 290:25
Support 5:19 33:8 34:10 74:2 240:15, 24 261:22 262:15
supported 178:19, 20, 23, 25
supports 238:2 241:1
supposed 86:17 282:15
Sure 8:10 10:24 14:17 16:9, 10, 11, 12 34:15 35:25 36:3 37:11 39:5, 10, 13 42:4 49:2 51:1 59:12 60:23 69:13 71:4 86:14 96:16 97:8 98:19 108:21 111:7, 12 112:15 115:3 131:7, 10, 23 132:1, 8 133:14 134:15 136:14 137:2 141:10, 16 145:15, 24 159:4 161:13, 20, 25 162:5, 17 164:12, 15 166:11, 15 167:8 168:2, 15 186:3, 4, 16, 17, 19 190:13, 19

199:7 204:19 206:6, 12 209:24 214:4 215:22 218:6 219:4 222:13, 23 230:3 243:14 244:23 246:18 248:7, 19 249:14 253:2 255:25 257:23 259:9, 24 274:14 283:11 284:5 285:3 286:22
surgeon 219:22
surgery 62:16 208:12 210:20, 21, 23 211:1 219:18
Surgical 5:22, 24 210:19 212:7, 8 219:11, 18, 19 220:3
Surplus 6:2 262:20, 22 263:8, 9 264:2, 6, 9, 16 265:7
surprise 139:19, 23 140:5 284:18
surveil 251:10
Survey 76:5 86:17, 18, 24 87:19, 20 208:8 209:22 210:11
surveys 86:22 218:24
suspect 167:15, 18
switch 169:3
sworn 7:14, 24 297:10
symmetric 215:9 269:6

symptoms 96:21 120:7, 12
synonymous 288:4
System 44:11 131:16 144:6 150:23 151:8 155:25 204:11
systemic 62:15
systems 92:23

< T >
tail 197:5 200:14
tails 198:9
Take 5:14 9:9, 11 17:22 23:14 40:8 47:25 56:17 59:11, 13 62:19 84:18, 19 87:7, 11 103:25 116:17 126:21 151:3, 13 159:11 177:2, 3, 8 178:21, 22 188:1, 2 189:12, 13, 16, 19 190:1 191:7 198:19 199:13, 14, 16, 17 201:6, 9, 10 203:17 204:18 213:23, 24, 25 214:19, 20, 21 215:3, 17 217:20 220:4 222:1, 2, 8, 21 232:9, 21 243:1 244:11 271:12 286:3
takeaway 46:10
taken 63:7 107:9 126:13 133:21 159:24

204:23 243:5 281:14 286:6 290:14
takes 200:16 201:1 202:22 208:13 219:21 252:19
talk 19:20 34:19 36:1 60:25 65:8 108:15 111:21 118:23 121:18, 23 122:11, 22 221:21 237:5 260:23 261:2 263:2 264:9 271:10 274:22
talked 90:3 120:3 153:22 203:18 224:17 239:20
talking 30:9 88:2, 15 95:5 107:14 119:16 120:8, 10 137:24 139:18, 21 161:5 175:13, 16 180:11 181:1 200:5, 8, 9 233:5 239:12 264:23, 24 272:19, 20 273:10 274:13 279:17
talks 93:4 230:13 235:13
target 96:11
Task 97:18, 21, 22 250:7
tax 145:2
taxpayer 153:2, 5
taxpayers 153:8, 16
teaching 223:2
team 16:16, 17 33:8

211:15, 20 213:4 286:8
Technical 242:15 246:18
technique 218:23 219:1, 2, 6
techniques 217:12, 16, 18 218:4, 7, 13 219:5 231:20
technologies 31:19
technology 10:13 39:11 105:7, 8, 11 123:18, 24, 25 124:7, 8 250:23
telephone 244:6
tell 8:21 9:8 14:12, 15 15:4 23:13 25:11 30:25 37:12, 16 43:10 50:22 63:18 64:20 66:11, 14 67:10 79:1, 13 86:13 115:10 127:17 134:21 138:21 160:24 184:10 186:23 187:1 188:18 194:11 196:13 207:22 223:14 225:20 227:25 241:12 257:11 262:14 267:7, 14
telling 20:16

Confidential Information Subject to Protective Order

**tells** 143:*3*
179:*8* 229:*21*
237:*9* 280:*5*
**ten** 62:*19*
204:*18* 286:*3*
**tend** 50:*10*
**tendency**
232:*17*
**tenfold** 139:*6*
**term** 72:*15*
226:*13* 228:*2*
246:*16, 18, 20,*
*21* 251:*20*
252:*2* 257:*7,*
*9, 11*
**terminology**
118:*25*
**terms** 15:*1*
38:*4, 7* 42:*2*
44:*24* 49:*5*
52:*24* 53:*18*
61:*25* 79:*15*
93:*18* 105:*8*
106:*5* 151:*12*
167:*10*
180:*12*
197:*11*
210:*22* 212:*2*
237:*3, 4*
258:*10, 11*
275:*20* 287:*6*
291:*1*
**test** 94:*16*
121:*19* 125:*9,*
*10, 11, 13, 14,*
*15, 22* 127:*2,*
*6, 8* 155:*23*
**testified** 7:*25*
25:*6* 32:*24*
74:*7* 114:*3*
173:*12* 248:*6,*
*8, 13, 18*
249:*3, 6, 10,*
*11* 270:*9*
291:*12*
**testify** 9:*2*
134:*4* 297:*10*
**testifying**
24:*18* 72:*22*
86:*1, 4*

**TESTIMONY**
1:*16* 24:*13*
36:*7, 12*
63:*14* 66:*3*
68:*2, 3, 18, 25*
69:*7* 71:*25*
72:*7, 12*
73:*16* 84:*10*
133:*25*
134:*21, 22*
145:*9* 247:*25*
248:*2, 3, 15,*
*25* 249:*7, 15,*
*20, 23* 252:*24*
256:*10*
257:*14*
280:*15* 291:*2,*
*17* 292:*22*
297:*12*
**testing** 96:*10*
106:*7* 121:*5,*
*8* 149:*9*
**tests** 31:*22, 23*
91:*12* 98:*1*
106:*5* 108:*25*
121:*10, 11, 19,*
*24* 122:*3, 5, 7,*
*10, 15* 246:*24*
285:*8, 12, 15*
**Teva** 2:*15, 18*
**Texas** 198:*6, 7*
**text** 263:*22*
**textbook**
261:*24* 263:*2*
265:*6*
**thank** 8:*23*
9:*15* 25:*8, 9*
72:*19* 235:*10*
246:*4, 7*
255:*15*
285:*21, 23*
290:*8* 292:*19*
**Thanks** 8:*6*
143:*20*
**thematically**
134:*24* 135:*1,*
*3*
**theory** 261:*13,*
*22* 287:*15, 19,*
*22*

**therapeutic**
62:*16*
**therapy** 113:*6*
**thereof** 128:*24*
**thing** 9:*6*
112:*25*
144:*21*
156:*22*
229:*13, 21, 22*
233:*3* 234:*5*
271:*6, 8*
279:*15* 287:*8*
288:*1* 289:*20*
292:*6*
**things** 61:*8*
89:*15, 20*
118:*17*
144:*15* 150:*1*
156:*5* 166:*3*
183:*21*
207:*22*
218:*20*
220:*21*
246:*23, 25*
266:*15*
275:*25*
282:*15, 19*
284:*13, 16, 17*
**think** 11:*5, 6*
15:*8* 17:*5, 23*
20:*21* 21:*10*
22:*7, 12*
23:*19* 24:*7*
25:*18* 29:*21*
30:*19* 31:*5*
32:*15, 24*
33:*11* 34:*18,*
*20* 35:*23*
37:*17* 40:*24*
41:*6, 8* 43:*7*
47:*3* 49:*1*
51:*24* 52:*13*
53:*17* 54:*6*
56:*8, 25*
57:*20* 58:*4,*
*15* 59:*4, 25*
60:*20* 61:*8,*
*25* 63:*15*
64:*8, 12, 19*
65:*8* 66:*9, 11,*
*13, 15, 18*

67:*4, 14, 24*
70:*17, 19*
71:*3, 14* 74:*7*
77:*2* 78:*1, 23*
79:*5, 20* 80:*5*
86:*14* 90:*4*
91:*16* 93:*21*
96:*25* 102:*22,*
*25* 104:*5, 15*
105:*17, 21*
106:*12, 15*
107:*3, 14*
108:*14, 16*
110:*22*
112:*10, 24*
115:*2, 12, 18*
117:*16, 23*
118:*13, 24*
119:*18, 21, 22*
120:*4* 121:*18,*
*20, 23* 122:*23,*
*25* 125:*1, 25*
127:*15*
128:*22*
132:*19, 20, 22*
133:*8, 21*
134:*12* 135:*6*
136:*14* 137:*5*
140:*5, 12, 22*
141:*11*
147:*13*
149:*11, 13, 17*
150:*17* 151:*3,*
*5* 152:*7*
153:*3, 21*
154:*1, 18*
156:*15* 158:*7,*
*14* 159:*18, 19,*
*20* 160:*6, 10*
161:*5* 162:*24*
163:*6, 8, 16*
164:*13* 165:*1*
167:*23* 168:*3,*
*21* 169:*10, 12*
171:*7* 176:*18*
177:*17*
178:*19*
179:*10, 14*
180:*23*
181:*20*
182:*20*

184:*20* 185:*2,*
*9* 187:*24*
188:*7, 20*
189:*1, 16*
190:*19*
191:*10, 15, 24*
192:*1, 2, 4, 17,*
*18* 193:*8, 25*
194:*1, 4, 5, 7,*
*15* 197:*20*
198:*22*
199:*18*
200:*15, 24, 25*
203:*3, 7*
204:*2, 12, 13*
207:*6, 18*
208:*2* 209:*13*
211:*8* 214:*20*
216:*22*
218:*17* 219:*9*
221:*22*
223:*12, 25*
226:*22*
227:*14*
228:*10*
229:*23* 230:*7*
235:*11* 236:*5*
237:*17*
238:*10* 241:*9*
245:*6, 13, 19*
252:*6* 254:*24*
258:*3, 5*
259:*4* 262:*4*
265:*10* 266:*8,*
*11, 24* 268:*14,*
*15* 269:*12*
272:*17*
275:*14* 276:*5*
278:*4* 279:*10*
283:*18* 284:*6*
288:*21* 291:*9,*
*22* 292:*6, 7, 8*
**thinking** 27:*7*
58:*16* 59:*5*
71:*16, 20*
118:*5* 151:*3*
**third** 30:*10*
40:*11* 43:*6*
73:*25* 74:*3*
96:*6* 129:*6*
172:*24*

Confidential Information Subject to Protective Order

231:*11* 249:*5,
13*
**third-party**
171:*20, 22*
172:*21*
**thirty** 294:*14*
**Thornburg**
3:*8, 13*
**thought**
124:*13, 14*
148:*6* 151:*13*
167:*18* 205:*8*
209:*15* 275:*7,
18* 276:*4*
291:*10*
**three** 17:*20,
24* 21:*11*
24:*8* 63:*15*
64:*14* 67:*17*
68:*6, 19*
69:*24* 71:*10,
24* 72:*3* 73:*9*
75:*18* 87:*10*
101:*24*
102:*10*
118:*25*
183:*10*
216:*15* 230:*7,
15*
**threshold**
107:*24* 108:*8,
12, 18* 112:*1,
14* 117:*4*
118:*9, 10, 18,
19, 23, 24*
119:*3, 6, 9, 10,
15* 129:*2, 5, 9,
13, 14, 17, 22*
130:*8, 9, 12*
131:*4, 16*
171:*15*
**thresholds**
106:*14* 107:*15*
**Thursday** 1:*19*
**thyroid** 123:*1*
**Tibrewal** 82:*7*
**tickets** 263:*5,
6, 15, 19, 21*
265:*2, 5, 8*
**tiering** 248:*11*

**time** 7:*5* 8:*6*
22:*18, 19, 20*
27:*7* 28:*12*
29:*6* 34:*5*
37:*13, 16*
38:*15, 19*
40:*8, 18* 42:*7,
12* 45:*8, 19,
23* 46:*23*
47:*2, 3, 4*
58:*16* 59:*5,
10* 63:*4, 9*
77:*24* 78:*17,
20, 24* 86:*23,
24* 100:*20*
101:*7* 102:*2*
103:*25* 104:*5*
107:*1, 8, 11*
116:*3* 124:*7*
126:*9* 142:*11*
154:*25*
157:*21* 159:*1,
17, 23* 160:*1,
23* 164:*1*
177:*12, 14, 18*
204:*17, 22, 25*
206:*15*
208:*12*
210:*10, 12, 16*
212:*9, 14, 15*
217:*5, 25*
219:*12, 18, 19,
23, 25* 220:*1,
3* 222:*5*
230:*1* 243:*4,
7* 244:*22, 25*
245:*5, 6, 11*
246:*5* 252:*14*
253:*14, 19*
270:*11*
271:*19* 272:*1,
18* 280:*24*
281:*13, 16*
284:*5, 16*
286:*8* 292:*24*
**timeline** 23:*16*
271:*22* 278:*15*
**Timeliness**
154:*22*
**timely** 154:*12,
17*

**times** 110:*16*
118:*25*
128:*23*
206:*23*
209:*21*
226:*13, 24*
227:*8, 10*
239:*24*
**timing** 246:*2*
**tissue** 126:*13,
14, 19, 21*
127:*12, 18*
128:*1, 6*
**titles** 79:*6*
**tobacco**
104:*21*
**today** 8:*25*
35:*22* 75:*8*
117:*2* 247:*24*
260:*11*
**Today's** 7:*4*
16:*21* 78:*12*
292:*22*
**told** 17:*5*
27:*3, 15*
32:*15* 71:*3*
128:*20, 23*
177:*7* 209:*15*
223:*8* 224:*3*
**tool** 233:*10*
**tools** 151:*4, 5*
**top** 63:*19*
78:*23, 25*
80:*1* 197:*13*
**topic** 106:*23*
269:*8*
**total** 48:*17, 18*
72:*5* 148:*16,
20, 25* 149:*7,
13* 186:*18*
**totally** 9:*14*
**touched**
249:*17*
**TPP** 260:*21*
**TPPs** 259:*20*
260:*4* 266:*4*
**TPP's** 261:*18*
265:*17*
**trace** 153:*16*
**track** 42:*8*

185:*14*
**tradeoff** 92:*20*
**tradeoffs**
92:*15*
**training** 52:*18*
**transcribed**
297:*14*
**transcript**
294:*15, 16*
**transcription**
296:*7* 297:*15*
**transcripts**
66:*9* 135:*16,
24* 136:*1, 5*
**transform**
214:*11*
215:*10, 25*
**transformation**
213:*22*
**transformation
s** 214:*16*
**transforming**
215:*23*
**transforms**
215:*6*
**transparency**
138:*17*
140:*23*
141:*24* 142:*2*
146:*7, 24*
148:*4*
**transparent**
138:*15, 25*
139:*13* 141:*2*
145:*7*
**Traurig** 2:*20*
**treat** 61:*14*
62:*8* 124:*1, 8*
155:*2*
**treatable**
57:*23*
**treated** 55:*25*
**treating** 61:*19*
62:*13* 258:*11*
275:*24*
**treatise** 261:*24*
**treatment**
56:*10, 12*
58:*8* 94:*15*
98:*22, 23*
99:*4, 17*

109:*1, 4*
123:*22* 128:*7*
154:*12, 17*
**Trial** 36:*12*
68:*2* 86:*2*
**tried** 176:*25*
**true** 137:*2*
150:*2* 180:*24*
223:*11, 15, 16,
17, 18* 272:*7*
297:*15*
**truly** 113:*18*
**Trump** 140:*22*
**truth** 196:*12*
297:*10, 11*
**truthfully** 9:*2*
**try** 9:*5* 10:*12*
39:*9* 56:*17*
58:*18* 134:*19,
20* 152:*10*
163:*1, 25*
227:*21* 230:*4,
5* 232:*22*
**trying** 22:*10*
23:*2* 37:*25*
38:*1, 6* 39:*11*
65:*3* 101:*20*
153:*23* 163:*3*
166:*24* 230:*8*
232:*25* 234:*7*
238:*19* 255:*7*
**tucked** 227:*6*
**turn** 97:*7*
100:*1*
**twice** 118:*25*
227:*4*
**two** 9:*19*
15:*4* 17:*24*
21:*2, 3, 8, 9*
24:*8* 39:*18,
19* 43:*17*
45:*17* 48:*3, 5,
7* 51:*13* 52:*3*
67:*19* 75:*17*
78:*1* 80:*15*
101:*24*
102:*10, 11*
112:*17* 113:*7*
152:*15* 158:*3,
12* 170:*7, 10*
182:*3* 183:*4,

9  185:25
200:5, 8, 9
208:14, 16, 22
220:22
222:11
228:19
231:15  255:12
**two-week**
48:4, 5, 15
**type**  40:12, 13
45:11  49:10
54:22  57:17,
21  61:8
83:14  86:25
92:19, 24, 25
93:1  104:10
109:8  113:21
120:18
155:16
191:22  202:9
219:21
222:16  223:3,
9  282:11
**types**  27:8
45:17  57:9,
11  60:21, 22
99:12, 14
107:22
111:16
119:22
152:15
221:20
235:22  269:1
288:25
**typewriting**
297:14
**typical**  44:23
45:5, 8  49:22
**typically**
183:22
**typos**  16:6, 11

**< U >**
**U.S**  4:7
86:18  87:22
97:17  181:12
197:11  198:5
**UCLA**  39:16
**Uh-huh**  38:7
61:2  66:1
75:19  76:3

77:15, 22
88:7  97:15
103:3, 10
105:2  114:14
118:23
122:24
124:22  126:9
134:16
137:10  143:2,
5  144:8
148:2  157:4
164:25  170:4
174:11  178:7
184:10  185:4
187:5, 9, 16,
20  206:18, 21
209:18  212:4,
17, 25  214:22
215:15  216:2,
18  217:1, 9
218:15  220:2,
24  224:8
225:23  226:3,
9, 15  227:15,
18  230:11
241:12
245:12  261:1,
9  274:16
279:23
**ultimate**  175:5
**ultimately**
52:22  53:19,
23  153:11
186:17  207:9
269:12  278:11
**Umm**  230:11
**unaccounted**
174:18
**unavailability**
177:7
**unavailable**
177:11
**uncertain**
182:5, 8
183:7, 11
**uncertainty**
127:18, 19
138:16
139:10
182:18  183:1
266:14  270:2

276:2  279:6
280:6
**unclear**
140:25  145:22
**uncommon**
288:15
**uncontaminate**
**d**  273:19
**underdiagnosis**
92:16
**undergrad**
39:15
**underlying**
19:24  20:2
124:2  214:14,
16  215:3
217:17
**underserved**
223:4
**understand**
8:20  9:10
37:9, 18
40:18  56:8
60:4, 6  66:7
92:14  106:7
123:4  130:11
131:3, 7, 19
132:10  138:3
148:15  149:2
172:11  186:4,
17  190:20
211:11
221:19
245:23  246:2
247:10, 23
253:13  259:9
**understanding**
67:24  68:23
72:20  80:9
83:24  149:3
170:22  171:9
172:2, 3, 4, 6
194:17
246:15, 17
247:15  255:11
**understood**
148:19, 24
**undertake**
278:23
**unexpected**
140:9

**unfortunate**
197:1
**uniform**  108:5
**uniformly**
236:21
**unique**  253:15
**UNITED**  1:1
7:9  95:4, 14
**University**
81:18
**unlucky**  180:8
**unprecedented**
282:2
**unweighted**
186:22
**update**  218:19
237:13
**updated**  270:8
**upsides**  60:8
**urgent**  9:7
**urinalysis**
144:15
**urology**
210:20
**USA**  2:15
**use**  31:19
53:17  70:8
101:21  108:4
122:5, 15
128:16
132:20  151:8
156:4, 10
157:4  168:12
180:24
195:23
206:19  208:3,
4  212:12, 15,
19  213:7, 10,
13, 17  214:1
217:7  218:24
219:4  225:3,
4, 6, 7  226:13
231:21
232:16  233:7,
13  234:3, 4
238:2, 7, 19
246:21
251:20  257:7,
9  279:5, 14
289:14, 16, 25

**useful**  191:25
192:2  233:9,
12
**user**  163:8
164:3, 19
**users**  104:21
**uses**  165:22
231:14  263:4
276:9
**USP**  102:17
**USPS**  98:3
**USPSTF**  97:9,
13, 16, 17
98:4  102:17
104:2  108:15,
22  111:15
117:13, 25
118:4
**usual**  105:17
264:23
**usually**  61:23
237:5  245:7,
19  264:22
**utility**  264:25
275:20
277:10  280:6,
10, 11, 13
286:23
**utilization**
86:19

**< V >**
**VA**  46:15, 20
47:2  49:16
50:1, 3, 8
52:1  53:21
55:1  190:8, 17
**valid**  130:9
288:23
**VALSARTAN**
1:5  7:7  83:1,
4, 15  84:18,
19  85:1  87:6,
8, 11, 12, 13
88:1, 2, 3, 5,
10, 13, 16, 17,
21, 24  89:18,
25  90:1
108:4  110:7,
9, 11, 15
115:20

Confidential Information Subject to Protective Order

116:*15, 22*
130:*2*  158:*12, 16*  163:*8*
164:*3, 19*
177:*2, 3*
178:*21, 22*
179:*19*  188:*1, 2*  189:*12, 13, 16, 19*  190:*1*
191:*7*  198:*12, 19, 20*  199:*6, 13, 14, 17, 18*
200:*16*  201:*1, 6, 10*  202:*22*
203:*6*  251:*21, 23, 25*  252:*2, 3, 6, 10, 12*
253:*4, 15*
254:*14, 21*
255:*21*  256:*2, 6, 12, 17, 23*
257:*4, 10, 19, 25*  258:*8, 9, 10, 13, 20*
259:*21*  260:*5, 21*  270:*4, 17, 22, 23*  271:*12*
273:*5, 6, 13, 17, 20, 22*
274:*1, 7, 9, 24*
275:*3*  276:*17*
279:*1*  281:*5, 19, 22*  282:*3, 6, 8, 11, 24*
284:*20*  290:*6*
**valsartan-containing**
158:*17*
171:*16*  199:*5*
**valsartan's**
278:*19*
**valuable**
266:*16, 23*
**Valuations**
5:*20, 24*
**value**  213:*25*
218:*19*
248:*25*  249:*4*
257:*4*  258:*19*
259:*6, 9, 11*
261:*14, 17*

262:*17, 21*
265:*12, 19*
267:*19, 22, 24, 25*  269:*13, 17, 19, 20, 21, 22, 24, 25*  270:*5, 8, 12*  272:*11, 19*  273:*3, 5, 13, 16, 19, 22*
274:*8, 10, 20*
275:*2, 13, 19, 20, 22, 23, 24*
276:*8, 11, 22*
277:*6, 12, 17, 20, 24, 25*
278:*1, 2, 19*
279:*1, 4, 9, 12, 19*  280:*23*
281:*6*  286:*18, 23*  287:*3, 5, 8, 16, 22, 23*
288:*2, 4*  291:*3*
**values**  206:*15, 16*  228:*23*
274:*18*  276:*1*
278:*16*
**Vanderbilt**
2:*21*
**variable**
215:*7*  229:*4, 7, 8, 14*
**variables**
152:*6*  228:*19*
**variants**
156:*24*  227:*9*
229:*8*
**variation**
125:*9*  137:*8, 11, 14*  146:*22*
147:*1, 5*
156:*12, 25*
174:*18, 19, 21*
175:*10, 13, 19*
176:*1, 12*
178:*23, 25*
179:*3, 4, 5, 7*
187:*11*
193:*22*  195:*6, 22*  196:*13, 14, 15, 17, 18, 22*
197:*1*  220:*3*

222:*5, 19*
227:*10*  228:*7, 19*  292:*1*
**variations**
192:*22*  193:*6*
220:*15, 18*
**variation's**
137:*17*
**varies**  280:*14*
**variety**  46:*14, 17*  49:*17*
247:*25*
**various**  31:*16, 18, 20, 21*
32:*1*  44:*25*
54:*3*  76:*1*
85:*17*  92:*15*
97:*23, 24*
98:*11*  116:*14*
142:*6*  147:*21, 22*  168:*6*
214:*9, 15*
219:*13*
235:*16*  251:*7*
260:*8*  281:*3*
**vary**  51:*19*
187:*23*  188:*2, 4, 8, 10, 23*
190:*23*  196:*4*
220:*21*
237:*10*  279:*21*
**vast**  142:*9*
**Vearrier**  117:*8*
**vector**  232:*5*
**verbatim**
237:*13*
**version**  101:*5*
186:*22*
**versions**  101:*9*
**versus**  84:*18*
92:*15*  100:*10*
105:*11*
149:*15*  189:*9*
198:*7, 19*
201:*10*
202:*11*
206:*15*
209:*17*
222:*22*
235:*24*  236:*2*

257:*12, 16*
280:*10*  288:*25*
**vet**  243:*18*
244:*7*
**Veterans**
44:*10*  50:*8, 10, 11, 12, 14*
**video**  7:*5, 6*
10:*17*
**videographer**
4:*19*  7:*1, 3*
63:*5, 8*  107:*7, 10*  159:*22, 25*
204:*21, 24*
243:*3, 6*
281:*12, 15*
285:*25*  286:*4, 7*  290:*12, 15*
292:*21*
**VIDEO-RECORDED**
1:*15*
**Videotaped**
5:*14*
**Vietnam**  50:*12*
**view**  115:*9*
**viewed**  93:*12*
**visits**  247:*20*
**voluntary**
147:*17*

**< W >**
**wait**  67:*3, 5*
**walk**  39:*2*
42:*3*  118:*5*
**walked**  139:*4*
**WALKER**
4:*10*
**Wallack**  4:*2*
**want**  9:*9*
10:*23*  17:*20*
24:*15*  27:*9*
33:*1*  35:*21*
37:*25*  38:*3, 23*  45:*11*
54:*7*  58:*17*
59:*7*  63:*12*
66:*23, 25*
76:*22*  82:*20*
83:*7*  86:*8*
90:*13*  96:*2*

104:*9*  107:*15, 20*  111:*8*
120:*9*  121:*15*
129:*1*  132:*18*
133:*22, 23*
134:*3*  136:*15*
145:*11, 24*
153:*23*  156:*9*
157:*2*  159:*5, 7, 14*  160:*3, 5*
161:*7*  165:*25*
168:*5*  174:*6*
186:*18*
190:*10, 19*
199:*8, 19*
204:*13*  205:*2*
213:*10*  216:*3*
217:*20*  230:*1*
246:*5*  271:*10*
281:*10*  286:*3*
287:*13*  289:*8, 9, 19*  290:*11*
291:*18*
**wanted**  13:*4*
39:*24*  65:*14*
67:*7*  80:*22*
87:*9*  165:*23*
166:*2*  195:*18, 21*
**ward**  55:*2*
**wards**  45:*1*
47:*5*
**wars**  50:*11, 15*
**Washington**
2:*10*  3:*3*
144:*3, 7*
**waste**  230:*1*
**watched**  10:*16*
**waves**  50:*14, 18*
**way**  23:*12*
31:*13*  32:*7, 8*
40:*17*  44:*5*
45:*20*  51:*11*
53:*3*  55:*1*
71:*6, 7*  90:*19*
93:*22*  102:*16*
118:*5*  124:*19*
126:*1*  129:*23*
138:*9, 12*
153:*15, 20*

180:*17* 198:*5*
214:*7* 215:*23*
238:*2* 242:*14*,
*19* 253:*24*
258:*14*, *22*
266:*22* 270:*8*
275:*25*
278:*18* 297:*20*
**ways** 52:*22*
62:*24* 84:*15*
99:*18* 122:*20*
125:*1*, *6*
207:*19* 214:*5*,
*6*, *17* 230:*24*
251:*10* 269:*6*
275:*15*, *17*, *19*
276:*3* 284:*6*
**wearing** 227:*1*
**website** 80:*22*
101:*10* 254:*21*
**week** 10:*7*
47:*12*, *25*
**weeks** 21:*2*, *3*
44:*23* 45:*4*
46:*25* 47:*6*, *7*,
*14*, *17*, *18*, *19*,
*21* 48:*17*, *18*
49:*3*, *6*, *7*
51:*8*, *13*
**week-shift**
51:*16*
**weigh** 29:*15*
**weighed**
269:*13* 277:*13*
**weighting**
186:*20*
**welcome**
217:*10*
218:*10* 286:*12*
**welfare** 151:*12*
**Well** 14:*24*
22:*6*, *11*
23:*11* 33:*11*
35:*25* 42:*20*
59:*1* 61:*22*
65:*1* 67:*3*
80:*12*, *16*
87:*7* 90:*17*
92:*16* 93:*2*
100:*21* 105:*9*
118:*3* 132:*13*

134:*19* 139:*2*
156:*12*
158:*10*
160:*22*
161:*17* 162:*2*,
*13*, *18* 165:*24*
166:*16*, *25*
169:*12*
174:*16* 177:*8*,
*17* 198:*4*
210:*1* 214:*1*
215:*8* 242:*1*
246:*4* 263:*23*
269:*19* 276:*19*
**went** 40:*20*
139:*8* 181:*25*
217:*2*
**we're** 9:*5*, *21*
10:*15* 22:*4*
59:*17* 62:*21*
63:*5* 88:*1*, *2*
89:*12* 158:*25*
159:*22*
166:*23*
170:*21*
175:*13*, *16*
178:*3*, *4*
180:*11*, *25*
200:*9* 204:*21*
208:*15*
209:*14*
229:*22*
236:*16*, *22*
243:*3* 281:*12*
286:*5* 290:*12*
**western**
136:*22* 137:*4*
**we've** 12:*2*, *5*
35:*19* 102:*5*
106:*23* 115:*4*
120:*3*, *20*
133:*21* 243:*1*
**whatsoever**
272:*11* 275:*1*
**whistleblower**
64:*17*, *19* 65:*4*
**White** 250:*23*
**Whiteley** 2:*5*
**wide** 46:*17*
49:*17* 137:*8*,
*10*

**widespread**
57:*22*
**wildly** 179:*11*,
*12* 290:*7*
291:*15*, *21*
292:*5*
**WILLIAM**
4:*2*
**willing** 266:*4*,
*12* 275:*8*
**willingness**
261:*18*
262:*18*
264:*24*
265:*18* 279:*7*
280:*23* 288:*1*,
*3*
**wishes** 56:*18*
**within-entitled**
297:*11*
**WITNESS**
1:*16* 7:*13*, *23*
14:*20* 15:*4*
18:*14*, *24*
19:*2* 25:*9*
26:*17* 28:*15*
29:*2* 30:*24*
32:*20* 33:*5*,
*22* 34:*16*
35:*1* 52:*17*
57:*20* 58:*4*
59:*25* 60:*11*
62:*11* 64:*7*
65:*16* 66:*23*
67:*13*, *16*
69:*11* 70:*6*,
*23*, *25* 71:*13*
72:*25* 78:*2*
83:*22* 84:*12*
85:*4* 86:*4*
90:*11* 91:*9*
92:*11* 94:*23*
95:*9*, *19* 99:*1*,
*9* 104:*4*, *23*
109:*23* 111:*7*,
*12* 114:*24*
116:*12*
121:*15* 129:*8*
130:*17*, *22*
131:*23*
132:*13*

133:*14* 135:*8*,
*19*, *23* 136:*2*
137:*17* 142:*1*
145:*11*, *22*
147:*12*
149:*11*
150:*13*, *25*
151:*22* 152:*2*
154:*15* 156:*9*
157:*7*, *20*
159:*8*, *12*, *14*
161:*13*, *20*
162:*5*, *15*
164:*12*
166:*11*
167:*17*
173:*13*, *16*
174:*6*, *25*
175:*24* 178:*3*
184:*2* 185:*13*
186:*12*
188:*25* 191:*5*
192:*25* 193:*8*
197:*9* 203:*23*
205:*24*
206:*12* 209:*8*
216:*11* 218:*6*
224:*23*
232:*19*
233:*12*
235:*11*
238:*14*
240:*18*
242:*18* 246:*7*
252:*25*
255:*25*
256:*11*, *19*
257:*1* 259:*4*
262:*3*, *5*
268:*13*, *25*
271:*22* 275:*6*
276:*25* 277:*4*
282:*5*, *18*
283:*9*, *18*
284:*24* 285:*2*
289:*19* 294:*1*
297:*9*, *12*
**WITTLAKE**
2:*20* 17:*12*
**Wittlakek@gtl**
**aw.com** 2:*23*

**Wmurtha@hill**
**wallack.com**
4:*4*
**Women's**
39:*23* 42:*6*
43:*20* 44:*14*
**word** 159:*6*
207:*1*
**words** 12:*4*
19:*20* 23:*1*
54:*7* 195:*5*
238:*6* 251:*22*
257:*17*
**work** 14:*24*
18:*12* 21:*25*
22:*25* 28:*12*
34:*10*, *11*
37:*2* 38:*8*
40:*13* 44:*15*
48:*5*, *9*, *10*
49:*6* 51:*17*
52:*1* 53:*1*, *14*
63:*4* 69:*21*
70:*9* 81:*19*
90:*5* 91:*5*
142:*4* 157:*5*
161:*23* 163:*2*
183:*12*, *13*
198:*25*
205:*20* 206:*8*
211:*14*, *19*
213:*2*, *21*
214:*2* 225:*3*,
*5*, *10* 232:*17*
243:*19*, *21*, *24*
251:*3*, *14*, *17*
**worked** 13:*24*
14:*1* 15:*20*
16:*4* 24:*2*, *4*
26:*6* 42:*19*,
*21*, *23* 52:*4*
70:*12* 250:*7*,
*11*, *14*, *19*, *22*
251:*7*
**working** 15:*2*
23:*8*, *24*, *25*
25:*14* 38:*13*,
*19* 51:*9*
70:*13* 73:*8*,
*10* 81:*25*
82:*2*, *5*, *8*, *12*

Confidential Information Subject to Protective Order

93:*2* 100:*3* 101:*3* 102:*5* 183:*13, 16* 229:*12* 230:*6, 10* 243:*20*

**works** 10:*17* 31:*1* 47:*7* 51:*11* 53:*3* 55:*1* 183:*23*

**world** 133:*6* 156:*13* 223:*9* 233:*8* 266:*17* 280:*14, 25*

**worried** 62:*23*

**worry** 229:*6*

**worse** 196:*6, 8*

**worst** 110:*5*

**worst-case** 110:*5*

**worth** 258:*7, 8, 17* 276:*18*

**worthless** 274:*25* 276:*17*

**worthlessness** 29:*16*

**Wow** 133:*9*

**write** 206:*22* 243:*13, 15* 261:*10* 265:*10, 14* 277:*21* 279:*18* 282:*8*

**writing** 29:*14* 92:*7, 11*

**written** 35:*10* 92:*13* 231:*2* 288:*6*

**wrong** 54:*15* 110:*23* 115:*10* 126:*11* 209:*1* 292:*1*

**wrote** 243:*15, 16*

**< X >**

**x-ray** 105:*12, 13, 15, 16, 19, 23* 114:*4* 155:*23*

**x-rays** 104:*25*

**< Y >**

**yeah** 19:*25* 27:*1* 28:*18* 31:*3* 32:*23* 34:*22* 37:*8, 20* 41:*7, 8, 11, 13* 43:*14, 15* 48:*1, 16* 51:*2* 54:*18* 58:*4, 9* 59:*25* 60:*14* 62:*25* 63:*21* 65:*6, 21* 66:*7, 15* 67:*2, 14* 69:*2, 5* 72:*18* 73:*14* 78:*2, 4* 81:*11* 89:*23* 90:*16* 95:*12* 97:*7* 100:*1, 6* 101:*9* 103:*17* 106:*21* 107:*3* 110:*12, 24* 111:*2* 112:*22* 119:*3* 121:*18* 132:*9, 25* 133:*3, 4, 5, 8* 136:*5* 141:*18* 142:*20* 148:*7, 11* 151:*22* 152:*10* 153:*18* 154:*1* 158:*21, 24* 159:*2, 9, 13* 160:*22* 161:*1, 13* 162:*8* 163:*11* 166:*11* 168:*18* 176:*19* 179:*14* 181:*17* 182:*7* 186:*16* 187:*3* 191:*15* 193:*3* 202:*4* 204:*16, 19* 207:*6, 7, 18* 214:*4* 215:*22* 217:*20, 21* 224:*24* 226:*25* 227:*2,*

16 229:*24, 25* 230:*4, 16* 231:*22, 24* 234:*11* 239:*5* 240:*21* 242:*22* 262:*4* 271:*25* 283:*13*

**year** 9:*18* 23:*16, 20* 25:*19* 42:*17, 22, 25* 43:*6, 22* 46:*25* 47:*6, 8, 12, 14, 18, 19, 21* 48:*3, 6, 7* 49:*3, 7* 51:*6, 9* 100:*23* 101:*4* 138:*14, 24* 141:*6, 7* 146:*25* 152:*4* 177:*18, 23* 178:*11* 182:*2, 10, 12, 16* 183:*9* 184:*9, 18* 185:*3, 11, 13* 222:*15* 223:*10* 284:*20*

**yearly** 86:*22*

**years** 24:*8* 39:*18* 48:*4* 51:*8* 97:*12* 104:*20* 147:*5* 158:*18* 163:*8, 20* 164:*5, 9, 20* 182:*3* 183:*4, 9, 10* 184:*19*

**Yep** 10:*21* 110:*25* 129:*11* 163:*12* 176:*7, 8, 9* 206:*25* 226:*1, 19* 230:*15, 17, 18* 234:*17* 262:*13* 289:*12*

**YOLO** 297:*2*

**York** 2:*14, 21*

**< Z >**

**zero** 131:*11* 215:*7, 9* 228:*23* 229:*2, 6, 9* 237:*1, 3* 279:*1*

**Zhejiang** 4:*4*

**Zhu** 102:*13*

**Zirui** 5:*19*

**Zoom** 244:*6*

# Exhibit 208

REDACTED

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
 2

                          -  -  -
 3
        IN RE:  VALSARTAN,       :MDL NO. 2875
 4      LOSARTAN, AND IRBESARTAN :
        PRODUCTS LIABILITY       :CIVIL NO.
 5      LITIGATION               :19-2875 (RBK/JS)
                                 :
 6      THIS DOCUMENT APPLIES    :HON. ROBERT
        TO ALL CASES             : B. KUGLER
 7
                    - CONFIDENTIAL INFORMATION -
 8                 SUBJECT TO PROTECTIVE ORDER
 9                         -  -  -
10                      MARCH 10, 2022
11                         -  -  -
12
13              Videotaped remote deposition of LEWIS
14       A. CHODOSH, M.D., Ph.D., taken pursuant to
15       notice, was held via Zoom Videoconference,
16       beginning at 9:15 A.M. (EST), on the above
17       date, before Margaret M. Reihl, RPR, CRR,
18       CCR-NJ.
19                         -  -  -
20
21            GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
22                   deps@golkow.com
23
24
25
```

Confidential Information Subject to Protective Order

Page 2

APPEARANCES VIA ZOOM:

MARTIN, HARDING & MAZZOTTI LLP
BY: ROSEMARIE BOGDAN, ESQUIRE
    DOLORES DeSALVO, JD, PHR
P.O. Box 15141
Albany, New York  12212-5141
(518) 724-2298
rosemarie.bogdan@1800law1010.com
Representing the Plaintiffs

HOLLIS LAW FIRM
BY: C. BRETT VAUGHN, RN, BSN, ESQUIRE
8101 College Boulevard, Suite 260
Overland Park, Kansas  66210
(913) 385-5400
Representing the Plaintiffs

GOLDENBERG LAW
BY: MARLENE J. GOLDENBERG, ESQUIRE
800 Lasalle Avenue, Suite 2150
Minneapolis, Minnesota 55402
(800) 504-0281
Representing the Plaintiffs

GREENBERG TRAURIG, LLP
BY: VICTORIA LANGTON, ESQUIRE
3333 Piedmont Road NE
Suite 2500
Atlanta, Georgia  30305
(678) 553-2385
langtont@gtlaw.com
    AND
BY: NICHOLAS A. INSOGNA, ESQUIRE
One International Place
Suite 200
Boston, Massachusetts  02110
(617) 310-6231
insognan@gtlaw.com
Representing the Defendants
Teva Pharmaceutical Industries, Ltd.,
Teva Pharmaceuticals USA, Inc.,
Actavis LLC and Actavis Pharma, Inc.

Page 3

APPEARANCES VIA ZOOM (cont'd):

PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
BY:  CLEM C. TRISCHLER, ESQUIRE
38th Floor, One Oxford Centre
Pittsburgh, Pennsylvania  15219
(412) 263-1840
cct@pietragallo.com
Representing the Defendant Mylan

BARNES & THORNBURG LLP
BY:  KRISTEN RICHER, ESQUIRE
2029 Century Park East Suite 300
Los Angeles, California  90067
(310) 284-3896
kristen.richer@btlaw.com
Representing the Defendants
CVS Pharmacy, Inc. and Rite Aid Corporation

HINSHAW & CULBERTSON LLP
BY:  KATHLEEN E. KELLY, ESQ.
53 State Street, 27th Floor
Boston, Massachusetts 02109
(617) 213-7045
kekelly@hinshawlaw.com
Representing the Defendants
H.J. Harkins and ScieGen Pharmaceuticals

DUANE MORRIS, LLP
BY:  ALYSON WALKER LOTMAN, ESQUIRE
     ROBERT KUM, ESQUIRE
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1164
alotman@duanemorris.com
Representing the Defendants,
Zhejiang Huahai Pharmaceutical Co,
Ltd., Prinston Pharmaceutical Inc.,
Huahai U.S., Inc., and Solco
Healthcare US, LLC

Also present:  Bill Geigert, Videographer
               Mike Kutys, Trial Technician

Page 4

I N D E X

Testimony of:                            PAGE
LEWIS A. CHODOSH, M.D., Ph.D.

    By Ms. Bogdan              8, 237
    By Mr. Insogna               230

E X H I B I T S

NO.        DESCRIPTION              PAGE

1    Notice to Take Videotaped
     Oral Deposition                 15

2    Defendants' Responses and
     Objections to Plaintiffs'
     Notice of Videotaped
     Deposition of Lewis Chodosh,
     M.D., Ph.D.                     17

3    Invoices and receipts          21

4    Opinions of Lewis A.
     Chodosh, M.D., Ph.D.
     1/12/22                         26

5    Lewis A. Chodosh, M.D., Ph.D.
     Amended List of Materials
     Considered 3/8/22               27

6    Laboratory analysis of
     valsartan products             71

7    Testing Result of
     N-Nitrosodimethylamine
     (NDMA)
     PRINSTON00273444 to 3479        77

8    Testing Result of
     N-Nitrosodimethylamine
     (NDMA)
     PRINSTONO0068872 to 8900        86

Page 5

E X H I B I T S

NO.        DESCRIPTION              PAGE

9    Deviation Investigation
     Report by Zhou Xiaohui
     ZHP00013245 to 13353            91

10   Exhibit B-Report
     Dr. Madigan                    114

11   Concise International
     Chemical Assessment
     Document 38 WHO 2002           126

12   Mean Daily Intake of
     Volatile N-Nitrosamines
     From Foods and Beverages
     In West Germany In
     1989-1990                      143

13   Mean Daily Intake of
     N-Nitrosodimethylamine
     From Foods and Beverages In
     France In 1987-1992            144

14   Estimation of the total
     daily oral intake of NDMA
     attributable to drinking
     water                          147

15   Drinking Water as a
     Proportion of Total
     Human Exposure
     to Volatile
     N-Nitrosamines                 156

16   N-nitroso compounds and
     man:  sources of exposure,
     endogenous formation and
     occurrence in body fluids      197

17   Urinary excretion of nitrate,
     nitrite and N-nitroso
     compounds in Schistosomiasis
     and bilharzia bladder
     cancer patients                199

Page 6

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 18 | Endogenous versus exogenous exposure to N-nitroso compounds and gastric cancer risk in the European Prospective Investigation into Cancer and Nutrition (EPIC-EURGAST) study | 202 |
| 19 | Diet Composition Is Associated with Endogenous Formation of N-Nitroso Compounds in Obese Men | 205 |
| 20 | Volatile N-Nitrosamine Formation after Intake of Nitrate at the ADI Level In Combination with an Amine-rich Diet | 208 |
| 21 | Intragastric formation and modulation of N-nitrosodimethylamine in a dynamic in vitro gastrointestinal model under human physiological conditions | 214 |
| 22 | Use of N-nitrosodimethylamine (NDMA) contaminated valsartan products and risk of cancer: Danish nationwide cohort study | 219 |
| 23 | N-Nitrosodimethylamine-Contaminated Valsartan and the Risk of Cancer | 224 |

– – –

Page 7

THE VIDEOGRAPHER:  Good morning, we are now on the record.  My name is Bill Geigert, I'm a videographer for Golkow Litigation Services.  Today's date is March 10th, 2022, and the time is 9:15 a.m.

This remote video deposition is being held in the matter of Valsartan, Losartan and Irbesartan Products Liability Litigation for the United States District Court for the District of New Jersey.  The deponent is Dr. Lewis Chodosh.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.  Due to the nature of remote reporting, please pause briefly before speaking to ensure all parties are heard completely.

All counsel will be noted on the stenographic record.  The court reporter is Peg Reihl and she will now swear in the witness.

LEWIS A. CHODOSH, M.D., Ph.D., having been duly sworn as a witness, was examined and testified as follows:

Page 8

BY MS. BOGDAN:

Q.    Good morning, Dr. Chodosh, we've met before.  My name is Rosemarie Bogdan and I represent the plaintiffs in the Valsartan, Losartan, Irbesartan Products Liability Litigation that is pending in the United States District Court, District of New Jersey.

I'm going to be asking you some questions today and I would ask if you don't understand the question that I pose to you, that you please let me know that so I have the opportunity to rephrase it.

If you answer the question, I'm going to assume that you understood it; is that fair?

A.    It's fair, with the proviso of I may think that I understood it but that may be different than what you understand it to mean.  Not to pick hairs.

Q.    Okay.  Well, if you, for any reason, don't understand or perceive that you don't understand what I'm asking, please let me know that so I have the opportunity to rephrase my question for you, okay?

A.    Absolutely.

Q.    Where are you currently located?

A.    You mean where am I sitting?

Q.    Yes.

Page 9

A.    I am sitting in Greenberg Traurig on Arch Street in Philadelphia.

Q.    Okay.  And is there anyone in the room with you?  I'm asking that because we are taking this deposition remote.

A.    Yes, there is.

Q.    Okay.  Who is in the room with you?

A.    Nick Insogna and Alyson.  And I'm not sure I know Alyson's last name.

Q.    And is Alyson one of the counsel?

A.    That is my understanding, yes.

Q.    So with the same firm?

A.    I don't believe so, but I don't know.

MR. INSOGNA:  Rosemarie, if it helps, it's Alyson Lotman with Duane Morris.

MS. BOGDAN:  Okay, I didn't see her appearance on the record, so thank you.

BY MS. BOGDAN:

Q.    All right.  Now, what electronics are you using today for this deposition?

A.    Everything in this room.

Q.    Okay.

A.    A lot of electronics in this room.

Q.    Well, the electronics that are available to you personally and you can control them, I see a

Confidential Information Subject to Protective Order

Page 10

1  laptop in front of you perhaps?
2  A.    Yeah, there's a laptop with a window that
3  says "Lewis Chodosh, M.D., Marked Exhibits."
4  Q.    And are there any -- other than the exhibit
5  portal that is on that laptop and open to you, are
6  there any other applications or e-mails or message
7  systems or anything available to you on that laptop?
8  A.    There are applications on there.  There's
9  nothing else open on this laptop.
10 Q.    Actually, I should --
11 A.    I think all computers have applications on
12 them, but there's one window open on this laptop and
13 that's the one I just told you.
14 Q.    Okay.  And you're not using any of those
15 other applications that might be available on that
16 laptop?
17 A.    No, I am not.
18 Q.    What about any type of a cell phone or iPad
19 or hand-held device, are you using anything like
20 that during the deposition today?
21 A.    No.
22 Q.    What did you do to prepare for your
23 deposition today?
24 A.    I reread some materials, including my
25 reports.  I met with attorneys, that was pretty much

Page 11

1  it.
2  Q.    When you say you "reread materials," you are
3  talking about the two reports that you've provided
4  in this litigation?
5  A.    The two reports in this litigation.  I
6  looked back over the deposition from my original
7  report.  I looked over Dr. Madigan's report.  Those
8  were the primary things that I spent time with.
9  Q.    Do you have any documents with you today
10 that you're using during this deposition?
11 A.    Yes.
12 Q.    What documents do you have?
13 A.    Do you want me to go clockwise or
14 counterclockwise?  I'll go counterclockwise.
15 Q.    Whichever you prefer, Doctor.
16 A.    I have a copy of my supplemental report, a
17 copy of my original report, there's a binder marked
18 "Pleadings Binder," March 10th, 2022, that has a
19 bunch of numbers at the top of that that I'm happy
20 to read to you if you would like.
21 Q.    What is in --
22 A.    It says it's the -- first page, says
23 it's "Lewis Chodosh Supplemental Expert Report
24 Binder," and it's a tabbed set of documents.
25 Q.    Who compiled those documents that are in

Page 12

1  that binder?
2      MR. INSOGNA:  Rosemarie, I think I
3  can help with this.  The binder is each of
4  the sources cited as a footnote to
5  Dr. Chodosh's supplemental report, it's hard
6  copies of those documents.
7  BY MS. BOGDAN:
8  Q.    Are there any notes or highlights that
9  you've made on those documents that are in that
10 binder?
11 A.    No.  This binder was here, sitting at this
12 spot when I came in this morning.  It's not
13 something that I've had; it's not something that
14 I've looked through or made any notes on.
15     MS. BOGDAN:  The representation by
16 Counsel is that that binder only has in it
17 hard copies of the documents that are
18 referenced in the doctor's supplemental
19 report.
20     MR. INSOGNA:  That's correct.
21     THE WITNESS:  And if it helps you,
22 there are 31 tabs in this binder.
23 BY MS. BOGDAN:
24 Q.    And other than the documents you mentioned
25 as well as the binder, is there anything else as you

Page 13

1  go counterclockwise around the table?
2  A.    Yes, and I apologize, I've lost
3  counterclockwise clockwise.
4      So I have a copy of Dr. Madigan's report
5  dated July 7, 2021.  I have -- it's entitled
6  "Defendant's Responses and Objections to Plaintiffs'
7  Notice of Videotaped Deposition of Lewis Chodosh,
8  M.D., Ph.D."
9      I have a "Notice to Take Videotaped Oral
10 Deposition."
11     I have what was exhibits -- looks like one
12 through five from the last deposition you and I did
13 together.
14     I have Exhibits 7 and 8 from the last
15 deposition we did together.
16     And then finally, there is a binder, again,
17 that was here when I came in that says "Teva
18 Valsartan MM and Class Cert Pleading Binder,
19 March 10th, 2022," that appears to have two tabs.
20 The first tab is "Plaintiffs' Consolidated Third MM
21 Class Action Complaint" and the second tab is
22 "Plaintiffs' Motion for Class Certification of
23 Consumer TPP and MM Claims," and both of those are
24 dated November 1st, 2021.
25     MR. INSOGNA:  And, Rosemarie, let me

Confidential Information Subject to Protective Order

Page 14

1    just clarify one thing, when Dr. Chodosh
2    referenced the Exhibits 1 through 5 and 7
3    and 8 to the prior deposition, those are the
4    documents Bates labeled Chodosh 001 through
5    008, the calculation tables that you had
6    marked during the last deposition.
7        MS. BOGDAN: Okay.
8 BY MS. BOGDAN:
9 Q.    And for that series of documents that you
10 just mentioned, Dr. Chodosh, have you made any notes
11 or highlights on any of those documents?
12 A.    No, I have not.
13 Q.    Now, you mentioned that you met with the
14 attorneys to prepare for this deposition.
15    How much time did you spend meeting with
16 counsel to prepare for this deposition?
17 A.    It was about three hours.
18 Q.    Was that all on one occasion or multiple
19 occasions?
20 A.    That was one occasion. There may have been
21 a brief phone call that would have been, you know,
22 some other point over the last few days, but that
23 probably would have been less than 15 minutes.
24        MS. BOGDAN: If we could pull the
25    notice to take oral videotaped deposition

Page 15

1    and mark that as an exhibit, please.
2        (Document marked for identification
3    as Chodosh Deposition Exhibit No. 1.)
4        MS. BOGDAN: Is Mike there? Please
5    mark that the first exhibit.
6        TRIAL TECHNICIAN: It's on your
7    screen now. Give me one second to mark it
8    in the exhibit folder. Having a brief tech
9    glitch.
10        THE WITNESS: Should I be seeing
11    something in the folder in this window in
12    front of me?
13        TRIAL TECHNICIAN: Doctor, you should
14    have it on the screen in the conference
15    room, correct?
16        THE WITNESS: Yes, but my
17    understanding was that documents would also
18    show up in this window --
19        TRIAL TECHNICIAN: Yes.
20        THE WITNESS: -- so that I could look
21    at them.
22        TRIAL TECHNICIAN: Yes, that's
23    correct, I'm putting them in right now. And
24    it should -- if you hit refresh you should
25    see Exhibit Number 1.

Page 16

1        THE WITNESS: Great. Thank you very
2    much.
3 BY MS. BOGDAN:
4 Q.    Doctor, do you --
5        MS. BOGDAN: Has it been marked, are
6    we all set?
7        THE WITNESS: I'm not sure who you
8    are asking that question.
9        TRIAL TECHNICIAN: It has been
10    marked, yes. It has been marked as
11    Exhibit 1.
12 BY MS. BOGDAN:
13 Q.    Doctor, do you recognize this notice?
14 A.    Checking it. Yes, I do.
15 Q.    And directing your attention to the third
16 page of the notice, Exhibit A?
17 A.    Yes, I see.
18 Q.    There's a document entitled "Document
19 Requests"?
20 A.    Yes, I see that.
21 Q.    Were you involved in assembling these
22 documents responsive to the requests in Exhibit A of
23 the notice?
24 A.    Was I involved, yes. We walked through the
25 thing so that I could make sure I understood as best

Page 17

1 I could what was being requested and whether or not
2 those things existed and to a lesser extent whether
3 there were -- had been objections to any of these
4 things that you all talk about amongst yourselves
5 that I don't understand.
6        MS. BOGDAN: If you could please mark
7    the defendant's responses and objections to
8    the plaintiffs' notice as Exhibit 2, please.
9        TRIAL TECHNICIAN: The document on
10    your screen has been marked as Exhibit 2.
11        (Document marked for identification
12    as Chodosh Deposition Exhibit No. 2.)
13 BY MS. BOGDAN:
14 Q.    Doctor, do you recognize this document?
15 A.    I have seen it. I have not -- I have not
16 read through it.
17 Q.    Okay. I'm going to ask you just a couple
18 follow-up questions with regard to the requests that
19 were made in the notice to take your deposition.
20 A.    I'm sorry, are we back to the previous
21 document or the one you have me looking at now?
22 Q.    Well, this one has them all repeated in it
23 so we're -- we can use the one that's up on the
24 screen now.
25        So if we -- but actually, we can take -- we

Page 18

1 can take it down, I can just ask you the questions.
2      Have you done any presentations, seminars or
3 classes with regard to the risks or benefits of
4 angiotensin II receptor blockers for nitrosamines?
5 A.     Are you reading Number 3?
6 Q.     What I'm asking -- I'm not reading Number 3.
7 I'm asking if you have done any PowerPoints
8 or presentations or seminars regarding the risks and
9 benefits of angiotensin receptor blockers or
10 nitrosamines?
11 A.     The answer to that is no, and, again, that's
12 Number 3 on the document request.
13 Q.     Have you done any presentations, seminars or
14 classes with regard to medical monitoring?
15      MR. INSOGNA:  Object to form.
16      THE WITNESS:  Depends on how -- how
17    do you define "medical monitoring"?
18 BY MS. BOGDAN:
19 Q.     The type of medical care that one would need
20 if they're at a risk of developing cancer.
21      Have you given any types of presentations or
22 seminars or classes with regard to the type of
23 medical treatment one may need if they're at a risk
24 for developing cancer?
25 A.     I have not specifically given a presentation

Page 19

1 in the way that you described that.  I mean, as a
2 physician and teaching medical students, for
3 example, one might talk about colonoscopy, what are
4 the guidelines for colonoscopy for screening so
5 that's -- that's monitoring.  It's not a lecture
6 about colonoscopy, you know, genetic testing for
7 people who have a family history, but it would have
8 been in the general context of, you know, teaching
9 medical students, teaching graduate students, et
10 cetera, about general principles in medicine and
11 cancer biology not a dedicated presentation to, I
12 think, what you are referring to as "medical
13 monitoring."
14 Q.     That answers my question.  Thank you,
15 Doctor.
16      Have you authored any articles or done any
17 presentations, seminars, classes with regard to
18 hypertension treatments, ARBs or medical monitoring
19 plans?
20 A.     I don't think so.  It's not clear to me.
21 How is this different than the last question you
22 asked me?  So articles so --
23 Q.     The last question was medical monitoring.
24 I'm now asking with regard to hypertension,
25 treatments for hypertension or ARBs?

Page 20

1 A.     No, I have not.
2 Q.     Have you performed any research with regard
3 to angiotensin II receptor blockers?
4 A.     No, I have not.
5 Q.     Have you performed any research with regard
6 to nitrosamines?
7      MR. INSOGNA:  Object to form, vague.
8      THE WITNESS:  We -- I believe we had
9    this discussion at the last deposition.  I
10    don't have articles that specifically focus
11    on the topic of nitrosamines and cancer, but
12    we have used nitrosamines in research in our
13    laboratory and I believe we talked about
14    that at length in the last deposition from
15    my original report.
16 BY MS. BOGDAN:
17 Q.     We did and so my question was more geared
18 and I should have actually posed it this way, since
19 your last deposition with me have you done anything
20 new that you couldn't have testified about last time
21 because it hadn't yet occurred with regard to
22 research regarding nitrosamines?
23 A.     No, I have not.
24 Q.     Have you ever served as an expert for a
25 medical monitoring cause of action in another

Page 21

1 litigation?
2 A.     No, I have not.
3 Q.     Since your last deposition, have you done
4 any new research regarding -- or done any research
5 regarding angiotensin blockers -- angio- -- excuse
6 me -- angiotensin II receptor blockers?
7 A.     No, I have not.
8 Q.     Did you have a new retainer agreement or
9 letter of retention for this medical monitoring
10 cause of action that was separate and distinct from
11 the one that we spoke of at your last deposition?
12 A.     To the best of my recollection, no.
13      MS. BOGDAN:  If we could pull up
14    Dr. Chodosh's invoices as Exhibit 3, please.
15      (Document marked for identification
16    as Chodosh Deposition Exhibit No. 3.)
17 BY MS. BOGDAN:
18 Q.     And, Dr. Chodosh, please let me know once
19 that exhibit is available to you and you are able to
20 see it.
21 A.     Yes, it is, I have it.
22 Q.     Can you please look through Exhibit 3 and
23 tell me if that is a complete copy of the invoices
24 that you have rendered regarding this matter?
25 A.     Yes, I believe it's complete.

Page 22

1 Q.    I see that the invoices stop as far as time
2 as of December 31st, 2021?
3 A.    That's correct.
4 Q.    Have you spent additional time since
5 December 31st, 2021?
6 A.    Yes, I have.
7 Q.    And you haven't yet submitted an invoice for
8 that additional time?
9 A.    Correct, I have not submitted an additional
10 invoice.
11 Q.    How much time have you spent working on this
12 litigation since December 31st, 2021?
13 A.    Somewhere in the vicinity of about 65 or 70
14 hours.
15 Q.    So the invoices that have been marked as
16 Exhibit 3 total $336,175.
17        Does that sound right to you?
18 A.    That sounds about right.
19 Q.    And the 65 to 70 hours that you spent since
20 you last submitted an invoice, at what hourly rate
21 has that work been performed?
22 A.    That hourly rate is $925 an hour.
23 Q.    So for an additional 65 hours at $925 an
24 hour, that would be another $60,125, approximately?
25 A.    That sounds about right.  I don't have a

Page 23

1 calculator in front of me so I don't know.
2 Q.    And on the third page of this exhibit --
3 A.    Yes -- oh, third page, sorry.
4 Q.    -- third page, which I believe would be with
5 the date January 18th, 2022, at the top?
6 A.    That's not my third page.  My third page is
7 parking receipts from January 28th, 2022.
8 Q.    Okay.  How about -- it's probably then your
9 first page.
10 A.    What's up on the screen is the one I was
11 just referring to, which is parking receipts.
12        MS. BOGDAN:  That's correct.
13        If the tech could please move to the
14        first page of this exhibit, which would be,
15        I believe, with a date -- okay.
16 BY MS. BOGDAN:
17 Q.    So you have a different -- here's the first
18 page, which is August 3rd, and the third page of
19 this exhibit should have a date of January 18th at
20 the top?
21 A.    That's the fifth page of my exhibit.
22 Q.    Okay.
23        MS. BOGDAN:  If the tech could please
24        move to the page that begins with
25        January 18th.  There we go.  Perfect.  Oh,

Page 24

1 go back, please.  There we go.  All right.
2 BY MS. BOGDAN:
3 Q.    You see in the numbered list where it shows
4 an on-site deposition that occurred September 29th
5 and September 30th?  It's about three-quarters of
6 the way down.
7 A.    Yes.
8 Q.    Okay.  And then there are a series of
9 entries that begin on October 24th, 2021, and go
10 through December 31st, 2021?
11 A.    Yes, I see that.
12 Q.    Was that work that you did on the medical
13 monitoring cause of action?
14 A.    And the dates, again, that you're asking
15 about are which?
16 Q.    October 24th, 2021, through the end of the
17 invoice.
18 A.    I actually don't recall because I also
19 recall spending time going through the deposition
20 transcripts from September 29th and September 30th
21 and I can't remember if I had to get those notarized
22 or -- so it's possible that that's what the October
23 dates are.  I don't -- I don't specifically recall.
24 Q.    Do you have any written record of your
25 activities done in this matter that has more of a

Page 25

1 description of what you did, other than what's on
2 the invoice?
3 A.    No.  I could probably figure it out by
4 looking at when the errata for the deposition
5 transcripts were notarized, that would probably give
6 me a clue, but there are no other notes that would
7 give me more information on it.
8 Q.    Did you go about recording your time in this
9 invoice in the same -- or for -- in the same manner
10 that you used as you testified to in your prior
11 deposition?
12        MR. INSOGNA:  Object to form.
13        THE WITNESS:  Yeah, well, no.  I
14        mean, I clarified how I did it in the prior
15        deposition since the prior invoice was for a
16        very short period of time, about five weeks.
17        So for things like this that's spread
18        over months, I would typically just put a
19        date and a number for hours spent.
20 BY MS. BOGDAN:
21 Q.    And that's what's recorded on the invoice?
22 A.    That's what's recorded on the invoice after
23 I fill-in the other things, like the review of
24 medical and scientific materials and making sure
25 that the year is on there and things like that.

Page 26

1 Q.    Is there any written record that would
2 provide more detail as to what medical and
3 scientific literature you reviewed on any particular
4 date?
5 A.    No, there is not.
6         MS. BOGDAN:  If you could please pull
7     up Dr. Chodosh's supplemental report.  And I
8     believe we're on Exhibit 4.
9         THE WITNESS:  I don't -- yes.
10        (Document marked for identification
11     as Chodosh Deposition Exhibit No. 4.)
12 BY MS. BOGDAN:
13 Q.    Do you recognize that document that's been
14 marked as Exhibit 4?
15 A.    Yes, I do.
16 Q.    What is that document?
17 A.    That is my supplemental report and looks
18 like the appended materials and the exhibits.
19        MS. BOGDAN:  If we could please pull
20     up the amended list of materials considered,
21     which is number 5.  I think it's entitled
22     "List of Materials Considered."
23        THE WITNESS:  Yeah.  I can see it on
24     the computer.  I don't see it on the screen.
25        MS. BOGDAN:  I don't see it on the

Page 27

1     screen yet either, Dr. Chodosh.  There we
2     go.
3        (Document marked for identification
4     as Chodosh Deposition Exhibit No. 5.)
5 BY MS. BOGDAN:
6 Q.    As the document that's been marked
7 Exhibit 5, is that your amended list of materials
8 considered that accompanied your supplemental expert
9 report?
10 A.    Yes.
11 Q.    And is that a comprehensive list of the
12 materials that you considered?
13 A.    Yes, it is.
14 Q.    Were there additional materials added to
15 this list that you considered for your supplemental
16 report that were not on the list of materials
17 considered for your original report?
18        MR. INSOGNA:  Object to form.
19        THE WITNESS:  You're asking me if
20     there are any things in the thing up on the
21     screen, the amended list of materials
22     considered from March 8, you're asking me is
23     there anything on here that wasn't in the
24     original list of materials considered back
25     in whenever that was, August 2021?

Page 28

1 BY MS. BOGDAN:
2 Q.    That's correct.  I'm asking if there are any
3 additional materials considered that have been added
4 to this list that were not in the list that we spoke
5 about at your last deposition, that accompanied your
6 first report?
7 A.    So there would have been reports from, you
8 know, experts, the -- reports from experts in this
9 matter, in the medical monitoring matter, so
10 obviously I wouldn't have had those back in August.
11 I don't believe there's the -- any differences in
12 scientific materials, you know, publications, things
13 like that, but I would have to go through it line by
14 line to tell you that there isn't anything.
15        Just sitting here today, I don't recall
16 anything that was added.  Any other publications
17 that were added, to clarify.
18 Q.    Did you review any additional internal
19 documents of the defendants between your last
20 deposition and today?
21 A.    Not to the best of my recollection, no.
22 Q.    Now, your hourly rate for your continued
23 work on this litigation is $925 per hour?
24 A.    That's correct.
25 Q.    And your original rate for your work when

Page 29

1 you were first retained on this litigation was 850
2 per hour; isn't that correct?
3 A.    That's correct.  Yes, that's correct.
4 Q.    When did your hourly rate change?
5 A.    January 1st.
6 Q.    What percentage of your income comes from
7 litigation work?
8        MR. INSOGNA:  Object to form.
9        THE WITNESS:  I can't tell you a
10     precise number and for sure it would vary
11     over the years.
12 BY MS. BOGDAN:
13 Q.    Can you give me a range?
14 A.    Over the years, it would vary from zero or
15 1% to something probably less than half of what I
16 earned in my roles at the University of
17 Pennsylvania, but I can't -- I can't give you any --
18 any numbers.  I've never calculated that.
19 Q.    So it depends on -- it varies year to year;
20 is that a fair statement?
21 A.    Yes.
22 Q.    What question were you asked to answer with
23 regard to your supplemental report?
24 A.    As it states on the first page of my
25 supplemental report, I have been asked to "Provide

Page 30

1  my opinions regarding the scientific and medical
2  basis for the requests for medical monitoring for
3  cancer, as expressed in Plaintiffs' Third Amended
4  Medical Monitoring Class Action Complaint filed
5  November 1st, 2021."
6  Q.    Does that statement encompass all that you
7  were asked to do with regard to rendering the
8  opinion that's in your supplemental report?
9          MR. INSOGNA:  Objection to form.
10         THE WITNESS:  I think that statement
11     adequately covers it to my understanding of
12     it.
13 BY MS. BOGDAN:
14  Q.    Now, you reviewed Dr. Dipak Panigraphy's
15 report?
16  A.    If you're asking me did I review
17 Dr. Panigraphy's report as he originally filed it
18 back in the summer or whenever that was of 2021, the
19 answer is yes, and my understanding is that it was
20 more or less exactly that same report that was
21 refiled in this medical monitoring matter.
22  Q.    And did you review the whole report or just
23 parts of the report?
24  A.    I don't recall.
25  Q.    Did you review Dr. Panigraphy's deposition

Page 31

1  testimony?
2  A.    I believe that I read his -- I believe his
3  first deposition.  Again, I don't know what the date
4  was from his original report.  I don't believe -- I
5  think he was -- there was an additional session that
6  I don't believe I reviewed, but I'm not sure.
7  Q.    Did you review Dr. Madigan's expert report?
8  A.    Yes, I did.  And by which you mean
9  Dr. Madigan's report for the medical monitoring of
10 the -- yeah, the one that I have -- let's see.
11  Q.    You can tell me the date of the report, that
12 will --
13  A.    First page for the hard copy I have says
14 "July 7th, 2021."
15  Q.    Did you review Dr. Madigan's deposition
16 testimony?
17  A.    I'm not -- I don't recall.  I'm not sure
18 that I did.
19  Q.    Did you review the plaintiffs' memorandum of
20 law in support of the medical monitoring motion for
21 class certification?
22  A.    Can you repeat what the title of that was?
23  Q.    Plaintiffs' memorandum of law in support of
24 the medical monitoring plaintiffs' motion for class
25 certification?

Page 32

1  A.    So that title is familiar, but the titles
2  that are listed in this binder -- so this says
3  "Third Amended Medical Monitoring Class Action
4  Complaint" --
5  Q.    Did you --
6  A.    [Zoom technical malfunction.]
7  Q.    It's a different document, but did you
8  review that document the one you just read, the
9  third amended medical monitoring class action
10 complaint?
11  A.    Yes, I did and the other, as I said
12 previously, was the plaintiffs' motion for class
13 certification of consumer third-party payor and
14 medical monitoring claims.
15  Q.    You read that document?
16  A.    Yes, I did.  And this is assuming we're not
17 referring to different things or -- yeah.  I mean,
18 the titles were --
19  Q.    That's fine, Doctor, you --
20         [cross-talking]
21  A.    I don't think this is the one.
22  Q.    When you say you don't think it is the one,
23 are you looking at a document that you don't think
24 you reviewed?
25  A.    If it's what's in Tab 2, it actually looks

Page 33

1  to be something different.  This looks like it's
2  economic.
3      Can you --
4         MR. INSOGNA:  Yeah.
5         MS. BOGDAN:  My question  --
6         MR. INSOGNA:  Yeah, for the record, I
7      think that the hard copy that we printed out for
8      Dr. Chodosh this morning may be the wrong
9      document.  As he said, he has a different
10     thing in front of him than what is listed on
11     the amended list of -- the list of materials
12     considered.
13         THE WITNESS:  So if it helps, just
14     looking at the titles that I put in my
15     report, it was the third amended medical
16     monitoring class action complaint and there
17     was the memorandum of law in support of
18     plaintiffs' motion for class certification.
19         Does that answer your question?
20     Those were the two primary documents that I
21     was reviewing for attorney-generated things.
22 BY MS. BOGDAN:
23  Q.    And other than those two attorney-generated
24 documents, did you review for purposes of your
25 report any other attorney-generated documents, and

Confidential Information Subject to Protective Order

1  I'm adopting your terminology, or were those the two
2  that you've referenced in your report and you
3  considered when drafting it?
4  A.    Those were the two that -- those were the
5  two that I recall.  It's possible I was given a
6  document that had things related to economics that
7  I -- if I had opened that, I would not have read
8  through that.
9  Q.    Was it important for you to understand
10 Dr. Madigan's opinions in order to provide a medical
11 monitoring opinion in this case?
12 A.    Yes, it was.
13 Q.    Was it important for you to understand
14 Dr. Panigraphy's opinions in order to provide an
15 opinion in this case?
16 A.    Yes.
17 Q.    Do you have any experience in actually
18 setting up a medical monitoring program for a cohort
19 of people who are at risk for developing cancer?
20 A.    No, I do not.
21 Q.    Did you review the medical monitoring plan
22 offered by the plaintiffs in this litigation?
23 A.    What I reviewed was what I assume is the
24 reference to that in Dr. Madigan's report.
25 Q.    Directing your attention to paragraph 6 of

1  your report, which is marked I believe -- I believe
2  we marked it four?
3  A.    Yes.
4  Q.    And can you see that now, Doctor?  It just
5  popped up on my screen.
6  A.    Yes, I can.
7  Q.    And referring you to that part of your
8  paragraph that begins "And that such Plaintiffs
9  "require additional targeted testing" consisting of
10 periodic fecal occult blood testing, low dose CT
11 chest scan, urinalysis, blood smear evaluation,
12 colonoscopy and upper endoscopy and Galleri
13 multi-cancer early detection blood test or similar
14 liquid biopsy."
15     Do you see that?
16 A.    I see those words, yes.
17 Q.    Did you review the medical monitoring plan
18 that had been submitted by Dr. Kaplan as part of
19 your review in this case?
20 A.    I may or may not have glanced at it.  I
21 would not have reviewed it in detail.
22 Q.    And the language that you have there in
23 paragraph 6, you're citing to the memorandum of law
24 in support of plaintiffs' motion for class
25 certification as to where you got that language

1  from?
2  A.    The language "require additional targeted
3  testing," which is what's quoted, is that what
4  you're referring to?
5  Q.    That language and then the description that
6  you have of what that additional targeted testing
7  would be, did you get that from the memorandum of
8  law in support of plaintiffs' motion for class
9  certification?
10 A.    I need to look at that material to answer
11 your question.
12     THE WITNESS:  So is this the one that
13     I have or is this the one that I don't have,
14     the memorandum of law in support of motion
15     for class certification?
16     MR. INSOGNA:  I don't think we have a
17     hard copy in the room.
18     THE WITNESS:  Okay.  Well, I'm going
19     to need to look at that to know the answer
20     to your question.
21 BY MS. BOGDAN:
22 Q.    Okay.  Did you cite anything other than the
23 memorandum of law in support of plaintiffs' motion
24 for class certification in that paragraph?
25 A.    No, I did not.

1  Q.    Do you recognize that type of additional
2  testing as a physician?
3     MR. INSOGNA:  Objection, vague.
4     THE WITNESS:  Are you speaking to the
5     portion that begins "Periodic fecal occult
6     blood screening"?
7  BY MS. BOGDAN:
8  Q.    Yes, I am.  I am referring to the part that
9  begins with "Periodic fecal occult blood testing,
10 low dose CT chest scan, urinalysis, blood smear
11 evaluation, colonoscopy and upper endoscopy and
12 Galleri," if that's how you pronounce it,
13 "multi-cancer early detection blood test or similar
14 liquid biopsy."
15     Do you recognize those types of tests?
16 A.    I recognize all of those types of tests,
17 including the liquid biopsy, as vague as that term
18 is, but not -- I'm not familiar with the Galleri --
19 in any detail, of the Galleri multi-cancer early
20 detection blood test.  I can infer based on a -- or
21 similar liquid biopsy that it is a liquid biopsy
22 based method, meaning a blood-based method.
23 Q.    Are you offering any opinions here today
24 whether or not those additional tests that are
25 listed in paragraph 6 of your report are appropriate

Confidential Information Subject to Protective Order

Page 38

1  tests for someone who is at risk of developing
2  cancers?
3          MR. INSOGNA:  Object to form.
4          THE WITNESS:  Could you repeat the
5  question, please?
6  BY MS. BOGDAN:
7  Q.     Are you offering any opinion with regard to
8  those specific tests and whether or not they're
9  appropriate tests for someone who is at risk of
10 developing cancers?
11         MR. INSOGNA:  Objection, vague.
12         THE WITNESS:  If what you're asking
13     me is, was I asked to opine on the
14     appropriateness of those specific tests for
15     this portion of the litigation, no, that's
16     not what I'm offering opinions on, however,
17     I'm a physician so, of course, I would have
18     opinions about those things when asked as a
19     physician.
20         But I was not asked to specifically
21     address those tests and their
22     appropriateness in this litigation, again,
23     other than that is informed by me being a
24     physician.
25 BY MS. BOGDAN:

Page 39

1  Q.     And did you not review the report of
2  plaintiffs' expert Edward Kaplan, which set forth
3  the plaintiffs' proposed medical monitoring plan?
4          MR. INSOGNA:  Objection, misstates
5     testimony.
6          THE WITNESS:  I believe what I said
7     was that I may have glanced at it, I may
8     have skimmed it, but I did not read it in
9     great detail.  I don't recall sitting here
10    today.
11 BY MS. BOGDAN:
12 Q.     Is -- and just so I'm clear, when you say
13 you were not asked to offer an opinion on the
14 appropriateness of various tests for someone who is
15 at risk of developing cancer, is it my -- is my
16 understanding correct, that you're not going to be
17 offering opinions in this litigation with regard to
18 that issue?
19         MR. INSOGNA:  Objection, vague.
20         THE WITNESS:  I mean, I think the way
21    I answered it, your last question is
22    accurate and that's my best answer.  I was
23    not asked to specifically address those
24    things, nor do I believe they're
25    specifically addressed in my report.

Page 40

1          But as a physician, if asked as a
2     physician, I can't remove that part of my
3     brain.
4  BY MS. BOGDAN:
5  Q.     I understand your response, Doctor, but what
6  I'm asking is, are you going to as an expert in this
7  litigation offer opinions in those areas?
8          MR. INSOGNA:  Objection, vague.
9  BY MS. BOGDAN:
10 Q.     Personally, as a physician, if I asked you
11 the questions, but are you offering those opinions
12 in your role as an expert in this litigation?
13         MR. INSOGNA:  Objection, vague as to
14    "those opinions."
15         THE WITNESS:  I'm sorry that we're
16    going around here.
17         My understanding is that there are
18    other experts involved who are addressing
19    the issues of those specific tests.  I can't
20    tell you sitting here now what questions you
21    or some other attorney will ask me in court
22    in my role as a physician.
23 BY MS. BOGDAN:
24 Q.     With regard to the first item of additional
25 testing that you list in paragraph 6, "fecal occult

Page 41

1  blood testing," is that an appropriate test to give
2  a patient who is at risk for developing a certain
3  type of cancer?
4          MR. INSOGNA:  Objection, vague.
5          THE WITNESS:  Yeah, so you're now --
6     you're now asking me questions about -- in a
7     medical practice when might one ask a
8     patient to do fecal occult blood testing and
9     I think what I'm trying to explain to you
10    is, I'm not offering opinions on those
11    things, nor would they -- nor were they
12    covered in my report.
13        If somebody asked me as a physician
14    have I ever asked a patient to do that,
15    well, I can answer that, but I'm not
16    offering opinions about, oh, you know, what
17    are the test characteristics of fecal occult
18    blood testing in different populations in
19    the United States.  Those aren't my
20    opinions.  This is not -- it's not in my
21    report.
22 BY MS. BOGDAN:
23 Q.     The same question, then, I would ask with
24 regard to -- I'm assuming that should be "low dose
25 CT chest scan" --

Page 42

1  A.     Yes, it is.
2  Q.     -- the next item?
3  A.     Yes.
4  Q.     Are you offering any opinions with regard to
5  the appropriateness of low dose CT chest scans?
6           MR. INSOGNA:  Objection, vague.
7           THE WITNESS:  So -- so my
8       understanding is the opinions that I am
9       being asked, that I was asked to give and
10      that I will be asked about in court, to the
11      best of my understanding, are the things
12      that are in my supplemental report.
13          And that if I am asked questions as a
14      physician about any of this list of tests,
15      well, I can answer in my role as a
16      physician, if I was asked about that by you
17      or someone else, but that was not the focus
18      of my report, nor, I believe, is there a
19      discussion of those particular tests in my
20      supplemental report.
21 BY MS. BOGDAN:
22 Q.     And likewise, there is no discussion of the
23 appropriateness of your analysis, blood smear
24 evaluation, colonoscopy and upper endoscopy and
25 Galleri multi-cancer early detection blood test or

Page 43

1  similar liquid biopsies in your report, correct?
2           MR. INSOGNA:  Objection, vague.
3           Rosemarie, I don't want to step on
4       your questions and all.  I think -- I think
5       we're having difficulty with the "at risk of
6       cancer" language as opposed to plaintiff
7       specifically.
8           MS. BOGDAN:  Excuse me?  You broke up
9       a little bit.  You said --
10          MR. INSOGNA:  I'm trying to
11      avoid anything that's going to --
12          MS. BOGDAN:  Yeah, I mean --
13          MR. INSOGNA:  -- Dr. Chodosh while
14      there's a question pending.  I think I see
15      where the disconnect is in the questioning
16      and it's your phrase "people at risk of
17      cancer."
18 BY MS. BOGDAN:
19 Q.     All right.  But my question -- my question
20 stands.
21 A.     I don't know how else to answer your
22 question.
23 Q.     I mean, is the doctor offering opinions with
24 regard to the particular targeted testing that the
25 plaintiffs have provided in the medical monitoring

Page 44

1  program?
2           MR. INSOGNA:  So my objection is
3       still to the question, vague.
4           But you can answer that question.
5           THE WITNESS:  I -- yeah, my
6       apologies, but I feel like I've answered
7       this in the best way that I can a couple
8       times already, so I'm not -- I'm not sure
9       what else I can say that will -- that will
10      clarify this.
11          I was not asked by defense attorneys
12      to offer opinions, that is, to evaluate and
13      write opinions in my report about whether
14      the tests you are referring to here that
15      were proposed for plaintiffs in this
16      litigation.  I was not asked to evaluate
17      whether those tests, those specific tests
18      would be appropriate for -- for specific
19      plaintiffs.
20          What I'm trying to express is that as
21      a physician, knowing what those tests are,
22      if asked as a physician, I have opinions
23      about that insofar as I'm a physician.  I
24      don't know what questions that you're going
25      to ask me in court, but it's not in my --

Page 45

1       it's not in my supplemental report.
2           There is no discussion of those
3       individual tests in my supplemental report.
4  BY MS. BOGDAN:
5  Q.     But since you've indicated to me now, I
6  think, multiple times that you do have opinions as a
7  physician and if someone asked you, you would
8  comment on your knowledge and evaluation of whether
9  those tests would be appropriate tests because you
10 have stated that as a physician you have opinions on
11 those and if you're asked, you would provide them,
12 then, I am going to ask as a physician what those
13 opinions are.
14 A.     Okay.
15 Q.     Okay.  So with regard to the additional
16 targeted testing consisting of periodic fecal occult
17 blood testing, are you familiar with that test?
18 A.     Yes, I am.
19 Q.     And is that test used in cancer detection?
20 A.     It can be, yes.
21 Q.     With regard to low dose CT chest scans, are
22 you familiar with that test?
23 A.     Yes, I am.
24 Q.     Would that test be used in cancer detection?
25 A.     That test, as I understand it, can be used

Confidential Information Subject to Protective Order

Page 46

1  in cancer screening.
2  Q.    With regard to urinalysis, are you familiar,
3  with that test?
4  A.    Yes, I am.
5  Q.    Would that test be used in cancer screening?
6  A.    For cancer screening, not commonly.
7  Q.    For cancer diagnosis?
8  A.    As the word is written, "urinalysis," and as
9  the way that I am used to referring to that word, in
10 the clinic and in the hospital a urinalysis is not
11 the test that would typically be ordered to detect
12 cancer.
13 Q.    With regard to blood -- blood smear
14 evaluation -- there was a lot of feedback there so I
15 will repeat my question.
16    With regard to blood smear evaluation, are
17 you familiar with that test?
18 A.    Yes, I am.
19 Q.    Is that test used for cancer screening or
20 diagnosis?
21 A.    It is a test that could be used potentially
22 to detect cancer.
23 Q.    With regard to colonoscopy and upper
24 endoscopy, are you familiar with those tests?
25 A.    Yes, I am.

Page 47

1  Q.    Can those tests be used to screen or
2  diagnose cancer?
3  A.    That is one of the purposes to which those
4  tests can be used.
5  Q.    And with regard to liquid biopsy detection
6  blood tests, are you familiar with those types of
7  tests?
8  A.    I am familiar with those types of tests but
9  as you can imagine, the term "liquid biopsy," is
10 almost a colloquial term. It's a vague term, that
11 doesn't specify a particular test, but I believe
12 from context, I understand what that is and so your
13 question about that is -- could you repeat that?
14 Q.    My question is could that type of test be
15 used to screen or diagnose cancer?
16 A.    To my understanding, that would only be in
17 experimental use, presumably for research purposes.
18 I am not aware of that test being used in a standard
19 of care practice for the detection of cancer but,
20 again, it's a colloquial and vague term, so...
21    MR. INSOGNA:  Rosemarie, we've been
22    going for about an hour since we started, is
23    now an okay time for a comfort break?
24    MS. BOGDAN:  Let me just ask just a
25    follow-up question with regard to this

Page 48

1  paragraph and then it's a fine time to take
2  a break.
3  BY MS. BOGDAN:
4  Q.    About the use of similar, you know, liquid
5  biopsies or detection blood tests for cancer
6  screening, are you familiar with their use for
7  cancer screening?
8  A.    I heard you say "liquid biopsy," but you
9  also said something else about blood tests, you were
10 breaking up.
11    So are you referring to two things or to one
12 thing?
13    The audio is a little broken, Dr. Chodosh,
14 and I'm even hearing myself in bits and pieces so
15 let me reask the question.
16    Are you familiar with liquid biopsies or
17 detection blood tests used as cancer screening
18 tests?
19 A.    In your -- my understanding is based on this
20 paragraph, you're using "detection blood test" not
21 to refer to a blood smear, but as it is written for
22 the Galleri multi-cancer early detection blood test
23 or similar liquid biopsy.
24 Q.    That's correct.
25 A.    So I am -- as I said, I am familiar with

Page 49

1  liquid biopsy and what types of tests that generally
2  refers to. I'm not specifically familiar with the
3  Galleri version of that test and I'm just -- I'm
4  reading based on context that that test is a similar
5  liquid biopsy.
6  Q.    Are they used for cancer screening or cancer
7  diagnosis or both?
8  A.    So as I said, this is not, to my
9  understanding, for the detection of cancer or
10 screening. This would not be standard of care. My
11 understanding is to the extent that these would be
12 used, it would be in an experimental setting for
13 research purposes.
14    MS. BOGDAN:  Okay.  Do you want to --
15    I think someone asked for a break. I can't
16    see who, but I'm assuming it was probably
17    Nick.
18    MR. INSOGNA:  Yes, it was, if we
19    could, just five minutes, that would be
20    great.  Thank you.
21    THE VIDEOGRAPHER:  Off the record
22    10:24.
23    (Brief recess.)
24    THE VIDEOGRAPHER:  We are back on the
25    record at 10:33 a.m.

Page 50

1      MS. BOGDAN:  Is Nick ready?  I don't
2   see him.
3      MR. INSOGNA:  I am.
4      MS. BOGDAN:  Okay.
5      MR. INSOGNA:  I'm sorry.
6      MS. BOGDAN:  Okay.  Okay.  That's
7   okay.  I didn't want to be accused of
8   starting without counsel ready so there we
9   are.  All right.
10  BY MS. BOGDAN:
11  Q.    Now, Dr. Chodosh, directing you to page 4 of
12  your report, which I believe you have a paper copy
13  of there, right?
14  A.    Yes.
15  Q.    You have a section title of your report that
16  reads "Plaintiffs proposed approach cannot ascertain
17  actual NDMA or NDEA exposures"?
18  A.    That's correct.
19      MS. BOGDAN:  You can take down that
20  exhibit.
21  BY MS. BOGDAN:
22  Q.    Now, you considered FDA test results of
23  NDMA-contaminated valsartan when researching and
24  investigating this case, correct?
25  A.    Can you restate the question?

Page 51

1   Q.    Did you, as part of your review of this
2   matter look at the laboratory analysis of valsartan
3   products done by the FDA?
4   A.    Yes, I did.
5   Q.    Now, is your claim that plaintiffs cannot
6   ascertain actual NDMA or NDEA exposures one of the
7   basis for your opinions that you're rendering?
8      MR. INSOGNA:  Object to form.
9      THE WITNESS:  That is -- that is one
10      of my critiques of the proposal that has
11      been made, yes.
12  BY MS. BOGDAN:
13  Q.    Are you aware of approved medical monitoring
14  programs that have potentially varying levels of
15  individual exposures?
16  A.    I'm not sure what you are referring to.
17  Q.    Are you familiar with any approved medical
18  monitoring programs for other litigations?
19  A.    For other litigations, no.
20  Q.    Are you aware of approved medical monitoring
21  programs for any cohort of people that were exposed
22  to a carcinogen?
23  A.    When you say "medical monitoring programs,"
24  I'm not sure if what you're referring to is what a
25  physician might prescribe for a patient after

Page 52

1   discussing with their patient some type of screening
2   or whether you're talking about medical monitoring
3   programs that have been set up in litigation or for
4   some other purposes.
5   Q.    Referring to the latter, which would be a
6   medical monitoring program that's been set up for a
7   litigation or for another matter, which could be a
8   cohort that was exposed, for example, to a
9   carcinogen, an actual program, not an individual
10  patient/doctor decision as to how to monitor a
11  particular patient?
12  A.    So based on your question, not for the
13  purposes of litigation but you appended something to
14  that that was like "and other things."  I don't know
15  what you are referring to.
16  Q.    Meaning, are you familiar with a medical
17  monitoring program that may not be related to
18  litigation, but is a program that is available for
19  any person that might meet the criteria for that
20  cohort to participate in because they were exposed
21  to something environmentally or -- you know, I'm
22  just trying to understand your familiarity with
23  medical monitoring programs.
24      I'm not asking about an individual decision
25  between a doctor and a patient as to a program for

Page 53

1   an individual.  I'm asking about medical monitoring
2   programs that are available to a group.
3   A.    Well, maybe I can help clarify this by
4   saying -- by giving you an example.  So if there's a
5   patient of a certain age with, you know, 150 pack a
6   year smoking history, that would meet certain
7   guidelines for doing low dose chest CT for
8   screening, but that's -- to my understanding, we're
9   not talking about physicians and patients, not what
10  I think you are referring to by "and other things."
11      Is that -- do I have -- am I understanding
12  you correctly?
13  Q.    You are understanding me correctly.
14      I'm asking about your familiarity with
15  established programs that if an individual meets the
16  criteria they can participate in a set program, as
17  opposed to an individual screening decided upon by a
18  doctor and their patient?
19  A.    So there are certainly research protocols,
20  for instance, the research trials that went into the
21  low dose chest CT scanning and screening for lung
22  cancer.  Again, I don't think that's what you're
23  referring to.  Maybe if you could give me an example
24  of what you're referring to, that might make it
25  clearer for me.  I just -- I don't know what you

Page 54

1 mean by "program."
2 Q.    For example, if there is a group of
3 individuals that were working in a sick building,
4 for example, and were exposed in that building and
5 that the state or the government has set up a
6 screening program, but it's a medical monitoring
7 program for anyone that worked in that building for
8 more than X number of years.
9      Are you familiar with any established
10 medical monitoring programs of that nature?
11 A.    Based on your example and your explanation,
12 no, I don't believe so.
13 Q.    When there are potential varying levels of
14 exposure can't averages and means and medians and
15 midpoints and ranges be used to assess varying
16 levels?
17      MR. INSOGNA:  Objection, vague.
18      THE WITNESS:  That's such a -- that's
19      such a general question, I can't even begin
20      to answer it.  If you would like to give me
21      an example, I would be happy to comment on
22      it, but I can't answer that question based
23      on the way you phrased it.
24 BY MS. BOGDAN:
25 Q.    Okay.  If you have a group of people that

Page 55

1 had varying levels of exposure to a carcinogen
2 because they worked in a plant, isn't it possible to
3 use means or medians or averages to determine the
4 levels of exposure?
5      MR. INSOGNA:  Same objection.
6      THE WITNESS:  Maybe you could give me
7      an example of a carcinogen and a plant.
8      It's just such a general question, I
9      can't -- I don't have enough information to
10      answer you.
11 BY MS. BOGDAN:
12 Q.    We'll come back to it actually.  I'll just
13 move on at this point.
14      With regard to this particular matter, in
15 your expert report you don't mention the possibility
16 that plaintiffs may have utilized means, medians,
17 midpoints or ranges to estimate plaintiffs' exposure
18 to NDMA in contaminated valsartan-containing drugs,
19 correct?
20 A.    Could you restate that?  I could not follow
21 that question.
22 Q.    I'm asking if in your expert report --
23 A.    You're talking about my original report or
24 the supplemental report?
25 Q.    The supplemental report first, all right?

Page 56

1 A.    All right.
2 Q.    Your supplemental expert report, you don't
3 mention the possibility that plaintiffs can
4 ascertain NDMA or NDEA exposures by using averages
5 or means or medians or midpoints or ranges of
6 exposure, correct?
7 A.    I do not recall any discussion in materials
8 that I've read of plaintiffs proposing that and if
9 you could point me to the section where they do
10 that, it might jog my memory, but I don't recall it.
11 Q.    I'm asking if you mentioned it in your
12 report?
13 A.    If I mentioned what in my report?
14 Q.    The possibility that plaintiffs could
15 utilize means, averages, medians or ranges to
16 estimate exposure to NDMA or NDEA in
17 valsartan-containing drugs?
18 A.    What I'm trying to say is that my report
19 comments on what plaintiffs did say and what
20 plaintiffs did propose, as I understood it.
21      And I'm telling you, again, I do not recall
22 any point in Dr. Madigan's report or the two
23 documents with names longer than I care to repeat,
24 the amended motion and whatever the other one was, I
25 do not recall any proposal by plaintiffs to use

Page 57

1 midpoints or averages or things like that.
2      If you could point me to that language, it
3 might jog my memory, but I do not recall it.
4      Can you point me to the language?
5 Q.    I'm not asking you if plaintiffs proposed
6 it.
7      I'm asking if you commented or considered it
8 in your supplemental report the fact that plaintiffs
9 could rely on means, medians, midpoints or ranges to
10 estimate exposure?
11 A.    If you're asking me in writing my
12 supplemental report, did imagine or consider the
13 universe of possibilities of things that plaintiffs
14 might have proposed but did not, I did not consider
15 the universe of possibilities of things that they
16 might have said or might have proposed but didn't.
17 I was focused on what they did say and what they did
18 propose.
19 Q.    In your expert report, did you attempt to
20 assess the average or median or midpoint or ranges
21 of NDMA or NDEA associated for each NDC code?
22      MR. INSOGNA:  Objection, vague.
23      THE WITNESS:  I apologize, that
24      was -- that was a very long question and I
25      followed you right until the end about the

Page 58

1    NDC code.
2  BY MS. BOGDAN:
3  Q.    In your expert report, did you attempt to
4  assess the means, averages, midpoints or range of
5  NDMA or NDEA exposure associated for each NDC code
6  of valsartan-containing drugs that had
7  contamination?
8         MR. INSOGNA:  Objection to form.
9         THE WITNESS:  And by "expert report,"
10    again, I'm not sure if you're talking about
11    the supplemental report or my original
12    report, but what I -- what I did was
13    estimate the range, which is what was the
14    maximum hypothetical exposure based on when
15    products from particular manufacturers were
16    on the US market, recognizing -- and that
17    was -- we talked for a very long time at my
18    last deposition about those calculations.
19         Those were the maximum possible
20    hypothetical exposures based on FDA
21    measurements where the minimum would have
22    been things that were below the FDA ADI of
23    96 nanograms per day so that -- that is that
24    range, irrespective of any NDC codes.
25  BY MS. BOGDAN:

Page 59

1  Q.    I'm asking if you actually researched the
2  average levels of NDMA or NDEA contamination
3  associated with NDC codes?
4         MR. INSOGNA:  Objection, asked and
5    answered.
6         MS. BOGDAN:  I don't believe he
7    answered the question with regard to whether
8    he attempted to ascertain the average or the
9    range of NDMA or NDEA exposures associated
10    with particular NDC codes.
11         MR. INSOGNA:  I believe that was --
12         MS. BOGDAN:  That's my question.
13         MR. INSOGNA:  I think that was the
14    subject of the calculations we discussed in
15    the last deposition.
16         You can answer the question.
17         THE WITNESS:  So as we talked about
18    in my last deposition, I calculated the
19    maximum possible hypothetical range.  We've
20    talked about what the minimum was, less than
21    96 nanograms per dose, and my understanding
22    of NDC codes is that while it indicates an
23    API manufacturer, that it does not indicate
24    a specific lot and, therefore, you could
25    not, from an NDC code, to my understanding,

Page 60

1  determine a specific exposure.
2         And that is why the calculations that
3    I did is the maximum hypothetical range
4    based on FDA testing under even unrealistic,
5    quote/unquote, worst case assumptions.
6  BY MS. BOGDAN:
7  Q.    And you're referring to your reliance on the
8  FDA laboratory analysis of valsartan products,
9  correct?
10  A.    When I refer to "FDA testing," yes, that's
11  what I'm referring to.
12  Q.    And the, quote, worst case scenario, to use
13  your language, that you mentioned, was the highest
14  value found by the FDA in the testing data it
15  published with regard to contaminated valsartan
16  products, correct?
17         MR. INSOGNA:  Objection, asked and
18    answered.  This was all covered in the prior
19    deposition.
20         THE WITNESS:  So, yes, as I have
21    testified to previously.
22  BY MS. BOGDAN:
23  Q.    Which finished dose manufacturers use ZHP
24  API for their valsartan finished pills?
25  A.    You cut out at the beginning.  Could you

Page 61

1  repeat that?
2  Q.    Which finished dose manufacturers used ZHP
3  API for valsartan finished pills?
4  A.    Sitting here now, I don't memorize that.  I
5  could go back through materials if you would like me
6  to do that.
7  Q.    You don't know the answer, though, to that
8  question, sitting here today?
9         MR. INSOGNA:  Objection to form.
10    Asked and answered.
11         THE WITNESS:  I do not memorize that
12    information, no.
13  BY MS. BOGDAN:
14  Q.    Which finished dose manufacturers use Myland
15  API for valsartan finished pills?
16         MR. INSOGNA:  Same objection.
17         THE WITNESS:  My calculations were
18    based on -- these were where the -- yeah, I
19    mean, this was Exhibit 7 from the past
20    deposition.
21         So those were the FDA numbers and
22    that was as FDA referred to them and that
23    was how I referred to them.
24  BY MS. BOGDAN:
25  Q.    I'm asking, Doctor, if you know which

Confidential Information Subject to Protective Order

Page 62

¹ finished dose manufacturers used Myland API for
² their valsartan finished pills?
³         MR. INSOGNA:  Same objection.
⁴         THE WITNESS:  Yeah, as I've said, I
⁵     have not memorized the correspondence
⁶     between the finished dose manufacturers and
⁷     the lots of drug that the FDA tested.
⁸ BY MS. BOGDAN:
⁹ Q.     Which finished dose manufacturers used
¹⁰ Hetero API for valsartan finished dose?
¹¹         MR. INSOGNA:  Same objection.  Also
¹²     beyond the scope of his report.
¹³     You can answer the question.
¹⁴         THE WITNESS:  My calculations were
¹⁵     based on the FDA testing, Hetero Labs, as
¹⁶     well as the algorithm that was presented by
¹⁷     plaintiffs that also refers to Hetero Labs.
¹⁸ BY MS. BOGDAN:
¹⁹ Q.     Do you know which finished dose
²⁰ manufacturers used Hetero API in their
²¹ valsartan-containing drugs?
²²         MR. INSOGNA:  Same objection.
²³         THE WITNESS:  Again, I do not
²⁴     memorize what that correspondence is.  I am
²⁵     referring to data that the FDA published,

Page 63

¹     which are -- is the same nomenclature that
²     is used in the plaintiffs' materials
³     proposing an algorithm by which to derive a
⁴     lifetime cumulative threshold.
⁵ BY MS. BOGDAN:
⁶ Q.     For valsartan pills made with ZHP API, have
⁷ you seen any testing demonstrating that no NDMA was
⁸ found in those pills?
⁹         MR. INSOGNA:  Objection to form.
¹⁰     This was also covered in the prior
¹¹     deposition.
¹²         THE WITNESS:  So in part in answering
¹³     your question, so as in my report, paragraph
¹⁴     21, I refer to Prinston Pharmaceutical
¹⁵     corresponding to the ZHP API from the
¹⁶     manufactured lot containing the highest
¹⁷     level of NDMA measured by the FDA in the
¹⁸     320-milligram valsartan product.
¹⁹ BY MS. BOGDAN:
²⁰ Q.     And what was that level?
²¹ A.     The maximum level measured by the FDA in any
²² valsartan product, 320 milligrams was
²³ 20.19 micrograms per tablet.
²⁴ Q.     And that --
²⁵ A.     And that was the maximum in a specific lot.

Page 64

¹ Q.     A Prinston Pharmaceutical product, correct?
² A.     That's correct.
³ Q.     And that would be 20,190 nanograms found in
⁴ that 320-milligram Prinston tablet, correct?
⁵ A.     That's correct.
⁶ Q.     My question that I asked is, have you seen
⁷ any testing demonstrating that tablets made with ZHP
⁸ API have no NDMA in them?
⁹         MS. LOTMAN:  Objection to form.
¹⁰         THE WITNESS:  I don't recall, sitting
¹¹     here today.
¹² BY MS. BOGDAN:
¹³ Q.     Have you seen any testing demonstrating that
¹⁴ any pills made with ZHP API had less than
¹⁵ 96 nanograms of NDMA in them?
¹⁶         MR. INSOGNA:  Same objection.
¹⁷     Rosemarie, you spent hours in the
¹⁸     last deposition discussing the levels of
¹⁹     specific lots.  I'll give you a little bit
²⁰     of leeway here, but we're not going to redo
²¹     that whole set of questioning.
²²         MS. BOGDAN:  Well, with regard to the
²³     supplemental report there is a -- you know,
²⁴     a majority and a big part of the report is,
²⁵     again, discussing levels as it pertains to

Page 65

¹     the plaintiffs' medical monitoring, so I
²     believe I have every right to ask these
³     questions.  They are completely cured off
⁴     the supplemental report and they go towards
⁵     the medical monitoring class and --
⁶         MR. INSOGNA:  All of the -- all of
⁷     the discussion of levels refers back to the
⁸     prior report, which you deposed him on for
⁹     ten hours.  I think we've more than covered
¹⁰     this.
¹¹         I will give you a little bit of
¹²     leeway, but if it continues to be questions
¹³     about levels observed and internal testing
¹⁴     versus FDA reporting, we're not going to
¹⁵     redo those questions.
¹⁶         Dr. Chodosh, you can answer this
¹⁷     question if you remember it.
¹⁸         THE WITNESS:  So let me clarify, as
¹⁹     it says in my report, "As detailed in this
²⁰     supplemental report, my opinions regarding
²¹     plaintiffs' request for medical monitoring
²²     for cancer follow any straightforward manner
²³     from the opinions expressed in my report of
²⁴     August 2nd, 2021, regarding the question of
²⁵     whether ingestion of valsartan products

Page 66

1  affects the risk of developing cancer, which
2  is attached as Exhibit C.  Where applicable,
3  my response to each element of plaintiffs'
4  third amended medical monitoring class
5  action complaint refers to the relevant
6  sections of my report of August 2nd, 2021."
7       Which is to say, in each place in my
8  supplemental report where I am referring to,
9  you know, numbers, calculations, whatever it
10  may be, I cite that paragraph, the section
11  of my original expert report that that is --
12  that serves as the foundation for that.
13      So the foundation of those things
14  hasn't changed since my original report that
15  we spent a great many hours talking about,
16  the FDA-measured doses and doses measured by
17  manufacturers.
18  BY MS. BOGDAN:
19  Q.    For the purposes of the supplemental report
20  that you have now provided, did you review any of
21  the finished dose manufacturers internal documents,
22  which indicate levels of NDMA or NDEA that they
23  found in their products?
24      MR. INSOGNA:  Are you asking about
25  subsequent to the prior deposition where he

Page 67

1  testified to what he had reviewed?
2       MS. BOGDAN:  I'm asking for the
3  purposes of the supplemental medical
4  monitoring report that Dr. Chodosh has
5  issued, if he is relying on and/or reviewed
6  any manufacturers' internal testing data
7  with regard to the levels of contamination
8  that they found in their drugs, product or
9  substance?
10      MR. INSOGNA:  Objection, compound and
11  partially asked and answered at the prior
12  deposition.
13      THE WITNESS:  So as we spoke about
14  for several hours back in September about my
15  original report, we talked at length about
16  internal testing documents that I had looked
17  at and my choice of FDA evaluations of NDMA
18  and NDEA levels in my calculations.  And the
19  only thing subsequent to that deposition
20  would be, for instance, as noted in
21  Dr. Madigan's report, on page 2 of
22  Dr. Madigan's report, where as a footnote he
23  refers to sentences -- well, Dr. Madigan
24  cites the FDA levels, same levels that I
25  have cited, and then he appends to that

Page 68

1  "Other sources show levels as high as
2  60.2 micrograms of NDMA," with footnote
3  number 6, which lists a ZHP number.
4       So that's an internal number and the
5  rest of Dr. Madigan's statement is "and
6  5.4 micrograms of NDEA," with the footnote 7
7  that refers to a "Torrent-related" document.
8       So, again, internal documents and
9  those numbers, those additional numbers that
10  Dr. Madigan is citing in addition to the FDA
11  numbers that he cites, same numbers that I
12  cite, those are -- those are numbers that,
13  as I recall, I've seen before in the
14  original reports from Dr. Panigraphy and
15  others.
16      And those were the things that we
17  discussed back in September at great length.
18  BY MS. BOGDAN:
19  Q.    In reviewing Dr. Madigan's report in
20  preparation for your supplemental report that you
21  have now served in this litigation, did you review
22  those underlying documents that Dr. Madigan is
23  citing to in those footnotes 6 and 7 in his report?
24  A.    In this case I did not, because I believe I
25  have seen those values referenced by some

Page 69

1  plaintiffs' experts before, that's number one.  So I
2  will take at his word that Dr. Madigan was -- was
3  citing those accurately, especially since those
4  numbers are generally familiar to me.
5       And I also would not have done that because
6  the difference of threefold for NDMA or roughly
7  fourfold for NDEA would not make a difference for my
8  opinions that those levels of exposure are far below
9  what would be associated with an increased risk of
10  cancer.
11  Q.    Since your last deposition, have you made
12  inquiries as to how many lots of the finished dose
13  medications were tested for NDMA or NDEA by each of
14  the defendant manufacturers?
15  A.    I'm not sure what you're asking me.  Are you
16  asking me testing subsequent to some date or
17  products manufactured subsequent?  I -- I'm not sure
18  what you're asking me.
19  Q.    Since I last deposed you, which was, I
20  believe, in October of 2021 --
21  A.    No, September 29th and September 30th.
22  Q.    September.  Okay.  Right.  It was right at
23  the end, okay, so in September of 2021.
24      Have you made any inquiry to ascertain how
25  many lots of the finished dose medications were

Confidential Information Subject to Protective Order

Page 70

1  tested by the defendant manufacturers for NDMA or
2  NDEA?
3  A.     How many lots from when?
4  Q.     At any point in time.  I'm asking if after
5  the depositions that we had in September, if you
6  made any inquiry as to the number of lots of
7  finished dose medications that were tested by the
8  defendants in this case for NDMA or NDEA?
9  A.     If you're referring to the period of time
10  that preceded the final recall, I did not, since
11  that deposition, ask for additional information and
12  nor would it have changed my opinion.
13  Q.     Since your last deposition, have you made
14  any inquiry as to how many lots of the API were
15  tested by each of the defendant manufacturers for
16  levels of NDMA or NDEA?
17  A.     Since the last deposition, I have not
18  inquired about that type of testing and, again, nor
19  would it have changed my opinion in this matter.
20        MS. BOGDAN:  Please pull up
21     exhibit -- I believe, it might be entitled
22     FDA control -- no, it's "Laboratory Analysis
23     of Valsartan Products."
24        TRIAL TECHNICIAN:  Counsel, would it
25     be under any other name?

Page 71

1        MS. BOGDAN:  I don't think so.  Let's
2     just go off the record so I can just check
3     on this exhibit.
4        THE VIDEOGRAPHER:  Off the record at
5     11:11.
6        (Brief recess.)
7        THE VIDEOGRAPHER:  We are back on the
8     record at 11:13 a.m.
9        MS. BOGDAN:  What exhibit are we up
10     to now?
11        TRIAL TECHNICIAN:  This is Exhibit 6.
12        (Document marked for identification
13     as Chodosh Deposition Exhibit No. 6.)
14  BY MS. BOGDAN:
15  Q.     Okay, Doctor, let me know once you can see
16  this exhibit.
17  A.     Yes, I can see it.
18  Q.     Are you familiar with this document?
19  A.     Yes, I am.
20  Q.     And directing your attention to the second
21  page of the document?
22  A.     Yes.
23  Q.     And then the third page of the document?
24  A.     Yes.
25  Q.     Are these the FDA testing levels that you've

Page 72

1  been referring to?
2  A.     Yes.
3  Q.     If we could go back to the second page of
4  the document.
5        With regard to the manufacturer Aurobindo,
6  do you see that on the second page of the document?
7  A.     Yes, I do.
8  Q.     And there are three rows for Aurobindo right
9  at the top, correct?
10  A.     Yes, I see that, yes.
11  Q.     FDA is indicating that it tested nine total
12  lots for Aurobindo in those three rows?
13        MR. INSOGNA:  Yeah, you asked these
14     exact questions at the last deposition.  You
15     went through this document and asked how
16     many lots by each manufacturer were tested.
17     It's page 96 of the September 29th
18     deposition.
19  BY MS. BOGDAN:
20  Q.     In lots they're tested?
21  A.     You're asking me again?
22  Q.     Asking you again because I need it as a lead
23  in, in to my next question.
24  A.     For those three rows listed as "Aurobindo
25  Pharma," there are nine lots listed by the FDA as

Page 73

1  having been tested.
2  Q.     Other than those nine test results that are
3  on this FDA document for purposes of your
4  supplemental report, did you rely on any other
5  testing results for Aurobindo product?
6  A.     I relied on no other testing results beyond
7  those of the FDA, beyond the fact of my expectation
8  that Dr. Madigan, and both referring to the FDA
9  numbers himself for his report, as well as the ZHP
10  and the Torrent values that he listed that I
11  factored in, that if there had been other levels,
12  I'm confident that plaintiffs' experts would have
13  told me what they were if they were higher.
14        But as I -- we discussed for seemingly hours
15  at my last deposition, the FDA measurements of the
16  lots listed from the companies listed in this
17  document is what I relied upon for the calculations
18  that I presented.  Whether those numbers are twofold
19  or threefold or fourfold different, if plaintiffs
20  wanted to propose that that would not change my
21  opinion in this matter that plaintiffs, who had
22  taken such products, would not be at an increased
23  risk of cancer.
24  Q.     Okay.
25        MS. BOGDAN:  Move to strike the

Confidential Information Subject to Protective Order

Page 74

1    latter part of that.
2  BY MS. BOGDAN:
3  Q.     My question was simply, for your
4  supplemental report did you rely on any testing
5  levels for Aurobindo, other than what are
6  shown in this FDA laboratory analysis of valsartan
7  products that's been marked Exhibit 6?
8          MR. INSOGNA:  Objection, asked and
9  answered.
10          THE WITNESS:  I just answered you.
11  If you'd like, perhaps, it could be read
12  back.
13  BY MS. BOGDAN:
14  Q.     It's a simple question, you know, with
15  regard to what testing levels you have relied on for
16  your supplemental report.
17          And I'm asking this line of questioning to
18  find out if you rely for your supplemental report,
19  on any testing levels other than the FDA levels that
20  are shown on this document for the lots that are
21  shown on this document?
22          MR. INSOGNA:  Same objection.
23          You can answer again.
24          THE WITNESS:  And as I answered you,
25  I used the FDA information in this document,

Page 75

1    as well as looking at the numbers that
2  Dr. Madigan cited and my expectation that if
3  there had been higher numbers, that your
4  experts felt were important to consider,
5  that I would have seen them, and that the
6  only two numbers that I saw, I factored that
7  into my consideration.
8          And those were from Dr. Madigan's
9  report, they were not in the FDA report.
10  And I factored them in, insofar as I could
11  see those levels compared to the FDA levels
12  and determined that those levels, even if I
13  were to accept those as listed in
14  Dr. Madigan's citations, would not have
15  changed my opinions in this case.
16  BY MS. BOGDAN:
17  Q.     Okay.  So since your deposition in September
18  that was over two days, you haven't taken into
19  consideration any other testing levels, other than
20  the ones that are shown on what's been marked as
21  Exhibit 6?
22          MR. INSOGNA:  Objection, misstates
23  testimony.
24          THE WITNESS:  I'm -- this is, I
25  think, the fourth time you've asked this

Page 76

1    exact question.  I've given you an answer
2  each of the three previous times.  I'm not
3  sure if the issue is you don't understand
4  what I've said, I don't know how to -- I
5  can't give you a different answer than what
6  I gave.  I gave you the truthful answer to
7  your question three times.
8  BY MS. BOGDAN:
9  Q.     Doctor, I'm not actually trying -- I'm
10  trying to sort of just be able to ask this and move
11  on.
12          We did discuss this at your last deposition
13  and I just want to make sure since your last
14  deposition you haven't taken into consideration any
15  other testing levels, other than what's shown on
16  this document that's been marked as Exhibit 6.
17          I'm asking about anything that you've done
18  since September up until now that would be
19  additional or different than what you did up to the
20  point of your last deposition.
21          MR. INSOGNA:  Objection, misstates
22  testimony.
23          THE WITNESS:  That is not -- that is
24  not what I -- that was not in the first
25  three answers to my question to you, put the

Page 77

1    way that you summarized it.
2          I was very clear, and I was very
3  clear that what's additional is looking at
4  your expert's reports, and particularly
5  Dr. Madigan, and the numbers that he cited
6  that are not FDA numbers so I could factor
7  that into my overall opinion.
8          And I've given you this answer now
9  four times.  There is no other answer to the
10  question.

Confidential Information - Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order





Page 90

Page 92

23 BY MS. BOGDAN:
24 Q.    Now, you testified that you did not know
25 what assays that the defendant manufacturers used

Page 91

1

Page 93

1 when testing for levels of NDMA and NDEA in their
2 drug substance and drug products, correct?
3 A.    I'm sorry, the beginning of your question
4 cut out.  Could you repeat your question, please?
5 Q.    You have testified that a concern of yours
6 is that you did not know the assay method that was
7 used by the defendant manufacturers in testing their
8 drug substance and drug products, correct?
9 A.    Based on my last deposition that was one of
10 the reasons that I brought up why I chose to use FDA
11 testing data of manufactured lots of finished
12 product on the United States market, as opposed to
13 testing data from individual companies where there
14 were many unknowns so that was one of the reasons.
15 Q.    Do you have any information that leads you
16 to believe that the defendant manufacturers were not
17 competent at using the FDA prescribed methods to
18 test for NDMA and NDEA in their drug products and
19 drug substance?
20      MR. INSOGNA:  Objection, asked and
21      answered at the last deposition.  On page
22      110, you asked him if he found reliable the
23      testing the defendants did on their own
24      product.  I think we've covered all of this
25      ground.

Confidential Information Subject to Protective Order

1    MS. BOGDAN:  I think the question is
2  actually different and it's a basis for his
3  medical monitoring opinion and the levels
4  he's relying on.  I'm asking if he's learned
5  any information that would cause him to
6  believe that the defendant manufacturers
7  were not competent in using testing methods
8  to detect NDMA and NDEA in their drug
9  substance and product.
10    MR. INSOGNA:  You can answer this
11  question.
12    I'm excited to get to his actual
13  opinions in this case, but that's fine.
14    THE WITNESS:  So as we talked about
15  for what seemed like hours at my last
16  deposition, we articulated -- I articulated
17  for you the list of reasons why I chose to
18  use FDA data, as opposed to data from
19  manufacturing companies.
20    And parts of those -- some of those
21  reasons, not to be inclusive, were that the
22  testing procedures themselves recommended by
23  the FDA changed over those periods of time,
24  such that I wouldn't know which -- which
25  version or which assay was being used, how

1  familiar the people performing the testing
2  were, how they were calibrating it, what the
3  instruments were that they were performing
4  these on, as well as my experience as a
5  laboratory scientist, that even given
6  exactly the same written protocol when
7  performed by different scientists in
8  different laboratories that more often than
9  not a different answer will be gained.
10    And, therefore, you cannot compare
11  those numbers between manufacturers tested
12  at different sites using I don't know what
13  assays.  And as I testified in my
14  last deposition, that the fact that the
15  people who developed the protocol, the FDA,
16  had measured many lots of manufactured drugs
17  that were available on the US market and
18  that could be linked up to times when they
19  were on the US market, such that I could
20  calculate highest hypothetical worst case
21  scenarios, those data are far superior, in
22  my opinion, to make a determination of
23  exposures.
24    We went through all of this ad
25  nauseam and I have to say it's disappointing

1  that we're still talking about this.
2  BY MS. BOGDAN:
3  Q.    I think there was a disconnect with the
4  question that I asked and the answer that I
5  received.
6    My question was:  Is in your investigation
7  and research into this case, if you learned any
8  information that the testing results that the
9  manufacturers came to using their testing methods
10  were unreliable or faulty?
11    MR. INSOGNA:  Same objection.
12  BY MS. BOGDAN
13  Q.    Not why -- not why you chose to use the FDA
14  test results, we have been over that.
15    What I'm asking is, in all of the documents
16  you reviewed in your list of materials considered,
17  et cetera, did you learn any information during your
18  investigation of this case that led you to believe
19  that the manufacturer's testing results were not
20  reliable or accurate?
21    MR. INSOGNA:  Same objection.
22    THE WITNESS:  And as I have testified
23  to, since I don't know the assay that was
24  used, the calibration methods, the equipment
25  that was used, the time in which the assays

1  were performed or any standard sets of NDMA
2  or NDEA reference samples that were shared,
3  I have every expectation, based on all of my
4  scientific experience for the past 45 years,
5  that those numbers would not be comparable
6  to other manufacturers and I have no way to
7  assess whether they were done in a reliable
8  fashion using a reliable assay.
9  BY MS. BOGDAN:
10  Q.    And that's true even if they were using a
11  validated method, is that your opinion?
12    MR. INSOGNA:  Same objection.  That
13  exact question was answered.
14    THE WITNESS:  I don't know what you
15  mean by "a validated method."
16  BY MS. BOGDAN:
17  Q.    A method that has been scientifically tested
18  and determined to be accurate through validation
19  procedures that are done at the laboratory?
20  A.    I'm sorry, that -- the way that you've asked
21  that question is too vague for me to give you an
22  answer.
23  Q.    Let's go to your report, which is Exhibit 4,
24  to paragraph 26.
25  A.    Yes.

Confidential Information Subject to Protective Order

Page 98

1   Q.    In that paragraph you are providing the
2   maximum periods of time that valsartan products
3   potentially containing NDMA and NDEA were available
4   on the US market, correct?
5   A.    That's correct.
6   Q.    Okay.  And so you are stating there were 51
7   months for potentially containing NDMA product on
8   the market, correct?
9   A.    That's correct.
10  Q.    Seventy-five months for valsartan products
11  potentially containing NDEA on the market?
12  A.    Yes, that's correct, as I wrote in my
13  original report and as I testified to during our
14  prior deposition on this.
15  Q.    So if we take the highest level of
16  contamination that was found by the FDA in its
17  laboratory analysis for NDMA, that would be
18  20.19 micrograms, correct?
19         MR. INSOGNA:  Objection.
20         THE WITNESS:  20.19 micrograms was
21      the highest level measured by the FDA.  The
22      highest level of NDMA measured in an FDA --
23      in a manufactured product, in a
24      320-milligram valsartan product.
25  BY MS. BOGDAN:

Page 99

1   Q.    So, hypothetically, if a plaintiff took a
2   20.19-microgram contaminated 320-milligram valsartan
3   tablet for the 51 month time period that you
4   indicated the valsartan products potentially
5   containing NDMA were on the market, what would be
6   the total cumulative exposure to NDMA?
7          MR. INSOGNA:  Objection,
8       mischaracterizes the document.
9          THE WITNESS:  So the -- so these
10      calculations were calculations that we
11      discussed at my last deposition and that are
12      described in detail in my original report in
13      this matter.
14         So are we going back to that now?
15  BY MS. BOGDAN:
16  Q.    Well, let me just -- so, you know, if a
17  patient took a 300-milligram valsartan tablet with
18  approximately 20 micrograms of NDMA in it for 51
19  months, that would equal 30,600 micrograms of total
20  NDMA, correct?
21         MR. INSOGNA:  Object to form.
22      Mischaracterizes the document and asked and
23      answered at the prior deposition.
24         MS. BOGDAN:  I do not believe that
25      this was.  And since we're talking

Page 100

1   about medical --
2          THE WITNESS:  Do you have Exhibit 8?
3   Do you have Exhibit 8 from the prior
4   deposition?
5          MR. INSOGNA:  The document Bates
6   labeled Chodosh 008, I forget what number it
7   was marked as.  I can tell you what number.
8   It was Exhibit 18 of the September 29th
9   deposition, I believe.
10         MS. BOGDAN:  I'm sorry, what?
11         MR. INSOGNA:  Exhibit 18 of the
12  September 29 deposition, which are
13  Dr. Chodosh's calculations.
14         MS. BOGDAN:  Nick?
15         MR. INSOGNA:  It was Exhibit Number
16  18.
17         MS. BOGDAN:  Exhibit 18?
18         MR. INSOGNA:  Eighteen, 1-8, yes,
19  Bates labeled Chodosh 008.
20  BY MS. BOGDAN:
21  Q.    Yes I -- I pulled that exhibit back up and
22  my question is, which I do not believe is answered
23  on this exhibit, is if a patient took a valsartan
24  320-milligram tablet with approximately
25  20 micrograms of NDMA for 51 months, that would

Page 101

1   equal over 30,000 micrograms of NDMA, correct?
2          Now, I don't see that calculation on this
3   exhibit and I'm using the FDA number, which is what
4   the doctor has said he's relied on and the number of
5   months that the doctor has represented in paragraph
6   26 of his supplemental report that the valsartan
7   products potentially containing NDMA were available
8   on the US market.
9          MR. INSOGNA:  Objection, that
10      mischaracterizes his calculation.
11         But you can answer that question,
12      Dr. Chodosh.
13         THE WITNESS:  So if you want to
14      understand the calculation, let's go to my
15      original report --
16  BY MS. BOGDAN:
17  Q.    I don't understand the calculation, no.
18  A.    That's what the calculation is.
19  Q.    I'm sorry?
20  A.    I calculated the maximum theoretical amount
21  of -- that a person taking the highest available
22  dose of a valsartan product for the 1611 days, I
23  believe it was, what that amount would be.  And then
24  on my original report, paragraphs 136 and following,
25  I did a calculation based on -- let me find it.

Page 102

1  Q.    And what was that total exposure of --
2  A.    Sorry, I wasn't finished my answer.  I
3  apologize for the pause.
4       Did a calculation based on the albeit
5  unrealistic assumption of what the theoretical
6  maximum total amount of NDMA to which plaintiffs
7  could conceivably have been exposed from any
8  valsartan product produced by any combination of
9  manufacturers where I assume that on any given day a
10 theoretical plaintiff took the valsartan product
11 available on the market.
12      MR. INSOGNA:  Rosemarie, can you --
13      MS. BOGDAN:  That's not me.
14      MR. INSOGNA:  Sorry.  For the
15 feedback.  Our room just lost power.
16      THE VIDEOGRAPHER:  Off the record --
17 off the record at 12:15.
18      (Luncheon recess.)
19      THE VIDEOGRAPHER:  We are back on the
20 record at 1:06 p.m.
21 BY MS. BOGDAN:
22 Q.    Good afternoon, Doctor.
23 A.    Good afternoon.
24 Q.    Can you hear my audio okay?  I'm just
25 checking that you can hear me --

Page 103

1  A.    It's very --
2  Q.    -- and I can hear you.
3  A.    It's a very loud and it's a bit choppy.  Are
4  we able to just -- how about now?
5       MR. INSOGNA:  Rosemarie, do you want
6  to try to just say something for us and test
7  the volume?
8       MS. BOGDAN:  Yeah, I'm just lowering
9  my volume a little bit because it is a
10 different dynamic.
11      Does that help at all?
12      MR. INSOGNA:  It sounds a little bit
13 garbled.
14      THE WITNESS:  Yeah, it's a little
15 garbled and like metallic, like tinny.
16      THE VIDEOGRAPHER:  Would you like to
17 go off the record?
18      MS. BOGDAN:  Sure.
19      THE VIDEOGRAPHER:  Off the record at
20 1:07.
21      (Pause.)
22      THE VIDEOGRAPHER:  We are back on the
23 record at 1:09 p.m.
24 BY MS. BOGDAN:
25 Q.    Dr. Chodosh -- okay.

Page 104

1       I think before we took the break because the
2  power went out, we were -- you were looking back on
3  your previous report and one thing that I just want
4  to make clear, a lot of the questions I'm asking are
5  attempting to find out if you have done anything
6  different or looked at more documents or changed
7  what you're basing your opinion on since I last
8  deposed you, all right?
9       So when I'm asking you these questions,
10 that's what I'm trying to get to, if there's
11 something additional you did after the last time I
12 deposed you on these issues.  I can read the report,
13 but if there was some other activity or data you
14 looked at or something you considered, then that's
15 what I'm trying to glean by my questions, okay?
16      So while we had this break, I went and
17 pulled up your first report and in that report in
18 paragraphs 137, you do a calculation for NDMA, a
19 hypothetical scenario that corresponds to the
20 theoretical maximum total NDMA exposure.
21      Do you see that in your first report?
22 A.    Yes, I do.
23 Q.    Is that the calculation that you were
24 referring to before the power went out as far as --
25 A.    That is the section of the report where I

Page 105

1  walk through for NDMA and for NDEA separately, I
2  walked through two scenarios for each, one related
3  to Teva products and the maximum -- yeah, for
4  products available during that period potentially
5  contaminated with NDMA and then I walked through it
6  with any valsartan product so that's, as I recall,
7  what I was referring to.
8  Q.    Okay.  And so -- I'm sorry, were you
9  speaking?  There was feedback going on.
10 A.    I started to speak, but I'll just wait for
11 your next question.
12 Q.    Okay.  I didn't mean -- the audio is a
13 little delayed and funky so, hopefully, we can get
14 through this and...
15      So in paragraph 137 of your previous report,
16 is -- does that paragraph have the maximum
17 hypothetical scenario that corresponds to the
18 theoretical maximum of total NDMA exposure?
19 A.    Yes, it does and I'm -- I am -- ah, okay.
20      So, first, in answer to your question, yes,
21 it is; and, second, and this is maybe why I'm so
22 puzzled is that my supplemental report very
23 specifically refers to these paragraphs and the
24 calculation.
25      So I wasn't -- my supplemental report, I

Confidential Information Subject to Protective Order

Page 106

1  think, is pretty clear, and, again, in my paragraph
2  36, "As discussed in detail in my report of August
3  2nd, 2021," and then at the end of that I reference
4  paragraphs 132 to 137, 142, 148 to 153.
5      Similarly, with the next paragraph that I
6  felt that I was very clear in my supplemental report
7  that there was nothing new about those calculations,
8  those were presented in my original report, you
9  deposed me on those and I was simply referring to
10 them.  And in that same way, that was the intention
11 of my statement when I said that my opinions follow
12 in a straightforward manner from the opinions
13 expressed in my report of August 2nd.
14     So there are no -- there aren't -- I didn't
15 redo calculations.  This is predicated on the
16 original report and those calculations.
17 Q.   So for the purpose of the medical monitoring
18 claim, the theoretical maximum total exposure to
19 NDMA which a plaintiff could conceivably have been
20 exposed to is 26,635 micrograms?
21     MR. INSOGNA:  Object to form.
22     THE WITNESS:  26,635 micrograms
23 refers to the hypothetical, if the
24 completely unrealistic set of assumptions
25 that somehow a theoretical plaintiff managed

Page 107

1  to take the valsartan product on the market
2  on that day that had the highest amount of
3  NDMA, which I layout, I think, very clearly
4  in my report.
5      I do not consider those to be
6  realistic assumptions.  It is presented
7  merely as an example that even if that takes
8  the unrealistic scenario that I've just laid
9  out, that that would be the amount.  And I
10 believe as I have also said both in my
11 report and in my testimony at my last
12 deposition and, I believe, in the
13 supplemental report that whether one changes
14 it -- well, I've already said it today.
15     If one changes that number to twofold
16 or threefold or fourfold, it does not make a
17 difference in terms of risk and, therefore,
18 does not change my opinion that those values
19 are so far below any doses of NDMA ever
20 shown to cause cancer in any system, no
21 matter how sensitive.  They're so far below
22 it that whether you're, you know, that
23 level, the 26635, which I already believe is
24 a gross overestimate, even if one were
25 looking at twofold or threefold or fourfold,

Page 108

1  it does not change my opinion that it's
2  still not capable of increasing cancer risk.
3  BY MS. BOGDAN:
4  Q.   In your opinion what cumulative exposure to
5  NDMA would increase a person's cancer risk?
6  A.   So we talked about this as well at length in
7  my original deposition for a period of time and so
8  I'm -- if you want to revisit that, I'm happy to
9  revisit that.
10 Q.   Let me ask the question another way.
11     What cumulative exposure to NDMA with regard
12 to the medical monitoring claim is it your opinion
13 would increase the risk to warrant medical
14 monitoring?
15     MR. INSOGNA:  Objection to form.
16     THE WITNESS:  So I've answered before
17 that what I was asked to evaluate was
18 whether the doses of NDMA or NDEA to which
19 plaintiffs could conceivably have been
20 exposed as a consequence of ingesting
21 valsartan products is not within orders of
22 magnitude, not within orders of magnitude of
23 what might be associated with an increased
24 risk.
25     So as I testified in my original

Page 109

1  deposition, I was not asked nor did I opine
2  on what is -- what is the dose of NDMA that
3  might theoretically increase risk, that is
4  not the question that I opined on.  I opined
5  on the question of the amounts that people
6  conceivably could have been exposed to.
7      And even erring with extremely
8  conservative estimates that the conclusion
9  that that is not within orders of magnitude
10 of what could be associated with an
11 increased risk.
12 BY MS. BOGDAN:
13 Q.   With regard to providing your opinions
14 regarding the scientific and medical basis for
15 requests for medical monitoring for cancer, have you
16 formed an opinion as to what the cumulative exposure
17 to NDMA or NDEA would need to be in order to justify
18 medical monitoring?
19     MR. INSOGNA:  Objection, asked and
20 answered.
21     THE WITNESS:  So the answer I just
22 gave you would be the exact same answer.
23 BY MS. BOGDAN:
24 Q.   And the reason I asked the question again is
25 I asked you with regard to NDEA as well.

Page 110

1   A.    Oh, I apologize then.  Can you restate the
2   question?  I did not pick that up.
3   Q.    With regard to being asked to provide your
4   opinions regarding the scientific and medical basis
5   for the requests for medical monitoring, did you
6   determine a cumulative dose of NDEA that would
7   warrant medical monitoring?
8   A.    For NDEA my answer is precisely analogous to
9   my opinion regarding NDMA, which was I was asked to
10  opine on whether the maximum hypothetical doses of
11  NDEA that plaintiffs could have been exposed to,
12  even using unrealistic, overly conservative
13  assumptions, are not within orders of magnitude of
14  doses that would be capable of causing cancer.
15        I was not opining on trying to determine a
16  specific level of NDEA at which even hypothetically
17  there might have been an increased risk.
18  Q.    So for the medical monitoring opinion that
19  you're offering, you have not determined any
20  particular exposure that results in increased risk
21  of cancer?
22              MR. INSOGNA:  Objection, asked and
23        answered.
24              THE WITNESS:  What I determined was
25        that the maximum theoretical cumulative

Page 111

1         exposures using worst case assumptions and
2         overly conservative assumptions, were that
3         those values, those cumulative amounts of
4         NDMA or NDEA are nowhere vaguely in the
5         vicinity of a dose that could cause cancer
6         in a human being or a mammal for that
7         matter.
8   BY MS. BOGDAN:
9   Q.    When you say they're not the doses in -- in
10  the vicinity of the doses that would increase risk
11  to warrant medical monitoring, can you provide a
12  range or any type of quantitative analysis as to how
13  much NDMA or NDEA that would be?
14  A.    So with the proviso, I believe, that the
15  answers I have given you are my best and most
16  truthful answers.  The values derived that -- that
17  the -- if you will, that the FDA uses for linear
18  low-dose extrapolation that I included in my
19  calculations.
20        And they're in both my original report,
21  they're in my supplemental report, that effectively
22  says that given a dose -- well, let me start -- let
23  me take one step back.
24        Neither NDMA nor NDEA is a known human
25  carcinogen, so there's no -- there's no evidence

Page 112

1   that these things are capable of causing cancer in
2   human beings.  But to the extent that there were
3   estimates, I have presented the maximum hypothetical
4   amounts both in relation to normal dietary intake,
5   exposures from food, air and water relative to
6   potential endogenous exposures and then relative to
7   the lowest dose of NDMA or NDEA that could cause
8   cancer in the most sensitive animal species in the
9   most sensitive tissue within that species.
10        And so recognizing that the cumulative
11  amounts in this litigation that have been alleged if
12  they are not within a hundredfold, a thousandfold,
13  10,000-fold of that level, that's what I mean by
14  "nowhere in the vicinity."
15  Q.    And when you're speaking to that are you
16  referring to your medical monitoring report,
17  paragraph 41, where you're talking about the dosage
18  in rats that would correspond to an exposure of
19  60,850,650 micrograms over a 70-year lifetime for a
20  70-kilogram person?
21  A.    So it is paragraph 41 of my supplemental
22  report, which references my original report from
23  August 2nd, 2021, for paragraphs 132 to 137, 142,
24  and 154 to 156.  So there's, of course, a forward
25  explication of where those numbers come from in my

Page 113

1   original report that we spent quite a bit of time
2   talking about back in September.
3   Q.    With regard to the medical monitoring claim,
4   do you -- and I recognize that you're citing to your
5   previous report -- you are using the same analysis
6   to the dosage in rats and converting that to a human
7   dose in order to come up with the orders of
8   magnitude that you're speaking of?
9               MR. INSOGNA:  Object to form.
10              THE WITNESS:  My sense is your
11        description of paragraph 41 is largely
12        correct.  I would only say that, yes, I have
13        done that in the same way that the FDA and
14        EMA and Health Canada has done that, that
15        is, converting the dose in milligrams per
16        kilogram from the Peto 1991 study or studies
17        to what a human dose -- a human equivalent
18        to that would be.
19              MS. BOGDAN:  Have we marked
20        Dr. Madigan's report as an exhibit yet?  I
21        don't believe we have.
22              TRIAL TECHNICIAN:  Just the
23        supplemental report.
24              MS. BOGDAN:  All right.  Could you
25        please mark Dr. Madigan's report as an

Confidential Information Subject to Protective Order

Page 114

1  exhibit.  And if you could, remind me what
2  number we're on.  I believe it's number 34
3  in order in the repository.
4      TRIAL TECHNICIAN:  That's Exhibit 10.
5      MS. BOGDAN:  If we could go to the
6  first page of the actual report.  I don't
7  know, Doctor, if this is available for you
8  to see it yet, but...
9      THE WITNESS:  Yes, it is.  I can see
10  it.
11      (Document marked for identification
12  as Chodosh Deposition Exhibit No. 10.)
13  BY MS. BOGDAN:
14  Q.    Is this the report of Dr. Madigan that you
15  reviewed and comment on in your medical monitoring
16  report?
17  A.    I believe it is.  The only reason that I'm
18  pausing is that the hard copy that I have has a date
19  under the signature and so -- but other than that,
20  let me just make sure that this is --
21  Q.    That looks like it's really faint on there.
22  Looks like it might be July 7th, 2021?
23  A.    Yes.  Oh, okay.  Yeah, I can't see that.
24      Yes, I believe it is the same report.
25  Q.    And did you thoroughly review this report as

Page 115

1  part of your preparation for your medical monitoring
2  supplemental report?
3  A.    Yes, I did.  And I think as is evident in my
4  supplemental report, I reference Dr. Madigan's
5  wording throughout.
6  Q.    Now, turning your attention to Table 1,
7  which is on page 7 of the report.
8  A.    Yes.
9  Q.    And did you review this table?
10  A.    Yes, I did.  And as I've said, I think
11  there's a discussion of data from this table in my
12  supplemental report.
13  Q.    And did you review the underlying studies to
14  see where Dr. Madigan was getting the values that
15  are in Table 1 on page 7 of his report?
16  A.    So for the great majority of these, yes
17  there were, I believe, instances in which I had a
18  bit more of a challenge in figuring out exactly
19  which number from the paper that he had taken and
20  for those I made the assumption that he is
21  accurately representing data.
22  Q.    And upon your review you didn't find any
23  misrepresentations of the data based on your review
24  of the studies and review of the table, correct?
25  A.    Could you say that again, please?

Page 116

1  Q.    Based on your review of the studies and the
2  table, you didn't find any inaccuracies to your
3  knowledge, correct?
4  A.    If by "inaccuracies" you mean do I believe
5  he misrepresented one of the numbers?  No, but,
6  again, with the proviso that I couldn't always find
7  what the particular number was that he found.  And
8  I'll also say that there were, you know, instances
9  in which while the number that he selected from the
10  paper versus the number that I saw, you know, I did
11  not -- in those instances, I was largely writing my
12  opinions to say if -- if he has represented this
13  correctly, what would it actually say about risk,
14  because he notes in his report that there were
15  instances in which he's done his own calculations.
16      And so, therefore, not everything -- it's
17  not simply that he identified a number in a report,
18  that there were instances in which he was indicating
19  that he was doing his own calculations.
20      (Zoom interruption.)
21      MS. BOGDAN:  Are we still on the
22  record and everybody can hear?
23      THE VIDEOGRAPHER:  We are still on
24  the record.  Please continue.
25  BY MS. BOGDAN:

Page 117

1  Q.    Now, do you see the column in Table 1 of
2  LCE?
3  A.    Yes, I do.
4  Q.    What do you understand that to represent?
5  A.    That stands for "Lifetime Cumulative
6  Exposure."
7  Q.    And the lifetime cumulative exposures in
8  that column are associated with particular studies,
9  correct?
10  A.    Yes.  "Associated with," meaning they were
11  derived in some way from the study on the same row
12  of that table; is that what you mean?
13  Q.    Yes.
14  A.    Yes.
15  Q.    And those values range from a low of 3,343
16  on the table, you see that or actually there's --
17  strike that.  Let me ask this another way.
18      In the plaintiffs' medical monitoring plan
19  it lists a level of exposure of cumulative NDMA of
20  1,962 micrograms; is that your understanding?
21  A.    I'm sorry, can you say that again?
22  Q.    In the plaintiffs' proposed medical
23  monitoring plan it lists a cumulative exposure of
24  1,962 micrograms of NDMA as the value that
25  significantly raises the risk of cancer and warrants

Page 118

1 lifetime medical monitoring.
2       Are you aware of that?
3 A.     Could you point me to that?  Could you point
4 me to that, please, what you are referring to?
5 Q.     I'm referring to paragraph 28.
6 A.     So I'm looking at paragraph 28 and I believe
7 the sentence that you're referring to, please
8 correct me if I'm wrong, "Consequently, it is
9 difficult to reconcile the FDA's assessment that
10 lifetime cumulative exposure to 2,454 micrograms of
11 NDMA is safe (an assessment with which Plaintiffs'
12 expert Dr. Madigan agrees) with Plaintiffs' claim
13 that lifetime cumulative exposure to
14 1,962 micrograms of NDMA significantly raises the
15 risk of cancer and warrants lifetime medical
16 monitoring for cancer."
17       So is that what you're referring to?
18 Q.    What I'm referring to is the value of
19 Dr. Madigan's of 1,962 and your understanding of
20 what study that comes from?
21 A.     I understand what study that number came
22 from, which -- hold on one second -- is Larsson but,
23 of course, it only appears as a footnote to his
24 table.  He did not include it in the table proper.
25 Q.     Okay.  And in the footnote to the table it

Page 119

1 notes that the "Larsson study is also significant
2 for the third quintile to first quintile contrast"?
3 A.     You've read that correctly, yes.
4 Q.     And LCE of 1,962 micrograms, correct?
5 A.     Yes.
6 Q.     Now, given your calculations of the
7 potential exposure that patients taking contaminated
8 valsartan with NDMA, isn't it possible that
9 plaintiffs can reach the LCEs that are shown in
10 Table 1, associated with the studies that have a
11 statistically significant increased risk?
12       MR. INSOGNA:  Objection to form.
13       THE WITNESS:  I guess I'm not
14       understanding your question.
15 BY MS. BOGDAN:
16 Q.     Well, part of your analysis with regard to
17 the medical monitoring claim was to calculate what
18 plaintiffs' potential exposure could be to NDMA from
19 their valsartan-containing drugs, correct?
20 A.     Yes, that's correct.
21 Q.     And part of that analysis would be
22 determining the potential levels of exposure.
23       And so my question is, the potential levels
24 of exposure that you have calculated for plaintiffs
25 taking valsartan to NDMA exceed the lifetime

Page 120

1 cumulative figures that are listed by Dr. Madigan in
2 Table 1, correct?
3 A.     If you are asking me is the total cumulative
4 hypothetical maximum exposure that I calculated
5 under all of the various overly conservative and
6 unrealistic assumptions, if you're asking me is that
7 number greater than some of the numbers in this
8 table, yes, that is correct.
9       However, given that Dr. Madigan's opinion is
10 internally contradictory, I have a very hard time
11 assigning a great deal of meaning to that.  But if
12 what you are asking about is one number larger than
13 another number, yes, one number is larger than
14 several of the other numbers.  I don't think it has
15 biological significance and apparently neither does
16 Dr. Madigan.
17 Q.     Well, you can't testify to Dr. Madigan's
18 opinion.
19       But my question is, you calculated that to
20 be 26,640 micrograms, correct?
21 A.     I'm sorry, I disagree with the premise.  I
22 can testify to what is in Dr. Madigan's report.  And
23 he says very clearly that the FDA ADI, he agrees, is
24 a safe level.  And yet, the figure of
25 1,962 micrograms, is lower than what Dr. Madigan

Page 121

1 says is a safe level.
2       So I can testify to the internal
3 contradiction in Dr. Madigan's own report.
4 Q.     Back to the question I was asking and then
5 we will get to that, but the potential worst case
6 scenario exposure to NDMA you calculated was
7 26,640 micrograms, correct?
8 A.     That is -- excuse me -- that is what I
9 calculated labeled, quote/unquote, worst case
10 scenario, which was a -- very explicitly a
11 hypothetical based on a series of assumptions that
12 would have to be met.
13       And as I stated in my report and in my
14 supplemental report, it's very unlikely that anyone
15 actually ever reached that level.
16 Q.     That number of 26,640 micrograms is
17 significantly higher than the LCE listed for the
18 Palli study, which is with the first study in the
19 chart, correct?
20 A.     Yes.
21 Q.     And it's significantly higher than the
22 DeStefani study, which is the second study in the
23 chart, correct?
24 A.     Yes, as I've already answered in response to
25 your questions, that number 26,000 -- 26,635 is

Confidential Information Subject to Protective Order

Page 122

1 higher than nearly all of the numbers in this
2 dietary epidemiology table. So as a matter of math,
3 is number A bigger than number B, yes, I agree with
4 that number is bigger. I do not believe it has
5 biological significance.
6 Q.    And with regard to Dr. Madigan's notation of
7 "SS?"; do you see that as a column heading?
8 A.    Yes, I see that column heading.
9 Q.    Do you know what that stands for?
10 A.    My recollection is that that stands for
11 "Statistically Significant," question mark, but I
12 would have to go back and look to be sure.
13 Q.    I will represent to you it stands for -- you
14 are correct -- statistical significance.
15    And Dr. Madigan noted several of these
16 studies in Table 1 that have statistically
17 significant results; isn't that true?
18 A.    One second. So of the -- by my count, at
19 least, of the 25 studies listed here half or list
20 than half are statistically significant.
21    So, yes, some of them are statistically
22 significant.
23 Q.    You reviewed those statistically significant
24 studies as part of your investigation into this
25 matter for purposes of the medical monitoring,

Page 123

1 correct?
2        MR. INSOGNA: Object to form.
3        THE WITNESS: As I have said --
4 BY MS. BOGDAN:
5 Q.    You are offering your medical monitoring
6 opinion, I'm sorry.
7    There's a --
8 A.    I'm sorry, we're cutting in and cutting out.
9    Could you just repeat your question one more
10 time?
11 Q.    I'll rephrase it. I think the audio got
12 dropped a little bit.
13    For purposes of rendering your medical
14 monitoring opinion, you reviewed those studies as
15 noted in Dr. Madigan's Table 1 that had
16 statistically significant increased risk findings,
17 correct?
18 A.    Yes, as I've said, I've looked at the vast
19 majority of these studies.
20 Q.    According to your medical monitoring report
21 page 8, section titled "Plaintiffs' claimed
22 dose/duration/API thresholds for medical monitoring
23 for cancers are orders of magnitude lower than
24 levels of NDMA, NDEA and other nitrosamines to which
25 humans beings are routinely exposed."

Page 124

1 Did I read that correctly?
2 A.    Yes, you did.
3 Q.    And is part of your opinion in that regard
4 for medical monitoring based on exogenous dietary
5 exposure to NDMA?
6 A.    Yes, that is one of the types of exposures
7 that I discuss in this section.
8 Q.    And in your medical monitoring report you
9 speak to that in paragraphs 30, 31 and 32?
10 A.    Yes.
11 Q.    You rely in footnote 10 and in the text of
12 your medical monitoring report itself on the Liteplo
13 WHO 2002 Nitrosodimethylamine "Concise International
14 Chemical Assessment Document," correct?
15 A.    That is the reference in paragraph 32, which
16 also cites -- I'll take a look -- paragraph 91 of my
17 original report.
18 Q.    And you specifically mentioned that study in
19 paragraph 32 of your medical monitoring report,
20 correct?
21 A.    I do and there are other -- so, yes, I do,
22 there are other estimates of dietary exposures
23 beyond Liteplo that are cited in the supplementary
24 report and were cited in my original report.
25 Q.    Footnote 4, which is Tricker; footnote 5,

Page 125

1 Biaudet; footnote 6, Dich; footnote 7, Fristachi;
2 footnote 3, Hrudey or Hrudey, if that's how it's
3 pronounced, correct?
4 A.    Yes, remind me which -- or could you tell me
5 which paragraph are you looking at? Is that the
6 supplemental report?
7 Q.    Yes, it's all in your supplemental report
8 and I'm referring -- I was just referring to the
9 references that you have specifically listed on your
10 supplemental report and I believe they're references
11 3 through 9.
12 A.    Okay, but I asked you -- I was asking you if
13 you could just point me to which paragraph of my
14 supplemental report.
15 Q.    Oh, I was reading --
16 A.    Is it paragraph 30?
17 A.    -- from 30 is where it starts.
18 A.    Yeah, okay.
19 Q.    And then it goes through like 33 in my
20 estimation and in paragraph 30 of your supplemental
21 report, is where you have the majority of the
22 footnotes 3 through 9 in the first sentence of
23 paragraph 30 in your report.
24 A.    Yes, thank you.
25 Q.    So referring to the -- you pronounce it

Confidential Information Subject to Protective Order

Page 126

1  Liteplo, Liteplo study?

2  A.    I pronounce it Liteplo, but I have no idea

3  how it's actually pronounced.

4        MS. BOGDAN:  Okay.  Liteplo study, if

5  we could pull that up, please, number 18.

6  Plaintiffs' number 18 in the document

7  repository.

8        TRIAL TECHNICIAN:  Got it.  Thank

9  you.

10       (Document marked for identification

11       as Chodosh Deposition Exhibit No. 11.)

12 BY MS. BOGDAN:

13 Q.    Doctor, just let me know when you have the

14 document.

15 A.    Yes, I do.

16 Q.    So you cite to this document, actually, as a

17 reference to your medical monitoring report.  I'd

18 like to direct your attention to page 4 of the

19 document.  Actually number 4, not Roman numeral IV.

20 Thank you.  All right.

21       And in the second column, third paragraph

22 down it reads, "Based upon laboratory studies in

23 which tumors have been induced in all species

24 examined at relatively low doses, NDMA is clearly

25 carcinogenic."

Page 127

1        Dr. Chodosh, do you agree with that

2  statement?

3        MR. INSOGNA:  Objection, Rosemarie,

4        asked and answered at his September

5        deposition, that exact question.

6        THE WITNESS:  So NDMA is clearly not

7  carcinogenic in human beings and "relatively

8  low dose" has no scientific meaning.

9        So I can't agree or disagree with

10 that statement as it is.

11 BY MS. BOGDAN:

12 Q.    And is it your opinion for medical

13 monitoring with regard to the last statement in that

14 same paragraph, "Qualitatively, the mechanism of

15 NDMA appears to be similar in humans and animals; as

16 a result, it is considered highly likely that NDMA

17 is carcinogenic to humans, potentially at relatively

18 low levels of exposure."

19       Is it still your opinion with regard to the

20 medical monitoring cause of action that you disagree

21 with that statement?

22       MR. INSOGNA:  Same objection.  In the

23       September deposition at pages 380 to 396, is

24       where you read statements from Liteplo and

25       asked him whether he agreed or disagreed

Page 128

1  with the statement.  I understand you are

2  adding the qualifier about medical monitor

3  and I'm not going to instruct him not to

4  answer.

5        MS. BOGDAN:  Okay.

6        THE WITNESS:  My opinions remain the

7  same.  Again, the phrase "relatively low

8  levels of exposure" has no meaning as

9  written since we measure levels of exposure.

10 And since the levels of exposure that are

11 alleged in this litigation are so many

12 orders of magnitude lower than the doses to

13 which Liteplo is referring, I -- no, I do

14 not agree with that, nor do I believe that

15 the author would agree with that if you

16 actually used the quantitative number.

17       "Relatively low levels of exposure,"

18 does not have meaning here.

19 BY MS. BOGDAN:

20 Q.    All right.  If we can move to page 12 of the

21 document, please, and in your medical monitoring

22 report at paragraph 32, you refer to this study for

23 "reasonable worst-case estimates" for daily intake

24 of NDMA from food, water and outdoor air?

25 A.    That's correct.

Page 129

1  Q.    And the -- that you have in your medical

2  monitoring report is from Section 6.2 and Table 2 of

3  the study, which is on page -- the next page, page

4  13; is that correct?

5  A.    That would appear to be correct looking at

6  the column labeled "20 to 59 years" and the row

7  labeled "Subtotals," that that amount is .005 to

8  .016 micrograms per kilogram body weight per day and

9  that corresponds to the numbers in paragraph 32 that

10 you are referring to.

11 Q.    Okay.

12       MS. BOGDAN:  If the tech could please

13       just move the exhibit to page 13.  Okay.

14 BY MS. BOGDAN:

15 Q.    Okay.  And now that we have the exhibit up

16 on the screen, you're referring to the values that

17 are under the "20 to 59 year" category?

18 A.    Yes, as I just stated.

19 Q.    Yeah, we just didn't -- the technology

20 wasn't keeping up with you, Dr. Chodosh.

21       So -- and you derived the value for your

22 report from the subtotal category that's "0.005

23 through 0.016," which is the fourth category down

24 under "20 to 59 years"?

25 A.    That's correct.

Page 130

1  Q.     Now, a whole section of this study and this
2  table are "reasonable worst-case estimates,"
3  correct?
4  A.     That is how it is labeled, yes.
5  Q.     Okay.  And in the footnotes under the table,
6  the authors expand on the conditions and where
7  they're getting these estimates from, correct?
8  A.     That appears to be correct.
9  Q.     And in the section of the report that
10 precedes this table and the section that references
11 this table that it's included in, if we could just
12 go back to page 12, in the second paragraph on the
13 right-hand side of the page, about two-thirds of the
14 way down that paragraph, it reads --
15       MS. BOGDAN:  Got to go a little
16       further than that.  All right.  There we go.
17       All right.
18 BY MS. BOGDAN:
19 Q.     "Based on the assumptions underlying the
20 reasonable worst-case estimates, most of the daily
21 intake could be attributed to consumption of food
22 contaminated with NDMA during processing,
23 preservation and/or preparation."
24       Did I read that correctly?
25 A.     Yes, you read it correctly.

Page 131

1  Q.     And then the authors go on to say, "It
2  should be noted, though, that the data on which the
3  estimates in food are based may not be
4  representative of the situation today, due to the
5  impact of subsequent introduction of changes in food
6  processing and controls to limit formation in food."
7        Did I read that correctly?
8  A.     You read that correctly.
9  Q.     So the authors are acknowledging that these
10 reasonable worst case estimates may not be
11 applicable to the situation today and the
12 publication of this study that was in 2002, correct?
13 A.     The publication of this study was in 2002
14 and I spent some amount of time in my original
15 report and, I believe, referenced to in my
16 supplemental report, dealing with precisely this
17 issue of the uncertainty around dietary estimates of
18 NDMA content, how they are never a measurement in
19 any of the studies that Dr. Madigan refers to, they
20 are never a measurement of actual NDMA.
21       We've discussed that those are the best
22 estimates that are out there and while there is some
23 reason to believe that levels may have declined over
24 time in food stuffs, there are exceedingly few
25 measurements to actually demonstrate that, so much

Page 132

1  so that as far as I can tell, most of the dietary
2  studies use very similar and older databases of
3  food.
4        And I dealt with this at length in my
5  original report, as well as reference to it in my
6  supplemental report.
7  Q.     Are you aware that the food industry, in
8  general, has tried to lower the amount of nitrites
9  in processed foods in the last 20 years?
10       MR. INSOGNA:  Object to form.
11       THE WITNESS:  What I am aware of are
12       discussions of efforts to reduce amounts in
13       some foods, but I have not seen any
14       substantial body of data indicating that
15       that has happened or that just other things
16       haven't been substituted.
17       So the -- my -- the issues -- the
18       shortcomings of dietary studies and what
19       Dr. Madigan relies upon for his LCE
20       estimates, I do not accept those dietary
21       studies as a reliable basis to demonstrate
22       or determine or guess at a threshold of NDMA
23       exposure that might be associated in a human
24       being with increased risk.
25       So they're all subject to the same

Page 133

1  uncertainties and the same lack of
2  measurement.
3  BY MS. BOGDAN:
4  Q.     But you're relying on dietary studies to
5  support your opinion with regard to the amount of
6  exogenous exposure to NDMA through a person's diet,
7  correct?
8        MR. INSOGNA:  Objection to form.
9        THE WITNESS:  So I dealt with this
10       very specifically in my original report,
11       paragraph 86, "Precise quantification of
12       dietary exposures to pre-formed NDMA and
13       other nitrosamines in food is extremely
14       difficult, in part, because concentrations
15       of NDMA and other nitrosamines in different
16       foods change over time, can differ by
17       geographic region and are affected by
18       numerous variables, including the method of
19       preparation or preservation.  In addition,
20       the types of foods consumed, as well as
21       serving sizes, vary widely between
22       individuals and data derived from
23       self-reporting and dietary questionnaires
24       are notoriously inaccurate.  It is also
25       reasonable to note, that dietary exposures

Page 134

1  relative to cancer development likely
2  occurred decades prior to cancer diagnosis."
3      And then here's the key that
4  references your question, paragraph 87,
5  "With these caveats in mind, reasonable
6  estimates of daily dietary intake of NDMA
7  can be made."
8      And then I go on to cite the numbers
9  that we are now talking about.
10     So I think I was exceedingly clear in
11 my report and as referenced from my
12 supplementary report of what the uncertainty
13 is around these numbers.  And as an example,
14 I have used these numbers to point out how
15 extraordinarily low these exposures to NDMA
16 are in relationship to doses of NDMA that
17 are capable of causing cancer in a mammal,
18 in even the most sensitive mammal and the
19 most sensitive tissue.
20 BY MS. BOGDAN:
21 Q.    Doctor, with all due respect, my question
22 was, will you rely on dietary studies to support
23 your opinion with regard to the amount of exogenous
24 NDMA people are exposed to through their diet?  That
25 was the question, do you cite those reports as

Page 135

1  references for your section on endogenous formation
2  of -- excuse me -- exogenous exposure to NDMA?
3      MR. INSOGNA:  Objection.
4      THE WITNESS:  I apologize, but I did
5  not follow the question.
6  BY MS. BOGDAN:
7  Q.    Okay.  My -- and I'll reask it.
8      So my question was simply, in your medical
9  monitoring report with regard to your section that
10 addresses peoples' exposure to NDMA through their
11 diet, you reference in that section dietary studies
12 to support your opinion as to the levels of exposure
13 through the diet, correct?
14 A.    I have cited to the studies that we've been
15 discussing and Liteplo, or as summarized in Liteplo,
16 to provide a rough estimate of what likely exposures
17 are from food, air and water and while detailing the
18 caveats surrounding how imprecise those estimates
19 are.
20 Q.    So going back to the Liteplo study and the
21 incorporation in your report in paragraph 32 of the
22 "Reasonable worst-case estimates" that you derive
23 from Table 2, which is on page 13.
24     Would you agree that worst case estimates of
25 daily intake of NDMA are not indicative of average?

Page 136

1  A.    Yeah, I don't have enough information to
2  answer your question.  The range given there is
3  8,950 to 28,600 micrograms of exposure to NDMA over
4  a 70-year lifetime for 70-kilogram person based on
5  food, air and water, which is roughly in the
6  ballpark of the numbers given in the previous
7  paragraph of dietary intake ranging from 4,190 to
8  19,700-microgram.
9  Q.    In paragraph 33 of your report, if we could
10 now, I guess, pull your report back up, which is
11 Exhibit 4.  I would like to take paragraph 32 and 33
12 if we could.
13     So in paragraph 32 you are citing to the
14 Liteplo study and the table that we've already
15 discussed to get the values ranging from .005 to
16 .016 micrograms per kilogram per day, correct?
17 A.    Yes, you've read those numbers correctly.
18 Q.    And that's from the table that's entitled
19 "Reasonable worst-case estimates," correct?
20 A.    I don't remember the title of the table.
21 Yes, that is in -- that is in the name of that
22 title.
23 Q.    And then in paragraph 32 you go on to say
24 that "This would correspond to an 8,950 to
25 28,600 micrograms of exposure to NDMA over a 70-year

Page 137

1  lifetime for a 70-kilogram person," correct?
2  A.    Yes, you've read that correctly.
3  Q.    Okay.  Then if we go to paragraph 33, right,
4  As above, in light of the estimates of lifetime
5  cumulative exposure to NDMA attributable to food,
6  air, water ranging from again 8,950 to
7  28,600 micrograms, correct?
8  A.    Yes, you've read that correctly.
9  Q.    But those lifetime cumulative exposures as
10 referenced in the Liteplo study are "reasonable
11 worst-case estimates," correct?
12 A.    That is the label that Liteplo, et al.,
13 gave.  But, of course, if you look at Dr. Madigan's
14 table, Table 1, you can see we're on the same order
15 of magnitude of what the levels are where his are
16 just dealing with food.  And if you look in the
17 previous paragraph, paragraph 31, I give a dietary
18 range from 4,190 to 19,700.
19     And I'm looking at Dr. Madigan's Table 1,
20 and what I'm seeing are values that go up to 31,000
21 and down into the 3,343.  So the ranges that
22 Dr. Madigan is citing in Table 1, in those dietary
23 studies are the same ranges that I am citing in my
24 report.
25 Q.    Yeah, Dr. Madigan -- Dr. Chodosh, I wasn't

Page 138

1 asking you about what Dr. Madigan cited.  If you
2 could just please answer the question that I asked.
3        What I asked was, that in 33 you're quoting
4 8,950 to 28,600 micrograms of -- as an estimate of
5 the lifetime cumulative exposure to NDMA and you're
6 getting those values from a study that has those
7 values, but they're stating they are "Reasonable
8 worst-case estimates" of the daily intake; isn't
9 that correct?
10        MR. INSOGNA:  Objection to form.
11        THE WITNESS:  I guess the -- the way
12     I'm trying to answer your question is that
13     what you keep referring to as "Reasonable
14     worst-case estimates," that's language that
15     those authors used.  And since that's a
16     completely relative term, I'm pointing out
17     that what those authors called "Reasonable
18     worst-case estimates," are in the same
19     vicinity both in what is in my report and
20     what is in Dr. Madigan's table of study
21     after study after study.
22        So what Liteplo et al., may have
23     referred to as "Reasonable worst-case
24     estimates," what I'm saying is, are not
25     terribly different since we're talking about

Page 139

1     apples and oranges here, diet versus food,
2     air and water.  You know, if you look right
3     at -- look right around -- we're talking
4     about maybe a factor of two.
5 BY MS. BOGDAN:
6 Q.     But you're taking values that are in the
7 study that the authors are calling "Reasonable
8 worst-case estimates," and then you, in paragraph
9 33, are adopting those as estimates of lifetime
10 cumulative exposure to NDMA; am I correct?
11 A.     No, I'm sorry.  I don't -- I disagree with
12 your premise.  I am not -- what is the word you
13 used, "adopting those"?  I'm not adopting those.
14 This is but one piece of evidence that I provided in
15 this report of various estimates of dietary intake,
16 of intake from food, air and water and how they
17 compare to estimates that Dr. Madigan is listing as
18 an LCE.
19        So if you're asking me was this one piece of
20 evidence that I considered in arriving at my
21 opinions, yes, it was one piece of evidence.
22 Q.     So -- but I would point out as you are
23 referencing the LCEs that are in Dr. Madigan's
24 report that many of those LCEs as referenced in his
25 report come with a statistically significant

Page 140

1 increased risk of cancer and that would be the
2 DeStefani study, the Pobel study, the LaVecchia
3 study, the Larsson study, the Keszie study, the
4 Zheng study, the DeStefani study, the Goodman study,
5 the Knekt study, the Loh-Rectal study and the Zhu
6 study.
7        MR. INSOGNA:  Objection to form.
8        THE WITNESS:  I'm sorry, was there a
9     question?  If there was a question, I
10     apologize, I missed the question.
11 BY MS. BOGDAN:
12 Q.     Doctor, you keep referencing that the levels
13 that you put in paragraph 33 of your medical
14 monitoring report are in the ballpark or similar to
15 what Dr. Madigan has as his lifetime cumulative
16 exposure estimates in Table 1, correct?
17 A.     No, no, incorrect.  Dr. Madigan's tables are
18 dietary studies.  My understanding is that that's
19 diet and not food, air and water, which is what you
20 are referring to in Liteplo.  The data that I
21 included about diet or as I've been trying to point
22 out to you in paragraph 30, that would be the apples
23 to apples comparison, I believe.
24        Paragraph 30, "As detailed in my report,
25 estimates of dietary intake of NDMA (excluding beer

Page 141

1 and tobacco) from seven studies yield an average
2 cumulative exposure of 4,190 micrograms over a
3 70-year lifetime for a 70-kilogram person."
4 Q.     Yes, I see that in your report and,
5 similarly, that 4,190-microgram over a 70-year
6 lifetime for a 70-kilogram person is in the range of
7 several of the studies that show statistically
8 significant increased risk of cancer that are
9 indicated on Madigan's chart?
10 A.     If your question is, is the number 4,190 in
11 a similar range as a number of the numbers in
12 Dr. Madigan's Table 1, my answer to that is, yes,
13 that's correct, mathematically.  It still has no
14 biological significance for determining a threshold
15 of risk.
16 Q.     Did you do a risk assessment with regard to
17 the exposure of NDMA that would cause cancer?
18        MR. INSOGNA:  Objection, that exact
19     question was asked and answered in the prior
20     deposition.
21 BY MS. BOGDAN:
22 Q.     Did you do a risk assessment --
23        MS. BOGDAN:  Let me -- well, my
24     questions are going to what the doctor did
25     between his deposition at the end of

Page 142

1  September and now as we're sitting here in
2  March.
3  BY MS. BOGDAN:
4  Q.    So when I ask that question with regard to
5  the medical monitoring claim, did you perform a risk
6  assessment?
7  A.    Between the last time that you and I met on
8  September 29th and September 30th, I have not done a
9  different analysis of really any of the numbers in
10 this and this is why this supplemental report states
11 on page 1, that my conclusions "follow in a
12 straightforward manner" from my original report.
13        MR. INSOGNA:  Rosemarie, if you are
14    done with the Liteplo study, I'm sure Peg
15    would appreciate a quick break.
16        MS. BOGDAN:  Or if you want to take
17    five minutes, that would be fine.
18        MR. INSOGNA:  I think five minutes
19    would be fine.
20        THE VIDEOGRAPHER:  Off the record at
21    2:24.
22        (Brief recess.)
23        THE VIDEOGRAPHER:  We're back on the
24    record at 2:32.
25 BY MS. BOGDAN:

Page 143

1  Q.    Okay.  Doctor, let's look at a couple of the
2  dietary studies that you cite in your medical
3  monitoring report as references.
4        MS. BOGDAN:  If we could pull up the
5    Tricker study, please?
6        TRIAL TECHNICIAN:  Counselor, I have
7    two Tricker studies.  Could you be a little
8    more descriptive?
9        MS. BOGDAN:  Sure.  The number 20,
10    "Mean Daily Intake Of Volatile
11    N-Nitrosamines From Foods And Beverages in
12    West Germany."
13        TRIAL TECHNICIAN:  Okay.  This will
14    be marked as Exhibit 12.
15        (Document marked for identification
16    as Chodosh Deposition Exhibit No. 12.)
17 BY MS. BOGDAN:
18 Q.    Okay, Doctor, let me know when you can see
19 that exhibit, please.
20 A.    Yes, I can see it.
21 Q.    Is this one of the studies that you --
22        THE COURT REPORTER:  Lost that last
23    word there, Counsel.
24        MS. BOGDAN:  Actually, I don't -- I
25    think we have the wrong Tricker study

Page 144

1  actually.  Let's take this one down.
2        Let's go to the Biaudet study, number
3  21.
4        TRIAL TECHNICIAN:  And do you want to
5    make this Exhibit 12 or just remove Exhibit
6    11 and make this 11?
7        MS. BOGDAN:  Your choice.
8        TRIAL TECHNICIAN:  This will be
9    Exhibit 12 then.
10        MS. BOGDAN:  Okay.
11        THE WITNESS:  I have the old one.
12    This is --
13        TRIAL TECHNICIAN:  Excuse me, this is
14    Exhibit 13, I misspoke.
15        MS. BOGDAN:  Okay.
16        (Document marked for identification
17    as Chodosh Deposition Exhibit No. 13.)
18 BY MS. BOGDAN:
19 Q.    Doctor, do you see the "Mean Daily Intake of
20 N-Nitrosodimethylamines From Foods and Beverages in
21 France" study?
22 A.    Yes, I do.
23 Q.    Okay.  And that's one of the studies that
24 you actually put as a reference cited in your
25 medical monitoring report, correct?

Page 145

1  A.    Yes.  And, I believe, it is cited in
2  Liteplo, as well, as many other papers on dietary
3  studies.
4  Q.    Directing your attention to the second
5  paragraph under "Introduction," which reads, "To
6  date, the carcinogenic properties of the
7  nitrosamines have been tested in 39 different animal
8  species:  These included rats, mice, guinea pigs,
9  hamsters, dogs, rabbits, pigs, birds, amphibians,
10 fish and also five species of primate.  None of
11 these species showed resistance to the action of
12 these compounds, and there is no reason why humans
13 should be an exception."
14        Do you agree with that statement in the
15 study?
16 A.    I disagree with that statement for the same
17 reason I believe your plaintiffs' experts would,
18 which is dose.  It is all about dose.  Human beings
19 are never exposed to the levels of NDMA that were
20 administered to these 39 different animal species.
21 Q.    Now, this study was done in France, correct,
22 in the late '80s, early '90s?
23 A.    That's correct, 1987 to 1992.
24 Q.    Are there different diets that populations
25 have in different countries?  Is there variability

Page 146

1 in diets in countries?
2 A.    I -- yes, there is variability across
3 countries.  There is variability within countries;
4 there's variability across time; there's variability
5 from person-to-person.  Those were the quotes that I
6 read to you before from my report.
7 Q.    Do you agree with me on that?
8 A.    I agree with you that what?
9 Q.    Diets vary country-to-country?
10 A.    Yes, I think that's fair to say.
11 Q.    And this study is also dealing with diets
12 that predated 1992, correct?
13 A.    That's correct.
14 Q.    And diets change over time as well, correct?
15 A.    Yes, they do.
16        MS. BOGDAN:  If we could pull up the
17 Dich study, it's number 22.  That's not it.
18 Actually, it's Dich, et al., "Dietary
19 Intakes of Nitrate, Nitrite and NDMA in the
20 Finnish."  The last name of the author is
21 D-I-C-H.  That's not the right study either.
22        Yeah, let's try another one.  Set
23 that aside.
24        How about Fristachi,
25 F-R-I-S-T-A-C-H-I, "Estimation of the total

Page 147

1 oral intake of NDMA."
2        Do you see that study yet, Doctor?
3        THE WITNESS:  No, I do not.
4        TRIAL TECHNICIAN:  If you click
5 refresh it will show Exhibit 14.
6        (Document marked for identification
7 as Chodosh Deposition Exhibit No. 14.)
8        THE WITNESS:  Yeah, what I have is
9 "M7R1 assessment and control of DNA reactive
10 mutagenic impurities in pharmaceuticals to
11 limit potential carcinogenic risk, which is
12 a guidance for industry."  I don't think
13 that's the one.
14        MS. BOGDAN:  That's not it.  That's
15 not it.  This is a study that you cited in
16 your medical monitoring report.  That's
17 supposed to be up on the screen.
18        THE WITNESS:  Well, I can see it on
19 the screen.  I don't have it on my -- and
20 this folder has not shown up yet.
21        TRIAL TECHNICIAN:  Doctor, click
22 refresh and there will be a new Exhibit 14
23 and that should be the same exhibit as you
24 see on the screen.
25        THE WITNESS:  No, I'm refreshing it

Page 148

1 and not getting it.
2        MR. INSOGNA:  Yeah, he still has the
3 M7.
4        MS. BOGDAN:  Okay.
5        TRIAL TECHNICIAN:  Okay.  One moment.
6 I'll diagnose it.
7        Try Exhibit 14 and if that doesn't
8 work I'll make it 14A.
9        THE WITNESS:  Yes, now that's worked.
10 BY MS. BOGDAN:
11 Q.    Do you recognize that study, Doctor, as one
12 of the studies that you referenced in your medical
13 monitoring report?
14 A.    Yes.
15 Q.    And this is a study regarding the NDMA
16 attributable to drinking water, correct?
17 A.    Correct.
18 Q.    And why did you cite this report?
19 A.    Because if you look at Table 1, for
20 instance, "Ingestion rates for selected foods and
21 drinking water," this is solely not about drinking
22 water.  So cereal, dairy, fish, meat, vegetables,
23 beer, formula, water, this -- yeah, or page 347,
24 "NDMA concentrations in foods," "NDMA concentrations
25 in powdered infant formula."

Page 149

1        So there are data in this paper not solely
2 due to drinking water.  Although, of course,
3 drinking water factors into total exposure and if
4 one looks at -- here we go, Table 4, "Average daily
5 dose micrograms per kilograms day and proportional
6 oral intake estimates for NDMA in foods and drinking
7 water calculated from a generated sample of 10,000."
8        So the -- I cited this because it deals with
9 concentrations -- estimated concentrations of NDMA
10 in foods and it's frequently cited by many studies
11 that look at dietary epidemiology of NDMA.
12        And I'm fairly confident it's also cited by
13 Liteplo in the WHO2002 paper that you were
14 discussing earlier.
15 Q.    Directing your attention to the third page
16 of the document, which I believe has page number
17 3343 in the upper left-hand corner, but it's very
18 difficult to read.
19 A.    Yes.
20 Q.    That's the right page.
21        All right.  So directing your attention to
22 the right-hand column, second paragraph down from
23 the top that begins, "Although the chemistry and
24 kinetics of in vivo NDMA formation are understood."
25        Do you see that?

Confidential Information Subject to Protective Order

Page 150

1  A.    Yes, I do.

2  Q.    Do you believe the chemistry and kinetics of

3  in vivo NDMA formation are understood?

4  A.    I believe it's reasonably well understood.

5  Q.    And what do you understand the chemistry and

6  kinetics of in vivo NDMA formation to be?

7         MR. INSOGNA:  Objection to form.

8         THE WITNESS:  I have no idea based on

9     that question what you're asking me.

10 BY MS. BOGDAN:

11 Q.    Would you describe the chemistry and

12 kinetics of in vivo NDMA formation?

13 A.    NDMA is formed endogenously as a consequence

14 of normal physiological metabolism in many cells at

15 very high levels compared to anything that we are

16 exposed to in the diet.  It is metabolized by a

17 cytochrome P450 enzymes CYP2E1, which is present in

18 a variety of tissues, but with principal metabolism

19 within the liver due to delivery through the portal

20 circulation from the stomach, if it's something that

21 was ingested, or created by metabolic processes

22 within cells.

23     When metabolized by CYP2E1 and other

24 enzymes, eventually, from some NDMA molecules a

25 methyldiazonium ion will be created and the

Page 151

1  half-life of that methyldiazonium ion is

2  relatively -- well, it's actually quite short.

3     There is a small fraction of the total pool

4  of NDMA that people are exposed to due to endogenous

5  processes that is excreted as NDMA in a detectable

6  form in the urine.  There are estimates that I have

7  referenced in my report, in both of my reports, of

8  endogenous production based on a variety of

9  parameters considered in modeling given the fact

10 that one can actually detect the DNA adducts that

11 form as a consequence of endogenous NDMA production.

12     I don't know what your -- is there more

13 information you would like?

14 Q.    So the -- you mentioned that NDMA has a --

15 not NDMA, the methyldiazonium ion has a short

16 half-life?

17 A.    That's correct.

18 Q.    Okay.  What -- when you say "short

19 half-life," what is the half-life or range for the

20 half-life?

21 A.    My understanding of the approximate

22 half-life of a methyldiazonium ion is probably less

23 than a second.

24 Q.    And how would you describe the rate at which

25 NDMA is metabolized in the body?

Page 152

1  A.    I missed a word.  You were a little bit

2  garbled.  Can you repeat the question, please?

3  Q.    How would you describe the rate in which

4  NDMA is metabolized in the body?

5  A.    The way you've -- I can't answer that

6  question the way you've asked it.  If you could

7  clarify what you're asking, that would -- that would

8  be helpful and I would be glad to try to answer.

9  Q.    Is NDMA rapidly metabolized?

10 A.    I don't know what you mean by "metabolism."

11 Q.    When I say "metabolism," I mean conversion

12 into its reactive form, which would be the

13 methyldiazonium ion?

14 A.    The rates of -- I can't give you -- off the

15 top of my head, I can't give you a rate constant or

16 the rate at which NDMA is metabolized through its

17 pathways to generate formaldehyde or

18 methyldiazonium.  I can't give you a precise

19 half-life for that off the top of my head sitting

20 here today.

21 Q.    Once NDMA is metabolized into its reactive

22 form, then the NDMA itself ceases to exist, correct?

23         MR. INSOGNA:  Objection to form.  The

24     exact question was asked and answered in the

25     prior deposition.

Page 153

1         THE WITNESS:  Yes, once a molecule of

2     NDMA is metabolized, that original molecule

3     of NDMA is no longer there.

4  BY MS. BOGDAN:

5  Q.    And where do CYP2E enzymes exist in the

6  body?

7  A.    When looking at cytochrome P450 enzymes,

8  which are, sort of, the body's way of dealing with

9  most chemical compounds, whether from within the

10 body or outside the body, the liver is the organ

11 that is principally responsible for metabolism of

12 most things, but the CYP2E1 enzyme itself is

13 expressed in a variety of tissues.

14     I can't speak to the precise levels in each

15 tissue that it might be expressed in.

16 Q.    Going back to that second paragraph in the

17 right-hand column, the next part of that sentence

18 is, "Inadequate data exists to accurately estimate

19 the quantities of NDMA formed endogenously in

20 humans."

21     Do you agree with that statement?

22 A.    I disagree with that statement.

23 Q.    What is the basis for you disagreeing with

24 that statement?

25         MR. INSOGNA:  Objection, that

Confidential Information Subject to Protective Order

Page 154

1    question was asked and answered at page 375
2    of the prior deposition.
3         You can answer it again.
4         THE WITNESS:  So if you look at my
5    original report, paragraph 95, paragraph 96,
6    paragraph 97, paragraph 98.  So I would be
7    glad to read those into the record, but that
8    would be my, I think, reasonably detailed
9    explication of what the basis for my
10   opinions are about endogenous NDMA and the
11   ability to measure it, since it references
12   publications that have done just that and
13   we've talked about them at some length.
14   BY MS. BOGDAN:
15   Q.    For purposes of the medical monitoring cause
16   of action, have you discovered any additional basis
17   for your opinion with regard to disagreeing with the
18   statement, "Inadequate data exists to accurately
19   estimate the quantities of NDMA formed endogenously
20   in humans"?
21   A.    In any other thing -- I have to go back and
22   look exactly what I referenced in these sections,
23   which I would be glad to do now, if you'd like.  But
24   otherwise, the basis would be within the same set of
25   materials considered that were provided with my

Page 155

1    original report.
2         I just can't tell you sitting here right now
3    without going back and cross-checking whether or not
4    I've referenced every one of those in the paragraphs
5    that I just referred you to regarding endogenous
6    NDMA formation.
7    Q.    My question is with regard to your opinion
8    that you're offering for medical monitoring, is
9    there anything in addition that you now have to
10   support your testimony that you disagree with that
11   statement aside from what you have in your
12   supplemental report, your -- or your original
13   report.
14        Is there something new?
15        MR. INSOGNA:  Object to form, asked
16   and answered.
17        You can answer.
18        THE WITNESS:  As I just said, all of
19   the data are on my materials considered list
20   or lists.  There's no new data since you
21   deposed me at the end of September that I
22   have -- that I am relying upon for this
23   opinion.
24        MS. BOGDAN:  If we could now pull up
25   the Hrudey study, H-R-U-D-E-Y.  H-R-U-D-E-Y,

Page 156

1    if my voice cut out.  See if I can find that
2    sheet here.  Number 19 in the document
3    repository.  There you go.
4         TRIAL TECHNICIAN:  This will be
5    available as Exhibit 15.
6         MS. BOGDAN:  Thank you.
7         (Document marked for identification
8    as Chodosh Deposition Exhibit No. 15.)
9         THE WITNESS:  Okay.  I can see it.
10   BY MS. BOGDAN:
11   Q.    Now, this is a study that you cite as one of
12   your references in your medical monitoring report,
13   correct?
14   A.    Yes, it is and was cited in my original
15   report as well.
16   Q.    And it's one of the bases of your opinion
17   with regard to medical monitoring?
18   A.    If that's a question, yes.  Is this one
19   paper part of my opinions on medical monitoring,
20   yes, this paper is a part of my opinion.
21   Q.    Now, in the what I would call "Abstract,"
22   which is the summary right on that first page, it
23   mentions that the "Analysis of ingested NDMA from
24   food and water based on Monte Carlo modeling."
25        Do you see that?

Page 157

1    A.    If you give me a moment, I would like just
2    to reread the abstract for myself since you are
3    starting in the middle.
4         Okay.
5    Q.    Okay.  Do you see where it references a
6    "Monte Carlo modeling" analysis?
7    A.    Yes, I do.
8    Q.    My question is, what is a Monte Carlo
9    modeling analysis?
10        MR. INSOGNA:  Objection, outside the
11   scope of his opinion.
12        THE WITNESS:  Monte Carlo analysis,
13   to my understanding, is essentially a
14   statistical approach taken to modeling data,
15   but I can't speak more specifically about
16   it.
17   BY MS. BOGDAN:
18   Q.    Do you know how it's actually performed?
19        MR. INSOGNA:  Same objection.
20   Dr. Chodosh is not here offering statistics
21   opinions.
22        THE COURT REPORTER:  I'm sorry, Nick.
23   I could not hear that objection.
24        MR. INSOGNA:  Sorry.  I said,
25   Dr. Chodosh is not offering statistics

Page 158

1    opinions.  He is not a statistician.
2    BY MS. BOGDAN:
3    Q.     Other than it being a statistical analysis
4    that's done, do you have any further, more specific
5    idea as to how such Monte Carlo analysis is
6    performed?
7    A.     My recollection is if given a large set of
8    data, items of data that a Monte Carlo analysis can
9    run multiple permutations of those data, dividing
10   them in -- sequentially in different ways to compare
11   what the result is for each iteration of that, but
12   that's as much as I can tell you sitting here today.
13   Q.     Do you know why the authors of this study
14   employed a Monte Carlo analysis?
15          MR. INSOGNA:  Object to the form,
16   calls for speculation.
17          THE WITNESS:  The authors use three
18   different types of data to estimate
19   endogenous NDMA formation in humans and they
20   presented what those estimates are for each
21   of those three different methods, each of
22   which were based on measurements.  One of
23   them -- one of them is based on NDMA levels
24   in blood samples, so that's just a chemical
25   measurement taken in combination with blood

Page 159

1    clearance rates.
2           And the other looks at
3    06-methylguanine levels in DNA from human
4    blood cells.  And then the third is based on
5    urinary excretion.  So for each of those
6    very different approaches to estimating
7    endogenous NDMA levels, there are
8    mathematical models that need to be employed
9    in order to estimate the thing you're trying
10   to estimate, which in this case is how many
11   micrograms of NDMA are produced in a human
12   being everyday.
13          So in the same way that for a patient
14   who has a PET scan looking at radioactive
15   glucose uptake, that -- those results are
16   all based on modeling, on compartmental
17   modeling, which is in some ways similar to
18   this.  You have to measure the rate at which
19   something is entering the system and the
20   rate at which something is leaving the
21   system in order to calculate production
22   rates, if that makes sense.
23   BY MS. BOGDAN:
24   Q.     And modeling was used in this study in order
25   to attempt to predict endogenous formation in

Page 160

1    humans, correct?
2    A.     No, I would not agree with that
3    characterization.
4    Q.     Why wouldn't you agree with that
5    characterization?
6    A.     They weren't predicting concentrations, they
7    were estimating concentrations based on three
8    different methods.  Those methods involve modeling,
9    as does the great majority of things that are
10   measured in human beings or in clinical practice.
11          So they weren't predicting it, they were
12   measuring it.
13   Q.     And is that because you can't actually
14   measure NDMA forming in a person, meaning able to
15   actually catch it as it forms and quantify it?
16          MR. INSOGNA:  Objection to form.
17          THE WITNESS:  There are most
18   certainly studies that measure levels of
19   NDMA.  It's absolutely possible to measure
20   that.  The issue is you're not talking about
21   steady state levels as in how much NDMA is
22   there per milliliter of blood.  The measure
23   that these authors are after is how much is
24   generated in a person per day, that's a
25   rate, not a level.  And so to get you a rate

Page 161

1    from a level, that that requires some
2    modeling.
3           And, I believe, when we talked about
4    this in my deposition in September, I may
5    have given the example of a bucket.  And you
6    have a bucket that has some level of water
7    in it and water leaves that bucket at some
8    rate and water enters that bucket at some
9    rate.  And if the level of water in that
10   bucket stays the same and you can measure
11   the amount that's leaving then you know the
12   amount that's being added to the bucket.
13          So that's just an example of what
14   would be referred to as "modeling," but
15   which, in fact, is done routinely in
16   clinical medicine and human physiology, as
17   well as in animals.
18   BY MS. BOGDAN:
19   Q.     And that's because NDMA is forming, NDMA can
20   be metabolized and then cease to exist, more can
21   form and it's a dynamic system, correct?
22   A.     Correct, in that all things in human beings
23   are dynamic.  So sodium level in your bloodstream is
24   actually dynamic.  You don't have the same number of
25   sodium molecules of -- pinging around in your body.

Confidential Information Subject to Protective Order

Page 162

1 There's stuff getting added and there's stuff that's
2 leaving, so it's the same for most physiological
3 things in a human being.
4 Q.    Directing you to page 2186, the first
5 sentence in the first full paragraph on the left
6 side of the page where it says "The clearance rate
7 of NDMA has not been study directly in humans."
8      Is that true to your knowledge?
9          MR. INSOGNA:  Object to form.
10         THE WITNESS:  Give me a moment to let
11 me read -- look at the context.
12         Number one, so this was in 2013, so
13 in -- I would need to go back and look at
14 some more recent studies.
15 BY MS. BOGDAN:
16 Q.    Right.
17 A.    Including those from -- there were certainly
18 more recent studies on NDMA, so I can't speak to
19 whether or not a clearance rate in human being has
20 been directly studied.
21     But what this paragraph describes is that
22 the clearance rate of systemically applied NDMA has
23 been studied across species and that NDMA clearance
24 scales across those species as a function of body
25 weight.  And as it says "Given a blood concentration

Page 163

1 and evidence that the concentration represents a
2 steady state, this clearance rate is a basis for
3 estimating a rate of endogenous formation of NDMA
4 using conventional pharmacokinetic models," which
5 just emphasizes that these -- the models that you're
6 referring to, this is standard fare for looking at
7 the flux of things in a human being, looking at the
8 flux of chemical compounds in a human being.
9 Q.    Are you familiar with those Gombar studies
10 that are in that paragraph you just read?
11 A.    I believe I have -- let's see what their
12 paper referenced.
13     Yeah, so in my materials considered list in
14 my original report, I list five different studies
15 from Gombar.  Two in 1990, one in 1988, one in 1987
16 and another in 1988.  I would be happy to read you
17 the titles of those.
18     So I have looked at those and these are
19 studies that are -- have been referred to in a
20 number of places throughout the literature, I'm
21 looking at NDMA levels in human beings.
22 Q.    So the answer is you are familiar with the
23 studies?
24 A.    I -- they're on my materials considered.  I
25 believe, I have looked at those studies.  I am not

Page 164

1 intimately familiar with those nor have I committed
2 them to memory.
3 Q.    Same page but down a little further, please.
4 Section --
5 A.    Can you tell me which page?  I was going to
6 the references to look at the Gombar, what the
7 reference was.
8     So can you tell me what page again?
9 Q.    2186.
10 A.    Okay.
11 Q.    And the section numbered 2.3.5?
12 A.    Yes.
13 Q.    Which reads "Estimating endogenous rates of
14 N-Nitrosamine formation from their daily excretion
15 in urine is less certain as the amount eliminated in
16 urine is a very small fraction of that which is
17 ingested or formed endogenously."
18     Do you agree with that statement?
19         MR. INSOGNA:  Object to form.
20         THE WITNESS:  I generally do agree
21 with that statement and as Hrudey, et al.,
22 state that their estimates -- this was the
23 third approach that they took to estimating
24 endogenous production levels, that the range
25 for this estimate based on urine

Page 165

1 concentrations that range was quite a bit
2 broader and for the first two methods, which
3 agreed quite well with each other.
4     And so I think they're referring to
5 that back in 2013, however, that being said,
6 for instance, current studies even in the
7 past year from FDA scientists, it's possible
8 to very accurately measure amounts of NDMA
9 in urine and the approximate concentrations
10 or what -- if you will, what fractions of
11 endogenous NDMA is excreted in the urine.
12     There are reasonably consistent
13 estimates of that and the technology for
14 measuring NDMA is far beyond now what it was
15 and what Hrudey is referring to back in
16 2013.
17 BY MS. BOGDAN:
18 Q.    So the Florian study of 2021?
19 A.    That is one of the studies.
20 Q.    Jumping to page 2187, second column on the
21 right, starts with "Five studies," but the sentence
22 that I'm interested in reads -- it's about a third
23 of the way down, "Therefore, it seems reasonable
24 that these data indicate significant variation among
25 populations in the nature of endogenous

Page 166

1  N-nitrosamine formation."
2      And then the next sentence is, "These
3  geographic differences may be explained by many
4  factors; genetic differences in the processes
5  involved in either nitrosamine formation or
6  metabolism, pre-existing disease processes,
7  differences in diet or lifestyle, even the presence
8  of trihalomethanes in drinking water because they
9  are inhibitors/inducers of CYP2E1."
10     Do you agree with those two sentences?
11  A.    I do not agree that those conclusions can be
12  reached by the data presented here and specifically
13  because they're discussing urinary excretion of NDMA
14  in humans, which the same authors had pointed out
15  that of the three methods that they used, that of
16  those three methods, urinary excretion using
17  technology available at those points in time was the
18  least precise.
19     So to me, the first two methods that they
20  use which are not based on urinary excretion are the
21  ones that enable an assessment of this issue. And
22  my reading of the literature, would be that much in
23  the metabolism of NDMA, whether across species, the
24  enzymes involved, the levels of 06-methylguanine
25  adducts or N7-methyl adducts are quite similar, even

Page 167

1  going across species.
2      So estimates -- well, I'll just leave it at
3  that. So I think -- you don't use -- from my -- in
4  my opinion, you don't use the least accurate
5  measurement approach to draw conclusion about
6  variation across a population.
7      So I disagree with that statement for those
8  reasons, among others.
9  Q.    Significant variation among populations due
10  to diet regarding the level of endogenous NDMA that
11  forms?
12     MR. INSOGNA:  Object to form.
13     THE WITNESS:  My point is that -- the
14     way I'm trying to address your question, my
15     point is, is that if you take an assay and
16     approach to measuring a level and that's
17     your least precise way to measure it and it
18     intrinsically, just based on the nature of
19     the assay, gives you a very broad range.
20        They're -- in my opinion, if you then
21     ask -- in different samples when I see
22     variation in the levels, I do not think it
23     is easily discernible whether that is due to
24     the assay itself or whether that is due to
25     some intrinsic aspect of the population.

Page 168

1      So I just don't think based on these
2  data that that would be a conclusion that I
3  would have reached or think you can reach
4  based on the data.
5  BY MS. BOGDAN:
6  Q.    Does a person's diet influence the amount of
7  endogenous formation of NDMA?
8  A.    Yes, it is influenced by diet.
9  Q.    Okay.  If we could go to page 2197, please,
10  the section entitled "Dietary Intake."  The study
11  actually estimate the daily dietary intake of NDMA
12  in the US population.
13     Do you see that in Section 5.2?
14  A.    Yes, I do.
15  Q.    And what do they estimate the daily dietary
16  intake of NDMA in the US population to be?
17  A.    Yeah.  So I believe that what is referenced
18  in this paragraph for -- so Hrudey, et al., are
19  providing their estimate of dietary intake and then
20  they are pointing out that the intake that others
21  have reported.
22     And I believe that several of those are
23  actually the references that I alluded to before.
24  Q.    In this study the authors are saying that
25  the estimate of daily dietary intake of NDMA in the

Page 169

1  US population ranges from 0.03 to 0.06 micrograms
2  per day, depending on age, with adults aged 20 to 49
3  years experiencing an exposure of 0.06 micrograms
4  per day or 0.08 micrograms per day, if beer is
5  included.
6      MR. INSOGNA:  Is that a question?
7  BY MS. BOGDAN:
8  Q.    There's estimate?
9  A.    Yes, I wasn't sure if that was -- are you
10  saying did you read that correctly, those numbers?
11  Q.    I'm saying the authors estimate, that's what
12  my question was, did the authors estimate that the
13  daily dietary intake of NDMA in the US population
14  ranges from 0.03 to 0.06 micrograms per day
15  depending on age with adults aged 20 to 49 years
16  experiencing exposure of 0.06 micrograms per day or
17  0.08 micrograms per day when beer is included?
18  A.    So you read that correctly and my
19  recollection is that their estimate of .03 to
20  .06 micrograms per day was one of the -- I believe,
21  the six or seven values that I included in the
22  average dietary intake, also including several of
23  the other studies that they listed in this same
24  paragraph, in order to arrive at an average estimate
25  across these different dietary studies in different

Confidential Information Subject to Protective Order

Page 170

1  countries, including the United States, in part to
2  reflect the fact that the majority of dietary
3  epidemiology studies of NDMA in cancer are not
4  performed in the United States, they are by and
5  large in other countries as is evident by looking at
6  Table 1 of Dr. Madigan's report.
7       So I viewed that as a representative then --
8  a set of dietary studies from similar countries as
9  they're being represented by the dietary
10 epidemiology studies.
11 Q.    But this study unlike the others where we
12 have estimates in the German population or the
13 Finnish population or the French population, they
14 date back into the '80s or the '90s.
15      This study which is a 2013 study actually
16 provides an estimate of the dietary intake of the US
17 population, correct?
18          MR. INSOGNA:  Object to form.
19          THE WITNESS:  I would have to spend
20      more time going back through this to be able
21      to answer your question accurately.
22 BY MS. BOGDAN:
23 Q.    Well, using the 0.06 micrograms per day,
24 which is the estimate that they provide for adults
25 aged 20 to 49 years, 0.06 micrograms a day would be

Page 171

1  60 nanograms per day, correct?
2  A.    I'm sorry, can you say that again?
3  Q.    0.06 micrograms per day is the same as
4  60 nanograms per day, correct?
5  A.    That's correct.  That's correct.
6  Q.    So if we take that 60 nanograms and we want
7  to know the total dietary intake over a 70-year
8  lifetime, we would take that 60, we would multiply
9  it by 365 days and then by 70 years, correct?
10 A.    Predicated on the assumption that those
11 estimates are reasonably accurate estimates.
12 Q.    And when we do that, we get a total dietary
13 intake over a 70-year lifetime of 1,533 micrograms?
14 A.    If what you're saying is that instead of
15 surveying an average of dietary levels that have
16 been cited in the literature representing the
17 dietary epidemiology study, that instead of doing
18 that you cherrypick one number, do you get a
19 different number than you do from the average, yes,
20 you do.
21 Q.    I'm asking if we -- if we calculate the
22 total dietary intake over a 70-year lifetime using
23 the values that are now highlighted on the screen in
24 Hrudey, we end up with a total dietary intake over a
25 70-year lifetime of 1,533 micrograms?

Page 172

1  A.    From this one figure in this one paper this
2  math sounds grossly correct.  That is not a number
3  that I would rely on.
4  Q.    And that 1,533 micrograms of total dietary
5  intake over a 70-year lifetime is lower than the
6  value that the FDA provides based on their
7  96 nanograms per day, which results in a lifetime
8  cumulative exposure of 2,454 micrograms, correct?
9  A.    If you're --
10          MR. INSOGNA:  Object to form.
11          THE WITNESS:  If you're asking me
12      does the FDA acceptable daily intake due to
13      pharmaceutical products of 96 nanograms per
14      day, you're asking me is that 70-year
15      cumulative total -- I believe, it's
16      2454 micrograms -- if you're asking me is
17      that different than this one number that
18      you're pointing to in this paper if you
19      calculate it out, yes, that is larger than
20      this one number.
21 BY MS. BOGDAN:
22 Q.    Do you in your medical monitoring report
23 include a narrative description of this estimate in
24 the Hrudey study that speaks to the US population?
25          MR. INSOGNA:  Object -- objection to

Page 173

1  form.
2          THE WITNESS:  Yeah, can you say that
3      again?
4  BY MS. BOGDAN:
5  Q.    In your medical monitoring report did you
6  include in the narrative a specific mention to these
7  values in the Hrudey study that estimate daily
8  dietary intake of NDMA in the US population?
9          MR. INSOGNA:  Same objection.
10          THE WITNESS:  Let me look.  Yes, I
11      do.
12 BY MS. BOGDAN:
13 Q.    And where do you mention this in your
14 medical monitoring report?
15 A.    Paragraph 30, "As detailed in my report,
16 estimated dietary intake of NDMA (excluding beer and
17 tobacco) from seven studies yield an average
18 cumulative exposure of," blah, blah, blah.  The
19 citation to the seven studies are references 3
20 through 9.  Reference 3 is exactly the paper that
21 we're talking about.
22 Q.    I asked if in the narrative of your report
23 you specifically mention the values that the Hrudey
24 study estimates as the daily dietary intake of US --
25 of NDMA in the US population, which ranges from

Page 174

1  30 nanograms to 60 nanograms per day, if you
2  actually mention the values in your narrative?
3          MR. INSOGNA:  Object to form.
4          THE WITNESS:  So of the seven studies
5  that I cite, I do not cite the specific
6  values for any of those individual seven
7  studies.  What I cited was the average level
8  from those seven studies, which I consider
9  to be a more reliable number to base an
10  opinion on, but they are included by
11  citation.
12          So if I were to include every number
13  from every paper that I read we would have a
14  10,000-page report.  So I'm confident that
15  any scientist or physician reading that
16  statement, can see what it is based on and
17  what studies it refers to and encompasses.
18  BY MS. BOGDAN:
19  Q.    This averaging that you did across these
20  seven studies, did you do the figuring on a separate
21  calculation sheet?
22  A.    My recollection is I did on an Excel
23  spreadsheet when I was writing my original report
24  back in -- back over the summer.
25  Q.    You have a similar spreadsheet like the one

Page 175

1  that was marked, I believe, as Exhibit 18 in the
2  previous deposition --
3  A.    There's nothing that is --
4  Q.    -- calculating --
5  A.    -- that -- I'm sorry, is labeled number
6  what?
7  Q.    You said you used the spreadsheet in the
8  previous deposition that was involving your
9  calculations of the different potential exposures
10  from the contaminated valsartan medication.
11          And I'm asking if you have a similar
12  spreadsheet for your averaging of those seven
13  studies to come up with the cumulative exposure
14  average of 4,190 micrograms over a 70-year lifetime,
15  as stated in paragraph 30 of your medical monitoring
16  report?
17  A.    Sitting here right now, I don't recall if I
18  had a spreadsheet back in the summer.  I believe
19  that I did.  Sitting here right now, I can't point
20  to it.  There's certainly the exhibit that you're
21  discussing -- yeah, this is labeled in a way that
22  hopefully anyone involved in this litigation can
23  look at it and have it be intuitively obvious.
24          That isn't the way that I would do a
25  spreadsheet or a calculation for myself for the

Page 176

1  purposes of arriving at the numbers, but as I
2  sitting here right now, I don't recall if there is a
3  spreadsheet or not.
4  Q.    If you locate such a spreadsheet I would ask
5  that you continue to maintain it.
6  A.    Certainly.
7  Q.    If you can go to page -- not page, to
8  paragraph 62 of your medical monitoring report.
9  A.    Yes.
10  Q.    The second sentence that you have in that
11  paragraph begins, Notwithstanding the above
12  conclusion that seven of the nine claimed cancer
13  associations with NDMA lack reliable scientific
14  support from dietary epidemiological studies.
15          Do you see that?
16  A.    Yes, I do.
17  Q.    What are the two cancers that you're not
18  referring to in that statement?
19  A.    What that statement is referring to is --
20  since this is specifically in reference to
21  Dr. Madigan's Table 1 and this is also predicated on
22  my very explicit statement in the supplemental
23  report paragraph 47, "Second, for the many reasons
24  described at length in my report, dietary
25  epidemiology studies are an unreliable basis for

Page 177

1  identifying an amount of NDMA or NDEA associated
2  with an increased risk of cancer in human beings."
3          And I raise that because the context of the
4  statement that you just had me read is, of course,
5  encompassed within that original one.  I don't
6  accept that any of these numbers, statistically
7  significant or not, are a reliable basis to identify
8  a threshold associated with increased risk.
9          And, in fact your own experts have
10  contradicted themselves and said there is no
11  threshold.  But the -- I believe that --
12          MS. BOGDAN:  You can take that down,
13  please.  Thank you.  I couldn't see you,
14  Dr. Chodosh.  I had...
15          THE WITNESS:  Consider yourself
16  lucky.
17  BY MS. BOGDAN:
18  Q.    Well, you know, I consider myself lucky that
19  you can hear me and I can hear you, so...
20  A.    Thank goodness for small favors.
21          So the way -- in the discussion in my
22  supplemental report, is I went through the tissue
23  cites that Dr. Madigan refers to.
24  Q.    I'm just asking you say "seven of the nine"?
25  A.    I know what you're asking me and I'm -- and

1 so the answer is right in my report. So we're
2 starting from nine, so paragraph 53 and following.
3 We're starting with nine cancers of which,
4 basically, seven are addressed by dietary
5 epidemiology studies, okay, three of those seven --
6 so there's only seven being addressed at all, but
7 three of those seven, bladder cancer, prostate
8 cancer, pancreas cancer, there's no statistically
9 significant increased risk associated with NDMA
10 dietary lifetime cumulative exposures was shown in
11 any study that Dr. Madigan lists. So those three
12 are off the board. So let's take them away.
13     "In addition, for gastric cancer and
14 esophageal cancer, the majority of studies listed by
15 Dr. Madigan did not show a statistically significant
16 increased risk of cancer associated with dietary
17 lifetime cumulative exposure to NDMA (gastric
18 cancer: Five of nine studies not statistically
19 significant; esophageal cancer: Three of four
20 studies not statistically significant.)"
21     And mind you, these are the studies he's
22 referring to, to establish his threshold. There's
23 also -- there's no statistically significant
24 increased risk for liver cancer, even though that's
25 supposed to be the most sensitive cite.

1     So even when considering only two of the
2 seven cancers that Dr. Madigan evaluated in Table 1,
3 for which at least half of the studies showed a
4 statistically significant association with dietary
5 lifetime cumulative exposure to NDMA, these values
6 ranged from 6,114 to 16,363 micrograms for lung
7 cancer, so an average of 11,238 micrograms, and
8 3,343 to 27,628 micrograms for colon -- colorectal
9 cancer.
10 Q.     So the answer to my --
11 A.     So of the table that you present --
12 Q.     Sorry.
13 A.     -- of the table that he presents for dietary
14 epidemiology studies the only two for which there's
15 a majority of studies that are statistically
16 significant are lung and colorectal.
17     And as I point out in my report, if I'm
18 looking at 25 studies selected by plaintiffs' expert
19 to make the argument that there is a reliable
20 threshold for lifetime cumulative exposure that
21 could be identified and I see that right from the
22 get-go half of those studies aren't even
23 statistically significant and that there's multiple
24 cancers that either aren't even addressed by dietary
25 epidemiology as in there are no significant findings

1 and several of which -- that are presented with --
2 where there are no significant findings.
3     So I think this Table 1 underscores the
4 points made in my supplemental report, I believe.
5 Q.     So the two cancers that are not in the seven
6 of the nine claimed are lung and colorectal; is that
7 the answer?
8 A.     Of the dietary studies, yes.
9 Q.     Okay. Thank you.
10     Did you consider the Song meta-analysis of
11 the gastric studies?
12 A.     I have looked at the Song meta-analysis.
13 Q.     What is the purpose of the meta-analysis?
14 A.     The purpose of the meta-analysis is to
15 attempt to take multiple published studies and to
16 attempt to combine them in some way that increases
17 power without sacrificing validity by combining
18 things that were actually done by different people
19 at different times in different populations using
20 different methods.
21 Q.     Increasing the power of a study, in general,
22 is that a positive thing?
23 A.     I apologize, but I feel that you didn't --
24 maybe I didn't make myself clear.
25     So in aggregate, if you have increased power

1 and everything else stays the same -- if I could
2 have one set of investigators have a -- of
3 essentially a similar population have a much larger
4 number of cases, that might be associated with
5 increased power.
6     But just referring to a meta-analysis as --
7 well, all it's really doing is increasing power
8 because you're aggregating studies, what my prior
9 answer was trying to get across was that would be a
10 mischaracterization of what a meta-analysis is.
11     So by increasing the number of cases, you
12 are decreasing the accuracy because you are
13 combining things that are dissimilar.
14 Q.     If you have -- are combining things that are
15 similar, right, is increasing the power usually a
16 good thing, if there is a homogeneous blending of
17 studies?
18 A.     So my accurate answer to you is there is no
19 such thing as either similar or -- you know, every
20 epidemiological study has strengths and limitations.
21 They're performed by different people in different
22 populations using different methods. And I think
23 many people would say that meta-analyses are fraught
24 with problems, for exactly that reason that when you
25 start combining things that were done in very

Confidential Information Subject to Protective Order

Page 182

1 different ways and very different people, very hard
2 to know whether the answer that you get is, you
3 know, accurate, if you will.
4        And, in fact, I was -- well, I'll leave it
5 at that.
6 Q.    So in your opinion you don't favor
7 meta-analysis, is that what I'm gleaning from you?
8 A.    No, that's not what you're hearing from me
9 and I apologize for not being clear.
10        It's going to depend on the study and the
11 studies that are aggregated and the methods by which
12 it is done, so I can't answer that in the abstract.
13 I've tried to outline for you what some of the
14 potential problems are that one could run into, but
15 I can't answer it in the abstract.
16 Q.    Okay.  In speaking of the potential
17 problems, were you mentioning those in reference to
18 the Song meta-analysis or just mentioning them in
19 general?
20 A.    You -- I lost like the first five or six
21 words of what you said.
22 Q.    I said when you were referencing those
23 limitations of a meta-analysis study, were you
24 speaking in terms of the Song meta-analysis study or
25 were you just speaking to meta-analysis studies in

Page 183

1 general?
2 A.    I believe that those -- those would be some
3 of the general potential limitations of
4 meta-analyses.  And, again, you would have to look
5 at the individual, the particular meta-analysis and
6 the studies that it was attempting to aggregate
7 where one of those -- you know, yet another of those
8 limitations is which studies do authors decide to
9 include or exclude.
10        And in that respect, if I recall, Dr.
11 Madigan, I believe, takes at least one
12 meta-analysis, possibly two, where he indicates that
13 while the authors -- he noticed that they didn't
14 include a study that he might have thought was
15 interesting and that are -- here.
16        So paragraph 10 of Dr. Madigan's report --
17 Q.    I'm sorry, I'm not -- I'm sorry, Doctor.
18 I'm not asking what Dr. Madigan did.  My --
19 A.    No, I'm answering your question.  And if I
20 could finish my answer, I would be grateful.
21 Q.    Okay, I'll let -- this is --
22 A.    This is literally what you are talking
23 about.  Paragraph 9 is the 2015 meta-analysis by
24 Song, et al. that's what we're talking about.
25 Paragraph 9, it included 11 studies concerning NDMA

Page 184

1 gastric cancer and yielded a relative risk, which
2 they said -- they said, "There was, however,
3 considerable between-study heterogeneity LCE's
4 across the component studies ranged from
5 1,412 micrograms to 6,607 micrograms."  And then the
6 very next sentence is Dr. Madigan saying "I note
7 that Loh, et al., reported a stomach cancer hazard
8 ratio of 1.13 adding Loh to the Song meta-analysis
9 yields a estimate of 1.32."
10        And so when we talk about the problems with
11 meta-analyses, which is what I'm answering, one of
12 the problems is what studies people choose to
13 include.  And the fact that Dr. Madigan decided that
14 he would add one on his own to a published
15 meta-analysis is quite striking to me.
16 Q.    That's your analysis of what Dr. Madigan
17 did, which is not what I was asking.
18        What I was asking is if you, one, when I
19 asked the question to begin with, I wasn't sure if
20 you were answering just in general or with regard to
21 your analysis of Song.
22        But what I'm asking is did you, Dr. Chodosh,
23 do your own independent analysis of the Song
24 meta-analysis?
25 A.    I did not do an -- and by an "independent

Page 185

1 analysis," are you asking me did I try to obtain the
2 raw data from Song et al., and perform a
3 statistic -- a statistical analysis of my own?
4 Q.    Or did you look for additional dietary
5 studies as Dr. Madigan did that you would feel would
6 be properly included in that meta-analysis or did
7 you yourself look at the Song meta-analysis and come
8 up with your own critique of its strengths and
9 limitations?
10        MR. INSOGNA:  Objection, compound.
11        THE WITNESS:  So the meta-analysis by
12     Song is subject to the same types of
13     limitations that I outlined for you as to being
14     common limitations of meta-analyses.
15     Fundamentally, given the statement in my
16     report that dietary epidemiology studies
17     fundamentally are not a reliable basis for
18     establishing an LCE associated with human
19     cancer risk.
20        You can aggregate as many as you like
21     and you're still left with the collection of
22     studies that are an unreliable basis to
23     establish a threshold for risk.
24        MR. INSOGNA:  Rosemarie, --
25

Confidential Information – Subject to Protective Order

Page 186

BY MS. BOGDAN:

1  Q.    And that would be your opinion, correct?

2       THE WITNESS: I'm sorry, Peg.

3       THE COURT REPORTER: Can you repeat

4  that question, please, Rosemarie?

5  BY MS. BOGDAN:

6  Q.    I said, and that would be your opinion,

7  correct?

8  A.    Yes, it's a paragraph in a document labeled

9  "Opinions of Lewis A. Chodosh, M.D., Ph.D," so yes,

10 I think that's what we're here to talk about is my

11 opinions.

12      MR. INSOGNA: Rosemarie, when you are

13 at a transition point to take a break, a

14 short break.

15      MS. BOGDAN: Sure. Now would be

16 fine. I had just finished with the Song

17 meta-analysis unless you would like to hear

18 about that some more.

19      MR. INSOGNA: You are finished with

20 Song?

21      MS. BOGDAN: I am finished with Song.

22      MR. INSOGNA: Yeah, okay. That's

23 what I thought.

24      MS. BOGDAN: I'm just saying, we

Page 187

1  could all breakout in song, maybe, you know,

2  that would take -- but if you would like to

3  take a break right now, then that's fine.

4       MR. INSOGNA: Thank you. I would

5  like to.

6       THE WITNESS: I would like to hear

7  what the song is.

8       THE VIDEOGRAPHER: Off the record at

9  3:54.

10      (Brief recess.)

11      THE VIDEOGRAPHER: We are back on the

12 record at 4:06 p.m.

13 BY MS. BOGDAN:

14 Q.    Dr. Chodosh, are you aware that the FDA

15 published an NDMA estimated risk with this

16 laboratory analysis of valsartan products?

17      MR. INSOGNA: Object to form.

18      THE WITNESS: You want to point me

19 specifically what your reference is.

20      MS. BOGDAN: Could we pull up the

21 laboratory analysis of valsartan products

22 that was marked as Exhibit 6 today.

23 BY MS. BOGDAN:

24 Q.    And it's, Dr. Chodosh, right on the first

25 page of this where it says "NDMA estimated risk"?

Page 188

1  A.    Okay. Hang on. That's which Exhibit?

2  Q.    It was marked, I believe, as Exhibit 6.

3  A.    Okay.

4  Q.    My question is: Were you aware that the FDA

5  published an NDMA estimated risk associated with the

6  recalled valsartan?

7  A.    So I am aware and as I recall, you and I

8  talked about it to some extent at my last

9  deposition.

10 Q.    Okay. My question is for this medical

11 monitoring cause of action, did you compare the FDA

12 estimated NDMA additional risk of cancer with the

13 risks associated with the plaintiffs' proposed

14 medical monitoring plan?

15 A.    Can you say that again?

16 Q.    Sure.

17      For this medical monitoring cause of action,

18 did you do any type of comparison of the FDA's

19 estimated NDMA risk, cancer risk, to any cancer

20 risks associated with the plaintiffs' proposed

21 medical monitoring plan?

22 A.    Well, so those two things you are

23 referencing, the FDA estimate that you are referring

24 to says "there may be one additional case of

25 cancer," so it doesn't say there will be or there

Page 189

1  would be or we expect there would be. It says

2  "there may be," as in it's a possibility, which is

3  based on linear low-dose extrapolation.

4       And for the plaintiffs, boy, I don't --

5  maybe you could point me to some numbers, because I

6  read your complaint and it's -- it simply lists a

7  certain number of months of duration of exposure to

8  APIs from different manufacturers.

9       So that was part of what made this quite

10 challenging is that I don't see you having committed

11 to any numbers or risks.

12 Q.    I was referring to the risks associated with

13 the actual medical treatment that is proposed in the

14 medical monitoring plan, the things that we went

15 through and -- earlier which were the specialized

16 testing, the lab tests, the blood smears, the --

17 those things.

18      Did you do any type of risk analysis with

19 regard to the cancer risk versus the risks to the

20 patient of undergoing the monitoring procedures that

21 the plaintiffs have put forth in the plan?

22      MR. INSOGNA: Objection, vague.

23      THE WITNESS: So as a physician in

24 reading an estimated -- the FDA estimated

25 risk of one in 8,000 people might get

Page 190

1  cancer.  From first principles as a
2  physician, I would say there's no way that
3  you could justify medical monitoring given
4  that almost 50% of people ultimately develop
5  cancer.
6         So a risk of trying to find the one
7  person in 8,000, if -- that's even assuming
8  it is that, that there isn't a screening
9  program, as a physician, that I understand
10 where you say, Ah, the risk is one in 8,000
11 of cancer, should we go do this procedure?
12 That's me speaking as a physician.
13        As part of my supplemental report,
14 that was not a focus of my opinions, other
15 than I believe my report points out that
16 risks on the order of, you know, one in
17 10,000, one in 100,000, you know, one in
18 100,000 being the 96 nanogram per day, that
19 even if one wore to accept that those are
20 actual risks, which I don't believe they
21 are, even if one were to accept that those
22 are actual risks, they are minuscule
23 compared to the risks we all have of getting
24 cancer as one gets older.  That's extremely
25 rare, compared to the disease that's

Page 191

1  occurring throughout the population, namely
2  cancer.
3  BY MS. BOGDAN:
4  Q.    Do you have an opinion with regard to one
5  out of how many number of people risk is necessary
6  to warrant medical monitoring?
7         MR. INSOGNA:  Objection to form.
8         THE WITNESS:  So I'm not here to
9  opine on at what point -- at what point does
10 risk justify or outweigh the potential harm
11 from specific screening procedures.  My
12 opinion as I've laid out is that none of the
13 plaintiffs at the maximum possible
14 hypothetical exposures to NDMA or NDEA would
15 be at an increased risk for cancer.
16        And, therefore, if you have a
17 population that has the same risk, namely
18 people who took these valsartan products
19 have the same risk of cancer as everybody
20 else in the country, that does not warrant
21 medical monitoring.
22        You know, that's my opinion.  They're
23 not at increased risk so why would you take
24 on potential harm from the medical
25 monitoring tests that are proposed.

Page 192

1  BY MS. BOGDAN:
2  Q.    You refer to the language that's highlighted
3  here for NDMA estimated risk, the FDA statement
4  reads, "FDA estimated that if 8,000 people took the
5  highest valsartan dose (320 milligrams) containing
6  NDMA from the recalled batches daily for four years,
7  there may be one additional case of cancer over the
8  lifetimes of the 8,000 people."
9         So they're talking about additional cancer
10 above and beyond the background rate?
11 A.    I'm sorry, was that a question?  I
12 couldn't -- you cut out for a few words.  Was that a
13 question?
14 Q.    Right, so I'm just -- do you see in the
15 language from the FDA how they -- how they speak
16 specifically about not there's one case of cancer in
17 8,000 people, but they're referring to there may be
18 one additional case of cancer?
19 A.    Oh, yes, I understand that, that's how I was
20 answering that question, that out of those 8,000
21 people over the course of their lifetime nearly
22 4,000 of those people will develop cancer.  And what
23 this FDA statement says is instead of 4,000 people
24 getting cancer in their lifetime it might be 4,001
25 with the emphasis on "may be," because the FDA risk

Page 193

1  estimate is based on linear low-dose extrapolation
2  as you and I have talked about, and as is written
3  extensively in my report.
4         So that assumes that there is no threshold
5  and that one molecule of NDMA will increase risk,
6  which I think as we've talked about is a ludicrous
7  proposition.
8  Q.    Isn't it also true that the FDA is basing
9  that risk assessment on the highest dose of
10 valsartan based upon their testing is
11 20.19 micrograms of NDMA in a 320 tablet?
12        MR. INSOGNA:  Objection to form.
13        THE WITNESS:  So that's how that
14 sentence reads and given the context in this
15 document laboratory analysis of valsartan
16 products, that's what I assume.  ███████████
17 ██  █████████████████████████████████████████
18 ██  ████████████████████████████████████████████
19 ██  ████████████████████████████████████████████████
20 ██  ███████████████████████████████████████████████
21 ██  ██████████████████████████████████████████.
22        So I think it's the same number
23 either way and almost certainly the
24 exposures were substantially less than that
25 just given the realities of the assumptions

Confidential Information Subject to Protective Order

Page 194

1 that are made.
2      But, of course, the most important
3 assumption in this sentence that you have
4 highlighted is the "may be" and the
5 recognition that this is based on the
6 assumption that there is no threshold
7 because you're dealing with doses that
8 were -- in effect could not be measured in
9 human beings or in animals.
10 BY MS. BOGDAN:
11 Q.    Is it your understanding when the NDMA --
12 when FDA did the NDMA estimated risk that it used an
13 average amount of contamination in the tablets or
14 when it does an estimated risk calculation, like the
15 one you see highlighted on the screen, it uses the
16 highest amount found in the tablets?
17      MR. INSOGNA:  Objection to form.
18      THE WITNESS:  It -- as it stated
19 there, it used the highest amount and your
20 question was -- to me was, do I recognize
21 that that was the highest amount that the
22 FDA measured with the implication being that
23 there are other measurements that might be
24 higher.
25      And my point was that the average of

Page 195

1 the other measurements that you showed me,
2 as I'm sitting here trying to recall that
3 table, was just about that same level as
4 what the FDA measured and based this risk
5 estimate on.
6 BY MS. BOGDAN:
7 Q.    Yes. ██████████████████████████████
██████████████████████████████
██████████████████████████
██████████████████████
11      MR. INSOGNA:  Objection to form.
12      THE WITNESS:  So the difference
13 between -- that you're not within, you know,
14 several thousandfold of the dose that would
15 be needed to cause cancer or the doses of
16 endogenous exposure that we all have,
17 whether that's 3,000 or 1,000 doesn't
18 matter, you're still far below any threshold
19 where you would expect to see any increase
20 in risk.
21      And I think a calculation, if talking
22 about is it that 4,000 people will get
23 cancer or will 4,001 people get cancer
24 emphasizes that this is, even with their --
25 the FDA's conservative assumptions, which

Page 196

1 are intended for regulatory purposes for
2 precautionary reasons, that even by that
3 measure it is a very small risk.
4      But I do not -- as I have articulated
5 in my report, I do not believe that there is
6 any increased risk at all nor is the FDA
7 stating that there is.
8 BY MS. BOGDAN:
9 Q.    Let's move on to some of the studies that
10 you cited in your medical monitoring report
11 regarding endogenous formation of NDMA.
12      MS. BOGDAN:  Can we pull up, I almost
13 hate to say, the Tricker study, "Urinary
14 excretion of nitrite, nitrate."
15      TRIAL TECHNICIAN:  Counsel, do you
16 have a number assigned to that one?
17      MS. BOGDAN:  I'm looking at my cheat
18 sheet with regard to the numbers.  Just a
19 second.  Let me see if I can locate it.
20 It's called "Urinary excretion of nitrite,
21 nitrate and N-nitroso compounds."
22      TRIAL TECHNICIAN:  I have two Tricker
23 studies and neither one of those contains
24 those words in the title.
25      MS. BOGDAN:  Okay.  Let me run to

Page 197

1 another study.  How about Tricker
2 Spiegelhalder urinary excretion, you
3 don't -- that's the one you can't find,
4 right?
5      How about Tricker, "N-nitroso
6 compounds and man"?
7      TRIAL TECHNICIAN:  Yes, coming up.
8      MS. BOGDAN:  Thank you.
9 BY MS. BOGDAN:
10 Q.    Dr. Chodosh, this is one of the references
11 that you cite in your medical monitoring report?
12 A.    I don't have it yet.
13 Q.    Okay.  Sorry.
14      (Document marked for identification
15 as Chodosh Deposition Exhibit No. 16.)
16      TRIAL TECHNICIAN:  You should now see
17 Exhibit 16 if you hit refresh.
18      THE WITNESS:  Okay.  Thank you.
19 Okay.  I see the paper.
20 BY MS. BOGDAN:
21 Q.    That paper is speaking of endogenous
22 formation of N-nitrosamines, in general, correct?
23 A.    Well, I see both exogenous -- it's dealing
24 with exogenous and endogenous.
25 Q.    But it's dealing with N-nitrosamines as a

Page 198

1  group, correct, not NDMA?
2  A.    That's correct.  Well, I mean, they're
3  certainly talking about NDMA.  They're also talking
4  more broadly about N-nitrosamines.
5        MS. BOGDAN:  If we could pull up the
6  Jakszyn study.
7        THE WITNESS:  Are we -- I'm sorry,
8  are we done with this study?
9        MS. BOGDAN:  We're done.
10       THE WITNESS:  Study, yeah.
11       TRIAL TECHNICIAN:  I'm sorry, was
12  that Jaiswal, J-A-I-S-W-A-L?
13       MS. BOGDAN:  No.  It was Jakszyn,
14  J-A-K-S-Z-Y-N.
15       TRIAL TECHNICIAN:  Sorry, I don't
16  have anything with Jakszyn.
17  Is there more to the title?
18       MS. BOGDAN:  It's J-A-K-S-Z-Y-N, you
19  don't have that?
20       TRIAL TECHNICIAN:  No, I'm sorry.
21       MS. BOGDAN:  Okay.
22  How about Holtrop, H-O-L-T-R-O-P.
23  It's called "Diet composition is associated
24  with endogenous formation."
25       TRIAL TECHNICIAN:  No, I'm sorry.

Page 199

1        MS. BOGDAN:  Okay.  Why don't we
2  just -- I think there are some documents
3  that might have gotten stuck in hyperspace
4  here, so I've just run into a series of them
5  now that aren't in the portal.  So let's
6  just take a three-minute break and I can see
7  if something didn't quite upload, okay.
8        THE VIDEOGRAPHER:  Off the record at
9  4:26.
10       (Brief recess.)
11       THE VIDEOGRAPHER:  We are back on the
12  record at 4:32 p.m.
13       MS. BOGDAN:  Which study did you say,
14  Mike, that you had identified that you can
15  put up?
16       TRIAL TECHNICIAN:  I will mark
17  Tricker as Exhibit 17.
18       (Document marked for identification
19  as Chodosh Deposition Exhibit No. 17.)
20       MS. BOGDAN:  Which Tricker?  We'll
21  see.
22  BY MS. BOGDAN:
23  Q.    Is this one of the studies, Doctor, that you
24  cited in your medical monitoring report?
25  A.    Hang on, yeah.

Page 200

1  Q.    I believe it is.  I think it's the --
2  A.    If you can -- I mean, the paper is familiar.
3  I can't remember where specifically it's referenced.
4        Can you point me to where it's referenced?
5  Q.    Yes, I believe it's your reference number
6  12.
7  A.    And is there a paragraph with my
8  supplemental report?  And I'm happy to look for it,
9  but if you know what the paragraph is...
10 Q.    I believe it's paragraph 34, where you
11 string cite and it's one of the studies that you
12 have after the sentence that reads, "Indeed, NDMA
13 and other nitrosamines are formed endogenously
14 within the body as a consequence of normal human
15 physiology."  And you cite to reference three and
16 then 11 through 16 and this reference is number 12.
17       And I was just going to ask you a general
18 question as to why you referenced this particular
19 study, which is focused on bladder cancer patients
20 that have -- I don't know how you pronounce this
21 condition, schistosomiasis.
22 A.    Schistosomiasis.
23 Q.    Schistosomiasis?
24 A.    Correct.
25 Q.    Did I do it better the second time.

Page 201

1  A.    Perfect.
2  Q.    What is schistosomiasis?
3  A.    Schistosomiasis is a parasitic disease and
4  it's very common in certain parts of the world
5  caused by trematodes.
6  Q.    Is that something that's common here in the
7  US?  I've never heard of it.
8  A.    Schistosomiasis in the United States would
9  typically -- would be one of the things that medical
10 students read about and get tested about and are
11 unlikely to see unless they were in a tertiary
12 academic medical center.  Endemic in other parts of
13 the world, not in the United States.
14 Q.    Sounds like the medical equivalent of the
15 rule against perpetuities.
16 A.    Okay. I have more than that so...
17 Q.    Does the cite to this just show that there
18 could be physiological conditions that happen in the
19 human body that influence endogenous formation of
20 nitrosamines?
21 A.    I think what it's saying is that since
22 there's a control group in this paper that people
23 make -- you know, there are endogenous amounts of
24 NDMA that get excreted in the urine.
25 Q.    And you are referring to the control group,

Page 202

1 not the group that has this infectious condition?
2 A.     Well, for -- for instance, if one looks at
3 Table 2, the heading "Concentrations microgram per
4 day of volatile nitrosamines in urines," there are
5 German controls that has NDMA levels of .2.  There
6 are Egyptian controls that have an average level
7 that's like a .27 and then you have patients who
8 have schistosomiasis.
9 Q.     Which have higher levels, correct?
10 A.     Yes, associated with that infection, that's
11 correct.
12         MS. BOGDAN:  Well, now maybe we will
13     have success in pulling up the Jakszyn
14     paper, J-A-K-S-Z-Y-N.
15         TRIAL TECHNICIAN:  This will be
16     Exhibit 18.  It's available on the link and
17     I will have it on your screen momentarily.
18         MS. BOGDAN:  And this is cited in
19     your medical monitoring report as reference
20     Number 13.
21         (Document marked for identification
22     as Chodosh Deposition Exhibit No. 18.)
23 BY MS. BOGDAN:
24 Q.     Which, again, is in that same paragraph
25 number 34.

Page 203

1 A.     One second.  Yes, that's correct.
2         TRIAL TECHNICIAN:  Rosemarie, for the
3     record, I just wanted to let you that
4     Bob Kum from Duane Morris also just joined
5     us in the room now.
6         MS. BOGDAN:  Okay.  Bob from
7     Duane Morris.
8 BY MS. BOGDAN:
9 Q.     Now, this study is focused on N-nitroso
10 compounds, in general, correct?
11 A.     That's correct.
12 Q.     Does this study estimate an amount of
13 endogenous NDMA that forms, as opposed to
14 nitrosamines in general?
15 A.     If you look at Table 1, there is --
16 endogenous nitrosamines is listed and NDMA is listed
17 as a standalone below it and then if you look at
18 Table 2 --
19 Q.     Well, let me just ask a question about
20 Table 1.
21     Is the NDMA listed, though, in Table 1, the
22 NDMA that someone would get exogenously from diet or
23 air or water?
24 A.     Give me a moment.  I need to check back.
25     (Witness reviews document.)

Page 204

1 Q.     All right.  My overarching question,
2 Dr. Chodosh, is just does this study provide any
3 estimate of the endogenous formation of NDMA?
4 A.     So, in general, NDMA is the most abundant of
5 nitrosamines, so they're N-nitrosamines.  And the
6 point of the paper is that endogenous nitrosamines
7 formation is about 100 times greater than NDMA
8 exposure from the diet and that the cancer risk
9 association in the stomach does not correlate with
10 NDMA intake, it correlates with endogenous
11 nitrosamines, arguing that it is endogenous
12 N-nitrosamines, which are more important in
13 determining cancer risk and NDMA exposures, in
14 this case, that would be dietary exposures.
15 Q.     How many compounds are there in the
16 nitrosamine family?
17 A.     There are -- my recollection -- I can't
18 remember whether it's 100 or -- there are a broad
19 number of N-nitrosamines of which NDMA is -- in the
20 setting of diet, my understanding is, is one of the
21 more abundant, if not the most abundant.  It's
22 certainly the best studied of N-nitrosamines.
23 Q.     Are the N-nitrosamines in the family equally
24 genotoxic?
25 A.     I'm sorry, you cut out right at the

Page 205

1 beginning.
2 Q.     I'll ask it a different way.
3     Are there varying degrees of potency of the
4 various compounds that are in the N-nitrosamines
5 group?
6 A.     Yeah, so potency is a chemical compound
7 specific analysis.  And my recollection is ten or
8 15 percent of N-nitrosamines are not considered be
9 to be carcinogenic when tested in animals, so there
10 clearly is variability across the family, as you
11 would expect, given that they each have different
12 chemical structures.
13         MS. BOGDAN:  If we could pull up the
14     Holtrop study, H-O-L-T-R-O-P.
15         (Document marked for identification
16     as Chodosh Deposition Exhibit No. 19.)
17 BY MS. BOGDAN:
18 Q.     Now, this study is another one that you
19 specifically reference in your medical monitoring
20 report as reference number 15.
21 A.     If you could just give me a moment to
22 refresh my memory.
23 Q.     Sure.
24 A.     (Witness reviews document.)
25 Q.     Which, again, is footnoted in paragraph 34.

Confidential Information Subject to Protective Order

Page 206

1   A.    Okay.
2   Q.    And asking the same question again, is this
3   a study of endogenous formation of N-nitroso
4   compounds in general, meaning the whole group, as
5   opposed to NDMA specifically?
6   A.    Give me one moment.
7         (Witness reviews document.)
8         So I believe that this is N-nitroso
9   compounds in general.  Although, again, my
10  understanding is that NDMA is typically the most
11  abundant in that class of endogenous N-nitrosamines.
12  Q.    Turning your attention to page 1657 of this
13  study, directing your attention to the left-hand
14  side of that paragraph which reads, "The ultimate
15  link between diet, endogenously formed NOC, and
16  causation and prevention of DNA damage in animals
17  and humans is still missing."
18  A.    Let me just read this paragraph for context
19  so I can try to get a better idea what they're
20  talking about.
21  Q.    That was going to be my question, do you
22  have an understanding of what the authors are
23  talking about?
24  A.    (Witness reviews document.)
25        So if I look at the sentence immediately

Page 207

1   preceding the one you asked me about, which is a
2   summation sentence, it says, "Even though NOC --
3   nitrosamines compounds -- "even though NOC
4   concentrations were not determined in these studies,
5   they provide a cause of the DNA adducts that are
6   specific to DNA methylating agents such as NOC.  The
7   ultimate link between diet, endogenously formed NOC,
8   and causation and prevention of DNA damage to humans
9   and animals is still missing."
10        My interpretation, given that this is in a
11  discussion and based on context, is they're saying,
12  in fact, there is endogenous DNA damage and the
13  formation of promutagenic DNA adducts and that that
14  is higher in the setting of a high protein or a high
15  red meat diet.  So as in endogenous causes of
16  nitrosamine formation damaging DNA is, you know, a
17  major issue, for lack of a better phrase, and that
18  that last sentence essentially says, we haven't
19  figured out every last thing.  We don't know every
20  piece of the puzzle.
21  Q.    And they're looking for basically a link
22  between red meat intake and endogenous NOCs,
23  correct?
24  A.    Well, as it says in the abstract, "Red meat
25  is considered the most important dietary component

Page 208

1   linked to NOC formation."  I think they're looking
2   at the effects of diet composition and in particular
3   of protein composition and how that is related to
4   endogenous NOC formation.
5         So it's the same thing in my report, in both
6   of my reports.  And the same thing that was
7   basically in Jakszyn that red meat in particular is
8   a known source of NDMA and endogenous nitrosamines.
9   Q.    But this study, again, is looking at NOCs,
10  nitrosamines in general, correct?
11  A.    Yes, that's correct.
12        MS. BOGDAN:  If we could pull up the
13        Vermeer study, V-E-R-M-E-E-R.
14        (Document marked for identification
15        as Chodosh Deposition Exhibit No. 20.)
16  BY MS. BOGDAN:
17  Q.    And this is reference number 14 in your
18  medical monitoring report.
19        TRIAL TECHNICIAN:  This will be
20        Exhibit 20.  It's available through the
21        marked exhibit link and will be up on your
22        screen momentarily.
23        THE WITNESS:  And if I could just
24        have one second to refresh my memory.
25        (Witness reviews document.)

Page 209

1         Okay.
2   BY MS. BOGDAN:
3   Q.    The purpose of this study was to look at
4   NDMA formation with a high amine rich diet, correct?
5   A.    From my reading it looks like that is at
6   least one -- [Zoom glitch].
7         MS. BOGDAN:  Oh, the audio cut out.
8   Oh, please tell me that the audio is
9   working, please.  It's not working?
10        THE VIDEOGRAPHER:  Excuse me, Doctor,
11  can you hear me?  Mr. Insogna, can you hear
12  me?
13        Going off the record at 4:54.
14        (Brief recess.)
15        THE VIDEOGRAPHER:  We are back on the
16  record at 4:58.
17  BY MS. BOGDAN:
18  Q.    So, Doctor, before we lost the audio, I
19  believe, I was asking you if the purpose of the
20  Vermeer study is to look at nitrosamine formation
21  associated with amine rich diets?  And they use
22  different types of fish in the study to study that
23  phenomenon.
24  A.    Well, it's looking at intake of nitrate and
25  what the impact might be on endogenous

Confidential Information Subject to Protective Order

Page 210

1  N-nitrosamines and it's in the setting of as in
2  combination with an amine rich diet.
3       But they're each variables that are being
4  tested here, both the nitrate and the amines.
5  Q.    And the nitrate without the amines, how is
6  that impacting NDMA formation?
7  A.    When you say "without the amines," I don't
8  understand what you mean.
9  Q.    They test the nitrate as a control without
10 the amine rich foods as well?
11 A.    Which part of this study are you referring
12 to because you can't get rid of amines in food
13 unless there are no proteins whatsoever.
14 Q.    Right.  I'm asking you if they just tried
15 nitrate rich foods alone without any type of protein
16 or if the nitrate that you're referring to was
17 always being put on board, so to speak, with the
18 amine rich?
19 A.    Yeah, I don't -- my memory of this paper is
20 not so detailed that I recall that immediately
21 evident to me, looking at it, what the -- if you
22 will, what the baseline diet is.  But, right, pretty
23 much -- I mean, all diets are going to have some
24 protein in it, which means that there's going to be
25 amines in it.

Page 211

1       So they're saying there's no such thing --
2  you're not able to do a study or I don't think this
3  is a study of what's the effect of nitrate in the
4  absence of any amines, but I would have to spend
5  more time with the paper to refresh my memory about
6  the details.
7  Q.    What was your purpose in citing it in your
8  medical monitoring report as a reference?
9  A.    Well, so, currently you can get at it from
10 the first sentence so "Formation of nitrites from
11 ingested nitrate, can result in several adverse
12 health effects and implies a genotoxic risk as an
13 consequence of endogenous formation of carcinogenic
14 N-nitroso compounds."
15      So partly this is another piece of the
16 puzzle that arrives at the conclusion that
17 endogenous formation of N-nitrosamines is -- is
18 biologically important and then this is also, as I
19 recall, this was the body of data that were also
20 employed to make estimates or one of the estimates
21 of endogenous formation of NDMA.
22      But, again, I'd have to go back through this
23 paper.  It's a pretty detailed paper, but -- so it
24 says -- go to page 462, to the far column on the
25 right, to the paragraph that begins "Absolute levels

Page 212

1  of volatile nitrosamines formed in the stomach are
2  probably much higher than the amounts excreted in
3  urine," and then it refers to Spiegelhalder and
4  co-workers showing that between 0.5 and 2.4% of an
5  ingested NDMA dose is excreted or metabolized in
6  urine.
7       Or less than 0.5 in the absence of alcohol,
8  so that's actually -- that's an important number
9  because that comes into play in Hrudey and a number
10 of other things.
11      But then in the next sentence it says
12 "Assuming that 0.5% of the NDMA is excreted in
13 urine, the volunteers in this study may have formed
14 174 micrograms of NDMA per day or 2.9 micrograms per
15 kilogram body weight per day during days 1-3 of the
16 test week."
17      And they're making the point of how does
18 that compare with carcinogenic doses in the rat.
19 And, yeah, granted this is what, 1990 something, but
20 this is one of the estimates of endogenous NDMA
21 production.  I reference that actually in the table
22 that we were talking about because this is -- this
23 is the low end of the estimate, so for completeness
24 I included this endogenous estimate, whereas the
25 Hrudey estimates were six, seven, eight, nine times

Page 213

1  higher than this.  And I did calculations, as you
2  may recall, that looked both at the levels of
3  endogenous NDMA production predicted by this paper
4  and the levels of endogenous production estimated --
5  I should say "estimated" not "predicted" --
6  estimated by Hrudey, et al., by two of the three
7  methods that they used, each of which makes the same
8  point that these levels of endogenous production of
9  NDMA that have been estimated are substantially
10 higher than what is generally accepted as amounts in
11 the diet.  That is, amounts of pre-formed NDMA in
12 the diet.
13      And, of course, if one were to accept -- I
14 believe, you were making the point that while the --
15 Hrudey gave an estimate for the United States
16 population of preformed NDMA dietary intake.  Well,
17 in fact, that would just mean that the endogenous
18 formation is an even greater multiple of what's in
19 the diet.  They all make the same point that
20 endogenous NDMA production, endogenous
21 N-nitrosamines production, that's the thing driving
22 the biology.  That's the endogenous mutagen or one
23 of the endogenous mutagens, I should say.
24 Q.    In the case of the contaminated valsartan
25 with NDMA or NDEA, each patient that is taking

Page 214

1 valsartan would have a background amount of NDMA
2 exposure in their diet, correct?  And the amount in
3 the contaminated medication would be in addition to
4 their background?
5 A.     Yes, in a medication, if there's NDMA in a
6 medication, that will be added to whatever NDMA is
7 in the diet.
8         But the point of these papers that you're
9 citing -- that your -- we're talking about right now
10 are that those amounts are quite low compared to
11 endogenous production of NDMA and, therefore, the
12 DNA repair systems that have evolved to repair that
13 specific type of DNA damage caused by that, that's
14 the point of these.
15         MS. BOGDAN:  If you could please pull
16         up the next exhibit, the Krul study,
17         K-R-U-L.
18         (Document marked for identification
19         as Chodosh Deposition Exhibit No. 21.)
20 BY MS. BOGDAN:
21 Q.     This study, Dr. Chodosh, is in your amended
22 list of materials considered that was provided to
23 our office with the medical monitoring.
24 A.     Yes, may I have a moment to refresh my
25 memory.

Page 215

1 Q.     Sure.
2 A.     (Witness reviews document.)
3 Q.     The question I'm going to ask you, Doctor,
4 is in the abstract itself.
5 A.     Okay.  Why don't you ask it and then I'll
6 see if I can answer it based on -- about this paper.
7 Q.     In the abstract, does the study indicate
8 that under these conditions the cumulative amounts
9 of NDMA formed were 2.3 to 422 micrograms of NDMA
10 and 1.8 to 42.7 micrograms of NDMA at a rapid and
11 slow gastric PH decrease respectively?
12 A.     I -- two things, one, I don't see a hyphen
13 there.  I see "2.3" and then I see a space and I see
14 "422."  So with that paper, I don't -- that isn't
15 how I would write a range.
16         Is it -- do you see it there?
17 Q.     There is a hyphen on the paper copy I'm
18 looking at.  I'm thinking that happened in the
19 upload and the translation on to the screen.  I
20 don't see it on the screen, but the one that I have
21 has the hyphen there between the 2.3 and the 422 and
22 between the 1.8 and the 42.7?
23 A.     Yeah.  And, I guess, the overall point is
24 really this is -- this is an in vitro model of
25 simulated conditions in the stomach where they're

Page 216

1 looking at dynamic changes as best I can refresh my
2 memory, as a function of time and as a function of
3 how nitrites are added.  But I think as has been
4 apparent in recent publications of both Bronstein
5 and Gau [ph.], that the conditions in which such
6 experiments are done have a dramatic influence on
7 what the results are, number one.  And that, number
8 two, things that authors describe as "physiological"
9 very often are not.
10         So I would have to spend more time with this
11 to actually see what are the -- what are the ranges
12 here, especially of nitrite and how those
13 correspond.
14 Q.     From the abstract, assuming that there's a
15 hyphen between the 2.3 and the 422 and the 1.8 and
16 the 42.7, the study indicates that there could be a
17 wide range, right, of NDMA forming under the
18 conditions in the study, correct?
19 A.     Well, that's -- so, yes, but that's circular
20 and it may be that -- in that wide range that none
21 of it overlaps with what happens with human beings.
22 That's my point.
23 Q.     Right, I get it.  I get it.
24 A.     In their in vitro system that they have set
25 up that's what they're reporting and the real

Page 217

1 question, of course, is how good a model is this for
2 what happens in human beings.
3 Q.     Turning to page 53 of the study, which is
4 the third page.
5 A.     I'm sorry, which page?
6 Q.     Page 53 and in the study right before
7 "Materials and Methods"?
8 A.     Yeah.
9 Q.     They're indicating that "Experiments with
10 respect to the inhibition of NDMA formation were
11 formed with two inhibitors, orange juice as a source
12 of ascorbic acid and black tea, which contains large
13 amounts of polyphenols"?
14 A.     Yes, I see where you read that.
15 Q.     Do you know those to be inhibitors of NDMA
16 formation?
17 A.     As a general matter or at specific
18 concentrations and specific context?
19 Q.     As a general matter.
20 A.     I don't know as a general matter.  As a
21 biochemist, basically, I would believe has to be on
22 the concentration of either of those components and
23 the overall conditions of the experiment like PH and
24 everything else that's present.  And, in fact, just
25 scanning through this on the next page, page 54 on

Page 218

1 the right-hand column it says "To investigate
2 whether the formation of NDMA can occur under the
3 experimental conditions of the in vitro model.  The
4 gastric compartment was loaded with 300 milliliters
5 of 0.1 molar setting citrate buffer (pH 6.8)
6 containing 5-millimolar DMA and 5-millimolar sodium
7 nitrite."
8 Q.     Yeah, I understand, Doctor, that you would
9 want to look at the study further to determine the
10 different --
11 A.     I'm sorry, I wasn't done.
12         What my point is, 5-millimolar study of
13 nitrite is to my recollection wildly
14 nonphysiological.  So this is back to the original
15 point that I made that people -- if you're modeling
16 something in vitro, it's critical that you're
17 actually modeling something that has physiological
18 conditions and just looking at that one number,
19 that's not vague.
20         To the best of my recollection, I believe
21 that number is multiples, many multiples of
22 physiological, of the upper range of physiological.
23 I could be wrong, but that's my best recollection.
24 Q.     Not to interrupt you, Dr. Chodosh, but my
25 question right now on the table had to do with

Page 219

1 whether or not orange juice and black tea can
2 inhibit NDMA formation, that's the last question I
3 asked you.
4 A.     I answered you.  I said as a biochemist that
5 has to be dependent on the concentration of each
6 of the components of the system.  That's the answer
7 to your question.
8 Q.     Okay.
9         MS. BOGDAN:  Let's pull up Pottegard,
10 please.
11         MR. INSOGNA:  You lost your exhibits
12 window.
13         THE WITNESS:  I lost my exhibits
14 window.
15         (Document marked for identification
16 as Chodosh Deposition Exhibit No. 22.)
17 BY MS. BOGDAN:
18 Q.     Doctor, this is another one of the studies
19 that you specifically cited as a reference in your
20 medical monitoring report.
21         MR. INSOGNA:  Rosemarie, one second.
22 Dr. Chodosh lost the exhibits window.  We're
23 just reopening that right now.
24         MS. BOGDAN:  Okay.  I don't have much
25 more, but with the different drops like that

Page 220

1         I...
2         THE WITNESS:  I have it back.  Okay.
3         MS. BOGDAN:  Okay.
4         THE WITNESS:  Is this 22?
5         TRIAL TECHNICIAN:  That's correct.
6 This is Exhibit 22.
7 BY MS. BOGDAN:
8 Q.     Doctor, and you're familiar with this study
9 as it's cited to in your report?
10 A.     Yes.
11 Q.     And directing your attention to the
12 participants.  This was a study that involved 5,150
13 Danish patients with no history of cancer, correct,
14 aged 40 years or older using valsartan at the 1st of
15 January 2012, or initiating use between the 1st of
16 January 2012, and the 30th of June 2017, correct?
17 A.     Yes, you read that correctly.
18 Q.     And this study was actually ended on
19 June 30th, 2018.
20         Do you see that?
21 A.     Yes.
22 Q.     And there were actually various recalls of
23 valsartan that occurred after this study closed.
24         Are you aware of that?
25 A.     Yes.

Page 221

1 Q.     Would you consider that to be a limitation
2 of the study that the full extent of the
3 contaminated medication wasn't known at the time
4 that the study period closed?
5 A.     Say that again, please.
6 Q.     Would you consider that to be a limitation
7 of the study, in that the full amount of the
8 contaminated valsartan wasn't known as of the time
9 the study closed, which would prevent proper
10 identification of patients that had taken
11 contaminated valsartan versus not contaminated
12 valsartan?
13         MR. INSOGNA:  Objection to form.
14         THE WITNESS:  I don't think I'm
15 following your logic.  I apologize, maybe
16 it's just late in the day.  But I see where
17 it says when the end of the study period
18 was, 30 June 2018, and I know that there
19 were additional recalls that happened later
20 that year, at the end of that year, but I'm
21 not -- I'm not following your argument
22 is.
23 BY MS. BOGDAN:
24 Q.     Okay.  There's a "Conclusion" section on
25 that first page of the study?

Page 222

1  A.    Yes.
2  Q.    It mentions that "The results do not imply a
3  markedly increased short term overall risk of cancer
4  in users of valsartan contaminated with NDMA.
5  However, uncertainty persists about single cancer
6  outcomes and studies with longer follow-up are
7  needed to assess long term cancer risk."
8        Do you see that conclusion?
9  A.    I see where you've read that and you've read
10 it correctly.
11 Q.    Okay.  What was the follow-up period for
12 this study, do you know?
13 A.    (Witness reviews document.)
14       It says "Participants were followed until
15 cancer outcome, death, migration or end of the study
16 period, whichever occurred first."  But I'm looking
17 for what the overall follow-up time was.
18 Q.    I direct you to the "Results" section on
19 page 3.
20 A.    It says "A median of 4.6 years of follow-up
21 interquartile range 2.0-5.5 years."
22 Q.    Would you consider only having a median of
23 4.6 years of follow-up in a study with a cancer
24 endpoint to be a limitation of the study?
25 A.    Well, yes and no.  The -- what's notable to

Page 223

1  me about this study is that this time frame
2  corresponds quite closely to what your experts have
3  claimed that NDMA can cause cancer in human beings.
4        So while I believe that opinion,
5  particularly from Dr. Panigraphy, is utterly
6  unsupported by available scientific evidence and, in
7  fact, contradicted by a battleship of medical and
8  scientific evidence.  It's the plaintiffs who have
9  claimed that cancers can arise within this general
10 period of time and people exposed to valsartan
11 products containing NDMA or NDEA.
12       So to some extent this is -- well, this
13 would be a logical test of your expert's predictions
14 and it says their predictions are wrong.
15 Q.    I'm asking if you consider a 4.6 follow-up
16 period for a study with cancer as the endpoint a
17 sufficient period of time?
18       MR. INSOGNA:  Objection to form.
19       THE WITNESS:  A sufficient period of
20 what?
21 BY MS. BOGDAN:
22 Q.    Can you see that as a limitation of the
23 study?
24 A.    In general, longer follow-up is better for
25 cancer outcomes.  However, in this case, you could

Page 224

1  follow people who have been exposed to valsartan
2  products in that period of time for as long as you
3  want.  The point is that their exposures are so far
4  below any dose that could conceivably cause cancer
5  you're going to get the same result.
6        But you can't have it both ways.  You can't
7  both claim that valsartan exposure causes cancer in
8  the short term and at the very same time turn around
9  and say, Oh, but you would never see it unless you
10 looked at very long intervals of time.  It's just
11 internally contradictory, like much of the evidence
12 that your experts have presented.
13       MS. BOGDAN:  Let's move to the Gomm
14 study, please, G-O-M-M.
15       (Document marked for identification
16 as Chodosh Deposition Exhibit No. 23.)
17 BY MS. BOGDAN:
18 Q.    And this is another one of the studies that
19 you cited in your references to your medical
20 monitoring report?
21 A.    That's correct.  Since these were -- well --
22 Q.    Yes?
23 A.    -- I believe these are studies of
24 populations exposed to product at issue in this
25 litigation so that they're perfectly ignored.

Page 225

1  Q.    And in the Gomm study a statistically
2  significant association was found between exposure
3  to NDMA contaminated valsartan and hepatic cancer;
4  isn't that correct?
5  A.    You've read the conclusion correctly.
6  However, as I believe I noted in my -- in both of my
7  reports that there was no dose response effect for
8  the liver as would be expected and that the multiple
9  testing adjustment was not made and so the absence
10 of those two things -- I do not put a great deal of
11 weight on that particular finding.
12       And, in fact, the study that we just looked
13 in Pottegard, I don't think they saw any liver
14 cancer so that's -- for first principles you have a
15 marginal -- at best a marginal association that was
16 not seen in another study so that is sort of the
17 opposite of a robust or a consistent finding, so I
18 put very little weight on that.
19 Q.    But the authors of the Gomm study did find a
20 statistically significant association between
21 exposure to NDMA-contaminated valsartan and hepatic
22 cancer, correct?
23 A.    As it says it's associated with a slightly
24 increased risk of hepatic cancer, no association
25 with risk of cancer overall.  And as I've said, it

Page 226

1 may have been nominally marginally significant, but
2 the fact that, to my recollection, was not adjusted
3 overall in the study and the fact that there's no
4 dose response and the fact that another study of
5 patients exposed to the same products there's no
6 liver cancer that tells me this is not a consistent
7 finding.
8 Q.    All right.
9        If you could please look at the results on
10 the first page of the study and it says on the
11 results "A total of 780,871 persons who had filed a
12 prescription for valsartan between 2012 and 2017
13 were included in the study," correct?
14 A.    Correct.
15 Q.    And that would make this a larger study size
16 than the Pottegard study, correct?
17 A.    Larger does not mean better.
18 Q.    I didn't ask better, I asked if it was
19 larger?
20 A.    I don't recall what the number was in
21 Pottegard.
22 Q.    The number in Pottegard was 5,150 Danish
23 patients.  The Pottegard had 5,150 patients and this
24 study had 780,000-plus patients and then the results
25 read as follows: "There was no association between

Page 227

1 the exposure to NDMA-contaminated valsartan and the
2 overall risk of cancer" --
3 A.    I'm sorry, where are you reading?
4 Q.    I'm reading from --
5 A.    Is that the beginning of the "Results"
6 section or where is that?  Okay, got it.
7 Q.    That is in the "Results" section.  I first
8 read -- I'm reading the whole section.
9 A.    Yes, just -- years ago are not accessible so I
10 just have a little icon of a table, but I can't
11 actually see that table.
12 Q.    I'm sorry, and the audio isn't great either.
13      But my last question is does the "Results"
14 section say in the final sentence in the "Results"
15 section "A statistically significant association was
16 found, however, between exposure to
17 NDMA-contaminated valsartan and hepatic cancer"?
18 A.    I'm sorry, where are you reading?
19 Q.    I read the last sentence of the "Results"
20 section?
21      MR. INSOGNA:  On the first page.
22      THE WITNESS:  I'm looking at the end
23      of the "Results" section and that isn't the
24      end of the "Results" section, so...
25 BY MS. BOGDAN:

Page 228

1 Q.    On the very first page of the study, Doctor,
2 under the summary?
3 A.    Okay, so not in the "Results" section in the
4 "Results" section of the summary.  Okay.
5 Q.    Right, that's right.
6      So I'll ask my question one more time since
7 now we're oriented to where I was reading from.
8      The last sentence of the "Results" section
9 in the summary of the study reads, "A statistically
10 significant association was found, however, between
11 exposure to NDMA-contaminated valsartan and hepatic
12 cancer"; isn't that true?
13 A.    You read those words correctly.  And so, for
14 instance, it also says in this paper, "We cannot
15 rule out residual confounding."
16 Q.    Oh.
17 A.    So, for instance, they did not adjust for
18 factors that might have influenced risk factors for
19 liver cancer.  And this drug is being given to a
20 population of people with hypertension, in general,
21 who to my understanding of liver cancer risk factors
22 are going to have an increased risk of liver cancer.
23      So when you have findings that are not
24 adjusted for multiple testing, do not show a dose
25 response, are very close to 1.0 and have not been

Page 229

1 adjusted for risk factors for the disease, that
2 is -- in my opinion, that's extraordinarily weak
3 evidence.
4 Q.    And from your --
5      MS. BOGDAN:  You can pull that down.
6 BY MS. BOGDAN:
7 Q.    With regard to the contamination of --
8 contaminated valsartan, do the higher milligram
9 doses of valsartan always have a higher amount of
10 NDMA compared to the lower doses of valsartan or
11 does it vary by manufacturer, different lots,
12 et cetera?
13 A.    It varies by manufacturer and by different
14 lots.
15      MS. BOGDAN:  Those are all the
16      questions I have.
17      MR. INSOGNA:  Rosemarie, I will have
18      some follow-up questions.  I'm anticipating
19      they will be pretty limited.  I would like
20      to take maybe ten minutes to look through my
21      notes and get that together.
22      THE VIDEOGRAPHER:  Off the record at
23      5:36.
24      (Brief recess.)
25      THE VIDEOGRAPHER:  We are back on the

Page 230

1    record at 5:53.
2  BY MR. INSOGNA:
3  Q.    All right.  Dr. Chodosh, I appreciate you
4  bearing with us today.  I have just a few follow-up
5  questions based on Counsel's questions as to earlier
6  today.
7        The first question for you, did you read the
8  plaintiffs' medical monitoring complaint in this
9  case?
10  A.    Yes, I did.
11  Q.    And did you read their memorandum of law in
12  support of their motion to certify a class for
13  medical monitoring?
14  A.    Yes, I did.
15  Q.    In those documents, did you see a reference
16  to a specific numerical lifetime cumulative exposure
17  threshold for NDMA or NDEA that would qualify a
18  plaintiff for membership in their proposed class?
19  A.    No, I did not.  The algorithm appears to be
20  predicated entirely on how many months of a
21  particular manufacturer's product one took.  There
22  are no numbers in there that would translate to an
23  NDMA/NDEA level.
24  Q.    And is that an opinion that you have set
25  forth in your report in this case?

Page 231

1  A.    Yes, it is.  It's set forth in my opinion
2  that there is no way to go from that algorithm to
3  determine a specific exposure of a plaintiff to NDMA
4  or NDEA.
5  Q.    And in the sections of your supplemental
6  report that discuss those opinions about that
7  algorithm, have you set forth the basis for your
8  opinions and the details surrounding those opinions?
9  A.    Yes, I have.
10  Q.    Earlier today Counsel asked you a number of
11  questions about studies of dietary exposure to NDMA.
12        Do you generally recall that questioning?
13  A.    Yes, I do.
14  Q.    Does dietary exposure to NDMA or NDEA factor
15  into the opinions that you've offered in this case?
16  A.    It factors into from the standpoint that I'm
17  trying to factor in all the information that I can
18  get.  So from that standpoint, yes, but the critical
19  aspect or the two critical aspects of diet are that
20  the estimates of dietary intake are minuscule
21  compared to endogenous exposures and are minuscule
22  compared to the lowest dose that has ever been shown
23  to cause cancer in any animal.
24        So whether those dietary levels that are
25  estimated of NDMA are a little bit lower or a little

Page 232

1  bit higher, it's irrelevant because on a ratio basis
2  they're tiny compared to endogenous production and
3  the levels needed to generate cancer.
4        And the second point I just have to
5  underscore is the language of those papers is
6  talking about NDMA levels, but in none of those
7  papers, to my knowledge, are NDMA levels ever
8  measured in the food that any participant, was
9  exposed to in any of these studies.  These are
10  estimates based on, you know, old food tables, so
11  they're not even measuring the thing that is -- they
12  are attempting to associate with a cancer outcome.
13  Q.    And I think I understand your point there
14  about the measuring in the dietary studies.
15        Just so our record is clear, what is the
16  significance to your opinions about that lack of
17  measuring of NDMA levels in food?
18  A.    So if you don't actually measure the NDMA
19  levels in the food that participants took you can't
20  possibly know what their exposures actually were.
21  You're estimating based on, you know, a series of
22  food charts and self-reported eating behaviors and
23  lots of things that are notoriously unreliable.
24        And in addition to that, there are thousands
25  of things in the food not being measured, so dietary

Page 233

1  studies are infamously subject to all sorts of
2  inaccuracy.  And that's just one of the reasons why,
3  as set forth in my report, they are an unreliable
4  basis to determine a threshold for increased risk
5  due to exposure to NDMA.
6  Q.    Now, a few responses ago or maybe your prior
7  response, you mentioned that on a ratio basis the
8  levels estimated in these dietary studies are
9  minuscule compared to endogenous NDMA formation.
10        Is there also set forth in your report an
11  opinion about the ratio basis of potential exposure
12  to NDMA or NDEA through valsartan and endogenous
13  production?
14  A.    Yes, there are opinions in my report and it
15  is similar to diet.  They are very low exposures
16  compared to endogenous exposures to NDMA and
17  certainly -- well, compared to the lowest possible
18  dose of NDMA that could cause cancer in laboratory
19  animals.
20  Q.    And just so I make sure that I'm clear on
21  that.
22        The level of potential exposure to NDMA or
23  NDEA through valsartan is are you saying lower --
24  you tell me, as compared against endogenous and then
25  also as compared against the lowest level shown to

Confidential Information Subject to Protective Order

| Page 234 | Page 236 |
|---|---|

**Page 234**

1  cause any cancer in any mammal species.
2  A.     So endogenous levels of NDMA production as
3  it has been estimated are up to a thousand times
4  higher than the levels of likely exposure to
5  plaintiffs who took valsartan products that might
6  have had NDMA or NDEA and they are -- and the level
7  of NDMA exposure required to generate cancers in an
8  animal are even higher than the endogenous levels.
9        So there's just an enormous gulf between the
10  lowest dose of NDMA that would cause cancer in even
11  the most sensitive animal and the great amount of
12  NDMA or NDEA that a plaintiff could have been
13  exposed to as a consequence of taking valsartan
14  products.
15  Q.    Okay, I understand that.  Thank you.
16        I'm going to go back to something that we
17  talked about very early in the day, so forgive me.
18        But Counsel asked you whether you were
19  offering any opinions about whether any of the
20  specific tests in plaintiffs' medical monitoring
21  plan were appropriate for people who are at risk of
22  cancer.
23        Do you remember generally those questions?
24  A.    I do.
25  Q.    Okay.  So, first, let me ask you, are you

**Page 235**

1  aware whether there are cancer-screening protocols
2  in place for the general population of Americans?
3  A.     There are screening protocols that are
4  recommended for people that -- as implemented by
5  physicians talking to their patients, yes.
6  Q.    Now, Counsel's questions were about whether
7  specific tests were appropriate for people who are
8  at risk of cancer.
9        Let me ask you, generally speaking, who is
10  at risk of cancer?
11  A.     All human beings are at risk of cancer.
12  Q.    And over the course of a lifetime, what is
13  the cancer risk in the general population?
14  A.     A lifetime cancer risk in this country
15  approaches one out of two people.
16  Q.    Now, when you were answering those questions
17  about the specific tests and testing protocol put
18  forth by plaintiffs, did I understand correctly that
19  you're not offering any opinions about whether any
20  specific test would be appropriate for any plaintiff
21  in this litigation?
22  A.     That's correct.
23  Q.    Do you have any opinion about whether any of
24  the plaintiffs should undergo any screening program
25  regardless of which tests the proposed program

**Page 236**

1  involves?
2  A.     Yes, I do have an opinion.
3  Q.    What is that opinion?
4  A.     They should not.
5  Q.    Okay.  And why is that?
6  A.     Because for the many reasons articulated in
7  my original report and my supplemental report the
8  exposures are far, far too low to conceivably
9  elevate risk for cancer.  So the risk of cancer of
10  the population of people who took valsartan products
11  during this period of time, is effectively the same
12  risk of cancer as everybody else in the country.
13        So if you're not elevated risk compared to
14  other people, then you get no benefit from some
15  additional kind of screening.  And what you get is
16  the additional risk of harm that comes from doing
17  screening procedures that basically are not
18  indicated in this population.
19  Q.    Okay.  And I understand that was sort of an
20  encapsulation of your report.
21        Are those opinions that you just summarized
22  for us set forth in detail in your original and
23  supplemental reports in this litigation?
24  A.     Yes, they are.
25  Q.    And do you set forth each of the bases for

**Page 237**

1  each of the opinions that you offered in your
2  report?
3  A.     Yes, I do.
4  Q.    And do you identify the sources that you
5  considered in forming those opinions?
6  A.     Yes, I did.
7        MR. INSOGNA:  I don't have any
8        further questions subject to anything that
9        Counsel may ask you.
10  BY MS. BOGDAN:
11  Q.    So you cite extensively in your medical
12  monitoring report to the Liteplo 2002 study about
13  N-Nitrosodimethylamine, correct?
14        MR. INSOGNA:  I'm going to object.
15        That's beyond the scope of what I just asked
16        him about.
17  BY MS. BOGDAN:
18  Q.    Well, I'm going to get right to it then.
19        You just testified on redirect regarding the
20  scaling of doses of NDMA between animals and humans,
21  right, are you aware that the Liteplo study which
22  you cite extensively in your report reads "Scaling
23  for variations in the ratio of surface area to body
24  weight between rodent species and humans was not
25  considered appropriate for the measures of exposure

Confidential Information Subject to Protective Order

Page 238

1  response developed on the basis of experimental data
2  in animals, since it is highly probable that the
3  carcinogenicity of NDMA is mediated primarily
4  through the generation of an active metabolite,
5  i.e., the methyldiazonium ion."
6          MR. INSOGNA:  So --
7  BY MS. BOGDAN:
8  Q.    Are you aware that that study says that?
9          MR. INSOGNA:  I'm going to make the
10         same objection and just point out that you
11         asked him extensively about what's in the
12         Liteplo or Liteplo study and this is not
13         something that I covered in my redirect and
14         it's something that you certainly could have
15         asked him about before.  I won't instruct
16         Dr. Chodosh not to answer, though.
17         THE WITNESS:  I'm happy to answer it
18         because you made my point for me, so thank
19         you very much.
20         I did not do any scaling based on
21         surface area.  So the very statement that
22         you read that says "Scaling by surface area
23         is not appropriate," I didn't scale by
24         surface area.  I scaled by weight, which is
25         exactly what the FDA does and exactly what

Page 239

1          EMA does and exactly what Health Canada
2          does, so you've made my point for me, thank
3          you.
4  BY MS. BOGDAN:
5  Q.    You scaled between the weight of the rodent
6  and the weight of a person, correct?
7  A.    Milligrams --
8          MR. INSOGNA:  Same objections.
9          THE WITNESS:  Milligrams per
10         kilogram, that is not surface area.
11 BY MS. BOGDAN:
12 Q.    The species scale between a rodent and a
13 human, correct?
14 A.    I didn't hear the question.  Could you
15 repeat it?
16 Q.    You scaled between a rodent and a human,
17 correct?
18 A.    I scaled between a rodent and human as we've
19 talked about many times, both now and in September,
20 based on milligram per kilogram exposure which is,
21 number one, exactly what the FDA does and the risk
22 assessment that you showed to me, as well as EMA, as
23 well as Health Canada.
24         And I did not use a surface area scaling
25 factor, which is what you just read what Liteplo

Page 240

1  says is inappropriate.  And I agree, it's not what I
2  did, so please don't mischaracterize what I did.
3          MS. BOGDAN:  The study speaks for
4  itself, but I don't have any further
5  questions.
6          MR. INSOGNA:  I don't either.
7          THE VIDEOGRAPHER:  Okay.  Hearing no
8  further questions, that concludes today's
9  deposition and the time is 6:08 p.m.
10         (Witness excused.)
11                  _ _ _

Page 241

1         C E R T I F I C A T I O N
2          I, MARGARET M. REIHL, a
3  Registered Professional Reporter, Certified
4  Realtime Reporter, Certified Court Reporter,
5  Certified LiveNote Reporter, do hereby
6  certify that the foregoing is a true and
7  accurate transcript of the testimony as
8  taken stenographically, by and before me,
9  remotely, via Zoom, to the best of my
10 ability, and on the date hereinbefore set
11 forth.
12         I DO FURTHER CERTIFY that I am
13 neither a relative nor employee nor attorney
14 nor counsel of any of the parties to this
15 action, and that I am neither a relative nor
16 employee of such attorney or counsel, and
17 that I am not financially interested in the
18 action.
19
20
21 ------------------------------------------------
   Margaret M. Reihl, RPR, CRR, CLR
22 CCR License #XI01497
   NCRA License #047425
23
24
25

Page 242

```
1        ACKNOWLEDGMENT OF DEPONENT
2        I, LEWIS A. CHODOSH, M.D., Ph.D., do
3    hereby certify that I have read the
4    foregoing pages and that the same is a
5    correct transcription of the answers given
6    by me to the questions therein propounded,
7    except for the corrections or changes in
8    form or substance, if any, noted in the
9    attached Errata Sheet.
10
11
12   _____
     LEWIS A. CHODOSH, M.D., Ph.D.    DATE
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 243

```
1                  ERRATA
2   Page    Line            Change/Reason
3   -----:------------------------------------
4   -----:------------------------------------
5   -----:------------------------------------
6   -----:------------------------------------
7   -----:------------------------------------
8   -----:------------------------------------
9   -----:------------------------------------
10  -----:------------------------------------
11  -----:------------------------------------
12  -----:------------------------------------
13  -----:------------------------------------
14  -----:------------------------------------
15  -----:------------------------------------
16  -----:------------------------------------
17  -----:------------------------------------
18  -----:------------------------------------
19  -----:------------------------------------
20  -----:------------------------------------
21  -----:------------------------------------
22  -----:------------------------------------
23  -----:------------------------------------
24
25
```

**WORD**
**INDEX**

< $ >
$336,175
22:16
$60,125  22:24
$925  22:22,
23  28:23

< 0 >
0.005  129:22
0.016  129:23
0.03  169:1, 14
0.06  169:1, 3,
14, 16  170:23,
25  171:3
0.08  169:4, 17
0.1  218:5
0.5  212:4, 7,
12
001  14:4
00273444
77:12
005  129:7
136:15
0068872  86:11
008  14:5
100:6, 19
016  129:8
136:16
02109  3:13
02110  2:21
03  169:19
04  83:18
047425  241:22
06  169:20
06-
methylguanine
159:3  166:24

< 1 >
1  4:8  14:2
15:3, 25
16:11  29:15
80:1, 2, 3
82:23  115:6,
15  117:1
119:10  120:2
122:16
123:15

137:14, 19, 22
140:16
141:12
142:11
148:19  170:6
176:21  179:2
180:3  203:15,
20, 21
1,000  195:17
1,412  184:5
1,533  171:13,
25  172:4
1,962  117:20,
24  118:14, 19
119:4  120:25
1.0  228:25
1.13  184:8
1.32  184:9
1.8  215:10, 22
216:15
1/12/22  4:14
1:06  102:20
1:07  103:20
1:09  103:23
10  1:10  5:5
114:4, 12
124:11  183:16
10,000  149:7
190:17
10,000-fold
112:13
10,000-page
174:14
10:24  49:22
10:33  49:25
100  204:7, 18
100,000
190:17, 18
102  90:3
10th  7:5
11:18  13:19
11  5:5
126:11  144:6
183:25  200:16
11,238  179:7
11:11  71:5
11:13  71:8
110  93:22
114  5:5
12  5:7
128:20

130:12
143:14, 16
144:5, 9
200:6, 16
12:15  102:17
12212-5141
2:4
126  5:7
13  5:10
129:4, 13
135:23
144:14, 17
202:20
1-3  212:15
132  106:4
112:23
13353  5:4
136  101:24
137  104:18
105:15  106:4
112:23
14  5:14
147:5, 7, 22
148:7  208:17
142  106:4
112:23
143  5:10
144  5:13
147  5:15
148  106:4
14A  148:8
15  4:8  5:15
14:23  156:5,
8  205:8, 20
150  53:5
15141  2:4
15219  3:3
153  106:4
154  112:24
156  5:18
112:24
16  5:18
197:15, 17
200:16
16,363  179:6
1611  101:22
1657  206:12
17  4:11  5:22
199:17, 19
174  212:14
17th  3:18

18  6:3  92:3
100:8, 11, 16,
17  126:5, 6
175:1  202:16,
22
1-8  100:18
188.1  90:9, 15
18th  23:5, 19,
25
19  6:7  156:2
205:16
19,700  137:18
19,700-
microgram
136:8
19103  3:18
19-2875  1:5
197  5:21
1987  145:23
163:15
1987-1992
5:13
1988  163:15,
16
1989-1990
5:10
199  5:24
1990  163:15
212:19
1991  113:16
1992  145:23
146:12
1st  13:24
29:5  30:5
220:14, 15

< 2 >
2  4:8  17:8,
10, 12  32:25
67:21  79:19,
25  88:15
91:3  129:2
135:23  202:3,
5  203:18
2,454  118:10
172:8
2.0-5.5  222:21
2.3  215:9, 13,
21  216:15
2.3.5  164:11

2.4  212:4
2.9  212:14
2:24  142:21
2:32  142:24
20  6:10
99:18  100:25
129:6, 17, 24
132:9  143:9
169:2, 15
170:25
208:15, 20
20,190  64:3
20.19  63:23
98:18, 20
193:11
20.19-
microgram
99:2
200  2:20
2002  5:7
124:13
131:12, 13
237:12
2012  220:15,
16  226:12
2013  162:12
165:5, 16
170:15
2015  183:23
2017  220:16
226:12
2018  220:19
221:18
202  6:6
2021  13:5, 24
22:2, 5, 12
24:9, 10, 16
27:25  30:5,
18  31:14
65:24  66:6
69:20, 23
106:3  112:23
114:22  165:18
2022  1:10
7:5  11:18
13:19  23:5, 7
2029  3:7
205  6:9
208  6:12

**21** 4:11 6:13 63:14 144:3 214:19
**213-7045** 3:13
**214** 6:16
**215** 3:19
**2150** 2:12
**2186** 162:4 164:9
**2187** 165:20
**219** 6:19
**2197** 168:9
**22** 6:17 146:17 219:16 220:4, 6
**224** 6:21
**23** 6:20 224:16
**230** 4:4
**237** 4:4
**2454** 172:16
**24th** 24:9, 16
**25** 90:1 122:19 179:18
**2500** 2:17
**25-milligram** 90:6
**26** 4:14 97:24 101:6
**26,000** 121:25
**26,635** 106:20, 22 121:25
**26,640** 120:20 121:7, 16
**260** 2:8
**263-1840** 3:4
**26635** 107:23
**27** 4:16 202:7
**27,628** 179:8
**27th** 3:12
**28** 118:5, 6
**28,600** 136:3, 25 137:7 138:4
**284-3896** 3:8
**2875** 1:1
**28th** 23:7
**29** 100:12

**29th** 24:4, 20 69:21 72:17 100:8 142:8
**2nd** 65:24 66:6 106:3, 13 112:23

**< 3 >**
**3** 4:11 18:5, 6, 12 21:14, 16, 22 22:16 125:2, 11, 22 173:19, 20 222:19
**3,000** 195:17
**3,343** 117:15 137:21 179:8
**3/8/22** 4:16
**3:54** 187:9
**30** 3:18 124:9 125:16, 17, 20, 23 140:22, 24 173:15 174:1 175:15 221:18
**30,000** 101:1
**30,600** 99:19
**300** 3:7 218:4
**300-milligram** 90:11 99:17
**30305** 2:17
**30th** 24:5, 20 69:21 142:8 220:16, 19
**31** 12:22 124:9 137:17
**31,000** 137:20
**310** 3:8
**310-6231** 2:21
**31st** 22:2, 5, 12 24:10
**32** 124:9, 15, 19 128:22 129:9 135:21 136:11, 13, 23
**320** 63:22 82:15 192:5 193:11 195:8
**320-milligram** 63:18 64:4 90:6, 10, 12,

15, 17 98:24 99:2 100:24
**33** 125:19 136:9, 11 137:3 138:3 139:9 140:13
**3333** 2:16
**3343** 149:17
**34** 114:2 200:10 202:25 205:25
**347** 148:23
**3479** 4:20
**36** 85:10 106:2
**365** 171:9
**375** 154:1
**38** 5:7
**380** 127:23
**385-5400** 2:9
**38th** 3:3
**39** 145:7, 20
**396** 127:23
**3rd** 23:18

**< 4 >**
**4** 4:11 26:8, 11, 14 50:11 97:23 124:25 126:18, 19 136:11 149:4
**4,000** 192:22, 23 195:22
**4,001** 192:24 195:23
**4,190** 136:7 137:18 141:2, 10 175:14
**4,190-microgram** 141:5
**4.6** 222:20, 23 223:15
**4:06** 187:12
**4:26** 199:9
**4:32** 199:12
**4:54** 209:13
**4:58** 209:16
**40** 80:10 82:17 83:17 220:14

**40-milligram** 82:16 83:11, 13
**41** 112:17, 21 113:11
**412** 3:4
**42.7** 215:10, 22 216:16
**422** 215:9, 14, 21 216:15
**45** 97:4
**462** 211:24
**47** 176:23
**49** 169:2, 15 170:25

**< 5 >**
**5** 4:14 14:2 26:21 27:4, 7 124:25
**5,150** 220:12 226:22, 23
**5.2** 168:13
**5.4** 68:6
**5:36** 229:23
**5:53** 230:1
**50** 190:4
**50.4** 83:10, 13, 19
**504-0281** 2:13
**51** 98:6 99:3, 18 100:25
**518** 2:5
**53** 3:12 178:2 217:3, 6
**54** 217:25
**553-2385** 2:18
**55402** 2:13
**59** 129:6, 17, 24
**5-millimolar** 218:6, 12

**< 6 >**
**6** 4:16 34:25 35:23 37:25 40:25 68:3, 23 71:11, 13 74:7 75:21 76:16 125:1

187:22 188:2
**6,114** 179:6
**6,607** 184:5
**6.2** 129:2
**6.8** 218:5
**6:08** 240:9
**60** 91:8 171:1, 4, 6, 8 174:1
**60,000** 90:11, 17
**60,850,650** 112:19
**60.2** 68:2 91:4
**617** 2:21 3:13
**62** 176:8
**65** 22:13, 19, 23
**66210** 2:9
**678** 2:18

**< 7 >**
**7** 4:19 13:5, 14 14:2 61:19 68:6, 23 77:15, 19 115:7, 15 125:1
**70** 22:13, 19 171:9
**70-kilogram** 112:20 136:4 137:1 141:3, 6
**70-year** 112:19 136:4, 25 141:3, 5 171:7, 13, 22, 25 172:5, 14 175:14
**71** 4:18
**724-2298** 2:5
**77** 4:20
**780,000-plus** 226:24
**780,871** 226:11
**7th** 31:14 114:22

**< 8 >**

**8** 4:4, 20
13:14 14:3
27:22 86:13
100:2, 3
123:21
**8,000** 189:25
190:7, 10
192:4, 8, 17, 20
**8,950** 136:3,
24 137:6
138:4
**800** 2:12, 13
**80s** 145:22
170:14
**8101** 2:8
**850** 29:1
**86** 4:23
133:11
**87** 134:4
**877.370.3377**
1:21
**8900** 4:23

**< 9 >**
**9** 5:3 77:13
91:16, 18
92:3, 6
125:11, 22
173:20
183:23, 25
**9:15** 1:16 7:5
**90067** 3:8
**90s** 145:22
170:14
**91** 5:4 124:16
**913** 2:9
**917.591.5672**
1:21
**95** 154:5
**96** 58:23
59:21 64:15
72:17 154:5
172:7, 13
190:18
**97** 154:6
**979-1164** 3:19
**98** 154:6

**< A >**
**A.M** 1:16 7:5

**49:25** 71:8
**a1** 79:23 80:6
**ability** 154:11
241:10
**able** 21:19
76:10 77:18
79:8 103:4
160:14
170:20 211:2
**absence** 211:4
212:7 225:9
**Absolute**
211:25
**Absolutely**
8:22 160:19
**Abstract**
156:21 157:2
182:12, 15
207:24 215:4,
7 216:14
**abundant**
204:4, 21
206:11
**academic**
201:12
**accept** 75:13
132:20 177:6
190:19, 21
213:13
**acceptable**
172:12
**accepted**
213:10
**accessible**
227:9
**accompanied**
27:8 28:5
**accuracy**
181:12
**accurate**
39:22 96:20
97:18 167:4
171:11
181:18 182:3
241:7
**accurately**
69:3 115:21
153:18
154:18 165:8
170:21

**accused** 50:7
**acid** 217:12
**acknowledging**
131:9
**ACKNOWLE
DGMENT**
242:1
**Actavis** 2:24
**Action** 13:21
20:25 21:10
24:13 30:4
32:3, 9 33:16
66:5 127:20
145:11
154:16
188:11, 17
241:15, 18
**active** 238:4
**activities**
24:25
**activity** 104:13
**actual** 50:17
51:6 52:9
94:12 114:6
131:20
189:13
190:20, 22
**ad** 95:24
**add** 184:14
**added** 27:14
28:3, 16, 17
161:12 162:1
214:6 216:3
**adding** 128:2
184:8
**addition**
68:10 133:19
155:9 178:13
214:3 232:24
**additional**
22:4, 8, 9, 23
27:14 28:3,
18 31:5 35:9
36:2, 6 37:1,
24 40:24
45:15 68:9
70:11 76:19
77:3 104:11
154:16 185:4
188:12, 24
192:7, 9, 18

**221:19**
236:15, 16
**address** 38:21
39:23 167:14
**addressed**
39:25 178:4,
6 179:24
**addresses**
135:10
**addressing**
40:18
**adducts**
151:10
166:25 207:5,
13
**adequately**
30:11
**ADI** 6:11
58:22 120:23
**adjust** 228:17
**adjusted**
226:2 228:24
229:1
**adjustment**
225:9
**administered**
145:20
**adopting** 34:1
139:9, 13
**adults** 169:2,
15 170:24
**adverse**
211:11
**afternoon**
102:22, 23
**age** 53:5
169:2, 15
**aged** 169:2,
15 170:25
220:14
**agents** 207:6
**aggregate**
180:25 183:6
185:20
**aggregated**
182:11
**aggregating**
181:8
**ago** 233:6
**agree** 122:3
127:1, 9

**128:14, 15**
135:24
145:14 146:7,
8 153:21
160:2, 4
164:18, 20
166:10, 11
240:1
**agreed** 7:13
127:25 165:3
**agreement**
21:8
**agrees** 118:12
120:23
**ah** 105:19
190:10
**Aid** 3:10
**air** 112:5
128:24
135:17 136:5
137:6 139:2,
16 140:19
203:23
**al** 137:12
138:22
146:18
164:21
168:18
183:24 184:7
185:2 213:6
**Albany** 2:4
**albeit** 102:4
**alcohol** 212:7
**ALFANO** 3:2
**algorithm**
62:16 63:3
230:19 231:2,
7
**alleged**
112:11 128:11
**alluded** 168:23
**alotman@duan
emorris.com**
3:19
**ALYSON**
3:17 9:8, 10,
15
**Alyson's** 9:9
**Amended**
4:16 26:20
27:7, 21 30:3

32:3, 9  33:11,
15  56:24
66:4  214:21
**Americans**
235:2
**amine**  209:4,
21  210:2, 10,
18
**Amine-rich**
6:12
**amines**  210:4,
5, 7, 12, 25
211:4
**amount**  81:16,
25  82:7
101:20, 23
102:6  107:2,
9  129:7
131:14  132:8
133:5  134:23
161:11, 12
164:15  168:6
177:1  194:13,
16, 19, 21
195:7, 9, 10
203:12  214:1,
2  221:7
229:9  234:11
**amounts**
92:11  109:5
111:3  112:4,
11  132:12
165:8  201:23
212:2  213:10,
11  214:10
215:8  217:13
**amphibians**
145:9
**analogous**
110:8
**analysis**  4:16
42:23  51:2
60:8  70:22
74:6  98:17
111:12  113:5
119:16, 21
142:9  156:23
157:6, 9, 12
158:3, 5, 8, 14
184:16, 21, 23
185:1, 3

187:16, 21
189:18
193:15  205:7
**and/or**  67:5
130:23
**Angeles**  3:8
**angio**  21:5
**angiotensin**
18:4, 9  20:3
21:5, 6
**animal**  112:8
145:7, 20
231:23  234:8,
11
**animals**
127:15
161:17  194:9
205:9  206:16
207:9  233:19
237:20  238:2
**answer**  8:12
18:11  29:22
30:19  33:19
36:10, 19
39:22  41:15
42:15  43:21
44:4  54:20,
22  55:10
59:16  61:7
62:13  65:16
74:23  76:1, 5,
6  77:8, 9
82:9  83:7
94:10  95:9
96:4  97:22
101:11  102:2
105:20
109:21, 22
110:8  128:4
136:2  138:2,
12  141:12
152:5, 8
154:3  155:17
163:22
170:21  178:1
179:10  180:7
181:9, 18
182:2, 12, 15
183:20  215:6
219:6  238:16,
17

**answered**
39:21  44:6
59:5, 7  60:18
61:10  67:11
74:9, 10, 24
93:21  97:13
99:23  100:22
108:16
109:20
110:23
121:24  127:4
141:19
152:24  154:1
155:16  219:4
**answering**
63:12  183:19
184:11, 20
192:20  235:16
**answers**  19:14
76:25  111:15,
16  242:5
**anticipating**
229:18
**anybody**  78:24
**API**  59:23
60:24  61:3,
15  62:1, 10,
20  63:6, 15
64:8, 14
70:14  78:9,
11  81:11, 16,
21  82:6, 18,
23  83:2, 10,
13, 24  84:20
88:2, 8
**APIs**  81:20
85:21  87:5,
15  189:8
**apologies**  44:6
**apologize**
13:2  57:23
102:3  110:1
135:4  140:10
180:23  182:9
221:15
**apparent**
216:4
**apparently**
120:15
**appear**  85:16
129:5

**appearance**
9:17
**APPEARANC
ES**  2:1  3:1
**appearing**
7:13
**appears**  13:19
89:20  118:23
127:15  130:8
230:19
**appended**
26:18  52:13
**appends**  67:25
**apples**  139:1
140:22, 23
**applicable**
66:2  131:11
**applications**
10:6, 8, 11, 15
**applied**  162:22
**APPLIES**  1:6
**appreciate**
142:15  230:3
**approach**
50:16  157:14
164:23  167:5,
16
**approaches**
159:6  235:15
**appropriate**
37:25  38:9
41:1  44:18
45:9  234:21
235:7, 20
237:25  238:23
**appropriatenes
s**  38:14, 22
39:14  42:5, 23
**approved**
51:13, 17, 20
**approximate**
151:21  165:9
**approximately**
22:24  99:18
100:24
**approximation**
82:10
**ARBs**  19:18,
25
**Arch**  9:2

**area**  237:23
238:21, 22, 24
239:10, 24
**areas**  40:7
**arguing**
204:11
**argument**
179:19  221:21
**arrive**  169:24
**arrives**  211:16
**arriving**
139:20  176:1
**arrow**  79:4
**articles**  19:16,
22  20:10
**articulated**
94:16  196:4
236:6
**ascertain**
50:16  51:6
56:4  59:8
69:24
**ascorbic**
217:12
**aside**  146:23
155:11
**asked**  19:22
29:22, 25
30:7  38:13,
18, 20  39:13,
23  40:1, 10
41:13, 14
42:9, 10, 13,
16  44:11, 16,
22  45:7, 11
49:15  59:4
60:17  61:10
64:6  67:11
72:13, 15
74:8  75:25
86:8  93:20,
22  96:4
97:20  99:22
108:17  109:1,
19, 24, 25
110:3, 9, 22
125:12  127:4,
25  138:2, 3
141:19  152:6,
24  154:1
155:15

Confidential Information Subject to Protective Order

173:*22*
184:*19* 207:*1*
219:*3* 226:*18*
231:*10*
234:*18*
237:*15*
238:*11, 15*
**asking** 8:*8, 19*
9:*4* 16:*8*
18:*6, 7* 19:*24*
24:*14* 27:*19,*
*22* 28:*2*
30:*16* 38:*12*
40:*6* 41:*6*
52:*24* 53:*1,*
*14* 55:*22*
56:*11* 57:*5, 7,*
*11* 59:*1*
61:*25* 66:*24*
67:*2* 69:*15,*
*16, 18* 70:*4*
72:*21, 22*
74:*17* 76:*17*
80:*22, 24*
81:*1* 82:*5, 11*
88:*11* 89:*13*
90:*20* 94:*4*
96:*15* 104:*4,*
*9* 120:*3, 6, 12*
121:*4* 125:*12*
138:*1* 139:*19*
150:*9* 152:*7*
171:*21*
172:*11, 14, 16*
175:*11*
177:*24, 25*
183:*18*
184:*17, 18, 22*
185:*1* 206:*2*
209:*19*
210:*14* 223:*15*
**aspect** 167:*25*
231:*19*
**aspects** 231:*19*
**assay** 86:*1, 4*
87:*13, 14*
89:*15* 93:*6*
94:*25* 96:*23*
97:*8* 167:*15,*
*19, 24*

**assays** 92:*25*
95:*13* 96:*25*
**assembling**
16:*21*
**assess** 54:*15*
57:*20* 58:*4*
97:*7* 222:*7*
**Assessment**
5:*7* 118:*9, 11*
124:*14*
141:*16, 22*
142:*6* 147:*9*
166:*21* 193:*9*
239:*22*
**assigned**
196:*16*
**assigning**
120:*11*
**associate**
232:*12*
**Associated**
6:*7* 57:*21*
58:*5* 59:*3, 9*
69:*9* 108:*23*
109:*10* 117:*8,*
*10* 119:*10*
132:*23* 177:*1,*
*8* 178:*9, 16*
181:*4* 185:*18*
188:*5, 13, 20*
189:*12*
198:*23*
202:*10*
209:*21* 225:*23*
**association**
179:*4* 204:*9*
225:*2, 15, 20,*
*24* 226:*25*
227:*15* 228:*10*
**associations**
176:*13*
**assume** 8:*13*
34:*23* 102:*9*
193:*16*
**assumes** 193:*4*
**assuming**
32:*16* 41:*24*
49:*16* 190:*7*
212:*12* 216:*14*
**assumption**
102:*5* 115:*20*

171:*10* 194:*3,*
*6*
**assumptions**
60:*5* 106:*24*
107:*6* 110:*13*
111:*1, 2*
120:*6* 121:*11*
130:*19*
193:*25* 195:*25*
**Atlanta** 2:*17*
**attached** 66:*2*
242:*9*
**attempt** 57:*19*
58:*3* 159:*25*
180:*15, 16*
**attempted**
59:*8*
**attempting**
104:*5* 183:*6*
232:*12*
**attention**
16:*15* 34:*25*
71:*20* 78:*15*
79:*22* 80:*5*
81:*9* 90:*3*
92:*1* 115:*6*
126:*18* 145:*4*
149:*15, 21*
206:*12, 13*
220:*11*
**attorney**
40:*21* 241:*13,*
*16*
**attorney-**
**generated**
33:*21, 23, 25*
**attorneys**
10:*25* 14:*14*
44:*11*
**attributable**
5:*15* 137:*5*
148:*16*
**attributed**
130:*21*
**audio** 48:*13*
102:*24*
105:*12*
123:*11* 209:*7,*
*8, 18* 227:*12*
**August** 23:*18*
27:*25* 28:*10*

65:*24* 66:*6*
106:*2, 13*
112:*23*
**Aurobindo**
72:*5, 8, 12, 24*
73:*5* 74:*5*
**author** 128:*15*
146:*20*
**authored**
19:*16*
**authors** 130:*6*
131:*1, 9*
138:*15, 17*
139:*7* 158:*13,*
*17* 160:*23*
166:*14*
168:*24*
169:*11, 12*
183:*8, 13*
206:*22* 216:*8*
225:*19*
**available** 9:*24*
10:*7, 15*
21:*19* 52:*18*
53:*2* 89:*7, 20*
95:*17* 98:*3*
101:*7, 21*
102:*11* 105:*4*
114:*7* 156:*5*
166:*17*
202:*16*
208:*20* 223:*6*
**Avenue** 2:*12*
**average** 57:*20*
59:*2, 8* 87:*9*
89:*12, 17, 22*
92:*11* 135:*25*
141:*1* 149:*4*
169:*22, 24*
171:*15, 19*
173:*17* 174:*7*
175:*14* 179:*7*
193:*20*
194:*13, 25*
202:*6*
**averages**
54:*14* 55:*3*
56:*4, 15* 57:*1*
58:*4*
**averaging**

174:*19* 175:*12*
**avoid** 43:*11*
**aware** 47:*18*
51:*13, 20*
118:*2* 132:*7,*
*11* 187:*14*
188:*4, 7*
220:*24* 235:*1*
237:*21* 238:*8*

**< B >**
**back** 11:*6*
17:*20* 24:*1*
27:*24* 28:*10*
30:*18* 49:*24*
55:*12* 61:*5*
65:*7* 67:*14*
68:*17* 71:*7*
72:*3* 74:*12*
81:*18* 99:*14*
100:*21*
102:*19*
103:*22* 104:*2*
111:*23* 113:*2*
121:*4* 122:*12*
130:*12*
135:*20*
136:*10*
142:*23*
153:*16*
154:*21* 155:*3*
162:*13* 165:*5,*
*15* 170:*14, 20*
174:*24*
175:*18*
187:*11*
199:*11*
203:*24*
209:*15*
211:*22*
218:*14* 220:*2*
229:*25* 234:*16*
**background**
192:*10* 214:*1,*
*4*
**ballpark**
136:*6* 140:*14*
**BARNES** 3:*5*
**base** 174:*9*
**based** 37:*20,*
*22* 48:*19*

49:4  52:12
54:11, 22
58:14, 20
60:4  61:18
62:15  93:9
97:3  101:25
102:4  115:23
116:1  121:11
124:4  126:22
130:19  131:3
136:4  150:8
151:8  156:24
158:22, 23
159:4, 16
160:7  164:25
166:20
167:18  168:1,
4  172:6
174:16  189:3
193:1, 10
194:5  195:4
207:11  215:6
230:5  232:10,
21  238:20
239:20
**baseline**
210:22
**bases**  156:16
236:25
**basically**
82:25  178:4
207:21  208:7
217:21  236:17
**basing**  104:7
193:8
**basis**  30:2
51:7  85:20
94:2  109:14
110:4  132:21
153:23  154:9,
16, 24  163:2
176:25  177:7
185:17, 22
231:7  232:1
233:4, 7, 11
238:1
**batches**  80:11,
18  85:18, 19
87:25  88:2, 4,
5, 8, 9, 10, 12,

16  89:11, 12
192:6
**Bates**  14:4
92:2  100:5, 19
**battleship**
223:7
**bearing**  230:4
**beer**  140:25
148:23  169:4,
17  173:16
**beginning**
1:16  60:25
93:3  205:1
227:5
**begins**  23:24
35:8  37:5, 9
149:23
176:11  211:25
**behaviors**
232:22
**beings**  112:2
123:25  127:7
145:18
160:10
161:22
163:21  177:2
194:9  216:21
217:2  223:3
235:11
**believe**  9:13
20:8, 13
21:25  23:4,
15  26:8
28:11  31:2, 4,
6  35:1  39:6,
24  42:18
47:11  50:12
54:12  59:6,
11  65:2
68:24  69:20
70:21  81:20
84:13  90:21,
24  93:16
94:6  96:18
99:24  100:9,
22  101:23
107:10, 12, 23
111:14
113:21  114:2,
17, 24  115:17
116:4  118:6

122:4  125:10
128:14
131:15, 23
140:23  145:1,
17  149:16
150:2, 4
161:3  163:11,
25  168:17, 22
169:20
172:15  175:1,
18  177:11
180:4  183:2,
11  188:2
190:15, 20
196:5  200:1,
5, 10  206:8
209:19
213:14
217:21
218:20  223:4
224:23  225:6
**bells**  78:4
**benefit**  83:15
236:14
**benefits**  18:3,
9
**best**  16:25
21:12  28:21
39:22  42:11
44:7  111:15
131:21
204:22  216:1
218:20, 23
225:15  241:9
**better**  200:25
206:19
207:17
223:24
226:17, 18
**between-study**
184:3
**Beverages**  5:9,
12  143:11
144:20
**beyond**  62:12
73:6, 7
124:23
165:14
192:10  237:15
**Biaudet**  125:1

144:2
**big**  64:24
**bigger**  122:3, 4
**bilharzia**  5:23
**Bill**  3:24  7:3
**binder**  11:17,
18, 24  12:1, 3,
10, 11, 16, 22,
25  13:16, 18
32:2
**biochemist**
217:21  219:4
**biological**
120:15  122:5
141:14
**biologically**
211:18
**biology**  19:11
213:22
**biopsies**  43:1
48:5, 16
**biopsy**  35:14
37:14, 17, 21
47:5, 9  48:8,
23  49:1, 5
**birds**  145:9
**bit**  43:9
64:19  65:11
103:3, 9, 12
113:1  115:18
123:12  152:1
165:1  231:25
232:1
**bits**  48:14
**black**  217:12
219:1
**bladder**  5:23
178:7  200:19
**blah**  173:18
**blending**
181:16
**blockers**  18:4,
9  20:3  21:5, 6
**blood**  35:10,
11, 13  37:6, 9,
10, 13, 20
41:1, 8, 18
42:23, 25
45:17  46:13,
16  47:6  48:5,
9, 17, 20, 21, 22

158:24, 25
159:4  160:22
162:25  189:16
**blood-based**
37:22
**bloodstream**
161:23
**blow**  79:18
**board**  178:12
210:17
**Bob**  203:4, 6
**body**  5:21
129:8  132:14
151:25  152:4
153:6, 10
161:25
162:24
200:14
201:19
211:19
212:15  237:23
**body's**  153:8
**BOGDAN**  2:3
4:4  8:1, 3
9:16, 18  12:7,
15, 23  14:7, 8,
24  15:4  16:3,
5, 12  17:6, 13
18:18  20:16
21:13, 17
23:12, 16, 23
24:2  25:20
26:6, 12, 19,
25  27:5  28:1
29:12  30:13
33:5, 22
36:21  37:7
38:6, 25
39:11  40:4, 9,
23  41:22
42:21  43:8,
12, 18  45:4
47:24  48:3
49:14  50:1, 4,
6, 10, 19, 21
51:12  54:24
55:11  58:2,
25  59:6, 12
60:6, 22
61:13, 24
62:8, 18  63:5,

19 64:12, 22
66:18 67:2
68:18 70:20
71:1, 9, 14
72:19 73:25
74:2, 13
75:16 76:8
77:11, 16
78:14 79:2,
20, 21 80:25
83:8, 21 85:3,
6, 12 86:9, 14
87:6, 21
91:12, 19
92:21, 23
94:1 96:2, 12
97:9, 16
98:25 99:15,
24 100:10, 14,
17, 20 101:16
102:13, 21
103:8, 18, 24
108:3 109:12,
23 111:8
113:19, 24
114:5, 13
116:21, 25
119:15 123:4
126:4, 12
127:11 128:5,
19 129:12, 14
130:15, 18
133:3 134:20
135:6 139:5
140:11
141:21, 23
142:3, 16, 25
143:4, 9, 17,
24 144:7, 10,
15, 18 146:16
147:14 148:4,
10 150:10
153:4 154:14
155:24 156:6,
10 157:17
158:2 159:23
161:18
162:15
165:17 168:5
169:7 170:22
172:21 173:4,

12 174:18
177:12, 17
186:1, 6, 16,
22, 25 187:13,
20, 23 191:3
192:1 194:10
195:6 196:8,
12, 17, 25
197:8, 9, 20
198:5, 9, 13,
18, 21 199:1,
13, 20, 22
202:12, 18, 23
203:6, 8
205:13, 17
208:12, 16
209:2, 7, 17
214:15, 20
219:9, 17, 24
220:3, 7
221:23
223:21
224:13, 17
227:25 229:5,
6, 15 237:10,
17 238:7
239:4, 11
240:3
**BOSICK** 3:2
**Boston** 2:21
3:13
**Boulevard** 2:8
**Box** 2:4
**boy** 189:4
**brain** 40:3
**break** 47:23
48:2 49:15
104:1, 16
142:15
186:14, 15
187:3 199:6
**breaking**
48:10
**breakout**
187:1
**B-Report** 5:5
**BRETT** 2:8
**brief** 14:21
15:8 49:23
71:6 142:22
187:10

199:10
209:14 229:24
**briefly** 7:16
**broad** 167:19
204:18
**broader** 165:2
**broadly** 198:4
**broke** 43:8
**broken** 48:13
**Bronstein**
216:4
**brought** 93:10
**BSN** 2:8
**bucket** 161:5,
6, 7, 8, 10, 12
**buffer** 218:5
**building** 54:3,
4, 7
**bunch** 11:19

< C >
**calculate**
81:25 83:12
95:20 119:17
159:21
171:21 172:19
**calculated**
29:18 59:18
101:20
119:24 120:4,
19 121:6, 9
149:7
**calculating**
175:4
**calculation**
14:5 83:22
90:20 101:2,
10, 14, 17, 18,
25 102:4
104:18, 23
105:24
174:21
175:25
194:14 195:21
**calculations**
58:18 59:14
60:2 61:17
62:14 66:9
67:18 73:17
99:10 100:13
106:7, 15, 16

111:19
116:15, 19
119:6 175:9
213:1
**calculator**
23:1 82:21
83:16 90:23
**calibrated**
89:15
**calibrating**
89:16 95:2
**calibration**
96:24
**California** 3:8
**call** 14:21
156:21
**called** 138:17
196:20 198:23
**calling** 139:7
**calls** 158:16
**Canada**
113:14 239:1,
23
**cancer** 5:24
6:4, 5, 18, 21
18:20, 24
19:11 20:11
30:3 34:19
39:15 41:3
43:6, 17
45:19, 24
46:1, 5, 6, 7,
12, 19, 22
47:2, 15, 19
48:5, 7, 17
49:6, 9 53:22
65:22 66:1
69:10 73:23
107:20 108:2,
5 109:15
110:14, 21
111:5 112:1,
8 117:25
118:15, 16
134:1, 2, 17
140:1 141:8,
17 170:3
176:12 177:2
178:7, 8, 13,
14, 16, 18, 19,
24 179:7, 9

184:1, 7
185:19
188:12, 19, 25
189:19 190:1,
5, 11, 24
191:2, 15, 19
192:7, 9, 16,
18, 22, 24
195:15, 23
200:19 204:8,
13 220:13
222:3, 5, 7, 15,
23 223:3, 16,
25 224:4, 7
225:3, 14, 22,
24, 25 226:6
227:2, 17
228:12, 19, 21,
22 231:23
232:3, 12
233:18 234:1,
10, 22 235:8,
10, 11, 13, 14
236:9, 12
**cancers** 38:2,
10 123:23
176:17 178:3
179:2, 24
180:5 223:9
234:7
**cancer-
screening**
235:1
**capable** 108:2
110:14 112:1
134:17
**carcinogen**
51:22 52:9
55:1, 7 111:25
**carcinogenic**
126:25 127:7,
17 145:6
147:11 205:9
211:13 212:18
**carcinogenicity**
238:3
**care** 18:19
47:19 49:10
56:23

Confidential Information Subject to Protective Order

**Carlo** 156:*24*
157:*6, 8, 12*
158:*5, 8, 14*
**case** 34:*11, 15*
35:*19* 50:*24*
60:*5, 12*
68:*24* 70:*8*
75:*15* 82:*15*
84:*5* 86:*21*
88:*20* 91:*5*
92:*14* 94:*13*
95:*20* 96:*7,*
*18* 111:*1*
121:*5, 9*
131:*10*
135:*24*
159:*10*
188:*24* 192:*7,*
*16, 18* 204:*14*
213:*24*
223:*25* 230:*9,*
*25* 231:*15*
**CASES** 1:*6*
181:*4, 11*
**catch** 160:*15*
**categories**
85:*17*
**category**
129:*17, 22, 23*
**causation**
206:*16* 207:*8*
**cause** 20:*25*
21:*10* 24:*13*
94:*5* 107:*20*
111:*5* 112:*7*
127:*20*
141:*17*
154:*15*
188:*11, 17*
195:*15* 207:*5*
223:*3* 224:*4*
231:*23*
233:*18* 234:*1,*
*10*
**caused** 201:*5*
214:*13*
**causes** 207:*15*
224:*7*
**causing**
110:*14* 112:*1*
134:*17*

**caveats** 134:*5*
135:*18*
**CCR** 241:*22*
**CCR-NJ** 1:*18*
**cct@pietragallo**
**.com** 3:*4*
**cease** 161:*20*
**ceases** 152:*22*
**cell** 10:*18*
**cells** 150:*14,*
*22* 159:*4*
**center** 201:*12*
**Centre** 3:*3*
**Century** 3:*7*
**cereal** 148:*22*
**Cert** 13:*18*
**certain** 41:*2*
53:*5, 6*
164:*15* 189:*7*
201:*4*
**certainly**
53:*19* 160:*18*
162:*17*
175:*20* 176:*6*
193:*23* 198:*3*
204:*22*
233:*17* 238:*14*
**Certification**
13:*22* 31:*21,*
*25* 32:*13*
33:*18* 35:*25*
36:*9, 15, 24*
**Certified**
241:*3, 4, 5*
**certify** 230:*12*
241:*6, 12*
242:*3*
**cetera** 19:*10*
96:*17* 229:*12*
**challenge**
115:*18*
**challenging**
189:*10*
**change** 29:*4*
73:*20* 107:*18*
108:*1* 133:*16*
146:*14*

**Change/Reason**
243:*2*

**changed**
66:*14* 70:*12,*
*19* 75:*15*
94:*23* 104:*6*
**changes**
107:*13, 15*
131:*5* 216:*1*
242:*7*
**characteristics**
41:*17*
**characterizatio**
**n** 160:*3, 5*
**chart** 121:*19,*
*23* 141:*9*
**charts** 232:*22*
**cheat** 196:*17*
**check** 71:*2*
203:*24*
**Checking**
16:*14* 102:*25*
**checkmark**
79:*10*
**Chemical** 5:*7*
124:*14* 153:*9*
158:*24* 163:*8*
205:*6, 12*
**chemistry**
149:*23* 150:*2,*
*5, 11*
**cherrypick**
171:*18*
**chest** 35:*11*
37:*10* 41:*25*
42:*5* 45:*21*
53:*7, 21*
**CHODOSH**
1:*14* 4:*3, 11,*
*14* 7:*11, 22*
8:*2* 10:*3*
11:*23* 13:*7*
14:*1, 4, 10*
15:*3* 17:*12*
21:*16, 18*
26:*11* 27:*1, 4*
33:*8* 43:*13*
48:*13* 50:*11*
65:*16* 67:*4*
71:*13* 77:*15*
86:*13* 91:*18*
100:*6, 19*
101:*12*

103:*25*
114:*12*
126:*11* 127:*1*
129:*20*
137:*25*
143:*16*
144:*17* 147:*7*
156:*8* 157:*20,*
*25* 177:*14*
184:*22*
186:*10*
187:*14, 24*
197:*10, 15*
199:*19*
202:*22* 204:*2*
205:*16*
208:*15*
214:*19, 21*
218:*24*
219:*16, 22*
224:*16* 230:*3*
238:*16* 242:*2,*
*12*
**Chodosh's**
12:*5* 21:*14*
26:*7* 100:*13*
**choice** 67:*17*
144:*7*
**choose** 79:*15*
89:*17* 184:*12*
**choppy** 103:*3*
**chose** 93:*10*
94:*17* 96:*13*
**circular**
216:*19*
**circulation**
150:*20*
**citation**
173:*19* 174:*11*
**citations** 75:*14*
**cite** 36:*22*
66:*10* 68:*12*
126:*16* 134:*8,*
*25* 143:*2*
148:*18*
156:*11* 174:*5*
178:*25*
197:*11*
200:*11, 15*
201:*17*
237:*11, 22*

**cited** 12:*4*
67:*25* 75:*2*
77:*5* 124:*23,*
*24* 135:*14*
138:*1* 144:*24*
145:*1* 147:*15*
149:*8, 10, 12*
156:*14*
171:*16* 174:*7*
196:*10*
199:*24*
202:*18*
219:*19* 220:*9*
224:*19*
**cites** 67:*24*
68:*11* 124:*16*
177:*23*
**citing** 35:*23*
68:*10, 23*
69:*3* 113:*4*
136:*13*
137:*22, 23*
211:*7* 214:*9*
**citrate** 218:*5*
**CIVIL** 1:*4*
**claim** 51:*5*
106:*18*
108:*12* 113:*3*
118:*12*
119:*17* 142:*5*
224:*7*
**claimed**
123:*21*
176:*12* 180:*6*
223:*3, 9*
**Claims** 13:*23*
32:*14*
**clarified** 25:*14*
**clarify** 14:*1*
28:*17* 44:*10*
53:*3* 65:*18*
152:*7*
**Class** 13:*18,*
*21, 22* 30:*4*
31:*21, 24*
32:*3, 9, 12*
33:*16, 18*
35:*24* 36:*8,*
*15, 24* 65:*5*
66:*4* 206:*11*
230:*12, 18*

Confidential Information Subject to Protective Order

classes 18:3, 14, 22 19:17
clear 19:20 39:12 77:2, 3 104:4 106:1, 6 134:10 180:24 182:9 232:15 233:20
clearance 159:1 162:6, 19, 22, 23 163:2
clearer 53:25
clearly 107:3 120:23 126:24 127:6 205:10
CLEM 3:2
click 79:15 147:4, 21
clinic 46:10
clinical 160:10 161:16
clockwise 11:13 13:3
close 228:25
closed 88:17 220:23 221:4, 9
closely 223:2
CLR 241:21
clue 25:6
code 57:21 58:1, 5 59:25
codes 58:24 59:3, 10, 22
cohort 6:19 34:18 51:21 52:8, 20
collection 185:21
College 2:8
colloquial 47:10, 20
colon 179:8
colonoscopy 19:3, 4, 6 35:12 37:11 42:24 46:23

colorectal 179:8, 16 180:6
column 92:12 117:1, 8 122:7, 8 126:21 129:6 149:22 153:17 165:20 211:24 218:1
columns 81:9, 12
Combination 6:11 102:8 158:25 210:2
combine 180:16
combining 180:17 181:13, 14, 25
come 55:12 82:8 112:25 113:7 139:25 175:13 185:7
comes 29:6 118:20 212:9 236:16
comfort 47:23
coming 197:7
comment 45:8 54:21 114:15
commented 57:7
comments 56:19
committed 164:1 189:10
common 185:14 201:4, 6
commonly 46:6
companies 73:16 93:13 94:19
company 193:21
comparable 97:5

compare 95:10 139:17 158:10 188:11 212:18
compared 75:11 150:15 190:23, 25 214:10 229:10 231:21, 22 232:2 233:9, 16, 17, 24, 25 236:13
comparing 85:22
comparison 92:7 140:23 188:18
compartment 218:4
compartmental 159:16
competent 93:17 94:7
compiled 11:25
Complaint 13:21 30:4 32:4, 10 33:16 66:5 189:6 230:8
complete 21:23, 25
completely 7:17 65:3 106:24 138:16
completeness 212:23
component 184:4 207:25
components 217:22 219:6
Composition 6:7 198:23 208:2, 3
compound 67:10 185:10 205:6
compounds 5:18, 23 6:4,

8 145:12 153:9 163:8 196:21 197:6 203:10 204:15 205:4 206:4, 9 207:3 211:14
comprehensive 27:11
computer 26:24 79:6, 7
computers 10:11
conceivably 102:7 106:19 108:19 109:6 224:4 236:8
concentration 162:25 163:1 217:22 219:5
concentrations 133:14 148:24 149:9 160:6, 7 165:1, 9 202:3 207:4 217:18
concern 93:5
concerning 183:25
Concise 5:5 124:13
concludes 240:8
conclusion 109:8 167:5 168:2 176:12 211:16 221:24 222:8 225:5
conclusions 142:11 166:11
condition 200:21 202:1
conditions 6:16 130:6 201:18 215:8, 25 216:5, 18 217:23 218:3, 18

conference 15:14
confident 73:12 149:12 174:14
CONFIDENTIAL 1:6
confounding 228:15
conjunction 91:21
consequence 108:20 150:13 151:11 200:14 211:13 234:13
Consequently 118:8
conservative 109:8 110:12 111:2 120:5 195:25
consider 57:12, 14 75:4 81:14 86:20 92:13 107:5 174:8 177:15, 18 180:10 221:1, 6 222:22 223:15
considerable 184:3
consideration 75:7, 19 76:14
Considered 4:16 26:20, 22 27:8, 12, 15, 17, 22, 24 28:3 33:12 34:3 50:22 57:7 77:24 80:23 84:9 91:11 96:16 104:14 127:16 139:20 151:9 154:25 155:19 163:13, 24

Confidential Information Subject to Protective Order

205:8  207:25
214:22  237:5,
25
**considering**
179:1
**consistent**
165:12
225:17  226:6
**consisting**
35:9  45:16
**Consolidated**
13:20
**constant**
152:15
**consumed**
133:20
**Consumer**
13:23  32:13
**consumption**
89:7, 21
130:21
**containing**
63:16  98:3, 7,
11  99:5
101:7  192:5
218:6  223:11
**contains**
196:23  217:12
**contaminated**
6:17, 20
55:18  60:15
99:2  105:5
119:7  130:22
175:10
213:24  214:3
221:3, 8, 11
222:4  225:3
229:8
**contamination**
58:7  59:2
67:7  82:2
87:10  89:10,
12  98:16
194:13  229:7
**cont'd**  3:1
**content**  131:18
**context**  19:8
47:12  49:4
162:11  177:3
193:14

206:18
207:11  217:18
**continue**
116:24  176:5
**continued**
28:22
**continues**
65:12
**contradicted**
177:10  223:7
**contradiction**
121:3
**contradictory**
120:10  224:11
**contrast**  119:2
**control**  9:25
70:22  147:9
201:22, 25
210:9
**controls**  131:6
202:5, 6
**conventional**
163:4
**conversion**
82:25  152:11
**convert**  82:6
**converting**
113:6, 15
**copies**  12:6, 17
**copy**  11:16,
17  13:4
21:23  31:13
33:7  36:17
50:12  114:18
215:17
**corner**  149:17
**Corporation**
3:10
**correct**  12:20
15:15, 23
22:3, 9  23:12
28:2, 24  29:2,
3  39:16  43:1
48:24  50:18,
24  55:19
56:6  60:9, 16
64:1, 2, 4, 5
72:9  85:5
88:1, 6, 11
90:7, 12, 18
93:2, 8  98:4,

5, 8, 9, 12, 18
99:20  101:1
113:12
115:24  116:3
117:9  118:8
119:4, 19, 20
120:2, 8, 20
121:7, 19, 23
122:14  123:1,
17  124:14, 20
125:3  128:25
129:4, 5, 25
130:3, 7, 8
131:12  133:7
135:13
136:16, 19
137:1, 7, 11
138:9  139:10
140:16
141:13
144:25
145:21, 23
146:12, 13, 14
148:16, 17
151:17
152:22
156:13  160:1
161:21, 22
170:17  171:1,
4, 5, 9  172:2,
8  186:2, 8
197:22  198:1,
2  200:24
202:9, 11
203:1, 10, 11
207:23
208:10, 11
209:4  214:2
216:18  220:5,
13, 16  224:21
225:4, 22
226:13, 14, 16
235:22
237:13  239:6,
13, 17  242:5
**corrections**
242:7
**correctly**
53:12, 13
116:13  119:3
124:1  130:24,

25  131:7, 8
136:17  137:2,
8  169:10, 18
220:17
222:10  225:5
228:13  235:18
**correlate**
204:9
**correlates**
204:10
**correspond**
83:23  112:18
136:24  216:13

**correspondence**
62:5, 24
**corresponding**
63:15  82:17
**corresponds**
104:19
105:17  129:9
223:2
**counsel**  7:18
9:10  12:16
14:16  50:8
70:24  143:23
196:15
231:10
234:18  237:9
241:14, 16
**Counselor**
143:6
**Counsel's**
230:5  235:6
**count**  122:18
**counterclockwi
se**  11:14  13:1,
3
**countries**
145:25  146:1,
3  170:1, 5, 8
**country**
191:20
235:14  236:12
**country-to-
country**  146:9
**couple**  17:17
44:7  143:1
**course**  38:17
112:24
118:23

137:13  149:2
177:4  192:21
194:2  213:13
217:1  235:12
**COURT**  1:1
7:9, 19  8:6
40:21  42:10
44:25  143:22
157:22  186:4
241:4
**covered**  41:12
60:18  63:10
65:9  93:24
238:13
**covers**  30:11
**co-workers**
212:4
**created**
150:21, 25
**criteria**  52:19
53:16
**critical**
218:16
231:18, 19
**critique**  185:8
**critiques**  51:10
**cross-checking**
155:3
**cross-talking**
32:20
**CRR**  1:17
241:21
**CT**  35:10
37:10  41:25
42:5  45:21
53:7, 21
**CULBERTSO
N**  3:10
**cumulative**
63:4  99:6
108:4, 11
109:16  110:6,
25  111:3
112:10  117:5,
7, 19, 23
118:10, 13
120:1, 3
137:5, 9
138:5  139:10
140:15  141:2
172:8, 15

Confidential Information Subject to Protective Order

173:*18*
175:*13*
178:*10, 17*
179:*5, 20*
215:*8* 230:*16*
**cured** 65:*3*
**current** 165:*6*
**currently**
8:*23* 211:*9*
**cut** 60:*25*
93:*4* 156:*1*
192:*12*
204:*25* 209:*7*
**cutting** 123:*8*
**CVS** 3:*10*
**CYP2E** 153:*5*
**CYP2E1**
150:*17, 23*
153:*12* 166:*9*
**cytochrome**
150:*17* 153:*7*

**< D >**
**Daily** 5:*7, 10,*
*14* 128:*23*
130:*20* 134:*6*
135:*25* 138:*8*
143:*10*
144:*19* 149:*4*
164:*14*
168:*11, 15, 25*
169:*13*
172:*12* 173:*7,*
*24* 192:*6*
**dairy** 148:*22*
**damage**
206:*16* 207:*8,*
*12* 214:*13*
**damaging**
207:*16*
**Danish** 6:*18*
220:*13* 226:*22*
**data** 60:*14*
62:*25* 67:*6*
78:*10* 81:*19,*
*21, 22, 24*
83:*3* 84:*18*
89:*1, 3* 92:*15*
93:*11, 13*
94:*18* 95:*21*
104:*13*

115:*11, 21, 23*
131:*2* 132:*14*
133:*22*
140:*20* 149:*1*
153:*18*
154:*18*
155:*19, 20*
157:*14* 158:*8,*
*9, 18* 165:*24*
166:*12* 168:*2,*
*4* 185:*2*
211:*19* 238:*1*
**databases**
132:*2*
**date** 1:*17* 7:*4*
23:*5, 15, 19*
25:*19* 26:*4*
31:*3, 11*
69:*16* 86:*2*
114:*18* 145:*6*
170:*14*
241:*10* 242:*12*
**dated** 13:*5, 24*
**dates** 24:*14, 23*
**day** 58:*23*
102:*9* 107:*2*
129:*8* 136:*16*
149:*5* 160:*24*
169:*2, 4, 14,*
*16, 17, 20*
170:*23, 25*
171:*1, 3, 4*
172:*7, 14*
174:*1* 190:*18*
202:*4* 212:*14,*
*15* 221:*16*
234:*17*
**days** 14:*22*
75:*18* 101:*22*
171:*9* 212:*15*
**deal** 120:*11*
225:*10*
**dealing**
131:*16*
137:*16*
146:*11* 153:*8*
194:*7* 197:*23,*
*25*
**deals** 149:*8*
**dealt** 132:*4*

133:*9*
**death** 222:*15*
**decades** 134:*2*
**December**
22:*2, 5, 12*
24:*10*
**decide** 183:*8*
**decided** 53:*17*
184:*13*
**decision** 52:*10,*
*24*
**declined**
131:*23*
**decrease**
215:*11*
**decreasing**
181:*12*
**dedicated**
19:*11*
**Defendant** 3:*5*
69:*14* 70:*1,*
*15* 92:*25*
93:*7, 16* 94:*6*
195:*8*
**Defendants**
2:*22* 3:*9, 14,*
*20* 4:*8* 28:*19*
70:*8* 93:*23*
**Defendant's**
13:*6* 17:*7*
**defense** 44:*11*
**define** 18:*17*
**degrees** 205:*3*
**delayed**
105:*13*
**delivery**
150:*19*
**demonstrate**
131:*25* 132:*21*
**demonstrating**
63:*7* 64:*7, 13*
**depend** 182:*10*
**dependent**
219:*5*
**depending**
169:*2, 15*
**Depends**
18:*16* 29:*19*
**deponent** 7:*10*
242:*1*

**deposed** 65:*8*
69:*19* 104:*8,*
*12* 106:*9*
155:*21*
**deposition**
1:*13* 4:*8, 11*
7:*6, 12* 9:*5,*
*20* 10:*20, 23*
11:*6, 10* 13:*7,*
*10, 12, 15*
14:*3, 6, 14, 16,*
*25* 15:*3*
17:*12, 19*
20:*9, 14, 19*
21:*3, 11, 16*
24:*4, 19* 25:*4,*
*11, 15* 26:*11*
27:*4* 28:*5, 20*
30:*25* 31:*3,*
*15* 58:*18*
59:*15, 18*
60:*19* 61:*20*
63:*11* 64:*18*
66:*25* 67:*12,*
*19* 69:*11*
70:*11, 13, 17*
71:*13* 72:*14,*
*18* 73:*15*
75:*17* 76:*12,*
*14, 20* 77:*15*
78:*7* 84:*3, 7*
86:*8, 13*
88:*25* 91:*18*
93:*9, 21*
94:*16* 95:*14*
98:*14* 99:*11,*
*23* 100:*4, 9,*
*12* 107:*12*
108:*7* 109:*1*
114:*12*
126:*11* 127:*5,*
*23* 141:*20, 25*
143:*16*
144:*17* 147:*7*
152:*25* 154:*2*
156:*8* 161:*4*
175:*2, 8*
188:*9* 197:*15*
199:*19*
202:*22*
205:*16*

208:*15*
214:*19*
219:*16*
224:*16* 240:*9*
**depositions**
70:*5*
**deps@golkow.c**
**om** 1:*22*
**derive** 63:*3*
135:*22*
**derived**
111:*16*
117:*11*
129:*21* 133:*22*
**DeSALVO** 2:*3*
**describe**
150:*11*
151:*24* 152:*3*
216:*8*
**described**
19:*1* 99:*12*
176:*24*
**describes**
162:*21*
**DESCRIPTIO**
**N** 4:*7* 5:*2*
6:*2* 25:*1*
36:*5* 113:*11*
172:*23*
**descriptive**
143:*8*
**DeStefani**
121:*22* 140:*2,*
*4*
**detail** 26:*2*
35:*21* 37:*19*
39:*9* 99:*12*
106:*2* 236:*22*
**detailed** 65:*19*
140:*24* 154:*8*
173:*15*
210:*20* 211:*23*
**detailing**
135:*17*
**details** 211:*6*
231:*8*
**detect** 46:*11,*
*22* 94:*8*
151:*10*
**detectable**
151:*5*

Confidential Information Subject to Protective Order

detection
35:13  37:13,
20  42:25
45:19, 24
47:5, 19  48:5,
17, 20, 22  49:9
determination
95:22
determine
55:3  60:1
87:9  89:11
110:6, 15
132:22  218:9
231:3  233:4
determined
75:12  97:18
110:19, 24
207:4
determining
119:22
141:14  204:13
develop  190:4
192:22
developed
95:15  238:1
developing
18:20, 24
34:19  38:1,
10  39:15
41:2  66:1
development
134:1
Deviation  5:3
device  10:19
diagnose  47:2,
15  148:6
diagnosis  46:7,
20  49:7  134:2
Dich  125:1
146:17, 18
D-I-C-H
146:21
Diet  6:7, 12
133:6  134:24
135:11, 13
139:1  140:19,
21  150:16
166:7  167:10
168:6, 8
198:23
203:22  204:8,

20  206:15
207:7, 15
208:2  209:4
210:2, 22
213:11, 12, 19
214:2, 7
231:19  233:15
dietary  112:4
122:2  124:4,
22  131:17
132:1, 18, 20
133:4, 12, 23,
25  134:6, 22
135:11  136:7
137:17, 22
139:15
140:18, 25
143:2  145:2
146:18
149:11
168:10, 11, 15,
19, 25  169:13,
22, 25  170:2,
8, 9, 16  171:7,
12, 15, 17, 22,
24  172:4
173:8, 16, 24
176:14, 24
178:4, 10, 16
179:4, 13, 24
180:8  185:4,
16  204:14
207:25
213:16
231:11, 14, 20,
24  232:14, 25
233:8
diets  145:24
146:1, 9, 11,
14  209:21
210:23
differ  133:16
difference
69:6, 7
107:17  195:12
differences
28:11  166:3,
4, 7
different  8:15
19:21  23:17
32:7, 17  33:1,

9  41:18
73:19  76:5,
19  79:12
81:6  83:6
85:17  94:2
95:7, 8, 9, 12
103:10  104:6
133:15
138:25  142:9
145:7, 20, 24,
25  158:10, 18,
21  159:6
160:8  163:14
167:21
169:25
171:19
172:17  175:9
180:18, 19, 20
181:21, 22
182:1  189:8
205:2, 11
209:22
218:10
219:25
229:11, 13
difficult  118:9
133:14  149:18
difficulty  43:5
Dipak  30:14
direct  126:18
222:18
directing
16:15  34:25
50:11  71:20
78:15  79:22
80:5  81:9
90:3  92:1
145:4  149:15,
21  162:4
206:13  220:11
directly  162:7,
20
disagree
120:21  127:9,
20  139:11
145:16
153:22
155:10  167:7
disagreed
127:25

disagreeing
153:23  154:17
disappointing
95:25
discernible
167:23
disconnect
43:15  96:3
discovered
154:16
discuss  76:12
124:7  231:6
discussed
59:14  68:17
73:14  99:11
106:2  131:21
136:15
discussing
52:1  64:18,
25  135:15
149:14
166:13  175:21
discussion
20:9  42:19,
22  45:2  56:7
65:7  115:11
177:21  207:11
discussions
132:12
disease  166:6
190:25  201:3
229:1
dissimilar
181:13
distinct  21:10
86:19
DISTRICT
1:1  7:9, 10
8:6
dividing  158:9
DMA  218:6
DNA  147:9
151:10  159:3
206:16  207:5,
6, 8, 12, 13, 16
214:12, 13
Doctor  11:15
15:13  16:4,
13  17:14
19:15  32:19
35:4  40:5

43:23  52:25
53:18  61:25
71:15  76:9
77:17  85:13
86:15  91:20
101:4, 5
102:22  114:7
126:13
134:21
140:12
141:24  143:1,
18  144:19
147:2, 21
148:11
183:17
199:23
209:10, 18
215:3  218:8
219:18  220:8
228:1
doctor's  12:18
DOCUMENT
1:6  5:7  15:2
16:18  17:9,
11, 14, 21
18:12  21:15
26:10, 13, 16
27:3, 6  32:7,
8, 15, 23  33:9
34:6  68:7
71:12, 18, 21,
23  72:4, 6, 15
73:3, 17
74:20, 21, 25
76:16  77:12,
14, 23, 24
78:3, 13
79:11, 15, 19,
23  80:4, 14,
18  81:2, 4
85:14, 15
86:10, 12, 24
87:1  88:12,
16  91:17, 20
92:2, 4  99:8,
22  100:5
114:11
124:14  126:6,
10, 14, 16, 19
128:21
143:15

144:*16*  147:*6*
149:*16*  156:*2,*
*7*  186:*9*
193:*15, 19*
197:*14*
199:*18*
202:*21*
203:*25*
205:*15, 24*
206:*7, 24*
208:*14, 25*
214:*18*  215:*2*
219:*15*
222:*13*  224:*15*
**documents**
11:*9, 12, 24,*
*25*  12:*6, 9, 17,*
*24*  14:*4, 9, 11*
*15:17*  16:*22*
*28:19*  33:*20,*
*24, 25*  56:*23*
*66:21*  67:*16*
*68:8, 22*  78:*9*
*81:15*  96:*15*
*104:6*  199:*2*
*230:15*
**document's**
*77:18*
**dogs**  145:*9*
**doing**  53:*7*
*116:19*
*171:17*  181:*7*
*236:16*
**DOLORES**
*2:3*
**dosage**  82:*14*
*112:17*  113:*6*
**dose**  35:*10*
*37:10*  41:*24*
*42:5*  45:*21*
*53:7, 21*
*59:21*  60:*23*
*61:2, 14*  62:*1,*
*6, 9, 10, 19*
*66:21*  69:*12,*
*25*  70:*7*
*89:11*  101:*22*
*109:2*  110:*6*
*111:5, 22*
*112:7*  113:*7,*
*15, 17*  127:*8*

145:*18*  149:*5*
192:*5*  193:*9*
195:*14*  212:*5*
224:*4*  225:*7*
226:*4*  228:*24*
231:*22*
233:*18*  234:*10*
**dose/duration/**
**API**  123:*22*
**doses**  66:*16*
107:*19*
108:*18*
110:*10, 14*
111:*9, 10*
126:*24*
128:*12*
134:*16*  194:*7*
195:*15*
212:*18*  229:*9,*
*10*  237:*20*
**download**
79:*5, 11, 16*
**dozens**  88:*24*
89:*8*
**DP**  81:*11*
**Dr**  5:*5*  7:*11*
8:*2*  11:*7*
12:*5*  13:*4*
14:*1, 10*
21:*14, 18*
26:*7*  27:*1*
30:*14, 17, 25*
31:*7, 9, 15*
33:*8*  34:*10,*
*14, 24*  35:*18*
43:*13*  48:*13*
50:*11*  56:*22*
65:*16*  67:*4,*
*21, 22, 23*
68:*5, 10, 14,*
*19, 22*  69:*2*
73:*8*  75:*2, 8,*
*14*  77:*5*  91:*3,*
*9*  100:*13*
101:*12*
103:*25*
113:*20, 25*
114:*14*  115:*4,*
*14*  118:*12, 19*
120:*1, 9, 16,*
*17, 22, 25*

121:*3*  122:*6,*
*15*  123:*15*
127:*1*  129:*20*
131:*19*
132:*19*
137:*13, 19, 22,*
*25*  138:*1, 20*
139:*17, 23*
140:*15, 17*
141:*12*
157:*20, 25*
170:*6*  176:*21*
177:*14, 23*
178:*11, 15*
179:*2*  183:*10,*
*16, 18*  184:*6,*
*13, 16, 22*
185:*5*  187:*14,*
*24*  197:*10*
204:*2*  214:*21*
218:*24*
219:*22*  223:*5*
230:*3*  238:*16*
**drafting**  34:*3*
**dramatic**
216:*6*
**dramatically**
83:*6*
**draw**  167:*5*
**drinking**  5:*15*
148:*16, 21*
149:*2, 3, 6*
166:*8*
**driving**  213:*21*
**dropped**
123:*12*
**drops**  219:*25*
**drug**  62:*7*
81:*17*  84:*20*
93:*2, 8, 18, 19*
94:*8*  228:*19*
**drugs**  55:*18*
56:*17*  58:*6*
62:*21*  67:*8*
95:*16*  119:*19*
**DUANE**  3:*15*
9:*15*  203:*4, 7*
**Due**  7:*14*
131:*4*  134:*21*
149:*2*  150:*19*
151:*4*  167:*9,*

*23, 24*  172:*12*
233:*5*
**duly**  7:*23*
**duration**  189:*7*
**dynamic**  6:*14*
103:*10*
161:*21, 23, 24*
216:*1*

**< E >**
**earlier**  149:*14*
189:*15*
193:*19*  230:*5*
231:*10*
**early**  35:*13*
37:*13, 19*
42:*25*  48:*22*
145:*22*  234:*17*
**earned**  29:*16*
**easily**  167:*23*
**East**  3:*7*  92:*7*
**eating**  232:*22*
**economic**  33:*2*
**economics**
34:*6*
**Edward**  39:*2*
**effect**  194:*8*
211:*3*  225:*7*
**effectively**
111:*21*  236:*11*
**effects**  208:*2*
211:*12*
**efforts**  132:*12*
**Egyptian**
202:*6*
**eight**  212:*25*
**Eighteen**
100:*18*
**either**  27:*1*
79:*3*  146:*21*
166:*5*  179:*24*
181:*19*
193:*23*
217:*22*
227:*12*  240:*6*
**electronics**
9:*19, 23, 24*
**element**  66:*3*
**elevate**  236:*9*
**elevated**
236:*13*

**eliminated**
164:*15*
**EMA**  113:*14*
239:*1, 22*
**e-mails**  10:*6*
**emphasis**
192:*25*
**emphasizes**
163:*5*  195:*24*
**employed**
158:*14*  159:*8*
211:*20*
**employee**
241:*13, 16*
**enable**  166:*21*
**encapsulation**
236:*20*
**encompass**
30:*6*
**encompassed**
177:*5*
**encompasses**
174:*17*
**ended**  220:*18*
**Endemic**
201:*12*
**endogenous**
5:*20*  6:*3, 8*
112:*6*  135:*1*
151:*4, 8, 11*
154:*10*  155:*5*
158:*19*  159:*7,*
*25*  163:*3*
164:*13, 24*
165:*11, 25*
167:*10*  168:*7*
195:*16*
196:*11*
197:*21, 24*
198:*24*
201:*19, 23*
203:*13, 16*
204:*3, 6, 10,*
*11*  206:*3, 11*
207:*12, 15, 22*
208:*4, 8*
209:*25*
211:*13, 17, 21*
212:*20, 24*
213:*3, 4, 8, 17,*
*20, 22, 23*

Confidential Information Subject to Protective Order

214:*11*
231:*21* 232:*2*
233:*9, 12, 16,
24* 234:*2, 8*
**endogenously**
150:*13*
153:*19*
154:*19*
164:*17*
200:*13*
206:*15* 207:*7*
**endoscopy**
35:*12* 37:*11*
42:*24* 46:*24*
**endpoint**
222:*24* 223:*16*
**enormous**
234:*9*
**ensure** 7:*16*
**entering**
159:*19*
**enters** 161:*8*
**entirely**
230:*20*
**entitled** 13:*5*
16:*18* 26:*21*
70:*21* 77:*21*
81:*11* 84:*16*
136:*18* 168:*10*
**entries** 24:*9*
**environmentall
y** 52:*21*
**enzyme** 153:*12*
**enzymes**
150:*17, 24*
153:*5, 7*
166:*24*
**EPIC-
EURGAST**
6:*6*

**epidemiological**
176:*14* 181:*20*
**epidemiology**
122:*2* 149:*11*
170:*3, 10*
171:*17*
176:*25* 178:*5*
179:*14, 25*
185:*16*

**equal** 99:*19*
101:*1*
**equally** 204:*23*
**equate** 90:*10,
16*
**equipment**
96:*24*
**equivalent**
83:*25* 113:*17*
201:*14*
**errata** 25:*4*
242:*9* 243:*1*
**erring** 109:*7*
**esophageal**
178:*14, 19*
**especially**
69:*3* 216:*12*
**ESQ** 3:*12*
**ESQUIRE**
2:*3, 8, 12, 16,
19* 3:*2, 7, 17*
**essentially**
91:*8* 157:*13*
181:*3* 207:*18*
**EST** 1:*16*
**establish**
178:*22* 185:*23*
**established**
53:*15* 54:*9*
**establishing**
185:*18*
**estimate**
55:*17* 56:*16*
57:*10* 58:*13*
135:*16* 138:*4*
153:*18*
154:*19*
158:*18* 159:*9,
10* 164:*25*
168:*11, 15, 19,
25* 169:*8, 11,
12, 19, 24*
170:*16, 24*
172:*23* 173:*7*
184:*9* 188:*23*
193:*1* 195:*5*
203:*12* 204:*3*
212:*23, 24*
213:*15*
**estimated**
149:*9* 173:*16*

187:*15, 25*
188:*5, 12, 19*
189:*24* 192:*3,
4* 194:*12, 14*
213:*4, 5, 6, 9*
231:*25* 233:*8*
234:*3*
**estimates**
109:*8* 112:*3*
124:*22*
128:*23* 130:*2,
7, 20* 131:*3,
10, 17, 22*
132:*20* 134:*6*
135:*18, 22, 24*
136:*19* 137:*4,
11* 138:*8, 14,
18, 24* 139:*8,
9, 15, 17*
140:*16, 25*
149:*6* 151:*6*
158:*20*
164:*22*
165:*13* 167:*2*
170:*12*
171:*11*
173:*24*
211:*20*
212:*20, 25*
231:*20* 232:*10*
**estimating**
159:*6* 160:*7*
163:*3* 164:*13,
23* 232:*21*
**Estimation**
5:*14* 125:*20*
146:*25*
**et** 19:*9* 96:*17*
137:*12*
138:*22*
146:*18*
164:*21*
168:*18*
183:*24* 184:*7*
185:*2* 213:*6*
229:*12*
**Europe** 87:*18*
**European** 6:*4*
**evaluate**
44:*12, 16*
87:*19* 108:*17*

**evaluated**
179:*2*
**evaluation**
35:*11* 37:*11*
42:*24* 45:*8*
46:*14, 16*
**evaluations**
67:*17*
**eventually**
150:*24*
**everybody**
116:*22*
191:*19* 236:*12*
**everyday**
159:*12*
**evidence**
111:*25*
139:*14, 20, 21*
163:*1* 223:*6,
8* 224:*11*
229:*3*
**evident** 115:*3*
170:*5* 210:*21*
**evolved** 214:*12*
**exact** 72:*14*
76:*1* 86:*7*
97:*13* 109:*22*
127:*5* 141:*18*
152:*24*
**exactly** 30:*20*
95:*6* 115:*18*
154:*22*
173:*20*
181:*24*
238:*25* 239:*1,
21*
**examined**
7:*23* 126:*24*
**example** 19:*3*
52:*8* 53:*4, 23*
54:*2, 4, 11, 21*
55:*7* 83:*9*
107:*7* 134:*13*
161:*5, 13*
**exceed** 119:*25*
**exceedingly**
131:*24* 134:*10*
**Excel** 174:*22*
**exception**
145:*13*

**excited** 94:*12*
**exclude** 183:*9*
**excluding**
140:*25* 173:*16*
**excreted**
151:*5* 165:*11*
201:*24* 212:*2,
5, 12*
**excretion** 5:*22*
159:*5* 164:*14*
166:*13, 16, 20*
196:*14, 20*
197:*2*
**excuse** 21:*5*
43:*8* 121:*8*
135:*2* 144:*13*
209:*10*
**excused**
240:*10*
**Exhibit** 5:*5*
10:*4* 15:*1, 3,
5, 8, 25* 16:*11,
16, 22* 17:*8,
10, 12* 21:*14,
16, 19, 22*
22:*16* 23:*2,
14, 19, 21*
26:*8, 11, 14*
27:*4, 7* 50:*20*
61:*19* 66:*2*
70:*21* 71:*3, 9,
11, 13, 16*
74:*7* 75:*21*
76:*16* 77:*15,
19* 84:*15*
85:*5, 8* 86:*13,
16, 19, 20*
89:*24* 91:*14,
16, 18* 92:*21*
97:*23* 100:*2,
3, 8, 11, 15, 17,
21, 23* 101:*3*
113:*20* 114:*1,
4, 12* 126:*11*
129:*13, 15*
136:*11*
143:*14, 16, 19*
144:*5, 9, 14,
17* 147:*5, 7,
22, 23* 148:*7*
156:*5, 8*

175:*1, 20*
187:*22* 188:*1,
2* 197:*15, 17*
199:*17, 19*
202:*16, 22*
205:*16*
208:*15, 20, 21*
214:*16, 19*
219:*16* 220:*6*
224:*16*
**Exhibits** 10:*3*
13:*11, 14*
14:*2* 26:*18*
87:*8, 22, 24*
219:*11, 13, 22*
**exist** 152:*22*
153:*5* 161:*20*
**existed** 17:*2*
**exists** 153:*18*
154:*18*
**exogenous** 6:*3*
124:*4* 133:*6*
134:*23* 135:*2*
197:*23, 24*
**exogenously**
203:*22*
**expand** 130:*6*
**expect** 83:*5*
189:*1* 195:*19*
205:*11*
**expectation**
73:*7* 75:*2*
97:*3*
**expected** 225:*8*
**experience**
34:*17* 95:*4*
97:*4*
**experiencing**
169:*3, 16*
**experiment**
217:*23*
**experimental**
47:*17* 49:*12*
218:*3* 238:*1*
**experiments**
216:*6* 217:*9*
**Expert** 11:*23*
20:*24* 27:*8*
31:*7* 39:*2*
40:*6, 12*
55:*15, 22*

56:*2* 57:*19*
58:*3, 9* 66:*11*
118:*12* 179:*18*
**experts** 28:*8*
40:*18* 69:*1*
73:*12* 75:*4*
91:*1* 145:*17*
177:*9* 223:*2*
224:*12*
**expert's** 77:*4*
223:*13*
**explain** 41:*9*
**explained**
166:*3*
**explanation**
54:*11*
**explication**
112:*25* 154:*9*
**explicit** 176:*22*
**explicitly**
121:*10*
**exposed** 51:*21*
52:*8, 20* 54:*4*
102:*7* 106:*20*
108:*20* 109:*6*
110:*11*
123:*25*
134:*24*
145:*19*
150:*16* 151:*4*
223:*10* 224:*1,
24* 226:*5*
232:*9* 234:*13*
**Exposure**
5:*17, 20* 6:*3*
54:*14* 55:*1, 4,
17* 56:*6, 16*
57:*10* 58:*5,
14* 60:*1* 69:*8*
99:*6* 102:*1*
104:*20*
105:*18*
106:*18* 108:*4,
11* 109:*16*
110:*20*
112:*18* 117:*6,
19, 23* 118:*10,
13* 119:*7, 18,
22, 24* 120:*4*
121:*6* 124:*5*
127:*18* 128:*8,*

9, 10, 17*
132:*23* 133:*6*
135:*2, 10, 12*
136:*3, 25*
137:*5* 138:*5*
139:*10*
140:*16* 141:*2,
17* 149:*3*
169:*3, 16*
172:*8* 173:*18*
175:*13*
178:*17* 179:*5,
20* 189:*7*
195:*16* 204:*8*
214:*2* 224:*7*
225:*2, 21*
227:*1, 16*
228:*11*
230:*16* 231:*3,
11, 14* 233:*5,
11, 22* 234:*4,
7* 237:*25*
239:*20*
**exposures**
50:*17* 51:*6,
15* 56:*4*
58:*20* 59:*9*
95:*23* 111:*1*
112:*5, 6*
117:*7* 124:*6,
22* 133:*12, 25*
134:*15*
135:*16* 137:*9*
175:*9* 178:*10*
191:*14*
193:*24*
204:*13, 14*
224:*3* 231:*21*
232:*20*
233:*15, 16*
236:*8*
**express** 44:*20*
**expressed**
30:*3* 65:*23*
106:*13*
153:*13, 15*
**extensively**
193:*3* 237:*11,
22* 238:*11*
**extent** 17:*2*
49:*11* 91:*10*

112:*2* 188:*8*
221:*2* 223:*12*

**extraordinarily**
134:*15* 229:*2*
**extrapolation**
111:*18* 189:*3*
193:*1*
**extremely**
109:*7* 133:*13*
190:*24*

**< F >**
**fact** 57:*8*
73:*7* 95:*14*
151:*9* 161:*15*
170:*2* 177:*9*
182:*4* 184:*13*
207:*12*
213:*17*
217:*24* 223:*7*
225:*12* 226:*2,
3, 4*
**factor** 77:*6*
139:*4* 231:*14,
17* 239:*25*
**factored**
73:*11* 75:*6, 10*
**factors** 149:*3*
166:*4* 228:*18,
21* 229:*1*
231:*16*
**faint** 114:*21*
**fair** 8:*13, 14*
29:*20* 146:*10*
**fairly** 149:*12*
**familiar** 32:*1*
37:*18* 45:*17,
22* 46:*2, 17,
24* 47:*6, 8*
48:*6, 16, 25*
49:*2* 51:*17*
52:*16* 54:*9*
69:*4* 71:*18*
91:*24* 95:*1*
163:*9, 22*
164:*1* 200:*2*
220:*8*
**familiarity**
52:*22* 53:*14*

**family** 19:*7*
204:*16, 23*
205:*10*
**far** 22:*1* 69:*8*
84:*19* 95:*21*
104:*24*
107:*19, 21*
132:*1* 165:*14*
195:*18*
211:*24* 224:*3*
236:*8*
**fare** 163:*6*
**fashion** 97:*8*
**faulty** 96:*10*
**favor** 182:*6*
**favors** 177:*20*
**fax** 1:*21*
**FDA** 50:*22*
51:*3* 58:*20,
22* 60:*4, 8, 10,
14* 61:*21, 22*
62:*7, 15, 25*
63:*17, 21*
65:*14* 67:*17,
24* 68:*10*
70:*22* 71:*25*
72:*11, 25*
73:*3, 7, 8, 15*
74:*6, 19, 25*
75:*9, 11* 77:*6*
89:*1, 5, 19*
93:*10, 17*
94:*18, 23*
95:*15* 96:*13*
98:*16, 21, 22*
101:*3* 111:*17*
113:*13*
120:*23* 165:*7*
172:*6, 12*
187:*14* 188:*4,
11, 23* 189:*24*
192:*3, 4, 15,
23, 25* 193:*8*
194:*12, 22*
195:*4* 196:*6*
238:*25* 239:*21*
**FDA-
measured**
66:*16*
**FDA-related**
81:*22*

Confidential Information Subject to Protective Order

**FDA's** 118:*9*
188:*18*
195:*10, 25*
**fecal** 35:*10*
37:5, *9* 40:*25*
41:*8, 17* 45:*16*
**feedback**
46:*14* 102:*15*
105:*9*
**feel** 44:*6*
180:*23* 185:*5*
**felt** 75:*4*
106:*6*
**fifth** 23:*21*
**figure** 25:*3*
120:*24* 172:*1*
**figured** 207:*19*
**figures** 120:*1*
**figuring**
115:*18* 174:*20*
**filed** 30:*4, 17*
226:*11*
**files** 79:*12*
**fill-in** 25:*23*
**final** 70:*10*
227:*14*
**finally** 13:*16*
**financially**
241:*17*
**find** 74:*18*
101:*25* 104:*5*
115:*22* 116:*2,*
*6* 156:*1*
190:*6* 197:*3*
225:*19*
**finding**
225:*11, 17*
226:*7*
**findings**
123:*16*
179:*25* 180:*2*
228:*23*
**fine** 32:*19*
48:*1* 94:*13*
142:*17, 19*
186:*17* 187:*3*
**finish** 183:*20*
**finished** 60:*23,*
*24* 61:*2, 3, 14,*
*15* 62:*1, 2, 6,*
*9, 10, 19*

66:*21* 69:*12,*
*25* 70:*7*
81:*23* 82:*7*
83:*4* 84:*1*
88:*9* 89:*1, 11*
93:*11* 102:*2*
186:*17, 20, 22*
**Finnish**
146:*20* 170:*13*
**FIRM** 2:*6*
9:*12*
**first** 11:*22*
13:*20* 15:*5*
23:*9, 14, 17*
28:*6* 29:*1, 24*
31:*3, 13*
40:*24* 55:*25*
76:*24* 78:*6*
83:*9* 104:*17,*
*21* 105:*20*
114:*6* 119:*2*
121:*18*
125:*22*
156:*22* 162:*4,*
*5* 165:*2*
166:*19*
182:*20*
187:*24* 190:*1*
211:*10*
221:*25*
222:*16*
225:*14*
226:*10* 227:*7,*
*21* 228:*1*
230:*7* 234:*25*
**fish** 145:*10*
148:*22* 209:*22*
**five** 13:*12*
25:*16* 49:*19*
142:*17, 18*
145:*10*
163:*14*
165:*21*
178:*18* 182:*20*
**Floor** 3:*3, 12*
**Florian** 165:*18*
**fluids** 5:*21*
**flux** 163:*7, 8*
**focus** 20:*10*
42:*17* 190:*14*

**focused** 57:*17*
200:*19* 203:*9*
**folder** 15:*8,*
*11* 147:*20*
**follow** 55:*20*
65:*22* 106:*11*
135:*5* 142:*11*
224:*1*
**followed**
57:*25* 222:*14*
**following**
101:*24* 178:*2*
221:*15, 21*
**follows** 7:*24*
226:*25*
**follow-up**
17:*18* 47:*25*
222:*6, 11, 17,*
*20, 23* 223:*15,*
*24* 229:*18*
230:*4*
**food** 112:*5*
128:*24*
130:*21* 131:*3,*
*5, 6, 24* 132:*3,*
*7* 133:*13*
135:*17* 136:*5*
137:*5, 16*
139:*1, 16*
140:*19*
156:*24*
210:*12* 232:*8,*
*10, 17, 19, 22,*
*25*
**Foods** 5:*9, 12*
132:*9, 13*
133:*16, 20*
143:*11*
144:*20*
148:*20, 24*
149:*6, 10*
210:*10, 15*
**footnote** 12:*4*
67:*22* 68:*2, 6*
91:*2* 118:*23,*
*25* 124:*11, 25*
125:*1, 2*
**footnoted**
205:*25*

**footnotes**
68:*23* 125:*22*
130:*5*
**foregoing**
241:*6* 242:*4*
**forget** 100:*6*
**forgive** 234:*17*
**form** 18:*15*
20:*7* 25:*12*
27:*18* 29:*8*
30:*9* 38:*3*
51:*8* 58:*8*
61:*9* 63:*9*
64:*9* 78:*1*
80:*20* 84:*21*
87:*11* 90:*19*
92:*18* 99:*21*
106:*21*
108:*15* 113:*9*
119:*12* 123:*2*
132:*10* 133:*8*
138:*10* 140:*7*
150:*7* 151:*6,*
*11* 152:*12, 22,*
*23* 155:*15*
158:*15*
160:*16*
161:*21* 162:*9*
164:*19*
167:*12*
170:*18*
172:*10* 173:*1*
174:*3* 187:*17*
191:*7* 193:*12*
194:*17*
195:*11*
221:*13*
223:*18* 242:*8*
**formaldehyde**
152:*17*
**formation**
5:*20* 6:*8, 10,*
*13* 131:*6*
135:*1* 149:*24*
150:*3, 6, 12*
155:*6* 158:*19*
159:*25* 163:*3*
164:*14* 166:*1,*
*5* 168:*7*
196:*11*
197:*22*

198:*24*
201:*19* 204:*3,*
*7* 206:*3*
207:*13, 16*
208:*1, 4*
209:*4, 20*
210:*6* 211:*10,*
*13, 17, 21*
213:*18*
217:*10, 16*
218:*2* 219:*2*
233:*9*
**formed**
109:*16*
150:*13*
153:*19*
154:*19*
164:*17*
200:*13*
206:*15* 207:*7*
212:*1, 13*
215:*9* 217:*11*
**forming** 86:*21*
160:*14*
161:*19*
216:*17* 237:*5*
**forms** 160:*15*
167:*11* 203:*13*
**formula**
148:*23, 25*
**formulating**
92:*14*
**forth** 39:*2*
189:*21*
230:*25* 231:*1,*
*7* 233:*3, 10*
235:*18*
236:*22, 25*
241:*11*
**forward**
112:*24*
**found** 60:*14*
63:*8* 64:*3*
66:*23* 67:*8*
93:*22* 98:*16*
116:*7* 194:*16*
225:*2* 227:*16*
228:*10*
**foundation**
66:*12, 13*

Confidential Information Subject to Protective Order

four 35:2
77:9 81:19
178:19 192:6
fourfold 69:7
73:19 107:16,
25
fourth 75:25
129:23
fraction 151:3
164:16
fractions
165:10
frame 223:1
France 5:13
144:21 145:21
fraught 181:23
French 170:13
frequently
149:10
Fristachi
125:1 146:24
F-R-I-S-T-A-C-
H-I 146:25
front 10:1
15:12 23:1
33:10 84:16
full 162:5
221:2, 7
function
162:24 216:2
Fundamentally
185:15, 17
funky 105:13
further
130:16 158:4
164:3 218:9
237:8 240:4,
8 241:12
furthest 81:10

< G >
gained 95:9
Galleri 35:12
37:12, 18, 19
42:25 48:22
49:3
garbled
103:13, 15
152:2
gastric 6:4
178:13, 17

180:11 184:1
215:11 218:4

gastrointestinal
6:15
Gau 216:5
geared 20:17
Geigert 3:24
7:3
general 19:8,
10 54:19
55:8 82:10
132:8 180:21
182:19 183:1,
3 184:20
197:22
200:17
203:10, 14
204:4 206:4,
9 208:10
217:17, 19, 20
223:9, 24
228:20 235:2,
13
generally 49:1
69:4 164:20
213:10
231:12
234:23 235:9
generate
152:17 232:3
234:7
generated
149:7 160:24
generation
238:4
genetic 19:6
166:4
genotoxic
204:24 211:12
geographic
133:17 166:3
Georgia 2:17
German
170:12 202:5
Germany
5:10 143:12
get-go 179:22
getting 115:14
130:7 138:6

148:1 162:1
190:23 192:24
Give 15:7
25:5, 7 29:13,
17 41:1 42:9
53:23 54:20
55:6 64:19
65:11 76:5
83:23 97:21
137:17
152:14, 15, 18
157:1 162:10
203:24
205:21 206:6
given 18:21,
25 34:5 76:1
77:8 84:3
88:24 95:5
102:9 111:15,
22 119:6
120:9 136:2,
6 151:9
158:7 161:5
162:25
185:15 190:3
193:14, 25
205:11
207:10
228:19 242:5
gives 167:19
giving 53:4
glad 152:8
154:7, 23
glanced 35:20
39:7
glean 104:15
gleaning 182:7
glitch 15:9
209:6
glucose 159:15
go 11:13, 14
13:1 23:25
24:1, 9 25:8
27:2 28:13
61:5 65:4
71:2 72:3
82:11, 12
90:1 97:23
101:14
103:17 114:5
122:12

130:12, 15, 16
131:1 134:8
136:23 137:3,
20, 21 144:2
149:4 154:21
156:3 162:13
168:9 176:7
190:11
211:22, 24
231:2 234:16
goes 125:19
going 8:8, 12
17:17 24:19
36:18 39:16
40:6, 16
43:11 44:24
45:12 47:22
64:20 65:14
81:18 91:14
99:14 105:9
128:3 135:20
141:24
153:16 155:3
164:5 167:1
170:20
182:10
200:17
206:21
209:13
210:23, 24
215:3 224:5
228:22
234:16
237:14, 18
238:9
GOLDENBER
G 2:10, 12
GOLKOW
1:21 7:3
Gombar
163:9, 15
164:6
Gomm 224:13
225:1, 19
G-O-M-M
224:14
Good 7:1 8:2
102:22, 23
181:16 217:1
Goodman
140:4

goodness
177:20
GORDON 3:2
gotten 199:3
government
54:5
graduate 19:9
gram 82:20,
23
grams 83:18
granted
212:19
grateful
183:20
Great 16:1
39:9 49:20
66:15 68:17
115:16
120:11 160:9
225:10 227:12
greater 120:7
204:7 213:18
greatest
234:11
GREENBERG
2:14 9:1
gross 107:24
grossly 172:2
ground 93:25
group 53:2
54:2, 25
198:1 201:22,
25 202:1
205:5 206:4
guess 119:13
132:22
136:10
138:11 215:23
guidance
147:12
guidelines
19:4 53:7
guinea 145:8
gulf 234:9

< H >
H.J 3:15
hairs 8:16
half 29:15
122:19, 20
179:3, 22

Confidential Information Subject to Protective Order

half-life 151:*1, 16, 19, 20, 22* 152:*19*
hamsters 145:*9*
hand-held 10:*19*
Hang 188:*1* 199:*25*
happen 201:*18*
happened 87:*4* 132:*15* 215:*18* 221:*19*
happens 216:*21* 217:*2*
happy 11:*19* 54:*21* 108:*8* 163:*16* 200:*8* 238:*17*
hard 12:*5, 17* 31:*13* 33:*7* 36:*17* 114:*18* 120:*10* 182:*1*
HARDING 2:*1*
Harkins 3:*15*
harm 191:*10, 24* 236:*16*
hate 196:*13*
hazard 184:*7*
head 152:*15, 19*
heading 122:*7, 8* 202:*3*
Health 113:*14* 211:*12* 239:*1, 23*
Healthcare 3:*22*
hear 102:*24, 25* 103:*2* 116:*22* 157:*23* 177:*19* 186:*18* 187:*6* 209:*11* 239:*14*
heard 7:*17* 48:*8* 90:*25* 201:*7*
hearing 48:*14*

182:*8* 240:*7*
held 1:*15* 7:*7*
help 12:*3* 53:*3* 103:*11*
helpful 152:*8*
helps 9:*14* 12:*21* 33:*13*
hepatic 225:*3, 21, 24* 227:*17* 228:*11*
hereinbefore 241:*10*
Hetero 62:*10, 15, 17, 20*
heterogeneity 184:*3*
high 68:*1* 150:*15* 207:*14* 209:*4*
higher 73:*13* 75:*3* 121:*17, 21* 122:*1* 194:*24* 202:*9* 207:*14* 212:*2* 213:*1, 10* 229:*8, 9* 232:*1* 234:*4, 8*
highest 60:*13* 63:*16* 95:*20* 98:*15, 21, 22* 101:*21* 107:*2* 192:*5* 193:*9, 17* 194:*16, 19, 21* 195:*7, 10*
highlighted 171:*23* 192:*2* 194:*4, 15*
highlights 12:*8* 14:*11*
highly 127:*16* 238:*2*
HINSHAW 3:*10*
history 19:*7* 53:*6* 220:*13*
hit 15:*24* 79:*11* 197:*17*
hold 118:*22*
HOLLIS 2:*6*
Holtrop 198:*22* 205:*14*

H-O-L-T-R-O-P 198:*22* 205:*14*
homogeneous 181:*16*
HON 1:*6*
hopefully 105:*13* 175:*22*
hospital 46:*10*
hour 22:*22, 24* 28:*23* 29:*2* 47:*22*
hourly 22:*20, 22* 28:*22* 29:*4*
hours 14:*17* 22:*14, 19, 23* 25:*19* 64:*17* 65:*9* 66:*15* 67:*14* 73:*14* 94:*15*
Hrudey 125:*2* 155:*25* 164:*21* 165:*15* 168:*18* 171:*24* 172:*24* 173:*7, 23* 212:*9, 25* 213:*6, 15*
H-R-U-D-E-Y 155:*25*
Huahai 3:*20, 21*
Human 5:*17* 6:*15* 111:*6, 24* 112:*2* 113:*6, 17* 127:*7* 132:*23* 145:*18* 159:*3, 11* 160:*10* 161:*16, 22* 162:*3, 19* 163:*7, 8, 21* 177:*2* 185:*18* 194:*9* 200:*14* 201:*19* 216:*21* 217:*2* 223:*3* 235:*11* 239:*13, 16, 18*
humans 123:*25*

127:*15, 17*
145:*12*
153:*20*
154:*20*
158:*19* 160:*1* 162:*7* 166:*14* 206:*17* 207:*8* 237:*20, 24*
hundredfold 112:*12*
hundreds 85:*4, 14, 15*
hydrochlorothiazide 90:*7*
hyperspace 199:*3*
hypertension 19:*18, 24, 25* 228:*20*
hyphen 215:*12, 17, 21* 216:*15*
hypothetical 58:*14, 20* 59:*19* 60:*3* 95:*20* 104:*19* 105:*17* 106:*23* 110:*10* 112:*3* 120:*4* 121:*11* 191:*14*
hypothetically 99:*1* 110:*16*

< I >
i.e 238:*5*
icon 79:*3* 227:*10*
idea 92:*15* 126:*2* 150:*8* 158:*5* 206:*19*
identical 83:*3, 5*
identification 15:*2* 17:*11* 21:*15* 26:*10* 27:*3* 71:*12* 77:*14* 86:*12* 87:*23* 91:*17* 114:*11* 126:*10*

143:*15*
144:*16* 147:*6*
156:*7* 197:*14* 199:*18*
202:*21*
205:*15*
208:*14*
214:*18*
219:*15*
221:*10* 224:*15*
identified 116:*17* 179:*21* 199:*14*
identify 177:*7* 237:*4*
identifying 177:*1*
ignored 224:*25*
II 18:*4* 20:*3* 21:*6*
imagine 47:*9* 57:*12*
immediately 206:*25* 210:*20*
impact 131:*5* 209:*25*
impacting 210:*6*
implemented 235:*4*
implication 194:*22*
implies 211:*12*
imply 222:*2*
important 34:*9, 13* 75:*4* 194:*2* 204:*12* 207:*25* 211:*18* 212:*8*
imprecise 135:*18*
impurities 147:*10*
inaccuracies 116:*2, 4*
inaccuracy 233:*2*
inaccurate 133:*24*

Confidential Information Subject to Protective Order

**Inadequate**
153:*18*  154:*18*
**inappropriate**
240:*1*
**include**
118:*24*
172:*23*  173:*6*
174:*12*  183:*9,*
*14*  184:*13*
**included**
81:*19*  111:*18*
130:*11*
140:*21*  145:*8*
169:*5, 17, 21*
174:*10*
183:*25*  185:*6*
212:*24*  226:*13*
**including**
10:*24*  37:*17*
133:*18*
162:*17*
169:*22*  170:*1*
**inclusive**  94:*21*
**income**  29:*6*
**incorporation**
135:*21*
**incorrect**
140:*17*
**increase**
108:*5, 13*
109:*3*  111:*10*
193:*5*  195:*19*
**increased**
69:*9*  73:*22*
108:*23*
109:*11*
110:*17, 20*
119:*11*
123:*16*
132:*24*  140:*1*
141:*8*  177:*2,*
*8*  178:*9, 16,*
*24*  180:*25*
181:*5*  191:*15,*
*23*  196:*6*
222:*3*  225:*24*
228:*22*  233:*4*
**increases**
180:*16*

**increasing**
108:*2*  180:*21*
181:*7, 11, 15*
**independent**
184:*23, 25*
**indicate**  59:*23*
66:*22*  88:*5*
165:*24*  215:*7*
**indicated**  45:*5*
99:*4*  141:*9*
236:*18*
**indicates**
59:*22*  183:*12*
216:*16*
**indicating**
72:*11*  116:*18*
132:*14*  217:*9*
**indicative**
135:*25*
**individual**
45:*3*  51:*15*
52:*9, 24*  53:*1,*
*15, 17*  93:*13*
174:*6*  183:*5*
**individuals**
54:*3*  133:*22*
**induced**
126:*23*
**Industries**
2:*23*
**industry**
132:*7*  147:*12*
**infamously**
233:*1*
**infant**  148:*25*
**infection**
202:*10*
**infectious**
202:*1*
**infer**  37:*20*
**influence**
168:*6*  201:*19*
216:*6*
**influenced**
168:*8*  228:*18*
**INFORMATIO
N**  1:*6*  25:*7*
55:*9*  61:*12*
70:*11*  74:*25*
87:*20*  92:*13*
93:*15*  94:*5*

96:*8, 17*
136:*1*  151:*13*
231:*17*
**informed**
38:*23*
**ingested**
150:*21*
156:*23*
164:*17*
211:*11*  212:*5*
**ingesting**
108:*20*
**ingestion**
65:*25*  148:*20*
**inhibit**  219:*2*
**inhibition**
217:*10*
**inhibitors**
217:*11, 15*
**inhibitors/indu
cers**  166:*9*
**initiating**
220:*15*
**inquired**  70:*18*
**inquiries**
69:*12*
**inquiry**  69:*24*
70:*6, 14*  88:*21*
**insofar**  44:*23*
75:*10*
**INSOGNA**
2:*19*  4:*4*  9:*8,*
*14*  12:*2, 20*
13:*25*  18:*15*
20:*7*  25:*12*
27:*18*  29:*8*
30:*9*  33:*4, 6*
36:*16*  37:*3*
38:*3, 11*  39:*4,*
*19*  40:*8, 13*
41:*4*  42:*6*
43:*2, 10, 13*
44:*2*  47:*21*
49:*18*  50:*3, 5*
51:*8*  54:*17*
55:*5*  57:*22*
58:*8*  59:*4, 11,*
*13*  60:*17*
61:*9, 16*  62:*3,*
*11, 22*  63:*9*
64:*16*  65:*6*

66:*24*  67:*10*
72:*13*  74:*8,*
*22*  75:*22*
76:*21*  78:*1,*
*25*  80:*20*
82:*3*  83:*14*
84:*21*  86:*7,*
*22*  87:*11*
90:*19*  92:*18*
93:*20*  94:*10*
96:*11, 21*
97:*12*  98:*19*
99:*7, 21*
100:*5, 11, 15,*
*18*  101:*9*
102:*12, 14*
103:*5, 12*
106:*21*
108:*15*
109:*19*
110:*22*  113:*9*
119:*12*  123:*2*
127:*3, 22*
132:*10*  133:*8*
135:*3*  138:*10*
140:*7*  141:*18*
142:*13, 18*
148:*2*  150:*7*
152:*23*
153:*25*
155:*15*
157:*10, 19, 24*
158:*15*
160:*16*  162:*9*
164:*19*
167:*12*  169:*6*
170:*18*
172:*10, 25*
173:*9*  174:*3*
185:*10, 24*
186:*13, 20, 23*
187:*4, 17*
189:*22*  191:*7*
193:*12*
194:*17*
195:*11*
209:*11*
219:*11, 21*
221:*13*
223:*18*
227:*21*

229:*17*  230:*2*
237:*7, 14*
238:*6, 9*
239:*8*  240:*6*
**insognan@gtla
w.com**  2:*22*
**instance**
53:*20*  67:*20*
82:*13*  148:*20*
165:*6*  202:*2*
228:*14, 17*
**instances**
115:*17*  116:*8,*
*11, 15, 18*
**instruct**  128:*3*
238:*15*
**instruments**
95:*3*
**Intake**  5:*7, 10,*
*14*  6:*10*
112:*4*  128:*23*
130:*21*  134:*6*
135:*25*  136:*7*
138:*8*  139:*15,*
*16*  140:*25*
143:*10*
144:*19*  147:*1*
149:*6*  168:*10,*
*11, 16, 19, 20,*
*25*  169:*13, 22*
170:*16*  171:*7,*
*13, 22, 24*
172:*5, 12*
173:*8, 16, 24*
204:*10*
207:*22*
209:*24*
213:*16*  231:*20*
**Intakes**  146:*19*
**intended**  196:*1*
**intention**
106:*10*
**interested**
165:*22*  241:*17*
**interesting**
183:*15*
**internal**  28:*18*
65:*13*  66:*21*
67:*6, 16*  68:*4,*
*8*  89:*3*  121:*2*
193:*21*

Confidential Information Subject to Protective Order

**internally**
120:*10* 224:*11*
**International**
2:*20* 5:5
124:*13*
**interpretation**
207:*10*
**interquartile**
222:*21*
**interrupt**
218:*24*
**interruption**
116:*20*
**intervals**
224:*10*
**intimately**
164:*1*
**Intragastric**
6:*13*
**intrinsic**
167:*25*
**intrinsically**
167:*18*
**introduction**
131:5 145:5
**intuitively**
175:*23*
**investigate**
218:*1*
**investigating**
50:*24*
**Investigation**
5:3 6:5
80:*16* 84:*4*
88:*20* 96:6,
*18* 122:*24*
**investigators**
181:*2*
**invoice** 22:7,
*10, 20* 24:*17*
25:*2, 9, 15, 21,
22*
**Invoices** 4:*11*
21:*14, 23*
22:*1, 15*
**involve** 160:*8*
**involved**
16:*21, 24*
40:*18* 166:5,
*24* 175:*22*

220:*12*
**involves** 236:*1*
**involving**
175:*8*
**ion** 150:*25*
151:*1, 15, 22*
152:*13* 238:5
**iPad** 10:*18*

**IRBESARTAN**
1:*4* 7:*8* 8:*4*
**irrelevant**
232:*1*
**irrespective**
58:*24*
**issue** 39:*18*
76:3 131:*17*
160:*20*
166:*21*
207:*17* 224:*24*
**issued** 67:5
**issues** 40:*19*
104:*12* 132:*17*
**item** 40:*24*
42:*2* 79:6
**items** 158:*8*
**iteration**
158:*11*
**its** 86:5
98:*16* 152:*12,
16, 21* 185:*8*
**IV** 126:*19*

< J >
**Jaiswal** 198:*12*
**J-A-I-S-W-A-**
**L** 198:*12*
**Jakszyn** 198:6,
*13, 16* 202:*13*
208:7
**J-A-K-S-Z-Y-**
**N** 198:*14, 18*
202:*14*
**January** 23:5,
*7, 19, 25* 29:5
220:*15, 16*
**JD** 2:3
**JERSEY** 1:*1*
7:*10* 8:7
**jog** 56:*10*

57:*1*
**joined** 203:*4*
**juice** 217:*11*
219:*1*
**July** 13:5
31:*14* 114:*22*
**Jumping**
165:*20*
**June** 220:*16,
19* 221:*18*
**justify** 109:*17*
190:3 191:*10*

< K >
**Kansas** 2:9
**Kaplan** 35:*18*
39:*2*
**KATHLEEN**
3:*12*
**keep** 138:*13*
140:*12*
**keeping**
129:*20*
**kekelly@hinsh**
**awlaw.com**
3:*14*
**KELLY** 3:*12*
**Keszie** 140:3
**key** 134:*3*
**kilogram**
113:*16* 129:*8*
136:*16*
212:*15*
239:*10, 20*
**kilograms**
149:5
**kind** 236:*15*
**kinetics**
149:*24* 150:*2,
6, 12*
**Knekt** 140:5
**know** 8:*11, 19*
9:*9, 13* 14:*21*
19:6, *8* 21:*18*
23:*1* 28:*8, 12*
31:3 36:*19*
41:*16* 43:*21*
44:*24* 48:*4*
52:*14, 21*
53:5, *25* 61:7,
*25* 62:*19*

64:*23* 66:9
71:*15* 74:*14*
76:*4* 77:*17*
78:5, *10, 24*
81:*22* 83:*2, 4*
84:*24* 85:*16,
20, 25* 86:*1, 2,
15* 87:*2, 3, 4,
13* 88:*2, 3, 8,
19* 89:6, *18*
90:*22* 92:*24*
93:6 94:*24*
95:*12* 96:*23*
97:*14* 99:*16*
107:*22* 114:7
116:*8, 10*
122:9 126:*13*
139:*2* 143:*18*
151:*12*
152:*10*
157:*18*
158:*13*
161:*11* 171:7
177:*18, 25*
181:*19* 182:*2,
3* 183:7
187:*1* 190:*16,
17* 191:*22*
195:*13* 200:9,
*20* 201:*23*
207:*16, 19*
217:*15, 20*
221:*18*
222:*12*
232:*10, 20, 21*
**knowing** 44:*21*
**knowledge**
45:*8* 116:*3*
162:*8* 232:*7*
**known** 111:*24*
208:*8* 221:*3, 8*
**KRISTEN** 3:7
**kristen.richer**
**@btlaw.com**
3:*9*
**Krul** 214:*16*
**K-R-U-L**
214:*17*
**KUGLER** 1:6
**KUM** 3:*17*

203:*4*
**Kutys** 3:*24*

< L >
**lab** 189:*16*
**label** 137:*12*
**labeled** 14:*4*
100:6, *19*
121:9 129:6,
*7* 130:*4*
175:5, *21*
186:9
**laboratories**
95:*8*
**Laboratory**
4:*16* 20:*13*
51:*2* 60:*8*
70:*22* 74:6
95:5 97:*19*
98:*17* 126:*22*
187:*16, 21*
193:*15* 233:*18*
**Labs** 62:*15, 17*
**lack** 133:*1*
176:*13*
207:*17* 232:*16*
**laid** 107:*8*
191:*12*
**LANGTON**
2:*16*
**langtont@gtla**
**w.com** 2:*18*
**language**
35:*22, 25*
36:*2, 5* 43:6
57:*2, 4* 60:*13*
88:*21* 138:*14*
192:*2, 15*
232:5
**laptop** 10:*1, 2,
5, 7, 9, 12, 16*
**large** 158:7
170:5 217:*12*
**largely** 113:*11*
116:*11*
**larger** 120:*12,
13* 172:*19*
181:3 226:*15,
17, 19*

Confidential Information Subject to Protective Order

**Larsson**
118:*22*  119:*1*
140:*3*
**Lasalle**  2:*12*
**late**  145:*22*
221:*16*
**LaVecchia**
140:*2*
**LAW**  2:*6, 10*
31:*20, 23*
33:*17*  35:*23*
36:*8, 14, 23*
230:*11*
**layout**  107:*3*
**LCE**  117:*2*
119:*4*  121:*17*
132:*19*
139:*18*  185:*18*
**LCEs**  119:*9*
139:*23, 24*
**LCE's**  184:*3*
**lead**  72:*22*
**leads**  93:*15*
**learn**  96:*17*
**learned**  94:*4*
96:*7*
**leave**  167:*2*
182:*4*
**leaves**  161:*7*
**leaving**
159:*20*
161:*11*  162:*2*
**lecture**  19:*5*
**led**  96:*18*
**leeway**  64:*20*
65:*12*
**left**  162:*5*
185:*21*
**left-hand**
149:*17*  206:*13*
**length**  20:*14*
67:*15*  68:*17*
95:*13*  108:*6*
132:*4*  154:*13*
176:*24*
**lesser**  17:*2*
**letter**  21:*9*
**Level**  6:*11*
63:*17, 20, 21*
82:*1*  89:*12*
90:*9*  98:*15,*

21, 22  107:*23*
110:*16*
112:*13*
117:*19*
120:*24*  121:*1,
15*  160:*25*
161:*1, 6, 9, 23*
167:*10, 16*
174:*7*  193:*17,
20*  195:*3*
202:*6*  230:*23*
233:*22, 25*
234:*6*
**levels**  51:*14*
54:*13, 16*
55:*1, 4*  59:*2*
64:*18, 25*
65:*7, 13*
66:*22*  67:*7,
18, 24*  68:*1*
69:*8*  70:*16*
71:*25*  73:*11*
74:*5, 15, 19*
75:*11, 12, 19*
76:*15*  86:*5*
87:*9*  93:*1*
94:*3*  119:*22,
23*  123:*24*
127:*18*  128:*8,
9, 10, 17*
131:*23*
135:*12*
137:*15*
140:*12*
145:*19*
150:*15*
153:*14*
158:*23*  159:*3,
7*  160:*18, 21*
163:*21*
164:*24*
166:*24*
167:*22*
171:*15*  202:*5,
9*  211:*25*
213:*2, 4, 8*
231:*24*  232:*3,
6, 7, 17, 19*
233:*8*  234:*2,
4, 8*

**LEWIS**  1:*13*
4:*3, 11, 14*
7:*11, 22*  10:*3*
11:*23*  13:*7*
186:*10*  242:*2,
12*
**LIABILITY**
1:*4*  7:*8*  8:*5*
**License**  241:*22*
**lifestyle**  166:*7*
**lifetime**  63:*4*
112:*19*  117:*5,
7*  118:*1, 10,
13, 15*  119:*25*
136:*4*  137:*1,
4, 9*  138:*5*
139:*9*  140:*15*
141:*3, 6*
171:*8, 13, 22,
25*  172:*5, 7*
175:*14*
178:*10, 17*
179:*5, 20*
192:*21, 24*
230:*16*
235:*12, 14*
**lifetimes**  192:*8*
**light**  137:*4*
**likewise**  42:*22*
**limit**  131:*6*
147:*11*
**limitation**
221:*1, 6*
222:*24*  223:*22*
**limitations**
181:*20*
182:*23*  183:*3,
8*  185:*9, 13, 14*
**limited**  229:*19*
**line**  28:*13, 14*
74:*17*  243:*2*
**linear**  111:*17*
189:*3*  193:*1*
**link**  202:*16*
206:*15*  207:*7,
21*  208:*21*
**linked**  95:*18*
208:*1*
**liquid**  35:*14*
37:*14, 17, 21*
43:*1*  47:*5, 9*

48:*4, 8, 16, 23*
49:*1, 5*
**List**  4:*16*
24:*3*  26:*20,
22*  27:*7, 11,
15, 16, 21, 24*
28:*4*  33:*11*
40:*25*  42:*14*
80:*23*  84:*9*
85:*14*  94:*17*
96:*16*  122:*19*
155:*19*
163:*13, 14*
214:*22*
**listed**  32:*2*
33:*10*  37:*25*
72:*24, 25*
73:*10, 16*
75:*13*  81:*20*
84:*23*  85:*5*
88:*18*  120:*1*
121:*17*
122:*19*  125:*9*
169:*23*
178:*14*
203:*16, 21*
**listing**  78:*10*
139:*17*
**lists**  68:*3*
80:*18*  85:*15*
92:*7, 10*
117:*19, 23*
155:*20*
178:*11*  189:*6*
**Liteplo**
124:*12, 23*
126:*1, 2, 4*
127:*24*
128:*13*
135:*15, 20*
136:*14*
137:*10, 12*
138:*22*
140:*20*
142:*14*  145:*2*
149:*13*
237:*12, 21*
238:*12*  239:*25*
**literally**
183:*22*

**literature**
26:*3*  163:*20*
166:*22*  171:*16*
**LITIGATION**
1:*5, 21*  7:*4, 8*
8:*5*  11:*4, 5*
21:*1*  22:*12*
28:*23*  29:*1, 7*
34:*22*  38:*15,
22*  39:*17*
40:*7, 12*
44:*16*  52:*3, 7,
13, 18*  68:*21*
112:*11*
128:*11*
175:*22*
224:*25*
235:*21*  236:*23*
**litigations**
51:*18, 19*
**little**  43:*9*
48:*13*  64:*19*
65:*11*  79:*3, 4*
103:*9, 12, 14*
105:*13*
123:*12*
130:*15*  143:*7*
152:*1*  164:*3*
225:*18*
227:*10*  231:*25*
**LiveNote**
241:*5*
**liver**  150:*19*
153:*10*
178:*24*  225:*8,
13*  226:*6*
228:*19, 21, 22*
**LLC**  2:*24*
3:*22*
**LLP**  2:*1, 14*
3:*2, 5, 10, 15*
**loaded**  77:*18*
218:*4*
**locate**  176:*4*
196:*19*
**located**  8:*23*
**logic**  221:*15*
**logical**  223:*13*
**Loh**  184:*7, 8*
**Loh-Rectal**
140:*5*

Confidential Information Subject to Protective Order

long 57:*24*
58:*17* 222:7
224:2, *10*
longer 56:*23*
153:3 222:6
223:*24*
look 15:*20*
21:*22* 36:*10*,
*19* 51:*2* 90:5
91:*24* 122:*12*
124:*16*
137:*13, 16*
139:*2, 3*
143:*1* 148:*19*
149:*11* 154:*4*,
*22* 162:*11, 13*
164:6 173:*10*
175:*23* 183:*4*
185:*4, 7*
200:8 203:*15*,
*17* 206:*25*
209:*3, 20*
218:9 226:9
229:*20*
looked 11:6, 7
12:*14* 67:*16*
78:6, 8 89:*2*
104:6, *14*
123:*18*
163:*18, 25*
180:*12* 213:*2*
224:*10* 225:*12*
looking 17:*21*
25:*4* 32:*23*
33:*14* 75:*1*
77:3 78:3
81:5, *19*
104:*2* 107:*25*
118:6 125:5
129:5 137:*19*
153:7 159:*14*
163:6, 7, *21*
170:5 179:*18*
196:*17*
207:*21* 208:*1*,
*9* 209:*24*
210:*21*
215:*18* 216:*1*
218:*18*
222:*16* 227:*22*

looks 13:*11*
26:*17* 32:*25*
33:*1* 84:9
114:*21, 22*
149:*4* 159:*2*
202:*2* 209:5
Los 3:*8*
LOSARTAN
1:*4* 7:7 8:*4*
lost 13:*2*
102:*15*
143:*22*
182:*20*
209:*18*
219:*11, 13, 22*
lot 9:*23*
46:*14* 59:*24*
63:*16, 25*
84:*19, 23*
85:*22* 89:5
104:*4*
LOTMAN
3:*17* 9:*15*
64:9
lots 62:7
64:*19* 69:*12*,
*25* 70:3, 6, *14*
72:*12, 16, 20*,
*25* 73:*16*
74:*20* 81:6
85:*4* 93:*11*
95:*16* 229:*11*,
*14* 232:*23*
loud 103:*3*
low 35:*10*
37:*10* 41:*24*
42:5 45:*21*
53:7, *21*
117:*15*
126:*24* 127:*8*,
*18* 128:7, *17*
134:*15*
212:*23*
214:*10*
233:*15* 236:*8*
low-dose
111:*18* 189:*3*
193:*1*
lower 120:*25*
123:*23*
128:*12* 132:*8*

172:5 229:*10*
231:*25* 233:*23*
lowering 103:*8*
lowest 112:7
231:*22*
233:*17, 25*
234:*10*
lucky 177:*16*,
*18*
ludicrous
193:6
Luncheon
102:*18*
lung 53:*21*
179:6, *16*
180:6

< M >
M.D 1:*14* 4:3,
*11, 14* 7:*22*
10:3 13:*8*
186:*10* 242:*2*,
*12*
M7 148:*3*
M7R1 147:9
Madigan 5:5
67:*23* 68:*10*,
*22* 69:*2* 73:*8*
75:2 77:5
91:3 114:*14*
115:*14*
118:*12* 120:*1*,
*16, 25* 122:*15*
131:*19*
132:*19*
137:*22, 25*
138:*1* 139:*17*
140:*15*
177:*23*
178:*11, 15*
179:*2* 183:*11*,
*18* 184:6, *13*,
*16* 185:5
Madigan's
11:7 13:*4*
31:7, *9, 15*
34:*10, 24*
56:*22* 67:*21*,
*22* 68:5, *19*
75:8, *14* 91:9
113:*20, 25*

115:*4* 118:*19*
120:*9, 17, 22*
121:*3* 122:6
123:*15*
137:*13, 19*
138:*20*
139:*23*
140:*17* 141:*9*,
*12* 170:6
176:*21* 183:*16*
magnitude
108:*22* 109:9
110:*13* 113:*8*
123:*23*
128:*12* 137:*15*
maintain
176:5
major 207:*17*
majority
64:*24* 115:*16*
123:*19*
125:*21* 160:9
170:*2* 178:*14*
179:*15*
making 25:*24*
212:*17* 213:*14*
malfunction
32:6
mammal
111:6 134:*17*,
*18* 234:*1*
man 5:*20*
197:6
managed
106:*25*
manner 25:9
65:*22* 106:*12*
142:*12*
manufactured
63:*16* 69:*17*
89:*20* 93:*11*
95:*16* 98:*23*
manufacturer
59:*23* 72:5,
*16* 89:*13*
229:*11, 13*
manufacturers
58:*15* 60:*23*
61:*2, 14* 62:*1*,
6, 9, 20* 66:*17*,
*21* 67:6

69:*14* 70:*1*,
*15* 78:9 81:6,
*22* 89:*3*
92:*25* 93:7,
*16* 94:6
95:*11* 96:9
97:6 102:9
189:*8* 195:*8*

manufacturer's
96:*19* 230:*21*
manufacturing
84:*19, 23*
85:*19* 94:*19*
MARCH 1:*10*
7:5 11:*18*
13:*19* 27:*22*
142:*2*
Margaret
1:*17* 241:*2, 21*
marginal
225:*15*
marginally
226:*1*
mark 15:*1, 5*,
7 17:6 86:*10*
113:*25*
122:*11* 199:*16*
Marked 10:*3*
11:*17* 14:6
15:*2* 16:5, *10*
17:*10, 11*
21:*15* 22:*15*
26:*10, 14*
27:3, 6 35:*1*,
*2* 71:*12* 74:7
75:*20* 76:*16*
77:*14* 84:*15*
86:*12* 87:*23*
89:*24* 90:*1*
91:*15, 17*
100:7 113:*19*
114:*11*
126:*10*
143:*14, 15*
144:*16* 147:6
156:7 175:*1*
187:*22* 188:*2*
197:*14*
199:*18*
202:*21*

205:*15*
208:*14, 21*
214:*18*
219:*15* 224:*15*
**markedly**
222:*3*
**market** 58:*16*
80:*11, 19*
85:*18* 87:*25*
88:*6, 10, 13,*
*17* 89:*6*
93:*12* 95:*17,*
*19* 98:*4, 8, 11*
99:*5* 101:*8*
102:*11* 107:*1*
**MARLENE**
2:*12*
**MARTIN** 2:*1*
**Massachusetts**
2:*21* 3:*13*
**match** 89:*5*
**material** 36:*10*
**Materials**
4:*16* 10:*24*
11:*2* 25:*24*
26:*18, 20, 22*
27:*7, 12, 14,*
*16, 21, 24*
28:*3, 12*
33:*11* 56:*7*
61:*5* 63:*2*
80:*22* 84:*9*
96:*16* 154:*25*
155:*19*
163:*13, 24*
214:*22* 217:*7*
**math** 122:*2*
172:*2*
**mathematical**
89:*22* 159:*8*

**mathematically**
141:*13*
**matter** 7:*7*
21:*24* 24:*25*
28:*9* 30:*21*
51:*2* 52:*7*
55:*14* 70:*19*
73:*21* 80:*17*
99:*13* 107:*21*
111:*7* 122:*2,*

*25* 195:*18*
217:*17, 19, 20*
**maximum**
58:*14, 19*
59:*19* 60:*3*
63:*21, 25*
98:*2* 101:*20*
102:*6* 104:*20*
105:*3, 16, 18*
106:*18*
110:*10, 25*
112:*3* 120:*4*
191:*13*
**MAZZOTTI**
2:*1*
**MDL** 1:*1*
**Mean** 5:*7, 10*
8:*16, 24* 19:*1*
25:*14* 31:*8*
32:*17* 39:*20*
43:*12, 23*
54:*1* 61:*19*
80:*1* 89:*23*
97:*15* 105:*12*
112:*13* 116:*4*
117:*12*
143:*10*
144:*19*
152:*10, 11*
198:*2* 200:*2*
210:*8, 23*
213:*17* 226:*17*
**meaning**
37:*22* 52:*16*
89:*18, 23*
117:*10*
120:*11* 127:*8*
128:*8, 18*
160:*14* 206:*4*
**means** 54:*14*
55:*3, 16* 56:*5,*
*15* 57:*9* 58:*4*
210:*24*
**measure**
128:*9* 154:*11*
159:*18*
160:*14, 18, 19,*
*22* 161:*10*
165:*8* 167:*17*
196:*3* 232:*18*

**measured**
63:*17, 21*
66:*16* 95:*16*
98:*21, 22*
160:*10*
193:*20* 194:*8,*
*22* 195:*4, 7*
232:*8, 25*
**measurement**
83:*2* 131:*18,*
*20* 133:*2*
158:*25* 167:*5*
193:*21*
**measurements**
58:*21* 73:*15*
131:*25*
158:*22*
194:*23* 195:*1*
**measures**
237:*25*
**measuring**
160:*12*
165:*14*
167:*16*
232:*11, 14, 17*
**meat** 148:*22*
207:*15, 22, 24*
208:*7*
**mechanism**
127:*14*
**median** 57:*20*
222:*20, 22*
**medians**
54:*14* 55:*3,*
*16* 56:*5, 15*
57:*9*
**mediated**
238:*3*
**medical** 18:*14,*
*17, 19, 23*
*19:2, 9, 12, 18,*
*23* 20:*25*
21:*9* 24:*12*
25:*24* 26:*2*
28:*9* 30:*1, 2,*
*4, 21* 31:*9, 20,*
*24* 32:*3, 9, 14*
33:*15* 34:*10,*
*18, 21* 35:*17*
39:*3* 41:*7*
43:*25* 51:*13,*

*17, 20, 23*
52:*2, 6, 16, 23*
53:*1* 54:*6, 10*
65:*1, 5, 21*
66:*4* 67:*3*
94:*3* 100:*1*
106:*17*
108:*12, 13*
109:*14, 15, 18*
110:*4, 5, 7, 18*
111:*11*
112:*16* 113:*3*
114:*15* 115:*1*
117:*18, 22*
118:*1, 15*
119:*17*
122:*25* 123:*5,*
*13, 20, 22*
124:*4, 8, 12,*
*19* 126:*17*
127:*12, 20*
128:*2, 21*
129:*1* 135:*8*
140:*13* 142:*5*
143:*2* 144:*25*
147:*16*
148:*12*
154:*15* 155:*8*
156:*12, 17, 19*
172:*22* 173:*5,*
*14* 175:*15*
176:*8* 188:*10,*
*14, 17, 21*
189:*13, 14*
190:*3* 191:*6,*
*21, 24* 196:*10*
197:*11*
199:*24* 201:*9,*
*12, 14* 202:*19*
205:*19*
208:*18* 211:*8*
214:*23*
219:*20* 223:*7*
224:*19* 230:*8,*
*13* 234:*20*
237:*11*
**medication**
175:*10* 214:*3,*
*5, 6* 221:*3*
**medications**
69:*13, 25* 70:*7*

**medicine**
19:*10* 161:*16*
**meet** 52:*19*
53:*6*
**meeting** 14:*15*
**meets** 53:*15*
**membership**
230:*18*
**memorandum**
31:*19, 23*
33:*17* 35:*23*
36:*7, 14, 23*
230:*11*
**memorize**
61:*4, 11* 62:*24*
**memorized**
62:*5*
**memory**
56:*10* 57:*3*
81:*2, 4, 5*
164:*2* 205:*22*
208:*24*
210:*19* 211:*5*
214:*25* 216:*2*
**Men** 6:*9*
**mention**
55:*15* 56:*3*
173:*6, 13, 23*
174:*2*
**mentioned**
12:*24* 14:*10,*
*13* 56:*11, 13*
60:*13* 124:*18*
151:*14*
193:*18* 233:*7*
**mentioning**
182:*17, 18*
**mentions**
156:*23* 222:*2*
**merely** 107:*7*
**message** 10:*6*
**met** 8:*2*
10:*25* 14:*13*
121:*12* 142:*7*
**meta-analyses**
181:*23* 183:*4*
184:*11* 185:*14*
**meta-analysis**
180:*10, 12, 13,*
*14* 181:*6, 10*
182:*7, 18, 23,*

24, 25  183:5,
12, 23  184:8,
15, 24  185:6,
7, 11  186:18
**metabolic**
150:21
**metabolism**
150:14, 18
152:10, 11
153:11  166:6,
23
**metabolite**
238:4
**metabolized**
150:16, 23
151:25  152:4,
9, 16, 21
153:2  161:20
212:5
**metallic**
103:15
**method**  37:22
93:6  97:11,
15, 17  133:18
**methodology**
85:1  86:2, 4
**methods**
93:17  94:7
96:9, 24
158:21  160:8
165:2  166:15,
16, 19  180:20
181:22
182:11  213:7
217:7
**methylating**
207:6
**methyldiazoniu**
**m**  150:25
151:1, 15, 22
152:13, 18
238:5
**mice**  145:8
**microgram**
82:22, 23
202:3
**micrograms**
63:23  68:2, 6
82:15  91:4, 8
98:18, 20
99:18, 19

100:25  101:1
106:20, 22
112:19
117:20, 24
118:10, 14
119:4  120:20,
25  121:7, 16
129:8  136:3,
16, 25  137:7
138:4  141:2
149:5  159:11
169:1, 3, 4, 14,
16, 17, 20
170:23, 25
171:3, 13, 25
172:4, 8, 16
175:14  179:6,
7, 8  184:5
193:11
212:14  215:9,
10
**middle**  157:3
**midpoint**
57:20
**midpoints**
54:15  55:17
56:5  57:1, 9
58:4
**migration**
222:15
**Mike**  3:24
15:4  199:14
**milligram**
229:8  239:20
**milligrams**
63:22  82:17
83:17  113:15
192:5  239:7, 9
**milligrams-**
**Testing**  80:10
**milliliter**
160:22
**milliliters**
218:4
**million**  81:20,
21, 24  82:1, 6,
12, 19, 24
83:10  90:9,
16  92:11
**mind**  134:5
178:21

**minimum**
58:21  59:20
**Minli**  84:3, 11
**M-I-N-L-I**
84:11
**Minneapolis**
2:13
**Minnesota**
2:13
**minus**  83:20
**minuscule**
190:22
231:20, 21
233:9
**minutes**  14:23
49:19  142:17,
18  229:20
**mischaracteriz**
**ation**  181:10
**mischaracteriz**
**e**  240:2
**mischaracteriz**
**es**  99:8, 22
101:10
**misrepresentati**
**ons**  115:23

**misrepresented**
116:5
**missed**  140:10
152:1
**missing**
206:17  207:9
**misspoke**
144:14
**misstates**  39:4
75:22  76:21
**MM**  13:18, 20,
23
**model**  6:15
215:24  217:1
218:3
**modeling**
151:9  156:24
157:6, 9, 14
159:16, 17, 24
160:8  161:2,
14  218:15, 17
**models**  159:8
163:4, 5

**modulation**
6:13
**molar**  218:5
**molecule**
153:1, 2  193:5
**molecules**
150:24  161:25
**moment**
148:5  157:1
162:10
203:24
205:21  206:6
214:24
**momentarily**
202:17  208:22
**monitor**  52:10
128:2
**monitoring**
18:14, 17
19:5, 13, 18,
23  20:25
21:9  24:13
28:9  30:2, 4,
21  31:9, 20,
24  32:3, 9, 14
33:16  34:11,
18, 21  35:17
39:3  43:25
51:13, 18, 20,
23  52:2, 6, 17,
23  53:1  54:6,
10  65:1, 5, 21
66:4  67:4
94:3  106:17
108:12, 14
109:15, 18
110:5, 7, 18
111:11
112:16  113:3
114:15  115:1
117:18, 23
118:1, 16
119:17
122:25  123:5,
14, 20, 22
124:4, 8, 12,
19  126:17
127:13, 20
128:21  129:2
135:9  140:14
142:5  143:3

144:25
147:16
148:13
154:15  155:8
156:12, 17, 19
172:22  173:5,
14  175:15
176:8  188:11,
14, 17, 21
189:14, 20
190:3  191:6,
21, 25  196:10
197:11
199:24
202:19
205:19
208:18  211:8
214:23
219:20
224:20  230:8,
13  234:20
237:12
**Monte**  156:24
157:6, 8, 12
158:5, 8, 14
**month**  99:3
**months**  25:18
98:7, 10
99:19  100:25
101:5  189:7
230:20
**morning**  7:1
8:2  12:12
33:8
**MORRIS**
3:15  9:15
203:4, 7
**Motion**  13:22
31:20, 24
32:12  33:18
35:24  36:8,
14, 23  56:24
230:12
**move**  23:13,
24  55:13
73:25  76:10
128:20
129:13  196:9
224:13
**multi-cancer**
35:13  37:13,

Confidential Information - Subject to Protective Order

19 42:25 48:22
multiple 14:18 45:6 83:24 84:23 89:9 158:9 179:23 180:15 213:18 225:8 228:24
multiples 218:21
multiply 171:8
multiplying 83:19
mutagen 213:22
mutagenic 147:10
mutagens 213:23
Mylan 3:5
Myland 61:14 62:1

< N >
N7-methyl 166:25
name 7:2 8:3 9:9 70:25 80:5 84:10, 12 136:21 146:20
names 56:23
nanogram 190:18
nanograms 58:25 59:21 64:3, 15 82:13 83:12 90:11, 17 171:1, 4, 6 172:7, 13 174:1
narrative 172:23 173:6, 22 174:2
nationwide 6:18

nature 7:15 54:10 165:25 167:18
nauseam 95:25
NCRA 241:22
NDC 57:21 58:1, 5, 24 59:3, 10, 22, 25
NDEA 50:17 51:6 56:4, 16 57:21 58:5 59:2, 9 66:22 67:18 68:6 69:7, 13 70:2, 8, 16 86:5 93:1, 18 94:8 97:2 98:3, 11 105:1 108:18 109:17, 25 110:6, 8, 11, 16 111:4, 13, 24 112:7 123:24 177:1 191:14 213:25 223:11 230:17 231:4, 14 233:12, 23 234:6, 12
NDMA 4:20, 22 5:14 6:17 50:17 51:6 55:18 56:4, 16 57:21 58:5 59:2, 9 63:7, 17 64:8, 15 66:22 67:17 68:2 69:6, 13 70:1, 8, 16 77:22 80:10 81:11, 16, 17 82:7 83:10, 12, 13 84:20 86:5 89:9, 14 90:11, 16, 17 91:4 92:7, 11 93:1, 18 94:8 97:1 98:3, 7, 17, 22 99:5, 6,

18, 20 100:25 101:1, 7 102:6 104:18, 20 105:1, 5, 18 106:19 107:3, 19 108:5, 11, 18 109:2, 17 110:9 111:4, 13, 24 112:7 117:19, 24 118:11, 14 119:8, 18, 25 121:6 123:24 124:5 126:24 127:6, 15, 16 128:24 130:22 131:18, 20 132:22 133:6, 12, 15 134:6, 15, 16, 24 135:2, 10, 25 136:3, 25 137:5 138:5 139:10 140:25 141:17 145:19 146:19 147:1 148:15, 24 149:6, 9, 11, 24 150:3, 6, 12, 13, 24 151:4, 5, 11, 14, 15, 25 152:4, 9, 16, 21, 22 153:2, 3, 19 154:10, 19 155:6 156:23 158:19, 23 159:7, 11 160:14, 19, 21 161:19 162:7, 18, 22, 23 163:3, 21 165:8, 11, 14 166:13, 23 167:10 168:7, 11, 16, 25

169:13 170:3 173:8, 16, 25 176:13 177:1 178:9, 17 179:5 183:25 187:15, 25 188:5, 12, 19 191:14 192:3, 6 193:5, 11 194:11, 12 196:11 198:1, 3 200:12 201:24 202:5 203:13, 16, 21, 22 204:3, 4, 7, 10, 13, 19 206:5, 10 208:8 209:4 210:6 211:21 212:5, 12, 14, 20 213:3, 9, 11, 16, 20, 25 214:1, 5, 6, 11 215:9, 10 216:17 217:10, 15 218:2 219:2 222:4 223:3, 11 225:3 229:10 230:17 231:3, 11, 14, 25 232:6, 7, 17, 18 233:5, 9, 12, 16, 18, 22 234:2, 6, 7, 10, 12 237:20 238:3
NDMA/NDEA 230:23
NDMA- contaminated 50:23 225:21 227:1, 17 228:11
NE 2:16
nearly 122:1 192:21
necessarily 84:1

necessary 191:5
need 18:19, 23 36:10, 19 72:22 109:17 159:8 162:13 203:24
needed 195:15 222:7 232:3
Neither 111:24 120:15 196:23 241:13, 15
never 29:18 131:18, 20 145:19 201:7 224:9
NEW 1:1 2:4 7:10 8:7 20:20 21:4, 8 106:7 147:22 155:14, 20
NICHOLAS 2:19
Nick 9:8 49:17 50:1 100:14 157:22
nine 72:11, 25 73:2 176:12 177:24 178:2, 3, 18 180:6 212:25
nitrate 5:22 6:11 146:19 196:14, 21 209:24 210:4, 5, 9, 15, 16 211:3, 11
nitrite 5:22 146:19 196:14, 20 216:12 218:7, 13
nitrites 132:8 211:10 216:3
nitrosamine 166:5 204:16 207:16 209:20

**nitrosamines**
18:*4*, *10*  20:*6*, *11*, *12*, *22*
123:*24*
133:*13*, *15*
145:*7*  200:*13*
201:*20*  202:*4*
203:*14*, *16*
204:*5*, *6*, *11*
207:*3*  208:*8*, *10*  212:*1*
**Nitrosodimethy lamine** 124:*13*
**N-Nitrosamine**
6:*10*  164:*14*
166:*1*
**N-Nitrosamines**
5:*9*, *18*
143:*11*
197:*22*, *25*
198:*4*  204:*5*, *12*, *19*, *22*, *23*
205:*4*, *8*
206:*11*  210:*1*
211:*17*  213:*21*
**N-nitroso**
5:*18*, *22*  6:*3*, *8*  196:*21*
197:*5*  203:*9*
206:*3*, *8*
211:*14*
**N-Nitrosodimethy lamine** 4:*19*, *22*  5:*12*  6:*14*, *17*, *20*  77:*22*
84:*17*  237:*13*
**N-Nitrosodimethy lamines**
144:*20*
**NOC** 206:*15*
207:*2*, *3*, *6*, *7*
208:*1*, *4*
**NOCs** 207:*22*
208:*9*
**nomenclature**
63:*1*
**nominally**
226:*1*

**nonphysiologic al** 218:*14*
**normal** 112:*4*
150:*14*  200:*14*
**notable** 222:*25*
**notarized**
24:*21*  25:*5*
**notation** 122:*6*
184:*6*
**noted** 7:*18*
67:*20*  88:*14*
122:*15*
123:*15*  131:*2*
225:*6*  242:*8*
**notes** 12:*8*, *14*
14:*10*  25:*6*
116:*14*  119:*1*
229:*21*
**notice** 1:*15*
4:*8*, *10*  13:*7*, *9*  14:*25*
16:*13*, *16*, *23*
17:*8*, *19*
**noticed** 183:*13*
**notoriously**
133:*24*  232:*23*
**Notwithstandin g** 176:*11*
**November**
13:*24*  30:*5*
**Number**
15:*25*  18:*5*, *6*, *12*  25:*19*
26:*21*  29:*10*
54:*8*  68:*3*, *4*
69:*1*  70:*6*
77:*13*  78:*9*
80:*1*, *2*  82:*18*
83:*12*  89:*10*
90:*22*, *25*
91:*7*, *9*  100:*6*, *7*, *15*  101:*3*, *4*
107:*15*  114:*2*
115:*19*  116:*7*, *9*, *10*, *17*
118:*21*  120:*7*, *12*, *13*  121:*16*, *25*  122:*3*, *4*
126:*5*, *6*, *19*
128:*16*

141:*10*, *11*
143:*9*  144:*2*
146:*17*
149:*16*  156:*2*
161:*24*
162:*12*
163:*20*
171:*18*, *19*
172:*2*, *17*, *20*
174:*9*, *12*
175:*5*  181:*4*, *11*  189:*7*
191:*5*  193:*22*
196:*16*  200:*5*, *16*  202:*20*, *25*
204:*19*
205:*20*
208:*17*  212:*8*, *9*  216:*7*
218:*18*, *21*
226:*20*, *22*
231:*10*  239:*21*
**numbered**
24:*3*  80:*2*, *3*
164:*11*
**numbers**
11:*19*  29:*18*
61:*21*  66:*9*
68:*9*, *11*, *12*
69:*4*  73:*9*, *18*
75:*1*, *3*, *6*
77:*5*, *6*  84:*19*, *23*  85:*22*, *24*
89:*4*, *5*, *16*, *17*, *19*, *23*  95:*11*
97:*5*  112:*25*
116:*5*  120:*7*, *14*  122:*1*
129:*9*  134:*8*, *13*, *14*  136:*6*, *17*  141:*11*
142:*9*  169:*10*
176:*1*  177:*6*
189:*5*, *11*
196:*18*  230:*22*
**numeral**
126:*19*
**numerical**
230:*16*
**numerous**

133:*18*
**Nutrition** 6:*5*

**< O >**
**Obese** 6:*9*
**Object** 18:*15*
20:*7*  25:*12*
27:*18*  29:*8*
38:*3*  51:*8*
78:*1*  80:*20*
84:*21*  87:*11*
90:*19*  92:*18*
99:*21*  106:*21*
113:*9*  123:*2*
132:*10*
155:*15*
158:*15*  162:*9*
164:*19*
167:*12*
170:*18*
172:*10*, *25*
174:*3*  187:*17*
237:*14*
**Objection**
30:*9*  37:*3*
38:*11*  39:*4*, *19*  40:*8*, *13*
41:*4*  42:*6*
43:*2*  44:*2*
54:*17*  55:*5*
57:*22*  58:*8*
59:*4*  60:*17*
61:*9*, *16*  62:*3*, *11*, *22*  63:*9*
64:*9*, *16*
67:*10*  74:*8*, *22*  75:*22*
76:*21*  82:*3*
83:*14*  86:*7*, *22*  93:*20*
96:*11*, *21*
97:*12*  98:*19*
99:*7*  101:*9*
108:*15*
109:*19*
110:*22*
119:*12*  127:*3*, *22*  133:*8*
135:*3*  138:*10*
140:*7*  141:*18*
150:*7*  152:*23*

153:*25*
157:*10*, *19*, *23*
160:*16*
172:*25*  173:*9*
185:*10*
189:*22*  191:*7*
193:*12*
194:*17*
195:*11*
221:*13*
223:*18*  238:*10*
**Objections**
4:*10*  13:*6*
17:*3*, *7*  239:*8*
**observed**
65:*13*
**obtain** 185:*1*
**obvious**
175:*23*
**obviously**
28:*10*
**occasion**
14:*18*, *20*
**occasions**
14:*19*
**occult** 35:*10*
37:*5*, *9*  40:*25*
41:*8*, *17*  45:*16*
**occur** 218:*2*
**occurred**
20:*21*  24:*4*
134:*2*  220:*23*
222:*16*
**occurrence**
5:*21*
**occurring**
191:*1*
**October** 24:*9*, *16*, *22*  69:*20*
**offer** 39:*13*
40:*7*  44:*12*
**offered** 34:*22*
231:*15*  237:*1*
**offering** 37:*23*
38:*7*, *16*
39:*17*  40:*11*
41:*10*, *16*
42:*4*  43:*23*
77:*25*  81:*14*
110:*19*  123:*5*
155:*8*  157:*20*,

Confidential Information Subject to Protective Order

**25** 234:*19* 235:*19*
**office** 214:*23*
**oh** 23:*3, 25* 41:*16* 110:*1* 114:*23* 125:*15* 192:*19* 209:*7, 8* 224:*9* 228:*16*
**Okay** 8:*17, 21* 9:*3, 7, 16, 22* 10:*14* 14:*7* 17:*17* 23:*8, 15, 22* 24:*8* 36:*18, 22* 45:*14, 15* 47:*23* 49:*14* 50:*4, 6, 7* 54:*25* 69:*22, 23* 71:*15* 73:*24* 75:*17* 78:*25* 79:*9, 17, 18, 20* 86:*9* 90:*2* 98:*6* 102:*24* 103:*25* 104:*15* 105:*8, 12, 19* 114:*23* 118:*25* 125:*12, 18* 126:*4* 128:*5* 129:*11, 13, 15* 130:*5* 135:*7* 137:*3* 143:*1, 13, 18* 144:*10, 15, 23* 148:*4, 5* 151:*18* 156:*9* 157:*4, 5* 164:*10* 168:*9* 178:*5* 180:*9* 182:*16* 183:*21* 186:*23* 188:*1, 3, 10* 196:*25* 197:*13, 18, 19* 198:*21* 199:*1, 7* 201:*16* 203:*6* 206:*1* 209:*1* 215:*5* 219:*8, 24*

**220:**2, 3
221:*24*
222:*11* 227:*6* 228:*3, 4* 234:*15, 25* 236:*5, 19* 240:*7*
**old** 144:*11* 232:*10*
**older** 132:*2* 190:*24* 220:*14*
**once** 21:*18* 71:*15* 152:*21* 153:*1*
**ones** 75:*20* 166:*21*
**on-site** 24:*4*
**open** 10:*5, 9, 12* 79:*6*
**opened** 34:*7*
**operation** 89:*22*
**opine** 38:*13* 109:*1* 110:*10* 191:*9*
**opined** 109:*4*
**opining** 110:*15*
**opinion** 30:*8* 34:*11, 15* 38:*7* 39:*13* 70:*12, 19* 73:*21* 77:*7* 94:*3* 95:*22* 97:*11* 104:*7* 107:*18* 108:*1, 4, 12* 109:*16* 110:*9, 18* 120:*9, 18* 123:*6, 14* 124:*3* 127:*12, 19* 133:*5* 134:*23* 135:*12* 154:*17* 155:*7, 23* 156:*16, 20* 157:*11* 167:*4, 20* 174:*10* 182:*6* 186:*2, 7* 191:*4, 12, 22* 223:*4* 229:*2* 230:*24*

**231:**1 233:*11* 235:*23* 236:*2, 3*
**Opinions** 4:*11* 30:*1* 34:*10, 14* 37:*23* 38:*16, 18* 39:*17* 40:*7, 11, 14* 41:*10, 16, 20* 42:*4, 8* 43:*23* 44:*12, 13, 22* 45:*6, 10, 13* 51:*7* 65:*20, 23* 69:*8* 75:*15* 77:*25* 81:*14* 86:*21* 92:*14* 94:*13* 106:*11, 12* 109:*13* 110:*4* 116:*12* 128:*6* 139:*21* 154:*10* 156:*19* 157:*21* 158:*1* 186:*10, 12* 190:*14* 231:*6, 8, 15* 232:*16* 233:*14* 234:*19* 235:*19* 236:*21* 237:*1, 5*
**opportunity** 8:*11, 20*
**opposed** 43:*6* 53:*17* 93:*12* 94:*18* 203:*13* 206:*5*
**opposite** 225:*17*
**Oral** 4:*8* 5:*14* 13:*9* 14:*25* 147:*1* 149:*6*
**orange** 217:*11* 219:*1*
**oranges** 139:*1*
**ORDER** 1:*8* 34:*10, 14* 109:*17* 113:*7* 114:*3* 137:*14*

**159:**9, 21, 24
169:*24* 190:*16*
**ordered** 46:*11*
**orders** 108:*21, 22* 109:*22* 110:*13* 113:*7* 123:*23* 128:*12*
**organ** 153:*10*
**oriented** 228:*7*
**original** 11:*6, 17* 20:*15* 27:*17, 24* 28:*25* 31:*4* 55:*23* 58:*11* 66:*11, 14* 67:*15* 68:*14* 80:*23* 98:*13* 99:*12* 101:*15, 24* 106:*8, 16* 108:*7, 25* 111:*20* 112:*22* 113:*1* 124:*17, 24* 131:*14* 132:*5* 133:*10* 142:*12* 153:*2* 154:*5* 155:*1, 12* 156:*14* 163:*14* 174:*23* 177:*5* 218:*14* 236:*7, 22*
**originally** 30:*17*
**outcome** 222:*15* 232:*12*
**outcomes** 222:*6* 223:*25*
**outdoor** 128:*24*
**outline** 182:*13*
**outlined** 185:*13*
**outside** 82:*3* 153:*10* 157:*10*
**outweigh** 191:*10*
**overall** 77:*7* 215:*23* 217:*23* 222:*3,

**17** 225:*25*
226:*3* 227:*2*
**overarching** 204:*1*
**overestimate** 107:*24*
**Overland** 2:*9*
**overlaps** 216:*21*
**overly** 110:*12* 111:*2* 120:*5*
**Oxford** 3:*3*

**< P >**
**p.m** 102:*20* 103:*23* 187:*12* 199:*12* 240:*9*
**P.O** 2:*4*
**P450** 150:*17* 153:*7*
**PA** 3:*18*
**pack** 53:*5*
**PAGE** 4:*2, 7* 5:*2* 6:*2* 11:*22* 16:*16* 23:*2, 3, 4, 6, 9, 14, 18, 21, 24* 29:*24* 31:*13* 50:*11* 67:*21* 71:*21, 23* 72:*3, 6, 17* 78:*15* 79:*19, 25* 80:*2, 3, 4* 81:*10* 83:*10* 85:*9* 88:*15, 18* 90:*1, 8* 91:*3* 92:*1, 3* 93:*21* 114:*6* 115:*7, 15* 123:*21* 126:*18* 128:*20* 129:*3, 13* 130:*12, 13* 135:*23* 142:*11* 148:*23* 149:*15, 16, 20* 154:*1* 156:*22* 162:*4, 6* 164:*3, 5, 8*

165:20  168:9
176:7  187:25
206:12
211:24  217:3,
4, 5, 6, 25
221:25
222:19
226:10
227:21  228:1
243:2
**pages**  81:7
85:7, 10  92:4
127:23  242:4
**Palli**  121:18
**pancreas**
178:8
**Panigraphy**
68:14  223:5
**Panigraphy's**
30:14, 17, 25
34:14
**paper**  50:12
115:19
116:10  149:1,
13  156:19, 20
163:12  172:1,
18  173:20
174:13
197:19, 21
200:2  201:22
202:14  204:6
210:19  211:5,
23  213:3
215:6, 14, 17
228:14
**papers**  145:2
214:8  232:5, 7
**paragraph**
34:25  35:8,
23  36:24
37:25  40:25
48:1, 20
63:13  66:10
97:24  98:1
101:5  105:15,
16  106:1, 5
112:17, 21
113:11  118:5,
6  124:15, 16,
19  125:5, 13,
16, 20, 23

126:21
127:14
128:22  129:9
130:12, 14
133:11  134:4
135:21  136:7,
9, 11, 13, 23
137:3, 17
139:8  140:13,
22, 24  145:5
149:22
153:16  154:5,
6  162:5, 21
163:10
168:18
169:24
173:15
175:15  176:8,
11, 23  178:2
183:16, 23, 25
186:9  200:7,
9, 10  202:24
205:25
206:14, 18
211:25
**paragraphs**
101:24
104:18
105:23  106:4
112:23  124:9
155:4
**parameters**
151:9
**parasitic**  201:3
**parentheses**
88:16, 17
**Park**  2:9  3:7
**parking**  23:7,
11
**part**  35:7, 18
37:8  40:2
51:1  63:12
64:24  74:1
82:24  84:4
115:1  119:16,
21  122:24
124:3  133:14
153:17
156:19, 20
170:1  189:9

190:13  210:11
**partially**  67:11
**participant**
232:8
**participants**
220:12
222:14  232:19
**participate**
52:20  53:16
**particular**
26:3  42:19
43:24  47:11
52:11  55:14
58:15  59:10
78:13  81:25
87:1  110:20
116:7  117:8
183:5  200:18
208:2, 7
225:11  230:21
**particularly**
77:4  223:5
**parties**  7:12,
17  241:14
**partly**  211:15
**parts**  30:23
81:20, 21, 24
82:1, 6, 12, 18,
19  83:10
90:9, 16
91:24  92:11
94:20  201:4,
12
**pathways**
152:17
**patient**  41:2,
8, 14  51:25
52:1, 11, 25
53:5, 18
99:17  100:23
159:13
189:20  213:25
**patient/doctor**
52:10
**patients**  5:24
53:9  119:7
200:19  202:7
220:13
221:10  226:5,
23, 24  235:5

**pause**  7:15
102:3  103:21
**pausing**
114:18
**payor**  32:13
**PDF**  78:16
79:7  80:2, 4
85:8
**Peg**  7:20
142:14  186:3
**pending**  8:5
43:14
**Pennsylvania**
3:3  29:17
**people**  19:7
34:19  43:16
51:21  54:25
95:1, 15
109:5  134:24
151:4  180:18
181:21, 23
182:1  184:12
189:25  190:4
191:5, 18
192:4, 8, 17,
21, 22, 23
195:22, 23
201:22
218:15
223:10  224:1
228:20
234:21  235:4,
7, 15  236:10,
14
**peoples**  135:10
**perceive**  8:18
**percent**  205:8
**percentage**
29:6
**Perfect**  23:25
201:1
**perfectly**
224:25
**perform**
142:5  185:2
**performed**
20:2, 5  22:21
85:2  86:3
87:2, 3  89:14
95:7  97:1

157:18  158:6
170:4  181:21
**performing**
87:14  95:1, 3
**period**  25:16
70:9  99:3
105:4  108:7
221:4, 17
222:11, 16
223:10, 16, 17,
19  224:2
236:11
**periodic**
35:10  37:5, 9
45:16
**periods**  94:23
98:2
**permutations**
158:9
**perpetuities**
201:15
**persists**  222:5
**person**  52:19
84:10  101:21
112:20  136:4
137:1  141:3,
6  160:14, 23
190:7  239:6
**personally**
9:25  40:10
**persons**
226:11
**person's**
108:5  133:6
168:6
**person-to-
person**  146:5
**pertains**  64:25
**PET**  159:14
**Peto**  113:16
**ph**  1:21
215:11  216:5
217:23  218:5
**Ph.D**  1:14
4:3, 11, 14
7:22  13:8
186:10  242:2,
12
**Pharma**  2:24
72:25

Pharmaceutical 2:23 3:20, 21 63:14 64:1 172:13
Pharmaceuticals 2:23 3:15 147:10
pharmacokinetic 163:4
Pharmacy 3:10
phenomenon 209:23
Philadelphia 3:18 9:2
phone 10:18 14:21
PHR 2:3
phrase 43:16 128:7 207:17
phrased 54:23
physician 19:2 37:2 38:17, 19, 24 40:1, 2, 10, 22 41:13 42:14, 16 44:21, 22, 23 45:7, 10, 12 51:25 174:15 189:23 190:2, 9, 12
physicians 53:9 235:5
physiological 6:15 150:14 162:2 201:18 216:8 218:17, 22
physiology 161:16 200:15
pick 8:16 110:2
piece 139:14, 19, 21 207:20 211:15
pieces 48:14
Piedmont 2:16
PIETRAGALL

O 3:2
pigs 145:8, 9
pill 90:17
pills 60:24 61:3, 15 62:2 63:6, 8 64:14
pinging 161:25
Pittsburgh 3:3
Place 2:20 66:7 235:2
places 163:20
plaintiff 43:6 99:1 102:10 106:19, 25 230:18 231:3 234:12 235:20
Plaintiffs 2:6, 10, 14 4:10 8:4 13:6, 20, 22 17:8 30:3 31:19, 23, 24 32:12 33:18 34:22 35:8, 24 36:8, 23 39:2, 3 43:25 44:15, 19 50:16 51:5 55:16, 17 56:3, 8, 14, 19, 20, 25 57:5, 8, 13 62:17 63:2 65:1, 21 66:3 69:1 73:12, 19, 21 91:1 102:6 108:19 110:11 117:18, 22 118:11, 12 119:9, 18, 24 123:21 126:6 145:17 179:18 188:13, 20 189:4, 21 191:13 223:8 230:8 234:5, 20 235:18, 24
plan 34:21 35:17 39:3 117:18, 23

188:14, 21 189:14, 21 234:21
plans 19:19
plant 55:2, 7
play 212:9
Pleading 13:18
Pleadings 11:18
please 7:15 8:10, 19 15:1, 4 17:6, 8 21:14, 18, 22 23:13, 23 24:1 26:6, 19 38:5 70:20 77:11 85:7 86:10 93:4 113:25 115:25 116:24 118:4, 7 126:5 128:21 129:12 138:2 143:5, 19 152:2 164:3 168:9 177:13 186:5 209:8, 9 214:15 219:10 221:5 224:14 226:9 240:2
Pobel 140:2
point 14:22 55:13 56:9, 22 57:2, 4 70:4 76:20 88:24 89:8 118:3 125:13 134:14 139:22 140:21 167:13, 15 175:19 179:17 186:14 187:18 189:5 191:9 193:17 194:25 200:4 204:6 212:17 213:8, 14, 19

214:8, 14 215:23 216:22 218:12, 15 224:3 232:4, 13 238:10, 18 239:2
pointed 166:14
pointing 138:16 168:20 172:18
points 166:17 180:4 190:15
polyphenols 217:13
pool 151:3
popped 35:5
population 167:6, 25 168:12, 16 169:1, 13 170:12, 13, 17 172:24 173:8, 25 181:3 191:1, 17 213:16 228:20 235:2, 13 236:10, 18
populations 41:18 145:24 165:25 167:9 180:19 181:22 224:24
portal 10:5 150:19 199:5
portion 37:5 38:15
pose 8:10
posed 20:18
positive 180:22
possibilities 57:13, 15
possibility 55:15 56:3, 14 189:2
possible 24:22 34:5 55:2 58:19 59:19 87:7 89:11 119:8 160:19

165:7 191:13 233:17
possibly 183:12 232:20
potency 205:3, 6
potential 54:13 112:6 119:7, 18, 22, 23 121:5 147:11 175:9 182:14, 16 183:3 191:10, 24 233:11, 22
potentially 46:21 51:14 98:3, 7, 11 99:4 101:7 105:4 127:17
Pottegard 219:9 225:13 226:16, 21, 22, 23
powdered 148:25
power 102:15 104:2, 24 180:17, 21, 25 181:5, 7, 15
PowerPoints 18:7
practice 41:7 47:19 160:10
precautionary 196:2
preceded 70:10
precedes 130:10
preceding 207:1
precise 29:10 133:11 152:18 153:14 166:18 167:17
precisely 110:8 131:16
predated 146:12

Confidential Information Subject to Protective Order

predicated
106:15
171:10
176:21  230:20
predict  159:25
predicted
213:3, 5
predicting
160:6, 11
predictions
223:13, 14
pre-existing
166:6
prefer  11:15
preformed
213:16
pre-formed
133:12  213:11
premise
120:21  139:12
preparation
68:20  115:1
130:23  133:19
prepare  10:22
14:14, 16
prescribe
51:25
prescribed
93:17
prescription
226:12
presence  166:7
present  3:24
150:17
179:11  217:24
presentation
18:25  19:11
presentations
18:2, 8, 13, 21
19:17
presented
62:16  73:18
106:8  107:6
112:3  158:20
166:12  180:1
224:12
presents
179:13
preservation
130:23  133:19

presumably
47:17
pretty  10:25
106:1  210:22
211:23  229:19
prevent  221:9
prevention
206:16  207:8
previous
17:20  76:2
104:3  105:15
113:5  136:6
137:17  175:2,
8
previously
32:12  60:21
primarily
238:3
primary  11:8
33:20
primate
145:10
principal
150:18
principally
153:11
principles
19:10  190:1
225:14
Prinston  3:21
63:14  64:1, 4
77:12  86:11
PRINSTON002
73444  4:20
PRINSTONO0
068872  4:23
printed  33:7
prior  14:3
25:10, 14, 15
60:18  63:10
65:8  66:25
67:11  78:6
98:14  99:23
100:3  134:2
141:19
152:25  154:2
181:8  233:6
probable
238:2
probably
14:23  23:8

25:3, 5  29:15
49:16  151:22
212:2
problems
181:24
182:14, 17
184:10, 12
procedure
190:11
procedures
94:22  97:19
189:20
191:11  236:17
processed
132:9
processes
150:21  151:5
166:4, 6
processing
130:22  131:6
produced
102:8  159:11
product  63:18,
22  64:1  67:8
73:5  74:5
81:17  82:7
83:4  84:2, 20
87:16, 18
88:9  89:6
93:12, 24
94:9  98:7, 23,
24  101:22
102:8, 10
105:6  107:1
224:24  230:21
production
151:8, 11
159:21
164:24
212:21  213:3,
4, 8, 20, 21
214:11  232:2
233:13  234:2
PRODUCTS
1:4  4:18
6:18  7:8  8:5
51:3  58:15
60:8, 16
65:25  66:23
69:17  70:23
73:22  74:7

81:6, 23  86:6
89:2  93:2, 8,
18  98:2, 10
99:4  101:7
105:3, 4
108:21
172:13
187:16, 21
191:18
193:16
223:11  224:2
226:5  234:5,
14  236:10
product's
89:20
Professional
241:3
program
34:18  44:1
52:6, 9, 17, 18,
25  53:16
54:1, 6, 7
190:9  235:24,
25
programs
51:14, 18, 21,
23  52:3, 23
53:2, 15  54:10
promutagenic
207:13
pronounce
37:12  125:25
126:2  200:20
pronounced
125:3  126:3
proper  118:24
221:9
properly  185:6
properties
145:6
Proportion
5:17
proportional
149:5
proposal
51:10  56:25
propose  56:20
57:18  73:20
proposed  39:3
44:15  50:16
57:5, 14, 16

117:22
188:13, 20
189:13
191:25
230:18  235:25
proposing
56:8  63:3
proposition
193:7
propounded
242:6
Prospective
6:5
prostate  178:7

PROTECTIVE
1:8
protein
207:14  208:3
210:15, 24
proteins
210:13
protocol  95:6,
15  235:17
protocols
53:19  235:1, 3
provide  26:2
29:25  34:10,
14  45:11
84:18  110:3
111:11
135:16
170:24  204:2
207:5
provided  11:3
43:25  66:20
80:17  139:14
154:25  214:22
provides
170:16  172:6
providing
98:1  109:13
168:19
proviso  8:14
111:14  116:6
publication
131:12, 13
publications
28:12, 16
154:12  216:4

Confidential Information Subject to Protective Order

**published**
60:*15*  62:*25*
180:*15*
184:*14*
187:*15*  188:*5*
**pull**  14:*24*
21:*13*  26:*6,*
*19*  70:*20*
77:*11*  86:*10*
91:*12*  126:*5*
136:*10*  143:*4*
146:*16*
155:*24*
187:*20*
196:*12*  198:*5*
205:*13*
208:*12*
214:*15*  219:*9*
229:*5*
**pulled**  100:*21*
104:*17*
**pulling**  202:*13*
**purpose**
106:*17*
180:*13, 14*
209:*3, 19*
211:*7*
**purposes**
33:*24*  47:*3,*
*17*  49:*13*
52:*4, 13*
66:*19*  67:*3*
73:*3*  122:*25*
123:*13*
154:*15*  176:*1*
196:*1*
**pursuant**  1:*14*
**put**  25:*18*
33:*14*  76:*25*
79:*10*  91:*6*
140:*13*
144:*24*
189:*21*
199:*15*
210:*17*
225:*10, 18*
235:*17*
**putting**  15:*23*
**puzzle**  207:*20*
211:*16*

**puzzled**
105:*22*

**< Q >**
**qualifier**  128:*2*
**qualify**  230:*17*
**Qualitatively**
127:*14*
**quantification**
133:*11*
**quantify**
160:*15*
**quantitative**
111:*12*  128:*16*
**quantities**
153:*19*  154:*19*
**quarantined**
85:*19*
**question**  8:*10,*
*12, 20*  16:*8*
19:*14, 21, 23*
20:*17*  29:*22*
33:*5, 19*
36:*11, 20*
38:*5*  39:*21*
41:*23*  43:*14,*
*19, 22*  44:*3, 4*
46:*15*  47:*13,*
*14, 25*  48:*15*
50:*25*  52:*12*
54:*19, 22*
55:*8, 21*
57:*24*  59:*7,*
*12, 16*  61:*8*
62:*13*  63:*13*
64:*6*  65:*17,*
*24*  72:*23*
74:*3, 14*  76:*1,*
*7, 25*  77:*10*
83:*7*  84:*18*
85:*13*  86:*8,*
*18*  93:*3, 4*
94:*1, 11*  96:*4,*
*6*  97:*13, 21*
100:*22*
101:*11*
105:*11, 20*
108:*10*  109:*4,*
*5, 24*  110:*2*
119:*14, 23*
120:*19*  121:*4*

122:*11*  123:*9*
127:*5*  134:*4,*
*21, 25*  135:*5,*
*8*  136:*2*
138:*2, 12*
140:*9, 10*
141:*10, 19*
142:*4*  150:*9*
152:*2, 6, 24*
154:*1*  155:*7*
156:*18*  157:*8*
167:*14*  169:*6,*
*12*  170:*21*
183:*19*
184:*19*  186:*5*
188:*4, 10*
192:*11, 13, 20*
194:*20*
200:*18*
203:*19*  204:*1*
206:*2, 21*
215:*3*  217:*1*
218:*25*  219:*2,*
*7*  227:*13*
228:*6*  230:*7*
239:*14*
**questioning**
43:*15*  64:*21*
74:*17*  231:*12*
**questionnaires**
133:*23*
**questions**  8:*8*
17:*18*  18:*1*
40:*11, 20*
41:*6*  42:*13*
43:*4*  44:*24*
65:*3, 12, 15*
72:*14*  104:*4,*
*9, 15*  121:*25*
141:*24*
229:*16, 18*
230:*5*  231:*11*
234:*23*  235:*6,*
*16*  237:*8*
240:*5, 8*  242:*6*
**quick**  142:*15*
**quintile**  119:*2*
**quite**  113:*1*
151:*2*  165:*1,*
*3*  166:*25*
184:*15*  189:*9*

199:*7*  214:*10*
223:*2*
**quote**  60:*12*
**quote/unquote**
60:*5*  121:*9*
**quoted**  36:*3*
**quotes**  146:*5*
**quoting**  138:*3*

**< R >**
**rabbits**  145:*9*
**radioactive**
159:*14*
**raise**  177:*3*
**raises**  117:*25*
118:*14*
**range**  29:*13*
58:*4, 13, 24*
59:*9, 19*  60:*3*
111:*12*
117:*15*  136:*2*
137:*18*  141:*6,*
*11*  151:*19*
164:*24*  165:*1*
167:*19*
215:*15*
216:*17, 20*
218:*22*  222:*21*
**ranged**  179:*6*
184:*4*
**ranges**  54:*15*
55:*17*  56:*5,*
*15*  57:*9, 20*
137:*21, 23*
169:*1, 14*
173:*25*  216:*11*
**ranging**  136:*7,*
*15*  137:*6*
**rapid**  215:*10*
**rapidly**  152:*9*
**rare**  190:*25*
**RASPANTI**
3:*2*
**rat**  212:*18*
**rate**  22:*20, 22*
28:*22, 25*
29:*4*  151:*24*
152:*3, 15, 16*
159:*18, 20*
160:*25*  161:*8,*
*9*  162:*6, 19,*

*22*  163:*2, 3*
192:*10*
**rates**  148:*20*
152:*14*  159:*1,*
*22*  164:*13*
**ratio**  82:*18*
184:*8*  232:*1*
233:*7, 11*
237:*23*
**rats**  112:*18*
113:*6*  145:*8*
**raw**  185:*2*
**RBK/JS**  1:*5*
**reach**  119:*9*
168:*3*
**reached**
121:*15*
166:*12*  168:*3*
**reactive**  147:*9*
152:*12, 21*
**read**  11:*20*
17:*16*  31:*2*
32:*8, 15*  34:*7*
39:*8*  56:*8*
74:*11*  78:*21*
85:*17, 18*
90:*8*  92:*9*
104:*12*  119:*3*
124:*1*  127:*24*
130:*24, 25*
131:*7, 8*
136:*17*  137:*2,*
*8*  146:*6*
149:*18*  154:*7*
162:*11*
163:*10, 16*
169:*10, 18*
174:*13*  177:*4*
189:*6*  201:*10*
206:*18*
217:*14*
220:*17*  222:*9*
225:*5*  226:*25*
227:*8, 19*
228:*13*  230:*7,*
*11*  238:*22*
239:*25*  242:*3*
**reading**  18:*5,*
*6*  49:*4*
125:*15*
166:*22*

Confidential Information - Subject to Protective Order

174:*15*
189:*24*  209:*5*
227:*3, 4, 8, 18*
228:*7*
**reads**  50:*16*
80:*9*  126:*22*
130:*14*  145:*5*
164:*13*
165:*22*  192:*4*
193:*14*
200:*12*
206:*14*  228:*9*
237:*22*
**ready**  50:*1, 8*
**real**  216:*25*
**realistic**  107:*6*
**realities**
193:*25*
**really**  114:*21*
142:*9*  181:*7*
215:*24*
**Realtime**
241:*4*
**reask**  48:*15*
135:*7*
**reason**  8:*17*
109:*24*
114:*17*
131:*23*
145:*12, 17*
181:*24*
**reasonable**
128:*23*  130:*2,*
*20*  131:*10*
133:*25*  134:*5*
135:*22*
136:*19*
137:*10*  138:*7,*
*13, 17, 23*
139:*7*  165:*23*
**reasonably**
150:*4*  154:*8*
165:*12*  171:*11*
**reasons**  88:*23*
93:*10, 14*
94:*17, 21*
167:*8*  176:*23*
196:*2*  233:*2*
236:*6*
**recall**  24:*18,*
*19, 23*  28:*15*

30:*24*  31:*17*
34:*5*  39:*9*
56:*7, 10, 21,*
*25*  57:*3*
64:*10*  68:*13*
70:*10*  78:*12*
80:*16*  92:*19*
105:*6*  175:*17*
176:*2*  183:*10*
188:*7*  193:*18*
195:*2*  210:*20*
211:*19*  213:*2*
226:*20*  231:*12*
**recalled**  188:*6*
192:*6*
**recalls**  220:*22*
221:*19*
**receipts**  4:*11*
23:*7, 11*
**received**  96:*5*
**receptor**  18:*4,*
*9*  20:*3*  21:*6*
**recess**  49:*23*
71:*6*  102:*18*
142:*22*
187:*10*
199:*10*
209:*14*  229:*24*
**recognition**
194:*5*
**recognize**
16:*13*  17:*14*
26:*13*  37:*1,*
*15, 16*  113:*4*
148:*11*  194:*20*
**recognizing**
58:*16*  112:*10*
**recollection**
21:*12*  28:*21*
80:*13*  81:*18*
84:*14*  86:*25*
91:*25*  122:*10*
158:*7*  169:*19*
174:*22*
204:*17*  205:*7*
218:*13, 20, 23*
226:*2*
**recommended**
94:*22*  235:*4*
**reconcile**
118:*9*

**record**  7:*2, 19*
9:*17*  24:*24*
26:*1*  33:*6*
49:*21, 25*
71:*2, 4, 8*
102:*16, 17, 20*
103:*17, 19, 23*
116:*22, 24*
142:*20, 24*
154:*7*  187:*8,*
*12*  199:*8, 12*
203:*3*  209:*13,*
*16*  229:*22*
230:*1*  232:*15*
**recorded**
25:*21, 22*
**recording**  25:*8*
**red**  207:*15, 22,*
*24*  208:*7*
**redirect**
237:*19*  238:*13*
**redo**  64:*20*
65:*15*  106:*15*
**reduce**  132:*12*
**refer**  48:*21*
60:*10*  63:*14*
91:*1*  92:*16*
128:*22*  192:*2*
**reference**
34:*24*  97:*2*
106:*3*  115:*4*
124:*15*
126:*17*  132:*5*
135:*11*
144:*24*  164:*7*
173:*20*
176:*20*
182:*17*
187:*19*  200:*5,*
*15, 16*  202:*19*
205:*19, 20*
208:*17*  211:*8*
212:*21*
219:*19*  230:*15*
**referenced**
12:*18*  14:*2*
34:*2*  68:*25*
91:*2*  131:*15*
134:*11*
137:*10*
139:*24*

148:*12*  151:*7*
154:*22*  155:*4*
163:*12*
168:*17*  200:*3,*
*4, 18*
**references**
112:*22*  125:*9,*
*10*  130:*10*
134:*4*  135:*1*
143:*3*  154:*11*
156:*12*  157:*5*
164:*6*  168:*23*
173:*19*
197:*10*  224:*19*
**referencing**
139:*23*
140:*12*
182:*22*  188:*23*
**referred**
61:*22, 23*
138:*23*  155:*5*
161:*14*  163:*19*
**referring**
19:*12*  23:*11*
32:*17*  35:*7*
36:*4*  37:*8*
44:*14*  46:*9*
48:*11*  51:*16,*
*24*  52:*5, 15*
53:*10, 23, 24*
60:*7, 11*
62:*25*  66:*8*
70:*9*  72:*1*
73:*8*  77:*19*
91:*4*  104:*24*
105:*7*  106:*9*
112:*16*  118:*4,*
*5, 7, 17, 18*
125:*8, 25*
128:*13*
129:*10, 16*
138:*13*
140:*20*  163:*6*
165:*4, 15*
176:*18, 19*
178:*22*  181:*6*
188:*23*
189:*12*
192:*17*
201:*25*
210:*11, 16*

**refers**  49:*2*
62:*17*  65:*7*
66:*5*  67:*23*
68:*7*  88:*3, 4,*
*19, 22*  105:*23*
106:*23*
131:*19*
174:*17*
177:*23*  212:*3*
**refiled**  30:*21*
**reflect**  170:*2*
**reflected**  84:*25*
**refresh**  15:*24*
80:*13*  147:*5,*
*22*  197:*17*
205:*22*
208:*24*  211:*5*
214:*24*  216:*1*
**refreshing**
147:*25*
**regard**  17:*18*
18:*3, 14, 22*
19:*17, 24*
20:*2, 5, 21*
29:*23*  30:*7*
38:*7*  39:*17*
40:*24*  41:*24*
42:*4*  43:*24*
45:*15, 21*
46:*2, 13, 16,*
*23*  47:*5, 25*
55:*14*  59:*7*
60:*15*  64:*22*
67:*7*  72:*5*
74:*15*  84:*15,*
*19*  86:*18*
89:*24*  92:*6*
108:*11*
109:*13, 25*
110:*3*  113:*3*
119:*16*  122:*6*
124:*3*  127:*13,*
*19*  133:*5*
134:*23*  135:*9*
141:*16*  142:*4*
154:*17*  155:*7*
156:*17*
184:*20*
189:*19*  191:*4*
196:*18*  229:*7*

Confidential Information Subject to Protective Order

regarding
18:8  20:22
21:4, 5, 24
30:1  65:20,
24  109:14
110:4, 9
148:15  155:5
167:10
196:11  237:19
regardless
235:25
region  133:17
Registered
241:3
regulatory
196:1
Reihl  1:17
7:20  241:2, 21
related  34:6
52:17  105:2
208:3
relates  89:19
relation  112:4
relationship
134:16
relative  112:5,
6  134:1
138:16  184:1
241:13, 15
relatively
126:24  127:7,
17  128:7, 17
151:2
relevant  66:5
reliable  93:22
96:20  97:7, 8
132:21  174:9
176:13  177:7
179:19  185:17
reliance  60:7
relied  73:6, 17
74:15  89:1, 4
101:4
relies  132:19
rely  57:9
73:4  74:4, 18
124:11
134:22  172:3
relying  67:5
94:4  133:4

155:22
remain  128:6
remember
24:21  65:17
136:20  200:3
204:18  234:23
remind  114:1
125:4
remote  1:13
7:6, 15  9:5
remotely  7:13,
14  241:9
remove  40:2
144:5
rendered
21:24
rendering
30:7  51:7
123:13
reopening
219:23
repair  214:12
repeat  31:22
38:4  46:15
47:13  56:23
61:1  93:4
123:9  152:2
186:4  239:15
repeated  17:22
rephrase  8:11,
20  123:11
Report  5:3
11:7, 16, 17,
23  12:5, 19
13:4  20:15
26:7, 17  27:9,
16, 17  28:6
29:23, 25
30:8, 15, 17,
20, 22, 23
31:4, 7, 9, 11
33:15, 25
34:2, 24  35:1
37:25  39:1,
25  41:12, 21
42:12, 18, 20
43:1  44:13
45:1, 3  50:12,
15  55:15, 22,
23, 24, 25
56:2, 12, 13,

18, 22  57:8,
12, 19  58:3, 9,
11, 12  62:12
63:13  64:23,
24  65:4, 8, 19,
20, 23  66:6, 8,
11, 14, 19
67:4, 15, 21,
22  68:19, 20,
23  73:4, 9
74:4, 16, 18
75:9  77:25
80:23  81:15
82:4  91:3, 9
97:23  98:13
99:12  101:6,
15, 24  104:3,
12, 17, 21, 25
105:15, 22, 25
106:2, 6, 8, 13,
16  107:4, 11,
13  111:20, 21
112:16, 22
113:1, 5, 20,
23, 25  114:6,
14, 16, 24, 25
115:2, 4, 7, 12,
15  116:14, 17
120:22  121:3,
13, 14  123:20
124:8, 12, 17,
19, 24  125:6,
7, 10, 14, 21, 23
126:17
128:22  129:2,
22  130:9
131:15, 16
132:5, 6
133:10
134:11, 12
135:9, 21
136:9, 10
137:24
138:19
139:15, 24, 25
140:14, 24
141:4  142:10,
12  143:3
144:25  146:6
147:16
148:13, 18

151:7  154:5
155:1, 12, 13
156:12, 15
163:14  170:6
172:22  173:5,
14, 15, 22
174:14, 23
175:16  176:8,
23, 24  177:22
178:1  179:17
180:4  183:16
185:16
190:13, 15
193:3  196:5,
10  197:11
199:24  200:8
202:19
205:20  208:5,
18  211:8
219:20  220:9
224:20
230:25  231:6
233:3, 10, 14
236:7, 20
237:2, 12, 22
reported
168:21  184:7
reporter  7:19
143:22
157:22  186:4
241:3, 4, 5
reporting
7:15  65:14
216:25
reports  10:25
11:3, 5  28:7,
8  68:14  77:4
134:25  151:7
208:6  225:7
236:23
repository
114:3  126:7
156:3
represent  8:3
117:4  122:13
representation
12:15
representative
131:4  170:7

represented
101:5  116:12
170:9
Representing
2:6, 10, 14, 22
3:5, 9, 14, 20
91:7  115:21
171:16
represents
163:1
request  18:12
65:21
requested  17:1
Requests
16:19, 22
17:18  30:2
109:15  110:5
require  35:9
36:2
required  234:7
requires  161:1
reread  10:24
11:2  157:2
research  20:2,
5, 12, 22  21:4
47:17  49:13
53:19, 20  96:7
researched
59:1
researching
50:23
residual
228:15
resistance
145:11
respect
134:21
183:10  217:10
respectively
215:11
response  40:5
66:3  121:24
225:7  226:4
228:25  233:7
238:1
Responses  4:8
13:6  17:7
233:6
responsible
153:11

responsive
16:22
rest 68:5
restate 50:25
55:20 110:1
Result 4:19,
20 77:21
80:10 84:17
127:16
158:11
211:11 224:5
results 50:22
73:2, 5, 6
81:5 85:14,
16 86:1 87:7,
9, 10 89:9
92:7 96:8, 14,
19 110:20
122:17
159:15 172:7
216:7 222:2,
18 226:9, 11,
24 227:5, 7,
13, 14, 19, 23,
24 228:3, 4, 8
retained 29:1
retainer 21:8
retention 21:9
review 25:23
28:18 30:16,
22, 25 31:7,
15, 19 32:8
33:24 34:21
35:17, 19
39:1 51:1
66:20 68:21
84:4 86:20
91:20 114:25
115:9, 13, 22,
23, 24 116:1
reviewed 26:3
30:14 31:6
32:24 34:23
35:21 67:1, 5
96:16 114:15
122:23 123:14
reviewing
33:21 68:19
81:2, 4
reviews
203:25

205:24 206:7,
24 208:25
215:2 222:13
revisit 108:8, 9
rich 209:4, 21
210:2, 10, 15,
18
RICHER 3:7
rid 210:12
right 9:19
15:23 22:17,
18, 25 24:1
43:19 50:9,
13 55:25
56:1 57:25
65:2 69:22
72:8 79:15
80:9 81:10
82:20 83:18
84:16 89:25
90:22 91:23
104:8 113:24
126:20
128:20
130:16, 17
137:3 139:2,
3 146:21
149:20, 21
155:2 156:22
162:16
165:21
175:17, 19
176:2 178:1
179:21
181:15 187:3,
24 192:14
197:4 204:1,
25 210:14, 22
211:25 214:9
216:17, 23
217:6 218:25
219:23 226:8
228:5 230:3
237:18, 21
right-hand
130:13
149:22
153:17 218:1
ring 78:4
risk 6:4, 18,
21 18:20, 23

34:19 38:1, 9
39:15 41:2
43:5, 16 66:1
69:9 73:23
107:17 108:2,
5, 13, 24
109:3, 11
110:17, 20
111:10
116:13
117:25
118:15
119:11
123:16
132:24 140:1
141:8, 15, 16,
22 142:5
147:11 177:2,
8 178:9, 16,
24 184:1
185:19, 23
187:15, 25
188:5, 12, 19
189:18, 19, 25
190:6, 10
191:5, 10, 15,
17, 19, 23
192:3, 25
193:5, 9
194:12, 14
195:4, 20
196:3, 6
204:8, 13
211:12 222:3,
7 225:24, 25
227:2 228:18,
21, 22 229:1
233:4 234:21
235:8, 10, 11,
13, 14 236:9,
12, 13, 16
239:21
risks 18:3, 8
188:13, 20
189:11, 12, 19
190:16, 20, 22,
23
Rite 3:10
RN 2:8
Road 2:16

ROBERT 1:6
3:17
robust 225:17
rodent 237:24
239:5, 12, 16,
18
role 40:12, 22
42:15
roles 29:16
Roman 126:19
room 9:3, 7,
21, 23 15:15
36:17 78:22
102:15 203:5
ROSEMARIE
2:3 8:3 9:14
12:2 13:25
43:3 47:21
64:17 102:12
103:5 127:3
142:13
185:24 186:5,
13 203:2
219:21 229:17
rosemarie.bogd
an@1800law10
10.com 2:5
rotate 78:23
79:8
rough 135:16
roughly 69:6
136:5
routinely
123:25 161:15
row 83:9
90:3 117:11
129:6
rows 72:8, 12,
24
RPR 1:17
241:21
rule 201:15
228:15
run 158:9
182:14
196:25 199:4

< S >
sacrificing
180:17

safe 118:11
120:24 121:1
sample 149:7
samples 97:2
158:24 167:21
saw 75:6
116:10 225:13
saying 53:4
138:24
168:24
169:10, 11
171:14 184:6
186:25
201:21
207:11 211:1
233:23
says 10:3
11:22 13:17
31:13 32:2
65:19 79:23
80:6 88:10,
12 111:22
120:23 121:1
162:6, 25
187:25
188:24 189:1
192:23 207:2,
18, 24 211:24
212:11 218:1
221:17
222:14, 20
223:14
225:23
226:10
228:14 238:8,
22 240:1
scale 238:23
239:12
scaled 238:24
239:5, 16, 18
scales 162:24
scaling 237:20,
22 238:20, 22
239:24
scan 35:11
37:10 41:25
84:17 85:8
159:14
scanning
53:21 217:25

Confidential Information Subject to Protective Order

scans 42:5 45:21
scenario 60:12 104:19 105:17 107:8 121:6, 10
scenarios 95:21 105:2
Schistosomiasis 5:23 200:21, 22, 23 201:2, 3, 8 202:8
ScieGen 3:15
scientific 25:24 26:3 28:12 30:1 97:4 109:14 110:4 127:8 176:13 223:6, 8
scientifically 97:17
scientist 95:5 174:15
scientists 95:7 165:7
scope 62:12 82:4 157:11 237:15
screen 15:7, 14 17:10, 24 23:10 26:24 27:1, 21 35:5 47:1, 15 78:20, 21 89:25 129:16 147:17, 19, 24 171:23 194:15 202:17 208:22 215:19, 20
screening 19:4 37:6 46:1, 5, 6, 19 48:6, 7, 17 49:6, 10 52:1 53:8, 17, 21 54:6 190:8

191:11 235:3, 24 236:15, 17
second 13:21 15:7 71:20 72:3, 6 78:15 80:1, 4 105:21 118:22 121:22 122:18 126:21 130:12 145:4 149:22 151:23 153:16 165:20 176:10, 23 196:19 200:25 203:1 208:24 219:21 232:4
section 50:15 56:9 66:10 104:25 123:21 124:7 129:2 130:1, 9, 10 135:1, 9, 11 164:4, 11 168:10, 13 221:24 222:18 227:6, 7, 8, 14, 15, 20, 23, 24 228:3, 4, 8
sections 66:6 154:22 231:5
see 9:16, 25 15:25 16:17, 20 21:20 22:1 24:3, 11 26:23, 24, 25 31:10 35:4, 15, 16 43:14 49:16 50:2 71:15, 17 72:6, 10 75:11 77:18, 23 78:17 79:24 80:3, 7 81:12 84:22 86:15 88:1

92:5, 6, 10, 12 101:2 104:21 114:8, 9, 23 115:14 117:1, 16 122:7, 8 137:14 141:4 143:18, 20 144:19 147:2, 18, 24 149:25 156:1, 9, 25 157:5 163:11 167:21 168:13 174:16 176:15 177:13 179:21 189:10 192:14 194:15 195:19 196:19 197:16, 19, 23 199:6, 21 201:11 215:6, 12, 13, 16, 20 216:11 217:14 220:20 221:16 222:8, 9 223:22 224:9 227:11 230:15
seeing 15:10 137:20
seemingly 73:14
seen 17:15 63:7 64:6, 13 68:13, 25 75:5 80:14 81:21 90:25 92:9, 17 132:13 225:16
selected 116:9 148:20 179:18
self-reported 232:22
self-reporting 133:23

seminars 18:2, 8, 13, 22 19:17
sense 113:10 159:22
sensitive 107:21 112:8, 9 134:18, 19 178:25 234:11
sentence 118:7 125:22 153:17 162:5 165:21 166:2 176:10 184:6 193:14 194:3 200:12 206:25 207:2, 18 211:10 212:11 227:14, 19 228:8
sentences 67:23 166:10
separate 21:10 86:19 174:20
separately 105:1
September 24:4, 5, 20 67:14 68:17 69:21, 22, 23 70:5 72:17 75:17 76:18 81:18 100:8, 12 113:2 127:4, 23 142:1, 8 155:21 161:4 239:19
sequence 77:13
sequentially 158:10
series 14:9 24:8 89:16 121:11 199:4 232:21
served 20:24 68:21
serves 66:12

SERVICES 1:21 7:4
serving 133:21
session 31:5
set 11:24 16:6 39:2 52:3, 6 53:16 54:5 64:21 89:22 106:24 146:22 154:24 158:7 170:8 181:2 216:24 230:24 231:1, 7 233:3, 10 236:22, 25 241:10
sets 97:1
setting 34:18 49:12 204:20 207:14 210:1 218:5
seven 141:1 169:21 173:17, 19 174:4, 6, 8, 20 175:12 176:12 177:24 178:4, 5, 6, 7 179:2 180:5 212:25
Seventy-five 98:10
shared 97:2
sheet 156:2 174:21 196:18 242:9
short 25:16 151:2, 15, 18 186:15 222:3 224:8
shortcomings 132:18
show 15:18 68:1 141:7 178:15 201:17 228:24
showed 145:11 179:3 193:19 195:1

239:*22*
**showing** 212:*4*
**shown** 74:*6,*
*20, 21* 75:*20*
76:*15* 87:*8*
107:*20* 119:*9*
147:*20*
178:*10*
231:*22* 233:*25*
**shows** 24:*3*
78:*20*
**sick** 54:*3*
**side** 130:*13*
162:*6* 206:*14*
**sideways**
78:*20*
**signature**
114:*19*
**significance**
120:*15* 122:*5,*
*14* 141:*14*
232:*16*
**significant**
119:*1, 11*
122:*11, 17, 20,*
*22, 23* 123:*16*
139:*25* 141:*8*
165:*24* 167:*9*
177:*7* 178:*9,*
*15, 19, 20, 23*
179:*4, 16, 23,*
*25* 180:*2*
225:*2, 20*
226:*1* 227:*15*
228:*10*
**significantly**
117:*25*
118:*14*
121:*17, 21*
**similar** 35:*13*
37:*13, 21*
43:*1* 48:*4, 23*
49:*4* 86:*18,*
*23* 127:*15*
132:*2* 140:*14*
141:*11*
159:*17*
166:*25* 170:*8*
174:*25*
175:*11* 181:*3,*
*15, 19* 233:*15*

**Similarly**
106:*5* 141:*5*
**simple** 74:*14*
**simplest** 82:*9*
**simply** 74:*3*
106:*9* 116:*17*
135:*8* 189:*6*
**simulated**
215:*25*
**single** 222:*5*
**site** 85:*19*
**sites** 95:*12*
**sitting** 8:*24*
9:*1* 12:*11*
28:*15* 39:*9*
40:*20* 61:*4, 8*
64:*10* 78:*2*
81:*3* 82:*20*
84:*14* 86:*24*
91:*25* 142:*1*
152:*19* 155:*2*
158:*12*
175:*17, 19*
176:*2* 195:*2*
**situation**
131:*4, 11*
**six** 83:*20*
169:*21*
182:*20* 212:*25*
**size** 226:*15*
**sizes** 133:*21*
**skimmed** 39:*8*
**slightly** 225:*23*
**slow** 215:*11*
**small** 151:*3*
164:*16*
177:*20* 196:*3*
**smear** 35:*11*
37:*10* 42:*23*
46:*13, 16*
48:*21*
**smears** 189:*16*
**smoking** 53:*6*
**sodium**
161:*23, 25*
218:*6*
**Solco** 3:*21*
**solely** 148:*21*
149:*1*
**somebody**
41:*13*

**Song** 180:*10,*
*12* 182:*18, 24*
183:*24* 184:*8,*
*21, 23* 185:*2,*
*7, 12* 186:*17,*
*21, 22* 187:*1, 7*
**sorry** 17:*20*
23:*3* 40:*15*
50:*5* 78:*18*
93:*3* 97:*20*
100:*10*
101:*19* 102:*2,*
*14* 105:*8*
117:*21*
120:*21* 123:*6,*
*8* 139:*11*
140:*8* 157:*22,*
*24* 171:*2*
175:*5* 179:*12*
183:*17* 186:*3*
192:*11*
197:*13* 198:*7,*
*11, 15, 20, 25*
204:*25* 217:*5*
218:*11* 227:*3,*
*12, 18*
**sort** 76:*10*
153:*8* 225:*16*
236:*19*
**sorts** 233:*1*
**sound** 22:*17*
**sounds** 22:*18,*
*25* 103:*12*
172:*2* 201:*14*
**source** 208:*8*
217:*11*
**sources** 5:*20*
12:*4* 68:*1*
237:*4*
**South** 3:*18*
**space** 215:*13*
**speak** 105:*10*
124:*9* 153:*14*
157:*15*
162:*18*
192:*15* 210:*17*
**speaking** 7:*16*
37:*4* 105:*9*
112:*15* 113:*8*
182:*16, 24, 25*

190:*12*
197:*21* 235:*9*
**speaks** 172:*24*
240:*3*
**specialized**
189:*15*
**species** 112:*8,*
*9* 126:*23*
145:*8, 10, 11,*
*20* 162:*23, 24*
166:*23* 167:*1*
234:*1* 237:*24*
239:*12*
**specific** 38:*8,*
*14* 40:*19*
44:*17, 18*
59:*24* 60:*1*
63:*25* 64:*19*
81:*4* 86:*25*
91:*25* 110:*16*
158:*4* 173:*6*
174:*5* 191:*11*
205:*7* 207:*6*
214:*13*
217:*17, 18*
230:*16* 231:*3*
234:*20* 235:*7,*
*17, 20*
**specifically**
18:*25* 20:*10*
24:*23* 38:*20*
39:*23, 25*
43:*7* 49:*2*
87:*24* 105:*23*
124:*18* 125:*9*
133:*10*
157:*15*
166:*12*
173:*23*
176:*20*
187:*19*
192:*16* 200:*3*
205:*19* 206:*5*
219:*19*
**specify** 47:*11*
**speculation**
158:*16*
**spelled** 84:*11*
**spend** 14:*15*
170:*19* 211:*4*
216:*10*

**spending**
24:*19*
**spent** 11:*8*
22:*4, 11, 19*
25:*19* 64:*17*
66:*15* 113:*1*
131:*14*
**Spiegelhalder**
197:*2* 212:*3*
**split** 85:*17*
**spoke** 21:*11*
28:*4* 67:*13*
**spot** 12:*12*
**spread** 25:*17*
**spreadsheet**
90:*23* 174:*23,*
*25* 175:*7, 12,*
*18, 25* 176:*3, 4*
**SS** 122:*7*
**stamped** 92:*2*
**standalone**
203:*17*
**standard**
47:*18* 49:*10*
97:*1* 163:*6*
**standpoint**
231:*16, 18*
**stands** 43:*20*
117:*5* 122:*9,*
*10, 13*
**start** 83:*17*
111:*22* 181:*25*
**started** 47:*22*
105:*10*
**starting** 50:*8*
82:*14* 157:*3*
178:*2, 3*
**starts** 125:*17*
165:*21*
**State** 3:*12*
54:*5* 160:*21*
163:*2* 164:*22*
**stated** 45:*10*
121:*13*
129:*18*
175:*15* 194:*18*
**statement**
29:*20* 30:*6,*
*10* 68:*5*
106:*11* 127:*2,*
*10, 13, 21*

Confidential Information Subject to Protective Order

128:*1* 145:*14,*
*16* 153:*21, 22,*
*24* 154:*18*
155:*11*
164:*18, 21*
167:*7* 174:*16*
176:*18, 19, 22*
177:*4* 185:*15*
192:*3, 23*
238:*21*
**statements**
127:*24*
**STATES** 1:*1*
7:*9* 8:*6*
29:*24* 41:*19*
87:*18* 89:*21*
93:*12* 142:*10*
170:*1, 4*
201:*8, 13*
213:*15*
**stating** 98:*6*
138:*7* 196:*7*
**statistic** 185:*3*
**statistical**
122:*14*
157:*14* 158:*3*
185:*3*
**statistically**
119:*11*
122:*11, 16, 20,*
*21, 23* 123:*16*
139:*25* 141:*7*
177:*6* 178:*8,*
*15, 18, 20, 23*
179:*4, 15, 23*
225:*1, 20*
227:*15* 228:*9*
**statistician**
158:*1*
**statistics**
157:*20, 25*
**stays** 161:*10*
181:*1*
**steady** 160:*21*
163:*2*
**stenographic**
7:*19*
**stenographicall**
**y** 241:*8*
**step** 43:*3*
111:*23*

**stomach**
150:*20* 184:*7*
204:*9* 212:*1*
215:*25*
**stop** 22:*1*
**straightforwar**
**d** 65:*22*
106:*12* 142:*12*
**Street** 3:*12,*
*18* 9:*2*
**strengths**
181:*20* 185:*8*
**strike** 73:*25*
117:*17*
**striking**
184:*15*
**string** 200:*11*
**structures**
205:*12*
**stuck** 199:*3*
**students** 19:*2,*
*9* 201:*10*
**studied**
162:*20, 23*
204:*22*
**studies** 113:*16*
115:*13, 24*
116:*1* 117:*8*
119:*10*
122:*16, 19, 24*
123:*14, 19*
126:*22*
131:*19* 132:*2,*
*18, 21* 133:*4*
134:*22*
135:*11, 14*
137:*23*
140:*18* 141:*1,*
*7* 143:*2, 7, 21*
144:*23* 145:*3*
148:*12*
149:*10*
160:*18*
162:*14, 18*
163:*9, 14, 19,*
*23, 25* 165:*6,*
*19, 21* 169:*23,*
*25* 170:*3, 8,*
*10* 173:*17, 19*
174:*4, 7, 8, 17,*
*20* 175:*13*

176:*14, 25*
178:*5, 14, 18,*
*20, 21* 179:*3,*
*14, 15, 18, 22*
180:*8, 11, 15*
181:*8, 17*
182:*11, 25*
183:*6, 8, 25*
184:*4, 12*
185:*5, 16, 22*
196:*9, 23*
199:*23*
200:*11* 207:*4*
219:*18* 222:*6*
224:*18, 23*
231:*11* 232:*9,*
*14* 233:*1, 8*
**study** 6:*6, 19*
113:*16*
117:*11*
118:*20, 21*
119:*1* 121:*18,*
*22* 124:*18*
126:*1, 4*
128:*22* 129:*3*
130:*1* 131:*12,*
*13* 135:*20*
136:*14*
137:*10* 138:*6,*
*20, 21* 139:*7*
140:*2, 3, 4, 5,*
*6* 142:*14*
143:*5, 25*
144:*2, 21*
145:*15, 21*
146:*11, 17, 21*
147:*2, 15*
148:*11, 15*
155:*25*
156:*11*
158:*13*
159:*24* 162:*7*
165:*18*
168:*10, 24*
170:*11, 15*
171:*17*
172:*24* 173:*7,*
*24* 178:*11*
180:*21*
181:*20*
182:*10, 23, 24*

183:*14*
196:*13* 197:*1*
198:*6, 8, 10*
199:*13*
200:*19* 203:*9,*
*12* 204:*2*
205:*14, 18*
206:*3, 13*
208:*9, 13*
209:*3, 20, 22*
210:*11* 211:*2,*
*3* 212:*13*
214:*16, 21*
215:*7* 216:*16,*
*18* 217:*3, 6*
218:*9, 12*
220:*8, 12, 18,*
*23* 221:*2, 4, 7,*
*9, 17, 25*
222:*12, 15, 23,*
*24* 223:*1, 16,*
*23* 224:*14*
225:*1, 12, 16,*
*19* 226:*3, 4,*
*10, 13, 15, 16,*
*24* 228:*1, 9*
237:*12, 21*
238:*8, 12*
240:*3*
**stuff** 162:*1*
**stuffs** 131:*24*
**SUBJECT**
1:*8* 59:*14*
132:*25*
185:*12* 233:*1*
237:*8*
**submitted**
22:*7, 9, 20*
35:*18*
**subsequent**
66:*25* 67:*19*
69:*16, 17*
131:*5*
**substance**
67:*9* 93:*2, 8,*
*19* 94:*9* 242:*8*
**substantial**
132:*14*
**substantially**
193:*24* 213:*9*

**substituted**
132:*16*
**subtotal**
129:*22*
**Subtotals**
129:*7*
**success** 202:*13*
**sufficient**
223:*17, 19*
**Suite** 2:*8, 12,*
*17, 20* 3:*7*
**summarized**
77:*1* 135:*15*
236:*21*
**summary**
156:*22* 228:*2,*
*4, 9*
**summation**
207:*2*
**summer**
30:*18* 174:*24*
175:*18*
**superior** 95:*21*
**supplemental**
11:*16, 23*
12:*5, 18* 26:*7,*
*17* 27:*8, 15*
29:*23, 25*
30:*8* 42:*12,*
*20* 45:*1, 3*
55:*24, 25*
56:*2* 57:*8, 12*
58:*11* 64:*23*
65:*4, 20* 66:*8,*
*19* 67:*3*
68:*20* 73:*4*
74:*4, 16, 18*
77:*25* 81:*15*
101:*6* 105:*22,*
*25* 106:*6*
107:*13*
111:*21*
112:*21*
113:*23* 115:*2,*
*4, 12* 121:*14*
125:*6, 7, 10,*
*14, 20* 131:*16*
132:*6* 142:*10*
155:*12*
176:*22*
177:*22* 180:*4*

Confidential Information Subject to Protective Order

190:*13* 200:*8*
231:*5* 236:*7,*
*23*
**supplementary**
124:*23* 134:*12*
**support** 31:*20,*
*23* 33:*17*
35:*24* 36:*8,*
*14, 23* 133:*5*
134:*22*
135:*12*
155:*10*
176:*14* 230:*12*
**supposed**
147:*17* 178:*25*
**sure** 9:*8* 16:*7,*
*25* 25:*24*
29:*10* 31:*6,*
*17* 44:*8*
51:*16, 24*
58:*10* 69:*15,*
*17* 76:*3, 13*
90:*14* 103:*18*
114:*20*
122:*12*
142:*14* 143:*9*
169:*9* 184:*19*
186:*16*
188:*16*
205:*23* 215:*1*
233:*20*
**surface**
237:*23*
238:*21, 22, 24*
239:*10, 24*
**surrounding**
135:*18* 231:*8*
**surveying**
171:*15*
**swear** 7:*20*
**sworn** 7:*14, 23*
**system** 107:*20*
159:*19, 21*
161:*21*
216:*24* 219:*6*
**systemically**
162:*22*
**systems** 10:*7*
214:*12*

< T >

**tab** 13:*20, 21*
32:*25*
**tabbed** 11:*24*
**table** 13:*1*
79:*23* 80:*6*
92:*3, 6, 10, 12,*
*15, 17* 115:*6,*
*9, 11, 15, 24*
116:*2* 117:*1,*
*12, 16* 118:*24,*
*25* 119:*10*
120:*2, 8*
122:*2, 16*
123:*15* 129:*2*
130:*2, 5, 10,*
*11* 135:*23*
136:*14, 18, 20*
137:*14, 19, 22*
138:*20*
140:*16*
141:*12*
148:*19* 149:*4*
170:*6* 176:*21*
179:*2, 11, 13*
180:*3* 195:*3*
202:*3* 203:*15,*
*18, 20, 21*
212:*21*
218:*25*
227:*10, 11*
**tables** 14:*5*
87:*23, 24*
140:*17* 232:*10*
**tablet** 63:*23*
64:*4* 82:*1, 13,*
*14, 16* 83:*11,*
*13* 90:*7, 10,*
*12, 15* 99:*3,*
*17* 100:*24*
193:*11* 195:*8,*
*10*
**tablets** 64:*7*
80:*9* 194:*13,*
*16*
**tabs** 12:*22*
13:*19*
**Take** 4:*8*
13:*9* 14:*25*
17:*19, 25*
18:*1* 48:*1*
50:*19* 69:*2*

87:*8* 92:*21*
98:*15* 107:*1*
111:*23*
124:*16*
136:*11*
142:*16* 144:*1*
167:*15* 171:*6,*
*8* 177:*12*
178:*12*
180:*15*
186:*14* 187:*2,*
*3* 191:*23*
199:*6* 229:*20*
**taken** 1:*14*
73:*22* 75:*18*
76:*14* 115:*19*
157:*14*
158:*25*
221:*10* 241:*8*
**takes** 107:*7*
183:*11*
**talk** 17:*4*
19:*3* 184:*10*
186:*11*
**talked** 20:*13*
58:*17* 59:*17,*
*20* 67:*15*
94:*14* 108:*6*
154:*13* 161:*3*
188:*8* 193:*2,*
*6* 234:*17*
239:*19*
**talking** 11:*3*
52:*2* 53:*9*
55:*23* 58:*10*
66:*15* 84:*6*
96:*1* 99:*25*
112:*17* 113:*2*
134:*9* 138:*25*
139:*3* 160:*20*
173:*21*
183:*22, 24*
192:*9* 195:*21*
198:*3* 206:*20,*
*23* 212:*22*
214:*9* 232:*6*
235:*5*
**targeted** 35:*9*
36:*2, 6* 43:*24*
45:*16*

**tea** 217:*12*
219:*1*
**teaching** 19:*2,*
*8, 9*
**tech** 15:*8*
23:*13, 23*
85:*6* 129:*12*
**technical** 32:*6*
**Technician**
3:*24* 15:*6, 13,*
*19, 22* 16:*9*
17:*9* 70:*24*
71:*11* 79:*5,*
*14* 85:*10*
91:*16* 113:*22*
114:*4* 126:*8*
143:*6, 13*
144:*4, 8, 13*
147:*4, 21*
148:*5* 156:*4*
196:*15, 22*
197:*7, 16*
198:*11, 15, 20,*
*25* 199:*16*
202:*15* 203:*2*
208:*19* 220:*5*
**technology**
129:*19*
165:*13* 166:*17*
**tell** 21:*23*
28:*14* 29:*9*
31:*11* 40:*20*
85:*7, 23*
100:*7* 125:*4*
132:*1* 155:*2*
158:*12* 164:*5,*
*8* 209:*8*
233:*24*
**telling** 56:*21*
88:*18*
**tells** 226:*6*
**ten** 65:*9*
83:*19* 205:*7*
229:*20*
**term** 37:*17*
47:*9, 10, 20*
138:*16* 222:*3,*
*7* 224:*8*
**terminology**
34:*1*

**terms** 107:*17*
182:*24*
**terribly**
138:*25*
**tertiary**
201:*11*
**test** 35:*13*
37:*13, 20*
41:*1, 17*
42:*25* 45:*17,*
*19, 22, 24, 25*
46:*3, 5, 11, 17,*
*19, 21* 47:*11,*
*14, 18* 48:*20,*
*22* 49:*3, 4*
50:*22* 73:*2*
85:*14, 15*
86:*5* 87:*7, 8,*
*10* 93:*18*
96:*14* 103:*6*
210:*9* 212:*16*
223:*13* 235:*20*
**tested** 62:*7*
69:*13* 70:*1, 7,*
*15* 72:*11, 16,*
*20* 73:*1*
95:*11* 97:*17*
145:*7* 201:*10*
205:*9* 210:*4*
**testified** 7:*24*
20:*20* 25:*10*
60:*21* 67:*1*
78:*8* 83:*24*
89:*7* 91:*10*
92:*24* 93:*5*
95:*13* 96:*22*
98:*13* 108:*25*
237:*19*
**testify** 120:*17,*
*22* 121:*2*
**Testimony**
4:*2* 31:*1, 16*
39:*5* 75:*23*
76:*22* 107:*11*
155:*10* 241:*7*
**Testing** 4:*19,*
*20* 19:*6* 35:*9,*
*10* 36:*3, 6*
37:*2, 9* 40:*25*
41:*1, 8, 18*
43:*24* 45:*16,*

Confidential Information Subject to Protective Order

17  60:4, 10,
14  62:15
63:7  64:7, 13
65:13  67:6,
16  69:16
70:18  71:25
73:5, 6  74:4,
15, 19  75:19
76:15  77:21
78:10  81:5,
15, 19  84:16,
25  85:25
89:1, 3, 14, 19
93:1, 7, 11, 13,
23  94:7, 22
95:1  96:8, 9,
19  189:16
193:10  225:9
228:24  235:17
**tests**  37:15, 16,
24  38:1, 8, 9,
14, 21  39:14
40:19  42:14,
19  44:14, 17,
21  45:3, 9
46:24  47:1, 4,
6, 7, 8  48:5, 9,
17, 18  49:1
86:3  87:2, 3
89:10  189:16
191:25
234:20  235:7,
17, 25
**Teva**  2:23
13:17  105:3
**text**  124:11
**thank**  9:17
16:1  19:14
49:20  79:9
125:24  126:8,
20  156:6
177:13, 20
180:9  187:4
197:8, 18
234:15
238:18  239:2
**theoretical**
101:20  102:5,
10  104:20
105:18

106:18, 25
110:25
**theoretically**
109:3
**thing**  14:1
16:25  27:20
33:10  48:12
67:19  104:3
154:21  159:9
180:22
181:16, 19
207:19  208:5,
6  211:1
213:21  232:11
**things**  11:8
17:2, 4  25:17,
23, 25  27:20
28:12  32:17
33:21  34:6
38:18  39:24
41:11  42:11
48:11  52:14
53:10  57:1,
13, 15  58:22
66:13  68:16
81:8  112:1
132:15
153:12  160:9
161:22  162:3
163:7  180:18
181:13, 14, 25
188:22
189:14, 17
201:9  212:10
215:12  216:8
225:10
232:23, 25
**think**  8:14
10:11  12:2
19:12, 20
26:21  30:10
31:5  32:21,
22, 23  33:7
36:16  39:20
41:9  43:4, 14
45:6  49:15
53:10, 22
59:13  65:9
71:1  75:25
77:13  93:24
94:1  96:3

104:1  106:1
107:3  115:3,
10  120:14
123:11
134:10
142:18
143:25
146:10
147:12  154:8
165:4  167:3,
22  168:1, 3
180:3  181:22
186:11  193:6,
22  195:21
199:2  200:1
201:21  208:1
211:2  216:3
221:14
225:13  232:13
**thinking**
215:18
**Third**  13:20
16:15  23:2, 3,
4, 6, 18  30:3
32:3, 9  33:15
66:4  71:23
119:2  126:21
149:15  159:4
164:23
165:22  217:4
**third-party**
32:13

**THORNBURG**
3:5
**thoroughly**
114:25
**thought**
183:14  186:24
**thousand**
234:3
**thousandfold**
112:12  195:14
**thousands**
232:24
**three**  14:17
72:8, 12, 24
76:2, 7, 25
158:17, 21
160:7  166:15,
16  178:5, 7,

11, 19  195:9
200:15  213:6
**threefold**  69:6
73:19  107:16,
25
**three-minute**
199:6
**three-quarters**
24:5
**threshold**
63:4  132:22
141:14  177:8,
11  178:22
179:20
185:23  193:4
194:6  195:18
230:17  233:4
**thresholds**
123:22
**time**  7:5  11:8
14:15  20:20
22:1, 4, 8, 11
24:19  25:8,
16  47:23
48:1  58:17
70:4, 9  75:25
84:8  94:23
96:25  98:2
99:3  104:11
108:7  113:1
120:10
123:10
131:14, 24
133:16  142:7
146:4, 14
166:17
170:20
200:25  211:5
216:2, 10
221:3, 8
222:17  223:1,
10, 17  224:2,
8, 10  228:6
236:11  240:9
**times**  44:8
45:6  76:2, 7
77:9  82:18
83:19, 24
88:24  89:8
95:18  180:19
195:9  204:7

212:25  234:3
239:19
**tinny**  103:15
**tiny**  232:2
**tissue**  112:9
134:19
153:15  177:22
**tissues**  150:18
153:13
**title**  31:22
32:1  50:15
136:20, 22
196:24  198:17
**titled**  123:21
**titles**  32:1, 18
33:14  163:17
**tobacco**  141:1
173:17
**today**  8:9
9:20  10:20,
23  11:9
28:15, 20
37:23  39:10
61:8  64:11
81:3  84:14
86:24  91:25
107:14  131:4,
11  152:20
158:12
187:22  230:4,
6  231:10
**Today's**  7:4
240:8
**told**  10:13
73:13  89:2, 4
**top**  11:19
23:5, 20  72:9
79:22, 25
90:5  92:3
149:23
152:15, 19
**topic**  20:11
**Torrent**  73:10
**Torrent-
related**  68:7
**total**  5:14, 17
22:16  72:11
85:11  99:6,
19  102:1, 6
104:20
105:18

106:*18*  120:*3*
146:*25*  149:*3*
151:*3*  171:*7,*
*12, 22, 24*
172:*4, 15*
226:*11*
**TPP**  13:*23*
**transcript**
241:*7*
**transcription**
242:*5*
**transcripts**
24:*20*  25:*5*
**transition**
186:*14*
**translate**
230:*22*
**translation**
215:*19*
**TRAURIG**
2:*14*  9:*1*
**treatment**
18:*23*  189:*13*
**treatments**
19:*18, 25*
**trematodes**
201:*5*
**Trial**  3:*24*
15:*6, 13, 19,*
*22*  16:*9*  17:*9*
70:*24*  71:*11*
79:*5, 14*
85:*10*  91:*16*
113:*22*  114:*4*
126:*8*  143:*6,*
*13*  144:*4, 8,*
*13*  147:*4, 21*
148:*5*  156:*4*
196:*15, 22*
197:*7, 16*
198:*11, 15, 20,*
*25*  199:*16*
202:*15*  203:*2*
208:*19*  220:*5*
**trials**  53:*20*
**Tricker**
124:*25*  143:*5,*
*7, 25*  196:*13,*
*22*  197:*1, 5*
199:*17, 20*

**tried**  132:*8*
182:*13*  210:*14*
**trihalomethane
s**  166:*8*
**TRISCHLER**
3:*2*
**true**  97:*10*
122:*17*  162:*8*
193:*8*  228:*12*
241:*6*
**truthful**  76:*6*
111:*16*
**try**  79:*17*
83:*16*  103:*6*
146:*22*  148:*7*
152:*8*  185:*1*
206:*19*
**trying**  41:*9*
43:*10*  44:*20*
52:*22*  56:*18*
76:*9, 10*
104:*10, 15*
110:*15*
138:*12*
140:*21*  159:*9*
167:*14*  181:*9*
190:*6*  195:*2*
231:*17*
**tumors**  126:*23*
**turn**  224:*8*
**turning**  115:*6*
206:*12*  217:*3*
**two**  11:*3, 5*
13:*19*  33:*20,*
*23*  34:*1, 4, 5*
48:*11*  56:*22*
75:*6, 18*  81:*9,*
*12*  87:*8, 22*
105:*2*  139:*4*
143:*7*  163:*15*
165:*2*  166:*10,*
*19*  176:*17*
179:*1, 14*
180:*5*  183:*12*
188:*22*
196:*22*  213:*6*
215:*12*  216:*8*
217:*11*
225:*10*
231:*19*  235:*15*

**twofold**  73:*18*
107:*15, 25*
**two-thirds**
130:*13*
**type**  10:*18*
18:*19, 22*
37:*1*  41:*3*
47:*14*  52:*1*
70:*18*  111:*12*
188:*18*
189:*18*
210:*15*  214:*13*
**types**  18:*21*
37:*15, 16*
47:*6, 8*  49:*1*
124:*6*  133:*20*
158:*18*
185:*12*  209:*22*
**typically**
25:*18*  46:*11*
201:*9*  206:*10*

**< U >**
**U.S**  3:*21*
**ultimate**
206:*14*  207:*7*
**ultimately**
190:*4*
**uncertainties**
133:*1*
**uncertainty**
131:*17*
134:*12*  222:*5*
**undergo**
235:*24*
**undergoing**
189:*20*
**underlying**
68:*22*  115:*13*
130:*19*
**underneath**
79:*4*
**underscore**
232:*5*
**underscores**
180:*3*
**understand**
8:*9, 16, 18*
17:*5*  34:*9, 13*
40:*5*  45:*25*
47:*12*  52:*22*

76:*3*  101:*14,*
*17*  117:*4*
118:*21*  128:*1*
150:*5*  190:*9*
192:*19*  210:*8*
218:*8*  232:*13*
234:*15*
235:*18*  236:*19*
**understanding**
9:*11*  15:*17*
30:*11, 19*
39:*16*  40:*17*
42:*8, 11*
47:*16*  48:*19*
49:*9, 11*  53:*8,*
*11, 13*  59:*21,*
*25*  117:*20*
118:*19*
119:*14*
140:*18*
151:*21*
157:*13*
194:*11*
204:*20*
206:*10, 22*
228:*21*
**understood**
8:*13, 15*
16:*25*  56:*20*
149:*24*  150:*3,*
*4*
**unique**  85:*24*
**UNITED**  1:*1*
7:*9*  8:*6*
41:*19*  87:*18*
89:*21*  93:*12*
170:*1, 4*
201:*8, 13*
213:*15*
**universe**
57:*13, 15*
**University**
29:*16*
**unknown**  83:*1*
**unknowns**
93:*14*
**unrealistic**
60:*4*  102:*5*
106:*24*  107:*8*
110:*12*  120:*6*

**unreliable**
96:*10*  176:*25*
185:*22*
232:*23*  233:*3*
**unsupported**
223:*6*
**upload**  199:*7*
215:*19*
**upper**  35:*12*
37:*11*  42:*24*
46:*23*  149:*17*
218:*22*
**uptake**  159:*15*
**urinalysis**
35:*11*  37:*10*
46:*2, 8, 10*
**Urinary**  5:*22*
159:*5*  166:*13,*
*16, 20*  196:*13,*
*20*  197:*2*
**urine**  151:*6*
164:*15, 16, 25*
165:*9, 11*
201:*24*  212:*3,*
*6, 13*
**urines**  202:*4*
**USA**  2:*23*
**Use**  6:*17*
17:*23*  47:*17*
48:*4, 6*  55:*3*
56:*25*  60:*12,*
*23*  61:*14*
93:*10*  94:*18*
96:*13*  132:*2*
158:*17*
166:*20*  167:*3,*
*4*  209:*21*
220:*15*  239:*24*
**users**  222:*4*
**uses**  111:*17*
194:*15*
**usually**  181:*15*
**utilize**  56:*15*
**utilized**  55:*16*
**utterly**  223:*5*

**< V >**
**vague**  20:*7*
37:*3, 17*
38:*11*  39:*19*
40:*8, 13*  41:*4*

42:6  43:2
44:3  47:10,
20  54:17
57:22  97:21
189:22  218:19
**vaguely**  111:4
**validated**
97:11, 15
**validation**
97:18
**validity**  180:17
**VALSARTAN**
1:1  4:18
6:17, 20  7:7
8:4  13:18
50:23  51:2
60:8, 15, 24
61:3, 15  62:2,
10  63:6, 18,
22  65:25
70:23  74:6
80:9  83:11
90:6  98:2, 10,
24  99:2, 4, 17
100:23  101:6,
22  102:8, 10
105:6  107:1
108:21  119:8,
25  175:10
187:16, 21
188:6  191:18
192:5  193:10,
15  213:24
214:1  220:14,
23  221:8, 11,
12  222:4
223:10  224:1,
7  225:3, 21
226:12  227:1,
17  228:11
229:8, 9, 10
233:12, 23
234:5, 13
236:10
**valsartan-**
**containing**
55:18  56:17
58:6  62:21
119:19
**value**  60:14
91:11  117:24

118:18
129:21  172:6
**values**  68:25
73:10  107:18
111:3, 16
115:14
117:15
129:16
136:15
137:20  138:6,
7  139:6
169:21
171:23  173:7,
23  174:2, 6
179:5
**variability**
145:25  146:2,
3, 4  205:10
**variables**
133:18  210:3
**variation**
165:24  167:6,
9, 22
**variations**
237:23
**varies**  29:19
229:13
**variety**
150:18  151:8
153:13
**various**  39:14
78:10  120:5
139:15  205:4
220:22
**vary**  29:10, 14
133:21  146:9
229:11
**varying**  51:14
54:13, 15
55:1  205:3
**vast**  123:18
**VAUGHN**  2:8
**vegetables**
148:22
**Vermeer**
208:13  209:20
**V-E-R-M-E-E-**
**R**  208:13
**version**  49:3
94:25

**versus**  6:3
65:14  116:10
139:1  189:19
221:11
**vicinity**  22:13
111:5, 10
112:14  138:19
**VICTORIA**
2:16
**video**  7:6
**Videoconferenc**
**e**  1:15
**Videographer**
3:24  7:1, 3
49:21, 24
71:4, 7
102:16, 19
103:16, 19, 22
116:23
142:20, 23
187:8, 11
199:8, 11
209:10, 15
229:22, 25
240:7
**Videotaped**
1:13  4:8, 10
13:7, 9  14:25
**viewed**  170:7
**viewer**  79:7
**vitro**  6:14
215:24
216:24  218:3,
16
**vivo**  149:24
150:3, 6, 12
**voice**  156:1
**Volatile**  5:9,
18  6:10
143:10  202:4
212:1
**volume**  103:7,
9
**volunteers**
212:13

**< W >**
**wait**  105:10
**walk**  83:16
105:1

**walked**  16:24
105:2, 5
**WALKER**
3:17
**want**  11:13
43:3  49:14
50:7  76:13
101:13  103:5
104:3  108:8
142:16  144:4
171:6  187:18
218:9  224:3
**wanted**  73:20
203:3
**warrant**
108:13  110:7
111:11  191:6,
20
**warrants**
117:25  118:15
**water**  5:15
112:5  128:24
135:17  136:5
137:6  139:2,
16  140:19
148:16, 21, 22,
23  149:2, 3, 7
156:24  161:6,
7, 8, 9  166:8
203:23
**way**  19:1
20:18  24:6
39:20  44:7
46:9  54:23
77:1  78:19,
23  85:9
87:16, 19
91:6  97:6, 20
106:10
108:10
113:13
117:11, 17
130:14
138:11  152:5,
6  153:8
159:13
165:23
167:14, 17
175:21, 24
177:21
180:16  190:2

193:23  205:2
231:2
**ways**  158:10
159:17  182:1
224:6
**weak**  229:2
**week**  212:16
**weeks**  25:16
**weight**  129:8
162:25
212:15
225:11, 18
237:24
238:24  239:5,
6
**Well**  8:17
9:24  12:25
17:22  25:13
36:18  41:15
42:15  53:3
62:16  64:22
67:23  73:9
75:1  81:16
82:8  95:4
99:16  107:14
108:6  109:25
111:22
119:16
120:17  132:5
133:20
141:23  145:2
146:14
147:18  150:4
151:2  156:15
161:17  165:3
167:2  170:23
177:18  181:7
182:4  188:22
197:23  198:2
202:2, 12
203:19
207:24
209:24
210:10  211:9
213:16
216:19
222:25
223:12
224:21
233:17

Confidential Information Subject to Protective Order

237:*18*
239:*22, 23*
**went** 53:*20*
72:*15* 95:*24*
104:*2, 16, 24*
177:*22* 189:*14*
**we're** 17:*23*
26:*8* 32:*16*
40:*15* 43:*5*
53:*8* 64:*20*
65:*14* 96:*1*
99:*25* 114:*2*
123:*8* 137:*14*
138:*25* 139:*3*
142:*1, 23*
173:*21* 178:*1,*
*3* 183:*24*
186:*11* 198:*9*
214:*9* 219:*22*
228:*7*
**West** 5:*10*
92:*8* 143:*12*
**we've** 8:*2*
47:*21* 59:*19*
65:*9* 93:*24*
131:*21*
135:*14*
136:*14*
154:*13* 193:*6*
239:*18*
**whatsoever**
210:*13*
**Whichever**
11:*15* 222:*16*
**WHO2002**
149:*13*
**wide** 216:*17,*
*20*
**widely** 133:*21*
**wildly** 218:*13*
**window** 10:*2,*
*12* 15:*11, 18*
219:*12, 14, 22*
**witness** 7:*14,*
*21, 23* 12:*21*
15:*10, 16, 20*
16:*1, 7* 18:*16*
20:*8* 25:*13*
26:*9, 23*
27:*19* 29:*9*
30:*10* 33:*13*

36:*12, 18*
37:*4* 38:*4, 12*
39:*6, 20*
40:*15* 41:*5*
42:*7* 44:*5*
51:*9* 54:*18*
55:*6* 57:*23*
58:*9* 59:*17*
60:*20* 61:*11,*
*17* 62:*4, 14,*
*23* 63:*12*
64:*10* 65:*18*
67:*13* 74:*10,*
*24* 75:*24*
76:*23* 78:*2,*
*19* 79:*9, 17*
80:*21* 82:*5*
83:*15* 84:*22*
86:*23* 87:*12*
90:*21* 92:*19*
94:*14* 96:*22*
97:*14* 98:*20*
99:*9* 100:*2*
101:*13*
103:*14*
106:*22*
108:*16*
109:*21*
110:*24*
113:*10* 114:*9*
119:*13* 123:*3*
127:*6* 128:*6*
132:*11* 133:*9*
135:*4* 138:*11*
140:*8* 144:*11*
147:*3, 8, 18,*
*25* 148:*9*
150:*8* 153:*1*
154:*4* 155:*18*
156:*9* 157:*12*
158:*17*
160:*17*
162:*10*
164:*20*
167:*13*
170:*19*
172:*11* 173:*2,*
*10* 174:*4*
177:*15*
185:*11* 186:*3*
187:*6, 18*

189:*23* 191:*8*
193:*13*
194:*18*
195:*12*
197:*18* 198:*7,*
*10* 203:*25*
205:*24* 206:*7,*
*24* 208:*23, 25*
215:*2* 219:*13*
220:*2, 4*
221:*14*
222:*13*
223:*19*
227:*22*
238:*17* 239:*9*
240:*10*
**word** 46:*8, 9*
69:*2* 139:*12*
143:*23* 152:*1*
**wording** 115:*5*
**words** 35:*16*
88:*15, 17*
90:*8* 92:*9*
182:*21*
192:*12*
196:*24* 228:*13*
**wore** 190:*19*
**work** 22:*21*
24:*12* 28:*23,*
*25* 29:*7* 148:*8*
**worked** 54:*7*
55:*2* 148:*9*
**working**
22:*11* 54:*3*
209:*9*
**world** 201:*4,*
*13*
**worst** 60:*5, 12*
95:*20* 111:*1*
121:*5, 9*
131:*10* 135:*24*
**worst-case**
128:*23* 130:*2,*
*20* 135:*22*
136:*19*
137:*11* 138:*8,*
*14, 18, 23*
139:*8*
**wound** 85:*21*
87:*17*

**write** 44:*13*
215:*15*
**writing** 57:*11*
116:*11* 174:*23*
**written** 24:*24*
26:*1* 46:*8*
48:*21* 88:*6,*
*15* 95:*6*
128:*9* 193:*2*
**wrong** 33:*8*
118:*8* 143:*25*
218:*23* 223:*14*
**wrote** 98:*12*

**< X >**
**XI01497**
241:*22*
**Xiaohui** 5:*3*

**< Y >**
**Yeah** 10:*2*
25:*13* 26:*23*
31:*10* 32:*17*
33:*4, 6* 41:*5*
43:*12* 44:*5*
61:*18* 62:*4*
72:*13* 103:*8,*
*14* 105:*3*
114:*23*
125:*18*
129:*19* 136:*1*
137:*25*
146:*22* 147:*8*
148:*2, 23*
163:*13*
168:*17* 173:*2*
175:*21*
186:*23*
198:*10*
199:*25* 205:*6*
210:*19*
212:*19*
215:*23* 217:*8*
218:*8*
**year** 25:*25*
29:*19* 53:*6*
129:*17* 165:*7*
221:*20*
**years** 29:*11,*
*14* 54:*8* 97:*4*
129:*6, 24*

132:*9* 169:*3,*
*15* 170:*25*
171:*9* 192:*6*
220:*14*
222:*20, 21, 23*
227:*9*
**yield** 141:*1*
173:*17*
**yielded** 184:*1*
**yields** 184:*9*
**York** 2:*4*

**< Z >**
**zero** 29:*14*
**Zhang** 84:*3,*
*11*
**Z-H-A-N-G**
84:*12*
**Zhejiang** 3:*20*
**Zheng** 140:*4*
**Zhou** 5:*3*
**ZHP** 60:*23*
61:*2* 63:*6, 15*
64:*7, 14* 68:*3*
73:*9* 86:*5*
91:*5*
**ZHP00013245**
5:*4* 91:*13*
**ZHP00013263**
92:*2*
**Zhu** 140:*5*
**zones** 92:*8*
**Zoom** 1:*15*
2:*1* 3:*1* 32:*6*
116:*20* 209:*6*
241:*9*

# Exhibit 209

REDACTED

Confidential Information - Subject to Protective Order

1            IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW JERSEY
2

3

     *****************************
4    IN RE:  VALSARTAN, LOSARTAN,
     AND IRBESARTAN PRODUCTS        MDL No. 2875
5    LIABILITY LITIGATION
6    ***************************
     THIS DOCUMENT APPLIES TO ALL  HON ROBERT B.
7    CASES                         KUGLER
8    ***************************
9            - CONFIDENTIAL INFORMATION -
             SUBJECT TO PROTECTIVE ORDER
10

11           Videotaped Deposition of PUNAM
12   ANAND KELLER, Ph.D., commencing at 9:19 a.m.
13   Eastern, on the 10th of March, 2022, at the
14   offices of Duane Morris, 100 High Street,
15   Boston, Massachusetts, before Maureen
16   O'Connor Pollard, Registered Diplomate
17   Reporter, Realtime Systems Administrator,
18   Certified Shorthand Reporter.
19

20                  - - -
21

         GOLKOW LITIGATION SERVICES
22     877.370.3377 ph | 917.591.5672 fax
             deps@golkow.com
23

24

Confidential Information Subject to Protective Order

1
2  APPEARANCES:

3  GOLOMB & HONIK PC
   BY:  RUBEN HONIK, ESQ.
4       1835 Market Street, Suite 2900
        Philadelphia, Pennsylvania 19102
5       215-327-9166
        ruben@honiklaw.com
6       Representing the Plaintiffs

7  SLACK DAVIS SANGER, LLP
   BY:  JOHN R. DAVIS, ESQ.
8  BY:  BETH QUESTAD, Paralegal (remotely)
        6001 Bold Ruler Way, Suite 100
9       Austin, Texas 78746
        512-795-8686
10      jdavis@slackdavis.com
        Representing the Plaintiffs
11
12 KANNER & WHITELEY, LLC
   BY:  CONLEE WHITELEY, ESQ. (Remotely)
13      701 Camp Street
        New Orleans, Louisiana 70130
14      504-524-5777
        c.whiteley@kanner-law.com
15      Representing the Plaintiffs
16
17 DUANE MORRIS, LLP
   BY:  SETH A. GOLDBERG, ESQ
18 BY:  ALEKSANDER SMOLIJ, ESQ.
   BY:  DANA B. KLINGES, ESQ. (Remote)
19      30 South 17th Street
        Philadelphia, Pennsylvania 19103
20      215-979-1194
        sgoldberg@duanemorris.com
21      dklinges@duanemorris.com
        Representing the Defendants Zhejiang
22      Huahai Pharmaceutical Co., Ltd.,
        Prinston Pharmaceutical Inc., Huahai
23      U.S., Inc., and Solco Healthcare US,
        LLC
24

1
2  APPEARANCES (Continued):

3  DUANE MORRIS LLP
   BY:  REBECCA BAZAN, ESQ. (Remote)
4       505 9th Street, N.W., Suite 1000
        Washington, DC 20004-2166
5       202-776-5253
        rebazan@duanemorris.com
6       Representing the Defendants Zhejiang
        Huahai Pharmaceutical Co., Ltd.,
7       Prinston Pharmaceutical Inc., Huahai
        U.S., Inc., and Solco Healthcare US,
8       LLC

9  CROWELL & MORING LLP
   BY:  DANIEL T. CAMPBELL, ESQ. (Remote)
10      1001 Pennsylvania Avenue, NW
        Washington, DC 20004
11      202-624-2774
        dcampbell@crowell.com
12      Representing the Defendant Cardinal
        Health, Inc.
13
14 GREENBERG TRAURIG LLP
   BY:  TIFFANY M. ANDRAS, ESQ.
15      77 West Wacker Drive, Suite 3100
        Chicago, Illinois 60601
16      312-456-1065
        andrast@gtlaw.com
17      Representing the Defendants Teva
        Pharmaceutical Industries, Ltd., Teva
18      Pharmaceuticals SA, Inc., Actavis LLC,
        and Actavis Pharma, Inc.
19
20 HUSCH BLACKWELL LLP
   BY:  SARAH ZIMMERMAN, ESQ. (Remote)
21      190 Carondelet Plaza
        St. Louis, Missouri 63105
22      314-345-6664
        sarah.zimmerman@huschblackwell.com
23      Representing the Defendant Express
        Scripts, Inc.
24

1
2  APPEARANCES (Continued):

3  GREENBERG TRAURIG, LLP
   BY:  DOUGLAS JOHNSON, ESQ. (Remote)
4       Terminus 200
        3333 Piedmont Road NE
5       Suite 2500
        Atlanta, Georgia 30305
6       678-553-2100
        johnson@gtlaw.com
7       Representing the Defendants Teva
        Pharmaceutical Industries, Ltd., Teva
8       Pharmaceuticals SA, Inc., Actavis LLC,
        and Actavis Pharma, Inc.
9
10 WALSH PIZZI O'REILLY
   BY:  CHRISTINE I. GANNON, ESQ. (Remote)
11      Three Gateway Center
        100 Mulberry Street, 15th Floor
12      Newark, New Jersey 07102
        973-757-1017
13      Representing the Defendants Teva
        Pharmaceutical Industries, Ltd., Teva
14      Pharmaceuticals SA, Inc., Actavis LLC,
        and Actavis Pharma, Inc.
15
16 PIETRAGALLO GORDON ALFANO BOSICK &
   RASPANTI, LLP
17 BY:  FRANK H. STOY, ESQ. (Remote)
        One Oxford Centre
18      Pittsburgh, Pennsylvania 15219
        412-263-1840
19      fhs@pietragallo.com
        Representing the Defendant, Mylan
20      Pharmaceuticals, Inc.
21
22
23
24

1
2  APPEARANCES (Continued):

3  NORTON ROSE FULBRIGHT US LLP
   BY:  D'LESLI M. DAVIS, ESQ. (Remote)
4       2200 Ross Avenue, Suite 3600
        Dallas, Texas 75201
5       214-855-8000
        dlesli.davis@nortonrosefulbright.com
6       Representing the Defendant McKesson
        Corporation
7
8  HINSHAW & CULBERTSON, LLP
   BY:  GEOFFREY M. COAN, ESQ. (Remote)
9       53 State Street
        Boston, Massachusetts 02109
10      617-213-7047
        gcoan@hinshawlaw.com
11      Representing the Defendant SciGen
        Pharmaceuticals
12
13 BARNES & THORNBURG, LLP
   BY:  KARA KAPKE, ESQ. (Remote)
14      11 S. Meridian Street
        Indianapolis, Indiana 46204
15      317-231-6491
        kara.kapke@btlaw.com
16      Representing the Defendants CVS
        Pharmacy, Inc., and Rite Aid
17      Corporation
18 FALKENBERG IVES, LLP
   BY:  MEGAN A. ZMICK, ESQ. (Remote)
19      230 W. Monroe Street, Suite 2220
        Chicago, Illinois 60606
20      312-566-4808
        maz@falkenbergives.com
21      Representing the Defendant Humana
22
23
24

Page 6

1  APPEARANCES (Continued):
2
   BUCHANAN INGERSOLL & ROONEY PC
3  BY:  ASHLEY D.N. JONES, ESQ. (Remote)
      1700 K Street, N.W., Suite 300
4     Washington, DC 20006-3807
      202-452-7318
5     ashley.jones@bipc.com
      Representing the Defendant,
6     Albertsons, LLC
7
8  Videographer:  Alex Jandrow
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 8

1
8     Three graphs, Monthly ZHP Rxs by
2  Valsartan Product................  181
3  9    Diovan (valsartan) Tablets,
      Highlights of Prescribing
4     Information......................  199
5  10   Excerpts of the Samuel Cisneros
      December 3, 2021 deposition
6     transcript........................  210
7  11   MTD Opinion 3: Warranty Claim.....  225
8  12   2/3/22 invoice from Analysis
      Group............................  234
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 7

1           INDEX
2  EXAMINATION                        PAGE
3  PUNAM ANAND KELLER, Ph.D.
4  BY MR. DAVIS                        11
5
6
7         E X H I B I T S
8  NO.       DESCRIPTION             PAGE
9  1    Punam Anand Keller's bio from
      Analysis Group website............  19
10
11 2    January 12, 2022 Expert
      Declaration of Professor Punam
12    A. Keller, PhD....................  37
13 3    Report to GTMRx National Task
      Force: Building Vaccine
14    Confidence in the Medical
      Neighborhood.  Background and
15    Resources to Build Vaccine
      Confidence in the Health
16    Neighborhood, March 2001..........  60
17 4    Document titled Generic Drugs:
      Questions & Answers...............  79
18 5    Accutane label....................  138
19 6    May 13, 2013 Department of
      Justice press release, Generic
20    Drub Manufacturer Ranbaxy Pleads
      Guilty and Agrees to Pay $500
21    Million to Resolve False Claims
      Allegations, cGMP Violations and
22    False Statements to the FDA.......  142
23 7    Copy of 21 U.S. Code Section 331
      - Prohibited Acts.................  172
24

Page 9

1         - - -
2  DEPOSITION SUPPORT INDEX
         - - -
3
   Direction to Witness Not to Answer
4  PAGE  LINE
5  None.
6
7
8  Request for Production of Documents
   PAGE  LINE
9
10 245     15
11 Stipulations
   PAGE  LINE
12 None.
13
14 Questions Marked Highly Confidential
   PAGE  LINE
15 None.
16
17
18
19
20
21
22
23
24

Confidential Information Subject to Protective Order

Page 10

1   P R O C E E D I N G S
2
3          THE VIDEOGRAPHER:  We are now
4   on the record.  My name is Alex
5   Jandrow, I'm a videographer for Golkow
6   Litigation Services.
7          Today's date is March 10, 2022,
8   and the time is 9:19 a.m.
9          This video deposition is being
10  held in Duane Morris LLP of Boston
11  Massachusetts in the matter of
12  Valsartan, Losartan, and Irbesartan
13  Products Liability Litigation, MDL
14  Number 2875, for the United States
15  District Court, District of New
16  Jersey.
17         The deponent is Punam Keller,
18  MD.
19         And the court reporter is
20  Maureen O'Connor Pollard.
21         Counsel will now introduce
22  themselves for the record.
23         MR. DAVIS:  John Davis and
24  Ruben Honik for the plaintiffs.

Page 11

1          MR. GOLDBERG:  Seth Goldberg on
2   behalf of the ZHP defendants and
3   defendants.
4          MR. SMOLIJ:  Alek Smolij on
5   behalf of the ZHP defendants.
6          MS. ANDRAS:  Tiffany Andras on
7   behalf of Teva and Actavis
8   Pharmaceuticals.
9          MR. DAVIS:  Good morning,
10  Dr. Keller.  How are you today?
11         ///
12         PUNAM ANAND KELLER, Ph.D.,
13  having been duly identified and sworn, was
14  examined and testified as follows:
15         ///
16         THE WITNESS:  And the first
17  thing I want to do is, it's not MD,
18  it's Ph.D.
19         EXAMINATION
20  BY MR. DAVIS:
21    Q.   Okay.  Let me try that again.
22         Good morning, Dr. Keller.  How
23  are you this morning?
24    A.   Good.  How are you?

Page 12

1     Q.   Okay.  Let me start just with
2   some background questions for you.
3          When were you engaged as an
4   expert in this case?
5     A.   In -- at the end of last year.
6     Q.   Okay.  So November, December?
7     A.   Yes, that period.
8     Q.   Okay.  Have you given testimony
9   under oath before?
10    A.   Yes.
11    Q.   Okay.  About how many times?
12    A.   Three, including this one.
13    Q.   Okay.  So two prior times.
14         Would that have been in the
15  capacity as an expert witness?
16    A.   Yes.
17    Q.   Your CV, I believe, lists two
18  Johnson & Johnson pelvic mesh cases.  Is that
19  what you're referring to for your past
20  testimony?
21    A.   Yes.
22    Q.   Okay.  Have you offered an
23  expert report in a case where you have not
24  been deposed under oath?

Page 13

1     A.   Yes.
2     Q.   About how many times?
3     A.   Three.
4     Q.   Okay.  And the -- going back to
5   the J&J pelvic mesh cases, on whose behalf
6   did you submit an expert report?
7     A.   Defendants.
8     Q.   That would be the Johnson &
9   Johnson defendants?
10    A.   Johnson & Johnson/Ethicon.
11    Q.   Which is a subsidiary of
12  Johnson & Johnson?
13    A.   Yes.
14    Q.   To the best of your
15  recollection, what did those expert opinions
16  relate to?
17    A.   They related to my expertise on
18  consumer decision-making.
19    Q.   In the context of evaluating
20  Ethicon/J&J's marketing of their pelvic mesh
21  products?
22    A.   Could you repeat that question?
23    Q.   Sure.
24         Would that have been in the

Page 14

1  context of J&J and Ethicon's marketing and
2  promotion of their pelvic mesh products?
3      A.    Could you be more specific?
4      Q.    Well, sure.
5          Why don't you tell me what
6  your -- what you were evaluating from a
7  consumer decision-making standpoint regarding
8  Ethicon's pelvic mesh products.
9      A.    I was providing opinions on how
10  consumers -- the range of consumer responses
11  to Ethicon's marketing communication for the
12  pelvic mesh.
13     Q.    You mentioned Ethicon's
14  marketing communications.  Can you describe
15  to me what those included?
16     A.    It's been a while.  So to the
17  best of my recollection, it was brochures,
18  and I don't remember anything else.
19     Q.    Okay.  Brochures like the
20  product labeling, or handouts to physicians?
21     A.    I don't recall.
22     Q.    Okay.  Did you do any kind of
23  empirical study, like a survey, in that case?
24     A.    That was not my -- no, that was

Page 15

1  not my task.
2      Q.    Okay.  Have you ever done a
3  damages analysis as an expert in a
4  litigation?
5      A.    Define what you mean by
6  "analysis."
7      Q.    Have you ever been tasked, for
8  example, with calculating the amount of
9  litigation damages in a case?
10     A.    No.
11     Q.    Okay.  Have you -- I believe
12  you may have answered this indirectly, but
13  you said you did not do a survey or other
14  empirical study of any kind in the J&J case.
15  Have you ever done a survey or empirical
16  study of any kind in litigation in an expert
17  capacity at all?
18     A.    No.
19     Q.    Okay.  Have you ever conducted
20  a survey or some other kind of empirical
21  study outside the context of litigation?
22     A.    Yes, frequently.
23     Q.    Frequently.
24          Okay.  Describe for me, just

Page 16

1  walk me through briefly your educational
2  background, if you don't mind.
3      A.    I have a bachelor's in -- from
4  -- it used to be called Bombay University,
5  because that was the name of the city, it's
6  now been changed to Mumbai, but it was first
7  Bombay University.  And I majored in
8  economics and statistics, and -- major in
9  economics, minor in statistics.
10          And then I got an MBA with a
11  major in marketing also from Bombay.  The
12  name of the school also has been changed a
13  little bit, but it used to be called, in
14  short, JBIMS.
15          And then I came to get a Ph.D
16  in marketing from Northwestern University in
17  the Kellogg school of management.
18     Q.    Thank you.
19          So your postgraduate degrees,
20  meaning your MBA and Ph.D, those are in the
21  field of marketing?
22     A.    Yes.
23     Q.    Okay.
24     A.    I'd like to just add with, my

Page 17

1  specialization is consumer behavior.
2      Q.    Okay.  I've seen that variously
3  referred to as consumer psychology.  Similar
4  concept?
5      A.    Yes.
6      Q.    Okay.  Did you go straight to
7  academia after obtaining your postgraduate
8  degrees?
9      A.    Yes.
10     Q.    Okay.  Walk me through just
11  very briefly that history, if you don't mind,
12  and conclude with what you're doing
13  currently.
14     A.    I -- upon graduation from the
15  Ph.D program, I have held marketing positions
16  in multiple institutions.
17          Do you need a list of all the
18  institutions?
19     Q.    I don't believe so, but let me
20  clarify.
21          You said "marketing positions."
22  You mean like faculty?
23     A.    Yes, I was a marketing
24  professor.

Confidential Information Subject to Protective Order

Page 18

1 Q. Marketing professors.
2    Okay. And you're currently a
3 professor of marketing at Dartmouth?
4 A. At the Tuck School of Business
5 at Dartmouth.
6 Q. Do you teach undergrad or
7 graduate students there?
8 A. Both.
9 Q. Both. Okay.
10    All marketing classes?
11 A. All related to marketing.
12 Q. Okay. My next question was
13 what's your research focus, but I believe you
14 answered that by telling me it's consumer
15 behavior and consumer psychology. Is that
16 how you would describe your research focus?
17 A. That would be the broadest
18 description. A more specific description
19 would be with an emphasis on how consumers
20 process information, form attitudes and
21 beliefs, intentions to purchase, and purchase
22 products and services. And the two contexts
23 that I study are health and financial
24 well-being.

Page 19

1    MR. DAVIS: Okay. I'm going to
2 mark Keller Exhibit 1, which I'm
3 handing to the reporter.
4 A. Thank you.
5    (Whereupon, Keller Exhibit
6 Number 1 was marked for
7 identification.)
8 BY MR. DAVIS:
9 Q. Do you recognize that as a web
10 bio for you, Dr. Keller, from the Analysis
11 Group website?
12 A. I have actually not seen this
13 on the website before, but, okay.
14 Q. So your testimony is you've
15 never seen this bio for you that's on the
16 Analysis Group website?
17 A. No, I didn't say that. I know
18 that they sought approval for putting my bio
19 on their website, and they asked me for some
20 information, and my recall is that I approved
21 it. But I didn't actually see it on the
22 website.
23 Q. Okay. So under -- there's a
24 paragraph under "Summary of Experience"

Page 20

1 there. Did you draft that and provide that
2 to them?
3 A. I don't recall.
4 Q. Okay. But you did say you
5 approved the content, I suppose, right?
6 A. Yes.
7 Q. Okay. It says that "Professor
8 Keller is an expert in consumer information
9 processing and choice behavior. She studies
10 the application of social marketing
11 principles and behavioral theory in consumer
12 and employee contexts, with a focus on
13 designing and implementing consumer
14 communication programs."
15    Did I read that correctly?
16 A. Yes.
17 Q. Do you agree with that
18 description of your expertise?
19 A. It's a subset of my expertise,
20 yes.
21 Q. When you say "a subset," what
22 do you mean by that?
23 A. I just shared, you know, I have
24 broad expertise that goes beyond how

Page 21

1 consumers process information. It also
2 includes how consumers form attitudes and
3 beliefs, intentions to purchase, and purchase
4 behavior of products and services.
5 Q. Okay. So this -- you would say
6 that this description that I just read you
7 from your Analysis Group bio would be sort of
8 a subset, as you say, of your broader
9 expertise in the field of consumer behavior?
10 A. Yes. I view it as a summary.
11 Like any summary bio, it is not going to be
12 exhaustive.
13 Q. Have you ever taught an
14 economics class, Dr. Keller?
15 A. No.
16 Q. Do you have any postgraduate
17 degrees in economics?
18 A. No.
19 Q. Do you research in the field of
20 economics?
21 A. Please be more specific.
22 Q. Well, does any of your
23 research -- would you characterize any of the
24 research that you've done or publications

Page 22

1 that you've authored, have they been in the
2 field of economics?
3     A.    Yes, in the field of behavioral
4 economics.
5     Q.    Explain what you mean by
6 "behavioral economics."
7     A.    So -- and I'm going to try to
8 simplify things, and just for the purposes of
9 comparison.
10        By no means do I want to say
11 that what I'm saying is an exhaustive
12 description of both fields because that would
13 take us many, many days.
14        From my point of view, and many
15 others, economics -- when economists, or in
16 the field of economics, when they study
17 consumers they use utility theory, and the
18 field of behavioral economics was formed
19 because utility theory was inadequate to
20 explain consumer behavior.
21        To the best of my recollection,
22 there are at least four Nobel Prize winners
23 in the four economic sciences, the Nobel
24 Prize in economic sciences that work on

Page 23

1 behavioral economics.
2     Q.    Okay.  But I guess if I'm
3 understanding you correctly, and keeping it
4 high level, when you say "behavioral
5 economics," you're still -- that still falls
6 within the field of consumer behavior,
7 correct?
8     A.    It is, and beyond.  So I have
9 co-authors that are behavioral economists
10 that are in the economics department.
11     Q.    But your focus would be on the
12 behavioral aspect of it, correct?
13     A.    In large part, yes.
14     Q.    Okay.  Are you on any review
15 boards, editorial boards, or do you have any
16 peer-review duties for any economics-related
17 journal?
18     A.    Yes.  And I want to give you an
19 example.  The Journal of Consumer Research,
20 for which in the past I was an area editor,
21 which is even higher than an editorial board
22 member, and have been on the editorial board
23 for many years until recently, is made up of
24 multiple subdisciplines such as psychology,

Page 24

1 sociology, economics, and anthropology.
2     Q.    Can you think of any other
3 journals, or is that the one?
4     A.    So Journal of Consumer
5 Psychology is similar.  Many of the journals
6 are multidisciplinary, and so it's hard for
7 me to separate the disciplines.
8     Q.    You said that there were
9 multiple subdisciplines, for example, for the
10 Journal of Consumer Research.  Was your --
11 and I think you said you were an area editor?
12     A.    Correct.
13     Q.    Okay.  What do you mean by
14 "area editor"?
15     A.    So the review process varies
16 for different journals, but a common review
17 process is when a paper is submitted for
18 review for possible publication in the
19 journal, the editor works with the area
20 editor to determine who those reviewers will
21 be, and after the reviews are -- after the
22 reviews do their peer reviews, the area
23 editor gets all of the reviews and makes a
24 recommendation to the editor for the

Page 25

1 progression of that manuscript for maybe a
2 revision, rejection, acceptance, etcetera.
3     Q.    So by "area editor," is that by
4 -- sort of by discipline?  "Area" means sort
5 of discipline, and you would assign out --
6 you would, as the area editor, say you got a
7 manuscript in, you would review the
8 manuscript and say, Oh, well, this pertains
9 mostly to the psychological subdiscipline, so
10 I'm going to send it over to this particular
11 reviewer?  Is that sort of how it works?
12     A.    It's quite close, yes.
13     Q.    Okay.
14     A.    You try to find reviewers who
15 are experts in the subject matter of the
16 article -- sorry, of the paper, not an
17 article yet, so that they can provide an
18 expert opinion.
19     Q.    Okay.  So as the area editor,
20 you would not have been doing the peer
21 reviewing yourself, you would have been
22 assigning it out to peer reviewers based on
23 their area of expertise?
24     A.    I write a separate report, and

Confidential Information Subject to Protective Order

Page 26

that also in that report includes my own
review of the article. And it's, I would
say, similar to what I would do as a reviewer
on the editorial review board.
    Q.    Okay. Putting aside your
behavioral economics, you wouldn't hold
yourself out as an expert in economic theory,
would you?
    A.    Please define what you mean by
"economic theory."
    Q.    Well, sure. I mean, would you
agree that the field of economics, like
there's, for example -- let me strike that.
        There's an economics department
at Dartmouth, for example, correct?
    A.    Yes.
    Q.    Okay. And you said you've
never taught an economics class there?
    A.    Correct.
    Q.    Okay. Or anywhere, correct?
    A.    Correct.
    Q.    Okay. For any of the course
subject matter that would be subject to a
Ph.D in economics, you wouldn't characterize

Page 27

yourself as an expert on any of that, would
you?
    A.    I'm sorry, what do you mean by
"any of that"?
    Q.    Well, any -- let me reframe.
        So you had to do quite a bit of
work to get your Ph.D in marketing, correct?
    A.    Yes.
    Q.    Okay. Would you imagine that
there's -- to get a Ph.D in economics, you
have to also do quite a bit of work that's
different?
    A.    Yes. And I'm sure there's some
overlap as well.
        For example, in a Ph.D program,
and I was in a Ph.D program in the business
school where people were getting their Ph.Ds
with different specializations, and we all
had to take core classes, so our core classes
overlapped. And then we had what you might
call elective, so they're not called that in
a Ph.D program. So we all had core classes,
and then elective classes for our
specialization. Yeah.

Page 28

    Q.    Sure. I don't disagree with
you that there's some level of crossover, but
do you agree that economics is a separate and
distinct discipline from marketing?
    A.    I do not. Marketing is really
a combination of multiple disciplines, which
is why the premier journal, the Journal of
Consumer Research, has in their description
of why the journal was formed was to
encourage researchers from multiple
disciplines, including economics, to study
the intersection between consumer research
and economics, because we're talking about
economics, it's true also for psychology,
anthropology, etcetera.
        So it is very difficult for me
to say that as a consumer researcher that I
don't have any knowledge of economics.
    Q.    I'm not saying that you don't
have any knowledge of economics. I'm just
asking if you would agree that it's a
separate discipline.
    A.    Is there a separate degree in
economics, yes.

Page 29

    Q.    Okay. And, for example, at
Dartmouth there's a separate department of
economics that has a separate faculty of
professors and Ph.Ds who teach economics,
correct?
    A.    Yes. And since the time that
I've been at the Tuck School of Business at
Dartmouth, three of the faculty members from
the department of economics at Dartmouth
College in the college of arts and sciences
are now faculty members in the Tuck School of
Business.
    Q.    Okay. Faculty members of what
exactly?
    A.    We are all faculty members of
management with subspecialties.
    Q.    Okay. And their subspecialty,
for example, would be the economics side of
what you would study to get an MBA from Tuck,
correct?
    A.    Yes.
    Q.    Okay. Do you have any what I
would call -- well, are you familiar with the
prescription drug approval process in the

Page 30

1  United States?
2      A.    I am not an expert, and don't
3  have an opinion on that.
4      Q.    Okay.  You do some
5  health-related messaging initiatives, though,
6  don't you?  And you study -- I believe you
7  said one of your consumer behavior sort of
8  sub-research interest was health choices,
9  correct?
10     A.    Yes.
11     Q.    Okay.  So does that -- do you
12  have some level of knowledge of how
13  prescription drugs are approved in the US?
14     A.    I am an expert on how consumers
15  make health-related decisions.  I am not an
16  expert on the approval process for health
17  products and services.
18     Q.    Okay.  Do you know what an NDA
19  is, for example?
20     A.    No.
21     Q.    What about an ANDA?
22     A.    No.
23     Q.    Okay.  Do you at least have an
24  understanding that prescription drugs can't

Page 31

1  just simply be sold in the United States,
2  that they actually have to go through a
3  pre-approval process?
4      A.    Yes.
5      Q.    You shrugged a little bit
6  there.  Is there some level of confusion
7  or...
8      A.    I shrugged because there were
9  two questions, but I decided to answer
10  because it was approval and pre-approval.
11  And that's okay.
12     Q.    Sure.  And if any of my
13  questions are unclear, just ask me for
14  clarification.
15     A.    Thank you.
16         MR. HONIK:  Before you proceed.
17  Maureen, I have an e-mail from someone
18  saying they're waiting to get in.  I
19  don't know who is letting people into
20  the Zoom.
21         THE WITNESS:  Clearly I'm not.
22         THE VIDEOGRAPHER:  Do you want
23  to go off the record so I can let them
24  in?

Page 32

1         MR. HONIK:  You can stay on.
2  It will just take a second, right?
3  Thank you.
4         Sorry for the interruption.
5         (Pause.)
6  BY MR. DAVIS:
7      Q.    Okay.  So just to clarify my
8  last question, you do understand that
9  prescription drugs have to be pre-approved in
10  the US, but I think your testimony is that
11  you don't know much beyond just that fact, is
12  that right?
13         MR. GOLDBERG:  Objection to
14  form.
15     A.    That is not what I said.  You
16  asked me the question, and I answered it.
17  And you did not ask me about anything beyond
18  that, because that is vague, I don't know
19  what beyond that means.
20  BY MR. DAVIS:
21     Q.    Okay.  So, well, let me
22  rephrase it.
23         What you're saying is you're
24  generally familiar with the fact that

Page 33

1  prescription drugs have to be pre-approved in
2  the US, but you are not familiar with the
3  details of how that happens?
4      A.    I am not an expert on the
5  pre-approval or the approval process --
6      Q.    Okay.
7      A.    -- for prescription drugs.
8      Q.    And likewise, is it your
9  testimony that you would not have any
10  expertise in FDA regulations regarding
11  prescription pharmaceuticals after the point
12  of approval?
13     A.    Could you repeat that?
14     Q.    Sure.
15         Would it likewise be your
16  testimony that you don't have any particular
17  expertise regarding FDA regulations of
18  prescription pharmaceuticals after the point
19  of approval?
20     A.    I don't understand the
21  question.
22     Q.    Sure.
23         Do you understand that there
24  are FDA regulations of approved prescription

Confidential Information Subject to Protective Order

Page 34

1  pharmaceuticals?
2      A.    Yes.
3      Q.    Okay.  Have you studied them in
4  any detail?
5      A.    You would have to be more
6  specific.
7      Q.    Have you studied those FDA
8  regulations that you just testified existed
9  in any detail?
10     A.    What does it mean "in any
11 detail"?
12     Q.    Have you looked at the -- for
13 example, have you looked at Title 21 of the
14 Code of Federal Regulations?
15     A.    No.
16     Q.    Okay.  Have you looked at any
17 FDA regulations regarding prescription
18 pharmaceuticals?
19     A.    You would need to be more
20 specific.
21     Q.    Sure.
22          You testified you were retained
23 in this case in, I think, November or
24 December of last year you said, correct?

Page 35

1      A.    Yes.
2      Q.    Since that time, do you recall
3  looking at, as part of your work on this
4  case, any FDA regulations regarding
5  prescription pharmaceuticals?
6      A.    As is outlined in my report, I
7  looked at some FDA-sourced material related
8  to the valsartan recall.
9      Q.    That would be FDA announcements
10 and the like specifically related to
11 valsartan, correct?
12     A.    To the best of my recall, yes.
13     Q.    Okay.  Do you recall looking at
14 any FDA regulations of general applicability
15 to prescription pharmaceuticals as part of
16 your work in this case?
17     A.    Not that I recall.
18     Q.    Do you know what cGMPs are?
19     A.    I know what the acronym stands
20 for.
21     Q.    Okay.  What is that?
22     A.    Current manufacturing -- sorry,
23 current good manufacturing practices.
24     Q.    Okay.  Have you actually looked

Page 36

1  at what the FDA regulations are regarding
2  cGMPs?
3      A.    I am not an expert on
4  manufacturing processes.  I'm an expert on
5  consumer decision-making.
6      Q.    Okay.  Have you reviewed any
7  FDA or congressional definitions of
8  adulteration and misbranding of drugs?
9      A.    First, those were multiple
10 questions.  Could you ask, and be specific.
11     Q.    Sure, I'll break it down.
12          Have you reviewed any FDA or
13 congressional definitions of "adulteration"?
14     A.    No.
15     Q.    Okay.  Same question for
16 "misbranding."
17     A.    No.
18     Q.    You don't have any expertise in
19 chemistry, do you?
20     A.    Please define "expertise in
21 chemistry."
22     Q.    Have you studied chemistry
23 ever?
24     A.    Only in school, high school.

Page 37

1      Q.    Okay.  So you would not call
2  yourself an expert chemist?
3      A.    No.
4      Q.    How about toxicology?
5      A.    I would not consider myself an
6  expert in toxicology.
7      Q.    I'm going to mark your report,
8  Dr. Keller, as Exhibit 2.
9          (Whereupon, Keller Exhibit
10          Number 2 was marked for
11          identification.)
12          MR. GOLDBERG:  She has a copy
13 of it.
14     A.    A copy of my report, yes.  It's
15 okay, I'm happy to use yours.
16 BY MR. DAVIS:
17     Q.    You can keep mine, the marked
18 copy, but if you feel more comfortable
19 reviewing yours, that's fine.
20     A.    No, I'm fine with either copy.
21          MR. DAVIS:  Do you want a copy,
22 Seth?
23          MR. GOLDBERG:  I'll take it
24 just for recordkeeping purposes.

Page 38

1    Thank you.
2   BY MR. DAVIS:
3      Q.    Do you recognize what I've
4   handed to you as your expert report in this
5   case?
6      A.    Yes.
7      Q.    Okay.  In drafting that expert
8   report, did you familiarize yourself at all
9   with Federal Rule of Civil Procedure 26 which
10  governs the use of an expert report in
11  federal court litigation?
12     A.    No, I did not do it for this
13  case, but I did in the past when I had to
14  create an expert witness report.
15     Q.    I'm going to read a statement
16  from that rule, and I'm going to ask you if
17  you feel your report complies with that.  It
18  says, "The report must contain a complete
19  statement of all opinions the witness will
20  express, and the basis and reasons for them."
21     Do you feel that your report
22  complies with that provision of Rule 26?
23     A.    Yes.
24     Q.    Okay.  Thank you.

Page 39

1       So there are no opinions that
2   you would be seeking to offer in this case
3   that are not in your report, is that correct?
4      A.    Yes.
5      Q.    And you've cited everything
6   that -- to the best of your ability, you've
7   cited everything that would support your
8   opinions in that report?
9      A.    No, I cannot cite everything
10  that would support my opinions.  This is a
11  subset of citations that would support my
12  opinions.
13     Q.    Sure.  Let me reframe the
14  question.
15     Are there any cites that are
16  out there that you intended to put in your
17  report that didn't make it in, to the best of
18  your memory and knowledge?
19     MR. GOLDBERG:  Objection to
20  form.
21     A.    Yeah, I don't know how to
22  answer the question.
23  BY MR. DAVIS:
24     Q.    Well, I'm just asking, and

Page 40

1   maybe I should rephrase it, is, are there any
2   citations out there to anything that you
3   neglected to put in your report that you want
4   to tell me about today?
5      A.    Well, I did not cite many of my
6   own publications because I felt that my
7   experience and my opinions reflected that
8   research expertise.
9      Q.    Okay.  So with the exception of
10  your research in publications, is there any
11  citation that's not in your report that you'd
12  like to tell me about today?
13     A.    No.
14     Q.    Okay.  I believe your report is
15  signed January 12, 2022, is that right?  I
16  believe that would be on the last page of
17  your report.
18     A.    Yes.
19     Q.    Do you recognize that as your
20  signature?
21     A.    This one isn't signed.
22     MR. DAVIS:  Seth, do you know
23  why that would be?
24     MR. GOLDBERG:  I don't.  I

Page 41

1   don't know how you would have not
2   signed copy.  That's interesting.
3     Can I see what you have there?
4     THE WITNESS:  (Handing).
5     MR. DAVIS:  It looks like it's
6   a digital signature.  Perhaps it just
7   got -- when it got printed, that got
8   removed from the printing.
9      A.    My copy is signed.
10  BY MR. DAVIS:
11     Q.    My electronic copy is also
12  signed, so it must be a printing error.
13     Okay.  So looking at --
14     A.    Can I have --
15     MR. HONIK:  Here's one with a
16  signature if you want it.
17     MR. DAVIS:  Should we trade
18  out?
19     MR. GOLDBERG:  Sure.  We can do
20  that later.
21  BY MR. DAVIS:
22     Q.    So when you signed your report
23  on January 12, 2022, did you feel that you
24  had set forth your complete statement of your

Confidential Information Subject to Protective Order

Page 42

1  opinions and the basis and reasons for them?
2      A.   Yes.
3      Q.   Okay.  You didn't do any kind
4  of survey or empirical study as part of your
5  assignment in this case, did you?
6      A.   No, because I felt that there
7  was evidence from consumers as well as
8  literature from consumers that were
9  sufficient to support my opinions.
10      Q.   We'll get into that a little
11  bit later.
12          But your answer is no, you did
13  not do a survey or any kind of empirical
14  study as part of your assignment in this
15  case?
16      A.   Yes.
17      Q.   Okay.  Have you been asked to
18  at some point in the future?
19      A.   No.
20      Q.   I think you said earlier that
21  you've done some consumer messaging in the
22  field of healthcare, is that correct?
23      A.   Yes.
24      Q.   Okay.  Can you describe that

Page 43

1  work generally to me?
2      A.   I use my expertise in consumer
3  decision-making to design communications that
4  would create value for consumers.
5      Q.   And I think -- so is it fair to
6  say that that messaging is directed to
7  consumers specifically?
8      A.   In large part.  I have also
9  done work to design health communication to
10  physicians to help them create value for
11  consumers.
12      Q.   What was -- let's start with
13  the messaging to consumers that you
14  described.  What would be the substance of
15  those messaging campaigns that you've
16  designed?
17      A.   As I've stated in my report,
18  message factors are part of one of my
19  frameworks, acronym MICI -- that stands for
20  message-individual-contextual factors and the
21  interaction between those -- are very
22  important, so the message part of that is
23  very important for consumers to consider as
24  inputs when they are making a health product

Page 44

1  or service valuation.  And the messages
2  contain information on the benefits and the
3  costs of the advocated action to help
4  consumers make the value determination.
5      Q.   Well, let's move away from the
6  theoretical for a moment.
7          And on the specific sort of
8  messaging that you've designed for healthcare
9  consumers, can you give me some examples of
10  what the substance of those messages conveyed
11  to them were?
12      A.   So first I object to it being
13  characterized as "theoretical," because it is
14  also very practical.
15          And an example of the message
16  would be, you know, here are the benefits of
17  following -- in the message, there's a
18  portion of the message that would focus on,
19  Here are the benefits of following the
20  advocated recommendations.
21      Q.   Let me --
22      A.   For example --
23      Q.   I didn't mean to cut you off.
24      A.   For example, one of my studies

Page 45

1  is on encouraging women to get a -- to get
2  screened regularly for mammograms, and so,
3  you know, I would list the benefits of
4  getting a mammogram, and then also try to
5  anticipate some of the costs from a consumer
6  point of view and try to overcome those.
7          So, for example, a potential
8  cost for a consumer might be the discomfort
9  or pain from the mammogram testing procedure,
10  and in my message I might include some coping
11  methods for that, including managing
12  expectations and maybe, you know, asking them
13  to check to see if they can take pain
14  medication and the like.
15      Q.   Okay.  So you've given me an
16  example, I believe, of an advocated
17  recommendation, I believe that's the term you
18  used, and that's getting screened for a
19  mammogram.  That would be an example of an
20  advocated recommendation --
21      A.   Yes.
22      Q.   -- is that correct?
23          For mammograms, let's run with
24  that example.  For a mammogram, are there any

Confidential Information Subject to Protective Order

Page 46

1 sort of guidances or anything similar to that
2 about when and how often individuals should
3 get screened?
4      A.   Yes.
5      Q.   Okay.  Would some of the
6 content that's conveyed with that advocated
7 recommendation, for example, cite to those
8 guidances around compliance and the like?
9      A.   In the mammogram example,
10 because there are multiple guidelines -- and
11 this again supports my MICI framework because
12 based on some individual differences such as
13 your age, your health status, for example, or
14 history of breast cancer, or cancer as
15 another example, contexts in which the
16 decision is made, you know, whether it is --
17 whether one has a relationship with a primary
18 care physician or specialist, all of those
19 factors are considered in the design of -- in
20 my research, in the design of multiple
21 communication that is tailored to different
22 audiences.
23      Q.   So I believe you said that
24 there was -- there were some guidances, for

Page 47

1 example, about when and how often to get
2 screened for a mammogram, correct?
3      A.   Yes.
4      Q.   Okay.  Who issues those
5 guidances?
6      A.   I don't know.  I work with
7 physicians, or someone from the medical
8 community, that gives me the information, and
9 I use that information in the messages.
10      When I have to do an experiment
11 where it's a hypothetical situation, I
12 don't -- you know, I go through a human
13 subject review committee.
14      When it's in a practical
15 context, there are other reviewers.
16      Q.   So I believe you said you did
17 use that information regarding when and how
18 often to get screened in the messages you
19 designed, for example, in this instance for
20 mammograms, correct?
21      A.   Yes.
22      Q.   Okay.  Have you done any
23 similar messaging for pharmaceutical
24 products?

Page 48

1      A.   Yes.
2      Q.   Does the messages supporting
3 the advocated recommendation for
4 pharmaceuticals often center around
5 compliance?
6      A.   Sorry, I don't understand the
7 question.
8      Q.   Sure.
9      For pharmaceuticals that you've
10 given advocated recommendations for, has the
11 messaging accompanying the advocated
12 recommendation often incorporated messaging
13 around patient compliance, i.e., you know,
14 staying on schedule with the drug and
15 following -- you know, taking it as
16 prescribed, etcetera?
17      A.   The study that's coming to my
18 mind now as I answer your question, so the
19 answer is yes, and I'm going to qualify it.
20      It's for a diabetes medication,
21 and my messaging is text messaging, and there
22 are over 60 different types of text messages
23 to remind -- in different formats to remind
24 people to not only stay on schedule for their

Page 49

1 medication, but also diet and exercise and
2 screening.
3      Q.   Okay.  Thank you for that.
4      I see that you've also designed
5 some messaging around COVID vaccine
6 hesitancy, correct?
7      A.   I'm sorry, what are you
8 referring to so I can make sure I understand
9 the context?
10      Q.   Are you on some kind of panel
11 related to designing messaging to tackle
12 COVID vaccine hesitancy?
13      A.   I am -- I would not
14 characterize it as a panel.  I would say that
15 I am a member of a team that -- of multiple
16 teams.  One of the teams, yes.
17      Q.   Sorry.
18      A.   I apologize, I started to
19 explain.  You didn't ask that.  You just
20 asked am I a member of panel, and it's not a
21 panel, it was a team, and I started
22 describing it, but you may not need that.
23      Q.   Sure.  I mean, that was going
24 to be my next question, is, describe to me

Confidential Information Subject to Protective Order

Page 50

1  what it is and what your involvement with it
2  is.
3      A.   So I'm on multiple ones.
4  Starting with the research that I'm doing is
5  to, and this is gathering primary data, is to
6  encourage those with COVID-19 vaccine
7  hesitancies to either get vaccinated or to
8  get boosted.  It's actually in Massachusetts.
9      Q.   Okay.
10     A.   The second study I'm thinking
11 about is on a team to understand how
12 behavioral economics -- how behavioral
13 economic principles have worked during the
14 pandemic to reduce vaccine hesitancy and to
15 encourage vaccination and COVID-19 booster
16 shots.
17          And the third one is on a large
18 team organized by the Get the Medication
19 Right X, GTMRx, and that study, or that
20 publication/paper, it is not a peer-reviewed
21 paper, but that paper that is put out by that
22 institution, I was part of a team to think
23 about structural issues, process issues,
24 system issues related to -- and this is why I

Page 51

1  was invited as an expert -- related to MICI,
2  the messaging, individual differences, and
3  the context, and how we might improve those
4  to not only address the current pandemic, but
5  any future pandemics.
6      Q.   Let's take the second one for a
7  moment, and this might be a fruitful example
8  to help me understand what you mean by
9  "behavioral economics."
10          So I guess draw the connection
11 for me between overcoming COVID vaccine
12 hesitancy and how behavioral economics shaped
13 into that.
14     A.   Right.  And I can do that, and
15 actually will also give you insight on the
16 first study, which is based on behavioral
17 economic principles as well.
18          So one example -- and there are
19 many, many behavioral economists out there
20 and, as I said, made up of people with
21 multiple disciplinary backgrounds, and they
22 have tried different things such as, should
23 we pay people to get vaccinated is one
24 example; should we create a lottery, right,

Page 52

1  to encourage people to get vaccinated; should
2  we frame the message positively or
3  negatively; should we say here's what you
4  gain if you get the vaccine, here's what you
5  lose if you don't get the vaccine.  So those
6  are just examples, okay, just to give you a
7  few.
8          And so, you know, how well
9  have -- and there's a variety of principles,
10 how well have those -- sometimes they call
11 them nudges, a lot of the times behavioral
12 economists call them nudges, the
13 interventions that they use to nudge
14 consumers to take the recommended or
15 advocated actions.  But those are examples.
16          And in the first study that I
17 was describing where I'm actually doing the
18 study here in the State of Massachusetts, we
19 are looking at -- and I'm with a team that is
20 funded -- that sits in the Mass
21 General/Brigham Young Hospital and the
22 Harvard Medical School, and it's a center
23 for -- that's related to use of behavioral
24 economics to improve medication adherence.

Page 53

1      Q.   Okay.
2      A.   And -- okay.  And this
3  particular -- I'm doing the study with that
4  group, with a subset of that group, and we
5  are looking at some eligible patients or
6  consumers get -- why one should get the
7  vaccine.  Some get a message on how to get
8  the vaccine, and that includes the booster.
9  And the third arm is usual care.
10          And then we track and see which
11 message is the most effective compared to
12 each other, one arm to the other, in a
13 randomized control trial.
14     Q.   Okay.  Let me try and see if I
15 understand this.
16          So I think you mentioned that
17 some of these nudges, for example, for
18 behavioral economics might have been a
19 lottery or to pay people to get vaccinated or
20 what they might gain or lose, for example,
21 losing a job, or something like that?
22     A.   No, gain or loss, sorry, I
23 refer to in a framed message.
24     Q.   Okay.  Understood.

Page 54

1    So it seems like the baseline
2  for all of that is that it's like a monetary
3  incentive, is that --
4     A.    That is incorrect.  Monetary
5  incentives are a subset of the -- as nudges
6  used in behavioral economics.  For example, I
7  mentioned frames, you know, you're focused on
8  the benefits or the gains versus the losses
9  are a very popular behavioral economics
10 messaging, not related to money, messaging
11 nudge, and, in fact, the foundation for that
12 is prospect theory, and to prominent
13 economists Kahneman and Tversky, both Nobel
14 Prize laureates, who created the foundation
15 for these and other nudges.
16    Q.    So -- and perhaps monetary
17 incentives could be a subset, I suppose, is
18 what you're saying?
19    A.    Yes.
20    Q.    Okay.  Gotcha.
21    So it's any kind of reward or
22 disincentive, sort of, that affects behavior,
23 I suppose.  Is that a more accurate,
24 wholistic way of capturing the idea?

Page 55

1    A.    I would prefer to rephrase that
2  in terms of benefits and costs.  If you think
3  about rewards as benefits, there's some
4  overlap, but not perfect overlap.
5    And by costs, I am not just
6  referring to monetary costs.  There are
7  switching costs, transaction costs,
8  convenience costs.  So just want to clarify
9  that we are talking about value as a function
10 of costs and benefits, and those benefits
11 could be a range of benefits.
12    Q.    So, and I'm happy to adopt your
13 terminology there.
14    It's essentially cost benefit
15 for behavioral economics; what are the
16 benefits of the behavior, what are the costs
17 of the behavior, is that right?
18    A.    (Nodding in the affirmative).
19    Q.    Okay.  Flip, if you don't mind,
20 in your report, which is Exhibit 2, to
21 page 17, and that's footnote 36 specifically.
22    That footnote reads -- let me
23 paraphrase it, I guess.  I don't want to read
24 the whole thing.  But essentially is what

Page 56

1  you're saying there that the -- in ranking --
2  there's empirical evidence out there that in
3  ranking topics of importance for medical
4  therapy, that consumers and physicians place
5  safety and efficacy routinely at the top of
6  those priorities?
7     A.    So because you are referencing
8  a specific paper, I will say that in this
9  particular paper they look at -- so, for
10 example, there are about 108 consumers, and
11 about 115 or so, a little higher, physicians,
12 that 33 consumers rated safety as the most
13 important topic, the topic of importance for
14 them during initiation of medical therapy.
15 So it's very important to get the details.
16    And what that means is
17 basically 70-plus consumers did not rate
18 safety as the most important topic during the
19 initiation of medical therapy.
20    So I just want to make sure
21 that this data is understood correctly, that
22 it will be a range of -- even in the study, a
23 range of consumer responses as to the
24 importance of specific features and the

Page 57

1  weight -- sorry, their -- yeah, weight on
2  those features, and that, as I say in my
3  report, is likely to change during the
4  consumers' and the physicians' experience
5  with the consumer taking the drug over time.
6    Q.    Okay.  But to -- but what
7  you're saying is the results of that survey
8  show that numerically the most common answer
9  was safety number one, efficacy number two?
10    A.    During the -- topic of
11 importance during the initiation of medical
12 therapy.
13    Q.    Okay.  And did you look at the
14 survey design and read the article in citing
15 it in this paper?
16    A.    Yes.
17    Q.    Okay.  All right.  Thank you.
18    Do you feel like it was a
19 well-designed survey?
20    MR. GOLDBERG:  Objection to
21 form.
22    A.    I -- it was well designed.  It
23 was a good survey.  Are there things that
24 could have been -- could have been done

Confidential Information Subject to Protective Order

Page 58

1 differently? Yes.
2 BY MR. DAVIS:
3    Q.    Okay.  Well, would you agree it
4 was reliable enough for you to cite it in
5 your report?
6    A.    Yes.  I mean, you know, it's --
7 yes.
8    Q.    You wouldn't cite any kind of
9 study or survey or piece of literature in
10 your report that you thought had significant
11 reliability issues, would you?
12    A.    No.  The quality of the report
13 is the most important.
14    Q.    So back to your messaging
15 campaigns that you've done, and maybe let's
16 stick with COVID as the example.  In the
17 COVID messaging -- vaccine messaging
18 campaigns, how were concerns about safety and
19 efficacy addressed in the communications that
20 supported the advocated recommendation, which
21 was to get vaxed or boosted?
22    A.    I mentioned multiple studies,
23 but I will talk about the question -- I can
24 answer the question for one of those, which

Page 59

1 is the three arms of how and why and usual
2 care messaging.
3       So the messaging goes to people
4 who are eligible for the vaccine or the
5 booster, and I rely on the hospital system
6 and the electronic database, health record
7 database.  I am not involved with actually
8 sending out these messages, I only design the
9 messages, but they -- the rest of the team
10 works on the eligibility of the participants.
11    Q.    Okay.  So, and you said you
12 were responsible for designing the content of
13 the message, correct?
14    A.    The letter that goes to the
15 patients, yeah.
16    Q.    So what sort of -- in terms of
17 the content of the messages that you
18 designed, what sort of content did you
19 include to address safety or efficacy
20 concerns that may exist amongst the un- or
21 undervaccinated?
22    A.    In these particular messages,
23 to the best of my recall, we use language
24 that the vaccine is -- has been demonstrated

Page 60

1 to be shown as effective for mitigating the
2 risk associated with the COVID-19 virus.
3    Q.    Is part of the messaging that
4 the vaccines have gone through an approval
5 process that demonstrated, for example, their
6 efficacy and safety?
7    A.    I'm sorry, can you repeat that?
8    Q.    Was one of the messages that
9 you designed, was the content of one of those
10 messages, did that emphasize the fact that
11 the vaccines had gone through an approval
12 process to demonstrate scientifically their
13 safety and efficacy?
14    A.    I don't recall.
15    Q.    Okay.  You sit on the COVID
16 vaccine hesitancy task force, right?
17    A.    One of them, yes.
18    Q.    Let me just mark something as
19 an exhibit then.
20       MR. DAVIS:  This is being
21 handed to the reporter to be marked as
22 Keller 3.
23       (Whereupon, Keller Exhibit
24 Number 3 was marked for

Page 61

1 identification.)
2       MS. ANDRAS:  Since we don't
3 have electronic exhibits, could you
4 for the record and counsel who don't
5 have copies, introduce the exhibit
6 with a little more specificity?
7       MR. DAVIS:  Sure.  And I'll do
8 that on the record when I'm going
9 through it with the witness.
10 BY MR. DAVIS:
11    Q.    For the record, this Exhibit 3
12 is a -- the cover page to it is a report to
13 the GTR -- GTMRx National Task Force, and
14 it's titled "Background and Resources to
15 Build Vaccine Confidence in the Health
16 Neighborhood" dated March 2021.
17       Do you see that, Dr. Keller?
18    A.    Yes.
19    Q.    And if you flip to the -- if
20 you go one, two, three, four pages in, do you
21 see your name under "Task Force Participants"
22 there?
23    A.    Yes.
24       MR. GOLDBERG:  John, let me

Confidential Information Subject to Protective Order

Page 62

1     just say, if you're going to ask about
2  the document, I do think the witness
3  should be able to take a chance to
4  review it.
5         MR. DAVIS:  I mean, I have very
6  limited questions regarding it.
7  BY MR. DAVIS:
8     Q.    Why don't I ask them, and if
9  you feel like you want to review it, then we
10  can go off the record and you can take a look
11  at it.
12     A.    Can I just stop you for a
13  moment?
14     Q.    Sure.
15     A.    I'm going to ask you to review
16  it regardless of the question you ask, so I
17  don't want you to think that --
18     Q.    Sure.
19         MR. DAVIS:  Why don't we go off
20  the record, then, and you can review
21  it.
22         MR. GOLDBERG:  I think we're
23  going to stay on the record.  You can
24  review it.  If it takes more than a

Page 63

1     few minutes, then we can go off the
2  record.  That's the rule in this case.
3         The rule is that we start
4  reviewing, if it's going to take a
5  long time, then we'll go off the
6  record.  But that's what we do in this
7  case.
8         (Witness reviewing document.)
9     A.    Okay.
10  BY MR. DAVIS:
11     Q.    And I promise I don't have
12  detailed questions for you on this.
13     A.    Thank you.  I --
14         MR. GOLDBERG:  There's not a
15  question pending.  Just let counsel
16  ask a question.
17  BY MR. DAVIS:
18     Q.    So you saw on the first page
19  that this is dated March 2021, correct?
20     A.    Yes.
21     Q.    At the time of March 2021,
22  COVID vaccines were operating under an
23  emergency use authorization, correct, or a
24  EUA?

Page 64

1     A.    I'm not sure.
2     Q.    Why don't you flip to page,
3  what's numbered as page 6 in the bottom left
4  corner.  You'll see some numbering in the
5  bottom left corner, there's a page 6.
6         Do you see there's a third
7  block bullet, a blue block?  Do you see that?
8  Actually yours is black and white.  Sorry.
9         There's a third block there
10  that says, "COVID-19 vaccines have been
11  approved under emergency use authorization."
12         Do you see that?
13     A.    Yes.
14     Q.    Okay.  These vaccines now have
15  full approval, correct, full FDA approval?
16  Is that your understanding?
17     A.    I'm not sure.
18     Q.    Okay.  Do you see that there's
19  a third bullet under that bullet I pointed
20  out to you, a smaller bullet that says,
21  "Others warn that EUAs exacerbate the
22  deterioration of the public's confidence in
23  science"?
24         Do you see that?

Page 65

1     A.    I need a moment to just look at
2  the context.
3         (Witness reviewing document.)
4     A.    Okay.
5     Q.    Was that one of the findings of
6  this task force that's in this report that
7  you sat on, was that among the vaccine
8  hesitant there was -- some of that was
9  related to the fact at the time of this
10  report that the vaccines had not undergone a
11  full approval process?
12         MR. GOLDBERG:  Objection to
13  form.  Vague, mischaracterizes the
14  document.
15     A.    Could you please be more
16  specific?
17  BY MR. DAVIS:
18     Q.    Did you assist in drafting this
19  report?
20     A.    I was a member of the task
21  force that reviewed certain sections of the
22  document, and participated in discussions on
23  the creation of the document.
24     Q.    Let me just tell you where I'm

Page 66

1  going with this, which is that, would you
2  agree -- and maybe we can bypass all of this.
3  Would you agree that consumers and physicians
4  look at approval by the regulator as an
5  important piece of information to consider in
6  making a consumer choice?
7      A.    You need to be more specific.
8  Those are two questions.
9      Q.    What are the two questions in
10 there?
11     A.    You said "consumers and
12 physicians."
13     Q.    Okay.  Well, let's take it from
14 the consumers first.  So the same question,
15 just for consumers.
16     A.    Could you repeat the question?
17     Q.    Sure.
18         Would you agree that consumers
19 in making choices regarding medications or
20 medical therapy view approval by the
21 regulator as an important piece of
22 information?
23     A.    There is a range of consumer
24 responses, as I have explained in my report,

Page 67

1  in various section -- subsections of Section
2  IV in my report, such as IV.B, that using
3  different decision rules, compensatory and
4  non-compensatory, some may and some may not.
5         Same with the MICI factors in
6  Section IV.C of my report, some consumers may
7  pay attention to the information or approval
8  from the FDA as part of the messaging that
9  they consider, and some may not.
10        For example, they may pay much
11 more attention to their individual health
12 status or the context such as their
13 relationship with the physician, rely on the
14 physician to give them guidance.
15     Q.    Let's take it back to the COVID
16 vaccines for a second.
17        You're currently, I think you
18 testified, doing some messaging encouraging
19 vaccination and boosting, correct?
20     A.    Yes.
21     Q.    Okay.  Is part of the substance
22 of that message that's being conveyed now
23 that these vaccines have full safety and
24 efficacy endorsement by the FDA; they're, in

Page 68

1  other words, approved as safe and effective
2  by the FDA?  Is that part of the messaging?
3      A.    I do not recall.  My task in
4  this project is to focus on the how versus
5  why components of that message.  There are
6  other team members that are focused on other
7  aspects of who gets the message and the
8  context in which they get the message.
9      Q.    Okay.  Let's transition.
10         MR. GOLDBERG:  John, if we are
11 transitioning, can we take a break?
12         MR. DAVIS:  Sure.  Yeah, that's
13 fine.
14         THE VIDEOGRAPHER:  Off the
15 record at 10:43.
16         (Whereupon, a recess was
17 taken.)
18         THE VIDEOGRAPHER:  Back on the
19 record at 11:04.
20 BY MR. DAVIS:
21     Q.    Do you have any understanding
22 of how generic drugs specifically get
23 approved in the US?
24     A.    No.

Page 69

1      Q.    Do you have any understanding
2  of what -- how generic drugs are supposed to
3  compare to their brand counterparts?
4          MR. GOLDBERG:  Objection to
5  form.  Vague.
6      A.    Please clarify.
7  BY MR. DAVIS:
8      Q.    Sure.
9          What is a generic drug, can you
10 tell me that?
11     A.    From a marketing perspective, a
12 generic drug is an unbranded drug.
13     Q.    And compared to branded drugs,
14 what are unbranded drugs supposed to be in
15 comparison to them?
16     A.    One thing they're supposed to
17 be is cheaper.
18     Q.    Okay.  Do you understand that
19 they're supposed to be therapeutically
20 equivalent?
21     A.    In a prescription drug context,
22 yes.
23     Q.    In fact, would you agree that
24 many aspects of our healthcare system rely on

Confidential Information Subject to Protective Order

---

Page 70

¹ an assumption that generic drugs are
² therapeutically equivalent to their brand
³ counterparts?
⁴      A.    Could you please repeat?
⁵           MR. DAVIS:  Could you repeat
⁶ the question?
⁷           (Whereupon, the reporter read
⁸ back the question:
⁹           QUESTION:  In fact, would you
¹⁰      agree that many aspects of our
¹¹      healthcare system rely on an
¹² assumption that generic drugs are
¹³      therapeutically equivalent to their
¹⁴      brand counterparts?)
¹⁵           MR. GOLDBERG:  Objection.
¹⁶      Vague.
¹⁷      A.    Many aspects of our healthcare
¹⁸ system, it's too -- it's not specific enough
¹⁹ for me.
²⁰ BY MR. DAVIS:
²¹      Q.    Okay.  Are you familiar with
²² automatic generic substitution at the
²³ pharmacy level as a concept?
²⁴      A.    Could you repeat that?

---

Page 71

¹      Q.    Are you familiar with automatic
² generic substitution at the pharmacy level as
³ a concept?
⁴      A.    What do you mean "as a
⁵ concept"?
⁶      Q.    Well, let's take that off.
⁷           Are you familiar with automatic
⁸ generic substitution at the pharmacy level?
⁹      A.    I know that -- I don't know who
¹⁰ does it, but I know that sometimes when
¹¹ you -- as a consumer when you expect a
¹² branded drug you are given a generic.
¹³      Q.    Well, it's regardless of
¹⁴ whether a consumer expects a branded drug or
¹⁵ not, the substitution occurs, does it not?
¹⁶           MR. GOLDBERG:  Objection to
¹⁷      form.
¹⁸      A.    I don't know.
¹⁹ BY MR. DAVIS:
²⁰      Q.    Okay.  Do you have any
²¹ familiarity with how reimbursement or
²² formulary decisions are made in response to
²³ the market entry of a generic vis-à-vis the
²⁴ brand?

---

Page 72

¹      A.    No, I am not an expert on that.
²      Q.    Okay.  Are you familiar with
³ the fact that when a physician writes a
⁴ prescription on a prescription pad, even if
⁵ the physician writes the brand name, that
⁶ oftentimes if there's a generic, the generic
⁷ will be dispensed because of generic
⁸ substitution laws?
⁹      A.    I don't have an opinion on
¹⁰ that.
¹¹      Q.    And I believe you said you
¹² don't know what generic manufacturers have to
¹³ demonstrate to the FDA to get their generic
¹⁴ drugs approved for sale in the US, correct?
¹⁵      A.    I do not recall saying that.
¹⁶      Q.    Okay.  Well, then, let me ask
¹⁷ it then.
¹⁸           Are you aware --
¹⁹      A.    Can you please repeat it?
²⁰      Q.    Are you aware of what generic
²¹ drug manufacturers have to demonstrate to the
²² FDA in order to get their generic drugs
²³ approved for marketing and sale in the US?
²⁴      A.    I am not an expert.  I don't

---

Page 73

¹ have an opinion.
²      Q.    Well, the question is do you
³ know.
⁴      A.    No.
⁵      Q.    Are you familiar with the fact
⁶ that generic pharmaceutical manufacturers do
⁷ not routinely engage in promotional
⁸ activities for their drugs?
⁹      A.    I do not know.
¹⁰      Q.    When I refer to FDA-approved
¹¹ labeling, do you know what that means?
¹²      A.    Could you be more specific?
¹³      Q.    Sure.
¹⁴           Do you know what an
¹⁵ FDA-approved label is?
¹⁶      A.    No.
¹⁷      Q.    Have you looked at any
¹⁸ FDA-approved labeling for any of the generic
¹⁹ valsartan products at issue in this case?
²⁰      A.    I have looked at some labels of
²¹ valsartan.  I do not know if they are
²² FDA-approved or not.
²³      Q.    In general terms, the labels
²⁴ that you looked at, what kind of information

---

Page 74

1 did they contain?
2   A.   To the best of my recall, they
3 contained the name of the drug, the dosage,
4 the manufacturer, and the country of
5 manufacture.
6   Q.   Did you see any section in
7 those labels that had warnings or
8 contraindications or side effect information,
9 anything like that?
10   A.   I do not recall.
11   Q.   Okay.  What about a listing of
12 ingredients?
13   A.   I do not recall.
14   Q.   Would you agree that the
15 purpose of those labels that you reviewed was
16 to provide information regarding the drug?
17   A.   Please define "information."
18   Q.   Well, sure.  I mean, you
19 mentioned what it is, who manufactures it,
20 things like that.  Would that in your mind
21 constitute information regarding the drug?
22   A.   In my mind it would constitute
23 some information regarding the drug.  There
24 could be other information regarding the drug

Page 75

1 that is not on the label or that I do not
2 recall was on the label.
3   Q.   If the purpose of FDA-approved
4 labeling was to provide information to
5 consumers and physicians regarding the drug,
6 what's in it, potential side effects,
7 etcetera, would you disagree with that?
8   A.   Please repeat the question.
9   Q.   Would you disagree with the
10 proposition that FDA-approved labeling is
11 designed to provide to consumers and
12 physicians certain information regarding the
13 drug?
14      MR. GOLDBERG:  Objection to
15 form.  Foundation.
16   A.   I cannot answer that question.
17 BY MR. DAVIS:
18   Q.   So you don't know the purpose
19 of FDA-approved labeling?
20   A.   That was not the question you
21 asked, but is that the question you're asking
22 now?
23   Q.   Well, that's my new question,
24 yes.

Page 76

1   A.   No.
2   Q.   Have you ever studied health
3 messaging to consumers or physicians
4 regarding generic drugs vis-à-vis brand
5 drugs?
6      MR. GOLDBERG:  Objection to
7 form.  Ambiguous.
8   A.   Could you repeat that, please?
9 BY MR. DAVIS:
10   Q.   Sure.
11      Have you ever studied any kind
12 of health messaging to consumers or
13 physicians regarding generic drugs?
14   A.   Not that I recall.
15   Q.   Okay.  Not in your work in this
16 case, and not ever, is that your testimony?
17   A.   I don't understand the
18 question.
19   Q.   Sure.  I'm trying to clarify
20 whether your answer is you haven't looked at
21 that in this case or you haven't looked at
22 that at all ever.
23   A.   Okay.  So can you repeat the
24 question again so I understand the context?

Page 77

1   Q.   Sure.
2      The question that you said "no"
3 to was whether you had any occasion to
4 look at health messaging to consumers or
5 physicians regarding generic drugs, and I
6 believe you said "no" to that, right?
7   A.   I'm going to qualify.  If by
8 "health messaging" you are also including
9 what the FDA said about generic valsartan,
10 then I did have a chance to look at that for
11 this case.
12   Q.   I'm talking about from a
13 general proposition, so regarding generic
14 drugs generally, their uses, their benefits,
15 what they are, etcetera.
16      Have you ever looked at any
17 generalized messaging to physicians or
18 consumers regarding generic drugs as a
19 therapeutic sort of class?
20   A.   Not that I recall.
21   Q.   Okay.  Not in this case?
22   A.   I can't answer the question.
23 Could you repeat the question?
24      MR. DAVIS:  Could you repeat

Page 78

1   the question?
2        (Whereupon, the reporter read
3   back the following:
4        QUESTION:  I'm talking about
5   from a general proposition, so
6   regarding generic drugs generally,
7   their uses, their benefits, what they
8   are, etcetera.
9        Have you ever looked at any
10  generalized messaging to physicians or
11  consumers regarding generic drugs as a
12  therapeutic sort of class?
13       THE WITNESS:  Not that I
14  recall.
15       QUESTION:  Okay.  Not in this
16  case?)
17  A.    So the challenge I'm facing is
18  you asked about as a general proposition, and
19  I answered, and then now you're saying "not
20  in this case," and so I'm just trying to make
21  sure I understand the question, which is a
22  very specific proposition.
23  BY MR. DAVIS:
24  Q.    Okay.  So let me just try it

Page 79

1   again.
2        In this case, have you looked
3   at any generalized messaging to physicians or
4   consumers regarding generic drugs generally
5   as a therapeutic option or class?
6        MR. GOLDBERG:  Objection to
7   form.  Ambiguous.
8   A.    Can you give me an example of
9   what that messaging would look like so I'm
10  better able to understand?
11  BY MR. DAVIS:
12  Q.    Sure.
13       MR. DAVIS:  I'm handing to be
14  marked as Exhibit 4 a 14-page
15  document.
16       (Whereupon, Keller Exhibit
17  Number 4 was marked for
18  identification.)
19       MR. HONIK:  Is this 16, John?
20       MR. DAVIS:  Yes.
21       MS. ANDRAS:  Can you describe
22  for the record for counsel who do not
23  have copies of these what document
24  you've marked?

Page 80

1        MR. DAVIS:  Sure.  For the
2   record, this is an FDA resource from
3   the FDA's website titled "Generic
4   Drugs: Questions and Answers."
5   BY MR. DAVIS:
6   Q.    Have you ever seen this
7   document before, or this content on the FDA
8   website?
9   A.    I would like to check my
10  report.  It looks familiar, but I'm not sure.
11  Q.    Sure.  If you want to check
12  your report, that's fine.
13       (Witness reviewing document.)
14  A.    Okay.  Thank you.
15  Q.    You don't see it in your
16  report, do you?
17  A.    I do not.
18  Q.    Okay.  And is it your testimony
19  that you've never seen this before or
20  reviewed it on the FDA's website?
21  A.    Correct, yes.
22  Q.    Okay.  This, Dr. Keller, is an
23  example of, like you asked for, of what I'm
24  talking about here.  Do you see that this is

Page 81

1   a sort of general resource put out by the FDA
2   titled "Generic Drugs: Questions & Answers"?
3   A.    That's what the title says,
4   yes.
5   Q.    And it has some subsections
6   like, "What are generic drugs?  How does the
7   FDA ensure generic medicines work the same as
8   brand-name medicines?"
9        Do you see that?
10  A.    I see that on the first page,
11  but I have not had a chance to review this
12  document, so...
13  Q.    Well, I only provided this as
14  an example.
15       So as an example of what I was
16  talking about prior to showing you this
17  document, have you reviewed or had any
18  occasion to review any kind of general
19  resources similar to the one that I've marked
20  as Exhibit 4 that have to do with generic
21  drugs generally?
22  A.    I cannot answer that question
23  about how -- whether I've reviewed anything
24  similar without knowing what this is to make

Confidential Information Subject to Protective Order

Page 82

1 that comparison. I need time to review this
2 document.
3 　　Q.　Okay.
4 　　　　(Witness reviewing document.)
5 　　　　MR. GOLDBERG: Dr. Keller, if
6 you're going to go further, we can go
7 off the record for a minute until you
8 finish, okay? That's fine.
9 　　　　Can we go off the record?
10 　　　　THE VIDEOGRAPHER: Off record
11 at 11:25.
12 　　　　(Off the record.)
13 　　　　THE VIDEOGRAPHER: Back on the
14 record at 11:30.
15 BY MR. DAVIS:
16 　　Q.　Okay. Dr. Keller, you had a
17 chance to flip through every page of that
18 document, correct?
19 　　A.　Yes.
20 　　Q.　Okay. And you read it, you
21 didn't just flip the pages?
22 　　A.　I, I'm going to use the word
23 surveyed, or looked broadly over would be a
24 better term for it. I tried -- it was not a

Page 83

1 lot of time. I tried to look at it as
2 carefully as I could.
3 　　Q.　Okay. Have you ever seen a --
4 you see that this is a Q&A titled "Generic
5 Drugs: Questions & Answers"?
6 　　A.　Yes.
7 　　Q.　Have you ever seen a Q&A or an
8 FAQ document in any context?
9 　　A.　Yes.
10 　　Q.　And this is an example of one
11 of those, but for generic drugs, put out by
12 the FDA, correct?
13 　　A.　Yes.
14 　　Q.　Okay. Would you characterize
15 this as an educational resource having looked
16 at it?
17 　　A.　You need to be more specific.
18 What does "educational resource" mean?
19 　　Q.　Well, for example, did you --
20 in reading it, were you able to educate
21 yourself a little bit on generic drugs?
22 　　A.　Yes.
23 　　Q.　Okay. Thank you.
24 　　　　Is the -- having looked at it

Page 84

1 now, would you agree that the basic message
2 that's being put out by the FDA is that
3 generic drugs are just as safe, effective,
4 and high quality as their brand name
5 counterparts?
6 　　　　MR. DAVIS: Could you repeat
7 the question?
8 　　　　(Whereupon, the reporter read
9 back the following:
10 　　　　QUESTION: Having looked at it
11 now, would you agree that the basic
12 message that's being put out by the
13 FDA is that generic drugs are just as
14 safe, effective, and high quality as
15 their brand name counterparts?)
16 　　A.　Yes, from -- more true, yes,
17 from the FDA's perspective. No, that would
18 not be my uniform takeaway from a consumer
19 perspective.
20 BY MR. DAVIS:
21 　　Q.　Well, what's unclear about the
22 first page, the little graphic that the FDA
23 provides, where it says "Generic, Safe,
24 Effective, High-Quality" all with checkmarks,

Page 85

1 "Brand-Name, Safe, Effective, High-Quality,"
2 all with checkmarks?
3 　　　　Do you see that?
4 　　A.　Yes.
5 　　Q.　Okay. And the message that the
6 FDA is trying to convey is that generic drugs
7 are just as safe, effective, and high quality
8 as their brand name counterparts. Is that
9 not the message the FDA is trying to convey
10 here?
11 　　A.　You are correct that those
12 checkmarks appear on the first page. But
13 when I read the information on subsequent
14 pages, as I read information such as The
15 generic may act differently from the brand
16 name, for example, in absorption.
17 　　Q.　So you disagree that the FDA is
18 attempting to convey a message here that
19 generic drugs and brand name drugs are
20 interchangeable?
21 　　A.　No.
22 　　　　MR. GOLDBERG: Objection to
23 form.
24 　　A.　Please specify.

Page 86

BY MR. DAVIS:

Q.    Okay.  Well, let's start with my prior question.

You agree, yes, that the FDA's intended message with this document, and specifically with this graphic on the first page, is that generic drugs are just as safe, effective, and high quality as their brand name counterparts?

A.    Incorrect.  I said that the graphic displays that.  But if you said the document, which I'm assuming you're referring to the document before me, that that has information in there, and I gave you only one example from my quick read or survey of the information that led me to believe that they are not the same.

For example, on effectiveness, I just told you that I read that the absorption for generics may be different from brand products, brand name products.

Q.    Do you know what "absorption" means?

A.    Again, I need to look at the

Page 87

document.

Q.    Well, why don't I take you to page 12 of the document.  Do you see the heading "How Does FDA monitor side effects or safety issues with generic medicines?"  Do you see that heading on page 12?

A.    Before I answer that, can I assume when you ask a different question without my answering the previous one that you are striking it?

Q.    Sure.  Yeah.  I'm moving on.

A.    Okay.

Q.    I might come back to it.

So do you see the header there on page 12?

A.    "How Does FDA monitor side effects or safety issues with generic medicines?"

Q.    It says there that the "FDA takes several actions to ensure safety and quality before and after a new or generic medicine is approved."

Do you see that?

A.    Yes.

Page 88

Q.    And then it reads further down that part of that is ensuring, last two lines, "that every generic drug is safe, effective, high quality, and substitutable to the brand name drug."

Do you see that?

A.    I do not, sorry.  Where is that?

Q.    That would be the last two lines of the first paragraph.

A.    Oh, the last two lines, okay.  I went to the bottom of the page.

Yes, I see that.

Q.    Okay.  And so the FDA is essentially stating in text there what it stated in the graphic on the first page, correct?

A.    I do not view them the same.

Q.    What's different to you?

A.    So for me, when I see a graphic with the checkmarks, the checkmarks look the same, and it appears to be the same for generic and brand name.

But when I look at the text

Page 89

here, the text that you asked -- that you referred to for this question, when it says that the word "to ensure" is not telling -- they're saying they're trying their best, that's my interpretation of "ensure," but that does not mean that they are, for example, in a marketing context doing something more, like saying it is the same.

Q.    Well, they're not saying anything about trying their best here, they're saying that they "ensure that every generic drug is safe, effective, high quality, and substitutable to the brand name drug."  They say that right there, correct?

A.    They say that.  You asked me why I didn't think it was the same in the graphic and the document, and I'm telling you that it appears to me to be the same, brand and generic on those three features in the graphic, but not in the document.

And the reason it is not for me the same in the document is because of the language that is used here, specifically in this particular case in the sentence you

Confidential Information Subject to Protective Order

1  asked me to read on ensure, that makes me
2  believe that it may not be the same, or that
3  FDA is doing something to ensure that it is
4  the same, but it's not saying it is the same.
5      Q.    Okay.  Do you know what would
6  happen, for example, if the FDA, despite
7  their best efforts, found out that a generic
8  drug was not safe, not effective, or not high
9  quality?  Do you know what would happen in
10  that case?
11     A.    I'm not an expert.  I cannot
12  tell you for sure.
13     Q.    Okay.  Go to page 2 of the
14  document, if you don't mind.
15     A.    The same document?
16     Q.    Same document.  Exhibit 4 for
17  the record.
18         That first question there that
19  appears in this Q&A is, "What are generic
20  drugs?"
21         Do you see that?
22     A.    Yes.
23     Q.    And it says, "A generic drug is
24  a medication created to be the same as an

1  already marketed brand-name drug in dosage
2  form, safety, strength, route of
3  administration, quality, performance
4  characteristics, and intended use."
5         And then if you go down to the
6  last sentence you'll see, "In other words,
7  you can take a generic medicine as an equal
8  substitute for its brand-name counterpart."
9         Do you see that?
10     A.    Yes.
11     Q.    Okay.  Who is the "you" there
12  in this document?  Who do you imagine the FDA
13  is referring to as "you" here?
14     A.    Whoever is reading the message.
15     Q.    Or whoever is taking the
16  generic medicine, as they say, correct?  "You
17  can take a generic medicine."
18     A.    No.  It says you can take it.
19  It doesn't mean they're taking it.
20     Q.    Do you read "you" here as being
21  directed to the consumer, the person who
22  takes the generic medicine?
23     A.    I need to look at the document
24  again.

1         So you're referring to the last
2  sentence, "In other words, you can take a" --
3  yes, I see that, yes.
4      Q.    And the "you" there is the
5  patient, correct, the consumer?
6      A.    The consumer for whom this
7  medicine is applicable, right.
8      Q.    And to borrow some terminology
9  you used before, this would be the advocated
10  recommendation, correct, by the FDA regarding
11  generic drugs?
12     A.    Yes and no.  Yes if this
13  document was defined as a communication
14  message to consumers; no because it's not
15  clear to me what the specific advocated
16  action is.
17     Q.    What makes you think that this
18  might not be a document directed to
19  consumers?
20     A.    I don't know.  I don't know the
21  context in which this was created, or when it
22  was created, and for whom it was intended.  I
23  don't have that information.
24     Q.    You can't derive that from

1  having just read this?
2      A.    As a health communication
3  expert, I would not like to make that
4  determination.
5      Q.    Okay.  Well, you did agree with
6  me earlier that the "you" in that sentence
7  was directed towards the consumer or patient,
8  correct?
9      A.    I said that it was directed at
10  a person for whom a decision about a generic
11  or brand name selection was applicable.
12     Q.    And that would be a consumer or
13  a patient, correct?
14     A.    If a consumer was considering
15  whether -- what the difference was, they
16  might or might not seek this information.
17  There would be a range.
18     Q.    And that advocated
19  recommendation there that we read, "you can
20  take a generic medicine as an equal
21  substitute for its brand-name counterpart,"
22  that's founded on the assumption that the
23  generic drug and the brand-name drug are both
24  safe, effective, and high quality, and

Confidential Information Subject to Protective Order

Page 94

1 substitutable as we saw on page 12 that we
2 just read, correct?
3        MR. GOLDBERG:  Objection to
4     form.  Foundation.
5     A.    That is not how I interpret
6 that.
7 BY MR. DAVIS:
8     Q.    What's incorrect about my
9 interpretation?
10     A.    I'll highlight one.
11     Q.    Sure.
12     A.    First, very simply, this
13 information appears before page 12, so I
14 don't know whether this was based on what is
15 in page 12, especially if it appears before.
16 I'll stop there.
17     Q.    Okay.  Well, I mean, what about
18 what appears just before the sentence on
19 page 2, "A generic drug is a medication that
20 is created to be the same as an already
21 marketed brand-name drug in dosage form,
22 safety, strength, route of administration,
23 quality, performance characteristics,
24 intended use," those various things, do you

Page 95

1 think safety, efficacy, and high quality are
2 encompassed by those terms in that sentence?
3     A.    No.
4     Q.    You don't?
5     A.    No.
6     Q.    Okay.  Explain to me why not.
7     A.    From -- as a consumer expert,
8 consumer health decision-making expert, one
9 example would be that for me, efficacy is
10 broken down into self efficacy and response
11 efficacy.
12        Response efficacy is, you know,
13 does the drug do what it's supposed to do;
14 self efficacy is, you know, will the drug
15 work for me.
16     Q.    Okay.  You testified earlier
17 that you have very little knowledge of what's
18 required for drug approval in the US,
19 correct?
20     A.    Yes.
21     Q.    Okay.  So you really don't know
22 what the FDA means by "efficacy" in terms of
23 approval of a brand or generic drug, is that
24 correct?

Page 96

1     A.    Actually please repeat that
2 question.
3        MR. DAVIS:  Can you read the
4     question back?
5        (Whereupon, the reporter read
6     back the question:
7        QUESTION:  Okay.  So you really
8     don't know what the FDA means by
9     "efficacy" in terms of approval of a
10     brand or generic drug, is that
11     correct?)
12     A.    I'm not going to form an
13 opinion on that.
14 BY MR. DAVIS:
15     Q.    Okay.  You're a health
16 communication expert, correct?
17     A.    I'm an expert on consumer
18 decision-making with a focus on health.
19     Q.    In fact, you testified today
20 that you've designed some of the content of
21 the messages to consumers, correct?
22     A.    The content of some of the
23 health communication to consumers.
24     Q.    Correct.

Page 97

1        And having just leafed through
2 this document here, Exhibit 4, using your --
3 you know, relying on your expertise as
4 someone who does this for a living, what is
5 the message that the FDA is trying to impart
6 with this Q&A document that's Exhibit 4?
7     A.    There's a lot of information
8 here.  I would not be comfortable telling you
9 what the FDA's intentions are or what they
10 are trying to impart.
11     Q.    You don't think they're trying
12 to impart to a consumer or patient that they
13 can take a generic medicine as an equal
14 substitute for its brand-name counterpart?
15     A.    I've tried to answer that
16 question.  As a communication expert, I'm
17 leery of any sentence that starts with "in
18 other words."
19     Q.    Aren't they -- I mean, the in
20 other words to me is the FDA trying to take a
21 complex regulatory system of drug approval
22 and put it in simple terms for a patient or
23 consumer.  Do you not read it that way?
24     A.    I do not, because I'm putting

Confidential Information Subject to Protective Order

Page 98

1  on my consumer hat, and I see a lot of things
2  here that -- route of administration,
3  etcetera -- that are not -- may not be
4  familiar to some consumers, they may be
5  familiar to other consumers, but I'm going to
6  predict a range of what consumers take away
7  from that message.
8      Q.   Flip to page 6.  You'll see
9  some pagination in the bottom right corner of
10 page 6 of 14.  The header there is "What
11 standards must generic medicines meet to
12 receive FDA approval?"
13         Do you see that?
14     A.   Yes.
15     Q.   Okay.  And I think you
16 testified earlier that you didn't know what
17 an ANDA was.  I'll represent to you that an
18 ANDA is an Abbreviated New Drug Application,
19 which is what a generic manufacturer submits
20 to the FDA for approval of its proposed
21 generic medicine to be marketed in the US.
22         Do you understand that?
23     A.   I see here it says "drug
24 companies," it does not say "generic

Page 99

1  manufacturers."  But I see the rest.
2      Q.   Well, I'll represent to you
3  that an ANDA, or A-N-D-A, Abbreviated New
4  Drug Application is what a generic
5  manufacturer submits to market a generic
6  drug, okay?  And then it says below that, "An
7  ANDA must show the generic medicine is
8  equivalent to the brand in the following
9  ways:"
10         Do you see that?
11     A.   Yes.
12     Q.   And then there's some bullet
13 points that start on 6, go down to 7 and 8,
14 and conclude on page 9, I believe.
15         Do you see that?
16     A.   Yes.
17     Q.   Okay.  If you flip to page 7,
18 you'll see that the last bullet point there
19 says that "It" -- being the generic drug --
20 "is manufactured under the same strict
21 standards as the brand-name medicine."
22         Do you see that?
23     A.   Yes.
24     Q.   Okay.  Did you have any idea

Page 100

1  that that was a requirement for ANDA approval
2  of a generic drug to be marketed in the US?
3      A.   I saw that in Dr. Conti's
4  report.
5      Q.   Do you have any reason to
6  disagree with what's in this bullet point
7  here --
8      A.   NO.
9      Q.   -- on page 7?
10         Let's say that the FDA, that
11 you've worked -- strike that.
12         You've worked with regulatory
13 bodies in the US, correct, like, for example,
14 the CDC?
15     A.   Yes.
16     Q.   Okay.  Let's say that the FDA
17 came to you and said, Dr. Keller, we've
18 noticed that consumers/patients in the US,
19 there's a distrust for generic medicines, we
20 want you to design a messaging campaign to
21 advocate -- to create an advocated
22 recommendation that patients can trust their
23 generic drugs.
24         Are you following me?

Page 101

1      A.   Mm-hmm.
2      Q.   Okay.  Would not one of the
3  messages you would include in that advocated
4  recommendation to patients, would not one of
5  those messages be exactly what the FDA is
6  emphasizing here, which is that generic drugs
7  are subject to -- are substitutable as we saw
8  on page 12, that they are safe, effective,
9  high quality as we saw on page 1, and that
10 they are manufactured under the same strict
11 standards as the brand-name medication as we
12 see on page 7?
13         Would those not be messages you
14 might want to include in your communication
15 to patients to overcome that objection to
16 generic drugs?
17         MR. GOLDBERG:  Objection.
18     Ambiguous, compound.
19     A.   I don't know how -- I stopped
20 counting how many questions there were in
21 that question.  Could you please break it
22 down?
23 BY MR. DAVIS:
24     Q.   I mean, I thought it was quite

Confidential Information Subject to Protective Order

Page 102

1 clear, to be honest.
2         Would you not want to include
3 those messages that we've called out and read
4 in this document in your advocated
5 recommendation to consumers that the FDA in
6 this hypothetical assignment is giving you?
7         MR. GOLDBERG:  Same objection.
8     A.    I cannot answer that question.
9 I was even flipping pages, and I'm on
10 page 12, and I cannot in my quick survey even
11 find the word "substitutable," so I cannot
12 answer that question.
13 BY MR. DAVIS:
14     Q.    We read it.  It's the last
15 sentence of the first paragraph there.
16 "Ensure that every generic drug is safe,
17 effective, high quality, and substitutable to
18 the brand-name drug."
19     A.    Thank you.
20     Q.    Would you not want to include
21 those messages that we've read in this
22 document just now in your communication to
23 consumers/patients in this hypothetical
24 assignment from the FDA?

Page 103

1     A.    If the FDA came to me with this
2 assignment, I would need a lot of information
3 on consumers to make a decision about the
4 different types of effective -- the different
5 types of messages that may be effective for
6 different types of consumers based on -- I'll
7 just give you examples because it was a long
8 question -- where and how and from whom they
9 would trust the message, or message factors,
10 I'm using MICI, their individual differences,
11 for example education level, language
12 fluency, etcetera; the context in which they
13 were making this decision, for example with a
14 trusted physician or a new physician; and the
15 interaction of those factors.
16         I would also want to know
17 information on the features that patients
18 take into account when they're making such a
19 decision.
20         I testified earlier about
21 the -- how I create communication to create
22 and communicate value to consumers, so I
23 would need to know what kind of benefits
24 different consumers are seeking in the

Page 104

1 communication and what kind of costs I need
2 to address or overcome in the communication.
3         My research shows that these
4 factors vary across individuals, and all of
5 my work and my report supports, along with
6 many, many others, the need to get this
7 information in order to tailor this
8 communication so that I can understand how
9 consumers would evaluate my advocated
10 recommendation, "my" as in in my task.
11     Q.    Do you think there's a single
12 consumer out there in the US who if they went
13 to the pharmacy and got dispensed a generic
14 drug, that they would not want that generic
15 drug to be substitutable to the brand-name
16 drug?
17     A.    As a consumer behavior expert,
18 you never want to make an assumption about
19 uniformity on consumer reactions or
20 valuations of work.
21     Q.    So are you saying that you
22 think it's a possibility that there are
23 consumers out there who, when they went to
24 the pharmacy to fill a prescription and they

Page 105

1 got dispensed the generic drug, that they
2 would not want that generic drug to be
3 substitutable to the brand-name drug?
4     A.    I'm going to say yes and no.
5         I will say yes, they will
6 expect that they are getting something from
7 the pharmacy that the pharmacist or someone
8 else who made the decision believes is
9 similar.
10         No as in they don't know
11 whether it would be similar for them because
12 they don't -- they have more information and
13 agency on what has worked for them in the
14 past, what has not worked for them in the
15 past, the individual factors that I'm talking
16 about, how they take their medication, you
17 can't make an assumption, you know, are they
18 used to taking it once a day, multiple times
19 a day, whether they take it with food,
20 without food.
21         There are so many additional
22 factors where they would have questions about
23 similarity or substitutability, because from
24 a consumer behavior perspective it's not what

Confidential Information Subject to Protective Order

Page 106

1 someone else is saying is similar, it's how
2 they're experiencing similarity, or if their
3 experience is the same.
4     Q.    If a generic drug were not
5 substitutable to the brand-name drug, do you
6 have any idea whether that would be a
7 non-approved drug?
8     A.    I am not familiar with the FDA
9 regulations, so I cannot answer that
10 question.
11     Q.    Have you ever designed any kind
12 of messaging to consumers or physicians that
13 advocated that they take or prescribe
14 unapproved medications?
15     A.    No.
16     Q.    Have you ever designed any kind
17 of messaging to consumers or physicians that
18 they take or prescribe adulterated
19 medications?
20     A.    Not to my knowledge.
21     Q.    Misbranded medications?
22     A.    Please define "misbranded."
23     Q.    Do you know what misbranded
24 means?

Page 107

1     A.    From Dr. Conti's report I have
2 a general understanding.
3     Q.    And what's that understanding?
4     A.    That the -- what is in the
5 brand -- in the product is not the same as
6 what is on the description.
7     Q.    Right.  That the label is false
8 or misleading in any particular, correct?
9     A.    Well, no, I will not go that
10 far.  I will not say the label is false or
11 misleading.  That will vary by the consumer.
12     Q.    Well, you don't know whether
13 that's, in fact, the definition that congress
14 provides for misbranding.
15     A.    Agreed, I'm not an expert.
16     Q.    Okay.  Have you ever designed
17 any kind of communication or messaging to
18 physicians or consumers that they take or use
19 any kind of medication that was illegally
20 sold or distributed to them?
21     A.    Not that I'm aware of.
22         MR. DAVIS:  I'm at a transition
23     point.  Do we want to take lunch, or
24     do you want to keep going?

Page 108

1         MR. GOLDBERG:  Up to you.  I
2 know lunch is here.
3         THE WITNESS:  I'm indifferent.
4         MR. DAVIS:  Why don't we go off
5 the record for a second.
6         THE VIDEOGRAPHER:  Off the
7 record at 12:01.
8         (Whereupon, a luncheon recess
9 was taken.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 109

1         AFTERNOON SESSION
2
3         THE VIDEOGRAPHER:  Back on the
4 record at 12:40.
5 BY MR. DAVIS:
6     Q.    Okay.  Dr. Keller, your report,
7 Exhibit 2, would you mind pulling that out?
8 I want to ask you --
9     A.    You mean Appendix B?
10     Q.    No, no, just your report, which
11 is -- I've marked as Exhibit 2.
12     A.    I'm so sorry.  I misunderstood.
13     Q.    Not a problem.
14         So I just want to ask a
15 clarifying question regarding your assignment
16 on paragraph 1, which is on the first page.
17         You say, "I have been asked by
18 counsel for Defendants to review health care
19 decision-making and how valuation of VCDs
20 should be viewed in light of the voluntary
21 recall of VCDs in 2018 and '19."
22         Are you with me there?
23     A.    Yes.
24     Q.    Okay.  I'm just trying to

Page 110

1  understand the word "and" there.  Is that two
2  assignments, or is that one assignment?
3      A.    I'd say that the assignments
4  are connected.
5      Q.    Okay.  And what do you mean by
6  that?
7      A.    That I reviewed the healthcare
8  decision-making literature to help inform my
9  opinion on how consumers -- the range of
10  consumer responses for those taking the VCDs,
11  how they might respond, if at all, to the
12  recall of the VCDs in 2018 and 2019.
13      Q.    Okay.  So when you say
14  healthcare decision-making there, you're
15  referring to the portion of your report
16  discussing and setting forth compensatory
17  decision analysis and noncompensatory, and
18  non-MICI, that acronym, that's what you mean
19  by healthcare decision-making?
20      A.    Could you please repeat that
21  question?
22      Q.    Sure.  I'm just trying to
23  connect your assignment to the substance of
24  your report.

Page 111

1      So when you say you've been
2  asked by counsel for defendants to review
3  healthcare decision-making, am I to
4  understand the healthcare decision-making
5  there to refer to the portion of your report
6  that discusses the compensatory decision rule
7  and noncompensatory decision rule that you
8  explain in your report, as well as the MICI
9  factors?
10      A.    Yes and no.  The yes is that I
11  have reviewed the literature on the
12  compensatory/noncompensatory decision rules,
13  and reported a subset of that literature as
14  well as the MICI framework, but not just for
15  the -- how consumers might react to the
16  recall of VCDs in question, because
17  there's a second part of the paragraph, which
18  I also reviewed the literature to evaluate
19  from a consumer's perspective Dr. Conti's
20  claim, in particular that the VCDs at issue
21  were worthless to consumers as a result of
22  the recall.
23      Q.    Well, and I'm -- we'll get to
24  that.  I'm just trying to connect your

Page 112

1  assignment to what's in your report.
2      And so you reviewed healthcare
3  decision-making as a general proposition from
4  a consumer and physician standpoint, correct?
5      A.    Yes.
6      Q.    Okay.  And that's discussed in
7  sort of your general outline of compensatory
8  and noncompensatory decision rules and MICI,
9  correct?
10      A.    Yes.
11      Q.    Okay.  And then you applied
12  that framework to the facts of this case, or
13  attempted to, correct?
14      A.    No, to perform my task that you
15  just highlighted in the first paragraph.
16      Q.    So are you telling me you did
17  not apply that framework to -- or attempt to
18  apply that framework to the facts of this
19  case?
20      A.    I didn't say that.  I think I
21  said just the opposite.
22      Q.    Well, that's what I was asking
23  you to confirm, and you wouldn't confirm it.
24      A.    Yes.

Page 113

1      Q.    So let me rephrase it so we're
2  on the same page.
3      You then applied the
4  compensatory/noncompensatory decision rule
5  analysis and MICI to the facts of this case,
6  correct?
7      A.    I would not go so far as to the
8  facts of this case.  There are many facts of
9  this case that I -- that are not part of my
10  task.
11      Q.    So are you saying you did not
12  apply -- what did you -- let me ask this
13  way.
14      What did you apply those
15  healthcare decision-making concepts that you
16  outlined?  What did you apply those to?
17      A.    The
18  compensatory/noncompensatory rules for how
19  consumers make a value judgment based on the
20  alternatives they consider, the weights of
21  the different attributes they consider, and
22  the ratings that they give to those
23  attributes in different combinations, and the
24  MICI factors were used by me or applied by me

Confidential Information Subject to Protective Order

Page 114

1 to make an assessment of how consumers might
2 respond to the recall -- to the recall VCDs,
3 and to answer the question would all
4 consumers uniformly believe that the recall
5 VCDs were worthless.
6    Q.    You're not a physician, are
7 you?
8    A.    No.
9    Q.    Okay.  And you're not a public
10 health official?
11    A.    Define "public health
12 official."
13    Q.    Like you don't work for the FDA
14 or the CDC, or you're not a public health
15 official, are you?
16    A.    I am not a full-time employee
17 of a government agency.
18    Q.    Okay.  And you wouldn't hold
19 yourself out as being an expert on the
20 substance of any medical decisions,
21 treatments, that a physician might make or
22 the FDA might recommend, correct?
23    A.    Please define "substance."
24    Q.    Sure.

Page 115

1       You wouldn't be -- you wouldn't
2 step into the role of a physician and say --
3 to tell consumers do this or don't do this
4 from a medical standpoint, would you?
5    A.    Please define "from a medical
6 standpoint."
7    Q.    Exactly what physicians do
8 every day when they talk to their patients,
9 you wouldn't step into that role, would you?
10    A.    As shown in my report, and one
11 recent project comes to mind, I provide
12 communication strategies for physicians to
13 tailor their messages and recommendations to
14 their patients.
15    Q.    But you wouldn't come up with
16 the recommendation itself; you're coming up
17 with the messaging around that
18 recommendation, correct?
19    A.    I'm having a hard time
20 separating some of those, or trying to
21 understand what you're getting at.
22    Q.    It's a simple question.
23       You don't practice medicine, do
24 you?

Page 116

1    A.    No.
2    Q.    And as far as the medical
3 substance of medical care, you don't step
4 into the role of the physician and actually
5 advocate of your own accord treatment
6 decisions, do you?
7    A.    No.
8    Q.    Okay.  And same thing for --
9 same question for public health officials,
10 you don't substitute your judgment for that
11 of the regulator, for example the FDA, in any
12 of the decisions that are within its
13 regulatory ambit, do you?
14       MR. GOLDBERG:  Objection to
15 form.  Ambiguous.
16    A.    I'm not clear on the question.
17 BY MR. DAVIS:
18    Q.    Okay.  I mean, I asked a
19 variation of that question right before
20 lunch, which was, you would never advocate in
21 any message that physicians take or a
22 patient -- physicians prescribe or patients
23 take unapproved medications, for example,
24 would you?

Page 117

1    A.    I do not recall that question,
2 so...
3    Q.    Well, let me ask that question
4 again.
5       Would you ever advocate in any
6 kind of health communication messaging that a
7 physician prescribe an unapproved medication?
8       MR. GOLDBERG:  Objection to
9 form.
10    A.    Please repeat that.
11       MR. DAVIS:  Can you read the
12 question back?
13       (Whereupon, the reporter read
14 back the question:
15       QUESTION:  Would you ever
16 advocate in any kind of health
17 communication messaging that a
18 physician prescribe an unapproved
19 medication?)
20       MR. GOLDBERG:  Objection to
21 form.  Ambiguous.
22    A.    Unapproved by?
23 BY MR. DAVIS:
24    Q.    You understand that drugs have

Confidential Information Subject to Protective Order

Page 118

1    to be pre-approved, correct?
2         A.    So I just want to make sure
3    that this is not unapproved by the physician
4    or somebody else.  I just want to be clear.
5         Q.    Yes.  When I say "unapproved
6    medication," I'm talking about FDA approval
7    that's required for all drug products in the
8    US.
9             So the question is, would you
10   ever in any of your health communication
11   messaging advocate for the use of an
12   unapproved medication?
13        A.    In this particular case I have
14   reviewed and included in my report materials
15   where physicians continued to ask -- to
16   recommend to their patients that they take a
17   VCD that was recalled.
18        Q.    That's not answering my
19   question.
20        A.    So if I -- you said are there
21   any circumstances.  So just like your
22   previous hypothetical that if the FDA asked
23   me to create a communication, if a physician
24   asked me to create a communication I would

Page 119

1    not -- I would try to say no, I'm not going
2    to do that because the FDA has not approved
3    this communication.  And that's why I gave
4    you the example I did.
5             If there is some understanding
6    that they should continue to take the
7    medication, then I would help them do that.
8         Q.    Well, I'm not -- you're not
9    following the thrust of my question.  I'm
10   asking you about --
11        A.    Sorry.
12        Q.    -- a drug that was never
13   approved.
14        A.    Oh, I'm sorry, I didn't hear
15   never approved.
16        Q.    That's what I mean by
17   "unapproved medication," something that
18   wasn't approved.
19             So would you ever advocate --
20   and this gets to my broader question about
21   you not substituting your judgment or making
22   any kind of public health judgments that are
23   preserved for the regulator, correct?  And
24   the question is, would you ever advocate for

Page 120

1    the use of an unapproved drug?  And by that I
2    mean something that was never approved by the
3    FDA.
4             MR. GOLDBERG:  Objection to
5         form.  Ambiguous, speculative.
6         A.    I don't ask those questions.
7    There is a review process for the work that I
8    do, and I leave it to others to make those
9    determinations.
10            I have a very specific role
11   that I play in designing the message
12   communication, and that role does not require
13   any expertise or knowledge on my part on
14   regulatory approval or unapproved or anything
15   of that spectrum.
16        Q.    Right.  And that's simply my
17   question, is you rely on those people to do
18   their job, right?  You rely on the FDA to do
19   the business of public health regulation,
20   correct?
21        A.    That is not what I said.  You
22   asked me in my projects, in all my previous
23   work, you know, do I -- this is my
24   understanding of what you asked me, do I

Page 121

1    ensure, or do I seek information or -- sorry,
2    I'm sorry, it was dinging away and I
3    didn't --
4             MR. GOLDBERG:  Can we just go
5         off the record for a second?
6             THE VIDEOGRAPHER:  Off record
7         at 12:54.
8             (Off the record.)
9             THE VIDEOGRAPHER:  Back on at
10        12:54.
11        A.    So I agree that that was not my
12   job on these projects.  I'm not agreeing that
13   it's the FDA's job.  I'm saying, depending on
14   the project, I don't know who takes care of
15   different aspects of the job.
16   BY MR. DAVIS:
17        Q.    Let me ask it this way.
18            Have you ever designed any kind
19   of messaging that's health-related to
20   consumers or physicians that you knew was
21   inconsistent with what the FDA's position was
22   on that very subject?
23        A.    I have never checked to see
24   whether what I'm designing a message -- a

Confidential Information Subject to Protective Order

Page 122

1  health message for has or has not been
2  approved by the FDA.
3      Q.    Well, I'm not saying approved
4  by the FDA.  I'm saying, have you ever done
5  that, have you ever designed a message
6  related to healthcare that goes out to a
7  consumer or physician that you knew was
8  inconsistent with the FDA's position on that
9  very same subject matter?
10     A.    I'm not an expert on the FDA,
11  and that is not something that I would seek
12  or look for information on before I designed
13  the message.
14     Q.    Okay.  You wouldn't hold
15  yourself out as an expert on how to
16  appropriately address from a medical care
17  standpoint a patient who was taking
18  nitrosamine-contaminated VCDs, would you?
19     A.    Please repeat that question.
20     Q.    You wouldn't hold yourself out
21  as an expert on the medical care decisions
22  that a physician and patient may want to make
23  in response to a patient's exposure to
24  nitrosamines in their valsartan, would you?

Page 123

1      A.    I'm not an expert in that.  I
2  would not have an opinion.
3      Q.    Okay.  And when you discuss
4  healthcare decision-making, for example in
5  paragraph 1 of your report that we just read
6  in your assignment, you're not discussing the
7  decisions of congress and the FDA regarding
8  structural aspects of our healthcare system,
9  are you?  That healthcare decision-making
10  you're focused on here is related to
11  physicians' and consumers' choices, correct?
12     A.    It's more specific.  It's
13  related to how consumers, sometimes on their
14  own and sometimes in conjunction with their
15  physicians, would assess the worthiness or
16  value of a drug, and in this particular case
17  the recalled VCDs.
18     Q.    Okay.  Let's stick with my
19  question, which is, you're not critiquing or
20  in any way discussing in your discussion of
21  healthcare decision-making the structural
22  aspects of our healthcare system that
23  congress and the FDA have set up, are you?
24          MR. GOLDBERG:  Objection to

Page 124

1  form.  Ambiguous.
2      A.    I don't know what those
3  structural elements are, and I'm not an
4  expert on what congress and the FDA have --
5  the system that they've created, and I'm not
6  going to give you an opinion on that.
7  BY MR. DAVIS:
8      Q.    Right.
9          And you're not taking any issue
10  with any of that is my question, correct?
11     A.    I'm -- if I'm not an expert on
12  it and I'm not giving an opinion on it, I
13  should not be interpreted as taking issue
14  with it.  I have nothing to say about it.
15     Q.    Okay.  You -- continuing in
16  that assignment paragraph, you say you've
17  been tasked with evaluating certain
18  assertions from Dr. Conti, particularly her
19  claim that VCDs in this case were worthless.
20          Do you see that?
21     A.    Yes.
22     Q.    And you call her -- you call
23  her analysis -- you basically say that she's
24  applying a non -- uniform noncompensatory

Page 125

1  decision rule, do you not?
2      A.    I do not say that.
3      Q.    Take a look at paragraph 9 of
4  your report, first bullet point.  You say in
5  the middle of that bullet point, "In doing
6  so, Dr. Conti's analysis implicitly relies on
7  a uniform noncompensatory decision-rule for
8  calculating damages."
9          Do you see that?
10     A.    Yes.
11     Q.    So you are saying that she's
12  applying a uniform noncompensatory decision
13  rule, do you not?
14     A.    You forgot a critical word.
15  No, I did not say that, I said she is
16  implicitly applying.
17     Q.    How is that different from her
18  applying, which is my question?
19     A.    The different between an
20  explicit and an implicit application.  She
21  does not mention a noncompensatory decision
22  rule, but her assertions are consistent with
23  a noncompensatory decision rule, which is why
24  I said she implicitly applies a

Confidential Information Subject to Protective Order

Page 126

1 noncompensatory decision rule.
2     Q.    Okay.  Thank you for that.
3 That was going to be my next question, is
4 Dr. Conti never uses that term in her report,
5 does she?
6     A.    No.
7     Q.    Thank you.
8         That's a term -- compensatory
9 decision rules, noncompensatory decision
10 rules, those are terms that are borne out of
11 the field of sort of behavioral science,
12 right?  Consumer behavior, consumer
13 psychology, your field of expertise, correct?
14     A.    As I mentioned in my testimony
15 earlier, the foundation for some of this work
16 on compensatory/noncompensatory decision
17 rules came from economists, and I mentioned
18 several, Simon, Tversky, Kahneman, amongst
19 others.
20         Simon actually was the first
21 one that came up, from what I know, or is at
22 least given credit for the first
23 noncompensatory rule satisfying.  This is
24 Herbert Simon, he's an economist.

Page 127

1     Q.    This is behavioral science,
2 correct?
3     A.    At that time it was not defined
4 as such, but he's an economist, and now it is
5 commonly adopted in behavioral economics as
6 well.
7     Q.    Let's go to paragraphs 21
8 through 28 of your report.  And this is where
9 you set forth some discussion and definitions
10 of what you mean by compensatory decision
11 rules and noncompensatory decision rules, is
12 that correct?
13     A.    Yes.
14     Q.    For example, in paragraph 22
15 you state that "The compensatory
16 decision-rule involves physicians and
17 consumers placing a higher value of one drug
18 feature to compensate for a lesser value of
19 another feature," correct?
20     A.    Yes.
21     Q.    There's an assumption there, is
22 there not, that the information regarding
23 those features is available for them to
24 actually weigh, correct?

Page 128

1     A.    No.
2     Q.    Explain to me how that could
3 not be.
4     A.    Some consumers use their
5 experiences to make judgments about which
6 features are important, what weights they
7 want to put on those features, and how they
8 would evaluate those features even if they
9 did not have any external information.
10     Q.    So what you're saying is that
11 even if -- the consumers may make, you know,
12 make -- draw conclusions without the
13 information, correct?
14     A.    Yes.
15     Q.    Okay.  But to actually weigh
16 the benefits, the costs and benefits of a
17 particular feature, that feature has to be
18 disclosed to them, does it not?
19     A.    Explain what you mean by
20 "disclosed."
21     Q.    How can someone weigh the costs
22 and benefits of a particular feature of a
23 medicine, for example, if the feature itself
24 is not known to them?

Page 129

1     A.    Well, I think you're making an
2 assumption that the feature is not known to
3 them unless someone else gives them the
4 information.
5         If they have no information on
6 the feature regardless of the source, I agree
7 with you, then they would probably not
8 include it in their decision-making and their
9 valuation.  But they can get information from
10 a variety of sources and decide which source
11 they want to include, which source they don't
12 want to include, and make the deliberation
13 accordingly.
14     Q.    There's also an assumption here
15 in this paragraph 22 that the drug, like the
16 hypothetical drug you discuss here, you say,
17 "placing a higher value of one drug feature
18 to compensate for a lesser value of another
19 feature," right?  So you're discussing this
20 in the context of a pharmaceutical drug
21 product, correct?
22     A.    I don't believe a chewable
23 multivitamin is a pharmaceutical drug
24 product, but maybe it is.

Confidential Information Subject to Protective Order

Page 130

1    Q.    Well, I'm not asking about
2 chewable multivitamins.  I'm asking about the
3 first sentence of paragraph 22, "The
4 compensatory decision-rule involves
5 physicians and consumers placing a higher
6 value of one drug feature to compensate for a
7 lesser value of another feature."
8         Do you see that?
9    A.    Yes.
10   Q.    Okay.  And by "drug" there you
11 mean a prescription drug, because you're
12 saying physicians as well as consumers,
13 correct?
14   A.    That is incorrect.
15   Q.    Okay.  Well, it could
16 include -- when you say "drug," what do you
17 mean there?
18   A.    It could mean any kind of drug,
19 over-the-counter, prescription, any kind of
20 drug.
21   Q.    Okay.  So that term "drug" does
22 include prescription drugs?
23   A.    Yes.
24   Q.    Okay.  Thank you.

Page 131

1        There's an assumption in there
2 that that drug is actually available to them,
3 correct, for them to be able to engage in
4 some kind of meaningful compensatory decision
5 rule, correct?
6    A.    Incorrect.
7    Q.    How could that be?
8    A.    As a consumer, I could think
9 about, even if I -- something was available
10 but not accessible to me, or not available
11 because it was in short supply, or for some
12 other reason, I could think about what the
13 drug would -- how much value I would place on
14 the drug if it were available, for example.
15   Q.    Okay.  But you're not going to
16 end up paying anything for it, correct,
17 because it's not available regardless of what
18 the outcome of the decision is, right?
19   A.    I mean, if there's no product
20 or service, in this case a drug to pay for,
21 I'm not going to pay for nothing.
22   Q.    Right.  Exactly.
23   A.    Yes.
24   Q.    Let's take -- are you familiar

Page 132

1 with the drug Fen-Phen?  Do you remember
2 Fen-Phen?
3    A.    It sounds familiar, but I don't
4 remember any details.
5    Q.    Okay.  Fen-Phen was a weight
6 loss drug that was widely used, and then
7 pulled from the market in the late '90s due
8 to severe side effects, so it's not available
9 today.
10        Do you understand that?
11   A.    I'll take your word for it.
12   Q.    Okay.  Can a physician in --
13 let's say a consumer patient goes in to their
14 doctor today and says, I want you to
15 prescribe me Fen-Phen.
16        Do you follow me?
17   A.    Yes.
18   Q.    And the drug has been withdrawn
19 from the market, it's not available.
20        Do you follow me there?
21   A.    Yes.
22   Q.    Okay.  What would -- the result
23 of that discussion, no matter how much the
24 patient wanted Fen-Phen, is that the patient

Page 133

1 is not going to get Fen-Phen, right?
2    A.    I will say that the physician
3 cannot prescribe Fen-Phen.
4    Q.    Right.  And the patient will
5 not be able to lawfully get Fen-Phen,
6 correct?
7         MR. GOLDBERG:  Objection to
8    form.
9    A.    I don't want to make any
10 assumptions here.  So, for example, they
11 could go to another country and lawfully get
12 Fen-Phen.  I don't want to make an
13 assumption.
14 BY MR. DAVIS:
15   Q.    Okay.  I'm talking --
16 everything we're talking about today, I'm
17 talking about in the US.
18   A.    Okay.
19   Q.    In the US, a patient really
20 wants Fen-Phen, they go in to their doctor
21 and ask for it, they're not going to be able
22 to get it here because of the way our
23 prescription drug system works, right?  You
24 need a prescription from a doctor to get

Confidential Information Subject to Protective Order

Page 134

1 Fen-Phen, and it needs to be available,
2 approved, and able to be marketed, correct?
3     A.    If Fen-Phen was a prescription
4 drug, yes.
5     Q.    So whatever the decision
6 analysis that the consumer, you know, arrived
7 at based on what they wanted out of Fen-Phen,
8 the serious side effects that ultimately made
9 it unavailable, the outcome of that is going
10 to be they're not going to get Fen-Phen in
11 the US, correct?
12     A.    In your hypothetical example,
13 yes.
14     Q.    Right.
15          And therefore, they're not
16 going to pay anything for Fen-Phen, correct?
17     A.    Again, there's an assumption
18 there.  There are some consumers who would
19 have had to pay nothing even if Fen-Phen was
20 available, so yes.
21     Q.    Okay.  Right.  They're not
22 going to pay for it, correct?
23     A.    Right.  I'm just clarifying
24 that they may not have had to pay for it even

Page 135

1 if it were available in some circumstances.
2     Q.    I'll grant you that.
3          But the outcome is going to be
4 they're not going to pay for it, right?
5     A.    Correct.
6     Q.    You mentioned your multivitamin
7 example, I believe that's in
8 paragraph twenty -- yeah, paragraph 22,
9 sorry, just on the next page, and then
10 spilling over into paragraph 23, right?
11     A.    Right.
12     Q.    Do you know whether
13 multivitamins are subject to the same
14 approval framework as prescription drugs?
15     A.    No.
16     Q.    Okay.  Do you know whether any
17 generic multivitamin must demonstrate that
18 it's somehow equivalent to some brand
19 multivitamin in order to be marketed?
20     A.    No.
21     Q.    Another example you provide is
22 Accutane.
23          Do you recall that?
24     A.    Yes.

Page 136

1     Q.    Okay.  And that appears around
2 paragraphs 38 and 39 of your report, right?
3     A.    Right.
4     Q.    Okay.  What's the point you're
5 trying to make with this Accutane example
6 here?
7     A.    The general point I'm trying to
8 make is as a consumer behavior expert, I want
9 to emphasize that consumers have agency, and
10 that they can and do make choices even when
11 they may know about negative side effects to
12 others and even to themselves.
13     Q.    Okay.  Those side effects you
14 mention, those are all inherent to the drug
15 itself, correct?
16          MR. GOLDBERG:  Objection to
17     form.  Vague and ambiguous.
18     A.    I don't understand.
19 BY MR. DAVIS:
20     Q.    Sure.
21          Is there some version of
22 Accutane out there that you're aware of that
23 does not carry those side effects?
24     A.    I cannot speak to that.

Page 137

1     Q.    You haven't investigated that
2 one way or the other?
3     A.    No.
4     Q.    Can't you deduce that if a
5 generic drug like we've talked about has to
6 show that it's the same as the brand drug in
7 a lot of ways, can't you deduce that Accutane
8 and its generic equivalents out there would
9 all carry the same risk of these various side
10 effects?
11     A.    No.
12     Q.    You can't deduce that?
13     A.    No.
14     Q.    Okay.  Do you know whether the
15 FDA label -- have you looked at the FDA label
16 for Accutane?
17     A.    No.
18     Q.    Okay.  That's -- do you
19 understand that the FDA label would be
20 exactly where those side effects are
21 disclosed regarding Accutane?
22     A.    I'm not an expert.  I'll take
23 your word for it.
24     Q.    Okay.  And do you have any

Confidential Information - Subject to Protective Order

Page 138

1  understanding of whether the generic label
2  for generic Accutane has to read exactly the
3  same way with regard to those side effects as
4  brand Accutane's label?
5      A.   Not an expert.  I'll take your
6  word for it.
7      Q.   And you don't understand why
8  the FDA requires that that label be read the
9  same way, do you?
10     A.   Not an expert on the FDA
11 processes.  I'm not going to form an opinion.
12         MR. DAVIS:  I'm handing
13 Exhibit 5 to be marked.
14         (Whereupon, Keller Exhibit
15         Number 5 was marked for
16         identification.)
17 BY MR. DAVIS:
18     Q.   I'm not going to burden you
19 with reading the entire Accutane label here.
20 Did you -- I guess just answer me this.
21         Did you, in coming up with your
22 Accutane example in your report, did you look
23 at the label for the drug?  I think you said
24 no, right?

Page 139

1      A.   No.
2          MR. GOLDBERG:  Objection.
3      Asked and answered.
4  BY MR. DAVIS:
5      Q.   In your report on paragraph 38
6  you mention that Accutane "has a number of
7  potentially serious side effects, including:
8  eye irritation; skin infection; bone
9  tenderness; vision loss; birth defects (in
10 pregnant women); skin inflammation."
11         Do you see that?
12     A.   Yes.
13     Q.   Where did you get that
14 information from?
15     A.   Footnote 62, and it's in
16 Appendix B of my report.
17     Q.   Okay.  So that is -- that
18 appears to be the label, so you did --
19     A.   I didn't know that's what the
20 label was.  Thank you.
21     Q.   Yes.  So this is the label.  So
22 you have looked at this?
23     A.   Yes.
24     Q.   And that's how you pulled out

Page 140

1  for example, these potential side effects,
2  was from looking at what's been marked as
3  Exhibit 5, correct?
4      A.   Sorry, can you repeat the
5  question?  What has been -- sorry, can you
6  ask the question again?
7      Q.   Sure.
8          The way you came to understand
9  that Accutane carries the risk of these side
10 effects that you discuss in paragraph 38 is
11 because, as you cite in footnote 62, you
12 actually went and looked at the label for the
13 drug, correct?
14     A.   That's right.
15     Q.   Okay.  And that's where those
16 side effects were disclosed?
17     A.   I'm sure -- there may be more,
18 but that's where the ones I've listed were
19 disclosed, yes.
20     Q.   So essentially what happened
21 here is the FDA approved Accutane, correct?
22 The FDA granted approval for Accutane to be
23 marketed to Roche, which was the brand
24 company as you see there.

Page 141

1          Do you understand that?
2      A.   I take your word for it.
3      Q.   And they approved Accutane
4  despite the drug carrying these disclosed
5  side effects, correct?
6      A.   I'll take your word for it.
7      Q.   And left it up to physicians
8  and consumers to weigh the costs and benefits
9  of taking the medicine with those -- with the
10 knowledge of those disclosed side effects in
11 the label, right?
12     A.   Yes.
13     Q.   Okay.  Let me ask you, how do
14 you think users of --
15     A.   Should I put this away?
16     Q.   Sure, if you want to.
17         How do you think users of
18 generic Accutane manufactured by Ranbaxy
19 weighed the fact that that generic Accutane
20 was contaminated?
21     A.   Could you please repeat the
22 question?
23     Q.   Sure.
24         Are you familiar with a company

Confidential Information Subject to Protective Order

Page 142

1  called Ranbaxy?
2      A.    No.
3      Q.    Okay.  Let me mark something
4  else for you.
5          MR. DAVIS:  I'm handing
6      Exhibit 6 to the reporter to be
7      marked.
8          (Whereupon, Keller Exhibit
9      Number 6 was marked for
10      identification.)
11  BY MR. DAVIS:
12      Q.    Okay.  I'm handing you a --
13  Exhibit 6, for the record, is a US Department
14  of Justice press release titled "Generic Drug
15  Manufacturer Ranbaxy Pleads Guilty and Agrees
16  to Pay $500 Million to Resolve False Claims
17  Allegations, cGMP Violations and False
18  Statements to the FDA."
19          Do you see that?
20      A.    I see it.
21      Q.    That's dated May 13, 2013?
22      A.    I see.
23      Q.    Okay.  So, in fact, if you --
24  just to orient you, if you go back to

Page 143

1  Exhibit 5 just for a moment, which is the
2  Roche label for Accutane, do you see what the
3  generic name for that drug is?
4      A.    Exhibit -- where?  It's a big
5  document.
6      Q.    Well, actually it's in your
7  report at paragraph 38, "As an example,
8  Accutane, or isotretinoin."
9      A.    Yes.
10      Q.    Do you know that Accutane's
11  generic name is isotretinoin?
12      A.    Yes.
13      Q.    Okay.  I'm going to direct your
14  attention to page 2 of Exhibit 6, which is
15  this DOJ announcement.
16      A.    Okay.
17      Q.    And you'll see in the second
18  paragraph on that page, "Ranbaxy USA admitted
19  to introducing into interstate commerce
20  certain batches of adulterated drugs that
21  were produced at Paonta Sahib in 2005 and '6,
22  including Sotret, gabapentin, and
23  ciprofloxacin."
24          And then it says, "Sotret is

Page 144

1  Ranbaxy's branded generic form of
2  isotretinoin," which is Accutane, correct?
3      A.    Is the generic form.
4      Q.    Right.
5      A.    Yes.
6      Q.    So do you see there that
7  Ranbaxy admitted that in 2005 and '6 that
8  they distributed adulterated isotretinoin?
9      A.    According to this statement,
10  yes.
11      Q.    Okay.  So my question is, how
12  do you think consumers of Ranbaxy's Sotret or
13  isotretinoin manufactured by them who got
14  that drug in 2005 and 2006 were able to weigh
15  at the moment they went to the pharmacy and
16  got it the fact that it was adulterated?
17          MR. GOLDBERG:  Objection to
18      form.
19          I think it would be fair to
20      allow the witness to review the
21      document, given the question.
22  BY MR. DAVIS:
23      Q.    You don't need to review the
24  document to answer the question.  I'm asking

Page 145

1  you what I think is a pretty simple question.
2          How do you think consumers of
3  Ranbaxy's Sotret, which is, as we've seen,
4  generic Accutane, how do you think those
5  consumers in 2005 and '6 were able to weigh
6  the fact that it was adulterated when it was
7  dispensed to them at the time they purchased
8  the drug?
9          MR. GOLDBERG:  I'm going to
10      place the same objection.  I think the
11      witness can read the document, that
12      statement that you're asking her about
13      into context.  You're sort of showing
14      her a document --
15          MR. DAVIS:  This is
16      filibustering.
17          MR. GOLDBERG:  It is not.
18  BY MR. DAVIS:
19      Q.    Feel free, Dr. Keller, if you
20  want --
21          MR. GOLDBERG:  You placed a
22      document in front of the witness, you
23      didn't give her a chance to review it.
24      Let her review the document, and let

Confidential Information Subject to Protective Order

Page 146

1    her answer the question.
2  BY MR. DAVIS:
3      Q.    I'm not sure how helping the
4  document is going -- or reviewing the
5  document is going to help you answer the
6  question. I've set forth a fact that was
7  admitted to by Ranbaxy, which is that they
8  distributed in 2005 and 2006 certain
9  adulterated batches of isotretinoin.
10       You see that in the document,
11 do you not?
12     A.    Yes.
13     Q.    Okay. And you have no reason
14 to dispute what Ranbaxy is admitting there,
15 correct, that they did that?
16     A.    Right.
17     Q.    Okay. So my question to you
18 is, how do you think consumers who purchased
19 those adulterated isotretinoin prescriptions
20 in 2005 and 2006 were able to weigh the fact
21 that they were adulterated in 2005 and '6
22 when they actually bought the drugs?
23     A.    This is the reason for wanting
24 to read the document, to see if there is any

Page 147

1  context that would help me answer the
2  question more accurately.
3      Q.    The fact is they couldn't,
4  right? The answer is no, they can't weigh
5  that information, right, because they didn't
6  know it, right?
7        MR. GOLDBERG: Objection to
8  form.
9      A.    Again, I don't know that. I
10 accepted what you said earlier when you
11 pointed to where I -- where that was in the
12 report. If you let me read this report, I'll
13 see if that same statement is made in the
14 report, and then you can ask me the question
15 again whether I have any reason to doubt it.
16 BY MR. DAVIS:
17     Q.    Okay. Take a few moments.
18       MR. DAVIS: Let's go off the
19 record.
20       MR. GOLDBERG: No, let's not go
21 off the record. The document is a
22 couple of pages. Under the rules in
23 this case, the witness gets to read
24 the document for a few minutes, if

Page 148

1  it's going to take longer we'll go off
2  the record. But we don't go off the
3  record automatically just because a
4  document is presented. That's how it
5  goes.
6  BY MR. DAVIS:
7      Q.    Feel free to give the document
8  a cursory review.
9      A.    I'm sorry, I'm going to
10 undertake my task so that I can answer your
11 question to the best of my ability.
12     Q.    Sure. Okay.
13     A.    Thank you.
14     Q.    Review the document.
15     A.    Thank you.
16       (Witness reviewing document.)
17     A.    Thank you.
18     Q.    Sure. So let's start with the
19 portion of the document that I called out to
20 you.
21       You agree that Ranbaxy admitted
22 to distributing in 2005 and 2006 certain
23 batches of adulterated isotretinoin, which is
24 generic Accutane, correct?

Page 149

1      A.    Yes.
2      Q.    Okay. So my question is, how
3  can consumers who purchased those drugs in
4  2005 and '6 have weighed the fact that they
5  were adulterated at the time that they
6  purchased them?
7      A.    You are making an assumption
8  that consumers uniformly would have wanted to
9  weigh that fact.
10     Q.    No, that's not my question, and
11 you're not answering my question.
12       My question is, how could they
13 have weighed that information when it wasn't
14 disclosed to them?
15     A.    But the assumption is that they
16 would even want to. So if I don't want to,
17 the issue of how I could is irrelevant.
18     Q.    Well, you're taking it --
19 you're taking my question and you're
20 answering a different question.
21     A.    I see.
22     Q.    My question is, how can
23 consumers who purchased adulterated Ranbaxy
24 isotretinoin in 2005 and 2006 that was

Confidential Information Subject to Protective Order

Page 150

1  adulterated, how could they have weighed the
2  fact that it was adulterated?  If they wanted
3  to weigh that fact, how could they have
4  weighed that fact that it was adulterated?
5  They couldn't, right?
6      A.    Again, I'll explain why I'm
7  having a hard time answering that question
8  directly.
9          Based on my understanding of
10 consumer behavior, there are consumers who
11 think drugs are adulterated when they're not
12 and consider that.  And the example that I
13 give in my report was on -- because we were
14 talking about COVID vaccine earlier, about
15 bleach, and I cited a supporting document,
16 you know, something from the CDC on the
17 percentage of people that were using bleach
18 because they thought that was more
19 efficacious for them or safer or whatever set
20 of reasons they had that I'm unsure of than
21 the COVID-19 vaccine.
22         So I don't -- I said this
23 earlier, I don't think that consumers need to
24 get specific information in order for them to

Page 151

1  include features, whether they're benefits or
2  costs or both in some cases, in order to make
3  a determination of how they impact the value
4  that they are assessing.
5      Q.    You don't think consumers are
6  entitled -- you don't think these Ranbaxy
7  isotretinoin consumers were entitled to know
8  that the drug they got was adulterated?  Is
9  that what you're saying?
10     A.    No, I did not say that.  I
11 actually don't know what you mean by
12 "entitled."
13     Q.    You don't think it would have
14 been right for them to know that the drug
15 they were getting was adulterated?
16     A.    There are some consumers who
17 would say, It is my right to know, and there
18 are others who would say, I don't care.
19         There is a range of consumer
20 behavior, and I don't think that you can
21 uniformly assume any consumer would be
22 exactly the same in this context of they
23 would feel that they have the right to know.
24     Q.    But you're not answering my

Page 152

1  question.  You're answering a different
2  question, which is how they might have
3  weighed that information or not have weighed
4  that information.
5          My question is, it wasn't
6  disclosed to them, so even if they wanted to
7  weigh it they couldn't have, right?  Even if
8  they would have considered that in their
9  decision-making, they couldn't have, right,
10 because it wasn't disclosed to them.  Would
11 you agree with that?
12     A.    So you're saying make the
13 assumption that people -- that there were
14 people who wanted to know, and then -- you're
15 asking me to make a lot of assumptions.
16     Q.    Well, I don't think it's a big
17 assumption to assume that people would want
18 to know that their drug was contaminated.
19     A.    Some will and some will not,
20 and that's what I said.
21     Q.    Assume it for me, Dr. Keller,
22 assume that there were patients of Ranbaxy's
23 Sotret who would have wanted to know that
24 information.

Page 153

1      A.    Okay.
2      Q.    But they didn't know that
3  information at the time they purchased the
4  drug, right?
5      A.    Correct.
6      Q.    Okay.  How could they have
7  weighed that information when it wasn't
8  disclosed to them?  They couldn't have,
9  right?  They could not have weighed that
10 information, correct?
11     A.    They could not have weighed the
12 specific information, but they could have
13 weighed related information.
14     Q.    What do you mean by "related
15 information"?
16     A.    You know, there are consumers
17 out there who believe that pure drugs is an
18 oxymoron, and that -- you know, and as I
19 state in my report in Section IV, I think it
20 was IV.B, which is what we were referring to
21 earlier, there are some consumers who learn
22 over time that things that they thought were
23 safe were not safe, and things that they
24 thought may have not been safe have reentered

Confidential Information Subject to Protective Order

Page 154

1  the market in a different form or in some
2  other form.
3        So I think the situation is
4  much more fluid, and that consumers are aware
5  of this.
6     Q.    So you're saying that you don't
7  think consumers should be entitled to expect
8  that the drugs that are distributed to them
9  at the pharmacy are as approved by the FDA?
10    A.    I would never use consumers, if
11  your -- I would never agree to any sentence
12  that says "consumers" if by that you mean all
13  consumers.
14    Q.    I'm asking, because you said
15  that -- I think you said that the notion of a
16  pure drug was an oxymoron.  Is that what you
17  said?
18    A.    I said for some consumers, not
19  for -- remember, I'm doing -- I'm applying
20  the same rule to myself that I'm applying to
21  you.  I said for some consumers.  I would not
22  say for all consumer a pure drug is an
23  oxymoron.
24    Q.    So what you're saying is you

Page 155

1  don't think consumers of pharmaceuticals
2  dispensed in the US should be entitled to a
3  belief or an expectation that those drugs are
4  dispensed to them as described and approved
5  by the FDA?
6     A.    Again, I don't believe that is
7  the case for all consumers.  I think many
8  consumers don't think about whether the drug
9  is approved or not approved, or who approves
10  it or doesn't approve it.
11        And I'm going to break one of
12  my own rules and give you an example where if
13  I was taking a drug, and it could be this one
14  that you have as an example, and I thought it
15  was working brilliantly for me, I might not
16  want to know that the drug -- I mean, sorry,
17  I can say drug, yeah -- that the drug was
18  adulterated because I would like to continue
19  taking the drug without any trepidation.
20    Q.    You might not want to know?
21    A.    I might not want to know.
22    Q.    Well, what if -- I mean, we're
23  talking about just one manufacturer's version
24  of generic Accutane, you wouldn't want to

Page 156

1  know that so you could just take another
2  manufacturer's version of generic Accutane
3  that wasn't adulterated?
4     A.    It's a hypothetical, so I'm
5  giving you a hypothetical back, and that is,
6  if I like this one that I'm taking and it's
7  worked for me -- and back to my framework
8  that I talk about in the model, and I'll use
9  MICI this time, which is, depending on the
10  message that I got -- and I can give you
11  examples, depending on -- I'm focusing on the
12  individual differences, that if I've tried
13  other acne medicines and they haven't worked
14  for me, and then I find one that I really
15  like and it seems to work for me, and then
16  there is this information out there, I'm
17  saying that there are some consumers in those
18  situations that might not want to know or not
19  care about this information about the
20  adulteration from this specific batch because
21  they don't want to switch, they don't want to
22  consider any alternative products.
23    Q.    Do you understand that the
24  point of our generic drug system is that all

Page 157

1  the generics are supposed to work in the same
2  way to each other and to the brand?
3        MR. GOLDBERG:  Objection.
4  BY MR. DAVIS:
5     Q.    Do you understand that?
6        MR. GOLDBERG:  Objection to
7  form.  Asked and answered.
8     A.    I am not an expert on how
9  generics are supposed to work, and I will not
10  give you an opinion on that.
11  BY MR. DAVIS:
12    Q.    Let's back up for a second.
13        You talk a lot about this
14  choice exercise that consumers make in the
15  healthcare context, right?
16    A.    Which context are you speaking?
17  We were talking about how a consumer might
18  value the drug that they have, so when you
19  say "choice exercise," I'm trying to
20  understand the context.
21    Q.    Sure.
22        Your whole report is about
23  healthcare decision-making, right?  And that
24  involves a choice, right?

Page 158

1    A.   I would say that that's a bit
2 of a mischaracterization.  The bulk of my
3 report is focused on how consumers would
4 assess the value or worth of a drug to them.
5    Q.   Okay.  And once they make that
6 assessment, at what point is the decision
7 finalized for them?
8    A.   Lots of cases, never.  In some
9 cases, they try one, they never switch.  That
10 varies by consumer.
11    Q.   Well, the choice is culminated
12 when they go buy the drug, right?  They're
13 acting, would you agree --
14    A.   No, no.
15    Q.   Would you agree that a
16 consumer, when they go fill a prescription,
17 they're acting on a choice that they've made,
18 correct?  They may -- I hear what you're
19 saying, they may reevaluate that choice in
20 the future, but they're acting on a choice
21 that they made prior to that, because they
22 had to -- I mean, it's just common sense, you
23 go fill a prescription, you're doing an act,
24 right?

Page 159

1    A.   As I mentioned to you earlier,
2 the consumer value is defined as a comparison
3 of benefits and costs, and the price they pay
4 or the act of actually exchanging a product
5 for money is only one aspect of the cost.
6    Q.   It's an action, though, that a
7 consumer is taking, correct?
8    A.   It's one of several.
9    Q.   As a result of the decision and
10 choice analysis that they went through prior
11 to engaging in that act, right?
12    A.   I take objection to that.  As I
13 explain in my report, and this is in Section
14 IV.B of my report, consumers use a variety of
15 different methods to make those choices.
16 Some of them are noncompensatory or
17 reflexive, they haven't thought about
18 anything, they've just gone and done it
19 spontaneous, others -- there's a range --
20 others will spend a lot of time and think
21 about the plusses and minuses.  There's a
22 range.
23    Q.   I'm not going into the
24 qualitative aspect of that choice.  All I'm

Page 160

1 saying is that in order to act, which is to
2 go fill the prescription at the pharmacy,
3 some level of choice had to be made to go do
4 that.  We're not talking about zombies here
5 who are just like, you know, going to the
6 pharmacy, this is a choice that humans make
7 to go fill a prescription, is it not?
8    A.   I would say some will go fill
9 and some will not.  And again, as is
10 explained in my report, many consumers do not
11 fill their prescriptions, and many consumers
12 who fill their prescriptions do not take
13 their drugs.  So those are also actions.
14    Q.   So with this Sotret example,
15 which consumers affirmatively made the choice
16 to go get adulterated Sotret from Ranbaxy?
17    A.   I have no idea.
18    Q.   None, right?
19    A.   Well, no, that is -- I have no
20 information on that.  I can't tell you that.
21    Q.   If you don't know -- if they
22 didn't know about it, how could they
23 affirmatively go choose that at the time?
24 They can't, right?

Page 161

1    A.   I'm going to repose -- I'm
2 going to, sorry, reframe, reframe that
3 question.
4        Compare that to a consumer who
5 should have had the information, could have
6 had the information but did not, right?  What
7 is the difference between their action and
8 someone who could not have known?
9    Q.   Do you have any -- is there any
10 indication in this DOJ announcement that you
11 read that any consumer had any indication, or
12 any ability to even go and find out that
13 Ranbaxy's Sotret was adulterated at the time
14 it was dispensed to them?
15    A.   That information is not
16 contained in this document.
17    Q.   In fact, the opposite is
18 contained in the document, right?  Part of
19 the settlement was related to Ranbaxy knowing
20 and not telling the FDA until 2007, which is
21 years after the adulterated Sotret was
22 distributed in 2005 and '6, right?  So the
23 indication in this document at least is that
24 no one knew except Ranbaxy, right?

Page 162

1    A.    I don't know that to be a fact.
2    Q.    Okay.  Take a look at the last
3  paragraph of page 3 of this document.  It
4  says -- and this is a quote from John Roth,
5  the director of the FDA's office of criminal
6  investigations.  He says, "The FDA expects
7  that companies will comply with the cGMP
8  requirements mandated bylaw so that consumers
9  can be assured that their medical products
10 are safe and pure."
11        Do you see that?
12   A.    Yes.
13   Q.    Okay.  Is there anything about
14 that statement that you disagree with?
15   A.    I am not an expert on the FDA,
16 so I have no idea what they expect companies
17 to do.
18   Q.    Do you think that consumers are
19 entitled to the same expectation that the FDA
20 has here, which is that their medical
21 products are safe and pure?
22   A.    Again, it depends on how you
23 ask consumers those questions.  If they had
24 to make trade-offs, they might make different

Page 163

1  trade-offs on how important safety or purity
2  might be to them if it meant lower efficacy
3  or lower experience for them.
4    Q.    So you're saying that consumers
5  of prescription drugs in the US should be
6  forced into a position of making a trade-off
7  that includes whether their products are safe
8  or pure?
9    A.    That is not what I said.
10   Q.    Wouldn't that position
11 completely undermine our prescription drug
12 approval framework in this country?
13   A.    I am not an expert on the
14 approval drug process, and I am not offering
15 an opinion on it.
16   Q.    Okay.  Go back to page 1 of
17 this document, which is Exhibit 6 for the
18 record.  Another quote from Stuart Delery,
19 who was acting assistant attorney general for
20 the civil division of the department -- U.S.
21 Department of Justice.  He says, "When
22 companies sell adulterated drugs, they
23 undermine the integrity of the FDA's approval
24 process and may cause patients to take drugs

Page 164

1  that are substandard, ineffective, or
2  unsafe."
3        Do you see that?
4    A.    Yes.
5    Q.    Okay.  Do you agree from a --
6  put your marketing concern-patient messaging
7  hat on -- do you agree that that would
8  complicate your job if the integrity of the
9  FDA's approval process was undermined?
10   A.    I cannot answer that question.
11   Q.    Okay.  You don't think it would
12 be harder, for example, to advocate for
13 medication compliance when -- if the approval
14 process for that very medication was -- the
15 integrity of it was undermined because
16 companies were selling adulterated drugs?
17        MR. GOLDBERG:  Objection to
18     form.  Ambiguous.
19   A.    I cannot answer that question.
20 BY MR. DAVIS:
21   Q.    On page 3, back to page 3 of
22 Exhibit 6, you'll see a paragraph, second to
23 last paragraph, "Last year" -- which would
24 have been 2012 based on the date of this

Page 165

1  document -- "FDA and Ranbaxy agreed to an
2  injunction that prevents drugs produced at
3  the Paonta Sahib and Dewas facilities from
4  entering the US market until the facilities
5  have been brought into full compliance with
6  the FDCA and its implementing regulations."
7        Do you see that?
8    A.    Yes.
9    Q.    So for that period of time from
10 the beginning of the injunction until a
11 determination of full compliance was made,
12 there was no consumer in the US market who
13 could have gotten a Ranbaxy drug produced at
14 those two facilities, right?  Is that what
15 that says?
16   A.    I will make that assumption
17 that there were no leftovers or -- there's
18 many assumptions there, but okay.
19   Q.    And so, therefore, there would
20 have been no supply of drugs from those
21 facilities, correct, entering the US market?
22        MR. GOLDBERG:  Objection to
23     form.
24   A.    Please explain that.

Confidential Information Subject to Protective Order

Page 166

BY MR. DAVIS:

Q.   I'm sure what there is to explain.

There would have been no supply of drugs from those two facilities that could have entered the US market for the period of the injunction, correct?

MR. GOLDBERG:  Objection to form.  Foundation.

A.   So can you please explain what period we're talking about?

BY MR. DAVIS:

Q.   Sure.

The period that I thought we had understood, which was the beginning of the injunction until full compliance.

A.   So I'm not a lawyer, and, you know, I need to understand.  You know, these are fluent terms for you.

So when you say "the beginning of the injunction," what -- and you're asking me about a time period, so what time period am I referring to?

Q.   The date of the injunction last

Page 167

year, so 2012, FDA and Ranbaxy agreed to an injunction.

A.   So from 2012 to?

Q.   Whatever that date was that they were brought into full compliance, if that date ever occurred, would you agree with me that there was no supply of Ranbaxy drugs from those two facilities that could have entered the US market?

A.   I am not an expert on this and I cannot answer that question.

Q.   I mean, it just plainly says it there, doesn't it?

MR. GOLDBERG:  Objection to form.  Argumentative.

A.   It's not plain to me.

BY MR. DAVIS:

Q.   So the FDA and Ranbaxy agreeing to an injunction that, quote, prevents drugs produced at the two facilities from entering the US market, that doesn't suggest to you that, for that time period, that there was no supply of Ranbaxy drugs into the US market from those two facilities?

Page 168

A.   I will repeat why I am not saying that there was no supply.  In part, I don't know what supply there already was in the marketplace, I don't know what -- how it was recalled, I don't know what instructions people gave, physicians and otherwise, as to what people should do with whatever supply was available, and I actually from this sentence don't even know.

It says later that they're going to work with them.  I don't know when they started working with them and allowed them to reenter the market.  I don't know.

Q.   Do you know what happens to the supply of pharmaceuticals that are already in the market once a recall is announced?  Do you know what happens to those pills that are sitting on warehouse shelves or pharmacy shelves after the recall is announced?

A.   I am not an expert on this, and I will not form an opinion.

MR. GOLDBERG:  John, I think we've been going about 90 minutes.

MR. DAVIS:  Sure.  Five

Page 169

minutes?

We can go off the record.

MR. GOLDBERG:  Yes, let's go off the record.

THE VIDEOGRAPHER:  Off the record at 1:53.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER:  Back on the record at 2:09.

BY MR. DAVIS:

Q.   Okay.  Dr. Keller, we left off, I was asking you about this FDA Ranbaxy injunction, I was asking you how that would have affected the supply of Ranbaxy's in this case Sotret that we were talking about into the market that was produced at these two facilities, into the US market.

Do you recall that discussion?

A.   I recall the discussion before the break, yes.

Q.   Okay.

A.   Should I bring this document forth again?

Page 170

1    Q.   No, I was resetting our --
2    A.   I'm sorry.  Okay.
3    Q.   -- context here.
4         Have you examined in any detail
5    how the fact of adulteration in this case,
6    for example, affects a company's ability to
7    supply their drugs into the US?
8    A.   I need a clarification.
9    Q.   Sure.
10   A.   In this case are we talking
11   about the Ranbaxy case, or are we talking
12   about the VCD case, or some other case?
13   Q.   I'm just talking generally
14   about pharmaceutical prescription drugs.
15   A.   Okay.
16   Q.   Did you as part of this
17   assignment, or not as part of this
18   assignment, just generally, have you ever
19   studied how the fact of a prescription drug's
20   adulteration affects its ability to be
21   distributed, marketed, sold, dispensed in the
22   United States?
23        MR. GOLDBERG:  Objection.
24   Ambiguous and compound.

Page 171

1    A.   I am not an expert on many of
2    the things that were raised, and I'm not
3    going to give an opinion.
4    BY MR. DAVIS:
5    Q.   So you haven't looked into how
6    the fact of adulteration might affect the
7    supply of a drug in the US?
8    A.   Not prior to this case.
9    Q.   Did you in this case?
10   A.   I reviewed Dr. Conti's report,
11   so yes.
12   Q.   Okay.  I'm asking not did you
13   review Dr. Conti's report.  I'm asking if you
14   did any independent analysis of your own how
15   the fact of adulteration under the law might
16   affect the supply or the ability of a
17   manufacturer to supply its drug product in
18   the United States market?
19   A.   No.  I am a consumer behavior
20   expert.  I have no opinion on drug supply for
21   the example you've given.
22        MR. DAVIS:  I'm going to mark
23   Exhibit 7.
24        ///

Page 172

1         (Whereupon, Keller Exhibit
2    Number 7 was marked for
3    identification.)
4    BY MR. DAVIS:
5    Q.   I understand you're not a
6    lawyer, Dr. Keller.  What I'm showing --
7         MS. ANDRAS:  Can you please
8    identify it with specificity on the
9    record?
10        MR. DAVIS:  Sure.  For the
11   record, this is Exhibit 7, which is 21
12   USC 331, part of the US Code entitled
13   "Prohibited Acts."
14   BY MR. DAVIS:
15   Q.   Do you see that?
16   A.   Yes.
17   Q.   Do you have familiarity with
18   what the US Code is?
19   A.   No.
20   Q.   Do you understand that that's
21   federal law enacted by congress, signed by
22   the President?
23        MR. GOLDBERG:  Objection to
24   form.  Foundation.

Page 173

1    A.   I did not know that.  I'm not
2    an expert on the law.
3    BY MR. DAVIS:
4    Q.   Okay.  I'm granting you that.
5         It says there that, "The
6    following acts and the causing thereof are
7    prohibited."  And then it says, "(a) The
8    introduction or delivery" into -- sorry.
9    "The introduction or delivery for
10   introduction into interstate commerce of
11   any," and it lists several things, including
12   drugs, that are adulterated or misbranded.
13        Do you see that?
14   A.   Yes.
15   Q.   Okay.  And then (c) says, "The
16   receipt in interstate commerce of any" of the
17   same categories, including drugs, that are
18   adulterated or misbranded, and the delivery
19   or preferred delivery thereof for pay or
20   otherwise.
21        Do you see that?
22   A.   I do.
23   Q.   Okay.  Were you aware -- your
24   testimony is you're not aware of these

Page 174

1  prohibitions under federal law, are you?
2      A.    Correct.
3      Q.    Okay.  Thank you.
4          MR. GOLDBERG:  Are you done
5      with this one?
6          MR. DAVIS:  For the moment,
7      yes.
8  BY MR. DAVIS:
9      Q.    Do you have any opinion about,
10  or -- let me rephrase it.
11          Do you have any understanding
12  about whether the at-issue VCDs in this case
13  were deemed to be adulterated or misbranded
14  under the law?
15      A.    I don't have an opinion.
16      Q.    Okay.  You don't have any
17  understanding, correct?
18      A.    That's not what you asked.  You
19  asked if I had an opinion.  So could you
20  reask the question?
21      Q.    Sure.
22          MR. HONIK:  I'd like Maureen to
23      read it exactly as John posed.
24          THE WITNESS:  Thank you.

Page 175

1          (Whereupon, the reporter read
2      back the question:
3          QUESTION:  Do you have any
4      understanding about whether the
5      at-issue VCDs in this case were deemed
6      to be adulterated or misbranded under
7      the law?)
8          MR. HONIK:  Not opinion.
9      A.    I apologize.
10          Could you read that again?
11          (Whereupon, the reporter read
12      back the question:
13          QUESTION:  Do you have any
14      understanding about whether the
15      at-issue VCDs in this case were deemed
16      to be adulterated or misbranded under
17      the law?)
18      A.    I am not a lawyer.  I do not --
19  I am not going to offer any opinion on that.
20  BY MR. DAVIS:
21      Q.    Okay.  And the question was,
22  you don't have any understanding of whether
23  they were or not, correct?
24      A.    Please explain what you mean by

Page 176

1  "understanding."
2      Q.    So my question was, do you have
3  any understanding of whether the at-issue
4  VCDs in this case were deemed to be
5  adulterated or misbranded under the law?
6      A.    I will answer to the best of my
7  ability.  I have read the -- as you can see
8  in Appendix B of my report, I have read a
9  couple of legal documents that explain that
10  some of the at-issue VCDs were found to be
11  adulterated and unbranded under the law.
12      Q.    Okay.  But you're not sure how
13  many, right?  You said "some."  You're not
14  sure whether it's some or all of them, are
15  you?
16      A.    I am -- my understanding, which
17  is what you asked, is that of the VCDs that
18  were voluntarily recalled by the
19  manufacturers, some of them, not all of them,
20  were adulterated or unbranded.
21      Q.    You're not sure how many that
22  is, though?
23      A.    No.
24      Q.    Okay.  And you didn't do any

Page 177

1  independent analysis of whether that's true
2  or not true, right?
3      A.    Correct.
4      Q.    Okay.  Do you have any
5  understanding of whether there are
6  valsartan-containing drugs out there that
7  don't have and never had NDMA and NDEA in
8  them?
9      A.    I am not an expert.  I will
10  qualify that some of the material that I have
11  in my supporting documents suggested --
12  indicated to me that there were levels of
13  these two impurities that you just mentioned,
14  but I am assuming they were acceptable
15  levels.
16      Q.    So my -- that's not my
17  question, though.  My question -- and I'll
18  reask it just to make sure we're clear, my
19  question is, do you have any understanding of
20  whether there were not at-issue VCDs
21  manufactured by entities other than the
22  defendants in this case that did not have any
23  NDEA or NDMA in them?
24      A.    I have no information on them.

Page 178

1    Q.    You have no information on
2  that.
3         Didn't look at it?
4    A.    No.
5    Q.    Didn't investigate it?
6    A.    No.  Not part of my task.
7    Q.    Do you have any understanding
8  of whether NDMA or NDEA are supposed to be in
9  valsartan drugs?
10    A.    I'm not an expert on the
11  formulation of these drugs.  I have no
12  opinion.
13    Q.    Okay.  So you don't know
14  whether these two substances are supposed to
15  or not supposed to be in valsartan drugs?
16    A.    I am not an expert.  I cannot
17  comment as to the presence, absence, or
18  extent to which these are or are not
19  necessary for these drugs.
20    Q.    Well, the drugs were recalled,
21  as you said, right?
22    A.    (Nodding in the affirmative).
23    Q.    Doesn't that indicate to you
24  that they weren't supposed to be in there?

Page 179

1    A.    My caveat is when you say
2  they're not supposed to be there, my
3  understanding is that they are there, it's
4  just not they're not supposed to be there
5  above certain levels, and that's what I'm
6  qualifying.
7    Q.    But you don't know whether
8  they're supposed to be there at all or not,
9  correct?
10         MR. GOLDBERG:  Objection to
11  form.  Foundation.
12    A.    No.
13  BY MR. DAVIS:
14    Q.    Did you look at a valsartan
15  label like you looked at the Accutane label?
16    A.    I already testified that I
17  looked at valsartan product labels.
18    Q.    Can you point me -- it may be
19  in there, I just want to point me to
20  where in your materials considered that would
21  be.
22    A.    I can show you from my report,
23  but I don't have the binder of all the -- and
24  actually there's maybe six on a page, they're

Page 180

1  visuals, in case you have those materials and
2  you're trying to look for them, but I can
3  help.
4         (Witness reviewing document.)
5    A.    I'm -- I wish I had my
6  materials in front of me, but I'm going to --
7  I don't want to guess.  It could be in the
8  drugs.com or the MedlinePlus.  I'm picturing
9  the page in front of me, and they're pictures
10  of multiple labels with on the left side the
11  name, and on the right side the drug
12  manufacturer and the place of manufacture.
13  That's what I'm picturing.
14    Q.    Okay.  You say -- flip to
15  page 30 of your report, if you don't mind,
16  Exhibit 1.
17    A.    Of course.
18    Q.    The title of that section is
19  "Real-world Evidence Indicates that the
20  At-Issue VCDs Held Value," correct?
21    A.    Yes.
22    Q.    Okay.  Did you look at any
23  sales data of -- sorry.
24         Did you look at any sales data

Page 181

1  of the actual sales of these drugs after the
2  recalls were announced?
3    A.    Only information that was part
4  of Dr. Conti's report, not otherwise.
5    Q.    So do you know what happened to
6  sales of these products after the recalls?
7    A.    I don't recall.
8    Q.    Sorry, give me a few moments
9  here.  I should have two copies of all this
10  somewhere, but I don't.  I'm just going to
11  mark one, it's big enough for, I think, you
12  to see it.
13         MR. DAVIS:  This is being
14  marked as Exhibit 8, let's start with
15  that.
16         (Whereupon, Keller Exhibit
17  Number 8 was marked for
18  identification.)
19  BY MR. DAVIS:
20    Q.    Let me represent to you that
21  what I'm showing you there is the monthly
22  prescription data for --
23    A.    Should I put the -- my report
24  away?

Page 182

1    Q.    Sure, sure.
2    A.    Thank you.  Okay.
3    Q.    What I'm representing to you
4  here is that what's marked as Exhibit 8 is a
5  graph showing monthly prescription data for
6  ZHP manufactured valsartan products.
7          Do you understand what I mean
8  by that?
9    A.    Yes.
10         Can I ask a clarifying
11  question --
12   Q.    Sure.
13   A.    -- so I know how to interpret
14  this graph?
15   Q.    Yes.
16   A.    I see that the X axis is
17  labeled as time, but the Y axis is not
18  labeled, and so I'm not quite sure how to
19  interpret a graph with only one labeled axis.
20  I could be missing something.
21   Q.    Read for me, if you don't mind,
22  the header up at the top there.
23   A.    "Monthly ZHP Rxs by Valsartan
24  Product."

Page 183

1    Q.    Okay.  So what I'll represent
2  to you that the Y axis is there is Rxs, which
3  is prescriptions.
4          Do you understand that?
5    A.    So these are prescription --
6  just clarifying, these are prescriptions of
7  valsartan over this period of time.
8    Q.    Correct, manufactured by ZHP.
9    A.    Right.  Prescriptions that were
10  given, filled, or -- just again clarifying,
11  because it isn't labeled.
12   Q.    Prescriptions that were filled.
13   A.    Thank you.
14   Q.    Yes.  Absolutely.
15         You didn't look -- I think your
16  testimony was you didn't actually look at any
17  of the sales data, did you?
18   A.    Not unless it was in
19  Dr. Conti's appendices.
20   Q.    Do you see that the sales
21  abruptly dropped to zero?
22   A.    So can I now assume in the Y
23  axis that the bottom is the zero?
24   Q.    Yes, yes.

Page 184

1    A.    Okay.  Then yes.
2    MR. GOLDBERG:  Objection to
3  form.
4  BY MR. DAVIS:
5    Q.    Do you understand why for ZHP
6  the monthly sales dropped to zero?
7    A.    I don't have that information.
8    Q.    Did you come to any
9  understanding or investigate whether similar
10  to Ranbaxy, ZHP was barred from importing
11  prescription drug products to the US?
12   A.    I just want to make sure,
13  exporting, that ZHP was barred from -- we
14  barred them from imports of their product,
15  right?
16   Q.    Yes.  ZHP products were made
17  illegal to sell in the US, correct?
18   A.    Yes.
19   MR. GOLDBERG:  Objection to
20  form.
21  BY MR. DAVIS:
22   Q.    And subject to seizure by
23  federal agents if they were imported or
24  attempted to be distributed?

Page 185

1    A.    I am not an expert on this
2  process.  I cannot form an opinion.
3    Q.    Well, you sort of do form an
4  opinion, though.  If you look at paragraph 71
5  of your report, you have a hypothetical
6  supply-demand curve, do you not?
7    A.    Excuse me, I need to get there.
8          Could you ask that question
9  again?
10   Q.    Sure.
11         You said you don't have an
12  opinion one way or the other on whether ZHP
13  was barred from importing or selling its
14  products in the US.  Am I right about that?
15   A.    I'm not sure, that may have
16  been before your last question, I don't
17  recall that as your last question, so I'm
18  trying to be accurate.
19   MR. DAVIS:  Could you read that
20  last question?  Sorry.
21         (Whereupon, the reporter read
22  back the following:
23         QUESTION:  And subject to
24  seizure by federal agents if they were

Confidential Information Subject to Protective Order

Page 186

1  imported or attempted to be
2  distributed?
3      THE WITNESS:  I am not an
4  expert on this process.  I cannot form
5  an opinion.
6      QUESTION:  Well, you sort of do
7  form an opinion, though.  If you look
8  at paragraph 71 of your report, you
9  have a hypothetical supply-demand
10  curve, do you not.
11      THE WITNESS:  Excuse me, I need
12  to get there.
13      Could you ask that question
14  again?
15      QUESTION:  Sure.
16      You said you don't have an
17  opinion one way or the other on
18  whether ZHP was barred from importing
19  or selling its products in the US.  Am
20  I right about that?)
21  BY MR. DAVIS:
22      Q.    So let me -- I'll withdraw the
23  last question.
24      You do at paragraph 71 on

Page 187

1  page 43, the next page over, supply a
2  hypothetical supply-demand curve, do you not?
3      A.    Several.
4      Q.    Well --
5      A.    Several demand curves, and
6  therefore --
7      Q.    You have several demand curves,
8  but you have one supply, correct?
9      A.    Yes, so a combination would be
10  several supply-demand curves.
11      Q.    Right.  But with one supply
12  line, correct?
13      A.    Yes.
14      Q.    And this is hypothetical,
15  right?  This is a hypothetical supply-demand
16  curve, is it not?
17      A.    Well, it is a figure, and the
18  changes or the alternatives of the demand
19  curve that I'm sharing with you here reflect
20  my argument that consumers would have
21  different assessments of what the drug would
22  be -- what the at-issue VCD would be to them,
23  and based on the compensatory/noncompensatory
24  decision rules and MICI.

Page 188

1      And some consumers would say, I
2  don't want any of this product, it is not
3  worth anything to me, all the way to the
4  other end of the continuum where you have
5  some consumers who would say, I'm consuming
6  these impurities in multiple forms and it's
7  of no consequence to me, and everything in
8  between.
9      That's what these alternative
10  demand curves, or multiple demand curves are
11  meant to represent.
12      So when you ask the question,
13  you know, are they hypothetical demand
14  curves, yes, they are, as that they're not
15  based on data, nor is the supply curve, by
16  the way, based on data, they're just
17  representing how my frameworks and opinions
18  would translate into alternative demand
19  curves.
20      Q.    Okay.  And that was -- I think
21  you've answered my next question, which is,
22  this is not informed by any look at data, is
23  it?  These are hypothetical scenarios you're
24  putting forward, right?

Page 189

1      A.    Yes.
2      Q.    And in fact, your supply curve
3  is just inconsistent with the facts if you
4  accept, for example, the ZHP graph as
5  actually representing the sales situation,
6  correct?
7      A.    It is incorrect, because the
8  example that I'm giving you in my report is
9  that one can retrospectively go to those
10  consumers -- because there was supply, they
11  were supplied the product.  I mean, I'm not a
12  lawyer, but how do you have a recall if
13  there's -- no product was given?  How do you
14  make, what, ZHP or any manufacturer say they
15  committed fraud because they sold something
16  if they didn't sell anything.  So if there's
17  no supply, how is it possible if someone
18  sells something that there's no supply.
19      So I'm just saying that this to
20  me is not relevant -- sorry, your -- what
21  exhibit is this?
22      Q.    This is Exhibit 8.
23      A.    Sorry.  Oh, I see that.
24      Exhibit 8 does not help inform

Page 190

1 my figure on page 43, because they were
2 supplied. And I'm saying that if you went
3 back retrospectively and asked those
4 consumers, Hey, given what you know now about
5 the impurities and whichever way you want to
6 define it -- and that is going to make a
7 difference how you define it and how you
8 communicate it and who communicates it -- how
9 would you assess the value of the work of
10 this -- of the at-issue VCD that you took.
11        And all this is saying here in
12 my figure is that you will get a range of
13 responses.
14     Q.    What literature do you have to
15 support what appears to be your proposition
16 that an economic damages analysis should be
17 based on a retrospective look as opposed to
18 measuring at the time of injury?
19     A.    I am not a lawyer. I don't
20 have an opinion on that.
21     Q.    Okay. And you're not offering
22 an economic damages analysis here, are you?
23     A.    No.
24     Q.    And you're not qualified to do

Page 191

1 that, correct?
2        MR. GOLDBERG: Objection to
3    form.
4     A.    It was not my task. I did not
5 do that.
6 BY MR. DAVIS:
7     Q.    So -- and we'll get to the
8 retrospective aspect of this later.
9     A.    Should I put it away?
10    Q.    Sure.
11        But my question is, after the
12 point of recall, there was no supply of ZHP
13 valsartan in the US, was there?
14        MR. GOLDBERG: Objection to
15    form. Foundation.
16    A.    No. According to this graph,
17 based on how you described it to me, no more
18 prescriptions were filled for this product
19 after this period on the X axis.
20 BY MR. DAVIS:
21    Q.    Correct. That means there was
22 no more supply of it, correct, in the US
23 market?
24        MR. GOLDBERG: Same objection.

Page 192

1     A.    That is incorrect.
2 BY MR. DAVIS:
3     Q.    How is that incorrect?
4     A.    Because the information in this
5 case, and some of it is described in Section
6 IV.E of my report, that not only was there
7 evidence that consumers continued to take the
8 recalled valsartan based on depositions from
9 plaintiffs, but that -- and I've quoted some
10 of them, but that physicians, and I've also
11 quoted some of them, encouraged some of their
12 patients to continue taking the recalled
13 valsartan until they had other options.
14        That is my understanding of why
15 there had to be supply if that was -- if the
16 information I just shared is true.
17    Q.    That's existing supply, right,
18 what had been distributed, dispensed to
19 patients prior to the recall, correct?
20        My question is, after the point
21 of recall, are you aware of any evidence of a
22 single prescription of ZHP valsartan being
23 dispensed to a patient after the point of
24 recall?

Page 193

1     A.    I don't have that information.
2     Q.    Okay. So your supply curve
3 here that you supply is just inconsistent
4 with the facts, correct?
5     A.    No.
6        MR. GOLDBERG: Objection to
7    form. Argumentative.
8     A.    And I'm assuming now you're
9 referring to my report, because we have
10 multiple supply curves here.
11 BY MR. DAVIS:
12    Q.    I'm talking about your
13 hypothetical supply curve, not what the
14 actual data show.
15    A.    Got it.
16        So could you please repeat the
17 question?
18    Q.    Your hypothetical supply curve
19 here is uninformed by the facts of this case,
20 is it not?
21    A.    This figure is -- and you can
22 look at the context before and after, and I
23 will read it out to you because it's on the
24 same page, 72, "As shown in the figure above,

Page 194

1 there existed some original supply and demand
2 curve (denoted by 'Demand0' and 'Supply'),
3 which resulted in an equilibrium price, P0,
4 and equilibrium quantity, Q*.  Instead of
5 removing the supply curve, and assuming zero
6 demand, it is more appropriate to envision
7 how each consumer's demand would shift due to
8 knowledge of the presence (or potential
9 presence) of impurities."
10     Q.    Let me ask you about that.
11         You say that there would be an
12 equilibrium price, you just read me that,
13 right?
14     A.    That's one.  There are multiple
15 equilibrium prices based on which demand
16 curve you're referring to.
17     Q.    Let me ask you a very specific
18 question, which is, after the point of recall
19 for ZHP, since you have that data right in
20 front of you, after the point of recall there
21 would have been no supply -- there would have
22 been no equilibrium price because there was
23 no supply, right?
24     A.    Yes and no.

Page 195

1     Q.    Okay.  Well, how is it
2 different from what you -- do you recall our
3 discussion of Fen-Phen earlier?
4     A.    Yes.
5     Q.    And you agreed with me that
6 even if a patient wanted to get Fen-Phen they
7 couldn't get it, they couldn't pay for it,
8 right?  How is it different after the point
9 of recall for ZHP valsartan?
10     A.    Let's use your Fen-Phen
11 example.  What I'm trying to communicate here
12 is how consumers make decisions about what a
13 product is worth to them, and price is one
14 manifestation or reflection of that.  It is
15 not the only one.  Let me just finish.
16         Your Fen-Phen example, you
17 brought it up again, the way -- from my
18 recall of how you described the situation is
19 it was recalled, and if a consumer of
20 Fen-Phen went to their physician and asked
21 for Fen-Phen, they could not write a
22 prescription for Fen-Phen.  Am I right?  Is
23 that a good --
24     Q.    Yes.

Page 196

1     A.    The very fact that consumers
2 are going and asking their physician for
3 Fen-Phen -- I'm not making any assumptions
4 about all consumers here, you know that --
5 and there's a possibility that they knew
6 about the recall, and I'm going to go one
7 step further and say given my knowledge of
8 consumer-physicians' interactions, they might
9 have even asked the physician why it was
10 recalled, they still wanted it.
11         So that gives you some sense of
12 how consumers will calculate what is valuable
13 to them or what is worth to them, even if in
14 your example the product is not available.
15     Q.    So, but my question is
16 different.  My question is, there is no
17 equilibrium price.  Let's say there was some
18 crazy consumer who said, Yes, I want the
19 carcinogen-laced valsartan, and went in and
20 asked their physician for that, the physician
21 couldn't give them ZHP valsartan, could he?
22         MR. GOLDBERG:  Objection to
23     form.  Argumentative.
24     A.    Well, first I want to say, and

Page 197

1 I'm relying on my frameworks, depending on
2 how that message was communicated, if you say
3 carcinogen-laced the way you said it versus a
4 valsartan that may contain impurities, the
5 individual's -- I'm using MICI factors -- the
6 individual's status, so if they were happy
7 with their valsartan and had -- as I shared
8 in my report in Section IV.E, they were happy
9 with their valsartan, they had serious health
10 issues, they may have even tried alternative
11 medications and felt that the valsartan was
12 the best at controlling their hypertension,
13 and contextual factors, how much their
14 relationship with their doctor and their
15 ability or inability to have a healthy
16 lifestyle, all of those factors would have an
17 impact on what they thought the drug was
18 worth.
19 BY MR. DAVIS:
20     Q.    Okay.  But you're not answering
21 my question.
22         My question is, if there's no
23 supply after the recall, as you can see from
24 the sales data, even if a consumer -- like

Confidential Information Subject to Protective Order

Page 198

1 let's just assume that there is a consumer
2 who does want ZHP valsartan after the recall
3 and wants to go get a new prescription of it
4 from their doctor, the result is just like it
5 was with Fen-Phen, they can't get it, right?
6     A.    I'm assuming that is the case,
7 yes.
8     Q.    And they would end up,
9 therefore, paying no money for it, correct?
10     A.    Yes.
11     Q.    Okay.  Thank you.
12          And there would be no
13 intersection of -- sorry, showing you my
14 screen, you've got it right there.
15     A.    Yes.
16     Q.    There would be no intersection
17 of supply and demand in that very specific
18 situation I just asked you about, correct?
19     A.    Correct.
20     Q.    Okay.  Thank you.
21     A.    Should I put these away?
22     Q.    Sure.
23     A.    Okay.
24          MR. DAVIS:  I'm marking

Page 199

1     Exhibit 9.
2          (Whereupon, Keller Exhibit
3          Number 9 was marked for
4          identification.)
5 BY MR. DAVIS:
6     Q.    This is a -- can you identify
7 this document for me?
8     A.    No.
9     Q.    I'll represent to you that it's
10 a valsartan -- I'll represent to you that
11 it's a valsartan label, which may or may
12 not -- I think, we looked at your materials
13 considered.
14          Is this a document you recall
15 seeing ever?
16     A.    No.
17     Q.    Okay.  I'll represent to you --
18 but, you know, you're free to look, but I'll
19 represent to you that there's no mention of
20 nitrosamines, NDMA, NDEA, anywhere in this
21 label.
22          Are you willing to accept that,
23 or do you want to take a look?
24     A.    I actually don't have any idea

Page 200

1 what is in this label period, so I don't know
2 how to understand the absence of the two
3 impurities you just mentioned.
4     Q.    Well, I'm not asking you yet to
5 understand the absence of them.  I'm just
6 asking you if you see any reference to them
7 in that document.
8     A.    I cannot do that.  You're
9 asking if there's any reference, and I don't
10 know if there's any reference without having
11 a chance to review the document.
12     Q.    Okay.  So you're not willing to
13 take my word for it that they're not in
14 there?  You're willing to look.  Why don't
15 you take a look, that's fine.
16          Do you want to look at -- and I
17 can direct your attention, for example, to
18 make this go a little faster, okay, if you
19 don't mind, go to the very last page.
20          Do you see that last question
21 there, "What are the ingredients in Diovan?"
22     A.    I do.
23     Q.    Okay.  Do you see any reference
24 to NDEA, NDMA?

Page 201

1     A.    I am not a chemist.  I don't
2 know the different forms and labels.  Those
3 drugs may be represented some other way.  I
4 cannot answer the question.
5     Q.    Would you agree with me --
6 let's start with just a very general
7 proposition.
8          Would you agree with me that a
9 manufacturer of valsartan when they
10 distribute it into the US market, by calling
11 it valsartan and by distributing this label
12 with it, they're conveying some kind of
13 message to the people that will interact with
14 it, namely physicians and consumers, correct?
15          MR. GOLDBERG:  Objection to
16 form.  Foundation.
17     A.    Please be more specific.
18 BY MR. DAVIS:
19     Q.    Do you think that by -- when a
20 manufacturer of valsartan distributes
21 valsartan in the US market, by calling it
22 valsartan, are they conveying a message that
23 it's valsartan?  It's a pretty general
24 proposition, right?

Confidential Information Subject to Protective Order

Page 202

1    A.    They're saying it's valsartan.
2 I'm not going to speak to what that means to
3 consumers, or physicians or anybody else.
4    Q.    But there's a message embedded
5 in there, right, that this is valsartan,
6 correct?
7    A.    I am not an expert on the drug
8 ingredients, and I don't know what that
9 communication would mean.
10    All I'm willing to acknowledge
11 is if they say it's valsartan, that that may
12 have meaning, and different meanings to
13 different people.  I am not an expert on
14 valsartan, and I cannot give you an opinion.
15    Q.    Sure.
16    And let's excise that from the
17 question, which by that I mean whatever
18 valsartan means, by calling it valsartan, the
19 manufacturer is conveying a message that it's
20 valsartan, whatever that means, right?
21    A.    I'm just -- I am always
22 representing the consumer point of view, and
23 valsartan would just have different meanings
24 for different consumers based on the

Page 203

1 different messages and the context in which
2 these, you know, messages and drugs were
3 taken.
4    So I don't want to give the
5 impression that if there was a term valsartan
6 that all consumers would derive the same
7 meaning from it.
8    Q.    Well, I'm not talking about the
9 recipient of the message right now.  I'm
10 talking about the entity delivering the
11 message.
12    I'm saying that -- what I'm
13 asking you is do you agree that by calling it
14 valsartan, the manufacturer that calls it
15 valsartan is intending to convey a message
16 that it's valsartan, whatever that means?
17    A.    Okay.
18    Q.    You don't take any issue with
19 that, right?  It's a pretty simple
20 proposition.
21    A.    I don't like answering
22 questions that end in "whatever it means."
23 That's just my comfort level.
24    Q.    Whatever valsartan means.  I'm

Page 204

1 trying to --
2    A.    I understand.
3    Q.    I heard what you said about
4 that.
5    A.    I understand.
6    Q.    So what I'm trying to do is
7 just focus on a very simple question here.
8    And is there anything about
9 that that you disagree with, that a
10 manufacturer is not attempting to convey the
11 message that this is valsartan by calling it
12 valsartan, whatever that term valsartan
13 means?
14    A.    Okay.
15    Q.    And similarly with Exhibit 9
16 we're looking at, this label, prescribing
17 information, there's a message there, or
18 multiple messages in fact, but they all
19 relate to valsartan, correct?
20    A.    Now I will need to read the
21 document.  I anticipated this.
22    Q.    You don't think that this
23 document that has to do with valsartan
24 conveys a message about valsartan, or

Page 205

1 multiple messages?  It's a pretty simple
2 question.
3    A.    I cannot answer that question.
4 I mean, if you're just saying is there
5 communication about valsartan in here?  I
6 would say yes.  For me, a message has a
7 different meaning, and I would need to read
8 the document to understand what the
9 message -- multiple messages might be.
10    Q.    Okay.  Let's go back to your
11 report for a moment, and again that section E
12 that's titled Real-world evidence indicates
13 that the at-issue VCDs held value.
14    A.    Yes.
15    Q.    And I understand you have --
16 you know, and I'm going to try and
17 short-circuit a long back and forth here by
18 stating that I understand that you have quite
19 a few sources of general applicability here
20 to support what you're saying amounts to
21 real-world evidence of value.
22    My question very specifically
23 here is, what evidence from this fact
24 situation and case specifically, what

Confidential Information Subject to Protective Order

Page 206

1 valsartan-specific evidence do you have that
2 is real-world evidence that indicates that
3 the VCDs at issue had value?
4     A.    I have evidence from the
5 individual depositions from the plaintiffs,
6 and I have quoted some of them, who said that
7 the at-issue VCDs provided them with
8 therapeutic benefit.
9         I want to qualify, this is a
10 small subset of depositions. I know that
11 there were probably thousands if not tens of
12 thousands consumers who took valsartan and
13 this is a small group. But this is one
14 source of evidence that consumers who took
15 the at-issue valsartan said that -- some of
16 them, not all of them -- that it helped them
17 with controlling their blood pressure, that
18 they had fewer side effects such as
19 light-headedness and dizziness and nausea,
20 and that they did not suffer any extreme
21 emotional consequences to the point of
22 actually seeking professional help. So those
23 are just some examples of value from the
24 real-world evidence.

Page 207

1         I also -- the other sources of
2 value also come from information in the
3 public press as well as in some of the
4 depositions, in the individual plaintiff
5 depositions, where physicians are either
6 publicly recommended, for example, I believe
7 Dr. Neeson, to AARP group members that, you
8 know, they should not stop taking the
9 at-issue VCDs on their own without talking to
10 their physicians because it is more important
11 to control their blood pressure, and they
12 could face very serious consequences, health
13 consequences if they stopped, and that it
14 would be -- the trade-off would be -- even if
15 there were any problems in the short or the
16 long-term with regard to any of the potential
17 cancers, which again would vary across
18 individuals, that the immediate serious
19 health consequence of stopping their at-issue
20 VCDs would be serious.
21         So the sources, just to sum,
22 are the plaintiff depositions as well as --
23 as well as physicians. This includes
24 cardiologists who shared that the at-issue

Page 208

1 VCDs held value.
2     Q.    Anything else, or those two?
3     A.    I will also add -- thank you
4 for asking -- the FDA also mentioned that
5 consumers or patients who were taking the
6 at-issue VCDs should not stop taking the
7 VCDs, thereby indicating that they held
8 value, unless, you know, an alternative was
9 available to them. So that is also a source.
10         So I appreciate your giving me
11 a chance.
12     Q.    Sure.
13         So you've identified those
14 three things. Is that everything?
15     A.    To the best of my recall.
16     Q.    Sure. Okay. Well, let's, I
17 guess, take them somewhat in order.
18         You concede, you know, for the
19 first point, which is the plaintiff
20 depositions, you do concede at paragraph 52
21 that in your view "The statements of
22 consumers, particularly those...in
23 litigation, regarding their retrospective
24 valuation of at-issue VCDs may not be

Page 209

1 reliable measures of even individual value
2 assessments," right?
3     A.    I will say yes and no.
4     Q.    Why are you saying yes and no
5 to something you wrote in your report?
6     A.    Again, because of the context
7 in which you are reading out that one
8 sentence, and I'm going to do the following
9 sentence, which is -- okay, so I read it so I
10 don't have to go through the -- this will be
11 more efficient.
12         "Nonetheless, testimony of
13 several consumer-plaintiffs in this case
14 corroborates this post-awareness value for
15 the at-issue VCDs," and then we have a quote
16 from Samuel Cisneros. I hope I didn't
17 butcher that.
18         And "Additionally, many other
19 consumers that even with their current
20 knowledge of the impurities, the VCDs they
21 took were effective in treating their
22 hypertension."
23     Q.    Since you called out
24 Mr. Cisneros particularly, I'm going to mark

Confidential Information Subject to Protective Order

Page 210

¹ Exhibit 10 here.
²      (Whereupon, Keller Exhibit
³     Number 10 was marked for
⁴     identification.)
⁵ BY MR. DAVIS:
⁶    Q.   Did you read the entirety of
⁷ Mr. Cisneros' deposition?
⁸    A.   I did.
⁹    Q.   Did you read the entirety of
¹⁰ every class rep deposition that you cite in
¹¹ your materials considered?
¹²    A.   I read some of them, and I
¹³ reviewed the rest.
¹⁴    Q.   How did you make a decision
¹⁵ about which ones to read in their entirety
¹⁶ and which ones to read portions of?
¹⁷    A.   I used a couple of different
¹⁸ selection criteria.  I was -- in alignment
¹⁹ with my MICI framework, I was looking for
²⁰ different types of individuals, you know,
²¹ male, female, race, education, just to get
²² some variety or variance in those individual
²³ characteristics.
²⁴     I also, for contextual

Page 211

¹ variance, I looked at things like whether
² they were smokers or drank alcohol or
³ consumed red meat, so just to give you an
⁴ example of my methodology.
⁵     So I selected as -- like a
⁶ researcher, I tried to select different types
⁷ of consumers in the set of depositions.
⁸    Q.   Were you provided the full
⁹ transcripts, or were you provided some full
¹⁰ transcripts and some incomplete transcripts?
¹¹    A.   I was provided the full
¹² transcripts.
¹³    Q.   Okay.  And I get -- I hear what
¹⁴ you're saying, that you tried to review some
¹⁵ of them based on varying individual
¹⁶ characteristics.
¹⁷     How did you decide which of
¹⁸ those to review in full and which of those to
¹⁹ review selections of?
²⁰    A.   I -- once I started looking and
²¹ I started reading it, if I thought it was
²² interesting I read the whole thing.
²³     I will admit that sometimes,
²⁴ you know, if it was shorter I was more

Page 212

¹ motivated, if it was 173 pages versus 349
² pages.
³     And at other times I felt, you
⁴ know, I was not getting any new insights or
⁵ information, so then I would just review the
⁶ rest of the document.
⁷    Q.   Okay.  I mean, we're talking
⁸ about thousands upon thousands of pages of
⁹ testimony here, right?
¹⁰    A.   I am aware.  I don't want to
¹¹ say -- I'm not going to multiply or give you
¹² a number, but I know that there were over 40
¹³ depositions, and the range was typically
¹⁴ anywhere from like 150, 160 pages to like 350
¹⁵ or 400-plus pages, so yes.
¹⁶    Q.   Okay.  So many thousands of
¹⁷ pages?
¹⁸    A.   Correct.
¹⁹    Q.   So would you have reviewed
²⁰ page 99 of Mr. Cisneros' deposition that I
²¹ have for you there?  Do you see where he says
²² on lines 11 through 13, "███████████
²³ ████████████████████████████████████
²⁴ ████████████████."

Page 213

¹     Do you see that?
²    A.   Yes, I do.
³    Q.   Does that sound like someone
⁴ who would pay a dime for contaminated
⁵ valsartan?
⁶    A.   ████████████████████
⁷ ████████████████████████, which I'm
⁸ going to object to now because I don't
⁹ believe that that is necessarily the message
¹⁰ that he was given, "███████████████████
¹¹ ██████████" is not saying that he did
¹² not get any value from it.  Because I just
¹³ quoted something in my report that said██
¹⁴ ████████████████████████████████████
¹⁵ █████████████████.
¹⁶    Q.   Right.  So let me see if I
¹⁷ understand what you're saying.
¹⁸     You're drawing a distinction
¹⁹ between therapeutic value and economic value,
²⁰ right?
²¹    A.   In part correct.  I am saying
²² that the value or worth of a drug will vary
²³ by consumers who are going to compare the
²⁴ benefits, and that includes therapeutic

Confidential Information Subject to Protective Order

---

Page 214

1  benefits just like you describe, and the
2  costs of the drug, and that includes price.
3        So you have many other
4  variables going on simultaneously on the
5  benefit and the cost side in order to make an
6  assessment of value.
7     Q.    And for you that's therapeutic
8  value in the context that we're talking about
9  right here with Mr. Cisneros?
10    A.    All I'm saying is as a
11 researcher who is looking at this, I would
12 not assume the value is zero or the drug is
13 worth nothing to him because ██████████████
14 ████████████████████████████████████
15 ████████████████████████████████
16 ██████████████████████████████
17 ████████
18        And even though what I just
19 read is -- ████████████████████████████
20 ████████ it does not mean that the calculation
21 of what the drug is worth is zero.
22    Q.    Do you have any reason to doubt
23 ████████████████████████████████████
24 ████████

---

Page 215

1     A.    I don't have any context to
2  answer that question.
3     Q.    Then you -- back to your
4  report, you provide a citation, this is
5  paragraph 52, to it looks like about a dozen
6  or so class reps, right?
7     A.    Yes.
8     Q.    Okay.  Did you read all of
9  those transcripts in their entirety?
10    A.    I read or reviewed all of them.
11    Q.    Okay.  So were you aware, for
12 example, that Eric Erwin in his deposition,
13 who is in your footnote here, that he stated
14 that non-contaminated VCDs wouldn't even hold
15 value for him if they came from a facility
16 that had issues?
17    A.    I don't recall that exact
18 statement, but I'll take your word for it.
19        And it supports my general
20 premise that different consumers will take
21 into account different message variables,
22 their individual differences will lead them
23 to put weights on different pieces of
24 information, and the context in which that

---

Page 216

1  they are making this decision, that includes
2  not only their physician but their diet and
3  lifestyle, would all have an impact on how
4  they would use either a compensatory or
5  non-compensatory decision.
6        So I mean just go back to this
7  footnote.  Part of what I learned from
8  reading and reviewing these plaintiff
9  depositions was the fact that many of the
10 variables that I've just mentioned, the
11 message, the individual difference, and the
12 context, were all part of the ecosystem or
13 the wholistic inputs into thinking about the
14 drug.
15    Q.    Okay.  You also refer to a
16 Mr. Dennis Kaplan's testimony in your
17 footnote there.  Did you read at page 145 of
18 his deposition that "they should never have
19 enabled it to be out in the market where I
20 and other people could have taken it"?  Did
21 you read that portion of his deposition?
22    A.    Again, I don't recall that
23 exact thing, but I believe you.  If you are
24 stating that was in his deposition, I believe

---

Page 217

1  you.
2        And again, just your last two
3  examples showed how much variance there is in
4  how consumers would respond to this
5  information.
6     Q.    What about page 18 of Mary
7  McLean's deposition where she says, "I
8  wouldn't have taken it knowing that it was
9  contaminated."  Do you recall reading that?
10    A.    Again, I do not recall
11 specifically, but it does -- it does not go
12 against my premise that consumers will have a
13 range of reactions to the recall.
14    Q.    Okay.  But you're citing these
15 people in particular to say that they
16 acknowledged it had value, but they're all
17 telling you -- or they're all telling under
18 oath that it had no economic value for them,
19 that they wouldn't have purchased it, right?
20    A.    I'm sorry to repeat this again.
21 Value equals benefit minus cost.  They're
22 acknowledging there was therapeutic benefit.
23 That means something positive.  Even if some
24 of them are acknowledging that there is no

---

Confidential Information Subject to Protective Order

Page 218

1  economic value, one cannot assume that the
2  sum or the difference between all of their
3  benefits and costs would equal not only
4  uniform, but would equal zero.
5      Q.    I want you to -- and I hear
6  what you're saying regarding therapeutic
7  benefit, that there's -- your assertion is
8  that there's therapeutic value here and that
9  has to be accounted for, right?
10      A.    My assertion is that there are
11  benefits and costs that need to be assessed
12  in order to make a determination of worth,
13  and therapeutic benefit is one example of
14  benefit.
15      Q.    So let me ask you to -- I'm
16  going to set forth a hypothetical for you,
17  and I want -- I'm going to walk through it
18  step-by-step, and indulge me here, if you
19  don't mind.
20          I want you to assume that for
21  all of the at-issue VCDs, that they were all
22  adulterated.
23          Do you follow me there?
24      A.    Okay.

Page 219

1      Q.    Okay.  And as I showed you in
2  the US Code exhibit I showed you, 21 USC 331,
3  I showed you that it's illegal to distribute
4  adulterated drugs, right?
5      A.    That's the document I did not
6  have a chance to review, is that correct?
7  Are you referring to Exhibit 9?
8      Q.    I'm referring to Exhibit 7
9  here.
10      A.    Oh, I'm so sorry.
11          Okay.  That's also a document
12  that I did not review completely, and you
13  just read the first page.
14      Q.    Well, indulge my hypothetical
15  here, that all the at-issue VCDs here were
16  adulterated, and indulge me also that it was
17  illegal to sell those adulterated drugs, for
18  example, under 21 USC 331 or Exhibit 7.
19          Do you follow me so far?
20      A.    Mm-hmm.
21      Q.    I want you to also assume that
22  these VCDs are economically worthless at the
23  point of sale regardless of any medical
24  benefit they provide.  I want you to assume

Page 220

1  that for me.  I know you disagree with it,
2  but I want you to assume that with me, right?
3  Okay?
4      A.    Okay.
5      Q.    Assuming those things, would
6  you not agree that the value of these drugs
7  is zero dollars?
8      A.    I disagree.
9      Q.    Okay.  How do you disagree with
10  that?
11      A.    As I said, there is a set of
12  benefits.  The therapeutic benefits is just
13  one benefit.  So saying to me that there is
14  no therapeutic benefit just makes the value
15  of therapeutic benefits in the set of
16  benefits zero, but not the other benefits.
17          When you say it's unavailable
18  and the price is zero, yes, there is no
19  economic price or cost in the set of costs,
20  but there are many other costs.
21          So again, the remaining, not
22  the therapeutic value which you asked me to
23  assume is zero, and not the price that you
24  asked me to assume is zero, there are other

Page 221

1  variables in this equation that would
2  determine worth.
3      Q.    I think you misheard the third
4  part there.  Let me try it again.
5          So I've got -- I think we're
6  through two points, right, in this
7  hypothetical, which is that all the at-issue
8  VCDs here are adulterated, that the sale of
9  those drugs would have been prohibited under
10  the law, correct?
11      A.    Correct.
12      Q.    Okay.  Meaning that there would
13  have been no supply of them in the market,
14  and no ability for consumers to purchase
15  them, right?
16      A.    Okay.
17      Q.    Okay.  And then I want you to
18  assume that the value of those drugs from an
19  economic standpoint as applied to -- that
20  every single person was found to have derived
21  zero economic value from these drugs
22  regardless of the medical benefit they may
23  have provided.
24          Do you follow me?

Confidential Information Subject to Protective Order

Page 222

1    A.   I do follow you, and I
2  disagree.  I cannot -- I cannot respond
3  because I disagree with the basic premise.
4    Q.   Okay.  So, well, let me show
5  you something then.
6         Well, follow me through.  I
7  know you disagree with the premise.
8    A.   Okay.
9    Q.   But follow me through here.
10   A.   Okay.
11   Q.   And let's just take it as a
12 fact, even if you disagree with that fact,
13 that for every single consumer of these drugs
14 that there was zero economic value for them
15 at the time of sale, that the drugs were
16 economically worthless at the time of sale
17 regardless of any medical benefit to be
18 derived from them.  Assume that for me, that
19 that applies to everyone.
20        Would you not agree that,
21 assuming those things, that the value of the
22 drugs in that case would be zero dollars,
23 granted that you disagree with the premise?
24        MR. GOLDBERG:  Objection to

Page 223

1  form.  Foundation.
2    A.   I'm going to go back to my
3  formula and say that there will be a range of
4  consumers, and I have this information in my
5  report, actually throughout my report, so I
6  can't even tell you which section of IV this
7  would belong to, but that there would be a
8  range of consumers who would say that the
9  drug had value to me, or has value to me --
10 even if they cannot get it, that the drug has
11 value to me because I did not have side
12 effects; the drug has value to me because I
13 had peace of mind; the drug had value to me
14 because I could take it in a single pill
15 form.
16        And I'll go to the cost side,
17 not paying anything, as you said, that I
18 don't -- the drug had value to me because it
19 was familiar and now I have to learn about
20 another drug; the drug has value to me
21 because now I have to go and talk to my
22 physician about another prescription; the
23 drug has value to me because -- okay.
24        I'll stop there.  So you got my

Page 224

1  general idea.
2  BY MR. DAVIS:
3    Q.   Sure.  And I'm trying to
4  exclude that from this hypothetical, and I
5  know you disagree with the premise, I know
6  you do, and you've articulated that.  But
7  just follow me through with the premise here,
8  which is that it's been determined for every
9  single one of these consumers who you just
10 posited a list of questions they might ask or
11 opinions they may have, just assume for me
12 that it's been determined that the drugs are
13 economically worthless for them regardless of
14 all that stuff.
15        Do you follow me?
16   A.   Yes.
17   Q.   Okay.  And in that situation,
18 combine that with the fact that all the drugs
19 are posited to have been adulterated and
20 therefore illegally sold, couldn't have
21 gotten them, couldn't have paid anything for
22 them, at that point, with all those premises
23 and stuff that you don't agree with, but just
24 follow me through, would you agree with me at

Page 225

1  that point, if all those things were true,
2  which I get you don't agree with, that the
3  drugs would have no value at that point,
4  economic value?
5    A.   Whoever made that determination
6  was wrong.
7    Q.   Okay.
8         MR. DAVIS:  I'm going to mark
9  an exhibit here.
10        MR. GOLDBERG:  John, do you
11 want to take a minute break?  We've
12 been going another 90 minutes.
13        MR. DAVIS:  I just want to
14 finish this real fast, and then I'm
15 close to being done, to be honest.
16        MR. GOLDBERG:  Okay.  Got it.
17        MR. DAVIS:  I'll probably want
18 to take a quick break just to go
19 through my notes.
20        MR. GOLDBERG:  Sure.  Got it.
21        MR. DAVIS:  I'm going to mark
22 Exhibit 11.
23        (Whereupon, Keller Exhibit
24 Number 11 was marked for

Confidential Information Subject to Protective Order

Page 226

1    identification.)
2  BY MR. DAVIS:
3    Q.    Just to pick up where we left
4  off, you testified to me that you thought
5  that that person who made that determination
6  would be wrong, correct?
7    A.    Yes.
8    Q.    Okay.  Do you understand that
9  the Court is that person that's made that
10  determination in this case?
11        MR. GOLDBERG:  Objection to
12    form.  Foundation, mischaracterizes
13    the document.
14  BY MR. DAVIS:
15    Q.    Why don't you flip to --
16        MR. GOLDBERG:  You're marking
17    this as --
18        MR. DAVIS:  This is Exhibit 11,
19    I believe.
20  BY MR. DAVIS:
21    Q.    I want you to turn to page 20
22  of the document.  The numbering is very small
23  in the top right corner.
24    A.    And again, I haven't had time

Page 227

1  to review this document.
2        MR. GOLDBERG:  Somehow we're
3    going to have to figure out what you
4    want to do here.  She hasn't reviewed
5    the document.  I know you want to ask
6    her about page 20.
7        MR. DAVIS:  I don't really have
8    much to ask her.  I just want to --
9        MR. GOLDBERG:  I think you
10    should explain to her what the
11    document is, and give her a second to
12    at least scan it for a minute or two
13    so she can get familiar with the
14    document.
15  BY MR. DAVIS:
16    Q.    I will represent to you this is
17  an opinion that the Court has issued in this
18  case, a written opinion.  Do you see the case
19  header up there, "In Re: Valsartan"?
20    A.    I see that.
21    Q.    And do you see that on the
22  right in bold there it says, "MTD Opinion 3:
23  Warranty Claims"?
24    A.    Yes.

Page 228

1    Q.    You then you see "Kugler,
2  United States District Judge"?
3    A.    Yes.
4    Q.    Okay.  And in fact, that blue
5  version at the top -- sorry, it's blue in my
6  version, but it printed black and white, but
7  you'll see the case number information, Case
8  1:19-md-2875, document number 775, filed on
9  to the docket January 22, 2021.
10        Do you see that?
11    A.    Yes.
12    Q.    Okay.  So I'll represent to you
13  that this is an opinion of the Court that's
14  been entered into this case.  And I just want
15  to -- I'm not going to ask you any detailed
16  questions about it, but on page 20 --
17    A.    Sorry for clarification.  So
18  when you say "an opinion of the Court," is
19  that the same thing as the opinion of the
20  judge?
21    Q.    Yes, yes.  The judge's order.
22    A.    Thank you.
23    Q.    And on page 20 the Court says,
24  "This court finds that contaminated drugs are

Page 229

1  economically worthless at the point of sale
2  by virtue of the dangerousness caused by
3  their contamination, regardless whether the
4  sole VCDs actually achieved the medical
5  purpose of lowering blood pressure.  Put
6  differently, contaminated drugs, even if
7  medically efficacious for their purpose,
8  cannot create a benefit of the bargain
9  because the contaminants, and their dangerous
10  effects, were never bargained for."
11        Do you see that?
12    A.    Yes.
13    Q.    And your testimony is you
14  disagree with that?
15    A.    I did not testify that I
16  disagreed with this.  I testified that I
17  disagreed with your example.
18        I will now say that I don't
19  know the context in which this determination
20  or this decision was made.  I don't know what
21  other facts were provided to the Court or to
22  the judge.  I am not a lawyer.  And I don't
23  know what was the input for this decision,
24  and how -- what the laws are that helped make

Page 230

1  this determination, but to say that a drug is
2  worthless because it's -- let me read that
3  again, even if it is efficacious that the
4  economic value is zero is wrong.
5      Q.    Okay.  But you testified
6  earlier that you've never done an economic
7  damages analysis in litigation, have you?
8      A.    Correct.
9      Q.    And you've never done one
10  period, right?
11      A.    Correct.
12      Q.    Okay.  And you're not an
13  economist, right?
14      A.    I have a bachelor's in
15  economics, but I'm not an economist.
16      Q.    All right.  Thank you.
17      MR. DAVIS:  Let's take a quick
18  break, five minutes, and I'm pretty
19  close.
20      MR. GOLDBERG:  Okay.
21      MR. DAVIS:  We can go off the
22  record.
23      THE VIDEOGRAPHER:  Off the
24  record at 3:29.

Page 231

1      (Whereupon, a recess was
2  taken.)
3      THE VIDEOGRAPHER:  Back on the
4  record at 3:46.
5  BY MR. DAVIS:
6      Q.    I've just got ten more minutes
7  of questions maybe and one new document for
8  you.
9      So just to re-cover one area
10  very briefly, do you remember talking with me
11  about -- we were going back and forth about
12  the fact that there's a message embedded in
13  calling the product valsartan, whatever the
14  consumer made of that message or whatever the
15  term valsartan means, I think we agreed that
16  there was a message embedded in there, right?
17      A.    My recall is that this was in
18  response to the document that you showed me
19  that's Exhibit 9 that I didn't review in
20  total, and that I said I would concede that
21  there is communication in there.
22      In my expertise on health
23  message processing, I could not make a
24  determination if there was a message in

Page 232

1  there.
2      Q.    But there's a communication,
3  right?
4      A.    There's some material, written
5  material in there.
6      Q.    Okay.  And your -- and I don't
7  want to overgeneralize here, but your whole
8  focus is oriented towards the consumer,
9  right?  You look at things from a mostly
10  consumer standpoint, and that also includes
11  the physician, I suppose, but your whole
12  focus is sort of consumer-oriented, right?
13      A.    I am an expert on how consumers
14  assess value or worth of products and
15  services they're considering, have consumed,
16  or want to continue consuming.  And so yes,
17  from that perspective I'm focused on the
18  consumers' assessment of worthiness.
19      Q.    Okay.  Would you agree with me
20  that the communication that -- you know, and
21  I'll adopt your term here, communication --
22  that the communication of calling the drug
23  valsartan, that was a communication that
24  consumers really had no choice but to rely

Page 233

1  on, right?
2      A.    Incorrect.  It is very clear
3  that consumers have a lot of different
4  sources of communication from different
5  people, from -- in different formats, and
6  that who would seek what kind of information
7  in different times, in different formats
8  would depend on the individual.  It would
9  need to be an individual inquiry.
10      Q.    That's your opinion?
11      A.    Yes.
12      Q.    Okay.  Well, flip to -- back to
13  Exhibit 11, if you don't mind.
14      A.    Sure.
15      Q.    And go to page 14.
16      A.    Just give me a moment because I
17  can't see it.  All right.
18      Q.    Do you see in the last --
19  second to last full paragraph on that page it
20  starts with "The manufacturer's very naming
21  of the drug"?
22      A.    Yes.
23      Q.    It reads, "The manufacturer's
24  very naming of the drug as valsartan or

Confidential Information Subject to Protective Order

Page 234

¹ valsartan-containing amounted to an express
² warranty on which plaintiffs had no choice
³ but to 'rely' when they were prescribed the
⁴ drug and bought it as a medication for their
⁵ high blood pressure."
⁶       Do you see that?
⁷    A.   Yes.
⁸    Q.   Okay.  And do you see that
⁹ that's part of this Court opinion that I
¹⁰ showed you earlier?
¹¹    A.   Yes.
¹²    Q.   And you disagree with that?
¹³    A.   I said I did not have an
¹⁴ opinion on that because I am not a lawyer and
¹⁵ I do not have all the information that was
¹⁶ presented to this Court before this
¹⁷ determination was made.  I cannot agree or
¹⁸ disagree with this statement.
¹⁹       MR. DAVIS:  Okay.  I'm going to
²⁰ mark Exhibit 12.
²¹       (Whereupon, Keller Exhibit
²²       Number 12 was marked for
²³       identification.)
²⁴          ///

Page 235

¹ BY MR. DAVIS:
²    Q.   Do you recognize this as -- I
³ suppose it's not technically your invoice,
⁴ but it's Analysis Group's invoice to
⁵ Mr. Goldberg here.
⁶       Do you see that?
⁷    A.   I do.
⁸    Q.   Okay.  And it includes -- it
⁹ includes the statement that this is just the
¹⁰ ZHP share of that invoice for 16.67 percent
¹¹ of the total.
¹²       Do you see that on page 1?
¹³    A.   I do.  But I'll be honest with
¹⁴ you, I'm not sure exactly what that 16.6
¹⁵ refers to.
¹⁶    Q.   Let me ask it a different way.
¹⁷       Did you prepare this invoice?
¹⁸    A.   No, no.
¹⁹    Q.   All right.
²⁰    A.   When you say "this," you're
²¹ talking about the page that you're just
²² referring to, right?
²³    Q.   Yes.
²⁴    A.   I don't know what's on the

Page 236

¹ remaining pages.
²    Q.   Did you actually send this
³ invoice to -- okay, somebody else did that?
⁴    A.   I did not prepare or send the
⁵ invoice.
⁶    Q.   You'll see on page 1 it says
⁷ that the invoice is "For professional
⁸ services rendered in connection with the
⁹ above referenced case for the period ending
¹⁰ December 31, 2021," right?
¹¹    A.   Yes.
¹²    Q.   Okay.  And your report was
¹³ signed on January 12th, correct?
¹⁴    A.   Correct.
¹⁵    Q.   And you've also done some work
¹⁶ on the case since that point, right?
¹⁷    A.   Yes.
¹⁸    Q.   You're sitting here today, for
¹⁹ example.  Did you sit for any preparation
²⁰ sessions?
²¹    A.   Yes.
²²    Q.   Okay.  About how many would
²³ that be?
²⁴    A.   Sessions defined by what unit

Page 237

¹ of time?
²    Q.   Hours.
³    A.   Hours.
⁴       Are you talking about
⁵ preparation that I did for the depo on my
⁶ own, or only in some other context?
⁷    Q.   Sure.  Any context.
⁸       What I'm trying to get at is
⁹ what your next invoice might look like.
¹⁰    A.   I cannot -- I cannot give you
¹¹ an exact number because I have not calculated
¹² it.
¹³    Q.   Do you think that it's -- for
¹⁴ example in this invoice you had billed -- you
¹⁵ personally had billed 37 hours.  Do you think
¹⁶ it's more than that?
¹⁷    A.   I don't want to guess.  I'd
¹⁸ like to go back to my records to check.
¹⁹    Q.   Okay.  When do you anticipate
²⁰ the next invoice being submitted to the
²¹ defendants in this case by Analysis Group?
²²    A.   Oh, I don't know when Analysis
²³ Group would submit it.
²⁴    Q.   Do these invoices get sent out

Confidential Information Subject to Protective Order

Page 238

1  monthly or quarterly?

2      A.    I don't know what their

3  procedure is.

4      Q.    Okay.  It says your rate here

5  is $1,000 per hour, is that correct?

6      A.    Yes.

7      Q.    Okay.  And then there's a

8  number of Analysis Group professionals that

9  are also listed here, correct?

10     A.    Should I turn the page?

11     Q.    Sure, on page 2, yeah.

12     A.    Yes.

13     Q.    Do you recognize all those

14 names?

15     A.    Yes.

16     Q.    How did you select those people

17 to work with on this report?

18     A.    I did not select them to work

19 with me on the report.  One of the members of

20 the team, Brian Ellman, got in touch with me

21 and asked me if I would be interested in

22 speaking to some lawyers about this case, and

23 I agreed, and I did so.  And the lawyers

24 decided to retain me, and this team came as

Page 239

1  part of that.

2      Q.    So you don't know who --

3  putting aside Mr. Ellman, all the names below

4  him, you don't know how those individuals

5  were assigned to your team?

6      A.    No.

7      Q.    Okay.  Did you independently go

8  and vet any of their credentials?

9      A.    No.

10     Q.    Okay.  And do the hour

11 allocations here on page 2 look accurate to

12 you, that you billed 37 hours, and this whole

13 team here billed 326 hours --

14     A.    Well --

15     Q.    -- up to this point?

16     A.    -- I'm assuming it's accurate.

17 It's not something that I ever saw until this

18 document was presented to me.

19     Q.    If you go to the third page,

20 the next page.

21     A.    Yes.

22     Q.    You'll see that this is your

23 line item of your work on the case, right?

24     A.    Yes.

Page 240

1      Q.    Did you write those narrative

2  entries there?

3      A.    I did.

4      Q.    And would that be the same

5  for -- to the best of your understanding,

6  maybe you don't have any idea, but for these

7  other individuals at Analysis Group, Ellman,

8  O'Laughlin, below, would they have written

9  their own narrative descriptions?

10     A.    I have no idea.

11     Q.    You have no idea.

12         You would expect they probably

13 would have, though?

14     A.    I have no idea.

15     Q.    So what did these Analysis

16 Group employees do for you on this case?

17     A.    The short answer is that I use

18 them the way I use research assistants.  As

19 you mentioned, I got the case -- not the

20 case, sorry.

21         I got the request to be an

22 expert witness and write a report late last

23 year, and that is when the students are on

24 break.  And just like I use the students as

Page 241

1  research assistants, I did the same with the

2  AG team.

3      Q.    Okay.  Did that include them

4  writing any of your report in its draft form?

5      A.    The way it works is I work on

6  the report, I ask them for collaborating or

7  supporting material on -- for my opinions, I

8  ask them to read those materials that I

9  provided and find similar materials to help

10 me make a list of the references that I might

11 want to cite or I might not want to cite.

12         And I also, you know, ask them

13 as they were going through this if they had

14 any ideas, you know, they're welcome to share

15 them.  But at the end of the day it's my

16 report, I care about quality, and I accept or

17 reject, you know, any ideas from anyone.

18     Q.    Okay.  And your invoice, your

19 time here is complete, in your opinion, up

20 through December 31st?

21     A.    I mean, I will say that I, as

22 in other cases, I don't put in time that's

23 related to thinking or abstract things that

24 are associated with some of the case

Confidential Information Subject to Protective Order

Page 242

1  preparation.  And, yeah, so I will say it's
2  pretty accurate.
3      Q.    Okay.  But more tangible things
4  like actually writing the report, that would
5  something you would bill, right?
6      A.    So reading, writing, revising,
7  editing, checking, searching for literature
8  myself, those would be tangible things.
9      Q.    Why is it in your line items
10  for time that the first time the mention of
11  any draft report appears is on December 16,
12  2021 where you say you reviewed an already
13  existed draft report?
14      A.    That's not how I interpret
15  "review."  For me, as I mentioned earlier, as
16  a reviewer and an aid, I think of review as
17  creating drafts, revising drafts, editing
18  drafts, for me it's all part of a review
19  process.
20      Q.    So what you're saying is you
21  may have miswritten the narrative here and
22  this is when you started writing the report,
23  December 16th?
24      A.    No.  From my perspective I'm

Page 243

1  not misrepresenting it.  That's what review
2  means for me.
3          So, for example, if you use the
4  page that we're looking at, when I say
5  "Review of Conti Declaration and Protective
6  Order," 12/09, I'm already reviewing and
7  writing the report based on what I'm seeing
8  from Dr. Conti's declaration and thoughts in
9  response to the protective order.
10          When I say "Review of online
11  Valsartan recall materials," I'm already
12  writing parts of the report because I'm
13  thinking about -- I'm thinking about what
14  will go into forming my opinions in the
15  report that are connected with these
16  materials.
17      Q.    Sure.
18          Go down to Mr. Ellman's hours
19  on page 4, the next page.  He says on
20  December 10th that he had a call with the
21  case team and reviewed an outline.
22          Do you recall what he is
23  referring to by the "outline" there?
24      A.    I do not.

Page 244

1      Q.    Okay.  Was that something that
2  was provided by counsel?
3      A.    I do not know that.
4      Q.    Okay.  You'll see that a number
5  of the other Analysis Group employees do have
6  narrative line items regarding their work
7  drafting the report.
8          Take a look at Laura O'Laughlin
9  on page 4.  For example, on December 8th she
10  says, "Assist in preparing expert report."
11          Do you see that?
12      A.    Yes.
13      Q.    Same thing on the 9th, same
14  thing on the 10th.
15          And then if you go down to Kate
16  Schoenbach, I believe -- I hope I pronounced
17  that right, she says she "assisted with
18  drafting," and then something is redacted
19  there for a number of days.
20      A.    Correct.
21      Q.    Okay.  Same thing with
22  Mr. Jacob Eby, he says that he -- for
23  example, on December 13th he said he assisted
24  in drafting.

Page 245

1      A.    Yes.
2      Q.    And that's all prior to
3  December 16th where you first mention
4  reviewing a draft report, right?
5      A.    As I mentioned earlier, for me,
6  I started writing the report, you know, and
7  thinking -- you know, thinking through what I
8  would be looking for during that first call
9  with counsel.  And I continued doing it on
10  the 9th, on the 10th, on the 16th, on the
11  17th, on the dates that you see there.
12          MR. DAVIS:  Okay.  All right.
13  I believe that's all the questions I
14  have.
15          I will make a formal request
16  that when the next invoice is
17  submitted that that be produced to us
18  as soon as possible.
19          And thank you, Dr. Keller.  I
20  appreciate your time today.
21          THE WITNESS:  Thank you very
22  much, I appreciate it.
23          MR. GOLDBERG:  Just give us a
24  two-minute break and we can figure out

Confidential Information Subject to Protective Order

Page 246

1  if we have any questions for
2  Dr. Keller.
3      MR. DAVIS:  Sure.
4      THE VIDEOGRAPHER:  Off the
5  record at 4:03.
6      (Whereupon, a recess was
7  taken.)
8      THE VIDEOGRAPHER:  Back on the
9  record at 4:07.
10     MR. GOLDBERG:  We have no
11  questions for Dr. Keller at this time.
12  Thank you.
13     MR. DAVIS:  Okay.  Thanks.
14     THE WITNESS:  Thank you very
15  much, everyone.
16     THE VIDEOGRAPHER:  Off record
17  at 4:07.
18     (Whereupon, the deposition was
19  concluded.)
20
21
22
23
24

Page 248

1      INSTRUCTIONS TO WITNESS
2
3      Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8      After doing so, please sign the errata
9  sheet and date it.  It will be attached to
10  your deposition.
11     It is imperative that you return the
12  original errata sheet to the deposing
13  attorney within thirty (30) days of receipt
14  of the deposition transcript by you.  If you
15  fail to do so, the deposition transcript may
16  be deemed to be accurate and may be used in
17  court.
18
19
20
21
22
23
24

Page 247

1  COMMONWEALTH OF MASSACHUSETTS )
2  SUFFOLK, SS.                  )
3      I, MAUREEN O'CONNOR POLLARD,
4  Registered Diplomate Reporter and Notary
5  Public in and for the Commonwealth of
6  Massachusetts, do certify that on the 10th
7  day of March, 2022, at 9:19, the person
8  above-named was duly sworn to testify to the
9  truth of their knowledge, and examined, and
10  such examination reduced to typewriting under
11  my direction, and is a true record of the
12  testimony given by the witness.  I further
13  certify that I am neither attorney, related
14  or employed by any of the parties to this
15  action, and that I am not a relative or
16  employee of any attorney employed by the
17  parties hereto, or financially interested in
18  the action.
19      In witness whereof, I have
20  hereunto set my hand this 14th day of March,
21  2022.
22  _____
23  MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC
24  CSR #149108

Page 249

1      - - - - - -
          E R R A T A
2      - - - - - -
3  PAGE  LINE  CHANGE
4  ____ ____ _____
5      REASON: _____
6  ____ ____ _____
7      REASON: _____
8  ____ ____ _____
9      REASON: _____
10  ____ ____ _____
11      REASON: _____
12  ____ ____ _____
13      REASON: _____
14  ____ ____ _____
15      REASON: _____
16  ____ ____ _____
17      REASON: _____
18  ____ ____ _____
19      REASON: _____
20  ____ ____ _____
21      REASON: _____
22  ____ ____ _____
23
24

Confidential Information Subject to Protective Order

Page 250

1
2      ACKNOWLEDGMENT OF DEPONENT
3
4      I, _____, do
Hereby certify that I have read the foregoing
5   pages, and that the same is a correct
transcription of the answers given by me to
6   the questions therein propounded, except for
the corrections or changes in form or
7   substance, if any, noted in the attached
Errata Sheet.
8
9

_____
10  PUNAM ANAND KELLER, Ph.D.        DATE
11
12
13
14
15
16

Subscribed and sworn
17  To before me this
_____ day of _____, 20_____.
18
My commission expires: _____
19
20  _____
Notary Public
21
22
23
24

Page 251

1      LAWYER'S NOTES
2   PAGE  LINE
3   _____ _____ _____
4   _____ _____ _____
5   _____ _____ _____
6   _____ _____ _____
7   _____ _____ _____
8   _____ _____ _____
9   _____ _____ _____
10  _____ _____ _____
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23  _____ _____ _____
24  _____ _____ _____

# Exhibit 210

REDACTED

```
 1              IN THE UNITED STATES DISTRICT COURT

                    DISTRICT OF NEW JERSEY

 2

 3   IN RE: VALSARTAN          )   MDL No. 2875

     LOSARTAN, AND IRBESARTAN  )

 4   PRODUCTS LIABILITY         )

     LITIGATION                 )   HON. ROBERT B. KUGLER

 5                              )

                                )

 6   This Document Relates to  )

     All Actions                )

 7

 8              * CONFIDENTIAL INFORMATION *

 9              SUBJECT TO PROTECTIVE ORDER

10

11

12        VIDEOTAPED DEPOSITION OF TIMOTHY E. KOSTY,

13   called by the Plaintiffs for examination, taken by

14   and before Ann Medis, RPR, CLR, CSR-WA, and Notary

15   Public in and for the Commonwealth of

16   Pennsylvania, via Zoom Videoconference, at the

17   offices of Duane Morris, 600 Grant Street, Suite

18   5010, Pittsburgh, Pennsylvania 15219, on Thursday,

19   February 24, 2022, commencing at 10:07 a.m.

20

21

22

23

24

25
```

Confidential Information - Subject to Protective Order

Page 2

```
 1        A P P E A R A N C E S
 2  On behalf of Plaintiffs
 3       (via Zoom)
         HONIK LLC
 4       BY:  RUBEN HONIK, ESQUIRE
         1515 Market Street, Suite 1100
 5       Philadelphia, Pennsylvania 19102
         267.435.1300
 6       ruben@honiklaw.com
 7       (via Zoom)
         KANNER & WHITELEY, LLC
 8       BY:  CONLEE WHITELEY, ESQUIRE
            LAYNE HILTON, ESQUIRE
 9          DAVID J. STANOCH, ESQUIRE
         701 Camp Street
10       New Orleans, Louisiana  70130
         504.524.5777
11       c.whiteley@kanner-law.com
         l.hilton@kanner-law.com
12       d.stanoch@kanner-law.com
13
    On behalf of Defendants Teva Pharmaceuticals USA, Inc.;
14  Teva Pharmaceutical Industries, Ltd.; Actavis LLC; and
    Actavis Pharma, Inc.
15
         GREENBERG TRAURIG, LLP
16       BY:  TIFFANY M. ANDRAS, ESQUIRE
         77 West Wacker Drive
17       Suite 3100
         Chicago, Illinois  60601
18       312.456.8400
         andrast@gtlaw.com
19
20       (via Zoom)
         WALSH PIZZI O'REILLY FALANGA LLP
21       BY:  CHRISTINE I. GANNON, ESQUIRE
            LIZA WALSH, ESQUIRE
22       Three Gateway Center
         100 Mulberry Street, 15th Floor
23       Newark, New Jersey  07102
         973.757.1100
24       cgannon@walsh.law
         lwalsh@walsh.law
25
```

Page 4

```
 1        A P P E A R A N C E S (Continued)
 2  On behalf of Defendant Zhejiang Huahai Pharmaceutical
    Co., Ltd.; Prinston Pharmaceutical, Inc.; Huahai U.S.,
 3  Inc.; and Solco Healthcare U.S., LLC
         DUANE MORRIS LLP
 4       BY:  DREW T. DORNER, ESQUIRE
            REBECCA BAZAN, ESQUIRE (via Zoom)
 5          DANA B. KLINGES, ESQUIRE (via Zoom)
            ALEK SMOLJI, ESQUIRE (via Zoom)
 6
         30 South 17th Street
 7       Philadelphia, Pennsylvania  19103
         215.979.1000
 8       dtdorner@duanemorris.com
         rebazan@duanemorris.com
 9       dklinges@duanemorris.com
         asmolji@duanemorris.com
10
11  On behalf of Defendant Humana Pharmacy, Inc.
12       (via Zoom)
         FALKENBERG IVES LLP
13       BY:  MEGAN A. ZMICK, ESQUIRE
         230 W. Monroe Street, Suite 2220
14       Chicago, Illinois  60606
         312.566.4808
15       maz@falkenbergives.com
16
    On behalf of Defendants H.J. Harkins Co., Inc. and
17  Sciengen Pharmaceuticals Inc.
18       (via Zoom)
         HINSHAW & CULBERTSON LLP
19       BY:  GEOFFREY M. COAN, ESQUIRE
         53 State Street, 27th Floor
20       Boston, Massachusetts  02109
         617.213.7047
21       gcoan@hinshawlaw.com
22
23
24
25
```

Page 3

```
 1        A P P E A R A N C E S (Continued)
 2  On behalf of Defendant Albertsons Pharmacy
 3       (via Zoom)
         BUCHANAN INGERSOLL & ROONEY, PC
 4       BY:  CHRISTOPHER B. HENRY, ESQUIRE
         227 West Trade Street, Suite 600
 5       Charlotte, North Carolina  28202
         704.444.3475
 6       christopher.henry@bipc.com
 7
    On behalf of Defendants CVS Pharmacy and Rite Aid
 8
         (via Zoom)
 9       BARNES & THORNBURG, LLP
         BY:  KARA KAPKE, ESQUIRE
10       2029 Century Park East, Suite 300
         Los Angeles, California  90067
11       310.284.3766
         kara.kapke@btlaw.com
12
13  On behalf of Defendant Mylan Laboratories
14       (via Zoom)
         PIETRAGALLO GORDON ALFANO BOSICK &
15       RASPANTI, LLP
         BY:  FRANK H. STOY, ESQUIRE
16       One Oxford Centre
         301 Grant Street, 38th Floor
17       Pittsburgh, Pennsylvania  15219
         412.263.4397
18       FHS@pietragallo.com
19
20
21
22
23
24
25
```

Page 5

```
 1        A P P E A R A N C E S (Continued)
 2  On behalf of Defendant Amerisource Bergen
 3       (via Zoom)
         ULMER & BERNE LLP
 4       BY:  JEFFREY D. GEOPPINGER, ESQUIRE
         312 Walnut Street, Suite 1400
 5       Cincinnati, Ohio  45202
         513.698.5038
 6       jgeoppinger@ulmer.com
 7
    On behalf of Defendant McKesson Corporation
 8
         (via Zoom)
 9       NORTON ROSE FULBRIGHT US LLP
         BY:  ELIZABETH NORRIS, ESQUIRE
10       2200 Ross Avenue, Suite 3600
         Dallas, Texas 75201
11       214.855.8074
         ellie.norris@nortonrosefulbright.com
12
13  On behalf of Defendant Optum, Inc.
14       (via Zoom)
         DORSEY & WHITNEY LLP
15       BY:  SHEVON D.B. ROCKETT, ESQUIRE
         51 West 52nd Street
16       New York, New York  10019
         212.415.9357
17       rockett.shevon@dorsey.com
18
19  On behalf of Defendant Cigna Corporation
20       (via Zoom)
         HUSCH BLACKWELL LLP
21       BY:  A. JAMES SPUNG, ESQUIRE
         190 Carondelet Plaza, Suite 600
22       St. Louis, Missouri  63105
         314.480.1500
23       james.spung@huschblackwell.com
24
25
```

Page 6

```
 1      A P P E A R A N C E S (Continued)
 2  On behalf of Defendant Cardinal Health Inc.
 3      (via Zoom)
        CROWELL & MORING LLP
 4      BY:  DANIEL T. CAMPBELL, ESQUIRE
        1001 Pennsylvania Avenue, NW
 5      Washington, DC  20004
        202.624.2544
 6      dcampbell@crowell.com
 7
    Also present
 8
    Matt Martin, videographer
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1      * INDEX OF KOSTY EXHIBITS (Continued) *
 2  NO.     DESCRIPTION          PAGE
 3  Exhibit 11  Chang, et al., article National    298
                Rates of Nonadherence to
 4              Antihypertensive Medications Among
                Insured Adults With Hypertension,
 5              2015
 6  Exhibit 12  Article "Gianforte signals support  323
                for state pay plan proposal"
 7
    Exhibit 13  Montana University System Summary   324
 8              Plan Description, Effective 7/1/21
 9  Exhibit 14  Analysis Group invoices for         333
                services performed in the case
10
    Exhibit 15  Excel spreadsheet containing        356
11              amounts invoiced for services
                performed by Analysis Group and
12              T. Kosty
13  Exhibit 16  ASHP Guidelines on the Pharmacy     342
                and Therapeutics Committee and the
14              Formulary System
15  Exhibit 17  Expert Report of Kali Panagos,      352
                Pharm.D., R.Ph.
16
    Exhibit 18  Orange Book Preface, Food and Drug  357
17              Administration Center Drug Evaluation
                and Research, Approved Drug Products
18              for Therapeutic Equivalence
                Evaluations
19
20              - - - -
21
22
23
24
25
```

Page 7

```
 1          * I N D E X *
 2  TIMOTHY E. KOSTY                  PAGE
 3  EXAMINATION BY MR. HONIK          10, 339, 368
    EXAMINATION BY MR. STANOCH        209
 4  EXAMINATION BY MS. ANDRAS         365
 5
```

```
 6      * INDEX OF KOSTY EXHIBITS *
 7  NO.     DESCRIPTION          PAGE
 8  Exhibit 1   Expert Report of Timothy E. Kosty,   25
                January 12, 2022
 9
    Exhibit 2   Letter, 6/16/20, from S. Johnston    90
10              to Judge Schneider, Re: In re
                Valsartan, Losartan and Irbesartan
11              Product Liability Litigation
12  Exhibit 3   MTD Opinion 3: Warranty Claims      106
13  Exhibit 4   21 U.S.C.A. § 331                   117
14  Exhibit 5   FDA Warning Letter, 11/29/18, to    137
                ZHP
15              ZHP01344159 - 01344164
16  Exhibit 6   Expert Declaration of Rena          158
                Conti, Ph.D.
17
    Exhibit 7   Express Scripts Part D Medicare     231
18              and Medicaid Policy
                Express_Scripts_1120_00000253
19
    Exhibit 8   CVS and Target Document Retention   233
20              and Confidential Pharmacy Records
                Retention and Storage
21              CVS_MDL2875_0000000208 - 0000000214
22  Exhibit 9   Navitus Record Retention and Record 237
                Availability Schedule
23
    Exhibit 10  Article "The Epidemiology of        267
24              Prescriptions Abandoned at the
                Pharmacy"
25
```

Page 9

```
 1      P R O C E E D I N G S
 2          - - - -
 3      THE VIDEOGRAPHER:  We are now on the
 4  record.  My name is Matt Martin.  I'm the
 5  videographer for Golkow Litigation Services.
 6  Today's date is February 24, 2022, and the time is
 7  10:07 a.m.  This video deposition is being held in
 8  Pittsburgh, Pennsylvania for the United States
 9  District Court, the District of New Jersey,
10  MDL No. 2875.
11      The deponent is Timothy Kosty.
12      Counsel, please identify yourselves for
13  the record.
14      MR. DORNER:  Drew Dorner on behalf of
15  the defendants.
16      MR. HONIK:  Ruben Honik appearing for
17  plaintiffs.
18      MS. ANDRAS:  Tiffany Andras, Greenberg
19  Taurig, on behalf of Teva Pharmaceuticals.
20      MR. HONIK:  Can we ask Ann to just note
21  the other appearances so that we don't need to go
22  through everybody orally?
23      MR. DORNER:  We have no objection to
24  that.
25
```

Confidential Information Subject to Protective Order

Page 10

1       MR. HONIK:  Drew, you are very faint.
2  Are you going to be defending?
3       MR. DORNER:  Yes.  I'll be happy to
4  speak up.
5       MR. HONIK:  Because I could barely hear
6  the videographer.
7       Ann, we're ready if you want to
8  administer the oath.
9            TIMOTHY E. KOSTY,
10     having been first duly sworn, was examined
11          and testified as follows:
12               EXAMINATION
13  BY MR. HONIK:
14     Q.   Mr. Kosty, good morning to you.
15     A.   Good morning.
16     Q.   My name is Ruben Honik.  Can you see and
17  hear me?
18     A.   Yes.
19     Q.   Great.  And just as a housekeeping point
20  of order, are you looking at me and the others or
21  just me?
22     A.   I'm looking at you.  You're on the
23  laptop in front of me.  There's a videographer at
24  the end of the table.  So I might look at that
25  camera occasionally, but I'm looking at you.

Page 11

1       Q.   And what I'm really getting at is can
2  you see the other lawyers as well?
3       A.   Yes.  It's a small conference room.
4       Q.   Are there lawyers present with you in
5  the conference room?
6       A.   Just the ones who identified themselves,
7  yes.
8       Q.   You're in Pittsburgh; right?
9       A.   Correct.
10      Q.   I'm in Philadelphia, and I don't know
11  who's in the room with you.  Can you tell me who's
12  in the room with you?
13      A.   Yes, the court reporter, the
14  videographer, Tiffany Andras and Drew Dorner and
15  myself.
16      Q.   That's all?
17      A.   Yes.
18      Q.   Forgive me for not knowing.  Are you in
19  one of those lawyer's offices or in an office of
20  Golkow?
21      A.   No.  We're at the Duane Morris office in
22  downtown Pittsburgh.
23      Q.   In Pittsburgh?
24      A.   Yeah.
25      Q.   Okay.  With that out of way, I'm one of

Page 12

1  the plaintiffs' lawyers in the case.  You may know
2  that.  And I'm going to start the questioning of
3  you today.  I anticipate that my colleague,
4  Mr. Stanoch, will likewise be examining you.  And
5  we're likely going to do it in that order.  That
6  is to say, I'll start.  He'll pick up at some
7  point.  And I may come in on the back end with
8  some additional areas of questioning.
9       Do you understand that?
10      A.   Yes.
11      Q.   So, Mr. Kosty, I'm aware that at the
12  least, you've given sworn testimony in legal
13  matters in at least two instances, in the Loestrin
14  case in which you participated as an expert, and
15  in the A&P bankruptcy case; is that right?
16      A.   That's correct.
17      Q.   Have you given deposition testimony in
18  any other matters at any time before today?
19      A.   Yes; a couple depositions years ago.  I
20  don't know how long.  At least 15 years.  One of
21  the cases was a contract dispute with an award on
22  the state Medicaid program, and the second dispute
23  was another contract dispute between trading
24  partners.
25      Q.   You cut out a little bit when you

Page 13

1  referred to the Medicaid matter.  Can you tell me
2  a little bit more about that?
3       A.   Well, it was actually a state workers'
4  comp award to a PBM, and there was a contestation.
5  They contested the award.  So they asked me to
6  testify as an industry expert in that case.  So I
7  gave --
8       Q.   Let me -- I apologize.  Did you finish?
9  I may have spoken over you.
10      A.   No, I did not.  I gave a short expert
11  report in that case.  And then I testified via
12  deposition.  I did not testify in court in that
13  case.  But that was, like I said, 15 years ago.  I
14  don't keep track of that.
15      Q.   Okay.  But let me unpack what you did a
16  little bit.  Then we can move on.  You represented
17  and gave testimony on behalf of the PBM, is that
18  what I understood?
19      A.   One of the workers' comp PBMs, yes.
20      Q.   And as I understand it, it was a
21  workers' comp proceeding in which a worker
22  received an award.  And you gave some testimony in
23  support of one of the PBMs; is that correct?
24      A.   No, that's not correct.
25      Q.   All right.  Why don't you clarify it for

Confidential Information Subject to Protective Order

Page 14

1  me.

2      A.   The dispute was over the award of the

3  PBM contract to process that state's workers' comp

4  claims.  So it was many steps above an individual

5  patient or workers' comp claimant.

6      Q.   I understand.

7      A.   So it was the award to the PBM.

8      Q.   And have you retained the testimony that

9  you gave in that matter?

10     A.   No.  Our document retention policy in

11 our company is five years.  And every December we

12 go through.  If it's older than five years, it's

13 deleted, destroyed.

14     Q.   And so given that policy that you've now

15 described to me, is it safe to say that your

16 company has retained your testimony in the four

17 matters that you describe in your report that was

18 rendered in this case?

19     MR. DORNER:  Object to the

20 characterization.

21     You can answer.

22     THE WITNESS:  Yes.

23 BY MR. HONIK:

24     Q.   And specifically, for example, did you

25 keep your transcript of testimony that you

Page 15

1  provided in the Loestrin case?

2      A.   I am sure it's on our system.  I haven't

3  looked at it since that case was settled or

4  whatever happened to it.

5      Q.   Right.  It was settled.  You know that;

6  right?

7      A.   I knew after my testimony.  There were

8  some other proceedings, but I did not keep up with

9  that case to find out what happened at the end.

10 But you evidently know it's been settled.

11     Q.   How long did you work on that case?

12     MR. DORNER:  Object to form.  Vague.

13     You can answer.

14     THE WITNESS:  About four months.

15 BY MR. HONIK:

16     Q.   And who engaged you in that matter?

17     A.   It was --

18     MR. DORNER:  While you answer, I'll just

19 caution to not answer anything that might be

20 subject to a confidentiality or the

21 attorney/client privilege.

22     But with those instructions, you can

23 answer, Mr. Kosty.

24     THE WITNESS:  It was a law firm.  I know

25 your next question is going to be what was the law

Page 16

1  firm's name.  I'm trying to remember that.  It's

2  not coming to the top of my head.  Give me a

3  minute here, and I'll see if I can remember it.

4  BY MR. HONIK:

5      Q.   While you think about that, Mr. Kosty,

6  my next question actually is:  What party did you

7  give expert testimony on behalf?

8      MR. DORNER:  Same instruction.

9      You can answer.

10     THE WITNESS:  The defendants.

11 BY MR. HONIK:

12     Q.   And that was what, GSK in that case?

13     A.   Yes, the maker of Loestrin.  I don't

14 recall if there were multiple because of all the

15 subsidiaries and different manufacturers.  I don't

16 recall all them, but it was for the defense.

17     Q.   Right.  But suffice to say some law

18 firm, the specific name of which you can't

19 remember now, on behalf of GSK or one or more of

20 its subsidiaries engaged you in that case;

21 correct?

22     A.   That's correct.

23     Q.   And, similarly, if we go to your firm's

24 system, we would be able is to locate the

25 testimony that you gave in the A&P bankruptcy

Page 17

1  case; correct?

2      A.   Yes.

3      Q.   And would we be able to retrieve the

4  report or reports, plural, that you prepared in

5  each of those cases as well?

6      MR. DORNER:  And before you answer, I'll

7  just note there may be confidentiality

8  considerations in either of those cases with

9  respect to any testimony or reports given.

10     So with that understanding and note on

11 the record, you can answer.

12     THE WITNESS:  I would confer with

13 counsel in those cases and get their input before

14 disclosing it.  I'm not an attorney.

15 BY MR. HONIK:

16     Q.   Right.  I haven't asked you --

17     MR. DORNER:  I'm sorry, Mr. Honik.

18 Mr. Honik, the witness was not finished with his

19 answer.  Could you please let him answer.

20 BY MR. HONIK:

21     Q.   Go ahead, sir.  Go ahead, Mr. Kosty.

22     A.   I would consult with the attorneys in

23 that case because there's typically provisions in

24 the engagement letter that if any discovery has

25 asked for case materials, you have to contact the

Page 18

1 attorneys and give them at least an opportunity to
2 object or not. Hold on a second.
3    (There was a discussion off the record.)
4 BY MR. HONIK:
5    Q. Mr. Kosty, let me give you an
6 instruction, and let me go back to the question
7 which you didn't respond to. The instruction is
8 this: Counsel is permitted to lodge objections on
9 the record to protect the record in the interest
10 of our respective clients. There's nothing wrong
11 with that. We're not permitted to make speaking
12 objections which in any way, shape or form
13 suggests an answer to the witness.
14    Now, the question I asked you was not,
15 can you turn the material over to me. It was
16 simply: Does it exist and is it on your system
17 and accessible to you? Can you answer that
18 question?
19    A. Yes, and I previously answered that
20 question.
21    Q. Okay. And as a point of clarification,
22 both your deposition testimony as well as the
23 report or reports that you authored are available
24 to you on your system; is that correct?
25    A. Yes.

Page 19

1    Q. Now, a couple of words. Inasmuch as
2 you've given testimony before, I won't spend much
3 time on this, but obviously we're not in person,
4 which typically makes this exchange a lot easier.
5 There's sometimes a bit of a lag. And for that
6 reason and others, it's important that only one of
7 us speak at a time. I've already violated that,
8 and I apologize. I will try not to do it again.
9    But let's pledge not to speak over one
10 another so that the court reporter can take down
11 everything that's said in the course of this exam.
12 Can you do that with me?
13    A. Yes.
14    Q. Number two, it's not your job to guess
15 my meaning or to understand the question if you
16 don't understand the question. In fact, I would
17 instruct you if you haven't heard or understood my
18 question, you are not to answer in favor of
19 telling me or asking me to repeat or rephrase it
20 so you do understand it.
21    Will you do that for me?
22    A. Yes.
23    Q. Today is not an endurance test. And so
24 if you need or want to take a break for any reason
25 at any time, just let me know, and we'll take a

Page 20

1 break. Okay?
2    A. Yes.
3    Q. Let me give you a little bit of a road
4 map of how I think today will go so there are as
5 few surprises as possible for you. As I
6 mentioned, obviously I've started the examination
7 of you, and as I understand your opinions and
8 reports in this case, I think they can be fairly
9 broken down into two buckets of opinions or
10 information.
11    One pertains to the damages in this case
12 and in particular what Dr. Conti did on behalf of
13 plaintiffs in this case. And the other bucket
14 concerns what we refer to, and I think you might
15 agree, as ascertainability of class membership,
16 which is an area that Laura Craft provided on
17 behalf of plaintiffs and you criticize each of
18 them. Is that fair?
19    MR. DORNER: Object to the
20 characterization.
21    You can answer.
22    THE WITNESS: Yes.
23 BY MR. HONIK:
24    Q. So what I'm going to be doing initially
25 is focusing on the views that you express

Page 21

1 concerning damages in this case and your
2 criticisms such as it is of Dr. Conti. And
3 Mr. Stanoch, to a great extent, will limit his
4 questions or confine them to Laura Craft's views
5 and in turn your criticism of her.
6    Do you understand that?
7    A. Yes.
8    Q. One or both of us may weave in questions
9 concerning your training, background and
10 experience as it relates to some of the
11 substantive questions that we're going to ask you.
12 And so from time to time, we may interpose areas
13 of question concerning that.
14    Do you understand that?
15    A. Yes.
16    Q. Do you have a written copy of your
17 expert report, dated January 12, 2022, in front of
18 you?
19    A. Yes. I asked counsel to provide me with
20 a clean copy of my report, which they did.
21    Q. And by clean you mean it contains no
22 annotations or notes?
23    A. Correct.
24    Q. Is there a copy in your possession that
25 has notes or annotations?

Page 22

1    A.   Not in my possession here today, no.
2    Q.   Okay.  And you have a copy, as you
3 described it, a clean copy of your expert report
4 in front of you?
5    A.   Yes.  It's in a binder here.  I'll show
6 it to you.
7    Q.   That's okay.  Do you have the three
8 appendices that were attached to your expert
9 report?
10    A.   Let me see if I have it included in
11 here.  Yes, I do.  They have included the
12 appendices.
13    Q.   And is it correct, is it not, that you
14 prepared and submitted this report, dated
15 January 12, 2022; correct?
16    A.   That is correct.
17    Q.   Did you prepare the report by yourself?
18    A.   With assistance from the Analysis Group,
19 which is litigation support services that under my
20 direction did some of the data analysis for me,
21 did some of the background research on citations.
22 But it was my report, yes.
23    Q.   Is it okay if I refer to that outside
24 group as AG?
25    A.   Sure.

Page 23

1    Q.   Did AG actually write any of the words
2 that comprise your report?
3    A.   No, they didn't.  What they did is they
4 provided suggestions, and I was the arbiter of
5 those suggestions.  Either I thought they were
6 appropriate or not.  So it was my decision whether
7 or not to accept their recommendations.  So I
8 looked at all suggestions.  The report is written
9 by me.  And that's why I signed it, because it was
10 written by me.
11    Q.   So let me unpack that a little bit.  I
12 understand that AG does data analysis and you used
13 them in that way; is that right?
14    A.   That's one component of their work, yes.
15    Q.   And what are the other components to
16 which you turned to them for help?
17    A.   Well, they provide a wide range of
18 services.  They do data analysis, like I
19 mentioned.  They also do research into -- it's
20 interesting.  I don't do a lot of these expert
21 reports in our work.  My consulting business, you
22 know, it's a small component of it.  So when you
23 have 38 years of experience and you say a
24 statement, you know it's true, but oftentimes in
25 these legal cases, they say, well, that may be

Page 24

1 true, but we need a citation.
2       So the Analysis Group helps with
3 identifying citations that support my position.
4 And then they're also involved with billing for my
5 work, and I believe some invoices that they've
6 submitted are part of the document disclosure.
7    Q.   Anything else?
8    A.   No.  That's it.
9    Q.   I wrote down four things, Mr. Kosty.
10 They do data analysis.  They do research.  They
11 provide help in citing or citation.  And they do
12 billing for your work.
13       Did I get that correct?
14    A.   Yeah.  I may have missed a component or
15 two, but at the top level, that's the four areas
16 that they assist.
17    Q.   And to be clear, those are the four
18 areas in which they assisted you in preparing the
19 report in this case; correct?
20    A.   Yes.
21    Q.   For the benefit of the record, we're
22 going to mark your complete report with the three
23 appendices as Kosty Exhibit 1.  And I'll refer to
24 it as Exhibit 1 from time to time.  Is that okay?
25    A.   Yes.

Page 25

1       (Kosty Exhibit 1 was marked.)
2 BY MR. HONIK:
3    Q.   You mentioned, and this is how we sort
4 of got to this place, you said that they made --
5 and I'm paraphrasing you -- recommendations to you
6 and you selected those that ultimately were
7 incorporated in your report.
8       Did I get that right?
9       MR. DORNER:  Object to the
10 characterization.
11       You can answer.
12       THE WITNESS:  Yes.
13 BY MR. HONIK:
14    Q.   When you say they made recommendations
15 to you, what kinds of recommendations did they
16 make?
17    A.   It was mainly on background information
18 on the deals, the details associated with it.
19    Q.   And when you say background, what do you
20 mean by background?
21    A.   Well, one example I can cite is the
22 Medicaid Part D financial structure.  It's been
23 the same structure since the program was
24 implemented in 2006.  The details have changed in
25 terms of what components are paid, what are the

Confidential Information Subject to Protective Order

Page 26

1 risk corridors, what is the deductible levels each
2 year.
3        So in order to make sure that it was up
4 to date for this report, they would do the
5 research into the components that now are
6 applicable for that Part D program.  And they
7 change every year based on CMS's call letter and
8 what changes are made to the program in terms of
9 the financing.  So that's one example of how they
10 did the detailed research to say, all right, the
11 Med D program has all these four components.
12 However, this is what it looks like today based
13 upon their review of a call letter from CMS.
14    Q.  Mr. Kosty, the example that you gave me,
15 which you describe as background that resulted
16 from detailed research, that's an example of a
17 recommendation that AG made to you?
18    A.  Yes.
19    Q.  And if I understood your previous
20 testimony, there were certain recommendations that
21 you accepted and incorporated into your report and
22 others that you didn't; is that correct?
23    A.  That is correct.
24    Q.  Can you give me an example of something
25 that they recommended that you declined to put in

Page 27

1 your report?
2        MR. DORNER:  Objection.  And I'll just
3 instruct you not to divulge the contents of any
4 draft reports or forms of draft reports that you
5 may have prepared.
6        With that, if you're able to answer, you
7 can answer.
8        THE WITNESS:  None comes to mind.  I
9 know there was plenty because based on my
10 experience in the industry, if you're not in the
11 industry, you might read something and come to a
12 conclusion that's inaccurate.  So I would review
13 what was proposed and say, no, that doesn't --
14 that's not how it works.  It's the wrong citation.
15 It's the wrong research.
16        So I don't have a specific instance I
17 can cite for you right now, but that's the process
18 that we went through.
19 BY MR. HONIK:
20    Q.  And with whom did you interface at AG
21 regarding receipt of these recommendations?  Who
22 did you speak with or communicate with?
23    A.  My interface at AG is Brian Ellman, who
24 is the vice president there, one of the vice
25 presidents; Ngoc Pham, who is a manager, and Tom

Page 28

1 Beckford.  Those three individuals were my primary
2 contacts.
3        So I would instruct them on what I was
4 looking for, and then it was up to them to decide
5 how to utilize the resources within their company
6 to comply with my request.  So if they --
7    Q.  Let's say --
8        MR. DORNER:  I'm sorry.  Mr. Kosty
9 wasn't finished.
10        THE WITNESS:  So if there was analyst
11 work that needed to be done, I don't micromanage
12 how they do their work.  It's up to them to
13 decide.  Here's what I need.  How they go about
14 doing that and coming back to me, it's not up to
15 me to decide or direct.
16 BY MR. HONIK:
17    Q.  You mentioned a moment ago that these
18 are the folks with whom you interfaced to make
19 requests; correct?
20    A.  Requests for data analysis, requests for
21 research, those four areas.
22    Q.  And when you would make those requests,
23 would you make them in writing, that is, would you
24 convey your request by email or letter?  How would
25 you do that?

Page 29

1    A.  It would be either via email or
2 telephone call.
3    Q.  And would it be fair to say that all of
4 the email exchanges you had with these individuals
5 at AG requesting assistance are emails that are on
6 your system?
7    A.  The ones that I kept were, but I don't
8 keep all my emails.  I get hundreds of emails a
9 day.  So the ones that are pertinent, I may have
10 kept.  Others I delete immediately.  If you're on
11 an email string and you have eight emails on the
12 same damn subject, I don't keep eight emails.  If
13 it's an important issue, I might keep the last
14 email, but not all eight of them.  It's just not
15 practical.
16    Q.  Is there a document that reflects the
17 retention of AG to provide assistance to you?
18    A.  There's an engagement letter between AG
19 and the defendants, defendants' counsel, to engage
20 me.  So I don't have a direct engagement letter
21 with the defendants' counsel.  I'll work -- my
22 billing is through AG.  They handle the billing
23 for me.
24    Q.  So is it my understanding that AG
25 brought you into this case?

Confidential Information Subject to Protective Order

1    MR. DORNER:  Object to the
2 characterization.
3        You can answer.
4        THE WITNESS:  My understanding of it is
5 counsel approached AG and said, do you know an
6 expert with these qualifications.  And AG said,
7 well, we have worked with Mr. Kosty before.  We'll
8 set up a phone call and you can talk to him and
9 decide if he meets the needs of this case or not.
10 BY MR. HONIK:
11    Q.  And then who did you speak with?
12    A.  Can you be more specific?  Speak with
13 who, from what company?
14    Q.  What counsel did you speak with to see
15 if there was a match?
16        MR. DORNER:  And again I'll caution not
17 to get into the subject of any conversations.
18        But you can answer.
19        THE WITNESS:  I don't recall
20 specifically.  There's many counsel and defendants
21 on this case.  I believe on one call there was 15
22 counsel.  I don't recall who those people were.
23 BY MR. HONIK:
24    Q.  Right.  So what you did, Mr. Kosty, you
25 explained to me how you got involved.  You've told

1 me that AG has a retention or engagement letter or
2 arrangement with defense counsel, and that defense
3 counsel sought an expert with certain
4 qualifications and that's how you got involved.
5        Did I get that straight?
6    A.  Yes.
7    Q.  And my initial question before I move
8 forward is:  In that initial contact, can you
9 identify by name any of the attorneys who, I'll
10 say, interviewed you to see if there was a fit?
11    A.  I think Drew Dorner is the only attorney
12 I remember who was the call because he's continued
13 after I've been engaged as one of the primary
14 defense counsel.
15    Q.  Okay.  Now, with respect to the
16 background or characteristics that you said they
17 were looking for, what characteristics or areas of
18 expertise were they looking for?
19    A.  I don't know.  They didn't share it with
20 me.
21    Q.  Well, when Mr. Dorner and perhaps others
22 interviewed you to see if you were suitable, what
23 were they looking for?
24        MR. DORNER:  Objection.  I'll instruct
25 you not to answer.  That gets into the work

1 product of counsel.
2 BY MR. HONIK:
3    Q.  What characteristics or background and
4 training and experience did you identify in that
5 initial meeting to counsel?
6        MR. DORNER:  Same objection.  Same
7 instruction.
8 BY MR. HONIK:
9    Q.  That you possessed.
10        MR. DORNER:  Same instruction.
11        THE WITNESS:  On the advice of
12 counsel --
13        MR. HONIK:  You're instructing him not
14 to answer what he said?
15        MR. DORNER:  It reflects the work
16 product of counsel because he's answering our
17 questions.  Yes, I am.  Please move on.
18 BY MR. HONIK:
19    Q.  When you were hired, Mr. Kosty, did you
20 execute or have counsel send a letter reflecting
21 your retention?
22    A.  Not directly from me.  AG has an
23 engagement letter with counsel.
24    Q.  Okay.  Does AG have an engagement letter
25 with you?

1    A.  No.
2    Q.  And is there one or more communications,
3 be it email or otherwise, that reflects your
4 engagement or retention in the case with anyone?
5    A.  There would be an email from the
6 Analysis Group that would have indicated to me
7 that we've been retained, I've been retained
8 through Analysis Group on this case.  Whether I
9 kept that email or not, I don't recall.  But I
10 could certainly look if needed.
11    Q.  Okay.  But you remember getting such an
12 email; right?
13    A.  Yes.
14    Q.  And that came from the AG group you to;
15 right?
16    A.  Yes.
17    Q.  And did that email describe what you
18 were tasked to do?
19    A.  At a very high level, yes.
20    Q.  Can you tell me what you were asked to
21 do that's reflected in that email?
22    A.  Provide expert insight, consulting,
23 perhaps an expert report and testimony.  When I
24 was engaged, it was unclear exactly what my role
25 was going to be.  So it was a vague description,

Confidential Information Subject to Protective Order

Page 34

1  high level like I mentioned.
2      Q.  Did it become clearer as time went on?
3      A.  Absolutely.
4      Q.  And what specific clarification did you
5  receive regarding your assignment as time went on?
6      MR. DORNER:  Objection.  Lack of
7  foundation.
8      You can answer.
9      THE WITNESS:  The instruction I got was
10  I needed to produce an expert report evaluating
11  Ms. Craft, Dr. Conti's and Dr. Panagos' opinions
12  of the case and then provide the court background
13  on the industry and how it works based on my 38
14  years of experience.
15  BY MR. HONIK:
16      Q.  Okay.  And we may go into this a little
17  more as the deposition goes on today, Mr. Kosty,
18  but you're a pharmacist with an MBA; right?
19      A.  That's correct, yes.
20      Q.  And as I know it from your CV, you were
21  for roughly 12 or 13 years working for Rite-Aid
22  and then Thrift Drug as a pharmacist on the
23  business side; correct?
24      A.  Yes.  In my career, I started dispensing
25  prescriptions for about a year and a half at a

Page 35

1  pharmacy in Whitesville, West Virginia.  Shortly
2  thereafter, I was promoted into a district manager
3  role where I managed 25 pharmacies.  That was more
4  beginning the business side of it.
5      And then subsequent, I managed the
6  third-party operations at both companies, Rite-Aid
7  for about five years and Thrift Drug for about a
8  year.
9      Q.  Right.  And toward the end of your
10  tenure at Thrift Drug, you were involved in the
11  creation of a PBM that was created by Thrift;
12  right?
13      A.  Yes.  I was lucky to be the second
14  employee hired for that new business, and the CEO
15  told me -- tasked me with the opportunity to build
16  a company which not many times in your career you
17  have that opportunity.  So I ran with it.
18      My job was to build all the
19  administrative functions of the PBM and hire
20  people to run those functions.  So it included
21  developing a clinical component, clinical
22  services.  We stood up a call center for both
23  pharmacies and patients to call.  We had network
24  administration.  We did an RFP and installed a
25  multimillion dollar claims processing system that

Page 36

1  our senior executive management wanted us to own
2  the means of production.
3      So I got to put all that together and
4  hire people then to help me run it.  And then my
5  job after we stood up the company was to help
6  create differentiating services so we could sell
7  in the marketplace our services.
8      Q.  And it was sold; was it not?
9      A.  Well, we left the company in '96 to
10  start our consulting company.  Thrift Drug -- it's
11  a long story, but Thrift Drug was merged with
12  Eckerd Health Services.  J.C. Penney's owned
13  Thrift Drug.  And they decided to let -- after we
14  had left, the Eckerd Health Services people kind
15  of ran the PBM.  And then it was rolled up through
16  acquisitions, through PharmaCare and eventually in
17  CVS Caremark.
18      Q.  And I gather, Mr. Kosty, your experience
19  in helping start that business coupled with your
20  background as a pharmacist is what catapulted you
21  into the consulting side; correct?
22      A.  Yes.  When we left and started our
23  business, the genesis of it was we see a lot of,
24  and we still do today, silos in the industry where
25  people in certain market segments understand

Page 37

1  certain things, but they don't have the
2  perspective of the multiple market segments.
3      So when I say market segments, I mean
4  manufacturers, branded and generic companies.
5  Then you have the payor segment where you have
6  PBMs.  You could have health plans, workers' comp
7  PBMs, Medicaid Part D plans, a number of different
8  payor types.
9      Then you have pharmacies where you have
10  retail pharmacy chains.  That was my background.
11  Initially you have specialty pharmacies.  You have
12  mail service pharmacies.  You have different types
13  of pharmacies we consult with.  And then we also
14  worked with technology companies that help
15  businesses within the pharmaceutical market become
16  more efficient and profitable.  And we also work
17  we say an et al. category, which would include our
18  legal work.
19      Q.  Okay.  How much of the work that your
20  company presently does is legal versus support for
21  the pharma or tech side of the business?
22      MR. DORNER:  Objection.  Vague.
23      You can answer.
24      THE WITNESS:  Our legal work is very
25  minimal for our company.  It's under -- I'd

Page 38

1 estimate 15 percent or under.  Quite frankly, we
2 enjoy working with clients on real business
3 issues.  We've obtained a lot of expertise working
4 on different business issues and understanding
5 different segments.  That's a lot of fun.
6     I'm not sure if I'd characterize this as
7 fun, but it's part of the legal process, right.
8 So it's not a big component of our consulting
9 business.
10 BY MR. HONIK:
11    Q.  So when you say 15 percent or less, do
12 you mean by revenue or time spent?
13    A.  Revenue.
14    Q.  How would you quantify it in terms of
15 time spent?
16    A.  Well, in the last couple of months, it's
17 been a lot of time spent.  But typically I will
18 work on five to ten different client engagements
19 at a time, and that keeps me busy a hundred
20 percent of the time.
21    Q.  How many folks work in your firm?
22    A.  We have 15 full-time employees.  We have
23 eight pharmacists on staff.  We have an MBA from
24 the University of Chicago joined us last year.
25    Q.  I'm sorry.  What?  I didn't hear.

Page 39

1    A.  I'm sorry.  MBA, business-type person
2 who joined us, some great experience.  Then we
3 have IT, a couple IT people.  We have
4 administrative assistant support that is about 60
5 or 40 percent of our employee base helps us,
6 allows our consultants to focus on projects and
7 not worry about the administrative work.
8    Q.  Do you have any economists on your
9 staff?
10    A.  No.
11    Q.  And you, yourself, don't hold yourself
12 out to be an economist, do you?
13    A.  I haven't been trained as an economist,
14 but in my coursework both at Ohio State and
15 graduate work at Penn State to get my MBA, I've
16 had a number of economic courses, yes.
17    Q.  But you understand that there's such a
18 thing as a professional economist who is trained
19 to serve in that capacity; right?
20       MR. DORNER:  Object to the
21 characterization.
22       You can answer.
23       THE WITNESS:  Yes.
24 BY MR. HONIK:
25    Q.  And you don't have any degrees in

Page 40

1 economics, do you?
2    A.  I don't have any degrees in economics,
3 no.
4    Q.  You know, do you not, that there's a
5 specialty area within economics as an academic
6 pursuit called health economics; correct?
7    A.  Yes.
8    Q.  And you're not a health economics expert
9 either, are you?
10       MR. DORNER:  Object to form.
11       You can answer.
12       THE WITNESS:  Maybe.  It depends how you
13 define an expert.  I certainly know the economic
14 background on how things work in the economy, and
15 I can read and understand people's opinions on
16 different components.  So I don't need to be an
17 economist or a healthcare economist to do that.
18 BY MR. HONIK:
19    Q.  Suffice to say you've made no
20 contributions to the academic peer-reviewed
21 literature in economics?
22    A.  Suffice it to say that's correct.
23    Q.  You've never taught a course at any
24 level, undergraduate or graduate, in economics or
25 health economics; correct?

Page 41

1    A.  Correct.
2    Q.  We'll get back to some of your
3 qualifications and experience, but I just wanted
4 to establish that.
5     Is there anyone at AG upon whom you
6 relied as an economist in doing the work in this
7 case?
8       MR. DORNER:  Object to the form.  Vague.
9       You can answer if you can.
10       THE WITNESS:  One of the persons who
11 worked on the case was an economist, but he wasn't
12 working for me in that role.  It was more of an
13 analyst role for data.
14 BY MR. HONIK:
15    Q.  And who was that?
16    A.  Tom Beckford.
17    Q.  You said Tom Beckford?
18    A.  Correct.
19    Q.  So Mr. Beckford is an economist, but
20 didn't work for you in this case or on this case
21 in that capacity, is that what you mean?
22    A.  Yes.
23    Q.  And was he the only economist at AG with
24 whom you were involved?
25       MR. DORNER:  Object to foundation.

Confidential Information Subject to Protective Order

Page 42

1    You can answer.
2         THE WITNESS:  He was the only economist
3    I was involved with or worked with me on my
4    report.  I don't know if they have other
5    economists.  I assume they do, but I haven't met
6    them.
7    BY MR. HONIK:
8         Q.  So limiting my area of questioning and
9    interest to folks that helped you in this case to
10   write your report, the only one would be Tom
11   Beckford, and he didn't work with you in his
12   capacity as an economist.  Did I get that right?
13        A.  Yes.
14        Q.  What did he do if not serve as an
15   economist to support you?  What did he do?
16        A.  Data analysis.
17        Q.  I'm sorry.  You said data analysis?
18        A.  Yes.
19        Q.  And can you be a little more particular
20   and tell me what kind of data analysis he did on
21   your behalf in support of your work in this case?
22        A.  Sure.  Let me give you an example from
23   my report.  If you go to Table 1.  That's the
24   problem with writing a long report.  There's a lot
25   of pages to go through.

Page 43

1         Q.  What page are you on?
2         A.  I'm not there yet.
3         (There was a discussion off the record.)
4    BY MR. HONIK:
5         Q.  Are you at a page yet, Mr. Kosty?
6         A.  No.  It's Table 1.  I'm sorry.  I don't
7    have this memorized what page it's on.
8         Q.  Take a look at page 27.  It might be
9    there.
10        A.  Thank you.  Yes.  So an example, to
11   create Table 1, we took IQVIA data, added the
12   method of payment to that data, and then sorted
13   differently by method of payment to create this
14   table.  So that's one example of how Tom Beckford
15   helped with the data analysis of this report.
16        Q.  So Mr. Beckford, the economist at AG,
17   helped to prepare Table 1.  That's an example?
18        A.  Yes.
19        Q.  Did you discuss with Mr. Beckford any of
20   the economic theories Dr. Conti speaks of in her
21   report to get his insights?
22        A.  No.
23        MR. DORNER:  Objection.  Vague.  The
24   question is answered.  That's fine.
25        MR. HONIK:  Did the reporter get the

Page 44

1    answer negative, "no"?
2    BY MR. HONIK:
3         Q.  Did you say "no," sir?
4         A.  That's correct.
5         Q.  Can you tell me why you didn't speak to
6    Mr. Beckford about the economic theories that
7    underpin Dr. Conti's views?
8         MR. DORNER:  Same objection.
9         You can answer.
10        THE WITNESS:  I didn't need his opinion.
11   BY MR. HONIK:
12        Q.  Did you, nonetheless, ask him his
13   opinions?
14        A.  No.
15        Q.  Okay.  Did he offer any insights as you
16   suggested to me at the beginning of your sworn
17   testimony that you rejected, recommendations from
18   Beckford that you declined to incorporate in your
19   report or analysis?
20        MR. DORNER:  Objection.  Asked and
21   answered.
22        You can answer.
23        THE WITNESS:  I don't recall specifics,
24   no.
25

Page 45

1    BY MR. HONIK:
2         Q.  Can you give me a single example of a
3    recommendation anyone at AG made in connection
4    with your work in this case that you rejected?
5         MR. DORNER:  Objection.  Asked and
6    answered.
7         You can answer.
8         THE WITNESS:  I previously responded no.
9    I don't recall offhand.
10   BY MR. HONIK:
11        Q.  Okay.  You gave me a single example of a
12   recommendation that you accepted.  Do you know of
13   any others that you can recall today?
14        A.  No.  I can't recall specifics.
15        Q.  You've given me this example of Table 1
16   as something that Mr. Beckford assisted you in.
17   And I had asked you earlier what parts of this
18   report, the actual language, tables and other
19   material that we find here, was authored by AG
20   versus you.
21        Can you tell me any other places that AG
22   wrote in this report, Exhibit 1?
23        MR. DORNER:  Object to the
24   characterization.
25        You may answer.

Confidential Information Subject to Protective Order

Page 46

1    THE WITNESS:  You mischaracterized my
2  statement around Table 1.  I asked them to produce
3  it for me to evaluate it.  I went through their
4  methodology.  I checked it myself.  And then I
5  agreed to put it in my report.
6  BY MR. HONIK:
7    Q.  Understood.  Are there any other parts
8  of your written report marked Exhibit 1 that was
9  authored in whole or in part by anyone at AG?
10    MR. DORNER:  Objection.
11  BY MR. HONIK:
12    Q.  You can answer.
13    MR. DORNER:  You can answer.  I'll
14  object to form, but you can answer.
15    THE WITNESS:  They assisted with the
16  tables that were created for this report.
17  BY MR. HONIK:
18    Q.  Understood.  Is there any other language
19  that AG wrote that's in Exhibit 1?
20    MR. DORNER:  Object to form.
21  Mischaracterization.  Asked and answered.
22    You can answer.
23    THE WITNESS:  As I previously testified,
24  they made suggestions.  It was up to me to
25  evaluate suggestions.  But when I accepted them, I

Page 47

1  accepted them into my report.
2  BY MR. HONIK:
3    Q.  I totally understand that, Mr. Kosty.
4  I've moved past that.  And I'm asking a very
5  specific question.  You, yourself, identified
6  correctly that this is a long report with many
7  sections.
8    I'm asking you whether there is any
9  language or other material in this report that was
10  specifically authored, written by anyone at AG.
11  Yes or no.
12    MR. DORNER:  Object to form.
13  Mischaracterization.  Asked and answered.  The
14  witness is also permitted to offer an explanation.
15  He can't be forced to answer "yes" or "no."
16    With that, you can answer one more time.
17    THE WITNESS:  As I said twice before,
18  they made suggestions.  I evaluated suggestions,
19  and I decided what to include or not.
20  BY MR. HONIK:
21    Q.  Let me understand how this suggestion
22  and recommendation process worked.  Did you write
23  a draft of the report and then share it with AG?
24    A.  Yes.
25    Q.  And did you undergo a process in which

Page 48

1  they made comments to those drafts or to that
2  draft, some of which you accepted, others that you
3  rejected, and then you incorporated them in a new
4  draft?  Is that part of the way you did this?
5    MR. DORNER:  Object to form.  Compound.
6    You may answer.
7    THE WITNESS:  Yes.  Certainly in
8  drafting and creating a hundred-page report, you
9  don't just sit down and write the final copy to
10  start with.
11  BY MR. HONIK:
12    Q.  Absolutely.  Absolutely.
13    A.  If someone can do that, I'd love to meet
14  them.  But you have to go through, create,
15  criticize, edit, update and repeat.
16    Q.  Understood.
17    A.  I don't know any other expert that would
18  sit down and write an entire report.  So that's
19  the process we went through.  I would create the
20  report.  I would get feedback.  I would edit my
21  report.  And then there would be another iteration
22  until we got to the final product.
23  BY MR. HONIK:
24    Q.  Totally understand.  How many different
25  iterations would you say you exchanged with AG

Page 49

1  before the final form of this report as submitted
2  to plaintiffs' counsel occurred?
3    A.  I have no idea.
4    Q.  Well, more than five?
5    MR. DORNER:  Objection.  Asked and
6  answered.
7    You can answer.
8    THE WITNESS:  It was more than five.
9  The exact number I don't know.
10  BY MR. HONIK:
11    Q.  And over what period of time would this
12  iterative exchange of drafts and comments -- how
13  long did it take place?
14    A.  I'm trying to recall.  I was engaged on
15  the project I think in early August.  So it was
16  probably somewhere in the October, November
17  timeframe I started working on a report.  But I
18  don't recall the specific date.  I don't know if
19  it's October 31, it's November 1, but it was about
20  that timeframe.
21    Q.  And what areas of your report did you
22  solicit comments from AG on?
23    A.  I solicited comments on the entire
24  report.
25    Q.  Did you solicit comments from AG as to

Confidential Information Subject to Protective Order

<table>
<tr><td>

Page 50

¹ the specifics of the opinions authored by
² Dr. Conti?
³        MR. DORNER: Objection. Vague. And
⁴ form.
⁵        But you can answer.
⁶        THE WITNESS: No.
⁷ BY MR. HONIK:
⁸    Q.  Did you send Dr. Conti's report up to
⁹ the folks at AG?
¹⁰    A.  I believe they have access to the
¹¹ report. I didn't send it to them. Perhaps
¹² defense counsel sent it to them.
¹³    Q.  Did you discuss Dr. Conti's reports with
¹⁴ the folks at AG?
¹⁵    A.  Yes.
¹⁶    Q.  Did you discuss Laura Craft's report
¹⁷ with the folks at AG?
¹⁸    A.  Yes.
¹⁹    Q.  And did they offer comments first as to
²⁰ Rena Conti's opinions to you?
²¹    A.  Based on my report, they offered me
²² comments. I mean, obviously, when you review
²³ someone's report, you'll have a discussion on the
²⁴ contents, et cetera. That's just a normal course
²⁵ of business.

</td><td>

Page 52

¹ BY MR. HONIK:
²    Q.  And one or more folks at AG provided
³ recommendations, substantive recommendations about
⁴ the section of your report that pertains to
⁵ Dr. Conti; is that correct?
⁶        MR. DORNER: Object to form.
⁷ Characterization.
⁸        You may answer.
⁹        THE WITNESS: Your word is substantial
¹⁰ or substantive I believe you said, counselor. I
¹¹ don't recall if they were or were not. But like I
¹² indicated earlier, I had requested feedback on the
¹³ entirety of my report. So whatever feedback they
¹⁴ provided, as I mentioned three times previously, I
¹⁵ reviewed and decided whether it had merit or not
¹⁶ and either included or did not.
¹⁷ BY MR. HONIK:
¹⁸    Q.  So I'm still trying to understand the
¹⁹ process. And the reason for that, Mr. Kosty, is
²⁰ that the court in this case, in the valsartan case
²¹ is going to need to understand your methodology
²² about how you arrived at your opinions.
²³        Do you understand that?
²⁴        MR. DORNER: Object to form. Calls for
²⁵ a legal conclusion.

</td></tr>
<tr><td>

Page 51

¹    Q.  Well, that's what I'm trying to unpack
² and understand before we move on, Mr. Kosty. With
³ respect specifically to Dr. Conti's report, you
⁴ first and foremost spoke with AG about her
⁵ opinions; is that correct?
⁶        MR. DORNER: Object to the
⁷ characterization.
⁸        You may answer.
⁹        THE WITNESS: I wouldn't say first and
¹⁰ foremost. That's not my words. They were a
¹¹ component of the discussion. Obviously, there was
¹² discussion with counsel about it, too.
¹³ BY MR. HONIK:
¹⁴    Q.  Mr. Kosty, I apologize. I don't think I
¹⁵ made myself clear. I don't mean first and
¹⁶ foremost on your part. I mean that's the first
¹⁷ question I have that's foundational. And all I'm
¹⁸ trying to establish at the outset, and I'll ask
¹⁹ more questions as we go along, you spoke to one or
²⁰ more people at AG about Dr. Conti's opinions in
²¹ this case; correct?
²²        MR. DORNER: Objection. Asked and
²³ answered.
²⁴        You may answer.
²⁵        THE WITNESS: Yes.

</td><td>

Page 53

¹        But you may answer.
²        THE WITNESS: Yes.
³ BY MR. HONIK:
⁴    Q.  And part of your methodology was to rely
⁵ upon advice from AG in the preparation of your
⁶ report; was it not?
⁷        MR. DORNER: Object to the
⁸ characterization.
⁹        You may answer.
¹⁰        THE WITNESS: I did not rely on AG to
¹¹ write my report is what you're asking. It's my
¹² report.
¹³ BY MR. HONIK:
¹⁴    Q.  No, sir. That's not what I'm asking.
¹⁵        MR. DORNER: I'm sorry. The witness
¹⁶ wasn't finished with his answer. Go ahead,
¹⁷ Mr. Kosty.
¹⁸        THE WITNESS: Thank you.
¹⁹        In Dr. Conti's section, I read her
²⁰ expert report and came to my own conclusions.
²¹ Those directed my writing and my report in that
²² section that I criticized her methodology. Those
²³ are my conclusions based on my reading of the
²⁴ facts in the case.
²⁵

</td></tr>
</table>

Confidential Information Subject to Protective Order

Page 54

BY MR. HONIK:

1

2   Q.  Mr. Kosty, I have no doubt that you
3  arrived at your own impressions about Dr. Conti's
4  views and that you wrote the section that
5  criticizes her.  I have no doubt about that.
6       But you've also confirmed to me that you
7  spoke with one or more persons at AG about
8  Dr. Conti's opinions and views; isn't that
9  correct?
10   A.  Yes.
11   Q.  So first question based on that
12  foundational point is:  Who did you speak with
13  about Dr. Conti's views at AG?
14   A.  It would be Brian Ellman, Ngoc Pham and
15  Tom Beckford, and there was one other person who
16  has since left their company, Kelly Adamski.
17   Q.  Kelly?
18   A.  Adamski.
19   Q.  Where is Ms. Adamski now?
20   A.  I have no idea.
21       MR. DORNER:  Object to form.  Calls for
22  speculation.
23       You can answer if you can.
24       THE WITNESS:  I don't know.
25

Page 55

BY MR. HONIK:

1

2   Q.  What did you speak to these four people
3  about at AG as concerns Dr. Conti's opinions and
4  views?
5       MR. DORNER:  I'll caution not to get
6  into any discussions particularly where counsel
7  were involved and also which would be reflected in
8  drafts of your report which are work product.
9       MR. HONIK:  That's an improper
10  instruction, Mr. Doren.
11       MR. DORNER:  You can put that on the
12  record, Mr. Honik, but draft reports you're not
13  accessible to.
14       With that, to the extent you can answer,
15  you may answer.
16  BY MR. HONIK:
17   Q.  Before you do, Mr. Kosty, I've not asked
18  you a single question about the drafts.  What I've
19  asked you, for clarification, and Mr. Dorner's
20  instructions are highly improper in shaping your
21  testimony, is simply:  What did you discuss with
22  the four people at AG that you've now identified
23  to me as it concerns Dr. Conti's views and
24  impressions in her report?
25       MR. DORNER:  And the instruction to

Page 56

1  Mr. Kosty is to not divulge the contents of any
2  draft of a report.  It's a simple instruction.
3  Clearly not improper, Mr. Honik.  It's in the
4  federal rules.
5       And with that instruction and an
6  objection to the form, you may answer.
7       THE WITNESS:  I don't recall specifics.
8  BY MR. HONIK:
9   Q.  What topics did you discuss with those
10  four people concerning Dr. Conti's views?
11   A.  Like I said, I don't recall specifics of
12  those discussions, but obviously we would have had
13  to discuss the methodology and her conclusions.
14   Q.  So you've now identified that you
15  discussed the methodology that Dr. Conti used; is
16  that right?
17   A.  Yes.
18   Q.  What was that discussion?  What did you
19  and the four people at AG discuss concerning
20  Dr. Conti's methodology?
21       MR. DORNER:  Same instruction with
22  respect to drafts.
23       But you may otherwise answer.
24       THE WITNESS:  I don't recall that
25  specific discussion.

Page 57

BY MR. HONIK:

1

2   Q.  How is it you recall that you discussed
3  methodology that Dr. Conti employed?
4   A.  Well, if you read the report, you have
5  to read the methodology, right.  And you also have
6  to look at the conclusion based on those
7  methodologies, which I say in my report, and I'm
8  sure we'll get into later, I disagree with
9  completely.  But it's my reading of the report, my
10  analysis and recommendations of critique of her
11  work is in my report.
12   Q.  Okay.  So let me unpack that.  You
13  discuss and write about the methodology Dr. Conti
14  employed, and you're assuming you spoke to these
15  four people about that.  Is that what you're
16  telling me?
17       MR. DORNER:  Object to the
18  characterization.
19       You may answer, Mr. Kosty.
20       THE WITNESS:  This mischaracterizes the
21  statement.  We may have discussed the methodology
22  and her conclusion, but in the report, when I came
23  to my conclusion, which is in my report that her
24  methodology -- she creates an alternative reality
25  of how the world works, and she defends that

Confidential Information Subject to Protective Order

Page 58

1 reality that nowhere shall I go outside of that
2 alternative reality. And if you question my
3 alternative reality, you're wrong.
4        Well, in the real world, things work
5 differently, Mr. Honik. People have to go to the
6 pharmacy. They need to be treated for their
7 medication -- their healthcare issues. In this
8 case, the products were in the marketplace. They
9 were dispensed to millions of patients, right, and
10 they were effective in treating people's blood
11 pressures and preventing adverse outcomes.
12       So along that way, people got tremendous
13 therapeutic value from these products. So to say
14 they're worthless is just nonsense. Those
15 products stayed out of the hospital. They didn't
16 have strokes. They didn't have heart attacks.
17 They kept them healthy. Even in the
18 economic plaintiffs, people that were deposed
19 said, yeah, we received benefit from these
20 products.
21       So when Dr. Conti says they're
22 worthless, that just does not hold any water in
23 how the real world works. Unfortunately, things
24 happen and you have to deal with it, and that's
25 what was done in this case when the manufacturer

Page 59

1 identified there was an impurity. They didn't
2 know what the impurity was. They did some
3 research and they went to the FDA. The FDA
4 conducted the research in 2018. And you can look
5 on their website for the entire chronology of what
6 happened.
7        Then they decided to implement voluntary
8 recalls. And part of the recall notices to
9 patients were to enable them as a recommendation.
10 Don't stop taking your medication. Go contact
11 your healthcare provider and decide with them what
12 course of action to take, which could be either
13 stay on those products, switch to another VCD
14 product that was not -- did not have the
15 impurities, or switch to another therapy
16 completely.
17       The reason they didn't recommend stop
18 taking that medication, because there were adverse
19 outcomes that could happen. Excuse me. I need a
20 drink here.
21       So the regulatory process that's been
22 set up in the industry was followed. The problem
23 was identified. The FDA was involved and
24 informed, and they took action through the
25 voluntary recalls to recall those products out of

Page 60

1 the marketplace. So in the real world, you can't
2 just assume those things didn't happen. We have
3 to deal with the patients. We have to deal with
4 supply. We have to deal with alternatives.
5        In order to do that, you have to address
6 the problem. And you just can't say in an
7 alternative reality, oh, it's worthless and never
8 happened because that's not what, in fact,
9 happened.
10 BY MR. HONIK:
11    Q.  Are you done?
12    A.  Yes.
13    Q.  The long answer that you just gave, is
14 that the substance of the conversation you had
15 with the four folks at AG regarding the
16 worthlessness analysis that Dr. Conti provided?
17        MR. DORNER: Object to form.
18        You can answer.
19        THE WITNESS: No. That's my conclusion
20 of Dr. Conti's analysis and my experience --
21 BY MR. HONIK:
22    Q.  I know it's your conclusion. The
23 question, sir --
24        MR. DORNER: I'm sorry. I'm sorry. The
25 witness wasn't finished with his answer,

Page 61

1 Mr. Honik.
2 BY MR. HONIK:
3    Q.  The question, Mr. Kosty --
4        MR. DORNER: The witness was not
5 finished with his answer. Please let him finish.
6 BY MR. HONIK:
7    Q.  Did you talk about the subjects --
8 Mr. Kosty, here's the question. Did you talk
9 about the subjects that were in your elaborate
10 response with the four people at AG? Yes or no.
11       MR. DORNER: Objection. Form.
12 Mischaracterizes. And I'll note for the record
13 that opposing counsel didn't let the witness
14 finish his prior answer.
15       With that, you may answer.
16       THE WITNESS: No, because they don't
17 have the background in the industry that I do.
18 And, unfortunately, things happen, like I just
19 went through the explanation of the regulatory
20 safeguards in the industry with the FDA. They
21 don't have that background. I do.
22       I've worked with pharmacies. I've
23 worked with mail service pharmacies. I've worked
24 with PBMs. You have to address these issues as
25 they come up. And those issues were identified,

1  fairly quickly were addressed and implemented in
2  the industry.  So that's my opinion, that you just
3  can't say, oh, my gosh, if this never happened,
4  these products are worthless.
5        I see no documentation in this case that
6  would illustrate any patient did not receive the
7  therapeutic benefit of the VCD products they were
8  taking.  So my conclusion is you just can't say,
9  well, this is how the world should work.  This is
10 my alternative reality.  You have to deal with how
11 the world actually works.
12       And how the world actually works is the
13 products were in commerce.  They were identified
14 as issues.  Those issues were addressed.
15 Processes were changed.  And patients got on
16 alternative therapy or they got on VCD products
17 that didn't have the impurities.
18       That's the reality of the matter.  And I
19 can't in my world where you have to deal with
20 these things wish it away.
21 BY MR. HONIK:
22    Q.  Did you discuss this idea about the real
23 world that you've now twice explained to me with
24 the four folks at AG that you identified?
25       MR. DORNER:  Objection.  Vague.

1        You can answer.
2        THE WITNESS:  I don't recall if I
3  specifically addressed this issue or not.
4  BY MR. HONIK:
5    Q.  And when you say you don't recall, does
6  that convey to me that you may have spoken with
7  the four folks at AG you identified about
8  Dr. Conti's economic worth analysis?
9        MR. DORNER:  Objection to the
10 characterization.
11       You may answer.
12       THE WITNESS:  I don't recall.  I just
13 answered the same question.
14 BY MR. HONIK:
15    Q.  And when you say you don't recall, does
16 that leave open the possibility that you may or
17 may not have?  Is that fair?
18       MR. DORNER:  Asked and answered.
19       You can answer.
20       THE WITNESS:  Yes.  It could be either
21 way.  I don't recall.
22 BY MR. HONIK:
23    Q.  Is it equally true that you spoke with
24 these four folks at AG about Laura Craft's
25 opinions in her report?

1        MR. DORNER:  Objection to the
2  characterization.
3        You may answer.
4        THE WITNESS:  I spoke in a similar
5  manner about Ms. Craft's report.  We --
6  BY MR. HONIK:
7    Q.  And -- I'm sorry.
8    A.  Go ahead.  That's fine.
9    Q.  What did these folks convey to you at AG
10 about Laura Craft's opinions?
11       MR. DORNER:  I'll caution not to divulge
12 the contents of any drafts that you may have
13 received.
14       THE WITNESS:  I don't recall specific
15 conversations.  Ms. Craft had another long report
16 that had many components to it.  But I don't
17 recall the specific conversations.
18 BY MR. HONIK:
19    Q.  Mr. Kosty, one of the things that needs
20 to be assured in this instance is that the report
21 which will be evaluated ultimately by the court
22 and potentially fact finders was authored by you.
23       So I'll ask you before moving on:  Is
24 there any part of this report that reflects the
25 views of anyone at AG exclusively?

1        MR. DORNER:  Object to form.  Asked and
2  answered.  Mischaracterizes.  Argumentative.
3        You may answer.
4        THE WITNESS:  The answer is no.
5  BY MR. HONIK:
6    Q.  When you had this iterative exchange
7  with the folks at AG over drafts of this report,
8  would you get back written comments or track
9  changes or red lines to your draft?
10       MR. DORNER:  Object to form.
11 Mischaracterizes.
12       You may answer.
13       THE WITNESS:  It could have been via
14 conversation on a telephone call.  There could
15 have been red line suggestions.  Both of those
16 were alternatives that we discussed.
17 BY MR. HONIK:
18    Q.  And the red lines and the suggestions
19 weren't limited to help in preparing tables.  They
20 were red lines to language of your report; is that
21 correct?
22    A.  I previously answered that question yes.
23 I told you we went through an edit process
24 iteration.  I explained the methodology.  It's the
25 same methodology now that it was half an hour ago.

Confidential Information Subject to Protective Order

Page 66

1    Q.   Was there anyone at your own consulting
2  firm that assisted you in writing this report?
3    A.   No.
4    Q.   And when in relation to its date,
5  namely, January 12, 2022, would you say it was
6  completed?
7    A.   Probably January 11, 2022.
8    Q.   And to whom did you send it initially
9  when it was complete?
10   A.   It goes to counsel.
11   Q.   And who did you send it to specifically?
12 Mr. Dorner?
13   A.   Yes.
14   Q.   Turn, if you would, in Exhibit 1, which
15 is your report, to page 9.
16      MR. DORNER:  Actually, Ruben, we've been
17 going for about an hour.  If this is on the same
18 topic, I'm fine with exploring and wrapping up
19 that topic, but then I think at that point it
20 might be a good time for our first break.
21 BY MR. HONIK:
22   Q.   Mr. Kosty, do you need a break?
23   A.   Yes.  That would be great.
24   Q.   Do you want five minutes now?
25   A.   Sure.

Page 67

1    Q.   All right.  Let's take five minutes.
2  We'll return at, let's call it, 15 after the hour.
3      THE VIDEOGRAPHER:  Off record 11:09.
4      (Recess from 11:09 a.m. to 11:18 a.m.)
5      THE VIDEOGRAPHER:  We are back on the
6  record at 11:18.
7      MR. DORNER:  Ruben, I know it's faint
8  because the videographer is at the other end.  We
9  went on 11:18.  We're on.
10      MR. HONIK:  Okay.  I didn't hear anybody
11 or anything.
12 BY MR. HONIK:
13   Q.   Mr. Kosty, do you agree that the FDA has
14 a specific definition of adulterated?
15      MR. DORNER:  Objection.  Outside the
16 scope.
17      You may answer.
18      THE WITNESS:  Yes.  There's a definition
19 of adulterated in the code, yes.
20 BY MR. HONIK:
21   Q.   Do you agree that the FDA has a specific
22 definition of mislabeled?
23      MR. DORNER:  Same objection.
24      You can answer.
25      THE WITNESS:  Yes.  They also define

Page 68

1  that in the code.
2  BY MR. HONIK:
3    Q.   And you're familiar with both of those
4  definitions in your extensive experience in the
5  pharma space; right?
6    A.   Yes.
7    Q.   Do you agree that U.S. pharmacies are
8  not permitted to sell drugs which are adulterated
9  under that FDA definition?
10      MR. DORNER:  Objection.  Outside the
11 scope.  Calls for a legal conclusion.
12      You may answer.
13      THE WITNESS:  Yeah.  The pharmacies can
14 only purchase and the wholesalers only provide
15 approved FDA drugs.  So they have to purchase
16 FDA-approved drugs.  They don't have an option to
17 purchase nonFDA-approved drugs.
18 BY MR. HONIK:
19   Q.   Right.  And I appreciate that response
20 and I understand it.  But I've asked a rather
21 specific question.
22      Do you agree that pharmacists in the
23 United States are prohibited from selling
24 adulterated drugs as defined by the FDA?
25      MR. DORNER:  Objection.  Asked and

Page 69

1  answered.  Calls for a legal conclusion.  Outside
2  the scope.
3      You may answer.
4      THE WITNESS:  When you say pharmacist
5  dispensed, the pharmacists are covered under the
6  state Board of Pharmacy regulations in all 50
7  states, and I have not looked at all 50 states to
8  see what those regulations are.  So I don't know
9  off the top of my head if those regulations
10 address that or not.  Like I said in my earlier
11 response, pharmacists can only order drugs that
12 have been approved by the FDA.
13 BY MR. HONIK:
14   Q.   And I apologize if you didn't hear my
15 question.  I didn't talk about dispensing.  I
16 talked about selling.  I'm asking you whether you
17 agree that no pharmacy -- no pharmacy or pharmacy
18 system can sell an adulterated drug in the class
19 of trade in the U.S. as defined by the FDA.  Yes
20 or no.
21      MR. DORNER:  Objection.  Asked and
22 answered.  This is the third time.  The witness
23 cannot be required to give a "yes" or "no" answer.
24 He's permitted to explain.
25      MR. HONIK:  Stop instructing him.

Page 70

1    MR. DORNER:  It's not an instruction,
2  Ruben.  It's the law of the case.
3    MR. HONIK:  You're making a speaking
4  objection.
5    MR. DORNER:  Do not talk over me,
6  Mr. Honik.  Do not talk over me.  It's very hard
7  for Ms. Medis to take all that down if you do.  I
8  will restart.
9    Asked and answered a third time.  The
10 witness cannot be required to give a "yes" or
11 "no."  Calls for a legal conclusion.  And outside
12 the scope.
13   You may answer.
14   THE WITNESS:  Like I said, the pharmacy
15 can only purchase approved drugs.  In this case,
16 they purchased the adulterated -- excuse me -- the
17 VCD drugs that had impurities.  So they purchased
18 them.  They were approved under ANDAs and they
19 were dispensed to patients.
20   So when you say the pharmacy sells, the
21 pharmacy dispenses drugs.  That's how they sell
22 them to patients.
23 BY MR. HONIK:
24   Q.  Mr. Kosty, you apparently read a lot of
25 deposition testimony in this case and you listed

Page 71

1  it in your reliance material; right?
2    A.  Yes.
3    Q.  Did you read any of the testimony from
4  30(b)(6) witnesses proffered by the retailers in
5  this case?
6    MR. DORNER:  Object to form.
7    You can answer.
8    THE WITNESS:  I'm not sure from a legal
9  perspective what's a 30(b)(6) witness.  I read
10 declarations from the pharmacy executives about
11 their business practices.
12 BY MR. HONIK:
13   Q.  Um-hum.  Did you read any testimony from
14 any of the retailer defendants in this case?
15   A.  Yes.
16   MR. DORNER:  Objection.  Vague.
17   You can answer.
18   THE WITNESS:  Yes.
19 BY MR. HONIK:
20   Q.  Which ones did you read?
21   A.  I think I cite a number of them in my
22 report.  The one that I recall offhand is the lady
23 from Kroger's.  Her last name is Britt, I believe,
24 or first name.  But, yeah, I did read some of
25 those testimonies.

Page 72

1    Q.  Did you read any testimony from any of
2  the retailers which confirmed that none of those
3  retail chains would sell adulterated drugs as
4  defined by the FDA?
5    MR. DORNER:  Object to the
6  characterization.  Objection.  Outside the scope.
7  Vague.
8    You can answer.
9    THE WITNESS:  I don't recall those
10 specifics.
11 BY MR. HONIK:
12   Q.  And so if I suggested to you that each
13 and every one of them confirmed under oath that
14 none of those retail chains would or could sell
15 adulterated drugs as defined by the FDA, you'd
16 have no basis to deny that, would you?
17   MR. DORNER:  Objection.
18 Mischaracterizes.  Outside the scope.
19   You may answer.
20   THE WITNESS:  No.  I wouldn't have any
21 basis to object to their testimony if that's what
22 their testimony is.
23 BY MR. HONIK:
24   Q.  And, similarly, you didn't read any
25 testimony from any of the retailer defendants that

Page 73

1  confirmed that they would never sell mislabeled
2  drugs as defined by the FDA, would you?
3    MR. DORNER:  Objection.  Compound.
4  Outside the scope.
5    You can answer.
6    THE WITNESS:  I don't recall those
7  specifics.
8  BY MR. HONIK:
9    Q.  You agree that the FDA has the power
10 through its regulatory enforcement to identify
11 drugs which are adulterated as defined by them as
12 well as mislabeled; correct?
13   MR. DORNER:  Objection.  Compound.
14 Calls for a legal conclusion.  Outside the scope.
15 Mischaracterizes.
16   You may answer.
17   THE WITNESS:  Yes.
18 BY MR. HONIK:
19   Q.  Turn, if you would, to page 9 of your
20 report, section D that's called Assignment.
21   A.  Yes.
22   Q.  And I take it in paragraph 24, this
23 describes what you were asked to do by the
24 defendants in this case; right?
25   A.  Yes.

Confidential Information Subject to Protective Order

Page 74

1    Q.  The first sentence up till that first
2  semicolon I take to be background material or
3  information, right, explain the factors and
4  practices in the industry; is that correct?
5         MR. DORNER:  Objection.  Compound.
6         You can answer.
7         THE WITNESS:  Yeah.  It's more than
8  background on the pharmaceutical industry.
9         Someone on the call is not on mute.
10 BY MR. HONIK:
11   Q.  Sorry for the interruption.  Continue
12 your answer.
13   A.  So it's more than background
14 information.  It's information on how the industry
15 works in practice.
16   Q.  Okay.  And then what follows after that
17 semicolon are the, I'll say, four specific
18 assignments that you undertook; right?
19        MR. DORNER:  Objection to the
20 characterization.
21        You can answer.
22        THE WITNESS:  Yes.
23 BY MR. HONIK:
24   Q.  The first is to describe presumably the
25 complexities that are relevant to the assessment

Page 75

1  of injury; right?
2    A.  Yes.
3    Q.  The second is the extent to which data
4  is available to allow someone to identify class
5  membership; right?
6         MR. DORNER:  Objection to the
7  characterization.  You're not reading the entirety
8  of the paragraph.
9         MR. HONIK:  Nor am I trying to.  Stop
10 interrupting.
11        MR. DORNER:  I'm allowed to make an
12 objection, Mr. Honik.  Don't interrupt me.
13 BY MR. HONIK:
14   Q.  Mr. Kosty, was that the second thing
15 that you tried to do --
16        MR. DORNER:  Objection.
17 BY MR. HONIK:
18   Q.  -- to discuss available data to identify
19 class membership?
20        MR. DORNER:  Objection.
21 Mischaracterizes.
22        You can answer.
23        THE WITNESS:  It was to -- let me see
24 the specific verbiage -- was to include class
25 members and also class exclusions.

Page 76

1  BY MR. HONIK:
2    Q.  Class membership, if you're in or out of
3  the class, you looked at data on that question;
4  did you not?
5    A.  I did, yes.
6    Q.  That was one of your claimed
7  assignments; correct?
8    A.  Yes.
9    Q.  The third thing that you did to look at
10 available data to allow someone to calculate the
11 amount of impurities to which a patient might have
12 been exposed.  Did you do that?
13   A.  Yes.
14   Q.  How did you do that?
15   A.  I looked at the specifics in this case
16 with the impurities in the different lots.  Then I
17 looked at the industry to see could we identify by
18 patient what potential impurities they may have
19 ingested in taking the VCD products at issue.  So
20 I looked at that.
21        I looked at the DSCSA, which is a
22 10-year long implementation of the law which
23 really had two components to it.  One component
24 was to prevent and make very difficult for the
25 introduction of counterfeit drug products into the

Page 77

1  supply chain.  And the second component of that
2  law was to provide the ability for the industry in
3  the event of a recall to be able to track a
4  recalled product down to the patient level.
5         So this law from 2013 to 2023, it's a
6  rolling implementation over that timeframe.  That
7  law has not been fully implemented, not until
8  November of 2023.  The ability to track a specific
9  lot to a patient is not available in the industry
10 today.  So when I looked at could we track to an
11 individual patient the specific lot numbers and
12 the impurities potentially ingested, could that be
13 done, my conclusion is no, it can't be done given
14 the state of the industry today.
15   Q.  So I gather from your answer that FDA
16 regulations and federal law impacted your
17 analysis; correct?
18        MR. DORNER:  Objection to the
19 characterization.
20        You can answer.
21        THE WITNESS:  Yeah, it mischaracterizes
22 it.  The DSCSA is the law that I looked at and
23 understand.  I don't know if there's other federal
24 regulations that pertain to this.  But the DSCSA
25 implementation obviously has been a big issue in

Confidential Information Subject to Protective Order

Page 78

1 the industry since 2013 when it was passed.
2        So there's been a whole process involved
3 with supply chain participants having discussions
4 in the industry to determine, A, how can we comply
5 with this, B, what are the operational
6 alternatives for compliance and, C how do we work
7 with our trading partners to implement so we can
8 comply with these regulations.
9        So this has been an ongoing process for
10 nine or ten years now to decide as an industry how
11 do you implement these complex regulations.  So
12 it's an ongoing process.  It's iterative.
13 Business partners can agree to do things one way.
14 They can agree to do things another way.  The
15 industry consortiums that are looking at these
16 implementation issues are trying to understand
17 what's the best way to do that so it's effective
18 and most cost effective for all the participants.
19 So, like I said, it's an ongoing process.
20 BY MR. HONIK:
21     Q.  Mr. Kosty, I just wanted to know if the
22 law impacted your analysis.
23        MR. DORNER:  Objection.  Vague.
24        You may answer.
25        THE WITNESS:  Yes.  The DSCSA impacted

Page 79

1 my analysis.
2 BY MR. HONIK:
3     Q.  And did other FDA regulations impact
4 your analysis?
5     A.  No.
6     Q.  Did you say "no"?
7     A.  I said no.
8     Q.  The fourth item that you discussed among
9 your assignments is the "extent to which data are
10 available and sufficient to reliably estimate
11 damages on a class-wide basis in the event any
12 defendants are found liable."
13        Do you see that sentence?
14     A.  Yes.
15     Q.  Did I read that correctly?
16     A.  You did.
17     Q.  First, is it true that you offer no
18 opinions on defendants' liability?
19     A.  That is true.  I critiqued the
20 plaintiffs' experts' reports.
21     Q.  You concede that -- I'm sorry.  I spoke
22 over you.  What?
23     A.  I critiqued the plaintiffs' experts'
24 that I was assigned to look at reports.
25     Q.  Right.  And I'm just trying to be

Page 80

1 certain on the record that none of your opinions
2 go to the liability part of this case, correct,
3 that is, whether the defendants did anything wrong
4 or right as to the VCDs; right?
5        MR. DORNER:  Objection.  Compound.
6 Mischaracterizes.
7        You can answer.
8        THE WITNESS:  Yes, that's correct.
9 BY MR. HONIK:
10     Q.  What you did is really confined to
11 commenting in the areas we've now described with
12 respect to damages, on the one hand, and
13 ascertaining class membership, on the other; is
14 that correct?
15        MR. DORNER:  Same objections.
16        You can answer.
17        THE WITNESS:  Those were the primary
18 focuses of my report, yes.
19 BY MR. HONIK:
20     Q.  Fair enough.  Now, this last assignment
21 that I just read to you that you agreed I read
22 correctly, do you agree that you'd have to
23 understand on what legal basis defendants may be
24 found liable to answer the question and determine
25 if reliable data exists to estimate damages?

Page 81

1        MR. DORNER:  Objection.  Vague.  Calls
2 for a legal conclusion.  Mischaracterizes.
3        You may answer.
4        THE WITNESS:  No.  I am not an attorney.
5 I'm not in the legal profession.  I looked at this
6 from an industry perspective.
7 BY MR. HONIK:
8     Q.  Right.  And I get that.  You've
9 expressed that to me, and I accepted that's what
10 you did.
11     A.  Right.
12     Q.  But I'm asking a slightly different
13 question.  In order to comment on whether there is
14 data that's sufficient to reliably estimate
15 damages, don't you need to understand the legal
16 basis upon which one or more of these defendants
17 may be found liable?
18        MR. DORNER:  Same objections.
19 BY MR. HONIK:
20     Q.  Yes or no.
21        MR. DORNER:  Same objection.
22        You can answer.
23        THE WITNESS:  No, because I'm looking at
24 the data as an industry perspective, not a legal
25 perspective.

Page 82

1  BY MR. HONIK:
2      Q.  Well, let me ask you this:  Do you think
3  whether a defendant is liable under principles,
4  for example, of warranty versus unjust enrichment
5  impact your assignment?
6          MR. DORNER:  Objection.  Calls for a
7  legal conclusion.  Outside the scope.  And vague.
8          You may answer.
9          THE WITNESS:  No.  It does not impact my
10 evaluation of available data in this case.
11 BY MR. HONIK:
12     Q.  Did you consider in any way, shape or
13 form in any of your analyses whether a defendant
14 might be liable under one or an alternative theory
15 of legal liability?
16         MR. DORNER:  Objection.  Outside the
17 scope.  Calls for a legal conclusion.
18         You may answer.
19         THE WITNESS:  No.
20 BY MR. HONIK:
21     Q.  And so specifically when you drill down
22 to answer the question is there reliable data to
23 estimate damages, you didn't consider at all
24 whether that liability attaches in a theory of
25 warranty breach or unjust enrichment; correct?

Page 83

1          MR. DORNER:  Objection.  Compound.
2  Calls for a legal conclusion.  Vague.  And
3  mischaracterizes.
4          You may answer.
5          THE WITNESS:  I did not look at the
6  legal definitions of all those different legal
7  terms to inform my analysis of the data.  I looked
8  at it again from an industry perspective.
9  BY MR. HONIK:
10     Q.  When you received this assignment, were
11 you asked to make any assumptions by anyone?
12     A.  Not in this area, no.  I don't recall
13 any assumptions I was asked to make.  My
14 assignment is pretty straightforward, the
15 different areas.  But, no, I was not asked to make
16 assumptions in it.
17     Q.  You've said to me repeatedly, Mr. Kosty,
18 that you looked at this from an industry
19 perspective.  Do you remember telling me that?
20     A.  Yes.
21     Q.  And can you tell me why you think that's
22 a proper way to answer the assignments or
23 questions that you delineate on page 9, paragraph
24 24 of your report?
25         MR. DORNER:  Objection.  Vague.

Page 84

1          You can answer.
2          THE WITNESS:  Yes.  I'm not here to make
3  a legal conclusion based on the legal terms that
4  you just stated.  I'm here to provide an opinion
5  in my industry expertise on the available data and
6  what potentially could that show or not show.
7  That was the basis for my critiques of Dr. Conti's
8  economic report.
9  BY MR. HONIK:
10     Q.  Did you understand in reading
11 Dr. Conti's report that she was asked to make
12 certain assumptions?
13         MR. DORNER:  Objection to
14 mischaracterization.
15         You may answer if you know.
16         THE WITNESS:  Yes.  She was instructed
17 to make a lot of assumptions that really limited
18 her focus to that alternative reality that she
19 worked in.
20 BY MR. HONIK:
21     Q.  And tell me in as clear a way as you can
22 what alternative reality you're referring to when
23 you use that phrase.
24     A.  Well, she assumes that the products are
25 worthless.  She assumes that there is no supply

Page 85

1  curve for those products.  She assumes that the
2  retailers and wholesalers dispense those products
3  knowing that they had impurities.  So she's
4  created the sandbox where anything outside of
5  that, it's not of importance to her.
6      Q.  You reject those assumptions; is that
7  correct?
8      A.  Yes.  In my analysis, I do reject those
9  assumptions because, as I explained earlier, in
10 the real world it works differently, and we have
11 to deal with those things.
12     Q.  In addition to reviewing Dr. Conti's
13 report, did you read her testimony from her
14 deposition?
15     A.  I read a draft, rough draft of it, and I
16 skimmed through her testimony, yes.
17     Q.  Were you directed to read specific parts
18 of it by anyone?
19     A.  No.
20     Q.  Turn, if you would, to Appendix C of
21 Exhibit 1, your report, which is the listing of
22 materials you relied upon.
23     A.  What page in Exhibit C?
24     Q.  The page is delineated C-1, your
25 Appendix C.

Confidential Information Subject to Protective Order

Page 86

1     A.  Yes.
2     Q.  Earlier in your report you actually
3  state that you relied upon certain court filings;
4  isn't that right?
5     A.  Yes, and they're listed here.
6     Q.  And there are seven listed documents
7  that you claim to have relied upon in helping to
8  form your opinions; correct?
9     A.  Yes.
10    Q.  Are these the only seven court filings
11 or court documents that you relied upon apart from
12 depositions and the like?
13       MR. DORNER: Objection.  Vague.
14       You can answer.
15       THE WITNESS: Yes.
16 BY MR. HONIK:
17    Q.  Did you select these seven court
18 filings?
19    A.  No.  Defense counsel selected those for
20 my review based on their legal expertise.  I would
21 have no basis of understanding the legal process
22 and all the motions and back and forth attorneys
23 do from a pharmacist and industry perspective.
24       So, no, I relied on counsel to provide
25 me the documentations they felt relevant in my

Page 87

1  assignment.
2     Q.  And in what way did you rely upon the
3  retailer pharmacy defendants' letter Re:  Macro
4  Discovery Disputes, which is the fifth item that
5  you list as a reliance material?
6     A.  I would have to find out the exact
7  footnote that references this to answer that
8  question.  If you want to give me a couple of
9  minutes to find it, I will.
10       But the gist of that letter was, I
11 guess, there were discovery disputes and
12 objections on what was to be disclosed, and my
13 recollection --
14       MR. DORNER: I'm sorry.  The witness
15 wasn't finished quite.  I'm sorry.
16       THE WITNESS: My recollection was this
17 document explained that back and forth between, I
18 guess, the retailers and the plaintiffs'
19 attorneys.
20 BY MR. HONIK:
21    Q.  Can you find the footnote that you think
22 references that reliance material?
23    A.  Give me a minute to find that material.
24 I'm trying to narrow it down to the area of the
25 report where I discuss the pharmacy data.

Page 88

1     Q.  Take a look at footnote 43.
2     A.  Okay.  Yes.  I'm at the footnote.
3     Q.  Is that the footnote that refers to the
4  reliance material letter that we looked at in
5  Appendix C?
6     A.  In addition to the declaration of Megan
7  Mistarz from Walgreens.
8     Q.  And your reliance on it, is it limited
9  to this idea that open pharmacy networks have
10 higher reimbursement rates?
11    A.  In referencing the section, yes, but I
12 also read it for general knowledge on the
13 background of the case.
14    Q.  Meaning you read the letter that was
15 sent in on this issue to the court on macro
16 discovery; correct?
17    A.  Yes.
18       MR. DORNER: Object to form.
19       You can answer.
20 BY MR. HONIK:
21    Q.  What else did you extract from the
22 letter that you relied upon?
23    A.  I don't recall the specifics from that
24 letter.  If I recall correctly, it was about a
25 hundred pages.

Page 89

1     Q.  You think it was a hundred-page letter?
2     A.  If it's the one that I believe was
3  referenced here, yes, it was about a hundred-page
4  letter.
5     Q.  Mr. Kosty, there are nearly 2000 docket
6  entries in this case.  Do you have any idea or can
7  you tell me why this one letter was sent to you?
8       MR. DORNER: Objection.  Asked and
9  answered.  Calls for speculation.  And
10 mischaracterizes.
11       You may answer.
12       THE WITNESS: I recall asking for this
13 background on what the retailers' issues were with
14 the data.
15 BY MR. HONIK:
16    Q.  What do you mean retailer issues?
17    A.  My understanding, if I recall the
18 letter -- and as you rightly point out, there's
19 hundreds of documents in this case, so to recall
20 specifically -- but my recollection is it was a
21 back and forth on what information would be
22 disclosed.
23    Q.  Sir, the seven court filings and only
24 seven that you rely upon, six of them are briefs
25 or memos that counsel provided.  This is the only

Confidential Information Subject to Protective Order

Page 90

1 letter.
2     Can you tell me why this is the only
3 letter upon which you rely?
4     MR. DORNER:  Same objection.
5     THE WITNESS:  No.
6     MR. HONIK:  Why don't we mark and bring
7 up the June 16, 2020 letter that Mr. Kosty claims
8 to have relied on and mark that Exhibit 2.
9     (Kosty Exhibit 2 was marked.)
10     THE WITNESS:  Do I need to download
11 these or something, or how does this work?
12     MR. DORNER:  I believe if we refresh
13 your screen, it should appear.
14     THE WITNESS:  How does one refresh the
15 screen?
16     MR. DORNER:  That mouse is live.  You
17 can use the mouse to navigate as you need.
18 BY MR. HONIK:
19     Q.  Do we have that on the share screen?
20     MR. DORNER:  I don't see it, Ruben.
21     MR. HONIK:  Dave, Layne, can somebody
22 bring it up?
23     MR. STANOCH:  The letter is available
24 and marked as Exhibit 2.  This is David Stanoch.
25 I could share my screen if that would help.

Page 91

1     MR. HONIK:  Thank you.
2 BY MR. HONIK:
3     Q.  Mr. Kosty, this is page 1 of what's now
4 marked Exhibit 2 that you listed as a reliance
5 document from among the court filings.  It's dated
6 June 16, 2020.  It's a letter authored by Sarah
7 Johnston at Barnes & Thornburg on behalf of one or
8 more retailers.
9     Does this refresh your recollection
10 about this letter upon which you relied?
11     A.  This does refresh my recollection.  And
12 my earlier recollection was incorrect.  This is a
13 different document.
14     MR. DORNER:  And I do want to note for
15 the record this letter comes with many
16 attachments, as I understand it.  So these
17 attachments are not part of Exhibit 2 that's been
18 entered by plaintiffs' counsel.
19 BY MR. HONIK:
20     Q.  Mr. Kosty, do you remember now seeing
21 this and in what way you relied upon this letter?
22     A.  Give me a moment to go through here.
23     Q.  Sure.  Take your time.
24     MS. KAPKE:  This is Kara Kapke for CVS
25 and Rite Aid.  I just want to lodge an objection

Page 92

1 to the use of an incomplete exhibit.
2     MR. HONIK:  Thank you.
3 BY MR. HONIK:
4     Q.  Let us know when you're ready to answer,
5 Mr. Kosty.
6     Mr. Kosty, are you ready to respond to
7 my question?
8     A.  I'm still looking through the document,
9 counselor.
10     Q.  Let me know when you're done.
11     A.  Will do.  Okay.
12     Q.  Do you remember the question?
13     A.  How did I rely on this in my report?
14     Q.  Correct.
15     A.  The reliance is in terms of the
16 confidentiality nature of the PBM agreements that
17 both parties -- the retailers and the PBMs hold
18 these documents close to the vest as very
19 confidential.  It outlines the business
20 arrangement between those parties.
21     Q.  Is that your complete response?
22     A.  Yes.
23     Q.  In what way does the confidentiality
24 which is claimed to attach to those PBM agreements
25 impact any of your opinions?

Page 93

1     A.  In this section of the report, this was
2 the background on the industry, and it's
3 explaining why these things are confidential and
4 kept close to the vest.  So it informed my opinion
5 in terms of how it's used in the industry and that
6 all parties to the agreement believe they're
7 highly confidential.
8     Q.  What is it about the confidential or
9 claimed confidential nature of PBM agreements
10 impacts any of your opinions in this case?
11     A.  It impacts on what the actual rates were
12 paid to those pharmacies both at the point of
13 adjudication, and then subsequent to the
14 adjudication, whether there's adjustments to it
15 made through a DIR fee.  There might be a
16 withhold.  There might be a performance network
17 payment for certain metrics that are achieved.
18     So all those different types of terms
19 and conditions are documented in these agreements
20 between the parties.  And it's not surprising to
21 me that they've put up a fight to not disclose
22 those documents.
23     Q.  So accepting as true that those
24 arrangements or PBM contracts may or may not
25 reflect differing rates, my question is:  What is

Page 94

1  it about their confidentiality which you claim you
2  relied upon impacts any of your opinions?
3      A.  The section here I use as a citation is
4  the background on the industry to explain why
5  they're important, but it doesn't impact my
6  opinions further on in the report, just basic
7  industry knowledge that these documents are highly
8  confidential.
9      Q.  Sir, turn to the page 4 of this exhibit
10 marked 2 now, page 4 of the letter, under Roman
11 III. Argument, heading A, which reads,
12 "Disgorgement of profits is not an available
13 remedy to plaintiffs."  Do you see that?
14     A.  Yes.
15     Q.  Didn't you rely upon that statement in
16 authoring your report?
17        MR. DORNER:  Objection to both the form
18 and also to the use of an incomplete exhibit.
19        You may answer if you can.
20        THE WITNESS:  I did not use this
21 document in that analysis, no.
22 BY MR. HONIK:
23     Q.  Well, I didn't ask you that.  I asked
24 you whether you assumed that disgorgement of
25 profits is not an available remedy to plaintiffs

Page 95

1  in authoring your report.  Yes or no.
2        MR. DORNER:  Same objection.
3        You can answer.
4        THE WITNESS:  I did not, no.
5  BY MR. HONIK:
6      Q.  You understood that the retailers in
7  this document and others made that argument;
8  correct?
9        MR. DORNER:  Objection.  Outside the
10 scope.
11        You may answer if you can.
12        THE WITNESS:  No.  I don't understand
13 that because I didn't read it for that legal
14 perspective.
15 BY MR. HONIK:
16     Q.  Sir, I'm confused.  How can you comment
17 on a methodology for calculating damages if you
18 don't understand or attempt to understand whether
19 disgorgement of profits is a proper measure of
20 damages?
21        MR. DORNER:  Objection.  Calls for a
22 legal conclusion.  Vague.
23        You may answer.
24        THE WITNESS:  It calls for a legal
25 conclusion.  I don't -- like I've said many times

Page 96

1  in this deposition, I'm not an attorney.  I'm not
2  in the legal profession.  When I critiqued
3  Dr. Conti's methodology, I'm doing it from a
4  business perspective, as I say in my report.
5        So I did not include any legal arguments
6  in my analysis.  It was of no importance to me in
7  my report.  I'm looking at her methodology from a
8  business perspective, and that's where my comments
9  are taken from.
10 BY MR. HONIK:
11     Q.  Do you know what disgorgement of profits
12 means?
13     A.  Not from a legal perspective, no.
14     Q.  From any perspective.  From that of a
15 pharmacist with an MBA.
16     A.  Disgorgement would be to give them back,
17 the profit back.  Certainly in this section A, it
18 doesn't say what the profit is or how it's
19 calculated, and that goes the gist of my argument
20 against the methodology proposed.
21     Q.  What do you mean by that?
22     A.  I mean Dr. Conti does not take into
23 account the cost associated.  In the retailer
24 example in this section, this Exhibit 2, she just
25 assumes whatever happened at the point of sale is

Page 97

1  the cost to the retailer.  It's so ludicrous that
2  she doesn't even include the cost of the drug in
3  her analysis.
4        So if there's no cost of the drug, then
5  what in the world could a patient pick up if there
6  was no product there?  So obviously the pharmacy
7  had to account and purchase those products they
8  can dispense to patients.  They have to hire staff
9  to run their pharmacies.  They have to hire a
10 pharmacist.  They have to hire technicians.  They
11 hire clerical people.  They hire front end people.
12        They have rent.  They have leases they
13 have to pay for.  I'm sorry I'm going too fast.
14 They have all these other operating costs, heat,
15 light, upkeep, to provide services to patients
16 when they come into the pharmacies.
17        Dr. Conti includes none of those in her
18 methodology.  So I went and looked in the industry
19 because the cost of dispensing is an important
20 concept, especially in the Medicaid arena where
21 the Medicaid programs have gone to NADAC plus
22 dispensing fee.  So NADAC is more an estimate of
23 the product cost.  So states were required to
24 conduct a cost of dispensing survey.
25        And so NACDS, as I reference in my

Page 98

1 report, published a survey that indicated it was
2 $12.40 per prescription cost to fill those
3 prescriptions. Dr. Conti accounts for none of
4 those costs. Again, another assumption is that
5 that product is magically there for a patient and
6 doesn't consider all these other operating costs
7 that retailers have to have in order to provide
8 services to patients.
9     So that's the basis of my business
10 review of her methodology for retailers.
11     Q.  Mr. Kosty, do you think you need to
12 understand what the point of injury is to comment
13 on the damages available in this case?
14     MR. DORNER: Object to form. Calls for
15 a legal conclusion. Vague.
16     You may answer.
17     THE WITNESS: The way I look at this is
18 there's a -- the way the case -- my understanding
19 is there's an allegation that those patients were
20 harmed. I see no documentation that indicates
21 that they were harmed from a pharmacist/healthcare
22 perspective. The point of sale is one moment in
23 time. All these adjustments that have been after
24 the fact need to be accounted for.
25     I don't know your answer from a legal

Page 99

1 perspective. From a business perspective, the
2 initial engagement with the healthcare system is
3 when that patient, at least in this example, gets
4 their prescription filled in the retail pharmacy.
5 BY MR. HONIK:
6     Q.  Mr. Kosty, do you think it matters in
7 calculating class-wide economic damages to
8 understand when the harm occurred in the eyes of
9 the law?
10     MR. DORNER: Same objection.
11     You may answer.
12     THE WITNESS: Again, I did not look at
13 this issue from a legal perspective. I looked at
14 it from a practical business perspective. And as
15 I just went through, the components that are
16 required for a pharmacy to be operational and
17 dispensing prescriptions are many and numerous and
18 costly.
19 BY MR. HONIK:
20     Q.  And you've already confirmed that in no
21 way did the theory of liability, whether pursued
22 under warranty or unjust enrichment or any theory
23 legally, weighed in on your opinions; correct?
24     MR. DORNER: Objection. Asked and
25 answered. Mischaracterizes.

Page 100

1     You may answer if you can.
2     THE WITNESS: Yes. My opinions did not
3 depend on any legal understanding of those terms.
4 BY MR. HONIK:
5     Q.  Did you ever have an understanding that
6 there needs to be a connection between theory of
7 liability and calculation of damages in cases such
8 as this that you've been asked to work on? Did
9 anybody tell you that?
10     MR. DORNER: Objection. Compound.
11 Calls for a legal conclusion.
12     You may answer.
13     THE WITNESS: It was outside the scope
14 of my assignment.
15 BY MR. HONIK:
16     Q.  And you don't have any idea or view
17 about whether the legal theories supporting a
18 claim of damages is connected; correct?
19     MR. DORNER: Objection. Vague. Calls
20 for a legal conclusion.
21     You may answer.
22     THE WITNESS: I don't have an
23 understanding of the legal ramifications of those
24 terms.
25

Page 101

1 BY MR. HONIK:
2     Q.  Take a look at page 7 of this exhibit.
3 Do you see the paragraph that begins with the
4 language, "Put another way, to the extent the
5 consumer plaintiffs have suffered no actual harm
6 (because, for instance, they had no copay for
7 valsartan) they have no standing to bring any type
8 of economic loss claim."
9     Do you see that sentence?
10     A.  Yes.
11     Q.  Did you adopt that assumption in writing
12 your report?
13     MR. DORNER: Objection. Asked and
14 answered.
15     You may answer.
16     THE WITNESS: No.
17 BY MR. HONIK:
18     Q.  Do you agree that the plaintiffs have no
19 economic loss and have suffered no actual harm?
20     MR. DORNER: Objection to the extent it
21 calls for a legal conclusion. Compound. Outside
22 the scope.
23     You may answer.
24     THE WITNESS: So in the case the
25 sentence that says patients that had no copay,

Confidential Information Subject to Protective Order

---

Page 102

1 they had zero out-of-pocket expense for the
2 valsartan prescription. So from an economic
3 perspective, they had no payment to the pharmacy
4 for that prescription. So there's no copay. So
5 it's zero.
6        But from a legal perspective, like I
7 just mentioned, I don't have an opinion one way or
8 another on it.
9 BY MR. HONIK:
10       Q.  Sir, do you have a belief that consumer
11 plaintiffs who purchased contaminated or
12 adulterated VCDs have no economic harm?  Is that
13 your view?
14       MR. DORNER:  Objection.
15 Characterization.  Vague.  Form.
16       You may answer if you can.
17       THE WITNESS:  That was not part of my
18 assignment to evaluate that.
19 BY MR. HONIK:
20       Q.  You did look at Dr. Conti's report which
21 expressed the view that there was economic harm
22 that those class members suffered; correct?
23       A.  Yes.
24       Q.  And at a high level, you don't agree
25 with that opinion; right?

---

Page 103

1        MR. DORNER:  Objection.  Vague.
2        You may answer.
3        THE WITNESS:  Yes.
4 BY MR. HONIK:
5        Q.  And so the question naturally devolves
6 to:  Do you believe that there was any economic
7 harm to consumers of contaminated or adulterated
8 VCDs during the class period?
9        MR. DORNER:  Objection.
10 Characterization.  Vague.  Calls for a legal
11 conclusion.  Outside the scope.  Compound.
12       You may answer.
13       THE WITNESS:  That's outside the scope
14 of my assignment.
15 BY MR. HONIK:
16       Q.  Sir, is it, in your view, outside of the
17 purview of what should inform your opinion to
18 understand what the court's view of the right
19 measure of damages may be in this case?
20       MR. DORNER:  Objection.  Vague.  And to
21 form.
22       You can answer if you understand.
23       THE WITNESS:  Could you repeat that
24 again, counselor?
25

---

Page 104

1 BY MR. HONIK:
2        Q.  Yeah.  Let me rephrase it.
3        Do you think it matters what the court's
4 legal view is about how to measure damages in this
5 case?
6        MR. DORNER:  Objection.  Calls for a
7 legal conclusion.  Form.  Vague.
8        You may answer.
9        THE WITNESS:  It does matter what the
10 court says, but it didn't matter to me in my
11 assignment, in my report, what those legal
12 decisions may or may not be.  My assignment was
13 from an industry perspective to comment on these
14 four topics we previously went through.
15 BY MR. HONIK:
16       Q.  I totally get that your perspective was
17 limited or confined to what you describe as the
18 industry perspective.  But before I dig deeper
19 into this point, I'm just trying to understand
20 whether it would matter to your analysis, albeit
21 limited to the industry, to know and understand
22 how the court views the proper calculation of
23 damages might occur.
24       MR. DORNER:  Objection.
25

---

Page 105

1 BY MR. HONIK:
2        Q.  Yes or no.
3        MR. DORNER:  Objection.
4 Mischaracterizes.  Outside the scope.  Calls for a
5 legal conclusion.  Form.  Vague.  And compound.
6        You may answer.
7        THE WITNESS:  It was outside the scope
8 of my assignment.  And, no, I didn't look at the
9 legal issues that you just described.
10 BY MR. HONIK:
11       Q.  And it was of no moment to you in
12 writing your report to understand what the proper
13 criteria would be under the law to calculate
14 economic damages for consumer plaintiffs or TPPs;
15 correct?
16       MR. DORNER:  Objection.  Lacks
17 foundation.  Calls for a legal conclusion.  Vague.
18 And calls for a legal conclusion.
19       You may answer.
20       THE WITNESS:  Yes.  It was of no moment
21 for me to evaluate those issues.  As I said
22 previously, I looked at them from an industry
23 perspective.
24       MR. HONIK:  Let's mark as Exhibit 3
25 Judge Kugler's Motion to Dismiss Opinion 3

---

Confidential Information Subject to Protective Order

Page 106

1 Regarding Warranty Claims.  If you can bring that
2 up, that would be great.
3       MR. DORNER:  Ruben, would you mind if I
4 either showed Mr. Kosty how to refresh the exhibit
5 folder or do it for him?  Would that bother you?
6       MR. HONIK:  You can do whatever you
7 like.
8       (Kosty Exhibit 3 was marked.)
9 BY MR. HONIK:
10      Q.  We'll mark this Exhibit 3, Mr. Kosty.  I
11 did not see this listed in your Appendix C of
12 Exhibit 1, your report, that this was a material
13 you relied upon.  Is that right?
14      A.  Yes.
15      Q.  So the defense lawyers that engaged you
16 to write your report never produced it so that you
17 could read it; right?
18      A.  Yes.
19      Q.  And are you looking at this for the
20 first time ever?
21      A.  Yes.
22      Q.  I want to represent to you that what a
23 motion to dismiss opinion is is a ruling by the
24 court on the sufficiency in this case of the
25 complaint or the amended complaint which you did

Page 107

1 look at; correct?
2       A.  Yes.
3       Q.  And, in fact, you quite accurately
4 listed the allegations that plaintiff make in the
5 complaint against the various defendants here;
6 right?
7       A.  Yes.
8       Q.  So I represent to you that this is an
9 expression of the court's view about whether those
10 allegations sufficiently lay out an actionable and
11 cognizable legal claim.  Do you understand that?
12      MR. DORNER:  I'll object to the
13 characterization.  And this is really legal
14 testimony.
15      But you can answer.
16      THE WITNESS:  Can you explain what a
17 cognizable legal claim is?
18 BY MR. HONIK:
19      Q.  Sure.  Plaintiffs make allegations in a
20 complaint, and what the court does is accept them
21 as true for the purposes of determining whether
22 they lay out a proper legal claim.
23      Do you understand that?
24      A.  Yes.
25      Q.  Okay.  And so you didn't look at the

Page 108

1 court's view on the question of how to measure
2 economic worth as it relates to the claims
3 asserted in this case, did you?
4       A.  I did not.
5       Q.  If you turn with me in Exhibit 3 to page
6 20 of the court's opinion, I want to point some
7 language out to you.
8       Do you see the second paragraph that
9 begins with the words, "This court finds"?
10      A.  I'll still getting there.  Page 20?
11      Q.  Yes, sir.  Are you there?
12      A.  I'm there now.  Okay.
13      Q.  Do you see the paragraph that begins
14 with the words "This court finds"?
15      A.  Yes.
16      Q.  It reads, and I quote, "This court finds
17 that contaminated drugs are economically worthless
18 at the point of sale by virtue of the
19 dangerousness caused by their contamination
20 regardless whether the sold VCDs actually achieved
21 the medical purpose of lowering blood pressure."
22      Did I read that correctly?
23      A.  You did.
24      Q.  And do you understand now that that
25 principle articulated by the court, albeit in this

Page 109

1 context, was something we asked Dr. Conti to
2 assume?  Do you understand that?
3       MR. DORNER:  Objection to the
4 characterization of the court opinion.  Object to
5 form.  Compound.  Calls for a legal conclusion.  I
6 think that's it.
7       You can answer if you understand.
8       THE WITNESS:  I'm unaware of any
9 conversations between plaintiffs' attorneys and
10 Dr. Conti on this issue.
11 BY MR. HONIK:
12      Q.  Right.  But you read her report and you
13 understood that the underpinning of her economic
14 analysis is predicated on the fact that she was
15 asked to assume that the drugs were adulterated as
16 defined by the FDA and that there was no sale
17 curve that would give the drugs any value.  You
18 understand that, don't you?
19      MR. DORNER:  Objection.  Compound.
20      You can answer.
21      THE WITNESS:  Yes.  She states that as
22 one of her assumptions in her report, yes.
23 BY MR. HONIK:
24      Q.  And you can see for yourself that the
25 court tracks that assumption in this opinion; do

Page 110

1 you not?

2     MR. DORNER:  Objection.

3 Mischaracterizes the opinion.  Calls for a legal

4 conclusion.

5     You may answer.

6     THE WITNESS:  Yes.

7 BY MR. HONIK:

8     Q.  You see the second sentence that

9 follows, it says, "Put differently, contaminated

10 drugs, even if medically efficacious for their

11 purpose, cannot create a benefit of the bargain

12 because the contaminants and their dangerous

13 effects were never bargained for."

14     Do you see that?

15     A.  Yes.

16     Q.  And do you understand that principle to

17 be that when you are sold or purchase an

18 adulterated drug, that you're not getting the

19 benefit of the bargain?  Do you understand that?

20     MR. DORNER:  Objection.

21 Mischaracterizes.  Outside the scope.  Calls for a

22 legal conclusion.  Compound and vague.

23     You may answer.

24     THE WITNESS:  I don't know what -- can

25 you explain to me from a legal perspective what

Page 111

1 the benefit of the bargain is?

2 BY MR. HONIK:

3     Q.  Is it correct that the persons who

4 engaged you to write your report never explained

5 that principle to you?

6     A.  Yes.

7     Q.  And so, therefore, you couldn't possibly

8 have any economic insight into whether benefit of

9 the bargain damages exist in this case or not, can

10 you?

11     MR. DORNER:  Objection.

12 Mischaracterizes.  Argumentative.  Compound.  And

13 vague.  And calls for a legal conclusion.

14     You may answer.

15     THE WITNESS:  My assignment was not to

16 make economic conclusions, but to evaluate the

17 economic -- Conti's calculations from a business

18 perspective, and that's what I have done.

19     MR. HONIK:  Can I have the answer read

20 back.

21     (The following record was read back:

22     "THE WITNESS:  My assignment was

23     not to make economic conclusions, but to

24     evaluate the economic -- Conti's calculations

25     from a business perspective, and that's what

Page 112

1 I have done."

2 BY MR. HONIK:

3     Q.  Mr. Kosty, you confirm that you made no

4 economic conclusions in your report; correct?

5     MR. DORNER:  Objection.

6 Characterizations.

7     You can answer if you can.

8     THE WITNESS:  I think it

9 mischaracterizes my economic conclusions based on

10 my industry analysis of those additional

11 associated costs with both the pharmacies, the

12 retailers and the wholesalers.

13 BY MR. HONIK:

14     Q.  Sir, the last sentence reads, "Further,

15 contaminated drugs do create a present injury

16 because their sale should never have occurred."

17     Do you see that?

18     A.  Yes.

19     Q.  Did you take that statement into account

20 in any of your analyses in your report?

21     A.  I did not.

22     Q.  You understand that if legally the sale

23 of these adulterated drugs should not have

24 occurred, that that impacts their economic worth?

25     MR. DORNER:  Objection.  Calls for a

Page 113

1 legal conclusion.  Mischaracterizes.  Outside the

2 scope.

3     You can answer.

4     THE WITNESS:  I don't have a legal

5 opinion on this.  But from a business perspective,

6 those products were sold and were dispensed to

7 patients.

8 BY MR. HONIK:

9     Q.  Do you deny that they should not have

10 been?

11     MR. DORNER:  Objection.  Calls for

12 speculation.  Lack of foundation.  Again,

13 mischaracterizes.  Calls for a legal conclusion.

14 Vague.  I think that's all of them.

15     THE WITNESS:  I think in this case, if

16 it was known before these products were on the

17 market -- the FDA has the duty to uphold

18 products and regulate them as safe and effective.

19 If this information was known before those

20 products were launched into the marketplace, then

21 my expectation is the FDA would not have approved

22 those products.

23     In fact, they were approved and were

24 launched into the marketplace and the pharmacies

25 dispensed them, unbeknownst to them, that they had

Confidential Information Subject to Protective Order

Page 114

1 impurities and the wholesalers distributed them,
2 unbeknownst to them, there were impurities. And
3 that's how they got into the market.
4        Assuming perfect information and all
5 that was known up front before this happened, my
6 expectation would be those products would not have
7 been available because the FDA would not have
8 approved them.
9 BY MR. HONIK:
10    Q.   You will agree that the FDA prohibits
11 the introduction or delivery into interstate
12 commerce any prescription drug that is adulterated
13 or misbranded?
14        MR. DORNER:  Objection.  Calls for a
15 legal conclusion.  Outside the scope.
16        You can answer.
17        THE WITNESS:  I don't know the specific
18 FDA regulation, but my understanding would be
19 those drugs, if they were misbranded and
20 adulterated, would not be approved.
21 BY MR. HONIK:
22    Q.   Well, we're not talking about approval.
23 We're talking about whether you accept as true
24 that the FDA specifically prohibits the
25 introduction of adulterated or misbranded drugs

Page 115

1 into interstate commerce.  Yes or no.
2        MR. DORNER:  Same objections.  And the
3 witness is entitled to an explanation.
4        THE WITNESS:  Yes.  The FDA would
5 prohibit those if they had known about them.  But
6 in this case, they did not know about them.
7 BY MR. HONIK:
8    Q.   Did you consider that prohibition in any
9 of your analysis in your report?
10        MR. DORNER:  Objection to the extent it
11 calls for a legal conclusion.  Outside the scope.
12        You may answer.
13        THE WITNESS:  No, I did not because, as
14 I stated previously, these things did happen and
15 the industry, as I explained earlier, had the
16 regulatory mechanism to identify and respond to
17 them and conduct the voluntary recalls.  So, no, I
18 did not take that into account in my answer or my
19 report.
20 BY MR. HONIK:
21    Q.   And is it true that you also didn't take
22 into account that those prohibited drugs that are
23 either adulterated or misbranded cannot be
24 proffered for pay or otherwise?
25        MR. DORNER:  Objection.  Calls for a

Page 116

1 legal conclusion.  Mischaracterization.  Outside
2 the scope.  Vague.  And I think compound.
3        You may answer.
4        THE WITNESS:  No, I did not.
5 BY MR. HONIK:
6    Q.   Are you, in fact, familiar with the
7 listing of FDA's prohibited acts as it concerns
8 prescription drugs?
9        MR. DORNER:  Objection to vague.
10        You can answer.
11        THE WITNESS:  Not at a detailed level
12 because that's not my area of expertise in terms
13 of regulatory compliance.  But as a pharmacist,
14 yes, you have an understanding of those
15 requirements.
16 BY MR. HONIK:
17    Q.   Sir, do you understand that Dr. Conti
18 looked at this with care and is the very
19 foundation of her damage analysis, mainly that
20 these drugs were improperly introduced into the
21 stream of commerce because they were adulterated
22 and misbranded as defined by the FDA?
23        MR. DORNER:  Objection.  Compound.
24 Lacks foundation.  Mischaracterizes.  Vague.
25        You can answer.

Page 117

1        THE WITNESS:  I have no foundation as to
2 what Dr. Conti considered besides the report that
3 she provided.
4 BY MR. HONIK:
5    Q.   Well, did you consider foundational to
6 your expressed opinions what the FDA's views are
7 on the placement of prohibited adulterated,
8 misbranded drugs in the stream of commerce?  Did
9 that in any way weigh on your opinions?
10        MR. DORNER:  Objection.  Lacks
11 foundation.
12        You can answer.
13        THE WITNESS:  No, it did not.  I looked
14 at the formularies for calculating unjust
15 enrichment for both retailers and the wholesalers,
16 and my comments were limited to those formulas.
17        MR. HONIK:  Let's mark as Exhibit 4 and
18 bring up 21 U.S.C.A. Section 331.
19        (Kosty Exhibit 4 was marked.)
20        THE WITNESS:  Is that Exhibit 4?
21        MR. HONIK:  It's going to be marked
22 Exhibit 4.
23 BY MR. HONIK:
24    Q.   Have you seen this before today?
25    A.   No.

Confidential Information Subject to Protective Order

Page 118

1    Q.   Part of the Food and Drug Act.
2    A.   No.  I have not reviewed this prior to
3  this.
4    Q.   No.  I've asked a different question.
5  In your 38 years of experience, have you ever seen
6  this act?
7    A.   Oh, yes, of course.
8    Q.   And have you seen this specific section
9  that defines with particularity prohibited acts by
10  the FDA?
11       MR. DORNER:  Objection to
12  characterization.
13       You can answer.
14       THE WITNESS:  I've reviewed the FDA act,
15  certain parts of it based upon our consulting
16  projects and the need to know certain information.
17  But for this case, I did not specifically go and
18  read the FDA's Food, Drug and Cosmetics Act.
19  BY MR. HONIK:
20    Q.   Let me unpack that.  For this report
21  that you prepared in valsartan that we're here to
22  talk about today, you didn't look at any of the
23  FDA regulations.  Is that what you're saying?
24    A.   No.  That mischaracterizes my statement.
25  I did go and look at the specific definitions of

Page 119

1  misbranded and adulterated.
2    Q.   Okay.  Apart from that, did you look at
3  anything else pertaining to FDA's regulations and
4  rules?
5    A.   Not in terms of reviewing this FD&C Act,
6  but I did -- not in terms of regulations.  I did
7  review, like I mentioned earlier, the website that
8  gave us the chronology of the nitrosamines issue.
9    Q.   Right.  But I'm talking about FDA
10  regulations.  Did you look at any besides the two
11  you mentioned, namely, the definition of
12  adulterated and misbranded?
13    A.   I did not.
14    Q.   This one reads, "The following acts and
15  the costing thereof are prohibited."  Do you see
16  that?
17    A.   Yes.
18    Q.   And the very first thing listed at (a)
19  is "The introduction or delivery for introduction
20  into interstate commerce of any food, drug,
21  device, tobacco product or cosmetic that is
22  adulterated or misbranded."
23       Did I read that correctly?
24    A.   Yes.
25    Q.   And that means in plain English that the

Page 120

1  FDA prohibits the placement of an adulterated or
2  misbranded drug into the stream of commerce;
3  correct?
4       MR. DORNER:  Objection.  Calls for a
5  legal conclusion.  Characterization.
6       You can answer.
7       THE WITNESS:  I don't know the answer to
8  that because the way I read this, the
9  introduction, in my mind, it's the introduction, a
10  known introduction of a product that meets these
11  criteria.  If I don't know there's an issue, then
12  I could have, like in this case, introduced that
13  product not knowing that it was -- had an impurity
14  into it.
15       So the way I interpret this, it doesn't
16  say it, but knowingly introducing.  If I don't
17  know there's an issue, then I wouldn't know I was
18  potentially violating this.
19  BY MR. HONIK:
20    Q.   Sir, you don't list this among your
21  reliance materials; right?
22    A.   That's correct.
23    Q.   And you don't disagree that whether one
24  knows it or doesn't know it, this prohibited act
25  is not in any way qualified by that.  It simply

Page 121

1  states that you can't put an adulterated or
2  misbranded product, drug product into the stream
3  of commerce.  That is what it says; correct?
4       MR. DORNER:  Objection.  Compound.
5  Calls for a legal conclusion.  Outside the scope.
6  And mischaracterizes.
7       You may answer.
8       THE WITNESS:  Yes.  That's what it says.
9  BY MR. HONIK:
10    Q.   And that's synonymous or the same as
11  saying that there's no legitimate supply curve.
12  That is, you can't legally introduce into the
13  legal class of trade an adulterated or misbranded
14  drug product; correct?
15       MR. DORNER:  Objection.
16  Mischaracterizes.  Lacks foundation.  Calls for a
17  legal conclusion.  Let me see the question.
18  BY MR. HONIK:
19    Q.   Your answer, sir?
20       MR. DORNER:  I'm sorry.  I was making
21  sure that my objection was complete.  I apologize,
22  Mr. Honik.
23  BY MR. HONIK:
24    Q.   Your answer, Mr. Kosty?
25       MR. DORNER:  I'm sorry.  I'm confirming

Confidential Information Subject to Protective Order

Page 122

1  my objection is complete.
2  BY MR. HONIK:
3      Q.  Your answer, Mr. Kosty?
4          MR. DORNER:  You may answer.
5          THE WITNESS:  Yes.
6  BY MR. HONIK:
7      Q.  And if you look with me at (c), the
8  prohibited acts are even more specific.  It says,
9  and I quote, "The receipt in interstate commerce
10  of any food, drug, device, tobacco product or
11  cosmetic that is adulterated on misbranded and the
12  delivery or proffered delivery for pay or
13  otherwise."
14          Do you see that?
15      A.  Yes.
16      Q.  And so the FDA act here is specific in
17  saying that you cannot exchange for money an
18  adulterated or misbranded product that you placed
19  into the stream of commerce; correct, sir?
20          MR. DORNER:  Objection.  Calls for a
21  legal conclusion.  Outside the scope.  And
22  mischaracterizes.
23          You can answer.
24          THE WITNESS:  Yes.  That's how it's
25  written.

Page 123

1  BY MR. HONIK:
2      Q.  And you told me that you're familiar
3  with the FDA definition of adulterated and
4  misbranded; right?
5      A.  Yes.
6      Q.  And do you understand and accept that an
7  adulterated and misbranded product can be one that
8  was not subject to appropriate cGMPs?
9          MR. DORNER:  Objection.  Outside the
10  scope.  Calls for a legal conclusion.
11  Mischaracterizes.
12          You may answer.
13          THE WITNESS:  Yeah, that's the outside
14  the scope my expertise.  I'm not a cGMP expert.
15  BY MR. HONIK:
16      Q.  Do you, nonetheless, understand in your
17  experience in the pharmacy area that failure of
18  cGMP can be a basis upon which the FDA finds a
19  drug to be adulterated or misbranded?
20          MR. DORNER:  Same objections.
21          THE WITNESS:  Yes.
22  BY MR. HONIK:
23      Q.  And are you aware in reading Dr. Conti's
24  report that she was asked to assume that the drugs
25  were, in fact, adulterated and misbranded here

Page 124

1  and, therefore, subject to this prohibition of
2  placing them in interstate commerce?
3          MR. DORNER:  Objection.
4  Mischaracterizes.  Calls for a legal conclusion.
5          You may answer.
6          THE WITNESS:  Yes.  That was one of the
7  assumptions in the Conti report.
8  BY MR. HONIK:
9      Q.  Correct.  Do you know what the word
10  syllogism means?
11      A.  No.
12      Q.  It's where you take one element and add
13  another element and perhaps more and you arrive at
14  a conclusion or assumption.
15          Accepting that definition of syllogism,
16  do you understand that what Dr. Conti did was to
17  accept as true that these valsartan-containing
18  drugs were as defined by the FDA adulterated and
19  mislabeled and, therefore, subject to this
20  prohibition where you couldn't place them into the
21  stream of commerce?
22          Do you understand that?
23          MR. DORNER:  Same objections.
24          You can answer.
25          THE WITNESS:  I understand that's one of

Page 125

1  the assumptions she made in her report, yes.
2  BY MR. HONIK:
3      Q.  Okay.  Now, Mr. Kosty, if you were asked
4  by the court to serve as an expert witness in this
5  case, you wouldn't turn down that opportunity if
6  presented, would you?
7          MR. DORNER:  Objection.  Form.  Vague.
8  Lacks foundation.  Calls for speculation.
9          You can answer.
10          THE WITNESS:  Maybe.  It depends.  It
11  depends on what other projects I would have going
12  on at the time whether or not I would accept
13  another legal assignment, because it's been my
14  experience working on these cases that they're
15  very time consuming and you have deadlines that
16  just are all encompassing in terms of work
17  activity.
18          So I'd evaluate if I had the bandwidth
19  to take on another project or not.
20  BY MR. HONIK:
21      Q.  That's fair and I understand your
22  response.  Here's the beauty of these
23  examinations.
24          I want you to assume, Mr. Kosty, that
25  the court has given you that assignment and you've

Confidential Information Subject to Protective Order

Page 126

1  accepted it and the court is asking you to assess
2  damages in this case and only that.  And I want
3  you to further assume that the court has
4  instructed you in the face of a demonstration that
5  the VCDs in question were adulterated and
6  mislabeled and, therefore, should never have been
7  in the marketplace, that there was a failure of
8  the bargain to be satisfied and your job is to
9  calculate the damages at the point of sale.
10        Do you understand that hypothetical?
11    A.  Yes.
12        MR. DORNER:  I'll object to --
13  BY MR. HONIK:
14    Q.  How would you go --
15        MR. DORNER:  I'm sorry.  I will object
16  to an incomplete hypothetical, to compound, to
17  mischaracterizing and to calling for a legal
18  conclusion.
19        You may ask the next question.
20  BY MR. HONIK:
21    Q.  How would you then calculate the damages
22  for consumers at the point of sale?
23        MR. DORNER:  Objection.  Outside the
24  scope.  Incomplete hypothetical.
25  Mischaracterizes.

Page 127

1        You may answer.
2        THE WITNESS:  The only information at
3  the point of sale concerning a patient on when a
4  prescription is adjudicated is the amount of
5  copay.
6        MR. DORNER:  And I'll likewise add an
7  objection to calling for a legal conclusion.  I
8  apologize.  Please keep going.
9  BY MR. HONIK:
10    Q.  So you agree that if one could determine
11  the amount of a copay or co-insurance at the point
12  of sale for a consumer buying a contaminated or
13  adulterated VCD, that would be the proper measure
14  of their damages under my hypothetical; correct?
15        MR. DORNER:  Objection.  Calls for a
16  legal conclusion.  Outside the scope.
17  Mischaracterizes.
18        You may answer.
19        THE WITNESS:  Yes.  That would be the
20  only information you would have, at the point of
21  sale.
22  BY MR. HONIK:
23    Q.  That's right.  And if you were asked
24  under a similar hypothetical to calculate what the
25  TPPs or insurers paid as part of that transaction

Page 128

1  at the point of sale, what would you do as to
2  those damages?  What would you look at?
3        MR. DORNER:  Same objections plus
4  incomplete hypothetical.
5        You may answer.
6        THE WITNESS:  I would need further
7  research to do that.  I would have to identify
8  legal -- in this case what a TPP is and identify
9  who that TPP was responsible for that
10  prescription.
11  BY MR. HONIK:
12    Q.  You know that at the point of sale when
13  there's a prescription, a VCD dispensed, it's
14  known instantly in that financial transaction how
15  much an insurer paid and how much the consumer
16  paid; correct?
17    A.  No, that is not correct.  All you know
18  at the point of sale at the pharmacy is how much
19  to collect from the patient and what PBM is
20  responsible for paying the pharmacist.
21    Q.  And the amount --
22        MR. DORNER:  I'm sorry.  I'm sorry.
23  Mr. Kosty wasn't finished with his answer.  We've
24  also been going for an hour and ten here.  So I'd
25  ask for a break at some point.

Page 129

1        But, Mr. Kosty, please finish you
2  answer.
3        THE WITNESS:  So what the pharmacy
4  knows -- and you got to think about what does the
5  pharmacy care about.  The pharmacy was presented a
6  prescription drug card from the patient.  The
7  pharmacy enters certain information into their
8  computer system.  They adjudicate the claim.  They
9  know what PBM is responsible for paying them.
10        So as long as the PBM makes payment to
11  that pharmacy, they don't need to know any
12  information further than that.  In my experience,
13  running a third party for Rite-Aid and Thrift
14  Drug, it did not matter who the TPP was.  It only
15  mattered if that PBM that we had the contractual
16  relationship paid their claims.  And if they did
17  that, we were satisfied, and that was all we
18  needed to know.  And it's very straightforward
19  from a pharmacy perspective.  The PBM pays us, and
20  we relieve our receivable.
21  BY MR. HONIK:
22    Q.  It is straightforward such that at the
23  point of adjudication, one knows in an insured
24  situation how much the consumer has to pay and how
25  much the insurer is paying; correct?

Confidential Information Subject to Protective Order

Page 130

1   MR. DORNER:  Same objections.
2   THE WITNESS:  The pharmacy doesn't know
3   who the payor is outside the PBM.  And your
4   characterization that's the insurance company is
5   inaccurate.  The PBM may be contracted with a
6   self-insured employer.  They could have a
7   contractual relationship with another PBM.  They
8   could have a relationship with a TPA.
9   So there's all different opportunities
10  for relationships.  All the pharmacy knows is that
11  PBM is responsible for the payment to them.
12  BY MR. HONIK:
13  Q.  Sir, and I apologize because I don't
14  think I made my question clear enough.  It's not
15  consequential what the pharmacy knows.  I'm asking
16  about data that's created at the point of
17  adjudication.
18  You agree, do you not, that every single
19  time an American picks up a prescription who
20  happens to be insured, there is data collected
21  that exists somewhere that reveals how much the
22  consumer paid, that is, the patient, and how much
23  his or her insurance company contributed?  That
24  data exists; correct?
25  MR. DORNER:  Objection.  Argumentative

Page 131

1   and lacks foundation.  Vague.  Compound.  And
2   mischaracterizes.
3   You may answer.
4   THE WITNESS:  So the point of sale, as
5   I've stated before, is the transaction between the
6   pharmacy and the patient and the PBM.  So the PBM
7   now has that transaction.  Let's just assume for
8   argument's sake that that transaction has been
9   completed and the PBM is in possession of it.
10  So now the PBM has to bill their client.
11  And the way the PBMs are set up, they have a
12  number of different business models, the first one
13  being a transparent pass-through, and that means
14  that the PBM is going to bill their customer,
15  whoever that may be which could include an
16  insurance company, the amount paid at the
17  pharmacy.  So it's transparent.  It's a
18  pass-through price.
19  The other model that PBMs employ is
20  called a traditional spread model.  And what the
21  PBMs do is take whatever that transaction amount
22  is at the pharmacy and they add a markup to it
23  before they bill their customer.  So the amount
24  the PBM ultimately pays may be different than what
25  is adjudicated at the point of sale at the

Page 132

1   pharmacy.
2   BY MR. HONIK:
3   Q.  Sir, if a cash customer, an uninsured
4   customer pays cash for any prescription drug, that
5   amount is known; correct?
6   A.  Yes.
7   MR. DORNER:  And, Ruben, I do want to
8   jump in.  I could use a break here soon as well.
9   MR. HONIK:  We're almost done.  Stop
10  interrupting me for now.
11  MR. DORNER:  Ruben, please.  I'm asking
12  for a break.  It's a civil matter.
13  MR. HONIK:  We're not going to take a
14  break right now.  I have several more questions.
15  MR. DORNER:  I'm not asking you to stop
16  now.
17  MR. HONIK:  Excuse me?
18  MR. DORNER:  I'm not asking you to stop
19  now.  I'm asking shortly I could use a break.
20  MR. HONIK:  Stop interrupting me.  I
21  heard you the first time.  We'll stop when I want
22  to stop.  We're near the end.
23  BY MR. HONIK:
24  Q.  Mr. Kosty, inasmuch as you know what the
25  cash payor pays, isn't it true the data exists

Page 133

1   that is knowable as to the amount an insured
2   consumer pays, what his or her share is, and what
3   the insurance company paid and what their share
4   is?  That is data that is available today; is it
5   not?
6   MR. DORNER:  Objection.  Vague.
7   Compound.  Argumentative.  Lacks foundation.  And
8   mischaracterizes.
9   You may answer.
10  THE WITNESS:  Yeah, the data would be
11  available if you knew what party to go ask for it.
12  BY MR. HONIK:
13  Q.  Do you agree that IQVIA collects the
14  very datapoints that we're discussing now, mainly
15  the amount of payments by consumers and TPPs for
16  prescription drugs in America?
17  MR. DORNER:  Object to characterization.
18  You may answer.
19  THE WITNESS:  Yes.  IQVIA buys data from
20  various entities in the pharmaceutical industry.
21  And the purpose of the IQVIA data is to provide
22  trend information to market participants.  It's
23  also used in the pharmaceutical industry to track
24  from a brand pharmaceutical manufacturer
25  perspective their salesforce effectiveness.

Page 134

1  So if I'm a salesman in a certain
2  territory, say Pittsburgh, and I'm promoting a
3  product, then the IQVIA data is used to track the
4  performance of that drug product in my sales
5  territory.  So there's a lot of uses of the IQVIA
6  data that's typically aggregated.  You can't go
7  and look at individual claims from them.  That's
8  not part of their business model.
9  BY MR. HONIK:
10  Q.  You agree that IQVIA data is the gold
11  standard that's used day in and day out in the
12  pharmaceutical industry; correct?
13  A.  Yes.  It's the leading provider of that
14  data, although there are other alternatives you
15  could purchase.
16  MR. HONIK:  We can take a break now.
17  How much time do you want, Drew?
18  MR. DORNER:  It's up to Mr. Kosty.  Five
19  or ten?
20  THE WITNESS:  My question, when are we
21  going to plan to break for lunch?
22  MR. DORNER:  Is now a good time, Ruben?
23  MR. HONIK:  We can do that if you'd
24  like.  It's 12:36.  What time do you want to
25  resume?

Page 135

1  MR. DORNER:  Do you want a half hour or
2  do you want a little longer?
3  THE WITNESS:  1:15.
4  MR. HONIK:  1:15 we'll resume.  Thank
5  you.
6  THE VIDEOGRAPHER:  Off the record 12:36.
7  (Recess from 12:36 p.m. to 1:19 p.m.)
8  THE VIDEOGRAPHER:  We're back on the
9  record at 1:19.
10  BY MR. HONIK:
11  Q.  Mr. Kosty, good afternoon.  I presume
12  you had a satisfactory lunch break and you're
13  ready to proceed now?
14  A.  Yes.
15  Q.  Before we took our lunch break, we were
16  talking about in lawyerly terms the benefit of the
17  bargain theory and the proper criteria for
18  assessing damages in this case.
19  Do you remember that?
20  A.  Yes.
21  Q.  And that's a topic that you took
22  Dr. Conti to task in your report; did you not?
23  A.  I did.
24  Q.  Can you turn with me to Exhibit 1, which
25  is your report, paragraph 31 appearing on page 13.

Page 136

1  A.  Yes.  I'm there.
2  Q.  And if I'm reading your report
3  correctly, the subparts to paragraph 31 beginning
4  with (a) and going through several pages
5  concluding in (e) are the various specific ways in
6  which you disagree with Dr. Conti and her views;
7  right?
8  A.  Yes.
9  Q.  And in 31(a), we sort of talked about
10  this, this is the part of her conclusions that I
11  think you described as being in an unreal or
12  fantasy world.  Do you remember that?
13  A.  I do.
14  Q.  And the reason you made those statements
15  previously is because you place a value on the
16  clinical or therapeutic benefit of even these
17  contaminated drugs; right?
18  A.  I haven't used the word contaminated.
19  The ones with impurity, yes, I do place a clinical
20  value on them.
21  Q.  Well, I hate to retrench and go back
22  over territory I thought we had reached agreement
23  to, but the definition of adulterated is specific
24  and defined by the FDA; correct?
25  MR. DORNER:  Object to form.  Legal

Page 137

1  conclusion.
2  THE WITNESS:  Yes.
3  BY MR. HONIK:
4  Q.  And you accept that that is the
5  operative definition that we have to work under
6  when we speak about adulterated drugs; correct?
7  A.  Yes.
8  Q.  In other words, we can't make up our own
9  definition of adulterated; correct?
10  A.  Correct.
11  Q.  And I'm happy to spend some time doing
12  so, but you agree that adulteration can occur
13  where the FDA decides there's noncompliance with
14  current good manufacturing practices; correct?
15  MR. DORNER:  Objection to form.  Asked
16  and answered.  Calls for a legal conclusion.
17  THE WITNESS:  I don't know all the
18  remedies the FDA has in their armamentarium.  What
19  they could do, I don't know for sure from a
20  regulatory perspective.
21  BY MR. HONIK:
22  Q.  Let's take a moment and talk about this
23  before we continue because I see that there may be
24  some gap in our shared knowledge and experience
25  about this.

Confidential Information Subject to Protective Order



Page 138

1    MR. HONIK:  Dave, can you bring up the
2  FDA warning letter, the first of them for, say,
3  ZHP.
4    MR. DORNER:  Are you entering this as an
5  exhibit?
6    MR. HONIK:  Yep.  Are we up to five?
7    MR. DORNER:  That's what I have.
8    (Kosty Exhibit 5 was marked.)
9  BY MR. HONIK:
10   Q.  Mr. Kosty, I apologize, but I don't
11 think this was among the reliance materials that
12 you cited; correct?
13   A.  Correct.
14   Q.  And for the benefit of the record,

Page 140

Page 139

Page 141

8  BY MR. HONIK:
9    Q.  Okay.  So if we're now talking about as
10 defined adulterated drugs according to the FDA, by
11 reason of a failure to maintain current good
12 manufacturing practices, you certainly understand
13 that that can form a basis for a drug being
14 defined as adulterated; correct?
15     MR. DORNER:  Object to form.  Calls for
16 a legal conclusion.  Outside the scope.
17     You may answer.
18     THE WITNESS:  Yes.
19 BY MR. HONIK:
20   Q.  And we looked earlier -- again this
21 foundational -- that among the prohibited acts
22 that the FDA has listed under its regulations
23 under the Food and Drug Act is the sale and
24 placement in the stream of commerce of adulterated
25 drugs.  We looked at that together; did we not?

Confidential Information Subject to Protective Order

Page 142

1    MR. DORNER: Same objections.
2    THE WITNESS: Yes.
3 BY MR. HONIK:
4    Q.  Now, circling back to where I wanted to
5 be, we looked together in Exhibit 3 Judge Kugler's
6 opinion in the Motion to Dismiss in which he said
7 that regardless whether the sold VCDs actually
8 achieved the medical purpose of lowering blood
9 pressure, it's still considered worthless.
10    Do you remember we looked at that
11 together?
12    MR. DORNER: Are you going to show the
13 witness the document?
14    MR. HONIK: I can if he needs to.
15 BY MR. HONIK:
16    Q.  But do you remember that?
17    A.  Yes.
18    Q.  Okay.  Now, if we turn to your paragraph
19 31(a), the criticism that you have here of
20 Dr. Conti is that she didn't take into
21 consideration some potential therapeutic or
22 clinical value of the adulterated VCDs; correct?
23    A.  Yes.
24    Q.  And in your view as a pharmacist with an
25 MBA, one must take the actual purchase price and

Page 143

1 offset it by some calculation for its therapeutic
2 value.  That's your point, isn't it?
3    A.  Can you repeat that question once more?
4    Q.  Sure.  Let me rephrase it.
5    Your point in 31(a) is that even if
6 there is some diminution in value to the VCD, that
7 you have to offset whatever that number is by its
8 therapeutic or clinical value to the patient.
9 That's your point, isn't it?
10    MR. DORNER: Object to form.  Outside
11 the scope.  Mischaracterizes.
12    You may answer.
13    THE WITNESS: Yes.  The therapeutic
14 value that the patients receive do have value to
15 them in the healthcare system, yes.
16 BY MR. HONIK:
17    Q.  Correct.  And according to you, what
18 your model or formula is is that you have to take
19 whatever the purchase or actual price of the drug
20 is and deduct from it the clinical value that the
21 patient received.  That's your point; right?
22    MR. DORNER: Same objections.
23    THE WITNESS: I don't think I stated it
24 in that way in my report.  Obviously, the
25 therapeutic value, the decision on what percentage

Page 144

1 of that value that you indicate here is yet to be
2 determined by anybody.  But it does have value.
3 BY MR. HONIK:
4    Q.  Okay.  Well, let's unpack that a little
5 bit.  Number one, if the court is correct that
6 even if the adulterated VCDs lowered blood
7 pressure, that is, did what it was supposed to do
8 clinically, if it's still without value, then the
9 full purchase price is the damage; correct?
10    MR. DORNER: Object to the form.
11 Outside the scope.  Calls for a legal conclusion.
12    You may answer.
13    THE WITNESS: I'm not an attorney.  I
14 don't know the legal answer to that question.
15 BY MR. HONIK:
16    Q.  I want you to assume that even if a
17 contaminated drug that works to lower blood
18 pressure and, therefore, creates a clinical value
19 as you suggest in 31(a), that that drug is still
20 worthless.
21    Assuming that statement to be true, the
22 proper measure of damages is the full purchase
23 price of that drug; correct?
24    MR. DORNER: Object to form.  Calls for
25 a legal conclusion.  Outside the scope.

Page 145

1    You can answer.
2    THE WITNESS: In those hypotheticals and
3 with those requirements, the answer is yes.
4 BY MR. HONIK:
5    Q.  Now if you're somehow correct, if you
6 were somehow correct as a matter of legal
7 principle, which really controls here, and one
8 must deduct the clinical or therapeutic value,
9 then one must arrive at some value for that
10 clinical benefit; correct?
11    A.  Yes.
12    Q.  Is it true that you did not present a
13 methodology or formula for evaluating and placing
14 a value on therapeutic benefit?
15    A.  That question was outside the scope of
16 my assignment.  So, no, I did not calculate that
17 calculation.
18    Q.  And, in fact, you have no way of knowing
19 how to do that, do you?
20    A.  Well, this is the first time it's been
21 suggested, so I don't know.  I haven't thought
22 about it.  I would need to consider it and
23 certainly --
24    Q.  How would you in your experience even
25 begin to go about placing a value on the

Confidential Information Subject to Protective Order

---

Page 146

1  therapeutic benefits of a drug?
2      MR. DORNER:  Object to form.  Outside
3  the scope.
4      You can answer.
5      THE WITNESS:  Therapeutic benefits to
6  the patient in the healthcare system would be what
7  would the adverse events be if you didn't have
8  that drug and didn't have it replaced by an
9  alternative with similar therapeutic
10  characteristics.
11      Like in this case, you have an ARB that
12  is at issue.  It could be an ACE inhibitor.  It
13  could be a replacement for that ARB.  It could
14  create the value for the patient in lowering the
15  blood pressure.
16      So the first part I would look at would
17  be what is the alternative cost if we don't
18  control this instance.  So in this example, if we
19  have antihypertensive patients that have a
20  hypertensive crisis and perhaps they may be
21  subject to a stroke, they might have a heart
22  attack, there are other adverse consequences to
23  not taking their medication.  So I would begin to
24  look at what are the costs to the system and to
25  patients for those activities.

---

Page 147

1      And I would venture a guess that the
2  cost of treating an MI or a stroke patient -- that
3  could take months to treat a stroke patient -- is
4  much more expensive than a low cost generic VCD
5  drug.  So I would start looking at what would my
6  cost be without those medications as a basis to
7  begin the analysis.
8      You just suggested this, so I haven't
9  thought through other aspects of this, but I'm
10  sure there are other components that would need to
11  be researched, and I'm sure there's data published
12  on what is the average cost of a heart attack, the
13  average cost of a stroke patient.  I imagine
14  there's ranges that you could model to estimate
15  what those costs would be if VCD drugs were not
16  taken and the therapeutic benefit was not
17  received.
18  BY MR. HONIK:
19      Q.  Suffice to say you didn't do any of that
20  work, did you?
21      A.  No.  That was not my assignment.
22      Q.  Number one.  Number two, you're aware,
23  Mr. Kosty, that there were noncontaminated,
24  nonadulterated generic valsartan in the
25  marketplace that the consumer could choose; are

---

Page 148

1  you not?
2      MR. DORNER:  Object to characterization.
3      You can answer.
4      THE WITNESS:  Well, the pharmacist would
5  choose.  The consumer doesn't choose the valsartan
6  drug that's dispensed.  It's the pharmacist that
7  would choose.  Yeah, the pharmacist would know
8  there were products that didn't have any
9  impurities.
10  BY MR. HONIK:
11      Q.  Sir, I'm asking a very simple question.
12  During the relevant class period from 2012 to
13  2018, you were aware, were you not, that apart
14  from the defendants who put contaminated valsartan
15  into the stream of commerce, there were other
16  suppliers who provided uncontaminated valsartan;
17  are you not?
18      MR. DORNER:  Object to the
19  characterization.
20      You may answer.
21      THE WITNESS:  Yes.
22  BY MR. HONIK:
23      Q.  And you were similarly aware that there
24  were other therapies available in the
25  pharmaceutical marketplace to treat high blood

---

Page 149

1  pressure and other coronary ailments; correct?
2      A.  Correct.
3      Q.  So during the time that consumers and
4  third-party payors were paying for FDA-defined
5  adulterated drugs, there was an option for those
6  entities to purchase drugs that were not
7  adulterated; correct?
8      MR. DORNER:  Object to form.  Calls for
9  a legal conclusion.  Therefore, outside the scope.
10      You may answer.
11      THE WITNESS:  Once they were informed
12  there was an issue with the supply of the at-issue
13  VCDs, yes.
14  BY MR. HONIK:
15      Q.  And, in fact, that's what happened even
16  after the recall; correct?  Consumers were in a
17  position to choose either uncontaminated valsartan
18  or other therapies to control their health
19  conditions; correct?
20      A.  Yes, because the at-issue VCD drugs were
21  off the market through a voluntary recall.
22      MR. DORNER:  I'll put a late objection
23  to characterization.
24  BY MR. HONIK:

---

Page 150



BY MR. HONIK:
13    Q.   And do you think knowing about the basis
14 for the lack of a sales curve, that is, the
15 legitimacy of uncontaminated drugs in the
16 marketplace would have been relevant to your
17 analysis?
18        MR. DORNER:  Objection.
19 Characterization.  Outside the scope.  Calls for a
20 legal conclusion.
21        You may answer.
22        THE WITNESS:  No.  I would have -- like
23 I did in my report, from an industry perspective,
24 I would have looked at what was available and what
25 could have been purchased and what, in fact,

Page 151

1 happened.
2        Please repeat the question if I didn't
3 answer it.  But in my mind, that was the issue.
4 BY MR. HONIK:
5    Q.   I understand you.  Do you accept as true
6 that a product that doesn't meet cGMP cannot be
7 entered into the legal class of trade in the U.S.
8 pharmaceutical market?
9        MR. DORNER:  Object to form.  Calls for
10 a legal conclusion.  Outside the scope.
11        You may answer.
12        THE WITNESS:  From a legal conclusion, I
13 don't know.  I would not expect that, but from a
14 legal conclusion, I don't know.
15 BY MR. HONIK:
16    Q.   Respectfully, Mr. Kosty, it's not a
17 legal conclusion.  It comes from the FDA
18 regulatory scheme.
19        And the question was whether you
20 understood under the FDA's regulatory and
21 enforcement powers that a product that doesn't
22 meet cGMP can't enter the legal class of trade in
23 the U.S. pharmaceutical market.  Either you do or
24 you don't.
25        MR. DORNER:  Same objections.  And lacks

Page 152

1 foundation.
2        You can answer.
3        THE WITNESS:  Yes.
4 BY MR. HONIK:
5    Q.   And in plainer English, that means that
6 pharmacies can't sell products that don't meet
7 cGMP practices and standards nor can a consumer
8 pay for it or their insurance company pay for it.
9 Do you understand that?
10        MR. DORNER:  Object to form.  Calls for
11 a legal conclusion.  Outside the scope.
12        You can answer.
13        THE WITNESS:  It depends when that issue
14 is known in the marketplace.  If it's known before
15 the product is launched or afterwards and it's
16 recalled, then that product is not available for
17 sale.  But, for example, the wholesaler does not
18 test products to determine whether they meet cGMP
19 requirements of the manufacturers.
20        The retailers don't buy product either
21 direct from manufacturers or from wholesalers and
22 test products whether they meet cGMP requirements.
23 So they're depending upon the manufacturer and the
24 FDA to provide that information that they can use
25 in the supply chain.

Page 153

1        So if the product was already launched
2 and it was found out that there was issues like
3 there were in this case, products were voluntarily
4 recalled like I would expect to happen in the
5 regulatory framework.
6        If it was before the products were
7 introduced in the market, then those products
8 would not have been available and would not have
9 been launched in the marketplace because the FDA
10 would not have approved those products.
11 BY MR. HONIK:
12    Q.   Mr. Kosty, do you agree that the FDA's
13 regulatory scheme requires manufacturers to attest
14 to cGMP compliance not only when first entering
15 the market, but yearly thereafter?
16        MR. DORNER:  Object to form.  Calls for
17 a legal conclusion.  Outside the scope.
18        You may answer.
19        THE WITNESS:  My understanding is in
20 this example, the ANDA process, when generics are
21 approved, those attestations are made.  And it's
22 my understanding they're reconfirmed on a yearly
23 basis.
24 BY MR. HONIK:
25    Q.   And do you agree that the FDA requires

Page 154

1 not only attestation, that is, a statement, but
2 that you have to produce evidence or proof that
3 you're meeting those cGMP requirements?
4      MR. DORNER: Same objections. Legal
5 conclusion. Outside the scope.
6      THE WITNESS: I don't know. I've never
7 seen those documents to comment on what they
8 include or don't include.
9 BY MR. HONIK:
10     Q. Do you agree that only prescriptions
11 that have met that evidentiary standard for cGMP
12 and are safe and efficacious are allowed to be
13 sold in the U.S. market?
14     MR. DORNER: Same objections. Legal
15 conclusion. Outside the scope.
16     You may answer.
17     THE WITNESS: Yes. Upon approval of
18 their ANDA in this case, yes.
19 BY MR. HONIK:
20     Q. And do you have any knowledge about the
21 economic principle that a drug which doesn't meet
22 those requirements are considered economically
23 worthless and, therefore, have no legitimate
24 supply curve?
25     MR. DORNER: Objection. Lacks

Page 155

1 foundation. Outside the scope.
2      You may answer.
3      THE WITNESS: Could you repeat that one
4 more time, please?
5 BY MR. HONIK:
6      Q. Do you agree with the corollary of the
7 last question, namely, that drugs only have an
8 economic value if they meet cGMP and are safe and
9 efficacious?
10     MR. DORNER: Objection. Lacks
11 foundation. Outside the scope.
12     You may answer.
13     THE WITNESS: How do you define economic
14 value?
15 BY MR. HONIK:
16     Q. Do you agree that manufacturers have to
17 attest and prove cGMP compliance and that their
18 drugs are safe and efficacious to sell into the
19 U.S. legal class of trade?
20     MR. DORNER: Object to form. Calls for
21 a legal conclusion. Outside the scope.
22     You may answer.
23     THE WITNESS: They have to attest that
24 their products meet the cGMP requirements, my
25 understanding, and, B, the FDA also conducts

Page 156

1 periodic inspections of manufacturers to verify
2 their forms that they meet the cGMP requirements.
3 BY MR. HONIK:
4      Q. And, sir, again I understand you're not
5 an economist, but do you understand that there can
6 only be a legitimate supply curve for drugs if and
7 only if a drug is produced in accordance with
8 cGMP, not only by attestation but by empirical
9 proof?
10     MR. DORNER: Object to the form. Lacks
11 foundation. Outside the scope. Calls for a legal
12 conclusion.
13     You can answer.
14     THE WITNESS: The supply curve -- there
15 wouldn't be a supply curve because there wouldn't
16 be a product available in the marketplace in your
17 hypothetical here.
18 BY MR. HONIK:
19     Q. Do you understand that the FDA
20 evidentiary standard for this compliance we've
21 been speaking of concerns not only the cGMP
22 requirements, but evidence of quality, purity,
23 identity and strength of the drug product?
24     MR. DORNER: Object to the
25 characterization. Outside the scope. Calls for a

Page 157

1 legal conclusion.
2      You may answer.
3      THE WITNESS: I'm not a regulatory
4 compliance expert for a pharmaceutical
5 manufacturer, so I don't know specifics what
6 they're required to produce.
7 BY MR. HONIK:
8      Q. Sir, when you got your MBA at Penn
9 State, did you understand there can't be a price
10 given or associated with a product where its
11 demand curve does not meet its supply curve?
12     MR. DORNER: Object to form. Outside
13 the scope.
14     You can answer.
15     THE WITNESS: Yes.
16 BY MR. HONIK:
17     Q. So you understood from that standpoint
18 that if there's no legitimate supply curve which
19 meets that demand curve, no price can be
20 associated with the product in question,
21 correct --
22     MR. DORNER: Object to form.
23 BY MR. HONIK:
24     Q. -- as a matter of economic principle?
25     MR. DORNER: Object to the form. Lacks

Page 158

1 foundation. Vague. And outside the scope.
2      You may answer.
3      THE WITNESS: There would be no price
4 because there would be no supply.
5 BY MR. HONIK:
6      Q. Now, in terms of determining the actual
7 purchase price of valsartan-containing drugs as to
8 consumers and TPPs, there is available data that
9 we talked about before the break that would reveal
10 those sums; correct?
11      A. There would be multiple data sources
12 that would have to be referred to to be able to
13 calculate that information. But with the
14 information supplied, you could, yes.
15      Q. And if we could -- do you have a copy of
16 Dr. Conti's report in front of you?
17      A. No, I do not.
18      Q. No problem.
19      MR. HONIK: Dave, can we bring up her
20 report and I'll direct you to a specific part of
21 it. We're going to call this Exhibit 6, I guess.
22      MR. STANOCH: Stand by.
23      THE WITNESS: Okay.
24      (Kosty Exhibit 6 was marked.)
25

Page 159

1 BY MR. HONIK:
2      Q. You've seen this before no doubt, yes?
3      A. Yes.
4      Q. If we turn together to page 31 and look
5 at Table 1 together, this is the table which
6 reflects the Aggregate Manufacturer Group Damages
7 attached to the various theories of liability in
8 this case. Do you remember reviewing this?
9      A. Yes.
10      Q. And you understand because there are
11 multiple theories of legal liability, that there
12 may be an opportunity to add those sums up, but
13 you note in the footnote to this table that
14 they're deduplicated. In other words, they're not
15 added together.
16      Do you understand that concept?
17      MR. DORNER: Object to the
18 characterization. Mr. Kosty didn't note anything
19 in this report. It's not his.
20      THE WITNESS: Yes.
21 BY MR. HONIK:
22      Q. Can you answer my question?
23      A. Yes.
24      Q. So, in other words, just by way of
25 example, if you look at ZHP -- do you see the ZHP

Page 160

1 line?
2      A. I do.
3      Q. The end payor, that's the TPP; right?
4      A. Yes.
5      Q. And the consumer, that's the patient who
6 picked up the prescription; right?
7      A. Yes.
8      Q. And you understood that what Dr. Conti
9 did in arriving at these numbers in this table is
10 she just looked at the actual price paid at the
11 point of sale as between payment from TPPs and
12 payments from consumers. Do you see that?
13      MR. DORNER: Object to the
14 characterization.
15      You can answer.
16      THE WITNESS: Can you point me to where
17 she states that?
18 BY MR. HONIK:
19      Q. So the table doesn't state anything
20 other than the numbers. But having read the
21 report, you understood that the method she
22 employed was to look at IQVIA data of sales at
23 point of sale, and she simply took the actual
24 price. Do you understand that that's what she
25 did?

Page 161

1      A. Yes.
2      Q. And she divided it up between the
3 payment that went from the TPP or insurer and the
4 payment that was collected from the consumer in
5 the form of copays and co-insurances. Do you see
6 that reflected in those numbers?
7      A. Yes.
8      Q. So I understand that you have a
9 different theory and that you've applied this
10 industry sort of approach to it. But assuming the
11 court is correct and assuming we can prove the
12 elements of the Complaint which Dr. Conti assumed,
13 this would be the way you would arrive at the
14 actual cash or purchase price of the drug to
15 determine the damages in a model that looks at the
16 benefit of the bargain theory; correct?
17      MR. DORNER: Object to form. Calls for
18 a legal conclusion. Outside the scope.
19 Mischaracterizes.
20      You can answer.
21      THE WITNESS: The method is partially
22 correct. As I point out in my report, the IQVIA
23 data doesn't identify in approximately 15 percent
24 of the cases who the actual TPP is. And IQVIA is
25 unable to identify those entities. But absent

Confidential Information Subject to Protective Order

---

Page 162

1 that, the only other information you would have
2 would be the data available here.
3 BY MR. HONIK:
4   Q.   Would be the what?
5   A.   The data here that's available through
6 IQVIA.
7   Q.   Okay.  So your criticism of the use of
8 the IQVIA data is that you believe there's some
9 15 percent that may not be reflected; correct?
10      MR. DORNER:  Object to form.
11 Characterization.
12      You can answer.
13      THE WITNESS:  Yeah.  My characterization
14 review would be overstated.
15 BY MR. HONIK:
16   Q.   Sir, the methodology that arrived at
17 these numbers is correct, save for your criticism
18 of the 15 percent that you alluded to in the IQVIA
19 data; is that correct?
20      MR. DORNER:  Object to form.  Outside
21 the scope.  Calls for a legal conclusion.
22      You may answer.
23      THE WITNESS:  That was outside the scope
24 of my analysis.  But given the IQVIA data, that's
25 the only data that would be available to add up

---

Page 163

1 here.
2 BY MR. HONIK:
3   Q.   Okay.  Fair enough.  And if we took this
4 and if, as you claim, there should be offsets for
5 clinical or therapeutic benefit, you don't know
6 and you can't tell us how to arrive at those
7 numbers; correct?
8   A.   That was not part of my assignment, no.
9   Q.   Do you know of anyone who did that on
10 behalf of the defendants?
11      MR. DORNER:  Object to form.  Outside
12 the scope.  Calls for speculation.
13      You can answer.
14      THE WITNESS:  I don't know.
15 BY MR. HONIK:
16   Q.   Take a look at subparagraph (c) on the
17 next page of your report, page 14.
18   A.   Yes.
19   Q.   This is the paragraph in which you
20 criticized Dr. Conti for ignoring the role of
21 government payors.  Do you see that?
22   A.   Yes.
23   Q.   Do you not remember seeing in her report
24 that she specifically excluded government payments
25 for these drugs?

---

Page 164

1      MR. DORNER:  Object to form.
2 Mischaracterization.
3      You can answer.
4      THE WITNESS:  My critique of Dr. Conti's
5 analysis is she only did the easy ones.  The
6 difficult ones are like a Medicare Part D program
7 where the government subsidizes approximately 75
8 percent of the direct payments to the Med D plan
9 which includes the basic -- average national basic
10 payment plus a reinsurance payment.  The other
11 25 percent is paid by the beneficiary through
12 premiums.
13      So in a Med D plan, the government is
14 actually paying 75 percent of the cost of the
15 product for the patients.  Dr. Conti does not take
16 into account those expenditures for these VCD
17 prescriptions that are government funded.
18 BY MR. HONIK:
19   Q.   Sir, we're going to ask you a lot of
20 questions about Medicare a little later, but when
21 you say that she ignores the role of government
22 payors, that's false, isn't it?  She doesn't
23 ignore it, does she?
24   A.   Not completely, but in certain cases she
25 does.

---

Page 165

1   Q.   In fact, if you look at Dr. Conti's
2 report at paragraph 75, she states the specific
3 ways in which she accounts for government payment,
4 doesn't she?
5   A.   Hold on.  Let me get there.  That's what
6 she states, yes.
7   Q.   Right.  In fact, she's rather specific,
8 isn't she?  She says that she eliminated CHIP,
9 federal assistance programs, Medicare Parts A and
10 B, state assistance programs, for example ADAP,
11 Tricare, Department of Veterans Affairs, Indian
12 Health Service and state employee plans, not
13 excluding city and county plans because they're
14 private, and workers' compensation.
15      Do you see that?
16   A.   You read that correctly, yes.
17   Q.   And she footnoted that and said see
18 valsartan TPP class definitions and exclusions to
19 confirm the fact that she was conforming to the
20 class definition and the theories of liability;
21 correct?
22      MR. DORNER:  Object to form.
23 Characterization.
24      You can answer.
25      THE WITNESS:  Yes, without seeing that

---

Confidential Information Subject to Protective Order

Page 166

1 specific.  Could you bring that up and I could
2 take a look at it?
3 BY MR. HONIK:
4     Q.  Are you talking about the footnote?
5     A.  No, not the footnote.  I don't have
6 these class definitions and exclusions memorized.
7     Q.  Well, you do because you listed them
8 among your reliance material.  They're in the
9 Complaint and Motion for Class Certification.
10 Didn't you read it there?
11         MR. DORNER:  Object to form.
12 Argumentative.
13         You can answer.
14         THE WITNESS:  I don't have a
15 photographic memory to all the documents I relied
16 upon to recall the specific definition here.
17 BY MR. HONIK:
18     Q.  Well, the point here is that, A, she
19 didn't ignore it, and, B, you don't doubt for a
20 second that what she put in or excluded is
21 reflected in the class definition, do you?
22         MR. DORNER:  Objection.  Object to form.
23         You can answer.
24         THE WITNESS:  No, I don't.
25

Page 167

1 BY MR. HONIK:
2     Q.  Okay.  And if you had, if there was some
3 lack of consonance there, you would have raised
4 that in your report and you didn't; right?
5     A.  The issues I had were raised in my
6 report, yes.
7     Q.  No, no.  What I'm asking you is:  If
8 there was inconsistency between what Dr. Conti
9 eliminated in the form of government payments, if
10 that was inconsistent with the class definition,
11 you would have pointed that out; would you not?
12         MR. DORNER:  Object to form to the
13 extent it calls for a legal conclusion or was
14 outside the scope.
15         You can answer.
16         THE WITNESS:  Yes.
17 BY MR. HONIK:
18     Q.  And you're familiar -- and you didn't do
19 so; right?
20     A.  Didn't do so what?  I'm sorry.
21     Q.  You didn't point out any inconsistencies
22 between the damage model and the theory of
23 liability, did you?
24         MR. DORNER:  Object to form.  Outside
25 the scope.

Page 168

1         You can answer.
2         THE WITNESS:  The theory of liability
3 was not part of my assignment.  I did not look at
4 it.
5 BY MR. HONIK:
6     Q.  You didn't consider it at all; right?
7     A.  No.
8         MR. DORNER:  Object to form.  Outside
9 the scope.
10 BY MR. HONIK:
11     Q.  So it didn't matter to you whether a
12 particular theory yielding damages sounded in
13 warranty or sounded in unjust enrichment; that
14 difference didn't matter to you, did it?
15         MR. DORNER:  Object to form.  Outside
16 the scope.
17         You can answer.
18         THE WITNESS:  It was outside the scope.
19 It did not.
20 BY MR. HONIK:
21     Q.  Sir, do you understand generally that
22 the proper measure of damages at the end of the
23 day will be determined by the court or a court in
24 conjunction with jury findings and not what you
25 think or even I think?  Do you understand that?

Page 169

1     A.  Yes.
2     Q.  And did you take into consideration any
3 assumptions about what the proper criteria should
4 be for calculating damages in this case?
5         MR. DORNER:  Object to form.  Outside
6 the scope.
7         You may answer.
8         THE WITNESS:  Not from a legal
9 perspective, no.
10 BY MR. HONIK:
11     Q.  And it's true that the only perspective,
12 as I understand it, that you applied is something
13 that you referred to as the industry standpoint;
14 right?
15     A.  Yes.
16     Q.  What exactly do you mean by the industry
17 standpoint?  Since if that's the only criteria you
18 used, the court is going to have to evaluate that
19 criteria.  What does it mean to look at it from
20 the industry standpoint?
21     A.  Well, we have to unpack that a little
22 bit.  The industry includes obviously the
23 manufacturers.  It includes the wholesalers.  It
24 includes the retail pharmacies.  So when you look
25 at it from the industry perspective, there's a

Confidential Information Subject to Protective Order

Page 170

1 business model that follows that we all know and
2 are familiar with. I can do a high fly by.
3        But you have the manufacturers that
4 produce the products. You have wholesalers and
5 retailers that buy products from manufacturers.
6 You have retail pharmacies and other types of
7 pharmacies, mail service, specialty, et cetera,
8 that will dispense products to patients.
9        As I note in one of my tables and
10 diagrams in my report, there's a flow of product
11 information, supply information, and there's a
12 flow of pharmacy benefit information in the
13 industry. So when I'm looking at it from an
14 industry perspective, I'm taking both of those
15 flows of product and pharmacy benefit payment flow
16 into account in my opinions.
17     Q.  I'm not really sure what you're trying
18 to convey, but are you suggesting that the
19 criteria for measuring damages should be viewed by
20 those that introduced these adulterated drugs into
21 the stream of commerce?
22        MR. DORNER: Object to form.
23 Argumentative. Lacks foundation.
24        THE WITNESS: You mischaracterized my
25 testimony. What I'm explaining to you is how the

Page 171

1 industry works in practice.
2 BY MR. HONIK:
3     Q.  And that's well and good, Mr. Kosty. I
4 get that you understand how that works. I'm
5 asking a rather specific question, and that is --
6 because you criticized Dr. Conti for how she
7 arrived at damages. And she used legal standards
8 acknowledging she, herself, is not a lawyer
9 because that's how damages get calculated, based
10 on what the court or jury or some combination
11 thereof decides.
12        My question to you is since you didn't
13 do that and you only relied upon an industry's
14 point of view, I'm trying to understand what that
15 point of view is and how it informs the
16 calculation of damages.
17        What is it about the manufacturers, the
18 wholesalers and the retailers informs how to
19 measure damages?
20        MR. DORNER: Object to form.
21 Unintelligible question. Argumentative. Outside
22 the scope. Mischaracterizes. And lacks
23 foundation.
24        You can answer if you can.
25        THE WITNESS: That was not part of my

Page 172

1 assignment.
2 BY MR. HONIK:
3     Q.  Sir, I'm just asking you what you mean
4 by looking at damages from an industry
5 perspective. How do you take that statement and
6 translate that into a methodology or manner of
7 calculation that the court can evaluate in a
8 Daubert proceeding?
9        MR. DORNER: Object to form. Outside
10 the scope. Calls for a legal conclusion.
11        You may answer.
12        THE WITNESS: That was not my objective
13 or assignment in the report, to calculate -- to
14 develop an economic model of damages. My
15 assignment was to review the expert reports and
16 critique them from an industry perspective. I
17 explained how the flow of product and the flow of
18 pharmacy benefit information happens in the
19 industry.
20        And from an industry perspective,
21 products are sold at a cost from manufacturers to
22 their customers. They're resold in the wholesaler
23 case to the pharmacies. Pharmacies that buy them
24 direct from the manufacturer have a different cost
25 perhaps than the wholesaler cost. So those

Page 173

1 transactions within the industry inform my opinion
2 on what costs are associated with providing those
3 services.
4        So, for example, the wholesalers, in
5 order to provide drugs to pharmacies to dispense
6 to patients, they have to have distribution
7 capabilities. They have to procure product. They
8 likely have over a hundred thousand products in
9 their distribution center to be able to sell to
10 pharmacies for dispensing to patients. So they've
11 incurred a tremendous amount of costs. They have
12 delivery vehicles. They have automation. You
13 name it. There's a lot of costs associated with a
14 wholesaler providing services to their customers.
15        Earlier I explained the cost associated
16 with retailers and their ability to dispense
17 product to patients in terms of purchasing,
18 staffing stores, et cetera. So the revenue flows
19 through. On the other pharmacy side, you have the
20 reimbursement that impacts your revenue, but from
21 the manufacturer and wholesaler and pharmacies,
22 there's a cost of goods sold associated with
23 providing products.
24        From an industry perspective, that's the
25 flow of products through the channels ultimately

Page 174

1  to patients.  That's the perspective I'm taking
2  and that's what I mean from an industry
3  perspective.
4        So when I critique the different
5  analyses, I'm including from the industry
6  perspective.  Unlike Dr. Conti, you have to have a
7  product in the pharmacy to be able to sell to a
8  patient.  Her assumption is, well, there's no cost
9  associated with the product.  In fact, in the
10 industry there is a cost associated with that
11 product.  So that's what I'm reflecting in my
12 analysis and differentiating from what she's done.
13 BY MR. HONIK:
14     Q.  Mr. Kosty, did you not understand or
15 know that the very letter that you cited as a
16 reliance material was over a discovery battle of
17 whether upstream costs from the retailers and
18 wholesalers could be produced to the plaintiffs in
19 this case?  Did you know that?
20     MR. DORNER:  Object to form.  The
21 characterization.
22     THE WITNESS:  I did not.
23 BY MR. HONIK:
24     Q.  Even though you read the letter and
25 cited it in the Appendix C as a reliance material;

Page 175

1  correct?
2        MR. DORNER:  Same objections.
3  Argumentative.
4        You can answer.
5        THE WITNESS:  Could you refer me to that
6  specific letter you're mentioning, the one you
7  showed earlier?
8  BY MR. HONIK:
9      Q.  Sure.  It's been marked as an exhibit,
10 and you specifically relied on it or I should say
11 more accurately, the defense lawyers provided it
12 to you.
13     MR. DORNER:  Object to the
14 characterization.  There's no question either.
15     THE WITNESS:  What exhibit was that?
16     MR. HONIK:  Dave, do you remember the
17 number?
18     MR. STANOCH:  Two.
19 BY MR. HONIK:
20     Q.  It's Exhibit 2, sir.
21     MR. DORNER:  Is there a question
22 pending?
23     MR. HONIK:  Yeah.
24 BY MR. HONIK:
25     Q.  Do you remember looking at that exhibit?

Page 176

1      A.  Yes.
2      Q.  And do you remember we discussed --
3  let's back up.  Among all the letters, countless
4  letters sent into the court in this case and
5  various things on the docket, you listed this as a
6  reliance material; right?
7      A.  Yes.
8      Q.  And as I understood it, the reason you
9  told me you did that was because of some
10 confidentiality that attached to this upstream
11 data that the retailers and wholesalers didn't
12 want to produce; right?
13     A.  Yeah, specific to the pharmacy, yes, to
14 pharmacy benefit agreements, yes.
15     Q.  So here's my question:  Are you aware
16 sitting here today that no upstream cost data was
17 ever provided to the plaintiffs in this case?
18     MR. DORNER:  Object to form.  Outside
19 the scope.  Mischaracterizes.
20        You can answer.
21     THE WITNESS:  Yes.  I am aware of that.
22 BY MR. HONIK:
23     Q.  And you're aware, or maybe you're not,
24 that unjust enrichment requires looking at a
25 formula that requires calculating profit; correct?

Page 177

1      MR. DORNER:  Object to form.  Calls for
2  a legal conclusion.  Outside the scope.
3        You may answer.
4        THE WITNESS:  I'm not familiar with the
5  unjust enrichment formula from a legal
6  perspective, no.
7  BY MR. HONIK:
8      Q.  Well, that's curious because one of your
9  most substantial criticisms is that profit isn't
10 properly calculated by Dr. Conti because she
11 didn't take into consideration costs.
12        Isn't that one of your criticisms?
13     A.  Yes.
14     Q.  And my only question you to is:  Were
15 you aware that we sought the identity of those
16 costs and they were not produced at least to this
17 point?  Are you aware of that?
18     MS. KAPKE:  Object to form.
19 Mischaracterizes the record to date.
20     MR. DORNER:  We'll join in that.
21 BY MR. HONIK:
22     Q.  Mr. Kosty, you can answer.
23     A.  Yes.  I'm aware that information has not
24 been produced.
25     Q.  We have sales data.  We have point of

Confidential Information Subject to Protective Order

| Page 178 |
| --- |

1 purchase data. But we have no upstream costs
2 provided to us. Do you know that?
3     MR. DORNER: Same objections.
4     THE WITNESS: Yes.
5 BY MR. HONIK:
6   Q. And are you aware having reviewed at
7 least some parts of Dr. Conti's testimony and all
8 of her report that she said if we're produced that
9 information, that can be easily and flexibly
10 worked into her methodology for calculating
11 damages? Are you aware of that?
12     MR. DORNER: Same objection.
13 Mischaracterizes. Outside the scope.
14     You can answer.
15     THE WITNESS: Yes.
16 BY MR. HONIK:
17   Q. I'm sorry. Did you say "yes"?
18   A. Yes.
19   Q. And you did not design or certainly in
20 your report there's no evidence that you designed
21 a methodology or formula for calculating the costs
22 that you complained that Dr. Conti didn't
23 consider; right?
24     MR. DORNER: Outside the scope.
25     You can answer.

| Page 179 |
| --- |

1     THE WITNESS: That was not my
2 assignment, so I did not do that.
3 BY MR. HONIK:
4   Q. Understood. You didn't do it because
5 nobody asked you to do it; right?
6   A. Correct.
7   Q. Now, in your assignment in Loestrin, did
8 you use the same methodology, that is, look at
9 damages from the standpoint of industry much as
10 you did here?
11     MR. DORNER: Mr. Kosty, in response to
12 this question, I'll just caution you to the extent
13 there's any of confidentiality orders in place
14 that prohibits you, to avoid violating any of
15 those provisions.
16     THE WITNESS: I don't recall.
17 BY MR. HONIK:
18   Q. What did you do in Loestrin?
19     MR. DORNER: Same instruction,
20 Mr. Kosty.
21     THE WITNESS: At a high level, I
22 reviewed the case documentation, produced an
23 expert report and testified via deposition.
24 BY MR. HONIK:
25   Q. So that involved the drug Loestrin and

| Page 180 |
| --- |

1 the fact that there was cGMP violations from the
2 facility from which it was manufactured; correct?
3     MR. DORNER: Object to form.
4     You can answer.
5     THE WITNESS: I don't recall the
6 specifics, no.
7 BY MR. HONIK:
8   Q. Do you recall any of the specifics?
9   A. Not to that level of detail, no. I'm
10 not sure how many years ago, three or four years
11 ago. I've had probably hundreds of projects since
12 that time. I haven't looked at that
13 documentation. No, I don't recall.
14   Q. That's somewhat astonishing to me
15 because for all of your projects in the industry,
16 you've only had in the last four years four legal
17 matters. Am I wrong about that?
18     MR. DORNER: Object to form.
19 Argumentative.
20     You can answer.
21     THE WITNESS: You mischaracterized our
22 business. Like I mentioned to you earlier in this
23 deposition, our focus is not on legal cases. Our
24 focus is on working with our clients in different
25 market segments on their business problems.

| Page 181 |
| --- |

1 BY MR. HONIK:
2   Q. That's precisely my point.
3     MR. DORNER: I'm sorry. Mr. Honik, the
4 witness was not finished.
5     THE WITNESS: Thank you.
6     So the focus of our consulting practice
7 is not legal cases. The focus of our consulting
8 practice is on consulting in the industry. And
9 along the line of doing hundreds of projects over
10 the years with multiple segments of the industry,
11 we understand, I understand how the industry
12 works, how the interrelationships between all the
13 different parties work from a contractual
14 perspective, from an operational perspective, and
15 from a financial perspective.
16     So that's been the focus of our
17 consulting business. It's not been a focus to be
18 a professional witness.
19 BY MR. HONIK:
20   Q. You have billed something on the order
21 of magnitude -- Mr. Stanoch will review it with
22 you -- about $600,000 in this case; right?
23     MR. DORNER: Objection. If you're going
24 to refer to invoices and Mr. Stanoch will go over
25 them, I'd ask that he at least be shown the

Page 182

1  documents you're referencing.
2  BY MR. HONIK:
3      Q.   Am I wrong?  You made about $600,000 in
4  this case?
5          MR. DORNER:  Object to the
6  characterization.
7          THE WITNESS:  I do not know how much our
8  company has made.  I haven't made money
9  personally.  Our company is paid for my services.
10  BY MR. HONIK:
11      Q.   AG billed for your work and their work
12  collectively about 600 grand; right?
13      A.   I don't know.  I haven't added up the
14  invoice.  It was not important to me.
15      Q.   It strikes me, Mr. Kosty, that the very
16  point you're making, that your ordinary work in
17  the pharmacy industry is the vast bulk of what you
18  do, that your work in this legal arena, few cases
19  as there have been, do not stand out in your mind
20  such that you don't know anything about Loestrin;
21  right?
22          MR. DORNER:  Objection.  Counsel is
23  testifying.  Argumentative.
24          You can answer if there is a question.
25          THE WITNESS:  I don't know what the

Page 183

1  question is, but you mischaracterize.  There was
2  no need for me to look at --
3  BY MR. HONIK:
4      Q.   What work did you do in Loestrin?  What
5  work did you do in Loestrin?
6          MR. DORNER:  Objection.  Asked and
7  answered.  I would caution the witness not to
8  divulge anything subject to a confidentiality
9  order or privilege.
10          THE WITNESS:  I would have to consult
11  with counsel before getting into specifics.
12  BY MR. HONIK:
13      Q.   Did you do work that was similar in
14  nature to the work you were asked to do here?
15          MR. DORNER:  Same instruction.  You're
16  trying to back door it, Mr. Honik.  I can't allow
17  that and allow the witness to get in trouble.
18          THE WITNESS:  On the advice of counsel,
19  I'm not going to answer that question.
20  BY MR. HONIK:
21      Q.   Did you do work in Loestrin pertaining
22  to damages and ascertainability?
23          MR. DORNER:  Same -- if you can answer
24  it, that's fine.
25          THE WITNESS:  I don't recall specifics,

Page 184

1  no.
2  BY MR. HONIK:
3      Q.   You recall giving testimony, don't you?
4      A.   I recall a deposition, yes.  I don't
5  recall specifically what I said during that
6  testimony if you're going to ask me questions
7  about that, sir.
8      Q.   Well, in preparation for today's
9  testimony, you reviewed your Loestrin testimony,
10  didn't you?
11      A.   I did not.
12      Q.   Did you have a discussion about your
13  involvement in Loestrin?  Yes or no.
14      A.   Discussion with whom?
15      Q.   I don't know what you said.  Did you
16  talk to anybody in preparation for today about the
17  work you previously did in the Loestrin matter?
18      A.   No.
19          MR. DORNER:  Objection to the extent
20  it's seeking conversations with counsel.  They're
21  protected by work product.
22  BY MR. HONIK:
23      Q.   You're aware, are you not --
24          MR. DORNER:  Sorry.  Mr. Honik, I wasn't
25  finished with my objection, and the court reporter

Page 185

1  needs a break here.  Object to the extent it's
2  calling for work product and the impressions of
3  counsel.  Next question.
4  BY MR. HONIK:
5      Q.   You're aware that there was a motion to
6  exclude your testimony in that case; correct?
7      A.   That's my understanding, that that's a
8  motion made for all experts.
9      Q.   Whether it was or not, you're aware of
10  there was one made for you; right?
11      A.   Yes.
12      Q.   And when that occurred, that was shared
13  with you so that you could consult with the
14  attorneys in defending your opinions; did you not?
15          MR. DORNER:  Objection.  Again, don't
16  answer anything respecting conversations that you
17  had with counsel for the purpose providing an
18  expert opinion in another case potentially also
19  protected by a confidentiality order.
20          THE WITNESS:  On the advice of counsel,
21  I'm not going to answer that question.
22  BY MR. HONIK:
23      Q.   You're not being advised not to answer
24  it.  You're being advised not to reveal certain
25  information if it's subject to the

Confidential Information Subject to Protective Order

Page 186

1  confidentiality.  Otherwise, you can respond.
2      A.  It's subject to confidentiality.
3      Q.  I beg your pardon?
4      A.  I don't have approval from the attorneys
5  in that case to discuss anything.  Like I
6  mentioned to you, I haven't reviewed those
7  documents.  So I don't recall specifics to any of
8  those motions, et cetera.
9      Q.  Do you remember the question I asked?
10     A.  Yes.  You asked if I had reviewed the
11  opinion -- I think it's called a Daubert motion,
12  is that correct -- to exclude my testimony.
13     Q.  I asked you if you were aware that there
14  was a motion to exclude your specific testimony.
15     A.  Yes.
16     Q.  And do you recall discussing that motion
17  and the basis with counsel?  Yes or no.  I don't
18  want to know what was said.
19     A.  No.
20     Q.  You don't recall --
21     A.  No.
22     Q.  -- speaking to counsel about it?
23     A.  No.  I don't recall.
24     Q.  Do you remember that you, yourself, read
25  the motion and the basis for challenging your

Page 187

1  opinions?
2      A.  I did read the motion.



19  BY MR. HONIK:
20     Q.  Mr. Kosty, are you aware that the
21  defense lawyers in the Loestrin case, in fact,
22  dedesignated much of your testimony as not
23  confidential?
24         MR. DORNER:  Objection.
25  Mischaracterizes.  Lacks foundation.  Same

Confidential Information Subject to Protective Order

---

Page 190

1  instruction.
2      MR. HONIK:  How do you know that that is
3  a mischaracterization?  Are you attesting to the
4  fact that it's confidential, his testimony?
5      MR. DORNER:  I'm not attesting to
6  anything, and I haven't said that, Mr. Honik.
7      MR. HONIK:  Then don't instruct your
8  client not to answer because we're just going to
9  come back here.
10     MR. DORNER:  The instruction is to not
11 answer with anything that is covered by a
12 confidentiality order.
13 BY MR. HONIK:

---

Page 191

12 BY MR. HONIK:
13     Q.  You're able to get an answer by review
14 of your own testimony, a transcript of which you
15 possess; correct?
16     A.  I could review my testimony, but I would
17 need to contact the attorneys we worked with in
18 this case, in the Loestrin case, to get any
19 clearance from them.  I don't have clearance to
20 share documentation.
21     Q.  Let me ask you this before I move on:
22 Apart from that potential obstacle which I
23 maintain doesn't exist, do you, nonetheless, have
24 recall sufficient to answer my question now?
25     A.  I don't.

---

Page 192

6  instructing you not to answer anything subject to
7  a confidentiality order.  Asked and answered a
8  ridiculous amount of times.  Calls for a legal
9  conclusion.  Outside the scope.  Lacks foundation.
10 Argumentative.
11     Move on, counsel.
12     MR. HONIK:  Mr. Dorner, do you know
13 Shakespeare?
14     MR. DORNER:  I'm not testifying here
15 today, Ruben.
16     MR. HONIK:  Do you know the phrase,
17 "Methinks she doth protest too much"?  You may
18 want to stop while you're ahead.
19 BY MR. HONIK:
20     Q.  Do you remember the question, Mr. Kosty?
21     A.  No, I don't.
22     Q.  The question was:  Do you have
23 sufficient memory today sitting there under oath
24 to at least remember that the basis for trying to
25 exclude your testimony was that the central

---

Page 193

1  premise of your opinion was false?  Do you
2  remember that that was raised?
3      MR. DORNER:  Same objections.
4      You can answer.
5      THE WITNESS:  No, I don't.
6  BY MR. HONIK:
7      Q.  Do you know that the court did not rule
8  on your exclusion because the case was certified
9  and then settled?  Do you know that much?
10     MR. DORNER:  Objection.  Outside the
11 scope.  Calls for a legal conclusion.  Lacks
12 foundation.
13     You may answer.
14     THE WITNESS:  I do know the case was
15 settled.  That's the extent to it.
16 BY MR. HONIK:
17     Q.  And in your memory, how long ago did
18 this occur?
19     MR. DORNER:  Objection as to whatever
20 "this" is.
21     THE WITNESS:  Yeah, what is "this"?
22 What do you speak of?
23 BY MR. HONIK:
24     Q.  If I said to you that the motion to
25 exclude your testimony was filed in February of

---

Page 194

1 2019, would that comport with your memory?

2    A.  Yes, because it was before COVID.  I
3 always look at things pre- and post-COVID, right.

4    Q.  It was only in 2019; correct?

5    A.  Yes.

6    Q.  And you have no memory that would allow
7 you to respond to any of my questions?

8    A.  That's correct.  No memory to those
9 specifics that you obviously want to get into.  I
10 don't recall.  I haven't looked at that
11 documentation since 2019.

12    Q.  You're aware that there was an in-person
13 or in-court class certification hearing in
14 Loestrin?

15    A.  Yes.

16    Q.  Did you say "yes"?

17    A.  Yes.

18    Q.  And you're aware that every single one
19 of the defense experts got to testify, but you
20 didn't; right?

21    A.  I wasn't aware of that.  I know I didn't
22 testify.  I was there available to testify.

23    Q.  I'm sorry.  I spoke over you, and I
24 apologize.  What was the last thing you said?

25    A.  I was there available to testify and I

Page 195

1 wasn't called upon.

2    Q.  Well, in fact, the defense lawyers told
3 you that they weren't going to call you; isn't
4 that right?

5    MR. DORNER:  Don't answer that question.

6    THE WITNESS:  On the advice of counsel,
7 I'm not going to answer that question.

8 BY MR. HONIK:

9    Q.  Sir, the fact remains that you didn't
10 testify at the class certification hearing.  Do
11 you know why?

12    MR. DORNER:  Don't answer that question
13 to the extent -- don't answer the question.

14    MR. HONIK:  You're instructing him not
15 to answer why he understands he didn't testify?

16    MR. DORNER:  Yes, I am.  Move on.

17 BY MR. HONIK:

18    Q.  You testified in the A&P bankruptcy
19 case, didn't you?

20    A.  Yes.  I produced a report and took a
21 deposition.

22    Q.  And in that case I think you were an
23 expert for McKesson; right?

24    A.  Correct.

25    Q.  And that case involved significant

Page 196

1 rebate payments under their supply agreement that
2 was the subject of a creditor action to recoup
3 those payments, right, into the bankruptcy estate?

4    A.  That's incorrect.

5    Q.  Okay.  What was involved if not that?

6    A.  I don't have approval from counsel to
7 discuss this matter.

8    Q.  What can you tell me that you did and
9 your assignment was in that matter?

10    A.  I don't have approval from counsel to
11 discuss this matter.

12    Q.  On what basis do you believe it's
13 subject to a confidentiality or other protective
14 order?

15    MR. DORNER:  Object to form.  Calls for
16 a legal conclusion.

17    You can answer.

18    THE WITNESS:  My experience with legal
19 cases, if anything that needs to be disclosed, it
20 needs to be discussed with the attorneys ahead of
21 time and get proper clearances.  And my
22 understanding is any of these questions that come
23 up, I need to consult with counsel for McKesson in
24 this case.

25

Page 197

1 BY MR. HONIK:

2    Q.  So you didn't do that in advance of
3 today.  And you don't know sitting here if you are
4 prohibited or not; right?

5    A.  I'm not an attorney, but in an abundance
6 of caution, I will request that I need to consult
7 with counsel in that case before making any
8 statements.

9    Q.  You didn't do that before today, did
10 you?

11    A.  No.

12    Q.  What did you do in the confidential
13 arbitration related to pharmacy claims that you
14 listed?

15    A.  I know that one is confidential because
16 I asked the counsel proactively about that case.

17    Q.  I'm sorry.  I'm sorry.  You said it's
18 not confidential?

19    A.  I said it is confidential.

20    Q.  Let me understand your testimony.  Did
21 you just tell me that before today, you checked
22 with counsel on that one?

23    A.  Yes.

24    Q.  And you did so in anticipation that you
25 might be asked questions about it today?

Page 198

1   A.   I did it in anticipation of what could
2   be disclosed in my report.  So if you look at the
3   exhibit in my report, it's very high level, right?
4   Would you agree?
5   Q.   I don't know what you're talking about.
6   What exhibit?
7   A.   Appendix B.  I'm sorry.
8   Q.   I'm looking at Appendix B in which you
9   list --
10   A.   Confidential --
11   Q.   Let me ask the question.  Are you
12   referring to Appendix B in which you list the only
13   four expert testimonies in the past four years?
14   A.   Yes, and specifically to number two.
15   Q.   Right.  And what you're telling me is
16   that in advance of today, you took the time to
17   check with counsel in item number two, this
18   arbitration-related matter, to learn whether or
19   not it was confidential, and you told me that it
20   is.  Isn't that what you said?
21       MR. DORNER:  Object to the
22   characterization.
23       You can answer.
24       THE WITNESS:  Yeah, that
25   mischaracterizes the statement there.  The reason

Page 199

1   I checked with counsel was to get an update on the
2   status of the case.  And, oh, by the way, counsel,
3   I'm involved with another legal matter.  How is
4   this considered?  Is there anything I can state
5   about this if questioned, and the answer was no.
6   BY MR. HONIK:
7   Q.   Wait, wait.  Let me understand what
8   you're telling me.  The item at number two, the
9   legal matter there, that's still pending?
10   A.   It's been settled is my understanding.
11   I haven't seen any documentation, but counsel said
12   it was settled.
13   Q.   And number three is settled and number
14   four is settled; right?
15   A.   I do not know about number three.  I
16   don't know the status of that case.
17   Q.   But you told me under oath that you
18   reached out to the lawyers in matter number two,
19   the confidential arbitration, to find out the
20   status, but it was already settled; right?
21   A.   It was in the process of being settled
22   was what was told to me by counsel.
23       MR. DORNER:  And, again, I have to
24   instruct don't go on anything that you're not
25   allowed to say pursuant to confidentiality.

Page 200

1   BY MR. HONIK:
2   Q.   Why didn't you do the same exact thing
3   for the Loestrin matter and the A&P matter?  Why
4   didn't you call the lawyers there in advance of
5   today and check on the status and whether you
6   were, as Mr. Dorner seems to suggest, prohibited
7   from revealing information to us?
8       MR. DORNER:  Object to form.
9   Argumentative.
10       You can answer.
11       THE WITNESS:  It was not part of my
12   preparation for this case.  I mean, you wanted a
13   listing of the ones I've submitted expert reports.
14   That's what I provided.  It wasn't -- like I said,
15   it wasn't my point to go ask these people for
16   permission or not to testify about it.  My
17   understanding of this process today, you were
18   going to ask me about my report in this case.
19   BY MR. HONIK:
20   Q.   Sir, you did tell me that you did call
21   the lawyers in item number two to find out if it
22   was subject to confidentiality.  That's what you
23   told me.
24       And my question is -- let me finish the
25   question -- why didn't you do the very same thing

Page 201

1   in the two other matters involving McKesson and
2   Loestrin?
3       MR. DORNER:  Object to form.
4   Mischaracterizes.  Argumentative.
5       You may answer.
6       THE WITNESS:  I reached out to counsel
7   to see if I could provide a description of the
8   case to include in Appendix B.  Counsel informed
9   me, no, we do not want you to provide that
10   information.  It's confidential.  So on advice of
11   counsel, that's what I've done.  And number two is
12   read that way.
13   BY MR. HONIK:
14   Q.   I understand that completely, Mr. Kosty.
15   And my question is:  Why didn't you do the very
16   same thing as to item three, the A&P/McKesson
17   matter, and number four, the Loestrin matter in
18   which your testimony was sought to be excluded?
19   Why didn't you check on those two?
20       MR. DORNER:  Same objection plus asked
21   and answered multiple times.
22       THE WITNESS:  Those cases -- obviously
23   Loestrin settled.  The A&P, I don't know the
24   status of that case.  There was no reason to reach
25   out for an update.  So I didn't.

Confidential Information Subject to Protective Order

Page 202

BY MR. HONIK:

1  Q.  What I'm asking you is why didn't you
2  learn in advance of today --
3  A.  I just answered your question.  There
4  was no reason.
5  Q.  Let me finish the question, sir.  Let me
6  finish.
7  Why didn't you do as to the McKesson and
8  Loestrin matters the same as you did in the
9  arbitration and learn whether you were subject to
10  some confidentiality or other privilege obstacle?
11  Why didn't you do that?
12  MR. DORNER:  I have to stop you, but not
13  because of an objection.  You cut out in the
14  middle of your question, Ruben.  I'm sorry, but
15  could you repeat it?
16  MR. HONIK:  Ann, did you get it?
17  COURT REPORTER:  I think I did.
18  MR. DORNER:  I missed about four words
19  in the middle.
20  (The following record was read back:
21  "Q  Why didn't you do as to the
22  McKesson and Loestrin matters the same as you
23  did in the arbitration and learn whether you
24  were subject to some confidentiality or other

Page 203

1  privilege obstacle?  Why didn't you do
2  that?")
3  THE WITNESS:  Because I didn't need an
4  update on those cases.
5  BY MR. HONIK:
6  Q.  Did you check with the lawyers in the
7  Takeda matter about whether you could testify
8  about your role in that case?
9  A.  I did not.
10  Q.  Do you know whether or not there's any
11  prohibition against your revealing what you did in
12  that case?
13  A.  I don't, but I would ask them before
14  providing any information on that case.
15  Q.  And who engaged you in that matter?
16  A.  That's another case with the Analysis
17  Group.
18  Q.  I didn't quite catch the end of your
19  answer.
20  A.  Who engaged me?  The attorneys engaged
21  me in that case through the Analysis Group.
22  Q.  And what work did you do?
23  A.  I will need to get their approval before
24  sharing that information.
25  Q.  You can't even tell me what kind of work

Page 204

1  you did?
2  A.  I submitted an expert report in the
3  case, and no deposition was taken.
4  Q.  That was a case concerning Actos; right?
5  And that was a RICO claim.  Do you remember that?
6  A.  Yes.
7  Q.  And that was brought by TPPs and end
8  users as well; right?
9  A.  I don't recall the specifics.
10  Q.  Well, did you prepare a report or submit
11  a report, as you state here, on the issues of
12  damages and ascertainability?
13  A.  As previously answered, I will have to
14  consult with the counsel for that case before
15  answering that question.
16  Q.  I'm just asking the topics on which
17  you --
18  A.  I'm unwilling to provide those topics to
19  you.
20  Q.  Do you know sitting here what the topics
21  are and you're just not going to tell me because
22  you might be subject to a confidentiality?  Just
23  tell me that.
24  A.  Yes.
25  Q.  Okay.  So you do know the topics that

Page 205

1  you prepared your report in Takeda; right?
2  A.  Yes.
3  Q.  And you do know the subjects of your
4  submitted expert report in the arbitration;
5  correct?
6  A.  Yes.
7  Q.  And you do know the topics in which you
8  prepared a report and gave deposition testimony in
9  the A&P bankruptcy case; right?
10  A.  Yes.
11  Q.  And we've already -- well, perhaps we
12  haven't.  Can you tell me the subjects of your
13  report in Loestrin?
14  MR. DORNER:  Same instruction with
15  respect to confidentiality and privilege.
16  THE WITNESS:  I'm going to have to
17  consult with counsel before answering those
18  questions.
19  BY MR. HONIK:
20  Q.  Do you know sitting here today whether
21  or not the topics of your expert report in
22  Loestrin are the same topics as those on which
23  you've given a report in this case?
24  MR. DORNER:  Same instructions.  It's
25  just a back door.

Confidential Information Subject to Protective Order

Page 206

1    THE WITNESS:  Yeah, I'm going to have to
2  ask counsel before disclosing any information.
3  BY MR. HONIK:
4    Q.  I'm simply asking if they're the same or
5  different topics.
6    A.  I don't recall.
7    Q.  You don't recall the topics on which you
8  gave testimony and prepared a report in Loestrin,
9  is that your sworn testimony?
10    MR. DORNER:  Same instruction.
11    THE WITNESS:  I'm going to have to
12  consult with counsel before answering.
13  BY MR. HONIK:
14    Q.  Listen to what I'm asking, Mr. Kosty.
15  Sitting here today, is it your testimony that you
16  do not know in your head, putting aside any
17  confidentiality, that you simply do not know the
18  topics on which you gave testimony and prepared a
19  report in Loestrin?
20    A.  I do know the topics, but I don't know
21  the specifics.
22    Q.  That's right.  And the follow-up and
23  final question is:  Are those topics the same or
24  different topics than those in which you wrote in
25  this case?

Page 207

1    MR. DORNER:  Do not answer that question
2  to the extent it requires you to divulge
3  confidential information.
4    MR. HONIK:  In what way would that be
5  subject to any confidentiality impediment?
6    MR. DORNER:  Mr. Honik, your experts
7  have marked their reports as Restricted
8  Confidential, which means they can be disclosed
9  for other purposes.  If Mr. Kosty's report is
10  likewise marked that way in the Loestrin matter, a
11  point which I don't know --
12    MR. HONIK:  I don't know what you're
13  talking about.
14    MR. DORNER:  I'm answering your
15  question, Mr. Honik.
16    MR. HONIK:  I'm only asking if the
17  topics are the same or different.  That's the
18  question that's pending.
19    MR. DORNER:  Do not answer.
20  BY MR. HONIK:
21    Q.  Are the topics in Loestrin the same or
22  different than the ones you wrote on here?  That's
23  all.  Can you answer that question?
24    MR. DORNER:  If he answers yes, then you
25  can back door exactly what was said in Loestrin.

Page 208

1  So I'm instructing Mr. Kosty --
2    MR. HONIK:  No.  If the answer is "yes"
3  or "no," I move on.
4  BY MR. HONIK:
5    Q.  Are the topics the same on which you
6  wrote in Loestrin as here?
7    MR. DORNER:  To the extent it will
8  divulge confidential information, I advise you not
9  to provide an answer on that matter.
10  BY MR. HONIK:
11    Q.  Are you not going to answer, Mr. Kosty?
12    A.  Yes.  I'm not going to answer.

24    MR. HONIK:  Why don't we take five
25  minutes, and then we'll resume.  It's 2:33.  Let's

Page 209

1  get back at 2:40, in six minutes.  Okay?
2    THE WITNESS:  Make it 10, please.
3    MR. HONIK:  What?
4    THE WITNESS:  Make it 10 minutes.
5    MR. HONIK:  Let's call it a quarter of
6  3:00 Eastern.  Okay?
7    THE VIDEOGRAPHER:  Off the record 2:34.
8    (Recess from 2:34 p.m. to 2:51 p.m.)
9    THE VIDEOGRAPHER:  We are back on the
10  record at 2:51.
11    MR. STANOCH:  I'm going to pass the
12  witness to Mr. Stanoch at this point.  Dave.
13    EXAMINATION
14  BY MR. STANOCH:
15    Q.  Good afternoon, Mr. Kosty.  Can you see
16  me?
17    A.  Yes, I can.
18    Q.  Can you hear me?
19    A.  Loud and clear.
20    Q.  Very good, sir.  You understand you're
21  still under oath; right?
22    A.  Yes.
23    Q.  I'd like to focus on your opinions
24  regarding Ms. Craft and what courts call
25  ascertainability.  Okay?

Confidential Information Subject to Protective Order

Page 210

1    A.  Yes.
2    Q.  And you understand you offer some
3  opinions in this case in that regard; right?
4    A.  Right.
5    Q.  And, for instance, if we look at
6  paragraph 30 of your report, you summarize your
7  opinions with respect to the identification of
8  class members; correct?
9    A.  Let me get there real quick.  Paragraph
10  30 did you say?
11    Q.  Let me know when you're there.
12    A.  Yes.  Okay.
13    Q.  You're there, sir?
14    A.  I am there.
15    Q.  Great.  And is it correct that this
16  paragraph and its subsections is your summary of
17  opinions relating to identification of class
18  members?
19    A.  Yes.
20    Q.  And you have five subparts there, (a)
21  through (e); is that right?
22    A.  That's correct.
23    Q.  Subpart (a) talks about identifying the
24  final TPP payor for prescription drugs; right?
25    A.  Yes.

Page 211

1    Q.  So this subsection relates to the
2  proposed third-party payor or TPP class; correct?
3    A.  Correct.
4    Q.  And actually, before we keep going, we
5  can agree, can we not, that there's three proposed
6  classes here; correct?  There's the economic loss
7  consumer class, the economic loss TPP class, and
8  the medical monitoring class; right?
9    A.  Yes.
10    Q.  So we can speak generally about those
11  three overarching buckets of proposed classes; is
12  that fair?
13    A.  Thank you.
14    Q.  So as you said, subpart (a) of your
15  paragraph 30 relates to the proposed TPP class;
16  correct?
17    A.  Correct.
18    Q.  This critique of yours has nothing to do
19  with the economic loss consumer class or the
20  medical monitoring class; correct?
21    A.  That's correct.
22    Q.  The next subpart you have is 30(b);
23  right?
24    A.  Yes.
25    Q.  And this critique of yours relates to

Page 212

1  the proposed medical monitoring classes; correct?
2    A.  That's correct.
3    Q.  This critique does not relate to the
4  proposed TPP or economic loss consumer classes;
5  right?
6    A.  Correct.
7    Q.  And then subpart (c), you talk about
8  exclusions; correct?
9    A.  Yes.
10    Q.  You give the example of state government
11  entities; correct?
12    A.  Correct.
13    Q.  Which classes does this critique relate
14  to?
15    A.  The TPP class.
16    Q.  Right.  So the paragraph 30(c) relates
17  to the proposed TPP class only; right?
18    A.  Correct.
19    Q.  And then subpart (d) of paragraph 30
20  talks about lot number information and expiration
21  date; is that correct?
22    A.  That's correct.
23    Q.  And these critiques as set forth in
24  paragraph 30(d) relate to the medical monitoring
25  class; correct?

Page 213

1    A.  Correct.
2    Q.  And finally your subpart (e) of
3  paragraph 30 relates to combining information and
4  manual review as you say; right?
5    A.  That would be associated with the
6  patients' economic loss class and the TPPs.
7    Q.  So paragraph 30(e) reflects the critique
8  that relates to which classes?
9    A.  The TPP class and the consumer class,
10  the economic damages.
11    Q.  Other than it sounds like the combining
12  of information in paragraph 30(e), the only
13  critiques you have of the economic loss -- strike
14  that.
15      The only critiques that you have here of
16  the economic loss consumer class are those
17  reflected in 30(e); right?
18      MR. DORNER:  Object to form.
19  Characterization.
20      You can answer.
21      THE WITNESS:  That's the only one
22  reflected in the summary.  If you give me a
23  minute, I'll go through the detail to see if
24  there's any others.  There's more detail in my
25  report, but I'm sure we'll get there.

Page 214

BY MR. STANOCH:

1    Q.  Tell me what that is.

3    A.  It's covered in 88 and 89 paragraphs,
but I would say that's a summary of those
paragraphs.

6    Q.  Got it.  So paragraphs 88, 89 again
relate to the combining of data sources, as you
say it, which was what paragraph 30(e) summarized;
right?

10       MR. DORNER:  Object to the
characterization.

12       You can answer.

13       THE WITNESS:  Yes.

14   BY MR. STANOCH:

15   Q.  And, look, I'm not trying to trick you,
Mr. Kosty.  I think, correct me if I'm wrong, at
some point you talk about an exclusion of classes
about defendants' employees.  You recall that in
your opinions; right?

20   A.  Yes.

21   Q.  I'm sorry.  I didn't hear you.

22   I'm sorry.  Yes.

23   Q.  Thank you for that.  And would that
critique apply to all three of the proposed
classes?

Page 215

1    A.  It would only apply to the consumer
economic class for the patients specifically.  Did
I answer your question?

4    Q.  You did.  Thanks.  So I think after
going through that, it sounds like there's two
critiques that you opine on in this case as
to the economic loss consumer case.  One is about
combining data as elaborated in your report;
correct?

10   A.  Yes.

11   Q.  And the second is the ability to exclude
defendants' employees; correct?

13   A.  In this subsection (e) is what you're
speaking to specifically; correct?  Is there a way
to turn this up?  Can you hear me okay or not?

16   Q.  Now I can.  So maybe if you make sure
you lean into the mic.  So it sounds like you said
this subsection (e).  Is that what you were
talking about?

20   A.  Yes.  That was my question.  Were you
referring just to this subsection (e)?

22   Q.  No, sir.  I was running through your
summary of opinions to help frame for our
questions.  And then the question I'll repose to
you is:  It sounds like your two critiques that

Page 216

1    you opine on in this case as to the economic loss
consumer case is combining data as elaborated in
your report; correct?

4    A.  Yes.

5        MR. DORNER:  I'll object to the
characterization.  But keep going, Dave.

7    BY MR. STANOCH:

8    Q.  And number two, the class exclusion
relating to defendants' employees?

10       MR. DORNER:  Same objection.

11       You can answer.

12       THE WITNESS:  Yes.

13   BY MR. STANOCH:

14   Q.  Are there any other opinions that you're
offering as to the economic loss consumer class
besides those two we just listed?

17       MR. DORNER:  Same objection.

18       You can answer.

19       THE WITNESS:  No.

20   BY MR. STANOCH:

21   Q.  As to the medical monitoring class,
again, one of your critiques relates to combining
data as set forth in your report; right?

24   A.  Yes.

25   Q.  And the other is as summarized in

Page 217

1    paragraph 30(b) about levels of exposure; right?

2    A.  For specific patients, yes.

3    Q.  And the same issue regarding exclusion
of defendants' employees; right?

5        MR. DORNER:  Object to the form.

6        But you can answer if you understand.

7        THE WITNESS:  What section are you
referring to?

9    BY MR. STANOCH:

10   Q.  I'm just asking you, sir.  I'm trying to
get all of your opinions critiquing the medical
monitoring class.  Then we can go through each of
them.

14   A.  You were going through (a), (b).  That's
why I asked the question which one are you
referring to.  So can you repeat that question?

17   Q.  Sure.  Your critique about excluding
defendants' employees, would that apply to the
medical monitoring class?

20   A.  Yes.

21   Q.  And then are there any other critiques
of the medical monitoring class besides those
three that we just listed that you're opining on
in this case?

25   A.  Not that I recall.

Confidential Information Subject to Protective Order

Page 218

1   Q.   You make reference in paragraph 30 to
2   manual review.  Do you see that, sir?
3   A.   Yes.
4   Q.   You see that; right?
5   A.   I do.
6   Q.   What do you mean by manual review as you
7   use the phrase in your report?
8   A.   You would have to look at specific
9   documents or contact people for additional
10  information that would have to be somehow
11  documented to apply the various inclusions,
12  exclusions in this class.
13  Q.   How do you use the phrase manual review
14  as it relates to data?
15  A.   I don't believe I talked about that
16  context here, but manual review of data would be
17  the process of matching different data sources.
18  If you have disparate data sources, you have to
19  have a way to link them.
20      Oftentimes that's a manual review, at
21  least initially, so you can determine if you have
22  multiple sources how do they link to each other,
23  if at all, and if they do, then what's the
24  limitations to that linking, or are you happy with
25  the sufficiency of it.

Page 219

1   Q.   Does the fact that some data
2   manipulation by a human being mean that it's
3   administratively infeasible to use that data to
4   identify class members?
5       MR. DORNER:  Objection.  To the extent
6   it calls for a legal conclusion.  And
7   mischaracterization.
8       You can answer.
9       THE WITNESS:  When you're linking
10  different datasets, you have to have some kind of
11  manual evaluation of those datasets unless it's
12  coming from the same system where you know the
13  database criteria and the keys to those database
14  tables.
15  BY MR. STANOCH:
16  Q.   And the fact that you need a human being
17  to do what you just described, does that mean that
18  it's administratively infeasible to use that data
19  to identify class members?
20      MR. DORNER:  Repeat objections.
21      You can answer.
22      THE WITNESS:  No.
23  BY MR. STANOCH:
24  Q.   Do you quantify anywhere in your report
25  how much manual review would be required for any

Page 220

1   particular task that may be necessary to identify
2   class members?
3   A.   I do not.  That was not part of my
4   assignment to try to cobble these data sources
5   together, no.
6   Q.   And putting aside the cobbling together,
7   as you say, it is correct, is it not, that nowhere
8   do you purport to quantify how much manual review
9   would be required for any particular task that may
10  be necessary to identify class members?
11  A.   No.  I don't quantify the hours that
12  would be required to do these things, no.
13  Q.   Do you propose in your report anywhere
14  any methodology for how you would attempt to
15  quantify the amount of manual review necessary to
16  perform any particular task to identify class
17  members?
18  A.   That was not my assignment, no.
19  Q.   You're familiar with the National
20  Council for Prescription Drug Programs; correct?
21  A.   Yes.
22  Q.   Can we call that NCPDP today?
23  A.   Absolutely.
24  Q.   And you understand, of course, that the
25  NCPDP have promulgated certain standards?

Page 221

1   A.   Yes.  I'm a member of that organization.
2   Q.   And what are the NCPDP data standards?
3   A.   I don't know all of them in particular,
4   but the one that applies to this case is the D.0
5   telecommunications standard.
6   Q.   And do those NCPDP standards relate to
7   the data fields used for communications for
8   adjudicating pharmacy claims?
9   A.   Yes.  That's the purpose of the
10  standard.
11  Q.   Has that standard been in effect since
12  2003?
13  A.   I'm trying to recall.  I think it was a
14  little bit later than that.  But it's the D.0
15  standard.  The organization started with
16  Version 1.  Once it became a HIPAA named standard,
17  then there was a whole process involved with
18  NCPDP, creating the new standard and, B, it had to
19  get approved through CMS and another committee or
20  two.
21      So it's been very difficult for the
22  industry to update that standard.  So it's been in
23  use for a number of years.  I'm not sure if it's
24  2003, but late 2000s, 2008 maybe is when it first
25  went into use.

Confidential Information Subject to Protective Order

1    Q.   That's fair.  Would you agree that since
2 approximately 2008, pharmacies have used those
3 NCPDP standards to process pharmaceutical claims?
4    A.   Yes.
5    Q.   Would you agree that since approximately
6 2008, PBMs have used the NCPDP standards to
7 process pharmaceutical claims?
8    A.   Yes.
9    Q.   Would you agree that to process
10 pharmaceutical claims, PBMs must be able to map
11 communications from pharmacies to their own claims
12 databases?
13   A.   Yes.
14   Q.   You don't identify any instance in your
15 report, do you, of where a PBM has not or cannot
16 map communications from pharmacies to their own
17 claims databases for pharmacy claims; right?
18   A.   That's correct.
19   Q.   Do the NCPDP standards contain a field
20 for NDC code for the drug dispensed by the
21 pharmacy?
22   A.   Yes.
23   Q.   You understand the NDC code allows
24 identification of the drug manufacturer?
25   A.   I do.

1        MR. DORNER:  I'll object to the
2 characterization.  But you can keep going, Dave.
3        THE WITNESS:  Let me add a
4 clarification.  It identifies a supplier which may
5 be the manufacturer.  Supplier, product code and
6 package size is the three components of the NDC.
7 BY MR. STANOCH:
8    Q.   You agree that the NDC code identifies a
9 given drug's package size and type; right?
10   A.   Yes.
11   Q.   And you would agree the NDC number
12 identifies the product's strength, dosage form and
13 formulation?
14   A.   Yes.
15   Q.   Do you agree that pharmacies maintain
16 data about the drugs they dispense to consumers?
17   A.   Yes.
18   Q.   Would you agree that PBMs maintain data
19 on the pharmacy claims submitted to them by drugs
20 dispensed by pharmacies?
21   A.   Yes.
22   Q.   Do you agree that pharmacies maintain
23 personal identifying information for the consumers
24 to whom a prescription is dispensed?
25   A.   Yes.

1    Q.   And do you agree that PBMs maintain
2 personal identifying information for the
3 prescriptions that are dispensed and communicated
4 to them by pharmacies?
5    A.   Yes.
6    Q.   Do you agree that pharmacies maintain
7 data on the amount paid by a consumer for a drug
8 dispensed?
9        MR. DORNER:  Object to form.  Vague.
10       You can answer.
11       THE WITNESS:  Yes.
12 BY MR. STANOCH:
13   Q.   Do you agree that PBMs maintain the
14 amount paid by a consumer for a drug dispensed by
15 a pharmacy that's communicating to that PBM?
16   A.   Yes.
17   Q.   Do you agree that pharmacies maintain
18 data on which pharmacy dispenses a drug to a
19 consumer?
20   A.   Yes.
21   Q.   Do you agree that PBMs maintain data on
22 which pharmacy dispenses a drug to a consumer from
23 the communications the PBM receives from the
24 pharmacies?
25       MR. DORNER:  Objection to form.  Vague.

1        You can answer.
2        THE WITNESS:  Yes.
3 BY MR. STANOCH:
4    Q.   Do you agree that pharmacies maintain
5 the data on when a drug is dispensed to a
6 consumer?
7    A.   Yes.
8    Q.   Do you agree that PBMs maintain data on
9 when a drug is dispensed to a consumer from the
10 communications the PBM receives from the pharmacy?
11   A.   Yes.
12   Q.   Do you agree that pharmacies maintain
13 data on the state in which a drug is dispensed to
14 a consumer?
15   A.   Yes.
16   Q.   Do you agree that PBMs maintain data on
17 the state in which a drug is dispensed to a
18 consumer from the communications the PBM receives
19 from the pharmacy?
20   A.   Yes.
21   Q.   You do not specifically opine on how
22 long any specific pharmacy or PBM maintains
23 pharmacy claims data, do you?
24   A.   Not in my report, no.
25   Q.   In your report I believe at paragraph

Confidential Information Subject to Protective Order

Page 226

1 159, you do allude to a Medicare requirement of
2 maintaining records for 10 years; correct?
3     A.  Let me get there.  But, yes, that's the
4 requirement for Med D programs.
5     Q.  Are you familiar from your experience of
6 pharmacies maintaining pharmacy claims data for at
7 least 10 years?
8         MR. DORNER:  Object to form.
9     You can answer.
10        THE WITNESS:  It's up to the individual
11 pharmacy or pharmacy chain to decide how long they
12 want to keep it.  Obviously, Med D is the longest
13 period of time.  So like in this case, the
14 defendant retail pharmacies produced data I think
15 that went back to 2013 or so.
16        But anyway, it's up to the individual
17 pharmacy.  They could delete data or archive it
18 earlier based on other provisions.  But that's an
19 individual business decision of each of those
20 pharmacies.
21 BY MR. STANOCH:
22    Q.  You're not offering any opinion in this
23 case, are you, that any specific pharmacy retained
24 pharmacy claims data for less than 10 years, are
25 you?

Page 227

1         MR. DORNER:  Object to form.  Vague.
2     You can answer.
3         THE WITNESS:  That's not covered in my
4 report.  I don't know what individual pharmacy
5 chains do in that regard.
6 BY MR. STANOCH:
7     Q.  You're not offering any opinion in this
8 case about any specific pharmacy deleting any
9 pharmacy claims data, are you?
10    A.  I'm not.
11    Q.  As part of your opinions in this case,
12 did you review any document retention policies for
13 the retail pharmacy defendants?
14    A.  No, I did not.
15    Q.  Would you be surprised to know that the
16 produced policies set a record retention for 10
17 years on pharmacy claims?
18        MR. DORNER:  Object to the
19 characterization.  Lacks foundation.
20        You can answer if you know.
21        THE WITNESS:  I would not be surprised
22 due to the Medicare Part D requirements, no.
23 BY MR. STANOCH:
24    Q.  You're certainly not offering any
25 opinion that any retail pharmacy defendant

Page 228

1 affirmatively deleted any pharmacy claims data;
2 right?
3     A.  I have knowledge of that, no.
4     Q.  And you have no knowledge about whether
5 any retail pharmacy defendant maintains pharmacy
6 claims data for less than 10 years, do you?
7     A.  I don't know.
8     Q.  And you didn't even look into that for
9 purposes of your report; correct?
10    A.  That is correct.
11    Q.  You allude to whether PBMs may store
12 data for certain periods of time in your paragraph
13 159; is that right?
14    A.  Are you speaking of the second sentence
15 of that paragraph?
16    Q.  Yes, sir.
17    A.  Yes.  I'm not aware of any legal
18 requirements for PBMs to store commercial claims
19 data for a specified period of time.
20    Q.  You're not offering any opinion in this
21 case about how long any PBM retains pharmacy
22 claims data, do you?
23    A.  I do not offer that opinion, no.
24    Q.  And you don't know sitting here one way
25 or the other, do you, about how long any

Page 229

1 particular PBM maintains any pharmacy claims data,
2 do you?
3     A.  I don't.
4     Q.  And did you look into the document
5 retention policies for any PBM in connection with
6 your opinions in this case?
7     A.  I did not.
8     Q.  You're not offering any opinion in this
9 case that any PBM affirmatively deleted pharmacy
10 claims data, are you?
11    A.  I'm not.
12    Q.  Stand by for an exhibit, sir.  Are you
13 familiar with entity known as Express Scripts?
14    A.  Yes.
15    Q.  They're a PBM; correct?
16        MR. DORNER:  Object to form.
17        You can answer.
18        THE WITNESS:  Yes.  I'm trying to -- is
19 the exhibit going to come up here?
20 BY MR. STANOCH:
21    Q.  I haven't pulled up an exhibit, sir.
22    A.  I thought you were going to reference
23 one.
24    Q.  Stand by for the exhibit, but before we
25 get there, you're familiar with Express Scripts;

Confidential Information Subject to Protective Order

Page 230

1  correct?
2      A.  Yes.
3      Q.  What do you understand their primary
4  line of business to be?
5      A.  Express Scripts is a PBM.
6          MR. SPUNG:  I'll put an objection to the
7  form on the record, please.
8          THE WITNESS:  To be more inclusive,
9  they're a PBM.  They also have mail service
10 pharmacies.  They have clinical departments.  They
11 have specialty pharmacies.  They have a number of
12 components under that PBM label.
13 BY MR. STANOCH:
14     Q.  Would you characterize Express Scripts
15 as the United States market's largest PBM?
16         MR. DORNER:  Object to form.
17         You can answer.
18         THE WITNESS:  They're one of the top
19 two.
20 BY MR. STANOCH:
21     Q.  Who are the top two PBMs in the United
22 States, sir?
23         MR. DORNER:  Object to form.
24         You can answer.
25         THE WITNESS:  It would be Express

Page 231

1  Scripts and CVS Caremark.
2  BY MR. STANOCH:
3      Q.  Approximately how much market share of
4  the PBM market would you attribute to Express
5  Scripts and CVS Caremark?
6      A.  I don't know specific numbers, but I
7  would estimate it's north of 50 percent.
8      Q.  Combined?
9      A.  Combined, yes.
10     Q.  I'm going to be marking an exhibit, sir.
11 Stand by.
12         (Kosty Exhibit 7 was marked.)
13 BY MR. STANOCH:
14     Q.  Sir, Exhibit 7 should be in your folder.
15 Let me know when you can access it.
16     A.  All right.  I've got it.



Confidential Information Subject to Protective Order



Page 234

Page 236

9   BY MR. STANOCH:
10      Q.   Are you familiar with the entity known
11   as Navitus?
12      A.   Yes.
13      Q.   What is Navitus?
14      A.   Navitus is a regional PBM.
15      Q.   Have you ever done any work with them
16   outside of litigation?
17      A.   Yes; many, many years ago.
18      Q.   What do you remember doing with Navitus?
19         MR. DORNER:   And I'll just caution to
20   the extent any of this is covered by
21   confidentiality designation.
22         THE WITNESS:   This one is a long time.
23   We worked with their pharmacy director on various
24   activities to help them run a better pharmacy
25   program in the PBM.

Page 235

Page 237

1   BY MR. STANOCH:
2      Q.   Navitus is a PBM you said; right?
3      A.   Yes.
4      Q.   I'm going to mark the next exhibit,
5   Exhibit 9.  Stand by.
6         (Kosty Exhibit 9 was marked.)
7   BY MR. STANOCH:
8      Q.   Let me know when you can access that
9   document.
10      A.   It came up in small format.  I was able
11   to figure out how to increase it.  Okay.  Got it.
12      Q.   You see this appears to be a Navitus
13   Record Retention and Record Availability Schedule?
14      A.   Yes.
15      Q.   Do you see here there's a few paragraphs
16   under Requirements?
17      A.   Yes.  It leads me to believe -- yeah,
18   the first sentence leads me to believe this
19   applies to the Medicare policy.
20      Q.   The sentence reads, "PBMs as first tier
21   and downstream entities must comply with Medicare
22   laws, regulations and CMS instructions," paren,
23   citation, "and agree to audits and inspection by
24   CMS and/or its designees and to cooperate, assist
25   and provide information as requested and maintain

Confidential Information Subject to Protective Order

Page 238

1   records a minimum of 10 years."
2       Did I read that right?
3       A.  Yes.
4       Q.  Do you have any reason to disagree with
5   that statement from Navitus?
6       A.  Not as it applies to Medicare, no.
7       Q.  You don't offer any opinion in your
8   report whatsoever about whether any pharmacy or
9   PBM retains non-Medicare records for less than 10
10  years; right?
11      MR. DORNER:  Object to form.
12      You can answer.
13      THE WITNESS:  I do not.
14  BY MR. STANOCH:
15      Q.  You can put that aside.  Back to the
16  NCPDP standards, Mr. Kosty, do those standards
17  have a field for group number?
18      A.  Yes.
19      Q.  Do those standards have a field for
20  cardholder ID?
21      A.  Yes.
22      Q.  Do those standards have a code for, I
23  guess, a person, a person code?
24      A.  Person code, yes.
25      Q.  Do those standards have a code for birth

Page 239

1   date?
2       A.  They have a field for birth date, yes.
3       Q.  Do those standards have a field for
4   name?
5       A.  Yes.
6       Q.  Do those standards have a field for
7   address?
8       A.  The patient's address, yes.
9       Q.  Correct.  When we're referring to birth
10  date, we're referring to the patient's birth date;
11  correct?
12      A.  Yes.
13      Q.  And when we're referring to name, that
14  would be the patient's name; correct?
15      A.  Correct.
16      Q.  And as you said, the address field would
17  be the patient's address; correct?
18      A.  Yes.
19      Q.  And the group number field would be
20  what?
21      A.  It would be an identifier that tells the
22  PBM system as one component how to process the
23  claim.  So a group number can be anything,
24  anything.  It's up to the card issuer to determine
25  what the group number is.

Page 240

1       Q.  And cardholder ID field, sir, what does
2   that show?
3       A.  It's whatever the card issuer designates
4   as the cardholder ID.
5       Q.  That would be the ID that was assigned
6   to the particular person who has the card?
7       A.  Right.  Whoever issued the card would
8   assign that number, yes.
9       Q.  And person code, what does that reflect?
10      A.  Well, person code reflects probably at a
11  higher level the relationship of that patient to
12  the cardholder.  So some systems require a person
13  code.  Others might have a different ID for each
14  member of your family, for example.
15      So the person code is typically used
16  when there's one ID for the family, and then it
17  identifies the individual patient within that
18  family who that prescription is being filled for.
19      Q.  Understood.  So hypothetically I could
20  have a card where my person code is 1 and my
21  spouse's code would be 2?
22      A.  Correct.
23      Q.  And that's the purpose of the person
24  code field, to differentiate between persons under
25  the same plan; right?

Page 241

1       A.  No.  It would be under the same
2   cardholder.
3       Q.  Correct.
4       A.  So it may be an employee.  So the
5   employee has coverage, and if he has family
6   coverage or if she has family coverage, then those
7   dependents would be listed.  In some cases the
8   person code is used to identify those people.
9       Q.  Do you agree that within a single system
10  you can follow a particular consumer over time
11  using the group number, cardholder ID, person
12  code, birth date, name and address fields?
13      MR. DORNER:  Object to form.
14      You can answer.
15      THE WITNESS:  Maybe.  If that person
16  stays within the same group for that time period,
17  yes, you could track that person.  Let's say you
18  had a person that moved to a different group.
19  Then you wouldn't be able to track them with that
20  group number key.
21  BY MR. STANOCH:
22      Q.  Because the group number might change?
23      A.  Exactly.
24      Q.  But you would not expect, for
25  instance -- strike that.

Confidential Information Subject to Protective Order

---

Page 242

1  Do you agree that you can map equivalent
2 data fields from different software packages using
3 the field names used?
4      MR. DORNER:  Object to form.
5      You can answer.
6      THE WITNESS:  Can you be more specific?
7 The field names used, what specific fields are you
8 talking about?
9 BY MR. STANOCH:
10     Q.  Well, let's keep it confined to the six
11 we just identified, group number, cardholder ID,
12 person code, birth date, name and address.
13     A.  Can you repeat your question now?
14     Q.  Sure.  Do you agree that you can map
15 equivalent data fields from different software
16 packages using the six fields we just described?
17     A.  For the most part, yes.  The only caveat
18 I would have, if it's the same -- well, you would
19 need to know who the PBM was that retained that
20 data because if you had a person, maybe they
21 changed PBMs or their health plan changed PBMs or
22 their employer changed benefits and went to a
23 different PBM.  You would not be able to track
24 that across the different PBM systems.
25     But within one PBM system that was

---

Page 243

1 responsible for that claim you could track it.
2     Q.  You could map data from equivalent
3 fields across systems in certain circumstances;
4 correct?
5      MR. DORNER:  Object to form.
6      You can answer.
7      THE WITNESS:  Yes.  In certain
8 circumstances, yes.
9 BY MR. STANOCH:
10     Q.  For instance, let's take a field for
11 birth date.  Okay?
12     A.  Um-hum.
13     Q.  If I go to pharmacy one and they have my
14 birth date, then I go to pharmacy two and they
15 have my birth date, those fields, everything else
16 aside, could be mapped; correct?
17     A.  That would be one key to the mapping,
18 yes.
19     Q.  And the process you would use for the
20 mapping would be similar for other available
21 fields; correct?
22     MR. DORNER:  Objection.  Form.
23     You can answer.
24     THE WITNESS:  Yes.  You would try to get
25 as many key fields as possible to be able to

---

Page 244

1 ensure that you were looking at the same patient
2 record.
3 BY MR. STANOCH:
4     Q.  You agree that PBMs and pharmacies can
5 only transmit data between themselves if the data
6 is understandable by each entity; right?
7     A.  Yes.
8     Q.  And you agree that PBMs and pharmacies
9 can only transmit data between themselves if the
10 data are stored in each entity's respective
11 system; right?
12     A.  Yes.  It's got to be stored somewhere to
13 transmit it.
14     Q.  Right.  When a data transmission from a
15 pharmacy at a point of dispensement goes to a PBM,
16 that data doesn't disappear.  Each entity would
17 have a record of the transaction; right?
18     A.  That's correct.
19     Q.  In fact, if there's any data missing
20 during that communication between the pharmacy and
21 the PBM, can the transaction be completed?
22     A.  It depends.  We've talked, I think, six
23 key fields here.  It depends on the PBM claims
24 processing system, what fields they're requiring
25 to approve a claim and process it.  So if they

---

Page 245

1 only use four of those fields and the other two
2 are blank, it doesn't matter.
3     But if they require all six fields, they
4 would have to have information that could be
5 validated on the PBM side.
6     Q.  You're familiar with the term data
7 dictionaries; right?
8     A.  Yes.
9     Q.  What does that mean to you?
10     A.  It's a description of the data
11 attributes of the fields within a system.
12     Q.  In laymen's parlance, it's sort of a
13 key, if you will, for what fields or values mean
14 in pharmacy claims data?
15     MR. DORNER:  Object to the
16 characterization.
17     You can answer.
18     THE WITNESS:  Yes.  But organizations
19 may keep other data that's not part of the
20 standard, and that would be included also in their
21 data dictionary, assuming they have good IT
22 hygiene practices.
23 BY MR. STANOCH:
24     Q.  In your experience, do PBMs and
25 pharmacies maintain data dictionaries for the

---

Confidential Information Subject to Protective Order

**Page 246**

1 fields and values in their pharmacy claims data?
2    A.  Somewhere in their IT department, they
3 might have a data dictionary.  My experiences
4 running a PBM is I didn't go to a data dictionary
5 every day to look at fields.  I knew what they
6 meant.  So, likely somewhere in the organization
7 you could find one.
8    Q.  For purposes of your opinions in this
9 case, you did not undertake to collect any data
10 dictionaries from any PBM, pharmacy or other
11 entity, did you?
12    A.  I did not.
13    Q.  You talk a little bit about potential
14 difficulties in merging or matching data across
15 different entities, pharmacy claims databases; is
16 that right?
17    A.  Yes.
18    Q.  For that part of that discussion, you
19 cite the Pew Charitable Trust study from 2018;
20 right?
21    A.  Yes.
22    Q.  And the Pew Charitable Trust study, that
23 was not confined to matching just pharmacy or PBM
24 data; correct?
25       MR. DORNER:  Object to form.

**Page 247**

1       You can answer.
2       THE WITNESS:  If I recall correctly, the
3 Pew study was looking at records within a health
4 plan using their patient management system.  So,
5 yeah, they indicated there was, I think,
6 18 percent duplication of patient records within
7 their medical management system and that health
8 plan.
9 BY MR. STANOCH:
10    Q.  Right.  The Pew Charitable Trust study
11 was talking about matching patient medical records
12 such as doctor's notes, lab diagnostics and the
13 things of that nature; right?
14    A.  Yes.  The same thing happens in pharmacy
15 systems where you have to go from -- you could
16 create duplicate records within your pharmacy
17 system.  If you went to a different pharmacy, if
18 you were a snow bird and had two addresses, then
19 you could potentially create additional records
20 for the same patient.
21       That's always been a challenge for
22 pharmacies because you obviously would want the
23 same patient in one record.
24    Q.  The Pew Charitable Trust was talking
25 about medical records.  They were not talking

**Page 248**

1 specifically about matching PBM and pharmacy
2 claims data; correct?
3    A.  Yes.  That was not the nature of the
4 study.
5    Q.  In fact, I can put it in front of you if
6 you like.  The Pew charitable Trust study you cite
7 does not even mention PBMs, does it?
8    A.  No.
9    Q.  And you agree that pharmaceutical claims
10 adjudication depends on different data than the
11 data being used for the medical claims
12 adjudication; right?
13    A.  Yes.  It's specific to pharmacy.
14    Q.  In looking at your report in paragraph
15 158, sir --
16    A.  Yes.
17    Q.  -- other than your footnote 298 to the
18 Pew Charitable Trust study we're talking about,
19 you don't cite any other information or source
20 regarding the difficulties with matching records;
21 correct?
22       MR. DORNER:  Object to form.
23       You can answer.
24       THE WITNESS:  I don't cite another
25 source, but my experience in the industry has

**Page 249**

1 indicated the challenges there are matching across
2 these different systems when, for example, a TPP
3 may change benefits and use one PBM for a two-year
4 period and maybe switch to another PBM.  There's
5 movement between PBMs.  There's movement of
6 patients between employers.  Perhaps someone got a
7 new job.
8       The other component that is tricky is
9 people get married.  They get divorced.  They have
10 name changes for whatever reason.  So all those
11 issues make it difficult to track across different
12 systems for patient information.
13 BY MR. STANOCH:
14    Q.  You mentioned TPP may switch PBMs.  Is
15 that what you said?
16    A.  Yes.
17    Q.  For instance, a TPP may be using one PBM
18 and then it may use a different PBM.  Is that what
19 you're saying?
20    A.  Yes.  It's an ongoing competition in the
21 marketplace to determine what PBM to use and what
22 benefits that are offered that are attractive to
23 employers.
24    Q.  And the risk you're opining on in that
25 instance is that the TPP may show up twice, once

Confidential Information Subject to Protective Order

1  in the first PBM's data and then again in the
2  second PBM's data; right?
3      A.  Yes.  They may be in multiple systems.
4  They may have new cards issued to their
5  membership.  There's a number of different
6  components that introduce variability into these
7  systems.
8      Q.  So that risk there as it comes to
9  identifying TPPs is that there's twice as many
10  opportunities to identify that TPP; right?
11          MR. DORNER:  Object to form.
12  Mischaracterization.
13          You can answer.
14          THE WITNESS:  Yeah, if it's in the
15  multiple systems, then you would have many
16  opportunities, yes.
17  BY MR. STANOCH:
18      Q.  You mentioned this, I think, a moment
19  ago.  In your experience, have you, in fact,
20  worked on merging claims data from the two
21  different entities using NCPDP fields?
22      A.  Yes.
23      Q.  Have you done that for PBMs?
24      A.  Yes.
25      Q.  You were able to merge claims data from

1  the two different PBMs for work that you or your
2  consulting firm was doing?
3      A.  Yeah.  We had two projects where we
4  helped a PBM convert claims processing systems
5  from one PBM to the other.  I think I mentioned in
6  the report somewhere there's a lot of individual
7  business decisions that need to be made when you
8  do claims conversion.
9          You have to decide how much prescription
10  data to convert.  How are you going to use that
11  data?  You're going to have make sure that you can
12  map the data into the new system or the successor
13  claims processing system.  Then you got to test
14  that information to make sure the mapping is
15  correct, and then you have as much data as
16  management decided to ingest into the new systems.
17          That's one of the management decisions,
18  is how much data do you need and why and why do we
19  load any more data than is absolutely required.
20  Typically, it's more of a clinical discussion on
21  how far back in the patient profile do you want to
22  look for those clinical edits.
23      Q.  What fields did you use to map the
24  claims data between the two PBMs that you were
25  analyzing?

1      A.  The six fields that you identified are
2  key fields.  Other fields would be the pharmacy.
3  Those would probably be the majority of them,
4  unless there were other components, prior
5  authorizations or clinical edits.
6          One of the things that when you have to
7  do these projects, you look at minimizing patient
8  disruption.  So if you're able to convert
9  information that precludes calling your help desk
10  or the patient going back to their benefits
11  office, you try to look at those situations.  But
12  six I think at a minimum you would need, plus the
13  pharmacy ID.
14      Q.  That would be a pharmacy ID for the
15  particular pharmacy dispensing a particular drug?
16      A.  Correct.
17      Q.  How about the field for NDC code?
18      A.  Yes.
19      Q.  How about the field for date of service?
20      A.  Yes.  That's part of the conversion
21  process.  You look at how long back you have to
22  use the date of service to make that decision.
23      Q.  Date of service is the date a pharmacy
24  dispensed a drug to a consumer; right?
25      A.  It's the date they filled the

1  prescription.  Whether it was dispensed to the
2  consumer, we don't know, but they sent it through
3  the claims adjudication process on that date.
4      Q.  Fair enough.  Was your
5  engagement -- strike that.
6          Which PBMs data were you working on when
7  you were doing this claims data merger analysis?
8      A.  Catalyst Rx and Systems Excellence at
9  the time.  Those two companies eventually merged
10  into Catamaran Rx.
11      Q.  You said the letters X -- I'm sorry.
12  The second one you said, that's also known as SXC;
13  right?
14      A.  Yeah.  The name of the company changed
15  over the years.
16      Q.  Got it.  And you said ultimately
17  Catalyst Rx and SXC successfully merged into the
18  PBM known as Catamaran?
19      A.  Correct.
20      Q.  And your work in analyzing the Catalyst
21  and SXC's PBM claims data was part of the
22  underlying work that led to that successful
23  merger; right?
24      A.  Yes.  We actually converted Catalyst Rx
25  from an Argus claims processing system to the SXC

Confidential Information Subject to Protective Order

Page 254

1 system.
2  Q.  You just faded out.  I heard you
3 converted the Catalyst from an Argus claims
4 processing system to a what?
5  A.  SXC.
6  Q.  So you essentially -- you can use your
7 own words if I'm wrong -- you essentially were
8 able to convert the Catalyst PBM pharmacy claims
9 data to the SXC pharmacy claims data platform?
10  A.  Yes.
11  Q.  If you can go to paragraph 152 of your
12 report, sir.  Let me know when you're there.
13  A.  Okay.
14  Q.  Here you talk in part about Ms. Craft's
15 report, about the data from the large PBMs and
16 retail pharmacy data in this case could be
17 expected to cover up to 98 percent of class
18 purchases.  Do you see that?
19  A.  Yes.
20  Q.  You don't offer any specific opinion
21 regarding that characterization of that
22 combination to be expected to cover up to
23 98 percent of class purchases of valsartan, do
24 you?
25  A.  No.  I note that the time and expense

Page 255

1 required to obtain data from all these entities is
2 the issue at hand here.
3  Q.  You don't quantify either here in
4 paragraph 152 or anywhere else how much time and
5 expense would be required to do that combination;
6 correct?
7  A.  That was not part of my assignment, no.
8  Q.  In the next paragraph, again you do not
9 specifically refute Ms. Craft's statement that the
10 top six PBMs processed between 89 and 96 percent of
11 U.S. prescription volume annually between 2015 and
12 2018; correct?
13  A.  Correct.
14  MR. DORNER:  Object to form.
15  You can keep going.
16 BY MR. STANOCH:
17  Q.  Do you agree with Ms. Craft's statement,
18 that the top six PBMs processed between 89 and 96
19 percent of U.S. prescription volume annually
20 between 2015 and 2018?
21  A.  Based on the source she provides, yes.
22 There's been consolidation.  But as I also note,
23 there's an additional 60 PBMs in the United States
24 that do similar functions.
25  Q.  You go on to talk about that in this

Page 256

1 paragraph 153; right?
2  A.  Yes.
3  Q.  You say, "PBM consolidation over time
4 may make data production review more difficult as
5 information needs to be pulled and combined from
6 multiple claims processing systems, which have
7 different field naming conventions and meaning."
8 Correct?
9  A.  Yes.
10  Q.  You don't identify which, if any, PBMs
11 have combined over time that may make data
12 production and review more difficult, correct, in
13 this paragraph?



19  It's one of those things you have to as
20 a business perspective decide what's the value for
21 me to exert the energy to convert clients to a
22 different claims processing system, or do I wait a
23 period of time until their renewal is up and they
24 renew with the company and then convert them to
25 the new system.

Page 257

1  So there's management decisions made.
2 So you may run systems in parallel.  You might
3 have systems that have different versions.  So
4 there's a number of components that go into making
5 that management decision on what claims processing
6 system to use or if you use both of them or
7 multiple systems.



15  Q.  You don't identify any other potential
16 examples, do you?
17  A.  I did not in this report.  There's many
18 examples of PBM acquisition.
19  Q.  Well, you understand I'm here to depose
20 you about the confines of your opinions as set
21 forth in your report; right?
22  A.  Yes.
23  Q.  Your report contains all the opinions
24 you intend to offer at this point in this case?
25  A.  Yes.

Confidential Information Subject to Protective Order



Page 258

Page 259

MR. DORNER: Hey, Dave, we're a little over an hour. I don't know where a good place to break is, but when you get there, let's go ahead and take a short one.

MR. STANOCH: Sure. We'll go a few more minutes just to round this out, Mr. Dorner, if that's okay with your witness, and then we can take a break, absolutely.

MR. DORNER: Sure.

BY MR. STANOCH:

Q. Mr. Kosty, you're not offering any

Page 260

1  opinion as to subpoenaeing claims data from PBMs,
2  are you?
3      MR. DORNER: Object to the form.
4      You can answer if you understand.
5      THE WITNESS: I don't believe so, no.
6  BY MR. STANOCH:
7      Q. You've never been involved in a
8  litigation subpoena to a PBM for pharmacy claims
9  data; is that correct?
10     A. That's not correct, no.
11     Q. You have been involved in that?
12     A. Yes. I have been involved in that, yes.
13     Q. Do you offer any opinions in this case
14  concerning the process for subpoenaeing pharmacy
15  claims data from PBMs?
16     A. No, I have not. There's nothing in my
17  report that addresses that issue.
18     Q. So you're not opining, for instance, and
19  I'll remind you you're under oath, sir, on how
20  long the subpoena process may take to obtain
21  pharmacy claims data from a PBM?
22     MR. DORNER: Object to form. Outside
23  the scope. Argumentative.
24     You can answer.
25     THE WITNESS: I'm looking to see where

Page 261

1  they characterize it, but I believe I use the term
2  burdensome. I'm trying to figure out which
3  paragraph that's at. Let me look.
4  BY MR. STANOCH:
5      Q. Well, sir, you said you're not offering
6  any opinion on subpoenaing pharmacy claims data
7  from PBMs; correct?
8      A. Yes.
9      Q. And I'm happy to share my screen, but I
10  can't even find the word subpoena in your report.
11  Would that surprise you?
12     A. No.
13     Q. So again, you're not opining, sir, on
14  how long the subpoena process may take to obtain
15  pharmacy claims data from a PBM, are you?
16     MR. DORNER: Object to form.
17  Characterization.
18     You can answer.
19     THE WITNESS: No.
20  BY MR. STANOCH:
21     Q. You're aware that -- I think we
22  established this -- some of the retail pharmacy
23  defendants in this case have corporate affiliates
24  that are PBMs; right?
25     A. Yes.

Page 262

1    Q.  ESI is one of them; right?
2    A.  Yes.
3    Q.  CVS Caremark; right?
4    A.  Yes.
5    Q.  OptumRx; right?
6    A.  Yeah.  Their mail service is part of the
7  PBM, yes.
8    Q.  And while they may not be a defendant,
9  Humana Pharmacy also has a PBM, a Humana
10 affiliate; right?
11   A.  Yes.
12   Q.  Did you talk to anyone at any of those
13 retail pharmacy defendants about what it would
14 take to obtain PBM pharmacy claims data from their
15 PBM affiliates?
16       MR. DORNER:  Object to form.
17       MS. KAPKE:  Object to form.
18       MR. DORNER:  Vague.
19       You can answer.
20       THE WITNESS:  No, I did not speak
21 directly to any retailers or pharmacy defendants.
22 BY MR. STANOCH:
23   Q.  I'm sorry.  Are you done?
24   A.  Or pharmacy defendants.
25   Q.  Did you communicate with any retail

Page 263

1  pharmacy defendant for purposes of preparing your
2  opinions in this case?
3       MS. KAPKE:  Object to form.
4    A.  No.
5       MR. STANOCH:  What's the form objection,
6  Ms. Kapke?
7       MS. KAPKE:  You're asking him if he's
8  communicated with the defendants, and I frankly
9  don't know what you mean by that, if you mean
10 counsel or if you mean directly with the
11 defendants.  If you're talking counsel, he has
12 been retained by counsel for the retail pharmacy
13 defendants, and those communications are
14 privileged.
15       I don't understand your question.  So
16 I'm not going to instruct him further.  But if you
17 want to clarify what you're talking about, then I
18 will make further objections.
19 BY MR. STANOCH:
20   Q.  Mr. Kosty, did you communicate with any
21 business personnel at any retail pharmacy
22 defendant for purposes of preparing your opinions
23 in this case?
24   A.  No.
25   Q.  Were you provided any information

Page 264

1  regarding the process that would be involved to
2  obtain PBM claims data from the retail pharmacy
3  defendants' PBM affiliates in this case?
4       MR. DORNER:  Object to form.  Vague.
5       You can answer.
6       THE WITNESS:  No.
7       MS. KAPKE:  I'll join that objection.
8  And since you asked the basis of my objection, I
9  think his report speaks for itself on what he was
10 provided.  And with that objection, I'll let him
11 go ahead and answer.
12       THE WITNESS:  No.
13 BY MR. STANOCH:
14   Q.  You opine in paragraph 160 of your
15 report, sir -- tell me when you're there.  Are you
16 on paragraph 160, sir?
17   A.  Yes.
18   Q.  Very good.  I just want to make sure
19 we're on the same page.  Here you reference an
20 OptumRx declaration; correct?
21   A.  Yes.
22   Q.  And you reference claims data that may
23 be archived were not as readily accessible as more
24 recent claims.  Do you see that?
25   A.  Yes.

Page 265

1    Q.  You never analyzed how long it would
2  take any PBM to produce archived claims data, did
3  you?
4    A.  That was not part of my assignment, no.
5    Q.  You never analyzed how long it would
6  take any PBM to produce pharmacy claims data that
7  is not as readily accessible, did you?
8    A.  No.  That was not part of my assignment.
9    Q.  Do you have any understanding about what
10 archived data means?
11   A.  Yes.
12   Q.  Do you offer any opinions in your report
13 as to archived data?
14   A.  No.
15   Q.  So you're not opining in this case then
16 how long it would take any PBM to produce archived
17 pharmacy claims data; correct?
18   A.  Correct.
19   Q.  And you're not opining in this case how
20 long it would take any PBM to produce pharmacy
21 claims data that is not as readily accessible;
22 correct?
23   A.  That is correct.
24   Q.  Have you ever worked in any litigation
25 context to obtain archived data?

Page 266

1    A.  Could you explain what you mean by
2 litigation context?
3    Q.  Have you ever been retained in any case
4 in which your work included obtaining archived
5 data?
6    A.  No.
7    Q.  Have you ever been retained in any case
8 in which your work included obtaining not readily
9 accessible data?
10    A.  No.
11    Q.  Now might be a good time to honor your
12 counsel's request for a break, sir.
13    A.  Yes.  Let's do that.  You said 10
14 minutes?
15        MR. STANOCH:  Off the record.
16        THE VIDEOGRAPHER:  Off the record 4:04.
17    (Recess from 4:04 p.m. to 4:19 p.m.)
18        THE VIDEOGRAPHER:  We are back on the
19 record at 4:19.
20 BY MR. STANOCH:
21    Q.  Welcome back, Mr. Kosty.  Just yes/no.
22 Did you talk to your counsel during the break?
23    A.  Yes.
24    Q.  Did you talk to anyone else besides your
25 counsel during the break?

Page 267

1    A.  No.
2    Q.  Did you communicate via email, text or
3 telephone with anybody during the break?
4    A.  No.
5    Q.  Did you look at any documents during the
6 break?
7    A.  No.
8    Q.  You did not conduct any literature
9 review for purposes of quantifying the feasibility
10 of combining claims data from different sources,
11 did you?
12        MR. DORNER:  Object to form.
13    You can answer.
14        THE WITNESS:  No.
15 BY MR. STANOCH:
16    Q.  So you don't know what published
17 literature may exist concerning the feasibility of
18 combining claims data; you don't have any opinions
19 on that in this case?
20    A.  I did not research that in the
21 literature, no.
22    Q.  Stand by.  I'm marking Exhibit 10, sir.
23 It should be in your folder.  I'll share my screen
24 as well.
25        (Kosty Exhibit 10 was marked.)

Page 268

1 BY MR. STANOCH:
2    Q.  Can you see it?
3    A.  I'm bringing it up.
4    Q.  Tell me when you're there.
5    A.  All right.  It's up.
6    Q.  This is appears to be an article
7 entitled "The Epidemiology of Prescriptions
8 Abandoned at the Pharmacy" from the Annals of
9 Internal Medicine; is that right?
10    A.  That is the title of the article, yes.
11    Q.  Have you seen this before?
12    A.  I have not.
13    Q.  If you would scroll down to the second
14 page, sir.  Are you there?
15    A.  I'm getting there.  Just trying to get
16 an understanding what this article is about.
17 Okay.
18    Q.  And you see here as part of what the
19 authors of this article did is they said, "...we
20 merged the database from a large retail pharmacy
21 chain with a database from a large pharmacy
22 benefits manager (PBM)."
23        Do you see that?
24        MR. DORNER:  I'll object to form just to
25 the extent this is a document several pages in

Page 269

1 length that Mr. Kosty has never seen.  So I'll
2 object to the form in that sense.
3        But other than that, you can continue.
4        THE WITNESS:  Yeah, so the title is
5 Epidemiology of Prescriptions Abandoned at the
6 Pharmacy.  Okay.  So that's the intent.  What
7 section did you highlight?
8 BY MR. STANOCH:
9    Q.  I'll repeat it.  Do you see on page 2
10 the authors of this study say, "...we merged the
11 database from a large retail pharmacy chain with a
12 database from a large pharmacy benefits manager
13 (PBM)"?
14    A.  Yes.  That's what it says.
15    Q.  And you see in the right-hand column
16 they state, "Electronic pharmacy data from the
17 retail pharmacy and PBM were matched on pharmacy
18 store number, prescription number, fill date and
19 patient zip code.  We successfully matched
20 99.93 percent of retail transactions with pharmacy
21 data."
22        Do you see that?
23    A.  You've read that correctly.
24        MR. DORNER:  Same objection as my
25 previous.

Confidential Information Subject to Protective Order

Page 270

BY MR. STANOCH:

Q. Do you have any basis to disagree with the authors' statements regarding their 99.93 percent match of the pharmacy and PBM pharmacy data that they were working with?

MR. DORNER: Same objection with respect to the document and Mr. Kosty's unfamiliarity.

THE WITNESS: I would need to read this document to determine the parameters around this matching. If it's within a year, yes, those data are going to be available and that would not surprise me. But I would need to see what context and how long the data matching period was from this article.

I don't know if you want to give me a minute to read it and find that information.

BY MR. STANOCH:

Q. I think it would be fair enough for us to put it aside. But the question would be being here now without reviewing the article more closely, you can't say one way or the other anything about the successful match rate reported in this article?

MR. DORNER: Same objections as previous.

Page 271

You can answer.

THE WITNESS: I would have to study this article and understand the context and what were the motivations of both parties, et cetera, before opining on whether that could be replicated.

BY MR. STANOCH:

Q. You can put that aside.

You can turn to paragraph 156 of your report, sir. Tell me when you're there.

A. Yes.

Q. And here, among other things, you're talking about what you say are the payor mix at independent pharmacies; right?

A. Yes.

Q. And then you go on in the next paragraph talking about the prices paid for VCDs may be different for independent pharmacies versus larger chain stores pharmacy; right?

A. Yes. Typically, an independent pharmacy is not able to negotiate as favorable reimbursement rates as a large major chain.

Q. Does variation in the price paid for a valsartan-containing drug matter in this litigation for purposes of either of the two economic loss classes?

Page 272

MR. DORNER: Object to the form to the extent it's outside the scope and/or calls for a legal conclusion.

You can answer if you know.

THE WITNESS: Yeah, for the TPP class, it would vary on what was paid.

BY MR. STANOCH:

Q. TPP class membership is based on whether they paid; right?

MR. DORNER: I'm sorry. I didn't catch that, Dave. We had a cutout on that. Could you repeat that?

BY MR. STANOCH:

Q. TPP class membership is based on whether they paid or reimbursed for a drug; right?

MR. DORNER: Object to the characterization. Legal conclusion.

You can answer.

THE WITNESS: Yes.

BY MR. STANOCH:

Q. TPP class membership does not depend on the dollar amount that was reimbursed for a particular drug; correct?

MR. DORNER: Same objection.

THE WITNESS: In order to calculate

Page 273

damages, you would need to know what that TPP paid for that individual drug.

BY MR. STANOCH:

Q. We're just talking about ascertainability and identification of class membership now. Okay, sir?

A. Okay.

Q. And for that purpose, price variation in the amounts paid or reimbursed for valsartan-containing drugs doesn't matter, does it?

MR. DORNER: Object to form. Same objection.

THE WITNESS: No, it doesn't matter. It just matters if the TPP is self-insured or fully insured.

BY MR. STANOCH:

Q. If a TPP was ultimately responsible for reimbursing a dollar, it falls within the class as much as a TPP that would have been reimbursing a thousand dollars; right?

MR. DORNER: Same objections.

You can answer.

THE WITNESS: Yes.

Page 274

```
1   BY MR. STANOCH:
2       Q.  We're not in this case trying to
3   construct a but-for world price for valsartan, are
4   we?
5           MR. DORNER:  Object to the form.  Calls
6   for a legal conclusion.  Vague.
7           You can answer if you understand.
8           THE WITNESS:  I don't know.
9   BY MR. STANOCH:
10      Q.  You're certainly not proffering any
11  opinion on what the price for valsartan-containing
12  drugs should have been in a different hypothetical
13  world, are you?
14      A.  No.  That was not part of my assignment.
15      Q.  You can look at paragraph 161, sir.
16  Tell me when you're there.
17      A.  Yes.
18      Q.  Here you're talking about obtaining
19  claims data from individual TPPs; correct?
20      A.  Yes.
21      Q.  You're not opining, sir, that TPPs
22  cannot provide their own data to show how much
23  they ultimately paid for valsartan-containing
24  drugs, are you?
25          MR. DORNER:  Object to form.
```

Page 275

```
1           You can answer.
2           THE WITNESS:  They may have difficulty
3   getting that information.  In this case, MADA had
4   to go to two or three entities to get that
5   information.  They were the TPP, so they were able
6   to obtain that information.
7           MR. DORNER:  I think the court reporter
8   might have had difficulty.  Could you just repeat
9   the last part of your answer, Mr. Kosty?  Never
10  mind.
11  BY MR. STANOCH:
12      Q.  Sir, you're not opining that TPPs cannot
13  access records themselves showing what they paid
14  for valsartan-containing drugs, are you?
15      A.  It's a little bit more complicated than
16  that.  If the TPP maintains their own records,
17  then they could access them obviously.  But if
18  they don't maintain their own records and they
19  have to go to their PBM or TPA to get that
20  information, then that's what they would need to
21  do.
22      Q.  And are you opining that a TPP could not
23  go to its own PBM and TPA to obtain data on how
24  much the TPP reimbursed for valsartan-containing
25  drugs?
```

Page 276

```
1       A.  No.  They could go ask their PBM or TPA,
2   yes.
3       Q.  You don't offer any opinion that any TPP
4   class member could not go to its PBM, TPA, ASO to
5   obtain data on how much a given TPP reimbursed for
6   valsartan-containing drugs, are you?
7           MR. DORNER:  Object to form.  Asked and
8   answered.
9           You can answer.
10          THE WITNESS:  I did not.
11  BY MR. STANOCH:
12      Q.  You did not analyze how hard it would be
13  for any particular TPP to access their own payment
14  data to provide proof of class membership, did
15  you?
16      A.  No.  That was not part of my assignment.
17      Q.  In fact, the only example you cite in
18  paragraph 161 was plaintiff MADA and it did go to
19  its ASO and PBM to get certain data for its
20  payment for valsartan-containing drugs; right?
21      A.  Yes.
22      Q.  You don't have any other specific
23  examples about TPPs and whether or not it would be
24  difficult for them or not -- strike that.
25          You don't offer in paragraph 161 or
```

Page 277

```
1   elsewhere any specific examples of a particular
2   TPP and whether it can or cannot obtain its own
3   reimbursement data, do you?
4       A.  I do not.
5       Q.  Sir, do you agree that a
6   claims -- strike that.
7           You make discussion in your report
8   throughout about TPAs and ASOs; right?
9       A.  Yes.
10      Q.  And we can agree TPA means third-party
11  administrator?
12      A.  Yes.
13      Q.  And ASO means administrative services
14  organization?
15      A.  Yes.
16      Q.  And I think you may mention once or
17  twice a PSAO.  And what's a PSAO?
18      A.  PSAO is in context to a group of
19  independent pharmacies, a pharmacy services
20  administrative organization.
21      Q.  Do you offer any opinion in your report
22  that PSAOs would not have records of their own
23  pharmacy clients' transactions?
24      A.  That was not part of my assignment, so I
25  didn't offer an opinion on that question.
```

Page 278

1    Q.   You're not offering any opinions, sir,
2  are you, that a TPA or ASO does not have data on
3  their respective clients' drug reimbursements?
4        MR. DORNER:  Object to the
5  characterization.
6        You can answer.
7        THE WITNESS:  I do not.
8  BY MR. STANOCH:
9    Q.   Do you agree that the claims data that a
10 PBM presents to a TPA or ASO must be sufficient to
11 allow the TPA or ASO to bill their respective TPP
12 clients?
13       MR. DORNER:  Object to form.
14       You can answer if you understand.
15       THE WITNESS:  I understand, yes, in
16 terms of invoicing, perhaps in terms of detail.
17 BY MR. STANOCH:
18   Q.   Do you agree that PBM data must be in a
19 format that allows a TPA or ASO to link particular
20 pharmacy claims to their respective self-funded
21 plan clients?
22   A.   Could you repeat the question?
23   Q.   Sure.  Do you agree that PBM -- I'll
24 start over.
25       Do you agree that PBM data must be in a

Page 279

1  format that allows a TPA or ASO to link particular
2  pharmacy claims to their respective self-funded
3  plan clients?
4        MR. DORNER:  Object to form.  Vague.
5  And foundation.
6        You can answer if you understand it.
7        THE WITNESS:  Same as the previous
8  answer.  Yes and no.  It depends on what that TPA
9  requires from the PBM to bill their clients.  If
10 they want the claims detail associated with it,
11 then it would be available.  If they just want a
12 bill that says pay us X, that would be available,
13 too.
14 BY MR. STANOCH:
15   Q.   You don't offer an opinion, do you, sir,
16 in your report as to any TPA or ASO that says just
17 send us a bill; right?
18       MR. DORNER:  Object to the
19 characterization.
20       You can answer if you understand.
21       THE WITNESS:  I do not.
22 BY MR. STANOCH:
23   Q.   You said if you just want a bill that
24 says pay us X, that's a possibility.  Is that what
25 you said?

Page 280

1    A.   Yes.
2    Q.   You don't offer any opinion anywhere in
3  your report of any particular TPA or ASO that
4  simply tells a PBM just give us a bill that says
5  pay us X, do you?
6    A.   I do not.
7    Q.   Do you offer any opinion in your report
8  that any TPA or ASO does not have data to identify
9  its client payors?
10       MR. DORNER:  Object to form.
11       You can answer.
12       THE WITNESS:  Can you define client
13 payors?
14 BY MR. STANOCH:
15   Q.   Sure.  How would you define the entities
16 that would retain a TPA or ASO to manage pharmacy
17 benefits?
18   A.   It would be the TPA's clients.  So
19 you're asking that question with --
20   Q.   Yes.  I'll re-ask it.
21   A.   Thank you.
22   Q.   Do you offer any opinion in your report
23 that any TPA or ASO does not have data to identify
24 its clients?
25   A.   No.

Page 281

1    Q.   You mentioned in your report the
2  potential for an ASO that may contract with
3  another ASO.
4    A.   Yes.
5    Q.   You don't provide any analysis in your
6  report, do you, about how frequently the layering
7  of ASOs might occur, do you?
8    A.   Not in that example, no.
9    Q.   You did not analyze whether PBMs and any
10 TPA or ASO name their fields in their respective
11 claims data system differently, did you?
12       MR. DORNER:  Object to form.
13       You can answer.
14       THE WITNESS:  I did not.
15 BY MR. STANOCH:
16   Q.   Would you agree that a PBM needs a PCN
17 number to process a pharmacy claim and route it to
18 the appropriate party?
19   A.   No.
20   Q.   What is a PCN number?
21   A.   It's a processor control number.
22   Q.   Did you provide any analysis in your
23 report about whether a PBM needs a PCN number to
24 process a pharmacy claim and route it to the
25 appropriate party?

Confidential Information Subject to Protective Order

Page 282

1    A.   I didn't provide an analysis, but I
2  provided an example.  Let me find it.  It was the
3  OptumRx payor sheet.
4    Q.   Other than the OptumRx payor sheet that
5  you cite, did you provide any other examples?
6    A.   No.  I just provided that one example.
7  Once I get to it, I'll go through it with you.
8    Q.   When you get to that page, let me know
9  the page first.  That's the question.  What page
10 is that?
11   A.   That's a good question.  That's what I'm
12 looking for.  It is page 53 of the report.
13   Q.   Are you talking about Figure 2?
14   A.   Yes, that's correct.  This is a sample
15 of the 2021 OptumRx payor sheet.  It explains to
16 the pharmacy how to route a claim to them.  And if
17 you look through here, it will tell you who the
18 client is.
19       I know ProAct, as I mentioned in the
20 report, is a PBM with a BIN and processor control
21 number.  So the pharmacy needs that BIN and
22 processor control number to route claims for Optum
23 for ProAct PBM.  The pharmacy has no idea who
24 ProAct PBM's customers are, nor do they
25 necessarily care.  All they care is they can route

Page 283

1  the claim, get it processed, approved for payment
2  and service their patient.
3        So in the bottom example here, it's a
4  company named MedalistRx, BIN number 016580, PCN
5  NA.  It's not applicable.  So this example
6  supports my industry experience that is a PCN
7  number is not required to process a pharmacy
8  claim.  It's dependent upon on the claims
9  processing system and what key fields they need to
10 process the claim.
11       If you look at the NCPDP D.0 standard,
12 the PCN is an optional field.
13   Q.   Do you agree that in this instance,
14 ProAct would have data to indicate which of its
15 clients it should route a particular claim back
16 to?
17   A.   They would be able to bill their client
18 based on the information.  If one of their clients
19 is a TPA, they would not necessarily know who that
20 TPA's client is.  All they know is their
21 contractual relationship with the TPA.
22   Q.   And the question was:  Do you agree that
23 ProAct would have its own data to indicate which
24 of its clients it should route a particular claim
25 back to?  The answer to that is yes; right?

Page 284

1    A.   They don't route the claim back to them.
2  They bill them for the services provided.  But,
3  yes, they would be able to identify who to bill
4  for those service.
5    Q.   And the services we're talking about
6  would be the pharmacy benefit to cover in this
7  case valsartan-containing drugs?
8    A.   Correct.
9    Q.   And you would expect that to be the same
10 in the instance of MedalistRx; right?
11   A.   Yes.
12   Q.   Thank you.  Let's switch gears a little
13 bit to a discussion about the medical monitoring
14 class, sir.
15   A.   Yes.
16   Q.   I think your discussion there is on
17 paragraphs 119 and 126 of your report.  So why
18 don't you get there and let me know when you're
19 there.
20   A.   You said 119?
21   Q.   Yes, sir.
22   A.   Okay.  Thank you.  I'm there.
23   Q.   Great.  And these are your opinions
24 concerning the medical monitoring class
25 specifically; right?

Page 285

1        MR. DORNER:  Object to form.
2        You can answer.
3        THE WITNESS:  Yes.
4  BY MR. STANOCH:
5    Q.   One of the first things you say in
6  paragraph 120 relates to the levels of NDMA or
7  NDEA in VCDs; right?
8    A.   Yes.
9    Q.   You never analyzed the levels of
10 nitrosamines in any valsartan-containing drug, did
11 you?
12   A.   No.
13   Q.   You never analyzed the levels of
14 nitrosamine contamination in any valsartan API,
15 did you?
16   A.   No.
17   Q.   You mentioned Aurobindo here
18 specifically; right?
19   A.   Yes, in paragraph 120.
20   Q.   Do you have any other specific examples
21 about any other defendants' valsartan-containing
22 drugs that you discuss in the context of the
23 levels of nitrosamines in their
24 valsartan-containing drugs?
25   A.   No.

Confidential Information Subject to Protective Order

Page 286

1    Q.   Did you -- strike that.
2         You never analyzed whether Aurobindo's
3    lot level recalls encompassed all product lots
4    then available on the market, did you?
5         MR. DORNER: Object to form.
6         THE WITNESS: No.
7    BY MR. STANOCH:
8    Q.   Because you make it a point to say, oh,
9    well, Aurobindo did lot level recalls; right?
10   A.   Yes.
11   Q.   But you don't know whether those lot
12   level recalls encompassed all products from lots
13   then available on the market at the time of the
14   recall, did you?
15   A.   No.  I did not have access to the
16   recalled product that was obtained, no.
17   Q.   You would agree, would you, that if a
18   lot level recall included all available lots of a
19   given NDC, then that would effectively mean there
20   was no product under that NDC remaining on the
21   market?
22        MR. DORNER: Object to form.  Outside
23   the scope.  Mischaracterizes.
24        You can answer.
25        THE WITNESS: Yes.  If they recall all

Page 287

1    lots of an NDC number, then the pharmacies would
2    have removed those from the shelves and the
3    wholesalers, too.
4    BY MR. STANOCH:
5    Q.   You don't know if that occurred for
6    Aurobindo product or not; right?
7    A.   I don't have specific examples of that
8    occurring or not occurring, no.
9    Q.   And you don't know if that occurred for
10   any other defendant's valsartan-containing drugs;
11   right?
12   A.   No.  I haven't seen that information.
13   Q.   As a pharmacist, do you agree that
14   nitrosamines are carcinogenic?
15        MR. DORNER: Object to form.  Outside
16   the scope.
17   BY MR. STANOCH:
18   Q.   You can answer.
19        THE WITNESS: Can I answer?
20        MR. DORNER: Yes.
21        THE WITNESS: I didn't know if you were
22   done.  Please repeat the question.  I'm sorry.
23   BY MR. STANOCH:
24   Q.   As a pharmacist, do you agree that
25   nitrosamines are carcinogenic?

Page 288

1        MR. DORNER: Object to form.  Outside
2    the scope.  And mischaracterizes.
3        THE WITNESS: As a pharmacist, I don't
4    know.  I read some reports in this case both from
5    the plaintiffs' and the defendants' clinical
6    experts to get some background.  But I haven't
7    formed an opinion whether it's carcinogenic or
8    not.
9    BY MR. STANOCH:
10   Q.   As a pharmacist, do you agree that
11   nitrosamines are genotoxic?
12        MR. DORNER: Object to form.  Same
13   objections as my previous.
14        THE WITNESS: Based on the clinical
15   experts in this case, that was their contention,
16   but I haven't independently verified it.  But I
17   assume they're right.  So that's their opinion it
18   is genotoxic.
19   BY MR. STANOCH:
20   Q.   Were you familiar with nitrosamines from
21   your work prior to your involvement in this case?
22   A.   Yes, only in regards to how much
23   nitrosamines one could consume by eating a
24   cheeseburger topped with applewood bacon and
25   washing it down with a beer.  So I am familiar

Page 289

1    that nitrosamines are available for patients to
2    consume and they're a naturally occurring
3    byproduct of cooked meats, smoked meats, a number
4    of different products that do contain
5    nitrosamines.  So, yes, I was familiar with it.
6        MR. DORNER: Mark my late objection.
7        I'm sorry, Dave, to cut you off.
8    BY MR. STANOCH:
9    Q.   Do you agree that any exposure to a
10   carcinogenic substance contributes to a cancer
11   risk?
12        MR. DORNER: Objection to form.  Lacks
13   foundation.  Outside the scope.
14        THE WITNESS: I don't have one opinion
15   one way or another.  I'm not an epidemiologist.  I
16   don't do those kind of studies, so I don't have an
17   opinion on it.
18   BY MR. STANOCH:
19   Q.   You said you heard about nitrosamines
20   with a bacon burger and a beer; right?
21   A.   Yes.
22   Q.   So as a pharmacist, do you think if that
23   person having the bacon burger and beer also took
24   valsartan with nitrosamines, was that valsartan
25   additive to that person's carcinogenic risk?

Confidential Information Subject to Protective Order

Page 290

1    MR. DORNER: Object to form. I'll
2  repeat my previous objections made. Outside the
3  scope. Mischaracterizes.
4    THE WITNESS: I don't have a clinical
5  opinion on that. I don't know.
6    MS. KAPKE: This is Kara for CVS and
7  Rite-Aid. I'm just going to interpose a form
8  objection to the use of "as a pharmacist." I
9  think Mr. Kosty's report reflects his opinion in
10 this case as someone who has worked in the
11 pharmacy industry.
12    But I object to your characterization of
13 his questions starting with "as a pharmacist" when
14 they relate to these opinions that are clearly
15 outside the scope of his report.
16    MR. STANOCH: Ms. Kapke, Mr. Dorner is
17 perfectly capable of lodging objections. I'd
18 appreciate if you confined your objections to a
19 single objector. And I'll also ask him another
20 question then.
21 BY MR. STANOCH:
22    Q. Mr. Kosty, do you think that a person
23 having a bacon burger and a beer who also took
24 valsartan that contained nitrosamines -- was that
25 valsartan additive to that person's carcinogenic

Page 291

1  risk?
2    MR. DORNER: Object to form. Outside
3  the scope. Mischaracterizes. And with respect to
4  the term "as a pharmacist," object to usage of
5  that term.
6    Furthermore, other defendants have a
7  right to object on the record just as we do, and
8  that's what Ms. Kapke is going to do. She's
9  permitted to make those objections just as I am.
10    MR. STANOCH: Mr. Dorner, first of all,
11 you've said all day mischaracterizes. I'm asking
12 him the question, not his testimony. So nothing
13 is being mischaracterized. Number two, I didn't
14 use the phrase "as a pharmacist." So I don't
15 appreciate that objection.
16 BY MR. STANOCH:
17    Q. So I'm going to ask the question again,
18 sir. Mr. Kosty, do you think a person having a
19 bacon burger and a beer who also ingested
20 valsartan that had nitrosamines -- was that
21 valsartan contributive to that person's
22 carcinogenic rink?
23    MR. DORNER: Object to form. Lacks
24 foundation. Outside the scope.
25    You can answer.

Page 292

1    THE WITNESS: I don't know if it
2  increases the carcinogenic risk. I know it
3  increases the amount they consumed, but that's it.
4  BY MR. STANOCH:
5    Q. When did you first remember hearing
6  anything about nitrosamines?
7    A. I don't recall specifically. It was
8  probably related to this case though. Or in the
9  industry we get, gosh, 20, 25 news feeds to inform
10 our consultants and keep up to speed on what's
11 going on in the industry. I'm sure one of those
12 news feeds had a story about this situation.
13    Q. So it's your testimony that you never
14 knew about nitrosamines until you were retained in
15 this litigation?
16    MR. DORNER: Object to form.
17 Mischaracterizes.
18    THE WITNESS: That mischaracterizes. As
19 I mentioned, I'm sure I saw it in one of those
20 news feeds, but I don't recall the specific time
21 or date that might have happened.
22 BY MR. STANOCH:
23    Q. Those are news feeds though about this
24 litigation; right?
25    A. No. They're news feeds about the

Page 293

1  industry. Every member organization typically has
2  a news feed, some annoyingly multiple times a day.
3  I'm sure you get them, too, right. So it at least
4  informs you that there's something that perhaps
5  you need to look at. So it's just a matter of an
6  ongoing process for our consultants to stay up to
7  speed.
8    I'm sure this morning I had 20 of those
9  emails in my in-basket when I woke up.
10    Q. So sometime prior to this litigation,
11 you think you may have had a news feed that
12 discussed something about nitrosamines; fair?
13    A. Fair, yes.
14    Q. You just can't say how much before in
15 time that feed might have made it to your
16 attention?
17    MR. DORNER: Object to form.
18    You can answer.
19    THE WITNESS: I don't know.
20 BY MR. STANOCH:
21    Q. In paragraph 121 you talk about the
22 lifetime cumulative exposure threshold set forth.
23 I'm sorry. It's paragraph 119. You talk about
24 the lifetime cumulative thresholds of NDMA, NDEA
25 exposure for the medical monitoring class; is that

Confidential Information Subject to Protective Order

Page 294

1  right?
2      A.  That's correct.
3      Q.  You don't know how the lifetime
4  cumulative exposure thresholds were established
5  for purposes of the medical monitoring motion for
6  class certification, do you?
7      A.  No.  All I have known is what I read.
8  It would have been interesting to see some
9  information on how this was established, but it
10 wasn't in the Complaint.
11     Q.  You never analyzed the lifetime
12 cumulative exposure thresholds set forth in the
13 medical monitoring class then; right?
14     A.  I did not.
15     Q.  You don't know, for instance, if the
16 lifetime cumulative exposure thresholds were based
17 on the lowest levels of nitrosamine contamination
18 found in any particular valsartan-containing drug,
19 do you?
20     A.  How those levels were established by the
21 plaintiffs, I don't know how they did it, so no.
22     Q.  If the thresholds were based on the
23 lowest documented nitrosamine levels, then your
24 point about variations of levels you write about
25 doesn't matter, does it?

Page 295

1      MR. DORNER:  Objection.  Argumentative.
2  Lacks foundation.
3      THE WITNESS:  No.  That's incorrect.  It
4  does matter.  It matters that you're able to
5  accurately identify the amount ingested by
6  patients over time.  And part of my assignment was
7  to opine on the ability -- and let me find it for
8  you so I can read it.
9      "The extent to which available data
10 allow for the calculation of the amount of
11 impurities to which a patient may have been
12 exposed and the extent to which the data are
13 available sufficiently to reliably estimate
14 damages."
15     So it's the amount that the patients
16 were exposed to.
17 BY MR. STANOCH:
18     Q.  What are you reading from?
19     A.  Paragraph 24, my assignment.
20     Q.  It's a hundred paragraphs earlier.  Hold
21 on.
22     A.  I know.  So if you go four lines up from
23 the bottom once you get there.
24     Q.  I see it.  Thank you.  I see it.  Your
25 point on the levels is that -- again, you didn't

Page 296

1  analyze the nitrosamine levels any particular
2  drug; right?
3      A.  No.
4      Q.  Your point is that they may have varied;
5  right?
6      A.  Well, the documentation I've seen, for
7  example, the Aurobindo you mentioned, there were
8  variations of nitrosamine levels between lot
9  numbers, yes.
10     Q.  If the thresholds were based on the
11 lowest documented Aurobindo levels, then that
12 would be the most conservative assumption?
13     MR. DORNER:  Object to form.  Lacks
14 foundation.
15     You can answer.
16     THE WITNESS:  The assumption there is
17 they all had impurities.  I don't know if they did
18 or not, but there could have been some lot numbers
19 that had no detectable impurities.  I don't know
20 specifically to that level of detail without
21 looking at documentation.
22 BY MR. STANOCH:
23     Q.  Assume that all the given defendant
24 manufacturers of valsartan had some level of
25 nitrosamine in it.  Okay?

Page 297

1      A.  Okay.
2      Q.  And if the lowest documented level of
3  nitrosamine was used to calculate the thresholds,
4  that would be the most conservative assumption?
5      MR. DORNER:  Object to form.  Lacks
6  foundation.
7      You can answer.
8      THE WITNESS:  Yes.  As a hypothetical,
9  yes.
10 BY MR. STANOCH:
11     Q.  Another opinion you have about the
12 medical monitoring class is about actual
13 consumption.  You talk about that in paragraph
14 122; is that right?
15     A.  Yes.  That's correct.  This is an area
16 that the pharmacy industry has focused on for
17 years to try to get patients that -- just because
18 a prescription was dispensed to a patient doesn't
19 mean they take the medication as prescribed.
20     So this illustrates a study for
21 hypertensive patients.  I believe it was about
22 70 percent of the medication that was dispensed
23 was actually consumed in this study.
24     Q.  You're talking about the study
25 referenced in your footnote 219, Chang, et al.?

Page 298

1    A.   Correct.
2    Q.   We'll mark that as the next exhibit,
3  Exhibit 11.
4        (Kosty Exhibit 11 was marked.)
5  BY MR. STANOCH:
6    Q.   Tell me when you can see it, sir.  I'm
7  also sharing it.
8    A.   Okay.
9    Q.   Do you have it in front of you now, sir?
10   A.   I do.
11   Q.   And before we get into it, this is the
12 only study that you cite specifically for your
13 opinion in paragraph 122; right?
14   A.   That's correct.
15   Q.   Again, your opinion there is talking
16 about actual consumption, which I take to mean
17 someone who filled the prescription, if they
18 actually ingested the pill; right?
19   A.   Correct.
20   Q.   You would call it nonadherence if
21 somebody filled the script and then didn't take
22 all of that script; right?
23   A.   Correct.
24   Q.   That's not the same type of nonadherence
25 that the Chang article is talking about, is it?

Page 299

1    A.   I'm going to have to refamiliarize
2  myself with this article, so give me a minute.
3    Q.   While you're doing that, I'll ask a
4  different question, sir.
5        MR. DORNER:  Then I'll move to strike
6  the pending question.
7        MR. STANOCH:  Hold on, Mr. Dorner.
8  Relax.  I don't need a smirk either.
9        MR. DORNER:  Are you withdrawing your
10 question?
11       MR. STANOCH:  Withdraw the prior
12 question.  I will withdraw the prior question,
13 Mr. Dorner.
14       MR. DORNER:  Thanks.
15 BY MR. STANOCH:
16   Q.   Mr. Kosty, have you seen this article
17 before today?
18   A.   Yes.
19   Q.   You read it before?
20   A.   Yes.
21   Q.   When is the last time you read it?
22   A.   I looked at an excerpt of it preparing
23 for this deposition, or a highlighted.  I don't
24 recall offhand.
25   Q.   I'm going to direct your attention to

Page 300

1  the section called Calculation of Nonadherence and
2  Prescription Fill Characteristics.  Do you see
3  that?
4    A.   What page are you on there?
5    Q.   This would be page 137.
6    A.   Okay.
7    Q.   Do you see the article writes there,
8  "Medication nonadherence was calculated using the
9  proportion of days covered algorithm."  Is that
10 right?
11   A.   Yes.
12   Q.   It continues, "Proportion of days
13 covered represents the proportion of days an
14 individual had prescription medication available
15 from the index prescription fill date until their
16 death or the study end date, December 31, 2015."
17      Do you see that?
18   A.   Yes.
19   Q.   Then it continues, "Nonadherence was
20 defined as the proportion of days covered less
21 than 80 percent which aligns with current
22 standards."  Right?
23   A.   Yes.
24   Q.   So this article is talking about
25 nonadherence in terms of days in which a

Page 301

1  prescription was in existence for a particular
2  drug; right?
3    A.   Yes.
4    Q.   This article is not talking about
5  nonadherence in terms of whether a particular
6  patient actually ingested any pill that they got
7  from a dispensed product; right?
8        MR. DORNER:  Object to the
9  characterization of the document.
10       You can answer.
11       THE WITNESS:  Where are you reading that
12 from, counselor?
13 BY MR. STANOCH:
14   Q.   I'm asking.  We established here that
15 nonadherence, as this article defines it, means
16 days in which a prescription was not available to
17 cover those dates; right?
18   A.   Yeah.  Proportion of days covered
19 measures the prescription available to a patient
20 that hasn't been taken.
21   Q.   Right.  So, for instance, if someone got
22 a 30-day prescription, stopped for 30 days and
23 then got another prescription for the next 30
24 days, in that 90-day period, days covered would be
25 60 out of 90; right?

Confidential Information Subject to Protective Order

Page 302

1    A.  Correct.

2    Q.  And nonadherence in that instance for
3  how this articles defines nonadherence would be 30
4  days out of that 90-day period; right?

5    A.  In that example, yes.

6    Q.  So that type of nonadherence is
7  different than what you're talking about in terms
8  of whether someone actually ingests the pills in a
9  prescription bottle they get from a pharmacy;
10  right?

11    A.  Right.  But let's go back to the metric.
12  This metric doesn't measure whether patients have
13  taken that medication or not.  All we know in your
14  example there's a prescription that was refilled
15  twice in the 90-day period.  And for 30 days we're
16  assuming they didn't take that medication, right.
17  But we don't know.  We don't know if they had a
18  supplier medication, that they took those or they
19  didn't take it.

20    So this is the measurement that's used
21  in the industry to calculate nonadherence and
22  determine in this example that the patient was not
23  taking their medication for the 30 days.  In fact,
24  CMS uses a similar metric for the Medicare Part D
25  Star Ratings to measure this rate of adherence.

Page 303

1  So it's a standard measurement in the industry.

2    Q.  In fact, this article assumes, does it
3  not, that a patient took all of the pills for a
4  given prescription that he or she received;
5  correct?

6    MR. DORNER:  Object to the
7  characterization.

8    You can answer if you know.

9    THE WITNESS:  Yes.  That's the only
10  assumption you can make, because no one knows.  No
11  one is at that patient's house watching them
12  whether or not they take the medication or not.
13  So when you're looking at claims data or pharmacy
14  data, those are the things that are implied in
15  these calculations.

16  BY MR. STANOCH:

17    Q.  So again, the Chang article's discussion
18  of nonadherence relates to days during a given
19  period of time where there that was not a
20  prescription available for a drug; right?

21    MR. DORNER:  Object to form.

22    THE WITNESS:  A prescription was
23  available, but the medication was not taken.  So
24  without getting into the specific calculations of
25  percentage of days covered or proportion -- I

Page 304

1  think it's proportion -- but anyway, you have to
2  look at how much was available for that patient to
3  take.  Then you track them longitudinally over
4  time to see how much they actually took based on
5  the claims data.  And then making that use of
6  data, that's how you determine the nonadherence
7  rate like they did here.

8    That's exactly how the industry does it,
9  and those are the determinations made on those.
10  So when Medicare Part D implemented these Star
11  Ratings, all Medicare Part D plans were incented
12  to work with patients to try to get their
13  adherence rates up.  And they got bonuses for
14  improving those metrics.

15    So one easy way to improve the metric is
16  to convert people to mail service, right.  So
17  instead of having to fill 12 prescriptions per
18  year for a maintenance drug, you only need to fill
19  four prescriptions a year for the maintenance
20  drug.  So immediately upon that change, at least
21  for the first quarter, you've increased that
22  patient's compliance rate because they have that
23  90-day supply in their possession.

24    Then you would have to look at when they
25  got their next refill in my mail service example

Page 305

1  to determine if they're taking it and ingesting it
2  as prescribed by the physician.  So, yeah, the
3  claims data is all we have to do these
4  calculations, and this is the industry standard
5  for how to do it.

6  BY MR. STANOCH:

7    Q.  In paragraph 123 you talk about
8  combining data records; is that right?

9    A.  Yes, a consumption record for individual
10  consumers.

11    Q.  You're aware that the retailer pharmacy
12  defendants in this case along with Humana Pharmacy
13  produced data for individual consumers of
14  valsartan prescriptions; right?

15    MR. DORNER:  Object to form.

16    You can answer.

17    THE WITNESS:  Yes.

18  BY MR. STANOCH:

19    Q.  You performed no analysis, did you, to
20  test whether pharmacy data could not be combined
21  to track a patient's drug usage across multiple
22  pharmacies, did you?

23    A.  I did not.  That was not part of my
24  assignment.

25    Q.  And because you never analyzed that, you

Page 306

1 cannot say and do not offer an opinion how long it
2 would take to construct such a record; correct?
3     A.  I did not offer that opinion, no.
4     Q.  In fact, you never even looked at all
5 the retail pharmacy defendants' data that they
6 produced in this case, did you?
7         MR. DORNER:  Object to form.
8         You can answer if you know.
9         THE WITNESS:  I did not.
10 BY MR. STANOCH:
11    Q.  In your discussion of the medical
12 monitoring class here, you're also presuming that
13 it's going to be necessary to combine pharmacy
14 data in the first place, aren't you?
15    A.  That's one of the assumptions, yes.  So
16 if you have a patient that goes to Walgreens and
17 then transfers their prescriptions to CVS and then
18 eventually to Rite-Aid, you would have to track
19 those patients across those pharmacies to identify
20 what their cumulative lifetime consumption of
21 those products were.
22        The challenge is how do you track those
23 patients across the different pharmacy datasets.
24 As I indicate in my report, there's no universal
25 patient identifier that allows one to track those

Page 307

1 patients.  So each pharmacy system assigns a
2 unique patient identification number that enables
3 that chain to track the patient.  That number is
4 unique to the chain and it doesn't vary -- it does
5 vary between chains.
6        So when you say I'll need to track that
7 patient, well, if they've only gone to Walgreens,
8 you can track that patient.  But if they switch
9 pharmacies, maybe they went to an independent
10 pharmacy, then that information would not be even
11 available today based on what data was presented.
12        So, no, you can't track patients across
13 pharmacies in the data to determine the lifetime
14 cumulative threshold.
15    Q.  Because you did not look at all at least
16 the retail pharmacies' data they produced in this
17 case, you have no opinion on how frequently it may
18 be that patients switched between pharmacies?
19    A.  I didn't do a study of this data, but
20 based on my experience working with pharmacies and
21 pharmacists, it's gotten to be even more frequent
22 now to change pharmacies because people -- for
23 example, if you have after high deductible health
24 plan and your pharmacy benefit -- you have a
25 $5,000 deductible, that patient knows for the most

Page 308

1 part unless I'm on a specialty medication, I'm not
2 going to meet my deductible.
3        So they, in fact, have adopted cash
4 customer behaviors in the marketplace to shop for
5 the lowest prescription.  I'm sure if you've
6 watched any TV or listened to the radio or
7 Pandora, GoodRx is advertising everywhere, right.
8 So we can save you money.  The GoodRx app requires
9 you to go to the pharmacy of their choice that
10 they've identified as having a lower price.
11        So, yes, there's a tremendous amount of
12 pharmacy shopping.  Quite frankly, from a clinical
13 perspective, it's detrimental to the patient
14 because no one pharmacy has all their records.
15    Q.  You don't offer any opinion in your
16 report, Mr. Kosty, as to how many patients would
17 satisfy the lifetime cumulative exposure
18 thresholds based solely on a single pharmacy's
19 records, do you?
20    A.  No.  That was not part of my assignment.
21    Q.  And because you didn't even look at all
22 the retail pharmacies' data that they produced in
23 this case, you can't tell us how hard or easy it
24 would be to combine that data, can you?
25    A.  No.  I haven't looked at those specific

Page 309

1 datasets.
2    Q.  And you don't offer that opinion in your
3 report, do you?
4    A.  I don't.
5    Q.  On this topic, you mentioned date of
6 birth.  Let's say a patient goes to one pharmacy
7 and they record their date of birth, the year,
8 just the last two digits, say birthday January 15,
9 '90.  Okay?  Are you with me?
10    A.  You broke up a little bit.  January 15,
11 1990?
12    Q.  Correct.  But their data only looked at
13 the last two digits.  So it would be 011590.  Are
14 you with me?
15    A.  Okay.
16    Q.  Now, let's say that patient goes to
17 another pharmacy, and they have a four digit for
18 the year, right.  So the patient's birth date
19 there is 01151990.  Okay?
20    A.  Okay.
21    Q.  Is it your position that it is not
22 administratively feasible to identify that
23 patient's prescriptions in those two pharmacies
24 because some manual review would be necessary to
25 reconcile the year values?

Page 310

1    MR. DORNER: Object to form. Incomplete
2 hypothetical. Calls for a legal conclusion.
3        You can answer.
4    THE WITNESS: Yeah, the pharmacies
5 typically do have four-digit year numbers, so that
6 wouldn't be an issue. But if not, you would have
7 to assume, and especially older people, someone is
8 over 85 years old or 80 years old, maybe older
9 than that. You would have to make some
10 assumptions. But you could get a good first pass
11 and then look at exceptions.
12 BY MR. STANOCH:
13    Q. And that's part of sort of the normal
14 data analysis in the field in which you work;
15 right?
16    A. Yeah. It's part of the manual review
17 required.
18    Q. It's your opinion though that that
19 manual review, to reconcile a date of '90 versus
20 1990, would render identification of class members
21 not administratively feasible?
22    MR. DORNER: Object to form. Calls for
23 a legal conclusion. Incomplete hypothetical.
24    But you can answer.
25    THE WITNESS: It mischaracterizes my

Page 311

1 report. The date of birth is one example that
2 you're focused on here. The others are the
3 patient's name, the patient address. Those are
4 the components that are confounding in trying to
5 match up the patient information as well as the
6 identifier within that specific pharmacy system.
7 BY MR. STANOCH:
8    Q. I think we touched on this before, but
9 we'll be clear. You don't offer any opinions in
10 your report, do you, about how much, quote, manual
11 effort would be required to reconcile data in
12 different sources; correct?
13    MR. DORNER: Object to form. Asked and
14 answered.
15    THE WITNESS: That was not my
16 assignment, no.
17 BY MR. STANOCH:
18    Q. And simply because a human being may
19 have to reconcile two sets of data, does that
20 render identification of class members not
21 administratively feasible?
22    MR. DORNER: Object to form. Calls for
23 a legal conclusion.
24    THE WITNESS: Yeah, you've
25 mischaracterized it. You're talking about two

Page 312

1 data sources. What if you have a hundred or
2 hundreds of data sources that have to be combined.
3 So you multiple that exercise by 50 or a
4 hundredfold. And then it does become
5 administratively not feasible to do this.
6 BY MR. STANOCH:
7    Q. You never did that analysis and don't
8 offer an opinion, do you, Mr. Kosty, as to at what
9 point would that analysis become administratively
10 feasible? Do you?
11    MR. DORNER: Same objection.
12    You can answer.
13    THE WITNESS: I did not offer that
14 analysis. Neither did Ms. Craft.
15 BY MR. STANOCH:
16    Q. You talk in paragraphs 137, 139 about
17 the class exclusion for defendants' employees; is
18 that right?
19    A. Yes.
20    Q. And with respect to that exclusion, you
21 list it there in paragraph 137; right? First
22 sentence.
23    A. Yes.
24    Q. And you're quoting Ms. Craft in part
25 where it says, "Defendants and affiliated entities

Page 313

1 and their employees, officers, directors and
2 agents"; right?
3    A. Yes.
4    Q. And the only portion of that exclusion
5 you're focused on is defendants' employees as you
6 state; correct?
7    A. Correct.
8    Q. You're not offering any opinions on
9 whether it would be challenging or not
10 administratively feasible to identify defendants'
11 affiliate entities; right?
12    MR. DORNER: Object to form. Legal
13 conclusion.
14    You can answer.
15    THE WITNESS: Well, it depends on how
16 you define affiliated entities. So in the example
17 in the case today, we have Express Scripts and
18 Cigna are owned by the same entity. I would
19 consider both sets of patients part, or employees,
20 of that entity.
21 BY MR. STANOCH:
22    Q. In terms of -- I'm sorry. Are you done?
23    A. Yeah. I'm just saying a lot of these
24 companies have -- you might say, well, it's
25 Amerisource Bergen, but they might have 30 or 50

Confidential Information Subject to Protective Order

Page 314

1  subsidiaries that they own and manage under that
2  corporate umbrella.
3       So when I state employees, it would
4  include not only ABC corporate, but all their
5  affiliates and subsidiaries to evaluate.
6       Q.  You're not offering any opinion on
7  whether it would be challenging or not to identify
8  a defendant's affiliate entities, are you?
9       A.  No.
10      Q.  You're focused purely on human beings,
11 not entities; right?
12      A.  Correct.
13      Q.  Employees; right?
14      A.  Employees.
15      MR. DORNER:  Object to form.
16      You can answer.
17 BY MR. STANOCH:
18      Q.  I don't think you are, but let's make it
19 clear.  You're not opining that the defendants in
20 this case do not maintain records of who their
21 employees are, are you?
22      A.  No, I'm not.
23      Q.  Did you ask any defendant in this case
24 whether they keep records of their employees?
25      A.  I did not.

Page 315

1       Q.  Did anyone provide you any information
2  suggesting any defendant in this case did not keep
3  required records for their employees?
4       A.  I did not ask for that information nor
5  ask the question, no.
6       Q.  And it's certainly not referenced
7  anywhere in your report any such information;
8  right?
9       A.  Correct.
10      Q.  You did not look at any defendants'
11 employment records to determine how many employees
12 they may have during the class period; right?
13      A.  No.  We looked at publicly-available
14 information that's summarized in Table 3.
15      Q.  But you didn't look at the defendants'
16 employment records such as W-2s or anything else,
17 did you?
18      A.  That was not part of my assignment, no.
19      Q.  And you're not opining that any
20 defendant affirmatively deleted records that would
21 show their employees during the class period, are
22 you?
23      MR. DORNER:  Object to form.  Calls for
24 speculation.
25      You can answer.

Page 316

1       THE WITNESS:  I don't know.  I would not
2  think so, but I don't know.
3  BY MR. STANOCH:
4       Q.  You're not offering that opinion here;
5  right?
6       A.  I'm not, no.
7       Q.  And you're not offering any opinion on
8  how frequently this same exclusion appears in
9  other class cases, are you?
10      A.  No.
11      Q.  And the numbers of employees you list in
12 your Table 3, you agree those are numbers you
13 pulled from publicly-available information?
14      A.  Yes.
15      Q.  And those are numbers concerning the
16 entire United States; right?
17      A.  It would be numbers of employees
18 employed by these entities.  I have no idea.
19 Assuming if they're global, maybe it's included.
20 I don't know.
21      Q.  You understand that the class
22 definitions here encompass less than all 50 states
23 of the country; right?
24      A.  Yes.
25      Q.  Did you do any analysis whatsoever to

Page 317

1  try to identify how many employees each defendant
2  had in a given state during the class period?
3       A.  No.  That was not part of my assignment.
4       Q.  Did you do any analysis of how many
5  defendants' employees might have filled
6  prescriptions for at-issue valsartan during the
7  class period?
8       A.  No.  That was not part of my assignment.
9       Q.  Are you offering any opinion on how much
10 effort it would take any defendant to produce its
11 own employee records to identify its employees
12 during the class period?
13      MR. DORNER:  Object to form.
14      You can answer.
15      THE WITNESS:  No.
16 BY MR. STANOCH:
17      Q.  Let's flip back a few pages to around
18 paragraphs 128 to 136.  Tell me when you're there,
19 sir.
20      MR. DORNER:  Dave, we're at about an
21 hour.  So I don't know what a good stopping point
22 is.
23      THE WITNESS:  Can we take a quick
24 five-minute break?
25      MR. DORNER:  Mr. Kosty has asked for a

Page 318

1 quick five.
2        MR. STANOCH:  Fine.  We can go off the
3 record.  We'll come back at 5:25.
4        THE VIDEOGRAPHER:  Off the record at
5 5:18.
6        (Recess from 5:18 p.m. to 5:28 p.m.)
7        THE VIDEOGRAPHER:  Back on the record at
8 5:28.
9        MR. DORNER:  We're back on.
10        MR. STANOCH:  Thank you.
11 BY MR. STANOCH:
12     Q.  Welcome back, Mr. Kosty.  Other than
13 your counsel, did you communicate with anyone else
14 during the break?
15     A.  No.
16     Q.  Did you look at any documents during the
17 break?
18     A.  No.
19     Q.  Let's turn to paragraphs 128 to 136 of
20 your report, please.  Tell me when you're there.
21     A.  I'm there.
22     Q.  Wonderful.  This is where you talk about
23 exclusion of state government entities from the
24 TPP class; correct?
25     A.  Yes.

Page 319

1     Q.  And you provide certain examples in this
2 section; correct?
3     A.  Yes.
4     Q.  One of them in paragraph 130 is that of
5 the New York State Nurses Association and the
6 Patrolmen's Benevolent Association; right?
7     A.  Correct.
8     Q.  And you write at the end Dr. Conti
9 excluded New York State Nurses Association; right?
10     A.  Yes.
11     Q.  You'd agree that exclusion would be
12 correct though because that would be a state
13 government entity; right?
14        MR. DORNER:  Objection.  Lacks
15 foundation.
16        You can answer.
17        THE WITNESS:  Yes.  They should be
18 excluded.
19 BY MR. STANOCH:
20     Q.  And you say she includes Patrolmen's
21 Benevolent Association of New York; right?
22     A.  Yes.
23     Q.  And it's your contention that
24 Patrolmen's Benevolent Association of New York
25 should have been excluded as a state government

Page 320

1 entity?
2     A.  Yes.
3     Q.  You're aware that the Patrolmen's
4 Benevolent Association of New York is a city level
5 organization?
6        MR. DORNER:  Object to form.
7 Characterization.
8        THE WITNESS:  Yes.
9 BY MR. STANOCH:
10     Q.  You said "yes"?
11     A.  Yes.  I looked at it one time.  I
12 couldn't tell you what the city was, but, yes, I
13 looked at it.
14     Q.  It's probably New York City; is that
15 fair?
16        MR. DORNER:  Same objection.
17        You can answer.
18        THE WITNESS:  Yes.  I would expect it,
19 yes.
20 BY MR. STANOCH:
21     Q.  And as a city, state government entity,
22 it's proper, is it not, to include it as Dr. Conti
23 did; correct?
24        MR. DORNER:  Object to form.  Calls for
25 a legal conclusion.

Page 321

1        You can answer.
2        THE WITNESS:  As long as it's a
3 self-funded plan, yes.
4 BY MR. STANOCH:
5     Q.  Well, the point here is about exclusion
6 of state government entities; right?
7     A.  Yes.
8     Q.  And city and county governments were not
9 part of that; right?
10     A.  Well, it depends how you define state
11 government entities.
12     Q.  Well, it's defined in the class
13 definition for the TPPs.  You remember that;
14 right?
15     A.  Okay.
16     Q.  I'm sorry.  What was the answer?
17     A.  Yes.
18     Q.  So if the Patrolmen's Benevolent
19 Association of New York is a city government
20 entity, then it's proper to include it as
21 Dr. Conti did; correct?
22        MR. DORNER:  Repeat my objections.
23        THE WITNESS:  If it's a city-based
24 organization.
25

Confidential Information Subject to Protective Order

Page 322

BY MR. STANOCH:

1   BY MR. STANOCH:
2       Q.   You didn't offer any analysis that you
3   did here to confirm whether Patrolmen's Benevolent
4   Association of New York is a city government
5   entity that should be included; right?
6       A.   I did not.
7       Q.   If you jump down to paragraph 132, you
8   talk about Montana; correct?
9       A.   Yes.
10      Q.   I think you say that Montana considers
11  the Montana University System employees to be
12  state employees; right?
13      A.   Yes.
14      Q.   And you cite an article from a local
15  Montana paper.
16      A.   What footnote are you referring to?
17      Q.   I'm looking at footnote 244 in paragraph
18  133, sir.
19      A.   Yes.  It is from a Montana paper.
20      Q.   That article doesn't say anything about
21  the pharmacy benefit plan, does it.
22      A.   I would have to refer to that article to
23  answer your question.
24      Q.   I'll pull it up.  Did you look at that
25  article prior to today?

Page 323

1       A.   Yes.
2            MR. DORNER:  Object to form.
3            You can answer.
4            THE WITNESS:  Yes.
5            (Kosty Exhibit 12 was marked.)
6   BY MR. STANOCH:
7       Q.   Here's Exhibit 12.  Let me know when you
8   can access it.  I'm sharing my screen as well.  Do
9   you see it?
10      A.   I'm bringing it up.
11      Q.   Do you have it?
12      A.   I do have it up.  I'm reading through
13  it.  Okay.
14      Q.   This article is talking about the
15  salaries of certain folks; right?
16      A.   At the start of it it does, yes.
17      Q.   It doesn't talk anything about the
18  pharmacy benefit plan for any particular
19  employees, does it?  Sir?
20      A.   I'm sorry.  I was looking through it.  I
21  do not see that reference, no.
22      Q.   There's no discussion about whether the
23  Montana University System's prescription drug plan
24  is self-funded or not, is there?
25      A.   There is not.

Page 324

1       Q.   Did you think to go to anything publicly
2   available from the State of Montana to confirm
3   your assertion that Montana University System is
4   not self-funded?
5       A.   I did not.
6       Q.   I'm going to mark the next exhibit,
7   Exhibit 13.
8            (Kosty Exhibit 13 was marked.)
9   BY MR. STANOCH:
10      Q.   The title page, it reads Montana
11  University System Summary Plan Description
12  Effective July 1, 2021.  Do you see that?
13      A.   I do.
14      Q.   Have you seen this document before?
15      A.   No.
16      Q.   In the plan funding section, it says,
17  "The Montana University System medical plan,
18  prescription drug plan, dental plans and the
19  vision hardware plans are self-insured,
20  self-funded."
21           Do you see that?
22           MR. DORNER:  I'll object to form.  This
23  is a document from 2021.  It doesn't cover the
24  claim period.  I'll further object that this is a
25  112-page document that Mr. Kosty has never before

Page 325

1   seen.  With that noted --
2            MR. STANOCH:  Noted.
3   BY MR. STANOCH:
4       Q.   Do you see that you language, Mr. Kosty?
5       A.   Yes.
6       Q.   That would suggest, would it not, that
7   the prescription drug plan for Montana University
8   System employees is self-funded; right?
9            MR. DORNER:  Same objections.
10           THE WITNESS:  Yeah, for benefits
11  effective July 1, 2021, yes.
12  BY MR. STANOCH:
13      Q.   Right.  You didn't go ahead and conduct
14  any analysis to see how easily one could look up
15  your assertion which you cited the newspaper
16  article for that the Montana University System
17  would not be self-funded?
18           MR. DORNER:  Objection.  Unintelligible
19  question.
20           THE WITNESS:  What I would do is go back
21  through the class period from 2012 forward to look
22  at SPD if it was available to make that
23  determination.
24  BY MR. STANOCH:
25      Q.   And you didn't do that, did you?

Page 326

1    A.  I did not, no.

2    Q.  And are you aware that Montana maintains

3  a publicly-available list of self-insured plans

4  that operate within the state?

5    A.  No.

6    Q.  You never conducted any analysis of

7  whether Montana or any other state maintains

8  publicly-available information about self-insured

9  plans that operate within their borders, did you?

10    A.  No.  That was not part of my assignment.

11    Q.  So you can't really say one way or the

12  other how burdensome it would be to look up

13  publicly-available sources to determine whether

14  certain plans are self-funded or not from state

15  sources; right?

16    A.  Well, this is one example of a paper

17  document that you would have to obtain and review.  If

18  you had to do that same thing for every

19  state-funded employee group, then that could be

20  burdensome, if you had to do that for all 50

21  states, without looking at those self-funded

22  websites and whether you could download

23  information that was usable.  You would have to go

24  through a manual review assuming that's not

25  downloadable to do that analysis.

Page 327

1       But I have not looked at that and would

2  need to do that to opine further.

3  BY MR. STANOCH:

4    Q.  You did not contact any state to verify

5  any information about the status of their plans as

6  self-funded or not, did you?

7    A.  No.  That was not my assignment.

8    Q.  So you can't quantify for us how much

9  time it would take to do that; correct?

10    A.  That was not my assignment.  And in

11  Ms. Craft's report, she did not undertake a

12  similar exercise to determine how burdensome it

13  would be or not, no.

14    Q.  That's not my question, sir.  I'm asking

15  what you did.

16       Am I correct that you can't quantify for

17  us how much time it would take to contact each

18  state to determine the status if the plan is

19  self-funded or not?

20       MR. DORNER:  Objection.  Asked and

21  answered.

22       THE WITNESS:  I did not undertake that

23  analysis, no.

24  BY MR. STANOCH:

25    Q.  So you can't quantify for us how much

Page 328

1  time it would take to contact each state to

2  determine the status if the plan is self-funded or

3  not; right?

4       MR. DORNER:  Objection for the third

5  time.  Asked and answered.

6       THE WITNESS:  No.  That was not part of

7  my assignment.

8  BY MR. STANOCH:

9    Q.  Sitting here today, could you quantify

10  for me how much time it would take to contact each

11  state to determine the status if the plan is

12  self-funded or not?

13    A.  That was not part of my assignment.  It

14  would probably take a tremendous effort to go

15  through all 50 states and analyze that.

16  Plaintiffs have not done that to indicate their

17  analysis of how burdensome this is in order to

18  contact 50 states.

19       I know from my work in the pharmacy

20  industry, working with -- trying to get ahold of

21  people at state is very difficult.  But I have not

22  undertaken that analysis, no.

23    Q.  You're offering no opinion in this case,

24  are you, Mr. Kosty, about how much burden would

25  become too much burden for purposes of verifying

Page 329

1  which plans states consider self-funded or not;

2  correct?

3       MR. DORNER:  Object to form.  Vague.  To

4  the extent it calls for a legal conclusion also.

5       You can answer.

6       THE WITNESS:  No.  I did not undertake

7  that exercise.

8  BY MR. STANOCH:

9    Q.  Would an hour be burdensome?

10       MR. HONIK:  Same objections.

11       THE WITNESS:  No.  For all 50 states?

12  If you can do that in an hour, no, that would not

13  be burdensome.

14  BY MR. STANOCH:

15    Q.  Would five hours be burdensome?

16       MR. DORNER:  Same objection.

17       THE WITNESS:  No.  Five hours would not

18  be burdensome.

19  BY MR. STANOCH:

20    Q.  Would 15 hours be burdensome?

21       MR. DORNER:  Same objections.

22       THE WITNESS:  No.

23  BY MR. STANOCH:

24    Q.  Would 25 hours be burdensome?

25    A.  No, but no one knows sitting here today

Page 330

1  how long it would take.
2      Q.  You can't tell me at what point the
3  number of hours it would take to do this exercise
4  becomes burdensome, can you?
5      MR. DORNER:  Same objections as the ones
6  I stated two questions ago.
7      THE WITNESS:  That was not my
8  assignment, no.
9  BY MR. STANOCH:
10     Q.  Put that aside, sir.  Stand by.  Go to
11 paragraph 115, sir.
12     A.  One one five, is that it?
13     Q.  Yes, sir.
14     A.  Okay.
15     Q.  Here you're talking about Ms. Craft and
16 Dr. Conti's use of the Xponent data; right?
17     A.  Yes.
18     Q.  And you say that Dr. Conti included
19 certain payors in her damages calculations; right?
20     A.  Yes.
21     Q.  And that Ms. Craft excluded for purposes
22 of her counting TPPs some of those same payors in
23 the IQVIA data; right?
24     A.  Yes.
25     Q.  The data that both Ms. Craft and

Page 331

1  Dr. Conti were looking at, they show that some
2  entity paid something for valsartan; right?
3      MR. DORNER:  Object to form.
4      You can answer.
5      THE WITNESS:  Yeah, third party
6  unspecified, yes, there is data that says someone
7  paid for it.  We just don't know who paid for it.
8  BY MR. STANOCH:
9      Q.  Right.  So for Ms. Craft's purpose of
10 identifying a particular TPP, it's appropriate to
11 not count those folks because you don't know who
12 they are particularly; right?
13     A.  Right.  I would not have counted them in
14 my analysis for either Craft or Conti.
15     Q.  For Dr. Conti though, the fact that
16 someone paid for the valsartan, that's properly
17 included in the damages estimate for the class;
18 correct?
19     MR. DORNER:  Object to form.  Outside
20 the scope.  Calls for a legal conclusion.
21     THE WITNESS:  I would disagree with
22 that.  IQVIA that you said earlier is the gold
23 standard of pharmacy data doesn't know who these
24 payors are.  So I don't know how Ms. Conti or
25 Dr. Conti can identify who those payors are.

Page 332

1  BY MR. STANOCH:
2      Q.  We're not talking about who, Mr. Kosty.
3  We're talking about the amounts paid for valsartan
4  drugs; right?
5      A.  Well, if you use that logic, then you
6  would not have excluded anybody in the IQVIA data,
7  right.
8      Q.  We're indicating here that Dr. Conti
9  included payments by third-party entities
10 reflected in the third party unspec and all other
11 third-party fields; right?
12     A.  Yes.
13     Q.  And those fields indicate that there
14 were payors who paid for at-issue valsartan during
15 the class period; right?
16     MR. DORNER:  Object to form.
17     You can answer.
18     THE WITNESS:  Based on IQVIA's
19 definition, they don't know who paid for them.
20 The payment was made, but they don't know who.
21 BY MR. STANOCH:
22     Q.  Payment was paid; correct?
23     A.  Payment was made by someone.
24     Q.  Exactly.  And, therefore, the fact that
25 there was payment for at-issue valsartan is

Page 333

1  pertinent to the total amount of damages paid
2  regardless of identity during the class period;
3  correct?
4      MR. DORNER:  Object to form.  Lacks
5  foundation.  Outside the scope.  Calls for a legal
6  conclusion.
7      THE WITNESS:  If you would take that
8  tact, I don't know how you would apply class
9  exclusions to that data.
10 BY MR. STANOCH:
11     Q.  We're not talking about exclusions here.
12 You don't talk about that, do you, as to
13 Dr. Conti?
14     A.  No.
15     Q.  And I think we talked about this this
16 morning.  You didn't perform any econometric
17 analysis of the IQVIA data, did you?
18     A.  No.
19     Q.  I'm going to mark another exhibit, sir.
20 Stand by.
21     (Kosty Exhibit 14 was marked.)
22 BY MR. STANOCH:
23     Q.  Sir, Exhibit 14 is the collection of
24 invoices for your and AG's work in this case.
25 Tell me when you have that in front of you.

Confidential Information Subject to Protective Order

Page 334

1    A.  Yes, I have it.
2    Q.  Are there any other invoices that have
3  been issued for your and AG's work in this case
4  besides those reflected here?
5    A.  I don't know.  I'm not part of the AG
6  invoicing process.
7    Q.  As far as you know, all invoices for
8  your and AG's work in this case, have they been
9  produced?
10   A.  Yes.
11   Q.  And I want to ask you a couple of
12  questions here.  Just look at that first page, for
13  instance.  Do you see there's a current billing
14  section break-out?
15   A.  Yes.
16   Q.  It lists AG professional services at
17  59,000 and change.  Do you see that?
18   A.  Yes.
19   Q.  And it lists expert services at $8,125;
20  right?
21   A.  Yes.
22   Q.  Is it correct that expert services
23  refers to the amounts billed for your time and AG
24  professional services reflects the amounts billed
25  for all of the other Analysis Group folks who

Page 335

1  worked with you on the report?
2    A.  Yes.  That's my understanding.
3    Q.  And why is Aurobindo Pharma, Ltd.'s
4  share, 16.67 percent, broken out here in this
5  invoice?
6      MR. DORNER:  Object to form.  This was
7  communicated in our document responses.  And,
8  furthermore, calls for speculation.
9      THE WITNESS:  I don't know the
10  arrangement between the manufacturers, defense
11  counsel in terms of payments.  All I see is what
12  the portion is listed on this invoice.
13  BY MR. STANOCH:
14   Q.  Do you know why no other defendant is
15  listed, broken out as Aurobindo is?
16     MR. DORNER:  Object to form.  Again, I'd
17  refer counsel to our document responses which
18  explain this.  Lacks foundation.  Calls for
19  speculation.
20     MR. STANOCH:  I'm trying to establish
21  foundation, Mr. Dorner, with the witness.
22  BY MR. STANOCH:
23   Q.  Please answer the question.
24   A.  It would be my expectation that each
25  defendant would be invoiced separately based upon

Page 336

1  whatever agreed upon share of the expenses were
2  made.
3    Q.  Are there other invoices that break out
4  other defendants' percentages out there?
5      MR. DORNER:  Object to form.  This is
6  summed up in our document responses, which are
7  already available.  Calls for speculation.
8      THE WITNESS:  I don't know.  I don't see
9  AG's invoices besides the one that have been
10  produced and shown to me here.
11  BY MR. STANOCH:
12   Q.  Did you see invoices before they're
13  issued by AG to one or more defendants in this
14  case?
15   A.  No.
16   Q.  Going back to AG professional services
17  and expert services, would it be correct then that
18  the total amount billed by you and AG reflected in
19  this invoice would be the sum of the 59,000 and
20  change and 8,125?
21   A.  Yes.  That's my reading of this invoice.
22   Q.  Stand by.  I'm going to mark the next
23  exhibit, Exhibit 15.
24     (Kosty Exhibit 15 was marked.)
25

Page 337

1  BY MR. STANOCH:
2    Q.  Mr. Kosty, can you see this?
3    A.  Yes.
4    Q.  And I quickly tried to put this
5  together, and there is a typo for December there.
6  But we took the amounts for the Analysis Group
7  listed in the invoices, the amounts under expert
8  services, and we put them here.  Do you see that?
9    A.  Yes.
10   Q.  Again, so expert services means the
11  amounts billed for your time and the amounts
12  listed for Analysis Group is for everybody else;
13  correct?
14   A.  Yes.
15   Q.  So it would be correct, would it not,
16  that the total amounts billed for your work on a
17  monthly basis then is the sum for each month on
18  the invoices; right?
19   A.  Yes, based on the one we just looked at.
20   Q.  So the total amount that you and
21  Analysis Group combined have billed through your
22  work thus far in this case, assuming the numbers
23  are transposed accurately from the invoices, is
24  $644,540.45?
25     MR. DORNER:  Just objection, "assuming

Confidential Information Subject to Protective Order

Page 338

1  that."

2       You can answer.

3       THE WITNESS:  Yes.

4  BY MR. STANOCH:

5       Q.  Have you done any other work in this

6  case that's been invoiced that's not reflected in

7  the invoices produced or the chart that's in front

8  of you?

9       A.  No, because February's invoice would not

10 go out until march.

11      Q.  Approximately how much time do you think

12 you've billed to this matter for the month of

13 February thus far?

14      A.  I don't know.  I'd have to run a report

15 off of our time tracking system.

16      Q.  You don't know how much time you spent

17 preparing for today's deposition?

18      A.  I didn't say that.  I said I don't know

19 the total hours spent this month on this case.

20      Q.  About how much time do you think you

21 spent in total preparing for today's deposition?

22      A.  Well, this week I met with counsel and I

23 reviewed my own report to go through in

24 preparation for today.  So probably 16 hours this

25 week plus today's time.

Page 339

1       Q.  How much time approximately do you think

2  the Analysis Group has spent supporting you to

3  this point in February?

4       MR. DORNER:  Object to form.  Calls for

5  speculation.

6       THE WITNESS:  I don't know.  I don't

7  have access to their time tracking system.

8  BY MR. STANOCH:

9       Q.  How many times have you communicated

10 with Analysis Group personnel in connection with

11 this litigation in the month of February 2022?

12      A.  I don't know.

13      Q.  You don't know?

14      A.  I don't know, no.

15      MR. STANOCH:  I'm going to -- for the

16 record, I'll correct the December typo and change

17 the period ending to January 31, 2021 to 2022 in

18 the copy of this, which is part of the record.

19 I'll take care of this later.

20      I believe I'm going to hand the mic.

21 back to Mr. Honik at this point.

22      RE-EXAMINATION

23 BY MR. HONIK:

24      Q.  Mr. Kosty, we're in the home stretch.

25      MR. DORNER:  We object.  We object.

Page 340

1  Hold on.  Hold on.  We object to the constant back

2  and forth from attorney to attorney, particularly

3  going back to Mr. Honik when he's already had an

4  opportunity to ask his questions.  This is

5  contrary to the court's directive of how inquiry

6  should go.  Two attorneys I think is fine, but

7  going to back and forth like a tennis match is

8  unacceptable.  So note our objection to this

9  practice.

10      MR. HONIK:  I have no idea what you're

11 talking about.  Mr. Goldberg who started the

12 examination of Dr. Conti a full day later resumed.

13 So your objection is ridiculous.

14 BY MR. HONIK:

15      Q.  Mr. Kosty, there's a few more minutes

16 that I need with you to cover one area that we had

17 yet to cover.  You're familiar with the American

18 Society of Health System Pharmacists?

19      A.  Yes.

20      Q.  Have you ever been a member of that

21 organization?

22      A.  No.  Our consulting practice is more

23 ambulatory focused and not hospital.

24      Q.  Nonetheless, you appreciate that they

25 prepare guidelines that are relied upon

Page 341

1  professionally by P&T committees routinely?

2       MR. DORNER:  Object to form.  Lacks

3  foundation.  Calls for speculation.

4       THE WITNESS:  Yeah, they're one of many

5  organizations that provide guidelines to P&T

6  committees.

7  BY MR. STANOCH:

8       Q.  But my question you to is:  Do you

9  recognize them and their guidelines as

10 authoritative and reliable?

11      A.  For the hospital market.

12      Q.  I'm sorry.  Only for the hospital

13 market?

14      A.  Right, because an ambulatory entity, a

15 Medicare Part D plan is not looking at hospital or

16 health system-based formularies or P&T committee

17 recommendations.

18      Q.  Let me unpack that a little bit.  Is it

19 your testimony that some of their guidelines are

20 authoritative and reliable and others are not?

21      MR. DORNER:  Object to the

22 characterization.

23      THE WITNESS:  You mischaracterized my

24 statement.  My statement was the P&T committees in

25 the ambulatory market, Med D, commercial ASHP

Confidential Information Subject to Protective Order

Page 342

1  guidelines may be reviewed, but is not considered
2  authoritative. It's a guideline, as I mentioned.
3       I mentioned in my report AMCP, the
4  Academy of Managed Care Pharmacy, also has
5  guidelines that are more targeted to the
6  ambulatory market, the managed care market, that
7  have P&T committees that work with prescription
8  drug programs.
9       When I look at ASHP, my process is that
10 they're focused on the hospital market.
11 BY MR. HONIK:
12   Q.  And do you know whether or not their
13 guidelines speak to health systems?
14   A.  I haven't reviewed those guidelines for
15 this case.
16   Q.  You haven't reviewed them?
17   A.  Not for this, no.
18   Q.  Is that right?
19       MR. HONIK:  Can we bring up, Dave, the
20 ASHP guideline that I sent you.
21       MR. STANOCH:  Stand by.
22       (Kosty Exhibit 16 was marked.)
23 BY MR. HONIK:
24   Q.  Mr. Kosty, let me direct your attention
25 to what we're now going to mark Exhibit 16. As

Page 343

1  you can see, it's an ASHP report, and specifically
2  it's Guidelines on the P&T Committee and the
3  Formulary System. Do you see that?
4    A.  Yes.
5    Q.  Have you seen this before, or aren't you
6  sure?
7    A.  I'm trying to increase the size of it.
8    Q.  For the record, this is Volume 78,
9  Number 10, May 15, 2021. Do you see that?
10       MR. DORNER:  I think the witness is
11 still trying to get the document on his system in
12 the public folder, Mr. Honik.
13       THE WITNESS:  Now it came up.
14 BY MR. STANOCH:
15   Q.  The question is:  Have you seen this
16 before, or aren't you sure?
17   A.  I'm not sure. If I have, I don't recall
18 right offhand.
19   Q.  So sitting here today under oath, you're
20 not sure and you don't recall; right?
21   A.  That's what I just said, yes.
22   Q.  Okay. Do you see where it says Purpose,
23 the purpose of the guideline, lower left?
24   A.  Yes.
25   Q.  It reads, "These guidelines outline

Page 344

1  important considerations and recommend processes
2  for formulary system management within the context
3  of a hospital or health system."
4        Did I read that right?
5    A.  Yes.
6    Q.  A little further down in that paragraph
7  it says, "These guidelines also provide assistance
8  to pharmacists in the organization and operation
9  of the pharmacy and therapeutics (P&T) committee
10 or equivalent body..."
11       Did I read that correct?
12   A.  You did.
13       MR. DORNER:  Objection. The whole
14 sentence wasn't read. I also object to asking
15 questions about a document -- Mr. Honik, please.
16 I also object to use of a document and asking
17 questions when the witness hadn't had a full
18 opportunity to review --
19       MR. HONIK:  Let me ask you a question.
20 Why do you object to the use of this document?
21       MR. DORNER:  I didn't object to the use
22 of this document. I object to the use in asking
23 questions before Mr. Kosty has opportunity to
24 review it in full. He's just testified that he
25 may not have ever seen this before, and he's being

Page 345

1  presented with it at the end of a long day.
2        MR. HONIK:  Uh-huh. His testimony is he
3  hasn't seen this, right?
4  BY MR. HONIK:
5    Q.  Is that your testimony, Mr. Kosty?
6    A.  That was not my testimony.
7        MR. DORNER:  Objection. Asked and
8  answered.
9        THE WITNESS:  I don't recall seeing
10 this. I may have.
11 BY MR. HONIK:
12   Q.  Well, you agree that the portion that I
13 read to you quickly, because it is the end of the
14 day, which sets out the purpose of this guideline
15 includes not only hospitals, but health systems;
16 right?
17   A.  Yes, within the context of a hospital or
18 health system.
19   Q.  Or health system. So it refers to P&T
20 committees or their equivalent bodies; correct?
21       MR. DORNER:  Object to the
22 characterization.
23       THE WITNESS:  Within a hospital or
24 health system.
25

Page 346

1 BY MR. HONIK:
2    Q.  It's not limited to hospitals, is it?
3    A.  That's what the context says.  The
4 purpose of the document, management within the
5 context of a hospital or a health system.  That's
6 what it says.
7    Q.  Take a look at -- let's go ahead to page
8 911 of this document, Exhibit 16.  Do you see in
9 the third column to the right it says Strategies
10 For Managing Medication Use?
11    A.  Yes.
12    Q.  And it reads, "Common strategies for
13 managing medication use via the formulary include
14 use of generic drugs..." and then it lists some
15 other items.  Do you see that?
16    A.  Yes.
17    Q.  Then it says Generic drugs.  Do you see
18 that section?
19    A.  I do.
20    Q.  "Optimizing the number of medication
21 entities and products available from the pharmacy
22 can produce substantial patient care and financial
23 benefits.  These benefits are greatly increased
24 through the use of generic equivalents (drugs
25 considered bioequivalent by FDA [i.e., AB-rated

Page 347

1 drug products.])"  And there's a footnote number
2 42.
3       Do you see that, sir?
4    A.  I do see that.
5    Q.  And you know that relates to the Orange
6 Book; does it not?
7       MR. DORNER:  Object to form.  Lacks
8 foundation.
9       THE WITNESS:  The AB rating does reflect
10 the Orange Book, yes.
11 BY MR. HONIK:
12    Q.  Do you have the ability to quickly look
13 at footnote 42 to satisfy yourself that they are
14 specifically referring to the Orange Book?  We can
15 look at it on the share screen.
16    A.  Yes.  I see it.
17    Q.  So you agree that in this ASHP report
18 and guideline, they're referring to the positive
19 use of the Orange Book for P&T committees; right?
20       MR. DORNER:  Object to the
21 characterization.  Lacks foundation.
22       You can answer.
23       THE WITNESS:  I think they're referring
24 to the generic equivalent ratings in the Orange
25 Book.  The Orange Book is the approved products

Page 348

1 with generic equivalence ratings, is the name of
2 that book like it says in footnote 42.  So part of
3 that compilation is whether these products are
4 considered bioequivalent, i.e., AB-rated products.
5 So yes.
6 BY MR. HONIK:
7    Q.  And what it's doing as a guideline is
8 encouraging reference to the Orange Books for the
9 reasons that we've just gone over in this exhibit;
10 correct?
11       MR. DORNER:  Object to form.
12 Characterization.  Lacks foundation.
13       You can answer.
14       THE WITNESS:  Yeah, I don't know
15 specifically because the Orange Book is produced,
16 right.  But that data is available in other drug
17 compendia sources that includes the therapeutic
18 equivalence rating, in this case AB.
19 BY MR. HONIK:
20    Q.  Sir, I'm not sure what you're responding
21 to.  I'm simply asking you if it isn't true that
22 this guideline from a society that you told me is
23 reliable speaks to the use of the Orange Book to
24 rely upon and receive assurance about the use of
25 AB-rated generic drug products.

Page 349

1       MR. DORNER:  Objection.
2 Mischaracterization.  Lacks foundation.
3       You can answer.
4       THE WITNESS:  Yeah, this guideline
5 refers to the Orange Book, at least in footnote
6 42.
7 BY MR. HONIK:
8    Q.  And it encourages P&T committees to
9 refer to them to satisfy themselves that the drugs
10 are considered bioequivalent by the FDA; correct?
11       MR. DORNER:  Objection.
12 Mischaracterization.  Lacks foundation.
13       THE WITNESS:  I'm just rereading that
14 section to see exactly what it says.  There's a
15 number of reasons why they say you look at the
16 Orange Book, yes.
17 BY MR. HONIK:
18    Q.  That's right.  There are.  And one of
19 them is that the drugs by reference to the Orange
20 Book are those that are bioequivalent as
21 considered by the FDA; correct?
22       MR. DORNER:  Object to form.
23 Characterization.
24       THE WITNESS:  Yes.
25

Confidential Information Subject to Protective Order

Page 350

1 BY MR. HONIK:
2 Q. And before we leave the document, it
3 encourages, among others, P&T committees to make
4 use of that reference; correct?
5 MR. DORNER: Object to form.
6 Mischaracterization. Lacks foundation.
7 BY MR. HONIK:
8 Q. That's what it says; right, sir?
9 MR. DORNER: Same objections.
10 THE WITNESS: Yes.
11 BY MR. HONIK:
12 Q. I'm sorry. Did you say "yes"?
13 A. Yes.
14 Q. Thank you. Take a look at your own
15 report, sir. Do you have that in front of you?
16 A. Yes.
17 MR. DORNER: Are you going to direct him
18 to a paragraph?
19 BY MR. HONIK:
20 Q. Take a look at page C-4. That's in your
21 Appendix C. This is the beginning of your list of
22 books and academic articles that you, yourself,
23 relied upon; correct?
24 A. Yes.
25 Q. Did you say "yes"?

Page 351

1 A. I did.
2 Q. The very first book or academic article
3 that you relied upon is Exhibit 16, isn't it?
4 A. Yes.
5 Q. Does that refresh your memory that you,
6 yourself, placed reliance on this guideline?
7 A. Yes.
8 Q. Thank you. Now, you criticized
9 Dr. Panagos for her reference to the Orange Book
10 and the use of it by P&T committees, didn't you?
11 A. Yes.
12 Q. In fact, at paragraph 201 of your
13 report, you call her out for providing no support
14 for P&T committees' use of the Orange Book; right?
15 A. Yes.
16 Q. And, in fact, do you have Ms. Panagos'
17 report?
18 A. Not in front of me, no.
19 MR. HONIK: Can we get that up as well,
20 Dave.
21 MR. STANOCH: Stand by.
22 MR. HONIK: Thank you.
23 BY MR. HONIK:
24 Q. Obviously in order to criticize her, you
25 had to read her entire report, didn't you,

Page 352

1 Mr. Kosty?
2 A. Yes.
3 Q. And if you turn to page 8 of her report,
4 beginning at paragraph 47, this is where -- we're
5 going to call this Exhibit 17, by the way.
6 (Kosty Exhibit 17 was marked.)
7 BY MR. HONIK:
8 Q. She's got paragraph 47, "The 'AB' rating
9 in the FDA Orange Book, based as it is on the
10 generic drug manufacturer's ANDA, represents a
11 manufacturer's warranty to TPPs and P&T committees
12 for placement on a prescription drug formulary."
13 And then she drops a footnote number 6.
14 Do you see that?
15 A. Yes.
16 Q. Your criticism of her that she provided
17 no support for that proposition is incorrect
18 because she, herself, cited the very same
19 guideline that you placed on your reliance list;
20 isn't that right?
21 MR. DORNER: Object to form.
22 Mischaracterization. Argumentative.
23 You can answer.
24 THE WITNESS: No. That's not the case.
25 My beef with Dr. Panagos is her use of the word

Page 353

1 warranty. Perhaps we can go back to the ASHP
2 guidelines to see if the word warranty is there or
3 not.
4 BY MR. HONIK:
5 Q. Sir, you're not a lawyer. I'm sorry.
6 Did you finish?
7 A. No, I did not finish. I also went to
8 the Orange Book itself, Edition 41, and searched
9 it for the word warranty. In the 1600-plus pages
10 in the Orange Book, the word warranty is not found
11 at all. It's not found once.
12 So my beef with Dr. Panagos is her use
13 of the word warranty, that the FDA Orange Book
14 creates a warranty. That is the issue I have with
15 her. And the FDA Orange Book doesn't even mention
16 a warranty. So I don't know how she says it
17 creates a warranty or represents a manufacturer
18 warranty.
19 Q. Mr. Kosty, do you remember hours ago
20 telling me you're not a lawyer?
21 A. Yes.
22 Q. And you know Ms. Panagos is not a lawyer
23 either; correct?
24 A. That's my understanding.
25 Q. Do you know how she used the term or

Page 354

1 word warranty in her report?
2      MR. DORNER:  Object to form.  Calls for
3 speculation.
4      THE WITNESS:  I didn't know what her
5 intent is, but the word warranty is more than
6 it's just listed.  It implies a legal obligation.
7 And I don't see that in the Orange Book.
8      What I do see in the Orange Book is a
9 list of all of the approved drug products the FDA
10 has done through either an NDA or an ANDA process.
11 They also list BLAs and OTC products.  So when I
12 went to the Orange Book looking for the word
13 warranty, I did not find it.
14 BY MR. HONIK:
15      Q.  Did you read Ms. Panagos' testimony?
16      A.  No.
17      Q.  So you don't understand how she used the
18 word warranty herself, do you?
19      A.  I did not read her testimony, no.
20      Q.  Do you know that the word warranty
21 outside of the legal context refers to ability to
22 rely upon or to receive assurance about?
23      MR. DORNER:  Object to form.  Lacks
24 foundation.  Characterization.  Calls for a legal
25 conclusion.

Page 355

1      THE WITNESS:  Yeah, I don't know what
2 her testimony was, but the warranty -- where I
3 read this and my comments were I just explained.
4 BY MR. HONIK:
5      Q.  Do you know that when somebody warrants
6 something outside of the legal definition of
7 warrant, that it could mean to rely upon or
8 receive assurance about?
9      MR. DORNER:  Same objections as last
10 time, plus asked and answered.
11      THE WITNESS:  Yeah, I think in a
12 consumer perspective, when I look at a warranty,
13 when I buy something, the manufacturer provides a
14 warranty and it includes certain components that I
15 as a consumer can expect.
16      So it's a document that's given to me
17 when I purchase, say, a technology item that
18 indicates the warranty the manufacturer is
19 standing behind.  That is how I viewed her
20 testimony in this report.  And that's why I made
21 the objection I did in my report.
22 BY MR. HONIK:
23      Q.  Sir, did you actually look at the Orange
24 Book and determine how they use the term
25 therapeutic equivalent?

Page 356

1      A.  Yes.
2      Q.  And don't you agree that if you've got
3 an AB-rated drug that purports to be therapeutic
4 equivalent, that that imparts certain specific
5 criteria that one can rely upon?
6      MR. DORNER:  Object to form.  Calls for
7 a legal conclusion.  Lacks foundation.
8      THE WITNESS:  There's requirements in
9 the Orange Book under that therapeutic equivalence
10 rating that specifies it, yes.
11 BY MR. HONIK:
12      Q.  That's right.  And when you look at the
13 criteria set out in the Orange Book for that
14 therapeutic equivalent, it connotes very specific
15 criteria that the reader can rely upon in
16 believing a drug which is AB rated; correct?
17      MR. DORNER:  Same objections as last
18 time plus improper characterization.
19      THE WITNESS:  Yes.  It explains the AB
20 rating and the components behind it, yes.
21 BY MR. HONIK:
22      Q.  And the reason one reads it and can rely
23 upon it is because that criteria comes from the
24 FDA; correct?
25      MR. DORNER:  Objection.  Improper

Page 357

1 characterization.  Lacks foundation.  Calls for a
2 legal conclusion.  Mischaracterizes.
3      You can answer.
4      THE WITNESS:  Yes.  It's a compilation
5 of in this case an ANDA approval process by the
6 manufacturer.
7      MR. HONIK:  Dave, can we bring up the
8 Orange Book Preface section that we have
9 available.
10      MR. STANOCH:  Exhibit 18.
11      (Kosty Exhibit 18 was marked.)
12 BY MR. HONIK:
13      Q.  We have, Mr. Kosty, on page 1 here the
14 Orange Book, Food and Drug Administration Center
15 for Drug Evaluation and Research, Approved Drug
16 Products for Therapeutic Equivalence Evaluations.
17 Do you see that?
18      A.  Yes.
19      Q.  You're familiar with this preface to the
20 42nd Edition?
21      A.  I'm familiar with the contents but not
22 every specific item in here.  But, yes, generally
23 so.
24      Q.  You're certainly aware that Ms. Panagos
25 was referring to this document; correct?

Confidential Information Subject to Protective Order

Page 358

1   A.  Yes.
2   Q.  It says, "The publication, Approved Drug
3  Products for Therapeutic Equivalence Evaluations,
4  (the List, commonly known as the Orange Book)
5  identifies drug products approved on the basis of
6  safety and effectiveness by the FDA under the
7  Federal Food, Drug, and Cosmetic Act."
8       Did I read that correctly?
9   A.  You did.
10   Q.  You know that those who use the Orange
11  Book rely upon it; correct?
12       MR. DORNER:  Object to form.  Vague.
13  Lacks foundation.  Mischaracterizes.
14       THE WITNESS:  When you say rely upon it,
15  in what context?
16  BY MR. HONIK:
17   Q.  In the following context.
18       MR. HONIK:  Turn to the page, Dave, that
19  says Therapeutic Equivalence.
20  BY MR. HONIK:
21   Q.  As Exhibit 16 suggested, P&T committees
22  are encouraged within the guidelines to rely upon
23  this for determining when a drug is
24  therapeutically equivalent among other things;
25  correct?

Page 359

1       MR. DORNER:  Object to form.  Improper
2  characterization.  Misstates the testimony.  Lacks
3  foundation.
4       You can answer.
5       THE WITNESS:  Yes.
6  BY MR. HONIK:
7   Q.  Correct?
8   A.  Yes.
9   Q.  And it says, "Approved drug products are
10  considered to be therapeutic equivalents if they
11  are pharmaceutical equivalents for which
12  bioequivalence has been demonstrated, and they can
13  be expected to have the same clinical effect and
14  safety profile when administered to patients under
15  the conditions specified in the labeling."
16       Did I read that correctly?
17   A.  Yes.
18       MR. DORNER:  And I'll object to outside
19  the scope at this point.
20  BY MR. HONIK:
21   Q.  It then says, "FDA classifies as
22  therapeutically equivalent those drug products
23  that meet the following general criteria."
24       Do you see that?
25   A.  Yes.

Page 360

1       MR. DORNER:  Objection.  Outside the
2  scope.
3  BY MR. HONIK:
4   Q.  And you're familiar with the criteria
5  that are enumerated here, aren't you, Mr. Kosty?
6       MR. DORNER:  Same objection.
7       THE WITNESS:  Yes.
8  BY MR. HONIK:
9   Q.  And you know from your own experience as
10  well as the guideline we looked at in Exhibit 16
11  that P&T committees are encouraged to rely upon
12  this criteria; correct?
13       MR. DORNER:  Object to form.  Improper
14  characterization of both the document and the
15  testimony.  Lacks foundation.  Outside the scope.
16  Speculative.
17       You can answer.
18       THE WITNESS:  Yes, based on that ASHP
19  guideline.
20  BY MR. HONIK:
21   Q.  And that's exactly what Ms. Panagos
22  relied upon in support of her statement that you
23  criticized; correct?
24       MR. DORNER:  Object to form.
25  Speculation.  Characterization.

Page 361

1       THE WITNESS:  Yeah, back to her use of
2  the word warranty, that's what my objection was,
3  and I previously stated why.
4  BY MR. HONIK:
5   Q.  Well, if we understand her to use
6  warranty as ability to rely upon or receive
7  assurance about, you would agree with that
8  statement; right?
9       MR. DORNER:  Object to form.  Improper
10  characterization.  Calls for speculation.  Lacks
11  foundation.
12       You can answer.
13       THE WITNESS:  Yes.  If she had written
14  that in her report, it would have been clear what
15  she was getting to.  She did not write that in the
16  report.
17  BY MR. HONIK:
18   Q.  Can you read to us what the fifth
19  criteria is for the FDA classifying as
20  therapeutically equivalent drugs that meet the
21  criteria?
22       MR. DORNER:  Object to form.  Outside
23  the scope.
24       THE WITNESS:  What page are you on?
25

Confidential Information Subject to Protective Order

Page 362

1  BY MR. HONIK:
2      Q.  It's the one we're looking at presently.
3  "FDA classifies as therapeutically equivalent
4  those drug products that meet the following
5  general criteria."  And I've asked you to read
6  into the record and for our benefit what the fifth
7  criteria is.
8      MR. DORNER:  Object to form.  Outside
9  the scope.
10     THE WITNESS:  I'm not seeing it on the
11 screen.  That's my issue.  I'm trying to ask you
12 what page is this on in the document that I can go
13 to in a different --
14 BY MR. HONIK:
15     Q.  Mr. Stanoch just highlighted it for you
16 on the screen share.  You can read it that way.
17     A.  Can you make that bigger, please?
18 Number five -- sorry to squint into the camera.
19 "They are manufactured" --
20     MR. DORNER:  This is the wrong exhibit.
21     THE WITNESS:  "They are manufactured in
22 compliance with current good manufacturing
23 practice regulations."
24 BY MR. HONIK:
25     Q.  So you acknowledge that that is one of

Page 363

1  the FDA's criteria for achieving therapeutic
2  equivalence; right?
3      MR. DORNER:  Objection.  Misstates the
4  testimony.  Argumentative.  Outside the scope of
5  the report.
6      THE WITNESS:  Yes.  That's what it reads
7  here.
8  BY MR. HONIK:
9      Q.  And you were aware of that when you
10 authored your report; correct?
11     MR. DORNER:  Same objections.
12     THE WITNESS:  Yes.
13 BY MR. HONIK:
14     Q.  And you're aware that Ms. Panagos relied
15 upon the Orange Book for that reason among others;
16 correct?
17     MR. DORNER:  Object to form.
18 Speculation.  Lacks foundation.
19     THE WITNESS:  Yeah, I don't know what
20 she relied on in her report.
21 BY MR. HONIK:
22     Q.  Well, you relied upon Exhibit 16, which
23 is the guideline that makes reference to this; did
24 you not?
25     A.  Yes.

Page 364

1      Q.  Did you cite that as a reliance material
2  for some other reason or purpose, Mr. Kosty?
3      A.  No.
4      Q.  And you don't disagree that this
5  criteria is FDA generated for therapeutic
6  equivalence; right?
7      MR. DORNER:  Object to form.  Outside
8  the scope.
9      Once again, you can answer.
10     THE WITNESS:  I don't disagree.  That's
11 what the FDA has as the regulation.
12 BY MR. HONIK:
13     Q.  Mr. Kosty, those are all the questions
14 that we have of you today.  For our purposes, and
15 certainly the defense may ask you questions
16 presently, but for our purposes, we intend to keep
17 this deposition open.  And I will instruct you and
18 counsel to retain and do nothing to disrupt or
19 destroy any of your electronically or paper saved
20 material regarding your contact with AG.
21     Do you understand that instruction?
22     A.  Yes.
23     MR. DORNER:  We object.  Sorry.  Go
24 ahead.
25

Page 365

1  BY MR. HONIK:
2      Q.  And any other materials that you may
3  have that we asked for in our Notice of Deposition
4  about which objections were raised.
5      MR. HONIK:  With that, I yield the
6  floor.  Anybody have questions of Mr. Kosty?
7      MR. DORNER:  Well, first of all, we
8  object to keeping the deposition open, absolutely
9  and completely.  Second of all, we've set forth
10 all the objections to any requests that you've
11 made, and you can reference those and find the
12 defense's position on that.
13     There's no basis for this deposition to
14 be kept open whatsoever.  With that said, we can
15 go off the record.  We may have more to say off
16 the record, but we'd like to take -- let's go to
17 6:35 just to confer among us as to whether or not
18 there are any further questions for Mr. Kosty.
19     THE VIDEOGRAPHER:  Off the record 6:21.
20     (Recess from 6:21 p.m. to 6:36 p.m.)
21     THE VIDEOGRAPHER:  We are back on the
22 record at 6:36.
23         EXAMINATION
24 BY MS. ANDRAS:
25     Q.  Hi, Mr. Kosty.  As you know, I'm Tiffany

Page 366

1  Andras, and I represent Teva Pharmaceuticals in
2  this case.
3        MR. HONIK:  Tiffany, I can barely hear
4  you.  Can you speak up?
5        MS. ANDRAS:  Can we go off the record
6  for a second.
7        THE VIDEOGRAPHER:  Off the record at
8  6:36.
9  (There was a pause in the proceedings.)
10        THE VIDEOGRAPHER:  We are back on the
11  record at 6:36.
12  BY MS. ANDRAS:
13    Q.   Mr. Kosty, earlier today Mr. Stanoch
14  asked some questions about the two examples of
15  business consolidations that you cite to in your
16  report in paragraphs 153 and 154.
17        Do you recall that?
18    A.   Yes.
19    Q.   Do you have experience working with
20  entities attempting to integrate and combine
21  disparate sets of claims data?
22    A.   Yes, I do.
23    Q.   Approximately how many times have you
24  been involved with projects with that task?
25    A.   A dozen times or so.

Page 367

1    Q.   And did those projects involve a
2  combination of two or more entities?
3    A.   Yes.
4    Q.   How many times did it involve a
5  combination with two entities?
6    A.   Probably 95 percent of the time.
7    Q.   Did you rely on those experiences to
8  inform your opinions in this case?
9    A.   I did, yes.
10    Q.   And how many of the projects that you
11  worked on that involved attempting to integrate
12  and combine disparate assets of claims data were
13  there data discrepancies that were discovered
14  during the testing and validation process?
15    A.   Every time.
16    Q.   Mr. Kosty, do you recall Mr. Honik
17  asking some hypothetical questions about the
18  supply curve?
19    A.   Yes.
20    Q.   Did consumers and TPPs actually purchase
21  the at-issue VCDs during the time period before
22  the recalls in this case?
23    A.   Yes.
24        MR. HONIK:  I'm sorry.  I didn't catch
25  the question.  Can I have it read back by Ann.

Page 368

1        (The following record was read back:
2    "Q   Did consumers and TPPs actually
3  purchase the at-issue VCDs during the time
4  period before the recalls in this case?")
5        THE WITNESS:  Yes.
6  BY MS. ANDRAS:
7    Q.   So there was, in fact, a supply
8  available for purchases at the time those
9  purchases were made?
10    A.   Yes.
11    Q.   Was there, in fact, a supply curve?
12    A.   Yes.  They had the ability to buy
13  products that was supplied, yes.
14    Q.   And was there a price?
15    A.   Yes.
16        MS. ANDRAS:  Nothing further.
17        MR. HONIK:  Any other questions?
18        MS. ANDRAS:  Nope.
19        RE-EXAMINATION (Continued)
20  BY MR. HONIK:
21    Q.   Mr. Kosty, do you know what the
22  definition from an economics standpoint of a
23  supply curve is?
24    A.   Yes.
25    Q.   What is that?

Page 369

1    A.   It's a supply of products for purchase
2  in the marketplace.
3    Q.   Do you have any other definition or
4  understanding of it?
5    A.   That's my definition of it, yes.
6    Q.   Do you understand, have any
7  understanding that Dr. Conti used it and qualified
8  it with the word legitimate?  Do you remember
9  that?
10    A.   I do remember that, and that was the
11  first time I've ever seen that word as an
12  adjective for a supply curve.
13    Q.   And is that right, you've never read or
14  heard in any academic publication or otherwise the
15  term legitimate supply curve?
16        MS. ANDRAS:  Objection.  Form.
17  Foundation.
18        THE WITNESS:  I don't read academic
19  economic theory publications.  That's not on my
20  reading list, no.
21  BY MR. HONIK:
22    Q.   I gather that you don't.  You do concede
23  that there has to be a meeting of the supply curve
24  or the demand curve for there to be an associated
25  price; correct?

Confidential Information Subject to Protective Order

---

Page 370

1    A.  Yes.  That happened in this case when
2  there was a supply of VCD products that was
3  purchased by wholesalers and retailers at a price
4  in the marketplace, yes.
5    Q.  And what you're trying to convey is that
6  there was an actual supply of illegitimate
7  product; correct?
8        MS. ANDRAS:  Objection.
9  Mischaracterizes prior testimony.  Form.
10       THE WITNESS:  I didn't say that.  That
11  does mischaracterize it.  I said there was a
12  supply of that product available for purchase in
13  the marketplace.
14  BY MR. HONIK:
15    Q.  Sir, you don't argue that there was
16  contaminated VCDs in the marketplace during the
17  relevant class period; correct?
18       MS. ANDRAS:  Objection.  Form.
19       THE WITNESS:  I've never used the word
20  contaminated.  There were impurities identified in
21  those products, yes.
22  BY MR. HONIK:
23    Q.  And you don't disagree that we
24  established today extensively with your help that
25  according to the FDA, it's a prohibited act to

---

Page 371

1  place into the stream of commerce a contaminated
2  or adulterated drug; correct?
3        MS. ANDRAS:  Objection.  Form.
4  Foundation.  Misstate prior testimony.  Calls for
5  a legal conclusion.  And outside the scope.
6        THE WITNESS:  My point was the product
7  was available for purchase and it was purchased.
8  BY MR. HONIK:
9    Q.  Sir, of course, it was purchased.  You
10  understand the entire reason for this lawsuit is
11  the allegation that it was improperly in the
12  marketplace and those that purchased it should
13  have their money back.  Do you understand that?
14    A.  Yes.
15    Q.  And that what Dr. Conti did from an
16  econometric standpoint is to model what that would
17  look like if the manufacturers did not break the
18  law?
19       MS. ANDRAS:  Objection.  Argumentative.
20  Assumes facts not in evidence.  Calls for
21  speculation.  And outside the scope.
22       THE WITNESS:  It's outside my scope, and
23  it calls for a legal conclusion.
24  BY MR. HONIK:
25    Q.  Sir, you say it's outside the scope, and

---

Page 372

1  yet you authored a nearly hundred page, more than
2  a hundred-page report criticizing Dr. Conti for
3  her methodology, didn't you?
4    A.  The whole hundred pages didn't
5  criticize, but the total report was a hundred
6  pages, yes.
7    Q.  Sir, the thrust of your criticism of
8  Dr. Conti is that she used an improper
9  methodology; right?
10       MS. ANDRAS:  Ruben, I'm going to object.
11  This is outside the scope of my redirect.  I don't
12  believe I even discussed Dr. Conti's methodology.
13  And you're just trying to rehash ground that you
14  already covered on direct.
15       MR. HONIK:  Your objection is noted.
16  BY MR. HONIK:
17    Q.  Can you answer my question, Mr. Kosty?
18    A.  Could you repeat it please or read it
19  back?
20    Q.  You criticized Dr. Conti extensively for
21  her methodology, that is, for I think you
22  described it as a fanciful world that doesn't
23  exist in the real world; isn't that right?
24    A.  That's correct.
25    Q.  And what you meant by that is that her

---

Page 373

1  methodology was wrong.  She considered the wrong
2  universe in arriving at a damage calculation;
3  correct?
4        MS. ANDRAS:  Objection.  Form.
5  Foundation.  Outside the scope of my redirect.
6  Outside the scope of his opinion.  And
7  mischaracterizes testimony.
8        THE WITNESS:  Yeah, mischaracterizes my
9  testimony.  My testimony was Dr. Conti's model,
10  she creates this assumption that's infallible.
11  And I'm saying in the real world in the
12  pharmaceutical industry, these products were
13  available for purchase.  They were purchased and
14  dispensed to patients.  And once the impurities
15  were identified, they were taken off the market in
16  voluntarily recalls with the manufacturers.
17       That's what my problem is.  It just
18  dismisses any of the things that actually happened
19  in the marketplace.  When I say I'm an industry
20  expert, those are the industry things that had to
21  be dealt with because those products were
22  purchased.  They were consumed.  So we had to deal
23  with how it works in the real world.  That's my
24  beef with her methodology.
25       She just assumes all that never happened

---

Confidential Information Subject to Protective Order

---

Page 374

1 when, in fact, it did.  I'm saying in the real
2 world, those things happened and they had to be
3 addressed.
4 BY MR. HONIK:
5    Q.   Sir, it's been a long day, but you
6 understand that the metric or criteria for damage
7 assessment is going to be determined as a legal
8 matter?  Do you accept that?
9       MS. ANDRAS:  Ruben, this way outside the
10 scope of my direct examination now.  If you don't
11 cut it out, we're going to pull the witness.  This
12 is getting well outside the scope.  I asked him
13 simple questions about the supply curve.  I did
14 not mention Dr. Conti's name.  And now you're
15 talking about measure of damages again.  And we
16 did not ask him questions about that.
17       MR. HONIK:  Your objection is noted.
18       MS. ANDRAS:  We're going to pull the
19 witness, Ruben, if you continue this.  You had
20 your chance for questions.
21       MR. HONIK:  Your objection is noted.
22 BY MR. HONIK:
23    Q.   Mr. Kosty, can you answer my question?
24    A.   I testified earlier that's a legal
25 decision that I'm not qualified to make.

---

Page 375

1    Q.   That's correct.  And if a legal decision
2 is made that assumes, as Dr. Conti did, that the
3 drugs were under the FDA definition adulterated
4 and, therefore, should not have been in the
5 marketplace, you agree the measure of damages is
6 the purchase price; correct?
7       MS. ANDRAS:  Objection.  Outside the
8 scope of redirect.  Outside the scope of his
9 opinion.  Form.  And calls for a legal conclusion.
10 BY MR. HONIK:
11    Q.   Isn't that right?
12    A.   I don't know.  Like I said earlier, I'm
13 not a legal person to make those legal decisions.
14 That's up to the court.
15    Q.   Sir, I asked you earlier today if you
16 are to assume that the benefit of the bargain was
17 not achieved here -- I showed you any number of
18 cases including language from the judge in charge
19 of this case -- you would agree that the measure
20 of damages, and I know you don't agree with it,
21 but under those circumstances, the measure of
22 damages is the actual price spent or purchased for
23 these drugs; correct?
24       MS. ANDRAS:  Form.  Objection.  Form.
25 Foundation.  Mischaracterizes prior testimony.

---

Page 376

1 And requires a legal conclusion.  And outside the
2 scope of both redirect and his opinion.  And asked
3 and answered.
4 BY MR. HONIK:
5    Q.   Right, Mr. Kosty?
6    A.   In your narrowly defined hypothetical, I
7 would think that would be the case.
8    Q.   Thank you.  I appreciate that.
9       MR. HONIK:  With that I have no further
10 questions.  Are we done?
11       MS. ANDRAS:  Done.
12       MR. HONIK:  Subject to the statement I
13 placed on the record a little while ago and
14 certainly your objection, Drew, I think we're done
15 for the night.
16       MR. DORNER:  We will read and sign.  And
17 certainly to our objection, this is not going to
18 be kept open.
19       MR. HONIK:  Thank you, Mr. Kosty.  Thank
20 you, Ann, and Mr. Video.
21       THE VIDEOGRAPHER:  Off the record at
22 6:46.
23       (Whereupon, at 6:46 p.m. the taking of
24 the instant deposition ceased.)
25

---

Page 377

1 COMMONWEALTH OF PENNSYLVANIA )
2 COUNTY OF ALLEGHENY         )    SS:
3       C E R T I F I C A T E
4    I, Ann Medis, RPR, CLR, CSR-WA and
5 Notary Public within and for the Commonwealth of
6 Pennsylvania, do hereby certify:
7       That TIMOTHY E. KOSTY, the witness whose
8 deposition is hereinbefore set forth, was duly
9 sworn by me and that such deposition is a true
10 record of the testimony given by such witness.
11       I further certify the inspection,
12 reading and signing of said deposition were not
13 waived by counsel for the respective parties and
14 by the witness.
15       I further certify that I am not related
16 to any of the parties to this action by blood or
17 marriage and that I am in no way interested in the
18 outcome of this matter.
19       IN WITNESS WHEREOF, I have hereunto set
20 my hand this 28th day of February, 2022.
21
22
23         _____
              Notary Public
24
25

---

Confidential Information Subject to Protective Order

Page 378

1  COMMONWEALTH OF PENNSYLVANIA  )  E R R A T A
   COUNTY OF ALLEGHENY        )  S H E E T

2

3  I, TIMOTHY E. KOSTY, have read the foregoing pages
   of my deposition given on February 24, 2022, and
4  wish to make the following, if any, amendments,
   additions, deletions or corrections:

5

6  Page  Line   Change and reason for change:
7  _____ _____  _____
8  _____ _____  _____
9  _____ _____  _____
10 _____ _____  _____
11 _____ _____  _____
12 _____ _____  _____
13 _____ _____  _____
14 _____ _____  _____
15 _____ _____  _____
16 _____ _____  _____
17 _____ _____  _____
18

   In all other respects, the transcript is true and
19 correct.

20

   _____
21        TIMOTHY E. KOSTY

22

   _____ day of _____, 2022.

23

   _____
24     Notary Public

25

**WORD INDEX**

**< $ >**
**$12.40**  98:2
**$5,000**  307:25
**$600,000**  181:22  182:3
**$644,540.45**  337:24
**$8,125**  334:19

**< § >**
**§**  7:13

**< 0 >**
**0000000214**  7:21
**01151990**  309:19
**011590**  309:13
**01344164**  7:15
**016580**  283:4
**02109**  4:20
**07102**  2:22

**< 1 >**
**1**  7:8  24:23, 24  25:1  42:23  43:6, 11, 17  45:15, 22  46:2, 8, 19  49:19  66:14  85:21  91:3  106:12  135:24  159:5  221:16  240:20  324:12  325:11  357:13
**1:15**  135:3, 4
**1:19**  135:7, 9
**10**  7:3, 22  209:2, 4  226:2, 7, 24  227:16  228:6  233:2  238:1, 9  266:13  267:22, 25  343:9

**10:07**  1:19  9:7
**100**  2:22
**1001**  6:4
**10019**  5:16
**106**  7:12
**10-year**  76:22  233:5  235:2, 7  236:1
**11**  8:3  66:7  298:3, 4
**11/29/18**  7:14
**11:09**  67:3, 4
**11:18**  67:4, 6, 9
**1100**  2:4
**112-page**  324:25
**115**  330:11
**117**  7:13
**119**  284:17, 20  293:23
**12**  7:8  8:6  21:17  22:15  34:21  66:5  304:17  323:5, 7
**12:36**  134:24  135:6, 7
**120**  285:6, 19
**121**  293:21
**122**  297:14  298:13
**123**  305:7
**126**  284:17
**128**  317:18  318:19
**13**  8:6  34:21  135:25  324:7, 8
**130**  319:4
**132**  322:7
**133**  322:18
**136**  317:18  318:19
**137**  7:14  300:5  312:16, 21
**139**  312:16

**14**  8:9  163:17  333:21, 23
**1400**  5:4
**15**  8:9  12:20  13:13  30:21  38:1, 11, 22  67:2  161:23  162:9, 18  309:8, 10  329:20  336:23, 24  343:9
**1515**  2:4
**152**  254:11  255:4
**15219**  1:18  3:17
**153**  256:1  257:11  366:16
**154**  256:15  257:12  366:16
**156**  271:8
**158**  7:16  248:15
**159**  226:1  228:13
**15th**  2:22
**16**  8:13  90:7  91:6  338:24  342:22, 25  346:8  351:3  358:21  360:10  363:22
**16.67**  335:4
**160**  264:14, 16
**1600-plus**  353:9
**161**  274:15  276:18, 25
**17**  8:15  352:5, 6
**17th**  4:6
**18**  8:15  247:6  357:10, 11
**190**  5:21
**19102**  2:5
**19103**  4:7
**1990**  309:11

**310**:20

**< 2 >**
**2**  7:8  90:8, 9, 24  91:4, 17  94:10  96:24  175:20  240:21  269:9  282:13
**2:33**  208:25
**2:34**  209:7, 8
**2:40**  209:1
**2:51**  209:8, 10  292:9  293:8
**20**  108:6, 10  292:9  293:8
**2000**  89:5
**20004**  6:5
**2000s**  221:24
**2003**  221:12, 24
**2006**  25:24
**2008**  221:24  222:2, 6
**201**  351:12
**2012**  148:12  325:21
**2013**  77:5  78:1  226:15
**2015**  8:5  255:11, 20  300:16
**2018**  59:4  138:16  148:13  246:19  255:12, 20
**2019**  194:1, 4, 11
**202.624.2544**  6:5
**2020**  90:7  91:6
**2021**  282:15  324:12, 23  325:11  339:17  343:9
**2022**  1:19  7:8  9:6  21:17  22:15  66:5, 7  339:11, 17

**377**:20  378:3, 21
**2023**  77:5, 8
**2029**  3:10
**209**  7:3
**21**  7:13  117:18
**210**  234:18
**212.415.9357**  5:16
**214.855.8074**  5:11
**215.979.1000**  4:7
**219**  297:25
**2200**  5:10
**2220**  4:13
**227**  3:4
**230**  4:13
**231**  7:16
**233**  7:18
**237**  7:22
**24**  1:19  9:6  73:22  83:24  295:19  378:3
**244**  322:17
**25**  7:8  35:3  164:11  292:9  329:24
**267**  7:22
**267.435.1300**  2:5
**27**  43:8
**27th**  4:19
**28202**  3:5
**2875**  1:3  9:10
**28th**  377:20
**29**  138:16
**298**  8:3  248:17

**< 3 >**
**3**  7:12  105:24, 25  106:8, 10  108:5  142:5  234:18, 19  315:14  316:12
**3:00**  209:6
**30**  4:6  210:6, 10  211:15

212:19  213:3
218:1  301:22,
23  302:3, 15,
23  313:25
**30(b** 211:22
217:1
**30(b)(6** 71:4, 9
**30(c** 212:16
**30(d** 212:24
**30(e** 213:7, 12,
17  214:8
**300** 3:10
**301** 3:16
**30-day** 301:22
**31** 49:19
135:25  136:3
159:4  300:16
339:17
**31(a** 136:9
142:19  143:5
144:19
**310.284.3766**
3:11
**3100** 2:17
**312** 5:4
**312.456.8400**
2:18
**312.566.4808**
4:14
**314.480.1500**
5:22
**320-19-04**
138:16
**323** 8:6
**324** 8:6
**331** 7:13
117:18
**333** 8:9
**339** 7:3
**342** 8:13
**352** 8:15
**356** 8:9
**357** 8:15
**3600** 5:10
**365** 7:4
**368** 7:3
**38** 23:23
34:13  118:5
139:4
**38th** 3:16

< 4 >
**4** 7:13  94:9,
10  117:17, 19,
20, 22
**4:04** 266:16,
17
**4:19** 266:17,
19
**40** 39:5
**41** 353:8
**412.263.4397**
3:17
**42** 347:2, 13
348:2  349:6
**42nd** 357:20
**43** 88:1
**45202** 5:5
**47** 352:4, 8

< 5 >
**5** 7:14  138:8,
15
**5:18** 318:5, 6
**5:25** 318:3
**5:28** 318:6, 8
**50** 69:6, 7
231:7  312:3
313:25
316:22
326:20
328:15, 18
329:11
**5010** 1:18
**504.524.5777**
2:10
**51** 5:15
**513.698.5038**
5:5
**52nd** 5:15
**53** 4:19
282:12
**59,000** 334:17
336:19

< 6 >
**6** 7:16
158:21, 24
352:13
**6/16/20** 7:8

**6:21** 365:19,
20
**6:35** 365:17
**6:36** 365:20,
22  366:8, 11
**6:46** 376:22,
23
**60** 39:4
255:23  301:25
**600** 1:17  3:4
5:21  182:12
**60601** 2:17
**60606** 4:14
**617.213.7047**
4:20
**63105** 5:21

< 7 >
**7** 7:16  101:2
231:12, 14
234:18
**7/1/21** 8:8
**70** 297:22
**701** 2:9
**70130** 2:10
**704.444.3475**
3:5
**75** 164:7, 14
165:2
**75201** 5:10
**77** 2:16
**78** 343:8

< 8 >
**8** 7:18
233:10, 12
352:3
**8,125** 336:20
**80** 300:21
310:8
**85** 310:8
**88** 214:3, 6
**89** 214:3, 6
255:10, 18

< 9 >
**9** 7:22  66:15
73:19  83:23
237:5, 6

**90** 7:8
301:25  309:9
310:19
**90067** 3:10
**90-day** 301:24
302:4, 15
304:23
**911** 346:8
**95** 367:6
**96** 36:9
255:10, 18
**973.757.1100**
2:23
**98** 254:17, 23
**99.93** 269:20
270:4

< A >
**A&P** 12:15
16:25  195:18
200:3  201:23
205:9
**A&P/McKesso
n** 201:16
**a.m** 1:19  9:7
67:4
**AB** 347:9
348:18  352:8
356:16, 19
**Abandoned**
7:24  268:8
269:5
**ABC** 314:4
**ability** 77:2, 8
173:16
215:11  295:7
347:12
354:21  361:6
368:12
**able** 16:24
17:3  27:6
77:3  158:12
173:9  174:7
191:13
222:10
233:12
237:10
241:19
242:23
243:25
250:25  252:8

**254:8** 271:20
275:5  283:17
284:3  295:4
**AB-rated**
346:25  348:4,
25  356:3
**absent** 161:25
**Absolutely**
34:3  48:12
220:23
251:19
259:22  365:8
**abundance**
197:5
**abundantly**
140:14
**academic**
40:5, 20
350:22  351:2
369:14, 18
**Academy**
342:4
**accept** 23:7
107:20
114:23  123:6
124:17
125:12  137:4
151:5  374:8
**accepted**
26:21  45:12
46:25  47:1
48:2  81:9
126:1
**accepting**
93:23  124:15
**access** 50:10
231:15  237:8
275:13, 17
276:13
286:15  323:8
339:7
**accessible**
18:17  55:13
264:23  265:7,
21  266:9
**account** 96:23
97:7  112:19
115:18, 22
164:16  170:16
**accounted**
98:24

Confidential Information Subject to Protective Order

accounts 98:3
165:3
accurately
107:3 175:11
295:5 337:23
ACE 146:12
achieved
93:17 108:20
142:8 375:17
achieving
363:1
acknowledge
362:25
acknowledged
187:4 188:10
acknowledging
171:8
acquired
256:16
acquisition
257:18
acquisitions
36:16
Act 118:1, 6,
14, 18 119:5
120:24
122:16 140:1
141:23 358:7
370:25
Actavis 2:14
action 59:12,
24 196:2
231:25 377:16
actionable
107:10
Actions 1:6
active 139:17
activities
146:25 236:24
activity 125:17
Actos 204:4
acts 116:7
118:9 119:14
122:8 141:21
actual 45:18
93:11 101:5,
19 142:25
143:19 158:6
160:10, 23
161:14, 24
297:12

298:16 370:6
375:22
Adamski
54:16, 18, 19
ADAP 165:10
add 124:12
127:6 131:22
159:12
162:25 223:3
added 43:11
159:15 182:13
addition
85:12 88:6
additional
12:8 112:10
218:9 247:19
255:23
additions
378:4
additive
289:25 290:25
address 60:5
61:24 69:10
239:7, 8, 16,
17 241:12
242:12 311:3
addressed
62:1, 14 63:3
138:17 374:3
addresses
247:18 260:17
adherence
302:25 304:13
adjective
369:12
adjudicate
129:8
adjudicated
127:4 131:25
adjudicating
221:8
adjudication
93:13, 14
129:23
130:17
248:10, 12
253:3
adjustments
93:14 98:23
administer
10:8

administered
359:14

Administration
8:17 35:24
357:14
administrative
35:19 39:4, 7
277:13, 20
administrativel
y 219:3, 18
309:22
310:21
311:21 312:5,
9 313:10
administrator
277:11
admitted
191:3 192:3
admittedly
189:4
adopt 101:11
adopted 308:3
adulterated
67:14, 19
68:8, 24
69:18 70:16
72:3, 15
73:11 102:12
103:7 109:15
110:18
112:23
114:12, 20, 25
115:23
116:21 117:7
119:1, 12, 22
120:1 121:1,
13 122:11, 18
123:3, 7, 19,
25 124:18
126:5 127:13
136:23 137:6,
9 139:24
140:5, 25
141:10, 14, 24
142:22 144:6
149:5, 7
170:20 371:2
375:3
adulteration

137:12
Adults 8:4
advance
197:2 198:16
200:4 202:3
adverse 58:11
59:18 146:7,
22
advertising
308:7
advice 32:11
53:5 183:18
185:20 195:6
201:10
advise 191:8
208:8
advised
185:23, 24
advising
187:13
Affairs 165:11
affiliate
262:10
313:11 314:8
affiliated
312:25 313:16
affiliates
261:23
262:15 264:3
314:5
affirmatively
228:1 229:9
315:20
afternoon
135:11 209:15
AG 22:24
23:1, 12
26:17 27:20,
23 29:5, 17,
18, 22, 24
30:5, 6 31:1
32:22, 24
33:14 41:5,
23 43:16
45:3, 19, 21
46:9, 19
47:10, 23
48:25 49:22,
25 50:9, 14,
17 51:4, 20
52:2 53:5, 10

54:7, 13 55:3,
22 56:19
60:15 61:10
62:24 63:7,
24 64:9, 25
65:7 182:11
334:5, 16, 23
336:13, 16, 18
364:20
agents 313:2
Aggregate
159:6
aggregated
134:6
ago 12:19
13:13 28:17
65:25 180:10,
11 193:17
236:17
250:19 330:6
353:19 376:13
agree 20:15
67:13, 21
68:7, 22
69:17 73:9
78:13, 14
80:22 101:18
102:24
114:10
127:10
130:18
133:13
134:10
137:12
153:12, 25
154:10 155:6,
16 198:4
211:5 222:1,
5, 9 223:8, 11,
15, 18, 22
224:1, 6, 13,
17, 21 225:4,
8, 12, 16
236:6 237:23
241:9 242:1,
14 244:4, 8
248:9 255:17
277:5, 10
278:9, 18, 23,
25 281:16
283:13, 22

286:*17*
287:*13, 24*
288:*10* 289:*9*
316:*12*
319:*11*
345:*12*
347:*17* 356:*2*
361:*7* 375:*5,*
*19, 20*
**agreed** 46:*5*
80:*21* 336:*1*
**agreement**
93:6 136:*22*
196:*1*
**agreements**
92:*16, 24*
93:*9, 19*
176:*14*
**AG's** 333:*24*
334:*3, 8* 336:*9*
**ahead** 17:*21*
53:*16* 64:*8*
192:*18*
196:*20* 232:7
259:*17*
264:*11*
325:*13* 346:*7*
364:*24*
**ahold** 328:*20*
**Aid** 3:*6* 91:*25*
**ailments** 149:*1*
**al** 8:*3* 37:*17*
297:*25*
**albeit** 104:*20*
108:*25*
**Albertsons** 3:*2*
**ALEK** 4:*6*
**ALFANO** 3:*14*
**algorithm**
300:*9*
**aligns** 300:*21*
**allegation**
98:*19* 371:*11*
**allegations**
107:*4, 10, 19*
**ALLEGHENY**
377:*2* 378:*1*
**allow** 75:*4*
76:*10* 183:*16,*
*17* 194:*6*
278:*11* 295:*10*

**allowed** 75:*11*
154:*12* 199:*25*
**allows** 39:*6*
222:*23*
278:*19* 279:*1*
306:*25*
**allude** 226:*1*
228:*11* 257:*11*
**alluded**
162:*18* 259:*10*
**alternative**
57:*24* 58:*2, 3*
60:*7* 62:*10,*
*16* 82:*14*
84:*18, 22*
146:*9, 17*
**alternatives**
60:*4* 65:*16*
78:6 134:*14*
**ambulatory**
340:*23*
341:*14, 25*
342:*6*
**AMCP** 342:*3*
**amended**
106:*25*
**amendments**
378:*4*
**America**
133:*16*
**American**
130:*19* 340:*17*
**Amerisource**
5:*2* 313:*25*
**amount** 76:*11*
127:*4, 11*
128:*21*
131:*16, 21, 23*
132:*5* 133:*1,*
*15* 173:*11*
192:*8* 220:*15*
224:*7, 14*
272:*22* 292:*3*
295:*5, 10, 15*
308:*11* 333:*1*
336:*18* 337:*20*
**amounts** 8:*11*
273:*9* 332:*3*
334:*23, 24*
337:*6, 7, 11, 16*

**analyses**
82:*13* 112:*20*
174:*5*
**Analysis** 8:*9,*
*11* 22:*18, 20*
23:*12, 18*
24:*2, 10*
28:*20* 33:*6, 8*
42:*16, 17, 20*
43:*15* 44:*19*
57:*10* 60:*16,*
*20* 63:*8*
77:*17* 78:*22*
79:*1, 4* 83:*7*
85:*8* 94:*21*
96:*6* 97:*3*
104:*20*
109:*14*
112:*10* 115:*9*
116:*19* 147:*7*
150:*17*
162:*24* 164:*5*
174:*12*
203:*16, 21*
253:*7* 281:*5,*
*22* 282:*1*
305:*19*
310:*14* 312:*7,*
*9, 14* 316:*25*
317:*4* 322:*2*
325:*14* 326:*6,*
*25* 327:*23*
328:*17, 22*
331:*14*
333:*17*
334:*25* 337:*6,*
*12, 21* 339:*2,*
*10*
**analyst** 28:*10*
41:*13*
**analyze**
276:*12* 281:*9*
296:*1* 328:*15*
**analyzed**
265:*1, 5*
285:*9, 13*
286:*2* 294:*11*
305:*25*
**analyzing**
251:*25* 253:*20*

**and/or** 237:*24*
272:*2*
**ANDA** 153:*20*
154:*18*
352:*10*
354:*10* 357:*5*
**ANDAs** 70:*18*
**ANDRAS**
2:*16* 7:*4*
9:*18* 11:*14*
365:*24* 366:*1,*
*5, 12* 368:*6,*
*16, 18* 369:*16*
370:*8, 18*
371:*3, 19*
372:*10* 373:*4*
374:*9, 18*
375:*7, 24*
376:*11*
**andrast@gtlaw
.com** 2:*18*
**Angeles** 3:*10*
**Ann** 1:*14*
9:*20* 10:*7*
202:*17*
367:*25*
376:*20* 377:*4*
**Annals** 268:*8*
**annotations**
21:*22, 25*
**annoyingly**
293:*2*
**annually**
255:*11, 19*
**answer** 14:*21*
15:*13, 18, 19,*
*23* 16:*9* 17:*6,*
*11, 19* 18:*13,*
*17* 19:*18*
20:*21* 25:*11*
27:*6, 7* 30:*3,*
*18* 31:*25*
32:*14* 34:*8*
37:*23* 39:*22*
40:*11* 41:*9*
42:*1* 44:*1, 9,*
*22* 45:*7, 25*
46:*12, 13, 14,*
*22* 47:*15, 16*
48:*6* 49:*7*
50:*5* 51:*8, 24*

52:*8* 53:*1, 9,*
*16* 54:*23*
55:*14, 15*
56:*6, 23*
57:*19* 60:*13,*
*18, 25* 61:*5,*
*14, 15* 63:*1,*
*11, 19* 64:*3*
65:*3, 4, 12*
67:*17, 24*
68:*12* 69:*3,*
*23* 70:*13*
71:*7, 17* 72:*8,*
*19* 73:*5, 16*
74:*6, 12, 21*
75:*22* 77:*15,*
*20* 78:*24*
80:*7, 16, 24*
81:*3, 22* 82:*8,*
*18, 22* 83:*4,*
*22* 84:*1, 15*
86:*14* 87:*7*
88:*19* 89:*11*
92:*4* 94:*19*
95:*3, 11, 23*
98:*16, 25*
99:*11* 100:*1,*
*12, 21* 101:*15,*
*23* 102:*16*
103:*2, 12, 22*
104:*8* 105:*6,*
*19* 107:*15*
109:*7, 20*
110:*5, 23*
111:*14, 19*
112:*7* 113:*3*
114:*16*
115:*12, 18*
116:*3, 10, 25*
117:*12*
118:*13* 120:*6,*
*7* 121:*7, 19,*
*24* 122:*3, 4,*
*23* 123:*12*
124:*5, 24*
125:*9* 127:*1,*
*18* 128:*5, 23*
129:*2* 131:*3*
133:*9, 18*
138:*22*
140:*10* 141:*3,*

Confidential Information Subject to Protective Order

17 143:12
144:12, 14
145:1, 3
146:4 148:3,
20 149:10
150:9, 21
151:3, 11
152:2, 12
153:18
154:16 155:2,
12, 22 156:13
157:2, 14
158:2 159:22
160:15
161:20
162:12, 22
163:13 164:3
165:24
166:13, 23
167:15 168:1,
17 169:7
171:24
172:11 175:4
176:20 177:3,
22 178:14, 25
180:4, 20
182:24
183:19, 23
185:16, 21, 23
187:7 188:1,
15, 23, 25
189:6, 14, 16
190:8, 11, 19
191:6, 10, 13,
24 192:6
193:4, 13
195:5, 7, 12,
13, 15 196:17
198:23 199:5
200:10 201:5
203:19 207:1,
19, 23 208:2,
9, 11, 12
213:20
214:12 215:3
216:11, 18
217:6 219:8,
21 224:10
225:1 226:9
227:2, 20
229:17

230:17, 24
235:10 236:5
238:12
241:14 242:5
243:6, 23
245:17 247:1
248:23
250:13
258:22 260:4,
24 261:18
262:19 264:5,
11 267:13
271:1 272:4,
18 273:23
274:7 275:1,
9 276:9
278:6, 14
279:6, 8, 20
280:11
281:13
283:25 285:2
286:24
287:18, 19
291:25
293:18
296:15 297:7
301:10 303:8
305:16 306:8
310:3, 24
312:12
313:14
314:16
315:25
317:14
319:16
320:17 321:1,
16 322:23
323:3 329:5
331:4 332:17
335:23 338:2
347:22
348:13 349:3
352:23 357:3
359:4 360:17
361:12 364:9
372:17 374:23
answered
18:19 43:24
44:21 45:6
46:21 47:13
49:6 51:23

63:13, 18
65:2, 22 69:1,
22 70:9 89:9
99:25 101:14
137:16 183:7
189:8 192:7
201:21 202:4
204:13 276:8
311:14
327:21 328:5
345:8 355:10
376:3
answering
32:16 204:15
205:17
206:12 207:14
answers
207:24
anticipate 12:3
anticipation
197:24 198:1
Antihypertensi
ve 8:4 146:19
anybody
67:10 100:9
144:2 184:16
188:2 267:3
332:6 365:6
anyway
226:16 304:1
apart 86:11
119:2 148:13
191:22
API 138:20
139:18, 24
140:21 285:14
apologize
13:8 19:8
51:14 69:14
121:21 127:8
130:13
138:10 194:24
app 308:8
apparently
70:24
appear 90:13
appearances
9:21
appearing
9:16 135:25

appears
233:20 234:2
237:12 268:6
316:8
appendices
22:8, 12 24:23
Appendix
85:20, 25
88:5 106:11
174:25 198:7,
8, 12 201:8
350:21
applewood
288:24
applicable
26:6 235:12
283:5
applied 161:9
169:12
applies 221:4
232:4 233:25
237:19 238:6
apply 214:24
215:1 217:18
218:11 333:8
appreciate
68:19 290:18
291:15
340:24 376:8
approach
161:10
approached
30:5
appropriate
23:6 123:8
281:18, 25
331:10
approval
114:22
154:17 186:4
196:6, 10
203:23 357:5
approve
244:25
Approved
8:17 68:15
69:12 70:15,
18 113:21, 23
114:8, 20
153:10, 21
221:19 283:1

347:25 354:9
357:15 358:2,
5 359:9
approximately
161:23 164:7
222:2, 5
231:3 338:11
339:1 366:23
ARB 146:11,
13
arbiter 23:4
arbitration
197:13
199:19
202:10, 24
205:4
arbitration-
related 198:18
archive 226:17
archived
264:23 265:2,
10, 13, 16, 25
266:4
area 20:16
40:5 42:8
83:12 87:24
116:12
123:17
297:15 340:16
areas 12:8
21:12 24:15,
18 28:21
31:17 49:21
80:11 83:15
arena 97:20
182:18
argue 370:15
Argument
94:11 95:7
96:19
Argumentative
65:2 111:12
130:25 133:7
166:12
170:23
171:21 175:3
180:19
182:23
192:10 200:9
201:4 258:21
260:23 295:1

Confidential Information Subject to Protective Order

352:22  363:4
371:19

**arguments**
96:5

**argument's**
131:8

**Argus**  253:25
254:3

**armamentariu
m**  137:18

**arrangement**
31:2  92:20
335:10

**arrangements**
93:24

**arrive**  124:13
145:9  161:13
163:6

**arrived**  52:22
54:3  162:16
171:7

**arriving**
160:9  373:2

**Article**  7:22
8:3, 6  268:6,
10, 16, 19
270:14, 20, 23
271:3  298:25
299:2, 16
300:7, 24
301:4, 15
303:2  322:14,
20, 22, 25
323:14
325:16  351:2

**articles**  302:3
350:22

**article's**
303:17

**articulated**
108:25

**ascertainability**
20:15  183:22
204:12
209:25  273:5

**ascertaining**
80:13

**ASHP**  8:13
341:25  342:9,
20  343:1

347:17  353:1
360:18

**aside**  206:16
220:6  233:8
238:15
243:16
270:19  271:7
330:10

**asked**  13:5
17:16, 25
18:14  21:19
33:20  44:20
45:5, 17  46:2,
21  47:13
49:5  51:22
55:17, 19
63:18  65:1
68:20, 25
69:21  70:9
73:23  83:11,
13, 15  84:11
89:8  94:23
99:24  100:8
101:13  109:1,
15  118:4
123:24  125:3
127:23
137:15  179:5
183:6, 14
186:9, 10, 13
192:7  197:16,
25  201:20
217:15  264:8
276:7  311:13
317:25
327:20  328:5
345:7  355:10
362:5  365:3
366:14
374:12
375:15  376:2

**asking**  19:19
47:4, 8  53:11,
14  69:16
81:12  89:12
126:1  130:15
132:11, 15, 18,
19  148:11
167:7  171:5
172:3  202:2
204:16  206:4,

14  207:16
217:10  263:7
280:19
291:11
301:14
327:14
344:14, 16, 22
348:21  367:17

**asmolji@duane
morris.com**
4:9

**ASO**  276:4,
19  277:13
278:2, 10, 11,
19  279:1, 16
280:3, 8, 16,
23  281:2, 3, 10

**ASOs**  277:8
281:7

**aspects**  147:9

**asserted**  108:3

**assertion**
324:3  325:15

**assess**  126:1

**assessing**
135:18

**assessment**
74:25  374:7

**assets**  367:12

**assign**  240:8

**assigned**
79:24  240:5

**assignment**
34:5  73:20
80:20  82:5
83:10, 14
87:1  100:14
102:18
103:14
104:11, 12
105:8  111:15,
22  125:13, 25
145:16
147:21  163:8
168:3  172:1,
13, 15  179:2,
7  196:9
220:4, 18
255:7  265:4,
8  274:14
276:16

277:24  295:6,
19  305:24
308:20
311:16
315:18  317:3,
8  326:10
327:7, 10
328:7, 13
330:8

**assignments**
74:18  76:7
79:9  83:22

**assigns**  307:1

**assist**  24:16
237:24

**assistance**
22:18  29:5,
17  165:9, 10
344:7

**assistant**  39:4

**assisted**  24:18
45:16  46:15
66:2

**associated**
25:18  96:23
112:11
157:10, 20
173:2, 13, 15,
22  174:9, 10
213:5  279:10
369:24

**Association**
319:5, 6, 9, 21,
24  320:4
321:19  322:4

**assume**  42:5
60:2  109:2,
15  123:24
125:24  126:3
131:7  144:16
288:17
296:23  310:7
375:16

**assumed**
94:24  161:12

**assumes**
84:24, 25
85:1  96:25
303:2  371:20
373:25  375:2

**assuming**
57:14  114:4
144:21
161:10, 11
245:21
302:16
316:19
326:24
337:22, 25

**assumption**
98:4  101:11
109:25
124:14  174:8
296:12, 16
297:4  303:10
373:10

**assumptions**
83:11, 13, 16
84:12, 17
85:6, 9
109:22  124:7
125:1  169:3
306:15  310:10

**assurance**
348:24
354:22  355:8
361:7

**assured**  64:20

**astonishing**
180:14

**at-issue**
149:12, 20
317:6  332:14,
25  367:21
368:3

**attach**  92:24

**attached**  22:8
159:7  176:10

**attaches**  82:24

**attachments**
91:16, 17

**attack**  146:22
147:12

**attacks**  58:16

**attempt**  95:18
220:14

**attempting**
366:20  367:11

**attention**
293:16
299:25  342:24

Confidential Information Subject to Protective Order

attest 153:13
155:17, 23
attestation
154:1  156:8
attestations
153:21
attesting
190:3, 5
attorney
17:14  31:11
81:4  96:1
144:13  197:5
340:2
attorney/client
15:21
attorneys
17:22  18:1
31:9  86:22
87:19  109:9
185:14  186:4
191:17
196:20
203:20  340:6
attractive
249:22
attribute
231:4
attributes
245:11
audits  237:23
August  49:15
Aurobindo
285:17  286:9
287:6  296:7,
11  335:3, 15
Aurobindo's
286:2
authored
18:23  45:19
46:9  47:10
50:1  64:22
91:6  363:10
372:1
authoring
94:16  95:1
authoritative
341:10, 20
342:2
authorizations
252:5

authors
268:19
269:10  270:3
automation
173:12
Availability
7:22  237:13
available
18:23  75:4,
18  76:10
77:9  79:10
82:10  84:5
90:23  94:12,
25  98:13
114:7  133:4,
11  148:24
150:24
152:16  153:8
156:16  158:8
162:2, 5, 25
194:22, 25
243:20
270:11
279:11, 12
286:4, 13, 18
289:1  295:9,
13  300:14
301:16, 19
303:20, 23
304:2  307:11
324:2  325:22
336:7  346:21
348:16  357:9
368:8  370:12
371:7  373:13
Avenue  5:10
6:4
average
147:12, 13
164:9
avoid  179:14
award  12:21
13:4, 5, 22
14:2, 7
aware  12:11
123:23
147:22
148:13, 23
176:15, 21, 23
177:15, 17, 23
178:6, 11

184:23  185:5,
9  186:13
189:20
194:12, 18, 21
228:17
261:21
305:11  320:3
326:2  357:24
363:9, 14

< B >
back  12:7
18:6  28:14
41:2  65:8
67:5  86:22
87:17  89:21
96:16, 17
111:20, 21
135:8  136:21
142:4  176:3
183:16
187:15  188:8
190:9, 15
202:21
205:25
207:25  209:1,
9  226:15
238:15
251:21
252:10, 21
266:18, 21
283:15, 25
284:1  302:11
317:17  318:3,
7, 9, 12
325:20
336:16
339:21  340:1,
3, 7  353:1
361:1  365:21
366:10
367:25  368:1
371:13  372:19
background
21:9  22:21
25:17, 19, 20
26:15  31:16
32:3  34:12
36:20  37:10
40:14  61:17,
21  74:2, 8, 13

88:13  89:13
93:2  94:4
288:6
bacon  288:24
289:20, 23
290:23  291:19
bandwidth
125:18
bankruptcy
12:15  16:25
195:18  196:3
205:9
barely  10:5
366:3
bargain
110:11, 19
111:1, 9
126:8  135:17
161:16  375:16
bargained
110:13
BARNES  3:9
91:7
base  39:5
based  26:7, 12
27:9  34:13
50:21  53:23
54:11  57:6
84:3  86:20
112:9  118:15
171:9  226:18
255:21  272:8,
14  283:18
288:14
294:16, 22
296:10  304:4
307:11, 20
308:18
332:18
335:25
337:19  352:9
360:18
basic  94:6
164:9
basis  72:16,
21  79:11
80:23  81:16
84:7  86:21
98:9  123:18
140:19
141:13  147:6

150:13
153:23
186:17, 25
192:24
196:12  264:8
270:2  337:17
358:5  365:13
Bates  234:17
battle  174:16
BAZAN  4:5
beauty  125:22
Beckford  28:1
41:16, 17, 19
42:11  43:14,
16, 19  44:6,
18  45:16
54:15
beef  352:25
353:12  373:24
beer  288:25
289:20, 23
290:23  291:19
beg  186:3
beginning
35:4  44:16
136:3  350:21
352:4
begins  101:3
108:9, 13
behalf  2:2, 12
3:2, 6, 13  4:2,
11, 15  5:2, 6,
13, 17  6:2
9:14, 19
13:17  16:7,
19  20:12, 17
42:21  91:7
163:10
behaviors
308:4
beings  314:10
belief  102:10
believe  24:5
30:21  50:10
52:10  71:23
89:2  90:12
93:6  103:6
162:8  196:12
218:15
225:25
237:17, 18

Confidential Information Subject to Protective Order

260:5  261:1
297:21
339:20  372:12
believing
356:16
beneficiary
164:11
benefit  24:21
58:19  62:7
110:11, 19
111:1, 8
135:16
136:16
138:14
145:10, 14
147:16
161:16  163:5
170:12, 15
172:18
176:14  284:6
307:24
322:21
323:18  362:6
375:16
benefits  146:1,
5  242:22
249:3, 22
252:10
268:22
269:12
280:17
325:10  346:23
Benevolent
319:6, 21, 24
320:4  321:18
322:3
Bergen  5:2
313:25
BERNE  5:3
best  78:17
better  236:24
big  38:8
77:25
bigger  233:15,
16  362:17
bill  131:10, 14,
23  278:11
279:9, 12, 17,
23  280:4
283:17  284:2,
3

billed  181:20
182:11
334:23, 24
336:18
337:11, 16, 21
338:12
billing  24:4,
12  29:22
334:13
BIN  282:20,
21  283:4
binder  22:5
bioequivalence
359:12
bioequivalent
346:25  348:4
349:10, 20
bird  247:18
birth  238:25
239:2, 9, 10
241:12
242:12
243:11, 14, 15
309:6, 7, 18
311:1
birthday  309:8
bit  12:25
13:2, 16  19:5
20:3  23:11
144:5  169:22
221:14
246:13
275:15
284:13
309:10  341:18

BLACKWELL
5:20
blank  245:2
BLAs  354:11
blood  58:10
108:21  142:8
144:6, 17
146:15
148:25  377:16
Board  69:6
bodies  345:20
body  344:10
bonuses
304:13

Book  8:15
347:6, 10, 14,
19, 25  348:2,
15, 23  349:5,
16, 20  351:2,
9, 14  352:9
353:8, 10, 13,
15  354:7, 8,
12  355:24
356:9, 13
357:8, 14
358:4, 11
363:15
Books  348:8
350:22
borders  326:9
BOSICK  3:14
Boston  4:20
bother  106:5
bottle  302:9
bottom  283:3
295:23
bought  234:1
brand  133:24
branded  37:4
breach  82:25
break  19:24
20:1  66:20,
22  128:25
132:8, 12, 14,
19  134:16, 21
135:12, 15
158:9  185:1
259:17, 22
266:12, 22, 25
267:3, 6
317:24
318:14, 17
336:3  371:17
break-out
334:14
Brian  27:23
54:14
briefs  89:24
bring  90:6, 22
101:7  106:1
117:18  138:1
158:19  166:1
342:19  357:7
bringing

268:3  323:10
Britt  71:23
broke  309:10
broken  20:9
335:4, 15
brought  29:25
204:7
BUCHANAN
3:3
bucket  20:13
buckets  20:9
211:11
build  35:15, 18
bulk  182:17
burden
328:24, 25
burdensome
261:2  326:12,
20  327:12
328:17  329:9,
13, 15, 18, 20,
24  330:4
burger  289:20,
23  290:23
291:19
business
23:21  34:23
35:4, 14
36:19, 23
37:21  38:2, 4,
9  50:25
71:11  78:13
92:19  96:4, 8
98:9  99:1, 14
111:17, 25
113:5  131:12
134:8  170:1
180:22, 25
181:17
226:19  230:4
251:7  256:20
258:5  263:21
366:15
businesses
37:15
business-type
39:1
busy  38:19
but-for  274:3

buy  152:20
170:5  172:23
355:13  368:12
buying  127:12
buys  133:19
byproduct
289:3

< C >
c.whiteley@ka
nner-law.com
2:11
C-1  85:24
C-4  350:20
calculate
76:10  105:13
126:9, 21
127:24
145:16
158:13
172:13
272:25  297:3
302:21
calculated
96:19  171:9
177:10  300:8
calculating
95:17  99:7
117:14  169:4
176:25
178:10, 21
calculation
100:7  104:22
143:1  145:17
171:16  172:7
295:10  300:1
373:2
calculations
111:17, 24
303:15, 24
305:4  330:19
California
3:10
call  26:7, 13
29:2  30:8, 21
31:12  35:22,
23  65:14
67:2  74:9
158:21  195:3
200:4, 20
209:5, 24

Confidential Information Subject to Protective Order

220:22 298:20 351:13 352:5 **called** 1:13 40:6 73:20 131:20 186:11 195:1 300:1 **calling** 126:17 127:7 185:2 252:9 **Calls** 52:24 54:21 68:11 69:1 70:11 73:14 81:1 82:6, 17 83:2 89:9 95:21, 24 98:14 100:11, 19 101:21 103:10 104:6 105:4, 17, 18 109:5 110:3, 21 111:13 112:25 113:11, 13 114:14 115:11, 25 120:4 121:5, 16 122:20 123:10 124:4 125:8 127:15 137:16 141:2, 15 144:11, 24 149:8 150:19 151:9 152:10 153:16 155:20 156:11, 25 161:17 162:21 163:12 167:13 172:10 177:1 192:8 193:11 196:15 219:6 272:2 274:5 310:2, 22 311:22 315:23 320:24 329:4

331:20 333:5 335:8, 18 336:7 339:4 341:3 354:2, 24 356:6 357:1 361:10 371:4, 20, 23 375:9 **camera** 10:25 362:18 **Camp** 2:9 **CAMPBELL** 6:4 **cancer** 289:10 **capabilities** 173:7 **capable** 290:17 **capacity** 39:19 41:21 42:12 **carcinogenic** 287:14, 25 288:7 289:10, 25 290:25 291:22 292:2 **card** 129:6 239:24 240:3, 6, 7, 20 **cardholder** 238:20 240:1, 4, 12 241:2, 11 242:11 **Cardinal** 6:2 **cards** 250:4 **care** 116:18 129:5 282:25 339:19 342:4, 6 346:22 **career** 34:24 35:16 **Caremark** 36:17 231:1, 5 257:13 259:10 262:3 **Carolina** 3:5 **Carondelet** 5:21 **case** 8:9 12:1, 14, 15 13:6, 11, 13 14:18

15:1, 3, 9, 11 16:12, 20 17:1, 23, 25 20:8, 11, 13 21:1 24:19 29:25 30:9, 21 33:4, 8 34:12 41:7, 11, 20 42:9, 21 45:4 51:21 52:20 53:24 58:8, 25 62:5 70:2, 15, 25 71:5, 14 73:24 76:15 80:2 82:10 88:13 89:6, 19 93:10 98:13, 18 101:24 103:19 104:5 106:24 108:3 111:9 113:15 115:6 118:17 120:12 125:5 126:2 128:8 135:18 138:19, 24 140:20 141:6 146:11 150:3 153:3 154:18 159:8 169:4 172:23 174:19 176:4, 17 179:22 181:22 182:4 185:6, 18 186:5 189:21 190:16 191:4, 18 193:8, 14 195:19, 22, 25 196:24 197:7, 16 199:2, 16 200:12, 18 201:8, 24 203:8, 12, 14, 16, 21 204:3, 4, 14 205:9, 23 206:25 208:14 210:3 215:6, 7

216:1, 2 217:24 221:4 226:13, 23 227:8, 11 228:21 229:6, 9 234:9 246:9 254:16 257:24 260:13 261:23 263:2, 23 264:3 265:15, 19 266:3, 7 267:19 274:2 275:3 284:7 288:4, 15, 21 290:10 292:8 305:12 306:6 307:17 308:23 313:17 314:20, 23 315:2 328:23 333:24 334:3, 8 336:14 337:22 338:6, 19 342:15 348:18 352:24 357:5 366:2 367:8, 22 368:4 370:1 375:19 376:7 **cases** 12:21 17:5, 8, 13 23:25 100:7 125:14 161:24 164:24 180:23 181:7 182:18 196:19 201:22 203:4 241:7 316:9 375:18 **cash** 132:3, 4, 25 161:14 308:3 **Catalyst** 253:8, 17, 20, 24 254:3, 8

**Catamaran** 253:10, 18 **catapulted** 36:20 **catch** 203:18 272:10 367:24 **catching** 234:11 **category** 37:17 **caused** 108:19 **caution** 15:19 30:16 55:5 64:11 179:12 183:7 197:6 236:19 **caveat** 242:17 **ceased** 376:24 **Center** 2:21 8:17 35:22 173:9 357:14 **central** 191:3 192:3, 25 **Centre** 3:16 **Century** 3:10 **CEO** 35:14 **certain** 26:20 31:3 36:25 37:1 80:1 84:12 86:3 93:17 118:15, 16 129:7 134:1 164:24 185:24 220:25 228:12 243:3, 7 276:19 319:1 323:15 326:14 330:19 355:14 356:4 **certainly** 33:10 40:13 48:7 96:17 141:12 145:23 178:19 227:24 235:17 259:2 274:10 315:6 357:24

364:*15*
376:*14, 17*
**Certification**
166:*9* 194:*13*
195:*10*
208:*22* 294:*6*
**certified** 193:*8*
**certify** 377:*6,
11, 15*
**cetera** 50:*24*
170:*7* 173:*18*
186:*8* 271:*4*
**cgannon@wals**
**h.law** 2:*23*
**cGMP** 123:*14,
18* 139:*17, 24*
140:*4, 24*
151:*6, 22*
152:*7, 18, 22*
153:*14* 154:*3,
11* 155:*8, 17,
24* 156:*2, 8,
21* 180:*1*
**cGMPs** 123:*8*
**chain** 77:*1*
78:*3* 152:*25*
226:*11*
268:*21*
269:*11*
271:*18, 21*
307:*3, 4*
**chains** 37:*10*
72:*3, 14*
227:*5* 307:*5*
**challenge**
247:*21* 306:*22*
**challenges**
249:*1*
**challenging**
186:*25* 313:*9*
314:*7*
**chance** 374:*20*
**Chang** 8:*3*
297:*25*
298:*25* 303:*17*
**change** 26:*7*
241:*22* 249:*3*
304:*20*
307:*22*
334:*17*

336:*20*
339:*16* 378:*6*
**changed**
25:*24* 62:*15*
242:*21, 22*
253:*14*
**changes** 26:*8*
65:*9* 249:*10*
**channels**
173:*25*
**characteristics**
31:*16, 17*
32:*3* 146:*10*
300:*2*
**characterizatio**
**n** 14:*20*
20:*20* 25:*10*
30:*2* 39:*21*
45:*24* 51:*7*
52:*7* 53:*8*
57:*18* 63:*10*
64:*2* 72:*6*
74:*20* 75:*7*
77:*19* 102:*15*
103:*10*
107:*13* 109:*4*
118:*12* 120:*5*
130:*4* 133:*17*
141:*1* 148:*2,
19* 149:*23*
150:*8, 19*
156:*25*
159:*18*
160:*14*
162:*11, 13*
165:*23*
174:*21*
175:*14* 182:*6*
188:*14* 191:*8*
198:*22*
213:*19*
214:*11* 216:*6*
223:*2* 227:*19*
245:*16*
254:*21*
261:*17*
272:*17* 278:*5*
279:*19*
290:*12* 301:*9*
303:*7* 320:*7*
341:*22*

345:*22*
347:*21*
348:*12*
349:*23*
354:*24*
356:*18* 357:*1*
359:*2* 360:*14,
25* 361:*10*
**Characterizatio**
**ns** 112:*6*
**characterize**
38:*6* 230:*14*
261:*1*
**charge** 375:*18*
**Charitable**
246:*19, 22*
247:*10, 24*
248:*6, 18*
**Charlotte** 3:*5*
**chart** 338:*7*
**check** 198:*17*
200:*5* 201:*19*
203:*6*
**checked** 46:*4*
197:*21* 199:*1*
**cheeseburger**
288:*24*
**Chicago** 2:*17*
4:*14* 38:*24*
**CHIP** 165:*8*
**choice** 308:*9*
**choose** 147:*25*
148:*5, 7*
149:*17*
**CHRISTINE**
2:*20*
**CHRISTOPHE**
**R** 3:*4*
**christopher.hen**
**ry@bipc.com**
3:*6*
**chronology**
59:*5* 119:*8*
**Cigna** 5:*17*
313:*18*
**Cincinnati** 5:*5*
**circling** 142:*4*
**circumstances**
243:*3, 8*
375:*21*
**citating** 24:*11*

**citation** 24:*1,
11* 27:*14*
94:*3* 237:*23*
**citations**
22:*21* 24:*3*
**cite** 25:*21*
27:*17* 71:*21*
246:*19* 248:*6,
19, 24* 276:*17*
282:*5* 298:*12*
322:*14* 364:*1*
366:*15*
**cited** 138:*12*
174:*15, 25*
325:*15* 352:*18*
**cites** 139:*25*
**city** 165:*13*
320:*4, 12, 14,
21* 321:*8, 19*
322:*4*
**city-based**
321:*23*
**civil** 132:*12*
**claim** 86:*7*
94:*1* 100:*18*
101:*8* 107:*11,
17, 22* 129:*8*
163:*4* 204:*5*
239:*23* 243:*1*
244:*25*
281:*17, 24*
282:*16* 283:*1,
8, 10, 15, 24*
284:*1* 324:*24*
**claimant** 14:*5*
**claimed** 76:*6*
92:*24* 93:*9*
**Claims** 7:*12*
14:*4* 35:*25*
90:*7* 106:*1*
108:*2* 129:*16*
134:*7* 197:*13*
221:*8* 222:*3,
7, 10, 11, 17*
223:*19*
225:*23* 226:*6,
24* 227:*9, 17*
228:*1, 6, 18,
22* 229:*1, 10*
233:*6* 235:*14*
244:*23*

245:*14* 246:*1,
15* 248:*2, 9,
11* 250:*20, 25*
251:*4, 8, 13,
24* 253:*3, 7,
21, 25* 254:*3,
8, 9* 256:*6, 22*
257:*5* 258:*16*
259:*5, 12*
260:*1, 8, 15,
21* 261:*6, 15*
262:*14* 264:*2,
22, 24* 265:*2,
6, 17, 21*
267:*10, 18*
274:*19* 277:*6*
278:*9, 20*
279:*2, 10*
281:*11*
282:*22* 283:*8*
303:*13* 304:*5*
305:*3* 366:*21*
367:*12*
**clarification**
18:*21* 34:*4*
55:*19* 223:*4*
**clarify** 13:*25*
263:*17*
**class** 20:*15*
69:*18* 75:*4,
19, 24, 25*
76:*2, 3* 80:*13*
102:*22* 103:*8*
121:*13*
148:*12* 151:*7,
22* 155:*19*
165:*18, 20*
166:*6, 9, 21*
167:*10*
194:*13*
195:*10* 210:*8,
17* 211:*2, 7, 8,
15, 19, 20*
212:*15, 17, 25*
213:*6, 9, 16*
215:*2* 216:*8,
15, 21* 217:*12,
19, 22* 218:*12*
219:*4, 19*
220:*2, 10, 16*
254:*17, 23*

272:5, 8, 14, 21  273:5, 19  276:4, 14  284:14, 24  293:25  294:6, 13  297:12  306:12  310:20  311:20  312:17  315:12, 21  316:9, 21  317:2, 7, 12  318:24  321:12  325:21  331:17  332:15  333:2, 8  370:17

**classes**  211:6, 11  212:1, 4, 13  213:8  214:17, 25  271:25

**classifies**  359:21  362:3

**classifying**  361:19

**class-wide**  79:11  99:7

**clean**  21:20, 21  22:3

**clear**  24:17  51:15  84:21  130:14  140:15  209:19  311:9  314:19  361:14

**clearance**  191:19

**clearances**  196:21

**clearer**  34:2

**Clearly**  56:3  290:14

**clerical**  97:11

**client**  38:18  131:10  190:8  280:9, 12  282:18  283:17, 20

**clients**  18:10  38:2  180:24  256:21  277:23  278:3, 12, 21  279:3, 9  280:18, 24  283:15, 18, 24

**clinical**  35:21  136:16, 19  142:22  143:8, 20  144:18  145:8, 10  163:5  230:10  251:20, 22  252:5  288:5, 14  290:4  308:12  359:13

**clinically**  144:8

**close**  92:18  93:4

**closely**  270:21

**CLR**  1:14  377:4

**CMS**  26:13  221:19  237:22, 24  302:24

**CMS's**  26:7

**COAN**  4:19

**cobble**  220:4

**cobbling**  220:6

**code**  67:19  68:1  222:20, 23  223:5, 8  238:22, 23, 24, 25  240:9, 10, 13, 15, 20, 21, 24  241:8, 12  242:12  252:17  269:19

**cognizable**  107:11, 17

**co-insurance**  127:11

**co-insurances**  161:5

**colleague**  12:3

**collect**  128:19  246:9

**collected**  130:20  161:4

**collection**  333:23

**collectively**  182:12

**collects**  133:13

**column**  269:15  346:9

**combination**  171:10  254:22  255:5  367:2, 5

**combine**  306:13  308:24  366:20  367:12

**Combined**  231:8, 9  256:5, 11  305:20  312:2  337:21

**combining**  213:3, 11  214:7  215:8  216:2, 22  267:10, 18  305:8

**come**  12:7  27:11  61:25  97:16  187:14  190:9, 15  196:22  229:19  318:3

**comes**  27:8  91:15  151:17  250:8  356:23

**coming**  16:2  28:14  219:12

**commencing**  1:19

**comment**  81:13  95:16  98:12  104:13  154:7

**commenting**  80:11

**comments**  48:1  49:12, 22, 23, 25  50:19, 22

65:8  96:8  117:16  355:3

**commerce**  62:13  114:12  115:1  116:21  117:8  119:20  120:2  121:3  122:9, 19  124:2, 21  141:24  148:15  170:21  371:1

**commercial**  228:18  341:25

**Committee**  8:13  221:19  341:16  343:2  344:9

**committees**  341:1, 6, 24  342:7  345:20  347:19  349:8  350:3  351:10, 14  352:11  358:21  360:11

**Common**  346:12

**commonly**  358:4

**Commonwealt h**  1:15  377:1, 5  378:1

**communicate**  27:22  262:25  263:20  267:2  318:13

**communicated**  141:7  224:3  263:8  335:7  339:9

**communicating**  224:15

**communication**  244:20

**communication s**  33:2  221:7  222:11, 16  224:23

225:10, 18  263:13

**comp**  13:4, 19, 21  14:3, 5  37:6

**companies**  35:6  37:4, 14  253:9  313:24

**company**  14:11, 16  28:5  30:13  35:16  36:5, 9, 10  37:20, 25  54:16  130:4, 23  131:16  133:3  152:8  182:8, 9  253:14  256:24  283:4

**compendia**  348:17

**compensation**  165:14

**competition**  249:20

**compilation**  348:3  357:4

**complained**  178:22

**complaint**  106:25  107:5, 20  161:12  166:9  294:10

**complete**  24:22  66:9  92:21  121:21  122:1

**completed**  66:6  131:9  244:21

**completely**  57:9  59:16  164:24  201:14  365:9

**complex**  78:11

**complexities**  74:25

**compliance**  78:6  116:13  153:14  155:17

156:*20*  157:*4*
304:*22*  362:*22*
**complicated**
275:*15*
**complied**
233:*5*
**comply**  28:*6*
78:*4, 8*
232:*20*  237:*21*
**component**
23:*14, 22*
24:*14*  35:*21*
38:*8*  51:*11*
76:*23*  77:*1*
239:*22*  249:*8*
**components**
23:*15*  25:*25*
26:*5, 11*
40:*16*  64:*16*
76:*23*  99:*15*
147:*10*  223:*6*
230:*12*  250:*6*
252:*4*  257:*4*
311:*4*  355:*14*
356:*20*
**comport**  194:*1*
**Compound**
48:*5*  73:*3, 13*
74:*5*  80:*5*
83:*1*  100:*10*
101:*21*
103:*11*  105:*5*
109:*5, 19*
110:*22*
111:*12*  116:*2,*
*23*  121:*4*
126:*16*  131:*1*
133:*7*
**comprise**  23:*2*
**computer**
129:*8*
**concede**  79:*21*
369:*22*
**conceded**
189:*3*  191:*2*
**concept**  97:*20*
159:*16*
**concerning**
21:*1, 9, 13*
56:*10, 19*
127:*3*  190:*21*

191:*6*  204:*4*
258:*4*  259:*11*
260:*14*
267:*17*
284:*24*  316:*15*
**concerns**
20:*14*  55:*3,*
*23*  116:*7*
156:*21*  189:*7*
**concluding**
136:*5*
**conclusion**
27:*12*  52:*25*
57:*6, 22, 23*
60:*19, 22*
62:*8*  68:*11*
69:*1*  70:*11*
73:*14*  77:*13*
81:*2*  82:*7, 17*
83:*2*  84:*3*
95:*22, 25*
98:*15*  100:*11,*
*20*  101:*21*
103:*11*  104:*7*
105:*5, 17, 18*
109:*5*  110:*4,*
*22*  111:*13*
113:*1, 13*
114:*15*
115:*11*  116:*1*
120:*5*  121:*5,*
*17*  122:*21*
123:*10*  124:*4,*
*14*  126:*18*
127:*7, 16*
137:*1, 16*
140:*9*  141:*16*
144:*11, 25*
149:*9*  150:*20*
151:*10, 12, 14,*
*17*  152:*11*
153:*17*  154:*5,*
*15*  155:*21*
156:*12*  157:*1*
161:*18*
162:*21*
167:*13*
172:*10*  177:*2*
192:*9*  193:*11*
196:*16*  219:*6*
272:*3, 17*

274:*6*  310:*2,*
*23*  311:*23*
313:*13*
320:*25*  329:*4*
331:*20*  333:*6*
354:*25*  356:*7*
357:*2*  371:*5,*
*23*  375:*9*
376:*1*
**conclusions**
53:*20, 23*
56:*13*  111:*16,*
*23*  112:*4, 9*
136:*10*
**conditions**
93:*19*  149:*19*
359:*15*
**conduct**  97:*24*
115:*17*  267:*8*
325:*13*
**conducted**
59:*4*  326:*6*
**conducts**
155:*25*
**confer**  17:*12*
365:*17*
**conference**
11:*3, 5*
**CONFIDENTI
AL**  1:*8*  7:*20*
92:*19*  93:*3, 7,*
*8, 9*  94:*8*
187:*22*
188:*15, 22*
189:*23*  190:*4*
197:*12, 15, 18,*
*19*  198:*10, 19*
199:*19*
201:*10*  207:*3,*
*8*  208:*8*
233:*22*
**confidentiality**
15:*20*  17:*7*
92:*16, 23*
94:*1*  176:*10*
179:*13*  183:*8*
185:*19*  186:*1,*
*2*  187:*9, 23*
189:*7*  190:*12,*
*21*  191:*7*
192:*7*  196:*13*

199:*25*
200:*22*
202:*11, 25*
204:*22*
205:*15*
206:*17*  207:*5*
236:*21*
**confine**  21:*4*
**confined**
80:*10*  104:*17*
242:*10*
246:*23*  290:*18*
**confines**
257:*20*
**confirm**  112:*3*
165:*19*  322:*3*
324:*2*
**confirmed**
54:*6*  72:*2, 13*
73:*1*  99:*20*
**confirming**
121:*25*
**conform**
139:*23*
**conforming**
165:*19*
**confounding**
311:*4*
**confused**
95:*16*
**conjunction**
168:*24*
**CONLEE**  2:*8*
**connected**
100:*18*
**connection**
45:*3*  100:*6*
229:*5*  339:*10*
**connotes**
356:*14*
**consequences**
146:*22*
**consequential**
130:*15*
**conservative**
296:*12*  297:*4*
**consider**
82:*12, 23*
98:*6*  115:*8*
117:*5*  145:*22*

168:*6*  178:*23*
313:*19*  329:*1*
**consideration**
142:*21*  169:*2*
177:*11*
**considerations**
17:*8*  344:*1*
**considered**
117:*2*  142:*9*
154:*22*  199:*4*
342:*1*  346:*25*
348:*4*  349:*10,*
*21*  359:*10*
373:*1*
**considers**
322:*10*
**consolidation**
255:*22*  256:*3*
257:*8*
**consolidations**
366:*15*
**consonance**
167:*3*
**consortiums**
78:*15*
**constant**  340:*1*
**construct**
274:*3*  306:*2*
**consult**  17:*22*
37:*13*  183:*10*
185:*13*
196:*23*  197:*6*
204:*14*
205:*17*  206:*12*
**consultants**
39:*6*  292:*10*
293:*6*
**consulting**
23:*21*  33:*22*
36:*10, 21*
38:*8*  66:*1*
118:*15*  181:*6,*
*7, 8, 17*  251:*2*
340:*22*
**consume**
288:*23*  289:*2*
**consumed**
292:*3*  297:*23*
373:*22*
**consumer**
101:*5*  102:*10*

Confidential Information Subject to Protective Order

105:*14*
127:*12*
128:*15*
129:*24*
130:*22*  133:*2*
147:*25*  148:*5*
152:*7*  160:*5*
161:*4*  211:*7,*
*19*  212:*4*
213:*9, 16*
215:*1, 7*
216:*2, 15*
224:*7, 14, 19,*
*22*  225:*6, 9,*
*14, 18*  241:*10*
252:*24*  253:*2*
355:*12, 15*
**consumers**
103:*7*  126:*22*
133:*15*  149:*3,*
*16*  158:*8*
160:*12*
223:*16, 23*
305:*10, 13*
367:*20*  368:*2*
**consuming**
125:*15*
**consumption**
297:*13*
298:*16*  305:*9*
306:*20*
**contact**  17:*25*
31:*8*  59:*10*
191:*17*  218:*9*
327:*4, 17*
328:*1, 10, 18*
364:*20*
**contacts**  28:*2*
**contain**
222:*19*  289:*4*
**contained**
290:*24*
**containing**  8:*9*
**contains**
21:*21*  257:*23*
**contaminants**
110:*12*
**contaminated**
102:*11*  103:*7*
108:*17*  110:*9*
112:*15*

127:*12*
136:*17, 18*
138:*20*
144:*17*
148:*14*  150:*5*
370:*16, 20*
371:*1*
**contamination**
108:*19*  150:*6*
285:*14*  294:*17*
**contention**
288:*15*  319:*23*
**contents**  27:*3*
50:*24*  56:*1*
64:*12*  357:*21*
**contestation**
13:*4*
**contested**  13:*5*
**context**  109:*1*
218:*16*
265:*25*  266:*2*
270:*12*  271:*3*
277:*18*
285:*22*  344:*2*
345:*17*  346:*3,*
*5*  354:*21*
358:*15, 17*
**Conti**  7:*16*
20:*12*  21:*2*
43:*20*  50:*2*
52:*5*  56:*15*
57:*3, 13*
58:*21*  60:*16*
96:*22*  97:*17*
98:*3*  109:*1,*
*10*  116:*17*
117:*2*  124:*7,*
*16*  135:*22*
136:*6*  142:*20*
160:*8*  161:*12*
163:*20*
164:*15*  167:*8*
171:*6*  174:*6*
177:*10*
178:*22*  319:*8*
320:*22*
321:*21*
330:*18*  331:*1,*
*14, 15, 24, 25*
332:*8*  333:*13*
340:*12*  369:*7*

371:*15*  372:*2,*
*8, 20*  375:*2*
**Continue**
74:*11*  137:*23*
269:*3*  374:*19*
**Continued**
3:*1*  4:*1*  5:*1*
6:*1*  8:*1*
31:*12*  368:*19*
**continues**
232:*22*
300:*12, 19*
**Conti's**  34:*11*
44:*7*  50:*8, 13,*
*20*  51:*3, 20*
53:*19*  54:*3, 8,*
*13*  55:*3, 23*
56:*10, 20*
60:*20*  63:*8*
84:*7, 11*
85:*12*  96:*3*
102:*20*
111:*17, 24*
123:*23*
158:*16*  164:*4*
165:*1*  178:*7*
330:*16*
372:*12*  373:*9*
374:*14*
**contract**
12:*21, 23*
14:*3*  281:*2*
**contracted**
130:*5*
**contracts**
93:*24*
**contractual**
129:*15*  130:*7*
181:*13*  283:*21*
**contrary**  340:*5*
**contributed**
130:*23*
**contributes**
289:*10*
**contributions**
40:*20*
**contributive**
291:*21*
**control**
146:*18*
149:*18*

281:*21*
282:*20, 22*
**controls**
139:*22*  145:*7*
**conventions**
256:*7*
**conversation**
60:*14*  65:*14*
**conversations**
30:*17*  64:*15,*
*17*  109:*9*
184:*20*
185:*16*  190:*22*
**conversion**
251:*8*  252:*20*
**convert**  251:*4,*
*10*  252:*8*
254:*8*  256:*21,*
*24*  304:*16*
**converted**
253:*24*  254:*3*
256:*17*
**convey**  28:*24*
63:*6*  64:*9*
170:*18*  370:*5*
**cooked**  289:*3*
**cooperate**
237:*24*
**copay**  101:*6,*
*25*  102:*4*
127:*5, 11*
**copays**  161:*5*
**copy**  21:*16,*
*20, 24*  22:*2, 3*
48:*9*  158:*15*
339:*18*
**corollary**
155:*6*
**coronary**
149:*1*
**corporate**
232:*16*
261:*23*  314:*2,*
*4*
**Corporation**
5:*6, 17*
**Correct**  11:*9*
12:*16*  13:*23,*
*24*  16:*21, 22*
17:*1*  18:*24*
21:*23*  22:*13,*

*15, 16*  24:*13,*
*19*  26:*22, 23*
28:*19*  34:*19,*
*23*  36:*21*
40:*6, 22, 25*
41:*1, 18*  44:*4*
51:*5, 21*  52:*5*
54:*9*  65:*21*
73:*12*  74:*4*
76:*7*  77:*17*
80:*2, 8, 14*
82:*25*  85:*7*
86:*8*  88:*16*
92:*14*  95:*8*
99:*23*  100:*18*
102:*22*
105:*15*  107:*1*
111:*3*  112:*4*
120:*3, 22*
121:*3, 14*
122:*19*  124:*9*
127:*14*
128:*16, 17*
129:*25*
130:*24*  132:*5*
134:*12*
136:*24*  137:*6,*
*9, 10, 14*
138:*12, 13*
140:*17, 18*
141:*14*
142:*22*
143:*17*  144:*5,*
*9, 23*  145:*5, 6,*
*10*  149:*1, 2, 7,*
*16, 19*  150:*6*
157:*21*
158:*10*
161:*11, 16, 22*
162:*9, 17, 19*
163:*7*  165:*21*
175:*1*  176:*25*
179:*6*  180:*2*
185:*6*  186:*12*
191:*15*  194:*4,*
*8*  195:*24*
205:*5*  210:*8,*
*15, 22*  211:*2,*
*3, 6, 16, 17, 20,*
*21*  212:*1, 2, 6,*
*8, 11, 12, 18, 21,*

Confidential Information Subject to Protective Order

22, 25 213:1
214:16 215:9,
12, 14 216:3
220:7, 20
222:18 226:2
228:9, 10
229:15 230:1
232:5 239:9,
11, 14, 15, 17
240:22 241:3
243:4, 16, 21
244:18
246:24 248:2,
21 251:15
252:16
253:19 255:6,
12, 13 256:8,
12 259:13
260:9, 10
261:7 264:20
265:17, 18, 22,
23 272:23
274:19
282:14 284:8
294:2 297:15
298:1, 14, 19,
23 302:1
303:5 306:2
309:12
311:12 313:6,
7 314:12
315:9 318:24
319:2, 7, 12
320:23 322:8
327:9, 16
329:2 331:18
332:22 333:3
334:22
336:17
337:13, 15
339:16
344:11
345:20
348:10
349:10, 21
350:4, 23
353:23
356:16, 24
357:25
358:11, 25
359:7 360:12,

23 363:10, 16
369:25 370:7,
17 371:2
372:24 373:3
375:1, 6, 23
378:19
**corrections**
378:4
**correctly** 47:6
79:15 80:22
88:24 108:22
119:23 136:3
165:16 247:2
269:23 358:8
359:16
**corridors** 26:1
**cosmetic**
119:21
122:11 358:7
**Cosmetics**
118:18
**cost** 78:18
96:23 97:1, 2,
4, 19, 23, 24
98:2 146:17
147:2, 4, 6, 12,
13 164:14
172:21, 24, 25
173:15, 22
174:8, 10
176:16
**costing** 119:15
**costly** 99:18
**costs** 97:14
98:4, 6
112:11
146:24
147:15 173:2,
11, 13 174:17
177:11, 16
178:1, 21
**Council**
220:20
**Counsel** 9:12
17:13 18:8
21:19 29:19,
21 30:5, 14,
20, 22 31:2, 3,
14 32:1, 5, 12,
16, 20, 23
49:2 50:12

51:12 55:6
61:13 66:10
86:19, 24
89:25 91:18
182:22
183:11, 18
184:20 185:3,
17, 20 186:17,
22 189:11
190:23 191:9
192:11 195:6
196:6, 10, 23
197:7, 16, 22
198:17 199:1,
2, 11, 22
201:6, 8, 11
204:14
205:17 206:2,
12 263:10, 11,
12 266:22, 25
318:13
335:11, 17
338:22
364:18 377:13
**counselor**
52:10 92:9
103:24 301:12
**counsel's**
266:12
**count** 331:11
**counted**
331:13
**counterfeit**
76:25
**counting**
330:22
**countless**
176:3
**country**
316:23
**county** 165:13
321:8 377:2
378:1
**couple** 12:19
19:1 38:16
39:3 87:8
256:15 334:11
**coupled** 36:19
**course** 19:11
40:23 50:24

59:12 118:7
220:24 371:9
**courses** 39:16
**coursework**
39:14
**COURT** 1:1
9:9 11:13
13:12 19:10
34:12 52:20
64:21 86:3,
10, 11, 17
88:15 89:23
91:5 104:10,
22 106:24
107:20 108:9,
14, 16, 25
109:4, 25
125:4, 25
126:1, 3
144:5 161:11
168:23
169:18
171:10 172:7
176:4 184:25
193:7 202:18
208:22 275:7
375:14
**courts** 209:24
**court's** 103:18
104:3 107:9
108:1, 6 340:5
**cover** 254:17,
22 284:6
301:17
324:23
340:16, 17
**coverage**
241:5, 6
**covered** 69:5
190:11 214:3
227:3 236:20
300:9, 13, 20
301:18, 24
303:25 372:14
**COVID** 194:2
**Craft** 20:16
34:11 64:15
208:17, 21
209:24
312:14, 24

330:15, 21, 25
331:14
**Craft's** 21:4
50:16 63:24
64:5, 10
254:14 255:9,
17 327:11
331:9
**create** 36:6
43:11, 13
48:14, 19
110:11
112:15
146:14
247:16, 19
**created** 35:11
46:16 85:4
130:16
**creates** 57:24
144:18
353:14, 17
373:10
**creating** 48:8
221:18
**creation** 35:11
**creditor** 196:2
**crisis** 146:20
**criteria**
105:13
120:11
135:17 169:3,
17, 19 170:19
219:13 356:5,
13, 15, 23
359:23 360:4,
12 361:19, 21
362:5, 7
363:1 364:5
374:6
**criticism** 21:5
142:19 162:7,
17 352:16
372:7
**criticisms**
21:2 177:9, 12
**criticize** 20:17
48:15 351:24
372:5
**criticized**
53:22 163:20

171:6 351:8
360:23 372:20
**criticizes** 54:5
**criticizing**
372:2
**critique** 57:10
164:4 172:16
174:4 211:18,
25 212:3, 13
213:7 214:24
217:17
**critiqued**
79:19, 23 96:2
**critiques** 84:7
212:23
213:13, 15
215:6, 25
216:22 217:21
**critiquing**
217:11
**CROWELL**
6:3
**CSR-WA**
1:14 377:4
**CULBERTSO
N** 4:18
**cumulative**
293:22, 24
294:4, 12, 16
306:20
307:14 308:17
**curious** 177:8
**current**
137:14
139:16
141:11
300:21
334:13 362:22
**curve** 85:1
109:17
121:11
150:14
154:24 156:6,
14, 15 157:11,
18, 19 367:18
368:11, 23
369:12, 15, 23,
24 374:13
**customer**
131:14, 23
132:3, 4 308:4

**customers**
172:22
173:14 282:24
**cut** 12:25
202:14 289:7
374:11
**cutout** 272:11
**CV** 34:20
**CVS** 3:6
7:18 36:17
91:24 231:1,
5 233:20, 21,
24, 25 234:3
235:6, 25
256:16
257:13 259:9
262:3 290:6
306:17
**CVS_MDL287
5_0000000208
7**:21

< D >
**D.0** 221:4, 14
283:11
**D.B** 5:15
d.stanoch@kan
ner-law.com
2:12
**Dallas** 5:10
**damage**
116:19 144:9
167:22 373:2
374:6
**damages**
20:11 21:1
79:11 80:12,
25 81:15
82:23 95:17,
20 98:13
99:7 100:7,
18 103:19
104:4, 23
105:14 111:9
126:2, 9, 21
127:14 128:2
135:18
144:22 159:6
161:15
168:12, 22
169:4 170:19

171:7, 9, 16,
19 172:4, 14
178:11 179:9
183:22
204:12
213:10 273:1
295:14
330:19
331:17 333:1
374:15 375:5,
20, 22
**damn** 29:12
**DANA** 4:5
**dangerous**
110:12
**dangerousness**
108:19
**DANIEL** 6:4
**data** 22:20
23:12, 18
24:10 28:20
41:13 42:16,
17, 20 43:11,
12, 15 75:3,
18 76:3, 10
79:9 80:25
81:14, 24
82:10, 22
83:7 84:5
87:25 89:14
130:16, 20, 24
132:25 133:4,
10, 19, 21
134:3, 6, 10,
14 147:11
158:8, 11
160:22
161:23 162:2,
5, 8, 19, 24, 25
176:11, 16
177:25 178:1
214:7 215:8
216:2, 23
218:14, 16, 17,
18 219:1, 3,
18 220:4
221:2, 7
223:16, 18
224:7, 18, 21
225:5, 8, 13,
16, 23 226:6,

14, 17, 24
227:9 228:1,
6, 12, 19, 22
229:1, 10
232:21 242:2,
15, 20 243:2
244:5, 9, 10,
14, 16, 19
245:6, 10, 14,
19, 21, 25
246:1, 3, 4, 9,
14, 24 248:2,
10, 11 250:1,
2, 20, 25
251:10, 11, 12,
15, 18, 19, 24
253:6, 7, 21
254:9, 15, 16
255:1 256:4,
11 257:9
258:4, 18
259:5 260:1,
9, 15, 21
261:6, 15
262:14 264:2,
22 265:2, 6,
10, 13, 17, 21,
25 266:5, 9
267:10, 18
269:16, 21
270:5, 10, 13
274:19, 22
275:23 276:5,
14, 19 277:3
278:2, 9, 18,
25 280:8, 23
281:11
283:14, 23
295:9, 12
303:13, 14
304:5, 6
305:3, 8, 13,
20 306:5, 14
307:11, 13, 16,
19 308:22, 24
309:12
310:14
311:11, 19
312:1, 2
330:16, 23, 25
331:6, 23

332:6 333:9,
17 348:16
366:21
367:12, 13
**database**
219:13 258:3,
17 268:20, 21
269:11, 12
**databases**
222:12, 17
246:15 259:12
**datapoints**
133:14
**datasets**
219:10, 11
306:23 309:1
**date** 9:6 26:4
49:18 66:4
177:19
212:21 239:1,
2, 10 241:12
242:12
243:11, 14, 15
252:19, 22, 23,
25 253:3
269:18
292:21
300:15, 16
309:5, 7, 18
310:19 311:1
**dated** 21:17
22:14 91:5
138:16
**dates** 301:17
**Daubert**
172:8 186:11
**Dave** 90:21
138:1 158:19
175:16
209:12 216:6
223:2 233:15
259:15
272:11 289:7
317:20
342:19
351:20 357:7
358:18
**DAVID** 2:9
90:24
**day** 29:9
134:11

168:23 246:5
291:11 293:2
340:12 345:1,
14 374:5
377:20 378:21
**days** 300:9, 12,
13, 20, 25
301:16, 18, 22,
24 302:4, 15,
23 303:18, 25
**DC** 6:5
**dcampbell@cro
well.com** 6:6
**deadlines**
125:15
**deal** 58:24
60:3, 4 62:10,
19 85:11
259:10 373:22
**deals** 25:18
**dealt** 373:21
**death** 300:16
**December**
14:11 300:16
337:5 339:16
**decide** 28:4,
13, 15 30:9
59:11 78:10
226:11 251:9
256:20
**decided** 36:13
47:19 52:15
59:7 251:16
**decides**
137:13 171:11
**decision** 23:6
143:25
226:19
252:22 257:5
258:16
259:11
374:25 375:1
**decisions**
104:12 251:7,
17 257:1
258:6 375:13
**Declaration**
7:16 88:6
256:17 264:20
**declarations**
71:10

**declined**
26:25 44:18
**dedesignated**
189:22
**deduct** 143:20
145:8
**deductible**
26:1 307:23,
25 308:2
**deduplicated**
159:14
**deeper** 104:18
**Defendant** 3:2,
13 4:11 5:2,
6, 13, 17 6:2
82:3, 13
226:14
227:25 228:5
231:25 262:8
263:1, 22
296:23
314:23 315:2,
20 317:1, 10
335:14, 25
**Defendants**
2:12 3:6 4:2,
15 9:15
16:10 29:19,
21 30:20
71:14 72:25
73:24 79:12,
18 80:3, 23
81:16 87:3
107:5 138:19,
24 140:16, 21
148:14
163:10
214:18
215:12 216:9
217:4, 18
227:13
261:23
262:13, 21, 24
263:8, 11, 13
264:3 285:21
288:5 291:6
305:12 306:5
312:17, 25
313:5, 10
314:19
315:10, 15

317:5 336:4,
13
**defendant's**
287:10 314:8
**defending**
10:2 185:14
**defends** 57:25
**defense** 16:16
31:2, 14
50:12 86:19
106:15
175:11
189:21
194:19 195:2
335:10 364:15
**defense's**
365:12
**define** 40:13
67:25 155:13
280:12, 15
313:16 321:10
**defined** 68:24
69:19 72:4,
15 73:2, 11
109:16
116:22
124:18
136:24
141:10, 14
300:20
321:12 376:6
**defines** 118:9
301:15 302:3
**definition**
67:14, 18, 22
68:9 119:11
123:3 124:15
136:23 137:5,
9 165:20
166:16, 21
167:10
321:13
332:19 355:6
368:22 369:3,
5 375:3
**definitions**
68:4 83:6
118:25
165:18 166:6
316:22

**degrees** 39:25
40:2
**delete** 29:10
226:17
**deleted** 14:13
228:1 229:9
315:20
**deleting** 227:8
**deletions**
378:4
**delineate**
83:23
**delineated**
85:24
**delivery**
114:11
119:19
122:12 173:12
**demand**
157:11, 19
369:24
**demonstrated**
359:12
**demonstration**
126:4
**dental** 324:18
**deny** 72:16
113:9 140:19
**Department**
165:11 246:2
**departments**
230:10
**depend** 100:3
272:21
**dependent**
283:8
**dependents**
241:7
**depending**
152:23
**depends**
40:12 125:10,
11 152:13
244:22, 23
248:10 279:8
313:15 321:10
**deponent** 9:11
**depose** 257:19
**deposed** 58:18
**DEPOSITION**
1:12 9:7

12:17 13:12
18:22 34:17
70:25 85:14
96:1 179:23
180:23 184:4
190:22
195:21 204:3
205:8 299:23
338:17, 21
364:17 365:3,
8, 13 376:24
377:8, 9, 12
378:3
**depositions**
12:19 86:12
**describe**
14:17 26:15
33:17 74:24
104:17
**described**
14:15 22:3
80:11 105:9
136:11
219:17
242:16 372:22
**describes**
73:23
**DESCRIPTIO
N** 7:7 8:2, 8
33:25 201:7
245:10 324:11
**design** 178:19
**designates**
240:3
**designation**
236:21
**designed**
178:20
**designees**
237:24
**desk** 252:9
**destroy** 364:19
**destroyed**
14:13
**detail** 180:9
213:23, 24
278:16
279:10 296:20
**detailed** 26:10,
16 116:11

details 25:*18,*
*24*
detectable
296:*19*
determination
325:*23*
determinations
304:*9*
determine
78:*4* 80:*24*
127:*10*
152:*18*
161:*15*
218:*21*
239:*24*
249:*21* 270:*9*
302:*22* 304:*6*
305:*1* 307:*13*
315:*11*
326:*13*
327:*12, 18*
328:*2, 11*
355:*24*
determined
144:*2* 168:*23*
374:*7*
determining
107:*21* 158:*6*
358:*23*
detrimental
308:*13*
develop
172:*14*
developing
35:*21*
deviations
139:*16*
device 119:*21*
122:*10*
devolves 103:*5*
diagnostics
247:*12*
diagrams
170:*10*
dictionaries
245:*7, 25*
246:*10*
dictionary
245:*21* 246:*3,*
*4*

difference
168:*14*
different
16:*15* 37:*7,*
*12* 38:*4, 5, 18*
40:*16* 48:*24*
76:*16* 81:*12*
83:*6, 15*
91:*13* 93:*18*
118:*4* 130:*9*
131:*12, 24*
161:*9* 172:*24*
174:*4* 180:*24*
181:*13* 206:*5,*
*24* 207:*17, 22*
218:*17*
219:*10*
240:*13*
241:*18* 242:*2,*
*15, 23, 24*
246:*15*
247:*17*
248:*10* 249:*2,*
*11, 18* 250:*5,*
*21* 251:*1*
256:*7, 22*
257:*3* 259:*5*
267:*10*
271:*17*
274:*12* 289:*4*
299:*4* 302:*7*
306:*23*
311:*12* 362:*13*
differentiate
240:*24*
differentiating
36:*6* 174:*12*
differently
43:*13* 58:*5*
85:*10* 110:*9*
281:*11*
differing 93:*25*
difficult 76:*24*
164:*6* 221:*21*
249:*11* 256:*4,*
*12* 257:*10*
276:*24* 328:*21*
difficulties
246:*14*
248:*20* 258:*4,*
*18*

difficulty
275:*2, 8*
dig 104:*18*
digit 309:*17*
digits 309:*8,*
*13*
diminution
143:*6*
DIR 93:*15*
direct 28:*15*
29:*20* 152:*21*
158:*20* 164:*8*
172:*24*
299:*25*
342:*24*
350:*17*
372:*14* 374:*10*
directed
53:*21* 85:*17*
direction
22:*20*
directive 340:*5*
directly 32:*22*
262:*21* 263:*10*
director
236:*23*
directors
313:*1*
disagree 57:*8*
120:*23* 136:*6*
191:*2* 238:*4*
270:*2* 331:*21*
364:*4, 10*
370:*23*
disappear
244:*16*
disclose 93:*21*
disclosed
87:*12* 89:*22*
196:*19* 198:*2*
207:*8*
disclosing
17:*14* 206:*2*
disclosure
24:*6*
discovered
367:*13*
discovery
17:*24* 87:*4,*
*11* 88:*16*
174:*16*

discrepancies
367:*13*
discuss 43:*19*
50:*13, 16*
55:*21* 56:*9,*
*13, 19* 57:*13*
62:*22* 75:*18*
87:*25* 186:*5*
196:*7, 11*
285:*22*
discussed
56:*15* 57:*2,*
*21* 65:*16*
79:*8* 176:*2*
196:*20*
293:*12* 372:*12*
discussing
133:*14* 186:*16*
discussion
18:*3* 43:*3*
50:*23* 51:*11,*
*12* 56:*18, 25*
184:*12, 14*
246:*18*
251:*20* 277:*7*
284:*13, 16*
303:*17*
306:*11* 323:*22*
discussions
55:*6* 56:*12*
78:*3*
Disgorgement
94:*12, 24*
95:*19* 96:*11,*
*16*
Dismiss
105:*25*
106:*23* 142:*6*
dismisses
373:*18*
disparate
218:*18*
366:*21* 367:*12*
dispense 85:*2*
97:*8* 170:*8*
173:*5, 16*
223:*16*
dispensed
58:*9* 69:*5*
70:*19* 113:*6,*
*25* 128:*13*

148:*6* 222:*20*
223:*20, 24*
224:*3, 8, 14*
225:*5, 9, 13,*
*17* 252:*24*
253:*1* 297:*18,*
*22* 301:*7*
373:*14*
dispensement
244:*15*
dispenses
70:*21* 224:*18,*
*22*
dispensing
34:*24* 69:*15*
97:*19, 22, 24*
99:*17* 173:*10*
252:*15*
dispute 12:*21,*
*22, 23* 14:*2*
Disputes 87:*4,*
*11*
disrupt 364:*18*
disruption
252:*8*
distributed
114:*1*
distribution
173:*6, 9*
DISTRICT
1:*1* 9:*9* 35:*2*
divided 161:*2*
divorced 249:*9*
divulge 27:*3*
56:*1* 64:*11*
183:*8* 207:*2*
208:*8*
dklinges@duan
emorris.com
4:*9*
docket 89:*5*
176:*5*
doctor's
247:*12*
Document 1:*6*
7:*18* 14:*10*
24:*6* 29:*16*
87:*17* 91:*5,*
*13* 92:*8*
94:*21* 95:*7*
142:*13*

188:*15*
227:*12* 229:*4*
231:*17* 232:*3,
10, 21* 233:*1,
19, 20, 21*
234:*14* 237:*9*
268:*25* 270:*7,
9* 301:*9*
324:*14, 23, 25*
326:*17* 335:*7,
17* 336:*6*
343:*11*
344:*15, 16, 20,
22* 346:*4, 8*
350:*2* 355:*16*
357:*25*
360:*14* 362:*12*
**documentation**
62:*5* 98:*20*
179:*22*
180:*13*
191:*20*
194:*11*
199:*11* 296:*6,
21*
**documentation
s** 86:*25*
**documented**
93:*19* 218:*11*
294:*23*
296:*11* 297:*2*
**documents**
86:*6, 11*
89:*19* 92:*18*
93:*22* 94:*7*
154:*7* 166:*15*
182:*1* 186:*7*
218:*9* 235:*12*
267:*5* 318:*16*
**doing** 20:*24*
28:*14* 41:*6*
96:*3* 137:*11*
181:*9* 188:*2*
235:*18*
236:*18* 251:*2*
253:*7* 299:*3*
348:*7*
**dollar** 35:*25*
272:*22* 273:*19*
**dollars** 273:*21*

**door** 183:*16*
205:*25* 207:*25*
**Doren** 55:*10*
**DORNER** 4:*4*
9:*14, 23* 10:*3*
11:*14* 14:*19*
15:*12, 18*
16:*8* 17:*6, 17*
20:*19* 25:*9*
27:*2* 28:*8*
30:*1, 16*
31:*11, 21, 24*
32:*6, 10, 15*
34:*6* 37:*22*
39:*20* 40:*10*
41:*8, 25*
43:*23* 44:*8,
20* 45:*5, 23*
46:*10, 13, 20*
47:*12* 48:*5*
49:*5* 50:*3*
51:*6, 22* 52:*6,
24* 53:*7, 15*
54:*21* 55:*5,
11, 25* 56:*21*
57:*17* 60:*17,
24* 61:*4, 11*
62:*25* 63:*9,
18* 64:*1, 11*
65:*1, 10*
66:*12, 16*
67:*7, 15, 23*
68:*10, 25*
69:*21* 70:*1, 5*
71:*6, 16* 72:*5,
17* 73:*3, 13*
74:*5, 19* 75:*6,
11, 16, 20*
77:*18* 78:*23*
80:*5, 15* 81:*1,
18, 21* 82:*6,
16* 83:*1, 25*
84:*13* 86:*13*
87:*14* 88:*18*
89:*8* 90:*4, 12,
16, 20* 91:*14*
94:*17* 95:*2, 9,
21* 98:*14*
99:*10, 24*
100:*10, 19*
101:*13, 20*

102:*14* 103:*1,
9, 20* 104:*6,
24* 105:*3, 16*
106:*3* 107:*12*
109:*3, 19*
110:*2, 20*
111:*11* 112:*5,
25* 113:*11*
114:*14* 115:*2,
10, 25* 116:*9,
23* 117:*10*
118:*11* 120:*4*
121:*4, 15, 20,
25* 122:*4, 20*
123:*9, 20*
124:*3, 23*
125:*7* 126:*12,
15, 23* 127:*6,
15* 128:*3, 22*
130:*1, 25*
132:*7, 11, 15,
18* 133:*6, 17*
134:*18, 22*
135:*1* 136:*25*
137:*15* 138:*4,
7, 21* 140:*8*
141:*1, 15*
142:*1, 12*
143:*10, 22*
144:*10, 24*
146:*2* 148:*2,
18* 149:*8, 22*
150:*7, 18*
151:*9, 25*
152:*10*
153:*16* 154:*4,
14, 25* 155:*10,
20* 156:*10, 24*
157:*12, 22, 25*
159:*17*
160:*13*
161:*17*
162:*10, 20*
163:*11* 164:*1*
165:*22*
166:*11, 22*
167:*12, 24*
168:*8, 15*
169:*5* 170:*22*
171:*20* 172:*9*
174:*20* 175:*2,

13, 21* 176:*18*
177:*1, 20*
178:*3, 12, 24*
179:*11, 19*
180:*3, 18*
181:*3, 23*
182:*5, 22*
183:*6, 15, 23*
184:*19, 24*
185:*15* 187:*7,
10, 17, 21*
188:*13, 21*
189:*5, 11, 15,
24* 190:*5, 10,
19* 191:*5*
192:*5, 12, 14*
193:*3, 10, 19*
195:*5, 12, 16*
196:*15*
198:*21*
199:*23* 200:*6,
8* 201:*3, 20*
202:*13, 19*
205:*14, 24*
206:*10* 207:*1,
6, 14, 19, 24*
208:*7* 213:*18*
214:*10* 216:*5,
10, 17* 217:*5*
219:*5, 20*
223:*1* 224:*9,
25* 226:*8*
227:*1, 18*
229:*16*
230:*16, 23*
233:*14* 234:*6,
9, 10* 235:*9*
236:*4, 19*
238:*11*
241:*13* 242:*4*
243:*5, 22*
245:*15*
246:*25*
248:*22*
250:*11*
255:*14*
258:*20*
259:*15, 20, 23*
260:*3, 22*
261:*16*
262:*16, 18*

264:*4* 267:*12*
268:*24*
269:*24* 270:*6,
24* 272:*1, 10,
16, 24* 273:*12,
22* 274:*5, 25*
275:*7* 276:*7*
278:*4, 13*
279:*4, 18*
280:*10*
281:*12* 285:*1*
286:*5, 22*
287:*15, 20*
288:*1, 12*
289:*6, 12*
290:*1, 16*
291:*2, 10, 23*
292:*16*
293:*17* 295:*1*
296:*13* 297:*5*
299:*5, 7, 9, 13,
14* 301:*8*
303:*6, 21*
305:*15* 306:*7*
310:*1, 22*
311:*13, 22*
312:*11*
313:*12*
314:*15*
315:*23*
317:*13, 20, 25*
318:*9* 319:*14*
320:*6, 16, 24*
321:*22* 323:*2*
324:*22* 325:*9,
18* 327:*20*
328:*4* 329:*3,
16, 21* 330:*5*
331:*3, 19*
332:*16* 333:*4*
335:*6, 16, 21*
336:*5* 337:*25*
339:*4, 25*
341:*2, 21*
343:*10*
344:*13, 21*
345:*7, 21*
347:*7, 20*
348:*11* 349:*1,
11, 22* 350:*5,
9, 17* 352:*21*

354:2, 23
355:9  356:6,
17, 25  358:12
359:1, 18
360:1, 6, 13,
24  361:9, 22
362:8, 20
363:3, 11, 17
364:7, 23
365:7  376:16
**Dorner's**
55:19
**DORSEY**  5:14
**dosage**  223:12
**dose**  140:22
**doth**  192:17
**doubt**  54:2, 5
159:2  166:19
**download**
90:10  326:22
**downloadable**
326:25
**downstream**
237:21
**downtown**
11:22
**dozen**  366:25
**Dr**  20:12
21:2  34:11
43:20  44:7
50:2, 8, 13
51:3, 20  52:5
53:19  54:3, 8,
13  55:3, 23
56:10, 15, 20
57:3, 13
58:21  60:16,
20  63:8  84:7,
11  85:12
96:3, 22
97:17  98:3
102:20  109:1,
10  116:17
117:2  123:23
124:16
135:22  136:6
142:20
158:16  160:8
161:12
163:20  164:4,
15  165:1

167:8  171:6
174:6  177:10
178:7, 22
319:8  320:22
321:21
330:16, 18
331:1, 15, 25
332:8  333:13
340:12  351:9
352:25
353:12  369:7
371:15  372:2,
8, 12, 20
373:9  374:14
375:2
**draft**  27:4
47:23  48:2, 4
55:12  56:2
65:9  85:15
**drafting**  48:8
**drafts**  48:1
49:12  55:8,
18  56:22
64:12  65:7
**DREW**  4:4
9:14  10:1
11:14  31:11
134:17  376:14
**drill**  82:21
**drink**  59:20
**Drive**  2:16
**drops**  352:13
**Drug**  8:15, 17
34:22  35:7,
10  36:10, 11,
13  69:18
76:25  97:2, 4
110:18
114:12  118:1,
18  119:20
120:2  121:2,
14  122:10
123:19  129:6,
14  132:4
134:4  139:10
140:1, 5
141:13, 23
143:19
144:17, 19, 23
146:1, 8
147:5  148:6

154:21  156:7,
23  161:14
179:25
220:20
222:20, 24
224:7, 14, 18,
22  225:5, 9,
13, 17  252:15,
24  271:23
272:15, 23
273:2  278:3
285:10
294:18  296:2
301:2  303:20
304:18, 20
305:21
323:23
324:18  325:7
342:8  347:1
348:16, 25
352:10, 12
354:9  356:3,
16  357:14, 15
358:2, 5, 7, 23
359:9, 22
362:4  371:2
**drugs**  68:8, 15,
16, 17, 24
69:11  70:15,
17, 21  72:3,
15  73:2, 11
108:17
109:15, 17
110:10
112:15, 23
114:19, 25
115:22  116:8,
20  117:8
123:24
124:18
133:16
136:17  137:6
140:23, 25
141:10, 25
147:15  149:5,
6, 20  150:4,
15  155:7, 18
156:6  158:7
163:25
170:20  173:5
210:24

223:16, 19
273:10
274:12, 24
275:14, 25
276:6, 20
284:7  285:22,
24  287:10
332:4  346:14,
17, 24  349:9,
19  361:20
375:3, 23
**drug's**  223:9
**DSCSA**  76:21
77:22, 24
78:25
**dtdorner@dua
nemorris.com**
4:8
**Duane**  1:17
4:4  11:21
**due**  189:7
227:22
**duly**  10:10
377:8
**duplicate**
247:16
**duplication**
247:6
**duty**  113:17

**< E >**
**earlier**  45:17
52:12  69:10
85:9  86:2
91:12  115:15
119:7  141:20
173:15  175:7
180:22
226:18
295:20
331:22
366:13
374:24
375:12, 15
**early**  49:15
**easier**  19:4
**easily**  178:9
325:14
**East**  3:10
**Eastern**  209:6

**easy**  164:5
304:15  308:23
**eating**  288:23
**Eckerd**  36:12,
14
**econometric**
333:16  371:16
**economic**
39:16  40:13
43:20  44:6
58:18  63:8
84:8  99:7
101:8, 19
102:2, 12, 21
103:6  105:14
108:2  109:13
111:8, 16, 17,
23, 24  112:4,
9, 24  154:21
155:8, 13
157:24
172:14  211:6,
7, 19  212:4
213:6, 10, 13,
16  215:2, 7
216:1, 15
271:25  369:19
**economically**
108:17  154:22
**economics**
40:1, 2, 5, 6, 8,
21, 24, 25
368:22
**economist**
39:12, 13, 18
40:17  41:6,
11, 19, 23
42:2, 12, 15
43:16  156:5
**economists**
39:8  42:5
**economy**
40:14
**edit**  48:15, 20
65:23
**Edition**  353:8
357:20
**edits**  251:22
252:5
**effect**  221:11
359:13

Confidential Information Subject to Protective Order

**Effective** 8:8
58:10 78:17,
18 113:18
324:12 325:11
**effectively**
187:25 286:19
**effectiveness**
133:25 358:6
**effects** 110:13
**efficacious**
110:10
154:12 155:9,
18
**efficient** 37:16
**effort** 311:11
317:10 328:14
**eight** 29:11,
12, 14 38:23
**either** 17:8
23:5 29:1
40:9 52:16
59:12 63:20
106:4 115:23
149:17
151:23
152:20
175:14 255:3
271:24 299:8
331:14
353:23 354:10
**elaborate** 61:9
**elaborated**
215:8 216:2
**Electronic**
269:16
**electronically**
364:19
**element**
124:12, 13
**elements**
161:12
**eliminated**
165:8 167:9
**ELIZABETH**
5:9
ellie.norris@no
rtonrosefulbrig
ht.com 5:11
**Ellman** 27:23
54:14

**email** 28:24
29:1, 4, 11, 14
33:3, 5, 9, 12,
17, 21 267:2
**emails** 29:5, 8,
11, 12 293:9
**empirical**
156:8
**employ** 131:19
**employed**
57:3, 14
160:22 316:18
**employee**
35:14 39:5
165:12 241:4,
5 317:11
326:19
**employees**
38:22 214:18
215:12 216:9
217:4, 18
312:17 313:1,
5, 19 314:3,
13, 14, 21, 24
315:3, 11, 21
316:11, 17
317:1, 5, 11
322:11, 12
323:19 325:8
**employer**
130:6 242:22
**employers**
249:6, 23
**employment**
315:11, 16
**enable** 59:9
**enables** 307:2
**encompass**
316:22
**encompassed**
286:3, 12
**encompassing**
125:16
**encouraged**
358:22 360:11
**encourages**
349:8 350:3
**encouraging**
348:8
**endurance**

19:23
**energy** 256:21
**enforcement**
73:10 151:21
**engage** 29:19
**engaged**
15:16 16:20
31:13 33:24
49:14 106:15
111:4 203:15,
20
**engagement**
17:24 29:18,
20 31:1
32:23, 24
33:4 99:2
253:5
**engagements**
38:18
**English**
119:25 152:5
**enjoy** 38:2
**enlighten**
139:8
**enrichment**
82:4, 25
99:22 117:15
168:13
176:24 177:5
**ensure** 244:1
**ensuring**
235:22
**enter** 151:22
**entered** 91:18
151:7
**entering**
138:4 153:14
**enters** 129:7
**entire** 48:18
49:23 59:5
233:19
316:16
351:25 371:10
**entirety** 52:13
75:7
**entities**
133:20 149:6
161:25
212:11
237:21
246:15

250:21 255:1
275:4 280:15
312:25
313:11, 16
314:8, 11
316:18
318:23 321:6,
11 332:9
346:21
366:20 367:2,
5
**entitled** 115:3
231:19
233:21 268:7
**entity** 229:13
236:10 244:6,
16 246:11
313:18, 20
319:13 320:1,
21 321:20
322:5 331:2
341:14
**entity's** 244:10
**entries** 89:6
**enumerated**
360:5
**epidemiologist**
289:15
**Epidemiology**
7:22 268:7
269:5
**equally** 63:23
**Equivalence**
8:18 348:1,
18 356:9
357:16 358:3,
19 363:2
364:6
**equivalent**
242:1, 15
243:2 344:10
345:20
347:24
355:25 356:4,
14 358:24
359:22
361:20 362:3
**equivalents**
346:24
359:10, 11

**ESI** 257:12
258:2 259:5
262:1
**ESI/Medco**
258:1, 9
**ESI's** 232:9
258:16
**especially**
97:20 310:7
**ESQUIRE**
2:4, 8, 9, 16,
20, 21 3:4, 9,
15 4:4, 5, 6,
13, 19 5:4, 9,
15, 20 6:4
**essentially**
254:6, 7
**establish** 41:4
51:18 335:20
**established**
232:25
261:22 294:4,
9, 20 301:14
370:24
**estate** 196:3
**estimate** 38:1
79:10 80:25
81:14 82:23
97:22 147:14
231:7 295:13
331:17
**et** 8:3 37:17
50:24 170:7
173:18 186:8
271:4 297:25
**evaluate** 46:3,
25 102:18
105:21
111:16, 24
125:18
169:18 172:7
314:5
**evaluated**
47:18 64:21
**evaluating**
34:10 145:13
**Evaluation**
8:17 82:10
219:11 357:15

Confidential Information Subject to Protective Order

Evaluations
8:*18* 357:*16*
358:*3*
event 77:*3*
79:*11*
events 146:*7*
eventually
36:*16* 253:*9*
306:*18*
everybody
9:*22* 337:*12*
evidence
154:*2* 156:*22*
178:*20* 371:*20*
evidentiary
154:*11* 156:*20*
evidently
15:*10*
exact 49:*9*
87:*6* 200:*2*
exactly 33:*24*
169:*16*
207:*25*
241:*23*
259:*11* 304:*8*
332:*24*
349:*14* 360:*21*
exam 19:*11*
examination
1:*13* 7:3, *4*
10:*12* 20:*6*
209:*13*
340:*12*
365:*23* 374:*10*
examinations
125:*23*
examined
10:*10*
examining
12:*4*
example
14:*24* 25:*21*
26:*9, 14, 16,*
*24* 42:*22*
43:*10, 14, 17*
45:*2, 11, 15*
82:*4* 96:*24*
99:*3* 146:*18*
152:*17*
153:*20*
159:*25*

165:*10* 173:*4*
212:*10*
240:*14* 249:*2*
276:*17* 281:*8*
282:2, *6*
283:3, *5*
296:*7* 302:5,
*14, 22* 304:*25*
307:*23* 311:*1*
313:*16* 326:*16*
examples
256:*15* 257:8,
*11, 16, 18*
276:*23* 277:*1*
282:*5* 285:*20*
287:*7* 319:*1*
366:*14*
Excel 8:*9*
Excellence
253:*8*
exceptions
310:*11*
excerpt 299:*22*
exchange 19:*4*
49:*12* 65:*6*
122:*17*
exchanged
48:*25*
exchanges
29:*4*
exclude 185:*6*
186:*12, 14*
192:2, *25*
193:*25* 215:*11*
excluded
163:*24*
166:*20*
201:*18* 319:9,
*18, 25* 330:*21*
332:*6*
excluding
165:*13* 217:*17*
exclusion
193:*8* 214:*17*
216:*8* 217:*3*
312:*17, 20*
313:*4* 316:*8*
318:*23*
319:*11* 321:*5*
exclusions
75:*25* 165:*18*

166:*6* 212:*8*
218:*12* 333:9,
*11*
exclusively
64:*25*
Excuse 59:*19*
70:*16* 132:*17*
execute 32:*20*
executive 36:*1*
executives
71:*10*
exercise 312:*3*
327:*12* 329:*7*
330:*3*
exert 256:*21*
Exhibit 7:8,
*12, 13, 14, 16,*
*18, 22* 8:3, *6,*
*9, 13, 15*
24:*23, 24*
25:*1* 45:*22*
46:8, *19*
66:*14* 85:*21,*
*23* 90:8, *9, 24*
91:*4, 17* 92:*1*
94:*9, 18*
96:*24* 101:*2*
105:*24* 106:*4,*
*8, 10, 12*
108:*5* 117:*17,*
*19, 20, 22*
135:*24* 138:*5,*
*8, 15* 142:*5*
150:*1* 158:*21,*
*24* 175:*9, 15,*
*20, 25* 198:*3,*
*6* 229:*12, 19,*
*21, 24* 231:*10,*
*12, 14* 233:*9,*
*10, 12* 237:*4,*
*5, 6* 267:*22,*
*25* 298:*2, 3, 4*
323:*5, 7*
324:*6, 7, 8*
333:*19, 21, 23*
336:*23, 24*
342:*22, 25*
346:*8* 348:*9*
351:*3* 352:*5,*
*6* 357:*10, 11*
358:*21*

360:*10*
362:*20* 363:*22*
EXHIBITS
7:*6* 8:*1*
exist 18:*16*
111:*9* 191:*23*
267:*17* 372:*23*
existence
301:*1*
exists 80:*25*
130:*21, 24*
132:*25*
expect 151:*13*
153:*4* 241:*24*
284:*9* 320:*18*
355:*15*
expectation
113:*21* 114:*6*
335:*24*
expected
254:*17, 22*
359:*13*
expenditures
164:*16*
expense 102:*1*
254:*25* 255:*5*
expenses 336:*1*
expensive
147:*4*
experience
21:*10* 23:*23*
27:*10* 32:*4*
34:*14* 36:*18*
39:*2* 41:*3*
60:*20* 68:*4*
118:*5* 123:*17*
125:*14*
129:*12*
137:*24* 139:*4,*
*6* 145:*24*
196:*18* 226:*5*
245:*24*
248:*25*
250:*19* 283:*6*
307:*20* 360:*9*
366:*19*
experiences
246:*3* 367:*7*
Expert 7:8, *16*
8:*15* 12:*14*
13:*6, 10* 16:*7*

21:*17* 22:*3, 8*
23:*20* 30:*6*
31:*3* 33:*22,*
*23* 34:*10*
40:*8, 13*
48:*17* 53:*20*
123:*14* 125:*4*
157:*4* 172:*15*
179:*23*
185:*18*
195:*23*
198:*13*
200:*13* 204:*2*
205:*4, 21*
208:*13*
334:*19, 22*
336:*17* 337:7,
*10* 373:*20*
expertise
31:*18* 38:*3*
84:*5* 86:*20*
116:*12* 123:*14*
experts 79:*20,*
*23* 185:*8*
194:*19* 207:*6*
208:*18* 288:*6,*
*15*
expiration
212:*20*
explain 69:*24*
74:*3* 94:*4*
107:*16*
110:*25* 266:*1*
335:*18*
explained
30:*25* 62:*23*
65:*24* 85:*9*
87:*17* 111:*4*
115:*15*
172:*17*
173:*15* 355:*3*
explaining
93:*3* 170:*25*
explains
282:*15* 356:*19*
explanation
47:*14* 61:*19*
115:*3*
exploring
66:*18*

Confidential Information Subject to Protective Order

exposed 76:*12*
295:*12*, *16*
exposure
217:*1* 289:*9*
293:*22*, *25*
294:*4*, *12*, *16*
308:*17*
Express 7:*16*
20:*25* 229:*13*,
*25* 230:*5*, *14*,
*25* 231:*4*, *18*,
*19*, *24* 232:*4*,
*13*, *20* 233:*4*
256:*16* 313:*17*
Express_Script
s_1120_000002
53 7:*18*
expressed
81:*9* 102:*21*
117:*6*
expression
107:*9*
extensive 68:*4*
extensively
370:*24* 372:*20*
extent 21:*3*
55:*14* 75:*3*
79:*9* 101:*4*,
*20* 115:*10*
167:*13*
179:*12*
184:*19* 185:*1*
188:*14*
190:*20*
193:*15*
195:*13* 207:*2*
208:*7* 219:*5*
236:*20*
268:*25* 272:*2*
295:*9*, *12*
329:*4*
extract 88:*21*
eyes 99:*8*

< F >
face 126:*4*
facilities
139:*22*
facility 139:*10*,
*11* 180:*2*

fact 19:*16*
60:*8* 64:*22*
98:*24* 107:*3*
109:*14*
113:*23* 116:*6*
123:*25*
145:*18*
149:*15*
150:*25* 165:*1*,
*7*, *19* 174:*9*
180:*1* 189:*21*
190:*4* 192:*2*
195:*2*, *9*
219:*1*, *16*
244:*19* 248:*5*
250:*19*
276:*17*
302:*23* 303:*2*
306:*4* 308:*3*
331:*15*
332:*24*
351:*12*, *16*
368:*7*, *11*
374:*1*
factors 74:*3*
facts 53:*24*
140:*20* 371:*20*
faded 254:*2*
failure 123:*17*
126:*7* 141:*11*
failures 140:*24*
faint 10:*1*
67:*7*
fair 20:*18*
29:*3* 63:*17*
80:*20* 125:*21*
163:*3* 211:*12*
222:*1* 253:*4*
270:*18*
293:*12*, *13*
320:*15*
fairly 20:*8*
62:*1*
FALANGA
2:*20*
FALKENBER
G 4:*12*
falls 273:*19*
false 164:*22*
191:*4* 193:*1*

familiar 68:*3*
116:*6* 123:*2*
139:*2* 167:*18*
170:*2* 177:*4*
220:*19* 226:*5*
229:*13*, *25*
236:*10* 245:*6*
288:*20*, *25*
289:*5* 340:*17*
357:*19*, *21*
360:*4*
family 240:*14*,
*16*, *18* 241:*5*, *6*
fanciful
372:*22*
fantasy 136:*12*
far 251:*21*
334:*7* 337:*22*
338:*13*
fashion 141:*7*
fast 97:*13*
favor 19:*18*
favorable
271:*20*
FD&C 119:*5*
FDA 7:*14*
59:*3*, *23*
61:*20* 67:*13*,
*21* 68:*9*, *15*,
*24* 69:*12*, *19*
72:*4*, *15* 73:*2*,
*9* 77:*15* 79:*3*
109:*16*
113:*17*, *21*
114:*7*, *10*, *18*,
*24* 115:*4*
116:*22*
118:*10*, *14*, *23*
119:*9* 120:*1*
122:*16* 123:*3*,
*18* 124:*18*
136:*24*
137:*13*, *18*
138:*2*, *15*
139:*10* 140:*4*,
*24* 141:*10*, *22*
150:*3* 151:*17*
152:*24* 153:*9*,
*25* 155:*25*
156:*19*
346:*25*

349:*10*, *21*
352:*9* 353:*13*,
*15* 354:*9*
356:*24* 358:*6*
359:*21*
361:*19* 362:*3*
364:*5*, *11*
370:*25* 375:*3*
FDA-approved
68:*16*
FDA-defined
149:*4*
FDA's 116:*7*
117:*6* 118:*18*
119:*3* 140:*6*
151:*20*
153:*12* 363:*1*
feasibility
267:*9*, *17*
feasible
309:*22*
310:*21*
311:*21* 312:*5*,
*10* 313:*10*
February
1:*19* 9:*6*
193:*25*
338:*13* 339:*3*,
*11* 377:*20*
378:*3*
February's
338:*9*
federal 56:*4*
77:*16*, *23*
165:*9* 358:*7*
fee 93:*15*
97:*22*
feed 293:*2*, *11*,
*15*
feedback
48:*20* 52:*12*,
*13*
feeds 292:*9*,
*12*, *20*, *23*, *25*
felt 86:*25*
FHS@pietragal
lo.com 3:*18*
field 222:*19*
238:*17*, *19*
239:*2*, *3*, *6*, *16*,
*19* 240:*1*, *24*

242:*3*, *7*
243:*10*
252:*17*, *19*
256:*7* 283:*12*
310:*14*
fields 221:*7*
241:*12* 242:*2*,
*7*, *15*, *16*
243:*3*, *15*, *21*,
*25* 244:*23*, *24*
245:*1*, *3*, *11*,
*13* 246:*1*, *5*
250:*21*
251:*23* 252:*1*,
*2* 281:*10*
283:*9* 332:*11*,
*13*
fifth 87:*4*
361:*18* 362:*6*
fight 93:*21*
figure 237:*11*
261:*2* 282:*13*
file 233:*16*
filed 193:*25*
filing 187:*8*, *9*
filings 86:*3*,
*10*, *18* 89:*23*
91:*5*
fill 98:*2*
269:*18* 300:*2*,
*15* 304:*17*, *18*
filled 99:*4*
240:*18*
252:*25*
298:*17*, *21*
317:*5*
final 48:*9*, *22*
49:*1* 206:*23*
210:*24*
finally 213:*2*
financial
25:*22* 128:*14*
181:*15* 346:*22*
financing 26:*9*
find 15:*9*
45:*1* 87:*6*, *9*,
*21*, *23* 199:*19*
200:*21* 246:*7*
261:*10*
270:*16* 282:*2*

295:7  354:13
365:11
finders  64:22
findings
168:24
finds  108:9,
14, 16  123:18
fine  43:24
64:8  66:18
183:24  318:2
340:6
finish  13:8
61:5, 14
129:1  200:24
202:6, 7
353:6, 7
finished  17:18
28:9  53:16
60:25  61:5
87:15  128:23
140:22  181:4
184:25
firm  15:24
16:18  38:21
66:2  251:2
firm's  16:1, 23
first  10:10
50:19  51:4, 9,
15, 16  54:11
66:20  71:24
74:1, 24
79:17  106:20
119:18
131:12
132:21  138:2
139:9  141:4
145:20
146:16
153:14
221:24
237:18, 20
250:1  282:9
285:5  291:10
292:5  304:21
306:14
310:10
312:21
334:12  351:2
365:7  369:11
fit  31:10

five  14:11, 12
35:7  38:18
49:4, 8  66:24
67:1  134:18
138:6  208:24
210:20  318:1
329:15, 17
330:12  362:18
five-minute
317:24
flexibly  178:9
flip  317:17
Floor  2:22
3:16  4:19
365:6
flow  170:10,
12, 15  172:17
173:25
flows  170:15
173:18
fly  170:2
focus  39:6
84:18  180:23,
24  181:6, 7,
16, 17  209:23
focused
297:16  311:2
313:5  314:10
340:23  342:10
focuses  80:18
focusing  20:25
folder  106:5
231:14
233:13
267:23  343:12
folks  28:18
38:21  42:9
50:9, 14, 17
52:2  60:15
62:24  63:7,
24  64:9  65:7
323:15
331:11  334:25
follow  235:7
236:1  241:10
followed  59:22
following
111:21
119:14  188:8
202:21
358:17

359:23  362:4
368:1  378:4
follows  10:11
74:16  110:9
170:1
follow-up
206:22
Food  8:15
118:1, 18
119:20
122:10
139:25
141:23
357:14  358:7
footnote  87:7,
21  88:1, 2, 3
159:13  166:4,
5  248:17
297:25
322:16, 17
347:1, 13
348:2  349:5
352:13
footnoted
165:17
forced  47:15
foregoing
378:3
foremost  51:4,
10, 16
Forgive  11:18
form  15:12
18:12  40:10
41:8  46:14,
20  47:12
48:5  49:1
50:4  52:6, 24
54:21  56:6
60:17  61:11
65:1, 10  71:6
82:13  86:8
88:18  94:17
98:14  102:15
103:21  104:7
105:5  109:5
125:7  136:25
137:15
138:21  139:3
140:8  141:13,
15  143:10
144:10, 24

146:2  149:8
151:9  152:10
153:16
155:20
156:10
157:12, 22, 25
161:5, 17
162:10, 20
163:11  164:1
165:22
166:11, 22
167:9, 12, 24
168:8, 15
169:5  170:22
171:20  172:9
174:20
176:18  177:1,
18  180:3, 18
196:15  200:8
201:3  213:18
217:5  223:12
224:9, 25
226:8  227:1
229:16  230:7,
16, 23  234:6
235:9  236:4
238:11
241:13  242:4
243:5, 22
246:25
248:22
250:11
255:14
258:20  260:3,
22  261:16
262:16, 17
263:3, 5
264:4  267:12
268:24  269:2
272:1  273:12
274:5, 25
276:7  278:13
279:4  280:10
281:12  285:1
286:5, 22
287:15  288:1,
12  289:12
290:1, 7
291:2, 23
292:16
293:17

296:13  297:5
303:21
305:15  306:7
310:1, 22
311:13, 22
313:12
314:15
315:23
317:13  320:6,
24  323:2
324:22  329:3
331:3, 19
332:16  333:4
335:6, 16
336:5  339:4
341:2  347:7
348:11
349:22  350:5
352:21  354:2,
23  356:6
358:12  359:1
360:13, 24
361:9, 22
362:8  363:17
364:7  369:16
370:9, 18
371:3  373:4
375:9, 24
format  237:10
278:19  279:1
formed  288:7
forms  27:4
156:2
formula
143:18
145:13
176:25  177:5
178:21
formularies
117:14  341:16
Formulary
8:14  343:3
344:2  346:13
352:12
formulas
117:16
formulation
223:13
forth  86:22
87:17  89:21
212:23

Confidential Information Subject to Protective Order

216:23  236:2
257:10, 21
293:22
294:12  340:2,
7  365:9  377:8
forward  31:8
325:21
found  79:12
80:24  81:17
153:2  294:18
353:10, 11
foundation
34:7  41:25
105:17
113:12
116:19, 24
117:1, 11
121:16  125:8
131:1  133:7
141:2  152:1
155:1, 11
156:11  158:1
170:23
171:23
189:25  192:9
193:12
227:19
258:21  279:5
289:13
291:24  295:2
296:14  297:6
319:15  333:5
335:18, 21
341:3  347:8,
21  348:12
349:2, 12
350:6  354:24
356:7  357:1
358:13  359:3
360:15
361:11
363:18
369:17  371:4
373:5  375:25
foundational
51:17  54:12
117:5  141:21
four  14:16
15:14  24:9,
15, 17  26:11
28:21  55:2,

22  56:10, 19
57:15  60:15
61:10  62:24
63:7, 24
74:17  104:14
180:10, 16
198:13
199:14
201:17
202:19  232:8
245:1  295:22
304:19  309:17
four-digit
310:5
fourth  79:8
frame  215:23
framework
153:5
FRANK  3:15
frankly  38:1
263:8  308:12
frequent
307:21
frequently
281:6  307:17
316:8
front  10:23
21:17  22:4
97:11  114:5
150:1  158:16
248:5  298:9
333:25  338:7
350:15  351:18
FULBRIGHT
5:9
full  144:9, 22
232:12
340:12
344:17, 24
full-time  38:22
fully  77:7
273:15
fun  38:5, 7
functions
35:19, 20
255:24
funded  164:17
funding
324:16
further  94:6
112:14  126:3

128:6  129:12
263:16, 18
324:24  327:2
344:6  365:18
368:16  376:9
377:11, 15
Furthermore
291:6  335:8

< G >
GANNON
2:20
gap  137:24
Gateway  2:21
gather  36:18
77:15  369:22
gcoan@hinsha
wlaw.com
4:21
gears  284:12
general  88:12
359:23  362:5
generally
168:21
211:10  357:22
generated
364:5
generic  37:4
147:4, 24
346:14, 17, 24
347:24  348:1,
25  352:10
generics
153:20
genesis  36:23
genotoxic
288:11, 18
GEOFFREY
4:19

GEOPPINGER
5:4
getting  11:1
33:11  108:10
110:18
183:11
268:15  275:3
303:24
361:15  374:12
Gianforte  8:6

gist  87:10
96:19
Give  16:2, 7
18:1, 5  20:3
26:24  42:22
45:2  69:23
70:10  87:8,
23  91:22
96:16  109:17
212:10
213:22
270:15  280:4
299:2
given  12:12,
17  14:14
17:9  19:2
45:15  77:13
125:25
157:10
162:24
205:23  223:9
276:5  286:19
296:23  303:4,
18  317:2
355:16
377:10  378:3
giving  184:3
global  316:19
go  9:21
14:12  16:23
17:21  18:6
20:4  28:13
34:16  42:23,
25  48:14
51:19  53:16
58:1, 5  59:10
64:8  80:2
91:22  118:17,
25  126:14
133:11  134:6
136:21
145:25
181:24
199:24
200:15
213:23
217:12  232:7
243:13, 14
246:4  247:15
254:11
255:25  257:4

259:17, 19
264:11
271:15  275:4,
19, 23  276:1,
4, 18  282:7
295:22
302:11  308:9
318:2  324:1
325:13, 20
326:23
328:14
330:10
338:10, 23
340:6  346:7
353:1  362:12
364:23
365:15, 16
366:5
goes  34:17
66:10  96:19
232:19
244:15
306:16  309:6,
16
going  10:2
12:2, 5  15:25
20:24  21:11
24:22  33:25
52:21  66:17
97:13  117:21
125:11  127:8
128:24
131:14
132:13
134:21  136:4
142:12
158:21
164:19
169:18
181:23
183:19  184:6
185:21
187:17, 21
188:25  189:6,
16  190:8
195:3, 7
200:18
204:21
205:16  206:1,
11  208:11, 12
209:11  211:4

215:5 216:6
217:14 223:2
229:19, 22
231:10 234:7
237:4 251:10,
11 252:10
255:15
263:16
270:11 290:7
291:8, 17
292:11 299:1,
25 306:13
308:2 324:6
333:19
336:16, 22
339:15, 20
340:3, 7
342:25
350:17 352:5
372:10 374:7,
11, 18 376:17
**gold** 134:10
331:22
**Goldberg**
340:11
**Golkow** 9:5
11:20
**good** 10:14,
15 66:20
134:22
135:11
137:14
139:16
141:11 171:3
209:15, 20
245:21
259:16
264:18
266:11
282:11
310:10
317:21 362:22
**GoodRx**
308:7, 8
**goods** 173:22
**GORDON**
3:14
**gosh** 62:3
292:9
**gotten** 307:21

**government**
163:21, 24
164:7, 13, 17,
21 165:3
167:9 212:10
318:23
319:13, 25
320:21 321:6,
11, 19 322:4
**governments**
321:8
**graduate**
39:15 40:24
**grand** 182:12
**Grant** 1:17
3:16
**Great** 10:19
21:3 39:2
66:23 106:2
210:15 284:23
**greatly** 346:23
**GREENBERG**
2:14 9:18
**ground** 372:13
**Group** 8:9, 11
22:18, 24
24:2 33:6, 8,
14 159:6
203:17, 21
238:17
239:19, 23, 25
241:11, 16, 18,
20, 22 242:11
277:18
326:19
334:25 337:6,
12, 21 339:2,
10
**GSK** 16:12, 19
**guess** 19:14
87:11, 18
147:1 158:21
238:23
**guideline**
342:2, 20
343:23
345:14
347:18 348:7,
22 349:4
351:6 352:19

360:10, 19
363:23
**Guidelines**
8:13 340:25
341:5, 9, 19
342:1, 5, 13,
14 343:2, 25
344:7 353:2
358:22

**< H >**
**H.J** 4:15
**half** 34:25
65:25 135:1
**hand** 80:12
255:2 339:20
377:20
**handle** 29:22
**happen** 58:24
59:19 60:2
61:18 115:14
153:4
**happened**
15:4, 9 59:6
60:8, 9 62:3
96:25 114:5
149:15 151:1
292:21 370:1
373:18, 25
374:2
**happens**
130:20
172:18 247:14
**happy** 10:3
137:11
218:24 261:9
**hard** 70:6
276:12 308:23
**hardware**
324:19
**Harkins** 4:15
**harm** 99:8
101:5, 19
102:12, 21
103:7
**harmed** 98:20,
21
**hate** 136:21
**head** 16:2
69:9 206:16
**heading** 94:11

**Health** 6:2
36:12, 14
37:6 40:6, 8,
25 149:18
165:12
242:21 247:3,
7 307:23
340:18
341:16
342:13 344:3
345:15, 18, 19,
24 346:5
**Healthcare**
4:3 40:17
58:7 59:11
99:2 143:15
146:6
**healthy** 58:17
**hear** 10:5, 17
38:25 67:10
69:14 209:18
214:21
215:15 366:3
**heard** 19:17
132:21 254:2
289:19 369:14
**hearing** 188:2
194:13
195:10
208:22 292:5
**heart** 58:16
146:21 147:12
**heat** 97:14
**held** 9:7
**He'll** 12:6
**help** 23:16
24:11 36:4, 5
37:14 65:19
90:25 215:23
236:24 252:9
370:24
**helped** 42:9
43:15, 17
251:4
**helpful** 234:21
**helping** 36:19
86:7
**helps** 24:2
39:5
**HENRY** 3:4

**hereinbefore**
377:8
**hereunto**
377:19
**Hey** 259:15
**Hi** 365:25
**high** 33:19
34:1 102:24
148:25 170:2
179:21 198:3
307:23
**higher** 88:10
240:11
**highlight**
269:7
**highlighted**
299:23 362:15
**highly** 55:20
93:7 94:7
**HILTON** 2:8
**HINSHAW**
4:18
**HIPAA** 221:16
**hire** 35:19
36:4 97:8, 9,
10, 11
**hired** 32:19
35:14
**Hold** 18:2
39:11 58:22
92:17 165:5
235:15
295:20 299:7
340:1
**holding** 139:23
**home** 339:24
**HON** 1:4
**HONIK** 2:3, 4
7:3 9:16, 20
10:1, 5, 13, 16
14:23 15:15
16:4, 11
17:15, 17, 18,
20 18:4
20:23 25:2,
13 27:19
28:16 30:10,
23 32:2, 8, 13,
18 34:15
38:10 39:24
40:18 41:14

42:7  43:4, 25
44:2, 11  45:1,
10  46:6, 11,
17  47:2, 20
48:11, 23
49:10  50:7
51:13  52:1,
17  53:3, 13
54:1  55:1, 9,
12, 16  56:3, 8
57:1  58:5
60:10, 21
61:1, 2, 6
62:21  63:4,
14, 22  64:6,
18  65:5, 17
66:21  67:10,
12, 20  68:2,
18  69:13, 25
70:3, 6, 23
71:12, 19
72:11, 23
73:8, 18
74:10, 23
75:9, 12, 13,
17  76:1
78:20  79:2
80:9, 19  81:7,
19  82:1, 11,
20  83:9  84:9,
20  86:16
87:20  88:20
89:15  90:6,
18, 21  91:1, 2,
19  92:2, 3
94:22  95:5,
15  96:10
99:5, 19
100:4, 15
101:1, 17
102:9, 19
103:4, 15
104:1, 15
105:1, 10, 24
106:6, 9
107:18
109:11, 23
110:7  111:2,
19  112:2, 13
113:8  114:9,
21  115:7, 20

116:5, 16
117:4, 17, 21,
23  118:19
120:19  121:9,
18, 22, 23
122:2, 6
123:1, 15, 22
124:8  125:2,
20  126:13, 20
127:9, 22
128:11
129:21
130:12  132:2,
9, 13, 17, 20, 23
133:12  134:9,
16, 23  135:4,
10  137:3, 21
138:1, 6, 9
139:1  140:13
141:8, 19
142:3, 14, 15
143:16  144:3,
15  145:4
147:18
148:10, 22
149:14, 24
150:12  151:4,
15  152:4
153:11, 24
154:9, 19
155:5, 15
156:3, 18
157:7, 16, 23
158:5, 19
159:1, 21
160:18  162:3,
15  163:2, 15
164:18  166:3,
17  167:1, 17
168:5, 10, 20
169:10  171:2
172:2  174:13,
23  175:8, 16,
19, 23, 24
176:22  177:7,
21  178:5, 16
179:3, 17, 24
180:7  181:1,
3, 19  182:2,
10  183:3, 12,
16, 20  184:2,

22, 24  185:4,
22  187:10, 19,
25  188:4, 18
189:1, 5, 9, 12,
19  190:2, 6, 7,
13  191:1, 12
192:12, 16, 19
193:6, 16, 23
195:8, 14, 17
197:1  199:6
200:1, 19
201:13  202:1,
17  203:5
205:19  206:3,
13  207:4, 6,
12, 15, 16, 20
208:2, 4, 10,
24  209:3, 5
329:10
339:21, 23
340:3, 10, 14
342:11, 19, 23
343:12
344:15, 19
345:2, 4, 11
346:1  347:11
348:6, 19
349:7, 17
350:1, 7, 11,
19  351:19, 22,
23  352:7
353:4  354:14
355:4, 22
356:11, 21
357:7, 12
358:16, 18, 20
359:6, 20
360:3, 8, 20
361:4, 17
362:1, 14, 24
363:8, 13, 21
364:12  365:1,
5  366:3
367:16, 24
368:17, 20
369:21
370:14, 22
371:8, 24
372:15, 16
374:4, 17, 21,

22  375:10
376:4, 9, 12, 19
honor  266:11
hospital  58:15
340:23
341:11, 12, 15
342:10  344:3
345:17, 23
346:5
hospitals
345:15  346:2
hour  65:25
66:17  67:2
128:24  135:1
259:16
317:21  329:9,
12
hours  220:11
329:15, 17, 20,
24  330:3
338:19, 24
353:19
house  303:11
housekeeping
10:19
Huahai  4:2
human  219:2,
16  311:18
314:10
Humana  4:11
262:9  305:12
hundred
38:19  88:25
173:8  295:20
312:1  372:1,
4, 5
hundredfold
312:4
hundred-page
48:8  89:1, 3
372:2
hundreds
29:8  89:19
180:11  181:9
312:2
HUSCH  5:20
hygiene
245:22
Hypertension
8:4

hypertensive
146:20  297:21
hypothetical
126:10, 16, 24
127:14, 24
128:4  156:17
274:12  297:8
310:2, 23
367:17  376:6
hypothetically
240:19
hypotheticals
145:2

< I >
i.e  346:25
348:4
ID  238:20
240:1, 4, 5, 13,
16  241:11
242:11
252:13, 14
idea  49:3
54:20  62:22
88:9  89:6
100:16
282:23
316:18  340:10
identification
210:7, 17
222:24  273:5
307:2  310:20
311:20
identified
11:6  47:5
55:22  56:14
59:1, 23
61:25  62:13,
24  63:7
242:11  252:1
308:10
370:20  373:15
identifier
239:21
306:25  311:6
identifies
139:11  223:4,
8, 12  240:17
358:5
identify  9:12
31:9  32:4

73:10  75:4,
18  76:17
113:17
115:16  128:7,
8  161:23, 25
219:4, 19
220:1, 10, 16
222:14  241:8
250:10
256:10
257:15  280:8,
23  284:3
295:5  306:19
309:22
313:10  314:7
317:1, 11
331:25
identifying
24:3  210:23
223:23  224:2
250:9  331:10
identity
156:23
177:15  333:2
ignore  164:23
166:19
ignores  164:21
ignoring
163:20
III  94:11
illegitimate
370:6
Illinois  2:17
4:14
illustrate  62:6
illustrates
297:20
imagine  141:6
147:13
immediately
29:10  304:20
impact  79:3
82:5, 9  92:25
94:5
impacted
77:16  78:22,
25
impacts  93:10,
11  94:2
112:24  173:20
imparts  356:4

impediment
207:5
implement
59:7  78:7, 11

implementation
76:22  77:6,
25  78:16
implemented
25:24  62:1
77:7  304:10
implied  303:14
implies  354:6
importance
85:5  96:6
important
19:6  29:13
94:5  97:19
182:14  344:1
impressions
54:3  55:24
185:2
improper
55:9, 20  56:3
356:18, 25
359:1  360:13
361:9  372:8
improperly
116:20  371:11
improve
304:15
improving
304:14
impurities
59:15  62:17
70:17  76:11,
16, 18  77:12
85:3  114:1, 2
148:9  295:11
296:17, 19
370:20  373:14
impurity  59:1,
2  120:13
136:19
inaccurate
27:12  130:5
inappropriate
187:11  189:9
Inasmuch
19:1  132:24

in-basket
293:9
incented
304:11
include  37:17
47:19  75:24
96:5  97:2
131:15  154:8
201:8  314:4
320:22
321:20  346:13
included
22:10, 11
35:20  52:16
245:20  266:4,
8  286:18
316:19  322:5
330:18
331:17  332:9
includes
97:17  164:9
169:22, 23, 24
319:20
345:15
348:17  355:14
including
174:5  375:18
inclusions
218:11
inclusive  230:8
incomplete
92:1  94:18
126:16, 24
128:4  310:1,
23
inconsistencies
167:21
inconsistency
167:8
inconsistent
167:10
incorporate
44:18
incorporated
25:7  26:21
48:3
incorrect
91:12  187:5
188:11  196:4
295:3  352:17

in-court
194:13
increase
237:11  343:7
increased
304:21  346:23
increases
292:2, 3
incurred
173:11
independent
271:13, 17, 19
277:19  307:9
independently
288:16
INDEX  7:6
8:1  300:15
Indian  165:11
indicate  144:1
256:15
283:14, 23
306:24
328:16  332:13
indicated  33:6
52:12  98:1
247:5  249:1
indicates
98:20  355:18
indicating
150:4  332:8
individual
14:4  77:11
134:7  226:10,
16, 19  227:4
240:17  251:6
273:2  274:19
300:14  305:9,
13
individuals
28:1  29:4
Industries
2:14
industry  13:6
27:10, 11
34:13  36:24
59:22  61:17,
20  62:2  74:4,
8, 14  76:17
77:2, 9, 14
78:1, 4, 10, 15
81:6, 24  83:8,

18  84:5
86:23  93:2, 5
94:4, 7  97:18
104:13, 18, 21
105:22
112:10
115:15
133:20, 23
134:12  139:7
150:23
161:10
169:13, 16, 20,
22, 25  170:13,
14  171:1
172:4, 16, 19,
20  173:1, 24
174:2, 5, 10
179:9  180:15
181:8, 10, 11
182:17
221:22
248:25  283:6
290:11  292:9,
11  293:1
297:16
302:21  303:1
304:8  305:4
328:20
373:12, 19, 20
industry's
171:13
infallible
373:10
infeasible
219:3, 18
inform  83:7
103:17  173:1
292:9  367:8
INFORMATIO
N  1:8  20:10
25:17  74:3,
14  89:21
113:19  114:4
118:16  127:2,
20  129:7, 12
133:22
152:24
158:13, 14
162:1  170:11,
12  172:18
177:23  178:9

Confidential Information Subject to Protective Order

185:25  200:7
201:10
203:14, 24
206:2  207:3
208:8  212:20
213:3, 12
218:10
223:23  224:2
232:14
237:25  245:4
248:19
249:12
251:14  252:9
256:5  263:25
270:16  275:3,
5, 6, 20
283:18
287:12  294:9
307:10  311:5
315:1, 4, 7, 14
316:13  326:8,
23  327:5
**informed**
59:24  93:4
140:15
149:11  201:8
**informs**
171:15, 18
293:4
**INGERSOLL**
3:3
**ingest**  251:16
**ingested**
76:19  77:12
291:19  295:5
298:18  301:6
**ingesting**
305:1
**ingests**  302:8
**ingredients**
139:18
**inhibitor**
146:12
**initial**  31:7, 8
32:5  99:2
**initially**  20:24
37:11  66:8
218:21
**injury**  75:1
98:12  112:15

**in-person**
194:12
**input**  17:13
**inquiry**  340:5
**insight**  33:22
111:8
**insights**  43:21
44:15
**inspected**
139:10, 12
**inspection**
237:23  377:11
**inspections**
156:1
**installed**  35:24
**instance**
27:16  64:20
101:6  146:18
210:5  222:14
241:25
243:10
249:17, 25
260:18
283:13
284:10
294:15
301:21  302:2
334:13
**instances**
12:13
**instant**  376:24
**instantly**
128:14
**instruct**  19:17
27:3  28:3
31:24  187:17,
21  190:7
199:24
263:16  364:17
**instructed**
84:16  126:4
**instructing**
32:13  69:25
192:6  195:14
208:1
**instruction**
16:8  18:6, 7
32:7, 10  34:9
55:10, 25
56:2, 5, 21
70:1  179:19

183:15
188:22
189:10  190:1,
10  191:6
205:14
206:10  364:21
**instructions**
15:22  55:20
205:24  237:22
**insurance**
130:4, 23
131:16  133:3
152:8
**Insured**  8:4
129:23
130:20  133:1
273:16
**insurer**
128:15
129:25  161:3
**insurers**
127:25
**integrate**
366:20  367:11
**intend**  257:24
364:16
**intent**  269:6
354:5
**interest**  18:9
42:9
**interested**
377:17
**interesting**
23:20  294:8
**interface**
27:20, 23
**interfaced**
28:18
**internal**
232:14  268:9
**interpose**
21:12  290:7
**interpret**
120:15
**interrelationshi
ps**  181:12
**interrupt**
75:12
**interrupting**
75:10  132:10,
20

**interruption**
74:11
**interstate**
114:11  115:1
119:20  122:9
124:2
**interviewed**
31:10, 22
**introduce**
121:12  250:6
**introduced**
116:20
120:12  153:7
170:20
**introducing**
120:16
**introduction**
76:25  114:11,
25  119:19
120:9, 10
**invoice**
182:14  335:5,
12  336:19, 21
338:9
**invoiced**  8:11
335:25  338:6
**invoices**  8:9
24:5  181:24
333:24  334:2,
7  336:3, 9, 12
337:7, 18, 23
338:7
**invoicing**
278:16  334:6
**involve**  367:1,
4
**involved**  24:4
30:25  31:4
35:10  41:24
42:3  55:7
59:23  78:2
179:25
195:25  196:5
199:3  221:17
260:7, 11, 12
264:1  366:24
367:11
**involvement**
184:13  288:21
**involving**
201:1

**IQVIA**  43:11
133:13, 19, 21
134:3, 5, 10
160:22
161:22, 24
162:6, 8, 18,
24  330:23
331:22  332:6
333:17
**IQVIA's**
332:18

**IRBESARTAN**
1:3  7:10
**issue**  29:13
63:3  76:19
77:25  88:15
99:13  109:10
119:8  120:11,
17  146:12
149:12  151:3
152:13  217:3
255:2  260:17
310:6  353:14
362:11
**issued**  240:7
250:4  334:3
336:13
**issuer**  239:24
240:3
**issues**  38:3, 4
58:7  61:24,
25  62:14
78:16  89:13,
16  105:9, 21
153:2  167:5
204:11  249:11
**item**  79:8
87:4  198:17
199:8  200:21
201:16
355:17  357:22
**items**  346:15
**iteration**
48:21  65:24
**iterations**
48:25
**iterative**
49:12  65:6
78:12

Confidential Information Subject to Protective Order

its 16:*20*
66:*4* 73:*10*
141:*22* 143:*1,*
*7* 157:*10, 11*
210:*16* 235:*6,*
*25* 237:*24*
275:*23* 276:*4,*
*19* 277:*2*
280:*9, 24*
283:*14, 23, 24*
317:*10, 11*
IVES 4:*12*

< J >
J.C 36:*12*
JAMES 5:*20*
james.spung@
huschblackwell
.com 5:*22*
January 7:*8*
21:*17* 22:*15*
66:*5, 7* 309:*8,*
*10* 339:*17*
JEFFREY 5:*4*
JERSEY 1:*1*
2:*22* 9:*9*
jgeoppinger@u
lmer.com 5:*6*
job 19:*14*
35:*18* 36:*5*
126:*8* 249:*7*
Johnston 7:*8*
91:*7*
join 177:*20*
264:*7*
joined 38:*24*
39:*2*
Judge 7:*10*
105:*25* 142:*5*
375:*18*
July 324:*12*
325:*11*
jump 132:*8*
322:*7*
June 90:*7*
91:*6*
jury 168:*24*
171:*10*

< K >

Kali 8:*15*
KANNER 2:*7*
KAPKE 3:*9*
91:*24* 177:*18*
262:*17* 263:*3,*
*6, 7* 264:*7*
290:*6, 16*
291:*8*
KARA 3:*9*
91:*24* 290:*6*
kara.kapke@bt
law.com 3:*11*
keep 13:*14*
14:*25* 15:*8*
29:*8, 12, 13*
127:*8* 187:*14*
211:*4* 216:*6*
223:*2* 226:*12*
234:*7* 242:*10*
245:*19*
255:*15*
258:*16*
292:*10*
314:*24* 315:*2*
364:*16*
keeping 365:*19*
keeps 38:*19*
Kelly 54:*16,*
*17*
kept 29:*7, 10*
33:*9* 58:*17*
93:*4* 258:*2*
259:*5* 365:*14*
376:*18*
key 241:*20*
243:*17, 25*
244:*23*
245:*13* 252:*2*
283:*9*
keys 219:*13*
kind 36:*14*
42:*20* 203:*25*
219:*10* 289:*16*
kinds 25:*15*
KLINGES 4:*5*
knew 15:*7*
133:*11* 246:*5*
292:*14*
know 11:*10*
12:*1, 20* 15:*5,*
*10, 24* 19:*25*

23:*22, 24*
27:*9* 30:*5*
31:*19* 34:*20*
40:*4, 13* 42:*4*
45:*12* 48:*17*
49:*9, 18*
54:*24* 59:*2*
60:*22* 67:*7*
69:*8* 77:*23*
78:*21* 84:*15*
92:*4, 10*
96:*11* 98:*25*
104:*21*
110:*24*
114:*17* 115:*6*
118:*16* 120:*7,*
*11, 17, 24*
124:*9* 128:*12,*
*17* 129:*9, 11,*
*18* 130:*2*
132:*24*
137:*17, 19*
144:*14*
145:*21* 148:*7*
151:*13, 14*
154:*6* 157:*5*
163:*5, 9, 14*
170:*1* 174:*15,*
*19* 178:*2*
182:*7, 13, 20,*
*25* 184:*15*
186:*18*
188:*24, 25*
189:*17* 190:*2,*
*24* 192:*12, 16*
193:*7, 9, 14*
194:*21*
195:*11* 197:*3,*
*15* 198:*5*
199:*15, 16*
201:*23*
203:*10*
204:*20, 25*
205:*3, 7, 20*
206:*16, 17, 20*
207:*11, 12*
208:*13, 21, 23*
210:*11*
219:*12* 221:*3*
227:*4, 15, 20*
228:*7, 24*

231:*6, 15*
232:*7* 233:*13*
237:*8* 242:*19*
253:*2* 254:*12*
258:*11, 14, 23*
259:*7, 11, 16*
263:*9* 267:*16*
270:*15* 272:*4*
273:*1* 274:*8*
282:*8, 19*
283:*19, 20*
284:*18*
286:*11* 287:*5,*
*9, 21* 288:*4*
290:*5* 292:*1,*
*2* 293:*19*
294:*3, 15, 21*
295:*22*
296:*17, 19*
302:*13, 17*
303:*8* 306:*8*
316:*1, 2, 20*
317:*21* 323:*7*
328:*19* 331:*7,*
*11, 23, 24*
332:*19, 20*
333:*8* 334:*5,*
*7* 335:*9, 14*
336:*8* 338:*14,*
*16, 18* 339:*6,*
*12, 13, 14*
342:*12* 347:*5*
348:*14*
353:*16, 22, 25*
354:*4, 20*
355:*1, 5*
358:*10* 360:*9*
363:*19*
365:*25*
368:*21*
375:*12, 20*
knowable
133:*1*
knowing
11:*18* 85:*3*
120:*13*
145:*18* 150:*13*
knowingly
120:*16*
knowledge
88:*12* 94:*7*

137:*24*
154:*20* 228:*3,*
*4*
known 113:*16,*
*19* 114:*5*
115:*5* 120:*10*
128:*14* 132:*5*
152:*14*
229:*13*
236:*10*
253:*12, 18*
294:*7* 358:*4*
knows 120:*24*
129:*4, 23*
130:*10, 15*
303:*10*
307:*25* 329:*25*
KOSTY 1:*12*
7:*2, 6, 8* 8:*1,*
*12* 9:*11* 10:*9,*
*14* 12:*11*
15:*23* 16:*5*
17:*21* 18:*5*
24:*9, 23* 25:*1*
26:*14* 28:*8*
30:*7, 24*
32:*19* 34:*17*
36:*18* 43:*5*
47:*3* 51:*2, 14*
52:*19* 53:*17*
54:*2* 55:*17*
56:*1* 57:*19*
61:*3, 8* 64:*19*
66:*22* 67:*13*
70:*24* 75:*14*
78:*21* 83:*17*
89:*5* 90:*7, 9*
91:*3, 20* 92:*5,*
*6* 98:*11* 99:*6*
106:*4, 8, 10*
112:*3* 117:*19*
121:*24* 122:*3*
125:*3, 24*
128:*23* 129:*1*
132:*24*
134:*18*
135:*11* 138:*8,*
*10* 147:*23*
151:*16*
153:*12*
158:*24*

159:18  171:3
174:14
177:22
179:11, 20
182:15
187:20  188:6
189:20
190:14
192:20
201:14
206:14  208:1,
11  209:15
214:16
231:12
233:10
234:13  237:6
238:16
259:25
263:20
266:21
267:25  269:1
275:9  290:22
291:18  298:4
299:16
308:16  312:8
317:25
318:12  323:5
324:8, 25
325:4  328:24
332:2  333:21
336:24  337:2
339:24
340:15
342:22, 24
344:23  345:5
352:1, 6
353:19
357:11, 13
360:5  364:2,
13  365:6, 18,
25  366:13
367:16
368:21
372:17
374:23  376:5,
19  377:7
378:3, 21
**Kosty's** 207:9
270:7  290:9
**Kroger's**

71:23
**KUGLER**  1:4
**Kugler's**
105:25  142:5

**< L >**
**l.hilton@kanne
r-law.com**
2:11
**lab** 247:12
**label** 230:12
**labeled** 234:18
**labeling**
359:15
**Laboratories**
3:13
**Lack** 34:6
113:12
150:14  167:3
**Lacks** 105:16
116:24
117:10
121:16  125:8
131:1  133:7
141:2  151:25
154:25
155:10
156:10
157:25
170:23
171:22
189:25  192:9
193:11
227:19
258:21
289:12
291:23  295:2
296:13  297:5
319:14  333:4
335:18  341:2
347:7, 21
348:12  349:2,
12  350:6
354:23  356:7
357:1  358:13
359:2  360:15
361:10  363:18
**lady** 71:22
**lag** 19:5
**language**
45:18  46:18

47:9  65:20
101:4  108:7
325:4  375:18
**laptop** 10:23
**large** 254:15
268:20, 21
269:11, 12
271:21
**larger** 271:17
**largest** 230:15
**late** 149:22
221:24  289:6
**launched**
113:20, 24
152:15  153:1,
9
**Laura** 20:16
21:4  50:16
63:24  64:10
208:17
**law** 15:24, 25
16:17  70:2
76:22  77:2, 5,
7, 16, 22
78:22  99:9
105:13  371:18
**laws** 237:22
**lawsuit** 371:10
**lawyer** 171:8
353:5, 20, 22
**lawyerly**
135:16
**lawyers** 11:2,
4  12:1
106:15  150:2
175:11
189:21
190:17  195:2
199:18  200:4,
21  203:6
**lawyer's** 11:19
**lay** 107:10, 22
**layering** 281:6
**laymen's**
245:12
**LAYNE** 2:8
90:21
**leading** 134:13
**leads** 237:17,
18
**lean** 215:17

**learn** 198:18
202:3, 10, 24
**leases** 97:12
**leave** 63:16
350:2
**led** 253:22
**left** 36:9, 14,
22  54:16
343:23
**legal** 12:12
23:25  37:18,
20, 24  38:7
52:25  68:11
69:1  70:11
71:8  73:14
80:23  81:2, 5,
15, 24  82:7,
15, 17  83:2, 6
84:3  86:20,
21  95:13, 22,
24  96:2, 5, 13
98:15, 25
99:13  100:3,
11, 17, 20, 23
101:21  102:6
103:10  104:4,
7, 11  105:5, 9,
17, 18  107:11,
13, 17, 22
109:5  110:3,
22, 25  111:13
113:1, 4, 13
114:15
115:11  116:1
120:5  121:5,
13, 17  122:21
123:10  124:4
125:13
126:17  127:7,
16  128:8
136:25
137:16  140:8
141:16
144:11, 14, 25
145:6  149:9
150:20  151:7,
10, 12, 14, 17,
22  152:11
153:17  154:4,
14  155:19, 21
156:11  157:1

159:11
161:18
162:21
167:13  169:8
171:7  172:10
177:2, 5
180:16, 23
181:7  182:18
192:8  193:11
196:16, 18
199:3, 9
219:6  228:17
272:3, 17
274:6  310:2,
23  311:23
313:12
320:25  329:4
331:20  333:5
354:6, 21, 24
355:6  356:7
357:2  371:5,
23  374:7, 24
375:1, 9, 13
376:1
**legally** 99:23
112:22  121:12
**legitimacy**
150:15
**legitimate**
121:11
154:23  156:6
157:18  369:8,
15
**length** 269:1
**Letter** 7:8, 14
17:24  26:7,
13  28:24
29:18, 20
31:1  32:20,
23, 24  87:3,
10  88:4, 14,
22, 24  89:1, 4,
7, 18  90:1, 3,
7, 23  91:6, 10,
15, 21  94:10
138:2, 15, 16
139:3, 15
140:12, 16
141:5  174:15,
24  175:6

**letters** 140:*23*
150:*3, 4, 11*
176:*3, 4*
253:*11*
**level** 24:*15*
33:*19* 34:*1*
40:*24* 77:*4*
102:*24*
116:*11*
179:*21* 180:*9*
198:*3* 240:*11*
286:*3, 9, 12,*
*18* 296:*20, 24*
297:*2* 320:*4*
**levels** 26:*1*
217:*1* 285:*6,*
*9, 13, 23*
294:*17, 20, 23,*
*24* 295:*25*
296:*1, 8, 11*
**LIABILITY**
1:*4* 7:*11*
79:*18* 80:*2*
82:*15, 24*
99:*21* 100:*7*
159:*7, 11*
165:*20*
167:*23* 168:*2*
**liable** 79:*12*
80:*24* 81:*17*
82:*3, 14*
**lifetime**
293:*22, 24*
294:*3, 11, 16*
306:*20*
307:*13* 308:*17*
**light** 97:*15*
**likewise** 12:*4*
127:*6* 207:*10*
**limit** 21:*3*
**limitations**
218:*24*
**limited** 65:*19*
84:*17* 88:*8*
104:*17, 21*
117:*16* 346:*2*
**limiting** 42:*8*
**line** 65:*15*
160:*1* 181:*9*
230:*4* 378:*6*

**lines** 65:*9, 18,*
*20* 295:*22*
**link** 218:*19,*
*22* 278:*19*
*279:1*
**linking**
218:*24* 219:*9*
**list** 87:*5*
120:*20* 198:*9,*
*12* 312:*21*
316:*11* 326:*3*
350:*21*
352:*19* 354:*9,*
*11* 358:*4*
369:*20*
**listed** 70:*25*
86:*5, 6* 91:*4*
106:*11* 107:*4*
119:*18*
141:*22* 166:*7*
176:*5* 197:*14*
216:*16*
217:*23* 241:*7*
335:*12, 15*
337:*7, 12*
354:*6*
**Listen** 206:*14*
**listened** 308:*6*
**listing** 85:*21*
116:*7* 200:*13*
**lists** 334:*16,*
*19* 346:*14*
**literature**
40:*21* 267:*8,*
*17, 21*
**LITIGATION**
1:*4* 7:*11* 9:*5*
22:*19* 231:*18*
236:*16* 260:*8*
265:*24* 266:*2*
271:*24*
292:*15, 24*
293:*10* 339:*11*
**little** 12:*25*
13:*2, 16* 20:*3*
23:*11* 34:*16*
42:*19* 135:*2*
144:*4* 164:*20*
169:*21*
187:*13*
221:*14*

233:*14, 16*
246:*13*
259:*15*
275:*15*
284:*12*
309:*10*
341:*18* 344:*6*
376:*13*
**live** 90:*16*
**LIZA** 2:*21*
**LLC** 2:*3, 7,*
*14* 4:*3*
**LLP** 2:*14, 20*
3:*9, 15* 4:*4,*
*12, 18* 5:*3, 9,*
*14, 20* 6:*3*
**load** 251:*19*
**local** 322:*14*
**locate** 16:*24*
**located** 234:*3*
**lodge** 18:*8*
91:*25*
**lodging** 290:*17*
**Loestrin**
12:*13* 15:*1*
16:*13* 179:*7,*
*18, 25* 182:*20*
183:*4, 5, 21*
184:*9, 13, 17*
189:*21*
190:*16* 191:*4,*
*18* 194:*14*
200:*3* 201:*2,*
*17, 23* 202:*9,*
*23* 205:*13, 22*
206:*8, 19*
207:*10, 21, 25*
208:*6, 14, 19*
**logic** 332:*5*
**long** 12:*20*
15:*11* 36:*11*
42:*24* 47:*6*
49:*13* 60:*13*
64:*15* 76:*22*
129:*10*
193:*17*
225:*22*
226:*11*
228:*21, 25*
236:*22*
252:*21*

260:*20*
261:*14* 265:*1,*
*5, 16, 20*
270:*13* 306:*1*
321:*2* 330:*1*
345:*1* 374:*5*
**longer** 135:*2*
**longest** 226:*12*
**longitudinally**
304:*3*
**look** 10:*24*
33:*10* 43:*8*
57:*6* 59:*4*
76:*9* 79:*24*
83:*5* 88:*1*
98:*17* 99:*12*
101:*2* 102:*20*
105:*8* 107:*1,*
*25* 118:*22, 25*
119:*2, 10*
122:*7* 128:*2*
134:*7* 146:*16,*
*24* 159:*4, 25*
160:*22*
163:*16* 165:*1*
166:*2* 168:*3*
169:*19, 24*
179:*8* 183:*2*
189:*2* 194:*3*
198:*2* 210:*5*
214:*15* 218:*8*
228:*8* 229:*4*
232:*6* 235:*17*
246:*5* 251:*22*
252:*7, 11, 21*
261:*3* 267:*5*
274:*15*
282:*17*
283:*11* 293:*5*
304:*2, 24*
307:*15*
308:*21*
310:*11*
315:*10, 15*
318:*16*
322:*24*
325:*14, 21*
326:*12*
334:*12* 342:*9*
346:*7* 347:*12,*
*15* 349:*15*

350:*14, 20*
355:*12, 23*
356:*12* 371:*17*
**looked** 15:*3*
23:*8* 69:*7*
76:*3, 15, 17,*
*20, 21* 77:*10,*
*22* 81:*5* 83:*7,*
*18* 88:*4*
97:*18* 99:*13*
105:*22*
116:*18*
117:*13*
141:*20, 25*
142:*5, 10*
150:*24*
160:*10*
180:*12*
194:*10*
299:*22* 306:*4*
308:*25*
309:*12*
315:*13*
320:*11, 13*
327:*1* 337:*19*
360:*10*
**looking** 10:*20,*
*22, 25* 28:*4*
31:*17, 18, 23*
78:*15* 81:*23*
92:*8* 96:*7*
106:*19* 139:*3*
147:*5* 170:*13*
172:*4* 175:*25*
176:*24* 198:*8*
232:*3* 234:*19*
236:*3* 244:*1*
247:*3* 248:*14*
260:*25*
282:*12*
296:*21*
303:*13*
322:*17*
323:*20*
326:*21* 331:*1*
341:*15*
354:*12* 362:*2*
**looks** 26:*12*
161:*15* 235:*11*
**Los** 3:*10*

Confidential Information Subject to Protective Order

**LOSARTAN**
1:*3* 7:*10*
**loss** 101:*8, 19*
211:*6, 7, 19*
212:*4* 213:*6,*
*13, 16* 215:*7*
216:*1, 15*
271:*25*
**lot** 19:*4*
23:*20* 36:*23*
38:*3, 5, 17*
42:*24* 70:*24*
77:*9, 11*
84:*17* 134:*5*
164:*19*
173:*13*
212:*20* 251:*6*
286:*3, 9, 11,*
*18* 296:*8, 18*
313:*23*
**lots** 76:*16*
286:*3, 12, 18*
287:*1*
**Loud** 209:*19*
**Louis** 5:*21*
**Louisiana** 2:*10*
**love** 48:*13*
**low** 147:*4*
**lower** 144:*17*
308:*10* 343:*23*
**lowered** 144:*6*
**lowering**
108:*21* 142:*8*
146:*14*
**lowest** 294:*17,*
*23* 296:*11*
297:*2* 308:*5*
**Ltd.'s** 335:*3*
**lucky** 35:*13*
**ludicrous** 97:*1*
**lunch** 134:*21*
135:*12, 15*
lwalsh@walsh.l
aw 2:*24*

**< M >**
**Macro** 87:*3*
88:*15*
**MADA** 275:*3*
276:*18*
**magically** 98:*5*

**magnitude**
181:*21*
**mail** 37:*12*
61:*23* 170:*7*
230:*9* 232:*1,*
*5, 9* 262:*6*
304:*16, 25*
**maintain**
141:*11*
191:*23*
223:*15, 18, 22*
224:*1, 6, 13,*
*17, 21* 225:*4,*
*8, 12, 16*
237:*25*
245:*25*
275:*18* 314:*20*
**maintained**
232:*16*
**maintaining**
226:*2, 6*
**maintains**
225:*22* 228:*5*
229:*1* 275:*16*
326:*2, 7*
**maintenance**
304:*18, 19*
**major** 271:*21*
**majority**
252:*3* 256:*17*
**maker** 16:*13*
**making** 70:*3*
121:*20*
182:*16* 197:*7*
257:*4* 304:*5*
**manage**
280:*16* 314:*1*
**managed** 35:*3,*
*5* 342:*4, 6*
**management**
36:*1* 232:*15,*
*17* 247:*4, 7*
251:*16, 17*
257:*1, 5*
259:*13* 344:*2*
346:*4*
**manager**
27:*25* 35:*2*
268:*22* 269:*12*
**Managing**
346:*10, 13*

**manipulation**
219:*2*
**manner** 64:*5*
172:*6*
**manual** 213:*4*
218:*2, 6, 13,*
*16, 20* 219:*11,*
*25* 220:*8, 15*
309:*24*
310:*16, 19*
311:*10* 326:*24*
**manufactured**
180:*2* 362:*19,*
*21*
**manufacturer**
58:*25* 133:*24*
152:*23* 157:*5*
159:*6* 172:*24*
173:*21*
222:*24* 223:*5*
353:*17*
355:*13, 18*
357:*6*
**manufacturers**
16:*15* 37:*4*
152:*19, 21*
153:*13*
155:*16* 156:*1*
169:*23* 170:*3,*
*5* 171:*17*
172:*21*
296:*24*
335:*10*
371:*17* 373:*16*
**manufacturer's**
352:*10, 11*
**manufacturing**
137:*14* 139:*7,*
*16, 22* 141:*12*
362:*22*
**map** 20:*4*
222:*10, 16*
242:*1, 14*
243:*2* 251:*12,*
*23*
**mapped**
243:*16*
**mapping**
243:*17, 20*

251:*14*
**march** 338:*10*
**mark** 24:*22*
90:*6, 8*
105:*24*
106:*10*
117:*17* 237:*4*
289:*6* 298:*2*
324:*6* 333:*19*
336:*22* 342:*25*
**marked** 25:*1*
46:*8* 90:*9, 24*
91:*4* 94:*10*
106:*8* 117:*19,*
*21* 138:*8*
158:*24* 175:*9*
207:*7, 10*
231:*12*
233:*10* 237:*6*
267:*25* 298:*4*
323:*5* 324:*8*
333:*21*
336:*24*
342:*22* 352:*6*
357:*11*
**Market** 2:*4*
36:*25* 37:*2, 3,*
*15* 113:*17*
114:*3* 133:*22*
149:*21* 151:*8,*
*23* 153:*7, 15*
154:*13*
180:*25* 231:*3,*
*4* 286:*4, 13,*
*21* 341:*11, 13,*
*25* 342:*6, 10*
373:*15*
**marketplace**
36:*7* 58:*8*
60:*1* 113:*20,*
*24* 126:*7*
147:*25*
148:*25*
150:*16*
152:*14* 153:*9*
156:*16*
249:*21* 308:*4*
369:*2* 370:*4,*
*13, 16* 371:*12*
373:*19* 375:*5*

**market's**
230:*15*
**marking**
231:*10* 267:*22*
**markup**
131:*22*
**marriage**
377:*17*
**married** 249:*9*
**Martin** 6:*6*
9:*4*
**Massachusetts**
4:*20*
**match** 30:*15*
270:*4, 22*
311:*5* 340:*7*
**matched**
269:*17, 19*
**matching**
218:*17*
246:*14, 23*
247:*11* 248:*1,*
*20* 249:*1*
270:*10, 13*
**material**
18:*15* 45:*19*
47:*9* 71:*1*
74:*2* 87:*5, 22,*
*23* 88:*4*
106:*12* 166:*8*
174:*16, 25*
176:*6* 364:*1,*
*20*
**materials**
17:*25* 85:*22*
120:*21*
138:*11* 365:*2*
**Matt** 6:*6* 9:*4*
**matter** 13:*1*
14:*9* 15:*16*
62:*18* 104:*9,*
*10, 20* 129:*14*
132:*12* 145:*6*
157:*24*
168:*11, 14*
184:*17* 196:*7,*
*9, 11* 198:*18*
199:*3, 9, 18*
200:*3* 201:*17*
203:*7, 15*
207:*10* 208:*9*

Confidential Information Subject to Protective Order

245:2  271:23
273:10, 14
293:5  294:25
295:4  338:12
374:8  377:18
**mattered**
129:15
**matters**  12:13,
18  14:17
99:6  104:3
180:17  201:1
202:9, 23
273:15  295:4
**maz@falkenbe**
**rgives.com**
4:15
**MBA**  34:18
38:23  39:1,
15  96:15
142:25  157:8
**McKesson**  5:6
195:23
196:23  201:1
202:8, 23
**MDL**  1:3
9:10
**mean**  21:21
25:20  37:3
38:12  41:21
50:22  51:15,
16  89:16
96:21, 22
169:16, 19
172:3  174:2
200:12  218:6
219:2, 17
245:9, 13
263:9, 10
266:1  286:19
297:19
298:16  355:7
**meaning**
19:15  88:14
139:24  140:6
256:7
**means**  36:2
96:12  119:25
124:10
131:13  152:5
207:8  265:10

277:10, 13
301:15  337:10
**meant**  246:6
372:25
**measure**
95:19  103:19
104:4  108:1
127:13
144:22
168:22
171:19
302:12, 25
374:15  375:5,
19, 21
**measurement**
302:20  303:1
**measures**
301:19
**measuring**
170:19
**meats**  289:3
**mechanism**
115:16
**Med**  26:11
164:8, 13
226:4, 12
235:12  236:6
341:25
**MedalistRx**
283:4  284:10
**Medco**  256:16
257:12  258:2,
16  259:5
**Medicaid**
7:18  12:22
13:1  25:22
37:7  97:20,
21  231:20
232:21  233:1
**medical**
108:21  142:8
211:8, 20
212:1, 24
216:21
217:11, 19, 22
247:7, 11, 25
248:11
284:13, 24
293:25  294:5,
13  297:12
306:11  324:17

**medically**
110:10
**Medicare**
7:16  164:6,
20  165:9
226:1  227:22
231:19
232:20  233:1,
5  235:3, 7
237:19, 21
238:6  302:24
304:10, 11
341:15
**medication**
58:7  59:10,
18  146:23
297:19, 22
300:8, 14
302:13, 16, 18,
23  303:12, 23
308:1  346:10,
13, 20
**Medications**
8:4  147:6
**Medicine**
268:9
**Medis**  1:14
70:7  377:4
**meet**  48:13
151:6, 22
152:6, 18, 22
154:21  155:8,
24  156:2
157:11  308:2
359:23
361:20  362:4
**meeting**  32:5
154:3  369:23
**meetings**
259:14
**meets**  30:9
120:10  157:19
**MEGAN**  4:13
88:6
**member**
221:1  240:14
276:4  293:1
340:20
**members**
75:25  102:22
210:8, 18

219:4, 19
220:2, 10, 17
310:20  311:20
**membership**
20:15  75:5,
19  76:2
80:13  250:5
272:8, 14, 21
273:6  276:14
**memorized**
43:7  166:6
**memory**
166:15
192:23
193:17  194:1,
6, 8  351:5
**memos**  89:25
**mention**
232:9  248:7
277:16
353:15  374:14
**mentioned**
20:6  23:19
25:3  28:17
34:1  52:14
102:7  119:7,
11  180:22
186:6  235:19
249:14
250:18  251:5
281:1  282:19
285:17
292:19  296:7
309:5  342:2, 3
**mentioning**
175:6
**mentions**
235:21
**merge**  250:25
**merged**  36:11
253:9, 17
268:20  269:10
**merger**  253:7,
23  257:12, 13
258:1, 9
**merging**
246:14
250:20  258:4
**merit**  52:15
**met**  42:5
154:11  338:22

**Methinks**
192:17
**method**  43:12,
13  160:21
161:21
**methodologies**
57:7
**methodology**
46:4  52:21
53:4, 22
56:13, 15, 20
57:3, 5, 13, 21,
24  65:24, 25
95:17  96:3, 7,
20  97:18
98:10  145:13
162:16  172:6
178:10, 21
179:8  220:14
372:3, 9, 12,
21  373:1, 24
**methods**
139:21
**metric**  302:11,
12, 24  304:15
374:6
**metrics**  93:17
304:14
**MI**  147:2
**mic**  215:17
339:20
**micromanage**
28:11
**middle**  202:15,
20
**migrating**
258:18
**millions**  58:9
**mind**  27:8
106:3  120:9
151:3  182:19
275:10
**minimal**  37:25
**minimizing**
252:7
**minimum**
238:1  252:12
**minute**  16:3
87:23  213:23
270:16  299:2

minutes 66:24
67:1 87:9
208:25 209:1,
4 259:20
266:14 340:15
misbranded
114:13, 19, 25
115:23
116:22 117:8
119:1, 12, 22
120:2 121:2,
13 122:11, 18
123:4, 7, 19, 25
Mischaracteriz
ation 46:21
47:13 84:14
116:1 164:2
190:3 219:7
250:12 349:2,
12 350:6
352:22
mischaracteriz
e 183:1
370:11
mischaracteriz
ed 46:1
170:24
180:21
291:13
311:25 341:23
mischaracteriz
es 57:20
61:12 65:2,
11 72:18
73:15 75:21
77:21 80:6
81:2 83:3
89:10 99:25
105:4 110:3,
21 111:12
112:9 113:1,
13 116:24
118:24 121:6,
16 122:22
123:11 124:4
126:25
127:17 131:2
133:8 143:11
161:19
171:22
176:19

177:19
178:13
189:25
198:25 201:4
286:23 288:2
290:3 291:3,
11 292:17, 18
310:25 357:2
358:13 370:9
373:7, 8
375:25
mischaracterizi
ng 126:17
mislabeled
67:22 73:1,
12 124:19
126:6
missed 24:14
202:19
missing 244:19
Missouri 5:21
Misstate 371:4
Misstates
359:2 363:3
mistaken
190:18 234:9
Mistarz 88:7
mix 271:12
model 131:19,
20 134:8
143:18
147:14
161:15
167:22 170:1
172:14
371:16 373:9
models 131:12
moment
28:17 91:22
98:22 105:11,
20 137:22
233:15 250:18
money 122:17
182:8 308:8
371:13
monitoring
211:8, 20
212:1, 24
216:21
217:12, 19, 22
284:13, 24

293:25 294:5,
13 297:12
306:12
Monroe 4:13
Montana 8:6
322:8, 10, 11,
15, 19 323:23
324:2, 3, 10,
17 325:7, 16
326:2, 7
month 337:17
338:12, 19
339:11
monthly
337:17
months 15:14
38:16 147:3
MORING 6:3
morning
10:14, 15
293:8 333:16
Morris 1:17
4:4 11:21
Motion
105:25
106:23 142:6
166:9 185:5,
8 186:11, 14,
16, 25 187:2
192:2 193:24
294:5
motions 86:22
186:8
motivations
271:4
mouse 90:16,
17
move 13:16
31:7 32:17
51:2 189:5,
11 191:9, 21
192:11
195:16 208:3
299:5
moved 47:4
241:18
movement
249:5
moving 64:23
MTD 7:12
Mulberry 2:22

multimillion
35:25
multiple
16:14 37:2
158:11
159:11
181:10
201:21
218:22 250:3,
15 256:6
257:7 293:2
305:21 312:3
mute 74:9
Mylan 3:13

< N >
NACDS 97:25
NADAC
97:21, 22
name 9:4
10:16 16:1,
18 31:9
71:23, 24
173:13 239:4,
13, 14 241:12
242:12
249:10
253:14
281:10 311:3
348:1 374:14
named 221:16
283:4
names 242:3, 7
naming 256:7
narrow 87:24
narrowly
376:6
National 8:3
164:9 220:19
naturally
103:5 289:2
nature 92:16
93:9 183:14
247:13 248:3
navigate 90:17
Navitus 7:22
236:11, 13, 14,
18 237:2, 12
238:5
NCPDP
220:22, 25

221:2, 6, 18
222:3, 6, 19
238:16
250:21 283:11
NDA 354:10
NDC 222:20,
23 223:6, 8,
11 252:17
286:19, 20
287:1
NDEA 285:7
293:24
NDMA 285:6
293:24
near 132:22
nearly 89:5
372:1
necessarily
282:25 283:19
necessary
220:1, 10, 15
306:13 309:24
need 9:21
19:24 24:1
28:13 40:16
44:10 52:21
58:6 59:19
66:22 81:15
90:10, 17
98:11, 24
118:16 128:6
129:11
145:22
147:10 183:2
190:15
191:17
196:23 197:6
203:3, 23
219:16
242:19 251:7,
18 252:12
270:8, 12
273:1 275:20
283:9 293:5
299:8 304:18
307:6 327:2
340:16
needed 28:11
33:10 34:10
129:18

Confidential Information Subject to Protective Order

**needs** 30:9
64:19 100:6
142:14 185:1
196:19, 20
256:5 281:16,
23 282:21
**negative** 44:1
**negotiate**
271:20
**Neither** 312:14
**network**
35:23 93:16
**networks** 88:9
**never** 40:23
60:7 62:3
73:1 106:16
110:13 111:4
112:16 126:6
140:15 150:2
154:6 260:7
265:1, 5
269:1 275:9
285:9, 13
286:2 292:13
294:11
305:25 306:4
312:7 324:25
326:6 369:13
370:19 373:25
**NEW** 1:1
2:10, 22 5:16
9:9 35:14
48:3 221:18
249:7 250:4
251:12, 16
256:25 319:5,
9, 21, 24
320:4, 14
321:19 322:4
**Newark** 2:22
**news** 292:9,
12, 20, 23, 25
293:2, 11
**newspaper**
325:15
**Ngoc** 27:25
54:14
**night** 376:15
**nine** 78:10
**nitrosamine**
285:14

294:17, 23
296:1, 8, 25
297:3
**nitrosamines**
119:8 285:10,
23 287:14, 25
288:11, 20, 23
289:1, 5, 19,
24 290:24
291:20 292:6,
14 293:12
**Nonadherence**
8:3 298:20,
24 300:1, 8,
19, 25 301:5,
15 302:2, 3, 6,
21 303:18
304:6

**nonadulterated**
147:24
**noncompliance**
137:13
**noncontaminat
ed** 147:23
**nonFDA-
approved**
68:17
**non-Medicare**
238:9
**nonsense**
58:14
**Nope** 368:18
**normal** 50:24
310:13
**NORRIS** 5:9
**North** 3:5
231:7
**NORTON** 5:9
**Notary** 1:14
377:5, 23
378:24
**note** 9:20
17:7, 10
61:12 91:14
159:13, 18
170:9 254:25
255:22 340:8
**noted** 325:1, 2
372:15
374:17, 21

**notes** 21:22,
25 247:12
**Notice** 365:3
**notices** 59:8
**November**
49:16, 19
77:8 138:16
**Number**
19:14 37:7
39:16 49:9
71:21 131:12
143:7 144:5
147:22
175:17
190:18
198:14, 17
199:8, 13, 15,
18 200:21
201:11, 17
212:20 216:8
221:23
223:11
230:11
234:23 235:1
238:17
239:19, 23, 25
240:8 241:11,
20, 22 242:11
250:5 257:4
269:18
281:17, 20, 21,
23 282:21, 22
283:4, 7
287:1 289:3
291:13 307:2,
3 330:3
343:9 346:20
347:1 349:15
352:13
362:18 375:17
**numbered**
234:23
**numbers**
77:11 160:9,
20 161:6
162:17 163:7
231:6 296:9,
18 310:5
316:11, 12, 15,
17 337:22

**numerous**
99:17
**Nurses** 319:5,
9
**NW** 6:4

**< O >**
**oath** 10:8
72:13 187:6
188:12, 19
192:23
199:17
209:21
260:19 343:19
**Object** 14:19
15:12 18:2
20:19 25:9
30:1 39:20
40:10 41:8,
25 45:23
46:14, 20
47:12 48:5
51:6 52:6, 24
53:7 54:21
57:17 60:17
65:1, 10 71:6
72:5, 21
88:18 98:14
107:12 109:4
126:12, 15
133:17
136:25
138:21 140:8
141:1, 15
143:10
144:10, 24
146:2 148:2,
18 149:8
150:7 151:9
152:10
153:16
155:20
156:10, 24
157:12, 22, 25
159:17
160:13
161:17
162:10, 20
163:11 164:1
165:22
166:11, 22

167:12, 24
168:8, 15
169:5 170:22
171:20 172:9
174:20
175:13
176:18 177:1,
18 180:3, 18
182:5 185:1
191:8 196:15
198:21 200:8
201:3 213:18
214:10 216:5
217:5 223:1
224:9 226:8
227:1, 18
229:16
230:16, 23
235:9 236:4
238:11
241:13 242:4
243:5 245:15
246:25
248:22
250:11
255:14
258:20 260:3,
22 261:16
262:16, 17
263:3 264:4
267:12
268:24 269:2
272:1, 16
273:12 274:5,
25 276:7
278:4, 13
279:4, 18
280:10
281:12 285:1
286:5, 22
287:15 288:1,
12 290:1, 12
291:2, 4, 7, 23
292:16
293:17
296:13 297:5
301:8 303:6,
21 305:15
306:7 310:1,
22 311:13, 22
313:12

Confidential Information Subject to Protective Order

314:*15*
315:*23*
317:*13* 320:*6,*
*24* 323:*2*
324:*22, 24*
329:*3* 331:*3,*
*19* 332:*16*
333:*4* 335:*6,*
*16* 336:*5*
339:*4, 25*
340:*1* 341:*2,*
*21* 344:*14, 16,*
*20, 21, 22*
345:*21* 347:*7,*
*20* 348:*11*
349:*22* 350:*5*
352:*21* 354:*2,*
*23* 356:*6*
358:*12* 359:*1,*
*18* 360:*13, 24*
361:*9, 22*
362:*8* 363:*17*
364:*7, 23*
365:*8* 372:*10*
**objection** 9:*23*
27:*2* 31:*24*
32:*6* 34:*6*
37:*22* 43:*23*
44:*8, 20* 45:*5*
46:*10* 49:*5*
50:*3* 51:*22*
56:*6* 61:*11*
62:*25* 63:*9*
64:*1* 67:*15,*
*23* 68:*10, 25*
69:*21* 70:*4*
71:*16* 72:*6,*
*17* 73:*3, 13*
74:*5, 19* 75:*6,*
*12, 16, 20*
77:*18* 78:*23*
80:*5* 81:*1, 21*
82:*6, 16* 83:*1,*
*25* 84:*13*
86:*13* 89:*8*
90:*4* 91:*25*
94:*17* 95:*2, 9,*
*21* 99:*10, 24*
100:*10, 19*
101:*13, 20*
102:*14* 103:*1,*

9, 20 104:*6,*
*24* 105:*3, 16*
109:*3, 19*
110:*2, 20*
111:*11* 112:*5,*
*25* 113:*11*
114:*14*
115:*10, 25*
116:*9, 23*
117:*10*
118:*11* 120:*4*
121:*4, 15, 21*
122:*1, 20*
123:*9* 124:*3*
125:*7* 126:*23*
127:*7, 15*
130:*25* 133:*6*
137:*15*
149:*22*
150:*18*
154:*25*
155:*10*
166:*22*
178:*12*
181:*23*
182:*22* 183:*6*
184:*19, 25*
185:*15* 187:*7*
188:*13, 21*
189:*10, 24*
190:*19* 191:*5*
192:*5* 193:*10,*
*19* 201:*20*
202:*14*
216:*10, 17*
219:*5* 224:*25*
230:*6* 234:*6*
243:*22* 263:*5*
264:*7, 8, 10*
269:*24* 270:*6*
272:*24*
273:*13* 289:*6,*
*12* 290:*8*
291:*15* 295:*1*
312:*11*
319:*14*
320:*16*
325:*18*
327:*20* 328:*4*
329:*16*
337:*25* 340:*8,*

13 344:*13*
345:*7* 349:*1,*
*11* 355:*21*
356:*25* 360:*1,*
*6* 361:*2*
363:*3* 369:*16*
370:*8, 18*
371:*3, 19*
372:*15* 373:*4*
374:*17, 21*
375:*7, 24*
376:*14, 17*
**objections**
18:*8, 12*
80:*15* 81:*18*
87:*12* 115:*2*
123:*20*
124:*23* 128:*3*
130:*1* 142:*1*
143:*22*
151:*25* 154:*4,*
*14* 175:*2*
178:*3* 187:*11,*
*12* 189:*15*
193:*3* 219:*20*
263:*18*
270:*24*
273:*22*
288:*13* 290:*2,*
*17, 18* 291:*9*
321:*22* 325:*9*
329:*10, 21*
330:*5* 350:*9*
355:*9* 356:*17*
363:*11* 365:*4,*
*10*
**objective**
172:*12*
**objector**
290:*19*
**obligation**
354:*6*
**obstacle**
191:*22*
202:*11* 203:*1*
**obtain** 255:*1*
260:*20*
261:*14*
262:*14* 264:*2*
265:*25* 275:*6,*

23 276:*5*
277:*2* 326:*17*
**obtained** 38:*3*
286:*16*
**obtaining**
266:*4, 8*
274:*18*
**obviously**
19:*3* 20:*6*
50:*22* 51:*11*
56:*12* 77:*25*
97:*6* 143:*24*
169:*22* 194:*9*
201:*22*
226:*12*
247:*22*
275:*17* 351:*24*
**occasionally**
10:*25*
**occur** 104:*23*
137:*12*
193:*18* 281:*7*
**occurred** 49:*2*
99:*8* 112:*16,*
*24* 185:*12*
287:*5, 9*
**occurring**
287:*8* 289:*2*
**October**
49:*16, 19*
**offer** 44:*15*
47:*14* 50:*19*
79:*17* 210:*2*
228:*23* 238:*7*
254:*20*
257:*24*
260:*13*
265:*12* 276:*3,*
*25* 277:*21, 25*
279:*15* 280:*2,*
*7, 22* 306:*1, 3*
308:*15* 309:*22*
311:*9* 312:*8,*
*13* 322:*2*
**offered** 50:*21*
249:*22*
**offering**
216:*15*
226:*22* 227:*7,*
*24* 228:*20*
229:*8* 259:*2,*

4, 25 261:*5*
278:*1* 313:*8*
314:*6* 316:*4,*
*7* 317:*9*
328:*23*
**offhand** 45:*9*
71:*22* 299:*24*
343:*18*
**office** 11:*19,*
*21* 252:*11*
**officers** 313:*1*
**offices** 1:*17*
11:*19*
**offset** 143:*1, 7*
**offsets** 163:*4*
**oftentimes**
23:*24* 218:*20*
**oh** 60:*7* 62:*3*
118:*7* 199:*2*
286:*8*
**Ohio** 5:*5*
39:*14*
**Okay** 11:*25*
13:*15* 18:*21*
20:*1* 22:*2, 7,*
*23* 24:*24*
31:*15* 32:*24*
33:*11* 34:*16*
37:*19* 44:*15*
45:*11* 57:*12*
67:*10* 74:*16*
88:*2* 92:*11*
107:*25*
108:*12* 119:*2*
125:*3* 139:*8*
141:*9* 142:*18*
144:*4* 158:*23*
162:*7* 163:*3*
167:*2* 196:*5*
204:*25* 209:*1,*
*6, 25* 210:*12*
215:*15*
233:*17*
237:*11*
243:*11*
254:*13*
259:*21*
268:*17* 269:*6*
273:*6, 7*
284:*22*
296:*25* 297:*1*

298:8  300:6
309:9, 15, 19,
20  321:15
323:13
330:14  343:22
**old**  310:8
**older**  14:12
310:7, 8
**once**  143:3
149:11
221:16
249:25
277:16  282:7
295:23
353:11  364:9
373:14
**ones**  11:6
29:7, 9  71:20
136:19  141:5
164:5, 6
200:13
207:22  330:5
**ongoing**  78:9,
12, 19  249:20
293:6
**open**  63:16
88:9  364:17
365:8, 14
376:18
**operate**  326:4,
9
**operating**
97:14  98:6
**operation**
344:8
**operational**
78:5  99:16
181:14
**operations**
35:6
**operative**
137:5
**opine**  215:6
216:1  225:21
264:14  295:7
327:2
**opining**
217:23
249:24
260:18
261:13

265:15, 19
271:5  274:21
275:12, 22
314:19  315:19
**Opinion**  7:12
44:10  62:2
84:4  93:4
102:7, 25
103:17
105:25
106:23  108:6
109:4, 25
110:3  113:5
142:6  173:1
185:18
186:11  193:1
226:22  227:7,
25  228:20, 23
229:8  238:7
254:20  259:3,
4  260:1
261:6  274:11
276:3  277:21,
25  279:15
280:2, 7, 22
288:7, 17
289:14, 17
290:5, 9
297:11
298:13, 15
306:1, 3
307:17
308:15  309:2
310:18  312:8
314:6  316:4,
7  317:9
328:23  373:6
375:9  376:2
**opinions**  20:7,
9  34:11
40:15  44:13
50:1, 20  51:5,
20  52:22
54:8  55:3
63:25  64:10
79:18  80:1
86:8  92:25
93:10  94:2, 6
99:23  100:2
117:6, 9
170:16

185:14  187:1,
4  188:10, 20
189:4  190:18
191:4  209:23
210:3, 7, 17
214:19
215:23
216:14
217:11
227:11  229:6
246:8  257:20,
23  260:13
263:2, 22
265:12
267:18  278:1
284:23
290:14  311:9
313:8  367:8
**opportunities**
130:9  250:10,
16
**opportunity**
18:1  35:15,
17  125:5
159:12  340:4
344:18, 23
**opposing**
61:13
**Optimizing**
346:20
**option**  68:16
149:5
**optional**
283:12
**Optum**  5:13
282:22
**OptumRx**
262:5  264:20
282:3, 4, 15
**orally**  9:22
**Orange**  8:15
347:5, 10, 14,
19, 24, 25
348:8, 15, 23
349:5, 16, 19
351:9, 14
352:9  353:8,
10, 13, 15
354:7, 8, 12
355:23  356:9,
13  357:8, 14

358:4, 10
363:15
**ORDER**  1:9
10:20  12:5
26:3  60:5
69:11  81:13
98:7  173:5
181:20  183:9
185:19  187:9,
23  190:12, 21
191:7  192:7
196:14  232:5
272:25
328:17  351:24
**orders**  179:13
**ordinary**
182:16
**O'REILLY**
2:20
**organization**
221:1, 15
246:6  277:14,
20  293:1
320:5  321:24
340:21  344:8
**organizations**
245:18  341:5
**Orleans**  2:10
**OTC**  354:11
**outcome**
377:18
**outcomes**
58:1  59:19
**outline**  343:25
**outlines**  92:19
**out-of-pocket**
102:1
**outset**  51:18
**outside**  22:23
58:1  67:15
68:10  69:1
70:11  72:6,
18  73:4, 14
82:7, 16  85:4
95:9  100:13
101:21
103:11, 13, 16
105:4, 7
110:21  113:1
114:15
115:11  116:1

121:5  122:21
123:9, 13
126:23
127:16  130:3
140:9  141:16
143:10
144:11, 25
145:15  146:2
149:9  150:19
151:10
152:11
153:17  154:5,
15  155:1, 11,
21  156:11, 25
157:12  158:1
161:18
162:20, 23
163:11
167:14, 24
168:8, 15, 18
169:5  171:21
172:9  176:18
177:2  178:13,
24  192:9
193:10
236:16
260:22  272:2
286:22
287:15  288:1
289:13  290:2,
15  291:2, 24
331:19  333:5
354:21  355:6
359:18  360:1,
15  361:22
362:8  363:4
364:7  371:5,
21, 2, 25
372:11  373:5,
6  374:9, 12
375:7, 8  376:1
**overarching**
211:11
**overstated**
162:14
**owned**  36:12
313:18
**Oxford**  3:16

**< P >**

Confidential Information Subject to Protective Order

**P&T** 341:*1, 5, 16, 24* 342:*7* 343:*2* 344:*9* 345:*19* 347:*19* 349:*8* 350:*3* 351:*10, 14* 352:*11* 358:*21* 360:*11*
**p.m** 135:*7* 209:*8* 266:*17* 318:*6* 365:*20* 376:*23*
**package** 223:*6, 9*
**packages** 242:*2, 16*
**packing** 139:*23*
**PAGE** 7:*2, 7* 8:*2* 43:*1, 5, 7, 8* 66:*15* 73:*19* 83:*23* 85:*23, 24* 91:*3* 94:*9, 10* 101:*2* 108:*5, 10* 135:*25* 159:*4* 163:*17* 234:*17, 18, 19, 21* 264:*19* 268:*14* 269:*9* 282:*8, 9, 12* 300:*4, 5* 324:*10* 334:*12* 346:*7* 350:*20* 352:*3* 357:*13* 358:*18* 361:*24* 362:*12* 372:*1* 378:*6*
**pages** 42:*25* 88:*25* 136:*4* 232:*8* 268:*25* 317:*17* 353:*9* 372:*4, 6* 378:*3*
**paid** 25:*25* 93:*12* 127:*25* 128:*15, 16* 129:*16* 130:*22* 131:*16* 133:*3*

160:*10* 164:*11* 182:*9* 224:*7, 14* 271:*16, 22* 272:*6, 9, 15* 273:*1, 9* 274:*23* 275:*13* 331:*2, 7, 16* 332:*3, 14, 19, 22* 333:*1*
**Panagos** 8:*15* 34:*11* 351:*9, 16* 352:*25* 353:*12, 22* 354:*15* 357:*24* 360:*21* 363:*14*
**Pandora** 308:*7*
**paper** 322:*15, 19* 326:*16* 364:*19*
**paragraph** 73:*22* 75:*8* 83:*23* 101:*3* 108:*8, 13* 135:*25* 136:*3* 139:*9, 14* 142:*18* 163:*19* 165:*2* 210:*6, 9, 16* 211:*15* 212:*16, 19, 24* 213:*3, 7, 12* 214:*8* 217:*1* 218:*1* 225:*25* 228:*12, 15* 248:*14* 254:*11* 255:*4, 8* 256:*1, 13, 14* 257:*11, 12* 261:*3* 264:*14, 16* 271:*8, 15* 274:*15* 276:*18, 25* 285:*6, 19* 293:*21, 23* 295:*19* 297:*13* 298:*13* 305:*7* 312:*21* 319:*4*

322:*7, 17* 330:*11* 344:*6* 350:*18* 351:*12* 352:*4, 8*
**paragraphs** 214:*3, 5, 6* 234:*24* 237:*15* 284:*17* 295:*20* 312:*16* 317:*18* 318:*19* 366:*16*
**parallel** 257:*2*
**parameters** 270:*9*
**paraphrasing** 25:*5*
**pardon** 186:*3*
**paren** 237:*22*
**Park** 3:*10*
**parlance** 245:*12*
**Part** 7:*16* 24:*6* 25:*22* 26:*6* 37:*7* 38:*7* 46:*9* 48:*4* 51:*16* 53:*4* 59:*8* 64:*24* 80:*2* 91:*17* 102:*17* 118:*1* 127:*25* 134:*8* 136:*10* 146:*16* 158:*20* 163:*8* 164:*6* 168:*3* 171:*25* 200:*11* 220:*3* 227:*11, 22* 231:*19* 234:*19* 235:*3, 8* 242:*17* 245:*19* 246:*18* 252:*20* 253:*21* 254:*14* 255:*7* 262:*6* 265:*4, 8* 268:*18* 274:*14* 275:*9*

276:*16* 277:*24* 295:*6* 302:*24* 304:*10, 11* 305:*23* 308:*1, 20* 310:*13, 16* 312:*24* 313:*19* 315:*18* 317:*3, 8* 321:*9* 326:*10* 328:*6, 13* 334:*5* 339:*18* 341:*15* 348:*2*
**partially** 161:*21*
**participants** 78:*3, 18* 133:*22*
**participated** 12:*14*
**particular** 20:*12* 42:*19* 168:*12* 220:*1, 9, 16* 221:*3* 229:*1* 240:*6* 241:*10* 252:*15* 272:*23* 276:*13* 277:*1* 278:*19* 279:*1* 280:*3* 283:*15, 24* 294:*18* 296:*1* 301:*1, 5* 323:*18* 331:*10*
**particularity** 118:*9*
**particularly** 55:*6* 331:*12* 340:*2*
**parties** 92:*17, 20* 93:*6, 20* 181:*13* 271:*4* 377:*13, 16*
**partners** 12:*24* 78:*7, 13*
**parts** 45:*17* 46:*7* 85:*17* 118:*15* 165:*9* 178:*7*

**party** 16:*6* 129:*13* 133:*11* 281:*18, 25* 331:*5* 332:*10*
**pass** 209:*11* 310:*10*
**passed** 78:*1*
**pass-through** 131:*13, 18*
**patient** 14:*5* 62:*6* 76:*11, 18* 77:*4, 9, 11* 97:*5* 98:*5* 99:*3* 127:*3* 128:*19* 129:*6* 130:*22* 131:*6* 143:*8, 21* 146:*6, 14* 147:*2, 3, 13* 160:*5* 174:*8* 240:*11, 17* 244:*1* 247:*4, 6, 11, 20, 23* 249:*12* 251:*21* 252:*7, 10* 269:*19* 283:*2* 295:*11* 297:*18* 301:*6, 19* 302:*22* 303:*3* 304:*2* 306:*16, 25* 307:*2, 3, 7, 8, 25* 308:*13* 309:*6, 16* 311:*3, 5* 346:*22*
**patients** 35:*23* 58:*9* 59:*9* 60:*3* 62:*15* 70:*19, 22* 97:*8, 15* 98:*8, 19* 101:*25* 113:*7* 143:*14* 146:*19, 25* 164:*15* 170:*8* 173:*6, 10, 17* 174:*1* 213:*6* 215:*2* 217:*2* 249:*6* 289:*1* 295:*6, 15*

297:*17, 21*
302:*12*
304:*12*
306:*19, 23*
307:*1, 12, 18*
308:*16*
313:*19*
359:*14* 373:*14*
**patient's**
239:*8, 10, 14, 17* 303:*11*
304:*22*
305:*21*
309:*18, 23*
311:*3*
**Patrolmen's**
319:*6, 20, 24*
320:*3* 321:*18*
322:*3*
**pause** 366:*9*
**pay** 8:*6*
97:*13* 115:*24*
122:*12*
129:*24* 152:*8*
279:*12, 24*
280:*5*
**paying** 128:*20*
129:*9, 25*
149:*4* 164:*14*
**payment**
43:*12, 13*
93:*17* 102:*3*
129:*10*
130:*11*
160:*11* 161:*3, 4* 164:*10*
165:*3* 170:*15*
276:*13, 20*
283:*1* 332:*20, 22, 23, 25*
**payments**
133:*15*
160:*12*
163:*24* 164:*8*
167:*9* 196:*1, 3* 332:*9*
335:*11*
**payor** 37:*5, 8*
130:*3* 132:*25*
160:*3* 210:*24*

211:*2* 271:*12*
282:*3, 4, 15*
**payors** 149:*4*
163:*21*
164:*22* 280:*9, 13* 330:*19, 22*
331:*24, 25*
332:*14*
**pays** 129:*19*
131:*24* 132:*4, 25* 133:*2*
**PBM** 13:*4, 17*
14:*3, 7* 35:*11, 19* 36:*15*
92:*16, 24*
93:*9, 24*
128:*19* 129:*9, 10, 15, 19*
130:*3, 5, 7, 11*
131:*6, 9, 10, 14, 24* 222:*15*
224:*15, 23*
225:*10, 18, 22*
228:*21* 229:*1, 5, 9, 15* 230:*5, 9, 12, 15*
231:*4* 236:*14, 25* 237:*2*
238:*9* 239:*22*
242:*19, 23, 24, 25* 244:*15, 21, 23* 245:*5*
246:*4, 10, 23*
248:*1* 249:*3, 4, 17, 18, 21*
251:*4, 5*
253:*18, 21*
254:*8* 256:*3*
257:*18* 258:*2*
260:*8, 21*
261:*15* 262:*7, 9, 14, 15*
264:*2, 3*
265:*2, 6, 16, 20* 268:*22*
269:*13, 17*
270:*4* 275:*19, 23* 276:*1, 4, 19* 278:*10, 18, 23, 25* 279:*9*

280:*4* 281:*16, 23* 282:*20, 23*
**PBMs** 13:*19, 23* 37:*6, 7*
61:*24* 92:*17*
131:*11, 19, 21*
222:*6, 10*
223:*18* 224:*1, 13, 21* 225:*8, 16* 228:*11, 18*
230:*21*
237:*20*
242:*21* 244:*4, 8* 245:*24*
248:*7* 249:*5, 14* 250:*23*
251:*1, 24*
253:*6* 254:*15*
255:*10, 18, 23*
256:*10* 260:*1, 15* 261:*7, 24*
281:*9*
**PBM's** 250:*1, 2* 282:*24*
**PC** 3:*3*
**PCN** 281:*16, 20, 23* 283:*4, 6, 12*
**PDF** 234:*18*
**peer-reviewed**
40:*20*
**pending**
175:*22* 188:*5*
189:*13* 199:*9*
207:*18* 299:*6*
**Penn** 39:*15*
157:*8*
**Penney's**
36:*12*
**Pennsylvania**
1:*16, 18* 2:*5*
3:*17* 4:*7* 6:*4*
9:*8* 377:*1, 6*
378:*1*
**people** 30:*22*
35:*20* 36:*4, 14, 25* 39:*3*
51:*20* 55:*2, 22* 56:*10, 19*
57:*15* 58:*5, 12, 18* 61:*10*

97:*11* 200:*15*
218:*9* 241:*8*
249:*9* 304:*16*
307:*22* 310:*7*
328:*21*
**people's** 40:*15*
58:*10*
**percent** 38:*1, 11, 20* 39:*5*
161:*23* 162:*9, 18* 164:*8, 11, 14* 231:*7*
247:*6* 254:*17, 23* 255:*10, 19*
269:*20* 270:*4*
297:*22*
300:*21* 335:*4*
367:*6*
**percentage**
143:*25* 303:*25*
**percentages**
336:*4*
**perfect** 114:*4*
**perfectly**
290:*17*
**perform**
220:*16* 333:*16*
**performance**
93:*16* 134:*4*
**performed**
8:*9, 11* 305:*19*
**period** 49:*11*
103:*8* 148:*12*
226:*13*
228:*19*
241:*16* 249:*4*
256:*23*
270:*13*
301:*24* 302:*4, 15* 303:*19*
315:*12, 21*
317:*2, 7, 12*
324:*24*
325:*21*
332:*15* 333:*2*
339:*17*
367:*21* 368:*4*
370:*17*
**periodic** 156:*1*
**periods** 228:*12*

**permission**
200:*16*
**permitted**
18:*8, 11*
47:*14* 68:*8*
69:*24* 291:*9*
**person** 19:*3*
39:*1* 54:*15*
238:*23, 24*
240:*6, 9, 10, 12, 15, 20, 23*
241:*8, 11, 15, 17, 18* 242:*12, 20* 289:*23*
290:*22*
291:*18* 375:*13*
**personal**
223:*23* 224:*2*
**personally**
182:*9*
**personnel**
263:*21* 339:*10*
**persons** 41:*10*
54:*7* 111:*3*
240:*24*
**person's**
289:*25*
290:*25* 291:*21*
**perspective**
37:*2* 71:*9*
81:*6, 24, 25*
83:*8, 19*
86:*23* 95:*14*
96:*4, 8, 13, 14*
98:*22* 99:*1, 13, 14* 102:*3, 6* 104:*13, 16, 18* 105:*23*
110:*25*
111:*18, 25*
113:*5* 129:*19*
133:*25*
137:*20*
150:*23* 169:*9, 11, 25* 170:*14*
172:*5, 16, 20*
173:*24* 174:*1, 3, 6* 177:*6*
181:*14, 15*
256:*20*

Confidential Information Subject to Protective Order

308:*13*  355:*12*
**pertain** 77:*24*
**pertaining**
119:*3*  183:*21*
**pertains**
20:*11*  52:*4*
**pertinent** 29:*9*
333:*1*
**peruse** 233:*19*
**Pew** 246:*19,*
*22*  247:*3, 10,*
*24*  248:*6, 18*
**Ph.D** 7:*16*
**Pham** 27:*25*
54:*14*
**Pharm.D** 8:*15*
**Pharma** 2:*14*
37:*21*  68:*5*
335:*3*
**PharmaCare**
36:*16*

**Pharmaceutical**
2:*14*  4:*2*
37:*15*  74:*8*
133:*20, 23, 24*
134:*12*
139:*18*
148:*25*  151:*8,*
*23*  157:*4*
222:*3, 7, 10*
248:*9*  359:*11*
373:*12*
**Pharmaceutical**
**s** 2:*12*  4:*17*
9:*19*  366:*1*
**pharmacies**
35:*3, 23*  37:*9,*
*11, 12, 13*
61:*22, 23*
68:*7, 13*
93:*12*  97:*9,*
*16*  112:*11*
113:*24*  152:*6*
169:*24*  170:*6,*
*7*  172:*23*
173:*5, 10, 21*
222:*2, 11, 16*
223:*15, 20, 22*
224:*4, 6, 17,*
*24*  225:*4, 12*

226:*6, 14, 20*
230:*10, 11*
234:*1, 3*
244:*4, 8*
245:*25*
247:*22*
271:*13, 17*
277:*19*  287:*1*
305:*22*
306:*19*  307:*9,*
*13, 16, 18, 20,*
*22*  308:*22*
309:*23*  310:*4*
**pharmacist**
34:*18, 22*
36:*20*  69:*4*
86:*23*  96:*15*
97:*10*  116:*13*
128:*20*
142:*24*  148:*4,*
*6, 7*  287:*13,*
*24*  288:*3, 10*
289:*22*  290:*8,*
*13*  291:*4, 14*
**pharmacist/hea**
**lthcare** 98:*21*
**pharmacists**
38:*23*  68:*22*
69:*5, 11*
307:*21*
340:*18*  344:*8*
**Pharmacy** 3:*2,*
*6*  4:*11*  7:*20,*
*24*  8:*13*  35:*1*
37:*10*  58:*6*
69:*6, 17*
70:*14, 20, 21*
71:*10*  87:*3,*
*25*  88:*9*  97:*6*
99:*4, 16*
102:*3*  123:*17*
128:*18*  129:*3,*
*5, 7, 11, 19*
130:*2, 10, 15*
131:*6, 17, 22*
132:*1*  170:*12,*
*15*  172:*18*
173:*19*  174:*7*
176:*13, 14*
182:*17*
197:*13*  221:*8*

222:*17, 21*
223:*19*
224:*15, 18, 22*
225:*10, 19, 22,*
*23*  226:*6, 11,*
*17, 23, 24*
227:*4, 8, 9, 13,*
*17, 25*  228:*1,*
*5, 21*  229:*1, 9*
232:*1, 5, 10*
233:*6, 22*
234:*15*
235:*14, 19, 21,*
*22*  236:*1, 23,*
*24*  238:*8*
243:*13, 14*
244:*15, 20*
245:*14*  246:*1,*
*10, 15, 23*
247:*14, 16, 17*
248:*1, 13*
252:*2, 13, 14,*
*15, 23*  254:*8,*
*9, 16*  260:*8,*
*14, 21*  261:*6,*
*15, 22*  262:*9,*
*13, 14, 21, 24*
263:*1, 12, 21*
264:*2*  265:*6,*
*17, 20*  268:*8,*
*20, 21*  269:*6,*
*11, 12, 16, 17,*
*20*  270:*4, 5*
271:*18, 19*
277:*19, 23*
278:*20*  279:*2*
280:*16*
281:*17, 24*
282:*16, 21, 23*
283:*7*  284:*6*
290:*11*
297:*16*  302:*9*
303:*13*
305:*11, 12, 20*
306:*5, 13, 23*
307:*1, 10, 24*
308:*9, 12, 14*
309:*6, 17*
311:*6*  322:*21*
323:*18*
328:*19*

331:*23*  342:*4*
344:*9*  346:*21*
**pharmacy's**
308:*18*
**Philadelphia**
2:*5*  4:*7*  11:*10*
**phone** 30:*8*
**photographic**
166:*15*
**phrase** 84:*23*
192:*16*  218:*7,*
*13*  291:*14*
**physically**
234:*3*
**physician**
305:*2*
**pick** 12:*6*
97:*5*
**picked** 160:*6*
**picks** 130:*19*
**PIETRAGALL**
**O** 3:*14*
**pill** 298:*18*
301:*6*
**pills** 302:*8*
303:*3*
**Pittsburgh**
1:*18*  3:*17*
9:*8*  11:*8, 22,*
*23*  134:*2*
**PIZZI** 2:*20*
**place** 25:*4*
49:*13*  124:*20*
136:*15, 19*
179:*13*
259:*16*
306:*14*  371:*1*
**placed** 122:*18*
351:*6*  352:*19*
376:*13*
**placement**
117:*7*  120:*1*
141:*24*  352:*12*
**places** 45:*21*
**placing** 124:*2*
145:*13, 25*
**plain** 119:*25*
**plainer** 152:*5*
**plaintiff** 107:*4*
276:*18*

**Plaintiffs** 1:*13*
2:*2*  9:*17*
12:*1*  20:*13,*
*17*  49:*2*
58:*18*  79:*20,*
*23*  87:*18*
91:*18*  94:*13,*
*25*  101:*5, 18*
102:*11*
105:*14*
107:*19*  109:*9*
174:*18*
176:*17*  288:*5*
294:*21*  328:*16*
**plan** 8:*6, 8*
134:*21*  164:*8,*
*13*  240:*25*
242:*21*  247:*4,*
*8*  278:*21*
279:*3*  307:*24*
321:*3*  322:*21*
323:*18, 23*
324:*11, 16, 17,*
*18*  325:*7*
327:*18*  328:*2,*
*11*  341:*15*
**plans** 37:*6, 7*
165:*12, 13*
304:*11*
324:*18, 19*
326:*3, 9, 14*
327:*5*  329:*1*
**platform**
254:*9*  258:*3,*
*17, 19*  259:*6*
**Plaza** 5:*21*
**please** 9:*12*
17:*19*  32:*17*
61:*5*  127:*8*
129:*1*  132:*11*
151:*2*  155:*4*
209:*2*  230:*7*
287:*22*
318:*20*
335:*23*
344:*15*
362:*17*  372:*18*
**pledge** 19:*9*
**plenty** 27:*9*
**plural** 17:*4*

Confidential Information Subject to Protective Order

plus 97:21
128:3 164:10
201:20
252:12
338:25
355:10 356:18
point 10:19
12:7 18:21
54:12 66:19
89:18 93:12
96:25 98:12,
22 104:19
108:6, 18
126:9, 22
127:3, 11, 20
128:1, 12, 18,
25 129:23
130:16 131:4,
25 143:2, 5, 9,
21 160:11, 16,
23 161:22
166:18
167:21
171:14, 15
177:17, 25
181:2 182:16
187:12
200:15
207:11
209:12
214:17
244:15
257:24 286:8
294:24
295:25 296:4
312:9 317:21
321:5 330:2
339:3, 21
359:19 371:6
pointed 167:11
policies
227:12, 16
229:5 232:14
Policy 7:18
14:10, 14
231:20
232:13, 19
236:2 237:19
portion 313:4
335:12 345:12

position 24:3
149:17
309:21 365:12
positive
347:18
possess 191:15
possessed 32:9
possession
21:24 22:1
131:9 304:23
possibility
63:16 279:24
possible 20:5
243:25
possibly 111:7
post-COVID
194:3
post-merger
259:6
potential
76:18 142:21
191:22
246:13
257:15 281:2
potentially
64:22 77:12
84:6 120:18
185:18 247:19
power 73:9
powers 151:21
practical
29:15 99:14
practice 74:15
139:17 171:1
181:6, 8
340:9, 22
362:23
practices
71:11 74:4
137:14
141:12 152:7
245:22
pre 194:3
precisely
181:2
precludes
252:9
predicated
109:14
Preface 8:15
357:8, 19

premise 191:3
192:3 193:1
premiums
164:12
preparation
53:5 184:8,
16 200:12
338:24
prepare 22:17
43:17 204:10
340:25
prepared 17:4
22:14 27:5
118:21 205:1,
8 206:8, 18
preparing
24:18 65:19
263:1, 22
299:22
338:17, 21
prescribed
297:19 305:2
prescription
98:2 99:4
102:2, 4
114:12 116:8
127:4 128:10,
13 129:6
130:19 132:4
133:16 160:6
210:24
220:20
223:24
240:18 251:9
253:1 255:11,
19 269:18
297:18
298:17 300:2,
14, 15 301:1,
16, 19, 22, 23
302:9, 14
303:4, 20, 22
308:5 323:23
324:18 325:7
342:7 352:12
Prescriptions
7:24 34:25
98:3 99:17
154:10
164:17 224:3
235:16 268:7

269:5 304:17,
19 305:14
306:17
309:23 317:6
present 6:6
11:4 112:15
145:12
presented
125:6 129:5
150:2, 10
307:11 345:1
presently
37:20 362:2
364:16
presents
278:10
president
27:24
presidents
27:25
pressure
108:21 142:9
144:7, 18
146:15 149:1
pressures
58:11
presumably
74:24
presume
135:11
presuming
306:12
pretty 83:14
prevent 76:24
preventing
58:11
previous
26:19 269:25
270:25 279:7
288:13 290:2
previously
18:19 45:8
46:23 52:14
65:22 104:14
105:22
115:14
136:15
184:17
204:13 361:3
price 131:18
142:25

143:19 144:9,
23 157:9, 19
158:3, 7
160:10, 24
161:14
271:22 273:8
274:3, 11
308:10
368:14
369:25 370:3
375:6, 22
prices 271:16
primary 28:1
31:13 80:17
230:3
principle
108:25
110:16 111:5
145:7 154:21
157:24
principles 82:3
Prinston 4:2
prior 61:14
118:2 252:4
288:21
293:10
299:11, 12
322:25 370:9
371:4 375:25
private 165:14
privilege
15:21 183:9
202:11 203:1
205:15
privileged
187:14 263:14
ProAct
282:19, 23, 24
283:14, 23
proactively
197:16
probably
49:16 66:7
180:11
240:10 252:3
292:8 320:14
328:14
338:24 367:6
problem
42:24 59:22

60:6  158:18
373:17
**problems**
180:25
**proceed**
135:13
**proceeding**
13:21  172:8
**proceedings**
15:8  366:9
**process**  14:3
27:17  38:7
47:22, 25
48:19  52:19
59:21  65:23
78:2, 9, 12, 19
86:21  153:20
199:21
200:17
218:17
221:17  222:3,
7, 9  239:22
243:19
244:25
252:21  253:3
260:14, 20
261:14  264:1
281:17, 24
283:7, 10
293:6  334:6
342:9  354:10
357:5  367:14
**processed**
255:10, 18
283:1
**Processes**
62:15  344:1
**processing**
35:25  139:23
244:24  251:4,
13  253:25
254:4  256:6,
22  257:5
283:9
**processor**
281:21
282:20, 22
**procure**  173:7
**produce**
34:10  46:2
154:2  157:6

170:4  176:12
265:2, 6, 16,
20  317:10
346:22
**produced**
106:16
138:19
140:21  156:7
174:18
177:16, 24
178:8  179:22
195:20
226:14
227:16
231:17
305:13  306:6
307:16
308:22  334:9
336:10  338:7
348:15
**Product**  7:11
32:1, 16
48:22  55:8
59:14  77:4
97:6, 23  98:5
119:21
120:10, 13
121:2, 14
122:10, 18
123:7  134:3,
4  151:6, 21
152:15, 16, 20
153:1  156:16,
23  157:10, 20
164:15
170:10, 15
172:17  173:7,
17  174:7, 9,
11  184:21
185:2  223:5
286:3, 16, 20
287:6  301:7
370:7, 12
371:6
**production**
36:2  256:4,
12  257:9
**PRODUCTS**
1:4  8:17
58:8, 13, 15,
20  59:13, 25

62:4, 7, 13, 16
76:19, 25
84:24  85:1, 2
97:7  113:6,
16, 18, 20, 22
114:6  140:22
148:8  152:6,
18, 22  153:3,
6, 7, 10
155:24  170:4,
5, 8  172:21
173:8, 23, 25
286:12  289:4
306:21
346:21  347:1,
25  348:3, 4,
25  354:9, 11
357:16  358:3,
5  359:9, 22
362:4  368:13
369:1  370:2,
21  373:12, 21
**product's**
223:12
**profession**
81:5  96:2
**professional**
39:18  181:18
334:16, 24
336:16
**professionally**
341:1
**proffered**
71:4  115:24
122:12
**proffering**
274:10
**profile**  251:21
359:14
**profit**  96:17,
18  176:25
177:9
**profitable**
37:16
**profits**  94:12,
25  95:19
96:11
**program**
12:22  25:23
26:6, 8, 11
164:6  236:25

**programs**
97:21  165:9,
10  220:20
226:4  342:8
**prohibit**  115:5
**prohibited**
68:23  115:22
116:7  117:7
118:9  119:15
120:24  122:8
141:21  197:4
200:6  370:25
**prohibition**
115:8  124:1,
20  203:11
**prohibits**
114:10, 24
120:1  179:14
**project**  49:15
125:19
**projects**  39:6
118:16
125:11
180:11, 15
181:9  251:3
252:7  366:24
367:1, 10
**promoted**  35:2
**promoting**
134:2
**promulgated**
220:25
**proof**  154:2
156:9  276:14
**proper**  83:22
95:19  104:22
105:12
107:22
127:13
135:17
144:22
168:22  169:3
196:21
320:22  321:20
**properly**
177:10  331:16
**proportion**
300:9, 12, 13,
20  301:18
303:25  304:1
**proposal**  8:6

**propose**
220:13
**proposed**
27:13  96:20
211:2, 5, 11,
15  212:1, 4,
17  214:24
**proposition**
352:17
**protect**  18:9
**protected**
184:21  185:19

**PROTECTIVE**
1:9  196:13
**protest**  192:17
**prove**  155:17
161:11
**provide**  21:19
23:17  24:11
29:17  33:22
34:12  68:14
77:2  84:4
86:24  97:15
98:7  133:21
152:24  173:5
201:7, 9
204:18  208:9
237:25
274:22
276:14  281:5,
22  282:1, 5
315:1  319:1
341:5  344:7
**provided**  15:1
20:16  23:4
52:2, 14
60:16  89:25
117:3  148:16
175:11
176:17  178:2
200:14
263:25
264:10  282:2,
6  284:2
352:16
**provider**
59:11  134:13
**provides**
255:21  355:13

Confidential Information Subject to Protective Order

providing
173:2, 14, 23
185:17
203:14  351:13
provisions
17:23  179:15
226:18
PSAO  277:17,
18
PSAOs  277:22
Public  1:15
187:9  343:12
377:5, 23
378:24
publication
358:2  369:14
publications
369:19
publicly  324:1
publicly-
available
315:13
316:13  326:3,
8, 13
published
98:1  147:11
267:16
pull  233:15
322:24
374:11, 18
pulled  229:21
256:5  316:13
purchase
68:14, 15, 17
70:15  97:7
110:17
134:15
142:25
143:19  144:9,
22  149:6
158:7  161:14
178:1  355:17
367:20  368:3
369:1  370:12
371:7  373:13
375:6
purchased
70:16, 17
102:11
150:25  370:3
371:7, 9, 12

373:13, 22
375:22
purchases
254:18, 23
368:8, 9
purchasing
173:17
purely  314:10
purity  156:22
purport  220:8
purports
356:3
purpose
108:21
110:11
133:21  142:8
185:17  221:9
232:12
234:13
235:18
240:23  273:8
331:9  343:22,
23  345:14
346:4  364:2
purposes
107:21  207:9
228:9  246:8
263:1, 22
267:9  271:24
294:5  328:25
330:21
364:14, 16
pursuant
199:25
pursued  99:21
pursuit  40:6
purview
103:17
put  26:25
36:3  46:5
55:11  93:21
101:4  110:9
121:1  148:14
149:22
166:20  230:6
233:8  238:15
248:5  270:19
271:7  330:10
337:4, 8
putting

206:16  220:6

< Q >
qualification
232:4
qualifications
30:6  31:4
41:3
qualified
120:25  369:7
374:25
qualifying
234:8
quality  156:22
quantify
38:14  219:24
220:8, 11, 15
255:3  327:8,
16, 25  328:9
quantifying
267:9
quarter  209:5
304:21
question
15:25  16:6
18:6, 14, 18,
20  19:15, 16,
18  21:13
31:7  43:24
47:5  51:17
54:11  55:18
58:2  60:23
61:3, 8  63:13
65:22  68:21
69:15  76:3
80:24  81:13
82:22  87:8
92:7, 12
93:25  103:5
108:1  118:4
121:17  126:5,
19  130:14
134:20  143:3
144:14
145:15
148:11  150:5
151:2, 19
155:7  157:20
159:22  171:5,
12, 21  175:14,
21  176:15

177:14
179:12
182:24  183:1,
19  185:3, 21
186:9  187:20
188:1, 5, 23,
25  189:8, 13
190:14, 20
191:11, 24
192:20, 22
195:5, 7, 12,
13  198:11
200:24, 25
201:15  202:4,
6, 15  204:15
206:23  207:1,
15, 18, 23
215:3, 20, 24
217:15, 16
233:20
242:13
263:15
270:19
277:25
278:22
280:19  282:9,
11  283:22
287:22
290:20
291:12, 17
299:4, 6, 10,
12  315:5
322:23
325:19
327:14
335:23  341:8
343:15
344:19
367:25
372:17  374:23
questioned
199:5
questioning
12:2, 8  42:8
questions
21:4, 8, 11
32:17  51:19
83:23  132:14
164:20  184:6
194:7  196:22
197:25

205:18
215:24
290:13  330:6
334:12  340:4
344:15, 17, 23
364:13, 15
365:6, 18
366:14
367:17
368:17
374:13, 16, 20
376:10
quick  210:9
317:23  318:1
quickly  62:1
337:4  345:13
347:12
Quite  38:1
87:15  107:3
203:18  308:12
quote  108:16
122:9  139:15
311:10
quoting
312:24

< R >
R.Ph  8:15
radio  308:6
raised  167:3,
5  193:2  365:4
ramifications
100:23
ran  35:17
36:15  256:18
range  23:17
ranges  147:14
RASPANTI
3:15
rate  270:22
302:25  304:7,
22
rated  356:16
Rates  8:3
88:10  93:11,
25  271:21
304:13
rating  347:9
348:18  352:8
356:10, 20

Confidential Information Subject to Protective Order

**Ratings**
302:*25*
304:*11*
347:*24* 348:*1*
**reach** 201:*24*
**reached**
136:*22*
199:*18* 201:*6*
**read** 27:*11*
40:*15* 53:*19*
57:*4, 5* 70:*24*
71:*3, 9, 13, 20,*
*24* 72:*1, 24*
79:*15* 80:*21*
85:*13, 15, 17*
88:*12, 14*
95:*13* 106:*17*
108:*22*
109:*12*
111:*19, 21*
118:*18*
119:*23* 120:*8*
160:*20*
165:*16*
166:*10*
174:*24*
186:*24* 187:*2*
188:*8* 201:*12*
202:*21*
232:*12* 238:*2*
269:*23* 270:*8,*
*16* 288:*4*
294:*7* 295:*8*
299:*19, 21*
344:*4, 11, 14*
345:*13*
351:*25*
354:*15, 19*
355:*3* 358:*8*
359:*16*
361:*18* 362:*5,*
*16* 367:*25*
368:*1* 369:*13,*
*18* 372:*18*
376:*16* 378:*3*
**reader** 356:*15*
**readily**
264:*23* 265:*7,*
*21* 266:*8*
**reading** 53:*23*
57:*9* 75:*7*

84:*10* 123:*23*
136:*2* 187:*3*
188:*9* 295:*18*
301:*11*
323:*12*
336:*21*
369:*20* 377:*12*
**reads** 94:*11*
108:*16*
112:*14*
119:*14*
139:*14*
237:*20*
324:*10*
343:*25*
346:*12*
356:*22* 363:*6*
**ready** 10:*7*
92:*4, 6* 135:*13*
**real** 38:*2*
58:*4, 23* 60:*1*
62:*22* 85:*10*
210:*9* 372:*23*
373:*11, 23*
374:*1*
**reality** 57:*24*
58:*1, 2, 3*
60:*7* 62:*10,*
*18* 84:*18, 22*
**really** 11:*1*
76:*23* 80:*10*
84:*17* 107:*13*
145:*7* 170:*17*
326:*11*
**re-ask** 280:*20*
**reason** 19:*6,*
*24* 52:*19*
59:*17* 136:*14*
141:*11* 150:*5*
176:*8* 198:*25*
201:*24* 202:*5*
233:*4* 235:*5,*
*24* 238:*4*
249:*10*
356:*22*
363:*15* 364:*2*
371:*10* 378:*6*
**reasons** 258:*8,*
*24* 348:*9*
349:*15*
**rebate** 196:*1*

**rebazan@duan**
**emorris.com**
4:*8*
**REBECCA**
4:*5*
**rebutted**
208:*14, 18*
**recall** 16:*14,*
*16* 30:*19, 22*
33:*9* 44:*23*
45:*9, 13, 14*
49:*14, 18*
52:*11* 56:*7,*
*11, 24* 57:*2*
59:*8, 25* 63:*2,*
*5, 12, 15, 21*
64:*14, 17*
71:*22* 72:*9*
73:*6* 77:*3*
83:*12* 88:*23,*
*24* 89:*12, 17,*
*19* 149:*16, 21*
166:*16*
179:*16* 180:*5,*
*8, 13* 183:*25*
184:*3, 4, 5*
186:*7, 16, 20,*
*23* 188:*16, 19*
189:*17*
191:*24*
194:*10* 204:*9*
206:*6, 7*
208:*13, 20*
214:*18*
217:*25*
221:*13* 247:*2*
286:*14, 18, 25*
292:*7, 20*
299:*24*
343:*17, 20*
345:*9* 366:*17*
367:*16*
**recalled** 77:*4*
152:*16* 153:*4*
286:*16*
**recalls** 59:*8,*
*25* 115:*17*
286:*3, 9, 12*
367:*22* 368:*4*
373:*16*

**receipt** 27:*21*
122:*9*
**receivable**
129:*20*
**receive** 34:*5*
62:*6* 143:*14*
348:*24*
354:*22* 355:*8*
361:*6*
**received**
13:*22* 58:*19*
64:*13* 83:*10*
140:*23*
143:*21*
147:*17* 303:*4*
**receives**
224:*23*
225:*10, 18*
**Recess** 67:*4*
135:*7* 209:*8*
266:*17* 318:*6*
365:*20*
**recognize**
341:*9*
**recollection**
87:*13, 16*
89:*20* 91:*9,*
*11, 12*
**recommend**
59:*17* 344:*1*
**recommendatio**
**n** 26:*17* 45:*3,*
*12* 47:*22* 59:*9*
**recommendatio**
**ns** 23:*7* 25:*5,*
*14, 15* 26:*20*
27:*21* 44:*17*
52:*3* 57:*10*
341:*17*
**recommended**
26:*25*
**reconcile**
309:*25*
310:*19*
311:*11, 19*
**reconfirmed**
153:*22*
**Record** 7:*22*
9:*4, 13* 17:*11*
18:*3, 9* 24:*21*
43:*3* 55:*12*

61:*12* 67:*3, 6*
80:*1* 91:*15*
111:*21* 135:*6,*
*9* 138:*14*
140:*14*
177:*19* 188:*8*
202:*21* 209:*7,*
*10* 227:*16*
230:*7* 232:*15*
235:*2, 7*
237:*13* 244:*2,*
*17* 247:*23*
266:*15, 16, 19*
291:*7* 305:*9*
306:*2* 309:*7*
318:*3, 4, 7*
339:*16, 18*
343:*8* 362:*6*
365:*15, 16, 19,*
*22* 366:*5, 7,*
*11* 368:*1*
376:*13, 21*
377:*10*
**Records** 7:*20*
226:*2* 232:*14,*
*16* 233:*22*
234:*15* 235:*2,*
*19, 22* 236:*2,*
*7* 238:*1, 9*
247:*3, 6, 11,*
*16, 19, 25*
248:*20*
275:*13, 16, 18*
277:*22* 305:*8*
308:*14, 19*
314:*20, 24*
315:*3, 11, 16,*
*20* 317:*11*
**recoup** 196:*2*
**red** 65:*9, 15,*
*18, 20*
**redirect**
372:*11* 373:*5*
375:*8* 376:*2*
**RE-**
**EXAMINATIO**
**N** 339:*22*
368:*19*
**refamiliarize**
299:*1*

Confidential Information Subject to Protective Order

refer 20:*14*
22:*23* 24:*23*
175:*5* 181:*24*
322:*22*
335:*17* 349:*9*
reference
97:*25* 218:*1*
229:*22* 258:*1*
264:*19, 22*
323:*21* 348:*8*
349:*19* 350:*4*
351:*9* 363:*23*
365:*11*
referenced
89:*3* 297:*25*
315:*6*
references
87:*7, 22*
referencing
88:*11* 182:*1*
referred 13:*1*
158:*12* 169:*13*
referring
84:*22* 198:*12*
215:*21* 217:*8,
16* 239:*9, 10,
13* 322:*16*
347:*14, 18, 23*
357:*25*
refers 88:*3*
334:*23*
345:*19* 349:*5*
354:*21*
refill 304:*25*
refilled 302:*14*
reflect 93:*25*
240:*9* 347:*9*
reflected
33:*21* 55:*7*
161:*6* 162:*9*
166:*21* 187:*5*
188:*11*
213:*17, 22*
332:*10* 334:*4*
336:*18* 338:*6*
reflecting
32:*20* 174:*11*
reflects 29:*16*
32:*15* 33:*3*
64:*24* 159:*6*

213:*7* 240:*10*
290:*9* 334:*24*
refresh 90:*12,
14* 91:*9, 11*
106:*4* 351:*5*
refute 255:*9*
regard 210:*3*
227:*5*
regarding
27:*21* 34:*5*
60:*15* 106:*1*
209:*24* 217:*3*
248:*20*
254:*21* 259:*9*
264:*1* 270:*3*
364:*20*
regardless
108:*20* 142:*7*
333:*2*
regards
288:*22*
regional
236:*14*
regulate
113:*18*
regulation
114:*18* 364:*11*
regulations
69:*6, 8, 9*
77:*16, 24*
78:*8, 11* 79:*3*
118:*23* 119:*3,
6, 10* 140:*6*
141:*22*
237:*22* 362:*23*
regulatory
59:*21* 61:*19*
73:*10* 115:*16*
116:*13*
137:*20*
151:*18, 20*
153:*5, 13*
157:*3*
rehash 372:*13*
reimbursed
272:*15, 22*
273:*9* 275:*24*
276:*5*

reimbursement

88:*10* 173:*20*
271:*21* 277:*3*
reimbursement
s 278:*3*
reimbursing
273:*19, 20*
reinsurance
164:*10*
reject 85:*6, 8*
rejected 44:*17*
45:*4* 48:*3*
relate 212:*3,
13, 24* 214:*7*
221:*6* 290:*14*
related
197:*13* 292:*8*
377:*15*
Relates 1:*6*
21:*10* 108:*2*
211:*1, 15, 25*
212:*16* 213:*3,
8* 216:*22*
218:*14*
232:*13* 285:*6*
303:*18* 347:*5*
relating
210:*17* 216:*9*
relation 66:*4*
relationship
129:*16* 130:*7,
8* 240:*11*
283:*21*
relationships
130:*10*
Relax 299:*8*
relevant
74:*25* 86:*25*
148:*12*
150:*16* 370:*17*
reliable 80:*25*
82:*22* 341:*10,
20* 348:*23*
reliably 79:*10*
81:*14* 295:*13*
reliance 71:*1*
87:*5, 22* 88:*4,
8* 91:*4* 92:*15*
120:*21*
138:*11* 166:*8*
174:*16, 25*

176:*6* 351:*6*
352:*19* 364:*1*
relied 41:*6*
85:*22* 86:*3, 7,
11, 24* 88:*22*
90:*8* 91:*10,
21* 94:*2*
106:*13*
166:*15*
171:*13*
175:*10*
340:*25*
350:*23* 351:*3*
360:*22*
363:*14, 20, 22*
relieve 129:*20*
rely 53:*4, 10*
87:*2* 89:*24*
90:*3* 92:*13*
94:*15* 348:*24*
354:*22* 355:*7*
356:*5, 15, 22*
358:*11, 14, 22*
360:*11* 361:*6*
367:*7*
remaining
286:*20*
remains 195:*9*
remedies
137:*18*
remedy 94:*13,
25*
remember
16:*1, 3, 19*
31:*12* 33:*11*
83:*19* 91:*20*
92:*12* 135:*19*
136:*12*
142:*10, 16*
159:*8* 163:*23*
175:*16, 25*
176:*2* 186:*9,
24* 187:*3, 20*
188:*9* 192:*1,
4, 20, 24*
193:*2* 204:*5*
236:*18* 292:*5*
321:*13*
353:*19* 369:*8,
10*

remind 260:*19*
removed 287:*2*
Rena 7:*16*
50:*20*
render 140:*5*
310:*20* 311:*20*
rendered
14:*18* 191:*4*
renew 256:*24*
renewal
256:*23*
rent 97:*12*
repeat 19:*19*
48:*15* 103:*23*
143:*3* 151:*2*
155:*3* 188:*7*
202:*16*
217:*16*
219:*20*
242:*13* 269:*9*
272:*12* 275:*8*
278:*22*
287:*22* 290:*2*
321:*22* 372:*18*
repeatedly
83:*17*
rephrase
19:*19* 104:*2*
143:*4*
replaced 146:*8*
replacement
146:*13*
replicated
271:*5*
Report 7:*8*
8:*15* 13:*11*
14:*17* 17:*4*
18:*23* 21:*17,
20* 22:*3, 9, 14,
17, 22* 23:*2, 8*
24:*19, 22*
25:*7* 26:*4, 21*
27:*1* 33:*23*
34:*10* 42:*4,
10, 23, 24*
43:*15, 21*
44:*19* 45:*18,
22* 46:*5, 8, 16*
47:*1, 6, 9, 23*
48:*8, 18, 20,
21* 49:*1, 17,*

*21, 24* 50:*8,
11, 16, 21, 23*
51:*3* 52:*4, 13*
53:*6, 11, 12,
20, 21* 55:*8,
24* 56:*2* 57:*4,
7, 9, 11, 22, 23*
63:*25* 64:*5,
15, 20, 24*
65:*7, 20* 66:*2,
15* 71:*22*
73:*20* 80:*18*
83:*24* 84:*8,
11* 85:*13, 21*
86:*2* 87:*25*
92:*13* 93:*1*
94:*6, 16* 95:*1*
96:*4, 7* 98:*1*
101:*12*
102:*20*
104:*11*
105:*12*
106:*12, 16*
109:*12, 22*
111:*4* 112:*4,
20* 115:*9, 19*
117:*2* 118:*20*
123:*24* 124:*7*
125:*1* 135:*22,
25* 136:*2*
143:*24*
150:*23*
158:*16, 20*
159:*19*
160:*21*
161:*22*
163:*17, 23*
165:*2* 167:*4,
6* 170:*10*
172:*13* 178:*8,
20* 179:*23*
187:*5* 188:*11*
195:*20* 198:*2,
3* 200:*18*
204:*2, 10, 11*
205:*1, 4, 8, 13,
21, 23* 206:*8,
19* 207:*9*
210:*6* 213:*25*
215:*8* 216:*3,
23* 218:*7*

219:*24*
220:*13*
222:*15*
225:*24, 25*
227:*4* 228:*9*
238:*8* 248:*14*
251:*6* 254:*12,
15* 257:*14, 17,
21, 23* 260:*17*
261:*10* 264:*9,
15* 265:*12*
271:*9* 277:*7,
21* 279:*16*
280:*3, 7, 22*
281:*1, 6, 23*
282:*12, 20*
284:*17* 290:*9,
15* 306:*24*
308:*16* 309:*3*
311:*1, 10*
315:*7* 318:*20*
327:*11* 335:*1*
338:*14, 23*
342:*3* 343:*1*
347:*17*
350:*15*
351:*13, 17, 25*
352:*3* 354:*1*
355:*20, 21*
361:*14, 16*
363:*5, 10, 20*
366:*16* 372:*2,
5*
**reported**
270:*22*
**reporter**
11:*13* 19:*10*
43:*25* 184:*25*
202:*18* 275:*7*
**reports** 17:*4,
9* 18:*23* 20:*8*
23:*21* 27:*4*
50:*13* 55:*12*
79:*20, 24*
172:*15*
200:*13* 207:*7*
288:*4*
**repose** 215:*24*
**represent**
106:*22* 107:*8*
366:*1*

**represented**
13:*16*
**represents**
300:*13*
352:*10* 353:*17*
**request** 28:*6,
24* 197:*6*
266:*12*
**requested**
52:*12* 237:*25*
**requesting**
29:*5*
**requests**
28:*19, 20, 22*
365:*10*
**require**
240:*12* 245:*3*
**required**
69:*23* 70:*10*
97:*23* 99:*16*
157:*6* 219:*25*
220:*9, 12*
251:*19* 255:*1,
5* 283:*7*
310:*17*
311:*11* 315:*3*
**requirement**
226:*1, 4*
235:*2, 7* 236:*2*
**requirements**
116:*15* 145:*3*
152:*19, 22*
154:*3, 22*
155:*24* 156:*2,
22* 227:*22*
228:*18*
232:*22* 233:*2*
237:*16* 356:*8*
**requires**
153:*13, 25*
176:*24, 25*
207:*2* 279:*9*
308:*8* 376:*1*
**requiring**
244:*24*
**rereading**
349:*13*
**Research** 8:*17*
22:*21* 23:*19*
24:*10* 26:*5,
10, 16* 27:*15*

28:*21* 59:*3, 4*
128:*7* 267:*20*
357:*15*
**researched**
147:*11*
**resold** 172:*22*
**resources** 28:*5*
**respect** 17:*9*
31:*15* 51:*3*
56:*22* 80:*12*
205:*15* 210:*7*
235:*25* 270:*6*
291:*3* 312:*20*
**Respectfully**
151:*16* 187:*15*
**respecting**
185:*16*
**respective**
18:*10* 244:*10*
278:*3, 11, 20*
279:*2* 281:*10*
377:*13*
**respects**
378:*17*
**respond** 18:*7*
92:*6* 115:*16*
186:*1* 194:*7*
**responded**
45:*8*
**responding**
348:*20*
**response**
61:*10* 68:*19*
69:*11* 92:*21*
125:*22* 179:*11*
**responses**
335:*7, 17*
336:*6*
**responsible**
128:*9, 20*
129:*9* 130:*11*
235:*22* 243:*1*
273:*18*
**restart** 70:*8*
**Restricted**
207:*7*
**resulted** 26:*15*
**resulting**
140:*24*

**resume**
134:*25* 135:*4*
208:*25*
**resumed**
340:*12*
**retail** 37:*10*
72:*3, 14* 99:*4*
169:*24* 170:*6*
226:*14*
227:*13, 25*
228:*5* 254:*16*
261:*22*
262:*13, 25*
263:*12, 21*
264:*2* 268:*20*
269:*11, 17, 20*
306:*5* 307:*16*
308:*22*
**retailer** 71:*14*
72:*25* 87:*3*
89:*16* 96:*23*
97:*1* 305:*11*
**retailers** 71:*4*
72:*2* 85:*2*
87:*18* 89:*13*
91:*8* 92:*17*
95:*6* 98:*7, 10*
112:*12*
117:*15*
152:*20* 170:*5*
171:*18*
173:*16*
174:*17*
176:*11*
262:*21* 370:*3*
**retain** 280:*16*
364:*18*
**retained** 14:*8,
16* 33:*7*
226:*23*
242:*19*
263:*12* 266:*3,
7* 292:*14*
**retains** 228:*21*
238:*9*
**Retention**
7:*18, 20, 22*
14:*10* 29:*17*
31:*1* 32:*21*
33:*4* 227:*12,
16* 229:*5*

Confidential Information Subject to Protective Order

232:15, 21
233:1, 6, 21,
22  234:14
237:13
**retrench**
136:21
**retrieve** 17:3
**return** 67:2
**reveal** 140:20
158:9  185:24
187:22
**revealing**
200:7  203:11
**reveals** 130:21
**revenue** 38:12,
13  173:18, 20
**review** 26:13
27:12  50:22
86:20  98:10
119:7  162:14
172:15
181:21
191:13, 16
213:4  218:2,
6, 13, 16, 20
219:25  220:8,
15  227:12
256:4, 12
257:10  267:9
309:24
310:16, 19
326:17, 24
344:18, 24
**reviewed**
52:15  118:2,
14  178:6
179:22  184:9
186:6, 10
338:23  342:1,
14, 16
**reviewing**
85:12  119:5
159:8  270:20
**RFP** 35:24
**RICO** 204:5
**ridiculous**
192:8  340:13
**right** 11:8
12:15  13:25
15:5, 6  16:17
17:16  23:13

25:8  26:10
27:17  30:24
33:12, 15
34:18  35:9,
12  38:7
39:19  42:12
56:16  57:5
58:9  67:1
68:5, 19  71:1
73:24  74:3,
18  75:1, 5
79:25  80:4
81:8, 11  86:4
102:25
103:18
106:13, 17
107:6  109:12
119:9  120:21
123:4  127:23
132:14  136:7,
17  143:21
160:3, 6
165:7  167:4,
19  168:6
169:14  176:6,
12  178:23
179:5  181:22
182:12, 21
185:10  194:3,
20  195:4, 23
196:3  197:4
198:3, 15
199:14, 20
204:4, 8
205:1, 9
206:22
209:21  210:3,
4, 21, 24
211:8, 23
212:5, 16, 17
213:4, 17
214:9, 19
216:23  217:1,
4  218:4
222:17  223:9
228:2, 13
231:16, 22, 25
233:2  234:2,
4, 15  235:3,
14, 20  237:2
238:2, 10

240:7, 25
244:6, 11, 14,
17  245:7
246:16, 20
247:10, 13
248:12  250:2,
10  252:24
253:13, 23
256:1  257:21
258:6  259:6,
12  261:24
262:1, 3, 5, 10
268:5, 9
271:13, 18
272:9, 15
273:21
276:20  277:8
279:17
283:25
284:10, 25
285:7, 18
286:9  287:6,
11  288:17
289:20  291:7
292:24  293:3
294:1, 13
296:2, 5
297:14
298:13, 18, 22
300:10, 22
301:2, 7, 17,
21, 25  302:4,
10, 11, 16
303:20
304:16  305:8,
14  308:7
309:18
310:15
312:18, 21
313:2, 11
314:11, 13
315:8, 12
316:5, 16, 23
319:6, 9, 13,
21  321:6, 9,
14, 21  323:15,
12  323:15
325:8, 13
326:15  328:3
330:16, 19, 23
331:2, 9, 12,

13  332:4, 7,
11, 15  334:20
337:18
341:14
342:18
343:18, 20
344:4  345:3,
16  346:9
347:19
348:16
349:18  350:8
351:14
352:20
356:12  361:8
363:2  364:6
369:13  372:9,
23  375:11
376:5
**right-hand**
269:15
**rightly** 89:18
**rink** 291:22
**risk** 26:1
249:24  250:8
289:11, 25
291:1  292:2
**Rite** 3:6
91:25
**Rite-Aid**
34:21  35:6
129:13  290:7
306:18
**road** 20:3
**ROBERT** 1:4
**ROCKETT**
5:15
**rockett.shevon
@dorsey.com**
5:17
**role** 33:24
35:3  41:12,
13  163:20
164:21  203:8
**rolled** 36:15
**rolling** 77:6
**Roman** 94:10
**room** 11:3, 5,
11, 12
**ROONEY** 3:3
**ROSE** 5:9

**Ross** 5:10
**rough** 85:15
**roughly** 34:21
**round** 259:20
**route** 281:17,
24  282:16, 22,
25  283:15, 24
284:1
**routinely**
341:1
**RPR** 1:14
377:4
**RUBEN** 2:4
9:16  10:16
66:16  67:7
70:2  90:20
106:3  132:7,
11  134:22
192:15
202:15
372:10  374:9,
19
**ruben@honikla
w.com** 2:6
**rubric** 140:3
**rule** 193:7
**rules** 56:4
119:4
**ruling** 106:23
**run** 35:20
36:4  97:9
236:24  257:2
338:14
**running**
129:13
215:22  246:4
**Rx** 253:8, 10,
17, 24

**< S >**
**safe** 14:15
113:18
154:12  155:8,
18
**safeguards**
61:20
**safety** 358:6
359:14
**sake** 131:8
**salaries** 323:15

**sale** 96:*25*
98:*22* 108:*18*
109:*16*
112:*16, 22*
126:*9, 22*
127:*3, 12, 21*
128:*1, 12, 18*
131:*4, 25*
141:*23*
152:*17*
160:*11, 23*
**sales** 134:*4*
150:*14*
160:*22* 177:*25*
**salesforce**
133:*25*
**salesman**
134:*1*
**sample** 282:*14*
**sandbox** 85:*4*
**Sarah** 91:*6*
**satisfactory**
135:*12*
**satisfied**
126:*8* 129:*17*
**satisfy** 308:*17*
347:*13* 349:*9*
**save** 162:*17*
308:*8*
**saved** 364:*19*
**saw** 235:*19*
292:*19*
**saying** 118:*23*
121:*11*
122:*17*
140:*23*
187:*24*
249:*19* 258:*2*
313:*23*
373:*11* 374:*1*
**says** 58:*21*
101:*25*
104:*10* 110:*9*
121:*3, 8*
122:*8* 139:*9,*
*21* 140:*12*
165:*8* 233:*24*
269:*14*
279:*12, 16, 24*
280:*4* 312:*25*
324:*16* 331:*6*

343:*22* 344:*7*
346:*3, 6, 9, 17*
348:*2* 349:*14*
350:*8* 353:*16*
358:*2, 19*
359:*9, 21*
**Schedule** 7:*22*
232:*16* 233:*6*
234:*15* 237:*13*
**scheme**
151:*18* 153:*13*
**Schneider**
7:*10*
**Sciengen** 4:*17*
**scope** 67:*16*
68:*11* 69:*2*
70:*12* 72:*6,*
*18* 73:*4, 14*
82:*7, 17*
95:*10* 100:*13*
101:*22*
103:*11, 13*
105:*4, 7*
110:*21* 113:*2*
114:*15*
115:*11* 116:*2*
121:*5* 122:*21*
123:*10, 14*
126:*24*
127:*16* 140:*9*
141:*16*
143:*11*
144:*11, 25*
145:*15* 146:*3*
149:*9* 150:*19*
151:*10*
152:*11*
153:*17* 154:*5,*
*15* 155:*1, 11,*
*21* 156:*11, 25*
157:*13* 158:*1*
161:*18*
162:*21, 23*
163:*12*
167:*14, 25*
168:*9, 16, 18*
169:*6* 171:*22*
172:*10*
176:*19* 177:*2*
178:*13, 24*
192:*9* 193:*11*

260:*23* 272:*2*
286:*23*
287:*16* 288:*2*
289:*13* 290:*3,*
*15* 291:*3, 24*
331:*20* 333:*5*
359:*19* 360:*2,*
*15* 361:*23*
362:*9* 363:*4*
364:*8* 371:*5,*
*21, 22, 25*
372:*11* 373:*5,*
*6* 374:*10, 12*
375:*8* 376:*2*
**screen** 90:*13,*
*15, 19, 25*
150:*1* 261:*9*
267:*23* 323:*8*
347:*15*
362:*11, 16*
**script** 298:*21,*
*22*
**Scripts** 7:*16*
229:*13, 25*
230:*5, 14*
231:*1, 5, 18,*
*19, 24* 232:*5,*
*13, 20* 233:*5*
256:*16* 313:*17*
**scroll** 234:*17*
268:*13*
**searched**
353:*8*
**second** 12:*22*
18:*2* 35:*13*
75:*3, 14* 77:*1*
108:*8* 110:*8*
139:*14*
166:*20*
215:*11*
228:*14* 250:*2*
253:*12*
268:*13* 365:*9*
366:*6*
**section** 52:*4*
53:*19, 22*
54:*4* 73:*20*
88:*11* 93:*1*
94:*3* 96:*17,*
*24* 117:*18*
118:*8* 139:*25*

217:*7* 235:*18*
269:*7* 300:*1*
319:*2* 324:*16*
334:*14*
346:*18*
349:*14* 357:*8*
**sections** 47:*7*
**see** 10:*16*
11:*2* 16:*3*
22:*10* 30:*14*
31:*10, 22*
36:*23* 62:*5*
69:*8* 75:*23*
76:*17* 79:*13*
90:*20* 94:*13*
98:*20* 101:*3,*
*9* 106:*11*
108:*8, 13*
109:*24* 110:*8,*
*14* 112:*17*
119:*15*
121:*17*
122:*14*
137:*23*
139:*12, 19*
140:*1* 159:*25*
160:*12* 161:*5*
163:*21*
165:*15, 17*
189:*3* 201:*7*
209:*15*
213:*23* 218:*2,*
*4* 231:*18*
232:*9, 17, 22*
233:*12, 23*
234:*13, 23*
235:*15*
237:*12, 15*
254:*18*
260:*25*
264:*24* 268:*2,*
*18, 23* 269:*9,*
*15, 22* 270:*12*
294:*8* 295:*24*
298:*6* 300:*2,*
*7, 17* 304:*4*
323:*9, 21*
324:*12, 21*
325:*4, 14*
334:*13, 17*
335:*11* 336:*8,*

*12* 337:*2, 8*
343:*1, 3, 9, 22*
346:*8, 15, 17*
347:*3, 4, 16*
349:*14*
352:*14* 353:*2*
354:*7, 8*
357:*17* 359:*24*
**seeing** 91:*20*
163:*23*
165:*25* 345:*9*
362:*10*
**seeking** 184:*20*
**seen** 117:*24*
118:*5, 8*
139:*4* 141:*5,*
*6* 154:*7*
159:*2* 199:*11*
231:*22*
268:*11* 269:*1*
287:*12* 296:*6*
299:*16*
324:*14* 325:*1*
343:*5, 15*
344:*25* 345:*3*
369:*11*
**segment** 37:*5*
**segments**
36:*25* 37:*2, 3*
38:*5* 180:*25*
181:*10*
**select** 86:*17*
**selected** 25:*6*
86:*19*
**self-funded**
278:*20* 279:*2*
321:*3* 323:*24*
324:*4, 20*
325:*8, 17*
326:*14, 21*
327:*6, 19*
328:*2, 12*
329:*1*
**self-insured**
130:*6* 273:*15*
324:*19* 326:*3,*
*8*
**sell** 36:*6* 68:*8*
69:*18* 70:*21*
72:*3, 14* 73:*1*

Confidential Information Subject to Protective Order

152:6  155:18
173:9  174:7
**selling**  68:23
69:16
**sells**  70:20
**semicolon**
74:2, 17
**send**  32:20
50:8, 11  66:8,
11  279:17
**senior**  36:1
**sense**  269:2
**sent**  50:12
88:15  89:7
176:4  253:2
342:20
**sentence**  74:1
79:13  101:9,
25  110:8
112:14
228:14
237:18, 20
312:22  344:14
**separate**
258:3, 17
**separately**
335:25
**serve**  39:19
42:14  125:4
140:5
**service**  37:12
61:23  165:12
170:7  230:9
232:1, 9
252:19, 22, 23
262:6  283:2
284:4  304:16,
25
**services**  8:9,
11  9:5  22:19
23:18  35:22
36:6, 7, 12, 14
97:15  98:8
173:3, 14
182:9  232:5
277:13, 19
284:2, 5
334:16, 19, 22,
24  336:16, 17
337:8, 10

**set**  30:8
59:22  131:11
212:23
216:23
227:16  236:2
257:10, 20
293:22
294:12
356:13  365:9
377:8, 19
**sets**  311:19
313:19
345:14  366:21
**settled**  15:3, 5,
10  193:9, 15
199:10, 12, 13,
14, 20, 21
201:23
**seven**  86:6, 10,
17  89:23, 24
**Shakespeare**
192:13
**shape**  18:12
82:12
**shaping**  55:20
**share**  31:19
47:23  90:19,
25  133:2, 3
191:20  231:3
234:20  261:9
267:23  335:4
336:1  347:15
362:16
**shared**  137:24
185:12
**sharing**
203:24  298:7
323:8
**sheet**  282:3, 4,
15
**shelves**  287:2
**SHEVON**  5:15
**shop**  308:4
**shopping**
308:12
**short**  13:10
259:18
**Shortly**  35:1
132:19
**show**  22:5
84:6  142:12

240:2  249:25
274:22
315:21  331:1
**showed**  106:4
175:7  375:17
**showing**
275:13
**shown**  140:15
181:25  336:10
**side**  34:23
35:4  36:21
37:21  173:19
245:5
**sign**  376:16
**signals**  8:6
**signed**  23:9
**significant**
139:15  195:25
**signing**  377:12
**silos**  36:24
**similar**  64:4
127:24  146:9
183:13
243:20
255:24
302:24  327:12
**similarly**
16:23  72:24
148:23  259:9
**simple**  56:2
148:11  374:13
**simply**  18:16
55:21  120:25
160:23  206:4,
17  280:4
311:18  348:21
**single**  45:2, 11
55:18  130:18
194:18  241:9
290:19  308:18
**sir**  17:21
44:3  53:14
60:23  89:23
94:9  95:16
102:10
103:16
108:11
112:14
116:17
120:20
121:19

122:19
130:13  132:3
148:11  156:4
157:8  162:16
164:19
168:21  172:3
175:20  184:7
189:18
190:25
191:11  195:9
200:20  202:6
209:20
210:13
215:22
217:10  218:2
228:16
229:12, 21
230:22
231:10, 14
233:12
234:21  240:1
248:15
254:12
260:19  261:5,
13  264:15, 16
266:12
267:22
268:14  271:9
273:6  274:15,
21  275:12
277:5  278:1
279:15
284:14, 21
291:18  298:6,
9  299:4
317:19
322:18
323:19
327:14
330:10, 11, 13
333:19, 23
347:3  348:20
350:8, 15
353:5  355:23
370:15  371:9,
25  372:7
374:5  375:15
**sit**  48:9, 18
**sitting**  176:16
192:23  197:3
204:20

205:20
206:15
228:24  328:9
329:25  343:19
**situation**
129:24
189:18  292:12
**situations**
252:11
**six**  89:24
209:1  242:10,
16  244:22
245:3  252:1,
12  255:10, 18
**size**  223:6, 9
233:16  343:7
**skimmed**
85:16
**slightly**  81:12
**small**  11:3
23:22  237:10
**smirk**  299:8
**smoked**  289:3
**SMOLJI**  4:6
**snow**  247:18
**Society**
340:18  348:22
**software**
242:2, 15
**Solco**  4:3
**sold**  36:8
108:20
110:17  113:6
142:7  154:13
172:21  173:22
**solely**  308:18
**solicit**  49:22,
25
**solicited**  49:23
**somebody**
90:21  298:21
355:5
**someone's**
50:23
**somewhat**
180:14
**soon**  132:8
**sorry**  17:17
28:8  38:25
39:1  42:17
43:6  53:15

60:24  64:7
74:11  79:21
87:14, 15
97:13  121:20,
25  126:15
128:22
167:20
178:17  181:3
184:24
194:23
197:17  198:7
202:15
214:21, 22
253:11
262:23
272:10
287:22  289:7
293:23
313:22
321:16
323:20
341:12
350:12  353:5
362:18
364:23  367:24
**sort**  25:3
136:9  161:10
245:12  310:13
**sorted**  43:12
**sought**  31:3
177:15  201:18
**sounded**
168:12, 13
**sounds**  213:11
215:5, 17, 25
**source**  248:19,
25  255:21
**sources**
158:11  214:7
218:17, 18, 22
220:4  267:10
311:12  312:1,
2  326:13, 15
348:17
**South**  4:6
**space**  68:5
**SPD**  325:22
**speak**  10:4
19:7, 9  27:22
30:11, 12, 14
44:5  54:12

55:2  137:6
193:22
211:10
262:20
342:13  366:4
**speaking**
18:11  70:3
156:21
186:22
187:12
215:14  228:14
**speaks**  43:20
264:9  348:23
**specialty**
37:11  40:5
170:7  230:11
308:1
**specific**  16:18
27:16  30:12
34:4  47:5
49:18  56:25
64:14, 17
67:14, 21
68:21  74:17
75:24  77:8,
11  85:17
114:17  118:8,
25  122:8, 16
136:5, 23
158:20  165:2,
7  166:1, 16
171:5  175:6
176:13
186:14
189:17  217:2
218:8  225:22
226:23  227:8
231:6  242:6,
7  248:13
254:20
276:22  277:1
285:20  287:7
292:20
303:24
308:25  311:6
356:4, 14
357:22
**specifically**
14:24  30:20
47:10  51:3
63:3  66:11

82:21  89:20
114:24
118:17
163:24
175:10  184:5
190:17
198:14  215:2,
14  225:21
248:1  255:9
284:25
285:18  292:7
296:20
298:12  343:1
347:14  348:15
**specifics**
44:23  45:14
50:1  56:7, 11
72:10  73:7
76:15  88:23
157:5  180:6,
8  183:11, 25
186:7  188:16
190:24  194:9
204:9  206:21
**specified**
228:19  359:15
**specifies**
356:10
**specify**  236:8
**speculation**
54:22  89:9
113:12  125:8
141:2  163:12
315:24  335:8,
19  336:7
339:5  341:3
354:3  360:25
361:10
363:18  371:21
**Speculative**
360:16
**speed**  292:10
293:7
**spend**  19:2
137:11
**spent**  38:12,
15, 17  338:16,
19, 21  339:2
375:22
**spoke**  51:4, 19
54:7  57:14

63:23  64:4
79:21  194:23
**spoken**  13:9
63:6
**spouse's**
240:21
**spread**  131:20
**spreadsheet**
8:9
**SPUNG**  5:20
230:6
**squint**  362:18
**SS**  377:2
**St**  5:21
**staff**  38:23
39:9  97:8
**staffing**  173:18
**Stand**  158:22
182:19
229:12, 24
231:11  233:9
237:5  267:22
330:10
333:20
336:22
342:21  351:21
**standard**
134:11
154:11
156:20  221:5,
10, 11, 15, 16,
18, 22  245:20
283:11  303:1
305:4  331:23
**standards**
152:7  171:7
220:25  221:2,
6  222:3, 6, 19
238:16, 19, 22,
25  239:3, 6
300:22
**standing**
101:7  355:19
**standpoint**
157:17
169:13, 17, 20
179:9  368:22
371:16
**STANOCH**
2:9  7:3  12:4
21:3  90:23,

24  158:22
175:18
181:21, 24
209:11, 12, 14
214:1, 14
216:7, 13, 20
217:9  219:15,
23  223:7
224:12  225:3
226:21  227:6,
23  229:20
230:13, 20
231:2, 13
233:11, 18
234:8, 11, 12
235:13  236:9
237:1, 7
238:14
241:21  242:9
243:9  244:3
245:23  247:9
249:13
250:17
255:16  259:1,
19, 24  260:6
261:4, 20
262:22  263:5,
19  264:13
266:15, 20
267:15  268:1
269:8  270:1,
17  271:6
272:7, 13, 20
273:3, 17
274:1, 9
275:11
276:11  278:8,
17  279:14, 22
280:14
281:15  285:4
286:7  287:4,
17, 23  288:9,
19  289:8, 18
290:16, 21
291:10, 16
292:4, 22
293:20
295:17
296:22
297:10  298:5
299:7, 11, 15

Confidential Information Subject to Protective Order

301:*13*
303:*16* 305:*6, 18* 306:*10*
310:*12* 311:*7, 17* 312:*6, 15*
313:*21*
314:*17* 316:*3*
317:*16* 318:*2, 10, 11* 319:*19*
320:*9, 20*
321:*4* 322:*1*
323:*6* 324:*9*
325:*2, 3, 12, 24* 327:*3, 24*
328:*8* 329:*8, 14, 19, 23*
330:*9* 331:*8*
332:*1, 21*
333:*10, 22*
335:*13, 20, 22*
336:*11* 337:*1*
338:*4* 339:*8, 15* 341:*7*
342:*21*
343:*14*
351:*21*
357:*10*
362:*15* 366:*13*
**Star** 302:*25*
304:*10*
**start** 12:*2, 6*
36:*10, 19*
48:*10* 147:*5*
278:*24* 323:*16*
**started** 20:*6*
34:*24* 36:*22*
49:*17* 221:*15*
340:*11*
**starting**
290:*13*
**State** 4:*19*
8:*6* 12:*22*
13:*3* 39:*14, 15* 69:*6*
77:*14* 86:*3*
157:*9* 160:*19*
165:*10, 12*
199:*4* 204:*11*
212:*10*
225:*13, 17*
269:*16* 313:*6*

314:*3* 317:*2*
318:*23* 319:*5, 9, 12, 25*
320:*21* 321:*6, 10* 322:*12*
324:*2* 326:*4, 7, 14* 327:*4, 18* 328:*1, 11, 21*
**stated** 84:*4*
115:*14* 131:*5*
143:*23* 187:*6*
188:*12* 189:*6*
330:*6* 361:*3*
**state-funded**
326:*19*
**statement**
23:*24* 46:*2*
57:*21* 94:*15*
112:*19*
118:*24*
144:*21* 154:*1*
172:*5* 198:*25*
238:*5* 255:*9, 17* 341:*24*
360:*22* 361:*8*
376:*12*
**statements**
136:*14* 197:*8*
270:*3*
**STATES** 1:*1*
9:*8* 68:*23*
69:*7* 97:*23*
109:*21* 121:*1*
160:*17* 165:*2, 6* 230:*15, 22*
232:*11*
255:*23*
316:*16, 21*
326:*21*
328:*15, 18*
329:*1, 11*
**state's** 14:*3*
**stating** 140:*25*
188:*19*
**status** 199:*2, 16, 20* 200:*5*
201:*24* 327:*5, 18* 328:*2, 11*
**stay** 59:*13*

293:*6*
**stayed** 58:*15*
**stays** 241:*16*
**steps** 14:*4*
**stood** 35:*22*
36:*5*
**stop** 59:*10, 17*
69:*25* 75:*9*
132:*9, 15, 18, 20, 21, 22*
187:*16*
192:*18* 202:*13*
**stopped**
301:*22*
**stopping**
317:*21*
**Storage** 7:*20*
233:*23*
**store** 228:*11, 18* 234:*4, 7, 9*
269:*18*
**stored** 244:*10, 12*
**stores** 173:*18*
233:*25* 235:*6, 25* 271:*18*
**story** 36:*11*
292:*12*
**STOY** 3:*15*
**straight** 31:*5*
**straightforwar
d** 83:*14*
129:*18, 22*
**Strategies**
346:*9, 12*
**stream** 116:*21*
117:*8* 120:*2*
121:*2* 122:*19*
124:*21*
141:*24*
148:*15*
170:*21* 371:*1*
**Street** 1:*17*
2:*4, 9, 22* 3:*4, 16* 4:*6, 13, 19* 5:*4, 15*
**strength**
156:*23* 223:*12*
**stretch** 339:*24*
**strike** 213:*13*
241:*25* 253:*5*

258:*14* 259:*3*
276:*24* 277:*6*
286:*1* 299:*5*
**strikes** 182:*15*
**string** 29:*11*
**stroke** 146:*21*
147:*2, 3, 13*
**strokes** 58:*16*
**structure**
25:*22, 23*
**studies** 289:*16*
**study** 246:*19, 22* 247:*3, 10*
248:*4, 6, 18*
269:*10* 271:*2*
297:*20, 23, 24*
298:*12*
300:*16* 307:*19*
**SUBJECT**
1:*9* 15:*20*
29:*12* 30:*17*
123:*8* 124:*1, 19* 146:*21*
183:*8* 185:*25*
186:*2* 187:*8, 23* 190:*20*
192:*6* 196:*2, 13* 200:*22*
202:*10, 25*
204:*22* 207:*5*
376:*12*
**subjects** 61:*7, 9* 205:*3, 12*
**submit** 204:*10*
**submitted**
22:*14* 24:*6*
49:*1* 200:*13*
204:*2* 205:*4*
223:*19*
**subparagraph**
163:*16*
**Subpart**
210:*23*
211:*14, 22*
212:*7, 19*
213:*2*
**subparts**
136:*3* 210:*20*
**subpoena**
260:*8, 20*
261:*10, 14*

**subpoenaeing**
260:*1, 14*
**subpoenaing**
261:*6*
**subsection**
211:*1* 215:*13, 18, 21*
**subsections**
210:*16*
**subsequent**
35:*5* 93:*13*
**subsidiaries**
16:*15, 20*
314:*1, 5*
**subsidizes**
164:*7*
**substance**
60:*14* 289:*10*
**substantial**
52:*9* 177:*9*
346:*22*
**substantive**
21:*11* 52:*3, 10*
**successful**
253:*22* 270:*22*
**successfully**
253:*17* 269:*19*
**successor**
251:*12*
**suffered**
101:*5, 19*
102:*22*
**suffering**
187:*11*
**suffice** 16:*17*
40:*19, 22*
147:*19*
**sufficiency**
106:*24* 218:*25*
**sufficient**
79:*10* 81:*14*
191:*24*
192:*23* 278:*10*
**sufficiently**
107:*10* 295:*13*
**suggest**
144:*19*
187:*15* 200:*6*
325:*6*
**suggested**
44:*16* 72:*12*

145:*21* 147:*8*
358:*21*
**suggesting**
170:*18* 315:*2*
**suggestion**
47:*21*
**suggestions**
23:*4, 5, 8*
46:*24, 25*
47:*18* 65:*15,*
*18*
**suggests** 18:*13*
**suitable** 31:*22*
**Suite** 1:*17*
2:*4, 17* 3:*4,*
*10* 4:*13* 5:*4,*
*10, 21*
**sum** 336:*19*
337:*17*
**summarize**
210:*6*
**summarized**
214:*8* 216:*25*
315:*14*
**summarizes**
139:*15*
**Summary** 8:*6*
210:*16*
213:*22* 214:*4*
215:*23* 324:*11*
**summed** 336:*6*
**sums** 158:*10*
159:*12*
**super** 234:*4, 9*
**supplied**
158:*14* 368:*13*
**supplier**
223:*4, 5*
302:*18*
**suppliers**
148:*16*
**supply** 60:*4*
77:*1* 78:*3*
84:*25* 121:*11*
149:*12*
152:*25*
154:*24* 156:*6,*
*14, 15* 157:*11,*
*18* 158:*4*
170:*11* 196:*1*
304:*23*

367:*18* 368:*7,*
*11, 23* 369:*1,*
*12, 15, 23*
370:*2, 6, 12*
374:*13*
**support** 8:*6*
13:*23* 22:*19*
24:*3* 37:*20*
39:*4* 42:*15,*
*21* 351:*13*
352:*17* 360:*22*
**supporting**
100:*17* 339:*2*
**supports** 283:*6*
**supposed**
144:*7*
**sure** 15:*2*
22:*25* 26:*3*
38:*6* 42:*22*
57:*8* 66:*25*
71:*8* 91:*23*
107:*19*
121:*21*
137:*19* 143:*4*
147:*10, 11*
170:*17* 175:*9*
180:*10*
213:*25*
215:*16*
217:*17*
221:*23* 232:*7*
233:*25* 236:*7*
242:*14*
251:*11, 14*
259:*19, 23*
264:*18*
278:*23*
280:*15*
292:*11, 19*
293:*3, 8*
308:*5* 343:*6,*
*16, 17, 20*
348:*20*
**surprise**
258:*13*
261:*11* 270:*12*
**surprised**
227:*15, 21*
258:*15*
**surprises** 20:*5*

**surprising**
93:*20*
**survey** 97:*24*
98:*1*
**switch** 59:*13,*
*15* 249:*4, 14*
284:*12* 307:*8*
**switched**
307:*18*
**sworn** 10:*10*
12:*12* 44:*16*
190:*16* 206:*9*
377:*9*
**SXC** 253:*12,*
*17, 25* 254:*5, 9*
**SXC's** 253:*21*
**syllogism**
124:*10, 15*
**synonymous**
121:*10*
**System** 8:*6,*
*14* 15:*2*
16:*24* 18:*16,*
*24* 29:*6*
35:*25* 69:*18*
99:*2* 129:*8*
143:*15* 146:*6,*
*24* 219:*12*
239:*22* 241:*9*
242:*25*
244:*11, 24*
245:*11* 247:*4,*
*7, 17* 251:*12,*
*13* 253:*25*
254:*1, 4*
256:*18, 22, 25*
257:*6* 281:*11*
283:*9* 307:*1*
311:*6* 322:*11*
324:*3, 11, 17*
325:*8, 16*
338:*15* 339:*7*
340:*18* 343:*3,*
*11* 344:*2, 3*
345:*18, 19, 24*
346:*5*
**system-based**
341:*16*
**systems**
240:*12*
242:*24* 243:*3*

247:*15* 249:*2,*
*12* 250:*3, 7,*
*15* 251:*4, 16*
253:*8* 256:*6*
257:*2, 3, 7*
342:*13* 345:*15*
**System's**
323:*23*

**< T >**
**table** 10:*24*
42:*23* 43:*6,*
*11, 14, 17*
45:*15* 46:*2*
159:*5, 13*
160:*9, 19*
315:*14* 316:*12*
**tables** 45:*18*
46:*16* 65:*19*
170:*9* 219:*14*
**tact** 333:*8*
**take** 19:*10, 24,*
*25* 43:*8*
49:*13* 59:*12*
67:*1* 70:*7*
73:*22* 74:*2*
88:*1* 91:*23*
96:*22* 101:*2*
112:*19*
115:*18, 21*
124:*12*
125:*19*
131:*21*
132:*13*
134:*16*
137:*22*
142:*20, 25*
143:*18* 147:*3*
149:*25*
163:*16*
164:*15* 166:*2*
169:*2* 172:*5*
177:*11*
208:*24*
243:*10*
259:*18, 22*
260:*20*
261:*14*
262:*14* 265:*2,*
*6, 16, 20*
297:*19*

298:*16, 21*
302:*16, 19*
303:*12* 304:*3*
306:*2* 317:*10,*
*23* 327:*9, 17*
328:*1, 10, 14*
330:*1, 3*
333:*7* 339:*19*
346:*7* 350:*14,*
*20* 365:*16*
**Takeda** 203:*7*
205:*1*
**taken** 1:*13*
96:*9* 147:*16*
204:*3* 301:*20*
302:*13*
303:*23* 373:*15*
**talk** 30:*8*
61:*7, 8* 69:*15*
70:*5, 6*
118:*22*
137:*22*
184:*16* 212:*7*
214:*17*
246:*13*
254:*14*
255:*25*
262:*12*
266:*22, 24*
293:*21, 23*
297:*13* 305:*7*
312:*16*
318:*22* 322:*8*
323:*17* 333:*12*
**talked** 69:*16*
136:*9* 158:*9*
218:*15*
244:*22* 333:*15*
**talking**
114:*22, 23*
119:*9* 135:*16*
141:*9* 166:*4*
190:*25* 198:*5*
207:*13*
215:*19* 234:*2*
242:*8* 247:*11,*
*24, 25* 248:*18*
263:*11, 17*
271:*12, 16*
273:*4* 274:*18*
282:*13* 284:*5*

Confidential Information Subject to Protective Order

297:*24*
298:*15, 25*
300:*24* 301:*4*
302:*7* 311:*25*
323:*14*
330:*15* 332:*2,
3* 333:*11*
340:*11* 374:*15*
talks 210:*23*
212:*20* 235:*1*
Target 7:*18*
233:*21, 24*
234:*1, 4*
targeted 342:*5*
Targets 235:*6*
236:*1*
task 135:*22*
220:*1, 9, 16*
366:*24*
tasked 33:*18*
35:*15*
taught 40:*23*
Taurig 9:*19*
teams 235:*21*
tech 37:*21*
technicians
97:*10*
technology
37:*14* 355:*17*
telecommunica
tions 221:*5*
telephone
29:*2* 65:*14*
267:*3*
tell 11:*11*
13:*1* 33:*20*
42:*20* 44:*5*
45:*21* 83:*21*
84:*21* 89:*7*
90:*2* 100:*9*
163:*6* 196:*8*
197:*21*
200:*20*
203:*25*
204:*21, 23*
205:*12* 214:*2*
258:*15, 24*
264:*15* 268:*4*
271:*9* 274:*16*
282:*17* 298:*6*
308:*23*

317:*18*
318:*20*
320:*12* 330:*2*
333:*25*
telling 19:*19*
57:*16* 83:*19*
187:*25*
198:*15* 199:*8*
353:*20*
tells 239:*21*
280:*4*
ten 38:*18*
78:*10* 128:*24*
134:*19*
tennis 340:*7*
tenure 35:*10*
term 245:*6*
261:*1* 291:*4,
5* 353:*25*
355:*24* 369:*15*
terms 25:*25*
26:*8* 38:*14*
83:*7* 84:*3*
92:*15* 93:*5,
18* 100:*3, 24*
116:*12* 119:*5,
6* 125:*16*
135:*16* 158:*6*
173:*17*
278:*16*
300:*25* 301:*5*
302:*7* 313:*22*
335:*11*
territory
134:*2, 5*
136:*22*
test 19:*23*
152:*18, 22*
251:*13* 305:*20*
testified 10:*11*
13:*11* 46:*23*
179:*23*
195:*18*
208:*21*
344:*24* 374:*24*
testify 13:*6,
12* 194:*19, 22,
25* 195:*10, 15*
200:*16* 203:*7*
testifying
182:*23* 192:*14*

testimonies
71:*25* 198:*13*
testimony
12:*12, 17*
13:*17, 22*
14:*8, 16, 25*
15:*7* 16:*7, 25*
17:*9* 18:*22*
19:*2* 26:*20*
33:*23* 44:*17*
55:*21* 70:*25*
71:*3, 13* 72:*1,
21, 22, 25*
85:*13, 16*
107:*14*
170:*25* 178:*7*
184:*3, 6, 9*
185:*6* 186:*12,
14* 188:*2*
189:*22* 190:*4,
16* 191:*14, 16*
192:*25*
193:*25*
197:*20*
201:*18* 205:*8*
206:*8, 9, 15,
18* 291:*12*
292:*13*
341:*19* 345:*2,
5, 6* 354:*15,
19* 355:*2, 20*
359:*2* 360:*15*
363:*4* 370:*9*
371:*4* 373:*7,
9* 375:*25*
377:*10*
testing 367:*14*
Teva 2:*12, 14*
9:*19* 366:*1*
Texas 5:*10*
text 267:*2*
Thank 43:*10*
53:*18* 91:*1*
92:*2* 135:*4*
181:*5* 211:*13*
214:*23*
232:*11* 233:*8*
234:*11*
280:*21*
284:*12, 22*
295:*24*

318:*10*
350:*14* 351:*8,
22* 376:*8, 19*
Thanks 215:*4*
299:*14*
theories 43:*20*
44:*6* 100:*17*
159:*7, 11*
165:*20*
theory 82:*14,
24* 99:*21, 22*
100:*6* 135:*17*
161:*9, 16*
167:*22* 168:*2,
12* 369:*19*
Therapeutic
8:*18* 58:*13*
62:*7* 136:*16*
142:*21* 143:*1,
8, 13, 25*
145:*8, 14*
146:*1, 5, 9*
147:*16* 163:*5*
348:*17*
355:*25* 356:*3,
9, 14* 357:*16*
358:*3, 19*
359:*10* 363:*1*
364:*5*
therapeutically
358:*24*
359:*22*
361:*20* 362:*3*
Therapeutics
8:*13* 344:*9*
therapies
148:*24* 149:*18*
therapy 59:*15*
62:*16*
thereof
119:*15* 171:*11*
thing 39:*18*
75:*14* 76:*9*
119:*18*
194:*24* 200:*2,
25* 201:*16*
232:*12*
247:*14* 326:*18*
things 24:*9*
37:*1* 40:*14*
58:*4, 23* 60:*2*

61:*18* 62:*20*
64:*19* 78:*13,
14* 85:*11*
93:*3* 115:*14*
176:*5* 194:*3*
220:*12*
247:*13* 252:*6*
256:*19*
271:*11* 285:*5*
303:*14*
358:*24*
373:*18, 20*
374:*2*
think 16:*5*
20:*4, 8, 14*
31:*11* 49:*15*
51:*14* 66:*19*
71:*21* 82:*2*
83:*21* 87:*21*
89:*1* 98:*11*
99:*6* 104:*3*
109:*6* 112:*8*
113:*14, 15*
116:*2* 129:*4*
130:*14*
136:*11*
138:*11*
143:*23*
150:*13*
168:*25*
186:*11*
195:*22*
202:*18*
214:*16* 215:*4*
221:*13*
226:*14*
232:*25* 233:*4*
235:*5, 24*
244:*22* 247:*5*
250:*18* 251:*5*
252:*12*
261:*21* 264:*9*
270:*18* 275:*7*
277:*16*
284:*16*
289:*22* 290:*9,
22* 291:*18*
293:*11* 304:*1*
311:*8* 314:*18*
316:*2* 322:*10*
324:*1* 333:*15*

338:*11, 20*
339:*1*  340:*6*
343:*10*
347:*23*
355:*11*
372:*21*  376:*7,
14*
**third**  69:*22*
70:*9*  76:*9*
129:*13*  328:*4*
331:*5*  332:*10*
346:*9*
**third-party**
35:*6*  149:*4*
211:*2*  277:*10*
332:*9, 11*

**THORNBURG**
3:*9*  91:*7*
**thought**  23:*5*
136:*22*
145:*21*  147:*9*
229:*22*
**thousand**
173:*8*  273:*21*
**Three**  2:*21*
22:*7*  24:*22*
28:*1*  52:*14*
180:*10*
199:*13, 15*
201:*16*  211:*5,
11*  214:*24*
217:*23*  223:*6*
232:*8*  275:*4*
**threshold**
293:*22*  307:*14*
**thresholds**
293:*24*  294:*4,
12, 16, 22*
296:*10*  297:*3*
308:*18*
**Thrift**  34:*22*
35:*7, 10, 11*
36:*10, 11, 13*
129:*13*
**thrust**  372:*7*
**Thursday**  1:*18*
**tier**  237:*20*
**TIFFANY**
2:*16*  9:*18*

11:*14*  365:*25*
366:*3*
**till**  74:*1*
**time**  9:*6*
12:*18*  19:*3, 7,
25*  21:*12*
24:*24*  34:*2, 5*
38:*12, 15, 17,
19, 20*  47:*16*
49:*11*  66:*20*
69:*22*  70:*9*
91:*23*  98:*23*
106:*20*
125:*12, 15*
130:*19*
132:*21*
134:*17, 22, 24*
137:*11*
145:*20*  149:*3*
155:*4*  180:*12*
196:*21*
198:*16*
226:*13*
228:*12, 19*
236:*22*
241:*10, 16*
253:*9*  254:*25*
255:*4*  256:*3,
11, 23*  257:*9*
266:*11*
286:*13*
292:*20*
293:*15*  295:*6*
299:*21*
303:*19*  304:*4*
320:*11*  327:*9,
17*  328:*1, 5,
10*  334:*23*
337:*11*
338:*11, 15, 16,
20, 25*  339:*1,
7*  355:*10*
356:*18*  367:*6,
15, 21*  368:*3,
8*  369:*11*
**timeframe**
49:*17, 20*  77:*6*
**times**  35:*16*
52:*14*  95:*25*
192:*8*  201:*21*
293:*2*  339:*9*

366:*23, 25*
367:*4*
**TIMOTHY**
1:*12*  7:*2, 8*
9:*11*  10:*9*
377:*7*  378:*3,
21*
**title**  268:*10*
269:*4*  324:*10*
**tobacco**
119:*21*  122:*10*
**today**  12:*3, 18*
19:*23*  20:*4*
22:*1*  26:*12*
34:*17*  36:*24*
45:*13*  77:*10,
14*  117:*24*
118:*22*  133:*4*
176:*16*
184:*16*
192:*15, 23*
197:*3, 9, 21,
25*  198:*16*
200:*5, 17*
202:*3*  205:*20*
206:*15*
220:*22*
299:*17*
307:*11*
313:*17*
322:*25*  328:*9*
329:*25*
338:*24*
343:*19*
364:*14*
366:*13*
370:*24*  375:*15*
**Today's**  9:*6*
184:*8*  338:*17,
21, 25*
**told**  30:*25*
35:*15*  65:*23*
123:*2*  176:*9*
190:*17*  195:*2*
198:*19*
199:*17, 22*
200:*23*  348:*22*
**Tom**  27:*25*
41:*16, 17*
42:*10*  43:*14*
54:*15*

**top**  16:*2*
24:*15*  69:*9*
230:*18, 21*
255:*10, 18*
**topic**  66:*18,
19*  135:*21*
309:*5*
**topics**  56:*9*
104:*14*
204:*16, 18, 20,
25*  205:*7, 21,
22*  206:*5, 7,
18, 20, 23, 24*
207:*17, 21*
208:*5*
**topped**  288:*24*
**total**  333:*1*
336:*18*
337:*16, 20*
338:*19, 21*
372:*5*
**totally**  47:*3*
48:*24*  104:*16*
**touched**  311:*8*
**TPA**  130:*8*
275:*19, 23*
276:*1, 4*
277:*10*  278:*2,
10, 11, 19*
279:*1, 8, 16*
280:*3, 8, 16,
23*  281:*10*
283:*19, 21*
**TPAs**  277:*8*
**TPA's**  280:*18*
283:*20*
**TPP**  128:*8, 9*
129:*14*  160:*3*
161:*3, 24*
165:*18*
210:*24*  211:*2,
7, 15*  212:*4,
15, 17*  213:*9*
249:*2, 14, 17,
25*  250:*10*
272:*5, 8, 14,
21*  273:*1, 15,
18, 20*  275:*5,
16, 22, 24*
276:*3, 5, 13*

277:*2*  278:*11*
318:*24*  331:*10*
**TPPs**  105:*14*
127:*25*
133:*15*  158:*8*
160:*11*  204:*7*
213:*6*  250:*9*
274:*19, 21*
275:*12*
276:*23*
321:*13*
330:*22*
352:*11*
367:*20*  368:*2*
**track**  13:*14*
65:*8*  77:*3, 8,
10*  133:*23*
134:*3*  241:*17,
19*  242:*23*
243:*1*  249:*11*
304:*3*  305:*21*
306:*18, 22, 25*
307:*3, 6, 8, 12*
**tracking**
338:*15*  339:*7*
**tracks**  109:*25*
**Trade**  3:*4*
69:*19*  121:*13*
151:*7, 22*
155:*19*
**trading**  12:*23*
78:*7*
**traditional**
131:*20*
**trained**  39:*13,
18*
**training**  21:*9*
32:*4*
**transaction**
127:*25*
128:*14*  131:*5,
7, 8, 21*
244:*17, 21*
**transactions**
173:*1*  269:*20*
277:*23*
**transcript**
14:*25*  188:*23*
189:*2*  190:*22*
191:*14*  378:*17*

transfers
306:17
translate
172:6
transmission
244:14
transmit
244:5, 9, 13
transparent
131:13, 17
transposed
337:23
TRAURIG
2:14
treat 147:3
148:25
treated 58:6
treating 58:10
147:2
tremendous
58:12 173:11
308:11 328:14
trend 133:22
Tricare 165:11
trick 214:15
tricky 249:8
tried 75:15
337:4
trouble 183:17
true 23:24
24:1 63:23
79:17, 19
93:23 107:21
114:23
115:21
124:17
132:25
144:21
145:12
149:25 151:5
169:11
190:15
348:21 377:9
378:17
Trust 246:19,
22 247:10, 24
248:6, 18
try 19:8
220:4 234:20
243:24
252:11

297:17
304:12 317:1
trying 16:1
49:14 51:1,
18 52:18
75:9 78:16
79:25 87:24
104:19
170:17
171:14
183:16
192:24
214:15
217:10
221:13
229:18 261:2
268:15 274:2
311:4 328:20
335:20 343:7,
11 362:11
370:5 372:13
turn 18:15
21:5 66:14
73:19 85:20
94:9 108:5
125:5 135:24
142:18 159:4
215:15 271:8
318:19 352:3
358:18
turned 23:16
192:2
TV 308:6
twice 47:17
62:23 189:8
249:25 250:9
277:17 302:15
two 12:13
19:14 20:9
24:15 76:23
119:10
147:22
175:18
198:14, 17
199:8, 18
200:21 201:1,
11, 19 215:5,
25 216:8, 16
221:20
230:19, 21
243:14 245:1

247:18
250:20 251:1,
3, 24 253:9
257:11
271:24 275:4
291:13 309:8,
13, 23 311:19,
25 330:6
340:6 366:14
367:2, 5
two-year
249:3
type 101:7
223:9 298:24
302:6
types 37:8, 12
93:18 170:6
typically
17:23 19:4
38:17 134:6
240:15
251:20
271:19 293:1
310:5
typo 337:5
339:16

< U >
U.S 4:2, 3
68:7 69:19
138:15 151:7,
23 154:13
155:19
255:11, 19
U.S.C.A 7:13
117:18
Uh-huh 345:2
ULMER 5:3
ultimately
25:6 64:21
131:24
173:25
253:16
273:18 274:23
umbrella
314:2
Um-hum
71:13 243:12
unable 161:25
unacceptable

340:8
unaware 109:8
unbeknownst
113:25 114:2
unclear 33:24
uncontaminate
d 148:16
149:17 150:15
undergo 47:25
undergraduate
40:24
underlying
253:22
underpin 44:7
underpinning
109:13
understand
12:9 13:20
14:6 19:15,
16, 20 20:7
21:6, 14
23:12 36:25
39:17 40:15
47:3, 21
48:24 51:2
52:18, 21, 23
68:20 77:23
78:16 80:23
81:15 84:10
91:16 95:12,
18 98:12
99:8 103:18,
22 104:19, 21
105:12
107:11, 23
108:24 109:2,
7, 18 110:16,
19 112:22
116:17 123:6,
16 124:16, 22,
25 125:21
126:10
138:18, 23
140:3, 7
141:12 151:5
152:9 156:4,
5, 19 157:9
159:10, 16
160:24 161:8
168:21, 25
169:12 171:4,

14 174:14
181:11 188:3,
5 197:20
199:7 201:14
209:20 210:2
217:6 220:24
222:23 230:3
231:24 232:1
257:19 260:4
263:15 271:3
274:7 278:14,
15 279:6, 20
316:21
354:17 361:5
364:21 369:6
371:10, 13
374:6

understandable
244:6
understanding
17:10 29:24
30:4 38:4
86:21 89:17
98:18 100:3,
5, 23 114:18
116:14
153:19, 22
155:25 185:7
196:22
199:10
200:17 265:9
268:16 335:2
353:24 369:4,
7
understands
195:15
understood
13:18 19:17
26:19 46:7,
18 48:16
95:6 109:13
151:20
157:17 160:8,
21 176:8
179:4 234:10
240:19
undertake
246:9 327:11,
22 329:6

Confidential Information Subject to Protective Order

undertaken
328:*22*

undertook
74:*18*

unfamiliarity
270:*7*

Unfortunately
58:*23*  61:*18*

uninsured
132:*3*

Unintelligible
171:*21*  325:*18*

unique  307:*2,
4*

UNITED  1:*1
9:8*  68:*23*
230:*15, 21*
255:*23*  316:*16*

universal
306:*24*

universe  373:*2*

University  8:*6*
38:*24*  322:*11*
323:*23*  324:*3,
11, 17*  325:*7,
16*

unjust  82:*4,
25*  99:*22*
117:*14*
168:*13*
176:*24*  177:*5*

unpack  13:*15*
23:*11*  51:*1*
57:*12*  118:*20*
144:*4*  169:*21*
341:*18*

unreal  136:*11*

unspec  332:*10*

unspecified
331:*6*

unwilling
204:*18*

update  48:*15*
199:*1*  201:*25*
203:*4*  221:*22*

upkeep  97:*15*

upstream
174:*17*
176:*10, 16*
178:*1*

USA  2:*12*

usable  326:*23*

usage  291:*4*
305:*21*

use  84:*23*
90:*17*  92:*1*
94:*3, 18, 20*
132:*8, 19*
152:*24*  162:*7*
179:*8*  218:*7,
13*  219:*3, 18*
221:*23, 25*
243:*19*  245:*1*
249:*3, 18, 21*
251:*10, 23*
252:*22*  254:*6*
257:*6*  261:*1*
290:*8*  291:*14*
304:*5*  330:*16*
332:*5*  344:*16,
20, 21, 22*
346:*10, 13, 14,
24*  347:*19*
348:*23, 24*
350:*4*  351:*10,
14*  352:*25*
353:*12*
355:*24*
358:*10*  361:*1,
5*

users  204:*8*

uses  134:*5*
302:*24*

utilize  28:*5*


< V >

Vague  15:*12*
33:*25*  37:*22*
41:*8*  43:*23*
50:*3*  62:*25*
71:*16*  72:*7*
78:*23*  81:*1*
82:*7*  83:*2, 25*
86:*13*  95:*22*
98:*15*  100:*19*
102:*15*  103:*1,
10, 20*  104:*7*
105:*5, 17*
110:*22*
111:*13*
113:*14*  116:*2,*

9, 24*  125:*7*
131:*1*  133:*6*
158:*1*  224:*9,
25*  227:*1*
262:*18*  264:*4*
274:*6*  279:*4*
329:*3*  358:*12*

validated
245:*5*

validation
367:*14*

VALSARTAN
1:*3*  7:*10*
52:*20*  101:*7*
102:*2*  118:*21*
147:*24*  148:*5,
14, 16*  149:*17*
165:*18*
254:*23*  274:*3*
285:*14*
289:*24*
290:*24, 25*
291:*20, 21*
296:*24*
305:*14*  317:*6*
331:*2, 16*
332:*3, 14, 25*

valsartan-
containing
124:*17*
140:*22*  158:*7*
271:*23*
273:*10*
274:*11, 23*
275:*14, 24*
276:*6, 20*
284:*7*  285:*10,
21, 24*  287:*10*
294:*18*

value  58:*13*
109:*17*
136:*15, 20*
142:*22*  143:*2,
6, 8, 14, 20, 25*
144:*1, 2, 8, 18*
145:*8, 9, 14,
25*  146:*14*
155:*8, 14*
256:*20*

values  245:*13*
246:*1*  309:*25*

variability
250:*6*

variation
271:*22*  273:*8*

variations
294:*24*  296:*8*

varied  296:*4*

various  107:*5*
133:*20*  136:*5*
159:*7*  176:*5*
218:*11*  236:*23*

vary  272:*6*
307:*4, 5*

vast  182:*17*

VCD  59:*13*
62:*7, 16*
70:*17*  76:*19*
127:*13*
128:*13*  143:*6*
147:*4, 15*
149:*20*
164:*16*  370:*2*

VCDs  80:*4*
102:*12*  103:*8*
108:*20*  126:*5*
142:*7, 22*
144:*6*  149:*13*
150:*5*  271:*16*
285:*7*  367:*21*
368:*3*  370:*16*

vehicles
173:*12*

venture  147:*1*

verbiage  75:*24*

verified
288:*16*

verify  156:*1*
327:*4*

verifying
328:*25*

Version
221:*16*

versions  257:*3*

versus  37:*20*
45:*20*  82:*4*
271:*17*  310:*19*

vest  92:*18*
93:*4*

Veterans
165:*11*

vice  27:*24*

video  9:*7*
376:*20*

Videoconferenc
e  1:*16*

videographer
6:*6*  9:*3, 5*
10:*6, 23*
11:*14*  67:*3, 5,
8*  135:*6, 8*
209:*7, 9*
266:*16, 18*
318:*4, 7*
365:*19, 21*
366:*7, 10*
376:*21*


VIDEOTAPED
1:*12*

view  100:*16*
102:*13, 21*
103:*16, 18*
104:*4*  107:*9*
108:*1*  142:*24*
171:*14, 15*

viewed  170:*19*
355:*19*

views  20:*25*
21:*4*  44:*7*
54:*4, 8, 13*
55:*4, 23*
56:*10*  64:*25*
104:*22*  117:*6*
136:*6*  139:*9*

violated  19:*7*

violating
120:*18*  179:*14*

violations
140:*4*  180:*1*

Virginia  35:*1*

virtue  108:*18*

vision  324:*19*

volume
255:*11, 19*
343:*8*

voluntarily
153:*3*  373:*16*

voluntary
59:*7, 25*
115:*17*  149:*21*

Confidential Information Subject to Protective Order

**< W >**
**W-2s** 315:*16*
**Wacker** 2:*16*
**Wait** 199:*7*
256:*22*
**waived** 377:*13*
**Walgreens**
88:*7* 306:*16*
307:*7*
**Walnut** 5:*4*
**WALSH** 2:*20,*
*21*
**want** 10:*7*
19:*24* 66:*24*
87:*8* 91:*14,*
*25* 106:*22*
108:*6* 125:*24*
126:*2* 132:*7,*
*21* 134:*17, 24*
135:*1, 2*
144:*16*
176:*12*
186:*18*
192:*18* 194:*9*
201:*9* 226:*12*
247:*22*
251:*21*
263:*17*
264:*18*
270:*15*
279:*10, 11, 23*
334:*11*
**wanted** 36:*1*
41:*3* 78:*21*
142:*4* 200:*12*
**Warning** 7:*14*
138:*2, 15*
139:*3, 15*
141:*4* 150:*4,*
*11*
**warrant** 355:*7*
**warrants**
355:*5*
**Warranty**
7:*12* 82:*4, 25*
99:*22* 106:*1*
168:*13*
352:*11* 353:*1,*
*2, 9, 10, 13, 14,*
*16, 17, 18*
354:*1, 5, 13,*

*18, 20* 355:*2,*
*12, 14, 18*
361:*2, 6*
**washing**
288:*25*
**Washington**
6:*5*
**watched** 308:*6*
**watching**
303:*11*
**water** 58:*22*
**way** 11:*25*
18:*12* 23:*13*
48:*4* 58:*12*
63:*21* 78:*13,*
*14, 17* 82:*12*
83:*22* 84:*21*
87:*2* 91:*21*
92:*23* 98:*17,*
*18* 99:*21*
101:*4* 102:*7*
117:*9* 120:*8,*
*15, 25* 131:*11*
139:*2* 143:*24*
145:*18*
159:*24*
161:*13* 199:*2*
201:*12* 207:*4,*
*10* 215:*14*
218:*19*
228:*24*
270:*21*
289:*15*
304:*15*
326:*11* 352:*5*
362:*16* 374:*9*
377:*17*
**ways** 136:*5*
165:*3*
**weave** 21:*8*
**website** 59:*5*
119:*7*
**websites**
326:*22*
**week** 338:*22,*
*25*
**weigh** 117:*9*
**weighed** 99:*23*
**Welcome**
266:*21* 318:*12*

**well** 11:*2*
13:*3* 17:*5*
18:*22* 23:*17,*
*25* 25:*21*
30:*7* 31:*21*
36:*9* 38:*16*
49:*4* 51:*1*
57:*4* 58:*4*
62:*9* 73:*12*
82:*2* 84:*24*
94:*23* 114:*22*
117:*5* 132:*8*
136:*21* 139:*8*
144:*4* 145:*20*
148:*4* 166:*7,*
*18* 169:*21*
171:*3* 174:*8*
177:*8* 184:*8*
195:*2* 204:*8,*
*10* 205:*11*
232:*15*
240:*10*
242:*10, 18*
257:*19*
258:*11* 261:*5*
267:*24* 286:*9*
296:*6* 307:*7*
311:*5* 313:*15,*
*24* 321:*5, 10,*
*12* 323:*8*
326:*16* 332:*5*
338:*22*
345:*12*
351:*19*
360:*10* 361:*5*
363:*22* 365:*7*
374:*12*
**went** 27:*18*
34:*2, 5* 46:*3*
48:*19* 59:*3*
61:*19* 65:*23*
67:*9* 97:*18*
99:*15* 104:*14*
161:*3* 221:*25*
226:*15*
242:*22*
247:*17* 307:*9*
353:*7* 354:*12*
**we're** 10:*7*
11:*21* 12:*5*
18:*11* 19:*3*

21:*11* 24:*21*
67:*9* 114:*22,*
*23* 118:*21*
132:*9, 13, 22*
133:*14* 135:*8*
139:*3* 141:*9*
158:*21*
164:*19* 178:*8*
190:*8* 236:*2*
239:*9, 10, 13*
248:*18*
259:*15*
264:*19* 273:*4*
274:*2* 284:*5*
302:*15*
317:*20* 318:*9*
332:*2, 3, 8*
333:*11*
339:*24*
342:*25* 352:*4*
362:*2* 374:*11,*
*18* 376:*14*
**West** 2:*16*
3:*4* 5:*15* 35:*1*
**we've** 33:*7*
38:*3* 66:*16*
80:*11* 128:*23*
156:*20*
205:*11*
244:*22* 348:*9*
365:*9*
**whatsoever**
238:*8* 316:*25*
365:*14*
**WHEREOF**
377:*19*
**WHITELEY**
2:*7, 8*
**Whitesville**
35:*1*
**WHITNEY**
5:*14*
**wholesaler**
152:*17*
172:*22, 25*
173:*14, 21*
**wholesalers**
68:*14* 85:*2*
112:*12* 114:*1*
117:*15*
152:*21*

169:*23* 170:*4*
171:*18* 173:*4*
174:*18*
176:*11* 287:*3*
370:*3*
**wide** 23:*17*
**wish** 62:*20*
378:*4*
**Withdraw**
299:*11, 12*
**withdrawing**
299:*9*
**withhold**
93:*16*
**WITNESS**
14:*22* 15:*14,*
*24* 16:*10*
17:*12, 16*
18:*13* 20:*22*
25:*12* 27:*8*
28:*10* 30:*4,*
*19* 32:*11*
34:*9* 37:*24*
39:*23* 40:*12*
41:*10* 42:*2*
44:*10, 23*
45:*8* 46:*1, 15,*
*23* 47:*14, 17*
48:*7* 49:*8*
50:*6* 51:*9, 25*
52:*9* 53:*2, 10,*
*15, 18* 54:*24*
56:*7, 24*
57:*20* 60:*19,*
*25* 61:*4, 13,*
*16* 63:*2, 12,*
*20* 64:*4, 14*
65:*4, 13*
67:*18, 25*
68:*13* 69:*4,*
*22* 70:*10, 14*
71:*8, 9, 18*
72:*9, 20* 73:*6,*
*17* 74:*7, 22*
75:*23* 77:*21*
78:*25* 80:*8,*
*17* 81:*4, 23*
82:*9, 19* 83:*5*
84:*2, 16*
86:*15* 87:*14,*
*16* 89:*12*

90:5, 10, 14
94:20  95:4,
12, 24  98:17
99:12  100:2,
13, 22  101:16,
24  102:17
103:3, 13, 23
104:9  105:7,
20  107:16
109:8, 21
110:6, 24
111:15, 22
112:8  113:4,
15  114:17
115:3, 4, 13
116:4, 11
117:1, 13, 20
118:14  120:7
121:8  122:5,
24  123:13, 21
124:6, 25
125:4, 10
127:2, 19
128:6  129:3
130:2  131:4
133:10, 19
134:20  135:3
137:2, 17
138:23
140:11  141:4,
18  142:2, 13
143:13, 23
144:13  145:2
146:5  148:4,
21  149:11
150:10, 22
151:12  152:3,
13  153:19
154:6, 17
155:3, 13, 23
156:14  157:3,
15  158:3, 23
159:20
160:16
161:21
162:13, 23
163:14  164:4
165:25
166:14, 24
167:16  168:2,
18  169:8

170:24
171:25
172:12
174:22  175:5,
15  176:21
177:4  178:4,
15  179:1, 16,
21  180:5, 21
181:4, 5, 18
182:7, 25
183:7, 10, 17,
18, 25  185:20
187:18, 22
188:16, 24
189:6, 16
190:24
191:10  193:5,
14, 21  195:6
196:18
198:24
200:11  201:6,
22  203:3
205:16  206:1,
11  209:2, 4,
12  213:21
214:13
216:12, 19
217:7  219:9,
22  223:3
224:11  225:2
226:10  227:3,
21  229:18
230:8, 18, 25
233:17
235:11  236:6,
22  238:13
241:15  242:6
243:7, 24
245:18  247:2
248:24
250:14
258:23
259:21  260:5,
25  261:19
262:20  264:6,
12  267:14
269:4  270:8
271:2  272:5,
19, 25  273:14,
24  274:8
275:2  276:10

278:7, 15
279:7, 21
280:12
281:14  285:3
286:6, 25
287:19, 21
288:3, 14
289:14  290:4
292:1, 18
293:19  295:3
296:16  297:8
301:11  303:9,
22  305:17
306:9  310:4,
25  311:15, 24
312:13
313:15  316:1
317:15, 23
319:17  320:8,
18  321:2, 23
323:4  325:10,
20  327:22
328:6  329:6,
11, 17, 22
330:7  331:5,
21  332:18
333:7  335:9,
21  336:8
338:3  339:6
341:4, 23
343:10, 13
344:17  345:9,
23  347:9, 23
348:14  349:4,
13, 24  350:10
352:24  354:4
355:1, 11
356:8, 19
357:4  358:14
359:5  360:7,
18  361:1, 13,
24  362:10, 21
363:6, 12, 19
364:10  368:5
369:18
370:10, 19
371:6, 22
373:8  374:11,
19  377:7, 10,
14, 19

**witnesses**  71:4
**woke**  293:9
**Wonderful**
318:22
**word**  52:9
124:9  136:18
261:10
352:25  353:2,
9, 10, 13
354:1, 5, 12,
18, 20  361:2
369:8, 11
370:19
**words**  19:1
23:1  51:10
108:9, 14
137:8  159:14,
24  202:19
254:7
**work**  15:11
23:14, 21
24:5, 12
28:11, 12
29:21  31:25
32:15  37:16,
18, 19, 24
38:18, 21
39:7, 15
40:14  41:6,
20  42:11, 21
45:4  55:8
57:11  58:4
62:9  78:6
90:11  100:8
125:16  137:5
147:20
181:13
182:11, 16, 18
183:4, 5, 13,
14, 21  184:17,
21  185:2
203:22, 25
236:15  251:1
253:20, 22
258:9  266:4,
8  288:21
304:12
310:14
328:19
333:24  334:3,

8  337:16, 22
338:5  342:7
**worked**  30:7
37:14  41:11
42:3  47:22
61:22, 23
84:19  178:10
191:17
236:23
250:20
265:24
290:10  335:1
367:11
**worker**  13:21
**workers**  13:3,
19, 21  14:3, 5
37:6  165:14
**working**
34:21  38:2, 3
41:12  49:17
125:14
180:24  253:6
270:5  307:20
328:20  366:19
**works**  27:14
34:13  57:25
58:23  62:11,
12  74:15
85:10  144:17
171:1, 4
181:12  373:23
**world**  57:25
58:4, 23  60:1
62:9, 11, 12,
19, 23  85:10
97:5  136:12
274:3, 13
372:22, 23
373:11, 23
374:2
**worry**  39:7
**worth**  63:8
108:2  112:24
**worthless**
58:14, 22
60:7  62:4
84:25  108:17
142:9  144:20
154:23
**worthlessness**
60:16

Confidential Information Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| wrapping | 262:6  269:4 | 7:15 | | |
| 66:18 | 272:5  301:18 | ZHP's  139:10 | | |
| write  23:1 | 305:2  310:4, | zip  269:19 | | |
| 42:10  47:22 | 16  311:24 | ZMICK  4:13 | | |
| 48:9, 18 | 313:23 | Zoom  1:16 | | |
| 53:11  57:13 | 325:10  331:5 | 2:3, 7, 18  3:3, | | |
| 106:16  111:4 | 341:4  348:14 | 6, 14  4:5, 6, | | |
| 294:24  319:8 | 349:4  355:1, | 12, 18  5:3, 6, | | |
| 361:15 | 11  361:1 | 14, 17  6:3 | | |
| writes  300:7 | 363:19  373:8 | | | |
| writing  28:23 | year  26:2, 7 | | | |
| 42:24  53:21 | 34:25  35:8 | | | |
| 66:2  101:11 | 38:24  270:10 | | | |
| 105:12 | 304:18, 19 | | | |
| written  21:16 | 309:7, 18, 25 | | | |
| 23:8, 10  46:8 | 310:5 | | | |
| 47:10  65:8 | yearly  153:15, | | | |
| 122:25  361:13 | 22 | | | |
| wrong  18:10 | years  12:19, | | | |
| 27:14, 15 | 20  13:13 | | | |
| 58:3  80:3 | 14:11, 12 | | | |
| 180:17  182:3 | 23:23  34:14, | | | |
| 188:20  189:4 | 21  35:7 | | | |
| 192:3  214:16 | 78:10  118:5 | | | |
| 254:7  362:20 | 139:4  180:10, | | | |
| 373:1 | 16  181:10 | | | |
| wrote  24:9 | 198:13 | | | |
| 45:22  46:19 | 221:23  226:2, | | | |
| 54:4  206:24 | 7, 24  227:17 | | | |
| 207:22  208:6 | 228:6  233:2 | | | |
| | 236:17  238:1, | | | |
| < X > | 10  253:15 | | | |
| Xponent | 297:17  310:8 | | | |
| 330:16 | Yep  138:6 | | | |
| | yes/no  266:21 | | | |
| < Y > | yield  365:5 | | | |
| Yeah  11:24 | yielding | | | |
| 24:14  58:19 | 168:12 | | | |
| 68:13  71:24 | York  5:16 | | | |
| 74:7  77:21 | 319:5, 9, 21, | | | |
| 104:2  123:13 | 24  320:4, 14 | | | |
| 133:10  148:7 | 321:19  322:4 | | | |
| 162:13 | | | | |
| 175:23 | < Z > | | | |
| 176:13 | zero  102:1, 5 | | | |
| 193:21 | Zhejiang  4:2 | | | |
| 198:24  206:1 | ZHP  7:14 | | | |
| 235:11 | 138:3, 17 | | | |
| 237:17  247:5 | 140:16  159:25 | | | |
| 250:14  251:3 | ZHP01344159 | | | |
| 253:14  258:7 | | | | |

Exhibit211

Confidential Information - Subject to Protective Order

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF NEW JERSEY

 3     *****************************

       IN RE: VALSARTAN, LOSARTAN,

 4     AND IRBESARTAN PRODUCTS          MDL No. 2875

       LIABILITY LITIGATION

 5     *****************************

       THIS DOCUMENT APPLIES TO ALL       HON ROBERT B.

 6     CASES                              KUGLER

       *****************************

 7

 8                  MARCH 25, 2022

 9        CONFIDENTIAL INFORMATION - SUBJECT TO

10              PROTECTIVE ORDER

11       Videotaped Deposition of LAUREN J. STIROH,

12     Ph.D., commencing at 10:13 a.m., at the offices of

13     Duane Morris, LLP, 1540 Broadway, New York, New

14     York, before Jeffrey Benz, a Certified Realtime

15     Reporter, Registered Merit Reporter and Notary

16     Public within and for the State of New York.

17

18

19

20

21

22

23

24
```

Page 2

A P P E A R A N C E S:

HONIK LLC
Attorneys for Plaintiffs
   1515 Market Street, Suite 1100
   Philadelphia, Pennsylvania 19102
BY:  RUBEN HONIK, ESQ.  (remote)
   267-435-1300
   ruben@honiklaw.com

KANNER & WHITELEY, L.L.C.
Attorneys for Plaintiffs
   701 Camp Street
   New Orleans, Louisiana 70130
BY:  CONLEE S. WHITELEY, ESQ.  (remote)
   DAVID J. STANOCH, ESQ.  (remote)
   504.524.5777
   c.whiteley@kanner-law.com
   d.stanoch@kanner-law.com

DUANE MORRIS, LLP
Attorneys for Defendants Zhejiang Huahai Pharmaceutical
Co., Ltd., Prinston Pharmaceutical Co., Ltd., Prinston
Pharmaceutical Inc., Huhai U.S., Inc., and Solco
Healthcare US, LLC
   30 South 17th Street
   Philadelphia, Pennsylvania 19103-4196
BY:  SETH A. GOLDBERG, ESQ.
   DANA B. KLINGES, ESQ. (remote)
   LAUREN PUGH, ESQ. (remote)
   215.979.1164
   sagoldberg@duanemorris.com
   dklinges@duanemorris.com
   lpugh@duanemorris.com
   -and-
   REBECCA E. BAZAN, ESQ. (remote)
   505 9th Street, N.W., Suite 1000
   Washington, D.C. 20004-2166
   202.776.5253
   rebazan@duanemorris.com

Page 3

A P P E A R A N C E S: (Ctd.)

CROWELL & MORING LLP
Attorneys for Defendant Cardinal Health, Inc.
   1001 Pennsylvania Avenue, NW
   Washington, D.C. 20004
BY:  DANIEL T. CAMPBELL, ESQ. (remote)
   202.624.2774
   dcampbell@crowell.com

GREENBERG TRAURIG LLP
Attorneys for Defendants Teva Pharmaceutical
Industries, Ltd., Teva Pharmaceuticals SA, Inc.,
Actavis LLC, and Actavis Pharma, Inc.
   77 South Wacker Drive, Suite 3100
   Chicago, Illinois 60601
BY:  TIFFANY M. ANDRAS, ESQ. (remote)
   GREGORY E. OSTFELD, ESQ. (remote)
   312.456.1065
   andrast@gtlaw.com
   ostfeldg@gtlaw.com

HUSCH BLACKWELL LLP
Attorneys for Defendant Express Scripts, Inc.
   190 Carondelet Plaza
   St. Louis, Missouri 63105
BY:  MATTHEW D. KNEPPER, ESQ. (remote)
   314.480.1848
   matt.knepper@huschblackwell.com

PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
Attorneys for Defendant Mylan Pharmaceuticals, Inc.
   One Oxford Centre
   Pittsburgh, Pennsylvania 15219
BY:  JOHN B. ZAPPONE, ESQ. (remote)
   412.263.4362
   JBZ@Pietragallo.com

Page 4

A P P E A R A N C E S: (Ctd.)

HINSHAW & CULBERTSON, LLP
Attorneys for Defendant SciGen Pharmaceuticals
   53 State Street
   Boston, Massachusetts 02109
BY:  KATHLEEN E. KELLY, ESQ. (remote)
   617.213.7000
   kekelly@hinshawlaw.com

BARNES & THORNBURG, LLP
Attorneys for Defendants CVS Pharmacy, Inc., and
Rite Aid Corporation
   11 S. Meridian Street
   Indianapolis, Indiana 46204-3535
BY:  KARA KAPKE, ESQ. (remote and in-person)
   317.231.6491
   kara.kapke@btlaw.com

BUCHANAN INGERSOLL & ROONEY PC
Attorneys for Defendant Albertsons, LLC
   1700 K Street, N.W. Suite 300
   Washington, D.C. 20006-3807
BY:  ASHLEY D.N. JONES, ESQ. (remote)
   202.452.7318
   ashley.jones@bipc.com

HILL WALLACK LLP
Attorneys for Defendant Hetero Labs Limited
   2 Bridge Avenue, Suite 211
   Red Bank, New Jersey 07701
BY:  JACLYN M. KAVENDEK, ESQ. (remote)
   732.631.8315
   jkavendek@hillwallack.com

ALSO PRESENT:
   DANNY ORTEGA, Videographer

Page 5

INDEX

LAUREN J. STIROH, Ph.D.

| Examination by: | Page |
|---|---|
| MR. HONIK | 7 |
| MS. KAPKE | 228 |
| MR. HONIK | 234 |

EXHIBITS

| Number | Description | Page |
|---|---|---|
| Exhibit 1 | Expert report of Lauren J. Stiroh, Ph.D. | 9 |
| Exhibit 2 | MTD Opinion 3: Warranty Claims | 124 |
| Exhibit 3 | Prohibited Acts, 21 USCA Section 331 | 173 |
| Exhibit 4 | Transcript of deposition of William J. Lambert | 188 |
| Exhibit 5 | Invoice from NERA Economic Consulting | 197 |
| Exhibit 6 | Summary of invoices | 197 |
| Exhibit 7 | Opinion in LaPoint v. AmerisourceBergen Corp. | 218 |

                ***

WITNESS DIRECTED NOT TO ANSWER:
Page 211

Page 6

1    THE VIDEOGRAPHER:  We are now on the
2  record.  My name is Danny Ortega, and I am
3  the legal videographer for Golkow
4  Litigation Services.
5    Today's date is March 25, 2022, and
6  the time is 10:13 a.m.
7    This video deposition is being held at
8  1540 Broadway, New York, New York, in the
9  matter of Valsartan, Losartan, and
10  Irbesartan Products Liability Litigation,
11  for the United States District Court,
12  District of New Jersey.
13    The deponent today is Dr. Lauren
14  Stiroh.
15    All counsel will be noted on the
16  stenographic record.
17    The court reporter today is Jeff Benz,
18  who will now swear in the witness.
19  LAUREN J. STIROH, Ph.D.,
20  called as a witness, having been first
21  duly sworn by Jeffrey Benz, a Notary
22  Public within and for the State of New
23  York, was examined and testified as
24  follows:

Page 7

1  EXAMINATION BY MR. HONIK:
2    Q.  Dr. Stiroh, good morning to you once
3  again.
4    A.  Good morning.
5    Q.  As I introduced myself briefly to you
6  earlier, my name is Ruben Honik.  I am one of
7  the plaintiffs' attorneys in this case.  There
8  are, as you might expect, a number of other
9  plaintiffs' lawyers who are observing on Zoom,
10  together with a great many defense attorneys.
11    You're aware of all that?
12    A.  I am, yes.
13    Q.  And I know that you've given testimony
14  under oath before, and I want to take a moment,
15  in a moment, to highlight a couple things.
16    But inasmuch as I'm in Philadelphia
17  and you're in New York, who is in the room with
18  you?
19    A.  The court reporter, the videography,
20  and Seth Goldberg.
21    Q.  Okay.  And I gather you're in the
22  offices of Duane Morris in New York?
23    A.  I am.
24    Q.  I don't know -- I know you've given

Page 8

1  many depositions before.  I don't know how many
2  you've done remotely since the pandemic.  But
3  there are a couple of housekeeping items that I
4  think are worth mentioning so that we can end up
5  with a good transcription and video of your
6  testimony today.
7    First, I'll be the principal
8  questioner today on the plaintiffs' side, and as
9  is always the case, it's my job to make myself
10  clearly understood to you.
11    If you don't understand a question or
12  you haven't heard my question, if there's a
13  technical problem, it's really important that
14  you let me know so that I have an opportunity to
15  restate it or clarify it for your benefit.
16    Can we agree to that?
17    A.  Yes.
18    Q.  I'm sure you're aware that it's
19  important that we not speak over one another,
20  largely because the court reporter needs to be
21  able to take down one speaker at a time.
22    That's sometimes a challenge when it's
23  conducted remote.  I'll do my level best not to
24  ask a new question as you're speaking, and if

Page 9

1  you could, after you give your answer, maybe
2  pause for a second in the event that
3  Mr. Goldberg or one of the other defense lawyers
4  needs to make an objection, that could be noted
5  as well.
6    Can you do that for me?
7    A.  Yes.
8    Q.  I'm going to be marking some exhibits,
9  most if not all of which I hope are in paper
10  form near you.
11    Do you have, for example, your report
12  with you?
13    A.  I do.
14    Q.  Well, for the benefit of the record,
15  when the opportunity arises, we're going to mark
16  that as Exhibit 1, Stiroh 1.
17    (Expert report of Lauren J. Stiroh,
18    Ph.D. was marked Stiroh Exhibit 1 for
19    identification, as of this date.)
20    Q.  Is the copy that you have, does it
21  contain the list of your reliance materials?
22    A.  It does.
23    Q.  And does it contain your CV as well?
24    A.  It does.

Confidential Information Subject to Protective Order

---

Page 10

1    Q.   And you're satisfied that the copy
2  that we're going to mark Exhibit 1 is your true
3  and correct report that you issued, or is dated
4  January 12th of this year?
5    A.   Let me just flip through it briefly.
6       THE WITNESS:  I think that's going to
7  be Conti.
8       Can you pass me?
9       (Witness reviewing document.)
10   A.   It is.
11   Q.   Dr. Stiroh, I assume you've had an
12 opportunity to review your report or
13 refamiliarize yourself with it before today?
14   A.   Yes.
15   Q.   You've, doubtless, had time to prepare
16 with defense counsel who engaged you as well?
17   A.   I have.
18   Q.   And you feel ready this morning to
19 discuss the opinions that you express in that
20 report, to me?
21   A.   I do.
22   Q.   And in paragraph 5 of your report,
23 Exhibit 1, you describe your assignment.  If you
24 could turn to that section.

---

Page 11

1    A.   I have it in front of me.
2    Q.   And -- thank you.
3       And specifically, as I read it, you
4  [indistinct], as well as the things that you did
5  not do; right?
6    A.   I'm sorry.  I lost a little bit of
7  that question.  If you don't mind saying it
8  again.
9    Q.   Not at all.
10       As I read that paragraph entitled
11 Assignment, what I take it you did was to
12 enumerate the things --
13       MR. GOLDBERG:  Hang on a second,
14 Ruben.
15   Q.   -- that you didn't do; right?
16       MR. GOLDBERG:  Ruben, hang on one
17 second.  We're getting a little bit of a
18 delay.
19       MR. HONIK:  Yes.  I'm experiencing a
20 little bit of it here, but it's mostly the
21 image that Dr. Stiroh is a little bit
22 halting.
23       Can we have the videographer address
24 that?

---

Page 12

1       MR. GOLDBERG:  Let's see if it goes
2  away, because it's a little bit --
3       you're -- you're also sort of coming in and
4  out a little bit.
5       So why don't you go ahead and let's
6  see if it goes away.
7       MR. HONIK:  Seth, I must tell you,
8  you're very crisp, but Dr. Stiroh is a
9  little fuzzy, and there's a bit of a delay.
10      I guess all we can do is just go
11 forward and see how it goes.  Okay?
12      MR. GOLDBERG:  Yeah.
13   Q.   So let me reload the question,
14 Dr. Stiroh.
15      We're looking -- excuse me -- at your
16 paragraph 5 together, which you've headed
17 Assignment.
18      And I'm simply trying to establish if
19 it isn't so, that in that paragraph, you
20 describe the things -- pardon me -- that you did
21 in discharging the assignment, as well as the
22 things you did not do.
23      Is that fair?
24      MR. GOLDBERG:  Objection to form.

---

Page 13

1    A.   Generally, yes.  Paragraph 5 of my
2  report describes the assignment, and then also
3  certain assumptions or areas of testimony where
4  I am not offering opinion.
5    Q.   And that's clear to me.
6       If you turn to page 2 of your report,
7  we're still in paragraph 5, and if you were to
8  count down about six lines, do you see the
9  sentence that begins, I do not make an
10 assessment?
11   A.   I see that.
12   Q.   From that line forward, you enumerate
13 certain things that you did not do or assess;
14 correct?
15   A.   I'm not sure what you mean by I
16 enumerate them.
17      I have a sentence that says, I do not
18 make an assessment regarding actual risk of
19 safety issues.
20      And I have a sentence towards the end
21 that says, I also do not opine on the legal
22 issues, and goes on.
23      Those are two areas where I am
24 clarifying that that is not an area for my

---

Confidential Information Subject to Protective Order

Page 14

1 testimony.

2    Q.   That's right.  And all I was really
3 getting at is you attempt to list some things
4 that you didn't do; correct?

5    A.   Yes.

6    Q.   I want to spend some time unpacking
7 the language here so I understand the things
8 that you didn't do before we talk about some of
9 the things that you did do.  Okay?

10    A.   Yes.

11    Q.   So the first sentence on page 2,
12 within paragraph 5 that I would like to direct
13 your attention to is the one that begins, I do
14 not make an assessment regarding any actual risk
15 of safety issues with regard to the subject
16 VCDs.

17       Do you see that clause?

18    A.   I do.

19    Q.   Can you tell me what that means?

20    A.   Yes.  I am not a medical expert and I
21 am not intending to offer opinions related to
22 the safety risk, if any, of the products at
23 issue on the patients who consumed them.

24    Q.   And in that regard, the sentence

Page 15

1 continues, And I offer no opinion on whether the
2 presence of NDMA or NDEA impurities rendered any
3 of the at-issue VCDs adulterated or misbranded
4 during the relevant time period.

5       Did I read that correctly?

6    A.   You did.

7    Q.   And does it mean that you have no
8 opinion whether NDMA or NDEA rendered the VCDs
9 in this case adulterated or misbranded?

10    A.   That is correct.  I am not offering
11 opinions on whether the presence, or if there
12 is, of NDMA and NDEA rendered the products at
13 issue misbranded or adulterated.

14       I have reviewed Dr. Conti's report and
15 have opinions with respect to her valuation of
16 the products at issue where she does make those
17 assumptions, and I take her assumptions that she
18 has made and consider them in my opinions.  I do
19 not offer an opinion on adulteration or
20 misbranding.

21    Q.   Let me unpack that a bit.

22       Do you have an opinion whether these
23 contaminants were present at all in these VCDs?

24    A.   That is not a subject of my testimony

Page 16

1 or opinions.

2       I take into account the possibility
3 that the products were -- that the -- the
4 impurities were included in the products at
5 issue and have an understanding from materials
6 that I have read in this case of the impact of
7 that, but I am not offering testimony that the
8 product -- the impurities were included in the
9 products at issue or what implication that has
10 for the risk profile.

11    Q.   Do you have an opinion whether NDMA or
12 NDEA are, in fact, contaminants?

13    A.   I do not.

14    Q.   Do you have an opinion whether NDMA or
15 NDEA are mutagenic?

16    A.   I do not.

17    Q.   Do you have an opinion whether NDMA or
18 NDEA are carcinogenic?

19    A.   I do not.

20    Q.   Do you have an opinion whether NDMA or
21 NDEA are genotoxic?

22    A.   I do not.

23    Q.   Can you explain to me why you read and
24 cited as reliance material the expert report of

Page 17

1 Dr. Ron Najafi?

2    A.   I released certain expert reports of
3 various individuals that offered reports in this
4 case, to gain an understanding of some of the
5 background issues and scope.

6       Some of the materials that I have
7 reviewed were to inform me on the broader
8 background materials and information that is at
9 issue in this case.  It does not mean I am
10 offering opinions on all of the materials that I
11 read.

12       I don't recall offhand if I have cited
13 Dr. Najafi in my report other than in mentioning
14 him in paragraph 6.

15       But if and where I have cited him, it
16 will indicate the reasons for why I have relied
17 on that report.

18    Q.   Well, why don't you turn to Exhibit 2
19 of your report, which we are marking in this
20 deposition as Exhibit 1, which lists the expert
21 reports that you relied upon.

22       Do you see that list?

23    A.   Yes.

24    Q.   I take your point about obtaining some

Confidential Information Subject to Protective Order

Page 18

1 background information even as to areas that you
2 don't specifically offer an opinion.
3      But as best as you can, what was it
4 about Dr. Najafi's report that caused you to
5 list it as a reliance material?
6      A.  I don't recall if there is specific
7 information from that report that I cite in my
8 background materials or later in my report.  I
9 could page through it and see.
10      But as I sit here, I don't have a
11 specific recollection what caused me to list
12 that one in my materials considered.
13      Q.  Do you recall what kind of expert
14 Dr. Najafi is?
15      A.  No, not by memory.
16      Q.  Can you tell me why you listed as
17 reliance material the expert --
18      MR. GOLDBERG:  Ruben, that question
19 cut out.  You're going to have to ask it
20 again.
21      Q.  Doctor, I'm asking you if you can tell
22 me why you listed reliance upon the report of
23 Dr. Panigraby.
24      A.  I would give you essentially the same

Page 19

1 answer.
2      I don't recall specifically any
3 information from the report of Dr. Panigraby
4 that I rely on for my opinions.
5      If I cite him in the footnotes, then
6 that would indicate the information that I am
7 citing for that report.
8      If I don't and it was simply a report
9 that I reviewed in the context of getting
10 broader information, I don't recall why that one
11 in particular I chose to cite.
12      Q.  Did you prepare this list of reliance
13 material yourself?
14      A.  I have a person on my team that
15 prepares it for me.
16      Q.  Okay.  You mean physically prepares
17 the document?  Is that what you mean?
18      A.  Yes.
19      Q.  Are you the one that's collected the
20 expert reports that you listed as reliance
21 material?
22      A.  Yes.
23      Q.  And so, I take it, since you were the
24 one to list them, that you had a reason for

Page 20

1 doing so; right?
2      A.  For the most part, that is correct.
3      The materials that appear on Exhibit 2
4 are materials that are cited throughout my
5 report.
6      It may be that there are certain
7 expert reports that are cited only in paragraph
8 6 and nowhere else.
9      And the reason they would appear on my
10 Exhibit 2 is that they appear in a footnote,
11 even if the footnote is no more than to identify
12 that report.
13      Q.  Do you know what the subject of
14 Dr. Panigraby's report was?
15      A.  Not by memory, no.
16      Q.  Can you tell me why you listed the
17 report of Dr. Etminan as reliance material for
18 you?
19      A.  The same answer.  I reviewed various
20 expert reports.
21      If they are cited in my footnotes,
22 they are included on Exhibit 2.
23      There are some that may be cited only
24 in connection with paragraph 6 where I have

Page 21

1 listed some of the expert reports.
2      But if it is not cited elsewhere in
3 the report, it is not the basis for any of the
4 information or opinions that I am offering.
5      Q.  Would your answer be the same for
6 Dr. David Chan, who is also listed as a report
7 you relied upon?
8      A.  Yes.
9      Q.  That's a rebuttal report.
10      Do you know what the subject of his
11 report was?
12      A.  Not as I sit here without it in front
13 of me, I don't.
14      Q.  Do you offer any opinions on cGMP?
15      A.  I do not.
16      Q.  Well -- but, Dr. Stiroh, is -- there
17 you go.
18      Dr. Stiroh, can you hear me?
19      A.  Okay.  My computer has a message that
20 says that my Internet connection is unstable.
21      I can hear you now.  I think that cut
22 out in some -- at some point if you were asking
23 a question, and so if you could ask it again.
24      Q.  I will.  Thank you.

Confidential Information Subject to Protective Order

Page 22

1    I asked you whether you offered any
2 opinions in the area of cGMP and cGMP
3 compliance.
4    MR. GOLDBERG:  Objection to form.
5    A.  I do not.
6    Q.  Can you tell me why you listed the
7 expert report of Dr. -- or Mr. Quick in your
8 reliance material, plaintiffs' cGMP expert?
9    A.  I reviewed the Quick report at the
10 time that I received it, I think in part to see
11 if there were opinions that related to economic
12 losses.
13    I don't recall anything specific in
14 his report that I rely on, unless there might be
15 a definition that I cite to him for.
16    Q.  Was it meaningful for your economic
17 analysis to have an understanding of the
18 allegations regarding the cGMP failures in this
19 case?
20    MR. GOLDBERG:  Objection to form.
21 Vague.
22    A.  I reviewed his report.  I don't recall
23 that there is anything specific that was
24 meaningful for me and my analysis of economic

Page 23

1 loss damages.
2    But I did at the time that I reviewed
3 his report have a -- the understanding from
4 reading it what the subject matter was that he
5 was opining on.
6    Q.  Did you give any weight or
7 consideration whatsoever to any of the opinions
8 of either Mr. Quick or the defense experts in
9 cGMP to your economic analysis?
10    MR. GOLDBERG:  Objection to form.
11 Vague.  Overbroad.
12    A.  I don't recall anything by memory
13 where I am relying on or use as a basis an
14 opinion of any cGMP experts in this case.
15    I reviewed some pieces of information
16 to understand the context of the case, but I
17 don't think there is any of my opinions with
18 respect to economic loss damages that rely on a
19 cGMP expert's opinion.
20    Q.  So would it be fair to say that if
21 there was pervasive cGMP failures on the part of
22 one or more of the defendants in this case, that
23 that did not impact any of your economic
24 analysis?

Page 24

1    A.  I don't think that is fair to say.
2    As a general matter, damages experts
3 will take certain allegations in the complaint
4 at face value and consider, if they are true,
5 what are the economic damages that arise from
6 those actions, and also to consider as
7 appropriate, if some of the allegations are true
8 and others are not, whether damages can be
9 assessed with information common to the class.
10    I have considered the scope of
11 allegations.
12    I have considered how Dr. Conti refers
13 to the alleged wrongdoing and taken that
14 information into account when I formed my
15 opinions.
16    Q.  In what way have you taken into
17 account the allegations in this case as they
18 pertain to cGMP failures?
19    A.  I am going to have to tell you from
20 memory without looking at specific information.
21    To the best of my recollection,
22 Dr. Conti has a section in her report where she
23 either opines or assumes that if there is a cGMP
24 failure, that a drug is then misbranded or

Page 25

1 adulterated, and in her framework, that means
2 that for her, that the drug is economically
3 worthless.
4    I consider that chain of reasoning and
5 respond to it in my report.
6    Q.  What consideration do you give it --
7 the fact in your framework?
8    MR. GOLDBERG:  Can you ask that again,
9 Ruben?  You broke up.
10    Q.  Yeah.  You described understanding
11 that Dr. Conti in her report discusses and gives
12 some specific weight and consideration to the
13 fact of cGMP failures.
14    That's what you've told me; right?
15    A.  I don't think it is what I told you.
16    I am not opining that there is a fact
17 of cGMP failures, and I don't think that
18 Dr. Conti did, unless I have misread her report.
19    I understand that she has taken it as
20 an assumption that there were cGMP failures, and
21 I consider the implication of that assumption
22 for her assessment of economic loss damages and
23 how I think economic loss damages would be
24 properly calculated if there are any in this

Page 26

matter.
Q. Did you assume that there were cGMP failures for your analysis?
A. I don't have a specific assumption that there were cGMP failures.
I take under consideration the possibility that the drugs would be considered misbranded or adulterated and consider how that impacts Dr. Conti's opinions.
I understand that chain of reasoning in her report starts from an assumption of cGMP failures.
I can't think as I sit here whether there are specific aspects of my opinions that depend on me making that assumption.
Q. Well, so, before we move on from this idea, I am understanding with some clarity that you understood how Dr. Conti treated that in her framework.
I'm simply trying to understand what you did with either the compliance or noncompliance of cGMP.
How does that fit into your framework or analysis?

Page 27

MR. GOLDBERG: Objection to form. Vague. Compound.
A. I do not offer opinions on whether there was compliance or noncompliance with cGMP.
I offer opinions with respect to whether damages can be calculated with information common to the class and whether Dr. Conti has put forward a valid economic model to assess damages, if any, with information common to the class.
Q. Is the fact of compliance with cGMP relevant to an economic analysis of damages in this case?
A. For the analysis itself, whether there is compliance or noncompliance, may not be relevant in the following sense: That if there is ultimately no finding of wrongdoing, my understanding is that there is no damage, regardless of assumptions made by economists.
At the stage where I as a damages expert am typically involved in a matter, there has not been a finding of wrongdoing in many cases, and so we would then consider, if there is a finding of wrongdoing, what are the

Page 28

economic damages that flow from the conduct that is ultimately deemed to be wrongful.
Q. Do you have analysis anywhere in your report that assumes liability and then determines if damages are calculable?
MR. GOLDBERG: You're going to have to ask that again, Ruben. You broke up again.
MR. HONIK: Did the court reporter get it?
THE COURT REPORTER: I did not.
Q. Is there any part of your report that assumes liability, as you've just described to me that damages experts sometimes do, in order to address damages?
Is that something that you did?
A. Yes.
Q. And we'll certainly get more deeply into it.
But where would I find that in your report, that is, your assumption of liability as a foundation for discussing damages? Where is that?
A. There is nowhere in my report where I assume no liability.

Page 29

So in that sense, the entirety of my report assumes that liability will be found for some conduct.
If liability is found for no conduct, I think my report generally becomes irrelevant.
Q. Right. But my question is -- is specific.
Can you point to any language in your report that I or any reader could find that says you've assumed liability on any basis in order to discuss or analyze economic damages?
MR. GOLDBERG: Objection to form. Asked and answered.
A. I don't recall having written that into my report.
It is typically a standard going-forward assumption for a damages economist to consider the impact of certain acts where liability for those acts may be determined at a later stage by a court.
Q. Okay. And I'm familiar with that construct as well.
Is there someplace in your report where I could see your discussion of the basis

Page 30

1  for that liability; in other words, whether the
2  basis lies in warranty or statutory --
3  the -- for economic analysis?
4        Where would I find it in your report?
5        MR. GOLDBERG:  You're going to have to
6  ask that again, Ruben.
7        MR. HONIK:  Jeff, did you hear it?
8        THE COURT REPORTER:  No.  Part of it
9  cut out.
10       MR. HONIK:  Okay.
11       Q.  The question I'm trying to get at,
12 Dr. Stiroh, is this:  Having read the --
13       MR. GOLDBERG:  Ruben, hang on for one
14 second.
15       Q.  -- complaint and other --
16       MR. GOLDBERG:  Can we go off the
17 record for one second?  I do have an idea.
18       MR. HONIK:  Yeah, let's do that.
19       THE VIDEOGRAPHER:  The time right now
20 is 10:42 a.m.  We are off the record.
21       (Discussion off the record.)
22       THE VIDEOGRAPHER:  The time now is
23 11:08 a.m.  We are back on the record.
24       Q.  Dr. Stiroh, thank you for your

Page 31

1  considerable patience.  I am sorry it's taking
2  so long.  And let's see how it goes.  Okay?
3        A.  Yes.
4        Q.  I want to try to pick up where I think
5  we left off, and that is, we were discussing --
6  I was attempting to understand what assumptions
7  you made around the liability questions.
8        You -- you have already described
9  yourself as a damage expert; correct?
10       A.  Yes.
11       Q.  And do you agree generally that the
12 basis for liability impacts damage analysis?
13       MR. GOLDBERG:  Objection to form.
14 Vague.
15       A.  I don't agree generally.
16       As a matter of economics, it may be
17 that it is the fact of liability on a particular
18 claim that then generates damages flowing from
19 that claim.
20       But as a legal basis, the basis for
21 liability I don't think I can tell you matters
22 without some specificity as to what it is that
23 you mean.
24       Q.  So, for example, if you assume

Page 32

1  liability on the basis of a warranty claim, does
2  that impact your analysis differently than
3  assuming, for example, that liability is
4  predicated on negligence?
5        MR. GOLDBERG:  Objection to form.
6  Ambiguous.  Calls for a legal conclusion.
7        A.  It does not affect my analysis in any
8  way as I sit here.
9        To the extent that the legal framework
10 has different ways of considering economic
11 damages, that I would look for guidance from
12 counsel as to whether there are different
13 measures of economic damages depending on the
14 bases for liability, if any, is found.
15       Q.  We'll talk about the basis for
16 measuring or the formulas for measuring.
17       But you agree those are legal
18 determinants; correct?
19       MR. GOLDBERG:  Objection to form.
20 Ambiguous.
21       A.  It is my understanding that it --
22 there would be a legal determination as to
23 whether there is a basis for damages, yes.
24       Q.  And before moving on, in connection

Page 33

1  with your analysis in your report, did you make
2  one or more assumptions about the basis for
3  liability in order to arrive at your economic
4  damages opinions?
5        A.  I don't recall having done so.
6        I have considered the possibility that
7  there would be a finding that the products at
8  issue contain impurities.
9        And I have considered the assumptions
10 that Dr. Conti made and followed with my
11 economic analyses of damages in her framework
12 and the framework I put forward in my report.
13       Q.  In the many cases in which you've been
14 asked to serve as an expert consultant in
15 litigation matters, you frequently need to make
16 assumptions, do you not, in order to answer
17 certain economic questions; correct?
18       A.  I agree.
19       Q.  And so, for example, I know one of
20 your particular -- I'll refer to it as a
21 subspecialty area is evaluating damages in the
22 antitrust context; correct?
23       A.  I'm sorry.  What was the question?
24       Q.  The question is:  You have

Page 34

1 considerable expertise in analyzing economic
2 damages in the antitrust area; correct?
3     A.  Yes.
4     Q.   And I gather one of the things, for
5 example, by way of illustration, that you do
6 there is that you either yourself or you
7 evaluate others' assessments of a but-for world
8 with an actual world in terms of economic
9 consequences; correct?
10        MR. GOLDBERG:  Objection to form.
11     A.  That is a damage model that I am
12 familiar with, yes.
13     Q.  That's right.
14        And in order to actions such models,
15 you have to make certain assumptions in order to
16 arrive at a reasonable understanding of what the
17 models propose; correct?
18     A.  Yes.
19     Q.   So you use things, for example, like
20 regression modeling; correct?
21        MR. GOLDBERG:  Objection to form.
22 Vague.
23     A.  I have used regressions in analyzing
24 things like economic damages or relevant

Page 35

1 markets, as they are relevant to work that I
2 have done.
3     Q.   Have you had occasion to do economic
4 or damage analysis based on assumptions or
5 representations about legal rulings, or based on
6 legal rulings?
7     A.  Yes.
8     Q.   And, in fact, for example, in the
9 antitrust area, have you had occasions where
10 you've been asked to assume or you've been told
11 that courts have determined that there's
12 antitrust culpability and antitrust impact, and
13 then the question becomes how to assess the
14 damages related thereto?  Have you done that?
15     A.  I have not in my experience in
16 antitrust matter.
17        Whether there's antitrust impact is a
18 question for economic testimony, and it's a
19 question on which I have opined.
20        In the antitrust scenario, it would be
21 common for a damage expert to assume the facts
22 in a complaint with respect to conduct are true,
23 but not to assume impact of that conduct without
24 analyzing it in a framework of economics.

Page 36

1     Q.  Understood.  Did you assume any of the
2 facts in the master complaints here?  Did you
3 assume those allegations to be true?
4     A.  I believe where appropriate I have.
5        I have not assumed that facts are not
6 true, as far as I can recall.
7        I have considered the economic
8 implications if there are impurities in the
9 drugs at issue.
10        There may be certain scenarios that I
11 consider that are different from what plaintiff
12 put forward, but that, to my mind, is different
13 from assuming the facts away.
14     Q.  What allegations of plaintiffs'
15 economic loss complaint did you assume to be
16 true?
17     A.  I understand that there is an
18 allegation that NDMA and NDEA impurities were
19 added in the manufacturing process for certain
20 of the Valsartan-containing drugs at issue.
21        I take -- I understand that there is
22 the allegation that then the FDA would not have
23 approved drugs with those impurities in them.
24        I take as given the market facts as I

Page 37

1 understand them that the drugs at issue were
2 withdrawn in 2018 and '19.
3        I take as my understanding that there
4 is a dispute over whether the impurities at
5 issue enhanced any risk that a patient would
6 face, and I consider that aspect of the dispute,
7 taking into account both the possibility that
8 the impurities at issue would have increased
9 risks to patients and the possibility that the
10 impurities at issue would not have increased
11 risk to patients.
12        And I explain in my report how that
13 variation flows through into assessing economic
14 damages.
15     Q.  What do you mean when you say that you
16 assumed the FDA would not have approved the
17 drugs, in your response?
18     A.  I consider the framework that I
19 understand Dr. Conti to have put forward where
20 she says there would not have been a supply of
21 the products at issue.
22        To the best of my recollection, I
23 think that she is assuming that from 2012
24 forward, whereas the market facts as I

Page 38

1 understand them is that the products at issue
2 were not available in 2018 and 2019.
3    Q.  Where in your report would it reveal
4 to me or any reader that you assumed the fact
5 you just described?
6    A.  There is a section in my report where
7 I discuss what consumers would have done in the
8 absence of the availability of the VCDs at
9 issue.
10       That is consistent with the framework
11 that Dr. Conti has put forward where she assumes
12 that there would not be supply of the products
13 at issue.
14    Q.  Where is that analysis in your report?
15    A.  It is included at various places in my
16 report as appropriate, and specifically in
17 section Roman Numeral IV of my report, the
18 discussion begins on paragraph 26.
19       I have discussed various aspects, I
20 think, that are aligned with that theory, what
21 if the drugs were not available at other places
22 as well.  But at least Roman Section IV.
23    Q.  So I want to make sure that you and I
24 are on the same page.

Page 39

1       My Roman IV is headed, Plaintiffs'
2 payments for VCDs and VCD substitutes would
3 likely have been equal or higher.
4       Is that the section you're directing
5 me to?
6       Because that comports with paragraph
7 50, 5-0, in my report.
8    A.  Yes.  Did I say a different number?  I
9 meant to say page 26, paragraph 50.
10    Q.  Got it.
11       Are there any other discrete places in
12 your report that you believe discusses assuming
13 that the FDA would not have approved these
14 drugs, and, therefore, they wouldn't have been
15 in the marketplace?
16       Where else do you discuss it?
17    MR. GOLDBERG:  Objection to form.
18    Mischaracterizes the testimony.
19    A.  I think all of Roman IV, which goes
20 over to a chart that is on page 34.
21       But there may be other places,
22 certainly in the summary of opinions that's at
23 the beginning of my report.
24       And then there may be parts of Roman

Page 40

1 III where I also consider what patients would
2 have done in the absence of available supply for
3 VCDs at issue.
4       But the part that I recall discussing
5 it more explicitly is Roman IV.
6    Q.  Would section Roman IV of your report,
7 in addition to the other sections to which
8 you've cited me, reflect your analysis of
9 potential damages in the absence of a supply
10 curve for VCDs?
11    A.  My analysis in section IV reflects a
12 consideration of the financial losses in the
13 absence of supply for the VCDs at issue.
14    Q.  Do you assume in your analysis found
15 in section IV that there is an absence of a
16 supply curve for VCDs?
17    A.  I do not assume an absence of a supply
18 curve for VCDs.
19       I understand that one of the
20 alternatives available to consumers in the
21 absence of the at-issue VCDs would have been the
22 brand drug and I think some supply available
23 from other manufacturers that are not
24 defendants.

Page 41

1    Q.  Is there any part of your analysis in
2 which you assume an absence of a supply curve
3 for contaminated VCDs?
4    A.  In my section Roman IV, I consider
5 what the economic implications are if there had
6 not been supply of contaminated VCDs.
7    Q.  And was your conclusion in that
8 section, generally speaking, that patients would
9 go to alternative drug therapy?
10    A.  Did you ask me if that was my
11 conclusion?
12    Q.  Yes.
13    A.  It is not a conclusion that I have.
14 It is a consideration that I have.
15       My understanding is that patients that
16 are currently on VCDs or blood pressure
17 medication, if they could not take their current
18 medication, would for the most part be required
19 to switch to something else.
20       I have seen in the data that there are
21 some patients that appear to have switched to
22 things like Vitamin C.
23       So I don't assume that everybody needs
24 to switch, but it is my understanding that the

Confidential Information Subject to Protective Order

Page 42

1  majority of consumers would need to take a
2  medication to manage their blood pressure.  It
3  is not necessary to my conclusions that all of
4  them do.
5      Q.   Are you aware that "adulterated" is a
6  term of art with a specific definition under the
7  Federal Food, Drug and Cosmetic Act?
8      A.   My understanding is that it is.
9      Q.   And did you list the relevant section
10 that defines "adulterated" among your reliance
11 materials?
12     A.   I don't think that I did.  I did not
13 rely on an FDA statement of adulteration.  I
14 have considered what Dr. Conti considered in her
15 report, and my report responds to her opinions.
16     Q.   Well, do you acknowledge that
17 Dr. Conti merely applied the definition of
18 "adulterated" as the FDA in the Federal Food,
19 Drug and Cosmetic Act sets it out?
20     A.   As I recall from her report, I believe
21 that is what she sets out to do.
22        I did not go to check whether she had
23 cited it correctly or interpreted it correctly.
24 I take the words in her report as given and

Page 43

1  consider the implications for economic loss
2  damages.
3      Q.   What are the implications, in your
4  judgment, for economic loss damages that we may
5  be dealing with and, in fact, are dealing with
6  adulterated drugs?
7        MR. GOLDBERG:  Objection to form.
8        Assumes facts not in evidence.  Ambiguous.
9      A.   As an economic matter, the economic
10 losses that relate to the difference between the
11 price paid and the value received depend on the
12 impact on the value received by consumers of
13 VCDs from having consumed a product that has an
14 impurity in it that caused it to be deemed
15 adulterated or misbranded.
16        As I explained in my report, as a
17 matter of economics, that diminution of value,
18 if any, depends on what I think I have called
19 the degree of adulteration.  By that, I mean
20 depends on how the risk profile of the product
21 may change for any consumer consuming the
22 product.
23     Q.   And would that be the risk profile as
24 appreciated by that consumer?  Is that what you

Page 44

1  mean?
2      A.   As appreciated by that consumer and/or
3  their doctor.
4      Q.   Okay.  You listed in your reliance
5  material at Exhibit 2, which is now part of your
6  report at Exhibit 1, four court filings.
7        Do you see that?
8      A.   Yes.
9      Q.   There are roughly 2,000 court filings
10 in this MDL.
11        Why did you pick these four?
12     A.   The four that are cited here are the
13 ones that I cited in my report for -- as the
14 basis for certain statements or quotes that I
15 have taken from those court filings.
16     Q.   Yeah.  That strikes me as a tautology.
17 They're there because you cite them in your
18 report.
19        My question is, Why did you select
20 these four?
21        How are they relevant to your analysis
22 and opinions?
23     A.   We can see from where I have cited
24 them how they fit in.

Page 45

1        The definition of the class -- of the
2  purported class, the identities of defendants,
3  the identities of the named plaintiffs all come
4  from the complaint.  And so that is cited.
5        There are certain background facts
6  where I understand there may be a dispute, but
7  from my -- for my purposes, I am using a
8  particular definition, and frequently I will
9  cite a definition that comes from the complaint
10 or the opposing party, if -- if relevant, so
11 that there is not dispute over that fact, and,
12 instead, I focus on the economic analyses.
13     Q.   Were these four court filings provided
14 to you by counsel and suggested as material you
15 should rely on, or did you have a larger pool of
16 documents from which you selected these four on
17 your basis?
18     A.   I have a larger pool of documents and
19 selected these four as having information that I
20 wanted to put either in the background of my
21 report or to define what has been put forward as
22 the class, the dates of the class, the
23 identities of the parties, things like that.
24     Q.   I note that you didn't rely on any

Page 46

1  opinions or writings of the court to shed light
2  on either the theories or the appropriate
3  measure of damages.
4       Why didn't you do that?
5       A.  I have been asked to assess from the
6  standpoint of an economist what -- whether
7  economic loss damages in the -- for the class
8  members as described in the motion for class
9  certification can be assessed with information
10 methods common to the class.
11      I did that based on my training as an
12 economist, and have explained at certain places
13 in my report where I understand there to be a
14 correspondence of legal theories and economic
15 theories.
16      But for the most part, my report is an
17 independent economic analysis of economic loss
18 damages.
19      Q.  Yeah, I understand all that.
20      But my question was very specific, and
21 that was, why didn't you look at any of the
22 writings of the court in the form of opinions to
23 shed light on any issues that may impact that
24 economic analysis and the ability to certify a

Page 47

1  class for damages?
2       MR. GOLDBERG:  Objection to form.
3  Asked and answered.
4       A.  In the course of my work on this case,
5  I have reviewed other legal documents, including
6  opinions of the court.  For the purposes of my
7  opinions that relate to economic losses, and
8  whether there are economic losses that can be
9  calculated on a class-wide basis, I rely on my
10 training and experience as an economist and
11 review the types of information that are
12 available in this case that economists typically
13 rely upon.
14      Q.  So you did review opinions in the
15 court, you just didn't list them as reliance
16 materials; right?
17      A.  I reviewed opinions of the court.  I
18 did not rely on an opinion of the court to reach
19 my independent conclusions as an economist.
20      Q.  When you say "independent," what do
21 you mean by that?
22      A.  I mean that I have not been asked to
23 assume somebody else's opinion is true.  I have
24 been asked to reach my own opinions.

Page 48

1       Q.  Were you told not to assume that the
2  court's opinions are reliable?
3       A.  I was not.
4       MR. GOLDBERG:  Objection.  Note my
5  objection to that question as ambiguous.
6       Q.  What opinions of the court did you
7  read that you failed to list in your reliance
8  materials list?
9       A.  I did not fail to list any opinions in
10 my reliance list, because I did not rely on
11 opinions for the court.
12      I recall reviewing an opinion of the
13 court.  I believe there are more than one.  I
14 can't recall them for you with certainty as I
15 sit here without them in front of me.
16      I think Dr. Conti refers to them
17 either in her report or in her deposition, and
18 it would be those ones that are referenced that
19 I have reviewed.
20      Q.  So these opinions that you did review,
21 it sounds like you reviewed them after you wrote
22 your report; correct?
23      A.  I have reviewed them after I wrote my
24 report.  To the best of my recollection, I have

Page 49

1  seen the opinions of the court prior to writing
2  my report as well.
3       Q.  What opinions of the court did you
4  review prior to the preparation and tendering of
5  your report that would not be listed in your
6  reliance materials list?
7       A.  I don't recall by title opinions of
8  the court that I reviewed prior to my report.
9       There are no opinions of the court
10 listed in my reliance materials because I did
11 not rely on opinions of the court in reaching my
12 economic opinions.
13      Q.  Right.  I understand that you didn't
14 rely on anything the court has said.
15      Now I'm trying to identity what you,
16 nonetheless, read that the court opined on prior
17 to January 12th of this year, which is the date
18 of your report.
19      If you don't remember the titles or
20 formal names of the opinions, tell me what the
21 subjects were.
22      A.  To the best of my recollection, the
23 subjects are motions to dismiss documents where
24 the court has written a document that I think

Page 50

1 the title has opinion in it.
2     Q.  Okay.  And is it correct that when you
3 read the motions to dismiss, there was nothing
4 in there that the court shed light on which
5 impacted your economic analysis or damage
6 analysis?
7         MR. GOLDBERG:  Objection.  Ambiguous.
8     A.  I don't recall if there was anything
9 in them that shed light on my economic analysis.
10        To the extent that there was something
11 that is consistent with other documents that I
12 have read that shed light on my economic
13 analysis, I have relied on materials and
14 information that are commonly relied upon by
15 economists in reaching independent economic
16 opinions, and I have not relied on an opinion of
17 the court to reach my own opinion.
18     Q.  So if the court offered an opinion
19 about the viability of a certain cause of action
20 alleged in plaintiffs' complaint and the
21 economic impact of that, you did not place any
22 weight or reliance on such views; correct?
23     A.  I think it is not correct to phrase
24 what I did in that way.

Page 51

1        I reviewed certain court documents.
2 The opinion of the court that I have read does
3 not -- is not something that I relied on in
4 reaching my own opinions with respect to
5 economic loss damages.
6     Q.  Did you read Dr. Conti's deposition
7 testimony in preparation for today?
8     A.  I did.
9     Q.  What opinions were you shown or did
10 you review after the preparation of your written
11 report?
12        You've only authored one written
13 report; correct?
14     A.  In connection with this matter, that
15 is correct.
16     Q.  When you say "in connection with this
17 matter," have you authored any other writings in
18 connection with this MDL which concerns
19 Valsartan, Losartan and Irbesartan?
20     A.  I have not.
21     Q.  So the question is, What opinions of
22 the court did you read and/or consider after the
23 preparation of your one and only written report?
24     A.  To the best of my recollection, I have

Page 52

1 reviewed opinions of the court connected with
2 motions to dismiss.
3        To the best of my recollection, they
4 are the same that I had reviewed earlier in the
5 case.  They are not things that I relied upon to
6 reach my opinions.
7     Q.  Okay.  And so if I've understood you,
8 what you're saying is, you read opinions of the
9 court on motions to dismiss both before and
10 after you wrote your report, and in neither
11 instance do you place reliance on the court's
12 views; correct?
13        MR. GOLDBERG:  Objection.
14 Mischaracterizes the testimony.
15     A.  For purposes of reaching my opinions
16 with respect to the economic loss damages
17 purportedly suffered by the class, I did not
18 rely on a judge's legal opinion.
19        I relied on my own training as an
20 economist and the materials that an economist
21 would typically consider in evaluating whether
22 damages can be assessed with information and
23 methods common to the class.
24     Q.  What do you mean by typically rely

Page 53

1 upon?
2        What do economists typically rely upon
3 that you place reliance on to the exclusion of
4 the court's views?
5     A.  I do not exclude the court's views.  I
6 did not rely on the court's views for purposes
7 of my -- of reaching my opinions.
8        The things that I rely upon, as I
9 mentioned, my training and experience as an
10 economist, that is, the economic -- the
11 application of economic theory and models to
12 business situations to assess whether there is
13 economic loss to individuals in a given set of
14 circumstances.
15     Q.  Does it matter to you to understand
16 what the court's views about what the proper
17 measure of damages is to do the work you were
18 asked to do?
19        MR. GOLDBERG:  Objection to form.
20 Ambiguous.
21     A.  To do the work that I was asked to do
22 is what I have in my report.
23        I was asked to assess whether damages
24 could be determined on a class-wide basis with

Confidential Information Subject to Protective Order

Page 54

1 information common to the class where those
2 damages were economic loss damages.
3       I have explained in my report the
4 framework that I am using for economic loss
5 damage.
6       To carry out my assignment in this
7 case, it was not necessary to take an
8 assumption -- sorry -- to take an opinion of the
9 court as an assumption in reaching my economic
10 opinions.
11    Q.  You wrote, and I quote, I also do not
12 opine on the legal issues relating to the proper
13 measure of damages or on which measures should
14 be used.
15       Do you remember writing that?
16    A.  Yes.
17    Q.  Does it matter to you whether the
18 court has a view or opinion on what the proper
19 measure of damages is or which measure should be
20 used?  Is that relevant to you?
21    A.  I would anticipate, in the fullness of
22 time, the court will eventually reach an opinion
23 on the proper measure of damages to be used, and
24 my report is something that I have been asked to

Page 55

1 prepare that reflects my opinions on those
2 topics.
3    Q.  If the fullness of time were to have
4 occurred already and it coincided with today,
5 and if you were told today what the court said
6 is the proper measure of damages, or which
7 measure should be used, would you accept that
8 and rely upon it in forming opinions?
9    A.  I'm sorry.  I need you to say the
10 beginning of that again.  I missed at least one
11 of the words in your question.  Not a technology
12 issue.  I just didn't hear it.
13       MR. HONIK:  Jeff, did you get my
14 question?
15       THE COURT REPORTER:  Yes, I did.
16       MR. HONIK:  Would you be kind enough
17 to read it to Dr. Stiroh.
18       THE COURT REPORTER:  Sure.
19       (The record was read back.)
20    A.  I would not, for the reason that if
21 the court has fully determined what the measure
22 of damages is and does not require, or the
23 parties do not believe, that there is any role
24 for opinion testimony, I would not anticipate

Page 56

1 being asked to give my opinions on economic loss
2 damages.
3    Q.  If you were told to assume VCDs in
4 this case were adulterated under the meaning of
5 the Food, Drug and Cosmetic Act, would that have
6 changed any of your opinions in this case?
7    A.  No.
8    Q.  I'm sorry.  Did you say no?
9    A.  I did say no.
10    Q.  Did you consider in any way in your
11 economic analysis whether if the VCDs in
12 question were adulterated as defined under that
13 act, what impact it would have on your economic
14 analysis and various conclusions?
15    A.  The question was, did I consider that?
16       THE WITNESS:  I'm sorry, Jeff.  If you
17 don't mind reading that one back to me as
18 well.
19    Q.  I'll restate it.
20       Did you consider in any way in your
21 economic analysis whether if the VCDs in
22 question were, in fact, adulterated as defined
23 under the Food, Drug and Cosmetic Act, if that
24 would influence or impact any of your economic

Page 57

1 analysis or conclusions?
2       MR. GOLDBERG:  Objection.  Vague.
3 Overbroad.
4    A.  I have considered that scenario.
5       It does have an impact on my damages
6 assessment.
7       If it is not -- if the products at
8 issue are not found to be adulterated or
9 misbranded, my understanding is there would then
10 be no damages arising from the conduct at issue.
11       If their products at issue are found
12 to be adulterated and misbranded, then, as I
13 explained in my report, to an economist
14 assessing diminution of value that comes from
15 adulteration or misbranding, it matters the
16 degree to which any product consumed by any
17 consumer was adulterated or misbranded, the
18 impact that that adulteration has for the
19 efficacy of the drug for that consumer, whether
20 it still has a therapeutic benefit to the
21 consumer, the amount of the product that they
22 consumed, the change in the risk profile for the
23 consumer, and I understand that some of those
24 factors depend on things individual to the

Page 58

1 consumer, such at their weight and health
2 history.
3     Q.   What is the proper measure of damages
4 for a contaminated drug in the U.S. supply
5 chain?
6         MR. GOLDBERG:  Object to form.  Calls
7 for a legal conclusion.
8     A.   I'm not offering an opinion on what
9 the proper measure of damages is.  I'm offering
10 opinions on how to properly use economics to
11 assess damages when those damages come from
12 diminution of loss or differences in financial
13 circumstances of patients.
14     Q.   What is the difference between the
15 phrases you used, "proper measure of damages,"
16 versus "which measure should be used"?
17         Are those terms synonymous or
18 different?
19     A.   They are different.
20     Q.   Can you tell me the difference.
21     A.   Yes.  In my report when I use "proper
22 measure of damages," I am speaking from the
23 standpoint of an economist how to use economics
24 properly in the measure of damages.

Page 59

1         I am not opining to the court on which
2 measure of damages, and in my report, I consider
3 alternative approaches to damage valuation.
4     Q.   Okay.  So what is -- what is "which
5 measure should be used," how is that different?
6     A.   As I hear you say that, I -- I
7 understand that to mean am I telling the court
8 which measure should be used, and that is not
9 what I am intending to do.
10     Q.   Okay.  I think there's some confusion,
11 and I apologize.
12         I am directing your attention to
13 paragraph 5 of your own report, marked as
14 Exhibit 1, in which you write in the penultimate
15 sentence, quote, I also do not opine on the
16 legal issues relating to the proper measure of
17 damages or on which measure should be used.
18         Do you see that clause?
19     A.   I do.
20     Q.   And my question is, are those two
21 different things, the proper measure of damages
22 on the one hand, and which measures should be
23 used on the other?
24         Are they two different concepts or are

Page 60

1 they synonymous as you've used them?
2     A.   They're not synonymous as I have used
3 them.  I think that the explanation that I gave
4 you a minute ago is correct.
5         I don't know with certainty, but it
6 would not surprise me if elsewhere in the report
7 I have used the phrase "to properly calculate
8 economic damages" or "a proper measure of
9 economic damages," or even just "a proper
10 measure of damage" with the word "economic"
11 elsewhere in the sentence.
12         When I use "proper measure of damages"
13 elsewhere in my report, I'm opining on
14 economics.
15         In this sentence that you have quoted
16 that is towards the end of paragraph 5, I am
17 clarifying that if there are legal issues that
18 relate to the proper measure of damages as I
19 would calculate them, I am not opining on the
20 legal issues and I am not opining on which
21 measure should be used.
22     Q.   So do you accept that legal issues can
23 impact the proper measure of damages in a case
24 such as this?

Page 61

1         MR. GOLDBERG:  Objection to form.
2     A.   I don't have an opinion on that.
3     Q.   Listen to my question.
4         Do you accept that legal issues may
5 have an impact on how and what the proper
6 measure of damages is in this case?
7         MR. GOLDBERG:  Objection to form.
8     Vague.
9     A.   I accept that there would be legal
10 issues that could determine which measure of
11 damages would be used.
12         As we've just had in our exchange,
13 when I use "proper measure of damages," I have
14 in that an expectation that it is properly using
15 economics, an economic theory.
16         When you asked the question, it sounds
17 like you maybe have a different measure or
18 definition that is the legal theory.
19         And what I've intended to do in the
20 sentence that you've quoted in paragraph 5 is
21 say specifically, that is not the subject I am
22 opining on.  I am opining on economic damages,
23 and I do have an opinion on how economics would
24 properly be used in determining economic

Confidential Information Subject to Protective Order

Page 62

1  damages.
2      Q.  Right.  And I'm only trying to
3  understand to what extent, if any, you accept or
4  allow that legal principles and legal
5  conclusions in a case like this impact your
6  economic measure of damage analysis.
7      A.  I guess I am not following your
8  question, then, or would need it explained.
9      I have written a report that gives my
10  opinions.  I would expect the court would take
11  into account economic opinions as well as legal
12  information.
13      I do not have an opinion with respect
14  to the legal framework.  I have opinions with
15  respect to the economic framework.
16      If the court takes into account
17  different information, and particularly a legal
18  framework, I think that affects what the court
19  does with my opinion.  It does not affect my
20  opinions, unless you give me an example that
21  then I can consider.
22      Q.  So is it your testimony that the legal
23  framework, to borrow your phrase, doesn't impact
24  your economic analysis?

Page 63

1      A.  It is my understanding that a court
2  may take into account things other than
3  economics in assessing damages.
4      The things that I take into account
5  are economic variables.
6      I have in my report explained why I
7  have an understanding that some of the
8  approaches that I describe may also be of
9  relevance to the court.  I am not telling the
10  court which ones to consider.
11      Q.  Yeah.  Dr. Stiroh, respectfully,
12  you've turned the question on its head.
13      I have a well-developed understanding
14  of what courts consider.
15      What I have asked you is whether, in
16  your economic analysis and your opinions, you
17  considered the legal framework, as you used that
18  term.
19      MR. GOLDBERG:  Objection to form.
20  Argumentative.  Asked and answered.
21      A.  I don't have a basis to incorporate a
22  legal framework into my analysis.
23      I am not a lawyer.  I have worked on
24  matters where, for example, there is a -- a

Page 64

1  statutory prejudgment interest rate, and I have
2  taken those cases -- where appropriate, I have
3  taken the statutory interest rate and used it in
4  analyses.
5      I don't know -- I can't think of an
6  example like that that is relevant here.
7      Q.  Does it matter to you when the point
8  of injury occurred in this case?
9      MR. GOLDBERG:  Objection to form.
10  Vague.
11      A.  It does.
12      Q.  In what way?
13      A.  I understand that the allegations
14  include an allegation that the VCDs at issue
15  increase the risk profile of a potentially
16  adverse health outcome for patients that consume
17  them.
18      I understand that the change in the
19  risk profile depends on factors such as the
20  amount of the -- of the products at issue that
21  were consumed, the weight of the person
22  consuming them, and other health factors.  Those
23  can change over time.
24      I have an analysis in my report that

Page 65

1  considers the available information on how long
2  and how many and of what concentrations of the
3  products at issue certain class members took.
4      That timeframe comes into account in
5  assessing whether damages can be determined on a
6  class-wide basis with information common to the
7  class.
8      Q.  Did you give any consideration to when
9  the drugs were purchased in time, to your
10  economic analysis?
11      A.  I --
12      MR. GOLDBERG:  Objection.
13      A.  I think my answer just -- I think my
14  answer answered that question.
15      It -- my understanding is that the
16  class period for the consumers and TPPs starts
17  in 2012 and goes to the recalls.
18      And I consider that patients are
19  differently situated over that timeframe, that
20  there are potentially class members who have
21  taken the products at issue for longer periods
22  than others.  And I describe that in my report.
23      Q.  You listed the plaintiffs' economic
24  loss complaint, as well as our memorandum of law

Confidential Information Subject to Protective Order

Page 66

1 supporting class certification, as items that
2 you read and relied upon; correct?
3      A.  Yes.
4      Q.  Did you glean from any of that when
5 the plaintiffs allege that the economic harm
6 occurred?
7           And I don't mean the class period.  I
8 mean, when was economic harm occurring for each
9 class member?  Did you glean that?
10     A.  Are you asking me about the economic
11 loss damages to the purported class of
12 consumers?
13     Q.  Yes.
14         MR. GOLDBERG:  Objection to form.
15     A.  It is my understanding that the harm
16 to consumers is alleged to come from consumption
17 of the products at issue.
18         The products at issue were --
19     Q.  And when you -- I apologize.  I spoke
20 over you.  Go ahead.
21     A.  The product at issue were consumed in
22 different amounts, in different quantities, and
23 over different frame -- timeframes by the class,
24 and I have considered that in my report.

Page 67

1      Q.  When you say "consumption," do you
2 mean ingest?
3      A.  I do.  Sorry about that.  I do.
4      Q.  Did you in any way, shape or form
5 consider that the economic harm is unrelated to
6 consumption, but related to the purchase of the
7 drug?
8      A.  I understand that the allegations of
9 harm to TPPs are not related to their
10 consumption of the drug.
11          I understand that the allegations of
12 harm to consumers comes from the fact that they
13 have consumed a drug that includes impurities.
14          If a consumer did not consume it or
15 purchased it on behalf of somebody else, a -- a
16 parent for a child, for example, I understand
17 that it is considering the harm for -- on the
18 consumers to the person that consumed the drug.
19     Q.  Is it your understanding, therefore,
20 that the economic harm claimed in the economic
21 loss complaint on behalf of the consumer class
22 is unrelated to the purchase of the drug, that
23 is, the transaction at the retail level in which
24 some monies is exchanged between consumer and

Page 68

1 the retailer?
2      A.  It is not my understanding that those
3 are unrelated.
4      Q.  Well, how is that related to your
5 analysis of the economic harm here?
6      A.  My consideration of economic harm
7 includes a consideration of the difference
8 between the price paid, which would be the price
9 that was paid at retail, for example, for the
10 products at issue, and the value received.
11          And the value received would be the
12 value that a patient who consumed the product
13 received from consuming it.
14     Q.  So the definition of value in that
15 sentence and in your analysis is the therapeutic
16 value that was given or provided to the patient;
17 correct?
18     A.  It includes the therapeutic value that
19 was provided to the patient, yes.
20     Q.  What else is included in your
21 definition of value in that construct?
22     A.  The -- other factors that could be
23 considered in value to a patient that consumes
24 it are the either presence or lack of side

Page 69

1 effects from consuming the product at issue, the
2 effectiveness of the drug that they have
3 experienced relative to perhaps taking other
4 blood pressure medications, the ease with which
5 they can take it and remember to take it on a
6 particular daily, weekly, timeframe.
7           Whether they are obtaining it through
8 a mail order and it comes to their house versus
9 they have to drive to get it.
10          There may be other things, but those
11 are the ones that come to mind.
12     Q.  Are you able to assign economic values
13 to the elements that you just laid out for me?
14     A.  Can you say what you mean by "assign
15 economic value"?
16     Q.  Yeah.  Assign a cash value to it, a
17 dollar value to the elements you just described
18 as making up value.
19         MR. GOLDBERG:  Objection to form.
20 Ambiguous.  Overbroad.
21     A.  From the standpoint of economic
22 theory, things that give value to a consumer can
23 be measured in dollar terms.
24     Q.  Okay.  Have you done that in your

Confidential Information Subject to Protective Order

Page 70

¹ analysis and report?

²    A.  I have not assessed the value of the

³ products received on a

⁴ class-member-by-class-member basis.

⁵      My report and opinions of this class

⁶ certification stage of the case includes the

⁷ opinion that such an analysis requires

⁸ individual information and cannot be performed

⁹ on a class-wide basis.

¹⁰    Q.  Is there a reliable methodology of

¹¹ which you're aware that can place a dollar value

¹² on any of the elements of value that you've

¹³ described to me?

¹⁴    A.  In a general sense, there are economic

¹⁵ methods that have been used to assess changes in

¹⁶ consumer welfare that to an economist means all

¹⁷ of the aspects of value that a consumer would

¹⁸ obtain.

¹⁹      To assess damages or loss of consumer

²⁰ welfare in this matter, the diminution of value

²¹ to a consumer depends on factors that are unique

²² to a consumer and are not market-wide.

²³      So information in this matter would

²⁴ be, you would need individual-by-individual

Page 71

¹ information to assess the diminution of value,

² if any.

³    Q.  Yeah.  And assuming all of that to be

⁴ true, it's correct that you didn't attempt to

⁵ provide a formula or describe a methodology at

⁶ which any of those values could be quantified;

⁷ correct?

⁸    A.  I do not describe how an economist

⁹ would consider putting a dollar value on loss of

¹⁰ consumer welfare.  It is the concept that is

¹¹ underlying my report.

¹²      I described the information that would

¹³ be needed to do so and note that that

¹⁴ information is individualized and not

¹⁵ class-wide.

¹⁶    Q.  So, in other words, if a court and/or

¹⁷ jury were to decide that the proper measure of

¹⁸ damages in this case is the actual dollars paid

¹⁹ by both consumers as well as TPPs, and that

²⁰ number is $4.4 billion, you would have no way to

²¹ reduce that by ascribing any value or diminution

²² to the value elements that you described for me;

²³ correct?

²⁴    A.  I don't think I'm following the

Page 72

¹ hypothetical in your question.

²      It had in it at the beginning, as I

³ heard it --

⁴    Q.  I'll restate it for you.  I'll restate

⁵ it for you.

⁶      I want you to assume that a court and

⁷ a jury has concluded that the damages in this

⁸ case total $4 billion, which is the actual money

⁹ paid by consumers and insurers for these

¹⁰ contaminated drugs.

¹¹      You with me so far?

¹²    A.  Yes.

¹³    Q.  And I want you to further assume that

¹⁴ the court will allow some evidence to diminish

¹⁵ that number by value that the consumers or the

¹⁶ TPPs received.

¹⁷      Tell me how you would measure that and

¹⁸ offer it as a -- what to deduct the $4 billion

¹⁹ number I asked you to assume.

²⁰      MR. GOLDBERG:  Objection to form.

²¹ Ambiguous.

²²    A.  I don't understand your hypothetical.

²³      In my experience, if a jury has

²⁴ reached an opinion and conclusion that is after

Page 73

¹ I have given my report and testimony, and I --

² my role has typically ended.

³    Q.  I want you to assume the following,

⁴ and I want you to listen carefully to me.

⁵      I want you to assume you haven't

⁶ testified me.

⁷      I want you to assume that the result

⁸ of a legal proceeding is that gross damages in

⁹ the amount of $4 billion have been arrived at

¹⁰ through testimony other than your own and

¹¹ through legal conclusions that the court made,

¹² and that the gross damages in this hypothetical

¹³ case is $4 billion, which was derived at by

¹⁴ simply adding the amount of that consumers paid

¹⁵ and insurers paid, and the court is now inviting

¹⁶ you as an expert to tell the court how to

¹⁷ diminish that sum by the value which you believe

¹⁸ the consumers or insurers in this case received.

¹⁹      Tell me the method by which you will

²⁰ apprise the court how to diminish the 4 billion

²¹ sum.

²²    A.  In a scenario where the court has

²³ determined a sum of money, if -- to me, if they

²⁴ have determined what damages are, then I have

Page 74

1  got to say this is outside of my experience to
2  understand what it is that I'm now being asked
3  to do.
4       If a judge were to tell me, I
5  understand, here is all of the spending on the
6  drugs.  How do I get from this spending to what
7  are economic damages?
8       Depending on the information that I
9  have available to me, if it is the set of
10 information that I have in my report, I would
11 explain to the judge that individual information
12 is required from consumers to assess the
13 diminution of value in the product that they
14 actually experienced.
15     Q.  And you would agree you didn't do that
16 in your report; correct?
17     A.  I don't think that is correct.
18      I think exactly what I have done in my
19 report is to tell the court or the judge that
20 individual information is required to assess
21 diminution of value.
22     Q.  Did you provide a methodology for
23 arriving at a dollar value assigned to the
24 intangible values you've described?

Page 75

1      A.  I have not laid out a framework in my
2  report for assessing the reduction in consumer
3  welfare, if any.
4       I have described that that cannot be
5  done without information that is individualized.
6      Q.  Did you consider whether or not
7  adulterated drugs can be placed into and sold
8  within the U.S. drug supply market, that is,
9  placed into the interstate commerce in the
10 United States?
11     A.  I have considered that -- in my
12 report, I have considered that in the context of
13 evaluating Dr. Conti's opinions.
14      I have an example in my report where
15 it is not reasonable from an economic standpoint
16 to assume that a product loses value because it
17 is not FDA approved in the U.S. where it may be
18 FDA approved elsewhere, and that it is not
19 reasonable to assume from an economic standpoint
20 that because it is not FDA approved, it would
21 have zero value to all potential consumers.
22      MR. GOLDBERG:  Ruben, could we --
23     Q.  Did it matter to you --
24      MR. GOLDBERG:  Can you hear me?

Page 76

1       Can we take a minute off -- can we
2  take a minute off the record?  We've been
3  going -- I know we had a break, but I would
4  like to take a -- a bio break, if we could.
5       MR. HONIK:  Yeah.  Okay.  I'm in the
6  middle of something.  There's one or two
7  questions that would be a more --
8       MR. GOLDBERG:  Okay.  Why don't you go
9  ahead.  That's fine.  Go ahead, Ruben.
10     Q.  Dr. Stiroh, did it matter to you in
11 your analysis and in arriving at your opinions
12 whether it is permissible under U.S. law to sell
13 adulterated or misbranded drugs to U.S.
14 consumers and end payers?
15     A.  It matters to my opinions.
16      I have an opinion that that fact, if
17 or where true, does not mean that the drugs do
18 not have value to consumers.
19      I have opinions in my report that
20 relate to the fact that the drugs at issue were,
21 in fact, sold and consumed by consumers.
22     Q.  If you were told to assume that
23 adulterated drug products cannot be placed into
24 the stream of commerce, would any of your

Page 77

1  opinions have changed?
2      A.  On a going-backward basis for
3  considering the diminution of value, if any, for
4  products that were consumed, that factor does
5  not affect whether consumers obtained value for
6  the product that they consumed, I have
7  considered and described elsewhere in my report
8  a consideration of how to evaluate differences
9  in financial outcomes for consumers if the
10 products had not ever been available in the
11 United States.
12      MR. HONIK:  This is a good time to
13 break.
14      Go off the record.
15      THE VIDEOGRAPHER:  The time now is
16 12:07 p.m.  We are off the record.
17      (A recess was taken from 12:07 to
18 12:15.)
19      THE VIDEOGRAPHER:  The time right now
20 is 12:15 p.m.  We are back on the record.
21     Q.  Dr. Stiroh, are you ready to proceed?
22     A.  I am.  Thank you.
23     Q.  I want to develop just a little kind
24 of -- call it almost a side understanding here

Confidential Information Subject to Protective Order

Page 78

1 by way of a -- an illustration unrelated to this
2 case specifically, but just to understand how
3 you do certain things as an economist in
4 analyzing litigation issues.
5      If you're working on an antitrust
6 case, for example, involving a claim of generic
7 delay -- an antitrust claim of generic delay,
8 would an economist -- or doesn't an economist
9 typically try to assess what impact to the cost
10 of the drugs during the period of delay may or
11 may not have occurred?
12    A.   In a generic delay case, an economist
13 may consider potentially whether there was a
14 difference in the cost of the drugs, but also
15 the price of the drugs to which they were sold
16 through various channels of distribution.
17    Q.   Right.  And I -- look, I don't want to
18 belabor this.  I just -- I don't need to be
19 provocative.  I just want to get certain
20 understanding about how you go about things as
21 an economist.
22      But the claim in that case is that
23 consumers and/or insurers pay more for the drug
24 than they should have because there was some

Page 79

1 collusion or antitrust behavior that caused the
2 delay for generic entry.
3      That's what those cases are about;
4 right?
5      MR. GOLDBERG:  Objection to form.
6 Ambiguous.
7    A.   There are generic delay cases that I
8 am aware of that have the economic component
9 that I would be familiar with is that the -- the
10 price of the product is higher than it otherwise
11 would be.
12      But for the delay, there could also be
13 a component that the cost is also different.
14    Q.   Where do you turn to to understand
15 what the pricing is or was for the drugs in
16 question in that scenario?  Where do you turn?
17    A.   In cases where I have worked on a
18 generic delay matter, the data that I look at is
19 frequently historic data.
20      Cases that I have been involved in
21 have had a period where there is no generic
22 entry and a period when there is generic entry,
23 and the economic exercise is essentially
24 back-casting from that data to consider what

Page 80

1 outcomes would have been had the point of
2 generic entry occurred earlier.
3    Q.   Right.  When you say "back-casting,"
4 you mean creating a but-for world where there is
5 different points of generic entry; right?
6    A.   Yes.
7    Q.   And all I -- and here is, sort of, the
8 punch line.
9      I just want to understand, where do
10 you collect or get the historic data for
11 pricing?
12    A.   In cases that I have worked on, there
13 have been -- has been available data both for
14 scenarios where there are few generic
15 manufacturers and cases where there then has
16 been later in the timeframe generic entry.
17      And from the actual data on actual
18 transactions for the products at issue, it is
19 possible to construct a model to say what if
20 the -- a generic had entered six months earlier?
21      And we see from the pricing pattern
22 what actually happened to prices when the
23 generic did enter, and we consider can that be
24 moved back six months?  How did economic

Page 81

1 conditions vary in the six-month-earlier period?
2 Are there other factors, such as availability of
3 the active ingredient?  Factors such as that.
4      But it's essentially in matters like
5 that that I have worked on.
6      There are cases where we do have
7 representative data to show what happens when
8 there is generic entry and how prices behaved
9 prior to generic entry.
10    Q.   Yeah.  I understand all that.
11      And do you get the pricing data from
12 IQVIA?
13    A.   I have worked with pricing data from
14 IQVIA for matters like that, yes.
15    Q.   And you find that reliable data?
16      MR. GOLDBERG:  Objection to form.
17 Speculative.  Ambiguous.
18    A.   It matters as to what it is that I am
19 using it for.
20      The IQVIA data are generally used, in
21 my experience in pharmaceutical matters, because
22 they gather data from a variety of different
23 sources.
24      In matters that I have worked on, it

---

Page 82

1 may be that that -- those data are supplemented
2 by information on sales and prices from the
3 manufacturers.
4        But I have used IQVIA data in other
5 matters.
6    Q.  So if I heard you correctly, there are
7 two sources for what you described as historic
8 data -- or historical data:  Sales and pricing
9 from the actual manufacturer, as well as pricing
10 information from IQVIA; correct?
11    A.  I'm not sure what you're asking me.
12        Are you asking me specifically what I
13 have looked at, or you're asking me to tell you
14 what might be available in a generic delay case?
15    Q.  I'm asking you if as an economist in
16 doing antitrust cases, you routinely rely on
17 both IQVIA sales data, pricing data, as well as,
18 when available, sales and pricing data from the
19 manufacturer of a particular pharmaceutical drug
20 product.  Yes or no?
21        MR. GOLDBERG:  Objection to form.
22 Ambiguous.
23    A.  In matters that I have been involved
24 in that involved pharmaceutical markets, I have

---

Page 83

1 relied on IQVIA data.
2        I don't know if I can say that I
3 relied on it in every instance, but I have
4 relied on IQVIA data, and I have relied on
5 information available from the manufacturers.
6    Q.  Thank you.
7        Now, before we broke, we spoke a
8 little bit about the impact of the theories of
9 liability in this case to your economic
10 analysis.
11        Do you remember we talked a bit about
12 that?
13    A.  I do.
14    Q.  And I know you discussed and you
15 listed among your -- the reliance materials the
16 complaint in this case which formed the
17 plaintiffs' allegations.
18        You've looked at the briefing on class
19 certification.
20        You've certainly acquainted yourself
21 with the various theories of liability against
22 not only the manufacturers, but all of the
23 defendant entities in this supply chain;
24 correct?

---

Page 84

1    A.  I don't think that is correct.
2        I have read the complaint.  I have
3 read the information in -- that is listed in my
4 Exhibit 2 to my report.
5        I have reviewed other information on
6 other court filings, but I did not set out to
7 understand all of the theories of harm or
8 liability from a legal standpoint.
9        I have looked at information that is
10 relevant to a consideration of economic loss
11 damages.
12    Q.  Did you consider whether or if
13 warranties were breached in this case?
14    A.  I did not make an assumption one way
15 or another whether or if warranties were
16 breached in this case.
17    Q.  Did you consider what the proper
18 measure of damages would be for a breach of
19 warranty-based claim?
20        MR. GOLDBERG:  Objection to form.
21 Calls for a legal opinion.
22    A.  I'm not opining and not offering an
23 opinion to the court on what the appropriate
24 measure of damages would be for a breach of

---

Page 85

1 warranty claim.
2        I have considered the economic
3 theories that underlie economic losses and
4 described how I approached that type of
5 analysis.
6        And to the extent that that is
7 relevant to various theories of liability that a
8 court might consider, the court can take my
9 opinion into account.
10        I have not set out to tell the court
11 what theory of damages applies to different
12 theories of harm.
13    Q.  I'm a little confused.
14        What do you mean by "underlying
15 theories" in your answer?
16    A.  I'm not sure how I used it.
17    Q.  Okay.
18        MR. HONIK:  Jeff, can I have the
19 answer read back to me, please.
20        (The record was read back.)
21    Q.  Dr. Stiroh, what did you mean by
22 "considered economic theories" in that response
23 that the court reporter just read back?
24    A.  I had in mind the discussion that is

---

Confidential Information Subject to Protective Order

Page 86

1  in my report that considers diminution of value
2  being the difference between the price paid and
3  the value received.  From an economic
4  standpoint, that is a change in consumer
5  surplus.
6      I have also considered a difference in
7  financial outcomes, and that is the difference
8  in prices paid in a scenario where the products
9  at issue were consumed compared to a scenario
10 where alternative products would have been
11 purchased.
12     Q.  Well, is it fair to say that each of
13 the two models that you just described would be
14 measures of damage?
15     MR. GOLDBERG:  Objection.  Calls for a
16 legal opinion.
17     THE COURT REPORTER:  Counsel, could
18 you repeat that question?  I didn't hear it
19 clearly.  This is Jeff.
20     Q.  Did you hear it, Dr. Stiroh?
21     A.  I believe that I did, yes.
22     Q.  Okay.  For the benefit of the court
23 reporter, let me try to restate or rephrase it.
24     You described, one -- I'll call it a

Page 87

1  model or a measure that you referred to as
2  "diminution of value."
3      Do you remember that?
4      A.  Yes.
5      Q.  And then you described what I
6  understood, and I wrote down in shorthand,
7  another measure or formula that you referred to
8  as "financial outcome."
9      Do you remember that?
10     A.  I do.
11     Q.  The second of those two, the
12 financial -- could we refer to it, just for ease
13 of reference in our talk here, to the second
14 model or measure as financial outcome and the
15 first one dimunition?
16     Would that be okay with you?
17     A.  Yes.
18     Q.  So if we focus on financial outcome,
19 if I listen carefully, the formula for
20 determining damages under that approach would be
21 prices paid and compare it to alternative
22 product cost; correct?
23     A.  You are describing for me what I said
24 is a model comparing financial outcomes?

Page 88

1      Q.  Yes, ma'am.
2      A.  I think you use "cost" differently
3  from how I use it, and I'm concerned there could
4  be some confusion.
5      I -- my model, where I would consider
6  differences in financial outcomes from the
7  standpoint of a consumer, I consider the
8  financial outlay, the difference in their
9  financial position purchasing the products at
10 issue and an alternative product.
11     For a -- somebody further upstream,
12 then it may be relevant to consider the
13 difference in both the prices paid and the costs
14 of the -- acquiring the product.
15     Q.  Yeah.  So I completely understand.
16     Let me give you an illustration of
17 what I understand you mean by the measure of
18 damages we're referring to as financial outcome.
19     If someone pays $10 for a drug and you
20 now want to compare the cost of getting an
21 alternative drug, if that alternative drug is
22 $12, there's no economic loss, because the
23 alternative cost exceeds the paid price;
24 correct, in that hypothetical?  Right?

Page 89

1      A.  No.  In that hypothetical, there is no
2  financial loss to the consumers.
3      I have defined economic loss in my
4  report as a difference between the price paid
5  and the value received.
6      Q.  Okay.  But I don't want to leave this
7  area until I've understood the two measures that
8  you've outlined for me.
9      And the one we're going to focus on
10 now is what we referred to -- I referred to, and
11 you agreed to accept -- as financial outcome.
12     Can you give me an example using
13 specific drugs and costs and tell me how
14 financial outcome is a measure?
15     A.  If there were a consumer that was
16 taking Valsartan, and in the absence of supply
17 of the Valsartan that they consumed they would
18 have switched to Irbesartan, the difference in
19 financial outcomes for them depends on whether
20 they are a cash consumer and pay a retail price
21 for two products, because the retail prices are
22 different, or whether they are insured, and then
23 it depends on their insurance plan and what the
24 co-pay or co-insurance amount is for differences

Confidential Information Subject to Protective Order

Page 90

1 for the -- the two products.
2        The exercise is to consider what were
3 the financial outlays for the Valsartan that
4 they purchased and what the financial outlays
5 would have been had they consumed a different
6 blood pressure medication.
7     Q.   That's correct.  So if the financial
8 outlay would have been $10 for the Valsartan and
9 the replacement drug is $12, there's no
10 financial outlay or loss to that consumer,
11 right; in the simplest terms; right?
12    A.   If the financial outlay would have
13 been the same, that is correct, there is no
14 difference in the financial outcomes for the
15 consumer.
16    Q.   I actually completely misspoke.  I
17 misspoke.
18        If the replacement drug was actually
19 $12, or $2 more, their loss is $2, in my
20 hypothetical; correct?
21    A.   No.  I think you have assumed that the
22 financial outlay for the replacement drug is
23 higher, which is a reasonable assumption,
24 because I think the replacement drugs often did

Page 91

1 have a higher price.
2        But for that consumer, they did not
3 suffer a financial loss from taking the
4 Valsartan at issue, because their financial
5 outlays would have been higher in the absence of
6 the supply of the Valsartan product that they
7 consumed.
8     Q.   What if the replacement drug was less
9 expensive than the $10 Valsartan cost?
10    A.   In instances for class members who
11 would have switched to a replacement drug and
12 had a lower financial outlay, their financial
13 losses are calculated as the difference in the
14 financial outlay consuming Valsartan and the
15 financial outlay that they would have had with a
16 different medication.
17    Q.   So if in my hypothetical it was $10
18 for the Valsartan and $8 for the replacement or
19 alternative, what's the loss for that consumer
20 in your model?
21    A.   The financial loss to the consumer in
22 that model would be $2.
23        If it is assuming equivalence of the
24 product that they're purchasing, if that is what

Page 92

1 they go for, pay for a month's supply of
2 Valsartan and a month's supply of the
3 replacement product, the financial loss is $2 in
4 your scenario.
5     Q.   And turning to the diminution model,
6 which you said was price minus the value
7 received, if the price of the drug was $10 and
8 the value you're ascribing is control of one's
9 blood pressure, what would the deduction be?
10    A.   The -- sorry.  The scenario here is to
11 consider for a consumer the diminution of value
12 from the Valsartan at issue?
13    Q.   That's right.
14    A.   Yes.  Then the consideration for that
15 consumer is how they value the -- or would price
16 the increased risk of their consumption of
17 Valsartan, if any, because of the presence of
18 alternatives, and whether that has a change to
19 their risk profile of eventually contracting a
20 disease that they wouldn't, in the absence of
21 the impurities at issue.
22        And the diminution of value, their
23 internal intrinsic valuation of the product
24 would depend on things such as how much they had

Page 93

1 to consume, over what timeframe, the degree of
2 impurities, if any, in the product that they
3 consumed, their ability to manage their blood
4 pressure with Valsartan compared to what the
5 alternative products might be, what side effects
6 of alternatives might be that made Valsartan be
7 the product of choice for that consumer, and, my
8 understanding, things like their weight and
9 health history.
10    Q.   Dr. Stiroh, I confess, I'm completely
11 confused by your answer.
12        What I want to understand before
13 moving on is how your diminution model works.
14        And I want you to assume that a
15 particular consumer of a VCD has paid $10 for
16 his or her prescription.
17        And the question in court and for you
18 as an economist is, what, if any, financial loss
19 did that individual suffer by accepting as true
20 that there's some impurity or contamination to
21 that product?
22        What would you look at in the
23 diminution model, assuming the consumer paid
24 $10?

Page 94

1  Tell me what you would do step by
2  step.
3  MR. GOLDBERG: Objection. Asked and
4  answered.
5  A. I think in your question you added
6  financial loss into how I would approach the
7  diminution.
8  I have described them in my report as
9  two separate pieces.
10  The financial loss is what comes out
11  of your pocket.
12  The diminution of value starts with an
13  economic framework where the price that a person
14  pays for a product, the fact that they have gone
15  and paid that price indicates to an economist
16  that they value the product at least as much as
17  the price paid.
18  If there is additional information
19  that comes to light that changes their
20  understanding of a product that they received,
21  so that they understand that they received a
22  different product than they believed they were
23  purchasing, it is possible that their value for
24  that product would have been diminished.

Page 95

1  As economists, we think of that as a
2  loss of consumer surplus. I think I used the
3  phrase "consumer welfare." I mean them
4  equivalently.
5  The measures of consumer welfare would
6  depend on what the loss of intrinsic value to a
7  customer is based on the new information about
8  the product that they consumed.
9  That diminution is going to depend on
10  factors that are specific to an individual, such
11  as the risk of consuming it, the information
12  that they may receive from their doctor, their
13  health histories, their own aversion to risk, or
14  their willingness to accept risk because of the
15  attributes of the product that they feel they
16  cannot get elsewhere.
17  Q. That is extremely helpful, because if
18  I've understood you correctly, there are
19  actually two definitions of "value," according
20  to you in your last answer; correct?
21  MR. GOLDBERG: Objection to form.
22  Ambiguous. Mischaracterizes the testimony.
23  A. I don't know what you have in mind as
24  my two definitions of "value." If you could

Page 96

1  explain them, then I'll consider them.
2  Q. Yes, I can tell you.
3  I wrote down that you said one way to
4  look at value is, quote, financial loss is what
5  comes out of your pocket.
6  Remember you told me that?
7  A. I did tell you that.
8  My recollection when I said that was
9  because the question that you had asked me had
10  diminution of value and financial loss.
11  And in the prior questions, we had
12  separated those two topics, and I was clarifying
13  for you the financial loss discussion has to do
14  with the money that comes out of your pocket.
15  The diminution of value discussion has
16  to do with the intrinsic value of a product to a
17  consumer who purchases it.
18  Q. That's right. Financial loss is
19  defined by you as what comes out of your pocket,
20  and diminution in value is what you paid less
21  consumer welfare; right, loss of consumer
22  welfare?
23  Is that what you said?
24  A. Yes.

Page 97

1  Q. And so if we focus only on what you've
2  now defined for all of us as financial loss,
3  namely, what comes out of your pocket, that --
4  that's one measure of damage; right?
5  MR. GOLDBERG: Objection to form.
6  Calls for a legal opinion.
7  A. Financial losses have been used as a
8  measure of damages in economic matters in which
9  I have been engaged.
10  Diminution of value considers other
11  factors, not just the market prices of products.
12  Q. Tell me as succinctly as you can how
13  you yourself have used and measured financial
14  loss in matters in which you've been engaged as
15  an expert economist.
16  A. I have considered -- sorry. Just to
17  make sure I'm answering it correctly, I'm just
18  going to ask that the question be read back
19  again.
20  Q. Sure.
21  (The record was read back.)
22  A. All right. I have measured financial
23  loss for a class of franchisees who were the --
24  alleged wrongdoing was that they did not have

Confidential Information Subject to Protective Order

Page 98

¹ available to them multiple source of supply for
² products that they needed to run their
³ franchises.
⁴       And I measured that using a regression
⁵ analysis where I compared the prices for the
⁶ necessary inputs where there were multiple
⁷ sources of supply, with necessary inputs where
⁸ there were few sources of supply to estimate
⁹ what happens to prices when there are available
¹⁰ additional sources of supply.
¹¹       And I used that to estimate what the
¹² difference in profits would have been for the
¹³ franchisees had there been additional sources of
¹⁴ supply for a number of necessary products.
¹⁵       I have performed --
¹⁶       Q.  Let me -- I'm sorry.  I didn't mean to
¹⁷ cut you off.  Please continue.
¹⁸       A.  I understood that your question to ask
¹⁹ me how I have done this, but -- how I have
²⁰ considered financial losses, and I can take you
²¹ through the ones that I remember.
²²       Q.  Let me clarify.
²³       As a way of explaining to me and to
²⁴ others listening to you, as an economist, what

Page 99

¹ the formula or model is for financial loss.  I
² understand you've given a very concrete example.
³       Can you give me a somewhat more
⁴ generic -- generic or general description of how
⁵ financial loss as an economist is arrived at,
⁶ that is, how you figure out someone or some
⁷ entity's loss coming out of their pocket?
⁸       How do you determine that?
⁹       A.  I consider --
¹⁰       MR. GOLDBERG:  Objection.  Ambiguous.
¹¹       A.  -- the economic circumstances of the
¹² entity in the world as it is, and that may
¹³ include the prices paid, or for an entity
¹⁴ further up the distribution chain, the prices
¹⁵ paid in the costs -- or the prices received and
¹⁶ the costs paid, and I consider what the economic
¹⁷ variables would be in the absence of some
¹⁸ conduct that is challenged as being wrongful.
¹⁹       And that analysis depends on what
²⁰ conduct is challenged to be wrongful and the way
²¹ that that conduct would interact with economic
²² variables.
²³       I have worked on matters where the
²⁴ conduct at issue would affect the cost of

Page 100

¹ certain inputs, in addition to, or in the
² alternative, where the conduct at issue affects
³ the prices of products paid, I have worked on
⁴ matters where the conduct at issue affects the
⁵ availability of alternative products.
⁶       Basically, economics has to do with
⁷ the interaction of various economic variables,
⁸ and if something changes in the supply chain,
⁹ there may be other economic implications for
¹⁰ other variables.
¹¹       And the economist's role would be to
¹² consider those implications and arrive at a
¹³ comparison of the financial situation as is and
¹⁴ the financial situation as it would have been
¹⁵ under different circumstances.
¹⁶       Q.  I totally understand that answer.
¹⁷       What you're conveying is that you
¹⁸ start by looking, as you put it, at economic
¹⁹ circumstances, which is often the price in
²⁰ question that was paid; right?
²¹       That's where you started; correct?
²²       A.  That is often a starting place,
²³ correct.
²⁴       Q.  That's right.  It's often the starting

Page 101

¹ place.
²       And then if I've understood you, what
³ you look at is the alleged conduct that alters
⁴ that construct, the liability, and you look at
⁵ and consider a but-for world of sorts in which
⁶ that conduct did not occur, and then you try to
⁷ figure out that economic variable in its absence
⁸ what impact to price occurs; right?
⁹       A.  I don't --
¹⁰       MR. GOLDBERG:  Objection.  Ambiguous.
¹¹       THE WITNESS:  Sorry.
¹²       A.  I don't think so precisely.
¹³       You put the word "liability," when --
¹⁴ in your restatement, and that's not something
¹⁵ that I considered.
¹⁶       I consider the economic implications
¹⁷ of conduct and not liability because -- as I
¹⁸ understand it as a legal matter.
¹⁹       Q.  I take your point.  And you're right,
²⁰ I speak as a lawyer.
²¹       And, really, what I meant to say and
²² should have said is "conduct."  That's the word
²³ you used to describe the shift or the point of
²⁴ comparison, economically speaking, between the

Confidential Information Subject to Protective Order

1  starting point, which is the price paid, and
2  this sort of but-for economic scenario that was
3  caused by some conduct; correct?
4      MR. GOLDBERG:  Objection.
5  Mischaracterizes.
6      A.  I think at a high level, that is
7  correct.
8      I consider the economic scenario that
9  would have unfolded absent some type of conduct
10 in a consideration of financial loss damages
11 where the financial losses are differences in
12 economic outcomes.
13     Q.  And reasonable economic minds can
14 disagree about the components of that model or
15 measure; isn't that true?
16     MR. GOLDBERG:  Objection to form.
17 Ambiguous.
18     A.  I don't know what you have in mind
19 about what the reasonable minds would disagree
20 on with respect to the components of that
21 measure.
22     I have been involved in matters where
23 there was disagreement over the appropriate
24 interest rate, what the cost implications of

1  certain conduct was, what available alternatives
2  might have been.
3      I don't know if I'm agreeing with you
4  or disagreeing with you at this point.
5      Q.  No.  I -- I kind of get what you're
6  doing.
7      So reasonable economic minds could
8  disagree about the starting pricing, right, that
9  you're starting with the -- as you put it,
10 economic circumstances, you -- one could
11 disagree about what the starting price is;
12 right?
13     A.  I would have to think of a situation,
14 and I don't -- only because when I said starting
15 price and agreement with you, I had in mind
16 actual prices as they are.  Those would be
17 market facts.  Those -- that would be
18 information in the record, and I don't see a
19 dispute over that.
20     Q.  Okay.  So let's start with that.
21 That's a good starting place.
22     There's no dispute in your mind that
23 the market fact, the market reality, is that
24 consumers and insurers paid what they paid for

1  these VCDs during the class period; correct?
2      A.  Did you say there's no ambiguity in my
3  mind?
4      Q.  That's right.
5      A.  I'm not aware of a dispute on those
6  market facts.  If there is one, it's something
7  that I'm not aware of.
8      I understand that to be in the class,
9  a consumer had to have paid some amount for a --
10 for the Valsartan that they consumed.
11     Q.  That's right.  I mean, the
12 prescription records are so abundantly detailed,
13 that we know exactly what consumers contributed
14 and we know how much insurers paid.
15     That's not in dispute in this case;
16 right?
17     A.  I disagree with that.
18     MR. GOLDBERG:  Objection to form.
19     A.  One of the issues that matters at the
20 class certification stage is whether you can
21 tell whether a class member has -- what amount
22 they have paid.  And I think you need to do --
23 you need individual information from class
24 members on that.

1      I think that what you are saying is
2  some amount in aggregate.  And even there, there
3  could be dispute over whether that is the amount
4  paid or whether it fails to include things like
5  discounts or rebates that were given at a time
6  and collected in a different database and cannot
7  be accurately tied back to the initial purchase.
8      Q.  Do you -- do you dispute anywhere in
9  your report what the economic circumstances or
10 prices paid were by the two economic classes?
11     A.  I do not dispute that there were
12 prices paid by the two purported classes.
13     It is my opinion that to assess on a
14 class-member-by-class-member basis what the
15 damages incurred by any individual class member,
16 you would need information on the price that
17 that actual class member paid.  And that
18 information is not widely available.  It is --
19 to my mind, we only --
20     Q.  Weren't you --
21     MR. GOLDBERG:  Hang on.  Wait.  Let
22 the witness answer the question.
23     A.  I understand that there has been some
24 data provided only by three plaintiffs, and one

Confidential Information Subject to Protective Order

Page 106

1 plaintiff had, I think, some aggregated data,
2 but I don't think that there exists in this case
3 class-member-by-class-member expenditures on the
4 products at issue.
5     Q.  Class-member-by-class-member
6 expenditures?  Is that what you said?
7     A.  It is.
8     Q.  Is it your opinion that
9 class-member-by-class-member expenditure needs
10 to be demonstrated in order to certify a class?
11 Is that your opinion?
12        MR. GOLDBERG:  Objection to form.
13    Calls for a legal opinion.
14    A.  My understanding as an economist is
15 that one of the things that a court would
16 consider in determining to certify a class is
17 whether the class members have been harmed.
18        And when I use "harm," I use it in an
19 economic sense, by the conduct at issue, where
20 the measure of harm being considered is
21 diminution of value.
22        And that is the difference between the
23 price paid and the value received, you need to
24 have information on the price paid, and then you

Page 107

1 also need information that would allow you to
2 assess the value received.
3        Both of those require individual
4 information that has not been provided, or I'm
5 not aware of, on a class-member-by-class-member
6 basis.
7     Q.  Dr. Stiroh, we're not talking about
8 your diminution model; we're talking about your
9 financial outcome or financial loss model.
10        Do you remember that?
11        MR. GOLDBERG:  Objection --
12    Q.  That's what I want to stick with.
13    Can we do that?
14        MR. GOLDBERG:  Objection to form.
15    Mischaracterizes the record.
16    A.  Within the financial model, the
17 information that is not currently available on a
18 class-member-by-class-member basis is still the
19 amount that they actually paid for both models.
20        One of the inputs is the actual
21 expenditures, and we don't have that information
22 on a class-member-by-class-member basis.
23    Q.  Ma'am, I want to direct your attention
24 to one thing and one thing only, and that is the

Page 108

1 measure of damages that you described to me,
2 that you and I have been referring to as
3 "financial loss," which begins by looking at
4 actual prices.
5        Isn't that what you told me?
6        MR. GOLDBERG:  Objection to form.
7    Mischaracterizes the record.
8    A.  I'm not sure what you're asking me.
9        I think you're --
10    Q.  I'm asking you if it is true that you
11 told me under oath that in looking at the
12 financial loss model, which is the loss that
13 comes out of your pocket, one begins by looking
14 at, as you put it, economic circumstances, which
15 is usually the actual price paid for something.
16        Isn't that the starting point?
17        MR. GOLDBERG:  Objection to form.
18    Mischaracterizes the testimony.
19    A.  For financial losses, you compare the
20 actual economic circumstances of a class member
21 with the economic circumstances -- the financial
22 economic circumstances they would have
23 experienced under some alternative.
24        And so an input, whether it is the

Page 109

1 first one or a different -- or something
2 considered later on is what they actually paid
3 for the product at issue.
4    Q.  That's right.  What they actually paid
5 for the product.  Let's just stop there.
6        The question I next have is:  In
7 calculating the actual price paid, isn't it true
8 that as an economist, you can take an aggregate
9 of the prices paid for the products in question?
10 Yes or no?
11        MR. GOLDBERG:  Objection to form.
12    Ambiguous.
13    A.  It depends on what your purpose is.
14        If your purpose is to assess the
15 aggregate expenditures, you can use an
16 aggregate.
17        If your purpose is to assess whether
18 you can -- whether class members have been
19 financially affected by the conduct under
20 consideration, you need to evaluate the
21 expenditures on a class-member-by-class-member
22 basis.
23    Q.  And then the next step would be, as
24 you described it, to look at the alternative

Confidential Information Subject to Protective Order

Page 110

¹ circumstance and assign a value to that;
² correct?
³    A.   What do you mean by "assign a value to
⁴ that"?
⁵    Q.   Well, you tell me.  We're looking at
⁶ your financial loss model.  We've now
⁷ established the pricing and the way that you've
⁸ described.
⁹         How would you then arrive at a dollar
¹⁰ value for this alternative circumstance in order
¹¹ to determine the loss?
¹²    A.   In a situation such as this one where
¹³ class members can choose to take different
¹⁴ actions --
¹⁵    Q.   I'm not asking you about this one,
¹⁶ Doctor, respectfully.  I'm not asking you about
¹⁷ VCDs.
¹⁸         I'm asking you about this measure,
¹⁹ this model that we're talking about generally in
²⁰ economics.
²¹         You've established there's a financial
²² loss model, which is defined as what comes out
²³ of your pocket.  The starting place is actual
²⁴ economic circumstances, typically prices paid.

Page 111

¹ You've established that.
²         You've now told me that you -- the
³ next step in this formula that you apply,
⁴ economically speaking, is to determine the
⁵ alternative; in other words, the economic
⁶ variable in the absence of whatever conduct is
⁷ that changed the world.
⁸         And I'm asking you, how do you arrive
⁹ at a dollar value for that to deduct it from the
¹⁰ actual price paid?
¹¹    MR. GOLDBERG:  Objection to form.
¹² Mischaracterizes the testimony.  Asked and
¹³ answered.
¹⁴    A.   In a general sense, you would consider
¹⁵ what the range of alternatives are that are
¹⁶ available in the absence of certain conduct,
¹⁷ whether there is information that guides which
¹⁸ of the alternatives class member might take up,
¹⁹ what the costs of those alternatives,
²⁰ whether there are any relevant market factors to
²¹ be taken into account, and assess the
²² differences between the financial situation of
²³ the -- call it the actual world and the
²⁴ financial situation of a class member under some

Page 112

¹ alternative course of conduct.
²    Q.   So the two terms that I wrote down
³ that you employed was "the actual world," and
⁴ then you compare it to the "alternative course
⁵ of conduct world."
⁶         Did I get that right?
⁷    A.   Yes.
⁸    Q.   And you used the -- the expression
⁹ "range of alternative circumstances," I think to
¹⁰ imply that there are sometimes multiple ways to
¹¹ look at the alternative course of conduct world;
¹² correct?
¹³    MR. GOLDBERG:  Objection to form.
¹⁴ Mischaracterizes testimony.
¹⁵    A.   There may be multiple ways to look at
¹⁶ the alternative course of conduct world.
¹⁷         There may also be alternatives
¹⁸ available to purported class members for any
¹⁹ particular characterization of the alternative
²⁰ course of conduct world.
²¹         And in my answer, I may have used the
²² same words to talk about two different things,
²³ but there are two points of variation:
²⁴         One, what does the overall alternative

Page 113

¹ course of conduct world look like, and then
² within any one of those, what do consumers do?
³    Q.   What do you mean, "what do consumers
⁴ do," in that sentence?
⁵    A.   With respect to this case, one of the
⁶ things that consumers might do is choose a
⁷ different medication in consultation with their
⁸ doctor to manage their blood pressure.
⁹         And so the economic circumstances,
¹⁰ choosing a different medication, depend on the
¹¹ medication that they choose.
¹²    Q.   And so you would ascribe a cost to
¹³ that alternative medicine in that scenario and
¹⁴ deduct that from the actual cost that you start
¹⁵ with; is that right, in that measure?
¹⁶    A.   From the standpoint of a consumer, I
¹⁷ would consider the price that they paid for the
¹⁸ medication that they are on and the price that
¹⁹ they would have paid for an alternative
²⁰ medication, and the alternative medication can
²¹ vary class member by class member.
²²    Q.   And to go back to an example that you
²³ and I spoke about and you confirmed, if the
²⁴ actual price was 10 and the alternative price

Confidential Information Subject to Protective Order

Page 114

1  was 8, you told me the loss is 2; right?
2      That would be an example of what we
3  just described; right?
4      MR. GOLDBERG:  Objection to form.
5      A.  The financial loss for a class member
6  who paid 8 -- $10 and would have paid a co-pay
7  of $8 would be 2.
8      Q.  And if we had an alternative course
9  of --
10     A.  I'm sorry.  I said that back -- I
11 apologize.  I said that backwards.  And so the
12 answer will not make sense.
13     The other way around.  If they would
14 have paid 8 and would have paid 10 -- no.  I
15 forget now which way you asked me.
16     The difference in financial outlays
17 between what they did pay and what they would
18 have paid is the measure of financial losses.
19     Q.  Dr. Stiroh, here's where I end up.
20     If the alternate course of conduct is
21 subject to various alternative circumstances,
22 aren't you telling me that economically, there
23 are multiple ways in certain circumstances to
24 look at what you're comparing between the actual

Page 115

1  and this alternate circumstance world?
2      It can vary; correct?
3      MR. GOLDBERG:  Objection.  Ambiguous.
4      A.  The choices that consumers make can
5  vary consumer by consumer.
6      For an individual --
7      Q.  I haven't asked you that --
8      MR. GOLDBERG:  Counsel, don't
9  interrupt -- Counsel, don't interrupt the
10 witness.
11     A.  My answer was that the choices that
12 consumers make can vary consumer to consumer.
13     Q.  Yeah.  I'm asking a question about
14 economics and about economists and models that
15 they use.
16     And the question I'm posing to you is,
17 when you look at the range of alternative
18 circumstances, figuring out if it's $8 or $9 or
19 $15 to compare to the starting place, which you
20 said is the actual price, I'm just asking, that
21 can vary depending upon how you look at it;
22 correct?
23     MR. GOLDBERG:  Objection.  Ambiguous.
24     Asked and answered.

Page 116

1      A.  I'm not sure what you mean by that,
2  and it may be that I am focused more on this
3  case and this framework than in a general sense.
4      In this case, the frame -- the
5  circumstances that we are considering changing
6  is that a consumer chooses a different product.
7      The -- depending on the product chosen
8  and the insurance plan, if any, for the
9  consumer, the amount they pay may differ.  A
10 different consumer for the same product may pay
11 a different price, and a different consumer may
12 choose a different product and also pay a
13 different price, and all of that would have to
14 be considered.
15     Q.  Dr. Stiroh, from an economic
16 standpoint, you acknowledge and understand that
17 what Dr. Conti did was a financial loss
18 analysis; correct?
19     A.  In my view, she has done neither a
20 diminution of value or a financial loss analysis
21 that is consistent with economic principles.
22     Q.  Yeah.  I know that's your conclusion,
23 and I know you disagree with her in every
24 respect.

Page 117

1      But based on what you've now told us
2  under oath, she took the actual prices paid by
3  consumers and insurers and compared it or
4  deducted it from the alternative circumstance.
5      And the alternative circumstance in
6  Dr. Conti's economic model is that those drugs
7  should have never been in the supply chain,
8  which means they have a zero value.
9      At the minimum, disagreeing as I know
10 you do, you understand that that's what she did;
11 correct?
12     A.  I understand that she assumed that all
13 of the drugs at issue were worthless, and I
14 disagree with her on that.
15     She did not do a financial loss model
16 because she did not consider in any
17 circumstances the financial circumstances of
18 consumers if they had consumed a different
19 product.
20     Q.  That's right.  Your complaint here is
21 that there isn't an offset for a replacement or
22 an alternative drug; correct?
23     A.  For the financial loss model, there
24 needs to be a consideration of what consumers

Confidential Information Subject to Protective Order

Page 118

1 would have done in the absence of supply for the
2 Valsartan at issue.
3        Without that consideration there -- it
4 is an incomplete model.  It is not consistent
5 with economic theory.
6    Q.  Understood.  So if we take Dr. Conti's
7 model and fix it in the way you say it needs to
8 be fixed, we'll use this example.
9        The actual price for the drug is $10.
10 She believes the comparative price in the
11 alternative circle is zero.  That means you have
12 net 10.  And you have now told us that you now
13 have to take an alternative cost and factor that
14 in.
15        And so if the alternative cost is 8,
16 the person has a $2 loss; right?
17    A.  I'm not sure what you're asking me to
18 agree with in that sentence.
19        You had statements about what
20 Dr. Conti has done or hasn't done, and then
21 something else that needs to be added.
22        In my view, her approach to financial
23 losses is incomplete, because she does not
24 consider what consumers would have purchased in

Page 119

1 the absence of supply of the
2 Valsartan-containing drugs at issue.
3    Q.  You really have two principal
4 objections to what Dr. Conti has done.
5        Objection Number 1 is that she has
6 ascribed zero value or worthlessness to the
7 contaminated drug, and in the model you and I
8 have now been speaking about for the last
9 half-hour she has failed to factor in the actual
10 cost of an alternative drug; right?
11    MR. GOLDBERG:  What is the question?
12    A.  Those are among the points that I
13 disagree with Dr. Conti's opinion.
14        I disagree that it is appropriate from
15 an economic standpoint to assume the products
16 consumed are worthless.
17        And I disagree that she has put
18 forward a valid damage model because she neither
19 considers the diminution of value to the
20 products -- to the consumers based on the
21 products that they consumed, nor does she
22 consider a financial differences model, which
23 would require considering what patients would
24 have done in the alternative to consuming

Page 120

1 Valsartan-containing drugs.
2    Q.  If you were instructed by the court as
3 a matter of law that these contaminated drugs
4 were legally worthless, would you accept that?
5    A.  I don't know what that means.
6        I have training and experience as an
7 economist.  And as an economist, my opinion is
8 that it is not appropriate to say that they are
9 worthless.
10        If there is a legal opinion and that
11 has legal meaning, then I'm not sure the court
12 needs me.
13        My opinions and my -- the report that
14 I have written give an economic opinion and an
15 economic assessment of the issues involved in
16 assessing class-wide damages from the conduct at
17 issue in this case.
18    Q.  Dr. Stiroh, I'm at a loss to
19 understand why you say the court wouldn't need
20 you if the court determined as a matter of law
21 that these contaminated drugs were worthless.
22        The court would still need an
23 economist like you or Dr. Conti to count up the
24 losses.

Page 121

1        Don't you agree?
2    MR. GOLDBERG:  Objection to form.
3    A.  I guess I don't know what the court
4 needs and don't mean to be opining on what the
5 court needs.
6        I have been asked to give my opinions
7 as an economist on certain topics related to
8 economic loss damages and other models of
9 economic damage assessment, and I have done
10 that, and I don't have an opinion on what the
11 court requires.
12    Q.  I haven't asked you that.
13        What I have done is what I'm permitted
14 to do, and that is to direct you to accept the
15 hypothetical.
16        And the hypothetical I'm asking you to
17 accept for our -- purposes of discussion is that
18 the drugs are economically worthless as a matter
19 of law, and, in turn, economics, law imposing
20 its will on economics.
21        Under that circumstance, could you,
22 number 1, accept that, and then calculate
23 damages?
24    MR. GOLDBERG:  Objection to form.

Confidential Information Subject to Protective Order

Page 122

1  Calls for a legal opinion.  Ambiguous.
2  Speculation.
3      A.  It is outside my experience for how I
4  as an economist have a role in various cases
5  where there are allegations of wrongdoing and an
6  assessment of harm.
7      Where I have participated in cases and
8  assessed damages, I have done my own damage
9  calculation by applying economic principles.
10      There is frequently an economist or an
11  accountant or somebody on the opposing side that
12  may do an alternative or different measure of
13  damages.
14      The -- in my experience, those models
15  are presented to the court and the court reaches
16  opinions.
17      Q.  Well, you're confirming that you would
18  be incapable of accepting as a matter of fact in
19  your analysis that the comparative in the
20  alternative circumstance is zero?
21      You would be unable to accept that and
22  work with that value; correct?
23      MR. GOLDBERG:  Objection to form.
24  Mischaracterize the testimony.

Page 123

1      A.  In my opinion, that is not a measure
2  of value, and my opinions would be based, as
3  they are in this case, on what an economist
4  considers in assessing value.
5      Q.  Doctor, take the next exhibit in your
6  pile that we sent you there.
7      MR. GOLDBERG:  Ruben --
8      Q.  I believe it's --
9      MR. GOLDBERG:  -- if this is -- you
10  know --
11      MR. HONIK:  Yes.
12      MR. GOLDBERG:  We said we were going
13  to take a lunch break.  We have been back
14  on for about an hour.
15      Is this a good time, or are you still
16  in this line of questioning?
17      MR. HONIK:  No.  I'm still in this
18  line of questioning.
19      Q.  I would like you to take out, at Tab
20  Number 6, that document, please.
21      THE COURT REPORTER:  Counsel, this is
22  the court reporter.  I take it you want me
23  to put exhibit stickers on these as they're
24  produced?

Page 124

1      MR. HONIK:  That would be great.
2      We're going to call this one Stiroh 2,
3  Exhibit 2.
4      MR. GOLDBERG:  Ruben, do you have a
5  tile for this document?  I just want to
6  make sure I've got the right one.
7      MR. HONIK:  It's Judge Kugler's Motion
8  to Dismiss Opinion 3:  Warranty Claims.
9      MR. GOLDBERG:  Then I don't have the
10  right thing.
11      MR. HONIK:  Should be attached.
12      (MTD Opinion 3: Warranty Claims was
13  marked Stiroh Exhibit 2 for identification,
14  as of this date.)
15      Q.  Do you have it?
16      A.  I have this.
17      Q.  Okay.  I'm not able to see that.
18      Can you verify that you're holding the
19  caption of this case, Judge Kugler's Motion to
20  Dismiss Opinion 3:  Warranty Claims?
21      A.  I do.  I have it.
22      Q.  Okay.  Have you ever seen Exhibit 2
23  before?
24      A.  I believe that I have.

Page 125

1      Q.  Is it true that you've never seen it
2  before January 12, 2022?
3      MR. GOLDBERG:  Objection to form.
4  Mischaracterizes the testimony.
5      A.  It is not true to the best of my
6  recollection.
7      Q.  Is it true that you didn't list this
8  document in your reliance materials?
9      A.  That is correct.
10      Q.  And you have a specific list of
11  reliance materials called Court Filings;
12  correct?
13      A.  Correct.
14      Q.  And this is not on that list, nor is
15  any other pronouncement of the court; correct?
16      A.  Correct.
17      Q.  I want you to turn with me to page 14
18  of Exhibit 2.
19      Are you there, Dr. Stiroh?
20      A.  Not yet.  If you just give me a
21  minute.
22      I have page 14 in front of me.
23      Q.  If you look at the second line --
24  sentence of that page, of Exhibit 2, the court's

Page 126

1  opinion, it says, and I quote, The court finds
2  that for prescription drugs, the mere
3  identifying and marketing a drug as the generic
4  equivalent to a branded pharmaceutical listed in
5  the Orange Book, and then selling that generic
6  equivalent when it contains a contaminant not
7  included in the Orange Book listing, constitutes
8  a breach of express warranty.
9       Did I read that correctly?
10      A.  I believe so, yes.
11      Q.  Did you consider that finding in your
12  analysis and the opinions in your report?
13      A.  To the best of my recollection, I had
14  reviewed this document.
15      It does not have a specific role for
16  my opinions with respect to my economic
17  conclusions regarding economic losses.
18      Q.  So whether or not there's a breach of
19  express warranty for the reasons set out by the
20  court did not influence or impact your opinions
21  at all; correct?
22      MR. GOLDBERG:  Objection to form.
23      Asked and answered.
24      A.  In my opinions evaluating the economic

Page 127

1  loss to consumers, that is correct.
2      Q.  Turn to page 20 of Exhibit 2, please.
3      Let me know when you're there.
4      A.  I have page 20.
5      Q.  You see the second full paragraph that
6  begins with the words, This court finds...?
7      A.  I see that.
8      Q.  The court wrote as follows, and I
9  quote, This court finds that contaminated drugs
10  are economically worthless at the point of sale
11  by virtue of the dangerousness caused by their
12  contamination, regardless whether the sold VCDs
13  actually achieved the medical purpose of
14  lowering blood pressure.
15      Did I read that correctly?
16      A.  I believe so.
17      Q.  Did you consider that finding by the
18  court anywhere in your analysis or opinions?
19      A.  I reviewed this document.  I did not
20  rely on it for reaching my opinions.
21      My opinions are based on my training
22  and experience as an economist, and I have
23  reached independent opinions about the economic
24  value of the products at issue and how to assess

Page 128

1  economic loss damages, if any.
2      I don't know the basis for what the
3  court takes into account.  I know the basis for
4  what I take into account in reaching that
5  opinion.
6      Q.  Can you explain to me why you read and
7  then ignored the court's finding that these
8  drugs are, as it puts it, economically
9  worthless?
10      Why did you ignore that?
11      MR. GOLDBERG:  Objection to form.
12      Mischaracterizes the testimony, and
13      argumentative.
14      A.  I don't think it is right to say that
15  I ignored it.  I reviewed this document.
16      I was asked to offer my opinion as an
17  economist about whether economic loss damages
18  can be determined with information and methods
19  common to the class.
20      I approached that in an independent
21  manner, considering what I as an economist would
22  review to reach an opinion about economic loss
23  damages, and I have done that.
24      Q.  By "independent," do you mean at odds

Page 129

1  with the court?
2      A.  I do not mean at odds with the court.
3      MR. GOLDBERG:  Note my objection.
4      Q.  Do you see the sentence that follows,
5  which reads, Put differently, contaminated
6  drugs, even if medically efficacious for their
7  purpose, cannot create a benefit of the bargain
8  because the contaminants in their dangerous
9  effects were never bargained for?
10      Did I read that correctly?
11      A.  I believe that you did.
12      Q.  Did you consider that finding by the
13  court in your report or any part of your
14  analysis?
15      A.  I reviewed this document for the
16  purposes of my report and my opinions.
17      I consider the -- independently, the
18  economic information that is available and reach
19  an opinion based on my training and experience
20  as an economist.
21      Q.  So you disagree when the court writes
22  that the -- that the consumer didn't receive a
23  benefit of his or her bargain?
24      You fundamentally agree with that and

Page 130

1 believe that there was some benefit; correct?
2          MR. GOLDBERG:  Objection to form.
3          Ambiguous.
4     A.  I don't know what the framework is
5 that the judge takes into account in reaching a
6 legal opinion.
7          I do know what the framework is that I
8 take into account, and my economic framework
9 leads me to the opinion that it is not correct
10 to assume that the drugs were uniformly
11 worthless to all purported class members.
12     Q.  But you understood that, unlike you,
13 Dr. Conti took this for what it says, that the
14 drugs are economically worthless?
15          You understand that she accepted what
16 the court found; correct?
17     A.  I understand that she has assumed the
18 drugs are economically worthless, and I have
19 explained in my report why as a matter of
20 economics that is not a valid assumption to
21 make.
22     Q.  But if the court hired you,
23 Dr. Stiroh, to be the court's expert and
24 directed you that the drugs were worthless, you

Page 131

1 would then ascribe the value of zero to them in
2 your financial loss model that you and I went
3 through earlier, wouldn't you?
4          MR. GOLDBERG:  Objection to form.
5 Mischaracterize the testimony.
6     A.  That is wholly outside my experience
7 or any work that I have ever undertaken.
8          If I were retained by the court, and I
9 have been retained by antitrust authorities, I
10 still offer an independent economic analysis
11 that may or may not comport with the legal
12 framework because the legal framework is outside
13 of my experience.
14          What the court does with that would
15 be, I think, up to the court to decide.
16          I have never in my experience been
17 told what opinion to reach and then offered that
18 opinion.
19     Q.  Dr. Stiroh, respectfully, if the court
20 instructed you that the drugs in question here,
21 the VCDs in this MDL, are economically worthless
22 because of a legal principle, could you not then
23 ascribe a zero value and compute the loss
24 exactly as Dr. Conti did?

Page 132

1          MR. GOLDBERG:  Objection to form.
2 Speculation.
3     A.  I will say again that is just so far
4 outside my experience, that I cannot imagine
5 that scenario happening.
6          In my experience, economists are
7 brought into legal proceedings to give an
8 economist's point of view, and where I have been
9 retained, that is what I have done, including in
10 this matter.
11          I have never been asked to assume a
12 value and then asked to opine on that value.
13          I have been asked to consider whether
14 economic loss damages can be determined with
15 information common to the class, and it is my
16 opinion that economic loss damages, being the
17 difference between the price paid and the value
18 received, vary class member by class member and
19 cannot be determined with information common to
20 the class.
21     Q.  Doctor, didn't you tell me earlier
22 today and write in your report that you offer no
23 legal opinions and don't venture into the legal
24 framework of what the proper measure of damages

Page 133

1 is?  Didn't you tell me that?
2          MR. GOLDBERG:  Objection to form.
3 Mischaracterizes the testimony.
4     A.  I believe that I told you that.  I
5 don't think my answer in any way differed from
6 that.
7          To the extent that there was
8 confusion, my opinions are economic opinions,
9 and I offer them in the context of economics.
10          I am not opining for the court on what
11 the appropriate legal context is.
12     Q.  Dr. Stiroh, I'm not confused.  I'm
13 reading your language.
14          And it says the following:  I also do
15 not opine on the legal issues relating to the
16 proper measure of damages or on which measure
17 should be used.
18          Those are your words in paragraph 5 of
19 your report.
20          And so what I'm positing before we
21 break for lunch is, if the court tells you that
22 the proper measure to be used is to take the
23 actual price paid for the drug, reduce it by its
24 economic worth, which in this case is zero, and

Confidential Information Subject to Protective Order

Page 134

1 then calculate the loss, is that something you
2 could do?
3         MR. GOLDBERG:  Objection to form.
4         Asked and answered.
5     A.  If I were asked to perform a
6 calculation and told what numbers to sum up, I
7 could do that.
8         If I were told to call that result
9 economic losses, I would not be comfortable
10 offering that opinion because, in my opinion,
11 that summation of numbers is not economic
12 losses.
13        MR. HONIK:  All right.  Good time to
14 break.  Let's go off the record.
15        THE VIDEOGRAPHER:  The time right now
16 is 1:25 p.m.  We are off the record.
17        (Luncheon recess at 1:25)
18
19
20
21
22
23
24

Page 135

1     A F T E R N O O N  S E S S I O N
2     (2:04)
3 LAUREN J. STIROH, Ph.D.,
4     resumed, having been previously duly
5     sworn by a Notary Public, was
6     examined and testified further
7     as follows:
8         THE VIDEOGRAPHER:  Time now is
9     2:04 p.m.  We are back on the record.
10 CONTINUED EXAMINATION BY MR. HONIK:
11    Q.  Dr. Stiroh, a while before we broke
12 for lunch and we spent some time talking about
13 the two different models that you described for
14 me, namely financial loss and diminution of
15 value, I was actually asking you some questions
16 that pertain to some of the specific theories of
17 liability in this case.
18        Do you remember we talked a bit about
19 that?
20    A.  Probably not with sufficient clarity.
21 To continue on that conversation, I would need
22 to hear questions again.
23    Q.  Of course.  And one of the things you
24 told me, or confirmed, is that you didn't

Page 136

1 consider specifically what the proper measure of
2 damages might be, for example, for a warranty
3 base claim, correct?  Do you remember telling me
4 that?
5         MR. GOLDBERG:  Objection to form.
6         Mischaracterizes the testimony.
7     A.  I did not opine on what the
8 appropriate measure of damages would be for a
9 warranty claim.
10        To the extent that the Court finds
11 that the work and the measures of damages that I
12 have considered are relevant, then the work that
13 I have done is relevant to those claims.
14    Q.  I'm sorry, I -- I thought you started
15 out by saying that you didn't offer an opinion
16 about what the measure of damages would be for a
17 warranty claim.  Is that -- that part right?
18    A.  That's not what I said.  I said I
19 didn't offer an opinion on what the correct
20 measure of damages would be for a warranty
21 claim.
22        I do have opinions on the economic
23 considerations and economic loss damages, or
24 damages measured as differences in financial

Page 137

1 outcomes.
2         And to the extent that my opinions and
3 work related to those measures of damages are
4 relevant to what a Court would consider for a
5 warranty claim, then that work would apply.  But
6 I have not been the person that says, This is
7 the damages for a warranty claim.
8         MR. HONIK:  Jeff, can I trouble you to
9     read just the very beginning part of that
10    response?  I tried to get it, but I -- I --
11 I was exasperated and didn't get it down.
12    (The record was read back.)
13        MR. HONIK:  Stop there for a minute.
14    Q.  I don't think that's what you said,
15 Dr. Stiroh, is it?
16    A.  It is not.
17    Q.  You said you did not, that's right.
18 Jeff, she said, I did not.
19        MR. GOLDBERG:  Hang on.
20        MR. HONIK:  Can you read it again
21    slowly starting with, I did not offer.
22    (The record was read back.)
23    Q.  Okay.  Next question, you ready,
24 Dr. Stiroh?

Confidential Information Subject to Protective Order

Page 138

1    Did you offer an opinion on what the
2  correct measure of damages are for an unjust
3  enrichment claim in this case?
4      MR. GOLDBERG:  Objection to form.
5  Calls for a legal opinion.
6      A.  I have an understanding of what the
7  measure of damages for unjust enrichment are,
8  and it is expressed at least under romanette ix,
9  on page 8 in my report.
10     Q.  What is that measure or calculation?
11     A.  I understand unjust enrichment damages
12 to be the portion of a benefit conferred by a
13 plaintiff on a defendant which it would be
14 unjust for the defendant to retain.
15     Q.  Did you actually perform a calculation
16 to determine whether or not unjust enrichment
17 damages exist in this case?
18     A.  I have considered what Dr. Conti wrote
19 in her report about the methods that she says
20 she would apply to calculate unjust enrichment
21 damages, and I have considered what she said in
22 her deposition regarding how the variables that
23 she thinks would be relevant, and I have
24 opinions related to the -- what she purports to

Page 139

1  do, that are expressed in my report.
2      Q.  Do you have any opinions about the
3  correct measure of unjust enrichment damages,
4  separate and apart from whatever criticism you
5  may have of what Dr. Conti did on unjust
6  enrichment?
7      A.  Are you asking me do I have opinions
8  about the quantum of unjust enrichment damages,
9  if any, or the methods?
10     Q.  No.  I'm asking you how you would
11 measure unjust enrichment.
12     MR. GOLDBERG:  Objection to form.
13 Ambiguous.
14     A.  In Section Roman V of my report, I
15 have a discussion of the retail pharmacy and
16 wholesaler damages related to plaintiff's theory
17 of liability and unjust enrichment, and in that
18 section, I describe my understanding of unjust
19 enrichment damages and the flaws that I see in
20 Dr. Conti's description of what she would do to
21 assess unjust enrichment damages, and I explain
22 the ways in which what she has set forward are
23 incomplete.
24     Q.  What paragraph are you referring to in

Page 140

1  your report?
2      A.  In that answer, I was referring to
3  paragraphs 65 through 72.  There is also a
4  discussion in my summary of opinions under
5  romanette ix, which is on page 8.
6      Q.  Do you agree that if the unjust
7  enrichment formula or calculation used by
8  Dr. Conti reflected profits, that the formula
9  would then be complete according to you?
10     A.  No.
11     The formula that Dr. Conti puts in her
12 report, in my view, is a superficial formula of
13 profits.  She says little more than profits are
14 revenues minus costs.
15     Calculating unjust enrichment damages,
16 even if starting -- if starting with profits as
17 part of that measure, there needs to be a way of
18 assessing what the relevant revenues are, and
19 assessing what the relevant costs are, and in
20 the pharmaceutical industry, both of those
21 measures can be very complicated.
22     There is a complex supply chain.
23 There are differences in the business structures
24 wholesaler to wholesaler, or retailer to

Page 141

1  retailer, such as the costs and the relevant
2  costs for each entity might differ depending on
3  the defendant, depending on the time period,
4  depending on the product that is being sold, and
5  the channel of distribution through which it
6  reached a wholesaler and then ultimately a
7  retailer.
8      Q.  That's your complete answer?
9      A.  Yes.
10     Q.  Dr. Stiroh, did you arrive at an
11 opinion about the proper measure of damages for
12 Consumer Product Act damages?
13     MR. GOLDBERG:  Objection to form.
14 Calls for legal opinion.
15     A.  I do not offer an opinion on the
16 correct legal framework for damages for Consumer
17 Product Act damages.
18     Q.  Dr. Stiroh, do you offer an opinion
19 anywhere in your report about the proper measure
20 of damages for common law fraud?
21     MR. GOLDBERG:  Objection to form.
22 Calls for a legal opinion.
23     A.  I do not offer an opinion on the
24 proper legal damages for common law fraud.

Confidential Information Subject to Protective Order

Page 142

1    Q.   Is therapeutic benefit synonymous with
2  economic worth, in your opinion?
3    A.   For a pharmaceutical product,
4  therapeutic benefit is a significant component
5  of economic worth.
6    Q.   And how do you go about measuring it?
7        MR. GOLDBERG:  Objection.  Ambiguous.
8    A.   For purposes of an economic analysis
9  that takes therapeutic benefit into account, I
10  would consider the relative therapeutic benefits
11  of one product compared to an alternative, and
12  need information from a consumer, or the doctor
13  of the consumer, that describes the
14  alternatives.
15        A component of damages that considers
16  what a consumer would take in the alternative to
17  Valsartan would have to consider what the
18  therapeutic value of that alternative was and
19  whether it was equivalent to the Valsartan that
20  they took, and differences in the therapeutic
21  value would have to be accounted for.
22        Assessing what those differences are,
23  would require, I think, a medical opinion, not
24  just an economic opinion.

Page 143

1    Q.   And in what way would you be able to
2  translate that economic analysis into dollars
3  and cents?
4        How do you value that in dollars?
5        MR. GOLDBERG:  Objection.  Ambiguous.
6    A.   For -- considering -- I'm sorry, I
7  guess I need you to say what the -- what it is
8  that you want me to value in dollars.
9    Q.   You said that therapeutic benefit,
10  while not synonymous with economic worth, is a
11  significant component.
12        I'm asking you whether and how that
13  translates or could be translated into dollars
14  and cents.
15    A.   We know, from expenditures on the
16  products at issue, that consumers valued the
17  therapeutic benefits of the products at least as
18  much as the price paid for them.
19        The -- if there is a difference in
20  therapeutic benefits measured, for example, by
21  differences in the ability to manage blood
22  pressure, then I could translate that into
23  dollars and cents, with input from a medical
24  expert, by considering what the expenditures

Page 144

1  would need to be to get to the same level of
2  blood pressure management.
3    Q.   Have you seen that input in this case
4  from any medical experts?
5    A.   I have not seen any input in the
6  materials that I have reviewed.
7    Q.   Have you ever had an engagement or
8  consultation in which you had such medical input
9  to arrive at a dollar value for therapeutic
10  value of a prescription drug?
11        MR. GOLDBERG:  Objection.  Vague.
12    A.   I have not worked on a matter that had
13  a sufficiently similar fact profile where the
14  measure of harm includes a potential diminution
15  of value that comes from differences in health
16  outcomes where that would need to be valued, but
17  it is something that would need to be valued in
18  this matter.
19    Q.   Have you ever so much as heard or read
20  about a reported case, in the economic or legal
21  literature, which done -- which has done what
22  you just described, namely, gotten medical input
23  in order to arrive at a dollar value for
24  therapeutic benefit in a prescription drug?

Page 145

1    A.   Yes.  Generally, I am aware of various
2  economic papers that look at the costs of
3  treating certain indications and the costs of
4  managing health outcomes.  It is not a field
5  that I specialize in.
6        I have encountered articles depending
7  on other cases that I have worked on that have
8  overlapped with health sciences, but that
9  economic concept of putting dollar values on
10  either -- certainly on mortality, as I mentioned
11  in my report, but the -- the costs of treating
12  different types of medical conditions, and the
13  costs of treating them under different
14  approaches to controlling that medical
15  condition, is something that I think is fairly
16  common in health economics.
17    Q.   You don't hold yourself out to be a
18  health economist, do you?
19    A.   I don't call myself a health
20  economist.  I am an economist that has expertise
21  working in some industries that relate to health
22  sciences.
23        I would consider this case to be a
24  matter like that, where I bring my experience as

Confidential Information Subject to Protective Order

1 an economist to a case that involves health
2 outcomes.
3    Q.   You know, of course, that that's all
4 Dr. Conti does, she's a health economist, don't
5 you?
6    A.   I recall her testifying something
7 along the lines of that is all she does.
8    Q.   And -- and you saw her bibliography in
9 which she authored literally hundreds of papers
10 and other contributions to the literature in
11 health economics.  Right?
12    A.   I have read her report.  I have to say
13 I'm not sure I paged through her bibliography
14 ever, but I take your word for it.
15    Q.   Do you agree that equilibrium price
16 from a classical economic standpoint is set by
17 the intersection of supply and demand?
18    A.   I do.
19    Q.   And do you agree that according to
20 economic theory, for a consumer product -- and
21 we're talking generally -- for a consumer
22 product to have economic value, demand for the
23 product must exist and supply must be allowed to
24 meet that demand?

1    A.   I disagree.
2    Q.   I didn't see among your reliance
3 materials your having relied upon -- unless I
4 missed it -- with the exception, I think, of
5 Dr. Chan, you -- you didn't read any of the
6 defense class experts in this case.  Have you?
7    A.   My team and I have reviewed the expert
8 reports that are listed in paragraph 6.  I don't
9 recall others and certainly not that I have
10 reviewed, if there are -- I just don't think
11 that I have, no.
12    Q.   Did you review the defense class
13 expert report prepared by Dr. Lambert, who is
14 both a Ph.D. chemist, an expert in the
15 pharmaceutical supply chain, a cGMP, and CMC
16 expert?
17    A.   I don't believe so.
18    Q.   Do you understand that in this case,
19 there are any number of pharmacy industry
20 experts with a variety of expertise in how the
21 supply chain works, how cGMP compliance occurs,
22 how CMC occurs, how FDA regulations impact this
23 case?  Are you aware of that generally?
24    A.   I'm aware that there are more experts

1 involved in this case, and my expertise is in
2 economics and I have focused my analysis on
3 materials that are relevant to my economic
4 analyses.
5    Q.   In listing your various reliance
6 materials, unless I missed it, I -- I do not
7 note your having relied on any of the U.S. Code
8 as it pertains to the introduction of drugs into
9 the supply chain.  Have you?
10    A.   I do not rely on any of the U.S. Code
11 as it pertains to the introduction of drugs into
12 the supply chain for the purposes of my opinions
13 that I'm offering in this report.
14    Q.   Are you -- are you, nonetheless,
15 familiar with any aspects of federal law as it
16 concerns the ability for a drug manufacturer to
17 introduce into the legal class of trade a
18 prescription drug?
19    A.   I have some familiarity with the
20 regulations concerning transactions in
21 pharmaceuticals, and entry of either new
22 pharmaceutical products or generic
23 pharmaceutical equivalents to existing
24 pharmaceutical products.

1    I have familiarity based on my prior
2 work, but it is not something that I am
3 intending to put forward opinions related to.
4    Q.   And certainly in this case, you didn't
5 rely upon any of those laws or regulations in
6 forming your opinions here, correct?
7    A.   That is correct.
8    Q.   Do you -- do you disagree that those
9 laws have an impact on determining whether
10 there's a legitimate supply curve for a
11 particular prescription drug?
12    MR. GOLDBERG:  Objection to form.
13 Ambiguous.
14    A.   Can you say how you are using the
15 phrase, "legitimate supply curve"?
16    Q.   Sure.  Do you think that there are any
17 laws that impact the ability of a manufacturer
18 to sell a drug in interstate commerce?
19    A.   My understanding is that there are.
20    Q.   And what impact, so far as you
21 understand, would those laws have on
22 determining, from an economic standpoint, the
23 legitimacy of producing a supply of a
24 prescription drug and, in turn, having a supply

Confidential Information Subject to Protective Order

Page 150

1 curve?

2       MR. GOLDBERG:  Objection to form.

3     Ambiguous.

4     A.  With respect to this case, are you

5 asking me?

6     Q.  No.

7       MR. GOLDBERG:  Same objection.

8     A.  I am aware that there are consumers in

9 the United States who seek to buy prescription

10 drugs outside of the United States for

11 consumption inside the United States.

12       That is a -- from an economic point of

13 view, that is supply of a product that could be

14 taken into account in doing an economic analysis

15 of supply and demand.

16     Q.  Are you familiar with the drug now

17 long banned called fen-phen?

18     A.  I am not.

19     Q.  That was a prescription diet drug that

20 caused a certain type of heart damage, that's

21 been long banned in the United States.

22       Do you have an opinion, as an

23 economist, what the value of that drug is, if

24 I'm not able to get it lawfully here?

Page 151

1     A.  I don't have a fully formed opinion

2 because I have never considered this scenario

3 before.

4       The components of value, though, if it

5 is something that you desire to get,

6 notwithstanding the fact that you can't get it

7 here, that tells me, as an economist, it has

8 value to you as a consumer.

9     Q.  Your -- your economic opinion is that

10 if it's unlawful for me to obtain, and no doctor

11 will give me a prescription, that fen-phen still

12 has some dollar value.  Is that your opinion?

13     A.  My opinion is that if you want it, or

14 a consumer wants it, that product has value to

15 you.

16     Q.  Let me ask the question differently.

17 In my hypothetical for fen-phen, is it lawful

18 for someone to sell it, a manufacturer, and

19 receive money for it?

20     A.  I don't know.  That -- you're asking

21 me now a legal opinion.  And my opinions are

22 rooted in economics, and economic value comes

23 from somebody wanting a product.

24     Q.  Well, respectfully, Dr. Stiroh, you

Page 152

1 don't limit your views in this case to purely

2 economic principles.  Your essential thesis here

3 is that class certification isn't available.

4 That's a legal question, isn't it?

5       MR. GOLDBERG:  Objection to form.

6     A.  Can you say again what my fundamental

7 opinion is?

8     Q.  Sure.  You're familiar with Rule 23 of

9 the Federal Rules of Civil Procedure, aren't

10 you?

11     A.  I am.

12     Q.  You -- you've written on that, haven't

13 you?

14     A.  I have written on the economics of it.

15     Q.  Well, you've written specifically

16 about case law, haven't you?

17     A.  I have written specifically about

18 various cases, but it is -- my writings are

19 related to the economics that were used in the

20 cases and considered by the court.

21     Q.  Dr. Stiroh, your writings relate to

22 the interplay between the class certification

23 rule, Rule 23, and economics, extensively,

24 haven't you?

Page 153

1     A.  I have written on the economics of

2 class certification, and I agree with you that

3 class certification is something that takes

4 place in a legal context.

5     Q.  That's a -- that's a very curious way

6 to put it, because, you know, as I read your

7 opinions, you write for -- just for example,

8 Economic loss damages to members of the consumer

9 or third-party payor classes, if any, cannot be

10 assessed on a class-wide basis using information

11 and methods common to the proposed class.

12       Is that your language?

13     A.  It is.

14     Q.  And I gather you've probably written

15 that sentence numerous times before, right?

16       MR. GOLDBERG:  Objection to form.

17     Ambiguous.

18     A.  I have not.

19     Q.  "Methods common to the proposed

20 class," is that an economic phrase or a legal

21 phrase?

22     A.  It may be a legal phrase.  In my

23 sentence when I said that the class-wide

24 damages, from my perspective, that aspect, is

Page 154

1 the economic part of it, whether the same words
2 would be used in a legal context or not.
3    Q.   "Cannot be assessed on a class-wide
4 basis," is that a legal phrase or an economics
5 phrase?
6    A.   It is the same answer I just gave you.
7 My assignment, as described in my report, was to
8 consider whether economic damages where I
9 have -- or economic harm, where it is -- I have
10 defined what I understand that to mean, can be
11 assessed on a class-wide basis, and that has
12 meaning to me as an economist, but my answer,
13 then, to the question is rooted in economics,
14 and it is an economic finding, not a legal one.
15    Q.   What does class-wide basis mean?
16    A.   As I use it, it means for the class as
17 a whole.
18    Q.   And how is that different in your
19 mind, as you use it, from individual basis?
20    A.   An individual basis would be to an
21 individual class member, and class-wide basis is
22 to the class as a whole.
23    Q.   Is that the extent of your
24 understanding?

Page 155

1    A.   Sufficient to answer your question,
2 yes.  To the extent that you will expand the
3 context, I may have a different answer, but in
4 the context in which I understood you to ask it,
5 that is the --
6    Q.   Do you understand --
7    A.   If I could just finish the answer so
8 it makes sense.
9       MR. GOLDBERG:  Hang on, Ruben.  She's
10 not finished the answer.
11    Q.   Let me know when you're done.
12       THE WITNESS:  I'm sorry.  If you could
13 just mark that my answer was incomplete,
14 there, that would be good.  I don't -- I've
15 lost my train of thought for it.
16    Q.   Are you addressing what's commonly
17 referred to as the commonality requirement, in
18 the sentence we just went over?
19       MR. GOLDBERG:  Objection to form.
20 Calls for a legal opinion.
21    A.   I have an understanding that when
22 doing work related to the class certification
23 phase of a litigation, that the work that I do
24 is most frequently used by the legal team in the

Page 156

1 context of responding to a commonality argument.
2       The work that I do is based on
3 economics and then is used by a legal team in
4 the legal context in whatever way they feel is
5 most appropriate based on their experience and
6 understanding.
7    Q.   Yeah, that's not really what I'm
8 asking you.  I'm simply asking if we can agree
9 that the shorthand way to refer to your
10 application of economic principles to this
11 aspect of class certification that you've been
12 speaking at length about is referred to as
13 commonality.  That's all I'm asking.
14       MR. GOLDBERG:  Objection --
15    Q.   Do you agree with that?
16       MR. GOLDBERG:  Objection to form,
17 asked and answered.  Calls for a legal
18 opinion.
19    A.   I guess I don't know that to be true
20 in all cases.  Or even in this one.
21       I have an understanding that if the
22 lawyers or the court is considering whether
23 there is a predominance of common issues, that
24 an economist's report and opinions may factor

Page 157

1 into the legal opinions on that subject.
2    Q.   Now you've introduced another legal
3 term, "predominance."  Do you know what that
4 means?
5       MR. GOLDBERG:  Objection to form.
6 Calls for a legal opinion.
7    A.   I understand it is a term that is
8 included in class certification findings, and I
9 have an understanding, from a layperson, of what
10 that means.  I don't -- wouldn't say I have a
11 legal understanding, because I'm not a lawyer.
12    Q.   Well, you do understand, though, don't
13 you, that this issue, or business of
14 commonality, needs to apply, on the one hand, to
15 liability issues, and on the other hand, to
16 damage issues.  Do you understand that much?
17       MR. GOLDBERG:  Objection to form.
18 Calls for a legal opinion.
19    A.   I have an understanding that a court
20 may consider whether the liability theories and
21 defenses are common to the class, and a court
22 may consider whether there are individual issues
23 and potentially weigh the common issues against
24 the individual issues to assess from a legal

Page 158

1   perspective which ones dominate.
2       Q.   You do understand that they fall into
3   two buckets, right?  That you have to
4   demonstrate this commonality concept on
5   liability, and separately for damages.  Do you
6   get that?
7           MR. GOLDBERG:  Objection.  Calls for a
8       legal opinion.
9       A.   I don't -- I don't get that from an
10  economic perspective.  I work on class
11  certification matters where I have an assignment
12  that I carry out, and then whether that is used
13  by the legal term to assess common issues on
14  liability or common issues with respect to
15  damages, that is up to the legal team.
16      Q.   Do you agree that whether the
17  manufacturers in this case who have produced the
18  VCDs adhere to cGMP in making them is a --
19  presents a common question of fact or law?
20          MR. GOLDBERG:  Objection to form.
21      Calls for a legal opinion.
22      A.   I don't have an opinion on that.
23      Q.   Do you have an opinion whether
24  nitrosamines, a probable human carcinogen, can

Page 159

1   present a common question of fact or law?
2           MR. GOLDBERG:  Objection to form.
3       Calls for a legal opinion.
4       A.   I don't have an opinion on that.
5       Q.   Do you have an opinion whether it's a
6   common question of fact or law whether the VCDs
7   in this case were contaminated with NDMA or
8   NDEA?
9           MR. GOLDBERG:  Objection to form.
10      Calls for a legal opinion.
11      A.   I don't have an opinion on that.  I
12  consider in my report the possibility that not
13  all products included the impurities NDMA and
14  NDEA in quantities that have been alleged to
15  cause an increase in the risk of cancer, and I
16  have opinions that stem from the -- or that --
17  that talk about how that interplays with the
18  economic outcomes.
19      Q.   Do you agree that it's a common
20  question of fact or law whether the defendant
21  manufacturers in this case were aware, or should
22  have been aware, of the potential for
23  nitrosamine formation prior to 2018?
24          MR. GOLDBERG:  Objection.  Objection

Page 160

1   to form.  Calls for a legal opinion.
2       A.   I don't have an opinion on that.
3       Q.   Do you -- do you know whether it's a
4   common question of fact or law whether the VCDs
5   were adulterated within the meaning of the
6   Federal Food, Drug, and Cosmetic Act?
7           MR. GOLDBERG:  Objection to form.
8       Calls for a legal opinion.
9       A.   I don't have an opinion on that.  I
10  have an understanding that not all of the drugs
11  at issue or all of the lots of the drugs at
12  issue may have contained any of the impurities
13  at issue, and I have a discussion of what that
14  means for Dr. Conti's opinions.  I don't have an
15  opinion as to the facts surrounding that issue.
16      Q.   Do you disagree that it's a common
17  question of fact or law to determine whether the
18  VCDs in question were misbranded?
19          MR. GOLDBERG:  Objection to form.
20      Calls for a legal opinion.
21          THE WITNESS:  Did he ask me do I have
22      an opinion or understanding?  Can you
23      repeat.  Or sorry.
24      Q.   I asked you if you agree --

Page 161

1       A.   Oh.
2       Q.   -- that whether or not the VCDs in
3   question here are misbranded is a common
4   question of law or fact.
5           MR. GOLDBERG:  Again, object to form.
6       Calls for a legal opinion.
7       A.   I don't think I even understand how
8   your question is constructed.  Whether --
9   whether I'm being asked to agree with the
10  statement, or being asked to agree that the
11  issue is a common issue.
12          I don't have an opinion, I think, on
13  either.  But I will say I don't think I
14  understood the question.
15      Q.   Dr. Stiroh, the fact is, you don't
16  question that there are common questions of fact
17  and law that would support certifying a class on
18  liability grounds.  Correct?
19          MR. GOLDBERG:  Objection to form.
20      Calls for a legal opinion.
21      A.   I don't offer opinions on that.  I
22  have opinions in my report related to the
23  assignment I was asked to undertake.
24          And the assignment was to consider

Page 162

1  whether damages from economic losses or
2  differences in financial outcomes can be
3  determined with information common to the class,
4  and it is my opinion that they cannot be
5  determined with information common to the class,
6  and you would need individualized information
7  for -- from purported class members.
8      Q.  Right.  You said that multiple times.
9  And the reason for that is because according to
10  you, you'd have to value the therapeutic benefit
11  on the one hand, and the various risk factors
12  that can only be viewed through the individual
13  consumer.  Right?
14      MR. GOLDBERG:  Objection to form.
15  Mischaracterizes the testimony.
16      A.  That is one of the reasons why you
17  need individual information.
18      Q.  I'm sorry, you're saying I'm correct?
19      A.  Your full statement was not correct,
20  but I do agree with you that you have stated
21  some of the reasons why you would need
22  individual information to properly assess
23  damages in this matter from an economic
24  standpoint.

Page 163

1      Q.  Yeah.  Before we broke for lunch, and
2  you and I looked together at what Judge Kugler
3  wrote about the economic worthlessness of the
4  drug and the concept that the drugs were worth
5  zero because of the failure of the benefit of
6  the bargain, you don't disagree that if that
7  ends up being the measure of damages, that that
8  subject is subject to common proof, do you?
9      MR. GOLDBERG:  Objection to form.
10  Mischaracterizes the testimony.  Calls for
11  a legal opinion.
12      A.  Can you say it again, or may I ask the
13  court reporter to repeat that question.
14      Q.  Sure.  Judge Kugler is correct that
15  the drugs are economically worthless for the
16  reasons you and I looked at together and,
17  therefore, have a value of zero that, arising in
18  class damages, is a simple matter of common
19  proof.  Correct?
20      A.  I don't agree with you.
21      MR. GOLDBERG:  And note my objection
22  as calling for a legal opinion.
23      Q.  Well, I know that you don't agree with
24  the premise and the foundation for that, for all

Page 164

1  the reasons you've written and we've talked
2  about, but if it turns out that the measure of
3  damages is financial loss, in the way you've
4  outlined to me, and you assume or accept that
5  the value of these drugs is zero, then one
6  could, quite readily, with common evidence,
7  proof, arrive at damages.  Correct?
8      A.  I disagree.  If the measure of damages
9  is determined to be financial loss, and thus, as
10  we discussed this morning, you compare the
11  financial position of class members as they were
12  and the financial positions as they would have
13  been had they not consumed the at-issue VCDs,
14  you have to consider, Are there other variables
15  that change.
16      The other variable that would change
17  is what product would they consume instead of
18  the VCD to manage their blood pressure.  That is
19  what is missing from what Dr. Conti did.
20      If you assume away or say that there
21  would not be any management of blood pressure,
22  then the comparison of situations at -- as they
23  are, and the situations as they would be, would
24  have to consider what happens to patients if

Page 165

1  they stop taking blood pressure medication, and
2  do they have adverse health outcomes that then
3  would also have different financial outlays than
4  they currently did when their blood pressure was
5  managed.
6      Q.  Dr. Stiroh, are you aware that in the
7  marketplace when these contaminated drugs were
8  sold, and afterwards, that there were
9  uncontaminated generic forms of Valsartan
10  available?  Are you aware of that?
11      A.  I am aware that there are other forms
12  of Valsartan that are not alleged to have the
13  impurities, yes.
14      Q.  And you are aware that in addition to
15  these uncontaminated generic forms of Valsartan,
16  there were a whole host of other ARBs, drugs of
17  this class, that control blood pressure,
18  correct --
19      A.  I'm aware of that --
20      Q.  -- available to consumers?
21      And you are aware that there were also
22  branded or innovator drug -- drugs available to
23  treat these conditions as well, correct?
24      A.  I am aware of the presence of other

Confidential Information Subject to Protective Order

Page 166

1 ARBs and the presence of a branded Valsartan
2 product.
3     Q.  Do you agree with the statement that
4 when these drugs were sold between 2012 and
5 their removal from the market in 2018, the
6 contaminated forms of it, that no consumer was
7 aware if the drugs were contaminated?
8     A.  Did you ask me if I am aware of that
9 or I agree with that?
10     Q.  Is there a difference for you?
11     A.  I think if you asked me if I'm aware,
12 you are stating a fact that I'm -- I don't know
13 to be true.
14         And if you're asking me if I am
15 aware -- if -- well, either way, I don't know
16 that it is true about what consumers understood
17 to be included in their Valsartan-containing
18 drugs as I sit here today.
19     Q.  Do you have any facts or evidence to
20 share with us under oath that any consumer,
21 between 2012 and 2018, had any basis to
22 understand that their Valsartan contained
23 nitrosamines?
24     A.  That is not a subject on which I am

Page 167

1 offering testimony.  I don't have information to
2 share with you as I sit here today on that
3 subject.
4     Q.  Do you think for a split second that a
5 single consumer knew about it and none of the
6 manufacturers did?  Because that's what they
7 claim, you know.
8         MR. GOLDBERG:  Object- --
9     Q.  You know that, right?
10         MR. GOLDBERG:  Objection to form.
11 Foundation.  Argumentative.
12     A.  Are you asking do I know what is
13 claimed by manufacturers?
14     Q.  Are you aware that the manufacturers,
15 uniformly in this case, claim that they didn't
16 know and couldn't know of the presence of
17 nitrosamines in their own products during the
18 relevant class period?  Are you aware of that?
19     A.  I don't think --
20         MR. GOLDBERG:  Objection to form.
21     A.  -- I have reviewed information that --
22 or at least that I recall as I sit here, on what
23 the defendant manufacturers are stating.  It is
24 not something that I recall reviewing for

Page 168

1 purposes of my report.
2     Q.  Well, I want you to assume in a
3 hypothetical that that is what they claim.
4         And I want to then ask you, on the
5 basis of that assumed fact, if it's conceivable
6 to you that the manufacturers didn't know there
7 were nitrosamines in their Valsartan pills, but
8 you believe that consumers might have known that
9 fact.  Is that your statement?
10         MR. GOLDBERG:  Objection to form.
11 Argumentative.
12     A.  That is not my statement.
13     Q.  Okay.  Let me ask you a different
14 question.
15         Can you -- do you believe, as a matter
16 of economics, that if there's a binary choice
17 given to a consumer to buy, in this case, with
18 knowledge, a VCD that's contaminated with a
19 carcinogen and the exact same VCD that is
20 uncontaminated with any carcinogen, that there's
21 any consumer who would rationally select the
22 contaminated one?
23     A.  I could envision a scenario in which
24 that happens, yes.

Page 169

1     Q.  Okay.  Can you tell us, under oath, in
2 what scenario would a rational person pick the
3 contaminated VCD.
4     A.  A scenario in which that may happen is
5 if the VCD that contains impurities is priced
6 lower than the VCD with -- without impurities,
7 and a consumer, in consultation with their
8 doctor, is informed that the level of impurities
9 is not likely to change their health comes --
10 health outcomes in any meaningful way, that a
11 consumer may decide to save money by choosing a
12 product that has impurities in it.
13     Q.  Do you know facts that support that
14 having occurred here ever?
15     A.  I have examples in my report where I
16 talk about similar types of comparisons where
17 consumers choose between organic products and
18 products that contain pesticides, where
19 pesticides may include elements that could have
20 risks for human health outcomes.
21         And consumers make different choices
22 in different scenarios, but we can observe
23 market differences in prices.  We observe
24 organic vegetables being sold, and we observe

Confidential Information Subject to Protective Order

Page 170

1 vegetables that have been exposed to pesticides
2 being sold.
3         I have an example where economists
4 have measured differences in housing prices,
5 where houses are located in an area where there
6 is a higher incidence of leukemia than other
7 areas, and economists can observe and measure
8 the differences in prices that would be
9 attributable to the added risk in one geographic
10 area to another geographic area.
11         The section in my report that
12 describes other examples of where economists
13 have measured and priced risk I have in my
14 report as an indication that economists do look
15 at these types of things.
16         The presence of risk doesn't render a
17 product worthless.  The presence of risk has
18 been measured by economists in other factors.
19 It's not appropriate to make the assumption that
20 Dr. Conti did.  It's not appropriate to assume
21 worthlessness because of the presence of a risk.
22     Q.  In order to price the presence of a
23 risk, doesn't a consumer need to know that the
24 risk exists?

Page 171

1     A.  In the examples that I gave you, I was
2 envisioning that the economist prices the risk.
3         The -- whether the consumer prices the
4 risks, there are examples where the consumer
5 could know about a risk, and in those scenarios,
6 we can see a divergence in price and consumption
7 patterns of products that are deemed more or
8 less risky.
9     Q.  Dr. Stiroh, respectfully, you didn't
10 answer my question.  In order for either a
11 consumer or an economist, on an assumption, to
12 price or place a value on risk, to exercise that
13 choice, you have to have knowledge of the risk,
14 do you not?
15     MR. GOLDBERG:  Objection to form.
16 Ambiguous.
17     A.  To price the risk, an economist would
18 have an understanding or an assumption regarding
19 the risk profile, yes.
20     Q.  That's right.  In order to
21 affirmatively choose to live in an area with
22 high leukemia because of environmental factors,
23 you'd have to know about that risk in order to
24 take it or assume it or exercise a choice around

Page 172

1 it, correct?
2     A.  To do an economic study and draw the
3 conclusion that a price differential is due to
4 risk, you would have built into that some
5 expectation regarding information that is known
6 about the risks.
7     Q.  Have you seen a single shred of
8 evidence in this case that any consumer, during
9 the relevant class period, proposed class
10 period, was aware of the presence of
11 nitrosamines in these Valsartan-containing
12 drugs?
13     A.  I am not aware of any information that
14 indicates that.
15     Q.  Let's bring up -- go into your
16 document if you would, and pull up -- just find
17 it -- bear with me.  It's a -- it should be a
18 Tab 3.  And it's a section of the United States
19 Code.
20     MR. GOLDBERG:  Is this 331 or 351?
21     MR. HONIK:  331.
22     MR. GOLDBERG:  Okay.
23         (Prohibited Acts, 21 USCA, Section
24     331, was marked Stiroh Exhibit 3 for

Page 173

1     identification, as of this date.)
2     Q.  Dr. Stiroh, do you have what's been
3 marked as Exhibit 3?
4         Dr. Stiroh, have you ever laid eyes on
5 21 United States Code Annotated Section 331?
6     A.  I don't have a particular recollection
7 of it.  I may have seen it before.
8     Q.  Do you see at the top, it's part of
9 the Federal Food, Drug, and Cosmetic Act?
10     Do you see that?
11     A.  I see a heading, Chapter 9, Federal
12 Food, Drug, and Cosmetic Act, is that what
13 you're referring me to?
14     Q.  Yes, ma'am.  And underneath it, it
15 should say Subchapter 3, Prohibited Acts and
16 Penalties.
17     Do you see that?
18     A.  I do.
19     Q.  And the construct for this, as a
20 prohibited act piece of litigation, is to set
21 out what's prohibited.
22     You see where it says, The following
23 acts and the causing thereof are prohibited,
24 colon?

Confidential Information Subject to Protective Order

Page 174

1    You see that?
2    A.  I do.
3    Q.  And the very first prohibited act
4 that's listed is as follows:  The introduction
5 or delivery for introduction into interstate
6 commerce, of any food, drug, device, tobacco
7 product or cosmetic that is adulterated or
8 misbranded.
9        Did I read that correctly?
10   A.  I believe you did.
11   Q.  Have you ever seen this statement
12 in -- in the -- in federal law?
13   A.  I don't think I have set out to read
14 federal law.  The statement sounds familiar from
15 Dr. Conti's materials.  I may have seen it in
16 this context as well, but I don't have a
17 recollection of having reviewed this document.
18   Q.  Suffice to say you didn't give any
19 weight or consideration to this prohibited act
20 as set out in 21 USCA Section 331?
21   A.  I don't think that is accurate to say
22 that I didn't give it weight.  I didn't -- don't
23 recall having reviewed this particular document.
24       To the extent that it is something

Page 175

1 that factors into Dr. Conti's opinions, I --
2 that is something that I consider explicitly in
3 my report.
4    Q.  This prohibits legally introducing,
5 into the legal class of trade, an adulterated or
6 misbranded product.  Correct?
7        MR. GOLDBERG:  Objection.  Calls for a
8    legal opinion.
9    A.  I can see what the words are.  I can't
10 give you an opinion on what this prohibits or
11 doesn't prohibit.  I'm not a lawyer.
12   Q.  Doctor, you have a Ph.D. from Harvard
13 in economics.  Can you apply a plain meaning to
14 what we read together sufficient to understand
15 and agree that it prohibits introducing
16 adulterated drugs in interstate commerce in the
17 United States?
18       MR. GOLDBERG:  Same --
19   Q.  Can you draw that meaning from it?
20       MR. GOLDBERG:  Same objection.
21   A.  I can draw the plain English meaning
22 from the words.  I cannot give you a legal
23 opinion related to it.
24   Q.  Would you agree that because an

Page 176

1 adulterated drug can't be introduced into
2 interstate commerce in the U.S., that that means
3 such a drug, namely an adulterated drug, cannot
4 have a legitimate supply curve in our market?
5        MR. GOLDBERG:  Objection to form,
6    ambiguous.
7    A.  I have an understanding of what
8 Dr. Conti was seeking to do when she removed the
9 supply curve and called that legitimate supply.
10 I have a discussion in my report about economic
11 loss damages and that her analysis does not
12 establish worthlessness.
13       Whether there is a supply of product
14 that the U.S. court allows, that is not the same
15 as measuring the worth or value of drugs.  The
16 worth or value of drugs to consumers depends on
17 their valuation of the products, not the supply
18 of the products.
19       I disagree with Dr. Conti on that
20 point.
21   Q.  Did you hear me invoke Dr. Conti's
22 name or any of her findings in my question,
23 Dr. Stiroh?
24   A.  I don't recall if you said it.  It is

Page 177

1 relevant to my answer because my assignment in
2 this case was to consider her opinions.
3    Q.  I'm not talking about your assignment
4 now.  I've asked you a profoundly simple
5 question.
6        And that is, as an economic principle,
7 how can you have a legitimate supply curve of a
8 product that is, by law, prohibited from
9 entering interstate commerce?
10       MR. GOLDBERG:  Objection to form.
11   Ambiguous.
12   A.  As a matter of economics, you could
13 have a supply curve if there is supply of the
14 product.  What I take you to mean by "legitimate
15 supply" is supply of a product that meets
16 certain requirements.
17       My understanding is that there was
18 supply of VCDs that met those requirements, and
19 the question is whether there -- the absence of
20 supply from defendants causes products to be
21 worthless.
22   Q.  You agree, if we were constructing,
23 economically speaking, as you do all the time,
24 and appropriately so, a but-for world in which

Page 178

1 there's compliance with the law, and
2 specifically this prohibition of introducing
3 into interstate commerce adulterated drugs, that
4 in that but-for world, there is no legitimate
5 supply curve, correct?
6      A.  I don't think that's correct.  I think
7 you -- if you assume that the drugs that are
8 alleged to have impurities are not part of the
9 market, if you assume them away, there is still
10 supply of other Valsartan-containing drugs.
11      Q.  You agree that if all of VHP's drug
12 products were adulterated, that none of them
13 could lawfully be in the U.S. legal class of
14 trade.  Correct?
15          MR. GOLDBERG:  Objection to form.
16 Calls for a legal opinion.
17      A.  I don't know if I agree with that or
18 not.  The facts that I take into account for my
19 report is that there were supply of drugs, there
20 were purchases of drugs, and I consider the
21 value of those drugs and how the value might be
22 diminished if consumers knew that there were
23 impurities in them.
24          It's a framework that I have worked

Page 179

1 with in my report.  The concept of legitimate
2 supply being necessary for value is something I
3 reject.
4      Q.  Do you see, in Exhibit 3, that the
5 third prohibited act under C reads, The receipt
6 in interstate commerce of any food, drug,
7 device, tobacco product or cosmetic that is
8 adulterated or misbranded, and the delivery or
9 proper delivery thereof, for pay or otherwise,
10 is yet another prohibited act.
11          Do you see that?
12      A.  I see where you are reading from the
13 document.
14      Q.  And where it says, And the delivery or
15 proffered delivery thereof for pay, do you
16 understand that the prohibition against, in this
17 case, a drug manufacturer being paid for an
18 adulterated drug?
19          MR. GOLDBERG:  Objection to form.
20 Calls for a legal opinion.
21      A.  I guess I don't have an opinion on
22 what this means or a clear understanding of what
23 number C means.
24      Q.  You don't have an understanding that

Page 180

1 the totality of these two statements means that
2 you can't introduce adulterated drugs into the
3 U.S. interstate commerce and you can't get paid
4 for it?  You don't understand that construct?
5          MR. GOLDBERG:  Objection to form.
6 Calls for a legal opinion.
7      A.  I guess as the plain English, if I
8 look at C, it seems to be illegal or prohibited
9 to receive it.  Does that mean to you that it is
10 prohibited for a consumer to receive a drug?
11          I don't think that's what would be
12 intended.  But if I, as an economist and not a
13 lawyer read it, that's what the words say.
14      Q.  Suffice to say you didn't consider
15 21 USCA 331 A or C in your own analysis, right?
16          MR. GOLDBERG:  Objection to form.
17 Asked and answered.
18      A.  I did not rely on this document to
19 reach my opinions.  My recollection is that
20 these statements are included in the materials
21 used by Dr. Conti, and so I consider her
22 materials and the opinions that she draws, in my
23 report, responding to those opinions.
24      Q.  Can you show me or tell me where in

Page 181

1 your report you discuss these prohibited acts
2 and their impact on your economic analysis?
3          MR. GOLDBERG:  Ruben, while Dr. Stiroh
4      is looking at that, when you get a chance,
5      could we take a break for a minute or two?
6          MR. HONIK:  At a -- at an appropriate
7      place to stop, which is soon, I think.
8          MR. GOLDBERG:  Thanks.
9      A.  In my report, I have a section
10 Roman II, "Background," that starts on page 9,
11 with paragraph 9.
12          Paragraph 10 has my understanding of
13 some of the facts at issue in this case,
14 including whether there are amounts of NDMA in
15 the VCDs at issue.
16      Q.  Dr. Stiroh, I'm looking at
17 paragraphs 9 and 10, and this entire
18 "Background" section.  I don't see a blessed
19 thing about the law prohibiting the introduction
20 of adulterated drugs in interstate commerce.
21 Where is -- where is it that you say it's in
22 there?
23          MR. GOLDBERG:  Objection.
24 Argumentative.

Page 182

1    A.  I don't believe I used that phrase
2  anywhere in my report.
3    Q.  Do you -- are you aware that
4  defendants' own expert on the pharmaceutical
5  supply chain, cGMP chemistry, agrees that this
6  construct in Exhibit 3 that we've been looking
7  at means that there could be no legitimate
8  supply curve?  Are you aware of that?
9    A.  I am not.
10    Q.  Have you read or been informed
11  about -- by the defense, about the testimony of
12  Dr. Lambert in this case?
13    A.  I'm not familiar with the testimony of
14  Dr. Lambert.
15    Q.  And I don't -- I don't think you so
16  much as refer to him in your reliance materials,
17  correct?
18    A.  I don't believe I refer to him in my
19  reliance materials.  I don't recall having
20  relied on anything that he wrote.
21    Q.  Would it surprise you, then, that he
22  agrees that if the FDA considers a drug to be
23  adulterated or misbranded, as set out here, and
24  the fact that it can't be lawfully introduced

Page 183

1  into interstate commerce, and the manufacturer
2  or supplier of that lawfully receives money,
3  that that means under that construct, it can't
4  be a legitimate supply curve?
5    MR. GOLDBERG:  Objection --
6    Q.  Do you deny that?
7    MR. GOLDBERG:  Objection to form.
8  Foundation.
9    A.  Are you asking me if I deny what
10  somebody else said in testimony I haven't read?
11    Q.  Yes.  Do you have any basis to
12  disagree with what Dr. Lambert, on behalf of
13  defendants, told us under oath?
14    MR. GOLDBERG:  Objection to form.
15  Assumes facts not in evidence.
16    A.  I have a basis to disagree with
17  certain statements that you have made on the
18  grounds of them not being economic principles.
19    Whether they are legal principles, I
20  don't have a basis to agree with you or disagree
21  about whether somebody else in this case said
22  something or agreed to something when I have not
23  read their testimony.
24    Q.  Well, let me read it to you, and if

Page 184

1  you'd like, I can put it up on a share screen or
2  direct your attention to a paper exhibit, but
3  let me first begin by reading it.
4    And for the record, this is the
5  deposition -- sworn deposition testimony of
6  Dr. Lambert.  It appears at page 104, beginning
7  at line 21, and the question was as follows:
8    And so does that not mean,
9  Dr. Lambert, that there can be no legitimate
10  supply curve, that is, an adulterated drug
11  cannot be legally introduced into the legal
12  class of trade in the United States?
13    And the witness, Dr. Lambert, for the
14  defense, said, So if it's determined by the FDA
15  that it is indeed adulterated, then I would
16  agree.
17    And so my question to you is, are you
18  in disagreement with Dr. Lambert that there can
19  be no legitimate supply curve by the application
20  of this law, and if so, if you do disagree, can
21  you tell us under oath why?
22    MR. GOLDBERG:  Objection.  Calls for a
23  legal opinion.
24    A.  In my opinion as an economist, there

Page 185

1  is a supply curve if there is supply of
2  products, and -- or willingness to supply
3  products at different price points.  That's what
4  a representation of a supply curve would be.
5    My understanding is that not all of
6  the VCDs at issue contained the NDMA and NDEA
7  impurities, and it is also my opinion, as an
8  economist, that whether there is supply of the
9  Valsartan-containing drugs at issue or not,
10  there is value that was received for the
11  products that were purchased and consumed.
12    Q.  Dr. Stiroh, if Dr. Lambert is right
13  and you're wrong, that there is an illegitimate
14  supply curve, you'd agree that no equilibrium
15  price could be set, because you've already
16  confirmed that it requires the intersection of a
17  supply-and-demand curve.  Right?
18    A.  I would agree that an equilibrium
19  price is the intersection of a supply-and-demand
20  curve.  I have disagreed with you about whether
21  there is still a supply curve for
22  Valsartan-containing drugs, and I disagree with
23  Dr. Conti that the absence of supply of certain
24  Valsartan-containing drugs implies that the

Confidential Information Subject to Protective Order

Page 186

1 value of those products that were consumed by
2 consumers is zero.
3    Q.  Dr. Stiroh, inasmuch as you're not a
4 cGMP expert, would you disagree with the idea,
5 in good manufacturing practices and by the
6 application of FDA regulations, that if you
7 can't guarantee the integrity, purity, safety
8 and efficacy of one lot or batch of drugs that
9 fail to meet cGMP, that that implicates and
10 causes all of the pills to be adulterated?
11       MR. GOLDBERG:  Objection to form.
12    Ambiguous.  Calls for a legal opinion.
13    A.  The part of that that I agree with is
14 that I am not a cGMP expert.
15       I don't think I even followed the rest
16 of the question.
17       And -- I guess not sure why you would
18 ask my opinion with -- starting it out by saying
19 that you agree that I am not a cGMP expert.  I
20 don't have opinions on that topic.
21       Actually, if we could take a break.
22       MR. GOLDBERG:  Okay.  The witness has
23    just asked to take a break, and I had asked
24    about ten minutes ago.

Page 187

1       MR. HONIK:  I just have some quick
2    follow-up to that, and then we can break.
3    Q.  The reason I've asked you, Doctor, is
4 that you keep repeating that some but not all of
5 the drugs, as to some of the manufacturers, was
6 contaminated, and I'm merely asking if you have
7 any awareness of the rules and regulations of
8 current manufacturing practices which renders
9 all drugs from a facility as adulterated if you
10 can't guarantee the safety of each and every
11 product coming out of that facility.
12       You either are or are not aware of
13 that.  That's what I've asked.
14       MR. GOLDBERG:  Objection to form.
15    Calls for a legal opinion.
16    Q.  Are you?
17    A.  I am not aware of that, and I am not
18 offering opinions on that.
19    Q.  Thank you.
20       MR. HONIK:  How much time of a break
21    would you like, Seth?
22       MR. GOLDBERG:  Why don't we take
23    ten minutes.
24       THE VIDEOGRAPHER:  The time right

Page 188

1 now --
2       MR. HONIK:  Thank you.
3       THE VIDEOGRAPHER:  The time right now
4 is 3:11 p.m.  We are off the record.
5       (A recess was taken from 3:11 to
6 3:28.)
7       THE VIDEOGRAPHER:  Time right now is
8 3:28 p.m.  We are back on the record.
9       MR. HONIK:  Jeff, for the benefit of
10 the record, I've had Dr. Stiroh pull a
11 transcription about which I questioned her
12 earlier, and we're going to be marking this
13 Exhibit 4.
14       (Transcript of deposition of William
15 J. Lambert was marked Stiroh Exhibit 4 for
16 identification, as of this date.)
17       THE COURT REPORTER:  It's now marked.
18    Q.  Dr. Stiroh, we had been talking a bit
19 about this idea of equally -- equilibrium
20 pricing and the intersection of
21 supply-and-demand curves.
22       As an economist -- I don't want to
23 oversimplify it, but the way one would graph a
24 supply curve or put that on the graph, you'd be

Page 189

1 able to see, in the case of a consumer product,
2 the actual movement of a line representing sales
3 in the marketplace.  Correct?
4    A.  No.  I think you are -- either I am
5 confused from your question or you're confusing
6 concepts in your question.
7       A demand curve and a supply curve that
8 intersects at a point that we call the
9 equilibrium price does not show movement along a
10 line.
11       You can imagine it as the amounts that
12 would be consumed at different price points from
13 the standpoint of consumers, or would be
14 supplied at different price points from the
15 standpoint of suppliers.  What we observe in
16 data is what happens at the intersection.
17    Q.  That's right.  And you got me on the
18 words.  All I meant to ask you, in -- however
19 inartful, and we can go around on this if
20 you'd like, but all I want to understand is, if
21 it isn't -- if you aren't able, as an economist,
22 to plot on a graph a supply curve.
23    A.  I'm sorry.  You're asking me if it is
24 possible to plot on a graph a supply curve?

Confidential Information Subject to Protective Order

Page 190

1    Q.   Yeah.

2    A.   Yes.

3    Q.   And when you do so, if the value of a
4  particular point on that graph is zero, is at
5  zero, is -- does that mean that there's no
6  supply of that item or product?

7    A.   No.  There may be a point where
8  quantity demanded is zero and the price could be
9  quite high.  And you would expect that there
10  would be many suppliers that would be willing to
11  supply the product at that high price, but there
12  would be no consumer demand for it.

13    Q.   Did you hear me ask you anything about
14  pricing?

15        MR. GOLDBERG:  Objection to form.
16  Argumentative.

17    A.   I -- then I should have asked for
18  clarification, what are you envisioning on the
19  axes for a supply curve or a demand curve that
20  would intersect.

21        I imagined that they were intersecting
22  at a point that gives you coordinates for price
23  and quantity.

24    Q.   Okay.  So let's try it again.  I'm not

Page 191

1  talking about a demand curve, and I'm not
2  talking about equilibrium pricing.  I'm merely
3  asking you if, as an economist, when you plot a
4  supply curve on a graph, if -- if it's at zero
5  on the horizontal axis and zero at the vertical
6  axis, if that means there's no supply.

7    A.   Yes.

8        MR. GOLDBERG:  Objection.

9    Q.   Okay.

10        Have you seen the sales of any of the
11  at-issue VCDs after recall?

12    A.   Yes.

13    Q.   And do you agree that those sales are
14  at zero in the case of the recalled manufacturer
15  products?

16    A.   I have seen, in the IQVIA data, that
17  there continue to be records of sales of the
18  recalled products after the dates of recalls.

19    Q.   You don't agree that there was no
20  supply, legitimate supply curve for ZHP VCDs
21  after the recall?

22        MR. GOLDBERG:  Objection to form.
23  Ambiguous.

24    A.   I think the term, "legitimate supply,"

Page 192

1  is something that Dr. Conti has created for this
2  report.  I don't understand it outside of the
3  context of her report.  And I hear you use it,
4  and before, you objected to me saying her name.

5        I have seen IQVIA data, and after the
6  dates of recalls, it is apparent in the IQVIA
7  data that it looks like there are sales of the
8  products at issue.  Whether that's a flaw in the
9  data source or an actual fact, I cannot tell you
10  as I sit here.

11        You asked me if I have seen the data.
12  I have seen it, and that is what I have
13  observed.

14    Q.   Let -- let me ask the question this
15  way.  What's your definition of no supply curve?

16    A.   I don't have a definition of no supply
17  curve.  I have a definition of no supply.  Which
18  I think that you asked me earlier, and I agreed,
19  that if supply is zero, that is no supply.  That
20  is not the same as there being no supply curve.

21        A supply curve is a construct of the
22  consideration of how much would be supplied by
23  suppliers at different price points.

24        Would be willing to be supplied.

Page 193

1    Q.   Do you agree that one of the ways to
2  think about this case is to create a but-for
3  world prior to the recall starting in 2018,
4  going back to the beginning of manufacturing in
5  2012, in which there's zero supply?

6        MR. GOLDBERG:  Objection to form.
7  Ambiguous.

8    A.   I have considered that if the but-for
9  world has zero supply of certain Valsartan
10  products between 2012 and 2018, what
11  implications that has for consumer expenditures.

12    Q.   Yeah, that's not really what I asked
13  you.

14        Could you, at my direction, supply a
15  but-for or develop a but-for model in which
16  there's zero supply, between 2012 and 2018, of
17  Valsartan-containing drugs, yes or no?  And then
18  I have a follow-up question.

19    A.   I could construct a model, considering
20  the scenario where there is zero supply of
21  certain Valsartan-containing drug products, and
22  consider the economic implications of that model
23  for financial outcomes for consumers.

24    Q.   I don't know what the second part of

Page 194

1  it is, but I take it you can -- you can create a
2  but-for world with zero VCD supplies.  That much
3  you said you could do.  Right?
4      A.  I can do that.
5      Q.  In that but-for world, is not the --
6  the cost of that drug zero?
7          Isn't the -- excuse me, I misspoke.
8  Isn't the price of that drug zero?
9      A.  No.
10         As an economic matter, the price for a
11 product that has been taken out of the market no
12 longer exists.
13         For a but-for world to be complete and
14 meaningful in a damages context, then you would
15 need to consider what consumers would purchase
16 instead of the product that they did purchase.
17         I can construct a damages model where
18 this but-for scenario is that there is no supply
19 of the Valsartan-containing drugs at issue.
20         For that to be a complete damage
21 model, I need to consider what do patients do to
22 manage their blood pressure in the absence of
23 the products that they actually did consume.
24     Q.  Dr. Stiroh, you didn't even come close

Page 195

1  to answering my question.
2          What I asked you to assume is not all
3  the things you ingrafted upon my hypothetical.
4  It's true, because you've already told me there
5  could be no equilibrium price where there's no
6  intersection of supply and demand, and having
7  informed me that you can create a but-for world
8  with zero supply, which means it will never meet
9  a demand curve, there can be no equilibrium
10 price.  Correct?
11         MR. GOLDBERG:  Objection to form.
12 Argumentative.  Asked and answered.
13         Ambiguous.
14     A.  No.
15         Acknowledging it's getting a little
16 late in the afternoon, that question was
17 absolutely meaningless from a standpoint of
18 economics.
19         I can create a but-for world --
20     Q.  I guess --
21     A.  Let me finish my answer, please.
22         MR. GOLDBERG:  Hang on, Ruben.  Hang
23 on, Ruben.  The witness is talking.
24     A.  I can create a but-for world and

Page 196

1  estimate damages under a scenario where we
2  imagine removing the supply of
3  Valsartan-containing drugs.
4          To make that an economically valid
5  damage assessment, I would need to consider what
6  do consumers who purchase those drugs do in the
7  alternative.  I would consider the prices they
8  would pay for alternative drugs, whether they
9  alternative -- they are alternative ARBs or
10 different VCDs other than the contaminated ones.
11         It is not true to say the price is
12 zero if there is no supply.  There is -- price
13 does not exist in that case.  That is
14 meaningless, to say that the price is zero.
15 Price is zero is a free good; price nonexistent
16 is for a product that doesn't exist.
17     Q.  I understand your -- your answer.  And
18 I think anyone listening to this will understand
19 it as well.
20         Why don't you pull up from your pile
21 of exhibits there, both Tabs 18 and 19, which
22 would be your invoicing in this case.
23         We're going to mark your exhibits --
24 excuse me, your invoices as Exhibit --

Page 197

1  Exhibit 5, and the summary that we prepared as
2  Exhibit 6.
3          Would you give that to our reporter,
4  please.
5          (Invoice from NERA Economic Consulting
6          was marked Stiroh Exhibit 5 for
7          identification, as of this date.)
8          (Summary of invoices was marked Stiroh
9          Exhibit 6 for identification, as of this
10         date.)
11     Q.  Do you have Exhibits 5 and 6 in front
12 of you?
13         MR. GOLDBERG:  Not yet, not yet.  Hang
14 on.  Wait one second, please.
15         Okay, go ahead.
16     Q.  Do you have Exhibit 5, the collection
17 of invoices that were turned over to us?
18     A.  I do.
19     Q.  You're familiar with your own
20 invoicing for the work that you and your
21 associates at your firm did in this case?
22     A.  I am.
23     Q.  You reviewed them before today's
24 deposition?

Page 198

1  A.  I did.
2  Q.  The earliest of the activity on
3  invoicing that I have relates to October of
4  2020.  Is that correct?
5  A.  The -- the first page of the project
6  diaries that I have has an entry from me from
7  September 15, 2020.
8  Q.  Does that correspond to the earliest
9  point at which you did work on this matter?
10  A.  I expect I would have read the
11  complaint prior to that date, but it is the --
12  the first date that I recall once I had
13  received -- been retained and received an
14  assignment.
15  Q.  And the work that you did in this
16  matter, Dr. Stiroh, you did perhaps hired by one
17  counsel but you did it on behalf of all the
18  defendants.  Didn't you?
19  A.  Yes, that is correct.
20  Q.  And that's specifically set out in
21  your report, is it not?
22  A.  Yes.  My report, under "Assignment,"
23  says, I've been asked for counsel for all
24  defendants, and goes on from there.

Page 199

1  Q.  Do you know of any other economist
2  that was engaged to do any work similar to your
3  own by the defendants in this case?
4  A.  I'm not sure what you mean by that.
5  Q.  Are you the sole economist engaged by
6  the defendants to prepare a report on whether or
7  not damages can be ascertained on a class-wide
8  basis?
9  A.  I am the only -- I'm the only one that
10  I'm aware of, but I -- I don't know if they've
11  engaged others.
12  Q.  And from my review of your own
13  invoicing, the last of the invoices covers the
14  period December ending last year, 2021.  Is that
15  correct?
16  A.  Yes.
17  Q.  Would you put Exhibit 6 in front of
18  you.
19  A.  I have it.
20  Q.  This is a summary that we put together
21  that's a simple computation or addition of the
22  various invoice amounts from October of 2020
23  through the end of December 2021.
24  Do you see that?

Page 200

1  A.  I do.
2  Q.  Do you have any reason to dispute the
3  amounts that are indicated or enumerated in
4  Exhibit 6?
5  A.  I haven't gone through it and matched
6  them up, but I don't have a reason to dispute
7  them.
8  Q.  So, if the total of the invoice
9  amounts for your work and that of your firm was
10  $1,369,114 through the end of calendar year
11  2021, you would agree with that.  Right?
12  A.  Yes.
13  Q.  How -- with what frequency did your
14  firm issue invoicing for work done by NERA, your
15  firm in this case?
16  MR. GOLDBERG:  Ruben, are you able to
17  put the summary document up on the screen.
18  I'm getting that request from people who
19  are watching in on Zoom.
20  MR. HONIK:  Yeah, I'd be delighted to.
21  Dave, are you able to do that?
22  MR. STANOCH:  It's in the public
23  exhibit folder at Exhibit 6, but --
24  MR. HONIK:  Do you know how to pull it

Page 201

1  up as a screen share?
2  MR. STANOCH:  Stand by.
3  Q.  There we go.  Is -- is what you see on
4  the screen, Dr. Stiroh, the summary that we
5  marked Exhibit 6?
6  A.  It is what you marked as Exhibit 6.
7  Looking at it now, I -- I'm not sure -- I see
8  for January dash 21, 301,262.50.  And if I look
9  at an invoice that I think is intended to cover
10  that period, I see 30,162.50.
11  Q.  Okay.  If there's a computational
12  error, then we'll correct it.
13  A.  If I can, then I think I need to
14  correct my last answer.  I did not dispute that
15  these were accurate, and now I do.
16  Q.  The -- the question that I -- that I
17  posed to you, which I don't think you answered
18  as yet, is, with what frequency has NERA, on
19  your behalf and on behalf of your associates,
20  billed the defendants for your time?  Has it
21  been on a monthly basis?
22  A.  Generally, the invoices reflect a
23  month's work.  The frequency with which we get
24  them out the door is not quite monthly, but

Confidential Information Subject to Protective Order

Page 202

1 the -- the -- the period of coverage is
2 typically a month.
3    Q.  Have you seen any invoicing for the
4 work of yourself and your team for any part of
5 2022?
6    A.  Yes.
7    Q.  When did you see such invoicing?
8    A.  We are in the process of reviewing
9 those currently.  I have not yet completed my
10 review of them.  I have seen that they're in the
11 process of being prepared.
12    Q.  And is that true for January 2022,
13 that is, you haven't billed for January 2022?
14    A.  That is correct.
15    Q.  Are you able to -- since you've seen
16 the invoicing, and you're auditing it, can you
17 tell me the number of additional hours that
18 reflect work of yourself and others at NERA in
19 2022?
20    A.  Not by memory.  There would be hours
21 associated with completing my report.  But I
22 don't recall specifically what the hours were.
23    Q.  Right.  And all I'm asking you is to
24 estimate for me, if you can, how many total

Page 203

1 hours NERA is likely to bill from January 1,
2 2022, to the present, which would include the
3 finalization of your report, subsequent review,
4 any testimony of experts in this case,
5 preparation for today, anything else that you
6 might have done in -- in connection with your
7 engagement.
8        MR. GOLDBERG:  Objection.
9    Q.  How many hours would that total?
10        MR. GOLDBERG:  Objection.
11 Speculation.
12    A.  I think the total would be around,
13 say, 3,500 hours for all of NERA's work in this
14 matter.  And so whatever is totaled up in the
15 invoices through December 2021 would be
16 subtracted off of that with the understanding
17 that that is sort of a ballpark guess.
18    Q.  Understood.
19        Turn with me, in Exhibit 5, which is
20 the -- which are the invoices themselves, and I
21 just want to go through some of them to get a
22 flavor for what I'm looking at here.
23        There's something called "Project
24 Diary," dated November 24, 2020, and there's an

Page 204

1 invoice number US 48601P005.
2        Do you see that page, for example?
3    A.  I might need you to say it again a
4 little bit slower.  What is the invoice date
5 that you want me to look at?
6    Q.  Let's try to do it this way.  I think
7 it's the second page of Exhibit 5.
8    A.  I have the second page --
9    Q.  Let's do that.
10    A.  I have the second page of Exhibit 5 in
11 front of me.
12    Q.  In the right-hand upper corner, does
13 it say November 24, 2020?
14    A.  It does.
15    Q.  And do you see under your own name as
16 managing director, there's an entry, it says
17 December 15, 2020?
18    A.  Yes.
19    Q.  And the description of services
20 rendered is redacted, with the exception of the
21 word "discussion," with S.LI.
22        Do you see that?
23    A.  Yes.
24    Q.  Did you cause that redaction?

Page 205

1    A.  I did not.
2    Q.  Do you know why it was redacted?
3        MR. GOLDBERG:  Objection.  I mean,
4 that -- that calls for a legal conclusion.
5        And this is information that has been
6 marked confidential by counsel.
7        MR. HONIK:  Nothing's been marked
8 confidential.  I just have black lines.  Do
9 you want to convey why this has been
10 redacted?
11        MR. GOLDBERG:  You can ask the witness
12 the questions.  I'm not here to testify.
13        MR. HONIK:  I have asked her.
14    A.  All right.  But I thought you were
15 asking Mr. Goldberg.  Sorry.
16    Q.  Well, he -- he interrupted.
17        The question I asked was, why was this
18 redacted and what's in there?  What -- what
19 service did you render on September 15, 2020?
20        MR. GOLDBERG:  Let me object to the
21 extent you are being asked to provide
22 information not in a testifying capacity.
23        THE WITNESS:  Now I answer?
24        MR. GOLDBERG:  Yes.

Page 206

1    A.  My team and I spent time on this case
2  in a consulting capacity separate from the
3  assignment that I have described in my report.
4        It's my understanding that --
5    Q.  I don't -- I'm sorry, I don't
6  understand the distinction you're making.
7        MR. GOLDBERG:  Well, counsel, that's
8    not really for Dr. Stiroh.  We can talk
9    about this among lawyers.  But -- but I'll
10   leave it at that.
11       If you'd like to go off the record,
12   I'm happy to do that, and we can talk about
13   it.
14       MR. HONIK:  Well, I -- no, I'd like to
15   stay on the record.  I think it's
16   permissible for me to ask about her work in
17   this case.
18       It's -- you've been billed for it.
19   It's in the invoice that's been produced to
20   us.  I'd like to know what the work was
21   that relates to this case.
22   Q.  Do you -- do you -- first of all, do
23 you know the answer to my question?
24   A.  I have a general recollection of some

Page 207

1  of the work that was done that is not connected
2  with my assignment with respect to class
3  certification issues.
4    Q.  So, are you saying that you had
5  multiple assignments from these same defendants?
6        MR. GOLDBERG:  Counsel, I don't want
7    to belabor the point here.  Just as you
8    have done with your experts, to the extent
9    Dr. Stiroh provided services for defendants
10   that were not related to the opinions in
11   her report, that information is redacted.
12       MR. HONIK:  Is that the reason they
13   were redacted?
14       MR. GOLDBERG:  I just represented that
15   to you.
16   Q.  Dr. Stiroh, can you turn deeper into
17 the pile of invoices -- let me try to shorthand
18 way to -- shorthand way.
19       Can you go to project diaries dated
20 December 8, 2021.  It's in- -- Invoice
21 Number US 53163P005.  And I would estimate it's
22 about eight or ten pages from the back.
23   A.  I have in front me a page with project
24 diaries with my time that encompasses

Page 208

1  December 2021.
2    Q.  Well, do you see, for example, the
3  time entries for an associate analyst by the
4  name of Nathan Evans?  Do you see that?
5        MR. GOLDBERG:  We're not on the same
6    page, Ruben.  So -- are you talking about
7    the invoice dated December 8, 2021, or the
8    time --
9        MR. HONIK:  No, I'm talking about a
10   page called "Project Diaries."
11   A.  I have a page called "Project Diaries"
12 that reflects time for Nathan Evans for
13 December 2021.
14   Q.  Okay.  But do you see the entries for
15 October 14 through October 20 are completely
16 redacted?
17   A.  I'm sorry.  I was looking at the wrong
18 one.  I think -- let me catch up with you.  If
19 you give me the dates for the entries, I think I
20 can find the page.  The person and the dates for
21 the entries.
22   Q.  October -- October 14 through
23 October 20, 2021.
24   A.  I believe I have the correct page in

Page 209

1  front of me.
2    Q.  Do you see how all of Mr. Evans' time
3  for those dates are redacted?
4    A.  I do.
5    Q.  What does this work relate to that
6  caused it to be redacted, if not support for
7  this report?
8        MR. GOLDBERG:  Again, counsel, that
9    information has been redacted because it
10   is -- does not pertain to Dr. Stiroh's
11   opinions and work in developing her
12   opinions and the report, and therefore,
13   it's been redacted.  And -- it --
14   Q.  Let me ask a different question.
15       Doctor -- Dr. Stiroh, are you able,
16 you yourself, able to go through all of these
17 invoices and project diaries and, on your own,
18 separate out what was supporting, allegedly,
19 your report in this case that you proffered to
20 this point, and other work?  Can you discern the
21 difference?
22   A.  I could potentially do that, yes.
23   Q.  What -- what criteria would you use to
24 distinguish work done in support of this report,

Confidential Information Subject to Protective Order

Page 210

1  dated January 12 of this year, and any other
2  assignments that you may have received?
3     A.  Work that I asked to be done for
4  purposes -- from -- to my staff for reviewing
5  information or data, or doing data analyses
6  related to my report, would be things that I
7  would consider in support of my work.
8        If there are tasks that counsel asked
9  of any of my team that was not coming at my
10 direction and not for purposes of my report,
11 that would be -- not be something I would
12 consider to be work for my report.
13    Q.  Are you -- are you preparing another
14 report in this case?
15    A.  I am not preparing another report in
16 this case.
17    Q.  Have you, nonetheless, been asked to
18 undertake a different assignment in this case as
19 it relates to VCDs in this MDL?
20        MR. GOLDBERG:  Objection to form.  To
21    the extent that there's information or
22    services that Dr. Stiroh is providing that
23    are not pertaining to her opinions as a
24    testifying expert, that information is off

Page 211

1     limits.
2        MR. HONIK:  It's just a yes or no.
3     I'm not going to ask her what it is.
4        MR. GOLDBERG:  And that's the answer.
5     I just gave you answer, which is the
6     question is not a proper question.
7        MR. HONIK:  You don't get to decide
8     what's a proper question or not.
9        I'd like Jeff to read it -- excuse me,
10    I'd like Jeff to read it back, please.
11       (The record was read back.)
12       MR. HONIK:  It's MDL.
13       MR. GOLDBERG:  Same.
14    Q.  Without revealing what the nature or
15 name of that assignment is, are you able to
16 answer the question simply yes or no?
17    A.  I have not been given an additional
18 assignment in this case.
19 DIR Q.  Is that true from the beginning of your
20 engagement to the present?
21       MR. GOLDBERG:  I'm -- I'm going to
22    instruct the witness not to answer, because
23    you're taking her down a road that is
24    misleading.

Page 212

1        I've given you the explanation for
2  the information has been redacted.  And
3  that's because it doesn't pertain to the
4  services Dr. Stiroh is providing for us in
5  the capacity as a testifying expert.
6        I will instruct the witness not to
7  answer --
8        MR. HONIK:  She just testified --
9        MR. GOLDBERG:  -- because you're just
10    going to -- you're just going to create a
11    record that's confused and misleading.
12       MR. HONIK:  She's just testified under
13    oath that she's had no other assignment.
14       MR. GOLDBERG:  Then that's -- that's
15    my point.  That's my point.
16       MR. HONIK:  That she's had a single
17    assignment.
18       MR. GOLDBERG:  That's my point.
19       So you could move on, because I've
20    instructed her not to answer.
21       MR. HONIK:  I -- I take that.
22    Q.  Doctor, you apparently, some years
23 ago, were involved in a case called LaPoint
24 versus AmerisourceBergen Corp.

Page 213

1     Do you remember that case?
2     A.  I do.
3     Q.  And apparently in that case you were
4  hired by the plaintiff.  The legal dispute
5  concerned a would-be merger between
6  two companies, plaintiff having a product called
7  a bedside point-of-care, a bar code product of
8  some sort, that was supposed to have been merged
9  or acquired by AmerisourceBergen.
10       Did I get that about right?
11    A.  I don't remember those details.  I
12 remember that there was a point-of-care bar code
13 product that was involved.  I don't recall
14 the -- the aspects of the merger.
15    Q.  That's right.  And your -- your job as
16 an economist was to determine and -- and provide
17 economic support for the contention that but for
18 the merger, that -- that the company who made
19 this product, which was called Bridge, was
20 destined to remain a dominant force in that
21 particular market, and you were going to do some
22 economic calculations based on that premise.
23 Correct?
24    A.  I -- I can't agree with you, just

Confidential Information Subject to Protective Order

Page 214

1 the -- with respect to I don't have the
2 memory of that. It -- every word you're saying
3 brings back more memories of it, but I don't -- it's a
4 while ago and I don't remember the specifics of
5 the case.
6      Q.   Uh-huh.   Why don't we -- have you seen
7 the -- the decision by the Court of Chancery of
8 Delaware in this case?
9          Ever?
10     A.   I have.   Some time ago.   But I have.
11     Q.   Right.   And do you remember what
12 happened to your testimony and your work in that
13 case?   Your report?
14     A.   I do.
15     Q.   Can you tell me what you remember
16 happening to it?
17     A.   Yes.   I had written a report.   I can't
18 recall if it -- I think it might have had
19 damages in it.   But it had an economic analysis,
20 in which I relied on the report of another
21 expert to supply certain inputs from my report,
22 particularly market share.
23          In discussions with the other expert,
24 I had -- was given an understanding of the

Page 215

1 methodologies that he used to assess market
2 shares.
3          On the eve of trial, it became
4 apparent that what I had been given to
5 understand about his methodologies was not, in
6 fact, true, and his report was withdrawn.
7          Because his report was withdrawn and I
8 did not have confidence in the method by which
9 the data were collected, I did not feel I could
10 testify to the numbers in my report, and
11 together with counsel, we withdrew my report
12 from the case.
13     Q.   So according to you, there was some
14 unreliable data that was used in your report,
15 and you -- you were pulled as an expert; is that
16 what you're saying?
17          MR. GOLDBERG:   Objection to form.
18     Mischaracterizes the testimony.
19     A.   That's not what I'm saying.   The -- in
20 the course of vetting the data that I used in my
21 report, I was given to understand a set of
22 circumstances that I later understood to be
23 incorrect.
24          I, with -- together with the counsel

Page 216

1 that I was working with, decided not to put my
2 report into evidence, and I did not testify to
3 it.
4      Q.   But was it clearly known that this
5 reliance upon data was not data collected or
6 compiled by you but, in fact, by some other
7 expert?   Was that well known and clear?
8      A.   I don't know what you mean by "well
9 known."   But certainly in my report, it was
10 referenced to the other expert, and the other
11 expert, I think, also had a report or opinion or
12 materials that were not included --
13     Q.   And --
14     A.   -- in the court materials.
15     Q.   -- did you say that that other
16 expert's report was likewise pulled?
17          MR. GOLDBERG:   Objection to form.
18     Mischaracterizes the testimony.
19     A.   I don't recall what happened with the
20 other expert and his report.   To the best of my
21 recollection, the information and circumstances
22 became apparent during his deposition, which
23 suggests that maybe he did have a report, but I
24 don't recall with certainty.

Page 217

1      Q.   Well, I thought you had testified a
2 moment ago under oath that his report was pulled
3 just like yours.   Is that incorrect
4 understanding?
5          MR. GOLDBERG:   Objection.
6     Mischaracterizes the testimony.
7      A.   That is an incorrect understanding.
8 What I have indicated to you with respect to
9 this case, it was some time ago and my memory
10 isn't perfect.
11          My recollection is that for my report,
12 I, in consultation with the counsel that I was
13 working with, elected not to testify to it,
14 because I did not have faith in the numbers that
15 were drawn from a different expert's report.
16          I'm not telling you for a point of
17 fact what happened to that other expert's
18 report.
19     Q.   I see.   Well, why don't you actually
20 pull the -- the decision of the court out of the
21 pile of records there.   It's Tab 11.   And the
22 name of the case, again, is LaPoint versus
23 AmerisourceBergen.
24          And we'll get go ahead and mark that

Confidential Information Subject to Protective Order

Page 218

1 as Exhibit 7.
2      Do you now have the exhibit,
3 Dr. Stiroh?
4      A.  Not just yet.
5      MR. GOLDBERG:  Ruben, it looks like
6 you did not provide that document to us.
7      MR. HONIK:  Okay.  Then why don't we
8 go ahead and screen share it.
9      Dave, do you have it?
10      MR. STANOCH:  Stand by.
11      MR. HONIK:  Thank you.
12      Okay.  Here's the opinion.  We'll
13 separately send it to -- to Jeff, and he'll
14 mark it as Exhibit 7.  This is next in
15 order.
16      As I mentioned earlier, it's from the
17 Court of Chancery of Delaware.  It's called
18 LaPoint versus AmerisourceBergen Corp.
19      Q.  Do you see that, Dr. Stiroh?
20      (Opinion in LaPoint v.
21 AmerisourceBergen Corp. was marked Stiroh
22 Exhibit 7 for identification, as of this
23 date.)
24      A.  Yes, I do.

Page 219

1      Q.  And you see the opinions authored by
2 Judge Chandler?  Do you remember Judge Chandler
3 in the case?
4      A.  I don't think I had occasion to meet
5 him.
6      Q.  That's right.  That makes sense.
7      MR. HONIK:  Turn to page 5, please,
8 Dave.
9      MR. GOLDBERG:  You going to let the
10 witness review the document?
11      MR. HONIK:  If she would like, sure.
12      MR. GOLDBERG:  Why don't you give her
13 a second and let her take a look at page 1
14 and page 2 so that she has a chance to look
15 at it.
16      Q.  Is that what you'd like to do,
17 Dr. Stiroh?  Do you want to review this opinion?
18 Or it sounds like you may have remembered it
19 fairly well, based on what you told me thus far.
20      A.  I don't remember the details of the
21 case very well.  I'll have to say I do remember,
22 obviously, the circumstances, because it was
23 unique in my history.
24      If -- if you could just go back to

Page 220

1 page 1 and so I can refresh my recollection of
2 the summary of details of the case perhaps.
3      Q.  We can do that if you'd like.
4      (Witness reviewing document.)
5      MR. GOLDBERG:  You want to scroll down
6 a little bit, to the -- the -- that
7 paragraph under Statement of Facts?
8      MR. HONIK:  Well, respectfully, this
9 isn't your deposition.  If --
10      MR. GOLDBERG:  Yeah, but as counsel,
11 I'm allowed to -- as counsel, I'm allowed
12 to review the documents that you're going
13 to ask questions about.  And since you
14 didn't provide the document, I also need to
15 see it.
16      MR. HONIK:  Okay.  Well, we can email
17 it to you right now.  I mean, it's only
18 about six or seven pages, and, Seth, you
19 can take as much time as you'd like to
20 review it.  Is that what you want?
21      MR. GOLDBERG:  You can do that.  I
22 don't want you to ask questions until I've
23 been able to review it.
24      MR. HONIK:  I think it's a colossal

Page 221

1 waste of time and a stalling tactic, but if
2 you want to read it, I really don't care
3 very much.  I'm trying to wrap up
4 Dr. Stiroh's deposition and get her out of
5 there.  We're nearly done.
6      MR. GOLDBERG:  Ruben, all we're --
7      MR. HONIK:  She's demonstrated to
8 me --
9      MR. GOLDBERG:  Ruben, all we're doing
10 is --
11      MR. HONIK:  Excuse me.  She's --
12 excuse me.  She's demonstrated to me a
13 rather keen recollection of this case.  I'm
14 not going to quiz her on the case.  I'm
15 going to focus on what she did and what
16 she's already told us happened, which is
17 that there was some data problem and she
18 got pulled.
19      And all I'm going to do is direct her
20 to that part of the opinion that addresses
21 it.  It's a very narrow section.
22      But if you want to read the entire
23 report -- or, excuse me, opinion, we'll
24 send it to you.

Page 222

1    MR. GOLDBERG:  Yeah, I -- I --
2    MR. HONIK:  You can take as much time
3  as you like.
4    MR. GOLDBERG:  I think all we wanted
5  to do is just take a quick scan of the
6  first page to get familiar with what the
7  case is.
8    And Mr. Stanoch had not shown us that
9  first paragraph.
10    MR. HONIK:  There's no "we"; she
11  remembers it, you don't.  If you want to
12  read it, read it.
13    MR. GOLDBERG:  Like I said, I just
14  wanted to get familiar with the first page
15  here.  I wanted Dr. Stiroh to familiarize
16  herself with it.
17  A.  I have looked at the paragraphs that
18  are before me on this screen.  Until looking at
19  this, I had not actually recalled that the
20  entire dispute came from a -- an acquisition.
21    I remembered the details about my
22  report and decision not to testify.  And if you
23  ask me the question related to what is in this
24  decision, I can see if it -- I feel like I need

Page 223

1  to have more information about the background of
2  the case itself.
3  Q.  Let's go to page 5, and we'll see if
4  you need more review.
5    And if you do, you'll tell me.
6    All right.
7    So -- hold on.
8    Yeah, go up a little bit.  Sorry.
9    See where it says, B, Questions of
10  material fact relating to causation and damages?
11  A.  I do.
12  Q.  That's yes?
13  A.  Yes.
14  Q.  So you were -- you were a damage
15  expert on -- as to causation; do you remember
16  that?
17  A.  I don't have an independent memory of
18  it.  I'll have to say I -- I -- if you ask the
19  next question or see if there's something -- I
20  don't actually remember my specific assignment
21  without looking back at what the assignment was
22  that I had been given.
23  Q.  Yeah.  So, it says in the -- in the
24  second full paragraph, in the right-hand column,

Page 224

1  you see it's highlighted, it says, Plaintiff's
2  causation arguments are not helped by the
3  withdrawal of their key expert witness,
4  Dr. Lauren J. Stiroh, whose report was meant to
5  provide support for the contention that but for
6  a merger with ABC, Bridge was destined to remain
7  the dominant force in the BPOC market.
8    Do you see that?
9  A.  I see where you are reading.
10  Q.  Does that refresh your recollection
11  about what you were doing in the case?
12  A.  It doesn't.  I don't -- I don't have
13  any reason to disagree with what's written
14  there, but I don't have a recollection of the
15  work that I did, other than the ultimate
16  outcome.
17  Q.  Yeah.  So, the ultimate outcome is
18  that, as the judge wrote, virtually on the eve
19  of trial and after this motion had -- had been
20  filed, had been fully briefed, Plaintiffs
21  discovered that the data on which Dr. Stiroh
22  relied may not have been credibly gathered.
23  Plaintiffs no longer rely upon the conclusions
24  in this report.

Page 225

1    Did I read that correctly?
2  A.  You did.
3  Q.  Is there any mention about your
4  reliance upon data or conclusions or anything
5  from another expert in that paragraph?
6  A.  In that paragraph, it mentions the
7  data on which I had relied.  The data on which I
8  relied came from another expert.
9  Q.  Okay.  But you agree that the court
10  doesn't note that it came from another expert.
11  It only notes that it came from your report.
12  Right?
13  A.  I don't think it does note that it
14  came from my report.  It notes the data on which
15  I relied, and I am telling you, and I believe
16  the court knew, that it came from another expert
17  who might be referenced somewhere else in this
18  document.  I don't know that as I sit here.  But
19  the data on which I relied came from another
20  expert.
21  Q.  Okay.  You see where it says,
22  Plaintiffs no longer rely upon the conclusions
23  in this report?
24    That refers to your report, right?

Page 226

1    A.  It does.

2    Q.  So the data that the judge is writing

3  about that -- that was not credibly gathered was

4  in your report.  Correct?

5    A.  I can tell you that the data upon

6  which I relied was gathered by another expert.

7  It was the method by -- by which he had gathered

8  data that I found to be unreliable, and so I did

9  not testify to my report.

10    Q.  Well, I'm now confused.  Was the

11  method for gathering it unreliable, or was the

12  data itself unreliable, or both?

13    A.  To the best of my recollection, the

14  method for gathering it was unreliable, and that

15  led me to conclude that the data itself would

16  not be a reliable input into a damages estimate.

17    Q.  And you only discovered that after you

18  employed the data using the methodology which

19  you knew to be unreliable.  Right?

20    A.  No.

21    I did not -- when I used the data, I

22  did not know them to be unreliable.  I was -- I

23  had vetted the data and the process.

24    What I was told about the process of

Page 227

1  data gathering turned out not to be the process

2  that had been employed.  When I learned that a

3  different process that I felt was unreliable had

4  been employed, it was my opinion that the --

5  because the data gathering process was not

6  reliable, I could not rely upon the data and was

7  not willing to testify as to the damages that

8  used those data as an input.

9    MR. HONIK:  Those are all the

10  questions I have of this witness.  We're

11  going to keep the deposition open, hope

12  never have -- to have to revisit it, but

13  inasmuch as you withheld invoicing

14  information which needs to be supplemented,

15  we'll keep the record open.

16    You want to take a break and determine

17  if you have any questions?

18    MR. GOLDBERG:  Yeah.  Why don't we do

19  that.  Why don't we come back in

20  ten minutes.

21    THE VIDEOGRAPHER:  Time right now is

22  4:16 p.m.  We are off the record.

23    (A recess was taken from 4:16 to

24  4:31.)

Page 228

1    THE VIDEOGRAPHER:  Time right now is

2  4:31 p.m.  We are back on the record.

3  EXAMINATION BY MS. KAPKE:

4    Q.  Good afternoon, Dr. Stiroh.  My name's

5  Kara Kapke.  I'm counsel for CVS and Rite Aid,

6  and I have a few questions for you about your

7  opinions regarding Dr. Conti's unjust enrichment

8  opinions with respect to retail pharmacies and

9  wholesalers.

10    Where does therapeutic value fit into

11  the unjust enrichment analysis?

12    A.  My understanding of unjust enrichment

13  damages, as described in my report, are the

14  portion of a benefit conferred by a plaintiff on

15  a defendant which would be unjust for the

16  defendant to maintain.

17    The portion, then, that would be -- my

18  understanding of just for the plaintiff -- for

19  the defendant to retain would be the benefit

20  that the plaintiffs received from the

21  therapeutic benefits of the drugs.

22    Q.  I want to ask you specifically now

23  about Dr. Conti's unjust enrichment calculations

24  with respect just to pharmacies.

Page 229

1    Do you recall having opinions about

2  those calculations?

3    A.  I do.

4    Q.  And after you wrote those opinions,

5  did you have a chance to read Dr. Conti's

6  deposition transcript where she was asked

7  questions about her unjust enrichment opinions

8  with respect to pharmacies?

9    A.  I did.

10    Q.  After reading her report and

11  deposition transcript, what's your understanding

12  of how Dr. Conti calculated unjust enrichment

13  damages with respect to pharmacies from a

14  mechanical perspective?

15    A.  I understand that she summed up

16  certain revenues received by pharmacies, from

17  her report, which reads as if she had intended

18  then to subtract relevant costs.

19    From her deposition, it seems to me

20  from reading that she does not think there are

21  relevant costs, and so she -- my understanding

22  of her opinion is that it is simply revenues

23  received without subtracting costs and without

24  any apportionment with respect to what part

Confidential Information Subject to Protective Order

Page 230

1  might be just or any consideration of a
2  therapeutic benefit that patients received.
3      Q.  From -- after reading her report and
4  deposition transcript, what's your primary
5  criticism for how Dr. Conti describes her
6  methodology for calculating profits for the
7  pharmacies?
8      A.  I would say it is too simplistic and
9  incomplete.  It was not apparent, from reading
10  her report, her opinion was that it was
11  essentially revenues that she thought were
12  unjust enrichment.
13          From reading her deposition, it is
14  apparent that she thinks that there are certain
15  costs that she thinks are not relevant, that I
16  think would be relevant for calculating profits
17  even before any apportionment.
18      Q.  Not asking you to give an exhaustive
19  list, but what are some of those costs that you,
20  as an economist, would consider in a profits
21  calculation?
22      A.  I think often and first and foremost
23  it would be the cost of goods sold, is quite
24  often the biggest component of costs.

Page 231

1          There are typically other types of
2  costs that are associated with delivering a
3  product to consumers.  They could be cost of
4  storing the product, delivering the product,
5  operating the facility, but I think there are a
6  wide variety of categories.  None of the
7  categories are included in Dr. Conti's
8  calculation.
9      Q.  For purposes about thinking about the
10  cost of goods sold, does it matter if a pharmacy
11  acquired and paid for the product the day it
12  sold it to the customer, a month before, or a
13  year before?
14      A.  Not from a standpoint of economics,
15  no.
16      Q.  Why not?
17      A.  The profits that are received are the
18  part of the revenue that the retailer gets to
19  hold on to, putting aside the question of
20  apportionment.  The retailer does not benefit
21  from the entirety of revenue.  They have to then
22  use that revenue to pay out their costs, and
23  there would not be the entirety of revenue as a
24  profit calculation.

Page 232

1      Q.  As an economist, have you ever seen
2  profits calculated without including the cost of
3  ingredients?
4      A.  Not profits for a pharmaceutical
5  product, no.
6      Q.  Have you ever seen an economics
7  textbook or scholarly piece of literature, or
8  anything like that, where someone measures
9  profits from an economics perspective without
10  considering the cost of ingredients?
11      A.  No.  For the highest level with no
12  detail, to say that profits are revenue minus
13  cost, it still has cost.
14          As part of that definition, from an
15  accounting point of view, which when we are then
16  applying economic theory to an actual case, we
17  typically would look at accounting data, and
18  that would start with a cost of goods sold and
19  other costs of delivering the product to
20  consumers.
21      MS. KAPKE:  Thank you so much,
22  Dr. Stiroh.  I don't have any further
23  questions.
24      THE WITNESS:  Thank you.

Page 233

1      MR. HONIK:  Any questions from anyone
2  else?
3      MR. GOLDBERG:  I may have a question
4  or two, but I do need to take just a
5  two-minute break.  Sorry.  If we can go off
6  the record for two minutes.
7      THE VIDEOGRAPHER:  The time right now
8  is 4:35 p.m.  We are off the record.
9      (A recess was taken from 4:35 to
10  4:39.)
11      THE VIDEOGRAPHER:  Time right now is
12  4:39 p.m.  We are back on the record.
13      MR. HONIK:  So Ms. Kapke is done
14  questioning.  Are there any other questions
15  from defense counsel?
16      Seth?
17      MR. GOLDBERG:  No.  There are no other
18  questions from defense counsel.
19      MR. HONIK:  Was that Leslie in the
20  room?
21      MR. GOLDBERG:  No one else is in the
22  room at this time.  Just myself, Kara --
23      MR. HONIK:  When we were off the
24  record, was there someone else in the room?

Confidential Information Subject to Protective Order

Page 234

1    MR. GOLDBERG:  Leslie was in the room.
2    MS. KAPKE:  She came in to talk to me.
3    MR. HONIK:  Oh.
4    Okay.
5  EXAMINATION BY MR. HONIK:
6    Q.  Dr. Stiroh, you were asked some
7  questions by Ms. Kapke, who represents CVS,
8  about the way in which profits were calculated
9  in an unjust enrichment model.
10    Are you aware that plaintiff sought
11  from the retailers the very costs that you
12  referred to, cost of goods, delivery cost,
13  storage, all the other items that you believe
14  might be incorporated in such a model, and --
15  and we were not provided that?
16    In fact, the court, to this point in
17  the litigation, has not directed the retailers
18  to provide that.  Were you aware of that?
19    MS. KAPKE:  Object to form.  I think
20  that misstates the record.
21    But go ahead and answer.
22    A.  I'm not aware of what costs were
23  requested.  I have considered what Dr. Conti
24  said, and it was my understanding from reading

Page 235

1  her deposition that she had opined that
2  additional costs would not be relevant to the
3  calculation, and in my opinion, additional costs
4  would be relevant to the calculation.
5    Q.  And if -- if those costs were
6  identified and produced in -- in the model that
7  you're talking about, you could subtract those
8  and arrive at your own calculation for profits.
9  Couldn't you?
10    A.  Not for the purposes of assessing
11  damages that accrue from individual plaintiffs
12  and any benefit that they im- -- brought to an
13  individual defendant, the portion of which would
14  be unjust for that defendant to keep.
15    I think tracing the costs through the
16  complex supply chain would be something that
17  could not be done with broad accounting level
18  data.
19    I have not seen what model Dr. Conti
20  purports to put forward to assess profits and
21  how to trace payments through from the --
22  through the entire chain to assess what the
23  unjust portion of profits are for any part of
24  the chain or how they relate to specific

Page 236

1  benefits that come from specific plaintiffs.
2    But at a minimum, my understanding of
3  what she had set forward, the simplistic thing
4  that she put in her report, is not even what I
5  think she said in her deposition from what she
6  intended to do.
7    Q.  Have you done an unjust enrichment
8  calculation for retailers?
9    A.  I have not.
10    Q.  So, you've done little more than
11  criticize what Dr. Conti did, but you've not
12  offered any other opinion about how to go about
13  it the right way, have you?
14    MS. KAPKE:  Object to form.
15  Argumentative.
16    A.  I have the critique in my report that
17  is summarized under Roman IX, and a section that
18  expands on that.  I have not done a
19  quantification of unjust enrichment.
20    I have explained where I think there
21  are flaws in the overarching premise that
22  Dr. Conti puts forward, and the part that is
23  missing in my report is what she had said in her
24  deposition, where it seems that she thinks that

Page 237

1  there are not relevant costs that would need to
2  be considered.
3    I think there are relevant costs that
4  would need to be considered, and it would be
5  very complex to be able to take them into
6  account appropriately to assess unjust
7  enrichment in the manner in which I understand
8  unjust enrichment damages need to be assessed.
9    Q.  So you've assessed unjust enrichment
10  damages in the past.  Have you not?
11    MS. KAPKE:  Object to form.  Vague.
12  Ambiguous.
13    A.  I have worked on matters involving
14  unjust enrichment damages.  I don't recall in a
15  class action setting having done so.
16    Q.  Such models exist, don't they, in the
17  economic world?
18    A.  Unjust enrichment damages models exist
19  in the economic world, yes.
20    MR. HONIK:  Thank you.  Those are all
21  the questions I have.
22    MS. KAPKE:  I don't have redirect.
23    MR. HONIK:  All right.  That concludes
24  the deposition.  Thank you, Dr. Stiroh.

Confidential Information Subject to Protective Order

Page 238

```
 1        THE WITNESS:  Thank you.
 2        THE VIDEOGRAPHER:  The time right now
 3   is 4:44 p.m.  We are off the record.
 4        (Time noted: 4:44 p.m.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 240

```
 1            C E R T I F I C A T E
 2
 3   STATE OF NEW YORK    )
 4                        ) Ss.:
 4   COUNTY OF NEW YORK   )
 5
 6        I JEFFREY BENZ, a Certified Realtime
 7   Reporter, Registered Merit Reporter and Notary
 8   Public within and for the State of New York, do
 9   hereby certify:
10        That the witness whose examination is
11   hereinbefore set forth was duly sworn by me and
12   that this transcript of such examination is a true
13   record of the testimony given by such witness.
14        I further certify that I am not related to
15   any of the parties to this action by blood or
16   marriage and that I am in no way interested in the
17   outcome of this matter.
18        IN WITNESS WHEREOF, I have hereunto set my
19   hand this _____ of _____, 2022.
20
21   _____
22   JEFFREY BENZ, CRR, RMR
23
24
```

Page 239

```
 1
 2        A C K N O W L E D G E M E N T
 3   STATE OF NEW YORK    )
                          ) ss.:
 4   COUNTY OF NEW YORK   )
 5
 6        I, LAUREN J. STIROH, Ph.D., hereby certify, I
 7   have read the transcript of my testimony taken
 8   under oath in my deposition of March 25, 2022;
 9   that the transcript is a true, complete and
10   correct record of what was asked, answered and
11   said during this deposition, and that the answers
12   on the record as given by me are true and correct.
13
14
     _____
15   LAUREN J. STIROH, Ph.D.
16   Subscribed and sworn to
17   before me on this _____ day
18   of _____, 2022
19
20   _____
21        NOTARY PUBLIC
22
23
24
```

## WORD INDEX

**< $ >**
**$1,369,114**
200:*10*
**$10** 88:*19*
90:*8* 91:*9, 17*
92:*7* 93:*15,*
*24* 114:*6*
118:*9*
**$12** 88:*22*
90:*9, 19*
**$15** 115:*19*
**$2** 90:*19*
91:*22* 92:*3*
118:*16*
**$4** 72:*8, 18*
73:*9, 13*
**$4.4** 71:*20*
**$8** 91:*18*
114:*7* 115:*18*
**$9** 115:*18*

**< 0 >**
**02109** 4:*4*
**07701** 4:*18*

**< 1 >**
**1** 5:*10* 9:*16,*
*18* 10:*2, 23*
17:*20* 44:*6*
59:*14* 119:*5*
121:*22* 203:*1*
219:*13* 220:*1*
**1:25** 134:*16,*
*17*
**10** 113:*24*
114:*14*
118:*12*
181:*12, 17*
**10:13** 1:*12*
6:*6*
**10:42** 30:*20*
**1000** 2:*21*
**1001** 3:*4*
**104** 184:*6*
**11** 4:*9* 217:*21*
**11:08** 30:*23*
**1100** 2:*4*

**12** 125:*2*
210:*1*
**12:07** 77:*16,*
*17*
**12:15** 77:*18,*
*20*
**124** 5:*10*
**12th** 10:*4*
49:*17*
**14** 125:*17, 22*
208:*15, 22*
**15** 198:*7*
204:*17* 205:*19*
**1515** 2:*4*
**15219** 3:*20*
**1540** 1:*13* 6:*8*
**1700** 4:*13*
**173** 5:*13*
**17th** 2:*16*
**18** 196:*21*
**188** 5:*13*
**19** 37:*2*
196:*21*
**190** 3:*15*
**19102** 2:*5*
**19103-4196**
2:*16*
**197** 5:*16*

**< 2 >**
**2** 4:*18* 5:*10*
13:*6* 14:*11*
17:*18* 20:*3,*
*10, 22* 44:*5*
84:*4* 114:*1, 7*
124:*2, 3, 13,*
*22* 125:*18, 24*
127:*2* 219:*14*
**2,000** 44:*9*
**2:04** 135:*2, 9*
**20** 127:*2, 4*
208:*15, 23*
**20004** 3:*4*
**20004-2166**
2:*22*
**20006-3807**
4:*14*
**2012** 37:*23*
65:*17* 166:*4,*
*21* 193:*5, 10,*
*16*

**2018** 37:*2*
38:*2* 159:*23*
166:*5, 21*
193:*3, 10, 16*
**2019** 38:*2*
**202.452.7318**
4:*15*
**202.624.2774**
3:*5*
**202.776.5253**
2:*22*
**2020** 198:*4, 7*
199:*22*
203:*24*
204:*13, 17*
205:*19*
**2021** 199:*14,*
*23* 200:*11*
203:*15*
207:*20* 208:*1,*
*7, 13, 23*
**2022** 1:*8* 6:*5*
125:*2* 202:*5,*
*12, 13, 19*
203:*2* 239:*8,*
*18* 240:*19*
**21** 5:*13*
172:*23* 173:*5*
174:*20*
180:*15* 184:*7*
201:*8*
**211** 4:*18* 5:*23*
**215.979.1164**
2:*18*
**218** 5:*16*
**228** 5:*5*
**23** 152:*8, 23*
**234** 5:*6*
**24** 203:*24*
204:*13*
**25** 1:*8* 6:*5*
239:*8*
**26** 38:*18* 39:*9*
**267-435-1300**
2:*6*
**2875** 1:*4*

**< 3 >**
**3** 5:*10, 13*
124:*8, 12, 20*
172:*18, 24*

173:*3, 15*
179:*4* 182:*6*
**3,500** 203:*13*
**3:11** 188:*4, 5*
**3:28** 188:*6, 8*
**30** 2:*16*
**30,162.50**
201:*10*
**300** 4:*13*
**301,262.50**
201:*8*
**3100** 3:*9*
**312.456.1065**
3:*11*
**314.480.1848**
3:*16*
**317.231.6491**
4:*10*
**331** 5:*13*
172:*20, 21, 24*
173:*5* 174:*20*
180:*15*
**34** 39:*20*
**351** 172:*20*

**< 4 >**
**4** 5:*13* 73:*20*
188:*13, 15*
**4:16** 227:*22,*
*23*
**4:31** 227:*24*
228:*2*
**4:35** 233:*8, 9*
**4:39** 233:*10,*
*12*
**4:44** 238:*3, 4*
**412.263.4362**
3:*21*
**46204-3535**
4:*9*
**48601P005**
204:*1*

**< 5 >**
**5** 5:*16* 10:*22*
12:*16* 13:*1, 7*
14:*12* 59:*13*
60:*16* 61:*20*
133:*18* 197:*1,*
*6, 11, 16*
203:*19* 204:*7,*

**10** 219:*7*
223:*3*
**50** 39:*7, 9*
**5-0** 39:*7*
**504.524.5777**
2:*11*
**505** 2:*21*
**53** 4:*4*
**53163P005**
207:*21*

**< 6 >**
**6** 5:*16* 17:*14*
20:*8, 24*
123:*20* 147:*8*
197:*2, 9, 11*
199:*17* 200:*4,*
*23* 201:*5, 6*
**60601** 3:*10*
**617.213.7000**
4:*5*
**63105** 3:*15*
**65** 140:*3*

**< 7 >**
**7** 5:*4, 16*
218:*1, 14, 22*
**701** 2:*9*
**70130** 2:*9*
**72** 140:*3*
**732.631.8315**
4:*19*
**77** 3:*9*

**< 8 >**
**8** 114:*1, 6, 14*
118:*15* 138:*9*
140:*5* 207:*20*
208:*7*

**< 9 >**
**9** 5:*10*
173:*11*
181:*10, 11, 17*
**9th** 2:*21*

**< A >**
**a.m** 1:*12* 6:*6*
30:*20, 23*
**ABC** 224:*6*

Confidential Information Subject to Protective Order

ability 46:24
93:3 143:21
148:16 149:17
able 8:21
69:12 124:17
143:1 150:24
189:1, 21
200:16, 21
202:15
209:15, 16
211:15
220:23 237:5
absence 38:8
40:2, 9, 13, 15,
17, 21 41:2
89:16 91:5
92:20 99:17
101:7 111:6,
16 118:1
119:1 177:19
185:23 194:22
absent 102:9
absolutely
195:17
abundantly
104:12
accept 55:7
60:22 61:4, 9
62:3 89:11
95:14 120:4
121:14, 17, 22
122:21 164:4
accepted
130:15
accepting
93:19 122:18
account 16:2
24:14, 17
37:7 62:11,
16 63:2, 4
65:4 85:9
111:21 128:3,
4 130:5, 8
142:9 150:14
178:18 237:6
accountant
122:11
accounted
142:21

accounting
232:15, 17
235:17
accrue 235:11
accurate
174:21 201:15
accurately
105:7
achieved
127:13
acknowledge
42:16 116:16

Acknowledging
195:15
acquainted
83:20
acquired
213:9 231:11
acquiring
88:14
acquisition
222:20
Act 42:7, 19
56:5, 13, 23
141:12, 17
160:6 173:9,
12, 20 174:3,
19 179:5, 10
Actavis 3:9
action 50:19
237:15 240:15
actions 24:6
34:14 110:14
active 81:3
activity 198:2
Acts 5:13
29:18, 19
172:23
173:15, 23
181:1
actual 13:18
14:14 34:8
71:18 72:8
80:17 82:9
103:16
105:17
107:20 108:4,
15, 20 109:7
110:23
111:10, 23

112:3 113:14,
24 114:24
115:20 117:2
118:9 119:9
133:23 189:2
192:9 232:16
added 36:19
94:5 118:21
170:9
adding 73:14
addition 40:7
100:1 165:14
199:21
additional
94:18 98:10,
13 202:17
211:17 235:2,
3
address 11:23
28:14
addresses
221:20
addressing
155:16
adhere 158:18
adulterated
15:3, 9, 13
25:1 26:8
42:5, 10, 18
43:6, 15 56:4,
12, 22 57:8,
12, 17 75:7
76:13, 23
160:5 174:7
175:5, 16
176:1, 3
178:3, 12
179:8, 18
180:2 181:20
182:23
184:10, 15
186:10 187:9
adulteration
15:19 42:13
43:19 57:15,
18
adverse 64:16
165:2
affect 32:7
62:19 77:5
99:24

affirmatively
171:21
afternoon
195:16 228:4
aggregate
105:2 109:8,
15, 16
aggregated
106:1
ago 60:4
186:24
212:23 214:4,
10 217:2, 9
agree 8:16
31:11, 15
32:17 33:18
74:15 118:18
121:1 129:24
140:6 146:15,
19 153:2
156:8, 15
158:16
159:19
160:24 161:9,
10 162:20
163:20, 23
166:3, 9
175:15, 24
177:22
178:11, 17
183:20
184:16
185:14, 18
186:13, 19
191:13, 19
193:1 200:11
213:24 225:9
agreed 89:11
183:22 192:18
agreeing 103:3
agreement
103:15
agrees 182:5,
22
ahead 12:5
66:20 76:9
197:15
217:24 218:8
234:21
Aid 4:8 228:5

Albertsons
4:13
ALFANO 3:17
aligned 38:20
allegation
36:18, 22
64:14
allegations
22:18 24:3, 7,
11, 17 36:3,
14 64:13
67:8, 11
83:17 122:5
allege 66:5
alleged 24:13
50:20 66:16
97:24 101:3
159:14
165:12 178:8
allegedly
209:18
allow 62:4
72:14 107:1
allowed
146:23 220:11
allows 176:14
alternate
114:20 115:1
alternative
41:9 59:3
86:10 87:21
88:10, 21, 23
91:19 93:5
100:2, 5
108:23
109:24
110:10 111:5
112:1, 4, 9, 11,
16, 19, 24
113:13, 19, 20,
24 114:8, 21
115:17 117:4,
5, 22 118:11,
13, 15 119:10,
24 122:12, 20
142:11, 16, 18
196:7, 8, 9
alternatives
40:20 92:18
93:6 103:1

Confidential Information Subject to Protective Order

111:*15, 18, 19*
112:*17* 142:*14*
**alters** 101:*3*
**ambiguity**
104:*2*
**Ambiguous**
32:6, *20* 43:*8*
48:*5* 50:*7*
53:*20* 69:*20*
72:*21* 79:*6*
81:*17* 82:*22*
95:*22* 99:*10*
101:*10*
102:*17*
109:*12* 115:*3,
23* 122:*1*
130:*3* 139:*13*
142:*7* 143:*5*
149:*13* 150:*3*
153:*17*
171:*16* 176:*6*
177:*11*
186:*12*
191:*23* 193:*7*
195:*13* 237:*12*
**AmerisourceBe
rgen** 5:*19*
212:*24* 213:*9*
217:*23*
218:*18, 21*
**amount** 57:*21*
64:*20* 73:*9,
14* 89:*24*
104:*9, 21*
105:*2, 3*
107:*19* 116:*9*
**amounts**
66:*22* 181:*14*
189:*11*
199:*22* 200:*3,
9*
**analyses**
33:*11* 45:*12*
64:*4* 148:*4*
210:*5*
**analysis** 22:*17,
24* 23:*9, 24*
26:*3, 24*
27:*12, 14*
28:*3* 30:*3*
31:*12* 32:*2, 7*

33:*1* 35:*4*
38:*14* 40:*8,
11, 14* 41:*1*
44:*21* 46:*17,
24* 50:5, *6, 9,
13* 56:*11, 14,
21* 57:*1* 62:*6,
24* 63:*16, 22*
64:*24* 65:*10*
68:*5, 15* 70:*1,
7* 76:*11*
83:*10* 85:*5*
98:*5* 99:*19*
116:*18, 20*
122:*19*
126:*12*
127:*18*
129:*14*
131:*10* 142:*8*
143:*2* 148:*2*
150:*14*
176:*11*
180:*15* 181:*2*
214:*19* 228:*11*
**analyst** 208:*3*
**analyze** 29:*11*
**analyzing**
34:*1, 23*
35:*24* 78:*4*
**and/or** 44:*2*
51:*22* 71:*16*
78:*23*
**ANDRAS** 3:*10*
**andrast@gtlaw
.com** 3:*12*
**Annotated**
173:*5*
**ANSWER**
5:*22* 9:*1*
19:*1* 20:*19*
21:*5* 33:*16*
65:*13, 14*
85:*15, 19*
93:*11* 95:*20*
100:*16*
105:*22*
112:*21*
114:*12*
115:*11* 133:*5*
140:*2* 141:*8*
154:*6, 12*

155:*1, 3, 7, 10,
13* 171:*10*
177:*1* 195:*21*
196:*17*
201:*14*
205:*23*
206:*23* 211:*4,
5, 16, 22*
212:*7, 20*
234:*21*
**answered**
29:*13* 47:*3*
63:*20* 65:*14*
94:*4* 111:*13*
115:*24*
126:*23* 134:*4*
156:*17*
180:*17*
195:*12*
201:*17* 239:*10*
**answering**
97:*17* 195:*1*
**answers**
239:*11*
**anticipate**
54:*21* 55:*24*
**antitrust**
33:*22* 34:*2*
35:*9, 12, 16,
17, 20* 78:*5, 7*
79:*1* 82:*16*
131:*9*
**apart** 139:*4*
**apologize**
59:*11* 66:*19*
114:*11*
**apparent**
192:*6* 215:*4*
216:*22* 230:*9,
14*
**apparently**
212:*22* 213:*3*
**appear** 20:*3,
9, 10* 41:*21*
**appears** 184:*6*
**application**
53:*11* 156:*10*
184:*19* 186:*6*
**applied** 42:*17*
**APPLIES** 1:*5*
85:*11*

**apply** 111:*3*
137:*5* 138:*20*
157:*14* 175:*13*
**applying**
122:*9* 232:*16*
**apportionment**
229:*24*
230:*17* 231:*20*
**appreciated**
43:*24* 44:*2*
**apprise** 73:*20*
**approach**
87:*20* 94:*6*
118:*22*
**approached**
85:*4* 128:*20*
**approaches**
59:*3* 63:*8*
145:*14*
**appropriate**
24:*7* 36:*4*
38:*16* 46:*2*
64:*2* 84:*23*
102:*23*
119:*14* 120:*8*
133:*11* 136:*8*
156:*5* 170:*19,
20* 181:*6*
**appropriately**
177:*24* 237:*6*
**approved**
36:*23* 37:*16*
39:*13* 75:*17,
18, 20*
**ARBs** 165:*16*
166:*1* 196:*9*
**area** 13:*24*
22:*2* 33:*21*
34:*2* 35:*9*
89:*7* 170:*5,
10* 171:*21*
**areas** 13:*3, 23*
18:*1* 170:*7*
**argument**
156:*1*
**Argumentative**
63:*20* 128:*13*
167:*11*
168:*11*
181:*24*

190:*16*
195:*12* 236:*15*
**arguments**
224:*2*
**arises** 9:*15*
**arising** 57:*10*
163:*17*
**arrive** 33:*3*
34:*16* 100:*12*
110:*9* 111:*8*
141:*10* 144:*9,
23* 164:*7*
235:*8*
**arrived** 73:*9*
99:*5*
**arriving**
74:*23* 76:*11*
**art** 42:*6*
**articles** 145:*6*
**ascertained**
199:*7*
**ascribe**
113:*12* 131:*1,
23*
**ascribed** 119:*6*
**ascribing**
71:*21* 92:*8*
**ASHLEY** 4:*14*
**ashley.jones@b
ipc.com** 4:*15*
**aside** 231:*11*
**asked** 22:*1*
29:*13* 33:*14*
35:*10* 46:*5*
47:*3, 22, 24*
53:*18, 21, 23*
54:*24* 56:*1*
61:*16* 63:*15,
20* 72:*19*
74:*2* 94:*3*
96:*9* 111:*12*
114:*15* 115:*7,
24* 121:*6, 12*
126:*23*
128:*16*
132:*11, 12, 13*
134:*4, 5*
156:*17*
160:*24* 161:*9,
10, 23* 166:*11*
177:*4* 180:*17*

186:23  187:3,
13  190:17
192:11, 18
193:12  195:2,
12  198:23
205:13, 17, 21
210:3, 8, 17
229:6  234:6
239:10
**asking**  18:21
21:22  66:10
82:11, 12, 13,
15  108:8, 10
110:15, 16, 18
111:8  115:13,
20  118:17
121:16
135:15  139:7,
10  143:12
150:5  151:20
156:8, 13
166:14
167:12  183:9
187:6  189:23
191:3  202:23
205:15  230:18
**aspect**  37:6
153:24  156:11
**aspects**  26:14
38:19  70:17
148:15  213:14
**assess**  13:13
27:9  35:13
46:5  53:12,
23  58:11
70:15, 19
71:1  74:12,
20  78:9
105:13  107:2
109:14, 17
111:21
127:24
139:21
157:24
158:13
162:22  215:1
235:20, 22
237:6
**assessed**  24:9
46:9  52:22
70:2  122:8

153:10  154:3,
11  237:8, 9
**assessing**
37:13  57:14
63:3  65:5
75:2  120:16
123:4  140:18,
19  142:22
235:10
**assessment**
13:10, 18
14:14  25:22
57:6  120:15
121:9  122:6
196:5
**assessments**
34:7
**assign**  69:12,
14, 16  110:1, 3
**assigned**  74:23
**assignment**
10:23  11:11
12:17, 21
13:2  54:6
154:7  158:11
161:23, 24
177:1, 3
198:14, 22
206:3  207:2
210:18
211:15, 18
212:13, 17
223:20, 21
**assignments**
207:5  210:2
**associate**
208:3
**associated**
202:21  231:2
**associates**
197:21  201:19
**assume**  10:11
26:2  28:24
31:24  35:10,
21, 23  36:1, 3,
15  40:14, 17
41:2, 23
47:23  48:1
56:3  72:6, 13,
19  73:3, 5, 7
75:16, 19

76:22  93:14
119:15
130:10
132:11  164:4,
20  168:2
170:20
171:24  178:7,
9  195:2
**assumed**
29:10  36:5
37:16  38:4
90:21  117:12
130:17  168:5
**assumes**
24:23  28:4,
12  29:2
38:11  43:8
183:15
**assuming**
32:3  36:13
37:23  39:12
71:3  91:23
93:23
**assumption**
25:20, 21
26:4, 11, 15
28:20  29:17
54:8, 9  84:14
90:23  130:20
170:19
171:11, 18
**assumptions**
13:3  15:17
27:19  31:6
33:2, 9, 16
34:15  35:4
**at-issue**  15:3
40:21  164:13
191:11
**attached**
124:11
**attempt**  14:3
71:4
**attempting**
31:6
**attention**
14:13  59:12
107:23  184:2
**Attorneys**  2:4,
8, 14  3:3, 8,

14, 19  4:3, 8,
13, 17  7:7, 10
**attributable**
170:9
**attributes**
95:15
**auditing**
202:16
**authored**
51:12, 17
146:9  219:1
**authorities**
131:9
**availability**
38:8  81:2
100:5
**available**  38:2,
21  40:2, 20,
22  47:12
65:1  74:9
77:10  80:13
82:14, 18
83:5  98:1, 9
103:1  105:18
107:17
111:16
112:18
129:18  152:3
165:10, 20, 22
**Avenue**  3:4
4:18
**aversion**  95:13
**aware**  7:11
8:18  42:5
70:11  79:8
104:5, 7
107:5  145:1
147:23, 24
150:8  159:21,
22  165:6, 10,
11, 14, 19, 21,
24  166:7, 8,
11, 15  167:14,
18  172:10, 13
182:3, 8
187:12, 17
199:10
234:10, 18, 22
**awareness**
187:7

**axes**  190:19
**axis**  191:5, 6

**< B >**
**back**  30:23
55:19  56:17
77:20  80:24
85:19, 20, 23
97:18, 21
105:7  113:22
114:10
123:13  135:9
137:12, 22
188:8  193:4
207:22
211:10, 11
214:3  219:24
223:21
227:19  228:2
233:12
**back-casting**
79:24  80:3
**background**
17:5, 8  18:1,
8  45:5, 20
181:10, 18
223:1
**backwards**
114:11
**ballpark**
203:17
**Bank**  4:18
**banned**
150:17, 21
**bar**  213:7, 12
**bargain**  129:7,
23  163:6
**bargained**
129:9
**BARNES**  4:6
**base**  136:3
**based**  35:4, 5
46:11  95:7
117:1  119:20
123:2  127:21
129:19  149:1
156:2, 5
213:22  219:19
**bases**  32:14
**Basically**
100:6

basis 21:*3*
23:*13* 29:*10,*
*24* 30:*2*
31:*12, 20*
32:*1, 15, 23*
33:*2* 44:*14*
45:*17* 47:*9*
53:*24* 63:*21*
65:*6* 70:*4, 9*
77:*2* 105:*14*
107:*6, 18, 22*
109:*22* 128:*2,*
*3* 153:*10*
154:*4, 11, 15,*
*19, 20, 21*
166:*21* 168:*5*
183:*11, 16, 20*
199:*8* 201:*21*
**batch** 186:*8*
**BAZAN** 2:*21*
**bear** 172:*17*
**bedside** 213:*7*
**beginning**
39:*23* 55:*10*
72:*2* 137:*9*
184:*6* 193:*4*
211:*19*
**begins** 13:*9*
14:*13* 38:*18*
108:*3, 13*
127:*6*
**behalf** 67:*15,*
*21* 183:*12*
198:*17* 201:*19*
**behaved** 81:*8*
**behavior** 79:*1*
**belabor** 78:*18*
207:*7*
**believe** 36:*4*
39:*12* 42:*20*
48:*13* 55:*23*
73:*17* 86:*21*
123:*8* 124:*24*
126:*10*
127:*16*
129:*11* 130:*1*
133:*4* 147:*17*
168:*8, 15*
174:*10* 182:*1,*
*18* 208:*24*

225:*15* 234:*13*
**believed** 94:*22*
**believes**
118:*10*
**benefit** 8:*15*
9:*14* 57:*20*
86:*22* 129:*7,*
*23* 130:*1*
138:*12* 142:*1,*
*4, 9* 143:*9*
144:*24*
162:*10* 163:*5*
188:*9* 228:*14,*
*19* 230:*2*
231:*20* 235:*12*
**benefits**
142:*10*
143:*17, 20*
228:*21* 236:*1*
**Benz** 1:*14*
6:*17, 21*
240:*6, 22*
**best** 8:*23*
18:*3* 24:*21*
37:*22* 48:*24*
49:*22* 51:*24*
52:*3* 125:*5*
126:*13*
216:*20* 226:*13*
**bibliography**
146:*8, 13*
**biggest** 230:*24*
**bill** 203:*1*
**billed** 201:*20*
202:*13* 206:*18*
**billion** 71:*20*
72:*8, 18* 73:*9,*
*13, 20*
**binary** 168:*16*
**bio** 76:*4*
**bit** 11:*6, 17,*
*20, 21* 12:*2, 4,*
*9* 15:*21* 83:*8,*
*11* 135:*18*
188:*18* 204:*4*
220:*6* 223:*8*
**black** 205:*8*

**BLACKWELL**
3:*14*
**blessed** 181:*18*

**blood** 41:*16*
42:*2* 69:*4*
90:*6* 92:*9*
93:*3* 113:*8*
127:*14*
143:*21* 144:*2*
164:*18, 21*
165:*1, 4, 17*
194:*22* 240:*15*
**Book** 126:*5, 7*
**borrow** 62:*23*
**BOSICK** 3:*17*
**Boston** 4:*4*
**BPOC** 224:*7*
**brand** 40:*22*
**branded**
126:*4* 165:*22*
166:*1*
**breach** 84:*18,*
*24* 126:*8, 18*
**breached**
84:*13, 16*
**break** 76:*3, 4*
77:*13* 123:*13*
133:*21*
134:*14* 181:*5*
186:*21, 23*
187:*2, 20*
227:*16* 233:*5*
**Bridge** 4:*18*
213:*19* 224:*6*
**briefed** 224:*20*
**briefing** 83:*18*
**briefly** 7:*5*
10:*5*
**bring** 145:*24*
172:*15*
**brings** 214:*2*
**broad** 235:*17*
**broader** 17:*7*
19:*10*
**Broadway**
1:*13* 6:*8*
**broke** 25:*9*
28:*7* 83:*7*
135:*11* 163:*1*
**brought** 132:*7*
235:*12*
**BUCHANAN**
4:*11*

**buckets** 158:*3*
**built** 172:*4*
**business**
53:*12* 140:*23*
157:*13*
**but-for** 34:*7*
80:*4* 101:*5*
102:*2* 177:*24*
178:*4* 193:*2,*
*8, 15* 194:*2, 5,*
*13, 18* 195:*7,*
*19, 24*
**buy** 150:*9*
168:*17*

**< C >**
**c.whiteley@ka**
**nner-law.com**
2:*11*
**calculable**
28:*5*
**calculate** 60:*7,*
*19* 121:*22*
134:*1* 138:*20*
**calculated**
25:*24* 27:*6*
47:*9* 91:*13*
229:*12* 232:*2*
234:*8*
**calculating**
109:*7* 140:*15*
230:*6, 16*
**calculation**
122:*9* 134:*6*
138:*10, 15*
140:*7* 230:*21*
231:*8, 24*
235:*3, 4, 8*
236:*8*
**calculations**
213:*22*
228:*23* 229:*2*
**calendar**
200:*10*
**call** 77:*24*
86:*24* 111:*23*
124:*2* 134:*8*
145:*19* 189:*8*
**called** 6:*20*
43:*18* 125:*11*
150:*17* 176:*9*

203:*23*
208:*10, 11*
212:*23* 213:*6,*
*19* 218:*17*
**calling** 163:*22*
**Calls** 32:*6*
58:*6* 84:*21*
86:*15* 97:*6*
106:*13* 122:*1*
138:*5* 141:*14,*
*22* 155:*20*
156:*17* 157:*6,*
*18* 158:*7, 21*
159:*3, 10*
160:*1, 8, 20*
161:*6, 20*
163:*10* 175:*7*
178:*16*
179:*20* 180:*6*
184:*22*
186:*12*
187:*15* 205:*4*
**Camp** 2:*9*
**CAMPBELL**
3:*5*
**cancer** 159:*15*
**capacity**
205:*22* 206:*2*
212:*5*
**caption** 124:*19*
**carcinogen**
158:*24*
168:*19, 20*
**carcinogenic**
16:*18*
**Cardinal** 3:*3*
**care** 221:*2*
**carefully** 73:*4*
87:*19*
**Carondelet**
3:*15*
**carry** 54:*6*
158:*12*
**case** 7:*7* 8:*9*
15:*9* 16:*6*
17:*4, 9* 22:*19*
23:*14, 16, 22*
24:*17* 27:*13*
47:*4, 12* 52:*5*
54:*7* 56:*4, 6*
60:*23* 61:*6*

62:5  64:8
70:6  71:18
72:8  73:13,
18  78:2, 6, 12,
22  82:14
83:9, 16
84:13, 16
104:15  106:2
113:5  116:3,
4  120:17
123:3  124:19
133:24
135:17  138:3,
17  144:3, 20
145:23  146:1
147:6, 18, 23
148:1  149:4
150:4  152:1,
16  158:17
159:7, 21
167:15
168:17  172:8
177:2  179:17
181:13
182:12
183:21  189:1
191:14  193:2
196:13, 22
197:21  199:3
200:15  203:4
206:1, 17, 21
209:19
210:14, 16, 18
211:18
212:23  213:1,
3  214:5, 8, 13
215:12  217:9,
22  219:3, 21
220:2  221:13,
14  222:7
223:2  224:11
232:16
CASES  1:6
27:23  33:13
64:2  79:3, 7,
17, 20  80:12,
15  81:6
82:16  122:4,
7  145:7
152:18, 20
156:20

cash  69:16
89:20
catch  208:18
categories
231:6, 7
causation
223:10, 15
224:2
cause  50:19
159:15  204:24
caused  18:4,
11  43:14
79:1  102:3
127:11
150:20  209:6
186:10
causes  177:20
causing  173:23
Centre  3:19
cents  143:3,
14, 23
certain  13:3,
13  17:2  20:6
24:3  29:18
33:17  34:15
36:10, 19
44:14  45:5
46:12  50:19
51:1  65:3
78:3, 19
100:1  103:1
111:16
114:23  121:7
145:3  150:20
177:16
183:17
185:23  193:9,
21  214:21
229:16  230:14
certainly
28:17  39:22
83:20  145:10
147:9  149:4
216:9
certainty
48:14  60:5
216:24
certification
46:9  66:1
70:6  83:19
104:20  152:3,

22  153:2, 3
155:22
156:11  157:8
158:11  207:3
Certified  1:14
240:6
certify  46:24
106:10, 16
239:6  240:9,
14
certifying
161:17
cGMP  21:14
22:2, 8, 18
23:9, 14, 19,
21  24:18, 23
25:13, 17, 20
26:2, 5, 11, 22
27:4, 11
147:15, 21
158:18  182:5
186:4, 9, 14, 19
chain  25:4
26:10  58:5
83:23  99:14
100:8  117:7
140:22
147:15, 21
148:9, 12
182:5  235:16,
22, 24
challenge  8:22
challenged
99:18, 20
Chan  21:6
147:5
chance  181:4
219:14  229:5
Chancery
214:7  218:17
Chandler
219:2
change  43:21
57:22  64:18,
23  86:4
92:18  164:15,
16  169:9
changed  56:6
77:1  111:7
changes  70:15
94:19  100:8

changing
116:5
channel  141:5
channels  78:16
Chapter
173:11
characterizatio
n  112:19
chart  39:20
check  42:22
chemist
147:14
chemistry
182:5
Chicago  3:10
child  67:16
choice  93:7
168:16
171:13, 24
choices  115:4,
11  169:21
choose  110:13
113:6, 11
116:12
169:17  171:21
chooses  116:6
choosing
113:10  169:11
chose  19:11
chosen  116:7
circle  118:11
circumstance
110:1, 10
115:1  117:4,
5  121:21
122:20
circumstances
53:14  58:13
99:11  100:15,
19  103:10
105:9  108:14,
20, 21, 22
110:24  112:9
113:9  114:21,
23  115:18
116:5  117:17
215:22
216:21  219:22
cite  18:7
19:5, 11

22:15  44:17
45:9
cited  16:24
17:12, 15
20:4, 7, 21, 23
21:2  40:8
42:23  44:12,
13, 23  45:4
citing  19:7
Civil  152:9
claim  31:18,
19  32:1  78:6,
7, 22  84:19
85:1  136:3, 9,
17, 21  137:5,
7  138:3
167:7, 15
168:3
claimed  67:20
167:13
Claims  5:12
124:8, 12, 20
136:13
clarification
190:18
clarify  8:15
98:22
clarifying
13:24  60:17
96:12
clarity  26:17
135:20
class  24:9
27:7, 10  45:1,
2, 22  46:7, 8,
10  47:1
52:17, 23
54:1  65:3, 7,
16, 20  66:1, 7,
9, 11, 23
67:21  70:5
83:18  91:10
97:23  104:1,
8, 20, 21, 23
105:15, 17
106:10, 16, 17
108:20
109:18
110:13
111:18, 24
112:18

113:*21* 114:*5*
128:*19*
130:*11*
132:*15, 18, 20*
147:*6, 12*
148:*17* 152:*3, 22* 153:*2, 3, 11, 20* 154:*16, 21, 22* 155:*22*
156:*11* 157:*8, 21* 158:*10*
161:*17* 162:*3, 5, 7* 163:*18*
164:*11*
165:*17*
167:*18* 172:*9*
175:*5* 178:*13*
184:*12* 207:*2*
237:*15*
**classes** 105:*10, 12* 153:*9*
**classical**
146:*16*
**class-member-by-class-member** 70:*4*
105:*14* 106:*3, 5, 9* 107:*5, 18, 22* 109:*21*
**class-wide**
47:*9* 53:*24*
65:*6* 70:*9*
71:*15* 120:*16*
153:*10, 23*
154:*3, 11, 15, 21* 199:*7*
**clause** 14:*17*
59:*18*
**clear** 13:*5*
179:*22* 216:*7*
**clearly** 8:*10*
86:*19* 216:*4*
**close** 194:*24*
**CMC** 147:*15, 22*
**Code** 148:*7, 10* 172:*19*
173:*5* 213:*7, 12*
**coincided** 55:*4*

**co-insurance**
89:*24*
**collect** 80:*10*
**collected**
19:*19* 105:*6*
215:*9* 216:*5*
**collection**
197:*16*
**collusion** 79:*1*
**colon** 173:*24*
**colossal**
220:*24*
**column** 223:*24*
**come** 45:*3*
58:*11* 66:*16*
69:*11* 194:*24*
227:*19* 236:*1*
**comes** 45:*9*
57:*14* 65:*4*
67:*12* 69:*8*
94:*10, 19*
96:*5, 14, 19*
97:*3* 108:*13*
110:*22*
144:*15*
151:*22* 169:*9*
**comfortable**
134:*9*
**coming** 12:*3*
99:*7* 187:*11*
210:*9*
**commencing**
1:*12*
**commerce**
75:*9* 76:*24*
149:*18* 174:*6*
175:*16* 176:*2*
177:*9* 178:*3*
179:*6* 180:*3*
181:*20* 183:*1*
**common** 24:*9*
27:*7, 10*
35:*21* 46:*10*
52:*23* 54:*1*
65:*6* 128:*19*
132:*15, 19*
141:*20, 24*
145:*16*
153:*11, 19*
156:*23*
157:*21, 23*

158:*13, 14, 19*
159:*1, 6, 19*
160:*4, 16*
161:*3, 11, 16*
162:*3, 5*
163:*8, 18*
164:*6*
**commonality**
155:*17* 156:*1, 13* 157:*14*
158:*4*
**commonly**
50:*14* 155:*16*
**companies**
213:*6*
**company**
213:*18*
**comparative**
118:*10* 122:*19*
**compare**
87:*21* 88:*20*
108:*19* 112:*4*
115:*19* 164:*10*
**compared**
86:*9* 93:*4*
98:*5* 117:*3*
142:*11*
**comparing**
87:*24* 114:*24*
**comparison**
100:*13*
101:*24* 164:*22*
**comparisons**
169:*16*
**compiled**
216:*6*
**complaint**
24:*3* 30:*15*
35:*22* 36:*15*
45:*4, 9* 50:*20*
65:*24* 67:*21*
83:*16* 84:*2*
117:*20* 198:*11*
**complaints**
36:*2*
**complete**
140:*9* 141:*8*
194:*13, 20*
239:*9*
**completed**
202:*9*

**completely**
88:*15* 90:*16*
93:*10* 208:*15*
**completing**
202:*21*
**complex**
140:*22*
235:*16* 237:*5*
**compliance**
22:*3* 26:*21*
27:*4, 11, 15*
147:*21* 178:*1*
**complicated**
140:*21*
**component**
79:*8, 13*
142:*4, 15*
143:*11* 230:*24*
**components**
102:*14, 20*
151:*4*
**comport**
131:*11*
**comports** 39:*6*
**Compound**
27:*2*
**computation**
199:*21*
**computational**
201:*11*
**compute**
131:*23*
**computer**
21:*19*
**conceivable**
168:*5*
**concentrations**
65:*2*
**concept** 71:*10*
145:*9* 158:*4*
163:*4* 179:*1*
**concepts**
59:*24* 189:*6*
**concerned**
88:*3* 213:*5*
**concerning**
148:*20*
**concerns**
51:*18* 148:*16*
**conclude**
226:*15*

**concluded**
72:*7*
**concludes**
237:*23*
**conclusion**
32:*6* 41:*7, 11, 13* 58:*7*
72:*24* 116:*22*
172:*3* 205:*4*
**conclusions**
42:*3* 47:*19*
56:*14* 57:*1*
62:*5* 73:*11*
126:*17*
224:*23* 225:*4, 22*
**concrete** 99:*2*
**condition**
145:*15*
**conditions**
81:*1* 145:*12*
165:*23*
**conduct** 28:*1*
29:*3, 4* 35:*22, 23* 57:*10*
99:*18, 20, 21, 24* 100:*2, 4*
101:*3, 6, 17, 22* 102:*3, 9*
103:*1* 106:*19*
109:*19* 111:*6, 16* 112:*1, 5, 11, 16, 20*
113:*1* 114:*20*
120:*16*
**conducted**
8:*23*
**conferred**
138:*12* 228:*14*
**confess** 93:*10*
**confidence**
215:*8*
**CONFIDENTIAL** 1:*9* 205:*6, 8*
**confirmed**
113:*23*
135:*24* 185:*16*
**confirming**
122:*17*

Confidential Information - Subject to Protective Order

**confused**
85:*13*  93:*11*
133:*12*  189:*5*
212:*11*  226:*10*
**confusing**
189:*5*
**confusion**
59:*10*  88:*4*
133:*8*
**CONLEE**  2:*10*
**connected**
52:*1*  207:*1*
**connection**
20:*24*  21:*20*
32:*24*  51:*14*,
*16*, *18*  203:*6*
**consequences**
34:*9*
**consider**
15:*18*  24:*4*, *6*
25:*4*, *21*  26:*8*
27:*23*  29:*18*
36:*11*  37:*6*,
*18*  40:*1*  41:*4*
43:*1*  51:*22*
52:*21*  56:*10*,
*15*, *20*  59:*2*
62:*21*  63:*10*,
*14*  65:*18*
67:*5*  71:*9*
75:*6*  78:*13*
79:*24*  80:*23*
84:*12*, *17*
85:*8*  88:*5*, *7*,
*12*  90:*2*
92:*11*  96:*1*
99:*9*, *16*
100:*12*  101:*5*,
*16*  102:*8*
106:*16*
111:*14*
113:*17*
117:*16*
118:*24*
119:*22*
126:*11*
127:*17*
129:*12*, *17*
132:*13*  136:*1*
137:*4*  142:*10*,
*17*  145:*23*

154:*8*  157:*20*,
*22*  159:*12*
161:*24*
164:*14*, *24*
175:*2*  177:*2*
178:*20*
180:*14*, *21*
193:*22*
194:*15*, *21*
196:*5*, *7*
210:*7*, *12*
230:*20*
**considerable**
31:*1*  34:*1*
**consideration**
23:*7*  25:*6*, *12*
26:*6*  40:*12*
41:*14*  65:*8*
68:*6*, *7*  77:*8*
84:*10*  92:*14*
102:*10*
109:*20*
117:*24*  118:*3*
174:*19*
192:*22*  230:*1*
**considerations**
136:*23*
**considered**
18:*12*  24:*10*,
*12*  26:*7*  33:*6*,
*9*  36:*7*  42:*14*
57:*4*  63:*17*
66:*24*  68:*23*
75:*11*, *12*
77:*7*  85:*2*, *22*
86:*6*  97:*16*
98:*20*  101:*15*
106:*20*  109:*2*
116:*14*
136:*12*
138:*18*, *21*
151:*2*  152:*20*
193:*8*  234:*23*
237:*2*, *4*
**considering**
32:*10*  67:*17*
77:*3*  116:*5*
119:*23*
128:*21*  143:*6*,
*24*  156:*22*
193:*19*  232:*10*

**considers**
65:*1*  86:*1*
97:*10*  119:*19*
123:*4*  142:*15*
182:*22*
**consistent**
38:*10*  50:*11*
116:*21*  118:*4*
**constitutes**
126:*7*
**construct**
29:*22*  68:*21*
80:*19*  101:*4*
173:*19*  180:*4*
182:*6*  183:*3*
192:*21*
193:*19*  194:*17*
**constructed**
161:*8*
**constructing**
177:*22*
**consultant**
33:*14*
**consultation**
113:*7*  144:*8*
169:*7*  217:*12*
**Consulting**
5:*16*  197:*5*
206:*2*
**consume**
64:*16*  67:*14*
93:*1*  164:*17*
194:*23*
**consumed**
14:*23*  43:*13*
57:*16*, *22*
64:*21*  66:*21*
67:*13*, *18*
68:*12*  76:*21*
77:*4*, *6*  86:*9*
89:*17*  90:*5*
91:*7*  93:*3*
95:*8*  104:*10*
117:*18*
119:*16*, *21*
164:*13*
185:*11*  186:*1*
189:*12*
**consumer**
43:*21*, *24*
44:*2*  57:*17*,

*19*, *21*, *23*
58:*1*  67:*14*,
*21*, *24*  69:*22*
70:*16*, *17*, *19*,
*21*, *22*  71:*10*
75:*2*  86:*4*
88:*7*  89:*15*,
*20*  90:*10*, *15*
91:*2*, *19*, *21*
92:*11*, *15*
93:*7*, *15*, *23*
95:*2*, *3*, *5*
96:*17*, *21*
104:*9*  113:*16*
115:*5*, *12*
116:*6*, *9*, *10*,
*11*  129:*22*
141:*12*, *16*
142:*12*, *13*, *16*
146:*20*, *21*
151:*8*, *14*
153:*8*  162:*13*
166:*6*, *20*
167:*5*  168:*17*,
*21*  169:*7*, *11*
170:*23*  171:*3*,
*4*, *11*  172:*8*
180:*10*  189:*1*
190:*12*  193:*11*
**consumers**
38:*7*  40:*20*
42:*1*  43:*12*
65:*16*  66:*12*,
*16*  67:*12*, *18*
71:*19*  72:*9*,
*15*  73:*14*, *18*
74:*12*  75:*21*
76:*14*, *18*, *21*
77:*5*, *9*  78:*23*
89:*2*  103:*24*
104:*13*  113:*2*,
*3*, *6*  115:*4*, *12*
117:*3*, *18*, *24*
118:*24*
119:*20*  127:*1*
143:*16*  150:*8*
165:*20*
166:*16*  168:*8*
169:*17*, *21*
176:*16*
178:*22*  186:*2*

189:*13*
193:*23*
194:*15*  196:*6*
231:*3*  232:*20*
**consumes**
68:*23*
**consuming**
43:*21*  64:*22*
68:*13*  69:*1*
91:*14*  95:*11*
119:*24*
**consumption**
66:*16*  67:*1*, *6*,
*10*  92:*16*
150:*11*  171:*6*
**contain**  9:*21*,
*23*  33:*8*
169:*18*
**contained**
160:*12*
166:*22*  185:*6*
**contains**
126:*6*  169:*5*
**contaminant**
126:*6*
**contaminants**
15:*23*  16:*12*
129:*8*
**contaminated**
41:*3*, *6*  58:*4*
72:*10*  119:*7*
120:*3*, *21*
127:*9*  129:*5*
159:*7*  165:*7*
166:*6*, *7*
168:*18*, *22*
169:*3*  187:*6*
196:*10*
**contamination**
93:*20*  127:*12*
**contention**
213:*17*  224:*5*
**context**  19:*9*
23:*16*  33:*22*
75:*12*  133:*9*,
*11*  153:*4*
154:*2*  155:*3*,
*4*  156:*1*, *4*
174:*16*  192:*3*
194:*14*

Confidential Information Subject to Protective Order

Conti 10:7
24:12, 22
25:11, 18
26:18 27:8
33:10 37:19
38:11 42:14,
17 48:16
116:17
118:20 119:4
120:23
130:13
131:24
138:18 139:5
140:8, 11
146:4 164:19
170:20 176:8,
19 180:21
185:23 192:1
229:12 230:5
234:23
235:19
236:11, 22
continue
98:17 135:21
191:17
CONTINUED
135:10
continues 15:1
Conti's 15:14
26:9 51:6
75:13 117:6
118:6 119:13
139:20
160:14
174:15 175:1
176:21 228:7,
23 229:5
231:7
contracting
92:19
contributed
104:13
contributions
146:10
control 92:8
165:17
controlling
145:14
conversation
135:21
convey 205:9

conveying
100:17
coordinates
190:22
co-pay 89:24
114:6
copy 9:20
10:1
corner 204:12
Corp 5:19
212:24
218:18, 21
Corporation
4:8
correct 10:3
13:14 14:4
15:10 20:2
31:9 32:18
33:17, 22
34:2, 9, 17, 20
48:22 50:2,
22, 23 51:13,
15 52:12
60:4 66:2
68:17 71:4, 7,
23 74:16, 17
82:10 83:24
84:1 87:22
88:24 90:7,
13, 20 95:20
100:21, 23
102:3, 7
104:1 110:2
112:12 115:2,
22 116:18
117:11, 22
122:22 125:9,
12, 13, 15, 16
126:21 127:1
130:1, 9, 16
136:3, 19
138:2 139:3
141:16 149:6,
7 161:18
162:18, 19
163:14, 19
164:7 165:18,
23 172:1
175:6 178:5,
6, 14 182:17
189:3 195:10

198:4, 19
199:15
201:12, 14
202:14
208:24
213:23 226:4
239:10, 12
correctly 15:5
42:23 82:6
95:18 97:17
126:9 127:15
129:10 174:9
225:1
correspond
198:8

correspondence
46:14
Cosmetic 42:7,
19 56:5, 23
160:6 173:9,
12 174:7
179:7
cost 78:9, 14
79:13 87:22
88:2, 20, 23
91:9 99:24
102:24
113:12, 14
118:13, 15
119:10 194:6
230:23 231:3,
10 232:2, 10,
13, 18 234:12
costs 88:13
89:13 99:15,
16 111:19
140:14, 19
141:1, 2
145:2, 3, 11,
13 229:18, 21,
23 230:15, 19,
24 231:2, 22
232:19
234:11, 22
235:2, 3, 5, 15
237:1, 3
counsel 6:15
10:16 32:12
45:14 86:17
115:8, 9

123:21
198:17, 23
205:6 206:7
207:6 209:8
210:8 215:11,
24 217:12
220:10, 11
228:5 233:15,
18
count 13:8
120:23
COUNTY
239:4 240:4
couple 7:15
8:3
course 47:4
112:1, 4, 11,
16, 20 113:1
114:8, 20
135:23 146:3
215:20
COURT 1:1
6:11, 17 7:19
8:20 28:8, 10
29:20 30:8
44:6, 9, 15
45:13 46:1,
22 47:6, 15,
17, 18 48:6,
11, 13 49:1, 3,
8, 9, 11, 14, 16,
24 50:4, 17,
18 51:1, 2, 22
52:1, 9 54:9,
18, 22 55:5,
15, 18, 21
59:1, 7 62:10,
16, 18 63:1, 9,
10 71:16
72:6, 14
73:11, 15, 16,
20, 22 74:19
84:6, 23 85:8,
10, 23 86:17,
22 93:17
106:15 120:2,
11, 19, 20, 22
121:3, 5, 11
122:15
123:21, 22
125:11, 15

126:1, 20
127:6, 8, 9, 18
128:3 129:1,
2, 13, 21
130:16, 22
131:8, 14, 15,
19 133:10, 21
136:10 137:4
152:20
156:22
157:19, 21
163:13
176:14
188:17 214:7
216:14
217:20
218:17 225:9,
16 234:16
courts 35:11
63:14
court's 48:2
52:11 53:4, 5,
6, 16 125:24
128:7 130:23
cover 201:9
coverage
202:1
covers 199:13
create 129:7
193:2 194:1
195:7, 19, 24
212:10
created 192:1
creating 80:4
credibly
224:22 226:3
crisp 12:8
criteria 209:23
criticism
139:4 230:5
criticize
236:11
critique
236:16
CROWELL
3:3
CRR 240:22
Ctd 3:1 4:1
CULBERTSO
N 4:3

Confidential Information Subject to Protective Order

culpability
35:12
curious 153:5
current 41:17
187:8
currently
41:16 107:17
165:4 202:9
curve 40:10,
16, 18 41:2
149:10, 15
150:1 176:4,
9 177:7, 13
178:5 182:8
183:4 184:10,
19 185:1, 4,
14, 17, 20, 21
188:24 189:7,
22, 24 190:19
191:1, 4, 20
192:15, 17, 20,
21 195:9
curves 188:21
customer 95:7
231:12
cut 18:19
21:21 30:9
98:17
CV 9:23
CVS 4:8
228:5 234:7

< D >
D.C 2:22 3:4
4:14
D.N 4:14
d.stanoch@kan
ner-law.com
2:12
daily 69:6
damage 27:18
31:9, 12
34:11 35:4,
21 50:5 54:5
59:3 60:10
62:6 86:14
97:4 119:18
121:9 122:8
150:20
157:16

194:20 196:5
223:14
damages 23:1,
18 24:2, 5, 8
25:22, 23
27:6, 9, 12, 20
28:1, 5, 13, 14,
21 29:11, 17
31:18 32:11,
13, 23 33:4,
11, 21 34:2,
24 35:14
37:14 40:9
43:2, 4 46:3,
7, 18 47:1
51:5 52:16,
22 53:17, 23
54:2, 13, 19,
23 55:6, 22
56:2 57:5, 10
58:3, 9, 11, 15,
22, 24 59:2,
17, 21 60:8, 9,
12, 18, 23
61:6, 11, 13,
22 62:1 63:3
65:5 66:11
70:19 71:18
72:7 73:8, 12,
24 74:7
84:11, 18, 24
85:11 87:20
88:18 97:8
102:10
105:15 108:1
120:16 121:8,
23 122:8, 13
128:1, 17, 23
132:14, 16, 24
133:16 136:2,
8, 11, 16, 20, 23,
24 137:3, 7
138:2, 7, 11,
17, 21 139:3,
8, 16, 19, 21
140:15
141:11, 12, 16,
17, 20, 24
142:15 153:8,
24 154:8
158:5, 15

162:1, 23
163:7, 18
164:3, 7, 8
176:11
194:14, 17
196:1 199:7
214:19
223:10
226:16 227:7
228:13
229:13
235:11 237:8,
10, 14, 18
DANA 2:17
dangerous
129:8
dangerousness
127:11
DANIEL 3:5
DANNY 4:23
6:2
dash 201:8
data 41:20
79:18, 19, 24
80:10, 13, 17
81:7, 11, 13,
15, 20, 22
82:1, 4, 8, 17,
18 83:1, 4
105:24 106:1
189:16
191:16 192:5,
7, 9, 11 210:5
215:9, 14, 20
216:5 221:17
224:21 225:4,
7, 14, 19
226:2, 5, 8, 12,
15, 18, 21, 23
227:1, 5, 6, 8
232:17 235:18
database
105:6
date 6:5 9:19
49:17 124:14
173:1 188:16
197:7, 10
198:11, 12
204:4 218:23
dated 10:3
203:24

207:19 208:7
210:1
dates 45:22
191:18 192:6
208:19, 20
209:3
Dave 200:21
218:9 219:8
DAVID 2:10
21:6
day 231:11
239:17
dcampbell@cro
well.com 3:6
dealing 43:5
December
199:14, 23
203:15
204:17
207:20 208:1,
7, 13
decide 71:17
131:15
169:11 211:7
decided 216:1
decision 214:7
217:20
222:22, 24
deduct 72:18
111:9 113:14
deducted
117:4
deduction 92:9
deemed 28:2
43:14 171:7
deeper 207:16
deeply 28:17
Defendant 3:3,
14, 19 4:3, 13,
17 83:23
138:13, 14
141:3 159:20
167:23
228:15, 16, 19
235:13, 14
Defendants
2:14 3:8 4:8
23:22 40:24
45:2 177:20
182:4 183:13
198:18, 24

199:3, 6
201:20 207:5,
9
defense 7:10
9:3 10:16
23:8 147:6,
12 182:11
184:14
233:15, 18
defenses
157:21
define 45:21
defined 56:12,
22 89:3
96:19 97:2
110:22 154:10
defines 42:10
definition
22:15 42:6,
17 45:1, 8, 9
61:18 68:14,
21 192:15, 16,
17 232:14
definitions
95:19, 24
degree 43:19
57:16 93:1
Delaware
214:8 218:17
delay 11:18
12:9 78:7, 10,
12 79:2, 7, 12,
18 82:14
delighted
200:20
delivering
231:2, 4
232:19
delivery 174:5
179:8, 9, 14,
15 234:12
demand
146:17, 22, 24
150:15 189:7
190:12, 19
191:1 195:6, 9
demanded
190:8
demonstrate
158:4

Confidential Information Subject to Protective Order

demonstrated
106:*10* 221:7, *12*
deny 183:6, *9*
depend 26:*15*
43:*11* 57:*24*
92:*24* 95:6, *9*
113:*10*
depending
32:*13* 74:8
115:*21* 116:7
141:2, *3, 4*
145:6
depends
43:*18, 20*
64:*19* 70:*21*
89:*19, 23*
99:*19* 109:*13*
176:*16*
deponent 6:*13*
Deposition
1:*11* 5:*13*
6:7 17:*20*
48:*17* 51:6
138:*22* 184:5
188:*14*
197:*24*
216:*22* 220:9
221:*4* 227:*11*
229:6, *11, 19*
230:*4, 13*
235:*1* 236:5, *24* 237:*24*
239:8, *11*
depositions
8:*1*
derived 73:*13*
describe
10:*23* 12:*20*
63:8 65:*22*
71:5, *8*
101:*23* 139:*18*
described
25:*10* 28:*12*
31:8 38:5
46:8 69:*17*
70:*13* 71:*12, 22* 74:*24*
75:4 77:7
82:7 85:*4*
86:*13, 24*

87:5 94:*8*
108:*1* 109:*24*
110:8 114:*3*
135:*13*
144:*22* 154:7
206:3 228:*13*
describes 13:2
142:*13*
170:*12* 230:5
describing
87:*23*
Description
5:9 99:*4*
139:*20* 204:*19*
desire 151:5
destined
213:*20* 224:6
detail 232:*12*
detailed
104:*12*
details 213:*11*
219:*20* 220:2
222:*21*
determinants
32:*18*
determination
32:*22*
determine
61:*10* 99:8
110:*11* 111:*4*
138:*16*
160:*17*
213:*16* 227:*16*
determined
29:*19* 35:*11*
53:*24* 55:*21*
65:5 73:*23, 24* 120:*20*
128:*18*
132:*14, 19*
162:*3, 5*
164:9 184:*14*
determines
28:5
determining
61:*24* 87:*20*
106:*16* 149:9, *22*
develop 77:*23*
193:*15*

developing
209:*11*
device 174:6
179:7
diaries 198:6
207:*19, 24*
208:*10, 11*
209:*17*
Diary 203:*24*
diet 150:*19*
differ 116:9
141:2
differed 133:5
difference
43:*10* 58:*14, 20* 68:7
78:*14* 86:2, *6, 7* 88:*8, 13*
89:*4, 18*
90:*14* 91:*13*
98:*12* 106:*22*
114:*16*
132:*17*
143:*19*
166:*10* 209:*21*
differences
58:*12* 77:8
88:6 89:*24*
102:*11*
111:*22*
119:*22*
136:*24*
140:*23*
142:*20, 22*
143:*21*
144:*15* 162:2
169:*23* 170:*4, 8*
different
32:*10, 12*
36:*11, 12*
39:8 58:*18, 19* 59:5, *21, 24* 61:*17*
62:*17* 66:*22, 23* 79:*13*
80:5 81:*22*
85:*11* 89:*22*
90:5 91:*16*
94:*22* 100:*15*
105:6 109:*1*

110:*13*
112:*22* 113:7, *10* 116:6, *10, 11, 12, 13*
117:*18*
122:*12*
135:*13*
145:*12, 13*
154:*18* 155:3
165:3 168:*13*
169:*21, 22*
185:3 189:*12, 14* 192:*23*
196:*10*
209:*14*
210:*18*
217:*15* 227:3
differential
172:3
differently
32:2 65:*19*
88:2 129:5
151:*16*
diminish
72:*14* 73:*17, 20*
diminished
94:*24* 178:*22*
diminution
43:*17* 57:*14*
58:*12* 70:*20*
71:*1, 21*
74:*13, 21*
77:3 86:*1*
87:2, *15* 92:5, *11, 22* 93:*13, 23* 94:7, *12*
95:9 96:*10, 15, 20* 97:*10*
106:*21* 107:8
116:*20*
119:*19*
135:*14* 144:*14*
DIR 211:*19*
direct 14:*12*
107:*23*
121:*14* 184:2
221:*19*
DIRECTED
5:*22* 130:*24*
234:*17*

directing 39:*4*
59:*12*
direction
193:*14* 210:*10*
director
204:*16*
disagree
102:*14, 19*
103:*8, 11*
104:*17*
116:*23*
117:*14*
119:*13, 14, 17*
129:*21* 147:*1*
149:8 160:*16*
163:6 164:8
176:*19*
183:*12, 16, 20*
184:*20*
185:*22* 186:*4*
224:*13*
disagreed
185:*20*
disagreeing
103:*4* 117:9
disagreement
102:*23* 184:*18*
discern 209:*20*
discharging
12:*21*
discounts
105:5
discovered
224:*21* 226:*17*
discrete 39:*11*
discuss 10:*19*
29:*11* 38:7
39:*16* 181:*1*
discussed
38:*19* 83:*14*
164:*10*
discusses
25:*11* 39:*12*
discussing
28:*21* 31:5
40:*4*
discussion
29:*24* 30:*21*
38:*18* 85:*24*
96:*13, 15*
121:*17*

139:*15*  140:*4*
160:*13*
176:*10*  204:*21*
**discussions**
214:*23*
**disease**  92:*20*
**dismiss**  49:*23*
50:*3*  52:*2, 9*
124:*8, 20*
**dispute**  37:*4,*
*6*  45:*6, 11*
103:*19, 22*
104:*5, 15*
105:*3, 8, 11*
200:*2, 6*
201:*14*  213:*4*
222:*20*
**distinction**
206:*6*
**distinguish**
209:*24*
**distribution**
78:*16*  99:*14*
141:*5*
**DISTRICT**
1:*1, 2*  6:*11, 12*
**divergence**
171:*6*
**dklinges@duan
emorris.com**
2:*19*
**Doctor**  18:*21*
44:*3*  95:*12*
110:*16*  113:*8*
123:*5*  132:*21*
142:*12*
151:*10*  169:*8*
175:*12*  187:*3*
209:*15*  212:*22*
**DOCUMENT**
1:*5*  10:*9*
19:*17*  49:*24*
123:*20*  124:*5*
125:*8*  126:*14*
127:*19*
128:*15*
129:*15*
172:*16*
174:*17, 23*
179:*13*
180:*18*

200:*17*  218:*6*
219:*10*  220:*4,
14*  225:*18*
**documents**
45:*16, 18*
47:*5*  49:*23*
50:*11*  51:*1*
220:*12*
**doing**  20:*1*
82:*16*  103:*6*
150:*14*
155:*22*  210:*5*
221:*9*  224:*11*
**dollar**  69:*17,
23*  70:*11*
71:*9*  74:*23*
110:*9*  111:*9*
144:*9, 23*
145:*9*  151:*12*
**dollars**  71:*18*
143:*2, 4, 8, 13,
23*
**dominant**
213:*20*  224:*7*
**dominate**
158:*1*
**door**  201:*24*
**doubtless**
10:*15*
**Dr**  6:*13*  7:*2*
10:*11*  11:*21*
12:*8, 14*
15:*14*  17:*1,
13*  18:*4, 14,
23*  19:*3*
20:*14, 17*
21:*6, 16, 18*
22:*7*  24:*12,
22*  25:*11, 18*
26:*9, 18*  27:*8*
30:*12, 24*
33:*10*  37:*19*
38:*11*  42:*14,
17*  48:*16*
51:*6*  55:*17*
63:*11*  75:*13*
76:*10*  77:*21*
85:*21*  86:*20*
93:*10*  107:*7*
114:*19*
116:*15, 17*

117:*6*  118:*6,
20*  119:*4, 13*
120:*18, 23*
125:*19*
130:*13, 23*
131:*19, 24*
133:*12*
135:*11*
137:*15, 24*
138:*18*  139:*5,
20*  140:*8, 11*
141:*10, 18*
146:*4*  147:*5,
13*  151:*24*
152:*21*
160:*14*
161:*15*
164:*19*  165:*6*
170:*20*  171:*9*
173:*2, 4*
174:*15*  175:*1*
176:*8, 19, 21,
23*  180:*21*
181:*3, 16*
182:*12, 14*
183:*12*  184:*6,
9, 13, 18*
185:*12, 23*
186:*3*  188:*10,
18*  192:*1*
194:*24*
198:*16*  201:*4*
206:*8*  207:*9,
16*  209:*10, 15*
210:*22*  212:*4*
218:*3, 19*
219:*17*  221:*4*
222:*15*  224:*4,
21*  228:*4, 7,
23*  229:*5, 12*
230:*5*  231:*7*
232:*22*  234:*6,
23*  235:*19*
236:*11, 22*
237:*24*
**draw**  172:*2*
175:*19, 21*
**drawn**  217:*15*
**draws**  180:*22*
**Drive**  3:*9*
69:*9*

**drug**  24:*24*
25:*2*  40:*22*
41:*9*  42:*7, 19*
56:*5, 23*
57:*19*  58:*4*
67:*7, 10, 13,
18, 22*  69:*2*
75:*8*  76:*23*
78:*23*  82:*19*
88:*19, 21*
90:*9, 18, 22*
91:*8, 11*  92:*7*
117:*22*  118:*9*
119:*7, 10*
126:*3*  133:*23*
144:*10, 24*
148:*16, 18*
149:*11, 18, 24*
150:*16, 19, 23*
160:*6*  163:*4*
165:*22*  173:*9,
12*  174:*6*
176:*1, 3*
178:*11*  179:*6,
17, 18*  180:*10*
182:*22*
184:*10*
193:*21*  194:*6,
8*
**drugs**  26:*7*
36:*9, 20, 23*
37:*1, 17*
38:*21*  39:*14*
43:*6*  65:*9*
72:*10*  74:*6*
75:*7*  76:*13,
17, 20*  78:*10,
14, 15*  79:*15*
89:*13*  90:*24*
117:*6, 13*
119:*2*  120:*1,
3, 21*  121:*18*
126:*2*  127:*9*
128:*8*  129:*6*
130:*10, 14, 18,
24*  131:*20*
148:*8, 11*
150:*10*
160:*10, 11*
163:*4, 15*
164:*5*  165:*7,*

16, 22*  166:*4,
7, 18*  172:*12*
175:*16*
176:*15, 16*
178:*3, 7, 10,
19, 20, 21*
180:*2*  181:*20*
185:*9, 22, 24*
186:*8*  187:*5,
9*  193:*17*
194:*19*  196:*3,
6, 8*  228:*21*
**Duane**  1:*13*
2:*12*  7:*22*
**due**  172:*3*
**duly**  6:*21*
135:*4*  240:*11*

**< E >**
**earlier**  7:*6*
52:*4*  80:*2, 20*
131:*3*  132:*21*
188:*12*
192:*18*  218:*16*
**earliest**  198:*2,
8*
**ease**  69:*4*
87:*12*
**Economic**
5:*16*  22:*11,
16, 24*  23:*9,
18, 23*  24:*5*
25:*22, 23*
27:*8, 12*  28:*1*
29:*11*  30:*3*
32:*10, 13*
33:*3, 11, 17*
34:*1, 8, 24*
35:*3, 18*  36:*7,
15*  37:*13*
41:*5*  43:*1, 4,
9*  45:*12*  46:*7,
14, 17, 24*
47:*7, 8*  49:*12*
50:*5, 9, 12, 15,
21*  51:*5*
52:*16*  53:*10,
11, 13*  54:*2, 4,
9*  56:*1, 11, 13,
21, 24*  60:*8, 9,
10*  61:*15, 22,*

Confidential Information Subject to Protective Order

24 62:6, 11, 15, 24 63:5, 16 65:10, 23 66:5, 8, 10 67:5, 20 68:5, 6 69:12, 15, 21 70:14 74:7 75:15, 19 79:8, 23 80:24 83:9 84:10 85:2, 3, 22 86:3 88:22 89:3 94:13 97:8 99:11, 16, 21 100:7, 9, 18 101:7, 16 102:2, 8, 12, 13 103:7, 10 105:9, 10 106:19 108:14, 20, 21, 22 110:24 111:5 113:9 116:15, 21 117:6 118:5 119:15 120:14, 15 121:8, 9 122:9 126:16, 17, 24 127:23 128:1, 17, 22 129:18 130:8 131:10 132:14, 16 133:8, 24 134:9, 11 136:22, 23 142:2, 5, 8, 24 143:2, 10 144:20 145:2, 9 146:16, 20, 22 148:3 149:22 150:12, 14 151:9, 22 152:2 153:8, 20 154:1, 8, 9, 14 156:10 158:10 159:18 162:1,

23 163:3 172:2 176:10 177:6 181:2 183:18 193:22 194:10 197:5 213:17, 22 214:19 232:16 237:17, 19

**economically** 25:2 101:24 111:4 114:22 121:18 127:10 128:8 130:14, 18 131:21 163:15 177:23 196:4

**economics** 31:16 35:24 43:17 58:10, 23 60:14 61:15, 23 63:3 100:6 110:20 115:14 121:19, 20 130:20 133:9 145:16 146:11 148:2 151:22 152:14, 19, 23 153:1 154:4, 13 156:3 168:16 175:13 177:12 195:18 231:14 232:6, 9

**economist** 29:17 46:6, 12 47:10, 19 52:20 53:10 57:13 58:23 70:16 71:8 78:3, 8, 12, 21 82:15 93:18 94:15 97:15 98:24 99:5

106:14 109:8 120:7, 23 121:7 122:4, 10 123:3 127:22 128:17, 21 129:20 145:18, 20 146:1, 4 150:23 151:7 154:12 171:2, 11, 17 180:12 184:24 185:8 188:22 189:21 191:3 199:1, 5 213:16 230:20 232:1

**economists** 27:19 47:12 50:15 53:2 95:1 115:14 132:6 170:3, 7, 12, 14, 18

**economist's** 100:11 132:8 156:24

**effectiveness** 69:2

**effects** 69:1 93:5 129:9

**efficacious** 129:6

**efficacy** 57:19 186:8

**eight** 207:22

**either** 23:8 24:23 26:21 34:6 45:20 46:2 48:17 68:24 145:10 148:21 161:13 166:15 171:10 187:12 189:4

**elected** 217:13

**elements** 69:13, 17 70:12 71:22

169:19

**else's** 47:23

**email** 220:16

**employed** 112:3 226:18 227:2, 4

**encompasses** 207:24

**encountered** 145:6

**ended** 73:2

**ends** 163:7

**engaged** 10:16 97:9, 14 199:2, 5, 11

**engagement** 144:7 203:7 211:20

**English** 175:21 180:7

**enhanced** 37:5

**enrichment** 138:3, 7, 11, 16, 20 139:3, 6, 8, 11, 17, 19, 21 140:7, 15 228:7, 11, 12, 23 229:7, 12 230:12 234:9 236:7, 19 237:7, 8, 9, 14, 18

**enter** 80:23

**entered** 80:20

**entering** 177:9

**entire** 181:17 221:22 222:20 235:22

**entirety** 29:1 231:21, 23

**entities** 83:23

**entitled** 11:10

**entity** 99:12, 13 141:2

**entity's** 99:7

**entries** 208:3, 14, 19, 21

**entry** 79:2, 22 80:2, 5, 16 81:8, 9

148:21 198:6 204:16

**enumerate** 11:12 13:12, 16

**enumerated** 200:3

**environmental** 171:22

**envision** 168:23

**envisioning** 171:2 190:18

**equal** 39:3

**equally** 188:19

**equilibrium** 146:15 185:14, 18 188:19 189:9 191:2 195:5, 9

**equivalence** 91:23

**equivalent** 126:4, 6 142:19

**equivalently** 95:4

**equivalents** 148:23

**error** 201:12

**ESQ** 2:5, 10, 17, 18, 21 3:5, 10, 11, 16, 20 4:5, 10, 14, 19

**essential** 152:2

**essentially** 18:24 79:23 81:4 230:11

**establish** 12:18 176:12

**established** 110:7, 21 111:1

**estimate** 98:8, 11 196:1 202:24 207:21 226:16

**Etminan** 20:17

**evaluate** 34:7 77:8 109:20

Confidential Information Subject to Protective Order

evaluating
33:21  52:21
75:13  126:24
**Evans**  208:4,
12  209:2
**eve**  215:3
224:18
**event**  9:2
**eventually**
54:22  92:19
**everybody**
41:23
**evidence**  43:8
72:14  164:6
166:19  172:8
183:15  216:2
**exact**  168:19
**exactly**  74:18
104:13  131:24
**Examination**
5:3  7:1
135:10  228:3
234:5  240:10,
12
**examined**
6:23  135:6
**example**  9:11
31:24  32:3
33:19  34:5,
19  35:8
62:20  63:24
64:6  67:16
68:9  75:14
78:6  89:12
99:2  113:22
114:2  118:8
136:2  143:20
153:7  170:3
204:2  208:2
**examples**
169:15
170:12  171:1,
4
**exasperated**
137:11
**exceeds**  88:23
**exception**
147:4  204:20
**exchange**
61:12

exchanged
67:24
**exclude**  53:5
**exclusion**  53:3
**excuse**  12:15
194:7  196:24
211:9  221:11,
12, 23
**exercise**  79:23
90:2  171:12,
24
**exhaustive**
230:18
**Exhibit**  5:10,
13, 16  9:16,
18  10:2, 23
17:18, 20
20:3, 10, 22
44:5, 6  59:14
84:4  123:5,
23  124:3, 13,
22  125:18, 24
127:2  172:24
173:3  179:4
182:6  184:2
188:13, 15
196:24  197:1,
2, 6, 9, 16
199:17  200:4,
23  201:5, 6
203:19  204:7,
10  218:1, 2,
14, 22
**EXHIBITS**
5:8  9:8
196:21, 23
197:11
**exist**  138:17
146:23
196:13, 16
237:16, 18
**existing**
148:23
**exists**  106:2
170:24  194:12
**expand**  155:2
**expands**
236:18
**expect**  7:8
62:10  190:9
198:10

expectation
61:14  172:5
**expenditure**
106:9
**expenditures**
106:3, 6
107:21
109:15, 21
143:15, 24
193:11
**expensive**  91:9
**experience**
35:15  47:10
53:9  72:23
74:1  81:21
120:6  122:3,
14  127:22
129:19  131:6,
13, 16  132:4,
6  145:24
156:5
**experienced**
69:3  74:14
108:23
**experiencing**
11:19
**Expert**  5:10
9:17  14:20
16:24  17:2,
20  18:13, 17
19:20  20:7,
20  21:1  22:7,
8  27:21  31:9
33:14  35:21
73:16  97:15
130:23
143:24  147:7,
13, 14, 16
182:4  186:4,
14, 19  210:24
212:5  214:21,
23  215:15
216:7, 10, 11,
20  223:15
224:3  225:5,
8, 10, 16, 20
226:6
**expertise**  34:1
145:20
147:20  148:1

experts  23:8,
14  24:2
28:13  144:4
147:6, 20, 24
203:4  207:8
**expert's**  23:19
216:16
217:15, 17
**explain**  16:23
37:12  74:11
96:1  128:6
139:21
**explained**
43:16  46:12
54:3  57:13
62:8  63:6
130:19  236:20
**explaining**
98:23
**explanation**
60:3  212:1
**explicitly**  40:5
175:2
**exposed**  170:1
**Express**  3:14
10:19  126:8,
19
**expressed**
138:8  139:1
**expression**
112:8
**extensively**
152:23
**extent**  32:9
50:10  62:3
85:6  133:7
136:10  137:2
154:23  155:2
174:24
205:21  207:8
210:21
**extremely**
95:17
**eyes**  173:4

**< F >**
**face**  24:4
37:6
**facility**  187:9,
11  231:5

fact  16:12
25:7, 13, 16
27:11  31:17
35:8  38:4
43:5  45:11
56:22  67:12
76:16, 20, 21
94:14  103:23
122:18
144:13  151:6
158:19  159:1,
6, 20  160:4,
17  161:4, 15,
16  166:12
168:5, 9
182:24  192:9
215:6  216:6
217:17
223:10  234:16
**factor**  77:4
118:13  119:9
156:24
**factors**  57:24
64:19, 22
68:22  70:21
81:2, 3  95:10
97:11  111:20
162:11
170:18
171:22  175:1
**facts**  35:21
36:2, 5, 13, 24
37:24  43:8
45:5  103:17
104:6  160:15
166:19
169:13
178:18
181:13
183:15  220:7
**fail**  48:9
186:9
**failed**  48:7
119:9
**fails**  105:4
**failure**  24:24
163:5
**failures**  22:18
23:21  24:18
25:13, 17, 20
26:3, 5, 12

fair 12:23
23:20 24:1
86:12
fairly 145:15
219:19
faith 217:14
fall 158:2
familiar 29:21
34:12 79:9
148:15
150:16 152:8
174:14
182:13
197:19 222:6,
14
familiarity
148:19 149:1
familiarize
222:15
far 36:6
72:11 132:3
149:20 219:19
FDA 36:22
37:16 39:13
42:13, 18
75:17, 18, 20
147:22
182:22
184:14 186:6
Federal 42:7,
18 148:15
152:9 160:6
173:9, 11
174:12, 14
feel 10:18
95:15 156:4
215:9 222:24
felt 227:3
fen-phen
150:17
151:11, 17
field 145:4
figure 99:6
101:7
figuring
115:18
filed 224:20
filings 44:6, 9,
15 45:13
84:6 125:11

finalization
203:3
financial
40:12 58:12
77:9 86:7
87:8, 12, 14,
18, 24 88:6, 8,
9, 18 89:2, 11,
14, 19 90:3, 4,
7, 10, 12, 14, 22
91:3, 4, 12, 14,
15, 21 92:3
93:18 94:6,
10 96:4, 10,
13, 18 97:2, 7,
13, 22 98:20
99:1, 5
100:13, 14
102:10, 11
107:9, 16
108:3, 12, 19,
21 110:6, 21
111:22, 24
114:5, 16, 18
116:17, 20
117:15, 17, 23
118:22
119:22 131:2
135:14
136:24 162:2
164:3, 9, 11,
12 165:3
193:23
financially
109:19
find 28:19
29:9 30:4
81:15 172:16
208:20
finding 27:17,
22, 24 33:7
126:11
127:17 128:7
129:12 154:14
findings 157:8
176:22
finds 126:1
127:6, 9
136:10
fine 76:9

finish 155:7
195:21
finished
155:10
firm 197:21
200:9, 14, 15
first 6:20 8:7
14:11 87:15
109:1 174:3
184:3 198:5,
12 206:22
222:6, 9, 14
230:22
fit 26:23
44:24 228:10
fix 118:7
fixed 118:8
flavor 203:22
flaw 192:8
flaws 139:19
236:21
flip 10:5
flow 28:1
flowing 31:18
flows 37:13
focus 45:12
87:18 89:9
97:1 221:15
focused 116:2
148:2
folder 200:23
followed
33:10 186:15
following
27:16 62:7
71:24 73:3
133:14 173:22
follows 6:24
127:8 129:4
135:7 174:4
184:7
follow-up
187:2 193:18
Food 42:7, 18
56:5, 23
160:6 173:9,
12 174:6
179:6
footnote
20:10, 11

footnotes 19:5
20:21
force 213:20
224:7
foremost
230:22
forget 114:15
form 9:10
12:24 22:4,
20 23:10
27:1 29:12
31:13 32:5,
19 34:10, 21
39:17 43:7
46:22 47:2
53:19 58:6
61:1, 7 63:19
64:9 66:14
67:4 69:19
72:20 79:5
81:16 82:21
84:20 95:21
97:5 102:16
104:18
106:12
107:14 108:6,
17 109:11
111:11
112:13 114:4
121:2, 24
122:23 125:3
126:22
128:11 130:2
131:4 132:1
133:2 134:3
136:5 138:4
139:12
141:13, 21
149:12 150:2
152:5 153:16
155:19
156:16 157:5,
17 158:20
159:2, 9
160:1, 7, 19
161:5, 19
162:14 163:9
167:10, 20
168:10
171:15 176:5
177:10

178:15
179:19 180:5,
16 183:7, 14
186:11
187:14
190:15
191:22 193:6
195:11
210:20
215:17
216:17
234:19
236:14 237:11
formal 49:20
formation
159:23
formed 24:14
83:16 151:1
forming 55:8
149:6
forms 165:9,
11, 15 166:6
formula 71:5
87:7, 19 99:1
111:3 140:7,
8, 11, 12
formulas
32:16
forth 240:11
forward
12:11 13:12
27:8 33:12
36:12 37:19,
24 38:11
45:21 119:18
139:22 149:3
235:20 236:3,
22
found 29:2, 4
32:14 40:14
57:8, 11
130:16 226:8
foundation
28:21 163:24
167:11 183:8
four 44:6, 11,
12, 20 45:13,
16, 19
frame 66:23
116:4

Confidential Information Subject to Protective Order

framework
25:1, 7  26:19,
23  32:9
33:11, 12
35:24  37:18
38:10  54:4
62:14, 15, 18,
23  63:17, 22
75:1  94:13
116:3  130:4,
7, 8  131:12
132:24
141:16  178:24
franchisees
97:23  98:13
franchises
98:3
fraud  141:20,
24
free  196:15
frequency
200:13
201:18, 23
frequently
33:15  45:8
79:19  122:10
155:24
front  11:1
21:12  48:15
125:22
197:11
199:17
204:11
207:23  209:1
full  127:5
162:19  223:24
fullness  54:21
55:3
fully  55:21
151:1  224:20
fundamental
152:6
fundamentally
129:24
further  72:13
88:11  99:14
135:6  232:22
240:14
fuzzy  12:9

< G >
gain  17:4
gather  7:21
34:4  81:22
153:14
gathered
224:22  226:3,
6, 7
gathering
226:11, 14
227:1, 5
general  24:2
70:14  99:4
111:14  116:3
206:24
Generally
13:1  29:5
31:11, 15
41:8  81:20
110:19  145:1
146:21
147:23  201:22
generates
31:18
generic  78:6,
7, 12  79:2, 7,
18, 21, 22
80:2, 5, 14, 16,
20, 23  81:8, 9
82:14  99:4
126:3, 5
148:22  165:9,
15
genotoxic
16:21
geographic
170:9, 10
getting  11:17
14:3  19:9
88:20  195:15
200:18
give  9:1
18:24  23:6
25:6  56:1
62:20  65:8
69:22  88:16
89:12  99:3
120:14  121:6
125:20  132:7
151:11
174:18, 22

175:10, 22
197:3  208:19
219:12  230:18
given  7:13, 24
36:24  42:24
53:13  68:16
73:1  99:2
105:5  168:17
211:17  212:1
214:24  215:4,
21  223:22
239:12  240:13
gives  25:11
62:9  190:22
glean  66:4, 9
go  12:5, 10
21:17  30:16
41:9  42:22
66:20  76:8, 9
77:14  78:20
92:1  113:22
134:14  142:6
172:15
189:19
197:15  201:3
203:21
206:11
207:19
209:16
217:24  218:8
219:24  223:3,
8  233:5
234:21  236:12
goes  12:1, 6,
11  13:22
31:2  39:19
65:17  198:24
going  9:8, 15
10:2, 6  18:19
24:19  28:6
30:5  76:3
89:9  95:9
97:18  123:12
124:2  188:12
193:4  196:23
211:3, 21
212:10
213:21  219:9
220:12
221:14, 15, 19
227:11

going-
backward
77:2
going-forward
29:17
GOLDBERG
2:17  7:20
9:3  11:13, 16
12:1, 12, 24
18:18  22:4,
20  23:10
25:8  27:1
28:6  29:12
30:5, 13, 16
31:13  32:5,
19  34:10, 21
39:17  43:7
47:2  48:4
50:7  52:13
53:19  57:2
58:6  61:1, 7
63:19  64:9
65:12  66:14
69:19  72:20
75:22, 24
76:8  79:5
81:16  82:21
84:20  86:15
94:3  95:21
97:5  99:10
101:10  102:4,
16  104:18
105:21
106:12
107:11, 14
108:6, 17
109:11
111:11
112:13  114:4
115:3, 8, 23
119:11  121:2,
24  122:23
123:7, 9, 12
124:4, 9
125:3  126:22
128:11  129:3
130:2  131:4
132:1  133:2
134:3  136:5
137:19  138:4
139:12

141:13, 21
142:7  143:5
144:11
149:12  150:2,
7  152:5
153:16  155:9,
19  156:14, 16
157:5, 17
158:7, 20
159:2, 9, 24
160:7, 19
161:5, 19
162:14  163:9,
21  167:8, 10,
20  168:10
171:15
172:20, 22
175:7, 18, 20
176:5  177:10
178:15
179:19  180:5,
16  181:3, 8,
23  183:5, 7,
14  184:22
186:11, 22
187:14, 22
190:15  191:8,
22  193:6
195:11, 22
197:13
200:16  203:8,
10  205:3, 11,
15, 20, 24
206:7  207:6,
14  208:5
209:8  210:20
211:4, 13, 21
212:9, 14, 18
215:17
216:17  217:5
218:5  219:9,
12  220:5, 10,
21  221:6, 9
222:1, 4, 13
227:18  233:3,
17, 21  234:1
Golkow  6:3
good  7:2, 4
8:5  77:12
103:21
123:15

134:*13*
155:*14*  186:*5*
196:*15*  228:*4*
**goods**  230:*23*
231:*10*
232:*18*  234:*12*
**GORDON**
3:*17*
**gotten**  144:*22*
**graph**  188:*23,
24*  189:*22, 24*
190:*4*  191:*4*
**great**  7:*10*
124:*1*
**GREENBERG**
3:*6*
**GREGORY**
3:*11*
**gross**  73:*8, 12*
**grounds**
161:*18*  183:*18*
**guarantee**
186:*7*  187:*10*
**guess**  12:*10*
62:*7*  121:*3*
143:*7*  156:*19*
179:*21*  180:*7*
186:*17*
195:*20*  203:*17*
**guidance**
32:*11*
**guides**  111:*17*

**< H >**
**half-hour**
119:*9*
**halting**  11:*22*
**hand**  59:*22*
157:*14, 15*
162:*11*  240:*19*
**Hang**  11:*13,
16*  30:*13*
105:*21*
137:*19*  155:*9*
195:*22*  197:*13*
**happen**  169:*4*
**happened**
80:*22*  214:*12*
216:*19*
217:*17*  221:*16*

**happening**
132:*5*  214:*16*
**happens**  81:*7*
98:*9*  164:*24*
168:*24*  189:*16*
**happy**  206:*12*
**harm**  66:*5, 8,
15*  67:*5, 9, 12,
17, 20*  68:*5, 6*
84:*7*  85:*12*
106:*18, 20*
122:*6*  144:*14*
154:*9*
**harmed**
106:*17*
**Harvard**
175:*12*
**head**  63:*12*
**headed**  12:*16*
39:*1*
**heading**
173:*11*
**Health**  3:*3*
58:*1*  64:*16,
22*  93:*9*
95:*13*  144:*15*
145:*4, 8, 16,
18, 19, 21*
146:*1, 4, 11*
165:*2*  169:*9,
10, 20*
**Healthcare**
2:*15*
**hear**  21:*18, 21*
30:*7*  55:*12*
59:*6*  75:*24*
86:*18, 20*
135:*22*
176:*21*
190:*13*  192:*3*
**heard**  8:*12*
72:*3*  82:*6*
144:*19*
**heart**  150:*20*
**held**  6:*7*
**he'll**  218:*13*
**helped**  224:*2*
**helpful**  95:*17*
**hereinbefore**
240:*11*

**hereunto**
240:*18*
**Hetero**  4:*17*
**high**  102:*6*
171:*22*  190:*9,
11*
**higher**  39:*3*
79:*10*  90:*23*
91:*1, 5*  170:*6*
**highest**  232:*11*
**highlight**  7:*15*
**highlighted**
224:*1*
**HILL**  4:*17*
**HINSHAW**
4:*3*
**hired**  130:*22*
198:*16*  213:*4*
**historic**  79:*19*
80:*10*  82:*7*
**historical**  82:*8*
**histories**  95:*13*
**history**  58:*2*
93:*9*  219:*23*
**hold**  145:*17*
223:*7*  231:*19*
**holding**  124:*18*
**HON**  1:*5*
**HONIK**  2:*1, 5*
5:*4, 6*  7:*1, 6*
11:*19*  12:*7*
28:*8*  30:*7, 10,
18*  55:*13, 16*
76:*5*  77:*12*
85:*18*  123:*11,
17*  124:*1, 7,
11*  134:*13*
135:*10*  137:*8,
13, 20*  172:*21*
181:*6*  187:*1,
20*  188:*2, 9*
200:*20, 24*
205:*7, 13*
206:*14*
207:*12*  208:*9*
211:*2, 7, 12*
212:*8, 12, 16,
21*  218:*7, 11*
219:*7, 11*
220:*8, 16, 24*
221:*7, 11*

222:*2, 10*
227:*9*  233:*1,
13, 19, 23*
234:*3, 5*
237:*20, 23*
**hope**  9:*9*
227:*11*
**horizontal**
191:*5*
**host**  165:*16*
**hour**  123:*14*
**hours**  202:*17,
20, 22*  203:*1,
9, 13*
**house**  69:*8*
**housekeeping**
8:*3*
**houses**  170:*5*
**housing**  170:*4*
**Huahai**  2:*14*
**Huhai**  2:*15*
**human**
158:*24*  169:*20*
**hundreds**
146:*9*
**HUSCH**  3:*14*
**hypothetical**
72:*1, 22*
73:*12*  88:*24*
89:*1*  90:*20*
91:*17*  121:*15,
16*  151:*17*
168:*3*  195:*3*

**< I >**
**idea**  26:*17*
30:*17*  186:*4*
188:*19*
**identification**
9:*19*  124:*13*
173:*1*  188:*16*
197:*7, 9*
218:*22*
**identified**
235:*6*
**identify**  20:*11*
**identifying**
126:*3*
**identities**  45:*2,
3, 23*

**identity**  49:*15*
**ignore**  128:*10*
**ignored**  128:*7,
15*
**II**  181:*10*
**III**  40:*1*
**illegal**  180:*8*
**illegitimate**
185:*13*
**Illinois**  3:*10*
**illustration**
34:*5*  78:*1*
88:*16*
**im**  235:*12*
**image**  11:*21*
**imagine**  132:*4*
189:*11*  196:*2*
**imagined**
190:*21*
**impact**  16:*6*
23:*23*  29:*18*
32:*2*  35:*12,
17, 23*  43:*12*
46:*23*  50:*21*
56:*13, 24*
57:*5, 18*
60:*23*  61:*5*
62:*5, 23*  78:*9*
83:*8*  101:*8*
126:*20*
147:*22*  149:*9,
17, 20*  181:*2*
**impacted**  50:*5*
**impacts**  26:*9*
31:*12*
**implicates**
186:*9*
**implication**
16:*9*  25:*21*
**implications**
36:*8*  41:*5*
43:*1, 3*  100:*9,
12*  101:*24*
102:*24*
193:*11, 22*
**implies**  185:*24*
**imply**  112:*10*
**important**
8:*13, 19*
**imposing**
121:*19*

Confidential Information Subject to Protective Order

impurities
15:2  16:4, 8
33:8  36:8, 18,
23  37:4, 8, 10
67:13  92:21
93:2  159:13
160:12
165:13  169:5,
6, 8, 12  178:8,
23  185:7
impurity
43:14  93:20
inartfully
189:19
inasmuch
7:16  186:3
227:13
incapable
122:18
incidence
170:6
include  64:14
99:13  105:4
169:19  203:2
included  16:4,
8  20:22
38:15  68:20
126:7  157:8
159:13
166:17
180:20
216:12  231:7
includes
67:13  68:7,
18  70:6
144:14
including
47:5  132:9
181:14  232:2
incomplete
118:4, 23
139:23
155:13  230:9
incorporate
63:21
incorporated
234:14
incorrect
215:23  217:3,
7

increase
64:15  159:15
increased
37:8, 10  92:16
incurred
105:15
independent
46:17  47:19,
20  50:15
127:23
128:20, 24
131:10  223:17
independently
129:17
INDEX  5:1
Indiana  4:9
Indianapolis
4:9
indicate  17:16
19:6
indicated
200:3  217:8
indicates
94:15  172:14
indication
170:14
indications
145:3
indistinct  11:4
individual
57:24  70:8
74:11, 20
93:19  95:10
104:23
105:15  107:3
115:6  154:19,
20, 21  157:22,
24  162:12, 17,
22  235:11, 13
individual-by-
individual
70:24
individualized
71:14  75:5
162:6
individuals
17:3  53:13
Industries  3:8
145:21
industry
140:20  147:19

influence
56:24  126:20
inform  17:7
INFORMATIO
N  1:9  17:8
18:1, 7  19:3,
6, 10  21:4
23:15  24:9,
14, 20  27:7, 9
45:19  46:9
47:11  50:14
52:22  54:1
62:12, 17
65:1, 6  70:8,
23  71:1, 12,
14  74:8, 10,
11, 20  75:5
82:2, 10  83:5
84:3, 5, 9
94:18  95:7,
11  103:18
104:23
105:16, 18
106:24  107:1,
4, 17, 21
111:17
128:18
129:18
132:15, 19
142:12
153:10  162:3,
5, 6, 17, 22
167:1, 21
172:5, 13
205:5, 22
207:11  209:9
210:5, 21, 24
212:2  216:21
223:1  227:14
informed
169:8  182:10
195:7
INGERSOLL
4:11
ingest  67:2
ingrafted
195:3
ingredient
81:3
ingredients

232:3, 10
initial  105:7
injury  64:8
innovator
165:22
in-person  4:10
input  108:24
143:23  144:3,
5, 8, 22
226:16  227:8
inputs  98:6, 7
100:1  107:20
214:21
inside  150:11
instance
52:11  83:3
instances
91:10
instruct
211:22  212:6
instructed
120:2  131:20
212:20
insurance
89:23  116:8
insured  89:22
insurers  72:9
73:15, 18
78:23  103:24
104:14  117:3
intangible
74:24
integrity  186:7
intended
61:19  180:12
201:9  229:17
236:6
intending
14:21  59:9
149:3
interact  99:21
interaction
100:7
interest  64:1,
3  102:24
interested
240:16
internal  92:23
Internet  21:20
interplay
152:22

interplays
159:17
interpreted
42:23
interrupt
115:9
interrupted
205:16
intersect
190:20
intersecting
190:21
intersection
146:17
185:16, 19
188:20
189:16  195:6
intersects
189:8
interstate
75:9  149:18
174:5  175:16
176:2  177:9
178:3  179:6
180:3  181:20
183:1
intrinsic
92:23  95:6
96:16
introduce
148:17  180:2
introduced
7:5  157:2
176:1  182:24
184:11
introducing
175:4, 15
178:2
introduction
148:8, 11
174:4, 5
181:19
inviting  73:15
Invoice  5:16
197:5  199:22
200:8  201:9
204:1, 4
206:19
207:20  208:7
invoices  5:16
196:24  197:8,

17 199:13
201:22
203:15, 20
207:17 209:17
invoicing
196:22
197:20 198:3
199:13
200:14 202:3,
7, 16 227:13
invoke 176:21
involved
27:21 79:20
82:23, 24
102:22
120:15 148:1
212:23 213:13
involves 146:1
involving 78:6
237:13
IQVIA 81:12,
14, 20 82:4,
10, 17 83:1, 4
191:16 192:5,
6

IRBESARTAN
1:4 6:10
51:19 89:18
irrelevant 29:5
issue 14:23
15:13, 16
16:5, 9 17:9
33:8 36:9, 20
37:1, 5, 8, 10,
21 38:1, 9, 13
40:3, 13
55:12 57:8,
10, 11 64:14,
20 65:3, 21
66:17, 18, 21
68:10 69:1
76:20 80:18
86:9 88:10
91:4 92:12,
21 99:24
100:2, 4
106:4, 19
109:3 117:13
118:2 119:2
120:17

127:24
143:16
157:13
160:11, 12, 13,
15 161:11
181:13, 15
185:6, 9
192:8 194:19
200:14
issued 10:3
issues 13:19,
22 14:15
17:5 46:23
54:12 59:16
60:17, 20, 22
61:4, 10 78:4
104:19
120:15
133:15
156:23
157:15, 16, 22,
23, 24 158:13,
14 207:3
item 190:6
items 8:3
66:1 234:13
its 63:12
101:7 121:20
133:23
IV 38:17, 22
39:1, 19 40:5,
6, 11, 15 41:4
ix 138:8
140:5 236:17

< J >
JACLYN 4:19
January 10:4
49:17 125:2
201:8 202:12,
13 203:1
210:1
JBZ@Pietragal
lo.com 3:21
Jeff 6:17
30:7 55:13
56:16 85:18
86:19 137:8,
18 188:9
211:9, 10
218:13

Jeffrey 1:14
6:21 240:6, 22
JERSEY 1:2
4:18 6:12
jkavendek@hill
wallack.com
4:20
job 8:9
213:15
JOHN 3:20
JONES 4:14
judge 74:4, 11,
19 124:7, 19
130:5 163:2,
14 219:2
224:18 226:2
judge's 52:18
judgment 43:4
jury 71:17
72:7, 23

< K >
KANNER 2:8
KAPKE 4:10
5:5 228:3, 5
232:21
233:13 234:2,
7, 19 236:14
237:11, 22
KARA 4:10
228:5 233:22
kara.kapke@bt
law.com 4:11
KATHLEEN
4:5
KAVENDEK
4:19
keen 221:13
keep 187:4
227:11, 15
235:14
kekelly@hinsh
awlaw.com
4:6
KELLY 4:5
key 224:3
kind 18:13
55:16 77:23
103:5
KLINGES
2:17

KNEPPER
3:16
knew 167:5
178:22
225:16 226:19
know 7:13, 24
8:1, 14 20:13
21:10 33:19
60:5 64:5
76:3 83:2, 14
95:23 102:18
103:3 104:13,
14 116:22, 23
117:9 120:5
121:3 123:10
127:3 128:2,
3 130:4, 7
143:15 146:3
151:20 153:6
155:11
156:19 157:3
160:3 163:23
166:12, 15
167:7, 9, 12,
16 168:6
169:13
170:23 171:5,
23 178:17
193:24 199:1,
10 200:24
205:2 206:20,
23 216:8
225:18 226:22
knowledge
168:18 171:13
known 168:8
172:5 216:4,
7, 9
KUGLER 1:6
163:2, 14
Kugler's
124:7, 19

< L >
L.L.C 2:8
Labs 4:17
lack 68:24
laid 69:13
75:1 173:4
Lambert 5:15
147:13

182:12, 14
183:12 184:6,
9, 13, 18
185:12 188:15
language 14:7
29:8 133:13
153:12
LaPoint 5:16
212:23
217:22
218:18, 20
largely 8:20
larger 45:15,
18
late 195:16
LAUREN
1:11 2:18
5:2, 10 6:13,
19 9:17
135:3 224:4
239:6, 15
law 65:24
76:12 120:3,
20 121:19
141:20, 24
148:15
152:16
158:19 159:1,
6, 20 160:4,
17 161:4, 17
174:12, 14
177:8 178:1
181:19 184:20
lawful 151:17
lawfully
150:24
178:13
182:24 183:2
laws 149:5, 9,
17, 21
lawyer 63:23
101:20
157:11
175:11 180:13
lawyers 7:9
9:3 156:22
206:9
layperson
157:9
leads 130:9
learned 227:2

Confidential Information Subject to Protective Order

**leave** 89:6
206:10
**led** 226:15
**left** 31:5
**legal** 6:3
13:21 31:20
32:6, 9, 17, 22
35:5, 6 46:14
47:5 52:18
54:12 58:7
59:16 60:17,
20, 22 61:4, 9,
18 62:4, 11,
14, 17, 22
63:17, 22
73:8, 11 84:8,
21 86:16
97:6 101:18
106:13
120:10, 11
122:1 130:6
131:11, 12, 22
132:7, 23
133:11, 15
138:5 141:14,
16, 22, 24
144:20
148:17
151:21 152:4
153:4, 20, 22
154:2, 4, 14
155:20, 24
156:3, 4, 17
157:1, 2, 6, 11,
18, 24 158:8,
13, 15, 21
159:3, 10
160:1, 8, 20
161:6, 20
163:11, 22
175:5, 8, 22
178:13, 16
179:20 180:6
183:19
184:11, 23
186:12
187:15 205:4
213:4
**legally** 120:4
175:4 184:11

**legitimacy**
149:23
**legitimate**
149:10, 15
176:4, 9
177:7, 14
178:4 179:1
182:7 183:4
184:9, 19
191:20, 24
**length** 156:12
**Leslie** 233:19
234:1
**leukemia**
170:6 171:22
**level** 8:23
67:23 102:6
144:1 169:8
232:11 235:17
**LIABILITY**
1:4 6:10
28:4, 12, 20,
24 29:2, 4, 10,
19 30:1 31:7,
12, 17, 21
32:1, 3, 14
33:3 83:9, 21
84:8 85:7
101:4, 13, 17
135:17
139:17
157:15, 20
158:5, 14
161:18
**lies** 30:2
**light** 46:1, 23
50:4, 9, 12
94:19
**likewise**
216:16
**limit** 152:1
**Limited** 4:17
**limits** 211:1
**line** 13:12
80:8 123:16,
18 125:23
184:7 189:2,
10
**lines** 13:8
146:7 205:8

**list** 9:21 14:3
17:22 18:5,
11 19:12, 24
42:9 47:15
48:7, 8, 9, 10
49:6 125:7,
10, 14 230:19
**listed** 18:16,
22 19:20
20:16 21:1, 6
22:6 44:4
49:5, 10
65:23 83:15
84:3 126:4
147:8 174:4
**Listen** 61:3
73:4 87:19
**listening**
98:24 196:18
**listing** 126:7
148:5
**lists** 17:20
**literally** 146:9
**literature**
144:21
146:10 232:7
**LITIGATION**
1:4 6:4, 10
33:15 78:4
155:23
173:20 234:17
**little** 11:6, 17,
20, 21 12:2, 4,
9 77:23 83:8
85:13 140:13
195:15 204:4
220:6 223:8
236:10
**live** 171:21
**LLC** 2:1, 15
3:9 4:13
**LLP** 1:13
2:12 3:3, 6,
14, 17 4:3, 6,
17
**located** 170:5
**long** 31:2
65:1 150:17,
21

**longer** 65:21
194:12
224:23 225:22
**look** 32:11
46:21 78:17
79:18 93:22
96:4 101:3, 4
109:24
112:11, 15
113:1 114:24
115:17, 21
125:23 145:2
170:14 180:8
201:8 204:5
219:13, 14
232:17
**looked** 82:13
83:18 84:9
163:2, 16
222:17
**looking** 12:15
24:20 100:18
108:3, 11, 13
110:5 181:4,
16 182:6
201:7 203:22
208:17
222:18 223:21
**looks** 192:7
218:5
**LOSARTAN**
1:3 6:9 51:19
**loses** 75:16
**loss** 23:1, 18
25:22, 23
36:15 43:1, 4
46:7, 17 51:5
52:16 53:13
54:2, 4 56:1
58:12 65:24
66:11 67:21
70:19 71:9
84:10 88:22
89:2, 3 90:10,
19 91:3, 19,
21 92:3
93:18 94:6,
10 95:2, 6
96:4, 10, 13,
18, 21 97:2,
14, 23 99:1, 5,

7 102:10
107:9 108:3,
12 110:6, 11,
22 114:1, 5
116:17, 20
117:15, 23
118:16
120:18 121:8
127:1 128:1,
17, 22 131:2,
23 132:14, 16
134:1 135:14
136:23 153:8
164:3, 9
176:11
**losses** 22:12
40:12 43:10
47:7, 8 85:3
91:13 97:7
98:20 102:11
108:19
114:18
118:23
120:24
126:17 134:9,
12 162:1
**lost** 11:6
155:15
**lot** 186:8
**lots** 160:11
**Louis** 3:15
**Louisiana** 2:9
**lower** 91:12
169:6
**lowering**
127:14
**lpugh@duane
morris.com**
2:20
**lunch** 123:13
133:21
135:12 163:1
**Luncheon**
134:17

**< M >**
**ma'am** 88:1
107:23 173:14
**mail** 69:8
**maintain**

228:*16*
majority 42:*1*
making 26:*15*
69:*18* 158:*18*
206:*6*
manage 42:*2*
93:*3* 113:*8*
143:*21*
164:*18* 194:*22*
managed
165:*5*
management
144:*2* 164:*21*
managing
145:*4* 204:*16*
manner
128:*21* 237:*7*
manufacturer
82:*9, 19*
148:*16*
149:*17*
151:*18*
179:*17* 183:*1*
191:*14*
manufacturers
40:*23* 80:*15*
82:*3* 83:*5, 22*
158:*17*
159:*21* 167:*6,*
*13, 14, 23*
168:*6* 187:*5*
manufacturing
36:*19* 186:*5*
187:*8* 193:*4*
MARCH 1:*8*
6:*5* 239:*8*
mark 9:*15*
10:*2* 155:*13*
196:*23*
217:*24* 218:*14*
marked 9:*18*
59:*13* 124:*13*
172:*24* 173:*3*
188:*15, 17*
197:*6, 8*
201:*5, 6*
205:*6, 7*
218:*21*
Market 2:*4*
36:*24* 37:*24*
75:*8* 97:*11*

103:*17, 23*
104:*6* 111:*20*
166:*5* 169:*23*
176:*4* 178:*9*
194:*11*
213:*21*
214:*22* 215:*1*
224:*7*
marketing
126:*3*
marketplace
39:*15* 165:*7*
189:*3*
markets 35:*1*
82:*24*
market-wide
70:*22*
marking 9:*8*
17:*19* 188:*12*
marriage
240:*16*
Massachusetts
4:*4*
master 36:*2*
matched 200:*5*
material
16:*24* 18:*5,*
*17* 19:*13, 21*
20:*17* 22:*8*
44:*5* 45:*14*
223:*10*
materials
9:*21* 16:*5*
17:*6, 8, 10*
18:*8, 12* 20:*3,*
*4* 42:*11*
47:*16* 48:*8*
49:*6, 10*
50:*13* 52:*20*
83:*15* 125:*8,*
*11* 144:*6*
147:*3* 148:*3,*
*6* 174:*15*
180:*20, 22*
182:*16, 19*
216:*12, 14*
matt.knepper@
huschblackwell
.com 3:*17*
matter 6:*9*
23:*4* 24:*2*

26:*1* 27:*21*
31:*16* 35:*16*
43:*9, 17*
51:*14, 17*
53:*15* 54:*17*
64:*7* 70:*20,*
*23* 75:*23*
76:*10* 79:*18*
101:*18* 120:*3,*
*20* 121:*18*
122:*18*
130:*19*
132:*10*
144:*12, 18*
145:*24*
162:*23*
163:*18*
168:*15*
177:*12*
194:*10* 198:*9,*
*16* 203:*14*
231:*10* 240:*17*
matters 31:*21*
33:*15* 57:*15*
63:*24* 76:*15*
81:*4, 14, 18,*
*21, 24* 82:*5,*
*23* 97:*8, 14*
99:*23* 100:*4*
102:*22*
104:*19*
158:*11* 237:*13*
MATTHEW
3:*16*
MDL 1:*4*
44:*10* 51:*18*
131:*21*
210:*19* 211:*12*
mean 13:*15*
15:*7* 17:*9*
19:*16, 17*
31:*23* 37:*15*
43:*19* 44:*1*
47:*21, 22*
52:*24* 59:*7*
66:*7, 8* 67:*2*
69:*14* 76:*17*
80:*4* 85:*14,*
*21* 88:*17*
95:*3* 98:*16*
104:*11* 110:*3*

113:*3* 116:*1*
121:*4* 128:*24*
129:*2* 154:*10,*
*15* 177:*14*
180:*9* 184:*8*
190:*5* 199:*4*
205:*3* 216:*8*
220:*17*
meaning 56:*4*
120:*11*
154:*12* 160:*5*
175:*13, 19, 21*
meaningful
22:*16, 24*
169:*10* 194:*14*
meaningless
195:*17* 196:*14*
means 14:*19*
25:*1* 70:*16*
117:*8* 118:*11*
120:*5* 154:*16*
157:*4, 10*
160:*14* 176:*2*
179:*22, 23*
180:*1* 182:*7*
183:*3* 191:*6*
195:*8*
meant 39:*9*
101:*21*
189:*18* 224:*4*
measure 46:*3*
53:*17* 54:*13,*
*19, 23* 55:*6, 7,*
*21* 58:*3, 9, 15,*
*16, 22, 24*
59:*2, 5, 8, 16,*
*17, 21* 60:*8,*
*10, 12, 18, 21,*
*23* 61:*6, 10,*
*13, 17* 62:*6*
71:*17* 72:*17*
84:*18, 24*
87:*1, 7, 14*
88:*17* 89:*14*
97:*4, 8*
102:*15, 21*
106:*20* 108:*1*
110:*18*
113:*15*
114:*18*
122:*12* 123:*1*

132:*24*
133:*16, 22*
136:*1, 8, 16,*
*20* 138:*2, 7,*
*10* 139:*3, 11*
140:*17*
141:*11, 19*
144:*14* 163:*7*
164:*2, 8* 170:*7*
measured
69:*23* 97:*13,*
*22* 98:*4*
136:*24*
143:*20* 170:*4,*
*13, 18*
measures
32:*13* 54:*13*
59:*22* 86:*14*
89:*7* 95:*5*
136:*11* 137:*3*
140:*21* 232:*8*
measuring
32:*16* 142:*6*
176:*15*
mechanical
229:*14*
medical 14:*20*
127:*13*
142:*23*
143:*23* 144:*4,*
*8, 22* 145:*12,*
*14*
medically
129:*6*
medication
41:*17, 18*
42:*2* 90:*6*
91:*16* 113:*7,*
*10, 11, 18, 20*
165:*1*
medications
69:*4*
medicine
113:*13*
meet 146:*24*
186:*9* 195:*8*
219:*4*
meets 177:*15*
member 66:*9*
104:*21*
105:*15, 17*

108:*20*
111:*18*, *24*
113:*21*  114:*5*
132:*18*  154:*21*
**members**  46:*8*
65:*3*, *20*
91:*10*  104:*24*
106:*17*
109:*18*
110:*13*
112:*18*
130:*11*  153:*8*
162:*7*  164:*11*
**memorandum**
65:*24*
**memories**
214:*3*
**memory**
18:*15*  20:*15*
23:*12*  24:*20*
202:*20*  214:*1*
217:*9*  223:*17*
**mention**  225:*3*
**mentioned**
53:*9*  145:*10*
218:*16*
**mentioning**
8:*4*  17:*13*
**mentions**
225:*6*
**mere**  126:*2*
**merely**  42:*17*
187:*6*  191:*2*
**merged**  213:*8*
**merger**  213:*5*,
*14*, *18*  224:*6*
**Meridian**  4:*9*
**Merit**  1:*15*
240:*7*
**message**  21:*19*
**met**  177:*18*
**method**  73:*19*
215:*8*  226:*7*,
*11*, *14*
**methodologies**
215:*1*, *5*
**methodology**
70:*10*  71:*5*
74:*22*  226:*18*
230:*6*

**methods**
46:*10*  52:*23*
70:*15*  128:*18*
138:*19*  139:*9*
153:*11*, *19*
**middle**  76:*6*
**mind**  11:*7*
36:*12*  56:*17*
69:*11*  85:*24*
95:*23*  102:*18*
103:*15*, *22*
104:*3*  105:*19*
154:*19*
**minds**  102:*13*,
*19*  103:*7*
**minimum**
117:*9*  236:*2*
**minus**  92:*6*
140:*14*  232:*12*
**minute**  60:*4*
76:*1*, *2*
125:*21*
137:*13*  181:*5*
**minutes**
186:*24*
187:*23*
227:*20*  233:*6*
**misbranded**
15:*3*, *9*, *13*
24:*24*  26:*8*
43:*15*  57:*9*,
*12*, *17*  76:*13*
160:*18*  161:*3*
174:*8*  175:*6*
179:*8*  182:*23*
**misbranding**
15:*20*  57:*15*
**Mischaracteriz**
**e**  122:*24*
131:*5*
**Mischaracteriz**
**es**  39:*18*
52:*14*  95:*22*
102:*5*  107:*15*
108:*7*, *18*
111:*12*
112:*14*  125:*4*
128:*12*  133:*3*
136:*6*  162:*15*
163:*10*

215:*18*
216:*18*  217:*6*
**misleading**
211:*24*  212:*11*
**misread**  25:*18*
**missed**  55:*10*
147:*4*  148:*6*
**missing**
164:*19*  236:*23*
**Missouri**  3:*15*
**misspoke**
90:*16*, *17*
194:*7*
**misstates**
234:*20*
**model**  27:*8*
34:*11*  80:*19*
87:*1*, *14*, *24*
88:*5*  91:*20*,
*22*  92:*5*
93:*13*, *23*
99:*1*  102:*14*
107:*8*, *9*, *16*
108:*12*  110:*6*,
*19*, *22*  117:*6*,
*15*, *23*  118:*4*,
*7*  119:*7*, *18*,
*22*  131:*2*
193:*15*, *19*, *22*
194:*17*, *21*
234:*9*, *14*
235:*6*, *19*
**modeling**
34:*20*
**models**  34:*14*,
*17*  53:*11*
86:*13*  107:*19*
115:*14*  121:*8*
122:*14*
135:*13*
237:*16*, *18*
**moment**  7:*14*,
*15*  217:*2*
**money**  72:*8*
73:*23*  96:*14*
151:*19*
169:*11*  183:*2*
**monies**  67:*24*
**month**  202:*2*
231:*12*

**monthly**
201:*21*, *24*
**months**  80:*20*,
*24*
**month's**  92:*1*,
*2*  201:*23*
**MORING**  3:*3*
**morning**  7:*2*,
*4*  10:*18*
164:*10*
**Morris**  1:*13*
2:*12*  7:*22*
**mortality**
145:*10*
**motion**  46:*8*
124:*7*, *19*
224:*19*
**motions**  49:*23*
50:*3*  52:*2*, *9*
**move**  26:*16*
212:*19*
**moved**  80:*24*
**movement**
189:*2*, *9*
**moving**  32:*24*
93:*13*
**MTD**  5:*10*
124:*12*
**multiple**  98:*1*,
*6*  112:*10*, *15*
114:*23*  162:*8*
207:*5*
**mutagenic**
16:*15*
**Mylan**  3:*19*

**< N >**
**N.W**  2:*21*
4:*13*
**Najafi**  17:*1*,
*13*  18:*14*
**Najafi's**  18:*4*
**name**  6:*2*  7:*6*
176:*22*  192:*4*
204:*15*  208:*4*
211:*15*  217:*22*
**named**  45:*3*
**names**  49:*20*
**name's**  228:*4*
**narrow**  221:*21*

**Nathan**  208:*4*,
*12*
**nature**  211:*14*
**NDEA**  15:*2*, *8*,
*12*  16:*12*, *15*,
*18*, *21*  36:*18*
159:*8*, *14*
185:*6*
**NDMA**  15:*2*,
*8*, *12*  16:*11*,
*14*, *17*, *20*
36:*18*  159:*7*,
*13*  181:*14*
185:*6*
**near**  9:*10*
**nearly**  221:*5*
**necessary**
42:*3*  54:*7*
98:*6*, *7*, *14*
179:*2*
**need**  33:*15*
42:*1*  55:*9*
62:*8*  70:*24*
78:*18*  104:*22*,
*23*  105:*16*
106:*23*  107:*1*
109:*20*
120:*19*, *22*
135:*21*
142:*12*  143:*7*
144:*1*, *16*, *17*
162:*6*, *17*, *21*
170:*23*
194:*15*, *21*
196:*5*  201:*13*
204:*3*  220:*14*
222:*24*  223:*4*
233:*4*  237:*1*,
*4*, *8*
**needed**  71:*13*
98:*2*
**needs**  8:*20*
9:*4*  41:*23*
106:*9*  117:*24*
118:*7*, *21*
120:*12*  121:*4*,
*5*  140:*17*
157:*14*  227:*14*
**negligence**
32:*4*

neither 52:*10*
116:*19* 119:*18*
NERA 5:*16*
197:5 200:*14*
201:*18*
202:*18* 203:*1*
NERA's
203:*13*
net 118:*12*
never 117:7
125:*1* 129:9
131:*16*
132:*11* 151:2
195:8 227:*12*
NEW 1:*2, 13,
16* 2:9 4:*18*
6:*8, 12, 22*
7:*17, 22* 8:*24*
95:7 148:*21*
239:*3, 4*
240:*3, 4, 8*
nitrosamine
159:*23*
nitrosamines
158:*24*
166:*23*
167:*17* 168:7
172:*11*
noncompliance
26:*22* 27:*4, 15*
nonexistent
196:*15*
Notary 1:*15*
6:*21* 135:5
239:*21* 240:7
note 45:*24*
48:*4* 71:*13*
129:*3* 148:7
163:*21*
225:*10, 13*
noted 6:*15*
9:*4* 238:*4*
notes 225:*11,
14*
Nothing's
205:7
notwithstandin
g 151:*6*
November
203:*24* 204:*13*

Number 5:9
7:*8* 39:8
71:*20* 72:*15,
19* 98:*14*
119:5 121:*22*
123:*20*
147:*19*
179:*23*
202:*17* 204:*1*
207:*21*
numbers
134:6, *11*
215:*10* 217:*14*
Numeral
38:*17*
numerous
153:*15*
NW 3:*4*

< O >
oath 7:*14*
108:*11* 117:2
166:*20* 169:*1*
183:*13*
184:*21*
212:*13* 217:2
239:8
Object 58:*6*
161:5 167:*8*
205:*20*
234:*19*
236:*14* 237:*11*
objected 192:*4*
objection 9:*4*
12:*24* 22:*4,
20* 23:*10*
27:*1* 29:*12*
31:*13* 32:5,
*19* 34:*10, 21*
39:*17* 43:7
47:2 48:*4, 5*
50:7 52:*13*
53:*19* 57:2
61:*1, 7* 63:*19*
64:9 65:*12*
66:*14* 69:*19*
72:*20* 79:5
81:*16* 82:*21*
84:*20* 86:*15*
94:*3* 95:*21*
97:5 99:*10*

101:*10* 102:*4,
16* 104:*18*
106:*12*
107:*11, 14*
108:*6, 17*
109:*11*
111:*11*
112:*13* 114:*4*
115:*3, 23*
119:5 121:*2,
24* 122:*23*
125:*3* 126:*22*
128:*11* 129:*3*
130:*2* 131:*4*
132:*1* 133:*2*
134:*3* 136:5
138:*4* 139:*12*
141:*13, 21*
142:7 143:5
144:*11*
149:*12* 150:*2,
7* 152:5
153:*16*
155:*19*
156:*14, 16*
157:5, *17*
158:7, *20*
159:*2, 9, 24*
160:7, *19*
161:*19*
162:*14* 163:*9,
21* 167:*10, 20*
168:*10*
171:*15* 175:*7,
20* 176:5
177:*10*
178:*15*
179:*19* 180:5,
*16* 181:*23*
183:5, *7, 14*
184:*22*
186:*11*
187:*14*
190:*15* 191:*8,
22* 193:*6*
195:*11* 203:*8,
10* 205:*3*
210:*20*
215:*17*
216:*17* 217:5

objections
119:*4*
observe
169:*22, 23, 24*
170:7 189:*15*
observed
192:*13*
observing 7:9
obtain 70:*18*
151:*10*
obtained 77:5
obtaining
17:*24* 69:7
obviously
219:*22*
occasion 35:*3*
219:*4*
occasions 35:9
occur 101:*6*
occurred 55:*4*
64:*8* 66:*6*
78:*11* 80:*2*
169:*14*
occurring 66:*8*
occurs 101:*8*
147:*21, 22*
October
198:*3* 199:*22*
208:*15, 22, 23*
odds 128:*24*
129:*2*
offer 14:*21*
15:*1, 19* 18:*2*
21:*14* 27:*3, 5*
72:*18* 128:*16*
131:*10*
132:*22* 133:9
136:*15, 19*
137:*21* 138:*1*
141:*15, 18, 23*
161:*21*
offered 17:*3*
22:*1* 50:*18*
131:*17* 236:*12*
offering 13:*4*
15:*10* 16:7
17:*10* 21:*4*
58:*8, 9* 84:*22*
134:*10*
148:*13* 167:*1*

187:*18*
offhand 17:*12*
offices 1:*12*
7:*22*
offset 117:*21*
Oh 161:*1*
234:*3*
Okay 7:*21*
12:*11* 14:9
19:*16* 21:*19*
29:*21* 30:*10*
31:*2* 44:*4*
50:*2* 52:7
59:*4, 10*
69:*24* 76:5, *8*
85:*17* 86:*22*
87:*16* 89:*6*
103:*20*
124:*17, 22*
137:*23*
168:*13* 169:*1*
172:*22*
186:*22*
190:*24* 191:9
197:*15*
201:*11*
208:*14* 218:*7,
12* 220:*16*
225:*9, 21*
234:*4*
once 7:*2*
198:*12*
ones 44:*13*
48:*18* 63:*10*
69:*11* 98:*21*
158:*1* 196:*10*
one's 92:*8*
open 227:*11,
15*
operating
231:*5*
opine 13:*21*
54:*12* 59:*15*
132:*12*
133:*15* 136:7
opined 35:*19*
49:*16* 235:*1*
opines 24:*23*
opining 23:5
25:*16* 59:*1*
60:*13, 19, 20*

61:22  84:22
121:4  133:10
**Opinion**  5:10,
16  13:4  15:1,
8, 19, 22
16:11, 14, 17,
20  18:2
23:14, 19
47:18, 23
48:12  50:1,
16, 17, 18
51:2  52:18
54:8, 18, 22
55:24  58:8
61:2, 23
62:13, 19
70:7  72:24
76:16  84:21,
23  85:9
86:16  97:6
105:13  106:8,
11, 13  119:13
120:7, 10, 14
121:10  122:1
123:1  124:8,
12, 20  126:1
128:5, 16, 22
129:19  130:6,
9  131:17, 18
132:16
134:10
136:15, 19
138:1, 5
141:11, 14, 15,
18, 22, 23
142:2, 23, 24
150:22  151:1,
9, 12, 13, 21
152:7  155:20
156:18  157:6,
18  158:8, 21,
22, 23  159:3,
4, 5, 10, 11
160:1, 2, 8, 9,
15, 20, 22
161:6, 12, 20
162:4  163:11,
22  175:8, 10,
23  178:16
179:20, 21
180:6  184:23,

24  185:7
186:12, 18
187:15
216:11
218:12, 20
219:17
221:20, 23
227:4  229:22
230:10  235:3
236:12
**opinions**
10:19  14:21
15:11, 15, 18
16:1  17:10
19:4  21:4, 14
22:2, 11  23:7,
17  24:15
26:9, 14  27:3,
5  33:4  39:22
42:15  44:22
46:1, 22  47:6,
7, 14, 17, 24
48:2, 6, 9, 11,
20  49:1, 3, 7,
9, 11, 12, 20
50:16  51:4, 9,
21  52:1, 6, 8,
15  53:7
54:10  55:1, 8
56:1, 6  58:10
62:10, 11, 14,
20  63:16
70:5  75:13
76:11, 15, 19
77:1  120:13
121:6  122:16
123:2  126:12,
16, 20, 24
127:18, 20, 21,
23  129:16
132:23  133:8
136:22  137:2
138:24  139:2,
7  140:4
148:12  149:3,
6  151:21
153:7  156:24
157:1  159:16
160:14
161:21, 22
175:1  177:2

180:19, 22, 23
186:20
187:18
207:10
209:11, 12
210:23  219:1
228:7, 8
229:1, 4, 7
**opportunity**
8:14  9:15
10:12
**opposing**
45:10  122:11
**Orange**  126:5,
7
**ORDER**  1:10
28:13  29:10
33:3, 16
34:14, 15
69:8  106:10
110:10
144:23
170:22
171:10, 20, 23
218:15
**organic**
169:17, 24
**Orleans**  2:9
**ORTEGA**
4:23  6:2
**OSTFELD**
3:11
**ostfeldg@gtlaw**
**.com**  3:12
**outcome**
64:16  87:8,
14, 18  88:18
89:11, 14
107:9  224:16,
17  240:17
**outcomes**
77:9  80:1
86:7  87:24
88:6  89:19
90:14  102:12
137:1  144:16
145:4  146:2
159:18  162:2
165:2  169:10,
20  193:23

**outlay**  88:8
90:8, 10, 12,
22  91:12, 14,
15
**outlays**  90:3,
4  91:5
114:16  165:3
**outlined**  89:8
164:4
**outside**  74:1
122:3  131:6,
12  132:4
150:10  192:2
**overall**  112:24
**overarching**
236:21
**Overbroad**
23:11  57:3
69:20
**overlapped**
145:8
**oversimplify**
188:23
**Oxford**  3:19

**< P >**
**p.m**  77:16, 20
134:16  135:9
188:4, 8
227:22  228:2
233:8, 12
238:3, 4
**Page**  5:3, 9,
23  13:6
14:11  18:9
38:24  39:9,
20  125:17, 22,
24  127:2, 4
138:9  140:5
181:10  184:6
198:5  204:2,
7, 8, 10
207:23  208:6,
10, 11, 20, 24
219:7, 13, 14
220:1  222:6,
14  223:3
**paged**  146:13
**pages**  207:22
220:18

**paid**  43:11
68:8, 9  71:18
72:9  73:14,
15  86:2, 8
87:21  88:13,
23  89:4
93:15, 23
94:15, 17
96:20  99:13,
15, 16  100:3,
20  102:1
103:24  104:9,
14, 22  105:4,
10, 12, 17
106:23, 24
107:19
108:15  109:2,
4, 7, 9  110:24
111:10
113:17, 19
114:6, 14, 18
117:2  132:17
133:23
143:18
179:17  180:3
231:11
**pandemic**  8:2
**Panigraby**
18:23  19:3
**Panigraby's**
20:14
**paper**  9:9
184:2
**papers**  145:2
146:9
**paragraph**
10:22  11:10
12:16, 19
13:1, 7  14:12
17:14  20:7,
24  38:18
39:6, 9  59:13
60:16  61:20
127:5  133:18
139:24  147:8
181:11, 12
220:7  222:9
223:24  225:5,
6

Confidential Information - Subject to Protective Order

paragraphs 140:3 181:17 222:17
pardon 12:20
parent 67:16
part 20:2 22:10 23:21 28:11 30:8 40:4 41:1, 18 44:5 46:16 129:13 136:17 137:9 140:17 154:1 173:8 178:8 186:13 193:24 202:4 221:20 229:24 231:18 232:14 235:23 236:22
participated 122:7
particular 19:11 31:17 33:20 45:8 69:6 82:19 93:15 112:19 149:11 173:6 174:23 190:4 213:21
particularly 62:17 214:22
parties 45:23 55:23 240:15
parts 39:24
party 45:10
pass 10:8
patience 31:1
patient 37:5 68:12, 16, 19, 23
patients 14:23 37:9, 11 40:1 41:8, 15, 21 58:13 64:16 65:18 119:23 164:24 194:21 230:2
pattern 80:21

patterns 171:7
pause 9:2
pay 78:23 89:20 92:1 114:17 116:9, 10, 12 179:9, 15 196:8 231:22
payers 76:14
payments 39:2 235:21
payor 153:9
pays 88:19 94:14
PC 4:11
Penalties 173:16
Pennsylvania 2:5, 16 3:4, 20
penultimate 59:14
people 200:18
perfect 217:10
perform 134:5 138:15
performed 70:8 98:15
period 15:4 65:16 66:7 78:10 79:21, 22 81:1 104:1 141:3 167:18 172:9, 10 199:14 201:10 202:1
periods 65:21
permissible 76:12 206:16
permitted 121:13
person 19:14 64:21 67:18 94:13 118:16 137:6 169:2 208:20
perspective 153:24 158:1, 10 229:14 232:9

pertain 24:18 135:16 209:10 212:3
pertaining 210:23
pertains 148:8, 11
pervasive 23:21
pesticides 169:18, 19 170:1
Ph.D 1:12 5:2, 10 6:19 9:18 135:3 147:14 175:12 239:6, 15
Pharma 3:9
Pharmaceutical 2:14, 15 3:8 81:21 82:19, 24 126:4 140:20 142:3 147:15 148:22, 23, 24 182:4 232:4
Pharmaceuticals 3:8, 19 4:3 148:21
pharmacies 228:8, 24 229:8, 13, 16 230:7
Pharmacy 4:8 139:15 147:19 231:10
phase 155:23
Philadelphia 2:5, 16 7:16
phrase 50:23 60:7 62:23 95:3 149:15 153:20, 21, 22 154:4, 5 182:1
phrases 58:15
physically 19:16
pick 31:4 44:11 169:2

piece 173:20 232:7
pieces 23:15 94:9
PIETRAGALLO 3:17
pile 123:6 196:20 207:17 217:21
pills 168:7 186:10
Pittsburgh 3:20
place 50:21 52:11 53:3 70:11 100:22 101:1 103:21 110:23 115:19 153:4 171:12 181:7
placed 75:7, 9 76:23
places 38:15, 21 39:11, 21 46:12
plain 175:13, 21 180:7
plaintiff 36:11 106:1 138:13 213:4, 6 228:14, 18 234:10
Plaintiffs 2:4, 8 7:7, 9 8:8 22:8 36:14 39:1 45:3 50:20 65:23 66:5 83:17 105:24 224:20, 23 225:22 228:20 235:11 236:1
plaintiff's 139:16 224:1
plan 89:23 116:8
Plaza 3:15
please 85:19 98:17 123:20 127:2 195:21

197:4, 14 211:10 219:7
plot 189:22, 24 191:3
pocket 94:11 96:5, 14, 19 97:3 99:7 108:13 110:23
point 17:24 21:22 29:8 64:7 80:1 101:19, 23 102:1 103:4 108:16 127:10 132:8 150:12 176:20 189:8 190:4, 7, 22 198:9 207:7 209:20 212:15, 18 217:16 232:15 234:16
point-of-care 213:7, 12
points 80:5 112:23 119:12 185:3 189:12, 14 192:23
pool 45:15, 18
portion 138:12 228:14, 17 235:13, 23
posed 201:17
posing 115:16
positing 133:20
position 88:9 164:11
positions 164:12
possibility 16:2 26:7 33:6 37:7, 9 159:12
possible 80:19 94:23 189:24

**potential** 40:9
75:21 144:14
159:22
**potentially**
64:15 65:20
78:13 157:23
209:22
**practices**
186:5 187:8
**precisely**
101:12
**predicated**
32:4
**predominance**
156:23 157:3
**prejudgment**
64:1
**premise**
163:24
213:22 236:21
**preparation**
49:4 51:7, 10,
23 203:5
**prepare** 10:15
19:12 55:1
199:6
**prepared**
147:13 197:1
202:11
**prepares**
19:15, 16
**preparing**
210:13, 15
**prescription**
93:16 104:12
126:2 144:10,
24 148:18
149:11, 24
150:9, 19
151:11
**presence** 15:2,
11 68:24
92:17 165:24
166:1 167:16
170:16, 17, 21,
22 172:10
**PRESENT**
4:22 15:23
159:1 203:2
211:20

**presented**
122:15
**presents**
158:19
**pressure**
41:16 42:2
69:4 90:6
92:9 93:4
113:8 127:14
143:22 144:2
164:18, 21
165:1, 4, 17
194:22
**previously**
135:4
**price** 43:11
68:8 78:15
79:10 86:2
88:23 89:4,
20 91:1 92:6,
7, 15 94:13,
15, 17 100:19
101:8 102:1
103:11, 15
105:16
106:23, 24
108:15 109:7
111:10
113:17, 18, 24
115:20
116:11, 13
118:9, 10
132:17
133:23
143:18
146:15
170:22 171:6,
12, 17 172:3
185:3, 15, 19
189:9, 12, 14
190:8, 11, 22
192:23 194:8,
10 195:5, 10
196:11, 12, 14,
15
**priced** 169:5
170:13
**prices** 80:22
81:8 82:2
86:8 87:21
88:13 89:21

97:11 98:5, 9
99:13, 14, 15
100:3 103:16
105:10, 12
108:4 109:9
110:24 117:2
169:23 170:4,
8 171:2, 3
196:7
**pricing** 79:15
80:11, 21
81:11, 13
82:8, 9, 17, 18
103:8 110:7
188:20
190:14 191:2
**primary** 230:4
**principal** 8:7
119:3
**principle**
131:22 177:6
**principles**
62:4 116:21
122:9 152:2
156:10
183:18, 19
**Prinston** 2:14
**prior** 49:1, 4,
8, 16 81:9
96:11 149:1
159:23 193:3
198:11
**probable**
158:24
**Probably**
135:20 153:14
**problem** 8:13
221:17
**Procedure**
152:9
**proceed** 77:21
**proceeding**
73:8
**proceedings**
132:7
**process** 36:19
202:8, 11
226:23, 24
227:1, 3, 5
**produced**
123:24

158:17
206:19 235:6
**producing**
149:23
**product** 16:8
43:13, 20, 22
57:16, 21
66:21 68:12
69:1 74:13
75:16 77:6
79:10 82:20
87:22 88:10,
14 91:6, 24
92:3, 23 93:2,
7, 21 94:14,
16, 20, 22, 24
95:8, 15
96:16 109:3,
5 116:6, 7, 10,
12 117:19
141:4, 12, 17
142:3, 11
146:20, 22, 23
150:13
151:14, 23
164:17 166:2
169:12
170:17 174:7
175:6 176:13
177:8, 14, 15
179:7 187:11
189:1 190:6,
11 194:11, 16
196:16 213:6,
7, 13, 19
231:3, 4, 11
232:5, 19
**PRODUCTS**
1:4 6:10
14:22 15:12,
16 16:3, 4, 9
33:7 37:21
38:1, 12 57:7,
11 64:20
65:3, 21
66:17, 18
68:10 70:3
76:23 77:4,
10 80:18
86:8, 10 88:9
89:21 90:1

93:5 97:11
98:2, 14
100:3, 5
106:4 109:9
119:15, 20, 21
127:24
143:16, 17
148:22, 24
159:13
167:17
169:17, 18
171:7 176:17,
18 177:20
178:12 185:2,
3, 11 186:1
191:15, 18
192:8 193:10,
21 194:23
**proffered**
179:15 209:19
**profile** 16:10
43:20, 23
57:22 64:15,
19 92:19
144:13 171:19
**profit** 231:24
**profits** 98:12
140:8, 13, 16
230:6, 16, 20
231:17 232:2,
4, 9, 12 234:8
235:8, 20, 23
**profoundly**
177:4
**prohibit**
175:11
**Prohibited**
5:13 172:23
173:15, 20, 21,
23 174:3, 19
177:8 179:5,
10 180:8, 10
181:1
**prohibiting**
181:19
**prohibition**
178:2 179:16
**prohibits**
175:4, 10, 15
**project** 198:5
203:23

207:*19, 23*
208:*10, 11*
209:*17*

**pronouncement**
125:*15*
**proof** 163:*8,*
*19* 164:*7*
**proper** 53:*16*
54:*12, 18, 23*
55:*6* 58:*3, 9,*
*15, 21* 59:*16,*
*21* 60:*8, 9, 12,*
*18, 23* 61:*5,*
*13* 71:*17*
84:*17* 132:*24*
133:*16, 22*
136:*1* 141:*11,*
*19, 24* 179:*9*
211:*6, 8*
**properly**
25:*24* 58:*10,*
*24* 60:*7*
61:*14, 24*
162:*22*
**propose** 34:*17*
**proposed**
153:*11, 19*
172:*9*

**PROTECTIVE**
1:*10*
**provide** 71:*5*
74:*22* 205:*21*
213:*16* 218:*6*
220:*14* 224:*5*
234:*18*
**provided**
45:*13* 68:*16,*
*19* 105:*24*
107:*4* 207:*9*
234:*15*
**providing**
210:*22* 212:*4*
**provocative**
78:*19*
**Public** 1:*16*
6:*22* 135:*5*
200:*22*
239:*21* 240:*8*
**PUGH** 2:*18*

**pull** 172:*16*
188:*10*
196:*20*
200:*24* 217:*20*
**pulled** 215:*15*
216:*16* 217:*2*
221:*18*
**punch** 80:*8*
**purchase** 67:*6,*
*22* 105:*7*
194:*15, 16*
196:*6*
**purchased**
65:*9* 67:*15*
86:*11* 90:*4*
118:*24* 185:*11*
**purchases**
96:*17* 178:*20*
**purchasing**
88:*9* 91:*24*
94:*23*
**purely** 152:*1*
**purity** 186:*7*
**purported**
45:*2* 66:*11*
105:*12*
112:*18*
130:*11* 162:*7*
**purportedly**
52:*17*
**purports**
138:*24* 235:*20*
**purpose**
109:*13, 14, 17*
127:*13* 129:*7*
**purposes** 45:*7*
47:*6* 52:*15*
53:*6* 121:*17*
129:*16* 142:*8*
148:*12* 168:*1*
210:*4, 10*
231:*9* 235:*10*
**put** 27:*8*
33:*12* 36:*12*
37:*19* 38:*11*
45:*20, 21*
100:*18*
101:*13* 103:*9*
108:*14*
119:*17*
123:*23* 129:*5*

149:*3* 153:*6*
184:*1* 188:*24*
199:*17, 20*
200:*17* 216:*1*
235:*20* 236:*4*
**puts** 128:*8*
140:*11* 236:*22*
**putting** 71:*9*
145:*9* 231:*19*

**< Q >**
**quantification**
236:*19*
**quantified**
71:*6*
**quantities**
66:*22* 159:*14*
**quantity**
190:*8, 23*
**quantum**
139:*8*
**question** 8:*11,*
*12, 24* 11:*7*
12:*13* 18:*18*
21:*23* 29:*6*
30:*11* 33:*23,*
*24* 35:*13, 18,*
*19* 44:*19*
46:*20* 48:*5*
51:*21* 55:*11,*
*14* 56:*12, 15,*
*22* 59:*20*
61:*3, 16* 62:*8*
63:*12* 65:*14*
72:*1* 79:*16*
86:*18* 93:*17*
94:*5* 96:*9*
97:*18* 98:*18*
100:*20*
105:*22* 109:*6,*
*9* 115:*13, 16*
119:*11*
131:*20*
137:*23*
151:*16* 152:*4*
154:*13* 155:*1*
158:*19* 159:*1,*
*6, 20* 160:*4,*
*17, 18* 161:*3,*
*4, 8, 14, 16*
163:*13*

168:*14*
171:*10*
176:*22* 177:*5,*
*19* 184:*7, 17*
186:*16* 189:*5,*
*6* 192:*14*
193:*18* 195:*1,*
*16* 201:*16*
205:*17*
206:*23*
209:*14* 211:*6,*
*8, 16* 222:*23*
223:*19*
231:*19* 233:*3*
**questioned**
188:*17*
**questioner** 8:*8*
**questioning**
123:*16, 18*
233:*14*
**questions**
31:*7* 33:*17*
76:*7* 96:*11*
135:*15, 22*
161:*16*
205:*12*
220:*13, 22*
223:*9* 227:*10,*
*17* 228:*6*
229:*7* 232:*23*
233:*1, 14, 18*
234:*7* 237:*21*
**Quick** 22:*7, 9*
23:*8* 187:*1*
222:*5*
**quite** 164:*6*
190:*9* 201:*24*
230:*23*
**quiz** 221:*14*
**quote** 54:*11*
59:*15* 96:*4*
126:*1* 127:*9*
**quoted** 60:*15*
61:*20*
**quotes** 44:*14*

**< R >**
**range** 111:*15*
112:*9* 115:*17*
**RASPANTI**
3:*17*

**rate** 64:*1, 3*
102:*24*
**rational** 169:*2*
**rationally**
168:*21*
**reach** 47:*18,*
*24* 50:*17*
52:*6* 54:*22*
128:*22*
129:*18*
131:*17* 180:*19*
**reached** 72:*24*
127:*23* 141:*6*
**reaches** 122:*15*
**reaching**
49:*11* 50:*15*
51:*4* 52:*15*
53:*7* 54:*9*
127:*20* 128:*4*
130:*5*
**read** 11:*3, 10*
15:*5* 16:*6, 23*
17:*11* 30:*12*
48:*7* 49:*16*
50:*3, 12* 51:*2,*
*6, 22* 52:*8*
55:*17, 19*
66:*2* 84:*2, 3*
85:*19, 20, 23*
97:*18, 21*
126:*9* 127:*15*
128:*6* 129:*10*
137:*9, 12, 20,*
*22* 144:*19*
146:*12* 147:*5*
153:*6* 174:*9,*
*13* 175:*14*
180:*13*
182:*10*
183:*10, 23, 24*
198:*10* 211:*9,*
*10, 11* 221:*2,*
*22* 222:*12*
225:*1* 229:*5*
239:*7*
**reader** 29:*9*
38:*4*
**readily** 164:*6*
**reading** 23:*4*
56:*17* 133:*13*
179:*12* 184:*3*

Confidential Information Subject to Protective Order

224:9  229:10,
20  230:3, 9,
13  234:24
**reads**  129:5
179:5  229:17
**ready**  10:18
77:21  137:23
**reality**  103:23
**really**  8:13
14:2  101:21
119:3  156:7
193:12  206:8
221:2
**Realtime**  1:14
240:6
**reason**  19:24
20:9  55:20
162:9  187:3
200:2, 6
207:12  224:13
**reasonable**
34:16  75:15,
19  90:23
102:13, 19
103:7
**reasoning**
25:4  26:10
**reasons**  17:16
126:19
162:16, 21
163:16  164:1
**rebates**  105:5
**rebazan@duan
emorris.com**
2:23
**REBECCA**
2:21
**rebuttal**  21:9
**recall**  17:12
18:6, 13  19:2,
10  22:13, 22
23:12  29:14
33:5  36:6
40:4  42:20
48:12, 14
49:7  50:8
146:6  147:9
167:22, 24
174:23
176:24
182:19

191:11, 21
193:3  198:12
202:22
213:13
214:18
216:19, 24
229:1  237:14
**recalled**
191:14, 18
222:19
**recalls**  65:17
191:18  192:6
**receipt**  179:5
**receive**  95:12
129:22
151:19  180:9,
10
**received**
22:10  43:11,
12  68:10, 11,
13  70:3
72:16  73:18
86:3  89:5
92:7  94:20,
21  99:15
106:23  107:2
132:18
185:10
198:13  210:2
228:20
229:16, 23
230:2  231:17
**receives**  183:2
**recess**  77:17
134:17  188:5
227:23  233:9
**recollection**
18:11  24:21
37:12  48:24
49:22  51:24
52:3  96:8
125:6  126:13
173:6  174:17
180:19
206:24
216:21
217:11  220:1
221:13
224:10, 14
226:13

**record**  6:2, 16
9:14  30:17,
20, 21, 23
55:19  76:2
77:14, 16, 20
85:20  97:21
103:18
107:15  108:7
134:14, 16
135:9  137:12,
22  184:4
188:4, 8, 10
206:11, 15
211:11
212:11
227:15, 22
228:2  233:6,
8, 12, 24
234:20  238:3
239:10, 12
240:13
**records**
104:12
191:17  217:21
**Red**  4:18
**redacted**
204:20  205:2,
10, 18  207:11,
13  208:16
209:3, 6, 9, 13
212:2
**redaction**
204:24
**redirect**
237:22
**reduce**  71:21
133:23
**reduction**  75:2
**refamiliarize**
10:13
**refer**  33:20
87:12  156:9
182:16, 18
**reference**
87:13
**referenced**
48:18  216:10
225:17
**referred**  87:1,
7  89:10

155:17
156:12  234:12
**referring**
88:18  108:2
139:24  140:2
173:13
**refers**  24:12
48:16  225:24
**reflect**  40:8
201:22  202:18
**reflected**  140:8
**reflects**  40:11
55:1  208:12
**refresh**  220:1
224:10
**regard**  14:15,
24
**regarding**
13:18  14:14
22:18  126:17
138:22
171:18  172:5
228:7
**regardless**
27:19  127:12
**Registered**
1:15  240:7
**regression**
34:20  98:4
**regressions**
34:23
**regulations**
147:22
148:20  149:5
186:6  187:7
**reject**  179:3
**relate**  43:10
47:7  60:18
76:20  145:21
152:21  209:5
235:24
**related**  14:21
22:11  35:14
67:6, 9  68:4
121:7  137:3
138:24
139:16  149:3
152:19
155:22
161:22
175:23

207:10  210:6
222:23  240:14
**relates**  198:3
206:21  210:19
**relating**  54:12
59:16  133:15
223:10
**relative**  69:3
142:10
**released**  17:2
**relevance**  63:9
**relevant**  15:4
27:12, 16
34:24  35:1
42:9  44:21
45:10  54:20
64:6  84:10
85:7  88:12
111:20
136:12, 13
137:4  138:23
140:18, 19
141:1  148:3
167:18  172:9
177:1  229:18,
21  230:15, 16
235:2, 4
237:1, 3
**reliable**  48:2
70:10  81:15
226:16  227:6
**reliance**  9:21
16:24  18:5,
17, 22  19:12,
20  20:17
22:8  42:10
44:4  47:15
48:7, 10  49:6,
10  50:22
52:11  53:3
83:15  125:8,
11  147:2
148:5  182:16,
19  216:5
225:4
**relied**  17:16,
21  21:7
50:13, 14, 16
51:3  52:5, 19
66:2  83:1, 3,
4  147:3

Confidential Information Subject to Protective Order

148:7 182:20
214:20
224:22 225:7,
8, 15, 19 226:6
reload 12:13
rely 19:4
22:14 23:18
42:13 45:15,
24 47:9, 13,
18 48:10
49:11, 14
52:18, 24
53:2, 6, 8
55:8 82:16
127:20
148:10 149:5
180:18
224:23
225:22 227:6
relying 23:13
remain
213:20 224:6
remember
49:19 54:15
69:5 83:11
87:3, 9 96:6
98:21 107:10
135:18 136:3
213:1, 11, 12
214:4, 11, 15
219:2, 20, 21
223:15, 20
remembered
219:18 222:21
remembers
222:11
remote 2:5,
10, 17, 18, 21
3:5, 10, 11, 16,
20 4:5, 10, 14,
19 8:23
remotely 8:2
removal 166:5
removed 176:8
removing
196:2
render 170:16
205:19
rendered 15:2,
8, 12 204:20
renders 187:8

repeat 86:18
160:23 163:13
repeating
187:4
rephrase
86:23
replacement
90:9, 18, 22,
24 91:8, 11,
18 92:3
117:21
report 5:10
9:11, 17 10:3,
12, 20, 22
13:2, 6 15:14
16:24 17:13,
17, 19 18:4, 7,
8, 22 19:3, 7,
8 20:5, 12, 14,
17 21:3, 6, 9,
11 22:7, 9, 14,
22 23:3
24:22 25:5,
11, 18 26:11
28:4, 11, 20,
23 29:2, 5, 9,
15, 23 30:4
33:1, 12
37:12 38:3, 6,
14, 16, 17
39:7, 12, 23
40:6 42:15,
20, 24 43:16
44:6, 13, 18
45:21 46:13,
16 48:17, 22,
24 49:2, 5, 8,
18 51:11, 13,
23 52:10
53:22 54:3,
24 57:13
58:21 59:2,
13 60:6, 13
62:9 63:6
64:24 65:22
66:24 70:1, 5
71:11 73:1
74:10, 16, 19
75:2, 12, 14
76:19 77:7
84:4 86:1

89:4 94:8
105:9 120:13
126:12
129:13, 16
130:19
132:22
133:19 138:9,
19 139:1, 14
140:1, 12
141:19
145:11
146:12
147:13
148:13 154:7
156:24
159:12
161:22 168:1
169:15
170:11, 14
175:3 176:10
178:19 179:1
180:23 181:1,
9 182:2
192:2, 3
198:21, 22
199:6 202:21
203:3 206:3
207:11 209:7,
12, 19, 24
210:6, 10, 12,
14, 15 214:13,
17, 20, 21
215:6, 7, 10,
11, 14, 21
216:2, 9, 11,
16, 20, 23
217:2, 11, 15,
18 221:23
222:22 224:4,
24 225:11, 14,
23, 24 226:4,
9 228:13
229:10, 17
230:3, 10
236:4, 16, 23
reported
144:20
Reporter 1:15
6:17 7:19
8:20 28:8, 10
30:8 55:15,

18 85:23
86:17, 23
123:21, 22
163:13
188:17 197:3
240:7
reports 17:2,
3, 21 19:20
20:7, 20 21:1
147:8
representation
185:4

representations
35:5
representative
81:7
represented
207:14
representing
189:2
represents
234:7
request 200:18
requested
234:23
require 55:22
107:3 119:23
142:23
required
41:18 74:12,
20
requirement
155:17
requirements
177:16, 18
requires 70:7
121:11 185:16
respect 15:15
23:18 27:5
35:22 51:4
52:16 62:13,
15 102:20
113:5 116:24
126:16 150:4
158:14 207:2
214:1 217:8
228:8, 24
229:8, 13, 24
respectfully
63:11 110:16

131:19
151:24 171:9
220:8
respond 25:5
responding
156:1 180:23
responds
42:15
response
37:17 85:22
137:10
rest 186:15
restate 8:15
56:19 72:4
86:23
restatement
101:14
result 73:7
134:8
resumed 135:4
retail 67:23
68:9 89:20,
21 139:15
228:8
retailer 68:1
140:24 141:1,
7 231:18, 20
retailers
234:11, 17
236:8
retain 138:14
228:19
retained
131:8, 9
132:9 198:13
reveal 38:3
revealing
211:14
revenue
231:18, 21, 22,
23 232:12
revenues
140:14, 18
229:16, 22
230:11
review 10:12
47:11, 14
48:20 49:4
51:10 128:22
147:12
199:12

202:*10*  203:*3*
219:*10, 17*
220:*12, 20, 23*
223:*4*
**reviewed**
15:*14*  17:*7*
19:*9*  20:*19*
22:*9, 22*  23:*2,*
*15*  47:*5, 17*
48:*19, 21, 23*
49:*8*  51:*1*
52:*1, 4*  84:*5*
126:*14*
127:*19*
128:*15*
129:*15*  144:*6*
147:*7, 10*
167:*21*
174:*17, 23*
197:*23*
**reviewing**
10:*9*  48:*12*
167:*24*  202:*8*
210:*4*  220:*4*
**revisit**  227:*12*
**right**  11:*5, 15*
14:*2*  20:*1*
25:*14*  29:*6*
30:*19*  34:*13*
47:*16*  49:*13*
62:*2*  77:*19*
78:*17*  79:*4*
80:*3, 5*  88:*24*
90:*11*  92:*13*
96:*18, 21*
97:*4, 22*
100:*20, 24*
101:*8, 19*
103:*8, 12*
104:*4, 11, 16*
109:*4*  112:*6*
113:*15*  114:*1,*
*3*  117:*20*
118:*16*
119:*10*  124:*6,*
*10*  128:*14*
134:*13, 15*
136:*17*
137:*17*
146:*11*
153:*15*  158:*3*

162:*8, 13*
167:*9*  171:*20*
180:*15*
185:*12, 17*
187:*24*  188:*3,*
*7*  189:*17*
194:*3*  200:*11*
202:*23*
205:*14*
213:*10, 15*
214:*11*  219:*6*
220:*17*  223:*6*
225:*12, 24*
226:*19*
227:*21*  228:*1*
233:*7, 11*
236:*13*
237:*23*  238:*2*
**right-hand**
204:*12*  223:*24*
**risk**  13:*18*
14:*14, 22*
16:*10*  37:*5,*
*11*  43:*20, 23*
57:*22*  64:*15,*
*19*  92:*16, 19*
95:*11, 13, 14*
159:*15*
162:*11*  170:*9,*
*13, 16, 17, 21,*
*23, 24*  171:*2,*
*5, 12, 13, 17, 19,*
*23*  172:*4*
**risks**  37:*9*
169:*20*  171:*4*
172:*6*
**risky**  171:*8*
**Rite**  4:*8*
228:*5*
**RMR**  240:*22*
**road**  211:*23*
**ROBERT**  1:*5*
**role**  55:*23*
73:*2*  100:*11*
122:*4*  126:*15*
**Roman**  38:*17,*
*22*  39:*1, 19,*
*24*  40:*5, 6*
41:*4*  139:*14*
181:*10*  236:*17*

**romanette**
138:*8*  140:*5*
**Ron**  17:*1*
**room**  7:*17*
233:*20, 22, 24*
234:*1*
**ROONEY**
4:*11*
**rooted**  151:*22*
154:*13*
**roughly**  44:*9*
**routinely**
82:*16*
**RUBEN**  2:*5*
7:*6*  11:*14, 16*
18:*18*  25:*9*
28:*7*  30:*6, 13*
75:*22*  76:*9*
123:*7*  124:*4*
155:*9*  181:*3*
195:*22, 23*
200:*16*  208:*6*
218:*5*  221:*6, 9*
**ruben@honikla**
**w.com**  2:*6*
**Rule**  152:*8, 23*
**Rules**  152:*9*
187:*7*
**rulings**  35:*5, 6*
**run**  98:*2*

**< S >**
**S.LI**  204:*21*
**SA**  3:*8*
**safety**  13:*19*
14:*15, 22*
186:*7*  187:*10*
**sagoldberg@du**
**anemorris.com**
2:*19*
**sale**  127:*10*
**sales**  82:*2, 8,*
*17, 18*  189:*2*
191:*10, 13, 17*
192:*7*
**satisfied**  10:*1*
**save**  169:*11*
**saw**  146:*8*
**saying**  11:*7*
52:*8*  105:*1*
136:*15*

162:*18*
186:*18*  192:*4*
207:*4*  214:*2*
215:*16, 19*
**says**  13:*17, 21*
21:*20*  29:*9*
37:*20*  126:*1*
130:*13*
133:*14*  137:*6*
138:*19*
140:*13*
173:*22*
179:*14*
198:*23*
204:*16*  223:*9,*
*23*  224:*1*
225:*21*
**scan**  222:*5*
**scenario**
35:*20*  57:*4*
73:*22*  79:*16*
86:*8, 9*  92:*4,*
*10*  102:*2, 8*
113:*13*  132:*5*
151:*2*  168:*23*
169:*2, 4*
193:*20*
194:*18*  196:*1*
**scenarios**
36:*10*  80:*14*
169:*22*  171:*5*
**scholarly**
232:*7*
**sciences**  145:*8,*
*22*
**SciGen**  4:*3*
**scope**  17:*5*
24:*10*
**screen**  184:*1*
200:*17*  201:*1,*
*4*  218:*8*
222:*18*
**Scripts**  3:*14*
**scroll**  220:*5*
**second**  9:*2*
11:*13, 17*
30:*14, 17*
87:*11, 13*
125:*23*  127:*5*
167:*4*  193:*24*
197:*14*  204:*7,*

*8, 10*  219:*13*
223:*24*
**Section**  5:*13*
10:*24*  24:*22*
38:*6, 17, 22*
39:*4*  40:*6, 11,*
*15*  41:*4, 8*
42:*9*  139:*14,*
*18*  170:*11*
172:*18, 23*
173:*5*  174:*20*
181:*9, 18*
221:*21*  236:*17*
**sections**  40:*7*
**see**  12:*1, 6, 11*
13:*8, 11*
14:*17*  17:*22*
18:*9*  22:*10*
29:*24*  31:*2*
44:*7, 23*
59:*18*  80:*21*
103:*18*
124:*17*  127:*5,*
*7*  129:*4*
139:*19*  147:*2*
171:*6*  173:*8,*
*10, 11, 17, 22*
174:*1*  175:*9*
179:*4, 11, 12*
181:*18*  189:*1*
199:*24*  201:*3,*
*7, 10*  202:*7*
204:*2, 15, 22*
208:*2, 4, 14*
209:*2*  217:*19*
218:*19*  219:*1*
220:*15*
222:*24*  223:*3,*
*9, 19*  224:*1, 8,*
*9*  225:*21*
**seek**  150:*9*
**seeking**  176:*8*
**seen**  41:*20*
49:*1*  124:*22*
125:*1*  144:*3,*
*5*  172:*7*
173:*7*  174:*11,*
*15*  191:*10, 16*
192:*5, 11, 12*
202:*3, 10, 15*

214:6  232:1,
6  235:19
**select**  44:19
168:21
**selected**  45:16,
19
**sell**  76:12
149:18  151:18
**selling**  126:5
**send**  218:13
221:24
**sense**  27:16
29:1  70:14
106:19
111:14
114:12  116:3
155:8  219:6
**sent**  123:6
**sentence**  13:9,
17, 20  14:11,
24  59:15
60:11, 15
61:20  68:15
113:4  118:18
125:24  129:4
153:15, 23
155:18
**separate**  94:9
139:4  206:2
209:18
**separated**
96:12
**separately**
158:5  218:13
**September**
198:7  205:19
**serve**  33:14
**service**  205:19
**Services**  6:4
204:19  207:9
210:22  212:4
**set**  53:13
74:9  84:6
85:10  126:19
139:22
146:16
173:20
174:13, 20
182:23
185:15
198:20

215:21  236:3
240:11, 18
**SETH**  2:17
7:20  12:7
187:21
220:18  233:16
**sets**  42:19, 21
**setting**  237:15
**seven**  220:18
**shape**  67:4
**share**  166:20
167:2  184:1
201:1  214:22
218:8
**shares**  215:2
**shed**  46:1, 23
50:4, 9, 12
**shift**  101:23
**shorthand**
87:6  156:9
207:17, 18
**show**  81:7
180:24  189:9
**shown**  51:9
222:8
**shred**  172:7
**side**  8:8
68:24  77:24
93:5  122:11
**significant**
142:4  143:11
**similar**
144:13
169:16  199:2
**simple**  163:18
177:4  199:21
**simplest**  90:11
**simplistic**
230:8  236:3
**simply**  12:18
19:8  26:20
73:14  156:8
211:16  229:22
**single**  167:5
172:7  212:16
**sit**  18:10
21:12  26:13
32:8  48:15
166:18  167:2,
22  192:10

225:18
**situated**  65:19
**situation**
100:13, 14
103:13
110:12
111:22, 24
**situations**
53:12  164:22,
23
**six**  13:8
80:20, 24
220:18
**six-month-
earlier**  81:1
**slower**  204:4
**slowly**  137:21
**Solco**  2:15
**sold**  75:7
76:21  78:15
127:12  141:4
165:8  166:4
169:24  170:2
230:23
231:10, 12
232:18
**sole**  199:5
**somebody**
47:23  67:15
88:11  122:11
151:23
183:10, 21
**someplace**
29:23
**somewhat**
99:3
**soon**  181:7
**sorry**  11:6
31:1  33:23
54:8  55:9
56:8, 16  67:3
92:10  97:16
98:16  101:11
114:10
136:14  143:6
155:12
160:23
162:18
189:23
205:15  206:5

208:17  223:8
233:5
**sort**  12:3
80:7  102:2
203:17  213:8
**sorts**  101:5
**sought**  234:10
**sounds**  48:21
61:16  174:14
219:18
**source**  98:1
192:9
**sources**  81:23
82:7  98:7, 8,
10, 13
**South**  2:16
3:9
**speak**  8:19
101:20
**speaker**  8:21
**speaking**  8:24
41:8  58:22
101:24  111:4
119:8  156:12
177:23
**specialize**
145:5
**specific**  18:6,
11  22:13, 23
24:20  25:12
26:4, 14  29:7
42:6  46:20
89:13  95:10
125:10
126:15
135:16
223:20
235:24  236:1
**specifically**
11:3  18:2
19:2  38:16
61:21  78:2
82:12  136:1
152:15, 17
178:2  198:20
202:22  228:22
**specificity**
31:22
**specifics**  214:4

**Speculation**
122:2  132:2
203:11
**Speculative**
81:17
**spend**  14:6
**spending**  74:5,
6
**spent**  135:12
206:1
**split**  167:4
**spoke**  66:19
83:7  113:23
**ss**  239:3
240:3
**St**  3:15
**staff**  210:4
**stage**  27:20
29:20  70:6
104:20
**stalling**  221:1
**Stand**  201:2
218:10
**standard**
29:16
**standpoint**
46:6  58:23
69:21  75:15,
19  84:8  86:4
88:7  113:16
116:16
119:15
146:16
149:22
162:24
189:13, 15
195:17  231:14
**STANOCH**
2:10  200:22
201:2  218:10
222:8
**start**  100:18
103:20
113:14  232:18
**started**
100:21  136:14
**starting**
100:22, 24
102:1  103:8,
9, 11, 14, 21
108:16

Confidential Information Subject to Protective Order

110:*23*
115:*19*
137:*21*
140:*16*
186:*18* 193:*3*
**starts** 26:*11*
65:*16* 94:*12*
181:*10*
**State** 1:*16*
4:*4* 6:*22*
239:*3* 240:*3, 8*
**stated** 162:*20*
**statement**
42:*13* 161:*10*
162:*19* 166:*3*
168:*9, 12*
174:*11, 14*
220:*7*
**statements**
44:*14* 118:*19*
180:*1, 20*
183:*17*
**STATES** 1:*1*
6:*11* 75:*10*
77:*11* 150:*9,*
*10, 11, 21*
172:*18* 173:*5*
175:*17* 184:*12*
**stating** 166:*12*
167:*23*
**statutory** 30:*2*
64:*1, 3*
**stay** 206:*15*
**stem** 159:*16*
**stenographic**
6:*16*
**step** 94:*1, 2*
109:*23* 111:*3*
**stick** 107:*12*
**stickers**
123:*23*
**STIROH** 1:*11*
5:*2, 10* 6:*14,*
*19* 7:*2* 9:*16,*
*17, 18* 10:*11*
11:*21* 12:*8,*
*14* 21:*16, 18*
30:*12, 24*
55:*17* 63:*11*
76:*10* 77:*21*
85:*21* 86:*20*

93:*10* 107:*7*
114:*19*
116:*15*
120:*18* 124:*2,*
*13* 125:*19*
130:*23*
131:*19*
133:*12* 135:*3,*
*11* 137:*15, 24*
141:*10, 18*
151:*24*
152:*21*
161:*15* 165:*6*
171:*9* 172:*24*
173:*2, 4*
176:*23* 181:*3,*
*16* 185:*12*
186:*3* 188:*10,*
*15, 18* 194:*24*
197:*6, 8*
198:*16* 201:*4*
206:*8* 207:*9,*
*16* 209:*15*
210:*22* 212:*4*
218:*3, 19, 21*
219:*17*
222:*15* 224:*4,*
*21* 228:*4*
232:*22* 234:*6*
237:*24* 239:*6,*
*15*
**Stiroh's**
209:*10* 221:*4*
**stop** 109:*5*
137:*13* 165:*1*
181:*7*
**storage** 234:*13*
**storing** 231:*4*
**stream** 76:*24*
**Street** 2:*4, 9,*
*16, 21* 4:*4, 9,*
*13*
**strikes** 44:*16*
**structures**
140:*23*
**study** 172:*2*
**Subchapter**
173:*15*
**SUBJECT**
1:*9* 14:*15*
15:*24* 20:*13*

21:*10* 23:*4*
61:*21* 114:*21*
157:*1* 163:*8*
166:*24* 167:*3*
**subjects** 49:*21,*
*23*
**Subscribed**
239:*16*
**subsequent**
203:*3*
**subspecialty**
33:*21*
**substitutes**
39:*2*
**subtract**
229:*18* 235:*7*
**subtracted**
203:*16*
**subtracting**
229:*23*
**succinctly**
97:*12*
**suffer** 91:*3*
93:*19*
**suffered** 52:*17*
**Suffice** 174:*18*
180:*14*
**sufficient**
135:*20* 155:*1*
175:*14*
**sufficiently**
144:*13*
**suggested**
45:*14*
**suggests**
216:*23*
**Suite** 2:*4, 21*
3:*9* 4:*13, 18*
**sum** 73:*17, 21,*
*23* 134:*6*
**summarized**
236:*17*
**Summary**
5:*16* 39:*22*
140:*4* 197:*1,*
*8* 199:*20*
200:*17* 201:*4*
220:*2*
**summation**
134:*11*

**summed**
229:*15*
**superficial**
140:*12*
**supplemented**
82:*1* 227:*14*
**supplied**
189:*14*
192:*22, 24*
**supplier** 183:*2*
**suppliers**
189:*15*
190:*10* 192:*23*
**supplies** 194:*2*
**supply** 37:*20*
38:*12* 40:*2, 9,*
*13, 16, 17, 22*
41:*2, 6* 58:*4*
75:*8* 83:*23*
89:*16* 91:*6*
92:*1, 2* 98:*1,*
*7, 8, 10, 14*
100:*8* 117:*7*
118:*1* 119:*1*
140:*22*
146:*17, 23*
147:*15, 21*
148:*9, 12*
149:*10, 15, 23,*
*24* 150:*13, 15*
176:*4, 9, 13,*
*17* 177:*7, 13,*
*15, 18, 20*
178:*5, 10, 19*
179:*2* 182:*5,*
*8* 183:*4*
184:*10, 19*
185:*1, 2, 4, 8,*
*14, 21, 23*
188:*24* 189:*7,*
*22, 24* 190:*6,*
*11, 19* 191:*4,*
*6, 20, 24*
192:*15, 16, 17,*
*19, 20, 21*
193:*5, 9, 14,*
*16, 20* 194:*18*
195:*6, 8*
196:*2, 12*
214:*21* 235:*16*

**supply-and-**
**demand**
185:*17, 19*
188:*21*
**support**
161:*17*
169:*13* 209:*6,*
*24* 210:*7*
213:*17* 224:*5*
**supporting**
66:*1* 209:*18*
**supposed**
213:*8*
**sure** 8:*18*
13:*15* 38:*23*
55:*18* 82:*11*
85:*16* 97:*17,*
*20* 108:*3*
116:*1* 118:*17*
120:*11* 124:*6*
146:*13*
149:*16* 152:*8*
163:*14*
186:*17* 199:*4*
201:*7* 219:*11*
**surplus** 86:*5*
95:*2*
**surprise** 60:*6*
182:*21*
**surrounding**
160:*15*
**swear** 6:*18*
**switch** 41:*19,*
*24*
**switched**
41:*21* 89:*18*
91:*11*
**sworn** 6:*21*
135:*5* 184:*5*
239:*16* 240:*11*
**synonymous**
58:*17* 60:*1, 2*
142:*1* 143:*10*

**< T >**
**Tab** 123:*19*
172:*18* 217:*21*
**Tabs** 196:*21*
**tactic** 221:*1*
**take** 7:*14*
8:*21* 11:*11*

15:17  16:2
17:24  19:23
24:3  26:6
36:21, 24
37:3  41:17
42:1, 24  54:7,
8  62:10  63:2,
4  69:5  76:1,
2, 4  85:8
98:20  101:19
109:8  110:13
111:18  118:6,
13  123:5, 13,
19, 22  128:4
130:8  133:22
142:16
146:14
171:24
177:14
178:18  181:5
186:21, 23
187:22  194:1
212:21
219:13
220:19  222:2,
5  227:16
233:4  237:5
**taken**  24:13,
16  25:19
44:15  64:2, 3
65:21  77:17
111:21
150:14  188:5
194:11
227:23  233:9
239:7
**takes**  62:16
128:3  130:5
142:9  153:3
**talk**  14:8
32:15  87:13
112:22
159:17
169:16  206:8,
12  234:2
**talked**  83:11
135:18  164:1
**talking**  107:7,
8  110:19
135:12
146:21  177:3

188:18  191:1,
2  195:23
208:6, 9  235:7
**tasks**  210:8
**tautology**
44:16
**team**  19:14
147:7  155:24
156:3  158:15
202:4  206:1
210:9
**technical**  8:13
**technology**
55:11
**tell**  12:7
14:19  18:16,
21  20:16
22:6  24:19
31:21  49:20
58:20  72:17
73:16, 19
74:4, 19
82:13  85:10
89:13  94:1
96:2, 7  97:12
104:21  110:5
132:21  133:1
169:1  180:24
184:21  192:9
202:17
214:15  223:5
226:5
**telling**  59:7
63:9  114:22
136:3  217:16
225:15
**tells**  133:21
151:7
**ten**  186:24
187:23
207:22  227:20
**tendering**  49:4
**term**  42:6
63:18  157:3,
7  158:13
191:24
**terms**  34:8
58:17  69:23
90:11  112:2
**testified**  6:23
73:6  135:6

212:8, 12
217:1
**testify**  205:12
215:10  216:2
217:13
222:22  226:9
227:7
**testifying**
146:6  205:22
210:24  212:5
**testimony**
7:13  8:6
13:3  14:1
15:24  16:7
35:18  39:18
51:7  52:14
55:24  62:22
73:1, 10
95:22  108:18
111:12
112:14
122:24  125:4
128:12  131:5
133:3  136:6
162:15
163:10  167:1
182:11, 13
183:10, 23
184:5  203:4
214:12
215:18
216:18  217:6
239:7  240:13
**Teva**  3:8
**textbook**  232:7
**thank**  11:2
21:24  30:24
77:22  83:6
187:19  188:2
218:11
232:21, 24
237:20, 24
238:1
**Thanks**  181:8
**theories**  46:2,
14, 15  83:8,
21  84:7  85:3,
7, 12, 15, 22
135:16  157:20
**theory**  38:20
53:11  61:15,

18  69:22
85:11  118:5
139:16
146:20  232:16
**therapeutic**
57:20  68:15,
18  142:1, 4, 9,
10, 18, 20
143:9, 17, 20
144:9, 24
162:10
228:10, 21
230:2
**therapy**  41:9
**thereof**
173:23  179:9,
15
**thereto**  35:14
**thesis**  152:2
**thing**  107:24
124:10
181:19  236:3
**things**  7:15
11:4, 12
12:20, 22
13:13  14:3, 7,
9  34:4, 19, 24
41:22  45:23
52:5  53:8
57:24  59:21
63:2, 4  69:10,
22  78:3, 20
92:24  93:8
105:4  106:15
112:22  113:6
135:23
170:15  195:3
210:6
**think**  8:4
10:6  21:21
22:10  23:17
24:1  25:15,
17, 23  26:13
29:5  31:4, 21
37:23  38:20
39:19  40:22
42:12  43:18
48:16  49:24
50:23  59:10
60:3  62:18
64:5  65:13

71:24  74:17,
18  84:1  88:2
90:21, 24
94:5  95:1, 2
101:12  102:6
103:13
104:22  105:1
106:1, 2
108:9  112:9
128:14
131:15  133:5
137:14
142:23
145:15  147:4,
10  149:16
161:7, 12, 13
166:11  167:4,
19  174:13, 21
178:6  180:11
181:7  182:15
186:15  189:4
191:24
192:18  193:2
196:18  201:9,
13, 17  203:12
204:6  206:15
208:18, 19
214:18
216:11  219:4
220:24  222:4
225:13
229:20
230:16, 22
231:5  234:19
235:15  236:5,
20  237:3
**thinking**  231:9
**thinks**  138:23
230:14, 15
236:24
**third**  179:5
**third-party**
153:9

**THORNBURG**
4:6
**thought**
136:14
155:15
205:14  217:1

Confidential Information Subject to Protective Order

230:*11*

**three** 105:*24*
**tied** 105:*7*
**TIFFANY**
3:*10*
**tile** 124:*5*
**time** 6:*6* 8:*21*
10:*15* 14:*6*
15:*4* 22:*10*
23:*2* 30:*19,*
*22* 54:*22*
55:*3* 64:*23*
65:*9* 77:*12,*
*15, 19* 105:*5*
123:*15*
134:*13, 15*
135:*8, 12*
141:*3* 177:*23*
187:*20, 24*
188:*3, 7*
201:*20* 206:*1*
207:*24* 208:*3,*
*8, 12* 209:*2*
214:*10* 217:*9*
220:*19* 221:*1*
222:*2* 227:*21*
228:*1* 233:*7,*
*11, 22* 238:*2, 4*
**timeframe**
65:*4, 19* 69:*6*
80:*16* 93:*1*
**timeframes**
66:*23*
**times** 153:*15*
162:*8*
**title** 49:*7* 50:*1*
**titles** 49:*19*
**tobacco** 174:*6*
179:*7*
**today** 6:*13, 17*
8:*6, 8* 10:*13*
51:*7* 55:*4, 5*
132:*22*
166:*18* 167:*2*
203:*5*
**Today's** 6:*5*
197:*23*
**told** 25:*14, 15*
35:*10* 48:*1*
55:*5* 56:*3*
76:*22* 96:*6*

108:*5, 11*
111:*2* 114:*1*
117:*1* 118:*12*
131:*17* 133:*4*
134:*6, 8*
135:*24*
183:*13* 195:*4*
219:*19*
221:*16* 226:*24*
**top** 173:*8*
**topic** 186:*20*
**topics** 55:*2*
96:*12* 121:*7*
**total** 72:*8*
200:*8* 202:*24*
203:*9, 12*
**totaled** 203:*14*
**totality** 180:*1*
**totally** 100:*16*
**TPPs** 65:*16*
67:*9* 71:*19*
72:*16*
**trace** 235:*21*
**tracing** 235:*15*
**trade** 148:*17*
175:*5* 178:*14*
184:*12*
**train** 155:*15*
**training** 46:*11*
47:*10* 52:*19*
53:*9* 120:*6*
127:*21* 129:*19*
**transaction**
67:*23*
**transactions**
80:*18* 148:*20*
**Transcript**
5:*13* 188:*14*
229:*6, 11*
230:*4* 239:*7,*
*9* 240:*12*
**transcription**
8:*5* 188:*11*
**translate**
143:*2, 22*
**translated**
143:*13*
**translates**
143:*13*
**TRAURIG** 3:*6*

**treat** 165:*23*
**treated** 26:*18*
**treating** 145:*3,*
*11, 13*
**trial** 215:*3*
224:*19*
**tried** 137:*10*
**trouble** 137:*8*
**true** 10:*2*
24:*4, 7* 35:*22*
36:*3, 6, 16*
47:*23* 71:*4*
76:*17* 93:*19*
102:*15*
108:*10* 109:*7*
125:*1, 5, 7*
156:*19*
166:*13, 16*
195:*4* 196:*11*
202:*12*
211:*19* 215:*6*
239:*9, 12*
240:*12*
**try** 31:*4* 78:*9*
86:*23* 101:*6*
190:*24* 204:*6*
207:*17*
**trying** 12:*18*
26:*20* 30:*11*
49:*15* 62:*2*
221:*3*
**turn** 10:*24*
13:*6* 17:*18*
79:*14, 16*
121:*19*
125:*17* 127:*2*
149:*24*
203:*19*
207:*16* 219:*7*
**turned** 63:*12*
197:*17* 227:*1*
**turning** 92:*5*
**turns** 164:*2*
**two** 13:*23*
59:*20, 24*
76:*6* 82:*7*
86:*13* 87:*11*
89:*7, 21* 90:*1*
94:*9* 95:*19,*
*24* 96:*12*
105:*10, 12*

112:*2, 22, 23*
119:*3* 135:*13*
158:*3* 180:*1*
181:*5* 213:*6*
233:*4, 6*
**two-minute**
233:*5*
**type** 85:*4*
102:*9* 150:*20*
**types** 47:*11*
145:*12*
169:*16*
170:*15* 231:*1*
**typically**
27:*21* 29:*16*
47:*12* 52:*21,*
*24* 53:*2* 73:*2*
78:*9* 110:*24*
202:*2* 231:*1*
232:*17*

**< U >**
**U.S** 2:*15*
58:*4* 75:*8, 17*
76:*12, 13*
148:*7, 10*
176:*2, 14*
178:*13* 180:*3*
**Uh-huh** 214:*6*
**ultimate**
224:*15, 17*
**ultimately**
27:*17* 28:*2*
141:*6*
**unable** 122:*21*
**uncontaminate**
**d** 165:*9, 15*
168:*20*
**underlie** 85:*3*
**underlying**
71:*11* 85:*14*
**underneath**
173:*14*
**understand**
8:*11* 14:*7*
23:*16* 25:*19*
26:*10, 20*
31:*6* 36:*17,*
*21* 37:*1, 19*
38:*1* 40:*19*
45:*6* 46:*13,*

*19* 49:*13*
53:*15* 57:*23*
59:*7* 62:*3*
64:*13, 18*
67:*8, 11, 16*
72:*22* 74:*2, 5*
78:*2* 79:*14*
80:*9* 81:*10*
84:*7* 88:*15,*
*17* 93:*12*
94:*21* 99:*2*
100:*16*
101:*18* 104:*8*
105:*23*
116:*16*
117:*10, 12*
120:*19*
130:*15, 17*
138:*11*
147:*18*
149:*21*
154:*10* 155:*6*
157:*7, 12, 16*
158:*2* 161:*7*
166:*22*
175:*14*
179:*16* 180:*4*
189:*20* 192:*2*
196:*17, 18*
206:*6* 215:*5,*
*21* 229:*15*
237:*7*
**understanding**
16:*5* 17:*4*
22:*17* 23:*3*
25:*10* 26:*17*
27:*18* 32:*21*
34:*16* 37:*3*
41:*15, 24*
42:*8* 57:*9*
63:*1, 7, 13*
65:*15* 66:*15*
67:*19* 68:*2*
77:*24* 78:*20*
93:*8* 94:*20*
106:*14* 138:*6*
139:*18*
149:*19*
154:*24*
155:*21* 156:*6,*
*21* 157:*9, 11,*

*19* 160:*10, 22*
171:*18*  176:*7*
177:*17*
179:*22, 24*
181:*12*  185:*5*
203:*16*  206:*4*
214:*24*  217:*4,*
*7*  228:*12, 18*
229:*11, 21*
234:*24*  236:*2*
**understood**
8:*10*  26:*18*
36:*1*  52:*7*
87:*6*  89:*7*
95:*18*  98:*18*
101:*2*  118:*6*
130:*12*  155:*4*
161:*14*
166:*16*
203:*18*  215:*22*
**undertake**
161:*23*  210:*18*
**undertaken**
131:*7*
**unfolded**
102:*9*
**uniformly**
130:*10*  167:*15*
**unique**  70:*21*
219:*23*
**UNITED**  1:*1*
6:*11*  75:*10*
77:*11*  150:*9,*
*10, 11, 21*
172:*18*  173:*5*
175:*17*  184:*12*
**unjust**  138:*2,*
*7, 11, 14, 16, 20*
139:*3, 5, 8, 11,*
*17, 18, 21*
140:*6, 15*
228:*7, 11, 12,*
*15, 23*  229:*7,*
*12*  230:*12*
234:*9*  235:*14,*
*23*  236:*7, 19*
237:*6, 8, 9, 14,*
*18*
**unlawful**
151:*10*
**unpack**  15:*21*

**unpacking**
14:*6*
**unrelated**
67:*5, 22*  68:*3*
78:*1*
**unreliable**
215:*14*  226:*8,*
*11, 12, 14, 19,*
*22*  227:*3*
**unstable**  21:*20*
**upper**  204:*12*
**upstream**
88:*11*
**USCA**  5:*13*
172:*23*
174:*20*  180:*15*
**use**  23:*13*
34:*19*  58:*10,*
*21, 23*  60:*12*
61:*13*  88:*2, 3*
106:*18*
109:*15*
115:*15*  118:*8*
154:*16, 19*
192:*3*  209:*23*
231:*22*
**usually**  108:*15*

**< V >**
**Vague**  22:*21*
23:*11*  27:*2*
31:*14*  34:*22*
57:*2*  61:*8*
64:*10*  144:*11*
237:*11*
**valid**  27:*8*
119:*18*
130:*20*  196:*4*
**VALSARTAN**
1:*3*  6:*9*
51:*19*  89:*16,*
*17*  90:*3, 8*
91:*4, 6, 9, 14,*
*18*  92:*2, 12,*
*17*  93:*4, 6*
104:*10*  118:*2*
142:*17, 19*
165:*9, 12, 15*
166:*1, 22*
168:*7*  193:*9*

**Valsartan-**
**containing**
36:*20*  119:*2*
120:*1*  166:*17*
172:*11*
178:*10*  185:*9,*
*22, 24*  193:*17,*
*21*  194:*19*
196:*3*
**valuation**
15:*15*  59:*3*
92:*23*  176:*17*
**value**  24:*4*
43:*11, 12, 17*
57:*14*  68:*10,*
*11, 12, 14, 16,*
*18, 21, 23*
69:*15, 16, 17,*
*18, 22*  70:*2,*
*11, 12, 17, 20*
71:*1, 9, 21, 22*
72:*15*  73:*17*
74:*13, 21, 23*
75:*16, 21*
76:*18*  77:*3, 5*
86:*1, 3*  87:*2*
89:*5*  92:*6, 8,*
*11, 15, 22*
94:*12, 16, 23*
95:*6, 19, 24*
96:*4, 10, 15,*
*16, 20*  97:*10*
106:*21, 23*
107:*2*  110:*1,*
*3, 10*  111:*9*
116:*20*  117:*8*
119:*6, 19*
122:*22*  123:*2,*
*4*  127:*24*
131:*1, 23*
132:*12, 17*
135:*15*
142:*18, 21*
143:*4, 8*
144:*9, 10, 15,*
*23*  146:*22*
150:*23*  151:*4,*
*8, 12, 14, 22*
162:*10*
163:*17*  164:*5*
171:*12*

176:*15, 16*
178:*21*  179:*2*
185:*10*  186:*1*
190:*3*  228:*10*
**valued**  143:*16*
144:*16, 17*
**values**  69:*12*
71:*6*  74:*24*
145:*9*
**variable**
101:*7*  111:*6*
164:*16*
**variables**  63:*5*
99:*17, 22*
100:*7, 10*
138:*22*  164:*14*
**variation**
37:*13*  112:*23*
**variety**  81:*22*
147:*20*  231:*6*
**various**  17:*3*
20:*19*  38:*15,*
*19*  56:*14*
78:*16*  83:*21*
85:*7*  100:*7*
114:*21*  122:*4*
145:*1*  148:*5*
152:*18*
162:*11*  199:*22*
**vary**  81:*1*
113:*21*  115:*2,*
*5, 12, 21*
132:*18*
**VCD**  39:*2*
93:*15*  164:*18*
168:*18, 19*
169:*3, 5, 6*
194:*2*
**VCDs**  14:*16*
15:*3, 8, 23*
38:*8*  39:*2*
40:*3, 10, 13,*
*16, 18, 21*
41:*3, 6, 16*
43:*13*  56:*3,*
*11, 21*  64:*14*
104:*1*  110:*17*
127:*12*
131:*21*
158:*18*  159:*6*
160:*4, 18*

161:*2*  164:*13*
177:*16*
181:*15*  185:*6*
191:*11, 20*
196:*10*  210:*19*
**vegetables**
169:*24*  170:*1*
**venture**
132:*23*
**verify**  124:*18*
**versus**  58:*16*
69:*8*  212:*24*
217:*22*  218:*18*
**vertical**  191:*5*
**vetted**  226:*23*
**vetting**  215:*20*
**VHP's**  178:*11*
**viability**  50:*19*
**video**  6:*7*  8:*5*
**Videographer**
4:*23*  6:*1, 3*
11:*23*  30:*19,*
*22*  77:*15, 19*
134:*15*  135:*8*
187:*24*  188:*3,*
*7*  227:*21*
228:*1*  233:*7,*
*11*  238:*2*
**videography**
7:*19*
**Videotaped**
1:*11*
**view**  54:*18*
116:*19*
118:*22*  132:*8*
140:*12*
150:*13*  232:*15*
**viewed**  162:*12*
**views**  50:*22*
52:*12*  53:*4, 5,*
*6, 16*  152:*1*
**virtually**
224:*18*
**virtue**  127:*11*
**Vitamin**  41:*22*

**< W >**
**Wacker**  3:*9*
**Wait**  105:*21*
197:*14*

Confidential Information Subject to Protective Order

**WALLACK**
4:*17*
**want** 7:*14*
14:*6* 31:*4*
38:*23* 72:*6,*
*13* 73:*3, 4, 5,*
*7* 77:*23*
78:*17, 19*
80:*9* 88:*20*
89:*6* 93:*12,*
*14* 107:*12, 23*
123:*22* 124:*5*
125:*17* 143:*8*
151:*13* 168:*2,*
*4* 188:*22*
189:*20*
203:*21* 204:*5*
205:*9* 207:*6*
219:*17* 220:*5,*
*20, 22* 221:*2,*
*22* 222:*11*
227:*16* 228:*22*
**wanted** 45:*20*
222:*4, 14, 15*
**wanting**
151:*23*
**wants** 151:*14*
**warranties**
84:*13, 15*
**Warranty**
5:*10* 30:*2*
32:*1* 85:*1*
124:*8, 12, 20*
126:*8, 19*
136:*2, 9, 17,*
*20* 137:*5, 7*
**warranty-**
**based** 84:*19*
**Washington**
2:*22* 3:*4* 4:*14*
**waste** 221:*1*
**watching**
200:*19*
**way** 24:*16*
32:*8* 34:*5*
50:*24* 56:*10,*
*20* 64:*12*
67:*4* 71:*20*
78:*1* 84:*14*
96:*3* 98:*23*
99:*20* 110:*7*

114:*13, 15*
118:*7* 133:*5*
140:*17* 143:*1*
153:*5* 156:*4,*
*9* 164:*3*
166:*15*
169:*10*
188:*23*
192:*15* 204:*6*
207:*18* 234:*8*
236:*13* 240:*16*
**ways** 32:*10*
112:*10, 15*
114:*23*
139:*22* 193:*1*
**weekly** 69:*6*
**weigh** 157:*23*
**weight** 23:*6*
25:*12* 50:*22*
58:*1* 64:*21*
93:*8* 174:*19,*
*22*
**welfare** 70:*16,*
*20* 71:*10*
75:*3* 95:*3, 5*
96:*21, 22*
**well** 9:*5, 14,*
*23* 10:*16*
11:*4* 12:*21*
17:*18* 21:*16*
26:*16* 29:*22*
38:*22* 42:*16*
49:*2* 56:*18*
62:*11* 65:*24*
68:*4* 71:*19*
82:*9, 17*
86:*12* 110:*5*
122:*17*
151:*24*
152:*15*
157:*12*
163:*23*
165:*23*
166:*15* 168:*2*
174:*16*
183:*24*
196:*19*
205:*16* 206:*7,*
*14* 208:*2*
216:*7, 8*
217:*1, 19*

219:*19, 21*
220:*8, 16*
226:*10*
**well-developed**
63:*13*
**went** 131:*2*
155:*18*
**we're** 9:*15*
10:*2* 11:*17*
12:*15* 13:*7*
88:*18* 89:*9*
107:*7, 8*
110:*5, 19*
124:*2* 146:*21*
188:*12*
196:*23* 208:*5*
221:*5, 6, 9*
227:*10*
**we've** 61:*12*
76:*2* 110:*6*
164:*1* 182:*6*
**whatsoever**
23:*7*
**WHEREOF**
240:*18*
**WHITELEY**
2:*8, 10*
**wholesaler**
139:*16*
140:*24* 141:*6*
**wholesalers**
228:*9*
**wholly** 131:*6*
**wide** 231:*6*
**widely** 105:*18*
**William** 5:*15*
188:*14*
**willing** 190:*10*
192:*24* 227:*7*
**willingness**
95:*14* 185:*2*
**withdrawal**
224:*3*
**withdrawn**
37:*2* 215:*6, 7*
**withdrew**
215:*11*
**withheld**
227:*13*
**WITNESS**
5:*22* 6:*18, 20*

10:*6, 9* 56:*16*
101:*11*
105:*22*
115:*10*
155:*12*
160:*21*
184:*13*
186:*22*
195:*23*
205:*11, 23*
211:*22* 212:*6*
219:*10* 220:*4*
224:*3* 227:*10*
232:*24* 238:*1*
240:*10, 13, 18*
**word** 60:*10*
101:*13, 22*
146:*14*
204:*21* 214:*2*
**words** 30:*1*
42:*24* 55:*11*
71:*16* 111:*5*
112:*22* 127:*6*
133:*18* 154:*1*
175:*9, 22*
180:*13* 189:*18*
**work** 35:*1*
47:*4* 53:*17,*
*21* 122:*22*
131:*7* 136:*11,*
*12* 137:*3, 5*
149:*2* 155:*22,*
*23* 156:*2*
158:*10*
197:*20* 198:*9,*
*15* 199:*2*
200:*9, 14*
201:*23* 202:*4,*
*18* 203:*13*
206:*16, 20*
207:*1* 209:*5,*
*11, 20, 24*
210:*3, 7, 12*
214:*12* 224:*15*
**worked** 63:*23*
79:*17* 80:*12*
81:*5, 13, 24*
99:*23* 100:*3*
144:*12* 145:*7*
178:*24* 237:*13*

**working** 78:*5*
145:*21* 216:*1*
217:*13*
**works** 93:*13*
147:*21*
**world** 34:*7, 8*
80:*4* 99:*12*
101:*5* 111:*7,*
*23* 112:*3, 5,*
*11, 16, 20*
113:*1* 115:*1*
177:*24* 178:*4*
193:*3, 9*
194:*2, 5, 13*
195:*7, 19, 24*
237:*17, 19*
**worth** 8:*4*
133:*24* 142:*2,*
*5* 143:*10*
163:*4* 176:*15,*
*16*
**worthless**
25:*3* 117:*13*
119:*16* 120:*4,*
*9, 21* 121:*18*
127:*10* 128:*9*
130:*11, 14, 18,*
*24* 131:*21*
163:*15*
170:*17* 177:*21*
**worthlessness**
119:*6* 163:*3*
170:*21* 176:*12*
**would-be**
213:*5*
**wrap** 221:*3*
**write** 59:*14*
132:*22* 153:*7*
**writes** 129:*21*
**writing** 49:*1*
54:*15* 226:*2*
**writings** 46:*1,*
*22* 51:*17*
152:*18, 21*
**written** 29:*14*
49:*24* 51:*10,*
*12, 23* 62:*9*
120:*14*
152:*12, 14, 15,*
*17* 153:*1, 14*

Confidential Information Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| 164:*1*  214:*17*<br>224:*13*<br>**wrong**  185:*13*<br>208:*17*<br>**wrongdoing**<br>24:*13*  27:*17*,<br>22, 24  97:*24*<br>122:*5*<br>**wrongful**  28:*2*<br>99:*18*, *20*<br>**wrote**  48:*21*,<br>23  52:*10*<br>54:*11*  87:*6*<br>96:*3*  112:*2*<br>127:*8*  138:*18*<br>163:*3*  182:*20*<br>224:*18*  229:*4*<br><br>**< Y >**<br>**Yeah**  12:*12*<br>25:*10*  30:*18*<br>44:*16*  46:*19*<br>63:*11*  69:*16*<br>71:*3*  76:*5*<br>81:*10*  88:*15*<br>115:*13*<br>116:*22*  156:*7*<br>163:*1*  190:*1*<br>193:*12*<br>200:*20*<br>220:*10*  222:*1*<br>223:*8*, *23*<br>224:*17*  227:*18*<br>**year**  10:*4*<br>49:*17*  199:*14*<br>200:*10*  210:*1*<br>231:*13*<br>**years**  212:*22*<br>**York**  1:*13*, *14*,<br>16  6:*8*, *23*<br>7:*17*, *22*<br>239:*3*, *4*<br>240:*3*, *4*, *8*<br><br>**< Z >**<br>**ZAPPONE**<br>3:*20*<br>**zero**  75:*21*<br>117:*8*  118:*11*<br>119:*6*  122:*20*<br>131:*1*, *23* | 133:*24*  163:*5*,<br>*17*  164:*5*<br>186:*2*  190:*4*,<br>*5*, *8*  191:*4*, *5*,<br>*14*  192:*19*<br>193:*5*, *9*, *16*,<br>*20*  194:*2*, *6*, *8*<br>195:*8*  196:*12*,<br>*14*, *15*<br>**Zhejiang**  2:*14*<br>**ZHP**  191:*20*<br>**Zoom**  7:*9*<br>200:*19* | | | |

Exhibit212

Confidential Information Subject to Protective Order

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
2                    CAMDEN VICINAGE
                     -   -   -
3

    IN RE:  VALSARTAN,        :   MDL NO. 2875
4   LOSARTAN, AND            :
    IRBESARTAN PRODUCTS      :   CIVIL NO.
5   LIABILITY LITIGATION     :   19-2875
    _____  :   (RBK/JS)
6                             :
    THIS DOCUMENT APPLIES    :   HON. ROBERT
7   TO ALL CASES             :   B. KUGLER
8        - CONFIDENTIAL INFORMATION -
          SUBJECT TO PROTECTIVE ORDER
9
10                    -   -   -
11             March 10, 2022
12                    -   -   -
13
14            Videotaped deposition of
    URSINA R. TEITELBAUM, M.D., taken
15  pursuant to notice, was held via
    in-person at Duane Morris, LLP, 30 South
16  17th Street, Philadelphia, Pennsylvania,
    and also Zoom Videoconference for certain
17  parties, beginning at 9:18 a.m., EST, on
    the above date, before Michelle L. Gray,
18  a Registered Professional Reporter,
    Certified Shorthand Reporter, Certified
19  Realtime Reporter, and Notary Public.
20
                      -   -   -
21
22         GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
23            deps@golkow.com
24

Page 2

```
 1
 2  APPEARANCES:
 3  LIEFF, CABRASER, HEIMANN &
    BERNSTEIN, LLP
 4  BY:  RACHEL GEMAN, ESQ.
    (In person in Philadelphia)
 5  250 Hudson Street, 8th Floor
    New York, New York 10013
 6  (212) 355-9500
 7  Rgeman@lchb.com
 8       - and -
 9  LIEFF, CABRASER, HEIMANN &
    BERNSTEIN, LLP
10  BY:  NICK W. LEE, ESQ.
    (Via Zoom)
11  275 Battery Street, 29th Floor
    San Francisco, California 94111
12  (415) 956-1000
13  Representing the Plaintiffs
14  MIGLIACCIO & RATHOD, LLP
    BY:  NICHOLAS MIGLIACCIO, ESQ.
15  BY:  MARK PATRONELLA, ESQ.
    (Via Zoom)
16  412 H Street NE Suite 302
    Washington, DC 20002
17  (202) 470-3520
    Nmigliaccio@classlawdc.com
18  Representing the Plaintiffs
19
20
21
22
23
24
```

Page 3

```
 1
 2  APPEARANCES:   (Cont'd.)
 3  DUANE MORRIS, LLP
    BY:  ROBERT KUM, ESQ.
 4  (In person in Philadelphia)
 5  865 South Figueroa Street
    Suite 3100
 6  Los Angeles, California 90017
    (213) 689-7424
 7  Rkum@duanemorris.com
    Representing the Defendants, Zhejiang
 8  Huahai Pharmaceutical Co., Ltd., Prinston
    Pharmaceutical Inc., Huahai US, Inc.,
 9  and Solco Healthcare US, LLC
10  GREENBERG TRAURIG, LLP
    BY:  GLENN S. KERNER, ESQ.
11  (In person in Philadelphia)
    One Vanderbilt Avenue
12  New York, New York 10017
    (212) 801-9306
13  Kernerg@gtlaw.com
14       - and -
15  GREENBERG TRAURIG, LLP
    BY:  STEVEN M. HARKINS, ESQ.
16  (Via Zoom)
    Terminus 200
17  3333 Piedmont Road NE
    Suite 2500
18  Atlanta, Georgia 30305
    (678) 553-2312
19  Representing the Defendants, Teva
    Pharmaceutical Industries, Ltd., Teva
20  Pharmaceuticals USA, Inc., Actavis LLC,
    and Actavis Pharma, Inc.
21
22
23
24
```

Page 4

```
 1
 2  APPEARANCES:   (Cont'd.)
 3  PIETRAGALLO GORDON ALFANO BOSICK &
    RASPANTI, LLP
    BY:  JOHN B. ZAPPONE, ESQ.
 4  BY:  JASON M. REEFER, ESQ.
    (Via Zoom)
 5  One Oxford Centre
    38th Floor
 6  Pittsburgh, Pennsylvania 15219
    (412) 263-1840
 7  jbz@pietragallo.com
    jmr@pietragallo.com
 8  Representing the Defendant, Mylan
    Pharmaceuticals, Inc.
 9
10  BARNES & THORNBURG, LLP
    BY:  MITCHELL CHARCHALIS, ESQ.
11  (Via Zoom)
    390 Madison Avenue, 12th Floor
12  New York, New York 10017
    (646) 746-2000
13  Mcharchalis@btlaw.com
14  Representing CVS Pharmacy, Inc., and Rite
15  Aid Corporation
    HILL WALLACK, LLP
16  BY:  WILLIAM P. MURTHA, JR., ESQ.
    (Via Zoom)
17  21 Roszel Road
    Princeton, New Jersey 08543
18  (609) 452-1888
    Wmurtha@hillwallack.com
19  Representing the Defendant, Hetero, USA,
    Inc., Hetero Labs
20
21
22
23
24
```

Page 5

```
 1
 2  APPEARANCES:   (Cont'd.)
 3  ALSO PRESENT:
 4  VIDEOTAPE TECHNICIAN:
 5  Chris Ritona (in person)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 6

```
 1                - - -
 2            I N D E X
 3                - - -
 4
 5   Testimony of:
 6       URSINA R. TEITELBAUM, M.D.
 7     By Ms. Geman        10, 310
 8     By Mr. Kerner         286
 9
10
11                - - -
12            E X H I B I T S
13                - - -
14
15   NO.        DESCRIPTION         PAGE
16   Teitelbaum-1 Amended Notice of   121
                  Deposition
17
     Teitelbaum-2 Invoice        124
18                12/27/21
                  Invoice
19                1/12/22
                  Invoice
20                1/21/22
21   Teitelbaum-3 Defendants'      121
                  Responses and
22                Objections to Plaintiffs'
                  Notice of Videotaped
23                Deposition
24
```

Page 8

```
 1                - - -
 2       DEPOSITION SUPPORT INDEX
 3                - - -
 4
 5   Direction to Witness Not to Answer
 6   PAGE   LINE
     286   3
 7
 8   Request for Production of Documents
 9   PAGE   LINE
     None.
10
11   Stipulations
12   PAGE   LINE
     None.
13
14   Questions Marked
15   PAGE   LINE
     None.
16
17
18
19
20
21
22
23
24
```

Page 7

```
 1                - - -
 2            E X H I B I T S
 3                - - -
 4
 5   NO.        DESCRIPTION         PAGE
 6   Teitelbaum-4 Expert Report      141
                  1/12/22
 7                Ursina R. Teitelbaum, MD
 8   Teitelbaum-5 Psychological      221
                  Distress Associated
 9                With Cancer Screening:
                  Systematic Review
10                (Chad-Friedman)
11   Teitelbaum-6 Implications of    228
                  False Positive
12                Results for Future
                  Cancer
13                Screenings
                  (Taksler)
14
15   Teitelbaum-7 Impact of BRCA1/   238
                  BRCA2
16                Mutation Testing
                  On Psychologic
17                Distress in a Clinic
                  Based Sample
18                (Schwartz)
19   Teitelbaum-8 What is            264
                  Overdiagnosis
20                And Why Should We Take
                  It Seriously in Cancer
21                Screening?
22
23
24
```

Page 9

```
 1                - - -
 2        THE VIDEOGRAPHER:  We are
 3   now on the record.
 4        My name is Chris Ritona.
 5   I'm the videographer with Golkow
 6   Litigation Services.
 7        Today's date is March 10th,
 8   2022, and the time is
 9   approximately 9:18 a.m.
10        This video deposition is
11   being held in Philadelphia, PA at
12   Duane Morris, 30 South 17th
13   Street, in the matter of
14   Valsartan, Losartan, and
15   Irbesartan Products Liability
16   Litigation, MDL No. 2875.
17        The deponent today is
18   Dr. Ursina Teitelbaum.
19        All counsel will be noted
20   upon the stenographic record.
21        The court reporter today is
22   Michelle Gray, and she will now
23   please swear in the witness.
24                - - -
```

1      ... URSINA R. TEITELBAUM, M.D.,
2  having been first duly sworn, was
3  examined and testified as follows:
4            - - -
5            EXAMINATION
6            - - -
7  BY MS. GEMAN:
8      Q.   Good morning.
9      A.   Good morning.
10      Q.   We met briefly off the
11  record, but my name is Rachel Geman.
12           Would you like to be
13  addressed as Dr. Teitelbaum?  Am I saying
14  that right?
15      A.   Yes, please.
16      Q.   Okay.  Could you please tell
17  me your business address?
18      A.   Hospital of the University
19  of Pennsylvania, 3400 Convention Center
20  Boulevard, South Tower 10, Philadelphia,
21  Pennsylvania 19104.
22      Q.   How many times have you
23  given testimony under oath?
24      A.   I have given testimony under

1  oath twice.
2      Q.   And were they both
3  depositions?
4      A.   Yes.
5      Q.   Can you tell me when the
6  first one was?
7      A.   It was 2007.
8      Q.   And what was the nature of
9  that matter?
10      A.   I was asked to speak about
11  the status of a patient's cancer, and it
12  was for the plaintiff.
13      Q.   Was it a medical malpractice
14  suit?
15      A.   Yes.
16      Q.   Do you recall the name of
17  either the parties or the lawyers?
18      A.   The lawyer's name was Rick
19  Levin.  It was in Chicago.
20      Q.   L-E-V-I-N?
21      A.   Yes.
22      Q.   And do you recall the name
23  of either party?
24      A.   The defense was Northwestern

1  Hospital.
2      Q.   And do you recall what kind
3  of cancer the plaintiff had?
4      A.   The patient had head and
5  neck cancer.
6      Q.   And was the allegation that
7  the cancer was missed?
8      A.   No.
9      Q.   Can you tell me the
10  allegation?
11      A.   The patient had locally
12  advanced head and neck cancer that was
13  being treated with curative intent.  He
14  had undergone curative intent
15  chemoradiation and then had surgery.
16           He was in the hospital when
17  he had an airway event.  And an
18  anesthesia code call was called overhead,
19  and it was called to the wrong building
20  in the hospital.
21      Q.   Oh, dear.  That sounds like
22  terrible facts.
23           And can you tell me about
24  the second time you were deposed?

1      A.   The second time was just
2  before the pandemic, so it was
3  January 2020.
4      Q.   What was the nature of that
5  case?
6      A.   I was testifying on behalf
7  of my patient.
8      Q.   What is the name of your
9  patient?
10      A.   I -- is that -- I think that
11  might be protected by HIPAA.
12      Q.   Okay.  Fair enough.  Was
13  that a -- were you testifying in a
14  percipient or an expert capacity?
15      A.   I was his physician.  I'm
16  not sure what that legal definition is.
17      Q.   Fair enough.  Do you -- can
18  you tell me about the nature of the
19  lawsuit?
20      A.   Yes.  So the patient as a
21  young man in his 20s was working with
22  radioimmunoassays, so radioactive
23  elements.  And I met him some years later
24  when he had a pancreatic cancer that I

Page 14

¹ treated with curative intent.
²          About two years after he was
³ likely cured from the first cancer, he
⁴ developed a cancer in his remnant
⁵ pancreas, which is very unusual.  And we
⁶ looked back in his history to see, you
⁷ know, multiple cancers at a young age is
⁸ unusual.
⁹          And he also had a melanoma,
¹⁰ a testicular cancer, and multiple basal
¹¹ cancers.  And they were all -- I don't
¹² know if I can do this, but they were on
¹³ in a very limited field.  And it turned
¹⁴ out that was exactly the -- where the
¹⁵ hood was to protect him from the
¹⁶ radiation.
¹⁷          And there had been some
¹⁸ concerns about how the radioactive
¹⁹ elements were handled in that company and
²⁰ how the hood was working.
²¹     Q.   Was he claiming the hood was
²² defective?
²³     A.   I don't think it was that
²⁴ specific.  I think it was broader

Page 15

¹ concerns about the management of the
² radioactive elements.
³     Q.   Do you know how that lawsuit
⁴ resolved, if it did?
⁵     A.   They settled it.
⁶     Q.   Okay.  And can you tell me
⁷ the name of the defendant in that case?
⁸          MR. KUM:  So, Counsel, just
⁹     to let you know, we did actually
¹⁰     provide in the list of her
¹¹     materials the name of the lawsuit.
¹²          MS. GEMAN:  Oh.
¹³ BY MS. GEMAN:
¹⁴     Q.   So was that suit David
¹⁵ Boscher et al., versus Johnson & Johnson?
¹⁶     A.   Yes.
¹⁷     Q.   I see.  And was that a -- do
¹⁸ you know if that was a class action?
¹⁹     A.   It was not.
²⁰     Q.   Okay.  And that suit was
²¹ resolved.  I understand.  And so you were
²² testifying for the plaintiff in that
²³ case?
²⁴     A.   Indeed.

Page 16

¹     Q.   So --
²          MR. KUM:  Just to be -- just
³ to be clear, she was the treater
⁴ in the case.  She wasn't an -- she
⁵ wasn't an expert.
⁶          MS. GEMAN:  I understand.
⁷ BY MS. GEMAN:
⁸     Q.   You were the --
⁹     A.   He was my patient.
¹⁰     Q.   I understand.  Thank you.
¹¹          And do you recall the name
¹² of the lawyer who was with you at the
¹³ deposition?
¹⁴     A.   Yes.  His name is Mark
¹⁵ Davies.  I think it's also on that
¹⁶ transcript.
¹⁷     Q.   Do you know what firm he is
¹⁸ with?
¹⁹     A.   I think it's his own firm.
²⁰     Q.   D-A-V-I-E-S?
²¹     A.   Yes.
²²     Q.   Is he in Pennsylvania?
²³     A.   Yes.
²⁴     Q.   Philadelphia?

Page 17

¹     A.   Yes.
²     Q.   Well, you're doing a great
³ job with the rules, but I will do the
⁴ tedious lawyer thing and reacquaint you
⁵ with the deposition rules regardless.
⁶          Do you realize you're
⁷ testifying today under a penalty of
⁸ perjury?
⁹     A.   Of course.
¹⁰     Q.   And do you understand that
¹¹ I'm entitled to your best recollection?
¹²     A.   Yes.
¹³     Q.   If you don't understand a
¹⁴ question I ask, can I ask you to ask me
¹⁵ to clarify?
¹⁶     A.   With pleasure.
¹⁷     Q.   Thank you.
¹⁸          And again, you're doing a
¹⁹ great job with this, but if you could
²⁰ verbalize your answers rather than
²¹ gesticulating or mm-hmm, unh-unh.
²²          Will you do that?
²³     A.   Yes.
²⁴     Q.   And do you understand that

Confidential Information Subject to Protective Order

Page 18

1 I'm allowed to ask you to speculate to
2 matters within your knowledge?
3     A.   Yes.
4     Q.   So for example, I could ask
5 you to speculate the size of this table,
6 but I couldn't ask you to speculate the
7 size of my table at home.
8         Does that make sense?
9     A.   Can you explain, give me
10 another example?
11     Q.   Sure.
12         I could -- I wouldn't, but I
13 could ask you to speculate the collective
14 ages of the people in this room.  But I
15 couldn't ask you to speculate the
16 collective ages of all my family members,
17 because of course you don't know them.
18 Is that fair?
19     A.   Okay.
20     Q.   Is there any reason you
21 can't testify today?
22     A.   No.
23     Q.   And if you need a break at
24 any time, please ask for it.  I would

Page 19

1 just ask that if there is a question
2 pending, that you answer it before the
3 break starts.
4     A.   Yes.
5     Q.   Who retained you in this
6 case?
7     A.   I think there's a lot of
8 firms, so I'm not really sure how to
9 answer that.
10     Q.   Fair enough.  With which --
11 with whom did you first speak about this
12 potential retention?
13     A.   I was contacted by RX Pro
14 which I think is sort of a connecting --
15 like a connector person that helps find
16 experts.
17     Q.   Mm-hmm.
18     A.   And I'm not sure why I said
19 yes, because I haven't in a long time.
20 But I said okay.
21         I had a 30-minute
22 conversation with Bob Kum where he mostly
23 asked questions about me.  I think it
24 was --

Page 20

1     Q.   Okay.  And --
2         MR. KUM:  Yeah, so Doctor,
3 just as an admonition, you are
4 allowed to sort of generally
5 discuss the fact that we've met.
6 But I would ask you not to
7 directly provide information about
8 the substance of any of our
9 conversations.  Okay?
10         THE WITNESS:  Yes.
11         MR. KUM:  Thank you.
12 BY MS. GEMAN:
13     Q.   Had you previously worked
14 with RX Pro?
15     A.   No.
16     Q.   Had you heard of them before
17 they reached out to you?
18     A.   No.
19     Q.   Do you recall the name of
20 the person at RX Pro who reached out to
21 you?
22     A.   His name is Patrick
23 O'Rourke.
24     Q.   Oh, Patrick O'Rourke.  Okay.

Page 21

1         And had you ever previously
2 met Mr. Kum before that phone call?
3     A.   Never.
4     Q.   When did RX Pro reach out to
5 you?
6     A.   I think it was early
7 December 2021.
8     Q.   And when was your -- and I'm
9 sorry.  Did you say it was a phone call
10 with Mr. Kum or a meeting?
11     A.   It was a phone call.
12     Q.   Okay.  When was that phone
13 call?
14     A.   Probably within a week of
15 the outreach from Patrick O'Rourke.
16     Q.   Is anybody at RX Pro working
17 with you on your report and opinions?
18     A.   No.
19     Q.   Is anybody working with you
20 on your report and opinions, like your
21 own staff or anything like that?
22     A.   No.
23     Q.   For which parties are you
24 providing your expert report?

Confidential Information Subject to Protective Order

Page 22

1    A.    I don't know all the names
2  of the firms.
3    Q.    So I'm sorry.  My
4  question -- my question wasn't clear.
5         Which -- you understand the
6  law firms are representing parties in the
7  litigation, correct?
8    A.    Yes.
9    Q.    So my question is, for which
10 parties, for which defendants, are you
11 providing your expert report?
12    A.    I mean, it's for the
13 defense, but I don't know beyond that.
14         MR. KUM:  And just for
15     clarification, Dr. Teitelbaum was
16     designated as an expert on behalf
17     of -- on behalf of all defendants.
18         MS. GEMAN:  All defendants.
19     Okay.
20 BY MS. GEMAN:
21    Q.    Have you ever done any
22 previous work for any of the defendants
23 in this litigation?
24    A.    Never.

Page 23

1    Q.    And who are the defendants
2  in this litigation?
3    A.    I don't really know.  I just
4  know the Duane Morris.  I don't know all
5  the company names.
6    Q.    Okay.  Fair enough.  Do you
7  know any of the company names that are
8  defendants in this litigation?
9    A.    I don't think so.
10    Q.    So is it -- can I fairly
11 infer that the reason that you're certain
12 that you have not worked for them before
13 is that you have not done any consulting
14 for companies?
15    A.    I have never done any
16 consulting for companies.
17    Q.    Okay.  And can you tell me
18 the names, not the content of any
19 conversations, but the names of any
20 lawyers with whom you have met in
21 connection with your expert report and/or
22 prep for this deposition?
23    A.    Yes.  I just met Glen.  But
24 he was on a Zoom once.  It's kind of a

Page 24

1  lot of blobs with names.  So forgive me.
2  Someone named Nick.  I don't do great
3  with remembering the blob names.  Someone
4  named Nilda.
5         There were more.  But I
6  don't remember.
7         There was a woman in a Zoom
8  in Israel.  And that's kind of it.
9    Q.    Fair enough.  Do you know,
10 were those individuals all attorneys?
11    A.    I don't know.
12    Q.    Have you spoken with anyone
13 about this deposition other than counsel?
14    A.    Absolutely not.
15    Q.    Have you spoken with anyone
16 about your expert report other than
17 counsel?
18    A.    No.
19    Q.    And on the subject of
20 deposition prep, how much time did you
21 spend preparing for this deposition?
22    A.    I'm not really sure.  Some
23 hours.
24    Q.    Could you give me an order

Page 25

1  of magnitude?
2    A.    Less than ten.
3    Q.    And were -- would you say it
4  was seven to nine?
5    A.    Five to eight.
6    Q.    Five to eight.  And were
7  those five to eight hours all with
8  counsel?
9    A.    Is counsel attorneys?
10    Q.    Yes.
11    A.    Yes.
12    Q.    Did you do any preparation
13 on your own?
14    A.    For what?
15    Q.    For this deposition.
16    A.    I don't know what that
17 means.  Can you explain?
18    Q.    Sure.
19         Did you do any reading or
20 research or revisit any materials?
21    A.    I studied my expert letter,
22 I studied Dr. Kaplan's expert letter, and
23 I reviewed Dr. Kaplan's deposition.
24    Q.    Have you reviewed any

Confidential Information Subject to Protective Order

Page 26

1 depositions in this matter other than
2 Dr. Kaplan's?
3      A.   I haven't.
4      Q.   Your list of materials
5 reviewed did not mention Dr. Kaplan, but
6 obviously you reviewed his materials,
7 correct?
8      A.   Yes.  I think that was the
9 premise of my mission.
10      Q.   Fair enough.  Did you review
11 Dr. Song's report?
12      A.   I did not.
13      Q.   Are you -- and so your
14 testimony is limited to responding to
15 Dr. Kaplan; is that correct?
16      A.   That is what I was asked to
17 do.  And that's what it's limited to.
18      Q.   All right.  And your
19 opinions are limited to responding to
20 Dr. Kaplan; is that correct?
21      A.   I was specifically asked to
22 offer my opinion on Dr. Kaplan's medical
23 monitoring plan.
24      Q.   And are you offering any

Page 27

1 opinions about whether NDMA or NDEA are
2 carcinogens?
3      A.   I am not a causative expert.
4      Q.   And regardless of that,
5 which I appreciate, are you offering any
6 opinions about whether those substances
7 are causation -- are carcinogens?
8      A.   I am not.  It's really not
9 pertinent to my opinion.
10      Q.   Are you offering --
11      MS. GEMAN:  Oh, is this the
12 phone in here?
13      (Whereupon, a discussion was
14 held off the stenographic record.)
15 BY MS. GEMAN:
16      Q.   Are you offering any
17 opinions, Doctor, about whether NDMA or
18 NDEA in the levels that were present in
19 the contaminated valsartan in this case
20 caused significantly increased risk of
21 cancer to any person?
22      A.   I am not.
23      MR. KUM:  I'm just going to
24 object.  Outside the scope.

Page 28

1      Dr. Teitelbaum, if you can
2 just pause for just a second and
3 let me interject an objection.
4      MS. GEMAN:  Thank you.
5 BY MS. GEMAN:
6      Q.   Are you offering any
7 opinions about the medical monitoring
8 class definition in this case?
9      MR. KUM:  Objection.  Vague
10 and ambiguous.  Outside the scope.
11      THE WITNESS:  I don't
12 understand your question.
13 BY MS. GEMAN:
14      Q.   Sure.  Are you offering --
15 strike that.
16      You reviewed the amended
17 complaint brought by the medical
18 monitoring plaintiffs, correct?
19      A.   I don't think I've seen
20 that.
21      Q.   If it was listed in your
22 materials reviewed, would that have been
23 a mistake?
24      A.   Is that -- I don't know what

Page 29

1 that means.  Is that that request for --
2 that deposition request?
3      MR. KUM:  So I don't think
4 she understands what you mean by a
5 complaint.  You might want to --
6 BY MS. GEMAN:
7      Q.   Did you review the document
8 that set forth the allegations that the
9 medical monitoring plaintiffs brought
10 against the defendants?
11      A.   I think that's that form?
12 Can you show it to me, Bob?  I know what
13 it looks like.  I'm not that familiar
14 with the terminology.  I apologize.
15      Q.   Fair enough.  So is it fair
16 to say that you're not offering any
17 opinion about how the plaintiffs have
18 defined who should be entitled to medical
19 monitoring in this case?
20      MR. KUM:  Objection.  Vague
21 and ambiguous.
22      THE WITNESS:  Can you
23 explain again?
24 BY MS. GEMAN:

Confidential Information Subject to Protective Order

Page 30

1    Q.   Sure.
2    A.   I'm not a lawyer.
3    Q.   Fair.  No, no, I understand.
4  And I'm definitely not asking for legal
5  opinions.
6         I am asking, however, if you
7  have an opinion about how the plaintiffs
8  have defined the threshold eligibility to
9  be entitled to monitoring.
10        MR. KUM:  Objection.
11        Outside the scope.
12  BY MS. GEMAN:
13   Q.   You can answer.
14   A.   Yeah, I just don't still --
15  I still don't understand.  I'm not -- I'm
16  not trying to be dense.  I just don't
17  understand.
18   Q.   No, not at all.  What is
19  your understanding about, broadly
20  speaking, who plaintiffs claim should be
21  entitled to medical monitoring?
22   A.   I think it's patients that
23  took VCDs with the impurity NDMA and NDEA
24  within a certain time period.

Page 31

1    Q.   Also, sorry, what is
2  curative intent?
3    A.   Oh, that's a great question.
4  Oncologists are always delighted to have
5  that opportunity.
6         Broadly speaking, the only
7  way to cure a solid a tumor is surgery.
8  And so if a patient is eligible for
9  surgery, we may add some chemotherapy or
10  radiation.  But if a patient is eligible
11  for surgery, we are treating them with
12  the goal of cure.
13   Q.   And do you define cure as
14  being cancer free for five years?
15   A.   It depends on the cancer.
16   Q.   Is it always a temporal
17  definition, as in cancer free for X time?
18   A.   Different cancers have
19  different ranges of time.  Some have a
20  longer tail than others.
21   Q.   But it's always defined by a
22  temporal period of being cancer free?
23   A.   Yes.  Mm-hmm.
24   Q.   And are you offering any

Page 32

1  opinions here about the economics of
2  medical monitoring?
3    A.   No.
4    Q.   You're not a public health
5  expert, correct?
6         MR. KUM:  Objection.  Vague
7  and ambiguous.
8         THE WITNESS:  I'm interested
9  in public health.  It's an
10  important part of my practice.
11  BY MS. GEMAN:
12   Q.   Do you consider yourself
13  qualified to render expert opinions about
14  public health topics?
15   A.   It depends on the topic.
16  I'm happy to opine if I am asked the
17  right question.
18   Q.   Do you consider your opinion
19  here to be related to public health?
20   A.   I consider my opinion here
21  to be related to the medical monitoring
22  protocol put forward by Dr. Kaplan.
23   Q.   And do you consider that to
24  be an aspect of public health?

Page 33

1    A.   Can you ask that again?
2         MR. KUM:  Objection.  Vague
3  and ambiguous.
4  BY MS. GEMAN:
5    Q.   Do you consider that to be a
6  public health opinion?
7         MR. KUM:  Same objections.
8         THE WITNESS:  Yeah, the
9  opinion about his medical
10  monitoring protocol.  Let me think
11  about that.
12        I would say cancer screening
13  is within the domain of public
14  health, although it's also within
15  the domain of other --
16  biostatistics, health outcomes,
17  you know.
18        So I'm really directing my
19  opinion to the screening protocol
20  put forward.  I don't really know
21  how to answer your question within
22  that context.
23  BY MS. GEMAN:
24   Q.   Do you consider yourself an

Confidential Information - Subject to Protective Order

Page 34

1   expert in biostatistics?
2       A.   I use and rely on
3   biostatistics in my clinical practice of
4   20 years.  We're certainly taught
5   biostatistics in medical school.  And
6   ongoing, it's important in fellowship and
7   I rely on it and refer to it in my
8   practice.
9       Q.   Do you consider yourself an
10  expert in biostatistics?
11          MR. KUM: Objection.  Calls
12      for a legal conclusion.
13          THE WITNESS: Again, I
14      certainly use biostatistics in my
15      practice.
16  BY MS. GEMAN:
17      Q.   Do you consider yourself an
18  expert in biostatistics?
19          MR. KUM:  Same objection.
20      Calls for a legal conclusion.
21  BY MS. GEMAN:
22      Q.   You can answer, unless your
23  counsel instructs you not to answer.
24      A.   I know.  I did answer.

Page 35

1   So...
2       Q.   So, my question is, to which
3   I have not gotten an answers do you
4   consider yourself an expert in
5   biostatistics?
6           MR. KUM:  Same objections.
7       You can answer again,
8       Doctor.
9           THE WITNESS:  Yeah, I rely
10      on biostatistics in my practice.
11      I have been in multiple lectures.
12      It's an important part of clinical
13      practice.  I don't know how to
14      answer you more specifically.
15          The question is broad, even
16      though it's just a few words.
17  BY MS. GEMAN:
18      Q.   Would you consider yourself
19  qualified to present yourself to a judge
20  and jury as an expert in biostatistics?
21          MR. KUM: Objection.  Calls
22      for a legal conclusion.
23          If you understand.
24          THE WITNESS:  I would just

Page 36

1   tell them I use it.  I don't have
2   a degree in it.  But I rely on it,
3   and I appreciate it, and I use it
4   in my daily practice.
5   BY MS. GEMAN:
6       Q.   I mean, I have a lot of
7   friends who are biostatisticians.  I rely
8   on it when I read the New York Times and
9   so on.  Would you consider me an expert
10  in biostatistics?
11          MR. KUM: Objection.  Vague.
12      Ambiguous.
13          THE WITNESS: I don't really
14      need to answer that question.
15          MR. KUM:  Doctor, go ahead
16      and answer.
17          THE WITNESS: Okay.  I --
18          MR. KUM:  To the extent you
19      can, if you understand the
20      question.
21          THE WITNESS: I don't -- I
22      don't know your depth of
23      knowledge.  I don't know how you
24      would present yourself.  I don't

Page 37

1       know if you use it in your daily
2       practice.
3           I rely on statistics to
4       guide my patients.  I use them
5       every day.  I don't have a
6       master's or a Ph.D. in
7       biostatistics.  But I use and rely
8       on biostatistics every day that
9       I'm in clinic caring for patients.
10  BY MS. GEMAN:
11      Q.   Have you ever taught public
12  health or biostatistics?
13      A.   I have not.
14      Q.   Have you ever published a
15  paper about -- in a public health
16  journal?
17      A.   I don't think so.
18      Q.   Have you ever published a
19  paper in a biostatistics journal?
20      A.   I don't think so.
21      Q.   Okay.  And are you offering
22  any opinions about the feasibility of
23  medical monitoring as distinct from
24  whether it's, in your view, clinically

Confidential Information Subject to Protective Order

| Page 38 |
| --- |

¹ warranted?
²          MR. KUM:  Objection.  Vague
³ and ambiguous.  If you understand
⁴ the distinction.
⁵          THE WITNESS:  Yes.  Only in
⁶ that if the patients being offered
⁷ this very intensive medical
⁸ monitoring protocol are frail or
⁹ very sick or -- you know, for
¹⁰ example, repeat upper and lower
¹¹ endoscopy, requires anesthesia and
¹² cardiology clearance.  If they
¹³ have heart conditions that
¹⁴ preclude it, then it isn't
¹⁵ feasible.  So just to that extent.
¹⁶ BY MS. GEMAN:
¹⁷     Q.    Is it your understanding
¹⁸ that a patient would be required to avail
¹⁹ him or herself of the services of the
²⁰ medical monitoring program that has been
²¹ proposed?
²²     A.    It didn't say that in
²³ Dr. Kaplan's letter.  I worry that if
²⁴ they know these are the recommended

| Page 39 |
| --- |

¹ tests, because the fear of cancer is so
² pervasive, that they would feel a
³ compulsion to try and do them.
⁴     Q.    Putting aside your worry,
⁵ you understand that Dr. Kaplan is not
⁶ proposing a mandatory program, correct?
⁷          MR. KUM:  Objection.  Vague
⁸ and ambiguous.  Calls for a legal
⁹ conclusion.
¹⁰          THE WITNESS:  He put forward
¹¹ a recommended protocol.
¹²          I don't know.  In the letter
¹³ he didn't say whether or not it
¹⁴ was mandatory.
¹⁵          I was certainly happy during
¹⁶ his deposition to go to the basic
¹⁷ principle of medicine, the art of
¹⁸ medicine, that it's a personalized
¹⁹ approach between the patient and
²⁰ their physician.  So I was very
²¹ happy to read that.
²² BY MS. GEMAN:
²³     Q.    Do you understand that the
²⁴ program is not mandatory?

| Page 40 |
| --- |

¹          MR. KUM:  Objection.  Vague
² and ambiguous.  Calls for a legal
³ conclusion.
⁴          THE WITNESS:  I haven't seen
⁵ the "mandatory" word as I recall,
⁶ but I don't know that it isn't.
⁷          It's being offered.  The
⁸ idea is to offer it, and I think
⁹ that alone would engender a lot of
¹⁰ anxiety and fear and potentially
¹¹ pressure because of the fear of
¹² cancer.
¹³ BY MS. GEMAN:
¹⁴     Q.    Have you purported to study
¹⁵ the delta between the baseline fear that
¹⁶ these class members already have and any
¹⁷ additional fear engendered by the
¹⁸ program?
¹⁹     A.    In my expert report, I did
²⁰ comment on anxiety and stress associated
²¹ with cancer testing.  And you know,
²² patients that are told they are at higher
²³ risk, have more stress about it.
²⁴          I'll also say that the more

| Page 41 |
| --- |

¹ you test someone, the frequency, the more
² opportunity there is for false diagnoses.
³ And just having a false positive and just
⁴ being told that you might have cancer and
⁵ then going through the workup, even if
⁶ you're negative, it creates fear with
⁷ every subsequent test.
⁸          I see that in our own
⁹ practice.  We used to use a lot more
¹⁰ imaging to track cancers.  We were
¹¹ following them in surveillance.
¹²          And there's actually a whole
¹³ literature now around what we call
¹⁴ "scanxiety" where the very act of testing
¹⁵ for cancer causes anxiety.
¹⁶          MS. GEMAN:  So I'm going to
¹⁷ be ask for that to be struck as
¹⁸ nonresponsive.
¹⁹ BY MS. GEMAN:
²⁰     Q.    My question is, have you
²¹ purported to study the delta between the
²² baseline fear that these class members
²³ already have and any additional fear
²⁴ engendered by the program?

Confidential Information Subject to Protective Order

---

Page 42

1    MR. KUM:  Asked and
2  answered.
3      You can answer again.
4      THE WITNESS:  In terms of
5  study, I have not written or
6  published in it.  But I have
7  certainly experienced it in my
8  years of practice.
9  BY MS. GEMAN:
10     Q.   Have you made any attempt to
11 gauge the baseline level of anxiety these
12 class members already have by dint of
13 having consumed contaminated valsartan?
14     MR. KUM:  Objection.
15 Assumes facts not in evidence.
16 Vague and ambiguous.  You can
17 answer.
18     THE WITNESS:  I have not.  I
19 am not aware of their fear level.
20 BY MS. GEMAN:
21     Q.   Do you deny that there is a
22 baseline level of anxiety?  Or rather --
23 I can rephrase the question.
24     Do you have any opinions

---

Page 43

1  about the baseline level of anxiety
2  experienced by the proposed class
3  members?
4      MR. KUM:  Objection.  Calls
5  for speculation, assumes facts not
6  in evidence.
7      THE WITNESS:  Is that a
8  speculate question?
9      MR. KUM:  Doctor, I'm
10 just -- I'm asserting an objection
11 on the record.
12     THE WITNESS:  Okay.
13     MR. KUM:  To the extent that
14 you understand her question, you
15 can answer.
16     THE WITNESS:  You know, it's
17 interesting.  Heart disease is the
18 number one cause of death in the
19 U.S.  But my patients are more
20 afraid of cancer.
21     I can imagine that the FDA
22 report of a concern for an
23 impurity was very anxiety
24 provoking.  I think it's notable

---

Page 44

1  that the FDA recognized their
2  cardiovascular risk and said don't
3  stop it, keep taking it until you
4  talk to your doctor.
5  BY MS. GEMAN:
6      Q.   What do you mean by notable?
7      A.   Well, if -- you know,
8  gauging risk, I think the FDA recognized
9  that the cardiovascular risk was great
10 and that stopping that medication would
11 cause harm.
12     Q.   Did you learn about the
13 recall in real time when it happened?
14     A.   No.
15     Q.   And I think you said this in
16 your objections to the subpoena, but you
17 have not written or -- you have not
18 written about valsartan or blood pressure
19 medications, correct?
20     A.   I have not.
21     Q.   Have you talked about
22 valsartan with your patients?
23     A.   Not for many years.  Early
24 in my career, I did work in primary care.

---

Page 45

1  And I -- normally a patient came to me on
2  valsartan after a critical event, usually
3  in a hospital, myocardial infarction, new
4  diagnosis of heart failure or diabetes
5  affecting their kidney function, which
6  are indications.
7      The only instance in which I
8  wrote it primarily was if a patient was
9  intolerant of an ACE inhibitor due to
10 cough.
11     I currently do not, and have
12 instructed my office, to not renew
13 patients' medications that aren't
14 directly related to their cancer care.
15     Q.   So they should go to
16 their -- another specialist or primary
17 care doctor?
18     A.   You know, our patients see
19 us every week or two weeks.  We write a
20 lot of prescriptions.  It's very natural
21 that they would ask.  But it's not the
22 area that I'm focusing now, and I think
23 it would be a disservice, and I also
24 would not want to delay the time that

---

Page 46

¹ they would then see their internist,
² family medicine doctor, or cardiologist.
³ So it is not my practice now to write or
⁴ renew valsartan-containing drugs.
⁵     Q.   Have you prescribed
⁶ valsartan in the last ten years?
⁷     A.   I have not prescribed
⁸ valsartan in the past 18 years.
⁹     Q.   Okay.  What happened
¹⁰ 18 years ago?
¹¹     A.   I moved -- I was in my
¹² geriatrics clinics, which was a form of
¹³ primary care.  And then I moved
¹⁴ exclusively to oncology clinics.  I'm
¹⁵ board-certified in internal medicine,
¹⁶ geriatrics, medical oncology, and
¹⁷ palliative care.
¹⁸         So I've had a lot of
¹⁹ training.  But currently, I'm working in
²⁰ oncology clinics, subspecializing in
²¹ gastrointestinal malignancies.
²²     Q.   Do you only treat or
²³ exclusively treat GI cancers?
²⁴     A.   So I largely -- I'm one of

Page 47

¹ the few in our practice that will see
² cancers of unknown primary.  So that
³ could be any range of cancers.
⁴         And on the inpatient side,
⁵ we are required to do a fair amount of
⁶ inpatient.  I attend on the solid tumor
⁷ services, which is every type of cancer.
⁸ And actually, I also attend on the bone
⁹ marrow transplant service.
¹⁰     Q.   Was there a time in your
¹¹ career when you only worked on GI
¹² cancers?
¹³     A.   I've been doing this since I
¹⁴ came to Penn.  That's, you know, in the
¹⁵ hospital, you see all patients.  I'm
¹⁶ trained to see all patients.  And I have
¹⁷ chosen to subspecialize, which is an
¹⁸ opportunity in academic medicine.  And
¹⁹ that way you can have a more narrower
²⁰ area of disease expertise.
²¹     Q.   So I'm sorry.  I'm not sure
²² I know the answer to the question.  Was
²³ there a time in your career when you only
²⁴ worked on GI cancers?

Page 48

¹     A.   Again, it's in the construct
² of being an attending in the hospital and
³ in the clinic.
⁴         In my clinic, I only get --
⁵ accept referrals for gastrointestinal
⁶ malignancies.  But again, I like the
⁷ workup and teaching opportunities for the
⁸ fellows with cancers of unknown primary,
⁹ which sometimes turn out to be breast or
¹⁰ lung.  So that's why I'm explaining my
¹¹ answer.
¹²         And on the inpatient side we
¹³ don't have the luxury of just treating GI
¹⁴ cancers.  We accept all of the inpatients
¹⁵ of the entire practice.
¹⁶     Q.   So if you've said publicly
¹⁷ that you only do GI cancers, was that a
¹⁸ slight exaggeration for marketing
¹⁹ purposes?
²⁰     A.   That's the -- if you look at
²¹ the list of cancers accepted on my
²² profile, it's all GI cancers.  And
²³ cancers of unknown primary is listed on
²⁴ that.  That is my outpatient clinic.

Page 49

¹         We all have to do service
² time.  It's two weeks or four weeks a
³ year.  So I just wanted to be very
⁴ truthful that I am exposed to other
⁵ cancers.
⁶         But in my clinic, I see
⁷ gastrointestinal cancers and the rare
⁸ cancer of unknown primary.
⁹     Q.   So your public statement
¹⁰ that you only treat GI cancers is not
¹¹ quite correct?
¹²     A.   It's within -- that's my
¹³ specialty interest.  All of us see
¹⁴ cancers that are thought to be GI and
¹⁵ turn out to be something else.  So I
¹⁶ think within that, it is still my
¹⁷ intention.
¹⁸     Q.   So why did you say publicly
¹⁹ you only treat GI cancers, if that is not
²⁰ true?
²¹         MR. KUM:  Objection.  Vague
²² and ambiguous.  Assumes facts not
²³ in evidence.
²⁴         If you know what she's

Confidential Information Subject to Protective Order

Page 50

1 referring to.
2 THE WITNESS: I'm not
3 understanding your term
4 "publicly."
5 BY MS. GEMAN:
6 Q. Did you put out a YouTube
7 video available for anyone to see in
8 which you said that you only treat GI
9 cancers?
10 A. The intent of my practice is
11 GI cancers.
12 I generally, if -- maybe
13 there are six or seven cancers of unknown
14 primary, which is also listed on my
15 public profile.
16 I tend to take the ones that
17 have cancer below the diaphragm, assuming
18 that they will be GI. But that's, you
19 know, just -- that was a -- they asked me
20 to talk about my GI practice. That is my
21 area of expertise.
22 Q. Did they ask you to say that
23 you only treat GI cancers?
24 A. I don't remember if they did

Page 51

1 or not. I think it was just a
2 promotional video on behalf of the
3 gastrointestinal program. My clinic is
4 called the gastrointestinal malignancy
5 clinic, and that is within the group that
6 I practice.
7 Q. Do you think it would be
8 more truthful to amend that video?
9 MR. KUM: Objection.
10 Argumentative.
11 THE WITNESS: I intend to
12 treat GI cancers. I accept the
13 cancers of unknown primary that
14 are below the diaphragm.
15 If they turn out to have a
16 breast cancer, I usually pass them
17 on to my breast cancer colleague.
18 Not every oncologist is willing to
19 take a cancer without a firm
20 diagnosis.
21 I am willing, for the
22 interest of the patient.
23 BY MS. GEMAN:
24 Q. Do you currently treat blood

Page 52

1 cancers?
2 A. I do not treat blood cancers
3 in the outpatient setting.
4 Q. Do you treat them anywhere?
5 A. I -- two years ago I
6 attended on the inpatient transplant
7 service. I haven't attended there for
8 two years.
9 Q. And previous to that
10 attendance on the inpatient transplant
11 service, when had been the last time that
12 you had treated blood cancers?
13 A. Fellowship.
14 Q. Okay. Like 20 years ago?
15 A. More.
16 Q. More. How long was that
17 attendance to which you just referred on
18 the inpatient transplant service?
19 A. It's two weeks every year.
20 Q. So in the last -- so in the
21 last greater than 20 years, have you just
22 spent two weeks treating blood cancers,
23 or do you mean two weeks every year? I'm
24 sorry if I misunderstood.

Page 53

1 A. Oh, I -- the -- let's see.
2 I came to Penn in 2007. I stopped doing
3 it as a courtesy to the division. It was
4 actually before the pandemic. So
5 probably 2019.
6 There are a lot of services
7 that are tough to get coverage for. So
8 it was a courtesy to the division.
9 Q. So I don't think that was
10 responsive.
11 So do you, in the last
12 20 years plus, other than that two-week
13 period to which you referred, how much
14 time have you spent treating blood
15 cancers?
16 A. None since fellowship.
17 Q. Okay. So it's been two
18 weeks in the last 20 years?
19 A. But for 12 years in a row I
20 did two weeks.
21 Q. That's what I was asking.
22 A. Yes.
23 Q. Okay. You've had 24 weeks?
24 A. Yes. Remember, these are

Confidential Information Subject to Protective Order

1 patients going through transplant. Our
2 role is largely to manage infection.
3      Q.   Mm-hmm.  As opposed to
4 treating the primary?
5      A.   It's managing their
6 hospitalization.
7      Q.   As opposed to treating the
8 primary cancer?
9           MR. KUM:  Objection.  Vague
10     and ambiguous.
11          If you understand the
12     distinction.
13          THE WITNESS:  Yeah.  Yeah,
14     I'm taking care of a patient,
15     getting a treatment plan in the
16     hospital.  And my -- you know,
17     managing their infections, if they
18     get infection or symptoms.
19 BY MS. GEMAN:
20     Q.   Do you devise their cancer
21 treatment plans?
22     A.   I do not.
23     Q.   Do you treat lung cancer?
24     A.   Excuse me?

1      Q.   I'm sorry.  Do you treat
2 lung cancer?
3      A.   I do not.
4      Q.   Do you treat liver cancer?
5      A.   I do.
6      Q.   You do.  Okay.  And liver
7 cancer can be cured or curable if caught
8 early; is that correct?
9           MR. KUM:  Objection.  Vague
10     and ambiguous.  Incomplete
11     hypothetical.
12          THE WITNESS:  It all depends
13     on if a surgery is possible.
14 BY MS. GEMAN:
15     Q.   And if it is, liver cancer
16 can be cured if caught early; is that
17 correct?
18     A.   Yes, or transplant.
19     Q.   And you do treat pancreatic
20 cancer; is that correct?
21     A.   About 70 percent of my
22 practice is pancreas cancer.
23     Q.   Oh, wow.  And how would you
24 divide the other 30?

1      A.   So 10 percent
2 esophagogastric.  I'm more interested in
3 upper GI intestinal malignancies,
4 although I attend all -- we have multiple
5 tumor -- interdisciplinary tumor board.
6 We have a tumor board for every disease
7 site.  So I also care for patients with
8 colorectal cancer.  I would lump small
9 bowel cancer into colorectal cancer, and
10 neuroendocrine tumors.
11     Q.   So of that remaining
12 20 percent, how much would you say is --
13     A.   That's why I was trying --
14 three of them, 10, 10, and 10, is roughly
15 what I would say.
16     Q.   So 10 for esophageal?
17     A.   Esophagogastric.
18     Q.   Mm-hmm.  I see.
19     A.   And 10 or bowel cancer,
20 large and small, and 10 percent for
21 neuroendocrine tumor.
22     Q.   And forgive my ignorance.
23 Do you embed prostate cancer into
24 neuroendocrine?

1      A.   Oh, no.
2      Q.   No?  Okay.
3      A.   That's a separate -- that's
4 GU, gastro-urinary.
5      Q.   Do you treat gastro-urinary
6 cancer?
7      A.   No.
8      Q.   So that means that you don't
9 treat prostate or bladder; is that
10 correct?
11     A.   Or kidney.
12     Q.   Or kidney.  And what is an
13 example of a neuroendocrine cancer?
14     A.   Mm-hmm.  So when you think
15 neuroendocrine, you think Steve jobs.  He
16 had a pancreas neuroendocrine tumor.
17          Anything -- any
18 neuroendocrine tumor that doesn't arise
19 from the pancreas is called carcinoid
20 tumor.
21     Q.   And can that happen in any
22 body part?
23     A.   There is a separate entity
24 in the lung, but generally it's in the

Confidential Information Subject to Protective Order

| Page 58 | Page 60 |
|---|---|

Page 58

1 pancreas, small bowel.  It can arise in
2 the rectum.  Those are the normal
3 locations.
4      Q.   And you consider those
5 distinct from small bowel and colorectal
6 cancers?
7      A.   Completely different cell
8 type.  Completely different treatment
9 regimen.  Every cancer has its own
10 prescription.
11           MS. GEMAN:  The reason that
12      you see me glancing at the time is
13      because I'm staring at something
14      that says 7:05 a.m., which might
15      be on Pacific time.
16           MR. KUM:  That's in honor of
17      me being a west coast attorney.
18           MS. GEMAN:  I'm sorry?
19           MR. KUM:  It's in honor of
20      me being a California attorney.
21           MS. GEMAN:  I understand.
22      Everything has to be three hours
23      earlier.
24 BY MS. GEMAN:

Page 59

1      Q.   Okay.  Thank you.  That's
2 very -- that's very helpful.
3           Do your opinions in this
4 case apply to the general population or
5 to the medical monitoring class?
6           MR. KUM:  Objection.  Vague
7      and ambiguous as to which opinions
8      you're referring to.
9           THE WITNESS:  I specifically
10      directed my opinion to the medical
11      monitoring program put forward by
12      Dr. Kaplan for this, the
13      valsartan-containing drug
14      population that may have been
15      exposed to the impurities, NDMA
16      and NDEA.
17 BY MS. GEMAN:
18      Q.   And is it your understanding
19 that they may have been exposed or that
20 they were exposed?
21      A.   I only bring it up because
22 of the issue of adherence that I did
23 mention in my expert letter.  And having
24 cared for patients with -- you know,

Page 60

1 patients are not always as adherent as
2 you think.  In fact, if you miss a week
3 out of a month, that's still considered
4 adherent.  That's 80 percent.
5           The average is 50 percent in
6 the literature.  When I have my --
7 particularly my older patients, I have
8 them bring in a bag of their medicines so
9 I can actually look through and do a pill
10 count to try and help figure out how much
11 of them they're taking.
12           And of course, sometimes
13 there's issue with affording medications
14 or tolerating medications.  A lot of
15 times I find patients stop the medication
16 without telling their physician.
17           So I think that's how --
18 I -- assuming they're taking them, but we
19 all know that there's some variability
20 there.
21      Q.   Are you offering any
22 opinions about the adherence of these
23 class members?
24      A.   I have no idea what their

Page 61

1 adherence was.  I'm just talking to a
2 general phenomenon that's well described
3 in the literature.
4      Q.   Did you study the adherence
5 of the named plaintiffs?
6           MR. KUM:  Objection.
7      Outside the scope.  You can
8      answer.
9           THE WITNESS:  I don't know
10      who they are.  I don't know if
11      it's been assessed.  I did not
12      study it.
13 BY MS. GEMAN:
14      Q.   So you're offering no --
15 just to be clear, you're offering no
16 expert opinions about the adherence of
17 the class here; is that correct?
18      A.   I'm speaking to the general
19 study of adherence in patients taking
20 medications.  It is not specific to these
21 patients or to these drugs.
22      Q.   And you're offering no
23 expert opinions on that subject here,
24 correct?

Page 62

1    MR. KUM:  I'm going to
2  object.  Other than to what she's
3  just testified to.
4    MS. GEMAN:  You can't do
5  speaking objections.
6    MR. KUM:  Objection.  Asked
7  and answered.
8    You can answer again.
9    THE WITNESS:  I addressed
10  the general concern about
11  adherence to medications in
12  general terms in my letter.
13  BY MS. GEMAN:
14    Q.   But again, I'm entitled to
15  know if you are claiming to offer expert
16  opinions on the adherence of the class
17  here.
18    A.   I have no idea what
19  medicines they did or did not take.
20    Q.   Okay.
21    A.   I don't know about any
22  individual patients.
23    Q.   And as a threshold, I think
24  it's -- am I correct to think that Dr. --

Page 63

1  that your opinion is that Dr. Kaplan's
2  protocol, in your view, should not be
3  applied to the general population; is
4  that correct?
5    A.   The general VCD-taking
6  population?
7    Q.   No, no, no.  The general
8  population?
9    MR. KUM:  Vague and
10  ambiguous.
11    If you understand what she
12  means.
13    THE WITNESS:  Yeah, I'm of
14  the opinion that his protocol
15  should be applied to no
16  population.
17  BY MS. GEMAN:
18    Q.   Do you see any clinical
19  difference between -- or strike that.
20    Let me ask it more
21  generally, if I could.
22    Do you see any difference
23  between the general population and the
24  class here in terms of cancer risk?

Page 64

1    A.   I think I'm going to answer
2  it in the other direction.  So the only
3  exposure we adjust any national cancer
4  screening guidelines for is cigarette
5  smoking.  And you have to have a certain
6  number of pack-years in a certain age
7  range.
8    We don't adjust screening
9  protocols for any exposure with the
10  exception of number of pack-years in a
11  certain age range.
12    Q.   So the people ultimately
13  seeing this deposition will be entitled
14  to an answer to this question.
15    Do you see any difference
16  between the general population and the
17  class here in terms of cancer risk?
18    MR. KUM:  Objection.  Vague
19  and ambiguous.  Asked and
20  answered.
21    Go ahead, Doctor.
22    THE WITNESS:  I don't know
23  that they are any different from
24  the general population.

Page 65

1    I don't know -- I don't know
2  that they -- I don't see why
3  they're any different from the
4  general population, I would say,
5  based on any potential impurity.
6  We don't -- I'll give you a good
7  example.
8    Asbestos is a very well
9  defined carcinogen with a very
10  well defined literature.
11    We do not change the
12  screening recommendations for
13  patients with documented asbestos
14  exposure.
15    The only exposure for which
16  there is a specified screening
17  indication is tobacco, certain
18  number of pack-years, certain age
19  range.
20  BY MS. GEMAN:
21    Q.   How long after it was clear
22  in the literature that tobacco was a
23  carcinogen was it that the tobacco
24  protocol became embedded in the cancer

Confidential Information Subject to Protective Order

Page 66

1 screening guidelines?
2          MR. KUM: Objection. Vague
3 and ambiguous.
4          THE WITNESS: That's
5 actually a great question because
6 it speaks to the point that it
7 takes years and decades, even when
8 you have an established
9 carcinogen, to prove that
10 screening -- established human
11 carcinogen to prove that screening
12 confers any benefit.
13          We've been trying to figure
14 out for years if screening for
15 lung cancer conferred any benefit.
16 So it was a big deal ten years ago
17 with the results of the national
18 cancer lung trial using low dose
19 spiral CT that there was actually
20 a benefit to that class of
21 patients.
22          And just to be clear, it
23 takes -- you have to screen 320
24 patients to find one with cancer.

Page 67

1          And what's important here is
2 we can screen for a lot of things,
3 but we have to show that it
4 confers benefit, and equally
5 importantly we have to assess the
6 magnitude of harm.
7          So again, you know, a study
8 makes it into New England Journal
9 and it's practice-changing. And
10 this was the first after years,
11 decades, to show benefit to a
12 screening protocol.
13          And to your point, we have,
14 I think, known about the
15 carcinogenicity of tobacco smoke
16 for years and decades even. I
17 don't know when the original
18 recognition of the risk of tobacco
19 was. I would actually love to
20 know that.
21          MR. KUM: Counsel, we've
22 been going about an hour.
23 Whenever you get to a natural --
24 I'm not saying that you should

Page 68

1 stop now. But whenever you get to
2 a natural breaking point, can we
3 take a comfort break?
4          MS. GEMAN: Sure.
5          THE WITNESS: I would
6 actually love a comfort break.
7 BY MS. GEMAN:
8     Q.   I'll just ask a couple more
9 questions, and we'll do that. Otherwise,
10 the thought will go right out of my head.
11          You acknowledge that
12 screening with the use of low dose CT
13 reduces mortality from lung cancer,
14 correct?
15     A.   There is an indication. The
16 expert opinion put forward by the United
17 States Preventive Task Force, that for
18 patients that have smoked 20 years and
19 are between the ages -- I believe, it's
20 55 and 80, that there is a potential
21 benefit to screening without undue risk.
22          So it's a very specific
23 range, duration of exposure, and a very
24 specific age range.

Page 69

1     Q.   The New England Journal of
2 Medicine study to which you referred did
3 not only study for that population before
4 reaching its conclusion about the
5 efficacy of low dose CT screening,
6 correct?
7     A.   I don't know that specific.
8 I've brought up the New England Journal.
9 That was the hallmark study. I didn't
10 study the other populations. I really
11 just related it to the updated screening
12 recommendation that became the standard
13 of good practice.
14     Q.   But I just want the record
15 to be very clear.
16          Do you agree, full stop,
17 with this conclusion that screening with
18 the use of low dose CT reduces mortality
19 from lung cancer?
20     A.   I think that is an
21 incomplete statement, without putting in
22 the duration of exposure and the specific
23 ages where it becomes reasonable to test
24 for it.

Confidential Information Subject to Protective Order

Page 70

¹      It is a very strict
² definition there.
³      Q.   So if the national lung
⁴ screening trial research team concluded
⁵ that screening with the use of low dose
⁶ CT he reduces mortality from lung cancer,
⁷ would you disagree with that conclusion?
⁸      MR. KUM:  Objection.
⁹ Assumes facts not in evidence.
¹⁰      You can go ahead and answer.
¹¹      THE WITNESS:  I don't really
¹²      know what that question means from
¹³      a medical lens.  It was the first
¹⁴      study to show benefit to screening
¹⁵      within a defined population with
¹⁶      an acceptable risk/benefit
¹⁷      profile.
¹⁸ BY MS. GEMAN:
¹⁹      Q.   And again, you're not
²⁰ claiming that the conclusion reached by
²¹ the national lung screening trial
²² research team was limited to those
²³ specific smoker profiles, correct?
²⁴      A.   I don't remember the exact

Page 71

¹ details.  What I think is important is
² the United States Preventive Task Force,
³ You know, they have, like, a literature
⁴ watch.  And if an important paper comes
⁵ up, they convene and address it.
⁶      And that group of experts
⁷ decided it was important enough and
⁸ limited the testing looking at the
⁹ benefit and magnitude of harm to favor
¹⁰ the testing for patients between 55 and
¹¹ 80 who had smoked 20 pack-years.
¹²      MS. GEMAN:  Okay.  We can
¹³      take a break.
¹⁴      THE WITNESS:  Thank you.
¹⁵      THE VIDEOGRAPHER:  10:18.
¹⁶      We are off the video record.
¹⁷      (Short break.)
¹⁸      THE VIDEOGRAPHER:  10:38.
¹⁹      We are on the video record.
²⁰ BY MS. GEMAN:
²¹      Q.   Do you agree that the
²² special screening protocols for heavy
²³ tobacco smokers in the guidelines are
²⁴ appropriate?

Page 72

¹      A.   So we are taught to look at
² evidence based medicine.  We do certainly
³ analyze the research as it comes out.
⁴      I appreciate that the United
⁵ States Preventive Task Force agreed, and
⁶ I say so because they have an
⁷ extraordinary panel, as I mentioned
⁸ before, of experts who design screening
⁹ protocols.
¹⁰      What I actually find
¹¹ interesting is that, again, I mention
¹² there's a literature watch that they
¹³ follow, and the new debate with the
¹⁴ screening guidelines is whether or not it
¹⁵ serves black Americans appropriately
¹⁶ since they may present differently and
¹⁷ they're currently analyzing the
¹⁸ literature.
¹⁹      So I appreciate that they
²⁰ keep their mind out and keep mind open
²¹ and they keep updated with the latest
²² studies and findings.
²³      Q.   Do you agree that the
²⁴ special screening protocols for heavy

Page 73

¹ tobacco smokers in the guidelines are
² appropriate?
³      A.   Yes.
⁴      Q.   Why?
⁵      A.   Well, it took decades to
⁶ find a randomized control trial that
⁷ could identify something that might help.
⁸ Again, an earlier diagnosis, I believe,
⁹ again, the number needed to screen is 1
¹⁰ in 320.  And they looked at it with a
¹¹ balance with the risk of biopsy, and
¹² there's obviously established risks when
¹³ you biopsy a lung tumor in the thorax.
¹⁴      And so I feel comfortable
¹⁵ using those screening tools.  In fact in
¹⁶ our practice we have electronic medical
¹⁷ records.  They are particularly designed
¹⁸ for primary care.  But I see them on the
¹⁹ side of the screen.
²⁰      And the goal there, to
²¹ maintain the standard of care, is to
²² offer the patient that study.  That's not
²³ me.  That's the primary care.  But I
²⁴ appreciate that it has become the

Confidential Information Subject to Protective Order

Page 74

1  national standard of care to offer the
2  patients that study.
3      Q.   And when you say identify
4  something that might help, what do you
5  mean?
6      A.   So you always want to find a
7  cancer earlier when you can.  It turns
8  out to be a very complicated science.
9          And, you know, people think
10 there is a test, you should just take it.
11 And they don't always understand that it
12 may help them live longer or better and
13 that there are risks associated.
14          And to be very clear, I hate
15 cancer, right, like if I could, find
16 every cancer early and treat curatively,
17 curative intent.
18          Yesterday I told one new
19 patient that they would have two and a
20 half years to live with chemotherapy,
21 life with chemotherapy.  I told one
22 patient that it was six months with or
23 without treatment, and I told one patient
24 it was weeks.

Page 75

1          So you have to understand
2  how passionately I wish that there were
3  tests that could find this.  And I
4  appreciate that that's Dr. Kaplan's wish
5  also.  We are on the front lines caring
6  for the most vulnerable patients.
7          And so, if there is a
8  validated intervention that meets the
9  level of approval based on the research
10 by the United States Preventative Task
11 Force, I'm appreciative of that national
12 standard of care.
13     Q.   If the -- so the tobacco
14 screening protocol came into existence on
15 date X.  We don't know when it was, but
16 it was a certain date, correct?
17     A.   You mean through the United
18 States Preventative Task Force.
19     Q.   Yes.
20     A.   I think it was 2011.
21     Q.   2000 --
22     A.   '11.
23     Q.   '11.  Would it have been
24 helpful to patients in 2008 to get that

Page 76

1  extra screening?
2          MR. KUM:  Objection.  Calls
3  for speculation.  Incomplete
4  hypothetical.
5          THE WITNESS:  I can answer?
6          MR. KUM:  You can answer.
7          Doctor, just as a reminder
8  I'm just objecting for the record.
9  Unless I specifically instruct you
10 not to answer, you need to answer
11 her question.
12          THE WITNESS:  I think until
13 it was established, again since
14 you're doing biopsies or surgeries
15 within the thorax, that the
16 benefit outweighed the risk.
17          I don't know that it would
18 be worth the radiation exposure.
19 I don't know that that technology
20 for low dose spiral CT was
21 available then.
22          So I can't really speak to
23 that.
24          But again, you don't want to

Page 77

1  do a test that's risky unless you
2  have some data showing that the
3  magnitude of benefit is greater
4  than the magnitude of harm, and it
5  met that threshold.
6  BY MS. GEMAN:
7      Q.   So you would not have
8  supported a patient undergoing that
9  screening protocol in 2010?
10     A.   I think it was only offered
11 on clinical trial, which is how these are
12 usually delivered.
13     Q.   Okay.  But you offer your
14 patients clinical trials all the time,
15 correct?
16     A.   I always try and put
17 patients on a clinical trial when I have
18 the opportunity.
19     Q.   So then would you have
20 supported a patient undergoing that
21 screening protocol in 2010?
22     A.   Only within the context of a
23 clinical trial.
24     Q.   Okay.  But the answer then

Confidential Information Subject to Protective Order

Page 78

¹ is yes, you would have supported a
² patient undergoing that screening
³ protocol in 2010?
⁴         MR. KUM:  Objection.
⁵     Misstates testimony.
⁶     You can answer again.
⁷         THE WITNESS:  If it were
⁸     within the context of a clinical
⁹     trial, I would support it.
¹⁰ BY MS. GEMAN:
¹¹     Q.   Are there other
¹² circumstances under which you would
¹³ support a screening protocol that is not
¹⁴ yet embedded in the task force?
¹⁵     A.   Can you give me an example,
¹⁶ please?
¹⁷     Q.   Well, you said a clinical
¹⁸ trial is one; is that right?
¹⁹     A.   If there were clinical trial
²⁰ specific to that question.  Again, this
²¹ is much more in the primary care domain.
²² They already have been diagnosed with
²³ cancer by the time they reach me.  So
²⁴ it's a little hard for me to speak to

Page 79

¹ that exact circumstance.
²         But I worry that if I order
³ a test, I don't know what to do with it.
⁴ And I could harm the patient in the
⁵ workup of -- I'll put it to you this way.
⁶         We can order a lot of tests.
⁷ And there's a lot of really fun tests to
⁸ order that sound amazing.  But every time
⁹ you order a test -- I teach this to the
¹⁰ residents and med students and fellows
¹¹ all the time -- you have to know what
¹² you're going to do with the result.
¹³         And, you know, I'll give you
¹⁴ a noncancer example, and I'll give you a
¹⁵ cancer example.
¹⁶         So if you have a patient
¹⁷ with a fever in a hospital, they may be
¹⁸ tachycardic.  And a resident or a student
¹⁹ will see that elevated heart rate and
²⁰ order an EKG.
²¹         And I ask them, you know,
²² why did you order the EKG?  They are
²³ tachycardic.  What are you going to do
²⁴ with that information?  How does it

Page 80

¹ inform their care?  How does it help
² them?
³         If you put them on telemetry
⁴ which monitors their heart rate, they're
⁵ tethered.  They may get confused.  They
⁶ may fall.
⁷         You can't give them a
⁸ medicine to slow down the heart rate,
⁹ because the cause of the elevated heart
¹⁰ rate is the fever.  Are you going to get
¹¹ a cardiology consult?  There's -- my
¹² point is, you have to know what to do
¹³ with every test you order.
¹⁴     Q.   I appreciate that.  So I'm
¹⁵ going to ask you the same question again.
¹⁶ And just, please, if you could answer the
¹⁷ question that's asked.
¹⁸         Are there other
¹⁹ circumstances under which you would
²⁰ recommend a screening protocol that is
²¹ not yet embedded in the task force?
²²     A.   The -- I would say, you
²³ know, again through my cancer lens,
²⁴ because I'm not on the front lines of

Page 81

¹ primary care right now.
²         If I had a patient with a
³ hereditary cancer syndrome, not only --
⁴ and, you know, I can say specifically --
⁵ we have a dedicated GI genetics program,
⁶ so I refer to them.  They then manage the
⁷ timing of the screening.
⁸         I do think some of this is
⁹ within the caveats to the recommended
¹⁰ protocol for high risk population.  But
¹¹ that would be an example of a population
¹² that's sort of ordering a test or
¹³ consultation based on a high risk
¹⁴ feature, cancer feature for that
¹⁵ individual patient.
¹⁶         Obviously, it's individual
¹⁷ care and personalizing the care to the
¹⁸ patient.
¹⁹     Q.   So other than clinical
²⁰ trials and hereditary cancer syndrome,
²¹ are there other circumstances under which
²² you would recommend screening protocols
²³ that are not embedded in the task force?
²⁴     A.   And actually I think these

Page 82

1 are in the task force. So inflammatory
2 bowel disease, you would refer. And
3 again, I'm not ordering a screening. I'm
4 referring to an expert who knows how to
5 manage that screening. So it's fraught.
6 It's fraught.
7         And you didn't want an
8 example, but may I offer one?
9     Q.   Well, I'd like to, if I
10 could, follow up on what you just said.
11         How is -- how is the
12 inflammatory bowel disease screening that
13 you recommend in the task force? Do you
14 mean it's in the caveats, or -- I just
15 want to understand.
16     A.   I think it's in the task
17 force recommendations that there are
18 different intervals within -- as we were
19 speaking, colorectal screening for a
20 certain population.
21     Q.   And what are the caveats?
22     A.   So the intervals of -- and
23 actually, I think this only applies to
24 colon cancer screening. There's no

Page 83

1 special indication for esophagogastric or
2 pancreas or others deemed as high risk.
3 I believe the interval was changed of the
4 endoscopy screening.
5     Q.   So I'm -- this might be my
6 misunderstanding. You referred earlier
7 to the caveats protocol. Can you tell me
8 what that is?
9     A.   I'm not sure what that means
10 in terms of caveat protocol. I know
11 within the United States preventive task
12 force, there's a recognition that
13 hereditary cancer syndrome and
14 inflammatory bowel disease confers a
15 higher risk of bowel cancer, and the
16 interval of screening is shortened from
17 ten to five years.
18     Q.   Are there any other
19 recognitions of high risk categories in
20 the USPSTF?
21     A.   So they only recommend
22 screening for a handful of cancers. I
23 think, again, the hereditary cancer
24 syndrome changes mammography. That's

Page 84

1 usually -- I remember that being a higher
2 risk.
3         I don't know that there's
4 any other caveat. There might be for
5 prostate cancer with no BRCA. But I
6 don't know for sure. I would have to
7 look at it.
8     Q.   Do you support special
9 screening for people who may be BRCA
10 positive?
11     A.   It depends. So for example,
12 with pancreas cancer, BRCA1 doesn't
13 really infer greater risk, but BRCA2
14 does. So again, it's individualized to
15 the patient.
16     Q.   Well, within that same
17 patient, that wouldn't be two separate
18 BRCA tests, correct? Wouldn't it just be
19 a test for BRCA and the information might
20 be inform relevant to one cancer than
21 another, but it's the same test; is that
22 correct?
23     A.   There is -- you know,
24 there's different -- there's Myriad,

Page 85

1 there's Ambry, there are panels that look
2 for the most concerning. They test a lot
3 of genes. It's usually about 10 to 12.
4         We actually have specialized
5 gene profiles for every -- for every
6 disease site.
7     Q.   No, but my question was a
8 little different, which is when you --
9 when you take that test, it's not like
10 there's a test for BRCA that -- the
11 pancreas BRCA versus the breast BRCA.
12 You're just testing for BRCA.
13     A.   Oh, I'm sorry. It's one,
14 you know, deleterious gene in the panel.
15     Q.   It's one allele?
16     A.   Yes.
17     Q.   And likewise for those 10 to
18 12 that you mentioned, each one, it's not
19 like there's organ specific alleles. You
20 have the allele or you don't; is that
21 right?
22     A.   Correct.
23     Q.   And so do you support
24 special screening for people who may be

Page 86

1 BRCA positive?
2       A.   So again, I refer them to --
3 we have cancer risk evaluation program,
4 as do most academic institutions.  I'm
5 sure Dr. Kaplan has access to that at
6 Rush as well.  And we usually refer them
7 to them, and then they direct the
8 screening.
9            We also, you know -- we test
10 a patient for, you know, any hereditary
11 cancer syndromes.  And if we identify it,
12 we refer them, and then they manage the
13 patient and any evaluation for their
14 kindred, for their family.
15      Q.   So you do support special
16 screening for people who may be BRCA
17 positive?
18      A.   I think that's, you know, as
19 stated within the guidelines,
20 appropriate.  You don't want to miss that
21 family or that patient.
22      Q.   What do you mean by miss
23 that family or the patient?
24      A.   Well, if you don't test, you

Page 87

1 don't know.  And if you identify the
2 patient, you refer them.
3      Q.   Have you ever had occasion
4 to study screening protocols that arose
5 out of lawsuits or mass accidents?
6      A.   No.
7      Q.   Have you ever studied
8 screening protocols for mutagens without
9 a threshold?
10           MR. KUM:  Objection.  Vague.
11 And ambiguous.
12           MS. GEMAN:  Sure.
13 BY MS. GEMAN:
14      Q.   Have you ever -- have you
15 ever studied screening protocols based on
16 a person's exposure to a mutagenic agent?
17      A.   No.  The patient that I
18 testified for, that wasn't a screening
19 protocol issue.
20      Q.   Okay.  And with that
21 patient, was it limited to -- were the
22 concerns about the workplace conditions
23 limited to his workplace facility?
24      A.   Yes.

Page 88

1      Q.   And would you support -- and
2 I'm sorry.
3           Was the company culpable in
4 not having sufficient workplace
5 protections?
6           MR. KUM:  Objection.  Calls
7 for a legal conclusion.
8           THE WITNESS:  I just
9 testified about his case.
10 BY MS. GEMAN:
11      Q.   Got it.
12      A.   And I don't really -- I
13 didn't even know what happened until I
14 later asked to get a copy of the
15 deposition to present to you.
16      Q.   And I think you mentioned
17 that there was a lot of cancers in the
18 part of the body that -- where there had
19 been a hood.
20           MR. KUM:  You have to give a
21 verbal response.
22           Sorry.
23           THE WITNESS:  Yes.  Sorry.
24 BY MS. GEMAN:

Page 89

1      Q.   Would you have -- were any
2 of the -- were any of the types of
3 cancers that that gentleman had cancers
4 where early testing could affect the
5 course of the illness?
6      A.   No.
7      Q.   Because they were
8 untreatable cancers?
9      A.   There are no United States
10 Preventive Task Force guidelines for
11 skin.  Actually, it's not -- I should say
12 it's not recommended for skin.  There are
13 no screening recommendations for pancreas
14 cancer.  There is no screening
15 recommendation -- well, I should say it's
16 I, they rate it as an I, which is their
17 lowest level of evidence.
18           So I think pancreas is an I.
19 Skin is an I.  Melanoma -- so that's
20 melanoma and basal cell and testicular,
21 there are no recommendations to screen
22 for those cancers.
23      Q.   If skin cancer is caught
24 early, that can help stop its spread,

Page 90

¹ correct?
²       A.   Certainly want to have eyes
³ on the skin.  But I don't know how -- and
⁴ I don't know how or why it is not in the
⁵ protocol.
⁶       Q.   But my question is separate
⁷ from what's in the protocol.  If skin
⁸ cancer is caught early, that can help
⁹ stop its spread, correct?
¹⁰       A.   Which skin cancer?
¹¹       Q.   Any skin cancers.
¹²             MR. KUM:  Vague and
¹³       ambiguous.
¹⁴             If you know.
¹⁵             THE WITNESS:  So basal cells
¹⁶       tend to stay localized.
¹⁷             So -- and then squamous
¹⁸       cells can spread.  Melanoma can
¹⁹       spread.
²⁰ BY MS. GEMAN:
²¹       Q.   Okay.  So if the cancer is
²² caught early, can it help stop the spread
²³ of melanoma or squamous cell skin cancer?
²⁴       A.   So I'm not sure why the

Page 91

¹ decision was made that the evidence isn't
² robust enough to make that a
³ recommendation.  I can't speak to why to
⁴ that level of evidence.
⁵       Q.   I appreciate that.  My
⁶ question is a little different, which is,
⁷ in your opinion as an oncologist, if
⁸ melanoma or squamous skin cancer is
⁹ caught early, can that help prevent its
¹⁰ spread?
¹¹       A.   I think probably yes.  I
¹² would assume yes.  But I don't know about
¹³ the screening protocol, if that actually
¹⁴ helps it be caught early.  I guess that
¹⁵ might be the issue.  We always -- that's
¹⁶ what I would say.
¹⁷       Q.   And can certain pancreatic
¹⁸ cancers be prevented from metastasizing
¹⁹ if caught early enough?
²⁰       A.   So this is a hard, hard one.
²¹ And believe me, everyone is trying to
²² figure it out.
²³             So there -- in the --
²⁴ there's an ongoing clinical trial called

Page 92

¹ CAPS5.  And it started in 2014.  And it
² ends -- hopefully it will be accrued by
³ 2025.  And their goal -- because this is
⁴ an unanswered question.  And it's been
⁵ very elusive.  And their goal is to see
⁶ if you do -- I can't remember if it's
⁷ every six months or yearly, endoscopic
⁸ ultrasounds, and you test -- you give
⁹ them secretin and you test the pancreas
¹⁰ juice or you biopsy a cyst.
¹¹             And they are seeing if
¹² scheduled interval of testing affects the
¹³ outcome.
¹⁴             I -- there is another study
¹⁵ that is very disheartening.  And they
¹⁶ took about -- let's see, it was almost
¹⁷ 700 patients, and they did endoscopic
¹⁸ ultrasounds, and I can't remember if it's
¹⁹ MRI or CT at very regular intervals.
²⁰             And they tracked -- these
²¹ were patients, like, BRCA, hereditary
²² cancer syndromes that are known to have
²³ an increased risk, about 5 to 7 percent
²⁴ risk.

Page 93

¹             And they tracked them.  It
² actually took 16 years to get any kind of
³ an answer.  And of the 20 percent -- so
⁴ that's about 70 patients who had a cyst
⁵ or something growing, I think 10 or 12 of
⁶ them had a frank cancer develop, and less
⁷ than ten were able to go to the OR with
⁸ curative intent.  And I think that their
⁹ five-year survival -- it wasn't
¹⁰ 100 percent, but it was a little higher.
¹¹             But again, this is 16 years
¹² of invasive procedures.  And the problem
¹³ is, we actually still don't have an
¹⁴ answer for that population.
¹⁵             There are three lesions
¹⁶ that, you know, just like with colon
¹⁷ cancer, you take it from polyp to cancer
¹⁸ over, you know, years, decades, which is
¹⁹ why they set the threshold of the
²⁰ intervals.
²¹             So there's three lesions
²² that they follow.  And one is IPMN, which
²³ is an intraductal mucinous, IP --
²⁴ mucinous neoplasm.  And the next one is

Page 94

[1] MCN, the mucinous cystic neoplasm.  And
[2] both of those have the potential to turn
[3] into cancer, but it's very low.
[4]         The most likely is something
[5] called PanIN.  And unfortunately these
[6] lesions are usually under 5 millimeters.
[7] You can't see them on a scan.  You really
[8] can only see them under a microscope.
[9] And they transform from PanIN 1 to PanIN
[10] 3.  There's -- over years, they can
[11] follow these things.
[12]         And the problem with them is
[13] they may not be really visible to the
[14] human eye.  This is -- this is the
[15] problem with this cancer.
[16]         And so they -- but they go
[17] right to the vein.  And the way the blood
[18] flows, the cancer goes into the vein and
[19] goes right to the liver.
[20]         And so, you know, part of
[21] that has been the issue.  We cannot
[22] reliably, even in a high risk population,
[23] know that screening is helping in any
[24] meaningful way.  We're still waiting for

Page 95

[1] that data.
[2]         And, you know, there is
[3] potential harm.  They stopped screening,
[4] to be very clear, if -- they kind of base
[5] it on the patient's life expectancy.  And
[6] interestingly, these cancers develop at
[7] the same age as regular patients that
[8] develop pancreas cancer, so 65, 70.
[9]         Again, they followed them
[10] 16 years.
[11]         So, it's -- and there's no
[12] blood test that's been reliable.
[13]         So it's -- it's a difficult
[14] issue.  And that's why there's, you know,
[15] no guidelines.  We're really trying to do
[16] clinical trials to answer the question.
[17]         And there's not tremendous
[18] optimism, even for these higher risk
[19] patients, that we're going to be able to
[20] figure it out.
[21]         And just one more thing.  So
[22] pancreas -- you hit my sweet spot.  I
[23] trained in pancreas.
[24]         Pancreas is actually a

Page 96

[1] really rare cancer.  It's designated as
[2] an orphan cancer.  It's only 3 percent of
[3] all cancers.  I think the number is 13 in
[4] 100,000 people will develop pancreas
[5] cancer.  Of course it has a really bad
[6] reputation, because it's difficult to
[7] treat.
[8]         And just for context,
[9] cancers that have established screening
[10] protocols that are effective, breast
[11] cancer, the risk of a woman developing
[12] breast cancer, I think is 1 in 8 in her
[13] lifetime.  And the general risk for colon
[14] cancer is 1 in 25.
[15]         So that's just to put in
[16] perspective 13 in 100,000 people will
[17] develop pancreas cancer.
[18]         And that's why it has an
[19] orphan designation.  In the U.S. I think
[20] it's about 56,000 cases per year.
[21]     Q.  So in the Johnson & Johnson
[22] case that you -- for which you provided
[23] testimony, would you have supported
[24] workers who were similarly situated to

Page 97

[1] your patient being given notification and
[2] the option to screen for skin cancers?
[3]         MR. KUM:  Objection.
[4] Incomplete hypothetical.  Assumes
[5] facts not in evidence.
[6]         THE WITNESS:  I don't know
[7] that it was known.  I can't really
[8] speak to that time.
[9]         There's -- even for patients
[10] with heavy history of burns,
[11] sunburns in childhood, there
[12] aren't any clear guidelines.
[13]         I will say, certainly,
[14] again, falls between the patient
[15] and their caregiver and the clinic
[16] physician or provider, that if,
[17] you know, the patient reported
[18] that, they'd probably pay more
[19] attention to the skin, just like
[20] if a patient reported a symptom,
[21] they would pay attention to the
[22] symptom.
[23] BY MS. GEMAN:
[24]     Q.  So you would support the

Page 98

1 patients being notified of the need to
2 pay more attention to their skin?
3       A.   I don't know.  I can't speak
4 to that time.  I don't know that he knew
5 it at the time or that it was known.  I
6 actually have no way to know that answer.
7       Q.   So you can't answer that
8 question, as to whether you would support
9 anyone -- you know, others who may have
10 worked under the same conditions as your
11 patient being notified that they should
12 pay particular attention to their skin as
13 a result of an exposure in the workplace?
14       MR. KUM:  Asked and
15       answered.
16       THE WITNESS:  I don't know
17       what was known or not known.  And,
18       you know, some people get exposed
19       to a lot of radiation and never
20       get cancer.  And some don't.  I
21       think at that time, since it was
22       all unknown, he was getting, you
23       know, more evaluations because of
24       his history of growing up at the

Page 99

1       shore.
2           But I don't think it was
3       known.  And so I really can't
4       speak to that.
5 BY MS. GEMAN:
6       Q.   But sitting here now, if
7 there were other similar workers to your
8 patient, meaning people who worked under
9 the same workplace conditions, don't you
10 think they should have been advised about
11 the risk exposure?
12       A.   Well --
13       MR. KUM:  Objection.  Calls
14       for speculation.  Assumes facts
15       not in evidence.
16 BY MS. GEMAN:
17       Q.   You can answer.
18       A.   I'll just say that he didn't
19 die from metastatic melanoma or basal
20 cell cancer.  They were surgically
21 removed when they were seen.  He died of
22 a cancer that's deep inside the body that
23 you can't screen for.
24           So, you know, I don't know

Page 100

1 how to answer that question.
2       Q.   Well, I wasn't asking how
3 that -- under those terrible facts how
4 that gentleman died.
5           What I was asking is whether
6 you would support notification to other
7 workers, working under the same
8 conditions, that they should pay special
9 attention to, at minimum, their skin?
10       MR. KUM:  Calls for
11       speculation.
12       THE WITNESS:  I don't know.
13       I don't know the answer.  It's way
14       back in time in a circumstance
15       that I really can't speak to.
16 BY MS. GEMAN:
17       Q.   What is C8?
18       A.   Excuse me.
19       Q.   What is carbon 8?
20       A.   A molecule.  An element.  I
21 don't know what you're --
22       Q.   Fair enough.  Have you ever
23 heard of something called PFOA?
24       A.   Not that I recall.

Page 101

1       Q.   I'm going to butcher this,
2 so bear with me.  Have you ever heard of
3 ammonium perfluorooctanoate?
4       A.   No.  I've heard of a lot of
5 things in all of my training.  I can't
6 remember that exact.
7       Q.   Okay.  Because I butchered
8 it so badly, I'm going to ask the court
9 reporter's indulgence in spelling it.  So
10 it's ammonium, A-M-M-O-N-I-U-M,
11 P-E-R-F-L-U-O-R-O-O-C-T-A-N-O-A-T-E.
12           So just to circle back,
13 whether known as carbon 8 or PFOA or
14 ammonium perfluorooctanoate, et cetera,
15 have you ever heard of that molecule in
16 connection with cancer?
17       A.   It's not familiar.  I
18 don't -- you know, have I ever heard of
19 it?  I took organic chemistry.  I may
20 have.
21       Q.   Okay?
22       A.   But there's a lot back in,
23 you know, 25 or 30 years ago that I --
24 just trying to be very truthful.  I

Confidential Information Subject to Protective Order

Page 102

1 certainly don't remember it sitting here.
2    Q.   Okay.  Do you remember
3 generally that a lot of -- that there are
4 a number of carbon molecules used in --
5 not just C8, but used in industrial
6 settings that can be carcinogenic?
7        MR. KUM:  Objection.
8    Outside the scope of her report.
9        THE WITNESS:  Yeah, I think,
10    again, I was not -- I'm not a
11    causative witness.  So I would
12    rather direct the discussion, if I
13    may, to the content of my letter,
14    which speaks to Dr. Kaplan's
15    proposed medical monitoring.
16 BY MS. GEMAN:
17    Q.   Fair enough.  But I am
18 entitled to the answer.  Do you have
19 knowledge as to whether there are certain
20 carbon molecules regularly used in
21 industrial settings that can, under some
22 circumstances, be carcinogenic?
23        MR. KUM:  Same objections.
24    If you know.

Page 103

1        THE WITNESS:  I don't know
2    specific molecules.  I know there
3    are industries of concerns like
4    metal and rubber.  I know there
5    are inhaled concerns from certain
6    agents.  But I don't really have a
7    list of them.
8 BY MS. GEMAN:
9    Q.   Does the USPTF have special
10 screening guidelines for people exposed
11 to excessive C8, carbon 8?
12    A.   I don't think so.
13    Q.   If there were a medical
14 monitoring program approved by a court
15 that provided that individuals improperly
16 exposed to excessive levels of C8 --
17 under which those individuals could
18 receive medical monitoring, would you
19 think that was inappropriate?
20        MR. KUM:  Objection.
21    Outside the scope of her report.
22    Calls for speculation.
23        If you have an opinion,
24    Doctor.

Page 104

1        THE WITNESS:  It's really
2 outside of the scope of the
3 report.
4        I focused on the potential
5 exposure of an impurity.  And I
6 will contend again that within the
7 construct of the national
8 guidelines, the only modification
9 for an exposure is 20 years of
10 tobacco from age 55 to 80 with the
11 example then, again, that
12 asbestos, which is known to
13 increase risk; radon, which is
14 known to increase risk, is not
15 part of that recommendation.
16        And, you know, another point
17 of knowledge is, for example, we
18 know that Barrett's esophagus,
19 which is a known precancerous
20 condition with a rate of
21 conversion to frank malignancy of
22 1 to 3 percent every year, also
23 does not change the guidelines.
24        So we have known human

Page 105

1 carcinogen exposure that don't
2 change the national guidelines,
3 and known premalignant conditions
4 that don't change the guidelines.
5        I can't speak to an exposure
6 about a chemical that I just don't
7 understand to a population that I
8 don't know about.
9        So -- but I -- I can speak
10 to the guidelines and the general
11 premise that exposures don't
12 change cancer screening.
13 BY MS. GEMAN:
14    Q.   Okay.  But can we agree or
15 do you agree that the presence or not of
16 a screening protocol in the task force,
17 does not prevent an otherwise valid
18 monitoring program from being enacted?
19        MR. KUM:  Objection.  Calls
20    for speculation.  Vague and
21    ambiguous.
22        THE WITNESS:  I really don't
23    know.
24 BY MS. GEMAN:

Confidential Information Subject to Protective Order

Page 106

Q.   Okay.  I mean, your upshot is if the monitoring program is not in the guidelines, it shouldn't be done, correct, other than those circumstances which you've already detailed?

A.   My upshot is that I appreciate the expertise and time that the experts in general internal medicine, pediatrics, biostatistics, health services research, that they put the time in and continue to do so based on the available literature for the average risk population, the asymptomatic population with some added information for the high risk population.

Again, noting that there are some high risk populations that -- or someone might say they were high risk, where the benefit of an invasive procedure is not deemed high enough relative to the magnitude of potential harm to change the guideline.

Q.   Well, you understand that a medical monitoring program ordered by a

Page 107

court after a finding of culpability by defendants does not change the guidelines for people of average risk, correct, but instead focuses on a subpopulation of particularized risk?

MR. KUM:  Objection.  Calls for a legal conclusion.  Calls for speculation.

THE WITNESS:  I don't really know much about that, to be honest.

It sounds very specific.

BY MS. GEMAN:

Q.   Well, it's specific and it's general.  I mean the question is:  Do you -- do you -- is it your view that any screening program is inappropriate, other than the two exceptions that you mentioned, unless it's already set forth in the guidelines?

A.   I don't feel really comfortable commenting without reviewing it.  It sounds like a broad topic.  It was not the focus of my report, which

Page 108

very specifically addressed the tests put forward by Dr. Kaplan.

Q.   Okay.  So it's not your opinion that any protocol, other than what already exists in the task force is ex-ante inappropriate?

MS. GEMAN:  Sorry, E-X, A-N-T-E.

THE WITNESS:  I don't really know what that means.  Is it Latin?

BY MS. GEMAN:

Q.   Sure.

It's not your opinion that any protocol other than what already exists in the task force, is categorically inappropriate?

A.   It is my opinion that this protocol put forward by Dr. Kaplan is extremely risky to these patients.  And quite honestly, it's not clear to me they're put forward without any evidence relative to the cancers he recommends them for.

Page 109

I really think I can only speak to what is in my expert letter.  And it's really outside of the scope of what I was asked to do and what I prepared for to address this.

Q.   Well, I am entitled to the answer you're able to give now.  Is it your opinion that any protocol, other than what's already extant in the task force, is categorically inappropriate?

MR. KUM:  Asked and answered.

You can answer it again, Doctor.

THE WITNESS:  I'm just going to say I don't know.

BY MS. GEMAN:

Q.   Okay.

A.   I don't have enough information.  But I can say that this protocol is incredibly risky.  And I'm happy to address the different tests and scenarios and risks that could arise from it, for this vulnerable class of cardiac

Confidential Information Subject to Protective Order

---

Page 110

¹ patients.
² Q. Does the -- did the task
³ force consider and reject the protocol --
⁴ strike that.
⁵ Does the task force in
⁶ addition to its caveats, allow for
⁷ change?
⁸ A. So again, they have a very
⁹ sophisticated literature watch. And if
¹⁰ updated information comes, they very
¹¹ eagerly consider it.
¹² For example, the last update
¹³ for pancreas cancer, they reviewed the
¹⁴ available literature and, again, were
¹⁵ recommended no specific protocol,
¹⁶ screening protocol, either for
¹⁷ asymptomatic average risk patients or
¹⁸ high risk patients based on the evidence.
¹⁹ So I think you're asking me
²⁰ if they are up-to-date and flexible. And
²¹ I would say within the constructs of the
²² available literature, they are very much
²³ attuned to evidence-based medicine.
²⁴ Q. So the task force has

---

Page 111

¹ caveats, and they are not fixed forever,
² they can change?
³ A. They will update their
⁴ recommendations based on any new
⁵ important studies or findings. That is
⁶ their mandate.
⁷ Q. Do you think it is
⁸ appropriate for someone who has one or
⁹ two biological parents with a marker for
¹⁰ Huntington's to get the test to see if
¹¹ they have the marker?
¹² A. I don't know much about
¹³ this.
¹⁴ I know that if it's offered,
¹⁵ a lot of people don't want to know.
¹⁶ That's actually all I know in that space.
¹⁷ Q. That's all you know in that
¹⁸ space? Okay.
¹⁹ A. Yeah.
²⁰ Q. What's the -- do you see any
²¹ benefit to knowing?
²² A. Well, it actually speaks a
²³ lot to the screening protocol. You can't
²⁴ change the outcome, whether you have it

---

Page 112

¹ or not. And there's no medical
² intervention.
³ So knowing it earlier won't
⁴ change your outcome or overall survival,
⁵ which is why I think a lot of patients
⁶ elect not to.
⁷ So again, that's a very
⁸ individual decision, but it plays to the
⁹ general point of screening, that you may
¹⁰ identify it earlier but it doesn't change
¹¹ your prognosis. That's actually -- I
¹² wish I thought of that. That was a good
¹³ example.
¹⁴ Q. So to be clear, we agree
¹⁵ that that is a paradigmatic example of
¹⁶ something that you can't change if you
¹⁷ know it?
¹⁸ A. Can you slow down and say
¹⁹ all those words, please?
²⁰ Q. Sorry. Sure.
²¹ To be clear, we agreed that
²² the marker for Huntington's in the HdG
²³ gene is sort of a paradigmatic example of
²⁴ something that you can't change. You

---

Page 113

¹ can't prevent getting Huntington's. You
² can't cure Huntington's if you have it.
³ Correct?
⁴ A. So the paradigm that finding
⁵ it earlier doesn't change the outcome.
⁶ Yes.
⁷ Q. Do you see any benefits,
⁸ nonetheless, to somebody being entitled
⁹ to find out if they have it?
¹⁰ A. Can you repeat the question?
¹¹ Q. Sure.
¹² Do you see any benefits to
¹³ somebody being entitled to find out if
¹⁴ they have it, it being the HdG marker?
¹⁵ A. So I think it depends on the
¹⁶ person. It's, again, very individual.
¹⁷ Some people would like to know so they
¹⁸ can plan their life and family affairs.
¹⁹ I think a large number would not want to
²⁰ know because of the anxiety and
²¹ psychological distress that it provokes.
²² So I think there are two
²³ sides to that. That's, I think, as I
²⁴ recall -- this is years ago, that's some

---

Confidential Information Subject to Protective Order

Page 114

1 of the controversy.
2          And again, comes down to,
3 you know, not one-size-fits-all,
4 personalized care in the sacred clinic
5 space between that patient's physician
6 and the individual wishes of the patient.
7     Q.   Do you think it's
8 appropriate for someone who has one or
9 two biological parents with Parkinson's
10 to see if they have the LRRK allele?
11          MR. KUM:  Objection.
12 Outside the scope.
13          THE WITNESS:  Yeah, I don't
14 know about this.  I don't know
15 that I can comfortably address
16 this.
17          It's not anything within the
18 mission that I was given to answer
19 to the screening protocol that was
20 put forth by Dr. Kaplan, which is
21 the focus.
22          MR. KUM:  Doctor, just to be
23 clear.  Ms. Geman is entitled to
24 ask you whatever questions she

Page 115

1 wants to ask you.
2          If you happen to have an
3 opinion, then you can answer her
4 question.
5          But if you can't answer it,
6 you can tell her that as well.
7          THE WITNESS:  Okay.
8          MR. KUM:  I just wanted to
9 let you know.
10          THE WITNESS:  I don't know
11 is just sort of the answer.
12          MR. KUM:  That's a --
13          THE WITNESS:  That's the
14 answer.
15          MR. KUM:  -- a perfectly
16 acceptable answer.
17          THE WITNESS:  I'm going to
18 go with I don't know.
19          MS. GEMAN:  Okay.  Fair
20 enough.
21 BY MS. GEMAN:
22     Q.   Let's segue back to cancer,
23 to oncology.
24     A.   That's my sweet spot.

Page 116

1     Q.   Do you agree that a Stage 0
2 cancer that has not metastasized is more
3 treatable than cancer that has
4 metastasized?
5          MR. KUM:  Objection.
6 Incomplete hypothetical.
7          THE WITNESS:  So it's a
8 fascinating question, because we
9 know that not all cancers will
10 progress.
11          And even though we offer
12 surgery or medications, we can't
13 say that this cancer will either
14 grow, progress, within your
15 lifetime.
16          So while it's sort of a
17 comforting thing to say that we
18 offer someone treatment, there's
19 no way to know that it changes
20 their overall survival.
21          And the flip is, if it
22 didn't, they've just been
23 subjected to surgery and
24 potentially other therapies that

Page 117

1 are harmful.
2          We always hope to catch it
3 earlier.  That would be my dream
4 for every patient.
5 BY MS. GEMAN:
6     Q.   And you would treat a Stage
7 0 cancer?
8     A.   I don't really know right
9 now what the standard of care is for
10 Stage 0 cancer.  There's different cancer
11 types.  And that's certainly a field
12 that's had a lot of evolution and nuance
13 since my time in fellowship.
14     Q.   Do you agree that cancer
15 screening can prevent certain advanced or
16 incurable cancers?
17     A.   I'm going to parse that out
18 a little bit.
19          So cancer screening can --
20 it doesn't -- nothing clearly prevents
21 cancer.
22          Cancer screening is designed
23 to find cancers earlier when they're more
24 amenable to treatment.

Confidential Information Subject to Protective Order

Page 118

1    Q.   So again, that's helpful.
2  Thank you.
3        Do you agree that cancer
4  screening followed by appropriate
5  treatment can prevent certain advanced or
6  incurable cancers?
7    A.   So the data that seems the
8  most promising, or I should say most
9  established, is that in terms of cancer
10  screening in an asymptomatic population,
11  which is validated, is through the task
12  force, and includes breast cancer, colon
13  cancer, prostate cancer with a negative
14  recommendation for screening, and lung
15  cancer.
16        I don't know what the
17  benefit is in other cancers compared to
18  the risk.
19    Q.   And a colonoscopy can both
20  screen for and treat a precancer; is that
21  correct?
22    A.   So that's a great question.
23        So you do sort of think of
24  it as both screening and potentially

Page 119

1  therapeutic if you're able to catch a
2  polyp.  The data actually isn't
3  completely mature to see if it's making
4  people live longer.
5        But, you know, it's the
6  practice that is the presumption.  Colon
7  cancer rates are ever so slightly
8  decreasing, although it's interesting
9  that there are so, so, so many
10  colonoscopies.
11        I would like to think that's
12  true.  I don't have the -- I haven't read
13  any updated studies on whether or not
14  that's confirmed.  It's actually a little
15  bit more in the gastroenterology
16  literature.
17    Q.   And the risk of colon
18  cancer -- I'm sorry.  Strike that.
19        The risk of perforation from
20  a colonoscopy have gone down since 1987,
21  correct?
22    A.   I don't know that data.
23  That's really -- I don't know went down.
24  I know the general perforation risk.  I

Page 120

1  don't know that data.
2    Q.   Do you believe that it's the
3  same now as it was 35 years ago?
4    A.   I can't say with any, you
5  know, certainty.  I really don't know
6  that data.  I hope so.
7    Q.   Okay.
8        MR. KUM:  Whenever you get
9  to another stopping point,
10  Counsel.
11        MS. GEMAN:  Sure.
12        Should we -- can we go off
13  the record for a second.
14        THE VIDEOGRAPHER:  Stand by.
15  11:31.  We are off the video
16  record.
17        (Brief recess.)
18        THE VIDEOGRAPHER:  11:41.
19  We are on the video record.
20        MS. GEMAN:  I'm going to
21  introduce two exhibits.  What's
22  marked as Exhibit 1 is entitled
23  the Amended Notice to Take
24  Videotaped Oral Deposition.

Page 121

1        (Document marked for
2  identification as Exhibit
3  Teitelbaum-1.)
4        MS. GEMAN:  What's been
5  marked as Exhibit 3 -- we'll come
6  back to 2 -- is Defendants'
7  Responses and Objections to
8  Plaintiffs' Notice of Videotaped
9  Deposition of Dr. Ursina
10  Teitelbaum.
11        THE WITNESS:  Ursina.
12        MS. GEMAN:  Ursina, I
13  apologize.
14        (Document marked for
15  identification as Exhibit
16  Teitelbaum-3.)
17        MS. GEMAN:  Madam Court
18  Reporter, please hand the witness
19  the exhibits.
20  BY MS. GEMAN:
21    Q.   Do you recognize, Doctor,
22  what's been marked as Exhibit 1 and
23  Exhibit 3?
24    A.   I see Exhibit 1.  And that's

Page 122

1  3.  And there's 2.  And that's 4.
2        I think I didn't read
3  through Exhibit 3.  But I think I've seen
4  the document or read through it briefly.
5  But, you know, yes.
6        Q.   Please turn to Page 3 of
7  Exhibit 1.
8        A.   Yes.
9        Q.   Do you see where it says,
10 "Document requests"?
11       A.   Yes.
12       Q.   Did you look for documents
13 in response to this request?
14       A.   Every single number.
15       Q.   Do you have a formal
16 retention letter?
17       A.   No.
18       Q.   Do you know if RX Pro has a
19 formal retention letter?
20       A.   I don't know.
21       Q.   Is part of the income that
22 you're earning in connection with this
23 engagement going to RX Pro?
24       A.   I believe so, yeah.  I think

Page 123

1  so.
2        Q.   So you have an hourly rate
3  and a fee schedule, correct?
4        A.   Yes.
5        THE VIDEOGRAPHER:  I
6        apologize.  You're hitting the
7        microphone.  Yeah.  Thank you.
8  BY MS. GEMAN:
9        Q.   Is it that you're then
10 giving part of what you receive over to
11 RX Pro or do you understand that they are
12 separately billing?
13       A.   I am asked to send my bills
14 to them.  And I do that, and then they
15 pay me.  And I assume that they are
16 adding on a fee.
17       Q.   So how much per hour are you
18 personally getting?
19       A.   I'm personally getting $500
20 an hour.
21       Q.   And is it different for
22 testimony?
23       A.   That's like today?
24       Q.   Yes.

Page 124

1        A.   I think that's $750 an hour.
2        Q.   Okay.  Any other hourly
3  rates that you personally are getting?
4        A.   No.
5        MS. GEMAN:  I'm going to now
6  introduce as Exhibit 2 some
7  invoices.
8        (Document marked for
9        identification as Exhibit
10       Teitelbaum-2.)
11       MS. GEMAN:  If the court
12 reporter would hand them over to
13 you.
14 BY MS. GEMAN:
15       Q.   You have them?
16       A.   Yes.
17       Q.   So Doctor, what's been
18 marked as Exhibit 2 is the three invoices
19 that were provided to me.  And my first
20 question is, do you recognize this packet
21 of three invoices?
22       A.   I've actually never seen
23 this packet.
24       Q.   So there is a different

Page 125

1  document that you provide to RX Pro?
2        A.   Yes.
3        Q.   And that document itemized?
4        A.   Yes.
5        Q.   How many invoices have you
6  provided to RX Pro?
7        A.   I think three.
8        Q.   Do you recall when the first
9  one was?
10       A.   I can't remember if it was
11 December or early January.
12       Q.   And the second?
13       A.   Was probably maybe
14 mid-January.
15       Q.   And the third?
16       A.   I don't know the exact date.
17 I'm guessing it was end of January or
18 early February.
19       Q.   Have you been paid yet for
20 all the work that you've done in this
21 case, other than today?
22       A.   Yes, I have.
23       Q.   So there was -- you have
24 already been paid for your deposition

Confidential Information Subject to Protective Order

Page 126

¹ prep time?
²      A.   I haven't been paid for any
³ time since -- I have another invoice to
⁴ submit.  I waited until after today.
⁵           I don't know when the last
⁶ check came exactly.
⁷      Q.   Oh, I see.  So you've been
⁸ paid for the invoices for which you've
⁹ already submitted?
¹⁰      A.   These are the only ones.  I
¹¹ don't know if there are dates on them.
¹²      Q.   How much is current invoice
¹³ for, the one that you have not yet
¹⁴ submitted?
¹⁵      A.   So it is probably about ten
¹⁶ hours, and then I would add today.
¹⁷      Q.   And that's deposition prep
¹⁸ time and then the deposition today will
¹⁹ be added?
²⁰      A.   And I -- you know, I had
²¹ to -- yes.  And the transportation.
²² Yeah.
²³      Q.   Okay.  If you could look at
²⁴ the first page of this invoice.

Page 127

¹           Is this a standard retainer
² of yours?
³      A.   I haven't seen this.  I
⁴ didn't -- explain what a retainer is.
⁵      Q.   Oh, do you see under
⁶ description, it said retainer?
⁷      A.   Yes.
⁸      Q.   So I -- is this -- is this
⁹ an invoice for a retainer?
¹⁰      A.   I don't think I have a
¹¹ retainer.  I don't know.
¹²           Can you just say what a
¹³ retainer is again?  I just have an hourly
¹⁴ rate.
¹⁵      Q.   I understand.  Sometimes
¹⁶ experts will say, I have an hourly rate,
¹⁷ but to get us going, please send us a
¹⁸ retainer of X, and then that gets billed
¹⁹ against essentially?
²⁰      A.   I've only sent hours.
²¹ That's all I've sent.
²²      Q.   Okay.  So can you please
²³ turn to the second page.
²⁴      A.   Wait one second.  For him,

Page 128

¹ I'm going to take the chain off.  Yes.
²      Q.   Do you see in this invoice
³ dated 1/12/2022 that it indicates that
⁴ you had billed 51 hours?
⁵      A.   Yes.
⁶      Q.   Does that seem accurate?
⁷      A.   Yes.  I -- and you'll see
⁸ that in my expert letter.  I reviewed --
⁹ and that's what the printing cost is
¹⁰ actually.
¹¹           I reviewed all of the expert
¹² letters from defense and plaintiff.  My
¹³ living room looked like a minefield.  And
¹⁴ I actually reviewed every one of them.
¹⁵ It was so long that that's why I had to
¹⁶ print, because I'm still a bit married to
¹⁷ paper, and I couldn't really do all the
¹⁸ reading on the computer.
¹⁹           So that took some time, in
²⁰ addition to the literature search, which
²¹ took a fair amount of time, and then
²² writing the expert letter.
²³      Q.   Did you write the expert
²⁴ report?

Page 129

¹      A.   I did.
²      Q.   Were you provided any
³ language by others?
⁴      A.   The only language that I
⁵ incorporated was that -- what is it
⁶ called -- Rule 26.  That wasn't familiar
⁷ to me.  But I think that's sort of an
⁸ expert letter or legal definition maybe.
⁹      Q.   But everything else was
¹⁰ written by you, other than the --
¹¹ essentially the intro?
¹²      A.   Well, it wasn't really the
¹³ intro.  It was a little blurb, but yes.
¹⁴      Q.   Okay.  And does this
¹⁵ 51 hours reflect time spent writing the
¹⁶ report, as well as engaging in medical
¹⁷ review?
¹⁸      A.   This 51 hours, the reason
¹⁹ it's longer, is I read, in addition to my
²⁰ literature search, and the time I spent
²¹ writing, it did take some time to work
²² through those very dense expert letters.
²³      Q.   I appreciate that.  What I'm
²⁴ trying to understand is, does this

Page 130

1 51 hours include the time you spent
2 writing the report?
3     A.   Yes.
4     Q.   Okay.  Do you have a sense
5 of how much time was spent writing the
6 report?
7     A.   I'm trying to think.
8 Maybe -- because I kept going back and
9 looking at references.
10     It's hard to tell.
11     MR. KUM:  Just ballpark it
12     if you can.
13     THE WITNESS:  It was all
14     kind of entwined.  Probably 12 to
15     15 hours.  It's a lot of time.
16     Because my process is I
17     write, I research, I write, I
18     research.
19     And then whenever you look
20     things up, you find more things.
21     And then I go back.
22     I can tell you that it was
23     my entire winter break since
24     Omicron ruined our family travel

Page 131

1     plans.  So it was a lot of time.
2 BY MS. GEMAN:
3     Q.   So you spent between a half
4 an hour and 40 minutes writing each page?
5     A.   I can't really process it
6 that way.  I mean, some of it was
7 saying -- you know, the substantive
8 things took time.  Again, it's -- I was
9 saying before, I'm a pretty fast typist
10 once I get going.
11     So there was both research
12 and writing and reviewing.  I'm -- I was
13 a history major, so I really like looking
14 at primary documents and trying to
15 understand the literature.
16     Q.   And the third page of this
17 document, Exhibit 2, indicates 18 and a
18 half hours?
19     A.   Mm-hmm.
20     Q.   This time there's a
21 breakdown of detail.
22     Do you see that?
23     A.   Yes.
24     Q.   Do you know why there isn't

Page 132

1 a breakdown of detail on the previous
2 page?
3     A.   I'm not sure.  I broke down
4 detail, I think, with each time.  But I
5 can't remember for sure.
6     Q.   Do you know why the RX Pro
7 provided detail on one invoice and not
8 another?
9     A.   I don't know.
10     Q.   Did anybody edit your
11 report?
12     A.   I had, with typos and
13 grammar.
14     Q.   You said I had with typos?
15     A.   There was help with editing
16 for typos and grammar.  But the substance
17 was mine.
18     Q.   Help from RX Pro?
19     A.   No.  Help from -- I can't
20 remember who did it.
21     Q.   Was it someone that you work
22 with?
23     A.   It was someone on the team,
24 and they were, you know, capitalize this,

Page 133

1 a semicolon is better.
2     Q.   You mean the legal team?
3     A.   Yeah.  What is CLIA?  It was
4 like if I had an abbreviation.  It was,
5 like, grammar.
6     Q.   Okay.  Fair enough.  And if
7 we could -- and I'm sorry.  You indicated
8 that you do have another invoice to be
9 sent, correct?
10     A.   Yes.  After today.
11     Q.   Okay.  So let's, if we could
12 now, turn back to the document requests.
13     A.   Mm-hmm.
14     MR. KUM:  It's Exhibit 1.
15     THE WITNESS:  Yes.  Mm-hmm.
16 BY MS. GEMAN:
17     Q.   Now, earlier you indicated
18 you read Dr. Kaplan's deposition
19 transcript, correct?
20     A.   Yes.
21     Q.   All right.  Did you read any
22 other documents in preparation for this
23 deposition other than those listed in
24 your report?

Confidential Information Subject to Protective Order

---

Page 134

1     MR. KUM:  Asked and
2 answered.
3     You can go ahead.
4     MS. GEMAN:  It may have
5 been.  I just don't remember.
6     THE WITNESS:  I read and
7 listed the expert letters from
8 both plaintiff and defense.
9     I read Dr. Kaplan's expert
10 letter.  I read his deposition.
11     And I read my own letter --
12 BY MS. GEMAN:
13     Q.   Sure.
14     A.   -- before I came here.
15     Q.   Did you rely on any of the
16 expert reports that you reviewed in
17 forming your opinions?
18     A.   Actually, not at all.  They
19 were so dense, really, that it would not
20 have informed my opinion.
21     And again, you know, a lot
22 of it boiled down to whether or not NDEA
23 and NDMA are a carcinogen or not.  And
24 that did not at all inform my review of

---

Page 135

1 the medical monitoring protocol.
2     Q.   Do you have an opinion about
3 whether NDMA or NDEA are carcinogens?
4     MR. KUM:  Objection.
5 Outside the scope.
6     THE WITNESS:  I don't think
7 it's really germane to my review
8 of Dr. Kaplan's medical
9 monitoring, again, noting that
10 known carcinogens exposure does
11 not change task force
12 recommendations.
13 BY MS. GEMAN:
14     Q.   Do you have an opinion about
15 whether NDMA or NDEA are carcinogens?
16     A.   I have no opinion.
17     Q.   And have you authored any
18 materials about medical monitoring?
19     A.   Of medical monitoring -- oh,
20 like a list of testing, screening?
21     Q.   Sure.
22     A.   I haven't.
23     Q.   Have you authored any
24 materials about cancer screening?

---

Page 136

1     A.   Cancer screening, like
2 specific cancers or -- I have not.
3     Q.   And how did you select the
4 articles that you reviewed and that were
5 cited in your report?
6     A.   I'm using the Penn
7 biomedical library, interrogated PubMed.
8 And once or twice I had to go to OVID.
9 And I had one document that I had to have
10 them -- that was sort of an archived
11 document because of age.  I had to have
12 them retrieve it for me.  And then I
13 could look at it.
14     Q.   Was that the 1993 article?
15     A.   That's the Ekstram.
16     Q.   The what?
17     A.   The author is Ekstram.
18     Q.   Okay.  Was that about
19 colonoscopies?
20     A.   That was about Swedish
21 population, looking at cancer rates in, I
22 think, metal and rubber workers of
23 inhaled.
24     Q.   Did you look for contrary

---

Page 137

1 information?
2     A.   I really focused on the
3 screening protocols.  I read every
4 document that I thought was updated and
5 relevant.
6     Q.   So take an example of
7 anxiety caused by tests.  Did you read --
8 did you look for both articles that said
9 yes, testing causes anxiety or no,
10 testing doesn't cause anxiety?
11     A.   So in truth, it is a very
12 sparse literature.  There isn't a lot of
13 information.  So what I look for and have
14 always looked, if there seems to be a
15 predominate author who is an expert in
16 the field -- and you'll see that when you
17 pull up, some names come up over and over
18 again, which suggests to me that's really
19 their main area of study.
20     So I read those.  And, you
21 know, anything that seems pertinent to
22 the topic that's more recent.
23     Q.   So just to be more precise
24 though, did you look for contrary

---

Confidential Information Subject to Protective Order

1 information?  So if you were --
2     A.   So I didn't not look for.  I
3 put in the topic, and I looked at the
4 results.
5     Q.   And how did you determine
6 who, in your view, seemed to be the
7 predominate author?
8     A.   For which topic?
9     Q.   For any topic.
10     A.   Again, it was number of
11 citations.
12     Q.   So in your view, if an
13 article said testing doesn't -- just
14 picking any example, testing doesn't
15 cause anxiety, such that it's -- strike
16 that.
17         If an article said the cost
18 of anxiety does not outweigh the benefits
19 of the test, and another article said the
20 opposite, do you think the one with more
21 citations wins?
22     A.   I would probably list that
23 as a controversial area.
24         I definitely welcome all

1 sides.
2     Q.   And are there documents that
3 you read that you did not put in your
4 report?
5     A.   If I didn't cite the source,
6 I read -- in my initial look, I looked at
7 Wikipedia to find out about the way the
8 valsartan impurity -- the date -- to kind
9 of get the dates and a context, because I
10 wasn't familiar with it.
11         I have looked at the United
12 States Preventive Task Force website.
13 And I -- you know, just to understand the
14 process.
15     Q.   That's helpful.  So other
16 than the wiki background and the website,
17 are there other materials that you looked
18 at that you did not cite in your report?
19     A.   I'm not really sure.  I'm
20 more of an overciter than an underciter
21 because I never want to plagiarize.  So I
22 always try to give credit, knowing how
23 much time and effort people put into
24 their work.

1         So I don't really know how
2 to answer that.  But knowing how I do it,
3 I would imagine not.
4     Q.   So sitting here now, you
5 can't think of any articles that you
6 reviewed but you didn't put in the
7 article -- put in the report?  Excuse me.
8     A.   There were so many -- you
9 know, I didn't open every -- you know, it
10 gives you a hundred options.  I may have
11 looked through titles to see if it was
12 relevant.  But I didn't open every
13 article.
14     Q.   That's helpful.
15         Of the ones that you did
16 open and review, are they all cited in
17 your report?
18     A.   I hope so.
19     Q.   Okay.
20         MS. GEMAN:  Let's introduce
21 your report.
22         Does anybody need a copy of
23 it?
24 BY MS. GEMAN:

1     Q.   Doctor, has -- is what's
2 been marked as Exhibit 4 the report that
3 you wrote?
4     A.   Yes.
5         (Document marked for
6         identification as Exhibit
7         Teitelbaum-4.)
8 BY MS. GEMAN:
9     Q.   Thank you.  Is that your
10 signature on Page 25?
11     A.   It's my electronic
12 signature.
13     Q.   And it's dated January 12th;
14 is that correct?
15     A.   Yes.
16     Q.   And the work you did on this
17 report, as you earlier indicated, was
18 between approximately December 27th and
19 January 12th?
20     A.   I think I -- well, I guess
21 the --
22     Q.   Let me withdraw the
23 question.  Your hesitancy reminds me that
24 my question was poor.

Confidential Information Subject to Protective Order

Page 142

1    I think you testified that
2  you started working at some point in
3  mid-December; is that correct?
4      A.   Yeah, because I did a lot
5  of -- again, reading all those -- those
6  really thick documents took some time.
7  And that was more to -- to your point, to
8  understand both sides and to get some
9  context.
10     Q.   And so what is Rule 26 of
11 the Federal Rules of Civil Procedure?
12 This was the point that you mentioned
13 earlier?
14     A.   Yeah.  I think it just
15 speaks to how I give my opinions.
16     Q.   So will you please identify
17 for me any facts or data that the
18 attorneys provided to you and that you
19 considered in forming your opinions?
20     A.   I -- only things that the
21 attorneys gave me were Dr. Kaplan's
22 letter and then later his deposition.
23 And again, I was very democratic in
24 reviewing all of the provided expert

Page 143

1  letters from plaintiffs and defendants.
2          And actually, this sort of
3  Rule 26 was repeated over and over again.
4  And that's quite honestly where I learned
5  about it and saw that it might be a
6  required element.
7          And I put it in, but then
8  confirmed that that was appropriate.
9      Q.   Can you identify for me any
10 assumptions that the attorneys provided
11 and that you relied on in forming your
12 opinions?
13     A.   They actually really just
14 wanted my opinions.  There were no
15 assumptions.  They gave me the document
16 and asked me to address it, which, you
17 know, that was my independent.
18     Q.   Okay.  And you state that --
19 in the second sentence of the second
20 paragraph, that, "Each of the opinions
21 offered in this report are given to a
22 reasonable degree of medical probability
23 and/or certainty."
24          Did you write that sentence?

Page 144

1      A.   I wrote it.  But again, I
2  think this was the language that I had
3  seen in the others.
4          I don't know -- I don't know
5  if that applies to the Rule 26 or not.  I
6  put it in there.
7      Q.   What is the meaning of
8  reasonable degree of medical probability
9  and/or certainty?
10     A.   I would say that, based on
11 my -- you know, my impression, based on
12 my 20 years of practice, my extensive
13 experience with clinical care and again,
14 my review of the literature.
15     Q.   So which -- which opinions
16 -- strike that.
17          About which opinions do you
18 assign probability as opposed to
19 certainty?
20          MR. KUM:  Objection.  Vague
21 and ambiguous.
22          THE WITNESS:  I am certain
23 that I am extremely uncomfortable
24 with Dr. Kaplan's medical

Page 145

1  monitoring protocol.
2          I guess the only
3  uncertainty -- I'm trying to think
4  what I'm uncertain about.  Because
5  I'm extremely certain about that
6  and would love to address it.
7          Let me think.
8  BY MS. GEMAN:
9      Q.   So with which opinions are
10 you giving a reasonable degree of
11 probability rather than certainty?
12     A.   I guess, you know, I know --
13          MR. KUM:  Objection.
14 Assumes facts not in evidence.
15          THE WITNESS:  I don't know
16 what the -- it's very hard.
17 There's a lot of opinions to parse
18 out.  I'm not sure.
19 BY MS. GEMAN:
20     Q.   Can you name any?
21     A.   I guess I'm not certain how
22 many pills the patients took.  I don't
23 know that information.  I actually don't
24 know how many there were.  I'm assuming

Page 146

1 it's a large number.  I'm assuming there
2 are cardiac patients.
3        You know, those are not
4 certainty, because I don't have
5 information about the patient
6 specifically.  But I'm assuming it's
7 about those patients.
8    Q.   And what's your
9 understanding of how much contaminated
10 product was in the valsartan that the
11 patients ingested?
12        MR. KUM:  Objection.
13    Outside the scope.
14        Don't guess.
15        THE WITNESS:  Yeah, I --
16    again, I read it for context.
17    It's not really relevant to the
18    mission that I was set forward to
19    review Dr. Kaplan's medical
20    monitoring program.
21 BY MS. GEMAN:
22    Q.   So sitting here now, you
23 just don't know how much nitrosamine was
24 in the valsartan; is that correct?

Page 147

1    A.   I don't.
2    Q.   You refer us to Exhibit A,
3 if we can turn to that on Page 27.
4    A.   Yes.
5    Q.   And a couple of -- some of
6 these individuals wrote more than one
7 report.  Do you know which reports you
8 read?
9    A.   I had one report from each.
10    Q.   One report from each.  Was
11 the report from Janice Britt about
12 general causation or medical monitoring?
13    A.   There were a lot, and it was
14 a long time ago.  I'm not certain.
15    Q.   Do you know which of these
16 experts of defendants have subsequently
17 been withdrawn or stricken as not
18 satisfying the gatekeeper functions?
19        Let me rephrase that.
20        Do you know which of these
21 experts of defendants have subsequently
22 been withdrawn or stricken by the court?
23    A.   I know Daniel Catenacci
24 was -- I don't know if it's stricken or

Page 148

1 withdrawn.
2    Q.   What's the basis of that
3 knowledge?
4        MR. KUM:  Again, without
5    disclosing specific conversations
6    that you've had with counsel.
7        THE WITNESS:  I'm assuming I
8    was forwarded some news reports
9    from colleagues, you know, about
10    an SEC indictment.
11        I don't know for sure that's
12    what it was.  But that's probably
13    a pretty good guess.
14 BY MS. GEMAN:
15    Q.   And did you rely on his
16 opinions in forming your own?
17    A.   I did not.
18    Q.   And do you know any of these
19 individuals listed?
20    A.   So I do not know
21 Dr. Etminan.  I do not know Dr. Hecht.  I
22 do not know Dr. Panigrahy.  I do not know
23 Dr. Madigan.  I do not know Dr. Lagana.
24 I have not met Dr. Catenacci in person.

Page 149

1 He was a fellow some years after I left.
2 I have seen him speak.
3        I do not know Dr. Bottorff.
4 I do not know Dr. Britt.
5        I know of Dr. Chodosh
6 because he is a very esteemed physician
7 scientist, among the best in -- I mean
8 amazing.  And I don't know that he would
9 even know me.  He -- there are some silos
10 at big institutions, especially with lab
11 scientists.  He would probably recognize
12 my name.
13        But he mostly does
14 translational research with the breast
15 group, which is a separate subspecialty
16 group.
17        I don't know Dr. Flack.  I
18 don't know how this to say this next
19 person's name, but I don't know him.  I
20 don't know Dr. Gibb.  I don't know
21 Dr. Johnson.  And I do not know Dr. Wei.
22    Q.   And you also reviewed -- and
23 you said this before -- the task force
24 guidelines, correct?

Page 150

1    A.   Yes.
2    Q.   Did you review any other
3  guidelines?
4    A.   I briefly looked at -- and
5  again, these are actually a little bit
6  more specific to patients that have
7  already been diagnosed with cancer.
8         So the National
9  Comprehensive Cancer Network, which I
10  looked at some of the subspecialty
11  guidelines, like hepatology and
12  gastroenterology.
13         Those were sort of more
14  relevant to when I was assessing each
15  item on Dr. Kaplan's monitoring list.
16  That's what I can think of sitting here.
17    Q.   Did you look at the ASCO?
18    A.   ASCO.  I did not.
19    Q.   You did not.
20    A.   ASCO?
21    Q.   Yes.
22    A.   I didn't look -- I mean, I
23  looked relative to referring high risk
24  patients.  I just confirmed because,

Page 151

1  since I have the good fortune of being in
2  an academic center, I just wanted to be
3  sure.
4         You know, they put out these
5  guidelines to standardize care and make
6  sure all care is of a good level.  So I
7  made sure that my practice was the same.
8         I mean, I look at NCCN
9  guidelines every day --
10    Q.   Why?
11    A.   -- multiple times a day.
12    Q.   Why?
13    A.   Because you always -- again,
14  it's safety and standard of care.  And
15  you want to make sure that you're within
16  the consensus recommendations, not only
17  because you want the best care for the
18  patient, because it may inform insurance
19  coverage, unfortunately, of a recommended
20  treatment.
21         So, you know, I'm sort of --
22  check, check, double-check all the time,
23  if I -- you know, every prescription,
24  everything I put my name to, I

Page 152

1  double-check.
2    Q.   So NCCN is part of the
3  consensus of standard of care?
4    A.   National Comprehensive
5  Cancer Network puts out these guidelines.
6  And it's interesting, I don't know --
7  like, you know, you have branch points
8  from diagnosis, what stage, what the
9  options are.  Obviously it's personalized
10  to the patient, both in terms of their
11  individual cancer and their fitness
12  status.
13         You know, I don't think it
14  was originally designed that way.  But
15  unfortunately, insurance tends to follow
16  the guidelines.  So I don't want patients
17  to get bills.  So I'm careful to review
18  them.
19    Q.   So is it NCCN part of the
20  consensus standard of care?
21    A.   It is a national
22  comprehensive cancer -- that puts out
23  guidelines, that help -- that's part of
24  the standard of care.

Page 153

1    Q.   Is it a respected
2  organization?
3    A.   Very.
4    Q.   Did you review their
5  screening guidelines?
6    A.   I think I did.  And I
7  remember that they -- again, these are
8  generally in the setting of cancer.
9         They did have some screening
10  guidelines.  I can't remember exactly.
11  They were not -- it's hard to say because
12  the task force guidelines are for
13  asymptomatic patients in the primary care
14  setting.
15         The NCCN were a little more
16  nuanced, but I don't think is the
17  national standard, I wouldn't say is the
18  national standard for asymptomatic
19  patients in the primary care setting.
20    Q.   To the extent NCCN and
21  U.S. --
22    A.   We'll just call it the task
23  force.
24    Q.   Thank you.  And by task

Confidential Information Subject to Protective Order

Page 154

¹ force, we mean the USPTF?
²        MR. KUM:  USPSTF.  You
³    missed an S.
⁴        THE WITNESS:  S. Screening.
⁵    S is screening.
⁶        MR. KUM:  You missed an S.
⁷ BY MS. GEMAN:
⁸    Q.   I missed the S.
⁹    A.   Preventive screening task
¹⁰ force.
¹¹    Q.   I apologize.
¹²        So to the extent that the
¹³ USPSTF, i.e., the task force, and NCCN
¹⁴ differ, do you think one is right and one
¹⁵ is wrong?
¹⁶    A.   I would put that
¹⁷ differently.  Every subspecialty group
¹⁸ comes out with it's sub -- you know, it's
¹⁹ consensus guidelines.  You know,
²⁰ hepatology, thoracic, pulmonary, they may
²¹ have them.  That doesn't mean that they
²² are -- and it's generally different,
²³ because these are patients that have been
²⁴ referred to them.

Page 155

¹        It is not the -- for
² example, hepatology, if they have a
³ patient referred to them with known
⁴ cirrhosis, will have a different
⁵ guideline.  It's usually
⁶ disease-specific.
⁷        Unfortunately, the way that
⁸ we know what the national standard is, is
⁹ what Medicare will cover.
¹⁰        Medicare will cover the task
¹¹ force recommendations, and regular
¹² insurance quickly follows.  And what I
¹³ would say also again -- I mentioned we
¹⁴ have electronic health records that
¹⁵ prompt us to what the standardized
¹⁶ evidence-based recommendations are from
¹⁷ the task force.
¹⁸        This comes from the
¹⁹ Department of Health & Human Services.
²⁰ And the task force recommendations are
²¹ what we are prompted for.
²²        And I am not certain, I
²³ would actually suspect not, that if you
²⁴ follow different guidelines, it would be

Page 156

¹ covered by any insurance.
²    Q.   If you could please turn to
³ your CV, which is Exhibit B of your
⁴ report.  It's within the report itself.
⁵    A.   Okay.
⁶    Q.   And I noted also that your
⁷ counsel provided a slightly more updated
⁸ that included abstracts?
⁹    A.   Yeah, I thought that would
¹⁰ be more complete.  It's sort of in
¹¹ oncology.  You know, you don't always put
¹² your abstracts on.  But I thought for
¹³ completeness, that would be appreciated.
¹⁴    Q.   So is the with the inclusion
¹⁵ of the abstracts, is your CV complete?
¹⁶    A.   Yes.
¹⁷    Q.   Let's turn to, please,
¹⁸ Page 4 of your report.
¹⁹        MR. KUM:  Are you marking
²⁰ this as an exhibit?
²¹        MS. GEMAN:  It's already --
²² well, it's within the -- I mean,
²³ we received it all as one.
²⁴        MR. KUM:  Oh, that's right.

Page 157

¹ Okay.
²        MS. GEMAN:  Yeah, we're
³ happy to -- I don't have it
⁴ printed.  But I'm happy to mark
⁵ the more updated CV if you wish.
⁶        Okay.
⁷        Actually, this is -- let's
⁸ go off the record and do a brief
⁹ lunch break now if that's okay
¹⁰ with you, Doctor.
¹¹        THE VIDEOGRAPHER:  12:20.
¹² We are off the record.
¹³        - - -
¹⁴         (Whereupon, a luncheon
¹⁵ recess was taken.)
¹⁶        - - -
¹⁷        THE VIDEOGRAPHER:  1:06.  We
¹⁸ are on the video record.
¹⁹        - - -
²⁰        CONTINUED EXAMINATION
²¹        - - -
²² BY MS. GEMAN:
²³    Q.   Good afternoon, Doctor.
²⁴        Sitting here now, is there

Page 158

¹ anything in your report that you would
² like to change?
³         A.   No.
⁴         Q.   Could I ask you to please
⁵ turn to the last page?
⁶         A.   Of the report?
⁷         Q.   Yes.
⁸         A.   Can you tell me which page?
⁹         Q.   Yes.  I'm sorry.  Page 24.
¹⁰ Do you see that?  Are you on Page 24?
¹¹        A.   I am.  I hope your page and
¹² my page match.
¹³        Q.   Well, I'm going to read you
¹⁴ the first sentence of the second-to-last
¹⁵ paragraph.
¹⁶        "It is not clear from any of
¹⁷ the data I have reviewed on valsartan
¹⁸ that nitrosamine exposure increases the
¹⁹ pretest probability of developing any
²⁰ cancer in the human patients and
²¹ therefore merits changes in validated
²² screening tests and intervals."
²³        Did I read that correctly?
²⁴        A.   Yes.

Page 159

¹        Q.   Does this -- earlier today
² you testified that you were offering no
³ opinion on whether nitrosamines caused
⁴ cancer; is that correct?
⁵        A.   I don't -- I don't know if
⁶ it does or it doesn't.
⁷        Q.   All right.  And are you
⁸ making a causal statement here that --
⁹ namely, that your review of the expert
¹⁰ reports in this case leads you to infer
¹¹ that nitrosamine exposure does not cause
¹² cancer?
¹³        A.   So I'm not a causal expert,
¹⁴ as I mentioned before.
¹⁵        I read both defendant and
¹⁶ plaintiff, sort of very different.  And
¹⁷ so I wasn't sure.  I think it's true that
¹⁸ I don't know from the data that it does
¹⁹ or doesn't.  So that's sort of that
²⁰ statement.
²¹        But again, no exposure
²² merits changing the national guidelines
²³ put out by the task force.
²⁴        So I can't speak to changing

Page 160

¹ those guidelines based on whether or not
² it is -- whether or not it is
³ carcinogenic or not.  I can't -- I
⁴ wouldn't change the guidelines.
⁵        And to me, what is reflected
⁶ in that sentence is, I don't know.
⁷        Q.   All right.  So but whether
⁸ it's appropriate for medical monitoring
⁹ to be ordered in this case is an entirely
¹⁰ separate question from whether the
¹¹ general population guidelines are
¹² formally changed.  Do you understand
¹³ that?
¹⁴        MR. KUM:  Objection.  Vague
¹⁵        and ambiguous.
¹⁶        THE WITNESS:  Yeah, can you
¹⁷        repeat or re --
¹⁸ BY MS. GEMAN:
¹⁹        Q.   Whether it's appropriate for
²⁰ medical monitoring to be ordered in this
²¹ case is an entirely separate question
²² from whether the general population
²³ guidelines are formally changed.
²⁴        Do you understand that?

Page 161

¹        MR. KUM:  Same objections.
²        THE WITNESS:  There's no
³        indication to change guidelines of
⁴        screening for asymptomatic
⁵        patients based on any exposure.
⁶ BY MS. GEMAN:
⁷        Q.   What does that mean?
⁸        A.   It means that whether or not
⁹ this is a carcinogen would not change my
¹⁰ opinion.
¹¹        Q.   So there's no amount of sort
¹² of danger from the contaminated medicine
¹³ that the class members took that would
¹⁴ cause you to believe that any screening
¹⁵ is appropriate?
¹⁶        A.   I can't speak to that.  I
¹⁷ expect that the task force would review
¹⁸ confirmed human carcinogens.  And whether
¹⁹ or not that would change it, is actually
²⁰ completely in the task force hands.  That
²¹ is not to me.
²²        But what I have read and
²³ reviewed is the only exposure that
²⁴ changed any of the recommendations was

Page 162

20 years of tobacco between ages 55 and 80.

And there are lots of known human carcinogens, including asbestos, radon exposure, that are confirmed, that did not inform the task force recommendations. It did not meet the magnitude of harm, magnitude of benefit definition.

Q.  So I'm asking a slightly separate question, which is that, is there any amount of danger from the -- danger meaning carcinogenic danger, from the contaminated medicine that the class members took that would cause you to believe that any screening is appropriate, whether or not it is accompanied by a change in the task force?

MR. KUM:  Asked and answered.

THE WITNESS:  I can't really speak to that.

BY MS. GEMAN:

Page 163

Q.  You can't answer that question?

A.  I don't know -- I don't know what the -- you know, again, right now it's not a known human carcinogen.  I don't know really anything about the dose, kinetics, or -- I have no idea.

Q.  So if I ask you to assume just for purposes of this question that it is a known human carcinogen, or that it is a carcinogen, is there any amount of danger, carcinogenic danger to the class that would prompt you to conclude that screening is appropriate whether or not accompanied by a change in the task force?

MR. KUM:  Incomplete hypothetical.  You can answer, if you can.

THE WITNESS:  This doesn't really address the task I was given to evaluate the tests that were put forth.

And I -- you know, to your

Page 164

point, they were suspecting that tobacco usage was carcinogenic for years.  And they didn't change the guidelines until a study came forth, randomized control trial, New England Journal, that was then reviewed by the task force, and one of the first major adjustments was put forth.

So I can't speak to whether or not it would influence.  It is quite honestly too hypothetical.

BY MS. GEMAN:

Q.  Sitting here today, you can't answer that question?

A.  Based on what I know of screening and how exposures are handled, I do not think it would change the guidelines.  And I do not think that the medical monitoring put forth would prove of more benefit than harm.

I think the medical monitoring program put forth by Dr. Kaplan is extraordinarily harmful and

Page 165

dangerous to an asymptomatic patient.

Q.  What screening would you suggest for patients who were exposed to dangerous amounts of nitrosamine in their valsartan due to culpable behavior of the defendants, which is the assumption that I'm offering for purposes of this question?

A.  I --

MR. KUM:  Objection.  Assumes facts not in evidence.  Incomplete hypothetical.

You can answer.

THE WITNESS:  I don't know of any exposure right now that changes the guidelines, including radon, asbestos, and others currently.  I don't -- I don't know.  That is the premise of my opinion.

BY MS. GEMAN:

Q.  If Galleri were available, would you use it?

A.  Galleri?

Confidential Information Subject to Protective Order

Page 166

1    Q.   Galleri.
2    A.   So it's -- it's so
3  interesting.  So I would not use it
4  outside of the context of a clinical
5  trial.  Frankly, I'm not sure how
6  Dr. Kaplan is ordering it since it's not
7  FDA approved.  It has a spectacular
8  advertising campaign.  I have patients
9  ask me about it all the time.
10          It would not be covered by
11 insurance.  It is not FDA approved.  And
12 it is particularly not validated in
13 screening.  The only studies today are
14 observational.  They are not even fully
15 prospective.
16          I suspect sometimes these
17 companies come to particularly private
18 practice offices.  They're not allowed in
19 ours.  And they give them some free ones
20 to kind of encourage interest and
21 enthusiasm for ordering them.
22          I don't know how he could
23 order it and have an insurance pay.  So
24 that's what I suspect is happening.

Page 167

1    Q.   So I'm sorry.  Are you
2  suggesting that Dr. Kaplan recommended
3  this test because, in your imagination,
4  they may have gone to his office?
5    A.   I have no idea how -- you
6  know, they come in these boxes.  You have
7  to either order them or oftentimes the
8  reps will deliver them.  He specifically
9  stated in his deposition that he ordered
10 them a few times.
11          They often give them gratis
12 because they want, in the future, the
13 doctors to order them.  So I don't even
14 know how he gets the kit.  It's only FDA
15 approved that -- or potentially
16 commercially available -- not FDA
17 approved.  It is not FDA approved.  But
18 it is only commercially available in New
19 York, based on what I read.
20          So I don't even know how he
21 had access to the test.
22    Q.   Well, you didn't cite the --
23 anything for the proposition that it's
24 only commercially available in New York.

Page 168

1    A.   It's in my letter.
2    Q.   Can you point to the cite?
3    A.   Sure.  Happy to.
4    Q.   It's probably on Galleri,
5  Galleri -- Galleri, Galleri.  It's on
6  Page 20 -- 21.
7    A.   So Number 1, these tests are
8  not FDA approved.  Galleri has --
9    Q.   Excuse me.  I'm going to ask
10 you to answer my question.  What is the
11 cite for your statement that it's not
12 commercially available outside of New
13 York?  There are no citations here.
14    A.   I might have gotten it from
15 the -- I looked at the website.  I can't
16 say for sure.  I did look at the website
17 of the company.  I didn't cite the
18 website.
19    Q.   So does this refresh your
20 recollection about other documents that
21 you looked at but did not cite in your
22 report?
23    A.   I'm not sure if a commercial
24 website for a product is a document.  But

Page 169

1  I would add that to it then.
2    Q.   What other websites did you
3  look at that you did not cite in your
4  report?
5    A.   I think that's the only test
6  that I had looked up.  I wasn't familiar
7  with it, and I wanted to see, you know,
8  how they were presenting it.
9    Q.   Are you aware that Galleri
10 is available all across the country?
11    A.   It depends on in what
12 context.  I don't know how to order it.
13 I've never -- you know, I don't know how
14 it's done.  It is not FDA approved.  So
15 it would not be something that I would be
16 ordering.
17    Q.   Do you have any -- you use
18 tests that aren't FDA approved
19 frequently, don't you?
20    A.   No.
21    Q.   None of your blood tests are
22 not FDA approved?
23    A.   I mean, they're all done in
24 a CLIA lab.  Which blood test do you

Confidential Information Subject to Protective Order

Page 170

1 mean?
2        Q.    Name for me the blood test
3 that you use and tell me, please, which
4 are FDA approved as distinct from CLIA
5 certified?
6        MR. KUM:  Objection.  Vague
7 and ambiguous.  Overbroad.
8 Outside the scope of her report.
9        But you can answer.
10        THE WITNESS:  I mean, any
11 lab I order within the Penn system
12 is CLIA approved.  It is a
13 CLIA-approved lab.
14        I've ordered Signatera,
15 which is FDA approved.  I've
16 ordered Caris.  I've ordered
17 Foundation.
18        The point is I don't order
19 tests for patients that I don't
20 think will get covered.  I don't
21 do the free test from the company
22 strategy.  I don't want a patient
23 to get a multithousand-dollar bill
24 for an uncertain indication.

Page 171

1 BY MS. GEMAN:
2        Q.    So let's parse that, because
3 that's a different answer.  So you do use
4 tests that are CLIA certified, correct?
5        A.    Absolutely.
6        Q.    Okay.  And this Galleri is
7 or is not CLIA certified, to your
8 knowledge?
9        A.    I don't know.
10        Q.    And if I tell you that it's
11 CLIA certified, would that change your
12 disinclination to offer it to your
13 patients?
14        A.    It's not FDA approved, and
15 the indication is uncertain.  Every
16 time -- and I -- actually, this is a good
17 opportunity.
18        I looked at the data.
19 There's been a couple studies.
20        The biggest issue with the
21 Galleri GRAIL test as it pertains to
22 Dr. Kaplan's recommendation is, first of
23 all, the initial studies were validation
24 studies.  If it says it's colon cancer,

Page 172

1 does the patient have colon cancer.
2        The other issue is it
3 depends to a degree how active the cancer
4 is, how many cell-free tumor DNAs in the
5 blood that can be measured.
6        And if you look at the most
7 updated data, for Stage I cancers, it
8 picks it up 14 percent of the time.  For
9 Stage II, it picks up 40 percent of the
10 time.
11        For Stage III, it picks up
12 cancer 70 percent of the time.  And for
13 Stage IV, it picks up cancer 90 percent
14 of the time.
15        And again, it speaks to the
16 activity of the tumor which is secreting
17 the cell-free DNA into the bloodstream.
18        My point with that is I
19 think Dr. Kaplan is hoping to find these
20 early stage cancers using this screening
21 tool.  And there is poor evidence that it
22 is helpful in the early stages.
23        My concern would be, if a
24 patient got a false -- if it was false

Page 173

1 negative, again, they might deny any
2 symptoms or screenings that were relevant
3 to that cancer.
4        That is my biggest concern
5 with Galleri.  It is not -- also, it's
6 not validated in the screening setting
7 for average risk or high risk.  That
8 study is actually going on right now.
9 And the scientists -- the oncologists are
10 extremely good, George Fisher, Brad
11 Wolpin, top docs that are using this.
12        I just have to say, I love
13 the study design.  So -- and it will take
14 years.
15        So they have two sets of
16 patients that are equivalent.  One set
17 they do standard screening.  The other
18 set they do Galleri in addition to
19 standard screening.  And if a signal is
20 picked up on Galleri, they leave the
21 decision between the patient and their
22 doctor whether or not to pursue it.
23        And the key there is if a
24 patient, is -- for example, if they're

Page 174

1  not a surgical candidate because of their
2  cardiovascular disease or renal disease
3  or frailty or whatever reason, you don't
4  want to put someone through invasive
5  tests when you then can't act on the
6  findings.
7      Q.   Dr. Teitelbaum, we're going
8  to have to keep coming back if you're not
9  going to answer my questions.  And I will
10 use many of these answers as Exhibit A of
11 the motion to extend this deposition.
12          It is your job today to
13 answer the questions that I ask, not to
14 make speeches.
15          Do you understand that?
16          MR. KUM:  Objection.
17      Argumentative.  She did answer the
18      question.  If you want to ask
19      another question, feel free.
20 BY MS. GEMAN:
21      Q.   Do you understand that?
22      A.   I would love to hear your
23 question again, if you think I didn't
24 address it.  I'm happy to.

Page 175

1      Q.   Good.  Does it surprise you
2  that the test is CLIA certified?
3          MR. KUM:  Asked and
4      answered.
5          THE WITNESS:  That is not a
6      tough metric.  Essentially every
7      lab in any sort of hospital or
8      clinic or LabQuest or Labcorp is
9      CLIA certified.  They can't
10     process anything in the labs if
11     it's not CLIA certified.
12 BY MS. GEMAN:
13     Q.   But you just said in your
14 earlier answer in support of the tests
15 that you order that they were CLIA
16 certified.  So is it a different standard
17 for this test?
18     A.   It's the standard for all
19 tests we order.  I -- sometimes if we are
20 in -- doing a clinical trial, we just
21 have to apply for a CLIA certification to
22 make sure the test is considered valid.
23         But essentially anything
24 that I order at my hospital is CLIA

Page 176

1  certified.
2      Q.   So contrary to your view in
3  your report, the test is CLIA certified.
4  It is available outside of New York.
5          Do you understand that?
6          MR. KUM:  Objection.
7      Misstates testimony.
8          Was there a question?
9          MS. GEMAN:  Yes.
10 BY MS. GEMAN:
11     Q.   Do you understand that?
12     A.   Well, you said contrary.
13         I said Galleri does have --
14 IDE -- I don't -- where is the -- I don't
15 say that it's CLIA certified?
16     Q.   Well, that's a good
17 question.  What is IDE approval?
18     A.   Investigative device
19 exemption.  It's just so that it can be
20 used in clinical trials.
21     Q.   Do you believe that -- and
22 is it used in clinical trials?
23     A.   I just mentioned the
24 PATHFINDER study.  There's actually three

Page 177

1  big ones going on right now.  PATHFINDER,
2  STRIVE, something else.  Everyone would
3  love to know if this is effective.
4  Again, we all hate cancer.
5      Q.   How many oncologists are
6  already using Galleri?
7      A.   I don't know any that are
8  using it.
9      Q.   How many oncologists are
10 there in the U.S.?
11     A.   I don't know that.
12     Q.   If I told you there is about
13 13,000, does that seem accurate?
14         MR. KUM:  Don't guess.
15         THE WITNESS:  I have no
16     idea.
17 BY MS. GEMAN:
18     Q.   Do you know what percent of
19 those are already using Galleri?
20     A.   (Shaking head.)
21         THE COURT REPORTER:  You
22     have to answer.
23         THE WITNESS:  No.
24         MR. KUM:  Could you just

Page 178

1   verbally answer?
2        Could you re-ask the
3   question?
4   BY MS. GEMAN:
5        Q.   Do you know what percent of
6   oncologists are already using Galleri?
7        A.   I do not.
8        Q.   Well, do you have any
9   estimate?
10       A.   I have none.
11       Q.   Okay.  If it's more than a
12  thousand, would that surprise you?
13       MR. KUM:  Calls for
14  speculation.
15       THE WITNESS:  I have no
16  idea.
17  BY MS. GEMAN:
18       Q.   Given that it's already
19  in -- let me ask a different question.
20       Do you have any reason to
21  believe that it won't be FDA approved as
22  soon as next year?
23       A.   I have no idea.
24       Q.   Have you ever -- have you

Page 179

1   heard any -- I mean, you -- sometimes
2   one -- sometimes there's information
3   pre-FDA determination that leads one to
4   have doubt as to whether a drug might be
5   approved.
6        Do you agree?
7        A.   I don't know the process of
8   the FDA nor do I get that, like,
9   preapproval.  But it sounds reasonable.
10       Q.   For example, there might
11  be -- have you ever read about a study
12  that didn't meet one of its clinical
13  endpoints?
14       A.   Of course.
15       Q.   Okay.  And have you ever
16  read news about a drug that -- where
17  there is consensus or belief among
18  medical professionals that FDA approval
19  is in doubt?
20       A.   Broadly, I'm sure I have
21  heard that.
22       Q.   Have you heard that about
23  Galleri?
24       A.   I have not heard anything

Page 180

1   about.  I just really focused on the
2   research aspect.  And I think the key
3   here is the data to date about early
4   stage findings because that's really the
5   question here.
6        It can be used as a
7   screening tool to find early stage
8   cancers when it's at an intervenable
9   interval.
10       There is no data, and I will
11  share with you as I did in this letter.
12  I do not know that any of the high risk
13  clinics nationally are using it, the high
14  risk clinics.
15       Q.   Do you find 14 percent a low
16  number?
17       A.   Yes.  That means that -- and
18  again, this is in patients with confirmed
19  Stage I cancer.  It means that 86 percent
20  don't think they have cancer.  And that's
21  devastating if they do.
22       Q.   So I want to make sure I
23  understand the statistic.
24       Your understanding is that

Page 181

1   there's an 86 percent false negative
2   rate?
3        A.   Yes.
4        Q.   Okay.  And when people are
5   using Galleri, is that the only
6   healthcare they're getting?
7        A.   I don't know.
8        Q.   Did Dr. Kaplan suggest use
9   of Galleri to the exclusion of other
10  treatments?
11       A.   He just said he's using it.
12       Q.   Is it your understanding
13  that Dr. Kaplan suggested using Galleri
14  to displace all other care?
15       A.   Can we look at his -- I
16  don't recall.  Can we look at his
17  deposition?
18       Q.   You can tell me your
19  recollection of that.  No, we can't look
20  at his deposition.
21       MR. KUM:  She can ask you
22  whatever question.  You can answer
23  it.
24       THE WITNESS:  I don't recall

Page 182

1    one way or another.
2 BY MS. GEMAN:
3    Q.   So your primary concern
4 about Galleri, or one of them, is the
5 false negative rate in early stage
6 cancers, correct?
7    A.   And, you know -- yes.  I
8 mean, the good news is it didn't seem to
9 have false positives.
10    Q.   Meaning people, if it said
11 you had something, you had something?
12    A.   Yes.
13    Q.   Okay.  You mentioned before
14 a concern a patient getting a large bill.
15 Can you explain -- or an unexpected bill.
16 I'm not trying to put words in your
17 mouth.  But can you tell me what you
18 meant by the link between FDA approval
19 and billing?
20    A.   So I don't know the
21 insurance companies' process on paying
22 for a study that's not FDA approved or in
23 the guidelines.  And we've certainly had
24 patients get bills, even for approved

Page 183

1 tests, and they are large.
2         And the other point I'd like
3 to make is that there are tests that are
4 FDA approved that we don't yet use in our
5 cancer practice.  So FDA approval in and
6 of itself is not the only metric,
7 although I find it important.
8         For example, there's a test
9 called -- and it goes again to ordering a
10 study and then not knowing what to do
11 with the results, which is the harm.
12         There is a test that is FDA
13 approved -- we're actually not sure how
14 in the oncology world -- called
15 Signatera.  And it assesses the presence
16 or absence of circulating tumor material
17 for colon cancer.
18         And the way that it's
19 indicated is after the cancer is removed
20 and before you start chemo, if there are
21 cancer cells in the bloodstream detected,
22 the risk of recurrence is higher.  That's
23 what it tests.  And if at the end, they
24 draw this test and it clears, your risk

Page 184

1 of recurrence is lower.
2         The problem is, it doesn't
3 say, if you draw this test it is
4 positive, and you draw it after the six
5 months are chemo are done and it's
6 positive, what do you do?  You have no
7 measurable disease in the body.  You have
8 no tumor marker.  You don't know what
9 you're treating.
10         Do you watch this anxious
11 patient who knows they have circulating
12 tumor colon cancer cells?  Do you try a
13 different chemo?
14         And even though it's FDA
15 approved, it's not really clear what to
16 do with the test.
17         So in our practice, we only
18 use it within a context of a clinical
19 trial because, again, it causes anxiety
20 without meaningful intervention.
21         So FDA approval is one
22 metric.  It's not the only.  And it would
23 have to have the indication of early
24 screening in an asymptomatic patient as

Page 185

1 one of the indications, and it would have
2 to be vetted by the United States
3 Preventive Task Force because it's in the
4 arena of cancer screening in asymptomatic
5 patients.
6    Q.   What was the name of that
7 test?
8    A.   Signatera.
9    Q.   Where in Dr. Kaplan's report
10 did you see his recommending it?
11    A.   He didn't.
12    Q.   He didn't.  Okay.
13    A.   I'm explaining to you the
14 risk of ordering tests and then not
15 knowing what to do with them.  Another
16 good one in there --
17    Q.   Well, hang on.
18         MR. KUM:  Hang on.
19 BY MS. GEMAN:
20    Q.   There's no question.
21 There's no question.
22    A.   Sorry.
23    Q.   Wait for the question.
24         Are there other clinical

Confidential Information Subject to Protective Order

1 facilities that use Signatera, yes or no?
2     A.   I assume yes.
3     Q.   Okay.  So there's a dispute
4 of opinion about that particular test and
5 its efficacy?
6     A.   In -- I don't know about --
7 I mean, it's accurate at measuring the
8 cancer cells.  The question is then what
9 do you do with it.
10     Q.   There's a dispute of opinion
11 among oncologists as to whether to use
12 that particular test, Signatera, correct?
13     A.   I don't know that it's a
14 dispute.  I think the question is, what
15 do you do with the results.
16           Every time you order a test,
17 you have to think about the results
18 because that's where the potential for
19 harm comes.  It's easy --
20     Q.   Some oncologists -- some
21 oncologists use the test; some do not,
22 correct?
23     A.   I presume, yes.
24     Q.   Similarly with Galleri, some

1 oncologists use it, some do not, correct?
2     A.   That's what I heard from
3 you.
4     Q.   Do you have any independent
5 knowledge otherwise?
6     A.   I don't know anyone that's
7 ordered it.
8     Q.   Do you dispute that there
9 are hundreds, maybe even more than a
10 thousand, providers that have used it?
11     MR. KUM:  Objection.  Calls
12     for speculation.
13           Don't guess.
14           THE WITNESS:  I have no
15     idea.
16 BY MS. GEMAN:
17     Q.   Have you discussed Galleri
18 with colleagues outside of this
19 litigation?
20     A.   Only thing I asked is if we
21 are using it in the high risk setting.
22 If we have it on -- I mean, there was
23 nobody ordering it.
24     Q.   And was -- is some of the

1 concern, not all, but some of the concern
2 about its use, the price tag?
3     A.   That actually wasn't the
4 concern.  The concern is that it's not a
5 validated screening tool.  And it has
6 poor results in early screening, Stage I
7 and Stage II.
8     Q.   When you mentioned earlier
9 the concern about the test, that if it's
10 not FDA approved, the consumer might have
11 to pay, are you now withdrawing that
12 testimony?
13           MR. KUM:  Objection.  Vague
14     and ambiguous.
15           THE WITNESS:  I don't really
16     understand your question.  I think
17     they're kind of unconnected.  But
18     I'm happy to hear it again.
19 BY MS. GEMAN:
20     Q.   Sure.  You testified a bit
21 ago that one concern for you with not
22 using an FDA-approved intervention is
23 that it might not be covered by
24 insurance; is that correct?  Do you

1 recall that testimony?
2     A.   It was the opposite.  I said
3 if it's not FDA approved, I would be
4 concerned that the patient would carry
5 the economic toxicity.
6     Q.   I'm sorry.  I said it
7 converse.  But that's what I meant.
8           So one concern with using a
9 drug that is not FDA approved is the
10 financial impact on the patient?
11     A.   You know, patients have
12 tremendous economic toxicity from all of
13 the tests.  We write a prescription or
14 order a test.  We don't always know and
15 they don't always tell us when the bill
16 comes.
17           I do have patients bring the
18 bill to me.  And it's incredibly
19 stressful.  And we help them work through
20 it, and we contest it, often for things
21 that are approved.
22           So even without the
23 conundrum of ordering a non-FDA-approved
24 or a test that's not indicated in that

Confidential Information Subject to Protective Order

Page 190

¹ setting, we have patients getting bills,
² and I've had patients be foreclosed upon
³ for tests that are certainly covered.
⁴          And so for me, with this
⁵ vulnerable class of patients, I have to
⁶ be sure they are not going to get a bill.
⁷          I will say that the task
⁸ force guidelines were created without
⁹ regard to the cost of the testing.
¹⁰          So it was completely
¹¹ financially blind when they were
¹² assessing the screening tests.
¹³     Q.   And how much, in your
¹⁴ experience, of patient anxiety about
¹⁵ testing relates to -- great phrase that I
¹⁶ hadn't used before -- economic toxicity?
¹⁷     A.   So this is actually just
¹⁸ that and "scanxiety."  These are terms
¹⁹ that are just -- it's sort of a brand-new
²⁰ field of study.
²¹          And you have to imagine, if
²² you're ill and you have a limited time to
²³ live, we're actually studying the burden
²⁴ of waiting room time, travel time.  This

Page 191

¹ is sort of a whole new field looking
² at -- in health sciences research
³ actually, to look at all of the impacts
⁴ of our cancer care on our patients, not
⁵ just the side effects of the chemotherapy
⁶ or the symptoms from the cancer.
⁷     Q.   And so thank you.  I
⁸ appreciate that clarification.
⁹          How much of patient anxiety
¹⁰ in testing relates to economic toxicity,
¹¹ in your view?
¹²     A.   They all ask me, "Am I going
¹³ to get a bill?"  I had a patient -- I
¹⁴ have a patient on a Signatera trial we're
¹⁵ getting -- we're doing.  And she said --
¹⁶ she messaged into our office and called
¹⁷ two times and said, "Am I going to get
¹⁸ billed for this?"  Patients are very
¹⁹ anxious.  Our supportive -- yeah.
²⁰     Q.   Were you done with your
²¹ answer?
²²     A.   Yes, relating to that.
²³     Q.   And you -- I'm going to give
²⁴ you a hypothetical.

Page 192

¹          Let's say a 73-year-old was
² exposed to substances that are proven to
³ raise his risk of prostate cancer by a
⁴ statistically significant degree.
⁵          And he is otherwise very
⁶ healthy.
⁷          Do you think it's
⁸ appropriate to screen him for prostate
⁹ cancer?
¹⁰          MR. KUM:  Incomplete
¹¹     hypothetical.
¹²          You can answer if you can.
¹³          THE WITNESS:  I do not.
¹⁴ BY MS. GEMAN:
¹⁵     Q.   What about for lung cancer?
¹⁶     A.   I'm going to go back to the
¹⁷ prostate cancer, if I may.
¹⁸     Q.   Well, no, no, if I may, I
¹⁹ meant specifically a 73-year-old was
²⁰ exposed to substances that are proven to
²¹ raise his risk of lung cancer by a
²² statistically significant degree, and
²³ he's otherwise healthy.
²⁴          Would you consider it

Page 193

¹ appropriate to screen him for lung
² cancer?
³          MR. KUM:  Incomplete
⁴     hypothetical.
⁵          You can answer if you can.
⁶          THE WITNESS:  I would not.
⁷ BY MS. GEMAN:
⁸     Q.   You would not.
⁹          What would need to change
¹⁰ about the hypothetical to incline you to
¹¹ recommend screening for lung cancer for
¹² that gentleman?
¹³          MR. KUM:  Assumes facts not
¹⁴     in evidence.  Calls for
¹⁵     speculation.
¹⁶          THE WITNESS:  Again,
¹⁷     exposures don't change guidelines,
¹⁸     generally, in asymptomatic
¹⁹     patients.
²⁰          I'll just say, you know, it
²¹     takes decades for people to make
²²     cancer.  That's been well
²³     established.
²⁴          I don't know what the life

Confidential Information Subject to Protective Order

Page 194

1  expectancy of a 73-year old is. I
2  don't know if that fits in with
3  the magnitude of risk and
4  magnitude of benefit.
5      I personally would not
6  screen that person for lung
7  cancer.
8  BY MS. GEMAN:
9      Q.   So if that person came in
10  your office and said essentially --
11  incredibly healthy guy. Let's say he has
12  a living parent even. His mom is living.
13      And you learned that he was,
14  in the workplace, exposed to a substance
15  that gave him a dramatically higher risk
16  of lung cancer, and he wanted to be
17  screened. You would tell him what?
18      MR. KUM: Incomplete
19      hypothetical.
20      THE WITNESS: You know, is
21      the risk of being exposed to
22      ionizing radiation without a --
23      you know, referring -- exposure
24      that hasn't changed the

Page 195

1  guidelines, I wouldn't do it. I
2  wouldn't test him.
3  BY MS. GEMAN:
4      Q.   Do you think most
5  oncologists would or would not test that
6  person?
7      A.   Again, this is going to be
8  not an oncologist. This will be in the
9  internal medicine space.
10      He would not be coming to an
11  oncologist for some report of an
12  exposure.
13      I don't even know if that
14  test would be covered under that
15  indication. I suspect not. I do not
16  think someone would order it for that
17  indication.
18      Q.   Let's assume the test was
19  paid for by the employer who caused the
20  exposure, and so he doesn't have to pay
21  for it.
22      Do you think most -- and
23  sorry, let me go back. If somebody was
24  afraid of lung cancer, you think they

Page 196

1  wouldn't go to an oncologist because they
2  would have to go through an internist
3  first, basically?
4      A.   Oh, we don't see patients
5  without a biopsy.
6      Q.   Do you understand that there
7  are oncologists who see patients who just
8  want to make an appointment because of
9  their concerns or what have you?
10      MR. KUM: Calls for
11      speculation.
12      THE WITNESS: In private
13      practice, probably, not at an
14      academic center.
15  BY MS. GEMAN:
16      Q.   But you don't dispute, then,
17  in private practice, doctors see patients
18  without a biopsy frequently, correct?
19      A.   I've never even thought
20  about that. It's not really something I
21  think about. Most every -- there's the
22  mnemonic, "Tissue is the issue. Cancer
23  is the answer."
24      It sounds funny. But

Page 197

1  everything we do is based on pathology.
2      I assume what you're saying
3  is they are seeing them in their -- their
4  internal medicine Hatt. I don't
5  understand why that would happen. But it
6  sounds like you know that it does.
7      Q.   Just -- you've been an
8  oncologist for decades, right?
9      A.   Mm-hmm.
10      MR. KUM: You have to give a
11      verbal answer, Doctor.
12      THE WITNESS: I've been an
13      oncologist, yes, two decades.
14  BY MS. GEMAN:
15      Q.   Do you feel you have an
16  understanding of the sort of range of
17  conditions or presenting conditions or
18  reasons why patients go see private
19  oncologists?
20      MR. KUM: Objection. Vague
21      and ambiguous.
22  BY MS. GEMAN:
23      Q.   Do you know why people see
24  oncologists?

Page 198

¹ A. When they're diagnosed with
² cancer.
³ Q. Okay. Do you know why,
⁴ outside of that, people see oncologists?
⁵ A. I don't know why.
⁶ Q. Okay. You're not aware of
⁷ people who are just concerned because of
⁸ an exposure seeing -- making an
⁹ appointment to see an oncologist?
¹⁰ A. I just know that I wouldn't
¹¹ see that patient without a confirmed
¹² cancer.
¹³ Q. But are you aware -- do you
¹⁴ have any knowledge at all about the
¹⁵ extent to which private practice
¹⁶ oncologists might see that patient, or
¹⁷ for that matter, oncologists in other --
¹⁸ in other hospital settings?
¹⁹ MR. KUM: Calls for
²⁰ speculation.
²¹ THE WITNESS: I have no
²² idea.
²³ BY MS. GEMAN:
²⁴ Q. Let us, in we could, turn

Page 199

¹ to -- well, I apologize. Before we leave
² Page 20 and 21 about Galleri, other than
³ the company's own website and the
⁴ articles cited in Footnotes 44 and 45,
⁵ are you relying on any materials about
⁶ Galleri?
⁷ A. I think I mentioned the
⁸ abstract I looked at in ASCO. It's
⁹ actually very hard to find out much about
¹⁰ Galleri because the studies are in
¹¹ process, which is not unusual.
¹² So, you know, I've really
¹³ tried hard to find information.
¹⁴ Q. Can you tell me -- I
¹⁵ don't -- forgive me. I don't recall the
¹⁶ abstract that you mentioned in ASCO.
¹⁷ Can you tell me if that's
¹⁸ cited in the report here?
¹⁹ A. I just mentioned that a
²⁰ poster, which again, is not -- is
²¹ usually -- an abstract is presented on a
²² poster of any updated data, was presented
²³ by the -- by Thomas Bayer.
²⁴ So in Number -- one, two,

Page 200

¹ three, four, five -- 6, at last year's
² ASCO.
³ The problem is that Covid
⁴ has really slowed down data acquisition,
⁵ not just for these trials, but for a lot
⁶ of studies, so there hasn't been much
⁷ lately that I could find. And so that's
⁸ why I commented on that being the most
⁹ extensive data to date.
¹⁰ Q. And why is it -- in your
¹¹ view, is it good if a test does not have
¹² false positives?
¹³ A. If a test does not have
¹⁴ false -- is it good?
¹⁵ Q. Mm-hmm?
¹⁶ A. False positive. I don't
¹⁷ know that I said it's good.
¹⁸ Q. Sorry. I'm asking. In your
¹⁹ view, is it good if a test does not have
²⁰ false positives?
²¹ A. Yes, because otherwise
²² you're subjecting a patient to a
²³ potentially risky and invasive workup.
²⁴ And the more you test them, the more

Page 201

¹ likely you'll have false positives. So
² yeah, that can be devastating for a
³ patient.
⁴ Q. If a test does not have
⁵ false positives, then having that test
⁶ frequently does not engender a risk of
⁷ false positives, correct?
⁸ A. So there's no test that does
⁹ not have false positives.
¹⁰ The whole premise is, you
¹¹ know, we learn a lot about -- and you
¹² probably came across this -- sensitivity
¹³ and specificity. And these are the way
¹⁴ we grade the value of a test or a study.
¹⁵ Sensitivity means true
¹⁶ positive. You really want the positive
¹⁷ patients to really have whatever you're
¹⁸ looking for.
¹⁹ And the other really
²⁰ important thing is specificity, which is
²¹ true negative. You don't want to get a
²² negative result and in fact the patient
²³ has cancer.
²⁴ That was my point on the

Page 202

¹ Stage I, Stage II findings of Galleri,
² that you will have 60 to 86 percent of
³ the patients potentially feeling
⁴ reassured that they don't have cancer
⁵ when they do.
⁶     Q.   If a test is highly
⁷ sensitive, recurrent use of that test
⁸ doesn't change its sensitivity; isn't
⁹ that correct?
¹⁰     A.   I believe the sensitivity is
¹¹ set out, but there is no test that
¹² doesn't have false positive or false
¹³ negatives.
¹⁴          Those specificity rates are
¹⁵ the -- the best ones are always in the
¹⁶ 90 percent.  But none of them are ever
¹⁷ 100 percent.
¹⁸     Q.   When you say the specificity
¹⁹ rates are in the 90 percent --
²⁰     A.   A good test.
²¹     Q.   Sorry.
²²          -- do you mean the
²³ sensitivity rates or --
²⁴     A.   Both.  You grade them with

Page 203

¹ both, sensitivity and specificity.
²     Q.   But again, if a test, is
³ highly -- strike that.
⁴          When you say that, quote,
⁵ the sensitivity is set out, you mean that
⁶ a highly sensitive test doesn't become
⁷ less highly sensitive on repeat use,
⁸ correct?
⁹     A.   It should have the same
¹⁰ statistic.  But it's never 100 percent.
¹¹     Q.   Can we please turn to Page 4
¹² of your report.
¹³     A.   Yes.
¹⁴     Q.   I'm looking at the
¹⁵ third-to-last sentence where you say,
¹⁶ "Screening for and surveillance of
¹⁷ Barrett's esophagus is a controversial
¹⁸ topic among gastroenterology societies,
¹⁹ and no guidelines exist in USPSTF
²⁰ recommendations for serial endoscopy."
²¹          Do you see that?
²²     A.   Yes.
²³     Q.   What is the cite for the
²⁴ proposition that screening and

Page 204

¹ surveillance of Barrett's esophagus is
² controversial?
³     A.   I don't remember which one
⁴ of these articles that specifically came
⁵ from.  Let me just look at nine, because
⁶ sometimes if I cite it, I carry on after.
⁷ I would guess that it was --
⁸     Q.   It's right after Footnote
⁹ 11.
¹⁰          MR. KUM:  Doctor, you have
¹¹ your references there, if you want
¹² to just pull them.
¹³          THE WITNESS:  Oh, yeah.
¹⁴          MR. KUM:  But take off your
¹⁵ microphone first.
¹⁶          THE WITNESS:  So, yeah.  No,
¹⁷ I mean, in my -- the way that I
¹⁸ write things out, and again, I
¹⁹ would have to -- I'm happy to look
²⁰ a the article and find it.  But
²¹ the way I usually cite things, it
²² would be from that 11 on down.
²³ BY MS. GEMAN:
²⁴     Q.   Okay.  So if we wanted to

Page 205

¹ look for an article that stated that
² proposition, we should look to the JAMA
³ article in Footnote 11, or perhaps the
⁴ article in Discovery Med on footnote 12?
⁵     A.   I'm happy to look through
⁶ them.
⁷     Q.   No, I'm sorry, Footnote 12
⁸ is Gastric.
⁹          And do you recall reading an
¹⁰ article that said that screening for and
¹¹ surveillance of Barrett's esophagus is
¹² controversial?  Or is that your
¹³ inference?
¹⁴     A.   Well, I know it's
¹⁵ controversial because most centers don't
¹⁶ do it.
¹⁷          But I'm not sure.
¹⁸     Q.   What do you mean by
¹⁹ controversial?
²⁰     A.   So a lot of this is in the,
²¹ you know, American Gastric Society.
²² There's differences between the Europeans
²³ and the Americans.  Sometimes -- some say
²⁴ you should never scope again serially.

Confidential Information - Subject to Protective Order

Page 206

¹ Some day one scope, and that's the
² standard.  I think they used to say
³ scopes every two years and then went out
⁴ of favor.
⁵         So some of this is just what
⁶ I've learned over the years.  And so it
⁷ may not be specifically cited.  It may go
⁸ to my clinical knowledge and experience.
⁹     Q.   Okay.  And if you could
¹⁰ please turn to Page 9.  Do you see that
¹¹ between Pages 9 and 13, there's --
¹² there's a number of charts imported?
¹³     A.   Yes.
¹⁴     Q.   And those were taken
¹⁵ verbatim from the task force website?
¹⁶     A.   Correct.
¹⁷     Q.   Okay.  So you did not change
¹⁸ the language in these charts, correct?
¹⁹     A.   I couldn't even correct
²⁰ anything of them, if it got cut off.  I
²¹ don't know why.
²²     Q.   Okay.  Is there a reason
²³ that you didn't use the updated C
²⁴ definition?

Page 207

¹     A.   I'm not sure what that is.
²     Q.   So if you see Grade C on
³ Page 9.
⁴     A.   Yes.
⁵     Q.   Okay.  And you note that
⁶ that statement was undergoing revision?
⁷     A.   You know, at whatever point
⁸ I pulled it, that's what it said.  So I
⁹ can look.  I think it was when I pulled
¹⁰ it January 2022.  And I know because this
¹¹ came up when we were printing off all of
¹² the articles and stuff for the binders.
¹³ And the comment was, that's what I cited.
¹⁴ So I don't know if it had changed in the
¹⁵ interim.
¹⁶         I guess that's your
¹⁷ question.  There wasn't a reason.
¹⁸     Q.   Okay.  Do you know if the
¹⁹ current definition for C is more
²⁰ pro-screening or less pro-screening?
²¹     A.   I don't know.  This is what
²² it was when I looked at it.  I'd love to
²³ know.
²⁴     Q.   Well, the suggestion for

Page 208

¹ practice in what you cited is, "Offer or
² provide this service only if other
³ considerations support the offering or
⁴ providing this service in an individual
⁵ patient."
⁶         Do you see that?
⁷     A.   Mm-hmm.
⁸     Q.   If I tell you that the
⁹ current language is, "Offer or provide
¹⁰ this service for selected patients
¹¹ depending on individual circumstances" --
¹² well, first of all, does that sound
¹³ familiar?
¹⁴     A.   I don't know that I've read
¹⁵ that.
¹⁶     Q.   Okay.  Does that seem more
¹⁷ sort of pro-screening or less or neither?
¹⁸     A.   I think, to me, that would
¹⁹ read, you know, if a patient had medical
²⁰ comorbidities that would make it, you
²¹ know, tough for the patient or without an
²² opportunity to -- circumstances, to me,
²³ says what the patient's circumstances
²⁴ are.  It would probably be their health

Page 209

¹ circumstance.
²         I think we're -- you know,
³ I'm not sure what the benefit is of fine
⁴ tuning this recommendation.  But
⁵ circumstance to me would speak to the
⁶ patient's circumstance, their health and
⁷ well-being.
⁸         And perhaps, you know, if a
⁹ patient is sick you wouldn't want to put
¹⁰ them through a test.
¹¹     Q.   And is it your understanding
¹² that the new definition of C was slightly
¹³ less focused on patient preferences and
¹⁴ more on professional judgment?
¹⁵     A.   I'm not sure.  I don't know
¹⁶ the answer to that.
¹⁷     Q.   Then I want to talk about
¹⁸ something that you said on Page 11,
¹⁹ please.
²⁰         Now, it's your interest in
²¹ limiting risk of harm from, quote,
²² unnecessary or unreliable
²³ tests/procedures?
²⁴     A.   Yeah.

Confidential Information Subject to Protective Order

Page 210

1    Q.   Correct?
2    A.   Correct.
3    Q.   What is your -- what is the
4  distinction between unnecessary and
5  unreliable?
6    A.   Oh.  That's straightforward.
7         So for example, the task
8  force does not -- the task force does not
9  recommend checking a PSA.  It has a D
10 level of recommendation.
11        It used to be a stronger
12 recommendation, but they discovered over
13 time that even though they were
14 diagnosing cancers earlier, it didn't
15 change the overall survival.
16        I actually was speaking
17 to -- when I was writing this, I was
18 really thinking about Dr. Kaplan's
19 recommendation for sending inflammatory
20 markers.
21        Inflammatory markers are
22 erythrocyte sedimentation rate or CRP.
23 Because these can be elevated in a lot of
24 conditions including vascular disease,

Page 211

1  and I don't know what one would do with
2  the information of an elevated
3  inflammatory marker.  It does not
4  necessarily mean cancer or infection.
5         In fact, I do believe that I
6  listed a long list of things that it
7  could be.
8         So that, to me, is a test
9  that is unreliable.
10   Q.   What is the distinction
11 you're drawing between unnecessary and
12 unreliable?
13   A.   You know, I think
14 unnecessary, like a task force
15 recommendation, you know, it's important
16 what they recommend and what they do not
17 recommend.  So that would be in the
18 unnecessary category.
19        Whereas, a test that may
20 falsely elevate a patient's fear of
21 cancer, if it's being tested in a cancer
22 screening and is not a sensitive or
23 specific test, that would be unreliable.
24   Q.   And what's your definition

Page 212

1  of when a test becomes unreliable.  Do
2  you have a threshold for specificity and
3  sensitivity?
4    A.   I mean, in this case I would
5  follow the tests put forth by the task
6  force.
7    Q.   Well, I'm asking a different
8  question, which is what is -- in your
9  view the threshold for sensitivity and
10 specificity to warrant a test being
11 considered reliable?
12   A.   I haven't evaluated all the
13 tests in terms of that.  That was not
14 what was asked of me in going for the
15 this mission.
16        I'm happy to go through all
17 of his recommended medical monitoring.
18 And I'm happy to give an opinion on that.
19   Q.   Do you have an opinion about
20 the threshold for sensitivity and
21 specificity that must be reached for a
22 test, in your view, to be considered
23 reliable?
24   A.   I don't know a number there.

Page 213

1  I mean, you always want as high as you
2  can for both numbers.  I'm going to leave
3  it there.
4    Q.   And a lot of tests are high
5  on one number and low on the other,
6  right?
7    A.   The best tests are higher on
8  both.
9    Q.   But a lot of tests are high
10 on one number and low on another,
11 correct?
12   A.   I'm not sure.
13   Q.   Are you -- I mean, you use a
14 lot of tests in your -- in your work; is
15 that right?
16   A.   Well, I mean, what do I
17 order?  I order a CBC.  I order a liver
18 panel, a kidney panel.  And I order tumor
19 markers.  That's the general testing that
20 I order for a cancer patient when I'm
21 supervising their chemotherapy.
22   Q.   So to the extent that
23 Dr. Kaplan suggests similar tests, then
24 you would agree that those are necessary

Page 214

¹ and reliable?
²     A.   I think you have to know
³ what the context is.  He is recommending
⁴ in the setting of screening asymptomatic
⁵ patients.  I'm using them in the setting
⁶ of giving these patients cytotoxic
⁷ chemotherapy and monitoring their safety
⁸ and response.
⁹     Q.   Are there -- and you
¹⁰ understand that Dr. Kaplan is
¹¹ recommending screening in the context of
¹² patients who were exposed to carcinogens
¹³ that, in his framework, are causally
¹⁴ linked with certain specific cancers,
¹⁵ correct?
¹⁶     MR. KUM:  Objection.
¹⁷ Assumes facts not in evidence.
¹⁸     THE WITNESS:  He said he
¹⁹ based his assumptions and sort of
²⁰ was very careful about that, of
²¹ reading three expert letters from
²² the plaintiffs.
²³     He sort of -- I don't even
²⁴ understand how he picked some of

Page 215

¹ these tests -- puts together a
² potpourri of screening tests
³ without any evidence offered and
⁴ without any thought to whether or
⁵ not they're safe or appropriate
⁶ for these patients:  It's honestly
⁷ a strange collection.
⁸     And I -- it doesn't pass the
⁹ sniff test for me.  I would not
¹⁰ subject myself or my loved one to
¹¹ those tests.
¹² BY MS. GEMAN:
¹³     Q.   He's seen tens of thousands
¹⁴ and treated tens of thousands of cancer
¹⁵ patients and is a well regarded
¹⁶ physician.
¹⁷     Do you believe that his
¹⁸ protocol was entered into without regard
¹⁹ for the safety of patients?
²⁰     MR. KUM:  Objection.
²¹ Assumes facts not in evidence.
²²     Go ahead.
²³     THE WITNESS:  He is a lovely
²⁴ private practice physician who

Page 216

¹ maintains an academic affiliation
² so that he can do teaching, which
³ I find very lovely, mentoring of
⁴ oncology fellows in his clinic.
⁵     I cannot -- he doesn't
⁶ really explain his thought process
⁷ or give any evidence or
⁸ explanation for his test
⁹ recommendations.
¹⁰     So I can't -- I've been
¹¹ trying to understand his thought
¹² process.  I have -- I can't.
¹³     It is not evidence or data
¹⁴ driven.
¹⁵ BY MS. GEMAN:
¹⁶     Q.   In your opinion?
¹⁷     A.   That's what you were asking,
¹⁸ right?
¹⁹     Q.   Yes.
²⁰     A.   Okay.  In my opinion, there
²¹ is no merit to this testing protocol.
²²     Q.   So to the extent that he's
²³ suggesting tests that are within the
²⁴ standard of care, do you think they've

Page 217

¹ become rendered meritless by his dint of
² suggesting them?
³     MR. KUM:  Objection.
⁴ Assumes facts not in evidence.
⁵     THE WITNESS:  I actually
⁶ went through his list and I
⁷ assessed sort of what standard of
⁸ care.
⁹     I looked at -- you know, I
¹⁰ was sort of surprised to hear that
¹¹ a CBC is -- you don't have to
¹² order that every year in a primary
¹³ care visit.
¹⁴     A liver and kidney panel,
¹⁵ you actually don't have to.
¹⁶     The only mandated things are
¹⁷ the history and physical.
¹⁸     The primary care would also
¹⁹ recommend against thyroid testing.
²⁰ There's no mention of inflammatory
²¹ markers.
²²     You know, it's -- I can go
²³ through that list with you.  I'd
²⁴ be delighted, because I actually

Confidential Information Subject to Protective Order

Page 218

1    put that exact question to the
2    test reviewing each of his
3    proposed medical monitoring study.
4    BY MS. GEMAN:
5        Q.   Do you agree that patients
6    should have -- and specifically patients
7    who have been exposed to a carcinogen
8    that is causally linked in this scenario
9    to various cancers, including many that
10   even you agree can be, you know, treated
11   if caught early -- annual physicals?
12       A.   Annual physical is standard
13   primary care.  It's already done.
14       Q.   And do you think it's
15   appropriate to have questions directed
16   towards signs/symptoms of malignancies?
17       A.   That's actually done at
18   every primary care visit also.
19           You know, the -- what we're
20   taught, the art of medicine, actually
21   it's talking to the patient and examining
22   the patient.  You get a lot of
23   information.
24           And to your point with

Page 219

1    asking questions or directing to
2    exposure, the history -- the history is
3    sort of the age old fundamental of the
4    primary care visit, and specifically a
5    yearly visit.
6        MR. KUM:  Counsel, whenever
7    you get to a reasonable breaking
8    point, can we take a break?
9        MS. GEMAN:  We can do that
10   now.
11       THE WITNESS:  I'd love that.
12   Thank you.
13       THE VIDEOGRAPHER:  All
14   right.  2:04.  We are off the
15   video record.
16       (Short break.)
17       THE VIDEOGRAPHER:  2:16.  We
18   are on the video record.
19   BY MS. GEMAN:
20       Q.   Doctor, would you please
21   turn to Page 14 of your report.
22           Do you see you have a
23   section on patient anxiety/psychological
24   distress?

Page 220

1        A.   Yes.
2        Q.   And among other things you
3    state that, "Patients in established
4    higher risk categories with validated
5    enhanced screening protocols are known to
6    have more psychological distress
7    associated with screening, even if
8    ultimately found to be at average risk.
9    False positives also generate a lot of
10   anxiety at the time of the positive test
11   result and with subsequent screening
12   tests."
13       A.   Yes.
14       Q.   Okay.  Just to help me, what
15   is the cite for that?
16       A.   So, again, 36 going down.
17       Q.   That's Chad-Freidman?
18       A.   And actually 37.  I don't
19   know why I changed my format, because 37,
20   "Implications of False Positives," should
21   actually be at the end of -- because
22   that's where it really starts --
23   "Screening Findings and Workups."
24           MS. GEMAN:  All right.  So

Page 221

1    let's, if we could, mark as
2    Exhibit 5 the article cited in
3    Footnote 36 of the doctor's report
4    which is "Psychological Distress
5    Associated With Cancer Screening.
6    A Systematic Review."
7        (Document marked for
8    identification as Exhibit
9    Teitelbaum-5.)
10       THE WITNESS:  Is this the
11   same thing?
12   BY MS. GEMAN:
13       Q.   What's been marked as
14   Exhibit 5 is an article in the journal
15   Cancer; is that correct?
16       A.   Yes.
17       Q.   And that is a well regarded
18   peer-reviewed journal?
19       A.   Yes.
20       Q.   Okay.  And if you could --
21   well, let me ask first, do you know any
22   of the authors of this study?
23       A.   I do.
24       Q.   Do you know them -- do you

Page 222

¹ work with them or do you know them
² personally?
³      A.   It looks like they're
⁴ psychiatrists, so no.  And in Boston, so
⁵ no.
⁶      Q.   Wait, I'm sorry.  You do
⁷ know them personally or you do not?
⁸      A.   I do not know them at all.
⁹ They are in Boston, and they are
¹⁰ psychiatrists.
¹¹      Q.   Okay.  I misunderstood or
¹² misheard your earlier answer.  And if you
¹³ could turn to Page 3892, which is the
¹⁴ last substantive page of the article.
¹⁵      And can you please read the
¹⁶ first sentence of the conclusions?
¹⁷      A.   Under summary of results or
¹⁸ under discussion?
¹⁹      Q.   Under conclusions.
²⁰      A.   Which page?
²¹      Q.   Page 3892.  Or I can read
²² it.  That's fine.  Just look on, please,
²³ Page 3892.
²⁴      A.   Yes.

Page 223

¹      Q.   Do you see the first
² sentence reads, "For this review, we
³ examined the literature on distress at
⁴ cancer screening and concluded that, with
⁵ the exception of colorectal cancer
⁶ screening, distress associated with
⁷ cancer screening itself is low."
⁸      Do you believe they made the
⁹ proper inferences from their data?
¹⁰      A.   I mean, I would have to -- I
¹¹ would ask then to have some time to go
¹² through the article.
¹³      I think the question is, if
¹⁴ this is in the setting of asymptomatic
¹⁵ general screening or -- I think the point
¹⁶ I was showing was if Dr. Kaplan is
¹⁷ calling this population high risk, that
¹⁸ there's a different anxiety level
¹⁹ associated with the recommended
²⁰ screening.
²¹      Q.   Well, are you changing your
²² opinion on what this article purportedly
²³ concludes or supports?
²⁴      MR. KUM:  Objection.

Page 224

¹      Argumentative.  Misstates
² testimony.
³      THE WITNESS:  I'd have to
⁴ read through the article again.
⁵ I'm happy to do that now.
⁶      MR. KUM:  Doctor, take your
⁷ time.
⁸      THE WITNESS:  Yeah.
⁹      MR. KUM:  Go ahead.
¹⁰ BY MS. GEMAN:
¹¹      Q.   Did you -- well, I'm not
¹² asking you to read the whole article.
¹³      MR. KUM:  Well, but
¹⁴ Counselor, you've just given her
¹⁵ an article to read, which is a
¹⁶ paper which is numerous pages
¹⁷ long.  She wasn't -- she's not
¹⁸ required to memorize this from --
¹⁹ you know, word for word.
²⁰      And she's just asked if she
²¹ could just be given a minute to
²² review it.  So if you're not
²³ allowing her to review it, okay, I
²⁴ want that on the record.  But

Page 225

¹ she's just asked if she could just
² have a minute to simply flip
³ through it.
⁴      MS. GEMAN:  Well, let me ask
⁵ my question.
⁶ BY MS. GEMAN:
⁷      Q.   And absolutely if you need
⁸ to review it to answer the question, of
⁹ course that's completely fine.  Take all
¹⁰ the time you need.
¹¹      Did you read the article
¹² before citing it in your report?
¹³      A.   Yes.
¹⁴      Q.   Okay.  And for what
¹⁵ proposition were you citing this article?
¹⁶      A.   So just speaking to the
¹⁷ sentence that was written, you know, it's
¹⁸ a little bit out of context, which is why
¹⁹ I think it would be useful for me to have
²⁰ some time with the article.
²¹      Let me just look at my
²² paragraph again.
²³      Q.   Sure.
²⁴      A.   And again, I say here, the

Confidential Information Subject to Protective Order

Page 226

¹ bulk is -- of anxiety associated with a
² more invasive procedure, screening,
³ colonoscopy.
⁴         I have to look back -- it's,
⁵ you know, been about two months --
⁶ whether or not this differentiates
⁷ between average risk and high risk.
⁸         I suspect this is average
⁹ risk patients having anxiety with a
¹⁰ colonoscopy, and I have to go back again.
¹¹ But I am concerned about the anxiety in
¹² patients that have been called high risk.
¹³     Q.    Do you know to what the
¹⁴ authors attribute the exception, meaning
¹⁵ why is it in the authors' view that it's
¹⁶ colorectal cancer screening patients who
¹⁷ had -- everyone else had low distress and
¹⁸ they had higher distress?
¹⁹     A.    I don't know the answer.  I
²⁰ would have to have 20 or 30 minutes to go
²¹ through the article.  And it just -- you
²² know, I read every line to try and
²³ understand what your question is.
²⁴     Q.    And did you look for all the

Page 227

¹ articles that you could find on
² psychological distress associated with
³ cancer screening?
⁴     A.    There are not many articles
⁵ that come up.
⁶     Q.    Did you review all the ones
⁷ that you could find?
⁸     A.    Yes.
⁹     Q.    So in addition to what's
¹⁰ been marked as Exhibit 5, did you tell me
¹¹ a minute ago that another article from
¹² Cancer that you cited is "Implications Of
¹³ False Positive Results For Future Cancer
¹⁴ Screenings"?
¹⁵     A.    Yes.
¹⁶     Q.    Okay.
¹⁷         MS. GEMAN:  Okay.  So let's
¹⁸     please mark as Exhibit 6 the
¹⁹     article that is cited in Footnote
²⁰     37 of the doctor's report.  And
²¹     it's entitled "Implications Of
²²     False Positive Results For Future
²³     Scanning" -- I'm sorry -- "For
²⁴     Future Cancer Screenings."

Page 228

¹         (Document marked for
²     identification as Exhibit
³     Teitelbaum-6.)
⁴         THE WITNESS:  So I'm going
⁵     to read these two articles now?
⁶         MR. KUM:  Well, read the
⁷     next article.  She moved on
⁸     questions from the prior article.
⁹         THE WITNESS:  Okay.
¹⁰ BY MS. GEMAN:
¹¹     Q.    I have a general question
¹² before this.
¹³         What is the -- does a false
¹⁴ positive mean someone is told, "You have
¹⁵ cancer," or does it mean that they're
¹⁶ told something like, "We have a result
¹⁷ that we want to follow up more on"?
¹⁸     A.    I mean, a patient is told
¹⁹ they have patient.  And then they get the
²⁰ next test in the workup, and they don't
²¹ have cancer.
²²     Q.    So your testimony is when
²³ there's an anomalous result, the patient
²⁴ is told that they have cancer?

Page 229

¹     A.    No.  They are told there is
² a positive result, and there needs to be
³ a further workup.
⁴     Q.    Okay.
⁵     A.    It prompts a workup for
⁶ cancer.
⁷     Q.    But not the --
⁸     A.    That's what the anxiety is
⁹ associated with.
¹⁰     Q.    And the concern -- or by
¹¹ including Taksler, is one of the points
¹² that you're making then a concern of a
¹³ false positive is that it's inherently
¹⁴ stressful and also that it might deter
¹⁵ your willingness to get more tests?
¹⁶     A.    Let me just have some time
¹⁷ to read.  And again, the one thing that
¹⁸ I'm going to say is the more frequently
¹⁹ you test somebody, the more chance of a
²⁰ false positive.
²¹         But if I could have some
²² time with this article, I would
²³ appreciate it so that I have a basis for
²⁴ properly answering your questions.

Confidential Information Subject to Protective Order

Page 230

1  Q.  Yes.  Would you mind
2  answering my question first, and then you
3  can look at the article.  Because my
4  question was about your report.
5  A.  Oh.  You were asking --
6  okay.
7  Q.  Are you making the point in
8  your report that a concern of a false
9  positive, in addition to its being
10  inherently stressful, is that it might
11  deter willingness to get subsequent
12  tests?  If I could just ask you that
13  question.
14  A.  I'm just going to read my
15  report, if you don't mind.
16  MR. KUM:  She's looking at
17  her report.
18  BY MS. GEMAN:
19  Q.  Right.  Well, no I was --
20  right.  At your report.  That's fine.
21  A.  Yep.
22  Q.  Go ahead.
23  A.  And again, these are average
24  risk patients from cancer screening.

Page 231

1  So you're still on false
2  positive, right?
3  Q.  Yeah.
4  A.  What is your question?
5  Q.  So what is the concern with
6  a false positive?  You mentioned anxiety.
7  A.  Well, there's both a
8  physical concern and a psychological
9  concern.  You know, if you are then --
10  all right.
11  So let's say you have a
12  positive finding on a low dose spiral CT.
13  Well, the only way to
14  confirm or deny that you have cancer,
15  again, in our oncology world is to get a
16  biopsy.
17  A biopsy for a lung mass is
18  actually very difficult.  You either have
19  to stick a needle through the chest wall,
20  and sometimes the first biopsy is not
21  conclusive and you have to do it again.
22  Or you have to do even a
23  more invasive test, where you put a scope
24  down, which, again, requires sedation and

Page 232

1  for a cardiac patient, would require
2  cardiac clearance.
3  And this is a more risky
4  test than an upper endoscopy, because it
5  requires -- goes in the airway.  And then
6  when they're in the airway, they take a
7  needle and poke through the bronchus to
8  get to the lung mass to biopsy it.
9  So the only way to prove
10  cancer is a biopsy.  And both of those
11  are invasive and have established risks.
12  There's no tumor marker for
13  lung cancer.
14  MR. KUM:  Doctor, now you
15  can read the article.
16  MS. GEMAN:  We can go off
17  the record if you want to read
18  your article.
19  THE WITNESS:  Can you tell
20  me what your question is again?
21  MR. KUM:  Why don't you read
22  the paper first.
23  THE WITNESS:  This -- and
24  you want Number 6.

Page 233

1  MR. KUM:  It's this Taksler.
2  THE VIDEOGRAPHER:  Off the
3  record?
4  MS. GEMAN:  Yeah.
5  THE VIDEOGRAPHER:  2:30 p.m.
6  We are off the video record.
7  (Short break.)
8  THE VIDEOGRAPHER:  2:40.  We
9  are on the video record.
10  BY MS. GEMAN:
11  Q.  Doctor, do you know any of
12  the authors of the article that's been
13  marked as Exhibit 6?
14  A.  I do not.
15  Q.  Do you see in the
16  conclusions here on the first Page 2390,
17  in the abstract?  Do you see where it
18  says, "Conclusions:  Patients who
19  previously had a false positive breast or
20  prostate screening cancer test were more
21  likely to engage in future screening"?
22  A.  I do.
23  Q.  Do you think these authors
24  accurately drew that conclusion from the

Page 234

¹ data and information they used?
² A. I -- this is their
³ single-institution dataset. It looks
⁴ like it matches their tables.
⁵ Q. Is that consistent with your
⁶ personal experience as an oncologist?
⁷ A. I don't order these
⁸ screening tests. They already have
⁹ cancer when they come to me.
¹⁰ Q. When was the last time in
¹¹ your career that you saw patients who
¹² were asymptomatic?
¹³ A. You mean with respect to
¹⁴ cancer?
¹⁵ Q. Yes.
¹⁶ A. Because I have patients that
¹⁷ have completed cancer therapy. They're
¹⁸ asymptomatic.
¹⁹ In a primary care setting,
²⁰ the last time was 2006.
²¹ Q. Okay. And do you have --
²² and so your experience in the last
²³ 16 years has been only with patients who
²⁴ have already had a cancer diagnosis,

Page 235

¹ correct?
² A. I practice to the top of my
³ scope as an oncologist.
⁴ Q. Practice to the top of my
⁵ scope -- that's figurative, right?
⁶ A. No. It's actually a term
⁷ that's used. I did a three-year
⁸ hematology/oncology fellowship. I use
⁹ those skills learned to manage cancer
¹⁰ patients.
¹¹ Q. So you do not have
¹² experience in the last 16 years treating
¹³ patients who are -- who have not already
¹⁴ had a cancer diagnosis?
¹⁵ A. The patients that I treat
¹⁶ have cancer.
¹⁷ Q. So the answer to my question
¹⁸ is yes?
¹⁹ A. Can you repeat the question
²⁰ again?
²¹ Q. Sure.
²² You do not have experience
²³ in the last 16 years of treating patients
²⁴ who have not already had a cancer

Page 236

¹ diagnosis, correct?
² A. Yes.
³ Q. When you -- you indicated
⁴ that you looked for all the articles that
⁵ you could find, and you did note that the
⁶ field is sparse on psychological effects
⁷ in screening?
⁸ A. Yes.
⁹ Q. Okay. Have you ever heard
¹⁰ of the Journal of Clinical Oncology?
¹¹ A. Yes.
¹² Q. Is that a refereed journal?
¹³ A. Is that a what?
¹⁴ Q. A refereed journal?
¹⁵ A. Refereed -- do you mean
¹⁶ peer-reviewed?
¹⁷ Q. Yes.
¹⁸ A. Yes.
¹⁹ Q. Okay. Is it a respected
²⁰ journal?
²¹ A. Yes.
²² Q. Do you recall coming across
²³ an article from the Journal of Clinical
²⁴ Oncology entitled "Impact of BRCA1/BRCA2

Page 237

¹ Mutation Testing on Psychologic Distress
² in a Clinic-Based Sample"?
³ A. I was -- in my search was
⁴ looking at screening in asymptomatic
⁵ patients. I did not look at -- obviously
⁶ patients with cancer is a different
⁷ scenario.
⁸ Q. Well, somebody can have
⁹ BRCA1 or 2 and be asymptomatic, correct?
¹⁰ A. Oh. So these are not cancer
¹¹ patients, these are patients that have
¹² been appropriately referred to a cancer
¹³ risk evaluation program?
¹⁴ Q. Well, my question is,
¹⁵ somebody can have BRCA1 or 2 and be
¹⁶ asymptomatic, correct?
¹⁷ MR. KUM: So I'm going to
¹⁸ object. Counsel is referring to
¹⁹ an article.
²⁰ I think the deponent is
²¹ entitled to see the article that
²² she's referring to. She already
²³ had a question about it. So if
²⁴ you could show it to her.

Confidential Information Subject to Protective Order

Page 238

1    MS. GEMAN:  I'm happy to do
2  that.  But I'm asking a sort of
3  question that's irregardless --
4  true or false irregardless of the
5  article.
6  BY MS. GEMAN:
7    Q.    Someone can have BRCA1 or 2
8  and be asymptomatic, correct?
9    A.    Yes.
10   Q.    And I'll show you the
11 article, and you can tell me if you came
12 across it in your -- in the literature
13 analysis.
14   MS. GEMAN:  And for the sake
15 of the court reporter, I'll say
16 this is -- Exhibit 7 will be an
17 article entitled "Impact of
18 BRCA1/BRCA2 Mutation Testing on
19 Psychologic Distressed in a
20 Clinic-Based Sample."
21   (Document marked for
22 identification as Exhibit
23 Teitelbaum-7.)
24   THE WITNESS:  I'm the only

Page 239

1  one without it.
2    MR. KUM:  No, the court
3  reporter -- let's go off the
4  record.
5    THE VIDEOGRAPHER:  2:46.  We
6  are off the video record.
7    (Brief pause.)
8    THE VIDEOGRAPHER:  The time
9  is 2:47.  We are on the video
10 record.
11 BY MS. GEMAN:
12   Q.    Doctor, did you come across
13 what's been marked as Exhibit 7 in your
14 research for your report?
15   A.    I don't think I searched the
16 database for the BRCA population.  So I
17 do not -- I did not bring this up.  Or if
18 I did, I didn't include it because it
19 didn't seem relevant.
20   Q.    I'm going to read the
21 conclusion.
22   "These results" -- and I'm
23 on the first page under conclusion.
24   A.    Mm-hmm.

Page 240

1    Q.    "These results suggest that
2  clinic-based BRCA1/2 testing can lead to
3  psychologic benefits for individuals who
4  receive negative test results.  At six
5  months after disclosure those who receive
6  positive or uninformative test results
7  did not exhibit increased psychological
8  distress or perceived risk."
9    Did I read that correctly?
10   MR. KUM:  So I'm going to
11 object.  Dr. Teitelbaum has asked
12 to read this paper.  She hasn't
13 finished reading it.
14   THE WITNESS:  I don't think
15 this is screening for cancer.  I
16 think this is offering a
17 BRCA1/BRCA2 test, and I will -- to
18 family members of an identified
19 patient with BRCA1/BRCA2.
20   And what I would just say
21 here, is this is an entirely
22 different literature.  This is not
23 based on offering cancer-directed
24 screenings.

Page 241

1    This is simply identifying
2  if they're BRCA1 or BRCA2 or not.
3    In fact, this is in the
4  world of testing and disclosure of
5  testing.  It's like an ethics
6  literature kind of thing.
7    I would not have searched
8  about genetic testing in my
9  search.
10 BY MS. GEMAN:
11   Q.    So your best recollection,
12 is you didn't do a search that would have
13 uncovered this article?
14   A.    I would not have typed in
15 testing for BRCA1/BRCA2 mutations and
16 psychological distress.
17   Q.    If you had found it, would
18 you have included it, to the extent that
19 you can answer that counterfactual?
20   A.    Well, again to your point,
21 these patients are -- this is just about
22 identifying whether or not they carry a
23 mutation, not about implementing the
24 screening tests.

Confidential Information Subject to Protective Order

Page 242

1   So I wouldn't have searched
2  for it, because it wasn't the question
3  being asked.
4        MR. KUM:  Doctor, if you
5  want to read it.
6        THE WITNESS:  I mean,
7  normally, I don't just read the
8  abstract.  I read the entire
9  article.
10       I will, for the purpose of
11  this, because I don't understand
12  why this is relevant, I will just
13  quickly read through the --
14       MS. GEMAN:  We can go off
15  the record if you want and you can
16  read it.
17       THE WITNESS:  Okay.  That
18  would be great.
19       THE VIDEOGRAPHER:  2:50.  We
20  are off the video record.
21       (Short break.)
22       THE VIDEOGRAPHER:  2:58.  We
23  are on the video record.
24 BY MS. GEMAN:

Page 243

1   Q.   Doctor, did you have the
2  chance to review what's been marked as
3  Exhibit 7?
4   A.   Yes.  Thank you for that
5  time.
6   Q.   Sure.
7        Did it refresh your
8  recollection as to whether you had or had
9  not seen it before?
10   A.   It didn't.
11   Q.   Okay.
12   A.   I read a lot of JCO, so I'm
13  not sure.
14   Q.   JCO is the Journal of
15  Clinical Oncology?
16   A.   Yes.
17   Q.   And I just wanted to
18  understand something about your earlier
19  testimony.
20       Do you consider testing for
21  BRCA1/2 distinct from screening?
22   A.   So it is actually, as of
23  three years ago, standard to test all
24  pancreas cancer patients -- I can only

Page 244

1  speak to that -- for BRCA1, BRCA2.
2  PALB2, CHEK2, ATM.
3        There's a high risk.
4        We actually refer them to
5  the cancer risk evaluation program
6  because, as is stated in this article,
7  it's a very emotional decision, and it
8  requires a lot of extensive counseling
9  before.  I'll just comment that they
10  think that might be part of that
11  response.
12       This is actually -- the
13  tricky thing here -- and there are other
14  articles that speak to this question,
15  which I'm not completely sure how it
16  refers to my expert letter, but I'll
17  continue.
18       So there -- what I find when
19  I make the referral is there's actually a
20  large amount of patients that choose not
21  to.  So this is selecting for a very
22  motivated group.  And I would be
23  interested to find out how many didn't.
24  And the reason I think they choose not

Page 245

1  to -- I mean, I don't know.
2        But I would just say there
3  is a big literature around choosing and
4  around how you inform people and how you
5  counsel people.
6        This is like a field in and
7  of its own.  But I am -- you know, I read
8  this, and I would just say this isn't
9  exactly a cancer screening.  This is
10  finding out your genetics.  And this
11  looks like a self-selected group that was
12  beautifully supported in the
13  decisionmaking.
14       MS. GEMAN:  So move to
15  strike all of that as
16  nonresponsive.
17 BY MS. GEMAN:
18   Q.   The question is:  Do you
19  consider BRCA testing as distinct from
20  screening?
21       MR. KUM:  Asked and
22  answered.
23       You can go ahead again.
24       THE WITNESS:  I don't see it

Confidential Information Subject to Protective Order

Page 246

1    as any part of the Preventative
2    task force.
3         It is not a screening test
4    for cancer because not every BRCA1
5    or BRCA2 patient gets cancer.  I
6    think it would be a screening for
7    a high risk -- for someone you
8    would include in a high risk
9    population if they were willing to
10   be followed.
11 BY MS. GEMAN:
12       Q.   So your testimony under oath
13 is that the BRCA test, is not one that
14 you consider part of a cancer screening
15 because not everyone with BRCA develops
16 cancer; is that correct?
17       A.   I mean, this isn't a general
18 test that's offered in an asymptomatic
19 patient population, which is what Dr.
20 Kaplan is addressing.  These patients are
21 probably, to your point, also
22 asymptomatic.
23       But it's not a cancer
24 screening test.  It is a prerequisite, if

Page 247

1    they are positive, to refer them to a
2    high risk cancer screening program.
3         Q.   And the cancer risk
4    evaluation program, that's a screening
5    and treatment program or a counseling
6    program?
7         A.   We have three of them.  We
8    have one, actually, exclusively for BRCA
9    patients with breast and ovarian cancer.
10   We have one for GI cancers.  And we have
11   one for, like, all the other weird stuff.
12        And there are different
13   people in charge of each of them.  And
14   they help counsel and recommend any
15   Preventative procedures that might be
16   indicated.
17        I don't practice in that
18   clinic, so I'm not really sure of the
19   whole procedure.  I just know --
20        Q.   You don't consider them
21   screening programs?
22        A.   So I don't consider ordering
23   the test a screening program.  I consider
24   it a prerequisite for referring to a

Page 248

1    screening program.
2         Q.   So under your logic, a
3    mammogram is not a screening; is that
4    right?
5              MR. KUM:  Objection.
6    Misstates testimony.
7              THE WITNESS:  Mammogram is a
8    task force-approved screening test
9    for breast cancer.
10 BY MS. GEMAN:
11       Q.   Even though not every
12 abnormality found leads to cancer,
13 correct?
14       A.   I'm still trying to figure
15 out the connection.  But mammography is a
16 well established test for women within a
17 certain age range to assess for cancer.
18       Q.   And my question, which you
19 did not answer, and I will ask you to try
20 to focus on the questions.
21       Not every abnormality found
22 in a mammogram leads to cancer, correct?
23              MR. KUM:  Asked and
24 answered.  Argumentative.

Page 249

1              THE WITNESS:  Correct.
2    BY MS. GEMAN:
3         Q.   All right.  And yet, a
4    mammogram is a cancer screening test,
5    correct?
6         A.   Correct.
7         Q.   And a pap smear, do you
8    consider that a cancer screening test?
9         A.   That's no longer recommended
10   as the same yearly frequency.  That's
11   been newly elevated to three.  But it is
12   a screening test for changes at the
13   cervix.
14        MS. GEMAN:  Move to strike
15   as nonresponsive.
16   BY MS. GEMAN:
17        Q.   I do need you to answer my
18   questions.  I didn't ask you how frequent
19   or about changes in the interval.
20        A pap smear is a cancer
21   screening test, correct?
22        A.   Yes.
23        Q.   Not every strand of HPV
24   leads to cancer, correct?

Page 250

1    A.   Correct.
2    Q.   Not every abnormality found
3 in a pap smear leads to cancer, correct?
4    A.   Correct.
5    Q.   Not every cell that's
6 abnormal in a pap smear leads to a
7 cervical cancer finding, correct?
8    A.   Correct.
9    Q.   All right.  So mammograms
10 and pap smears are cancer screening.  But
11 in your view, a test for BRCA is not,
12 because not everyone with a BRCA gene
13 develops cancer.  Is that the logic I'm
14 understanding?
15        MR. KUM:  Objection.
16    Misstates testimony.
17        THE WITNESS:  A BRCA test is
18    to assess someone if they have a
19    hereditary cancer syndrome.
20 BY MS. GEMAN:
21    Q.   So it is a cancer screening
22 test in your view or --
23    A.   It's a test for hereditary
24 cancer syndrome.

Page 251

1    Q.   So would you put it in the
2 bucket of screening?
3    A.   I -- not in asymptomatic
4 patients.
5    Q.   But if it's conducted on --
6 regardless of the person on whom it's
7 conducted, do you consider it a screening
8 test?
9    A.   I cons -- not for cancer.  I
10 consider it a screening test for
11 hereditary cancer syndrome.
12    Q.   And the relevance of --
13 strike that.
14        Do you consider the
15 literature on the psychological distress
16 in connection with BRCA testing relevant
17 to the study of psychological distress
18 associated with other tests that likewise
19 test either for cancer or a precursor to
20 cancer?
21    A.   I don't think they're the
22 same thing.
23    Q.   Do you have any cite for
24 drawing a distinction psychologically

Page 252

1 between those two?
2    A.   This is, you know, 20 years
3 of practice.  I think this is -- one is
4 testing for a gene that may predispose
5 you and merits referral to a center.  And
6 again, this is a single-institution study
7 that only assessed distress in motivated
8 patients.
9        And I think your other
10 question was mammography and pap smear,
11 which is not part of the U.S. task
12 force -- screening task force.  But I'm
13 directing your attention to mammography.
14 That is a screening test for cancer.
15    Q.   And you mentioned 20 years
16 of practice.  How many years -- how many
17 years were you in practice before 2006?
18    A.   I was -- before practice.
19 So I was in residency and fellowship and
20 then I came on faculty in 2005 at
21 University of Chicago.
22    Q.   Were you ever in private
23 oncology practice?
24    A.   No.

Page 253

1    Q.   Okay.  So you've never --
2 even before 2006, it wasn't a regular
3 part of your practice to see patients who
4 might benefit from cancer screening,
5 correct?
6        MR. KUM:  Objection.  Vague
7    and ambiguous.
8        MS. GEMAN:  Fair enough.
9 BY MS. GEMAN:
10    Q.   Even before 2006 you weren't
11 seeing patients who had not been
12 diagnosed with cancer?
13    A.   Actually, I did have a
14 geriatric primary care practice, 2005 to
15 2006, where I was the attending.  And in
16 that setting I was ordering screening
17 according to guidelines.
18    Q.   But that was in geriatric
19 primary care, not oncology, correct?
20    A.   Right.  We don't -- they
21 have cancer by the time they get to us,
22 so we're not ordering screening for
23 cancer.
24    Q.   You also express a concern

Confidential Information Subject to Protective Order

Page 254

1 in your report about overdiagnosis,
2 correct?
3       A.   Oh, yes.  Mm-hmm.
4       Q.   Okay.  So I'd like to -- and
5 you used as an example a hypothetical
6 where a person died at 70, regardless of
7 whether they were tested at age 60 or
8 tested at age 67, correct?
9       A.   They both die at the same
10 time, the time of diagnosis is different.
11 The age of death is the same.
12       Q.   And that was a hypothetical
13 where the authors expressly acknowledged
14 the limitation that the earlier -- "The
15 earlier diagnosis did nothing to change
16 the course of the disease."  Is that
17 correct?
18       A.   That's what's represented in
19 that cartoon.
20       Q.   Okay.  So that hypothetical
21 is not speaking at all about instances
22 where testing -- or where catching a
23 cancer earlier can affect the course of
24 the disease, correct?

Page 255

1       A.   That is not describing those
2 cancers.
3       Q.   Okay.  And the NCI was not
4 advocating less screening in that
5 article, but instead more sort of
6 numeracy in context for information,
7 correct?
8       A.   I think it speaks to
9 individualized recommendation for the
10 patient, doing no harm, making sure that
11 you know what you're testing for, and if
12 it will impact the patient's life.
13       Q.   And as an oncologist, if
14 you're presented with an otherwise
15 healthy 60-year-old who does have -- you
16 know, who did have a prostate cancer
17 diagnosis based on the screen, what would
18 you do?
19       A.   So to be fair, I wouldn't be
20 seeing that patient because --
21       Q.   Oh, yeah.  You don't treat
22 prostate.
23       A.   Right.
24       Q.   Do you have an understanding

Page 256

1 of what -- I don't know if it's still
2 called a proctologist?  I don't know.
3       A.   I'd say urologist.
4       Q.   Okay.  What would a urologic
5 oncologist -- what might a urologic
6 oncologist do in that scenario?
7       A.   Can you repeat the question?
8       Q.   Sure.
9            So she's presented with a
10 patient who's an otherwise totally
11 healthy 60-year-old who has prostate
12 cancer that was caught by that screen.
13       A.   Mm-hmm.
14            It depends on the stage, the
15 grade.  There's very specific treatment
16 algorithms.  In truth, urologists, or the
17 most straightforward ones, often start
18 androgen deprivation therapy.  And they
19 don't get to a genitourinary oncologist
20 until they have more advanced disease.
21       Q.   But the point is there's
22 things that can be done for that
23 60-year-old, right?  Unlike in the
24 hypothetical where there was nothing that

Page 257

1 could be done.
2       A.   If the patient is well
3 enough to treat, there are therapies to
4 be offered.
5       Q.   So it would be helpful for
6 that person to know at age 60 -- it would
7 be helpful for someone to know at age 60,
8 who is otherwise healthy, that they have
9 prostate cancer as opposed to only
10 knowing it when it's too late to do
11 anything about it?  Can we agree with
12 that?
13            MR. KUM:  Objection.
14 Incomplete hypothetical.
15            THE WITNESS:  I mean, I
16 think it's completely based on the
17 grade of the tumor.  If you have a
18 low grade, and I'm sure you're
19 familiar with the term, watchful
20 waiting.
21            I think -- and again, I'm
22 not doing this, but there's
23 different recommendations, some of
24 which are just observation based

Confidential Information Subject to Protective Order

---

Page 258

1    on the grade of the tumor and the
2    stage.
3         I know watchful waiting was
4    something that was accepted in
5    Europe.  And we've worked to
6    assess it here through -- and
7    integrate it in the care.
8         If you have an indolent
9    cancer, you may be offered
10   watchful waiting or other
11   therapies.
12   BY MS. GEMAN:
13        Q.   And so do you agree that it
14   is helpful for someone to know at age 60
15   that they have prostate cancer as opposed
16   to only learning about it when it's too
17   late to do anything about it?
18        MR. KUM:  Asked and
19   answered.  Incomplete
20   hypothetical.
21        THE WITNESS:  I think,
22   again, I can't answer that without
23   knowing the grade and the other
24   comorbidities.

---

Page 259

1         You said healthy.  But, you
2    know, what the life expectancy,
3    the activity level.  We assess
4    performance status.  There's a lot
5    that goes into a decision to
6    treat.
7    BY MS. GEMAN:
8         Q.   Under what circumstances is
9    it better to know at age 60 that you have
10   an early stage cancer as opposed to
11   waiting for seven years until it's too
12   late?
13        A.   Well, I think if you have --
14   I think that's exactly the point of that
15   graphic.
16        If you're diagnosed at 63,
17   we may be obliged to do more invasive
18   treatments, but you still die at 70.  But
19   if you're not diagnosed at 63, and you
20   have the same indolent cancer, you know,
21   at that time, you have years more of
22   normal uninstrumented or chemotherapy or
23   hormone therapy life.
24        Q.   No, no.  That hypothetical

---

Page 260

1    was expressly limited to a circumstance
2    where there was nothing the person can
3    do.  And the articles -- the authors of
4    that article acknowledge that.  So
5    whether you learned at 60, 61, 65 or 67,
6    you were going to die at 70.  That was
7    the hypothetical in that article,
8    correct?
9         A.   I would have to look back at
10   it.
11        Q.   That's your recollection,
12   correct?
13        A.   I don't --
14        Q.   You just said that a second
15   ago when we were talking about that.
16        A.   I just -- I don't know when
17   you die or when you die from or what that
18   discussion is.  I'm sorry.
19        Q.   You die at 70 from prostate
20   cancer.  Do you recall that now?
21        A.   I recall the graphic.
22        Q.   Okay.  What I'm --
23        MR. KUM:  Doctor, you can
24   pull your report.

---

Page 261

1         THE WITNESS:  Okay.  No, no.
2    I agree.  You die at 70 from
3    prostate -- that's the premise of
4    that graphic.
5    BY MS. GEMAN:
6         Q.   And I'm moving off that
7    hypothetical, which is the situation
8    where -- I'm saying generally, if
9    there's -- if there's possibly something
10   you can do about it, isn't it better to
11   learn that at 60 rather than at 67 when
12   it's too late?
13        MR. KUM:  Asked and
14   answered.  Incomplete
15   hypothetical.
16        You can answer.
17        THE WITNESS:  So you're
18   saying if you are diagnosed at 60,
19   and, I guess -- grade matters, so
20   I don't know how to -- I don't
21   know how to answer this question.
22        It's not exactly how we do
23   the evaluation from an oncology
24   perspective.  You can never make

---

Page 262

1    an assessment without looking at
2    the grade and stage of the cancer.
3         I'm not -- if you want to
4    repeat the question.
5  BY MS. GEMAN:
6    Q.   Yeah.
7    A.   I'm trying to answer.  And I
8  apologize.
9    Q.   No, it's not something that
10 one would necessarily -- a layperson
11 might imagine to be controversial.  If
12 you learn about something at age 60 and
13 can do something about it, isn't that
14 better than learning about it at 67 when
15 there's nothing you can do about it?
16       MR. KUM:  Incomplete
17 hypothetical.
18       THE WITNESS:  I mean,
19 there's always something you can
20 do about it even if it's later
21 stage.  If somebody is not
22 eligible for surgery, it's not
23 curative.  They may have different
24 treatments.

Page 263

1         I'm not really sure how to
2    answer this.  I'm trying to figure
3    out.
4         It's -- there's so many
5    factors.  It's not really that
6    black and white because the stage,
7    grade -- you know, how it looks
8    under the microscope tells you how
9    aggressive it's going to be.
10 BY MS. GEMAN:
11   Q.   Let's talk about your
12 discussion that overtreatment is a
13 particular concern for lung and prostate,
14 correct, while we're on the subject?
15   A.   Yes.
16   Q.   You cited Carter for that
17 proposition, correct?
18   A.   Mm-hmm.
19       MS. GEMAN:  So I'm going to
20 mark as Exhibit 8 -- I'm just
21 trying to help the court reporter
22 by saying where it was in your
23 report -- what's referenced in
24 Footnote 38 of the doctor's

Page 264

1    report.  "What is Overdiagnosis
2    and Why Should We Take It
3    Seriously in Cancer Screening?"
4         (Document marked for
5    identification as Exhibit
6    Teitelbaum-8.)
7  BY MS. GEMAN:
8    Q.   Do you recognize what's been
9  marked as Exhibit 8?
10   A.   I do.
11   Q.   And you were referring in
12 your report to the -- I'm trying to
13 figure out the page -- to the
14 second-to-last substantive page.
15       At the -- you see with the
16 Figure 2 at the bottom?
17   A.   Mm-hmm.
18   Q.   And I'm looking at the last
19 full paragraph.
20       MR. KUM:  Doctor, just a
21 reminder, you have to give a yes
22 or no.
23       THE WITNESS:  Oh, sorry.
24       MS. GEMAN:  That's okay.

Page 265

1         MR. KUM:  You keep saying
2    "mm-hmm."  And that's what the
3    court reporter is taking down.
4         THE WITNESS:  I apologize.
5  BY MS. GEMAN:
6    Q.   And it says, "Some cancers
7  are more likely to be overdiagnosed than
8  others."
9         Do you see that?
10   A.   Can you show me where again?
11 Which page?
12   Q.   Yes, it's on --
13   A.   Page 3?
14   Q.   That's a better way to do
15 it.  Yes, Page 3.
16   A.   Okay.
17   Q.   It's a short article.  Do
18 you see that?
19   A.   That, "Slow-growing cancer
20 is asymptotically present in the body
21 for much longer"?
22   Q.   "Some cancers are likely" --
23 "are more likely to be overdiagnosed than
24 others."

Page 266

1   Do you see that?
2   A.   Yes.
3   Q.   Okay.  And was this -- and
4   they quote an article from 2013; is that
5   correct?
6   A.   Who does?
7   Q.   The authors here.  They
8   refer to this Estermann.
9   A.   Yes.
10   Q.   Okay.  And these authors
11   note that screening that detects and
12   prompts removal of changes that can later
13   become cancer can occur for colorectal
14   screening, correct?
15   A.   That's what it says.
16   Q.   Okay.  And did the 2013
17   study, the Estermann study that you
18   referenced in your report, raise a
19   concern about overdiagnosis for the seven
20   cancers in -- at issue in this case,
21   other -- that are not lung and prostate?
22   A.   Could I see the report?  I
23   quoted the seven cancers from
24   Dr. Kaplan's report.  I didn't come up

Page 267

1   with those seven cancers on my own.
2   I directly referred to his
3   list, which he said he got from his
4   experts.
5   Q.   Okay.  Does this article
6   talk about liver cancer in this section?
7   A.   In which section?
8   Q.   The one we're talking about,
9   the one where they identify --
10   A.   In Estermann or in this
11   text?
12   Q.   In Estermann, which is what
13   you were quoting in your article.
14   A.   I need to see the article of
15   Estermann.  I don't have the opportunity
16   to comment on an article without the
17   opportunity to read it.
18   Q.   Well, I'm just using what
19   you gave us.  So I have -- this is
20   literally the document that you cited in
21   your report.
22   A.   But you're asking me a
23   question about Estermann.
24   Q.   That's right, because that

Page 268

1   was the section that you cited in your
2   report that you attributed to these
3   authors.
4   A.   I'd like the opportunity to
5   see it.
6   Q.   Okay.  Well, you didn't cite
7   it in your report, so --
8   A.   But you asked me about it.
9   Q.   Right, because you ascribe
10   their conclusions to another author.
11   A.   Okay.  Okay.  I'm happy to
12   look at it.
13   Q.   Okay.  Do you see -- do you
14   see where it says overdiagnosis -- and
15   you quoted this in your article.
16   "Overdiagnosis, or identification of
17   indolent cancer, is common in breast,
18   lung, prostate, and thyroid cancer"?
19   A.   Yes.
20   Q.   Do you see that?
21   Is liver in that list?
22   A.   I don't see it in that list.
23   Q.   Okay.  Is stomach?
24   A.   I don't see it in that list.

Page 269

1   Q.   Is colorectal?
2   A.   I don't see it in that list.
3   Q.   Is esophageal?
4   A.   I don't see it in that list.
5   Q.   Is bladder?
6   A.   Bladder is not in that list.
7   Q.   Is pancreatic?
8   A.   Pancreatic is not in that
9   list.
10   Q.   Is blood cancer?
11   A.   Blood cancer is not in that
12   list.
13   Q.   Okay.  And are you aware of
14   research from around 2020 that suggests
15   that less PSA testing was coming at a
16   steep price?
17   A.   I'd have to --
18   MR. KUM:  Objection.
19   Assumes facts not in evidence.
20   THE WITNESS:  Yeah, I have
21   to see the article.
22   BY MS. GEMAN:
23   Q.   Well, I'm just -- I'm asking
24   about your sort of general -- general

Page 270

1 knowledge.  Do you know if there's talk
2 of changing the PSA testing
3 recommendations?
4      A.   I don't know.
5      Q.   Okay.  And looking at your
6 article -- I'm sorry, looking at your
7 report again, you indicate what -- on
8 Page 15, you say, "The paradox" -- you
9 reference on Page 15 -- and then --
10      A.   Oh.
11      Q.   Mm-hmm.
12      A.   Mm-hmm.
13      MR. KUM:  Doctor.  Again,
14 please refrain from saying mm-hmm.
15      THE WITNESS:  I'm sorry.
16 I'm sorry.
17      MS. GEMAN:  No, no.  It's
18 okay.
19      THE WITNESS:  I'm just
20 trying to keep up with this.  It's
21 like a lot of documents.  I
22 apologize.
23 BY MS. GEMAN:
24      Q.   Sorry.  The good news is

Page 271

1 this is back to your report.
2      You state in the last
3 sentence of the full -- sorry, the
4 second-to-last full paragraph on Page 15
5 that, "Screening is less likely to find
6 the aggressive, rapidly progressive
7 cancers that cause the greatest mortality
8 and morbidity."
9      Do you see that?
10      A.   Yes.
11      Q.   And when I read the articles
12 that were referenced by you, they weren't
13 suggesting that the screens, like, catch
14 a small tumor and miss a large tumor, but
15 instead that -- instead that the those
16 tumors are faster growing, and by the
17 time -- and people are more likely to
18 have symptoms that present?
19      A.   So just one thing, back to
20 the list.  The cancers you mentioned,
21 only colon cancer has an indicated
22 screening option.
23      So just to speak to those
24 cancers on the list, the only one that --

Page 272

1 the only four that we have national
2 guidelines are -- with identified
3 screening tests are prostate, lung, colon
4 and -- I'm getting tired -- thyroid.  Not
5 thyroid.  Prostate, lung, and breast.
6      And there are specific
7 recommendations not to screen for
8 thyroid, pancreas.
9      So I think the distinction
10 here is people are trying to screen for
11 them or trying to test for them, and
12 that's not sort of the indication.
13 They're actually recommended against.
14      So -- and you actually said
15 it perfectly, that some cancers have a
16 different biology and may be very
17 aggressive and don't always obey the
18 general carcinogenesis timeline of
19 decades.  And perhaps there is an
20 aberrant cell that at year seven in your
21 screening interval of ten years appears
22 and grows rapidly.
23      And I think the point here
24 is that using established protocols of

Page 273

1 recommendations in that individual
2 patient, the screening would not catch
3 that cancer.
4      Q.   I see.  Because under the
5 recommended intervals, it just wouldn't
6 catch it.  It's not as though if the
7 person had a test on year eight, that it
8 would miss it?
9      A.   Right.
10      Q.   It's just they wouldn't have
11 been screened at all?
12      A.   They wouldn't have been
13 screened.  And again, this is -- there's,
14 you know, individuals and then there's
15 population science, and the guidelines
16 are based on population.
17      Q.   Are you against endoscopies?
18      A.   Upper or lower?
19      Q.   Upper.
20      A.   Against?  I'm not against
21 endoscopies.
22      Q.   Can -- I wanted to come back
23 to a subject about which we had some
24 colloquy earlier.

Confidential Information Subject to Protective Order

1    Which tests do you use that
2  are not FDA approved, to your knowledge?
3    A.   I don't know.
4    Q.   Do you have knowledge of the
5  FDA approval status of every test that
6  you use?
7    A.   The -- I mean, I have a list
8  of tests that I can order from.
9         I don't -- you know, usually
10 the ones that are outside the realm are
11 common boxes that we have to order
12 separately.  The ones that I can click in
13 my order panel are FDA approved.
14        And again, I'm ordering very
15 standard tests to monitor the toxicities
16 of cytotoxic chemotherapy.  So that's the
17 reference.
18   Q.   What are the tests that you
19 use that you have to order separately?
20   A.   I could order Signatera, as
21 I said, which is FDA approved.  Because
22 of the controversy, I only order it
23 within the context of a clinical trial.
24        I order Next Generation

1  Sequencing, which is an indicated
2  indication to find out a mutational
3  status of the tumors, to see if there's a
4  targeted therapy.  So like a lock and a
5  key, that's actually a genomic mutation
6  analysis of the tumor.
7         These are things that we
8  have in our lab.  So I don't, and I
9  don't -- you know, I know things that
10 aren't, but I don't know how to say what
11 I do.  I have --
12   Q.   I'm sorry.  I --
13   A.   I know what isn't FDA
14 approved, and I know what is.  And I hope
15 that you picked up that even if it is, I
16 make an informed decision.  Even if it's
17 available, it's really easy to order a
18 test.
19        But again, you have to know
20 what to do with the test and that speaks
21 to pretest probability and efficacy and
22 what you would do for it.
23   Q.   But you just said, "I know
24 what isn't FDA approved."  But then a

1  minute ago --
2    A.   Mm-hmm.
3    Q.   -- a minute ago, you said
4  you weren't sure about the approval
5  status of some of your tests.
6    A.   I said I know what isn't.
7  But I don't know -- you know, I order
8  very -- CBC is FDA approved.  Liver panel
9  is FDA approved.  I order very standard
10 tests.
11        The question for me comes
12 when it's a non-standard test.  And
13 that's when the FDA approval is relevant
14 to me.
15   Q.   And what, in addition to the
16 genomic sequencing that you mentioned,
17 are there any other non-standard tests
18 that you use?
19        MR. KUM:  Other than the
20 Signatera that she also mentioned
21 to you.
22        MS. GEMAN:  I think the
23 doctor said she does not use
24 Signatera.

1         THE WITNESS:  I use it
2  within the context of a clinical
3  trial.
4  BY MS. GEMAN:
5    Q.   Clinical trial, right.
6    A.   So I have certainly ordered
7  it.
8    Q.   Okay.
9    A.   I just don't feel
10 comfortable outside of the context of a
11 clinical trial.
12        I order Next Generation
13 Sequencing, which is indicated.  That's
14 mostly what I order.
15        I actually don't order
16 genetic testing of patients for
17 hereditary cancer syndrome, to your
18 point.  I actually refer them out, so
19 that they have all of the supportive care
20 that goes along with that recommendation,
21 including a genetic counselor and all of
22 those things.
23   Q.   And why do you use Next Gen
24 Sequencing if it isn't approved?

Confidential Information Subject to Protective Order

Page 278

1    A.  I didn't say it isn't
2  approved.  I said it's indicated.
3         MR. KUM:  I was going to
4    object.  That misstates her
5    testimony.
6         MS. GEMAN:  Oh, I may have
7    misunderstood.
8  BY MS. GEMAN:
9    Q.   Because I had asked what
10  tests you use that aren't FDA approved,
11  you included Next Gen Sequencing among
12  your answer.  So I may have
13  misunderstood.
14        MR. KUM:  Actually, your
15    question was non-standard tests.
16    That's not the same as --
17        MS. GEMAN:  But the doctor
18    also answered the previous
19    question, which was not FDA
20    approved.  So let's just clarify
21    this.
22  BY MS. GEMAN:
23    Q.   Next Gen Sequencing is
24  approved by the FDA?

Page 279

1    A.   Yes.
2    Q.   Okay.  And Signatera is not?
3    A.   It is approved.
4        MR. KUM:  Is.
5  BY MS. GEMAN:
6    Q.   Is approved.  Okay.
7        Are there tests that you use
8  that are not FDA approved?
9        MR. KUM:  Objection.  Asked
10    and answered.
11        You can answer again.
12        THE WITNESS:  I don't know.
13    I don't think, unless I know it
14    has approval, which usually means
15    when you can easily order it, and
16    I know the indication that I'm
17    ordering it for, then I order it.
18  BY MS. GEMAN:
19    Q.   Okay.  I understand better
20  now.
21        So there are tests that you
22  use that you know are FDA approved.  And
23  there are tests that you use about which
24  you are agnostic as to the FDA approval

Page 280

1  status?
2        MR. KUM:  Actually.
3    Objection.  Misstates testimony.
4    She never says she uses
5    non-FDA-approved tests.
6        MS. GEMAN:  Well, actually
7    you're testifying for the witness.
8        MR. KUM:  I'm not.  She
9    actually -- you asked this
10    question several times earlier,
11    and now you're asking this
12    question again.
13        So you can go ahead and ask
14    it again.
15  BY MS. GEMAN:
16    Q.   Is this correct:  You use
17  some tests that are FDA approved.  Not
18  all tests that are FDA approved are ones
19  that you use, obviously.  You also use
20  some tests where you are agnostic as to
21  whether they are approved.
22        MR. KUM:  Objection.
23    Misstates testimony.
24        THE WITNESS:  I order basic

Page 281

1    tests, CBC, liver panel, kidney
2    panel.  Those are the majority of
3    tests that are -- they are so long
4    standing, I'm not sure of their
5    FDA status.
6        But they are certainly
7    indicated and recommended, not
8    just in all of the 20 years that
9    I've been doing this, but the NCCN
10    guidelines certainly indicate that
11    we should be testing all of those
12    things to safely treat our
13    patients.
14  BY MS. GEMAN:
15    Q.   Are there any tests that you
16  use, other than those where you are
17  agnostic about the FDA approval status?
18        MR. KUM:  Objection.  Vague
19    and ambiguous.
20        THE WITNESS:  I don't order
21    many tests.
22  BY MS. GEMAN:
23    Q.   Okay.
24    A.   I order the same panel.

Page 282

1    MS. GEMAN:  Okay.  Let's
2  take a brief break if that's all
3  right.
4    THE VIDEOGRAPHER:  3:32.  We
5  are off the video record.
6    (Short break.)
7    THE VIDEOGRAPHER:  3:49, we
8  are on the video record.
9  BY MS. GEMAN:
10   Q.   Doctor, have you been
11 designated as an expert in any litigation
12 other than this one where you're a
13 proposed expert?
14   A.   I mentioned the two
15 depositions.
16    MR. KUM:  She means as an
17  expert, like a paid expert.  Not
18  just any depos.
19    THE WITNESS:  Oh, I did some
20  in residency, like a review of
21  records.
22 BY MS. GEMAN:
23   Q.   Okay.  So when you were a
24 resident, you were designated -- or do

Page 283

1  you know if you were designated as a
2  testifying expert in any of those cases?
3    A.   It was more -- I think -- it
4  was a long time ago.  I think it was more
5  kind of a review of records from a
6  medical standpoint so that the attorneys
7  could make a decision whether or not they
8  wanted to pursue.
9    Q.   In a medical malpractice?
10   A.   In a medical malpractice.
11   Q.   Did any of those cases
12 involve cancer?
13   A.   I don't remember.  I did --
14 I did maybe three.  I didn't -- I was too
15 tired as a resident to really do them
16 with any frequency, so I stopped.
17   Q.   Do you remember the subject
18 matter?
19   A.   I don't.
20   Q.   Are you -- other than this
21 case -- and this is a yes/no question.
22    Have you been retained as a
23 consultant or testifying expert in any
24 other cases?

Page 284

1    MR. KUM:  You mean like
2  ever, right?
3    MS. GEMAN:  Yeah.
4    THE WITNESS:  Yes, I was
5  asked -- although it never went
6  anywhere.  I was asked to review a
7  record about a patient with a
8  diagnosis of pancreas cancer, and
9  I think it was a missed diagnosis
10  on imaging.
11 BY MS. GEMAN:
12   Q.   For which side were you
13 asked to review records?
14   A.   The patient, is the
15 plaintiff, right?
16    For the defense.
17   Q.   For the defense.  Did you
18 conclude that there had been a missed
19 diagnosis?
20   A.   It was apparent on the
21 imaging.  It was for a different
22 indication, but it was present.
23   Q.   And do you know if they
24 settled?

Page 285

1    A.   I know they settled.
2    Q.   Were you ever disclosed to
3  the court, if you know?
4    MR. KUM:  Don't guess.
5    THE WITNESS:  I don't know.
6  Sorry.
7  BY MS. GEMAN:
8    Q.   And presently, are you
9  working on any cases as an expert other
10 than this one?
11   A.   Not a single one.
12    MS. GEMAN:  All right.  I
13  have nothing further.
14 BY MS. GEMAN:
15   Q.   Actually, I'm sorry.  I
16 didn't mean that as a bait and switch,
17 although I'm sure it sounded like it.  I
18 apologize.  I have just a couple more.
19    Did you just -- did you
20 discuss with your counsel -- or with this
21 counsel the question and answers that
22 they are going to ask now?
23    MR. KUM:  I'm going to
24  object that --

Page 286

BY MS. GEMAN:

1    Q.   Yes or no?
2         MR. KUM:  -- it invades the
3    attorney work product privilege,
4    and I'm going to instruct you not
5    to answer.
6         THE WITNESS:  Okay.
7         MS. GEMAN:  All right.  Pass
8    the witness.
9         Thank you for your time.
10        THE WITNESS:  Thank you.
11        THE VIDEOGRAPHER:  Let's go
12   off the record.
13        MR. KUM:  Yeah.
14        THE VIDEOGRAPHER:  3:52.  We
15   are off the video record.
16        (Brief pause.)
17        THE VIDEOGRAPHER:  3:54.  We
18   are on the video record.
19            - - -
20         EXAMINATION
21            - - -
22   BY MR. KERNER:
23   Q.   Dr. Teitelbaum, good

Page 287

1    afternoon.  It's been a relatively long
2    day.  So I will try keep this as short as
3    possible.  I just have a few questions.
4    And let's see if we can get through them.
5         Am I correct that you work
6    at Penn?
7    A.   Yes.
8    Q.   And you teach at Penn?
9    A.   Yes.
10   Q.   What's your title there?
11   A.   I am the Deenie Greizer and
12   Daniel Haller associate professor of
13   gastrointestinal malignancies, which is
14   an endowed chair.  And my current title
15   is associate professor of clinical
16   medicine.
17   Q.   Are you also involved in the
18   Pancreatic Cancer Research Center there?
19   A.   Oh, yeah.  I'm the clinical
20   director of the Penn Pancreatic Cancer
21   Research Center.
22   Q.   What do you do in connection
23   with that?
24   A.   Oh, that's a really fun part

Page 288

1    of my job.
2         So we have -- we get to -- I
3    work with the lab researchers and the
4    translational researchers, and we look
5    through our portfolio of clinical trials
6    and research questions, and we help
7    direct the efforts and the funds towards
8    those projects.
9         One of the things that we
10   like to do the most, actually, are
11   investigator-initiated trials, where --
12   you know, there's big, collaborative
13   trials but you're always interested in
14   independent research.
15   Q.   You said that you direct the
16   efforts and the funds towards those
17   projects?
18   A.   We work together to figure
19   it out.  And I also -- I get money as
20   part of my endowed chair that I get to
21   put to clinical trials.  So every year I
22   get to pick a study.
23   Q.   Not money that goes to you?
24   Money that goes to the trials?

Page 289

1    A.   I don't get money from the
2    endowed chair.  I actually direct it all
3    to interesting research projects that
4    need funding.
5    Q.   Okay.  I think you just said
6    that you were an associate professor?
7    A.   Yes.
8    Q.   That's your current title?
9    A.   Yes.
10   Q.   Do you also treat patients
11   in a clinical setting?
12   A.   Oh, yes.  I practice
13   primarily -- exclusively in the cancer
14   clinic.
15   Q.   Can you tell me a little bit
16   about your clinical experience?
17   A.   Oh, it's busy.
18        You know, I will see new
19   patients that are, you know, first
20   diagnosis with a difficult cancer.  And I
21   do a lot of the education about their
22   diagnosis, prognosis, and treatment
23   plans.
24        I see a large number of

Confidential Information Subject to Protective Order

Page 290

1 patients in consultation and render an
2 opinion, and then will often work with
3 their treating physician to help guide
4 their care.
5         I present every patient in
6 our multi-disciplinary clinic.  We have a
7 multi -- interdisciplinary clinic with
8 surgery, radiation -- radiation oncology,
9 all the disciplines, pathology.
10        And we -- I present every
11 one of my patients to make sure they have
12 the best treatment options.
13        And I run the
14 pancreatobiliary multidisciplinary
15 conference every Wednesday.
16        I also have a large percent
17 of patients that I'm actively treating
18 with chemotherapy.  So they will often
19 come every week or every other week,
20 depending on their regimen, and then
21 monitor them with scans and -- at
22 prescribed intervals.
23        And then I have patients
24 that are referred after surgery who meet

Page 292

1 submit that regimen for insurance
2 coverage and do all the planning, chemo
3 teaching.
4         And again, if a patient is
5 on regimen, I don't present them unless
6 there's a clinical question.  But if a
7 patient progresses on a therapy or
8 doesn't tolerate it, then I'll put them
9 up to tumor board again to get input.
10    Q.   Okay.  In the ordinary
11 course of your care and treatment of your
12 patients, are you required to weigh the
13 risks and benefits of administering
14 certain tests?
15    A.   I have to think about every
16 test that I offer.  And one of the most
17 important things is I have to make sure a
18 patient of mine is well enough.
19        These are cancer patients.
20 They are vulnerable.  A lot of them
21 are -- for example, colon cancer and
22 quite well and working.  But I still have
23 to make sure that it's safe and tolerable
24 for them.

Page 291

1 the indications for benefit of -- it's
2 called -- we call it adjuvant therapy,
3 postoperative therapy.  And the goal of
4 that therapy is to reduce the risk of
5 recurrence.  So it's enhancing their
6 chance for care.
7    Q.   Okay.  And I think you've
8 sort of just answered this.  But I'm
9 going to ask it anyway.  So feel free to
10 tell me you've just answered it.
11        In the ordinary course of
12 your care and treatment of your patients,
13 have you been responsible or are you
14 responsible for determining an
15 oncological care plan for those patients?
16    A.   Oh, I have to devise an
17 oncologic care plan for each patient.  We
18 always try and put patients on clinical
19 trial because you always want to see if
20 you can improve the standard of care
21 generally.
22        And by definition, if you're
23 enrolling them on trial or you're putting
24 them on standard therapy, you have to

Page 293

1    Q.   And so the short answer to
2 my question was yes?
3    A.   Yes.
4    Q.   Okay.  And my follow-up
5 question, which you started to answer,
6 is, what analysis do you conduct in
7 determining whether a particular test or
8 procedure is appropriate for a particular
9 patient?
10    A.   Sure.  So performance status
11 is really the language of oncology.  We
12 have EGOG performance status or Karnofsky
13 where we actually grade the wellness of
14 the patient.
15        And for example, if you have
16 zero symptoms, you're a performance
17 status zero.
18        If you are -- have some
19 symptoms day to day, but you're largely
20 functional, you are a one.
21        If you're up and out of bed
22 50 percent of the time but very affected
23 by your cancer, you're a two.
24        If you're in bed or chair

Page 294

¹ greater than 30 percent, you are a three.
² And if you're bedbound,
³ you're a four.
⁴ And this does two things.
⁵ We use those criteria to assess whether
⁶ or not a patient is appropriate for
⁷ clinical trial. Only zeros and ones go
⁸ to trial. But we also track the wellness
⁹ and well-being of the patient.
¹⁰ Q. Okay. Now, in assessing the
¹¹ risks and benefits of a particular test
¹² or procedure, have you reviewed medical
¹³ studies to help analyze those risks and
¹⁴ benefits?
¹⁵ MS. GEMAN: Objection.
¹⁶ THE WITNESS: I review -- I
¹⁷ try to be as informed as I can
¹⁸ about every test I'm offering, be
¹⁹ it a lab or a procedure. In the
²⁰ same context, I strive to be
²¹ informed by the therapies that I
²² give.
²³ BY MR. KERNER:
²⁴ Q. And in connection with that,

Page 295

¹ you'll review medical literature?
² A. Absolutely, or NCCN.
³ Q. All right. With respect to
⁴ this matter, how did you go about looking
⁵ into the question of whether Dr. Kaplan's
⁶ medical monitoring plan was appropriate
⁷ for the proposed class?
⁸ A. So, you know, first I went
⁹ to the standard of care, the national
¹⁰ standard of care guidelines for
¹¹ asymptomatic patients.
¹² And then I looked at his
¹³ recommendations. And I think, as you can
¹⁴ see in my expert report, actually went
¹⁵ through each test. And, for example
¹⁶ history as part of standard screening, I
¹⁷ commented on what is and what isn't in
¹⁸ the primary care setting.
¹⁹ And then I discussed what I
²⁰ agreed with or what I had concerns about.
²¹ Q. And did you conduct a
²² literature search in connection with your
²³ analysis?
²⁴ A. Yes.

Page 296

¹ MS. GEMAN: Objection.
² BY MR. KERNER:
³ Q. How did you do that?
⁴ MS. GEMAN: Objection.
⁵ Asked and answered.
⁶ THE WITNESS: I did a
⁷ literature search.
⁸ BY MR. KERNER:
⁹ Q. And how did you do that?
¹⁰ A. I --
¹¹ MS. GEMAN: Same objection.
¹² BY MR. KERNER:
¹³ Q. You can answer.
¹⁴ A. -- looked at U.S. --
¹⁵ Q. How did you conduct the
¹⁶ literature search?
¹⁷ A. Oh, I looked up the task
¹⁸ force recommendations, and then I looked
¹⁹ at each test with the data to see if
²⁰ there was data supporting it.
²¹ Q. In additional to -- in
²² addition to the materials on your list of
²³ materials considered in your report, did
²⁴ you also employ any general or background

Page 297

¹ knowledge or experience that you might
² have?
³ MS. GEMAN: Objection.
⁴ THE WITNESS: I look at
⁵ everything with my clinical
⁶ experience. I can't -- you know,
⁷ I've done this for 20 years. So
⁸ my personal experience, I can't
⁹ not have that as I evaluate a
¹⁰ regimen or a patient. It's who I
¹¹ am.
¹² BY MR. KERNER:
¹³ Q. Okay. And after employing
¹⁴ the methodology -- excuse me -- that you
¹⁵ employed, did you reach a conclusion as
¹⁶ to whether Dr. Kaplan's medical
¹⁷ monitoring plan is appropriate for the
¹⁸ proposed class members?
¹⁹ MS. GEMAN: Objection.
²⁰ THE WITNESS: I do not think
²¹ it's appropriate for these class
²² members or anybody.
²³ BY MR. KERNER:
²⁴ Q. Why not?

Confidential Information Subject to Protective Order

Page 298

1    A.   There are a lot of tests
2  that are risky that have no indication,
3  that would cause significant harm.  And
4  You know, we -- we actually, you know,
5  take an oath to do no harm.
6        And I think the magnitude of
7  harm that recommending this regimen would
8  be profound.
9    Q.   Okay.  And what did you rely
10  on to form that conclusion or that
11  opinion?
12       MS. GEMAN:  Objection.
13       THE WITNESS:  Again, I
14       reviewed each of the tests.  I
15       looked at what the indications
16       were for and what the indications
17       weren't for.
18       I mean, I even worry, again,
19       that you know, some of the
20       invasive tests these patients
21       wouldn't even be candidates for,
22       based on their cardio --
23       significant cardiovascular
24       disease, like heart failure.

Page 299

1        So -- but even without those
2        comorbidities, I wouldn't
3        recommend this for any person.
4  BY MR. KERNER:
5    Q.   And your conclusions are all
6  stated in your report, correct?
7    A.   Regarding the medical
8  monitoring?
9    Q.   Yes.
10   A.   They are all stated.
11   Q.   Thank you.
12       Do you have an opinion as to
13  whether Dr. Kaplan's proposed medical
14  monitoring plan would increase longevity
15  for any individual proposed class member?
16   A.   I have zero clue if it
17  would.  I worry, conversely, about the
18  real harm it might have for a patient.  I
19  mean, for example, if you do a
20  transrectal ultrasound biopsy, the risk
21  of sepsis is one in a thousand, which is
22  significant.  If -- I think we mentioned
23  before, colonoscopy, risks from the
24  procedure is 0.8.  But if you have a

Page 300

1  medically ill or older patient and you
2  put them through a colonoscopy prep, you
3  know, causes nausea, vomiting,
4  dehydration, and diarrhea -- and we used
5  to put these patients in the hospital
6  because the preps are so onerous for sick
7  or older adults.
8        And, you know, I don't know
9  that there's a literature, but I would
10  worry if someone fell.  It's not going to
11  say prepping for a colonoscopy on their
12  hospital admission or death certificate.
13  It would say fall.
14       So I don't know if all of
15  the morbidity is represented in that
16  procedure risk data.
17   Q.   Okay.  You mentioned
18  colonoscopy.  And I think you mentioned
19  perforation as well.
20       You were asked some
21  questions earlier today by counsel as to
22  whether there was a trend in the last
23  30 years of a decrease in perforations.
24       Do you remember that

Page 301

1  questioning?
2    A.   I do.
3    Q.   And I think you -- and I'm
4  paraphrasing, so I apologize if I don't
5  quote you exactly.  I think you said
6  something like you weren't familiar with
7  that data.
8        Are you familiar with the
9  data of perforations in 2022?
10   A.   Given that Dr. Kaplan is
11  recommending that test in 2022, I looked
12  at the current data, so I would know the
13  risk.
14   Q.   And you're familiar with
15  that now?
16   A.   I was always familiar with
17  that.  I didn't think a trend was
18  relevant.
19   Q.   We're almost there,
20  Dr. Teitelbaum.
21       You were also asked some
22  questions earlier today -- you talked
23  about adherence, the concept of
24  adherence.

Confidential Information Subject to Protective Order

Page 302

1    A.   Yes.
2    Q.   And I think you were asked
3 whether you knew the specific adherence
4 of the individual class members, the
5 proposed class members?
6    A.   Correct.
7    Q.   I think you said that you
8 didn't know the specific class members'
9 adherence, correct?
10    A.   I have no Epic -- I have no
11 access to their pharmacy data or pill
12 boxes.
13    Q.   Okay.  You do -- you are
14 aware of the adherence numbers in the
15 general population, correct?
16    A.   Yes.
17    Q.   And what are they again?
18    A.   Adherence is generally
19 around 50 percent.  And just to be clear,
20 a person that is taking 80 percent of
21 their medications is considered adherent.
22 And that means that you're essentially
23 missing one day -- one week every month,
24 right.

Page 303

1       So just to sort of establish
2 what the standard in the general
3 population is.
4    Q.   Okay.  And again, just the
5 concept of adherence, tell us very
6 quickly what that is.
7    A.   It's interesting.  It used
8 to be compliance.  But that's a little
9 judgy, so we call it adherence now.  And
10 it's if you're prescribed a pill, do you
11 take it at the prescribed dose, and do
12 you stop it on your own.  A lot of
13 patients stop it on their own.  It's
14 exactly that, adherence to the
15 prescription as written.
16    Q.   Okay.  And so 50 percent
17 adherence would mean to a layperson that
18 the individual taking the medication or
19 prescribed the medication complies or
20 takes the medication 50 percent of the
21 time, correct?
22    A.   Adheres 50 percent of the
23 time.  People -- nobody finishes their
24 antibiotics.  Like I've been guilty of

Page 304

1 that.  You know, a lot of people are not
2 adherent to their medications.
3    Q.   Do you have any reason to
4 think that the adherence of the purported
5 class is any different than the general
6 population?
7    A.   I would imagine it is.  This
8 was --
9    Q.   You imagine it is what?
10    A.   -- a general medicine
11 population.
12    Q.   Would you imagine that it is
13 different?
14    A.   That it is the same.
15    Q.   As the general population?
16    A.   I would imagine it is the
17 same as the general population.
18    Q.   Okay.  I'm sorry.
19       There was some testimony
20 earlier today and some questioning from
21 counsel about the levels of nitrosamines
22 in the valsartan-containing drugs.
23       Do you remember that?
24    A.   Yes.

Page 305

1    Q.   Is the level of nitrosamine
2 in valsartan-containing drugs relevant to
3 your opinion concerning Dr. Kaplan's
4 medical monitoring protocol?
5    A.   Completely irrelevant.
6    Q.   Why?
7    A.   It doesn't change the
8 screening recommended.  We don't change
9 screening just on the basis of an
10 exposure without evidence that -- and
11 there's only one exposure-driven task
12 force recommendation for screening.  And
13 that's lung cancer, 20 years, ages 55 to
14 80.  That is the only exposure-driven
15 recommendation for screening.
16    Q.   Okay.  Dr. Teitelbaum, would
17 an internist assessing cancer screening
18 for an asymptomatic patient in a clinic
19 refer to the NCCN guidelines for
20 screening recommendations?
21       MS. GEMAN:  Objection.
22 Objection.  Incomplete
23 hypothetical.
24       MR. KERNER:  Sorry.

Confidential Information Subject to Protective Order

Page 306

BY MR. KERNER:

1 BY MR. KERNER:
2    Q.   You can answer.
3    A.   Oh, the National
4 Comprehensive Cancer guidelines?
5    Q.   Yes.
6    A.   I don't even think they'd
7 even know what they are.
8    Q.   So is it your testimony that
9 in your opinion the internist would not
10 refer to the NCCN?
11    A.   They would not --
12         MS. GEMAN:  Same objection.
13         THE WITNESS:  -- refer to
14    the NCCN guidelines.
15 BY MR. KERNER:
16    Q.   Okay.  Dr. Teitelbaum, in
17 Dr. Kaplan's deposition -- and I think
18 you may have referred to this earlier, he
19 talked about or he testified that he
20 would order a PSA on a healthy
21 95-year-old man.
22         Do you recall reading that
23 testimony?
24    A.   Yes.

Page 307

1    Q.   Would you order a PSA on a
2 healthy 95-year-old man to screen for
3 prostate cancer?
4    A.   Never.
5    Q.   Why not?
6    A.   First of all, we know --
7 I've seen the numbers everywhere from 50
8 to 90 percent for patients 80 and above,
9 that they all have prostate cancer.  They
10 don't -- at autopsy, I remember
11 50 percent of 80-year-olds have prostate
12 cancer.  It's not what they die from.
13 It's what they die with.
14         And then again, it speaks --
15 you know, people don't think ordering a
16 test is risky.  But if you order a test,
17 you have to think about what you're going
18 to do.
19         So you sort of open the can
20 of worms that the PSA is high and the
21 patient has prostate cancer, even though
22 it's unlikely to impact them in the
23 entire course of their life.
24         And so if you get that test,

Page 308

1 what are you going to do next?  Are you
2 going to refer them for a transrectal
3 ultrasound biopsy, which is, again, very
4 difficult to sterilize, because you're
5 going through the rectum.  I think of
6 E. coli when I think of rectal organisms.
7         The act of the biopsy can
8 cause incontinence, impotence, blood in
9 your urine, blood in your sperm, in
10 addition to bleeding.
11         And so it's an invasive
12 test.  The risk of sepsis is one in a
13 thousand.  And the risk goes up if you're
14 older or if you have any medical issues
15 or you're on anticoagulants.
16         So then if you get -- so
17 then if you put the patient through that
18 test, then you have to figure out -- and
19 it's positive, are you going to treat
20 them?  Again, I mentioned watchful
21 waiting as an option.  But it's really
22 difficult to say to them, watchful
23 waiting, when you've put them through
24 this invasive test.

Page 309

1         Some people think, oh, you
2 can put them on androgen deprivation
3 therapy, Lupron, but then the risk is
4 muscle wasting, loss of bone density, and
5 cognitive impairment, which any
6 95-year-old can ill afford.  Almost
7 certainly not going to give them
8 chemotherapy and will not be offered
9 surgery.
10         So you've put a patient
11 through the anxiety of having a diagnosis
12 which is unlikely to affect them in their
13 lifetime, for which the therapies are
14 potentially incredibly toxic.
15         So that is actually not just
16 the rationale why not to order -- I think
17 he said 80-year-old, 90-year-old.
18 95-year-old, but really the question of
19 ordering it all.
20         MR. KERNER:  Okay.
21    Dr. Teitelbaum, thank you very
22    much for your time.  I have
23    nothing else.
24         - - -

Confidential Information Subject to Protective Order

| Page 310 |

EXAMINATION
- - -

BY MS. GEMAN:

Q.   Dr. Teitelbaum you spoke a little bit about the ACOG grades?

A.   ECOG.  It's the European -- it's the European Cooperative Oncology Group.

Q.   Okay.  And are those grades different for each person or is it the same grading scale but different people can have different grades?

A.   It's unique to a patient with cancer.

Q.   But is it the same grading scale applied to all patients with cancer and different people can have different grades?

A.   Yes.  Mm-hmm.

Q.   Okay.  And you said that you reviewed medical literature, right, when you were doing your research for this report, correct?

A.   Yes.

| Page 311 |

Q.   And that medical literature was done on studies of populations, correct, groups of people?

A.   Can you clarify?  I don't --

MR. KUM:  Objection.  Vague and ambiguous.

THE WITNESS:  -- understand your question.

BY MS. GEMAN:

Q.   Sure.

None of -- none of those articles did a study on just one person, correct?

MR. KERNER:  Let me interject for one second.  I apologize can we go off the record for one second and not leave the room.

THE VIDEOGRAPHER:  Stand by.  4:14.  We are off the video record.

(Brief pause.)

THE VIDEOGRAPHER:  4:15.  We are on the video record.

| Page 312 |

Q.   None of those articles did a study on just one person, correct?

A.   I don't recall looking at a case report.  So I would say no.

Q.   Typically, the medical literature rises out of studies on groups of people together, correct?

A.   Yes.

Q.   Okay.  You weren't suggesting that 0.8 percent of people die from a colonoscopy, were you?

MR. KUM:  Objection.  Misstates testimony.

THE WITNESS:  I said the complication rate.  And you know, it's broad.  It can include a large range of complications that I listed in my expert letter.

BY MS. GEMAN:

Q.   So the answer is you weren't suggesting that .8 percent of the people die, correct?

A.   No.

| Page 313 |

Q.   All right.  And would you advise against someone from getting a colorectal screening on the basis that they might be kind of dizzy from the treatment and fall?

MR. KUM:  Objection.  Incomplete hypothetical.

THE WITNESS:  I -- as you can tell, Dr. Kaplan and I, when we're doing the standard of care, you have to make sure that the patient can tolerate the prep.  That's actually really important, and be well enough to undergo a procedure with sedation, if that's your question.

BY MS. GEMAN:

Q.   So my question was, would you advise against someone from getting a colorectal screening on the basis that they might fall?

MR. KUM:  Same objections.

THE WITNESS:  To your point, again, that's an individual

Confidential Information Subject to Protective Order

Page 314

1  patient, and you'd have to
2  obviously weigh the risk of your
3  suspicion that the patient had --
4  in my field it would be the
5  suspicion that there's bleeding or
6  some sort of issue with the -- you
7  know, if a patient can't get a
8  ride home from their prep, if they
9  can't get the prep.  There's a lot
10 that goes into that.
11 BY MS. GEMAN:
12     Q.   And you recall Dr. Kaplan
13 talking about the distinction between
14 screening and treatment, correct?
15     A.   I think -- I don't remember
16 exactly.  But I'm sure that that's the
17 phraseology.
18     Q.   And there is a difference,
19 correct?
20     A.   Oh, yes.
21     Q.   You quoted a 50 percent
22 adherence rate.  And that's across all
23 medications?
24     A.   I will have to refer to that

Page 315

1  primary article.
2      Q.   Well, you just answered
3  questions to Mr. Kerner about it.  To
4  your knowledge, is that across all
5  medications?
6      A.   I think it is not medication
7  specific.  I think it's a general
8  principle of prescription adherence.
9      Q.   I'm sorry.  Prescriptions
10 for medications?
11     A.   Medications.
12     Q.   So it is medication
13 specific?
14     A.   It's -- oh, I see what
15 you're saying.  I thought it was like a
16 specific medication.  It's a prescribed
17 medication.
18     Q.   So it includes birth control
19 pills?
20     A.   I don't remember seeing that
21 specifically.  So I can't say.
22     Q.   Do you have any reason to
23 believe that's excluded?
24     A.   I don't know.

Page 316

1      Q.   Do you acknowledge that it
2  includes antibiotics?
3      A.   I would have to look at the
4  article to see.
5           As you said, they analyze
6  study groups.  And what their methods
7  were, I don't know if it included
8  short-term therapies or preventive
9  therapies.  I'm not sure.  I would have
10 to look at that article and look at the
11 study group and how the study was done.
12     Q.   So you have absolutely no
13 reason or even enough knowledge about
14 that figure to think that it applies to
15 the -- this particular class of valsartan
16 patients, correct?
17          MR. KUM:  Objection.
18 Misstates testimony.
19          THE WITNESS:  I reviewed the
20 literature.  This was the figure I
21 read and quoted in the general
22 population.  I use the general
23 population as the metric in this
24 sort of subspecialty area of

Page 317

1  adherence.
2  BY MS. GEMAN:
3      Q.   Do you think that's valid
4  methodology to say that a statistic that
5  includes antibiotics, birth control
6  pills, short-term medications, has any
7  applicability to blood pressure
8  medication?
9      A.   I would have to look again.
10 I think this was a primary care
11 population.  But I'm happy to look
12 through that data.  I don't know if it
13 separated into different prescriptions.
14     Q.   And you said that you had no
15 reason to assume that this -- you said
16 that you had no basis of knowledge about
17 the adherence of this class; is that
18 correct?
19     A.   I have no information on
20 that.
21     Q.   Did you ignore contrary
22 evidence?
23          MR. KUM:  Objection.
24 Assumes facts not in evidence.

Confidential Information Subject to Protective Order

Page 318

1    THE WITNESS: I looked at
2 the general principle. I
3 didn't -- I have no -- I don't
4 know anything about this
5 population.
6 BY MS. GEMAN:
7    Q.   Did you ask to see the
8 information about this population that's
9 available?
10    MR. KUM: Objection.
11 Outside the scope of her report.
12    THE WITNESS: I addressed
13 the medical monitoring and just
14 included adherence as one of the
15 concerns, if you're assigning
16 whatever dose of the impurity was
17 there.
18 BY MS. GEMAN:
19    Q.   So did you ask to see
20 information about this population that's
21 available, if you're describing adherence
22 in your report at all?
23    A.   I didn't --
24    MR. KUM: Same objection.

Page 319

1    Sorry.
2    THE WITNESS: I didn't know
3 it was available.
4 BY MS. GEMAN:
5    Q.   Are you purporting to draw
6 any conclusions about adherence sitting
7 here now?
8    MR. KUM: Asked and
9 answered.
10    THE WITNESS: I describe the
11 concept.
12 BY MS. GEMAN:
13    Q.   No. But are you purporting
14 to draw any conclusions whatsoever about
15 the adherence of this class?
16    A.   I'm not.
17    MS. GEMAN: Thank you.
18 Okay.
19    Thank you for your time.
20    MR. KUM: Good. Thank you.
21    MR. KERNER: Thank you.
22    THE VIDEOGRAPHER: 4:21 p.m.
23 We are off the video record.
24    This concludes the video

Page 320

1 deposition of Dr. Ursina
2 Teitelbaum.
3    **********
4    (Excused.)
5    (Deposition concluded at
6 approximately 4:21 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 321

1
2    CERTIFICATE
3
4
5    I HEREBY CERTIFY that the
witness was duly sworn by me and that the
6 deposition is a true record of the
testimony given by the witness.
7
    It was requested before
8 completion of the deposition that the
witness, URSINA R. TEITELBAUM, M.D., have
9 the opportunity to read and sign the
deposition transcript.
10
11
12
    _____
13    MICHELLE L. GRAY,
    A Registered Professional
    Reporter, Certified Shorthand
14    Reporter, Certified Realtime
    Reporter and Notary Public
15    Dated: March 14, 2022
16
17
18    (The foregoing certification
19 of this transcript does not apply to any
20 reproduction of the same by any means,
21 unless under the direct control and/or
22 supervision of the certifying reporter.)
23
24

Confidential Information Subject to Protective Order

Page 322

INSTRUCTIONS TO WITNESS

      Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

      After doing so, please sign the errata sheet and date it.

      You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

      It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 324

ACKNOWLEDGMENT OF DEPONENT

      I,_____, do hereby certify that I have read the foregoing pages, 1 - 325, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
URSINA R. TEITELBAUM, M.D.      DATE

Subscribed and sworn
to before me this
_____ day of _____, 20____.
My commission expires:_____

_____
Notary Public

Page 323

- - - - -
E R R A T A
- - - - -

PAGE  LINE  CHANGE
_____ ____  _____
  REASON:  _____
_____ ____  _____
  REASON:  _____
_____ ____  _____
  REASON:  _____
_____ ____  _____
  REASON:  _____
_____ ____  _____
  REASON:  _____
_____ ____  _____
  REASON:  _____
_____ ____  _____
  REASON:  _____
_____ ____  _____
  REASON:  _____
_____ ____  _____
  REASON:  _____

Page 325

LAWYER'S NOTES
PAGE  LINE
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____

**WORD**
**INDEX**

**< $ >**
**$500**   123:*19*
**$750**   124:*1*

**< 0 >**
**0**   116:*1*
117:*7, 10*
**0.8**   299:*24*
312:*11*
**08543**   4:*17*

**< 1 >**
**1**   73:*9*   94:*9*
96:*12, 14*
104:*22*
120:*22*
121:*22, 24*
122:*7*   133:*14*
168:*7*   324:*6*
**1/12/2022**
128:*3*
**1/12/22**   6:*19*
7:*6*
**1/21/22**   6:*20*
**1:06**   157:*17*
**10**   1:*11*   6:*7*
10:*20*   56:*1,*
*14, 16, 19, 20*
85:*3, 17*   93:*5*
**10:18**   71:*15*
**10:38**   71:*18*
**100**   93:*10*
202:*17*   203:*10*
**100,000**   96:*4,*
*16*
**10013**   2:*5*
**10017**   3:*12*
4:*12*
**10th**   9:*7*
**11**   75:*22, 23*
204:*9, 22*
205:*3*   209:*18*
**11:31**   120:*15*
**11:41**   120:*18*
**12**   53:*19*
85:*3, 18*   93:*5*
130:*14*   205:*4,*

**7**
**12/27/21**   6:*18*
**12:20**   157:*11*
**121**   6:*16, 21*
**124**   6:*16*
**12th**   4:*11*
141:*13, 19*
**13**   96:*3, 16*
206:*11*
**13,000**   177:*13*
**14**   172:*8*
180:*15*
219:*21*   321:*15*
**141**   7:*6*
**15**   130:*15*
270:*8, 9*   271:*4*
**15219**   4:*6*
**16**   93:*2, 11*
95:*10*   234:*23*
235:*12, 23*
**17th**   1:*16*
9:*12*
**18**   46:*8, 10*
131:*17*
**19104**   10:*21*
**19-2875**   1:*5*
**1987**   119:*20*
**1993**   136:*14*

**< 2 >**
**2**   121:*6*
122:*1*   124:*6,*
*18*   131:*17*
237:*9, 15*
238:*7*   264:*16*
**2:04**   219:*14*
**2:16**   219:*17*
**2:30**   233:*5*
**2:40**   233:*8*
**2:46**   239:*5*
**2:47**   239:*9*
**2:50**   242:*19*
**2:58**   242:*22*
**20**   34:*4*
52:*14, 21*
53:*12, 18*
56:*12*   68:*18*
71:*11*   93:*3*
104:*9*   144:*12*
162:*1*   168:*6*
199:*2*   226:*20*

**252**:*2, 15*
**281**:*8*   297:*7*
305:*13*   324:*20*
**200**   3:*16*
**2000**   75:*21*
**20002**   2:*16*
**2005**   252:*20*
253:*14*
**2006**   234:*20*
252:*17*   253:*2,*
*10, 15*
**2007**   11:*7*
53:*2*
**2008**   75:*24*
**2010**   77:*9, 21*
78:*3*
**2011**   75:*20*
**2013**   266:*4, 16*
**2014**   92:*1*
**2019**   53:*5*
**202**   2:*16*
**2020**   13:*3*
269:*14*
**2021**   21:*7*
**2022**   1:*11*
9:*8*   207:*10*
301:*9, 11*
321:*15*
**2025**   92:*3*
**20s**   13:*21*
**21**   4:*17*
168:*6*   199:*2*
**212**   2:*6*   3:*12*
**213**   3:*6*
**221**   7:*8*
**228**   7:*11*
**238**   7:*13*
**2390**   233:*16*
**24**   53:*23*
158:*9, 10*
**25**   96:*14*
101:*23*   141:*10*
**250**   2:*5*
**2500**   3:*17*
**26**   129:*6*
142:*10*   143:*3*
144:*5*
**263-1840**   4:*6*
**264**   7:*17*
**27**   147:*3*

**275**   2:*10*
**27th**   141:*18*
**286**   6:*8*   8:*6*
**2875**   1:*2*   9:*16*
**29th**   2:*10*

**< 3 >**
**3**   8:*6*   94:*10*
96:*2*   104:*22*
121:*5, 23*
122:*1, 3, 6*
265:*13, 15*
**3:32**   282:*4*
**3:49**   282:*7*
**3:52**   286:*15*
**3:54**   286:*18*
**30**   1:*15*   9:*12*
55:*24*   101:*23*
226:*20*   294:*1*
300:*23*   322:*16*
**302**   2:*15*
**30305**   3:*18*
**30-minute**
19:*21*
**310**   6:*7*
**3100**   3:*5*
**320**   66:*23*
73:*10*
**325**   324:*6*
**3333**   3:*17*
**3400**   10:*19*
**35**   120:*3*
**355-9500**   2:*6*
**36**   220:*16*
221:*3*
**37**   220:*18, 19*
227:*20*
**38**   263:*24*
**3892**   222:*13,*
*21, 23*
**38th**   4:*5*
**390**   4:*11*

**< 4 >**
**4**   122:*1*
141:*2*   156:*18*
203:*11*
**4:14**   311:*20*
**4:15**   311:*23*
**4:21**   319:*22*
320:*6*

**40**   131:*4*
172:*9*
**412**   2:*15*   4:*6*
**415**   2:*11*
**44**   199:*4*
**45**   199:*4*
**452-1888**   4:*18*
**470-3520**   2:*16*

**< 5 >**
**5**   92:*23*   94:*6*
221:*2, 14*
227:*10*
**50**   60:*5*
293:*22*
302:*19*
303:*16, 20, 22*
307:*7, 11*
314:*21*
**51**   128:*4*
129:*15, 18*
130:*1*
**55**   68:*20*
71:*10*   104:*10*
162:*1*   305:*13*
**553-2312**   3:*18*
**56,000**   96:*20*

**< 6 >**
**6**   200:*1*
227:*18*
232:*24*   233:*13*
**60**   202:*2*
254:*7*   257:*6,*
*7*   258:*14*
259:*9*   260:*5*
261:*11, 18*
262:*12*
**609**   4:*18*
**60-year-old**
255:*15*
256:*11, 23*
**61**   260:*5*
**63**   259:*16, 19*
**646**   4:*12*
**65**   95:*8*   260:*5*
**67**   254:*8*
260:*5*   261:*11*
262:*14*
**678**   3:*18*

Confidential Information Subject to Protective Order

**689-7424** 3:*6*

**< 7 >**
**7** 92:*23*
238:*16*
239:*13* 243:*3*
**7:05** 58:*14*
**70** 55:*21*
93:*4* 95:*8*
172:*12* 254:*6*
259:*18* 260:*6,*
*19* 261:*2*
**700** 92:*17*
**73-year** 194:*1*
**73-year-old**
192:*1, 19*
**746-2000** 4:*12*

**< 8 >**
**8** 96:*12*
100:*19*
101:*13*
103:*11*
263:*20* 264:*9*
312:*22*
**80** 60:*4*
68:*20* 71:*11*
104:*10* 162:2
302:*20*
305:*14* 307:*8*
**801-9306** 3:*12*
**80-year-old**
309:*17*
**80-year-olds**
307:*11*
**86** 180:*19*
181:*1* 202:2
**865** 3:*4*
**877.370.3377**
1:*22*
**8th** 2:*5*

**< 9 >**
**9** 206:*10, 11*
207:*3*
**9:18** 1:*17* 9:9
**90** 172:*13*
202:*16, 19*
307:*8*
**90017** 3:*5*

**90-year-old**
309:*17*
**917.591.5672**
1:*22*
**94111** 2:*11*
**956-1000** 2:*11*
**95-year-old**
306:*21* 307:2
309:*6, 18*

**< A >**
**a.m.** 1:*17* 9:9
58:*14*
**abbreviation**
133:*4*
**aberrant**
272:*20*
**able** 93:*7*
95:*19* 109:*7*
119:*1*
**abnormal**
250:*6*
**abnormality**
248:*12, 21*
250:2
**absence**
183:*16*
**Absolutely**
24:*14* 171:*5*
225:*7* 295:2
316:*12*
**abstract**
199:*8, 16, 21*
233:*17* 242:*8*
**abstracts**
156:*8, 12, 15*
**academic**
47:*18* 86:*4*
151:2 196:*14*
216:*1*
**accept** 48:*5,*
*14* 51:*12*
**acceptable**
70:*16* 115:*16*
**accepted**
48:*21* 258:*4*
**access** 86:*5*
167:*21* 302:*11*
**accidents** 87:*5*
**accompanied**

162:*18* 163:*15*
**accrued** 92:2
**accurate**
128:*6* 177:*13*
186:*7* 322:*20*
**accurately**
233:*24*
**ACE** 45:9
**acknowledge**
68:*11* 260:*4*
316:*1*
**acknowledged**
254:*13*
**ACKNOWLE**
**DGMENT**
324:2
**ACOG** 310:*5*
**acquisition**
200:*4*
**act** 41:*14*
174:*5* 308:*7*
**Actavis** 3:*20*
**action** 15:*18*
**active** 172:*3*
**actively**
290:*17*
**activity**
172:*16* 259:*3*
**add** 31:9
126:*16* 169:*1*
**added** 106:*14*
126:*19*
**adding** 123:*16*
**addition**
110:*6* 128:*20*
129:*19*
173:*18* 227:9
230:9 276:*15*
296:*22* 308:*10*
**additional**
40:*17* 41:*23*
296:*21*
**address** 10:*17*
71:*5* 109:*5,*
*22* 114:*15*
143:*16* 145:*6*
163:*21* 174:*24*
**addressed**
10:*13* 62:9
108:*1* 318:*12*

**addressing**
246:*20*
**adherence**
59:*22* 60:*22*
61:*1, 4, 16, 19*
62:*11, 16*
301:*23, 24*
302:*3, 9, 14,*
*18* 303:*5, 9,*
*14, 17* 304:*4*
314:*22* 315:*8*
317:*1, 17*
318:*14, 21*
319:*6, 15*
**adherent** 60:*1,*
*4* 302:*21*
304:2
**Adheres**
303:*22*
**adjust** 64:*3, 8*
**adjustments**
164:*8*
**adjuvant**
291:2
**administering**
292:*13*
**admission**
300:*12*
**admonition**
20:*3*
**adults** 300:*7*
**advanced**
12:*12* 117:*15*
118:*5* 256:*20*
**advertising**
166:*8*
**advise** 313:*2,*
*19*
**advised** 99:*10*
**advocating**
255:*4*
**affairs** 113:*18*
**affect** 89:*4*
254:*23* 309:*12*
**affiliation**
216:*1*
**afford** 309:*6*
**affording**
60:*13*
**afraid** 43:*20*
195:*24*

**afternoon**
157:*23* 287:*1*
**age** 14:*7* 64:*6,*
*11* 65:*18*
68:*24* 95:*7*
104:*10*
136:*11* 219:*3*
248:*17* 254:*7,*
*8, 11* 257:*6, 7*
258:*14* 259:9
262:*12*
**agent** 87:*16*
**agents** 103:*6*
**ages** 18:*14, 16*
68:*19* 69:*23*
162:*1* 305:*13*
**aggressive**
263:9 271:*6*
272:*17*
**agnostic**
279:*24*
280:*20* 281:*17*
**ago** 46:*10*
52:*5, 14*
66:*16* 101:*23*
113:*24* 120:*3*
147:*14*
188:*21*
227:*11*
243:*23*
260:*15* 276:*1,*
*3* 283:*4*
**agree** 69:*16*
71:*21* 72:*23*
105:*14, 15*
112:*14* 116:*1*
117:*14* 118:*3*
179:*6* 213:*24*
218:*5, 10*
257:*11*
258:*13* 261:2
**agreed** 72:*5*
112:*21* 295:*20*
**ahead** 36:*15*
64:*21* 70:*10*
134:*3* 215:*22*
224:9 230:*22*
245:*23* 280:*13*
**Aid** 4:*14*
**airway** 12:*17*

232:5, 6
al 15:15
ALFANO 4:1
algorithms
256:16
allegation
12:6, 10
allegations
29:8
allele 85:15,
20 114:10
alleles 85:19
allow 110:6
allowed 18:1
20:4 166:18
allowing
224:23
amazing 79:8
149:8
ambiguous
28:10 29:21
32:7 33:3
36:12 38:3
39:8 40:2
42:16 49:22
54:10 55:10
59:7 63:10
64:19 66:3
87:11 90:13
105:21
144:21
160:15 170:7
188:14
197:21 253:7
281:19 311:6
Ambry 85:1
amenable
117:24
amend 51:8
Amended
6:16 28:16
120:23
American
205:21
Americans
72:15 205:23
ammonium
101:3, 10, 14
A-M-M-O-N-I-
U-M 101:10

amount 47:5
128:21
161:11
162:12
163:11 244:20
amounts 165:4
analysis
238:13 275:6
293:6 295:23
analyze 72:3
294:13 316:5
analyzing
72:17
and/or 23:21
143:23 144:9
321:21
androgen
256:18 309:2
anesthesia
12:18 38:11
Angeles 3:5
annual 218:11,
12
anomalous
228:23
Answer 8:5
19:2, 9 30:13
33:21 34:22,
23, 24 35:7,
14 36:14, 16
42:3, 17
43:15 47:22
48:11 61:8
62:8 64:1, 14
70:10 76:5, 6,
10 77:24
78:6 80:16
93:3, 14
95:16 98:6, 7
99:17 100:1,
13 102:18
109:7, 13
114:18 115:3,
5, 11, 14, 16
140:2 163:1,
18 164:15
165:13
168:10 170:9
171:3 174:9,
13, 17 175:14
177:22 178:1

181:22
191:21
192:12 193:5
196:23
197:11
209:16
222:12 225:8
226:19
235:17
241:19
248:19
249:17
258:22
261:16, 21
262:7 263:2
278:12
279:11 286:6
293:1, 5
296:13 306:2
312:21
answered
42:2 62:7
64:20 98:15
109:12 134:2
162:21 175:4
245:22
248:24
258:19
261:14
278:18
279:10 291:8,
10 296:5
315:2 319:9
answering
229:24 230:2
answers 17:20
35:3 174:10
285:21 324:8
A-N-T-E
108:8
antibiotics
303:24 316:2
317:5
anticoagulants
308:15
anxiety 40:10,
20 41:15
42:11, 22
43:1, 23
113:20 137:7,
9, 10 138:15,

18 184:19
190:14 191:9
220:10
223:18 226:1,
9, 11 229:8
231:6 309:11
anxiety/psychol
ogical 219:23
anxious
184:10 191:19
anybody
21:16, 19
132:10
140:22 297:22
anyway 291:9
apologize
29:14 121:13
123:6 154:11
199:1 262:8
265:4 270:22
285:18 301:4
311:16
apparent
284:20
APPEARANC
ES 2:1 3:1
4:1 5:1
appears
272:21
applicability
317:7
applied 63:3,
15 310:16
APPLIES 1:6
82:23 144:5
316:14
apply 59:4
175:21 321:19
appointment
196:8 198:9
appreciate
27:5 36:3
72:4, 19
73:24 75:4
80:14 91:5
106:7 129:23
191:8 229:23
appreciated
156:13
appreciative
75:11

approach
39:19
appropriate
71:24 73:2
86:20 111:8
114:8 118:4
143:8 160:8,
19 161:15
162:17
163:14 192:8
193:1 215:5
218:15 293:8
294:6 295:6
297:17, 21
322:6
appropriately
72:15 237:12
approval 75:9
176:17
179:18
182:18 183:5
184:21 274:5
276:4, 13
279:14, 24
281:17
approved
103:14 166:7,
11 167:15, 17
168:8 169:14,
18, 22 170:4,
12, 15 171:14
178:21 179:5
182:22, 24
183:4, 13
184:15
188:10 189:3,
9, 21 274:2,
13, 21 275:14,
24 276:8, 9
277:24 278:2,
10, 20, 24
279:3, 6, 8, 22
280:17, 18, 21
approximately
9:9 141:18
320:6
archived
136:10
area 45:22
47:20 50:21

Confidential Information - Subject to Protective Order

137:*19*
138:*23* 316:*24*
**arena** 185:*4*
**Argumentative**
51:*10* 174:*17*
224:*1* 248:*24*
**arose** 87:*4*
**art** 39:*17*
218:*20*
**article** 136:*14*
138:*13, 17, 19*
140:*7, 13*
204:*20* 205:*1,*
*3, 4, 10* 221:*2,*
*14* 222:*14*
223:*12, 22*
224:*4, 12, 15*
225:*11, 15, 20*
226:*21*
227:*11, 19*
228:*7, 8*
229:*22* 230:*3*
232:*15, 18*
233:*12*
236:*23*
237:*19, 21*
238:*5, 11, 17*
241:*13* 242:*9*
244:*6* 255:*5*
260:*4, 7*
265:*17* 266:*4*
267:*5, 13, 14,*
*16* 268:*15*
269:*21* 270:*6*
315:*1* 316:*4,*
*10*
**articles** 136:*4*
137:*8* 140:*5*
199:*4* 204:*4*
207:*12* 227:*1,*
*4* 228:*5*
236:*4* 244:*14*
260:*3* 271:*11*
311:*12* 312:*2*
**Asbestos** 65:*8,*
*13* 104:*12*
162:*4* 165:*17*
**ASCO** 150:*17,*
*18, 20* 199:*8,*
*16* 200:*2*

**ascribe** 268:*9*
**aside** 39:*4*
**asked** 11:*10*
19:*23* 26:*16,*
*21* 32:*16*
42:*1* 50:*19*
62:*6* 64:*19*
80:*17* 88:*14*
98:*14* 109:*4,*
*11* 123:*13*
134:*1* 143:*16*
162:*20* 175:*3*
187:*20*
212:*14*
224:*20* 225:*1*
240:*11* 242:*3*
245:*21*
248:*23*
258:*18*
261:*13* 268:*8*
278:*9* 279:*9*
280:*9* 284:*5,*
*6, 13* 296:*5*
300:*20*
301:*21* 302:*2*
319:*8*
**asking** 30:*4, 6*
53:*21* 100:*2,*
*5* 110:*19*
162:*10*
200:*18* 212:*7*
216:*17* 219:*1*
224:*12* 230:*5*
238:*2* 267:*22*
269:*23* 280:*11*
**aspect** 32:*24*
180:*2*
**asserting**
43:*10*
**assess** 67:*5*
248:*17*
250:*18* 258:*6*
259:*3* 294:*5*
**assessed**
61:*11* 217:*7*
252:*7*
**assesses**
183:*15*
**assessing**
150:*14*

190:*12*
294:*10* 305:*17*
**assessment**
262:*1*
**assign** 144:*18*
**assigning**
318:*15*
**associate**
287:*12, 15*
289:*6*
**Associated**
7:*8* 40:*20*
74:*13* 220:*7*
221:*5* 223:*6,*
*19* 226:*1*
227:*2* 229:*9*
251:*18*
**assume** 91:*12*
123:*15* 163:*8*
186:*2* 195:*18*
197:*2* 317:*15*
**Assumes**
42:*15* 43:*5*
49:*22* 70:*9*
97:*4* 99:*14*
145:*14*
165:*11*
193:*13*
214:*17*
215:*21* 217:*4*
269:*19* 317:*24*
**assuming**
50:*17* 60:*18*
145:*24* 146:*1,*
*6* 148:*7*
**assumption**
165:*6*
**assumptions**
143:*10, 15*
214:*19*
**asymptomatic**
106:*13*
110:*17*
118:*10*
153:*13, 18*
161:*4* 165:*1*
184:*24* 185:*4*
193:*18* 214:*4*
223:*14*
234:*12, 18*
237:*4, 9, 16*

238:*8* 246:*18,*
*22* 251:*3*
295:*11* 305:*18*
**asymptomatica
lly** 265:*20*
**Atlanta** 3:*18*
**ATM** 244:*2*
**attached**
322:*12* 324:*11*
**attempt** 42:*10*
**attend** 47:*6, 8*
56:*4*
**attendance**
52:*10, 17*
**attended** 52:*6,*
*7*
**attending**
48:*2* 253:*15*
**attention**
97:*19, 21*
98:*2, 12*
100:*9* 252:*13*
**attorney**
58:*17, 20*
286:*4* 322:*16*
**attorneys**
24:*10* 25:*9*
142:*18, 21*
143:*10* 283:*6*
**attribute**
226:*14*
**attributed**
268:*2*
**attuned**
110:*23*
**author** 136:*17*
137:*15* 138:*7*
268:*10*
**authored**
135:*17, 23*
**authors**
221:*22*
226:*14, 15*
233:*12, 23*
254:*13* 260:*3*
266:*7, 10*
268:*3*
**autopsy**
307:*10*
**avail** 38:*18*

**available** 50:*7*
76:*21* 106:*12*
110:*14, 22*
165:*22*
167:*16, 18, 24*
168:*12*
169:*10* 176:*4*
275:*17* 318:*9,*
*21* 319:*3*
**Avenue** 3:*11*
4:*11*
**average** 60:*5*
106:*12* 107:*3*
110:*17* 173:*7*
220:*8* 226:*7,*
*8* 230:*23*
**aware** 42:*19*
169:*9* 198:*6,*
*13* 269:*13*
302:*14*

**< B >**
**back** 14:*6*
100:*14*
101:*12, 22*
115:*22* 121:*6*
130:*8, 21*
133:*12* 174:*8*
192:*16*
195:*23* 226:*4,*
*10* 260:*9*
271:*1, 19*
273:*22*
**background**
139:*16* 296:*24*
**bad** 96:*5*
**badly** 101:*8*
**bag** 60:*8*
**bait** 285:*16*
**balance** 73:*11*
**ballpark**
130:*11*
**BARNES** 4:*10*
**Barrett's**
104:*18*
203:*17* 204:*1*
205:*11*
**basal** 14:*10*
89:*20* 90:*15*
99:*19*
**base** 95:*4*

Confidential Information Subject to Protective Order

**Based** 7:17
65:5 72:2
75:9 81:13
87:15 106:11
110:18 111:4
144:10, 11
160:1 161:5
164:16
167:19 197:1
214:19
240:23
255:17
257:16, 24
273:16 298:22
**baseline** 40:15
41:22 42:11,
22 43:1
**basic** 39:16
280:24
**basically** 196:3
**basis** 148:2
229:23 305:9
313:3, 20
317:16
**Battery** 2:10
**Bayer** 199:23
**bear** 101:2
**beautifully**
245:12
**bed** 293:21, 24
**bedbound**
294:2
**beginning** 1:17
**behalf** 13:6
22:16, 17 51:2
**behavior**
165:5
**belief** 179:17
**believe** 68:19
73:8 83:3
91:21 120:2
122:24
161:14
162:16
176:21
178:21
202:10 211:5
215:17 223:8
315:23
**benefit** 66:12,
15, 20 67:4,

11 68:21
70:14 71:9
76:16 77:3
106:19
111:21
118:17 162:8
164:21 194:4
209:3 253:4
291:1
**benefits** 113:7,
12 138:18
240:3 292:13
294:11, 14
**BERNSTEIN**
2:3, 9
**best** 17:11
149:7 151:17
202:15 213:7
241:11 290:12
**better** 74:12
133:1 259:9
261:10
262:14
265:14 279:19
**beyond** 22:13
**big** 66:16
149:10 177:1
245:3 288:12
**biggest**
171:20 173:4
**bill** 170:23
182:14, 15
189:15, 18
190:6 191:13
**billed** 127:18
128:4 191:18
**billing** 123:12
182:19
**bills** 123:13
152:17
182:24 190:1
**binders** 207:12
**biological**
111:9 114:9
**biology** 272:16
**biomedical**
136:7
**biopsies** 76:14
**biopsy** 73:11,
13 92:10
196:5, 18

231:16, 17, 20
232:8, 10
299:20 308:3,
7
**biostatisticians**
36:7
**biostatistics**
33:16 34:1, 3,
5, 10, 14, 18
35:5, 10, 20
36:10 37:7, 8,
12, 19 106:9
**birth** 315:18
317:5
**bit** 117:18
119:15
128:16 150:5
188:20
225:18
289:15 310:5
**black** 72:15
263:6
**bladder** 57:9
269:5, 6
**bleeding**
308:10 314:5
**blind** 190:11
**blob** 24:3
**blobs** 24:1
**blood** 44:18
51:24 52:2,
12, 22 53:14
94:17 95:12
169:21, 24
170:2 172:5
269:10, 11
308:8, 9 317:7
**bloodstream**
172:17 183:21
**blurb** 129:13
**board** 56:5, 6
292:9
**board-certified**
46:15
**Bob** 19:22
29:12
**body** 57:22
88:18 99:22
184:7 265:20
**boiled** 134:22

**bone** 47:8
309:4
**Boscher** 15:15
**BOSICK** 4:1
**Boston** 222:4,
9
**bottom** 264:16
**Bottorff** 149:3
**Boulevard**
10:20
**bowel** 56:9,
19 58:1, 5
82:2, 12
83:14, 15
**boxes** 167:6
274:11 302:12
**Brad** 173:10
**branch** 152:7
**brand-new**
190:19
**BRCA** 84:5, 9,
18, 19 85:10,
11, 12 86:1,
16 92:21
239:16
245:19
246:13, 15
247:8 250:11,
12, 17 251:16
**BRCA1** 7:13
84:12 237:9,
15 238:7
241:2 244:1
246:4
**BRCA1/2**
240:2 243:21
**BRCA1/BRCA
2** 236:24
238:18
240:17, 19
241:15
**BRCA2** 7:15
84:13 241:2
244:1 246:5
**break** 18:23
19:3 68:3, 6
71:13, 17
130:23 157:9
219:8, 16
233:7 242:21
282:2, 6

**breakdown**
131:21 132:1
**breaking** 68:2
219:7
**breast** 48:9
51:16, 17
85:11 96:10,
12 118:12
149:14
233:19 247:9
248:9 268:17
272:5
**Brief** 120:17
157:8 239:7
282:2 286:17
311:22
**briefly** 10:10
122:4 150:4
**bring** 59:21
60:8 189:17
239:17
**Britt** 147:11
149:4
**broad** 35:15
107:23 312:17
**broader** 14:24
**broadly** 30:19
31:6 179:20
**broke** 132:3
**bronchus**
232:7
**brought** 28:17
29:9 69:8
**bucket** 251:2
**building** 12:19
**bulk** 226:1
**burden** 190:23
**burns** 97:10
**business** 10:17
**busy** 289:17
**butcher** 101:1
**butchered**
101:7

< C >
**C8** 100:17
102:5 103:11,
16
**CABRASER**
2:3, 6

Confidential Information Subject to Protective Order

**California**
2:*11*  3:*5*
58:*20*
**call**  12:*18*
21:*2, 9, 11, 13*
41:*13*  153:*22*
291:*2*  303:*9*
**called**  12:*18,*
19  51:*4*
57:*19*  91:*24*
94:*5*  100:*23*
129:*6*  183:*9,*
14  191:*16*
226:*12*  256:*2*
291:*2*
**calling**  223:*17*
**Calls**  34:*11,*
20  35:*21*
39:*8*  40:*2*
43:*4*  76:*2*
88:*6*  99:*13*
100:*10*
103:*22*
105:*19*  107:*6,*
7  178:*13*
187:*11*
193:*14*
196:*10*  198:*19*
**CAMDEN**  1:*2*
**campaign**
166:*8*
**Cancer**  7:*9,*
12, 20  11:*11*
12:*3, 5, 7, 12*
13:*24*  14:*3, 4,*
10  27:*21*
31:*14, 15, 17,*
22  33:*12*
39:*1*  40:*12,*
21  41:*4, 15*
43:*20*  45:*14*
47:*7*  49:*8*
50:*17*  51:*16,*
17, 19  54:*8,*
20, 23  55:*2, 4,*
7, 15, 20, 22
56:*8, 9, 19, 23*
57:*6, 13*  58:*9*
63:*24*  64:*3,*
17  65:*24*
66:*15, 18, 24*

68:*13*  69:*19*
70:*6*  74:*7, 15,*
16  78:*23*
79:*15*  80:*23*
81:*3, 14, 20*
82:*24*  83:*13,*
15, 23  84:*5,*
12, 20  86:*3,*
11  89:*14, 23*
90:*8, 10, 21,*
23  91:*8*
92:*22*  93:*6,*
17  94:*3, 15,*
18  95:*8*  96:*1,*
2, 5, 11, 12, 14,
17  98:*20*
99:*20, 22*
101:*16*
105:*12*
110:*13*
115:*22*  116:*2,*
3, 13  117:*7,*
10, 14, 19, 21,
22  118:*3, 9,*
12, 13, 15
119:*7, 18*
135:*24*  136:*1,*
21  150:*7, 9*
152:*5, 11, 22*
153:*8*  158:*20*
159:*4, 12*
171:*24*  172:*1,*
3, 12, 13
173:*3*  177:*4*
180:*19, 20*
183:*5, 17, 19,*
21  184:*12*
185:*4*  186:*8*
191:*4, 6*
192:*3, 9, 15,*
17, 21  193:*2,*
11, 22  194:*7,*
16  195:*24*
196:*22*  198:*2,*
12  201:*23*
202:*4*  211:*4,*
21  213:*20*
215:*14*  221:*5,*
15  223:*4, 5, 7*
226:*16*  227:*3,*
12, 13, 24

228:*15, 21, 24*
229:*6*  230:*24*
231:*14*
232:*10, 13*
233:*20*  234:*9,*
14, 17, 24
235:*9, 14, 16,*
24  237:*6, 10,*
12  240:*15*
243:*24*  244:*5*
245:*9*  246:*4,*
5, 14, 16, 23
247:*2, 3, 9*
248:*9, 12, 17,*
22  249:*4, 8,*
20, 24  250:*3,*
7, 10, 13, 19, 21,
24  251:*9, 11,*
19, 20  252:*14*
253:*4, 12, 21,*
23  254:*23*
255:*16*
256:*12*  257:*9*
258:*9, 15*
259:*10, 20*
260:*20*  262:*2*
264:*3*  265:*19*
266:*13*  267:*6*
268:*17, 18*
269:*10, 11*
271:*21*  273:*3*
277:*17*
283:*12*  284:*8*
287:*18, 20*
289:*13, 20*
292:*19, 21*
293:*23*
305:*13, 17*
306:*4*  307:*3,*
9, 12, 21
310:*14, 16*
**cancer-**
**directed**
240:*23*
**cancers**  14:*7,*
11  31:*18*
41:*10*  46:*23*
47:*2, 3, 12, 24*
48:*8, 14, 17,*
21, 22, 23
49:*5, 7, 10, 14,*

19  50:*9, 11,*
13, 23  51:*12,*
13  52:*1, 2, 12,*
22  53:*15*
58:*6*  83:*22*
88:*17*  89:*3, 8,*
22  90:*11*
91:*18*  95:*6*
96:*3, 9*  97:*2*
108:*23*  116:*9*
117:*16, 23*
118:*6, 17*
136:*2*  172:*7,*
20  180:*8*
182:*6*  210:*14*
214:*14*  218:*9*
247:*10*  255:*2*
265:*6, 22*
266:*20, 23*
267:*1*  271:*7,*
20, 24  272:*15*
**candidate**
174:*1*
**candidates**
298:*21*
**capacity**  13:*14*
**capitalize**
132:*24*
**CAPS5**  92:*1*
**carbon**
100:*19*
101:*13*  102:*4,*
20  103:*11*
**carcinogen**
65:*9, 23*  66:*9,*
11  105:*1*
134:*23*  161:*9*
163:*5, 10, 11*
218:*7*
**carcinogenesis**
272:*18*
**carcinogenic**
102:*6, 22*
160:*3*  162:*13*
163:*12*  164:*2*
**carcinogenicity**
67:*15*
**carcinogens**
27:*2, 7*  135:*3,*
10, 15  161:*18*
162:*4*  214:*12*

**carcinoid**
57:*19*
**cardiac**
109:*24*  146:*2*
232:*1, 2*
**cardio**  298:*22*
**cardiologist**
46:*2*
**cardiology**
38:*12*  80:*11*
**cardiovascular**
44:*2, 9*  174:*2*
298:*23*
**care**  44:*24*
45:*14, 17*
46:*13, 17*
54:*14*  56:*7*
73:*18, 21, 23*
74:*1*  75:*12*
78:*21*  80:*1*
81:*1, 17*
114:*4*  117:*9*
144:*13*  151:*5,*
6, 14, 17
152:*3, 20, 24*
153:*13, 19*
181:*14*  191:*4*
216:*24*  217:*8,*
13, 18  218:*13,*
18  219:*4*
234:*19*
253:*14, 19*
258:*7*  277:*19*
290:*4*  291:*6,*
12, 15, 17, 20
292:*11*  295:*9,*
10, 18  313:*10*
317:*10*
**cared**  59:*24*
**career**  44:*24*
47:*11, 23*
234:*11*
**careful**
152:*17*  214:*20*
**carefully**
322:*4*
**caregiver**
97:*15*
**caring**  37:*9*
75:*5*
**Caris**  170:*16*

carry 189:4
204:6 241:22
Carter 263:16
cartoon
254:19
case 13:5
15:7, 23 16:4
19:6 27:19
28:8 29:19
59:4 88:9
96:22 125:21
159:10 160:9,
21 212:4
266:20
283:21 312:5
CASES 1:7
96:20 283:2,
11, 24 285:9
catch 117:2
119:1 271:13
273:2, 6
catching
254:22
categorically
108:17 109:10
categories
83:19 220:4
category
211:18
Catenacci
147:23 148:24
caught 55:7,
16 89:23
90:8, 22 91:9,
14, 19 218:11
256:12
causal 159:8,
13
causally
214:13 218:8
causation
27:7 147:12
causative 27:3
102:11
cause 43:18
44:11 80:9
137:10
138:15
159:11
161:14

162:15 271:7
298:3 308:8
caused 27:20
137:7 159:3
195:19
causes 41:15
137:9 184:19
300:3
caveat 83:10
84:4
caveats 81:9
82:14, 21
83:7 110:6
111:1
CBC 213:17
217:11 276:8
281:1
cell 58:7
89:20 90:23
99:20 250:5
272:20
cell-free 172:4,
17
cells 90:15, 18
183:21
184:12 186:8
Center 10:19
151:2 196:14
252:5 287:18,
21
centers 205:15
Centre 4:5
certain 1:16
23:11 30:24
64:5, 6, 11
65:17, 18
75:16 82:20
91:17 102:19
103:5 117:15
118:5 144:22
145:5, 21
147:14
155:22
214:14
248:17 292:14
certainly 34:4,
14 39:15
42:7 72:2
90:2 97:13
102:1 117:11
182:23 190:3

277:6 281:6,
10 309:7
certainty
120:5 143:23
144:9, 19
145:11 146:4
certificate
300:12 321:2
certification
175:21 321:18
Certified 1:18
170:5 171:4,
7, 11 175:2, 9,
11, 16 176:1,
3, 15 321:13,
14
CERTIFY
321:5 324:5
certifying
321:22
cervical 250:7
cervix 249:13
cetera 101:14
Chad-
Freidman
220:17
Chad-
Friedman 7:10
chain 128:1
chair 287:14
288:20 289:2
293:24
chance 229:19
243:2 291:6
change 65:11
104:23 105:2,
4, 12 106:22
107:2 110:7
111:2, 4
112:4, 10, 16,
24 113:5
135:11 158:2
160:4 161:3,
9, 19 162:18
163:15 164:3,
18 171:11
193:9, 17
202:8 206:17
210:15
254:15 305:7,
8 323:4

changed 83:3
160:12, 23
161:24
194:24
207:14 220:19
changes 83:24
116:19
158:21
165:16
249:12, 19
266:12
322:11 324:10
changing
159:22, 24
223:21 270:2
CHARCHALI
S 4:10
charge 247:13
charts 206:12,
18
check 126:6
151:22
checking
210:9
CHEK2 244:2
chemical
105:6
chemistry
101:19
chemo 183:20
184:5, 13
292:2

chemoradiation
12:15
chemotherapy
31:9 74:20,
21 191:5
213:21 214:7
259:22
274:16
290:18 309:8
chest 231:19
Chicago
11:19 252:21
childhood
97:11
Chodosh
149:5
choose 244:20,

24
choosing 245:3
chosen 47:17
Chris 5:1 9:4
cigarette 64:4
circle 101:12
circulating
183:16 184:11
circumstance
79:1 100:14
209:1, 5, 6
260:1
circumstances
78:12 80:19
81:21 102:22
106:4 208:11,
22, 23 259:8
cirrhosis 155:4
citations
138:11, 21
168:13
cite 139:5, 18
167:22 168:2,
11, 17, 21
169:3 203:23
204:6, 21
220:15
251:23 268:6
cited 136:5
140:16 199:4,
18 206:7
207:13 208:1
221:2 227:12,
19 263:16
267:20 268:1
citing 225:12,
15
CIVIL 1:4
142:11
claim 30:20
claiming
14:21 62:15
70:20
clarification
22:15 191:8
clarify 17:15
278:20 311:4
class 15:18
28:8 40:16
41:22 42:12
43:2 59:5

Confidential Information - Subject to Protective Order

60:23  61:17
62:16  63:24
64:17  66:20
109:24
161:13
162:14
163:13  190:5
295:7  297:18,
21  299:15
302:4, 5, 8
304:5  316:15
317:17  319:15
**clear**  16:3
22:4  61:15
65:21  66:22
69:15  74:14
95:4  97:12
108:21
112:14, 21
114:23
158:16
184:15  302:19
**clearance**
38:12  232:2
**clearly**  117:20
**clears**  183:24
**CLIA**  133:3
169:24  170:4,
12  171:4, 7,
11  175:2, 9,
11, 15, 21, 24
176:3, 15
**CLIA-**
**approved**
170:13
**click**  274:12
**Clinic**  7:16
37:9  48:3, 4,
24  49:6  51:3,
5  97:15
114:4  175:8
216:4  247:18
289:14  290:6,
7  305:18
**clinical**  34:3
35:12  63:18
77:11, 14, 17,
23  78:8, 17,
19  81:19
91:24  95:16
144:13  166:4

175:20
176:20, 22
179:12
184:18
185:24  206:8
236:10, 23
243:15
274:23  277:2,
5, 11  287:15,
19  288:5, 21
289:11, 16
291:18  292:6
294:7  297:5
**clinically**
37:24
**Clinic-Based**
237:2  238:20
240:2
**clinics**  46:12,
14, 20  180:13,
14
**clue**  299:16
**coast**  58:17
**code**  12:18
**cognitive**
309:5
**coli**  308:6
**collaborative**
288:12
**colleague**
51:17
**colleagues**
148:9  187:18
**collection**
215:7
**collective**
18:13, 16
**colloquy**
273:24
**colon**  82:24
93:16  96:13
118:12  119:6,
17  171:24
172:1  183:17
184:12
271:21  272:3
292:21
**colonoscopies**
119:10  136:19
**colonoscopy**
118:19

119:20  226:3,
10  299:23
300:2, 11, 18
312:12
**colorectal**
56:8, 9  58:5
82:19  223:5
226:16
266:13  269:1
313:3, 20
**come**  121:5
137:17
166:17  167:6
227:5  234:9
239:12
266:24
273:22  290:19
**comes**  71:4
72:3  110:10
114:2  154:18
155:18
186:19
189:16  276:11
**comfort**  68:3,
6
**comfortable**
73:14  107:22
277:10
**comfortably**
114:15
**comforting**
116:17
**coming**  174:8
195:10
236:22  269:15
**comment**
40:20  207:13
244:9  267:16
**commented**
200:8  295:17
**commenting**
107:22
**commercial**
168:23
**commercially**
167:16, 18, 24
168:12
**commission**
324:21
**common**
268:17  274:11

**comorbidities**
208:20
258:24  299:2
**companies**
23:14, 16
166:17  182:21
**company**
14:19  23:5, 7
88:3  168:17
170:21
**company's**
199:3
**compared**
118:17
**complaint**
28:17  29:5
**complete**
156:10, 15
**completed**
234:17
**Completely**
58:7, 8  119:3
161:20
190:10  225:9
244:15
257:16  305:5
**completeness**
156:13
**completion**
321:8
**compliance**
303:8
**complicated**
74:8
**complication**
312:16
**complications**
312:18
**complies**
303:19

**Comprehensive**
150:9  152:4,
22  306:4
**compulsion**
39:3
**computer**
128:18
**concept**
301:23  303:5
319:11

**concern**  43:22
62:10  172:23
173:4  182:3,
14  188:1, 4, 9,
21  189:8
229:10, 12
230:8  231:5,
8, 9  253:24
263:13  266:19
**concerned**
189:4  198:7
226:11
**concerning**
85:2  305:3
**concerns**
14:18  15:1
87:22  103:3,
5  196:9
295:20  318:15
**conclude**
163:13  284:18
**concluded**
70:4  223:4
320:5
**concludes**
223:23  319:24
**conclusion**
34:12, 20
35:22  39:9
40:3  69:4, 17
70:7, 20  88:7
107:7  233:24
239:21, 23
297:15  298:10
**conclusions**
222:16, 19
233:16, 18
268:10  299:5
319:6, 14
**conclusive**
231:21
**condition**
104:20
**conditions**
38:13  87:22
98:10  99:9
100:8  105:3
197:17  210:24
**conduct**  293:6
295:21  296:15

Confidential Information Subject to Protective Order

conducted
251:5, 7
conference
290:15
conferred
66:15
confers 66:12
67:4 83:14
CONFIDENTI
AL 1:8
confirm
231:14
confirmed
119:14 143:8
150:24
161:18 162:5
180:18 198:11
confused 80:5
connecting
19:14
connection
23:21 101:16
122:22
248:15
251:16
287:22
294:24 295:22
connector
19:15
cons 251:9
consensus
151:16 152:3,
20 154:19
179:17
consider
32:12, 18, 20,
23 33:5, 24
34:9, 17 35:4,
18 36:9 58:4
110:3, 11
192:24
243:20
245:19
246:14
247:20, 22, 23
249:8 251:7,
10, 14
considerations
208:3
considered
60:3 142:19

175:22
212:11, 22
296:23 302:21
consistent
234:5
construct
48:1 104:7
constructs
110:21
consult 80:11
consultant
283:23
consultation
81:13 290:1
consulting
23:13, 16
consumed
42:13
consumer
188:10
contacted
19:13
contaminated
27:19 42:13
146:9 161:12
162:14
Cont'd 3:1
4:1 5:1
contend 104:6
content 23:18
102:13
contest 189:20
context 33:22
77:22 78:8
96:8 139:9
142:9 146:16
166:4 169:12
184:18 214:3,
11 225:18
255:6 274:23
277:2, 10
294:20
continue
106:11 244:17
CONTINUED
157:20
contrary
136:24
137:24 176:2,
12 317:21

control 73:6
164:5 315:18
317:5 321:21
controversial
138:23
203:17 204:2
205:12, 15, 19
262:11
controversy
114:1 274:22
conundrum
189:23
convene 71:5
Convention
10:19
conversation
19:22
conversations
20:9 23:19
148:5
converse 189:7
conversely
299:17
conversion
104:21
Cooperative
310:7
copy 88:14
140:22
Corporation
4:14
correct 22:7
26:7, 15, 20
28:18 32:5
39:6 44:19
49:11 55:8,
17, 20 57:10
61:17, 24
62:24 63:4
68:14 69:6
70:23 75:16
77:15 84:18,
22 85:22
90:1, 9 106:4
107:3 113:3
118:21
119:21 123:3
133:9, 19
141:14 142:3
146:24
149:24 159:4

171:4 182:6
186:12, 22
187:1 188:24
196:18 201:7
202:9 203:8
206:16, 18, 19
210:1, 2
213:11
214:15
221:15 235:1
236:1 237:9,
16 238:8
246:16
248:13, 22
249:1, 5, 6, 21,
24 250:1, 3, 4,
7, 8 253:5, 19
254:2, 8, 17,
24 255:7
260:8, 12
263:14, 17
266:5, 14
280:16 287:5
299:6 302:6,
9, 15 303:21
310:23 311:3,
13 312:3, 8,
23 314:14, 19
316:16
317:18 324:7
corrections
322:5, 7
324:10
correctly
158:23 240:9
cost 128:9
138:17 190:9
cough 45:10
counsel 9:19
15:8 24:13,
17 25:8, 9
34:23 67:21
120:10 148:6
156:7 219:6
237:18 245:5
247:14
285:20, 21
300:21 304:21
counseling
244:8 247:5

Counselor
224:14 277:21
count 60:10
counterfactual
241:19
country
169:10
couple 68:8
147:5 171:19
285:18
course 17:9
18:17 60:12
89:5 96:5
179:14 225:9
254:16, 23
291:11
292:11 307:23
COURT 1:1
9:21 101:8
103:14 107:1
121:17
124:11
147:22
177:21
238:15 239:2
263:21 265:3
285:3 322:20
courtesy 53:3,
8
cover 155:9,
10
coverage 53:7
151:19 292:2
covered 156:1
166:10
170:20
188:23 190:3
195:14
Covid 200:3
created 190:8
creates 41:6
credit 139:22
criteria 294:5
critical 45:2
CRP 210:22
CT 66:19
68:12 69:5,
18 70:6
76:20 92:19
231:12

**culpability**
107:*1*
**culpable** 88:*3*
165:5
**curable** 55:7
**curative**
12:*13, 14*
14:*1* 31:*2*
74:*17* 93:8
262:*23*
**curatively**
74:*16*
**cure** 31:7, *12,*
*13* 113:*2*
**cured** 14:*3*
55:7, *16*
**current**
126:*12*
207:19 208:9
287:*14* 289:8
301:*12*
**currently**
45:*11* 46:*19*
51:*24* 72:17
165:*18*
**cut** 206:*20*
**CV** 156:*3, 15*
157:5
**CVS** 4:*13*
**cyst** 92:*10*
93:*4*
**cystic** 94:*1*
**cytotoxic**
214:6 274:*16*

**< D >**
**daily** 36:*4*
37:*1*
**danger**
161:*12*
162:*12, 13*
163:*12*
**dangerous**
165:*1, 4*
**Daniel** 147:*23*
287:*12*
**data** 77:*2*
95:*1* 118:7
119:*2, 22*
120:*1, 6*
142:*17*

158:*17*
159:*18*
171:*18* 172:7
180:*3, 10*
199:*22* 200:*4,*
*9* 216:*13*
223:9 234:*1*
296:*19, 20*
300:*16* 301:*7,*
*9, 12* 302:*11*
317:*12*
**database**
239:*16*
**dataset** 234:*3*
**date** 1:*17* 9:7
75:*15, 16*
125:*16* 139:8
180:*3* 200:9
322:9 324:*16*
**dated** 128:*3*
141:*13* 321:*15*
**dates** 126:*11*
139:9
**David** 15:*14*
**Davies** 16:*15*
**D-A-V-I-E-S**
16:*20*
**day** 37:*5, 8*
151:*9, 11*
206:*1* 287:*2*
293:*19*
302:*23* 324:*20*
**days** 322:*16*
**DC** 2:*16*
**deal** 66:*16*
**dear** 12:*21*
**death** 43:*18*
254:*11* 300:*12*
**debate** 72:*13*
**decades** 66:7
67:*11, 16*
73:*5* 93:*18*
193:*21* 197:*8,*
*13* 272:*19*
**December**
21:7 125:*11*
141:*18*
**decided** 71:7
**decision** 91:*1*
112:*8* 173:*21*

244:7 259:*5*
275:*16* 283:7

**decisionmaking**
245:*13*
**decrease**
300:*23*
**decreasing**
119:8
**dedicated** 81:*5*
**deemed** 83:*2*
106:*20* 322:*19*
**Deenie** 287:*11*
**deep** 99:*22*
**defective**
14:*22*
**Defendant** 4:*8,*
*19* 15:7
159:*15*
**Defendants**
3:7, *19* 6:*21*
22:*10, 17, 18,*
*22* 23:*1, 8*
29:*10* 107:*2*
121:6 143:*1*
147:*16, 21*
165:6
**defense** 11:*24*
22:*13* 128:*12*
134:8 284:*16,*
*17*
**define** 31:*13*
**defined** 29:*18*
30:8 31:*21*
65:*9, 10* 70:*15*
**definitely**
30:*4* 138:*24*
**definition**
13:*16* 28:8
31:*17* 70:*2*
129:8 162:*9*
206:*24*
207:*19*
209:*12*
211:*24* 291:*22*
**degree** 36:*2*
143:*22* 144:8
145:*10* 172:*3*
192:*4, 22*
**dehydration**

300:*4*
**delay** 45:*24*
**deleterious**
85:*14*
**delighted** 31:*4*
217:*24*
**deliver** 167:8
**delivered**
77:*12*
**delta** 40:*15*
41:*21*
**democratic**
142:*23*
**dense** 30:*16*
129:*22* 134:*19*
**density** 309:*4*
**deny** 42:*21*
231:*14*
**Department**
155:*19*
**depending**
208:*11* 290:*20*
**depends**
31:*15* 32:*15*
55:*12* 84:*11*
113:*15*
169:*11* 172:*3*
256:*14*
**deponent** 9:*17*
237:*20* 324:*2*
**depos** 282:*18*
**deposed** 12:*24*
**deposing**
322:*16*
**deposition**
1:*14* 6:*16, 23*
8:*2* 9:*10*
16:*13* 17:*5*
23:*22* 24:*13,*
*20, 21* 25:*15,*
*23* 29:*2*
39:*16* 64:*13*
88:*15* 120:*24*
121:9 125:*24*
126:*17, 18*
133:*18, 23*
134:*10*
142:*22* 167:*9*
174:*11*
181:*17, 20*
306:*17* 320:*1,*

*5* 321:*6, 8, 9*
322:*3, 13, 17,*
*19*
**depositions**
11:*3* 26:*1*
282:*15*
**deprivation**
256:*18* 309:*2*
**deps@golkow.c**
**om** 1:*23*
**depth** 36:*22*
**describe**
319:*10*
**described** 61:*2*
**describing**
255:*1* 318:*21*
**DESCRIPTIO**
**N** 6:*15* 7:*5*
127:6
**design** 72:8
173:*13*
**designated**
22:*16* 96:*1*
282:*11, 24*
283:*1*
**designation**
96:*19*
**designed**
73:*17* 117:*22*
152:*14*
**detail** 131:*21*
132:*1, 4, 7*
**detailed** 106:*5*
**details** 71:*1*
**detected**
183:*21*
**detects** 266:*11*
**deter** 229:*14*
230:*11*
**determination**
179:*3*
**determine**
138:*5*
**determining**
291:*14* 293:7
**devastating**
180:*21* 201:*2*
**develop** 93:6
95:6, *8* 96:*4,*
*17*

developed
14:4
developing
96:11  158:19
develops
246:15  250:13
device  176:18
devise  54:20
291:16
diabetes  45:4
diagnosed
78:22  150:7
198:1  253:12
259:16, 19
261:18
diagnoses  41:2
diagnosing
210:14
diagnosis  45:4
51:20  73:8
152:8  234:24
235:14  236:1
254:10, 15
255:17  284:8,
9, 19  289:20,
22  309:11
diaphragm
50:17  51:14
diarrhea  300:4
die  99:19
254:9  259:18
260:6, 17, 19
261:2  307:12,
13  312:11, 23
died  99:21
100:4  254:6
differ  154:14
difference
63:19, 22
64:15  314:18
differences
205:22
Different
31:18, 19
58:7, 8  64:23
65:3  82:18
84:24  85:8
91:6  109:22
117:10
123:21
124:24

154:22  155:4,
24  159:16
171:3  175:16
178:19
184:13  212:7
223:18  237:6
240:22
247:12
254:10
257:23
262:23
272:16
284:21  304:5,
13  310:10, 11,
12, 17  317:13
differentiates
226:6
differently
72:16  154:17
difficult  95:13
96:6  231:18
289:20  308:4,
22
dint  42:12
217:1
direct  86:7
102:12  288:7,
15  289:2
321:21
directed
59:10  218:15
directing
33:18  219:1
252:13
Direction  8:5
64:2
directly  20:7
45:14  267:2
director
287:20
disagree  70:7
disciplines
290:9
disclosed
285:2
disclosing
148:5
disclosure
240:5  241:4
discount  173:1

discovered
210:12
Discovery
205:4
discuss  20:5
285:20
discussed
187:17  295:19
discussion
27:13  102:12
222:18
260:18  263:12
disease  43:17
47:20  56:6
82:2, 12
83:14  85:6
174:2  184:7
210:24
254:16, 24
256:20  298:24
disease-specific
155:6
disheartening
92:15
disinclination
171:12
displace
181:14
dispute  186:3,
10, 14  187:8
196:16
disservice
45:23
distinct  37:23
58:5  170:4
243:21  245:19
distinction
38:4  54:12
210:4  211:10
251:24  272:9
314:13
Distress  7:8,
16  113:21
219:24  220:6
221:4  223:3,
6  226:17, 18
227:2  237:1
240:8  241:16
251:15, 17
252:7

Distressed
238:19
DISTRICT
1:1
divide  55:24
division  53:3,
8
dizzy  313:4
DNA  172:17
DNAs  172:4
docs  173:11
Doctor  20:2
27:17  35:8
36:15  43:9
44:4  45:17
46:2  64:21
76:7  103:24
109:14
114:22
121:21
124:17  141:1
157:10, 23
173:22
197:11
204:10
219:20  224:6
232:14
233:11
239:12  242:4
243:1  260:23
264:20
270:13
276:23
278:17  282:10
doctors
167:13  196:17
doctor's  221:3
227:20  263:24
DOCUMENT
1:6  29:7
121:1, 14
122:4, 10
124:8  125:1,
3  131:17
133:12  136:9,
11  137:4
141:5  143:15
168:24  221:7
228:1  238:21
264:4  267:20

documented
65:13
Documents
8:8  122:12
131:14
133:22  139:2
142:6  168:20
270:21
doing  17:2, 18
47:13  53:2
76:14  175:20
191:15
255:10
257:22  281:9
310:22
313:10  322:8
domain  33:13,
15  78:21
dose  66:18
68:12  69:5,
18  70:5
76:20  163:7
231:12
303:11  318:16
double-check
151:22  152:1
doubt  179:4,
19
Dr  9:18
10:13  22:15
25:22, 23
26:2, 5, 11, 15,
20, 22  28:1
32:22  38:23
39:5  59:12
62:24  63:1
75:4  86:5
102:14  108:2,
19  114:20
121:9  133:18
134:9  135:8
142:21
144:24
146:19
148:21, 22, 23,
24  149:3, 4, 5,
17, 20, 21
150:15
164:24  166:6
167:2  171:22
172:19  174:7

Confidential Information Subject to Protective Order

181:8, 13
185:9 210:18
213:23
214:10
223:16
240:11
246:19
266:24
286:24 295:5
297:16
299:13
301:10, 20
305:3, 16
306:16, 17
309:21 310:4
313:9 314:12
320:1
**dramatically**
194:15
**draw** 183:24
184:3, 4
319:5, 14
**drawing**
211:11 251:24
**dream** 117:3
**drew** 233:24
**driven** 216:14
**drug** 59:13
179:4, 16
189:9
**drugs** 46:4
61:21 304:22
305:2
**Duane** 1:15
3:3 9:12 23:4
**due** 45:9
165:5
**duly** 10:2
321:5
**duration**
68:23 69:22

**< E >**
**eagerly** 110:11
**earlier** 58:23
73:8 74:7
83:6 112:3,
10 113:5
117:3, 23
133:17
141:17

142:13 159:1
175:14 188:8
210:14
222:12
243:18
254:14, 15, 23
273:24
280:10
300:21
301:22
304:20 306:18
**early** 21:6
44:23 55:8,
16 74:16
89:4, 24 90:8,
22 91:9, 14,
19 125:11, 18
172:20, 22
180:3, 7
182:5 184:23
188:6 218:11
259:10
**earning**
122:22
**easily** 279:15
**easy** 186:19
275:17
**ECOG** 310:6
**economic**
189:5, 12
190:16 191:10
**economics**
32:1
**edit** 132:10
**editing** 132:15
**education**
289:21
**effective**
96:10 177:3
**effects** 191:5
236:6
**efficacy** 69:5
186:5 275:21
**effort** 139:23
**efforts** 288:7,
16
**EGOG** 293:12
**eight** 25:5, 6,
7 273:7
**either** 11:17,
23 110:16

116:13 167:7
231:18 251:19
**EKG** 79:20, 22
**Ekstram**
136:15, 17
**elect** 112:6
**electronic**
73:16 141:11
155:14
**element**
100:20 143:6
**elements**
13:23 14:19
15:2
**elevate** 211:20
**elevated**
79:19 80:9
210:23 211:2
249:11
**eligibility** 30:8
**eligible** 31:8,
10 262:22
**elusive** 92:5
**embed** 56:23
**embedded**
65:24 78:14
80:21 81:23
**emotional**
244:7
**employ** 296:24
**employed**
297:15
**employer**
195:19
**employing**
297:13
**enacted**
105:18
**encourage**
166:20
**endoscopic**
92:7, 17
**endoscopies**
273:17, 21
**endoscopy**
38:11 83:4
203:20 232:4
**endowed**
287:14
288:20 289:2

**endpoints**
179:13
**ends** 92:2
**engage** 233:21
**engagement**
122:23
**engaging**
129:16
**engender** 40:9
201:6
**engendered**
40:17 41:24
**England** 67:8
69:1, 8 164:6
**enhanced**
220:5
**enhancing**
291:5
**enrolling**
291:23
**entered** 215:18
**enthusiasm**
166:21
**entire** 48:15
130:23 242:8
307:23
**entirely** 160:9,
21 240:21
**entitled** 17:11
29:18 30:9,
21 62:14
64:13 102:18
109:6 113:8,
13 114:23
120:22
227:21
236:24
237:21 238:17
**entity** 57:23
**entwined**
130:14
**Epic** 302:10
**equally** 67:4
**equivalent**
173:16
**errata** 322:6,
9, 12, 15
324:12
**erythrocyte**
210:22

**esophageal**
56:16 269:3
**esophagogastri
c** 56:2, 17
83:1
**esophagus**
104:18
203:17 204:1
205:11
**especially**
149:10
**ESQ** 2:4, 9,
14 3:3, 10, 15
4:3, 4, 10, 16
**essentially**
127:19
129:11 175:6,
23 194:10
302:22
**EST** 1:17
**establish** 303:1
**established**
66:8, 10
73:12 76:13
96:9 118:9
193:23 220:3
232:11
248:16 272:24
**esteemed**
149:6
**Estermann**
266:8, 17
267:10, 12, 15,
23
**estimate** 178:9
**et** 15:15
101:14
**ethics** 241:5
**Etminan**
148:21
**Europe** 258:5
**European**
310:6, 7
**Europeans**
205:22
**evaluate**
163:22 297:9
**evaluated**
212:12
**evaluation**
86:3, 13

237:13  244:5
247:4  261:23
**evaluations**
98:23
**event**  12:17
45:2
**evidence**
42:15  43:6
49:23  70:9
72:2  89:17
91:1, 4  97:5
99:15  108:22
110:18
145:14
165:11
172:21
193:14
214:17  215:3,
21  216:7, 13
217:4  269:19
305:10
317:22, 24
**evidence-based**
110:23  155:16
**evolution**
117:12
**E-X**  108:7
**exact**  70:24
79:1  101:6
125:16  218:1
**exactly**  14:14
126:6  153:10
245:9  259:14
261:22  301:5
303:14  314:16
**exaggeration**
48:18
**EXAMINATIO
N**  10:5
157:20
286:21  310:1
**examined**
10:3  223:3
**examining**
218:21
**example**  18:4,
10  38:10
57:13  65:7
78:15  79:14,
15  81:11
82:8  84:11

104:11, 17
110:12
112:13, 15, 23
137:6  138:14
155:2  173:24
179:10  183:8
210:7  254:5
292:21
293:15
295:15  299:19
**ex-ante**  108:6
**exception**
64:10  223:5
226:14
**exceptions**
107:18
**excessive**
103:11, 16
**excluded**
315:23
**exclusion**
181:9
**exclusively**
46:14, 23
247:8  289:13
**Excuse**  54:24
100:18  140:7
168:9  297:14
**Excused**  320:4
**exemption**
176:19
**Exhibit**
120:22  121:2,
5, 15, 22, 23, 24
122:3, 7
124:6, 9, 18
131:17
133:14  141:2,
6  147:2
156:3, 20
174:10  221:2,
8, 14  227:10,
18  228:2
233:13
238:16, 22
239:13  240:7
243:3  263:20
264:5, 9
**exhibits**
120:21  121:19
**exist**  203:19

**existence**
75:14
**exists**  108:5,
16
**expect**  161:17
**expectancy**
95:5  194:1
259:2
**experience**
144:13
190:14  206:8
234:6, 22
235:12, 22
289:16  297:1,
6, 8
**experienced**
42:7  43:2
**Expert**  7:6
13:14  16:5
21:24  22:11,
16  23:21
24:16  25:21,
22  27:3  32:5,
13  34:1, 10,
18  35:4, 20
36:9  40:19
59:23  61:16,
23  62:15
68:16  82:4
109:2  128:8,
11, 22, 23
129:8, 22
134:7, 9, 16
137:15
142:24  159:9,
13  214:21
244:16
282:11, 13, 17
283:2, 23
285:9  295:14
312:19
**expertise**
47:20  50:21
106:7
**experts**  19:16
71:6  72:8
106:8  127:16
147:16, 21
267:4
**expires**  324:21

**explain**  18:9
25:17  29:23
127:4  182:15
216:6
**explaining**
48:10  185:13
**explanation**
216:8
**exposed**  49:4
59:15, 19, 20
98:18  103:10,
16  165:3
192:2, 20
194:14, 21
214:12  218:7
**exposure**  64:3,
9  65:14, 15
68:23  69:22
76:18  87:16
98:13  99:11
104:5, 9
105:1, 5
135:10
158:18
159:11, 21
161:5, 23
162:5  165:15
194:23
195:12, 20
198:8  219:2
305:10
**exposure-
driven**  305:11,
14
**exposures**
105:11
164:17  193:17
**express**  253:24
**expressly**
254:13  260:1
**extant**  109:9
**extend**  174:11
**extensive**
144:12  200:9
244:8
**extent**  36:18
38:15  43:13
153:20
154:12
198:15

213:22
216:22  241:18
**extra**  76:1

**extraordinarily**
164:24
**extraordinary**
72:7
**extremely**
108:20
144:23  145:5
173:10
**eye**  94:14
**eyes**  90:2

**< F >**
**facilities**  186:1
**facility**  87:23
**fact**  20:5
60:2  73:15
201:22  211:5
241:3
**factors**  263:5
**facts**  12:22
42:15  43:5
49:22  70:9
97:5  99:14
100:3  142:17
145:14
165:11
193:13
214:17
215:21  217:4
269:19  317:24
**faculty**  252:20
**fail**  322:18
**failure**  45:4
298:24
**Fair**  13:12, 17
18:18  19:10
23:6  24:9
26:10  29:15
30:3  47:5
100:22
102:17
115:19
128:21  133:6
253:8  255:19
**fairly**  23:10

Confidential Information Subject to Protective Order

fall 80:6
300:13 313:5,
21
falls 97:14
False 7:11
41:2, 3
172:24 181:1
182:5, 9
200:12, 14, 16,
20 201:1, 5, 7,
9 202:12
220:9, 20
227:13, 22
228:13
229:13, 20
230:8 231:1,
6 233:19
238:4
falsely 211:20
familiar 29:13
101:17 129:6
139:10 169:6
208:13
257:19 301:6,
8, 14, 16
family 18:16
46:2 86:14,
21, 23 113:18
130:24 240:18
fascinating
116:8
fast 131:9
faster 271:16
favor 71:9
206:4
fax 1:22
FDA 43:21
44:1, 8 166:7,
11 167:14, 16,
17 168:8
169:14, 18, 22
170:4, 15
171:14
178:21 179:8,
18 182:18, 22
183:4, 5, 12
184:14, 21
188:10 189:3,
9 274:2, 5, 13,
21 275:13, 24
276:8, 9, 13

278:10, 19, 24
279:8, 22, 24
280:17, 18
281:5, 17
FDA-approved
188:22
fear 39:1
40:10, 11, 15,
17 41:6, 22,
23 42:19
211:20
feasibility
37:22
feasible 38:15
feature 81:14
February
125:18
Federal
142:11
fee 123:3, 16
feel 39:2
73:14 107:21
174:19
197:15 277:9
291:9
feeling 202:3
fell 300:10
fellow 149:1
fellows 48:8
79:10 216:4
fellowship
34:6 52:13
53:16 117:13
235:8 252:19
fever 79:17
80:10
field 14:13
117:11
137:16
190:20 191:1
236:6 245:6
314:4
Figueroa 3:4
figurative
235:5
figure 60:10
66:13 91:22
95:20 248:14
263:2 264:13,
16 288:18

308:18
316:14, 20
financial
189:10
financially
190:11
find 19:15
60:15 66:24
72:10 73:6
74:6, 15 75:3
113:9, 13
117:23
130:20 139:7
172:19 180:7,
15 183:7
199:9, 13
200:7 204:20
216:3 227:1,
7 236:5
244:18, 23
271:5 275:2
finding 107:1
113:4 231:12
245:10 250:7
findings 72:22
111:5 174:6
180:4 202:1
220:23
fine 209:3
222:22 225:9
230:20
finished
240:13
finishes 303:23
firm 16:17, 19
51:19
firms 19:8
22:2, 6
first 10:2
11:6 14:3
19:11 67:10
70:13 124:19
125:8 126:24
158:14 164:8
171:22 196:3
204:15
208:12
221:21
222:16 223:1
230:2 231:20
232:22

233:16
239:23
289:19 295:8
307:6
Fisher 173:10
fitness 152:11
fits 194:2
Five 25:5, 6, 7
31:14 83:17
200:1
five-year 93:9
fixed 111:1
Flack 149:17
flexible 110:20
flip 116:21
225:2
Floor 2:5, 10
4:5, 11
flows 94:18
focus 107:24
114:21 248:20
focused 104:4
137:2 180:1
209:13
focuses 107:4
focusing 45:22
follow 72:13
82:10 93:22
94:11 152:15
155:24 212:5
228:17
followed 95:9
118:4 246:10
following
41:11
follows 10:3
155:12
follow-up
293:4
Footnote
204:8 205:3,
4, 7 221:3
227:19 263:24
Footnotes
199:4
Force 68:17
71:2 72:5
75:11, 18
78:14 80:21
81:23 82:1,
13, 17 83:12

89:10 105:16
108:5, 16
109:10 110:3,
5, 24 118:12
135:11
139:12
149:23
153:12, 23
154:1, 10, 13
155:11, 17, 20
159:23
161:17, 20
162:6, 19
163:16 164:7
185:3 190:8
206:15 210:8
211:14 212:6
246:2 252:12
296:18 305:12
force-
approved
248:8
foreclosed
190:2
foregoing
321:18 324:6
forever 111:1
forgive 24:1
56:22 199:15
form 29:11
46:12 298:10
324:10
formal 122:15,
19
formally
160:12, 23
format 220:19
forming
134:17
142:19
143:11 148:16
forth 29:8
107:19
114:20
163:23 164:5,
9, 20, 23 212:5
fortune 151:1
forward
32:22 33:20
39:10 59:11

68:*16*  108:*2,*
*19, 22*  146:*18*
**forwarded**
148:*8*
**found**  220:*8*
241:*17*
248:*12, 21*
250:*2*
**Foundation**
170:*17*
**four**  49:*2*
200:*1*  272:*1*
294:*3*
**frail**  38:*8*
**frailty**  174:*3*
**framework**
214:*13*
**Francisco**  2:*11*
**frank**  93:*6*
104:*21*
**Frankly**  166:*5*
**fraught**  82:*5, 6*
**free**  31:*14, 17,*
*22*  166:*19*
170:*21*
174:*19*  291:*9*
**frequency**
41:*1*  249:*10*
283:*16*
**frequent**
249:*18*
**frequently**
169:*19*
196:*18*  201:*6*
229:*18*
**friends**  36:*7*
**front**  75:*5*
80:*24*
**full**  69:*16*
264:*19*  271:*3,*
*4*
**fully**  166:*14*
**fun**  79:*7*
287:*24*
**function**  45:*5*
**functional**
293:*20*
**functions**
147:*18*
**fundamental**

219:*3*
**funding**  289:*4*
**funds**  288:*7,*
*16*
**funny**  196:*24*
**further**  229:*3*
285:*13*
**Future**  7:*12*
167:*12*
227:*13, 22, 24*
233:*21*

< G >
**Galleri**
165:*22, 24*
166:*1*  168:*4,*
*5, 8*  169:*9*
171:*6, 21*
173:*5, 18, 20*
176:*13*  177:*6,*
*19*  178:*6*
179:*23*  181:*5,*
*9, 13*  182:*4*
186:*24*
187:*17*  199:*2,*
*6, 10*  202:*1*
**Gastric**  205:*8,*
*21*
**gastroenterolog**
**y**  119:*15*
150:*12*  203:*18*

**gastrointestinal**
46:*21*  48:*5*
49:*7*  51:*3, 4*
287:*13*
**gastro-urinary**
57:*4, 5*
**gatekeeper**
147:*18*
**gauge**  42:*11*
**gauging**  44:*8*
**GEMAN**  2:*4*
6:*7*  10:*7, 11*
15:*12, 13*
16:*6, 7*  20:*12*
22:*18, 20*
27:*11, 15*
28:*4, 5, 13*
29:*6, 24*
30:*12*  32:*11*

33:*4, 23*
34:*16, 21*
35:*17*  36:*5*
37:*10*  38:*16*
39:*22*  40:*13*
41:*16, 19*
42:*9, 20*  44:*5*
50:*5*  51:*23*
54:*19*  55:*14*
58:*11, 18, 21,*
*24*  59:*17*
61:*13*  62:*4,*
*13*  63:*17*
65:*20*  68:*4, 7*
70:*18*  71:*12,*
*20*  77:*6*
78:*10*  87:*12,*
*13*  88:*10, 24*
90:*20*  97:*23*
99:*5, 16*
100:*16*
102:*16*  103:*8*
105:*13, 24*
107:*13*  108:*7,*
*12*  109:*17*
114:*23*
115:*19, 21*
117:*5*  120:*11,*
*20*  121:*4, 12,*
*17, 20*  123:*8*
124:*5, 11, 14*
131:*2*  133:*16*
134:*4, 12*
135:*13*
140:*20, 24*
141:*8*  145:*8,*
*19*  146:*21*
148:*14*  154:*7*
156:*21*  157:*2,*
*22*  160:*18*
161:*6*  162:*24*
164:*13*
165:*21*  171:*1*
174:*20*
175:*12*  176:*9,*
*10*  177:*17*
178:*4, 17*
182:*2*  185:*19*
187:*16*
188:*19*
192:*14*  193:*7*

194:*8*  195:*3*
196:*15*
197:*14, 22*
198:*23*
204:*23*
215:*12*
216:*15*  218:*4*
219:*9, 19*
220:*24*
221:*12*
224:*10*  225:*4,*
*6*  227:*17*
228:*10*
230:*18*
232:*16*  233:*4,*
*10*  238:*1, 6,*
*14*  239:*11*
241:*10*
242:*14, 24*
245:*14, 17*
246:*11*
248:*10*  249:*2,*
*14, 16*  250:*20*
253:*8, 9*
258:*12*  259:*7*
261:*5*  262:*5*
263:*10, 19*
264:*7, 24*
265:*5*  269:*22*
270:*17, 23*
276:*22*  277:*4*
278:*6, 8, 17,*
*22*  279:*5, 18*
280:*6, 15*
281:*14, 22*
282:*1, 9, 22*
284:*3, 11*
285:*7, 12, 14*
286:*1, 8*
294:*15*  296:*1,*
*4, 11*  297:*3,*
*19*  298:*12*
305:*21*
306:*12*  310:*3*
311:*9*  312:*1,*
*20*  313:*17*
314:*11*  317:*2*
318:*6, 18*
319:*4, 12, 17*
**Gen**  277:*23*
278:*11, 23*

**gene**  85:*5, 14*
112:*23*
250:*12*  252:*4*
**general**  59:*4*
61:*2, 18*
62:*10, 12*
63:*3, 5, 7, 23*
64:*16, 24*
65:*4*  96:*13*
105:*10*  106:*8*
107:*15*  112:*9*
119:*24*
147:*12*
160:*11, 22*
213:*19*
223:*15*
228:*11*
246:*17*
269:*24*
272:*18*
296:*24*
302:*15*  303:*2*
304:*5, 10, 15,*
*17*  315:*7*
316:*21, 22*
318:*2*
**generally**  20:*4*
50:*12*  57:*24*
63:*21*  102:*3*
153:*8*  154:*22*
193:*18*  261:*8*
291:*21*  302:*18*
**generate**  220:*9*
**Generation**
274:*24*  277:*12*
**genes**  85:*3*
**genetic**  241:*8*
277:*16, 21*
**genetics**  81:*5*
245:*10*
**genitourinary**
256:*19*
**genomic**
275:*5*  276:*16*
**gentleman**
89:*3*  100:*4*
193:*12*
**George**  173:*10*
**Georgia**  3:*18*
**geriatric**
253:*14, 18*

geriatrics
46:12, 16
germane 135:7
gesticulating
17:21
getting 54:15
98:22 113:1
123:18, 19
124:3 181:6
182:14 190:1
191:15 272:4
313:2, 19
GI 46:23
47:11, 24
48:13, 17, 22
49:10, 14, 19
50:8, 11, 18,
20, 23 51:12
56:3 81:5
247:10
Gibb 149:20
give 18:9
24:24 65:6
78:15 79:13,
14 80:7
88:20 92:8
109:7 139:22
142:15
166:19
167:11
191:23
197:10
212:18 216:7
264:21
294:22 309:7
given 10:23,
24 97:1
114:18
143:21
163:22
178:18
224:14, 21
301:10 321:6
324:8
gives 140:10
giving 123:10
145:10 214:6
glancing 58:12
Glen 23:23
GLENN 3:10

go 36:15
39:16 45:15
64:21 68:10
70:10 93:7
94:16 115:18
120:12
130:21 134:3
136:8 157:8
192:16
195:23 196:1,
2 197:18
206:7 212:16
215:22
217:22
223:11 224:9
226:10, 20
230:22
232:16 239:3
242:14
245:23
280:13
286:12 294:7
295:4 311:16
goal 31:12
73:20 92:3, 5
291:3
goes 94:18, 19
183:9 232:5
259:5 277:20
288:23, 24
308:13 314:10
going 27:23
41:5, 16 54:1
62:1 64:1
67:22 79:12,
23 80:10, 15
95:19 101:1,
8 109:15
115:17
117:17
120:20
122:23 124:5
127:17 128:1
130:8 131:10
158:13 168:9
173:8 174:7,
9 177:1
190:6 191:12,
17, 23 192:16
195:7 212:14
213:2 220:16

228:4 229:18
230:14
237:17
239:20
240:10 260:6
263:9, 19
278:3 285:22,
23 286:5
291:9 300:10
307:17 308:1,
2, 5, 19 309:7
GOLKOW
1:22 9:5
Good 10:8, 9
65:6 69:13
112:12
148:13 151:1,
6 157:23
171:16
173:10 175:1
176:16 182:8
185:16
200:11, 14, 17,
19 202:20
270:24
286:24 319:20
GORDON 4:1
gotten 35:3
168:14
grade 201:14
202:24 207:2
256:15
257:17, 18
258:1, 23
261:19 262:2
263:7 293:13
grades 310:5,
9, 12, 18
grading
310:11, 15
GRAIL
171:21
grammar
132:13, 16
133:5
graphic
259:15
260:21 261:4
gratis 167:11
Gray 1:17
9:22 321:12

great 17:2, 19
24:2 31:3
44:9 66:5
118:22
190:15 242:18
greater 52:21
77:3 84:13
294:1
greatest 271:7
GREENBERG
3:10, 15
Greizer
287:11
group 51:5
71:6 149:15,
16 154:17
244:22
245:11 310:8
316:11
groups 311:3
312:7 316:6
grow 116:14
growing 93:5
98:24 271:16
grows 272:22
GU 57:4
guess 91:14
141:20 145:2,
12, 21 146:14
148:13
177:14
187:13 204:7
207:16
261:19 285:4
guessing
125:17
guide 37:4
290:3
guideline
106:22 155:5
guidelines
64:4 66:1
71:23 72:14
73:1 86:19
89:10 95:15
97:12 103:10
104:8, 23
105:2, 4, 10
106:3 107:2,
20 149:24
150:3, 11

151:5, 9
152:5, 16, 23
153:5, 10, 12
154:19
155:24
159:22 160:1,
4, 11, 23
161:3 164:4,
19 165:16
182:23 190:8
193:17 195:1
203:19
253:17 272:2
273:15
281:10
295:10
305:19 306:4,
14
guilty 303:24
guy 194:11

< H >
half 74:20
131:3, 18
Haller 287:12
hallmark 69:9
hand 121:18
124:12
handful 83:22
handled 14:19
164:17
hands 161:20
hang 185:17,
18
happen 57:21
115:2 197:5
happened
44:13 46:9
88:13
happening
166:24
happy 32:16
39:15, 21
109:22 157:3,
4 168:3
174:24
188:18
204:19 205:5
212:16, 18
224:5 238:1
268:11 317:11

hard 78:24
91:20 130:10
145:16
153:11 199:9,
13
HARKINS
3:15
harm 44:11
67:6 71:9
77:4 79:4
95:3 106:22
162:8 164:21
183:11
186:19
209:21
255:10 298:3,
5, 7 299:18
harmful
117:1 164:24
hate 74:14
177:4
Hatt 197:4
HdG 112:22
113:14
head 12:4, 12
68:10 177:20
health 32:4, 9,
14, 19, 24
33:6, 14, 16
37:12, 15
106:9 155:14,
19 191:2
208:24 209:6
Healthcare
3:8 181:6
healthy 192:6,
23 194:11
255:15
256:11 257:8
259:1 306:20
307:2
hear 174:22
188:18 217:10
heard 20:16
100:23 101:2,
4, 15, 18
179:1, 21, 22,
24 187:2
236:9
heart 38:13
43:17 45:4

79:19 80:4, 8,
9 298:24
heavy 71:22
72:24 97:10
Hecht 148:21
HEIMANN
2:3, 6
held 1:15
9:11 27:14
help 60:10
73:7 74:4, 12
80:1 89:24
90:8, 22 91:9
132:15, 18, 19
152:23
189:19
220:14
247:14
263:21 288:6
290:3 294:13
helpful 59:2
75:24 118:1
139:15
140:14
172:22 257:5,
7 258:14
helping 94:23
helps 19:15
91:14
hematology/onc
ology 235:8
hepatology
150:11
154:20 155:2
hereditary
81:3, 20
83:13, 23
86:10 92:21
250:19, 23
251:11 277:17
hesitancy
141:23
Hetero 4:19
high 81:10, 13
83:2, 19
94:22 106:14,
17, 18, 20
110:18
150:23 173:7
180:12, 13
187:21 213:1,

4, 9 223:17
226:7, 12
244:3 246:7,
8 247:2
307:20
higher 40:22
83:15 84:1
93:10 95:18
183:22
194:15 213:7
220:4 226:18
highly 202:6
203:3, 6, 7
HILL 4:14
HIPAA 13:11
history 14:6
97:10 98:24
131:13
217:17 219:2
295:16
hit 95:22
hitting 123:6
home 18:7
314:8
HON 1:6
honest 107:11
honestly
108:21 143:4
164:12 215:6
honor 58:16,
19
hood 14:15,
20, 21 88:19
hope 117:2
120:6 140:18
158:11 275:14
hopefully 92:2
hoping 172:19
hormone
259:23
Hospital
10:18 12:1,
16, 20 45:3
47:15 48:2
54:16 79:17
175:7, 24
198:18 300:5,
12
hospitalization
54:6

hour 67:22
123:17, 20
124:1 131:4
hourly 123:2
124:2 127:13,
16
hours 24:23
25:7 58:22
126:16
127:20 128:4
129:15, 18
130:1, 15
131:18
HPV 249:23
Huahai 3:7, 8
Hudson 2:5
human 66:10
94:14 104:24
155:19
158:20
161:18 162:4
163:5, 10
hundred
140:10
hundreds
187:9
Huntington's
111:10
112:22 113:1,
2
hypothetical
55:11 76:4
97:4 116:6
163:18
164:12
165:12
191:24
192:11 193:4,
10 194:19
254:5, 12, 20
256:24
257:14
258:20
259:24 260:7
261:7, 15
262:17
305:23 313:7

< I >
i.e 154:13

IDE 176:14,
17
idea 40:8
60:24 62:18
163:7 167:5
177:16
178:16, 23
187:15 198:22
identification
121:2, 15
124:9 141:6
221:8 228:2
238:22 264:5
268:16
identified
240:18 272:2
identify 73:7
74:3 86:11
87:1 112:10
142:16 143:9
267:9
identifying
241:1, 22
ignorance
56:22
ignore 317:21
II 172:9
188:7 202:1
III 172:11
ill 190:22
300:1 309:6
illness 89:5
imagination
167:3
imagine 43:21
140:3 190:21
262:11 304:7,
9, 12, 16
imaging 41:10
284:10, 21
Impact 7:13
189:10
236:24
238:17
255:12 307:22
impacts 191:3
impairment
309:5
imperative
322:14

implementing 241:23

**Implications** 7:11 220:20 227:12, 21

**important** 32:10 34:6 35:12 67:1 71:1, 4, 7 111:5 183:7 201:20 211:15 292:17 313:13

**importantly** 67:5

**imported** 206:12

**impotence** 308:8

**impression** 144:11

**improperly** 103:15

**improve** 291:20

**impurities** 59:15

**impurity** 30:23 43:23 65:5 104:5 139:8 318:16

**inappropriate** 103:19 107:17 108:6, 17 109:10

**incline** 193:10

**include** 130:1 239:18 246:8 312:17

**included** 156:8 241:18 278:11 316:7 318:14

**includes** 118:12 315:18 316:2 317:5

**including** 162:4 165:16 210:24 218:9 229:11 277:21

**inclusion** 156:14

**income** 122:21

**Incomplete** 55:10 69:21 76:3 97:4 116:6 163:17 165:12 192:10 193:3 194:18 257:14 258:19 261:14 262:16 305:22 313:7

**incontinence** 308:8

**incorporated** 129:5

**increase** 104:13, 14 299:14

**increased** 27:20 92:23 240:7

**increases** 158:18

**incredibly** 109:21 189:18 194:11 309:14

**incurable** 117:16 118:6

**independent** 143:17 187:4 288:14

**INDEX** 8:2

**indicate** 270:7 281:10

**indicated** 133:7, 17 141:17 183:19 189:24 236:3 247:16 271:21 275:1 277:13 278:2 281:7

**indicates** 128:3 131:17

**indication** 65:17 68:15 83:1 161:3 170:24 171:15 184:23 195:15, 17 272:12 275:2 279:16 284:22 298:2

**indications** 45:6 185:1 291:1 298:15, 16

**indictment** 148:10

**individual** 62:22 81:15, 16 112:8 113:16 114:6 152:11 208:4, 11 273:1 299:15 302:4 303:18 313:24

**individualized** 84:14 255:9

**individuals** 24:10 103:15, 17 147:6 148:19 240:3 273:14

**indolent** 258:8 259:20 268:17

**indulgence** 101:9

**industrial** 102:5, 21

**Industries** 3:19 103:3

**infarction** 45:3

**infection** 54:2, 18 211:4

**infections** 54:17

**infer** 23:11 84:13 159:10

**inference** 205:13

**inferences** 223:9

**inflammatory** 82:1, 12 83:14 210:19, 21 211:3 217:20

**influence** 164:11

**inform** 80:1 84:20 134:24 151:18 162:6 245:4

**INFORMATIO N** 1:8 20:7 79:24 84:19 106:14 109:20 110:10 137:1, 13 138:1 145:23 146:5 179:2 199:13 211:2 218:23 234:1 255:6 317:19 318:8, 20

**informed** 134:20 275:16 294:17, 21

**ingested** 146:11

**inhaled** 103:5 136:23

**inherently** 229:13 230:10

**inhibitor** 45:9

**initial** 139:6 171:23

**inpatient** 47:4, 6 48:12 52:6, 10, 18

**inpatients** 48:14

**in-person** 1:15

**input** 292:9

**inside** 99:22

**instance** 45:7

**instances** 254:21

**institutions** 86:4 149:10

**instruct** 76:9 286:5

**instructed** 45:12

**INSTRUCTIO NS** 322:1

**instructs** 34:23

**insurance** 151:18 152:15 155:12 156:1 166:11, 23 182:21 188:24 292:1

**integrate** 258:7

**intend** 51:11

**intensive** 38:7

**intent** 12:13, 14 14:1 31:2 50:10 74:17 93:8

**intention** 49:17

**interdisciplinar y** 56:5 290:7

**interest** 49:13 51:22 166:20 209:20

**interested** 32:8 56:2 244:23 288:13

**interesting** 43:17 72:11 119:8 152:6 166:3 289:3 303:7

**interestingly** 95:6

**interim** 207:15

**interject** 28:3 311:15

**internal** 46:15 106:8 195:9 197:4

**internist** 46:1 196:2 305:17 306:9

**interrogated** 136:7

interval 83:3,
16  92:12
180:9  249:19
272:21
intervals
82:18, 22
92:19  93:20
158:22  273:5
290:22
intervenable
180:8
intervention
75:8  112:2
184:20  188:22
intestinal  56:3
intolerant  45:9
intraductal
93:23
intro  129:11,
13
introduce
120:21  124:6
140:20
invades  286:3
invasive  93:12
106:19  174:4
200:23  226:2
231:23
232:11
259:17
298:20
308:11, 24
Investigative
176:18
investigator-
initiated
288:11
Invoice  6:16,
18, 19  126:3,
12, 24  127:9
128:2  132:7
133:8
invoices  124:7,
18, 21  125:5
126:8
involve  283:12
involved
287:17
ionizing
194:22

IP  93:23
IPMN  93:22

IRBESARTAN
1:4  9:15
irregardless
238:3, 4
irrelevant
305:5
Israel  24:8
issue  59:22
60:13  87:19
91:15  94:21
95:14  171:20
172:2  196:22
266:20  314:6
issues  308:14
item  150:15
itemized  125:3
its  58:9  69:4
89:24  90:9
91:9  110:6
179:12  186:5
188:2  202:8
230:9  245:7
IV  172:13

< J >
JAMA  205:2
Janice  147:11
January  13:3
125:11, 17
141:13, 19
207:10
JASON  4:4
jbz@pietragall
o.com  4:7
JCO  243:12,
14
JERSEY  1:1
4:17
jmr@pietragall
o.com  4:7
job  17:3, 19
174:12  288:1
jobs  57:15
JOHN  4:3
Johnson
15:15  96:21
149:21

journal  37:16,
19  67:8  69:1,
8  164:6
221:14, 18
236:10, 12, 14,
20, 23  243:14
JR  4:16
judge  35:19
judgment
209:14
judgy  303:9
juice  92:10
jury  35:20

< K >
Kaplan  26:5,
15, 20  32:22
39:5  59:12
86:5  108:2,
19  114:20
164:24  166:6
167:2  172:19
181:8, 13
213:23
214:10
223:16
246:20
301:10  313:9
314:12
Kaplan's
25:22, 23
26:2, 22
38:23  63:1
75:4  102:14
133:18  134:9
135:8  142:21
144:24
146:19
150:15
171:22  185:9
210:18
266:24  295:5
297:16
299:13  305:3
306:17
Karnofsky
293:12
keep  44:3
72:20, 21
174:8  265:1

270:20  287:2
kept  130:8
KERNER
3:10  6:8
286:23
294:23  296:2,
8, 12  297:12,
23  299:4
305:24  306:1,
15  309:20
311:14  315:3
319:21
Kernerg@gtla
w.com  3:13
key  173:23
180:2  275:5
kidney  45:5
57:11, 12
213:18
217:14  281:1
kind  12:2
23:24  24:8
93:2  95:4
130:14  139:8
166:20
188:17  241:6
283:5  313:4
kindred  86:14
kinetics  163:7
kit  167:14
knew  98:4
302:3
know  14:7, 12
15:3, 9, 18
16:17  18:17
22:1, 13  23:3,
4, 7  24:9, 11
25:16  28:24
29:12  33:17,
20  34:24
35:13  36:22,
23  37:1  38:9,
24  39:12
40:6, 21
43:16  44:7
45:18  47:14,
22  49:24
50:19  54:16
59:24  60:19
61:9, 10
62:15, 21

64:22  65:1
67:7, 17, 20
69:7  70:12
71:3  74:9
75:15  76:17,
19  79:3, 11,
13, 21  80:12,
23  81:4
83:10  84:3, 6,
23  85:14
86:9, 10, 18
87:1  88:13
90:3, 4, 14
91:12  93:16,
18  94:20, 23
95:2, 14  97:6,
17  98:3, 4, 6,
9, 16, 18, 23
99:24  100:12,
13, 21  101:18,
23  102:24
103:1, 2, 4
104:16, 18
105:8, 23
107:10
108:10
109:16
111:12, 14, 15,
16, 17  112:17
113:17, 20
114:3, 14
115:9, 10, 18
116:9, 19
117:8  118:16
119:5, 22, 23,
24  120:1, 5
122:5, 18, 20
125:16  126:5,
11, 20  127:11
131:7, 24
132:6, 9, 24
134:21
137:21
139:13  140:1,
9  143:17
144:4, 11
145:12, 15, 23,
24  146:3, 23
147:7, 15, 20,
23, 24  148:9,
11, 18, 20, 21,

22, 23  149:3,
4, 5, 8, 9, 17, 18,
19, 20, 21
151:4, 21, 23
152:6, 7, 13
154:18, 19
155:8  156:11
159:5, 18
160:6  163:3,
4, 6, 24
164:16
165:14, 19
166:22  167:6,
14, 20  169:7,
12, 13  171:9
177:3, 7, 11,
18  178:5
179:7  180:12
181:7  182:7,
20  184:8
186:6, 13
187:6  189:11,
14  193:20, 24
194:2, 20, 23
195:13  197:6,
23  198:3, 5,
10  199:12
200:17
201:11
205:14, 21
206:21  207:7,
10, 14, 18, 21,
23  208:14, 19,
21  209:2, 8,
15  211:1, 13,
15  212:24
214:2  217:9,
22  218:10, 19
220:19
221:21, 24
222:1, 7, 8
224:19
225:17  226:5,
13, 19, 22
231:9  233:11
245:1, 7
247:19  252:2
255:11, 16
256:1, 2
257:6, 7
258:3, 14

259:2, 9, 20
260:16
261:20, 21
263:7  270:1,
4  273:14
274:3, 9
275:9, 10, 13,
14, 19, 23
276:6, 7
279:12, 13, 16,
22  283:1
284:23  285:1,
3, 5  288:12
289:18, 19
295:8  297:6
298:4, 19
300:3, 8, 14
301:12  302:8
304:1  306:7
307:6, 15
312:16  314:7
315:24  316:7
317:12  318:4
319:2
**knowing**
111:21  112:3
139:22  140:2
183:10
185:15
257:10  258:23
**knowledge**
18:2  36:23
102:19
104:17  148:3
171:8  187:5
198:14  206:8
270:1  274:2,
4  297:1
315:4  316:13
317:16
**known**  67:14
92:22  97:7
98:5, 17  99:3
101:13
104:12, 14, 19,
24  105:3
135:10  155:3
162:3  163:5,
10  220:5
**knows**  82:4

184:11
**KUGLER**  1:7
**KUM**  3:3
15:8  16:2
19:22  20:2,
11  21:2, 10
22:14  27:23
28:9  29:3, 20
30:10  32:6
33:2, 7  34:11,
19  35:6, 21
36:11, 15, 18
38:2  39:7
40:1  42:1, 14
43:4, 9, 13
49:21  51:9
54:9  55:9
58:16, 19
59:6  61:6
62:1, 6  63:9
64:18  66:2
67:21  70:8
76:2, 6  78:4
87:10  88:6,
20  90:12
97:3  98:14
99:13  100:10
102:7, 23
103:20
105:19  107:6
109:11
114:11, 22
115:8, 12, 15
116:5  120:8
130:11
133:14  134:1
135:4  144:20
145:13
146:12  148:4
154:2, 6
156:19, 24
160:14  161:1
162:20
163:17
165:10  170:6
174:16  175:3
176:6  177:14,
24  178:13
181:21
185:18
187:11

188:13
192:10  193:3,
13  194:18
196:10
197:10, 20
198:19
204:10, 14
214:16
215:20  217:3
219:6  223:24
224:6, 9, 13
228:6  230:16
232:14, 21
233:1  237:17
239:2  240:10
242:4  245:21
248:5, 23
250:15  253:6
257:13
258:18
260:23
261:13
262:16
264:20  265:1
269:18
270:13
276:19  278:3,
14  279:4, 9
280:2, 8, 22
281:18
282:16  284:1
285:4, 23
286:3, 14
311:5  312:13
313:6, 22
316:17
317:23
318:10, 24
319:8, 20

**< L >**
**lab**  149:10
169:24
170:11, 13
175:7  275:8
288:3  294:19
**Labcorp**  175:8
**LabQuest**
175:8
**Labs**  4:19

175:10
**Lagana**  148:23
**language**
129:3, 4
144:2  206:18
208:9  293:11
**large**  56:20
113:19  146:1
182:14  183:1
244:20
271:14
289:24
290:16  312:18
**largely**  46:24
54:2  293:19
**late**  257:10
258:17
259:12  261:12
**lately**  200:7
**latest**  72:21
**Latin**  108:11
**law**  22:6
**lawsuit**  13:19
15:3, 11
**lawsuits**  87:5
**lawyer**  16:12
17:4  30:2
**lawyers**  11:17
23:20
**lawyer's**
11:18  325:1
**layperson**
262:10  303:17
**lead**  240:2
**leads**  159:10
179:3  248:12,
22  249:24
250:3, 6
**learn**  44:12
201:11
261:11  262:12
**learned**  143:4
194:13  206:6
235:9  260:5
**learning**
258:16  262:14
**leave**  173:20
199:1  213:2
311:17
**lectures**  35:11

Confidential Information Subject to Protective Order

**LEE** 2:*9*
**left** 149:*1*
**legal** 13:*16*
30:*4* 34:*12,*
*20* 35:*22*
39:*8* 40:*2*
88:*7* 107:*7*
129:*8* 133:*2*
**lens** 70:*13*
80:*23*
**lesions** 93:*15,*
*21* 94:*6*
**letter** 25:*21,*
*22* 38:*23*
39:*12* 59:*23*
62:*12* 102:*13*
109:*2* 122:*16,*
*19* 128:*8, 22*
129:*8* 134:*10,*
*11* 142:*22*
168:*1* 180:*11*
244:*16* 312:*19*
**letters** 128:*12*
129:*22* 134:*7*
143:*1* 214:*21*
**level** 42:*11, 19,*
*22* 43:*1* 75:*9*
89:*17* 91:*4*
151:*6* 210:*10*
223:*18* 259:*3*
305:*1*
**levels** 27:*18*
103:*16* 304:*21*
**Levin** 11:*19*
**L-E-V-I-N**
11:*20*
**LIABILITY**
1:*5* 9:*15*
**library** 136:*7*
**LIEFF** 2:*3, 6*
**life** 74:*21*
95:*5* 113:*18*
193:*24*
255:*12* 259:*2,*
*23* 307:*23*
**lifetime** 96:*13*
116:*15* 309:*13*
**likewise** 85:*17*
251:*18*
**limitation**
254:*14*

**limited** 14:*13*
26:*14, 17, 19*
70:*22* 71:*8*
87:*21, 23*
190:*22* 260:*1*
**limiting**
209:*21*
**LINE** 8:*6, 9,*
*12, 15* 226:*22*
323:*4* 325:*2*
**lines** 75:*5*
80:*24*
**link** 182:*18*
**linked** 214:*14*
218:*8*
**list** 15:*10*
26:*4* 48:*21*
103:*7* 135:*20*
138:*22*
150:*15* 211:*6*
217:*6, 23*
267:*3* 268:*21,*
*22, 24* 269:*2,*
*4, 6, 9, 12*
271:*20, 24*
274:*7* 296:*22*
**listed** 28:*21*
48:*23* 50:*14*
133:*23* 134:*7*
148:*19* 211:*6*
312:*19*
**literally**
267:*20*
**literature**
41:*13* 60:*6*
61:*3* 65:*10,*
*22* 71:*3*
72:*12, 18*
106:*12* 110:*9,*
*14, 22* 119:*16*
128:*20*
129:*20*
131:*15*
137:*12*
144:*14* 223:*3*
238:*12*
240:*22* 241:*6*
245:*3* 251:*15*
295:*1, 22*
296:*7, 16*
300:*9* 310:*21*

**311:***1* 312:*7*
316:*20*
**LITIGATION**
1:*5, 22* 9:*6,*
*16* 22:*7, 23*
23:*2, 8*
187:*19* 282:*11*
**little** 78:*24*
85:*8* 91:*6*
93:*10* 117:*18*
119:*14*
129:*13* 150:*5*
153:*15*
225:*18*
289:*15* 303:*8*
310:*5*
**live** 74:*12, 20*
119:*4* 190:*23*
**liver** 55:*4, 6,*
*15* 94:*19*
213:*17*
217:*14* 267:*6*
268:*21* 276:*8*
281:*1*
**living** 128:*13*
194:*12*
**LLC** 3:*8, 20*
**LLP** 1:*15* 2:*3,*
*9, 12* 3:*3, 10,*
*15* 4:*3, 10, 14*
**localized** 90:*16*
**locally** 12:*11*
**locations** 58:*3*
**lock** 275:*4*
**logic** 248:*2*
250:*13*
**long** 19:*19*
52:*16* 65:*21*
128:*15*
147:*14* 211:*6*
224:*17* 281:*3*
283:*4* 287:*1*
**longer** 31:*20*
74:*12* 119:*4*
129:*19* 249:*9*
265:*21*
**longevity**
299:*14*
**look** 48:*20*
60:*9* 72:*1*
84:*7* 85:*1*

**122:***12*
126:*23*
130:*19*
136:*13, 24*
137:*8, 13, 24*
138:*2* 139:*6*
150:*17, 22*
151:*8* 168:*16*
169:*3* 172:*6*
181:*15, 16, 19*
191:*3* 204:*5,*
*19* 205:*1, 2, 5*
207:*9* 222:*22*
225:*21* 226:*4,*
*24* 230:*3*
237:*5* 260:*9*
268:*12* 288:*4*
297:*4* 316:*3,*
*10* 317:*9, 11*
**looked** 14:*6*
73:*10* 128:*3*
137:*14* 138:*3*
139:*6, 11, 17*
140:*11* 150:*4,*
*10, 23* 168:*15,*
*21* 169:*6*
171:*18* 199:*8*
207:*22* 217:*9*
236:*4* 295:*12*
296:*14, 17, 18*
298:*15*
301:*11* 318:*1*
**looking** 71:*8*
130:*9* 131:*13*
136:*21* 191:*1*
201:*18*
203:*14*
230:*16* 237:*4*
262:*1* 264:*18*
270:*5, 6*
295:*4* 312:*4*
**looks** 29:*13*
222:*3* 234:*3*
245:*11* 263:*7*
**Los** 3:*5*
**LOSARTAN**
1:*4* 9:*14*
**loss** 309:*4*
**lot** 19:*7* 24:*1*
36:*6* 40:*9*
41:*9* 45:*20*

**46:***18* 53:*6*
60:*14* 67:*2*
79:*6, 7* 85:*2*
88:*17* 98:*19*
101:*4, 22*
102:*3* 111:*15,*
*23* 112:*5*
117:*12*
130:*15* 131:*1*
134:*21*
137:*12* 142:*4*
145:*17*
147:*13* 200:*5*
201:*11*
205:*20*
210:*23* 213:*4,*
*9, 14* 218:*22*
220:*9* 243:*12*
244:*8* 259:*4*
270:*21*
289:*21*
292:*20* 298:*1*
303:*12* 304:*1*
314:*9*
**lots** 162:*3*
**love** 67:*19*
68:*6* 145:*6*
173:*12*
174:*22* 177:*3*
207:*22* 219:*11*
**loved** 215:*10*
**lovely** 215:*23*
216:*3*
**low** 66:*18*
68:*12* 69:*5,*
*18* 70:*5*
76:*20* 94:*3*
180:*15* 213:*5,*
*10* 223:*7*
226:*17*
231:*12* 257:*18*
**lower** 38:*10*
184:*1* 273:*18*
**lowest** 89:*17*
**LRRK** 114:*10*
**lump** 56:*8*
**lunch** 157:*9*
**luncheon**
157:*14*
**lung** 48:*10*
54:*23* 55:*2*

Confidential Information Subject to Protective Order

57:24  66:15,
18  68:13
69:19  70:3, 6,
21  73:13
118:14
192:15, 21
193:1, 11
194:6, 16
195:24
231:17  232:8,
13  263:13
266:21
268:18  272:3,
5  305:13
**Lupron** 309:3
**luxury**  48:13

**< M >**
**M.D**  1:14  6:3
10:1  321:8
324:16
**Madam**
121:17
**Madigan**
148:23
**Madison**  4:11
**magnitude**
25:1  67:6
71:9  77:3, 4
106:21  162:8
194:3, 4  298:6
**main**  137:19
**maintain**
73:21
**maintains**
216:1
**major**  131:13
164:8
**majority**  281:2
**making**  119:3
159:8  198:8
229:12  230:7
255:10
**malignancies**
46:21  48:6
56:3  218:16
287:13
**malignancy**
51:4  104:21

**malpractice**
11:13  283:9,
10
**mammogram**
248:3, 7, 22
249:4
**mammograms**
250:9

**mammography**
83:24  248:15
252:10, 13
**man**  13:21
306:21  307:2
**manage**  54:2
81:6  82:5
86:12  235:9
**management**
15:1
**managing**
54:5, 17
**mandate**  111:6
**mandated**
217:16
**mandatory**
39:6, 14, 24
40:5
**March**  1:11
9:7  321:15
**MARK**  2:14
16:14  157:4
221:1  227:18
263:20
**Marked**  8:14
120:22  121:1,
5, 14, 22
124:8, 18
141:2, 5
221:7, 13
227:10  228:1
233:13
238:21
239:13  243:2
264:4, 9
**marker**  111:9,
11  112:22
113:14  184:8
211:3  232:12
**markers**
210:20, 21
213:19  217:21

**marketing**
48:18
**marking**
156:19
**married**
128:16
**marrow**  47:9
**mass**  87:5
231:17  232:8
**master's**  37:6
**match**  158:12
**matches**  234:4
**material**
183:16
**materials**
15:11  25:20
26:4, 6  28:22
135:18, 24
139:17  199:5
296:22, 23
**matter**  9:13
11:9  26:1
198:17
283:18  295:4
**matters**  18:2
261:19
**mature**  119:3
Mcharchalis@
btlaw.com
4:13
**MCN**  94:1
**MD**  7:7
**MDL**  1:2
9:16
**mean**  22:12
29:4  36:6
44:6  52:23
74:5  75:17
82:14  86:22
106:1  107:15
131:6  133:2
149:7  150:22
151:8  154:1,
21  156:22
161:7  169:23
170:1, 10
179:1  182:8
186:7  187:22
202:22  203:5
204:17
205:18  211:4

212:4  213:1,
13, 16  223:10
228:14, 15, 18
234:13
236:15  242:6
245:1  246:17
257:15
262:18  274:7
284:1  285:16
298:18
299:19  303:17
**meaning**  99:8
144:7  162:13
182:10  226:14
**meaningful**
94:24  184:20
**means**  25:17
29:1  57:8
63:12  70:12
83:9  108:10
161:8  180:17,
19  201:15
279:14
282:16
302:22  321:20
**meant**  182:18
189:7  192:19
**measurable**
184:7
**measured**
172:5
**measuring**
186:7
**med**  79:10
205:4
**medical**  11:13
26:22  28:7,
17  29:9, 18
30:21  32:2,
21  33:9  34:5
37:23  38:7,
20  46:16
59:5, 10
70:13  73:16
102:15
103:13, 18
106:24  112:1
129:16  135:1,
8, 18, 19
143:22  144:8,
24  146:19

147:12  160:8,
20  164:20, 22
179:18
208:19
212:17  218:3
283:6, 9, 10
294:12  295:1,
6  297:16
299:7, 13
305:4  308:14
310:21  311:1
312:6  318:13
**medically**
300:1
**Medicare**
155:9, 10
**medication**
44:10  60:15
303:18, 19, 20
315:6, 12, 16,
17  317:8
**medications**
44:19  45:13
60:13, 14
61:20  62:11
116:12
302:21  304:2
314:23  315:5,
10, 11  317:6
**medicine**
39:17, 18
46:2, 15
47:18  69:2
72:2  80:8
106:8  110:23
161:12
162:14  195:9
197:4  218:20
287:16  304:10
**medicines**
60:8  62:19
**meet**  162:7
179:12  290:24
**meeting**  21:10
**meets**  75:8
**melanoma**
14:9  89:19,
20  90:18, 23
91:8  99:19
**member**
299:15

Confidential Information Subject to Protective Order

**members**
18:*16*  40:*16*
41:*22*  42:*12*
43:*3*  60:*23*
161:*13*
162:*15*
240:*18*
297:*18, 22*
302:*4, 5, 8*
**memorize**
224:*18*
**mention**  26:*5*
59:*23*  72:*11*
217:*20*
**mentioned**
72:7  85:*18*
88:*16*  107:*19*
142:*12*
155:*13*
159:*14*
176:*23*
182:*13*  188:*8*
199:*7, 16, 19*
231:*6*  252:*15*
271:*20*
276:*16, 20*
282:*14*
299:*22*
300:*17, 18*
308:*20*
**mentoring**
216:*3*
**merit**  216:*21*
**meritless**
217:*1*
**merits**  158:*21*
159:*22*  252:*5*
**messaged**
191:*16*
**met**  10:*10*
13:*23*  20:*5*
21:*2*  23:*20,
23*  77:*5*
148:*24*
**metal**  103:*4*
136:*22*
**metastasized**
116:*2, 4*
**metastasizing**
91:*18*

**metastatic**
99:*19*
**methodology**
297:*14*  317:*4*
**methods**  316:*6*
**metric**  175:*6*
183:*6*  184:*22*
316:*23*
**Michelle**  1:*17*
9:*22*  321:*12*
**microphone**
123:*7*  204:*15*
**microscope**
94:*8*  263:*8*
**mid-December**
142:*3*
**mid-January**
125:*14*
**MIGLIACCIO**
2:*12, 14*
**millimeters**
94:*6*
**mind**  72:*20*
230:*1, 15*
**mine**  132:*17*
292:*18*
**minefield**
128:*13*
**minimum**
100:*9*
**minute**
224:*21*  225:*2*
227:*11*  276:*1,
3*
**minutes**  131:*4*
226:*20*
**misheard**
222:*12*
**missed**  12:*7*
154:*3, 6, 8*
284:*9, 18*
**missing**  302:*23*
**mission**  26:*9*
114:*18*
146:*18*  212:*15*
**Misstates**
78:*5*  176:*7*
224:*1*  248:*6*
250:*16*  278:*4*
280:*3, 23*

312:*14*  316:*18*
**mistake**  28:*23*
**misunderstandi
ng**  83:*6*
**misunderstood**
52:*24*  222:*11*
278:*7, 13*
**MITCHELL**
4:*10*
**mm-hmm**
17:*21*  19:*17*
31:*23*  54:*3*
56:*18*  57:*14*
131:*19*
133:*13, 15*
197:*9*  200:*15*
208:7  239:*24*
254:*3*  256:*13*
263:*18*
264:*17*  265:*2*
270:*11, 12, 14*
276:*2*  310:*19*
**mnemonic**
196:*22*
**modification**
104:*8*
**molecule**
100:*20*  101:*15*
**molecules**
102:*4, 20*
103:*2*
**mom**  194:*12*
**money**  288:*19,
23, 24*  289:*1*
**monitor**
274:*15*  290:*21*
**monitoring**
26:*23*  28:*7,
18*  29:*9, 19*
30:*9, 21*  32:*2,
21*  33:*10*
37:*23*  38:*8,
20*  59:*5, 11*
102:*15*
103:*14, 18*
105:*18*  106:*2,
24*  135:*1, 9,
18, 19*  145:*1*
146:*20*
147:*12*
150:*15*  160:*8,*

20*  164:*20, 23*
212:*17*  214:7
218:*3*  295:*6*
297:*17*  299:*8,
14*  305:*4*
318:*13*
**monitors**  80:*4*
**month**  60:*3*
302:*23*
**months**  74:*22*
92:7  184:*5*
226:*5*  240:*5*
**morbidity**
271:*8*  300:*15*
**morning**  10:*8,
9*
**Morris**  1:*15*
3:*3*  9:*12*  23:*4*
**mortality**
68:*13*  69:*18*
70:*6*  271:7
**motion**  174:*11*
**motivated**
244:*22*  252:7
**mouth**  182:*17*
**move**  245:*14*
249:*14*
**moved**  46:*11,
13*  228:7
**moving**  261:*6*
**MRI**  92:*19*
**mucinous**
93:*23, 24*  94:*1*
**multi**  290:7
**multidisciplina
ry**  290:*14*
**multi-
disciplinary**
290:*6*
**multiple**  14:7,
10*  35:*11*
56:*4*  151:*11*
**multithousand-
dollar**  170:*23*
**MURTHA**
4:*16*
**muscle**  309:*4*
**mutagenic**
87:*16*
**mutagens**  87:*8*

**Mutation**
7:*15*  237:*1*
238:*18*
241:*23*  275:*5*
**mutational**
275:*2*
**mutations**
241:*15*
**Mylan**  4:*8*
**myocardial**
45:*3*
**Myriad**  84:*24*

**< N >**
**name**  9:*4*
10:*11*  11:*16,
18, 22*  13:*8*
15:*7, 11*
16:*11, 14*
20:*19, 22*
145:*20*
149:*12, 19*
151:*24*  170:*2*
185:*6*
**named**  24:*2, 4*
61:*5*
**names**  22:*1*
23:*5, 7, 18, 19*
24:*1, 3*  137:*17*
**narrower**
47:*19*
**national**  64:*3*
66:*17*  70:*3,
21*  74:*1*
75:*11*  104:7
105:*2*  150:*8*
152:*4, 21*
153:*17, 18*
155:*8*  159:*22*
272:*1*  295:*9*
306:*3*
**nationally**
180:*13*
**natural**  45:*20*
67:*23*  68:*2*
**nature**  11:*8*
13:*4, 18*
**nausea**  300:*3*
**NCCN**  151:*8*
152:*2, 19*
153:*15, 20*

Confidential Information - Subject to Protective Order

154:*13* 281:*9*
295:*2* 305:*19*
306:*10, 14*
**NCI** 255:*3*
**NDEA** 27:*1,*
*18* 30:*23*
59:*16* 134:*22*
135:*3, 15*
**NDMA** 27:*1,*
*17* 30:*23*
59:*15* 134:*23*
135:*3, 15*
**NE** 2:*15* 3:*17*
**necessarily**
211:*4* 262:*10*
**necessary**
213:*24* 322:*4*
**neck** 12:*5, 12*
**need** 18:*23*
36:*14* 76:*10*
98:*1* 140:*22*
193:*9* 225:*7,*
*10* 249:*17*
267:*14* 289:*4*
**needed** 73:*9*
**needle** 231:*19*
232:*7*
**needs** 229:*2*
**negative** 41:*6*
118:*13* 173:*1*
181:*1* 182:*5*
201:*21, 22*
240:*4*
**negatives**
202:*13*
**neither** 208:*17*
**neoplasm**
93:*24* 94:*1*
**Network**
150:*9* 152:*5*

**neuroendocrine**
56:*10, 21, 24*
57:*13, 15, 16,*
*18*
**Never** 21:*3*
22:*24* 23:*15*
98:*19* 124:*22*
139:*21*
169:*13*
196:*19*

203:*10*
205:*24* 253:*1*
261:*24* 280:*4*
284:*5* 307:*4*
**NEW** 1:*1* 2:*5*
3:*12* 4:*12, 17*
36:*8* 45:*3*
67:*8* 69:*1, 8*
72:*13* 74:*18*
111:*4* 164:*6*
167:*18, 24*
168:*12* 176:*4*
191:*1* 209:*12*
289:*18*
**newly** 249:*11*
**news** 148:*8*
179:*16* 182:*8*
270:*24*
**NICHOLAS**
2:*14*
**NICK** 2:*9*
24:*2*
**Nilda** 24:*4*
**nine** 25:*4*
204:*5*
**nitrosamine**
146:*23*
158:*18*
159:*11* 165:*4*
305:*1*
**nitrosamines**
159:*3* 304:*21*
**Nmigliaccio@cl**
**asslawdc.com**
2:*17*
**noncancer**
79:*14*
**non-FDA-**
**approved**
189:*23* 280:*5*
**nonresponsive**
41:*18* 245:*16*
249:*15*
**non-standard**
276:*12, 17*
278:*15*
**normal** 58:*2*
259:*22*
**normally** 45:*1*
242:*7*

**Northwestern**
11:*24*
**notable** 43:*24*
44:*6*
**Notary** 1:*19*
321:*14* 324:*23*
**note** 207:*5*
236:*5* 266:*11*
**noted** 9:*19*
156:*6* 322:*11*
324:*11*
**NOTES** 325:*1*
**notice** 1:*15*
6:*16, 22*
120:*23* 121:*8*
**notification**
97:*1* 100:*6*
**notified** 98:*1,*
*11*
**noting** 106:*16*
135:*9*
**nuance** 117:*12*
**nuanced**
153:*16*
**number** 43:*18*
64:*6, 10*
65:*18* 73:*9*
96:*3* 102:*4*
113:*19*
122:*14*
138:*10* 146:*1*
168:*7* 180:*16*
199:*24*
206:*12*
212:*24* 213:*5,*
*10* 232:*24*
289:*24*
**numbers**
213:*2* 302:*14*
307:*7*
**numeracy**
255:*6*
**numerous**
224:*16*

**< O >**
**oath** 10:*23*
11:*1* 246:*12*
298:*5*
**obey** 272:*17*

**object** 27:*24*
62:*2* 237:*18*
240:*11* 278:*4*
285:*24*
**objecting** 76:*8*
**objection** 28:*3,*
*9* 29:*20*
30:*10* 32:*6*
33:*2* 34:*11,*
*19* 35:*21*
36:*11* 38:*2*
39:*7* 40:*1*
42:*14* 43:*4,*
*10* 49:*21*
51:*9* 54:*9*
55:*9* 59:*6*
61:*6* 62:*6*
64:*18* 66:*2*
70:*8* 76:*2*
78:*4* 87:*10*
88:*6* 97:*3*
99:*13* 102:*7*
103:*20*
105:*19* 107:*6*
114:*11* 116:*5*
135:*4* 144:*20*
145:*13*
146:*12*
160:*14*
165:*10* 170:*6*
174:*16* 176:*6*
187:*11*
188:*13*
197:*20*
214:*16*
215:*20* 217:*3*
223:*24* 248:*5*
250:*15* 253:*6*
257:*13*
269:*18* 279:*9*
280:*3, 22*
281:*18*
294:*15* 296:*1,*
*4, 11* 297:*3,*
*19* 298:*12*
305:*21, 22*
306:*12* 311:*5*
312:*13* 313:*6*
316:*17*
317:*23*
318:*10, 24*

**Objections**
6:*22* 33:*7*
35:*6* 44:*16*
62:*5* 102:*23*
121:*7* 161:*1*
313:*22*
**obliged** 259:*17*
**observation**
257:*24*
**observational**
166:*14*
**obviously**
26:*6* 73:*12*
81:*16* 152:*9*
237:*5* 280:*19*
314:*2*
**occasion** 87:*3*
**occur** 266:*13*
**offer** 26:*22*
40:*8* 62:*15*
73:*22* 74:*1*
77:*13* 82:*8*
116:*11, 18*
171:*12* 208:*1,*
*9* 292:*16*
**offered** 38:*6*
40:*7* 77:*10*
111:*14*
143:*21* 215:*3*
246:*18* 257:*4*
258:*9* 309:*8*
**offering** 26:*24*
27:*5, 10, 16*
28:*6, 14*
29:*16* 31:*24*
37:*21* 60:*21*
61:*14, 15, 22*
159:*2* 165:*7*
208:*3* 240:*16,*
*23* 294:*18*
**office** 45:*12*
167:*4* 191:*16*
194:*10*
**offices** 166:*18*
**oftentimes**
167:*7*
**Oh** 12:*21*
15:*12* 20:*24*
27:*11* 31:*3*
53:*1* 55:*23*
57:*1* 85:*13*

126:7  127:5
135:19
156:24  196:4
204:13  210:6
230:5  237:10
254:3  255:21
264:23
270:10  278:6
282:19
287:19, 24
289:12, 17
291:16
296:17  306:3
309:1  314:20
315:14
**Okay**  10:16
13:12  15:6,
20  18:19
19:20  20:1, 9,
24  21:12
22:19  23:6,
17  36:17
37:21  43:12
46:9  52:14
53:17, 23
55:6  57:2
59:1  62:20
71:12  77:13,
24  87:20
90:21  101:7,
21  102:2
105:14  106:1
108:3  109:18
111:18  115:7,
19  120:7
124:2  126:23
127:22
129:14  130:4
133:6, 11
136:18
140:19
143:18  156:5
157:1, 6, 9
171:6  178:11
179:15  181:4
182:13
185:12  186:3
198:3, 6
204:24  206:9,
17, 22  207:5,
18  208:16

216:20
220:14
221:20
222:11
224:23
225:14
227:16, 17
228:9  229:4
230:6  234:21
236:9, 19
242:17
243:11  253:1
254:4, 20
255:3  256:4
260:22  261:1
264:24
265:16  266:3,
10, 16  267:5
268:6, 11, 13,
23  269:13
270:5, 18
277:8  279:2,
6, 19  281:23
282:1, 23
286:7  289:5
291:7  292:10
293:4  294:10
297:13  298:9
300:17
302:13  303:4,
16  304:18
305:16
306:16
309:20  310:9,
20  312:10
319:18
**old**  194:1
219:3
**older**  60:7
300:1, 7
308:14
**Omicron**
130:24
**once**  23:24
131:10  136:8
**oncologic**
291:17
**oncological**
291:15
**oncologist**
51:18  91:7

195:8, 11
196:1  197:8,
13  198:9
234:6  235:3
255:13  256:5,
6, 19
**Oncologists**
31:4  173:9
177:5, 9
178:6  186:11,
20, 21  187:1
195:5  196:7
197:19, 24
198:4, 16, 17
**oncology**
46:14, 16, 20
115:23
156:11
183:14  216:4
231:15
236:10, 24
243:15
252:23
253:19
261:23  290:8
293:11  310:7
**onerous**  300:6
**ones**  50:16
126:10
140:15
166:19  177:1
202:15  227:6
256:17
274:10, 12
280:18  294:7
**one-size-fits-all**
114:3
**ongoing**  34:6
91:24
**open**  72:20
140:9, 12, 16
307:19
**opine**  32:16
**opinion**  26:22
27:9  29:17
30:7  32:18,
20  33:6, 9, 19
59:10  63:1,
14  68:16
91:7  103:23
108:4, 14, 18

109:8  115:3
134:20  135:2,
14, 16  159:3
161:10
165:20  186:4,
10  212:18, 19
216:16, 20
223:22  290:2
298:11
299:12  305:3
306:9
**opinions**
21:17, 20
26:19  27:1, 6,
17  28:7  30:5
32:1, 13
37:22  42:24
59:3, 7  60:22
61:16, 23
62:16  134:17
142:15, 19
143:12, 14, 20
144:15, 17
145:9, 17
148:16
**opportunities**
48:7
**opportunity**
31:5  41:2
47:18  77:18
171:17
208:22
267:15, 17
268:4  321:9
**opposed**  54:3,
7  144:18
257:9  258:15
259:10
**opposite**
138:20  189:2
**optimism**
95:18
**option**  97:2
271:22  308:21
**options**
140:10  152:9
290:12
**Oral**  120:24
**ORDER**  1:8
24:24  79:2, 6,
8, 9, 20, 22

80:13  166:23
167:7, 13
169:12
170:11, 18
175:15, 19, 24
186:16
189:14
195:16
213:17, 18, 20
217:12  234:7
274:8, 11, 13,
19, 20, 22, 24
275:17  276:7,
9  277:12, 14,
15  279:15, 17
280:24
281:20, 24
306:20  307:1,
16  309:16
**ordered**
106:24  160:9,
20  167:9
170:14, 16
187:7  277:6
**ordering**
81:12  82:3
166:6, 21
169:16  183:9
185:14
187:23
189:23
247:22
253:16, 22
274:14
279:17
307:15  309:19
**ordinary**
291:11  292:10
**organ**  85:19
**organic**  101:19
**organisms**
308:6
**organization**
153:2
**original**  67:17
322:15
**originally**
152:14
**O'Rourke**
20:23, 24
21:15

Confidential Information - Subject to Protective Order

orphan  96:2, 19

outcome 92:13  111:24  112:4  113:5

outcomes 33:16

outpatient 48:24  52:3

outreach 21:15

Outside  27:24  28:10  30:11  61:7  102:8  103:21  104:2  109:3  114:12  135:5  146:13  166:4  168:12  170:8  176:4  187:18  198:4  274:10  277:10  318:11

outweigh 138:18

outweighed 76:16

ovarian  247:9

overall  112:4  116:20  210:15

Overbroad 170:7

overciter 139:20

overdiagnosed 265:7, 23

Overdiagnosis 7:19  254:1  264:1  266:19  268:14, 16

overhead 12:18

overtreatment 263:12

OVID  136:8

Oxford  4:5

< P >

p.m  233:5  319:22  320:6

PA  9:11

Pacific  58:15

packet  124:20, 23

pack-years 64:6, 10  65:18  71:11

PAGE  6:15  7:5  8:6, 9, 12, 15  122:6  126:24  127:23  131:4, 16  132:2  141:10  147:3  156:18  158:5, 8, 9, 10, 11, 12  168:6  199:2  203:11  206:10  207:3  209:18  219:21  222:13, 14, 20, 21, 23  233:16  239:23  264:13, 14  265:11, 13, 15  270:8, 9  271:4  323:4  325:2

Pages  206:11  224:16  324:6

paid  125:19, 24  126:2, 8  195:19  282:17

PALB2  244:2

palliative 46:17

pancreas  14:5  55:22  57:16, 19  58:1  83:2  84:12  85:11  89:13, 18  92:9  95:8, 22, 23, 24  96:4, 17  110:13  243:24  272:8  284:8

pancreatic 13:24  55:19  91:17  269:7, 8  287:18, 20

pancreatobiliary  290:14

pandemic 13:2  53:4

panel  72:7  85:14  213:18  217:14  274:13  276:8  281:1, 2, 24

panels  85:1

Panigrahy 148:22

PanIN  94:5, 9

pap  249:7, 20  250:3, 6, 10  252:10

paper  37:15, 19  71:4  128:17  224:16  232:22  240:12

paradigm 113:4

paradigmatic 112:15, 23

paradox  270:8

paragraph 143:20  158:15  225:22  264:19  271:4

paraphrasing 301:4

parent  194:12

parents  111:9  114:9

Parkinson's 114:9

parse  117:17  145:17  171:2

part  32:10  35:12  57:22  88:18  94:20  104:15  122:21  123:10  152:2, 19, 23  244:10  246:1, 14  252:11  253:3  287:24  288:20  295:16

particular 98:12  186:4,

12  263:13  293:7, 8  294:11  316:15

particularized 107:5

particularly 60:7  73:17  166:12, 17

parties  1:17  11:17  21:23  22:6, 10

party  11:23

pass  51:16  215:8  286:8

passionately 75:2

PATHFINDER 176:24  177:1

pathology 197:1  290:9

patient  12:4, 11  13:7, 9, 20  16:9  31:8, 10  38:18  39:19  45:1, 8  51:22  54:14  73:22  74:19, 22, 23  77:8, 20  78:2  79:4, 16  81:2, 15, 18  84:15, 17  86:10, 13, 21, 23  87:2, 17, 21  97:1, 14, 17, 20  98:11  99:8  114:6  117:4  146:5  151:18  152:10  155:3  165:1  170:22  172:1, 24  173:21, 24  182:14  184:11, 24  189:4, 10  190:14  191:9, 13, 14  198:11, 16  200:22  201:3, 22  208:5, 19, 21  209:9, 13

213:20  218:21, 22  219:23  228:18, 19, 23  232:1  240:19  246:5, 19  255:10, 20  256:10  257:2  273:2  284:7, 14  290:5  291:17  292:4, 7, 18  293:9, 14  294:6, 9  297:10  299:18  300:1  305:18  307:21  308:17  309:10  310:13  313:12  314:1, 3, 7

patients  30:22  37:4, 9  38:6  40:22  43:19  44:22  45:13, 18  47:15, 16  54:1  56:7  59:24  60:1, 7, 15  61:19, 21  62:22  65:13  66:21, 24  68:18  71:10  74:2  75:6, 24  77:14, 17  92:17, 21  93:4  95:7, 19  97:9  98:1  108:20  110:1, 17, 18  112:5  145:22  146:2, 7, 11  150:6, 24  152:16  153:13, 19  154:23  158:20  161:5  165:3  166:8  170:19  171:13  173:16  180:18

Confidential Information - Subject to Protective Order

182:*24*  185:*5*
189:*11, 17*
190:*1, 2, 5*
191:*4, 18*
193:*19*  196:*4,*
*7, 17*  197:*18*
201:*17*  202:*3*
208:*10*  214:*5,*
*6, 12*  215:*6,*
*15, 19*  218:*5,*
*6*  220:*3*
226:*9, 12, 16*
230:*24*
233:*18*
234:*11, 16, 23*
235:*10, 13, 15,*
*23*  237:*5, 6,*
*11*  241:*21*
243:*24*
244:*20*
246:*20*  247:*9*
251:*4*  252:*8*
253:*3, 11*
277:*16*
281:*13*
289:*10, 19*
290:*1, 11, 17,*
*23*  291:*12, 15,*
*18*  292:*12, 19*
295:*11*
298:*20*  300:*5*
303:*13*  307:*8*
310:*16*  316:*16*
**patient's**
11:*11*  95:*5*
114:*5*  208:*23*
209:*6*  211:*20*
255:*12*
**Patrick**  20:*22,*
*24*  21:*15*
**PATRONELL**
**A**  2:*14*
**pause**  28:*2*
239:*7*  286:*17*
311:*22*
**pay**  97:*18, 21*
98:*2, 12*
100:*8*  123:*15*
166:*23*
188:*11*  195:*20*
**paying**  182:*21*

**pediatrics**
106:*9*
**peer-reviewed**
221:*18*  236:*16*
**penalty**  17:*7*
**pending**  19:*2*
**Penn**  47:*14*
53:*2*  136:*6*
170:*11*  287:*6,*
*8, 20*
**Pennsylvania**
1:*16*  4:*6*
10:*19, 21*
16:*22*
**people**  18:*14*
64:*12*  74:*9*
84:*9*  85:*24*
86:*16*  96:*4,*
*16*  98:*18*
99:*8*  103:*10*
107:*3*  111:*15*
113:*17*  119:*4*
139:*23*  181:*4*
182:*10*
193:*21*
197:*23*  198:*4,*
*7*  245:*4, 5*
247:*13*
271:*17*
272:*10*
303:*23*  304:*1*
307:*15*  309:*1*
310:*11, 17*
311:*3*  312:*8,*
*11, 22*
**perceived**
240:*8*
**percent**  55:*21*
56:*1, 12, 20*
60:*4, 5*  92:*23*
93:*3, 10*  96:*2*
104:*22*  172:*8,*
*9, 12, 13*
177:*18*  178:*5*
180:*15, 19*
181:*1*  202:*2,*
*16, 17, 19*
203:*10*
290:*16*
293:*22*  294:*1*
302:*19, 20*

303:*16, 20, 22*
307:*8, 11*
312:*11, 22*
314:*21*
**percipient**
13:*14*
**perfectly**
115:*15*  272:*15*
**perfluorooctan**
**oate**  101:*3, 14*
**P-E-R-F-L-U-**
**O-R-O-O-C-T-**
**A-N-O-A-T-E**
101:*11*
**perforation**
119:*19, 24*
300:*19*
**perforations**
300:*23*  301:*9*
**performance**
259:*4*  293:*10,*
*12, 16*
**period**  30:*24*
31:*22*  53:*13*
**perjury**  17:*8*
**person**  2:*4*
3:*4, 11*  5:*1*
19:*15*  20:*20*
27:*21*  113:*16*
148:*24*  194:*6,*
*9*  195:*6*
251:*6*  254:*6*
257:*6*  260:*2*
273:*7*  299:*3*
302:*20*
310:*10*
311:*12*  312:*3*
**personal**
234:*6*  297:*8*
**personalized**
39:*18*  114:*4*
152:*9*
**personalizing**
81:*17*
**personally**
123:*18, 19*
124:*3*  194:*5*
222:*2, 7*
**person's**
87:*16*  149:*19*

**perspective**
96:*16*  261:*24*
**pertains**
171:*21*
**pertinent**  27:*9*
137:*21*
**pervasive**  39:*2*
**PFOA**  100:*23*
101:*13*
**ph**  1:*22*
**Ph.D**  37:*6*
**Pharma**  3:*20*

**Pharmaceutical**
3:*7, 8, 19*
**Pharmaceutical**
**s**  3:*20*  4:*8*
**Pharmacy**
4:*13*  302:*11*
**phenomenon**
61:*2*
**Philadelphia**
1:*16*  2:*4*  3:*4,*
*11*  9:*11*
10:*20*  16:*24*
**phone**  21:*2, 9,*
*11, 12*  27:*12*
**phrase**  190:*15*
**phraseology**
314:*17*
**physical**
217:*17*
218:*12*  231:*8*
**physicals**
218:*11*
**physician**
13:*15*  39:*20*
60:*16*  97:*16*
114:*5*  149:*6*
215:*16, 24*
290:*3*
**pick**  288:*22*
**picked**  173:*20*
214:*24*  275:*15*
**picking**  138:*14*
**picks**  172:*8, 9,*
*11, 13*
**Piedmont**  3:*17*
**PIETRAGALL**
**O**  4:*1*

**pill**  60:*9*
302:*11*  303:*10*
**pills**  145:*22*
315:*19*  317:*6*
**Pittsburgh**  4:*6*
**plagiarize**
139:*21*
**plaintiff**  11:*12*
12:*3*  15:*22*
128:*12*  134:*8*
159:*16*  284:*15*
**Plaintiffs**  2:*12,*
*17*  6:*22*
28:*18*  29:*9,*
*17*  30:*7, 20*
61:*5*  121:*8*
143:*1*  214:*22*
**plan**  26:*23*
54:*15*  113:*18*
291:*15, 17*
295:*6*  297:*17*
299:*14*
**planning**
292:*2*
**plans**  54:*21*
131:*1*  289:*23*
**plays**  112:*8*
**please**  9:*23*
10:*15, 16*
18:*24*  78:*16*
80:*16*  112:*19*
121:*18*  122:*6*
127:*17, 22*
142:*16*  156:*2,*
*17*  158:*4*
170:*3*  203:*11*
206:*10*
209:*19*
219:*20*
222:*15, 22*
227:*18*
270:*14*  322:*3,*
*8*
**pleasure**  17:*16*
**plus**  53:*12*
**point**  66:*6*
67:*13*  68:*2*
80:*12*  104:*16*
112:*9*  120:*9*
142:*2, 7, 12*
164:*1*  168:*2*

Confidential Information Subject to Protective Order

170:*18*
172:*18*  183:*2*
201:*24*  207:*7*
218:*24*  219:*8*
223:*15*  230:*7*
241:*20*
246:*21*
256:*21*
259:*14*
272:*23*
277:*18*  313:*23*
**points**  152:*7*
229:*11*
**poke**  232:*7*
**polyp**  93:*17*
119:*2*
**poor**  141:*24*
172:*21*  188:*6*
**population**
59:*4, 14*  63:*3,*
*6, 8, 16, 23*
64:*16, 24*
65:*4*  69:*3*
70:*15*  81:*10,*
*11*  82:*20*
93:*14*  94:*22*
105:*7*  106:*13,*
*15*  118:*10*
136:*21*
160:*11, 22*
223:*17*
239:*16*  246:*9,*
*19*  273:*15, 16*
302:*15*  303:*3*
304:*6, 11, 15,*
*17*  316:*22, 23*
317:*11*  318:*5,*
*8, 20*
**populations**
69:*10*  106:*17*
311:*2*
**portfolio**  288:*5*
**Positive**  7:*11*
41:*3*  84:*10*
86:*1, 17*
184:*4, 6*
200:*16*
201:*16*
202:*12*
220:*10*
227:*13, 22*

228:*14*  229:*2,*
*13, 20*  230:*9*
231:*2, 6, 12*
233:*19*  240:*6*
247:*1*  308:*19*
**positives**
182:*9*  200:*12,*
*20*  201:*1, 5, 7,*
*9*  220:*9, 20*
**possible**  55:*13*
287:*3*
**possibly**  261:*9*
**poster**  199:*20,*
*22*
**postoperative**
291:*3*
**potential**
19:*12*  65:*5*
68:*20*  94:*2*
95:*3*  104:*4*
106:*21*  186:*18*
**potentially**
40:*10*  116:*24*
118:*24*
167:*15*
200:*23*  202:*3*
309:*14*
**potpourri**
215:*2*
**practice**  32:*10*
34:*3, 8, 15*
35:*10, 13*
36:*4*  37:*2*
41:*9*  42:*8*
46:*3*  47:*1*
48:*15*  50:*10,*
*20*  51:*6*
55:*22*  69:*13*
73:*16*  119:*6*
144:*12*  151:*7*
166:*18*  183:*5*
184:*17*
196:*13, 17*
198:*15*  208:*1*
215:*24*  235:*2,*
*4*  247:*17*
252:*3, 16, 17,*
*18, 23*  253:*3,*
*14*  289:*12*
**practice-**
**changing**  67:*9*

**preapproval**
179:*9*
**precancer**
118:*20*
**precancerous**
104:*19*
**precise**  137:*23*
**preclude**  38:*14*
**precursor**
251:*19*
**predispose**
252:*4*
**predominate**
137:*15*  138:*7*
**pre-FDA**
179:*3*
**preferences**
209:*13*
**premalignant**
105:*3*
**premise**  26:*9*
105:*11*
165:*19*
201:*10*  261:*3*
**prep**  23:*22*
24:*20*  126:*1,*
*17*  300:*2*
313:*12*  314:*8,*
*9*
**preparation**
25:*12*  133:*22*
**prepared**
109:*5*
**preparing**
24:*21*
**prepping**
300:*11*
**preps**  300:*6*
**prerequisite**
246:*24*  247:*24*
**prescribed**
46:*5, 7*
290:*22*
303:*10, 11, 19*
315:*16*
**prescription**
58:*10*  151:*23*
189:*13*
303:*15*  315:*8*

**prescriptions**
45:*20*  315:*9*
317:*13*
**presence**
105:*15*  183:*15*
**PRESENT**
5:*1*  27:*18*
35:*19*  36:*24*
72:*16*  88:*15*
265:*20*
271:*18*
284:*22*  290:*5,*
*10*  292:*5*
**presented**
199:*21, 22*
255:*14*  256:*9*
**presenting**
169:*8*  197:*17*
**presently**
285:*8*
**pressure**
40:*11*  44:*18*
317:*7*
**presume**
186:*23*
**presumption**
119:*6*
**pretest**  158:*19*
275:*21*
**pretty**  131:*9*
148:*13*
**prevent**  91:*9*
105:*17*  113:*1*
117:*15*  118:*5*
**Preventative**
75:*10, 18*
246:*1*  247:*15*
**prevented**
91:*18*
**Preventive**
68:*17*  71:*2*
72:*5*  83:*11*
89:*10*  139:*12*
154:*9*  185:*3*
316:*8*
**prevents**
117:*20*
**previous**
22:*22*  52:*9*
132:*1*  278:*18*

**previously**
20:*13*  21:*1*
233:*19*
**price**  188:*2*
269:*16*
**primarily**
45:*8*  289:*13*
**primary**
44:*24*  45:*16*
46:*13*  47:*2*
48:*8, 23*  49:*8*
50:*14*  51:*13*
54:*4, 8*  73:*18,*
*23*  78:*21*
81:*1*  131:*14*
153:*13, 19*
182:*3*  217:*12,*
*18*  218:*13, 18*
219:*4*  234:*19*
253:*14, 19*
295:*18*  315:*1*
317:*10*
**Princeton**  4:*17*
**principle**
39:*17*  315:*8*
318:*2*
**Prinston**  3:*7*
**print**  128:*16*
**printed**  157:*4*
**printing**
128:*9*  207:*11*
**prior**  228:*8*
**private**
166:*17*
196:*12, 17*
197:*18*
198:*15*
215:*24*  252:*22*
**privilege**  286:*4*
**Pro**  19:*13*
20:*14, 20*
21:*4, 16*
122:*18, 23*
123:*11*  125:*1,*
*6*  132:*6, 18*
**probability**
143:*22*  144:*8,*
*18*  145:*11*
158:*19*  275:*21*
**Probably**
21:*14*  53:*5*

Confidential Information Subject to Protective Order

91:11  97:18
125:13
126:15
130:14
138:22
148:12
149:11  168:4
196:13
201:12
208:24  246:21
**problem**
93:12  94:12,
15  184:2
200:3
**procedure**
106:20
142:11  226:2
247:19  293:8
294:12, 19
299:24
300:16  313:15
**procedures**
93:12  247:15
**process**
130:16  131:5
139:14
175:10  179:7
182:21
199:11  216:6,
12
**proctologist**
256:2
**product**
146:10
168:24  286:4
**Production**
8:8
**PRODUCTS**
1:4  9:15
**Professional**
1:18  209:14
321:13
**professionals**
179:18
**professor**
287:12, 15
289:6
**profile**  48:22
50:15  70:17
**profiles**  70:23
85:5

**profound**
298:8
**prognosis**
112:11  289:22
**program**
38:20  39:6,
24  40:18
41:24  51:3
59:11  81:5
86:3  103:14
105:18  106:2,
24  107:17
146:20
164:23
237:13  244:5
247:2, 4, 5, 6,
23  248:1
**programs**
247:21
**progress**
116:10, 14
**progresses**
292:7
**progressive**
271:6
**projects**  288:8,
17  289:3
**promising**
118:8
**promotional**
51:2
**prompt**
155:15  163:13
**prompted**
155:21
**prompts**
229:5  266:12
**proper**  223:9
**properly**
229:24
**proposed**
38:21  43:2
102:15  218:3
282:13  295:7
297:18
299:13, 15
302:5
**proposing**
39:6
**proposition**
167:23

203:24  205:2
225:15  263:17
**propounded**
324:9
**pro-screening**
207:20  208:17
**prospective**
166:15
**prostate**
56:23  57:9
84:5  118:13
192:3, 8, 17
233:20
255:16, 22
256:11  257:9
258:15
260:19  261:3
263:13
266:21
268:18  272:3,
5  307:3, 9, 11,
21
**protect**  14:15
**protected**
13:11
**protections**
88:5

**PROTECTIVE**
1:8
**protocol**
32:22  33:10,
19  38:8
39:11  63:2,
14  65:24
67:12  75:14
77:9, 21  78:3,
13  80:20
81:10  83:7,
10  87:19
90:5, 7  91:13
105:16  108:4,
15, 19  109:8,
21  110:3, 15,
16  111:23
114:19  135:1
145:1  215:18
216:21  305:4
**protocols**  64:9
71:22  72:9,
24  81:22

87:4, 8, 15
96:10  137:3
220:5  272:24
**prove**  66:9, 11
164:20  232:9
**proven**  192:2,
20
**provide**  15:10
20:7  125:1
208:2, 9
**provided**
96:22  103:15
124:19  125:6
129:2  132:7
142:18, 24
143:10  156:7
**provider**  97:16
**providers**
187:10
**providing**
21:24  22:11
208:4
**provokes**
113:21
**provoking**
43:24
**PSA**  210:9
269:15  270:2
306:20  307:1,
20
**psychiatrists**
222:4, 10
**Psychologic**
7:16  237:1
238:19  240:3
**Psychological**
7:8  113:21
220:6  221:4
227:2  231:8
236:6  240:7
241:16
251:15, 17
**psychologically**
251:24
**Public**  1:19
32:4, 9, 14, 19,
24  33:6, 13
37:11, 15
49:9  50:15
321:14  324:23

**publicly**  48:16
49:18  50:4
**published**
37:14, 18  42:6
**PubMed**  136:7
**pull**  137:17
204:12  260:24
**pulled**  207:8, 9
**pulmonary**
154:20
**purported**
40:14  41:21
304:4
**purportedly**
223:22
**purporting**
319:5, 13
**purpose**
242:10
**purposes**
48:19  163:9
165:7
**pursuant**  1:15
**pursue**  173:22
283:8
**put**  32:22
33:20  39:10
50:6  59:11
68:16  77:16
79:5  80:3
96:15  106:10
108:1, 19, 22
114:20  138:3
139:3, 23
140:6, 7
143:7  144:6
151:4, 24
154:16
156:11
159:23
163:23  164:9,
20, 23  174:4
182:16  209:9
212:5  218:1
231:23  251:1
288:21
291:18  292:8
300:2, 5
308:17, 23
309:2, 10

Confidential Information - Subject to Protective Order

puts 152:5, 22
215:1
**Putting** 39:4
69:21 291:23

< Q >
**qualified**
32:13 35:19
**question**
17:14 19:1
22:4, 9 28:12
31:3 32:17
33:21 35:2,
15 36:14, 20
41:20 42:23
43:8, 14
47:22 64:14
66:5 70:12
76:11 78:20
80:15, 17
85:7 90:6
91:6 92:4
95:16 98:8
100:1 107:15
113:10 115:4
116:8 118:22
124:20
141:23, 24
160:10, 21
162:11 163:2,
9 164:15
165:8 168:10
174:18, 19, 23
176:8, 17
178:3, 19
180:5 181:22
185:20, 21, 23
186:8, 14
188:16
207:17 212:8
218:1 223:13
225:5, 8
226:23
228:11 230:2,
4, 13 231:4
232:20
235:17, 19
237:14, 23
238:3 242:2
244:14
245:18

248:18
252:10 256:7
261:21 262:4
267:23
276:11
278:15, 19
280:10, 12
283:21
285:21 292:6
293:2, 5
295:5 309:18
311:8 313:16,
18
**questioning**
301:1 304:20
**Questions**
8:14 19:23
68:9 114:24
174:9, 13
218:15 219:1
228:8 229:24
248:20
249:18 287:3
288:6 300:21
301:22 315:3
324:8
**quickly**
155:12
242:13 303:6
**quite** 49:11
108:21 143:4
164:12 292:22
**quote** 203:4
209:21 266:4
301:5
**quoted** 266:23
268:15
314:21 316:21
**quoting**
267:13

< R >
**RACHEL** 2:4
10:11
**radiation**
14:16 31:10
76:18 98:19
194:22 290:8
**radioactive**
13:22 14:18
15:2

**radioimmunoas**
**says** 13:22
**radon** 104:13
162:5 165:17
**raise** 192:3,
21 266:18
**randomized**
73:6 164:5
**range** 47:3
64:7, 11
65:19 68:23,
24 197:16
248:17 312:18
**ranges** 31:19
**rapidly** 271:6
272:22
**rare** 49:7
96:1
**RASPANTI**
4:3
**rate** 79:19
80:4, 8, 10
89:16 104:20
123:2 127:14,
16 181:2
182:5 210:22
312:16 314:22
**rates** 119:7
124:3 136:21
202:14, 19, 23
**RATHOD**
2:12
**rationale**
309:16
**RBK/JS** 1:5
**reach** 21:4
78:23 297:15
**reached** 20:17,
20 70:20
212:21
**reaching** 69:4
**reacquaint**
17:4
**read** 36:8
39:21 119:12
122:2, 4
129:19
133:18, 21
134:6, 9, 10,
11 137:3, 7,
20 139:3, 6

146:16 147:8
158:13, 23
159:15
161:22
167:19
179:11, 16
208:14, 19
222:15, 21
224:4, 12, 15
225:11
226:22 228:5,
6 229:17
230:14
232:15, 17, 21
239:20 240:9,
12 242:5, 7, 8,
13, 16 243:12
245:7 267:17
271:11
316:21 321:9
322:3 324:5
**reading** 25:19
128:18 142:5
205:9 214:21
240:13 306:22
**reads** 223:2
**real** 44:13
299:18
**realize** 17:6
**really** 19:8
23:3 24:22
27:8 33:18,
20 36:13
69:10 70:11
76:22 79:7
84:13 88:12
94:7, 13
95:15 96:1, 5
97:7 99:3
100:15 103:6
104:1 105:22
107:9, 21
108:9 109:1,
3 117:8
119:23 120:5
128:17
129:12 131:5,
13 134:19
135:7 137:2,
18 139:19
140:1 142:6

143:13
146:17
162:22 163:6,
21 180:1, 4
184:15
188:15
196:20
199:12 200:4
201:16, 17, 19
210:18 216:6
220:22
247:18 263:1,
5 275:17
283:15
287:24
293:11
308:21
309:18 313:13
**realm** 274:10
**Realtime** 1:19
321:14
**re-ask** 178:2
**reason** 18:20
23:11 58:11
129:18 174:3
178:20
206:22
207:17
244:24 304:3
315:22
316:13
317:15 322:5
323:6, 8, 10,
12, 14, 16, 18,
20, 22, 24
**reasonable**
69:23 143:22
144:8 145:10
179:9 219:7
**reasons** 197:18
**reassured**
202:4
**recall** 11:16,
22 12:2
16:11 20:19
40:5 44:13
100:24
113:24 125:8
181:16, 24
189:1 199:15
205:9 236:22

260:*20, 21*
306:*22*  312:*4*
314:*12*
**receipt**  322:*17*
**receive**
103:*18*
123:*10*  240:*4,
5*
**received**
156:*23*
**recess**  120:*17*
157:*15*
**recognition**
67:*18*  83:*12*
**recognitions**
83:*19*
**recognize**
121:*21*
124:*20*
149:*11*  264:*8*
**recognized**
44:*1, 8*
**recollection**
17:*11*  168:*20*
181:*19*
241:*11*  243:*8*
260:*11*
**recommend**
80:*20*  81:*22*
82:*13*  83:*21*
193:*11*  210:*9*
211:*16, 17*
217:*19*
247:*14*  299:*3*
**recommendatio
n**  69:*12*
89:*15*  91:*3*
104:*15*
118:*14*
171:*22*  209:*4*
210:*10, 12, 19*
211:*15*  255:*9*
277:*20*
305:*12, 15*
**recommendatio
ns**  65:*12*
82:*17*  89:*13,
21*  111:*4*
135:*12*
151:*16*
155:*11, 16, 20*

161:*24*  162:*7*
203:*20*  216:*9*
257:*23*  270:*3*
272:*7*  273:*1*
295:*13*
296:*18*  305:*20*
**recommended**
38:*24*  39:*11*
81:*9*  89:*12*
110:*15*
151:*19*  167:*2*
212:*17*
223:*19*  249:*9*
272:*13*  273:*5*
281:*7*  305:*8*
**recommending**
185:*10*  214:*3,
11*  298:*7*
301:*11*
**recommends**
108:*23*
**record**  9:*3, 20*
10:*11*  27:*14*
43:*11*  69:*14*
71:*16, 19*
76:*8*  120:*13,
16, 19*  157:*8,
12, 18*  219:*15,
18*  224:*24*
232:*17*  233:*3,
6, 9*  239:*4, 6,
10*  242:*15, 20,
23*  282:*5, 8*
284:*7*  286:*13,
16, 19*  311:*16,
21, 24*  319:*23*
321:*6*
**records**  73:*17*
155:*14*
282:*21*  283:*5*
284:*13*
**rectal**  308:*6*
**rectum**  58:*2*
308:*5*
**recurrence**
183:*22*  184:*1*
291:*5*
**recurrent**
202:*7*
**reduce**  291:*4*

**reduces**  68:*13*
69:*18*  70:*6*
**REEFER**  4:*4*
**refer**  34:*7*
81:*6*  82:*2*
86:*2, 6, 12*
87:*2*  147:*2*
244:*4*  247:*1*
266:*8*  277:*18*
305:*19*
306:*10, 13*
308:*2*  314:*24*
**refereed**
236:*12, 14, 15*
**reference**
270:*9*  274:*17*
**referenced**
263:*23*
266:*18*  271:*12*
**references**
130:*9*  204:*11*
**referral**
244:*19*  252:*5*
**referrals**  48:*5*
**referred**
52:*17*  53:*13*
69:*2*  83:*6*
154:*24*  155:*3*
237:*12*  267:*2*
290:*24*  306:*18*
**referring**  50:*1*
59:*8*  82:*4*
150:*23*
194:*23*
237:*18, 22*
247:*24*  264:*11*
**refers**  244:*16*
**reflect**  129:*15*
**reflected**  160:*5*
**refrain**  270:*14*
**refresh**
168:*19*  243:*7*
**regard**  190:*9*
215:*18*
**regarded**
215:*15*  221:*17*
**Regarding**
299:*7*
**regardless**
17:*5*  27:*4*
251:*6*  254:*6*

**regimen**  58:*9*
290:*20*  292:*1,
5*  297:*10*
298:*7*
**Registered**
1:*18*  321:*13*
**regular**  92:*19*
95:*7*  155:*11*
253:*2*
**regularly**
102:*20*
**reject**  110:*3*
**related**  32:*19,
21*  45:*14*
69:*11*
**relates**  190:*15*
191:*10*
**relating**
191:*22*
**relative**
106:*21*
108:*23*  150:*23*
**relatively**
287:*1*
**relevance**
251:*12*
**relevant**
84:*20*  137:*5*
140:*12*
146:*17*
150:*14*  173:*2*
239:*19*
242:*12*
251:*16*
276:*13*
301:*18*  305:*2*
**reliable**  95:*12*
212:*11, 23*
214:*1*
**reliably**  94:*22*
**relied**  143:*11*
**rely**  34:*2, 7*
35:*9*  36:*2, 7*
37:*3, 7*
134:*15*
148:*15*  298:*9*
**relying**  199:*5*
**remaining**
56:*11*
**remember**
24:*6*  50:*24*

53:*24*  70:*24*
84:*1*  92:*6, 18*
101:*6*  102:*1,
2*  125:*10*
132:*5, 20*
134:*5*  153:*7,
10*  204:*3*
283:*13, 17*
300:*24*
304:*23*
307:*10*
314:*15*  315:*20*
**remembering**
24:*3*
**reminder**
76:*7*  264:*21*
**reminds**
141:*23*
**remnant**  14:*4*
**removal**
266:*12*
**removed**
99:*21*  183:*19*
**renal**  174:*2*
**render**  32:*13*
290:*1*
**rendered**
217:*1*
**renew**  45:*12*
46:*4*
**repeat**  38:*10*
113:*10*
160:*17*  203:*7*
235:*19*  256:*7*
262:*4*
**repeated**  143:*3*
**rephrase**
42:*23*  147:*19*
**Report**  7:*6*
21:*17, 20, 24*
22:*11*  23:*21*
24:*16*  26:*11*
40:*19*  43:*22*
102:*8*  103:*21*
104:*3*  107:*24*
128:*24*
129:*16*  130:*2,
6*  132:*11*
133:*24*  136:*5*
139:*4, 18*
140:*7, 17, 21*

141:*2, 17*
143:*21*  147:*7,
9, 10, 11*
156:*4, 18*
158:*1, 6*
168:*22*  169:*4*
170:*8*  176:*3*
185:*9*  195:*11*
199:*18*
203:*12*
219:*21*  221:*3*
225:*12*
227:*20*  230:*4,
8, 15, 17, 20*
239:*14*  254:*1*
260:*24*
263:*23*  264:*1,
12*  266:*18, 22,
24*  267:*21*
268:*2, 7*
270:*7*  271:*1*
295:*14*
296:*23*  299:*6*
310:*23*  312:*5*
318:*11, 22*
**reported**
97:*17, 20*
**Reporter**  1:*18,
19*  9:*21*
121:*18*
124:*12*
177:*21*
238:*15*  239:*3*
263:*21*  265:*3*
321:*13, 14, 22*
**reporter's**
101:*9*
**reports**
134:*16*  147:*7*
148:*8*  159:*10*
**represented**
254:*18*  300:*15*
**Representing**
2:*12, 17*  3:*7,
19*  4:*8, 13, 19*
22:*6*
**reproduction**
321:*20*
**reps**  167:*8*
**reputation**
96:*6*

**Request**  8:*8*
29:*1, 2*  122:*13*
**requested**
321:*6*
**requests**
122:*10*  133:*12*
**require**  232:*1*
**required**
38:*18*  47:*5*
143:*6*  224:*18*
292:*12*
**requires**
38:*11*  231:*24*
232:*5*  244:*8*
**research**
25:*20*  70:*4,
22*  72:*3*  75:*9*
106:*10*
130:*17, 18*
131:*11*
149:*14*  180:*2*
191:*2*  239:*14*
269:*14*
287:*18, 21*
288:*6, 14*
289:*3*  310:*22*
**researchers**
288:*3, 4*
**residency**
252:*19*  282:*20*
**resident**  79:*18*
282:*24*  283:*15*
**residents**
79:*10*
**resolved**  15:*4,
21*
**respect**
234:*13*  295:*3*
**respected**
153:*1*  236:*19*
**responding**
26:*14, 19*
**response**
88:*21*  122:*13*
214:*8*  244:*11*
**Responses**
6:*21*  121:*7*
**responsible**
291:*13, 14*
**responsive**
53:*10*

**result**  79:*12*
98:*13*  201:*22*
220:*11*
228:*16, 23*
229:*2*
**Results**  7:*12*
66:*17*  138:*4*
183:*11*
186:*15, 17*
188:*6*  222:*17*
227:*13, 22*
239:*22*  240:*1,
4, 6*
**retained**  19:*5*
283:*22*
**retainer**  127:*1,
4, 6, 9, 11, 13,
18*
**retention**
19:*12*  122:*16,
19*
**retrieve**
136:*12*
**return**  322:*15*
**Review**  7:*9*
26:*10*  29:*7*
129:*17*
134:*24*  135:*7*
140:*16*
144:*14*
146:*19*  150:*2*
152:*17*  153:*4*
159:*9*  161:*17*
221:*6*  223:*2*
224:*22, 23*
225:*8*  227:*6*
243:*2*  282:*20*
283:*5*  284:*6,
13*  294:*16*
295:*1*
**reviewed**
25:*23, 24*
26:*5, 6*  28:*16,
22*  110:*13*
128:*8, 11, 14*
134:*16*  136:*4*
140:*6*  149:*22*
158:*17*
161:*23*  164:*7*
294:*12*

298:*14*
310:*21*  316:*19*
**reviewing**
107:*22*
131:*12*
142:*24*  218:*2*
**revision**  207:*6*
**revisit**  25:*20*
**Rgeman@lchb.
com**  2:*6*
**Rick**  11:*18*
**ride**  314:*8*
**right**  10:*14*
26:*18*  32:*17*
68:*10*  74:*15*
78:*18*  81:*1*
85:*21*  94:*17,
19*  117:*8*
133:*21*
154:*14*
156:*24*  159:*7*
160:*7*  163:*4*
165:*15*  173:*8*
177:*1*  197:*8*
204:*8*  213:*6,
15*  216:*18*
219:*14*
220:*24*
230:*19, 20*
231:*2, 10*
235:*5*  248:*4*
249:*3*  250:*9*
253:*20*
255:*23*
256:*23*
267:*24*  268:*9*
273:*9*  277:*5*
282:*3*  284:*2,
15*  285:*12*
286:*8*  295:*3*
302:*24*
310:*21*  313:*1*
**rises**  312:*7*
**risk**  27:*20*
40:*23*  44:*2, 8,
9*  63:*24*
64:*17*  67:*18*
68:*21*  73:*11*
76:*16*  81:*10,
13*  83:*2, 15,
19*  84:*2, 13*

86:*3*  92:*23,
24*  94:*22*
95:*18*  96:*11,
13*  99:*11*
104:*13, 14*
106:*12, 15, 17,
18*  107:*3, 5*
110:*17, 18*
118:*18*
119:*17, 19, 24*
150:*23*  173:*7*
180:*12, 14*
183:*22, 24*
185:*14*
187:*21*  192:*3,
21*  194:*3, 15,
21*  201:*6*
209:*21*  220:*4,
8*  223:*17*
226:*7, 9, 12*
230:*24*
237:*13*  240:*8*
244:*3, 5*
246:*7, 8*
247:*2, 3*
291:*4*  299:*20*
300:*16*
301:*13*
308:*12, 13*
309:*3*  314:*2*
**risk/benefit**
70:*16*
**risks**  73:*12*
74:*13*  109:*23*
232:*11*
292:*13*
294:*11, 13*
299:*23*
**risky**  77:*1*
108:*20*
109:*21*
200:*23*  232:*3*
298:*2*  307:*16*
**Rite**  4:*13*
**Ritona**  5:*1*
9:*4*
**Rkum@duane
morris.com**
3:*6*
**Road**  3:*17*
4:*17*

Confidential Information Subject to Protective Order

**ROBERT** 1:6
3:3
**robust** 91:2
**role** 54:2
**room** 18:14
128:13
190:24  311:18
**Roszel** 4:17
**roughly** 56:14
**row** 53:19
**rubber** 103:4
136:22
**ruined** 130:24
**Rule** 129:6
142:10  143:3
144:5
**rules** 17:3, 5
142:11
**run** 290:13
**Rush** 86:6
**RX** 19:13
20:14, 20
21:4, 16
122:18, 23
123:11  125:1,
6  132:6, 18

**< S >**
**sacred** 114:4
**safe** 215:5
292:23
**safely** 281:12
**safety** 151:14
214:7  215:19
**sake** 238:14
**Sample** 7:17
237:2  238:20
**San** 2:11
**satisfying**
147:18
**saw** 143:5
234:11
**saying** 10:13
67:24  131:7,
9  197:2
261:8, 18
263:22  265:1
270:14  315:15
**says** 58:14
122:9  171:24
208:23

233:18  265:6
266:15
268:14  280:4
**scale** 310:11,
16
**scan** 94:7
**Scanning**
227:23
**scans** 290:21
**scanxiety**
41:14  190:18
**scenario**
218:8  237:7
256:6
**scenarios**
109:23
**schedule** 123:3
**scheduled**
92:12
**school** 34:5
**Schwartz** 7:17
**science** 74:8
273:15
**sciences** 191:2
**scientist** 149:7
**scientists**
149:11  173:9
**scope** 27:24
28:10  30:11
61:7  102:8
103:21  104:2
109:3  114:12
135:5  146:13
170:8  205:24
206:1  231:23
235:3, 5
318:11
**scopes** 206:3
**screen** 66:23
67:2  73:9, 19
89:21  97:2
99:23  118:20
192:8  193:1
194:6  255:17
256:12  272:7,
10  307:2
**screened**
194:17
273:11, 13
**Screening** 7:9,
20  33:12, 19

64:4, 8  65:12,
16  66:1, 10,
11, 14  67:12
68:12, 21
69:5, 11, 17
70:4, 5, 14, 21
71:22  72:8,
14, 24  73:15
75:14  76:1
77:9, 21  78:2,
13  80:20
81:7, 22  82:3,
5, 12, 19, 24
83:4, 16, 22
84:9  85:24
86:8, 16  87:4,
8, 15, 18
89:13, 14
91:13  94:23
95:3  96:9
103:10
105:12, 16
107:17
110:16
111:23  112:9
114:19
117:15, 19, 22
118:4, 10, 14,
24  135:20, 24
136:1  137:3
153:5, 9
154:4, 5, 9
158:22  161:4,
14  162:16
163:14
164:17  165:2
166:13
172:20  173:6,
17, 19  180:7
184:24  185:4
188:5, 6
190:12
193:11
203:16, 24
205:10
211:22  214:4,
11  215:2
220:5, 7, 11,
23  221:5
223:4, 6, 7, 15,
20  226:2, 16

227:3  230:24
233:20, 21
234:8  236:7
237:4  240:15
241:24
243:21  245:9,
20  246:3, 6,
14, 24  247:2,
4, 21, 23
248:1, 3, 8
249:4, 8, 12,
21  250:10, 21
251:2, 7, 10
252:12, 14
253:4, 16, 22
255:4  264:3
266:11, 14
271:5, 22
272:3, 21
273:2  295:16
305:8, 9, 12,
15, 17, 20
313:3, 20
314:14
**Screenings**
7:13  173:2
227:14, 24
240:24
**screens** 271:13
**search** 128:20
129:20  237:3
241:9, 12
295:22  296:7,
16
**searched**
239:15  241:7
242:1
**SEC** 148:10
**second** 12:24
13:1  28:2
120:13
125:12
127:23, 24
143:19
260:14
311:15, 17
**second-to-last**
158:14
264:14  271:4
**secretin** 92:9

**secreting**
172:16
**section** 219:23
267:6, 7  268:1
**sedation**
231:24  313:15
**sedimentation**
210:22
**see** 14:6
15:17  41:8
45:18  46:1
47:1, 15, 16
49:6, 13  50:7
53:1  56:18
58:12  63:18,
22  64:15
65:2  73:18
79:19  92:5,
16  94:7, 8
111:10, 20
113:7, 12
114:10  119:3
121:24  122:9
126:7  127:5
128:2, 7
131:22
137:16
140:11
158:10  169:7
185:10  196:4,
7, 17  197:18,
23  198:4, 9,
11, 16  203:21
206:10  207:2
208:6  219:22
223:1  233:15,
17  237:21
245:24  253:3
264:15  265:9,
18  266:1, 22
267:14  268:5,
13, 14, 20, 22,
24  269:2, 4,
21  271:9
273:4  275:3
287:4  289:18,
24  291:19
295:14
296:19
315:14  316:4
318:7, 19

Confidential Information Subject to Protective Order

**seeing** 64:*13* 92:*11* 197:*3* 198:*8* 253:*11* 255:*20* 315:*20*
**seen** 28:*19* 40:*4* 99:*21* 122:*3* 124:*22* 127:*3* 144:*3* 149:*2* 215:*13* 243:*9* 307:*7*
**segue** 115:*22*
**select** 136:*3*
**selected** 208:*10*
**selecting** 244:*21*
**self-selected** 245:*11*
**semicolon** 133:*1*
**send** 123:*13* 127:*17*
**sending** 210:*19*
**sense** 18:*8* 130:*4*
**sensitive** 202:*7* 203:*6, 7* 211:*22*
**sensitivity** 201:*12, 15* 202:*8, 10, 23* 203:*1, 5* 212:*3, 9, 20*
**sent** 127:*20, 21* 133:*9*
**sentence** 143:*19, 24* 158:*14* 160:*6* 203:*15* 222:*16* 223:*2* 225:*17* 271:*3*
**separate** 57:*3, 23* 84:*17* 90:*6* 149:*15* 160:*10, 21* 162:*11*
**separated** 317:*13*

**separately** 123:*12* 274:*12, 19*
**sepsis** 299:*21* 308:*12*
**Sequencing** 275:*1* 276:*16* 277:*13, 24* 278:*11, 23*
**serial** 203:*20*
**serially** 205:*24*
**Seriously** 7:*20* 264:*3*
**serves** 72:*15*
**service** 47:*9* 49:*1* 52:*7, 11, 18* 208:*2, 4, 10*
**SERVICES** 1:*22* 9:*6* 38:*19* 47:*7* 53:*6* 106:*10* 155:*19*
**set** 29:*8* 93:*19* 107:*19* 146:*18* 173:*16, 18* 202:*11* 203:*5*
**sets** 173:*15*
**setting** 52:*3* 153:*8, 14, 19* 173:*6* 187:*21* 190:*1* 214:*4, 5* 223:*14* 234:*19* 253:*16* 289:*11* 295:*18*
**settings** 102:*6, 21* 198:*18*
**settled** 15:*5* 284:*24* 285:*1*
**seven** 25:*4* 50:*13* 259:*11* 266:*19, 23* 267:*1* 272:*20*
**Shaking** 177:*20*
**share** 180:*11*
**sheet** 322:*7, 9, 12, 15* 324:*12*
**shore** 99:*1*

**Short** 71:*17* 219:*16* 233:*7* 242:*21* 265:*17* 282:*6* 287:*2* 293:*1*
**shortened** 83:*16*
**Shorthand** 1:*18* 321:*13*
**short-term** 316:*8* 317:*6*
**show** 29:*12* 67:*3, 11* 70:*14* 237:*24* 238:*10* 265:*10*
**showing** 77:*2* 223:*16*
**sick** 38:*9* 209:*9* 300:*6*
**side** 47:*4* 48:*12* 73:*19* 191:*5* 284:*12*
**sides** 113:*23* 139:*1* 142:*8*
**sign** 321:*9* 322:*8*
**signal** 173:*19*
**Signatera** 170:*14* 183:*15* 185:*8* 186:*1, 12* 191:*14* 274:*20* 276:*20, 24* 279:*2*
**signature** 141:*10, 12*
**significant** 192:*4, 22* 298:*3, 23* 299:*22*
**significantly** 27:*20*
**signing** 322:*10*
**signs/symptoms** 218:*16*
**silos** 149:*9*
**similar** 99:*7* 213:*23*

**similarly** 96:*24* 186:*24*
**simply** 225:*2* 241:*1*
**single** 122:*14* 285:*11*
**single-institution** 234:*3* 252:*6*
**site** 56:*7* 85:*6*
**sitting** 99:*6* 102:*1* 140:*4* 146:*22* 150:*16* 157:*24* 164:*14* 319:*6*
**situated** 96:*24*
**situation** 261:*7*
**six** 50:*13* 74:*22* 92:*7* 184:*4* 240:*4*
**size** 18:*5, 7*
**skills** 235:*9*
**skin** 89:*11, 12, 19, 23* 90:*3, 7, 10, 11, 23* 91:*8* 97:*2, 19* 98:*2, 12* 100:*9*
**slight** 48:*18*
**slightly** 119:*7* 156:*7* 162:*10* 209:*12*
**slow** 80:*8* 112:*18*
**slowed** 200:*4*
**Slow-growing** 265:*19*
**small** 56:*8, 20* 58:*1, 5* 271:*14*
**smear** 249:*7, 20* 250:*3, 6* 252:*10*
**smears** 250:*10*
**smoke** 67:*15*
**smoked** 68:*18* 71:*11*
**smoker** 70:*23*
**smokers** 71:*23* 73:*1*
**smoking** 64:*5*
**sniff** 215:*9*

**societies** 203:*18*
**Society** 205:*21*
**Solco** 3:*8*
**solid** 31:*7* 47:*6*
**somebody** 113:*8, 13* 195:*23* 229:*19* 237:*8, 15* 262:*21*
**Song's** 26:*11*
**soon** 178:*22*
**sophisticated** 110:*9*
**sorry** 21:*9* 22:*3* 31:*1* 47:*21* 52:*24* 55:*1* 58:*18* 85:*13* 88:*2, 22, 23* 108:*7* 112:*20* 119:*18* 133:*7* 158:*9* 167:*1* 185:*22* 189:*6* 195:*23* 200:*18* 202:*21* 205:*7* 222:*6* 227:*23* 260:*18* 264:*23* 270:*6, 15, 16, 24* 271:*3* 275:*12* 285:*6, 15* 304:*18* 305:*24* 315:*9* 319:*1*
**sort** 19:*14* 20:*4* 81:*12* 112:*23* 115:*11* 116:*16* 118:*23* 129:*7* 136:*10* 143:*2* 150:*13* 151:*21* 156:*10* 159:*16, 19* 161:*11* 175:*7* 190:*19* 191:*1* 197:*16*

208:*17*
214:*19, 23*
217:*7, 10*
219:*3*  238:*2*
255:5  269:*24*
272:*12*  291:*8*
303:*1*  307:*19*
314:6  316:*24*
**sound**  79:*8*
208:*12*
**sounded**
285:*17*
**sounds**  12:*21*
107:*12, 23*
179:*9*  196:*24*
197:*6*
**source**  139:*5*
**South**  1:*15*
3:*4*  9:*12*
10:*20*
**space**  111:*16,*
*18*  114:*5*
195:*9*  322:*6*
**sparse**  137:*12*
236:*6*
**speak**  11:*10*
19:*11*  76:*22*
78:*24*  91:*3*
97:*8*  98:*3*
99:*4*  100:*15*
105:*5, 9*
109:*2*  149:*2*
159:*24*
161:*16*
162:*23*
164:*10*  209:*5*
244:*1, 14*
271:*23*
**speaking**
30:*20*  31:*6*
61:*1, 18*  62:*5*
82:*19*  210:*16*
225:*16*  254:*21*
**speaks**  66:*6*
102:*14*
111:*22*
142:*15*
172:*15*  255:*8*
275:*20*  307:*14*
**special**  71:*22*
72:*24*  83:*1*

84:*8*  85:*24*
86:*15*  100:*8*
103:*9*
**specialist**
45:*16*
**specialized**
85:*4*
**specialty**  49:*13*
**specific**  14:*24*
61:*20*  68:*22,*
*24*  69:*7, 22*
70:*23*  78:*20*
85:*19*  103:*2*
107:*12, 14*
110:*15*  136:*2*
148:5  150:*6*
211:*23*
214:*14*
256:*15*  272:*6*
302:*3, 8*
315:*7, 13, 16*
**specifically**
26:*21*  35:*14*
59:*9*  76:*9*
81:*4*  108:*1*
146:6  167:*8*
192:*19*  204:*4*
206:*7*  218:*6*
219:*4*  315:*21*
**specificity**
201:*13, 20*
202:*14, 18*
203:*1*  212:*2,*
*10, 21*
**specified**  65:*16*
**spectacular**
166:*7*
**speculate**  18:*1,*
*5, 6, 13, 15*
43:*8*
**speculation**
43:5  76:*3*
99:*14*  100:*11*
103:*22*
105:*20*  107:*8*
178:*14*
187:*12*
193:*15*
196:*11*  198:*20*
**speeches**

174:*14*
**spelling**  101:*9*
**spend**  24:*21*
**spent**  52:*22*
53:*14*  129:*15,*
*20*  130:*1, 5*
131:*3*
**sperm**  308:*9*
**spiral**  66:*19*
76:*20*  231:*12*
**spoke**  310:*4*
**spoken**  24:*12,*
*15*
**spot**  95:*22*
115:*24*
**spread**  89:*24*
90:*9, 18, 19,*
*22*  91:*10*
**squamous**
90:*17, 23*  91:*8*
**staff**  21:*21*
**Stage**  116:*1*
117:*6, 10*
152:*8*  172:*7,*
*9, 11, 13, 20*
180:*4, 7, 19*
182:*5*  188:*6,*
*7*  202:*1*
256:*14*  258:*2*
259:*10*  262:*2,*
*21*  263:*6*
**stages**  172:*22*
**Stand**  120:*14*
311:*19*
**standard**
69:*12*  73:*21*
74:*1*  75:*12*
117:*9*  127:*1*
151:*14*  152:*3,*
*20, 24*  153:*17,*
*18*  155:*8*
173:*17, 19*
175:*16, 18*
206:*2*  216:*24*
217:*7*  218:*12*
243:*23*
274:*15*  276:*9*
291:*20, 24*
295:*9, 10, 16*
303:*2*  313:*10*

**standardize**
151:*5*
**standardized**
155:*15*
**standing**  281:*4*
**standpoint**
283:*6*
**staring**  58:*13*
**start**  183:*20*
256:*17*
**started**  92:*1*
142:*2*  293:*5*
**starts**  19:*3*
220:*22*
**state**  143:*18*
220:*3*  271:*2*
322:*5*
**stated**  86:*19*
167:*9*  205:*1*
244:6  299:*6,*
*10*
**statement**
49:*9*  69:*21*
159:*8, 20*
168:*11*  207:*6*
**STATES**  1:*1*
68:*17*  71:*2*
72:*5*  75:*10,*
*18*  83:*11*
89:*9*  139:*12*
185:*2*
**statistic**
180:*23*
203:*10*  317:*4*
**statistically**
192:*4, 22*
**statistics**  37:*3*
11:*11*
152:*12*  259:*4*
274:*5*  275:*3*
276:*5*  280:*1*
281:*5, 17*
293:*10, 12, 17*
**stay**  90:*16*
**steep**  269:*16*
**stenographic**
9:*20*  27:*14*
**sterilize**  308:*4*
**Steve**  57:*15*
**STEVEN**  3:*15*
**stick**  231:*19*

**Stipulations**
8:*11*
**stomach**
268:*23*
**stop**  44:*3*
60:*15*  68:*1*
69:*16*  89:*24*
90:*9, 22*
303:*12, 13*
**stopped**  53:*2*
95:*3*  283:*16*
**stopping**
44:*10*  120:*9*
**straightforwar
d**  210:*6*
256:*17*
**strand**  249:*23*
**strange**  215:*7*
**strategy**
170:*22*
**Street**  1:*16*
2:*5, 10, 15*
3:*4*  9:*13*
**stress**  40:*20,*
*23*
**stressful**
189:*19*
229:*14*  230:*10*
**stricken**
147:*17, 22, 24*
**strict**  70:*1*
**strike**  28:*15*
63:*19*  110:*4*
119:*18*
138:*15*
144:*16*  203:*3*
245:*15*
249:*14*  251:*13*
**STRIVE**
177:*2*  294:*20*
**stronger**
210:*11*
**struck**  41:*17*
**student**  79:*18*
**students**  79:*10*
**studied**  25:*21,*
*22*  87:*7, 15*
**studies**  72:*22*
111:5  119:*13*
166:*13*
171:*19, 23, 24*

199:*10*  200:*6*
294:*13*  311:*2*
312:*7*
**study**  40:*14*
41:*21*  42:*5*
61:*4, 12, 19*
67:*7*  69:*2, 3,*
*9, 10*  70:*14*
73:*22*  74:*2*
87:*4*  92:*14*
137:*19*  164:*4*
173:*8, 13*
176:*24*
179:*11*
182:*22*
183:*10*
190:*20*
201:*14*  218:*3*
221:*22*
251:*17*  252:*6*
266:*17*
288:*22*
311:*12*  312:*3*
316:*6, 11*
**studying**
190:*23*
**stuff**  207:*12*
247:*11*
**sub**  154:*18*
**SUBJECT**
1:*8*  24:*19*
61:*23*  215:*10*
263:*14*
273:*23*
283:*17*  322:*10*
**subjected**
116:*23*
**subjecting**
200:*22*
**submit**  126:*4*
292:*1*
**submitted**
126:*9, 14*
**subpoena**
44:*16*
**subpopulation**
107:*4*
**Subscribed**
324:*19*

**subsequent**
41:*7*  220:*11*
230:*11*
**subsequently**
147:*16, 21*
**subspecialize**
47:*17*
**subspecializing**
46:*20*
**subspecialty**
149:*15*
150:*10*
154:*17*  316:*24*
**substance**
20:*8*  132:*16*
194:*14*  324:*11*
**substances**
27:*6*  192:*2, 20*
**substantive**
131:*7*  222:*14*
264:*14*
**sufficient**  88:*4*
**suggest**  165:*3*
181:*8*  240:*1*
**suggested**
181:*13*
**suggesting**
167:*2*  216:*23*
217:*2*  271:*13*
312:*11, 22*
**suggestion**
207:*24*
**suggests**
137:*18*
213:*23*  269:*14*
**suit**  11:*14*
15:*14, 20*
**Suite**  2:*15*
3:*5, 17*
**summary**
222:*17*
**sunburns**
97:*11*
**supervising**
213:*21*
**supervision**
321:*22*
**SUPPORT**
8:*2*  78:*9, 13*
84:*8*  85:*23*
86:*15*  88:*1*

97:*24*  98:*8*
100:*6*  175:*14*
208:*3*
**supported**
77:*8, 20*  78:*1*
96:*23*  245:*12*
**supporting**
296:*20*
**supportive**
191:*19*  277:*19*
**supports**
223:*23*
**sure**  13:*16*
18:*11*  19:*8,*
*18*  24:*22*
25:*18*  28:*14*
30:*1*  47:*21*
68:*4*  83:*9*
84:*6*  86:*5*
87:*12*  90:*24*
108:*13*
112:*20*
113:*11*
120:*11*  132:*3,*
*5*  134:*13*
135:*21*
139:*19*
145:*18*
148:*11*  151:*3,*
*6, 7, 15*
159:*17*  166:*5*
168:*3, 16, 23*
175:*22*
179:*20*
180:*22*
183:*13*
188:*20*  190:*6*
205:*17*  207:*1*
209:*3, 15*
213:*12*
225:*23*
235:*21*  243:*6,*
*13*  244:*15*
247:*18*
255:*10*  256:*8*
257:*18*  263:*1*
276:*4*  281:*4*
285:*17*
290:*11*
292:*17, 23*
293:*10*

311:*10*
313:*11*
314:*16*  316:*9*
**surgeries**
76:*14*
**surgery**  12:*15*
31:*7, 9, 11*
55:*13*  116:*12,*
*23*  262:*22*
290:*8, 24*
309:*9*
**surgical**  174:*1*
**surgically**
99:*20*
**surprise**
175:*1*  178:*12*
**surprised**
217:*10*
**surveillance**
41:*11*  203:*16*
204:*1*  205:*11*
**survival**  93:*9*
112:*4*  116:*20*
210:*15*
**suspect**
155:*23*
166:*16, 24*
195:*15*  226:*8*
**suspecting**
164:*1*
**suspicion**
314:*3, 5*
**swear**  9:*23*
**Swedish**
136:*20*
**sweet**  95:*22*
115:*24*
**switch**  285:*16*
**sworn**  10:*2*
321:*5*  324:*19*
**symptom**
97:*20, 22*
**symptoms**
54:*18*  173:*2*
191:*6*  271:*18*
293:*16, 19*
**syndrome**
81:*3, 20*
83:*13, 24*
250:*19, 24*
251:*11*  277:*17*

**syndromes**
86:*11*  92:*22*
**system**  170:*11*
**Systematic**
7:*9*  221:*6*

**< T >**
**table**  18:*5, 7*
**tables**  234:*4*
**tachycardic**
79:*18, 23*
**tag**  188:*2*
**tail**  31:*20*
**Take**  7:*19*
50:*16*  51:*19*
62:*19*  68:*3*
71:*13*  74:*10*
85:*9*  93:*17*
120:*23*  128:*1*
129:*21*  137:*6*
173:*13*
204:*14*  219:*8*
224:*6*  225:*9*
232:*6*  264:*2*
282:*2*  298:*5*
303:*11*
**taken**  1:*14*
157:*15*  206:*14*
**takes**  66:*7, 23*
193:*21*  303:*20*
**Taksler**  7:*13*
229:*11*  233:*1*
**talk**  44:*4*
50:*20*  209:*17*
263:*11*  267:*6*
270:*1*
**talked**  44:*21*
301:*22*  306:*19*
**talking**
218:*21*
260:*15*  267:*8*
314:*13*
**targeted**  275:*4*
**Task**  68:*17*
71:*2*  72:*5*
75:*10, 18*
78:*14*  80:*21*
81:*23*  82:*1,*
*13, 16*  83:*11*
89:*10*  105:*16*
108:*5, 16*

109:*9* 110:*2, 5, 24* 118:*11*
135:*11*
139:*12*
149:*23*
153:*12, 22, 24*
154:*9, 13*
155:*10, 17, 20*
159:*23*
161:*17, 20*
162:*6, 18*
163:*15, 21*
164:*7* 185:*3*
190:*7* 206:*15*
210:*7, 8*
211:*14* 212:*5*
246:*2* 248:*8*
252:*11, 12*
296:*17* 305:*11*
**taught** 34:*4*
37:*11* 72:*1*
218:*20*
**teach** 79:*9*
287:*8*
**teaching** 48:*7*
216:*2* 292:*3*
**team** 70:*4, 22*
132:*23* 133:*2*
**TECHNICIAN**
5:*1*
**technology**
76:*19*
**tedious** 17:*4*
**TEITELBAU
M** 1:*14* 6:*3*
7:*7* 9:*18*
10:*1, 13*
22:*15* 28:*1*
121:*10* 174:*7*
240:*11*
286:*24*
301:*20*
305:*16*
306:*16*
309:*21* 310:*4*
320:*2* 321:*8*
324:*16*
**Teitelbaum-1**
6:*16* 121:*3*
**Teitelbaum-2**
6:*16* 124:*10*

**Teitelbaum-3**
6:*21* 121:*16*
**Teitelbaum-4**
7:*6* 141:*7*
**Teitelbaum-5**
7:*8* 221:*9*
**Teitelbaum-6**
7:*11* 228:*3*
**Teitelbaum-7**
7:*13* 238:*23*
**Teitelbaum-8**
7:*17* 264:*6*
**telemetry** 80:*3*
**tell** 10:*16*
11:*5* 12:*9, 23*
13:*18* 15:*6*
23:*17* 36:*1*
83:*7* 115:*6*
130:*10, 22*
158:*8* 170:*3*
171:*10*
181:*18*
182:*17*
189:*15*
194:*17*
199:*14, 17*
208:*8* 227:*10*
232:*19*
238:*11*
289:*15*
291:*10* 303:*5*
313:*9*
**telling** 60:*16*
**tells** 263:*8*
**temporal**
31:*16, 22*
**ten** 25:*2* 46:*6*
66:*16* 83:*17*
93:*7* 126:*15*
272:*21*
**tend** 50:*16*
90:*16*
**tends** 152:*15*
**tens** 215:*13, 14*
**term** 50:*3*
235:*6* 257:*19*
**terminology**
29:*14*
**Terminus** 3:*16*
**terms** 42:*4*
62:*12* 63:*24*

64:*17* 83:*10*
118:*9* 152:*10*
190:*18* 212:*13*
**terrible** 12:*22*
100:*3*
**test** 41:*1, 7*
69:*23* 74:*10*
77:*1* 79:*3, 9*
80:*13* 81:*12*
84:*19, 21*
85:*2, 9, 10*
86:*9, 24* 92:*8, 9* 95:*12*
111:*10*
138:*19* 167:*3, 21* 169:*5, 24*
170:*2, 21*
171:*21* 175:*2, 17, 22* 176:*3*
183:*8, 12, 24*
184:*3, 16*
185:*7* 186:*4, 12, 16, 21*
188:*9* 189:*14, 24* 195:*2, 5, 14, 18* 200:*11, 13, 19, 24*
201:*4, 5, 8, 14*
202:*6, 7, 11, 20* 203:*2, 6*
209:*10* 211:*8, 19, 23* 212:*1, 10, 22* 215:*9*
216:*8* 218:*2*
220:*10*
228:*20*
229:*19*
231:*23* 232:*4*
233:*20* 240:*4, 6, 17* 243:*23*
246:*3, 13, 18, 24* 247:*23*
248:*8, 16*
249:*4, 8, 12, 21* 250:*11, 17, 22, 23* 251:*8, 10, 19* 252:*14*
272:*11* 273:*7*
274:*5* 275:*18, 20* 276:*12*
292:*16* 293:*7*

294:*11, 18*
295:*15*
296:*19*
301:*11*
307:*16, 24*
308:*12, 18, 24*
**tested** 211:*21*
254:*7, 8*
**testicular**
14:*10* 89:*20*
**testified** 10:*3*
62:*3* 87:*18*
88:*9* 142:*1*
159:*2* 188:*20*
306:*19*
**testify** 18:*21*
**testifying** 13:*6, 13* 15:*22*
17:*7* 280:*7*
283:*2, 23*
**Testimony**
6:*3* 10:*23, 24*
26:*14* 78:*5*
96:*23* 123:*22*
176:*7* 188:*12*
189:*1* 224:*2*
228:*22*
243:*19*
246:*12* 248:*6*
250:*16* 278:*5*
280:*3, 23*
304:*19* 306:*8, 23* 312:*14*
316:*18* 321:*6*
**Testing** 7:*15*
40:*21* 41:*14*
71:*8, 10*
85:*12* 89:*4*
92:*12* 135:*20*
137:*9, 10*
138:*13, 14*
190:*9, 15*
191:*10*
213:*19*
216:*21*
217:*19* 237:*1*
238:*18* 240:*2*
241:*4, 5, 8, 15*
243:*20*
245:*19*
251:*16* 252:*4*

254:*22*
255:*11*
269:*15* 270:*2*
277:*16* 281:*11*
**tests** 39:*1*
75:*3* 79:*6, 7*
84:*18* 108:*1*
109:*22* 137:*7*
158:*22*
163:*22* 168:*7*
169:*18, 21*
170:*19* 171:*4*
174:*5* 175:*14, 19* 183:*1, 3, 23* 185:*14*
189:*13* 190:*3, 12* 212:*5, 13*
213:*4, 7, 9, 14, 23* 215:*1, 2, 11* 216:*23*
220:*12*
229:*15*
230:*12* 234:*8*
241:*24*
251:*18* 272:*3*
274:*1, 8, 15, 18* 276:*5, 10, 17* 278:*10, 15*
279:*7, 21, 23*
280:*5, 17, 18, 20* 281:*1, 3, 15, 21* 292:*14*
298:*1, 14, 20*
**tests/procedure
s** 209:*23*
**tethered** 80:*5*
**Teva** 3:*19*
**text** 267:*11*
**Thank** 16:*10*
17:*17* 20:*11*
28:*4* 59:*1*
71:*14* 118:*2*
123:*7* 141:*9*
153:*24* 191:*7*
219:*12* 243:*4*
286:*10, 11*
299:*11*
309:*21*
319:*17, 19, 20, 21*

Confidential Information Subject to Protective Order

therapeutic
119:*1*
therapies
116:*24*  257:*3*
258:*11*
294:*21*
309:*13*  316:*8,
9*
therapy
234:*17*
256:*18*
259:*23*  275:*4*
291:*2, 3, 4, 24*
292:*7*  309:*3*
thick  142:*6*
thing  17:*4*
95:*21*  116:*17*
187:*20*
201:*20*
221:*11*
229:*17*  241:*6*
244:*13*
251:*22*  271:*19*
things  67:*2*
94:*11*  101:*5*
130:*20*  131:*8*
142:*20*
189:*20*
204:*18, 21*
211:*6*  217:*16*
220:*2*  256:*22*
275:*7, 9*
277:*22*
281:*12*  288:*9*
292:*17*  294:*4*
think  13:*10*
14:*23, 24*
16:*15, 19*
19:*7, 14, 23*
21:*6*  23:*9*
26:*8*  28:*19*
29:*3, 11*
30:*22*  33:*10*
37:*17, 20*
40:*8*  43:*24*
44:*8, 15*
45:*22*  49:*16*
51:*1, 7*  53:*9*
57:*14, 15*
60:*2, 17*
62:*23, 24*

64:*1*  67:*14*
69:*20*  71:*1*
74:*9*  75:*20*
76:*12*  77:*10*
81:*8, 24*
82:*16, 23*
83:*23*  86:*18*
88:*16*  89:*18*
91:*11*  93:*5, 8*
96:*3, 12, 19*
98:*21*  99:*2,
10*  102:*9*
103:*12, 19*
109:*1*  110:*19*
111:*7*  112:*5*
113:*15, 19, 22,
23*  114:*7*
118:*23*
119:*11*  122:*2,
3, 24*  124:*1*
125:*7*  127:*10*
129:*7*  130:*7*
132:*4*  135:*6*
136:*22*
138:*20*  140:*5*
141:*20*  142:*1,
14*  144:*2*
145:*3, 7*
150:*16*
152:*13*  153:*6,
16*  154:*14*
159:*17*
164:*18, 19, 22*
169:*5*  170:*20*
172:*19*
174:*23*  180:*2,
20*  186:*14, 17*
188:*16*  192:*7*
195:*4, 16, 22,
24*  196:*21*
199:*7*  206:*2*
207:*9*  208:*18*
209:*2*  211:*13*
214:*2*  216:*24*
218:*14*
223:*13, 15*
225:*19*
233:*23*
237:*20*
239:*15*
240:*14, 16*

244:*10, 24*
246:*6*  251:*21*
252:*3, 9*
255:*8*  257:*16,
21*  258:*21*
259:*13, 14*
272:*9, 23*
276:*22*
279:*13*  283:*3,
4*  284:*9*
289:*5*  291:*7*
292:*15*
295:*13*
297:*20*  298:*6*
299:*22*
300:*18*  301:*3,
5, 17*  302:*2, 7*
304:*4*  306:*6,
17*  307:*15, 17*
308:*5, 6*
309:*1, 16*
314:*15*  315:*6,
7*  316:*14*
317:*3, 10*
thinking
210:*18*
third  125:*15*
131:*16*
third-to-last
203:*15*
thirty  322:*16*
Thomas
199:*23*
thoracic
154:*20*
thorax  73:*13*
76:*15*

THORNBURG
4:*10*
thought  49:*14*
68:*10*  112:*12*
137:*4*  156:*9,
12*  196:*19*
215:*4*  216:*6,
11*  315:*15*
thousand
178:*12*
187:*10*
299:*21*  308:*13*

thousands
215:*13, 14*
three  56:*14*
58:*22*  93:*15,
21*  124:*18, 21*
125:*7*  176:*24*
200:*1*  214:*21*
243:*23*  247:*7*
249:*11*
283:*14*  294:*1*
three-year
235:*7*
threshold
30:*8*  62:*23*
77:*5*  87:*9*
93:*19*  212:*2,
9, 20*
thyroid
217:*19*
268:*18*  272:*4,
5, 8*
time  9:*8*
12:*24*  13:*1*
18:*24*  19:*19*
24:*20*  30:*24*
31:*17, 19*
44:*13*  45:*24*
47:*10, 23*
49:*2*  52:*11*
53:*14*  58:*12,
15*  77:*14*
78:*23*  79:*8,
11*  97:*8*  98:*4,
5, 21*  100:*14*
106:*7, 10*
117:*13*  126:*1,
3, 18*  128:*19,
21*  129:*15, 20,
21*  130:*1, 5,
15*  131:*1, 8,
20*  132:*4*
139:*23*  142:*6*
147:*14*
151:*22*  166:*9*
171:*16*  172:*8,
10, 12, 14*
186:*16*
190:*22, 24*
210:*13*
220:*10*
223:*11*  224:*7*

225:*10, 20*
229:*16, 22*
234:*10, 20*
239:*8*  243:*5*
253:*21*
254:*10*
259:*21*
271:*17*  283:*4*
286:*10*
293:*22*
303:*21, 23*
309:*22*  319:*19*
timeline
272:*18*
times  10:*22*
36:*8*  60:*15*
151:*11*
167:*10*
191:*17*  280:*10*
timing  81:*7*
tired  272:*4*
283:*15*
Tissue  196:*22*
title  287:*10,
14*  289:*8*
titles  140:*11*
tobacco  65:*17,
22, 23*  67:*15,
18*  71:*23*
73:*1*  75:*13*
104:*10*  162:*1*
164:*2*
today  9:*17, 21*
17:*7*  18:*21*
123:*23*
125:*21*  126:*4,
16, 18*  133:*10*
159:*1*  164:*14*
166:*13*
174:*12*
300:*21*
301:*22*  304:*20*
Today's  9:*7*
told  40:*22*
41:*4*  74:*18,
21, 23*  177:*12*
228:*14, 16, 18,
24*  229:*1*
tolerable
292:*23*

Confidential Information Subject to Protective Order

tolerate 292:8
313:12
tolerating
60:14
tool 172:21
180:7 188:5
tools 73:15
top 173:11
235:2, 4
topic 32:15
107:23
137:22 138:3,
8, 9 203:18
topics 32:14
totally 256:10
tough 53:7
175:6 208:21
Tower 10:20
toxic 309:14
toxicities
274:15
toxicity 189:5,
12 190:16
191:10
track 41:10
294:8
tracked 92:20
93:1
trained 47:16
95:23
training 46:19
101:5
transcript
16:16 133:19
321:9, 19
322:17, 19
transcription
324:7
transform
94:9
translational
149:14 288:4
transplant
47:9 52:6, 10,
18 54:1 55:18
transportation
126:21
transrectal
299:20 308:2
TRAURIG
3:10, 15

travel 130:24
190:24
treat 46:22,
23 49:10, 19
50:8, 23
51:12, 24
52:2, 4 54:23
55:1, 4, 19
57:5, 9 74:16
96:7 117:6
118:20
235:15
255:21 257:3
259:6 281:12
289:10 308:19
treatable
116:3
treated 12:13
14:1 52:12
215:14 218:10
treater 16:3
treating 31:11
48:13 52:22
53:14 54:4, 7
184:9 235:12,
23 290:3, 17
treatment
54:15, 21
58:8 74:23
116:18
117:24 118:5
151:20 247:5
256:15
289:22
290:12
291:12
292:11 313:5
314:14
treatments
181:10
259:18 262:24
tremendous
95:17 189:12
trend 300:22
301:17
trial 66:18
70:4, 21 73:6
77:11, 17, 23
78:9, 18, 19
91:24 164:5
166:5 175:20

184:19
191:14
274:23 277:3,
5, 11 291:19,
23 294:7, 8
trials 77:14
81:20 95:16
176:20, 22
200:5 288:5,
11, 13, 21, 24
tricky 244:13
tried 199:13
true 49:20
119:12
159:17
201:15, 21
238:4 321:6
truth 137:11
256:16
truthful 49:4
51:8 101:24
try 39:3
60:10 77:16
139:22
184:12
226:22
248:19 287:2
291:18 294:17
trying 30:16
56:13 66:13
91:21 95:15
101:24
129:24 130:7
131:14 145:3
182:16
216:11
248:14 262:7
263:2, 21
264:12
270:20
272:10, 11
tumor 31:7
47:6 56:5, 6,
21 57:16, 18,
20 73:13
172:4, 16
183:16 184:8,
12 213:18
232:12
257:17 258:1

tumors 56:10
292:9
tuning 209:4
turn 48:9
49:15 51:15
94:2 122:6
127:23
133:12 147:3
156:2, 17
158:5 198:24
203:11
206:10
219:21 222:13
turned 14:13
turns 74:7
twice 11:1
136:8
two 14:2
45:19 49:2
52:5, 8, 19, 22,
23 53:17, 20
74:19 84:17
107:18 111:9
113:22 114:9
120:21
173:15
191:17
197:13
199:24 206:3
226:5 228:5
252:1 282:14
293:23 294:4
two-week
53:12
type 47:7
58:8
typed 241:14
types 89:2
117:11
Typically
312:6
typist 131:9
typos 132:12,
14, 16

< U >
U.S 3:8
43:19 96:19
153:21

177:10
252:11 296:14
ultimately
64:12 220:8
ultrasound
299:20 308:3
ultrasounds
92:8, 18
unanswered
92:4
uncertain
145:4 170:24
171:15
uncertainty
145:3
uncomfortable
144:23
unconnected
188:17
uncovered
241:13
underciter
139:20
undergo
313:14
undergoing
77:8, 20 78:2
207:6
undergone
12:14
understand
15:21 16:6,
10 17:10, 13,
24 22:5
28:12 30:3,
15, 17 35:23
36:19 38:3
39:5, 23
43:14 54:11
58:21 63:11
74:11 75:1
82:15 105:7
106:23
123:11
127:15
129:24
131:15
139:13 142:8
160:12, 24
174:15, 21
176:5, 11

180:*23*
188:*16*  196:*6*
197:*5*  214:*10,*
*24*  216:*11*
226:*23*
242:*11*
243:*18*
279:*19*  311:*7*
**understanding**
30:*19*  38:*17*
50:*3*  59:*18*
146:*9*  180:*24*
181:*12*
197:*16*
209:*11*
250:*14*  255:*24*
**understands**
29:*4*
**undue**  68:*21*
**unexpected**
182:*15*
**unfortunately**
94:*5*  151:*19*
152:*15*  155:*7*
**unh-unh**  17:*21*
**uninformative**
240:*6*
**uninstrumente**
**d**  259:*22*
**unique**  310:*13*
**UNITED**  1:*1*
68:*16*  71:*2*
72:*4*  75:*10,*
*17*  83:*11*
89:*9*  139:*11*
185:*2*
**University**
10:*18*  252:*21*
**unknown**
47:*2*  48:*8, 23*
49:*8*  50:*13*
51:*13*  98:*22*
**unnecessary**
209:*22*  210:*4*
211:*11, 14, 18*
**unreliable**
209:*22*  210:*5*
211:*9, 12, 23*
212:*1*
**untreatable**
89:*8*

**unusual**  14:*5,*
*8*  199:*11*
**update**  110:*12*
111:*3*
**updated**
69:*11*  72:*21*
110:*10*
119:*13*  137:*4*
156:*7*  157:*5*
172:*7*  199:*22*
206:*23*
**upper**  38:*10*
56:*3*  232:*4*
273:*18, 19*
**upshot**  106:*1,*
*6*
**up-to-date**
110:*20*
**urine**  308:*9*
**urologic**
256:*4, 5*
**urologist**
256:*3*
**urologists**
256:*16*
**URSINA**  1:*14*
6:*3*  7:*7*  9:*18*
10:*1*  121:*9,*
*11, 12*  320:*1*
321:*8*  324:*16*
**USA**  3:*20*
4:*19*
**usage**  164:*2*
**use**  34:*2, 14*
36:*1, 3*  37:*1,*
*4, 7*  41:*9*
68:*12*  69:*18*
70:*5*  165:*23*
166:*3*  169:*17*
170:*3*  171:*3*
174:*10*  181:*8*
183:*4*  184:*18*
186:*1, 11, 21*
187:*1*  188:*2*
202:*7*  203:*7*
206:*23*
213:*13*  235:*8*
274:*1, 6, 19*
276:*18, 23*
277:*1, 23*
278:*10*  279:*7,*

*22, 23*  280:*16,*
*19*  281:*16*
294:*5*  316:*22*
**useful**  225:*19*
**uses**  280:*4*
**USPSTF**
83:*20*  154:*2,*
*13*  203:*19*
**USPTF**  103:*9*
154:*1*
**usually**  45:*2*
51:*16*  77:*12*
84:*1*  85:*3*
86:*6*  94:*6*
155:*5*  199:*21*
204:*21*  274:*9*
279:*14*

**< V >**
**Vague**  28:*9*
29:*20*  32:*6*
33:*2*  36:*11*
38:*2*  39:*7*
40:*1*  42:*16*
49:*21*  54:*9*
55:*9*  59:*6*
63:*9*  64:*18*
66:*2*  87:*10*
90:*12*  105:*20*
144:*20*
160:*14*  170:*6*
188:*13*
197:*20*  253:*6*
281:*18*  311:*5*
**valid**  105:*17*
175:*22*  317:*3*
**validated**  75:*8*
118:*11*
158:*21*
166:*12*  173:*6*
188:*5*  220:*4*
**validation**
171:*23*
**VALSARTAN**
1:*2*  9:*14*
27:*19*  42:*13*
44:*18, 22*
45:*2*  46:*6, 8*
139:*8*  146:*10,*
*24*  158:*17*
165:*5*  316:*15*

**valsartan-**
**containing**
46:*4*  59:*13*
304:*22*  305:*2*
**value**  201:*14*
**Vanderbilt**
3:*11*
**variability**
60:*19*
**various**  218:*9*
**vascular**
210:*24*
**VCDs**  30:*23*
**VCD-taking**
63:*5*
**vein**  94:*17, 18*
**verbal**  88:*21*
197:*11*
**verbalize**
17:*20*
**verbally**  178:*1*
**verbatim**
206:*15*
**versus**  15:*15*
85:*11*
**vetted**  185:*2*
**VICINAGE**
1:*2*
**video**  9:*10*
50:*7*  51:*2, 8*
71:*16, 19*
120:*15, 19*
157:*18*
219:*15, 18*
233:*6, 9*
239:*6, 9*
242:*20, 23*
282:*5, 8*
286:*16, 19*
311:*20, 24*
319:*23, 24*
**Videoconferenc**
**e**  1:*16*
**VIDEOGRAP**
**HER**  9:*2, 5*
71:*15, 18*
120:*14, 18*
123:*5*  157:*11,*
*17*  219:*13, 17*
233:*2, 5, 8*
239:*5, 8*

242:*19, 22*
282:*4, 7*
286:*12, 15, 18*
311:*19, 23*
319:*22*
**VIDEOTAPE**
5:*1*
**Videotaped**
1:*14*  6:*22*
120:*24*  121:*8*
**view**  37:*24*
63:*2*  107:*16*
138:*6, 12*
176:*2*  191:*11*
200:*11, 19*
212:*9, 22*
226:*15*
250:*11, 22*
**visible**  94:*13*
**visit**  217:*13*
218:*18*  219:*4,*
*5*
**vomiting**
300:*3*
**vulnerable**
75:*6*  109:*24*
190:*5*  292:*20*

**< W >**
**Wait**  127:*24*
185:*23*  222:*6*
**waited**  126:*4*
**waiting**  94:*24*
190:*24*
257:*20*  258:*3,*
*10*  259:*11*
308:*21, 23*
**wall**  231:*19*
**WALLACK**
4:*14*
**want**  29:*5*
45:*24*  69:*14*
74:*6*  76:*24*
82:*7, 15*
86:*20*  90:*2*
111:*15*
113:*19*
139:*21*
151:*15, 17*
152:*16*
167:*12*

Confidential Information Subject to Protective Order

170:22  174:4,
18  180:22
196:8  201:16,
21  204:11
209:9, 17
213:1  224:24
228:17
232:17, 24
242:5, 15
262:3  291:19
**wanted**  49:3
115:8  143:14
151:2  169:7
194:16
204:24
243:17
273:22  283:8
**wants**  115:1
**warrant**
212:10
**warranted**
38:1
**Washington**
2:16
**wasting**  309:4
**watch**  71:4
72:12  110:9
184:10
**watchful**
257:19  258:3,
10  308:20, 22
**way**  31:7
47:19  79:5
94:17, 24
98:6  100:13
116:19  131:6
139:7  152:14
155:7  182:1
183:18
201:13
204:17, 21
231:13  232:9
265:14
**website**
139:12, 16
168:15, 16, 18,
24  199:3
206:15
**websites**  169:2
**Wednesday**
290:15

**week**  21:14
45:19  60:2
290:19  302:23
**weeks**  45:19
49:2  52:19,
22, 23  53:18,
20, 23  74:24
**Wei**  149:21
**weigh**  292:12
314:2
**weird**  247:11
**welcome**
138:24
**Well**  17:2
44:7  61:2
65:8, 10  73:5
78:17  82:9
84:16  86:6,
24  89:15
99:12  100:2
106:23
107:14  109:6
111:22  115:6
129:12, 16
141:20
156:22
158:13
167:22
176:12, 16
178:8  185:17
192:18
193:22  199:1
205:14
207:24
208:12  212:7
213:16
215:15
221:17, 21
223:21
224:11, 13
225:4  228:6
230:19  231:7,
13  237:8, 14
241:20
248:16  257:2
259:13
267:18  268:6
269:23  280:6
292:18, 22
300:19
313:14  315:2

**well-being**
209:7  294:9
**wellness**
293:13  294:8
**went**  119:23
206:3  217:6
284:5  295:8,
14
**We're**  34:4
94:24  95:15,
19  157:2
174:7  183:13
190:23
191:14, 15
209:2  218:19
253:22
263:14  267:8
301:19  313:10
**west**  58:17
**we've**  20:5
66:13  67:21
182:23  258:5
**whatsoever**
319:14
**white**  263:6
**wiki**  139:16
**Wikipedia**
139:7
**WILLIAM**
4:16
**willing**  51:18,
21  246:9
**willingness**
229:15  230:11
**wins**  138:21
**winter**  130:23
**wish**  75:2, 4
112:12  157:5
**wishes**  114:6
**withdraw**
141:22
**withdrawing**
188:11
**withdrawn**
147:17, 22
148:1
**Witness**  8:5
9:23  20:10
28:11  29:22
32:8  33:8
34:13  35:9,

24  36:13, 17,
21  38:5
39:10  40:4
42:4, 18  43:7,
12, 16  50:2
51:11  54:13
55:12  59:9
61:9  62:9
63:13  64:22
66:4  68:5
70:11  71:14
76:5, 12  78:7
88:8, 23
90:15  97:6
98:16  100:12
102:9, 11
103:1  104:1
105:22  107:9
108:9  109:15
114:13  115:7,
10, 13, 17
116:7  121:11,
18  130:13
133:15  134:6
135:6  144:22
145:15
146:15  148:7
154:4  160:16
161:2  162:22
163:20
165:14
170:10  175:5
177:15, 23
178:15
181:24
187:14
188:15
192:13  193:6,
16  194:20
196:12
197:12
198:21
204:13, 16
214:18
215:23  217:5
219:11
221:10  224:3,
8  228:4, 9
232:19, 23
238:24
240:14  242:6,

17  245:24
248:7  249:1
250:17
257:15
258:21  261:1,
17  262:18
264:23  265:4
269:20
270:15, 19
277:1  279:12
280:7, 24
281:20
282:19  284:4
285:5  286:7,
9, 11  294:16
296:6  297:4,
20  298:13
306:13  311:7
312:15  313:8,
23  316:19
318:1, 12
319:2, 10
321:5, 6, 8
322:1
**Wmurtha@hill
wallack.com**
4:18
**Wolpin**  173:11
**woman**  24:7
96:11
**women**  248:16
**word**  40:5
224:19
**words**  35:16
112:19  182:16
**work**  22:22
44:24  125:20
129:21
132:21
139:24
141:16
189:19
213:14  222:1
286:4  287:5
288:3, 18
290:2
**worked**  20:13
23:12  47:11,
24  98:10
99:8  258:5

Confidential Information Subject to Protective Order

**workers**
96:*24*  99:*7*
100:*7*  136:*22*
**working**
13:*21*  14:*20*
21:*16, 19*
46:*19*  100:*7*
142:*2*  285:*9*
292:*22*
**workplace**
87:*22, 23*
88:*4*  98:*13*
99:*9*  194:*14*
**workup**  41:*5*
48:*7*  79:*5*
200:*23*
228:*20*  229:*3,
5*
**Workups**
220:*23*
**world**  183:*14*
231:*15*  241:*4*
**worms**  307:*20*
**worry**  38:*23*
39:*4*  79:*2*
298:*18*
299:*17*  300:*10*
**worth**  76:*18*
**wow**  55:*23*
**write**  45:*19*
46:*3*  128:*23*
130:*17*
143:*24*
189:*13*  204:*18*
**writing**
128:*22*
129:*15, 21*
130:*2, 5*
131:*4, 12*
210:*17*
**written**  42:*5*
44:*17, 18*
129:*10*
225:*17*  303:*15*
**wrong**  12:*19*
154:*15*
**wrote**  45:*8*
141:*3*  144:*1*
147:*6*

**< Y >**

**Yeah**  20:*2*
30:*14*  33:*8*
35:*9*  54:*13*
63:*13*  102:*9*
111:*19*
114:*13*
122:*24*  123:*7*
126:*22*  133:*3*
142:*4, 14*
146:*15*  156:*9*
157:*2*  160:*16*
191:*19*  201:*2*
204:*13, 16*
209:*24*  224:*8*
231:*3*  233:*4*
255:*21*  262:*6*
269:*20*  284:*3*
286:*14*  287:*19*
**year**  49:*3*
52:*19, 23*
96:*20*  104:*22*
178:*22*
217:*12*
272:*20*  273:*7*
288:*21*
**yearly**  92:*7*
219:*5*  249:*10*
**years**  13:*23*
14:*2*  31:*14*
34:*4*  42:*8*
44:*23*  46:*6, 8,
10*  52:*5, 8, 14,
21*  53:*12, 18,
19*  66:*7, 14,
16*  67:*10, 16*
68:*18*  74:*20*
83:*17*  93:*2,
11, 18*  94:*10*
95:*10*  101:*23*
104:*9*  113:*24*
120:*3*  144:*12*
149:*1*  162:*1*
164:*3*  173:*14*
206:*3, 6*
234:*23*
235:*12, 23*
243:*23*  252:*2,
15, 16, 17*
259:*11, 21*
272:*21*  281:*8*

297:*7*  300:*23*
305:*13*
**year's**  200:*1*
**Yep**  230:*21*
**yes/no**  283:*21*
**Yesterday**
74:*18*
**York**  2:*5*
3:*12*  4:*12*
36:*8*  167:*19,
24*  168:*13*
176:*4*
**young**  13:*21*
14:*7*
**YouTube**  50:*6*

**< Z >**
**ZAPPONE**
4:*3*
**zero**  293:*16,
17*  299:*16*
**zeros**  294:*7*
**Zhejiang**  3:*7*
**Zoom**  1:*16*
2:*10, 15*  3:*16*
4:*4, 11, 16*
23:*24*  24:*7*

# Exhibit 213

REDACTED

1    IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF NEW JERSEY
2               CAMDEN VICINAGE
                  -   -   -
3

IN RE:  VALSARTAN,      :  MDL NO. 2875
4   LOSARTAN, AND          :
    IRBESARTAN PRODUCTS    :  CIVIL NO.
5   LIABILITY LITIGATION   :  19-2875
    _____ :  (RBK/JS)
6                          :
    THIS DOCUMENT APPLIES  :  HON. ROBERT
7   TO ALL CASES           :  B. KUGLER
8        - CONFIDENTIAL INFORMATION -
          SUBJECT TO PROTECTIVE ORDER
9

10                 -   -   -
11              March 9, 2022
12                 -   -   -
13

14        Videotaped remote deposition of
    TIMOTHY A. ANDERSON, M.S., MBA, taken
15   pursuant to notice, was held via Zoom
    Videoconference, beginning at 9:22 a.m.,
16   EST, on the above date, before Michelle
    L. Gray, a Registered Professional
17   Reporter, Certified Shorthand Reporter,
    Certified Realtime Reporter, and Notary
18   Public.
19

                  -   -   -
20

21        GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
22            deps@golkow.com
23

24

Page 2

1
2  ZOOM APPEARANCES:

3  KANNER & WHITELEY, LLC
   BY: DAVID J. STANOCH, ESQ.
   CONLEE S. WHITELEY, ESQ.
4  701 Camp Street
   New Orleans, Louisiana 70130
5  (504) 524-5777
   d.stanoch@kanner-law.com
6  c.whiteley@kanner-law.com
7  Representing the Plaintiffs

8  GREENBERG TRAURIG, LLP
   BY: STEVEN M. HARKINS, ESQ.
9  Terminus 200
   3333 Piedmont Road NE
10 Suite 2500
   Atlanta, Georgia 30305
11 (678) 553-2312
   harkinss@gtlaw.com
12
       - and -
13
   GREENBERG TRAURIG, LLP
14 BY: KENNETH DZIKOWSKI, ESQ.
   500 Campus Drive
15 Suite 400
   Florham Park, New Jersey 07932
16 (973) 360-7900
   Dzikowskik@gtlaw.com
17
       - and -
18
   GREENBERG TRAURIG, LLP
19 BY: BRIAN RUBENSTEIN, ESQ.
   1717 Arch Street
20 Philadelphia, Pennsylvania 19103
   (215) 988-7800
21 rubensteinb@gtlaw.com
   Representing the Defendants, Teva
22 Pharmaceutical Industries, Ltd., Teva
   Pharmaceuticals USA, Inc., Actavis LLC,
23 and Actavis Pharma, Inc.
24

Page 3

1  ZOOM APPEARANCES: (Cont'd.)

2  WALSH PIZZI O'REILLY FALANGA LLP
3  BY: CHRISTINE I. GANNON, ESQ.
   Three Gateway Center
4  100 Mulberry Street
   15th Floor
5  Newark, New Jersey 07102
   (973) 757-1017
6  Cgannon@walsh.law
   Representing the Defendants, Teva
7  Pharmaceutical Industries, Ltd., Teva
   Pharmaceuticals USA, Inc., Actavis LLC,
8  and Actavis Pharma, Inc.
9
   HINSHAW & CULBERTSON, LLP
10 BY: GEOFFREY M. COAN, ESQ.
   53 State Street
11 27th Floor
   Boston, Massachusetts  02109
12 (617) 213-7047
   Gcoan@hinshawlaw.com
13 Representing the Defendant, ScieGen
   Pharmaceuticals, Inc.
14
15 BARNES & THORNBURG, LLP
   BY: MITCHELL CHARCHALIS, ESQ.
16 390 Madison Avenue
   12th Floor
17 New York, New York 10017
   (646) 746-2000
18 Mcharchalis@btlaw.com
   Representing CVS Pharmacy, Inc., and Rite
19 Aid Corporation
20
21
22
23
24

Page 4

1  ZOOM APPEARANCES: (Cont'd.)
2
   PIETRAGALLO GORDON ALFANO BOSICK &
3  RASPANTI, LLP
   BY: CHRISTOPHER S. WINKLER, ESQ.
4  One Oxford Centre, 38th Floor
   Pittsburgh, Pennsylvania 15219
5  (412) 263-1840
   csw@pietragallo.com
6  Representing the Defendant, Mylan
   Pharmaceuticals, Inc.
7
8  ALSO PRESENT:
9
   VIDEOTAPE TECHNICIAN:
10 Danny Ortega
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1           - - -
2        I N D E X
3           - - -
4
   Testimony of:
5
       TIMOTHY A. ANDERSON, M.S., MBA
6
7  By Mr. Stanoch              12
8  By Mr. Harkins             412
9
10
11
12           - - -
13        E X H I B I T S
14           - - -
15
16 NO.       DESCRIPTION         PAGE
17 Anderson-1  Expert Report of    14
             Timothy Anderson
18           1/12/22
19 Anderson-2  List of Materials    57
             Considered
20
   Anderson-3  Facts about the     108
21           Current Good
             Manufacturing Practices
22           (cGMPs)
23
24

Confidential Information Subject to Protective Order

Page 6

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE

Anderson-4  E-mail Thread        164
8/13/18
Subject, FDA-483
Observations from
2017 and Current
Valsartan Situation
ZHP00912962-67

Anderson-5  Notice on the        198
Results of the Report
Of the Preliminary
Investigation on the
Formation of Unknown
Impurities
7/27/17
ZHP00190573-74

Anderson-6  E-mail Thread        265
10/25/18
Subject, NDEA - Possible
Other Impurity
TEVA-MDL2875-00137965-70

Anderson-7  CORP-0111        278
Third Party Suppliers
And Contract Laboratories
Compliance Status
TEVA-MDL2875-00631359

Anderson-8  E-mail Thread        282
8/13/15
Subject, Missing Part
TEVA-MDL2875-00631358

Page 8

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE

Anderson-17  E-mail Thread        339
8/1/19
Subject, Day 5
FDA Audit Jerusalem
OSD Final
TEVA-MDL2875-00067532-37

Anderson-18  Warning Letter        368
320-19-34
8/8/19
APL-MDL2875-00964965-70

Anderson-19  Warning Letter        390
320-19-04
11/29/18
ZHP001344159-64

Anderson-20  ProPharma Group        410
Invoices
For Timothy Anderson

Anderson-21  Curriculum Vitae        413
Timothy A. Anderson
MS, MBA

Anderson-22  FDA Statement        439
On the FDA's Ongoing
Investigation into
Valsartan and ARB
Class Impurities,
And the Agency's Steps
To Address the Root
Causes of the Safety
Issues
1/25/19

Page 7

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE

Anderson-9  CORP-0539        288
Management of Quality
Technical Agreements
TEVA-MDL2875-00331419

Anderson-10  CORP-1034        290
Managing Critical
Vendor Issues
TEVA-MDL2875-00040589

Anderson-11  CORP-0076        292
Notification to
Management of Critical
Quality Incidents
TEVA-MDL2875-00168948

Anderson-12  CORP-0016        301
Auditing Vendors
TEVA-MDL2875-00735010

Anderson-13  CORP-0131        303
Global Regulatory
Audits
TEVA-MDL2875-00735015

Anderson-14  ZHP Audit Report        310
June 2015
TEVA-MDL2875-00399168-246

Anderson-15  Deposition Excerpts        318
Of Narenda Vadsola
3/24/21

Anderson-16  Deposition Excerpts        325
Of Pan Lin
5/26/21

Page 9

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE

Anderson-23  FDA Inspection        445
7/28 - 8/1/2019

Confidential Information Subject to Protective Order

---

Page 10

                    - - -

            DEPOSITION SUPPORT INDEX
                    - - -

Direction to Witness Not to Answer
PAGE   LINE
None.

Request for Production of Documents
PAGE   LINE
    64    9

Stipulations
PAGE   LINE
None.

Questions Marked
PAGE   LINE
None.

---

Page 11

            - - -
        THE VIDEOGRAPHER:  We are
now on the record.
        My name is Danny Ortega, and
I'm the legal videographer for
Golkow Litigation Services.
        Today's date is March 9th,
2022, and the time is 9:22 a.m.
        This video deposition is
being held in the matter of
Valsartan, Losartan, and
Irbesartan Products Liability
Litigation MDL, for the United
States District Court, District of
New Jersey.
        The deponent today is
Timothy Anderson.
        All counsel will be noted on
the stenographic record.
        The court reporter today is
Michelle Gray and will now swear
in the witness.
            - - -
... TIMOTHY A. ANDERSON, M.S., MBA,

---

Page 12

having been first duly sworn, was
examined and testified as follows:
            - - -
            EXAMINATION
            - - -
BY MR. STANOCH:
        Q.   Good morning, Mr. Anderson.
        A.   Good morning.
        Q.   Could you just say your full
name for the record, sir?
        A.   Timothy A. Anderson.
        Q.   Thank you.  Where are you
located today, sir, for this deposition?
        A.   I am located in Danbury,
Connecticut.
        Q.   And you're in a conference
room in a hotel right now for this remote
deposition, I believe?
        A.   Correct.
        Q.   And other than your counsel,
Mr. Harkins, is anybody else in the room
with you, sir?
        A.   No, sir.
        Q.   And you've been deposed

---

Page 13

before, I take it; is that right?
        A.   I have.
        Q.   So you understand the
process here.  I'll be asking a series of
questions.  You'll be providing answers.
Everything everyone says will be taken
down by the stenographer and on video.
        You understand that, right?
        A.   I understand.
        Q.   Is it fair that I'll assume
you understand my question unless you
tell me otherwise, and I'll attempt to
rephrase?
        A.   That will be true, yes.
        Q.   Okay.  And you know that you
should answer the question, unless your
counsel instructs you otherwise, right?
        A.   Correct.
        Q.   All right.  If we need to
take a break later, just say so.  If
there's a question pending, I'd ask that
you answer it.  Is that fair?
        A.   That is fair.
        Q.   Okay.  Any reason that you

---

Page 14

¹ cannot testify truthfully and accurately
² today, sir?
³        A.   No reason at all.
⁴        Q.   Excellent.  Let's get into
⁵ it.
⁶            Mr. Anderson, what's your
⁷ understanding of this litigation?
⁸        A.   My understanding is that
⁹ John Quick has prepared a report, a
¹⁰ declaration that I was asked to review
¹¹ and to rebut.  And I was also asked to
¹² review cGMP issues that were made by
¹³ auditors and inspectors.
¹⁴        Q.   You've rendered opinions in
¹⁵ this case reflected in your report that
¹⁶ you submitted, correct?
¹⁷        A.   Correct.
¹⁸            MR. STANOCH:  I'm going to
¹⁹ mark that as Exhibit 1.
²⁰            (Document marked for
²¹        identification as Exhibit
²²        Anderson-1.)
²³ BY MR. STANOCH:
²⁴        Q.   Let me know, sir, when you

Page 15

¹ can access that on your screen.
²            MR. HARKINS:  I'm going to
³ copy the exhibit share into the
⁴ chat if it hasn't already been
⁵ done so that he can open it up.
⁶ He also has a hard copy of the
⁷ report in front of him.
⁸            MR. STANOCH:  That's fine.
⁹ And Mr. Harkins, do you want to
¹⁰ wait to get that set up with the
¹¹ remote, or do you want me to start
¹² asking questions?  I'm fine
¹³ proceeding either way.
¹⁴            MR. HARKINS:  Let's get it
¹⁵ set up.  We had it on the other
¹⁶ computer.  We switched.  So we'll
¹⁷ quickly do that.
¹⁸            Do you see the chat
¹⁹ function?
²⁰            THE WITNESS:  I do.
²¹            MR. HARKINS:  The link just
²² went up there.
²³ BY MR. STANOCH:
²⁴        Q.   Just let me know when you

Page 16

¹ can see that Exhibit 1, sir.
²        A.   I'll let you know.  I'm
³ trying to move it over to the other
⁴ screen.  Okay.  I'm there.
⁵        Q.   Okay.  Exhibit 1 is a copy
⁶ of your report in this litigation, right?
⁷        A.   That's correct.
⁸        Q.   And your report includes all
⁹ the opinions you're currently offering in
¹⁰ this matter, right?
¹¹        A.   Correct.
¹²        Q.   And your opinions in your
¹³ report apply to all the plaintiffs in
¹⁴ this litigation, right?
¹⁵        A.   They apply to Teva.
¹⁶        Q.   You mentioned in Paragraph
¹⁷ 19 class plaintiffs.
¹⁸            Do you see that?
¹⁹        A.   Yeah.
²⁰        Q.   And what's your
²¹ understanding of who the class plaintiffs
²² are in this case?
²³        A.   I understand that there are
²⁴ a class of plaintiffs and that there are

Page 17

¹ a class of defendants in this case.
²        Q.   Can you describe in more
³ detail the class of plaintiffs in this
⁴ case?
⁵        A.   The class of plaintiffs are
⁶ those who are alleging injury.  The class
⁷ of defendants are those who are accused.
⁸        Q.   What injuries are the class
⁹ of plaintiffs alleging, to your
¹⁰ knowledge?
¹¹            MR. HARKINS:  Objection.
¹²        Requires a legal conclusion.
¹³            But you can answer if you do
¹⁴        understand.
¹⁵            THE WITNESS:  I do not
¹⁶        understand all of the matters that
¹⁷        constitutes plaintiffs'
¹⁸        complaints.
¹⁹ BY MR. STANOCH:
²⁰        Q.   Well, what's the harm that
²¹ the class plaintiffs allege, to your
²² understanding?
²³        A.   They are -- they are
²⁴ complaining of -- about valsartan.

Confidential Information Subject to Protective Order

Page 18

1    Q.   In what respect?
2    A.   In respect that they have
3  named, of all of these complaints
4  specifically that they are alleging.  I
5  just know that they are alleging
6  complaints.
7    Q.   You don't know the
8  complaints that the class plaintiffs are
9  alleging in this litigation against the
10  defendants?
11    A.   Not in detail, no.
12    Q.   Can you tell me anything
13  besides what you've told us already about
14  the complaints that the class plaintiffs
15  are alleging in this litigation against
16  the defendants?
17    A.   All I know is that the class
18  plaintiffs are alleging harm.
19    Q.   What kind of harm?
20    A.   I do not have direct insight
21  into what specific class plaintiffs are
22  alleging.
23    Q.   So you can't give me any
24  more detail about the purported harm that

Page 19

1  the class plaintiffs are alleging?
2    A.   I cannot.
3    Q.   Can you tell me who the
4  class plaintiffs are, either by name or
5  categorically?
6    A.   I cannot.
7    Q.   Can you tell me the forms of
8  relief that the class plaintiffs seek in
9  this litigation?
10       MR. HARKINS:  Object to
11    form.  Calls for a legal
12    conclusion.
13       THE WITNESS:  I have no
14    legal opinion on that.
15  BY MR. STANOCH:
16    Q.   I don't need a legal
17  opinion, sir, just your lay
18  understanding.
19       Can you tell me the forms of
20  relief that the class plaintiffs seek in
21  this litigation?  And if you can't, you
22  can say you can't.
23    A.   I can't.
24    Q.   Can you tell me how many

Page 20

1  class plaintiffs there are?
2    A.   I do not know.
3    Q.   Can you tell me how many
4  states the class plaintiffs hail from?
5    A.   I do not know.
6    Q.   Can you tell me the time
7  period for which the class plaintiffs
8  alleged harm?
9    A.   I don't know what exact time
10  frame the plaintiffs are alleging harm.
11    Q.   Can you tell me any details
12  about the time frame for which the class
13  plaintiffs are alleging harm?
14    A.   I cannot.
15    Q.   Can you tell me anything
16  about the theories of liability the class
17  plaintiffs allege against the defendants
18  in this litigation?
19       MR. HARKINS:  Form.  Calls
20    for legal conclusion.  Outside the
21    scope.
22       THE WITNESS:  I have no
23    legal opinion to offer on this.
24  BY MR. STANOCH:

Page 21

1    Q.   Putting aside any legal
2  opinion, which I don't want from you,
3  sir, can you tell me anything about the
4  theories of liability the class
5  plaintiffs allege against the defendants
6  in this litigation?
7       MR. HARKINS:  Same
8    objection.  Calls for a legal
9    conclusion.
10       THE WITNESS:  My ability is
11    outside the scope of my report.
12  BY MR. STANOCH:
13    Q.   Did you read the complaints
14  filed by the class plaintiffs in this
15  case, sir?
16    A.   I read them once.
17    Q.   And so -- and you did that
18  to familiarize yourself with the case,
19  I'm sure, right?
20    A.   Generally correct.
21    Q.   And can you identify for me
22  a single theory alleged in the class
23  complaints that you've read by the class
24  plaintiffs against the defendants?

Page 22

1       MR. HARKINS: Objection.
2       THE WITNESS: There is no
3 theory that I recall.
4 BY MR. STANOCH:
5    Q. Do your opinions in this
6 case depend on the number of class
7 members in a litigation?
8    A. No, it does not.
9    Q. Your opinions are the same
10 no matter how many class members there
11 may be, correct?
12    A. Correct.
13    Q. Do your opinions vary based
14 on which states a class plaintiff may
15 hail from?
16    A. No.
17    Q. Your opinions apply equally
18 no matter what particular state a
19 plaintiff may hail from, right?
20    A. Correct.
21    Q. Your opinions don't depend
22 on the specific theory of liability
23 alleged by any particular class
24 plaintiff, does it?

Page 23

1    A. I have no theory with
2 respect to liability.
3    Q. So your opinions don't
4 depend on the specific theory of
5 liability alleged by a particular class
6 plaintiff, correct?
7    A. Correct.
8    Q. How, if at all, can you tell
9 me that your opinions fit the theories of
10 liability alleged by the class plaintiffs
11 in this case?
12       MR. HARKINS: Object to
13 form. Vague. Calls for a legal
14 conclusion.
15       You can answer.
16       THE WITNESS: I'm not
17 opining on anything having to do
18 with liability or legal matters.
19 BY MR. STANOCH:
20    Q. So you cannot tell me how
21 your opinions fit the theories of
22 liability alleged by the class plaintiffs
23 in this case, correct?
24       MR. HARKINS: Object to

Page 24

1 form. Calls for legal conclusion,
2 scope. Asked and answered.
3       THE WITNESS: This is
4 outside the scope of my report.
5 BY MR. STANOCH:
6    Q. So the answer to that is,
7 correct, you cannot tell me how your
8 opinions fit the theories of liability
9 alleged by the class plaintiffs in this
10 case?
11       MR. HARKINS: Same
12 objection.
13       THE WITNESS: I stated that
14 it's outside the scope of my
15 report.
16 BY MR. STANOCH:
17    Q. Therefore, your opinions
18 have no bearing on fitting the theories
19 of liability alleged by the class
20 plaintiffs in this case?
21       MR. HARKINS: Object to
22 form. Calls for a legal
23 conclusion, misstates testimony.
24 Vague.

Page 25

1       THE WITNESS: Could you
2 repeat the question, please?
3       MR. STANOCH: Stand by.
4       THE WITNESS: Could you
5 repeat the question, please?
6 BY MR. STANOCH:
7    Q. Yes, sir. I was just
8 finding the question.
9       So earlier I asked you if
10 you can -- whether you could tell me how
11 your opinions fit the theories of
12 liability alleged by the class plaintiffs
13 in this case.
14       Objections.
15       And you said, I believe, "I
16 stated that's outside the scope of my
17 report."
18       Do you remember that?
19    A. I do remember that.
20    Q. So --
21    A. And --
22    Q. -- it's correct then that
23 you cannot tell me how your opinions fit
24 the theories of liability alleged by the

Confidential Information Subject to Protective Order

1 class plaintiffs in this case?
2         MR. HARKINS:  Same
3     objection.
4         THE WITNESS:  I have no
5     opinion concerning liability.
6 BY MR. STANOCH:
7     Q.   You cannot tell me how your
8 opinions fit the theories alleged by the
9 class plaintiffs in this case, can you?
10         MR. HARKINS:  Objection.
11     Calls for a legal conclusion.
12         You can answer.
13         THE WITNESS:  In that is a
14     legal conclusion, I have no
15     opinion.
16 BY MR. STANOCH:
17     Q.   Again, I'm not asking for
18 your legal conclusion ever, sir.
19         Can you tell me how your
20 opinions fit the theories alleged by the
21 class plaintiffs in this case?
22         MR. HARKINS:  Same
23     objection.
24         THE WITNESS:  I'm commenting

1     only on cGMP-related matters, not
2     matters of liability.
3 BY MR. STANOCH:
4     Q.   So how if at all do your
5 theories fit -- strike that, sir.
6     So how, if at all, do your
7 opinions fit the theories alleged by the
8 class plaintiffs in this case?
9         MR. HARKINS:  Object to
10     form.  Asked and answered.
11         THE WITNESS:  I'm commenting
12     only on cGMP-related matters.
13 BY MR. STANOCH:
14     Q.   None of your opinions have
15 anything to do with the particular
16 theories alleged by class plaintiffs
17 then?
18         MR. HARKINS:  Object to
19     form.  Asked and answered.
20         THE WITNESS:  As I said, I'm
21     commenting only on cGMP-related
22     matters.
23 BY MR. STANOCH:
24     Q.   Are you commenting then on

1 any of the particular theories alleged by
2 class plaintiffs?
3         MR. HARKINS:  Object to
4     form.  Asked and answered.  Calls
5     for a legal conclusion.
6         THE WITNESS:  I am
7     commenting on cGMP-related
8     answers -- matters as they pertain
9     to my rebuttal of John Quick's
10     report.
11 BY MR. STANOCH:
12     Q.   And that's the only thing
13 that you're opining on, correct?
14     A.   Correct.
15     Q.   So you're not then opining
16 on the application of any of your
17 opinions to any particular theory alleged
18 by plaintiffs, correct?
19         MR. HARKINS:  Form.
20         THE WITNESS:  I'm commenting
21     only on cGMP-related matters.
22 BY MR. STANOCH:
23     Q.   And are you applying your
24 opinions of the cGMP matters to a

1 particular theory alleged by the class
2 plaintiffs?
3         MR. HARKINS:  Object to
4     form.  Calls for a legal
5     conclusion.
6         THE WITNESS:  I am
7     commenting on cGMP-related
8     matters.
9         Theory is something which is
10     vague.
11 BY MR. STANOCH:
12     Q.   We talked earlier about the
13 legal theories of harm alleged by class
14 plaintiffs.  You remember that, right?
15     A.   I recall you asking me about
16 that.
17     Q.   Right.  And I think you said
18 that you're not familiar with the
19 particular theories of harm alleged by
20 the plaintiffs, correct?
21     A.   That's correct.  Perhaps you
22 have a theory that you'd like to bring
23 up.
24     Q.   And I'm simply asking you

Confidential Information Subject to Protective Order

Page 30

1  then, that the opinions you're offering
2  on cGMP are not applied to particular
3  theories of harm alleged by the class
4  plaintiffs, right?
5          MR. HARKINS:  Form.  Calls
6  for a legal conclusion.
7          THE WITNESS:  Theory is a
8  very broad and general term, and I
9  can't answer that without knowing
10  what theory it is that you have a
11  question about.
12  BY MR. STANOCH:
13      Q.    The theories of harm, sir.
14      A.    Can you state what theory of
15  harm you're talking about?
16      Q.    I asked you, sir, what were
17  class plaintiffs' theories of harm.  And
18  you said that you don't know any of the
19  specific ones, correct?
20      A.    Correct.
21      Q.    So I'm asking you then, sir,
22  how do your opinions -- strike that.
23          So I'm asking you, sir,
24  whether it's true that because you don't

Page 31

1  know the class plaintiffs' theories of
2  harm, your opinions are not being applied
3  to a particular theory of harm alleged by
4  the class plaintiffs, right?
5          MR. HARKINS:  Objection to
6  form.  Asked and answered.  Calls
7  for a legal conclusion.
8          THE WITNESS:  Respectfully,
9  if there was a theory that you
10  have in mind, I can comment on it
11  in the context of cGMP-related
12  matters only.
13  BY MR. STANOCH:
14      Q.    Got it.  But sitting here
15  right now, you can't tell me a particular
16  theory of harm alleged by the class
17  plaintiffs, right?
18          MR. HARKINS:  Object to
19  form.  Asked and answered.
20          You can answer.
21          THE WITNESS:  If you have a
22  theory of harm that is framed in
23  the context of cGMP issues, then I
24  can comment.

Page 32

1          Outside of that, your
2  request for me to comment on
3  theories which you have not
4  enunciated are ones I find are too
5  general for me to answer at this
6  time.
7  BY MR. STANOCH:
8      Q.    Can you tell me a particular
9  claim alleged by any class plaintiffs?
10          MR. HARKINS:  Object to
11  form.  Asked and answered.
12          THE WITNESS:  No, I cannot.
13  BY MR. STANOCH:
14      Q.    Can you tell me then how
15  your opinions specifically apply to a
16  particular claim alleged by the class
17  plaintiffs?
18          MR. HARKINS:  Object to
19  form.  Asked and answered.  Calls
20  for a legal conclusion.
21          THE WITNESS:  I can comment
22  on cGMP-related matters as it
23  pertains to any comment that was
24  made in John Quick's report and on

Page 33

1  cGMP issues that were raised by
2  auditors and inspectors.
3  BY MR. STANOCH:
4      Q.    Can you tell me how any
5  comments you make about Mr. Quick's
6  report or cGMP issues should fit any
7  particular claim alleged by the class
8  plaintiffs?
9          MR. HARKINS:  Object to
10  form.  Vague.  Calls for a legal
11  conclusion.
12          THE WITNESS:  I was asked to
13  evaluate John Quick's report and
14  to rebut John Quick's report and
15  provide opinions related to audits
16  and inspections made by FDA.
17  BY MR. STANOCH:
18      Q.    Are you offering any
19  opinions, sir, on cGMP issues and how --
20      A.    Yes --
21      Q.    -- those issues fit to a
22  particular claim alleged by the class
23  plaintiffs?
24          MR. HARKINS:  Object to

Confidential Information Subject to Protective Order

Page 34

1    form.  Compound.  Calls for a
2    legal conclusion.
3         THE WITNESS:  I am
4    commenting on cGMP issues that
5    John Quick commented on and opined
6    upon and I was asked to rebut.
7  BY MR. STANOCH:
8    Q.   And respectfully, sir --
9         MR. STANOCH:  Mr. Harkins,
10   as we've gone over a number of
11   times, per your side's request,
12   we're entitled to a yes or no
13   answer and then the witness may
14   explain.
15        So I'm going to ask it one
16   more time.  And I'd ask that you
17   follow the Court's prior rulings.
18   And he can explain his answer
19   after he answers it yes or no.
20  BY MR. STANOCH:
21   Q.   So, sir, can you tell me how
22   your opinions fit a particular claim
23   alleged by the class plaintiffs?
24        MR. HARKINS:  Object to

Page 35

1    form.  Calls for a legal
2    conclusion.
3         To the extent that you were
4    asking for a yes or no answer as
5    to how his opinions fit the legal
6    theories that the parties are
7    discussing in this case, he is not
8    going to provide a yes or no
9    answer because he was not asked to
10   provide an opinion on how legally
11   any of his opinions fit the any of
12   the theories by either the
13   plaintiffs or the defendants in
14   this case.
15        You can answer.
16        THE WITNESS:  As I said, I
17   was asked to rebut John Quick's
18   report and provide opinions on
19   inspections and audits that were
20   conducted by Teva and by health
21   authorities.
22        That is the extent of what I
23   was asked to do.
24  BY MR. STANOCH:

Page 36

1    Q.   Did your opinions take into
2  account the specific legal claims alleged
3  by the class plaintiffs?
4         MR. HARKINS:  Object to
5    form.  Asked and answered.
6         THE WITNESS:  Again, whether
7    they are legal claims, I do not
8    know.
9         To the extent that they are,
10   I'm only commenting on
11   cGMP-related matters.
12  BY MR. STANOCH:
13   Q.   Were you asked by counsel to
14  make any assumptions for the purposes of
15  your report?
16   A.   That question is a bit
17  general.  Do you have a specific
18  assumption that you have in mind?
19   Q.   I'm asking you, sir.  I
20  don't know what you were asked to assume,
21  if anything.
22        Were you asked to assume any
23  fact in the preparation of your report?
24        MR. HARKINS:  Just remind

Page 37

1    the witness not to discuss the
2    substance of any conversations
3    with counsel.
4         But subject to that, you can
5    answer.
6         THE WITNESS:  There are no
7    assumptions that were sent to me,
8    if that's where you're going with
9    that.
10  BY MR. STANOCH:
11   Q.   Were you asked to assume
12  that Teva's finished dose products
13  contained nitrosamines?
14   A.   I was asked to review
15  documents that alleged that that is the
16  case.
17   Q.   Are you assuming in
18  rendering your opinions in this case that
19  Teva's finished dose valsartan products
20  did contain nitrosamines?
21   A.   There is evidence from
22  documentation to say such.
23   Q.   Were you asked to assume
24  that nitrosamines became present in

Page 38

¹ Teva's finished dose products through API
² purchased by ZHP or Mylan?
³      A.   Documents were presented to
⁴ me which showed evidence thereof.  There
⁵ were no assumptions that were made.
⁶      Q.   Were you asked to assume
⁷ that at all times between 2012 to June of
⁸ 2018, the valsartan API which Teva used
⁹ for its valsartan finished dose product
¹⁰ contained nitrosamines?
¹¹           MR. HARKINS:  Object to
¹²      form.  Vague.
¹³           THE WITNESS:  I was not
¹⁴      asked to assume anything.
¹⁵      Documentation was supplied to me
¹⁶      to provide evidence or lack
¹⁷      thereof that such a situation
¹⁸      existed.
¹⁹ BY MR. STANOCH:
²⁰      Q.   And what's your assessment
²¹ of whether such a situation existed?
²²      A.   The situation that I found
²³ existed was that ZHP informed Teva of the
²⁴ presence of NDMA in their drug substance,

Page 39

¹ and they notified Teva of this fact.  I
² believe it was on June 6th of 2018.
³      Q.   We'll come back to that,
⁴ sir.
⁵           Do you know whether Teva's
⁶ valsartan finished dose product between
⁷ 2012 and June 2018 contained
⁸ nitrosamines?
⁹      A.   Excuse me.  May I revise
¹⁰ that last answer that I just gave you?
¹¹      Q.   Please.
¹²      A.   Yes.  More correctly, June
¹³ 20th was the date on which Teva was
¹⁴ informed.  As I'm recalling the document
¹⁵ that I read, it was on June 6th that ZHP
¹⁶ confirmed that they had nitrosamines in
¹⁷ their API, just for clarification.
¹⁸      Q.   That's fine.  I'll repeat
¹⁹ the question before the revision, which
²⁰ was completely fine, Mr. Anderson.  Feel
²¹ free to -- if you need to do that
²² throughout the day, let me know.
²³           Do you know whether Teva's
²⁴ valsartan finished dose product between

Page 40

¹ 2012 and June 2018 contained
² nitrosamines?
³      A.   I have no evidence to
⁴ suggest that.
⁵      Q.   You don't know whether
⁶ Teva's valsartan finished dose products
⁷ contained nitrosamines?
⁸      A.   You asked during a specific
⁹ time period.  And I have no evidence that
¹⁰ Teva knew that there was NDMA present in
¹¹ any of the drug product.
¹²      Q.   Putting aside what Teva
¹³ knew.  From your review of materials in
¹⁴ this case, did Teva's valsartan finished
¹⁵ dose product between 2012 and June 2018
¹⁶ contain nitrosamines?
¹⁷      A.   Not as they were tested by
¹⁸ Teva.  It wasn't evident.
¹⁹      Q.   Regardless of whether Teva
²⁰ tested them or not, do you know whether
²¹ Teva's finished dose product between 2012
²² and June of 2018 contained any
²³ nitrosamines?
²⁴      A.   The API that was evaluated

Page 41

¹ by ZHP in 2018 in terms of the
² information request that FDA made of ZHP
³ showed that there were -- there was
⁴ evidence of NDMA in the API that ZHP
⁵ supplied lots for.
⁶           I don't know what lots Teva
⁷ had in their product, so it's hard for me
⁸ to say anything beyond what was revealed
⁹ in the ZHP response to FDA with regard to
¹⁰ specific lots of API.
¹¹      Q.   Is it fair to say that
¹² you're not opining on which lots or
¹³ batches of valsartan finished dose
¹⁴ product made by Teva did or did not
¹⁵ contain nitrosamines?
¹⁶      A.   I did not -- do not have
¹⁷ visibility to any direct connection
¹⁸ between a specific lot of API that was
¹⁹ manufactured by ZHP which had NDMA in it
²⁰ and a lot of API that was utilized in a
²¹ Teva product.
²²      Q.   Right.  But you did not
²³ conduct any analysis in your report about
²⁴ the levels of nitrosamines in any

Page 42

¹ valsartan finished dose product, right?
²     A.   I do not.
³     Q.   You're not opining, right,
⁴ about the levels of nitrosamines in any
⁵ valsartan finished dose product, correct?
⁶     A.   I am not.
⁷     Q.   You're not opining about
⁸ whether or not a particular valsartan
⁹ finished dose product did or did not
¹⁰ contain nitrosamines, right?
¹¹     A.   Correct.
¹²     Q.   You're not opining about the
¹³ levels of nitrosamines in any valsartan
¹⁴ API, correct?
¹⁵     A.   I'm not opining about the
¹⁶ specific levels, not at all.
¹⁷     Q.   You're not opining on
¹⁸ whether a particular batch of valsartan
¹⁹ API did or did not contain nitrosamines,
²⁰ right?
²¹     A.   I am not opining.  I have
²² reviewed documents supplied by ZHP
²³ specifically where they revealed that
²⁴ they had NDMA present in lots of API

Page 43

¹ which were featured as part of that
² response to FDA.
³          But I have no connection to
⁴ any one of those lots of API, as they
⁵ were -- with respect to Teva products.
⁶     Q.   That's fair.  You're not
⁷ conducting any batch or lot analysis of
⁸ valsartan API for nitrosamine levels,
⁹ fair?
¹⁰     A.   That is correct.
¹¹     Q.   And we've been talking about
¹² nitrosamines a little bit.  What's your
¹³ understanding of a nitrosamine, sir?
¹⁴     A.   Nitrosamines is a an
¹⁵ artifact of production, a process
¹⁶ impurity specifically, which arises and
¹⁷ was found to arise in a detailed sense as
¹⁸ described by ZHP, where, if I recall,
¹⁹ that there was a substitution of
²⁰ triethylamine hydrochlorothiazide with
²¹ zinc chloride as a catalyst.
²²          And I believe that there was
²³ a -- either an admission or substitution
²⁴ of methyl tertiary butyl either, MTBE

Page 44

¹ with dimethylformamide, DMF.
²     Q.   And we can agree for
³ purposes of today that NDMA, that's a
⁴ type of nitrosamine, right?
⁵     A.   It is.
⁶     Q.   We can agree for purposes of
⁷ today that NDEA is a type of nitrosamine,
⁸ correct?
⁹     A.   Correct.
¹⁰     Q.   And is it fair then that
¹¹ when we refer to nitrosamines throughout
¹² the day, that would include both NDMA and
¹³ NDEA, fair?
¹⁴     A.   In the proper context, yes.
¹⁵     Q.   Sure.
¹⁶          If you ever need to ever
¹⁷ split it out, feel free to do so.  Is
¹⁸ that okay?
¹⁹     A.   That's okay.
²⁰     Q.   Do you agree that
²¹ nitrosamines are genotoxic?
²²     A.   It is alleged that they are
²³ genotoxic.  And it is suspected that they
²⁴ are genotoxic.  There have been studies

Page 45

¹ that have been done, as I understand it,
² preclinically to suggest that they are
³ genotoxic.
⁴     Q.   Did you have any
⁵ professional familiarity with
⁶ nitrosamines prior to your engagement in
⁷ this case?
⁸     A.   I did not.
⁹     Q.   Do you agree that
¹⁰ nitrosamines are probable human
¹¹ carcinogens?
¹²          MR. HARKINS:  Object to
¹³ form.  Scope.
¹⁴          THE WITNESS:  They have been
¹⁵ characterized as such by FDA.
¹⁶ BY MR. STANOCH:
¹⁷     Q.   Do you agree that
¹⁸ nitrosamines are not an active ingredient
¹⁹ in any FDA-approved drug?
²⁰     A.   I agree, to my knowledge,
²¹ that that is true.
²²     Q.   Do you agree that
²³ nitrosamines are part of the cohort of
²⁴ concern under ICH M7 guidance?

Confidential Information Subject to Protective Order

Page 46

1    A.   I'm aware of that, yes.
2    Q.   Would you agree that the
3 presence of nitrosamines, even at trace
4 levels, could be considered unacceptable
5 because these impurities are potential
6 human carcinogens?
7         MR. HARKINS:  Object to
8    form.  Vague.  Scope.
9         THE WITNESS:  There's a
10    point in time that they were
11    deemed to be unsuitable and
12    unacceptable according to a
13    registry standard that FDA
14    established for them.
15 BY MR. STANOCH:
16    Q.   Do you recall what that
17 specific point in time was?
18    A.   That point in time there
19 were initial limits that were set by FDA.
20 I believe it was in December of 2018.
21    Q.   Okay.  Prior to December of
22 2018, were there any limits set by the
23 FDA for how much nitrosamine could be in
24 any drug?

Page 47

1    A.   There were none.
2    Q.   And were you aware of any
3 limits that allowed any amount of NDMA or
4 NDEA in a drug set by any regulatory
5 agency or professional body?
6    A.   None of which I am aware.
7    Q.   In Paragraph 19 of your
8 report, sir -- tell me when you're there.
9    A.   I'm here.
10    Q.   You say that counsel for
11 Teva Pharmaceuticals USA, Inc., and its
12 affiliates, collectively Teva, asked you
13 to review and respond to certain issues
14 as you set forth in this paragraph,
15 right?
16    A.   Correct, as I've stated.
17    Q.   Who are the affiliates that
18 you're including in your definition of
19 Teva?
20    A.   Teva company is comprised of
21 a series of -- we'll call them predicate
22 companies' names, of which that come to
23 mind are Watson Pharmaceuticals,
24 Actavis -- excuse me -- yes, Actavis

Page 48

1 Pharmaceuticals, Arrow Pharmaceuticals,
2 which over time became Teva companies.
3         So they are affiliates in
4 that sense that they were not part of the
5 original Teva, but are entities,
6 operating entities, that predate Teva's
7 acquisition of them.  Hence, I refer to
8 them as affiliates.
9    Q.   Got it.  So it's fair to say
10 Watson, Actavis, Arrow would be
11 predecessor entities that were acquired
12 or became part of Teva at a certain
13 point?
14    A.   Correct.
15    Q.   Do you know when any of
16 those entities became a part of Teva?
17    A.   I don't have the exact
18 recollection of specific dates.  I
19 believe they are in my report.  And I
20 don't have immediate recollection of what
21 those are.
22         If you would like me to go
23 through my report and find that paragraph
24 where I detailed it, I would be happy to

Page 49

1 try and locate it and read it back to
2 you.
3    Q.   I appreciate that.  But we
4 don't need to do that quite yet.  Just so
5 we are on the same page throughout the
6 day.
7         Is it your understanding
8 that Watson was acquired by Actavis, and
9 then Actavis was acquired by Teva at some
10 point?
11    A.   I believe that was the
12 sequence.
13    Q.   I think Arrow, that was also
14 a facility that was -- or company under
15 Actavis, and then Actavis came part of
16 Teva, right?
17    A.   That could be true.  I don't
18 have immediate recollection to know.  But
19 I'll accept your statement.
20    Q.   All right.  And so
21 throughout the day, we may refer to Teva.
22 And can we understand that Teva would
23 mean both sort of legacy Teva, as well as
24 entities which it acquired at some point

Confidential Information Subject to Protective Order

Page 50

1 for purposes of your report?
2    A.    Yes.
3    Q.    Right.  So for example, we
4 can say, you know, Teva sourced valsartan
5 API from two suppliers, ZHP and Mylan,
6 right?
7    A.    Yes.
8    Q.    And we understand though,
9 that it might have been Actavis initially
10 sourcing that API from ZHP, but then it
11 continued doing that once it was acquired
12 at some point by Teva, right?
13    A.    Agreed, yeah.
14    Q.    Great.  And you agree that
15 Actavis was sourcing valsartan API from
16 ZHP, correct?
17    A.    Yes.  That's correct.
18    Q.    And then it continued to do
19 so once it was acquired by Teva, right?
20    A.    Correct.
21    Q.    And Teva was also sourcing
22 API from Mylan for manufacture into
23 finished dose valsartan at its Jerusalem
24 facility, right?

Page 51

1    A.    That is my understanding,
2 yes.
3    Q.    Do you know approximately
4 when Actavis was acquired by Teva?
5    A.    I can look up that exact
6 date, I believe that I have in my report.
7 I have an idea of what that date is.  But
8 if you'll allow me the freedom to guess
9 on this --
10    MR. HARKINS:  Don't guess,
11    please.
12    THE WITNESS:  I've been
13    advised not to guess.
14    Would you like me to find it
15    in my report?
16 BY MR. STANOCH:
17    Q.    Sure.
18    I'm just making sure that we
19 have a timeline as we go through the day,
20 sir.  And if later, you have to correct
21 it.
22    When do you think Teva
23 acquired Actavis?  Even a year is fine.
24    A.    Again, yeah, I don't want to

Page 52

1 guess.  What I will say is that it is
2 sometime between 2012 and 2018.
3    Q.    That's good enough.  I
4 appreciate that, sir.  We can agree, you
5 know, for now, that sometime during the
6 2012 and 2018 time period, Actavis was
7 acquired by Teva, right?
8    A.    Agreed.
9    Q.    Great.  And if later it
10 becomes particularly pertinent about the
11 timing on it, feel free to look it up
12 your report and let me know that you need
13 to.
14    Is that okay?
15    A.    I will.
16    Q.    Great.  In Paragraph 20 of
17 your report, sir, you talk about some of
18 the regulatory inspections that were
19 pertinent to your opinions here?
20    A.    Correct.
21    Q.    That includes FDA inspection
22 of Teva facilities, right?
23    A.    It does.
24    MR. HARKINS:  Are you

Page 53

1 hearing an echo?
2    MR. STANOCH:  Yes.
3    MR. HARKINS:  Can we go off
4    the record for one second.
5    THE VIDEOGRAPHER:  The time
6    right now is 10:01 a.m.  We are
7    off the record.
8    (Short break.)
9    THE VIDEOGRAPHER:  The time
10    right now is 10:04 a.m.  We're
11    back on the record.
12 BY MR. STANOCH:
13    Q.    Mr. Anderson, welcome back.
14 We were looking at Paragraph 20 of your
15 report.  Do you remember that?
16    A.    I see the paragraph, yes.
17 It's in front of me.
18    Q.    And we were saying how you
19 looked at FDA inspections of Teva
20 facilities, right?
21    A.    Yes, that is correct.  I
22 believe that's in Paragraph 21.
23    Q.    And that would be FDA
24 inspections of the two Teva facilities

Confidential Information Subject to Protective Order

Page 54

1 that manufactured valsartan for the U.S.
2 market, the Jerusalem facility, and I'll
3 call it the Malta facility?
4     A.    Correct.
5     Q.    And you also looked at the
6 Malta authority's inspection of, I
7 assume, the Teva Malta facility?
8     A.    Correct.
9     Q.    Did you look at any Israeli
10 inspections of the Teva Jerusalem
11 facility?
12     A.    I did.
13     Q.    You did.  Where do you say
14 that?
15     A.    There is evidence thereof in
16 the appendix and later on in the report
17 of -- if it is not mentioned in this
18 paragraph, that is just something that I
19 did not happen to include, but it is
20 something which is very much part of my
21 report.
22     Q.    So you're saying that you
23 did look at Israeli authority inspection
24 documents for the Teva Jerusalem

Page 55

1 facility?
2     A.    I did.
3     Q.    And I don't see it here in
4 your Section 2.
5         Where might that appear in
6 your report?
7     A.    Okay.  One moment, please.
8 I do make reference to the host of
9 inspections which were -- which had taken
10 place.  I'm looking at Page 43 of my
11 report, Section 3, which is entitled "FDA
12 Inspection of Teva Israeli, October 13th
13 through 17 of 2013."  Following on Page
14 44, with "FDA Inspection of Teva Israeli
15 June 16th to 22, 2015."
16         And of course the details of
17 the observations that were made by FDA at
18 Teva Israeli are noted in the appendix.
19     Q.    I certainly agree that you
20 opine in your report about FDA
21 inspections of Teva Israel, including
22 those set forth in Paragraphs 172 to 176
23 of your report.
24         My question was, did you

Page 56

1 look at any Israeli government authority
2 inspections of Teva's Jerusalem facility?
3     A.    I did not.
4     Q.    And you mentioned the
5 materials considered.  I want to ask you
6 a few questions about that.
7         You have an appendix on
8 exhibit to your report, Exhibit B,
9 correct?
10     A.    Yes, I do.
11     Q.    And this is the list of
12 materials considered; is that right?
13     A.    That is correct.
14     Q.    And I also understand, and I
15 can put it in front of you, there's a
16 slightly revised version of this to
17 update that you may have read a few
18 additional deposition transcripts or
19 parties' experts who might have been
20 deposed since you issued your report,
21 right?
22     A.    That is correct.
23     Q.    I can put it in front of
24 you.  But other than the other deposition

Page 57

1 transcripts that you might have read
2 between the issuance of your report and
3 now, were there any other differences
4 that you recall between your original
5 materials considered list and the more
6 recent material considered list?
7     A.    Well, to be complete, I
8 received expert reports from defendants
9 that were supplied to me as well as
10 expert reports from plaintiffs' side.  So
11 that's in addition to reviewing
12 deposition transcripts, to be very clear.
13         So that is how this
14 materials considered has been
15 supplemented.
16     Q.    Perfect.  And just for the
17 record I'm going to mark as Exhibit 2
18 your updated materials considered list so
19 if we need it throughout the day, it will
20 be there.
21         I don't think we need to
22 belabor it at this point.
23         (Document marked for
24      identification as Exhibit

---

Page 58

1      Anderson-2.)
2   BY MR. STANOCH:
3      Q.   So going back to the
4   materials considered, are all of these
5   documents and other materials listed on
6   it, your Exhibit B, are you relying on
7   all of this material to render your
8   opinions in your report?
9      A.   No, I am not.  And
10  particularly the new reports and
11  deposition transcripts which were not in
12  existence prior to January 12th when I
13  submitted my completed report, these were
14  not part of anything that informed me
15  during the writing of my report because
16  they did not exist at that time.
17     Q.   That's fair.  But everything
18  else you list, these are all documents
19  that you're relying onto render your
20  opinions?
21     A.   I have -- this is a list of
22  materials considered.
23          Not every document here is
24  one with which I elect to become

---

Page 59

1   intimately familiar, although I may have
2   read it.
3          The documents which are in
4   here should line up with those that were
5   ones that John Quick had referenced.  And
6   this is really where I started my
7   document review, was directly in line
8   with documentation that John Quick has
9   supplied for his report.
10          And so all of that
11  documentation resides in this list of
12  materials considered.  So I would have
13  made the point to review those references
14  that John Quick made specifically.
15          However, there are other
16  documents in here that, while they were
17  made available to me, I may have simply
18  had a look at them and decided at that
19  point that they were not necessary for me
20  to actually cite in my report.
21          But in the manner of full
22  disclosure, these are the documents that
23  I became acquainted with to some degree.
24     Q.   I appreciate that.  So it

---

Page 60

1   sounds like your Exhibit B, materials
2   considered, is sort of the universe of
3   what was made available to you, and then
4   ultimately what you relied upon is some
5   subset of that universe?
6      A.   Relied upon to rebut John
7   Quick's report, that is correct.
8      Q.   Right.  So how can I tell,
9   looking at your Exhibit B, materials
10  considered, what materials you're relying
11  on rendering your opinions in this case,
12  and which were simply materials made
13  available to you that you might have
14  looked at briefly but you're not really
15  relying on to render your opinions?
16     A.   We would actually have to go
17  down a list one by one there and then
18  make a comparison to what specific
19  citation was made in John Quick's report.
20  If there is a citation in John Quick's
21  report that also appears on this list of
22  materials considered, one may say I was
23  relying on that very specific document to
24  form my opinion.

---

Page 61

1      Q.   Have you undertaken that
2   exercise of -- that you just described,
3   making the comparison?
4      A.   I do that in my report.
5          In fact, there are a number
6   of occasions where I quote Mr. Quick
7   directly and also comment upon the
8   citation that he has provided.
9      Q.   So sitting here today, is
10  there any way you can tell me, in your
11  materials considered, which materials are
12  ones that you are relying on in rendering
13  your opinions, or would you have to go
14  through this comparison exercise, as you
15  described it?
16     A.   I think the comparison
17  exercise would be the most accurate way
18  to go about doing that.
19     Q.   Have you undertaken that
20  comparison exercise prior to today?
21     A.   I made it a point to provide
22  to counsel the list of materials that I
23  used to prepare my report that were those
24  which John Quick relied upon, and other

---

Confidential Information Subject to Protective Order

Page 62

¹ materials that I requested that I wanted
² to see to provide more color to my
³ understanding of an issue.
⁴     Q.   I don't think that list
⁵ was -- go ahead.
⁶     A.   Yeah.  Let me give you a for
⁷ instance.  When John Quick says that he
⁸ did not review any of the details of the
⁹ Mylan inspection that Teva provided, by
¹⁰ contrast, I requested that document to
¹¹ review myself, to become acquainted with
¹² what the issues were that Teva inspectors
¹³ found at Mylan.
¹⁴         It was really the same with
¹⁵ respect to any of these other audit
¹⁶ reports that the outcomes of --
¹⁷ observations of which are contained in my
¹⁸ exhibit.
¹⁹         So those were not ones that
²⁰ John Quick appeared to have any knowledge
²¹ of, as I read his -- as I read his
²² transcript, but in fact, I made it a
²³ point to obtain myself to inform me.
²⁴     Q.   Short of us engaging in the

Page 63

¹ comparison exercise that you've described
² and going by one by one through all the
³ documents and other materials in your
⁴ Exhibit B right now, is there any other
⁵ way that you'd be able to tell me which
⁶ materials considered you actually relied
⁷ upon in rendering your opinions in your
⁸ report?
⁹     A.   If I footnote them in my
¹⁰ report they will be references that
¹¹ appeared in John Quick's report, pretty
¹² closely one to one, since I'm rebutting
¹³ point for point.  And I'm also taking
¹⁴ into consideration what documentation he
¹⁵ used to support his opinion.
¹⁶         So if you read my report and
¹⁷ read the footnotes in there, those are
¹⁸ what comprise the core of my opinion and
¹⁹ what documents were very specific to
²⁰ informing my opinion.
²¹     Q.   So is it fair to say that if
²² a material is mentioned in the body or
²³ footnotes of your report, it was
²⁴ something that you relied upon for your

Page 64

¹ opinions, and that would give me the full
² list of the reliance materials?
³         MR. HARKINS:  Object to
⁴ form.  Compound.
⁵         THE WITNESS:  Well,
⁶ materials that I reference in my
⁷ report are those which support my
⁸ opinion.
⁹         MR. STANOCH:  Right.  And
¹⁰ well, first before I forget, I'm
¹¹ just going to put on the record,
¹² you know, that we weren't provided
¹³ any list of the reliance materials
¹⁴ versus materials considered, as
¹⁵ Mr. Anderson mentioned a few
¹⁶ moments ago.  So we're going to
¹⁷ request that.
¹⁸ BY MR. STANOCH:
¹⁹     Q.   And so Mr. Anderson, let me
²⁰ just take an example.
²¹         So go to -- if I just go to
²² your materials considered, there's a
²³ number of certificates of analysis and
²⁴ certificates of conformance listed,

Page 65

¹ right?
²     A.   Yeah.
³     Q.   And these were made
⁴ available to you, I take it, correct?
⁵     A.   Correct.
⁶     Q.   Now, how do I know which, if
⁷ any, of these certificates of analysis or
⁸ conformance you're relying on to render
⁹ the opinions reflected in your report?
¹⁰     A.   If I refer you to --
¹¹ certificate of conformance --
¹²         (Audio interference.)
¹³ BY MR. STANOCH:
¹⁴     Q.   We did not get your answer
¹⁵ from audio interference on your end.  So
¹⁶ just for the record, I'm going to re-ask
¹⁷ my question, sir, and then you can begin
¹⁸ again.  Okay?
¹⁹     A.   That's fair enough.  Thank
²⁰ you.
²¹     Q.   How do I know which, if any,
²² of these certificates of analysis or
²³ conformance you're relying on to render
²⁴ the opinions reflected in your report?

Confidential Information - Subject to Protective Order

1    A.   You will note it on the
2  materials considered.  There is also a
3  Bates number that corresponds to that
4  certificate of conformance.  And if I
5  referred to anything having to do with
6  that specific certificate of conformance,
7  it would be footnoted in my report
8  according to the Bates number that
9  corresponds to it.
10   Q.   I see.  So unless the Bates
11 number or other unique identifier is
12 footnoted or explicitly noted in the body
13 of your report, that material is not one
14 you're relying on to render your
15 opinions?
16   A.   That is correct.
17   Q.   Let's flip back to the body
18 of your report around Page 6 and 7.  And
19 tell me when you're there, sir?
20   A.   I'm there.
21   Q.   And in Paragraph 22, you're
22 summarizing your opinion about whether
23 Teva had evidence to suggest that NDMA or
24 NDEA would be present in the API

1  purchased from ZHP or Mylan, right?
2    A.   Correct.
3    Q.   And what types of evidence
4  are you referring to in that instance?
5    A.   Evidence that would have
6  appeared on certificates of analysis.
7    Q.   Anything else?
8    A.   Evidence that would have
9  arisen as a consequence of an observation
10 made either by an auditor from Teva or an
11 inspector from FDA.
12   Q.   Anything else?
13   A.   Nothing else.
14   Q.   And which certificates of
15 analysis are you referring to
16 specifically?
17   A.   There would be certificates
18 of analysis that pertained to Teva
19 product that would be issued for API, as
20 well as for completed and finished drug
21 product.
22   Q.   As we talked about some
23 moments ago, there's no footnote or Bates
24 citation here in Paragraph 22.  So how do

1  I know what certificates of analysis
2  you're relying on to render your opinion
3  as to whether Teva had evidence or not
4  from certificates of analysis?
5    A.   I cannot tell you what is on
6  each of the specific certificates of
7  analysis that are listed in the list of
8  materials considered.
9         There were certificates of
10 analysis that were available for review,
11 let's say, in the ANDAs.
12        There were -- that I recall
13 being familiar with.  They could be among
14 those certificates of conformance --
15 conformance or analysis, as they're
16 described, that I reviewed in the course
17 of reviewing documentation generally for
18 this case.
19   Q.   Well, you told us moments
20 ago that unless it's specifically cited
21 in the body of your report, it's not one
22 you're relying on for your opinions,
23 right?
24   A.   That is correct.

1    Q.   So now I'm asking you, where
2  in your report at Paragraph 22 or
3  otherwise, are you specifically citing
4  any certificate of analysis that you just
5  told us is the basis for your opinion in
6  Paragraph 22, at least in part?
7    A.   I'm saying that I reviewed
8  certificates of analysis.  And those
9  certificates of analysis that I reviewed
10 reported no evidence of the presence of
11 NDMA or NDEA in any of them.
12   Q.   Which certificates did you
13 review?
14   A.   I reviewed some certificates
15 for API and some certificates for drug
16 product.
17   Q.   Which ones?
18   A.   I cannot tell you at this
19 time, which ones that I reviewed
20 specifically --
21   Q.   You --
22   A.   -- apart from the ones --
23 apart from the ones that are listed in
24 the materials considered.

Confidential Information Subject to Protective Order

Page 70

¹      They may have been
² considered, and I may have, upon viewing
³ them, made a mental note that no, I don't
⁴ have -- see any NDMA or NDEA evidence on
⁵ any certificates of analysis.
⁶      Q.   You may have.
⁷           Did you do that?  Yes or no?
⁸      A.   I did.  I looked at all of
⁹ the certificates of conformance that are
¹⁰ listed there.  But I had no specific
¹¹ comments to make on any of them in that I
¹² did not find any NDMA or NDEA mentioned
¹³ on any of the certificates of analysis.
¹⁴      Q.   So there's nothing in the
¹⁵ body of your report, though, that tells
¹⁶ me which specific Bates number I should
¹⁷ look at for the certificates of analysis
¹⁸ or conformance that you're claiming you
¹⁹ reviewed for your opinion that Teva did
²⁰ not have evidence to suggest NDMA or NDEA
²¹ would be present.
²²           MR. HARKINS:  Object to
²³      form.  Asked and answered.
²⁴           THE WITNESS:  I do not make

Page 71

¹      a direct connection between
²      certificates of analysis.  They're
³      in the materials considered, so
⁴      they do appear in the materials
⁵      considered.  I don't cite them
⁶      here.
⁷ BY MR. STANOCH:
⁸      Q.   So how -- looking at your
⁹ report, how am I to know whether or not
¹⁰ any material listed in your materials
¹¹ considered is actually something you
¹² relied upon for an opinion as written in
¹³ your report, or if it was just something
¹⁴ that you looked at but you're not
¹⁵ specifically relying on it?
¹⁶           MR. HARKINS:  Object to
¹⁷      form.
¹⁸           He just explained exactly
¹⁹      how you should do that for this
²⁰      material.
²¹           THE WITNESS:  Again, the
²²      certificates of conformance or
²³      certificates of analysis, as they
²⁴      are also often referred to, that

Page 72

¹      are listed here are ones which I
² considered.
³           And in that they did not
⁴ contain NDMA or NDEA in any kind
⁵ of report on there, it was not
⁶ necessary for me to say anything
⁷ more than what I've said here
⁸ about that matter, because I found
⁹ no records of NDMA or NDEA that
¹⁰ were in those certificates of
¹¹ conformance.
¹² BY MR. STANOCH:
¹³      Q.   How can I replicate your
¹⁴ analysis if I don't know what specific
¹⁵ documents you're relying on for specific
¹⁶ opinions in the paragraphs of your
¹⁷ report?
¹⁸           MR. HARKINS:  Object to
¹⁹      form.  Asked and answered.
²⁰           THE WITNESS:  Once again, if
²¹      there is documents that I have
²²      cited in this report or has been
²³      referenced by Mr. Quick and I've
²⁴      discussed it as a matter of that,

Page 73

¹      certainly it has been footnoted
² here.
³           And again as I say, I was
⁴ furnished a number of documents
⁵ here which, while I reviewed them,
⁶ I did not find -- feel it was
⁷ necessary to have to go through
⁸ document by document by document
⁹ here to say that I didn't see any
¹⁰ NDMA on certificate analysis
¹¹ Number 1, Number 2, Number 3,
¹² Number 4, Number 5.
¹³           I didn't find that to be
¹⁴ necessary for me to do, but merely
¹⁵ to state that as I've done so
¹⁶ here.
¹⁷ BY MR. STANOCH:
¹⁸      Q.   We can agree that Paragraph
¹⁹ 22 doesn't mention certificates of any
²⁰ form, right?
²¹      A.   Correct.
²²      Q.   And you have no footnote as
²³ any source for Paragraph 22, correct?
²⁴      A.   That's correct.

Confidential Information Subject to Protective Order

---

Page 74

1   Q.   All right.  And you told us
2  that if it wasn't specifically cited in
3  the body or a footnote in your report,
4  you're not relying on it, correct?
5       MR. HARKINS:  Object to
6    form.
7       He just explained how he was
8    relying on the certificates of
9    conformance for the paragraph
10   you're talking about.  Misstates
11   his testimony.
12      THE WITNESS:  Again, I
13   believe I've discussed how I
14   incorporate here and account for
15   on the list of materials that I
16   considered, which materials those
17   were.
18      But you're correct, there is
19   no citation for certificates of
20   analysis in Paragraph 22.
21 BY MR. STANOCH:
22   Q.   And the only way that I
23  would be able to determine which
24  documents you relied on for, say, the

---

Page 75

1  opinion in paragraph 22, would be to go
2  document by document with you through
3  your materials considered?
4    A.   That's correct.  And also
5  you may consult my evaluation of the
6  auditors and inspectors reports which
7  reside in the exhibit that's provided for
8  them.
9    Q.   And you also made a list of
10 the documents that you relied on, which
11 was a subset of the materials considered,
12 which you gave to counsel, right?
13     MR. HARKINS:  Object to
14   form.  Misstates the testimony.
15     THE WITNESS:  I did not make
16   a separate list which involved
17   only documents that were
18   referenced by John Quick.
19 BY MR. STANOCH:
20   Q.   Did you make a separate list
21 of the materials that you relied on to
22 render the opinions in your report, which
23 was a subset of the materials considered?
24     MR. HARKINS:  Object to

---

Page 76

1  form.  Misstates his testimony.
2       THE WITNESS:  And how you
3    clarified that correctly was to
4    say that these were documents that
5    Mr. Quick supplied in his report,
6    and I confirmed that in fact that
7    is -- that's the documents that I
8    used to rebut John Quick's
9    statements on the basis of
10   references that he made to such
11   documents.
12      So you characterized that as
13   a subset of documents, and you're
14   free to do so.  But there was no
15   separation of documentation in
16   that way that I made in this
17   report that way.
18 BY MR. STANOCH:
19   Q.   Then the next paragraph, you
20 talk about Teva's quality control
21 systems?
22   A.   Correct.
23   Q.   And you make reference to
24 Teva quality system, specifically the

---

Page 77

1  standard operating procedure, SOP CORP --
2  CORP-0001.
3    A.   Correct.
4    Q.   And that is -- strike that.
5       That SOP is what?
6    A.   That SOP is the -- we'll
7  call it an anchor SOP from which other
8  SOPs proceed.
9       It is a statement of what
10 the quality system is that Teva is
11 expected to uphold.
12      And from that SOP, there are
13 other SOPs that proceed to cover specific
14 areas that comprise the quality system.
15   Q.   And SOP CORP-0001, that's a
16 Teva standard operating procedure, right?
17   A.   Yes.  It is a foundational
18 SOP.
19   Q.   SOP CORP-0001 would not have
20 applied to Actavis prior to Teva's
21 acquisition of Actavis, correct?
22   A.   Not prior to Teva's
23 acquisition of Actavis.  I understand
24 that CORP-0001 as an SOP is something

---

Confidential Information Subject to Protective Order

Page 78

¹ that was instituted, if memory serves
² correctly, in 2011.
³         So as a corporate SOP, it
⁴ was something that was living within
⁵ Teva's system.  It was not part of
⁶ Actavis's system in this specific form.
⁷     Q.   Right.  And in this
⁸ paragraph, you don't say that you
⁹ reviewed any Actavis-specific quality
¹⁰ system SOPs prior to Actavis's
¹¹ acquisition by Teva, correct?
¹²     A.   That is correct.  The
¹³ serialization of SOPs, as they are, are
¹⁴ in a Teva format.  But if I might just
¹⁵ refer to the list here, just to be
¹⁶ absolutely sure that in fact these all
¹⁷ have the CORP -- okay.
¹⁸         I've seen the CORP
¹⁹ designation here for all of the Teva
²⁰ SOPs.  We have another SOP in here which
²¹ does not bear the CORP label to it.
²²         But -- and we also have
²³ QAG-51 Actavis SOP on deviations of
²⁴ nonconformance, which continues to be one

Page 79

¹ which was utilized but does not appear to
² have been updated into Teva's listing in
³ terms of formalization as a Teva SOP.
⁴         There are some SOPs that
⁵ were carried forward at some of these
⁶ affiliate units here, and they are listed
⁷ here.
⁸     Q.   What are you referring to,
⁹ that you're looking at?
¹⁰     A.   I'm sorry.
¹¹         The -- I have a list of SOPs
¹² that were comparing ones which --
¹³ actually as informed by ones which John
¹⁴ Quick noted were examples of SOPs which
¹⁵ were relevant to governing quality
¹⁶ systems.
¹⁷         I'm on Page 21 and 22 where
¹⁸ I've got a box that I've provided that
¹⁹ describes which SOP was operative for
²⁰ which system.
²¹         The CORP SOP designation
²² here would be one that was part of Teva's
²³ main corporate level SOPs and extends
²⁴ also to other Teva operating

Page 80

¹ corporations.
²         But deviations of
³ nonconformance, QAG-51, was one of
⁴ Actavis's SOPs that was continued to be
⁵ kept in its current form, and also
⁶ product complaints is another one, SOP
⁷ 0197, which, again, does not have a Teva
⁸ corporate inventory -- SOP inventory
⁹ number to it.
¹⁰         So I'll say that, what I'm
¹¹ recalling from it, it may or may not be a
¹² Teva inventory specifically.
¹³         That could have been one
¹⁴ from an earlier -- an earlier company to
¹⁵ which that product complaint SOP
¹⁶ pertained.
¹⁷         But again, deviations of
¹⁸ nonconformance was an Actavis SOP that
¹⁹ remains current within Teva's SOP
²⁰ inventory system and denoted this way.
²¹         So it's still a Teva SOP, as
²² much as Actavis is -- as we agreed it's
²³ considered a Teva company.  So it is
²⁴ something which can be understood in that

Page 81

¹ sense.
²     Q.   Do you offer any analysis
³ anywhere in your report about which
⁴ Actavis quality policies were integrated
⁵ into Teva's policies upon acquisition?
⁶     A.   I don't have any specific
⁷ commentary with respect to that.  Again,
⁸ there are -- this isn't meant to be a
⁹ complete list of all SOPs that Teva has.
¹⁰         There are quite a number of
¹¹ them.  And some of the SOPs, clearly,
¹² even as evidenced by this, were carried
¹³ over from the prior company and were
¹⁴ found to be suitable in the way that they
¹⁵ were composed.
¹⁶         And Teva, for their reasons
¹⁷ that I don't know, elected to keep them
¹⁸ with the same serialization as they had
¹⁹ before.
²⁰     Q.   You didn't do any analysis
²¹ as to which Actavis policies were
²² replaced by Teva policies upon Teva's
²³ acquisition of Actavis, did you?
²⁴     A.   I don't know that there were

Confidential Information Subject to Protective Order

Page 82

1 policies, actually, that were different
2 with respect to Actavis and Teva.
3        The SOPs are things which
4 are reviewed periodically for their
5 accessibility, for operation, at that
6 particular site, because there are
7 site-specific SOPs for operations that
8 are unique to those sites.
9        So in terms of policy, one
10 can say that as soon as Actavis was
11 acquired by Teva, they came under the
12 control of the overall CORP-0001
13 corporate policy of Teva.
14    Q.   So you're saying once
15 Actavis became part of Teva, the Teva
16 umbrella of CORP-designated SOPs, in your
17 view, was applied to the Actavis Malta
18 facility?
19    A.   Correct.
20    Q.   But other than the one
21 deviation Actavis policy you noted from
22 Paragraph 84 of your report, could you
23 tell us what, if any, Actavis policies
24 for quality continued to be in force upon

Page 83

1 Teva's acquisition of Actavis?
2    A.   Not down to that specific
3 level.
4        I only reviewed the SOPs
5 specifically for this comparison purpose,
6 again, against what John Quick had
7 detailed in his report.
8        And I did this for the
9 purpose of showing that John Quick made
10 it the point to say that these are the
11 types of SOPs that one should have in
12 place to govern these essential quality
13 system matters, that in fact there was
14 evidence that Teva companies had evidence
15 of these SOPs in place to govern these
16 quality system matters.
17    Q.   And back to Paragraph 23,
18 where you reference Teva's SOP CORP-0001,
19 you didn't review any overarching Actavis
20 quality policies that were in effect up
21 to the point of Actavis' acquisition by
22 Teva, did you?
23    A.   No, I made no such
24 comparison.

Page 84

1    Q.   Right.  Other than a
2 specific Actavis policy that may be
3 mentioned in the body or your footnotes
4 of your report, you're not offering any
5 opinion on any Actavis policies up
6 through the point of acquisition by Teva?
7    A.   I am not offering an opinion
8 there, no.
9    Q.   Do you know if Actavis had a
10 policy on quality systems similar to
11 Teva's SOP CORP-0001 up to the point of
12 Actavis's acquisition by Teva?
13    A.   I don't know what the
14 structure was that Actavis had in place.
15 Only knowledge of what these specific
16 SOPs are that were carried over, post
17 acquisition of Actavis.
18    Q.   Other than the one Actavis
19 policy, you talked about earlier in
20 Paragraph 84 of your report, what other
21 Actavis policies were carried over and
22 remained in effect upon Actavis's
23 acquisition by Teva?
24    A.   I have no direct

Page 85

1 recollection of which ones were carried
2 over by Teva and deemed suitable enough
3 to continue with that kind of
4 documentation maintenance structure.
5    Q.   And in fact, not only do you
6 not have any recollection, but you did
7 not undertake any analysis of which, if
8 any, Actavis policies carried over and
9 remained in effect upon acquisition by
10 Teva, right?
11        MR. HARKINS:  Asked and
12 answered.
13        THE WITNESS:  I did not
14 review every single Actavis SOP
15 that was in place that was carried
16 over by Teva.
17        But what I did speak to were
18 those specific SOPs that were
19 mentioned by John Quick as being
20 areas that companies should have
21 under control and governed by SOPs
22 as part of quality systems.
23        So I looked specifically at
24 only those SOPs.

Confidential Information Subject to Protective Order

Page 86

BY MR. STANOCH:
Q.   How did you know that
Actavis policy for handling of events and
deviation investigations, as referenced
in Paragraph 84 of your report, continued
to remain in force and effect upon Teva's
acquisition of Actavis?
A.   Well, one has to appreciate
the fact that at the point in time that I
asked what Teva's current SOPs were that
governed these particular aspects here,
in that the SOP is one that happens to
have mentioned Actavis or possibly have
some reference to Actavis there, in that
Actavis as a company predated the
acquisition by Teva, it is that SOP that
was carried over as a procedure that was
in place, established by Actavis in
advance of Teva having acquired them.
So at a time prior to Teva's
acquisition, it's possible that SOP
could get looked at and a revision
history could be drawn from the SOP, so
you'd properly understand exactly when

Page 87

the SOP was implemented and how many
different revisions it may have gone
through before it exists in its current
form.
So there's a date certain
that the SOP came into existence in that
form, and maybe even superseded another
SOP that wasn't named specifically called
handling of events and deviations
investigations. It may have been called
something different at a point in time in
the past by Actavis. But I'm not aware
of what that SOP might have been or
whether it's a predecessor.
Q.   I don't understand that,
Mr. Anderson. I'd like you to explain a
little more.
Did you say that you asked
for active policies and this is one that
was provided?
A.   Correct.
Q.   You weren't given any policy
that was a Teva CORP-designated policy?
A.   Not which pertained to

Page 88

deviations and nonconformance.
Q.   So the only policy that you
received when you asked Teva for
deviations and nonconformance which was
the Actavis policy which you identify in
Paragraph 84 of your report?
A.   I asked for what the current
SOPs were for Teva, and this was supplied
to me as a current SOP for Teva.
Q.   So it's your understanding
that the legacy Actavis policy for
deviations of nonconformance that you
cite in Paragraph 84 of your report,
applies to all Teva's facilities now?
MR. HARKINS:  Object to
form.
THE WITNESS:  Well,
certainly those that pertains to
Actavis.
I don't know to what extent
the Actavis SOP is one that
extends to other facilities.  But
this happens to be the way that
Teva has chosen to serialize their

Page 89

SOPs.
And when I asked for what
was the SOP that pertained to
deviations of nonconformance, this
was the SOP that was supplied to
me.
BY MR. STANOCH:
Q.   Is it your understanding
that this SOP on deviations of
nonconformance from Actavis would apply
to Teva's Jerusalem facility that was
making valsartan finished dose products?
A.   In that this was the SOP
that was supplied to me, that is what I
believe is the deviations of
nonconformance SOP that applied in
Teva's company.
Q.   Right.  So we're clear, the
only policy that was given to you by Teva
when you asked for a policy on deviations
of nonconformance was the QAG-51B Actavis
policy for handling deviations and
investigations?
MR. HARKINS:  Object to

Page 90

1  form.  Vague.
2       THE WITNESS:  To be clear,
3  this is not a policy.  It is a
4  procedure.
5       SOP means standard operating
6  procedure.  So I just want to be
7  very clear.
8       But I asked for standard
9  operating procedures, not
10  policies.
11  BY MR. STANOCH:
12     Q.   Fair enough.
13     A.   Policies are, again,
14  something that provide an environment
15  within which SOPs are generated.  They
16  are not necessarily the SOP itself.
17     Q.   So when you --
18     A.   This is the SOP.
19     Q.   So when you asked for the
20  standard operating procedure at Teva for
21  deviations of nonconformance, the only
22  operative policy they gave you was
23  QAG-51B Actavis SOP for handling
24  deviations investigations?

Page 91

1       MR. HARKINS:  Object to
2  form.  Vague.  Asked and answered.
3       THE WITNESS:  Correct.
4  BY MR. STANOCH:
5     Q.   Are you aware of any Teva
6  SOP under the CORP designation or
7  otherwise, that would deal with handling
8  events and deviation investigations?
9     A.   This is the only SOP that
10  was supplied to me from Teva when I asked
11  them for the Teva SOP that governed
12  deviations of nonconformance?
13     Q.   So as far as you know, there
14  is no Teva-specific SOP for handling
15  deviation investigations and events other
16  than this policy from Actavis?
17       MR. HARKINS:  Object to
18  form.  Speculation.
19       You can answer if you know.
20       THE WITNESS:  This is,
21  again, what is in Teva's inventory
22  here for governing deviations of
23  nonconformance.  It happens to be
24  named QAG-51B.  Its derivation

Page 92

1  happened to be from Actavis.
2       But to be clear, it's my
3  understanding that Actavis did not
4  just have one site that it owned
5  when it was a company.  And when
6  Teva bought that site, or bought
7  that name, Actavis, bought that
8  company, it also bought the assets
9  that belonged to that and
10  facilities that belonged to that.
11       And this deviations of
12  nonconformance SOP applied to
13  Actavis companies.
14       So as it applied to Actavis
15  companies and the processes and
16  the products that were made by
17  Actavis which were now owned by
18  Teva, was clear that there was not
19  a name change that was applied to
20  the SOP and an incorporation of
21  any renaming of the SOP to fit the
22  CORP regimen of SOP inventory.
23  BY MR. STANOCH:
24     Q.   Did you do anything to

Page 93

1  confirm that the Actavis SOP for handling
2  deviation investigations, QAG-51B,
3  applies to Teva facilities that were not
4  legacy Actavis facilities?
5       MR. HARKINS:  Form.  I'm
6  just going to instruct the witness
7  not to answer anything to the
8  extent it reflects conversations
9  with counsel.
10       You can answer.
11       THE WITNESS:  Right.  The --
12  when I made the request, I made
13  the request for the Teva SOP.  And
14  Teva supplied this SOP to be
15  representative of the current SOP
16  for deviations of nonconformance.
17       If this in fact the current
18  Teva SOP, as was represented to me
19  as being the case, then I would
20  expect that this SOP applies also
21  to Teva's Jerusalem facilities,
22  although Teva was clearly in
23  possession of those facilities
24  under their name at a time prior

Confidential Information Subject to Protective Order

Page 94

¹ to acquiring Actavis.
² BY MR. STANOCH:
³ Q. And certainly, Actavis's SOP
⁴ for handling deviation investigations
⁵ would not have applied to any Teva
⁶ facility prior to Teva's acquisition of
⁷ Actavis, right?
⁸ A. That is correct.
⁹ Q. So you don't then cite any
¹⁰ SOP for deviation investigations at Teva
¹¹ prior to Teva's acquisition of Actavis?
¹² A. That's correct.
¹³ Q. Are you aware of any Teva
¹⁴ SOP for handling events and deviation
¹⁵ investigations that existed prior to
¹⁶ Teva's acquisition of Actavis?
¹⁷ A. I asked them for the current
¹⁸ SOP and they supplied the current SOP.
¹⁹ Q. Current as of when?
²⁰ A. Current as of my request. I
²¹ guess that would have been either in
²² December of '21 or in January of '22.
²³ Q. First, are you aware of any
²⁴ Teva SOP for handling events and

Page 95

¹ deviation investigations that existed
² prior to Teva's acquisition of Actavis?
³ MR. HARKINS: Object to
⁴ form. Asked and answered.
⁵ THE WITNESS: I have not
⁶ seen an SOP other than this one.
⁷ BY MR. STANOCH:
⁸ Q. And your requests, you said,
⁹ were for then-active Teva SOPs as of
¹⁰ December of 2021 or January of 2022; is
¹¹ that right?
¹² A. That is correct.
¹³ Q. You did not ask for copies
¹⁴ of Teva or Actavis SOPs that were in
¹⁵ effect during the relevant time frame at
¹⁶ issue in this litigation of 2012 to 2018?
¹⁷ MR. HARKINS: Object to
¹⁸ form.
¹⁹ Instruct the witness not to
²⁰ answer to the extent that it
²¹ reflects communications with
²² counsel, the back-and-forth on
²³ what he requested or was
²⁴ represented to by counsel or Teva

Page 96

¹ in connection with the litigation.
² It's all inappropriate.
³ He has indicated the
⁴ document he received, what he
⁵ relied on it for, and we're
⁶ getting way close to
⁷ attorney/client privilege here.
⁸ You can answer, if you can,
⁹ subject to the instruction not to
¹⁰ reflect any communicated with
¹¹ counsel.
¹² THE WITNESS: The purpose
¹³ for my asking for the SOPs
¹⁴ themselves was simply to provide
¹⁵ evidence of the fact that Teva had
¹⁶ necessarily, or has necessarily,
¹⁷ excuse me, SOPs in place that are
¹⁸ reflective of a quality system
¹⁹ that are governing these essential
²⁰ points that John Quick had made in
²¹ his report.
²² So it was in direct
²³ response, generally, to supporting
²⁴ the fact that Teva has evidence of

Page 97

¹ the quality systems, as governed
² by the SOP.
³ I did not intend to make any
⁴ kind of historic comparison of
⁵ what was available in times past,
⁶ because, again, my sole intention
⁷ was to show that, in fact, Teva is
⁸ a company that is governed by SOPs
⁹ that manage the quality system.
¹⁰ BY MR. STANOCH:
¹¹ Q. Your understanding though,
¹² is that the SOPs you cite in your report
¹³ are the current versions of those quality
¹⁴ SOPs, right?
¹⁵ A. Correct.
¹⁶ Q. You did not undertake to
¹⁷ analyze or review which, if any, of those
¹⁸ policies might have been in effect and in
¹⁹ what forms during the 2012 to 2018 time
²⁰ period, correct?
²¹ A. The SOP that is in place
²² here for Actavis, and as I'm
²³ understanding that when it pertained to
²⁴ products that were manufactured by

Confidential Information Subject to Protective Order

Page 98

1 Actavis, certainly this form of deviation
2 and nonconformance procedure applied
3 to -- applied to the Actavis facility,
4 which, again, was eventually acquired by
5 Teva.
6          So at the time that
7 valsartan drug products were being made
8 at the Arrow facility, which I understand
9 was at one time an Actavis facility, the
10 deviations of nonconformance that
11 pertained to that facility was in fact
12 this SOP, or a version of this SOP that
13 was current at that time.
14     Q.   You did not cite or analyze,
15 though, any prior versions of the Actavis
16 QAG-51B SOP, other than the current
17 version, correct?
18     A.   That is correct.
19     Q.   And your answer a moment ago
20 focused on the QAG-51B Actavis policy.
21 It's correct, is it not, that you did not
22 undertake any analysis to determine
23 which, if any, of the Teva CORP policies
24 that you identify in your report might

Page 99

1 have been in effect and in what forms
2 during the 2012 to 2018 time period,
3 correct?
4     A.   I did not review that level
5 of detail as to when necessarily a
6 specific version of the corporate SOPs
7 came into existence.
8          What I do know is that the
9 CORP-0001 SOP, I did make a point to
10 seeing what was the overarching quality
11 philosophy that was going to be the
12 umbrella SOP, if you will, that was going
13 to be defining how quality systems were
14 structured.
15          And I do recall that that
16 SOP in its original form was initiated in
17 2011.
18          So it does, in fact, cover
19 the time during which valsartan products
20 were manufactured.
21     Q.   Other than Teva standard
22 operating procedure CORP-0001, you did
23 not undertake any analysis to determine
24 which other Teva quality SOPs came into

Page 100

1 effect when and in what forms during the
2 2012 to 2018 time period, did you?
3          MR. HARKINS:  Object to
4     form.
5          The policies, he said, were
6     dated, and we're discussing these
7     without looking at them, including
8     the dates on which they would have
9     been effective.
10          But you can answer if you
11     recall.
12          MR. STANOCH:  No need to
13     coach, Mr. Harkins.  Please
14     refrain.
15          Objection to form only.
16 BY MR. STANOCH:
17     Q.   Go ahead, Mr. Anderson.
18     A.   We're capable of bringing up
19 each one of these individual SOPs with
20 their documentation that you should also
21 have in your possession.
22          And we can go through the
23 revision history to gain some
24 appreciation for when the SOPs themselves

Page 101

1 were initiated.
2     Q.   You yourself, sir, testified
3 that the SOPs in Paragraph 84 are the
4 current versions, as of a few months ago,
5 right?
6     A.   Correct.
7     Q.   And all I'm asking you,
8 because I don't see it anywhere in your
9 report -- and point to it if I'm wrong.
10          Nowhere in your report do
11 you opine as to which Teva quality CORP
12 SOPs came into effect when, and what they
13 say, do you?
14     A.   I do not.  But in that I
15 have referenced them here, and they are
16 in my footnotes, and named individually,
17 those documents can be pulled up if there
18 is a question that pertains to when, in
19 fact, they were initially employed.
20     Q.   Sure.  And if we pulled one
21 up and it said it came into effect
22 July 2019, right, that would mean that
23 you would not know anything as to what
24 that policy might have said prior to that

Confidential Information Subject to Protective Order

Page 102

1 effective date, right?
2          MR. HARKINS:  Form.
3     Speculation.
4          THE WITNESS:  That is not
5     true.  SOPs have a history, a
6     revision history, which is part of
7     the SOP, typically found at the
8     back of the SOP, which describes
9     what iterations of the SOP and
10    version of the SOP had existed in
11    the past, and often contain what
12    were the updates to that revision
13    that caused the issuance of a new
14    revision.
15         So you will get what the
16    date is, what the initial issuance
17    of what that SOP was, and when it
18    went into effect.
19 BY MR. STANOCH:
20    Q.   But you don't opine anywhere
21 in your report, do you, as to what
22 revisions occurred, to what Teva policies
23 and when, correct?
24    A.   I do not.

Page 103

1     Q.   We'll get back to Teva
2 policies in a little bit.
3          Let's go to Paragraph 25 of
4 your report, sir.  Tell me when you're
5 there.
6     A.   I'm there.  Yes.  I'm there.
7     Q.   Could you read this
8 paragraph for me?
9     A.   Paragraph 25, "None of the
10 observations made during FDA's
11 inspections of Teva's or the relevant API
12 suppliers' facilities, nor Teva's own
13 observations made during audits of the
14 suppliers' facilities, prevented Teva
15 from identifying the NDMA or NDEA
16 impurities at issue in valsartan
17 medications, which were previously
18 unknown by both the industry and FDA
19 prior to Teva receiving notification of
20 the impurity from ZHP in June of 2018."
21    Q.   Thank you.
22         And, you know, I want to
23 talk about some of the wording in this,
24 because there's a few clauses offset by

Page 104

1 commas in this paragraph, right?
2     A.   There are.
3     Q.   I think because -- if I read
4 it as, "None of the observations made
5 during the FDA's inspection of Teva's or
6 the relevant API suppliers' facilities
7 prevented Teva from identifying the NDMA
8 or NDEA impurities at issue in valsartan
9 medications"?
10    A.   That is what I've written.
11    Q.   Right.  So you're saying
12 none of the observations prevented Teva
13 from identifying the NDMA or NDEA
14 impurities?
15    A.   That's true.
16    Q.   Right.  So in other words,
17 the observations would have allowed Teva
18 to identify the NDMA or NDEA impurities
19 at issue?
20         MR. HARKINS:  Object to
21    form.  Misstates the testimony.
22         THE WITNESS:  Again, as I'm
23    saying, these were previously
24    unknown by industry and FDA.  And

Page 105

1     none of these audits or
2     inspections prevented Teva from
3     identifying NDMA or NDEA.
4 BY MR. STANOCH:
5     Q.   Right.  None of the
6 observations got in the way of Teva
7 identifying the NDMA or NDEA impurities
8 at issue, in valsartan, right?
9         MR. HARKINS:  Object to
10    form.  Misstates testimony.
11         THE WITNESS:  As I'm stating
12    in my quotation here, none of the
13    observations prevented Teva from
14    identifying NDMA or NDEA.
15 BY MR. STANOCH:
16    Q.   Okay.  In Paragraph 27, you
17 start talking about Mr. Quick's report;
18 is that right?
19         MR. HARKINS:  And, Dave,
20    we've been going over an hour.  I
21    want to at least take a break at
22    some point shortly, check on our
23    tech issues and see if we have
24    anything better.  So whenever you

Confidential Information Subject to Protective Order

Page 106

1  find it's time for a break.
2      MR. STANOCH:  We were about
3  to flip the page.
4  BY MR. STANOCH:
5      Q.   Mr. Anderson, would you like
6  to keep going for another 10 or 15 or
7  take a break?  I'll let you decide.
8      A.   I can take -- I can go on
9  for another ten minutes if you'd like.
10  But let us be sure to agree to have a
11  break in ten minutes.
12      Q.   That's fine by me.  So
13  Mr. Anderson, here you write,
14  "Mr. Quick's statement that FDA's
15  official position regarding cGMPs is that
16  if a company is not complying with cGMP
17  regulations, any drug it makes is
18  considered adulterated under the law, is
19  completely untrue and unsupported by the
20  materials relied upon by Mr. Quick."
21      Did I read that right?
22      A.   You read that correctly.
23      Q.   And I should have clarified
24  this earlier, but as you used it in your

Page 107

1  report, cGMP stands for current good
2  manufacturing practices, right?
3      A.   Correct.
4      Q.   So it's your view then that
5  a company not complying with cGMP does
6  not render the company's drugs
7  adulterated?
8      A.   The statement that Mr. Quick
9  has drawn -- made this conclusion from,
10  is what I'll consider a cherry-picked
11  statement.  It is a very general
12  statement that is made, not in a policy
13  document by FDA.  It is something that
14  exists in an information web page as it
15  pertains to this.
16      But the context in which
17  this statement appears does not appear in
18  Mr. Quick's citation of this portion
19  here.
20      So it's -- it is an
21  incomplete rendering.  And it is not a
22  statement of FDA quote-unquote official
23  policy.
24      Q.   You know, with all due

Page 108

1  respect, Mr. Anderson, you don't really
2  say any of that in your report.  You say
3  that Mr. Quick's statement is completely
4  untrue and unsupported, don't you?
5      A.   I do.
6      MR. STANOCH:  Stand by.
7  Please pull up Exhibit 3.  Let me
8  know when you're there.
9      (Document marked for
10  identification as Exhibit
11  Anderson-3.)
12      MR. HARKINS:  It will be in
13  the DropBox.  So go here and hit
14  X.  Now refresh the page.  Great.
15  Yeah, when you exit out, make sure
16  not to exit out of the whole
17  thing.  Just exit out of the inner
18  window.
19      THE WITNESS:  I hit the
20  three document, but --
21      MR. HARKINS:  It's loading.
22      MR. STANOCH:  I can try to
23  move this along while it's
24  loading, sir.  Hopefully the

Page 109

1  document will load.  I can try to
2  share my screen just to move this
3  along.
4  BY MR. STANOCH:
5      Q.   Can you see my screen, sir?
6      A.   Yes.  It says David Stanoch
7  has started screen sharing.  I cannot see
8  a document yet.
9      Q.   You don't see a document?
10      A.   I don't see a document.  No.
11      MR. HARKINS:  Let me make
12  sure that he's not pinned to a
13  different screen.
14      THE WITNESS:  Ah, here we
15  go.
16      MR. HARKINS:  Here we go.
17  BY MR. STANOCH:
18      Q.   And again, you can access
19  the full document once it's available on
20  the folder.
21      But for now, on my screen,
22  you can see the document entitled "Facts
23  About the Current Good Manufacturing
24  Practices," cGMPs?

Confidential Information Subject to Protective Order

Page 110

1    A.  I see that, yes.
2    Q.  Have you seen this document
3 before, sir?
4    A.  I have seen this document.
5    Q.  All right.  And it's from
6 the FDA, correct?
7    A.  It is -- it appears to be
8 the rendering that was from an online
9 source supplied by FDA.
10   Q.  Right.
11   A.  I don't see FDA's name, for
12 instance, in the link that you have above
13 there.
14   Q.  Well, the link is obviously.
15 Right, the -- I'm sorry.  Go ahead.  I'm
16 sorry.  I apologize.  Where were you
17 looking?
18   A.  I'm looking at the very
19 first line where it says, "Pharmaceutical
20 quality/drug development approval
21 process."  It doesn't say FDA in that.
22        This looks familiar to me
23 from something that I have seen supplied
24 on the FDA website.  But it's not obvious

Page 111

1 that it's necessarily from FDA in the
2 form that you have it here.
3        For instance, you have not
4 brought me to the website, the FDA's
5 formal website.  This is a reproduction
6 of something that appears that was on the
7 website.
8    Q.  Right.
9    A.  I can't -- it's not an FDA
10 document.  Okay.  I'm just making that
11 clear.
12   Q.  All right.  That's fair.
13 You understand that we're not in a
14 dynamic situation where I'm pulling up
15 live websites as we go, right?  You
16 understand that?
17   A.  I understand only what you
18 told me here.  I didn't know that that
19 was not a possibility that you had.
20   Q.  Right.  And, you know, if we
21 need to do that, we'll start doing that.
22 But for now, this is something that we
23 did pull from the FDA website.  And I'll
24 represent that to you.

Page 112

1        And you're familiar --
2 regardless, you're familiar with this
3 being something from the FDA website,
4 right?
5    A.  This appears to be from the
6 FDA website.
7    Q.  And you see this section
8 here, it says, "If a manufacturer is not
9 following cGMPs, are drugs safe for use?"
10        Do you see that?
11   A.  Yes.
12   Q.  And read that first sentence
13 for me.
14   A.  At the bottom of this page
15 here?  Or do you have -- there we go.  We
16 have more of the document.  Let's move
17 the document up here.
18        So, "If a manufacturer is
19 not following cGMPs, are drug products
20 safe for use?"
21        Could you move that to the
22 top of your page so we include the entire
23 narrative?
24   Q.  How's that?

Page 113

1    A.  Keep going.  The narrative
2 continues below the page, and I don't see
3 that.  Is there a way to move that up?
4        There we go.  Okay.  Here we
5 go.
6    Q.  Again, the question is,
7 could you read that first sentence?
8    A.  Yeah.  Happily.
9        The first sentence as it
10 reads is:  "If a company is not complying
11 with cGMP regulations, any drug it makes
12 is considered 'adulterated' under the
13 law."
14   Q.  Right.  And as your
15 Paragraph 27 notes, Mr. Quick is quoting,
16 "If a company is not complying with cGMP
17 regulations, any drug it makes is
18 considered 'adulterated' under the law."
19 Correct?
20   A.  That is a statement that is
21 made here and that Mr. Quick is relying
22 upon.
23   Q.  Right.  So it's not then
24 that his statement was completely untrue

Confidential Information Subject to Protective Order

Page 114

¹ and unsupported, right?  Because we're
² looking at something that he took it
³ verbatim from, from the FDA website,
⁴ correct?
⁵        A.   He took this statement from
⁶ the FDA website, but it is not taken in
⁷ the full context in which it exists.
⁸            And that is the reason,
⁹ because it doesn't take in account the
¹⁰ full context, it is unsupported.
¹¹        Q.   Well, you don't say that in
¹² Paragraph 27, do you?
¹³        A.   Well, standing on its own,
¹⁴ it is not the complete context within
¹⁵ which this statement resides.  And if
¹⁶ you're only telling half the story, and
¹⁷ not the whole story, that's half the
¹⁸ truth and not the full truth.
¹⁹            So in that sense, it is not
²⁰ a truthful statement.  It merely just
²¹ cherry-picks and cuts that statement out
²² of there, as though that is the only
²³ representation of what FDA's official
²⁴ position is.

Page 115

¹        Q.   So you're disagreeing that
² Mr. Quick quoted this sentence
³ accurately?
⁴        A.   He quoted the sentence
⁵ alone.  He did not quote it in context;
⁶ hence, it is unsupported.
⁷            And because it is not quoted
⁸ in context, it is not entirely true as a
⁹ standalone statement.
¹⁰        Q.   Right.  Well, not entirely
¹¹ true is not the same as completely untrue
¹² and unsupported, is it, sir?
¹³        A.   It is certainly unsupported
¹⁴ because it is out of context and it is
¹⁵ untrue if just held -- and held this
¹⁶ sentence alone, as he chose to quote it,
¹⁷ and to then characterize that as FDA's
¹⁸ official position.
¹⁹        Q.   Mm-hmm.  And you take
²⁰ Mr. Quick to task for exaggerations.  But
²¹ then it sounds like, Mr. Anderson, you're
²² exaggerating in Paragraph 27 when you say
²³ this accurate verbatim quotation of a
²⁴ sentence from the FDA web website is

Page 116

¹ completely untrue and unsupported, right?
²        MR. HARKINS:  Object to
³ form.  Asked and answered.
⁴        THE WITNESS:  The statement
⁵ characterized as FDA's official
⁶ policy is untrue.  Completely.
⁷ BY MR. STANOCH:
⁸        Q.   You're agreeing though that
⁹ he's accurately quoting this sentence in
¹⁰ his report, right?
¹¹        A.   I'm not challenging that he
¹² hasn't accurately quoted the sentence.
¹³            My challenge is it's
¹⁴ completely untrue to say that that is the
¹⁵ sole statement of what forms FDA's
¹⁶ official policy.  That is untrue.  And it
¹⁷ is unsupported, particularly in the fact
¹⁸ that there is context which surrounds the
¹⁹ way that sentence should be appreciated.
²⁰        Q.   And nothing in your
²¹ Paragraph 27 says anything about context,
²² right?
²³            Do you see any mention of
²⁴ context in your Paragraph 27?

Page 117

¹        A.   I have not used that word.
²        Q.   Right.  And do you reference
³ any of that so-called context in
⁴ Paragraph 27 that you now say is missing?
⁵        A.   I speak to it later in the
⁶ report, where I take this whole matter
⁷ apart, and I do furnish what the context
⁸ is within which this opening statement
⁹ appears.
¹⁰        Q.   We'll get to that part.
¹¹            And if you look at Paragraph
¹² 28, in part you note the FDA's guidance
¹³ with respect to the presence of NDMA and
¹⁴ NDEA.
¹⁵            Do you see that?
¹⁶        A.   I see that.  If you'd like
¹⁷ to read it.
¹⁸        Q.   You can read it to yourself.
¹⁹            My question about that
²⁰ guidance is, that's the guidance issued
²¹ when?
²²        A.   Well, Paragraph 28 opens
²³ with Mr. Quick's statement that valsartan
²⁴ products containing NDMA and impurities

Page 118

1 were misbranded is similarly incorrect
2 and unsupported.
3        May I continue?
4    Q.   I'm not asking you to read,
5 Mr. Anderson.  I'm focused on your
6 reference to FDA's guidance in the last
7 sentence of that paragraph.
8        Do you see that?
9    A.   Very good.  Starting at,
10 "Moreover."  Is that correct?
11    Q.   That's where I am, sir,
12 absolutely.  And I'm asking, which
13 guidance is that, sir?
14    A.   Okay.  FDA's guidance with
15 respect to NDMA and NDEA is the current
16 guidance that was published in its latest
17 form in February 2021.
18    Q.   And when was that guidance
19 first published?
20    A.   Guidance was first published
21 back in, I believe it was December of
22 2018, when interim impurities --
23 acceptable impurity levels for these NDMA
24 and NDEA were communicated.

Page 119

1    Q.   And prior to December of
2 2018, were there any guidance from the
3 FDA allowing any amount of nitrosamines
4 in valsartan or any other drug products?
5    A.   FDA specifically had not
6 communicated a guidance having the
7 name -- having to do with nitrosamine
8 content in drug products.
9    Q.   Absent an interim limit for
10 nitrosamines prior to December 2018, then
11 the allowable limit was zero, right?
12    A.   That's not correct as you've
13 stated it.  It simply meant there was no
14 limit specified, not that the allowable
15 limit was zero.
16    Q.   Mm-hmm.  So the FDA never
17 set any allowable limit prior to December
18 of 2018 for nitrosamines, right?
19    A.   Not formally, no.
20    Q.   Informally?
21    A.   Not even informally.  There
22 was what was the governing standard by
23 which applications that Teva had for
24 valsartan at that time governed the

Page 120

1 presence of impurities as they might be
2 evaluated against standards that were
3 communicated in ICH -- that's
4 International Conference of
5 Harmonization, ICH, Value Q3A.
6    Q.   There was never an allowable
7 limit for nitrosamines in drug products
8 per the FDA until December of 2018,
9 right?
10    A.   Not one specified, no.
11    Q.   Rather than getting into the
12 ICH, let's take that break Mr. Anderson.
13    A.   Very good.  Thank you.
14        THE VIDEOGRAPHER:  The time
15 right now is 11:17 a.m.  We are
16 off the record.
17        (Short break.)
18        THE VIDEOGRAPHER:  The time
19 right now is 11:33 a.m.  We're
20 back on the record.
21 BY MR. STANOCH:
22    Q.   Welcome back, Mr. Anderson.
23 Just yes or no, did you talk to your
24 counsel during the break?

Page 121

1    A.   Yes.
2    Q.   Did you review any
3 documents?
4    A.   None.
5    Q.   Did you talk or communicate
6 in any way, text, e-mail, phone,
7 otherwise, with anyone besides
8 Mr. Harkins at the break?
9    A.   No.
10    Q.   Great.
11        You're familiar with the
12 term "adulteration," right?
13    A.   I am.
14    Q.   Right.  And what's your
15 understanding of an adulteration of a
16 drug?
17    A.   Adulteration is defined in
18 law in the FD&C Act.  It is also found in
19 regulations, specifically at 21 C.F.R.
20 210 that defines adulteration as any --
21 excuse me.
22        May I actually bring up the
23 specific quotation from 210 and read it
24 so that I do this accurately?

Confidential Information Subject to Protective Order

Page 122

1    Q.   I don't need you to read
2  from memory, sir.  We can say, fair
3  enough that you agree with the term
4  "adulteration" as it's defined in statute
5  and regulations?
6    A.   Yes.
7    Q.   And can a drug be
8  adulterated even if it was AB-rated?
9    A.   Yes.
10    Q.   Do you agree that drugs
11  could be adulterated even if they do not
12  contain any contaminants or impurities?
13    A.   Yes.
14    Q.   For instance, a drug could
15  be found to be adulterated if it was
16  manufactured in a way that was not in
17  conformance with current good
18  manufacturing practices, right?
19    A.   I agree with that.
20    Q.   And do you agree that
21  adulteration can occur absent official
22  action indicated by the FDA?
23    A.   Adulteration is a
24  determination that FDA themselves make.

Page 123

1      THE COURT REPORTER:  I think
2    we lost defense counsel.
3      MR. STANOCH:  Stand by.
4      (Whereupon a discussion was
5    held off the record.)
6  BY MR. STANOCH:
7    Q.   Mr. Anderson, you agree that
8  the FDCA and C.F.R. regulations
9  concerning adulteration make no mention
10  of official action indicated prior to the
11  existence of adulteration, yes?
12    A.   FDA determines adulteration
13  at a specific point in time.  The law, as
14  you've quoted it there, does not speak to
15  a specific point in time, merely the fact
16  that adulteration can exist given certain
17  conditions, and FDA will make that
18  determination at that time whether
19  adulteration is -- rises to -- that
20  adulteration -- it rises to the level of
21  adulteration.
22    Q.   A drug product can be
23  adulterated then prior to the FDA's
24  saying so, correct?

Page 124

1    A.   That's not what I said.  I
2  said there is a point in time at which
3  FDA determines that a drug product or
4  substance is in their -- and then
5  declared to be adulterated.
6    Q.   Right.  And the fact of
7  adulteration can be existent prior to the
8  FDA determination, correct?
9    A.   Adulteration is an
10  interpretation that is made by FDA with
11  respect to the drug product or drug
12  substance.  And it is pertinent to the
13  point in time at which FDA thinks that is
14  the case.
15    Q.   When the FDA makes the
16  determination that a drug is adulterated,
17  is that a prospective only determination?
18    A.   That would be from a
19  specific point in time and going forward
20  thereafter.
21    Q.   And the FDA can choose a
22  point in time for adulteration that
23  predates the date of the FDA's opinion,
24  correct?

Page 125

1    A.   FDA determines from a
2  specific date, and they communicate what
3  that specific date is that they made that
4  determination.
5    Q.   I'm sorry.  Are you talking
6  about a specific date of the FDA's
7  determination?  Or are you saying a
8  specific date that the FDA believes from
9  which adulteration existed?
10    A.   The specific date that FDA
11  communicates that a product or an API is
12  adulterated.
13    Q.   So if the FDA issues a
14  statement today, March 9, 2022, that a
15  drug product has been adulterated, you
16  can certainly say that it's been
17  adulterated for some period of time up to
18  today, correct?
19    A.   FDA does not say that in the
20  context of valsartan.
21    Q.   Well, I'm not talking about
22  that context specifically, sir.  All
23  right.
24      In my hypothetical, today,

March 9, 2022, FDA issues a statement
that a drug product has been adulterated.
It can certainly say that it's been
adulterated for some period of time up to
today, correct?
        MR. HARKINS:  Form.
Hypothetical.
        You can answer.
        THE WITNESS:  It is
hypothetical.  In my experience
I've not read FDA makes a
declaration of that type that I
have read.
BY MR. STANOCH:
    Q.   So you're saying that a drug
that might have been contaminated and
adulterated because of that, is not
adulterated up until the time that the
FDA says adulteration, and all the sales
prior to that date were not adulterated?
    A.   You have to be careful with
your use of terms here.  You have said
the word contaminant.
        I believe we are not talking

about a contaminant here.
        We're talking about a
process impurity.  There is a difference.
    Q.   Again, you're saying that a
drug that has been contaminated for years
up until March 9, 2022, until the FDA
issues a letter saying adulteration,
you're saying all the drug products sold
prior to that letter of today was not
adulterated?
    A.   You'll need to quote a
statement from FDA specifically saying
that a product is as you have described
it and what the context of that is.
    Q.   So you can't tell me sitting
here today, whether -- when the FDA says
a product is adulterated, you're saying
that it cannot, it does not say that's a
retrospective determination?
        MR. HARKINS:  Object to
form.  Misstates the testimony.
        THE WITNESS:  Respectfully,
Mr. Stanoch, you used the term
"has been," and as a -- what is

that -- past-perfect use of that.
It is not the present tense.
        And the FDA is speaking of
valsartan in the present tense as
they describe in their warning
letters that were issued, the
first one being issued with
respect to ZHP mentioning that
valsartan API is or are --
products are adulterated.
        So as of that point in time,
November 29th, I believe it was,
2018, when that warning letter was
issued, as of that point in time,
from that point forward,
adulteration is the
characterization of the APIs made
by ZHP.
BY MR. STANOCH:
    Q.   Part of that issue with ZHP
was nonconformance with cGMP, correct?
    A.   There were cGMP observations
that FDA made.
    Q.   About ZHP's processing of

valsartan API, right?
    A.   There were 483s that were
initially issued.  But the warning letter
that was the outcome of FDA's
investigation after having received ZHP's
response and having performed assays on
drug substances that they collected from
ZHP, FDA determined that as of
November 29, 2018, ZHP's products are
adulterated, valsartan products are
adulterated.
    Q.   So all -- I apologize.
        So all the valsartan API
product that was being manufactured under
the same deviations from the cGMP, none
of that was adulterated until
November 29, 2018, that's your
testimony?
    A.   Correct.
    Q.   And the exact same facts
that the FDA would cite in the
November 29th, 2018 letter could have
existed -- in fact, did exist prior to
that date, as to valsartan API, right?

Page 130

1      MR. HARKINS:  Form.  Facts
2  not in evidence.
3      THE WITNESS:  As we've said,
4  there is a date upon which FDA
5  declares that drug substance or
6  product is adulterated.  They did
7  so on November 29th, 2018, and not
8  at a time before that.
9  BY MR. STANOCH:
10     Q.   Right.  You agree, though,
11 that the facts that led the FDA to issue
12 its declaration on November 29, 2018,
13 existed prior to that date, correct?
14     MR. HARKINS:  Object to
15  form.
16     THE WITNESS:  There was a
17  fact-finding exercise that FDA
18  underwent in order to make that
19  final declaration on November 29,
20  2018, to say that ZHP's products
21  are adulterated.
22 BY MR. STANOCH:
23     Q.   And that fact finding
24 occurred prior to November 29, 2018,

Page 131

1  correct?
2      A.   Correct.
3      Q.   And the facts that were
4  found occurred prior to November 29,
5  2018, correct?
6      A.   Correct.
7      But the point is, the
8  product was not declared adulterated
9  until November 29, 2018, which is the
10 important point.
11     Q.   Well, every fact underlying
12 the FDA's decision on November 29, 2018,
13 existed prior to that date, correct?
14     MR. HARKINS:  Object to
15  form.  Vague.
16     THE WITNESS:  The body of
17  data and observations that they
18  had to inform what their final
19  determination and declaration with
20  respect to adulteration of, were
21  events which occurred in advance
22  of declaring that adulteration on
23  11/29/2018.
24     At no point -- at no time

Page 132

1  prior to that did FDA declare
2  valsartan API products made by ZHP
3  or by Teva, for that matter, as
4  adulterated.
5  BY MR. STANOCH:
6      Q.   There was no question
7  pending there.  So I appreciate you to
8  confine your answers that way and not
9  spontaneously speak, Mr. Anderson.  But
10 that's neither here nor there.
11     When did the FDA learn of
12 the events which led to its declaration
13 on November 29, 2018, as to ZHP's
14 valsartan API?
15     A.   According to the information
16 request that was satisfied by ZHP in
17 2018, which was made by the FDA, I recall
18 reading in that information request that
19 ZHP became aware of NDMA on or about
20 June 6, 2018.
21     Q.   You talk about this a little
22 in your report in the context, I think,
23 of referencing -- was it Mr. Tony
24 Binsol's testimony?

Page 133

1      Do you recall that?
2      A.   If you could point me to the
3  paragraph that you're referring to, I'll
4  be happy to speak to it.
5      Q.   Sure.
6      MR. STANOCH:  Stand by.
7  BY MR. STANOCH:
8      Q.   Look, starting around
9  Paragraph 95 and 96.  Tell me when you're
10 there.
11     A.   I'm at Paragraph 95 and 96.
12     Q.   And here you're talking
13 about bullets in Mr. Quick's report; is
14 that right?
15     A.   Paragraph 95 begins with
16 statements which were attributable to
17 Mr. Binsol, and the reason that I
18 reviewed those statements were because
19 Mr. Quick refers to this testimony.
20     Q.   Right.  And you agree in
21 Paragraph 95 that Mr. Quick's bullets,
22 which rely on Mr. Binsol's testimony are,
23 in your words, "The common and current
24 understanding in the pharmaceutical

Page 134

¹ industry for what constitute the general
² expectations made of API suppliers, and
³ in this specific case of Teva's suppliers
⁴ of valsartan API."
⁵        Right?
⁶    A.    Correct.
⁷    Q.    Okay.  And you agree with
⁸ Mr. Binsol's setting forth of the general
⁹ expectations, right?
¹⁰    A.    Could you be more specific,
¹¹ please?
¹²    Q.    Well, Mr. Quick had, you
¹³ know, one through eight in his paragraph
¹⁴ about common and current understanding
¹⁵ for the general expectation made of API
¹⁶ suppliers.  And he cited to Mr. Binsol,
¹⁷ right?
¹⁸    A.    He did.
¹⁹    Q.    And then in Paragraph 96,
²⁰ you talk a little bit more about those
²¹ same statements, right?
²²    A.    I do.
²³    Q.    Right.  And you agree with
²⁴ Mr. Binsol's testimony about the general

Page 135

¹ expectations of API suppliers,
² specifically Teva's suppliers of
³ valsartan API, right?
⁴    A.    Correct.
⁵    Q.    And in Paragraph 96, you go
⁶ on to say that -- you identify that some
⁷ of the statements attributable to
⁸ Mr. Binsol were about the obligations of
⁹ an API manufacturer to internally control
¹⁰ and document their processes.
¹¹    A.    That is an expectation.
¹²    Q.    And you agree with that
¹³ expectation, right?
¹⁴    A.    I do.
¹⁵    Q.    And then you also speak
¹⁶ about some of the statements attributed
¹⁷ to Mr. Binsol about an API supplier's
¹⁸ obligation to promptly inform API
¹⁹ customers of the potential or suspected
²⁰ presence of genotoxic impurities which
²¹ the API supplier identifies in the API,
²² right?
²³    A.    Correct.
²⁴    Q.    And you agree with those

Page 136

¹ obligations as well, correct?
²    A.    I'm sorry.  I didn't hear.
³ What kind of obligations?
⁴    Q.    The supplier's -- API
⁵ supplier's obligations, as you refer to
⁶ them in your Paragraph 96.
⁷    A.    Exactly true.  Yes.
⁸    Q.    And the only -- you say the
⁹ only thing that you would add to the
¹⁰ expectations of an API supplier, to those
¹¹ that Mr. Binsol identified was that, "An
¹² API customer of any potential or
¹³ suspected not previously known or
¹⁴ characterized impurity by the
¹⁵ manufacturer, however determined, whether
¹⁶ arising from a customer complaint or a
¹⁷ health authority notification or solely
¹⁸ by an investigation accomplished at the
¹⁹ API manufacturer as described, and not
²⁰ just of genotoxic impurities which it
²¹ detected, should constitute a reason for
²² notifying the API manufacturer's relevant
²³ customer base."
²⁴        Did I read that correctly?

Page 137

¹    A.    You did read that correctly.
²    Q.    And the gist of this is that
³ the only thing that you would add to the
⁴ eight points above that were attributable
⁵ to Teva's Mr. Binsol, was about this one
⁶ about an API customer's obligation to
⁷ notify its customers of any potential or
⁸ suspected impurities, genotoxic or not?
⁹    A.    That is what Paragraph 97 is
¹⁰ intending to convey, correct.
¹¹    Q.    Then you go on to discuss,
¹² as you understand it, when ZHP first
¹³ informed Teva about the NDMA issues in
¹⁴ valsartan API, right?
¹⁵    A.    Could you rephrase that
¹⁶ question for me, please?
¹⁷    Q.    Sure.  And then starting on
¹⁸ Paragraph 98 of your report, you start to
¹⁹ discuss when Teva first learned from ZHP
²⁰ of the NDMA issue with valsartan API?
²¹    A.    That is correct.
²²    Q.    And I think you say here
²³ that ZHP first learned of the presence of
²⁴ NDMA in ZHP's API, from ZHP, on June 20,

Confidential Information Subject to Protective Order

Page 138

1 2018?
2      A.   Correct.  That is my
3 understanding.
4      Q.   And I think you said earlier
5 today, and you can correct me if I'm
6 wrong, that ZHP was made aware of the
7 potential for NDMA by another customer in
8 June 6th of 2018?
9      A.   June 6, 2018, is the date,
10 as I recall it, from the response to the
11 information request made to FDA in August
12 of 2018.
13      Q.   And who is the customer then
14 that raised the NDMA issue with ZHP in
15 early June of 2018?
16      A.   That was never made known to
17 me at the time that I prepared this
18 report.
19           Subsequent to that, as I
20 have been reading Mr. Quick's report, he
21 has said that it is Novartis that was the
22 one who determined by way of ZHP that
23 NDMA existed.
24      Q.   And you were not aware of

Page 139

1 that fact until after you had issued your
2 report?
3      A.   That's correct.
4      Q.   And have you since
5 investigated for yourself whether it was
6 in fact Novartis who informed ZHP about
7 the NDMA issue in ZHP's valsartan API?
8      A.   I have not pursued that, no.
9      Q.   Do you know how Novartis was
10 able to detect NDMA in ZHP's Valsartan's
11 API?
12      A.   I do not know what method
13 they employed to make that determination.
14      Q.   Do you know how Novartis was
15 able to detect NDMA in ZHP's valsartan
16 API while other ZHP customers, such as
17 Teva, had not done so to that point?
18      A.   I do not know how it was
19 that Novartis became aware of NDMA or
20 what the method was that they used
21 specifically that was different than ones
22 which were methods for qualifying API for
23 impurities, according to the way that the
24 applications themselves were approved by

Page 140

1 FDA.
2      Q.   Because you have not
3 undertaken to analyze how Novartis was
4 able to detect NDMA in the valsartan API,
5 you're not offering any opinion, one way
6 or the other, on whether Teva should have
7 detected it as well, are you?
8           MR. HARKINS:  Object to
9      form.
10           THE WITNESS:  Again, I don't
11      know exactly which method Novartis
12      used to detect NDMA in valsartan
13      that was obtained from ZHP.
14 BY MR. STANOCH:
15      Q.   And so you don't know if
16 Teva was employing the same testing
17 methods as Novartis at the time on
18 June 2018 for valsartan API, do you?
19      A.   I don't know what the method
20 was that Novartis was using.
21           There was an approved method
22 that was validated that Teva was
23 employing to assess the purity of drug
24 substance received from -- received from

Page 141

1 ZHP and also, for that matter, from
2 Mylan.
3           But I do not know in what
4 specific ways Teva's methods differed
5 from the one that Novartis employed to
6 evaluate the product that they examined.
7 I have no idea which method they used.
8      Q.   Do you agree that a drug
9 finished dose -- strike that.
10           Do you agree that a finished
11 dose drug manufacturer is responsible for
12 the APIs used in their finished dose
13 product?
14      A.   They are responsible for the
15 API used in their drug product and it
16 must conform to specifications that have
17 been approved in their application.
18      Q.   So, Teva, from a quality
19 perspective, as a finished dose
20 manufacturer, was ultimately responsible
21 for the valsartan API that it used from
22 ZHP or Mylan, correct?
23      A.   It has to utilize API that
24 conforms with specifications that were

Confidential Information Subject to Protective Order

Page 142

¹ agreed to with FDA at the time of the
² approval of the drug product or at a
³ subsequent time when supplemental
⁴ applications may have been filed to
⁵ update that ANDA.
⁶      Q.   Do you disagree then that
⁷ Teva was ultimately responsible for any
⁸ quality issues for the valsartan API it
⁹ was incorporating into its own finished
¹⁰ dose valsartan product?
¹¹      MR. HARKINS:  Objection.
¹²      Asked and answered.
¹³      THE WITNESS:  It was
¹⁴      required to verify that the API
¹⁵      that they were using was of the
¹⁶      quality that was expected and
¹⁷      satisfied conformance to the
¹⁸      specifications that they had,
¹⁹      which were purchasing
²⁰      specifications, which also
²¹      mirrored those which were the
²²      approved specifications that FDA
²³      reviewed and granted approval for
²⁴      their application based on.

Page 143

¹ BY MR. STANOCH:
²      Q.   Did Teva -- strike that.
³      Did ZHP first learn about
⁴ the potential for nitrosamines in
⁵ valsartan API from Novartis on June 6,
⁶ 2018?
⁷      A.   That is the document to
⁸ which I referenced, and I believe that
⁹ ZHP has an obligation to make statements
¹⁰ to FDA which are truthful, and they
¹¹ attest to that fact.  So on that basis,
¹² I'm accepting of that date that they
¹³ communicated.
¹⁴      Q.   If ZHP knew about for --
¹⁵ strike that.
¹⁶      So if ZHP knew of a
¹⁷ potential or suspected nitrosamine
¹⁸ impurity in valsartan API at an earlier
¹⁹ date, it would be your expectation that
²⁰ ZHP would inform its customers such as
²¹ Teva, correct?
²²      MR. HARKINS:  Object to
²³      form.  Speculation.
²⁴      THE WITNESS:  The approved

Page 144

¹ specifications for valsartan API
² are ones which were in force for
³ Teva as a product manufacturer.
⁴      And if there were impurities
⁵ which rose above which were those
⁶ that were required -- those that
⁷ were appearing at levels above
⁸ those that were required by ICH
⁹ Q3A, it would be incumbent upon
¹⁰ the API supplier to communicate
¹¹ that to the customer, in this
¹² case, ZHP communicating such a
¹³ thing to Teva.
¹⁴      That was not the case here.
¹⁵ BY MR. STANOCH:
¹⁶      Q.   Let's be more pointed,
¹⁷ Mr. Anderson.
¹⁸      If ZHP knew about the
¹⁹ potential for nitrosamines in valsartan
²⁰ APIs prior to June of 2018, would it have
²¹ been incumbent upon them to notify Teva,
²² its customer?
²³      A.   Not necessarily.
²⁴      Q.   So ZHP, if it, in your

Page 145

¹ words, knew of a potential or suspected
² not previously known impurity, it did not
³ have to notify Teva?
⁴      A.   Not necessarily.
⁵      Q.   Even if that's a
⁶ nitrosamine?
⁷      A.   Not necessarily.
⁸      Q.   So what circumstances to you
⁹ then would ZHP have to inform Teva of a
¹⁰ potential or suspected nitrosamine
¹¹ impurity in valsartan API it was selling
¹² to Teva?
¹³      A.   FDA approved the
¹⁴ application, the valsartan application
¹⁵ for Teva based on the specifications for
¹⁶ the API such as they were supplied by ZHP
¹⁷ and Mylan to Teva for utilization in
¹⁸ valsartan products.
¹⁹      The impurity profile that
²⁰ was operative at that time was based on,
²¹ as many API manufacturers who were
²² expected to conform to and currently are,
²³ is ICH Q3, where the reporting threshold
²⁴ of impurities in API is set at a place

Confidential Information Subject to Protective Order

Page 146

¹ where 0.05 percent is the threshold.
²        Below that threshold, that
³ was not a requirement for ICH Q3A.  The
⁴ conformance of ICH Q3A was the
⁵ requirement for the approval of the
⁶ valsartan application.
⁷        That's not to say that ZHP
⁸ could not have undertaken their own
⁹ research and development to study their
¹⁰ valsartan processes even more thoroughly
¹¹ than what was required for approval and
¹² for meeting purchasing specs for Teva.
¹³        So again, nothing prevented
¹⁴ them from doing research and development.
¹⁵ And it may be that there were, depending
¹⁶ on studies that were done and whatever
¹⁷ the conditions of those studies as they
¹⁸ were performed, there may have been side
¹⁹ reactions that were identified that gave
²⁰ rise to impurities at a level which fell
²¹ below that required reporting level, and
²² then one would be doing more R&D for
²³ further characterizing as to what the
²⁴ nature of those impurities were and how

Page 147

¹ consistent it was an impurity to have
² formed.
³        There are a lot of things
⁴ that go into an investigation of this
⁵ type.  But these are things which happen
⁶ inside of ZHP.  It is not the instant --
⁷ it's not instantly necessary for the
⁸ manufacturer of API to inform a customer
⁹ of impurities which fall below what are
¹⁰ ICH qualifiable and quantifiable and
¹¹ reportable impurities, which was the
¹² regulatory metric that FDA employed to
¹³ approve and allow the marketing of
¹⁴ valsartan products.
¹⁵        Q.   You agreed this morning that
¹⁶ nitrosamines fall in the cohort of
¹⁷ concern, didn't you?
¹⁸        A.   I did.
¹⁹        Q.   Right.  And under the ICH
²⁰ guidelines that you're referencing, a
²¹ cohort of concern should have materials
²² assessed because they might test at lower
²³ thresholds than normal thresholds,
²⁴ correct?

Page 148

¹        A.   But I'll also be clear on
² that, that ICH Q3A where you're quoting
³ that stipulation from does not specify
⁴ levels at which potentially high potency
⁵ or other toxic substances would be
⁶ limited.  They do not specify any limits
⁷ for them.
⁸        Q.   That's right.  They put the
⁹ obligation on the manufacturer, and in
¹⁰ this case, the API manufacturer, to
¹¹ properly characterize and assess an
¹² impurity that falls within the cohort of
¹³ concern, don't they?
¹⁴        A.   That would be the obligation
¹⁵ of the API manufacturer.
¹⁶        Q.   Do you think Teva would have
¹⁷ wanted to know about the nitrosamine
¹⁸ impurities sooner, if ZHP knew about them
¹⁹ sooner than June 6, 2018?
²⁰        MR. HARKINS:  Objection to
²¹ form.  Vague.
²²        THE WITNESS:  What I'm
²³ hearing, and the way that I'm
²⁴ interpreting, was the information

Page 149

¹ request response that ZHP made
² to -- made to FDA, is as of that
³ date, June 6, 2018, that ZHP was,
⁴ at that time, at that point in
⁵ time then thoroughly convinced
⁶ that what they were seeing in
⁷ their valsartan API was identified
⁸ accurately and at levels that they
⁹ had confirmed.
¹⁰        It was likely within a range
¹¹ of values that they had selected
¹² from an assortment of APIs that
¹³ were under examination.
¹⁴        And at that one point in
¹⁵ time finally at which they were
¹⁶ convinced, they then, as I
¹⁷ understand it, or as I recall it,
¹⁸ is when they informed -- began to
¹⁹ initiate informing the API
²⁰ customers of theirs, and upon
²¹ which then roughly two and a half
²² weeks later, Teva was notified
²³ formally by ZHP who said that they
²⁴ were working with FDA on this

Page 150

1    issue, that the presence of NDMA
2    had been identified in their
3    valsartan drug substances.
4  BY MR. STANOCH:
5    Q.  Had you seen or relied on
6  any evidence suggesting that ZHP might
7  have suspected nitrosamines in valsartan
8  API earlier than June 6, 2018?
9    A.  No documentation to that
10 effect.  But when one is doing research
11 and development, I don't have any
12 visibility to exactly what they knew as
13 of what specific date.
14   All I know is what they have
15 represented to FDA.  And I'll take that
16 as a statement of truth.
17   Q.  Should Teva take as a
18 statement of truth everything its API
19 supplier, such as ZHP, say about the
20 product?
21     MR. HARKINS:  Object to
22 form.  Scope.
23     THE WITNESS:  Respectfully,
24 I said I took that as a statement

Page 151

1    of truth, that ZHP represented a
2  truthful statement that was being
3  made to FDA.
4    And in particular, in the
5  fact that FDA was working with
6  ZHP, I'm sure that they would be
7  able to attest -- or evaluate the
8  veracity of what it was that ZHP
9  stated in their information
10 request.
11   I, just as an outside
12 observer reading this document,
13 take it on its face that it's
14 truthful, because it is a
15 representation that they made to
16 FDA, and it is the obligation of
17 those who manufacture drug product
18 and drug substances to be truthful
19 with FDA.
20 BY MR. STANOCH:
21   Q.  And is it incumbent on a
22 finished dose drug manufacturer such as
23 Teva to have quality processes in place
24 to assure that its API suppliers are

Page 152

1  being truthful with Teva?
2    MR. HARKINS:  Vague.  Scope.
3    THE WITNESS:  I don't have
4  visibility at this moment to all
5  documents that Teva used to
6  support their impression of
7  veracity of representations made
8  to them by ZHP.
9    But this is something that I
10 really can't -- cannot comment on,
11 beyond what representations there
12 was that ZHP made to FDA.
13   And I believe that Teva
14 relies on representations made by
15 ZHP to FDA every bit as much as I
16 would.
17 BY MR. STANOCH:
18   Q.  And does Teva rely on the
19 FDA to make sure that Teva's own API
20 suppliers are complying with good
21 manufacturing practices?
22     MR. HARKINS:  Form.  Scope.
23     THE WITNESS:  FDA, excuse
24 me.  Teva remains abreast of

Page 153

1  findings that FDA has made at
2  their suppliers.
3    And these observations are
4  those which appear in 483.  And at
5  some point, should they have
6  access to it, as I even had access
7  to some of these in the
8  preparation of this report, the
9  establishment inspection reports.
10 BY MR. STANOCH:
11   Q.  You don't know how Teva
12 remains abreast of findings of the FDA
13 for its suppliers.  You don't opine on
14 that in your report, do you?
15   A.  I don't make a statement
16 specific to that.  But everything that I
17 have written in the report and have
18 referred to in the report involve
19 communications that Teva has had with FDA
20 in the course of the valsartan recall,
21 for instance.
22   The presence of NDMA as was
23 communicated by ZHP to Teva was in part
24 on a consequence of involvement of not

1 only the ZHP customer, who was the --
2 whose API was being studied, but also the
3 fact that FDA were, to my understanding,
4 involved in the knowledge of the
5 investigation that proceeded with respect
6 to NDMA.
7        So I believe communications
8 from FDA that are made by those who
9 interact with them are informative.  And
10 if I was Teva, I would find those to be
11 very informative.
12    Q.   Nowhere in your report do
13 you analyze any policy, practice, or
14 procedure at Teva for monitoring findings
15 of the FDA for Teva's suppliers, do you?
16    A.   I don't know if that's one
17 that is covered in one of the SOPs that
18 was cited.  If I could just refer -- it
19 was Paragraph 84, I think you referred
20 to.  I'm going to see if there's an SOP
21 here that may -- but without having it in
22 front of me, I can't say for sure.
23        But I would expect something
24 like that would possibly be referred to

1 in the risk management SOP, the out of
2 specification SOP, product complaint SOP.
3        Predominately those three
4 SOPs I would expect might have some
5 procedural narratives that would pertain
6 to information that Teva should know.
7    Q.   You are speculating right
8 now, right?
9    A.   I'm not recalling.  I'm
10 saying if you'd like to go to those SOPs,
11 we could look at those SOPs and to see to
12 what degree they do.  And we can read
13 from them together.
14    Q.   You're not offering any
15 opinion in your report, are you, sir,
16 that Teva had policies, procedures, and
17 practices in place to assure -- that
18 monitored FDA actions as to Teva's API
19 suppliers, are you?
20    A.   Okay.  Let me speak
21 specifically to ZHP.
22        I believe I have quoted from
23 the agreement which was in place with
24 ZHP, which causes them to be obligated to

1 inform -- yeah, here we go.  I believe we
2 are talking -- it's at Paragraph 110, on
3 Page 28.
4        I mention that since 2015
5 Teva, by way of Actavis, had in place the
6 quality agreement for active
7 pharmaceutical ingredients dated
8 3/24/2016, and entered into with ZHP,
9 Section 7.1 and 7.2 are a part of this
10 signed agreement, which reads as follows:
11        7.1, "Zhejiang Huahai shall
12 inform Actavis within" -- and I'm
13 saying -- is lacking a word here --
14 "within of any regulatory inspection that
15 relates to the manufacture of any API
16 supplied to Actavis, Zhejiang Huahai
17 shall provide Actavis with the
18 certificate issued after such an
19 inspection upon request."
20        7.2, "Zhejiang Huahai shall
21 promptly notify Actavis in writing on the
22 receipt of a regulatory inspection
23 report, deficiency letter, or written
24 regulatory compliance observation which

1 contains any significant adverse finding
2 that relates to API or the facilities
3 used to produce, test, or warehouse the
4 API sold and shipped to Actavis which
5 might impact the quality of the API
6 intended to be shipped to Actavis and/or
7 potentially affecting the ability of
8 Zhejiang Huahai to produce or ship the
9 API to Actavis, such as FDA Form 483, or
10 a warning letter received from any
11 applicable regulatory authority or
12 suspension/withdrawal of one or more
13 CDPs."
14        What this is telling me is
15 they had this agreement in place with ZHP
16 in -- as far back as 2016.
17        You'll note that the
18 agreement was structured in the context
19 of Actavis, which as an agreement didn't
20 have to be changed in Teva's case and for
21 their purposes to say anything different
22 than it does say here.
23        And that the obligation
24 exists that ZHP is expected to inform

Confidential Information Subject to Protective Order

Page 158

¹ Teva of any inspections and outcomes that
² a health authority has at their site.
³     Q.   Sir, the agreement that you
⁴ fortuitously just read without being
⁵ asked to do so, that speaks to ZHP's
⁶ obligation to inform Teva, correct?
⁷     A.   Correct.
⁸        MR. HARKINS:  Object to the
⁹     colloquy.  It's directly
¹⁰     responsive.
¹¹ BY MR. STANOCH:
¹²     Q.   You are not offering any
¹³ opinion in your report, sir, that Teva
¹⁴ had policies or procedures or SOPs in
¹⁵ place to ensure that Teva monitored FDA
¹⁶ actions as to Teva's API suppliers, are
¹⁷ you?
¹⁸     A.   There is an SOP which
¹⁹ required Teva to have quality agreements
²⁰ in place and the substance of that SOP
²¹ can be reviewed.
²²     Q.   We'll get to that, because
²³ certainly, Teva did not have a quality
²⁴ agreement in place with Mylan for

Page 159

¹ valsartan API, did it?
²     A.   It did not.
³     Q.   Right.  So under that same
⁴ SOP you just said that required quality
⁵ agreements, Teva wasn't following that at
⁶ least with respect to Mylan, right?
⁷     A.   Not in the context of Mylan,
⁸ no.
⁹     Q.   Right.  And so that would be
¹⁰ an instance in which Teva was not
¹¹ following an SOP that it had in place for
¹² quality, correct?
¹³     A.   It did not have a quality
¹⁴ agreement in place.  An SOP specified
¹⁵ that a quality agreement would need to be
¹⁶ in place.  They did not follow it in this
¹⁷ context.
¹⁸        That being said, not having
¹⁹ a quality agreement in place with Mylan
²⁰ did not stand in the way of Teva being
²¹ able to interact with Mylan freely with
²² regard to questions that arose and that
²³ pertained to cGMP issues or scheduling of
²⁴ audits by Teva of Mylan's facilities.

Page 160

¹     Q.   We'll certainly get to the
² Mylan situation a little more.  But let's
³ go back to what ZHP should have told Teva
⁴ about valsartan API.
⁵        So is it your belief, sir,
⁶ that under the quality agreement between
⁷ ZHP and Actavis, which Teva inherited,
⁸ that ZHP should have informed Teva about
⁹ any suspected impurities in the valsartan
¹⁰ API?
¹¹        MR. HARKINS:  Object to
¹²     form.  Vague.
¹³        THE WITNESS:  Not in all
¹⁴     circumstances.
¹⁵        MR. STANOCH:  Stand by.
¹⁶ BY MR. STANOCH:
¹⁷     Q.   In fact, the agreement that
¹⁸ you quoted and as you indicate in your
¹⁹ report, it's actually illegible about the
²⁰ time within which ZHP shall inform
²¹ Actavis about a regulatory inspection,
²² right?
²³     A.   You used a word there that
²⁴ was garbled.  Could you repeat the

Page 161

¹ question again, please?
²     Q.   In the quality agreement
³ between ZHP and Actavis that you quote in
⁴ your report, you yourself indicate that
⁵ the agreement has some sort of
⁶ typographical error about the time frame
⁷ within which ZHP shall inform Actavis of
⁸ regulatory inspections, right?
⁹     A.   What the typo is that's in
¹⁰ the agreement here is they've inserted
¹¹ the word "within."  And I just reproduced
¹² that accurately as was residing in the
¹³ agreement.
¹⁴        But if one was to read that
¹⁵ cleanly, it would be, "Zhejiang Huahai
¹⁶ shall inform Actavis of any regulatory
¹⁷ inspections that relate to the
¹⁸ manufacture," and so forth here as I said
¹⁹ before.
²⁰        But 7.2, I know you thought
²¹ this was a labored reading of this.  But
²² it's important to know that 7.2 is very
²³ clear to say that Zhejiang Huahai shall
²⁴ promptly notify Actavis in writing.  It

Page 162

1 does not, you know, specify what promptly
2 necessarily is in terms of days or weeks
3 or months or anything like that, how
4 promptly is interpreted.
5          But from my experience in
6 reviewing such quality agreements,
7 promptly means right away.  And that, I
8 believe, is probably how this was
9 expected to be interpreted as well.  And
10 that would be the expectation that Teva
11 had with ZHP.
12      Q.    Quantify promptly for me
13 based on your experience.  What do you
14 mean by right away?
15      A.    Promptly would be some time
16 at such point in time that they have
17 received their 483 report from -- from
18 FDA specifically, or at whatever the time
19 a report was produced from the health
20 authority, because that forms a basis to
21 inform a customer of the outcome of a
22 regulatory visit.
23          So it would be the most
24 meaningful information point in time to

Page 163

1 which that would happen.
2          And the firm typically has
3 15 days within to which to respond to
4 observations that are made in the 483.
5          So if you're going to be
6 communicating this kind of thing, it is
7 certainly within the ability of ZHP to
8 say oh, by the way, Teva, FDA stopped by.
9 We're still going over what the number of
10 observations are and the nature of
11 observations, such as they are.  We
12 haven't settled exactly on what those
13 are, because we're still preparing
14 responses to them.
15          So what the outcome of that
16 inspection is, is still unknown at this
17 time.  So the firm could communicate that
18 to Teva.  ZHP could communicate that to
19 Teva in this instance and be considered
20 prompt, or they could potentially wait
21 until they have all the facts, and
22 certainly within 15 days there is
23 considered to be a reasonable amount of
24 time and -- where one actually has

Page 164

1 meaningful information with respect to
2 the inspection.
3      Q.    And you're aware, are you
4 not, right, that the FDA inspected ZHP in
5 May of 2017, right?
6      A.    I'm aware of that, yes.
7      Q.    You are aware that that
8 inspection was not reported by ZHP to
9 Teva until quite some time after,
10 correct?
11      A.    Correct.
12      Q.    In fact, I think it was --
13 and you reference to your report -- a
14 Teva procurement officer stumbled upon
15 the existence of the May 2017 inspection
16 from a Bloomberg article, correct?
17      A.    Correct.
18      Q.    All right.
19          MR. STANOCH:  I'll mark as
20 Exhibit 4.
21          (Document marked for
22 identification as Exhibit
23 Anderson-4.)
24 BY MR. STANOCH:

Page 165

1      Q.    Tell me when you can see it,
2 sir.
3          MR. HARKINS:  Refresh the
4 DropBox.
5          THE WITNESS:  One moment,
6 please.
7 BY MR. STANOCH:
8      Q.    Of course.
9      A.    Loading Exhibit 4.  I'm
10 there.



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order

Page 170



11  non-specific requirements of our clients.
12      But what did Teva consider
13  prompt in this case, I can't speak to.
14      Q.   Are you saying it's
15  reasonable for Teva to receive
16  notification from ZHP over a year after
17  the FDA conducted an inspection of ZHP?
18          MR. HARKINS:  Object to
19      form.  Scope.
20          THE WITNESS:  You asked what
21      I did with respect to other
22      customers and what my experience
23      was with them.  I have no
24      experience with Teva in this

Page 171

1   matter.
2       So I don't know what Teva
3   would consider to be the full and
4   complete definition of prompt.
5       You asked me earlier what
6   was it in my experience.  I gave
7   you what was in my experience.
8       I do not have what is Teva's
9   experience or how they would
10  interpret this.
11  BY MR. STANOCH:
12      Q.   Based on your experience,
13  understanding that it does not relate to
14  any work that you've ever done with Teva,
15  you would agree that ZHP did not promptly
16  notify Teva about the FDA's May 2017
17  inspection, correct?
18          MR. HARKINS:  Object to
19      form.  Scope.
20          THE WITNESS:  I spoke to the
21      experience that I had with my own
22      clients, not experience that
23      anyone -- that Teva had with its
24      own suppliers or how they

Page 172

1   interpreted prompt in this case.
2       That's all I'm saying.
3   BY MR. STANOCH:
4       Q.   Based on your experience
5   then, outside of ZHP and Teva, would you
6   advise a paying client of yours that it's
7   okay for the API supplier to wait over a
8   year to inform them about an FDA
9   inspection?
10          MR. HARKINS:  Object to
11      form.  Speculation.  You
12      can answer.
13          THE WITNESS:  Again, that is
14      speculative and far too general a
15      consideration here.
16      I have worked with other
17      clients, other than Teva.  So what
18      Teva's interpretation of what
19      their agreement with ZHP is, I
20      would leave it up to Teva to
21      comment on.  I'm not here to
22      comment on that.
23  BY MR. STANOCH:
24      Q.   Have you ever advised any

Page 173

1   client of yours that it's okay to find
2   out about a regulatory inspection over a
3   year after it occurs at an API supplier?
4          MR. HARKINS:  Object to form
5      scope.  Speculation.
6          THE WITNESS:  I do not
7      recall a circumstance where that
8      hypothetical has presented itself.
9   BY MR. STANOCH:
10      Q.   You can't recall any example
11  in your decades of regulatory experience
12  in which an API supplier waited over a
13  year to tell the finished dose customer
14  about an FDA regulatory inspection; is
15  that right?
16      A.   I have not encountered a
17  similar situation with the hundreds of
18  audits of API suppliers and product
19  manufacturers that I have conducted,
20  worldwide.
21      Q.   Could you identify for me
22  any Teva SOP that was in place at the
23  time that should have required Teva to
24  follow up on whether the FDA conducted an

Confidential Information Subject to Protective Order

Page 174

¹ inspection of ZHP in 2017?
²          MR. HARKINS:  Object to
³     form.  Vague.
⁴          THE WITNESS:  Very vague in
⁵     the sense that I have not
⁶     memorized the content of SOPs and
⁷     would know immediately which SOP
⁸     contained that information.
⁹          We could go through the body
¹⁰     of SOPs one by one, I suppose, and
¹¹     see where that appears.
¹² BY MR. STANOCH:
¹³     Q.   Well, you know, which SOPs
¹⁴ are you talking about?  The ones that you
¹⁵ relied on in your report, or the bunch of
¹⁶ ones that you're citing in your materials
¹⁷ considered?
¹⁸     A.   It could be something
¹⁹ possibly that is found in either.  It's
²⁰ not something that I have immediate
²¹ knowledge of.  As I said, we could always
²² go through the SOPs and find out where
²³ that exists.
²⁴     Q.   We can agree, though, I

Page 175

¹ believe, Mr. Anderson, that you're not
² opining on whether or not Teva had an SOP
³ in place that would have required it to
⁴ monitor FDA actions at API suppliers such
⁵ as ZHP, correct?
⁶     A.   I am not certain which SOP
⁷ governs that particular operation.
⁸     Q.   You can't even tell me
⁹ sitting here whether there is an SOP that
¹⁰ governed that, correct?
¹¹          MR. HARKINS:  Form.  Scope.
¹²     You can answer.
¹³          THE WITNESS:  Again, the
¹⁴     content of SOPs that -- such they
¹⁵     are at Teva, is not something that
¹⁶     I familiarized myself with deeply,
¹⁷     nor do I quote from any of the
¹⁸     SOPs, with the exception on, I
¹⁹     believe, one SOP that I thought
²⁰     was necessary to make a point.
²¹          But I obviously don't recall
²²     which SOP this particular
²³     monitoring requirement is
²⁴     detailed.

Page 176

¹ BY MR. STANOCH:
²     Q.   All right.  Sitting here
³ now, can you identify for me any Teva SOP
⁴ that would have spoke to Teva's
⁵ obligation to monitor regulatory activity
⁶ at one of Teva's API suppliers content?
⁷          MR. HARKINS:  Form.  Scope.
⁸          THE WITNESS:  Again, I have
⁹     no immediate recall of which SOP
¹⁰     governs that function.
¹¹          MR. HARKINS:  Dave, I don't
¹²     know if you're switching to a new
¹³     thing.  We've been going over an
¹⁴     hour.  And I think we'll want to
¹⁵     recheck on what we're doing for a
¹⁶     lunch arrangement.  So probably a
¹⁷     short break here when it's ready.
¹⁸          MR. STANOCH:  Steve, let's
¹⁹     go a little longer on this
²⁰     subject, and then we can take a
²¹     break depending on Mr. Anderson's
²²     stamina.
²³ BY MR. STANOCH:
²⁴     Q.   Mr. Anderson, you talk a

Page 177

¹ little bit more about this particular
² e-mail exchange, I believe, in your
³ report around Paragraphs 112 through 117.
⁴     A.   I do.
⁵     Q.   Can you recall any instance
⁶ in your decades of experience in which a
⁷ finished drug product manufacturer had to
⁸ learn about an FDA inspection at one of
⁹ its API suppliers over a year later
¹⁰ through a public news article?
¹¹     A.   I have had no example of
¹²     that in my many years of experience
¹³     consulting.





Page 178

Page 180

3    Q.   You're not an expert in
4  reading documents, are you, Mr. Anderson?
5        MR. HARKINS:  Object to
6  form.
7        You can answer, I guess.
8        THE WITNESS:  I consider
9  myself to be an expert reader.
10 BY MR. STANOCH:

Page 179

Page 181

Confidential Information Subject to Protective Order



Confidential Information – Subject to Protective Order



Confidential Information Subject to Protective Order



Page 190

Page 191

Page 192

10   BY MR. STANOCH:
11        Q.   And you said that you didn't
12   undertake any analysis to determine if
13   anyone at Teva learned about the May 2017
14   inspection prior to August of 2018,
15   right?
16        A.   This is the only document
17   that I was supplied with.
18        Q.   Right.  Had Teva learned of
19   the May 2017 FDA inspection of ZHP
20   sooner, it could have had conversations
21   with ZHP about those inspection
22   observations at an earlier time, right?
23             MR. HARKINS:  Form.  Vague.
24   Speculation.

Page 193

1        THE WITNESS:  That is
2   speculation.  And what the nature
3   of those conversations are and the
4   timing as to those conversations,
5   it certainly depends on when those
6   happen.
7   BY MR. STANOCH:

Confidential Information Subject to Protective Order



Page 194

Page 195

<sup>12</sup>        MR. STANOCH:  Mr. Anderson,
<sup>13</sup> now is a good time for a lunch
<sup>14</sup> break.  I'm happy to do it or we
<sup>15</sup> can keep going.  You let me know.
<sup>16</sup>        THE WITNESS:  Let's break
<sup>17</sup> for lunch at 1 o'clock.
<sup>18</sup>        MR. STANOCH:  Okay.
<sup>19</sup>        THE VIDEOGRAPHER:  The time
<sup>20</sup> right now is 12:57 p.m.  We are
<sup>21</sup> off the record.
<sup>22</sup>           - - -
<sup>23</sup>        (Whereupon a luncheon recess
<sup>24</sup> was taken.)

Page 196

<sup>1</sup>           - - -
<sup>2</sup>        THE VIDEOGRAPHER:  The time
<sup>3</sup> right now is 2:11 p.m.  We're back
<sup>4</sup> on the record.
<sup>5</sup>           - - -
<sup>6</sup>        CONTINUED EXAMINATION
<sup>7</sup>           - - -
<sup>8</sup> BY MR. STANOCH:
<sup>9</sup>        Q.   Welcome back, Mr. Anderson.
<sup>10</sup> Other than Mr. Harkins, did
<sup>11</sup> you talk or communicate with anybody else
<sup>12</sup> during the lunch break?
<sup>13</sup>        A.   No, I did not.
<sup>14</sup>        Q.   Did you look at any
<sup>15</sup> documents during the break?
<sup>16</sup>        A.   No.
<sup>17</sup>        Q.   What's your understanding of
<sup>18</sup> some of the root causes identified by the
<sup>19</sup> FDA eventually for NDMA and NDEA?
<sup>20</sup>        A.   I believe, as I recall from
<sup>21</sup> the way that FDA has identified potential
<sup>22</sup> root causes, had to do with formation of
<sup>23</sup> nitrous acid during a reaction using the
<sup>24</sup> new catalysts and new DMF solvents and

Page 197

<sup>1</sup> the side reactions that resulted from
<sup>2</sup> that which were not heretofore detected
<sup>3</sup> was a reason for having this process
<sup>4</sup> impurity manifest itself, at least
<sup>5</sup> certainly by the ZHP process.
<sup>6</sup>        The Mylan process is not the
<sup>7</sup> same as ZHP's process.  And the presence
<sup>8</sup> of NDEA, which I understand is at a
<sup>9</sup> concentration far less than NDMA, is
<sup>10</sup> present in or was found in the Mylan
<sup>11</sup> process to be a consequence of a
<sup>12</sup> contamination entered into the API by use
<sup>13</sup> of recycled solvent that are used in
<sup>14</sup> manufacturing, or possibly water too that
<sup>15</sup> was used in the manufacturing process.
<sup>16</sup>        Q.   Thank you.
<sup>17</sup>        And that first potential
<sup>18</sup> root cause with respect to the ZHP
<sup>19</sup> valsartan API, you understand generally
<sup>20</sup> it had to do with the nitrous acid and
<sup>21</sup> the quenching process during the
<sup>22</sup> manufacture?
<sup>23</sup>        A.   Yes.  Reaction quenching
<sup>24</sup> process, yes, correct.

Confidential Information - Subject to Protective Order



Page 198

1    Q.   And I think we testified --
2  we talked about this a little bit before
3  lunch, that, you know, you cite in your
4  report that it was Novartis telling ZHP
5  about NDMA in the valsartan API in early
6  June of 2018, right?
7    A.   Correct.
8    Q.   And you're not aware of
9  whether or not ZHP knew about the
10  potential for nitrosamines in valsartan
11  API prior to June 2018?
12    A.   I'm not aware of what ZHP
13  knew to that point.  All I know is what
14  they attest to in the information request
15  response to FDA.
16       MR. STANOCH:  I'm going to
17    mark the next exhibit.  Exhibit 5.
18    (Document marked for
19    identification as Exhibit
20    Anderson-5.)
21  BY MR. STANOCH:

Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information - Subject to Protective Order



Confidential Information Subject to Protective Order

Page 226

[redacted]

BY MR. STANOCH:

Q.   You're saying until the FDA figured it out in December of 2018, all the other manufacturers, even if they found out about it, didn't have to do anything?

MR. HARKINS:  Object to form.  Misstates testimony. Scope.

THE WITNESS:  Well, they certainly took it upon themselves to pay attention to the issue.  I don't know what they mean by pay attention to the issue.  But it certainly wasn't ignored, the issue, okay.

So I don't know what level of attention they were giving to this, though they were put on

Page 227

notice to do so in 2017.

And again, I don't know at what point ZHP began to speak with FDA concerning the presence of NDMA, NDEA, or any of the levels that FDA might at some point adopt for limiting substances in API.

But there were no limits established for API during the time -- during the time that Teva was marketing their valsartan products.

BY MR. STANOCH:

Q.   When you say without -- there were no limits, that means the limit is zero; isn't that right?

MR. HARKINS:  Object to form.  Scope.

THE WITNESS:  I think there are no limits that are present. It's not that limit is zero.

When you said limit is limit is zero, that's coming with an expectation that no, absolutely

Page 228

zero, NDMA, NDEA may be present in a drug product.

FDA never said that.  Even today FDA never said that.

So when you use that terminology, in saying zero in this context, I think it's not -- it's not operative.

BY MR. STANOCH:

Q.   Was it your testimony a moment ago that the FDA never said that zero was the appropriate amount of nitrosamines in sartan API?

A.   As a specification, as they have stated it, they never said zero.

Q.   As a specification.  That's how you're qualifying the answer?

A.   Yes, because that is the regulatory metric that is used and how enforcement is understood.

Q.   And you understand, I take it then, that the FDA has said in the past that a drug substance should not contain any nitrosamines because it's

Page 229

controlled.  Do you recall that?

A.   What I recall is that they were at that time that you're referring to -- this document I believe was something that was issued in 2019.

You're talking about the general advice, I believe, where FDA essentially, in a perfect world, one would not want to have impurities of -- really of any kind that are in a drug substance.

Okay.  You realize that is not the real world and that impurities are there.  And in fact, FDA established limits for the impurities specific to NDMA and NDEA as far back as that point as December of 2018.

So it is a -- it is a time where FDA is -- is writing even as they're thinking.

They are formulating, you know, the direction that something like this is going to go, is ultimately going to go.

Confidential Information Subject to Protective Order

Page 230

1     This is a time that they
2 have not yet developed what became the
3 GC-MS assay method, which is now what is
4 operative for API manufacturers in order
5 to determine what level, if any, of NDMA
6 or NDEA are present in drug substances.
7 And that didn't come around until roughly
8 2020.
9     Q.   Are you aware of any risk
10 assessment that Teva conducted of
11 valsartan API for genotoxic impurities
12 prior to June of 2018?
13     A.   I do not have any -- I did
14 not review any risk assessments that
15 mentioned genotoxic impurities.
16     Q.   Are you aware of any risk
17 assessment Teva conducted of its own
18 valsartan finished dose product prior to
19 June of 2018?
20     A.   I did not review any
21 documents pertaining to genotoxicity and
22 discussions that Teva had as a product
23 manufacturer about it.
24     Q.   Did you review any Teva SOPs

Page 231

1 regarding when it should conduct risk
2 assessments and what they should entail
3 for API or finished dose product prior to
4 June 2018?
5          MR. HARKINS:  Object to
6      form.  Scope.
7          THE WITNESS:  Could you
8      rephrase that question, please?
9 BY MR. STANOCH:
10     Q.   Did you review any Teva SOPs
11 concerning Teva's conducting risk
12 assessments for finished dose product or
13 API?
14          MR. HARKINS:  Same
15      objection.
16          THE WITNESS:  I read the
17      risk assessments SOP that is based
18      on the ICH Q9.  I did just do a
19      cursory read through it.
20 BY MR. STANOCH:
21     Q.   That's the one that was put
22 into effect after the recalls began in
23 the summer of 2018, right?
24     A.   I don't know exactly what

Page 232

1 time the risk assessment SOP is dated.  I
2 know what I requested to look is what the
3 current version of that is.  I don't know
4 what the version history of it is.
5          Q.   You can't say sitting here
6 what the Teva SOP for risk assessment was
7 during the 2012 to 2018 time period?
8          MR. HARKINS:  Form.  Scope.
9          THE WITNESS:  I don't have
10      an immediate recollection of what
11      was in the risk assessment SOP or
12      what its revision history is.
13 BY MR. STANOCH:
14     Q.   And the risk assessment SOP
15 that you cite in your report, the current
16 version, that's as it relates to an
17 assessment in the summer of 2018, right?
18     A.   The SOP that I referred to
19 and the purposes that I referred to it
20 was to, again, compare against John
21 Quick's mention of risk assessment SOPs
22 as being meaningful to governing quality
23 systems.
24          I did not read the SOP to

Page 233

1 any amount of depth.  I gave it a cursory
2 review and confirmed that, in fact, one
3 existed.  That's the only thing that I
4 did with respect to that SOP.
5     Q.   Do you know if the Teva SOP
6 on risk assessments related to conducting
7 analyses of API before it is purchased?
8     A.   Again, what is contained in
9 that SOP is not something that I have an
10 immediate memory about.  It certainly can
11 be brought up and we can read the SOP
12 from front to back and learn what is in
13 it.
14     Q.   We had talked about
15 June 2018 and NDMA, and then I think you
16 write, starting in Paragraph 100, about
17 Teva's awareness of NDEA.
18     A.   I'm going to that paragraph
19 right now.
20          MR. HARKINS:  Which
21      paragraph?
22          THE WITNESS:  100, I believe
23      he mentioned.
24          Okay.  I am at Paragraph

Confidential Information Subject to Protective Order

Page 234

100.

BY MR. STANOCH:

Q.   And here you write in part that Teva first became aware of the potential of a different impurity, NDEA in valsartan API purchased from Mylan, India, by way of a notification from Swissmedic on November 5, 2018.  And then you continue there, right?

A.   That is correct.

Q.   Okay.  So your belief is that Teva first became aware of the potential for NDEA on November 5, 2018?

A.   In Mylan's API, yes.

Q.   Well, you're qualifying there with Mylan's API.  When did Teva first become aware of the potential for NDEA in valsartan API, period?

MR. HARKINS:  Form.  Scope.

THE WITNESS:  I understand that Teva was in the process of doing some significant investigation with respect to their valsartan API, first

Page 235

starting with respect to NDMA.

But also expanding into the possibility that the nitrosamine NDEA and possibly others might also be present.

So I believe this was all part of something that Teva was investigating at the time, but learned conclusively by way of a field alert here that involved Swissmedic, who reported that they found NDEA in Mylan API.

BY MR. STANOCH:

Q.   So you agree that Teva was aware of the potential for NDEA to form in valsartan API prior to November 5th, 2018, correct?

MR. HARKINS:  Form.  Misstates testimony.

THE WITNESS:  I believe that they were studying the possibility of its formation.

I do not know whether they determined that there was anything

Page 236

as a matter of an emergence of NDEA as a process impurity with their synthetic process.

Here, again, Mylan's synthetic process is different from ZHP's.  And Mylan in fact related to Mylan -- excuse me.

Mylan related to Teva early on in its investigative process, that its method of synthesis was different from ZHP's.

So an inquiry was made of Mylan, do you suspect that NDMA is part of your process, as we have found it to be elsewhere.

Mylan says that is not our process.  And on that basis, Teva did not at that time suspect that NDMA would be part of Mylan's process.

And I don't know that I have read anything to suggest that I recall that NDMA is part of Mylan's process.  Although it was

Page 237

revealed that NDEA was associated with Mylan's process.

BY MR. STANOCH:

Q.   Right.  And you're saying that was not revealed, about the NDEA, until Swissmedic affirmatively told Teva that Teva's own product contained NDEA on November 5th, 2018?

A.   By way of that notification from Swissmedic, yes, that Mylan API was found to contain NDEA, as I wrote down.

Q.   From your knowledge, did Teva ever test any of its own valsartan or the valsartan API that it was buying from Mylan, for NDEA prior to November 5th, 2018?

MR. HARKINS:  Object to form.  Scope.

THE WITNESS:  I have no knowledge of what kind of testing was being done specifically on Mylan's API.

BY MR. STANOCH:

Q.   From a cGMP perspective,

Confidential Information Subject to Protective Order

Page 238

1 would it be appropriate for a finished
2 dose manufacturer on notice of the
3 potential for NDEA, to test its valsartan
4 and valsartan API for that substance?
5          MR. HARKINS:  Form.  Vague.
6 Speculation.
7          THE WITNESS:  What Teva had
8 to inform themselves were
9 certificates of analysis from
10 their suppliers that showed
11 whether they conformed with the
12 specifications that were appended
13 to their purchasing of that API,
14 and whether in fact those
15 specifications were the same as
16 the ones that were approved for
17 the application.
18          Now, unless there was a
19 notification that any one of those
20 specifications were offended, Teva
21 was of the reasonable belief that
22 the drug substance, based on how
23 it was represented as conforming
24 with the specification, was

Page 239

1          something that was remaining
2          within cGMP compliance.
3 BY MR. STANOCH:
4     Q.    Well, let's unpack some of
5 that.  Well, first of all, certificates
6 of analysis that you reference, you told
7 us this morning that you don't rely on
8 specific ones in your opinions in your
9 report, right?
10          MR. HARKINS:  Object to
11     form.  Misstates testimony.
12          THE WITNESS:  I don't
13     reference them as footnotes in my
14     report, although they are
15     documents considered.
16 BY MR. STANOCH:
17     Q.    Right.  And again, how am I
18 supposed to replicate your analysis,
19 Mr. Anderson, and know whether something
20 in your materials considered was or was
21 not actually relied upon for the body or
22 footnotes of your report?
23          MR. HARKINS:  Form.  Asked
24     and answered.

Page 240

1          THE WITNESS:  You're welcome
2 to review any one of those
3 certificates of analysis and
4 inform yourself, even as I was.
5 BY MR. STANOCH:
6     Q.    That's not my question, sir.
7          How am I supposed to know
8 from reading your report, right, which
9 certificates of analysis you're relying
10 on for your opinions, not that you saw
11 and put aside, that you're relying on for
12 your opinions?
13          How can I know that?
14          MR. HARKINS:  Form.  Asked
15 and answered.
16          THE WITNESS:  There was no
17 specification for NDMA and NDEA at
18 the time that any of those
19 certificates of analysis were
20 generated; hence, the requirement
21 in a regulatory sense was not
22 there to report presence of NDMA
23 or NDEA in concentrations as
24 measured against the specification

Page 241

1          which did not exist.
2 BY MR. STANOCH:
3     Q.    I'm going to ask my question
4 again about the certificates that you
5 relied on, sir.
6          How am I supposed to know
7 reading from your report which
8 certificates of analysis you're relying
9 on for your opinions?
10          MR. HARKINS:  Objection to
11 form.  Asked and answered.
12          You can answer again.
13          THE WITNESS:  Again, you're
14 welcome to go through me -- with
15 me, each one of those certificates
16 of analysis to determine whether
17 there was an NDMA or NDEA value
18 that was reported to them or by
19 specification was required to be
20 reported to them.  And you will
21 find that there is no such
22 specification or report in any one
23 of them.
24 BY MR. STANOCH:

Confidential Information Subject to Protective Order

Page 242

1    Q.    You understand, sir, that
2  you're supposed to identify the materials
3  that you relied upon in forming your
4  opinions.  Do you understand that?
5          MR. HARKINS:  Dave, he told
6    you that he reviewed all of them
7    and did not find it necessary to
8    cite any of them in his report.
9          And he's explained the
10   specific reason that he didn't
11   feel it was necessary to cite any
12   of them, because he did not find
13   the information that he's
14   described five times in a row now,
15   in any of those certificates of
16   analysis.
17         You can answer again.
18         THE WITNESS:  Again, the
19   specifications for NDMA and NDEA
20   did not exist until December 2018.
21         The certificates of analysis
22   that I reviewed predated that
23   specification; hence, it was no
24   surprise to me, as I reviewed

Page 243

1  them, that there was no presence
2  of data that pertained to NDMA or
3  NDEA qualification or a
4  specification against which they
5  were evaluated or anything having
6  to do with the regulatory
7  submission that required any such
8  evaluation in order to remain
9  within cGMP compliance.
10 BY MR. STANOCH:
11   Q.    Sir, you understand you're
12 supposed to identify the materials that
13 you rely upon in forming your opinions.
14 Do you understand that?
15   A.    I understand that.
16   Q.    Right.  And you've told me
17 in the morning that you rely in your
18 opinions on the materials that are in
19 cited the body or the footnotes of your
20 report; is that right?
21   A.    That is correct.
22   Q.    So the only way I know what
23 you relied on is if it's cited in a
24 paragraph or in a footnote, correct?

Page 244

1          MR. HARKINS:  Object to
2    form.  Misstates the testimony.
3          THE WITNESS:  And there is
4    also this exhibit which has the
5    list of materials considered so
6    one is able to do as you have done
7    and ask me what those list of
8    materials were, and they happen to
9    include certificates of analysis
10   that are named that don't happen
11   to have specifications or data
12   pertaining to NDMA and NDEA,
13   unsurprisingly.
14 BY MR. STANOCH:
15   Q.    So now you're telling me all
16 the certificates of analysis in your
17 materials considered exhibit were things
18 that you relied on now.  Is that what
19 you're saying now?
20   A.    I'm saying that I looked at
21 those, but I didn't have to make a
22 statement regarding numerical
23 specifications and conformance therewith
24 until FDA issued its specification

Page 245

1  guidance in 2018, December of 2018.
2    Q.    In terms of these
3  specifications you keep saying, if a
4  manufacturer is put on notice of the
5  potential for an impurity in their
6  product, that's not on the specification,
7  is it incumbent on them to test and
8  evaluate for that or just ignore that?
9          MR. HARKINS:  Form.  Scope.
10         THE WITNESS:  Again, to
11   remain within cGMP compliance,
12   there is the expectation of FDA
13   that you make products in
14   accordance with the production as
15   it is described in the ANDA using
16   the API of the quality that is
17   approved to be used in that
18   application and to conform to
19   those specifications in order to
20   continue marketing the product.
21         NDMA and NDEA were not part
22   of API specifications to which
23   Teva's products were required to
24   conform because the specifications

Confidential Information Subject to Protective Order

Page 246

1  did not exist when valsartan made
2  by Teva was being marketed.
3  At the time the
4  specifications went in, there was
5  no valsartan product being
6  marketed by Teva.
7  BY MR. STANOCH:
8  Q.  So you're saying that even
9  if Teva had reason to believe that its
10 valsartan products contained NDEA, it had
11 no obligation to do anything with that
12 information if and unless the FDA changed
13 the specification?
14 MR. HARKINS:  Object to
15 form.  Vague.  Speculation.
16 misstates testimony.  Compound.
17 THE WITNESS:  In order to
18 continue marketing their product,
19 it was Teva's obligation to
20 conform to approved
21 specifications.  NDMA and NDEA
22 content were not governed by
23 FDA-directed specifications during
24 the time of Teva's marketing of

Page 247

1  valsartan.
2  BY MR. STANOCH:
3  Q.  Did Teva have any obligation
4  to do anything if it had reason to
5  believe its valsartan products might
6  contain NDEA?
7  MR. HARKINS:  Form.  Scope,
8  vague.
9  THE WITNESS:  Teva had the
10 obligation to conform with
11 specifications in their
12 application.
13 BY MR. STANOCH:
14 Q.  Anything else?
15 MR. HARKINS:  Objection.
16 THE WITNESS:  In order to
17 conform to cGMP compliance, which
18 is the scope of my report, nothing
19 else.
20 BY MR. STANOCH:
21 Q.  So let's take that a step
22 farther then.  Let's say Teva knew that
23 its product -- its valsartan had the NDEA
24 in it.

Page 248

1  Did Teva have any obligation
2  to do anything with that information from
3  a cGMP standpoint?
4  MR. HARKINS:  Form.  Scope.
5  Speculation.
6  THE WITNESS:  From a cGMP
7  aspect, the product that they had
8  to market had to contain API that
9  conformed to the specifications as
10 stated for reporting impurities,
11 and that threshold level was at
12 the level of 0.05 percent.
13 NDEA appears in valsartan
14 when it does at levels far below
15 0.05 percent.
16 In fact, we are talking in
17 terms of parts per million and
18 parts per billion.
19 So these types of
20 quantification and qualification,
21 per the specifications that
22 pertain to Teva's valsartan during
23 the time that it was being
24 manufactured and distributed and

Page 249

1  marketed, Teva had to conform to
2  the approved specifications based
3  on ICH Q3A.
4  BY MR. STANOCH:
5  Q.  What if some of Teva's
6  valsartan product had a thousand
7  milligrams of anthrax in it.  Anthrax is
8  not in the specification, is it?
9  A.  Anthrax is also, you
10 understand, an externally added
11 contaminant.  It is not something that is
12 part of the valsartan process.  There is
13 a difference.
14 Q.  Let's say there -- tell
15 me -- tell me a very highly toxic poison
16 impurity.
17 MR. HARKINS:  Dave, he
18 wasn't finished his answer.  So
19 I'm going to ask you to let him to
20 complete.
21 THE WITNESS:  Yes.  Allow me
22 to complete.
23 Anthrax as an external
24 contaminant to the product itself

Page 250

1  is exactly that.  And there is law
2  that speaks to contaminations.
3  Okay.
4        Process impurities are not
5  contaminations.  You must
6  distinguish that in your lexicon
7  here, because, again, what this is
8  is nitrosamine in the context of
9  ZHP, were process impurities that
10 happened from a side reaction
11 which no one anticipated, no
12 regulatory authority anticipated,
13 no other manufacturer of valsartan
14 product or API anticipated, and
15 FDA admitted caught them
16 unexpectedly.
17        Okay.  So that's a process
18 impurity.
19        What you have described,
20 anthrax, is something which in its
21 substance is so completely foreign
22 to the process of either valsartan
23 API synthesis or valsartan drug
24 product manufacture, it can only

Page 251

1  be classified as a contaminant.
2        So it's a very different
3  kind of circumstance that we're
4  talking about here, as an external
5  impurity.
6  BY MR. STANOCH:
7     Q.   Are you done, sir?
8     A.   I'm done now.
9     Q.   Very good.  I wanted to make
10 sure.
11        Take another process
12 impurity that you can imagine, and say it
13 was in a thousand milligrams of it in
14 Teva's valsartan.  But it's not in the
15 specification.
16        Does Teva have any
17 obligation to do anything about that?
18        MR. HARKINS:  Speculation.
19 Scope.  Objection.
20        THE WITNESS:  Let me start
21 off by saying that the valsartan
22 products there, I don't believe,
23 were tableted with a potency of
24 valsartan higher than

Page 252

1  320 milligrams.
2        So when you're talking about
3  a thousand milligrams of some
4  external entity being found as a
5  contaminant of a product, of a
6  valsartan product, this is a very
7  obvious contamination here.
8  BY MR. STANOCH:
9     Q.   Now, it's a contamination,
10 not an impurity?  I don't understand,
11 sir.  We are talking about process
12 impurities, right?
13     A.   It is contamination, not a
14 process impurity, because that did not
15 form during the process.
16     Q.   So you're telling me that
17 any process impurity that Teva might have
18 been aware of in its valsartan that was
19 not in the specification for valsartan
20 would not have to be acted on in any way
21 by Teva?
22        MR. HARKINS:  Object to
23 form.  Misstates the testimony.
24        THE WITNESS:  That was not

Page 253

1        above a reportable level,
2        according to ICH Q3, which I have
3        stated many times.
4  BY MR. STANOCH:
5     Q.   And ICH Q3, which
6  incorporates the M7 guidance, says that
7  it's incumbent on the manufacturer to
8  characterize and assess potential cohort
9  of concern impurities, such as
10 nitrosamines, and come up with a
11 potential level or control, does it not?
12     A.   M7 mentions the cohort of
13 concern, if I recall correctly, not ICH
14 Q3.
15        But that taken into
16 consideration, there is a cohort of
17 concern about which manufacturers of drug
18 substances should be aware and design
19 processes to minimize.
20        And in fact, looking at your
21 Exhibit Number 5, where it says to the
22 leaders, "Please pay attention to this
23 issue, I think that's something that's
24 done in the spirit of following the

Page 254

1 guidance that M7 recommends.
2      Q.   And to your knowledge, was
3 Teva ever designing any process to
4 minimize the NDEA in its valsartan
5 product prior to November 5, 2018?
6           MR. HARKINS:  Object to
7      form.  Scope.
8           THE WITNESS:  You do
9      understand that Teva is not
10     manufacturing the API within which
11     any of the NDMA or NDEA were
12     found.  This wasn't a subject of
13     product formulation or counting
14     specifications or dissolution
15     profiling or anything having to do
16     with that.
17          That's what Teva was
18     preparing and was marketing to the
19     public.  It incorporated API from
20     either ZHP or from Mylan.
21          And it was Teva's obligation
22     to tablet the product for
23     marketing purposes that conforms
24     with its specifications, and it

Page 256

1 appropriate for Teva to ignore customer
2 requests to test Teva's own valsartan
3 product for nitrosamines?
4           MR. HARKINS:  Object to
5      form.  Foundation.  Scope.
6           THE WITNESS:  I'm not aware
7      of any condition that you are
8      speaking of here, so I can't
9      really comment.
10 BY MR. STANOCH:
11     Q.   Well, from the cGMP
12 perspective, is it appropriate for Teva
13 to ignore a customer request to test
14 Teva's own valsartan product for
15 nitrosamines?
16          MR. HARKINS:  Form.
17     Foundation.  Scope.
18          THE WITNESS:  Teva handled
19     complaints.  It had an SOP which
20     is part of its quality system,
21     which describes how complaints are
22     handled.
23          It is not specific to the
24     type of complaints that it might

Page 255

1      did so during the time that it was
2      marketing valsartan.
3 BY MR. STANOCH:
4      Q.   You're not aware of Teva
5 ever communicating with any of its
6 valsartan API suppliers about processes
7 to minimize the NDMA or NDEA in the
8 valsartan API that Teva was purchasing,
9 correct?
10          MR. HARKINS:  Objection.
11     Scope.
12          THE WITNESS:  Not to my
13     knowledge during the time that
14     they were still marketing and
15     manufacturing the valsartan
16     products.
17          I do understand that there
18     were some investigations and there
19     was some dialogue that Teva
20     continued to have with the API
21     suppliers with respect to their
22     processes.
23 BY MR. STANOCH:
24     Q.   Do you think it's

Page 257

1      be able to field with any specific
2      context.
3           Complaints are fielded by
4      customers for any number of
5      reasons.  And it is possible that
6      a customer could have complained
7      about the level of valsartan --
8      excuse me -- the NDMA, NDEA, that
9      it found to be present in the drug
10     product that Teva made.
11 BY MR. STANOCH:
12     Q.   Would it be appropriate from
13 a cGMP perspective for Teva to ignore
14 such a customer request?
15          MR. HARKINS:  Same
16     objection.
17          THE WITNESS:  As I said,
18     there was an SOP which governs the
19     handling of complaints.  And since
20     any and all complaints would be
21     ones that Teva would be
22     considering and reporting, which
23     they must do by law, it is not up
24     to Teva to ignore complaints when

Confidential Information Subject to Protective Order

Page 258

1   they come in, no matter what they
2   are.
3   BY MR. STANOCH:
4       Q.   So if a customer asked Teva
5   if NDEA was in Teva's product, they
6   should report that complaint to the FDA?
7       A.   Well, you're doing two
8   things here.  One of them is asking a
9   question.  The other one is actually
10  saying we found NDEA in the valsartan
11  tablets, and we are watching that
12  complaint.  It's not making an inquiry of
13  whether Teva found NDEA or NDMA in a
14  product.  That's a different thing.
15  That's not a complaint.
16      Q.   So it would only be a
17  customer complaint if the customer
18  affirmatively identified the NDEA itself
19  in Teva's products?
20      MR. HARKINS:  Object to
21      form.  Foundation.  Scope.
22      THE WITNESS:  When one is
23  complaining, one is accusing.
24      So there must be a basis for

Page 259

1   what that accusation is.  And if
2   the accusation has any merit, it
3   will be judged accordingly by Teva
4   with respect to its severity, its
5   frequency, and the type of
6   complaints that was being made and
7   whether there is in fact any
8   evidence that is presented by the
9   one lodging the complaint that the
10  complaint itself is valid at all.
11  BY MR. STANOCH:
12      Q.   What obligations from a cGMP
13  standpoint does Teva have to investigate
14  a complaint itself?
15      A.   Teva has the obligation to
16  investigate the complaint thoroughly.
17  And whatever that complaint is, the
18  definition of thoroughness is per the
19  complaint itself.
20      Q.   What obligations from the
21  cGMP standpoint does Teva have to
22  investigate an inquiry as to whether
23  Teva's products contain nitrosamines?
24      A.   Well, that would be a

Page 260

1   different unit.  That would probably be
2   the medical information officer that
3   would be handling an inquiry that you're
4   describing here.  That's not a complaint.
5       Medical affairs is a
6   department which exists to address
7   questions.  But when we're talking about
8   product complaints, we're talking about
9   something that is directly related to
10  potential cGMP issues.  The other one is
11  merely an inquiry about certain aspects
12  of the drug product that someone may have
13  in their possession or not.
14      Q.   So if a Teva customer asked
15  Teva, "Is there nitrosamines in this
16  valsartan product you sold me?" is that a
17  complaint or an inquiry?
18      A.   That's an inquiry.
19      Q.   Okay.  So that would go to
20  Teva medical affairs?
21      A.   Right.  If the --
22      Q.   Did you review -- hold on.
23  I'm sorry, go ahead.
24      A.   I'm sorry.  If the customer

Page 261

1   comes to him, comes to Teva, and says, we
2   have detected NDMA in your drug product,
3   then that would be made part of the
4   complaint investigation to determine the
5   scope of what the complaint involved, how
6   the complaint was arrived at, what
7   evidence exists that the customer has
8   that it happened to exist at a certain
9   level, or if it exists at all.
10      The mere accusation is not
11  sufficient there for Teva to have to make
12  something actionable from a regulatory
13  standpoint apart from reporting what the
14  complaint itself is.
15      And if, after investigation,
16  they found there was no evidence for the
17  complaint, the complaint is closed.
18      Q.   What, if any, steps did Teva
19  take to assure that its own valsartan
20  product did not contain NDEA prior to
21  November 5, 2018?
22      MR. HARKINS:  Object to
23      form.  Foundation.  Scope.
24      THE WITNESS:  I know that

Confidential Information Subject to Protective Order

Page 262

1  Teva was undertaking
2  investigation.
3       In fact, if I recall
4  correctly, Teva's determination
5  that NDEA may be present in
6  valsartan products was a
7  determination that they came to
8  within days of learning of this
9  from Swissmedic.
10      So it was something that
11 they were looking at at that time.
12 But, of course, they had to make
13 sure that the data they were
14 requiring was data that was
15 supportive of the possibility that
16 NDEA was present. So it was
17 something they were looking at.
18 BY MR. STANOCH:
19      Q.   Was Teva aware that NDEA was
20 present in the valsartan API it was
21 purchasing from Mylan prior to
22 Swissmedic's notification of November 5,
23 2018?
24      MR. HARKINS:  Object to

Page 263

1  form.  Scope.
2       THE WITNESS:  I know that
3  they were studying both NDMA and
4  NDEA from -- whether they were
5  looking at both Mylan's as well as
6  ZHP's, I would consider that a
7  possibility.  But I don't know
8  what the scope of their
9  investigation was at that point,
10 only to say that NDEA was
11 something that was suspect as
12 possible, as might be any other
13 nitrosamines that were part of
14 that group.
15      So I think they were doing
16 kind of a broad investigation and
17 study of API suppliers, and I
18 don't know for certain, but it may
19 have come up that it was NDMA --
20 NDEA that was associated with
21 Mylan's API.
22 BY MR. STANOCH:
23      Q.   How soon do you believe NDEA
24 was something that Teva suspected was

Page 264

1  possible in its valsartan products?
2       A.   I would say that as they
3  were undergoing their own investigations,
4  these studies, without having an exact
5  reference, would be ones that would have
6  happened at some point in time that they
7  were notified by ZHP that NDMA was
8  present in their -- in their API.
9       I don't know exactly on what
10 date they initiated studies to look at
11 the presence of nitrosamines of other
12 kinds in all of the sources of APIs that
13 they were obtaining and where
14 nitrosamines might be possible.
15      I don't know the dates on
16 which they began their testing and
17 studies with regard to that.
18      Q.   What cGMP obligations, if
19 any, did Teva have to study the presence
20 of nitrosamines of other kinds, as you
21 say, in all the sources of the valsartan
22 APIs that it was purchasing?
23      MR. HARKINS:  Object to
24 form.  Scope.  Compound.

Page 265

1       THE WITNESS:  As far as cGMP
2  investigation was concerned, one
3  is doing investigations in
4  conjunction with what approved
5  specifications are.  This is what
6  cGMP is governing.
7       CGMP is not governing R&D
8  investigations.
9  BY MR. STANOCH:
10      Q.   Anything else?
11      A.   Nothing else.
12      MR. HARKINS:  Dave, we've
13 been going over an hour.  I don't
14 know if there's a spot for
15 five-minute coffee and bio break
16 whenever you're finding a good
17 spot.
18      MR. STANOCH:  Yeah, let's
19 wrap this up for a few more
20 minutes and then we can do that.

Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Page 274



Page 275

⁵        MR. HARKINS:  Object to
⁶    form.  Scope.
⁷ BY MR. STANOCH:
⁸    Q.    You can put that aside.
⁹        MR. STANOCH:  Why don't
¹⁰ you -- we take that five-minute
¹¹ break you want.
¹²        MR. HARKINS:  Okay.  Is five
¹³ good with you or --
¹⁴        THE WITNESS:  Yeah, five is
¹⁵ good with me.
¹⁶        THE VIDEOGRAPHER:  The time
¹⁷ right now is 3:28 p.m.  We are off
¹⁸ the record.
¹⁹        (Short break.)
²⁰        THE VIDEOGRAPHER:  The time
²¹ right now is 3:36 p.m.  We're back
²² on the record.
²³ BY MR. STANOCH:
²⁴    Q.    Sir, if you can flip to Page

Page 276

¹ 26 of your report.
²        A.    I'm there.
³        Q.    And here, starting at
⁴ Paragraph 101 and then the ensuing
⁵ paragraphs, you're rebutting an assertion
⁶ by Mr. Quick about SOPs Teva had in
⁷ place, which you say were called upon to
⁸ manage the customer API supplier
⁹ relationships with ZHP and Mylan; is that
¹⁰ right?
¹¹        A.    That's correct.
¹²        Q.    And we already discussed
¹³ that Teva did not have a quality
¹⁴ agreement in place with Mylan, right?
¹⁵        A.    Correct.
¹⁶        Q.    And then you go on to say,
¹⁷ well, in Paragraph 103 and 104, Teva had
¹⁸ SOPs in place to manage the customer API
¹⁹ supplier relationships anyway, right?
²⁰        A.    Correct.
²¹        Q.    And then in 103, you
²² identify -- one, two, three, four -- six
²³ CORP policies of Teva that you say
²⁴ governs the customer API supplier

Page 277

¹ relationship, right?
²        A.    Yeah.  These were just
³ mentioned to you.  There were others that
⁴ I don't have to mention.
⁵        Q.    Well, I can only read the
⁶ ones that you do mention, right?
⁷        A.    Right.  But it's -- my
⁸ reference here "just to mention a few,"
⁹ is that of the inventory of SOPs that
¹⁰ pertain to these subjects, these are the
¹¹ highlights.  There are others.  But these
¹² are relevant highlights.
¹³        Q.    Fair enough.  And sitting
¹⁴ here today, can you tell me what other
¹⁵ ones there would be on this particular
¹⁶ point that you're opining on in Paragraph
¹⁷ 103 besides the six that you identify?
¹⁸        A.    Not from memory, no.
¹⁹        Q.    That's fine.  All right.  So
²⁰ I'm going to -- let's pull up the first
²¹ one here, CORP 0111.
²²        MR. HARKINS:  In the exhibit
²³ box.
²⁴        THE WITNESS:  Oh.

Confidential Information Subject to Protective Order

Page 278

1    MR. STANOCH:  Hold on.
2    Stand by.  Okay.  Exhibit 7.
3        (Document marked for
4    identification as Exhibit
5    Anderson-7.)
6  BY MR. STANOCH:
7    Q.   This is the first example
8  SOP that you cite that Teva had in place
9  to manage the customer API supplier
10  relationship with ZHP and Mylan, right?
11    A.   Yes.
12    Q.   You'll see here on Page 1,
13  there's references.
14        Do you see that first
15  reference to CORP-176, quality technical
16  agreements?
17    A.   Yes.
18    Q.   You didn't review that
19  policy that's referenced, did you?
20    A.   I may have considered it.
21  If it's not listed amongst those that I
22  have noted here, that was not one that I
23  mentioned in the listing.
24        But that's why I say "just

Page 279

1  to mention a few."  There could be others
2  that would be one of those others.
3    Q.   Well, I'll tell you -- I
4  mean, obviously we can agree CORP-176 is
5  not mentioned in Paragraph 103, right?
6    A.   Correct.
7    Q.   And I don't see any
8  reference to CORP-0176 in the exhibit
9  materials considered to your report
10  either, do you?
11    A.   No, I don't believe that is
12  listed in here.  If you say it's not
13  listed in here, I'm just going to go
14  ahead and consult this and see if this is
15  in fact the case.
16        I do not see that SOP listed
17  amongst these that I considered.
18    Q.   Okay.  So then it's fair to
19  say that CORP-1076 was not relied on or
20  considered by you, right?
21    A.   Correct.  176 or 1076?
22    Q.   0176.



Confidential Information Subject to Protective Order



Page 282

14      (Document marked for
15   identification as Exhibit
16   Anderson-8.)
17  BY MR. STANOCH:
18      Q.   Tell me when you're there.
19      A.   Okay.  I'm here.

Page 284

Page 283

Page 285

13  BY MR. STANOCH:
14      Q.   Sir, I get to ask you what
15  documents you looked at, Mr. Anderson.
16  And my question is, did you do any
17  analysis of what's -- of your own to
18  confirm that the SOPs that you look at
19  and rely on in your report were final,
20  correct versions?
21      A.   I asked for the final
22  versions and what was given to me was
23  represented as the final versions.
24      Q.   Okay.  So you did not do any

Confidential Information Subject to Protective Order

Page 286

¹ analysis yourself to confirm that,
² correct?
³     A.   I asked for the current
⁴ version of the SOP and the -- and I was
⁵ supplied with what the current SOP was.
⁶         I don't know what you're
⁷ asking me to do apart from that.  I don't
⁸ have insight into Teva's documents stash
⁹ or collection of SOPs apart from those
¹⁰ that were given to me.
¹¹         I just don't understand how
¹² you would expect me to research something
¹³ like this further, apart from my simple
¹⁴ asking for it.
¹⁵     Q.   Right.  And you don't know
¹⁶ one way or the other, until this exhibit,
¹⁷ in fact, whether there are potential
¹⁸ missing important issues or accidental
¹⁹ deletions from any of the SOPs that were
²⁰ provided to you, correct?
²¹     A.   This is the first time that
²² I've seen this e-mail, is an exchange
²³ about two individuals wondering and
²⁴ coming from one here, saying that he

Page 287

¹ didn't -- he thought something pertaining
² to auditing of third parties ought to be
³ in the latest revision of the SOP, and
⁴ was it something that was deleted from
⁵ the SOP.
⁶         We can go back to the
⁷ earlier version of the SOP and look at
⁸ that revision history and see if there's
⁹ any description of something having to do
¹⁰ with third-party sites that was deleted
¹¹ from it.
¹²     Q.   You haven't done that
¹³ undertaking as you sit here today, right?
¹⁴     A.   I have not looked for that
¹⁵ specific topic, since you did not bring
¹⁶ this -- this topic was not brought to my
¹⁷ attention until you just brought it to me
¹⁸ now.
¹⁹     Q.   Fair enough.  Let's put that
²⁰ one aside.
²¹         The next one that you cite
²² in this paragraph is CORP-0539, correct?
²³     A.   CORP-0539?
²⁴     Q.   CORP-0539, correct.  That's

Page 288

¹ the one.
²     A.   That is the next one, yeah.
³         MR. STANOCH:  Okay.
⁴ Exhibit 9.
⁵         (Document marked for
⁶ identification as Exhibit
⁷ Anderson-9.)
⁸ BY MR. STANOCH:



Page 289



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Case 1:19-md-02875-RMB-SAK   Document 2009-39   Filed 04/12/22   Page 941 of 1394
PageID: 64817





Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order





Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



Page 334

Page 335

16    Q.    Okay.  Put that aside.
17         MR. STANOCH:  Stand by.
18  BY MR. STANOCH:
19    Q.    In your report you have a
20  discussion about the FDA inspection of
21  Teva's Jerusalem and Malta facilities,
22  right?
23    A.    I comment on that.  Is there
24  a specific paragraph you're going to

Page 336

1  there?
2    Q.    Not yet.  I'm happy to turn
3  to one, if you need to.  But, you know, I
4  believe you look at FDA inspections of
5  Jerusalem from -- what is it, 2011 to
6  2018; is that right?
7    A.    Let me confirm dates that
8  FDA inspections occurred.
9         I comment on those that
10  occurred during the time that valsartan
11  was being marketed, so that would not
12  include 2011, as far as the inspection
13  itself concerned.
14    Q.    I can help you out.  I think
15  it's starting on Page 42, you have a
16  heading, "Findings From Audits Conducted
17  At Teva Companies By FDA."  Is that
18  helpful?
19    A.    It is.  Thank you.
20    Q.    Great.  And it looks like
21  you discuss two FDA inspections at the
22  Malta facility, one in 2014 and one in
23  2017, right?
24    A.    Correct.

Page 337

1    Q.    And then you discuss two FDA
2  inspections of the Teva Jerusalem
3  facility, one in 2013 and one in 2015; is
4  that right?
5    A.    That is correct.
6    Q.    Are you aware that the FDA
7  inspected Teva's Jerusalem facility in
8  2019, sir?
9    A.    They may have inspected in
10  2019; however, that was at a time that
11  was outside of the time that valsartan
12  was being manufactured and distributed.
13  So I did not make it a point to review to
14  any depth, to the point of commenting,
15  any inspections that occurred at Teva in
16  2019.
17    Q.    Are you aware that the FDA's
18  inspection of Teva's Jerusalem facility
19  in 2019 focused on valsartan among other
20  things?
21    A.    I don't recall that.
22    Q.    Would that be pertinent to
23  your analysis of FDA inspections of
24  Teva's Jerusalem facility if the 2019

Confidential Information Subject to Protective Order



**Page 338**

¹ inspection focused on the valsartan
² issues prior to the recalls?
³      A.   I -- prior to the recall
⁴ would mean that was in 2018 or before.
⁵ So an audit took place in 2019, while it
⁶ may have mentioned valsartan that was
⁷ manufactured prior to the recall, that is
⁸ informational, as far as my report is
⁹ concerned.
¹⁰      So I only focused on audits
¹¹ which occurred during the time that Teva
¹² was marketing valsartan products.
¹³      Q.   It's not unusual in your
¹⁴ experience, is it, sir, for an FDA
¹⁵ inspection to look retrospectively at
¹⁶ things that have happened in the past?
¹⁷      A.   That is common.
¹⁸      Q.   Right.  So it wouldn't
¹⁹ necessarily be surprising to you, if the
²⁰ FDA, in 2019, just a few months after all
²¹ the recalls began, inspected Teva's
²² Jerusalem facility and focused on the
²³ situation concerning the recalls of
²⁴ valsartan the year earlier, correct?

**Page 339**

¹      A.   That would not be odd for
² them to take into the history of what the
³ OSD facility made and when.
⁴      MR. STANOCH:  I'll mark as
⁵      Exhibit 17.
⁶      (Document marked for
⁷      identification as Exhibit
⁸      Anderson-17.)
⁹ BY MR. STANOCH:

**Page 340**

**Page 341**

Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order



18      Q.   You're not offering any
19  opinion in your report whatsoever on the
20  outcome of the FDA's 2019 inspection of
21  Teva's Jerusalem facility, are you?
22      A.   I am not offering an opinion
23  apart from what I'm reading here on the
24  e-mail trail that you supplied me.

Page 350

1    Q.   In your report, you're not
2  offering any opinions whatsoever on the
3  FDA inspection of the Teva Jerusalem site
4  in 2019, correct?
5    A.   No, I am not.
6    Q.   And are you aware that the
7  Teva Jerusalem site that had made
8  valsartan was shut down?
9    A.   I'm aware of that, yes.
10    Q.   All right.  Do you know
11  when?
12    A.   I don't recall the exact
13  date.
14    Q.   Do you know the precise --
15    A.   I had no reason to ask --
16    Q.   Do you know the precise
17  reasons why it was shut down?
18        MR. HARKINS:  Object to
19    form.  Foundation.  Scope.
20    Speculation.
21        THE WITNESS:  I don't know
22    everything that informed Teva with
23    respect to the decision to shut
24    down the OSD facility.

Page 351

1  BY MR. STANOCH:
2    Q.   Right.  You have no idea
3  what the reasons were for why Teva shut
4  down the Jerusalem facility, right?
5    A.   I don't have knowledge of
6  specific reasons why that occurred.
7    Q.   And then in terms of the
8  Malta facility, you are aware, are you
9  not, that Teva shifted production of
10  valsartan away from the Malta facility to
11  a different one?
12    A.   I believe I recall seeing
13  that somewhere.
14    Q.   Where did it shift the
15  production to?
16    A.   I don't recall where that
17  was either.
18    Q.   Why did Teva do that?
19        MR. HARKINS:  Objection to
20    form.  Foundation.  Speculation.
21        THE WITNESS:  I do not know.
22  BY MR. STANOCH:
23    Q.   All right.  So you have no
24  idea one way or the other of whether Teva

Page 352

1  switched production away from the Malta
2  facility because of issues relating to
3  valsartan or not, correct?
4        MR. HARKINS:  Object to
5    form.  Foundation.  Speculation.
6    Scope.
7        THE WITNESS:  I don't know
8    why the valsartan product was
9    moved to another facility.
10  BY MR. STANOCH:
11    Q.   Right.  And similarly with
12  the Teva Jerusalem facility, you don't
13  know one way or the other about whether
14  the valsartan situation was a factor in
15  the closure of that facility, correct?
16        MR. HARKINS:  Form.  Same.
17        THE WITNESS:  The closure of
18    these facilities, again, happened
19    after Teva ceased manufacturing
20    and marketing the drug product.
21        So I limited my commentary
22    as it pertained to inspections and
23    things having to do with those
24    inspections to times when

Page 353

1  valsartan was being marketed.
2        So the reasons why those
3    plants shut down was not something
4    that I deemed it necessary to take
5    into consideration.
6  BY MR. STANOCH:
7    Q.   Are you aware of anything
8  that suggests that Teva was aware that
9  Mylan was using a third-party vendor,
10  Lantech, to manage the solvent recovery
11  process for the manufacture of valsartan
12  API?
13    A.   Please rephrase that
14  question again.
15    Q.   Sure.
16        MR. HARKINS:  And, Dave, I
17    don't know if you're getting to a
18    new topic.  We're about an hour
19    and a half on.  So we'd like a
20    quick break whenever you find a
21    good time.
22        MR. STANOCH:  If he wants a
23    quick break now, that's fine.

Confidential Information Subject to Protective Order

Page 354

¹ BY MR. STANOCH:
²      Q.   Do you want a quick break,
³ Mr. Anderson?
⁴      A.   Let's have a quick break.
⁵           MR. STANOCH:  Okay.
⁶           THE VIDEOGRAPHER:  The time
⁷ right now is 5:01 p.m.  We are off
⁸ the record.
⁹      (Short break.)
¹⁰          THE VIDEOGRAPHER:  The time
¹¹ right now is 5:08 p.m.  We're back
¹² on the record.
¹³ BY MR. STANOCH:
¹⁴      Q.   Welcome back, Mr. Anderson.
¹⁵ Did you talk to anybody besides your
¹⁶ counsel during the break?
¹⁷      A.   Nobody else.
¹⁸      Q.   Did you look at any
¹⁹ documents?
²⁰      A.   No, I did not.
²¹      Q.   You didn't e-mail or text
²² anybody, did you?
²³      A.   No, I did not.
²⁴      Q.   Okay.  And you're aware, are

Page 355

¹ you not that Mylan was using a
² third-party vendor, Lantech, to manage
³ the solvent recovery process for its
⁴ manufacture of valsartan API, correct?
⁵      A.   I learned that that was the
⁶ case.
⁷      Q.   You don't opine anywhere in
⁸ your report, do you, that Teva was aware
⁹ of that fact?
¹⁰      A.   I do not opine in that
¹¹ context, no.
¹²      Q.   And is it correct that you
¹³ are not aware of any facts suggesting
¹⁴ that Teva was aware that Mylan was using
¹⁵ a third-party vendor, Lantech, to manage
¹⁶ the solvent recovery process for the
¹⁷ manufacture of valsartan API?
¹⁸      A.   I don't recall any document
¹⁹ where Teva was found knowledgeable prior
²⁰ to discontinuing the production of
²¹ valsartan.
²²      Q.   Do you agree that whether an
²³ API supplier is using recovered solvents
²⁴ is potentially pertinent from a cGMP

Page 356

¹ quality standpoint?
²      A.   Not necessarily.
³      Q.   You disagree with that?
⁴      A.   I said not necessarily.
⁵      Q.   Well, Teva knew that ZHP
⁶ used recovered solvents in some of its
⁷ API processes, right?
⁸      A.   I know that from
⁹ investigations that Teva undertook and
¹⁰ information that they learned from Mylan
¹¹ at times after the marketing of valsartan
¹² ceased.
¹³      Q.   I want to make sure you
¹⁴ understood.  I was talking about ZHP.
¹⁵           Were you aware that Teva
¹⁶ knew that ZHP used recovered solvents in
¹⁷ some of ZHP's API processes?
¹⁸      A.   That is not something that
¹⁹ I'm aware of.  I've not seen any
²⁰ documents to suggest that Teva did know
²¹ this.
²²           MR. STANOCH:  Okay.  Well,
²³ why don't you pull up -- stand by.
²⁴

Page 357

¹ BY MR. STANOCH:



Confidential Information Subject to Protective Order



Confidential Information Subject to Protective Order

---

Page 362

[REDACTED]

9  BY MR. STANOCH:
10      Q.   You agree --
11      A.   It mentioned, as I recall,
12 that they even went out to other third
13 parties to have this done.
14      Q.   You agree that Teva did not
15 know prior to summer of 2018 that Mylan
16 was using recovered solvents in the
17 manufacture of valsartan API being sold
18 to Teva, right?
19          MR. HARKINS:  Form.  Scope.
20          THE WITNESS:  By ZHP?  Or by
21 Mylan?
22 BY MR. STANOCH:
23      Q.   No, sir.
24          Do you agree that Teva did

---

Page 363

1 not know prior to the summer of 2018 that
2 Mylan was using recovered solvents in the
3 manufacture of valsartan API being sold
4 to Teva?
5          MR. HARKINS:  Objection to
6 form.  Scope.
7          THE WITNESS:  I'm recalling
8      one of the audits reports that I
9      just described where there was
10     blending of same solvents with
11     other lots of solvents that were
12     on hand.
13         I don't recall directly from
14     memory whether that involved
15     recovered solvents or just simply
16     solvents that were on hand.
17         But in any case, they were
18     qualified for further use in
19     production at Mylan.  That is what
20     I believe I recall.
21 BY MR. STANOCH:
22     Q.   What Teva audit report of
23 Mylan do you believe makes any mention of
24 the use of recovered solvents in the

---

Page 364

1 manufacture of valsartan API?
2     A.   I don't recall which audit
3 report that was.  There were a couple
4 audit reports.  I do not recall which one
5 that was.
6     Q.   And you're not sure one way
7 or the other whether they mentioned
8 recovered solvents specifically, correct?
9     A.   I'm not recalling
10 immediately, no.  I do know they -- I
11 have a reasonable belief that I recall
12 that they blended same solvents together,
13 new and those that were on hand, in order
14 to have enough solvent to be able to
15 proceed to production.
16     Q.   And you're implying there
17 that you think it might have been a fresh
18 barrel -- an unopened barrel of solvent
19 and maybe one that had already been half
20 used to get the full amount that they
21 needed; you're not suggesting that it was
22 saying some of that was recovered or
23 recycled, are you?
24     A.   What I'm saying is I don't

---

Page 365

1 recall it.  I'm recalling there was
2 a blending and a certification.
3         I'm not recalling if it said
4 specifically that it was recovered
5 solvents that would be blended with new
6 solvents.  I am reasonably certain that
7 it was solvents which were on hand.
8     Q.   You are not opining anywhere
9 in your report, are you, that Teva knew
10 that Mylan was using recovered solvents
11 in the manufacture of valsartan API, are
12 you?
13     A.   I have commented on what
14 John Quick said as it pertains to
15 recovered solvents.
16         Again, if this was something
17 that showed up in the inspection report
18 for Mylan, and it was mentioned that
19 recovered solvents were those that were
20 blended -- but I don't happen to have an
21 immediate recollection of that -- Teva
22 then would have known at that time that
23 Mylan was using recovered solvents as
24 well as fresh solvents.

---

Confidential Information Subject to Protective Order

Page 366

1    Q.   I'm asking about your
2  report, sir.  Okay.  Are you with me,
3  Mr. Anderson?
4    A.   Yeah.
5    Q.   In your report, where do you
6  opine that Teva knew that Mylan was using
7  recovered solvents in the manufacture of
8  valsartan API?
9    A.   I'm not recalling that
10  citation at this moment.
11       But I've described to you
12  what I'm recalling from the audit reports
13  themselves.
14    Q.   Did you look at any of the
15  FDA inspection reports of Lantech, the
16  third party vendor that Mylan was using
17  to manage the solvent recovery process?
18    A.   No, I did not.
19    Q.   Don't you think it would be
20  important from a cGMP standpoint to
21  understand what the FDA said about the
22  vendor that was managing the solvents
23  that were found to be the potential root
24  cause of the NDEA contamination in

Page 367

1  Mylan's valsartan API?
2       MR. HARKINS:  Form.  Vague.
3       THE WITNESS:  What FDA had
4    to say about that processing
5    facility was something that was
6    related at a time after valsartan
7    was being manufactured and
8    distributed by Teva with API that
9    was sourced from Mylan.
10       So there was an inspection
11    that did take place afterward, and
12    FDA had comments about that.
13  BY MR. STANOCH:
14    Q.   If Teva did not know --
15  strike that.
16       As Teva did not know that
17  Mylan was using Lantech to manage the
18  recovered solvents process, Teva would
19  not even know to ask questions about
20  Lantech's cGMP compliance, correct?
21    A.   If Teva didn't know that
22  Lantech specifically was being used as a
23  vendor, Teva would not have reason to ask
24  questions about Lantech.



Page 368



Page 369



Page 370

Page 371

Page 372

Page 373

12  BY MR. STANOCH:
13      Q.   Mm-hmm.  And you make it a
14  point in Paragraph 142 of your report to
15  suggest that Teva had no vendor agreement
16  with Lantech, so it was in no position to
17  require Lantech to let it audit or manage
18  the solvent recovery process, right?
19      A.   That's correct.  Teva was
20  not Lantech's direct customer.  So there
21  were not supplier agreements because they
22  were not a direct supplier to Teva.  They
23  were a supplier of a service to Mylan.
24      And it would have been an

Confidential Information Subject to Protective Order

---

Page 374

1 agreement with Mylan that would have been
2 operative for managing the quality
3 aspects of the recovered solvents that
4 Mylan was subsequently then used to
5 manufacture API.
6      Q.   Mylan, though, was a direct
7 customer of Teva, correct?
8      A.   That's correct.
9      Q.   And Teva had the authority,
10 did it not, to require Mylan to ensure
11 that any of Mylan's own subcontracted
12 vendors were taking adequate cGMP quality
13 assurance steps, correct?
14           MR. HARKINS:  Object to
15      form.  Vague.
16           THE WITNESS:  That is not
17      something that is in every single
18      agreement that I've ever seen.  It
19      is just that suppliers, as I've
20      seen such contracts making
21      reference to other parties here,
22      just that it would be the
23      responsibility of that primary
24      vendor, in this case, Mylan, to

---

Page 375

1      support drug substance that
2      conforms to cGMP, and that it
3      managed its own quality system.
4           And by extension, that would
5      mean managing its relationship
6      with those who furnish services to
7      them to support their quality
8      system, in this case, Lantech.
9 BY MR. STANOCH:
10      Q.   Well, in here, we don't have
11 any agreement between Teva and Mylan,
12 right?
13      A.   We do not have a quality
14 agreement.  No, we do not.  But --
15      Q.   In fact -- go ahead.
16      A.   But that -- as of the
17 revelation of NDEA by Mylan, ultimately
18 by way of Swissmedic information and the
19 identification of Mylan as supplier of
20 API, it did not prevent Teva from
21 maintaining a relationship that involved
22 necessary dialogue as it pertained to the
23 control of NDEA in Mylan's API, and/or
24 getting to the investigation conclusion

---

Page 376

1 as to the reason why NDEA arose and was
2 evident in Mylan's API.
3           So whether they had a
4 quality agreement or not in place, that
5 did not prohibit what was necessary
6 dialogue that had to transpire between
7 Teva and Mylan on topics having to do
8 with cGMP compliance and conforming to
9 specifications that were agreed to with
10 Mylan contractually as a supplier of API
11 to Teva and the ability of Teva to be
12 able to perform quality audits on a
13 schedule negotiated with Teva --
14 negotiated with Mylan.
15      Q.   You don't cite anywhere in
16 your report any dialogue between Teva and
17 Mylan about the cGMP compliance issues
18 with respect to the recovered solvent
19 process for the manufacture of valsartan
20 API, do you?
21      A.   I do not speak to any
22 dialogue that Mylan had with Lantech
23 about which they informed Teva, no.  I
24 don't speak of that.

---

Page 377

1      Q.   And you don't cite anywhere
2 any dialogue between Teva and Mylan about
3 the recovered solvent process at all, do
4 you?
5      A.   Again, only what I recalled
6 from what was cited in the report as a
7 matter-of-fact point that older solvents
8 are blended with newer solvents, and that
9 may, although I don't recall it
10 immediately, that may have also included
11 recovered solvents.
12      Q.   You're not sure sitting
13 here --
14      A.   The source of recovered --
15      Q.   I'm sorry.  Go ahead.
16      A.   Yeah, the source of the
17 recovered solvents were not something
18 that was at issue.
19      Q.   Okay.  So why you say there
20 was not preventing Teva and Mylan having
21 a dialogue in the absence of a quality
22 agreement, you don't cite any evidence
23 that there was any such dialogue with
24 respect to the recovered solvent process

---

1 for valsartan API manufacturing, do you?
2           MR. HARKINS:  Objection to
3      form.  Vague.
4           THE WITNESS:  There was
5      dialogue that transpired after
6      Teva ceased marketing valsartan.
7           I do know that they were in
8      contact with and in dialogue with
9      Mylan certainly at that time.
10          I don't know what the level
11     of dialogue was that Teva had with
12     Mylan on the subject of NDEA prior
13     to December of 2018.
14 BY MR. STANOCH:
15     Q.   Do you cite in your report,
16 sir, any evidence of any dialogue between
17 Teva and Mylan prior to the summer of
18 2018 about the use of recovered solvents
19 in the manufacture of valsartan API?
20          MR. HARKINS:  Same
21     objection.
22          THE WITNESS:  Again, as I
23     pointed out what my recollection
24     of the audit report -- one of the

1      audit reports at least, if not
2      both, mentioning the blending of
3      solvents on hand with new solvents
4      that were coming in and having
5      them qualified for suitability for
6      use in further production.
7           I do not recall immediately
8      whether they mentioned recovered
9      solvents in that description, but
10     I do recall a blending of solvents
11     in this way.
12          So is that dialogue?  I
13     would say that's dialogue.
14 BY MR. STANOCH:
15     Q.   Well, you don't know whether
16 it was recovered solvents or not, do you?
17     A.   I am telling you that I
18 don't recall exactly whether it said it
19 was recovered solvents or not.  I would
20 have to review the -- review the reports
21 there.
22          I don't recall that there
23 was a deficiency that Teva lodged with
24 Mylan about the fact that they were using

1 recovered solvents, because as a
2 practice, utilization of recovered
3 solvents in production is not a -- is
4 commonly not an issue in drug substance
5 manufacturing.
6      Q.   Well, if Teva didn't know,
7 then they wouldn't be able to lodge an
8 objection or observation about it, could
9 they?
10     A.   What I'm saying, again, is,
11 it is possible that they did know.  And
12 the reference that I'm making that,
13 again, I am trying to recall from memory
14 if it included recovered solvents or just
15 old solvents.
16          But they were confident that
17 those solvents -- Teva was confident that
18 those solvents were suitable for use
19 because they met specifications for their
20 continued use in production with metrics
21 that Mylan had set up, governed by its
22 quality system to be able to proceed in
23 manufacturing with solvents that were
24 combined in this fashion.

1      Q.   Are you saying that Teva
2 might have known and said it was okay to
3 keep using recycled solvents in Mylan's
4 manufacture of valsartan API?
5           MR. HARKINS:  Objection to
6      form.  Misstates testimony.
7           THE WITNESS:  What I'm
8      saying is there was possibly a
9      reference of recovered solvent
10     every bit as much as there was a
11     mention of recovered solvent in
12     the ZHP audit report.
13          This was -- the use of
14     recovered solvents was not a --
15     something that raised a concern by
16     Teva of ZHP.  And the fact that
17     ZHP recovered solvent was not, to
18     my recollection, one of the
19     reasons why NDMA was found in
20     ZHP's API.
21          We're talking about NDEA in
22     the context of -- in the context
23     of Mylan and that it was
24     attributable, upon further

Confidential Information - Subject to Protective Order

Page 382

1 evaluation, to something having to
2 do with recovered solvents in the
3 way that they were recovered at
4 Lantech and subsequently utilized
5 in purification processes at
6 Mylan.
7 BY MR. STANOCH:
8     Q.   Tell me as specifically as
9 possible where you think this reference
10 to recycled solvents in the manufacture
11 of valsartan API at Mylan appears in Teva
12 audit reports?
13     A.   I don't recall which of the
14 audit reports I thought it was in.  But I
15 believe that I recall this residing in
16 one of those reports having to do with
17 older solvents, whether they were
18 recovered or just solvents on hand
19 blended with newer lots of solvents, and
20 then tested and qualified according to
21 specifications set for them at that time
22 for further use in API production.
23     Q.   Right.  You don't know if
24 that reference that you think you might

Page 383

1 recall, and can't tell me where it is,
2 whether it was just older solvents being
3 blended or recycled and new solvents
4 being blended, right?
5     A.   Right.  I don't recall
6 exactly.
7     Q.   That's fine.  That's fair.
8        Sir, in your appendix you
9 have a number of charts that you have
10 regarding observations from government or
11 Teva audits and responses and whether the
12 observations or responses suggest
13 presence of NDMA or NDEA; is that right?
14     A.   That none of the responses
15 indicated that NDMA or NDEA were present
16 or even suggested it.
17     Q.   And you can pull that up.  I
18 think it's an attachment to your report,
19 which you should have in front of you,
20 right?
21     A.   Yes, I do.  I'm starting
22 here on the very first page of the
23 appendix.
24     Q.   And your column on the

Page 384

1 right, "Observation or response suggest
2 presence of NDMA or NDEA," there you're
3 saying whether the observation was
4 evidence that NDMA or NDEA was present?
5        MR. HARKINS:  Object to
6 form.
7        THE WITNESS:  That my --
8 that the observation or response
9 suggests that presence of NDMA or
10 NDEA might be present, that is yes
11 or no, and what is the reason for
12 my saying so.
13 BY MR. STANOCH:
14     Q.   The actual presence of an
15 impurity is just one potential basis for
16 a drug being adulterated, correct?
17     A.   Presence of an impurity
18 beyond a controlled limit specified for
19 it.
20     Q.   And we talked about this
21 much earlier today.  You agreed that a
22 drug could still be adulterated even in
23 the absence of an impurity if it was not
24 manufactured in conformance with current

Page 385

1 good manufacturing practices, correct?
2     A.   That's correct.
3     Q.   So just because an
4 observation from a given inspection or
5 finding does not suggest the actual
6 presence of NDMA or NDEA does not mean
7 there was not a potential deviation from
8 cGMP, correct?
9     A.   Correct.
10     Q.   And in your appendix, you
11 address, among other things, the FDA
12 for-cause inspection of ZHP in 2018,
13 correct?
14     A.   I do.
15     Q.   And this was the FDA's
16 inspection of ZHP following the news
17 about NDMA in the summer of 2018, right?
18     A.   It occurred from July 23rd
19 to August 3rd, 2018.  So this for-cause
20 inspection followed on the revelation
21 that NDMA was present.
22     Q.   Right, this was after ZHP
23 disclosed to Teva and others about NDMA
24 in June 2018, right?

Confidential Information Subject to Protective Order

Page 386

1    A.    Correct.
2    Q.    And in fact, the very reason
3  for this for-cause inspection was the
4  NDMA contamination of valsartan, right?
5    A.    I believe that was one of
6  the topics here.  I don't recall
7  necessarily that it was the only topic
8  that was the subject of the for-cause
9  inspection, if I review this just a
10  second to gain some insight on whether
11  there were other products possibly that
12  were reviewed in the for-cause
13  inspection.  That's possible.
14        But, that you're focusing on
15  valsartan with respect to this for-cause
16  inspection, is accurate.
17    Q.    And you can look through
18  your chart, but I think in your
19  right-most column you say no, that every
20  observation in response did not suggest
21  the presence of NDMA or NDEA, right?
22    A.    Correct.
23    Q.    Wasn't the FDA for-cause
24  inspection of ZHP the basis for the FDA's

Page 387

1  warning letter to ZHP a few months later?
2    A.    It formed certainly some of
3  the basis.  Whether it informed all of
4  it, I cannot say.
5    Q.    You know that FDA issued a
6  warning letter to ZHP in -- was it late
7  2018, right?
8    A.    I believe that was
9  November 29, 2018, yeah.
10    Q.    I agree.  I appreciate the
11  specificity.
12        And among other things in
13  that letter, the FDA determined that
14  ZHP's valsartan API was adulterated,
15  right?
16    A.    As of that date they
17  declared that valsartan manufactured by
18  ZHP, valsartan products are adulterated.
19    Q.    And it was adulterated in
20  part because of the issues concerning
21  lack of cGMP compliance with respect to
22  the manufacture of valsartan API, right?
23    A.    There were detailed
24  citations in the warning letter that

Page 388

1  formed the basis for that, which included
2  observations as well as testing that FDA
3  had performed on certain valsartan lots.
4    Q.    And the observations you
5  reference are the observations made a few
6  months prior during the for-cause FDA
7  inspection in July through August of
8  2018, right?
9    A.    Correct.
10    Q.    So how could you say that
11  the FDA's inspection of ZHP in the summer
12  of 2018 did not suggest the presence of
13  NDMA and NDEA when just a few months
14  later, the FDA issues a warning letter
15  saying that your product is adulterated
16  because your process is going to result
17  in NDMA?
18    A.    What FDA did, as I just
19  mentioned, was take those samples from
20  ZHP and performed analyses of their own.
21  And on the basis of that evidence, it was
22  confirmed that there was presence of NDMA
23  in ZHP's API.
24        So observations were made

Page 389

1  prior to samples being taken and FDA
2  performing their own independent testing
3  thereof.
4        So the warning letter is
5  informed by observations made and on the
6  basis of testing that FDA had performed
7  themselves.
8    Q.    So unless an observation
9  was, "We found NDMA in your valsartan API
10  during this inspection," then you would
11  say no, the observation does not suggest
12  the presence of NDMA?
13        MR. HARKINS:  Objection to
14    form.  Misstates the testimony.
15    Misstates the report.
16        THE WITNESS:  There's
17    nothing in the observations that
18    FDA made that suggest or even
19    point to or implicate the presence
20    of NDMA in -- or NDEA in valsartan
21    API at the time of the inspection.
■        ████████████████████████
■        ████████████████████████
■        ████████████████████

Confidential Information Subject to Protective Order



Page 394

1  BY MR. STANOCH:
2      Q.   Okay.  You're not aware of
3  anything that prevented Teva from making
4  its own observation about this inadequate
5  investigation of unknown peaks, say,
6  during the May 2018 Teva audit of ZHP?
7          MR. HARKINS:  Form.
8      Speculation.
9          THE WITNESS:  Could you
10     rephrase your question, please?
11 BY MR. STANOCH:
12     Q.   Sure.
13         You don't opine on anything
14 that prevented Teva from making the same
15 observation about ZHP's inadequate
16 investigation of unknown peaks for the
17 valsartan intermediates that the FDA
18 identifies during Teva's May 2018 audit
19 of ZHP?
20         MR. HARKINS:  Same
21     objection.
22         THE WITNESS:  We can go back
23     to the 2018 audit and if there is
24     an observation that Teva made in

Page 395

1      May of 2018, that matches this
2      observation that was made by FDA,
3      I would invite you to find it.
4  BY MR. STANOCH:
5      Q.   Well, I'm going to invite
6  you, Mr. Anderson, to tell me, did Teva
7  ever review the deviation that FDA
8  observed in their 2018 investigation
9  itself?
10     A.   They may have.  But again,
11 this was at a time, in August of 2018,
12 when Teva had ceased to market valsartan.
13         It is possible that the
14 deviation investigation was something
15 that Teva elected to explore on its own
16 to learn more about the nature of the
17 quality of the deviation investigation
18 themselves and develop an opinion about
19 it.
20         But at the time that that
21 was occurring, Teva was not marketing
22 valsartan that was manufactured by ZHP.
23     Q.   I'm looking at your appendix
24 about this observation, and the deviation

Page 396

1  was initiated, according to you,
2  October 10, 2017.  So that -- that was
3  well prior to Teva's recalls of
4  valsartan, correct?
5      A.   The investigation at ZHP was
6  something that was undertaken earlier, by
7  your account.
8      Q.   And Teva, to your knowledge,
9  never evaluated ZHP's October 10, 2017
10 investigation into the deviation, which
11 ultimately led to -- in part, to the FDA
12 warning letter of ZHP?
13     A.   I don't know what kind of
14 dialogue transpired as it pertained to
15 that deviation.
16     Q.   Did you even attempt to map
17 whether, during its audits Teva had the
18 opportunity to look at the same things
19 that the FDA looked at at ZHP in 2018?
20         MR. HARKINS:  Form.  Vague.
21         THE WITNESS:  Are you saying
22     following on any audit that FDA
23     had of ZHP?  I'm not understanding
24     your question here.

Page 397

1  BY MR. STANOCH:
2      Q.   Sure.
3          The FDA inspection in 2018
4  noted, among other things, a deviation at
5  ZHP dated October 10, 2017, right?
6      A.   Okay.
7      Q.   And that was one of the
8  things that they cite in the warning
9  letter about failing to do testing and
10 adequate investigation that led to the
11 warning letter, right?
12     A.   Respectfully, could you
13 point me to the exact observation?  These
14 are numbered in my -- excuse me -- in
15 my -- excuse me.  I need water.
16     Q.   3D.
17     A.   Let me get there.  Okay
18 Observation 3D, did I hear you correctly?
19     Q.   Yes, sir.
20     A.   Okay.  I am at that
21 observation.  Your question, please?
22     Q.   You see it was initiated
23 October 10, 2017, by ZHP?
24     A.   I do.

Confidential Information Subject to Protective Order

Page 398

1    Q.   You're not aware of any --
2  you're not aware of whether Teva was
3  aware of that deviation at any time prior
4  to the summer of 2018, are you?
5    A.   I see that I was also
6  correct that this involved an
7  intermediate valsartan product, the
8  intermediate condensate HCl specifically.
9    A deviation with respect to
10 an intermediate that was being
11 investigated at the time is not something
12 that I necessarily would have expected
13 them to share with -- with Teva.  It's
14 possible that this deviation pertained to
15 a lot of valsartan that was not sold to
16 Teva.  It could have been sold to another
17 customer.
18    But it does happen to have
19 this amount of detail in it as FDA has
20 cited it.
21    Q.   Mr. Anderson, I'm going to
22 ask you to listen to my question.  Are
23 you aware of whether Teva knew of this
24 deviation at any time prior to the summer

Page 399

1  of 2018?
2    A.   I do not know.
3    Q.   Are you aware of anything
4  that prevented Teva from asking ZHP about
5  this deviation prior to the summer of
6  2018?
7    MR. HARKINS:  Form.  Vague.
8    THE WITNESS:  I do not know
9    that Teva had a reason to know
10   about this particular deviation,
11   as it may not have applied to API
12   that they had purchased from ZHP.
13 BY MR. STANOCH:
14    Q.   So then you're not aware of
15 anything that prevented Teva from asking
16 ZHP about this deviation prior to the
17 summer of 2018?
18    A.   Having knowledge of this
19 deviation is something that would not be
20 expected routinely for a substance that
21 was not incorporated into a Teva product.
22 So there is no reason to expect that ZHP
23 would have to inform Teva regarding an
24 intermediate deviation that was

Page 400

1  accomplished on behalf of -- or in the
2  course of manufacturing API on behalf of
3  another customer.
4    I don't know the detail
5  here.  But there is no reason why Teva
6  would necessarily have to be informed of
7  every single deviation that pertains to
8  valsartan manufacture, and particularly
9  those deviations that had nothing to do
10 with API that they had specifically
11 purchased.
12    Q.   You don't know one way or
13 the other whether Teva knew about this
14 deviation prior December of 2018,
15 correct?
16    A.   I do not know.
17    Q.   Did you review any Teva SOP
18 concerning whether a process change
19 should be classified as PAS or CBE?
20    A.   I did not review any SOP
21 that Teva had as it pertained to that
22 kind of classification.  That type of
23 classification is something that is
24 ultimately decided upon by FDA in their

Page 401

1  opinion, regardless of what the
2  submission that is made by the applicant.
3    For instance, an applicant
4  may submit a Changes Being Effected 30,
5  supplemental submission to their ANDA,
6  and describe what the change is in there.
7  And according to their opinion, it is
8  their belief that a CBE-30 filing is
9  appropriate.
10    But FDA may elevate the
11 level of that submission because, in
12 their opinion, they believe the matters
13 that are covered in that submission rise
14 to the level of requiring a preapproval
15 designation for that submission, not
16 merely a CBE-30.
17    Q.   Did you review any Actavis
18 policies, procedures, or practices as to
19 whether the company should classify a
20 process change as PAS or CBE?
21    A.   I don't recall that I did.
22    MR. STANOCH:  Let's go off
23    the record.
24    THE VIDEOGRAPHER:  The time

Confidential Information Subject to Protective Order



Page 402

1    right now is 6:00 p.m.  We are off
2    the record.
3        (Short break.)
4        THE VIDEOGRAPHER:  The time
5    right now is 6:38 p.m.  We are
6    off -- we're back on the record.
7  BY MR. STANOCH:
8        Q.    Just a few more questions,
9  Mr. Anderson.  I want to pull up again
10  the Narendra Vadsola transcript we looked
11  at earlier.
12        Do you recall that
13  transcript?
14        A.    I do.

Confidential Information Subject to Protective Order



Page 406

Page 408

23    Q.   All right.  Put that aside.
24         Sir, did you write your own

Page 407

Page 409

1  report here in this case?
2         A.   I did.
3         Q.   Did you prepare the appendix
4  to your report with the observation
5  chart?
6         A.   I did.
7         Q.   Did you prepare the
8  materials considered list appended to
9  your report?
10        A.   I did.
11        Q.   Did you ever do any
12 consulting work for any of the defendants
13 in this litigation prior to this case?
14        A.   No, I have not.
15        Q.   Actually, earlier you said
16 you don't know who the defendants are, so
17 I guess you're not sure.  Is that fair?
18        A.   I'll say I read Mr. Quick's
19 report, and to the degree that I was
20 familiar on having read any of those
21 names there, no, I have not consulted for
22 any of those.  So I'll leave it at that.
23        Q.   Fair enough.
24             MR. STANOCH:  I'm going to

Confidential Information Subject to Protective Order

Page 410

1   mark Exhibit 45 -- I'm sorry,
2   Exhibit 20.
3        (Document marked for
4   identification as Exhibit
5   Anderson-20.)
6   BY MR. STANOCH:
7   Q.   This is a collection of the
8   invoices that we've been provided for
9   your work in this case.  Can you see
10  those?
11       A.   I'm refreshing.  One moment,
12  please.
13       Q.   I can try to screen share if
14  that's faster.
15       How's that?  Can you see my
16  screen, sir?
17       A.   I do see your screen.
18       Q.   And you see there is an
19  invoice dated December 31, 2021; an
20  invoice dated January 31, 2022; and a
21  final invoice dated February 28th, 2022.
22       Is it correct that these are
23  all the invoices that have been issued
24  for your work in this case thus far?

Page 411

1   A.   As of this time, correct.
2   Q.   All right.  And ProPharma,
3   that's just a consulting outfit through
4   which you were connected with Teva in
5   this litigation?
6   A.   Yes.  Actually, my services
7   are being made by way of a subsidiary of
8   ProPharma Group known as NDA Partners.
9   Q.   Got it.  And then it looks
10  like the amounts invoiced thus far, we
11  see about $69,000 for your first invoice,
12  $78,000 for your second invoice, and
13  $30,000 and change for your most recent
14  February 2022 invoice, correct?
15  A.   Correct.
16  Q.   It looks like the total
17  is -- you've invoiced approximately
18  $177,000 for your work to date?
19  A.   If you add these numbers up
20  and they come to that amount and it is
21  accurate, I agree with it.  I've not
22  added it up that way myself.
23       MR. STANOCH:  I have no
24  further questions at this time for

Page 412

1   you, Mr. Anderson.
2        Thank you.
3        THE WITNESS:  Thank you.
4           - - -
5           EXAMINATION
6           - - -
7   BY MR. HARKINS:
8        Q.   All right.  Tim, I will have
9   some questions for you.  I figure we
10  should go ahead until the technology
11  gives out on us, which hopefully it
12  won't.
13       Are you good to go right
14  into it?
15       A.   Yes.
16       Q.   Okay.  Good.  All right.
17       MR. HARKINS:  Dave, correct
18  me if I'm wrong.  I don't believe
19  his CV has been introduced,
20  correct?
21       MR. STANOCH:  Correct,
22  unless it was part of the report.
23       MR. HARKINS:  I don't think
24  the version that you introduced

Page 413

1   had it as an attached exhibit.  I
2   just want to confirm so we're not
3   introducing extra stuff.
4   BY MR. HARKINS:
5        Q.   All right.  Tim, if you go
6   to the DropBox and pull up what should be
7   introduced electronically as Exhibit 21.
8        MR. STANOCH:  Sorry,
9   Mr. Harkins, it's also Exhibit A
10  to Exhibit 1, his report.
11       But any way you want to
12  proceed, I'm fine.
13       MR. HARKINS:  Sure.
14       Can you pull up Exhibit 21?
15  Just to make sure it's dropped in
16  there correctly.
17       THE WITNESS:  It's here,
18  correct.
19       (Document marked for
20  identification as Exhibit
21  Anderson-21.)
22  BY MR. HARKINS:
23       Q.   Right.  And Tim, if you go
24  down to review it quickly, is this an

Page 414

1 updated CV that you have prepared for us?
2     A.   It is.
3     Q.   And how can you tell it's
4 the updated CV?
5     A.   Because I see revisions to
6 this version of the CV that I made very
7 recently and furnished to NDA Partners,
8 who subsequently furnished a copy to you
9 as an update.
10     Q.   And just to clarify, what
11 are the revisions to your CV from the one
12 that was submitted as an attachment to
13 your report?
14     A.   The revisions include a
15 heading that at one time on Page 5, read
16 "Depositions," which was not entirely
17 correct.  And I changed the word to say
18 "Legal," which in fact is correct.
19          The reason it had to be
20 corrected is because all of the case work
21 that I list here did not necessarily
22 include a deposition.
23          However, for the assistance
24 of anyone who is referring to this here,

Page 415

1 one can learn what it is in fact that I
2 did do with respect to this case work;
3 that is, whether I wrote a report only or
4 I wrote a report and had a deposition or
5 I had written the report, had a
6 deposition, had court testimony, or
7 possibly testimony as arbitration, or
8 whether I just simply provided
9 consultative work.
10          So each one of these cases,
11 in addition to having the dates on
12 which -- or the years in the -- and
13 states in which the cases were done and
14 what type of service I provided to them
15 is now much more clear.
16     Q.   Okay.  Just to clarify, did
17 you add any new matters to that section
18 that you revised?
19     A.   No, I did not.
20     Q.   Other than changing the
21 heading and clarifying some of the
22 descriptions, did you make any other
23 changes to that section?
24     A.   No other changes.

Page 416

1     Q.   Did you make any other
2 changes to any other part of the CV?
3     A.   No, I did not.
4     Q.   Okay.  And just for the
5 benefit of the jury, just generally and
6 briefly, give us a little description of
7 your background, please.
8     A.   I celebrate my 40th career
9 year this year.  And I began right out of
10 school with a technical temporary
11 employment firm by the name of Clinton
12 Research Consultants where I did three
13 different assignments in a variety of
14 technical veins, none of which were
15 pharmaceutical.
16          In 1984, I had my first job
17 in the pharmaceutical industry in -- as
18 an experimental formulations chemist,
19 developing and validating methods, having
20 to do with bioanalytical methods
21 predominately for new formulations that
22 were being developed at the Purdue
23 Frederick research center.
24          I went on for -- after that,

Page 417

1 after three years being there, I went on
2 for another job which I took at Bayer
3 Pharmaceuticals where I was in quality
4 control and quality assurance for a total
5 of five years.
6          I joined the FDA after
7 leaving Bayer and stayed with FDA's
8 Office of Generic Drugs, where I served
9 as a review chemist and was there for
10 slightly more than two years.
11          But then went back into
12 industry and was hired by Sandoz
13 Pharmaceuticals Corporation, where I was
14 hired to build brand protection
15 strategies for what were Sandoz flagship
16 products at the time.
17          These were clozapine,
18 cyclosporine, bromocriptine,
19 predominately at that time.  And
20 strategies that we were developing were
21 related predominately to not only
22 excellence in filing, but also in terms
23 of bioequivalence development as well.
24          The whole intention being

Confidential Information Subject to Protective Order

Page 418

1 that we would have the files ultimately
2 by which the generic industry would be
3 measured according to quality and
4 requirements for their submissions.
5      I left Novartis -- or
6 actually Sandoz, which when they merged
7 with Ciba Geigy, it became Novartis.  I
8 left Novartis in February of 1996.
9      And 26 years ago, in
10 February, I formed my own consulting firm
11 which is specialized predominately in
12 chemistry and manufacturing controls
13 issues.
14      Q.   And specifically, in what
15 context in your professional experience
16 have you worked with cGMPs and conducted
17 cGMP inspections?
18      A.   I've conducted many cGMP
19 inspections in the context of mock
20 preapproval inspections, in terms of
21 preparing sites that were anticipating
22 FDA's visits and preparing them for that,
23 and in one particular instance,
24 accompanying that -- the clients at the

Page 419

1 time that the FDA was present to do their
2 inspection.
3      Also happened to be present
4 on another occasion where FDA just
5 happened to show up while I was doing my
6 inspection.
7      But those, in addition to
8 also performing such cGMP evaluations on
9 behalf of firms which are engaged in
10 merger and acquisition efforts to
11 evaluate certain aspects that have a cGMP
12 compliance component to them for purposes
13 of informing their investment decisions.
14      Q.   And during your time prior
15 to your consulting work, did you also
16 work on issues related to cGMPs?
17      A.   I did.
18      Q.   Please explain.
19      A.   Specifically, when I was at
20 Bayer.  For instance, this was my first
21 introduction to the meaningful
22 significance of cGMP compliance in the
23 marketed product world.
24      As I said, I was there for

Page 420

1 five years and was performing analytical
2 assays and overseeing the work of others
3 who were also performing analytical
4 assays for what were approved and in some
5 cases products which were also in
6 development.
7      Q.   In addition to your work
8 with cGMPs and cGMP inspections, have you
9 reviewed any FDA cGMP inspections?
10      A.   I have reviewed FDA cGMP
11 inspections in the form of FDA Form 483s
12 that have been issued.
13      Q.   What's an initial
14 observation?
15      A.   An initial observation is,
16 as the name suggests, a first
17 observation, a first statement that is
18 communicated that -- in the context of an
19 FDA inspection, it is the very first
20 observation that is made.
21      Typically on a 483 FDA,
22 arranges their observations in a manner,
23 in a descending sequence of priority.
24      Q.   In your experience, how

Page 421

1 common is it for an initial observation
2 about a facility to occur during an
3 inspection?
4      MR. STANOCH:  Objection to
5 form.
6      THE WITNESS:  It is --
7      MR. STANOCH:  Beyond the
8 scope.
9      Go ahead.
10 BY MR. HARKINS:
11      Q.   You can answer.
12      A.   An initial observation
13 occurs frequently at facilities which are
14 inspected by FDA.
15      Q.   In your experience how
16 common is it for an initial observation
17 about a facility to relate in some way to
18 cGMP compliance?
19      A.   It is -- the observations
20 are made on the basis of evaluation of
21 cGMP compliance.
22      Q.   Does such an observation
23 always lead to a recall?
24      A.   No, it does not.

Page 422

1    Q.   Does such an observation
2  always lead to product being put on hold
3  at that facility?
4    A.   No.
5    Q.   How, if at all, does such an
6  observation impact other products
7  manufactured at that facility?
8       MR. STANOCH:  Objection.
9       THE WITNESS:  It does not
10    necessarily impact the facility.
11 BY MR. HARKINS:
12    Q.   Does an observation related
13 to cGMPs always cause FDA to determine
14 that all product at a facility is
15 adulterated?
16       MR. STANOCH:  Objection to
17    form.
18       THE WITNESS:  No.
19 BY MR. HARKINS:
20    Q.   Would an observation -- I'm
21 sorry.
22       Does an observation related
23 to cGMPs always cause FDA to determine
24 that a specific product impacted by the

Page 423

1  observation is adulterated?
2    A.   It may.
3    Q.   What would be the
4  implication of Mr. Quick's opinion that
5  all products manufactured at a facility
6  where any cGMP observation occurs is
7  adulterated under the FD&C Act?
8       MR. STANOCH:  Objection --
9    objection to form.  Misstates
10    testimony and opinion.
11       Go ahead.
12       THE WITNESS:  As the former
13    corporate vice president of
14    manufacturing quality of Baxter, I
15    would expect Mr. Quick to know
16    better.
17 BY MR. HARKINS:
18    Q.   What do you mean by that?
19       MR. STANOCH:  Same
20    objection.
21       THE WITNESS:  Mr. Quick was
22    present at the time that a warning
23    letter was awarded to Baxter in
24    the year 2000, in an event that

Page 424

1  when asked under deposition, he
2  didn't seem to recall any detail
3  about, although the warning letter
4  that was issued was very specific
5  with respect to one product, and
6  did not indicate anywhere on the
7  warning letter that any other
8  products were affected by it.
9  BY MR. HARKINS:
10    Q.   Turning to something else, I
11 remember -- during your testimony today,
12 do you recall being discussed about your
13 knowledge of the legal claims made by
14 plaintiffs in this case?
15    A.   I recall being asked about
16 those.
17    Q.   Okay.  Do you have any
18 knowledge of the specific legal claims
19 made by the class plaintiffs in this
20 case?
21    A.   I am not a legal expert.  I
22 don't pretend to be a legal expert.  I
23 have no knowledge of that; hence, no
24 opinion.

Page 425

1    Q.   Okay.  And you've not been
2  asked to provide any opinions about
3  specific legal theories at issue on this
4  case?
5    A.   Not in my report, no.
6    Q.   Aside from specific legal
7  theories, do you have a general
8  understanding of the types of harm that
9  are alleged by the class plaintiffs?
10       MR. STANOCH:  Objection.
11    Asked and answered.
12       THE WITNESS:  So there
13    are -- there are plaintiffs that
14    are alleging injury who are in --
15    as I understand it, seeking a
16    restitution of some kind.
17 BY MR. HARKINS:
18    Q.   So does the specific type of
19 harm alleged by the class plaintiffs
20 factor at all to your opinions in this
21 case?
22    A.   No, not at all.
23    Q.   You spent some time today
24 discussing the Teva and Actavis SOPs that

Page 426

¹ you reviewed and chose to include at some
² point as citations in your report.
³          Do you recall that?
⁴     A.   I do.
⁵     Q.   What was your purpose in
⁶ including those Teva SOPs and Actavis
⁷ SOPs in your expert report?
⁸     A.   John Quick made reference to
⁹ the type of matters that form a quality
¹⁰ system in a firm, and there -- it stands
¹¹ as a fact that there are standard
¹² operating procedures that a company must
¹³ have in place that govern those
¹⁴ meaningful quality system aspects.  He
¹⁵ mentioned names, as I said, very
¹⁶ specifically.
¹⁷          And what I thought to do was
¹⁸ to request those SOPs from Teva that
¹⁹ addressed the same points that Mr. Quick
²⁰ did, though acknowledging, even as he
²¹ did, this was not intended to be a
²² comprehensive representation of all SOPs
²³ that Teva had that govern all these
²⁴ system matters.

Page 427

¹     Q.   You reviewed Mr. Quick's
² deposition, correct?
³     A.   I did.
⁴     Q.   What did he describe insofar
⁵ as he attempted to review and analyze
⁶ Teva SOPs in place?
⁷          MR. STANOCH:  Objection.
⁸ Hold on.  Hold on.
⁹          Objection to form.  Outside
¹⁰ the scope of the opinions this
¹¹ expert is offering in this case.
¹² Go ahead.
¹³          THE WITNESS:  He made the
¹⁴ admission in deposition that he
¹⁵ did not review SOPs himself.  He
¹⁶ may have casually passed by
¹⁷ documents that involved the topic
¹⁸ that are the subject of the SOPs
¹⁹ that are cited and the elements of
²⁰ quality systems that he cited, but
²¹ he said that he didn't review
²² SOPs.
²³ BY MR. HARKINS:
²⁴     Q.   And just to be

Page 428

¹ comprehensive, is that the same thing
² that you saw with respect to Actavis
³ SOPs?
⁴     A.   That is correct.
⁵          MR. STANOCH:  Same
⁶ objection.  Go ahead.
⁷          (Whereupon, a discussion was
⁸ held off the record.)
⁹          (Whereupon, the court
¹⁰ reporter read back the requested
¹¹ portions of the transcript.)
¹²          MR. STANOCH:  Same
¹³ objection.
¹⁴          THE WITNESS:  Yes.
¹⁵ BY MR. HARKINS:
¹⁶     Q.   Yeah, and Tim, as we go,
¹⁷ just try and give him a pause, because
¹⁸ he's -- with our incredible technology
¹⁹ setup here, you have to give him a moment
²⁰ to make an objection.
²¹     A.   Very well.
²²     Q.   Given what you saw insofar
²³ as Mr. Quick did not analyze Teva or
²⁴ Actavis SOPs, did you feel it was

Page 429

¹ necessary to do a fulsome review of those
² policies to prepare your opinion in this
³ case?
⁴          MR. STANOCH:  Objection to
⁵ form.
⁶          THE WITNESS:  I reviewed the
⁷ SOPs to the degree that I needed
⁸ to make certain that the SOPs were
⁹ ones that pertained to Teva's
¹⁰ quality systems, and they were, by
¹¹ virtue of their identification,
¹² ones which would be relevant to my
¹³ opinion.
¹⁴ BY MR. HARKINS:
¹⁵     Q.   Do you feel that you had
¹⁶ sufficient access to Teva's SOPs, and
¹⁷ that includes Actavis SOPs, to respond to
¹⁸ the statements about quality systems that
¹⁹ you saw in Mr. Quick's report?
²⁰          MR. STANOCH:  Objection to
²¹ form.
²²          THE WITNESS:  Yes.
²³          Yes.
²⁴ BY MR. HARKINS:

Page 430

1  Q.   Turning to a couple of the
2  exhibits that were introduced.
3        Can you go ahead and pull up
4  Exhibit 3 in the DropBox previously
5  introduced.
6  A.   Yeah.
7  Q.   And this is the "Facts About
8  Current Good Manufacturing Practices"
9  document.
10  A.   One moment, please.
11       All right.  I have it on the
12  display now.
13  Q.   And you said that you are
14  familiar with this document?
15  A.   I am.
16  Q.   Do you recall being asked if
17  John Quick accurately quoted a line from
18  that document?
19  A.   I recall that.
20  Q.   And then you testified that
21  that quote did not include what you
22  thought was necessary context; is that
23  accurate?
24  A.   That is accurate.

Page 431

1  Q.   Looking at this exhibit,
2  what is the context in this exhibit that
3  you felt was important?
4       MR. STANOCH:  Objection.
5       THE WITNESS:  In the section
6  which Mr. Quick cited, the title
7  of the section, "If a manufacturer
8  is not following cGMPs, are drug
9  products safe for use?"
10       Mr. Quick only quoted the
11  very first sentence in this
12  section.
13       But further into this
14  section, there is a context that
15  is relevant for this -- relevant
16  for this understanding here.
17       And if I may read from it, I
18  will quote what that section is
19  here.
20       And that starts at the
21  sentence which reads, "Regulatory
22  actions against companies with
23  poor cGMPs are often intended to
24  prevent the possibility of unsafe

Page 432

1  and ineffective drugs.
2       "In rare cases, FDA
3  regulatory action is intended to
4  stop the distribution or
5  manufacturing of violative
6  product.
7       "The impact of cGMP
8  violations depends on the nature
9  of those violations and on the
10  specific drugs involved."
11  BY MR. HARKINS:
12  Q.   Without that context which
13  you just now described, how would you
14  describe Mr. Quick's quotation of and use
15  of that single statement that he included
16  in his report?
17       MR. STANOCH:  Objection to
18  form.
19       THE WITNESS:  It is not
20  true.  It is not true because it
21  is not made in context.
22  BY MR. HARKINS:
23  Q.   Mr. Anderson, you were asked
24  early on today about a specific statement

Page 433

1  in your report where you stated that the
2  cGMP issues identified did not prevent
3  Teva from identifying NDMA or NDEA in the
4  valsartan medication.
5       Do you recall that?
6  A.   I do.
7  Q.   Do you recall where that
8  statement is in your report?
9  A.   I recall the fact that it is
10  in my report.  I don't have the immediate
11  knowledge of which paragraph that appears
12  in.
13  Q.   Let's go ahead and pull
14  that -- pull your report up.
15  A.   Okay.
16  Q.   And go to Paragraph 25,
17  where we were discussing this.
18  A.   I'm there.
19  Q.   Do you see that statement --
20  do you recall discussing this portion of
21  your report, specifically the first
22  clause, which was then combined with the
23  third clause of that sentence during your
24  testimony today?

Page 434

1    MR. STANOCH:  Objection to
2    form.
3    THE WITNESS:  We discussed
4    the entire -- we discussed the
5    entirety of this paragraph.
6  BY MR. HARKINS:
7    Q.    What do you mean by the
8  statement in this paragraph?
9    A.    What I mean by the statement
10  is that NDMA and NDEA were not substances
11  that were either anticipated or predicted
12  by those who were manufacturers of
13  valsartan at the time.  They were not
14  predicted by manufacturers of valsartan
15  drug products at the time.
16    And FDA readily admits that
17  NDMA and NDEA were unexpected, by their
18  telling of it.  And in fact, there was --
19  FDA went so far as to make the statement
20  that even cGMP evaluations of facilities
21  would likely not have picked up on NDMA
22  or NDEA.
23    Q.    And specifically, when you
24  say that none of the observations by the

Page 435

1  FDA nor Teva's own observations prevented
2  Teva from identifying the NDMA or NDEA
3  impurities at issue, can you explain that
4  statement?
5    MR. STANOCH:  Objection.
6    THE WITNESS:  That is a
7    statement which is -- sorry.
8    That statement is true on
9    its face as it appears in my
10    report.  But the context in which
11    we are speaking here is the global
12    lack of knowledge and lack of
13    anticipation that the industry, as
14    well as regulatory authorities,
15    had with regard to detection of
16    NDMA and NDEA.
17  BY MR. HARKINS:
18    Q.    Regardless of the existence
19  or nonexistence of any of the
20  observations identified in Paragraph 25
21  of your report, what is your opinion
22  about whether Teva could have identified
23  NDMA or NDEA impurities in valsartan
24  medication prior to June 2018?

Page 436

1    A.    I show in --
2    MR. STANOCH:  Objection to
3    form.
4    Go ahead.
5    THE WITNESS:  I show in the
6    exhaustive exhibit that is part of
7    this report that there were no
8    observations that were made,
9    either by Teva inspectors of
10    Mylan, Teva inspectors of ZHP,
11    FDA's inspections of either Mylan
12    or ZHP, or other health
13    authorities, namely, the
14    authorities in the island nation
15    of Malta, none of the observations
16    were ones which gave any
17    indication, spoke of, or any hint
18    of the presence or potential
19    presence of either NDMA or NDEA.
20  BY MR. HARKINS:
21    Q.    And you specifically
22  mentioned that even FDA had recognized
23  that it was unlikely cGMP issues -- I'm
24  sorry -- cGMP inspections would identify

Page 437

1  the presence of these impurities?
2    A.    That is correct.  I
3  believe --
4    MR. STANOCH:  Objection to
5    form.
6    THE WITNESS:  That's
7    correct.  I believe -- I believe
8    they uttered that opinion soon
9    after they had set interim
10    specifications for NDMA and NDEA
11    presence.  I believe it was in
12    January 2019.
13  BY MR. HARKINS:
14    Q.    Go ahead and turn to Page 5,
15  actually of your amended reliance list.
16  I just want to make sure that I'm talking
17  about the right document.
18    MR. STANOCH:  Are we talking
19    about Exhibit 2, Mr. Harkins?
20    MR. HARKINS:  Yeah, and I
21    want to make sure it's the right
22    one.
23    MR. STANOCH:  I'm going to
24    object to this as the reliance

Confidential Information Subject to Protective Order

Page 438

1   list, because there's a lot of
2   ambiguity on that, which we'll
3   follow up on.  But I understand
4   Exhibit 2.
5        MR. HARKINS:  It's
6   Exhibit 2, the materials
7   considered.
8   BY MR. HARKINS:
9        Q.   Do you see on the bottom of
10  Page 5 the January 2019 statement that
11  you just discussed?
12       A.   Page 1, Page 2, Page 3,
13  Page 4, Page 5.  And you say that it's at
14  the bottom of Page 5?
15       Q.   Fingers crossed.
16       MR. STANOCH:  I mean,
17  they're not numbered, and the one
18  on my Page 5 is letter from Malta
19  Medicines.
20       MR. HARKINS:  It's middle of
21  Page 6.
22       THE WITNESS:  There we are.
23  Entitled "FDA Statement
24  1/25/2019."  This is Teva Bates

Page 439

1        number TEVA-MDL2875-00065839.
2   BY MR. HARKINS:
3        Q.   Mr. Anderson, if you can go
4   to the exhibit share and refresh, and
5   pull up what's just been introduced as
6   the most recent exhibit.  I believe it's
7   22.
8        (Document marked for
9        identification as Exhibit
10       Anderson-22.)
11       THE WITNESS:  I'm there.
12  BY MR. HARKINS:
13       Q.   Is this the document that
14  you just identified on the list of
15  materials considered?
16       A.   This is the document.
17       Q.   Can you identify in this
18  document the statement that you're
19  referring to in our discussion of FDA
20  statements on cGMP inspections and their
21  ability to locate impurities?
22       A.   Give me a moment to locate
23  this, please.
24       I have found the paragraph.

Page 440

1   It is on the second page of this six-page
2   document.  The statement in the -- one,
3   two, three -- third full paragraph on
4   this page at the bottom states, and I
5   quote, "It's unlikely that the subtle
6   problem causing these impurities could
7   have been found on a routine current good
8   manufacturing practice inspection."
9        Q.   Thank you, Mr. Anderson.
10       I'd like to turn to another
11  one of the exhibits that was previously
12  introduced.  Can you go ahead and, in the
13  exhibit DropBox, reopen Exhibit 4.
14       A.   It's open.
15       Q.   And this is the e-mail from
16  Mr. Nassall to some folks at ZHP.  You
17  recall discussing this e-mail, correct?
18       A.   I do.
19       Q.   Why do you discuss this
20  document in your report?
21       A.   I discuss this document only
22  because it was something that was -- a
23  situation that was referenced in John
24  Quick's report, and the characterizations

Page 441

1   and what I felt were unfair implications
2   that Mr. Quick was making about the
3   dialogue with respect to ZHP's
4   cooperation with an inquiry that was
5   being made by Teva.
6        Q.   I -- to confirm, you don't
7   have any opinion or knowledge about
8   whether this is the first time anyone at
9   Teva learned of this document?  I believe
10  you testified to that.
11       MR. STANOCH:  Objection to
12  form.
13       THE WITNESS:  I testified
14  that I did not -- I'm sorry.
15       I testified that I did not
16  know necessarily that this was the
17  first notification that Teva as a
18  company had.
19  BY MR. HARKINS:
20       Q.   You didn't have any basis to
21  confirm or deny that, right?
22       A.   Correct.
23       Q.   That would be outside the
24  scope of the expert report and opinion

Confidential Information Subject to Protective Order

Page 442

¹ that you were asked to provide in this
² case?
³        A.   I agree.
⁴        Q.   Turn back to the list of
⁵ materials considered for just a moment.
⁶        Did you review all of the
⁷ certificates of analysis that are
⁸ identified on your list of materials
⁹ considered?
¹⁰       A.   I reviewed them --
¹¹       MR. STANOCH:  Objection.
¹² Asked and answered.
¹³       Go ahead.
¹⁴       THE WITNESS:  I reviewed and
¹⁵ considered them.
¹⁶ BY MR. HARKINS:
¹⁷       Q.   What did you review and how
¹⁸ did your review and consideration of
¹⁹ those factor into your opinions in this
²⁰ case?
²¹       A.   The certificates of analysis
²² that I reviewed had no evidence that any
²³ testing was done in the context of NDMA
²⁴ or NDEA for information purposes or

Page 443

¹ against a specification of any kind
² appearing on the certificates.
³        Q.   What in those certificates
⁴ of analysis did you feel it was necessary
⁵ to affirmatively cite to in your expert
⁶ report?
⁷        A.   The fact that the --
⁸        MR. STANOCH:  Objection to
⁹ form.  Asked and answered.
¹⁰       Go ahead.
¹¹       THE WITNESS:  The fact that
¹² the certificates of analysis
¹³ contained data on them that shows
¹⁴ that they conform to
¹⁵ specifications that were present
¹⁶ on the certificates of analysis.
¹⁷ BY MR. HARKINS:
¹⁸       Q.   Do you feel it was necessary
¹⁹ to include specific citations to each of
²⁰ these certificates of analysis in your
²¹ expert report?
²²       MR. STANOCH:  Objection.
²³       THE WITNESS:  I do not.
²⁴ BY MR. HARKINS:

Page 444

¹        Q.   You were also asked just a
² little while ago, technical issues
³ notwithstanding, about the 2019
⁴ inspection by the FDA of Teva's OSD
⁵ facility in Jerusalem.
⁶        Do you recall that?
⁷        A.   I do recall that.
⁸        Q.   Do you recall being told
⁹ that that inspection was about valsartan?
¹⁰       MR. STANOCH:  Objection to
¹¹ form.
¹²       THE WITNESS:  I recall that.
¹³ BY MR. HARKINS:
¹⁴       Q.   Do you recall the questions
¹⁵ about why you didn't consider this
¹⁶ inspection report in forming your opinion
¹⁷ in this case?
¹⁸       A.   I recall being questioned
¹⁹ about that.
²⁰       Q.   Do you recall being asked
²¹ whether you reviewed the results of the
²² inspection that purportedly related to
²³ valsartan?
²⁴       A.   I recall being asked that.

Page 445

¹        Q.   Were you shown the
² inspection report during that
³ questioning?
⁴        A.   I was not shown it.
⁵        Q.   You were just shown notes
⁶ about the inspection, which it does have
⁷ a mention of valsartan being discussed,
⁸ right?
⁹        A.   The notes mentioned
¹⁰ valsartan being discussed.
¹¹       Q.   Please reload the DropBox
¹² and open what is introduced as Exhibit
¹³ Number 23.
¹⁴       (Document marked for
¹⁵       identification as Exhibit
¹⁶       Anderson-23.)
¹⁷       THE WITNESS:  I'm there.
¹⁸ BY MR. HARKINS:
¹⁹       Q.   Scroll down past the first
²⁰ page.  And take a look at this document.
²¹ Take as long as you need.
²²       Have you seen this document
²³ before?
²⁴       A.   No, I have not.

Confidential Information Subject to Protective Order

Page 446

1    Q.   And again, take as long as
2 you need to familiarize, understanding
3 that.
4         What is this document?
5    A.   This document is a Form 483
6 that was issued in accordance with an
7 inspection that occurred in Israel at
8 Teva Pharmaceuticals Industry in
9 Jerusalem on the dates of July 28th
10 through August 1st, 2019.
11    Q.   And again, take as long as
12 you need to familiarize yourself with
13 this document.
14         Does this appear to be the
15 483 that the FDA sent in connection with
16 the 2019 inspection that you were asked
17 about by plaintiffs' counsel?
18    A.   Let me just have a look at
19 it from top to bottom.
20         There are four observations
21 which appear here, and I've made familiar
22 with the fact that there were four
23 observations which proceeded from this
24 inspection from the document that

Page 447

1 Mr. Stanoch provided.
2    Q.   Okay.  Does this appear to
3 be the 483 that relates to that
4 inspection?
5    A.   It does.
6    Q.   Go ahead and look at just
7 the first substantive page on this 483.
8 And understanding that you have not seen
9 this document before, I'd like you to go
10 ahead and review it and identify on the
11 first page where it mentions valsartan?
12    A.   Give me a moment.  I've read
13 Observation 1.  I do not see the word
14 "valsartan" anywhere in it.
15    Q.   Do you see a mention of any
16 other sartan medication?
17    A.   I do not.
18    Q.   Do you see any mention of
19 NDMA, NDEA, or any nitrosamines?
20    A.   Those abbreviations do not
21 appear in this observation.
22    Q.   Please go to the second
23 page.
24         Go ahead and review the

Page 448

1 second page, and I'd like you to identify
2 for me what drug substances are discussed
3 on the second page of this 483?
4    A.   Give me a moment to review.
5         The products that are named
6 in Observation 2 are imatinib mesylate,
7 clonazepam, clozapine, divalproex sodium,
8 and atorvastatin.
9    Q.   And is there any mention on
10 this page about valsartan or any other
11 sartan products?
12    A.   The word "valsartan" does
13 not appear anywhere in Observation 2.
14    Q.   Is there any discussion on
15 this page of the 483 of NDMA, NDEA, or
16 any nitrosamines whatsoever?
17    A.   Not at all.
18    Q.   Go to the next page.  And
19 again, sir, I'm just going to ask you to
20 review this, again looking for the
21 products that are identified and any
22 mention of nitrosamines, and let me know
23 whenever you're finished.
24    A.   I do not see the word

Page 449

1 "valsartan" anywhere in Observation 3.  I
2 see no mention of anything having to do
3 with detection of NDMA or NDEA.
4    Q.   Go to the next page of the
5 document.  Take your time to review it
6 since you're seeing it for the first
7 time.
8         Let me know if you see any
9 mention of valsartan or any other sartan
10 medication or nitrosamines.
11    A.   Okay.  To be clear, the top
12 of this page is a continuation of the
13 third observation.
14         So I'm going to comment
15 first on the context of Observation 3,
16 and will continue on to observation four,
17 which also itself continues on to the
18 following page.  So I'll separate my
19 observation in that context.
20    Q.   Sure.
21    A.   Finishing my comment with
22 respect to Observation 3, again, there is
23 no mention of valsartan or of anything
24 having to do with NDMA or NDEA.

Page 450

Continuing now onto Observation 4.  It begins on this page.  I will comment on the whole observation, once I have completed reading it.

Q.   Sure.

Let me know when you're done reading this part of it and we'll turn to the next page, and then I'll ask you question.  Okay?

A.   Very well.

On this first portion of Observation 4 which appears on Page 5 of 7 in this document, but named as Page 4 of 5 on the 483, there is no mention of the word "valsartan" or anything having to do with NDMA or NDEA.

Q.   And then turning to the final page, once again, I'll just ask you to review, take as much time as you need.

And ask you do you see any reference on this final page at the end of Observation 4 with respect to valsartan, any other sartan medication, or NDMA, NDEA, or nitrosamines?

Page 451

A.   There is no mention of valsartan on this page, nor is there any mention of NDMA or NDEA in the final observations for Observation Number 4.

Q.   And just scroll down to the last page, which appears to be some sort of boilerplate language, but I just want to confirm.

The same applies with respect to this nonsubstantive page?

A.   This is nonsubstantive and is something which is a part of every 483 as it refers to various sections of the FD&C and the U.S.C.

Q.   Mr. Anderson, did you see anything in this 483 that pertains to valsartan or any other sartan medication?

A.   Not a thing.

Q.   Do you see anything in this Form 483 that pertains to NDMA, NDEA, or any other nitrosamine?

A.   Not a thing.

Q.   Is there anything in this document that would change your opinions

Page 452

in this case that you rendered in your expert report on January 12th?

A.   Not at all.

Q.   Do you find anything in this document to be relevant to the opinions that you rendered in your expert report submitted on January 12th?

A.   Not relevant at all, the reason being, this 483 not only does not contain anything having to do with the topic of valsartan or the NDMA/NDEA impurity matter, but it is also something that was issued at a time long past the time that Teva ceased to be marketing valsartan products.

Q.   And just to confirm, because I don't know that we really squarely addressed it yet today, what is your conclusion from your review of material that you looked at to prepare your expert report in this case as to whether any of Teva's valsartan or valsartan-containing products was adulterated under the terms of the FD&C Act?

Page 453

MR. STANOCH:  Objection to form.

THE WITNESS:  The valsartan products, as they were made, were declared -- or the APIs declared -- was declared as adulterated as of November 29, 1918 and not a time before that.

BY MR. HARKINS:

Q.   Sorry about that.  2018?

A.   I'm sorry.  Forgive me.  Scratch that year.  More correctly, it's 2018.  Yes.

Q.   You reviewed a significant number of documents, both in preparing your report and in preparing to come in and take your deposition today?

A.   Yes.  And among those documents were included the actual inspection reports that were prepared by Teva auditors as well as the 483s which were issued by FDA or by the Maltese inspection authority.

Q.   And those -- that's the

Confidential Information Subject to Protective Order

Page 454

¹ material that you discuss, not only in
² the body of your report but in your
³ detailed appendix?
⁴     A.   I discuss this extensively
⁵ in the detailed appendix, which captures
⁶ all of the observations that were made in
⁷ all of these inspections and with
⁸ responses that were prepared by the -- by
⁹ Mylan or by ZHP or by Teva, depending on
¹⁰ what the nature of the audit or
¹¹ inspection was.
¹²     Q.   Have you seen anything
¹³ during your review of materials in
¹⁴ preparation to coming for your deposition
¹⁵ today that's caused you to change your
¹⁶ opinions as set forth in your January 12,
¹⁷ 2022 report?
¹⁸     MR. STANOCH:  Objection to
¹⁹     form.
²⁰     THE WITNESS:  Not a thing.
²¹ BY MR. HARKINS:
²²     Q.   Have you been shown anything
²³ by plaintiffs' counsel during the
²⁴ deposition today that has caused you to

Page 455

¹ change any of your opinions set forth in
² your January 12, 2022 expert report?
³     MR. STANOCH:  Same
⁴     objection.
⁵     THE WITNESS:  Not a thing.
⁶     MR. HARKINS:  Thank you,
⁷     Tim.
⁸     Those are all the questions
⁹ I have.
¹⁰     THE WITNESS:  Thank you all
¹¹ for your time.
¹²     MR. HARKINS:  He may have
¹³ more for you.
¹⁴     MR. STANOCH:  I do not.  No
¹⁵ questions.  We're done.
¹⁶     MR. HARKINS:  Anything from
¹⁷ anyone else?
¹⁸     All right.  Thanks everyone,
¹⁹ and sincere apologies.  Let's go
²⁰ off the record.
²¹     THE VIDEOGRAPHER:  The time
²² is 7:41 p.m.  We are off the
²³ record.
²⁴

Page 456

¹     ********
²     (Excused.)
³     (Deposition concluded at
     approximately 7:41 p.m.)
⁴
⁵
⁶
⁷
⁸
⁹
¹⁰
¹¹
¹²
¹³
¹⁴
¹⁵
¹⁶
¹⁷
¹⁸
¹⁹
²⁰
²¹
²²
²³
²⁴

Page 457

¹
²     CERTIFICATE
³
⁴
⁵     I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
⁶ deposition is a true record of the
   testimony given by the witness.
⁷
     It was requested before
⁸ completion of the deposition that the
   witness, TIMOTHY A. ANDERSON, M.S., MBA,
⁹ have the opportunity to read and sign the
   deposition transcript.
¹⁰
¹¹
¹²
     _____
¹³ MICHELLE L. GRAY,
   A Registered Professional
   Reporter, Certified Shorthand
¹⁴ Reporter, Certified Realtime
   Reporter and Notary Public
¹⁵ Dated:  March 11, 2022
¹⁶
¹⁷
¹⁸     (The foregoing certification
¹⁹ of this transcript does not apply to any
²⁰ reproduction of the same by any means,
²¹ unless under the direct control and/or
²² supervision of the certifying reporter.)
²³
²⁴

Confidential Information Subject to Protective Order

Page 458

## INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 460

## ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 461, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
TIMOTHY A. ANDERSON, M.S., MBA   DATE

Subscribed and sworn
to before me this
_____ day of_____, 20____.
My commission expires:_____

_____
Notary Public

Page 459

- - - - - -
E R R A T A
- - - - - -

PAGE  LINE  CHANGE
___ ___ _____
REASON: _____
___ ___ _____
REASON: _____
___ ___ _____
REASON: _____
___ ___ _____
REASON: _____
___ ___ _____
REASON: _____
___ ___ _____
REASON: _____
___ ___ _____
REASON: _____
___ ___ _____
REASON: _____
___ ___ _____
REASON: _____

Page 461

## LAWYER'S NOTES

PAGE  LINE
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____
___ ___ _____

Confidential Information Subject to Protective Order

**WORD
INDEX**

< $ >
**$177,000**
411:*18*
**$30,000**
411:*13*
**$69,000**
411:*11*
**$78,000**
411:*12*

< 0 >
**0.05**  146:*1*
248:*12, 15*
301:*10*
**0.56**  391:*7*
**0111**  277:*21*
**0176**  279:*22*
**0197**  80:*7*
**02109**  3:*11*
**07102**  3:*5*
**07932**  2:*15*

< 1 >
**1**  14:*19*  16:*1,
5*  73:*11*
195:*17*
204:*18*
278:*12*
339:*12*
413:*10*
438:*12*
447:*13*  460:*6*
**1/12/22**  5:*18*
**1/25/19**  8:*23*
**1/25/2019**
438:*24*
**10**  106:*6*
167:*13*  290:*4*
396:*2, 9*
397:*5, 23*
**10/25/18**  6:*15*
**10/25/2018**
267:*19*
**10:01**  53:*6*
**10:04**  53:*10*
**100**  3:*4*
233:*16, 22*

**234:***1*
**10017**  3:*17*
**101**  276:*4*
**102**  308:*5*
**103**  276:*17,
21*  277:*17*
279:*5*  282:*4*
288:*10*
289:*5*
303:*23*  304:*4*
305:*14*  306:*9*
307:*5*  308:*5*
**104**  276:*17*
306:*15*
**1076**  279:*21*
**108**  5:*19*
**11**  293:*2*
457:*15*
**11/29/18**  8:*13*
**11/29/2018**
131:*23*
**11:17**  120:*15*
**11:33**  120:*19*
**110**  156:*2*
**112**  177:*3*
**113**  178:*8*
**115**  180:*23*
**116**  184:*20*
185:*16*
**117**  177:*3*
**118**  189:*15*
**12**  5:*7*
301:*18*
326:*10, 18*
328:*10*  330:*2,
21*  331:*2, 8,
12, 14, 16, 17,
21*  332:*5, 13*
333:*3*  334:*21,
24*  335:*12*
403:*19*
406:*15*  408:*9*
454:*16*  455:*2*
**12:57**  195:*20*
**121**  313:*13*
**123**  406:*21*
**124**  330:*18*
331:*6*
**127**  405:*19*
**128**  314:*2*

**12th**  3:*16*
58:*12*  281:*10,
12*  452:*2, 7*
**13**  303:*17*
331:*9*  358:*22*
**137965**  266:*7*
**13th**  55:*12*
282:*23*
**14**  5:*17*
310:*15*  357:*2,
7, 12*
**142**  373:*14*
**15**  106:*6*
163:*3, 22*
170:*7*  318:*8*
**15219**  4:*4*
**15th**  3:*4*
**16**  325:*2*
**1612**  167:*14*
**164**  6:*6*
**16th**  55:*15*
**17**  55:*13*
339:*5, 10, 15*
**1717**  2:*19*
**172**  55:*22*
**176**  55:*22*
279:*21*
**18**  368:*2, 8*
369:*9*
**19**  16:*17*
47:*7*  389:*22,
23*  390:*8*
**19103**  2:*20*
**1918**  453:*8*
**19-2875**  1:*5*
**198**  6:*9*
**1984**  416:*16*
**1996**  418:*8*
**1st**  446:*10*

< 2 >
**2**  55:*4*  57:*17*
73:*11*  290:*22*
312:*5*  369:*20*
390:*15*
406:*20, 24*
407:*2, 6, 7, 12*
408:*3, 8, 19*
437:*19*  438:*4,
6, 12*  448:*6, 13*

**2.1**  302:*8*
304:*10*
**2:11**  196:*3*
**20**  52:*16*
53:*14*  137:*24*
170:*2*  410:*2*
460:*20*
**200**  2:*9*
**2000**  423:*24*
**2011**  78:*2*
99:*17*  336:*5,
12*
**2012**  38:*7*
39:*7*  40:*1, 15,
21*  52:*2, 6*
95:*16*  97:*19*
99:*2*  100:*2*
232:*7*
**2013**  55:*13*
211:*18, 24*
212:*24*  214:*5*
222:*23*
293:*13*  337:*3*
**2014**  336:*22*
**2015**  7:*19*
55:*15*  156:*4*
281:*10, 12*
282:*23*  311:*2*
326:*9*  337:*3*
342:*21*  357:*4*
**2016**  157:*16*
**2017**  6:*8*
164:*5, 15*
166:*2*  167:*19*
168:*11, 19*
169:*1*  170:*2*
171:*16*  174:*1*
177:*17*  178:*4,
7*  184:*10*
187:*18*
188:*18*
189:*14*  190:*7*
191:*2*  192:*13,
19*  193:*11*
194:*2, 10*
195:*10*  199:*2*
204:*1*  205:*13*
211:*17*
214:*21*
223:*20*  227:*1*
291:*4*  292:*7,*

**12**  336:*23*
396:*2, 9*
397:*5, 23*
**2018**  38:*8*
39:*2, 7*  40:*1,
15, 22*  41:*1*
46:*20, 22*
52:*2, 6*  95:*16*
97:*19*  99:*2*
100:*2*  103:*20*
118:*22*  119:*2,
10, 18*  120:*8*
128:*13*  129:*9,
17, 22*  130:*7,
12, 20, 24*
131:*5, 9, 12*
132:*13, 17, 20*
138:*1, 8, 9, 12,
15*  140:*18*
143:*6*  144:*20*
148:*19*  149:*3*
150:*8*  165:*20*
167:*14*
187:*20*
188:*19*
189:*17, 24*
191:*3*  192:*14*
193:*14*
194:*11*  198:*6,
11*  206:*13*
216:*23*  220:*8*
226:*3, 8*
229:*17*
230:*12, 19*
231:*4, 23*
232:*7, 17*
233:*15*  234:*8,
13*  235:*17*
237:*8, 16*
242:*20*  245:*1*
254:*5*  261:*21*
262:*23*
266:*14*  267:*2,
9*  268:*4*
269:*2*  270:*7*
273:*1*  288:*14,
18, 23*  289:*1,
7, 19*  300:*5*
313:*19*
325:*22*
326:*17*  327:*9*

328:*11* 330:*3*
336:*6* 338:*4*
362:*15* 363:*1*
378:*13, 18*
385:*12, 17, 19,*
*24* 387:*7, 9*
388:*8, 12*
389:*23*
391:*17*
392:*15* 394:*6,*
*18, 23* 395:*1,*
*8, 11* 396:*19*
397:*3* 398:*4*
399:*1, 6, 17*
400:*14* 403:*5,*
*21* 404:*6*
405:*15*
435:*24*
453:*10, 13*
**2019** 101:*22*
229:*5* 337:*8,*
*10, 16, 19, 24*
338:*5, 20*
339:*12* 340:*5,*
*8* 341:*17*
342:*1* 343:*1,*
*16* 346:*19*
347:*5* 348:*4*
349:*20* 350:*4*
368:*13*
437:*12*
438:*10* 444:*3*
446:*10, 16*
**2020** 230:*8*
**2021** 95:*10*
118:*17*
318:*21*
325:*14* 410:*19*
**2022** 1:*11*
11:*8* 95:*10*
125:*14* 126:*1*
127:*6* 410:*20,*
*21* 411:*14*
454:*17* 455:*2*
457:*15*
**20th** 39:*13*
**21** 53:*22*
79:*17* 94:*22*
121:*19*
358:*14, 18*

413:*7, 14*
**210** 121:*20, 23*
**213-7047** 3:*12*
**215** 2:*20*
**22** 55:*15*
66:*21* 67:*24*
69:*2, 6* 73:*19,*
*23* 74:*20*
75:*1* 79:*17*
94:*22* 405:*15*
439:*7*
**23** 83:*17*
274:*21* 445:*13*
**233** 311:*9*
**23rd** 266:*14*
272:*24* 273:*3*
385:*18*
**24** 318:*21*
**25** 103:*3, 9*
267:*9* 433:*16*
435:*20*
**2500** 2:*10*
**26** 276:*1*
325:*14* 418:*9*
**263-1840** 4:*5*
**265** 6:*15*
**26-minute**
200:*3*
**27** 105:*16*
113:*15*
114:*12*
115:*22*
116:*21, 24*
117:*4* 199:*2*
204:*1*
**278** 6:*18*
**27th** 3:*11*
**28** 117:*12, 22*
156:*3*
**282** 6:*21*
**2875** 1:*2*
**288** 7:*6*
**28th** 410:*21*
446:*9*
**29** 129:*9, 17*
130:*12, 19, 24*
131:*4, 9, 12*
132:*13* 387:*9*
453:*7*
**290** 7:*7*
**292** 7:*11*

**29th** 128:*12*
129:*22* 130:*7*

< 3 >
**3** 55:*11*
73:*11* 108:*7*
298:*10, 13*
340:*8* 344:*8,*
*17* 346:*2*
347:*22*
348:*18* 430:*4*
438:*12* 449:*1,*
*15, 22*
**3/24/2016**
156:*8*
**3/24/21** 7:*21*
**3:28** 275:*17*
**3:36** 275:*21*
**30** 401:*4*
458:*16*
**301** 7:*14*
**303** 7:*16*
**30305** 2:*10*
**30th** 340:*5, 8,*
*12*
**31** 410:*19, 20*
**310** 7:*17*
**318** 7:*19*
**31st** 340:*6, 11*
**320** 252:*1*
**320-19-04** 8:*12*
**320-19-34** 8:*10*
**325** 7:*21*
**32S** 274:*22*
**33** 357:*14*
**3333** 2:*9*
**339** 8:*6*
**360-7900** 2:*16*
**368** 8:*8*
**38th** 4:*4*
**390** 3:*16* 8:*12*
**3D** 397:*16, 18*
**3rd** 385:*19*

< 4 >
**4** 73:*12*
164:*20* 165:*9,*
*11* 167:*6*
188:*23*
288:*23* 289:*1,*
*12, 16, 19*

438:*13*
440:*13* 450:*2,*
*12, 13, 22*
451:*4*
**4.3** 293:*21*
296:*2* 299:*9*
300:*9*
**400** 2:*15*
**40th** 416:*8*
**410** 8:*13*
**412** 4:*5* 5:*8*
**413** 8:*15*
**42** 336:*15*
**43** 55:*10*
**439** 8:*17*
**44** 55:*14*
**445** 9:*6*
**45** 410:*1*
**461** 460:*6*
**483** 153:*4*
157:*9* 162:*17*
163:*4* 168:*14,*
*18* 177:*16*
178:*20* 182:*5,*
*18* 183:*6*
184:*10* 292:*2,*
*9, 15* 294:*11,*
*16, 17, 21*
295:*1* 393:*12*
420:*21* 446:*5,*
*15* 447:*3, 7*
448:*3, 15*
450:*14*
451:*12, 16, 20*
452:*9*
**483s** 129:*2*
180:*24* 181:*6*
183:*20*
291:*12, 18, 24*
292:*8, 11*
295:*5* 420:*11*
453:*21*
**4th** 288:*14*
289:*7*

< 5 >
**5** 8:*7* 73:*12*
198:*17, 24*
222:*15*
225:*13* 234:*8,*
*13* 253:*21*

254:*5* 261:*21*
262:*22*
289:*13, 19*
290:*22, 23*
339:*23* 346:*9*
348:*19, 23*
414:*15*
437:*14*
438:*10, 13, 14,*
*18* 450:*12, 14*
**5.1** 280:*2*
283:*11* 284:*21*
**5.1.2** 280:*4*
**5/26/21** 7:*23*
**5:01** 354:*7*
**5:08** 354:*11*
**500** 2:*14*
**504** 2:*5*
**524-5777** 2:*5*
**53** 3:*10*
**553-2312** 2:*11*
**57** 5:*19*
**5th** 235:*16*
237:*8, 16*

< 6 >
**6** 66:*18*
132:*20* 138:*9*
143:*5* 148:*19*
149:*3* 150:*8*
167:*6* 265:*21*
266:*5* 300:*5*
369:*21* 438:*21*
**6:00** 402:*1*
**6:09** 340:*14*
**6:38** 402:*5*
**6:42** 404:*24*
**6:50** 405:*4*
**617** 3:*12*
**64** 10:*9*
**646** 3:*17*
**66** 311:*9, 12*
**678** 2:*11*
**68** 302:*2*
**69** 311:*9, 12*
**6th** 39:*2, 15*
138:*8* 293:*13*

< 7 >
**7** 66:*18*

278:2 450:13
**7.1** 156:9, 11
**7.2** 156:9, 20
161:20, 22
170:3
**7/27/17** 6:13
**7/28** 9:6
**7:41** 455:22
456:4
**701** 2:4
**70130** 2:4
**746-2000** 3:17
**757-1017** 3:5
**79** 311:10, 13
357:14 358:14

**< 8 >**
**8** 282:12
368:13
**8/1/19** 8:6
**8/1/2019** 9:6
**8/13/15** 6:21
**8/13/18** 6:6
**8/8/19** 8:10
**84** 82:22
84:20 86:5
88:6, 13
101:3 154:19
**877.370.3377**
1:21

**< 9 >**
**9** 1:11 10:9
125:14 126:1
127:6 288:4, 9
**9:22** 1:15
11:8
**917.591.5672**
1:21
**95** 133:9, 11,
15, 21
**96** 133:9, 11
134:19 135:5
136:6
**965** 167:9
**968** 272:24
**97** 137:9
**973** 2:16 3:5
**98** 137:18
**988-7800** 2:20

**9th** 11:7

**< A >**
**a.m** 1:15
11:8 53:6, 10
120:15, 19
**abbreviations**
447:20
**ability** 21:10
157:7 163:7
327:20
330:12
376:11 439:21
**able** 63:5
74:23 139:10,
15 140:4
151:7 159:21
181:10 217:7
224:12 244:6
257:1 268:19
322:15 328:9
334:17
335:11
364:14
376:12 380:7,
22 407:17
**AB-rated**
122:8
**abreast**
152:24 153:12
**absence**
377:21 384:23
**Absent** 119:9
122:21
**absolutely**
78:16 118:12
227:24
**accept** 49:19
**acceptable**
118:23 225:11
**accepting**
143:12
**access** 15:1
109:18 153:6
191:22 293:5
368:8 429:16
**accessibility**
82:5
**accidental**
284:7 286:18
305:19

**accidentally**
283:22 284:24
**accompany**
295:15
**accompanying**
418:24
**accomplished**
136:18
343:16 400:1
**account** 36:2
74:14 114:9
396:7
**accounts**
327:19
**accurate**
61:17 115:23
281:6 386:16
411:21
430:23, 24
458:20
**accurately**
14:1 115:3
116:9, 12
121:24 149:8
161:12 430:17
**accusation**
259:1, 2
261:10
**accused** 17:7
**accusing**
258:23
**acetate**
358:23
359:13 361:3
**achieved** 220:1
**acid** 196:23
197:20 201:11
**acknowledge**
206:3
**acknowledging**
426:20
**ACKNOWLE
DGMENT**
460:2
**acquainted**
59:23 62:11
372:4
**Acquiesced**
187:5
**acquiescing**
186:24

**acquired**
48:11 49:8, 9,
24 50:11, 19
51:4, 23 52:7
82:11 86:19
98:4
**acquiring** 94:1
**acquisition**
48:7 77:21,
23 78:11
81:5, 23 83:1,
21 84:6, 12,
17, 23 85:9
86:7, 16, 21
94:6, 11, 16
95:2 215:10
419:10
**Act** 121:18
423:7 452:24
**Actavis** 2:22,
23 3:7, 8
47:24 48:10
49:8, 9, 15
50:9, 15 51:4,
23 52:6
77:20, 21, 23
78:23 80:18,
22 81:4, 21,
23 82:2, 10,
15, 17, 21, 23
83:1, 19, 21
84:2, 5, 9, 14,
17, 18, 21
85:8, 14 86:3,
7, 13, 14, 15, 18
87:12 88:5,
11, 19, 21
89:10, 21
90:23 91:16
92:1, 3, 7, 13,
14, 17 93:1, 4
94:1, 7, 11, 16
95:2, 14
97:22 98:1, 3,
9, 15, 20
156:5, 12, 16,
17, 21 157:4,
6, 9, 19 160:7,
21 161:3, 7,
16, 24 168:4
169:22 215:9

**401:17
425:24 426:6
428:2, 24
429:17
Actavis's** 78:6,
10 80:4
84:12, 22 94:3
**Actavis-
specific** 78:9
**acted** 252:20
**action** 122:22
123:10
220:12, 14
223:18 432:3
**actionable**
261:12
**actions**
155:18
158:16
169:23 175:4
290:18 291:1
431:22
**active** 45:18
87:19 156:6
302:11, 16
303:3
**activity** 176:5
**actual** 178:20
184:10 224:4
309:22 310:2
332:20
334:18
384:14 385:5
453:19
**add** 136:9
137:3 411:19
415:17
**added** 249:10
411:22
**adding** 284:18
**addition**
57:11 285:2
358:3 415:11
419:7 420:7
**additional**
56:18
**Address** 8:21
260:6 385:11
**addressed**
325:8 426:19
452:18

addressing
  169:7  199:16
adequate
  218:9, 15
  374:12  397:10
adequately
  213:17
adhered
  289:14
admission
  43:23  427:14
admits  434:16
admitted
  250:15
adopt  227:6
adulterated
  106:18  107:7
  113:12, 18
  122:8, 11, 15
  123:23  124:5,
  16  125:12, 15,
  17  126:2, 4,
  17, 18, 20
  127:10, 17
  128:10
  129:10, 11, 16
  130:6, 21
  131:8  132:4
  384:16, 22
  387:14, 18, 19
  388:15
  422:15  423:1,
  7  452:23
  453:7
adulteration
  121:12, 15, 17,
  20  122:4, 21,
  23  123:9, 11,
  12, 16, 19, 20,
  21  124:7, 9,
  22  125:9
  126:19  127:7
  128:16
  131:20, 22
advance
  86:19  131:21
adverse  157:1
advice  229:7
advise  172:6
  206:20

advised  51:13
  172:24  266:18
affairs  260:5,
  20
affiliate  79:6
affiliates
  47:12, 17
  48:3, 8
affirmatively
  237:6  258:18
  319:19  320:5
  322:1, 24
  443:5
affirming
  329:19
afterward
  367:11
agency  47:5
Agency's  8:21
ago  64:16
  67:23  68:20
  98:19  101:4
  166:14
  167:23
  228:11  320:3
  418:9  444:2
agree  44:2, 6,
  20  45:9, 17,
  20, 22  46:2
  50:14  52:4
  55:19  73:18
  106:10  122:3,
  10, 19, 20
  123:7  130:10
  133:20  134:7,
  23  135:12, 24
  141:8, 10
  171:15
  174:24
  177:14  182:4,
  17  183:5, 17
  190:24
  199:24
  202:16, 23
  203:21  216:7,
  9  235:14
  267:21  279:4
  289:12  306:7
  307:3  309:17
  312:4, 16
  328:8  329:24

332:1  342:18
  355:22
  362:10, 14, 24
  387:10  393:2
  411:21  442:3
Agreed  50:13
  52:8  80:22
  142:1  147:15
  184:9  190:17
  332:3  376:9
  384:21
agreeing
  116:8  334:3
agreement
  155:23  156:6,
  10  157:15, 18,
  19  158:3, 24
  159:14, 15, 19
  160:6, 17
  161:2, 5, 10,
  13  168:16
  169:2, 10, 17
  172:19
  184:15
  276:14
  280:14, 22
  373:15  374:1,
  18  375:11, 14
  376:4  377:22
Agreements
  7:7  158:19
  159:5  162:6
  278:16  280:5
  373:21
agrees  327:6
Ah  109:14
ahead  62:5
  100:17
  110:15
  209:13
  260:23
  279:14
  309:18
  375:15
  377:15
  412:10  421:9
  423:11
  427:12  428:6
  430:3  433:13
  436:4  437:14
  440:12

442:13
  443:10  447:6,
  10, 24
Aid  3:19
alert  235:10
alerts  291:20
ALFANO  4:1
allege  17:21
  20:17  21:5
alleged  20:8
  21:22  22:23
  23:5, 10, 22
  24:9, 19
  25:12, 24
  26:8, 20  27:7,
  16  28:1, 17
  29:1, 13, 19
  30:3  31:3, 16
  32:9, 16  33:7,
  22  34:23
  36:2  37:15
  44:22  425:9,
  19
alleging  17:6,
  9  18:4, 5, 9,
  15, 18, 22
  19:1  20:10,
  13  425:14
alleviate  186:4
allow  51:8
  147:13
  218:23
  249:21  325:7
allowable
  119:11, 14, 17
  120:6
allowed  47:3
  104:17
allowing
  119:3  218:23
alluded  311:19
ambiguity
  438:2
amended
  437:15
Amit  282:23
  284:12
amount  47:3
  119:3  163:23
  188:13  192:2
  228:12  233:1

364:20
  398:19  411:20
amounts
  411:10
analyses
  233:7  388:20
analysis  41:23
  43:7  64:23
  65:7, 22  67:6,
  15, 18  68:1, 4,
  7, 10, 15  69:4,
  8, 9  70:5, 13,
  17  71:2, 23
  72:14  73:10
  74:20  81:2,
  20  85:7
  98:22  99:23
  187:17
  192:12
  200:17
  221:13, 22
  224:17  238:9
  239:6, 18
  240:3, 9, 19
  241:8, 16
  242:16, 21
  244:9, 16
  272:4  285:17
  286:1  337:23
  442:7, 21
  443:4, 12, 16,
  20
analytical
  420:1, 3
analyze  97:17
  98:14  140:3
  154:13  427:5
  428:23
anchor  77:7
and/or  157:6
  375:23  457:21
ANDA  142:5
  219:23
  220:20
  245:15  401:5
ANDAs  68:11
ANDERSON
  1:14  5:3, 17
  8:15, 17
  11:17, 24
  12:7, 11  14:6

39:20  53:13
64:15, 19
87:16  100:17
106:5, 13
108:1  115:21
118:5  120:12,
22  123:7
132:9  144:17
175:1  176:24
180:4  182:3,
16  183:5
189:21
195:12  196:9
205:11
209:13
212:10, 17, 19
218:8  222:15
239:19
285:15  306:6
318:16  354:3,
14  366:3
395:6  398:21
402:9  412:1
432:23  439:3
440:9  451:15
457:8  460:16
**Anderson-1**
5:17  14:22
**Anderson-10**
7:7  290:7
**Anderson-11**
7:11  292:21
**Anderson-12**
7:14  301:16
**Anderson-13**
7:16  303:15
**Anderson-14**
7:17  310:18
**Anderson-15**
7:19  318:11
**Anderson-16**
7:21  325:5
**Anderson-17**
8:6  339:8
**Anderson-18**
8:8  368:5
**Anderson-19**
8:12  390:3
**Anderson-2**
5:19  58:1

**Anderson-20**
8:13  410:5
**Anderson-21**
8:15  413:21
**Anderson-22**
8:17  439:10
**Anderson-23**
9:6  445:16
**Anderson-3**
5:19  108:11
**Anderson-4**
6:6  164:23
**Anderson-5**
6:9  198:20
**Anderson-6**
6:15  265:24
**Anderson-7**
6:18  278:5
**Anderson-8**
6:21  282:16
**Anderson-9**
7:6  288:7
**Anderson's**
176:21
annotate
302:1  303:22
Answer  10:5
13:16, 22
17:13  23:15
24:6  26:12
30:9  31:20
32:5  34:13,
18  35:4, 9, 15
37:5  39:10
65:14  91:19
93:7, 10
95:20  96:8
98:19  100:10
126:8  172:12
175:12  180:7
181:15
182:11  183:2
225:8  228:17
241:12
242:17
249:18
271:13  285:4
289:2  317:1
319:13, 21
321:16  323:7
326:14, 22

328:16
332:24
402:22
403:24
404:20
405:13  421:11
answered
24:2  27:10,
19  28:4  31:6,
19  32:11, 19
36:5  70:23
72:19  85:12
91:2  95:4
116:3  142:12
202:10
214:13  215:1
239:24
240:15
241:11  329:3
348:7  425:11
442:12  443:9
answers  13:5
28:8  34:19
132:8  460:8
anthrax  249:7,
9, 23  250:20
anticipated
250:11, 12, 14
434:11
anticipating
418:21
anticipation
435:13
anybody
12:21  196:11
354:15, 22
anyway
276:19
apart  69:22,
23  117:7
188:1, 7
261:13  286:7,
9, 13  348:10
349:23
API  38:1, 8
39:17  40:24
41:4, 10, 18,
20  42:14, 19,
24  43:4, 8
50:5, 10, 15,
22  66:24

67:19  69:15
103:11  104:6
125:11  128:9
129:1, 13, 24
132:2, 14
134:2, 4, 15
135:1, 3, 9, 17,
18, 21  136:4,
10, 12, 19, 22
137:6, 14, 20,
24  139:7, 11,
16, 22  140:4,
18  141:15, 21,
23  142:8, 14
143:5, 18
144:1, 10
145:11, 16, 21,
24  147:8
148:10, 15
149:7, 19
150:8, 18
151:24
152:19  154:2
155:18
156:15  157:2,
4, 5, 9  158:16
159:1  160:4,
10  172:7
173:3, 12, 18
175:4  176:6
177:9  193:23
197:12, 19
198:5, 11
206:23
207:21  210:9
211:6  214:19,
22, 23  215:12
216:1, 13
217:2, 17
218:11, 18
219:3, 13, 20
221:1, 14, 23
223:21
224:16
225:12, 16
227:7, 9
228:13  230:4,
11  231:3, 13
233:7  234:6,
14, 16, 18, 24
235:12, 16

237:10, 14, 22
238:4, 13
245:16, 22
248:8  250:14,
23  254:10, 19
255:6, 8, 20
262:20
263:17, 21
264:8  268:7
276:8, 18, 24
278:9  280:24
281:3  290:17
291:23
296:19
299:11, 18
300:15  303:1,
5  305:6
306:11, 20
307:7  308:9
353:12  355:4,
17, 23  356:7,
17  358:5, 9
360:6  362:17
363:3  364:1
365:11  366:8
367:1, 8
370:9, 18
371:1  373:7
374:5  375:20,
23  376:2, 10,
20  378:1, 19
381:4, 20
382:11, 22
387:14, 22
388:23  389:9,
21  392:17
399:11  400:2,
10  402:19
403:22  404:6
408:5, 11, 21
**APIs**  128:17
141:12
144:20
149:12
199:12  201:6
202:8  213:19
214:11
264:12, 22
266:20  453:5
**APL-
MDL2875-**

Confidential Information Subject to Protective Order

**00964965-70**
8:*11*
**apologies**
455:*19*
**apologize**
110:*16* 129:*12*
**appear** 55:*5*
71:*4* 79:*1*
107:*17* 153:*4*
168:*15*
208:*17*
291:*16*
317:*11*
406:*11*
446:*14, 21*
447:*2, 21*
448:*13*
**APPEARANC**
**ES** 2:*1* 3:*1*
4:*1*
**appeared**
62:*20* 63:*11*
67:*6*
**appearing**
144:*7* 443:*2*
**appears** 60:*21*
107:*17* 110:*7*
111:*6* 112:*5*
117:*9* 174:*11*
185:*10, 20*
208:*15*
210:*16*
248:*13* 267:*4*
314:*23* 315:*2*
341:*20*
382:*11*
433:*11* 435:*9*
450:*12* 451:*6*
**appended**
238:*12* 409:*8*
**appendix**
54:*16* 55:*18*
56:*7* 383:*8,*
*23* 385:*10*
395:*23* 409:*3*
454:*3, 5*
**applicable**
157:*11*
**applicant**
401:*2, 3*

**application**
28:*16* 141:*17*
142:*24*
145:*14* 146:*6*
218:*3* 219:*18*
238:*17*
245:*18*
247:*12*
297:*22* 298:*23*
**applications**
119:*23*
139:*24* 142:*4*
**applied** 30:*2*
31:*2* 77:*20*
82:*17* 89:*16*
92:*12, 14, 19*
94:*5* 98:*2, 3*
288:*22* 289:*6*
300:*20* 303:*2*
399:*11*
**APPLIES** 1:*6*
88:*14* 93:*3,*
*20* 302:*9*
304:*11* 451:*9*
**apply** 16:*13,*
*15* 22:*17*
32:*15* 89:*10*
301:*3* 302:*16,*
*23* 303:*5*
306:*10* 307:*6*
457:*19*
**applying**
28:*23* 184:*5*
**appreciate**
49:*3* 52:*4*
59:*24* 86:*8*
132:*7* 320:*15*
340:*17* 387:*10*
**appreciated**
116:*19*
**appreciation**
100:*24*
269:*15*
270:*12* 373:*3*
**appropriate**
228:*12* 238:*1*
256:*1, 12*
257:*12*
320:*20* 328:*6*
370:*16* 401:*9*
458:*6*

**approval**
110:*20* 142:*2,*
*23* 146:*5, 11*
219:*24*
**approve**
147:*13*
**approved**
139:*24*
140:*21*
141:*17*
142:*22*
143:*24*
145:*13*
217:*24*
219:*23*
224:*13*
238:*16*
245:*17*
246:*20* 249:*2*
265:*4* 297:*22*
420:*4*
**approximately**
51:*3* 411:*17*
456:*4*
**ARB** 8:*20*
**arbitration**
415:*7*
**Arch** 2:*19*
**area** 315:*18*
**areas** 77:*14*
85:*20* 315:*17*
323:*18*
**argumentative**
181:*18*
182:*20* 205:*1*
345:*24*
**arisen** 67:*9*
**arises** 43:*16*
**arising** 136:*16*
291:*5* 292:*11*
341:*24*
**arose** 159:*22*
301:*6* 376:*1*
**arrangement**
176:*16*
**arranges**
420:*22*
**arrived** 261:*6*
**Arrow** 48:*1,*
*10* 49:*13* 98:*8*

**article** 164:*16*
166:*1* 177:*10*
189:*4* 190:*10*
**artifact** 43:*15*
**aside** 21:*1*
40:*12* 240:*11*
270:*21* 275:*8*
287:*20*
289:*24*
292:*17*
305:*10* 313:*2*
335:*16*
408:*23* 425:*6*
**asked** 14:*10,*
*11* 24:*2* 25:*9*
27:*10, 19*
28:*4* 30:*16*
31:*6, 19*
32:*11, 19*
33:*12* 34:*6*
35:*9, 17, 23*
36:*5, 13, 20,*
*22* 37:*11, 14,*
*23* 38:*6, 14*
40:*8* 47:*12*
70:*23* 72:*19*
85:*11* 86:*10*
87:*18* 88:*3, 7*
89:*2, 20* 90:*8,*
*19* 91:*2, 10*
94:*17* 95:*4*
116:*3* 142:*12*
158:*5* 170:*20*
171:*5* 181:*5*
182:*4, 17*
183:*6* 202:*10*
214:*13* 215:*1*
220:*24*
239:*23*
240:*14*
241:*11* 258:*4*
260:*14* 270:*6*
274:*14* 281:*8*
284:*9* 285:*21*
286:*3* 319:*6*
321:*12* 326:*9*
328:*23* 348:*7*
424:*1, 15*
425:*2, 11*
430:*16*
432:*23* 442:*1,*

*12* 443:*9*
444:*1, 20, 24*
446:*16*
**asking** 13:*4*
15:*12* 26:*17*
29:*15, 24*
30:*21, 23*
35:*4* 36:*19*
69:*1* 96:*13*
101:*7* 118:*4,*
*12* 181:*2, 7*
182:*1* 209:*8*
216:*7* 258:*8*
270:*15*
271:*16, 17, 18*
283:*21* 286:*7,*
*14* 296:*22*
315:*23* 317:*3*
366:*1* 369:*4*
399:*4, 15*
**asks** 270:*23*
**aspect** 248:*7*
**aspects** 86:*11*
260:*11* 370:*8*
374:*3* 419:*11*
426:*14*
**assay** 230:*3*
**assays** 129:*6*
420:*2, 4*
**assertion**
276:*5*
**assertions**
180:*20*
**assess** 140:*23*
148:*11* 211:*4*
253:*8*
**assessed**
147:*12* 219:*20*
**assessment**
38:*20* 230:*10,*
*17* 232:*1, 6,*
*11, 14, 17, 21*
304:*11* 306:*22*
**assessments**
230:*14* 231:*2,*
*12, 17* 233:*6*
**assets** 92:*8*
**assignments**
416:*13*
**assistance**
414:*23*

associated
206:6   237:1
263:20
371:18   372:6
373:3
assortment
149:12
assume   13:10
36:20, 22
37:11, 23
38:6, 14   54:7
assuming
37:17
assumption
36:18
assumptions
36:14   37:7
38:5
assurance
215:23
374:13   417:4
assurances
218:9, 16
assure   151:24
155:17
214:18
261:19   284:3
Atlanta   2:10
atorvastatin
448:8
attach   177:20
178:21
attached
178:18   210:9
212:12
281:19, 22
282:3, 7, 21
283:9   413:1
458:12   460:11
attachment
383:18   414:12
attempt   13:12
396:16
attempted
427:5
attention
208:8, 12
226:17, 19, 23
253:22   287:17
attest   143:11
151:7   198:14

attorney
458:16
attorney/client
96:7
attributable
133:16   135:7
137:4   381:24
attributed
135:16
Audio   65:12,
15
Audit   7:17
8:7   62:15
304:14, 17
306:24
309:15   311:2,
17, 20   313:14,
19   317:7, 11
319:8, 17
320:20
321:23
322:24
323:11
325:22
326:12   327:9,
12   328:11
329:9, 10, 12
330:3   331:17,
22   332:3
333:24
335:13   338:5
339:23   340:8,
21   341:16
343:1   346:3,
6   348:12
357:3   363:22
364:2, 4
366:12
373:17
378:24   379:1
381:12
382:12, 14
394:6, 18, 23
396:22   403:3,
5   404:4, 7
405:16   454:10
Auditing   7:14
283:10
284:19   287:2
302:5, 10
331:13

auditor   67:10
308:22   323:9
329:11, 17, 20
330:20, 24
332:12   333:2
407:5
auditors
14:13   33:2
75:6   306:17
307:2   309:5
314:7, 9
320:3   321:13,
16   323:1
326:20   327:4,
8, 13, 20
328:9   329:1
330:1   331:20
332:2, 4
333:23
335:10
402:18
403:20
405:18   453:21
Audits   7:17
33:15   35:19
103:13   105:1
159:24
173:18
283:13
303:11   304:3,
12, 23   306:18,
20   313:20
318:2, 4
324:23
336:16
338:10
360:10   363:8
376:12
383:11   396:17
August
138:11
165:20
167:13
187:19
188:19
189:24   191:3
192:14
194:11
266:14   267:1
268:4   269:1,
6   270:6

272:24   273:3
281:10, 12
282:23
339:12
368:13
385:19   388:7
395:11   446:10
authorities
35:21   266:18
269:6   435:14
436:13, 14
authority
54:23   56:1
136:17
157:11   158:2
162:20
250:12   270:6,
23   271:9, 12
374:9   453:23
authority's
54:6
available
59:17   60:3,
13   65:4
68:10   97:5
109:19
184:11
214:10
313:21   406:18
Avenue   3:16
awarded
423:23
aware   46:1
47:2, 6   87:12
91:5   94:13,
23   132:19
138:6, 24
139:19   164:3,
6, 7   165:24
185:22
191:12, 16
192:4, 6
198:8, 12
202:5   203:9,
22   204:16
205:12   217:5
230:9, 16
234:4, 12, 17
235:15
252:18
253:18   255:4

256:6   262:19
266:23
281:17   337:6,
17   350:6, 9
351:8   353:7,
8   354:24
355:8, 13, 14
356:15, 19
358:8   394:2
398:1, 2, 3, 23
399:3, 14
awareness
233:17
azide   201:19

< B >
back   39:3
49:1   53:11,
13   58:3
66:17   83:17
102:8   103:1
118:21
120:20, 22
157:16   160:3
196:3, 9
229:16
233:12   267:7,
10   272:3
274:16
275:21   287:6
313:3   314:18
320:14
343:17
354:11, 14
361:17
394:22   402:6
404:15, 18
405:4, 7, 10
417:11
428:10   442:4
back-and-forth
95:22
background
416:7
backstory
185:4, 21
badly   187:9
BARNES   3:15
barrel   364:18
base   136:23

based 22:13
142:24
145:15, 20
162:13
171:12 172:4
200:8 231:17
238:22 249:2
293:16
294:23
306:21 322:7
basically
284:23
basis 69:5
76:9 143:11
162:20
236:17
258:24
384:15
386:24 387:3
388:1, 21
389:6 391:18
421:20 441:20
batch 42:18
43:7 349:8, 9
batches 41:13
391:7
Bates 66:3, 8,
10 67:23
70:16 165:12
167:8 266:7
311:9 438:24
Baxter 423:14,
23
Bayer 417:2,
7 419:20
bear 78:21
bearing 24:18
becoming
165:24
began 149:18
227:3 231:22
264:16
338:21 416:9
beginning
1:15 165:12
313:12 359:8
370:1
begins 133:15
200:2 267:22
370:6 390:18
450:2

behalf 400:1,
2 419:9
belabor 57:22
belief 160:5
234:11
238:21
364:11 401:8
believe 12:18
25:15 39:2
43:22 46:20
48:19 49:11
51:6 53:22
74:13 89:15
118:21
126:24
128:12 143:8
152:13 154:7
155:22 156:1
162:8 175:1,
19 177:2, 23
178:11
196:20 229:4,
7 233:22
235:6, 20
246:9 247:5
251:22
263:23 275:2
279:11
293:15 307:9
315:10 324:7
328:1 336:4
339:16
342:16
351:12 357:9
363:20, 23
368:17
369:12, 15
372:10
382:15 386:5
387:8 401:12
412:18 437:3,
7, 11 439:6
441:9
believes 125:8
284:18, 20
believing
274:19
belonged 92:9,
10
belongs 284:21

benefit 416:5
best 208:19
better 105:24
325:18 423:16
beyond 41:8
152:11
208:14, 21
209:18 210:3
211:14
384:18 421:7
big 191:19
billion 248:18
Binsol 133:17
134:16 135:8,
17 136:11
137:5
Binsol's
132:24
133:22 134:8,
24
bio 265:15
bioanalytical
416:20
bioequivalence
417:23
bit 36:16
43:12 103:2
134:20
152:15 177:1
198:2 285:7
315:11
320:15
325:16 340:3
381:10
black 180:18
blended
364:12 365:5,
20 377:8
382:19 383:3,
4
blending
360:19
363:10 365:2
379:2, 10
Bloomberg
164:16
165:24
167:18 178:23
body 47:5
63:22 66:12,
17 68:21

70:15 74:3
84:3 131:16
174:9 239:21
243:19 289:9
294:18
342:19 454:2
boilerplate
451:7
bold 273:6
BOSICK 4:1
Boston 3:11
bottom
112:14
166:19, 21, 24
188:14
269:14, 17
270:2 273:21
283:3 370:4
438:9, 14
440:4 446:19
bottommost
266:13
bought 92:6,
7, 8
box 79:18
277:23
brand 211:17
417:14
break 13:20
53:8 105:21
106:1, 7, 11
120:12, 17, 24
121:8 176:17,
21 195:14, 16
196:12, 15
265:15
275:11, 19
353:20, 23
354:2, 4, 9, 16
402:3 405:2
breakages
407:10
BRIAN 2:19
briefly 60:14
416:6
bring 29:22
121:22
287:15
309:20, 23
bringing
100:18 179:8

broad 30:8
263:16
bromocriptine
417:18
brought 111:4
187:19
215:18
233:11
287:16, 17
build 417:14
building
208:18 209:3
Bullet 312:5
341:1
bullets 133:13,
21 296:1
370:1 390:17
bunch 174:15
butyl 43:24
buying 213:19
214:11 237:14

< C >
C.F.R 121:19
123:8
c.whiteley@ka
nner-law.com
2:6
C20213-17-339
391:4
C20213-17-340
391:5
call 47:21
54:3 77:7
called 87:8,
10 276:7
Calls 19:11
20:19 21:8
23:13 24:1,
22 26:11
28:4 29:4
30:5 31:6
32:19 33:10
34:1 35:1
370:20
CAMDEN 1:2
Camp 2:4
campaign
268:16
Campus 2:14

Confidential Information Subject to Protective Order

| | | | | |
|---|---|---|---|---|
| capable 100:*18* | catalysts 196:*24* | 168:*20* | 159:*23* | cGXP 297:*13* |
| capture 178:*1* | categorically | 170:*10* 189:*6* | 215:*17, 21* | 298:*5* 299:*8,* |
| captures 454:*5* | 19:*5* | 190:*9* 191:*11* | 217:*21* 218:*7* | *20* 300:*8* |
| carcinogens | category | 192:*8* 193:*5* | 219:*8, 11* | chain 165:*11* |
| 45:*11* 46:*6* | 193:*23* 307:*10* | 197:*5* 216:*17* | 221:*12, 21* | 199:*2* 266:*6,* |
| career 416:*8* | caught 224:*15* | 226:*16, 20* | 222:*12* 223:*9,* | *9, 10* 267:*7* |
| careful 126:*21* | 250:*15* | 233:*10* | *15* 237:*24* | 339:*11* 340:*4* |
| carefully | cause 197:*18* | 343:*12* | 239:*2* 243:*9* | challenge |
| 458:*4* | 366:*24* | 348:*24* 360:*3* | 245:*11* | 116:*13* |
| carried 79:*5* | 422:*13, 23* | 372:*3* 378:*9* | 247:*17* 248:*3,* | challenging |
| 81:*12* 84:*16,* | caused 102:*13* | 387:*2* | *6* 256:*11* | 116:*11* |
| *21* 85:*1, 8, 15* | 454:*15, 24* | certificate | 257:*13* | chance 166:*13* |
| 86:*17* | Causes 8:*22* | 65:*11* 66:*4, 6* | 259:*12, 21* | 167:*22* |
| case 14:*15* | 155:*24* | 69:*4* 73:*10* | 260:*10* | change 92:*19* |
| 16:*22* 17:*1, 4* | 196:*18, 22* | 156:*18* 457:*2* | 264:*18* 265:*1,* | 400:*18* 401:*6,* |
| 21:*15, 18* | causing 440:*6* | certificates | *6, 7* 270:*4* | *20* 411:*13* |
| 22:*6* 23:*11,* | CBE 400:*19* | 64:*23, 24* | 271:*1* 274:*6* | 451:*24* |
| *23* 24:*10, 20* | 401:*20* | 65:*7, 22* 67:*6,* | 275:*1* 297:*18* | 454:*15* 455:*1* |
| 25:*13* 26:*1, 9,* | CBE-30 401:*8,* | *14, 17* 68:*1, 4,* | 309:*9* 310:*5,* | 459:*4* |
| *21* 27:*8* 35:*7,* | *16* | *6, 9, 14* 69:*8,* | *8, 12* 312:*8,* | changed |
| *14* 37:*16, 18* | CDPs 157:*13* | *9, 12, 14, 15* | *17* 343:*13* | 157:*20* |
| 40:*14* 45:*7* | ceased 352:*19* | 70:*5, 9, 13, 17* | 355:*24* | 246:*12* 414:*17* |
| 60:*11* 68:*18* | 356:*12* 378:*6* | 71:*2, 22, 23* | 366:*20* | Changes |
| 93:*19* 124:*14* | 395:*12* 452:*14* | 72:*10* 73:*19* | 367:*20* | 401:*4* 415:*23,* |
| 134:*3* 144:*12,* | celebrate | 74:*8, 19* | 370:*16* | *24* 416:*2* |
| *14* 148:*10* | 416:*8* | 238:*9* 239:*5* | 374:*12* 375:*2* | 458:*11* 460:*10* |
| 157:*20* | Center 3:*3* | 240:*3, 9, 19* | 376:*8, 17* | changing |
| 169:*12* | 416:*23* | 241:*4, 8, 15* | 385:*8* 387:*21* | 415:*20* |
| 170:*10, 13* | Centre 4:*4* | 242:*15, 21* | 391:*20* 393:*4,* | characterizatio |
| 172:*1* 185:*19* | CEO 195:*5* | 244:*9, 16* | *14* 418:*17, 18* | n 128:*17* |
| 208:*18* 209:*2* | CEP 359:*18* | 442:*7, 21* | 419:*8, 11, 22* | 187:*7* 267:*11,* |
| 267:*5* 279:*15* | certain 47:*13* | 443:*2, 3, 12,* | 420:*8, 9, 10* | *23* 268:*14* |
| 355:*6* 360:*23* | 48:*12* 87:*5* | *16, 20* | 421:*18, 21* | characterizatio |
| 362:*3* 363:*17* | 123:*16* 175:*6* | certification | 423:*6* 432:*7* | ns 440:*24* |
| 374:*24* 375:*8* | 182:*23* 201:*5* | 365:*2* 457:*18* | 433:*2* 434:*20* | characterize |
| 409:*1, 13* | 215:*24* | Certified 1:*17* | 436:*23, 24* | 115:*17* |
| 410:*9, 24* | 220:*12* | 457:*13, 14* | 439:*20* | 148:*11* 211:*5* |
| 414:*20* 415:*2* | 260:*11* 261:*8* | CERTIFY | cGMP-related | 253:*8* |
| 424:*14, 20* | 263:*18* | 457:*5* 460:*5* | 27:*1, 12, 21* | characterized |
| 425:*4, 21* | 295:*16* 362:*6,* | certifying | 28:*7, 21* 29:*7* | 45:*15* 76:*12* |
| 427:*11* 429:*3* | *7* 365:*6* | 457:*22* | 31:*11* 32:*22* | 116:*5* 136:*14* |
| 442:*2, 20* | 388:*3* 419:*11* | Cgannon@wals | 36:*11* | 183:*10* 268:*6* |
| 444:*17* 452:*1,* | 429:*8* | h.law 3:*6* | cGMPs 5:*22* | characterizing |
| *21* | certainly | cGMP 14:*12* | 106:*15* | 146:*23* 186:*19* |
| CASES 1:*7* | 55:*19* 73:*1* | 28:*24* 30:*2* | 109:*24* 112:*9,* | CHARCHALI |
| 415:*10, 13* | 88:*18* 94:*3* | 31:*23* 33:*1, 6,* | *19* 220:*16* | S 3:*15* |
| 420:*5* 432:*2* | 98:*1* 115:*13* | *19* 34:*4* | 418:*16* | chart 386:*18* |
| casually | 125:*16* 126:*3* | 106:*16* 107:*1,* | 419:*16* 420:*8* | 409:*5* |
| 427:*16* | 158:*23* 160:*1* | *5* 113:*11, 16* | 422:*13, 23* | charts 383:*9* |
| catalyst 43:*21* | 163:*7, 22* | 128:*21, 22* | 431:*8, 23* | chased 222:*11* |
| | | 129:*15* | | |

chasing 222:4
chat 15:4, 18
check 105:22
chemical 204:6
chemist 416:18 417:9
chemistry 210:22 418:12
cherry-picked 107:10
cherry-picks 114:21
chloride 43:21
choices 372:22
choose 124:21 181:23
chose 115:16 426:1
chosen 88:24
CHRISTINE 3:3
CHRISTOPHER 4:3
chromatograms 390:24
chronological 191:1
Chuannan 326:10 334:21
Ciba 418:7
circumstance 173:7 184:1 251:3
circumstances 145:8 160:14
citation 60:19, 20 61:8 67:24 74:19 107:18 366:10 368:21
citations 349:8 387:24 426:2 443:19
cite 59:20 71:5 88:13 94:9 97:12 98:14 129:21 198:3 232:15 242:8, 11 278:8 281:18

282:4 287:21 288:10
289:19, 21 290:19 293:8 295:21
301:19 302:1, 20 303:10, 22 304:3 305:13 306:8 307:4 376:15 377:1, 22 378:15 391:18 397:8 443:5
cited 68:20 72:22 74:2 134:16 154:18 243:19, 23 296:23 307:2 324:7 377:6 398:20 407:20 427:19, 20 431:6
citing 69:3 174:16 296:17
CIVIL 1:4
claim 32:9, 16 33:7, 22 34:22
claiming 70:18
claims 36:2, 7 424:13, 18
clarification 39:17
clarified 76:3 106:23
clarify 414:10 415:16
clarifying 415:21
Class 8:20 16:17, 21, 24 17:1, 3, 5, 6, 8, 21 18:8, 14, 17, 21 19:1, 4, 8, 20 20:1, 4, 7, 12, 16 21:4, 14, 22, 23 22:6, 10, 14, 23 23:5, 10, 22 24:9, 19

25:12 26:1, 9, 21 27:8, 16 28:2 29:1, 13 30:3, 17 31:1, 4, 16 32:9, 16 33:7, 22 34:23 36:3 424:19 425:9, 19
classification 400:22, 23
classifications 311:16
classified 251:1 400:19
classify 401:19
clause 433:22, 23
clauses 103:24
clean 178:8 371:6
cleanliness 373:7
cleanly 161:15
clear 57:12 89:18 90:2, 7 92:2, 18 111:11 148:1 161:23 181:6 289:18 415:15 449:11
cleared 178:13
clearly 81:11 93:22 181:1 183:11 274:24 316:22 333:1
client 172:6 173:1
clients 170:9, 11 171:22 172:17 418:24
Clinton 416:11
clonazepam 448:7
close 96:6
closed 261:17
closely 63:12
closure 352:15, 17

clozapine 417:17 448:7
coach 100:13
COAN 3:10
coffee 265:15
cohort 45:23 147:16, 21 148:12 253:8, 12, 16
colleagues 283:21
collect 298:17
collected 129:7
collecting 406:14
collection 286:9 410:7
collectively 47:12
colloquy 158:9
color 62:2 309:24
column 383:24 386:19
combination 312:11
combined 380:24 433:22
come 39:3 47:22 230:7 253:10 258:1 263:19 272:3 313:3 411:20 453:16
comes 261:1
coming 227:23 286:24 379:4 454:14
commas 104:1
comment 31:10, 24 32:2, 21, 23 61:7 152:10 172:21, 22 179:8 189:11 256:9 270:14 274:2 284:17 322:16, 22 323:13 335:23 336:9

449:14, 21 450:3
commentary 81:7 180:2 352:21 361:3
commented 34:5 186:17 365:13
commenting 26:24 27:11, 21, 24 28:7, 20 29:7 34:4 36:10 322:5 323:18 337:14
comments 33:5 70:11 181:19 348:21 367:12
commission 460:21
common 133:23 134:14 201:4 334:7 338:17 421:1, 16
commonly 380:4
communicate 121:5 125:2 144:10 163:17, 18 168:21 191:4 196:11
communicated 96:10 118:24 119:6 120:3 143:13 153:23 168:24 294:24 345:11 371:12 420:18
communicates 125:11 190:9
communicating 144:12 163:6 255:5
communication 168:10

191:*10*  281:*2*
294:*9, 13*
**communication
s**  95:*21*
153:*19*  154:*7*
187:*24*
294:*17*  295:*2,
6*
**companies**
47:*22*  48:*2*
83:*14*  85:*20*
92:*13, 15*
336:*17*  431:*22*
**company**
47:*20*  49:*14*
80:*14, 23*
81:*13*  86:*15*
89:*17*  92:*5, 8*
97:*8*  106:*16*
107:*5*  113:*10,
16*  191:*19*
195:*3*  206:*20*
305:*7*  401:*19*
426:*12*  441:*18*
**company's**
107:*6*
**compare**
232:*20*
**comparing**
79:*12*  210:*23*
**comparison**
60:*18*  61:*3,
14, 16, 20*
63:*1*  83:*5, 24*
97:*4*  207:*5*
289:*16*
**complained**
257:*6*
**complaining**
17:*24*  258:*23*
**complaint**
80:*15*  136:*16*
155:*2*  258:*6,
12, 15, 17*
259:*9, 10, 14,
16, 17, 19*
260:*4, 17*
261:*4, 5, 6, 14,
17*
**complaints**
17:*18*  18:*3, 6,*

*8, 14*  21:*13,
23*  80:*6*
256:*19, 21, 24*
257:*3, 19, 20,
24*  259:*6*
260:*8*
**complete**  57:*7*
81:*9*  114:*14*
171:*4*  184:*11*
249:*20, 22*
297:*7*
**completed**
58:*13*  67:*20*
267:*12, 24*
268:*14*
273:*24*  450:*4*
**completely**
39:*20*  106:*19*
108:*3*  113:*24*
115:*11*  116:*1,
6, 14*  250:*21*
330:*16*
**completion**
457:*8*
**Compliance**
6:*19*  156:*24*
219:*11*
222:*12*
223:*15*  239:*2*
243:*9*  245:*11*
247:*17*
297:*18*
309:*10*  310:*5,
8, 12*  367:*20*
376:*8, 17*
387:*21*
391:*20*
393:*14*
419:*12, 22*
421:*18, 21*
**compliance-
related**  280:*10*
**complying**
106:*16*  107:*5*
113:*10, 16*
152:*20*
**component**
419:*12*
**composed**
81:*15*

**Compound**
34:*1*  64:*4*
200:*20*
202:*24*
204:*10, 14*
221:*3*  222:*3*
246:*16*
264:*24*  299:*23*
**compounds**
202:*7*  206:*4,
18*
**comprehensive**
426:*22*  428:*1*
**comprise**
63:*18*  77:*14*
**comprised**
47:*20*
**computer**
15:*16*
**concentration**
197:*9*  206:*1*
210:*8*
**concentrations**
206:*8*  207:*13*
208:*4*  240:*23*
**concept**
186:*20*
**concern**  45:*24*
147:*17, 21*
148:*13*  185:*1*
186:*4*  206:*2*
253:*9, 13, 17*
381:*15*
**concerned**
189:*3*  208:*11*
226:*2*  265:*2*
336:*13*  338:*9*
**concerning**
26:*5*  123:*9*
227:*4*  231:*11*
338:*23*
387:*20*  400:*18*
**concluded**
456:*3*
**conclusion**
17:*12*  19:*12*
20:*20*  21:*9*
23:*14*  24:*1,
23*  26:*11, 14,
18*  28:*5*  29:*5*
30:*6*  31:*7*

32:*20*  33:*11*
34:*2*  35:*2*
107:*9*  375:*24*
392:*1*  452:*19*
**conclusions**
407:*17*
**conclusive**
207:*9*
**conclusively**
235:*9*
**condensate**
398:*8*
**condition**
256:*7*
**conditions**
123:*17*  146:*17*
**conduct**  41:*23*
231:*1*
**conducted**
35:*20*  170:*17*
173:*19, 24*
230:*10, 17*
304:*12*
336:*16*
343:*21*
371:*19*
392:*16*
418:*16, 18*
**conducting**
43:*7*  231:*11*
233:*6*  332:*20*
**conduit**  190:*6*
194:*24*
**conference**
12:*16*  120:*4*
**confident**
380:*16, 17*
**CONFIDENTI
AL**  1:*8*
**confine**  132:*8*
**confirm**  93:*1*
190:*14*  273:*8*
274:*5, 17*
283:*21*
285:*18*  286:*1*
336:*7*  413:*2*
441:*6, 21*
451:*8*  452:*16*
**confirmed**
39:*16*  76:*6*
149:*9*  200:*10*

202:*18*  233:*2*
297:*12*  299:*8,
20*  300:*8*
388:*22*  404:*17*
**conflict**  327:*12*
**conform**
141:*16*
145:*22*
223:*14*
224:*11*
245:*18, 24*
246:*20*
247:*10, 17*
249:*1*  443:*14*
**conformance**
64:*24*  65:*8,
11, 23*  66:*4, 6*
68:*14, 15*
70:*9, 18*
71:*22*  72:*11*
74:*9*  122:*17*
142:*17*  146:*4*
244:*23*  384:*24*
**conformed**
238:*11*  248:*9*
**conforming**
217:*23*
238:*23*  376:*8*
**conforms**
141:*24*
254:*23*  375:*2*
**Confusing**
323:*5*  332:*23*
**conjunction**
265:*4*
**CONLEE**  2:*3*
**connected**
411:*4*
**Connecticut**
12:*15*
**connection**
41:*17*  43:*3*
71:*1*  96:*1*
215:*11*  327:*9*
446:*15*
**consequence**
67:*9*  153:*24*
197:*11*
**consider**
107:*10*
170:*12*  171:*3*

Confidential Information Subject to Protective Order

180:*8* 263:*6*
349:*15* 444:*15*
**consideration**
63:*14* 172:*15*
253:*16* 353:*5*
442:*18*
**Considered**
5:*19* 46:*4*
56:*5, 12* 57:*5,*
*6, 14, 18* 58:*4,*
*22* 59:*12*
60:*2, 10, 22*
61:*11* 63:*6*
64:*14, 22*
66:*2* 68:*8*
69:*24* 70:*2*
71:*3, 5, 11*
72:*2* 74:*16*
75:*3, 11, 23*
80:*23* 106:*18*
113:*12, 18*
163:*19, 23*
174:*17*
239:*15, 20*
244:*5, 17*
278:*20* 279:*9,*
*17, 20* 295:*5*
314:*22*
323:*24*
342:*13, 15*
347:*14*
349:*14*
368:*22* 409:*8*
438:*7* 439:*15*
442:*5, 9, 15*
**considering**
257:*22*
**consistent**
147:*1* 168:*3*
219:*10*
**constitute**
134:*1* 136:*21*
291:*2* 294:*12*
299:*19* 300:*7,*
*23*
**constitutes**
17:*17*
**constraints**
320:*24*
**construction**
331:*9*

**consult** 75:*5*
279:*14*
**Consultants**
416:*12*
**consultative**
415:*9*
**consulted**
409:*21*
**consulting**
177:*13*
409:*12* 411:*3*
418:*10* 419:*15*
**contact** 378:*8*
**contacting**
300:*6*
**contain** 37:*20*
40:*16* 41:*15*
42:*10, 19*
72:*4* 102:*11*
122:*12*
228:*24*
237:*11* 247:*6*
248:*8* 259:*23*
261:*20* 452:*10*
**contained**
37:*13* 38:*10*
39:*7* 40:*1, 7,*
*22* 62:*17*
174:*8* 233:*8*
237:*7* 246:*10*
372:*14* 443:*13*
**containing**
117:*24*
**contains**
157:*1* 181:*16*
**contaminant**
126:*23* 127:*1*
249:*11, 24*
251:*1* 252:*5*
**contaminants**
122:*12*
**contaminated**
126:*16* 127:*5*
**contamination**
197:*12* 252:*7,*
*9, 13* 366:*24*
386:*4*

**contaminations**
250:*2, 5*

**Cont'd** 3:*1*
4:*1* 6:*2* 7:*2*
8:*2* 9:*2*
**content** 119:*8*
174:*6* 175:*14*
182:*23*
246:*22*
295:*10* 326:*3*
**contents**
317:*21*
**context** 31:*11,*
*23* 44:*14*
107:*16* 114:*7,*
*10, 14* 115:*5,*
*8, 14* 116:*18,*
*21, 24* 117:*3,*
*7* 125:*20, 22*
127:*14*
132:*22*
157:*18* 159:*7,*
*17* 187:*4*
204:*7* 215:*21*
218:*7* 220:*15*
228:*7* 250:*8*
257:*2* 269:*16*
270:*13* 272:*8*
273:*16* 274:*8,*
*11* 296:*23*
297:*15* 298:*5*
300:*18* 308:*1,*
*16* 310:*13*
320:*12*
333:*12* 334:*5,*
*9* 347:*24*
355:*11* 358:*7*
381:*22* 408:*6,*
*20* 418:*15, 19*
420:*18*
430:*22* 431:*2,*
*14* 432:*12, 21*
435:*10*
442:*23*
449:*15, 19*
**continuation**
449:*12*
**continue** 85:*3*
118:*3* 234:*9*
245:*20*
246:*18* 449:*16*
**continued**
50:*11, 18*

80:*4* 82:*24*
86:*5* 196:*6*
255:*20* 380:*20*
**continues**
78:*24* 113:*2*
200:*12* 201:*3*
359:*15* 449:*17*
**Continuing**
450:*1*
**Contract** 6:*19*
371:*5*
**contracts**
374:*20*
**contractually**
376:*10*
**contrary** 320:*1*
**contrast** 62:*10*
**control** 76:*20*
82:*12* 85:*21*
135:*9* 208:*19*
219:*16*
253:*11*
375:*23* 417:*4*
457:*21*
**controlled**
229:*1* 384:*18*
**controlling**
221:*7*
**controls**
418:*12*
**conversation**
193:*18*
**conversations**
37:*2* 93:*8*
192:*20* 193:*3,*
*4* 224:*4, 23*
**convey** 137:*10*
**convinced**
149:*5, 16*
**cooperate**
184:*6* 185:*8*
**cooperation**
179:*23* 184:*9*
441:*4*
**cooperative**
190:*13*
**copies** 95:*13*
**copy** 15:*3, 6*
16:*5* 166:*5, 6*
281:*18*
289:*11*

301:*18*
303:*21* 311:*1*
368:*11* 414:*8*
**core** 63:*18*
**CORP** 77:*1*
78:*17, 18, 21*
79:*21* 91:*6*
92:*22* 98:*23*
101:*11*
276:*23* 277:*21*
**CORP-0001**
77:*2, 15, 19,*
*24* 82:*12*
83:*18* 84:*11*
99:*9, 22*
**CORP-0016**
7:*14* 301:*12*
302:*1*
**CORP-0076**
7:*11* 292:*18*
293:*7*
**CORP-0111**
6:*18* 281:*5*
305:*17*
**CORP-0126**
306:*23* 308:*17*
**CORP-0131**
7:*16* 303:*10*
**CORP-0134**
290:*1*
**CORP-0176**
279:*8*
**CORP-0539**
7:*6* 287:*22,*
*23, 24* 288:*9*
**CORP-1034**
7:*7*
**CORP-1076**
279:*19*
**CORP-176**
278:*15* 279:*4*
**CORP-**
**designated**
82:*16* 87:*23*
**corporate**
78:*3* 79:*23*
80:*8* 82:*13*
99:*6* 194:*23*
298:*14* 423:*13*
**Corporation**
3:*19* 417:*13*

Confidential Information Subject to Protective Order

corporations
80:*1*
corps  283:*9*
284:*3*
Correct  12:*19*
13:*18*  14:*16,*
*17*  16:*7, 11*
21:*20*  22:*11,*
*12, 20*  23:6, *7,*
*23*  24:*7*
25:*22*  28:*13,*
*14, 18*  29:*20,*
*21*  30:*19, 20*
42:*5, 11, 14*
43:*10*  44:8, *9*
47:*16*  48:*14*
50:*16, 17, 20*
51:*20*  52:*20*
53:*21*  54:4, *8*
56:*9, 13, 22*
60:*7*  65:4, *5*
66:*16*  67:*2*
68:*24*  73:*21,*
*23, 24*  74:*4,*
*18*  75:*4*
76:*22*  77:*3,*
*21*  78:*11, 12*
82:*19*  87:*21*
91:*3*  94:*8, 12*
95:*12*  97:*15,*
*20*  98:*17, 18,*
*21*  99:*3*
101:*6*  102:*23*
107:*3*  110:*6*
113:*19*  114:*4*
118:*10*
119:*11, 12*
123:*24*  124:*8,*
*24*  125:*18*
126:*5*  128:*21*
129:*19*
130:*13*  131:*1,*
*2, 5, 6, 13*
134:*6*  135:*4,*
*23*  136:*1*
137:*10, 21*
138:*2, 5*
139:*3*  141:*22*
143:*21*
147:*24*  158:*6,*
*7*  159:*12*

164:*10, 11, 16,*
*17*  167:*7*
169:*23, 24*
170:*3, 4*
171:*17*  175:*5,*
*10*  177:*18, 22*
178:*23*
179:*17*  181:*3*
182:*5, 18*
183:*7, 12, 16,*
*21*  189:*1*
197:*24*  198:*7*
199:*14*
202:*21*  210:*1*
217:*17*
218:*12, 13, 14*
234:*10*
235:*17*
243:*21, 24*
255:*9*  268:*1,*
*7*  276:*11, 15,*
*20*  279:6, *21*
285:*20*  286:*2,*
*20*  287:*22, 24*
288:*19*
289:*20*  290:*2,*
*14, 18*  292:*1*
293:*14*  294:*3,*
*6*  301:*13*
302:*3, 6, 13,*
*14, 17*  303:*7*
305:*1, 8*
306:*12*  307:*8,*
*12*  309:*7*
311:*4, 18, 22*
312:*3, 9, 18,*
*19, 21, 22, 24*
313:*1*  314:*5*
319:*10, 22*
320:6  321:*23*
322:*2*  323:*3*
327:*4, 9, 10*
328:*12*
329:*13*  330:*3*
331:*2*  333:*9*
335:*15*
336:*24*  337:*5*
338:*24*  341:*8,*
*11*  342:*22*
344:*13*  350:*4*
352:*3, 15*

355:*4, 12*
357:*9*  358:*6*
359:*19*  364:*8*
367:*20*
373:*19*  374:*7,*
*8, 13*  384:*16*
385:*1, 2, 8, 9,*
*13*  386:*1, 22*
388:*9*  393:*5,*
*14, 18*  396:*4*
398:*6*  400:*15*
402:*23*  403:*6,*
*24*  408:*11, 21*
410:*22*  411:*1,*
*14, 15*  412:*17,*
*20, 21*  413:*18*
414:*17, 18*
427:*2*  428:*4*
437:*2, 7*
440:*17*
441:*22*  460:*7*
corrected
414:*20*
corrections
458:*5, 7*
460:*10*
correctly
39:*12*  76:*3*
78:*2*  106:*22*
136:*24*  137:*1*
178:*2*  180:*21*
253:*13*  262:*4*
304:*15*  392:*4*
397:*18*
413:*16*  453:*12*
corresponded
392:*13*
corresponds
66:*3, 9*
counsel  11:*18*
12:*20*  13:*17*
36:*13*  37:*3*
47:*10*  61:*22*
75:*12*  93:*9*
95:*22, 24*
96:*11*  120:*24*
123:*2*  181:*23*
354:*16*
404:*15*
446:*17*  454:*23*

counting
254:*13*
couple  364:*3*
430:*1*
course  55:*16*
68:*16*  153:*20*
165:*8*  167:*5*
220:*12*
262:*12*
325:*24*  400:*2*
COURT  1:*1*
11:*14, 20*
123:*1*  319:*1*
404:*17*  405:*6,*
*9*  415:*6*
428:*9*  458:*20*
Court's  34:*17*
cover  77:*13*
99:*18*  178:*18,*
*21*  282:*3, 10*
305:*18*  325:*12*
covered
154:*17*
320:*19*
340:*20, 24*
401:*13*
criteria  300:*13*
Critical  7:*9,*
*12*  290:*12*
291:*2, 22*
293:*9, 21*
294:*2*  295:*12*
296:*10*  297:*2*
298:*6, 16*
300:*12, 24*
308:*22*  309:*4,*
*10, 13*  310:*6,*
*9*  312:*2, 18*
criticism
405:*23*
crossed  438:*15*
cross-reference
298:*11*
cross-
referencing
299:*4*
crude  213:*1*
358:*22*  406:*5*
Crystallization
359:*9*

csw@pietragall
o.com  4:*5*
CULBERTSO
N  3:*8*
Current  5:*21*
6:*8*  80:*5, 19*
86:*10*  87:*3*
88:*7, 9*  93:*15,*
*17*  94:*17, 18,*
*19, 20*  97:*13*
98:*13, 16*
101:*4*  107:*1*
109:*23*
118:*15*
122:*17*
133:*23*
134:*14*  232:*3,*
*15*  281:*9*
284:*10, 11*
285:*3, 9*
286:*3, 5*
288:*24*
293:*19*  306:*3*
312:*7*  384:*24*
405:*15*  430:*8*
440:*7*
currently
16:*9*  145:*22*
200:*9*
Curriculum
8:*15*
cursory
231:*19*  233:*1*
customer
136:*12, 16, 23*
138:*7, 13*
144:*11, 22*
147:*8*  154:*1*
162:*21*
173:*13*  184:*5*
256:*1, 13*
257:*6, 14*
258:*4, 17*
260:*14, 24*
261:*7*  276:*8,*
*18, 24*  278:*9*
296:*18*  308:*9*
373:*20*  374:*7*
398:*17*  400:*3*
customer/API
302:*21*  304:*6*

customers
135:*19*  137:7
139:*16*
143:*20*
149:*20*
170:22
205:*14*
206:22  257:4
customer's
137:6  370:9
cuts  114:*21*
CV  412:*19*
414:*1, 4, 6, 11*
416:2
CVS  3:*18*
cyclosporine
417:*18*

< D >
d.stanoch@kan
ner-law.com
2:5
Danbury
12:*14*
Danny  4:*10*
11:*4*
data  131:*17*
243:2  244:*11*
262:*13, 14*
443:*13*
date  1:*16*
11:7  39:*13*
51:6, 7  87:5
102:*1, 16*
124:*23*  125:*2,
3, 6, 8, 10*
126:20
129:*24*  130:*4,
13*  131:*13*
138:9  143:*12,
19*  149:3
150:*13*
264:*10*
267:*14*  281:*9,
16*  288:*13, 16*
326:2  350:*13*
387:*16*
411:*18*  458:9
460:*16*
dated  100:6
156:7  232:1

282:*23*
293:*12*
339:*11*  340:5
346:2  368:*12*
397:5  410:*19,
20, 21*  457:*15*
dates  48:*18*
100:8  264:*15*
336:7  415:*11*
446:9
Dave  105:*19*
176:*11*  242:5
249:*17*
265:*12*
353:*16*  412:*17*
DAVID  2:3
109:6  283:8
284:22
Day  8:7
39:22  44:*12*
49:6, 21
51:*19*  57:*19*
283:*18*  319:2
339:*23*  340:*8,
20*  344:7, *17*
345:*1, 17*
346:2, 9
347:22
348:*18, 19, 23*
402:*17*  460:*20*
days  162:2
163:3, 22
170:7  200:9
262:8  346:*14*
458:*16*
deal  91:7
dealing  217:*21*
decades
173:*11*  177:6
December
46:20, 21
94:22  95:*10*
118:*21*  119:*1,
1, 10, 17*  120:8
206:*13*  226:*3,
8*  229:*17*
242:20  245:*1*
378:*13*
400:*14*  410:*19*
decide  106:7

decided  59:*18*
400:*24*
decision
131:*12*  350:*23*
decisions
419:*13*
declaration
14:*10*  126:*12*
130:*12, 19*
131:*19*
132:*12*  184:3
declare  132:*1*
declared
124:5  131:8
387:*17*  453:5,
6
declares  130:5
declaring
131:22
dedicated
331:7  406:*24*
deemed  46:*11*
85:2  353:4
458:*19*
deeply  175:*16*
Defendant
3:*13*  4:6
316:*15*
Defendants
2:*21*  3:6
17:*1, 7*  18:*10,
16*  20:*17*
21:5, *24*
35:*13*  57:8
409:*12, 16*
defense  123:2
404:*14*
deficiencies
310:*11*  312:*12*
deficiency
156:*23*  379:*23*
defined
121:*17*  122:*4*
defines  121:20
defining  99:*13*
definition
47:*18*  171:*4*
259:*18*
definitions
293:*21*

309:*12, 22*
311:20
degree  59:*23*
155:*12*  212:2
217:22
289:*14*
297:*24*  343:8
369:*13*
409:*19*  429:7
delays  349:*10*
deleted
283:22  285:*1*
287:4, *10*
306:2
deletions
284:7  286:*19*
305:*19*
deliver  373:*11*
delivering
373:9
demonstrated
219:5
denoted  80:20
315:*17*
deny  441:*21*
department
260:6
depend  22:6,
21  23:4
depending
146:*15*
176:*21*  326:2
454:9
depends
193:5  432:8
deponent
11:*16*  460:2
deposed  12:*24*
56:20
deposing
458:*16*
deposition
1:*14*  7:*19, 21*
10:2  11:9
12:*13, 18*
56:*18, 24*
57:*12*  58:*11*
314:*14, 15*
318:20
325:*13*  326:*1*
328:*15*

414:22  415:*4,
6*  424:*1*
427:2, *14*
453:*17*
454:*14, 24*
456:3  457:6,
8, 9*  458:*3, 13,
17, 19*
Depositions
414:*16*
deps@golkow.c
om  1:22
depth  233:*1*
337:*14*
346:*24*  360:*16*
derivation
91:*24*
derivative
200:*11*  202:*19*
descending
420:*23*
describe  17:2
128:5  334:*23*
335:4  401:6
427:*4*  432:*14*
described
43:*18*  61:*2,
15*  63:*1*
68:*16*  127:*13*
136:*19*
168:*13*  204:7
205:*24*
242:*14*
245:*15*
250:*19*  363:9
366:*11*  432:*13*
describes
79:*19*  102:8
256:*21*
describing
260:*4*  305:*23*
DESCRIPTIO
N  5:*16*  6:5
7:5  8:5  9:5
287:9  379:9
416:6
descriptions
415:22
design  253:*18*

designation
78:19  79:21
91:6  401:15
designing
254:3
detail  17:3
18:11, 24
99:5  271:17
318:5  335:4
368:19  392:5
398:19  400:4
424:2
detailed  43:17
48:24  83:7
175:24
345:14
387:23  454:3,
5
details  20:11
55:16  62:8
179:15
184:24  186:4
detect  139:10,
15  140:4, 12
268:19
detected
136:21  140:7
197:2  205:4
207:11  213:3,
12  261:2
detection
301:7  435:15
449:3
determination
122:24
123:18  124:8,
16, 17  125:4,
7  127:19
131:19
139:13  262:4,
7
determine
74:23  98:22
99:23  192:12
230:5  241:16
261:4  272:1
284:23
422:13, 23
determined
129:8  136:15

138:22
235:24  387:13
determines
123:12  124:3
125:1
develop
395:18
developed
230:2  416:22
developing
416:19  417:20
development
110:20  146:9,
14  150:11
417:23  420:6
deviation
82:21  86:4
91:8, 15  93:2
94:4, 10, 14
95:1  98:1
283:12  309:9
310:5, 8
312:6, 15
385:7  393:4
395:7, 14, 17,
24  396:10, 15
397:4  398:3,
9, 14, 24
399:5, 10, 16,
19, 24  400:7,
14
deviations
78:23  80:2,
17  87:9  88:1,
4, 12  89:4, 9,
15, 20, 22
90:21, 24
91:12, 22
92:11  93:16
98:10  129:15
400:9
dialogue
177:24  179:8
180:17
185:10
188:22
189:12
209:20
255:19  272:8
280:23  285:8
305:24

320:16
375:22  376:6,
16, 22  377:2,
21, 23  378:5,
8, 11, 16
379:12, 13
396:14  441:3
differ  403:13
differed  141:4
difference
127:3  249:13
differences
57:3
different  82:1
87:2, 11
109:13
139:21
157:21  234:5
236:5, 11
251:2  258:14
260:1  329:10
330:16  332:7
333:22
351:11  403:2
416:13
difficulties
404:10
digest  317:20
dimethylforma
mide  44:1
direct  18:20
41:17  71:1
84:24  96:22
272:23
373:20, 22
374:6  457:21
Direction
10:5  229:22
directly  59:7
61:7  158:9
260:9  305:9
307:24  308:4,
6  363:13
director
193:22, 23
195:3
disagree
142:6  356:3
disagreeing
115:1

disclose
206:20  220:19
disclosed
225:3  385:23
disclosure
59:22  182:22
189:17
discontinuing
355:20
discovered
178:3  283:13
discoveries
199:17  207:7
discovery
206:22
211:10, 17
214:22
299:10, 17
300:3, 14
discretion
314:10
321:18  323:10
discuss  37:1
137:11, 19
187:18
313:17, 20
336:21  337:1
440:19, 21
454:1, 4
discussed
72:24  74:13
206:12
207:14  208:5
212:3  225:12,
17  269:21
276:12  318:5
342:19
348:10
424:12  434:3,
4  438:11
445:7, 10
448:2
discusses
340:20
discussing
35:7  100:6
210:18
211:24
425:24
433:17, 20
440:17

discussion
123:4  200:16
207:17, 20
208:23  211:4
309:24
313:14
335:20  358:4
404:21  428:7
439:19  448:14
discussions
230:22  313:18
display  430:12
dissolution
254:14
distinction
332:9, 17
distinctions
308:22
distinguish
250:6
distributed
248:24  296:4,
8  297:1, 10
337:12  367:8
distribution
432:4
DISTRICT
1:1  11:14
divalproex
448:7
DMF  44:1
196:24
220:19, 21
221:5, 9
DOCUMENT
1:6  14:20
39:14  57:23
58:23  59:7
60:23  62:10
73:8  75:2
96:4  107:13
108:9, 20
109:1, 8, 9, 10,
19, 22  110:2,
4  111:10
112:16, 17
135:10  143:7
151:12
164:21
177:21
181:11

191:17
192:16 194:6
198:18 199:6,
8 202:6, 13,
17 203:7, 17
205:3 209:18,
19, 23 210:4,
17 212:13, 21
213:7 217:10
222:21 223:6
225:4 229:4
265:22
270:17, 20
273:22 278:3
282:14, 20
288:5 289:4,
21 290:5, 11
292:19
301:14
303:13
310:16 318:9
325:3 339:6
346:5 355:18
368:3 369:18
390:1 410:3
413:19 430:9,
14, 18 437:17
439:8, 13, 16,
18 440:2, 20,
21 441:9
445:14, 20, 22
446:4, 5, 13,
24 447:9
449:5 450:13
451:24 452:5
**documentation**
37:22 38:15
59:8, 11
63:14 68:17
76:15 85:4
100:20 150:9
**Documents**
10:8 37:15
38:3 42:22
54:24 58:5,
18 59:3, 16,
22 63:3, 19
72:15, 21
73:4 74:24
75:10, 17
76:4, 7, 11, 13

101:17 121:3
152:5 180:4
185:1, 5, 9, 14,
16, 20, 24
186:5, 12
187:9 196:15
230:21
239:15
285:15 286:8
317:16
342:12, 15
347:14
354:19
356:20
427:17
453:15, 19
**doing** 50:11
61:18 111:21
146:14, 22
150:10
176:15
183:24
220:22
234:22 258:7
263:15 265:3
323:10 334:6
419:5 458:8
**dose** 37:12, 19
38:1, 9 39:6,
24 40:6, 15,
21 41:13
42:1, 5, 9
50:23 89:12
141:9, 11, 12,
19 142:10
151:22
173:13
215:23
216:12
219:11
230:18 231:3,
12 238:2
**draw** 332:8
333:22
**drawn** 86:23
107:9 369:1
**Drive** 2:14
**DropBox**
108:13 165:4
413:6 430:4
440:13 445:11

**dropped**
413:15
**drug** 38:24
40:11 45:19
46:24 47:4
67:20 69:15
98:7 106:17
112:19
113:11, 17
119:4, 8
120:7 121:16
122:7, 14
123:22 124:3,
11, 16 125:15
126:2, 15
127:5, 8
129:7 130:5
140:23 141:8,
11, 15 142:2
150:3 151:17,
18, 22 177:7
210:24
218:23
219:17, 22
228:2, 23
229:10 230:6
238:22
250:23
253:17 257:9
260:12 261:2
270:24 272:2
273:9 274:18
343:5 352:20
371:19 372:6,
14 373:3
375:1 380:4
384:16, 22
431:8 434:15
448:2
**drugs** 107:6
112:9 122:10
417:8 432:1,
10
**due** 107:24
407:19
**duly** 12:1
457:5
**dynamic**
111:14
**DZIKOWSKI**
2:14

Dzikowskik@gt
law.com 2:16

**< E >**
**earlier** 25:9
29:12 80:14
84:19 106:24
138:4 143:18
150:8 168:17
170:5 171:5
192:22 287:7
291:6 311:21
338:24
384:21
391:11 396:6
402:11
403:17 409:15
**early** 138:15
198:5 204:1
205:13
206:12 236:8
432:24
**echo** 53:1
**effect** 83:20
84:22 85:9
86:6 95:15
97:18 99:1
100:1 101:12,
21 102:18
150:10
191:18 231:22
**Effected** 401:4
**effective**
100:9 102:1
281:9 288:13,
16 293:13
**efforts** 360:24
419:10
**eight** 134:13
137:4
**EIR** 178:15
184:12
**either** 15:13
19:4 35:12
43:23, 24
67:10 94:21
174:19
183:18
204:14
250:22
254:20

279:10 344:5
351:17
434:11 436:9,
11, 19
**elect** 58:24
**elected** 81:17
395:15
**electronically**
413:7
**elements**
427:19
**elevate** 401:10
**else's** 224:17
**E-mail** 6:6, 15,
21 8:6 121:6
165:11, 18
166:5, 10
167:13 177:2,
15 180:14, 16
183:7, 19
189:16 199:2,
10, 15, 16
203:11, 22
204:1 210:1
212:23
214:21 266:6,
8, 10 267:4,
20 269:11, 13
270:13 273:1,
14, 21, 24
281:20, 22
282:1, 3, 7, 9,
21, 22 283:3
285:12
286:22
305:18, 23
339:11 340:4
341:20 344:2
345:14, 17, 20
346:2, 11
347:1 348:15,
23 349:24
354:21
440:15, 17
**e-mailing**
266:17
**embodied**
289:13 309:14
**embodies**
298:2

Confidential Information Subject to Protective Order

emergence 208:20 236:1
employed 101:19 139:13 141:5 147:12
employee 284:14
employing 140:16, 23
employment 416:11
encountered 173:16
enforcement 228:20
engaged 419:9
engagement 45:6
engaging 62:24
English 166:17
ensuing 276:4 292:7
ensure 158:15 213:17 374:10
entail 231:2
entered 156:8 197:12
entire 112:22 220:2 269:13 272:8 273:22 434:4
entirely 115:8, 10 414:16
entirety 434:5
entities 48:5, 6, 11, 16 49:24
entitled 34:12 55:11 109:22 302:4 438:23
entity 222:22 252:4 316:11
entrance 407:5
enunciated 32:4 220:6
environment 90:14
equally 22:17
equipment 406:12, 13

errata 458:6, 9, 12, 15 460:12
error 161:6
ESQ 2:3, 8, 14, 19 3:3, 10, 15 4:3
essential 83:12 96:19
essentially 229:8
EST 1:16
established 46:14 86:18 227:9 229:14 306:19 357:23
establishment 153:9
ethyl 358:23 359:13 361:3
EU 406:23 408:21
European 408:4, 7
evaluate 33:13 141:6 151:7 245:8 419:11
evaluated 40:24 120:2 243:5 396:9
evaluation 75:5 220:5 243:8 382:1 421:20
evaluations 419:8 434:20
event 309:10 310:6 423:24
events 86:3 87:9 91:8, 15 94:14, 24 131:21 132:12
eventually 98:4 196:19 294:18
everybody 184:16
evidence 37:21 38:4, 16 40:3, 9

41:4 54:15 66:23 67:3, 5, 8 68:3 69:10 70:4, 20 83:14 96:15, 24 130:2 150:6 188:16 190:22 259:8 261:7, 16 268:9 314:2 325:20 327:21 345:12 377:22 378:16 384:4 388:21 442:22
evidenced 81:12 191:10 204:14
evident 40:18 325:23 376:2
evolution 204:11
exact 20:9 48:17 51:5 129:20 211:19 264:4 350:12 397:13
exactly 71:18 86:24 136:7 140:11 150:12 163:12 194:12 231:24 250:1 264:9 270:15 272:1 315:19 324:21 361:24 372:20 379:18 383:6
exaggerating 115:22
exaggerations 115:20
EXAMINATION 12:4 149:13 196:6 412:5
examined 12:2 141:6

example 50:3 64:20 173:10 177:11 278:7 302:20 304:5 305:16 357:13 391:3
examples 79:14 390:22
excellence 417:22
Excellent 14:4 167:12
exception 175:18
excerpt 325:1
Excerpts 7:19, 21
exchange 165:18 177:2, 15, 19 179:11, 23 180:14 183:7, 19 184:8 186:19 189:16, 22 286:22
Excuse 39:9 47:24 96:17 121:21 152:23 190:10 193:22 219:5 224:5 236:7 257:8 397:14, 15
Excused 456:2
execute 215:22
exercise 61:2, 14, 17, 20 63:1 130:17
exhaustive 436:6
Exhibit 14:19, 21 15:3 16:1, 5 56:8 57:17, 24 58:6 60:1, 9 62:18 63:4 75:7 108:7, 10 164:20, 22 165:9, 11 188:23 198:17, 19, 24

222:15
225:13 244:4, 17 253:21
265:21, 23 277:22 278:2, 4 279:8 282:12, 15, 22 286:16 288:4, 6, 9 290:4, 6 292:20 293:2 301:15, 18 303:14, 17 310:15, 17 313:4, 5 318:6, 8, 10 325:2, 4 339:5, 7, 10, 15 357:2, 12 368:2, 4, 8 369:9 389:22 390:2, 6 410:1, 2, 4 413:1, 7, 9, 10, 14, 20 430:4 431:1, 2 436:6 437:19 438:4, 6 439:4, 6, 9 440:13 445:12, 15
exhibits 430:2 440:11
exist 58:16 123:16 129:23 241:1 242:20 246:1 261:8 349:13
existed 38:18, 21, 23 94:15 95:1 102:10 125:9 129:23 130:13 131:13 138:23 233:3
existence 58:12 87:6 99:7 123:11 164:15 435:18
existent 124:7
exists 87:3 107:14 114:7

Confidential Information Subject to Protective Order

157:*24*
174:*23* 223:*5*
260:*6* 261:*7, 9*
**exit** 108:*15,*
*16, 17*
**expanding**
235:*2*
**expect** 93:*20*
154:*23* 155:*4*
286:*12*
295:*15*
399:*22* 423:*15*
**expectation**
134:*15*
135:*11, 13*
143:*19*
162:*10* 222:*2,*
*16* 227:*24*
245:*12*
274:*23* 322:*17*
**expectations**
134:*2, 9*
135:*1* 136:*10*
**expected**
77:*11* 142:*16*
145:*22*
157:*24* 162:*9*
208:*10* 222:*9*
271:*8* 371:*3,*
*11* 398:*12*
399:*20*
**expecting**
195:*5, 6*
298:*22*
**experience**
126:*10* 162:*5,*
*13* 170:*6, 9,*
*22, 24* 171:*6,*
*7, 9, 12, 21, 22*
172:*4* 173:*11*
177:*6, 12*
206:*19*
217:*14* 322:*8*
338:*14*
418:*15*
420:*24* 421:*15*
**experimental**
416:*18*
**Expert** 5:*17*
57:*8, 10*
180:*3, 9*

181:*4, 17, 24*
182:*3, 16, 23*
186:*24*
314:*13* 322:*8,*
*13* 329:*8*
345:*16*
424:*21, 22*
426:*7* 427:*11*
441:*24* 443:*5,*
*21* 452:*2, 6,*
*20* 455:*2*
**experts** 56:*19*
**expires** 460:*21*
**explain** 34:*14,*
*18* 87:*16*
419:*18* 435:*3*
**explained**
71:*18* 74:*7*
242:*9*
**explicitly**
66:*12*
**explore** 395:*15*
**expressed**
347:*22*
**extends** 79:*23*
88:*22*
**extension**
375:*4*
**extensively**
454:*4*
**extent** 35:*3,*
*22* 36:*9*
88:*20* 93:*8*
95:*20* 181:*15*
**external**
249:*23* 251:*4*
252:*4* 305:*7*
**externally**
249:*10*
**extra** 413:*3*
**eyes** 331:*21*
332:*18*

< F >
**face** 151:*13*
435:*9*
**facilities**
52:*22* 53:*20,*
*24* 88:*14, 22*
92:*10* 93:*3, 4,*
*21, 23* 103:*12,*

*14* 104:*6*
157:*2* 159:*24*
304:*13, 18, 24*
307:*12, 16, 17*
335:*21*
352:*18*
405:*24*
421:*13* 434:*20*
**facility** 49:*14*
50:*24* 54:*2, 3,*
*7, 11* 55:*1*
56:*2* 82:*18*
89:*11* 94:*6*
98:*3, 8, 9, 11*
336:*22* 337:*3,*
*7, 18, 24*
338:*22* 339:*3*
341:*17* 343:*2*
346:*19* 347:*5*
348:*5* 349:*21*
350:*24* 351:*4,*
*8, 10* 352:*2, 9,*
*12, 15* 367:*5*
371:*20* 421:*2,*
*17* 422:*3, 7,*
*10, 14* 423:*5*
444:*5*
**fact** 36:*23*
39:*1* 61:*5*
62:*22* 76:*6*
78:*16* 83:*13*
85:*5* 86:*9*
93:*17* 96:*15,*
*24* 97:*7*
98:*11* 99:*18*
101:*19*
116:*17*
123:*15* 124:*6*
129:*23*
130:*23*
131:*11* 139:*1,*
*6* 143:*11*
151:*5* 154:*3*
160:*17*
164:*12*
168:*24*
178:*22, 23*
179:*18* 183:*9,*
*13* 185:*8*
190:*14* 192:*5*
206:*9, 12*

217:*11*
229:*14* 233:*2*
236:*6* 238:*14*
248:*16*
253:*20* 259:*7*
262:*3* 269:*22*
279:*15*
280:*21*
281:*10* 284:*5*
286:*17*
294:*20* 306:*9*
307:*6* 318:*24*
322:*23* 323:*3*
328:*1* 330:*13*
343:*9* 355:*9*
361:*14*
375:*15*
379:*24*
381:*16* 386:*2*
407:*9, 15, 21*
414:*18* 415:*1*
426:*11* 433:*9*
434:*18* 443:*7,*
*11* 446:*22*
**fact-finding**
130:*17*
**factor** 352:*14*
425:*20* 442:*19*
**Facts** 5:*19*
109:*22*
129:*20* 130:*1,*
*11* 131:*3*
163:*21*
355:*13* 430:*7*
**fail** 458:*18*
**failed** 391:*5*
392:*7*
**failing** 397:*9*
**fair** 13:*10, 22,*
*23* 41:*11*
43:*6, 9* 44:*10,*
*13* 48:*9*
58:*17* 63:*21*
65:*19* 90:*12*
111:*12* 122:*2*
277:*13*
279:*18*
287:*19*
289:*17, 23*
383:*7* 403:*16*
409:*17, 23*

**FALANGA**
3:*1*
**fall** 147:*9, 16*
170:*2*
**fallen** 292:*13*
**falls** 148:*12*
307:*10*
**familiar** 29:*18*
59:*1* 68:*13*
110:*22* 112:*1,*
*2* 121:*11*
266:*11* 267:*3*
314:*21* 324:*1*
326:*4* 409:*20*
430:*14* 446:*21*
**familiarity**
45:*5*
**familiarize**
21:*18* 446:*2,*
*12*
**familiarized**
175:*16*
**far** 91:*13*
157:*16*
172:*14* 189:*2*
193:*11* 194:*8*
197:*9* 226:*1*
229:*16*
248:*14* 265:*1*
269:*2* 336:*12*
338:*8* 410:*24*
411:*10* 434:*19*
**farther** 247:*22*
**fashion** 380:*24*
**faster** 339:*17*
410:*14*
**fax** 1:*21*
**FD&C** 121:*18*
423:*7* 451:*14*
452:*24*
**FDA** 8:*7, 17*
9:*6* 33:*16*
41:*2, 9* 43:*2*
45:*15* 46:*13,*
*19, 23* 52:*21*
53:*19, 23*
55:*11, 14, 17,*
*20* 67:*11*
103:*18*
104:*24*
107:*13, 22*

110:6, 9, 21, 24  111:1, 9, 23  112:3, 6  114:3, 6
115:24  119:3, 5, 16  120:8
122:22, 24  123:12, 17  124:3, 8, 10, 13, 15, 21
125:1, 8, 10, 13, 19  126:1, 11, 19  127:6, 12, 16  128:3, 23  129:8, 21
130:4, 11, 17  132:1, 11, 17
138:11  140:1  142:1, 22
143:10
145:13
147:12  149:2, 24  150:15
151:3, 5, 16, 19  152:12, 15, 19, 23  153:1, 12, 19  154:3, 8, 15  155:18
157:9  158:15  162:18  163:8  164:4  166:1  167:19
168:19  169:1  170:2, 17
172:8  173:14, 24  175:4
177:8, 17  187:18
188:18  191:2  192:19
193:11
194:10
196:19, 21  198:15  218:1, 22  220:7, 17  223:16, 19  224:5, 12, 14, 23  225:1
226:7  227:4, 6  228:3, 4, 11, 22  229:7, 14,

19  244:24  245:12  246:12
250:15  258:6  291:3, 9, 19, 20, 24  292:6  294:11
335:20  336:4, 8, 17, 21  337:1, 6, 23  338:14, 20  339:23  340:8, 21  342:20, 24  343:9, 15  344:3, 11  345:9  346:2, 18  347:4
350:3  366:15, 21  367:3, 12  368:12
371:15, 21  372:11
385:11
386:23  387:5, 13  388:2, 6, 14, 18  389:1, 6, 18  391:11  392:14  393:6, 18, 23  394:17  395:2, 7  396:11, 19, 22  397:3  398:19  400:24
401:10  417:6  419:1, 4
420:9, 10, 11, 19, 21  421:14  422:13, 23  432:2  434:16, 19  435:1
436:22
438:23
439:19  444:4  446:15  453:22
**FDA-483**  6:7
**FDA-approved** 45:19
**FDA-directed** 246:23
**FDA's**  8:19  103:10  104:5

106:14
110:11  111:4  114:23
115:17  116:5, 15  117:12  118:6, 14
123:23
124:23  125:6  129:4  131:12  171:16
292:12
294:22
337:17
341:16  342:1  345:1  348:4  349:20  369:8  385:15
386:24
388:11
389:23  417:7  418:22  436:11
**FDCA** 123:8
**featured** 43:1
**February** 118:17  410:21  411:14  418:8, 10
**feed** 167:18
**Feel** 39:20  44:17  52:11  73:6  242:11  428:24
429:15  443:4, 18
**fell** 146:20
**fellow** 284:22
**felt** 345:9  431:3  441:1
**field** 235:10  257:1
**fielded** 257:3
**figure** 412:9
**figured** 226:8
**figuring** 208:18
**filed** 21:14  142:4
**files** 372:15  418:1

**filing** 401:8  417:22
**Final** 8:8  130:19
131:18  284:5  285:19, 21, 23  339:23
345:19
346:17  347:3  392:8  410:21  450:18, 21  451:3
**finally** 149:15  268:4
**find** 32:4  48:23  51:14  70:12  73:6, 13  106:1  154:10  173:1  174:22
190:12  217:7  219:20
241:21  242:7, 12  353:20  395:3  452:4
**finding** 25:8  130:23  157:1  265:16  295:11  343:24  344:11  385:5
**findings** 153:1, 12  154:14  168:5  191:5  311:17  336:16  341:24  342:3, 24  344:3  345:2, 3, 19  346:17  347:4, 9  348:3
**fine**  15:8, 12  39:18, 20  51:23  106:12  220:22  277:19  339:20  353:23  361:5  383:7  413:12
**Fingers** 438:15

**finished** 37:12, 19  38:1, 9  39:6, 24  40:6, 14, 21  41:13  42:1, 5, 9  50:23  67:20  89:12  141:9, 10, 12, 19  142:9  151:22  173:13  177:7  215:23
216:12
219:11
230:18  231:3, 12  238:1
249:18  448:23
**Finishing** 449:21
**firm**  163:2, 17  168:14  416:11
418:10  426:10
**firms** 419:9
**firm's** 390:22
**first**  12:1  64:10  94:23  110:19
112:12  113:7, 9  118:19, 20  128:7  137:12, 19, 23  143:3  166:5  193:13  197:17  200:1  202:12, 19  203:16
209:17  210:4  217:23  223:8  234:4, 12, 17, 24  239:5
277:20  278:7, 14  286:21
305:16  341:1  346:8  359:4, 8  369:24
383:22
411:11
416:16
419:20
420:16, 17, 19  431:11
433:21  441:8,

Confidential Information Subject to Protective Order

17 445:19
447:7, 11
449:6, 15
450:11
**fit** 23:9, 21
24:8 25:11,
23 26:8, 20
27:5, 7 33:6,
21 34:22
35:5, 11 92:21
**fitting** 24:18
**five** 242:14
275:12, 14
417:5 420:1
**five-day**
344:13, 19
345:18 346:6
**five-minute**
265:15 275:10
**flagship**
417:15
**flip** 66:17
106:3 275:24
311:8 321:7
**Floor** 3:4, 11,
16 4:4
**Florham** 2:15
**Fluch** 266:14,
16
**focused** 98:20
118:5 308:18
337:19 338:1,
10, 22
**focusing**
386:14
**folder** 109:20
**folks** 207:21
440:16
**follow** 34:17
159:16
173:24 271:9
274:7, 12
438:3
**followed**
224:9 385:20
**Following**
55:13 112:9,
19 159:5, 11
214:3 253:24
271:21
319:15

359:21, 22
385:16
396:22 431:8
449:18
**follow-on**
285:11
**follows** 12:2
156:10
**footnote** 63:9
67:23 73:22
74:3 243:24
302:2
**footnoted**
66:7, 12 73:1
**footnotes**
63:17, 23
84:3 101:16
239:13, 22
243:19
**for-cause**
306:21
385:12, 19
386:3, 8, 12,
15, 23 388:6
391:12 393:9
**force** 82:24
86:6 144:2
186:23
**foregoing**
457:18 460:6
**foreign** 250:21
**forget** 64:10
**Forgive**
453:11
**form** 19:11
20:19 23:13
24:1, 22
27:10, 19
28:4, 19 29:4
30:5 31:6, 19
32:11, 19
33:10 34:1
35:1 36:5
38:12 45:13
46:8 60:24
64:4 70:23
71:17 72:19
73:20 74:6
75:14 76:1
78:6 80:5
87:4, 7 88:16

90:1 91:2, 18
93:5 95:4, 18
98:1 99:16
100:4, 15
102:2 104:21
105:10 111:2
116:3 118:17
126:6 127:21
130:1, 15
131:15 140:9
143:23
148:21
150:22
152:22 157:9
160:12 168:8
169:4 170:19
171:19
172:11 173:4
174:3 175:11
176:7 177:16
178:20 180:6
181:9 182:5,
18, 20 183:6,
20 187:12, 21
190:3 191:8
192:23
193:16
202:10 204:3
205:1, 17
207:2 208:1
209:5 210:13
211:7, 22
213:5, 22
214:12 215:1,
13 216:3, 15
217:4 218:20
219:14 221:2,
16 222:3, 17,
19, 22, 24
223:3, 4, 23
224:18
225:14
226:13
227:18 231:6
232:8 234:19
235:15, 18
237:18 238:5
239:11, 23
240:14
241:11 244:2
245:9 246:15

247:7 248:4
252:15, 23
254:7 256:5,
16 258:21
261:23 263:1
264:24 268:9
269:8 270:10
271:4 275:6
284:8 289:4
291:24 292:2,
7, 11, 14
294:11, 18
295:5, 7
296:12
298:15, 17
299:1, 13, 23
300:16 305:3,
21 307:14
308:12
312:14 320:8
322:11 323:5
327:16
328:14
329:15 330:5
331:4 332:23
333:10 335:2
341:18 342:9
344:15 345:6,
23 346:22
347:11 348:7
350:19
351:20 352:5,
16 360:12
362:19 363:6
367:2 370:20
372:2 374:15
378:3 381:6
384:6 389:14
392:21
393:19 394:7
396:20 399:7
403:8 420:11
421:5 422:17
423:9 426:9
427:9 429:5,
21 432:18
434:2 436:3
437:5 441:12
443:9 444:11
446:5 451:20

453:2 454:19
460:10
**formal** 111:5
168:14
**formalization**
79:3
**formally**
119:19
149:23 268:16
**format** 78:14
**Formation**
6:12 196:22
199:11
223:20
235:22 370:11
**formed** 147:2
222:6 310:13
387:2 388:1
418:10
**former** 423:12
**forming** 242:3
243:13 444:16
**forms** 19:7,
19 97:19
99:1 100:1
116:15 162:20
**formulating**
229:21
**formulation**
219:21 254:13
**formulations**
416:18, 21
**forth** 47:14
55:22 134:8
161:18 267:7
270:16
454:16 455:1
**fortuitously**
158:4
**forward** 79:5
124:19
128:15 362:4
**found** 38:22
43:17 62:13
72:8 81:14
102:7 121:18
122:15 131:4
174:19
197:10 206:9,
10 226:10
235:12

Confidential Information Subject to Protective Order

236:*15*
237:*11*  252:*4*
254:*12*  257:*9*
258:*10, 13*
261:*16*
355:*19*
366:*23*
381:*19*  389:*9*
392:*16*
393:*12*
439:*24*  440:*7*
**Foundation**
191:*8*  193:*16*
204:*3*  205:*17*
211:*22*  213:*5,
22*  215:*14*
217:*4, 19*
222:*19*
223:*24*  256:*5,
17*  258:*21*
261:*23*  269:*8*
270:*10*
305:*21*  320:*8*
335:*2*  345:*23*
350:*19*
351:*20*  352:*5*
370:*20*  403:*8*
**foundational**
77:*17*
**four**  276:*22*
311:*23*
446:*20, 22*
449:*16*
**frame**  20:*10,
12*  95:*15*
161:*6*
**framed**  31:*22*
**Frederick**
416:*23*
**free**  39:*21*
44:*17*  52:*11*
76:*14*  179:*2*
**freedom**  51:*8*
**freely**  159:*21*
**frequency**
223:*2*  259:*5*
**Frequently**
334:*10*  421:*13*
**fresh**  364:*17*
365:*24*

**front**  15:*7*
53:*17*  56:*15,
23*  154:*22*
233:*12*
267:*20*
269:*11*  289:*5,
16*  369:*18*
383:*19*
**fulfilled**
280:*16*
**fulfilling**
218:*22*
**full**  12:*9*
59:*21*  64:*1*
109:*19*  114:*7,
10, 18*  171:*3*
270:*13*
273:*10, 14, 16*
344:*13*
364:*20*  440:*3*
**fulsome**  429:*1*
**function**
15:*19*  176:*10*
**furnish**  117:*7*
185:*8*  375:*6*
**furnished**
73:*4*  284:*11*
414:*7, 8*
**further**
146:*23*  201:*3*
286:*13*
363:*18*  379:*6*
381:*24*
382:*22*
411:*24*  431:*13*

**< G >**
**gain**  100:*23*
269:*14*
270:*12*  386:*10*
**GANNON**  3:*3*
**garbled**
160:*24*
**gasoline**  222:*6*
**Gateway**  3:*3*
**GC-MS**  230:*3*
**Gcoan@hinsha
wlaw.com**
3:*12*
**Geigy**  418:*7*

**general**  30:*8*
32:*5*  36:*17*
107:*11*  134:*1,
8, 15, 24*
172:*14*  216:*6*
229:*7*  272:*17*
280:*2*  373:*4,
8*  425:*7*
**Generally**
21:*20*  68:*17*
96:*23*  197:*19*
319:*9*  416:*5*
**generated**
90:*15*  240:*20*
**generating**
408:*20*
**Generic**  417:*8*
418:*2*
**genotoxic**
44:*21, 23, 24*
45:*3*  135:*20*
136:*20*  137:*8*
230:*11, 15*
**genotoxicity**
215:*11*
216:*13*  217:*1,
16*  218:*17*
219:*12*  221:*1,
13, 22*  230:*21*
**GEOFFREY**
3:*10*
**geographically**
315:*11, 16*
**Georgia**  2:*10*
**German**
166:*17, 22*
**germane**  347:*6*
**getting**  96:*6*
120:*11*  166:*9*
188:*14*
353:*17*  375:*24*
**gist**  137:*2*
**give**  18:*23*
62:*6*  64:*1*
273:*17*
291:*13*  416:*6*
428:*17, 19*
439:*22*
447:*12*  448:*4*
**given**  87:*22*
89:*19*  123:*16*

217:*10*  281:*7*
285:*22*
286:*10*  385:*4*
428:*22*  457:*6*
460:*8*
**gives**  412:*11*
**giving**  226:*23*
**glass**  334:*14*
**Global**  7:*16*
193:*23*
298:*20*
303:*10*  304:*2,
11*  435:*11*
**GMP**  283:*12*
297:*14*  311:*17*
**go**  48:*22*
51:*19*  53:*3*
60:*16*  61:*13,
18*  62:*5*
64:*21*  73:*7*
75:*1*  100:*17,
22*  103:*3*
106:*8*  108:*13*
109:*15, 16*
110:*15*
111:*15*
112:*15*  113:*4,
5*  135:*5*
137:*11*  147:*4*
155:*10*  156:*1*
160:*3*  174:*9,
22*  176:*19*
204:*21*
209:*13*  222:*4*
229:*23, 24*
241:*14*
260:*19, 23*
266:*12*
276:*16*
279:*13*  287:*6*
295:*11*
306:*15*
309:*18*
311:*15*
313:*17*
340:*13*
358:*13*
359:*10*  362:*4*
370:*3*  375:*15*
377:*15*
394:*22*

401:*22*
412:*10, 13*
413:*5, 23*
421:*9*  423:*11*
427:*12*  428:*6,
16*  430:*3*
433:*13, 16*
436:*4*  437:*14*
439:*3*  440:*12*
442:*13*
443:*10*  447:*6,
9, 22, 24*
448:*18*  449:*4*
455:*19*
**goes**  201:*16*
304:*17*
319:*13*  348:*19*
**going**  14:*18*
15:*2*  34:*15*
35:*8*  37:*8*
57:*17*  58:*3*
63:*2*  64:*11,
16*  65:*16*
93:*6*  99:*11,
12*  105:*20*
106:*6*  113:*1*
124:*19*
154:*20*  163:*5,
9*  176:*13*
195:*15*
198:*16*
204:*20, 21*
207:*5*  229:*23*
233:*18*  241:*3*
249:*19*
265:*13*
269:*17*
277:*20*
279:*13*  318:*7,
14*  319:*18*
320:*5*  322:*1*
324:*24*
335:*24*
343:*17*  368:*1*
388:*16*  395:*5*
398:*21*
409:*24*
437:*23*
448:*19*  449:*14*
**GOLKOW**
1:*21*  11:*6*

Confidential Information Subject to Protective Order

**Good** 5:*21*
12:7, *8* 52:3
107:*1* 109:*23*
118:9 120:*13*
122:*17*
152:*20*
195:*13* 251:9
265:*16*
275:*13, 15*
312:7 340:*16,*
*17* 353:*21*
357:*11* 385:*1*
412:*13, 16*
430:*8* 440:7
**GORDON** 4:*1*
**govern** 83:*12,*
*15* 214:2
291:*22*
426:*13, 23*
**governed**
85:*21* 86:*11*
91:*11* 97:*1, 8*
119:*24*
175:*10*
246:*22*
295:*17* 380:*21*
**governing**
79:*15* 91:*22*
96:*19* 119:*22*
232:*22* 265:*6,*
*7* 297:*8*
**government**
56:*1* 383:*10*
**governs** 175:7
176:*10*
257:*18* 276:*24*
**GRA** 304:*12,*
*13, 17*
**grade** 359:*19*
402:*19* 408:*4,*
*7, 10*
**granted**
142:*23*
**Gray** 1:*16*
11:*21* 457:*12*
**Great** 50:*14*
52:9, *16*
108:*14*
121:*10* 274:*1*
311:*1* 318:5,

*19* 336:*20*
339:*21* 360:*16*
**greater** 205:7
**GREENBERG**
2:*8, 11, 16*
**ground** 407:*11*
**Group** 8:*13*
263:*14* 317:7
411:*8*
**guess** 51:*8, 10,*
*13* 52:*1*
94:*21* 178:*13*
180:7 271:*14*
409:*17*
**guidance**
45:*24* 117:*12,*
*20* 118:*6, 13,*
*14, 16, 18, 20*
119:*2, 6*
220:7 245:*1*
253:*6* 254:*1*
**guidelines**
147:*20*
**GXP** 298:*11*
299:5 306:*23*
**GXP-relevant**
300:*23*

**< H >**
**hail** 20:*4*
22:*15, 19*
**half** 114:*16,*
*17* 149:*21*
187:*10*
189:*23*
353:*19* 364:*19*
**hand** 180:*2*
361:*23*
363:*12, 16*
364:*13* 365:7
379:*3* 382:*18*
**handled**
256:*18, 22*
**handling** 86:*3*
87:9 89:*22*
90:*23* 91:7,
*14* 93:*1* 94:*4,*
*14, 24* 257:*19*
260:*3*
**Hang** 166:*18*
340:*10*

**happen** 54:*19*
147:5 163:*1*
185:*12* 193:6
195:*11*
225:*22* 244:*8,*
*10* 365:*20*
398:*18*
**happened**
92:*1* 166:*13*
167:*23* 189:5,
*17* 193:*9*
209:*24* 210:*3*
250:*10* 261:*8*
264:6 326:*11,*
*18* 338:*16*
343:*11*
352:*18* 419:*3,*
5
**happening**
269:*3*
**happens**
86:*12* 88:*23*
91:*23* 204:*16*
207:*15*
349:*13* 402:*17*
**Happily** 113:*8*
**happy** 48:*24*
133:*4* 195:*14*
336:2
**hard** 15:6
41:7 295:*1*
**HARKINS**
2:*8* 5:*8*
12:*21* 15:*2, 9,*
*14, 21* 17:*11*
19:*10* 20:*19*
21:7 22:*1*
23:*12, 24*
24:*11, 21*
26:*2, 10, 22*
27:*9, 18* 28:*3,*
*19* 29:*3* 30:5
31:*5, 18*
32:*10, 18*
33:*9, 24* 34:*9,*
*24* 36:*4, 24*
38:*11* 45:*12*
46:7 51:*10*
52:*24* 53:*3*
64:*3* 70:*22*
71:*16* 72:*18*

74:5 75:*13,*
*24* 85:*11*
88:*15* 89:*24*
91:*1, 17* 93:5
95:*3, 17*
100:*3, 13*
102:*2* 104:*20*
105:*9, 19*
108:*12, 21*
109:*11, 16*
116:*2* 121:*8*
126:6 127:*20*
130:*1, 14*
131:*14* 140:*8*
142:*11*
143:*22*
148:*20*
150:*21* 152:*2,*
*22* 158:*8*
160:*11* 165:*3*
166:*19, 24*
168:7 169:*4*
170:*18*
171:*18*
172:*10* 173:*4*
174:*2* 175:*11*
176:*7, 11*
180:5 181:*8*
182:*6, 12, 19*
187:*11, 21*
190:*2* 191:7
192:*23*
193:*15*
196:*10* 202:*9*
203:*4, 13*
204:*2, 24*
205:*16* 207:*1,*
*24* 209:*4, 7,*
*14* 210:*12*
211:*7, 21*
213:*4, 21*
214:*12, 24*
215:*13* 216:*2,*
*15* 217:*3, 18*
218:*19*
219:*14* 221:*2,*
*16, 24* 222:*18*
223:*23*
224:*18*
225:*14*
226:*12*

227:*17* 231:*5,*
*14* 232:*8*
233:*20*
234:*19*
235:*18*
237:*17* 238:5
239:*10, 23*
240:*14*
241:*10* 242:5
244:*1* 245:*9*
246:*14* 247:*7,*
*15* 248:*4*
249:*17*
251:*18*
252:*22* 254:*6*
255:*10* 256:*4,*
*16* 257:*15*
258:*20*
261:*22*
262:*24*
264:*23*
265:*12* 268:*8*
269:7 270:*9*
271:*3* 273:*13*
275:*5, 12*
277:*22* 284:*8*
291:7 295:7
296:*11* 297:*4*
299:*12, 22*
300:*16* 305:*2,*
*20* 307:*13*
308:*11*
315:*22*
316:*17*
317:*17* 320:7
322:*10* 323:*4*
324:*18*
327:*15*
328:*13*
329:*14* 330:*4*
331:*3* 332:*22*
333:*10* 335:*1*
341:*18* 342:*9*
344:*14* 345:*5,*
*22* 346:*21*
347:*11* 348:*6*
350:*18*
351:*19* 352:*4,*
*16* 353:*16*
360:*11*
362:*19* 363:5

367:2  370:19
372:1  374:14
378:2, 20
381:5  384:5
389:13  390:4
392:20
393:19  394:7,
20  396:20
399:7  403:7
412:7, 17, 23
413:4, 9, 13,
22  421:10
422:11, 19
423:17  424:9
425:17
427:23
428:15
429:14, 24
432:11, 22
434:6  435:17
436:20
437:13, 19, 20
438:5, 8, 20
439:2, 12
441:19
442:16
443:17, 24
444:13
445:18  453:9
454:21  455:6,
12, 16
**harkinss@gtla
w.com**  2:11
**harm**  17:20
18:18, 19, 24
20:8, 10, 13
29:13, 19
30:3, 13, 15,
17  31:2, 3, 16,
22  425:8, 19
**Harmonization**
120:5
**hatched**  190:7
**Hatt**  283:8, 17
284:22
**HCl**  398:8
**head**  193:24
**heading**
336:16
414:15  415:21

**health**  35:20
136:17  158:2
162:19  436:12
**healthy**  281:1
**hear**  136:2
344:4  397:18
**hearing**  53:1
148:23
**held**  1:15
11:10  115:15
123:5  404:22
428:8
**help**  318:15
336:14
**helpful**
336:18  369:3
**heretofore**
197:2
**high**  148:4
**higher**  186:24
194:1  195:7
251:24
**highlighted**
323:6
**highlights**
277:11, 12
**highly**  206:23
207:20  249:15
**HINSHAW**
3:8
**hint**  184:8
436:17
**hired**  417:12,
14
**historic**  97:4
**history**  86:23
100:23  102:5,
6  232:4, 12
287:8  339:2
**hit**  108:13, 19
**hold**  260:22
278:1  406:8
422:2  427:8
**HON**  1:6
**Honestly**
269:12
**honor**  183:18
**Hope**  185:3
186:8
**Hopefully**

108:24  412:11
**host**  55:8
**hotel**  12:17
**hour**  105:20
176:14
265:13  353:18
**How's**  112:24
325:17  410:15
**Huahai**
156:11, 16, 20
157:8  161:15,
23
**human**  45:10
46:6
**hundreds**
173:17
**hydrochlorothi
azide**  43:20
**hypothetical**
125:24  126:7,
10  173:8
216:4  219:15

**< I >**
**ICH**  45:24
120:3, 5, 12
144:8  145:23
146:3, 4
147:10, 19
148:2  205:7
231:18  249:3
253:2, 5, 13
301:10
**idea**  51:7
141:7  188:9
209:22, 24
347:8  351:2,
24
**identification**
14:21  57:24
108:10
164:22
198:19
265:23  278:4
282:15  288:6
290:6  292:20
301:15
303:14
310:17
318:10  325:4
339:7  368:4

375:19  390:2
410:4  413:20
429:11  439:9
445:15
**identified**
136:11
146:19  149:7
150:2  196:18,
21  202:7
258:18
280:11
340:24
392:12
408:22  433:2
435:20, 22
439:14  442:8
448:21
**identifier**
66:11
**identifies**
135:21  394:18
**identify**  21:21
88:5  98:24
104:18  135:6
173:21  176:3
242:2  243:12
276:22
277:17
368:20
436:24
439:17
447:10  448:1
**identifying**
103:15  104:7,
13  105:3, 7,
14  202:24
433:3  435:2
**identity**
218:10
**ignore**  245:8
256:1, 13
257:13, 24
**ignored**
226:20
**illegible**
160:19
**imagine**
251:12  272:18
**imatinib**  448:6
**immediate**
48:20  49:18

174:20  176:9
232:10
233:10
359:20, 22
365:21  433:10
**immediately**
174:7  280:9
314:21
316:14
324:11, 15
326:4  364:10
377:10  379:7
**impact**  157:5
296:4, 8
297:1, 9
422:6, 10
432:7
**impacted**
422:24
**impactful**
217:23
297:18, 19
310:12  347:18
**imperative**
458:14
**implemented**
87:1
**implicate**
389:19
**implicates**
393:13
**implication**
205:23  423:4
**implications**
295:19  441:1
**implied**  330:10
**imply**  184:3
**implying**
184:2  364:16
**import**  291:20
**important**
131:10
161:22
207:23
283:10
284:19
286:18
366:20
370:10  431:3
**impression**
152:6

Confidential Information - Subject to Protective Order

improve
201:17
**Impurities**
6:13  8:20
46:5  103:16
104:8, 14, 18
105:7  117:24
118:22  120:1
122:12
135:20
136:20  137:8
139:23  144:4
145:24
146:20, 24
147:9, 11
148:18  160:9
211:5, 19
213:19
216:20  229:9,
13, 15  230:11,
15  248:10
250:4, 9
252:12  253:9
435:3, 23
437:1  439:21
440:6
**Impurity**  6:16
43:16  103:20
118:23  127:3
136:14
143:18  145:2,
11, 19  147:1
148:12  197:4
200:4, 10
202:18  205:5
213:3  234:5
236:2  245:5
249:16
250:18  251:5,
12  252:10, 14,
17  266:19
267:10, 22
268:5, 13
270:24
384:15, 17, 23
391:6  392:12
452:12
**inadequate**
371:16
390:23  393:3
394:4, 15

**inappropriate**
96:2  181:19
**incident**
293:22  294:2
296:10  297:3,
13  298:7, 17
299:1, 8, 20
300:6, 8, 13, 24
**Incidents**  7:12
293:9  294:1
295:12
**include**  44:12
54:19  112:22
169:8  244:9
280:7  290:15
291:3  297:13
299:10
312:20, 23
336:12
414:14, 22
426:1  430:21
443:19
**included**
183:14  362:1
369:16
377:10
380:14  388:1
432:15  453:19
**includes**  16:8
52:21  291:12
293:24
304:18  312:5
429:17
**including**
47:18  55:21
100:7  181:1
199:13
290:17  426:6
**incomplete**
107:21  216:3
219:15
**incorporate**
74:14
**incorporated**
254:19  399:21
**incorporates**
253:6
**incorporating**
142:9
**incorporation**
92:20

**incorrect**
118:1
**incredible**
428:18
**incumbent**
144:9, 21
151:21  245:7
253:7
**independent**
389:2
**INDEX**  10:2
**India**  234:7
**indicate**
160:18  161:4
424:6
**indicated**  96:3
122:22
123:10
343:23
383:15  406:10
**indicates**
312:6
**indicating**
320:18  407:8
**indication**
436:17
**individual**
100:19  188:4
315:20  326:7
**individually**
101:16
**individuals**
286:23  318:1
**Industries**
2:22  3:7
**industry**
103:18
104:24  134:1
416:17
417:12  418:2
435:13  446:8
**ineffective**
432:1
**inference**
333:22
**inform**  62:23
131:18
135:18
143:20  145:9
147:8  156:1,
12  157:24

158:6  160:20
161:7, 16
162:21  172:8
202:23  205:6
238:8  240:4
292:6  399:23
**Informally**
119:20, 21
**INFORMATIO
N**  1:8  41:2
107:14
132:15, 18
138:11
148:24  151:9
155:6  162:24
164:1  168:24
174:8  184:22
188:20  190:6
191:23
194:24
198:14
203:11
206:21
214:10, 20
216:1  217:8
223:5  242:13
246:12  248:2
260:2  291:23
296:3, 7, 24
297:8  298:18
356:10
372:13
375:18  442:24
**informational**
338:8
**informative**
154:9, 11
**informed**
38:23  39:14
58:14  79:13
137:13  139:6
149:18  160:8
180:19  188:9
191:20
223:12
266:24
306:16
350:22
376:23  387:3
389:5  400:6

**informing**
63:20  149:19
419:13
**ingredient**
45:18
**ingredients**
156:7  302:12,
17  303:3
**inherited**
160:7
**initial**  46:19
102:16
420:13, 15
421:1, 12, 16
**initially**  50:9
101:19  129:3
**initiate**  149:19
**initiated**
99:16  101:1
224:5, 23
264:10  396:1
397:22
**injuries**  17:8
**injury**  17:6
425:14
**inner**  108:17
**in-process**
406:8
**inquire**  179:3
**inquiry**
236:12
258:12
259:22  260:3,
11, 17, 18
271:24  441:4
**insert**  167:17
**inserted**
161:10
**inset**  273:5
**inside**  147:6
189:13  372:14
**insight**  18:20
286:8  297:7
371:8  372:9
386:10
**insofar**  427:4
428:22
**inspect**
326:20  327:8
329:1  330:1
331:1, 22

332:4, 6, 9
333:14, 19
335:13   403:4
**inspected**
164:4   337:7,
9   338:21
402:20
403:10   421:14
**inspecting**
403:12
**Inspection**   9:6
52:21   54:6,
23   55:12, 14
62:9   104:5
153:9   156:14,
19, 22   160:21
163:16   164:2,
8, 15   166:1
167:19
168:11   169:1
170:2, 17
171:17   172:9
173:2, 14
174:1   177:8,
17   178:3, 6
179:2, 6, 20
187:18
188:18
189:10, 14
190:8, 15
191:3, 13, 16
192:14, 19, 21
193:12   194:3,
10   195:10
291:4   292:7,
12   329:12
332:20   334:6,
9, 16   335:20
336:12
337:18   338:1,
15   341:16
342:1, 21
343:10, 15, 22
344:8, 13, 20
345:4, 18
346:18   347:4
348:4   349:5,
20   350:3
361:19
365:17
366:15

367:10   385:4,
12, 16, 20
386:3, 9, 13,
16, 24   388:7,
11   389:10, 21
391:13
393:10, 18
397:3   419:2,
6   420:19
421:3   440:8
444:4, 9, 16,
22   445:2, 6
446:7, 16, 24
447:4   453:20,
23   454:11
**inspections**
33:16   35:19
52:18   53:19,
24   54:10
55:9, 21   56:2
103:11   105:2
158:1   161:8,
17   168:5
336:4, 8, 21
337:2, 15, 23
352:22, 24
418:17, 19, 20
420:8, 9, 11
436:11, 24
439:20   454:7
**inspector**
67:11   392:14
**inspectorial**
334:19
**inspectors**
14:13   33:2
62:12   75:6
436:9, 10
**instance**   62:7
67:4   110:12
111:3   122:14
153:21
159:10
163:19   177:5
301:4   303:5
314:1   401:3
418:23   419:20
**instances**
405:20   406:2
**instant**   147:6
**instantly**   147:7

**instituted**
78:1   193:13
**instruct**   93:6
95:19
**instructing**
181:14   182:11
**instruction**
96:9   289:9
**INSTRUCTIO
NS**   458:1
**instructs**   13:17
**integrated**
81:4
**intend**   97:3
273:15
**intended**
157:6   426:21
431:23   432:3
**intending**
137:10
**intention**   97:6
417:24
**interact**   154:9
159:21
**interactions**
307:17
**interference**
65:12, 15
**interim**
118:22   119:9
437:9
**intermediate**
392:6   398:7,
8, 10   399:24
406:9
**intermediates**
391:4   394:17
**internal**   199:2
**internally**
135:9
**International**
120:4
**interpret**
171:10
181:11   186:23
**interpretation**
124:10
172:18   181:12
**interpreted**
162:4, 9   172:1

**interpreting**
148:24
295:10
322:13   334:5
**interprets**
295:4
**interrelated**
312:14
**interspersed**
166:17
**intimately**
59:1
**introduced**
412:19, 24
413:7   430:2,
5   439:5
440:12   445:12
**introducing**
413:3
**introduction**
419:21
**inventory**
80:8, 12, 20
91:21   92:22
277:9
**investigate**
259:13, 16, 22
273:7   274:4,
15
**investigated**
139:5   200:3
211:11
392:11   398:11
**investigating**
235:8   269:23
**Investigation**
6:12   8:19
129:5   136:18
147:4   154:5
184:12
205:22
234:23   261:4,
15   262:2
263:9, 16
265:2   375:24
390:23   393:4
394:5, 16
395:8, 14, 17
396:5, 10
397:10

**investigations**
86:4   87:10
89:23   90:24
91:8, 15   93:2
94:4, 10, 15
95:1   255:18
264:3   265:3,
8   341:2, 15
343:4, 11, 19
348:1, 22
356:9
**investigative**
236:9
**investigators**
390:19, 21
**investment**
419:13
**invite**   395:3, 5
**invoice**
410:19, 20, 21
411:11, 12, 14
**invoiced**
411:10, 17
**Invoices**   8:15
410:8, 23
**involve**   153:18
**involved**
75:16   154:4
188:1   263:10
261:5   363:14
375:21   398:6
427:17   432:10
**involvement**
153:24
**involving**
201:10

**IRBESARTAN**
1:4   11:12
199:18
200:11
202:19   203:1
204:8
**island**   436:14
**Israel**   55:21
342:21   446:7
**Israeli**   54:9,
23   55:12, 14,
18   56:1
**issuance**   57:2
102:13, 16

issue 62:3
95:16 103:16
104:8, 19
105:8 128:20
130:11
137:20
138:14 139:7
150:1 178:11
179:7, 16
180:1 187:6
208:9 217:16
226:17, 19, 21
253:23
280:19
283:10
284:19
294:22
305:17 330:8
377:18 380:4
425:3 435:3
issued 56:20
67:19 117:20
128:6, 7, 14
129:3 139:1
156:18 214:5
220:8 229:5
244:24
294:21 387:5
393:12
410:23
420:12 424:4
446:6 452:13
453:22
Issues 7:9
8:22 14:12
31:23 33:1, 6,
19, 21 34:4
47:13 62:12
105:23
125:13 126:1
127:7 137:13
142:8 159:23
206:5 210:22
215:18, 22
217:21 218:8
260:10
280:10
286:18
290:12 291:2,
22 301:4, 6
325:8 338:2

343:23 344:3,
7, 24 345:13
347:21 349:3
352:2 376:17
387:20
388:14
404:13
418:13
419:16 433:2
436:23 444:2
italicized
273:5
items 340:20,
24
iterations
102:9
its 38:9
47:11 50:23
80:5 87:3
91:24 99:16
114:13
118:16
130:12
132:12 137:7
142:9 143:20
144:22
150:18
151:13, 24
153:13
171:23 177:9
193:13
200:23
205:14
214:18
215:10
216:13
217:17
219:13
220:19
221:11, 14, 20
225:23
230:17
232:12
235:22 236:9,
10 237:13
238:3 244:24
246:9 247:5,
23 250:20
252:18 254:4,
24 255:5
256:20 259:4

261:19 264:1
269:4, 23
270:7 271:12
289:4 292:5
295:19 355:3
356:6 360:10
375:3, 5
380:21 394:4
395:15
396:17 435:9

< J >
January
58:12 94:22
95:10 410:20
437:12
438:10 452:2,
7 454:16
455:2
Jens 165:18
188:5, 8, 22
189:2 191:11
193:18
194:15, 22
JERSEY 1:1
2:15 3:5
11:15
Jerusalem 8:7
50:23 54:2,
10, 24 56:2
89:11 93:21
335:21 336:5
337:2, 7, 18,
24 338:22
339:23 340:9
341:17 343:1
346:3, 19
347:5 348:5
349:21 350:3,
7 351:4
352:12 444:5
446:9
job 315:6
316:5, 8
416:16 417:2
Joerg 266:13
John 14:9
28:9 32:24
33:13, 14
34:5 35:17
59:5, 8, 14

60:6, 19, 20
61:24 62:7,
20 63:11
75:18 76:8
79:13 83:6, 9
85:19 96:20
179:9 183:24
186:18
215:19
232:20
365:14
369:14 426:8
430:17 440:23
joined 417:6
judged 259:3
judgment
320:24
July 101:22
199:2 204:1
205:13
214:21
288:14, 23
289:1, 7, 19
340:5, 6, 8, 11,
12 385:18
388:7 446:9
June 7:19
38:7 39:2, 7,
12, 15 40:1,
15, 22 55:15
103:20
132:20
137:24 138:8,
9, 15 140:18
143:5 144:20
148:19 149:3
150:8 189:17
198:6, 11
216:23
230:12, 19
231:4 233:15
288:18, 22
293:13 300:5
311:2 326:9,
17 357:4
385:24 435:24
jury 416:5
justification
274:22

< K >
KANNER 2:1
keep 81:17
106:6 113:1
195:15 245:3
381:3
keeping
271:19
KENNETH
2:14 283:8
kept 80:5
kind 18:19
72:4 85:3
97:4 136:3
163:6 186:22
187:1 188:11
194:24
209:19 220:5
229:10
237:20 251:3
263:16
272:16, 17
280:19 361:1
396:13
400:22
425:16 443:1
kinds 264:12,
20
knew 40:10,
13 143:14, 16
144:18 145:1
148:18
150:12
188:17
190:18 194:2,
9, 14 198:9,
13 220:23
247:22 356:5,
16 365:9
366:6 398:23
400:13
know 13:15
14:24 15:24
16:2 18:5, 7,
17 20:2, 5, 9
30:18 31:1
36:8, 20 39:5,
22, 23 40:5,
20 41:6
48:15 49:18
50:4 51:3

Confidential Information Subject to Protective Order

52:5, 12
64:12  65:6,
21  68:1  71:9
72:14  81:17,
24  84:9, 13
86:2  88:20
91:13, 19
99:8  101:23
103:22
107:24  108:8
111:18, 20
134:13  139:9,
12, 14, 18
140:11, 15, 19
141:3  148:17
150:14
153:11
154:16  155:6
161:20, 22
162:1  171:2
174:7, 13
176:12  179:1,
2, 4, 5, 19
182:8  184:14,
16  186:14
188:7, 10
189:10, 12
190:4, 20
191:14  192:7
193:10, 11, 20
194:8, 12, 17,
22  195:11, 15
198:3, 13, 22
199:14
207:23  209:1,
9, 10  212:1, 6
214:7  215:2
221:6, 11, 20
223:1, 22
224:2, 3, 22
226:18, 22
227:2  229:22
231:24  232:2,
3  233:5
235:23
236:21
239:19  240:7,
13  241:6
243:22
261:24  263:2,
7, 18  264:9,

15  265:14
269:9, 24
271:15  272:5,
14, 19  281:4
284:12, 13
285:7  286:6,
15  293:4
294:14  295:3,
8  301:21
303:19  315:8
316:11, 13, 15
317:1  321:7
326:2, 3
334:22  336:3
342:24
350:10, 14, 16,
21  351:21
352:7, 13
353:17  356:8,
20  360:21
362:15  363:1
364:10
367:14, 16, 19,
21  370:23
372:20  378:7,
10  379:15
380:6, 11
382:23  387:5
396:13  399:2,
8, 9  400:4, 12,
16  408:13, 18
409:16
423:15
441:16
448:22  449:8
450:6  452:17
knowing  30:9
194:5  195:3
knowledge
17:10  45:20
62:20  84:15
154:4  174:21
189:5  203:18
210:2  214:1,
15  215:16, 17
225:6  237:12,
20  254:2
255:13
272:12  351:5
396:8  399:18
424:13, 18, 23

433:11
435:12  441:7
knowledgeable
355:19
known  136:13
138:16  145:2
190:21
194:20  195:9
365:22  381:2
411:8
knows  209:7, 9
KUGLER  1:7

< L >
label  78:21
labels  406:10,
11
Laboratories
6:19  280:6
labored
161:21
lack  38:16
184:8  387:21
435:12
lacking  156:13
lag  325:8
Lahav  282:24
284:13
laid  331:21
372:21
language
178:11
181:21  310:2
451:7
Lantech
353:10  355:2,
15  366:15
367:17, 22, 24
368:12  369:9,
12  370:17, 23
371:4, 8, 12,
22  372:18
373:11, 16, 17
375:8  376:22
382:4
Lantech's
367:20  373:20
late  387:6
latest  118:16
287:3
Lavin  283:8

law  106:18
113:13, 18
121:18
123:13  250:1
257:23
LAWYER'S
461:1
lay  19:17
335:11
laying  332:17
LC-MS  213:2,
12
lead  421:23
422:2
leaders  253:22
learn  132:11
143:3  177:8
179:6, 20
189:7  191:2
233:12
395:16  415:1
learned
137:19, 23
178:22  188:3,
5  189:24
192:13, 18
235:9  355:5
356:10  441:9
learning
188:2  262:8
leave  172:20
181:21
202:13  409:22
leaving  417:7
led  130:11
132:12
396:11  397:10
left  418:5, 8
legacy  49:23
88:11  93:4
legal  11:5
17:12  19:11,
14, 16  20:20,
23  21:1, 8
23:13, 18
24:1, 22
26:11, 14, 18
28:5  29:4, 13
30:6  31:7
32:20  33:10
34:2  35:1, 5

36:2, 7
414:18
424:13, 18, 21,
22  425:3, 6
legally  35:10
length  169:16
344:22
Letter  8:8, 12
127:7, 9
128:13  129:3,
22  156:23
157:10
178:18, 21
190:10  294:6,
16, 19, 23
368:12  369:9,
12  387:1, 6,
13, 24  388:14
389:4, 24
396:12  397:9,
11  423:23
424:3, 7
438:18
letters  128:6
291:4, 10, 19
level  79:23
83:3  99:4
123:20
146:20, 21
179:23
189:12  205:4
206:14  210:8
226:22  230:5
248:11, 12
253:1, 11
257:7  261:9
271:16  281:1
378:10
401:11, 14
levels  41:24
42:4, 13, 16
43:8  46:4
118:23  144:7
148:4  149:8
204:13  225:3,
10  227:5
248:14  301:7
311:24
lexicon  250:6
LIABILITY
1:5  11:12

Confidential Information - Subject to Protective Order

20:*16* 21:*4*
22:*22* 23:*2, 5,*
*10, 18, 22*
24:*8, 19*
25:*12, 24*
26:*5* 27:*2*
**library** 349:*6*
**light** 166:*13*
167:*22*
**limit** 119:*9,*
*11, 14, 15, 17*
120:*7* 209:*11*
227:*16, 21, 22*
384:*18*
**limited** 148:*6*
280:*9* 352:*21*
**limiting** 227:*7*
**limits** 46:*19,*
*22* 47:*3*
148:*6* 227:*8,*
*15, 20* 229:*15*
**Lin** 7:*23*
323:*22* 324:*1*
325:*14* 327:*3*
328:*24*
329:*24* 332:*1*
**LINE** 10:*6, 9,*
*12, 15* 59:*4, 7*
110:*19*
335:*11* 346:*8*
430:*17* 459:*4*
461:*2*
**link** 15:*21*
110:*12, 14*
**Liron** 340:*7*
**List** 5:*19*
56:*11* 57:*5, 6,*
*18* 58:*18, 21*
59:*11* 60:*17,*
*21* 61:*22*
62:*4* 64:*2, 13*
68:*7* 74:*15*
75:*9, 16, 20*
78:*15* 79:*11*
81:*9* 185:*2,*
*14, 17* 186:*6,*
*11, 13, 15*
244:*5, 7*
294:*1* 301:*11*
314:*22*
323:*23*

342:*12, 14*
409:*8* 414:*21*
437:*15* 438:*1*
439:*14* 442:*4,*
*8*
**listed** 58:*5*
64:*24* 68:*7*
69:*23* 70:*10*
71:*10* 72:*1*
79:*6* 278:*21*
279:*12, 13, 16*
321:*1*
**listen** 398:*22*
**listing** 79:*2*
278:*23*
**LITIGATION**
1:*5, 21* 11:*6,*
*13* 14:*7* 16:*6,*
*14* 18:*9, 15*
19:*9, 21*
20:*18* 21:*6*
22:*7* 95:*16*
96:*1* 182:*24*
409:*13* 411:*5*
**little** 43:*12*
87:*17* 103:*2*
132:*21*
134:*20* 160:*2*
176:*19* 177:*1*
198:*2* 285:*7*
315:*11*
320:*15*
325:*16* 340:*3*
403:*17* 416:*6*
444:*2*
**live** 111:*15*
**living** 78:*4*
**LLC** 2:*1, 22*
3:*7*
**LLP** 2:*8, 11,*
*16* 3:*1, 8, 15*
4:*3*
**load** 109:*1*
**loaded** 310:*24*
339:*20*
**loading**
108:*21, 24*
165:*9* 310:*22*
**local** 298:*22*
**locate** 49:*1*
439:*21, 22*

**located** 12:*13,*
*14* 204:*17*
315:*9, 10, 14,*
*15, 16* 324:*13*
**lodge** 380:*7*
**lodged** 379:*23*
**lodging** 259:*9*
**long** 224:*24*
445:*21* 446:*1,*
*11* 452:*13*
**longer** 176:*19*
**look** 51:*5*
52:*11* 54:*9,*
*23* 56:*1*
59:*18* 70:*17*
117:*11* 133:*8*
155:*11* 166:*5*
196:*14* 199:*9,*
*13* 212:*15*
213:*18* 232:*2*
264:*10*
266:*11*
282:*11*
285:*18* 287:*7*
293:*20* 310:*1*
319:*17, 19*
320:*4, 6*
321:*24* 322:*2*
323:*2, 3*
336:*4* 338:*15*
341:*23* 342:*7*
346:*17* 347:*3,*
*10* 354:*18*
357:*17*
366:*14*
386:*17*
390:*14*
396:*18*
445:*20*
446:*18* 447:*6*
**looked** 53:*19*
54:*5* 60:*14*
70:*8* 71:*14*
85:*23* 86:*22*
244:*20*
285:*15*
287:*14* 296:*2*
298:*5* 305:*17*
319:*7, 9*
346:*9* 348:*24*

349:*2* 396:*19*
402:*10* 452:*20*
**looking** 53:*14*
55:*10* 60:*9*
71:*8* 79:*9*
100:*7* 110:*17,*
*18* 114:*2*
188:*24*
253:*20*
262:*11, 17*
263:*5* 272:*20*
280:*1* 282:*3*
288:*21*
297:*16* 313:*6*
346:*1, 10*
348:*15* 359:*7*
395:*23* 431:*1*
448:*20*
**looks** 110:*22*
207:*4* 336:*20*
402:*16* 411:*9,*
*16*
**LOSARTAN**
1:*4* 11:*11*
274:*9, 20*
**lost** 123:*2*
**lot** 41:*18, 20*
43:*7* 147:*3*
398:*15*
406:*23* 408:*7,*
*21* 438:*1*
**lots** 41:*5, 6,*
*10, 12* 42:*24*
43:*4* 363:*11*
382:*19* 388:*3*
**Louisiana** 2:*4*
**lower** 147:*22*
340:*11*
**lunch** 176:*16*
195:*13, 17*
196:*12* 198:*3*
**luncheon**
195:*23*

**< M >**
**M.S** 1:*14* 5:*3*
11:*24* 457:*8*
460:*16*
**M7** 45:*24*
253:*6, 12*
254:*1*

**Madam** 319:*1*
404:*17* 405:*6*
**Madison** 3:*16*
**magnify**
325:*16*
**main** 79:*23*
**maintained**
281:*1*
**maintaining**
375:*21*
**maintenance**
85:*4* 326:*19*
328:*12, 18*
402:*20*
403:*19*
405:*14*
406:*16, 17*
407:*2*
**major** 308:*23*
309:*13* 310:*9*
312:*1, 4, 6, 10,*
*15, 21* 406:*7*
**making** 51:*18*
61:*3* 89:*12*
111:*10*
180:*24*
183:*14*
185:*11*
212:*14*
258:*12*
284:*17*
374:*20*
380:*12* 394:*3,*
*14* 402:*18*
408:*10* 441:*2*
**Malta** 54:*3, 6,*
*7* 82:*17*
266:*18* 269:*6*
270:*6, 15*
271:*15*
272:*13, 21*
274:*4* 335:*21*
336:*22* 351:*8,*
*10* 352:*1*
436:*15* 438:*18*
**Malta's** 272:*6*
**Maltese**
453:*22*
**manage** 97:*9*
276:*8, 18*
278:*9* 302:*21*

304:5   305:6
306:10   307:7
308:9   353:10
355:2, 15
366:17
367:17   373:17
**managed**
304:19   375:3
**Management**
7:6, 12   155:1
293:9   298:20,
21
**manager**
223:13
359:16, 24
361:9
**manages**
296:18
**Managing**   7:9
290:12
291:21
366:22   374:2
375:5
**manifest**   197:4
**manner**   59:21
420:22
**manufacture**
50:22   151:17
156:15
161:18
197:22
199:12
250:24
353:11   355:4,
17   360:6
362:17   363:3
364:1   365:11
366:7   374:5
376:19
378:19   381:4
382:10
387:22   400:8
**manufactured**
41:19   54:1
97:24   99:20
122:16
129:14
225:18
248:24
337:12   338:7
367:7   384:24

387:17
395:22   422:7
423:5
**manufacturer**
112:8, 18
135:9   136:15,
19   141:11, 20
144:3   147:8
148:9, 10, 15
151:22   177:7
215:24
216:12   218:2
219:12
230:23   238:2
245:4   250:13
253:7   270:23
271:1   431:7
**manufacturers**
145:21
173:19   226:9
230:4   253:17
434:12, 14

**manufacturer's**
136:22
**Manufacturing**
5:21   107:2
109:23
122:18
152:21
197:14, 15
202:8   254:10
255:15   312:7
331:8   352:19
358:6   370:9,
18   371:19
372:6   373:3
378:1   380:5,
23   385:1
400:2   406:12,
22   408:16
418:12
423:14   430:8
432:5   440:8
**map**   396:16
**mapping**
341:13
**March**   1:11
11:7   125:14
126:1   127:6
318:21   457:15

**mark**   14:19
57:17   164:19
198:17
310:15   318:8
325:1   339:4
368:2   410:1
**Marked**   10:14
14:20   57:23
108:9   164:21
198:18
265:22   278:3
282:14   288:5
290:4, 5
292:19
301:14
303:13
310:16   318:9
325:3   339:6
368:3   390:1
410:3   413:19
439:8   445:14
**market**   54:2
224:12
225:24   248:8
395:12   406:23
**marketed**
218:24
219:22   246:2,
6   249:1
336:11   342:5
343:7   353:1
419:23
**marketing**
147:13   220:3
227:11
245:20
246:18, 24
254:18, 23
255:2, 14
271:11
338:12
352:20
356:11   378:6
395:21   452:14
**marking**   293:1
**mass**   200:16
204:17
**Massachusetts**
3:11
**Master**   349:8

372:14
**matches**   395:1
**material**   57:6
58:7   63:22
66:13   71:10,
20   359:17
361:10
452:19   454:1
**Materials**
5:19   40:13
56:5, 12   57:5,
14, 18   58:4, 5,
22   59:12
60:1, 9, 10, 12,
22   61:11, 22
62:1   63:3, 6
64:2, 6, 13, 14,
22   66:2   68:8
69:24   71:3, 4,
10   74:15, 16
75:3, 11, 21,
23   106:20
147:21
174:16
239:20   242:2
243:12, 18
244:5, 8, 17
279:9   295:22
314:22
323:24
349:14   360:5
368:22   409:8
438:6   439:15
442:5, 8
454:13
**materials/excip
ients**   302:11
**matter**   11:10
16:10   22:10,
18   72:8, 24
117:6   132:3
141:1   171:1
184:7   188:1
191:21   195:6
220:23   223:9
236:1   258:1
269:10   273:8
274:15
323:15
330:13
346:13, 14

361:14
370:23   452:12
**matter-of-fact**
377:7
**matters**   17:16
23:18   27:1, 2,
12, 22   28:8,
21, 24   29:8
31:12   32:22
36:11   83:13,
16   210:20
214:3   346:24
401:12
415:17   426:9,
24
**MBA**   1:14
5:3   8:17
11:24   457:8
460:16
**Mcharchalis@
btlaw.com**
3:18
**MDL**   1:2
11:13
**mean**   49:23
101:22
162:14
220:13
226:18   279:4
322:4   323:2
333:19   338:4
345:1   348:15,
17   360:3
375:5   385:6
423:18   434:7,
9   438:16
**meaning**
333:14, 18
**meaningful**
162:24   164:1
232:22
349:17
419:21   426:14
**means**   90:5
162:7   170:6
227:15
333:14   457:20
**meant**   81:8
119:13
178:12
345:19   371:6

**measured**
240:*24*
268:*20* 418:*3*
**medical** 260:*2*,
*5, 20*
**medication**
433:*4* 435:*24*
447:*16*
449:*10*
450:*23* 451:*17*
**medications**
103:*17* 104:*9*
**Medicines**
438:*19*
**meeting**
146:*12* 297:*20*
**member**
403:*3* 404:*4*
**members** 22:*7,
10*
**memo** 194:*17*
**memorized**
174:*6*
**memory** 78:*1*
122:*2* 233:*10*
277:*18*
316:*18*
317:*12*
324:*19*
363:*14* 380:*13*
**mental** 70:*3*
**mention**
73:*19* 116:*23*
123:*9* 156:*4*
232:*21* 277:*4,
6, 8* 279:*1*
291:*18, 19*
292:*9* 306:*14*
308:*16*
358:*23*
360:*19*
363:*23*
369:*11*
381:*11* 445:*7*
447:*15, 18*
448:*9, 22*
449:*2, 9, 23*
450:*14* 451:*1,
3*
**mentioned**
16:*16* 54:*17*

56:*4* 63:*22*
64:*15* 70:*12*
84:*3* 85:*19*
86:*13* 224:*10*
230:*15*
233:*23* 277:*3*
278:*23* 279:*5*
291:*10* 292:*3,
15* 307:*23*
328:*19* 338:*6*
362:*11* 364:*7*
365:*18* 379:*8*
388:*19* 408:*3*
426:*15*
436:*22* 445:*9*
**mentioning**
128:*8* 283:*13*
379:*2*
**mentions**
167:*16*
253:*12* 280:*4*
406:*21* 447:*11*
**mere** 261:*10*
294:*20*
**merely** 73:*14*
114:*20*
123:*15*
260:*11* 401:*16*
**merged** 418:*6*
**merger** 419:*10*
**merit** 259:*2*
**message**
266:*13* 267:*9,
16* 273:*6*
339:*11, 22*
340:*4*
**mesylate** 448:*6*
**met** 219:*1, 3*
380:*19*
**method**
139:*12, 20*
140:*11, 19, 21*
141:*7* 230:*3*
236:*10* 341:*10*
**methods**
139:*22*
140:*17* 141:*4*
416:*19, 20*
**methyl** 43:*24*
**metric** 147:*12*
228:*19*

**metrics**
309:*22* 380:*20*
**Michelle** 1:*16*
11:*21* 319:*4*
457:*12*
**middle** 200:*8*
357:*22* 438:*20*
**milligrams**
249:*7* 251:*13*
252:*1, 3*
**milling** 407:*11*
**million** 248:*17*
**mind** 31:*10*
36:*18* 47:*23*
294:*22*
**minimize**
253:*19* 254:*4*
255:*7*
**minor** 308:*24*
309:*13* 310:*9*
311:*24*
312:*24* 407:*8*
**minute** 359:*5*
**minutes** 106:*9,
11* 265:*20*
**mirrored**
142:*21*
**misbranded**
118:*1*
**mischaracteriz
es** 183:*22*
333:*11*
**misrepresentin
g** 182:*7*
**Missing** 6:*22*
117:*4* 272:*9*
283:*9* 286:*18*
**misstates**
24:*23* 74:*10*
75:*14* 76:*1*
104:*21*
105:*10*
127:*21*
182:*20, 22, 24*
221:*3* 224:*19*
226:*13*
235:*19*
239:*11* 244:*2*
246:*16*
252:*23* 268:*9*
308:*12, 13*

323:*5* 327:*16,
17* 328:*14*
329:*15, 16*
330:*5, 6*
331:*4* 342:*10*
346:*22* 381:*6*
389:*14, 15*
392:*21* 423:*9*
**MITCHELL**
3:*15*
**mixed** 361:*22*
**Mm-hmm**
115:*19*
119:*16*
201:*14*
206:*19* 322:*7*
373:*13*
**mock** 418:*19*
**Module**
274:*21*
**moment** 55:*7*
98:*19* 152:*4*
165:*5* 167:*2*
201:*22* 202:*3*
228:*11* 266:*4*
273:*2, 18*
291:*13*
293:*23*
311:*14*
358:*18*
366:*10* 368:*9*
390:*10*
410:*11*
428:*19*
430:*10*
439:*22* 442:*5*
447:*12* 448:*4*
**moments**
64:*16* 67:*23*
68:*19* 320:*3*
**monitor** 175:*4*
176:*5*
**monitored**
155:*18*
158:*15* 213:*17*
**monitoring**
154:*14*
175:*23* 214:*9*
**months** 101:*4*
162:*3* 268:*4*
338:*20* 387:*1*

388:*6, 13*
391:*11*
**morning** 12:*7,
8* 147:*15*
206:*13* 239:*7*
243:*17*
**move** 16:*3*
108:*23* 109:*2*
112:*16, 21*
113:*3* 318:*15*
**moved** 352:*9*
**MTBE** 43:*24*
**Mulberry** 3:*4*
**Muniz** 349:*4*
**Mylan** 4:*6*
38:*2* 50:*5, 22*
62:*9, 13* 67:*1*
141:*2, 22*
145:*17*
158:*24* 159:*6,
7, 19, 21*
160:*2* 197:*6,
10* 234:*6*
235:*12* 236:*6,
7, 8, 13, 16*
237:*10, 15*
254:*20*
262:*21*
266:*17* 267:*8,
10* 268:*3, 4*
276:*9, 14*
278:*10*
280:*15* 281:*2*
284:*14*
296:*20, 24*
302:*22* 303:*6*
304:*7* 305:*8*
306:*12, 18*
307:*8* 309:*5*
317:*23* 353:*9*
355:*1, 14*
356:*10*
360:*10*
361:*18*
362:*15, 21*
363:*2, 19, 23*
365:*10, 18, 23*
366:*6, 16*
367:*9, 17*
371:*2, 12*
373:*10, 23*

374:*1, 4, 6, 10, 24*  375:*11, 17, 19*  376:*7, 10, 14, 17, 22*
377:*2, 20*
378:*9, 12, 17*
379:*24*
380:*21*
381:*23*  382:*6, 11*  436:*10, 11*
454:*9*
**Mylan's**
159:*24*
234:*14, 16*
236:*4, 19, 24*
237:*2, 22*
263:*5, 21*
280:*23*  367:*1*
370:*17*  371:*9*
374:*11*
375:*23*  376:*2*
381:*3*

**< N >**
**NaClO**  201:*18*
**name**  11:*4*
12:*10*  19:*4*
92:*7, 19*
93:*24*  110:*11*
119:*7*  314:*19, 20, 23*  317:*10*
324:*2, 6, 7*
369:*12, 16*
416:*11*  420:*16*
**named**  18:*3*
87:*8*  91:*24*
101:*16*  178:*6*
210:*24*
244:*10*  448:*5*
450:*13*
**names**  47:*22*
317:*24*
409:*21*  426:*15*
**Narenda**  7:*21*
**Narendra**
314:*12, 19*
318:*21*  402:*10*
**narrative**
112:*23*  113:*1*
326:*5*

**narratives**
155:*5*
**Nassall**
165:*19, 23*
166:*11*
167:*13*
177:*15, 21*
178:*3, 22*
179:*1, 12, 24*
180:*12, 23*
181:*5*  182:*4, 17*  183:*6, 13, 21*  188:*5, 8, 22*  189:*3, 22*
190:*5, 14, 18*
191:*12, 22*
192:*3, 8*
193:*19*
194:*15, 23*
195:*10*  440:*16*
**nation**  436:*14*
**nation's**
270:*22*
**nature**  146:*24*
163:*10*  193:*2*
272:*5*  310:*10*
395:*16*  432:*8*
454:*10*
**NDA**  224:*4*
411:*8*  414:*7*
**NDEA**  6:*16*
44:*7, 13*  47:*4*
66:*24*  69:*11*
70:*4, 12, 20*
72:*4, 9*
103:*15*  104:*8, 13, 18*  105:*3, 7, 14*  117:*14*
118:*15, 24*
196:*19*  197:*8*
216:*21*  220:*6*
227:*5*  228:*1*
229:*16*  230:*6*
233:*17*  234:*5, 13, 18*  235:*4, 12, 15*  236:*2*
237:*1, 5, 7, 11, 15*  238:*3*
240:*17, 23*
241:*17*
242:*19*  243:*3*

244:*12*
245:*21*
246:*10, 21*
247:*6, 23*
248:*13*  254:*4, 11*  255:*7*
257:*8*  258:*5, 10, 13, 18*
261:*20*  262:*5, 16, 19*  263:*4, 10, 20, 23*
266:*20*  267:*1, 10, 22*  268:*5, 12, 17, 19*
269:*5, 24*
270:*8*  271:*20*
272:*1, 14, 15*
273:*8*  274:*5, 17*  349:*12, 16*
366:*24*
375:*17, 23*
376:*1*  378:*12*
381:*21*
383:*13, 15*
384:*2, 4, 10*
385:*6*  386:*21*
388:*13*
389:*20*  433:*3*
434:*10, 17, 22*
435:*2, 16, 23*
436:*19*
437:*10*
442:*24*
447:*19*
448:*15*  449:*3, 24*  450:*16, 24*
451:*3, 20*
**NDMA**  38:*24*
40:*10*  41:*4, 19*  42:*24*
44:*3, 12*  47:*3*
66:*23*  69:*11*
70:*4, 12, 20*
72:*4, 9*  73:*10*
103:*15*  104:*7, 13, 18*  105:*3, 7, 14*  117:*13, 24*  118:*15, 23*
132:*19*
137:*13, 20, 24*
138:*7, 14, 23*

139:*7, 10, 15, 19*  140:*4, 12*
150:*1*  153:*22*
154:*6*  189:*18*
196:*19*  197:*9*
198:*5*  203:*1, 23*  216:*21*
220:*5*  227:*5*
228:*1*  229:*16*
230:*5*  233:*15*
235:*1*  236:*13, 19, 23*  240:*17, 22*  241:*17*
242:*19*  243:*2*
244:*12*
245:*21*
246:*21*
254:*11*  255:*7*
257:*8*  258:*13*
261:*2*  263:*3, 19*  264:*7*
288:*18*
349:*12, 16*
381:*19*
383:*13, 15*
384:*2, 4, 9*
385:*6, 17, 21, 23*  386:*4, 21*
388:*13, 17, 22*
389:*9, 12, 20*
391:*23*
392:*13, 16, 19*
433:*3*  434:*10, 17, 21*  435:*2, 16, 23*  436:*19*
437:*10*
442:*23*
447:*19*
448:*15*  449:*3, 24*  450:*16, 24*
451:*3, 20*
**NDMA/NDEA**
452:*11*
**NE**  2:*9*
**necessarily**
90:*16*  96:*16*
99:*5*  111:*1*
144:*23*  145:*4, 7*  162:*2*
191:*4*  294:*14*
299:*15, 19*

300:*10*
322:*17*
331:*13*
338:*19*
347:*16*  356:*2, 4*  360:*22*
369:*17*  371:*2*
372:*10*  386:*7*
398:*12*  400:*6*
408:*14*
414:*21*
422:*10*  441:*16*
**necessary**
59:*19*  72:*6*
73:*7, 14*
147:*7*  175:*20*
205:*5*  242:*7, 11*  353:*4*
375:*22*  376:*5*
429:*1*  430:*22*
443:*4, 18*
458:*4*
**need**  13:*19*
19:*16*  39:*21*
44:*16*  49:*4*
52:*12*  57:*19, 21*  100:*12*
111:*21*  122:*1*
127:*11*
159:*15*  216:*7*
280:*6*  320:*9, 10*  336:*3*
359:*5*  397:*15*
445:*21*  446:*2, 12*  450:*19*
**needed**
364:*21*  429:*7*
**needs**  168:*20*
**negotiated**
376:*13, 14*
**negotiating**
225:*2*
**neither**  132:*10*
**net**  284:*19*
**never**  119:*16*
120:*6*  138:*16*
186:*14*
209:*23*
220:*13*  221:*4*
223:*18*  228:*3,*

*4, 11, 15*
335:6, 8 396:9
**NEW** 1:*1* 2:4,
*15* 3:5, *17*
11:*15* 58:*10*
102:*13*
176:*12*
196:*24*
211:*17*
266:*19* 283:9
353:*18*
361:*21*
364:*13* 365:5
379:3 383:3
415:*17* 416:*21*
**Newark** 3:5
**newer** 377:8
382:*19*
**news** 166:*1*
167:*18*
177:*10* 385:*16*
**nitrite** 199:*23*
200:*23* 203:3,
*24*
**nitrosamine**
43:8, *13* 44:4,
7 46:23
119:7 143:*17*
145:6, *10*
148:*17* 202:7
206:*4, 15, 18,
23* 210:8
211:*19* 222:2,
*17* 225:*10*
235:3 250:8
301:*4, 5*
370:*11* 451:*21*
**nitrosamines**
37:*13, 20, 24*
38:*10* 39:*8,
16* 40:2, 7, *16,
23* 41:*15, 24*
42:4, *10, 13,
19* 43:*12, 14*
44:*11, 21*
45:6, *10, 18,
23* 46:3
119:3, *10, 18*
120:7 143:4
144:*19*
147:*16* 150:7

198:*10*
199:*11*
205:*13* 208:6,
*20* 211:6
213:*13*
214:22
220:*19, 24*
221:7 223:*21*
224:*15*
228:*13, 24*
253:*10* 256:3,
*15* 259:23
260:*15*
263:*13*
264:*11, 14, 20*
270:8 299:*10,
18* 300:7, *15,
19* 447:*19*
448:*16, 22*
449:*10* 450:*24*
**nitroso**
200:*10*
202:*18* 204:*10*
**nitrous**
196:*23*
197:*20* 201:*10*
**n-
nitrosodimethy
lamine** 200:*21*
**N-NO** 200:*20*
**nonconformanc
e** 78:*24* 80:3,
*18* 88:*1, 4, 12*
89:*4, 10, 16,
21* 90:*21*
91:*12, 23*
92:12 93:*16*
98:2, *10*
128:*21*
**non-exhaustive**
294:*1*
**nonexistence**
435:*19*
**non-specific**
170:*11*
**nonsubstantive**
451:*10, 11*
**normal** 147:*23*
**Notary** 1:*17*
457:*14* 460:*23*

**note** 66:*1*
70:3 117:*12*
157:*17* 309:3
359:*12* 360:4
405:*19*
**noted** 11:*18*
55:*18* 66:*12*
79:*14* 82:*21*
278:*22* 309:5
319:8 347:*21*
390:*22* 397:4
407:*10*
458:*11* 460:*11*
**notes** 113:*15*
445:5, *9* 461:*1*
**notice** 1:*15*
6:*9* 227:*1*
238:2 245:4
**Notification**
7:*11* 103:*19*
136:*17*
168:*17*
169:22
170:*16* 234:7
237:*9* 238:*19*
262:22
288:*17*
290:*16* 293:8
298:*21*
300:*21* 441:*17*
**notifications**
299:2
**notified** 39:*1*
149:*22* 264:7
280:*20*
**notify** 137:7
144:*21* 145:3
156:*21*
161:*24* 168:4
171:*16* 280:8
**notifying**
136:*22* 298:*19*
**notwithstandin
g** 444:*3*
**Novartis**
138:*21* 139:6,
9, *14, 19*
140:3, *11, 17,
20* 141:5
143:5 198:4

300:6 418:5,
7, 8
**November**
128:*12* 129:*9,
17, 22* 130:7,
12, 19, 24*
131:4, *9, 12*
132:*13* 234:*8,
13* 235:*16*
237:8, *16*
254:5 261:*21*
262:*22* 387:9
389:*23* 453:7
**number** 22:6
34:*10* 61:5
64:*23* 66:3, *8,
11* 70:*16*
73:4, *11, 12*
80:9 81:*10*
163:9 165:*12*
253:*21* 257:4
266:5 312:5
313:6 315:*17*
330:2, *21*
357:7 383:9
407:*12* 408:8
439:*1* 445:*13*
451:4 453:*15*
**numbered**
397:*14* 438:*17*
**numbers**
315:*18* 411:*19*
**numerical**
207:*12* 244:*22*

**< O >**
**Object** 19:*10*
23:*12, 24*
24:*21* 27:*9,
18* 28:3 29:3
31:*18* 32:*10,
18* 33:9, *24*
34:*24* 36:4
38:*11* 45:*12*
46:7 64:3
70:*22* 71:*16*
72:*18* 74:5
75:*13, 24*
88:*15* 89:*24*
91:*1, 17* 95:3,
*17* 100:3

104:*20* 105:9
116:2 127:*20*
130:*14*
131:*14* 140:8
143:22
150:*21* 158:8
160:*11* 168:7
170:*18*
171:*18*
172:*10* 173:4
174:2 180:5
181:8 182:*19*
187:*11* 190:2
191:7 193:*15*
202:9 204:2
205:*16* 207:*1,
24* 209:4
210:*12*
211:*21* 213:*4,
21* 214:*24*
216:2 222:*18*
226:*12*
227:*17* 231:5
237:*17*
239:*10* 244:*1*
246:*14*
252:22 254:6
256:4 258:*20*
261:*22*
262:*24*
264:*23* 268:8
269:7 270:9
271:3 275:5
299:*12* 305:2
307:*13*
308:*11* 320:7
335:*1* 346:*21*
350:*18* 352:4
360:*11*
370:*19* 372:*1*
374:*14* 384:5
403:7 437:*24*
**Objection**
17:*11* 21:8
22:*1* 24:*12*
26:3, *10, 23*
31:5 100:*15*
142:*11*
148:*20* 203:4,
*13* 204:*24*
209:*15* 217:3

Confidential Information Subject to Protective Order

218:*19*
221:*24*
231:*15*
241:*10*
247:*15*
251:*19*
255:*10*
257:*16*
273:*13*  291:*7*
296:*11*  297:*5*
299:*22*
305:*20*
316:*18*
317:*18*
322:*10*  323:*4*
327:*15*
328:*13*
329:*14*  330:*4*
331:*3*  332:*22*
344:*14*  345:*5*,
*22*  348:*6*
351:*19*  363:*5*
378:*2*, *21*
380:*8*  381:*5*
389:*13*
392:*20*
394:*21*  421:*4*
422:*8*, *16*
423:*8*, *9*, *20*
425:*10*  427:*7*,
*9*  428:*6*, *13*,
*20*  429:*4*, *20*
431:*4*  432:*17*
434:*1*  435:*5*
436:*2*  437:*4*
441:*11*
442:*11*  443:*8*,
*22*  444:*10*
453:*1*  454:*18*
455:*4*
**Objections**
25:*14*  209:*11*
324:*19*
**obligated**
155:*24*  275:*2*
**obligation**
135:*18*  137:*6*
143:*9*  148:*9*,
*14*  151:*16*
157:*23*  158:*6*
168:*4*  176:*5*

205:*14*
210:*10*  222:*4*
224:*16*
246:*11*, *19*
247:*3*, *10*
248:*1*  251:*17*
254:*21*
259:*15*  270:*5*
274:*12*
**obligations**
135:*8*  136:*1*,
*3*, *5*  215:*23*
221:*12*, *21*
259:*12*, *20*
264:*18*  271:*1*
274:*6*
**obscured**
359:*11*
**observation**
67:*9*  156:*24*
309:*11*  310:*6*,
*13*  312:*1*, *2*, *5*,
*10*, *18*, *21*, *24*
380:*8*  384:*1*,
*3*, *8*  385:*4*
386:*20*  389:*8*,
*11*  391:*10*, *14*,
*17*, *22*  392:*2*,
*18*, *23*  393:*3*,
*9*, *11*, *17*, *21*, *22*
394:*4*, *15*, *24*
395:*2*, *24*
397:*13*, *18*, *21*
406:*7*  407:*8*
408:*19*  409:*4*
420:*14*, *15*, *17*,
*20*  421:*1*, *12*,
*16*, *22*  422:*1*,
*6*, *12*, *20*, *22*
423:*1*, *6*
447:*13*, *21*
448:*6*, *13*
449:*1*, *13*, *15*,
*16*, *19*, *22*
450:*2*, *3*, *12*,
*22*  451:*4*
**Observations**
6:*7*  55:*17*
62:*17*  103:*10*,
*13*  104:*4*, *12*,
*17*  105:*6*, *13*

128:*22*
131:*17*  153:*3*
163:*4*, *10*, *11*
166:*6*  192:*22*
292:*3*  294:*24*
308:*23*, *24*
309:*4*, *14*
312:*14*
317:*21*
327:*22*  345:*9*
347:*17*  348:*9*
360:*9*  383:*10*,
*12*  388:*2*, *4*, *5*,
*24*  389:*5*, *17*
406:*4*  407:*15*,
*24*  420:*22*
421:*19*
434:*24*  435:*1*,
*20*  436:*8*, *15*
446:*20*, *23*
451:*4*  454:*6*
**observed**
310:*11*
390:*24*
392:*11*  395:*8*
**observer**
151:*12*
**obtain**  62:*23*
358:*22*
**obtained**
140:*13*  179:*24*
**obtaining**
264:*13*
**obvious**
110:*24*  252:*7*
407:*10*
**obviously**
110:*14*
175:*21*  279:*4*
280:*13*
**occasion**  419:*4*
**occasions**  61:*6*
**occur**  122:*21*
421:*2*
**occurred**
102:*22*
130:*24*  131:*4*,
*21*  168:*6*
178:*4*  189:*23*
336:*8*, *10*
337:*15*

338:*11*  351:*6*
385:*18*  446:*7*
**occurring**
395:*21*
**occurs**  173:*3*
200:*22*  203:*2*,
*23*  421:*13*
423:*6*
**o'clock**  195:*17*
**October**
55:*12*  267:*9*
269:*2*  396:*2*,
*9*  397:*5*, *23*
**odd**  339:*1*
**offended**
238:*20*
**offer**  20:*23*
81:*2*
**offering**  16:*9*
30:*1*  33:*18*
84:*4*, *7*  140:*5*
155:*14*
158:*12*
169:*11*, *15*
180:*11*
349:*18*, *22*
350:*2*  427:*11*
**office**  315:*24*
316:*4*  417:*8*
**officer**  164:*14*
165:*23*  260:*2*
**official**  106:*15*
107:*22*
114:*23*
115:*18*  116:*5*,
*16*  122:*21*
123:*10*
**offset**  103:*24*
**oh**  163:*8*
271:*18*
272:*14*
277:*24*
311:*12*  321:*6*
359:*24*
**Okay**  13:*15*,
*24*  16:*4*, *5*
44:*18*, *19*
46:*21*  52:*14*
55:*7*  65:*18*
78:*17*  105:*16*
111:*10*  113:*4*

118:*14*  134:*7*
155:*20*
166:*16*  172:*7*
173:*1*  178:*17*
183:*17*  185:*6*,
*22*  195:*18*
202:*5*  203:*9*,
*21*  209:*8*
213:*15*  222:*8*
226:*21*
229:*12*
233:*24*
234:*11*  250:*3*,
*17*  260:*19*
267:*17*, *19*
268:*17*  273:*3*
274:*8*  275:*12*
278:*2*  279:*18*
282:*13*, *19*
284:*2*  285:*24*
288:*3*, *20*
290:*8*, *23*
292:*16*  293:*6*
303:*9*  311:*14*
313:*10*
314:*17*  315:*2*
321:*6*, *10*
324:*1*, *3*, *9*
332:*14*
334:*14*
335:*16*
340:*13*
344:*16*  354:*5*,
*24*  356:*22*
358:*15*, *20*
359:*12*  366:*2*
368:*10*, *11*
369:*22*
377:*19*  381:*2*
390:*9*  394:*2*
397:*6*, *17*, *20*
412:*16*
415:*16*  416:*4*
424:*17*  425:*1*
433:*15*  447:*2*
449:*11*  450:*9*
**old**  167:*16*
380:*15*
**older**  377:*7*
382:*17*  383:*2*

once 21:*16*
50:*11*, *19*
72:20 82:*14*
109:*19*
168:*14* 270:5
404:*16* 450:*4*,
*18*
ones 30:*19*
32:*4* 59:5
61:*12* 62:*19*
69:*17, 19, 22,*
*23* 72:*1*
79:*12, 13*
85:*1* 139:*21*
144:2 174:*14,*
*16* 238:*16*
239:*8* 257:*21*
264:5 277:*6,*
*15* 308:*8*
429:*9, 12*
436:*16*
Ongoing 8:*19*
online 110:*8*
404:*15*
open 15:5
188:*11*
440:*14* 445:*12*
opened 266:5
opening 117:*8*
opens 117:*22*
operating
48:6 77:*1, 16*
79:*24* 90:5, *9,*
*20* 99:*22*
426:*12*
operation
82:5 175:7
operations
82:7
operative
79:*19* 90:*22*
145:*20* 219:7
223:*11* 226:3
228:*8* 230:*4*
284:6 293:*16*
374:2
opine 55:*20*
101:*11*
102:*20*
153:*13* 355:7,

10 366:6
394:*13*
opined 34:5
opining 23:*17*
28:*13, 15*
41:*12* 42:*3, 7,*
*12, 15, 17, 21*
175:2 277:*16*
365:*8*
opinion 19:*14,*
*17* 20:*23*
21:2 26:5, *15*
35:*10* 60:*24*
63:*15, 18, 20*
64:8 66:*22*
68:2 69:5
70:*19* 71:*12*
75:*1* 84:5, 7
124:*23* 140:5
155:*15*
158:*13*
169:*12, 16*
180:*12* 181:5
205:*10* 210:6
225:*11*
349:*19, 22*
395:*18* 401:*1,*
*7, 12* 423:*4,*
*10* 424:*24*
429:*2, 13*
435:*21* 437:*8*
441:*7, 24*
444:*16*
opinions
14:*14* 16:*9,*
*12* 22:5, *9, 13,*
*17, 21* 23:*3, 9,*
*21* 24:*8, 17*
25:*11, 23*
26:*8, 20* 27:*7,*
*14* 28:*17, 24*
30:*1, 22* 31:2
32:*15* 33:*15,*
*19* 34:*22*
35:5, *11, 18*
36:*1* 37:*18*
52:*19* 58:*8,*
*20* 60:*11, 15*
61:*13* 63:7
64:*1* 65:*9, 24*
66:*15* 68:*22*

72:*16* 75:*22*
239:*8* 240:*10,*
*12* 241:*9*
242:*4* 243:*13,*
*18* 284:5
350:2 425:*2,*
*20* 427:*10*
442:*19*
451:*24* 452:5
454:*16* 455:*1*
opportunity
396:*18* 457:*9*
opposite
179:*21*
optimization
201:*18*
option 322:*15*
ORDER 1:*8*
130:*18*
219:*20*
223:*14*
224:*11* 230:*4*
243:*8* 245:*19*
246:*17*
247:*16* 364:*13*
O'REILLY
3:*1*
original 48:5
57:*4* 99:*16*
282:*22* 458:*15*
Orleans 2:*4*
Ortega 4:*10*
11:*4*
OSD 8:*8*
339:*3, 23*
350:*24* 444:*4*
ought 287:2
outcome
129:*4* 162:*21*
163:*15* 349:*20*
outcomes
62:*16* 158:*1*
outfit 411:*3*
Outside 20:*20*
21:*11* 24:*4,*
*14* 25:*16*
32:*1* 151:*11*
169:5 172:5
218:5 337:*11*
342:*4* 427:*9*

441:*23*
overall 82:*12*
overarching
83:*19* 99:*10*
overseeing
420:*2*
overview
291:*17*
owned 92:*4,*
*17* 304:*19*
owner 285:*3, 9*
Oxford 4:*4*

< P >

p.m 195:*20*
196:*3* 275:*17,*
*21* 340:*14*
354:*7, 11*
402:*1, 5*
404:*24* 405:*4*
455:*22* 456:*4*
packaging
349:*9*
PAGE 5:*16*
6:5 7:5 8:5
9:5 10:6, *9,*
*12, 15* 49:5
55:*10, 13*
66:*18* 79:*17*
106:*3* 107:*14*
108:*14*
112:*14, 22*
113:2 156:*3*
166:*7, 8, 9, 20,*
*22* 167:*1, 6, 8,*
*10* 199:*19*
200:*1, 15*
202:*2, 20, 22*
204:*18*
272:*24*
275:*24*
278:*12* 283:*4*
311:*8, 11*
318:*20*
319:*15* 321:*2,*
*8* 325:*13*
336:*15* 340:*3*
357:*14*
358:*13* 359:*7*
369:*20*
383:*22*

390:*15*
414:*15*
437:*14*
438:*10, 12, 13,*
*14, 18, 21*
440:*1, 4*
445:*20* 447:*7,*
*11, 23* 448:*1,*
*3, 10, 15, 18*
449:*4, 12, 18*
450:*2, 8, 12,*
*13, 18, 21*
451:*2, 6, 10*
459:*4* 461:*2*
pages 460:6
pain 271:*10*
Pan 7:*23*
323:*22* 324:*1*
325:*13* 327:*3*
328:*24*
Paragraph
16:*16* 47:*7,*
*14* 48:*23*
52:*16* 53:*14,*
*16, 22* 54:*18*
66:*21* 67:*24*
69:*2, 6* 73:*18,*
*23* 74:*9, 20*
75:*1* 76:*19*
78:*8* 82:*22*
83:*17* 84:*20*
86:5 88:*6, 13*
101:*3* 103:*3,*
*8, 9* 104:*1*
105:*16*
113:*15*
114:*12*
115:*22*
116:*21, 24*
117:*4, 11, 22*
118:*7* 133:*3,*
*9, 11, 15, 21*
134:*13, 19*
135:5 136:6
137:*9, 18*
154:*19* 156:2
169:*20* 178:*7*
180:*23*
184:*20*
185:*16*
189:*15* 200:*1,*

Confidential Information - Subject to Protective Order

2, 5  201:23
202:2  212:11
233:16, 18, 21,
24  243:24
276:4, 17
277:16  279:5
282:4  287:22
288:10
289:18
303:23  304:4
305:13  306:9,
14, 15  307:5
308:5, 15, 17
313:23  314:1
330:18  331:5
335:24  359:2,
6, 8, 21, 23
370:1, 5
373:14
390:18
391:24
405:19
406:21
433:11, 16
434:5, 8
435:20
439:24  440:3
**Paragraphs**
55:22  72:16
177:3  276:5
313:12
**parent**  282:21
**Park**  2:15
**Part**  6:22
43:1  45:23
48:4, 12, 16
49:15  54:20
58:14  69:6
78:5  79:22
82:15  85:22
102:6  117:10,
12  128:20
153:23  156:9
180:17  200:7
221:11, 20
224:17  234:3
235:7  236:14,
19, 23  245:21
249:12
256:20  261:3
263:13  273:6

283:20
298:10, 13
307:22
341:16
387:20
396:11
412:22  416:2
436:6  450:7
451:12
**particular**
22:18, 23
23:5  27:15
28:1, 17  29:1,
19  30:2  31:3,
15  32:8, 16
33:7, 22
34:22  42:8,
18  82:6
86:11  151:4
175:7, 22
177:1  208:5
210:9  277:15
299:5  314:3
317:4  334:12
344:2  399:10
418:23
**particularly**
52:10  58:10
116:17  400:8
**parties**  35:6
56:19  284:20
287:2  362:13
374:21
**Partners**
411:8  414:7
**parts**  248:17,
18
**Party**  6:18
280:8  361:1
366:16
**PAS**  400:19
401:20
**passed**  269:16
427:16
**passes**  195:1
**passing**  212:5,
9, 14  334:11
**past-perfect**
128:1
**patent**  211:18,
24  212:1, 7,

13, 15, 19, 20,
22, 24  213:10
214:10  222:23
**patents**
213:18  214:4
**pathway**  371:9
**pathways**
207:6  372:9
**pause**  428:17
**pay**  208:8
226:17, 18
253:22
**paying**  172:6
208:11
**peaks**  390:23
392:10, 13
394:5, 16
**pending**  13:21
132:7
**Pennsylvania**
2:20  4:4
**penultimate**
202:1
**people**  315:19
**percent**  146:1
248:12, 15
301:10  391:7
**Perfect**  57:16
229:8
**perform**
376:12
**performed**
129:6  146:18
318:1  388:3,
20  389:6
**performing**
389:2  419:8
420:1, 3
**period**  20:7
40:9  52:6
97:20  99:2
100:2  125:17
126:4  232:7
234:18  313:22
**periodic**
348:11, 14
**periodically**
82:4
**person**  317:4
340:24
343:21  344:7

**personally**
193:20
**personnel**
165:19
309:16  317:22
**perspective**
141:19
237:24
256:12
257:13
331:23
335:13  343:13
**pertain**  28:8
155:5  216:20
248:22
277:10
309:13  347:1
**pertained**
67:18  80:16
87:24  89:3
97:23  98:11
159:23
225:20  243:2
289:10  301:9
343:5  352:22
375:22
396:14
398:14
400:21  429:9
**pertaining**
230:21
244:12  287:1
348:21
**pertains**
32:23  88:18
101:18
107:15  285:9
298:18  349:1
365:14  372:8
400:7  451:16,
20
**pertinent**
52:10, 19
124:12
337:22
342:23
343:12  355:24
**ph**  1:21
**Pharma**  2:23
3:8

**Pharmaceutical**
2:22  3:7
110:19
133:24  156:7
302:12, 17
303:3  416:15,
17
**Pharmaceutical
s**  2:22  3:7, 13
4:6  47:11, 23
48:1  280:8
304:13  417:3,
13  446:8
**Pharmacy**
3:18
**Philadelphia**
2:20
**philosophy**
99:11
**phone**  121:6
**phrased**
372:22
**physical**
327:22
**physically**
315:14  316:2
324:13
331:21
332:17
335:11  392:15
**pick**  181:22
**picked**  434:21
**Piedmont**  2:9
**PIETRAGALL
O**  4:1
**pinned**  109:12
**Pittsburgh**  4:4
**PIZZI**  3:1
**place**  55:10
83:12, 15
84:14  85:15
86:18  96:17
97:21  145:24
151:23
155:17, 23
156:5  157:15
158:15, 20, 24
159:11, 14, 16,
19  173:22
175:3  213:16

214:9, 18
216:19  276:7,
14, 18  278:8
280:14, 22
308:8  334:17
338:5  346:4
367:11  376:4
426:13  427:6
**plaintiff**  22:14,
19, 24  23:6
**Plaintiffs**  2:6
16:13, 17, 21,
24  17:3, 5, 9,
17, 21  18:8,
14, 18, 21
19:1, 4, 8, 20
20:1, 4, 7, 10,
13, 17  21:5,
14, 24  23:10,
22  24:9, 20
25:12  26:1, 9,
21  27:8, 16
28:2, 18  29:2,
14, 20  30:4,
17  31:1, 4, 17
32:9, 17  33:8,
23  34:23
35:13  36:3
57:10  424:14,
19  425:9, 13,
19  446:17
454:23
**plan**  295:14
405:14
**plant**  408:16
**plants**  353:3
**please**  25:2, 5
39:11  51:11
55:7  100:13
108:7  134:11
137:16  161:1
165:6  167:3
179:3, 5, 19
208:8  209:10
221:18  231:8
253:22  266:3,
4  267:15
273:2, 18
291:14  320:8,
17  321:2
325:16

353:13
358:18  368:9
390:10
394:10
397:21  405:7
410:12  416:7
419:18
430:10
439:23
445:11
447:22  458:3,
8
**plenty**  212:17
**point**  46:10,
17, 18  48:13
49:10, 24
50:12  57:22
59:13, 19
61:21  62:23
63:13  83:10,
21  84:6, 11
86:9  87:11
99:9  101:9
105:22
123:13, 15
124:2, 13, 19,
22  128:11, 14,
15  131:7, 10,
24  133:2
139:17  149:4,
14  153:5
162:16, 24
175:20  180:1
189:16, 20
198:13  221:6
227:3, 6
229:16  263:9
264:6  272:10
277:16
309:21
317:10  330:8
337:13, 14
345:10
373:14  377:7
389:19
397:13
406:19  426:2
**pointed**
144:16  378:23
**points**  96:20

137:4  426:19
**poison**  249:15
**policies**  81:4,
5, 21, 22  82:1,
23  83:20
84:5, 21  85:8
87:19  90:10,
13  97:18
98:23  100:5
102:22  103:2
155:16
158:14  214:8,
17  276:23
284:3  401:18
429:2
**policy**  82:9,
13, 21  84:2,
10, 19  86:3
87:22, 23
88:2, 5, 11
89:19, 20, 22
90:3, 22
91:16  98:20
101:24
107:12, 23
116:6, 16
154:13
278:19  280:1
281:5, 18
282:22
288:14, 17, 20
296:18  297:3
298:9, 11
299:5, 21
300:9  301:2,
19  302:15, 19
303:4, 9, 22
304:3, 22
305:5, 12
**poor**  431:23
**popped**  167:17
**portion**
107:18
343:22
433:20  450:11
**portions**
405:11  428:11
**position**
106:15
114:24
115:18  309:8

310:4  324:22
373:16
**possession**
93:23  100:21
260:13
**possibility**
111:19
222:21  235:3,
21  262:15
263:7  332:19
431:24
**Possible**  6:16
86:21  222:24
223:20  257:5
263:12  264:1,
14  266:19, 24
271:10
281:21
323:18
331:15, 24
349:13
380:11  382:9
386:13
395:13  398:14
**possibly**  86:13
154:24
174:19
191:23  194:1
195:8, 9
197:14  235:4
334:14  381:8
386:11  415:7
**post**  84:16
**postdated**
345:20
**potassium**
274:10, 21
**potency**  148:4
251:23
**potential**  46:5
135:19
136:12  137:7
138:7  143:4,
17  144:19
145:1, 10
196:21
197:17
198:10
199:10
205:12  211:5
213:18  234:5,

13, 17  235:15
238:3  245:5
253:8, 11
260:10
286:17
297:12  299:8,
20  300:8
305:19  310:7
366:23
371:18, 23
372:4  373:2
384:15  385:7
436:18
**potentially**
148:4  157:7
163:20
355:24  361:21
**power**  187:1
**practice**
154:13  312:7
380:2  440:8
**Practices**  5:21
107:2  109:24
122:18
152:21
155:17  385:1
401:18  430:8
**pre-agreed**
185:11
**preapproval**
401:14  418:20
**precise**
350:14, 16
**preclinically**
45:2
**predate**  48:6
**predated**
86:15  242:22
**predates**
124:23
**predecessor**
48:11  87:14
**predicate**
47:21
**predicted**
434:11, 14
**predicting**
370:11
**Predominately**
155:3  416:21

417:*19, 21*
418:*11*
**Preliminary**
6:*11*
**preparation**
36:*23*  153:*8*
454:*14*
**prepare**  61:*23*
409:*3, 7*
429:*2*  452:*20*
**prepared**  14:*9*
138:*17*
309:*15*  414:*1*
453:*20*  454:*8*
**preparing**
163:*13*
188:*17*
254:*18*
418:*21, 22*
453:*15, 16*
**presence**
38:*24*  46:*3*
69:*10*  117:*13*
120:*1*  135:*20*
137:*23*  150:*1*
153:*22*  197:*7*
227:*4*  240:*22*
243:*1*  264:*11,
19*  266:*19, 24*
383:*13*  384:*2,
9, 14, 17*
385:*6*  386:*21*
388:*12, 22*
389:*12, 19*
391:*22*
392:*18*
436:*18, 19*
437:*1, 11*
**PRESENT**
4:*8*  37:*24*
40:*10*  42:*24*
66:*24*  70:*21*
128:*2, 4*
180:*16*
197:*10*  220:*6*
227:*20*  228:*1*
230:*6*  235:*5*
257:*9*  262:*5,
16, 20*  264:*8*
272:*2*  273:*9*
274:*5, 17*

293:*16*
383:*15*  384:*4,
10*  385:*21*
419:*1, 3*
423:*22*  443:*15*
**presented**
38:*3*  173:*8*
259:*8*
**president**
423:*13*
**pretend**
424:*22*
**pretty**  63:*11*
**prevent**
322:*21*
375:*20*
431:*24*  433:*2*
**prevented**
103:*14*  104:*7,
12*  105:*2, 13*
146:*13*
216:*24*  394:*3,
14*  399:*4, 15*
403:*12*  435:*1*
**preventing**
377:*20*
**previous**  289:*3*
**previously**
103:*17*
104:*23*
136:*13*  145:*2*
430:*4*  440:*11*
**primary**
374:*23*
**printed**  281:*11*
**prior**  34:*17*
45:*6*  46:*21*
58:*12*  61:*20*
77:*20, 22*
78:*10*  81:*13*
86:*20*  93:*24*
94:*6, 11, 15*
95:*2*  98:*15*
101:*24*
103:*19*  119:*1,
10, 17*  123:*10,
23*  124:*7*
126:*20*  127:*9*
129:*23*
130:*13, 24*
131:*4, 13*

132:*1*  144:*20*
182:*24*
187:*10*
188:*19*
189:*23*  190:*1*
191:*5*  192:*14*
198:*11*  202:*5*
215:*9*  216:*23*
230:*12, 18*
231:*3*  235:*16*
237:*15*  254:*5*
261:*20*
262:*21*
282:*21*
288:*22*  289:*6,
8*  306:*21*
338:*2, 3, 7*
343:*12*
355:*19*
362:*15*  363:*1*
378:*12, 17*
388:*6*  389:*1*
393:*18*  396:*3*
398:*3, 24*
399:*5, 16*
400:*14*
409:*13*
419:*14*  435:*24*
**priority**
420:*23*
**privilege**  96:*7*
**probable**
45:*10*
**probably**
162:*8*  176:*16*
178:*12*
199:*19*  260:*1*
340:*10*  349:*7*
**problem**
201:*4*  440:*6*
**procedural**
155:*5*
**procedure**
77:*1, 16*
86:*17*  90:*4, 6,
20*  98:*2*
99:*22*  154:*14*
**procedures**
90:*9*  155:*16*
158:*14*
213:*16*  214:*2,

9, 18*  341:*6*
401:*18*  426:*12*
**proceed**  77:*8,
13*  364:*15*
380:*22*  413:*12*
**proceeded**
154:*5*  209:*20*
446:*23*
**proceeding**
15:*13*
**process**  13:*4*
43:*15*  110:*21*
127:*3*  197:*3,
5, 6, 7, 11, 15,
21, 24*  201:*10,
20*  208:*12*
210:*21*
211:*12*
213:*18*  221:*8*
222:*7*  234:*21*
236:*2, 3, 5, 9,
14, 17, 20, 24*
237:*2*  249:*12*
250:*4, 9, 17,
22*  251:*11*
252:*11, 14, 15,
17*  254:*3*
314:*4*  353:*11*
355:*3, 16*
366:*17*
367:*18*
370:*10, 12, 18*
373:*18*
376:*19*  377:*3,
24*  388:*16*
400:*18*
401:*20*
403:*22*  404:*6*
405:*16*
**processes**
92:*15*  135:*10*
146:*10*
151:*23*
201:*17*
213:*15*
253:*19*  255:*6,
22*  356:*7, 17*
371:*19*  372:*7*
373:*4*  382:*5*

**processing**
128:*24*  360:*5*
367:*4*
**procurement**
164:*14*  165:*23*
**produce**
157:*3, 8*
**produced**
162:*19*  223:*7*
274:*18*
**product**  38:*9*
39:*6, 24*
40:*11, 15, 21*
41:*7, 14, 21*
42:*1, 5, 9*
67:*19, 21*
69:*16*  80:*6,
15*  123:*22*
124:*3, 11*
125:*11, 15*
126:*2*  127:*13,
17*  129:*14*
130:*6*  131:*8*
141:*6, 13, 15*
142:*2, 10*
144:*3*  150:*20*
151:*17*  155:*2*
173:*18*  177:*7*
206:*15*  211:*6*
218:*2, 24*
219:*22*
223:*13*
224:*12*  228:*2*
230:*18, 22*
231:*3, 12*
237:*7*  245:*6,
20*  246:*5, 18*
247:*23*  248:*7*
249:*6, 24*
250:*14, 24*
252:*5, 6*
254:*5, 13, 22*
256:*3, 14*
257:*10*  258:*5,
14*  260:*8, 12,
16*  261:*2, 20*
269:*5, 23*
271:*11*  297:*1,
10*  343:*6*
352:*8, 20*
388:*15*

391:*19*   392:*8*
398:*7*   399:*21*
406:*14*
419:*23*   422:*2,*
*14, 24*   424:*5*
432:*6*
**Production**
10:*8*   43:*15*
201:*5*   245:*14*
351:*9, 15*
352:*1*   355:*20*
359:*18*
361:*11*   362:*5,*
*8*   363:*19*
364:*15*   379:*6*
380:*3, 20*
382:*22*   406:*6*
**PRODUCTS**
1:*4*   11:*12*
37:*12, 19*
38:*1*   40:*6*
43:*5*   89:*12*
92:*16*   97:*24*
98:*7*   99:*19*
112:*19*
117:*24*   119:*4,*
*8*   120:*7*
127:*8*   128:*10*
129:*9, 10*
130:*20*   132:*2*
145:*18*
147:*14*
204:*15*
227:*12*
245:*13, 23*
246:*10*   247:*5*
251:*22*
255:*16*
258:*19*
259:*23*   262:*6*
264:*1*   267:*1*
270:*8*   271:*22*
272:*2*   296:*4,*
*9*   338:*12*
386:*11*
387:*18*
417:*16*   420:*5*
422:*6*   423:*5*
424:*8*   431:*9*
434:*15*   448:*5,*

*11, 21*   452:*15,*
*23*   453:*4*
**Professional**
1:*16*   45:*5*
47:*5*   418:*15*
457:*13*
**profile**   145:*19*
**profiling**
254:*15*
**program**
304:*14, 18*
306:*24*
**programs**
295:*22*
**progress**
405:*17*
**prohibit**
280:*23*   376:*5*
**prohibition**
323:*17*
**prompt**
163:*20*
169:*21*
170:*13*   171:*4*
172:*1*
**promptly**
135:*18*
156:*21*
161:*24*   162:*1,*
*4, 7, 12, 15*
168:*4, 21*
169:*1*   170:*6*
171:*15*
**promptness**
169:*8*
**proper**   44:*14*
320:*11*
**properly**
86:*24*   148:*11*
**ProPharma**
8:*13*   411:*2, 8*
**propounded**
460:*9*
**proprietary**
372:*13, 15*
**proscription**
217:*6*
**prospective**
124:*17*
**protection**
417:*14*

**PROTECTIVE**
1:*8*
**proven**   219:*4*
**provide**   33:*15*
35:*8, 10, 18*
38:*16*   61:*21*
62:*2*   90:*14*
96:*14*   156:*17*
179:*14*
183:*20*
184:*21*
274:*22*   349:*5*
425:*2*   442:*1*
**provided**   61:*8*
62:*9*   64:*12*
75:*7*   79:*18*
87:*20*   286:*20*
317:*19*   410:*8*
415:*8, 14*
447:*1*
**providing**   13:*5*
**provision**
291:*23*
**prudent**
216:*11*
**Public**   1:*18*
165:*24*
177:*10*
254:*19*
457:*14*   460:*23*
**publicly**
214:*10*
**published**
118:*16, 19, 20*
**pull**   108:*7*
111:*23*
277:*20*   310:*1*
316:*19*
356:*23*
383:*17*   402:*9*
413:*6, 14*
430:*3*   433:*13,*
*14*   439:*5*
**pulled**   101:*17,*
*20*
**pulling**   111:*14*
**purchased**
38:*2*   67:*1*
221:*14, 23*

233:*7*   234:*6*
399:*12*   400:*11*
**purchasing**
142:*19*
146:*12*
218:*12*
238:*13*   255:*8*
262:*21*   264:*22*
**Purdue**   416:*22*
**purification**
382:*5*
**purity**   140:*23*
218:*10*
**purported**
18:*24*   304:*4*
**purportedly**
328:*11*   444:*22*
**purpose**   83:*5,*
*9*   96:*12*
211:*3*   281:*24*
408:*16*   426:*5*
**purposes**
36:*14*   44:*3, 6*
50:*1*   157:*21*
222:*13*
232:*19*
254:*23*
268:*18*
419:*12*   442:*24*
**pursuant**   1:*15*
**pursued**   139:*8*
**put**   56:*15, 23*
64:*11*   148:*8*
226:*24*
231:*21*
240:*11*   245:*4*
270:*20*   275:*8*
287:*19*
289:*23*
292:*16*
305:*10*   313:*2*
335:*16*
408:*23*   422:*2*
**puts**   167:*17*
**Putting**   21:*1*
40:*12*

**< Q >**
**Q3**   145:*23*
253:*2, 5, 14*
301:*10*

**Q3A**   120:*5*
144:*9*   146:*3,*
*4*   148:*2*
205:*7*   249:*3*
**Q9**   231:*18*
**QAG-51**
78:*23*   80:*3*
**QAG-51B**
89:*21*   90:*23*
91:*24*   93:*2*
98:*16, 20*
**qualifiable**
147:*10*
**qualification**
219:*19*   243:*3*
248:*20*   341:*6*
**qualified**
363:*18*   379:*5*
382:*20*
**qualify**   296:*9*
**qualifying**
139:*22*
228:*17*   234:*15*
**Quality**   7:*6,*
*12*   76:*20, 24*
77:*10, 14*
78:*9*   79:*15*
81:*4*   82:*24*
83:*12, 16, 20*
84:*10*   85:*22*
96:*18*   97:*1, 9,*
*13*   99:*10, 13,*
*24*   101:*11*
141:*18*   142:*8,*
*16*   151:*23*
156:*6*   157:*5*
158:*19, 23*
159:*4, 12, 13,*
*15, 19*   160:*6*
161:*2*   162:*6*
169:*2, 17*
215:*22*
218:*10*
232:*22*
245:*16*
256:*20*
276:*13*
278:*15*   280:*5,*
*14, 21*   281:*15*
293:*9, 22*
294:*2*   295:*12*

Confidential Information - Subject to Protective Order

296:*10*  297:*2*
298:*6, 11, 16*
299:*5*  300:*13,*
*24*  356:*1*
374:*2, 12*
375:*3, 7, 13*
376:*4, 12*
377:*21*
380:*22*
395:*17*  417:*3,*
*4*  418:*3*
423:*14*  426:*9,*
*14*  427:*20*
429:*10, 18*
**quality/drug**
110:*20*
**quantifiable**
147:*10*
**quantification**
248:*20*
**Quantify**
162:*12*
**quantifying**
206:*17*
**quantities**
223:*4*
**quenched**
199:*22*
200:*22*  203:*2,*
*24*
**quenching**
197:*21, 23*
201:*10, 17, 19*
**question**
13:*11, 16, 21*
25:*2, 5, 8*
30:*11*  36:*16*
39:*19*  55:*24*
65:*17*  101:*18*
113:*6*  117:*19*
132:*6*  137:*16*
161:*1*  178:*9*
181:*16, 23*
182:*9, 13*
221:*18*  225:*8*
231:*8*  240:*6*
241:*3*  258:*9*
285:*16*  289:*3*
310:*3*  319:*16*
326:*16*
346:*16*

353:*14*
394:*10*
396:*24*
397:*21*
398:*22*
403:*18*
404:*19*  405:*8*
450:*9*
**questioned**
444:*18*
**questioning**
306:*1*  445:*3*
**Questions**
10:*14*  13:*5*
15:*12*  56:*6*
159:*22*  260:*7*
305:*18*
367:*19, 24*
402:*8*  411:*24*
412:*9*  444:*14*
455:*8, 15*
460:*8*
**Quick**  14:*9*
34:*5*  59:*5, 8,*
*14*  61:*6, 24*
62:*7, 20*
72:*23*  75:*18*
76:*5*  79:*14*
83:*6, 9*  85:*19*
96:*20*  106:*20*
107:*8*  113:*15,*
*21*  115:*2, 20*
133:*19*
134:*12*  179:*9,*
*13, 22*  181:*12*
186:*18*  187:*4*
276:*6*  291:*17*
313:*16*  324:*8*
328:*2*  330:*9*
353:*20, 23*
354:*2, 4*
365:*14*
369:*14*
403:*14*
407:*13*
423:*15, 21*
426:*8, 19*
428:*23*
430:*17*  431:*6,*
*10*  441:*2*

**quickly**  15:*17*
413:*24*
**Quick's**  28:*9*
32:*24*  33:*5,*
*13, 14*  35:*17*
60:*7, 19, 20*
63:*11*  76:*8*
105:*17*
106:*14*
107:*18*  108:*3*
117:*23*
133:*13, 21*
138:*20*
180:*20*
183:*24*  184:*3*
215:*19*
232:*21*
313:*13, 18*
405:*23*
409:*18*  423:*4*
427:*1*  429:*19*
432:*14*  440:*24*
**quite**  49:*4*
81:*10*  164:*9*
179:*21*
**quotation**
105:*12*
115:*23*
121:*23*  169:*9*
202:*4*  432:*14*
**quote**  61:*6*
115:*5, 16*
127:*11*  161:*3*
169:*20*
175:*17*
313:*16*
430:*21*
431:*18*  440:*5*
**quoted**  115:*2,*
*4, 7*  116:*12*
123:*14*
155:*22*
160:*18*
168:*16*
169:*16*
430:*17*  431:*10*
**quote-unquote**
107:*22*
**quoting**
113:*15*  116:*9*

148:*2*

**< R >**
**R&D**  146:*22*
207:*4*  265:*7*
**raised**  33:*1*
138:*14*  381:*15*
**range**  149:*10*
**rare**  432:*2*
**RASPANTI**
4:*3*
**raw**  302:*10*
**RBK/JS**  1:*5*
**reach**  204:*22*
**reached**
190:*11*
**reaction**
196:*23*
197:*23*
199:*20*  204:*6*
250:*10*
**reactions**
146:*19*  197:*1*
**read**  21:*13, 16,*
*23*  39:*15*
49:*1*  56:*17*
57:*1*  59:*2*
62:*21*  63:*16,*
*17*  103:*7*
104:*3*  106:*21,*
*22*  112:*12*
113:*7*  117:*17,*
*18*  118:*4*
121:*23*  122:*1*
126:*11, 13*
136:*24*  137:*1*
155:*12*  158:*4*
161:*14*
169:*21*
180:*19*
181:*11*  189:*3*
190:*11*
231:*16, 19*
232:*24*
233:*11*
236:*22*  268:*1*
269:*13*
270:*17*
273:*10, 14, 16*
277:*5*  292:*10*
304:*15, 20*

314:*11*
317:*13, 15*
319:*14*  321:*4,*
*10*  322:*3*
326:*24*
327:*11*
331:*10*
347:*13, 15*
361:*2, 12*
368:*18*
370:*13*
402:*16*
404:*18*  405:*7,*
*10*  409:*18, 20*
414:*15*
428:*10*
431:*17*
447:*12*  457:*9*
458:*3*  460:*5*
**reader**  180:*9*
181:*4, 18, 24*
182:*4, 17*
186:*24*  322:*9,*
*13*  345:*17*
**readily**  434:*16*
**reading**
132:*18*
138:*20*
151:*12*
161:*21*
168:*15*  180:*4*
184:*3*  186:*8*
203:*6*  223:*1*
240:*8*  241:*7*
268:*22*
273:*20, 22, 23*
282:*6*  307:*19*
323:*21*  329:*9*
333:*21*
345:*17*
349:*23*
368:*16*  450:*4,*
*7*
**reads**  113:*10*
156:*10*
185:*15*  200:*7*
329:*12*
390:*21*  431:*21*
**ready**  176:*17*
**real**  193:*10*

229:*13*

**realize**  229:*12*

**really**  59:*6*
60:*14*  62:*14*
108:*1*  152:*10*
194:*4*  208:*13*
211:*13*  218:*4*
226:*4*  229:*10*
256:*9*  368:*18*
452:*17*

**Realtime**  1:*17*
457:*14*

**re-ask**  65:*16*
181:*20*

**reason**  13:*24*
14:*3*  114:*8*
133:*17*
136:*21*
184:*19*
186:*17*
194:*16*  197:*3*
217:*15*
220:*13*
242:*10*  246:*9*
247:*4*  349:*14*
350:*15*
367:*23*
372:*16*  376:*1*
384:*11*  386:*2*
399:*9, 22*
400:*5*  414:*19*
452:*9*  458:*5*
459:*6, 8, 10,
12, 14, 16, 18,
20, 22, 24*

**reasonable**
163:*23*
170:*15*
238:*21*  364:*11*

**reasonably**
365:*6*

**reasons**  81:*16*
181:*1, 7*
183:*14*  257:*5*
350:*17*  351:*3,
6*  353:*2*
381:*19*

**rebut**  14:*11*
33:*14*  34:*6*
35:*17*  60:*6*

76:*8*

**rebuttal**  28:*9*

**rebutting**
63:*12*  276:*5*

**recall**  22:*3*
29:*15*  43:*18*
46:*16*  57:*4*
68:*12*  99:*15*
100:*11*
132:*17*  133:*1*
138:*10*
149:*17*
153:*20*  173:*7,
10*  175:*21*
176:*9*  177:*5*
196:*20*  199:*7*
229:*1, 2*
236:*23*
253:*13*  262:*3*
282:*2, 6*
314:*19*  315:*7,
19*  316:*3, 5, 8*
317:*2, 6, 9, 24*
321:*19*
323:*21*  324:*3,
5*  337:*21*
338:*3, 7*
342:*11*
346:*10*
347:*12, 15*
350:*12*
351:*12, 16*
355:*18*
360:*13, 17*
362:*11*
363:*13, 20*
364:*2, 4, 11*
365:*1*  377:*9*
379:*7, 10, 18,
22*  380:*13*
382:*13, 15*
383:*1, 5*
386:*6*  401:*21*
402:*12*
405:*22*
421:*23*  424:*2,
12, 15*  426:*3*
430:*16, 19*
433:*5, 7, 9, 20*
440:*17*  444:*6,*

7, 8, 12, 14, 18,
20, 24

**recalled**
225:*23*  377:*5*

**recalling**
39:*14*  80:*11*
155:*9*  215:*5*
346:*12*
361:*19, 24*
363:*7*  364:*9*
365:*1, 3*
366:*9, 12*
392:*4*

**recalls**  191:*6*
193:*13*
231:*22*  338:*2,
21, 23*  341:*2,
14*  343:*3, 11,
18*  347:*24*
348:*22*  396:*3*

**recap**  305:*11*

**receipt**  156:*22*
294:*5*  458:*17*

**receive**  170:*15*

**received**  57:*8*
88:*3*  96:*4*
129:*5*  140:*24*
157:*10*
162:*17*
168:*18*
178:*15*
180:*13*
184:*17*  284:*4*
406:*7*

**receives**
168:*14*

**receiving**
103:*19*
184:*18*  271:*2*
290:*16*

**recess**  195:*23*

**recheck**
176:*15*

**recognize**
166:*10*

**recognized**
436:*22*

**recollection**
48:*18, 20*
49:*18*  85:*1, 6*
232:*10*

316:*21*
324:*21*
365:*21*
368:*23*
378:*23*  381:*18*

**recommendatio
n**  311:*24*

**recommended**
201:*16*

**recommends**
254:*1*

**reconstruction**
326:*11*

**record**  11:*3,
19*  12:*10*
53:*4, 7, 11*
57:*17*  64:*11*
65:*16*  120:*16,
20*  123:*5*
165:*12*
195:*21*  196:*4*
275:*18, 22*
314:*7*  319:*17*
320:*4*  321:*14,
24*  330:*6*
349:*9*  354:*8,
12*  401:*23*
402:*2, 6*
404:*12, 22*
405:*1, 5*
406:*17*  428:*8*
455:*20, 23*
457:*6*

**recorded**
328:*19*

**records**  72:*9*

**recount**  407:*4*

**recovered**
355:*23*  356:*6,
16*  358:*5, 10,
24*  359:*13, 17*
360:*4, 20, 24*
361:*4, 10, 14*
362:*1, 16*
363:*2, 15, 24*
364:*8, 22*
365:*4, 10, 15,
19, 23*  366:*7*
367:*18*  374:*3*
376:*18*  377:*3,
11, 14, 17, 24*

378:*18*  379:*8,
16, 19*  380:*1,
2, 14*  381:*9,
11, 14, 17*
382:*2, 3, 18*

**recovered/recy
cled**  357:*23*

**recovering**
361:*7*

**recovery**
353:*10*  355:*3,
16*  366:*17*
370:*12*  373:*18*

**recycled**
197:*13*
360:*15*
364:*23*  381:*3*
382:*10*  383:*3*

**reduced**  341:*6*

**refer**  44:*11*
48:*7*  49:*21*
65:*10*  78:*15*
136:*5*  154:*18*

**reference**
55:*8*  64:*6*
76:*23*  83:*18*
86:*14*  117:*2*
118:*6*  164:*13*
178:*19*  204:*9*
211:*18*  212:*6,
10, 14*  239:*6,
13*  264:*5*
277:*8*  278:*15*
279:*8*  299:*3*
334:*7*  349:*5*
357:*21*  369:*8,
17*  374:*21*
380:*12*  381:*9*
382:*9, 24*
388:*5*  426:*8*
450:*21*

**referenced**
59:*5*  72:*23*
75:*18*  86:*4*
101:*15*  143:*8*
278:*19*  440:*23*

**references**
59:*13*  63:*10*
76:*10*  181:*17*
278:*13*
298:*10, 13*

Confidential Information - Subject to Protective Order

299:6  308:21
326:6
**referencing**
132:23
147:20  224:7
**referred**  66:5
71:24  153:18
154:19, 24
220:20
232:18, 19
348:18  369:14
**referring**  67:4,
15  79:8
133:3  185:23
212:3  229:3
290:20
294:15
313:24
368:24  369:2
414:24  439:19
**refers**  133:19
212:21, 24
451:13
**reflect**  96:10
**reflected**
14:15  65:9,
24  203:11
214:20
**reflective**
96:18
**reflects**  93:8
95:21  165:22
**refrain**  100:14
**refresh**
108:14  165:3
316:20
317:12  439:4
**refreshing**
410:11
**refusal**  179:14,
17  185:7
271:10  330:9
**refuse**  184:21
**refused**  328:3
330:11, 15
407:5
**refusing**
184:6  186:2
327:20
**regard**  41:9
159:22  188:5

211:12
215:16, 17
224:24
264:17
347:22  435:15
**regarding**
106:15
189:13  190:7
214:11  225:2
231:1  244:22
383:10  399:23
**Regardless**
40:19  112:2
279:23
344:22  401:1
435:18
**regards**
218:16
**regimen**  92:22
**Registered**
1:16  457:13
**registry**  46:13
**regulation**
220:11
**regulations**
106:17
113:11, 17
121:19  122:5
123:8
**Regulatory**
7:16  47:4
52:18  147:12
156:14, 22, 24
157:11
160:21  161:8,
16  162:22
168:5  169:23
173:2, 11, 14
176:5  206:16
210:20  220:4
225:19
228:19
240:21  243:6
250:12
261:12
270:22  271:8,
12  290:17
291:1  294:9,
12, 17  295:2,
6  303:11
304:3  341:24

431:21  432:3
435:14
**relate**  161:17
171:13  178:2
421:17
**related**  33:15
233:6  236:7,
8  260:9
281:15
307:12, 15
341:15  343:3,
10  367:6
417:21
419:16
422:12, 22
444:22
**relates**  156:15
157:2  199:10
232:16
290:11
304:23  447:3
**relating**  352:2
**relationship**
277:1  278:10
296:19
302:22, 24
304:6  305:6
306:11  307:7
375:5, 21
**relationships**
276:9, 19
308:10
**relevant**
79:15  95:15
103:11  104:6
136:22
277:12
313:22
429:12
431:15  452:5,
8
**reliance**  64:2,
13  437:15, 24
**relied**  60:4, 6
61:24  63:6,
24  71:12
74:24  75:10,
21  96:5
106:20  150:5
174:15
239:21  241:5

242:3  243:23
244:18
279:19  284:4
289:5  297:23
**relief**  19:8, 20
**relies**  152:14
**relieve**  184:24
**reload**  445:11
**rely**  133:22
152:18  239:7
243:13, 17
281:19  285:19
**relying**  58:6,
19  60:10, 15,
23  61:12
65:8, 23
66:14  68:2,
22  71:15
72:15  74:4, 8
113:21  240:9,
11  241:8
**remain**  86:6
223:14  243:8
245:11
**remained**
84:22  85:9
**remaining**
239:1
**remains**  80:19
152:24
153:12  310:3
407:22
**remember**
25:18, 19
29:14  53:15
315:5  316:23
317:14
368:16  424:11
**remind**  36:24
**remote**  1:14
12:17  15:11
**renaming**
92:21
**render**  58:7,
19  60:15
65:8, 23
66:14  68:2
75:22  107:6
**rendered**
14:14  452:1, 6

**rendering**
37:18  60:11
61:12  63:7
107:21  110:8
**reopen**  440:13
**repeat**  25:2, 5
39:18  160:24
182:12  208:3
221:18
**rephrase**
13:13  137:15
231:8  353:13
394:10
**replaced**  81:22
**replicate**
72:13  239:18
**replied**  178:5
**Report**  5:17
6:11  7:17
14:9, 15  15:7
16:6, 8, 13
21:11  24:4,
15  25:17
28:10  32:24
33:6, 13, 14
35:18  36:15,
23  41:23
47:8  48:19,
23  51:1  51:6,
15  52:12, 17
53:15  54:16,
21  55:6, 11,
20, 23  56:8,
20  57:2  58:8,
13, 15  59:9,
20  60:7, 19,
21  61:4, 23
63:8, 10, 11,
16, 23  64:7
65:9, 24  66:7,
13, 18  68:21
69:2  70:15
71:9, 13  72:5,
17, 22  74:3
75:22  76:5,
17  81:3
82:22  83:7
84:4, 20  86:5
88:6, 13
96:21  97:12
98:24  101:9,

Confidential Information - Subject to Protective Order

10 102:21
103:4  105:17
107:1  108:2
116:10  117:6
132:22
133:13
137:18
138:18, 20
139:2  153:8,
14, 17, 18
154:12
155:15
156:23
158:13
160:19  161:4
162:17, 19
164:13  169:6
174:15  177:3
179:10
188:17  198:4
209:2  215:19
232:15  239:9,
14, 22  240:8,
22  241:7, 22
242:8  243:20
247:18  258:6
272:4  276:1
279:9  281:19
282:5  285:19
295:22
303:23  307:2,
5  308:13, 24
309:3  314:9,
13  319:8
321:17
322:18, 24
325:19, 24
326:6, 13, 17,
23  327:7, 12,
17, 18  328:20
329:4, 7, 10,
12, 16  330:11,
19  331:6
332:3, 10
335:19  338:8
342:20  347:7
349:19  350:1
355:8  357:3
363:22  364:3
365:9, 17
366:2, 5

368:21, 24
369:2, 10
373:14
376:16  377:6
378:15, 24
381:12
383:18
389:15
402:23
407:23  409:1,
4, 9, 19
412:22
413:10
414:13  415:3,
4, 5  425:5
426:2, 7
429:19
432:16  433:1,
8, 10, 14, 21
435:10, 21
436:7  440:20,
24  441:24
443:6, 21
444:16  445:2
452:2, 6, 21
453:16  454:2,
17  455:2
**reportable**
147:11  253:1
**reported**
69:10  164:8
235:11
241:18, 20
272:15  298:7
**Reporter**  1:17
11:20  123:1
319:1  404:17
405:7, 10
428:10
457:13, 14, 22
**reporting**
145:23
146:21
206:17  221:8
248:10
257:22
261:13  301:9
**reports**  57:8,
10  58:10
62:16  75:6
153:9  309:15,

21  311:21
313:14
317:12
348:11, 14
363:8  364:4
366:12, 15
379:1, 20
382:12, 14, 16
453:20
**represent**
111:24
**representation**
114:23
151:15
179:10  184:1
426:22

**representations**
152:7, 11, 14
**representative**
93:15  179:4
193:19
**representatives**
179:12
**represented**
93:18  95:24
150:15  151:1
179:22
238:23
285:23  293:19
**Representing**
2:6, 21  3:6,
13, 18  4:6
**reproduced**
161:11
**reproduction**
111:5  457:20
**Request**  10:8
32:2  34:11
41:2  64:17
93:12, 13
94:20  132:16,
18  138:11
149:1  151:10
156:19  166:4
180:24  181:1,
6  183:15
198:14
215:24
216:12
217:16

219:12
256:13
257:14  271:2,
5  272:6, 12,
21  274:4, 7, 9
275:3  426:18
**requested**
62:1, 10
95:23  183:20
184:22  185:1,
14, 16  186:5
189:7  232:2
269:5  405:10
428:10  457:6
**requesting**
216:24
**requests**  95:8
177:16  183:8,
10, 19  218:4
256:2
**require**  282:9
373:17  374:10
**required**
142:14  144:6,
8  146:11, 21
158:19  159:4
173:23  175:3
205:8  217:12
220:11, 17
241:19  243:7
245:23  292:5
301:8  407:16
**requirement**
146:3, 5
175:23
206:17  220:4
240:20
279:24  280:7,
15, 17
**requirements**
170:11  214:3
219:2  306:22
418:4
**Requires**
17:12
**requiring**
262:14  401:14
**research**
146:9, 14
150:10

286:12
416:12, 23
**researching**
188:13
**reserved**
408:14
**reside**  75:7
215:4
**resides**  59:11
114:15  273:17
**residing**
161:12  382:15
**resolution**
184:9
**respect**  18:1,
2  23:2  43:5
62:15  81:7
82:2  108:1
117:13
118:15
124:11  128:8
131:20  154:5
159:6  164:1
170:21
184:12  185:5
197:18
199:21  218:3
219:7  233:4
234:23  235:1
255:21  259:4
271:21
272:13  274:9
280:23  281:2
291:6  324:22
343:2  347:18
350:23  360:9
361:18
376:18
377:24
386:15
387:21  398:9
406:20
407:19  415:2
424:5  428:2
441:3  449:22
450:22  451:10
**Respectfully**
31:8  34:8
127:22
150:23
212:10  397:12

Confidential Information Subject to Protective Order

respecting 344:*12*

respond 47:*13* 163:*3* 275:2 429:*17*

responding 181:*13*

responds 283:*17* 284:*23*

response 41:9 43:2 96:*23* 129:6 138:*10* 149:*1* 198:*15* 361:*17* 370:2, 7 371:*16* 372:*17, 21* 384:*1, 8* 386:*20*

responses 163:*14* 180:*13* 383:*11, 12, 14* 454:*8*

responsibilities 316:9 324:*10*

responsibility 315:*21* 371:*17, 22* 373:*1* 374:*23*

responsible 141:*11, 14, 20* 142:7

responsive 158:*10*

restitution 425:*16*

restricted 322:*5*

result 344:*12* 346:*18* 388:*16*

resulted 197:*1*

Results 6:*11* 200:8 391:6 444:*21*

retrospective 127:*19*

retrospectively 338:*15*

return 458:*15*

reuse 359:*17* 361:*11*

reused 358:*24* 359:*13* 361:*4*

reusing 361:8

revealed 41:*8* 42:*23* 237:*1, 5*

revelation 375:*17* 385:*20*

review 14:*10, 12* 37:*14* 40:*13* 47:*13* 59:7, *13* 62:*8, 11* 68:*10* 69:*13* 83:*19* 85:*14* 97:*17* 99:*4* 121:*2* 230:*14, 20, 24* 231:*10* 233:2 240:*2* 260:*22* 270:*1* 278:*18* 281:*8* 315:*3* 320:9, *10* 337:*13* 346:*24* 379:*20* 386:9 395:7 400:*17, 20* 401:*17* 413:*24* 417:9 427:*5, 15, 21* 429:*1* 442:*6, 17, 18* 447:*10, 24* 448:*4, 20* 449:*5* 450:*19* 452:*19* 454:*13*

reviewed 42:*22* 68:*16* 69:7, *9, 14, 19* 70:*19* 73:*5* 78:9 82:*4* 83:*4* 133:*18* 142:*23* 158:*21* 215:6 221:5 242:*6, 22, 24* 317:*16* 386:*12* 420:9, *10* 426:*1* 427:*1* 429:6 442:*10, 14, 22* 444:*21* 453:*14*

reviewing 57:*11* 68:*17*

162:6

revise 39:9

revised 56:*16* 415:*18*

revision 39:*19* 86:*22* 100:*23* 102:6, *12, 14* 232:*12* 283:*23* 285:*1* 287:*3, 8* 289:9, *11, 12, 13, 15, 19*

revisions 87:2 102:*22* 414:*5, 11, 14*

right 12:*17* 13:*1, 8, 17, 19* 16:6, *10, 14* 21:*19* 22:*19* 29:*14, 17* 30:4 31:*4, 15, 17* 41:*22* 42:*1, 3, 10, 20* 44:*4* 47:*15* 49:*16, 20* 50:*3, 6, 12, 19, 24* 52:*7, 22* 53:*6, 10, 20* 56:*12, 21* 60:*8* 63:*4* 64:9 65:*1* 67:*1* 68:*23* 73:*20* 74:*1* 75:*12* 77:*16* 78:7 84:*1* 85:*10* 89:*18* 93:*11* 94:7 95:*11* 97:*14* 101:5, *22* 102:*1* 104:*1, 11, 16* 105:5, *8, 18* 106:*21* 107:2 110:5, *10, 15* 111:*8, 12, 15, 20* 112:*4* 113:*14, 23* 114:*1* 115:*10* 116:*1, 10, 22* 117:2 119:*18* 120:9, *15, 19* 121:*12,*

14 122:*18* 124:6 125:*23* 129:*1, 24* 130:*10* 133:*14, 20* 134:5, *9, 17, 21, 23* 135:*3, 13, 22* 137:*14* 147:*19* 148:*8* 155:*7, 8* 159:*3, 6, 9* 160:*22* 161:*8* 162:*7, 14* 164:*4, 5, 18* 165:*17, 22* 166:*2, 6* 169:*18* 170:*6, 7* 173:*15* 176:*2* 177:*17* 181:*2, 7* 185:*18, 19* 189:*18, 20* 192:*15, 18, 22* 193:*8, 14* 194:*11, 18, 20* 195:*20* 196:*3* 198:6 199:*24* 201:*11* 202:*20* 203:*3* 206:*15* 209:*22* 212:*4, 23* 213:*3, 9, 13* 220:*14* 224:9 227:*16* 231:*23* 232:*17* 233:*19* 234:9 237:*4* 239:*9, 17* 240:*8* 243:*16, 20* 252:*12* 260:*21* 267:*6, 8, 21* 268:*3* 269:*1* 274:*3* 275:*3, 17, 21* 276:*10, 14, 19* 277:*1, 6, 7, 19* 278:*10* 279:5, 20 280:*11, 16* 283:*7, 18* 286:*15*

287:*13* 288:*14, 18, 23* 289:*2* 290:*1, 13* 291:6 292:*8, 23* 293:*10, 17, 22* 299:*3* 301:*12* 302:*2, 5, 7, 19* 303:*1, 4* 304:*20, 22, 24* 305:*14, 15, 19* 308:*7, 10* 309:*1, 6, 17, 23* 311:*3, 6, 17, 21* 312:*12* 313:*15, 19* 314:*4* 319:*5* 320:*1* 323:*2* 325:*22* 326:*13, 16, 21, 24* 327:*2, 6, 11, 14* 328:*22* 329:*2, 8, 23* 330:*22* 332:*5* 333:*7* 335:*6, 9, 14, 22* 336:*6, 23* 337:*4* 338:*18* 340:*21, 23* 341:*3, 7, 17* 342:*21* 344:*8, 23* 345:*4, 21* 346:*11* 348:*16, 17* 350:*10* 351:*2, 4, 23* 352:*11* 354:*7, 11* 356:*7* 358:*10* 359:*15* 360:6 362:*18* 369:6 370:*13* 371:*21, 24* 373:*18* 375:*12* 382:*23* 383:*4, 5, 13, 20* 384:*1* 385:*17, 22, 24* 386:*4, 21* 387:*7, 15, 22* 388:*8* 391:*13, 16*

Confidential Information Subject to Protective Order

393:*7, 10*
397:*5, 11*
402:*1, 5, 21*
403:*23*  404:*7,
24*  405:*4*
408:*5, 23*
411:*2*  412:*8,
13, 16*  413:*5,
23*  416:*9*
430:*11*
437:*17, 21*
441:*21*  445:*8*
455:*18*
**right-most**
386:*19*
**rise**  146:*20*
401:*13*
**rises**  123:*19,
20*
**risk**  155:*1*
230:*9, 14, 16*
231:*1, 11, 17*
232:*1, 6, 11,
14, 21*  233:*6*
304:*11*  306:*22*
**risks**  371:*18,
23*  372:*5*
373:*2*
**Rite**  3:*18*
**Road**  2:*9*
**ROBERT**  1:*6*
**role**  324:*10*
**room**  12:*17,
21*  341:*12*
407:*11*
**Root**  8:*21*
196:*18, 22*
197:*18*
366:*23*  370:*24*
**rose**  144:*5*
**roughly**
149:*21*  230:*7*
**routine**
306:*18*
323:*15*  440:*7*
**routinely**
371:*11*  399:*20*
**row**  242:*14*
**RUBENSTEIN**
2:*19*

rubensteinb@g
tlaw.com  2:*21*
**rulings**  34:*17*

**< S >**
**safe**  112:*9, 20*
431:*9*
**Safety**  8:*22*
206:*5*
**sales**  126:*19*
**samples**
388:*19*  389:*1*
**Sandoz**
417:*12, 15*
418:*6*
**sartan**  199:*12*
202:*8*  210:*23*
214:*22*
228:*13*
266:*20*  267:*1*
447:*16*
448:*11*  449:*9*
450:*23*  451:*17*
**satisfied**
132:*16*  142:*17*
**saw**  186:*14*
202:*20*
209:*23*  215:*7*
240:*10*
305:*17*
307:*11*  333:*5*
342:*16*  428:*2,
22*  429:*19*
**saying**  53:*18*
54:*22*  69:*7*
82:*14*  104:*11,
23*  123:*24*
125:*7*  126:*15*
127:*4, 7, 8, 12,
17*  155:*10*
156:*13*
170:*14*  172:*2*
179:*18*
184:*16*
194:*22*  208:*7*
213:*9*  220:*18*
226:*7*  228:*6*
237:*4*  244:*19,
20*  245:*3*
246:*8*  251:*21*
258:*10*  272:*7,

19*  283:*20*
286:*24*  301:*3*
320:*23*
325:*20*  328:*2*
331:*1*  334:*3*
344:*6, 10*
360:*23*
364:*22, 24*
371:*21*
372:*11*
380:*10*  381:*1,
8*  384:*3, 12*
388:*15*
391:*21*
392:*10*
396:*21*  403:*3,
9*  404:*4*
**says**  13:*6*
62:*7*  109:*6*
110:*19*  112:*8*
116:*21*
126:*19*
127:*16*  179:*5*
184:*23*
186:*20*  188:*4*
205:*3*  212:*24*
213:*7, 14*
222:*23*
236:*16*  253:*6,
21*  261:*1*
268:*12*  273:*6*
294:*8*  297:*12*
302:*8*  319:*12*
321:*23*
326:*13*
327:*18*  329:*6,
18*  333:*15*
343:*20*
344:*19*  346:*5*
361:*9*  369:*18*
393:*6*  407:*13*
**schedule**
376:*13*
**schedules**
306:*19*
**scheduling**
159:*23*
**school**  416:*10*
**ScieGen**  3:*13*
**scientific**
207:*16, 19*

208:*23*
210:*17*  211:*4,
10, 16*
**scope**  20:*21*
21:*11*  24:*2, 4,
14*  25:*16*
45:*13*  46:*8*
150:*22*  152:*2,
22*  168:*8*
169:*4, 6*
170:*19*
171:*19*
172:*11*  173:*5*
175:*11*  176:*7*
187:*21*  190:*3*
202:*10*  203:*5,
14*  204:*3*
205:*1, 17*
207:*2*  208:*1*
209:*5*  210:*13*
211:*8, 22*
213:*5, 22*
214:*12*  215:*1,
13*  217:*4, 19*
218:*5*  221:*16*
222:*19*
223:*24*
225:*14*
226:*14*
227:*18*  231:*6*
232:*8*  234:*19*
237:*18*  245:*9*
247:*7, 18*
248:*4*  251:*19*
254:*7*  255:*11*
256:*5, 17*
258:*21*  261:*5,
23*  263:*1, 8*
264:*24*
268:*10*
270:*10*  275:*6*
295:*7*  296:*13*
299:*13*
300:*17*  302:*8*
304:*10*  305:*3,
21*  317:*18*
350:*19*  352:*6*
362:*19*  363:*6*
370:*20*  372:*2*
421:*8*  427:*10*
441:*24*

**Scratch**
453:*12*
**screen**  15:*1*
16:*4*  109:*2, 5,
7, 13, 21*
318:*15, 17*
325:*10*
339:*17, 19*
410:*13, 16, 17*
**scroll**  340:*2*
369:*20*
445:*19*  451:*5*
**se**  184:*21*
**second**  53:*4*
166:*18, 22*
180:*23*
199:*19*  200:*1*
202:*2, 22*
340:*3*  341:*5*
386:*10*
390:*14*
411:*12*  440:*1*
447:*22*  448:*1,
3*
**second-to-the-
last**  166:*20*
**Section**  55:*4,
11*  112:*7*
156:*9*  170:*3*
280:*1*  283:*11*
284:*21*
290:*20*  299:*4*
302:*8*  304:*10*
357:*18*  369:*1*
415:*17, 23*
431:*5, 7, 12,
14, 18*
**sections**
451:*13*
**see**  15:*18*
16:*1, 18*
53:*16*  55:*3*
62:*2*  66:*10*
70:*4*  73:*9*
101:*8*  105:*23*
109:*5, 7, 9, 10,
22*  110:*1, 11*
112:*7, 10*
113:*2*  116:*23*
117:*15, 16*
118:*8*  154:*20*

Confidential Information Subject to Protective Order

155:*11* 165:*1*
166:*15, 16, 23*
167:*12, 15, 20,*
*24* 174:*11*
188:*16* 189:*4*
198:*22* 199:*3,*
*4, 15* 200:*5, 6,*
*13, 14* 201:*1,*
*2, 7, 8, 12, 13,*
*21* 202:*3*
204:*12*
205:*20*
207:*16*
211:*23* 266:*2,*
*16, 21, 22*
267:*13, 18*
273:*11, 12*
278:*12, 14*
279:*7, 14, 16,*
*24* 280:*2, 4*
281:*10* 283:*1,*
*11, 15, 16, 24*
284:*1* 287:*8*
288:*11, 12, 15*
290:*23* 291:*9,*
*11* 292:*2*
293:*21* 296:*5*
301:*21*
303:*12, 19, 24*
304:*9, 10*
310:*20* 314:*8,*
*22* 318:*17, 19,*
*22, 23* 319:*3,*
*4, 5, 11, 16, 23,*
*24* 320:*22*
321:*14, 15*
322:*6* 323:*14*
325:*10, 12, 15,*
*21* 326:*8*
327:*24* 328:*3,*
*5* 330:*12, 15*
333:*7, 14, 18*
334:*5, 8, 18*
339:*12, 21, 24*
340:*1, 4, 19*
348:*18, 20*
357:*18* 358:*1,*
*2* 359:*1, 14*
360:*2, 7*
368:*14* 369:*5*
370:*6* 391:*1,*

*8* 397:*22*
398:*5* 402:*24*
403:*1, 21*
404:*1, 2, 5, 8*
407:*7* 410:*9,*
*15, 17, 18*
411:*11* 414:*5*
433:*19* 438:*9*
447:*13, 15, 18*
448:*24* 449:*2,*
*8* 450:*20*
451:*15, 19*
**seeing** 99:*10*
149:*6* 199:*7*
202:*6* 207:*14*
208:*22* 223:*7*
268:*12*
284:*16*
323:*12*
334:*11*
340:*11*
343:*17*
344:*17* 349:*3,*
*4* 351:*12*
449:*6*
**seek** 19:*8, 20*
**seeking** 425:*15*
**seen** 78:*18*
95:*6* 110:*2, 4,*
*23* 150:*5*
165:*14*
191:*17* 199:*5,*
*21* 202:*12*
203:*16*
209:*17* 210:*4*
266:*8* 286:*22*
305:*12* 311:*5*
323:*19* 344:*5*
356:*19*
368:*15*
374:*18, 20*
445:*22* 447:*8*
454:*12*
**selected**
149:*11*
**selling** 145:*11*
206:*24* 207:*21*
**send** 177:*20*
**sending**
184:*17* 281:*24*

**senior** 193:*21,*
*22* 195:*2*
**sense** 43:*17*
48:*4* 81:*1*
114:*19* 174:*5*
223:*11*
240:*21*
274:*15*
334:*19* 349:*17*
**sent** 37:*7*
210:*1* 282:*1*
446:*15*
**sentence**
112:*12* 113:*7,*
*9* 115:*2, 4, 16,*
*24* 116:*9, 12,*
*19* 118:*7*
268:*22*
273:*11*
359:*23*
371:*15*
431:*11, 21*
433:*23*
**separate**
75:*16, 20*
449:*18*
**separately**
270:*21*
**separation**
76:*15*
**sequence**
49:*12* 420:*23*
**serialization**
78:*13* 81:*18*
**serialize** 88:*24*
**series** 13:*4*
47:*21*
**seriousness**
294:*22*
**served** 417:*8*
**serves** 78:*1*
**service** 371:*5*
373:*23* 415:*14*
**SERVICES**
1:*21* 11:*6*
375:*6* 411:*6*
**set** 15:*10, 15*
46:*19, 22*
47:*4, 14*
55:*22* 119:*17*
145:*24*

380:*21*
382:*21* 437:*9*
454:*16* 455:*1*
**setting** 134:*8*
**settled** 163:*12*
**setup** 428:*19*
**severity** 259:*4*
**share** 15:*3*
109:*2* 184:*24*
185:*2, 15, 17,*
*23* 186:*3, 6,*
*10* 187:*8*
210:*10*
214:*19*
318:*14* 325:*7*
339:*16* 371:*3*
398:*13*
410:*13* 439:*4*
**shared** 185:*6*
203:*10, 18*
**sharing** 109:*7*
318:*14*
**shed** 166:*13*
167:*22*
**sheet** 458:*7, 9,*
*12, 15* 460:*12*
**shift** 351:*14*
**shifted** 351:*9*
**ship** 157:*8*
**shipped** 157:*4,*
*6*
**Short** 53:*8*
62:*24* 120:*17*
176:*17*
275:*19*
312:*18* 354:*9*
402:*3* 405:*2*
**Shorthand**
1:*17* 457:*13*
**shortly** 105:*22*
**show** 97:*7*
285:*7* 419:*5*
436:*1, 5*
**showed** 38:*4*
41:*3* 238:*10*
365:*17* 402:*18*
**showing** 83:*9*
222:*16*
**shown** 445:*1,*
*4, 5* 454:*22*

**shows** 203:*22*
221:*6* 443:*13*
**shut** 350:*8, 17,*
*23* 351:*3*
353:*3*
**sic** 185:*2*
**side** 57:*10*
146:*18* 197:*1*
250:*10*
**side's** 34:*11*
**sight** 335:*12*
**sign** 457:*9*
458:*8*
**signed** 156:*10*
**significance**
186:*16* 419:*22*
**significant**
157:*1* 234:*22*
453:*14*
**signing** 458:*10*
**similar** 84:*10*
173:*17*
181:*18*
199:*20*
200:*21* 203:*1*
204:*10* 294:*9,*
*12, 16* 295:*2,*
*6* 360:*9*
**similarly**
118:*1* 352:*11*
**simple** 190:*24*
286:*13*
**simply** 29:*24*
59:*17* 60:*12*
96:*14* 119:*13*
204:*16*
271:*18*
344:*23*
363:*15* 415:*8*
**sincere** 455:*19*
**single** 21:*22*
85:*14* 323:*1*
374:*17* 400:*7*
432:*15*
**singular**
273:*20, 23*
**sir** 12:*10, 13,*
*22, 23* 14:*2,*
*24* 16:*1*
19:*17* 21:*3,*
*15* 25:*7*

Confidential Information - Subject to Protective Order

26:*18*  27:*5*
30:*13, 16, 21,*
*23*  33:*19*
34:*8, 21*
36:*19*  39:*4*
43:*13*  47:*8*
51:*20*  52:*4,*
*17*  65:*17*
66:*19*  101:*2*
103:*4*  108:*24*
109:*5*  110:*3*
115:*12*
118:*11, 13*
122:*2*  125:*22*
155:*15*  158:*3,*
*13*  160:*5*
165:*2, 15*
167:*9*  240:*6*
241:*5*  242:*1*
243:*11*  251:*7*
252:*11*
266:*15*
272:*23*
273:*21*
275:*24*
285:*14*
292:*17*
296:*17*  307:*5*
310:*3, 21*
313:*9*  314:*6*
320:*3*  321:*5,*
*12, 13*  322:*9*
323:*24*
325:*10*
330:*19*
332:*10*
335:*10*  337:*8*
338:*14*
339:*10, 17*
340:*15*
344:*23*  346:*9,*
*15*  362:*23*
366:*2*  368:*7*
369:*4, 21*
371:*14*
378:*16*  383:*8*
397:*19*
408:*24*
410:*16*  448:*19*
**sit**  287:*13*

**site**  82:*6*  92:*4,*
*6*  158:*2*
326:*10, 18*
327:*14*
334:*21*  350:*3,*
*7*
**sites**  82:*8*
283:*11*
287:*10*  302:*9*
418:*21*
**site-specific**
82:*7*
**sits**  315:*23*
**sitting**  31:*14*
61:*9*  127:*15*
175:*9*  176:*2*
194:*8*  232:*5*
277:*13*  369:*7*
377:*12*
**Situation**  6:*8*
38:*17, 21, 22*
111:*14*  160:*2*
173:*17*  178:*1*
187:*2*  338:*23*
352:*14*  440:*23*
**six**  276:*22*
277:*17*
**six-page**  440:*1*
**slightly**  56:*16*
333:*22*  417:*10*
**so-called**  117:*3*
**sodium**
199:*22*
200:*23*
201:*19*  203:*3,*
*24*  448:*7*
**sold**  127:*8*
157:*4*  260:*16*
299:*18*
362:*17*  363:*3*
398:*15, 16*
**sole**  97:*6*
116:*15*  194:*23*
**solely**  136:*17*
**solvent**
197:*13*
353:*10*  355:*3,*
*16*  362:*3*
364:*14, 18*
366:*17*
370:*12*

373:*18*
376:*18*  377:*3,*
*24*  381:*9, 11,*
*17*
**solvents**
196:*24*
355:*23*  356:*6,*
*16*  357:*24*
358:*5, 10*
360:*15, 20*
361:*15, 21, 22*
362:*2, 16*
363:*2, 10, 11,*
*15, 16, 24*
364:*8, 12*
365:*5, 6, 7, 10,*
*15, 19, 23, 24*
366:*7, 22*
367:*18*  371:*7*
374:*3*  377:*7,*
*8, 11, 17*
378:*18*  379:*3,*
*9, 10, 16, 19*
380:*1, 3, 14,*
*15, 17, 18, 23*
381:*3, 14*
382:*2, 10, 17,*
*18, 19*  383:*2, 3*
**somebody**
193:*24*  281:*21*
**soon**  82:*10*
263:*23*  437:*8*
**sooner**  148:*18,*
*19*  192:*20*
**SOP**  77:*1, 5, 6,*
*7, 12, 15, 18, 19,*
*24*  78:*3, 20,*
*23*  79:*3, 19,*
*21*  80:*6, 8, 15,*
*18, 19, 21*
83:*18*  84:*11*
85:*14*  86:*12,*
*16, 21, 23*
87:*1, 6, 8, 13*
88:*9, 21*  89:*3,*
*5, 9, 13, 16*
90:*5, 16, 18,*
*23*  91:*6, 9, 11,*
*14*  92:*12, 20,*
*21, 22*  93:*1,*
*13, 14, 15, 18,*

*20*  94:*3, 10,*
*14, 18, 24*
95:*6*  97:*2, 21*
98:*12, 16*
99:*9, 12, 16*
102:*7, 8, 9, 10,*
*17*  154:*20*
155:*1, 2*
158:*18, 20*
159:*4, 11, 14*
173:*22*  174:*7*
175:*2, 6, 9, 19,*
*22*  176:*3, 9*
215:*3*  231:*17*
232:*1, 6, 11,*
*14, 18, 24*
233:*4, 5, 9, 11*
256:*19*
257:*18*  278:*8*
279:*16*
280:*18*  281:*7,*
*14, 23*  282:*4,*
*7, 8*  284:*10,*
*11*  286:*4, 5*
287:*3, 5, 7*
289:*8*  290:*21*
291:*3, 21*
292:*4, 13, 14*
293:*19*  295:*4,*
*16, 17*  297:*8*
301:*24*  302:*9,*
*20*  304:*5*
306:*2, 8, 23*
307:*1, 4, 20*
308:*16*
400:*17, 20*
**SOPs**  77:*8, 13*
78:*10, 13, 20*
79:*4, 11, 14,*
*23*  80:*4*  81:*9,*
*11*  82:*3, 7, 16*
83:*4, 11, 15*
84:*16*  85:*18,*
*21, 24*  86:*10*
88:*8*  89:*1*
90:*15*  95:*9,*
*14*  96:*13, 17*
97:*8, 12, 14*
99:*6, 24*
100:*19, 24*
101:*3, 12*

102:*5*  154:*17*
155:*4, 10, 11*
158:*14*  174:*6,*
*10, 13, 22*
175:*14, 18*
230:*24*
231:*10*
232:*21*  276:*6,*
*18*  277:*9*
282:*1*  284:*4*
285:*18*  286:*9,*
*19*  306:*16, 17*
425:*24*  426:*6,*
*7, 18, 22*
427:*6, 15, 18,*
*22*  428:*3, 24*
429:*7, 8, 16, 17*
**sorry**  79:*10*
110:*15, 16*
125:*5*  136:*2*
224:*1*  260:*23,*
*24*  267:*17*
309:*18*
311:*12*
377:*15*  390:*7*
410:*1*  413:*8*
422:*21*  435:*7*
436:*24*
441:*14*
453:*10, 11*
**sort**  49:*23*
60:*2*  161:*5*
451:*6*
**sounds**  60:*1*
115:*21*  186:*21*
**source**  73:*23*
110:*9*  377:*14,*
*16*
**sourced**  50:*4*
367:*9*
**sources**
264:*12, 21*
**sourcing**
50:*10, 15, 21*
**space**  458:*6*
**speak**  85:*17*
117:*5*  123:*14*
132:*9*  133:*4*
135:*15*
155:*20*
170:*13*

Confidential Information Subject to Protective Order

187:13  227:3
376:21, 24
**speaking**
128:3  190:19
192:9  220:15,
16  225:1
256:8  274:20
333:13  349:4
435:11
**speaks**  158:5
211:18  250:2
**specialized**
418:11
**specific**  18:21
22:22  23:4
30:19  36:2,
17  40:8
41:10, 18
42:16  46:17
48:18  60:18,
23  63:19
66:6  68:6
70:10, 16
72:14, 15
77:13  78:6
81:6  83:2
84:2, 15
85:18  99:6
121:23
123:13, 15
124:19  125:2,
3, 6, 8, 10
134:3, 10
141:4  150:13
153:16
169:12  210:7
216:8  220:11
229:15  239:8
242:10
256:23  257:1
272:11
287:15
335:24  351:6
370:8  391:18
422:24  424:4,
18  425:3, 6,
18  432:10, 24
443:19
**specifically**
18:4  32:15
42:23  43:16

59:14  67:16
68:20  69:3,
20  71:15
74:2  76:24
80:12  83:5
85:23  87:8
119:5  121:19
125:22
127:12  135:2
139:21
155:21
162:18
201:15
216:21
237:21
305:13
308:18  364:8
365:4  367:22
382:8  398:8
400:10  406:5
418:14
419:19
426:16
433:21
434:23  436:21
**specification**
155:2  219:4
220:21
225:21
228:14, 16
238:24
240:17, 24
241:19, 22
242:23  243:4
244:24  245:6
246:13  249:8
251:15
252:19  392:7
443:1
**specifications**
141:16, 24
142:18, 20, 22
144:1  145:15
216:19  218:1
223:12  224:8,
10  226:1
238:12, 15, 20
242:19
244:11, 23
245:3, 19, 22,
24  246:4, 21,

23  247:11
248:9, 21
249:2  254:14,
24  265:5
297:21, 23
300:20
357:22  362:6
373:10  376:9
380:19
382:21
437:10  443:15
**specificity**
387:11
**specifics**
316:24
**specified**
119:14
120:10
159:14
219:18
281:12  384:18
**specify**  148:3,
6  162:1
**specs**  146:12
217:24
**spectometry**
200:16
**spectrograph**
204:17
**speculate**
296:15
**speculating**
155:7  194:19,
21  331:19
335:9
**Speculation**
91:18  102:3
143:23
172:11  173:5
187:12
192:24  193:2
195:8  203:14
204:4  205:18
207:2  208:1
209:5  210:14
213:23
215:14
216:16
218:20
223:24
224:19

225:15  238:6
246:15  248:5
251:18  271:4
296:12
299:23
300:17  305:3
344:15  345:6,
23  350:20
351:20  352:5
360:12
370:21  394:8
**speculative**
172:14  332:19
**spent**  188:12
425:23
**spirit**  253:24
**split**  44:17
**spoke**  171:20
176:4  436:17
**spontaneously**
132:9
**spot**  265:14,
17
**squarely**
452:17
**Stability**
341:12
**staff**  295:9
**stamina**
176:22
**Stand**  25:3
108:6  123:3
133:6  159:20
160:15
178:14  278:2
301:17
310:14  313:3
335:17  356:23
**standalone**
115:9
**standard**
46:13  77:1,
16  90:5, 8, 20
99:21  119:22
268:21  285:4,
10  298:15
304:10  426:11
**standards**
120:2  225:19
**standing**
114:13  316:17

**standpoint**
191:1  248:3
259:13, 21
261:13  270:4
275:1  356:1
366:20  370:16
**stands**  107:1
282:8  288:21
289:4  426:10
**STANOCH**
2:3  5:7  12:6
14:18, 23
15:8, 23
17:19  19:15
20:24  21:12
22:4  23:19
24:5, 16  25:3,
6  26:6, 16
27:3, 13, 23
28:11, 22
29:11  30:12
31:13  32:7,
13  33:3, 17
34:7, 9, 20
35:24  36:12
37:10  38:19
45:16  46:15
51:16  53:2,
12  58:2  64:9,
18  65:13
71:7  72:12
73:17  74:21
75:19  76:18
86:1  89:7
90:11  91:4
92:23  94:2
95:7  97:10
100:12, 16
102:19  105:4,
15  106:2, 4
108:6, 22
109:4, 6, 17
116:7  120:21
123:3, 6
126:14
127:23
128:19  130:9,
22  132:5
133:6, 7
140:14  143:1
144:15  150:4

Confidential Information Subject to Protective Order

151:*20*
152:*17*
153:*10*
158:*11*
160:*15, 16*
164:*19, 24*
165:*7* 167:*4*
168:*22*
169:*14*
171:*11* 172:*3,
23* 173:*9*
174:*12* 176:*1,
18, 23* 180:*10*
181:*22* 182:*2,
10, 15* 183:*3*
187:*15*
188:*15*
190:*23*
192:*10* 193:*7*
194:*7* 195:*12,
18* 196:*8*
198:*16, 21*
202:*15* 203:*8,
20* 204:*19*
205:*9* 206:*11*
207:*18*
208:*24* 209:*6,
12, 21* 211:*2,
15* 212:*8*
213:*8* 214:*6,
16* 215:*8, 20*
216:*10, 22*
217:*13* 218:*6*
219:*9* 220:*9*
221:*10, 19*
222:*14*
223:*17* 224:*6*
225:*9* 226:*6*
227:*13* 228:*9*
231:*9, 20*
232:*13* 234:*2*
235:*13* 237:*3,
23* 239:*3, 16*
240:*5* 241:*2,
24* 243:*10*
244:*14* 246:*7*
247:*2, 13, 20*
249:*4* 251:*6*
252:*8* 253:*4*
255:*3, 23*
256:*10*

257:*11* 258:*3*
259:*11*
262:*18*
263:*22* 265:*9,
18* 266:*1*
268:*24* 270:*3,
19* 272:*22*
273:*19* 275:*7,
9, 23* 278:*1, 6*
282:*17*
285:*13* 288:*3,
8* 290:*3, 10*
291:*15*
292:*22* 293:*1,
3* 295:*20*
296:*16* 298:*8*
299:*16* 300:*2*
301:*1, 17, 20*
303:*17, 18*
305:*4* 306:*4*
308:*3, 20*
310:*14, 19*
313:*7, 11*
316:*1* 317:*5*
318:*7, 12*
321:*3* 322:*19*
323:*20*
324:*24* 325:*6,
9* 328:*7, 21*
329:*22*
330:*17*
331:*18* 333:*4,
20* 335:*5, 17,
18* 339:*4, 9*
341:*22*
342:*17*
344:*21*
345:*15* 346:*7*
347:*2* 348:*2,
13* 351:*1, 22*
352:*10* 353:*6,
22* 354:*1, 5,
13* 356:*22*
357:*1* 362:*9,
22* 363:*21*
367:*13* 368:*1,
6* 371:*13*
373:*12* 375:*9*
378:*14*
379:*14* 382:*7*
384:*13*

389:*22* 390:*8,
11* 393:*1*
394:*1, 11*
395:*4* 397:*1*
399:*13*
401:*22* 402:*7*
403:*15*
404:*11* 405:*6*
407:*21* 408:*2*
409:*24* 410:*6*
411:*23*
412:*21* 413:*8*
421:*4, 7*
422:*8, 16*
423:*8, 19*
425:*10* 427:*7*
428:*5, 12*
429:*4, 20*
431:*4* 432:*17*
434:*1* 435:*5*
436:*2* 437:*4,
18, 23* 438:*16*
441:*11*
442:*11* 443:*8,
22* 444:*10*
447:*1* 453:*1*
454:*18* 455:*3,
14*
**start** 15:*11*
105:*17*
111:*21*
137:*18* 221:*7*
251:*20*
**started** 59:*6*
109:*7* 406:*1*
**Starting**
118:*9* 133:*8*
137:*17*
233:*16* 235:*1*
276:*3* 336:*15*
383:*21*
**starts** 431:*20*
**stash** 286:*8*
**State** 3:*10*
22:*18* 30:*14*
73:*15* 184:*20*
202:*17*
402:*23* 458:*5*
**stated** 24:*13*
25:*16* 47:*16*
119:*13* 151:*9*

228:*15*
248:*10* 253:*3*
274:*13, 24*
333:*16*
359:*16* 370:*7*
433:*1*
**Statement**
8:*17* 49:*19*
77:*9* 106:*14*
107:*8, 11, 12,
17, 22* 108:*3*
113:*20, 24*
114:*5, 15, 20,
21* 115:*9*
116:*4, 15*
117:*8, 23*
125:*14* 126:*1*
127:*12*
150:*16, 18, 24*
151:*2* 153:*15*
182:*7* 215:*11*
216:*6* 217:*1,
17* 218:*17*
219:*13*
244:*22*
323:*14, 17*
373:*5* 407:*3*
420:*17*
432:*15, 24*
433:*8, 19*
434:*8, 9, 19*
435:*4, 7, 8*
438:*10, 23*
439:*18* 440:*2*
**statements**
76:*9* 133:*16,
18* 134:*21*
135:*7, 16*
143:*9* 216:*13*
429:*18* 439:*20*
**STATES** 1:*1*
11:*14* 20:*4*
22:*14* 200:*19*
219:*1* 302:*18*
415:*13* 440:*4*
**stating** 105:*11*
**Status** 6:*19*
**statute** 122:*4*
**stay** 361:*16*
**stayed** 417:*7*

**stenographer**
13:*7*
**stenographic**
11:*19*
**step** 247:*21*
358:*24*
359:*14* 361:*5*
**Steps** 8:*21*
261:*18* 374:*13*
**Steve** 176:*18*
**STEVEN** 2:*8*
**stipulating**
283:*12*
**stipulation**
148:*3*
**Stipulations**
10:*11*
**stop** 342:*20*
432:*4*
**stopped** 163:*8*
**storage** 406:*13*
**story** 114:*16,
17*
**Strange**
283:*14*
**strategies**
417:*15, 20*
**Street** 2:*4, 19*
3:*4, 10*
**strength**
218:*10*
**strike** 27:*5*
30:*22* 77:*4*
141:*9* 143:*2,
15* 300:*4*
367:*15*
**strong-armed**
187:*1*
**strong-arming**
184:*4*
**structure**
84:*14* 85:*4*
185:*11* 200:*23*
**structured**
99:*14* 157:*18*
180:*21* 271:*6*
**studied** 154:*2*
**studies** 44:*24*
146:*16, 17*
264:*4, 10, 17*

**study** 146:*9*
208:*17*
263:*17*
264:*19* 342:*3,*
*7*
**studying**
235:*21* 263:*3*
**stuff** 271:*20*
413:*3*
**stumbled**
164:*14*
**subcontracted**
374:*11*
**SUBJECT**
1:*8* 6:*7, 16,*
*22* 8:*7* 37:*4*
96:*9* 176:*20*
254:*12*
269:*10*
339:*22* 346:*8*
378:*12* 386:*8*
427:*18* 458:*10*
**subjects**
277:*10*
**submission**
243:*7* 401:*2,*
*5, 11, 13, 15*
**submissions**
418:*4*
**submit** 401:*4*
**submitted**
14:*16* 58:*13*
414:*12* 452:*7*
**submitters**
213:*10*
**submitting**
186:*22*
**Subscribed**
460:*19*
**Subsequent**
138:*19* 142:*3*
**subsequently**
374:*4* 382:*4*
414:*8*
**subset** 60:*5*
75:*11, 23*
76:*13*
**subsidiaries**
302:*10*
**subsidiary**
411:*7*

**substance**
37:*2* 38:*24*
124:*4, 12*
130:*5* 140:*24*
158:*20*
207:*20*
219:*17*
228:*23*
229:*11* 238:*4,*
*22* 250:*21*
268:*20* 273:*9*
274:*18* 318:*3*
347:*16* 375:*1*
380:*4* 399:*20*
460:*11*
**substances**
129:*7* 148:*5*
150:*3* 151:*18*
210:*24* 227:*7*
230:*6* 253:*18*
434:*10* 448:*2*
**substantially**
301:*8*
**substantive**
447:*7*
**substitution**
43:*19, 23*
**subtle** 440:*5*
**suddenly**
269:*18*
**sufficient**
261:*11* 296:*9*
429:*16*
**suggest** 40:*4*
45:*2* 66:*23*
70:*20* 236:*22*
267:*4* 345:*8*
356:*20*
373:*15*
383:*12* 384:*1*
385:*5* 386:*20*
388:*12*
389:*11, 18*
391:*22*
392:*18, 24*
393:*3*
**suggested**
383:*16*
**suggesting**
150:*6* 355:*13*
364:*21* 402:*21*

**suggests**
344:*2* 353:*8*
384:*9* 420:*16*
**suitability**
379:*5*
**suitable** 81:*14*
85:*2* 219:*21*
362:*7* 380:*18*
**Suite** 2:*10, 15*
334:*18* 408:*17*
**suites** 327:*21*
**summarizing**
66:*22*
**summary**
372:*19*
**summer**
193:*14*
231:*23*
232:*17*
362:*15* 363:*1*
378:*17*
385:*17*
388:*11*
391:*17*
392:*15* 398:*4,*
*24* 399:*5, 17*
**superseded**
87:*7*
**supervision**
457:*22*
**supplemental**
142:*3* 401:*5*
**supplemented**
57:*15*
**supplied**
38:*15* 41:*5*
42:*22* 57:*9*
59:*9* 76:*5*
88:*8* 89:*5, 14*
91:*10* 93:*14*
94:*18* 110:*9,*
*23* 145:*16*
156:*16*
188:*21*
190:*22*
192:*17* 194:*5*
225:*4* 286:*5*
303:*6* 305:*22*
349:*24* 372:*18*
**supplier**
135:*21*

136:*10*
144:*10*
150:*19* 172:*7*
173:*3, 12*
219:*13* 276:*8,*
*19, 24* 278:*9*
296:*19*
297:*20*
302:*21* 304:*6*
308:*9* 355:*23*
358:*9* 371:*5*
373:*21, 22, 23*
375:*19* 376:*10*
**Suppliers**
6:*18* 50:*5*
103:*12, 14*
104:*6* 134:*2,*
*3, 16* 135:*1, 2*
151:*24*
152:*20* 153:*2,*
*13* 154:*15*
155:*19*
158:*16*
171:*24*
173:*18* 175:*4*
176:*6* 177:*9*
213:*20*
214:*19* 216:*1,*
*14* 238:*10*
255:*6, 21*
263:*17* 296:*3,*
*8* 297:*9*
303:*1* 305:*7*
306:*11, 20*
307:*8, 18*
374:*19*
**supplier's**
135:*17* 136:*4,*
*5*
**suppliers/contr
act** 280:*6*
**supply** 178:*20*
**supplying**
302:*16*
**SUPPORT**
10:*2* 63:*15*
64:*7* 152:*6*
375:*1, 7*
**supporting**
96:*23*

**supportive**
262:*15*
**suppose**
174:*10* 212:*16*
**supposed**
239:*18* 240:*7*
241:*6* 242:*2*
243:*12*
**sure** 21:*19*
44:*15* 51:*17,*
*18* 78:*16*
101:*20*
106:*10*
108:*15*
109:*12* 133:*5*
137:*17* 151:*6*
152:*19*
154:*22*
251:*10*
262:*13*
291:*16*
353:*15*
356:*13*
358:*13* 364:*6*
369:*6* 377:*12*
394:*12* 397:*2*
409:*17*
413:*13, 15*
437:*16, 21*
449:*20* 450:*5*
**surprise**
242:*24*
**surprised**
189:*4*
**surprising**
338:*19*
**surrounds**
116:*18*
**suspect**
236:*13, 18*
263:*11*
**suspected**
44:*23* 135:*19*
136:*13* 137:*8*
143:*17* 145:*1,*
*10* 150:*7*
160:*9* 178:*10*
263:*24*
**suspension/wit
hdrawal**

157:*12*

**swear**  11:*21*

**Swissmedic**

234:*8*  235:*11*

237:*6, 10*

262:*9*  375:*18*

**Swissmedic's**

262:*22*

**switched**

15:*16*  352:*1*

**switching**

176:*12*

**sworn**  12:*1*

457:*5*  460:*19*

**synthesis**

201:*5*  236:*10*

250:*23*  407:*1*

**synthesize**

268:*17*

**synthesized**

267:*11, 23*

268:*6, 13*

**synthetic**

207:*6*  236:*3,*

*5*  370:*24*

371:*9*

**system**  76:*24*

77:*10, 14*

78:*5, 6, 10*

79:*20*  80:*20*

83:*13, 16*

96:*18*  97:*9*

256:*20*

281:*15*  375:*3,*

*8*  380:*22*

426:*10, 14, 24*

**systems**  76:*21*

79:*16*  84:*10*

85:*22*  97:*1*

99:*13*  232:*23*

427:*20*

429:*10, 18*

**< T >**

**tablet**  254:*22*

**tableted**

251:*23*

**tablets**  258:*11*

**take**  13:*1, 20*

36:*1*  64:*20*

65:*4*  105:*21*

106:*7, 8*

114:*9*  115:*19*

117:*6*  120:*12*

150:*15, 17*

151:*13*

176:*20*

199:*13*

220:*12, 13*

228:*21*

247:*21*

251:*11*

261:*19*

270:*17*

275:*10*

282:*11*  320:*8*

322:*4*  333:*17*

334:*17*  339:*2*

353:*4*  367:*11*

388:*19*

445:*20, 21*

446:*1, 11*

449:*5*  450:*19*

453:*17*

**taken**  1:*14*

13:*6*  55:*9*

114:*6*  195:*24*

253:*15*  389:*1*

**talk**  52:*17*

76:*20*  103:*23*

120:*23*  121:*5*

132:*21*

134:*20*

176:*24*

196:*11*  206:*7*

313:*13*  354:*15*

**talked**  29:*12*

67:*22*  84:*19*

198:*2*  233:*14*

291:*5*  384:*20*

**talking**  30:*15*

43:*11*  74:*10*

105:*17*  125:*5,*

*21*  126:*24*

127:*2*  133:*12*

156:*2*  167:*6*

174:*14*  192:*1*

199:*20*

210:*21*  229:*6*

248:*16*  251:*4*

252:*2, 11*

260:*7, 8*

274:*20*  298:*4,*

*24*  299:*9*

315:*12*

356:*14*

381:*21*

437:*16, 18*

**talks**  201:*9*

**task**  115:*20*

184:*2*

**TD**  283:*9*

**team**  319:*17*

321:*23*  403:*3*

404:*4*

**tech**  105:*23*

**Technical**  7:*7*

278:*15*  404:*9*

416:*10, 14*

444:*2*

**TECHNICIAN**

4:*8*

**techniques**

214:*1*

**technological**

404:*12*

**technology**

412:*10*  428:*18*

**tell**  13:*12*

18:*12*  19:*3, 7,*

*19, 24*  20:*3, 6,*

*11, 15*  21:*3*

23:*8, 20*  24:*7*

25:*10, 23*

26:*7, 19*

31:*15*  32:*8,*

*14*  33:*4*

34:*21*  47:*8*

60:*8*  61:*10*

63:*5*  66:*19*

68:*5*  69:*18*

82:*23*  103:*4*

127:*15*  133:*9*

165:*1*  173:*13*

175:*8*  204:*23*

205:*14*

223:*19*

249:*14, 15*

266:*2*  269:*3*

273:*1*  277:*14*

279:*3*  282:*18*

300:*12*

310:*20*  324:*9,*

*12, 14, 16*

339:*12*  348:*8*

357:*5, 14*

358:*16*  368:*7*

369:*6, 23*

382:*8*  383:*1*

390:*15*  395:*6*

414:*3*

**telling**  114:*16*

157:*14*  198:*4*

244:*15*

252:*16*

268:*15*  334:*1*

379:*17*  434:*18*

**tells**  70:*15*

268:*5*

**telmisartan**

357:*18*  358:*12*

**temporary**

416:*10*

**ten**  106:*9, 11*

**tense**  128:*2, 4*

**term**  30:*8*

121:*12*  122:*3*

127:*23*  187:*3*

**terminology**

228:*6*

**Terminus**  2:*9*

**terms**  41:*1*

79:*3*  82:*9*

126:*22*  162:*2*

169:*7*  184:*14*

245:*2*  248:*17*

269:*4*  299:*7*

300:*14*  351:*7*

406:*8*  417:*22*

418:*20*  452:*23*

**tertiary**  43:*24*

**test**  147:*22*

157:*3*  200:*8*

213:*2, 12*

237:*13*  238:*3*

245:*7*  256:*2,*

*13*  269:*4*

316:*18*

324:*19*  392:*16*

**tested**  40:*17,*

*20*  213:*11*

362:*5*  382:*20*

**testified**  12:*2*

101:*2*  198:*1*

402:*15*

430:*20*

441:*10, 13, 15*

**testify**  14:*1*

**Testimony**

5:*3*  24:*23*

74:*11*  75:*14*

76:*1*  104:*21*

105:*10*

127:*21*

129:*18*

132:*24*

133:*19, 22*

134:*24*

182:*21*  183:*1*

221:*3*  224:*19*

226:*13*

228:*10*

235:*19*

239:*11*  244:*2*

246:*16*

252:*23*

308:*12*

316:*24*  320:*2*

321:*11, 20*

323:*6, 11*

327:*13, 16*

328:*14*

329:*15*  330:*5*

342:*10*

346:*22*  381:*6*

389:*14*

392:*21*

407:*20*  415:*6,*

*7*  423:*10*

424:*11*

433:*24*  457:*6*

**testing**  140:*16*

220:*21*

237:*20*

264:*16*  270:*7*

341:*7*  388:*2*

389:*2, 6*

391:*5*  397:*9*

442:*23*

**Teva**  2:*21, 22*

3:*6, 7*  16:*15*

35:*20*  38:*8,*

*23*  39:*1, 13*

40:*10, 12, 18,*

*19*  41:*6, 14,*

21  43:5
47:11, 12, 19,
20  48:2, 5, 12,
16  49:9, 16,
21, 22, 23
50:4, 12, 19,
21  51:4, 22
52:7, 22
53:19, 24
54:7, 10, 24
55:12, 14, 18,
21  62:9, 12
66:23  67:10,
18  68:3
70:19  76:24
77:10, 16
78:11, 14, 19
79:3, 24  80:7,
12, 21, 23
81:9, 16, 22
82:2, 11, 13,
15  83:14, 22
84:6, 12, 23
85:2, 10, 16
86:16, 19
87:23  88:3, 8,
9, 24  89:19
90:20  91:5,
10, 11  92:6,
18  93:3, 13,
14, 18, 22
94:5, 10, 13,
24  95:9, 14,
24  96:15, 24
97:7  98:5, 23
99:21, 24
101:11
102:22  103:1,
14, 19  104:7,
12, 17  105:2,
6, 13  119:23
132:3  137:13,
19  139:17
140:6, 16, 22
141:18  142:7
143:2, 21
144:3, 13, 21
145:3, 9, 12,
15, 17  146:12
148:16
149:22

150:17
151:23  152:1,
5, 13, 18, 24
153:11, 19, 23
154:10, 14
155:6, 16
156:5  158:1,
6, 13, 15, 19, 23
159:5, 10, 20,
24  160:3, 7, 8
162:10  163:8,
18, 19  164:9,
14  165:19
168:21  169:1,
2, 10, 17
170:12, 15, 24
171:2, 14, 16,
23  172:5, 17,
20  173:22, 23
175:2, 15
176:3  177:21
184:5  187:19
188:17  189:9,
13, 24  190:20
191:2, 15, 19,
24  192:5, 13,
18  193:10
194:9, 14, 23
195:4  203:12,
19  204:23
205:6, 15
207:22, 23
213:16  214:8,
11, 17  215:9,
10  216:24
217:6, 15
218:2, 15
219:1  220:2,
10, 21, 24
221:12, 21
223:12, 19
224:9, 11
225:22
227:10
230:10, 17, 22,
24  231:10
232:6  233:5
234:4, 12, 16,
21  235:7, 14
236:8, 17
237:6, 13

238:7, 20
246:2, 6, 9
247:3, 9, 22
248:1  249:1
251:16
252:17, 21
254:3, 9, 17
255:4, 8, 19
256:1, 12, 18
257:10, 13, 21,
24  258:4, 13
259:3, 13, 15,
21  260:14, 15,
20  261:1, 11,
18  262:1, 19
263:24
264:19
266:17, 23
267:8  268:5
269:4, 21
270:5  271:7
272:13, 18
274:6, 12
276:6, 13, 17,
23  278:8
280:8, 13, 24
284:15
288:18  292:6
295:4, 9
299:19
300:22  302:9
303:6  304:12,
18, 19  305:6
306:10
307:12, 16
309:5, 15
311:2, 17, 20
313:14, 19
314:3, 7, 9
315:6  317:8,
22  321:13, 16
322:23
325:20
326:20  327:4,
7, 12, 13
328:24  329:9
330:1  331:20
332:4  333:23
335:10
336:17  337:2,
15  338:11

341:17
342:21
346:19  347:5
348:4  350:3,
7, 22  351:3, 9,
18, 24  352:12,
19  353:8
355:8, 14, 19
356:5, 9, 15,
20  357:3
358:8  360:3,
8  362:14, 18,
24  363:4, 22
365:9, 21
366:6  367:8,
14, 16, 18, 21,
23  373:15, 19,
22  374:7, 9
375:11, 20
376:7, 11, 13,
16, 23  377:2,
20  378:6, 11,
17  379:23
380:6, 17
381:1, 16
382:11
383:11
385:23
393:17, 20
394:3, 6, 14,
24  395:6, 12,
15, 21  396:8,
17  398:2, 13,
16, 23  399:4,
9, 15, 21, 23
400:5, 13, 17,
21  403:2, 3,
20  404:3, 7
405:18  411:4
425:24  426:6,
18, 23  427:6
428:23  433:3
435:2, 22
436:9, 10
438:24  441:5,
9, 17  446:8
452:14
453:21  454:9
**TEVA-
MDL2875-
00040589**  7:10

**TEVA-
MDL2875-
00065839**
439:1
**TEVA-
MDL2875-
00067532-37**
8:8
**TEVA-
MDL2875-
00137965-70**
6:17
**TEVA-
MDL2875-
00168948**  7:13
**TEVA-
MDL2875-
00331419**  7:7
**TEVA-
MDL2875-
00399168-246**
7:19
**TEVA-
MDL2875-
00631358**  6:22
**TEVA-
MDL2875-
00631359**  6:20
**TEVA-
MDL2875-
00735010**  7:15
**TEVA-
MDL2875-
00735015**  7:17
**Teva's**  37:12,
19  38:1  39:5,
23  40:6, 14,
21  48:6  56:2
76:20  77:20,
22  78:5  79:2,
22  80:19
81:5, 22  83:1,
18  84:11
86:6, 10, 20
88:14  89:11,
17  91:21
93:21  94:6,
11, 16  95:2
103:11, 12
104:5  134:3
135:2  137:5

141:*4* 152:*19* 154:*15* 155:*18* 157:*20* 158:*16* 165:*22* 171:*8* 172:*18* 176:*4, 6* 214:*2* 220:*20* 231:*11* 233:*17* 237:*7* 245:*23* 246:*19, 24* 248:*22* 249:*5* 251:*14* 254:*21* 256:*2, 14* 258:*5, 19* 259:*23* 262:*4* 281:*15* 286:*8* 291:*21* 292:*4* 304:*23* 306:*17* 307:*7* 320:*3* 328:*8* 335:*21* 337:*7, 18, 24* 338:*21* 343:*1* 349:*21* 394:*18* 396:*3* 402:*17* 429:*9, 16* 435:*1* 444:*4* 452:*22*

**Teva-specific** 91:*14*

**text** 121:*6* 354:*21*

**Thank** 12:*12* 65:*19* 103:*21* 120:*13* 184:*17* 197:*16* 321:*9* 336:*19* 359:*10* 360:*1* 390:*13* 412:*2, 3* 440:*9* 455:*6, 10*

**Thanks** 292:*16* 455:*18*

**theirs** 149:*20*

**then-active** 95:*9*

**theories** 20:*16* 21:*4* 23:*9, 21*

24:*8, 18* 25:*11, 24* 26:*8, 20* 27:*5, 7, 16* 28:*1* 29:*13, 19* 30:*3, 13, 17* 31:*1* 32:*3* 35:*6, 12* 425:*3, 7*

**theory** 21:*22* 22:*3, 22* 23:*1, 4* 28:*17* 29:*1, 9, 22* 30:*7, 10, 14* 31:*3, 9, 16, 22*

**thereof** 38:*4, 17* 54:*15* 272:*12* 372:*19* 389:*3*

**therewith** 244:*23*

**thing** 28:*12* 108:*17* 136:*9* 137:*3* 144:*13* 163:*6* 176:*13* 188:*11* 233:*3* 258:*14* 270:*1* 272:*17* 323:*1* 330:*16* 428:*1* 451:*18, 22* 454:*20* 455:*5*

**things** 82:*3* 147:*3, 5* 166:*12* 169:*6* 184:*16* 218:*11* 220:*17* 244:*17* 258:*8* 280:*19* 323:*13* 332:*7* 334:*18* 337:*20* 338:*16* 341:*10* 348:*23* 349:*2* 352:*23* 385:*11* 387:*12* 396:*18* 397:*4, 8* 407:*14*

**think** 29:*17* 49:*13* 51:*22* 57:*21* 61:*16* 62:*4* 104:*3* 123:*1* 132:*22* 137:*22* 138:*4* 148:*16* 154:*19* 164:*12* 168:*2, 23* 176:*14* 198:*1* 199:*18* 207:*22* 217:*15* 224:*8* 227:*19* 228:*7* 233:*15* 253:*23* 255:*24* 263:*15* 298:*4* 315:*22* 323:*14, 16* 336:*14* 343:*14* 357:*2* 364:*17* 366:*19* 368:*24* 370:*15* 382:*9, 24* 383:*18* 386:*18* 392:*5* 412:*23*

**thinking** 229:*20*

**thinks** 124:*13*

**Third** 6:*18* 280:*7* 284:*20* 287:*2* 341:*9* 361:*1* 362:*12* 366:*16* 433:*23* 440:*3* 449:*13*

**third-party** 280:*5* 283:*11* 287:*10* 353:*9* 355:*2, 15*

**third-to-the-last** 167:*1*

**thirty** 458:*16*

**THORNBURG** 3:*15*

**thorough** 317:*20*

**thoroughly** 146:*10* 149:*5* 259:*16* 295:*18* 307:*20*

**thoroughness** 259:*18*

**thought** 161:*20* 175:*19* 180:*12* 287:*1* 382:*14* 426:*17* 430:*22*

**thousand** 249:*6* 251:*13* 252:*3*

**Thread** 6:*6, 15, 21* 8:*6*

**Three** 3:*3* 108:*20* 155:*3* 276:*22* 306:*23* 345:*1* 369:*24* 405:*20* 406:*2* 416:*12* 417:*1* 440:*3*

**threshold** 145:*23* 146:*1, 2* 204:*22* 248:*11* 301:*9*

**thresholds** 147:*23*

**Tim** 412:*8* 413:*5, 23* 428:*16* 455:*7*

**time** 11:*8* 20:*6, 9, 12* 32:*6* 34:*16* 40:*9* 46:*10, 17, 18* 48:*2* 52:*6* 53:*5, 9* 58:*16* 69:*19* 86:*9, 20* 87:*11* 93:*24* 95:*15* 97:*19* 98:*6, 9, 13* 99:*2, 19* 100:*2* 106:*1* 119:*24* 120:*14, 18* 123:*13, 15, 18* 124:*2, 13, 19,*

22 125:*17* 126:*4, 18* 128:*11, 14* 130:*8* 131:*24* 138:*17* 140:*17* 142:*1, 3* 145:*20* 149:*4, 5, 15* 160:*20* 161:*6* 162:*15, 16, 18, 24* 163:*17, 24* 164:*9* 167:*14* 173:*23* 178:*18* 179:*15* 185:*9* 186:*7, 11* 188:*13* 189:*8* 192:*2, 22* 195:*13, 19* 196:*2* 202:*12* 203:*16* 209:*17* 210:*4* 211:*11* 213:*1* 219:*24* 220:*2* 223:*8* 225:*17* 227:*10* 229:*3, 18* 230:*1* 232:*1, 7* 235:*8* 236:*18* 240:*18* 246:*3, 24* 248:*23* 255:*1, 13* 262:*11* 264:*6* 270:*17* 275:*16, 20* 281:*11, 13* 286:*21* 300:*21* 313:*22* 320:*9, 24* 326:*12* 331:*10* 332:*5* 336:*10* 337:*10, 11* 338:*11* 342:*4* 344:*23* 353:*21* 354:*6, 10* 365:*22* 367:*6* 378:*9* 382:*21* 389:*21* 391:*15* 392:*2*

395:*11, 20*
398:*3, 11, 24*
401:*24* 402:*4*
404:*23* 405:*3*
406:*8* 411:*1,
24* 414:*15*
417:*16, 19*
419:*1, 14*
423:*22*
425:*23*
434:*13, 15*
441:*8* 449:*5,
7* 450:*19*
452:*13, 14*
453:*8* 455:*11,
21*
**timeline** 51:*19*
**times** 34:*11*
38:*7* 97:*5*
242:*14* 253:*3*
352:*24* 356:*11*
**timing** 52:*11*
193:*4*
**TIMOTHY**
1:*14* 5:*3, 17*
8:*15, 17*
11:*17, 24*
12:*11* 457:*8*
460:*16*
**title** 195:*4*
316:*6* 318:*20*
431:*6*
**titles** 195:*7*
**today** 11:*16,
20* 12:*13*
14:*2* 44:*3, 7*
61:*9, 20*
125:*14, 18, 24*
126:*5* 127:*9,
16* 138:*5*
194:*9* 228:*4*
277:*14*
287:*13*
348:*16* 369:*7*
384:*21*
424:*11*
425:*23*
432:*24*
433:*24*
452:*18*

453:*17*
454:*15, 24*
**Today's** 11:*7*
**told** 18:*13*
68:*19* 69:*5*
74:*1* 111:*18*
160:*3* 237:*6*
239:*6* 242:*5*
243:*16*
293:*17* 444:*8*
**Tony** 132:*23*
**top** 112:*22*
201:*23*
269:*14, 18*
270:*1* 348:*19*
357:*19*
446:*19* 449:*11*
**topic** 167:*17*
287:*15, 16*
341:*21*
353:*18* 386:*7*
427:*17* 452:*11*
**topics** 376:*7*
386:*6*
**topmost** 267:*9,
16* 339:*11, 22*
**total** 411:*16*
417:*4*
**totally** 195:*8*
**toxic** 148:*5*
200:*24*
206:*23*
207:*20* 249:*15*
**trace** 46:*3*
**trail** 349:*24*
**trained** 295:*9*
**training**
295:*14, 21*
**transcript**
62:*22* 314:*11,
16* 315:*4*
316:*20*
317:*14*
318:*20*
320:*11*
323:*22, 23*
325:*1, 13*
328:*15* 331:*4*
333:*11*
402:*10, 13*
405:*11*

428:*11* 457:*9,
19* 458:*17, 19*
**transcription**
326:*1* 460:*7*
**transcripts**
56:*18* 57:*1,
12* 58:*11*
**translated**
199:*1*
**translation**
349:*10*
**transpire**
376:*6*
**transpired**
177:*24* 192:*2*
378:*5* 396:*14*
**transpiring**
189:*13*
**TRAURIG**
2:*8, 11, 16*
**trick** 315:*1*
**triethylamine**
43:*20*
**trigger** 297:*2*
**triggered**
300:*14*
**trouble** 318:*13*
**true** 13:*14*
30:*24* 45:*21*
49:*17* 102:*5*
104:*15* 115:*8,
11* 136:*7*
314:*6* 321:*13*
330:*23* 372:*5,
7* 432:*20*
435:*8* 457:*6*
**truncate** 306:*5*
**truth** 114:*18*
150:*16, 18*
151:*1*
**truthful**
114:*20*
143:*10* 151:*2,
14, 18* 152:*1*
**truthfully** 14:*1*
**try** 49:*1*
108:*22* 109:*1*
306:*5* 410:*13*
428:*17*
**trying** 16:*3*
269:*4* 291:*11*

314:*24* 321:*6*
380:*13* 404:*13*
**turn** 336:*2*
357:*13*
437:*14*
440:*10* 442:*4*
450:*7*
**Turning**
424:*10* 430:*1*
450:*17*
**twice** 181:*5*
182:*5, 17*
183:*6*
**two** 50:*5*
53:*24* 149:*21*
183:*8* 200:*9*
204:*15*
210:*23* 258:*7*
276:*22*
286:*23* 303:*1*
332:*7* 336:*21*
337:*1* 417:*10*
440:*3*
**type** 44:*4, 7*
126:*12* 147:*5*
256:*24* 259:*5*
400:*22*
415:*14*
425:*18* 426:*9*
**types** 67:*3*
83:*11* 248:*19*
299:*2* 425:*8*
**typically**
102:*7* 163:*2*
420:*21*
**typo** 161:*9*
**typographical**
161:*6*

< U >
**U.S** 54:*1*
402:*19* 408:*10*
**U.S.C** 451:*14*
**ultimate**
345:*2, 3*
**ultimately**
60:*4* 141:*20*
142:*7* 229:*23*
267:*8* 344:*11*
362:*1* 375:*17*

396:*11*
400:*24* 418:*1*
**umbrella**
82:*16* 99:*12*
**unacceptable**
46:*4, 12*
**unaware**
370:*8, 17*
**uncooperative**
186:*3*
**undergoing**
264:*3* 326:*19*
328:*12, 18*
**underlying**
131:*11*
**understand**
13:*3, 8, 9, 11*
16:*23* 17:*14,
16* 45:*1*
49:*22* 50:*8*
56:*14* 77:*23*
86:*24* 87:*15*
98:*8* 111:*13,
16, 17* 137:*12*
149:*17*
165:*17* 178:*1*
185:*3* 186:*9*
197:*8, 19*
228:*21*
234:*20* 242:*1,
4* 243:*11, 14,
15* 249:*10*
252:*10* 254:*9*
255:*17*
270:*14*
280:*24*
286:*11*
295:*18* 327:*3*
366:*21*
371:*17, 23*
373:*1* 425:*15*
438:*3*
**understanding**
14:*7, 8* 16:*21*
17:*22* 19:*18*
43:*13* 49:*7*
51:*1* 62:*3*
88:*10* 89:*8*
92:*3* 97:*11,
23* 121:*15*
133:*24*

134:*14* 138:*3*
154:*3* 171:*13*
196:*17*
396:*23* 425:*8*
431:*16* 446:*2*
447:*8*
**understood**
80:*24* 228:*20*
310:*23* 334:*9*
356:*14*
**undertake**
85:*7* 97:*16*
98:*22* 99:*23*
187:*16* 192:*12*
**undertaken**
61:*1, 19*
140:*3* 146:*8*
396:*6*
**undertaking**
262:*1* 287:*13*
**undertook**
221:*13, 22*
356:*9*
**underway**
184:*13*
**underwent**
130:*18*
**unexpected**
434:*17*
**unexpectedly**
250:*16*
**unfair** 441:*1*
**unique** 66:*11*
82:*8*
**unit** 260:*1*
334:*12*
**UNITED** 1:*1*
11:*13* 219:*1*
**units** 79:*6*
**universe** 60:*2,*
*5*
**Unknown**
6:*12* 103:*18*
104:*24*
163:*16*
186:*15* 200:*3*
289:*15*
390:*23* 391:*6*
392:*12* 394:*5,*
*16*

**unopened**
364:*18*
**unpack** 239:*4*
**unredacted**
177:*16*
**unsafe** 431:*24*
**unsuitable**
46:*11*
**unsupported**
106:*19* 108:*4*
114:*1, 10*
115:*6, 12, 13*
116:*1, 17*
118:*2*
**unsurprisingly**
244:*13*
**untrue** 106:*19*
108:*4* 113:*24*
115:*11, 15*
116:*1, 6, 14, 16*
**unusual**
338:*13*
**update** 56:*17*
142:*5* 414:*9*
**updated**
57:*18* 79:*2*
414:*1, 4*
**updates**
102:*12*
**uphold** 77:*11*
**upholding**
219:*8*
**urged** 208:*8*
**urgency** 273:*8*
274:*16*
**USA** 2:*22*
3:*7* 47:*11*
**USDMF**
359:*18*
**use** 112:*9, 20*
126:*22* 128:*1*
197:*12*
219:*21* 228:*5*
306:*21* 358:*4*
362:*8* 363:*18,*
*24* 378:*18*
379:*6* 380:*18,*
*20* 381:*13*
382:*22* 431:*9*
432:*14*

**utilization**
145:*17* 380:*2*
**utilize** 141:*23*
**utilized** 41:*20*
79:*1* 382:*4*
**uttered** 437:*8*

**< V >**
**Vadsola** 7:*21*
314:*12, 19*
317:*7* 318:*21*
319:*6* 321:*22*
333:*5* 402:*10*
**Vague** 23:*13*
24:*24* 29:*10*
33:*10* 38:*12*
46:*8* 90:*1*
91:*2* 131:*15*
148:*21* 152:*2*
160:*12* 168:*8*
174:*3, 4*
192:*23*
210:*13* 211:*7*
216:*3, 15*
217:*4, 18*
221:*2* 225:*7,*
*15* 238:*5*
246:*15* 247:*8*
270:*10* 284:*8*
291:*8* 296:*12*
332:*23*
341:*18* 367:*2*
374:*15* 378:*3*
393:*19*
396:*20* 399:*7*
**valid** 259:*10*
**validated**
140:*22*
**validating**
416:*19*
**validation**
341:*10*
**validation/temp
erature** 341:*13*
**VALSARTAN**
1:*2* 6:*8* 8:*20*
11:*11* 17:*24*
37:*19* 38:*8, 9*
39:*6, 24* 40:*6,*
*14* 41:*13*
42:*1, 5, 8, 13,*

*18* 43:*8* 50:*4,*
*15, 23* 54:*1*
89:*12* 98:*7*
99:*19* 103:*16*
104:*8* 105:*8*
117:*23* 119:*4,*
*24* 125:*20*
128:*4, 9*
129:*1, 10, 13,*
*24* 132:*2, 14*
134:*4* 135:*3*
137:*14, 20*
139:*7, 15*
140:*4, 12, 18*
141:*21* 142:*8,*
*10* 143:*5, 18*
144:*1, 19*
145:*11, 14, 18*
146:*6, 10*
147:*14* 149:*7*
150:*3, 7*
153:*20* 159:*1*
160:*4, 9*
191:*6* 193:*13*
197:*19* 198:*5,*
*10* 199:*13, 22*
200:*22*
201:*19* 203:*2,*
*23* 204:*9*
210:*9* 213:*2,*
*11* 215:*12*
217:*2, 17*
220:*3* 221:*14,*
*23* 223:*21*
225:*23*
227:*11*
230:*11, 18*
234:*6, 18, 24*
235:*16*
237:*13, 14*
238:*3, 4*
246:*1, 5, 10*
247:*1, 5, 23*
248:*13, 22*
249:*6, 12*
250:*13, 22, 23*
251:*14, 21, 24*
252:*6, 18, 19*
254:*4* 255:*2,*
*6, 8, 15* 256:*2,*
*14* 257:*7*

258:*10*
260:*16*
261:*19* 262:*6,*
*20* 264:*1, 21*
268:*7* 272:*16*
274:*11* 297:*1*
299:*11, 18*
300:*15* 314:*4*
325:*21*
326:*10*
328:*10* 330:*2*
336:*10*
337:*11, 19*
338:*1, 6, 12,*
*24* 341:*2, 14*
342:*5* 343:*3,*
*10, 18* 344:*12*
345:*3* 347:*20*
348:*22* 350:*8*
351:*10* 352:*3,*
*8, 14* 353:*1,*
*11* 355:*4, 17,*
*21* 356:*11*
358:*22*
359:*18* 360:*6*
362:*17* 363:*3*
364:*1* 365:*11*
366:*8* 367:*1,*
*6* 370:*9, 18*
371:*1, 10*
376:*19* 378:*1,*
*6, 19* 381:*4*
382:*11* 386:*4,*
*15* 387:*14, 17,*
*18, 22* 388:*3*
389:*9, 20*
391:*3* 392:*6,*
*17* 394:*17*
395:*12, 22*
396:*4* 398:*7,*
*15* 400:*8*
402:*19* 403:*4,*
*22* 404:*6*
406:*6* 408:*4,*
*7, 8, 10, 16*
433:*4* 434:*13,*
*14* 435:*23*
444:*9, 23*
445:*7, 10*
447:*11, 14*
448:*10, 12*

Confidential Information - Subject to Protective Order

449:*1, 9, 23*
450:*15, 23*
451:*2, 17*
452:*11, 15, 22*
453:*3*
**valsartan-**
**containing**
452:*22*
**Valsartan's**
139:*10*
**Value** 120:*5*
241:*17*
**values** 149:*11*
**variety** 416:*13*
**various**
199:*12*
315:*18* 451:*13*
**vary** 22:*13*
**veins** 416:*14*
**Vendor** 7:*9*
290:*12, 16, 17*
291:*2, 22, 24*
292:*5* 341:*6*
353:*9* 355:*2,*
*15* 366:*16, 22*
367:*23*
373:*15* 374:*24*
**Vendors** 7:*14*
302:*5, 10, 16*
374:*12*
**veracity** 151:*8*
152:*7*
**verbatim**
114:*3* 115:*23*
**verify** 142:*14*
178:*21*
**version** 56:*16*
98:*12, 17*
99:*6* 102:*10*
232:*3, 4, 16*
281:*4* 286:*4*
287:*7* 288:*21*
289:*20* 306:*3*
412:*24* 414:*6*
**versions**
97:*13* 98:*15*
101:*4* 284:*6*
285:*20, 22, 23*
**versus** 64:*14*
332:*20*
**vice** 423:*13*

**VICINAGE**
1:*2*
**video** 11:*9*
13:*7* 404:*13*
**Videoconferenc**
**e** 1:*15*
**VIDEOGRAP**
**HER** 11:*2, 5*
53:*5, 9*
120:*14, 18*
195:*19* 196:*2*
275:*16, 20*
354:*6, 10*
401:*24* 402:*4*
404:*23* 405:*3*
455:*21*
**VIDEOTAPE**
4:*8*
**Videotaped**
1:*14*
**view** 82:*17*
107:*4* 314:*3*
327:*21* 328:*9*
330:*20*
331:*12* 332:*6,*
*9, 12, 19*
333:*3* 334:*10,*
*12, 15* 405:*24*
407:*9, 14*
**viewage**
407:*16*
**viewed** 331:*15*
333:*9*
**viewing** 70:*2*
331:*12, 14*
405:*21* 406:*3*
408:*1*
**violation**
312:*17*
**violations**
432:*8, 9*
**violative** 432:*5*
**virtue** 407:*22*
429:*11*
**visibility**
41:*17* 150:*12*
152:*4* 187:*23*
**visible** 207:*12*
**visit** 162:*22*
**visits** 418:*22*

**visual** 349:*4*
**Vitae** 8:*15*
**VP** 195:*4*

< W >
**wait** 15:*10*
163:*20* 172:*7*
182:*8*
**waited** 173:*12*
**WALSH** 3:*1*
**Wang** 341:*1*
344:*7, 24*
347:*23*
348:*24* 349:*3*
**want** 15:*9, 11*
21:*2* 51:*24*
56:*5* 90:*6*
103:*22*
105:*21*
176:*14*
184:*23*
185:*23* 186:*3,*
*10* 212:*15*
229:*9* 270:*11,*
*16* 271:*24*
272:*3* 275:*11*
316:*19* 354:*2*
356:*13* 357:*8*
402:*9* 413:*2,*
*11* 437:*16, 21*
451:*7*
**wanted** 62:*1*
148:*17* 179:*1*
187:*8* 251:*9*
369:*5*
**wants** 353:*22*
**warehouse**
157:*3*
**Warning** 8:*8,*
*12* 128:*5, 13*
129:*3* 157:*10*
291:*4, 10, 19*
294:*6, 15, 19,*
*23* 368:*12*
387:*1, 6, 24*
388:*14* 389:*4,*
*24* 396:*12*
397:*8, 11*
423:*22* 424:*3,*
*7*

**watching**
258:*11*
**water** 197:*14*
397:*15*
**Watson** 47:*23*
48:*10* 49:*8*
**way** 15:*13*
61:*10, 17*
63:*5* 74:*22*
76:*16, 17*
80:*20* 81:*14*
88:*23* 96:*6*
105:*6* 113:*3*
116:*19* 121:*6*
122:*16* 132:*8*
138:*22*
139:*23* 140:*5*
148:*23* 156:*5*
159:*20* 163:*8*
178:*23*
179:*22*
182:*14* 186:*8,*
*18, 23* 194:*4*
196:*21* 207:*8*
214:*7* 215:*22*
219:*6* 234:*7*
235:*9* 237:*9*
243:*22*
252:*20*
268:*22*
269:*18* 271:*6*
286:*16* 295:*3*
322:*3* 347:*8*
351:*24*
352:*13* 364:*6*
375:*18*
379:*11* 382:*3*
400:*12* 406:*3*
411:*7, 22*
413:*11* 421:*17*
**ways** 141:*4*
208:*19*
218:*15* 330:*10*
**web** 107:*14*
115:*24*
**website**
110:*24* 111:*4,*
*5, 7, 23* 112:*3,*
*6* 114:*3, 6*
115:*24*

**websites**
111:*15*
**week** 274:*16*
**weeks** 149:*22*
162:*2*
**Weissbazak**
340:*7*
**welcome**
53:*13* 120:*22*
196:*9* 240:*1*
241:*14* 354:*14*
**Well** 17:*20*
49:*23* 57:*7, 9*
64:*5, 10*
67:*20* 68:*19*
86:*8* 88:*17*
110:*14*
114:*11, 13*
115:*10*
117:*22*
125:*21*
131:*11*
134:*12* 136:*1*
140:*7* 162:*9*
169:*15*
174:*13*
211:*16* 212:*9,*
*12* 216:*23*
218:*7, 21*
226:*15*
234:*15* 239:*4,*
*5* 256:*11*
258:*7* 259:*24*
263:*5* 270:*20*
272:*19*
276:*17* 277:*5*
279:*3* 281:*7*
290:*22*
297:*16*
298:*14*
306:*13*
307:*11* 308:*4*
312:*12* 315:*2*
317:*13*
330:*18* 332:*8*
342:*6* 343:*9*
344:*6* 356:*5,*
*22* 365:*24*
370:*22*
371:*14*
375:*10*

Confidential Information Subject to Protective Order

379:*15*  380:*6*
388:*2*  395:*5*
396:*3*  406:*1*
417:*23*
428:*21*
435:*14*
450:*10*  453:*21*
**went**  15:*22*
102:*18*  209:*2*
246:*4*  285:*8*
320:*16*
346:*12*
362:*12*
416:*24*  417:*1*,
*11*  434:*19*
**we're**  34:*12*
53:*10*  64:*16*
89:*18*  96:*5*
100:*6*, *18*
111:*13*  114:*1*
120:*19*  127:*2*
163:*9*, *13*
176:*15*  192:*1*
196:*3*  251:*3*
260:*7*, *8*
272:*19*
275:*21*  280:*1*
288:*21*
348:*15*
353:*18*
354:*11*
381:*21*  402:*6*
404:*13*, *24*
405:*4*  413:*2*
455:*15*
**wet**  406:*5*
407:*1*
**we've**  34:*10*
43:*11*  105:*20*
130:*3*  176:*13*
265:*12*
305:*12*  306:*7*
307:*3*  410:*8*
**whatsoever**
349:*19*  350:*2*
448:*16*
**white**  180:*19*
**WHITELEY**
2:*1*, *3*
**window**
108:*18*  334:*14*

**windows**
334:*20*
**WINKLER**
4:*3*
**Withdrawn**
183:*4*
**Witness**  10:*5*
11:*22*  15:*20*
17:*15*  19:*13*
20:*22*  21:*10*
22:*2*  23:*16*
24:*3*, *13*  25:*1*,
*4*  26:*4*, *13*, *24*
27:*11*, *20*
28:*6*, *20*  29:*6*
30:*7*  31:*8*, *21*
32:*12*, *21*
33:*12*  34:*3*,
*13*  35:*16*
36:*6*  37:*1*, *6*
38:*13*  45:*14*
46:*9*  51:*12*
64:*5*  70:*24*
71:*21*  72:*20*
74:*12*  75:*15*
76:*2*  85:*13*
88:*17*  90:*2*
91:*3*, *20*  93:*6*,
*11*  95:*5*, *19*
96:*12*  102:*4*
104:*22*
105:*11*
108:*19*
109:*14*  116:*4*
126:*9*  127:*22*
130:*3*, *16*
131:*16*
140:*10*
142:*13*
143:*24*
148:*22*
150:*23*  152:*3*,
*23*  160:*13*
165:*5*  166:*21*
167:*2*  168:*9*
169:*5*  170:*20*
171:*20*
172:*13*  173:*6*
174:*4*  175:*13*
176:*8*  180:*8*
181:*14*

187:*13*, *22*
190:*4*  191:*9*
193:*1*, *17*
195:*16*
202:*11*  203:*6*,
*15*  204:*5*
205:*2*, *19*
207:*3*  208:*2*
209:*16*
210:*15*  211:*9*,
*23*  213:*6*, *24*
214:*14*  215:*2*,
*15*  216:*5*, *17*
217:*5*, *20*
218:*21*
219:*16*  221:*4*,
*17*  222:*1*, *20*
224:*2*, *20*
225:*16*
226:*15*
227:*19*  231:*7*,
*16*  232:*9*
233:*22*
234:*20*
235:*20*
237:*19*  238:*7*
239:*12*  240:*1*,
*16*  241:*13*
242:*18*  244:*3*
245:*10*
246:*17*  247:*9*,
*16*  248:*6*
249:*21*
251:*20*
252:*24*  254:*8*
255:*12*  256:*6*,
*18*  257:*17*
258:*22*
261:*24*  263:*2*
265:*1*  268:*11*
269:*9*  270:*11*
271:*5*  273:*15*
275:*14*
277:*24*  284:*9*
290:*8*  291:*9*
295:*8*  296:*14*
297:*6*  299:*14*,
*24*  300:*18*
303:*16*
305:*22*
307:*15*

308:*14*  313:*5*,
*10*  316:*23*
317:*2*, *19*
320:*13*
322:*12*  323:*8*
324:*20*
327:*18*
328:*17*
329:*17*  330:*7*
331:*5*  333:*1*,
*12*  335:*3*
341:*19*
342:*11*
344:*16*  345:*7*
346:*1*, *23*
347:*12*  348:*8*
350:*21*
351:*21*  352:*7*,
*17*  360:*13*
362:*20*  363:*7*
367:*3*  370:*22*
372:*3*  374:*16*
378:*4*, *22*
381:*7*  384:*7*
389:*16*  390:*6*,
*9*  392:*22*
393:*20*  394:*9*,
*22*  396:*21*
399:*8*  403:*9*
404:*14*, *19*
405:*12*  412:*3*
413:*17*  421:*6*
422:*9*, *18*
423:*12*, *21*
425:*12*
427:*13*
428:*14*  429:*6*,
*22*  431:*5*
432:*19*  434:*3*
435:*6*  436:*5*
437:*6*  438:*22*
439:*11*
441:*13*
442:*14*
443:*11*, *23*
444:*12*
445:*17*  453:*3*
454:*20*  455:*5*,
*10*  457:*5*, *6*, *8*
458:*1*

**witness's**
182:*21*, *22*
**wondering**
286:*23*
**word**  117:*1*
126:*23*
156:*13*
160:*23*
161:*11*
178:*10*
186:*20*  187:*5*
328:*5*  333:*18*
372:*22*
414:*17*
447:*13*
448:*12*, *24*
450:*15*
**wording**
103:*23*
**words**  104:*16*
133:*23*  145:*1*
**work**  171:*14*
409:*12*  410:*9*,
*24*  411:*18*
414:*20*  415:*2*,
*9*  419:*15*, *16*
420:*2*, *7*
**worked**
172:*16*
315:*19*
316:*12*, *16*
317:*7*  324:*17*
418:*16*
**working**
149:*24*  151:*5*
313:*8*
**workshop**
314:*4*  315:*18*
325:*21*  326:*9*,
*18*  328:*10*
330:*2*, *21*
331:*1*, *8*, *12*,
*14*, *16*, *17*, *21*
332:*5*, *12*, *21*
333:*3*  334:*21*,
*24*  335:*12*
358:*21*
359:*16*, *24*
361:*9*  402:*18*
403:*4*, *18*, *22*
404:*5*  406:*15*,

Confidential Information Subject to Protective Order

20, 24  407:2, 6, 7, 12  408:3, 8, 9, 14, 19
**world**  193:10  229:8, 13  419:23
**worldwide**  173:20
**wrap**  265:19
**write**  106:13  233:16  234:3  320:5  330:19  333:6, 8  408:24
**writes**  166:11  167:21  267:10  283:7  371:15
**writing**  58:15  156:21  161:24  229:19
**written**  71:12  104:10  153:17  156:23  183:23  289:6  326:15, 23  329:4, 7, 18, 21  332:3  334:4  344:24  415:5
**wrong**  101:9  138:6  412:18
**wrote**  185:13  237:11  330:9  415:3, 4

**< Y >**
**Yeah**  16:19  50:13  51:24  62:6  65:2  108:15  113:8  156:1  169:19  265:18  275:14  277:2  283:2, 4  288:2  315:13  319:21  320:13  327:5  366:4  377:16  387:9  402:22

428:16  430:6  437:20
**year**  51:23  166:14  167:23  168:6, 10  170:16  172:8  173:3, 13  177:9  187:10  189:23  338:24  416:9  423:24  453:12
**years**  127:5  177:12  306:23  415:12  417:1, 5, 10  418:9  420:1
**Yep**  283:6
**York**  3:17

**< Z >**
**zero**  119:11, 15  227:16, 21, 23  228:1, 6, 12, 15
**Zhejiang**  156:11, 16, 20  157:8  161:15, 23
**ZHP**  7:17  38:2, 23  39:15  41:1, 2, 4, 9, 19  42:22  43:18  50:5, 10, 16  67:1  103:20  128:8, 18, 20  129:8  132:2, 16, 19  137:12, 19, 23, 24  138:6, 14, 22  139:6, 16  140:13  141:1, 22  143:3, 9, 14, 16, 20  144:12, 18, 24  145:9, 16  146:7  147:6  148:18  149:1, 3, 23  150:6, 19  151:1, 6, 8

152:8, 12, 15  153:23  154:1  155:21, 24  156:8  157:15, 24  160:3, 7, 8, 20  161:3, 7  162:11  163:7, 18  164:4, 8  165:19  166:1  167:19  168:16, 20, 23  169:3, 9, 18, 22  170:16, 17  171:15  172:5, 19  174:1  175:5  177:17, 20  178:4, 5  179:4, 13, 24  180:13, 24  183:18  184:4, 20, 23  187:8, 17  188:18  189:22  190:12, 13  191:3, 5  192:19, 21  193:12, 19  194:10  197:5, 18  198:4, 9, 12  199:1  202:6  203:10, 22  204:22  205:11  208:10  209:24  214:19  215:10  217:1, 8, 16  218:17  220:18, 23  221:15, 23  223:18  224:15, 22  227:3  250:9  254:20  264:7  276:9  278:10  288:17  291:6  292:6  296:19, 24  300:6  302:22  303:6  304:7  305:7  306:11, 18

307:8  309:5  311:2  313:14, 19  315:15, 17  317:22  326:10  327:19  329:9, 10  330:3  356:5, 14, 16  357:3  358:9  361:3, 6  362:20  381:12, 16, 17  385:12, 16, 22  386:24  387:1, 6, 18  388:11, 20  389:24  394:6, 19  395:22  396:5, 12, 19, 23  397:5, 23  399:4, 12, 16, 22  403:5  436:10, 12  440:16  454:9
**ZHP001344159-64**  8:13
**ZHP00190573-74**  6:14
**ZHP00912962**  165:13
**ZHP00912962-67**  6:9
**ZHP's**  128:24  129:5, 9  130:20  132:13  137:24  139:7, 10, 15  158:5  168:3, 18  197:7  211:12  213:1, 10  214:21  221:5  236:6, 11  263:6  328:9  356:17  360:4  381:20  387:14  388:23  393:13  394:15  396:9

441:3
**zinc**  43:21
**Zoom**  1:15  2:1  3:1  4:1  404:9

# Exhibit 214

REDACTED

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF NEW JERSEY

 3

 4

 5     ****************************

 6     IN RE: VALSARTAN, LOSARTAN,

 7     AND IRBESARTAN PRODUCTS          MDL No. 2875

 8     LIABILITY LITIGATION

 9     ****************************

10     THIS DOCUMENT APPLIES TO ALL

11     CASES                      HON. ROBERT B. KUGLER

12     ****************************

13

14              - CONFIDENTIAL INFORMATION -

15               SUBJECT TO PROTECTIVE ORDER

16

17

18

19

20           Remote videotaped deposition of

21           STEVEN BAERTSCHI, Ph.D., commencing

22           at 9:09 a.m. EST, on the 23rd of March,

23           2022.

24
```

Page 2

A-P-P-E-A-R-A-N-C-E-S

MARTIN, HARDING & MAZZOTTI, LLP
1 Wall Street
Albany, New York 12205
BY: Rosemarie Riddell Bogdan, Esq.
    rosemarie.bogdan@1800law1010.com
    Dolores DeSalvo, FD, PHR
    Dolores.desalvo@1800law1010.com
    Representing the Plaintiffs

KANNER & WHITELEY, LLC
701 Camp Street
New Orleans, Louisiana 70130
BY: David Stanoch, Esq.
    d.stanoch@kanner-law.com
    Representing the Plaintiffs

RIVERO MESTRE LLP
2525 Ponce De Leon Boulevard
Miami, Florida 33134
BY: Zalman Kass, ESQ.
    zkass@riveromestre.com
    Representing the Plaintiffs

FARR LAW FIRM
99 Nesbit Street
Punta Gorda, Florida 33950
BY: George T. Williamson, Esq.
    Gwilliamson@farr.com
    Representing the Plaintiffs

GOLDENBERG LAW
800 Lasalle Avenue, Suite 2150
Minneapolis, Minnesota 55402
BY: Marlene J. Goldberg, Esq.
    Mjgoldenberg@goldenberglaw.com
    Leah Taylor, Legal Assistant
    Representing the Plaintiffs

HOLLIS LAW FIRM
BY: C. BRETT VAUGHN, ESQ.
8101 College Boulevard, Suite 260
Overland Park, Kansas 66210
BY: C. BRETT VAUGHN, ESQ.
    brett@hollislawfirm.com
    Representing the Plaintiffs

Page 3

A-P-P-E-A-R-A-N-C-E-S (continued)

GREENBERG TRAURIG, LLP
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
BY: Steven Harkins, Esq.
    harkinss@gtlaw.com
    Victoria J. Langton, Esq.
    Langtoni@gtlaw
    Representing the Defendants Teva
    Pharmaceutical Industries, Ltd., Teva
    Pharmaceuticals SA, Inc., Actavis LLC,
    and Actavis Pharma, Inc.

WALSH PIZZI O'REILLY LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, New Jersey 07102
BY: Christine I. Gannon, ESQ.
    Representing the Defendants Teva
    Pharmaceutical Industries, Ltd., Teva
    Pharmaceuticals SA, Inc., Actavis LLC,
    and Actavis Pharma, Inc.

HINSHAW & CULBERTSON, LLP
53 State Street
Boston, Massachusetts 02109
BY: Geoffrey M. Coan, ESQ.
    gcoan@hinshawlaw.com
    Representing the Defendant SciGen
    Pharmaceuticals

BARNES & THORNBURG, LLP
11 S. Meridian Street
Indianapolis, Indiana 46204
BY: Mitch Charchalis, Esq.
    mitchcharchalis@btlaw.com
    Representing the Defendants CVS
    Pharmacy, Inc., and Rite Aid
    Corporation

Page 4

A-P-P-E-A-R-A-N-C-E-S (Continued)

HILL WALLACK, LLP
21 Roszel Road
Princeton, New Jersey 08543
BY: William Murtha, Esq.
    Wmurtha@hillwallack.com
    Representing the Defendant Hetero Labs,
    Hetero, USA:

VIDEOGRAPHER: Jeff Fleming

TRIAL TECH: Jessica Errington

Lois Anne Robinson, RPR, CRR
Court Reporter

Page 5

INDEX

EXAMINATION                    PAGE
By Ms. Bogdan                  11
By Mr. Harkins                 320
By Ms. Bogdan                  334

                * * * *

EXHIBITS                       PAGE
Deposition Exhibit 1           25
  Notice of Deposition
Deposition Exhibit 2           26
  Defendants' Response and Objections to Notice
Deposition Exhibit 3           30
  Baertschi expert report
Deposition Exhibit 4           31
  Baertschi export report updated 3.22.22
Deposition Exhibit 5           32
  Amended materials considered list 3.21.22
Deposition Exhibit 6           42
  Baertshci Consulting list of services
Deposition Exhibit 7           74
  Baertschi invoices to Greenberg Traurig
Deposition Exhibit 8           101
  1978 IARC monograph, Volume 17

Page 6

1          I N D E X -(continued)
2
3  Deposition Exhibit 9          120
4    FDA General Advice
5  Deposition Exhibit 10         153
6    July 13, 2018, FDA voluntary recall news release
7  Deposition Exhibit 11         157
8    Teva voluntary recall announcement 7/17/18
9  Deposition Exhibit 12         159
10   Teva voluntary recall announcement 11/27/18
11 Deposition Exhibit 13         160
12   Teva Global Quality Report 2019-GQ-005 1v1
13 Deposition Exhibit 14         168
14   Email - TEVA-MDL2875-00048605 - 609
15 Deposition Exhibit 15         171
16   US FDA Combined N-nitrosodimethylamine (NDMA) and
17   N-Nitrosodiethylamine (NDEA) Impurity Assay by
18   GC/MS-Headspace
19 Deposition Exhibit 16         178
20   US FDA Combined Direct Injection
21   N-nitrosodimethylamine (NDMA) and
22   N-Nitrosodiethylamine (NDEA) Impurity Assay
23   by GC/MS - 12/11/18
24

Page 8

1          I N D E X - (continued)
2  Deposition Exhibit 21         214
3    December 2008 Draft Guidance - Guidance for
4    Industry - Genotoxic and Carcinogenic Impurities
5    in Drug Substances and Products: Recommended
6    Approaches
7  Deposition Exhibit 22         216
8    June 2012 - Guidance for Industry S2(R1)
9    Genotoxicity Testing and Data Interpretation for
10   Pharmaceuticals Intended for Human Use
11 Deposition Exhibit 23         219
12   March 2018 Guidance For Industry - M7(R1)
13   Assessment and Control of DNA Reactive
14   (Mutagenic) Impurities in Pharmaceuticals To
15   Limit Potential Carcinogenic Risk
16 Deposition Exhibit 24         228
17   Chapter 12 - Mutagenic Impurities
18 Deposition Exhibit 25         239
19   February 2021 - Control of Nitrosamine Impurities
20   in Human Drugs - Guidance for Industry
21 Deposition Exhibit 26         241
22   "Did you join us for the webinar Nitrosamines: A
23   Moving Target?"
24

Page 7

1          I N D E X - (continued)
2
3  Deposition Exhibit 17         181
4    US FDA Liquid Chromatography-High Resolution Mass
5    Spectrometry (LC-HRMS) Method for the
6    Determination of Six Nitrosamine Impurities in
7    ARB Drugs - 5/21/19
8  Deposition Exhibit 18         184
9    US FDA Development and validation of a
10   RapidFire-MS/MS method for screening of
11   nitrosamine carcinogen impurities
12   N-nitrosodimethylamine (NDMA),
13   N-Nitrosodiethylamine (NDEA),
14   N-Nitrosoethylisopropylamine (NEIPA),
15   N-Nitrosodiisopropylamine (NDIPA),
16   N-Nitrosodibutylamine (NDBA), and
17   N-Nitroso-N-methyl-4-aminobutyric acid (NMBA) in
18   ARB drugs - 7/24/19
19 Deposition Exhibit 19         189
20   FDA Warning letter - ZHP01344159 to 164
21 Deposition Exhibit 20         195
22   ICH Harmonised Tripartite Guideline - Impurities
23   in New Drug Substances - Q3A(R2)
24

Page 9

1          I N D E X - (continued)
2  Deposition Exhibit 27         253
3    TEVA-MDL2875-0059150 - Certificates of Analysis
4  Deposition Exhibit 28         264
5    TEVA-MDL2875-00168043 - Certificates of Analysis
6  Deposition Exhibit 29         265
7    PRINSTON00074772 - Synthethic route of original
8    process - Triethylamine process
9  Deposition Exhibit 30         270
10   PRINSTON00074772 - Synthethic route of changed
11   process - ZnCl2 process
12 Deposition Exhibit 31         274
13   June 12, 2018 email - ZHP00388639 to 663
14 Deposition Exhibit 32         279
15   ZHP00190079 to 96 - Solvias - Valsartan:
16   Identification of unknown compounds
17 Deposition Exhibit 33         297
18   USP - Nitrosamine impurities
19 Deposition Exhibit 34         306
20   USP valsartan monograph
21 Deposition Exhibit 35         309
22   Email 7/27/17 - ZHP00190573 to 574
23
24

Confidential Information Subject to Protective Order

---

**Page 10**

1  VIDEOGRAPHER:
2        We are now on the record.
3        My name is Jeff Fleming.  I'm a
4  videographer for Golkow Litigation Services.
5        Today's date is March 23rd, 2022.  Time
6  is 9:09 a.m.
7        This remote video deposition is being
8  held in the matter of Valsartan, Losartan, and
9  Irbesartan Products Liability litigation, in the
10  United States District Court, District of New
11  Jersey.
12        The deponent is Dr. Steven Baertschi.
13        All parties to this deposition are
14  appearing remotely and have agreed to the witness
15  being sworn in remotely.  Due to the nature of
16  remote reporting, please pause briefly before
17  speaking to ensure all parties are heard
18  completely.
19        Appearances will be noted on the
20  stenographic record.
21        The court reporter is Lois Robinson,
22  who will now swear in the witness.
23        STEVEN BAERTSCHI, Ph.D.,
24        the witness, after having first been

---

**Page 11**

1  duly sworn to tell the truth, the whole truth,
2  and nothing but the truth, was examined and
3  testified as follows:
4            EXAMINATION
5  BY MS. BOGDAN:
6  Q        Good morning, Dr. Baertschi.  Did I
7  pronounce your name correctly?
8  A        It's Baertschi, like bear and cheese.
9  Yes.
10  Q        Okay.  Good morning.  My name is
11  Rosemarie Bogdan, and I'm a member of the
12  Plaintiffs' Steering Committee in this
13  litigation.  I'm going to be asking you some
14  questions today.  And my first question for you
15  is have you ever been deposed before?
16  A        Yes.
17  Q        Okay.  And how many times have you been
18  deposed?
19  A        Three or four.  I think it's three, but
20  it might be four.
21  Q        And how many of those were in a
22  litigation context?
23  A        All of them.
24  Q        And what matters were you deposed on?

---

**Page 12**

1  What cases?
2  A        Um, I don't have that committed to
3  memory, but they were all patent disputes between
4  two pharmaceutical companies.
5  Q        And over what -- do you remember what
6  party hired you for those cases?
7  A        Can I look at my CV to remember?
8  Q        Sure.
9  MR. HARKINS:
10        He has a copy of the original report.
11  It also has a CV attached as an exhibit.
12        So, Doctor, you can look at that.
13  A        One -- the most recent one was for
14  Exel- -- for Eton Pharmaceuticals versus Exela.
15        A previous one, that was not a
16  deposition, so I'll skip that.
17        Then there --
18        Well, no.  There was -- so that was
19  Mylan versus Teva.
20  MS. BOGDAN:
21  Q        Okay.  And, Doctor, could you tell me
22  what part of your CV you're looking at to refresh
23  your recollection with regard to my question?
24  A        The very end.  The very last page on my

---

**Page 13**

1  CV.
2  Q        And when you said -- you first spoke of
3  the Exela versus Eton Pharmaceutical case.
4  A        Yes.
5  Q        Which party were you hired by?
6  A        Eton.
7  Q        And then I believe you just referenced
8  a Mylan versus Teva case?
9  A        Yeah, and I -- yes.
10  Q        Which --
11  A        But I actually don't think -- I don't
12  think I was deposed in that record.
13  MR. HARKINS:
14        Let her finish her question.  Okay?
15  MS. BOGDAN:
16  Q        And which party did you represent or
17  you were retained by in that case?
18  A        Mylan.
19  Q        Okay.  And the last matter?
20  A        Last matter was a number of companies.
21  There were eleven companies represented by eleven
22  legal firms.  I think I was originally hired by
23  Mylan in that case versus Takeda and AstraZeneca.
24  Q        Now, prior to being hired as an expert

---

Confidential Information - Subject to Protective Order

Page 14

¹ by Mylan in the two litigations that you've
² testified that you were retained, had you worked
³ for Mylan as a consultant?
⁴ A        No.
⁵ Q        Prior to being retained in this
⁶ litigation, have you worked for Teva as a
⁷ consultant?
⁸ A        No.
⁹ Q        Now, with regard to the Exela Pharma
¹⁰ versus Eton Pharmaceutical case, that's one that
¹¹ you recently testified in; correct?
¹² A        Yes.
¹³ Q        Okay.  And that was --
¹⁴          Okay.  And when did you testify in that
¹⁵ case?
¹⁶ A        Last Tuesday.  Last week.
¹⁷ Q        And did you testify more than once in
¹⁸ that case?
¹⁹ A        I was deposed twice, and I testified
²⁰ once.
²¹ Q        So when you say "deposed," you mean at
²² a deposition?
²³ A        Yes.
²⁴ Q        When you say "testified," do you mean

Page 15

¹ in a court proceeding?
² A        Yes.
³ Q        Now, in that case, wasn't your
⁴ testimony precluded with regard to your
⁵ noninfringement positions by court order?
⁶ A        It was -- there was a preclusion of
⁷ part of what I testified about due to a legal
⁸ dispute on the interpretation of the law between
⁹ the two legal firms, which the judge made a
¹⁰ ruling on just prior to trial.  So one small part
¹¹ of my testimony was precluded, yes.
¹² Q        When you say "precluded," that meant
¹³ that the Court would not allow you to testify
¹⁴ about that particular part of your opinion at the
¹⁵ trial of the matter; correct?
¹⁶ MR. HARKINS:
¹⁷          Objection to the extent it calls for
¹⁸ legal conclusion.
¹⁹          You can answer.
²⁰ A        As I understand it, yes.
²¹ MS. BOGDAN:
²² Q        I'm going to be asking you questions
²³ today, and what I would like to ask of you is if
²⁴ you don't understand the question that I'm

Page 16

¹ posing, that you please let me know that so I
² have an opportunity to rephrase it for you.  Is
³ that acceptable to you?
⁴ A        That is acceptable.
⁵ Q        If you answer a question, I'm gonna
⁶ assume that you understand what I'm asking.
⁷ Okay?
⁸ A        Okay.
⁹ Q        And because we're doing this remotely,
¹⁰ it becomes particularly important -- and I
¹¹ believe the stenographer reminded both of us --
¹² if we don't talk over each other.  So sometimes
¹³ there's a little bit of a delay on the video,
¹⁴ et cetera.
¹⁵          So if -- I'm going to try to make sure
¹⁶ that you're done with your answer before I start
¹⁷ my next question.  And if you could just wait a
¹⁸ little bit to make sure I'm done with my question
¹⁹ before you start to answer.  Okay?
²⁰ A        Okay.
²¹ Q        Now, have you met --
²²          Sorry.  There was a little glitch here
²³ on the audio.
²⁴          What did you do to prepare for your

Page 17

¹ deposition today?
² A        Can I ask this question?  Can I change
³ my display so it doesn't flip like we have it so
⁴ I don't see the large screen of whoever's
⁵ speaking?  I'd just rather see the gallery,
⁶ because it's disruptive to me in my thinking when
⁷ the -- when the feed flips pictures.
⁸ Q        Why don't we just go off the record so
⁹ they can make that adjustment for you in the
¹⁰ room.  I don't think it's something that the
¹¹ videographer or I can do.  So let's just go off
¹² the record, and maybe Mr. Harkins can help you
¹³ with that setting.
¹⁴ VIDEOGRAPHER:
¹⁵          Off record, 9:19 a.m.
¹⁶          (OFF THE RECORD.)
¹⁷ VIDEOGRAPHER:
¹⁸          On record, 9:23 a.m.
¹⁹ MS. BOGDAN:
²⁰ Q        Dr. Baertschi, I believe before we went
²¹ off the record to deal with that technical issue,
²² my question that I asked you was what did you do
²³ to prepare for your deposition here today?
²⁴ A        Yes.  I reviewed my expert report, some

Confidential Information - Subject to Protective Order

Page 18

1 of the references -- on my own I did this -- some
2 of the references that I refer to in the expert
3 report. I had a preparative meeting with Steve
4 Harkins on Friday for a couple of hours. I had
5 another preparative meeting for a couple of
6 hours --
7         Wait. On Friday, yes.
8         And then I had another preparative
9 meeting on Monday for a couple of hours with
10 Steve Harkins, and then I spent all day or about
11 eight hours yesterday with both Steve Harkins and
12 Tori Langton.
13 Q      So you mentioned a bunch of different
14 preparatory meetings. How many hours did you
15 spend in preparatory meetings?
16 A      Twelve to 15.
17 Q      And as far as your document review, you
18 said you reviewed your report?
19 A      Yes.
20 Q      Did you review any other specific
21 documents?
22 A      Yes. I went through some of the
23 documents to refresh my memory. I can't remember
24 all of them. But, more explicitly, the ones that

Page 19

1 were cited in my report where I quoted from them,
2 I kind of went back to those reports and took a
3 look to refresh my memory.
4 Q      So you reviewed the documents that are
5 actually cited as references in your report?
6 A      Yes.
7 Q      That you specifically have in your
8 report on pages 25, 26, and 27?
9 MR. HARKINS:
10        And, just for clarity, Rosemarie, is
11 this the original report or the corrected report?
12 MS. BOGDAN:
13        I don't believe it makes a difference,
14 actually, but the corrected report.
15 MR. HARKINS:
16        So, Dr. Baertschi, the 3-22 date on it,
17 just to make sure your pages are exact.
18 A      Yes. I'm looking at 25, 26, and 27,
19 and it looks like a list of references 1 through
20 32. I'm not saying that I went through all of
21 those references. I looked at them all, the
22 reference, just like on this page, and decided
23 which ones to kind of go actually pull up and
24 reread. And that was partially guided by

Page 20

1 references that I specifically quote or
2 specifically call out versus I might have some
3 references where there's one, two, three, four,
4 five, six references to a particular statement I
5 make. I didn't necessarily go look at all of
6 those.
7 MS. BOGDAN:
8 Q      And was it that review that prompted
9 the corrected report that I received yesterday,
10 which was March 22nd?
11 A      Yes.
12 Q      And did you substantively change
13 anything in the report with regard to your
14 opinions in this matter?
15 A      No.
16 Q      Just changed reference cites,
17 essentially?
18 A      I changed errors that I had made in
19 referencing the wrong article, and I also had a
20 couple of numbers that I had copied wrong when I
21 made a grammatical -- not a grammatical --
22 copy/paste error looking at --
23        I mean, if you want to go through each
24 one, I can specifically tell you. But it was

Page 21

1 reference error, like I lost track of which
2 reference I was --
3        And then I -- I found that when I went
4 in to look at the articles that, oh, I have got
5 now the wrong reference for the quotation, and I
6 copied the wrong number for a threshold.
7 Q      One of the changes you made was with
8 regard to the number of peer-reviewed articles
9 you authored?
10 A      Yes. I think when I had submitted the
11 CV, there was one article that was in press --
12 not in press. It was -- I expected it to be
13 submitted before --
14        This was a while ago. And I just never
15 paid attention to --
16        It hasn't still yet been submitted.
17 And when I testified last week, they asked me the
18 question how many peer-reviewed, and I had just
19 looked at it, and I remembered 58. And then when
20 I looked in my CV -- not my CV -- I looked at
21 this expert report and it said 59, and I said
22 it's 58. And I looked and confirmed. So I had
23 made a -- an error on the numbers that I counted.
24 Q      So you counted one of the articles that

Confidential Information Subject to Protective Order

Page 22

1 you authored as a peer-reviewed article that had
2 not yet been peer-reviewed; correct?
3 A     Correct.
4 Q     With regard to the citation corrections
5 that you made, did you add any new citations to
6 the report?
7 A     No.
8 Q     So it was a matter of actually
9 assigning the right article to the right quote?
10 A     Yes.  That's my recollection.  That's
11 what I -- yes.
12 Q     Did you bring any documents with you
13 today?
14 A     No.  There's -- the only documents I
15 have are what's been provided by Steve Harkins.
16 Q     Okay.  And what documents are those
17 that you have?  Do you have documents sitting in
18 front of you?  I'm not in the room, so I can't --
19 I can't see.
20 A     Yes.  I have my expert report and my
21 corrected expert -- the pre-corrected expert
22 report, along with my CV and my corrected expert
23 report, and I have a list of materials
24 considered.  I don't know if you need me to hold

Page 23

1 these up.
2         I have a notice to take videotaped oral
3 deposition, and I have a defendant's responses
4 and objections to plaintiffs' notice.
5 Q     Okay.  Do you have anything else other
6 than what you've just listed off?
7 A     I have a cell phone that I have turned
8 off or silenced.  I have a pen, and I have a pad
9 of paper that's empty.
10 Q     I meant documents.
11 A     Oh.  No.
12 Q     Like -- I'll ask you about electronic
13 devices.  Now, I'm assuming you're speaking to me
14 through some type of computer or, you know,
15 audiovisual system.  On that computer, is there
16 any email or direct message or chat that you're
17 using?
18 A     No.
19 Q     All right.  So all applications right
20 now are off and will remain off during the course
21 of the deposition?
22 A     Yes.  And I don't have -- it's not my
23 computer.  It's a loaner computer from Greenberg
24 Traurig, so that it's clean.

Page 24

1 Q     Okay.  And in the room with you today,
2 is there anyone in the room with you today other
3 than Attorney Harkins and Attorney Langton?
4 A     No.
5 Q     If we could please pull up the notice
6 to take the videotaped oral deposition as an
7 exhibit, please.
8 MR. HARKINS:
9         And, Dr. Baertschi, just so you're used
10 to this now, in a moment you're gonna refresh
11 that just to make sure the Dropbox is working
12 appropriately for you.  But you can review it on
13 the hard copy or electronic copy.
14 THE WITNESS:
15         Okay.  I can see it on this screen.
16 I'm not seeing anything here.  It says no file.
17 Should I say download all files?
18 MR. HARKINS:
19         Rosemarie, is that being introduced
20 or --
21 MS. BOGDAN:
22         I'm gonna mark it.  I'm going to
23 introduce it.  If the doctor can see it on the
24 computer screen right in front of him --

Page 25

1 THE WITNESS:
2         I've got it up now on both screens, but
3 it's --
4 MS. BOGDAN:
5 Q     Okay.  Yeah.
6 A     -- it's clearer on this screen.
7 Q     Okay.  I believe the way this is
8 supposed to work is they should match at all
9 times.  If they don't match, you definitely let
10 us know.  Okay?
11 A     Okay.
12 Q     If we could mark the notice to take
13 videotaped deposition as exhibit --
14         Are we going to use numbers today?
15 One.
16 MR. HARKINS:
17         That sounds good to me.
18         (DEPOSITION EXHIBIT NUMBER 1
19         WAS MARKED FOR IDENTIFICATION.)
20 MS. BOGDAN:
21 Q     All right.  Doctor, is this the notice
22 that you referred to having with you today in the
23 room?
24 MR. HARKINS:

Confidential Information Subject to Protective Order

Page 26

1    The notice, not the objections.
2 A    Yes.
3 MS. BOGDAN:
4 Q    Okay. Do you see the document requests
5 that are a part of that notice on the third page?
6 A    Yes.
7 Q    Were you provided that list of document
8 requests?
9 A    Yes.
10 Q    Did you go about assembling responses
11 to those requests?
12 A    Yes. I -- I had a con- -- conversation
13 with Steve, and we went through all of these, and
14 I provided everything that I could that was
15 related that -- based on advice of counsel.
16 MS. BOGDAN:
17    If we could mark the defendant's
18 responses and objections to plaintiffs' notice.
19 A    Yes. I'm sorry. Could you repeat
20 that? Did you say do you mark?
21 Q    No. I'm sorry. I was asking the court
22 reporter to bring up the next exhibit, please,
23 and please mark this as Exhibit 2.
24    (DEPOSITION EXHIBIT NUMBER 2

Page 27

1    WAS MARKED FOR IDENTIFICATION.)
2 MS. BOGDAN:
3 Q    And, Dr. Baertschi, is what's been
4 marked as Exhibit 2 the defendant's responses and
5 objections to the plaintiffs' notice that you
6 mentioned that you have with you today?
7 A    Yes. Yes.
8 Q    And have you read that document?
9 A    Yes.
10 Q    And, to your knowledge, did you provide
11 to counsel all of the documentation that you had
12 that was responsive to the demands?
13 A    Well, I responded with everything that
14 counsel suggested or discussed with me that I
15 should provide, based on his objections or the
16 company's objections and what's appropriate to
17 provide.
18 Q    And were all those things that were
19 appropriate to provide included in your file that
20 was produced?
21 MR. HARKINS:
22    Object to form. Calls for a legal
23 conclusion.
24    You can answer, to the extent you know.

Page 28

1 A    I really don't know. I -- I might
2 know, but I'm uncertain with the question and
3 uncertain with...
4 MS. BOGDAN:
5 Q    Did you see a copy of the file for you
6 that was produced in this litigation?
7 A    Probably. But it's escaping my memory
8 right now. But I was probably made aware of
9 that.
10 Q    There was a file produced for you in
11 litigation on Monday of this week. Were you
12 provided a copy of that file?
13 A    I'm pretty sure I was. I think I was.
14 MR. HARKINS:
15    Don't -- don't assume if you're unsure.
16 A    I'm unsure. I really don't know for
17 sure.
18 MS. BOGDAN:
19 Q    So you don't know if you have received
20 a copy of the documents that were produced on
21 your behalf in prep- -- two days ago --
22 A    Yeah.
23 Q    -- in response to this notice that was
24 marked as Exhibit 1?

Page 29

1 A    I'm sorry. My memory is so full from
2 going over so much material, and I don't recall
3 for sure whether I received an email notice
4 with -- with the information, the response. I
5 have -- I was explained -- it was -- I -- I did
6 discuss what materials --
7 MR. HARKINS:
8    Just -- do not discuss anything that
9 reflects conversations that you had with me or
10 any other counsel. But you can answer, again, to
11 the extent you understand, what, if anything, was
12 produced.
13 A    I'm not sure what -- if I got a notice
14 or not.
15 MS. BOGDAN:
16 Q    Well, as you sit here today, you can't
17 tell me if the documents that were produced
18 included all of the documents that you provided
19 to counsel that were responsive to the demands?
20 A    As I sit here today, I cannot remember
21 if I was sent a notification via email of that.
22 Q    Do you have any notes in front of you
23 today?
24 A    No.

Confidential Information Subject to Protective Order

Page 30

1  MS. BOGDAN:
2       If we could please mark the first
3  expert report with exhibits that was produced by
4  the doctor.
5       (DEPOSITION EXHIBIT NUMBER 3
6         WAS MARKED FOR IDENTIFICATION.)
7  MS. BOGDAN:
8  Q     Has that been marked as Exhibit 3?
9  TRIAL TECH:
10      Yes.
11 MS. BOGDAN:
12 Q     Doctor, can you see what's been marked
13 as Exhibit 3?
14 A     I can see it on this screen, and now I
15 can see it on a big screen.  So, yes.
16 Q     Is that your first expert report with
17 exhibits that was produced in this litigation?
18 A     I will have to find where -- I will
19 have to go to where one of those changes were
20 made to -- to figure out whether or not --
21      Okay.  It looks like it, because I see
22 that I reference 59 peer-reviewed articles.  So
23 it must not be the corrected version.  So it must
24 be the first version.

Page 31

1  MS. BOGDAN:
2       All right.  And, then, if we could
3  please pull up the corrected expert report and
4  mark that as the next exhibit, Exhibit 4.
5       (DEPOSITION EXHIBIT NUMBER 4
6         WAS MARKED FOR IDENTIFICATION.)
7  A     Is there a question?
8  MS. BOGDAN:
9  Q     And, Doctor, can you see Exhibit 4 now
10 on your screen?  And my question would be:  Is
11 that a copy of your corrected report that was
12 served March 22nd, 2022?
13 A     I can see it.  I'm check- -- I'm
14 scrolling down to the point where I see I have
15 authored 58 peer-reviewed articles, which
16 suggests to me that this is the revised expert
17 report.
18 Q     And on the first page of that exhibit,
19 it actually has the date of March 22nd, 2022.
20 A     I see that.
21 Q     Okay.  And does that also indicate it's
22 your corrected expert report?
23 A     Yes.
24 MS. BOGDAN:

Page 32

1       If we could please pull up as Exhibit 5
2  and mark the amended list of materials
3  considered.
4       (DEPOSITION EXHIBIT NUMBER 5
5         WAS MARKED FOR IDENTIFICATION.)
6  A     I see it.
7  MS. BOGDAN:
8  Q     And, Doctor, is this a copy of your
9  amended list of materials considered that was
10 served on March 21st, 2022?
11 A     Yes.
12 Q     What did you amend regarding your
13 materials considered list between the original
14 one that was served and this one?
15 A     There were some depositions I know that
16 were added that weren't available at the time.
17 And I don't remember everything that was amended.
18 Q     So you remember that depositions in
19 general were added that weren't available at the
20 time of your original list of materials
21 considered?
22 A     That's my memory, yes.
23 Q     Did you add any research articles or
24 studies to this amended list of materials

Page 33

1  considered?
2  A     I do not believe so.  I --
3       Can I correct that?  I see two articles
4  that I co-authored at the bottom of -- well, it's
5  at the bottom of page 10 that I don't think were
6  in the original list but are -- are in this list.
7  So I think there are maybe -- there's at least
8  those two articles that were added.
9  Q     Which two articles are those?
10 A     The last two on page 10.  They're 2018
11 and 2013.
12 Q     The -- I believe if you could --
13 A     I believe --
14      I'm sorry.
15 MS. BOGDAN:
16      If we could just highlight those.
17 Q     "The Artificial Degradation of
18 Secondary Amine," that article?
19 A     Yes.  I think these were added, to the
20 best of my recollection.
21 Q     Okay.  However, both of those were
22 authored before you issued your first report in
23 this litigation; correct?
24 A     Yes.  I -- I added them as a -- when I

Confidential Information Subject to Protective Order

Page 34

1 was looking at the request for materials to
2 provide, and I believe it requested any articles
3 that I had authored that touch on, or some such
4 phrasing, nitrosamines. And these two articles
5 do, and so it occurred to me that I should
6 provide them. I don't think I provided them
7 before.
8 MS. BOGDAN:
9        Okay. If we could take that down,
10 please.
11 Q       Current employment?
12 A       I'm sorry. Could you repeat that? It
13 cut off for a second.
14 Q       What is your current employment?
15 A       My current employment is a consultant
16 with Baertschi Consulting, LLC.
17 Q       And how many employees does Baertschi
18 Consulting, LLC, have?
19 A       One.
20 Q       And how long have you been working for
21 Baertschi Consulting, LLC?
22 A       Seven years, one month, and a week or
23 two.
24 Q       And when you said there's one employee,

Page 35

1 I'm assuming that's you?
2 A       Yes, ma'am.
3 Q       Okay. Are you also a officer with the
4 LLC?
5 A       I -- I don't think with an LLC we have
6 to designate officers, but if we do, I am. I --
7 I think that was -- when I was looking to set it
8 up, I think that was a different type of
9 organization.
10 Q       Are there any other principals in the
11 organization other than yourself?
12 A       I do not believe so.
13 Q       What is the business of Baertschi
14 Consulting, LLC?
15 A       Providing consulting to any company
16 that would need but primarily to pharmaceutical
17 biotech, occasionally agrochemicals and
18 packaging, or sometimes instrumentation companies
19 related to my expertise, which is in impurities,
20 impurities identification, mutagenic impurities,
21 chemical drug degradation, formulation stability,
22 those sort -- photostability, photo safety, those
23 sorts of things.
24 Q       And when you say to pharmaceutical

Page 36

1 biotech, are you referring to pharmaceutical
2 companies that manufacture drugs?
3 A       Some do. Some do not. Because some
4 are small companies or companies that have never
5 launched a product. So it -- if they haven't
6 launched a product, they're not a manufacturer.
7        A lot of companies I -- some of the
8 companies I consult with are virtual, and so
9 they're trying to bring a drug to market and
10 they're not a manufacturer themselves but they
11 contract it out. So there's a wide variety.
12 Some are -- do manufacture their own drugs.
13 Q       And who are your clients that have
14 hired you for consulting purposes with regard to
15 nitrosamine impurities?
16 MR. HARKINS:
17        Object to the extent it calls for any
18 confidential information.
19        To the extent you're comfortable and
20 able to talk about that, you can answer.
21 A       I can't provide you with the companies'
22 names, but I can say that because of the
23 confidentiality agreement I have with companies
24 is that I won't disclose their name without

Page 37

1 getting permission. But I -- there are a couple
2 of companies that I can't -- one company I can
3 disclose the name of. Well, I'd better not
4 because I'm not completely sure of that.
5        So I'm gonna say it's about four or
6 five companies that I have consulted with regard
7 to primarily risk assessments of nitrosamine
8 formation on stability.
9 MS. BOGDAN:
10 Q       Have you been hired by any of the
11 defendants in this case to act as a consultant
12 with regard to nitrosamine impurities?
13 A       No.
14        Can I ask a question? I've reviewed a
15 number of companies, and I think I've seen ten or
16 twelve and -- I don't know -- maybe even more
17 than that with some of the Rite Aid and CVS and
18 Walgreens. But I did not see any companies that
19 I have consulted with on the list, that I can
20 recall, with regard to nitrosamines. I'm pretty
21 sure of that.
22 Q       Have you done work for any of the
23 companies in the past?
24 A       On the broad list.

Page 38

1  Have I done work for any companies on
2  the complete list of defendants?
3  Q  Yes.
4  A  I don't know that I know the complete
5  list of defendants.  But, to my knowledge, the
6  ones I have looked at, I have not provided any
7  consulting to them.
8  Q  Have you done any consulting work for
9  ZHP, Solco, or Prinston?
10  A  No.
11  Q  Have you done any consulting work for
12  Aurobindo, Mylan, or Teva?
13  A  No.
14  Q  Have you done any consulting work for
15  Torrent?
16  A  No.
17  I'm starting to get uncomfortable in
18  that you could continue to list companies, and
19  then if you hit one that I have -- has a client
20  of mine, now I'm revealing that.  So I'm starting
21  to get uncomfortable about whether or not you go
22  through a list of 20 or 30 companies and I --
23  Because I've contracted with over 60
24  companies in the last 70 years -- seven years.

Page 39

1  Q  Well, part of serving as a consulting
2  expert in this litigation, I am absolutely
3  entitled to ask you if you have worked for any of
4  the defendants in the litigation in the past.
5  A  Okay.  If that's the legal standard,
6  then I'll answer any -- any questions.
7  MR. HARKINS:
8  Wait for a question.
9  MS. BOGDAN:
10  Q  And, so, just so we can move on and
11  then we can maybe, you know, circle back to this,
12  with regard to the defendant list and the
13  documents you've reviewed, are there any of the
14  defendants that you know of as you sit here right
15  now that you have done work for in the past?
16  A  No.
17  Q  And when you say you've been hired by
18  60 companies in the past seven years, I'm
19  assuming you have a list of those 60 companies?
20  A  I have -- I don't have a single list of
21  the companies, but I have records of all
22  consulting that I've done with companies.  I mean
23  individual, not a combined list.
24  Q  And are they all either biotech or

Page 40

1  pharma companies?
2  A  No.
3  Q  What other type of companies do you do
4  work for?
5  A  Agrochemical, animal health, and
6  instrument providers, instrumentation providers
7  that -- that make mass spectrometers or -- well,
8  mass spectrometers.
9  For example, I published a paper with
10  ACD/Labs.  They're a software provider.  So
11  the -- the article is a non-peer-reviewed
12  publication, so it's not privileged that I could
13  say that I worked with ACD/Labs.  That's an
14  example of the kind of non-pharmaceutical
15  company.
16  Q  What percentage of your business is
17  working for pharmaceutical companies?
18  A  I don't have an accurate number from
19  calculating it, but I would estimate it at 90
20  percent.
21  Q  And what is the other 10 percent?
22  A  Other companies, non-pharmaceutical, or
23  litigation.
24  Q  What percent of your work is

Page 41

1  litigation-related?
2  A  From -- in what time frame?  Because
3  it's only been recently that I've had a few cases
4  in litigation.
5  Q  Well, let's say in 2021.
6  A  I would estimate 15 percent.
7  Q  And the other non-pharmaceutical
8  companies that you do consulting work for, are
9  those companies somehow related to biotech or the
10  pharmaceutical industry?
11  A  Related to --
12  Q  Meaning they provide instruments or
13  equipment that are used in biotech or the
14  pharmaceutical industry?
15  A  Yes.  They would be commercial vendors
16  that provide -- that sell instruments to not just
17  pharmaceuticals but the chemical industry, to
18  other related industries that use that kind of
19  advanced technology.
20  Q  Like bioanalytical laboratories or that
21  kind of business?
22  A  Exactly.  Yes.
23  MS. BOGDAN:
24  If we could please pull up as an

Confidential Information Subject to Protective Order

1 exhibit the Baertschi Consulting, LLC, service
2 overview.  It will be one of the last documents
3 loaded into the repository, if that's helpful.
4         (DEPOSITION EXHIBIT NUMBER 6
5         WAS MARKED FOR IDENTIFICATION.)
6 MS. BOGDAN:
7 Q       Dr. Baertschi, can you see the exhibit?
8 A       Yes.
9 Q       And are we now on Exhibit 6 for
10 identification?
11 TRIAL TECH:
12       Correct.
13 MS. BOGDAN:
14 Q       Do you recognize that exhibit?
15 A       I do recognize it.
16 Q       And under new expanded services, can
17 you read the section that begins "N-nitroso"?
18 A       "N-nitroso/N-nitrosamine impurities and
19 risk assessments for the formulated product."
20 Q       And what is involved with that type of
21 service?
22 A       That type of service involves helping a
23 company do a risk assessment per the guidance
24 provided by EMA and maybe FDA as to what you

1 should do to carry out a risk assessment related
2 to the formation of nitrosamines as degradation
3 products, degradation-related impurities in the
4 formulated product.
5       So I don't -- I don't focus on
6 nitrosamine formation in synthetic routes or the
7 process impurity, the synthetic process as
8 process impurities.  I focus on -- my -- my
9 expertise is on the potential formation
10 of N-nitroso compounds upon aging of a formulated
11 product.
12 Q       When you say that your expertise is on
13 the potential formation of N-nitroso compounds
14 upon aging of a formulated product, you're
15 talking about nitrosamines forming as a result of
16 degradation?
17 A       Yes.  It would be classified as
18 degradation, yes.
19 Q       Do you serve as a consultant with
20 regard to doing a risk assessment of the
21 synthetic process that is used to manufacture the
22 drug?
23 A       I have not.
24 Q       Now, you previously worked for

1 Eli Lilly.  Is that my understanding?
2 A       That is correct.
3 Q       Okay.  And your roles at Eli Lilly were
4 that of senior chemist and senior research
5 fellow?
6 A       That's -- my starting position was
7 labeled as a senior chemist, and my ending
8 position was labeled -- the title is a senior
9 research fellow.
10 Q       And what did your job responsibilities
11 entail in those positions with Eli Lilly?
12 A       A wide -- it --
13       Most of my responsibility focused on
14 helping assess stability, both predictive and
15 actual stability, and all the processes
16 associated with that.  So that -- that has to do
17 with force degradation studies, also known as
18 stress testing studies, the degradation of drug
19 substances and drug products, the formulation and
20 how formulations might stabilize or
21 destabilize -- and that's both chemical and
22 physical stability -- and photo safety,
23 photostability studies and impurity isolation and
24 identification mechanistic understanding.

1       And I also, by the time I was done, was
2 mentoring a wide variety of other scientists,
3 and -- and part of my responsibilities were to
4 mentor the next generation of scientists.
5 Q       So, from that response, I gather that
6 your work at Eli Lilly also pertained to studying
7 degradation of drug substances and products and
8 studying what can happen to them after they're
9 produced but before they would be taken by the
10 patient?
11 MR. HARKINS:
12       Object to form.  Compound.  Vague.
13       You can answer.
14 A       Yes.  I would agree with that
15 statement, that I -- the statement is that I
16 would -- my expertise focused on helping
17 understand what degradation products could and do
18 form prior to the exposure to the patient.
19 MS. BOGDAN:
20 Q       Would an analysis of the chemical
21 synthesis route that was used to create the drug
22 be important to understand as an initial matter
23 when looking at potential degradation pathways?
24 MR. HARKINS:

Confidential Information Subject to Protective Order

**Page 46**

1    Object to form.  Speculation.  Vague.
2  A    Looking at the synthetic route and
3  understanding the potential impurities and the
4  chemistry associated with forming the drug
5  substance can be of use in some circumstances
6  because sometimes the molecule can fall apart in
7  a same -- one step or two in the same manner it
8  was put together.  Sometimes that's not possible.
9    But the process impurities that result
10 from that are oftentimes used as a starting point
11 for the analytical method development to -- to
12 generate a stability-indicating method.  So you
13 have the -- the process impurities method as a
14 starting point, and then you need to develop a
15 stability-indicating analytical method, which
16 means it would detect any and all degradation
17 products that might form and do form.
18 MS. BOGDAN:
19 Q    So understanding that process
20 impurities method would be part of what you did
21 when you were looking at potential degradation
22 products in your role at Eli Lilly?
23 A    As a starting point, we would look at
24 the process impurities and the methods that had

**Page 47**

1  been developed to date as the starting point for
2  analytical method development for stability.  So
3  I'm -- I believe I'm agreeing with your
4  statement.
5  MS. BOGDAN:
6    If you could please pull back up
7  Exhibit 6.  If we could go to the second page.
8  Q    Doctor, do you see the box that is
9  entitled "analytical and mutagenic impurity
10 control strategies"?
11 A    I do see that box.
12 Q    Okay.  And what services are you
13 advertising that are available through your
14 company with regard to that...
15 A    Did you finish your question?
16 Q    With regard to that -- with regard to
17 analytical mutagenic impurity control strategies?
18 A    I'm advertising that -- that I can
19 assist with or provide consulting related to the
20 design and development of analytical methods for
21 ordinary impurities as well as for mutagenic
22 impurities, that I can provide services related
23 to troubleshooting of analytical methods, to
24 solving analytical artifact issues, to leveraging

**Page 48**

1  forced degradation studies, also known as stress
2  testing studies, to process impurity discovery,
3  structure elucidation and mechanistic chemistry,
4  and to analytical method development.
5  Q    Okay.  So when you refer to design and
6  development of analytical methods, what do you
7  mean by analytical method?
8  A    I mean a method that will enable the
9  separation of the -- the parent drug from any
10 associated impurities and a detection of the
11 other impurities with some form of quantitation,
12 quantification.
13 Q    So that would be assisting as -- with
14 developing the appropriate test in order to
15 identify an impurity and then be able to quantify
16 it?
17 A    Yes.
18 Q    And depending on what impurity is in a
19 drug, that governs what test is appropriate to
20 detect it and then quantify it; correct?
21 A    Um, could you repeat that question?
22 Q    And I can -- I can rephrase it for you.
23    When determining what test is
24 appropriate to detect an impurity and quantify

**Page 49**

1  it, it is important to know what the impurity is;
2  correct?
3  A    Yes.  You -- you -- it's not always
4  universally that situation, but, in general, yes.
5  Q    You help develop analytical methods and
6  tasks in order to find and quantify impurities;
7  correct?
8  A    Yes.
9  Q    Now, you mentioned two different types
10 of impurities.  You mentioned ordinary
11 impurities.  Can you please describe what you
12 mean by ordinary impurities?
13 A    Traditionally -- historically, I should
14 say, that is a term coined by USP to describe
15 related substances.  Ordinary impurities might be
16 anything that is related to the synthesis or the
17 degradation of a drug substance, and the ordinary
18 part of it implies that it's not particularly
19 toxic.
20 Q    Then you have another category of
21 genotoxic mutagenic impurities.  What do you mean
22 by that?
23 A    There -- the -- the terminology
24 there -- mutagenic is a subset of genotoxic

Confidential Information - Subject to Protective Order

Page 50

1  impurities, and mutagenic impurities are the
2  subset of potentially toxic impurities that have
3  been identified by ICH M7, a particular guidance
4  document to characterize molecules that might
5  react with DNA.
6       And, so, they have the potential for
7  reacting with DNA and causing a mutation.
8  Q       And why did you bullet-point these two
9  types of impurities as opposed to just saying
10 impurities as one category?
11 A       Because the challenges associated with
12 detecting and quantifying mutagenic impurities
13 are somewhat -- they're somewhat unique, more
14 difficult because of the low levels for -- when
15 you have identified a mutagenic or genotoxic
16 impurity for controlling or -- or measuring.
17      So it's -- you don't typically apply
18 the same analytical techniques because you need
19 more sensitivity.  And --
20 Q       Why are --
21      I'm sorry.
22 A       And there's certain expertise in -- in
23 that process of assessing and doing a mutagenic
24 risk assessment and trying to carry through that

Page 51

1  process as outlined by ICH M7.
2  Q       Why are genotoxic and mutagenic
3  impurities controlled at low levels?
4  A       Well, I'm struggling with the word
5  "controlled at low levels."  The thresholds for
6  when you need to -- where -- the thresholds for
7  controlling them are much lower than the
8  thresholds for controlling ordinary impurities,
9  and that's because they're much more potentially
10 toxic.
11 Q       And why are they much more potentially
12 toxic?
13 MR. HARKINS:
14      Object to form.  Scope.
15 A       They're much more potentially toxic
16 because they specifically react or they can
17 specifically react with DNA to form a mutation.
18      So that's different from the general
19 concern of toxicity, which would not be
20 associated with DNA reaction.
21 MS. BOGDAN:
22 Q       And why is it significant that
23 genotoxic and mutagenic impurities can react with
24 DNA to form mutations?

Page 52

1  MR. HARKINS:
2       Object to form.  Scope.  Vague.
3  A       Yeah.  I'm struggling with that
4  question, why is it important.  I feel like I
5  just answered why it's important, but maybe I
6  spoke too technically.
7  MS. BOGDAN:
8  Q       Why are genotoxic and mutagenic
9  impurities a concern?
10 MR. HARKINS:
11      Same objection.
12 A       They're a concern because a mutagen has
13 potential and it has to do with whether or not
14 it's --
15      I won't go too far, but if you want to
16 go to talk about this further, we can.  It's
17 because mutagens can react potentially with DNA.
18 And if a mutagen reacts with DNA and it's
19 ingested by an animal or a person, it can then
20 react with DNA.  Reactions with DNA can be the
21 initiating start of -- of cancer.
22 MS. BOGDAN:
23 Q       The next service that you indicate in
24 that part of your website is troubleshooting

Page 53

1  analytical methods.  What do you mean by that?
2  A       I mean sometimes companies will have an
3  analytical method, and then they're -- they start
4  to see -- have problems with it, like all of us.
5  They might be having a problem with variation of
6  peak size or with peaks moving in a relative
7  retention or with anomalous peaks that show up,
8  artifactual peaks, or with a method that they're
9  unsure -- they can't seem to figure out how to
10 sharpen up a peak because it's broad, it's
11 double-peaked, things like that.
12      And, so, you -- you -- I can provide
13 help in doing chromatographic troubleshooting to
14 sharpen up the peaks, to elude all the peaks.
15 You know, there are ways to tweak an analytical
16 method to make it perform better.
17 Q       I was gonna ask you -- you started to
18 talk about peaks.  And what are peaks, the peaks
19 that you're referring to?  Are you talking about
20 peaks on chromatograms or some other type of
21 test?
22 A       I am talking about peaks in a
23 chromatogram.  So that's kind of jargon for those
24 in the field.  The way you separate impurities

Page 54

1 is -- one example of a way you separate
2 impurities by HPLC is where the solution is
3 injected into a column, it goes through the
4 column at a certain rate because the solvent
5 pushes it along, and different compounds migrate
6 through that column at different rates.
7        And when they come out of the column,
8 they're detected by a detector, they're sensed by
9 a detector, and that detector gives a response
10 per the amount there or per some feature of that
11 molecule, and it will give a time-based
12 chromatogram where the peaks are associated with
13 some kind of impurity or non- -- process related,
14 degradation related, or extraneous leachable type
15 of material.
16 Q      And, so, you provide services reviewing
17 analytical methods, and specifically
18 chromatograms, in an effort to help refine the
19 process and make those testing methods better?
20 A      That would not comprehens-- -- not
21 comprehensibly describe it, but that is
22 certainly -- I agree with the way you
23 characterized it.
24 Q      And is this limited to HPLC or does it

Page 55

1 also involve chromatograms from other types of
2 analytical testing?
3 A      Primarily focused on HPLC, but I have
4 expertise beyond HPLC.  So it could involve other
5 type of separation methods and techniques.
6 Q      And what other type of separation
7 methods and techniques are you referring to?
8 A      The -- the most obvious one, the first
9 one would be gas chromatography.
10 Q      Do you also consult with regard to mass
11 spectrometry?
12 A      Yes.  But I no longer can hold myself
13 out as a mass spectrometry expert.  I consider
14 myself well versed in mass spectrometry, and,
15 yes, I can help in those issues.  But I -- it's
16 not a typical consulting topic that I am -- am
17 asked about.
18 Q      So you consider yourself an expert with
19 regard to HPLC and GC but not MS?
20 MR. HARKINS:
21        Object to form.  Misstates testimony.
22        You can answer.
23 A      I believe that my expertise in mass
24 spectrometry is pretty broad and pretty

Page 56

1 extensive.  And, again, I have a lot of tips and
2 tricks and things that I've learned along the
3 way.  So depending on how you define expert, you
4 might consider -- I might hold myself out as an
5 expert.
6        But I just know of people who work --
7 have worked for 20, 30, 40 years exclusively on
8 mass -- on mass spectrometry, and they have more
9 expertise than me.  So on a relative basis, I
10 wouldn't hold myself as that kind of an expert.
11 A user functional expert, I have -- I have -- I
12 am comfortable with that topic.
13 MS. BOGDAN:
14 Q      But you would refer [sic] to those
15 people that have 20, 30, or 40 years of work with
16 mass spectrometry if there was an issue with
17 regard to troubleshooting a mass spectrometry
18 analytical method?
19 A      It seems like that question was
20 incomplete.  You said I would refer to these
21 people --
22 Q      You would defer.  I'm sorry.
23 A      Defer.  Defer.  I -- I would engage
24 and -- yes.  I think defer means that if we had

Page 57

1 a --
2        Generally, those kind of people are
3 gonna have more insight into troubleshooting than
4 I would.
5 Q      And, just so the record is clear, I
6 started to use some acronyms there, and I'm sure
7 we're gonna use them going forward, but let me
8 ask you for the record.  When you say HPLC, what
9 are you referring to?
10 A      High performance liquid chromatography.
11 Q      And when you say GC, what are you
12 referring to?
13 A      Gas chromatography.
14 Q      And when you say MS, what are you
15 referring to?
16 A      Mass spectrometry.
17 Q      Now, the next service that you
18 advertise is solving analytical artifact issues.
19 What is meant by that description of the service
20 that you provide?
21 A      It -- in general, artifacts have to do
22 with peaks that show up that sometimes are
23 spurious, sometimes are variable.  Sometimes
24 they're not spurious or variable, but they're not

Confidential Information Subject to Protective Order

1 associated with anything to do with what was in
2 the solution that you're analyzing but are a
3 phenomenon of something else, such as on-column
4 degradation. So if a -- or on-column reaction.
5      So as a compound proceeds through the
6 separation column, sometimes it can do reactions
7 with things in the column, with trace metals,
8 with other things, and can produce an artifactual
9 impurity that's not part of the original
10 solution, so it's an artifact from the analytical
11 preparation workup or separation or analysis.
12 Q      You used a couple different terms in
13 that response. One was "spurious." Can you
14 please define what you mean by that term,
15 "spurious"? Spurious?
16 A      Unpredictably showing up. It occurs
17 occasionally in an unpredictable way.
18 Q      And then you also referred to artifacts
19 as being variable. What did you mean by the term
20 "variable"? And how does that differ from
21 spurious?
22 A      Variable would, to me -- I was implying
23 that maybe an artifact peak might go up and down
24 in size, might sometimes split into two peaks and

1 sometimes not. So spurious would mean it shows
2 up in your chromatogram unexpectedly sometimes,
3 and you don't know why at the start.
4      And, to me, the -- I use the term
5 "variable" means it's showing up regularly but
6 it's varying in how it appears in the
7 chromatogram in either level or shape.
8 Q      Is it showing up at the same retention
9 time if you're using the term "variable"?
10 A      You know, that's an imprecise term.
11 There's no clear definition. So it --
12      Variable could -- could involve moving
13 a retention time as well. I'm not trying to be
14 restrictive. I'm trying to emphasize that there
15 is a variation, and sometimes it's predictable --
16 or sometimes it's more -- when it -- when you
17 don't see one and you see a peak versus the peak
18 shows up somewhat regular -- pretty regularly but
19 it varies in appearance or retention time or
20 shape.
21 Q      And what services do you provide in
22 order to help solve these spurious or variable
23 peaks with regard to chromatogram?
24 A      I help companies figure out first

1 what's the source of the artifact, and because I
2 have worked for a long time in that area and
3 published on it, it's -- it's fairly frequent
4 that I have experienced that particular type of
5 artifact that they're seeing and can troubleshoot
6 it by providing them with, okay, try this change
7 and see what happens to the peak, add this to the
8 mobile phase of the -- of the system and see how
9 that affects the peak shape or eliminates it.
10      So there are some commonalities and
11 repeated motifs that happen with artifacts, and
12 I'm familiar with, you know, more than a dozen of
13 those kinds of issues and how to track it down
14 and identify the root cause and solve it.
15 Q      Is it prudent for a company, if they're
16 having artifact issues, to do an analysis to
17 determine the cause of those artifacts that
18 they're seeing when using chromatography?
19 MR. HARKINS:
20      Object to form. Vague. Scope.
21 A      So I'm hearing the question as is it
22 prudent for a company to investigate and -- and
23 try to understand or solve artifact peak problems
24 that they are seeing. I would say it is prudent

1 for that to occur. It may not always be
2 necessary, depending on the type of artifact
3 occurring, but it's -- it's prudent to be able to
4 investigate, understand the issue, because --
5 because it can affect your analytical results.
6 MS. BOGDAN:
7 Q      And you actually are hired by companies
8 to investigate and understand artifact peaks that
9 they are seeing in chromatograms; correct?
10 A      Yes. But when -- just to make sure you
11 understand what "hired" means, doesn't mean I
12 conduct any laboratory work, because I have no
13 laboratory. I am only providing intellectual
14 input. So I come up with ideas, suggestions,
15 experiments. I can help them, as they carry them
16 out, interpret the results and point them to the
17 underlying chemistry issue, as my background in
18 organic chemistry, my Ph.D. provide me -- and
19 experience provide me with that chemistry
20 background that oftentimes helps solve and
21 uncover the root cause of these kinds of artifact
22 issues.
23 Q      Using the term "root cause," can you
24 describe what you mean by that?

Confidential Information Subject to Protective Order

1 A    Yeah.  Another term could be "trigger,"
2 but I think root cause is a better term.  Root --
3 the root cause might be what's the underlying
4 phenomenon that -- that is the source of whatever
5 problem you're dealing with.
6      So if you're having an artifact
7 associated with a particular root cause, if you
8 can say, oh, it is because you're operating at a
9 high pH, your mobile phase is at a high pH and
10 you're using a metal frit and that metal is
11 ablating off the frit and it's depositing on the
12 head of the column and, as the compound passed
13 by, that transition -- one of the transition
14 metals is catalyzing on column degradation, so
15 that's an example of if you understand the root
16 cause, then you can say, oh, we can solve that by
17 replacing with a plastic frit, or we can change
18 the pH of the HPLC separation so that it no
19 longer ablates metal off the metal frit.
20      So I'm not trying -- I'm just trying to
21 give one example of how that plays out, the root
22 cause investigation.
23 Q    I appreciate that.
24      So it's important to determine what the

1 underlying phenomenon is that's causing a peak in
2 a chromatogram?
3 MR. HARKINS:
4      Object to form.  Scope.  Vague.
5 A    Yeah.  We were talk- -- we're in the
6 context of artifact issues, and it would relate
7 to the size of the peak.  So if a peak is an
8 artifact but it doesn't affect the quantitation,
9 like it's so small that it doesn't affect, you
10 can ignore things that are very small.
11      So there are examples when you wouldn't
12 need to solve or prevent or understand a root
13 cause, and there's often times when there's
14 unknowns at levels where you don't need to
15 investigate.
16      But for -- for things that are
17 affecting your analytical results or changing how
18 you would process the integration of a sample,
19 yeah, those artifact issues would be important to
20 under- -- to understand and control -- understand
21 at least to the point of control.  The
22 understanding that you need is guided by the --
23 the desire to control it.  So you can sometimes
24 control things without having a full root cause

1 understanding as long as you know that your
2 control is robust.
3 MS. BOGDAN:
4 Q    The next service that you mentioned is
5 leveraging forced degradation studies.  Would
6 that pertain to stress testing, for example?
7 A    Yes, it would.  Forced degradation and
8 stress testing are sometimes used colloquially as
9 jargon as the same term.
10 Q    The next service that you advertise is
11 process impurity discovery, structure
12 elucidation, and mechanistic chemistry.  What
13 services is that bullet point describing?
14 A    That's describing -- it's analogous to
15 if you're looking at -- at new peaks on a
16 stability sample that come up that you know
17 are -- are degradation-related in your synthetic
18 process if you have peaks beside your -- your API
19 or beside your intended step product that
20 elute -- you -- you can -- it can be helpful to
21 determine the structure of those impurities that
22 occur during the process, during the synthetic
23 process and, therefore, called process
24 impurities.  It can be useful to --

1      You don't always have to do those.  It
2 depends on the levels and the amounts and whether
3 or not there's mechanistic help, like if you're
4 getting low yields and you're trying to
5 understand how to increase your yields.  But
6 that's how I would frame it.
7 Q    Okay.  And when you say "process
8 impurity discovery," that would be impurities
9 that are created by the synthetic process itself;
10 correct?
11 A    Yes.
12 Q    And when you say "structure
13 elucidation," what are you referring to?
14 A    I'm referring to determining the
15 molecular structure of the impurity itself.
16 Q    When you say "the molecular structure,"
17 is that actually identifying what the impurity
18 is?
19 A    Yeah.  It doesn't identify --
20      Yes.  It identifies what it is at a --
21 at a fairly fundamental level, what the -- how
22 the atoms are arranged together in space that
23 comprise that compound.
24 Q    And why would you want to know that

Confidential Information Subject to Protective Order

Page 66

1 information?
2 A     Um, because if you understand the
3 structure of an impurity, it can help you
4 postulate or figure out how it's forming.  And
5 sometimes that information can be useful in
6 tweaking or changing the synthetic step to avoid
7 the impurity, to decrease in an area and to
8 increase the yield of the desired intermediate or
9 API that you're synthesizing.
10 Q     And how do you determine the molecular
11 structure of the impurity?
12 A     Usually that would involve a
13 combination of mass spectrometry, and there's
14 various ways -- there's high resolution.  There's
15 fragmentation studies.  So you use the general
16 technique of mass spectrometry coupled with NMR,
17 nuclear magnetic resonance, to definitively prove
18 a structure.
19 Q     And those are analytical tests that are
20 typically used in the pharmaceutical industry to
21 determine what a structure is; correct?
22 A     I would not say they are analytical
23 tests.  I would say they are spectroscopic
24 techniques that are used to elu- -- to determine

Page 67

1 the structure of compounds.
2 Q     Those are spectroscopic techniques that
3 are typically used in the pharmaceutical industry
4 to determine the identity of a structure?
5 A     I missed the very first part.  You cut
6 out.  Can you repeat the question?
7 Q     So mass spectrometry and NMR are
8 spectroscopic techniques that are typically used
9 in the pharmaceutical industry to determine the
10 identity of a structure?
11 A     Yes, I would agree with that.
12 Q     Now, you specifically mention
13 mechanistic chemistry.  How does mechanistic
14 chemistry relate to process impurity discovery
15 and structure elucidation?
16 A     I -- I would say mechanistic chemistry
17 is kind of a fancy way of saying understanding
18 the root cause in a chemistry environment.  So
19 mechanistic would involve understanding the
20 chemistry.  I -- I think, in a general sense, it
21 helps you identify the -- the sort of way some --
22 the process by which something is formed at a
23 molecular level such that it gives you insight
24 into the root cause.

Page 68

1 I'm trying not to get into, like, a
2 professorial mode and start talking chemistry and
3 losing everyone more than I already do, because,
4 as my wife tells me, it can be pretty boring.
5 MR. HARKINS:
6     You're doing just fine.
7 MS. BOGDAN:
8 Q     I am following you, so...
9     And when you're talking about the
10 mechanistic chemistry, again, you're talking
11 about an analysis of the chemical synthesis
12 process that is used to make the drug?
13 A     It's -- it's almost like a subset of an
14 analysis of the chemical synthesis.  It's -- it's
15 more like how does this molecule get formed
16 with -- under what conditions with -- with what
17 precursors?  What is attacking what?  What is
18 leaving what?
19     And, so, it's -- it's kind of like
20 the -- the detailed -- the nauseating details of
21 the chemical reaction that's occurring.
22 Sometimes that mechanistic insight is very useful
23 for control strategies or for ways to avoid or
24 maximize the formation of something, and

Page 69

1 sometimes the mechanistic insight gives you no
2 handles to play with, to -- to optimize or
3 divert.
4     So it's kind of like your son coming
5 home and he has a black eye and you're trying to
6 figure out what was the mechanism.  Okay.  A kid
7 punched him, but was he falling into him because
8 he tripped over a rock?
9     And so you're looking at the specifics
10 of how the chemistry -- how the two molecules
11 came together to form a reaction, and it's --
12 it -- it's a form of root cause investigation,
13 you could say.
14 Q     And that's actually sort of a
15 theoretical assessment; right?  It's done on
16 paper?
17 A     It's done on paper, but the -- it can
18 be tested.  So based on the mechanistic insight
19 that you get, you can test the mechanism by
20 saying if this is the mechanism, then if we
21 change this, something different will happen.
22     Then you can do experiments to change
23 conditions and tests to prove your mechanism
24 further, because mechanisms can never be

Page 70

1 unequivocally proven, but they can be a consent
2 upon or they can be pretty strong such that
3 they're -- they would be agreed upon and useful
4 for manipulating the reactions.
5 Q        So you would develop a theory of the
6 mechanistic chemistry but then design testing to
7 see if the theory is correct?
8 A       Yes.  I would say that is -- you can do
9 that.  You don't have to do that when you come up
10 with the mechanism.  But, yes, that's what a
11 mechanism would enable you to do.  And sometimes
12 the mechanism doesn't enable you to test it very
13 well because it can be very complex.
14        But some mechanism -- many mechanisms
15 are amenable to design of new tests to help
16 understand further and further control or modify.
17 Q       And the last service that you advertise
18 in that section is analytical method development.
19 What is meant by that?
20 A       It's -- it's kind of like what happens
21 before you're troubleshooting an analytical
22 method.  So if you have a -- if you need to
23 separate and detect all of the -- the degradation
24 products that occur for a product on stability,

Page 71

1 you -- you -- you need to be able to anticipate
2 what would happen in two, three, sometimes five
3 years, and you can't wait five years for that to
4 happen, so you have to figure out how do we come
5 up with those compounds and how do we -- how do
6 we provide an analytical method that's likely to
7 detect the compounds based on what we can do in a
8 shorter time?
9        So it's -- it's, from the ground up,
10 what method, what separation method should we
11 use, what -- and -- and then how do we put meat
12 on the bones?  How do we, you know, make certain
13 choices that we can with an analytical method
14 that's most likely to succeed, and then how do we
15 test it and continue to develop it until it's
16 comprehensive and accurate?
17 Q       Why is testing the analytical method
18 important?
19 A       To make sure you understand if it's
20 robust, if you can transfer it from one lab to
21 another.  If -- if you're doing a method every
22 day, how does it vary day to day?  How does it
23 vary as a function of the person carrying it out?
24 How well is it described so that different people

Page 72

1 can carry it out?  How linear is the response
2 to -- of the detector to differences in levels of
3 impurities or the API of the drug substance
4 itself?
5        So it's -- it's sort of confirming that
6 the method can perform up to the -- up to the
7 needs that are -- are required to ensure that the
8 method performs well.
9 Q       So is testing the analytical method
10 used to determine if the testing method is
11 accurate?
12 A       Yeah.  There's an accuracy component
13 of -- of the method.  There -- yes.  There's an
14 accuracy component to it.
15 MS. BOGDAN:
16        We can take that exhibit down.
17 MR. HARKINS:
18        Hey, Rosemarie, if you're moving on to
19 something else, we've been going for about an
20 hour and a half.  I just wanted to check if the
21 doctor needs a break.
22 THE WITNESS:
23        Yeah, that would probably be a good
24 idea to take a short break.

Page 73

1 MR. HARKINS:
2        Want to say five minutes?
3 MS. BOGDAN:
4        Just five minutes?  If we could limit
5 the break to five minutes, that would be good.
6 MR. HARKINS:
7        Would that be good for you, Doctor?
8 THE WITNESS:
9        Yes.  Can we make it six?  Can we make
10 it seven?
11 MS. BOGDAN:
12        Yes, we can make it seven.  I don't
13 know how long the walk is for you.  Because
14 lawyers tend to like to take lots and lots of
15 breaks, so I'm trying to --
16 THE WITNESS:
17        I'm not a lawyer.
18 MS. BOGDAN:
19        I know.  I like to avoid taking so many
20 breaks that we end up having the deposition go
21 three more hours than it needs to.  That's all.
22        But certainly if you as the witness
23 needs a break at any time, please let me know.
24 And we always can accommodate everybody, so --

Page 74

1  THE WITNESS:
2      Okay.  Great.
3  MR. HARKINS:
4      Can we go off the record?
5  VIDEOGRAPHER:
6      Off record, 10:40 a.m.
7          (OFF THE RECORD.)
8  VIDEOGRAPHER:
9      On record, 10:48 a.m.
10  MS. BOGDAN:
11      Okay.  If we could please pull up the
12  doctor's invoices.
13      (DEPOSITION EXHIBIT NUMBER 7
14      WAS MARKED FOR IDENTIFICATION.)
15  MS. BOGDAN:
16  Q      Now, my first question, Dr. Baertschi,
17  is did you have a separate retainer agreement
18  with Greenberg Traurig?
19  A      No.
20  Q      There is no -- there is no retainer
21  agreement?
22  A      Correct.
23  MS. BOGDAN:
24      Now, is this marked as Exhibit 7?

Page 75

1  Where are we with exhibits?
2  MR. HARKINS:
3      I think it's 7.
4  MS. BOGDAN:
5  Q      Take a look at this exhibit and tell me
6  if these are your complete invoices for the work
7  that you've done on this matter.
8  A      Yes, they are.  It is a little
9  embarrassing when I make invoices to think that
10  it's going to be displayed to a bunch of people.
11  I'm not that diligent in how I record my time.
12  But, anyway, you can see what I did.
13  Q      And when you say you're not that
14  diligent in how you record your time, what do you
15  mean by that?
16  A      I mean the -- the line describing what
17  I did isn't always comprehensive, and sometimes
18  it's -- it's too -- sometimes it's too detailed.
19  But it's just helping me document that I was
20  doing something and how long I did it.  The
21  amount of time is accurate.
22  Q      Okay.
23  A      It's a general note to say this is the
24  kind of stuff I was doing in that time period.

Page 76

1  Q      So for these invoices, when I total
2  them all up, it looks like you did about 77 hours
3  of work on this case through the time -- through
4  the date of your last invoice.
5  A      Okay.
6  Q      Does that sound about right to you?
7  A      That -- yeah.  I haven't done the math,
8  but that sounds reasonable, yes.
9  Q      And that was the -- through the invoice
10  that you served January 3rd of 2022, which is the
11  last invoice in this series in Exhibit 7.
12  A      Okay.
13  Q      How many hours have you spent on this
14  matter since your last invoice?
15  A      I don't know off the top of my head,
16  but let me see if I can kind of come up with a
17  rough ballpark-ish.  40?  30?  I -- I'm...
18  Q      Thirty to 40 more hours?
19  A      Well, I don't want to say that it's
20  definitely in that range.
21  Q      Okay.
22  A      But 50, in that kind of range, that's a
23  ballpark-ish range that sounds right to me.
24  Q      When you have in your invoices the

Page 77

1  letters ER, is that referring to expert report?
2  A      Yes.
3  Q      And then you have a reference on
4  December 29th, 2021, to work on getting UV
5  information for NDMA and for valsartan related to
6  relative response factor.
7  A      Yes.
8  Q      Can you describe what UV information is
9  for NDMA?
10  A      I was trying to understand if -- if
11  NDMA absorbed radiation in the wavelength range
12  where the method -- the analytical method for
13  impurities was centering on, which is, I believe,
14  if I recollect correctly, 230 nanometers.
15      So I was looking for information on the
16  UV spectrum of NDMA and valsartan and looking at
17  how much absorbance occurs out in that region.
18  Q      What did you learn from your
19  investigation?
20  A      I did not get definitive information,
21  but I was -- what I -- what I got was enough to
22  know that NDMA does appear to have some
23  absorbance out in the 230 nanometer region, if I
24  remember correctly, but it would likely be --

Page 78

1 have a lower response factor than valsartan.
2      So it would -- which means if -- if you
3 had a .1 percent peak of --
4      It means you have less sensitivity to
5 be able to detect NDMA using a UV detector.  It
6 would be more difficult than the same amount of
7 valsartan.
8 Q      When you say --
9 A      This also --
10 Q      I'm sorry.
11 A      This also potentially relates to
12 something I saw in the Najafi deposition where he
13 said that nitrosamines have no absorbance in the
14 UV and you wouldn't detect them at all in a UV,
15 in a UV detector.  And I don't agree with that.
16 Q      So you found that NDMA does have some
17 absorbance in the 230 nanometer region?
18 A      That's what I recollect.  The reason --
19 and I'm a little leery of saying definitively
20 because that absorbance is dependent on the
21 solvent.  And I -- I was looking for general
22 information to see if it was really worth
23 exploring, and I kind of, after looking for a
24 while, I decided it wasn't really worth

Page 79

1 continuing to explore because I didn't think it
2 was a -- a -- a big factor.
3      So, for example, if NDMA had a really
4 huge response, then -- at 230 nanometers, then
5 you might be able to detect very low levels of it
6 with a method at 230 nanometers.  But I didn't
7 find that, so I kind of abandoned that
8 investigational route.  And I don't exactly
9 remember such that I'm willing to say in a
10 deposition under oath that it does not have or it
11 does have absorbance at 230.  That's to the best
12 of my recollection.
13 Q      So you did not get definitive
14 information on whether NDMA has absorbance at the
15 230 nanometer region that would allow you to give
16 an opinion in this regard?
17 A      I would say I would need to review that
18 in order to --
19      I -- I can't recall confidently,
20 definitively here as I sit.  I -- I don't -- so I
21 would have to refresh my memory to make sure.
22 But I believe my best recollection is, more
23 likely than not, yes, it does have some
24 absorbance at 230 nanometer.

Page 80

1 Q      Did you do any type of testing of NDMA
2 or ask for testing to be done of NDMA to see if
3 it had absorbance at 230 nanometers?
4 A      No, I did not.
5 Q      So you didn't do anything independently
6 to verify this one way or the other?
7 A      Correct.
8 Q      What reference source were you
9 consulting with regard to whether NDMA has
10 absorbance at 230 nanometers?
11 A      I believe I was doing searches on
12 either Google Scholar or SciFinder, looking for
13 NDMA, NDEA, and other related compounds, small
14 N-nitroso compounds, and UV response, UV
15 spectrums, a variety of terms like that, and then
16 looking at the abstracts of papers and deducing
17 what I could, to the best of my recollection.
18 Q      Did any of these resources that you
19 found and read make it into your references for
20 this report?
21 A      I don't think so, because I don't think
22 I commented on NDMA relative response factor in
23 my expert report.
24 Q      Did any of these resources make it into

Page 81

1 your materials considered list?
2 A      I don't think so, because I don't think
3 I actually downloaded articles and digested them
4 thoroughly and verified the -- the pictures that
5 I was seeing.
6 Q      As you sit here today, can you say with
7 a reasonable degree of scientific certainty
8 whether NDMA has absorbance at 230 nanometers?
9 A      No.
10 Q      As you sit here today, can you say with
11 a reasonable degree of scientific certainty
12 whether NDMA will appear on an HPLC test?
13 A      That's an incomplete sort of question,
14 but I think you mean will an HPLC tested with UV
15 protection presumably at the wavelength that
16 they're using in the compendial methods, which I
17 believe is 230 nanometers.
18      I cannot say for sure that if you had a
19 high enough level of NDMA that you would detect
20 it at that wavelength.  I concluded tentatively
21 in my research that it would, but I didn't
22 actually do enough work to -- to make -- to nail
23 that down, as you said, so where I could sit here
24 today and stand by that or sit by it.

Page 82

¹ Q      And when you're talking about the
² compendial standard, are you talking about the
³ USP monograph or are you referring to some other
⁴ standard?
⁵ A      Yes.  I would be referring to the USP
⁶ monographs and/or the analytical methods that I
⁷ reviewed that were being used, for example, by
⁸ Teva for impurities in valsartan.
⁹ Q      And was Teva using the impurity method
¹⁰ that is set forth in the USP monograph for
¹¹ valsartan?
¹² A      I believe that the method was either
¹³ the same or very close, but I'm not -- I'm -- I'm
¹⁴ relying on memory.  And if I wanted to make a
¹⁵ definitive statement, I'd want to look at those
¹⁶ two things side by side.  But that's the way I
¹⁷ would say.
¹⁸ Q      When you did your review, did you find
¹⁹ any differences in the methods that you wanted to
²⁰ further investigate?
²¹ MR. HARKINS:
²²      Object to form.  Vague.
²³ A      No.  There wasn't -- I did not notice
²⁴ anything that seemed significant to me.  Did not

Page 83

¹ notice any differences that seemed significant to
² me.  I don't recall any.
³ MS. BOGDAN:
⁴ Q      Did you take any notes of any
⁵ differences that you discovered when looking at
⁶ the Teva impurity HPLC method versus the USP
⁷ impurity HPLC method?
⁸ MR. HARKINS:
⁹      Object to form.  Vague.
¹⁰ A      Did I take any notes?  I think -- I
¹¹ can't remember.  Did I address this in the expert
¹² report?  I -- I feel like maybe I did.  But I --
¹³ I don't know if I took notes on any -- anything.
¹⁴      Can you -- can you reask the question
¹⁵ so I'm accurate?  I may want to look at my expert
¹⁶ report to kind of make sure.
¹⁷ MS. BOGDAN.
¹⁸ Q      ...expert report where you compare the
¹⁹ Teva HPLC impurity method to the USP impurity
²⁰ method?
²¹ MR. HARKINS:
²²      Rosemarie, looked like you were
²³ speaking for a bit before we got the audio coming
²⁴ through.  I just want to make sure we have the

Page 84

¹ whole question.  Sorry about that.  There's a
² little delay.
³ MS. BOGDAN:
⁴ Q      Sure.  I'll repeat the question.
⁵      Is there part of the expert report
⁶ where you compare the Teva HPLC impurity method
⁷ to the USP impurity method?
⁸ A      I -- I don't remember for positive
⁹ because I know I've thought about this, but I
¹⁰ don't want to confuse what's in my brain that I
¹¹ thought about it versus what I actually recorded
¹² in the expert report.  Is there something you
¹³ could point me to that might be associated with
¹⁴ that?
¹⁵      Because I did make a comparison to the
¹⁶ sensitivity of the methods.  And, so, I'd like to
¹⁷ see the exact -- where I said what methods I was
¹⁸ referring to and what -- how I -- how I framed
¹⁹ the sensitivity issue.
²⁰ MR. HARKINS:
²¹      Take a moment to look at your report.
²² Okay?
²³ THE WITNESS:
²⁴      Okay.  I'm looking through my report

Page 85

¹ briefly here.  I think I might be able to find
² it.
³ MS. BOGDAN:
⁴ Q      Well, my question would be, which,
⁵ Dr. Baertschi, looking at your report would allow
⁶ you to answer, is there a part of your report
⁷ where you evaluate the HPLC method of Teva as it
⁸ compares to the USP monograph method?
⁹ A      I -- I don't think I have a direct
¹⁰ comparison of Teva to USP, the analytical methods
¹¹ for those, in my expert report.  I hope I'm not
¹² wrong, but I'm not seeing anything that is like a
¹³ direct comparison.
¹⁴ Q      When offering your opinions with regard
¹⁵ to what impurities HPLC testing would identify,
¹⁶ were you looking at the Teva HPLC testing method
¹⁷ or the USP HP--
¹⁸ A      I looked at --
¹⁹ Q      -- LC impurity testing method?
²⁰ A      I looked at both, and the -- the
²¹ wavelength of detection, the limit of disregard,
²² the limit of detection, the reporting levels were
²³ very comparable.  And my comparison was to try to
²⁴ assess could these methods have detected the --

Confidential Information Subject to Protective Order

Page 86

1 the levels of -- levels of NDMA or NDEA at the PM
2 levels being discussed. And that was the point
3 of my assessment.
4        And my determination was they're --
5 they're pretty comparable and they have pretty
6 similar specifications for the methods.
7        But I'm not seeing that I did a direct
8 comparison in my expert report. It didn't seem
9 worthy of that. I didn't think there was a
10 contention around whether or not the method could
11 have detected low levels of NDMA or NDEA.
12        I'm -- I'm looking now at a --
13 MR. HARKINS:
14        Wait for a question, unless you're --
15 A      I'm still continuing my answer, since
16 she paused for a long time. I'm finding
17 something now.
18        Paragraph 32, I'm looking at far -- I
19 did a compar- -- similar conclusions about the
20 ability of -- in paragraph 32, about the ability
21 of compendial impurity methods to detect low
22 levels of NDMA or NDEA can be made by looking at
23 the pharmacopeial methods listed in USP for
24 valsartan tablets, valsartan amlodipine tablets,

Page 87

1 et cetera.
2        These analytical methods for impurities
3 utilize HPLC with UV detection for tablets,
4 valsartan tablets, with a level of -- with a
5 disregard for any peaks less than --
6        So the answer to your question is yes,
7 I do do a comparison. It's in paragraph 32.
8 MS. BOGDAN:
9 Q      And paragraph 32 is referring to the
10 USP method?
11 A      Yes. I believe so. Because it says in
12 the last sentence, it says "it is clear that
13 these compendial methods are not appropriate for
14 detecting -- detecting and reporting of levels of
15 NDMA or NDEA at levels below 1,000 ppm, or .1
16 percent."
17 Q      And is it in paragraph 32, then, you
18 discuss the HPLC method used by Teva?
19 A      I don't know. I don't see any
20 specific reference to the method used by Teva in
21 my expert report, in that paragraph, and I'm not
22 seeing it anywhere else. I don't think that
23 changes my conclusions at all, and I think the
24 conclusions will hold.

Page 88

1 Q      Did you do an analysis of the Teva HPLC
2 impurity method that was being used to evaluate
3 impurities in the valsartan finished dose
4 product?
5 MR. HARKINS:
6        Objection. Asked and answered.
7 A      Yes.
8 MS. BOGDAN:
9 Q      And you didn't discuss it in your
10 report?
11 MR. HARKINS:
12        Objection. Asked and answered.
13 A      Apparently, I've already answered.
14 MR. HARKINS:
15        You have to answer again.
16 A      Oh, I have to answer again.
17        I don't think so. I -- I already made
18 one mistake in remembering what was in there. I
19 hope I'm not making another one. But I don't see
20 it, so I don't -- I don't think I made a direct
21 commentary on the -- the Teva method in here.
22 MS. BOGDAN:
23 Q      Now, for your work in this litigation,
24 you were retained by the Teva defendant; correct?

Page 89

1 A      Correct.
2 Q      And you're not working on behalf of any
3 of the other defendants; correct?
4 A      Correct.
5 Q      And, so, you're not offering any of
6 your opinions on behalf of the other defendants
7 in this litigation, are you?
8 MR. HARKINS:
9        Object to the form to the extent it
10 calls for a legal conclusion.
11        You can answer.
12 A      I don't know the extent to which my
13 testimony will be used. I -- I don't understand.
14 MS. BOGDAN:
15 Q      I'm not asking about it being used.
16 I'm being -- as far as you offering opinions in
17 this case, you're offering those opinions on
18 behalf of Teva; correct?
19 A      Correct.
20 Q      And do your opinions apply to all the
21 plaintiffs in this litigation?
22 MR. HARKINS:
23        Object to the form of the question.
24        You can answer if you know.

Confidential Information Subject to Protective Order

Page 90

1  A      Can you repeat the question?
2  MS. BOGDAN:
3  Q      Do your opinions apply to all of the
4  plaintiffs in this litigation?
5  MR. HARKINS:
6        Same objection, to the extent it calls
7  for a legal conclusion.
8        You can answer.
9  A      I -- I don't know.  I don't know the
10 details -- I didn't review all of the defendants'
11 materials or methods, or -- so I -- I don't know
12 what is applicable and what is usable --
13 MS. BOGDAN:
14 Q      Okay.
15 A      -- and how -- how extensive that goes.
16 Q      Do your opinions apply to all potential
17 class members?
18 MR. HARKINS:
19        Objection to the extent it calls for a
20 legal conclusion.
21        You can answer.
22 A      I would -- I would say the same kind of
23 answer.  I don't know legally what -- where the
24 limits of my testimony are useful for or can be

Page 91

1  applied against.
2  MS. BOGDAN:
3  Q      Do you have an understanding of the
4  proposed class or classes that the plaintiffs
5  seek to certify in this litigation?
6  MR. HARKINS:
7        Objection to the extent it calls for a
8  legal question.  You can answer to your
9  understanding.
10 A      I have a recollection of a layman's
11 understanding of there being three classes of
12 plaintiffs.
13 MS. BOGDAN:
14 Q      And what is your understanding of those
15 classes?
16 A      As I recall, there's one that maybe are
17 seeking their money back for the product because
18 they feel it wasn't effective, maybe.  I think
19 there was a second maybe seeking damages for
20 cancers or diseases that have incurred
21 potentially as a result of their taking of
22 valsartan, and I believe there was a third that
23 had to do with paying -- getting their medical
24 monitoring for the rest of their life or some

Page 92

1  length of time to see if they ever develop any
2  kind of diseases associated with their ingestion
3  of valsartan.
4  Q      Do your opinions vary depending on
5  which type of plaintiff?
6  MR. HARKINS:
7        Objection to the extent it calls for a
8  legal conclusion.
9  A      My opinions are -- I don't want to use
10 the word "agnostic" to those, but it's sort of
11 independent.  It's not affected by any of those
12 classes.
13 MS. BOGDAN:
14 Q      So your opinions don't vary depending
15 on how much valsartan a potential class member
16 paid for?
17 MR. HARKINS:
18        Object to form.  Facts not in evidence.
19        You can answer if you know.
20 A      No, they don't.  It's independent.
21 They don't seem to be over -- my opinions don't
22 seem to have a dependence on that information you
23 just specified.
24 MS. BOGDAN:

Page 93

1  Q      So you would agree that your opinions
2  apply equally to all the different types of
3  plaintiffs?
4  MR. HARKINS:
5        Object to the form to the extent it
6  calls for a legal conclusion.
7  A      I -- I feel like my opinions are not
8  dependent on, not derived from, not overlapping
9  with the claims.  So I don't feel that there's
10 any variation as a function of what one of --
11        Either of these three claims doesn't
12 affect my expert report or my opinions.
13 MS. BOGDAN:
14 Q      Okay.  Did counsel ask you to make any
15 assumptions for purposes of your report?
16 A      Not that I can recall.  Assumptions,
17 you know, no.  I can't think of any.
18 Q      Did they ask you to rely on the
19 opinions of any other expert for purposes of your
20 report?
21 A      No.  Well --
22 MR. HARKINS:
23        Just -- just to the extent that your
24 answer would reflect any discussions with

Confidential Information - Subject to Protective Order

Page 94

1 counsel, I'm going to instruct you not to answer.
2 But --
3 THE WITNESS:
4     Yeah.
5 MS. BOGDAN:
6 Q     Let me ask you this question.  I'll ask
7 it in a different way just to avoid the
8 objection.
9         Do you rely on the opinions of any
10 other experts for purposes of rendering your
11 opinions in this case?
12 A     No.  When you said "experts," I was
13 thinking -- you're probably thinking about
14 experts that have been in this case.  I'm
15 thinking about a lot of experts that I've cited
16 in my literature that I consider experts in the
17 field.  And, so, I've cited -- the literature I
18 cited and the experts that I have cited in my
19 expert report are -- definitely have influenced
20 my opinions as I've derived from the referee
21 literature.  But I don't -- I don't think there's
22 any expert opinions that have affected my expert
23 report conclusions or opinions.
24 Q     You're right.  The question I was

Page 95

1 asking is whether or not, for your opinions in
2 this litigation, you were relying on the opinions
3 of any other experts that have been retained in
4 this litigation.
5 A     No.
6 Q     ...nitrosamines?
7 A     We only caught "nitrosamines."
8 Q     Sorry.  What are nitrosamines, in an
9 organic chemistry sense?
10 A     This is too much fun for an organic
11 chemist, but I'll take it anyway.
12     Nitrosamines are compounds that have a
13 functional group on them of nitrogen connected to
14 a nitrogen connected to an oxygen.  And there can
15 be anything -- any things coming off the nitrogen
16 that's connected to a nitrogen that's connected
17 to an oxygen.  So in the case of NDMA, it's
18 dimethyl.
19     But you can have any kind of
20 substituent, so there can be a huge diversity of
21 N-nitrosamines as long as there's that one
22 subgroup or functional group attached to the
23 molecule.
24 Q     And it is that functional group that

Page 96

1 makes it a nitrosamine; correct?
2 A     Yes.  N-nitrosamine.  There are
3 nitrosamines that are not attached to nitrogen.
4 So it's N-nitrosamine, to be completely correct.
5 Q     And what type of bond is formed between
6 the nitrogen and the oxygen in an N-nitrosamine?
7 A     Wow.  This is getting, like, organic
8 chemistry test, which is good.  I love it.
9     It's a double bond, but it has single
10 bond characters.  So it's -- it's N, single bond,
11 N, double bond, O.  But there's double bond
12 character in the NN bond and there's single bond
13 character, which means you can have rotation
14 about the NN bond, and it can be inhibited
15 because of the partial double bond character in the
16 it and the partial single bond character in the
17 oxygen.
18     So you can get two atropisomers, which
19 means inhibition due to rotation about a single
20 bond.  And I learned that back in 1986 from
21 Stephen Hecht at a presentation at Vanderbilt
22 University.
23 Q     And that structure is what's in common
24 with all N-nitrosamines; correct?

Page 97

1 A     Yes.  Although that cis-trans, that
2 different orientation, the relative amounts of
3 the sister trans of the two orientations can vary
4 as a function of what's on the rest of the
5 molecule.  But I'm being nauseatingly detailed
6 there.  So the answer is yes.
7 Q     And you mentioned attending a
8 presentation or lecture by Dr. Hecht back in
9 1986, roughly?
10 A     Roughly.  It was when I was in graduate
11 school, so I'm guessing on the year.  I just know
12 the rough -- rough years.  I think it was '86.
13 Q     And, so, nitrosamines were being
14 studied in the '80s; correct?
15 A     Yes.  He was studying it in smoke, as I
16 recall, if I'm recalling correctly, what smokers
17 inhaled.
18 Q     ...nitrosamines formed?
19 A     You cut out, so I only heard
20 "nitrosamines formed."
21 Q     How are nitrosamines formed?
22 A     They're usually -- there is a variety
23 of ways.  You can form them from oxidation of --
24 of an azide, but -- but from the meaningful to

Confidential Information Subject to Protective Order

Page 98

1  this case and to most pharmaceutical concerns --
2  most, I would say -- is that they form as a
3  result of a nitrosating reagent reacting with,
4  typically, a secondary amine.
5       But it can also happen with a tertiary
6  amine.  It can also happen with some other
7  amines.  But it's primarily secondary amines and
8  a nitrosating reagent.
9  Q     It's recognized that it can also happen
10 with interaction with a tertiary amine or other
11 amines; correct?
12 A     Yes.  Just typically much slower, and
13 they're oftentimes, depending on the
14 circumstance, much less stable.
15 Q     Do you agree that nitrosamines are
16 mutagenic?
17 A     Not all nitrosamines are mutagenic.
18 Q     Do you agree that NDMA is mutagenic?
19 A     Yes.  Mutagenic being defined by Ames
20 positive result in the Ames test, Ames
21 mutagenicity test, yes.
22 Q     Do you agree that NDMA is genotoxic?
23 MR. HARKINS:
24      Object to form.  Scope.

Page 99

1       You can answer.
2  A     Yes.  Genotoxic is a -- mutagenic is a
3  subset of genotoxic.  So if something is
4  mutagenic, it's also genotoxic.  But there are
5  genotoxic compounds that are not mutagenic.  So,
6  yes, it's also genotoxic.
7  MS. BOGDAN:
8  Q     Do you agree that NDEA is genotoxic?
9  MR. HARKINS:
10      Same objection.
11 A     The same answers that I gave for NDMA
12 would apply to NDEA.
13 MS. BOGDAN:
14 Q     Oh, you agree that NDEA is genotoxic?
15 A     Yes.  But when you said -- yes.  From a
16 technical classification, yes.
17 Q     Okay.  And you agree that NDEA is
18 mutagenic?
19 A     Yes.  In the general term, yes.
20 Q     Do you agree that NDMA is a carcinogen?
21 A     Agree that it's a -- a known animal
22 carcinogen and speculated or postulated human
23 carcinogen.
24 Q     Do you agree that NDMA is a probable

Page 100

1  human carcinogen?
2  A     I believe that's the classification
3  that they use for NDMA.  That sounds correct.
4  Q     Do you agree that NDEA is a probable
5  human carcinogen?
6  A     Can I say "same answer" and that be
7  good enough?
8  Q     I'll ask -- I'll ask you the question
9  again.
10      Do you agree that NDEA is a probable
11 human carcinogen?
12 A     I believe that's the -- the
13 classification that goes with NDEA.  That sounds
14 correct.
15 Q     Do you agree with the classifications
16 of probable human carcinogens for NDMA and NDEA?
17 MR. HARKINS:
18      Object to form.  Scope.
19 A     I have no reason to dispute it, and I'm
20 not a trained toxicologist to be able to dispute
21 it.  So I have no disagreement with that.
22 MS. BOGDAN:
23 Q     Are you familiar with IARC?
24 A     Infrared?

Page 101

1  Q     IARC.
2  A     I-A-R-C.  I thought you were using an
3  abbreviation for infrared.  I'm vaguely familiar
4  with it, the committee that -- you know, for
5  deciding or classifying the toxicology of
6  chemicals and maybe classifying them as
7  cancer-causing.  I'm not exactly sure of the
8  charter or what they exactly do, but I have heard
9  of it and seen it.
10 Q     IARC stands for the International
11 Agency For Research on Cancer; correct?
12 A     That sounds correct.
13 MS. BOGDAN:
14      If we could bring up the IARC
15 monograph, 1978.
16      (DEPOSITION EXHIBIT NUMBER 8
17      WAS MARKED FOR IDENTIFICATION.)
18 MR. HARKINS:
19      Wait for the question.
20 THE WITNESS:
21      I see it on the screen, and it's still
22 coming up.  It's almost up on my big screen.
23 MR. HARKINS:
24      It's pretty large, but it's coming up.

Confidential Information Subject to Protective Order

Page 102

1  THE WITNESS:
2       Yeah, it is.  314 pages long, and I can
3  see the first page.
4  MS. BOGDAN:
5  Q       Okay.  Well, let's just wait for it
6  to --
7  A       It's up.
8  Q       -- to load.
9  A       It's all loaded.  It's good.
10 Q       You can see it?
11 A       Yes.
12 MS. BOGDAN:
13      Okay.  If we could go to page 36.  And
14 it's numbered in the bottom left corner, for the
15 tech.
16 A       Yes.  I'm on that page.
17 MS. BOGDAN:
18      Oh, that's 96.
19 A       36, not 96?  Is that 96, not 36?
20 MS. BOGDAN:
21 Q       The number, page number in the
22 document.  There we go.  I see it up on my
23 screen.
24 A       Okay.  So you can tell where I'm at.

Page 103

1  That's good.
2  Q       "The observation of severe liver
3  disease" is where it starts.
4  A       Show me where on the screen.
5       Okay.  That's helpful.
6  Q       Yep.
7  A       Am I on the wrong page?
8  Q       It's page 36 in the bottom left-hand
9  corner.
10 A       That's where I was.
11 Q       Not of the PDF but of the data plate.
12 A       Right.  That's where I was, on page 36
13 in the bottom left-hand corner, but I'm getting
14 back there.  44...
15 Q       And, actually, I'm gonna be asking you
16 about the third paragraph on that page that
17 starts with "It has been known since 1865."
18 A       Okay.  So I'm -- I'm with you, and I
19 can see both screens.
20 Q       Okay.  Can you read that first sentence
21 that starts with "It has been known since"?
22 A       "It has been known since 1865 that the
23 reaction of dimethylamine hydrochloride with
24 sodium nitrite at an acidic pH yields

Page 104

1  N-nitrosodimethylamine (Fridman, et al., 1971.)
2  Q       Does it say pH yields
3  N-nitrosodimethylamine?
4  A       Yes.  I believe I said that.
5  MR. HARKINS:
6       What does that mean?
7  THE WITNESS:
8       Oh.  N-nitrosodimethylamine.
9  MS. BOGDAN:
10 Q       Okay.  So do you agree with that
11 sentence?
12 A       Yes.  And I have no reason to dispute
13 it.
14 Q       And, so, you agree that the reaction of
15 dimethylamine hydrochloride with sodium nitrite
16 at an acidic pH yields N-nitrosodimethylamine?
17 A       NDMA -- yes.
18 Q       And that's well established in
19 chemistry?
20 A       Yes.  It's been established and -- and
21 I don't know how to classify "well," but I don't
22 think there's any controversy about it.
23 Q       If we could go to page 40.  It's four
24 ahead of where we are now.

Page 105

1  A       I'm there now.
2  Q       Okay.  And this monograph was published
3  in 1978.  But if you could read the first couple
4  sentences of the paragraph that begins with "Most
5  of."
6  A       "Most of the chemical and physical
7  properties of the nitrosamines described in these
8  monographs were taken from Druckrey, et al.,
9  1967.  The principal techniques employed for the
10 analysis of volatile N-nitrosamines have been
11 described in a recent publication, Preussmann,
12 et al., 1978."
13 Q       Are you familiar with that Preussmann
14 study?
15 A       I have seen it.  I wouldn't say I'm
16 familiar with it, but I have seen it.
17 Q       Are you familiar with the Ruckrey [sic]
18 study, or Druck-- if it's pronounced with the
19 D, making it Druckrey study?
20 A       I'm not sure I've ever looked at the
21 Druckrey study.
22 Q       Would you read the next sentence?
23 A       "The relative merits of high and
24 low-resolution mass spectrometry are discussed,

Confidential Information – Subject to Protective Order

Page 106

1  since use of mass spectrometry as a confirmatory
2  technique is particularly important."
3  Q       Do you agree that the use of mass
4  spectrometry is a confirmatory technique which is
5  important --
6  MR. HARKINS:
7         Object to form.  Vague.
8  MS. BOGDAN:
9  Q       -- in evaluating volatile
10 N-nitrosamines?
11 MR. HARKINS:
12        Same objection.
13 A      I agree that the use of mass
14 spectrometry as a -- as a confirmatory technique
15 or as a technique is -- is particularly
16 important, yes.
17 MS. BOGDAN:
18 Q       Okay.  If we could go to page 83, so
19 Dr. Baertschi can orient himself, which is the
20 part of the monograph that talks about
21 N-nitrosodiethylamine.
22 A      Yes, I -- I see it.
23 Q       Okay.  And I'm actually just going to
24 bring you right to --

Page 107

1         Well, let me ask you this question.  Is
2  N-nitrosodiethylamine a volatile chemical?
3  MR. HARKINS:
4         Object to form.  Vague.
5  A      It's described here as a yellow
6  volatile liquid with a boiling point of 177
7  degrees C.
8  MS. BOGDAN:
9  Q       Do you know it to be a volatile
10 chemical?
11 A      I don't know it to be a volatile
12 chemical, but I would presume it was somewhat
13 volatile based on how low the molecular weight is
14 and the aliphatic characteristics of the
15 molecule.  But it would be -- 177 degrees boiling
16 point is not particularly volatile from a chemist
17 point of view.
18 Q       Would you call it a semivolatile
19 chemical?
20 MR. HARKINS:
21        Object to the form.
22 A      I'm okay with the description as yellow
23 volatile liquid.  I have no dispute with that.
24 MS. BOGDAN:

Page 108

1  Q       Now, you used a term about the
2  molecular weight that was very much a chemistry
3  term, something about the characteristics of the
4  molecule.  You said based on how low the
5  molecular weight is and the "blank"
6  characteristics of the molecule.
7  A      I think I said aliphatic.
8  Q       That's what you said.  And I know that
9  the stenographer is gonna have difficulty with
10 that word.  Could you -- I don't know if you can
11 spell it, but if you could also then tell us what
12 it means.
13 A      Aliphatic is A-L-I-P-H-A-T-I-C, and it
14 has to do with, instead of nitrogen having two
15 hydrogens on it, for example, it has what -- a
16 two-carbon unit -- two two-carbon units coming
17 off of it, and they're saturated, which means
18 they have maximum number of hydrogens.
19        And when you have carbons with a
20 maximum number of hydrogens in a series, they're
21 called aliphatic series, and they tend to --
22 until you get -- they tend to be volatile.  And
23 then as you grow them, liquid, and, then, as you
24 grow them further, then they become semisolid and

Page 109

1  then eventually solids.
2         But the character -- a chemist can look
3  at that and sort of take a guess at whether it
4  might be volatile or -- or not.  It's -- it's an
5  incidental point that I don't see as being
6  important, but you can take it for what it's
7  worth.
8  Q       Just wanted to make sure I asked what
9  the word was and what it meant.  Okay.
10 A      Yeah.
11 Q       All right.  If we could go to page 107
12 in this N-nitrosodiethylamine section, which
13 brings you down to a summary of the data reported
14 and evaluation.  The 107 is in the bottom
15 right-hand corner of the document.
16 A      Yeah, I -- I've got it.
17 Q       Do you see where it says "summary of
18 data reported and evaluation"?
19 A      I do see that.
20 Q       Okay.  And under experimental data, it
21 says "N-nitrosodiethylamine is carcinogenic in
22 all animal species tested."  And then it gives a
23 list of all the different animal species.
24 A      Yes, I see that.

Confidential Information Subject to Protective Order

Page 110

1 Q      Do you disagree with that statement?
2 MR. HARKINS:
3        Object to form.  Scope.
4 A      No.  I have no reason to disagree with
5 it.
6 MS. BOGDAN:
7 Q      Then if we could go to the bottom of
8 this page where it says "evaluation," would you
9 read the first sentence, please.
10 A      "There is sufficient evidence of a
11 carcinogenic effect of N-nitrosodiethylamine in
12 many experimental animal species.  Although no
13 epidemiological data were available, the
14 N-nitrosodiethylamine should be regarded for
15 practical purposes as if it were carcinogenic to
16 humans."
17 Q      Do you agree with that statement?
18 MR. HARKINS:
19        Object to form.  Scope.
20 A      What I agree with, the practical
21 purposes means that you should treat it as -- as
22 if it were, regardless of whether it's firmly
23 established, because you take precautions for
24 safety.

Page 111

1 MS. BOGDAN:
2 Q      Do you agree with that statement?
3 MR. HARKINS:
4        Same objection.
5 A      I have no particular reason for --
6        From a practical purpose, you would
7 regard something as carcinogenic or highly toxic
8 in some other fashion.  You would treat it the
9 same as with extreme care and all that.  So, I --
10 from a practical point of view, I don't have any
11 contention with that sentence.
12 MS. BOGDAN:
13 Q      All right.  If we could move to page
14 125 of the document, which is the part of the
15 monograph that refers to N-nitrosodimethylamine.
16 And, Doctor, N-nitrosodimethylamine is NDMA;
17 correct?
18 A      Yes, correct, to my understanding.
19 Q      And we had just talked about NDEA.
20 Would you describe NDEA as a small molecule,
21 large molecule, or something else?
22 A      I'd describe --
23        NDMA; right?
24 Q      NDEA.

Page 112

1 A      NDEA I would describe as a small
2 molecule.
3 Q      Okay.  How would you describe NDMA as
4 far as its molecular size?
5 A      Small.  Slightly smaller than NDEA.
6 Q      Okay.  And NDMA, is that also a
7 volatile chemical?
8 MR. HARKINS:
9        Object to form.  Vague.
10 A      It says here "yellow oily liquid."
11 MS. BOGDAN:
12 Q      Okay.  And, then, under G, volatility,
13 what does it say?
14 A      Can you point me to where it says --
15        Oh, volatility, down at the bottom.
16 Q      The very bottom of the page.
17 A      Yes, I see now.  It was different order
18 than NDEA.  "Volatile; can be steam-distilled
19 quantitatively."  So, yes, it's classified as
20 volatile.  And I note that the boiling point is
21 much less than NDEA.  At 50 to 52 degrees C, a
22 much lower boiling point.
23 Q      Do you disagree with the description of
24 NDMA being volatile?

Page 113

1 MR. HARKINS:
2        Object to form.  Scope.  Vague.
3 A      No.  I don't disagree with the
4 classification as volatile.
5 MS. BOGDAN:
6 Q      Okay.  If we can go to page 151, which
7 is the summary of data reported and evaluation
8 for NDMA.
9 A      Sorry.  I'm probably doing the wrong
10 way, scrolling down, and it's going slower.  I'm
11 trying to go fast.  147, 48.
12 Q      I'm directing you to the center of that
13 page where it says, again, "summary of data
14 reported and evaluation," similar to what we had
15 for NDEA.
16 A      I am there.
17 Q      Okay.  And under "experimental data,"
18 do you see where it says "N-nitrosodimethylamine
19 is carcinogenic in all animal species tested"?
20 A      I do see that.
21 Q      Do you know that to be the case?
22 MR. HARKINS:
23        Object to form.  Scope.  Speculation.
24        You can answer.

Confidential Information - Subject to Protective Order

1 A      I don't know it personally.  I know it
2 from reading it in general knowledge of what's --
3 what I've seen in the literature over time.
4 MS. BOGDAN:
5 Q      Do you, based upon your research and by
6 knowledge in reading in the literature, agree
7 that N-nitrosodimethylamine is carcinogenic in
8 all animal species tested, as far as you know?
9 MR. HARKINS:
10      Object to form.  Outside the scope of
11 the expert report.  Asked and answered.
12 A      Yes.
13 MS. BOGDAN:
14 Q      And jumping down to evaluation, which
15 is actually on the next page, page 152, would you
16 read the evaluation for NDMA?
17 A      Do you want me to read that whole
18 paragraph or --
19 Q      Yes, please.
20 A      Okay.  Here -- here we go.
21      "There is sufficient evidence of a
22 carcinogenic effect of N-nitrosodimethylamine in
23 many experimental animal species.  Similarities
24 in its metabolism by human and rodent tissues

1 have been demonstrated.  Although no
2 epidemiological data were available (and efforts
3 should be directed toward this end),
4 N-nitrosodimethylamine should be regarded for
5 practical purposes as if it were carcinogenic to
6 humans."
7 Q      Do you agree with that paragraph?
8 MR. HARKINS:
9      Object to form.  Scope.  Foundation.
10 A      This is the same discussion as we had
11 with NDEA, and my conclusions would be the same,
12 so I hope I state it the same here, that I have
13 no issue with -- with the way it's stated; that
14 for practical purposes for -- to be extremely
15 cautious, that it should be handled as if it
16 were, in the same manner as a known carcinogen
17 would be.
18 MS. BOGDAN:
19 Q      Thank you.
20      If we could take that down, please.
21 Q      Do you know what group IARC has
22 classified NDEA or NDMA in?
23 MR. HARKINS:

1      Object to form.  Scope.
2 A      I don't know what you mean by "group."
3 MS. BOGDAN:
4 Q      IARC has a -- a classification where it
5 groups the different chemicals according to
6 different definitions, group 1, group 2, group
7 2A, group 2B, group 3, group 4.
8      Are you aware of those types of
9 classifications for NDMA or NDEA?
10 MR. HARKINS:
11      Object to form.  Scope.  Foundation.
12 A      I -- I have not researched this and I'm
13 not commenting on it in my expert report, and
14 I -- I don't have -- like, I'm not a
15 toxicologist, so I'm not completely aware of how
16 they've classified NDEA and NDMA.  But I would
17 think it -- it would be apparent from reading the
18 material if we were looking at it.
19 MS. BOGDAN:
20 Q      IARC has classified NDEA and NDMA as
21 group 2A, which is probably carcinogenic to
22 humans.  Do you agree with that classification?
23 MR. HARKINS:
24      Object to form.  Scope.  Foundation.

1 We're way outside anything in his expert report.
2      You can answer if you know.
3 A      I don't have any reason to contest what
4 toxicologists and official organization have put
5 together.  I've not researched the toxicology and
6 I've not -- not opined on it in my expert report.
7 MS. BOGDAN:
8 Q      As part of your investigation into this
9 matter, did you look at the FDA's advice that it
10 gave regarding the valsartan NDMA and NDEA
11 contamination --
12 MR. HARKINS:
13      Object to form.  Scope.
14 MS. BOGDAN:
15 Q      -- that was -- that was discovered?
16 A      I have reviewed several EMA and FDA
17 documents as part of my general work consulting
18 for N-nitroso compounds and particularly for NDEA
19 and NDMA, and I'm familiar.  But I -- I believe I
20 disclosed it in my references or materials
21 considered.  But I certainly am aware of it just
22 in my general consulting practice.
23 Q      When you say you "disclosed it in my
24 references or materials," what are you speaking

Confidential Information Subject to Protective Order

Page 118

1  of disclosing?
2  A      Well, I tried to be comprehensive in
3  what I disclosed in materials that I considered,
4  but I don't know what your question really is
5  getting at.  So maybe help me.
6  Q      Okay.  What I was asking is is -- I
7  asked, as far as your investigation into this
8  matter, if you reviewed the FDA's advice that it
9  gave with regard to the valsartan NDMA and NDEA
10  contamination --
11  A      Yes.
12  Q      -- and --
13  A      Sorry.  I thought you were complete.
14  Q      Yeah, no.  That's -- that's the
15  question I asked.
16        So I think, from your answer, that you
17  were saying that you have reviewed it?  Or you
18  haven't reviewed it in your consulting capacity
19  but perhaps reviewed it in your consulting
20  capacity for others, not in connection with the
21  work that you've done on this case?
22        But I'll let you clear the answer up.
23  I don't want it to be -- I don't want to
24  mischaracterize or misconstrue your response.

Page 119

1  A      When you -- when you say "it," the FDA
2  has had more than one "it" come out about
3  valsartan and nitrosamines and NDMA and NDEA, as
4  has EMA.  And, so, they're pretty much
5  self-consistent.
6        I've seen several things from the FDA
7  and several things from EMA, and if there's a
8  particular document you want to ask me and show
9  me and say have you -- have you reviewed this
10  "it," then I'm happy to look at it.
11        But I -- I believe I'm pretty
12  up to date on FDA disclosures about valsartan and
13  others' relation to nitrosamine contamination.
14  It's been a big, well-publicized issue in the
15  industry.
16  Q      With regard to the FDA references that
17  you're referring to, did you -- did you note the
18  ones that you reviewed in your report or in your
19  materials considered list if you reviewed them in
20  connection with this matter?
21  A      I can't say for a hundred percent sure.
22  I -- there are -- I can't list everything that --
23  that I've seen over the last couple of years
24  related to nitrosamines and guarantee that I've

Page 120

1  put it in -- in this document or in citations.
2        I don't know for sure.  I don't
3  remember.  I'm not encyclopedic.  I'm not an
4  encyclopedia.  I may have made a mistake, even.
5  MS. BOGDAN:
6        Let's pull up the FDA general advice
7  letter and mark that as an exhibit.
8        (DEPOSITION EXHIBIT NUMBER 9
9        WAS MARKED FOR IDENTIFICATION.)
10  MS. BOGDAN:
11  Q      And, Dr. Baertschi, you can let me know
12  once it's up on your screen.
13  A      It's up on my screen.
14  Q      All right.  Are you familiar with this
15  general advice letter?
16  A      Yes.  I believe I've seen this before.
17  Q      I'm going to bring you down to the
18  third paragraph on the first page.  And first
19  sentence refers to IARC, which is the monograph
20  that we just spoke about; correct?
21  A      Correct.
22  Q      Now, the second sentence reads, "In
23  fact, N-nitroso compounds are identified as a,"
24  quote, "cohort of concern in internationally

Page 121

1  harmonized guidance."
2        Are you familiar with that term,
3  "cohort of concern"?
4  A      Yes, I am.
5  Q      What does that term mean?
6  A      It refers to three classes of compounds
7  that are known to be associated with particularly
8  high mutagenicity responses such that members of
9  those classes of compounds, those three classes,
10  are considered to be -- the -- the thresholds for
11  toxicological concern listed in ICH M7 is not to
12  be used directly but only as a starting point to
13  think about for the cohorts of concern.
14        So the implication is that you would do
15  a case by case and it would be lower than the TTC
16  for typical mutagens that weren't part of the
17  cohort of concern.
18  Q      When you say "lower," meaning that they
19  would have a lower threshold for what would be
20  permitted in a drug substance or drug product?
21  A      Correct.
22  Q      And when you say "lower threshold,"
23  that means less of those particular chemicals
24  would be allowed in the drug substance or drug

Page 122

1  product; correct?
2  MR. HARKINS:
3       Object to form.  Vague.  Speculation.
4  A     Yes.
5  MS. BOGDAN:
6  Q     That's because those compounds are
7  associated with particularly high mutagenicity
8  responses; correct?
9  MR. HARKINS:
10       Object to form.  Vague.
11  A     Those classes of compounds, yes.
12  There -- there can be individual compounds within
13  those classes that aren't even mutagenic.  But in
14  the absence of that knowledge, you treat them as
15  the part of the cohort of concern.
16  MS. BOGDAN:
17  Q     So those compounds in the cohort of
18  concern are known to be associated with
19  particularly high mutagenicity responses?
20  MR. HARKINS:
21       Object to form.  Vague.  Asked and
22  answered.
23  A     I think I just answered that, that
24  within a particular class, such as N-nitroso

Page 123

1  compounds, there are N-nitroso compounds that are
2  not mutagenic at all that are in -- that are in
3  N-nitroso compounds that are similar to other
4  mutagenic compounds in their mutagenicity, and
5  then there are some that are more potent than the
6  typical mutagenic compounds list in the ICH M7
7  class of compounds.
8       So I'm just trying to straighten out
9  that you said "those compounds," and that can be
10  generalized too far, and I wanted to clarify what
11  I meant.
12  MS. BOGDAN:
13  Q     Okay.  With regard to NDMA
14  specifically, is that one of the N-nitroso
15  compounds that is associated with particularly
16  high mutagenicity response?
17  MR. HARKINS:
18       Object to form.  Vague.  Scope.
19  A     Yes.
20  MS. BOGDAN:
21  Q     When you refer to NDEA, is that one of
22  those N-nitroso compounds that is associated with
23  a particularly high mutagenicity response?
24  MR. HARKINS:

Page 124

1       Same objection.
2  A     Yes.  That's my understanding.  I don't
3  have personal knowledge.  I only have knowledge
4  I've derived from literature.
5  MS. BOGDAN:
6  Q     And, so, NDMA and NDEA are part of the
7  N-nitroso compounds that are identified in the
8  cohort of concern; correct?
9  A     Correct.
10  Q     And, then, moving further in this
11  paragraph, it says "ICH M7 recommends that known
12  mutagenic carcinogens such as nitrosamine be
13  controlled at or below the acceptable cancer risk
14  level."
15       Do you agree with that statement?
16  MR. HARKINS:
17       Object to form.  Scope.
18  A     Well, it's a funny wording, "the
19  acceptable cancer risk level," so I'm surprised
20  it's in a document from the FDA.  But the
21  acceptable threshold or risk level, and, so, I --
22  as defined by the threshold of toxicological
23  concern, the threshold for toxicological concern
24  for these two are lower than -- than those that

Page 125

1  are not in the cohort.
2  MS. BOGDAN:
3  Q     Do you agree that known mutagenic
4  carcinogens such as nitrosamines should be
5  controlled at or below the acceptable cancer risk
6  level?
7  MR. HARKINS:
8       Object to form.  Vague.  Scope.  Asked
9  and answered.
10  A     If the acceptable cancer -- cancer risk
11  level is the threshold of toxicological concern
12  for these compounds, yes.  I don't exactly know
13  what they mean by acceptable cancer risk level,
14  so that's -- that's my problem.  I normally have
15  seen toxicological threshold of toxicological
16  concern and that that threshold is lower for
17  these compounds.  Throwing in the cancer risk is
18  not what I'm used to seeing in thresholds.
19  MS. BOGDAN:
20  Q     Do you agree that NDMA should be
21  controlled in drug substances and drug products
22  to be 96 nanograms or less?
23  MR. HARKINS:
24       Object to form.  Scope.

Page 126

1 A      I agree that -- that -- that that is
2 the level that's been set by FDA and EMA, as I
3 understand it.
4 MS. BOGDAN:
5 Q      And with regard to NDEA, do you agree
6 that NDEA should be limited in drug products to
7 96 or -- excuse me -- to 26.5 nanograms or less?
8 MR. HARKINS:
9      Object to form.  Vague.  Scope.
10 A      The same answer.  I agree that that's
11 the level that's been set by EMA and FDA.
12 MS. BOGDAN:
13 Q      The next sentence reads, "Due to their
14 known potent carcinogenic effects and because it
15 is feasible to limit these impurities by taking
16 reasonable steps to prevent or eliminate their
17 presence, FDA has determined that there is no
18 acceptable specification for nitrosamines in ARB
19 API and drug product."
20      Do you see that sentence?
21 A      I see that.
22 Q      Okay.  Do you agree that it is feasible
23 to limit NDMA and NDEA by taking reasonable
24 steps?

Page 127

1 MR. HARKINS:
2      Object to form.  Vague.  Outside the
3 scope.
4 A      I agree that in the cases I know of,
5 there -- it is feasible to limit the levels of
6 those impurities by taking steps to prevent or --
7 to prevent their presence or reduce.
8 MS. BOGDAN:
9      We can take that down.
10 MR. HARKINS:
11      Hey, Rosemarie, when you get to a good
12 spot, we're gonna need a few minutes just to
13 finalize our lunch plans.  We won't take it right
14 now.  We just want to make sure we know when
15 that's gonna get here so we can plan for around
16 1:00 probably.
17 MS. BOGDAN:
18      I mean, if you want to take it right
19 now, Steve, that's fine.  I just took a document
20 down.  If it's just a few minutes and it will
21 make things go smoother, that's fine.
22 MR. HARKINS:
23      Can we go off the record?
24 VIDEOGRAPHER:

Page 128

1      Off record, 11:59 a.m.
2      (OFF THE RECORD.)
3 VIDEOGRAPHER:
4      On the record, 12:22 p.m.
5 MS. BOGDAN:
6 Q      Dr. Baertschi, I see a reference that
7 you're somehow affiliated with David P. Elder's
8 laboratory.  Is that true?
9 A      Affiliated, no.  He's a colleague, a
10 friend.  I don't even know -- I don't think he
11 has a laboratory.  He's a consultant now, as far
12 as I know.  So I do know David Elder.
13 Q      And how do you know him?
14 A      Presenting at conferences over many
15 years, running into him.  And then sort of as you
16 start to run into multiple times --
17      And he publishes some of the same
18 things, and, so, we exchange -- have in the past
19 exchanged email, you know, conversations and
20 such.
21 Q      Have you ever worked on a project
22 together with David Elder?
23 A      I believe I published a paper -- I
24 don't know if I published two, but I'm pretty

Page 129

1 sure he was a co-author on one article, at least,
2 that I published.
3 Q      As far as you know, you're not a member
4 of David Elder's laboratory?
5 A      Correct.
6 Q      And, then, do you know of an entity by
7 the name of ResearchGate?
8 A      Yes.
9 Q      Okay.  And what is that entity?
10 A      That's an Internet site that houses --
11 hosts referee journal articles for people to then
12 host their publications in a way that's compliant
13 with the copyright issues associated with -- so
14 that you can then view somebody's research,
15 request a paper if you see one of interest, that
16 sort of thing.
17 Q      So are you, like, a member of
18 ResearchGate or...
19 A      Well, in the same way that I'm a member
20 of, like, Google Docs or --
21      You know, I mean --
22 Q      Okay.
23 A      -- it's like -- you know, it's just
24 a -- I have a site or whatever -- an account

Page 130

1 where I have a ResearchGate profile, and my
2 publications and associated information is on
3 there.
4 Q      So you participate in that platform.
5 Is that a good way to summarize it?
6 A      Yes.
7 Q      What did you undertake to investigate
8 when you were retained as an expert consultant in
9 this matter?
10 A      I missed the first part of the
11 question.  What did you undertake -- what --
12 something about --
13 Q      What did you undertake to investigate
14 when you were retained as an expert consultant in
15 this matter?
16 MR. HARKINS:
17        Object to form.  Vague.
18 A      I believe I've stated that in my expert
19 report.  Should we -- should we look at that and
20 see what it says that I was asked to create an
21 expert report on?  Because that's essentially
22 what they asked me to do.
23        In -- I think it says assignment 3 in
24 my expert report at paragraph 11.

Page 131

1 MS. BOGDAN:
2 Q      Okay.  And what's -- you're referring
3 to the sentence that starts "Specifically"?
4 A      I have been retained by the Teva
5 defendants.
6 Q      Uh-huh.  And then the next sentence
7 that starts "Specifically," does that give us
8 information as to what investigation you
9 undertook with regard to your work on this case?
10 A      Yeah.  That's a representation of
11 what -- what I was requested to do.
12 Q      Okay.
13 A      I don't know if that exact wording
14 was -- the -- when they first approached me, you
15 know, to -- to -- as a potential expert witness,
16 but something along the lines of analytical
17 expertise for -- for this -- yeah, as an
18 analytical expertise.
19 Q      And what, with regard to your
20 analytical --
21        I'm assuming you're referring to
22 analytical chemistry.
23 A      Yes.
24 Q      We're in the chemistry field; right?

Page 132

1 Is that where we are?  Okay.
2 A      Yes.
3 Q      So with regard to your being retained
4 as an analytical chemist, what were you asked to
5 review?  Or what did you review?
6 MR. HARKINS:
7        Answer to the extent it doesn't reflect
8 conversations with counsel.  But you can discuss
9 generally.
10 A      Well, they provided me with a link to a
11 lot of documents associated with this case, some
12 testimony, some materials.  I can't remember all
13 of it.  But, you know, there was some expert
14 reports, some testimony, some references, some --
15 the actual -- what do you call them? -- the suits
16 or the legal documents that would say here's the
17 suits in question.  I don't know how -- the right
18 word.  So that kind of general information.
19        And they -- they gave me broader ac- --
20 very broad access and let me kind of go around to
21 figure out what would be most useful to help.  So
22 in terms of what they provided me with, access to
23 a lot of information.  Folders.
24 MS. BOGDAN:

Page 133

1 Q      And upon you reviewing that information
2 that you had access to, did you come up with a
3 suggestion as to what your focus of your expert
4 report would be?
5 MR. HARKINS:
6        Object to form.  Vague.  Legal
7 conclusion.
8        You can answer.
9 A      I don't -- I don't remember exactly how
10 that transpired.  I think it was generally can
11 you -- I think there was some general request,
12 some idea of, you know, can I comment as an
13 expert on the -- the analytical methods used and
14 the techniques used and -- and their viability
15 for detection of nitrosamines, et cetera, and
16 impurities in general.
17 MS. BOGDAN:
18 Q      And, so, your focus, when reviewing the
19 documentation, was on the testing methods that
20 were being employed?
21 A      That was one of my -- yeah.  That's
22 probably my main focus.  And -- but also getting
23 background information on the field and
24 understanding chemistry and making sure I

Confidential Information - Subject to Protective Order

Page 134

1 understood that the -- the current expert reports
2 and -- and testimony that was available at the
3 time.
4 Q     And understanding the chemistry was
5 important with regard to investigat- -- your
6 investigation into this case; correct?
7 A     "The chemistry" is a vague term, but
8 understanding chemistry is -- is part of
9 understanding how to apply analytical technique.
10     So if you're using an analytical
11 technique that's -- you -- you -- you want to
12 understand the chemistry underneath it so that
13 you can better discern the utility of and
14 limitations of the analytical -- analytical
15 techniques used.
16 Q     Now, you referred to your report,
17 paragraph 11, and I'm assuming when you were
18 referring to that paragraph, you actually, in
19 your report, stated what you were asked by
20 counsel to do?
21 A     Yeah.  It -- it -- it says that
22 clearly, "I was asked by counsel."
23 Q     Okay.  And could you read that sentence
24 of your report that answers the question as to

Page 135

1 what you were asked to do in this case as an
2 expert consultant?
3 A     Yes.  I'll read the sentence.  It says
4 "Specifically, I was asked by counsel for Teva to
5 assess testing conducted by and testing
6 capabilities available to Teva during the
7 relevant time period and to review and respond to
8 the opinions presented by plaintiffs' class
9 certification experts."
10 Q     And is that sentence accurate as to
11 what you were asked to do as a consultant in this
12 case?
13 A     As far as I can recollect, yes, I
14 believe so.
15 Q     Did you make inquiry as to what
16 analytical chemistry equipment Teva owned as of
17 the time that it was producing
18 valsartan-containing drugs?
19 A     I did not specifically make inquiry as
20 to what they had available.  I did see some
21 testimony on it or some documents associated with
22 that, and -- and there was no issue in my mind or
23 particular concern that I had to nail that down
24 to know exactly what equipment was available at

Page 136

1 what site wouldn't affect my opinion.
2 Q     When you say it wouldn't -- there
3 wasn't an issue in your mind as to what equipment
4 was available, why wouldn't that be important to
5 determining the testing capabilities available to
6 Teva?
7 A     Well, because I -- my understanding
8 was, without definitively -- definitively --
9 definitively confirming it, was that they -- they
10 would have various levels of instrumentation
11 available, but it wouldn't affect -- the
12 specifics of that wouldn't affect my opinion on
13 the general process for how -- for how you go
14 about releasing drug products that have
15 particular specifications associated with it and
16 when you would proceed to nonroutine
17 investigatory-type approaches, which would then
18 require different instrumentation.
19 Q     All right.  So if we break that down,
20 when you're talking about releasing drug products
21 that have particular specifications, what
22 instrumentation would be needed with regard to
23 testing that's required by particular
24 specifications, as you referred to?  Is that a

Page 137

1 PLC impurity testing?
2 MR. HARKINS:
3     Object to form.  Vague.
4 A     Yes.  If we focus on what I think is
5 the most relevant part for -- to discuss, it
6 would be the HPLC impurities testing.  There are
7 other specification tests, visual and -- and
8 things that I don't want to go list through
9 listing a bunch of techniques or instruments that
10 you might use in order to deal with the other
11 release specification testing, but if we focus
12 on the most relevant impurities one, it would be
13 HPLC with UV detection.
14 MS. BOGDAN:
15 Q     And, then, in your response, you refer
16 to nonroutine investigation-type instruments.
17 What would those be?
18 MR. HARKINS:
19     Did you hear the full -- I lost the
20 last part of that question.
21 A     I -- I -- it did fade out.  I don't
22 want to assume because I think I read your lips,
23 but let's maybe repeat so that I didn't.
24 MS. BOGDAN:

Page 138

1 Q      I said: And, then, in your response,
2 you referred to nonroutine investigation-type
3 instruments. What would those be?
4 A      Without limiting it or without trying
5 to be comprehensive, the most obvious and
6 relevant one would be HPLC attached to a mass
7 spectrometer with maybe variable capabilities,
8 because there are different type of mass
9 spectrometers. But something that would be
10 aligned with elucidating structures, detecting
11 and elucidating structures of unknowns that are
12 not part of the specifications or that --
13      I'm sorry. I should have finished.
14      They can be part of the
15 specifications -- like, it could be an unknown
16 peak that crops up -- or it can be something
17 that --
18      Well, that's what -- that's what it
19 would typically be, is an unknown peak or -- or,
20 for some reason, that triggers a follow-up to
21 investigate further, which you would need some
22 kind of spectroscopic help to nail down the
23 structure.
24 Q      And that instrument would be mass

Page 139

1 spectrometry or a mass spectra instrument?
2 A      Yes. Not necessarily limited to, but
3 that's probably the workhorse or the primary tool
4 that you would first go to, typically.
5 Q      And did Teva have a mass spec
6 instrument?
7 A      I am pretty sure they did.
8 Q      Now, you mentioned earlier in your
9 testimony, I believe, NMR testing.
10 A      Yes.
11 Q      Okay. Did Teva have that instrument
12 available?
13 MR. HARKINS:
14      Object to form. Scope.
15 A      I do not know, did not confirm. But I
16 would presume that a typical large firm would
17 have somewhere in its -- a large pharmaceutical
18 firm, that they would have NMR access somewhere
19 in their firm. But I do not know.
20 MS. BOGDAN:
21 Q      And what about gas chromatography? Did
22 you make inquiry as to whether Teva had gas
23 chromatography testing capabilities?
24 MR. HARKINS:

Page 140

1      Object to form. Scope. Asked and
2 answered.
3 A      I didn't make specific inquiry. I
4 presumed that they did, and -- I presumed that
5 they did.
6 MS. BOGDAN:
7 Q      In your experience working for
8 pharmaceutical companies, is gas chromatography a
9 typical instrument that pharmaceutical companies
10 have in their arsenal?
11 A      Yes.
12 Q      In your work for pharmaceutical
13 companies, are mass spectrometers something they
14 usually have in their instrument arsenal?
15 MR. HARKINS:
16      Object to form. Vague to the extent
17 that -- "arsenal."
18 A      Yeah.
19      I would -- I think interpreting -- I
20 would agree that, in general, mass -- mass
21 spectrometers, that firms would have -- firms
22 that can -- have laboratories typically would
23 have some kind of access somewhere in their
24 network to a mass spectrometer.

Page 141

1 MS. BOGDAN:
2 Q      ...valsartan API suppliers to Teva?
3 A      Something cut out at the start.
4 Q      Sorry. Who were the valsartan API
5 suppliers to Teva?
6 A      I am aware of two: ZHP and Mylan.
7 Q      Did Teva have quality agreements with
8 ZHP and Mylan --
9 MR. HARKINS:
10      Object to form.
11 MS. BOGDAN:
12 Q      -- for the API that was being supplied?
13 MR. HARKINS:
14      Object to form. It's outside the scope
15 of his expert report.
16      You can answer.
17 A      Yeah. I didn't look into that. I
18 wasn't asked to look into that. I believe there
19 were other expert witnesses that did look into
20 that question. That wasn't the focus of my work
21 or expert report. I don't talk about that.
22 MS. BOGDAN:
23 Q      So you aren't offering any opinions
24 with respect to quality agreements between Teva

Confidential Information Subject to Protective Order

Page 142

¹ and the API suppliers; correct?
² A      I would agree with that.  I...
³ Q      Do you agree that Teva, as the ANDA
⁴ holder, was ultimately responsible for the
⁵ safety, quality, and purity of the finished drug
⁶ product that it sold?
⁷ MR. HARKINS:
⁸         Object to form.  Scope of his expert
⁹ report.  Calls for a legal conclusion.  Vague.
¹⁰        You can answer if you have an opinion.
¹¹ A      I don't -- I don't know technically who
¹² is, from a regulatory or legal point of view, who
¹³ is ultimately responsible for sure.  I know that
¹⁴ there's an API manufacturer and there's a dosage
¹⁵ form manufacturer, and I think that there are --
¹⁶ I would think that there would be differences in
¹⁷ responsibility, but it's -- it's a little bit out
¹⁸ of my -- I didn't try to review or figure that
¹⁹ out or nail that down.  I didn't look into that
²⁰ aspect.
²¹ MS. BOGDAN:
²² Q      Are you a regulatory expert?
²³ A      I have regulatory expertise in that
²⁴ I've worked in the industry and been involved in

Page 143

¹ many regulatory submissions, NDAs and I&Ds over
² the years, thirty or more than that, but I've
³ never worked in regulatory, never been my primary
⁴ responsibility.  So while I have some expertise
⁵ and knowledge of it, I don't hold myself out as a
⁶ regulatory expert.
⁷ Q      In your experience, based upon your
⁸ years working in the pharmaceutical industry,
⁹ what is your understanding as to the
¹⁰ finished-dose manufacturer's responsibility for
¹¹ the quality of the API that's in their drug
¹² product?
¹³ MR. HARKINS:
¹⁴        Same objection.  Outside the scope of
¹⁵ his expert report.  Vague.  Facts not in
¹⁶ evidence.
¹⁷        You can answer.
¹⁸ A      My understanding is that they're
¹⁹ responsible for ensuring the -- the
²⁰ specifications are met and making sure that
²¹ quality has been -- you know, that -- that
²² they're manufacturing according to CGMPs, that
²³ they're compliant with all regulatory agencies,
²⁴ that they're -- that they're competent and that

Page 144

¹ they -- they do what should be done, what is
² expected to be done for -- to ensure the safety,
³ efficacy, and purity of their drug.
⁴ MS. BOGDAN:
⁵ Q      Did you review the recall notices for
⁶ the Teva product?  And let me be more specific.
⁷ Did you review the recall notices for the Teva
⁸ valsartan-containing drugs?
⁹ A      I believe so.  I mean, I'm familiar
¹⁰ with the recalls, and I believe I looked at
¹¹ material in the list of things that I looked at
¹² dealing with that.  There's so much discussion of
¹³ it, I don't know what's an official document in
¹⁴ terms of in my brain versus what -- where it was
¹⁵ referred to by somebody else.
¹⁶        I didn't review any documents with the
¹⁷ idea like I'm a CGMP guy or I'm a -- I'm a
¹⁸ quality, I'm reviewing.  I wasn't reviewing the
¹⁹ data for CGMP compliance and quality or
²⁰ regulatory aspects.
²¹ Q      And, so, you're not offering any
²² opinions with regard to CGMPs in this case?
²³ A      Well, I think some of my testimony
²⁴ overlaps with CGMPs because you're -- you're --

Page 145

¹ I'm looking at the analytical results in context
² of specifications that are part of the CGMP
³ process.  And, so, I wouldn't classify it as I'm
⁴ not saying anything related to CGMPs and I'm
⁵ not --
⁶        I'm just not trying to look between
⁷ companies, who's responsible for what, what
⁸ quality system agreements were in place, that
⁹ sort of thing.
¹⁰ Q      But to the extent that standards are
¹¹ involved with looking at the analytical chemistry
¹² and the testing that was being done on valsartan,
¹³ then you would be reviewing and commenting on
¹⁴ things like the USP monograph and potentially
¹⁵ CGMP; correct?
¹⁶ MR. HARKINS:
¹⁷        Object to form.  Vague.  Compound.
¹⁸ A      It was compound.  It sounded -- what
¹⁹ you said seemed -- sounded pretty good.  You
²⁰ threw in CGMP in there, and some of those terms
²¹ were loaded.  But I think, in general, looking at
²² standards and how they made sure that their
²³ product complied to the standards and how they --
²⁴ the scientific and the technical carrying out and

Confidential Information Subject to Protective Order

| Page 146 | Page 148 |
|---|---|

**Page 146**

1  aspect -- the scientific and technical aspects of
2  that, I was looking into.
3  Q       I want to ask the question another way.
4  Q       I want to ask the question another way.
5  One of the things that you did look to is to
6  whether or not Teva was complying to the
7  sceintifical -- scientific and technical
8  standards when manufacturing the finished-dose
9  product; correct?
10  MR. HARKINS:
11        Object to form.  Vague.  Scope.
12  A       I'm a little puzzled by the -- by the
13  question.  Maybe you could re- --
14  MS. BOGDAN:
15  Q       Okay.  Well, when you were reviewing
16  this matter, were you looking to see if Teva
17  complied with the specifications for impurity
18  testing with the finished-dose product?
19  A       Yes.  I was.
20  Q       And were you looking to see if Teva
21  complied with the other type of testing that
22  would be associated with the finished-dose
23  product?
24  MR. HARKINS:

**Page 147**

1        Object to form.  Vague.
2  A       When you say "other type," I'm
3  presuming you mean the other specification test,
4  the -- the quality attributes that are listed in
5  the specifications.
6  MS. BOGDAN:
7  Q       Yes.  I am.
8  A       In that sense, yes, I -- I agree with
9  your question.
10  Q       Did Teva recall all of its drug product
11  that was made with the ZHP API that was not
12  beyond the expiration date?
13  MR. HARKINS:
14        Objection.  Scope.
15  A       Yeah.  I'm not sure I could answer
16  that.  I think that there are other people who
17  have looked into that very -- you know, with a --
18  with close eyes.  I may have stumbled across
19  information related to that, but I didn't store
20  it in my brain, and I can't say confidently
21  absolutely.  So I can't really -- I can't really
22  answer it.  And I don't comment on it in my
23  report.
24  MS. BOGDAN:

**Page 148**

1  Q       So you didn't make any determination
2  with regard to the scope of the Teva recall that
3  involved API made with ZHP or made by ZHP?
4  MR. HARKINS:
5        Same objection.
6  A       I -- I did not look into it myself.  I
7  did read some testimony from Roger Williams,
8  maybe, I believe, that -- that talked about some
9  of that, but I -- again, I was looking through
10  that --
11        Even that deposition, I was just
12  looking to familiarize myself with -- with what's
13  already known, and I didn't -- I wasn't looking
14  for information to try to store in my head
15  related to the recalls and whether or not they
16  were comprehensive.
17  MS. BOGDAN:
18  Q       And would that be true for Mylan as
19  well?  Did you make any determination as to
20  whether Teva recalled all of its drug product
21  made with the Mylan API?
22  A       I did not make any determination on
23  that topic.
24  Q       When the recalls were first announced,

**Page 149**

1  was Teva product included in the early recalls?
2  MR. HARKINS:
3        Object to form.  Scope.  Foundation.
4  A       Say that again.  Can you -- was Teva --
5  I need to hear --
6  MS. BOGDAN:
7  Q       Was Teva product included in the early
8  recalls?
9  MR. HARKINS:
10        Same objection.  Also vague.
11  A       I don't know what "early recalls" means
12  in -- I --
13        You know, while I've read material
14  related to dates and times of recalls and -- and
15  whether or not certain recalls were related to
16  which manufacturer, but I -- I wasn't -- I wasn't
17  evaluating the information in a way to make a
18  determination or to -- to gather in and --
19  hold in my brain and -- and understand related to
20  that.
21  MS. BOGDAN:
22  Q       Do you know why Teva product was
23  recalled?
24  MR. HARKINS:

Confidential Information Subject to Protective Order

Page 150

1    Objection. Scope. Vague.
2  A    Well, I know that some -- that there
3  were general recalls.  It was widely published in
4  the industry, and I -- I believe I've seen some
5  information that -- that related to N-nitrosamine
6  contamination or impurities present in -- in API
7  material in mixed dosage forms for a variety of
8  manufacturers.
9  MS. BOGDAN:
10  Q    Do you know what nitrosamines were
11  found in the Teva product that prompted the
12  recall?
13  A    I know there were two separate
14  instances or two separate N-nitrosamines.  One
15  was for NDMA impurities present, and the other
16  was for NDEA impurities detected.
17  Q    And, to your recollection, those were
18  two separate recalls?
19  A    Yes, I believe so.  I'm not -- I'm not
20  confident in that answer, but...
21  Q    Did you review the Teva testing
22  information to see what the levels of NDMA were
23  that were found in the Teva product?
24  A    Yes, I -- I saw a number of tables

Page 151

1  and -- and data on the amounts of both
2  nitrosamines in different studies and different
3  tests for both the API and the finished-dose
4  product.
5  Q    What was the range of NDMA levels that
6  you saw were found in the Teva product?
7  A    Um, NDMA in Teva.  I would say, from
8  memory, pretty low, like maybe a tenth of a ppm,
9  in that range, up to a few hundred ppm of NDMA in
10  the finished-dose product, in general.  There
11  might have been a couple of outliers higher or
12  lower.  But, in general, in that .1 ppm to a few
13  hundred.
14  Q    And in order to figure out the amount
15  of nanograms of NDMA in a finished dose, from
16  knowing the ppm, you would just take the part per
17  million number and multiply it by the number of
18  milligrams in the tablet to get the amount of
19  nanograms in the finished dose?
20  A    I think nanograms per gram would be
21  the, quote -- well, that's parts per billion.
22  Nanograms per milligram, I think, would be ppm.
23  But you'd translate it from -- you'd put the
24  actual units on it, the nanograms per -- per

Page 152

1  weight of finished dose.
2  Q    Did you calculate the amount of NDMA
3  that was found in the tablets?
4  A    I looked at how they calculated the
5  NDMA translating from ppm to -- to weight units,
6  and it looked correct.  I mean, so that they
7  could figure out how many nanograms were in a
8  single dose so that they did compare that to --
9  well, so that they could just understand the
10  total number of nanograms in any given API or
11  finished-dose product.
12    So I saw that calculation.  It looked
13  right, and then I -- and I've seen many where
14  they were just listing nanograms per gram, I
15  believe.
16  Q    And those levels that you saw, were
17  some of them above the acceptable intake level
18  that's permitted by the FDA?
19  A    Yeah.  Some -- the acceptable limit
20  being 96 nanograms for -- per -- per daily dose.
21  So there were, yes, instances of -- of the levels
22  of NDMA being above that 96.
23  Q    And, then, the same question with
24  regard to NDEA.  Did you review any documents

Page 153

1  that showed the testing levels for NDEA in the
2  Teva finished-dose product?
3  A    Yes.
4  Q    And were some of those levels in excess
5  of the allowed acceptable daily intake as set
6  forth by the FDA?
7  A    Yes.  And I believe that level was 26.5
8  nanograms per day, as I recall.  And -- for NDEA.
9  And the NDEA levels in some of the lots -- I
10  believe it was from Mylan for the API and then
11  for Teva in the finished-dose product -- were
12  above 26.5.
13  MS. BOGDAN:
14    If we could please pull up the FDA
15  notice from July 13th, 2018.
16    (DEPOSITION EXHIBIT NUMBER 10
17    WAS MARKED FOR IDENTIFICATION.)
18  A    Is that Exhibit 10?
19  MS. BOGDAN:
20    I believe we're on Exhibit 10, but I
21  would ask the court reporter to just verify that
22  for us.
23  TRIAL TECH:
24    That's correct.

Confidential Information Subject to Protective Order

Page 154

1  THE WITNESS:
2      Yeah.  I've got it up now on my screen
3  and both screens.
4  MS. BOGDAN:
5  Q      Have you seen the FDA news release
6  before?
7  A      Yes.
8  Q      And directing your attention --
9      And this is dated July 13, 2018;
10  correct?
11  A      Correct.
12  Q      Directing your attention to the second
13  page, under recalled products, it lists the
14  medicine and the company.
15  A      Yes, I see that.
16  Q      Does it list Teva Pharmaceuticals for a
17  few of the medicines, and, in particular, two?
18  A      Yes.  I see it for the third one down
19  and for the bottom one.
20  Q      Now, directing your attention to the
21  paragraph, there's a note from Dr. Woodcock.  Do
22  you see that quote?
23  A      Yes, I do.
24  Q      Okay.  Were you familiar with

Page 155

1  Dr. Woodcock?
2  A      She's been a director -- she's been at
3  the FDA for a long time.  I'm familiar with her
4  name.  I met her a couple times.  She -- just
5  in -- she wouldn't know me.
6  Q      I was gonna say, have you ever met
7  Dr. Woodcock personally?
8  A      Yes, but, like, a three-second
9  handshake with a bunch of other people.
10  Q      Okay.
11  A      So not really.
12  Q      All right.  And she says "We have
13  carefully assessed the valsartan-containing
14  medications sold in the United States and we've
15  found that the valsartan sold by these specific
16  companies does not meet our safety standards."
17      And then she goes on to say "This is
18  why we've asked these companies to take immediate
19  action to protect patients."
20  MR. HARKINS:
21      Is there a question?
22  MS. BOGDAN:
23  Q      Do you -- is it your understanding that
24  that is why the FDA announced the recall of those

Page 156

1  valsartan products?
2  MR. HARKINS:
3      Object to form.  Outside the scope of
4  his expert report.
5  A      As I read this here, that's, in the
6  context, what it -- what it appears to be saying,
7  that they -- and it's in a recall announcement,
8  and this is their explanation.
9  MS. BOGDAN:
10      If you could please take that down.
11  Q      Did you review the specific Teva recall
12  announcements?
13  MR. HARKINS:
14      Object to form.  Asked and answered.
15  A      I think I've already answered that.
16  MS. BOGDAN:
17  Q      Was the answer yes or -- or no or you
18  weren't sure?
19  A      I'm not completely sure.  I know I've
20  seen a lot of documents that have recall
21  information.  So it -- if I had to say, it's
22  likely that I did, yes.  I'm not sure.  I can't
23  say for sure I've seen a specific document.
24  MS. BOGDAN:

Page 157

1      And will you please put up the Teva
2  recall from July 17th, 2018?
3      (DEPOSITION EXHIBIT NUMBER 11
4      WAS MARKED FOR IDENTIFICATION.)
5  MS. BOGDAN:
6  Q      Are you familiar with this company
7  announcement, Dr. Baertschi?
8      And if we could mark it.  I believe
9  we're on Exhibit 11.
10  A      It -- it looks familiar.  I can't say.
11  Sometimes documents look familiar and I haven't
12  seen the exact document.  But it --
13  Q      Okay.  And this document is dated July
14  17th of 2018?
15  A      Yes.
16  Q      At the top, Teva Pharmaceuticals USA is
17  issuing a voluntary nationwide recall of
18  valsartan and valsartan hydrochlorothiazide
19  tablets.
20  A      I see that.
21  Q      And bringing you down onto the company
22  announcement, into the first paragraph, it says
23  that the impurity detected in the API is
24  N-nitrosodimethylamine.

Confidential Information Subject to Protective Order

Page 158

MR. HARKINS:

    Is that a question?

MS. BOGDAN:

Q      Is this the recall that you were
referring to earlier in your testimony where you
said you reviewed one recall that was for NDMA
and then another one for NDEA?

A      Yes.  This is apparently the one for
NDMA.

Q      And, then, just directing your
attention to pages 2 through 5 of the document,
if we could go -- that's 2, page 2, and then page
3, and page 4, and page 5, does that list all of
the products that were recalled?

MR. HARKINS:

    Object to form.  Outside the scope.

A      Yeah, I didn't -- I didn't look in to
verify that that's all the lots.  I...

    That's, you know, somebody else's
responsibility.  I think that's -- FDA can be
accountable for that.

MS. BOGDAN:

Q      Okay.

A      Or Teva.  I guess Teva's the company

Page 159

announcement.

Q      Right.

MS. BOGDAN:

    Okay.  Let's pull up the Teva recall
notice of November 27th, 2018.

    (DEPOSITION EXHIBIT NUMBER 12
    WAS MARKED FOR IDENTIFICATION.)

A      Okay.

MS. BOGDAN:

Q      Dr. Baertschi, can you -- is that up on
your screen yet?  Okay.

A      Yes.

Q      Okay.  Now, the reason for this
announcement, if you could look under the
summary, it says "due to the detection of NDEA."

A      Yes, I see that.

Q      Okay.  Is this the recall announcement
that you were referring to when you said there
was one that was for NDEA?

A      Yes.  I don't know if this is the only
one that there was for NDEA, but, yeah, it's --
it's a recall for NDEA.

Q      Then, again, starting on page 3 of this
document, it lists the product and lots that are

Page 160

under the recall; correct?

A      Yes.

Q      And it continues to list those until
page 5 of the document?

A      Yeah.  It looks -- that looks to be
true.  I mean, that looks -- I agree with that.

Q      Okay.

MS. BOGDAN:

    If we could please pull up Teva
document that ends with 693423.  I believe it's
number 14 in the document repository, if that's
helpful.

    (DEPOSITION EXHIBIT NUMBER 13
    WAS MARKED FOR IDENTIFICATION.)

MS. BOGDAN:

    If we could actually move past the
Bates stamp first page to the second page.

THE WITNESS:

    Is this Exhibit 12 or 13?

MS. BOGDAN:

    Court reporter, what --

THE COURT REPORTER:

    It's number 13.

THE WITNESS:

Page 161

    It's not come up yet on my screen.

MS. BOGDAN:

    There's a blank page on the first part
of the exhibit that just has the Bates number
down low.  So if you're seeing a blank on your
screen, maybe you can scroll down.

MR. HARKINS:

    It's not showing in our exhibit box
here that we're refreshing.

THE WITNESS:

    Now it's there.

MS. BOGDAN:

    Okay.

THE WITNESS:  Okay.  Got it.

MS. BOGDAN:

Q      And if you can look at the second page,
which is really the first page of the -- of the
report.  Have you seen this document before?

A      It looks familiar, yes.  I believe so.

Q      And this is a -- a Teva document that
you can see on the top.

A      Yes.

Q      And the title of it is "valsartan

Page 162

1  analytical drug substance and drug product
2  testing results sourced from" -- and I'm gonna
3  say ZHP.
4  A      Yes.
5  Q      So if I could direct your attention to
6  table 1 in this document, which has the testing
7  results.  And in table 1, it looks like they
8  tested three different lots of valsartan
9  320-milligram tablets.
10  A      Yes.
11  Q      And directing your attention down to
12  the results section, which is the row that says
13  "NDMA results in sample equivalent to one gram
14  valsartan ppm."
15  A      I see that.
16  Q      Okay.  And what is the ppm acceptable
17  limit established by the FDA for NDMA?
18  MR. HARKINS:
19         Object to form.  Scope.
20         You can answer.
21  A      If I recall correctly, it's .3 ppm.
22  MS. BOGDAN:
23  Q      That would be 0.3?
24  A      Yes.  But -- but I'm not absolutely 100

Page 163

1  percent.  I'm calling that from memory.  I don't
2  think it's 3.  I believe it's .3.  If that's
3  important, we should establish it.
4  Q      Are all of the values in that column
5  higher than .3?
6  A      Yes.
7  Q      Now, the next column says "NDMA results
8  per tablet."  Do you see that?
9  A      Yes.
10  Q      And those results are expressed in
11  micrograms?
12  A      No.  They're expressed in parts per
13  million.
14  Q      Okay.  So they're expressed in parts
15  per million per tablet?
16  A      Yes.
17  Q      Okay.  And, then, how would you
18  calculate the amount of nanograms in each tablet?
19  A      You'd have to know the -- the weight,
20  the total weight of the tablet, which I believe
21  is 320 milligrams.  So --
22  Q      You'd have to -- you'd have to know the
23  dose of the API in the tablet; right?
24  A      Right.

Page 164

1  Q      The weight of the tablet, including its
2  event.
3  A      Yes.  Yeah.
4  Q      Now, just if we take the results for
5  the valsartan tablets that are in the third
6  column where it has NDMA results in sample
7  equivalent to one gram valsartan ppm of 61.2 --
8  A      Yes.
9  Q      Now, if you take that 61.2 and you
10  multiply it by 320, which is the milligrams, you
11  get 19,584, which would be, when it's rounded,
12  19,600.
13  MR. HARKINS:
14         Object to form in terms of the math.
15  A      Yeah.  I'm not sure what's -- what's
16  going on -- I mean, what you're doing.  I don't
17  perceive --
18  MS. BOGDAN:
19  Q      Let me ask this question.  Based on
20  this table, how many nanograms of NDMA did they
21  find in the valsartan tablets that are in the
22  third column on the table?
23  A      How many nanograms did they find?
24  MR. HARKINS:

Page 165

1         Object to form.  Just noting that
2  Dr. Baertschi does not have a calculator.  He's
3  being asked to do this math on the blank.
4         If you're comfortable performing that
5  calculation or if you need to ask for anything to
6  aid in it, let us know.
7  A      Yeah.  So if you'll allow me to think
8  out loud in -- much to my --
9         I would -- I would say --
10         So if you have 61.2 parts per million,
11  let's -- part per million per gram, and when you
12  adjust it to what's in a tablet, it's 19.6 parts
13  per million, that would be 19,600 nanograms per
14  gram, which is parts per billion, or 19.6 parts
15  per million compared to .3 parts per million
16  limit.
17  MS. BOGDAN:
18  Q      So the 19.6 parts per million is
19  significantly higher than 0.3 parts per million
20  limit; correct?
21  MR. HARKINS:
22         Object to form.  Scope.
23  A      19.6 is significantly higher than 0.3,
24  yes.

Confidential Information Subject to Protective Order

---

Page 166

¹ MS. BOGDAN:
² Q       And, in fact, all of the lots tested
³ that are shown in table 1 are higher than the 0.3
⁴ parts per million limit; correct?
⁵ A       Yeah.  I see six results per tablet
⁶ that give it in results, NDMA per tablet, and all
⁷ six of them are above the 0.3.
⁸ Q       And if I could direct your attention to
⁹ table 2, which is on the next page of the
¹⁰ document.
¹¹ A       Yeah.
¹²       And when I said six results, I was
¹³ looking at tables 1 and 2.  So my apologies.  I
¹⁴ was already jumping down to the next table.  I
¹⁵ looked at table 1 and 3 and table 2, and I added
¹⁶ them together to get all six results are above
¹⁷ .3.
¹⁸ Q       So the answer that you gave to my
¹⁹ previous question incorporated the sets of
²⁰ results that are shown for the three lots that
²¹ are in table 2 as well?
²² A       Yes.
²³ Q       And they're also all over the limit;
²⁴ correct?

---

Page 167

¹ A       Correct.
² Q       And if I could direct your attention to
³ the conclusion section of this report provided by
⁴ Teva, just to the last sentence in the first
⁵ paragraph, which reads "The API analytical test
⁶ results indicate that the ZHP valsartan API
⁷ manufacturing process in place is expected to
⁸ generate NDMA with levels above the FDA initial
⁹ interim acceptable limit of NMT 0.3 parts per
¹⁰ million."
¹¹       And my question is:  Do you have any
¹² information, based upon your investigation in
¹³ this case, that would result in you having an
¹⁴ opinion that that sentence is not correct?
¹⁵ MR. HARKINS:
¹⁶       Object to form.  Outside the scope.
¹⁷ Vague.
¹⁸       You can answer.
¹⁹ A       I have no information that would
²⁰ suggest that that is incorrect.  I don't have --
²¹ yeah.  I don't have any information on that.  But
²² I -- I have no information to challenge it.
²³ MS. BOGDAN:
²⁴       If we could please pull up what I

---

Page 168

¹ believe is marked as number 13 in the document
² repository, the Bates stamp number that ends with
³ 48605.
⁴       (DEPOSITION EXHIBIT NUMBER 14
⁵       WAS MARKED FOR IDENTIFICATION.)
⁶ MR. HARKINS:
⁷       This is going to be Exhibit 14 is what
⁸ she's saying.
⁹ MS. BOGDAN:
¹⁰       If you could please mark this as an
¹¹ exhibit as well.
¹² Q       So Exhibit 14 is an email from Claire
¹³ Lyons at Teva.  Do you know Claire Lyons?
¹⁴ A       I do not.
¹⁵ Q       Do you know any of the employees of
¹⁶ Teva?
¹⁷ A       It's possible that I do, but I don't --
¹⁸ I can't recall anybody that I know personally at
¹⁹ Teva.
²⁰ Q       Have you published any studies with a
²¹ co-author who works for Teva?
²² A       Not that I know of.
²³ Q       Have you published any studies with a
²⁴ co-author that works for Mylan?

---

Page 169

¹ A       Not that I know of.
² Q       Have you published any studies with a
³ co-author that works for ZHP, Solco, or Prinston?
⁴ A       Not that I know of.
⁵ Q       In this email, Claire is writing to
⁶ Sofia, and in her first sentence -- sentence she
⁷ references a term "COfA."  Do you see that?
⁸ A       Yes.
⁹ Q       Do you know what COfA stands for?
¹⁰ A       Certificate of analysis, I presume.
¹¹ Q       And, then, in that same first
¹² paragraph, she uses a term, "CEP."  Do you know
¹³ what CEP means?
¹⁴ A       I'm not recollecting it at the moment,
¹⁵ what CEP means, stands for.
¹⁶ Q       Now, directing you further down this
¹⁷ exhibit, which is an email from Sofia Schwartz to
¹⁸ Claire Lyons, which the one we just looked at is
¹⁹ responding to, and in that email there is a
²⁰ summary of the analytical testing that Teva
²¹ performed on 36 Mylan API batches.
²² MR. HARKINS:
²³       And, Doctor, feel free to look at the
²⁴ full email in the Dropbox if that makes it

---

Confidential Information Subject to Protective Order

Page 170

¹ easier.
² A      Yeah.  I want to make sure I understand
³ the sequence, which email was first, the
⁴ June 2nd -- July 1.  Okay.  This email that we're
⁵ looking at is July 1st.  It predates the one we
⁶ just looked at.
⁷ MS. BOGDAN:
⁸ Q      And my understanding -- and please feel
⁹ free to review the document -- but as Teva
¹⁰ produced these, the most recent email is on the
¹¹ top, and then they go in reverse chronological
¹² order.
¹³ A      Okay.
¹⁴ Q      So did you review that analytical
¹⁵ testing that Teva performed on the Mylan API
¹⁶ batches?
¹⁷ A      Yes, I believe so.  I don't know if
¹⁸ it's specifically this, you know, these batches,
¹⁹ but I reviewed a number of analytical results
²⁰ from Mylan and Teva, yeah.
²¹ Q      Sorry.
²² A      From --
²³      Sorry.  I wasn't quite finished.
²⁴      I've reviewed a number of results that

Page 171

¹ had ZHP results, Mylan results, and Teva results,
² and it's hard for me to keep that perfectly
³ straight as -- in my head.  But, yes, I believe
⁴ I've reviewed this data.
⁵ Q      And the results that you reviewed with
⁶ regard to testing of the Mylan API batches, did
⁷ those results show API batches that were found to
⁸ have NDEA values above the provisional limit of
⁹ 0.08 parts per million?
¹⁰ A      As I -- as I recall, yes, to the best
¹¹ of my recollection.
¹² MS. BOGDAN:
¹³      Will you please pull up exhibit --
¹⁴      I believe it's number 21 in the
¹⁵ document repository, but...
¹⁶      (DEPOSITION EXHIBIT NUMBER 15
¹⁷      WAS MARKED FOR IDENTIFICATION.)
¹⁸ MS. BOGDAN:
¹⁹ Q      Are you aware, Dr. Baertschi, of the
²⁰ testing methods that the FDA published for
²¹ determining levels of NDEA or NDMA in valsartan?
²² A      I -- I have seen a number of
²³ publications talking about post-July -- you know,
²⁴ 2019 and 2020 and 2021, even, where a variety of

Page 172

¹ companies and regulatory agencies have developed
² methods for testing specifically for NDEA or
³ NDMA, and some have even combined both or
⁴ multiple N-nitrosamines into a single procedure.
⁵      So I think my answer is yes, but I -- I
⁶ can't necessarily say I can recall a specific
⁷ release of method that FDA granted at one time.
⁸ Seems like they might have done more than one
⁹ release.  But...
¹⁰ Q      On the --
¹¹ A      If you want me to look at the document,
¹² I'd be happy to.
¹³ Q      Did you review the methods that the FDA
¹⁴ published for determining NDMA and NDEA in
¹⁵ valsartan --
¹⁶ MR. HARKINS:
¹⁷      Object to form.  You can answer.
¹⁸ MS. BOGDAN:
¹⁹ Q      -- when --
²⁰ A      I believe so.
²¹ Q      And did you --
²² A      I looked at a variety -- I looked at a
²³ variety of methods that a variety of people
²⁴ published, and I believe NDMA is one of -- FDA is

Page 173

¹ one of them, and I believe I've reviewed those.
² Q      Did you compare those testing methods
³ that the NDMA -- that the FDA published for NDMA
⁴ and NDEA and inquire whether Teva had those
⁵ testing capabilities?
⁶ A      It was never a question in my mind
⁷ whether or not Teva would have the testing
⁸ capabilities.
⁹      And let me define testing capabilities.
¹⁰ By having the instrumentation and even the -- the
¹¹ expertise to be able to carry out such a method
¹² or protocol.  So I don't know for sure, but I --
¹³ my presumption is that they would.
¹⁴ Q      And when you say there was never a
¹⁵ question in your mind whether Teva would have the
¹⁶ testing capabilities, why wasn't there a question
¹⁷ in your mind?
¹⁸ A      Because I don't think that the --
¹⁹      The instrumentation and expertise is
²⁰ outside of the norm of a pharmaceutical company
²¹ to have within its -- within its company or
²² within -- within -- accessible from a contract
²³ lab or something.
²⁴      The -- the technology itself is not

Confidential Information - Subject to Protective Order

Page 174

1 something that I would be concerned about a
2 typical large company like Teva having access to.
3 MS. BOGDAN:
4        If we could pull up Exhibit 21.  Or,
5 actually, I should ask, before you pull that up,
6 Steve, I see we're hitting on 1:30.
7 MR. HARKINS:
8        Yeah.  Our lunch is here.
9 Dr. Baertschi, it's up to you.
10 THE WITNESS:
11        Yeah.  So let's take a break and eat.
12 MS. BOGDAN:
13        Okay.  That's fine.  I just wanted to
14 acknowledge that we had reached that time, and I
15 don't -- I don't know if anyone got anything hot,
16 but I wouldn't want the soup to get cold on my
17 account.  So do you want to take a -- just, like,
18 can we keep it to about 30 minutes?
19 MR. HARKINS:
20        So let us -- let me check back in in 30
21 minutes.  We might need a few more than that.
22 But I'll jump back on at 2:00 and let you guys
23 know how long we'll need.
24 MS. BOGDAN:

Page 175

1        Okay.  I'm just trying to make sure
2 we're not here -- okay.
3 MR. HARKINS:
4        Can we go off the record?
5 MS. BOGDAN:
6        Yes.
7 VIDEOGRAPHER:
8        Off the record.  1:29 p.m.
9        (LUNCH RECESS)
10 VIDEOGRAPHER:
11        On record, 2:21 p.m.
12 MS. BOGDAN:
13        Could you please mark what I believe is
14 in the repository as number 21?
15 MS. BOGDAN:
16        Which are my -- marked, I think,
17 Combined Headspace Method.
18 Q        Okay, Doctor.  And let me know once
19 you're able to see that.  It should be coming up
20 as an FDA document.
21 A        I can see it.
22 Q        Okay.  And, for the record, this
23 exhibit is several publications from the FDA with
24 regard to methods for testing NDMA and NDEA in

Page 176

1 valsartan.  Have you reviewed these methods that
2 the FDA published?
3 A        Yes.  I've seen these.
4 Q        Okay.  With regard to this first
5 method, it says "by GC/MS-Headspace."
6 A        Yes.
7 Q        Could you tell us what GC/MS-Headspace
8 is?
9 A        Yeah.  It's a -- it's a hyphenated
10 technique starting with -- the separation occurs
11 in gas -- a gas chromatographic separation using
12 heat to -- to volatilize constituents, and then
13 they go through a column and separate it out
14 based on their vapor pressure and their
15 attraction to the stationary phase on the column,
16 the capillary column, and then they are eluted
17 into a mass spectrometer which detects on the
18 basis of molecular weight.
19        The Headspace part is where you have a
20 sample in a vial, typically, with a solution, and
21 you heat the solution, and it drives off volatile
22 constituents into equilibrium in the headspace,
23 and then you're just sampling the Headspace gas
24 and injecting that headspace gas onto the gas

Page 177

1 chromatograph to separate and then eventually
2 detect.
3 Q        And how long has gas chromatography
4 been around?
5 A        I could not tell you the very
6 beginning, but '50s or '60 -- 1950s or '60s,
7 maybe before that, '40s, '30s, a long time.  But
8 the technology has changed dramatically over the
9 years.
10 Q        So the technology has changed over the
11 years, but gas chromatography was first available
12 50 years or so or more ago?
13 A        At least that long ago, yes, I believe.
14 Q        And what about mass spectrometry?  How
15 long has that been around?
16 A        That's kind of a loaded question,
17 because some forms of mass spectrometry may have
18 been around for 50, 60, 70, 80 years.  I'm not
19 even sure.  I used to know that number years ago
20 when I was in graduate school, maybe.  But mass
21 spectrometers have continued to evolve over the
22 years and -- and get much more resolution and
23 capability and sensitivity.  But they've been
24 around for a long time as a technology or

Confidential Information Subject to Protective Order

Page 178

¹ instrument.

² Q      If we could go to what I believe is
³ page 8, maybe, of the exhibit.

⁴ A      I'm only seeing six pages, but...

⁵ Q      Oh, okay.  They're -- I think that we
⁶ need to maybe pull up the next exhibit, which is
⁷ number 22 in the repository, which is entitled
⁸ "Combined Direct Injection."  Do you see that?

⁹ A      I've got it.

¹⁰ MS. BOGDAN:

¹¹      What exhibit is this, so we don't lose
¹² track?

¹³ TRIAL TECH:

¹⁴      Sixteen.

¹⁵ MR. HARKINS:

¹⁶      That's for the court reporter.

¹⁷      (DEPOSITION EXHIBIT NUMBER 16
¹⁸      WAS MARKED FOR IDENTIFICATION.)

¹⁹ MS. BOGDAN:

²⁰ Q      Now, is this testing method another one
²¹ that is by GC/MS?

²² A      Yes.  Says so in the title, by GC/MS.

²³ Q      And this one does not have the
²⁴ Headspace designation.

Page 179

¹ A      Yeah.  It doesn't say that in the
² designation.  I haven't looked through the method
³ to make sure that it's not using Headspace.

⁴ Q      And is this testing method also using
⁵ gas chromatography and mass spectrometry?

⁶ A      Yes.

⁷ Q      Gas chromatography is the type of
⁸ instrument that you would expect most
⁹ pharmaceutical companies to have?

¹⁰ A      Yes.

¹¹ Q      And mass spectrometry is an instrument
¹² that you would expect most pharmaceutical
¹³ companies to have?

¹⁴ A      Yeah, I would expect most
¹⁵ pharmaceutical companies to have a mass
¹⁶ spectrometer in their -- in their company.

¹⁷ Q      Do you recall --

¹⁸ A      Not all --

¹⁹      Okay.  Sorry.

²⁰ Q      I'm sorry.

²¹      Did you familiarize yourself with all
²² of the testing methods that the FDA has published
²³ as appropriate for testing for NDMA or NDEA in
²⁴ valsartan products?

Page 180

¹ MR. HARKINS:

²      Object to form.  Vague.

³ A      I didn't spend a lot of time trying to
⁴ verify whether or not the -- the methods were
⁵ valid.  I would presume, based on the FDA, the
⁶ reputation of the -- of the -- the focus that
⁷ this topic has had, that they would have done a
⁸ very thorough job, and I would believe them, by
⁹ default, to have put out a method.  So there was
¹⁰ no question in my mind that I needed to review it
¹¹ for validity.

¹² MS. BOGDAN:

¹³ Q      I wasn't asking if you -- that wasn't
¹⁴ what I was trying to get to when I asked the
¹⁵ question, so I apologize.

¹⁶      What I was asking is simply if you did
¹⁷ familiarize yourself with the various testing
¹⁸ methods that were set forth by the FDA for
¹⁹ measuring NDMA or NDEA in valsartan.

²⁰ A      I believe I answered that before in
²¹ that I looked at a lot of the methods that have
²² come out from FDA and other regulatory agencies
²³ as well as private companies.  I'm not -- I have
²⁴ not -- when you say have you familiarized

Page 181

¹ yourself, I've looked at a lot of the different
² methods.  I can't say that I would be ready for a
³ quiz if we were taking a quiz.

⁴ Q      Did you question the validity of any of
⁵ the methods that the FDA put forth for the ones
⁶ you reviewed?

⁷ A      I have -- for valsartan, no.

⁸ MS. BOGDAN:

⁹      All right.  If we could pull up the
¹⁰ 5-21-2019 FDA method, which is document 26, I
¹¹ believe, in the repository.  Please mark that as
¹² an exhibit.

¹³      (DEPOSITION EXHIBIT NUMBER 17
¹⁴      WAS MARKED FOR IDENTIFICATION.)

¹⁵ MS. BOGDAN:

¹⁶ Q      Doctor, let me know when you can see
¹⁷ that on your screen.

¹⁸ A      I can see it on my screen.

¹⁹ Q      Okay.  This testing method refers to
²⁰ LC-HRMS; correct?

²¹ A      Correct.

²² Q      How does that differ from GC/MS?

²³ A      Yes, it is distinct from GC/MS.

²⁴ Q      And how does it differ?

Page 182

1  A      LCMS -- HP -- LCMS is -- HPLC-MS. So
2  we've already talked about HPLC and how it works.
3  It's just instead of taking the eluent off the
4  detect- -- off the column into a UV detector,
5  you're taking it and going into a mass
6  spectrometer of some sort. In this case, it's a
7  particular type of mass spectrometer that is high
8  resolution.
9  Q      Okay.
10  A      And that's significant.
11  Q      All right. So this particular testing
12  method has HPLC on the front end?
13  A      Right.
14  Q      Okay. And, then, it's using a high
15  resolution mass spec on the back end?
16  A      Yes.
17  Q      And is the -- the LC in this method, is
18  that the same type of instrument that would be
19  used for HPLC impurity testing?
20  A      Yes.
21  Q      And, then, the mass spectrometry that's
22  being used, is that somehow different from the
23  mass spectrometry that's noted in the GC/MS
24  testing methods that we just looked at, which

Page 183

1  were alternative FDA methods for testing NDMA and
2  NDEA in valsartan?
3  A      Yes, very significantly different.
4  Q      Okay. How is HRMS different?
5  A      Well, if -- if you look in the
6  equipment instrument part --
7        I don't know what page that is. Looks
8  like it's 2 of 12.
9        -- they describe the LC equipment --
10  the MS equipment. And this is a very kind of
11  state-of-the-art -- not kind of. It is a
12  state-of-the-art piece of equipment. It has two
13  mass spec sectors on it. One's a quadripole,
14  which is nominal mass resolution, which means one
15  atomic mass unit resolution, and then it's
16  combined with an Orbitrap mass spectrometer,
17  which is like ion cyclotron resonance mass
18  spectrometry, which -- I won't try to explain it.
19  But it is -- it is more of a state of the art
20  that allows you to measure very high resolution,
21  not just one AMU, but you can go to tenths and
22  thousandths of an AMU and distinguish between
23  isomers or topoisomers, compounds that have same
24  molecular weight but a different molecular

Page 184

1  formula.
2  Q      And when was that technology invented?
3  A      That -- well, the invention of it, the
4  Q exactive -- I'm not exactly sure, but that's
5  probably within the last --
6        Combined with the Orbitrap, I don't
7  know. It's five or ten years, I would guess.
8  I'm not exactly sure. I'm not an instrument --
9        You know, instrument vendors would --
10  Thermo Fisher could tell you. I'm not exact
11  sure. But it certainly wasn't around 20 or 30
12  years ago.
13  MS. BOGDAN:
14        And if we could please pull up as and
15  mark as an exhibit the July 24th, 2019,
16  RapidFire-MS/MS method.
17        (DEPOSITION EXHIBIT NUMBER 18
18        WAS MARKED FOR IDENTIFICATION.)
19  MS. BOGDAN:
20  Q      Dr. Baertschi, I can see it, but let me
21  know when you can, please.
22  A      I have it now up.
23  Q      You see on that exhibit that it talks
24  about development and validation of a

Page 185

1  RapidFire-MS/MS method?
2  A      Yes, I do.
3  MS. BOGDAN:
4        God bless you.
5  MS. LANGTON:
6        Thank you.
7  MS. BOGDAN:
8        God bless you.
9  MS. LANGTON:
10        Thank you.
11  MS. BOGDAN:
12  Q      Are you familiar with a RapidFire-MS/MS
13  method?
14  A      I have heard the terminology, and I --
15  it's new enough that I haven't -- well, I don't
16  know if it's new enough. I am not exactly sure.
17  It's a trademark. And I can kind of figure it
18  out from looking what's in this document, but I'm
19  not, like, intimately familiar with RapidFire
20  technology.
21  Q      Would you consider yourself an expert
22  on RapidFire-MS/MS technology?
23  A      No.
24  MR. HARKINS:

Confidential Information - Subject to Protective Order

Page 186

1 Object to form to the extent it calls
2 for a legal conclusion.
3 A I do -- I do not have experience with
4 RapidFire. I've seen publications talking about
5 it, but I have not studied it.
6 MS. BOGDAN:
7 Q With regard to the LC-HRMS method that
8 we just spoke about with the previous exhibit,
9 have you ever run a test like that yourself?
10 A For -- have I ever run a test like that
11 for nitrosamines?
12 Q Or for anything. An LC HRMS.
13 A Yes, but -- yes, I have, with
14 assistance.
15 Q And when you say "with assistance,"
16 what do you mean?
17 A To -- to getting the setup --
18 Oftentimes in industry you'll have a
19 mass spec instrumentation guide that will set up
20 a variety of instruments for open access for --
21 to allow other people to come and use. And, so,
22 as a user, you don't have to set up all the
23 parameters to -- to exacting precision. It's
24 already been done for you. So it's kind of, from

Page 187

1 a user point of view, it's easier.
2 Q And, so, you were the instrument
3 operator, but the instrument was already
4 programmed?
5 MR. HARKINS:
6 Object to form. Vague.
7 MS. BOGDAN:
8 Q I'm just trying to understand what
9 you're explaining.
10 A I was the instrument -- instrument
11 operator, yes, but I'm not an instrumentation
12 specialist. And it is common to have a
13 specialist set up instruments to allow other
14 chemists to use who only come in and use them
15 once in a while and are --
16 To save them time from having to set up
17 everything themselves, they -- they get
18 assistance with the person who's responsible for
19 the setup.
20 I'm not sure if that's vague or not,
21 but it's honest.
22 Q No. I -- I understand your -- your
23 response. Thank you.
24 With regard to GC/MS, have you run that

Page 188

1 type of test before?
2 A Yes.
3 Q And did you need the assistance of a
4 instrumentation specialist to run that test, or
5 is that something that you were capable, as the
6 instrument operator, of running without
7 assistance?
8 A I used to do GC/MS routinely every day
9 from about 1981 through 1986 or so, and then
10 occasionally in the early '90s. I have not
11 personally operated a GC/MS since probably
12 mid-1990s.
13 Q When you operated GC/MS in the 1980s,
14 that was in your capacity of working for Eli
15 Lilly?
16 A That was a previous position that I had
17 before graduate school.
18 Q What position was that?
19 A I think the technical term that I --
20 the title was Residues Chemist. I worked at --
21 in an environmental analysis laboratory.
22 Q Okay. And what type of --
23 Was it GC/MS that you were using?
24 A Yes.

Page 189

1 Q What type of machine? Do you remember?
2 A It was a Hewlett Packard. Uh-huh. It
3 was a quadripole detector, nominal mass. Would
4 not have the kind of sensitivity you'd need to be
5 able to carry out the N-nitrosamine analysis that
6 we're talking about now. Quite a -- quite a
7 number of years ago.
8 Q Did you review the warning letters
9 issued by the FDA to ZHP and Mylan concerning
10 their valsartan API?
11 A It depends on what you mean by review.
12 I've -- I've seen them. I -- I don't -- I can't
13 pull them up in my brain as we talk. I'd be
14 happy to look at them if you want me to.
15 MS. BOGDAN:
16 If we could please pull up ZHP warning
17 letter, November 29th, 2018.
18 (DEPOSITION EXHIBIT NUMBER 19
19 WAS MARKED FOR IDENTIFICATION.)
20 MS. BOGDAN:
21 And please mark it as an exhibit.
22 What exhibit number are we on?
23 THE COURT REPORTER:
24 Nineteen.

Confidential Information Subject to Protective Order

Page 190

1  TRIAL TECH:
2        Nineteen.
3  THE COURT REPORTER:
4        I'm sorry.  It's 19.
5  MS. BOGDAN:
6        Q       It's document 31 in the repository.
7        A       Yes, I see it.  I have it.
8        Q       Okay.  Did you review this warning
9  letter as part of your investigation into this
10  case?
11       A       Yes.  I do -- I do remember this.
12       Q       And directing your attention to page 2
13  of the warning letter --
14              Well, first of all, let's just -- this
15  was November 29th, 2018; correct?
16       A       Yes.
17       Q       All right.  And this warning letter is
18  directed to ZHP --
19       A       Yes.
20       Q       -- over in China.
21       A       Right.  Yes.
22       Q       Correct?
23              And it's directed to a Mr. Du, D-U;
24  correct?

Page 191

1        A       Yes.
2        Q       Then, on the bottom of this page, it's
3  referring to valsartan API; correct?
4        A       Yes.
5        Q       And then on page 2 of this letter --
6              Oops.  I'm sorry.  I think you have to
7  go back to page 1.  Thank you.
8              The third paragraph down --
9        A       Yes.
10       Q       -- where it says "because of your
11  methods" --
12       A       Okay.  I see that.
13       Q       -- "facilities" --
14              Okay.  All right.  Could you read that
15  sentence, please.

███████████████████      ████████████████
█      ████████████████████████████████████
█      ██████████████████████████████████████
█      █████████████████████████████████
█      ████████████████████████████████

22       Q       And during your research and
23  investigation into this case, did you learn any
24  information that contradicts what's in that

Page 192

1  statement in this letter from the FDA to Mr. Du?
2  MR. HARKINS:
3        Object to form.  Outside the scope of
4  his expert opinion and calls for a legal
5  conclusion.  Vague.
6        A       Yes, I -- I don't quite know.  Could
7  you restate the question?
8  MS. BOGDAN:
9        Q       Did you learn, during the course of
10  your investigation into this case, any
11  information that would cause you to disagree with
12  that sentence?
13  MR. HARKINS:
14        Same objection.  Form.  Scope.  Calls
15  for a legal conclusion.  Vague.
16       A       Yeah.  I -- I don't know how to define
17  adulterated and -- and how --
18              That's a -- sort of a regulatory term,
19  FDA term, and I've not -- I've not studied that
20  term in what qualifies as adulterated.  It's not
21  part of my investigation.
22  MS. BOGDAN:
23       Q       So you're not offering, then, any
24  opinions in this case regarding product being

Page 193

1  adulterated or not adulterated?
2        A       I -- to my knowledge, yeah, I've not
3  been asked to look at the term "adulterated" or
4  "not adulterated" for my expert report.
5        Q       So you are not offering any opinions in
6  this matter with regard to adulteration; correct?
7  MR. HARKINS:
8        Objection.  Just qualify it to the
9  extent, "this matter."  He's not offering any
10  opinions about them in this report submitted for
11  the class certification phase of this case.
12              You can answer.
13       A       To date, I haven't offered, I don't
14  think, any -- any opinion on adulteration, of
15  that term, on how that term plays into this case.
16  MS. BOGDAN:
17       Q       Are you --
18              Okay.  Are you offering any opinions
19  regarding the value of the drug product
20  manufactured by Teva Pharmaceutical that was
21  recalled?
22       A       Do you mean commercial value?  What
23  does value mean?
24       Q       I mean -- I mean commercial value.

Confidential Information — Subject to Protective Order

| Page 194 |
|---|

1  A      I'm not offering any opinion on a
2  commercial value.
3  Q      Are you offering any opinions regarding
4  any other values of the Teva drug product?
5  MR. HARKINS:
6          Object to form.  Vague.  Outside the
7  scope.
8          You can answer if you can.
9  A      I am not offering -- I don't -- I don't
10 think I am offering an opinion as you described
11 it, and I've kind of forgotten what -- what it is
12 that --
13         You probably need to restate the
14 question for me.
15 MS. BOGDAN:
16 Q      I had asked you a question if you were
17 offering any opinions regarding the value of the
18 Teva drug products.  And when I meant value, I
19 meant monetary value.  And, so, and you said
20 values, what values?  So I'm just trying to
21 circle back with regard to that question and ask
22 if you're offering any opinions with regard to
23 the monetary value of the Teva drug products.
24 A      I am not offering any opinion related

| Page 195 |
|---|

1  to the value of the valsartan drug products or
2  the Teva drug products, however you want to
3  characterize them.
4  MS. BOGDAN:
5          Could we please pull up the ICH Q3
6  guidance, which I believe is number 34?
7          (DEPOSITION EXHIBIT NUMBER 20
8          WAS MARKED FOR IDENTIFICATION.)
9  A      I've got it up.
10 MS. BOGDAN:
11 Q      Okay.  Now, are you familiar with this
12 ICH guidance?
13 A      Yes, I am.
14 Q      And what date is this guidance, or what
15 date was it issued?
16 A      Well, the -- the revision 2 was issued
17 on October 25th, 2006, as it says there.  There
18 were previous -- there was an R1 and there was
19 a -- before, there was an R1, and I believe the
20 Q3 goes back to 1993, if I'm remembering
21 correctly off the top of my head.
22 Q      If we look at the second page of this
23 guideline, I think it gives a little bit of
24 information regarding the history.

| Page 196 |
|---|

1  A      Sorry.
2  Q      So were you familiar with this ICH
3  guideline as it went through its various
4  revisions?
5  A      Yes.
6  Q      And what is ICH?
7  A      ICH is the International Conference on
8  Harmonization.
9  Q      And what purpose does it serve?
10 A      It was originally put together to try
11 to harmonize Europe, what was then EMEA, FDA, and
12 Japan so that there was one set of consistent
13 guidances that could be used for regulatory
14 submissions instead of separate ones for each
15 region.  And, so, it was a tripartite harmonized
16 guidance.  That was the intent, as I recall.
17 Q      And just so that everyone understands,
18 you're talking about in the pharmaceutical
19 industry or -- something else?
20 A      Pharmaceutical industry.  So for INDs,
21 ANDAs -- well, and NDAs.  Pharmaceutical
22 products.
23 Q      And this particular guideline deals
24 with impurities; correct?

| Page 197 |
|---|

1  A      Correct.  Impurities --
2  Q      And what is --
3  A      Go ahead.
4  Q      What is an impurity?
5  A      Well, there's a definition.  Can we go
6  to the back of this?  It defines impurity.  I
7  could vaguely describe it, but it will be a more
8  precise description if we go to the -- to the
9  back of this document and look at the --
10 Q      Sure.  I believe the glossary starts on
11 page 6 --
12 A      Yeah.
13 Q      -- if that's accessible to you, and
14 goes to page 7.
15 A      I'm on page -- yes, on 7.
16         An impurity -- I can read it.  "An
17 impurity is any component of the new -- component
18 of the new drug substance that is not a chemical
19 entity defined as the new drug substance."
20 Q      Do you agree with that definition?
21 A      Yes.
22 Q      And what does that mean, in layperson's
23 terms?
24 A      In layperson's terms, it would be a

Page 198

1  variety of ways to think of it.  But if you think
2  of a glass of water and there's just a little bit
3  of blue dye in it, you know, you can -- you
4  can -- it's something that's not supposed -- you
5  can see it, you can visually see that there's
6  something in there, even though it might be at a
7  very minuscule level, so it's something that's
8  not part of the -- it's not water.  It's
9  something else.
10         So in this case, it's not the drug
11 substance.  It's not the API.  It's something
12 apart from the API that is in the API.
13 Q       And when you use the term "API," can
14 you define that?
15 A       Active pharmaceutical ingredient.  So
16 sometimes API and drug substance term is used
17 interchangeably.  There are some conventions that
18 discriminate how to use it, but typical jargon in
19 the pharmaceutical industry is to use them
20 interchangeably.
21 Q       So an impurity is something that's in
22 the active pharmaceutical ingredient that is not
23 the actual active pharmaceutical ingredient.
24 A       Yeah.  And maybe it's clearer to say an

Page 199

1  impurity is something in the drug substance which
2  is -- that is not the active pharmaceutical
3  ingredient.
4  Q       Now, in that glossary section, it also
5  has a definition for potential impurity.  Do you
6  see that?  It's -- I believe they're in
7  alphabetical order.
8  A       I do see it.
9  Q       What is the definition of potential
10 impurity?
11 A       An impurity that theoretically can
12 arise during manufacture or storage.  It may or
13 may not actually appear in the new drug
14 substance.
15 Q       Do you agree with that definition of
16 potential impurity?
17 A       Yes.  There's -- the only sticking
18 point is theoretical versus potential.  And I
19 think, from a practical point of view, it's a
20 fine definition.  It may get revised in the next
21 version of -- revision of ICH Q3A, but it's a
22 fine working definition.
23 Q       All right.  If we could go back to page
24 1 of the guidance.  And this version of it that

Page 200

1       we're looking at is the 2006 version; correct?
2  But there were versions of this in 2002 as well?
3  A       Yes.
4  Q       Okay.  And if we go to page 1, which is
5  the next page after document history --
6  MS. BOGDAN:
7          One more page, please.  I'm sorry.  Two
8  pages after document history.  It starts
9  "impurities in new drug substances."  There we
10 go.
11 Q       Do you see how it, under subsection 2,
12 it has classification of impurities?
13 A       Yes.
14 Q       It classifies impurities into three
15 different categories?
16 A       Yes.
17         Pardon me, my throat.  Hold on a
18 second.
19 MR. HARKINS:
20         Would you like a glass of water or
21 something?
22 THE WITNESS:
23         Yeah, maybe so.
24 MS. LANGTON:

Page 201

1       I'll get one.
2  A       Yes.  Pardon me.  Now my voice --
3          But I see the three classifications,
4  organic, inorganic, and residual solvents.
5  MS. BOGDAN:
6  Q       Okay.  Do you agree that impurities can
7  be classified into those three categories?
8  A       Yes.
9  Q       And the NDMA and NDEA that was found in
10 valsartan-containing drugs, which type of
11 impurity category would they fall under?
12 A       Organic impurities.
13 Q       And the guidance goes on to explain how
14 organic impurities can arise?
15 A       Yes.
16 Q       And what does the guidance tell us
17 about how organic impurities can arise?
18 A       They can arise during the manufacturing
19 process and/or storage of the new drug substance.
20 Q       And do you agree with that?
21 A       Yes.
22 Q       Then the guideline goes on to tell us
23 that the organic impurities can be identified or
24 unidentified, volatile or nonvolatile.

Page 202

1    Do you agree with that?
2 A    Yes, I -- I agree with that.
3 Q    And it tells us that the organic
4 impurities -- it reads "they can be identified or
5 unidentified, volatile or nonvolatile, and
6 include starting materials, byproducts,
7 intermediates, degradation products, reagents,
8 ligands, and catalysts."
9    Do you see that?
10 A    I do see that.
11 Q    Do you agree with that statement in the
12 guideline?
13 A    Yes, I agree with that statement.
14 Q    And when evaluating a manufacturing
15 process as a chemist, should one be looking for
16 potential impurities that can form?
17 MR. HARKINS:
18    Object to form.  Calls for speculation.
19 Vague.
20 A    Should --
21    So I'm gonna restate the question as
22 best I answer it.  Should -- when you're
23 developing a synthetic process, should one be
24 looking for potential impurities that could form

Page 203

1 in the synthetic process?  I would say yes.
2 Q    Now, if we go to the next page of the
3 ICH guideline, under rationale for the reporting
4 and control of impurities, it has a section for
5 organic impurities; correct?
6 A    Yes.  Agree.
7 Q    NDMA and NDEA would be organic
8 impurities.
9 A    Yes.  Agreed.
10 Q    What does the first sentence say under
11 that section?
12 A    "The applicant should summarize the
13 actual and potential impurities most likely to
14 arise during the synthesis, purification, and
15 storage of the new drug substance."
16 Q    ...that statement?
17 A    Do -- could you repeat?  Something cut
18 out.
19 Q    Sorry.  Do you agree with that
20 statement?
21 A    Yes, I do.
22 Q    Okay.  Then if you could read the next
23 sentence, please.
24 A    "This summary should be based upon

Page 204

1 sound scientific appraisal of the chemical
2 reactions involved in the synthesis, impurities
3 associated with raw materials that could
4 contribute to the impurity profile of the new
5 drug substance, and possible degradation
6 products."
7 Q    Do you agree with that statement?
8 A    Yeah.  It's all part of the guidance,
9 so, in a way, it doesn't matter if I agree with
10 it or not.  It is what it is.  But I have no
11 problem with the wording of this -- what -- of
12 what we've highlighted.
13 Q    As an expert organic chemist that has
14 worked in the pharmaceutical industry, do you
15 agree that it's good practice to follow the
16 guidance, and the applicant should summarize the
17 actual and potential impurities most likely to
18 arise during the synthesis, purification, and
19 storage of the new drug substance?
20 A    Yes.  I agree that that's good
21 practice.
22 Q    And do you agree that it's good
23 practice that the summary should be based on
24 sound scientific appraisal of the chemical

Page 205

1 reactions involved in the synthesis, impurities
2 associated with raw materials that contribute to
3 the impurity profile of the new drug substance,
4 and possible degradation products?
5 MR. HARKINS:
6    Object to form as to the extent good
7 practice means anything different than following
8 the guidance.
9    You can answer.
10 A    Yeah, there's -- there doesn't seem to
11 be anything controversial there.  I think it's
12 clear.  And I -- I have no -- I take no issues
13 with the wording.
14 MS. BOGDAN:
15 Q    If we could go down to the last
16 paragraph in that section, which reads
17 "identification of impurities present at an
18 apparent level of not more than, less than, or
19 greater or equal to the identification threshold
20 is generally not considered necessary."
21    And then it goes on to say, "However,
22 analytical procedures should be developed for
23 these -- those potential impurities that are
24 expected to be unusually potent, producing toxic

Confidential Information Subject to Protective Order

Page 206

1  or pharmacological effects at a level not more
2  than the identification threshold."
3         Are you familiar with that language?
4  A     I am familiar with that language.
5  Q     What is it referring to when it says
6  analytical procedures should be developed for
7  those potential impurities that are expected to
8  be unusually potent?
9  A     It was undefined at the time of ICH
10 Q3A, and other revisions remain undefined. But
11 it has been discussed in numerous literature
12 articles, including some of my own, that that was
13 generally believed to be a placeholder for, at
14 the time, genotoxic impurities and, later, as
15 that was refined, mutagenic impurities.
16        But it would not be limited to, because
17 there could be other toxic -- you could have
18 something that causes convulsions or something
19 that causes some other form of -- of toxic event.
20 So it's not limited to, but it was intended to
21 include mutagenic impurities.
22 Q     And, so, it was intended to include
23 mutagenic impurities such as NDMA and NDEA?
24 A     Yes.  They would be examples of

Page 207

1  mutagenic impurities that would be -- yes.
2  Q     And when it references analytical
3  procedures that should be developed, would those
4  be analytical methods to test for those potential
5  impurities?
6  A     Yeah.  It would be analytical
7  procedures to separate, detect, and quantify, as
8  appropriate, those potential impurities.
9         So when you say test, it's a little
10 vague, so I was providing my understanding of the
11 intention is to have -- to separate, detect, and
12 potentially quantify.
13 Q     You say "to separate."  That would mean
14 to separate them from the active pharmaceutical
15 ingredient; correct?
16 A     Typically, yes.  There are ways to
17 sep- --
18        Yes, that's the implication.  There are
19 ways to "and devise analytical measures" to where
20 you don't actually separate.  So your -- your
21 signal, your detection signal would need to be
22 separate and unique to the impurity of interest.
23 Q     Procedures should be developed to
24 detect the impurity.

Page 208

1  A     Yes.
2  Q     All right.  And, then, the analytical
3  procedure, aside from separating and detecting,
4  can also be developed to actually quantify the
5  amount of the material; correct?
6  A     Yes.  Yes.  That's the implication.
7  There are exceptions to that in terms of
8  quantification.  Sometimes there are limit tests.
9  So -- and there are limit tests that could be
10 applicable to certain mutagenic impurity, you
11 know, below or above, pass/fail.  But, in
12 general, the way you stated it, I would agree
13 with.
14 Q     Now, moving to page 8 of the guidance,
15 which has Attachment 1, Thresholds, and a chart,
16 do you see that?
17 A     Yes, I do.
18 Q     Okay.  And it has different headings on
19 this chart for maximum daily dose, which I assume
20 would be the amount of the medication one would
21 be taking in a day; correct?
22 A     Correct.
23 Q     And then it has column headings.  One
24 is reporting threshold.  What is meant by a

Page 209

1  reporting threshold?
2  A     It -- it means that if you integrate
3  a -- a -- an impurity below .05 percent, you
4  don't have to integrate and report the presence
5  of that impurity.  To report it --
6         You can, but they're -- they're leaving
7  an expectation -- they're showing an expectation
8  here that if it's .05 percent or above, then you
9  should report it.
10 Q     To what --
11 A     By report, it means integrate it, put
12 it in your -- in your records and put it in a
13 regulatory document or wherever -- whatever phase
14 of development is appropriate for the
15 regulatory -- regulatory recording requirements.
16 Q     And then there's a separate column for
17 identification threshold.  What is meant by an
18 identification threshold?
19 A     It means to -- to identify it
20 structurally so that you can identify the
21 chemical molecular structure of the -- of the
22 impurity.
23 Q     Okay.  And, then, qualification
24 threshold, what is meant by that?

Confidential Information - Subject to Protective Order

Page 210

¹ A      That means that you have --
² qualification is a toxicological safety
³ terminology, so that means you qualified it as
⁴ safe through some series of toxicology test at
⁵ that level.
⁶         So if something is present, a -- a
⁷ compound is present at .15 percent or 1 milligram
⁸ per day or above, then you need to have some --
⁹         If it's below, you don't have to do any
¹⁰ special qualification, any special toxicology
¹¹ studies.  If it's above, then you would have to
¹² do some kind -- there's certain specified testing
¹³ to show the safety at that level.
¹⁴ Q      Now, if we could move to page 11 of
¹⁵ this guideline, and directing you to the notes on
¹⁶ attachment 3 section.  And the attachment 3,
¹⁷ Dr. Baertschi, is on the page before, just so
¹⁸ that you have the ability to get to it if you
¹⁹ want to review it.
²⁰ A      Yeah.  I can see it.
²¹ Q      You can see it?  Okay.
²² A      Well, I mean, I have the document, so
²³ if I want to --
²⁴ Q      Okay.

Page 211

¹ A      -- go back to 3 --
² Q      Perfect.
³         It indicates on notes on attachment 3
⁴ that lower thresholds can be appropriate if the
⁵ impurity is unusually toxic.  Do you see that?
⁶ A      Yes, I see that.
⁷ Q      Okay.  And does that pertain to
⁸ mutagenic impurities?
⁹ MR. HARKINS:
¹⁰         Object to form.  Vague.
¹¹ A      I believe that it's generally
¹² interpreted that that would apply to unusually --
¹³ to mutagenic impurities.
¹⁴ MS. BOGDAN:
¹⁵ Q      Do you consider NDMA to be unusually
¹⁶ toxic --
¹⁷ MR. HARKINS:
¹⁸         Object to form.
¹⁹ Q      -- as defined in the guideline?
²⁰ MR. HARKINS:
²¹         Object to form.  Scope.
²² A      Unusually toxic.  I consider it to be a
²³ mutagen, and it does -- it falls outside of the
²⁴ ordinary impurities and falls into the

Page 212

¹ lower-thresholds-can-be-appropriate category.
² MS. BOGDAN:
³ Q      And the same question as it pertains to
⁴ NDEA.  Do you consider NDEA to be a mutagen that
⁵ falls outside of the ordinary impurities and
⁶ falls into the lower thresholds category?
⁷ A      Yes, I do.
⁸ MS. BOGDAN:
⁹         We can put that exhibit down.
¹⁰ Q      That ICH impurities in drug guideline
¹¹ that we just looked at -- and the one we looked
¹² at was from 2006 -- was that the first guidelines
¹³ that were put out with regard to impurities in
¹⁴ drug products?
¹⁵ A      Well, it's not referring to impurities
¹⁶ in drug products.  That's Q3B.  It's referring to
¹⁷ impurities in drug substances.
¹⁸ Q      Oh, I'm sorry.  I misspoke.
¹⁹ A      Well, it's okay.  It's easy to
²⁰ interchange the two, so there --
²¹ Q      I don't -- I don't want to, though, so
²² let me -- let me ask the question again.
²³         The ICH guideline, impurities in new
²⁴ drug substances, the Q3A R2, was that the initial

Page 213

¹ guidelines for impurities in drug substances,
² that you're aware?
³ A      No.  It's a loaded question in this
⁴ sense.  It's -- it's my understanding the Q3A
⁵ before revision 2 --
⁶         And we saw the history that was
⁷ included in the -- in the guidance itself.
⁸         -- it -- it was, what, 1995, I believe
⁹ I saw, when it first came out.  That's the first
¹⁰ Q3 -- that's the first ICH guidance.  But there
¹¹ were individual guidelines from FDA and other
¹² regulatory agencies around the world prior to
¹³ that.
¹⁴         So it -- it's loaded in the sense that
¹⁵ do you mean ICH or are you saying globally?
¹⁶ Q      Well, let's -- we're -- we're in the
¹⁷ US, so let's talk about the FDA.  Did the FDA
¹⁸ have guidelines regarding impurities in drug
¹⁹ substances before Q3A R2?
²⁰ A      Yes.  Well, before -- and they
²¹ implement their guidance based on Q3A.  And
²² you're going to R2, which didn't come out till
²³ much later.  But if you go before 1995 and you go
²⁴ before ICH was in place, FDA had its own

1 guidances. After Q -- ICH came out, they -- they
2 bring out their guidances based on -- so it's
3 harmonized with ICH Q3A and Q3B. But prior to
4 that, they were -- FDA had guidances on
5 impurities that were their own, for the US only.
6 Q     So is it fair to say, at least starting
7 in the 1990s, that the pharmaceutical industry
8 recognized that impurities in drug substances
9 should be recognized?
10 MR. HARKINS:
11          Object to the form. Vague.
12 A     It's -- it's known that there were
13 guidance for -- for impurities and that there was
14 attention to impurities and the importance of
15 understanding that in -- from guidelines around
16 the world in various countries, including the
17 FDA.
18 MS. BOGDAN:
19          If we could pull up -- I believe it's
20 document 36 in the repository, which is guidance
21 for industry genotoxic and carcinogenic
22 impurities in drug substances and products.
23          (DEPOSITION EXHIBIT NUMBER 21
24          WAS MARKED FOR IDENTIFICATION.)

1 MS. BOGDAN:
2 Q     Dr. Baertschi, do you see this guidance
3 document?
4 A     I do see it.
5 Q     Is this -- this is a draft guidance, as
6 you can see from the page, the first page of the
7 document.
8 A     Is that a question?
9 Q     No. This is a draft guidance. My
10 question is: Was this guidance ever taken out of
11 draft form and issued as a guidance?
12 A     I -- I am not 100 percent sure on this,
13 but I don't think it ever was. I think they had
14 a draft guidance, and then I think they withdrew
15 that draft guidance once ICH M7 came out. But
16 I'm not a hundred percent sure on that.
17 Q     When did ICH M7 first come out?
18 A     I believe it was around 2006. But I
19 prefer, if I'm gonna be nailed down to it, let's
20 take a look at it, because it's right in the
21 guidance itself.
22 Q     Okay. Did you reference that guidance
23 in your report?
24 A     Yes.

1 Q     Okay.
2 A     Do you want me to look it up?
3 Q     Did you actually -- was it one of
4 your --
5          I see a --
6 A     Yeah. May 2015 revised -- yes. It
7 originally --
8          It's reference 4 in my expert report,
9 May 2015 I have written down for the first draft,
10 for the first nonrevised version.
11 MS. BOGDAN:
12          We can take this down, this document
13 down.
14          Put up, before we go to the 2015, the
15 document that is number 37 in the repository, the
16 2012 guidance for industry.
17          (DEPOSITION EXHIBIT NUMBER 22
18          WAS MARKED FOR IDENTIFICATION.)
19 MS. BOGDAN:
20 Q     Are you familiar with this guidance,
21 Dr. Baertschi?
22 A     I am aware of it. I would not call
23 myself familiar with it. I don't have the kind
24 of mastery. I've looked through it, but I -- I

1 don't have real good familiarity with it.
2 Q     And does this guidance pertain to the
3 field of analytical chemistry in the
4 pharmaceutical field?
5 MR. HARKINS:
6          Object to form. Vague.
7 A     Can you rephrase the question? Because
8 you had a couple of terms in there. You had
9 analytical, and -- and I'm kind of getting lost
10 in the connection.
11 MS. BOGDAN:
12 Q     You said you weren't -- or I think you
13 said you didn't have really good familiarity
14 with -- with this particular guidance document.
15 Does this guidance document pertain to the work
16 that you do as a pharmaceutical consultant?
17 A     It pertains to it, yes. But it is more
18 intended for a toxicologist because it's really
19 talking about how to set up -- design, set up,
20 and interpret toxicology tests and when -- and
21 what kinds of toxicology tests are needed to
22 qualify impurities and to test for genotoxicity.
23 Q     And that isn't anything that you do in
24 the course of your work as a consultant; correct?

Confidential Information Subject to Protective Order

Page 218

1  A       I would agree with that.  I -- I have
2  not to date consulted on this guidance or, you
3  know, with any kind of -- other than mostly,
4  like, you know, "let's look at this" and then
5  point them to a toxicologist to further the
6  study.  So, no, I don't consult on this.
7  Q       Directing your attention to page 19 of
8  this guidance, and, in particular, note 5.
9  A       I -- I see it, although it -- oh, now
10 it's on the screen.
11 Q       And the first sentence of that note
12 talks about structurally alerting molecular
13 entities are recognized as being causally related
14 to the carcinogenic or mutagenic potential of
15 chemicals.
16 A       Is there a question?
17 Q       Is one of the structurally alerting
18 molecular entities the nitrosamine functional
19 group that you described earlier in your
20 testimony?
21 MR. HARKINS:
22         Object to form.  Scope.
23 A       N-nitrosamine, yes.
24 MS. BOGDAN:

Page 219

1          We can take down this exhibit.
2          If we could please pull up the ICH M7
3  2015 guidance document.  It's number 38 in the
4  repository.
5          (DEPOSITION EXHIBIT NUMBER 23
6          WAS MARKED FOR IDENTIFICATION.)
7  A       Is -- is this Exhibit 23?  Can somebody
8  help me?  Or is it 24?
9  MS. BOGDAN:
10 Q       Yeah.  It's not the one, though, I
11 wanted to mark.
12         Actually, you could pull that --
13         No.  Let's go to -- let's try what's
14 been marked in the repository as number 39.
15 I don't know if that's loaded yet for
16 you, but do you see that guidance for industry?
17 A       I see it on my screen.  It hasn't
18 loaded yet.
19         I think it has loaded now.  Yes, I've
20 got it up now.
21 Q       Okay.  Are you familiar with this
22 guidance?
23 A       I am familiar with this guidance.
24 Q       Okay.  And when was this guidance first

Page 220

1  issued, the first version of it?
2  A       Can we go to the history?  I want to
3  say it's 20- --
4          Well, I'd rather just get on the record
5  correctly.  Does it have the history here listed?
6          It's before this date.
7  Q       I believe under the introduction
8  section it references that the guidance was
9  developed with the expert working group for ICH.
10 A       Yeah.  So it says it was endorsed by
11 the IC steering committee at step 4, which means
12 it's sort of official at that point in June of
13 2014.
14 Q       All right.  If we could go to page 5.
15         Actually, what is the purpose of this
16 guidance?
17 A       You know, let's take a look.  Well,
18 there's a scope.  You know, in general terms,
19 it's to provide some -- some assistance, some
20 granularity, some instruction as to how to
21 approach the topic of mutagenic impurities
22 when -- when previously it was essentially
23 undefined.
24 Q       And, so, the previous version of this

Page 221

1  had come out in 2014, and both NDMA and NDEA
2  would fall -- follow under the mutagenic
3  impurities that this document is giving guidance
4  regarding; correct?
5  A       I agree with that, yes.
6  Q       And if we go to the general principles
7  section, which is on page 5, does it tell us
8  right in the general principles section what the
9  focus of the guidance is?
10 A       Yes, it does.
11 Q       And what does it tell us the focus of
12 the guidance is?
13 A       It says that the focus is on DNA
14 reactive substances that have a potential to
15 directly cause DNA damage when present at low
16 levels, leading to mutations and, therefore,
17 potentially causing cancer.
18 Q       And NDMA and NDEA would be DNA reactive
19 substances; correct?
20 A       Correct.
21 Q       And, then, in that same paragraph, it
22 goes on to say "Therefore, to limit a possible
23 human cancer risk associated with the exposure to
24 potentially mutagenic impurities, the bacterial

Page 222

1 mutagenicity assay is used to assess the
2 mutagenic potential and the need for controls."
3        Do you agree with that statement?
4 MR. HARKINS:
5        Object to form.  Scope.
6 A      I agree that that statement is -- I'm
7 reading it, and it -- it's -- it says what it
8 says.
9 MS. BOGDAN:
10 Q      The next sentence has "structure-based
11 assessments are useful."
12        What is a structure-based assessment?
13 A      It's when you look at the molecular
14 structure of a compound and, based on the
15 moieties or the substructures within that
16 chemic- -- that molecular structure and how
17 they're arranged, can be correlated with,
18 associated with bacterial mutagenicity outcomes
19 from previous testing.
20        So it's a correlation or it's a
21 probability-based assessment based on similar
22 substructures in other compounds.
23 Q      And would that be -- type of
24 structure-based assessment be looking for a

Page 223

1 structure like N-nitroso functional groups?
2 A      Yeah.  N-nitroso functional groups are
3 one of the 31-plus alerting structures that would
4 be associated with a risk for mutagenicity as
5 part of that structure-based assessment.
6 Q      And is there a list of those 31
7 alerting structures in some type of a guidance?
8 A      There are a variety of publications
9 that deal with mutagenic or genotoxic alerting
10 structures.  The one that lists them as 31, I
11 believe I reference in my report, and I now
12 trying to access in my brain what -- where that
13 was.
14 MR. HARKINS:
15        Do you want to review your report?
16 THE WITNESS:
17        Yeah.
18 MR. HARKINS:
19        Paragraph 30 is where you discuss it.
20 That's what it looks like.
21 A      Paragraph 30 I'm looking at.  It's an
22 article by Benigni and Bossa, and they took some
23 pains to try to compile them into a -- a series
24 of rules that they built into software to allow

Page 224

1 you to use software to, just -- just looking at
2 the structure, say there is this alerting
3 substructure group in this compound.  So you can
4 input a chemical structure and have that software
5 do the work.
6        So they compiled a database to sort
7 of -- and that's where I came up with that number
8 of 31, as I recall.
9 MS. BOGDAN:
10 Q      And you relied on that Benigni and
11 Bossa study when writing your report?
12 A      I did in that I reference it.  It's
13 consistent with other assessments of alerting
14 structures, and I think pretty much every
15 alerting structure list I've seen would contain
16 the -- the cohort of concern and a number of
17 others.
18        The number of 31, it could be some --
19 it could be 19, it could be 26 -- it sort of
20 depends on how they subdivide certain
21 substructures.  But I -- I found that to be a
22 useful sort of comprehensive list of alerting
23 structures.  So I did rely on it in that sense.
24 I'm not solely relying on that.  It's an

Page 225

1 illustration of what I'm relying on.
2 Q      And of the references that you've read
3 and the ones that you cited in your report, the
4 N-nitroso functional group is one of the alerting
5 structures that's mentioned in those various
6 studies that you're speaking of?
7 A      Yes.
8 Q      Okay.  You mentioned cohort of concern.
9 I see that that concept is, again, from in the M7
10 R1 guidance, and it's in the next paragraph down.
11 And it's towards the bottom of that paragraph
12 where it starts "some structural groups were
13 identified to be of such high potency that
14 intakes even below the TTC would theoretically be
15 associated with a potential for a significant
16 carcinogenic risk."
17        And those structural groups that the
18 guidance is referring to, does that include
19 N-nitroso compounds?
20 MR. HARKINS:
21        Object to form.  Compound still.
22 A      The next sentence indicates that the
23 cohort of concern includes N-nitroso
24 substructure.

Confidential Information - Subject to Protective Order

Page 226

1  MS. BOGDAN:
2  Q      And N-nitroso substructures would
3  include NDMA and NDEA; correct?
4  A      Correct.
5  Q      So this guidance to industry is
6  alerting the industry of the potential concern
7  associated with N-nitroso compounds like NDMA and
8  NDEA; correct?
9  MR. HARKINS:
10       Object to form.  Scope.  Vague.
11  Speculation.  Compound.
12  A      Can you repeat the question?  Sorry.
13  MS. BOGDAN:
14  Q      Sure.
15       So this guidance to industry is
16  alerting the industry of the potential concerns
17  associated with N-nitroso compounds like NDMA and
18  NDEA; correct?
19  MR. HARKINS:
20       Same objection.
21  A      It's certainly alerting -- it's
22  certainly calling attention to the cohort of
23  concern structures, which include N-nitroso, of
24  which NDMA and NDEA are a subset.

Page 227

1  MS. BOGDAN:
2  Q      And this guidance, as we've already
3  gone through, first came out in 2014 with ICH;
4  correct?
5  A      I believe that's what we said earlier,
6  it was 2014, if my short-term memory serves
7  correct.
8  MS. BOGDAN:
9       Do we want to take a little break?  I
10  didn't know.
11  MR. HARKINS:
12       Sure.  Do you want five minutes,
13  Doctor?
14  THE WITNESS:
15       Yeah.  Let's take five minutes.
16  MS. BOGDAN:
17  Q      I just noticed that you were -- so I
18  wanted to offer.
19  A      Well, muscles are getting a little
20  tight here.
21  Q      Yeah.  So if you want to go off for
22  five minutes and take a break, we can come back,
23  since we're between documents.
24  VIDEOGRAPHER:

Page 228

1       Off record, 3:38 p.m.
2       (OFF THE RECORD.)
3  VIDEOGRAPHER:
4       On record, 3:52 p.m.
5  MS. BOGDAN:
6       If you could please pull up exhibit 41
7  in the document repository, and if you could give
8  me what exhibit we're on to mark it, please.
9  TRIAL TECH:
10       This will be 24.
11       (DEPOSITION EXHIBIT NUMBER 24
12       WAS MARKED FOR IDENTIFICATION.)
13  MS. BOGDAN:
14  Q      Dr. Baertschi, let me know when that
15  loads.
16  A      Okay.  It's there.  It's loading --
17  it's there.
18  Q      Do you recognize Chapter 12?
19  A      I want to be a smart aleck.  I hope so.
20  Yes, I recognize it.
21  Q      And are you the first author of that
22  chapter?
23  A      Yes, I am.
24  Q      Okay.  And what does that chapter

Page 229

1  appear in?
2  A      It's a book on -- by -- on
3  specifications of impurities, I think.  It has --
4  it's a book having to do with --
5       I don't remember the exact title of the
6  book, but it has to do with specifications.
7  Q      And your coauthor is a B. Olsen?
8  A      Yes.
9  Q      Okay.  How do you know --
10       What is Dr. -- is it a Dr. Olsen?
11  A      Yes, it is Dr. Olsen.
12  Q      Okay.  What is Dr. Olsen's first name?
13  A      Bernard.
14  Q      Bernard?
15       And have you worked with Dr. Olsen
16  before?
17  A      Yes.  We were colleagues at Eli
18  Lilly & Company.
19  Q      Does he work for your consulting
20  company?
21  A      He has done some contracts -- some
22  subcontracting work, but he's not a part of my...
23       So there have been a few projects where
24  I didn't have capacity or he was better suited

Page 230

1 and I subcontracted that out to him.
2 Q     Did you receive any compensation for
3 writing this chapter?
4 A     No, unfortunately.
5 Q     Who funded the writing of the book?
6 A     Who funded?  Is that what you asked?
7 Q     I did, yes.
8 A     The publisher, as far as I know.
9 Q     And who was the publisher?
10 A     I don't remember.  Elsevier, Springer.
11 I can't --
12 MR. HARKINS:
13        Don't guess if you don't know.
14 A     I don't remember.
15 MS. BOGDAN:
16 Q     I think it's on the bottom.  I think
17 you have it right.  Else- -- Elsevier?
18 A     Elsevier, yes.
19 Q     Had you written anything for them in
20 the past?
21 A     I'm not completely sure.  It's a
22 publishing company.  I know I review articles for
23 a --
24        A number of journals are published by

Page 231

1 Elsevier, and I'm a referee, scientific referee
2 for a number of journals that are Elsevier
3 published.  So -- but I don't know if I've
4 written anything in an Elsevier -- like another
5 book or another book chapter.  It's possible.
6 Q     Do you receive compensation when this
7 book is sold?
8 A     No.  I did get a free electronic copy
9 of the book chapter.  Oh, I actually received a
10 hard copy of the book as well.
11 Q     Oh, good.
12 A     Yeah.
13 Q     All right.  Other than receiving a hard
14 copy of the book, did you receive any
15 compensation for authoring this chapter?
16 A     No.
17 Q     If you could go to the introduction
18 section.
19 A     Yes.
20 Q     And in that introduction section, in
21 the first column, it gives a historical context.
22 A     Yes.  I see that.
23 Q     It goes all the way down to saying when
24 the M7 R1 guideline was finalized in 2014,

Page 232

1 followed by a revision in September of '17.  I
2 don't know if the tech could please put the whole
3 column up.
4        Did you write that section?
5 A     Bernie and I did.  Bernard, he goes by
6 Bernie.
7 Q     Okay.
8 A     Bernie Olsen and I co-wrote that
9 chapter.  Yes.
10 Q     Okay.  And, so, I'm assuming you agree
11 with the statements that are contained in this
12 historical context section that has been
13 highlighted for you, the first column?
14 A     Yes.  Unless I captured some -- unless
15 I captured some error accidentally, we tried to
16 be as accurate as possible and to document the
17 history.
18 Q     Okay.  And you mentioned in the middle
19 of this --
20        Let's just go through it briefly.  You
21 mention for historical context the ICH impurity
22 guidelines, the Q3A, which we have already
23 discussed today -- right? -- previously in your
24 testimony?

Page 233

1 A     Yes.  Correct.  I remember that.
2 Q     And the Q3A that you're citing there in
3 this textbook chapter that you wrote is referring
4 to, according to your references, the 2006
5 guidance.  And then --
6 A     No --
7        Oh, sorry.  There wasn't a question.
8 Q     Go ahead.  2006 guidance.
9 A     Okay.
10 Q     But --
11 A     Oh, sorry.  I did it again.
12 Q     But there was -- there was an earlier
13 version of the ICH guidance as well; correct?
14 A     Correct.
15 Q     That goes back into the '90s that we've
16 previously discussed.
17 A     Yes.
18 Q     And, then, when you're talking about
19 the ICH impurity guidelines, you actually take a
20 quote right out of those guidelines that read
21 "However, analytical procedures should be
22 developed for those potential impurities that are
23 expected to be unusually potent, producing toxic
24 or pharmacological effects at a level not more

Confidential Information Subject to Protective Order

Page 234

1 than the identification threshold."
2        Why was that language actually quoted
3 out of the ICH guideline in the book chapter that
4 you wrote?
5 A       Because we were trying to put ICH M7 in
6 historical perspective.
7 Q       And that particular quote from ICH
8 impurity guidelines relates directly to M7?
9 MR. HARKINS:
10        Object to form.
11 MS. BOGDAN:
12 Q       You were trying to show the connection
13 from one to the other?
14 A       In that -- in this book chapter, we are
15 trying to show the connection and at least
16 suggest the connection that was our understanding
17 and somewhat widespread in the industry that --
18 that that ICH M7 was anticipated by that phrase
19 in Q3A and Q3B.
20 Q       Okay.  And that Q3A was addressing
21 mutagenic impurities, and ICH M7 followed that
22 original guidance; correct?
23 A       I don't think I -- I don't think you
24 said that correctly.  Could you repeat the

Page 235

1 question?  I think there's an error in what you
2 said.
3 Q       Okay.  Well, I'm asking with regard to
4 your quoting of the ICH impurity guidelines, were
5 you trying to show a relationship between those
6 guidelines mentioning potential impurities that
7 are expected to be unusually potent and relating
8 them to the ICH M7 guidelines that came out
9 afterwards?
10 A       I think that's a fair representation of
11 what we were trying to do.  We were trying to
12 call attention to the fact that it -- that there
13 was potentially a connection and that this phrase
14 sort of served as a placeholder because it was
15 too big of a topic for them to tackle at the time
16 ICH Q3A and Q3B, both of those guidances, were
17 developed.
18 Q       Now, let's, if we can, move to the next
19 page of your book chapter.  And I want to direct
20 your attention to section 12.1.3 --
21 A       Yes.
22 Q       -- and the last sentence on that page
23 in that section which reads "drug development
24 scientists are well advised, however, to conduct

Page 236

1 a thorough toxicological evaluation of potential
2 and actual impurities to determine if they are
3 indeed a concern for mutagenicity."
4        What were you trying to convey with
5 that sentence?
6 A       I -- I'm disappointed that the wording
7 itself doesn't make that clear, but I'm trying
8 to, I think, suggest that it's a good idea for
9 scientists to do a thorough evaluation of both
10 potential and actual impurities to see if they
11 are a risk for mutagenicity.
12 Q       Now, on this page 324, which I see on
13 the right side of my screen, there is a table
14 12.1.
15 A       I see that.
16 Q       And it has different classes, impurity
17 classifications.
18 A       Yes.
19 Q       Are those impurity classifications the
20 same that are in ICH M7?
21 A       I believe so.
22 Q       Okay.  And where do NDMA and NDEA fall
23 as far as those classifications?
24 MR. HARKINS:

Page 237

1        Object to form.  Asked and answered
2 with the guidance already.
3        But you can answer again.
4 A       I -- I think there's some controversy
5 with whether or not they --
6        There's -- this has a class 1 and 2,
7 and I think there may be some revisions, and I'm
8 not completely sure because I'm not a
9 toxicologist.  But some question as to whether or
10 not they're 1 or 2, if there's a 1A and 1B.  I've
11 seen a text associated with that from
12 toxicologists talking about that.  But I -- I
13 don't recall myself, don't know how it's been
14 formally classified.  I have seen it written.  I
15 just don't recall it for sure.
16 MS. BOGDAN:
17 Q       So as you sit here today, you don't
18 know if NDMA or NDEA is a Class 1 known mutagenic
19 carcinogen?
20 MR. HARKINS:
21        Object to form.  Scope.  Asked and
22 answered.
23 A       Um, from a point of view of a chemist
24 dealing with control strategies and any process

Confidential Information Subject to Protective Order

Page 238

¹ associated with that, Class 1, 2, or 3, you're
² gonna deal with it essentially the same, so that
³ the process, the -- that you would undergo, the
⁴ risk assessment process is -- is the same.
⁵     Well, if it's a known mutagenic
⁶ carcinogen, you don't have to do it. You don't
⁷ have to establish -- it's not exactly the same.
⁸ But there's -- the implications for 1, 2, or 3
⁹ are the same.
¹⁰ Q     And under that table in section 12.2.1,
¹¹ where you have API and DP, the chapter reads
¹² "After actual and potential impurities have been
¹³ identified, a mutagenic risk assessment should be
¹⁴ conducted."
¹⁵     What did you mean by writing that
¹⁶ statement?
¹⁷ A     Once you have structural knowledge of
¹⁸ the chemical structure of an impurity, you should
¹⁹ conduct, as outlined in ICH M7, a mutagenic risk
²⁰ assessment.
²¹     And I would add that if you don't know
²² the structure, you -- you can't really do a
²³ mutagenic risk assessment.
²⁴ Q     To know the structure, you'd have to

Page 239

¹ identify it; correct?
² A     Yes.
³ MS. BOGDAN:
⁴     All right. If we could please take
⁵ down that exhibit and pull up the control
⁶ nitrosamine impurities in human drugs, which is
⁷ number 40 in the document repository.
⁸     (DEPOSITION EXHIBIT NUMBER 25
⁹     WAS MARKED FOR IDENTIFICATION.)
¹⁰ MS. BOGDAN:
¹¹ Q     Doctor, you're aware of this guidance
¹² that was issued by the FDA?
¹³ A     Yes, I am.
¹⁴ Q     Okay. And if I can direct your
¹⁵ attention to page 10. Do you see the acceptable
¹⁶ intake limit section on page 10?
¹⁷ A     I do.
¹⁸ Q     Okay. And table 1 that sets forth the
¹⁹ AI limits for NDMA, NDEA, and some other chemical
²⁰ compounds?
²¹ A     I see that.
²² Q     Okay. Are those the current acceptable
²³ intake limits for those compounds in
²⁴ pharmaceuticals?

Page 240

¹ MR. HARKINS:
²     Object to form.
³ MS. BOGDAN:
⁴ Q     To your knowledge?
⁵ A     I believe that they're current. I
⁶ believe that that's the current limits or
⁷ recommended limits.
⁸ MS. BOGDAN:
⁹     You can take that down, please.
¹⁰ THE COURT REPORTER:
¹¹     Did you want to make that Exhibit 25?
¹² MS. BOGDAN:
¹³     Yes, please. Any exhibit that I pull
¹⁴ up, you're not telling me what they're being
¹⁵ marked, but I was assuming they're being marked
¹⁶ in consecutive order.
¹⁷ MR. HARKINS:
¹⁸     I believe they are.
¹⁹ TRIAL TECH:
²⁰     Yeah.
²¹ MS. BOGDAN:
²²     If you could please pull up document 42
²³ in the document repository, which is the Teva
²⁴ webinar recap.

Page 241

¹     (DEPOSITION EXHIBIT NUMBER 26
²     WAS MARKED FOR IDENTIFICATION.)
³ MS. BOGDAN:
⁴ Q     Doctor, tell me if you -- if it's
⁵ loaded for you.
⁶ A     It's loaded.
⁷ Q     Can you see that?
⁸     Okay. So are you familiar with this
⁹ webinar, "Nitrosamines: A moving target" that
¹⁰ was --
¹¹ MR. HARKINS:
¹²     Let her complete her --
¹³ MS. BOGDAN:
¹⁴ Q     -- that was sponsored by Teva?
¹⁵ A     I -- I think I saw it advertised. I
¹⁶ did not log into it. I did not see it. I have
¹⁷ not looked at the webinar.
¹⁸ Q     Well, Teva -- Teva is providing this
¹⁹ recap, and it says in the middle of this page,
²⁰ "if you missed the live event, here are your
²¹ highlights."
²²     In this recap document, if we go to the
²³ next page, it talks about risk mapping for
²⁴ nitrosamines in the center.

Confidential Information Subject to Protective Order

Page 242

1  Are you familiar with the term "risk
2  mapping"?
3  A      No.  I -- that's a new term for me.
4  Q      Okay.  Well, they describe three steps
5  for nitrosamines risk mapping, and the first step
6  they describe is the theoretical risk assessment.
7  Are you familiar with the term
8  "theoretical risk assessment"?
9  A      Yes.
10 Q      What is a theoretical risk assessment?
11 MR. HARKINS:
12 Object to form.  Objection to
13 foundation.  Object to scope and any questions
14 about this document that he hasn't seen and this
15 concept under a heading that he's already stated
16 he's not familiar with.
17 You can answer.
18 A      Theoretical risk assessment, just
19 piecing together the meaning of all three of
20 those words with the commonly --
21 I have some familiarity with risk
22 assessment.  Theoretical means it's something
23 that you would do in silico or in cerebro.  By
24 that I mean in a computer, where you might use

Page 243

1  theory to theoretically assess, or you use
2  your -- in cerebro, use your brain, your chemical
3  knowledge, your -- your human knowledge to assess
4  theoretically what can you imagine might or will
5  happen or could happen.
6  MS. BOGDAN:
7  Q      And then --
8  A      Go ahead.
9  Q      Okay.  And then the next item they
10 mention is if risk is found, then you move to
11 confirmatory testing.
12 What is confirmatory testing, to your
13 knowledge?
14 MR. HARKINS:
15 Same objection to scope, foundation.
16 You can answer.
17 A      I don't know what they mean by
18 confirmatory testing here.  There's a potential
19 for a pretty broad range of -- of -- of meaning,
20 because it doesn't fit into the normal
21 terminology I've seen associated with mutagenic
22 risk assessment.
23 MS. BOGDAN:
24 Q      The next sentence, they say "if indeed

Page 244

1  nitrosamines have been found."  So --
2  And the sentence before that says if a
3  risk is found, then you move to confirmatory
4  testing.  Can confirmatory testing be testing to
5  see if a nitrosamine has been formed?
6  MR. HARKINS:
7  Object to form.  Scope.  Foundation.
8  Compound.  Vague.  Calls for speculation.
9  A      The way you worded it, say could it
10 involve?  I guess it could.  I really don't know
11 what -- because I don't -- I've not seen that
12 term used before in this context.
13 Q      Okay.  The statement reads "if indeed
14 nitrosamines have been found at higher amounts
15 than the limit, you will need to optimize or
16 change the process before submitting this change
17 to the relevant regulatory agencies."
18 Do you agree with that statement?
19 MR. HARKINS:
20 Object to form.  Scope.  Foundation.
21 Vague.
22 A      This is pretty far away from what I've
23 opined on in my expert report, and I don't --
24 I --

Page 245

1  It's -- it involves some assumptions I
2  would have to make, and I'm getting afield from
3  what I want to comment on.  So it's outside the
4  scope of my -- what's it called? -- expert report
5  and what I investigated, what I looked into, what
6  I prepared for.
7  MS. BOGDAN:
8  Q      So is it your testimony that you are
9  not offering any opinions with regard to risk
10 mapping?
11 MR. HARKINS:
12 Object to form.  Scope.  Calls for a
13 legal opinion.  And objection to the extent it's
14 using the risk mapping term, which he's already
15 stated he's not familiar with.
16 A      I -- I don't know -- without really
17 understanding the risk mapping process --
18 It seems like jargon that's been
19 invented by Teva or somebody that I'm not
20 familiar with, and in that it's a term that I'm
21 not -- generally understand, I would worry about
22 what all it entails, what it means before I would
23 make any kind -- before I would do any kind of
24 review and investigation to try to offer comment

Confidential Information Subject to Protective Order

Page 246

¹ on. But I'm certainly not offering comment on
² that in my expert report or now.
³ MS. BOGDAN:
⁴ Q      The next session on -- section --
⁵ excuse me -- on this recap is entitled "risk
⁶ assessment." And the first statement is
⁷ "theoretical risk assessment should address all
⁸ root causes as defined by relevant guidelines and
⁹ can be grouped into three potential sources for
¹⁰ risk with nitrosamines."
¹¹      Do you agree with that statement?
¹² MR. HARKINS:
¹³      Object to form. Object to foundation.
¹⁴ Object to the mischaracter-- or, sorry -- the
¹⁵ misstatement of risk assessment as opposed to
¹⁶ assessment, as it says in the document.
¹⁷      You can answer.
¹⁸ A      I understand that this is their --
¹⁹ their way of expressing a process that you can
²⁰ use to do risk assessment. I'm not sure I
²¹ understand everything they're saying. But --
²² So I -- you know, there's -- there's
²³ just some words there that are troubling when you
²⁴ say "should address all root causes as defined by

Page 247

¹ relevant guidelines." And I don't know
² guidelines that define all root causes, and I
³ don't know about the -- if -- the limitation of
⁴ the three potential sources that they list. So
⁵ I -- it's getting afield from -- from what I'm
⁶ here to represent, my expert report.
⁷ MS. BOGDAN:
⁸ Q      The next paragraph states "nitrosamine
⁹ formation is attributed to a reaction between the
¹⁰ secondary amine and nitrite ion."
¹¹      Do you agree with that statement?
¹² MR. HARKINS:
¹³      Object to form. Foundation. Scope.
¹⁴ A      I agree that nitrosamines can be formed
¹⁵ from reactions of secondary amines and nitrite
¹⁶ ions in the right chemical environment because
¹⁷ it's not nitrite itself that has the nitrosation.
¹⁸ It's a different form of the molecule. And
¹⁹ there's more than one nitrosating agent beside --
²⁰ in addition to nitrite, there are other
²¹ nitrosating reagents.
²² MS. BOGDAN:
²³ Q      If we go down to the next paragraph, it
²⁴ reads "It is important to recognize that a

Page 248

¹ secondary amine doesn't have to be present as it
² is. It could also be sourced from a
³ primary/tertiary/quaternary amine that is used in
⁴ the process."
⁵      Do you agree, as an organic chemist,
⁶ with that statement?
⁷ MR. HARKINS:
⁸      Object to form. Scope. Foundation.
⁹ Calls for speculation.
¹⁰ A      There are -- secondary amines are not
¹¹ the only type of amines that can react to form
¹² nitrosamines, so limiting your assessment to only
¹³ secondary amines isn't comprehensive.
¹⁴ MS. BOGDAN:
¹⁵ Q      The next sentence reads "secondary
¹⁶ amines can also process intermediates of the API
¹⁷ itself."
¹⁸      Do you agree with that sentence?
¹⁹ MR. HARKINS:
²⁰      Object to form. Scope. Foundation.
²¹ A      I don't think there's anything
²² controversial about that.
²³ MS. BOGDAN:
²⁴ Q      The next sentence, "Similarly, nitrite

Page 249

¹ can be used itself in the process or it could
² come from other sources, such as hydroxylamine or
³ nitric acid."
⁴      Do you agree with that statement?
⁵ MR. HARKINS:
⁶      Same objection.
⁷ A      I -- I don't disagree with it.
⁸ MS. BOGDAN:
⁹ Q      Do you agree that process water should
¹⁰ also be assessed for the presence of nitrite
¹¹ ions, as they can react with amines used in the
¹² process?
¹³ A      I've seen publications on process
¹⁴ water. I know the initial -- the -- the general
¹⁵ conservative approach is to say process water
¹⁶ should be evaluated. I believe that there's
¹⁷ literature out there now that would suggest that
¹⁸ there are no instances of that ever happening and
¹⁹ that any levels in process water that would
²⁰ contain -- any levels of nitrite that could be
²¹ contained in process water are so low as to not
²² be significant and that process water can
²³ generally be assumed to not have nitrite
²⁴ contamination.

Page 250

1    But the fact that they're suggesting
2 that it should be assessed, I don't disagree
3 with. I just don't think it's ever been
4 designated or found as a source of nitrosamine
5 formation in pharmaceuticals.
6 MS. BOGDAN:
7    Go to the next page of this exhibit.
8 It should --
9    I don't see it. Is there a page in
10 between? Be a second page? That's the third.
11 MR. HARKINS:
12    Looks like it doesn't continue cleanly
13 from one sentence to the other, at least on the
14 copy I'm seeing in the Dropbox.
15 MS. BOGDAN:
16    The top of the second page starts with
17 "remember a secondary amine." That's what I see
18 on my screen.
19 Q    Do you agree with the statement
20 "another aspect of potential risk could be
21 contaminated starting materials and solvents,
22 such as recycled solvents or materials that we
23 source from a third party"?
24 MR. HARKINS:

Page 251

1    Object to form. Scope. Foundation.
2 A    I believe it's been published rather
3 widely that recycled solvents played a role in at
4 least one case of ND -- of N-nitroso
5 contamination and -- and the concept that you
6 could have starting materials that contain -- and
7 solvents that con- -- that bring in with them
8 potential risk is noncontroversial to me.
9 MS. BOGDAN:
10 Q    And Teva goes on to say "to address
11 this risk at Teva API, we send dedicated
12 questionnaires to all our vendors and, based on
13 their answers, we conclude whether or not there
14 is a potential risk."
15    In this particular case, did you review
16 any questionnaires that were completed by either
17 Mylan or ZHP that were sent to them by Teva
18 asking about the potential risks associated with
19 starting materials or solvents used in their API
20 synthesis process?
21 MR. HARKINS:
22    Object to form. Scope. Foundation.
23 Compound.
24 A    I'm confused by the question because it

Page 252

1 was so long. Can you break it up into two or --
2 MS. BOGDAN:
3 Q    Did you -- did you review any
4 questionnaires that were sent by Teva to Mylan or
5 ZHP that asked them about the potential risks
6 associated with their starting materials or
7 solvents?
8 MR. HARKINS:
9    Object to form. Scope.
10 A    I do -- I do not recall reviewing any
11 questionnaires like that.
12 MS. BOGDAN:
13 Q    Do you know if any such questionnaires
14 exist --
15 MR. HARKINS:
16    Object to form.
17 MS. BOGDAN:
18 Q    -- as it pertains to valsartan?
19 MR. HARKINS:
20    Object to form. Scope. Foundation.
21 Calls for speculation.
22    You can answer if you know.
23 A    I do not know.
24 MS. BOGDAN:

Page 253

1    We can take this exhibit down.
2    Could we please pull up Teva 59150.
3 And if you don't have it --
4    I don't see it on this list I have.
5 Can we just go off the record so I can have it
6 sent?
7 MR. HARKINS:
8    Sure. We can take a five-minute break
9 for that.
10 VIDEOGRAPHER:
11    Off record. 4:25 p.m.
12    (OFF THE RECORD.)
13 VIDEOGRAPHER:
14    On the record, 4:29 p.m.
15 MS. BOGDAN:
16    If you could pull up document 59150.
17    (DEPOSITION EXHIBIT NUMBER 27
18    WAS MARKED FOR IDENTIFICATION.)
19 MS. BOGDAN:
20 Q    And, Dr. Baertschi, do you see this
21 Teva certificate of analysis for valsartan?
22 A    I do.
23 Q    On the certificate of analysis, does it
24 outline the different specifications --



Page 254

1  A        It outlines the --
2  Q        -- and tests?
3           Sorry.  There's a delay.
4  A        Yes.  It does outline specification and
5  the associated test for several attributes.
6  Q        Okay.  And the first tests are called
7  characters?
8  A        I see that.

Page 256

Page 255

Page 257

Page 258



Page 260

1 Volatile compounds can also be amenable to other
2 techniques, such as HPLC.  So it sort of depends
3 on what you need to separate, what you need to --
4       You know, it -- it's effective for this
5 particular application of residual solvents.
6 It's been used in many cases, in many industries
7 for that.
8 MS. BOGDAN:
9 Q       And gas chromatography can be used to
10 detect NDMA, can't it?
11 A       Yes.
12 Q       And gas chromatography can be used to
13 detect NDEA, can't it?
14 MR. HARKINS:
15       Objection --
16 A       I'm sorry.  I --
17       I'm sorry.
18 MR. HARKINS:
19       Objection.  Scope.  Objection.  Vague.
20 Calls for speculation.
21 A       I need to clarify.  Gas chromatography
22 doesn't detect anything itself.  It only
23 separates things.  The detector comes after the
24 separation of the gas chromatograph.  So the

Page 259

2 Q       And why is gas chromatography good for
3 residual solvent detection?
4 MR. HARKINS:
5       Object to form.  Misstates testimony.
6 A       Gas chromatography is -- is effective
7 for measuring residual solvents, as a lot of work
8 has been done over the years to develop
9 methodologies to resolve a wide variety of
10 solvents, and solvents are amenable to the
11 separation technique; that is, the
12 volatilization, maintaining themselves in the gas
13 phase while they transverse the column as you
14 heat the column to separate on the basis of
15 certain characteristics and elute off the column
16 of the flame ionization detector or some other
17 detector.
18 MS. BOGDAN:
19 Q       So gas chromatography is a good method
20 for detecting volatiles; correct?
21 MR. HARKINS:
22       Object to form.  Vague.
23 A       Gas chromatography is often used as an
24 effective method to test for volatile compounds.

Page 261

1 detector is completely different.  It's not part
2 of gas chromatography.  It's hyphenated GC/FID,
3 GC/MS, GC/specialized detector, nitrogen,
4 phosphorous.  There's many GC detectors.  I'm
5 just clarifying.
6       So if you want to restate your
7 question, if I didn't answer it, I'm happy to
8 address it.
9 MS. BOGDAN:
10 Q       Is gas chromatography an effective
11 technique for separating an NDMA impurity from
12 valsartan?
13 MR. HARKINS:
14       Object to form.  Vague.
15 A       You can get some specificity because
16 valsartan, I don't believe, volatilizes very
17 easily.  So it -- you're -- it -- as a matrix
18 background, it's kind of removed, and you'll
19 typically only see the residual solvents that are
20 present instead of the massive amount of
21 valsartan.  So, in that sense, it's -- it's --
22 it's one useful way of separating NDMA or NDEA
23 from valsartan.
24 MS. BOGDAN:

Page 262

1 Q      According to the certificate of
2 analysis --
3         Well, actually, this one, we don't know
4 what method they're using -- correct? -- for
5 residual solvent testing?
6 A      Right. I'm not seeing a -- a method.
7 Q      Does the NMT of 5,000 part per million
8 or the 1,493 part per million give you -- or is
9 it a clue as to what type of testing we'd be
10 using? Does that indicate anything to you?
11 A      No.
12 MR. HARKINS:
13        Object to form. Speculation.
14 THE WITNESS:
15        Sorry.
16        No. Not to me.
17 MS. BOGDAN:
18 Q      If we could go to -- move forward two
19 pages, please. And this is a certificate of
20 analysis from ZHP; correct?
21 A      Yes.
22        Sorry. I didn't realize there was a
23 question.



Page 263

Page 264

10 MS. BOGDAN:
11        Could we pull up document 168043,
12 please. And if we could go to the third page,
13 please.
14        (DEPOSITION EXHIBIT NUMBER 28
15         WAS MARKED FOR IDENTIFICATION.)
16 MS. BOGDAN:
17        I guess go to the second page.
18 A      Are we on 28?
19 MS. BOGDAN:
20 Q      There we go. And this is a certificate
21 of analysis of Mylan; correct? Can you see
22 Mylan?
23 A      I can see Mylan in the heading there,
24 yes, on the label.

Page 265

1 Q      And it says that it's a certificate of
2 analysis for valsartan USP?
3 A      Yes.
11 Q      And gas chromatography is a instrument
12 that can also be used to separate NDMA or NDEA
13 from valsartan; correct?
14 MR. HARKINS:
15        Object to form. Incomplete
16 hypothetical.
17 A      Yes. GC/MS has been demonstrated by
18 some of those FDA methods and others to be
19 effective for -- an effective separation
20 technique for those two compounds.
21 MS. BOGDAN:
22        Can we please pull up Prinston 74772,
23 which I think is document 43 in the repository?
24        (DEPOSITION EXHIBIT NUMBER 29

Confidential Information -- Subject to Protective Order

Page 266

1     WAS MARKED FOR IDENTIFICATION.)
2  MS. BOGDAN:
3  Q       While they're pulling up that document,
4  Dr. Baertschi, did you review the synthetic route
5  of synthesis process that was being used by the
6  API manufacturers to produce the valsartan API
7  that was being sold in the Teva finished-dose
8  product?
9  A       Yes.  The term "review it" is
10 potentially loaded because typical process
11 chemists, when they review a synthetic route,
12 they'll look at the actual process, procedure.
13       In this case, the procedure -- the
14 overall process is represented by these
15 illustrations on this figure.  And in terms of
16 looking at the figure and thinking about the
17 chemistry that they use to assemble the atoms
18 together and the molecule, yes, I did review it
19 in that sense.
20       But I didn't review it for, you know,
21 for the purposes of trying to understand all the
22 chemistry associated with the synthetic route.
23 Q       This synthetic route that is
24 illustrated on the exhibit that's marked --

Page 267

1  MS. BOGDAN:
2        What number is this, please?
3  TRIAL TECH:
4        29.
5  MS. BOGDAN:
6  Q       -- that's marked as Exhibit 29 has a
7  crude synthesis step.  Do you see that?
8  A       I do see that.
13 Q       And is sodium nitrite one of the
14 chemicals that is known to potentially produce
15 nitrosamines?
16 MR. HARKINS:
17       Object to form.  Vague.  Speculation.
18 A       Sodium nitrite is known that in the
19 acidic form, the HONO that nitrous acid form, it
20 can N-nitrosolate amines.
21 MS. BOGDAN:
22 Q       And when you say can N-nitrosolate
23 amines, does that mean form nitrosamines?
24 A       Yes.

Page 268

12 Q       And the triethylamine combined with
13 sodium nitrite, is that something, as an organic
14 chemist, alerts you to the possible formation of
15 NDEA?
16 MR. HARKINS:
17       Object to form.  Vague.
18 A       Well, it's kind of tricky in that
19 you're normally, when you're doing this kind of
20 analysis historically, you're looking at
21 triethylamine and you're thinking about the main
22 component and you're not thinking about trace
23 level impurities in that reagent.
24       Sodium nitrite is a common workup

Page 269

1  procedure for getting rid of excess azide
2  historically.  It's been used frequently for
3  that.  And now they've discovered that this --
4  this reaction happens and -- and that it's --
5  that surprised everybody, so the -- the -- the --
6        It's not obvious at first glance that
7  you have to think about that a low-level
8  potential impurity reacting with sodium nitrite.
9  In hindsight, now, it's more obvious because
10 there's been all this noise -- all this
11 information in -- in the regulatory system about
12 the formation of nitrosamines that hadn't been
13 observed before.
18 Q       And sodium nitrite, we know from
19 earlier on in the deposition, is known to
20 potentially cause nitrosamine formation; correct?
21 A       When -- when it's in the presence of an
22 amine, typically secondary amine, and -- and
23 there are acidic conditions.
24 Q       We also know from earlier in the

Confidential Information Subject to Protective Order

---

1 deposition that N-nitrosamines can form from
2 secondary amines, tertiary amines, or quad- --
3 quad amines; correct?
4 MR. HARKINS:
5         Object to form.  Asked and answered.
6 Compound.
7 A       Yes.
8 MS. BOGDAN:
9         If we could please pull up 74773.
10        (DEPOSITION EXHIBIT NUMBER 30
11         WAS MARKED FOR IDENTIFICATION.)
12 MS. BOGDAN:
13 Q       Dr. Baertschi, this is the ZHP
14 synthetic route for the zinc chloride process.
15         Have you looked at this?
16 A       I have seen this before, and I.
17 Q       ...this before?
18 A       I'm sorry.  I interrupted you.  Could
19 you repeat the question?
20 Q       Have you seen this before?
21 A       Yes, I've seen that synthetic route
22 before.  I don't know if I've seen this exact
23 page or this exact representation of it, but I
24 have seen the -- the synthetic route represented

---

1 before.
13 A       Dimethylformamide.
14 Q       And what is that?
15 A       A solvent used in organic chemistry a
16 lot to -- tends to be an inert solvent so that
17 you can conduct reactions between molecules where
18 the solvent doesn't generally get involved.
19 Q       Isn't it known that DMF can decompose
20 to result in dimethylamine?
21 MR. HARKINS:
22         Object to form.  Scope.
23 A       There is information in the literature
24 and elsewhere that DMF can have an impurity in it

---

1 and can decompose to dimethylamine under the
2 right --
3 MS. BOGDAN:
4 Q       And that --
5 A       Sorry.
6 Q       And dimethylamine with sodium nitrite
7 can form NDMA; correct?
8 A       Yes.  In the presence of acidic
9 conditions, that reaction could occur.

---

2 Q       And --
3 A       And I -- I would -- I would offer this.
4 I'm not a chemical process -- I'm not a process
5 chemist, and I haven't been asked to assess these
6 synthetic routes for, you know, for this kind of
7 chemistry.  I think it's kind of been published
8 widely, globally in the literature, and that's
9 where I first learned about this before I was
10 ever retained in this case.  So it's not
11 completely new to me.
12        But I'm not a chemical process -- a
13 process chemist, although I can understand the
14 representations because I do have an organic
15 chemistry background.  But I'm also not really
16 opining on that in my expert report.
17 Q       Do you know how NDMA was first
18 discovered in valsartan?
19 MR. HARKINS:
20         Object to form.  Scope.
21 A       My -- I do not know.  My -- the hearsay
22 or what I've read in some disclosures maybe
23 inside this case but probably outside this case,
24 that I recall Novartis was the first one to

---

Confidential Information Subject to Protective Order

---

Page 274

1 discover it or detect it. But I don't know that
2 to be the case.
3 MS. BOGDAN:
4 Q       Did counsel provide you with documents
5 from Novartis showing how NDMA was first
6 discovered in valsartan?
7 MR. HARKINS:
8       Object to form. Scope.
9       You can answer to the extent it doesn't
10 reflect discussions you had with counsel.
11 A       I don't remember if I've seen a
12 document or if there was a document that
13 disclosed that. It's -- I don't remember if I
14 have. It's possible, but I don't think so.
15 MS. BOGDAN:
16       If we could pull up ZHP4399.
17       (DEPOSITION EXHIBIT NUMBER 31
18       WAS MARKED FOR IDENTIFICATION.)
19 MS. BOGDAN:
20       And if you can't find that one, why
21 don't we pull up ZHP388639, which is number 48,
22 potentially.
23       Could I have a time check?
24 VIDEOGRAPHER:

---

Page 275

1       Six hours, five minutes.
2 MS. BOGDAN:
3 Q       Let me know, doctor, once you see that,
4 if it loads up on your screen.
5 A       I think it's Exhibit 31. I think it
6 just loaded up on my screen. I think it's the
7 right one.
8 MR. HARKINS:
9       That's right. It's Exhibit 31. That's
10 what I have.
11 A       Yeah. Okay. Looks like I've got it.
12 MS. BOGDAN:
13 Q       Do you have it on the screen?
14       Okay. Because we're using this
15 document, we're gonna have to go to a later page
16 in the document. Go to the -- just trying to
17 orient myself here, because the other document
18 wasn't in the box here. Just hold on a second
19 here.



---

Page 276



3 MR. HARKINS:
4       Object to form. Scope. Foundation.
5 Calls for speculation.
6       Doctor, please take any time that you
7 need to review the rest of this document,
8 including any of the other emails that are
9 attached, before you answer, to the extent you
10 think it's necessary.
11 A       Okay. Are these emails sequentially
12 from the most recent to the oldest, like top
13 down?
14       Oh, there's a lot of them.
15 MS. BOGDAN:
16 Q       Yes, I believe so.
17 A       Yeah. Are you asking a question
18 unrelated to this entire document? You're asking
19 a question what would --
20       Could you restate the question?
21 Q       Sure.
22       What should a scientist that is
23 operating a gas chromatography test on valsartan
24 do if there are unknown peaks?

---

Page 277

1 MR. HARKINS:
2       Object to form. Scope. Foundation.
3 Incomplete hypothetical. Calls for speculation.
4 A       Yeah, I don't --
5       Just having an unknown peak doesn't
6 call for necessarily anything unless that unknown
7 is above a level where it should be reported and
8 unless there is some kind of criteria associated
9 with it being a level of identification threshold
10 or qualification threshold. So it would -- it
11 would depend on more information as to what you
12 would do, what would be the -- a scientist would
13 be expected to do.
14       But there's not a default that anytime
15 you see an unknown in GC or HPLC that you should
16 automatically do something.
17 MS. BOGDAN:
18 Q       Okay. Fair enough. Why don't --
19       If we could go to the -- 1, 2, 3 -- I
20 think it's page 7 of this document. And we're
21 going to go to the email on the bottom.
22       When it says "valsartan ESO," do you
23 know what is meant by ESO?
24 MR. HARKINS:

---

Confidential Information Subject to Protective Order



Page 278

1    Object to form. Scope. Foundation.
2  A    I'm afraid I do not know what ESO means
3  in this context.
4  MS. BOGDAN:
5  Q    If we could go to the next page,

Page 279

6  MS. BOGDAN:
7    Okay. Could we please pull up document
8  190079.
9    (DEPOSITION EXHIBIT NUMBER 32
10    WAS MARKED FOR IDENTIFICATION.)
11  MS. BOGDAN:
12  Q    Dr. Baertschi, do you know what type of
13  testing Novartis was doing when it discovered
14  NDMA in the valsartan API?
15  MR. HARKINS:
16    Object to form. Scope. Foundation.
17  Facts not in evidence. Asked and answered.
18  A    I do not know.
19  MS. BOGDAN:
20  Q    Did you ask to review documents to
21  figure out what testing was done that resulted in
22  the discovery of NDMA in valsartan API?
23  MR. HARKINS:
24    Object to form. Scope. Foundation.

Page 280

1    You can answer to the extent it doesn't
2  reflect discussions with counsel.
3  A    I -- I do not recall asking that
4  question.
5  MS. BOGDAN:
6  Q    Would it be important to you when
7  rendering your opinion in this case to know what
8  type of testing was being done that resulted in
9  the discovery of NDMA in valsartan?
10  MR. HARKINS:
11    Object to form. Scope. Vague.
12  Foundation.
13  A    Um, you're asking would it be of
14  interest to me to know how it was discovered,
15  what testing was being done by Novartis. It --
16  it doesn't affect -- it -- I don't -- it doesn't
17  affect my opinion in that what I looked at is --
18  is the normal routine of how you -- a
19  finished-dose provider goes about and what
20  information they had this ability to.
21    So could -- could information like that
22  be interesting? I find it -- I would find it
23  interesting as a scientist.
24  MS. BOGDAN:

Page 281

1  Q    But you didn't ask for that information
2  when formulating your opinions in this case?
3  MR. HARKINS:
4    Same objection. Also asked and
5  answered.
6  A    I don't recall asking that question. I
7  really -- I really do not know -- I did not know
8  how Novartis --
9    The role Novartis played in that was
10  opaque to me.
11  MS. BOGDAN:
12  Q    If Novartis discovered the NDMA in
13  valsartan when doing residual solvent testing by
14  gas chromatography and found an unknown peak
15  which they then investigated and determined what
16  that unknown peak was, that would not be of
17  interest to you when forming an opinion with
18  regard to the type of testing that would reveal
19  NDMA in valsartan?
20  MR. HARKINS:
21    Object to form. Scope. Vague.
22  Foundation. Calls for speculation. Assumes
23  facts not evidence. Misstates the witness's
24  testimony.

Confidential Information - Subject to Protective Order

Page 282

1  A      If Novartis discovered NDMA in
2  somebody's lots by doing residual solvent testing
3  and then some follow-up investigation, I would
4  want to know more details, and it would be of
5  interest to me scientifically.  I don't know that
6  it would affect my opinions or the relevance to
7  my report.
8  MS. BOGDAN:
9  Q      Is it your opinion that finding NDMA or
10 NDEA in valsartan can't be determined by using
11 gas chromatography and mass spectrometry?
12 MR. HARKINS:
13        Object to form.  Scope.
14 A      Well, there's a problem with, one, when
15 you're doing residual solvents testing, it's
16 typically done with a flame ionization detector,
17 which doesn't give you any structural molecular
18 information, and the peak sizes are generally
19 related with FID, to the number of carbon atoms
20 in there, so it's hard to know what's significant
21 in terms of an amount.
22        If there was a small peak that Novartis
23 decided to go after for some particular reason, I
24 don't know enough information to know if that was

Page 283

1  compelling.  It's -- it's -- it's o- -- it's too
2  vague.  It's too opaque.  I would -- I would need
3  to actually have that laid out for me to -- to
4  understand it.
5        And -- and, further, when you go to
6  GC/MS analysis for NDMA, that's got the same
7  molecular weight as DMF, so you could get
8  confused and just see a peak and say, okay,
9  that's just DMF.  So it's -- or you could
10 overestimate because you're -- you're co-eluting,
11 you're -- you're -- you're not -- you're not
12 separating completely out, so you could get
13 convoluted results.
14        So I'm not sure if I've fully answered
15 your question or not.  I'm trying to.
16 MS. BOGDAN:
17 Q      Right.
18        With regard to Novartis, if this, what
19 I'm questioning you about it, is too vague or too
20 opaque, would it have been less vague if you had
21 been given the documents to show what testing
22 Novartis did that resulted in the discovery of
23 NDMA in valsartan?
24 MR. HARKINS:

Page 284

1        Object to form.  Scope.  Vague.
2  Assumes facts not in evidence.
3  A      Um, it -- it's possible.  I don't know
4  because there's so many unknowns.  It could be
5  that, say -- I don't know.  If I looked at it,
6  it's like I don't know how Novartis decided to
7  investigate an unknown peak or why.  But if I
8  did, it would -- I would evaluate it
9  scientifically and as best I could.
10 MS. BOGDAN:
11 Q      But as part of you arriving at your
12 opinion in this case, you were not provided with
13 the reports from Novartis showing the testing
14 that they did which resulted in the discovery of
15 NDMA; correct?
16 MR. HARKINS:
17        Object to form.  Scope.  Facts not in
18 evidence.  Asked and answered for the fourth time
19 now.
20 A      I'm not sure if I was provided any
21 documents.  There was literally more than a
22 hundred, maybe hundreds -- I'm not completely
23 sure -- documents that were made available to me,
24 and they gave me free reign through the

Page 285

1  documents.  But I can't -- I can't claim that
2  they were not provided to me.  I just don't know.
3  MS. BOGDAN:
4  Q      Well, let's look at the exhibit that
5  has been put up on the screen, which is a report





Page 286

Page 288

8 MR. HARKINS:

9      Object to form.  Scope.  Foundation.

10      Again, please review anything you need

11 to answer the question.

12 A      Could you restate that question?  Could

13 you restate the question?

14 MS. BOGDAN:

15 Q      Have you seen this -- this particular

16 report ever before?

17 A      I don't know.

18 Q      You don't know if you've ever seen

19 this --

20 A      I've seen some residual solvent results

21 in the reports.  I don't know if it was this one.

22 I don't think so.  But I've seen a -- a

23 chromatogram somewhere of residual solvents for

24 valsartan.

Page 287

Page 289

1      But there is no table on the --

2 question on the table, is there?

3 MR. HARKINS:

4      No.  Just wait.

5 MS. BOGDAN:

6 Q      No, other than I asked if you've ever

7 seen this.

8      If you could go to the instrument

9 methods that were being used --

10      Do you know who Solvias is?  Have you

11 ever worked with that company before?

12 A      It's Solvias.

13      I haven't personally worked with them,

14 but I'm familiar with them as a company and what

15 they -- some of the things they offer.

16 Q      And what does Solvias --

17      Or "Sol-val-is," did you say?

18      What do they do?

19 A      Solvias.

20      I think they're a contract research

21 organization where they do specific types of

22 laboratory analyses as a contract lab.  I think

23 they made some fame -- their -- I think they used

24 to be known for polymorph screening, but they --

Confidential Information Subject to Protective Order



Page 290

¹ they may do a lot more than that.

Page 292

¹ establish where they -- where they are in the
² chromatogram.
³ MS. BOGDAN:

Page 291

¹¹       Why is a sample compared to a reference
¹² solution when doing a chromatogram?
¹³ MR. HARKINS:
¹⁴       Object to form.  Scope.  Foundation.
¹⁵ Calls for speculation.
¹⁶       You can answer.
¹⁷ A     So there -- typically, when you have
¹⁸ a -- a peak you want to -- a compound that you
¹⁹ know and you want to establish where it elutes or
²⁰ where it -- the retention time for it, you -- and
²¹ for the various components, you'll have a -- a
²² sample made up with the various impurities that
²³ you're trying to establish so that you can -- at
²⁴ levels that you can detect and see.  So you

Page 293

Confidential Information Subject to Protective Order



Page 294

MS. BOGDAN:

14  MS. BOGDAN:
15  Q        Now, in your work as an organic
16  chemist, you've done gas chromatography before;
17  correct?
18  MR. HARKINS:
19        Object to form.  Asked and answered.
20  MS. BOGDAN:
21  Q        With mass spectrometry?  Are you
22  familiar with chromatograms like the one you have
23  in front of you?
24  MR. HARKINS:

Page 295

1        Same objection, and also compound.
2  A        I have conducted GC/MS analyses before.
3  I have seen GC -- GC/MS and GC/FID chromatograms
4  before.
5  MS. BOGDAN:
6  Q        And are you familiar with doing a peak
7  analysis looking at retention times?
8  A        When you say "doing a peak analysis,"
9  what do you mean, "doing a peak analysis"?
10  Q        Well, you -- when you're doing a
11  chromatogram -- right? -- then the analysis of
12  that chromatogram involves looking at the peaks;
13  correct?
14  MR. HARKINS:
15        Object to form.  Vague.
16  A        A part of the analysis would be looking
17  at the peaks, the shape, the size.  But that
18  doesn't tell you a whole lot.  But, yes.
19  MS. BOGDAN:

Page 296

Page 297

13  MS. BOGDAN:
14        Thank you.  You can take that down.
15  Q        Now, in your report, you reference the
16  USP; correct?
17  A        Yes.
18  MS. BOGDAN:
19        Could we please pull up exhibit 58?
20        (DEPOSITION EXHIBIT NUMBER 33
21        WAS MARKED FOR IDENTIFICATION.)
22  MS. BOGDAN:
23  Q        Are you familiar with the USP?
24  A        I am familiar --

Confidential Information Subject to Protective Order

Page 298

1  MR. HARKINS:
2      Object --
3  THE WITNESS:
4      Sorry.
5  MR. HARKINS:
6      Object to form.  Vague.
7  A      Familiar -- am I familiar?  I am aware
8  of the USP.  I have given talks there.  I've
9  given a workshop there.  I've been on a couple of
10 USP expert committees.
11 MS. BOGDAN:
12 Q      So the USP, on their website, with
13 regard to nitrosamine impurities, writes
14 "companies are responsible for understanding
15 their manufacturing processes, which includes
16 identifying and preventing the presence of
17 unacceptable impurities."
18     Do you agree with that statement made
19 by USP?
20 MR. HARKINS:
21     Object to form.  Foundation.  Vague.
22     You can answer.
23 A      I can't --
24     Company -- what comp- --

Page 299

1      To the extent if you were to define
2  companies, there's something implied there that's
3  not specifically stated, and I -- I -- I don't
4  want to speculate on what they're implying.  But
5  company A and company B and company Z are not
6  equally responsible.  So Google is not
7  responsible for something that company A in some
8  other country did in a different field.  So it
9  depends on what kind of company you're talking
10 about the relationship.  So in that -- to that
11 extent, I think there's some vagarity there.  But
12 certainly it's an important thing to understand
13 manufacturing processes, which includes
14 identifying and preventing presence of --
15 preventing or minimizing --
16     I don't like "preventing" because
17 they're not always preventable.
18     -- presence of --
19     "Unacceptable," that's another vague
20 term.
21     -- impurities.  So they're kind of
22 using loaded jargon there.
23 Q      Well, if we say companies that
24 manufacture drug products, do you agree with the

Page 300

1  statement that companies that manufacture drug
2  products are responsible for understanding their
3  manufacturing processes, which include
4  identifying and preventing the presence of
5  unacceptable impurities?
6  MR. HARKINS:
7      Object to form.  Outside the scope of
8  his expert report.  Foundation.
9      You can answer.
10 A      Yeah.  It seems to be getting into some
11 regulatory and quality aspects for which I've not
12 formed an -- I've not investigated or been asked
13 to opine on, and I think there are --
14     Unfortunately, that statement can be
15 expanded to mean something I wouldn't want it to
16 mean, so I'm uncomfortable with agreeing with it.
17 MS. BOGDAN:
18 Q      The next sentence that the USP has is
19 "this involves developing new predictive
20 approaches along with using suitable methods to
21 detect and control these impurities, as well as
22 others that may arise when making changes to the
23 manufacturing process."
24     Do you agree with that statement made

Page 301

1  by the USP?
2  MR. HARKINS:
3      Object to form.  Scope.  Foundation.
4  Vague.
5  A      That sentence seems to be aspirational
6  in its nature and encouraging the industry to
7  innovate to -- to do things to ensure safety and
8  to ensure purity.  It's -- it's not a legal
9  statement, and it's more of a -- a statement to
10 have encouraged to, to -- to encourage companies
11 to innovate and to develop and to consider.
12 MS. BOGDAN:
13 Q      Well, you relied on the USP
14 monograph -- correct? -- when providing your
15 opinion in this case?
16 A      Yes.  USP monographs are carefully
17 reviewed and -- peer-reviewed.  This is a
18 statement on their website that doesn't to me --
19     I'm not a lawyer, but it doesn't have
20 sort of --
21     It's just general jargon that you can
22 interpret in multiple -- multiple ways.  For
23 example, it involves developing new predictive
24 approaches.  That's kind of all aspirational and

Confidential Information Subject to Protective Order

Page 302

1 vague and difficult to say what that means.
2 So do I agree with new predictive
3 approaches can help manufacturers control
4 impurities?  Absolutely.
5 Q    Do you agree that manufacturers of
6 drugs should have suitable methods to detect and
7 control NDMA and NDEA in their drug products?
8 MR. HARKINS:
9 Object to form.  Outside the scope of
10 his expert report.  Foundation.  Vague.
11 A    What you're suggesting is that all
12 manufacturers of all drugs should have an
13 analytical method to test for NDMA and NDEA,
14 whether or not it's been established it's even
15 vaguely relevant.  And if you're gonna do that
16 for NDEA and NDMA, you're gonna need to do it for
17 all the other cohort-of-concern compounds and all
18 the other compounds in -- in the alerting
19 structures, those 31 groups, because you -- you
20 would be like fishing for -- you'd have to have
21 methods for everything.  So you can't just have
22 methods for --
23 I've established this well in my
24 report, that to have the expectation that no

Page 303

1 mutagenic impurity can escape detection in any
2 synthetic route is -- is not realistic for any
3 manufacturer that's ever manufactured drugs on
4 the earth or now.
5 So I do not agree that all
6 manufacturers should have a method for NDMA and
7 NDEA for all of their drug products.
8 MS. BOGDAN:
9 Q    Sodium nitrite is being used in the
10 chemical synthesis process to create the drug.
11 Should a manufacturer have developed a method to
12 detect whether NDMA or NDEA has been formed in
13 that chemical synthesis process?
14 MR. HARKINS:
15 Object to form.  Scope.  Incomplete
16 hypothetical.  Calls for speculation.  Vague.
17 A    That -- that is kind of a loaded
18 question that has all the assumptions built into
19 it.  It's -- it's easy --
20 And nit- -- and sodium nitrite doesn't
21 just have the potential for creating NDMA and
22 NDEA.  It has the potential for creating a vast
23 assortment of N-nitroso compounds depending on
24 any amine that might be present at any level in

Page 304

1 the synthetic route.
2 So to say that a specific NDMA after --
3 post-2018 retrospectively, in hindsight, looking
4 back, it's kind of easy to point at that being
5 something that -- that should be done.  But to
6 predictively anticipate that would mean that the
7 rest of the world -- the world wouldn't have --
8 it would have been expected.
9 And it's clear that the entire world,
10 all the regulatory agencies, every company,
11 this -- this occurrence was a surprise to them.
12 And now it seems like we're trying to frame that
13 as that it -- it was, in the case of Teva,
14 everybody else --
15 They're the -- they're the ones that
16 should have figured it out and never let it
17 happen.  Is it a surprise?  How could it be
18 unexpected if it's not a surprise?
19 So, in hindsight, we've learned
20 something as an industry.  But if we go back to
21 2018 and before, it was -- it was not sur- -- it
22 was unexpected.  It was a surprise.
23 MS. BOGDAN:
24 Q    If a company knew that NDMA or NDEA

Page 305

1 could form in valsartan, then, under those
2 circumstances, would you agree that they should
3 have had a method to detect NDMA and NDEA?
4 MR. HARKINS:
5 Object to form.  Outside the scope of
6 his expert report in the class certification
7 phase of the case.  Vague.  Incomplete
8 hypothetical.  Calls for speculation.
9 A    Yeah.  It seems to be getting far
10 afield.  I'm, like, being pulled into some kind
11 of a synthetic expert that can do a comprehensive
12 process risk assessment and make a pronunciation
13 when I haven't been asked to look into that, and
14 I don't offer that as a consulting service
15 myself.
16 And I think when you have some
17 suspicion that a nitrosamine might be formed, it
18 should be considered as part of your due
19 diligence risk assessment for the formation of
20 nitrosamines, and that process should lead you to
21 decide whether or not a method is needed.  And it
22 may very well be that at times it could be needed
23 or will be needed, but not in -- not in every
24 case.  Not as a blanket statement.

Confidential Information Subject to Protective Order

Page 306

1  MS. BOGDAN:
2       Will you please pull up document 58?
3  Or -- excuse me -- 57, the valsartan USP
4  monograph.
5       (DEPOSITION EXHIBIT NUMBER 34
6       WAS MARKED FOR IDENTIFICATION.)
7  MR. HARKINS:
8       Do you have it in your exhibit box?
9  THE WITNESS:
10      No.  Is it 33, 34?
11 MR. HARKINS:
12      I think it will be 34.
13 THE WITNESS:
14      Yes.  It just came up, and it's now up.
15 MS. BOGDAN:
16 Q      Are you familiar with the USP monograph
17 for valsartan?
18 A      Yes.  I have looked at this -- I have
19 looked at this and considered it.
20 Q      And this is the current USP monograph
21 for valsartan; correct?
22 A      It says, on the top, "official status,"
23 currently official as of January 28th.  So I
24 would presume -- they don't change those very

Page 307

1  often, so I presume that's official as of
2  now.
3  Q      And with your review of the document,
4  it's the monograph that you're familiar with?  It
5  looks familiar to you?
6  A      It looks familiar.  I don't know
7  what --
8       What I viewed was the current --
9       Let's see.  When was this updated?
10 Official date as of May 2020.  So this has been
11 revised since --
12      This is -- this is official as of May
13 2020, which implies that there was a different
14 monograph in place as of 2018.
15 Q      But this -- even though it is now
16 common knowledge in the industry that NDMA and
17 NDEA were found in valsartan, the monograph still
18 does not address those mutagenic impurities, does
19 it?
20 A      I don't see any reference to
21 nitrosamines, NDMA -- any nitrosamine referenced
22 as I skim through it.
23 Q      And this was published after the
24 recalls of valsartan, when it was known that NDMA

Page 308

1  and NDEA were found in the drugs; correct?
2  A      Yes.  It was published May 1st, 2020.
3  So that's after.
4  Q      And the FDA has said that valsartan
5  cannot be sold if it has more than 96 nanograms
6  of NDMA in it; correct?
7  A      I believe that's the implication of
8  their limit.  I don't actually know the legal
9  aspect of what they can or can't sell or, if they
10 could sell it, they'd be at risk.  I'm not
11 exactly sure of the legal implication.  But that
12 appears to me to be what is -- what they want by
13 having that limit.
14 Q      And this monograph does not -- by
15 complying with this monograph, it doesn't relieve
16 a manufacturer of having to also comply with the
17 acceptable intake limit set by the FDA for NDMA
18 or NDEA, does it?
19 MR. HARKINS:
20      Object to form.  Scope.
21 A      This -- this -- this monograph would
22 not supersede or cut out the responsibility of --
23 you could not ignore the NDMA, NDEA requirements
24 because they're not listed in this updated

Page 309

1  monograph.
2  MS. BOGDAN:
3       Can I have a time check, please?
4  VIDEOGRAPHER:
5       Six hours, 50 minutes.
6  MS. BOGDAN:
7       Can we just take a short break, five
8  minutes?
9  MR. HARKINS:
10      Sure.  How much more do you think you
11 have?
12 MS. BOGDAN:
13      Not much.  I just want to review my
14 notes.
15 MR. HARKINS:
16      Sure.
17 VIDEOGRAPHER:
18      Off record, 5:46 p.m.
19      (OFF THE RECORD.)
20 VIDEOGRAPHER:
21      On record, 6 p.m.
22      (DEPOSITION EXHIBIT NUMBER 35
23      WAS MARKED FOR IDENTIFICATION.)
24 MS. BOGDAN:

Confidential Information - Subject to Protective Order



Page 310

1 Q      Dr. Baertschi, I want to show you what
2 I believe is being marked as Exhibit 35 for
3 identification.
4 A      It's not shown up in the Dropbox yet,
5 but...
6 Q      Well, let me ask you this question in
7 the meantime, while the document is being loaded.
8       Did you rely, when formulating your
9 opinions in this case, on all the materials
10 listed in your amended materials considered list?
11 A      It -- it depends on your definition of
12 "rely," because all of the materials listed, I --
13 I tried to go through them all, and they were
14 certainly accessible to me.  There were a number
15 of documents where I'm looking through and I'm
16 saying, eh, there's nothing here that really
17 informs me to my opinion.  So I can't say that
18 all of them informed me.  So in that sense of
19 relying, that's how I would classify it.
20 Q      Meaning some of them you did not rely
21 on.
22 MR. HARKINS:
23       Object to form to the extent it calls
24 for a legal conclusion.

Page 311

1       You can --
2 A      I -- I sort of want to stand by the way
3 I framed it, is that not all the documents were
4 informative, and, so, I -- so I didn't --
5       The ones that weren't informative, if
6 you call that relying?  I would call it it didn't
7 affect my opinion or my opining.
8       I don't know what you mean by "rely,"
9 so --
10       So I'm not trying to be evasive.  I'm
11 trying to protect myself from saying something
12 incorrect.  I tried to be as comprehensive as I
13 could with the documents provided me, which were
14 extensive, and the materials that we've cited,
15 which are comprehensive.
16 MS. BOGDAN:
17 Q      Turning your attention to what's been
18 marked as Exhibit 35 for identification, which is

Page 312

Page 313

Confidential Information Subject to Protective Order



Page 314

⁹ MS. BOGDAN:
¹⁰ Q      Were you shown this document as part of
¹¹ your research and investigation into this case?
¹² A      Yes.
¹³ Q      And you were shown this?
¹⁴ A      Yes.
¹⁵ MR. HARKINS:
¹⁶      Asked and answered.
¹⁷ MS. BOGDAN:
¹⁸ Q      And are you telling me from your
¹⁹ responses now that you're unaware that sodium
²⁰ nitrite was used in ZHP's valsartan API
²¹ manufacturing process?
²² MR. HARKINS:
²³      Object to form.  Scope.  Misstates the
²⁴ witness's testimony.  Argumentative.

Page 316

⁷ MS. BOGDAN:
⁸ Q      Now, this particular document I don't
⁹ see on your materials considered list.  When did
¹⁰ you review this document?  Before or after the
¹¹ writing of your report?
¹² A      After.
¹³      I am concerned about the blacked-out
¹⁴ part.
¹⁵ MR. HARKINS:
¹⁶      Wait for a question.
¹⁷ MS. BOGDAN:
¹⁸ Q      ...asked for further information
¹⁹ regarding the black-out parts or the different
²⁰ questions that you have indicated in your
²¹ responses today after you saw this document?  Did
²² you request answers to those questions that you
²³ had?
²⁴ MR. HARKINS:

Page 315

¹ A      No, I'm not saying what you said.
² Because --

Page 317

¹      Object to form.  Scope.  Foundation.
² You can answer to the extent it doesn't reflect
³ conversations with counsel.
⁴ A      I didn't catch the full question.  I --
⁵ I missed it.
⁶ MS. BOGDAN:
⁷ Q      You indicated that you have some
⁸ questions in your mind based upon your review of
⁹ this document.
¹⁰ A      I -- I still don't understand it.  Was
¹¹ there a question?  Did I miss the first word?  I
¹² heard "indicated that" as the first -- as the
¹³ start of your sentence.  Was there something
¹⁴ before "indicated that"?
¹⁵ Q      Yeah.  You indicated that you had some
¹⁶ questions in your mind based on your review of
¹⁷ this document.
¹⁸ A      I'm reviewing it right now.
¹⁹ Q      Okay.  Well, you told me that you've
²⁰ reviewed it before I showed it to you.
²¹ A      Yes.
²² Q      When you first reviewed it, did you
²³ have these questions in your mind regarding the
²⁴ document?

Confidential Information - Subject to Protective Order

Page 318

1  A       Oh, yes.
2  Q       Did you seek to get answers to your
3  questions?
4  A       How do you seek --
5  MR. HARKINS:
6        Object to form.  Vague.
7        You can answer.
8  A       No.  I don't have any way to get
9  answers to my questions.
10 MS. BOGDAN:
11 Q       Did you ask for any further documents
12 that would be surrounding this document to answer
██  █████████████████████████████████████
██  █████████████████████████████████████████
    ██████████████████████████████████████
16 MR. HARKINS:
17       Object to form.  Scope.  Foundation.
18       You can answer to the extent it doesn't
19 reflect conversations with counsel.
20 A       I -- I have not asked for any documents
21 associated with this.
22 MS. BOGDAN:
23 Q       You are aware, as an expert in this
24 case, that Novartis discovered NDMA in valsartan

Page 319

1  API; correct?
2  MR. HARKINS:
3        Object to form.  Asked and answered.
4        Can I get a time check?
5  VIDEOGRAPHER:
6        I have seven hours and one minute.
7  MR. HARKINS:
8        You can answer the question, Doctor.
9  A       Repeat the question, please.  I'm
10 sorry.
11 MS. BOGDAN:
12 Q       Sure.
13       ...as an expert in this case, that
14 Novartis discovered NDMA in valsartan API;
15 correct?
16 MR. HARKINS:
17       Same objection.  Asked and answered.
18 A       That is my understanding, that Novartis
19 discovered NDMA in valsartan.  But I don't know
20 that to be a fact, but that's my understanding.
21 MS. BOGDAN:
22 Q       And it's your opinion --
23 MR. HARKINS:
24       Rosemarie, we don't have a question

Page 320

1  pending.  We're over the 7-hour time limit.  We
2  are way outside the scope, and we're doing things
3  that he's asked and answered multiple times
4  today.
5        We'll be back in about ten minutes,
6  because I will have a redirect.
7        Doctor, you can put your camera on
8  mute.
9  VIDEOGRAPHER:
10       Off record, 6:12 p.m.
11       (OFF THE RECORD.)
12 VIDEOGRAPHER:
13       On record, 6:42 p.m.
14          EXAMINATION
15 BY MR. HARKINS:
16 Q       All right.  Dr. Baertschi, I am going
17 to ask you some questions now.  If you'd go ahead
18 and --
19       You have your expert report with you;
20 right?
21 A       Yeah.
22 Q       Okay.  I just want to make sure you
23 have that in front of you.
24       First of all, though, to touch on

Page 321

1  something that you were just asked by plaintiffs'
2  counsel, do you remember being asked earlier
3  today about some specific language in the 1978
4  IARC monograph?
5  A       Yes.
6  Q       Do you remember being asked about some
7  specific statements in that document on the
8  potential carcinogenicity and toxicity of NDMA
9  and NDEA?
10 A       Yes.
11 Q       And I just want to clarify.  For
12 purposes of your report that you've provided in
13 this case, were you asked to provide any opinions
14 on the carcinogenicity or toxicity of NDMA or
15 NDEA?
16 A       No.
17 Q       Do you have any independent opinions on
18 whether NDMA or NDEA are a probable human
19 carcinogen or not?
20 A       No.  I'm not...
21 Q       You're not here to opine --
22 A       I'm not here to opine on that.
23 Q       Would you defer to a toxicologist on
24 any of those questions?

Confidential Information Subject to Protective Order

Page 322

1  A      Yes.
2  Q      You were also asked some questions
3  about the daily acceptable intake limits that are
4  currently in place by the FDA for NDMA and NDEA.
5  Do you recall that?
6  A      Yes.
7  Q      Are you offering any opinions today or
8  in your report about whether those levels are
9  appropriate?
10  A      No.
11  Q      Do you have any opinions or are you
12  intending to offer any opinions about --
13  whatsoever on those levels or how they were
14  calculated?
15  A      No.
16  Q      There was a discussion earlier on about
17  a recent case where you served as an expert
18  witness and some of your testimony was limited.
19  Do you recall that?
20  A      I do recall that.
21  Q      That's the case where just last week
22  you testified as an expert witness; right?
23  A      Yes, just last week.
24  Q      What's your understanding of the basis

Page 323

1  for the limitation of your testimony in that
2  case?
3  MS. BOGDAN:
4        Objection.  Calls for a legal
5  conclusion.
6  MR. HARKINS:
7  Q      You can answer.
8  A      There was a -- a legal relevance
9  dispute between the two sides and that relevance
10  of some of the content in one of my expert
11  reports.  And the judge was asked to rule on it
12  by the other counsel, and she ruled in favor of
13  the other counsel, which then she said I'm
14  forbidden or restricted from testifying as to the
15  content around that particular issue as to the
16  legal -- legal relevance of the -- of the data at
17  issue.
18  MR. HARKINS:
19  Q      And, just to clarify, you don't have a
20  legal opinion on that ruling or that decision;
21  right?
22  A      No.
23  Q      That's just your lay understanding of
24  why your opinion was limited?

Page 324

1  A      Yeah.  That it was a legal issue as to
2  whether or not it should be admitted and
3  relevant.
4  Q      Did the limitation, to your
5  understanding, have anything to do with the
6  scientific analysis that you performed?
7  A      It did not have anything to do with
8  scientific relevance.
9  Q      So here --
10        And, actually, we're gonna finally turn
11  to the opinions that you provided in the expert
12  report that you prepared, and specifically
13  looking at the corrected expert report that I
14  believe you have a hard copy of in front of you
15  and can refer to a specific exhibit in the
16  folder, but I just want to confirm which that is.
17  One second.  I just want to make sure it's --
18        So this will be Exhibit 4, previously
19  introduced in the electronic Dropbox.
20        Do you have a hard copy of this report
21  in front of you, Dr. Baertschi?
22  A      I do.
23  Q      Turning to the conclusions section,
24  subheading 6, and starting with paragraph 36,

Page 325

1  just for the benefit so that we actually can talk
2  about this today, can you please summarize for
3  maybe a potential jury the opinions and
4  conclusions that you provided in your report?
5  A      Yes.
6        I had opinions that can be lumped into
7  three main areas, the first one being that it's
8  inherently difficult to analyze low levels such
9  as ND- -- such as the NDMA and NDEA found in
10  valsartan medication- -- medications and that the
11  identification of those structures and the
12  quantification, when you combine those two, of
13  these impurities requires specialized analytical
14  testing methods that are well outside the scope
15  of standard impurities testing and screening for
16  impurities generally and for mutagenic
17  carcinogenic impurities specifically.
18        And those levels, more specifically,
19  are thousands of times smaller than would be seen
20  in valsartan time -- that would be seen in
21  valsartan products here, and they -- thousands of
22  time or hundreds of times lower than would be
23  identified by ordinary or detected by ordinary
24  methods for impurities.

Confidential Information - Subject to Protective Order

Page 326

1    And I -- I describe in that how many
2 times less, how much more sensitive screening you
3 would need, and -- and I say that the trace
4 levels of NDMA and NDEA impurities as defined by
5 the limits recommended by FDA would be 333 times
6 and 1220 times too low to be detected by these
7 methods for NDMA and NDEA, respectively.  So --
8 Q        Would that be the first sort of main
9 focus of your report?
10 A      Yeah.  So the first main focus can be
11 summarized it's inherently difficult to analyze
12 for low levels of impurities such as these levels
13 that we're talking about.  And then I detail -- I
14 detail about that more.
15      The second main area is that drug
16 manufacturers do not and cannot test for every
17 conceivable impurity or every conceivable
18 alerting structure that might be out there.
19 There is a wide variety and a huge number of
20 classes of potential mutagenic, carcinogenic
21 impurities that would make specialized testing
22 for impurities at the trace levels to detect all
23 of those or to be able to detect all of tho- --
24 all of those impractical -- or impossible from a

Page 327

1 practical point of view.  And, accordingly,
2 regulators do not routinely or expect or require
3 such testing as I described in my report.
4 Q        And what's the third main opinion that
5 you provided?
6 A        The third main opinion is that the
7 specification testing for valsartan medications
8 in place prior to July 2018 did not include
9 testing that was capable of detecting NDMA and
10 NDEA at the levels ultimately detected in the
11 products, the valsartan products, and that the
12 testing that Teva did was -- was appropriate and
13 reasonable as -- as it analyzed its finished-dose
14 products in connection with the process change
15 that ZHP implemented in 2014.
16 Q        Thank you, Doctor.
17      You were also asked some questions
18 about the testing instrumentation that Teva had
19 on hand during the relevant time period.  Do you
20 recall that?
21 A        I do recall that.
22 Q        And I believe you testified that you
23 did not specifically inquire or seek more
24 information about the testing instrumentation

Page 328

1 that Teva had on hand at any particular site.  Is
2 that right?
3 A        That's correct.
4 Q        You didn't inquire at all about
5 whether -- where any of the testing
6 instrumentation was located; right?
7 A        Correct.
8 Q        Why not?
9 A        Because I didn't think it was relevant
10 to the issue at hand.  It's not the presence of
11 specialized instrumentation, a mass spectrometer
12 or -- or a GC/MS.  It's whether or not you have a
13 reason to go into doing specialized testing in
14 order to look for, hunt or fish for a low-level
15 impurity.  And without reason to do that, you do
16 not do -- you -- that does not occur in -- in any
17 drug manufacturer.
18      So just having the instrumentation is
19 not -- does not affect what -- what my opinion
20 was as to whether or not --
21      And I -- I -- I assumed that they would
22 have, and I -- and I -- and I can just assume
23 that the manufacturer had relevant
24 instrumentation that would be capable of -- of

Page 329

1 being put together and used.
2 Q        Is the difficulty of analyzing for
3 low-level impurities like those seen in the
4 valsartan medication here addressed pretty
5 extensively as part of the first bucket in
6 conclusions in your expert report?
7 A        Yes.  I think it's addressed pretty --
8 pretty clearly and relevantly.
9 Q        And, just to clarify, does possession
10 of testing equipment alone determine whether Teva
11 had the ability to detect NDMA or NDEA at the
12 levels seen in valsartan medication?
13 A        No.  Just having instrumentation
14 doesn't mean that you're -- you -- you can test
15 it.  You have to implement that instrumentation.
16 You have to configure it.  You have to develop a
17 method for the matrix involved, and you have to
18 know what you're looking for, and you have to
19 have motivation to look for something of that
20 level.  It just doesn't happen spontaneously.
21 Q        All right.  Dr. Baertschi, as reflected
22 on your amended list of materials considered, you
23 have received and reviewed some additional
24 materials since January 12th, 2022, when you

Page 330

1 submitted your expert report in this case; right?
2 A      Yes.
3 Q      What kinds of materials have you seen?
4 A      Some depositions from expert witnesses,
5 maybe an expert report or two, and -- and some
6 other documents that maybe weren't --
7        I don't -- basically, those are the --
8 those are the things that come to mind is there
9 were some depositions and expert reports that
10 weren't available or that I reviewed, again, more
11 thoroughly, or for the first time more
12 thoroughly.
13 Q      Did you review any materials, either
14 the deposition transcript or the exhibits, for
15 Tim Anderson's deposition?
16 A      Yes.
17 Q      Who is Tim Anderson, to your
18 understanding?
19 A      I believe he's the CGMP witness for
20 Teva, but I kind of don't exactly know.  I don't
21 know Tim Anderson.  I know Roger Willings better
22 than Tim Anderson.
23 Q      Was one of the exhibits to Tim
24 Anderson's deposition that you reviewed in

Page 331

1 preparation for your deposition a version of the
2 ZHP internal document that you were shown at the
3 end of plaintiffs' counsel's questioning today?
4 A      Yes.
5 Q      Did you review that in preparation for
6 your deposition?
7 A      Yes.
8 Q      Was that document redacted differently,
9 the version that was introduced at Tim Anderson's
10 deposition and the version that you were shown by
11 plaintiffs' counsel today?
12 A      Yes.  I don't believe it was redacted
13 at all.
14 Q      You were asked some questions by
15 plaintiffs' counsel about whether, looking at the
16 document that you were shown today, you had
17 questions or wanted to obtain more information
18 about that document.  Do you recall that?
19 A      Yes, I do.
20 Q      Did the version that you reviewed that
21 was introduced at Mr. Anderson's deposition
22 contain additional information?
23 A      Yes, it did.
24 Q      And, just to clarify, that information

Page 332

1 was not on the document that you were shown
2 today.
3 A      Yes.  It's redacted, blacked out.
4 Q      Did that information provide
5 additional -- did that unredacted document
6 provide additional information about the chemical
7 structure and otherwise inform your opinions
8 about that document?
9 A      It certainly did.
10 Q      Regardless, do you have any -- is any
11 portion of your expert report, your opinions,
12 reliant on that document that you reviewed or the
13 document that you were shown today by plaintiffs'
14 counsel?
15 A      Not at all.
16 Q      You've reviewed a lot of documents,
17 both since you submitted your expert report and
18 preparing for your deposition today; right?
19 A      Yes.
20 Q      Have you seen anything during that
21 preparation or during your deposition today that
22 causes you to change any of the opinions set
23 forth in your January 12th, 2022, expert report?
24 A      No.

Page 333

1 Q      I have no further questions for you,
2 Dr. Baertschi.  Thank you very much.  It's been a
3 long day.
4        Can we go off the record?
5 MS. BOGDAN:
6        I have two questions on redirect.
7 MR. HARKINS:
8        I'm gonna have to ask what the scope
9 is, considering you have no time left.
10 MS. BOGDAN:
11        Well, first of all, your objections
12 have taken a lot of time on the record.  I have
13 two questions left, and I would like to ask them,
14 and they're within -- within the scope of what
15 you just questioned him on.
16 MR. HARKINS:
17        Dr. Baertschi, do you have a couple
18 more minutes?
19 THE WITNESS:
20        I do.  I've already missed my flight.
21 MR. HARKINS:
22        Okay.  We have time for two.
23
24

Confidential Information Subject to Protective Order

Page 334

EXAMINATION

1
2  BY MS. BOGDAN:
3  Q      What is your understanding of how your
4  opinions contribute to the defense of the class
5  case?
6  MR. HARKINS:
7        Object to form to the extent it calls
8  for a legal conclusion.
9        But you can answer.
10 A      I don't have a -- that's a puzzling
11 question.  I don't have an opinion.  I don't
12 understand.  I don't have an opinion on how it
13 affects the class certification.  That's a legal
14 process I don't really understand.
15 MS. BOGDAN:
16 Q      And is it your testimony and opinion in
17 this case that while Novartis found NDMA in
18 valsartan API, Teva could not?
19 MR. HARKINS:
20       Objet to form.  Scope.  Foundation.
21       You can answer.
22 A      Yeah, can -- can you rephrase it?
23 Because the beginning of that question had some
24 qualifiers that I want to make sure I understand.

Page 335

1  MS. BOGDAN:
2  Q      Is it your opinion that while Novartis
3  found NDMA in valsartan API, that Teva could not?
4  MR. HARKINS:
5        Object to form.  Scope.  Foundation.
6  Clearly not within the scope of his expert report
7  or my redirect, which actually did address
8  questions that he's answered in his expert
9  report.
10       But, Dr. Baertschi, if you have a
11 question -- if you have an answer.
12 A      When you say Teva could not, I would --
13 I would not agree with that, that Teva could not.
14 Novartis detected it before anybody else.
15 Teva and nobody else detected it up to that
16 point.  And I -- I don't even know if they're
17 relevant products but, you know, lots or
18 materials.  Just as a -- my understanding of the
19 facts is that Novartis was the first of anybody
20 in the world to detect NDMA in a valsartan
21 product.  I don't know that to be true, but it's
22 my understanding.
23 MR. HARKINS:
24       Thank you.

Page 336

1  MS. BOGDAN:
2        I don't have any further questions.
3  MR. HARKINS:
4        Can we go off the record?
5  VIDEOGRAPHER:
6        Off record, 6:57 p.m.
7        (Deposition concluded at 6:57 p.m. EST)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 337

1          C E R T I F I C A T E
2
3        I do hereby certify that the above and
4  foregoing transcript of proceedings in the matter
5  aforementioned was taken down by me in machine
6  shorthand, and the questions and answers thereto
7  were reduced to writing under my personal
8  supervision, and that the foregoing represents a
9  true and correct transcript of the proceedings
10 given by said witness upon said hearing.
11       I further certify that I am neither of
12 counsel nor of kin to the parties to the action,
13 nor am I in anywise interested in the result of
14 said cause.
15
16
17
18
19       LOIS ANNE ROBINSON, RPR, RMR
         REGISTERED DIPLOMATE REPORTER
         CERTIFIED REALTIME REPORTER
20
21
22
23
24

Confidential Information Subject to Protective Order

## WORD INDEX

**< 0 >**
**0.08** 171:9
**0.3** 162:23
165:19, 23
166:3, 7 167:9
**02109** 3:14
**05** 209:3, 8
**07102** 3:10
**08543** 4:3

**< 1 >**
**1** 2:2 5:9
19:19 25:18
28:24 78:3
87:15 116:6
151:12 162:6,
7 166:3, 13,
15 170:4
191:7 199:24
200:4 208:15
210:7 237:6,
10, 18 238:1,
8 239:18
263:18 277:19
**1,000** 87:15
**1,493** 262:8
**1:00** 127:16
**1:29** 175:8
**1:30** 174:6
**10** 6:5 33:5,
10 40:21
153:16, 18, 20
239:15, 16
**10:40** 74:6
**10:48** 74:9
**100** 3:9
162:24 215:12
**101** 5:23
**107** 109:11, 14
**11** 3:18 5:3
6:7 130:24
134:17 157:3,
9 210:14
**11/27/18** 6:10
**11:59** 128:1
**12** 6:9 8:17
9:13 159:6

160:19 183:8
228:18 265:5
**12.1** 236:14
**12.1.3** 235:20
**12.2.1** 238:10
**12/11/18** 6:23
**12:22** 128:4
**120** 6:3
**1220** 326:6
**12205** 2:3
**125** 111:14
**12th** 329:24
332:23
**13** 6:6, 11
154:9 160:13,
19, 23 168:1
296:4
**13th** 153:15
**14** 6:13
160:11 168:4,
7, 12
**147** 113:11
**15** 6:15
18:16 41:6
171:16 210:7
263:18
**151** 113:6
**152** 114:15
**153** 6:5
**157** 6:7
**159** 6:9
**15th** 3:9
**16** 6:19
178:17
**160** 6:11
**164** 7:20
**168** 6:13
**168043** 264:11
**17** 5:24 7:3
181:13 232:1
**171** 6:15
**177** 107:6, 15
**178** 6:19
**17th** 157:2, 14
**18** 7:8 184:17
**181** 7:3
**184** 7:8
**1865** 103:17,
22
**189** 7:19

**19** 7:19
189:18 190:4
218:7 224:19
297:6, 11
**19,584** 164:11
**19,600** 164:12
165:13
**19.6** 165:12,
14, 18, 23
**190079** 279:8
**195** 7:21
**1950s** 177:6
**1967** 105:9
**1971** 104:1
**1978** 5:24
101:15 105:3,
12 321:3
**1980s** 188:13
**1981** 188:9
**1986** 96:20
97:9 188:9
**1990s** 214:7
**1993** 195:20
**1995** 213:8, 23
**1A** 237:10
**1B** 237:10
**1st** 170:5
308:2
**1v1** 6:12

**< 2 >**
**2** 5:11 26:23,
24 27:4
116:6 158:11,
12 166:9, 13,
15, 21 183:8
190:12 191:5
195:16
200:11 213:5
237:6, 10
238:1, 8
255:20
277:19
292:12, 14, 19,
22 293:12
**2:00** 174:22
**2:21** 175:11
**20** 7:21
38:22 56:7,
15 184:11

**195**:7 220:3
**200** 3:2
**2002** 200:2
**2006** 195:17
200:1 212:12
215:18 233:4,
8
**2008** 8:3
**2012** 8:8
216:16
**2013** 33:11
**2014** 220:13
221:1 227:3,
6 231:24
327:15
**2015** 216:6, 9,
14 219:3
**2017** 311:21
**2018** 6:6
8:12 9:13
33:10 153:15
154:9 157:2,
14 159:5
189:17
190:15
304:21
307:14 327:8
**2019** 171:24
184:15
**2019-GQ-005**
6:12
**2020** 171:24
307:10, 13
308:2
**2021** 8:19
41:5 77:4
171:24
**2022** 1:23
10:5 31:12,
19 32:10
76:10 329:24
332:23
**21** 4:2 8:2
171:14 174:4
175:14
191:21 214:23
**214** 8:2
**2150** 2:17
**216** 8:7
**219** 8:11
**21st** 32:10

**22** 8:7 178:7
216:17
**228** 8:16
**22nd** 20:10
31:12, 19
**23** 8:11
219:5, 7
**230** 77:14, 23
78:17 79:4, 6,
11, 15, 24
80:3, 10 81:8,
17
**239** 8:18
**23rd** 1:22
10:5
**24** 8:16
219:8 228:10,
11 294:4, 8
**241** 8:21
**24th** 184:15
**25** 5:9 8:18
19:8, 18
239:8 240:11
**2500** 3:3
**2525** 2:10
**253** 9:2
**25th** 195:17
**26** 5:11 8:21
19:8, 18
181:10
224:19 241:1
**26.5** 126:7
153:7, 12
**260** 2:22
**264** 9:4
**265** 9:6
**27** 9:2 19:8,
18 253:17
**270** 9:9
**274** 9:12
**279** 9:14
**27th** 159:5
311:20
**28** 9:4
264:14, 18
**2875** 1:7
**28th** 306:23
**29** 9:6
265:24 267:4,
6
**297** 9:17

Confidential Information Subject to Protective Order

**29th** 77:*4*
189:*17* 190:*15*
**2A** 116:*7, 21*
**2B** 116:*7*
**2nd** 170:*4*

**< 3 >**
**3** 5:*13* 30:*5,
8, 13* 116:*7*
130:*23*
158:*13*
159:*23*
162:*21* 163:*2,
5* 165:*15*
166:*15, 17*
210:*16* 211:*1,
3* 238:*1, 8*
263:*18*
277:*19*
290:*20* 296:*3*
**3.21.22** 5:*18*
**3.22.22** 5:*16*
**3:38** 228:*1*
**3:52** 228:*4*
**30** 5:*13* 9:*9*
38:*22* 56:*7,
15* 76:*17*
174:*18, 20*
184:*11*
223:*19, 21*
270:*10*
**30305** 3:*3*
**306** 9:*19*
**309** 9:*21*
**30s** 177:*7*
**31** 5:*15* 9:*12*
190:*6* 223:*6,
10* 224:*8, 18*
274:*17* 275:*5,
9* 302:*19*
**314** 102:*2*
**31-plus** 223:*3*
**32** 5:*17* 9:*14*
19:*20* 86:*18,
20* 87:*7, 9, 17*
279:*9* 286:*14*
**320** 5:*4*
163:*21* 164:*10*
**320-milligram**
162:*9*

**3-22** 19:*16*
**324** 236:*12*
**33** 9:*17*
297:*20* 306:*10*
**33134** 2:*11*
**333** 326:*5*
**3333** 3:*3*
**334** 5:*5*
**33950** 2:*14*
**34** 9:*19*
195:*6* 306:*5,
10, 12*
**35** 9:*21*
309:*22* 310:*2*
311:*18*
**351(a)(2)(B**
191:*21*
**36** 102:*13, 19*
103:*8, 12*
169:*21*
214:*20* 324:*24*
**37** 216:*15*
**38** 219:*3*
**39** 219:*14*
**3rd** 76:*10*

**< 4 >**
**4** 5:*15* 31:*4,
5, 9* 116:*7*
158:*13* 216:*8*
220:*11*
292:*18*
293:*18*
295:*21* 324:*18*
**4:25** 253:*11*
**4:29** 253:*14*
**40** 56:*7, 15*
76:*17, 18*
104:*23* 239:*7*
**40s** 177:*7*
**41** 228:*6*
**42** 5:*19*
240:*22*
**43** 265:*23*
**44** 103:*14*
**46204** 3:*18*
**48** 113:*11*
274:*21*
**48605** 168:*3*

**< 5 >**

**5** 5:*17* 32:*1,
4* 158:*11, 13*
160:*4* 218:*8*
220:*14* 221:*7*
295:*20, 22, 24*
296:*20*
**5,000** 262:*7*
**5/21/19** 7:*7*
**5:46** 309:*18*
**50** 76:*22*
112:*21*
177:*12, 18*
309:*5*
**501(a)(2)(B**
191:*20*
**50s** 177:*6*
**52** 112:*21*
**5-21-2019**
181:*10*
**53** 3:*14*
**55402** 2:*18*
**57** 306:*3*
**574** 9:*22*
**58** 21:*19, 22*
31:*15* 297:*19*
306:*2*
**59** 21:*21*
30:*22*
**59150** 253:*2,
16*

**< 6 >**
**6** 5:*19* 42:*4,
9* 47:*7*
197:*11*
309:*21* 324:*24*
**6:12** 320:*10*
**6:42** 320:*13*
**6:57** 336:*6, 7*
**60** 38:*23*
39:*18, 19*
177:*6, 18*
**609** 6:*14*
**60s** 177:*6*
**61.2** 164:*7, 9*
165:*10*
**66210** 2:*22*
**663** 9:*13*
**693423** 160:*10*

**< 7 >**

**7** 5:*21* 74:*13,
24* 75:*3*
76:*11* 197:*14,
15* 277:*20*
**7/17/18** 6:*8*
**7/24/19** 7:*18*
**7/27/17** 9:*22*
**70** 38:*24*
177:*18*
**701** 2:*7*
**70130** 2:*7*
**7-27-2017**
313:*3*
**74** 5:*21*
**74772** 265:*22*
**74773** 270:*9*
**77** 76:*2*
**7-hour** 320:*1*

**< 8 >**
**8** 5:*23*
101:*16* 178:*3*
208:*14*
**80** 177:*18*
**800** 2:*17*
**80s** 97:*14*
**8101** 2:*22*
**83** 106:*18*
**86** 97:*12*

**< 9 >**
**9** 6:*3* 120:*8*
**9:09** 1:*22*
10:*6*
**9:19** 17:*15*
**9:23** 17:*18*
**90** 40:*19*
**90s** 188:*10*
233:*15*
**96** 9:*15*
102:*18, 19*
125:*22* 126:*7*
152:*20, 22*
308:*5*
**99** 2:*14*

**< A >**
**a.m** 1:*22*
10:*6* 17:*15,
18* 74:*6, 9*
128:*1*

**abandoned**
79:*7*
**abbreviation**
101:*3* 269:*15*
**ability** 86:*20*
210:*18*
280:*20* 329:*11*
**ablates** 62:*19*
**ablating** 62:*11*
**able** 36:*20*
48:*15* 61:*3*
71:*1* 78:*5*
79:*5* 85:*1*
100:*20*
173:*11*
175:*19* 189:*5*
297:*1* 326:*23*
**absence**
122:*14*
**absolutely**
39:*2* 147:*21*
162:*24* 302:*4*
**absorbance**
77:*17, 23*
78:*13, 17, 20*
79:*11, 14, 24*
80:*3, 10* 81:*8*
**absorbed**
77:*11*
**absorption**
255:*16*
**abstracts**
80:*16*
**ac** 132:*19*
**acceptable**
16:*3, 4*
124:*13, 19, 21*
125:*5, 10, 13*
126:*18*
152:*17, 19*
153:*5* 162:*16*
167:*9* 239:*15,
22* 308:*17*
322:*3*
**access** 132:*20,
22* 133:*2*
139:*18*
140:*23* 174:*2*
186:*20* 223:*12*

Confidential Information - Subject to Protective Order

accessible
173:*22*
197:*13*  310:*14*
accidentally
232:*15*
accommodate
73:*24*
account
129:*24*  174:*17*
accountable
158:*21*
accuracy
72:*12, 14*
accurate
40:*18*  71:*16*
72:*11*  75:*21*
83:*15*  135:*10*
232:*16*
ACD/Labs
40:*10, 13*
acetate  294:*12*
acid  7:*17*
249:*3*  267:*19*
acidic  103:*24*
104:*16*
267:*19*
269:*23*  272:*8*
acknowledge
174:*14*
acronyms  57:*6*
act  37:*11*
191:*21*
Actavis  3:*7, 12*
action  155:*19*
337:*12*
Active  198:*15,
22, 23*  199:*2*
207:*14*
actual  44:*15*
132:*15*
151:*24*
198:*23*
203:*13*
204:*17*  236:*2,
10*  238:*12*
257:*22*  266:*12*
add  22:*5*
32:*23*  60:*7*
238:*21*

added  32:*16,
19*  33:*8, 19,
24*  166:*15*
addition
247:*20*
additional
329:*23*
331:*22*  332:*5,
6*
address  83:*11*
246:*7, 24*
251:*10*  261:*8*
307:*18*  335:*7*
addressed
329:*4, 7*
addressing
234:*20*
adjust  165:*12*
adjustment
17:*9*
admitted
324:*2*
adulterated
191:*19*
192:*17, 20*
193:*1, 3, 4*
adulteration
193:*6, 14*
advanced
41:*19*
advertise
57:*18*  64:*10*
70:*17*
advertised
241:*15*
advertising
47:*13, 18*
Advice  6:*4*
26:*15*  117:*9*
118:*8*  120:*6,
15*
advised  235:*24*
affect  61:*5*
63:*8, 9*  93:*12*
136:*1, 11, 12*
280:*16, 17*
282:*6*  311:*7*
328:*19*
affiliated
128:*7, 9*

afield  245:*2*
247:*5*  305:*10*
aforementioned
337:*5*
afraid  278:*2*
agencies
143:*23*  172:*1*
180:*22*
213:*12*
244:*17*  304:*10*
Agency  101:*11*
agent  247:*19*
aging  43:*10,
14*
agnostic  92:*10*
ago  21:*14*
28:*21*  177:*12,
13, 19*  184:*12*
189:*7*  313:*3*
agree  45:*14*
54:*22*  67:*11*
78:*15*  93:*1*
98:*15, 18, 22*
99:*8, 14, 17,
20, 21, 24*
100:*4, 10, 15*
104:*10, 14*
106:*3, 13*
110:*17, 20*
111:*2*  114:*6*
115:*7*  116:*22*
124:*15*  125:*3,
20*  126:*1, 5,
10, 22*  127:*4*
140:*20*  142:*2,
3*  147:*8*
160:*6*  197:*20*
199:*15*  201:*6,
20*  202:*1, 2,
11, 13*  203:*6,
19*  204:*7, 9,
15, 20, 22*
208:*12*  218:*1*
221:*5*  222:*3,
6*  232:*10*
244:*18*
246:*11*
247:*11, 14*
248:*5, 18*
249:*4, 9*

250:*19*
298:*18*
299:*24*
300:*24*  302:*2,
5*  303:*5*
305:*2*  335:*13*
agreed  10:*14*
70:*3*  203:*9*
agreeing  47:*3*
300:*16*
agreement
36:*23*  74:*17,
21*
agreements
141:*7, 24*
145:*8*
Agrochemical
40:*5*
agrochemicals
35:*17*
ahead  104:*24*
197:*3*  233:*8*
243:*8*  320:*17*
AI  239:*19*
Aid  3:*20*
37:*17*  165:*6*
al  104:*1*
105:*8, 12*
Albany  2:*3*
aleck  228:*19*
alerting
218:*12, 17*
223:*3, 7, 9*
224:*2, 13, 15,
22*  225:*4*
226:*6, 16, 21*
302:*18*  326:*18*
alerts  268:*14*
aligned  138:*10*
aliphatic
107:*14*  108:*7,
13, 21*
A-L-I-P-H-A-
T-I-C  108:*13*
allow  15:*13*
79:*15*  85:*5*
165:*7*  186:*21*
187:*13*  223:*24*
allowed
121:*24*  153:*5*
allows  183:*20*

alphabetical
199:*7*
alternative
183:*1*  258:*24*
Ambiguous
258:*7*
amenable
70:*15*  259:*10*
260:*1*
amend  32:*12*
Amended
5:*18*  32:*2, 9,
17, 24*  310:*10*
329:*22*
Ames  98:*19,
20*
Amine  33:*18*
98:*4, 6, 10*
247:*10*  248:*1,
3*  250:*17*
269:*22*  303:*24*
amines  98:*7,
11*  247:*15*
248:*10, 11, 13,
16*  249:*11*
267:*20, 23*
270:*2, 3*
amlodipine
86:*24*
amount  54:*10*
75:*21*  78:*6*
151:*14, 18*
152:*2*  163:*18*
208:*5, 20*
256:*14*
261:*20*  282:*21*
amounts  65:*2*
97:*2*  151:*1*
244:*14*
AMU  183:*21,
22*
analogous
64:*14*
analyses
289:*22*
290:*15*  295:*2*
Analysis  9:*3,
5*  45:*20*
58:*11*  60:*16*
68:*11, 14*
88:*1*  105:*10*

169:*10*
188:*21* 189:*5*
253:*21, 23*
255:*19* 262:*2,*
*20* 263:*1*
264:*4, 21*
265:*2* 268:*20*
283:*6* 285:*15*
287:*2* 288:*5*
291:*9* 293:*19*
295:*7, 8, 9, 11,*
*16* 296:*21*
312:*8* 324:*6*

**analytical**
46:*11, 15*
47:*2, 9, 17, 20,*
*23, 24* 48:*4, 6,*
*7* 49:*5* 50:*18*
53:*1, 3, 15*
54:*17* 55:*2*
56:*18* 57:*18*
58:*10* 61:*5*
63:*17* 66:*19,*
*22* 70:*18, 21*
71:*6, 13, 17*
72:*9* 77:*12*
82:*6* 85:*10*
87:*2* 131:*16,*
*18, 20, 22*
132:*4* 133:*13*
134:*9, 10, 14*
135:*16* 145:*1,*
*11* 162:*1*
167:*5* 169:*20*
170:*14, 19*
205:*22* 206:*6*
207:*2, 4, 6, 19*
208:*2* 217:*3,*
*9* 233:*21*
288:*7* 302:*13*
325:*13*

**analyze** 288:*4*
325:*8* 326:*11*
**analyzed**
327:*13*
**analyzing**
58:*2* 329:*2*
**and/or** 82:*6*
201:*19*
**ANDA** 142:*3*

**ANDAs**
196:*21*
**Anderson**
330:*17, 21, 22*
**Anderson's**
330:*15, 24*
331:*9, 21*
**animal** 40:*5*
52:*19* 99:*21*
109:*22, 23*
110:*12*
113:*19* 114:*8,*
*23*
**Anne** 4:*21*
337:*14*
**announced**
148:*24* 155:*24*
**announcement**
6:*8, 10* 156:*7*
157:*7, 22*
159:*1, 14, 17*

**announcements**
156:*12*
**anomalous**
53:*7*
**answer** 15:*19*
16:*5, 16, 19*
27:*24* 29:*10*
36:*20* 39:*6*
45:*13* 55:*22*
85:*6* 86:*15*
87:*6* 88:*15,*
*16* 89:*11, 24*
90:*8, 21, 23*
91:*8* 92:*19*
93:*24* 94:*1*
97:*6* 99:*1*
100:*6* 113:*24*
117:*2* 118:*16,*
*22* 126:*10*
132:*7* 133:*8*
141:*16*
142:*10*
143:*17*
147:*15, 22*
150:*20*
156:*17*
162:*20*
166:*18*
167:*18* 172:*5,*

*17* 193:*12*
194:*8* 202:*22*
205:*9* 237:*3*
242:*17*
243:*16*
246:*17*
252:*22* 261:*7*
274:*9* 276:*9*
278:*18* 280:*1*
285:*22* 286:*2*
287:*9, 22*
288:*11*
291:*16* 293:*8*
296:*24*
298:*22* 300:*9*
317:*2* 318:*7,*
*12, 18* 319:*8*
323:*7* 334:*9,*
*21* 335:*11*
**answered**
52:*5* 88:*6, 12,*
*13* 114:*11*
122:*22, 23*
125:*9* 140:*2*
156:*14, 15*
180:*20* 237:*1,*
*22* 270:*5*
279:*17* 281:*5*
283:*14*
284:*18*
294:*19*
314:*16* 319:*3,*
*17* 320:*3*
335:*8*
**answers** 99:*11*
134:*24*
251:*13*
316:*22* 318:*2,*
*9* 337:*6*
**antecedent**
278:*20*
**anticipate**
71:*1* 304:*6*
**anticipated**
234:*18*
**anybody**
168:*18*
335:*14, 19*
**anytime**
277:*14*

**anyway** 75:*12*
95:*11*
**anywise**
337:*13*
**apart** 46:*6*
198:*12*
**API** 64:*18*
66:*9* 72:*3*
126:*19* 141:*2,*
*4, 12* 142:*1,*
*14* 143:*11*
147:*11* 148:*3,*
*21* 150:*6*
151:*3* 152:*10*
153:*10*
157:*23*
163:*23* 167:*5,*
*6* 169:*21*
170:*15* 171:*6,*
*7* 189:*10*
191:*3, 18*
198:*11, 12, 13,*
*16* 238:*11*
248:*16*
251:*11, 19*
266:*6* 279:*14,*
*22* 314:*20*
319:*1, 14*
334:*18* 335:*3*
**apologies**
166:*13*
**apologize**
180:*15*
**apparent**
116:*17* 205:*18*
**Apparently**
88:*13* 158:*8*
314:*4*
**appear** 77:*22*
81:*12* 199:*13*
229:*1*
**appearance**
59:*19* 254:*11,*
*13*
**Appearances**
10:*19*
**A-P-P-E-A-R-**
**A-N-C-E-S**
2:*1* 3:*1* 4:*1*
**appearing**
10:*14*

**appears** 59:*6*
156:*6* 308:*12*
**applicable**
90:*12* 208:*10*
**applicant**
203:*12* 204:*16*
**application**
260:*5*
**applications**
23:*19*
**applied** 91:*1*
**APPLIES** 1:*10*
**apply** 50:*17*
89:*20* 90:*3,*
*16* 93:*2*
99:*12* 134:*9*
211:*12*
**appraisal**
204:*1, 24*
**appreciate**
62:*23*
**approach**
220:*21*
249:*15* 258:*22*
**approached**
131:*14*
**Approaches**
8:*6* 136:*17*
300:*20*
301:*24* 302:*3*
**appropriate**
27:*16, 19*
48:*14, 19, 24*
87:*13* 179:*23*
207:*8* 209:*14*
211:*4* 276:*1*
322:*9* 327:*12*
**appropriately**
24:*12*
**approximately**
312:*1*
**ARB** 7:*7, 18*
126:*18*
**area** 60:*2*
66:*7* 326:*15*
**areas** 325:*7*
**Argumentative**
314:*24*
**arranged**
65:*22* 222:*17*

Confidential Information Subject to Protective Order

arriving 284:*11*

arrow 268:*3, 4* 269:*17*

arrows 272:*16*

arsenal 140:*10, 14, 17*

art 183:*19*

article 20:*19* 21:*11* 22:*1, 9* 33:*18* 40:*11* 129:*1* 223:*22*

articles 21:*4, 8, 24* 30:*22* 31:*15* 32:*23* 33:*3, 8, 9* 34:*2, 4* 81:*3* 129:*11* 206:*12* 230:*22*

artifact 47:*24* 57:*18* 58:*10, 23* 60:*1, 5, 16, 23* 61:*2, 8, 21* 62:*6* 63:*6, 8, 19*

artifacts 57:*21* 58:*18* 60:*11, 17*

artifactual 53:*8* 58:*8*

Artificial 33:*17* 314:*2*

ash 256:*8, 18*

ashes 256:*20*

aside 208:*3*

asked 17:*22* 21:*17* 55:*17* 88:*6, 12* 109:*8* 114:*11* 118:*7, 15* 122:*21* 125:*8* 130:*20, 22* 132:*4* 134:*19, 22* 135:*1, 4, 11* 140:*1* 141:*18* 155:*18* 156:*14* 165:*3* 180:*14* 193:*3* 194:*16* 230:*6* 237:*1, 21*

252:*5* 270:*5* 273:*5* 279:*17* 281:*4* 284:*18* 289:*6* 294:*19* 300:*12* 305:*13* 314:*16* 316:*18* 318:*20* 319:*3, 17* 320:*3* 321:*1, 2, 6, 13* 322:*2* 323:*11* 327:*17* 331:*14*

asking 11:*13* 15:*22* 16:*6* 26:*21* 89:*15* 95:*1* 103:*15* 118:*6* 180:*13, 16* 235:*3* 251:*18* 276:*17, 18* 280:*3, 13* 281:*6* 286:*23*

aspect 142:*20* 146:*1* 250:*20* 308:*9*

aspects 144:*20* 146:*1* 300:*11*

aspirational 301:*5, 24*

aspirin 255:*9*

Assay 6:*17, 22* 222:*1*

assemble 266:*17*

assembling 26:*10*

assess 44:*14* 85:*24* 135:*5* 222:*1* 243:*1, 3* 273:*5*

assessed 155:*13* 249:*10* 250:*2*

assessing 50:*23*

Assessment 8:*13* 42:*23* 43:*1, 20* 50:*24* 69:*15*

86:*3* 222:*12, 21, 24* 223:*5* 238:*4, 13, 20, 23* 242:*6, 8, 10, 18, 22* 243:*22* 246:*6, 7, 15, 16, 20* 248:*12* 305:*12, 19*

assessments 37:*7* 42:*19* 222:*11* 224:*13*

assigned 296:*3, 12* 297:*5, 10*

assigning 22:*9*

assignment 130:*23*

assist 47:*19*

assistance 186:*14, 15* 187:*18* 188:*3, 7* 220:*19*

Assistant 2:*19*

assisting 48:*13*

associated 44:*16* 46:*4* 48:*10* 50:*11* 51:*20* 54:*12* 58:*1* 62:*7* 84:*13* 92:*2* 121:*7* 122:*7, 18* 123:*15, 22* 129:*13* 130:*2* 132:*11* 135:*21* 136:*15* 146:*22* 204:*3* 205:*22* 221:*23* 222:*18* 223:*4* 225:*15* 226:*7, 17* 237:*11* 238:*1* 243:*21* 251:*18* 252:*6* 254:*5* 266:*22* 277:*8* 318:*21*

assortment 303:*23*

assume 16:*6* 28:*15* 137:*22* 208:*19* 328:*22*

assumed 249:*23* 328:*21*

Assumes 281:*22* 284:*2* 315:*22*

assuming 23:*13* 35:*1* 39:*19* 131:*21* 134:*17* 232:*10* 240:*15*

assumptions 93:*15, 16* 245:*1* 303:*18*

AstraZeneca 13:*23*

Atlanta 3:*3*

atomic 183:*15*

atoms 65:*22* 266:*17* 282:*19*

atropisomers 96:*18*

attach 258:*22*

attached 12:*11* 95:*22* 96:*3* 138:*6* 276:*9*

Attachment 208:*15* 210:*16* 211:*3*

attacking 68:*17*

attempting 292:*7, 9*

attending 97:*7*

attention 21:*15* 154:*8, 12, 20* 158:*11* 162:*5, 11* 166:*8* 167:*2* 190:*12* 214:*14* 218:*7* 226:*22* 235:*12, 20* 239:*15* 290:*19* 291:*7* 311:*17* 312:*5*

Attorney 24:*3*

attraction 176:*15*

attributed 247:*9*

attributes 147:*4* 254:*5*

audio 16:*23* 83:*23*

audiovisual 23:*15*

Aurobindo 38:*12*

author 228:*21*

authored 21:*9* 22:*1* 31:*15* 33:*22* 34:*3*

authoring 231:*15*

automatically 277:*16*

autosampler 290:*3*

autosampling 290:*6*

available 32:*16, 19* 47:*13* 110:*13* 115:*2* 134:*2* 135:*6, 20, 24* 136:*4, 5, 11* 139:*12* 177:*11* 284:*23* 330:*10*

Avenue 2:*17*

avoid 66:*6* 68:*23* 73:*19* 94:*7*

aware 28:*8* 116:*8, 15* 117:*21* 141:*6* 171:*19* 213:*2* 216:*22* 239:*11* 298:*7* 314:*7* 318:*23*

awareness 315:*17*

azide 97:*24* 269:*1* 271:*3, 5*

< B >

back 19:*2* 39:*11* 47:*6* 91:*17* 96:*20* 97:*8* 103:*14* 174:*20, 22*

Confidential Information - Subject to Protective Order

182:*15*  191:7
194:*21*
195:*20*  197:*6,*
*9*  199:*23*
211:*1*  227:*22*
233:*15*
257:*17*
286:*10*  304:*4,*
*20*  320:*5*
**background**
61:*17, 20*
133:*23*
261:*18*  273:*15*
**bacterial**
221:*24*  222:*18*
**BAERTSCHI**
1:*21*   5:*14, 16,*
*22*   10:*12, 23*
11:*6, 8*   17:*20*
19:*16*  24:*9*
27:*3*   34:*16,*
*17, 21*   35:*13*
42:*1, 7*   74:*16*
85:*5*   106:*19*
120:*11*   128:*6*
157:*7*   159:*10*
165:*2*   171:*19*
174:*9*   184:*20*
210:*17*   215:*2*
216:*21*
228:*14*
253:*20*   266:*4*
270:*13*
279:*12*   310:*1*
320:*16*
324:*21*
329:*21*   333:*2,*
*17*  335:*10*
**Baertshci**  5:*20*
**ballpark-ish**
76:*17, 23*
**BARNES**  3:*16*
**based**  26:*15*
27:*15*  69:*18*
71:*7*  107:*13*
108:*4*  114:*5*
143:*7*  164:*19*
167:*12*
176:*14*  180:*5*
203:*24*
204:*23*

213:*21*  214:*2*
222:*14, 21*
251:*12*
272:*23*
296:*13*  317:*8,*
*16*
**basically**  330:7
**basis**  56:*9*
176:*18*
259:*14*  322:*24*
**batch**  292:*13*
296:*1*
**batches**
169:*21*
170:*16, 18*
171:*6, 7*
**Bates**  160:*17*
161:*4*  168:*2*
**bear**  11:*8*
**beginning**
177:*6*  286:*24*
334:*23*
**begins**  42:*17*
105:*4*
**behalf**  28:*21*
89:*2, 6, 18*
**believe**  13:*7*
16:*11*  17:*20*
19:*13*  25:*7*
33:*2, 12, 13*
34:*2*  35:*12*
47:*3*  55:*23*
77:*13*  79:*22*
80:*11*  81:*17*
82:*12*  87:*11*
91:*22*  100:*2,*
*12*  104:*4*
117:*19*
119:*11*
120:*16*
128:*23*
130:*18*
135:*14*  139:*9*
141:*18*  144:*9,*
*10*  148:*8*
150:*4, 19*
152:*15*  153:*7,*
*10, 20*  157:*8*
160:*10*
161:*20*  163:*2,*
*20*  168:*1*

170:*17*  171:*3,*
*14*  172:*20, 24*
173:*1*  175:*13*
177:*13*  178:*2*
180:*8, 20*
181:*11*  195:*6,*
*19*  197:*10*
199:*6*  211:*11*
213:*8*  214:*19*
215:*18*  220:*7*
223:*11*  227:*5*
236:*21*  240:*5,*
*6, 18*  249:*16*
251:*2*  258:*1*
261:*16*
263:*23*
276:*16*  288:*6*
296:*11*  308:*7*
310:*2*  324:*14*
327:*22*
330:*19*  331:*12*
**believed**
206:*13*
**benefit**  325:*1*
**Benigni**
223:*22*  224:*10*
**benzene**  292:*5*
**Bernard**
229:*13, 14*
232:*5*
**Bernie**  232:*5,*
*6, 8*
**best**  33:*20*
79:*11, 22*
80:*17*  171:*10*
202:*22*  284:*9*
**better**  37:*3*
53:*16*  54:*19*
62:*2*  134:*13*
229:*24*  330:*21*
**beyond**  55:*4*
147:*12*
**big**  30:*15*
79:*2*  101:*22*
119:*14*  235:*15*
**billion**  151:*21*
165:*14*
**bioanalytical**
41:*20*

**biotech**  35:*17*
36:*1*  39:*24*
41:*9, 13*
**bit**  16:*13, 18*
83:*23*  142:*17*
195:*23*  198:*2*
**black**  69:*5*
**blacked**  332:*3*
**blacked-out**
316:*13*
**black-out**
316:*19*
**blank**  108:*5*
161:*3, 5*  165:*3*
**blanked**
313:*20*  315:*13*
**blanket**  305:*24*
**bless**  185:*4, 8*
**blue**  198:*3*
**Bogdan**  2:*3*
5:*3, 5*  11:*5,*
*11*  12:*20*
13:*15*  15:*21*
17:*19*  19:*12*
20:*7*  24:*21*
25:*4, 20*  26:*3,*
*16*  27:*2*  28:*4,*
*18*  29:*15*
30:*1, 7, 11*
31:*1, 8, 24*
32:*7*  33:*15*
34:*8*  37:*9*
39:*9*  41:*23*
42:*6, 13*
45:*19*  46:*18*
47:*5*  51:*21*
52:*7, 22*
56:*13*  61:*6*
64:*3*  68:*7*
72:*15*  73:*3,*
*11, 18*  74:*10,*
*15, 23*  75:*4*
83:*3, 17*  84:*3*
85:*3*  87:*8*
88:*8, 22*
89:*14*  90:*2,*
*13*  91:*2, 13*
92:*13, 24*
93:*13*  94:*5*
99:*7, 13*
100:*22*

101:*13*  102:*4,*
*12, 17, 20*
104:*9*  106:*8,*
*17*  107:*8, 24*
110:*6*  111:*1,*
*12*  112:*11*
113:*5*  114:*4,*
*13*  115:*18, 20*
116:*3, 19*
117:*7, 14*
120:*5, 10*
122:*5, 16*
123:*12, 20*
124:*5*  125:*2,*
*19*  126:*4, 12*
127:*8, 17*
128:*5*  131:*1*
132:*24*
133:*17*
137:*14, 24*
139:*20*  140:*6*
141:*1, 11, 22*
142:*21*  144:*4*
146:*3, 14*
147:*6, 24*
148:*17*  149:*6,*
*21*  150:*9*
153:*13, 19*
154:*4*  155:*22*
156:*9, 16, 24*
157:*5*  158:*3,*
*22*  159:*3, 9*
160:*8, 15, 20*
161:*2, 12, 16*
162:*22*
164:*18*
165:*17*  166:*1*
167:*23*  168:*9*
170:*7*  171:*12,*
*18*  172:*18*
174:*3, 12, 24*
175:*5, 12, 15*
178:*10, 19*
180:*12*  181:*8,*
*15*  184:*13, 19*
185:*3, 7, 11*
186:*6*  187:*7*
189:*15, 20*
190:*5*  192:*8,*
*22*  193:*16*
194:*15*  195:*4,*

*10* 200:6
201:5 205:14
211:14 212:2,
8 214:18
215:1 216:11,
19 217:11
218:24 219:9
222:9 224:9
226:1, 13
227:1, 8, 16
228:5, 13
230:15
234:11
237:16 239:3,
10 240:3, 8,
12, 21 241:3,
13 243:6, 23
245:7 246:3
247:7, 22
248:14, 23
249:8 250:6,
15 251:9
252:2, 12, 17,
24 253:15, 19
255:17
258:11
259:18 260:8
261:9, 24
262:17
264:10, 16, 19
265:21 266:2
267:1, 5, 21
270:8, 12
272:3 274:3,
15, 19 275:2,
12 276:15
277:17 278:4
279:6, 11, 19
280:5, 24
281:11 282:8
283:16
284:10 285:3
286:17
287:24
288:14 289:5
290:18 291:6
292:3 293:3,
10, 17, 23
294:14, 20
295:5, 19
296:19 297:4,

13, 18, 22
298:11
300:17
301:12 303:8
304:23 306:1,
15 309:2, 6,
12, 24 311:16
312:22
313:10 314:9,
17 315:15
316:7, 17
317:6 318:10,
22 319:11, 21
323:3 333:5,
10 334:2, 15
335:1 336:1
**boiling** 107:6,
15 112:20, 22
**bond** 96:5, 9,
10, 11, 12, 14,
15, 16, 20
**bones** 71:12
**book** 229:2, 4,
6 230:5
231:5, 7, 9, 10,
14 234:3, 14
235:19
**boring** 68:4
**Bossa** 223:22
224:11
**Boston** 3:14
**bottom** 33:4,
5 102:14
103:8, 13
109:14 110:7
112:15, 16
154:19 191:2
225:11
230:16 277:21
**Boulevard**
2:10, 22
**box** 47:8, 11
161:8 275:18
306:8
**brain** 84:10
144:14
147:20
149:19
189:13
223:12 243:2

**break** 72:21,
24 73:5, 23
136:19
174:11 227:9,
22 252:1
253:8 309:7
**breaks** 73:15,
20
**BRETT** 2:21,
23
**brett@hollisla**
**wfirm.com**
2:23
**briefly** 10:16
85:1 232:20
**bring** 22:12
26:22 36:9
101:14
106:24
120:17 214:2
251:7
**bringing**
157:21
**brings** 109:13
**broad** 37:24
53:10 55:24
132:20 243:19
**broader**
132:19
**bucket** 329:5
**building**
315:7, 9
**built** 223:24
303:18
**bullet** 64:13
**bullet-point**
50:8
**bunch** 18:13
75:10 137:9
155:9 293:12
**burning**
256:19
**business**
35:13 40:16
41:21
**byproducts**
202:6

**< C >**
**calculate**
152:2 163:18

**calculated**
152:4 292:16
322:14
**calculating**
40:19
**calculation**
152:12 165:5
**calculator**
165:2
**call** 20:2
107:18
132:15
216:22
235:12
256:17 277:6
311:6
**called** 64:23
108:21 245:4
254:6 255:6
**calling** 163:1
226:22
**calls** 15:17
27:22 36:17
89:10 90:6,
19 91:7 92:7
93:6 142:9
186:1 192:4,
14 202:18
244:8 245:12
248:9 252:21
260:20 276:5
277:3 278:17
281:22
291:15
303:16 305:8
310:23
313:15
315:22 323:4
334:7
**camera** 320:7
**Camp** 2:7
**cancer** 52:21
101:11
124:13, 19
125:5, 10, 13,
17 221:17, 23
**cancer-causing**
101:7
**cancers** 91:20
**capabilities**
135:6 136:5

138:7 139:23
173:5, 8, 9, 16
**capability**
177:23
**capable** 188:5
327:9 328:24
**capacity**
118:18, 20
188:14 229:24
**capillary**
176:16
**captured**
232:14, 15
**carbon** 282:19
**carbons**
108:19
**carcinogen**
7:11 99:20,
22, 23 100:1,
5, 11 115:16
237:19 238:6
321:19
**Carcinogenic**
8:4, 15
109:21
110:11, 15
111:7 113:19
114:7, 22
115:5 116:21
126:14
214:21
218:14
225:16
325:17 326:20
**carcinogenicity**
321:8, 14
**carcinogens**
100:16
124:12 125:4
**care** 111:9
**carefully**
155:19 301:16
**Carl** 256:15
**carried** 272:18
**carry** 43:1
50:24 61:15
72:1 173:11
189:5
**carrying**
71:23 145:24

Confidential Information Subject to Protective Order

case 13:*3, 8, 17, 23* 14:*10, 15, 18* 15:*3* 37:*11* 76:*3* 89:*17* 94:*11, 14* 95:*17* 98:*1* 113:*21* 118:*21* 121:*15* 131:*9* 132:*11* 134:*6* 135:*1, 12* 144:*22* 167:*13* 182:*6* 190:*10* 191:*23* 192:*10, 24* 193:*11, 15* 198:*10* 251:*4, 15* 254:*19, 20* 256:*23* 266:*13* 273:*10, 23* 274:*2* 280:*7* 281:*2* 284:*12* 292:*4* 301:*15* 304:*13* 305:*7, 24* 310:*9* 312:*2* 314:*11* 318:*24* 319:*13* 321:*13* 322:*17, 21* 323:*2* 330:*1* 334:*5, 17*
CASES 1:*11* 12:*1, 6* 41:*3* 127:*4* 260:*6*
catalysts 202:*8*
catalyzing 62:*14*
catch 317:*4*
categories 200:*15* 201:*7*
category 49:*20* 50:*10* 201:*11* 212:*1, 6*
caught 95:*7*
causally 218:*13*

cause 60:*14, 17* 61:*21, 23* 62:*2, 3, 7, 16, 22* 63:*13, 24* 67:*18, 24* 69:*12* 192:*11* 221:*15* 269:*20* 337:*14*
causes 206:*18, 19* 246:*8, 24* 247:*2* 332:*22*
causing 50:*7* 63:*1* 221:*17* 290:*16*
cautious 115:*15*
cell 23:*7*
Center 3:*9* 113:*12* 241:*24* 257:*6*
centering 77:*13*
CEP 169:*12, 13, 15*
cerebro 242:*23* 243:*2*
certain 50:*22* 54:*4* 71:*12* 149:*15* 208:*10* 210:*12* 224:*20* 254:*24* 259:*15* 263:*23* 296:*17*
certainly 54:*22* 73:*22* 117:*21* 184:*11* 226:*21, 22* 246:*1* 291:*4* 299:*12* 310:*14* 332:*9*
certainty 81:*7, 11*
Certificate 169:*10* 253:*21, 23* 255:*19* 262:*1, 19, 24* 264:*3, 20* 265:*1*

Certificates 9:*3, 5*
certification 135:*9* 193:*11* 305:*6* 334:*13*
CERTIFIED 337:*19*
certify 91:*5* 337:*3, 11*
cetera 16:*14* 87:*1* 133:*15*
CGMP 144:*17, 19* 145:*2, 15, 20* 191:*18* 330:*19*
CGMPs 143:*22* 144:*22, 24* 145:*4*
challenge 167:*22*
challenges 50:*11*
change 17:*2* 20:*12* 60:*6* 62:*17* 69:*21, 22* 244:*16* 306:*24* 327:*14* 332:*22*
changed 9:*10* 20:*16, 18* 177:*8, 10*
changes 21:*7* 30:*19* 87:*23* 271:*8* 300:*22*
changing 63:*17* 66:*6*
Chapter 8:*17* 228:*18, 22, 24* 230:*3* 231:*5, 9, 15* 232:*9* 233:*3* 234:*3, 14* 235:*19* 238:*11*
character 96:*12, 13, 15, 16* 109:*2*
characteristics 107:*14* 108:*3, 6* 254:*9* 259:*15*

characterize 50:*4* 195:*3*
characterized 54:*23*
characters 96:*10* 254:*7*
Charchalis 3:*19*
chart 208:*15, 19*
charter 101:*8*
chat 23:*16*
cheaper 258:*24*
check 31:*13* 72:*20* 174:*20* 274:*23* 309:*3* 319:*4*
cheese 11:*8*
chemic 222:*16*
chemical 35:*21* 41:*17* 44:*21* 45:*20* 68:*11, 14, 21* 105:*6* 107:*2, 10, 12, 19* 112:*7* 197:*18* 204:*1, 24* 209:*21* 224:*4* 238:*18* 239:*19* 243:*2* 247:*16* 269:*14* 273:*4, 12* 303:*10, 13* 332:*6*
chemicals 101:*6* 116:*5* 121:*23* 218:*15* 267:*14*
chemist 44:*4, 7* 95:*11* 107:*16* 109:*2* 132:*4* 188:*20* 202:*15* 204:*13* 237:*23* 248:*5* 268:*14* 273:*5, 13* 294:*16*
chemistry 46:*4* 48:*3* 61:*17, 18, 19*

64:*12* 67:*13, 14, 16, 18, 20* 68:*2, 10* 69:*10* 70:*6* 95:*9* 96:*8* 104:*19* 108:*2* 131:*22, 24* 133:*24* 134:*4, 7, 8, 12* 135:*16* 145:*11* 217:*3* 256:*17* 266:*17, 22* 271:*15* 273:*7, 15*
chemists 187:*14* 266:*11*
China 190:*20*
chiral 257:*3, 6, 7, 10, 13*
C-H-I-R-A-L 257:*10*
chirality 257:*3*
chloride 254:*21* 270:*14*
choice 254:*20*
choices 71:*13*
Christine 3:*10*
chromatogram 53:*23* 54:*12* 59:*2, 7, 23* 63:*2* 288:*23* 291:*9, 12* 292:*2, 12, 23* 293:*11, 16* 295:*11, 12*
chromatograms 53:*20* 54:*18* 55:*1* 61:*9* 294:*22* 295:*3*
chromatograph 177:*1* 260:*24*
chromatographic 53:*13* 176:*11*
chromatography 55:*9* 57:*10, 13* 60:*18* 139:*21, 23* 140:*8* 177:*3,*

Confidential Information – Subject to Protective Order

*11* 179:5, 7
257:7, 9, 13
259:2, 6, 19,
23  260:9, 12,
21  261:2, 10
264:9  265:8,
11  276:23
281:14
282:11  294:16
**Chromatograp**
**hy-High** 7:4
**chronological**
170:11
**circle** 39:11
194:21
**circumstance**
98:14
**circumstances**
46:5  305:2
**cis-trans** 97:1
**citation** 22:4
**citations** 22:5
120:1
**cited** 19:1, 5
94:15, 17, 18
225:3  311:14
**cites** 20:16
**citing** 233:2
**claim** 285:1
**claims** 93:9, 11
**Claire** 168:12,
13  169:5, 18
**clarify** 123:10
255:11
260:21
321:11
323:19  329:9
331:24
**clarifying**
261:5
**clarity** 19:10
**class** 90:17
91:4  92:15
122:24  123:7
135:8  193:11
237:6, 18
238:1  305:6
334:4, 13
**classes** 91:4,
11, 15  92:12
121:6, 9

122:11, 13
236:16  326:20
**classification**
99:16  100:2,
13  113:4
116:4, 22
200:12
**classifications**
100:15  116:9
201:3  236:17,
19, 23
**classified**
43:17  112:19
115:23
116:16, 20
201:7  237:14
**classifies**
200:14
**classify**
104:21  145:3
310:19
**classifying**
101:5, 6
**clean** 23:24
**cleanly** 250:12
**clear** 57:5
59:11  87:12
118:22
205:12  236:7
304:9
**clearer** 25:6
198:24
**clearly** 134:22
329:8  335:6
**client** 38:19
**clients** 36:13
**close** 82:13
147:18
**clue** 262:9
**Coan** 3:15
**coauthor**
229:7
**co-author**
129:1  168:21,
24  169:3
**co-authored**
33:4
**co-eluting**
283:10
**COfA** 169:7, 9

**cohort** 120:24
121:3, 17
122:15, 17
124:8  125:1
224:16  225:8,
23  226:22
**cohort-of-**
**concern**
302:17
**cohorts** 121:13
**coined** 49:14
**cold** 174:16
**colleague**
128:9
**colleagues**
229:17
**College** 2:22
**colloquially**
64:8
**column** 54:3,
4, 6, 7  58:6, 7
62:12, 14
163:4, 7
164:6, 22
176:13, 15, 16
182:4  208:23
209:16
231:21  232:3,
13  259:13, 14,
15
**combination**
66:13
**combine**
325:12
**Combined**
6:16, 20
39:23  172:3
175:17  178:8
183:16  184:6
268:12
**come** 54:7
61:14  64:16
70:9  71:4
76:16  119:2
133:2  161:1
180:22
186:21
187:14
213:22
215:17  221:1

227:22  249:2
330:8
**comes** 260:23
**comfortable**
36:19  56:12
165:4
**coming** 69:4
83:23  95:15
101:22, 24
108:16  175:19
**commencing**
1:21
**comment**
133:12
147:22  245:3,
24  246:1
272:22  287:23
**commentary**
88:21
**commented**
80:22
**commenting**
116:13  145:13
**commercial**
41:15  193:22,
24  194:2
**committed**
12:2
**Committee**
11:12  101:4
220:11
**committees**
298:10
**common**
96:23  187:12
258:22
268:24  307:16
**commonalities**
60:10
**commonly**
242:20
**comp** 298:24
**companies**
12:4  13:20,
21  35:18
36:2, 4, 7, 8,
21, 23  37:2, 6,
15, 18, 23
38:1, 18, 22,
24  39:18, 19,
21, 22  40:1, 3,

17, 22  41:8, 9
53:2  59:24
61:7  140:8, 9,
13  145:7
155:16, 18
172:1  179:9,
13, 15  180:23
298:14  299:2,
23  300:1
301:10
**company**
35:15  37:2
40:15  42:23
47:14  60:15,
22  154:14
157:6, 21
158:24
173:20, 21
174:2  179:16
229:18, 20
230:22
289:11, 14
298:24  299:5,
7, 9  304:10, 24
**company's**
27:16
**compar** 86:19
**comparable**
85:23  86:5
**compare**
83:18  84:6
152:8  173:2
**compared**
165:15  279:2
291:10, 11
**compares** 85:8
**comparison**
84:15  85:10,
13, 23  86:8
87:7
**compelling**
283:1
**compendial**
81:16  82:2
86:21  87:13
263:24
**compensation**
230:2  231:6,
15
**competent**
143:24

compile 223:23
compiled 224:6
complete 38:2, 4  75:6  118:13  241:12
completed 251:16
completely 10:18  37:4  96:4  116:15  156:19  230:21  237:8  261:1  273:11  283:12  284:22  286:12  290:13  296:4, 5  297:1
complex 70:13
compliance 144:19
compliant 129:12  143:23
complied 145:23  146:17, 21
comply 308:16
complying 146:6  308:15
component 72:12, 14  197:17  268:22
components 291:21
Compound 45:12  58:5  62:12  65:23  145:17, 18  210:7  222:14  224:3  225:21  226:11  244:8  251:23  257:4  258:13  263:9  270:6  291:18  295:1  312:9, 11  313:19
compounds 9:16  43:10, 13  54:5  67:1

71:5, 7  80:13, 14  95:12  99:5  117:18  120:23  121:6, 9  122:6, 11, 12, 17  123:1, 3, 4, 6, 7, 9, 15, 22  124:7  125:12, 17  183:23  222:22  225:19  226:7, 17  239:20, 23  255:12  258:14  259:24  260:1  265:20  285:10, 15  287:1  288:5  302:17, 18  303:23
comprehens 54:20
comprehensibl y 54:21
comprehensive 71:16  75:17  118:2  138:5  148:16  224:22  248:13  305:11  311:12, 15
comprise 65:23
computer 23:14, 15, 23  24:24  242:24  con  26:12  251:7
conceivable 326:17
concept  225:9  242:15  251:5
concern  51:19  52:9, 12  120:24  121:3, 11, 13, 17  122:15, 18  124:8, 23  125:11, 16

135:23  224:16  225:8, 23  226:6, 23  236:3
concerned 174:1  316:13
concerning 189:9
concerns  98:1  226:16
conclude 251:13
concluded 81:20  336:7
conclusion 15:18  27:23  89:10  90:7, 20  92:8  93:6  133:7  142:9  167:3  186:2  192:5, 15  310:24  323:5  334:8
conclusions 86:19  87:23, 24  94:23  115:11  324:23  325:4  329:6
conditions 68:16  69:23  269:23  272:9  290:14
conduct  61:12  235:24  238:19  271:17
conducted 135:5  238:14  258:19  295:2
Conference 196:7
conferences 128:14
confident 150:20
CONFIDENTI AL  1:14  36:18
confidentiality 36:23

confidently 79:19  147:20
configuration 257:5
configure 329:16
confirm 139:15  255:11  324:16
confirmatory 106:1, 4, 14  243:11, 12, 18  244:3, 4
confirmed 21:22
confirming 72:5  136:9
conform 191:18
confuse  84:10
confused 251:24  283:8
connected 95:13, 14, 16
connection 118:20  119:20  217:10  234:12, 15, 16  235:13  327:14
consecutive 240:16
consent  70:1
conservative 249:15
consider 55:13, 18  56:4  94:16  185:21  211:15, 22  212:4  301:11
considered 5:18  22:24  32:3, 9, 13, 21  33:1  81:1  117:21  118:3  119:19  121:10  205:20  305:18  306:19

310:10  316:9  329:22
considering 333:9
consistent 196:12  224:13
constituents 176:12, 22
consult  36:8  55:10  218:6
consultant 14:3, 7  34:15  37:11  43:19  128:11  130:8, 14  135:2, 11  217:16, 24
consulted 37:6, 19  218:2
Consulting 5:20  34:16, 18, 21  35:14, 15  36:14  38:7, 8, 11, 14  39:1, 22  41:8  42:1  47:19  55:16  80:9  117:17, 22  118:18, 19  229:19  305:14
contain 224:15  249:20  251:6  268:7, 8  331:22
contained 232:11  249:21
contaminated 250:21
contamination 117:11  118:10  119:13  150:6  249:24  251:5
content 323:10, 15
contention 86:10  111:11
contest  117:3
context  11:22  63:6  145:1  156:6  231:21

232:*12, 21*
244:*12* 278:*3,*
*22* 287:*12*
**continue**
38:*18* 71:*15*
250:*12*
**continued** 3:*1*
4:*1* 6:*1* 7:*1*
8:*1* 9:*1*
177:*21*
**continues**
160:*3*
**continuing**
79:*1* 86:*15*
**contract**
36:*11* 173:*22*
289:*20, 22*
**contracted**
38:*23*
**contracts**
229:*21*
**contradicts**
191:*24*
**contribute**
204:*4* 205:*2*
334:*4*
**Control** 8:*13,*
*19* 47:*10, 17*
63:*20, 21, 23,*
*24* 64:*2*
68:*23* 70:*16*
203:*4* 237:*24*
239:*5* 300:*21*
302:*3, 7*
**controlled**
51:*3, 5*
124:*13* 125:*5,*
*21*
**controlling**
50:*16* 51:*7, 8*
**controls**
191:*17* 222:*2*
**controversial**
205:*11* 248:*22*
**controversy**
104:*22* 237:*4*
**conventions**
198:*17*
**conversation**
26:*12*

**conversations**
29:*9* 128:*19*
132:*8* 317:*3*
318:*19*
**convey** 236:*4*
**convoluted**
283:*13*
**convulsions**
206:*18*
**copied** 20:*20*
21:*6*
**copy** 12:*10*
24:*13* 28:*5,*
*12, 20* 31:*11*
32:*8* 231:*8,*
*10, 14* 250:*14*
324:*14, 20*
**copy/paste**
20:*22*
**copyright**
129:*13*
**corner** 102:*14*
103:*9, 13*
109:*15*
**Corporation**
3:*21*
**correct** 14:*11*
15:*15* 22:*2, 3*
33:*3, 23*
42:*12* 44:*2*
48:*20* 49:*2, 7*
61:*9* 65:*10*
66:*21* 70:*7*
74:*22* 80:*7*
88:*24* 89:*1, 3,*
*4, 18, 19* 96:*1,*
*4, 24* 97:*14*
98:*11* 100:*3,*
*14* 101:*11, 12*
111:*17, 18*
120:*20, 21*
121:*21* 122:*1,*
*8* 124:*8, 9*
129:*5* 134:*6*
142:*1* 145:*15*
146:*9* 152:*6*
153:*24*
154:*10, 11*
160:*1* 165:*20*
166:*4, 24*
167:*1, 14*

181:*20, 21*
190:*15, 22, 24*
191:*3* 193:*6*
196:*24* 197:*1*
200:*1* 203:*5*
207:*15* 208:*5,*
*21, 22* 217:*24*
221:*4, 19, 20*
226:*3, 4, 8, 18*
227:*4, 7*
233:*1, 13, 14*
234:*22* 239:*1*
258:*5* 259:*20*
262:*4, 20*
264:*21*
265:*13*
269:*20* 270:*3*
272:*7, 11, 12,*
*14* 284:*15*
285:*19*
292:*24*
293:*12, 19*
294:*17*
295:*13* 296:*2*
297:*16*
301:*14*
306:*21* 308:*1,*
*6* 313:*1, 7, 12*
315:*19* 319:*1,*
*15* 328:*3, 7*
337:*9*
**corrected**
19:*11, 14*
20:*9* 22:*21,*
*22* 30:*23*
31:*3, 11, 22*
324:*13*
**corrections**
22:*4*
**correctly** 11:*7*
77:*14, 24*
97:*16* 162:*21*
195:*21* 220:*5*
234:*24*
**correlated**
222:*17*
**correlation**
222:*20*
**corresponding**
292:*16* 294:*9*

**corresponds**
264:*2*
**Cosmetic**
191:*21*
**counsel** 26:*15*
27:*11, 14*
29:*10, 19*
93:*14* 94:*1*
132:*8* 134:*20,*
*22* 135:*4*
274:*4, 10*
280:*2* 317:*3*
318:*19* 321:*2*
323:*12, 13*
331:*11, 15*
332:*14* 337:*12*
**counsel's**
331:*3*
**counted** 21:*23,*
*24*
**countries**
214:*16*
**country** 299:*8*
**couple** 18:*4, 5,*
*9* 20:*20* 37:*1*
58:*12* 105:*3*
119:*23*
151:*11* 155:*4*
217:*8* 298:*9*
333:*17*
**coupled** 66:*16*
**course** 23:*20*
192:*9* 217:*24*
**COURT** 1:*1*
4:*21* 10:*10,*
*21* 15:*1, 5, 13*
26:*21* 153:*21*
160:*21, 22*
178:*16*
189:*23* 190:*3*
240:*10*
**co-wrote** 232:*8*
**create** 45:*21*
130:*20* 303:*10*
**created** 65:*9*
**creating**
303:*21, 22*
**criteria**
254:*24* 277:*8*
**crops** 138:*16*
**CRR** 4:*21*

**crude** 267:*7,*
*10, 11* 268:*1*
271:*3, 7*
272:*10, 13*
**CULBERTSO
N** 3:*12*
**Current**
34:*11, 14, 15*
134:*1* 239:*22*
240:*5, 6*
306:*20* 307:*8*
**currently**
306:*23* 322:*4*
**Customer**
285:*6* 292:*13,*
*24* 293:*19*
**cut** 34:*13*
67:*5* 97:*19*
141:*3* 203:*17*
308:*22*
**CV** 12:*7, 11,*
*22* 13:*1*
21:*11, 20*
22:*22*
**CVS** 3:*20*
37:*17*
**cyclic** 312:*9*
**cyclotron**
183:*17*

**< D >**
**d.staoch@kann
er-law.com**
2:*8*
**daily** 152:*20*
153:*5* 208:*19*
322:*3*
**damage**
221:*15*
**damages** 91:*19*
**Data** 8:*9*
103:*11*
109:*13, 18, 20*
110:*13* 113:*7,*
*13, 17* 115:*2*
144:*19* 151:*1*
171:*4* 291:*3,*
*4* 323:*16*
**database**
224:*6* 296:*16*

Confidential Information Subject to Protective Order

**date** 10:5
19:16 31:19
47:1 76:4
119:12
147:12
193:13
195:14, 15
218:2 220:6
307:10
**dated** 154:9
157:13
311:19, 20
312:18, 24
313:3
**dates** 149:14
**David** 2:8
128:7, 12, 22
129:4
**day** 18:10
71:22 153:8
188:8 208:21
210:8 333:3
**days** 28:21
**De** 2:10
**deal** 17:21
137:10 223:9
238:2
**dealing** 62:5
144:12 237:24
**deals** 196:23
**December** 8:3
77:4
**decide** 254:23
305:21
**decided** 19:22
78:24 282:23
284:6
**deciding** 101:5
**decision**
323:20
**decompose**
271:19 272:1
**decrease** 66:7
**dedicated**
251:11
**deducing**
80:16
**default** 180:9
277:14

**Defendant**
3:16 4:4
39:12 88:24
**Defendants**
3:6, 11, 20
5:12 37:11
38:2, 5 39:4,
14 89:3, 6
90:10 131:5
**defendant's**
23:3 26:17
27:4
**defense** 334:4
**defer** 56:22,
23, 24 321:23
**define** 56:3
58:14 173:9
192:16
198:14 247:2
299:1
**defined** 98:19
124:22
197:19
211:19 246:8,
24 326:4
**defines** 197:6
**definitely**
25:9 76:20
94:19
**definition**
59:11 197:5,
20 199:5, 9,
15, 20, 22
310:11
**definitions**
116:6
**definitive**
77:20 79:13
82:15
**definitively**
66:17 78:19
79:20 136:8,
9 272:22
**Degradation**
33:17 35:21
43:2, 16, 18
44:17, 18
45:7, 17, 23
46:16, 21
48:1 49:17
54:14 58:4

62:14 64:5, 7
70:23 202:7
204:5 205:4
**degradation-
related** 43:3
64:17
**degree** 81:7,
11
**degrees** 107:7,
15 112:21
**delay** 16:13
84:2 254:3
**demands**
27:12 29:19
**demonstrated**
115:1 265:17
**depend** 277:11
**dependence**
92:22
**dependent**
78:20 93:8
**depending**
48:18 56:3
61:2 92:4, 14
98:13 303:23
**depends** 65:2
189:11
224:20 255:2
260:2 299:9
310:11
**deponent**
10:12
**deposed** 11:15,
18, 24 13:12
14:19, 21
**depositing**
62:11
**deposition**
1:20 5:9, 10,
11, 13, 15, 17,
19, 21, 23 6:3,
5, 7, 9, 11, 13,
15, 19 7:3, 8,
19, 21 8:2, 7,
11, 16, 18, 21
9:2, 4, 6, 9, 12,
14, 17, 19, 21
10:7, 13
12:16 14:22
17:1, 23 23:3,
21 24:6

25:13, 18
26:24 30:5
31:5 32:4
42:4 73:20
74:13 78:12
79:10 101:16
120:8 148:11
153:16 157:3
159:6 160:13
168:4 171:16
178:17
181:13
184:17
189:18 195:7
214:23
216:17 219:5
228:11 239:8
241:1 253:17
258:10
264:14
265:24
269:19 270:1,
10 274:17
279:9 297:20
306:5 309:22
330:14, 15, 24
331:1, 6, 10,
21 332:18, 21
336:7
**depositions**
32:15, 18
330:4, 9
**derived** 93:8
94:20 124:4
**DeSalvo** 2:4
**describe**
49:11, 14
54:21 61:24
77:8 111:20,
22 112:1, 3
183:9 197:7
242:4, 6 326:1
**described**
71:24 105:7,
11 107:5
194:10
218:19 327:3
**describing**
64:13, 14
75:16

**description**
57:19 107:22
112:23 197:8
**design** 47:20
48:5 70:6, 15
217:19
**designate** 35:6
**designated**
250:4
**designation**
178:24 179:2
263:16
**desire** 63:23
**desired** 66:8
**destabilize**
44:21
**detail** 326:13,
14
**detailed** 68:20
75:18 97:5
**details** 68:20
90:10 282:4
**detect** 46:16
48:20, 24
70:23 71:7
78:5, 14 79:5
81:19 86:21
177:2 182:4
207:7, 11, 24
260:10, 13, 22
274:1 291:24
300:21 302:6
303:12 305:3
326:22, 23
329:11 335:20
**detected** 54:8
85:24 86:11
150:16
157:23
285:15 287:2
296:1 325:23
326:6 327:10
335:14, 15
**detecting**
50:12 87:14
138:10 208:3
257:21
259:20 327:9
**detection**
48:10 85:21,
22 87:3

Confidential Information Subject to Protective Order

133:*15*
137:*13*
159:*15*
207:*21*
256:*16*  258:*8*
259:*3*  303:*1*
**detector**  54:*8,*
*9*  72:*2*  78:*5,*
*15*  182:*4*
189:*3*  259:*16,*
*17*  260:*23*
261:*1, 3*
282:*16*  296:*7*
**detectors**
258:*23*  261:*4*
**detects**  176:*17*
**Determination**
7:*6*  86:*4*
148:*1, 19, 22*
149:*18*
**determine**
60:*17*  62:*24*
64:*21*  66:*10,*
*21, 24*  67:*4, 9*
72:*10*  236:*2*
329:*10*
**determined**
126:*17*
281:*15*  282:*10*
**determining**
48:*23*  65:*14*
136:*5*  171:*21*
172:*14*
**develop**  46:*14*
49:*5*  70:*5*
71:*15*  92:*1*
259:*8*  301:*11*
329:*16*
**developed**
47:*1*  172:*1*
205:*22*  206:*6*
207:*3, 23*
208:*4*  220:*9*
233:*22*
235:*17*  303:*11*
**developing**
48:*14*  202:*23*
300:*19*  301:*23*
**Development**
7:*9*  46:*11*
47:*2, 20*  48:*4,*

*6*  70:*18*
184:*24*
209:*14*  235:*23*
**devices**  23:*13*
**devise**  207:*19*
**di**  268:*7*
**diethylamine**
268:*8*
**differ**  58:*20*
181:*22, 24*
**difference**
19:*13*  82:*19*
**differences**
72:*2*  83:*1, 5*
142:*16*
**different**
18:*13*  35:*8*
49:*9*  51:*18*
54:*5, 6*  58:*12*
69:*21*  71:*24*
93:*2*  94:*7*
97:*2*  109:*23*
112:*17*  116:*5,*
*6*  136:*18*
138:*8*  151:*2*
162:*8*  181:*1*
182:*22*  183:*3,*
*4, 24*  200:*15*
205:*7*  208:*18*
236:*16*
247:*18*
253:*24*
256:*24*  257:*5*
258:*23*  261:*1*
286:*12*  294:*4*
299:*8*  307:*13*
316:*19*
**differently**
331:*8*
**difficult**  50:*14*
78:*6*  302:*1*
325:*8*  326:*11*
**difficulty**
108:*9*  329:*2*
**digested**  81:*3*
**diligence**
305:*19*
**diligent**  75:*11,*
*14*
**dimeth**  297:*11*

**dimethyl**
95:*18*  316:*5*
**dimethylamine**
103:*23*
104:*15*
271:*20*  272:*1,*
*6*
**Dimethylforma**
**mide**  271:*13*
272:*14*
**DIPLOMATE**
337:*19*
**Direct**  6:*20*
23:*16*  85:*9,*
*13*  86:*7*
88:*20*  162:*5*
166:*8*  167:*2*
178:*8*  235:*19*
239:*14*  312:*5*
**directed**
115:*3*  190:*18,*
*23*
**directing**
113:*12*  154:*8,*
*12, 20*  158:*10*
162:*11*
169:*16*
190:*12*
210:*15*  218:*7*
290:*19*  291:*7*
**directly**
121:*12*
221:*15*  234:*8*
**director**  155:*2*
**disagree**
110:*1, 4*
112:*23*  113:*3*
192:*11*  249:*7*
250:*2*
**disagreement**
100:*21*
**disappointed**
236:*6*
**discern**  134:*13*
**disclose**  36:*24*
37:*3*
**disclosed**
117:*20, 23*
118:*3*  274:*13*
**disclosing**
118:*1*

**disclosures**
119:*12*  273:*22*
**discover**  274:*1*
**discovered**
83:*5*  117:*15*
269:*3*  273:*18*
274:*6*  279:*13*
280:*14*
281:*12*  282:*1*
318:*24*
319:*14, 19*
**discovery**
48:*2*  64:*11*
65:*8*  67:*14*
279:*22*  280:*9*
283:*22*  284:*14*
**discriminate**
198:*18*
**discuss**  29:*6,*
*8*  87:*18*  88:*9*
132:*8*  137:*5*
223:*19*
**discussed**
27:*14*  86:*2*
105:*24*
206:*11*
232:*23*
233:*16*  258:*9*
263:*7*
**discussion**
115:*10*
144:*12*  322:*16*
**discussions**
93:*24*  274:*10*
280:*2*
**disease**  103:*3*
**diseases**  91:*20*
92:*2*
**display**  17:*3*
292:*22*
**displayed**
75:*10*
**displays**
292:*15*
**dispute**  15:*8*
100:*19, 20*
104:*12*
107:*23*  323:*9*
**disputes**  12:*3*
**disregard**
85:*21*  87:*5*

**disruptive**
17:*6*
**dissolve**  255:*3*
**distinct**  181:*23*
**distinguish**
183:*22*
**DISTRICT**
1:*1, 2*  10:*10*
**diversity**  95:*20*
**divert**  69:*3*
**DMF**  271:*11,*
*12, 19, 24*
272:*18, 24*
283:*7, 9*  292:*6*
**DNA**  8:*13*
50:*5, 7*  51:*17,*
*20, 24*  52:*17,*
*18, 20*  221:*13,*
*15, 18*
**Docs**  129:*20*
**Doctor**  12:*12,*
*21*  24:*23*
25:*21*  30:*4,*
*12*  31:*9*  32:*8*
47:*8*  72:*21*
73:*7*  111:*16*
169:*23*
175:*18*
181:*16*
227:*13*
239:*11*  241:*4*
275:*3*  276:*6*
285:*22*
287:*20*
290:*10*  319:*8*
320:*7*  327:*16*
**doctor's**  74:*12*
**DOCUMENT**
1:*10*  18:*17*
26:*4, 7*  27:*8*
50:*4*  75:*19*
102:*22*
109:*15*
111:*14*  119:*8*
120:*1*  124:*20*
127:*19*
144:*13*
156:*23*
157:*12, 13*
158:*11*
159:*24*  160:*4,*

Confidential Information Subject to Protective Order

10, 11 161:19, 21 162:6
166:10 168:1
170:9 171:15
172:11
175:20
181:10
185:18 190:6
197:9 200:5, 8 209:13
210:22
214:20 215:3, 7 216:12, 15
217:14, 15
219:3 221:3
228:7 232:16
239:7 240:22, 23 241:22
242:14
246:16
253:16
264:11
265:23 266:3
274:12
275:15, 16, 17, 21 276:7, 18
277:20 279:7
286:1, 8, 12, 18, 21 287:21
290:11 293:9
306:2 307:3
310:7 312:18, 24 313:3, 4, 11 314:10
315:16, 19
316:8, 10, 21
317:9, 17, 24
318:12 321:7
331:2, 8, 16, 18 332:1, 5, 8, 12, 13
**documentation** 27:11 133:19
**documented** 294:9
**documents** 18:21, 23
19:4 22:12, 14, 16, 17
23:10 28:20
29:17, 18

39:13 42:2
117:17
132:11, 16
135:21
144:16
152:24
156:20
157:11
227:23 274:4
279:20
283:21
284:21, 23
285:1 310:15
311:3, 13
318:11, 20
330:6 332:16
**doing** 16:9
43:20 50:23
53:13 68:6
71:21 75:20, 24 80:11
113:9 164:16
257:23
268:19
279:13
281:13 282:2, 15 287:14
291:12 295:6, 8, 9, 10 320:2
328:13
**Dolores** 2:4
**Dolores.desalvo @1800law1010. com** 2:5
**dosage** 142:14
150:7
**dose** 88:3
151:15, 19
152:1, 8, 20
163:23 208:19
**double** 96:9, 11, 15
**double-peaked** 53:11
**download** 24:17
**downloaded** 81:3
**dozen** 60:12
**DP** 238:11

**Dr** 10:12
11:6 17:20
19:16 24:9
27:3 42:7
74:16 85:5
97:8 106:19
120:11 128:6
154:21 155:1, 7 157:7
159:10 165:2
171:19 174:9
184:20
210:17 215:2
216:21
228:14
229:10, 11, 12, 15 253:20
266:4 270:13
279:12 310:1
320:16
324:21
329:21 333:2, 17 335:10
**Draft** 8:3
215:5, 9, 11, 14, 15 216:9
**dramatically** 177:8
**drives** 176:21
**Dropbox** 24:11 169:24
250:14
286:10 310:4
324:19
**Druck** 105:18
**Druckrey** 105:8, 19, 21
**Drug** 7:23
8:5 35:21
36:9 43:22
44:18, 19
45:7, 21 46:4
48:9, 19
49:17 68:12
72:3 121:20, 24 125:21
126:6, 19
136:14, 20
142:5 143:11
144:3 147:10
148:20 162:1

191:20
193:19 194:4, 18, 23 195:1, 2 197:18, 19
198:10, 16
199:1, 13
200:9 201:19
203:15 204:5, 19 205:3
212:10, 14, 16, 17, 24 213:1, 18 214:8, 22
235:23
254:19
299:24 300:1
302:7 303:7, 10 326:15
328:17
**Drugs** 7:7, 18
8:20 36:2, 12
135:18 144:8
201:10 239:6
302:6, 12
303:3 308:1
**Du** 190:23
192:1
**D-U** 190:23
**Due** 10:15
15:7 96:19
126:13
159:15 305:18
**duly** 11:1
**dye** 198:3

< E >
**earlier** 139:8
158:5 218:19
227:5 233:12
258:4 269:19, 24 278:11, 24
279:2 321:2
322:16
**early** 149:1, 7, 11 188:10
**earth** 303:4
**easier** 170:1
187:1
**easily** 261:17
**easy** 212:19
303:19 304:4
**eat** 174:11

**effect** 110:11
114:22
**effective** 91:18 259:6, 24 260:4
261:10 265:19
**effects** 126:14
206:1 233:24
**efficacy** 144:3
**effort** 54:18
**efforts** 115:2
**eh** 310:16
**eight** 18:11
**either** 39:24
59:7 80:12
82:12 93:11
251:16 286:3
330:13
**Elder** 128:12, 22
**Elder's** 128:7
129:4
**electronic** 23:12 24:13
231:8 324:19
**eleven** 13:21
**Eli** 44:1, 3, 11
45:6 46:22
188:14 229:17
**eliminate** 126:16
**eliminates** 60:9
**else's** 158:19
**Elsevier** 230:10, 17, 18
231:1, 2, 4
**elu** 66:24
**elucidating** 138:10, 11
**elucidation** 48:3 64:12
65:13 67:15
**elude** 53:14
**eluent** 182:3
**elute** 64:20
259:15
**eluted** 176:16
**elutes** 291:19

**EMA** 42:*24* 117:*16* 119:*4, 7* 126:*2, 11*
**Email** 6:*14* 9:*13, 22* 23:*16* 29:*3, 21* 128:*19* 168:*12* 169:*5, 17, 19, 24* 170:*3, 4, 10* 277:*21* 278:*9* 286:*6* 311:*19* 314:*5*
**emails** 276:*8, 11*
**embarrassing** 75:*9*
**EMEA** 196:*11*
**emphasize** 59:*14*
**employed** 105:*9* 133:*20*
**employee** 34:*24*
**employees** 34:*17* 168:*15*
**employment** 34:*11, 14, 15*
**empty** 23:*9*
**enable** 48:*8* 70:*11, 12*
**enantiomer** 257:*4, 20, 22*
**enantiomeric** 256:*8* 257:*2, 12, 14, 18, 21*
**encourage** 301:*10*
**encouraged** 301:*10*
**encouraging** 301:*6*
**encyclopedia** 120:*4*
**encyclopedic** 120:*3*
**endorsed** 220:*10*
**ends** 160:*10* 168:*2*
**engage** 56:*23*

**ensure** 10:*17* 72:*7* 144:*2* 301:*7, 8*
**ensuring** 143:*19*
**entail** 44:*11*
**entails** 245:*22*
**entire** 276:*18* 304:*9*
**entities** 218:*13, 18*
**entitled** 39:*3* 47:*9* 178:*7* 246:*5* 258:*18* 285:*9*
**entity** 129:*6, 9* 197:*19*
**environment** 67:*18* 247:*16*
**environmental** 188:*21*
**epidemiological** 110:*13* 115:*2*
**equal** 205:*19*
**equally** 93:*2* 299:*6*
**equilibrium** 176:*22*
**equipment** 41:*13* 135:*16, 24* 136:*3* 183:*6, 9, 10, 12* 256:*2* 290:*22* 329:*10*
**equivalent** 162:*13* 164:*7*
**ER** 77:*1*
**Errington** 4:*18*
**error** 20:*22* 21:*1, 23* 232:*15* 235:*1*
**errors** 20:*18*
**escape** 303:*1*
**escaping** 28:*7*
**ESO** 275:*22* 277:*22, 23* 278:*2*
**Esq** 2:*3, 8, 11, 15, 18, 21, 23*

3:*4, 5, 10, 15, 19* 4:*3*
**essentially** 20:*17* 130:*21* 220:*22* 238:*2* 256:*19*
**EST** 1:*22* 336:*7*
**establish** 163:*3* 238:*7* 291:*19, 23* 292:*1*
**established** 104:*18, 20* 110:*23* 162:*17* 302:*14, 23*
**estimate** 40:*19* 41:*6*
**et** 16:*14* 87:*1* 104:*1* 105:*8, 12* 133:*15*
**ET3N** 268:*5*
**ethanol** 254:*21* 292:*5*
**Ethyl** 294:*11*
**Eton** 12:*14* 13:*3, 6* 14:*10*
**Europe** 196:*11*
**evaluate** 85:*7* 88:*2* 284:*8*
**evaluated** 249:*16*
**evaluating** 106:*9* 149:*17* 202:*14*
**evaluation** 109:*14, 18* 110:*8* 113:*7, 14* 114:*14, 16* 236:*1, 9*
**evasive** 311:*10*
**event** 164:*2* 206:*19* 241:*20*
**eventually** 109:*1* 177:*1*
**everybody** 73:*24* 269:*5* 304:*14*
**evidence** 92:*18* 110:*10*

114:*21* 143:*16* 279:*17* 281:*23* 284:*2, 18* 315:*22*
**evolve** 177:*21*
**exact** 19:*17* 84:*17* 131:*13* 157:*12* 184:*10* 229:*5* 270:*22, 23*
**exacting** 186:*23*
**exactive** 184:*4*
**Exactly** 41:*22* 79:*8* 101:*7, 8* 125:*12* 133:*9* 135:*24* 184:*4, 8* 185:*16* 238:*7* 308:*11* 330:*20*
**EXAMINATIO N** 5:*2* 11:*4* 320:*14* 334:*1*
**examined** 11:*2*
**example** 40:*9, 14* 54:*1* 62:*15, 21* 64:*6* 79:*3* 82:*7* 108:*15* 255:*9* 292:*4* 301:*23* 313:*17*
**examples** 63:*11* 206:*24*
**exceptions** 208:*7*
**excess** 153:*4* 269:*1*
**exchange** 128:*18* 272:*17*
**exchanged** 128:*19*
**exclusively** 56:*7*
**excuse** 126:*7* 246:*5* 306:*3*
**Exel** 12:*14*
**Exela** 12:*14* 13:*3* 14:*9*
**Exhibit** 5:*9, 11, 13, 15, 17,*

19, 21, 23* 6:*3, 5, 7, 9, 11, 13, 15, 19* 7:*3, 8, 19, 21* 8:*2, 7, 11, 16, 18, 21* 9:*2, 4, 6, 9, 12, 14, 17, 19, 21* 12:*11* 24:*7* 25:*13, 18* 26:*22, 23, 24* 27:*4* 28:*24* 30:*5, 8, 13* 31:*4, 5, 9, 18* 32:*1, 4* 42:*1, 4, 7, 9, 14* 47:*7* 72:*16* 74:*13, 24* 75:*5* 76:*11* 101:*16* 120:*7, 8* 153:*16, 18, 20* 157:*3, 9* 159:*6* 160:*13, 19* 161:*4, 8* 168:*4, 7, 11, 12* 169:*17* 171:*13, 16* 174:*4* 175:*23* 178:*3, 6, 11, 17* 181:*12, 13* 184:*15, 17, 23* 186:*8* 189:*18, 21, 22* 195:*7* 212:*9* 214:*23* 216:*17* 219:*1, 5, 7* 228:*6, 8, 11* 239:*5, 8* 240:*11, 13* 241:*1* 250:*7* 253:*1, 17* 264:*14* 265:*24* 266:*24* 267:*6* 270:*10* 274:*17* 275:*5, 9* 279:*9* 285:*4, 23* 286:*11, 14* 297:*19, 20* 306:*5, 8* 309:*22* 310:*2*

311:*18*
324:*15, 18*
**EXHIBITS**
5:*8*  30:*3, 17*
75:*1*  330:*14,*
*23*
**exist** 252:*14*
**expanded**
42:*16*  300:*15*
**expect** 179:*8,*
*12, 14*  327:*2*
**expectation**
209:*7*  302:*24*
**expected**
21:*12*  144:*2*
167:*7*  205:*24*
206:*7*  233:*23*
235:*7*  277:*13*
304:*8*
**experience**
61:*19*  140:*7*
143:*7*  186:*3*
296:*6*
**experienced**
60:*4*
**experiment**
314:*2*  316:*4, 6*
**experimental**
109:*20*
110:*12*
113:*17*  114:*23*
**experiments**
61:*15*  69:*22*
**expert** 5:*14*
13:*24*  17:*24*
18:*2*  21:*21*
22:*20, 21, 22*
30:*3, 16*  31:*3,*
*16, 22*  39:*2*
55:*13, 18*
56:*3, 5, 10, 11*
77:*1*  80:*23*
83:*11, 15, 18*
84:*5, 12*
85:*11*  86:*8*
87:*21*  93:*12,*
*19*  94:*19, 22*
114:*11*
116:*13*  117:*1,*
*6*  130:*8, 14,*
*18, 21, 24*

131:*15*
132:*13*  133:*3,*
*13*  134:*1*
135:*2*  141:*15,*
*19, 21*  142:*8,*
*22*  143:*6, 15*
156:*4*  185:*21*
192:*4*  193:*4*
204:*13*  216:*8*
220:*9*  244:*23*
245:*4*  246:*2*
247:*6*  273:*16*
298:*10*  300:*8*
302:*10*  305:*6,*
*11*  318:*23*
319:*13*
320:*19*
322:*17, 22*
323:*10*
324:*11, 13*
329:*6*  330:*1,*
*4, 5, 9*  332:*11,*
*17, 23*  335:*6, 8*
**expertise**
35:*19*  43:*9,*
*12*  45:*16*
50:*22*  55:*4,*
*23*  56:*9*
131:*17, 18*
142:*23*  143:*4*
173:*11, 19*
**experts** 94:*10,*
*12, 14, 15, 16,*
*18*  95:*3*  135:*9*
**expiration**
147:*12*
**explain**
183:*18*  201:*13*
**explained** 29:*5*
**explaining**
187:*9*
**explanation**
156:*8*
**explicitly**
18:*24*
**explore** 79:*1*
**exploring**
78:*23*
**export** 5:*16*
**exposed** 314:*3*
316:*3*

**exposure**
45:*18*  221:*23*
**expressed**
163:*10, 12, 14*
**expressing**
246:*19*
**extensive** 56:*1*
90:*15*  311:*14*
**extensively**
329:*5*
**extent** 15:*17*
27:*24*  29:*11*
36:*17, 19*
89:*9, 12*  90:*6,*
*19*  91:*7*  92:*7*
93:*5, 23*
132:*7*  140:*16*
145:*10*  186:*1*
193:*9*  205:*6*
245:*13*  274:*9*
276:*9*  280:*1*
287:*21*  293:*8*
299:*1, 11*
310:*23*  317:*2*
318:*18*  334:*7*
**extra** 312:*8*
313:*17*
**extraneous**
54:*14*
**extreme** 111:*9*
**extremely**
115:*14*
**eye** 69:*5*
254:*15*
**eyes** 147:*18*

< F >
**facilities**
191:*13, 16*
**fact** 120:*23*
166:*2*  235:*12*
250:*1*  319:*20*
**factor** 77:*6*
78:*1*  79:*2*
80:*22*
**Facts** 92:*18*
143:*15*
279:*17*
281:*23*  284:*2,*
*17*  315:*22*

335:*19*
**fade** 137:*21*
**fair** 214:*6*
235:*10*  277:*18*
**fairly** 60:*3*
65:*21*
**fall** 46:*6*
201:*11*  221:*2*
236:*22*
**falling** 69:*7*
**falls** 211:*23,*
*24*  212:*5, 6*
**fame** 289:*23*
**familiar** 60:*12*
100:*23*  101:*3*
105:*13, 16, 17*
117:*19*
120:*14*  121:*2*
144:*9*  154:*24*
155:*3*  157:*6,*
*10, 11*  161:*20*
185:*12, 19*
195:*11*  196:*2*
206:*3, 4*
216:*20, 23*
219:*21, 23*
241:*8*  242:*1,*
*7, 16*  245:*15,*
*20*  263:*19*
278:*22*
289:*14*
290:*13*
294:*22*  295:*6*
297:*23, 24*
298:*7*  306:*16*
307:*4, 5, 6*
**familiarity**
217:*1, 13*
242:*21*
**familiarize**
148:*12*
179:*21*  180:*17*
**familiarized**
180:*24*
**fancy** 67:*17*
**far** 18:*17*
52:*15*  86:*18*
89:*16*  112:*4*
114:*8*  118:*7*
123:*10*
128:*11*  129:*3*

135:*13*  230:*8*
236:*23*
244:*22*
263:*17*  305:*9*
**FARR** 2:*12*
**fashion** 111:*8*
**fast** 113:*11*
**favor** 323:*12*
**FD&C** 191:*21*
**FDA** 6:*4, 6,*
*16, 20*  7:*4, 9,*
*20*  42:*24*
117:*16*  119:*1,*
*6, 12, 16*
120:*6*  124:*20*
126:*2, 11, 17*
152:*18*  153:*6,*
*14*  154:*5*
155:*3, 24*
158:*20*
162:*17*  167:*8*
171:*20*  172:*7,*
*13, 24*  173:*3*
175:*20, 23*
176:*2*  179:*22*
180:*5, 18, 22*
181:*5, 10*
183:*1*  189:*9*
192:*1, 19*
196:*11*
213:*11, 17, 24*
214:*4, 17*
239:*12*
265:*18*  308:*4,*
*17*  322:*4*
326:*5*
**FDA's** 117:*9*
118:*8*
**feasible**
126:*15, 22*
127:*5*
**feature** 54:*10*
**February** 8:*19*
**Federal**
191:*20*
**feed** 17:*7*
**feel** 52:*4*
83:*12*  91:*18*
93:*7, 9*
169:*23*  170:*8*

Confidential Information Subject to Protective Order

fellow 44:5, 9
FID 282:19
field 53:24
94:17 131:24
133:23 217:3,
4 299:8
figure 30:20
53:9 59:24
66:4 69:6
71:4 132:21
142:18
151:14 152:7
185:17
266:15, 16
279:21 291:8
292:12, 14, 19,
22 293:11
figured 304:16
file 24:16
27:19 28:5,
10, 12
files 24:17
finalize 127:13
finalized
231:24
finally 324:10
find 30:18
49:6 79:7
82:18 85:1
164:21, 23
274:20 280:22
finding 86:16
282:9
fine 68:6
127:19, 21
174:13
199:20, 22
finish 13:14
47:15
finished 88:3
138:13 142:5
151:15, 19
152:1 170:23
finished-dose
143:10 146:8,
18, 22 151:3,
10 152:11
153:2, 11
266:7 280:19
327:13

FIRM 2:12,
21 139:16, 18,
19
firmly 110:22
firms 13:22
15:9 140:21
first 10:24
11:14 13:2
30:2, 16, 24
31:18 33:22
55:8 59:24
67:5 74:16
102:3 103:20
105:3 110:9
120:18
130:10
131:14 139:4
148:24
157:22
160:17 161:3,
18 167:4
169:6, 11
170:3 176:4
177:11
190:14
203:10
212:12 213:9,
10 215:6, 17
216:9, 10
218:11
219:24 220:1
227:3 228:21
229:12
231:21
232:13 242:5
246:6 254:6
268:4 269:6
273:9, 17, 24
274:5 285:13
286:23 291:8
317:11, 12, 22
320:24 325:7
326:8, 10
329:5 330:11
333:11 335:19
fish 328:14
Fisher 184:10
256:15
fishing 302:20
fit 243:20
296:14, 17, 18

five 20:4
37:6 71:2, 3
73:2, 4, 5
184:7 227:12,
15, 22 275:1
309:7
five-minute
253:8
flame 259:16
282:16
Fleming 4:17
10:3
flight 333:20
flip 17:3
flips 17:7
Floor 3:9
Florida 2:11,
14
focus 43:5, 8
133:3, 18, 22
137:4, 11
141:20 180:6
221:9, 11, 13
326:9, 10
focused 44:13
45:16 55:3
folder 324:16
Folders 132:23
follow 204:15
221:2
followed
232:1 234:21
following 68:8
205:7
follows 11:3
follow-up
138:20 282:3
Food 191:20
forbidden
323:14
force 44:17
forced 48:1
64:5, 7
foregoing
337:4, 8
forgotten
194:11
form 27:22
45:12, 18
46:1, 17
48:11 51:14,

17, 24 52:2
55:21 60:20
63:4 69:11,
12 82:22
83:9 89:9, 23
92:18 93:5
97:23 98:2,
24 100:18
106:7 107:4,
21 110:3, 19
112:9 113:2,
23 114:10
115:9 116:1,
11, 24 117:13
122:3, 10, 21
123:18
124:17 125:8,
24 126:9
127:2 130:17
133:6 137:3
139:14 140:1,
16 141:10, 14
142:8, 15
145:17
146:11 147:1
149:3 156:3,
14 158:16
162:19
164:14 165:1,
22 167:16
172:17 180:2
186:1 187:6
192:3, 14
194:6 202:16,
18, 24 205:6
206:19
211:10, 18, 21
214:11
215:11 217:6
218:22 222:5
225:21
226:10
234:10 237:1,
21 240:2
242:12 244:7,
20 245:12
246:13
247:13, 18
248:8, 11, 20
251:1, 22
252:9, 16, 20

258:7 259:5,
22 261:14
262:13 263:9
265:15
267:17, 19, 23
268:17 270:1,
5 271:22
272:7 273:20
274:8 276:4
277:2 278:1,
16 279:16, 24
280:11
281:21
282:13 284:1,
17 285:21
287:6 288:9
290:8 291:1,
14 293:2, 6,
14, 21 294:7,
19 295:15
296:9, 23
297:9 298:6,
21 300:7
301:3 302:9
303:15 305:1,
5 308:20
310:23 313:9,
14 314:23
315:21 317:1
318:6, 17
319:3 334:7,
20 335:5
formally
237:14
formation
37:8 43:2, 6,
9, 13 68:24
247:9 250:5
268:14
269:12, 20
305:19
formed 67:22
68:15 96:5
97:18, 20, 21
244:5 247:14
300:12
303:12 305:17
forming 43:15
46:4 66:4
281:17

Confidential Information Subject to Protective Order

forms 150:7
177:17
formula 184:1
formulated
42:19 43:4,
10, 14
formulating
281:2 310:8
formulation
35:21 44:19
formulations
44:20
forth 82:10
153:6 180:18
181:5 239:18
332:23
forward 57:7
262:18
found 21:3
78:16 80:19
150:11, 23
151:6 152:3
155:15 171:7
201:9 224:21
243:10 244:1,
3, 14 250:4
281:14
307:17 308:1
325:9 334:17
335:3
Foundation
115:9 116:11,
24 149:3
242:13
243:15 244:7,
20 246:13
247:13 248:8,
20 251:1, 22
252:20 276:4
277:2 278:1,
16 279:16, 24
280:12
281:22 287:6
288:9 290:8
291:1, 14
293:2, 7, 14,
21 294:7
296:9, 23
297:9 298:21
300:8 301:3
302:10

313:14
315:21 317:1
318:17
334:20 335:5
four 11:19, 20
20:3 37:5
104:23
fourth 275:20
284:18
fragment
312:10
fragmentation
66:15
frame 41:2
65:6 304:12
framed 84:18
311:3
free 169:23
170:9 231:8
284:24
freely 255:1
frequent 60:3
frequently
269:2
Friday 18:4, 7
Fridman
104:1
friend 128:10
frit 62:10, 11,
17, 19
front 22:18
24:24 29:22
182:12
294:23
320:23
324:14, 21
full 29:1
63:24 137:19
169:24
290:11 317:4
fully 283:14
285:23
fun 95:10
function
71:23 93:10
97:4
functional
56:11 95:13,
22, 24 218:18
223:1, 2 225:4

fundamental
65:21
funded 230:5,
6
funny 124:18
further 52:16
69:24 70:16
82:20 108:24
124:10
138:21
169:16 218:5
283:5 286:2
316:18
318:11 333:1
336:2 337:11

< G >
gallery 17:5
Gannon 3:10
gas 55:9
57:13 139:21,
22 140:8
176:11, 23, 24
177:3, 11
179:5, 7
259:2, 6, 12,
19, 23 260:9,
12, 21, 24
261:2, 10
264:9 265:8,
11 276:23
281:14
282:11 294:16
Gateway 3:9
gather 45:5
149:18
GC 55:19
57:11 261:4
275:22 276:1
277:15 278:6
290:3, 6 295:3
GC/FID
258:22, 24
261:2 295:3
GC/MS 6:23
178:21, 22
181:22, 23
182:23
187:24 188:8,
11, 13, 23
258:23 261:3

265:17 283:6
288:5, 7
295:2, 3
328:12
GC/MS-
Headspace
6:18 176:5, 7
GC/specialized
261:3
gcoan@hinsha
wlaw.com
3:15
General 6:4
32:19 49:4
51:18 57:21
66:15 67:20
75:23 78:21
99:19 114:2
117:17, 22
120:6, 15
132:18
133:11, 16
136:13
140:20
145:21 150:3
151:10, 12
208:12
220:18 221:6,
8 249:14
263:24 301:21
generalized
123:10
Generally
57:2 132:9
133:10
205:20
206:13
211:11
245:21
249:23 264:1
271:18
282:18 325:16
generate
46:12 167:8
generation
45:4
Genotoxic 8:4
49:21, 24
50:15 51:2,
23 52:8
98:22 99:2, 3,

4, 5, 6, 8, 14
206:14
214:21 223:9
Genotoxicity
8:9 217:22
Geoffrey 3:15
George 2:15
Georgia 3:3
getting 37:1
65:4 77:4
91:23 96:7
103:13 118:5
133:22
186:17 217:9
227:19 245:2
247:5 269:1
300:10 305:9
give 54:11
62:21 79:15
131:7 166:6
228:7 262:8
282:17
given 152:10
283:21 298:8,
9 337:10
gives 54:9
67:23 69:1
109:22
195:23 231:21
giving 221:3
glance 269:6
glass 198:2
200:20
glitch 16:22
Global 6:12
globally
213:15 273:8
glossary
197:10 199:4
go 17:8, 11
19:23 20:5,
23 26:10
30:19 38:21
47:7 52:15,
16 58:23
73:20 74:4
102:13, 22
104:23
106:18
109:11 110:7
113:6, 11

114:*20*
127:*21, 23*
132:*20*
136:*13* 137:*8*
139:*4* 158:*12*
170:*11* 175:*4*
176:*13* 178:*2*
183:*21* 191:*7*
197:*3, 5, 8*
199:*23* 200:*4,*
*10* 203:*2*
205:*15* 211:*1*
213:*23*
216:*14*
219:*13* 220:*2,*
*14* 221:*6*
227:*21*
231:*17*
232:*20* 233:*8*
241:*22* 243:*8*
247:*23* 250:*7*
253:*5* 255:*18*
262:*18* 263:*1*
264:*12, 17, 20*
275:*15, 16, 20*
277:*19, 21*
278:*5* 282:*23*
283:*5* 285:*12*
286:*10* 289:*8*
292:*11*
304:*20*
310:*13*
320:*17*
328:*13* 333:*4*
336:*4*
**God** 185:*4, 8*
**goes** 54:*3*
90:*15* 100:*13*
155:*17*
195:*20*
197:*14*
201:*13, 22*
205:*21*
221:*22*
231:*23* 232:*5*
233:*15*
251:*10* 280:*19*
**going** 11:*13*
15:*22* 16:*15*
24:*22* 25:*14*
29:*2* 57:*7*

72:*19* 75:*10*
94:*1* 106:*23*
113:*10*
120:*17*
164:*16* 168:*7*
182:*5* 213:*22*
277:*21*
285:*23*
287:*22* 320:*16*
**Goldberg** 2:*18*
**GOLDENBER**
**G** 2:*17*
**Golkow** 10:*4*
**gonna** 16:*5*
24:*10, 22*
37:*5* 53:*17*
57:*3, 7*
103:*15* 108:*9*
127:*12, 15*
155:*6* 162:*2*
202:*21*
215:*19* 238:*2*
275:*15* 286:*5*
302:*15, 16*
324:*10* 333:*8*
**Good** 11:*6, 10*
25:*17* 72:*23*
73:*5, 7* 96:*8*
100:*7* 102:*9*
103:*1* 127:*11*
130:*5* 145:*19*
204:*15, 20, 22*
205:*6* 217:*1,*
*13* 231:*11*
236:*8* 255:*10*
259:*1, 2, 19*
**Google** 80:*12*
129:*20* 299:*6*
**Gorda** 2:*14*
**governs** 48:*19*
**graduate**
97:*10* 177:*20*
188:*17*
**gram** 151:*20*
152:*14*
162:*13* 164:*7*
165:*11, 14*
**grammatical**
20:*21*
**granted** 172:*7*

**granularity**
220:*20*
**Great** 74:*2*
**greater** 205:*19*
**GREENBERG**
3:*2* 5:*22*
23:*23* 74:*18*
**ground** 71:*9*
**group** 95:*13,*
*22, 24* 115:*22*
116:*2, 6, 7, 21*
218:*19* 220:*9*
224:*3* 225:*4*
**grouped** 246:*9*
**groups** 116:*5*
223:*1, 2*
225:*12, 17*
302:*19*
**grow** 108:*23,*
*24*
**guarantee**
119:*24*
**guess** 109:*3*
158:*24* 184:*7*
230:*13*
244:*10* 264:*17*
**guessing** 97:*11*
**Guidance** 8:*3,*
*8, 12, 20*
42:*23* 50:*3*
121:*1* 195:*6,*
*12, 14* 196:*16*
199:*24*
201:*13, 16*
204:*8, 16*
205:*8* 208:*14*
213:*7, 10, 21*
214:*13, 20*
215:*2, 5, 9, 10,*
*11, 14, 15, 21,*
*22* 216:*16, 20*
217:*2, 14, 15*
218:*2, 8*
219:*3, 16, 22,*
*23, 24* 220:*8,*
*16* 221:*3, 9,*
*12* 223:*7*
225:*10, 18*
226:*5, 15*
227:*2* 233:*5,*
*8, 13* 234:*22*

237:*2* 239:*11*
263:*6*
**guidances**
196:*13* 214:*1,*
*2, 4* 235:*16*
**guide** 186:*19*
**guided** 19:*24*
63:*22*
**Guideline**
7:*22* 195:*23*
196:*3, 23*
201:*22*
202:*12* 203:*3*
210:*15*
211:*19*
212:*10, 23*
231:*24* 234:*3*
**guidelines**
212:*12* 213:*1,*
*11, 18* 214:*15*
232:*22*
233:*19, 20*
234:*8* 235:*4,*
*6, 8* 246:*8*
247:*1, 2*
**guy** 144:*17*
**guys** 174:*22*
**Gwilliamson@f**
**arr.com** 2:*15*

**< H >**
**half** 72:*20*
**hand** 327:*19*
328:*1, 10*
**handled**
115:*15*
**handles** 69:*2*
**handshake**
155:*9*
**happen** 45:*8*
60:*11* 69:*21*
71:*2, 4* 98:*5,*
*6, 9* 243:*5*
304:*17* 329:*20*
**happening**
249:*18*
**happens** 60:*7*
70:*20* 269:*4*
**happy** 119:*10*
172:*12*
189:*14* 261:*7*

**hard** 24:*13*
171:*2* 231:*10,*
*13* 282:*20*
324:*14, 20*
**HARDING**
2:*2*
**Harkins** 3:*4*
5:*4* 12:*9*
13:*13* 15:*16*
17:*12* 18:*4,*
*10, 11* 19:*9,*
*15* 22:*15*
24:*3, 8, 18*
25:*16, 24*
27:*21* 28:*14*
29:*7* 36:*16*
39:*7* 45:*11,*
*24* 51:*13*
52:*1, 10*
55:*20* 60:*19*
63:*3* 68:*5*
72:*17* 73:*1, 6*
74:*3* 75:*2*
82:*21* 83:*8,*
*21* 84:*20*
86:*13* 88:*5,*
*11, 14* 89:*8,*
*22* 90:*5, 18*
91:*6* 92:*6, 17*
93:*4, 22*
98:*23* 99:*9*
100:*17*
101:*18, 23*
104:*5* 106:*6,*
*11* 107:*3, 20*
110:*2, 18*
111:*3* 112:*8*
113:*1, 22*
114:*9* 115:*8,*
*24* 116:*10, 23*
117:*12* 122:*2,*
*9, 20* 123:*17,*
*24* 124:*16*
125:*7, 23*
126:*8* 127:*1,*
*10, 22* 130:*16*
132:*6* 133:*5*
137:*2, 18*
139:*13, 24*
140:*15* 141:*9,*
*13* 142:*7*

Confidential Information – Subject to Protective Order

143:*13*
145:*16*
146:*10, 24*
147:*13*  148:*4*
149:*2, 9, 24*
155:*20*  156:*2, 13*  158:*1, 15*
161:*7*  162:*18*
164:*13, 24*
165:*21*
167:*15*  168:*6*
169:*22*
172:*16*  174:*7, 19*  175:*3*
178:*15*  180:*1*
185:*24*  187:*5*
192:*2, 13*
193:*7*  194:*5*
200:*19*
202:*17*  205:*5*
211:*9, 17, 20*
214:*10*  217:*5*
218:*21*  222:*4*
223:*14, 18*
225:*20*  226:*9, 19*  227:*11*
230:*12*  234:*9*
236:*24*
237:*20*  240:*1, 17*  241:*11*
242:*11*
243:*14*  244:*6, 19*  245:*11*
246:*12*
247:*12*  248:*7, 19*  249:*5*
250:*11, 24*
251:*21*  252:*8, 15, 19*  253:*7*
258:*6*  259:*4, 21*  260:*14, 18*
261:*13*
262:*12*  263:*8*
265:*14*
267:*16*
268:*16*  270:*4*
271:*21*
273:*19*  274:*7*
275:*8*  276:*3*
277:*1, 24*
278:*15*

279:*15, 23*
280:*10*  281:*3, 20*  282:*12*
283:*24*
284:*16*
285:*20*  286:*9, 15*  287:*5, 19*
288:*8*  289:*3*
290:*7, 24*
291:*13*  293:*1, 5, 13, 20*
294:*6, 18, 24*
295:*14*  296:*8, 22*  297:*8*
298:*1, 5, 20*
300:*6*  301:*2*
302:*8*  303:*14*
305:*4*  306:*7, 11*  308:*19*
309:*9, 15*
310:*22*
312:*20*  313:*8, 13*  314:*15, 22*
315:*20*
316:*15, 24*
318:*5, 16*
319:*2, 7, 16, 23*  320:*15*
323:*6, 18*
333:*7, 16, 21*
334:*6, 19*
335:*4, 23*
336:*3*
**harkinss@gtlaw.com**  3:*4*
**Harmonised** 7:*22*
**Harmonization** 196:*8*
**harmonize** 196:*11*
**harmonized** 121:*1*  196:*15*  214:*3*
**HCL** 268:*5*
**head** 62:*12*  76:*15*  148:*14*  171:*3*  195:*21*
**heading** 242:*15*  264:*23*

**headings** 208:*18, 23*
**Headspace** 175:*17*  176:*19, 22, 23, 24*  178:*24*  179:*3*  288:*5, 7*
**health** 40:*5*
**hear** 137:*19*  149:*5*
**heard** 10:*17*  97:*19*  101:*8*  185:*14*  317:*12*
**hearing** 60:*21*  337:*10*
**hearsay** 273:*21*
**heat** 176:*12, 21*  259:*14*
**heavy** 256:*8, 21*  257:*1*
**Hecht** 96:*21*  97:*8*
**held** 10:*8*
**help** 17:*12*  49:*5*  53:*13*  54:*18*  55:*15*  59:*22, 24*  61:*15*  65:*3*  66:*3*  70:*15*  118:*5*  132:*21*  138:*22*  219:*8*  302:*3*
**helpful** 42:*3*  64:*20*  103:*5*  160:*12*
**helping** 42:*22*  44:*14*  45:*16*  75:*19*
**helps** 61:*20*  67:*21*
**Hetero** 4:*4, 5*
**Hewlett** 189:*2*
**Hey** 72:*18*  127:*11*
**High** 57:*10*  62:*9*  66:*14*  81:*19*  105:*23*  121:*8*  122:*7, 19*  123:*16, 23*

182:*7, 14*
183:*20*  225:*13*
**higher** 151:*11*  163:*5*  165:*19, 23*  166:*3*  244:*14*
**highlight** 33:*16*
**highlighted** 204:*12*  232:*13*
**highlights** 241:*21*
**highly** 111:*7*
**HILL** 4:*2*
**hindsight** 269:*9*  304:*3, 19*
**HINSHAW** 3:*12*
**hired** 12:*6*  13:*5, 22, 24*  36:*14*  37:*10*  39:*17*  61:*7, 11*
**historical** 231:*12*  232:*12, 21*  234:*6*
**historically** 49:*13*  268:*20*  269:*2*
**history** 195:*24*  200:*5, 8*  213:*6*  220:*2, 5*  232:*17*
**hit** 38:*19*
**hitting** 174:*6*
**hold** 22:*24*  55:*12*  56:*4, 10*  87:*24*  143:*5*  149:*19*  200:*17*  275:*18*
**holder** 142:*4*
**holding** 191:*18*
**HOLLIS** 2:*21*
**home** 69:*5*
**HON** 1:*11*
**honest** 187:*21*
**HONO** 267:*19*

**hope** 85:*11*  88:*19*  115:*12*  228:*19*
**host** 129:*12*
**hosts** 129:*11*
**hot** 174:*15*
**hour** 72:*20*
**hours** 18:*4, 6, 9, 11, 14*  73:*21*  76:*2, 13, 18*  275:*1*  309:*5*  319:*6*
**houses** 129:*10*
**HP** 85:*17*  182:*1*
**HPLC** 54:*2, 24*  55:*3, 4, 19*  57:*8*  62:*18*  81:*12, 14*  83:*6, 7, 19*  84:*6*  85:*7, 15, 16*  87:*3, 18*  88:*1*  137:*6, 13*  138:*6*  182:*2, 12, 19*  258:*2, 3, 8, 16, 21*  260:*2*  263:*3, 10, 11, 12*  277:*15*
**HPLC-MS** 182:*1*
**HPLC-type** 258:*4*
**HRMS** 183:*4*  186:*12*
**Huahai** 278:*10, 21, 23*
**huge** 79:*4*  95:*20*  326:*19*
**Human** 8:*10, 20*  99:*22*  100:*1, 5, 11, 16*  114:*24*  221:*23*  239:*6*  243:*3*  321:*18*
**humans** 110:*16*  115:*6*  116:*22*
**hundred** 119:*21*  151:*9,*

*13* 215:*16*
284:*22*
**hundreds**
284:*22* 325:*22*
**hunt** 328:*14*
**hydrochloride**
103:*23* 104:*15*
**hydrochlorothi**
**azide** 157:*18*
**hydrogens**
108:*15, 18, 20*
**hydroxylamine**
249:*2*
**hyphenated**
176:*9* 261:*2*
**hypothetical**
265:*16* 277:*3*
303:*16* 305:*8*

**< I >**
**I&Ds** 143:*1*
**IARC** 5:*24*
100:*23* 101:*1,*
*10, 14* 115:*22*
116:*4, 20*
120:*19* 321:*4*
**I-A-R-C** 101:*2*
**IC** 220:*11*
**ICH** 7:*22*
50:*3* 51:*1*
121:*11* 123:*6*
124:*11* 195:*5,*
*12* 196:*2, 6, 7*
199:*21* 203:*3*
206:*9* 212:*10,*
*23* 213:*10, 15,*
*24* 214:*1, 3*
215:*15, 17*
219:*2* 220:*9*
227:*3* 232:*21*
233:*13, 19*
234:*3, 5, 7, 18,*
*21* 235:*4, 8,*
*16* 236:*20*
238:*19*
**idea** 72:*24*
133:*12*
144:*17* 236:*8*
**ideas** 61:*14*
**Identification**
9:*16* 25:*19*

27:*1* 30:*6*
31:*6* 32:*5*
35:*20* 42:*5,*
*10* 44:*24*
74:*14* 101:*17*
120:*9* 153:*17*
157:*4* 159:*7*
160:*14* 168:*5*
171:*17*
178:*18*
181:*14*
184:*18*
189:*19* 195:*8*
205:*17, 19*
206:*2* 209:*17,*
*18* 214:*24*
216:*18* 219:*6*
228:*12* 234:*1*
239:*9* 241:*2*
253:*18* 255:*6,*
*7, 14* 264:*15*
266:*1* 270:*11*
274:*18* 277:*9*
279:*10*
285:*10*
297:*21* 306:*6*
309:*23* 310:*3*
311:*18* 325:*11*
**identifications**
295:*24*
**identified**
50:*3, 15*
120:*23* 124:*7*
201:*23* 202:*4*
225:*13*
238:*13* 297:*6*
325:*23*
**identifies**
65:*20*
**identify** 48:*15*
60:*14* 65:*19*
67:*21* 85:*15*
209:*19, 20*
239:*1* 288:*4*
**identifying**
65:*17* 298:*16*
299:*14* 300:*4*
**identity** 67:*4,*
*10*
**ignore** 63:*10*
308:*23*

**illustrated**
266:*24*
**illustration**
225:*1*
**illustrations**
266:*15*
**imagine** 243:*4*
**immediate**
155:*18*
**implement**
213:*21* 329:*15*
**implemented**
327:*15*
**implication**
121:*14*
207:*18* 208:*6*
308:*7, 11*
**implications**
238:*8*
**implied** 299:*2*
**implies** 49:*18*
307:*13*
**implying**
58:*22* 299:*4*
**importance**
214:*14*
**important**
16:*10* 45:*22*
49:*1* 52:*4, 5*
62:*24* 63:*19*
71:*18* 106:*2,*
*5, 16* 109:*6*
134:*5* 136:*4*
163:*3* 247:*24*
280:*6* 299:*12*
**impossible**
326:*24*
**impractical**
326:*24*
**imprecise**
59:*10*
**Impurities**
7:*6, 11, 22*
8:*4, 14, 17, 19*
9:*18* 35:*19,*
*20* 36:*15*
37:*12* 42:*18*
43:*3, 8* 46:*3,*
*9, 13, 20, 24*
47:*21, 22*
48:*10, 11*

49:*6, 10, 11,*
*12, 15, 21*
50:*1, 2, 9, 10,*
*12* 51:*3, 8, 23*
52:*9* 53:*24*
54:*2* 64:*21,*
*24* 65:*8* 72:*3*
77:*13* 82:*8*
85:*15* 87:*2*
88:*3* 126:*15*
127:*6* 133:*16*
137:*6, 12*
150:*6, 15, 16*
196:*24* 197:*1*
200:*9, 12, 14*
201:*6, 12, 14,*
*17, 23* 202:*4,*
*16, 24* 203:*4,*
*5, 8, 13* 204:*2,*
*17* 205:*1, 17,*
*23* 206:*7, 14,*
*15, 21, 23*
207:*1, 5, 8*
211:*8, 13, 24*
212:*5, 10, 13,*
*15, 17, 23*
213:*1, 18*
214:*5, 8, 13,*
*14, 22* 217:*22*
220:*21* 221:*3,*
*24* 229:*3*
233:*22*
234:*21* 235:*6*
236:*2, 10*
238:*12* 239:*6*
258:*2, 3, 14,*
*15* 263:*15, 16,*
*17* 268:*23*
291:*22*
298:*13, 17*
299:*21* 300:*5,*
*21* 302:*4*
307:*18*
325:*13, 15, 16,*
*17, 24* 326:*4,*
*12, 21, 22*
329:*3*
**Impurity** 6:*17,*
*22* 43:*7*
44:*23* 47:*9,*
*17* 48:*2, 15,*

*18, 24* 49:*1*
50:*16* 54:*13*
58:*9* 64:*11*
65:*8, 15, 17*
66:*3, 7, 11*
67:*14* 82:*9*
83:*6, 7, 19*
84:*6, 7* 85:*19*
86:*21* 88:*2*
137:*1* 146:*17*
157:*23*
182:*19* 197:*4,*
*6, 16, 17*
198:*21* 199:*1,*
*5, 10, 11, 16*
201:*11* 204:*4*
205:*3* 207:*22,*
*24* 208:*10*
209:*3, 5, 22*
211:*5* 232:*21*
233:*19* 234:*8*
235:*4* 236:*16,*
*19* 238:*18*
256:*9* 257:*2,*
*12, 14, 19, 21,*
*22* 261:*11*
263:*5, 20, 21*
268:*10* 269:*8*
271:*24* 303:*1*
326:*17* 328:*15*
**incidental**
109:*5*
**include** 202:*6*
206:*21, 22*
225:*18* 226:*3,*
*23* 254:*23*
300:*3* 327:*8*
**included**
27:*19* 29:*18*
149:*1, 7* 213:*7*
**includes**
225:*23*
298:*15* 299:*13*
**including**
164:*1* 206:*12*
214:*16* 276:*8*
**incomplete**
56:*20* 81:*13*
265:*15* 277:*3*
303:*15* 305:*7*

incorporate 287:9

incorporated 166:19

incorrect 167:20 311:12

increase 65:5 66:8

incurred 91:20

independent 92:11, 20 321:17

independently 80:5

Indiana 3:18

Indianapolis 3:18

indicate 31:21 52:23 167:6 262:10 265:7, 10

indicated 316:20 317:7, 12, 14, 15

indicates 211:3 225:22 263:10 315:16

individual 39:23 122:12 213:11 258:13

INDs 196:20

Industries 3:6, 11 41:18 260:6

Industry 8:4, 8, 12, 20 41:10, 14, 17 66:20 67:3, 9 119:15 142:24 143:8 150:4 186:18 196:19, 20 198:19 204:14 214:7, 21 216:16 219:16 226:5, 6, 15, 16 234:17 301:6 304:20 307:16

inert 271:16

inferred 312:8

influenced 94:19

inform 287:22 332:7

INFORMATION 1:14 29:4 36:18 66:1, 5 77:5, 8, 15, 20 78:22 79:14 92:22 130:2 131:8 132:18, 23 133:1, 23 147:19 148:14 149:17 150:5, 22 156:21 167:12, 19, 21, 22 191:24 192:11 195:24 269:11 271:23 277:11 279:5 280:20, 21 281:1 282:18, 24 285:24 316:2, 18 327:24 331:17, 22, 24 332:4, 6

informative 311:4, 5

informed 310:18

informs 310:17

Infrared 100:24 101:3 255:16

ingested 52:19

ingestion 92:2

ingredient 198:15, 22, 23 199:3 207:15

inhaled 97:17

inherently 325:8 326:11

inhibited 96:14

inhibition 96:19

initial 45:22 167:8 212:24 249:14

initially 255:21

initiating 52:21

injected 54:3

injecting 176:24

Injection 6:20 178:8

innovate 301:7, 11

inorganic 201:4

input 61:14 224:4

inquire 173:4 327:23 328:4

inquiry 135:15, 19 139:22 140:3

inside 273:23

insight 57:3 67:23 68:22 69:1, 18

insoluble 255:1

instances 150:14 152:21 249:18

Institute 296:16

instruct 94:1 285:23

instruction 220:20

instrument 40:6 138:24 139:1, 6, 11 140:9, 14 178:1 179:8, 11 182:18 183:6 184:8, 9 187:2, 3, 10 188:6 265:11 276:2 289:8 290:2, 6

instrumentation 35:18 40:6

136:10, 18, 22 173:10, 19 186:19 187:11 188:4 255:13 327:18, 24 328:6, 11, 18, 24 329:13, 15

instruments 41:12, 16 137:9, 16 138:3 186:20 187:13

intake 152:17 153:5 239:16, 23 308:17 322:3

intakes 225:14

integrate 209:2, 4, 11

integration 63:18

intellectual 61:13

Intended 8:10 64:19 206:20, 22 217:18

intending 322:12

intent 196:16

intention 207:11

intentional 316:4

interaction 98:10

interchange 212:20

interchangeably 198:17, 20

interest 129:15 207:22 280:14 281:17 282:5

interested 337:13

interesting 280:22, 23

interim 167:9

intermediate 66:8

intermediates 202:7 248:16

internal 331:2

International 101:10 196:7 285:17

internationally 120:24

Internet 129:10

interpret 61:16 217:20 301:22

Interpretation 8:9 15:8

interpreted 211:12

interpreting 140:19

interrupted 270:18

intimately 185:19

introduce 24:23

introduced 24:19 324:19 331:9, 21

introduction 220:7 231:17, 20

invented 184:2 245:19

invention 184:3

investigat 134:5

investigate 60:22 61:4, 8 63:15 82:20 130:7, 13 138:21 284:7

investigated 245:5 281:15 300:12

investigation 62:22 69:12 77:19 117:8 118:7 131:8

134:6  167:12
190:9  191:23
192:10, 21
245:24  282:3
287:15  314:11
**investigational**
79:8
**investigation-**
**type**  137:16
138:2
**investigatory-**
**type**  136:17
**invoice**  76:4,
9, 11, 14
**invoices**  5:22
74:12  75:6, 9
76:1, 24
**involve**  55:1,
4  59:12
66:12  67:19
244:10
**involved**
42:20  142:24
145:11  148:3
204:2  205:1
271:18  329:17
**involves**  42:22
245:1  295:12
300:19  301:23
**ion**  183:17
247:10
**ionization**
259:16  282:16
**ions**  247:16
249:11

**IRBESARTAN**
1:7  10:9
**isolation**  44:23
**isomers**
183:23
**issue**  17:21
56:16  61:4,
17  84:19
115:13
119:14
135:22  136:3
323:15, 17
324:1  328:10
**issued**  33:22
189:9  195:15,

16  215:11
220:1  239:12
**issues**  47:24
55:15  57:18
60:13, 16
61:22  63:6,
19  129:13
205:12
**issuing**  157:17
**item**  243:9
265:5
**items**  287:23
**its**  112:4
114:24
139:17
147:10
148:20  164:1
173:21  196:3
213:24  301:6
327:13

**< J >**
**J.D**  2:4
**January**
76:10  306:23
329:24  332:23
**Japan**  196:12
**jargon**  53:23
64:9  198:18
245:18
299:22  301:21
**Jeff**  4:17  10:3
**JERSEY**  1:2
3:10  4:3
10:11
**Jessica**  4:18
**job**  44:10
180:8
**join**  8:22
**journal**  129:11
**journals**
230:24  231:2
**judge**  15:9
323:11
**July**  6:6
153:15  154:9
157:2, 13
170:4, 5
184:15
311:20  327:8
**jump**  174:22

**jumping**
114:14  166:14
**June**  8:8
9:13  170:4
220:12
**jury**  325:3

**< K >**
**KANNER**  2:5
**Kansas**  2:22
**Kass**  2:11
**keep**  171:2
174:18
**KF**  256:7
**kid**  69:6
**kin**  337:12
**kind**  19:2, 23
40:14  41:18,
21  53:23
54:13  56:10
57:2  67:17
68:19  69:4
70:20  75:24
76:16, 22
78:23  79:7
83:16  90:22
92:2  95:19
132:18, 20
138:22
140:23
177:16
183:10, 11
185:17
186:24  189:4
194:11
210:12
216:23  217:9
218:3  245:23
261:18
268:18, 19
273:6, 7
277:8  287:14
290:14  299:9,
21  301:24
303:17  304:4
305:10  330:20
**kinds**  60:13
61:21  217:21
330:3
**knew**  304:24

**know**  16:1
22:24  23:14
25:10  27:24
28:1, 2, 16, 19
32:15  37:16
38:4  39:11,
14  49:1
53:15  56:6
59:3, 10
60:12  64:1,
16  65:24
71:12  73:13,
19, 23  76:15
77:22  83:13
84:9  87:19
89:12, 24
90:9, 11, 23
92:19  93:17
97:11  101:4
104:21  107:9,
11  108:8, 10
113:21  114:1,
8  115:22
116:2  117:2
118:4  120:2,
11  125:12
127:4, 14
128:10, 12, 13,
19, 24  129:3,
6, 21, 23
131:13, 15
132:13, 17
133:12
135:24
139:15, 19
142:11, 13
143:21
144:13
147:17
149:11, 13, 22
150:2, 10, 13
155:5  156:19
158:19
159:20
163:19, 22
165:6  168:13,
15, 18, 22
169:1, 4, 9, 12
170:17, 18
171:23
173:12

174:15, 23
175:18
177:19
181:16  183:7
184:7, 9, 21
185:16  192:6,
16  198:3
208:11  218:3,
4  219:15
220:17, 18
227:10
228:14  229:9
230:8, 13, 22
231:3  232:2
237:13, 18
238:21, 24
243:17
244:10
245:16
246:22  247:1,
3  249:14
252:13, 22, 23
256:21, 23
257:14  260:4
262:3  266:20
268:9  269:18,
24  270:22
273:6, 17, 21
274:1  275:3
277:23  278:2,
7, 21  279:4,
12, 18  280:7,
14  281:7
282:4, 5, 20,
24  284:3, 5, 6
285:2  288:17,
18, 21  289:10
291:19  293:8
307:6  308:8
311:8  314:6
315:11, 12
319:19
329:18
330:20, 21
335:16, 17, 21
**knowing**
151:16
**knowledge**
27:10  38:5
114:2, 6
122:14  124:3

143:5  193:2
238:17  240:4
243:3, 13
294:1  307:16
**known**  44:17
48:1  99:21
103:17, 21, 22
115:16  121:7
122:18
124:11  125:3
126:14
148:13
214:12
237:18  238:5
267:14, 18
269:19
271:19
289:24
307:24  313:5
**KUGLER**
1:11

< L >
**lab**  71:20
173:23  289:22
**label**  264:24
**labeled**  44:7,
8  293:22
294:1, 2
**laboratories**
41:20  140:22
**laboratory**
61:12, 13
128:8, 11
129:4  188:21
289:22
**Labs**  4:4
**laid**  283:3
**Langton**  3:5
18:12  24:3
185:5, 9
200:24
**Langtont@gtla
w**  3:5
**language**
206:3, 4
234:2  321:3
**large**  17:4
101:24
111:21

139:16, 17
174:2
**Lasalle**  2:17
**launched**  36:5,
6
**LAW**  2:12, 17,
21  15:8
**lawyer**  73:17
301:19
**lawyers**  73:14
**lay**  323:23
**layman's**
91:10
**layperson's**
197:22, 24
**LC**  85:19
182:17  183:9
186:12
**LC-HRMS**
7:5  181:20
186:7
**LCMS**  182:1
**leachable**
54:14
**lead**  305:20
**leading**  221:16
**Leah**  2:19
**learn**  77:18
191:23  192:9
**learned**  56:2
96:20  273:9
304:19
**leaving**  68:18
209:6
**lecture**  97:8
**leery**  78:19
**left**  102:14
333:9, 13
**left-hand**
103:8, 13
**Legal**  2:19
13:22  15:7, 9,
18  27:22
39:5  89:10
90:7, 20  91:8
92:8  93:6
132:16  133:6
142:9, 12
186:2  192:4,
15  245:13
301:8  308:8,

11  310:24
323:4, 8, 16,
20  324:1
334:8, 13
**legally**  90:23
**legend**  292:19
**length**  92:1
**Leon**  2:10
**letter**  7:20
120:7, 15
189:17  190:9,
13, 17  191:5
192:1
**letters**  77:1
189:8
**level**  59:7
65:21  67:23
81:19  87:4
124:14, 19, 21
125:6, 11, 13
126:2, 11
152:17  153:7
198:7  205:18
206:1  210:5,
13  233:24
268:23  277:7,
9  303:24
329:20
**levels**  50:14
51:3, 5  63:14
65:2  72:2
79:5  85:22
86:1, 2, 11, 22
87:14, 15
127:5  136:10
150:22  151:5
152:16, 21
153:1, 4, 9
167:8  171:21
221:16
249:19, 20
264:2  291:24
322:8, 13
325:8, 18
326:4, 12, 22
327:10  329:12
**leveraging**
47:24  64:5
**LIABILITY**
1:8  10:9

**library**  296:15
**life**  91:24
**ligands**  202:8
**Lilly**  44:1, 3,
11  45:6
46:22  188:15
229:18
**Limit**  8:15
73:4  85:21,
22  126:15, 23
127:5  152:19
162:17
165:16, 20
166:4, 23
167:9  171:8
208:8, 9
221:22
239:16
244:15  308:8,
13, 17  320:1
**limitation**
247:3  323:1
324:4
**limitations**
134:14
**limited**  54:24
126:6  139:2
206:16, 20
322:18  323:24
**limiting**  138:4
248:12
**limits**  90:24
239:19, 23
240:6, 7
322:3  326:5
**line**  75:16
**linear**  72:1
**lines**  131:16
**link**  132:10
**lips**  137:22
**Liquid**  7:4
57:10  107:6,
23  108:23
112:10  255:3
**list**  5:18, 20
19:19  22:23
26:7  32:2, 9,
13, 20, 24
33:6  37:19,
24  38:2, 5, 18,
22  39:12, 19,

20, 23  81:1
109:23
119:19, 22
123:6  137:8
144:11
154:16
158:13  160:3
223:6  224:15,
22  247:4
253:4  310:10
316:9  329:22
**listed**  23:6
86:23  121:11
147:4  220:5
256:10
308:24
310:10, 12
**listing**  137:9
152:14
**lists**  154:13
159:24  223:10
**literally**
284:21
**literature**
94:16, 17, 21
114:3, 6
124:4  206:11
249:17
271:23  273:8
**LITIGATION**
1:8  10:4, 9
11:13, 22
14:6  28:6, 11
30:17  33:23
39:2, 4  40:23
41:4  88:23
89:7, 21  90:4
91:5  95:2, 4
**litigation-
related**  41:1
**litigations**  14:1
**little**  16:13, 18,
22  75:8
78:19  84:2
142:17
146:12
195:23  198:2
207:9  227:9,
19  279:4
316:1

**live** 241:*20*
**liver** 103:*2*
**LLC** 2:*5* 3:*7*, *12* 34:*16*, *18*, *21* 35:*4*, *5*, *14* 42:*1*
**LLP** 2:*2*, *10* 3:*2*, *7*, *12*, *16* 4:*2*
**load** 102:*8*
**loaded** 42:*3* 102:*9* 145:*21* 177:*16* 213:*3*, *14* 219:*15*, *18*, *19* 241:*5*, *6* 266:*10* 275:*6* 299:*22* 303:*17* 310:*7*
**loading** 228:*16*
**loads** 228:*15* 275:*4*
**loaner** 23:*23*
**located** 328:*6*
**log** 241:*16*
**Lois** 4:*21* 10:*21* 337:*14*
**long** 34:*20* 60:*2* 64:*1* 73:*13* 75:*20* 86:*16* 95:*21* 102:*2* 155:*3* 174:*23* 177:*3*, *7*, *13*, *15*, *24* 252:*1* 333:*3*
**longer** 55:*12* 62:*19*
**look** 12:*7*, *12* 19:*3* 20:*5* 21:*4* 46:*23* 75:*5* 82:*15* 83:*15* 84:*21* 109:*2* 117:*9* 119:*10* 130:*19* 141:*17*, *18*, *19* 142:*19* 145:*6* 146:*5* 148:*6* 157:*11* 158:*17* 159:*14* 161:*17* 169:*23* 172:*11* 183:*5* 189:*14* 193:*3* 195:*22* 197:*9* 215:*20* 216:*2* 218:*4* 220:*17* 222:*13* 255:*19* 266:*12* 285:*4* 290:*15* 294:*3* 297:*3* 305:*13* 328:*14* 329:*19*
**looked** 19:*21* 21:*19*, *20*, *22* 38:*6* 83:*22* 85:*18*, *20* 105:*20* 144:*10*, *11* 147:*17* 152:*4*, *6*, *12* 166:*15* 169:*18* 170:*6* 172:*22* 179:*2* 180:*21* 181:*1* 182:*24* 212:*11* 216:*24* 241:*17* 245:*5* 270:*15* 271:*9* 280:*17* 284:*5* 306:*18*, *19* 314:*3*
**looking** 12:*22* 19:*18* 20:*22* 34:*1* 35:*7* 45:*23* 46:*2*, *21* 64:*15* 69:*9* 77:*15*, *16* 78:*21*, *23* 80:*12*, *16* 83:*5* 84:*24* 85:*5*, *16* 86:*12*, *18*, *22* 116:*18* 145:*1*, *11*, *21* 146:*2*, *16*, *20* 148:*9*, *12*, *13* 166:*13* 170:*5* 185:*18* 200:*1* 202:*15*, *24* 222:*24* 223:*21* 224:*1* 266:*16* 268:*20* 286:*8*, *19*, *20* 295:*7*, *12*, *16* 304:*3* 310:*15* 324:*13* 329:*18* 331:*15*
**looks** 19:*19* 30:*21* 76:*2* 157:*10* 160:*5*, *6* 161:*20* 162:*7* 183:*7* 223:*20* 250:*12* 254:*15*, *20* 256:*8* 272:*24* 275:*11* 290:*17* 294:*8* 296:*20* 307:*5*, *6* 313:*20* 316:*2*
**LOSARTAN** 1:*6* 10:*8*
**lose** 178:*11*
**losing** 68:*3*
**lost** 21:*1* 137:*19* 217:*9*
**lot** 36:*7* 56:*1* 94:*15* 132:*11*, *23* 156:*20* 180:*3*, *21* 181:*1* 259:*7* 271:*16* 276:*14* 290:*1* 295:*18* 313:*16* 315:*12* 332:*16* 333:*12*
**lots** 73:*14* 153:*9* 158:*18* 159:*24* 162:*8* 166:*2*, *20* 282:*2* 335:*17*
**loud** 165:*8*
**Louisiana** 2:*7*
**love** 96:*8*
**low** 50:*14* 51:*3*, *5* 65:*4* 79:*5* 86:*11*, *21* 107:*13* 108:*4* 151:*8* 161:*5* 221:*15* 249:*21* 325:*8* 326:*6*, *12*
**lower** 51:*7* 78:*1* 112:*22* 121:*15*, *18*, *19*, *22* 124:*24* 125:*16* 151:*12* 211:*4* 212:*6* 325:*22*
**lower-thresholds-can-be-appropriate** 212:*1*
**low-level** 269:*7* 328:*14* 329:*3*
**low-resolution** 105:*24*
**lumped** 325:*6*
**lunch** 127:*13* 174:*8* 175:*9*
**Lyons** 168:*13* 169:*18*

**< M >**
**M7** 50:*3* 51:*1* 121:*11* 123:*6* 124:*11* 215:*15*, *17* 219:*2* 225:*9* 231:*24* 234:*5*, *8*, *18*, *21* 235:*8* 236:*20* 238:*19*
**M7(R1** 8:*12*
**ma'am** 35:*2*
**machine** 189:*1* 337:*5*
**magnetic** 66:*17*
**main** 133:*22* 268:*21* 325:*7* 326:*8*, *10*, *15* 327:*4*, *6*
**maintaining** 259:*12*
**making** 88:*19* 105:*19* 133:*24* 143:*20* 300:*22*
**manipulating** 70:*4*
**manner** 46:*7* 115:*16*
**manufacture** 36:*2*, *12* 43:*21* 199:*12* 299:*24* 300:*1*
**manufactured** 193:*20* 303:*3*
**manufacturer** 36:*6*, *10* 142:*14*, *15* 149:*16* 303:*3*, *11* 308:*16* 328:*17*, *23*
**manufacturers** 150:*8* 266:*6* 302:*3*, *5*, *12* 303:*6* 326:*16*
**manufacturer's** 143:*10*
**manufacturing** 143:*22* 146:*8* 167:*7* 191:*17* 201:*18* 202:*14* 298:*15* 299:*13* 300:*3*, *23* 314:*21*
**mapping** 241:*23* 242:*2*, *5* 245:*10*, *14*, *17*
**March** 1:*22* 8:*12* 10:*5* 20:*10* 31:*12*, *19* 32:*10*
**mark** 24:*22* 25:*12* 26:*17*, *20*, *23* 30:*2* 31:*4* 32:*2* 120:*7* 157:*8* 168:*10* 175:*13* 181:*11* 184:*15* 189:*21* 219:*11* 228:*8*

**MARKED**
25:*19*  27:*1, 4*
28:*24*  30:*6, 8,*
*12*  31:6  32:5
42:5  74:*14,*
*24*  101:*17*
120:9  153:*17*
157:*4*  159:7
160:*14*  168:*1,*
*5*  171:*17*
175:*16*
178:*18*
181:*14*
184:*18*
189:*19*  195:*8*
214:*24*
216:*18*  219:*6,*
*14*  228:*12*
239:9  240:*15*
241:2  253:*18*
264:*15*  266:*1,*
*24*  267:6
270:*11*
274:*18*
279:*10*
297:*21*  306:6
309:*23*  310:2
311:*18*
**market**  36:9
**Marlene**  2:*18*
**MARTIN**  2:2
**Mass**  7:4
40:*7, 8*  55:*10,*
*13, 14, 23*
56:*8, 16, 17*
57:*16*  66:*13,*
*16*  67:7
105:*24*  106:*1,*
*3, 13*  138:*6, 8,*
*24*  139:*1, 5*
140:*13, 20, 24*
176:*17*
177:*14, 17, 20*
179:*5, 11, 15*
182:*5, 7, 15,*
*21, 23*  183:*13,*
*14, 15, 16, 17*
186:*19*  189:*3*
282:*11*
290:*20, 22*
291:*4*  294:*21*

296:*7, 18, 21*
312:7  328:*11*
**Massachusetts**
3:*14*
**massive**
261:*20*
**mastery**
216:*24*
**match**  25:*8, 9*
296:*18*
**matched**
296:*15*
**material**  29:*2*
54:*15*  116:*18*
144:*11*
149:*13*  150:7
208:5
**materials**
5:*18*  22:*23*
29:*6*  32:*2, 9,*
*13, 20, 24*
34:*1*  81:*1*
90:*11*  117:*20,*
*24*  118:*3*
119:*19*
132:*12*  202:6
204:3  205:2
250:*21, 22*
251:*6, 19*
252:6  310:*9,*
*10, 12*  311:*14*
316:9  329:*22,*
*24*  330:*3, 13*
335:*18*
**math**  76:7
164:*14*  165:3
**matrix**  261:*17*
329:*17*
**matter**  10:*8*
13:*19, 20*
15:*15*  20:*14*
22:*8*  45:*22*
75:7  76:*14*
117:9  118:*8*
119:*20*  130:*9,*
*15*  146:*16*
193:*6, 9*
204:9  337:4
**matters**  11:*24*
**maximize**
68:*24*

**maximum**
108:*18, 20*
208:*19*
**MAZZOTTI**
2:2
**MDL**  1:7
**mean**  14:*21,*
*24*  20:*23*
39:*22*  48:*7, 8*
49:*12, 21*
53:*1, 2*  58:*14,*
*19*  59:*1*
61:*11, 24*
75:*15, 16*
81:*14*  104:6
116:2  121:5
125:*13*
127:*18*
129:*21*  144:*9*
147:*3*  152:6
160:6  164:*16*
186:*16*
189:*11*
193:*22, 23, 24*
197:*22*
207:*13*
210:*22*
213:*15*
238:*15*
242:*24*
243:*17*
267:*23*
278:*13*
287:*12*  295:9
296:*4*  300:*15,*
*16*  304:6
311:*8*  329:*14*
**Meaning**
41:*12*  121:*18*
191:*19*
242:*19*
243:*19*  310:*20*
**meaningful**
97:*24*
**means**  46:*16*
56:*24*  59:5
61:*11*  78:*2, 4*
96:*13, 19*
108:*12, 17*
110:*21*
121:*23*

149:*11*
169:*13, 15*
183:*14*  205:7
209:*2, 11, 19*
210:*1, 3*
220:*11*
242:*22*
245:*22*  278:2
279:*1*  296:*15*
302:*1*
**meant**  15:*12*
23:*10*  57:*19*
70:*19*  109:9
123:*11*
194:*18, 19*
208:*24*
209:*17, 24*
277:*23*  318:*13*
**measure**
183:*20*  255:3
256:*24*
**measurement**
257:*24*
**measures**
207:*19*
**measuring**
50:*16*  180:*19*
257:*19, 21*
259:7
**meat**  71:*11*
**mechanism**
69:*6, 19, 20,*
*23*  70:*10, 11,*
*12, 14*
**mechanisms**
69:*24*  70:*14*
**mechanistic**
44:*24*  48:*3*
64:*12*  65:*3*
67:*13, 16, 19*
68:*10, 22*
69:*1, 18*  70:6
**medical**  91:*23*
**medication**
208:*20*
325:*10*  329:*4,*
*12*
**medications**
155:*14*
325:*10*  327:7

**medicine**
154:*14*
**medicines**
154:*17*
**meet**  155:*16*
**meeting**  18:*3,*
*5, 9*
**meetings**
18:*14, 15*
**member**
11:*11*  92:*15*
129:*3, 17, 19*
**members**
90:*17*  121:*8*
**memory**  12:*3*
18:*23*  19:*3*
28:7  29:*1*
32:*22*  79:*21*
82:*14*  151:*8*
163:*1*  227:6
**mention**
67:*12*  232:*21*
243:*10*
**mentioned**
18:*13*  27:6
49:*9, 10*  64:*4*
97:7  139:*8*
225:*5, 8*
232:*18*
**mentioning**
235:6
**mentor**  45:*4*
**mentoring**
45:*2*
**Meridian**  3:*18*
**merits**  105:*23*
**message**  23:*16*
**MESTRE**  2:*10*
**met**  16:*21*
143:*20*  155:*4,*
*6*
**metabolism**
114:*24*
**metal**  62:*10,*
*19*
**metals**  58:7
62:*14*  256:*8,*
*21*  257:*1*
**methanol**
292:5

Confidential Information - Subject to Protective Order

**Method** 7:5, 10  46:11, 12, 13, 15, 20  47:2  48:4, 7, 8  53:3, 8, 16  56:18  70:18, 22  71:6, 10, 13, 17, 21  72:6, 8, 9, 10, 13  77:12  79:6  82:9, 12  83:6, 7, 19, 20  84:6, 7  85:7, 8, 16, 19  86:10  87:10, 18, 20  88:2, 21  172:7  173:11  175:17  176:5  178:20  179:2, 4  180:9  181:10, 19  182:12, 17  184:16  185:1, 13  186:7  256:6  258:16  259:19, 24  262:4, 6  264:4, 7  278:10, 21, 23  279:3  290:2  302:13  303:6, 11  305:3, 21  329:17
**methodologies** 259:9
**methodology** 258:9
**methods** 46:24  47:20, 23  48:6  49:5  53:1  54:17, 19  55:5, 7  81:16  82:6, 19  84:16, 17  85:10, 24  86:6, 21, 23  87:2, 13  90:11  133:13, 19  171:20  172:2, 13, 23

173:2  175:24  176:1  179:22  180:4, 18, 21  181:2, 5  182:24  183:1  191:11, 16  207:4  257:13  263:24  265:18  288:7  289:9  300:20  302:6, 21, 22  325:14, 24  326:7
**methylene** 254:21
**Miami** 2:11
**micrograms** 163:11
**mid-1990s** 188:12
**middle** 232:18  241:19  269:17
**migrate** 54:5
**mil** 255:2
**milligram** 151:22  210:7
**milligrams** 151:18  163:21  164:10  255:2
**million** 151:17  163:13, 15  165:10, 11, 13, 15, 18, 19  166:4  167:10  171:9  262:7, 8
**mind** 135:22  136:3  173:6, 15, 17  180:10  317:8, 16, 23  330:8
**mine** 38:20
**minimizing** 299:15
**Minneapolis** 2:18
**Minnesota** 2:18
**minuscule**

198:7
**minute** 319:6
**minutes** 73:2, 4, 5  127:12, 20  174:18, 21  227:12, 15, 22  275:1  309:5, 8  320:5  333:18
**mischaracter** 246:14
**mischaracterize** 118:24
**misconstrue** 118:24
**missed** 67:5  130:10  241:20  317:5  333:20
**misspoke** 212:18
**misstatement** 246:15
**Misstates** 55:21  259:5  281:23  314:23
**mistake** 88:18  120:4
**Mitch** 3:19
**mitchcharchalis@btlaw.com** 3:19
**mixed** 150:7
**Mjgoldenberg@goldengla w.com** 2:19
**mobile** 60:8  62:9
**mode** 68:2
**modify** 70:16
**moieties** 222:15
**molecular** 65:15, 16  66:10  67:23  107:13  108:2, 5  112:4  176:18  183:24  209:21  218:12, 18

222:13, 16  282:17  283:7
**molecule** 46:6  54:11  68:15  95:23  97:5  107:15  108:4, 6  111:20, 21  112:2  247:18  266:18  315:9
**molecules** 50:4  69:10  271:17
**moment** 24:10  84:21  169:14
**Monday** 18:9  28:11
**monetary** 194:19, 23
**money** 91:17
**monitoring** 91:24
**monograph** 5:24  9:20  82:3, 10  85:8  101:15  105:2  106:20  111:15  120:19  145:14  301:14  306:4, 16, 20  307:4, 14, 17  308:14, 15, 21  309:1  321:4
**monographs** 82:6  105:8  301:16
**month** 34:22
**morning** 11:6, 10
**motifs** 60:11
**motivation** 287:17  329:19
**move** 39:10  111:13  160:16  210:14  235:18  243:10  244:3  262:18

**Moving** 8:23  53:6  59:12  72:18  124:10  208:14  241:9
**Mulberry** 3:9
**multiple** 128:16  172:4  301:22  320:3
**multiply** 151:17  164:10
**Murtha** 4:3
**muscles** 227:19
**mutagen** 52:12, 18  211:23  212:4
**Mutagenic** 8:14, 17  35:20  47:9, 17, 21  49:21, 24  50:1, 12, 15, 23  51:2, 23  52:8  98:16, 17, 18, 19  99:2, 4, 5, 18  122:13  123:2, 4, 6  124:12  125:3  206:15, 21, 23  207:1  208:10  211:8, 13  218:14  220:21  221:2, 24  222:2  223:9  234:21  237:18  238:5, 13, 19, 23  243:21  303:1  307:18  325:16  326:20
**mutagenicity** 98:21  121:8  122:7, 19  123:4, 16, 23  222:1, 18  223:4  236:3, 11
**mutagens** 52:17  121:16
**mutation** 50:7  51:17

Confidential Information Subject to Protective Order

mutations
51:24 221:16
mute 320:8
Mylan 12:19
13:8, 18, 23
14:1, 3 38:12
141:6, 8
148:18, 21
153:10
168:24
169:21
170:15, 20
171:1, 6
189:9 251:17
252:4 264:21,
22, 23

< N >
nail 81:22
135:23
138:22
142:19 255:11
nailed 215:19
Najafi 78:12
name 10:3
11:7, 10
36:24 37:3
129:7 155:4
229:12
names 36:22
NaN3 271:5
NaNO2
269:17 272:11
nanograms
125:22 126:7
151:15, 19, 20,
22, 24 152:7,
10, 14, 20
153:8 163:18
164:20, 23
165:13 308:5
nanometer
77:23 78:17
79:15, 24
nanometers
77:14 79:4, 6
80:3, 10 81:8,
17
National
296:16

nationwide
157:17
nature 10:15
301:6
nauseating
68:20
nauseatingly
97:5
ND 251:4
325:9
NDAs 143:1
196:21
NDBA 7:16
NDEA 6:17,
22 7:13
80:13 86:1,
11, 22 87:15
99:8, 12, 14,
17 100:4, 10,
13, 16 111:19,
20, 24 112:1,
5, 18, 21
113:15
115:11, 23
116:9, 16, 20
117:10, 18
118:9 119:3
123:21 124:6
126:5, 6, 23
150:16
152:24 153:1,
8, 9 158:7
159:15, 19, 21,
22 171:8, 21
172:2, 14
173:4 175:24
179:23
180:19 183:2
201:9 203:7
206:23 212:4
221:1, 18
226:3, 8, 18,
24 236:22
237:18
239:19
260:13
261:22
265:12
268:15
282:10 302:7,
13, 16 303:7,

12, 22 304:24
305:3 307:17
308:1, 18, 23
321:9, 15, 18
322:4 325:9
326:4, 7
327:10 329:11
NDIPA 7:15
NDMA 6:16,
21 7:12 77:5,
9, 11, 16, 22
78:5, 16 79:3,
14 80:1, 2, 9,
13, 22 81:8,
12, 19 86:1,
11, 22 87:15
95:17 98:18,
22 99:11, 20,
24 100:3, 16
104:17
111:16, 23
112:3, 6, 24
113:8 114:16
115:23 116:9,
16, 20 117:10,
19 118:9
119:3 123:13
124:6 125:20
126:23
150:15, 22
151:5, 7, 9, 15
152:2, 5, 22
158:6, 9
162:13, 17
163:7 164:6,
20 166:6
167:8 171:21
172:3, 14, 24
173:3 175:24
179:23
180:19 183:1
201:9 203:7
206:23
211:15 221:1,
18 226:3, 7,
17, 24 236:22
237:18
239:19
260:10
261:11, 22
265:12 272:7

273:17 274:5
279:14, 22
280:9 281:12,
19 282:1, 9
283:6, 23
284:15 302:7,
13, 16 303:6,
12, 21 304:2,
24 305:3
307:16, 21, 24
308:6, 17, 23
318:24
319:14, 19
321:8, 14, 18
322:4 325:9
326:4, 7
327:9 329:11
334:17 335:3,
20
NE 3:3
necessarily
20:5 139:2
172:6 277:6
necessary
61:2 205:20
276:10
need 22:24
35:16 46:14
50:18 51:6
63:12, 14, 22
70:22 71:1
79:17 127:12
138:21 149:5
165:5 174:21,
23 178:6
188:3 189:4
194:13
207:21 210:8
222:2 244:15
255:4 260:3,
21 276:7
283:2 285:24
288:10
290:10
302:16 326:3
needed
136:22
180:10
217:21
305:21, 22, 23

needs 72:7, 21
73:21, 23
NEIPA 7:14
neither 337:11
Nesbit 2:14
network
140:24
never 21:14
36:4 69:24
143:3 173:6,
14 304:16
NEW 1:2 2:3,
7 3:10 4:3
7:23 10:10
22:5 42:16
64:15 70:15
185:15, 16
197:17, 18, 19
199:13 200:9
201:19
203:15 204:4,
19 205:3
212:23 242:3
273:11
300:19
301:23 302:2
Newark 3:10
news 6:6
154:5
Nineteen
189:24 190:2
NIST 296:14
nit 303:20
nitric 249:3
nitrite 103:24
104:15
247:10, 15, 17,
20 248:24
249:10, 20, 23
267:9, 13, 18
268:13, 24
269:8, 15, 18
272:6, 11, 18
273:1 303:9,
20 312:14
313:6, 23
314:1, 3, 20
315:5, 7, 18
316:3 318:15
nitrogen
95:13, 14, 15,

Confidential Information Subject to Protective Order

16  96:3, 6
108:14  261:3
**Nitrosamine**
7:6, 11  8:19
9:18  36:15
37:7, 12  43:6
96:1  119:13
124:12
218:18  239:6
244:5  247:8
250:4  269:20
298:13
305:17  307:21
**Nitrosamines**
8:22  34:4
37:20  43:2,
15  78:13
95:6, 7, 8, 12
96:3  97:13,
18, 20, 21
98:15, 17
105:7  119:3,
24  125:4
126:18
133:15
150:10  151:2
186:11  241:9,
24  242:5
244:1, 14
246:10
247:14
248:12
267:15, 23
269:12
305:20  307:21
**nitrosating**
98:3, 8
247:19, 21
**nitrosation**
247:17
**nitroso**  297:11
**nitrosodimethy
lamine**  297:12
**nitrous**  267:19
**NMBA**  7:17
**NMR**  66:16
67:7  139:9, 18
**NMT**  167:9
262:7
**NN**  96:12, 14

**N-nitrosamine**
96:2, 4, 6
150:5  189:5
218:23
**N-
nitrosamines**
95:21  96:24
105:10
106:10
150:14  172:4
270:1
**N-nitroso**
42:17  43:10,
13  80:14
117:18
120:23
122:24  123:1,
3, 14, 22
124:7  223:1,
2  225:4, 19,
23  226:2, 7,
17, 23  251:4
303:23
**N-nitroso/N-
nitrosamine**
42:18
**N-
Nitrosodibutyla
mine**  7:16
**N-
Nitrosodiethyla
mine**  6:17, 22
7:13  106:21
107:2  109:12,
21  110:11, 14
316:5
**N-
Nitrosodiisopro
pylamine**  7:15
**N-
nitrosodimethy
lamine**  6:16,
21  7:12
104:1, 3, 8, 16
111:15, 16
113:18  114:7,
22  115:4
157:24  297:7
312:13  313:5
315:4, 17
318:14

**N-
Nitrosoethyliso
propylamine**
7:14
**N-nitrosolate**
267:20, 22
**N-Nitroso-N-
methyl-4-
aminobutyric**
7:17
**N-NO**  312:11
**noise**  269:10
**nominal**
183:14  189:3
**non**  54:13
**noncontroversi
al**  251:8
**noninfringeme
nt**  15:5
**non-peer-
reviewed**
40:11
**non-
pharmaceutical**
40:14, 22  41:7
**nonrevised**
216:10
**nonroutine**
136:16
137:16  138:2
**nonvolatile**
201:24  202:5
**norm**  173:20
**normal**
243:20  280:18
**normally**
125:14  268:19
**note**  75:23
112:20
119:17
154:21  218:8,
11
**noted**  10:19
182:23
**notes**  29:22
83:4, 10, 13
210:15  211:3
269:15  309:14
**Notice**  5:10,
12  23:2, 4
24:5  25:12,

21  26:1, 5, 18
27:5  28:23
29:3, 13
82:23  83:1
153:15  159:5
**noticed**  227:17
**notices**  144:5,
7
**notification**
29:21
**noting**  165:1
**Novartis**
273:24  274:5
279:13
280:15  281:8,
9, 12  282:1,
22  283:18, 22
284:6, 13
285:6, 17
288:4  318:24
319:14, 18
334:17  335:2,
14, 19
**November**
159:5  189:17
190:15
**nuclear**  66:17
**number**  13:20
21:6, 8  25:18
26:24  30:5
31:5  32:4
37:15  40:18
42:4  74:13
101:16
102:21
108:18, 20
120:8  150:24
151:17
152:10
153:16  157:3
159:6  160:11,
13, 23  161:4
168:1, 2, 4
170:19, 24
171:14, 16, 22
175:14
177:19  178:7,
17  181:13
184:17  189:7,
18, 22  195:6,
7  214:23

216:15, 17
219:3, 5, 14
224:7, 16, 18
228:11
230:24  231:2
239:7, 8
241:1  253:17
264:14  265:5,
24  267:2
270:10
274:17, 21
279:9  282:19
293:15  297:6,
20  306:5
309:22
310:14  326:19
**numbered**
102:14
**numbers**
20:20  21:23
25:14  263:19
**numerical**
296:18
**numerous**
206:11

**< O >**
**oath**  79:10
**Object**  27:22
36:17  45:12
46:1  51:14
52:2  55:21
60:20  63:4
82:22  83:9
89:9, 23
92:18  93:5
98:24  100:18
106:7  107:4,
21  110:3, 19
112:9  113:2,
23  114:10
115:9  116:1,
11, 24  117:13
122:3, 10, 21
123:18
124:17  125:8,
24  126:9
127:2  130:17
133:6  137:3
139:14  140:1,
16  141:10, 14

Confidential Information Subject to Protective Order

142:8  145:17
146:11  147:1
149:3  156:3,
14  158:16
162:19
164:14  165:1,
22  167:16
172:17  180:2
186:1  187:6
192:3  194:6
202:18  205:6
211:10, 18, 21
214:11  217:6
218:22  222:5
225:21
226:10
234:10  237:1,
21  240:2
242:12, 13
244:7, 20
245:12
246:13, 14
247:13  248:8,
20  251:1, 22
252:9, 16, 20
258:7  259:5,
22  261:14
262:13  263:9
265:15
267:17
268:17  270:5
271:22
273:20  274:8
276:4  277:2
278:1, 16
279:16, 24
280:11
281:21
282:13  284:1,
17  285:21
287:6  288:9
290:8  291:1,
14  293:2, 6,
14, 21  294:7,
19  295:15
296:9, 23
297:9  298:2,
6, 21  300:7
301:3  302:9
303:15  305:5
308:20

310:23  313:9,
14  314:23
315:21  317:1
318:6, 17
319:3  334:7
335:5
**Objection**
15:17  52:11
88:6, 12  90:6,
19  91:7  92:7
94:8  99:10
106:12  111:4
124:1  143:14
147:14  148:5
149:10  150:1
192:14  193:8
226:20
242:12
243:15
245:13  249:6
260:15, 19
281:4  295:1
319:17  323:4
**Objections**
5:12  23:4
26:1, 18  27:5,
15, 16  333:11
**objective**
285:12  286:24
**Objet**  334:20
**observation**
103:2
**observed**
269:13
**obtain**  331:17
**obvious**  55:8
138:5  269:6, 9
**obviously**
287:10
**occasionally**
35:17  58:17
188:10
**occur**  61:1
64:22  70:24
272:9  328:16
**occurred**  34:5
**occurrence**
304:11
**occurring**
61:3  68:21

**occurs**  58:16
77:17  176:10
312:13  313:5,
22  315:4, 17
318:14
**October**
195:17
**offer**  227:18
245:24  273:3
289:15
305:14  322:12
**offered**  193:13
**offering**  85:14
89:5, 16, 17
141:23
144:21
192:23  193:5,
9, 18  194:1, 3,
9, 10, 17, 22, 24
245:9  246:1
322:7
**officer**  35:3
**officers**  35:6
**official**  117:4
144:13
220:12
306:22, 23
307:1, 10, 12
**oftentimes**
46:10  61:20
98:13  186:18
254:22
**oh**  21:4
23:11  62:8,
16  88:16
99:14  102:18
104:8  112:15
178:5  212:18
218:9  231:9,
11  233:7, 11
276:14
292:18
312:16  318:1
**oily**  112:10
**Okay**  11:10,
17  12:21
13:14, 19
14:13, 14
16:7, 8, 19, 20
22:16  23:5
24:1, 15  25:5,

7, 10, 11  26:4
30:21  31:21
33:21  34:9
35:3  39:5
44:3  47:12
48:5  60:6
65:7  69:6
74:2, 11
75:22  76:5,
12, 21  84:22,
24  90:14
93:14  99:17
102:5, 13, 24
103:5, 18, 20
104:10  105:2
106:18, 23
107:22  109:9,
20  112:3, 6,
12  113:6, 17
114:20  118:6
123:13
126:22  129:9,
22  131:2, 12
132:1  134:23
139:11
146:15
154:24
155:10
157:13
158:23  159:4,
8, 11, 13, 17
160:7  161:13,
15  162:16
163:14, 17
170:4, 13
174:13  175:1,
2, 18, 22
176:4  178:5
179:19
181:19  182:9,
14  183:4
188:22  190:8
191:12, 14
193:18
195:11  200:4
201:6  203:22
208:18
209:23
210:21, 24
211:7  212:19
215:22  216:1

219:21, 24
225:8  228:16,
24  229:9, 12
232:7, 10, 18
233:9  234:20
235:3  236:22
239:14, 18, 22
241:8  242:4
243:9  244:13
254:6, 10, 16
262:24  264:3
267:9  271:11
275:11, 14
276:11
277:18  279:7
283:8  285:14
286:5  290:19
293:24
295:20
317:19
320:22  333:22
**oldest**  276:12
**Olsen**  229:7,
10, 11, 15
232:8
**Olsen's**  229:12
**once**  14:17, 20
120:12
175:18
187:15
215:15
238:17  275:3
286:3
**on-column**
58:3, 4
**ones**  18:24
19:23  38:6
119:18  181:5
196:14  225:3
254:23
304:15  311:5
**One's**  183:13
**Oops**  191:6
**opaque**
281:10  283:2,
20
**open**  186:20
285:23
**operated**
188:11, 13

Confidential Information – Subject to Protective Order

**operating**
62:8 276:23
**operator**
187:3, 11
188:6 276:2
**opine** 300:13
321:21, 22
**opined** 117:6
244:23
**opining**
273:16 311:7
**opinion** 15:14
79:16 136:1,
12 142:10
167:14 192:4
193:14 194:1,
10, 24 245:13
278:18 280:7,
17 281:17
282:9 284:12
301:15
310:17 311:7
319:22
323:20, 24
327:4, 6
328:19
334:11, 12, 16
335:2
**opinions**
20:14 85:14
89:6, 16, 17,
20 90:3, 16
92:4, 9, 14, 21
93:1, 7, 12, 19
94:9, 11, 20,
22, 23 95:1, 2
135:8 141:23
144:22
192:24 193:5,
10, 18 194:3,
17, 22 245:9
281:2 282:6
310:9 321:13,
17 322:7, 11,
12 324:11
325:3, 6
332:7, 11, 22
334:4
**opportunity**
16:2

**opposed** 50:9
246:15 255:8
**optimize** 69:2
244:15
**oral** 23:2
24:6
**Orbitrap**
183:16 184:6
**ORDER** 1:15
15:5 48:14
49:6 59:22
79:18 112:17
137:10
151:14
170:12 199:7
240:16 296:4
328:14
**ordinary**
47:21 49:10,
12, 15, 17
51:8 211:24
212:5 325:23
**O'REILLY**
3:7
**organic** 61:18
95:9, 10 96:7
201:4, 12, 14,
17, 23 202:3
203:5, 7
204:13 248:5
268:13
271:15
273:14 294:15
**organization**
35:9, 11
117:4 289:21
**orient** 106:19
275:17
**orientation**
97:2
**orientations**
97:3
**original** 9:7
12:10 19:11
32:13, 20
33:6 58:9
234:22
**originally**
13:22 196:10
216:7
**Orleans** 2:7

**outcomes**
222:18
**outliers** 151:11
**outline** 253:24
254:4
**outlined** 51:1
238:19 264:1
**outlines** 254:1
**Outside**
114:10 117:1
127:2 141:14
143:14 156:3
158:16
167:16
173:20 192:3
194:6 211:23
212:5 245:3
273:23 300:7
302:9 305:5
320:2 325:14
**overall** 266:14
**overestimate**
283:10
**Overland** 2:22
**overlapping**
93:8
**overlaps**
144:24
**overview** 42:2
**owned** 135:16
**oxidation**
97:23
**oxygen** 95:14,
17 96:6, 17

**< P >**
**p.m** 128:4
175:8, 11
228:1, 4
253:11, 14
309:18, 21
320:10, 13
336:6, 7
**packaging**
35:18
**Packard** 189:2
**packing**
191:17
**pad** 23:8
**PAGE** 5:2, 8
12:24 19:22

26:5 31:18
33:5, 10 47:7
102:3, 13, 16,
21 103:7, 8,
12, 16 104:23
106:18
109:11 110:8
111:13
112:16 113:6,
13 114:15
120:18
154:13
158:12, 13
159:23 160:4,
17 161:3, 17,
18 166:9
178:3 183:7
190:12 191:2,
5, 7 195:22
197:11, 14, 15
199:23 200:4,
5, 7 203:2
208:14
210:14, 17
215:6 218:7
220:14 221:7
235:19, 22
236:12
239:15, 16
241:19, 23
250:7, 9, 10,
16 255:18, 20
264:12, 17
270:23
275:15, 20
277:20 278:5
285:13
292:11 312:6
**pages** 19:8, 17
102:2 158:11
178:4 200:8
262:19
**paid** 21:15
92:16
**pains** 223:23
**paper** 23:9
40:9 69:16,
17 128:23
129:15
**papers** 80:16

**Paragraph**
86:18, 20
87:7, 9, 17, 21
103:16 105:4
114:18 115:7
120:18
124:11
130:24
134:17, 18
154:21
157:22 167:5
169:12 191:8
205:16
221:21
223:19, 21
225:10, 11
247:8, 23
278:7 324:24
**parameters**
186:23 290:3,
20, 21
**Pardon**
200:17 201:2
**parent** 48:9
**Park** 2:22
**part** 12:22
15:7, 10, 14
26:5 39:1
45:3 46:20
49:18 52:24
58:9 67:5
84:5 85:6
106:20
111:14 117:8,
17 121:16
122:15 124:6
130:10 134:8
137:5, 20
138:12, 14
145:2 151:16
161:3 165:11
176:19 183:6
190:9 192:21
198:8 204:8
223:5 229:22
258:1 261:1
262:7, 8
284:11
295:16
305:18

Confidential Information - Subject to Protective Order

314:*10*
316:*14* 329:*5*
**partial** 96:*15,*
*16*
**partially** 19:*24*
**participate**
130:*4*
**particular**
15:*14* 20:*4*
50:*3* 60:*4*
62:*7* 111:*5*
119:*8* 121:*23*
122:*24*
135:*23*
136:*15, 21, 23*
154:*17* 182:*7,*
*11* 196:*23*
217:*14* 218:*8*
234:*7* 251:*15*
256:*16* 260:*5*
282:*23*
288:*15* 316:*8*
323:*15* 328:*1*
**particularly**
16:*10* 49:*18*
106:*2, 15*
107:*16*
117:*18* 121:*7*
122:*7, 19*
123:*15, 23*
**parties** 10:*13,*
*17* 337:*12*
**parts** 151:*21*
163:*12, 14*
165:*10, 12, 14,*
*15, 18, 19*
166:*4* 167:*9*
171:*9* 316:*19*
**party** 12:*6*
13:*5, 16*
250:*23*
**pass/fail**
208:*11*
**passed** 62:*12*
**patent** 12:*3*
**pathways**
45:*23*
**patient** 45:*10,*
*18*
**patients**

155:*19*
**pause** 10:*16*
**paused** 86:*16*
**paying** 91:*23*
**PDF** 103:*11*
**peak** 53:*6, 10*
58:*23* 59:*17*
60:*7, 9, 23*
63:*1, 7* 78:*3*
138:*16, 19*
277:*5* 278:*9,*
*19* 281:*14, 16*
282:*18, 22*
283:*8* 284:*7*
291:*18*
293:*18* 295:*6,*
*8, 9* 296:*3*
297:*11*
**peaks** 53:*6, 7,*
*8, 14, 18, 20, 22*
54:*12* 57:*22*
58:*24* 59:*23*
61:*8* 64:*15,*
*18* 87:*5*
275:*22, 24*
276:*24* 278:*6*
293:*12, 15*
294:*4, 8*
295:*12, 17*
296:*1, 12*
297:*5*
**peer-reviewed**
21:*8, 18* 22:*1,*
*2* 30:*22*
31:*15* 301:*17*
**pen** 23:*8*
**pending** 320:*1*
**people** 56:*6,*
*15, 21* 57:*2*
71:*24* 75:*10*
129:*11*
147:*16* 155:*9*
172:*23* 186:*21*
**perceive**
164:*17*
**percent** 40:*20,*
*21, 24* 41:*6*
78:*3* 87:*16*
119:*21* 163:*1*
209:*3, 8*

210:*7* 215:*12,*
*16*
**percentage**
40:*16*
**Perfect** 211:*2*
**perfectly**
171:*2*
**perform**
53:*16* 72:*6*
**performance**
57:*10*
**performed**
169:*21*
170:*15*
254:*14* 324:*6*
**performing**
165:*4*
**performs** 72:*8*
**period** 75:*24*
135:*7* 327:*19*
**permission**
37:*1*
**permitted**
121:*20* 152:*18*
**person** 52:*19*
71:*23* 187:*18*
**personal**
124:*3* 337:*7*
**personally**
114:*1* 155:*7*
168:*18*
188:*11* 289:*13*
**perspective**
234:*6*
**pertain** 64:*6*
211:*7* 217:*2,*
*15*
**pertained** 45:*6*
**pertains**
212:*3* 217:*17*
252:*18*
**pH** 62:*9, 18*
103:*24* 104:*2,*
*16*
**Ph.D** 1:*21*
10:*23* 61:*18*
**Pharma** 3:*7,*
*12* 14:*9* 40:*1*

**Pharmaceutical**
3:*6, 11* 12:*4*

13:*3* 14:*10*
35:*16, 24*
36:*1* 40:*17*
41:*10, 14*
66:*20* 67:*3, 9*
98:*1* 139:*17*
140:*8, 9, 12*
143:*8* 173:*20*
179:*9, 12, 15*
193:*20*
196:*18, 20, 21*
198:*15, 19, 22,*
*23* 199:*2*
204:*14*
207:*14* 214:*7*
217:*4, 16*
**Pharmaceutical
s** 3:*7, 12, 16*
8:*10, 14*
12:*14* 41:*17*
154:*16*
157:*16*
239:*24* 250:*5*
285:*17*
**pharmacologic
al** 206:*1*
233:*24*
**pharmacopeial**
86:*23*
**Pharmacy**
3:*20*
**phase** 60:*8*
62:*9* 176:*15*
193:*11*
209:*13*
259:*13* 305:*7*
**phenomenon**
58:*3* 62:*4*
63:*1*
**phone** 23:*7*
**phosphorous**
261:*4*
**photo** 35:*22*
44:*22*
**photostability**
35:*22* 44:*23*
**PHR** 2:*4*
**phrase** 234:*18*
235:*13*
**phrasing** 34:*4*

**physical**
44:*22* 105:*6*
**pictures** 17:*7*
81:*4*
**piece** 183:*12*
**piecing** 242:*19*
**Piedmont** 3:*3*
**PIZZI** 3:*7*
**place** 145:*8*
167:*7* 213:*24*
307:*14* 322:*4*
327:*8*
**placeholder**
206:*13* 235:*14*
**placing** 254:*19*
**plaintiff** 92:*5*
**Plaintiffs** 2:*5,*
*9, 12, 16, 20, 24*
11:*12* 23:*4*
26:*18* 27:*5*
89:*21* 90:*4*
91:*4, 12* 93:*3*
135:*8* 321:*1*
331:*3, 11, 15*
332:*13*
**plan** 127:*15*
**plans** 127:*13*
**plastic** 62:*17*
**plate** 103:*11*
**platform**
130:*4*
**play** 69:*2*
**played** 251:*3*
281:*9*
**plays** 62:*21*
193:*15*
**PLC** 137:*1*
**please** 10:*16*
16:*1* 24:*5, 7*
26:*22, 23*
30:*2* 31:*3*
32:*1* 34:*10*
41:*24* 47:*6*
49:*11* 58:*14*
73:*23* 74:*11*
110:*9* 114:*19*
115:*21*
153:*14*
156:*10* 157:*1*
160:*9* 167:*24*
168:*10* 170:*8*

171:*13*
175:*13*
181:*11*
184:*14, 21*
189:*16, 21*
191:*15*  195:*5*
200:*7*  203:*23*
219:*2*  228:*6, 8*  232:*2*
239:*4*  240:*9, 13, 22*  253:*2*
262:*19*
264:*12, 13*
265:*22*  267:*2*
270:*9*  276:*6*
278:*6*  279:*7*
287:*21*
288:*10*
290:*10*
292:*12*
297:*19*  306:*2*
309:*3*  319:*9*
325:*2*
**PM**  86:*1*
**point**  31:*14*
46:*10, 14, 23*
47:*1*  61:*16*
63:*21*  64:*13*
84:*13*  86:*2*
107:*6, 16, 17*
109:*5*  111:*10*
112:*14, 20, 22*
121:*12*
142:*12*  187:*1*
199:*18, 19*
218:*5*  220:*12*
237:*23*  304:*4*
327:*1*  335:*16*
**polymorph**
289:*24*
**polymorphous**
255:*24*
**Ponce**  2:*10*
**portion**  332:*11*
**posing**  16:*1*
**position**  44:*6, 8*  188:*16, 18*
**positions**  15:*5*
44:*11*
**positive**  84:*8*
98:*20*

**possession**
329:*9*
**possible**  46:*8*
168:*17*  204:*5*
205:*4*  221:*22*
231:*5*  232:*16*
268:*10, 14*
274:*14*  284:*3*
**possibly**  268:*8*
**post-2018**
304:*3*
**post-July**
171:*23*
**postulate**  66:*4*
**postulated**
99:*22*
**potency**
225:*13*
**potent**  123:*5*
126:*14*
205:*24*  206:*8*
233:*23*  235:*7*
**Potential**  8:*15*
43:*9, 13*
45:*23*  46:*3, 21*  50:*6*
52:*13*  90:*16*
92:*15*  131:*15*
199:*5, 9, 16, 18*  202:*16, 24*
203:*13*
204:*17*
205:*23*  206:*7*
207:*4, 8*
218:*14*
221:*14*  222:*2*
225:*15*  226:*6, 16*  233:*22*
235:*6*  236:*1, 10*  238:*12*
243:*18*  246:*9*
247:*4*  250:*20*
251:*8, 14, 18*
252:*5*  269:*8*
303:*21, 22*
321:*8*  325:*3*
326:*20*
**potentially**
50:*2*  51:*9, 11, 15*  52:*17*
78:*11*  91:*21*

145:*14*
207:*12*
221:*17, 24*
235:*13*
266:*10*
267:*14*
269:*20*  274:*22*
**power**  256:*4*
**ppm**  87:*15*
151:*8, 9, 12, 16, 22*  152:*5*
162:*14, 16, 21*
164:*7*
**practical**
110:*15, 20*
111:*6, 10*
115:*5, 14*
199:*19*  327:*1*
**practically**
255:*1*
**practice**
117:*22*
204:*15, 21, 23*
205:*7*
**precautions**
110:*23*
**precise**  197:*8*
**precision**
186:*23*
**precluded**
15:*4, 11, 12*
**preclusion**
15:*6*
**pre-corrected**
22:*21*
**precursors**
68:*17*
**predates**  170:*5*
**predictable**
59:*15*
**predictive**
44:*14*  300:*19*
301:*23*  302:*2*
**predictively**
304:*6*
**prefer**  215:*19*
**prep**  28:*21*
**preparation**
58:*11*  331:*1, 5*  332:*21*

**preparative**
18:*3, 5, 8*
**preparatory**
18:*14, 15*
**prepare**  16:*24*
17:*23*
**prepared**
245:*6*  324:*12*
**preparing**
332:*18*
**presence**
126:*17*  127:*7*
209:*4*  249:*10*
269:*21*  272:*8*
298:*16*
299:*14, 18*
300:*4*  328:*10*
**present**  150:*6, 15*  205:*17*
210:*6, 7*
221:*15*  248:*1*
256:*15*
261:*20*  273:*1*
303:*24*
**presentation**
96:*21*  97:*8*
**presented**
135:*8*
**Presenting**
128:*14*
**press**  21:*11, 12*
**pressure**
176:*14*
**presumably**
81:*15*
**presume**
107:*12*
139:*16*
169:*10*  180:*5*
256:*18*  279:*1*
287:*11*  292:*8*
306:*24*  307:*1*
**presumed**
140:*4*
**presuming**
147:*3*
**presumption**
173:*13*
**pretty**  28:*13*
37:*20*  55:*24*
59:*18*  68:*4*

70:*2*  86:*5*
101:*24*  119:*4, 11*  128:*24*
139:*7*  145:*19*
151:*8*  224:*14*
243:*19*
244:*22*
255:*10*  329:*4, 7, 8*
**Preussmann**
105:*11, 13*
**prevent**  63:*12*
126:*16*  127:*6, 7*
**preventable**
299:*17*
**preventing**
298:*16*
299:*14, 15, 16*
300:*4*
**previous**
12:*15*  166:*19*
186:*8*  188:*16*
195:*18*
220:*24*  222:*19*
**previously**
43:*24*  220:*22*
232:*23*
233:*16*  258:*9*
324:*18*
**primarily**
35:*16*  37:*7*
55:*3*  98:*7*
**primary**
139:*3*  143:*3*
**primary/tertiary/quaternary**
248:*3*
**Princeton**  4:*3*
**principal**
105:*9*
**principals**
35:*10*
**principles**
221:*6, 8*
**Prinston**  38:*9*
169:*3*  265:*22*
**PRINSTON000
74772**  9:*7, 10*
**prior**  13:*24*
14:*5*  15:*10*

Confidential Information Subject to Protective Order

45:18  213:12
214:3  327:8
**private**  180:23
**privileged**
40:12
**probability-
based**  222:21
**probable**
99:24  100:4,
10, 16  321:18
**Probably**  28:7,
8  72:23
94:13  113:9
116:21
127:16
133:22  139:3
184:5  188:11
194:13  273:23
**problem**  53:5
62:5  125:14
204:11  282:14
**problems**
53:4  60:23
**procedure**
172:4  208:3
266:12, 13
269:1
**procedures**
205:22  206:6
207:3, 7, 23
233:21
**proceed**
136:16
**proceeding**
15:1
**proceedings**
337:4, 9
**proceeds**  58:5
**process**  9:8,
11  43:7, 8, 21
46:9, 13, 19,
24  48:2
50:23  51:1
54:13, 19
63:18  64:11,
18, 22, 23
65:7, 9  67:14,
22  68:12
136:13  145:3
167:7  201:19
202:15, 23

203:1  237:24
238:3, 4
244:16
245:17
246:19  248:4,
16  249:1, 9,
12, 13, 15, 19,
21, 22  251:20
266:5, 10, 12,
14  270:14
271:9, 11
273:4, 12, 13
300:23
303:10, 13
305:12, 20
314:21  315:6
327:14  334:14
**processes**
44:15  272:19
298:15
299:13  300:3
**processing**
191:17
**produce**  58:8
266:6  267:14
**produced**
27:20  28:6,
10, 20  29:12,
17  30:3, 17
45:9  170:10
316:5
**producing**
135:17
205:24  233:23
**product**  36:5,
6  42:19  43:4,
11, 14  64:19
70:24  88:4
91:17  121:20
122:1  126:19
142:6  143:12
144:6  145:23
146:9, 18, 23
147:10
148:20  149:1,
7, 22  150:11,
23  151:4, 6,
10  152:11
153:2, 11
159:24  162:1
192:24

193:19  194:4
266:8  285:16
314:4  335:21
**PRODUCTS**
1:7  8:5  10:9
43:3  44:19
45:7, 17
46:17, 22
70:24  125:21
126:6  136:14,
20  154:13
156:1  158:14
179:24
194:18, 23
195:1, 2
196:22  202:7
204:6  205:4
212:14, 16
214:22
299:24  300:2
302:7  303:7
325:21
327:11, 14
335:17
**professorial**
68:2
**profile**  130:1
204:4  205:3
**programmed**
187:4
**project**  128:21
**projects**
229:23
**prompted**
20:8  150:11
**pronounce**
11:7
**pronounced**
105:18
**pronunciation**
305:12
**properties**
105:7
**proposed**  91:4
**protect**
155:19  311:11
**protection**
81:15

**PROTECTIVE**
1:15

**protocol**
173:12
**prove**  66:17
69:23
**proven**  70:1
**provide**  27:10,
15, 17, 19
34:2, 6  36:21
41:12, 16
47:19, 22
53:12  54:16
57:20  59:21
61:18, 19
71:6  220:19
274:4  321:13
332:4, 6
**provided**
22:15  26:7,
14  28:12
29:18  34:6
38:6  42:24
132:10, 22
167:3  284:12,
20  285:2
292:13, 23
311:13
321:12
324:11  325:4
327:5
**provider**
40:10  280:19
**providers**  40:6
**Providing**
35:15  60:6
61:13  207:10
241:18  301:14
**provisional**
171:8
**prudent**  60:15,
22, 24  61:3
**publication**
40:12  105:11
**publications**
129:12  130:2
171:23
175:23  186:4
223:8  249:13
**published**
40:9  60:3
105:2  128:23,
24  129:2

150:3  168:20,
23  169:2
171:20
172:14, 24
173:3  176:2
179:22
230:24  231:3
251:2  273:7
307:23  308:2
**publisher**
230:8, 9
**publishes**
128:17
**publishing**
230:22
**pull**  19:23
24:5  31:3
32:1  41:24
47:6  74:11
120:6  153:14
159:4  160:9
167:24
171:13  174:4,
5  178:6
181:9  184:14
189:13, 16
195:5  214:19
219:2, 12
228:6  239:5
240:13, 22
253:2, 16
264:11
265:22  270:9
274:16, 21
279:7  297:19
306:2
**pulled**  305:10
**pulling**  266:3
**punched**  69:7
**Punta**  2:14
**purification**
203:14  204:18
**purity**  142:5
144:3  301:8
**purpose**  111:6
196:9  220:15
255:7
**purposes**
36:14  93:15,
19  94:10
110:15, 21

Confidential Information Subject to Protective Order

115:5, *14*
266:*21* 321:*12*
**pushes** 54:*5*
**put** 46:*8*
71:*11* 117:*4*
120:*1* 151:*23*
157:*1* 180:*9*
181:*5* 196:*10*
209:*11, 12*
212:9, *13*
216:*14* 232:2
234:5 285:5
320:7 329:*1*
**puzzled**
146:*12*
**puzzling**
334:*10*

**< Q >**
**Q3** 195:*5, 20*
213:*10*
**Q3A** 199:*21*
206:*10*
212:*24* 213:*4,
19, 21* 214:*3*
232:*22* 233:2
234:*19, 20*
235:*16*
**Q3A(R2** 7:*23*
**Q3B** 212:*16*
214:*3* 234:*19*
235:*16*
**quad** 270:2, *3*
**quadripole**
183:*13* 189:*3*
**qualification**
209:*23* 210:*2,
10* 277:*10*
**qualified**
210:*3*
**qualifiers**
334:*24*
**qualifies**
192:*20*
**qualify** 193:*8*
217:*22*
**Quality** 6:*12*
141:*7, 24*
142:*5* 143:*11,
21* 144:*18, 19*

145:*8* 147:*4*
300:*11*
**quantification**
48:*12* 208:*8*
325:*12*
**quantify**
48:*15, 20, 24*
49:*6* 207:*7,
12* 208:*4*
**quantifying**
50:*12*
**quantitation**
48:*11* 63:*8*
**quantitatively**
112:*19*
**quenched**
312:*14* 313:*6,
23, 24* 315:*5,
18* 318:*15*
**question**
11:*14* 12:*23*
13:*14* 15:*24*
16:*5, 17, 18*
17:*2, 22*
21:*18* 28:*2*
31:*7, 10*
37:*14* 39:*8*
47:*15* 48:*21*
52:*4* 56:*19*
60:*21* 67:*6*
74:*16* 81:*13*
83:*14* 84:*1, 4*
85:*4* 86:*14*
87:*6* 89:*23*
90:*1* 91:*8*
94:*6, 24*
100:*8* 101:*19*
107:*1* 118:*4,
15* 130:*11*
132:*17*
134:*24*
137:*20*
141:*20* 146:*4,
13* 147:*9*
152:*23*
155:*21* 158:*2*
164:*19*
166:*19*
167:*11* 173:*6,
15, 16* 177:*16*
180:*10, 15*

181:*4* 192:*7*
194:*14, 16, 21*
202:*21* 212:*3,
22* 213:*3*
215:*8, 10*
217:*7* 218:*16*
226:*12* 233:*7*
235:*1* 237:*9*
251:*24* 261:*7*
262:*23*
270:*19*
276:*17, 19, 20*
278:*12* 280:*4*
281:*6* 283:*15*
286:*4, 23*
287:*3* 288:*1,
2, 11, 12, 13*
289:*2* 303:*18*
310:*6* 312:*21*
316:*16* 317:*4,
11* 318:*13*
319:*8, 9, 24*
334:*11, 23*
335:*11*
**questioned**
333:*15*
**questioning**
283:*19* 331:*3*
**questionnaires**
251:*12, 16*
252:*4, 11, 13*
**questions**
11:*14* 15:*22*
39:*6* 242:*13*
286:*2* 287:*13*
316:*20, 22*
317:*8, 16, 23*
318:*3, 9*
320:*17*
321:*24* 322:*2*
327:*17*
331:*14, 17*
333:*1, 6, 13*
335:*8* 336:*2*
337:*6*
**quite** 170:*23*
189:*6* 192:*6*
**quiz** 181:*3*
**quotation** 21:*5*
**quote** 20:*1*
22:*9* 120:*24*

151:*21*
154:*22*
233:*20* 234:*7*
**quoted** 19:*1*
234:*2*
**quoting** 235:*4*

**< R >**
**R1** 195:*18, 19*
225:*10* 231:*24*
**R2** 212:*24*
213:*19, 22*
**radiation**
77:*11*
**range** 76:*20,
22, 23* 77:*11*
151:*5, 9*
243:*19*
**RapidFire**
185:*19* 186:*4*
**RapidFire-
MS/MS** 7:*10*
184:*16* 185:*1,
12, 22*
**rate** 54:*4*
**rates** 54:*6*
**rationale**
203:*3*
**raw** 204:*3*
205:*2*
**reached**
174:*14*
**react** 50:*5*
51:*16, 17, 23*
52:*17, 20*
248:*11* 249:*11*
**reacting** 50:*7*
98:*3* 269:*8*
**reaction**
51:*20* 58:*4*
68:*21* 69:*11*
103:*23*
104:*14* 247:*9*
269:*4* 272:*9,
17* 314:*4*
**Reactions**
52:*20* 58:*6*
70:*4* 204:*2*
205:*1* 247:*15*
271:*17*

**Reactive** 8:*13*
221:*14, 18*
**reacts** 52:*18*
**read** 27:*8*
42:*17* 80:*19*
103:*20* 105:*3,
22* 110:*9*
114:*16, 17*
134:*23* 135:*3*
137:*22* 148:*7*
149:*13* 156:*5*
191:*14*
197:*16*
203:*22* 225:*2*
233:*20* 273:*22*
**reading** 114:*2,
6* 116:*17*
222:*7* 292:*19*
315:*24*
**reads** 120:*22*
126:*13* 167:*5*
202:*4* 205:*16*
235:*23*
238:*11*
244:*13*
247:*24*
248:*15* 312:*7,
12*
**ready** 181:*2*
286:*3*
**reagent** 98:*3,
8* 268:*23*
271:*2*
**reagents**
202:*7* 247:*21*
**real** 217:*1*
**realistic** 303:*2*
**realize** 262:*22*
**really** 28:*1, 16*
78:*22, 24*
79:*3* 118:*4*
147:*21*
155:*11*
161:*18*
217:*13, 18*
238:*22*
244:*10*
245:*16*
273:*15* 281:*7*
310:*16* 334:*14*

**REALTIME**
337:*19*

**reask** 83:*14*

**reason** 78:*18*
100:*19*
104:*12* 110:*4*
111:*5* 117:*3*
138:*20*
159:*13*
282:*23*
328:*13, 15*

**reasonable**
76:*8* 81:*7, 11*
126:*16, 23*
327:*13*

**recall** 6:*6, 8,*
*10* 29:*2*
37:*20* 79:*19*
83:*2* 91:*16*
93:*16* 97:*16*
144:*5, 7*
147:*10* 148:*2*
150:*12* 153:*8*
155:*24* 156:*7,*
*11, 20* 157:*2,*
*17* 158:*4, 6*
159:*4, 17, 22*
160:*1* 162:*21*
168:*18*
171:*10* 172:*6*
179:*17*
196:*16* 224:*8*
237:*13, 15*
252:*10*
273:*24* 280:*3*
281:*6* 312:*19*
313:*1* 322:*5,*
*19, 20* 327:*20,*
*21* 331:*18*

**recalled**
148:*20*
149:*23*
154:*13*
158:*14* 193:*21*

**recalling** 97:*16*

**recalls** 144:*10*
148:*15, 24*
149:*1, 8, 11,*
*14, 15* 150:*3,*
*18* 307:*24*
312:*2*

**recap** 240:*24*
241:*19, 22*
246:*5*

**receive** 230:*2*
231:*6, 14*

**received** 20:*9*
28:*19* 29:*3*
231:*9* 288:*3*
329:*23*

**receiving**
231:*13*

**RECESS**
175:*9*

**recognize**
42:*14, 15*
228:*18, 20*
247:*24*

**recognized**
98:*9* 214:*8, 9*
218:*13*

**recollect**
77:*14* 78:*18*
135:*13*

**recollecting**
169:*14*

**recollection**
12:*23* 22:*10*
33:*20* 79:*12,*
*22* 80:*17*
91:*10* 150:*17*
171:*11* 286:*22*

**Recommended**
8:*5* 240:*7*
326:*5*

**recommends**
124:*11*

**record** 10:*2,*
*20* 13:*12*
17:*8, 12, 15,*
*16, 18, 21*
57:*5, 8* 74:*4,*
*6, 7, 9* 75:*11,*
*14* 127:*23*
128:*1, 2, 4*
175:*4, 8, 11,*
*22* 220:*4*
228:*1, 2, 4*
253:*5, 11, 12,*
*14* 287:*21*
309:*18, 19, 21*
320:*10, 11, 13*

333:*4, 12*
336:*4, 6*

**recorded**
84:*11*

**recording**
209:*15*

**records** 39:*21*
209:*12*

**recycled**
250:*22* 251:*3*

**redacted**
331:*8, 12*
332:*3*

**redirect** 320:*6*
333:*6* 335:*7*

**reduce** 127:*7*

**reduced** 337:*7*

**refer** 18:*2*
48:*5* 56:*14,*
*20* 123:*21*
137:*15* 324:*15*

**referee** 94:*20*
129:*11* 231:*1*

**reference**
19:*22* 20:*16*
21:*1, 2, 5*
30:*22* 77:*3*
80:*8* 87:*20*
128:*6* 215:*22*
216:*8* 223:*11*
224:*12*
291:*10, 11*
294:*12*
297:*15* 307:*20*

**referenced**
13:*7* 307:*21*

**references**
18:*1, 2* 19:*5,*
*19, 21* 20:*1, 3,*
*4* 80:*19*
117:*20, 24*
119:*16*
132:*14* 169:*7*
207:*2* 220:*8*
225:*2* 233:*4*
287:*1*

**referencing**
20:*19* 285:*18*

**referred**
25:*22* 58:*18*
134:*16*

136:*24* 138:*2*
144:*15* 263:*6*

**referring** 36:*1*
53:*19* 55:*7*
57:*9, 12, 15*
65:*13, 14*
77:*1* 82:*3, 5*
84:*18* 87:*9*
119:*17* 131:*2,*
*21* 134:*18*
158:*5* 159:*18*
191:*3* 206:*5*
212:*15, 16*
225:*18* 233:*3*
278:*6* 287:*4*
313:*17*

**refers** 111:*15*
120:*19* 121:*6*
181:*19* 255:*24*

**refine** 54:*18*

**refined** 206:*15*

**reflect** 93:*24*
132:*7* 274:*10*
280:*2* 317:*2*
318:*19*

**reflected**
329:*21*

**reflects** 29:*9*

**refraction**
256:*5*

**refresh** 12:*22*
18:*23* 19:*3*
24:*10* 79:*21*
286:*22*

**refreshing**
161:*9*

**regard** 12:*23*
14:*9* 15:*4*
20:*13* 21:*8*
22:*4* 36:*14*
37:*6, 12, 20*
39:*12* 43:*20*
47:*14, 16*
55:*10, 19*
56:*17* 59:*23*
79:*16* 80:*9*
85:*14* 111:*7*
118:*9* 119:*16*
123:*13* 126:*5*
131:*9, 19*
132:*3* 134:*5*

136:*22*
144:*22* 148:*2*
152:*24* 171:*6*
175:*24* 176:*4*
186:*7* 187:*24*
193:*6* 194:*21,*
*22* 212:*13*
235:*3* 245:*9*
263:*19* 265:*4*
281:*18*
283:*18*
298:*13* 312:*2*

**regarded**
110:*14* 115:*4*

**regarding**
32:*12* 117:*10*
192:*24*
193:*19* 194:*3,*
*17* 195:*24*
213:*18* 221:*4*
316:*19* 317:*23*

**regardless**
110:*22* 332:*10*

**region** 77:*17,*
*23* 78:*17*
79:*15* 196:*15*

**REGISTERED**
337:*19*

**regular** 59:*18*

**regularly** 59:*5,*
*18*

**regulators**
327:*2*

**regulatory**
142:*12, 22, 23*
143:*1, 3, 6, 23*
144:*20* 172:*1*
180:*22*
192:*18*
196:*13*
209:*13, 15*
213:*12*
244:*17*
269:*11*
300:*11* 304:*10*

**reign** 284:*24*

**relate** 63:*6*
67:*14*

**related** 26:*15*
35:*19* 41:*9,*

*11, 18* 43:*1*
47:*19, 22*
49:*15, 16*
54:*13, 14*
77:5 80:*13*
119:*24* 145:*4*
147:*19*
148:*15*
149:*14, 15, 19*
150:5 194:*24*
218:*13*
257:*16*
258:*12* 263:*1,*
*2* 282:*19*
**relates** 78:*11*
234:*8*
**relating** 235:7
**relation**
119:*13*
**relationship**
235:5 299:*10*
315:*11*
**relative** 53:*6*
56:*9* 77:*6*
80:*22* 97:*2*
105:*23*
292:*17*
294:*10, 11, 12*
**release** 6:6
137:*11* 154:5
172:7, *9*
**releasing**
136:*14, 20*
**relevance**
282:*6* 323:*8,*
*9, 16* 324:*8*
**relevant**
135:7 137:5,
*12* 138:*6*
244:*17* 246:*8*
247:*1* 302:*15*
324:3 327:*19*
328:*9, 23*
335:*17*
**relevantly**
329:*8*
**reliant** 332:*12*
**relied** 224:*10*
301:*13*
**relieve** 308:*15*

**rely** 93:*18*
94:9 224:*23*
310:*8, 12, 20*
311:*8*
**relying** 82:*14*
95:2 224:*24*
225:*1* 310:*19*
311:*6*
**remain** 23:*20*
206:*10*
**remaining**
256:*20*
**remember**
12:5, 7 18:*23*
29:*20* 32:*17,*
*18* 77:*24*
79:9 83:*11*
84:*8* 120:*3*
132:*12* 133:9
189:*1* 190:*11*
229:5 230:*10,*
*14* 233:*1*
250:*17*
274:*11, 13*
321:2, *6*
**remembered**
21:*19*
**remembering**
88:*18* 195:*20*
**reminded**
16:*11*
**Remote** 1:*20*
10:7, *16*
**remotely**
10:*14, 15* 16:9
**removed**
261:*18* 272:*19*
**rendering**
94:*10* 280:7
**repeat** 26:*19*
34:*12* 48:*21*
67:6 84:*4*
90:*1* 137:*23*
203:*17*
226:*12*
234:*24*
270:*19* 319:9
**repeated** 60:*11*
**rephrase** 16:*2*
48:*22* 217:7
334:*22*

**replacing**
62:*17*
**report** 5:*14,*
*16* 6:*12*
12:*10* 17:*24*
18:*3, 18* 19:*1,*
*5, 8, 11, 14*
20:*9, 13*
21:*21* 22:*6,*
*20, 22, 23*
30:*3, 16* 31:*3,*
*11, 17, 22*
33:*22* 77:*1*
80:*20, 23*
83:*12, 16, 18*
84:*5, 12, 21,*
*24* 85:*5, 6, 11*
86:*8* 87:*21*
88:*10* 93:*12,*
*15, 20* 94:*19,*
*23* 114:*11*
116:*13* 117:*1,*
*6* 119:*18*
130:*19, 21, 24*
133:*4* 134:*16,*
*19, 24* 141:*15,*
*21* 142:9
143:*15*
147:*23* 156:*4*
161:*19* 167:*3*
193:*4, 10*
209:*4, 5, 9, 11*
215:*23* 216:*8*
223:*11, 15*
224:*11* 225:*3*
244:*23* 245:*4*
246:2 247:*6*
264:*1* 273:*16*
282:7 285:5
287:*1* 288:*6,*
*16* 297:*15*
300:*8* 302:*10,*
*24* 305:*6*
316:*11*
320:*19*
321:*12* 322:*8*
324:*12, 13, 20*
325:*4* 326:9
327:*3* 329:*6*
330:*1, 5*

332:*11, 17, 23*
335:*6, 9*
**reported**
109:*13, 18*
113:7, *14*
277:7
**Reporter** 4:*21*
10:*21* 26:*22*
153:*21*
160:*21, 22*
178:*16*
189:*23* 190:*3*
240:*10* 337:*19*
**reporting**
10:*16* 85:*22*
87:*14* 203:*3*
208:*24* 209:*1*
**reports** 19:*2*
132:*14* 134:*1*
284:*13*
288:*21*
323:*11* 330:9
**repository**
42:*3* 160:*11*
168:*2* 171:*15*
175:*14* 178:7
181:*11* 190:*6*
214:*20*
216:*15* 219:*4,*
*14* 228:7
239:7 240:*23*
265:*23*
**represent**
13:*16* 247:*6*
**representation**
131:*10*
235:*10* 270:*23*

**representations**
273:*14*
**represented**
13:*21* 266:*14*
270:*24* 272:*23*
**Representing**
2:5, *9, 12, 16,*
*20, 24* 3:*6, 11,*
*16, 20* 4:*4*
**represents**
337:*8*
**reputation**
180:*6*

**request** 34:*1*
129:*15*
133:*11* 316:*22*
**requested**
34:*2* 131:*11*
**requests** 26:*4,*
*8, 11*
**require**
136:*18* 327:*2*
**required** 72:7
136:*23*
**requirements**
209:*15* 308:*23*
**requires**
325:*13*
**reread** 19:*24*
**research**
32:*23* 44:*4, 9*
81:*21* 101:*11*
114:5 129:*14*
191:*22*
289:*20* 314:*11*
**researched**
116:*12* 117:5
**ResearchGate**
129:7, *18*
130:*1*
**residual** 201:*4*
258:*18, 19*
259:*3, 7*
260:5 261:*19*
262:5 264:5
265:*4* 281:*13*
282:*2, 15*
285:*18* 287:*4,*
*11, 12, 16*
288:*20, 23*
290:*14*
**residue**
285:*16* 287:*2,*
*10*
**Residues**
188:*20*
**Resolution**
7:*4* 66:*14*
177:*22* 182:*8,*
*15* 183:*14, 15,*
*20*
**resolve** 259:9
**resonance**
66:*17* 183:*17*

Confidential Information - Subject to Protective Order

resources
80:18, 24
respect 141:24
respectively
326:7
respond 135:7
286:3 290:12
responded
27:13
responding
169:19
Response
5:12 28:23
29:4 45:5
54:9 58:13
72:1 77:6
78:1 79:4
80:14, 22
118:24
123:16, 23
137:15 138:1
187:23
responses
23:3 26:10,
18 27:4
121:8 122:8,
19 314:19
316:21
responsibilities
44:10 45:3
responsibility
44:13 142:17
143:4, 10
158:20 308:22
responsible
142:4, 13
143:19 145:7
187:18
298:14 299:6,
7 300:2
responsive
27:12 29:19
rest 91:24
97:4 276:7
304:7
restate 192:7
194:13
202:21 261:6
276:20
288:12, 13
restated 286:4

restricted
323:14
restrictive
59:14
result 43:15
46:9 91:21
98:3, 20
167:13
271:20 296:7,
21 337:13
resulted
279:21 280:8
283:22 284:14
results 61:5,
16 63:17
145:1 162:2,
7, 12, 13
163:7, 10
164:4, 6
166:5, 6, 12,
16, 20 167:6
170:19, 24
171:1, 5, 7
275:22
283:13
286:20
288:20 291:8
retained
13:17 14:2, 5
88:24 95:3
130:8, 14
131:4 132:3
273:10
retainer 74:17,
20
retention 53:7
59:8, 13, 19
278:11, 24
279:2, 3
291:20
292:16, 17
294:10 295:7
retrospectively
304:3
reveal 281:18
revealing
38:20
reverse 170:11
review 18:17,
20 20:8
24:12 79:17

82:18 90:10
132:5 135:7
142:18 144:5,
7, 16 150:21
152:24
156:11 170:9,
14 172:13
180:10 189:8,
11 190:8
210:19
223:15
230:22
245:24
251:15 252:3
266:4, 9, 11,
18, 20 276:7
279:20
285:24 286:5,
21 287:8, 21
288:10
290:10, 21
293:9 307:3
309:13
316:10 317:8,
16 330:13
331:5
reviewed
17:24 18:18
19:4 37:14
39:13 82:7
117:16 118:8,
17, 18, 19
119:9, 18, 19
158:6 170:19,
24 171:4, 5
173:1 176:1
181:6 301:17
315:7 317:20,
22 329:23
330:10, 24
331:20
332:12, 16
reviewing
54:16 133:1,
18 144:18
145:13
146:15
252:10 317:18
revised 31:16
199:20 216:6
307:11

revision
195:16
199:21 213:5
232:1
revisions
196:4 206:10
237:7
rid 269:1
Riddell 2:3
right 22:9
23:19 24:24
25:21 28:8
31:2 39:14
69:15 76:6,
23 94:24
103:12
106:24
109:11
111:13, 23
120:14
127:13, 18
131:24
132:17
136:19
152:13
155:12 159:2
163:23, 24
181:9 182:11,
13 190:17, 21
191:14
199:23 208:2
215:20
220:14 221:8
230:17
231:13
232:23
233:20
236:13 239:4
247:16 262:6
271:8 272:2
275:7, 9
283:17 286:8,
11 288:1
292:20
295:11 312:3,
6 315:3
317:18
320:16, 20
322:22
323:21 328:2,

6 329:21
330:1 332:18
right-hand
109:15
Risk 8:15
37:7 42:19,
23 43:1, 20
50:24 124:13,
19, 21 125:5,
10, 13, 17
221:23 223:4
225:16
236:11 238:4,
13, 19, 23
241:23 242:1,
5, 6, 8, 10, 18,
21 243:10, 22
244:3 245:9,
14, 17 246:5,
7, 10, 15, 20
250:20 251:8,
11, 14 305:12,
19 308:10
risks 251:18
252:5
Rite 3:20
37:17
RIVERO 2:10
RMR 337:14
Road 3:3 4:2
ROBERT 1:11
Robinson
4:21 10:21
337:14
robust 64:2
71:20
rock 69:8
rodent 114:24
Roger 148:7
330:21
role 46:22
251:3 281:9
roles 44:3
room 17:10
22:18 24:1, 2
25:23
root 60:14
61:21, 23
62:2, 3, 7, 15,
21 63:12, 24
67:18, 24

69:12 246:8,
24 247:2
**Rosemarie**
2:3 11:11
19:10 24:19
72:18 83:22
127:11 319:24
**rosemarie.bogd**
**an@1800law10**
**10.com** 2:4
**Roszel** 4:2
**rotation** 96:13,
19
**rough** 76:17
97:12
**roughly** 97:9,
10
**rounded**
164:11
**route** 9:7, 10
45:21 46:2
79:8 266:4,
11, 22, 23
270:14, 21, 24
303:2 304:1
**routes** 43:6
273:6
**routine** 263:5
280:18
**routinely**
188:8 327:2
**row** 162:12
**RPR** 4:21
337:14
**Ruckrey**
105:17
**rule** 323:11
**ruled** 323:12
**rules** 223:24
**ruling** 15:10
323:20
**run** 128:16
186:9, 10
187:24 188:4
**running**
128:15 188:6

**< S >**
**S2(R1** 8:8
**SA** 3:7, 12
**safe** 210:4

**safety** 35:22
44:22 110:24
142:5 144:2
155:16 210:2,
13 301:7
**sample** 63:18
64:16 162:13
164:6 176:20
291:9, 11, 22
**sampling**
176:23
**saturated**
108:17
**save** 187:16
**saw** 78:12
150:24 151:6
152:12, 16
213:6, 9
241:15 316:21
**saying** 19:20
50:9 67:17
69:20 78:19
118:17 145:4
156:6 168:8
213:15
231:23
246:21
292:18
310:16
311:11 315:1
**says** 24:16
87:11, 12
109:17, 21
110:8 112:10,
14 113:13, 18
124:11
130:20, 23
134:21 135:3
155:12
157:22
159:15
162:12 163:7
176:5 178:22
191:10
195:17 206:5
220:10
221:13 222:7,
8 241:19
244:2 246:16
255:22
257:16

263:13 265:1
275:21
277:22 278:9
285:6, 14
288:3 292:12,
15 296:13
306:22
313:11, 22
315:3, 19
**Scholar** 80:12
**school** 97:11
177:20 188:17
**Schwartz**
169:17
**scientific** 81:7,
11 145:24
146:1, 7
204:1, 24
231:1 324:6, 8
**scientifical**
146:7
**scientifically**
282:5 284:9
**scientist**
276:22
277:12 280:23
**scientists** 45:2,
4 235:24
236:9
**SciFinder**
80:12
**SciGen** 3:16
**Scope** 51:14
52:2 60:20
63:4 98:24
100:18 110:3,
19 113:2, 23
114:10 115:9
116:1, 11, 24
117:13
123:18
124:17 125:8,
24 126:9
127:3 139:14
140:1 141:14
142:8 143:14
146:11
147:14 148:2
149:3 150:1
156:3 158:16
162:19

165:22
167:16 192:3,
14 194:7
211:21
218:22
220:18 222:5
226:10
237:21
242:13
243:15 244:7,
20 245:4, 12
247:13 248:8,
20 251:1, 22
252:9, 20
260:19
271:22
273:20 274:8
276:4 277:2
278:1, 16
279:16, 24
280:11
281:21
282:13 284:1,
17 287:6
288:9 290:8
291:1, 14
293:2, 6, 14,
21 294:7
296:9, 23
297:9 300:7
301:3 302:9
303:15 305:5
308:20
313:14
314:23
315:21 317:1
318:17 320:2
325:14 333:8,
14 334:20
335:5, 6
**screen** 17:4
24:15, 24
25:6 30:14,
15 31:10
101:21, 22
102:23 103:4
120:12, 13
154:2 159:11
161:1, 6
181:17, 18
218:10

219:17
236:13
250:18 275:4,
6, 13 285:5
295:22, 23
**screening**
7:10 289:24
325:15 326:2
**screens** 25:2
103:19 154:3
254:22
**scroll** 161:6
**scrolling**
31:14 113:10
**search** 296:15
**searches** 80:11
**second** 34:13
47:7 91:19
120:22
154:12
160:17
161:17
195:22
200:18
250:10, 16
264:17
275:18 286:7
312:5 313:2
324:17 326:15
**Secondary**
33:18 98:4, 7
247:10, 15
248:1, 10, 13,
15 250:17
269:22 270:2
312:7
**section** 42:17
70:18 109:12
162:12 167:3
191:19 199:4
203:4, 11
205:16
210:16 220:8
221:7, 8
231:18, 20
232:4, 12
235:20, 23
238:10
239:16 246:4
290:11 291:8

324:*23*

**sectors** 183:*13*

**see** 17:*4, 5*
22:*19* 24:*15,
23* 26:*4* 28:*5*
30:*12, 14, 15,
21* 31:*9, 13,
14, 20* 32:*6*
33:*3* 37:*18*
42:*7* 47:*8, 11*
53:*4* 59:*17*
60:*7, 8* 70:*7*
75:*12* 76:*16*
78:*22* 80:*2*
84:*17* 87:*19*
88:*19* 92:*1*
101:*21* 102:*3,
10, 22* 103:*19*
106:*22* 109:*5,
17, 19, 24*
112:*17*
113:*18, 20*
126:*20, 21*
128:*6* 129:*15*
130:*20*
135:*20*
146:*16, 20*
150:*22*
154:*15, 18, 22*
157:*20*
159:*16*
161:*22*
162:*15* 163:*8*
166:*5* 169:*7*
174:*6* 175:*19,
21* 178:*8*
181:*16, 18*
184:*20, 23*
190:*7* 191:*12*
198:*5* 199:*6,
8* 200:*11*
201:*3* 202:*9,
10* 208:*16*
210:*20, 21*
211:*5, 6*
215:*2, 4, 6*
216:*5* 218:*9*
219:*16, 17*
225:*9* 231:*22*
236:*10, 12, 15*
239:*15, 21*

241:*7, 16*
244:*5* 250:*9,
17* 253:*4, 20*
254:*8, 9*
255:*22, 23*
256:*1, 9, 11*
261:*19*
264:*21, 23*
265:*5* 267:*7,
8* 268:*3*
275:*3, 21, 23*
277:*15* 278:*8*
283:*8* 285:*6,
8, 11* 290:*2*
291:*24* 292:*7,
9, 17* 293:*12,
15* 295:*20, 22*
296:*3* 307:*9,
20* 311:*20*
312:*15, 16*
316:*9*

**seeing** 24:*16*
60:*5, 18, 24*
61:*9* 81:*5*
85:*12* 86:*7*
87:*22* 125:*18*
161:*5* 178:*4*
250:*14* 262:*6*
290:*16* 291:*5*

**seek** 91:*5*
318:*2, 4*
327:*23*

**seeking** 91:*17,
19*

**seen** 37:*15*
101:*9* 105:*15,
16* 114:*3*
119:*6, 23*
120:*16*
125:*15* 150:*4*
152:*13* 154:*5*
156:*20, 23*
157:*12*
161:*19*
171:*22* 176:*3*
186:*4* 189:*12*
224:*15*
237:*11, 14*
242:*14*
243:*21*
244:*11*

249:*13*
270:*16, 20, 21,
22, 24* 274:*11*
278:*10* 286:*1*
288:*15, 18, 20,
22* 289:*7*
295:*3* 325:*19,
20* 329:*3, 12*
330:*3* 332:*20*

**self-consistent**
119:*5*

**sell** 41:*16*
308:*9, 10*

**semisolid**
108:*24*

**semivolatile**
107:*18*

**send** 251:*11*

**senior** 44:*4, 7,
8*

**sense** 67:*20*
95:*9* 147:*8*
213:*4, 14*
224:*23*
261:*21*
266:*19* 310:*18*

**sensed** 54:*8*

**sensitive** 326:*2*

**sensitivity**
50:*19* 78:*4*
84:*16, 19*
177:*23* 189:*4*

**sent** 29:*21*
251:*17* 252:*4*
253:*6*

**sentence**
87:*12* 103:*20*
104:*11*
105:*22* 110:*9*
111:*11*
120:*19, 22*
126:*13, 20*
131:*3, 6*
134:*23* 135:*3,
10* 167:*4, 14*
169:*6* 191:*15*
192:*12*
203:*10, 23*
218:*11*
222:*10*
225:*22*

235:*22* 236:*5*
243:*24* 244:*2*
248:*15, 18, 24*
250:*13*
278:*13*
286:*24*
300:*18* 301:*5*
317:*13*

**sentences**
105:*4*

**sep** 207:*17*

**separate**
53:*24* 54:*1*
70:*23* 74:*17*
150:*13, 14, 18*
176:*13* 177:*1*
196:*14* 207:*7,
11, 13, 14, 20,
22* 209:*16*
259:*14* 260:*3*
265:*12*

**separates**
260:*23*

**separating**
208:*3* 261:*11,
22* 283:*12*

**separation**
48:*9* 55:*5, 6*
58:*6, 11*
62:*18* 71:*10*
176:*10, 11*
259:*11*
260:*24* 264:*8*
265:*8, 19*
272:*15*

**September**
232:*1*

**sequence**
170:*3*

**sequential**
296:*5*

**sequentially**
276:*11*

**series** 76:*11*
108:*20, 21*
210:*4* 223:*23*

**serve** 43:*19*
196:*9*

**served** 31:*12*
32:*10, 14*

76:*10* 235:*14*
322:*17*

**serves** 227:*6*

**service** 42:*1,
21, 22* 52:*23*
57:*17, 19*
64:*4, 10*
70:*17* 305:*14*

**services** 5:*20*
10:*4* 42:*16*
47:*12, 22*
54:*16* 59:*21*
64:*13*

**serving** 39:*1*

**session** 246:*4*

**set** 35:*7*
82:*10* 126:*2,
11* 153:*5*
180:*18*
186:*19, 22*
187:*13, 16*
196:*12*
217:*19* 255:*5*
258:*17*
308:*17* 332:*22*

**sets** 166:*19*
239:*18*

**setting** 17:*13*

**setup** 186:*17*
187:*19*

**Seven** 34:*22*
38:*24* 39:*18*
73:*10, 12*
319:*6*

**severe** 103:*2*

**shape** 59:*7, 20*
60:*9* 295:*17*

**sharpen** 53:*10,
14*

**short** 72:*24*
309:*7*

**shorter** 71:*8*

**shorthand**
337:*6*

**short-term**
227:*6*

**show** 53:*7*
57:*22* 103:*4*
119:*8* 171:*7*
210:*13*
234:*12, 15*

Confidential Information - Subject to Protective Order

235:5 283:21
297:1 310:1
showed 153:1
313:2 317:20
showing
58:16 59:5, 8
161:8 209:7
274:5 284:13
shown 166:3,
20 310:4
314:10, 13
331:2, 10, 16
332:1, 13
shows 59:1, 18
sic 56:14
105:17 312:9
side 82:16
236:13
sides 323:9
signal 207:21
significant
51:22 82:24
83:1 182:10
225:15
249:22 282:20
significantly
165:19, 23
183:3
silenced 23:8
silico 242:23
similar 86:6,
19 113:14
123:3 222:21
312:12 318:14
Similarities
114:23
Similarly
248:24
simply 180:16
single 39:20
96:9, 10, 12,
16, 19 152:8
172:4
sister 97:3
sit 29:16, 20
39:14 79:20
81:6, 10, 23,
24 237:17
site 129:10, 24
136:1 328:1

sitting 22:17
situation 49:4
Six 7:6 20:4
73:9 166:5, 7,
12, 16 178:4
275:1 309:5
Sixteen 178:14
size 53:6
58:24 63:7
112:4 295:17
sizes 282:18
skim 307:22
skip 12:16
Slightly 112:5
263:23
slower 98:12
113:10
small 15:10
36:4 63:9, 10
80:13 111:20
112:1, 5
282:22
smaller 112:5
325:19
smart 228:19
smoke 97:15
smokers 97:16
smoother
127:21
sodium
103:24
104:15 267:9,
13, 18 268:13,
24 269:8, 15,
18 271:3, 5
272:6, 11, 14
273:1 303:9,
20 312:14
313:6, 23
314:1, 3, 19
315:5, 7, 18
316:3 318:15
Sofia 169:6, 17
software
40:10 223:24
224:1, 4
Solco 38:9
169:3
sold 142:6
155:14, 15

231:7 266:7
308:5
solely 224:24
solids 109:1
solubility
254:12, 16
soluble 255:1
solution 54:2
58:2, 10
176:20, 21
291:10, 12
Sol-val-is
289:17
solve 59:22
60:14, 23
61:20 62:16
63:12
solvent 54:4
78:21 254:20,
22 258:19
259:3 262:5
264:5 271:15,
16, 18 272:17
281:13 282:2
285:18 287:4
288:20 290:15
solvents 201:4
250:21, 22
251:3, 7, 19
252:7 258:18
259:7, 10
260:5 261:19
265:4 282:15
285:16 287:2,
12, 16 288:23
292:7, 9
Solvias 9:15
288:3 289:10,
12, 16, 19
solving 47:24
57:18
somebody
144:15
158:19 219:7
245:19 254:15
somebody's
129:14 282:2
somewhat
50:13 59:18
107:12

234:17 263:22
son 69:4
Sorry 16:22
26:19, 21
29:1 33:14
34:12 50:21
56:22 78:10
84:1 95:8
113:9 118:13
138:13 141:4
170:21, 23
179:19, 20
190:4 191:6
196:1 200:7
203:19
212:18
226:12 233:7,
11 246:14
254:3 260:16,
17 262:15, 22
270:18 272:5
293:6 298:4
319:10
sort 35:22
67:21 69:14
72:5 81:13
92:10 109:3
128:15
129:16 145:9
182:6 192:18
220:12 224:6,
19, 22 235:14
256:6 260:2
301:20 311:2
326:8
sorts 35:23
sound 76:6
204:1, 24
sounded
145:18, 19
sounds 25:17
76:8, 23
100:3, 13
101:12 314:1
soup 174:16
source 60:1
62:4 80:8
250:4, 23
sourced 162:2
248:2

sources 246:9
247:4 249:2
space 65:22
speaking
10:17 17:5
23:13 83:23
117:24 225:6
spec 139:5
182:15
183:13
186:19 291:4
special 210:10
specialist
187:12, 13
188:4
specialized
325:13
326:21
328:11, 13
species 109:22,
23 110:12
113:19 114:8,
23
specific 18:20
87:20 140:3
144:6 155:15
156:11, 23
172:6 289:21
304:2 321:3,
7 324:15
specifically
19:7 20:1, 2,
24 51:16, 17
54:17 67:12
123:14 131:3,
7 135:4, 19
170:18 172:2
272:18 297:6
299:3 324:12
325:17, 18
327:23
specification
126:18 137:7,
11 147:3
254:4 327:7
specifications
86:6 136:15,
21, 24 138:12,
15 143:20
145:2 146:17

Confidential Information Subject to Protective Order

147:5 229:3, 6 253:24

**specificity** 261:15

**specifics** 69:9 136:12

**specified** 92:23 210:12

**specify** 256:22, 23 257:11, 15, 18 263:12

**spectra** 139:1

**spectro** 296:18

**spectrometer** 138:7 140:24 176:17 179:16 182:6, 7 183:16 255:16 290:20 328:11

**spectrometers** 40:7, 8 138:9 140:13, 21 177:21 290:23

**Spectrometry** 7:5 55:11, 13, 14, 24 56:8, 16, 17 57:16 66:13, 16 67:7 105:24 106:1, 4, 14 139:1 177:14, 17 179:5, 11 182:21, 23 183:18 282:11 294:21 296:7, 21 312:7

**spectroscopic** 66:23 67:2, 8 138:22

**spectrum** 77:16

**spectrums** 80:15

**speculate** 287:20 299:4

**speculated** 99:22

**Speculation** 46:1 113:23

122:3 202:18 226:11 244:8 248:9 252:21 260:20 262:13 267:17 276:5 277:3 278:17 281:22 291:15 303:16 305:8 313:15 315:23

**spell** 108:11

**spend** 18:15 180:3

**spent** 18:10 76:13

**split** 58:24

**spoke** 13:2 52:6 120:20 186:8 258:4

**sponsored** 241:14

**spontaneously** 329:20

**spot** 127:12

**Springer** 230:10

**spurious** 57:23, 24 58:13, 15, 21 59:1, 22

**stability** 35:21 37:8 44:14, 15, 22 47:2 64:16 70:24

**stability-indicating** 46:12, 15

**stabilize** 44:20

**stable** 98:14

**stamp** 160:17 168:2

**stand** 81:24 311:2

**standard** 39:5 82:2, 4 325:15

**standards** 145:10, 22, 23 146:8 155:16 263:20, 21 296:16

**stands** 101:10 169:9, 15

**Stanoch** 2:8

**start** 16:16, 19 52:21 53:3 59:3 68:2 128:16 141:3 317:13

**started** 53:17 57:6

**starting** 38:17, 20 44:6 46:10, 14, 23 47:1 121:12 159:23 176:10 202:6 214:6 250:21 251:6, 19 252:6 324:24

**starts** 103:3, 17, 21 131:3, 7 197:10 200:8 225:12 250:16

**State** 3:14 115:12 183:19

**stated** 115:13 130:18 134:19 208:12 242:15 245:15 299:3

**statement** 20:4 45:15 47:4 82:15 110:1, 17 111:2 124:15 192:1 202:11, 13 203:16, 20 204:7 222:3, 6 238:16 244:13, 18 246:6, 11 247:11 248:6 249:4 250:19 298:18 300:1, 14, 24 301:9, 18 305:24 315:3

**statements** 232:11 321:7

**state-of-the-art** 183:11, 12

**STATES** 1:1 10:10 155:14 247:8

**stationary** 176:15

**status** 255:24 306:22

**steam-distilled** 112:18

**Steering** 11:12 220:11

**stenographer** 16:11 108:9

**stenographic** 10:20

**step** 46:7 64:19 66:6 220:11 242:5 267:7, 10, 12 268:2 269:16 271:3, 7 272:10, 13, 19 273:1 315:7

**Stephen** 96:21

**steps** 126:16, 24 127:6 242:4

**Steve** 18:3, 10, 11 22:15 26:13 127:19 174:6

**STEVEN** 1:21 3:4 10:12, 23

**sticking** 199:17

**storage** 199:12 201:19 203:15 204:19

**store** 147:19 148:14

**straight** 171:3

**straighten** 123:8

**strategies** 47:10, 17 68:23 237:24

**Street** 2:2, 7, 14 3:9, 14, 18

**stress** 44:18 48:1 64:6, 8

**strong** 70:2

**structural** 225:12, 17 238:17 282:17

**structurally** 209:20 218:12, 17

**structure** 48:3 64:11, 21 65:12, 15, 16 66:3, 11, 18, 21 67:1, 4, 10, 15 96:23 138:23 209:21 222:14, 16 223:1 224:2, 4, 15 238:18, 22, 24 313:18 326:18 332:7

**structure-based** 222:10, 12, 24 223:5

**structures** 138:10, 11 223:3, 7, 10 224:14, 23 225:5 226:23 302:19 325:11

**structure's** 315:13

**struggling** 51:4 52:3

**studied** 97:14 186:5 192:19

**studies** 32:24 44:17, 18, 23 48:1, 2 64:5 66:15 151:2 168:20, 23 169:2 210:11 225:6

**study** 105:14, 18, 19, 21 218:6 224:11

**studying** 45:6,

Confidential Information - Subject to Protective Order

8 97:15
stuff 75:24
stumbled
147:18
subcontracted
230:1
subcontracting
229:22
subdivide
224:20
subgroup
95:22
subheading
324:24
SUBJECT
1:15 275:21
submissions
143:1 196:14
submitted
21:10, 13, 16
193:10 330:1
332:17
submitting
244:16
subsection
200:11
subset 49:24
50:2 68:13
99:3 226:24
substance
46:5 49:17
72:3 121:20,
24 162:1
197:18, 19
198:11, 16
199:1, 14
201:19
203:15 204:5,
19 205:3
254:19
Substances
7:23 8:5
44:19 45:7
49:15 125:21
200:9 212:17,
24 213:1, 19
214:8, 22
221:14, 19
257:16
258:12 263:1,
3

substantively
20:12
substituent
95:20 313:18
substitute
312:9
substructure
224:3 225:24
substructures
222:15, 22
224:21 226:2
succeed 71:14
sufficient
110:10 114:21
suggest
167:20
234:16 236:8
249:17
suggested
27:14
suggesting
250:1 302:11
suggestion
133:3
suggestions
61:14
suggests 31:16
suitable
300:20 302:6
Suite 2:17, 22
3:3
suited 229:24
suits 132:15,
17
sulfated 256:7,
18
summarize
130:5 203:12
204:16 325:2
summarized
326:11
summary
109:13, 17
113:7, 13
159:15
169:20
203:24 204:23
supersede
308:22
supervision
337:8

supplied
141:12
suppliers
141:2, 5 142:1
supposed 25:8
198:4
sur 304:21
Sure 12:8
16:15, 18
19:17 24:11
28:13, 17
29:3, 13 37:4,
21 57:6
61:10 71:19
79:21 81:18
83:16, 24
84:4 101:7
105:20 109:8
119:21 120:2
127:14 129:1
133:24 139:7
142:13
143:20
145:22
147:15
156:18, 19, 22,
23 164:15
170:2 173:12
175:1 177:19
179:3 184:4,
8, 11 185:16
187:20
197:10
215:12, 16
226:14
227:12
230:21 237:8,
15 246:20
253:8 255:7
256:22
276:21
283:14
284:20, 23
286:11
294:11
308:11
309:10, 16
315:10
319:12
320:22
324:17 334:24

surprise
304:11, 17, 18,
22
surprised
124:19 269:5
surprising
272:20
surrounding
318:12
suspect 287:18
suspicion
305:17
suspicious
315:14
swear 10:22
sworn 10:15
11:1
synthesis
45:21 49:16
68:11, 14
203:14 204:2,
18 205:1
251:20 266:5
267:7, 10, 12
268:1 303:10,
13
synthesizing
66:9
Synthethic
9:7, 10
synthetic 43:6,
7, 21 46:2
64:17, 22
65:9 66:6
202:23 203:1
266:4, 11, 22,
23 270:14, 21,
24 273:6
303:2 304:1
305:11 315:6
system 23:15
60:8 145:8
269:11

< T >
table 162:6, 7
164:20, 22
166:3, 9, 14,
15, 21 236:13
238:10
239:18 288:2

289:1, 2
290:20
292:15, 18
293:18, 22
294:3, 9
295:20, 21, 22,
24 296:13, 20
tables 150:24
166:13
tablet 151:18
163:8, 15, 18,
20, 23 164:1
165:12 166:5,
6
tablets 86:24
87:3, 4 152:3
157:19 162:9
164:5, 21
tackle 235:15
take 23:2
24:6 25:12
34:9 72:16,
24 73:14
75:5 83:4, 10
84:21 95:11
109:3, 6
110:23
115:21 127:9,
13, 18 151:16
155:18
156:10 164:4,
9 174:11, 17
205:12
215:20
216:12 219:1
220:17 227:9,
15, 22 233:19
239:4 240:9
253:1, 8
257:17 276:6
297:14 309:7
Takeda 13:23
taken 45:9
105:8 215:10
333:12 337:5
talk 16:12
36:20 52:16
53:18 63:5
141:21
189:13
213:17 325:1

Confidential Information Subject to Protective Order

talked 111:*19*
148:*8* 182:*2*
**talking** 43:*15*
53:*19*, 22
68:*2, 9, 10*
82:*1, 2*
136:*20*
171:*23* 186:*4*
189:*6* 196:*18*
217:*19*
233:*18*
237:*12* 279:*2*
299:*9* 326:*13*
**talks** 106:*20*
184:*23*
218:*12*
241:*23* 298:*8*
**Target** 8:*23*
241:*9*
**task** 288:*3*
**tasks** 49:*6*
**Taylor** 2:*19*
**TEA** 271:*8*
**TECH** 4:*18*
30:*9* 42:*11*
102:*15*
153:*23*
178:*13* 190:*1*
228:*9* 232:*2*
240:*19* 267:*3*
**technical**
17:*21* 99:*16*
145:*24* 146:*1,*
*7* 188:*19*
**technically**
52:*6* 142:*11*
**technique**
66:*16* 106:*2,*
*4, 14, 15*
134:*9, 11*
176:*10*
259:*11*
261:*11* 264:*8*
265:*9, 20*
**techniques**
50:*18* 55:*5, 7*
66:*24* 67:*2, 8*
105:*9* 133:*14*
134:*15* 137:*9*
260:*2*

**technology**
41:*19* 173:*24*
177:*8, 10, 24*
184:*2* 185:*20,*
*22*
**tell** 11:*1*
12:*21* 20:*24*
29:*17* 75:*5*
102:*24*
108:*11* 176:*7*
177:*5* 184:*10*
201:*16, 22*
221:*7, 11*
241:*4* 263:*2*
264:*4, 7, 8*
295:*18* 296:*14*
**telling** 240:*14*
314:*18*
**tells** 68:*4*
202:*3* 264:*6*
**ten** 37:*15*
184:*7* 320:*5*
**tend** 73:*14*
108:*21, 22*
**tends** 271:*16*
**tentative**
295:*24* 296:*3*
297:*10, 12*
**tentatively**
81:*20* 296:*11*
297:*6*
**tenth** 151:*8*
**tenths** 183:*21*
**term** 49:*14*
58:*14, 19*
59:*4, 9, 10*
61:*23* 62:*1, 2*
64:*9* 99:*19*
108:*1, 3*
121:*2, 5*
134:*7* 169:*7,*
*12* 188:*19*
192:*18, 19, 20*
193:*3, 15*
198:*13, 16*
242:*1, 3, 7*
244:*12*
245:*14, 20*
266:*9* 299:*20*

**terminology**
49:*23* 185:*14*
210:*3* 243:*21*
**Terminus** 3:*2*
**terms** 58:*12*
80:*15* 132:*22*
144:*14*
145:*20*
164:*14*
197:*23, 24*
208:*7* 217:*8*
220:*18*
266:*15* 282:*21*
**tertiary** 98:*5,*
*10* 270:*2*
**test** 48:*14, 19,*
*23* 53:*21*
69:*19* 70:*12*
71:*15* 81:*12*
96:*8* 98:*20,*
*21* 147:*3*
167:*5* 186:*9,*
*10* 188:*1, 4*
207:*4, 9*
210:*4* 217:*22*
254:*5, 13, 16*
255:*21, 22*
256:*3, 6, 13,*
*14, 15, 16, 23*
257:*24* 258:*2,*
*3* 259:*24*
263:*11, 13*
276:*23*
302:*13*
326:*16* 329:*14*
**tested** 69:*18*
81:*14* 109:*22*
113:*19* 114:*8*
162:*8* 166:*2*
256:*12*
258:*15* 263:*3*
**testified** 11:*3*
14:*2, 11, 19,*
*24* 15:*7*
21:*17* 286:*1*
322:*22* 327:*22*
**testify** 14:*14,*
*17* 15:*13*
**testifying**
323:*14*

**testimony**
15:*4, 11*
55:*21* 89:*13*
90:*24* 132:*12,*
*14* 134:*2*
135:*21* 139:*9*
144:*23* 148:*7*
158:*5* 218:*20*
232:*24* 245:*8*
259:*5* 281:*24*
314:*24*
322:*18* 323:*1*
334:*16*
**Testing** 8:*9*
44:*18* 48:*2*
54:*19* 55:*2*
64:*6, 8* 70:*6*
71:*17* 72:*9,*
*10* 80:*1, 2*
85:*15, 16, 19*
133:*19* 135:*5*
136:*5, 23*
137:*1, 6, 11*
139:*9, 23*
145:*12*
146:*18, 21*
150:*21* 153:*1*
162:*2, 6*
169:*20*
170:*15* 171:*6,*
*20* 172:*2*
173:*2, 5, 7, 9,*
*16* 175:*24*
178:*20* 179:*4,*
*22, 23* 180:*17*
181:*19*
182:*11, 19, 24*
183:*1* 210:*12*
222:*19*
243:*11, 12, 18*
244:*4* 255:*6,*
*7, 14* 258:*4,*
*17, 19* 262:*5,*
*9* 263:*6*
264:*5* 279:*13,*
*21* 280:*8, 15*
281:*13, 18*
282:*2, 15*
283:*21*
284:*13*
285:*19* 287:*4*

325:*14, 15*
326:*21* 327:*3,*
*7, 9, 12, 18, 24*
328:*5, 13*
329:*10*
**tests** 66:*19, 23*
69:*23* 70:*15*
137:*7* 151:*3*
208:*8, 9*
217:*20, 21*
254:*2, 6*
255:*5, 20*
**Teva** 3:*6, 11*
6:*8, 10, 12*
12:*19* 13:*8*
14:*6* 38:*12*
82:*8, 9* 83:*6,*
*19* 84:*6* 85:*7,*
*10, 16* 87:*18,*
*20* 88:*1, 21,*
*24* 89:*18*
131:*4* 135:*4,*
*6, 16* 136:*6*
139:*5, 11, 22*
141:*2, 5, 7, 24*
142:*3* 144:*6,*
*7* 146:*6, 16,*
*20* 147:*10*
148:*2, 20*
149:*1, 4, 7, 22*
150:*11, 21, 23*
151:*6, 7*
153:*2, 11*
154:*16*
156:*11* 157:*1,*
*16* 158:*24*
159:*4* 160:*9*
161:*21* 167:*4*
168:*13, 16, 19,*
*21* 169:*20*
170:*9, 15, 20*
171:*1* 173:*4,*
*7, 15* 174:*2*
193:*20* 194:*4,*
*18, 23* 195:*2*
240:*23*
241:*14, 18*
245:*19*
251:*10, 11, 17*
252:*4* 253:*2,*
*21* 255:*15*

Confidential Information Subject to Protective Order

266:7  304:13
327:12, 18
328:1  329:10
330:20
334:18  335:3,
12, 13, 15
**TEVA-**
**MDL2875-**
**00048605**  6:14
**TEVA-**
**MDL2875-**
**00168043**  9:5
**TEVA-**
**MDL2875-**
**0059150**  9:3
**Teva's**  158:24
**text**  237:11
315:13
**textbook**  233:3
**Thank**  115:19
185:6, 10
187:23  191:7
297:14
327:16  333:2
335:24
**theoretical**
69:15  199:18
242:6, 8, 10,
18, 22  246:7
**theoretically**
199:11
225:14  243:1,
4
**theory**  70:5, 7
243:1
**thereto**  337:6
**Thermo**
184:10
**thing**  129:16
145:9  276:1
299:12
**things**  27:18
35:23  53:11
56:2  58:7, 8
63:10, 16, 24
82:16  95:15
119:6, 7
127:21
128:18  137:8
144:11
145:14  146:5

256:9, 12
260:23
289:15  301:7
320:2  330:8
**think**  11:19
13:11, 12, 22
17:10  21:10
28:13  33:5, 7,
19  34:6  35:5,
7, 8  37:15
56:24  62:2
67:20  75:3, 9
79:1  80:21
81:2, 14
83:10  85:1, 9
86:9  87:22,
23  88:17, 20
91:18  93:17
94:21  97:12
104:22  108:7
116:17
118:16
121:13
122:23
128:10
130:23
133:10, 11
137:4, 22
140:19
142:15, 16
144:23
145:21
147:16
151:20, 22
156:15
158:20  163:2
165:7  172:5
173:18
175:16  178:5
188:19  191:6
193:14
194:10
195:23  198:1
199:19
205:11
215:13, 14
217:12
219:19
224:14  229:3
230:16
234:23  235:1,

10  236:8
237:4, 7
241:15
248:21  250:3
264:1  265:23
269:7  273:7
274:14  275:5,
6  276:10
277:20  286:7
288:22
289:20, 22, 23
299:11
300:13
305:16
306:12
309:10
315:24  328:9
329:7
**thinking**  17:6
94:13, 15
266:16
268:21, 22
**third**  26:5
91:22  103:16
120:18
154:18  164:5,
22  191:8
250:10, 23
264:12  327:4,
6
**Thirty**  76:18
143:2
**tho**  326:23

**THORNBURG**
3:16
**thorough**
180:8  236:1, 9
**thoroughly**
81:4  330:11,
12
**thought**  84:9,
11  101:2
118:13
**thousands**
325:19, 21
**thousandths**
183:22
**Three**  3:9
11:19  20:3
71:2  73:21

91:11  93:11
121:6, 9
162:8  166:20
200:14  201:3,
7  242:4, 19
246:9  247:4
325:7
**three-second**
155:8
**threshold**
21:6  121:19,
22  124:21, 22,
23  125:11, 15,
16  205:19
206:2  208:24
209:1, 17, 18,
24  234:1
277:9, 10
**thresholds**
51:5, 6, 8
121:10
125:18
208:15  211:4
212:6
**threw**  145:20
**throat**  200:17
**Throwing**
125:17
**tight**  227:20
**till**  213:22
**Tim**  330:15,
17, 21, 22, 23
331:9
**Time**  10:5
32:16, 20
41:2  45:1
59:9, 13, 19
60:2  71:8
73:23  75:11,
14, 21, 24
76:3  86:16
92:1  114:3
134:3  135:7,
17  155:3
172:7  174:14
177:7, 24
180:3  187:16
206:9, 14
235:15
274:23  276:6
278:8, 11

279:1, 2, 4
284:18
291:20
294:10  309:3
319:4  320:1
325:20, 22
327:19
330:11  333:9,
12, 22
**time-based**
54:11
**times**  11:17
25:9  63:13
128:16
149:14  155:4
292:16, 17
294:10  295:7
305:22  320:3
325:19, 22
326:2, 5, 6
**tips**  56:1
**tissues**  114:24
**title**  44:8
161:24
178:22
188:20  229:5
**today**  11:14
15:23  17:1,
23  22:13
24:1, 2  25:14,
22  27:6
29:16, 20, 23
81:6, 10, 24
232:23
237:17  263:7
316:21  320:4
321:3  322:7
325:2  331:3,
11, 16  332:2,
13, 18, 21
**Today's**  10:5
**told**  317:19
**toluene**  268:4
269:17  292:6
**tool**  139:3
**top**  76:15
157:16
161:22
170:11
195:21
250:16

*276*:12
*306*:22 *312*:6
**topic** *55*:16
*56*:12 *148*:23
*180*:7 *220*:21
*235*:15
**topoisomers**
*183*:23
**Tori** *18*:12
**Torrent** *38*:15
**total** *76*:1
*152*:10 *163*:20
**touch** *34*:3
*320*:24
**toxic** *49*:19
*50*:2 *51*:10,
*12, 15* *111*:7
*205*:24
*206*:17, 19
*211*:5, 16, 22
*233*:23
**toxicity** *51*:19
*321*:8, 14
**toxicological**
*121*:11
*124*:22, 23
*125*:11, 15
*210*:2 *236*:1
**toxicologist**
*100*:20
*116*:15
*217*:18 *218*:5
*237*:9 *321*:23
**toxicologists**
*117*:4 *237*:12
**toxicology**
*101*:5 *117*:5
*210*:4, 10
*217*:20, 21
**trace** *58*:7
*268*:22 *326*:3,
*22*
**track** *21*:1
*60*:13 *178*:12
**trademark**
*185*:17
**traditional**
*256*:6
**Traditionally**
*49*:13

**trail** *286*:6
**trained** *100*:20
**trans** *97*:3
**transcript**
*330*:14 *337*:4,
*9*
**transfer** *71*:20
**transition**
*62*:13
**translate**
*151*:23
**translating**
*152*:5
**transpired**
*133*:10
**transverse**
*259*:13
**TRAURIG**
*3*:2 *5*:22
*23*:24 *74*:18
**treat** *110*:21
*111*:8 *122*:14
**TRIAL** *4*:18
*15*:10, 15
*30*:9 *42*:11
*153*:23
*178*:13 *190*:1
*228*:9 *240*:19
*267*:3
**tricks** *56*:2
**tricky** *268*:18
**tried** *118*:2
*232*:15
*310*:13 *311*:12
**Triethylamine**
*9*:8 *268*:2, 7,
*11, 12, 21*
**trigger** *62*:1
**triggers**
*138*:20
**Tripartite**
*7*:22 *196*:15
**tripped** *69*:8
**troubleshoot**
*60*:5

**troubleshooting**
*47*:23 *52*:24
*53*:13 *56*:17
*57*:3 *70*:21

**troubling**
*246*:23
**true** *128*:8
*148*:18 *160*:6
*268*:9 *335*:21
*337*:9
**truth** *11*:1, 2
**try** *16*:15
*60*:6, 23
*85*:23 *142*:18
*148*:14
*183*:18
*196*:10
*219*:13
*223*:23 *245*:24
**trying** *36*:9
*50*:24 *59*:13,
*14* *62*:20
*65*:4 *68*:1
*69*:5 *73*:15
*77*:10 *113*:11
*123*:8 *138*:4
*145*:6 *175*:1
*180*:3, 14
*187*:8 *194*:20
*223*:12 *234*:5,
*12, 15* *235*:5,
*11* *236*:4, 7
*266*:21
*275*:16
*283*:15
*291*:23
*304*:12
*311*:10, 11
**TTC** *121*:15
*225*:14
**Tuesday** *14*:16
**turn** *324*:10
**turned** *23*:7
**Turning**
*311*:17 *324*:23
**tweak** *53*:15
**tweaking** *66*:6
**Twelve** *18*:16
*37*:16
**twice** *14*:19
**two** *12*:4
*14*:1 *15*:9
*20*:3 *28*:21
*33*:3, 8, 9, 10
*34*:4, 23 *46*:7

*49*:9 *50*:8
*58*:24 *69*:10
*71*:2 *82*:16
*96*:18 *97*:3
*108*:14, 16
*124*:24
*128*:24 *141*:6
*150*:13, 14, 18
*154*:17
*183*:12 *200*:7
*212*:20 *252*:1
*262*:18
*265*:20 *323*:9
*325*:12 *330*:5
*333*:6, 13, 22
**two-carbon**
*108*:16
**type** *23*:14
*35*:8 *40*:3
*42*:20, 22
*53*:20 *54*:14
*55*:5, 6 *60*:4
*61*:2 *80*:1
*92*:5 *96*:5
*138*:8 *146*:21
*147*:2 *179*:7
*182*:7, 18
*188*:1, 22
*189*:1 *201*:10
*222*:23 *223*:7
*248*:11
*255*:13 *256*:3,
*16* *257*:9
*262*:9 *279*:12
*280*:8 *281*:18
*290*:5
**types** *49*:9
*50*:9 *55*:1
*93*:2 *116*:8
*289*:21
**typical** *55*:16
*121*:16 *123*:6
*139*:16 *140*:9
*174*:2 *198*:18
*266*:10 *290*:5,
*12, 22*
**typically**
*50*:17 *66*:20
*67*:3, 8 *98*:4,
*12* *138*:19
*139*:4 *140*:22

*176*:20
*207*:16
*254*:14 *256*:4
*257*:7 *258*:21
*261*:19
*269*:22
*282*:16
*291*:17 *296*:14

**< U >**
**Uh-huh** *131*:6
*189*:2
**ultimately**
*142*:4, 13
*327*:10
**Um** *12*:2
*48*:21 *66*:2
*151*:7 *237*:23
*280*:13 *284*:3
**unacceptable**
*298*:17
*299*:17 *300*:5
**unaware**
*314*:19
**uncertain**
*28*:2, 3
**unclear** *278*:20
**uncomfortable**
*38*:17, 21
*300*:16
**uncover** *61*:21
**undefined**
*206*:9, 10
*220*:23 *278*:19
**undergo** *238*:3
**underlying**
*61*:17 *62*:3
*63*:1
**underneath**
*134*:12
**understand**
*15*:20, 24
*16*:6 *29*:11
*45*:17, 22
*60*:23 *61*:4, 8,
*11* *62*:15
*63*:12, 20
*65*:5 *66*:2
*70*:16 *71*:19
*77*:10 *89*:13
*126*:3 *134*:12

Confidential Information Subject to Protective Order

149:*19* 152:*9* 170:2 187:*8, 22* 245:*21* 246:*18, 21* 266:*21* 273:*13* 278:*24* 283:4 299:*12* 317:*10* 334:*12, 14, 24*
**understanding** 44:*1, 24* 46:*3, 19* 63:*22* 64:*1* 67:*17, 19* 91:*3, 9, 11, 14* 111:*18* 124:2 133:*24* 134:*4, 8, 9* 136:7 143:*9, 18* 155:*23* 170:8 207:*10* 213:*4* 214:*15* 234:*16* 245:*17* 278:*23* 298:*14* 300:2 319:*18, 20* 322:*24* 323:*23* 324:5 330:*18* 334:*3* 335:*18, 22*
**understands** 196:*17*
**understood** 134:*1*
**undertake** 130:*7, 11, 13*
**undertook** 131:*9*
**undoubtedly** 263:*12*
**unequivocally** 70:*1*
**unexpected** 304:*18, 22*
**unexpectedly** 59:*2*
**unfortunately** 230:*4* 300:*14*
**unidentified** 201:*24* 202:5

**unique** 50:*13* 207:*22*
**unit** 108:*16* 183:*15*
**UNITED** 1:*1* 10:*10* 155:*14*
**units** 108:*16* 151:*24* 152:5
**universally** 49:*4*
**University** 96:*22*
**unknown** 9:*16* 138:*15, 19* 275:*22, 24* 276:*24* 277:*5, 6, 15* 281:*14, 16* 284:7 285:*10, 15* 287:*1* 288:*4* 296:*1*
**unknowns** 63:*14* 138:*11* 284:*4* 313:*16*
**unpredictable** 58:*17*
**Unpredictably** 58:*16*
**unredacted** 332:5
**unrelated** 276:*18*
**unspecified** 258:*14, 15*
**unsure** 28:*15, 16* 53:*9*
**unusual** 287:*15* 290:*17* 291:5
**unusually** 205:*24* 206:*8* 211:*5, 12, 15, 22* 233:*23* 235:7
**updated** 5:*16* 307:*9* 308:*24*
**USA** 4:5 157:*16*
**usable** 90:*12*
**USC** 191:*21*

**Use** 8:*10* 25:*14* 41:*18* 46:5 57:*6, 7* 59:*4* 66:*15* 71:*11* 92:*9* 100:*3* 106:*1, 3, 13* 137:*10* 186:*21* 187:*14* 198:*13, 18, 19* 224:*1* 242:*24* 243:*1, 2* 246:*20* 256:*4* 266:*17* 290:6
**useful** 64:*24* 66:5 68:*22* 70:*3* 90:*24* 132:*21* 222:*11* 224:*22* 261:*22*
**user** 56:*11* 186:*22* 187:*1*
**uses** 169:*12*
**USP** 9:*18, 20* 49:*14* 82:*3, 5, 10* 83:*6, 19* 84:7 85:*8, 10, 17* 86:*23* 87:*10* 145:*14* 265:2 297:*16, 23* 298:*8, 10, 12, 19* 300:*18* 301:*1, 13, 16* 306:*3, 16, 20*
**Usually** 66:*12* 97:*22* 140:*14*
**utility** 134:*13*
**utilize** 87:*3*
**UV** 77:*4, 8, 16* 78:*5, 14, 15* 80:*14* 81:*14* 87:*3* 137:*13* 182:*4* 258:*8, 16* 263:*13*

**< V >**
**vagarity** 299:*11*
**Vague** 45:*12* 46:*1* 52:2 60:*20* 63:*4*

82:*22* 83:*9* 106:7 107:*4* 112:*9* 113:2 122:*3, 10, 21* 123:*18* 125:8 126:*9* 127:*2* 130:*17* 133:6 134:7 137:*3* 140:*16* 142:*9* 143:*15* 145:*17* 146:*11* 147:*1* 149:*10* 150:*1* 167:*17* 180:*2* 187:*6, 20* 192:*5, 15* 194:6 202:*19* 207:*10* 211:*10* 214:*11* 217:*6* 226:*10* 244:*8, 21* 258:*7* 259:*22* 260:*19* 261:*14* 263:*9* 267:*17* 268:*17* 280:*11* 281:*21* 283:*2, 19, 20* 284:*1* 290:*9* 291:*2* 295:*15* 296:*10* 298:*6, 21* 299:*19* 301:*4* 302:*1, 10* 303:*16* 305:7 313:*15* 315:*22* 318:6
**vaguely** 101:*3* 197:7 302:*15*
**valid** 180:5
**validation** 7:9 184:*24*
**validity** 180:*11* 181:*4*
**VALSARTAN** 1:*6* 9:*15, 20* 10:8 77:*5, 16* 78:*1, 7* 82:*8, 11* 86:*24* 87:*4* 88:*3*

91:*22* 92:*3, 15* 117:*10* 118:*9* 119:*3, 12* 141:*2, 4* 145:*12* 155:*15* 156:*1* 157:*18* 161:*24* 162:*8, 14* 164:*5, 7, 21* 167:6 171:*21* 172:*15* 176:*1* 179:*24* 180:*19* 181:7 183:*2* 189:*10* 191:*3* 195:*1* 252:*18* 253:*21* 255:*8, 15* 257:*20* 261:*12, 16, 21, 23* 263:*22* 265:*2, 13* 266:*6* 273:*18* 274:6 275:*22* 276:*23* 277:*22* 279:*14, 22* 280:*9* 281:*13, 19* 282:*10* 283:*23* 285:*9, 16* 287:*3, 13* 288:*24* 291:*9* 292:*13, 23* 293:*19* 305:*1* 306:*3, 17, 21* 307:*17, 24* 308:*4* 312:*2, 14* 313:*6, 23, 24* 314:*2, 20* 315:*4, 8, 18* 316:*3* 318:*15, 24* 319:*14, 19* 325:*10, 20, 21* 327:*7, 11* 329:*4, 12* 334:*18* 335:*3, 20*
**valsartan-containing** 135:*18* 144:*8* 155:*13* 201:*10*

Confidential Information Subject to Protective Order

value 193:*19, 22, 23, 24* 194:*2, 17, 18, 19, 23* 195:*1*
values 163:*4* 171:*8* 194:*4, 20*
Vanderbilt 96:*21*
vapor 176:*14*
variable 57:*23, 24* 58:*19, 20, 22* 59:*5, 9, 12, 22* 138:*7*
variation 53:*5* 59:*15* 93:*10*
varies 59:*19*
variety 36:*11* 45:*2* 80:*15* 97:*22* 150:*7* 171:*24* 172:*22, 23* 186:*20* 198:*1* 223:*8* 254:*22* 259:*9* 326:*19*
various 66:*14* 136:*10* 180:*17* 196:*3* 214:*16* 225:*5* 291:*21, 22*
vary 71:*22, 23* 92:*4, 14* 97:*3* 263:*23*
varying 59:*6*
vast 303:*22*
VAUGHN 2:*21, 23*
vendors 41:*15* 184:*9* 251:*12*
verified 81:*4*
verify 80:*6* 153:*21* 158:*18* 180:*4*
versed 55:*14*
version 30:*23, 24* 199:*21, 24* 200:*1* 216:*10* 220:*1, 24* 233:*13* 331:*1,*

*9, 10, 20*
versions 200:*2*
versus 12:*14, 19* 13:*3, 8, 23* 14:*10* 20:*2* 59:*17* 83:*6* 84:*11* 144:*14* 199:*18*
viability 133:*14*
vial 176:*20*
Victoria 3:*5*
video 10:*7* 16:*13*
VIDEOGRAP HER 4:*17* 10:*1, 4* 17:*11, 14, 17* 74:*5, 8* 127:*24* 128:*3* 175:*7, 10* 227:*24* 228:*3* 253:*10, 13* 274:*24* 309:*4, 17, 20* 319:*5* 320:*9, 12* 336:*5*
videotaped 1:*20* 23:*2* 24:*6* 25:*13*
view 107:*17* 111:*10* 129:*14* 142:*12* 187:*1* 199:*19* 237:*23* 327:*1*
viewed 307:*8*
virtual 36:*8*
visual 137:*7* 254:*14*
visually 198:*5*
voice 201:*2*
volatile 105:*10* 106:*9* 107:*2, 6, 9, 11, 13, 16, 23* 108:*22* 109:*4* 112:*7, 18, 20, 24* 113:*4* 176:*21* 201:*24* 202:*5* 259:*24* 260:*1*

volatiles 259:*20*
volatility 112:*12, 15*
volatilization 259:*12*
volatilize 176:*12*
volatilizes 261:*16*
Volume 5:*24*
voluntary 6:*6, 8, 10* 157:*17*

< W >
wait 16:*17* 18:*7* 39:*8* 71:*3* 86:*14* 101:*19* 102:*5* 286:*7* 289:*4* 316:*16*
Walgreens 37:*18*
walk 73:*13*
Wall 2:*2*
WALLACK 4:*2*
WALSH 3:*7*
want 20:*23* 52:*15* 65:*24* 73:*2* 76:*19* 82:*15* 83:*15, 24* 84:*10* 92:*9* 114:*17* 118:*23* 119:*8* 127:*14, 18* 134:*11* 137:*8, 22* 146:*4* 170:*2* 172:*11* 174:*16, 17* 189:*14* 195:*2* 210:*19, 23* 212:*21* 216:*2* 220:*2* 223:*15* 227:*9, 12, 21* 228:*19* 235:*19* 240:*11* 245:*3* 257:*17* 261:*6* 282:*4* 287:*22* 291:*18, 19*

299:*4* 300:*15* 308:*12* 309:*13* 310:*1* 311:*2* 320:*22* 321:*11* 324:*16, 17* 334:*24*
wanted 72:*20* 82:*14, 19* 109:*8* 123:*10* 174:*13* 219:*11* 227:*18* 331:*17*
Warning 7:*20* 189:*8, 16* 190:*8, 13, 17*
water 198:*2, 8* 200:*20* 249:*9, 14, 15, 19, 21, 22* 254:*21* 256:*7, 14, 16*
wavelength 77:*11* 81:*15, 20* 85:*21*
way 25:*7* 53:*24* 54:*1, 22* 56:*3* 58:*17* 67:*17, 21* 80:*6* 82:*16* 94:*7* 113:*10* 115:*13* 117:*1* 129:*12, 19* 130:*5* 146:*4* 149:*17* 204:*9* 208:*12* 231:*23* 244:*9* 246:*19* 255:*10* 258:*20* 261:*22* 272:*23* 287:*15* 311:*2* 318:*8* 320:*2*
ways 53:*15* 66:*14* 68:*23* 97:*23* 198:*1* 207:*16, 19* 256:*5, 24* 257:*8* 301:*22*

webinar 8:*22* 240:*24* 241:*9, 17*
website 52:*24* 298:*12* 301:*18*
week 14:*16* 21:*17* 28:*11* 34:*22* 322:*21, 23*
weigh 256:*20*
weight 107:*13* 108:*2, 5* 152:*1, 5* 163:*19, 20* 164:*1* 176:*18* 183:*24* 283:*7*
Well 12:*18* 27:*13* 29:*16* 33:*4* 37:*3* 39:*1* 40:*7* 41:*5* 47:*21* 51:*4* 55:*14* 59:*13* 70:*13* 71:*24* 72:*8* 76:*19* 85:*4* 93:*21* 102:*5* 104:*18, 21* 107:*1* 118:*2* 124:*18* 129:*19* 132:*10* 136:*7* 138:*18* 144:*23* 146:*15* 148:*19* 150:*2* 151:*21* 152:*9* 166:*21* 168:*11* 180:*23* 183:*5* 184:*3* 185:*15* 190:*14* 195:*16* 196:*21* 197:*5* 200:*2* 210:*22* 212:*15, 19* 213:*16, 20* 220:*4, 17* 227:*19* 231:*10* 233:*13* 235:*3, 24* 238:*5*

Confidential Information - Subject to Protective Order

241:*18*  242:*4*
262:*3*  263:*15*
268:*18*
282:*14*  285:*4*
286:*7*  287:*10*
292:*4, 8*
295:*10*
296:*13*
299:*23*
300:*21*
301:*13*
302:*23*
305:*22*  310:*6*
317:*19*
325:*14*  333:*11*
**well-publicized**
119:*14*
**went**  17:*20*
18:*22*  19:*2,*
*20*  21:*3*
26:*13*  196:*3*
**we're**  16:*9*
57:*7*  63:*5*
117:*1*  127:*12*
131:*24*
153:*20*  157:*9*
161:*9*  170:*4*
174:*6*  175:*2*
189:*6*  200:*1*
213:*16*
227:*23*  228:*8*
275:*14, 15*
277:*20*
304:*12*  320:*1,*
*2*  324:*10*
326:*13*
**Wet**  256:*16*
**we've**  72:*19*
155:*14, 18*
182:*2*  204:*12*
227:*2*  233:*15*
263:*7*  304:*19*
311:*14*
**whatsoever**
322:*13*
**WHITELEY**
2:*5*
**whoever's**
17:*4*

**wide**  36:*11*
44:*12*  45:*2*
259:*9*  326:*19*
**widely**  150:*3*
251:*3*  273:*8*
**widespread**
234:*17*
**wife**  68:*4*
**William**  4:*3*
**Williams**
148:*7*
**Williamson**
2:*15*
**willing**  79:*9*
**Willings**
330:*21*
**withdrew**
215:*14*
**witness**  10:*14,*
*22, 24*  24:*14*
25:*1*  72:*22*
73:*8, 16, 22*
74:*1*  84:*23*
94:*3*  101:*20*
102:*1*  104:*7*
131:*15*  154:*1*
160:*18, 24*
161:*10, 14*
174:*10*
200:*22*
223:*16*
227:*14*
262:*14*
286:*13*  298:*3*
306:*9, 13*
322:*18, 22*
330:*19*
333:*19*  337:*10*
**witnesses**
141:*19*  330:*4*
**witness's**
281:*23*  314:*24*
**Wmurtha@hill
wallack.com**
4:*4*
**Woodcock**
154:*21*  155:*1,*
*7*
**word**  51:*4*
92:*10*  108:*10*

109:*9*  132:*18*
317:*11*
**worded**  244:*9*
**wording**
124:*18*
131:*13*
204:*11*
205:*13*  236:*6*
**words**  242:*20*
246:*23*
**work**  25:*8*
37:*22*  38:*1, 8,*
*11, 14*  39:*15*
40:*4, 24*  41:*8*
45:*6*  56:*6, 15*
61:*12*  75:*6*
76:*3*  77:*4*
81:*22*  88:*23*
117:*17*
118:*21*  131:*9*
140:*12*
141:*20*
217:*15, 24*
224:*5*  229:*19,*
*22*  259:*7*
294:*15*
**worked**  14:*2,*
*6*  39:*3*  40:*13*
43:*24*  56:*7*
60:*2*  128:*21*
142:*24*  143:*3*
188:*20*
204:*14*
229:*15*
289:*11, 13*
**workhorse**
139:*3*
**working**
24:*11*  34:*20*
40:*17*  89:*2*
140:*7*  143:*8*
188:*14*
199:*22*  220:*9*
**works**  168:*21,*
*24*  169:*3*
182:*2*
**workshop**
298:*9*
**workup**  58:*11*
268:*24*

**world**  213:*12*
214:*16*  304:*7,*
*9*  335:*20*
**worry**  245:*21*
**worth**  78:*22,*
*24*  109:*7*
**worthy**  86:*9*
**Wow**  96:*7*
**write**  232:*4*
**writes**  298:*13*
**writing**  169:*5*
224:*11*  230:*3,*
*5*  238:*15*
316:*11*  337:*7*
**written**  216:*9*
230:*19*  231:*4*
237:*14*
**wrong**  20:*19,*
*20*  21:*5, 6*
85:*12*  103:*7*
113:*9*
**wrote**  233:*3*
234:*4*

**< X >**
**X-ray**  256:*4*

**< Y >**
**Yeah**  13:*9*
25:*5*  28:*22*
52:*3*  62:*1*
63:*5, 19*
65:*19*  72:*12,*
*23*  76:*7*  94:*4*
102:*2*  109:*10,*
*16*  118:*14*
131:*10, 17*
133:*21*
134:*21*
140:*18*
141:*17*
147:*15*
152:*19*  154:*2*
158:*17*
159:*21*  160:*5*
164:*3, 15*
165:*7*  166:*5,*
*11*  167:*21*
170:*2, 20*
174:*8, 11*
176:*9*  179:*1,*

*14*  192:*16*
193:*2*  197:*12*
198:*24*
200:*23*  204:*8*
205:*10*  207:*6*
210:*20*  216:*6*
219:*10*
220:*10*  223:*2,*
*17*  227:*15, 21*
231:*12*
240:*20*  268:*9*
275:*11*
276:*17*  277:*4*
286:*10*
292:*21*  297:*3*
300:*10*  305:*9*
317:*15*
320:*21*  324:*1*
326:*10*  334:*22*
**year**  97:*11*
312:*1, 4, 19, 24*
**years**  34:*22*
38:*24*  39:*18*
56:*7, 15*  71:*3*
97:*12*  119:*23*
128:*15*  143:*2,*
*8*  177:*9, 11,*
*12, 18, 19, 22*
184:*7, 12*
189:*7*  259:*8*
**yellow**  107:*5,*
*22*  112:*10*
**Yep**  103:*6*
**yesterday**
18:*11*  20:*9*
**yield**  66:*8*
**yields**  65:*4, 5*
103:*24*  104:*2,*
*16*
**York**  2:*3*

**< Z >**
**Zalman**  2:*11*
**ZHP**  38:*9*
141:*6, 8*
147:*11*  148:*3*
162:*3*  167:*6*
169:*3*  171:*1*
189:*9, 16*
190:*18*
251:*17*  252:*5*

Confidential Information Subject to Protective Order

262:*20*
270:*13*
311:*19*  313:*4*
327:*15*  331:*2*
**ZHP00190079**
*9:15*
**ZHP00190573**
*9:22*
**ZHP00388639**
*9:13*
**ZHP01344159**
*7:20*
**ZHP388639**
*274:21*
**ZHP4399**
*274:16*
**ZHP's**  314:*20*
**zinc**  270:*14*
**zkass@riverom**
**estre.com**  2:*12*
**ZnCl2**  9:*11*

# Exhibit 215

REDACTED

1        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF NEW JERSEY
2                    -   -   -
3

     IN RE:  VALSARTAN, LOSARTAN,   :
4    AND IRBESARTAN PRODUCTS        : MDL No. 2875
     LIABILITY LITIGATION           :
5    -----------------------------------------
6    THIS DOCUMENT APPLIES TO ALL  : HON ROBERT B.
     CASES                         : KUGLER
7                    -   -   -
8       CONFIDENTIAL INFORMATION - SUBJECT TO
                  PROTECTIVE ORDER
9
                   MARCH 21, 2022
10
                     -   -   -
11
12           Remote Videotape Deposition,
13   taken via Zoom, of ERIC SHEININ, Ph.D.,
14   commencing at 9:35 a.m., on the above
15   date, before Amanda Maslynsky-Miller,
16   Realtime Reporter and Certified Court
17   Reporter in and for the State of New
18   Jersey.
19
20                   -   -   -
21

          GOLKOW LITIGATION SERVICES
22      877.370.3377 ph | 917.591.5672 fax
               deps@golkow.com
23
24

Page 2

APPEARANCES:

SLACK DAVIS SANGER LLP
BY: JOHN R. DAVIS, ESQUIRE
BY: BETH QUESTAD, PARALEGAL
6001 Bold Ruler Way
Suite 100
Austin, Texas 78746
(512) 795-8686
jdavis@slackdavis.com
Representing the Plaintiffs

PIETRAGALLO GORDON ALFANO BOSICK
& RASPANTI, LLP
BY: JASON M. REEFER, ESQUIRE
One Oxford Centre
301 Grant Street, 38th Floor
Pittsburgh, Pennsylvania 15219
(412) 263-2000
jmr@pietragallo.com
Representing the Defendant,
Mylan Pharmaceuticals, Inc.

WALSH PIZZI O'REILLY FALANGA LLP
BY: CHRISTINE I. GANNON, ESQUIRE
Three Gateway Center
100 Mulberry Street
15th Floor
Newark, New Jersey 07102
(973) 757-1100
cgannon@walsh.law
Representing the Defendants,
Teva Pharmaceutical Industries, Ltd.,
Teva Pharmaceuticals SA, Inc.,
Actavis LLC, and Actavis Pharma, Inc.

Page 3

APPEARANCES: (Continued)

HINSHAW & CULBERTSON LLP
BY: KATHLEEN E. KELLY, ESQUIRE
53 State Street
27th Floor
Boston, Massachusetts 02109
(617) 213-7000
kekelly@hinshawlaw.com
Representing the Defendant,
SciGen Pharmaceuticals

GREENBERG TRAURIG, LLP
BY: BRIAN RUBENSTEIN, ESQUIRE
1717 Arch Street
Suite 400
Philadelphia, Pennsylvania 19103
(215) 988-7800
rubensteinb@gtlaw.com
Representing the Defendants,
Teva Pharmaceutical Industries, Ltd.,
Teva Pharmaceuticals SA, Inc.,
Actavis LLC, and Actavis Pharma, Inc.

Page 4

APPEARANCES: (Continued)

BARNES & THORNBURG LLP
BY: BETH BEHRENS, ESQUIRE
11 South Meridian Street
Indianapolis, Indiana 46204
(317) 236-1313
beth.behrens@btlaw.com
Representing the Defendants,
CVS Pharmacy, Inc., and Rite Aid
Corporation

ALSO PRESENT:
Brad Matta, Esquire, In-House Counsel, Mylan
Chris Clee, Videographer

- - -

Page 5

- - -
I N D E X
- - -

Testimony of:  ERIC SHEININ, Ph.D.

By Mr. Davis          10, 288
By Mr. Reefer         256, 317

- - -
E X H I B I T S
- - -

NO.          DESCRIPTION                PAGE

Sheinin-1    No Bates
             Expert Report of
             Eric Sheinin, Ph.D.        31

Sheinin-2    No Bates
             1/12/22 Letter,
             Trischler to Counsel       55

Sheinin-3    MYLAN-MDL2875-003457
             11/5/19 FDA Warning
             Letter                     69

Sheinin-4    No Bates
             USP Announces Approval of
             Chapter on Nitrosamines
             Impurities                 78

Confidential Information Subject to Protective Order

---

Page 6

- - -
# EXHIBITS
- - -

NO.        DESCRIPTION                PAGE

Sheinin-5   No Bates
M7(R1) Assessment and
Control of DNA Reactive
(Mutagenic) Impurities in
Pharmaceuticals to Limit
Potential Carcinogenic
Risk, Guidance for
Industry               83
Sheinin-6   No Bates
Valsartan Guidance      93
Sheinin-7   MYLAN-MDL2875-00705126
3/14/19 Cover Letter for
Master File GDUFA
Complete Response Letter   101
Sheinin-8   No Bates
Impurities in Drug Products
and Drug Substances -
A USP Approach          117
Sheinin-9   No Bates
FAQs: Organic Impurities   135
Sheinin-10   MYLAN-MDL2875-00894833
Valsartan Drug Master
File, Section 3.2.S.3     170
Sheinin-11   MYLAN-MDL2875-00392350
11/26/18 E-mail,
Owens to Smith          182
Sheinin-12   MYLAN-MDL2875-00552465
DMF DLAPI Information
Request                 188

---

Page 7

- - -
# EXHIBITS
- - -

NO.        DESCRIPTION                PAGE

Sheinin-13   No Bates
Valsartan Development
Report, Addendum IV      202
Sheinin-14   No Bates
Orange Book Preface,
Food and Drug Administration,
Center for Drug Evaluation
and Research, Approved Drug
Products with Therapeutic
Equivalence Evaluations   222
Sheinin-15   No Bates
12/31/21 ProPharma Group
Invoice
#PPGUS000581            247
Sheinin-16   No Bates
1/31/22 ProPharma Group
Invoice
#PPGUS000820            248
Sheinin-17   No Bates
2/28/22 ProPharma Group
Invoice
#PPGUS001080            248
Sheinin-18   No Bates
Supplement to Exhibit B to
the Report of
Eric Sheinin, Ph.D.      253
Sheinin-19   No Bates
Warning Letter
Mylan Laboratories
Limited – Unit 7         293

---

Page 8

- - -
# DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
Page Line    Page Line    Page Line
None

Request for Production of Documents
Page Line    Page Line    Page Line
None

Stipulations
Page Line    Page Line    Page Line
9      1

Question Marked
Page Line    Page Line    Page Line
None

---

Page 9

- - -
(It is hereby stipulated and
agreed by and among counsel that
sealing, filing and certification
are waived; and that all
objections, except as to the form
of the question, will be reserved
until the time of trial.)
- - -
VIDEO TECHNICIAN:  Good
morning.  We are now on the
record.  My name is Chris Clee,
I'm a videographer for Golkow
Litigation Services.  Today's date
is March 21st, 2022, and the time
is 9:35 a.m. Eastern Standard
Time.
This remote video deposition
is being held in the matter of
valsartan, Losartan and Irbesartan
Products Liability Litigation, MDL
Number 2875.  The deponent is Eric
Sheinin.
All parties to this

---

Confidential Information Subject to Protective Order

Page 10

1  deposition are appearing remotely
2  and have agreed to the witness
3  being sworn in remotely.
4        Due to the nature of remote
5  reporting, please pause briefly
6  before speaking to ensure all
7  parties are heard.
8        Counsel will be noted on the
9  stenographic record.  The court
10  reporter is Amanda Miller, who
11  will now swear in the witness.
12        - - -
13        ERIC SHEININ, Ph.D., after
14  having been duly sworn, was
15  examined and testified as follows:
16        - - -
17        EXAMINATION
18        - - -
19  BY MR. DAVIS:
20      Q.  Good morning, Dr. Sheinin.
21  My name is John Davis, I'm at the law
22  firm of Slack Davis Sanger down here in
23  Austin, Texas.
24        How are you doing this

Page 11

1  morning?
2      A.  Okay, John.  I'm doing all
3  right, thank you.  How are you?
4      Q.  Good.  Not too bad.  We're
5  braving some tornado warnings and severe
6  hail threats here, so hopefully we'll
7  keep power throughout this entire thing.
8      A.  Okay.  Good.
9      Q.  Well, let me start by asking
10  you, have you ever given testimony under
11  oath before?
12      A.  Yes, I have.
13      Q.  Okay.  About how many times?
14      A.  Five or six, I think.
15      Q.  Would that have been in the
16  capacity of an expert witness each of
17  those times?
18      A.  I guess so.  One of the
19  times I was still at FDA, and I was --
20  what I was asked to talk about, it was a
21  device/drug combination.  And I had to
22  talk about the -- one of the chemicals in
23  the -- in the device/drug combination.
24        And I guess -- I wasn't

Page 12

1  necessarily called an expert witness, but
2  I was doing it as part of my job at FDA.
3      Q.  Okay.  Would that have been
4  in a court proceeding or some kind of
5  regulatory --
6      A.  It was a deposition.
7      Q.  -- proceeding?
8      A.  It was a deposition.
9      Q.  Okay.  The underlying sort
10  of proceeding that the deposition
11  occurred in, would that have been a court
12  case or some kind of regulatory action?
13      A.  I think it was regulatory.
14  I don't believe it was in a court action.
15      Q.  Do you recall what the
16  device/drug combo was?
17      A.  I'm not sure that I'm at
18  liberty to say.
19      Q.  And then the other -- I
20  think you said five to six times total,
21  once in this FDA proceeding.
22        The other -- each of the
23  other times would have been as an expert
24  witness?

Page 13

1      A.  Yes.
2      Q.  Can you tell me what those
3  instances of you serving as an expert
4  witness in litigation, minus the FDA
5  proceeding, related to?
6      A.  I can tell you that one of
7  them involved a court case in Canada
8  where I -- I did not give a deposition,
9  but I did appear at trial.  And that
10  involved how FDA would look at a pure
11  enantiomer, if the original application
12  was for a racemate, what would be
13  expected from the chemistry perspective.
14        MR. REEFER:  John is an
15        expert on that subject, aren't
16        you, John?
17  BY MR. DAVIS:
18      Q.  I think I'm going to defer
19  to you on all those chemistry terms and
20  just say, that was a -- mostly a
21  scientific-based expert opinion as a
22  process chemist?
23      A.  Not as a process chemist,
24  just as a review chemist and how -- how

Page 14

¹ FDA would -- what FDA would want in the
² application if it was a single enantiomer
³ versus what was -- what was already
⁴ approved as a racemate.
⁵       Q.   Okay.
⁶       A.   It didn't have anything to
⁷ do with the process.
⁸       Q.   Well, sure.  I guess let
⁹ me --
¹⁰       A.   The regulatory process.  Let
¹¹ me say that, yeah.
¹²       Q.   Right.  And that was going
¹³ to be my question.
¹⁴             The opinion you gave in that
¹⁵ was -- was a chemistry-related opinion,
¹⁶ not anything really focused on regulatory
¹⁷ affairs or anything like that, right?
¹⁸       A.   Correct.
¹⁹       Q.   Okay.
²⁰       MR. REEFER:  Eric -- can I
²¹ interject just to help us all out?
²²             Eric, if you could give a
²³ second-or-two pause before
²⁴ answering, that would be helpful

Page 15

¹ for everybody involved, okay?
²       THE WITNESS:  Okay.
³ BY MR. DAVIS:
⁴       Q.   Okay.  So I think you
⁵ mentioned there might be a couple of
⁶ other times you served as an expert
⁷ witness.
⁸             Can you give me a brief
⁹ description of those instances as well?
¹⁰       A.   One that I'll -- I should
¹¹ wait.
¹²             One that I recall was -- it
¹³ involved a company that received approval
¹⁴ for an ANDA, and there was basically a
¹⁵ Phase IV commitment that FDA wanted them
¹⁶ to do, and there was also litigation that
¹⁷ caused the approval to be delayed because
¹⁸ of the litigation.
¹⁹             And what I testified to
²⁰ involved a timeline that the company, for
²¹ whatever reason, delayed doing the work
²² that FDA wanted because they knew there
²³ was a litigation and they would not be
²⁴ able to launch the product until a

Page 16

¹ certain point in time.  And so they
² basically took their time responding to
³ FDA.
⁴             And my part of the -- what I
⁵ was asked to opine on was what if the
⁶ company had gone forward and done the
⁷ work immediately, what would FDA -- how
⁸ would FDA have looked at the final
⁹ approval, whether it would have speeded
¹⁰ up the -- getting the approval, which, of
¹¹ course, would have been -- the company
¹² would have been able to launch sooner.
¹³             So it was basically
¹⁴ something like that.
¹⁵       Q.   And so that, the litigation,
¹⁶ underlying litigation, would have been a
¹⁷ patent litigation, I suppose?
¹⁸       A.   Pardon me?
¹⁹       Q.   Was this an instance of what
²⁰ we call delayed generic entry litigation?
²¹       MR. REEFER:  Object to form.
²²       Go ahead, if you can.
²³       THE WITNESS:  I don't know
²⁴       what that -- what that means.  But

Page 17

¹       the litigation ended sooner than
²       the company expected, so they
³       could have presumably launched
⁴       sooner if they had done the work
⁵       sooner.
⁶ BY MR. DAVIS:
⁷       Q.   Who did you represent in
⁸ that case -- or, sorry, and by
⁹ "represent," I mean on whose behalf did
¹⁰ you submit an expert report?
¹¹       A.   You know, I don't recall
¹² which company it was.
¹³       Q.   Was it a follow-on generic
¹⁴ company, like, not the first-file ANDA
¹⁵ but a follow-on generic company?
¹⁶       A.   I believe it was a first
¹⁷ generic.
¹⁸       Q.   That company wasn't Mylan,
¹⁹ was it?
²⁰       A.   No.
²¹       Q.   Do you know if it was any of
²² the manufacturer defendants in this
²³ valsartan MDL litigation?
²⁴       A.   It was not.

Page 18

1    Q.   Okay.  Any other instances
2  of serving as an expert witness?
3    A.   Yeah.  I recall one,
4  actually, it was a functional food.  And
5  my part involved evaluating work that the
6  other side's contract lab had performed,
7  trying to quantify the amount of an
8  impurity that was in the functional food
9  ingredient.
10    Q.   Okay.  Any other instances?
11    A.   I believe -- I know there
12 were a couple of others.  I can't recall
13 what the specifics were, but it involved
14 chemistry.
15    Q.   What about a Fresenius
16 dialysis product?  Did you ever give
17 expert testimony in that -- for Fresenius
18 in that case?
19    A.   I don't believe I ever did
20 anything for Fresenius.
21    Q.   Okay.  You don't recall a
22 litigation versus Fresenius in the
23 Northern District of Illinois, Case
24 Number 16-cv-651?

Page 19

1    A.   I don't recall.  I know I
2  did do a deposition on a case in Chicago,
3  so it might be related to that.  But I
4  don't -- I don't recall that -- that I
5  was involved with Fresenius.
6    Q.   In each of those instances
7  of serving as an expert witness, were
8  your reports and opinions tendered on
9  behalf of pharmaceutical manufacturers or
10 device manufacturers in each of those
11 instances, aside from the FDA one?
12    A.   Pharmaceutical
13 manufacturers.
14    Q.   When were you engaged by
15 Mylan for this case?
16    A.   I believe it was late 2021.
17    Q.   By "late 2021," can you give
18 a month?
19    A.   November or December.
20    Q.   I noticed on a couple of
21 your invoices that the invoices were
22 submitted from an entity called ProPharma
23 Group.
24       Who are they?

Page 20

1    A.   I'm not sure all the --
2  represent -- how it all came about.
3       But it's, basically, I'm
4  doing work through NDA Partners.  And NDA
5  Partners has merged a couple of times.
6  So I still look at everything I've done
7  as through NDA Partners.  So I guess
8  ProPharma is maybe now the parent.
9    Q.   Does either ProPharma or NDA
10 Partners take a cut of your expert
11 witness fees?
12    A.   Yes, they do.
13    Q.   What is that percentage?
14    A.   I don't know what the
15 percentage is, but I get $400 an hour.
16    Q.   Okay.  Just to get a little
17 background on you, Dr. Sheinin, can you
18 give me a brief rundown of your
19 professional career as relates to FDA,
20 USP, and then your work in the consulting
21 industry?
22    A.   Sure.  I received a Ph.D.
23 from the University of Illinois, College
24 of Pharmacy, in organic chemistry in

Page 21

1  1971.
2       And I worked for FDA
3  beginning in February of 1971, in the
4  division of drug chemistry.  I was a
5  research chemist.  I was doing work on
6  nuclear magnetic resonance to identify
7  unknown samples and to develop analytical
8  methods to quantify the content of
9  pharmaceutical products.
10       Within a couple of years of
11 joining FDA, we bought our first mass
12 spectrometer on the drug side, and I
13 helped to run that instrument along with
14 another chemist who had come from a
15 different agency who was a mass
16 spectrometrist.
17       And between the two of us,
18 we published a number of papers, both
19 using NMR and using mass spec.  We were
20 able to couple a gas chromatograph to the
21 mass spectrometer, and we did do research
22 and -- trying to identify unknown
23 materials that FDA field labs were not
24 able to handle.

Confidential Information Subject to Protective Order

Page 22

¹ Around 1978 or so, we had
² four branches in the division of drug
³ chemistry.  And one of the branch chiefs
⁴ passed away.  I competed for that
⁵ position and was selected to become a
⁶ branch chief.
⁷ And during that -- my time
⁸ in that position, I was responsible for
⁹ supervising a group of chemists who,
¹⁰ quote/unquote, performed method
¹¹ validation for analytical methods that
¹² companies had submitted in their new drug
¹³ applications to make sure that a
¹⁴ competent FDA analyst could run the
¹⁵ procedures and come up with results that
¹⁶ were comparable to what the company had
¹⁷ provided.
¹⁸ We also had somebody in my
¹⁹ group who was doing powder -- x-ray
²⁰ powder diffraction studies.
²¹ Around 1985 or so, FDA
²² merged the Bureau of Drugs and the Bureau
²³ of Biologics.  They were called bureaus
²⁴ in those days.  And biologics was in

Page 23

¹ charge of the combined bureau, and they
² made the decision, at one point in time,
³ to move some people to the review area,
⁴ chemists to the review area, because
⁵ there was a big backlog of new drug
⁶ applications that were pending chemistry
⁷ review.
⁸ And as it turned out, they
⁹ closed the entire division of drug
¹⁰ chemistry and offered everybody in the
¹¹ division a position in headquarters.  And
¹² some people took the position, some
¹³ people retired, and some people took
¹⁴ other positions within the government.
¹⁵ I moved to the review area
¹⁶ as a supervisory chemist, and I had
¹⁷ responsibility, initially, for chemists
¹⁸ who were reviewing anti-inflammatory drug
¹⁹ applications on the new-drug side.  This
²⁰ was in the division of oncology and
²¹ radiopharmaceuticals.
²² It was the first division
²³ that had two supervisory chemists, and
²⁴ eventually the responsibility ended up

Page 24

¹ for all the drugs within the division.
² So I took over the oncology drugs and the
³ radiopharmaceuticals, which included
⁴ other imaging agents as well.
⁵ The bureau -- well, this was
⁶ now, then, the Center of Drug Evaluation
⁷ and Research.  And there was a
⁸ reorganization that took place, and what
⁹ was created was the Office of
¹⁰ Pharmaceutical Science.
¹¹ And within the Office of
¹² Pharmaceutical Science, there were four
¹³ smaller offices.  One was the Office of
¹⁴ New Drug Chemistry.  And I competed for
¹⁵ one of the three branches -- or one of
¹⁶ the three divisions within that office.
¹⁷ The Office of New Drug Chemistry had
¹⁸ three divisions.  And I was selected as
¹⁹ one of the division directors, the
²⁰ Division of New Drug Chemistry 3.
²¹ And within that office,
²² then, Roger Williams, who was the head of
²³ the office of -- Office of Pharmaceutical
²⁴ Science, was also acting as director of

Page 25

¹ the Office of New Drug Chemistry.
² The three division
³ directors -- as I mentioned, there were
⁴ three divisions.  The three of us
⁵ competed for the permanent position of
⁶ director of the Office of New Drug
⁷ Chemistry, along with approximately
⁸ 80-some people from the outside.
⁹ I was selected to lead the
¹⁰ division of -- the Office of New Drug
¹¹ Chemistry.  And I worked in that position
¹² for approximately two years, and then I
¹³ moved up to be the deputy director in the
¹⁴ Office of Pharmaceutical Science, which
¹⁵ was what was termed a super office versus
¹⁶ the smaller offices.  I stayed in that
¹⁷ position for approximately one year.
¹⁸ When I reached 30 years at
¹⁹ FDA, I was able to retire with a full --
²⁰ a full pension, and I decided to move to
²¹ USP.
²² My boss at FDA, Roger
²³ Williams, had left the year prior to my
²⁴ retirement, and he went to USP as the

Confidential Information Subject to Protective Order

Page 26

¹ chief executive officer, executive vice
² president. And he recruited me to move
³ to USP as a vice president.
⁴         And I had responsibility for
⁵ the scientists at USP who were
⁶ responsible for creating content of USP
⁷ and NF, working with expert -- volunteers
⁸ on expert committees as well as the
⁹ pharmaceutical industry and, at times,
¹⁰ academia.
¹¹         USP had a program to verify
¹² the quality of dietary supplement
¹³ ingredients, and eventually they moved
¹⁴ into dietary supplement products. And
¹⁵ Roger Williams wanted to start a program
¹⁶ to evaluate the quality of active
¹⁷ pharmaceutical ingredients or drug
¹⁸ substances.
¹⁹         And I moved to that area,
²⁰ and I worked on trying to recruit
²¹ companies to submit their DMFs or just
²² their procedures for their drug
²³ substances.
²⁴         And after working for about

Page 27

¹ a year on that side, I felt, if I was
² ever going to go into consulting, which
³ was something I had thought about when I
⁴ retired from FDA, that now was the time,
⁵ I was still young enough. And I went
⁶ into consulting.
⁷         And that's kind of a
⁸ nutshell of what my career has been.
⁹ I've been consulting since March of 2007.
¹⁰     Q.    Okay. Thank you for that.
¹¹ And I'll take a few questions just in
¹² order.
¹³         You mentioned Roger
¹⁴ Williams, who was your former boss at
¹⁵ FDA, right?
¹⁶     A.    Yes.
¹⁷     Q.    Are you aware that he's
¹⁸ submitted an expert report in this case?
¹⁹     A.    I'm not aware.
²⁰     Q.    So you would not have talked
²¹ to him or e-mailed with him about that at
²² all?
²³     A.    No, I have not.
²⁴     Q.    Have you communicated with

Page 28

¹ any of the other defense experts who have
² submitted opinions in this litigation?
³     A.    I have not.
⁴     Q.    You mentioned a -- and so
⁵ just a clarification on a few dates.
⁶         I think you said you retired
⁷ from FDA after 30 years, but you didn't
⁸ give a date. I assumed that means 2001,
⁹ if you started in 1971?
¹⁰     A.    Yes. The end of February
¹¹ 2000 -- 2001.
¹²     Q.    Okay. And then when did
¹³ you -- so you went to USP in 2001 as
¹⁴ well?
¹⁵     A.    Yes. March of 2001. I
¹⁶ think I had two weeks --
¹⁷     Q.    And then --
¹⁸     A.    -- two weeks in between.
¹⁹     Q.    Got you.
²⁰         And then you retired from
²¹ USP around 2007-ish?
²²     A.    Yes.
²³     Q.    You mentioned trying to
²⁴ recruit companies to submit their DMFs or

Page 29

¹ drug substance manufacturing procedures
² to USP.
³         Would that be for
⁴ pharmaceutical drugs, or was that in the
⁵ context of dietary supplements?
⁶     A.    No, this was pharmaceutical
⁷ ingredients. For the most part,
⁸ companies were reluctant to get into it
⁹ because FDA was the legal authority.
¹⁰         There was a -- the European
¹¹ Pharmacopoeia, through the European
¹² Directorate for the Quality of Medicines,
¹³ had a program that actually was required,
¹⁴ through EMA, to -- for companies to
¹⁵ submit their active ingredients for
¹⁶ evaluation.
¹⁷         And I believe Roger was
¹⁸ interested in getting into the same type
¹⁹ of -- same type of program. But I don't
²⁰ believe that FDA would ever have given up
²¹ the responsibility for evaluating the
²² chemistry of the -- of active
²³ pharmaceutical ingredients or drug
²⁴ substances.

Page 30

1    Q.   In your consulting work
2 since 2007, have you -- have you always
3 consulted for industry?
4         MR. REEFER:  Object to form.
5         THE WITNESS:  I have given
6    some advice, a couple of times, to
7    academia.  And I also did some
8    training for USP.  I did some
9    training courses that USP offered.
10 BY MR. DAVIS:
11    Q.   What percentage would you
12 say, of your consulting work since 2007,
13 has been for industry?
14    A.   Probably 98 percent or more.
15         MR. DAVIS:  I'm going to
16    mark your report, Dr. Sheinin.
17         That's Tab 1, Jason, in the
18    box, if he doesn't have a copy.
19         MR. REEFER:  John, I'm going
20    to stand up, and I'm going to be
21    off camera for a moment.
22         MR. DAVIS:  Sure.
23         MR. REEFER:  Actually, just
24    give me one second, okay?

Page 31

1         For purposes of formality,
2    John, you see me now?
3         MR. DAVIS:  Yes.
4         MR. REEFER:  I just wanted
5    you to see that we have not yet
6    opened the box.  So just give me
7    one moment, okay?  I have
8    scissors.
9         MR. DAVIS:  Not a problem.
10         MR. REEFER:  Tape must have
11    been on sale at Costco when you
12    packaged this.
13         Tab 1, John?
14         MR. DAVIS:  Tab 1.
15         - - -
16         (Whereupon, Exhibit
17    Sheinin-1, No Bates, Expert Report
18    of Eric Sheinin, Ph.D., was marked
19    for identification.)
20         - - -
21 BY MR. DAVIS:
22    Q.   Dr. Sheinin, do you
23 recognize what's been handed to you as
24 Exhibit-1 -- that I've now marked as

Page 32

1 Exhibit-1 as your expert report in this
2 case?
3    A.   Yes.
4    Q.   In coming up with your
5 expert report, did you review at all
6 Federal Rule of Civil Procedure 26, which
7 governs the disclosure of expert reports
8 in federal court litigation?
9    A.   No, I have never seen that.
10    Q.   Well, I'll just tell you
11 that that rule states that, and I'm
12 quoting, The report must contain a
13 complete statement of all opinions the
14 witness will express and the basis and
15 reasons for them.
16         Did you -- did you hear that
17 sentence well?
18    A.   Yes.
19    Q.   Okay.  Do you feel that your
20 expert report that you've submitted in
21 this case complies with what that rule
22 requires, namely, a complete statement of
23 all your opinions and the basis and
24 reasons for them?

Page 33

1         MR. REEFER:  Object to form.
2    Calls for a legal conclusion.
3         THE WITNESS:  Yes.
4 BY MR. DAVIS:
5    Q.   So, in other words, there's
6 no opinions in your -- that aren't in
7 your report that you would be seeking to
8 express in this litigation, correct?
9         MR. REEFER:  Object to form.
10         THE WITNESS:  Yes.
11 BY MR. DAVIS:
12    Q.   "Yes" meaning that there are
13 no other opinions that you're trying to
14 assert in this litigation that you have
15 not put in your expert report?
16         MR. REEFER:  Object to form.
17         THE WITNESS:  That's
18    correct.
19 BY MR. DAVIS:
20    Q.   Turn, if you would, to the
21 second page of your report at Paragraph
22 8.
23         You state there, I offer the
24 opinions set forth in this report to a

Page 34

¹ reasonable degree of scientific certainty
² based on my education, experience,
³ training, expertise and referenced
⁴ resources.
⁵          Do you see that?
⁶     A.   Yes.
⁷     Q.   I just want to get some
⁸ clarification of what you mean by
⁹ "referenced resources."
¹⁰          What are you referring to
¹¹ there?
¹²     A.   I actually copied this
¹³ beginning from another expert report, and
¹⁴ I did not think about what referenced
¹⁵ resources I was -- what referenced
¹⁶ resources this referred to.
¹⁷          But I would assume it would
¹⁸ be things like the USP, the NF, FDA
¹⁹ guidances, ICH guidances, documents like
²⁰ that.
²¹     Q.   Did you write this report
²² with a degree of care, Dr. Sheinin?
²³     A.   Yes.
²⁴          MR. REEFER:  Object to form.

Page 35

¹          THE WITNESS:  A lot of care.
² BY MR. DAVIS:
³     Q.   But what you're telling me
⁴ is that you're not sure what you mean by
⁵ "referenced resources" there because you
⁶ copied it from another expert report of
⁷ yours?
⁸          MR. REEFER:  Object to form.
⁹     Mischaracterizes testimony.
¹⁰          THE WITNESS:  I tried to
¹¹     explain what I would consider
¹²     referenced resources.  And I would
¹³     still say the same thing.
¹⁴          I would consider these
¹⁵     referenced resources things such
¹⁶     as USP, the NF, FDA guidances.  I
¹⁷     might add FDA policies and
¹⁸     procedures, ICH guidances.
¹⁹     That -- to me, that's what
²⁰     referenced resources would be.
²¹ BY MR. DAVIS:
²²     Q.   Okay.  Well, referenced
²³ resources means resources that are
²⁴ referenced, right?

Page 36

¹          Are there any resources that
² you relied on that aren't -- are not
³ referenced in your report somewhere,
⁴ either in a footnote or your materials
⁵ considered list, I believe which is
⁶ Exhibit B, as you state in Paragraph 7?
⁷     A.   I don't believe there are
⁸ any others.
⁹     Q.   So would I be correct in
¹⁰ making the assumption that if there's
¹¹ something that's not referred to
¹² somewhere in your report, that you didn't
¹³ consider it in coming to your opinions?
¹⁴          MR. REEFER:  Object to form.
¹⁵     Mischaracterizes testimony.
¹⁶          THE WITNESS:  Can you repeat
¹⁷     the question?
¹⁸ BY MR. DAVIS:
¹⁹     Q.   Sure.
²⁰          Would I be correct -- what
²¹ I'm trying to do, Dr. Sheinin, is sort
²² of, you know, capture the view of
²³ everything you reviewed for your expert
²⁴ report in this case.  And normally that's

Page 37

¹ through either footnoting it as citations
² in the body of your report or discussing
³ it explicitly in your report or
⁴ referencing a list of materials that you
⁵ considered or looked at in the process of
⁶ writing it.
⁷          And so what I'm trying to do
⁸ is clarify whether what's in the report
⁹ is the complete -- you know, wherever it
¹⁰ is in your report, that that's a complete
¹¹ list of everything you looked at in
¹² writing your report.
¹³          Do you follow?
¹⁴          MR. REEFER:  Object to form.
¹⁵          THE WITNESS:  I follow.  And
¹⁶     I believe that's the situation.
¹⁷ BY MR. DAVIS:
¹⁸     Q.   I just referenced Paragraph
¹⁹ 7.  You write there that, A list of
²⁰ materials provided for my consideration
²¹ is attached as Exhibit B.
²²          Do you see that?
²³     A.   Yes.
²⁴     Q.   Were those materials

Confidential Information Subject to Protective Order

Page 38

1 provided by counsel?
2     A.   Yes.
3     Q.   Did you ask for them
4 specifically or was it just a package
5 that was given to you?
6     A.   I believe it was a package
7 that was given to me.
8     Q.   Did you ask counsel or make
9 any inquiries as to whether there was
10 anything additional that you might want
11 to look at?
12     A.   I don't recall asking for
13 other things.
14     Q.   So you just trusted that
15 what was given to you by Mylan's counsel
16 was a complete picture of the relevant
17 information that you might want to look
18 at?
19          MR. REEFER:  Object to form.
20          THE WITNESS:  I was asked to
21     opine on how USP functions and
22     what drug master files are.
23     Anything that I looked at that
24     counsel provided was to get a

Page 39

1     background for the overall
2     picture.
3          But I used my background and
4     my expertise and experience at USP
5     and at FDA to create my report.
6 BY MR. DAVIS:
7     Q.   Well, my question was
8 whether you trusted that what was given
9 to you was a complete picture, including
10 for those topical areas you just
11 referenced, such as USP and drug master
12 files.
13          Is that --
14          MR. REEFER:  Object to form.
15     Asked -- sorry, John.
16 BY MR. DAVIS:
17     Q.   Did you trust that what was
18 given to you by Mylan's counsel painted a
19 complete and accurate picture for you?
20          MR. REEFER:  Object to form.
21     Asked and answered.
22          THE WITNESS:  What -- my
23     background, I believe, was
24     sufficient for me to give my

Page 40

1     opinion on USP and FDA's
2     consideration of drug master
3     files.
4          Anything that I looked at
5     that counsel had provided, as I
6     mentioned, was to provide a
7     background understanding of --
8     basic understanding of the issue.
9     It was nothing that I considered
10     in -- that I would have
11     incorporated into my report.
12          I would have to venture to
13     say that I would -- I would think
14     that the amount of material that I
15     received from counsel is a very,
16     very, very small proportion of the
17     documents that might have been
18     used to fully explain the
19     situation.
20          I just can't imagine that
21     if -- if counsel had provided me
22     everything that is included in the
23     court proceedings, it probably
24     would have more than filled up my

Page 41

1     office.
2          So I just don't understand
3     what -- what the question is
4     getting at.
5 BY MR. DAVIS:
6     Q.   Well, sure, let me ask it, I
7 suppose, in a different way, then, which
8 is, did you -- upon receiving the
9 information that is listed at Exhibit B
10 of your report, upon reviewing that, did
11 you ever go back to counsel and ask for
12 anything else?
13     A.   I'm turning the page.
14          Actually, I may have asked
15 for the response -- Mylan's response to
16 the warning letter.  I can't recall for
17 definite whether that was included in the
18 original group.
19     Q.   Did you ask -- sorry.  Go
20 ahead, Dr. Sheinin.  I didn't mean to cut
21 you off there.
22     A.   I think I may have asked for
23 that response to the warning letter.
24     Q.   Why would you have asked for

Confidential Information Subject to Protective Order

Page 42

¹ that?
²        A.    Just to get an overall
³ picture of how Mylan responded.
⁴        Q.    And by "warning letter,"
⁵ you're referring to the November 2019
⁶ warning letter issued to Unit 8?
⁷        A.    Yes.
⁸        Q.    While we're discussing that,
⁹ real fast, and we may come back to it,
¹⁰ but what's your understanding of how the
¹¹ FDA received Mylan's response to the
¹² warning letter?
¹³              MR. REEFER:  Object to form.
¹⁴ Beyond the scope.  Lack of
¹⁵ foundation.
¹⁶              THE WITNESS:  I am -- I
¹⁷ can't say how FDA responded.  I
¹⁸ have not seen anything in writing
¹⁹ from FDA about the response.
²⁰        But I do know that Mylan --
²¹ Mylan's valsartan products are
²² back on the market, so I would
²³ have to assume that the -- that
²⁴ FDA was satisfied with their

Page 43

¹        response, and that's how -- that's
²        why the products are on the market
³        again.
⁴ BY MR. DAVIS:
⁵        Q.    Well, do you understand that
⁶ the warning letter had to do, for Unit 8,
⁷ in part, with Mylan's practices around
⁸ recovered solvents and --
⁹              MR. REEFER:  Object to form
¹⁰ as beyond the scope.
¹¹ BY MR. DAVIS:
¹²        Q.    -- as well as the issue of
¹³ the nitrosamine contamination in the
¹⁴ first place?
¹⁵              MR. REEFER:  Object to form.
¹⁶ Beyond the scope.  Compound.  And
¹⁷ mischaracterizes the document.
¹⁸              THE WITNESS:  That is the --
¹⁹ the response from Mylan to FDA is
²⁰ not the basis of my report.
²¹        So I consider that to be --
²² it was irrelevant as to whether --
²³ is irrelevant in terms of how FDA
²⁴ might have responded to Mylan's

Page 44

¹        response.
²              It doesn't form the basis
³        for anything that's in my report.
⁴ BY MR. DAVIS:
⁵        Q.    Did you ask counsel to see a
⁶ copy of the FDA's close-out letter for
⁷ Mylan's warning letter?
⁸        A.    I don't believe I did.
⁹        Q.    Do you know if one exists?
¹⁰        A.    I do not know.
¹¹        Q.    So you wouldn't know if that
¹² warning letter remains unresolved to this
¹³ day?
¹⁴              MR. REEFER:  Object to form.
¹⁵ Beyond the scope.  Lack of
¹⁶ foundation.
¹⁷              THE WITNESS:  I have no way
¹⁸ of knowing whether it still exists
¹⁹ or not.
²⁰ BY MR. DAVIS:
²¹        Q.    Okay.  And you mentioned
²² Mylan having a -- bringing valsartan back
²³ to the market, correct?
²⁴        A.    As far as I know,

Page 45

¹        valsartan -- Mylan's valsartan products
²        are on the market.
³        Q.    Do you know if Mylan had to
⁴ commit to the FDA not to use recovered
⁵ solvents until they could ensure that
⁶ they were safely used and that --
⁷              MR. REEFER:  Object to form.
⁸        I'm sorry, John.
⁹ BY MR. DAVIS:
¹⁰        Q.    Sorry.  Let me start that
¹¹ question over, Dr. Sheinin.
¹²              Do you know if -- let me
¹³ break it down into bits.
¹⁴              Do you know if Mylan's
¹⁵ valsartan product that's back on the
¹⁶ market today is manufactured using
¹⁷ recovered solvents?
¹⁸              MR. REEFER:  Object to form.
¹⁹ Beyond the scope.  Lack of
²⁰ foundation.
²¹              THE WITNESS:  That's
²² something I don't have knowledge
²³ of.  It's -- again, it's not
²⁴ something that I used to create my

Confidential Information Subject to Protective Order

Page 46

1 report. Whether or not they're
2 using recovered solvents, I can't
3 tell you that. I don't know.
4 BY MR. DAVIS:
5     Q.   Okay. Do you know if Mylan
6 had to change the process chemistry of
7 its valsartan API to bring it back to the
8 market?
9         MR. REEFER: Object to form.
10 Beyond the scope. Lack of
11 foundation.
12         THE WITNESS: I'm not a
13 process chemist, so it's very hard
14 for me to answer that question.
15 It's a very specialized area.
16         I've never worked in the
17 pharmaceutical industry, never
18 worked in developing a process for
19 manufacturing of a drug substance.
20 And it's not something that I can
21 opine on.
22 BY MR. DAVIS:
23     Q.   Okay. But you're not --
24 you're not aware, for example, of whether

Page 47

1 Mylan had to remove its use of
2 triethylamine and substitute it with
3 sodium bicarbonate in an effort to avoid
4 NDEA or other nitrosamine contamination
5 in order to bring valsartan back to the
6 market?
7         MR. REEFER: Object to form.
8 Compound. Beyond the scope. Lack
9 of foundation.
10         THE WITNESS: Again, I'm not
11 a process chemist, and I would not
12 attempt to try to interpret or
13 understand what processes Mylan
14 used.
15         I did not consider whether
16 or not there was a change in the
17 manufacturing process to form the
18 basis for my report. And
19 that's -- I use my experience at
20 USP and at FDA to create the
21 report.
22         So it's beyond my
23 understanding of process
24 chemistry, which is essentially

Page 48

1 nothing. It's beyond my
2 expertise.
3 BY MR. DAVIS:
4     Q.   Well, sure, and I'm only
5 asking this because you brought up the
6 fact that Mylan has a valsartan product
7 back on the market.
8         And my question is, are you
9 familiar at all with the circumstances by
10 which Mylan was able to bring a valsartan
11 product back to the market?
12         MR. REEFER: Same objection.
13         THE WITNESS: Again, I'm not
14 a process chemist. And it's just
15 beyond what my expertise is. I
16 did not use any of that type of
17 information to form the basis for
18 my report.
19 BY MR. DAVIS:
20     Q.   Okay. So is the answer no,
21 you're not familiar with the
22 circumstances by which Mylan was able to
23 bring a valsartan product back to the
24 market?

Page 49

1     A.   It's -- I'm not a process
2 chemist, and understanding the -- what
3 would go into changing, if that's what
4 occurred, changing the manufacturing
5 procedures is not something that I'm
6 qualified to evaluate.
7         And I'm going to have to
8 stand on that, that it's nothing that I
9 used in my report.
10     Q.   Well, my question isn't, you
11 know, calling for any kind of process
12 chemistry. I'm just asking what you
13 reviewed.
14         And my question is, did you
15 review any documents or anything related
16 to how Mylan was able to bring a
17 valsartan product back to the market?
18     A.   My -- again, I'm not a
19 process chemist. So I -- as to what was
20 involved and how much work was involved,
21 I can't really opine on that.
22     Q.   What about concessions to
23 the regulator, are you familiar with any
24 concessions Mylan had to make to the

Confidential Information Subject to Protective Order

Page 50

¹ regulator, the FDA, in order to bring a
² valsartan product back on the market?
³         MR. REEFER:  Object to form.
⁴ Vague.  Beyond the scope.  Lack of
⁵ foundation.
⁶         THE WITNESS:  I am -- I
⁷ am -- let me start over.
⁸         I am -- I don't know what --
⁹ I'm not a process chemist, and I
¹⁰ just feel that whatever Mylan did
¹¹ to get on the market is beyond
¹² what I was asked to look at and
¹³ what I was asked to opine on.
¹⁴         I used my expertise and my
¹⁵ background at USP and FDA to
¹⁶ create my report.  Anything else
¹⁷ was immaterial to providing my
¹⁸ opinions that are in my report.
¹⁹ BY MR. DAVIS:
²⁰     Q.   Okay.  Well, let me ask it
²¹ this way, then:  Is the fact that Mylan
²² is back on the market with a valsartan
²³ product, under circumstances that you
²⁴ don't know or understand, that's not

Page 51

¹ relevant to any of the opinions in your
² report, is it?
³     A.   I don't believe so.
⁴     Q.   Okay.  Thank you.
⁵         You list the ANDAs in
⁶ Exhibit B to your report, do you not?
⁷     A.   Yes, I do list them.
⁸     Q.   Do you understand that those
⁹ ANDA applications all made reference to a
¹⁰ drug master file?
¹¹     A.   Yes.
¹²     Q.   Did you review the full drug
¹³ master file?
¹⁴     A.   I didn't review any part of
¹⁵ the drug master file.
¹⁶     Q.   Okay.  So that was my
¹⁷ question.
¹⁸         So you reviewed the ANDA
¹⁹ applications but not the underlying drug
²⁰ master file that those ANDAs made
²¹ reference to?
²²     A.   I glanced at one of the
²³ ANDAs.  I did not review all three of
²⁴ them.  And what I saw was mostly -- at

Page 52

¹ least the portions of the requirements in
² the ANDA for the drug substance made
³ reference to the drug master file.
⁴         So there was very little
⁵ information in the ANDA itself, and I did
⁶ not pursue asking counsel to provide me
⁷ the DMF because I felt it was irrelevant
⁸ to what my part of the -- creating my
⁹ report was.
¹⁰         I was just -- the ANDAs were
¹¹ there and I thought I probably ought to
¹² take a look at them, but there was really
¹³ nothing for me to understand.  And I just
¹⁴ said, I don't need that information to
¹⁵ create my report on how USP operates and
¹⁶ what a drug master file is.  So I did not
¹⁷ pursue it.
¹⁸     Q.   Well, that's my -- you kind
¹⁹ of touched on my next question, which is,
²⁰ you told me your assignment was to opine
²¹ on USP and drug master files.
²²         But you didn't think to ask
²³ Mylan for the drug master file that's at
²⁴ issue in this case?

Page 53

¹     A.   I did not because I was
² giving, in my expert report, a general
³ overview of drug master files.  I was not
⁴ asked to opine on the quality or the
⁵ content of Mylan's drug master file, so
⁶ it was irrelevant.
⁷     Q.   Okay.  That -- let me
⁸ clarify exactly what your assignment was
⁹ in this case, then, because it's nowhere
¹⁰ written in your report what your
¹¹ assignment was.
¹²         And to be honest, I'm a
¹³ little confused, because you're telling
¹⁴ me your assignment was to opine on drug
¹⁵ master files generally but not to opine
¹⁶ on Mylan's drug master file in any way in
¹⁷ this case; is that right?
¹⁸     A.   That's correct.  I was not
¹⁹ asked to opine on the quality of Mylan's
²⁰ drug master file.
²¹     Q.   And you did not, in fact,
²² opine on the quality of Mylan's drug
²³ master file in your report, did you?
²⁴     A.   I couldn't.  Because, one, I

Confidential Information Subject to Protective Order

Page 54

¹ wasn't asked to; and, two, I never saw
² the drug master file.
³      Q.   So since it's written
⁴ nowhere in your report, can you tell me
⁵ exactly what your assignment was in this
⁶ case?
⁷      A.   My assignment was to -- the
⁸ basic part of my assignment, the bulk of
⁹ it, was to talk about USP and the
¹⁰ background of USP, in terms of how USP is
¹¹ organized, USP's recognition in the Food,
¹² Drug and Cosmetic Act, and to give a
¹³ brief description, discussion of drug
¹⁴ master files and why -- why there are
¹⁵ drug master -- I talked about why there
¹⁶ are drug master files, types of drug
¹⁷ master files and so on.
¹⁸      I was also asked to comment
¹⁹ on Dr. Najafi's expert report.
²⁰      Q.   Were you asked to comment on
²¹ John Quick's expert report?
²²      A.   I was asked if I -- if I --
²³ if I wanted to comment on John Quick's,
²⁴ as well as Najafi, but I felt that

Page 55

¹ Quick's was more involved with GMPs,
² that was not my area of expertise at FDA.
³ So commenting on Najafi was more in line
⁴ with the function of my report and the
⁵ expertise that I have.
⁶      Q.   Okay.
⁷      MR. DAVIS:  I'm going to
⁸      mark Tab 2 as Exhibit-2, Jason.
⁹            - - -
¹⁰      (Whereupon, Exhibit
¹¹      Sheinin-2, No Bates, 1/12/22
¹²      Letter, Trischler to Counsel, was
¹³      marked for identification.)
¹⁴            - - -
¹⁵      MR. REEFER:  Okay.
¹⁶ BY MR. DAVIS:
¹⁷      Q.   Dr. Sheinin, this was a
¹⁸ letter from Jason's law firm that
¹⁹ accompanied the disclosure of your expert
²⁰ report.
²¹      Do you understand that?
²²      MR. REEFER:  Object to form.
²³      Why don't you start by asking if
²⁴      he's seen it before?

Page 56

¹ BY MR. DAVIS:
²      Q.   Have you seen this letter
³ before?
⁴      A.   I've not seen this letter
⁵ before, and I have never seen a letter
⁶ that looks like this.
⁷      Q.   Well, yeah, let me just
⁸ represent to you, then, that this was a
⁹ letter from Jason's law firm that was
¹⁰ delivered to us accompanying your expert
¹¹ report.
¹²      Do you see that your name is
¹³ referenced in there and it's addressed to
¹⁴ a number of plaintiffs' counsel in this
¹⁵ case?
¹⁶      MR. REEFER:  Object to form.
¹⁷      Lack of foundation.
¹⁸      THE WITNESS:  I see that my
¹⁹      name is on here, yes.  And it's --
²⁰ BY MR. DAVIS:
²¹      Q.   Okay.
²²      A.   -- talking about my expert
²³ report is also enclosed.
²⁴      Q.   If you look down at

Page 57

¹ Paragraph 2, it says that your report is,
² For purposes of rendering opinions as to
³ class certification issues and rebutting
⁴ the class certification opinions of the
⁵ class certification experts disclosed by
⁶ the plaintiffs' executive committee.
⁷      Do you see that?
⁸      A.   I see it.
⁹      Q.   Do you know what class
¹⁰ certification issues you address in your
¹¹ report?
¹²      MR. REEFER:  Object to form.
¹³      Beyond the scope.  Calls for a
¹⁴      legal conclusion.
¹⁵      THE WITNESS:  I don't know
¹⁶      what "class certification" means.
¹⁷ BY MR. DAVIS:
¹⁸      Q.   And the second part of that
¹⁹ is to rebut the reports of the
²⁰ plaintiffs' experts.
²¹      In your case, that's only
²² Dr. Najafi; is that right?  Is that your
²³ testimony?
²⁴      MR. REEFER:  Object to form.

Confidential Information Subject to Protective Order

---

1    Mischaracterizes testimony.
2         THE WITNESS:  I discuss
3    Dr. Najafi's report in my report,
4    yes.
5  BY MR. DAVIS:
6    Q.   And there's no other
7  plaintiffs' expert report that you both
8  reviewed and intend to rebut in your
9  report, is there?
10         MR. REEFER:  Object to form.
11  Foundation.
12         Go ahead, Doctor.
13         THE WITNESS:  That's
14    correct.
15  BY MR. DAVIS:
16    Q.   You mentioned, Dr. Sheinin,
17  that your educational background is that
18  you have a Ph.D. in organic chemistry; is
19  that right?
20    A.   That's correct.
21    Q.   Can you, at a very broad
22  level, speaking to a -- most certainly a
23  non-expert like me and Jason --
24         MR. REEFER:  That's right.

---

1  BY MR. DAVIS:
2    Q.   -- tell us -- tell us what
3  organic chemistry is?
4    A.   Organic chemistry is, in the
5  briefest of statements, is the chemistry
6  of carbon compounds.  That's probably the
7  easiest way to explain it.
8         There's different classes of
9  chemicals that are considered organic.
10  There's various functional groups.
11         I can't say 100 percent that
12  every organic chemical contains carbon,
13  but, for the most part, that's -- that's
14  true.  And it's -- involves reactions
15  using other organic chemicals as well as
16  non-organic chemicals to manufacture or
17  synthesize a second organic chemical and
18  sometimes maybe a third and a fourth.
19         That's what my -- my Ph.D.
20  thesis involved synthesizing a number of
21  compounds that were subsequently sent to
22  the National Cancer Institute for testing
23  for activity against -- against cancer.
24  And, unfortunately, none of the chemicals

---

1  I manu -- I synthesized had any activity.
2         I always felt that I was
3  going to get a job working for somebody
4  who is doing organic chemistry.  That
5  turned out not to be the case.  When I
6  joined FDA, we had an organic chemist in
7  our group, and he actually worked as a
8  functioning organic chemist.  I have
9  never worked as a functioning organic
10  chemist.
11         So it's -- I think it's
12  something that is fairly common,
13  certainly it is among people that I knew
14  who went to graduate school with me, they
15  don't necessarily end up working in what
16  your major was.
17         So I'm more of an analytical
18  chemist with knowledge of regulatory.
19  But I've never worked as an organic
20  chemist.
21    Q.   Right.  In fact, I think,
22  you know, in your brief FDA history you
23  gave me, your work with mass spec and
24  GC -- you know, coupling it with a GC in

---

1  the early '70s, that's more analytical
2  chemistry, right?
3    A.   Yes.
4    Q.   So harkening back to your
5  dissertation thesis days when you
6  synthesized a few compounds with the
7  hopes that they might have an effect on
8  cancer, did you work in the lab at all
9  in, you know, synthesizing those --
10  creating those chemical reactions to
11  synthesize those compounds?
12    A.   Oh, yeah.  I mean, that's
13  how I got the compounds.
14    Q.   So in working with -- would
15  you have worked with, like, reagents,
16  catalysts, solvents, all that business,
17  in order to create those chemical
18  reactions that would ultimately yield the
19  compound you wanted to create?
20         MR. REEFER:  Object to form.
21         THE WITNESS:  Yes.  I did
22    the synthesis myself.
23  BY MR. DAVIS:
24    Q.   So how would you know, in

---

Page 62

1 doing that, what to avoid mixing together
2 to create a dangerous reaction?  What
3 kind of materials would you look at,
4 aside from just your own educational
5 knowledge of how these substances
6 interact?
7          MR. REEFER:  Object to form.
8     Beyond the scope.
9          THE WITNESS:  I relied on my
10     advisor to give me advice on if
11     there was any danger or any
12     possible reactions that he
13     considered to be dangerous.
14 BY MR. DAVIS:
15     Q.   Did you rely on any kind of
16 written materials in addition to just
17 what your advisor told you?
18          MR. REEFER:  Object to form.
19     Beyond the scope.
20          THE WITNESS:  You know,
21     that's over 50 years ago, and I
22     can't remember if there was
23     anything written or not.  But I
24     relied on my advisor.

Page 63

1 BY MR. DAVIS:
2     Q.   Okay.  Do you know what an
3 MSDS is?
4     A.   Yes, I do.
5     Q.   Like a safety data sheet for
6 a particular substance?
7     A.   Yes.
8     Q.   Okay.  Is that something
9 that -- would those have existed at that
10 timeframe?
11     A.   As far as I can remember, I
12 don't believe there were safety data
13 sheets at that time.
14     Q.   If you were doing that kind
15 of organic chemistry today, is that
16 something you might want to look at, the
17 safety data sheets or MSDS?
18          MR. REEFER:  Objection.
19     Form.  Incomplete hypothetical.
20     Beyond the scope.
21          THE WITNESS:  I mean, if I
22     was doing organic chemistry today,
23     I would want to know if there was
24     any safety issues with the

Page 64

1     materials that I'm working with.
2     It's something that did not exist
3     in those days.
4 BY MR. DAVIS:
5     Q.   And if you were doing that
6 today, one of the most prominent
7 resources you could -- you could consult
8 would be the safety data sheet, or MSDS,
9 that accompanies whatever reagent or
10 catalyst it is that you're working with,
11 right?
12          MR. REEFER:  Object to form.
13     Beyond the scope.  Incomplete
14     hypothetical.
15          THE WITNESS:  I would have
16     to assume that I would look at
17     those, at least once, for any
18     chemical that I work with.  I
19     wouldn't have to keep going back
20     to look at them.
21 BY MR. DAVIS:
22     Q.   Okay.
23          MR. REEFER:  Hey, John, this
24     is Jason.  I had a venti coffee

Page 65

1 this morning.  We've been going
2 about an hour and 20 minutes.
3 Would you mind just taking a
4 five-minute bathroom break?
5          MR. DAVIS:  Sure.  Not a
6 problem.
7          Dr. Sheinin, do you need
8 five minutes or ten minutes?  Up
9 to you.
10          We can go off the record, by
11 the way.
12          VIDEO TECHNICIAN:  Going off
13 the record.  The time is
14 10:50 a.m.
15          - - -
16          (Whereupon, a brief recess
17 was taken.)
18          - - -
19          VIDEO TECHNICIAN:  We are
20 back on the record.  The time is
21 11:00 a.m.
22 BY MR. DAVIS:
23     Q.   Just one clean-up question,
24 Dr. Sheinin, before I move on.

Confidential Information - Subject to Protective Order

Page 66

1    Do you recall telling me
2  that you're not a CGMP expert?
3    A.   Yeah, I recall.
4    Q.   Okay.  So would I take that
5  to mean that you're not offering any
6  opinion in this litigation that Mylan
7  was, in fact, in compliance with CGMPs?
8    A.   I'm not offering an opinion
9  directly on whether they're in compliance
10  with GMPs.  I know that their product is
11  on the market.  I know that FDA has
12  inspected their facilities.  And I know
13  there was a warning letter, and I know
14  that they're back on the market.
15    That's pretty much beyond
16  what I know about Mylan and their GMPs.
17    Q.   But just to clarify, you're
18  not offering any kind of expert opinion
19  in this litigation that Mylan was in
20  compliance with CGMPs, despite stuff
21  that's tangential to that that you've
22  reviewed, correct?
23    A.   My expert report is
24  discussing drug master files and USP.  It

Page 67

1  does not discuss GMPs.  I'm not a -- I'm
2  not -- as I said and you agreed, I'm not
3  an expert in GMPs, and I'm not offering
4  to opine on it.
5    Q.   So, for example, you said
6  you reviewed the FDA warning letter
7  issued to Mylan Unit 8, which
8  manufactured valsartan API; isn't that
9  right?
10    A.   I looked at it.  I wouldn't
11  necessarily say -- I did not review it
12  in depth.  It was not something that I
13  needed for forming my opinions in my
14  expert report.  But I did look at it.
15    Q.   Right.  And would you have
16  seen the statement at the beginning of
17  that letter that the FDA observed CGMP
18  deviations at that facility, which was
19  the -- you know, the reason they were
20  sending the warning letter?
21    MR. REEFER:  Object to the
22  form.  Calls for speculation.
23    Go ahead --
24    MR. DAVIS:  Well, I'm not

Page 68

1  asking -- well, hang on, Jason,
2  I'm not asking him to speculate.
3  I'm just asking if he saw that
4  statement in the letter that he
5  reviewed.
6  BY MR. DAVIS:
7    Q.   Do you recall seeing that
8  statement in the letter that you -- in
9  the warning letter, Dr. Sheinin?
10    A.   I recall the warning letter.
11  Can you put it up on the screen?
12    Q.   Sure.
13    A.   So I can see the exact
14  language.  Or do we have it in our -- in
15  our package?
16    Q.   Just a second, I'll bring it
17  up.
18    MR. REEFER:  Do you have it
19  as an exhibit, John?
20    MR. DAVIS:  Yes.  That would
21  be Tab 15.
22    MR. REEFER:  One moment,
23  okay?
24    MR. DAVIS:  Yep.

Page 69

1    - - -
2    (Whereupon, Exhibit
3  Sheinin-3, MYLAN-MDL2875-003457,
4  11/5/19 FDA Warning Letter, was
5  marked for identification.)
6    - - -
7    MR. DAVIS:  I'm marking that
8  as Exhibit-3.
9    MR. REEFER:  John, I'm not
10  sure if there's a question
11  pending.  I'm sorry.
12    MR. DAVIS:  Sure.
13  BY MR. DAVIS:
14    Q.   Do you have the letter in
15  front of you, Dr. Sheinin?
16    A.   I do.
17    Q.   Do you recognize that to be
18  a copy of the November 5th, 2019, Unit 8
19  warning letter that you reference in
20  Exhibit B to your report?
21    A.   Yes.
22    Q.   And do you see the third
23  paragraph -- second and third paragraph
24  down, This warning letter summarizes

Confidential Information Subject to Protective Order

Page 70

1 significant deviations from CGMP for
2 APIs.  And, Because your methods and
3 facilities and controls for manufacturing
4 processing, packing or holding do not
5 conform to CGMP, your API are
6 adulterated.
7            Do you see those statements?
8       A.   I see them.
9       Q.   And because you're not
10 offering any kind of opinion that Mylan
11 was, in fact, in GMP compliance, you
12 don't take any issue with what the FDA
13 says here, do you?
14            MR. REEFER:  Object to form.
15 Mischaracterizes testimony.
16            THE WITNESS:  This -- this
17 Paragraph 2 and Paragraph 3, I
18 would say probably Paragraph 4,
19 with different dates is pretty
20 much standard boilerplate language
21 that's in every warning letter.
22       Mylan's valsartan product is
23 on the market, it's in conformance
24 with the requirements of the USP

Page 71

1       monograph for the API, as well as
2       for the tablets.  And the fact
3       that this language is in here,
4       it's in every warning letter that
5       I've seen.
6 BY MR. DAVIS:
7       Q.   Well, just like with your
8 report, Dr. Sheinin, you have some stock
9 language, for example, that we went over
10 this morning.
11            It doesn't make it any less
12 true, right?  It doesn't mean that the --
13 just because it's in every FDA warning
14 letter doesn't mean that this one issued
15 to Mylan, the FDA doesn't mean it when
16 they say that Mylan was not in GMP
17 compliance at Unit 8, correct?
18       A.   This is -- again, it's
19 boilerplate language that's in every
20 letter, every warning letter.  The fact
21 that FDA has allowed Mylan to come back
22 on the market, has not withheld anything
23 from Mylan, there are no import alerts
24 that -- over Mylan, and the fact that

Page 72

1 this is -- again, like in my report, this
2 is boilerplate language.  It's nothing
3 that forms the basis for my report.
4       Q.   So should I -- should I
5 give, for example, the boilerplate
6 language in your report less stock
7 somehow, or should I take that to
8 actually be language in your report?
9            MR. REEFER:  Object to form.
10 Compound.  Vague.
11            THE WITNESS:  You can -- you
12 can use that language in my report
13 in any way you like.  It's --
14 BY MR. DAVIS:
15       Q.   Well, I'm asking -- I'm
16 asking your opinion, Dr. Sheinin.
17            Are you telling me that the
18 language that you cribbed from an old
19 report, I should put less stock into
20 simply because you --
21            MR. REEFER:  Object to form.
22 BY MR. DAVIS:
23       Q.   -- simply because it's
24 boilerplate?

Page 73

1            MR. REEFER:  Object to form.
2 Argumentative.  Mischaracterizes
3 the testimony.
4            THE WITNESS:  Again,
5 that's -- it's typical language.
6 It's -- and the boilerplate
7 language here is just boilerplate
8 language.
9            It's -- the fact that FDA
10 let -- has let Mylan back on the
11 market says to me that whatever
12 deviations there were from current
13 good manufacturing practices are
14 such that FDA feels comfortable
15 with Mylan marketing the valsartan
16 products.
17 BY MR. DAVIS:
18       Q.   But that's just pure
19 speculation on your part.
20            You told me, Dr. Sheinin,
21 that you haven't looked at any follow-up
22 on this warning letter to see if it's
23 been closed out; and you told me you have
24 no idea what circumstances Mylan was

Confidential Information Subject to Protective Order

Page 74

1 allowed back on the market, right?
2         MR. REEFER:  Object to form.
3     John, you asked him questions
4     about this warning letter and now
5     you're yelling at him for trying
6     to answer them.
7         MR. DAVIS:  Well, no.  He's
8     told me, Jason, that he's not a
9     CGMP expert.  And I'm just trying
10    to elucidate what he means by that
11    with an example.
12        And my example here --
13        MR. REEFER:  Right.
14        MR. DAVIS:  -- is in this
15    warning letter that FDA issued to
16    Mylan, the FDA says that there's
17    significant CGMP deviations.
18 BY MR. DAVIS:
19    Q.   My question to you,
20 Dr. Sheinin, is, are you offering any
21 opinion that Mylan, in fact, during this
22 timeframe, was in CGMP compliance,
23 contrary to what the FDA says in this
24 warning letter?

Page 75

1         MR. REEFER:  Object to form.
2     Asked and answered.
3         THE WITNESS:  I'm not
4     offering any opinion, because I'm
5     not a GMP expert.
6 BY MR. DAVIS:
7     Q.   Okay.  Thank you.  Thank
8 you.
9         When did you first learn
10 anything about nitrosamines, Dr. Sheinin?
11    A.   I would have to say probably
12 in 2018 when I heard about the reports of
13 nitrosamines being in certain products,
14 FDA announcements.
15        I would think that's the
16 first time that I heard -- well, I
17 probably heard about them in graduate
18 school, but that's -- that's neither here
19 nor there.
20    Q.   Well, that's actually --
21    A.   I knew what a nitrosamine
22 was.
23    Q.   Sorry, I didn't mean to cut
24 you off there.

Page 76

1         Go ahead.
2     A.   But the first time I heard
3 about any issues with nitrosamines was in
4 2018.
5     Q.   Well, my question was
6 actually the more basic one, which is
7 when you first learned what a nitrosamine
8 compound was, not whether there were any
9 issues in medications.
10        And it sounds like the
11 answer is at some point in graduate
12 school for organic chemistry?
13    A.   Yeah, I mean, I -- that's a
14 functional group, and it's -- a
15 nitrosamine, you have to have an amine,
16 and it's -- so that's included in
17 functional groups in organic chemistry.
18    Q.   Right.
19    A.   It's nothing that I worried
20 about as a graduate student.
21    Q.   Right.  You would have to
22 have --
23    A.   It was just a functional
24 group.

Page 77

1     Q.   Sorry.
2         You would have to have an
3 amine and a nitrosating agent under
4 acidic conditions, right?
5     A.   That's nothing that I
6 studied in graduate school.  I knew what
7 a nitrosamine was.  I didn't know how
8 they formed or what reactions it would
9 take.
10    Q.   Do you know who Dr. Edwin
11 Gump is at USP?
12    A.   The name is not familiar.
13 I've been gone for over 15 years, so he
14 must be new or --
15    Q.   If that --
16    A.   -- since I left.
17    Q.   Sorry.
18        Well, he's stated that
19 nitrosamines can be formed, quote, Very
20 simply through really simple chemistries.
21        Do you have any reason to
22 disagree with that statement about how
23 nitrosamines are formed?
24        MR. REEFER:  Object to form.

Confidential Information Subject to Protective Order

Page 78

Beyond the scope.

THE WITNESS:  I'd have to
see what document -- what's his
name, Gump, Dr. Gump that
you're --

BY MR. DAVIS:

Q.   Dr. Edwin Gump.

A.   -- referring to?  I'd want
to try to see his documents and evaluate
it for myself.

Q.   Okay.

MR. DAVIS:  Let's mark Tab
9, Jason, as Exhibit-4.

- - -

(Whereupon, Exhibit
Sheinin-4, No Bates, USP Announces
Approval of Chapter on
Nitrosamines Impurities, was
marked for identification.)

- - -

BY MR. DAVIS:

Q.   And I apologize,
Dr. Sheinin, it appears that when I
printed this to PDF that part of the

Page 79

article's title was cut off.

It reads, USP Announces
Approval of Chapter on Nitrosamines
Impurities, dated December 3rd, 2021.

Do you see that?

A.   Yes, I do.

Q.   And then do -- you'll see in
the third paragraph, there's a quote
attributed to Edwin Gump, Ph.D., vice
president of the Small Molecules
Department at USP?

A.   Yes.

Q.   And he says that, One of the
things that makes nitrosamines really
tricky is that they actually can be
formed very simply through really simple
chemistries.

Do you see that?

A.   Yes.

Q.   You don't have any reason
to -- you know, putting on your organic
chemistry hat, do you disagree with that
statement in any way?

MR. REEFER:  Object to form.

Page 80

Beyond the scope.

THE WITNESS:  His statement
is nothing that I use in my report
to offer my opinion in this case.

I'm not sure that it's
really that simple.  I would --
well, I'm going to leave it at
that.  It may be simple, it may
not be quite so simple.

BY MR. DAVIS:

Q.   And in writing your report
in this case, did you refresh yourself on
the chemistry by which nitrosamines are
formed, specifically NDMA and NDEA?

A.   I may have looked at
whatever documents were provided and --
but I did not use any information as to
how nitrosamines form, to form the basis
for my opinion that's in my written
report.  It's not something that I was
concerned with.

Q.   Did you -- in preparing your
report, did you look to see how NDEA
specifically was formed in Mylan's

Page 81

valsartan API?

A.   I did not specifically look
to see how NDEA was formed in Mylan's
product.

Q.   Do you have -- do you have
an idea of how NDEA was formed in Mylan's
product?

MR. REEFER:  Objection.
Beyond the scope.  Calls for
speculation.

THE WITNESS:  I'm not a
process chemist, so I am not
equipped to make a determination
on how NDEA was formed.

And it just did not have any
influence or input into the basis
of my report.  So it's beyond what
I was asked to opine on.

BY MR. DAVIS:

Q.   I think I know the answer to
this question.

But you're not asserting any
kind of opinion, one way or the other,
regarding the genotoxic -- genotoxicity

Confidential Information Subject to Protective Order

Page 82

1 of NDMA or NDEA, are you?
2      A.   I may be a lot of things,
3 but I'm not a toxicologist.  And the --
4 whether or not it's a potential genotoxic
5 impurity or not is beyond my expertise.
6      Q.   Are you familiar with -- and
7 I think you have already mentioned it
8 just in passing today, but you're
9 familiar with ICH guidelines, correct?
10      A.   I'm very familiar, well,
11 with at least some of the ICH quality
12 guidelines.
13      Q.   Those would be the ones that
14 are ICHQ?  That start with ICHQ?
15      A.   That's correct.
16      Q.   Are you familiar with
17 ICH M7?
18      A.   I know what M7 is.  I would
19 not say that I'm really familiar with it.
20      Q.   Did you look at it in
21 preparing your expert report in this
22 case?
23      A.   I did not.
24      MR. DAVIS: Let me mark that

Page 83

1      as Tab 7 -- sorry, that's Tab 7,
2      Jason.  I'm going to mark that as
3      Exhibit-5.
4           - - -
5      (Whereupon, Exhibit
6      Sheinin-5, No Bates, M7(R1)
7      Assessment and Control of DNA
8      Reactive (Mutagenic) Impurities in
9      Pharmaceuticals to Limit Potential
10      Carcinogenic Risk, Guidance for
11      Industry, was marked for
12      identification.)
13           - - -
14 BY MR. DAVIS:
15      Q.   Do you have that in front of
16 you, Dr. Sheinin?
17      A.   Yes, I do.
18      Q.   Okay.  The title of -- the
19 specific title of the guidance is,
20 Assessment and Control of DNA Reactive
21 (Mutagenic) Impurities in Pharmaceuticals
22 to Limit Potential Carcinogenic Risk.
23           Do you see that?
24      A.   I see it.

Page 84

1      Q.   If you'd flip to Page 5,
2 Dr. Sheinin, there's a header titled,
3 General Principles.
4      A.   Okay.
5      Q.   Take a few moments, if you
6 would, to read that section, that's
7 Subsection 3, General Principles, and
8 it's on Page 5 and then goes down to
9 the -- about the middle of Page 6.
10           And let me know when you're
11 ready to discuss.
12      A.   Okay.
13           Okay.  I finished reading
14 it.
15      Q.   Let me start with a -- do
16 you see that this guidance refers
17 specifically to nitrosamines?
18           MR. REEFER:  Object to form.
19      Beyond the scope.  Lack of
20      foundation.
21           THE WITNESS:  I see that it
22      mentions N-nitroso compounds,
23      among others.
24 BY MR. DAVIS:

Page 85

1      Q.   And it refers to that group
2 that includes N-nitroso compounds as the
3 cohort of concern of high-potency
4 mutagenic carcinogens.
5           Do you see that?
6           MR. REEFER:  Object to form.
7      Beyond the scope.  Lack of
8      foundation.
9           THE WITNESS:  I see it, but
10      it's not -- I'm not a
11      toxicologist, so I can't evaluate
12      how much the concern is.  It's --
13      I can see the words on the paper,
14      but I'm not in a position to be
15      able to judge whether they're a
16      risk or not.
17 BY MR. DAVIS:
18      Q.   And I'm not asking you to,
19 Dr. Sheinin.
20           The only purpose of this is
21 I just want to ask you to confirm that,
22 on its face, nitrosamines, N-nitroso
23 compounds are subject to this guidance?
24           MR. REEFER:  Object to form.

Confidential Information Subject to Protective Order

Page 86

1  Beyond the scope.  Lack of
2  foundation.
3      THE WITNESS:  I'm not a
4  toxicologist, but I can see the
5  words on this paper -- on this
6  page.  It says, N-nitroso
7  compounds.
8  BY MR. DAVIS:
9      Q.   Right.  And on its face,
10  that means that N-nitroso compounds are
11  subject to what's set forth in this ICH
12  M7 guidance, correct?
13      MR. REEFER:  Objection.
14  Same objections.
15      THE WITNESS:  I can see on
16  this page that, yes, it says
17  N-nitroso compounds.  So N-nitroso
18  compounds are included in this
19  guidance.
20      But that's all I can say.
21  I'm not in a position to be able
22  to evaluate anything involved with
23  N-nitroso compounds.
24  BY MR. DAVIS:

Page 87

1      Q.   Right.  But you would agree
2  that this guidance does require
3  manufacturers to do that evaluation,
4  correct?
5      MR. REEFER:  Object to form.
6  Beyond the scope.  Foundation.
7      Go ahead, if you know.
8      THE WITNESS:  Again, I'm not
9  a toxicologist, so what would need
10  to be done in terms of N-nitroso
11  compounds is beyond my expertise.
12  And it does not form the basis for
13  anything that's in my report.
14  BY MR. DAVIS:
15      Q.   The title of the guidance
16  is, Assessment and Control of DNA
17  Reactive Impurities.
18      Do you have any opinion, one
19  way or the other, as to whether Mylan
20  appropriately assessed or controlled for
21  potential nitrosamine impurities in its
22  valsartan?
23      A.   I'm not a toxicologist, so I
24  really can't offer an opinion on whether

Page 88

1  Mylan did or did not do what you think
2  that they should have done in terms of
3  N-nitroso compounds.  It's not anything
4  that I used in my report, and it's beyond
5  my expertise.
6      Q.   Okay.  You can put that
7  away.  We'll move on.
8      You mentioned at the FDA
9  that you acquired a mass spec instrument
10  in the early 1970s, right?
11      A.   Yes.
12      Q.   And then -- and then you
13  coupled that with a gas chromatography
14  system?
15      A.   The instrument
16  manufacturers, Varian, is the one who
17  coupled it.  It's nothing that I would be
18  capable of doing.
19      But, yes, the company did
20  couple the GC with the mass spectrometer.
21      Q.   So were you telling me,
22  then, that the FDA acquired a GC-MS that
23  was coupled in the early '70s as well?
24      A.   No.  They -- we had gas

Page 89

1  chromatographs already.  We bought the
2  mass spectrometer.  And I don't recall if
3  it was a package to get the gas
4  chromatograph, but I'm thinking we got
5  the mass spectrometer first and then
6  Varian came out with a mechanism to
7  couple a gas chromatograph to a mass
8  spectrometer.
9      And the mass spectrometer
10  that we had operated in -- you had to
11  have a vacuum, and trying to take the
12  effluent from a gas chromatograph and
13  putting it into a mass spectrometer was
14  not something that we would have been
15  able to do.  And it was something that
16  eventually the instrument manufacturers
17  were able to do.
18      I don't believe that when we
19  got our mass spectrometer initially that
20  we had the capability to couple it to a
21  gas chromatograph.
22      Q.   But that was done a little
23  bit later in the 1970s, it sounds like?
24      A.   Yeah.  Yeah.

Confidential Information Subject to Protective Order

Page 90

1    Q.   Is the sensitivity -- was
2  the sensitivity of the mass spectrometer
3  back then substantially different from
4  what it is today?
5    A.   I don't know, but I would
6  expect that advances have been made in
7  mass spectrometry as well as in other
8  types of detectors for gas
9  chromatography.
10         It's just the nature of the
11  advancement in science that sensitivity
12  is always being improved.
13    Q.   Well, at least one area
14  that's developed is -- are you familiar
15  with, like, predictive modeling, where
16  you can run a chemical structure through
17  a database and it will flag -- flag it as
18  potentially mutagenic or genotoxic?
19         MR. REEFER:  Object to form.
20  Beyond the scope.  Lack of
21  foundation.
22         THE WITNESS:  I'm not
23  familiar with that type of
24  database.

Page 91

1  BY MR. DAVIS:
2    Q.   Okay.  Have you ever heard
3  of Derek Nexus?
4    A.   I've heard of it.  I'm not
5  familiar with it.
6    Q.   What about QSAR generally?
7    A.   What about what?
8    Q.   Quantitative
9  structural-activity relationships, QSAR.
10    A.   Oh.  I've heard of it.  I
11  really don't know anything about it.
12         Again, I'm not a
13  toxicologist, so I -- I've heard of it.
14  I don't know how it works, and I don't
15  know how to use it.
16    Q.   You would agree, wouldn't
17  you, that the GC and mass machines that
18  have existed since they were coupled in
19  the '70s, or even before then, that those
20  were capable of detecting nitrosamines,
21  correct?
22         MR. REEFER:  Object to form.
23  Beyond the scope.  Incomplete
24  hypothetical.

Page 92

1         THE WITNESS:  I would have
2  to know how much of any given
3  ingredient or chemical we're
4  talking about, in terms of whether
5  it could be detected or not.
6         It would -- a lot would
7  depend on what's in the column
8  that's in your gas chromatograph,
9  is it going to come off?  It's
10  very hypothetical, and I really
11  can't give you an opinion one way
12  or the other.
13  BY MR. DAVIS:
14    Q.   That's not something you
15  evaluated in this case, whether GC-MS
16  machines were capable of identifying
17  NDEA, NDMA in Mylan's valsartan in the
18  quantities they were present therein?
19         MR. REEFER:  Same objection.
20         THE WITNESS:  That's
21  correct, it's nothing that I used
22  to form my opinions in my report.
23         MR. DAVIS:  I'm going to
24  mark Tab 11, Jason, as Exhibit-6.

Page 93

1              -  -  -
2         (Whereupon, Exhibit
3  Sheinin-6, No Bates, Valsartan
4  Guidance, was marked for
5  identification.)
6              -  -  -
7         MR. REEFER:  He has it,
8  John.  He's just reviewing it.
9         MR. DAVIS:  Okay.  Sure.
10  BY MR. DAVIS:
11    Q.   Do you recognize this,
12  Dr. Sheinin, as the 2020 version of the
13  USP standard for valsartan?
14    A.   I see that it's the
15  monograph, official as of May 1st of
16  2020, USP, yes.
17    Q.   Is this the USP that's
18  currently effective?
19    A.   I don't know if this is the
20  one that's currently effective.  I'd have
21  to go online to the current -- to the USP
22  online to see if there was a new version
23  since May 1st of 2020.  I can't say yes
24  or no.

1    Q.   Do you see at the top there,
2  there's an official status that says,
3  Currently official on 28 January 2022?
4    A.   Yes.
5    Q.   Okay.  Does that suggest to
6  you that, at least as of that date, that
7  that was the current USP monograph for
8  valsartan?
9    A.   Yes.
10    Q.   Is there any place in this
11  2020 monograph that mentions anything
12  about nitrosamines at all?
13    A.   No.
14    Q.   It's not your opinion, is
15  it, then, Dr. Sheinin, that nitrosamines
16  for this monograph only need to be
17  controlled at not more than .1 percent,
18  is it?
19        MR. REEFER:  Objection to
20    form.  I think it's a double
21    negative.
22        But go on, if you
23    understood.
24        THE WITNESS:  Can you repeat

1    your question?
2  BY MR. DAVIS:
3    Q.   Okay.  It's not your
4  opinion, is it, Dr. Sheinin, that
5  nitrosamines only need to be controlled
6  at point -- not more than .1 percent, is
7  it?
8        MR. REEFER:  Object to form.
9    Do you mean per the monograph or
10    in general?
11        MR. DAVIS:  I'm asking --
12    I'm asking him generally.
13  BY MR. DAVIS:
14    Q.   My question is, you've told
15  me that nitrosamines aren't mentioned
16  anywhere in this monograph.
17        My question is, does that
18  mean, in your opinion, Dr. Sheinin, that
19  nitrosamines only need to be controlled
20  at not more than .1 percent, as stated in
21  this impurity section on the USP
22  monograph?
23    A.   It's not something that I
24  feel I can address, because I'm not a

1  toxicologist and I don't know at what
2  level those nitrosamines would have to be
3  controlled.
4    Q.   They would be -- in other
5  words, what you're telling -- let me
6  crystallize what you're telling me.
7        I think what you're telling
8  me is that, aside from this USP
9  monograph, there would be other -- other
10  regulatory items, so to speak, that would
11  set different limits for nitrosamines,
12  correct?
13    A.   There's always requirements
14  in an NDA or an ANDA application, in the
15  specification, that has tests that are
16  not included in the USP monograph.  So
17  it's entirely possible that there could
18  be additional information in what's filed
19  at FDA than what's in a USP monograph.
20    Q.   Right.  And, I guess, just
21  to tag a general point on that, the USP
22  monograph is not the end-all, be-all in
23  terms of tests that are required to be
24  done on a -- in this case, an API for

1  valsartan, or another substance, correct?
2        MR. REEFER:  Object to form.
3    Go ahead.
4        THE WITNESS:  According to
5    the Food, Drug and -- Federal
6    Food, Drug and Cosmetic Act, a
7    drug product or a drug substance
8    or an API, if you will, if there
9    is a USP monograph, that material
10    has to meet the requirements in a
11    USP -- in the USP monograph.
12        FDA has the authority to ask
13    for additional requirements in the
14    specification that's approved
15    generally.  Companies include
16    tests and procedures in their drug
17    application that are not included
18    in the USP monograph.
19  BY MR. DAVIS:
20    Q.   Right.  There are additional
21  tests and limits that can apply that just
22  simply aren't in the USP monograph,
23  correct?
24    A.   Yes, there are -- there are

Confidential Information - Subject to Protective Order

Page 98

1  tests and procedures and acceptance
2  criteria in the specification that's
3  included in an approved application that
4  are not in the USP.
5      Q.   And in the case of N-nitroso
6  compounds specifically, we just saw ICH
7  M7, which provides some guidance on
8  testing and limits to control for
9  nitrosamine impurities specifically per
10 that guidance, right?
11     MR. REEFER:  Object to form.
12     Beyond the scope.  Lack of
13     foundation.
14     THE WITNESS:  I saw what was
15     on -- whatever -- the Page 5 of
16     that guidance, that it mentioned
17     N-nitroso compounds.
18 BY MR. DAVIS:
19     Q.   You list a number of Mylan
20 fact witness depositions in your Exhibit
21 B to your report.
22     Do you recall listing those?
23     A.   I recall that they are on
24 the list and they are things that counsel

Page 99

1  provided to me.
2      Q.   Did you ask counsel if that
3  was all of the Mylan fact witness
4  depositions that have been taken in the
5  case?
6      A.   I did not.
7      Q.   You don't list the
8  deposition of Wayne Talton.
9      Is there -- did you know
10 that he was deposed in this case?
11     A.   The name is not familiar to
12 me.
13     Q.   You wouldn't know him as
14 Mylan's regulatory affairs corporate
15 witness in this case?
16     A.   No, I would not.
17

Page 100

22     MR. DAVIS:  Let me mark Tab
23     12, Jason.  That will be
24     Exhibit-7.

Page 101

1         -  -  -
2      (Whereupon, Exhibit
3  Sheinin-7, MYLAN-MDL2875-00705126,
4  3/14/19 Cover Letter for Master
5  File GDUFA Complete Response
6  Letter, was marked for
7  identification.)
8         -  -  -
9      MR. REEFER:  This is being
10 marked as 7, right, John?
11     MR. DAVIS:  That's correct,
12 Exhibit-7.
13     MR. REEFER:  Okay.  I'm just
14 making sure I was keeping count.
15 BY MR. DAVIS:
16     Q.   Dr. Sheinin, you'll see
17 there's a yellow exhibit sticker -- or
18 maybe it's not yellow if it printed in
19 black-and-white, but there's a sticker on
20 the first page that says Exhibit
21 Plaintiff Talton-11.
22     Do you see that on the top
23 right corner of the very first page of
24 the document?

Confidential Information Subject to Protective Order



Page 102

1    A.   Yeah.
2         PL-Talton-11?
3    Q.   Right.
4    A.   Yes, I see it.
5    Q.   And you'll see that the --
6 yes.
7         And you'll see that the file
8 name on that page of the file, as it was
9 produced to us by Mylan, says, DMF
10 Quality Information Amendment 20190314?
11   A.   Yes.
12   Q.   Okay.  If you go to the
13 fourth page of the document, you'll see a
14 header, valsartan DMF Number 018253.  And
15 then, Response to valsartan DMF letter,
16 dated February 5th, 2019.
17        Do you see that?
18   A.   Yes.
19



Page 106

1

BY MR. DAVIS:
Q.   Right.  And that's because

Page 108

1

7  BY MR. DAVIS:
8      Q.   Turning to your report for a
9  second, Dr. Sheinin, in Paragraphs 64 to
10  66 -- and I'm going to paraphrase you
11  here, and feel free to take issue with my
12  paraphrasing if you'd like, but --
13      A.   Which paragraphs again?
14      Q.   Sure.  Paragraphs 64 through
15  68, under the header, Mylan's Valsartan
16  API Manufactured Between Market Entry in
17  2012 and the Recalls in 2018 Complied
18  With the Standards and Specifications in
19  Place at the Time of Manufacture.
20      A.   Yes.
21      Q.   You write there in that
22  section -- or one of the things you write
23  is that the valsartan USP monograph did
24  not contain any testing or acceptance

Page 107

1  counsel didn't provide you Mr. Talton's
2  testimony and this exhibit, correct?
3          MR. REEFER:  Object to form.
4      Argumentative.  Beyond the scope.
5      Foundation.
6          THE WITNESS:  I have not
7      seen this document before.  So,
8      yes, I did not receive it.  I've
9      not seen it.
10  BY MR. DAVIS:
11

Page 109

1  criteria for nitrosamine content.
2          And I'm specifically guiding
3  you to Paragraph 66.
4          Do you see that?
5      A.   Yes.
6      Q.   Why is that relevant to you?
7  What's the point of having that in your
8  report?
9      A.   The relevance is that I'm
10  opining on the fact that Mylan's
11  valsartan API, manufactured between
12  market entry in 2012 and the recalls in
13  2018, complied with the standards and
14  specifications in place at the time of
15  the manufacture.
16          So it's relevant in that
17  there was no mention in the USP monograph
18  of the need to test for nitrosamines.
19      Q.   Okay.  But that doesn't mean
20  that Mylan's valsartan was okay simply
21  because it met the USP monograph,
22  correct?
23          MR. REEFER:  Object to form.
24      Vague.

Confidential Information Subject to Protective Order

1    THE WITNESS:  It meant that
2 the -- Mylan's valsartan met the
3 USP monograph prior to recalls of
4 2018, and Mylan's valsartan
5 products are on the market today.
6 They meet the USP monograph.  They
7 meet the specifications in the
8 FDA-approved applications.  They
9 have USP on the label of the --
10 both the drug product, valsartan
11 tablets USP, and they also include
12 the USP on the drug substance,
13 valsartan USP.
14    So at this point I've lost
15 track of what your initial
16 question was.
17 BY MR. DAVIS:
18    Q.   Well, sure, let me -- let me
19 ask it this way.
20    Is it your testimony,
21 Dr. Sheinin, that between Mylan's entry
22 on the market in 2012 and the time of
23 recall in late 2018/early 2019, that
24 nitrosamines only had to be controlled at

1 not more than .1 percent per the USP
2 monograph?
3    A.   The monograph, as well as
4 the specification in the approved
5 application, includes, in the impurities
6 section, a requirement for any unknown
7 impurity not more than 0.1 percent.
8    So in order to meet the
9 requirements of the USP monograph and the
10 ANDA specification for the API, any other
11 unknown impurity would need to be
12 controlled to not more than 0.1 percent.
13    Q.   So it is your opinion, then,
14 that during that timeframe Mylan only had
15 to control nitrosamine impurities at not
16 more than .1 percent?
17    Are you saying that the USP
18 standard governs solely Mylan's
19 marketability of its products?
20    A.   I'm not equipped to discuss
21 the marketability of a product.  I'm a
22 chemist, that's not my area.
23    But in order for Mylan to be
24 on the market, they have to meet the USP

1 monograph and they have to meet the
2 specification requirements in the
3 approved application.
4    Q.   And the approved application
5 here is the ANDA, correct?
6    A.   Correct.
7    Q.   And that references the DMF
8 in this case by Mylan, which you said you
9 didn't review, correct?
10    A.   Correct.  Because drug
11 master files are not approved or not --
12 and not not approved.
13    Q.   Well, in this case, Mylan --
14 Mylan's ANDA referenced the drug master
15 file, so it became incorporated into the
16 ANDA.
17    Do you understand that?
18    A.   That's correct.  And
19 that's -- that's the way it works.
20    But DMFs by themselves are
21 not approved or not -- and not not
22 approved.  The FDA takes no -- no
23 regulatory action on drug master files.
24    Q.   Right.  But they would have

1 taken an action on the ANDA in this case,
2 which incorporated, by reference, the
3 drug master file, correct?
4    A.   Yeah.  As I believe is
5 included in my -- in my expert report,
6 that when there's deficiencies in a drug
7 master file, the NDA or ANDA holder -- or
8 it's possible to have a DMF that
9 references another DMF.
10    So however it works, the FDA
11 would say in a letter to the applicant
12 that there's issues or deficiencies in
13 the drug master file, and the FDA would
14 send a detailed letter to the drug master
15 file holder detailing what those
16 deficiencies or issues are.  But they
17 would not communicate to the NDA or ANDA
18 applicant what those deficiencies are.
19    And I think that's included
20 in my report.  So that's how that works.
21    Q.   Well, sure.  But what I was
22 asking was whether the -- in the setup
23 that Mylan had, where they chose to
24 submit an ANDA and then incorporate, by

Confidential Information Subject to Protective Order

Page 114

¹ reference, their drug master file, that's
² submitted with the ANDA to the FDA,
³ correct, and reviewed by the FDA as part
⁴ of the ANDA review process, is it not?
⁵     A.   I don't think that's exactly
⁶ right.
⁷         The drug master file is
⁸ submitted separately to the agency, and
⁹ there's a letter authorizing reference to
¹⁰ the drug master file that's included in
¹¹ the ANDA.  But the ANDA and the drug
¹² master file are not submitted at the same
¹³ time to the same place.
¹⁴     Q.   Okay.  Well, taking that,
¹⁵ that they can come in waves -- I take
¹⁶ your point there.
¹⁷         The point -- the point I'm
¹⁸ trying to make, though, is that when the
¹⁹ ANDA is submitted -- let's say the drug
²⁰ master file is submitted a month
²¹ beforehand.  When the ANDA is submitted,
²² that makes reference and incorporates by
²³ reference the drug master file, that
²⁴ becomes, essentially, part of the ANDA

Page 115

¹ submission that the FDA reviews in
² determining whether to approve the ANDA,
³ correct?
⁴     A.   I wouldn't say -- well, from
⁵ a -- I'm not a lawyer, so I can't say how
⁶ that's incorporated -- a drug master file
⁷ is incorporated into the application.
⁸         But the drug master file may
⁹ or may not be reviewed for a given ANDA.
¹⁰ It depends on whether the drug master
¹¹ file has been reviewed in the past and
¹² found to be acceptable.  So when a new
¹³ ANDA comes in, that drug master file may
¹⁴ or may not be reviewed.  It depends --
¹⁵     Q.   Well, let's -- well, let's
¹⁶ take Mylan's first ANDA here that was
¹⁷ approved.  There were three ANDAs.
¹⁸         You're familiar with that,
¹⁹ right?
²⁰     A.   Yes.
²¹

Page 116

¹
¹³     Q.   Okay.  And you just told me
¹⁴ you haven't reviewed the ANDAs in any
¹⁵ particular detail and you haven't
¹⁶ reviewed the DMF at all, correct?
¹⁷     A.   Correct.
¹⁸     Q.   Let's say, Dr. Sheinin, that
¹⁹ there was a discrepancy between the
²⁰ impurity limits in the USP monograph and
²¹ the limits approved or set by the FDA,
²² whether approving an ANDA or in some
²³ other guidance document or official FDA
²⁴ document that sets limits, which would

Page 117

¹ control in that instance?  Would the USP
² monograph limit control or would the FDA
³ approved limit control?
⁴     A.   If I remember correctly, the
⁵ USP acceptance criteria would control.
⁶ But I'm not 100 percent certain of that.
⁷         MR. DAVIS:  I'm going to
⁸ mark Tab 10, Jason, as Exhibit-8.
⁹         - - -
¹⁰         (Whereupon, Exhibit
¹¹ Sheinin-8, No Bates, Impurities in
¹² Drug Products and Drug
¹³ Substances - A USP Approach, was
¹⁴ marked for identification.)
¹⁵         - - -
¹⁶ BY MR. DAVIS:
¹⁷     Q.   Do you have this set of USP
¹⁸ slides in front of you, Dr. Sheinin?
¹⁹     A.   I do.
²⁰     Q.   Do you see that it's titled,
²¹ Impurities in Drug Products and Drug
²² Substances - A USP Approach?
²³     A.   Yes.
²⁴     Q.   Do you know who

Confidential Information Subject to Protective Order

---

1  Dr. Ravichandran is?
2      A.   I do.  I hired him.
3      Q.   Have you seen this
4  presentation before?
5      A.   I don't believe I have.
6          Do you know where it was
7  given?
8      Q.   You might see in very, very
9  grayed-out text on the first page that
10  says, Last update, March 2018.
11         Do you see that?
12     A.   On the first page here of
13  the exhibit?  I don't see anything about
14  that.
15     Q.   Okay.  It might be too
16  grayed out in the way it printed.
17         I'll represent to you that
18  the document --
19     A.   Oh, yeah.  It's very, very
20  light.  I can't -- I can't see that.
21     Q.   And then even smaller text
22  on the bottom right corner of each page,
23  also grayed out, is a, Copyright 2020,
24  USP.

1          Do you see that?
2      A.   I see something.  I can't
3  tell you what it says.
4      Q.   Okay.  Do you hold
5  Dr. Ravichandran in high regard?
6          MR. REEFER:  Object to form.
7          THE WITNESS:  Yes.
8  BY MR. DAVIS:
9      Q.   You think he's quite
10  knowledgeable?
11         MR. REEFER:  Object to form.
12     Vague.
13         THE WITNESS:  I think he's
14     knowledgeable.  I don't know that
15     he's more or less knowledgeable
16     than other scientists at USP.
17  BY MR. DAVIS:
18     Q.   Do you think he's quite
19  knowledgeable regarding the USP approach
20  to impurities and drug products and drug
21  substances, which is the title of this
22  presentation?
23         MR. REEFER:  Object to form.
24     Vague.  Foundation.

1          THE WITNESS:  I think he's
2      knowledgeable to the point that
3      his supervisor approved giving
4      this presentation.
5          Again, I can't say that he's
6      more or less knowledgeable about
7      the topic than other scientists at
8      USP.  It's -- I -- there's only a
9      handful of USP scientists who are
10     still there from when I left.
11  BY MR. DAVIS:
12     Q.   Flip to Page 9 as it's
13  numbered on these slides.
14         And it's, again, in very
15     small numbering, gray text in the bottom
16     right corner.  You'll see a slide that's
17     titled, Contents.
18         MR. REEFER:  John, if you're
19     going to ask questions about, you
20     know, the substance of this, can
21     we have an opportunity to go
22     through it?  I think Dr. Sheinin
23     said he had not seen the
24     presentation before.

1          MR. DAVIS:  I mean, sure.
2      It's 90 pages, Jason, and I only
3      have questions regarding, at most,
4      a couple of them.  So I'm not
5      sure --
6          MR. REEFER:  All right.
7          MR. DAVIS:  -- if fully
8      reviewing the document in
9      different aspects of it will
10     pertain to what I want to talk
11     about.
12         I mean, what if we -- what
13     if we did this, I'll ask my
14     questions, and if Dr. Sheinin
15     wants to review the pages
16     surrounding that for context, I'm
17     happy to let him do that.
18         MR. REEFER:  Yeah.  John,
19     I'm not trying to interrupt you.
20     I just want to give him a fair
21     opportunity based on his testimony
22     he hadn't seen it before.
23         So if the doctor says that,
24     you know, he needs to take a

Page 122

1 minute to understand it, I just
2 ask that you let him do so.
3 That's all.
4          Fair enough?
5          MR. DAVIS:  Fair enough.
6          MR. REEFER:  Cool.  Thank
7 you.
8 BY MR. DAVIS:
9      Q.   So you're at Page 9, the
10 table of contents for this presentation,
11 Dr. Sheinin?
12      A.   I see on Page 3 of what
13 you've given me something that says,
14 Contents.  I don't know what's -- I can't
15 see any page numbers.
16      Q.   Yes.  Is it -- did it print
17 out for you as four slides to a page?
18      A.   Two slides to a page.
19      Q.   Two slides to a page.
20      A.   Yes.
21      Q.   Okay.  I see.
22          So the contents section
23 actually appears twice, it appears.  So
24 we can -- we can stick on the one you're

Page 123

1 on.
2          And, I guess, do you see
3 where it says -- there's a header,
4 Guidelines, guidances?  And it says, ICH
5 FDA, below that?
6      A.   Yes.
7      Q.   Why would -- why would
8 Dr. Ravichandran include ICH/FDA
9 guidelines and guidances in a
10 presentation that's titled, A USP
11 Approach to Impurities?
12          MR. REEFER:  Object to form.
13 Foundation.  Calls for
14 speculation.
15          THE WITNESS:  I don't know
16 why he included them.  I'd have to
17 ask him why he included this as a
18 topic.
19 BY MR. DAVIS:
20      Q.   Why would they be --
21      A.   I'm not --
22      Q.   Why would they be --
23      A.   I'm not in a position --
24          MR. REEFER:  Can you let him

Page 124

1 finish, John?  Sorry about that.
2          MR. DAVIS:  Yes, go ahead.
3          THE WITNESS:  I'm not in a
4 position to be able to say why he
5 included them.  I don't know.
6 BY MR. DAVIS:
7      Q.   Why would -- let me ask it
8 this way, then:  Why would ICH/FDA
9 guidelines and guidances be germane to
10 discussing in a presentation titled, A
11 USP Approach to Impurities?
12          MR. REEFER:  Object to form.
13 Foundation.  Calls for
14 speculation.
15          THE WITNESS:  I can't tell
16 you exactly why.  I can tell you
17 that there were times when ICH
18 created a guidance, in FDA
19 perspective, in ICH perspective,
20 when they created a guideline
21 where USP eventually modified a
22 general chapter to be in agreement
23 with what ICH did.
24          So that's the only reason I

Page 125

1 might be able to offer.  But I
2 don't know -- I don't know what
3 was in Ravi's mind as to why he
4 included them in this
5 presentation.  It's beyond my
6 capability to tell you why.
7 BY MR. DAVIS:
8      Q.   Okay.  Turn, if you would,
9 to the slide that's numbered 36.
10      A.   What's the -- I don't see
11 any numbers on any of them, so what's the
12 heading?
13      Q.   Okay.  Flip until you find a
14 USP sort of face page that says,
15 Discussion, in bold lettering.  It should
16 be about 15 or so pages in.
17      A.   I see something that says
18 Discussion and contents listed again.
19      Q.   Yes, correct.
20          And then if you flip a few
21 pages further than that, you'll see a
22 question and answer.
23          The question is, If a
24 manufacturer controls impurities and

Confidential Information Subject to Protective Order

1 degradation products in accordance with
2 only a pharmacopeial monograph, is that
3 acceptable to the regulators?
4          Do you see that?
5      A.   No.
6      Q.   It should be four -- the
7 fifth slide after that discussion face
8 page.
9      A.   So if we're counting
10 slides --
11          MR. REEFER:  John, would you
12 mind if I went over and helped a
13 little bit?
14          MR. DAVIS:  Sure.  If you
15 know where it is, Jason, feel free
16 to show it to him.
17          MR. REEFER:  I think the
18 challenge we're facing is the way
19 it's printed, the slide number is
20 super-duper faint.
21          And so if you don't mind,
22 I'm going to stand up and just
23 walk around the table.
24          MR. DAVIS:  Okay.  Not a

1 problem.
2          THE WITNESS:  Maybe I had
3 the wrong discussion slide.
4          MR. REEFER:  I think there's
5 a -- I think there's a number of
6 instances where the heading,
7 Discussion, appears, and I think
8 you guys might have landed on
9 different pages.
10          But, ultimately, Mr. Davis
11 will confirm.  But the top of the
12 slide that I'm looking at, John,
13 says, Source of impurities, and
14 it's got a little demonstrative.
15 And then below that it's the
16 second slide that begins with
17 question.
18          MR. DAVIS:  Yes, that's
19 right.
20          Thanks, Jason.
21          MR. REEFER:  You're welcome.
22 BY MR. DAVIS:
23      Q.   Okay.  So you'll see the
24 question presented there is, If a

1 manufacturer controls impurities and
2 degradation products in accordance with
3 only a pharmacopeial monograph, is that
4 acceptable to the regulators?
5          Do you see that?
6      A.   I see it.
7      Q.   And then Ravi responds to
8 that question by saying, in the second
9 bullet point of his answer, that, A
10 particular manufacturer's manufacturing
11 method for formulation components may
12 lead to unexpected impurities due to a
13 different route of synthesis, different
14 reagents, et cetera.  Different processes
15 may lead to different impurities.
16          Do you see that?
17      A.   Yes.
18      Q.   And then -- then he
19 continues in the third bullet, it says,
20 If an individual monograph is inadequate
21 to control an impurity, the manufacturer
22 is responsible for developing and
23 validating appropriate analytical
24 procedures, establishing acceptance

1 criteria, and communicating with USP.
2          Do you see that?
3      A.   Yes.
4      Q.   Okay.  At any time between
5 2012 and '18, did you see any evidence
6 that Mylan had attempted to communicate
7 with USP regarding setting an acceptance
8 criteria and test for NDMA or NDEA?
9      A.   I did not see anything
10 that -- of that nature.
11          MR. REEFER:  Object to form
12 and scope.
13          But go ahead.
14 BY MR. DAVIS:
15      Q.   Do you disagree with the way
16 that Ravi has answered the question as
17 presented?
18          MR. REEFER:  Object to form
19 and scope.
20          THE WITNESS:  This is --
21 this is why, when I was at USP, we
22 developed the flexible monograph
23 approach.  Because if the
24 innovator either synthesizes their

Confidential Information Subject to Protective Order

Page 130

API themselves or purchases it
from a third party and an ANDA
comes along and a generic company
purchases the active ingredient
from a different source that's
using a different manufacturing
procedure, they almost certainly
will introduce a different set of
impurities; some may be the same
as in the innovator's product,
some may be different.
    And USP created this
flexible monograph approach
between Roger Williams and myself
and another chemist who worked for
me. And we have a procedure where
a company, as it says here, if the
individual monograph is inadequate
to control the impurity, the
manufacturer is responsible for
developing, validating appropriate
analytical procedures and
communicating with USP.
    So that's a way for the

Page 131

generic to meet the USP monograph,
even if they have a different set
of impurities.
    And the way that works,
then, if there would be more than
one impurity procedure, as I
mention in my report, that I
don't -- I'm not sure that I
mentioned this part in the report,
but if you're using Impurity
Procedure 1, you don't have to say
anything. If you're using
Impurity Procedure 2, you would
have to say something in your
labeling. And I give an example
in my report to that extent.
    So that's -- that's the
premise for why we developed this
flexible monograph approach.
BY MR. DAVIS:
    Q.    So what Ravi is essentially
describing here in his answer is the
flexible monograph approach, correct?
    A.    Essentially, yes.

Page 132

    Q.    Do you agree that
manufacturers are responsible for
evaluating their manufacturing method for
these different impurities that may
result from that specific method that
they're undertaking?
        MR. REEFER:  Object to form.
    Scope.
        THE WITNESS:  I would agree
    that manufacturers are responsible
    for the analytical methods that
    are used to control impurities in
    their drug substance and drug
    product, if that's what you're
    asking.
BY MR. DAVIS:
    Q.    Right.  They're responsible
for evaluating their manufacturing method
for potentially different impurities and
then if they -- if they find them or
are -- let me strike that.
        Manufacturers are
responsible for both evaluating their
manufacturing method for these different

Page 133

impurities, like Ravi mentions, and then
once identified, they are also
responsible for developing controls for
them, which is what Ravi describes in the
third bullet of his answer, correct?
        MR. REEFER:  Object to form.
    Scope.
        You can answer.
        THE WITNESS:  Companies are
    responsible for developing the
    analytical methods and validating
    them to control whatever
    impurities are found in their drug
    substance or in their drug
    product.
BY MR. DAVIS:
    Q.    Well, they're not -- would
you agree, manufacturers aren't just
responsible for controlling for
impurities they happen to find in their
drug substances or products, they're also
responsible for evaluating the process
chemistry to predict potential impurities
that may arise from the chemical

Confidential Information Subject to Protective Order

Page 134

¹ reactions that take place, right?
²          MR. REEFER:  Object to form.
³     Beyond the scope.
⁴          THE WITNESS:  That's a
⁵     position or a responsibility for a
⁶     process chemist who is designing
⁷     the process.  That's not something
⁸     that I'm familiar with doing.
⁹ BY MR. DAVIS:
¹⁰     Q.   But you're --
¹¹     A.   I can't agree or disagree
¹² with you.
¹³     Q.   Okay.
¹⁴          MR. DAVIS:  Let me mark Tab
¹⁵     13, Jason.
¹⁶          MR. REEFER:  Can we put the
¹⁷     slides away, John, the USP stuff?
¹⁸          MR. DAVIS:  Yes, for now.
¹⁹          MR. REEFER:  Okay.  That was
²⁰     ominous.
²¹          THE WITNESS:  Can we go off
²²     the record for a second?
²³          MR. DAVIS:  Sure.  Yes.
²⁴          MR. REEFER:  I'm sorry,

Page 135

¹     before we do, John, can you just
²     say again what you want me to get?
³          MR. DAVIS:  Yes.  Tab 13.
⁴          MR. REEFER:  Tab 13?
⁵          MR. DAVIS:  Yes.  I'm
⁶     marking it as Exhibit-9, before we
⁷     go off the record.
⁸          - - -
⁹          (Whereupon, Exhibit
¹⁰     Sheinin-9, No Bates, FAQs: Organic
¹¹     Impurities, was marked for
¹²     identification.)
¹³          - - -
¹⁴          MR. DAVIS:  Okay.  We can go
¹⁵     off.
¹⁶          VIDEO TECHNICIAN:  Going off
¹⁷     the record.  The time is
¹⁸     12:37 p.m.
¹⁹          - - -
²⁰          (Whereupon, a discussion off
²¹     the record occurred.)
²²          - - -
²³          VIDEO TECHNICIAN:  We are
²⁴     back on the record.  The time is

Page 136

¹     12:38 p.m.
² BY MR. DAVIS:
³          Q.   Okay.  Do you have what's
⁴     been marked as Exhibit-9 in front of you,
⁵     Dr. Sheinin?
⁶          A.   Yes, Tab 13.  I'm trying to
⁷     write down the numbers.  That's 9.
⁸          Okay.  Yes, I have it.
⁹          Q.   You'll see that it's an FAQ
¹⁰     document, FAQs: Organic impurities.
¹¹     Do you see that?
¹²          A.   I see that.  I see also it's
¹³     a -- something from USP.
¹⁴          Q.   Correct.  It's been pulled
¹⁵     from the USP website.  The URL is at the
¹⁶     bottom, https://www.usp.org, frequently
¹⁷     asked questions, organic impurities.
¹⁸          Do you see that?
¹⁹          A.   Yes.
²⁰          Q.   And one of the FAQs at the
²¹     bottom, specifically the fourth one at
²²     the bottom of Page 1, is, What does it
²³     mean to characterize the impurity profile
²⁴     of a product?

Page 137

¹          Do you see that?
²          A.   Yes.
³          Q.   And then there's an answer
⁴     that appears on Page 2 of 3, correct?
⁵          A.   Where is the answer?
⁶          Q.   The answer appears on the
⁷     next page.  It starts with, As described
⁸     in applicable guidance.
⁹          Do you see that?
¹⁰          A.   Oh, so this is -- this is
¹¹     answering all four of these questions in
¹²     one --
¹³          Q.   No, no.  What I've done --
¹⁴     I'll explain --
¹⁵          MR. REEFER:  It looks like
¹⁶     it's probably a drop-down,
¹⁷     Dr. Sheinin, so.
¹⁸          MR. DAVIS:  That's correct.
¹⁹          MR. REEFER:  If you just
²⁰     click on --
²¹          MR. DAVIS:  He's right.
²² BY MR. DAVIS:
²³          Q.   It's a drop-down.  And to
²⁴     make the document less lengthy, I've only

1 dropped down the question that I'm
2 interested in seeing the answer to.
3      A.   Oh, okay.
4           MR. REEFER:  Then I'll
5      object on the basis that we don't
6      have the complete document before
7      us.
8           But with that said, if you
9      want to ask questions about it, go
10     ahead.
11          MR. DAVIS:  Sure.
12 BY MR. DAVIS:
13     Q.   So do you see where the
14 answer to that question, What does it
15 mean to characterize the impurity profile
16 of a product, starts on Page -- the next
17 page?
18     A.   I'd like to read it.  I'd
19 like to --
20     Q.   Sure.  Take a moment to read
21 it.
22     A.   -- be able to read it.
23          Okay.
24     Q.   Okay.  Have you had a chance

1 to read the answer that USP provides to
2 that question?
3      A.   Yes.
4      Q.   And it starts with -- it
5 starts with, As described in the --
6 sorry.  What was that, Dr. Sheinin?
7      A.   I was going to say, are
8 these next bullets, are they part of the
9 answer?  Or are they --
10     Q.   No, those are additional
11 frequently asked questions regarding
12 organic impurities that come up.
13          So what I'm directing your
14 attention to --
15     A.   Okay.
16     Q.   -- is the question and
17 answer that I read out for you, which is,
18 What does it mean to characterize the
19 impurity profile of a product?  And then
20 the answer that USP provides.
21          Do you understand that?
22     A.   Yes.
23     Q.   Okay.  And the first part of
24 the answer starts with, As described in

1 applicable guidance, which include but
2 are not limited to -- and then it refers
3 to some of the ICHQ guidances.
4           Do you see that?
5      A.   Yes.
6           MR. REEFER:  Objecting to
7      the form.  Beyond the scope.  But,
8      go ahead.  Sorry.
9 BY MR. DAVIS:
10     Q.   So would you agree that even
11 if there is a USP monograph for a
12 product, that doesn't mean that the
13 manufacturer doesn't also have to comply
14 with other applicable guidance, for
15 example, such as ICH guidances as the USP
16 states here, correct, especially
17 regarding organic impurities, right?
18          MR. REEFER:  Object to form.
19     Beyond the scope.
20          Go ahead, Dr. Sheinin.
21          THE WITNESS:  I believe USP
22     is in agreement with the ICH
23     guidances, in terms of how
24     impurities are handled in their

1      monographs.  So there's -- they
2      are in agreement.
3 BY MR. DAVIS:
4      Q.   Well, my question, and maybe
5 you're answering it in an indirect way,
6 but my question is, even if there is a
7 USP monograph for a product, that doesn't
8 mean that any other applicable guidances,
9 as USP terms it here, including,
10 specifically, ICH guidances, that those
11 aren't -- that those aren't likewise
12 applicable even in the presence of a USP
13 monograph?
14          MR. REEFER:  Same objection.
15     Go ahead, Doctor.
16          THE WITNESS:  FDA -- FDA
17     says guidances are suggestions.
18     So I -- there are other approaches
19     that a company can take that could
20     differ from an ICH guidance, as
21     well as an FDA guidance.
22          So I can't say that
23     companies are required to follow
24     other guidances.  They are not

Page 142

1    required to.  They can have
2    different approaches.
3  BY MR. DAVIS:
4        Q.   If a company were to take a
5  different approach under an ICH guidance,
6  isn't that something they would have to
7  consult with the FDA about first?
8        MR. REEFER:  Objection.
9    Beyond the scope.
10       THE WITNESS:  FDA's
11   guidances -- ICH guidances, in and
12   of themselves, don't have anything
13   to do with FDA, sort of.  FDA has
14   to publish those guidances before
15   they become FDA official
16   guidances.
17       But once they -- once they
18   publish them, there's no
19   difference between an ICH guidance
20   and an FDA guidance.  They're one
21   and the same.  So I can't
22   distinguish an FDA guidance from
23   an ICH guidance.
24  BY MR. DAVIS:

Page 143

1        Q.   My general question, though,
2  is, even where a USP monograph exists,
3  there are other applicable guidances,
4  regulations, et cetera, that don't just
5  go away, right?
6        MR. REEFER:  Object to form.
7    Beyond the scope.
8        THE WITNESS:  I don't -- I
9    don't discuss these other ICH
10   guidances or other FDA guidances
11   to form the basis of my opinion in
12   my report.  So I'm -- I'm at a
13   loss to understand what you're
14   really asking me.
15  BY MR. DAVIS:
16       Q.   Well, what I'm asking you,
17  and I'll phrase it differently, but just
18  because, you know, you haven't talked
19  about it in your report doesn't mean I'm
20  not entitled to ask you a question about
21  it.
22       My -- let me ask it this
23  way:  When there's a USP monograph, the
24  USP monograph doesn't just supercede

Page 144

1  other applicable FDA guidances,
2  regulations or other FDA authorities that
3  exist, right?
4        A.   As a layperson, not a
5  lawyer, I can't really comment on the
6  legal aspects of that.  So it's difficult
7  for me to give you an answer to that.
8  From a legal perspective, it's out of my
9  area.
10       Q.   So you're not holding
11  yourself out as a regulatory expert?
12       A.   I'm not holding myself out
13  as a legal expert.
14       Q.   Well, my question is a
15  regulatory one, not a legal one.
16       My question is, when there
17  is a USP monograph for a product, does
18  that supercede and just make, you know,
19  irrelevant other -- other applicable
20  regulations or guidances, including, for
21  example, ICH guidances that the FDA has
22  adopted?
23       A.   I think I said earlier that
24  USP in general is in conformance with ICH

Page 145

1  guidances.  So I don't know that there's
2  a difference there.
3        MR. REEFER:  John, if you're
4    happening to transition, do you
5    want to talk a little bit about
6    planning?  We've been on about an
7    hour and 50 minutes here.
8        MR. DAVIS:  Let me just
9    finish this document, and then we
10   can talk about that.
11  BY MR. DAVIS:
12       Q.   If you look at the next
13  paragraph, Dr. Sheinin, it says, The
14  methods used to characterize an impurity
15  profile include, but are not limited to,
16  a sound scientific appraisal of the
17  chemical reactions involved in the
18  synthesis of the drug substance and the
19  impurities associated with raw materials,
20  et cetera, et cetera.
21       Do you see that?
22       A.   Yes.
23       Q.   That's consistent with what
24  Ravi is saying in his presentation we

Page 146

¹ looked at in Exhibit-8, right, that you
² can't just rely on a USP monograph, you
³ have to do a sound scientific appraisal
⁴ of your own manufacturing method, right?
⁵         MR. REEFER:  Object to form.
⁶     Asked and answered.
⁷         THE WITNESS:  The -- whoever
⁸     is developing the process to
⁹     create the drug substance is a
¹⁰     process chemist, and they would be
¹¹     the ones to understand that
¹²     process.
¹³         It's not something that I
¹⁴     feel comfortable or capable of
¹⁵     second-guessing what a process
¹⁶     chemist would do.  It's not
¹⁷     something that I have done, as I
¹⁸     have not worked in the industry,
¹⁹     and it's not something I've done
²⁰     where you have to scale up a
²¹     process.  It's just not within my
²²     expertise.
²³ BY MR. DAVIS:
²⁴     Q.   And I'm not -- I'm not

Page 147

¹ asking you, Dr. Sheinin, to comment on
² the substance of any particular
³ scientific appraisal of impurities that
⁴ was done by anyone, including Mylan.
⁵         I'm just asking you to
⁶ confirm what USP is saying here and what
⁷ Ravi said in his presentation we just
⁸ looked at in Exhibit-8, that such an
⁹ obligation exists?
¹⁰         MR. REEFER:  Object to the
¹¹     form.  Scope.
¹²         THE WITNESS:  And I think I
¹³     discussed before about the purpose
¹⁴     of an analytical method is to
¹⁵     detect and quantify, or in some
¹⁶     cases to qualify, impurities in
¹⁷     these materials.
¹⁸         So I would have to say that
¹⁹     there needs to be analytical
²⁰     procedures to control impurities
²¹     in drug substances and drug
²²     products.
²³ BY MR. DAVIS:
²⁴     Q.   Not just analytical

Page 148

¹ procedures, though; there actually has to
² be -- and I hear you when you say this is
³ a process chemist's job to do
⁴ substantively, but there has -- there has
⁵ to be an evaluation, i.e., what -- in the
⁶ USP's terms, a quote, sound scientific
⁷ appraisal of the chemical reactions.
⁸         Do you disagree that that's
⁹ what the -- do you disagree with this USP
¹⁰ document here, that that obligation
¹¹ exists?
¹²         MR. REEFER:  Object to form.
¹³     Scope.
¹⁴         But go ahead, Doctor, you
¹⁵     can answer.
¹⁶         THE WITNESS:  I'm rereading
¹⁷     this paragraph.
¹⁸         I have difficulty in putting
¹⁹     into general terms this.  Yes, I
²⁰     think you need to be able to look
²¹     at your analytical method and have
²²     a technique, whatever your
²³     detection is, to be able to
²⁴     identify whatever impurities are

Page 149

¹     in the -- whatever analyte you're
²     looking for.
³ BY MR. DAVIS:
⁴     Q.   Okay.  But that's analytical
⁵ chemistry.
⁶         What --
⁷     A.   That -- that's what I can
⁸ talk to.
⁹     Q.   Okay.  So you have no
¹⁰ opinion on whether a manufacturer is
¹¹ required to do a sound scientific
¹² appraisal of the chemical reactions
¹³ involved in its manufacturing process?
¹⁴     A.   I did not use anything in
¹⁵ this -- that's discussed in this document
¹⁶ to form the basis of my opinions about
¹⁷ USP.
¹⁸         As I mention, I did talk
¹⁹ about the flexible monograph approach,
²⁰ and I understand that different routes of
²¹ synthesis can lead to different
²² impurities.  And that's a way for USP to
²³ be able to have companies able to meet
²⁴ the requirements of the monograph, even

Page 150

¹ when the impurity profile is different
² than what is there in the -- from the
³ innovator product.
⁴        Q.   And as part of that flexible
⁵ monograph approach, that requires
⁶ somebody to look at how -- how their
⁷ method of manufacture may differ from
⁸ another method and to predict the kinds
⁹ of impurities that may arise from that --
¹⁰ from that -- those changes in the
¹¹ manufacturing method, correct?
¹²        That's part of the sound
¹³ scientific appraisal that the USP is
¹⁴ referring to here, is it not?
¹⁵        MR. REEFER:  Object to form.
¹⁶ Scope.
¹⁷        Go ahead, Doctor, you can
¹⁸ answer.
¹⁹        THE WITNESS:  I'll have to
²⁰ fall back on what I've said.
²¹ There has -- the method that's
²² used is different depending on
²³ what the impurity profile is.
²⁴        So there's a -- that's why

Page 151

¹        USP created the flexible monograph
² approach.
³ BY MR. DAVIS:
⁴        Q.   Are you familiar with FDA
⁵ guidances on conducting risk assessments?
⁶        A.   On what?
⁷        Q.   Conducting risk assessments?
⁸        A.   For nitrosamines or just in
⁹ general?
¹⁰        Q.   No, generally.
¹¹        A.   No, I'm not.
¹²        Q.   Okay.  And in working on
¹³ your report, did you see any evidence
¹⁴ that Mylan had done a sound scientific
¹⁵ appraisal of the chemical reactions
¹⁶ involved in the synthesis of Mylan's
¹⁷ valsartan API for impurities?
¹⁸        MR. REEFER:  Objection to
¹⁹ form.  I'm sorry, John.  I thought
²⁰ you were done.  I apologize.
²¹        Objection to form.  Beyond
²² the scope.  Asked and answered.
²³        THE WITNESS:  I did not look
²⁴ to see if there was anything as

Page 152

¹ you described.  I did not go
² through the drug master file,
³ which is where any information
⁴ like that would have -- would have
⁵ been.
⁶        There was really nothing in
⁷ the application, in the ANDA that
⁸ I looked at, that contained any
⁹ information of that type.  I did
¹⁰ not see anything.  I have no way
¹¹ of knowing if it's there or not.
¹² BY MR. DAVIS:
¹³        Q.   Let's say that someone did
¹⁴ do a sound scientific appraisal and it
¹⁵ led them to believe they might be
¹⁶ creating nitrosamine by-products in their
¹⁷ drug substance.
¹⁸        Are you with me?
¹⁹        MR. REEFER:  What's that,
²⁰ John?  You broke up.
²¹        MR. DAVIS:  Sure.
²² BY MR. DAVIS:
²³        Q.   I'm asking you a
²⁴ hypothetical, Dr. Sheinin.

Page 153

¹        The hypothetical is, let's
² say there was someone at a generic
³ manufacturer who did a sound scientific
⁴ appraisal of the chemical reactions for
⁵ an API drug product substance and
⁶ believed, as a result of that sound
⁷ scientific appraisal, that the process
⁸ would create nitrosamine by-products.
⁹        Do you follow me?
¹⁰        A.   I follow you.
¹¹        Q.   What would be their
¹² obligation under applicable guidances and
¹³ regulations to do next, do you know?
¹⁴        MR. REEFER:  Objection to
¹⁵ form.  Incomplete hypothetical.
¹⁶ Beyond the scope.  And foundation.
¹⁷        But go ahead.
¹⁸        THE WITNESS:  I'm not
¹⁹ prepared to answer hypothetical
²⁰ questions.  It's --
²¹ BY MR. DAVIS:
²²        Q.   There's no basis for you not
²³ to answer any question.
²⁴        MR. REEFER:  John, you

Confidential Information Subject to Protective Order

Page 154

1  interrupted him.
2      MR. DAVIS:  Well, look, he's
3  saying he's not willing to answer
4  a hypothetical question.  That's
5  not how this works.  I'm
6  entitled --
7      MR. REEFER:  He wasn't --
8      MR. DAVIS:  -- to ask
9  questions --
10     MR. REEFER:  He wasn't --
11 John, he wasn't even able to
12 finish his answer.  So I think
13 it's a little bit presumptuous to
14 suggest how he was going to
15 respond in totality.  Perhaps --
16 BY MR. DAVIS:
17     Q.   You followed --
18     MR. REEFER:  -- you should
19 let him respond.
20 BY MR. DAVIS:
21     Q.   You followed my hypothetical
22 question.
23     What's your answer to it,
24 Dr. Sheinin?

Page 155

1      MR. REEFER:  Object to form.
2  Incomplete hypothetical.  Beyond
3  the scope.  And foundation.
4      But go ahead, Doctor, you
5  can continue your answer.
6      THE WITNESS:  I would have
7  to have some data, I would have to
8  have some real information to be
9  able to address a hypothetical
10 question.
11     It depends.  It could be
12 yes, it could be no.  It's just --
13 it's hypothetical.  It's not real
14 world.
15 BY MR. DAVIS:
16     Q.   No.  I respectfully and
17 wholeheartedly disagree.
18     I'm asking you, not
19 quantitatively, I'm asking you
20 qualitatively, if a person at a
21 pharmaceutical manufacturer did a sound
22 scientific appraisal and said, oh, we
23 might be creating nitrosamine
24 by-products, what's their obligation,

Page 156

1  under the regulations, to do next, do you
2  know?
3      MR. REEFER:  Object --
4  objection to form.  Beyond the
5  scope.  Incomplete hypothetical.
6  And foundation.
7      Go ahead, Doctor, if you
8  know.
9      THE WITNESS:  I don't know
10 what the obligation is under
11 applicable guidance.  I -- I have
12 to go back and reread some of
13 those guidances to see if there is
14 language to that effect that says
15 exactly what you said.
16 BY MR. DAVIS:
17     Q.   Would it be your
18 expectation -- and I get that you haven't
19 actually reviewed the necessary documents
20 in this case.
21     But would it be your
22 expectation that Mylan, here, did a sound
23 scientific appraisal for potential
24 genotoxic impurities, based on its

Page 157

1  detailed laboratory process for creating
2  valsartan API?
3      MR. REEFER:  Object to form.
4  Beyond the scope.
5      You almost acknowledge this
6  is beyond the scope, John.  I
7  mean, you keep asking these
8  questions.  But, you know, at some
9  point there's got to be some
10 connection to the report, right?
11     But with that being said, go
12 ahead, Doctor, if you can --
13     MR. DAVIS:  Let me respond
14 to that briefly, Jason.  I'm
15 entitled to ask him about what's
16 in his report.  I'm also entitled
17 to point out things that he hasn't
18 looked at, at all, or that he
19 might -- he might think relevant
20 or that he might, if he hasn't
21 reviewed them, might -- you know,
22 this is in his wheelhouse.
23     So, you know, I'm entitled
24 to ask the question even if it's

Page 158

1  not in the report, because it's
2  part of his -- his 40 years of
3  work at the regulator and at USP,
4  and it's tangential to what he's
5  got in his report.
6      So, yeah, I'm entitled to
7  ask the question.
8      MR. REEFER:  Well, that's
9  incorrect, John.  You can't force
10 him to offer opinions that he
11 hasn't formulated for purposes of
12 this litigation on the spot, on
13 the fly, based on your
14 hypotheticals.
15     He says that he hasn't done
16 this analysis.  He's not offering
17 the opinion on whether Mylan's DMF
18 was adequate or otherwise.
19 BY MR. DAVIS:
20     Q.   Would you expect that it was
21 adequate, given what you know about the
22 facts of this case?
23     MR. REEFER:  Objection to
24 form.  Foundation.  Scope.

Page 159

1      Go ahead.
2  BY MR. DAVIS:
3      Q.   Would you expect,
4  Dr. Sheinin, that Mylan did, in fact, do
5  a sound scientific appraisal for
6  potential genotoxic impurities, based on
7  its detailed laboratory process, when, in
8  fact, there were genotoxic impurities in
9  Mylan's valsartan?
10     Would you expect --
11     MR. REEFER:  Object to form.
12 BY MR. DAVIS:
13     Q.   -- they did do that, given
14 what the history showed?
15     MR. REEFER:  Object to form.
16 It's compound.  Beyond the scope.
17 Lack of foundation.  Incomplete
18 hypothetical.
19     But go ahead, Doctor.
20     THE WITNESS:  The fact that
21 Mylan is on the market and FDA has
22 not, again, recalled or asked
23 Mylan to recall their product says
24 to me that their DMF is adequate

Page 160

1  and FDA has no reason to take
2  other regulatory action.
3  BY MR. DAVIS:
4      Q.   Are you -- sir, are you not
5  aware that Mylan recalled every single
6  lot and batch of valsartan API that was
7  on the market in 2018 and 2019?  Are you
8  not aware of that fact?
9      A.   I'm aware of that.  I'm also
10 aware that Mylan is back on the market.
11     Q.   Okay.  But you haven't --
12 we've gone over this about four or five
13 times today.
14     You have no idea the
15 circumstances how they got back on the
16 market, do you?
17     MR. REEFER:  Object to form.
18 Argumentative.  Beyond the scope.
19     MR. DAVIS:  Well, he says
20 it's not in his report, and yet he
21 keeps bringing up the fact that
22 Mylan is back on the market, and
23 he doesn't know anything about how
24 they got back on the market.

Page 161

1      So I'm happy -- if you want
2  me to stick to your report,
3  Dr. Sheinin, you have to stick to
4  your report, too.  And you brought
5  this up six times, but you haven't
6  looked at it at all.
7      MR. REEFER:  Because, John,
8  you keep asking him questions
9  about areas that he's not going
10 into.  I mean --
11 BY MR. DAVIS:
12     Q.   You've reviewed the
13 nitrosamine testing data, have you not,
14 Dr. Sheinin?  That's in your materials
15 considered list, is it?
16     MR. REEFER:  Object to form.
17 Beyond the scope.
18     THE WITNESS:  What are you
19 saying I reviewed?
20 BY MR. DAVIS:
21     Q.   Your materials considered
22 list, Exhibit B, refers to you having
23 reviewed Mylan's nitrosamine testing data
24 for its valsartan products.

Confidential Information - Subject to Protective Order

Page 162

1    Did you actually look at
2 that?
3    A.   Are you referring to a
4 spreadsheet?
5    Q.   Yes, I am.
6    A.   I did see the spreadsheet.
7    Q.   Okay.  And did you see that
8 NDEA was present in every single line
9 there in that spreadsheet, every -- in
10 each line, representing a different lot
11 or batch of valsartan, that there was
12 NDEA in every single one of them?  Did
13 you see that?
14    MR. REEFER:  Object --
15 object to form.  Mischaracterizes
16 the document.
17    Do you want to look at it,
18 John?
19    MR. DAVIS:  He looked at it.
20 I'm entitled to ask him about it.
21 BY MR. DAVIS:
22    Q.   Did you see the document?
23    You said you saw the
24 spreadsheet that had the nitrosamine

Page 163

1 testing data, that's right, Dr. Sheinin,
2 correct?
3    A.   Correct.
4    Q.   Okay.  And did you see that
5 every single lot or batch on that
6 spreadsheet had NDEA in it?
7    A.   I did not notice -- I did
8 not look at the entire spreadsheet, so I
9 can't say that yes or no, every single
10 lot had NDEA -- NDEA in it.  I'd be happy
11 to look at it again.
12    Q.   Do you think that -- do you
13 think that NDEA would have made it into
14 Mylan's valsartan products if they had
15 done a sound scientific appraisal of
16 their chemical manufacturing process?
17    MR. REEFER:  Object to form.
18 Beyond the scope.  Calls for
19 speculation.  Foundation.
20    This is -- John, I'll just
21 let you know, this will be the
22 last question until -- you know, I
23 asked for a break 22 minutes ago.
24    And, you know, this is still going

Page 164

1    on.
2    So go ahead, Doctor.
3    THE WITNESS:  That is not
4 something that I can answer.  It's
5 organic chemistry, it's process
6 chemistry, and I can't say yes or
7 no.  It's not within my -- the
8 expertise that I developed over
9 the last 50 years.
10 BY MR. DAVIS:
11    Q.   It's in the FDA's warning
12 letter to Mylan, correct?
13    The FDA, in their warning
14 letter, said to Mylan that your firm had
15 not anticipated the creation of
16 nitrosamines in your drug product.
17    And that was the basis for
18 the warning letter, was that failure, was
19 it not?
20    MR. REEFER:  Object to form.
21 Beyond the scope.  Foundation.
22 Mischaracterizes the document.
23    THE WITNESS:  FDA has said
24 that the formation of nitrosamines

Page 165

1 was unexpected.  They did not see
2 it either.  And they did a -- I
3 would hope, did a very thorough
4 review of the drug master file
5 that was submitted by Mylan.  And
6 they did not see it.
7    So it's not something that I
8 would have seen, because it's
9 outside of my expertise.  FDA did
10 not see it either, so --
11 BY MR. DAVIS:
12    Q.   Okay.  Well, you're
13 assuming --
14    A.   -- it's not something --
15    Q.   -- that Mylan disclosed all
16 the facts.
17    You're assuming there that
18 Mylan, in the DMF, actually disclosed the
19 salient information to the FDA, are you
20 not?
21    MR. REEFER:  Object to form.
22 Beyond the scope.  Argumentative.
23 Foundation.
24    He's not reviewed the DMF.

Confidential Information Subject to Protective Order

Page 166

1  He's not offering an opinion on
2  the content of the DMF, whether
3  Mylan's risk evaluation was --
4      MR. DAVIS:  Hang on, Jason.
5      MR. REEFER:  -- or
6  otherwise.
7      MR. DAVIS:  Stop with the
8  speaking objections.  He's brought
9  up that the FDA didn't see it
10 either.  I'm entitled to ask about
11 that.
12 BY MR. DAVIS:
13     Q.   And my question about that,
14 Dr. Sheinin, is, you're making an
15 assumption there that the FDA had the
16 same information in their hands that
17 Mylan did, right, based on what was in
18 the DMF?
19     MR. REEFER:  Objection.
20 Foundation.  Form.  Can't speak to
21 what FDA knew or didn't know.
22     Go ahead, Doctor, if you
23 can.
24     THE WITNESS:  I mean, I have

Page 167

1  not seen the DMF, so I don't know
2  what was in it.
3      I -- maybe I'm naive, but I
4  did not -- when I was at FDA, I
5  did not make an assumption that
6  companies that submitted drug
7  master files were not telling me
8  the truth.  So I'm at a loss
9  there.
10     It's -- I don't know what
11 was in the DMF, so I don't know
12 exactly what FDA reviewed.  But
13 FDA has said in several of their
14 statements on nitrosamines that
15 the presence of nitrosamines was
16 unexpected.  So it goes beyond
17 Mylan, it goes to all the
18 companies who were making similar
19 types of APIs.  The FDA has said
20 this was totally unexpected.  And
21 I believe the EMA has said the
22 same thing, that it was
23 unexpected.
24     MR. REEFER:  With that said,

Page 168

1  John --
2      MR. DAVIS:  Last question --
3  last question before lunch.
4  BY MR. DAVIS:
5      Q.   You said that, you know, you
6  had a right, when you were at FDA, to
7  assume what was being provided to you was
8  the truth, correct?
9      A.   I didn't say it was a right.
10 I said that was me, as Eric Sheinin,
11 assuming that what was in the DMF was the
12 truth.
13     Q.   That's a fair --
14     MR. REEFER:  So, John --
15 BY MR. DAVIS:
16     Q.   That's a fair --
17     MR. REEFER:  John, hold on.
18 BY MR. DAVIS:
19     Q.   -- and reasonable assumption
20 to make, right?
21     MR. REEFER:  Hold on.
22     John, you said last question
23 and, you know.  That was your last
24 question.

Page 169

1      MR. DAVIS:  Let me -- let me
2  tie a bow on it.
3  BY MR. DAVIS:
4      Q.   That was a fair and
5  reasonable assumption for someone in your
6  shoes at the FDA to make, that the DMF
7  that was being provided to them was the
8  truth, was transparent, correct?
9      MR. REEFER:  Object to form.
10 Beyond the scope.
11     Go ahead, Dr. Sheinin, if
12 you want.
13     THE WITNESS:  Yes.  That was
14 my assumption.  And I would think
15 that when FDA investigators come
16 in to the facility and are doing
17 an inspection to make sure that
18 the manufacturer is performing the
19 synthetic scheme to what's in the
20 drug master file that they would
21 be viewing whether or not the
22 processes that are being used to
23 manufacture and synthesize the
24 active ingredient are what's

Confidential Information - Subject to Protective Order

Page 170

1  included in the drug master file.
2       If there was any
3  discrepancies, I would expect an
4  FDA investigator to note them.
5       MR. REEFER:  So with that
6  being said, John, how long do you
7  need for lunch?  And sort of let's
8  talk planning a little bit.
9       MR. DAVIS:  We can go off
10  the record.
11       VIDEO TECHNICIAN:  Going off
12  the record.  The time is 1:17 p.m.
13            - - -
14       (Whereupon, a luncheon
15  recess was taken.)
16            - - -
17       VIDEO TECHNICIAN:  We are
18  back on the record.  The time is
19  2:19 p.m.
20  BY MR. DAVIS:
21     Q.   Okay.  Dr. Sheinin, I'm
22  going to mark Tab 5.
23            - - -
24       (Whereupon, Exhibit

Page 171

1  Sheinin-10,
2  MYLAN-MDL2875-00894833, Valsartan
3  Drug Master File, Section 3.2.S.3,
4  was marked for identification.)
5            - - -
6  BY MR. DAVIS:
7     Q.   Let me know when you have
8  that document in front of you.
9       MR. REEFER:  And I think,
10  John, this is 10, Exhibit-10, that
11  is.
12       MR. DAVIS:  Exhibit-10,
13  that's right.
14       THE WITNESS:  I have it.
15  BY MR. DAVIS:
16     Q.   Okay.  Let me ask a
17  prefatory question.
18       You told me you did not
19  review any aspect of Mylan's DMF; is that
20  right?
21     A.   That is correct.
22     Q.   Can I ask why, given that
23  you have an entire section of your report
24  dedicated to discussing drug master

Page 172

1  files?
2     A.   I don't think that the --
3  whatever information that was in there
4  was really pertinent to my discussion of
5  drug master files in my report.  I wasn't
6  going to be opining on the adequacy of
7  Mylan's DMF.
8       So in the interest of the
9  time that I had to devote to this
10  project, if I had gotten involved in
11  really looking at the DMF, I probably
12  would have just wanted to keep going and
13  going.
14       So it just -- it wasn't
15  necessary for what I was asked to look
16  at.
17     Q.   Well, let me direct your
18  attention, then, before we turn to
19  Exhibit-10, back to your report for a
20  second.
21       I just want to get
22  clarification on what you mean in
23  Paragraph 68 of your report where you
24  write, Mylan's valsartan USP API

Page 173

1  continued to meet its specification, as
2  well as it's DMF specification,
3  throughout this period.
4       What are you -- what do you
5  mean by "DMF specification" there?
6     A.   By DMF specification I mean
7  what was on file with the FDA.
8     Q.   Okay.  But you didn't review
9  the DMF?
10     A.   That's correct.  But I did
11  look at certificates of analysis, so I
12  could see that Mylan was in compliance
13  with all of the acceptance criteria in
14  the DMF.
15     Q.   So what is -- is a DMF
16  specification similar to a USP
17  specification, it just has a test
18  procedure laid forth, basically?
19     A.   A DMF specification is,
20  basically, the same specification that's
21  in the ANDA.  Because that's where the
22  specification comes from, since Mylan is
23  using a drug master file to report that
24  information to FDA.

Page 174

1    So that means that the DMF
2  specification has more in it than what's
3  in the USP monograph.
4    Q.   Okay.
5    A.   Because the application
6  specification is the same as the DMF
7  specification, and that has additional
8  tests in it.
9    Q.   Is the DMF specification
10 sort of the final output of the ANDA DMF?
11   A.   I don't understand that
12 question.  I'm not clear.
13   Q.   Sure.
14     There might be -- for
15 example, let's take a category of
16 testing, like residual solvent testing,
17 that's in the DMF specification.
18     There's a lot of workup in
19 the DMF regarding what to test for that's
20 ultimately put in the DMF specification,
21 is it not -- is there not?
22   A.   That's correct.
23   Q.   So the DMF specification,
24 ultimately, is an output of all of the

Page 175

1  work that's done in the DMF itself,
2  right?
3    A.   Yes and no.  I mean, there's
4  other information in the DMF that has
5  nothing to do with the specification.
6    Q.   Sure.  But what's in the
7  specification is an output of what's --
8  of the work that's done in the DMF, is it
9  not?
10   A.   I've never heard it
11 expressed in that way.  It's the -- the
12 specification is what FDA says you have
13 to meet, your specification.
14     And, in general, what's in
15 the USP monograph is in agreement with
16 the part of the specification that those
17 tests are included in.
18   Q.   You wouldn't just write a
19 DMF specification, would you?  There's
20 quite a bit of work that goes into
21 generating a DMF specification, right?
22   A.   Well, yeah.  Yeah.  Of
23 course.
24   Q.   And where is that work

Page 176

1  documented?
2    A.   Well, part of the work
3  that's in the specification is the
4  analytical methods.  And that's -- that's
5  done in Section 4.2 of the application.
6  And Section 4.3 is the validation of the
7  analytical method.
8      So that -- that's -- that
9  has to be done before you can have a
10 specification.
11   Q.   And where -- where is that
12 work documented?  It's documented in the
13 DMF, is it not?
14   A.   The method validation work
15 is -- should be documented in the drug
16 master file.  So those -- the method
17 validation for each one of the analytical
18 procedures that's used to control the
19 quality of the product should be included
20 in the drug master file.
21   Q.   Okay.  Back to Exhibit-10,
22 which I just marked.
23     Do you recognize that as the
24 impurities section of the valsartan drug

Page 177

1  master file?
2    A.   No, I've never seen this,
3  because I didn't look at the drug master
4  file.
5    Q.   Right.  I understand that
6  you haven't seen this in particular.
7      But you've seen drug master
8  files generally, correct?
9    A.   Yes.
10   Q.   And a drug master file will
11 have an impurities section, will it not?
12   A.   It should have an impurities
13 section, yeah.
14   Q.   Okay.  And does what I've
15 marked here as Exhibit-10 look like that
16 might be the impurities section of
17 Mylan's valsartan USP drug master file?
18   A.   It looks like it.
19   Q.   Okay.  And you'll see on
20 the -- there's some numbering in the
21 bottom right corner, starting on the
22 second page.
23   A.   Page numbers?
24   Q.   That's correct.

Page 178

1    Do you see that?
2    A.   Yes.
3    Q.   At the first numbered page,
4  you'll see a table of contents for this
5  DMF impurities section.
6    Do you see that?
7    A.   Yes.
8    Q.   And then at the very end, at
9  Pages 80 to 82, there's a section on
10  genotoxic impurities.
11    Do you see that?
12    A.   Yes.
13    Q.   Why are genotoxic impurities
14  broken out as a separate category of
15  impurities, do you know?
16    MR. REEFER:  Object to form.
17  Scope.
18    THE WITNESS:  I don't know.
19  BY MR. DAVIS:
20    Q.   Okay.
21    A.   I've not seen them --
22  anything that I have looked at, at FDA or
23  USP, where genotoxic impurities were
24  broken out as a separate category of

Page 179

1  impurities.
2    I know impurities, I know
3  inorganic impurities, residual solvents
4  are basically organic impurities, but
5  they are oftentimes categorized different
6  because there's a separate analytical
7  method.  And I have never seen a list
8  like this that had genotoxic impurities
9  as a category.
10    Q.   You don't think that would
11  be because there's separate applicable
12  guidances that govern genotoxic
13  impurities, such as, for example, ICH M7
14  that I've shown you today?
15    MR. REEFER:  Objection.
16  Form and scope.
17    THE WITNESS:  It's possible,
18  but I can't say yes or no.  I
19  don't -- I don't know.
20  BY MR. DAVIS:
21    Q.   Flip, if you would, to the
22  very last two pages of this document,
23  which are numbered 81 and 82.
24    A.   Okay.

Page 180

1    Q.   Do you see the header at the
2  top of Page 81, Genotoxic Impurities?
3    A.   Yes.
4

Page 181

23    MR. DAVIS:  I'm going to
24  mark Tab 24.

Page 182

1    MR. REEFER:  Can we put this
2    away?
3    MR. DAVIS:  Yes.  Tab 24,
4    Jason.
5    MR. REEFER:  Is that one
6    that you sent today or --
7    MR. DAVIS:  Yes, that's one
8    sent today.
9    MR. REEFER:  What's the
10   one -- which one did you send me
11   at lunch?  Is that the one or is
12   that --
13   MR. DAVIS:  That's 25.
14   MR. REEFER:  Okay.  Just one
15   moment, then, okay, John?
16        - - -
17   (Whereupon, Exhibit
18   Sheinin-11,
19   MYLAN-MDL2875-00392350, 11/26/18
20   E-mail, Owens to Smith, was marked
21   for identification.)
22        - - -
23   MR. REEFER:  They're not
24   stapled, but I think that we

Page 183

1    should be able to make due.  So
2    I'm going to hand it to him now,
3    okay, John.
4    MR. DAVIS:  Sure.
5    BY MR. DAVIS:
6    Q.   You'll see, Dr. Sheinin,
7    that this is an internal -- or partly
8    internal Mylan e-mail chain that has a
9    Plaintiff Owens-2 sticker on it.
10   MR. REEFER:  I'm going to
11   object initially to foundation.
12   Is this Exhibit-11 marked,
13   John?
14   MR. DAVIS:  Yes, it is.
15   MR. REEFER:  Thanks.  But I
16   object to foundation.
17   But go ahead, Dr. Sheinin.
18   BY MR. DAVIS:
19   Q.   Sure.  And I'm just making a
20   representation to you here, Dr. Sheinin,
21   I understand that you haven't seen this
22   document before.
23   I'm representing this to you
24   to be a partly internal Mylan e-mail

Page 184

1    chain with a Mylan Bates stamp, as it was
2    produced to us, dated November 2018.
3    Do you see that?
4    A.   Yes.
5    Q.   And I say "partly internal,"
6    because if you go down to the second and
7    third e-mails, there are some FDA e-mail
8    addresses on the e-mails, including for
9    Ms. Dellarese Herbert.
10   Do you see that?
11   A.   Yes.
12   Q.   Okay.  And you'll see on the
13   second page of the e-mail chain, there's
14   an e-mail from Dellarese Herbert at FDA
15   to several Mylan individuals that's dated
16   November 19, 2018.
17   Do you see that?
18   MR. REEFER:  Let me, just
19   for a moment, Eric, object.  I'll
20   object on foundation.
21   But based on your prior
22   representation about who is on the
23   e-mail recipients, I'll let him
24   answer, okay, John?

Page 185

1    Do you understand what I'm
2    saying?
3    MR. DAVIS:  Sure.  Yeah.
4    MR. REEFER:  Yeah.  My point
5    being I don't think that
6    Dr. Sheinin knows exactly who
7    these people are.  But your
8    representation being that those
9    are Mylan employees, with that
10   said, I'll let him go, okay?
11   MR. DAVIS:  Sure.  And I'm
12   happy to ask about e-mail
13   addresses.
14   BY MR. DAVIS:
15   Q.   Do you see some FDA e-mail
16   addresses and some Mylan.com e-mail
17   addresses on that particular e-mail at
18   the top of Page 2?
19   A.   Yes.
20   Q.   And the from e-mail address,
21   it's dellarese.herbert@fda.hhs.gov.
22   Do you see that?
23   A.   Yes.
24   Q.   And there's several Mylan

Page 186

¹ individuals listed in the to and cc
² section.
³        Do you see that?
⁴        MR. REEFER:  Same objection.
⁵        THE WITNESS:  Yes.
⁶ BY MR. DAVIS:
⁷    Q.   Including a Ms. Cassandra
⁸ Bird.
⁹        Is that a name you
¹⁰ recognize?
¹¹    A.   No.
¹²    Q.   So you wouldn't know that
¹³ she was deposed in this case and that --
¹⁴ and that there would have been a
¹⁵ transcript of her deposition prepared?
¹⁶    A.   I don't know that she was
¹⁷ deposed.  I don't know who she is.  I
¹⁸ have not seen a deposition from her.  I
¹⁹ just don't know anything about her.
²⁰    Q.   Right.  And that's because
²¹ it wasn't provided to you by counsel in
²² the package, right?
²³        MR. REEFER:  Object to form.
²⁴        THE WITNESS:  Correct.

Page 187

¹ BY MR. DAVIS:
²
²¹ BY MR. DAVIS:
²²    Q.   Okay.
²³        MR. DAVIS:  I'm going to
²⁴ mark Tab 23 as Exhibit-12.

Page 188

¹        - - -
²        (Whereupon, Exhibit
³ Sheinin-12,
⁴ MYLAN-MDL2875-00552465, DMF DLAPI
⁵ Information Request, was marked
⁶ for identification.)
⁷        - - -
⁸        MR. REEFER:  Should we put
⁹ 11 away, John, or keep it handy?
¹⁰        MR. DAVIS:  We can put it
¹¹ away.
¹²        MR. REEFER:  Okay.  So now
¹³ you want 23.  What's on the front
¹⁴ page, John?  I'm trying to leaf
¹⁵ through this.
¹⁶        MR. DAVIS:  Plaintiff
¹⁷ Talton-7 is the exhibit stamp.
¹⁸        MR. REEFER:  Okay.  Thanks.
¹⁹        THE WITNESS:  This is going
²⁰ to be 12; is that right?
²¹        MR. DAVIS:  Exhibit-12,
²² that's correct.
²³ BY MR. DAVIS:
²⁴    Q.   And I only am going to show

Page 189

¹ you this for a limited reason,
² Dr. Sheinin.  So don't fret, I'm not
³ going to make you look at all 100 pages
⁴ of it.
⁵        So you'll see --
⁶    A.   Thank you.
⁷    Q.   -- in the first -- the first
⁸ actual page -- a lot of these documents
⁹ come with a slip page at the front, which
¹⁰ is just what's called metadata regarding
¹¹ the document that is as it was produced
¹² by Mylan.
¹³        But you'll see the first
¹⁴ actual page, there's a letter from the
¹⁵ FDA to Mylan, attention Michael Plastina.
¹⁶        Do you see that?
¹⁷    A.   Yes.
¹⁸    Q.   And it says, This
¹⁹ communication is in reference to your
²⁰ drug master file for valsartan.
²¹        Do you see that?
²²    A.   Yes.
²³    Q.   Okay.  If you flip to the
²⁴ next page, Page 2, you'll see the actual

Confidential Information - Subject to Protective Order



Page 190

1 information requests that start at the
2 very bottom, Numbered 1, and then 1 has A
3 through J subparts that continue on the
4 next pages.
5         Do you see that?
6     A.   Yeah.
7         I was looking for the date
8 of this letter.
9     Q.   I can help you with that.
10     A.   It's usually at the end.
11         MR. REEFER:  It's November
12     13th, 2018.  Is that what you were
13     going to say, John?
14         MR. DAVIS:  Yes.
15 BY MR. DAVIS:
16     Q.   That's on Page 7.
17         MR. REEFER:  Dr. Sheinin, if
18     you need to take a moment to
19     familiarize yourself with the
20     document, you're entitled to do
21     so.
22 BY MR. DAVIS:
23     Q.   Do you see the date stamp,
24 Dr. Sheinin, that appears after David

Page 191

1 Skanchy's signature?
2     A.   Yes.
3     Q.   And that date is November
4 13th, 2018?
5     A.   Yes.
6     Q.   What's your understanding
7 of -- what's your understanding of
8 where --
9     A.   I was going to say --
10     Q.   -- where that date falls in
11 the chronology of Mylan's valsartan
12 recall?
13     A.   I'm not sure if it was
14 before or after the recall.  But I think
15 it was -- this was after the recall, I
16 believe.  But I'm -- I can't say for
17 sure.
18     Q.   I'll represent to you that
19 Mylan's recall of all of its lots and
20 batches of valsartan on the market with
21 an expiry occurred in late November and
22 early December, after this letter --
23     A.   Okay.
24     Q.   -- if that gives you some

Page 192

1 context.
2

Page 193

1

Confidential Information Subject to Protective Order





Confidential Information - Subject to Protective Order



Page 202

6    MR. DAVIS: Let's mark Tab
7    25 as Exhibit-13.
8         - - -
9         (Whereupon, Exhibit
10    Sheinin-13, No Bates, Valsartan
11    Development Report, Addendum IV,
12    was marked for identification.)
13         - - -
14         MR. REEFER: Should we put
15    12 aside, John?
16         MR. DAVIS: Yes, you may.
17         MR. REEFER: Okay. And 25
18    is the new one, right --
19         MR. DAVIS: That's correct.
20         MR. REEFER: -- that you
21    sent during lunch?
22         Okay. Thank you.
23    BY MR. DAVIS:
24         Q.  Did you review any

Page 203

1    development reports related to Mylan's
2    development of its manufacturing process
3    for valsartan API, Dr. Sheinin?
4         A.  Not that I'm aware of. I
5    don't believe I reviewed any development
6    reports.
7         Q.  You'll see some numbering,
8    C01, C02, C03, it's kind of like stamped
9    numbering in the bottom center of the
10    pages.
11         A.  Yeah. Some of them are
12    rather blurry. But I can see there's
13    numbers or something down there.
14

Page 204

18         Q.  Did you -- in preparing your
19    expert report, Dr. Sheinin, did you come
20    to any kind of understanding of how NDEA
21    was formed exactly in Mylan's valsartan
22    API?
23         MR. REEFER: Object to form.
24    Scope and foundation.

Page 205

1         But go ahead, Doctor, if you
2    know.
3         THE WITNESS: I did not come
4    to any conclusion on that. I
5    wasn't asked to look into it.
6    BY MR. DAVIS:
7         Q.  Even though you weren't
8    asked to look into it, do you have at
9    least some kind of understanding of how
10    it formed?
11         MR. REEFER: Same objection.
12    Asked and answered.
13         THE WITNESS: I have some
14    understanding, but I don't know
15    the -- all the conditions and what
16    it takes to form NDEA.
17    BY MR. DAVIS:
18         Q.  Dr. Daniel Snyder's
19    deposition testimony and exhibits are
20    listed in your Exhibit B, materials
21    considered, are they not?
22         A.  I see a Dan Snyder, yes. I
23    did not look at his report.
24         Q.  Well, he's a -- he was a

Confidential Information -- Subject to Protective Order

Page 206

1 Mylan fact witness deposition that was
2 taken in this case.  So he wouldn't have
3 prepared an expert report.  However, his
4 testimony largely centered on Mylan's
5 root cause evaluation.
6          Do you recall reading his
7 testimony?
8      A.   I did not read it.
9      Q.   Did you look at any of the
10 exhibits to his deposition?
11     A.   I don't know anything about
12 him.  I didn't look at it.
13          I think I mentioned earlier
14 all those individuals listed at the end
15 of my list, I did not look at any of
16 their information, reports or depositions
17 or anything.
18     Q.   So it was provided to you
19 but you didn't look at it?
20     A.   Correct.
21     Q.   Okay.  What I've marked as
22 Exhibit-13 here, which is Addendum IV to
23 the valsartan development report, that's
24 also listed in your Exhibit B, materials

Page 207

1 considered, is it not?
2          MR. REEFER:  I'm sorry,
3      John, the correct -- I think you
4      said, maybe, the wrong exhibit
5      number.  Or did I write it down
6      wrong?
7          Oh, I'm sorry.  I'm so
8      sorry, John, I interrupted you.  I
9      messed up.  I wrote down
10     Exhibit-25 because it was Tab 25.
11     I'm sorry to interrupt your
12     examination, John.
13         MR. DAVIS:  Not a problem.
14 BY MR. DAVIS:
15     Q.   So the question,
16 Dr. Sheinin, is what I've marked as
17 Exhibit-13, which is the 70-page document
18 entitled, Addendum IV to Valsartan
19 Development Report, that's also listed in
20 your materials considered, is it not,
21 under Item 8?
22     A.   Yes.
23     Q.   Did you review this?
24     A.   No.

Page 208

1

Page 209

1

17 BY MR. DAVIS:
18     Q.   Let me ask you, Dr. Sheinin,
19 from a -- from a process chemistry
20 perspective, would you assume a different
21 result, in terms of chemical reactions,
22 if the same process was followed every
23 single time?
24          MR. REEFER:  Object to

Page 210

1  foundation and scope.
2       THE WITNESS:  And I'm not a
3  process chemist, but my experience
4  has been that when you're
5  manufacturing batch after batch
6  after batch of a drug substance,
7  you're not going to end up with
8  exactly the same impurity profile
9  and you're not going to end up
10 with exactly the same assay value.
11      So I wouldn't want to say
12 that everything is going to be
13 exactly the same if you run the
14 procedure the same way, with the
15 qualification that I'm not a
16 process chemist.
17 BY MR. DAVIS:
18      Q.   But assuming -- let's assume
19 that, you know, all of the -- all of the
20 variables, meaning, like, the reagents,
21 catalysts, the temperatures, the
22 equipment used, all of those things are
23 the same, chemical reactions don't choose
24 to happen sometimes and not others,

Page 211

1  right?
2           Isn't that a basic principle
3  of organic chemistry, is that you can
4  reliably cause chemical reactions to
5  occur under certain conditions?
6           MR. REEFER:  Object to the
7  scope.  Foundation.  Asked and
8  answered.
9           THE WITNESS:  Again, when
10 companies -- again, not being a
11 process chemist, but companies are
12 running their synthetic schemes, I
13 would assume, the same way, and
14 yet they can -- sometimes an
15 impurity shows up, sometimes it's
16 not.
17      So it's not always going to
18 be exactly the same even though
19 they run the procedure the same
20 way, use the same chemicals, the
21 same reagents, the same
22 temperatures, the same time.
23      There is variation in what
24 the results are.

Page 212

1  BY MR. DAVIS:
2       Q.   Right.  I'm asking more of a
3  theoretical question, which is, isn't it
4  a -- just a general principle of
5  chemistry that if you -- that chemical
6  reactions will occur in the way you would
7  expect them to reliably?
8           You don't mix two things and
9  have a completely different result one
10 time or another; chemical reactions occur
11 reliably as a matter of the basic
12 discipline of the science, correct?
13      MR. REEFER:  Object to form.
14      Scope.  Asked and answered again.
15      THE WITNESS:  In general,
16 chemical reactions will go the
17 same way.  But there's
18 different -- to a different
19 extent, I have to go back to I'm
20 not a process chemist, but when
21 they run the procedure the same
22 way, they are going to find
23 differences.  So it's not going to
24 be exactly the same every time.

Page 213

1  BY MR. DAVIS:
2       Q.   You did say that you had
3  reviewed the nitrosamine testing
4  spreadsheet, correct?
5       A.   Yes.
6       Q.   And that did show NDEA
7  present in every single lot batch that
8  was tested, correct?
9       A.   I believe what I said was
10 that I did not look at the entire
11 spreadsheet, so I can't say that it was
12 present in every single batch.
13      But the page that I looked
14 at, I did see it in those lots.  But I
15 did not look at the entire spreadsheet.
16      MR. DAVIS:  Hey, Jason,
17 let's take a quick break, five
18 minutes.  I'm actually almost
19 done, I just want to review my
20 notes.
21      MR. REEFER:  No problem.
22      VIDEO TECHNICIAN:  Going off
23 the record.  The time is 3:13 p.m.
24           - - -

Confidential Information Subject to Protective Order

Page 214

1    (Whereupon, a brief recess
2    was taken.)
3        - - -
4        VIDEO TECHNICIAN:  We are
5    back on the record.  The time is
6    3:26 p.m.
7  BY MR. DAVIS:
8    Q.   The last real item I want to
9  touch on, Dr. Sheinin, is your response
10 to Dr. Najafi's report.
11       That discussion appears at
12 Paragraphs 83 through, I guess, the end
13 of your report; is that right?
14   A.   Basically, yeah, I think.  I
15 don't think there's any other
16 subheadings.
17   Q.   Can you describe to me
18 what -- what is your critique of
19 Dr. Najafi's report?
20   A.   The main critique is that
21 he's saying that the impurity profile has
22 to be the same for the generic to be able
23 to say that the API is the same as is
24 used in the reference-listed drug.

Page 215

1        And I believe I go on to
2  discuss why that's not the case.  And,
3  again, I would come back to the fact that
4  when a company makes the drug substance
5  by one route and a second company is
6  making it by a different route, you're
7  going to get, almost for certain, a
8  different impurity profile, and, still,
9  under the definition in the regulations,
10 those two APIs are the same.
11       The impurity profile is
12 immaterial to whether or not the API is
13 the same as what's in the
14 reference-listed drug.  And he doesn't
15 seem to agree with that.
16   Q.   Well, he also doesn't say
17 that, though, does he?  He doesn't say
18 anywhere in his declaration that the
19 impurity profiles generally have to be
20 the same, does he?
21   A.   From what I remember, he's
22 saying that the impurity profiles have to
23 be the same or it's not considered to be
24 the same API.

Page 216

1    Q.   But you can't point me to a
2  particular portion of his report you're
3  referring to where you claim that he says
4  that?
5    A.   I don't have it in front of
6  me, and I'd have to read through his
7  report again.
8        But that's -- that's my
9  understanding and impression, was that he
10 was saying that they're not the same
11 because they have different impurity
12 profiles.
13   Q.   You don't cite the portion
14 of his report you're claiming where he
15 says that in your -- in your report, do
16 you?
17   A.   I don't -- I don't think so.
18   Q.   Okay.  So the answer is no?
19   A.   98, Dr. Najafi concludes
20 that valsartan-containing products that
21 contained NDMA and NDEA were not the
22 generic equivalent of Diovan or Exforge
23 because they contained NDMA and NDEA.
24       And what I'm saying is the

Page 217

1  drug substance used in Mylan's valsartan,
2  by the definition in the regulations, is
3  the same as the valsartan that's used in
4  the innovator product.  But he's saying
5  they're not, and I'm saying that they
6  are.
7    Q.   Well, what's your basis for
8  saying that they are, despite the fact
9  that they had NDMA and NDEA and were all,
10 by the way, recalled?
11   A.   The basis for what I'm
12 saying is that, as I stated a little bit
13 ago, you can have different impurity
14 profiles in the active ingredient and
15 it's still considered the same as that
16 that's used in the reference-listed drug.
17       That's what the regulations
18 describe, that the API is the same.  The
19 impurity profile is immaterial to that,
20 unless -- unless you have a case where
21 there's an impurity that makes up 50
22 percent of the API.
23       I mean, you're not going to
24 have that, so --

Confidential Information Subject to Protective Order

Page 218

1    Q.   So -- go ahead, Dr. Sheinin.
2  I didn't mean to cut you off.
3    A.   The impurity profile is not
4  what determines whether the API is the
5  same in the reference-listed drug and the
6  generic drug.
7    Q.   So let me get -- let me see
8  if I understand what you're saying.
9        You're saying, from a
10  general -- as a general proposition, it's
11  possible that an API can have a different
12  impurity profile and still be considered
13  a generic equivalent; is that what you're
14  saying?
15    A.   I'm saying that the API can
16  have a different impurity profile and be
17  considered the same as the
18  reference-listed drug.
19    Q.   And when you say "the
20  same" --
21    A.   I'm saying that the API in a
22  generic drug can have a different
23  impurity profile and still be considered
24  the same as the API that's used in the

Page 219

1  reference-listed drug.
2    Q.   Okay.  And you're saying --
3  by "the same" -- what do you mean by "the
4  same" there?
5    A.   That under the regulations
6  that it's considered the same ingredient
7  if it has the same structure, the same
8  purity -- I guess purity doesn't -- is
9  not really a factor.
10        But if it has the same
11  structure, if it's the same chemical,
12  then it's the same, regardless of what
13  its impurity profile is.
14    Q.   Well, purity is a factor,
15  though.
16        What -- what regulations are
17  you referring to when you say that it
18  doesn't have to be -- that it is the same
19  regardless of the impurity profiles?
20  What regulation are you referring to for
21  your understanding of that?
22    A.   I'd have to go back into the
23  CFR.  It could be in a guidance.  But
24  it's --

Page 220

1    Q.   Are you familiar with the
2  FDA's Orange Book?
3    A.   Yes.
4    Q.   You don't mention the Orange
5  Book anywhere in your report, do you?
6    A.   No, I do not.
7    Q.   And it's not listed in your
8  materials considered, is it?
9    A.   It is not.
10    Q.   Okay.  When is the last time
11  you think you reviewed the -- anything
12  regarding the FDA's Orange Book?
13    A.   It was at some point this
14  year that I can remember looking --
15  looking at the Orange Book.
16    Q.   In your understanding, what
17  is the FDA Orange Book?
18    A.   The Orange Book is --
19        MR. REEFER:  Objection to
20  scope.
21        THE WITNESS:  Sorry.
22        MR. REEFER:  Go ahead.
23        THE WITNESS:  The Orange
24  Book is a -- basically a

Page 221

1  compendium of all the products
2  that are approved by FDA, and
3  they're listed by active
4  ingredient.
5        And it shows whether or not
6  a generic is considered
7  bioequivalent to the
8  reference-listed drug, and it
9  shows which -- which product or
10  products are considered as
11  reference-listed drugs.
12  BY MR. DAVIS:
13    Q.   Well, bioequivalence is just
14  one aspect of therapeutic equivalence,
15  right, which is the larger thing the
16  Orange Book is concerned with, correct?
17    A.   I believe so.
18    Q.   And the Orange Book will
19  list, like you say, various drugs and
20  which ones are therapeutically
21  interchangeable with each other because
22  of a therapeutic equivalence
23  determination, correct?
24        MR. REEFER:  Object to form.

Confidential Information Subject to Protective Order

Page 222

1    Scope.
2         THE WITNESS:  Correct.
3         MR. DAVIS:  Let me mark Tab
4    17 as Exhibit-14.
5              - - -
6         (Whereupon, Exhibit
7    Sheinin-14, No Bates, Orange Book
8    Preface, Food and Drug
9    Administration, Center for Drug
10   Evaluation and Research, Approved
11   Drug Products with Therapeutic
12   Equivalence Evaluations, was
13   marked for identification.)
14             - - -
15   BY MR. DAVIS:
16        Q.   Have you read this
17   FDA-authored Orange Book preface, before,
18   Dr. Sheinin?
19        A.   No, I have not.
20        Q.   Do you see that the URL at
21   the bottom of the page is pulled from the
22   www.fda.gov website?
23        A.   Yes.
24        Q.   And you'll see on the second

Page 223

1    page, bottom -- bottom two paragraphs,
2    really, the FDA says that, The
3    therapeutic equivalence evaluations in
4    the Orange Book reflect the FDA's
5    application of specific criteria to the
6    multi-source prescription drug products
7    listed in the Orange Book and approved
8    under the FD&C Act.
9         Do you see that?
10        A.   Yes.
11        Q.   And then the next paragraph
12   down says that, A complete discussion of
13   the background and basis of the FDA's
14   therapeutic equivalence evaluation policy
15   was published in the Federal Register in
16   1979.
17        Do you see that?
18        A.   Yes.
19        Q.   If you go to Page 4, you'll
20   see a section titled, Introduction.
21        A.   Yes.
22        Q.   It says, The Orange Book is
23   composed of four parts.
24        And the first part is,

Page 224

1    Approved prescription drug products with
2    therapeutic equivalence evaluations.
3         Do you see that?
4         A.   Can you read that again?
5         Q.   The first sentence of the
6    introduction reads, The Orange Book is
7    composed of four parts.
8         And then the first part it
9    lists is, Approved prescription drug
10   products with therapeutic equivalence
11   evaluations.
12        Do you see that?
13        A.   Yes.
14        Q.   Okay.
15        A.   I see that.
16        Q.   So would you agree that
17   therapeutic equivalence is really the
18   regulatory touchstone of evaluating
19   whether a generic product is -- can be
20   considered the same as a brand product?
21        MR. REEFER:  Object to form.
22   Scope.
23        THE WITNESS:  I would say
24   that therapeutic equivalence,

Page 225

1    if -- if the generic is
2    therapeutically equivalent to the
3    reference-listed drug, that
4    they're interchangeable.
5    BY MR. DAVIS:
6         Q.   And that's the FDA's way of
7    saying you can -- you can take it to the
8    bank that this drug is going to be the
9    same as the RLD, correct?
10        MR. REEFER:  Object to form.
11   Vague.
12        THE WITNESS:  My -- my way
13   of looking at it is if FDA has
14   approved a generic drug and FDA
15   says it's therapeutically
16   equivalent, that I can take the
17   generic in lieu of taking the
18   reference-listed drug to achieve
19   the desired outcome for whatever
20   reason that I'm taking the drug
21   for.
22   BY MR. DAVIS:
23        Q.   And that's what's most
24   important here, right, for physicians'

Page 226

1  and patients' purposes in evaluating
2  whether a generic is the same as the
3  brand, right?
4          It's not living in some
5  hypothetical world, it's -- there's a
6  reason for that, which is, can I
7  substitute it for the brand, right?
8          MR. REEFER:  Object to form.
9      Scope.  Foundation.
10         THE WITNESS:  Yeah.  The --
11         again, to me, the generic means
12         that the FDA has approved it and
13         it's therapeutically equivalent,
14         so I have no problem with taking
15         the generic in lieu of taking a
16         reference-listed drug.
17 BY MR. DAVIS:
18     Q.   And that's what it means to
19 be -- sorry.  Go ahead.
20     A.   I was going to say, the
21 issue of sameness, we were discussing
22 sameness of the active ingredient.  I
23 don't know that that's exactly the same
24 as the sameness of whether it's

Page 227

1  therapeutically equivalent or not.
2          It's two different -- to me,
3  it's two different uses of "sameness."
4      Q.   Okay.  And you're not sure
5  what Dr. Najafi was referring to in his
6  report, whether he was referring to the
7  defendants at issue, VCDs being
8  therapeutic equivalents or generic
9  equivalents or whether the API was just
10 the same, are you?
11     A.   He's saying
12 valsartan-containing drug products that
13 contain NDMA and NDEA were not the
14 generic equivalent of Diovan or Exforge
15 because they contained NDMA and NDEA.
16         So I'm saying that they are
17 equivalent.
18     Q.   You're saying that they're
19 therapeutically equivalent under the
20 Orange Book?
21     A.   Yes.
22     Q.   But you haven't looked at
23 the Orange Book at all in your report,
24 have you?

Page 228

1      A.   No, I have not.
2      Q.   Okay.  And you're just now
3  looking at the Orange Book preface since
4  I've showed it to you, correct?
5      A.   Correct.
6      Q.   So is this, like, an
7  off-the-cuff opinion that you're making?
8          MR. REEFER:  Object to form.
9      Argumentative.
10         MR. DAVIS:  Well, no, it's a
11     fair question.
12 BY MR. DAVIS:
13     Q.   Dr. Sheinin, you don't --
14 you don't put anywhere in your report the
15 opinion that the NDMA- and
16 NDEA-contaminated valsartan is a
17 therapeutic equivalent to the RLD, do
18 you?  That's nowhere in your report, is
19 it?
20     A.   No.
21     Q.   Okay.  And do you know what
22 criteria, even, the FDA requires for a
23 drug to be considered therapeutically
24 equivalent to an RLD?

Page 229

1          MR. REEFER:  Object to form.
2      Foundation.
3          Go ahead.
4          THE WITNESS:  I know it has
5      to be considered to be
6      bioequivalent.  I'm not sure what
7      the second criteria is.  I know
8      that there's two factors that go
9      into the therapeutic equivalence.
10 BY MR. DAVIS:
11     Q.   So how could you form an
12 opinion that the defendants' valsartan in
13 this case was therapeutically equivalent
14 to the RLD when you're not sure what the
15 definition of therapeutic equivalence is?
16         MR. REEFER:  Object to form.
17     Misstates testimony.  Beyond the
18     scope.
19         THE WITNESS:  What exactly
20     did I say?
21         Najafi said that if it
22     contains NDMA and NDEA, that it's
23     not the generic equivalent.  I did
24     not use the words "therapeutically

Confidential Information Subject to Protective Order

Page 230

1    equivalent."
2            And, to me, the fact that
3    NDMA and NDEA may be present does
4    not make it not generically
5    equivalent to the reference-listed
6    drug.
7            It's the active ingredient
8    that's important.  The impurities
9    in general do not contribute to
10   the efficacy of the active
11   ingredient and the drug product.
12   So the presence of impurities is
13   immaterial to whether or not the
14   generic is equivalent to the
15   reference-listed drug.
16   BY MR. DAVIS:
17       Q.    Well, the FDA is not just
18   concerned with efficacy, they're also
19   concerned with safety, aren't they?
20           MR. REEFER:  Object to form.
21   Beyond the scope.
22           THE WITNESS:  They are.  And
23   FDA has said that there is a
24   very -- what's the word I'm

Page 231

1    looking for -- theoretical issue
2    with nitrosamines and that there's
3    a very minimal risk and that these
4    impurities are present at
5    extremely low levels, they are
6    trace impurities.  And there are
7    products that FDA has allowed on
8    the market that do contain
9    nitrosamines.
10   BY MR. DAVIS:
11       Q.    I thought you told me you're
12   not a toxicologist, right, so you have no
13   way to independently evaluate any of
14   those assertions, right?
15       A.    That's correct.  I'm not a
16   toxicologist, but I can read what's
17   written in the FDA statements, that it's
18   a theoretical risk.
19           And it may -- I think it
20   says further in those statements that it
21   may be a cause of cancer; it may.
22           As a scientist, I don't have
23   to be a toxicologist to understand what
24   FDA is saying there.

Page 232

1        Q.    The FDA did require the
2    recall of every single lot and batch of
3    Mylan's valsartan, did they not, though?
4            MR. REEFER:  Objection to
5    form.  Misstates facts.  Beyond
6    the scope.
7            THE WITNESS:  I believe
8    that, yes, FDA recalled all the
9    lots of Mylan's valsartan
10   products.
11   BY MR. DAVIS:
12       Q.    And you're aware that the
13   IARC, EPA and other regulatory bodies
14   that evaluate toxicology have classified
15   NDMA and NDEA as probable human
16   carcinogens, correct?
17           MR. REEFER:  Object to form.
18   Foundation.  Beyond the scope.
19           MR. DAVIS:  He's -- Jason,
20   he's the one who just brought this
21   up.  I've got to delve into it
22   now.
23           MR. REEFER:  He -- John, he
24   clarified that he was --

Page 233

1            MR. DAVIS:  No, he didn't,
2    Jason.  He went off on a tangent,
3    and now I've got to -- now I have
4    to put the lid back on it.
5    BY MR. DAVIS:
6        Q.    So you can answer the
7    question, Dr. Sheinin.
8            Are you aware that the IARC,
9    EPA and other regulatory bodies governing
10   toxicology assessments have classified
11   NDMA and NDEA as probable human
12   carcinogens?  Are you aware of that?
13           MR. REEFER:  Object to form.
14   Foundation.  Beyond the scope.
15           THE WITNESS:  I know that
16   I -- IA-what -- IAR-whatever was
17   mentioned in the M7, I believe, in
18   that paragraph you had me look at.
19           But other than that, I don't
20   know anything else about that
21   organization or what EPA has said
22   or what any other organization has
23   said.
24   BY MR. DAVIS:

Confidential Information Subject to Protective Order

Page 234

1    Q.   Are you aware that these
2  entities are so certain that NDMA and
3  NDEA are human carcinogens that it's
4  considered unethical to actually do the
5  studies to confirm that?
6         MR. REEFER:  Object to form.
7    Sorry.
8         Object to form.  Beyond the
9    scope.  Foundation.
10        THE WITNESS:  No, I'm not
11   aware.
12 BY MR. DAVIS:
13   Q.   Okay.  Are you aware that
14 Mylan's valsartan at times contained up
15 to 20 times what the FDA considers safe,
16 acceptable intakes for NDEA?
17        MR. REEFER:  Object to form.
18   Misstates testimony and evidence.
19        But go ahead, Doctor.
20        THE WITNESS:  I'm not aware
21   of -- I didn't do any calculations
22   to see how much above or below
23   the -- what FDA recommended.
24   That's all I can say.

Page 235

1         I did not do any kind of
2    calculation to determine that.
3  BY MR. DAVIS:
4    Q.   Okay.  Thank you.
5         So in Paragraph 99 of your
6  report, you say, As presented above,
7  valsartan manufactured by a different
8  route of synthesis that resulted in a
9  different impurity profile still would be
10 considered the same as that used in the
11 RLD.
12        Do you see that?
13   A.   Yes, I see that.
14   Q.   You're not saying there that
15 valsartan that contains NDMA and NDEA
16 would still be considered the same as
17 that -- as that used in the RDL, are you?
18        Is there a reason you're not
19 saying that -- is there -- let me strike
20 that and rephrase it.
21        Is there a reason that
22 Paragraph 99 reads the way it does as
23 opposed to stating the following, which
24 would be, valsartan that contains NDMA

Page 236

1  and NDEA would still be considered the
2  same as the RLD?
3         MR. REEFER:  Object --
4    object to form.  Vague.
5         But go ahead, Doctor, if you
6    understand.
7         THE WITNESS:  That's the way
8    I always refer to the active
9    ingredient in a generic drug
10   versus the active ingredient in
11   the reference-listed drug.
12        To me, it's always the same.
13   If you have different routes of
14   synthesis, and even if you have a
15   different impurity profile, it's
16   still going to be the same active
17   ingredient.
18 BY MR. DAVIS:
19   Q.   Well, the FDA, in that
20 situation, would have approved that
21 different route of synthesis, correct?
22   A.   Correct.
23   Q.   Okay.  Have you seen any
24 evidence that the FDA approved valsartan

Page 237

1  products where there was an affirmative
2  disclosure that they contained NDMA and
3  NDEA?
4         MR. REEFER:  Object to form.
5    Scope.
6         THE WITNESS:  I have no way
7    to access whether or not there was
8    a valsartan that claimed to have
9    NDMA or NDEA in it and that
10   application was submitted to the
11   FDA and that it was approved.  I
12   have no way of knowing that.  So I
13   can't say if that's a possibility.
14        That information is
15   confidential and the FDA would not
16   release that.  I don't have access
17   to FDA's information anymore.
18 BY MR. DAVIS:
19   Q.   Is it your position that
20 purity has nothing to do with therapeutic
21 equivalence?
22        MR. REEFER:  Object to form.
23   Misstates the testimony.  Beyond
24   the scope.

Confidential Information Subject to Protective Order

Page 238

1    THE WITNESS:  As long as the
2    drug substance meets the purity
3    acceptance criteria in the assay
4    in its specification, the purity
5    is going to vary for a number of
6    reasons.
7    And I don't believe that
8    that -- that a purity on one API
9    that was in the acceptance
10   criteria for the assay would be
11   considered not to be equivalent to
12   the reference-listed drug active
13   ingredient that had a different
14   assay value.
15   So there's -- that's why, in
16   many cases, the active ingredient
17   has an acceptance criteria of 98.0
18   to 102.0 percent.
19 BY MR. DAVIS:
20   Q.   What about quality, is it --
21 do you have any understanding of whether
22 quality has anything to do with
23 therapeutic equivalence?
24   MR. REEFER:  Object to form.

Page 239

1    Vague.  Beyond the scope.
2    THE WITNESS:  As long as the
3    generic or any -- any drug
4    substance meets the acceptance
5    criteria in the specification,
6    then -- and that includes not only
7    the assay but the impurity
8    testing, then I would consider
9    that to be the same as any other
10   API of that same chemical that has
11   also met the acceptance criteria
12   in the specification.
13 BY MR. DAVIS:
14   Q.   Okay.  Let me ask a
15 hypothetical to you, Dr. Sheinin.
16   The specification lists
17 impurities of not more than .1 percent in
18 this case, right, for valsartan?  That's
19 what the specification says, right?
20   A.   The specification for any
21 other unknown impurity is point -- not
22 more than .1 percent.
23   Q.   Right.  Let's say there was
24 some other unknown impurity that was

Page 240

1 guaranteed to kill anyone who ingested
2 the product at levels below .1 percent,
3 percent mortality rate, are you saying
4 that that would be considered the same,
5 from a purity or quality standpoint, as
6 the RLD?
7    MR. REEFER:  Object to form.
8    Assumes facts.  Incomplete
9    hypothetical.
10   Go ahead.
11   THE WITNESS:  That's a very
12   hypothetical question that has no
13   place in the real world.
14   But in the specification, if
15   it's -- if it's -- has -- if it
16   meets the specification, then it's
17   the same.
18 BY MR. DAVIS:
19   Q.   Okay.
20   A.   You have to have other --
21 other testing and other things to come
22 into play for it to be considered not the
23 same.
24   Q.   Okay.  Turn to Page 7 of

Page 241

1 Exhibit-14, which is the FDA Orange Book
2 preface.
3    A.   Okay.
4    Q.   You'll see there's a
5 definition provided there for therapeutic
6 equivalence.
7    Do you see that?
8    A.   Yes.
9    Q.   And it says, FDA classifies
10 as therapeutically equivalent those drug
11 products that meet the following general
12 criteria.
13   Do you see that?
14   A.   Yes.
15   Q.   Okay.  One, they are
16 approved as safe and effective.
17   Do you see that?
18   A.   Yes.
19   Q.   Do you know -- back to my
20 earlier question.
21   You don't know whether the
22 FDA has ever approved any valsartan drug
23 product -- or, rather, any product at all
24 that contains NDMA or NDEA as safe and

Confidential Information Subject to Protective Order

Page 242

¹ effective, with the disclosure that it
² actually contained NDMA or NDEA, correct?
³     A.   I have no way of knowing
⁴ that.
⁵     Q.   Do you have any
⁶ understanding of whether NDMA or NDEA
⁷ have any therapeutic benefit?
⁸         MR. REEFER:  Object to form.
⁹     Foundation and scope.
¹⁰        But go ahead, if you know.
¹¹        THE WITNESS:  I don't know
¹² whether they have any therapeutic
¹³ benefit.  I -- I have not looked
¹⁴ into that.
¹⁵        I don't -- I don't believe
¹⁶ they act -- act to enhance the
¹⁷ therapeutic effect of the
¹⁸ valsartan, but I don't know what
¹⁹ their -- what could possibly be
²⁰ their therapeutic benefit.
²¹        But I can't answer that
²² question.  I don't know.
²³ BY MR. DAVIS:
²⁴     Q.   Okay.  The second criteria

Page 243

¹ for meeting therapeutic equivalence is,
² 2, They are pharmaceutical equivalents in
³ that they contain identical amounts of
⁴ the identical active drug ingredient in
⁵ the identical dosage form and route of
⁶ administration.
⁷         Do you see that?
⁸     A.   Yes.
⁹     Q.   2A?
¹⁰    A.   I see that.
¹¹    Q.   Is that -- is that what
¹² you're talking about when you're saying
¹³ that the API is the same because it meets
¹⁴ the spec?  Are you saying that valsartan
¹⁵ API would be pharmaceutically equivalent
¹⁶ under 2A there?
¹⁷    A.   I would say under 2B, Meet
¹⁸ compendial or other applicable standards
¹⁹ of strength, quality, purity and
²⁰ identity.
²¹        If you take A and B
²² together, yes, that's what I'm saying.
²³    Q.   Okay.  But you're -- you
²⁴ conceded, though, that there are -- that

Page 244

¹ other applicable standards out there
² other than USP, correct?  For example,
³ the ICH guidelines?
⁴         MR. REEFER:  Object to form.
⁵     Misstates testimony.
⁶         THE WITNESS:  ICH guidelines
⁷     do not set acceptance criteria for
⁸     any particular test --
⁹ BY MR. DAVIS:
¹⁰    Q.   For ICH M7 it does, though.
¹¹ We saw that in ICH M7.
¹²        ICH M7 does set thresholds.
¹³ In fact, that's how the acceptable
¹⁴ intakes for NDMA and NDEA were created by
¹⁵ the FDA.
¹⁶        MR. REEFER:  John, you
¹⁷ interrupted -- John, you
¹⁸ interrupted his answer.  I'd like
¹⁹ to --
²⁰        MR. DAVIS:  My apologies.
²¹        MR. REEFER:  -- give him a
²² chance to finish.
²³        THE WITNESS:  I'm talking
²⁴ about the ICH quality guidelines.

Page 245

¹         I will give you that the ICH
² Q3C and Q3D do set standards for
³ the amount of residual solvent and
⁴ the amount of inorganic impurities
⁵ or elemental impurities.
⁶         But beyond that, they do not
⁷ set standards for what the assay
⁸ has to be, what the level of
⁹ impurities have to be.  There are
¹⁰ impurity guidelines that talk
¹¹ about various categories, but they
¹² don't say that the acceptance
¹³ criteria for a given impurity in a
¹⁴ given drug substance or drug
¹⁵ product has to meet a certain
¹⁶ level.
¹⁷        That's what I'm saying.  And
¹⁸ that's the guidelines and
¹⁹ guidances that I was talking
²⁰ about.  Where it talks here about,
²¹ meet compendial or other
²² standards, to me, that's the
²³ specification that's on file
²⁴ with -- in their application at

Confidential Information Subject to Protective Order

Page 246

1    FDA.
2    BY MR. DAVIS:
3        Q.   We saw that ICH M7 sets
4    acceptance criteria, correct?
5            MR. REEFER:  Object to form.
6    Misstates the document.
7            But go ahead, Doctor.
8            THE WITNESS:  The little bit
9    of M7 that I know, it has
10   information in there about these
11   impurities.  But I don't know that
12   they actually said acceptance
13   criteria.  I'd have to go back and
14   study that guideline.
15   BY MR. DAVIS:
16       Q.   Okay.  You haven't studied
17   it for your report here?
18       A.   Correct.
19       Q.   Or for your conclusion in
20   Paragraph 99 of your report, have you?
21       A.   Correct.
22       Q.   And you haven't even studied
23   the FDA's Orange Book definition of
24   therapeutic equivalence here for

Page 247

1    Paragraph 99 of your report, have you?
2        A.   I have not.
3        Q.   Do you see Number 5 a little
4    bit further down?
5        A.   Yes.
6        Q.   And they are manufactured in
7    compliance with current good
8    manufacturing practice regulations.
9            Do you see that as a
10   requirement that the FDA has for a drug
11   product to be considered therapeutically
12   equivalent?
13       A.   Yes.
14           MR. DAVIS:  Just a little
15   recordkeeping.  I'm going to mark
16   Tabs 20, 21 and 22 as Exhibits-15
17   through 17.
18           - - -
19           (Whereupon, Exhibit
20   Sheinin-15, No Bates, 12/31/21
21   ProPharma Group Invoice
22   #PPGUS000581, was marked for
23   identification.)
24           - - -

Page 248

1        (Whereupon, Exhibit
2    Sheinin-16, No Bates, 1/31/22
3    ProPharma Group Invoice
4    #PPGUS000820, was marked for
5    identification.)
6            - - -
7        (Whereupon, Exhibit
8    Sheinin-17, No Bates, 2/28/22
9    ProPharma Group Invoice
10   #PPGUS001080, was marked for
11   identification.)
12           - - -
13       MR. DAVIS:  Do you have
14   those, Jason?  Those are the
15   invoices.
16       MR. REEFER:  Yeah, I was --
17   I was understanding it was just
18   housekeeping, I wasn't about to
19   pull them up.  Do you want me to?
20       MR. DAVIS:  Sure.  I do want
21   him to see them and verify them
22   for me, so.
23       MR. REEFER:  Sure.  Sorry, I
24   just -- I thought you were just

Page 249

1    going to attach them and move on.
2    Remind me what you're looking at,
3    20 --
4        MR. DAVIS:  20 through 22,
5    which are now Exhibits-15 through
6    17.
7        MR. REEFER:  Three one-page
8    documents, correct?
9        MR. DAVIS:  That's right.
10       MR. REEFER:  I'm marking the
11   one dated 12/31/21 as
12   Exhibit-20 --
13       MR. DAVIS:  Okay.
14       MR. REEFER:  -- is that
15   correct?
16       MR. DAVIS:  Yes.  And then
17   do the January one for 21.
18       THE WITNESS:  15, 16 and 17
19   he said -- oh --
20       MR. DAVIS:  Yes.
21       THE WITNESS:  15, 16 and 17.
22       MR. DAVIS:  Yes.  Thank you,
23   Dr. Sheinin.
24       December would be

Confidential Information Subject to Protective Order

1    Exhibit-15.  January, 16 and
2    February, 17.
3         MR. REEFER:  All right.
4  BY MR. DAVIS:
5    Q.   Okay.  Just a few brief
6  housekeeping questions on these,
7  Dr. Sheinin.
8         Did you prepare these
9  invoices or did somebody else prepare
10  them?
11    A.   Somebody else.  I report my
12  time on a timekeeping system, and I
13  can't -- there have been -- let me back
14  up.
15         I used to file a time report
16  with NDA Partners, and then they went to
17  a timekeeping system, and I was using
18  that.  And then they went to a different
19  timekeeping system.
20         So I don't know at what
21  point in time that this new timekeeping
22  system went into effect.  But I think
23  it's -- since it's talking -- all these
24  are ProPharma Group, I believe it's the

1  current system.
2         And I enter my time on a
3  daily basis if I'm doing any work for NDA
4  Partners.  And I then enter the, in a
5  comment field, what work I did that day,
6  and it goes on a weekly basis.
7    Q.   Okay.  So even if you didn't
8  generate the actual invoice, the
9  description notations and dates,
10  quantities, et cetera, that's stuff you
11  would have written in your own words,
12  correct?
13    A.   Correct.
14    Q.   Okay.  Are there any
15  invoices prior to -- if you look at
16  Exhibit-15, which is the December
17  invoice, did you do any work on this case
18  prior to December 13th or would that have
19  been the first time you encountered work
20  on this case?
21    A.   I believe that's the first
22  time.
23    Q.   Okay.  And then the last --
24  Exhibit-17, the last entry is February

1  17th, 2022.
2         Do you see that?
3    A.   Yes.
4    Q.   Could you estimate for me
5  the amount of time you've billed in this
6  case since February 17?
7    A.   Not counting today?
8    Q.   Sure.  Not counting today.
9    A.   I think it's somewhere in
10  the neighborhood of 15 to 17 hours this
11  month.  But I can't say for certainty.
12    Q.   Okay.  Would all of that
13  time have been part of preparing for your
14  deposition today?
15    A.   I believe so.
16    Q.   Can you recall doing any
17  work after February 17 that was not
18  dedicated to preparing for today?
19    A.   No, I -- I mean, I -- this
20  is when -- I reviewed the certificates of
21  analysis and I looked at some additional
22  FDA statements.  But it was all in
23  relation to getting ready for today.
24    Q.   Okay.  Would that be the

1  supplement to Exhibit B to your report,
2  where you say you reviewed the deposition
3  of Ron Najafi?
4    A.   Yes.
5         MR. DAVIS:  Let me --
6  just another housekeeping matter.
7  Let me introduce that into
8  evidence.
9         - - -
10         (Whereupon, Exhibit
11  Sheinin-18, No Bates, Supplement
12  to Exhibit B to the Report of Eric
13  Sheinin, Ph.D., was marked for
14  identification.)
15         - - -
16  BY MR. DAVIS:
17    Q.   Okay.  I've marked that as
18  Sheinin-18.  And I don't need --
19  actually, here, what I'll do is just
20  screen share it.
21         Can you see that on your
22  screen, Dr. Sheinin?
23    A.   Yes.
24    Q.   It's a supplement to

Page 254

¹ Exhibit B, the report of Eric Sheinin,
² Ph.D., Deposition of Ron Najafi.
³     A.   I see that.
⁴     Q.   Was there anything else you
⁵ reviewed since submitting your expert
⁶ report on January 12th that didn't make
⁷ it into this supplemental exhibit,
⁸ supplement to Exhibit B?
⁹     A.   I don't believe so.
¹⁰     Q.   Okay.
¹¹     MR. DAVIS:  Okay.  That's
¹² all the questions I have for you
¹³ today, Dr. Sheinin.  Thank you for
¹⁴ your time.
¹⁵     I'll pass the witness.
¹⁶     THE WITNESS:  Thank you.
¹⁷     MR. REEFER:  Does anyone
¹⁸ have questions on the phone or
¹⁹ remote?
²⁰     Hearing none, John, let
²¹ me -- let's go off the record.
²²     VIDEO TECHNICIAN:  We're
²³ going off the record.  The time is
²⁴ 4:15 p.m.

Page 255

¹          -  -  -
²     (Whereupon, a brief recess
³ was taken.)
⁴          -  -  -
⁵     VIDEO TECHNICIAN:  We're
⁶ back on the record.  The time is
⁷ 4:51 p.m.
⁸     MR. DAVIS:  For the record,
⁹ before you start your questions,
¹⁰ Jason.  I'll note that we've been
¹¹ on a break for over 30 minutes
¹² since I concluded my questioning.
¹³     We'll reserve all rights
¹⁴ regarding how this is all going to
¹⁵ be allocated in terms of cost.  So
¹⁶ I'm going to reserve all that on
¹⁷ the record.
¹⁸     You can go ahead, Jason.
¹⁹     MR. REEFER:  I can also
²⁰ respond.  John, what's the basis
²¹ for your suggestion that my
²² taking -- I don't know if it was
²³ 30 minutes or not, but what's the
²⁴ basis for your suggestion that I

Page 256

¹ owe you costs for a 30-minute
² break in a deposition?
³     MR. DAVIS:  If we get a bill
⁴ for Dr. Sheinin's deposition time,
⁵ there will be a dispute over this
⁶ time period.
⁷     MR. REEFER:  Okay.  Well, I
⁸ guess you can raise that dispute
⁹ when you get the bill.
¹⁰     MR. DAVIS:  Okay.
¹¹     MR. REEFER:  I don't -- I
¹² don't understand the basis of your
¹³ objection.  But let's just move
¹⁴ on, okay?
¹⁵     MR. DAVIS:  Okay.  Go ahead.
¹⁶     MR. REEFER:  Thank you.
¹⁷          -  -  -
¹⁸          EXAMINATION
¹⁹          -  -  -
²⁰ BY MR. REEFER:
²¹     Q.   Dr. Sheinin, I just have a
²² few questions to clarify some of the
²³ testimony that you've offered thus far
²⁴ today.  I'll be as brief as I can,

Page 257

¹ recognizing it's already been a long day.
²     Do you remember,
³ Dr. Sheinin, this morning Mr. Davis asked
⁴ you a few questions about some of the
⁵ prior litigation work you've done as an
⁶ expert witness?
⁷     A.   Yes, I remember.
⁸     Q.   Okay.  And one of the
⁹ questions Mr. Davis asked you was whether
¹⁰ your prior work as an expert witness was
¹¹ all performed on behalf of pharmaceutical
¹² manufacturers.
¹³     Do you recall that question?
¹⁴     A.   I don't recall it in that
¹⁵ exact way.
¹⁶     Q.   Do you recall that during
¹⁷ Mr. Davis's previous questions to you, he
¹⁸ asked whether, during your prior work as
¹⁹ an expert consultant, that work was
²⁰ performed on behalf of pharmaceutical
²¹ manufacturers?
²²     A.   It was.
²³     Q.   And just to be clear, that
²⁴ prior work as an expert consultant

Page 258

1 involved litigation featuring
2 pharmaceutical manufacturers as both
3 plaintiffs and defendants, correct?
4       A.   Yes.
5       Q.   Were the only --
6          MR. DAVIS:  Objection.
7       Leading.
8 BY MR. REEFER:
9       Q.   Were the only parties to
10 those lawsuits pharmaceutical
11 manufacturers?
12      A.   Yes.
13      Q.   So, therefore, if you were
14 going to be involved as an expert
15 consultant, would you have any choice but
16 to represent a pharmaceutical
17 manufacturer?
18          MR. DAVIS:  Object to form.
19          THE WITNESS:  I doubt that
20       anybody would hire me.
21 BY MR. REEFER:
22      Q.   And to the best of your
23 recollection, did you represent
24 pharmaceutical manufacturers that were

Page 259

1 both plaintiffs and defendants?
2       A.   I believe so.
3       Q.   Dr. Sheinin, I think marked
4 as Exhibit-3 was a warning letter issued
5 to Unit 8, dated November 5th, 2019.
6          Do you recall talking about
7 that with Mr. Davis?
8       A.   Yes.
9       Q.   Does a warning letter
10 constitute final agency action by the
11 FDA?
12      A.   No, it doesn't.
13      Q.   Have you reviewed FDA's
14 website to determine whether Mylan, at
15 any point in time, has been placed on an
16 import alert?
17      A.   I have.  I could not find
18 any -- any time that Mylan had an import
19 alert.  I don't know how far back the
20 database goes, but it came back and said
21 no -- no response or something to that
22 effect.
23      Q.   So based on your review of
24 information published by FDA, you've seen

Page 260

1 no evidence to suggest Mylan was placed
2 on import alert following the recall of
3 valsartan, correct?
4       A.   Correct.
5       Q.   Under the FDCA, can FDA
6 permit the sale of drug product known by
7 the agency to be adulterated or
8 misbranded?
9       A.   I don't believe so.  I would
10 think not.
11      Q.   If you assume that Mylan's
12 Unit 8 continued to manufacture drug
13 substance for the United States market
14 from the time of the recalls to present,
15 would that confirm in your mind that FDA
16 did not consider drug substance from
17 Unit 8 to be misbranded or adulterated?
18      A.   Yes.
19          MR. DAVIS:  Wait.  Objection
20       to form.  Objection.  Leading.
21 BY MR. REEFER:
22      Q.   Do you remember,
23 Dr. Sheinin, having a discussion with
24 Mr. Davis about the M7 guidance?

Page 261

1       A.   Yes.
2       Q.   Did you testify that the M7
3 guidance was not one which you regularly
4 worked with during your time at FDA?
5       A.   I don't believe I worked
6 with it at all at FDA.
7          MR. REEFER:  And for the
8       record, I think the M7 guidance
9       was marked as Exhibit-5, but I
10       don't want to mess that up.
11 BY MR. REEFER:
12      Q.   If you'd pull out Exhibit-5,
13 please, Dr. Sheinin.
14      A.   Okay.
15      Q.   Dr. Sheinin, do you recall a
16 portion of your testimony with Mr. Davis
17 where he asked you to read beginning on
18 Page 5 of Exhibit-5 under the heading,
19 General Principles?
20      A.   Yes, I remember.  In fact, I
21 had to read this -- parts of two pages,
22 right?
23      Q.   Correct.  Yes, sir.
24          Dr. Sheinin, if you look at

Confidential Information Subject to Protective Order

Page 262

¹ the second paragraph under general
² principles, you'll see a sentence
³ beginning with, A threshold of
⁴ toxicological concern.
⁵          Do you see that paragraph,
⁶ sir?
⁷          A.   Yes.
⁸          Q.   And in the second sentence,
⁹ does this document state that, The
¹⁰ methods upon which the TTC -- that being
¹¹ the threshold of toxicological concern --
¹² is based are generally considered to be
¹³ very conservative since they involve a
¹⁴ simple linear extrapolation from the
¹⁵ dose, giving a 50 percent tumor incidence
¹⁶ to a 1 in 106 incidence, using TD50 data
¹⁷ for the most sensitive species and most
¹⁸ sensitive site of tumor induction?
¹⁹          Do you see that language,
²⁰ sir?
²¹          MR. DAVIS:  Before you
²²      answer, Dr. Sheinin, let me place
²³      an objection on the record here.
²⁴          He's testified a billion

Page 263

¹      times today he's not a
²      toxicologist, so asking him about
³      the substance of how thresholds
⁴      for toxicological concern are
⁵      created is totally outside of --
⁶      not only of his report but also of
⁷      his expertise, as he's admitted
⁸      today.
⁹          And I'll object to form,
¹⁰      just for the heck of it.
¹¹          MR. REEFER:  I understand
¹²      your position to be that the
¹³      section of M7 that you required my
¹⁴      witness to read cannot now be read
¹⁵      into the record; is that your
¹⁶      position, counsel?
¹⁷          MR. DAVIS:  No, I'm
¹⁸      objecting to where this is going,
¹⁹      which is -- which is --
²⁰          MR. REEFER:  You don't
²¹      know -- John -- you have no idea
²²      where this is going, John.
²³          MR. DAVIS:  I have a pretty
²⁴      good idea.  All right, go ahead

Page 264

¹          and answer the question.
²          Object to form.
³ BY MR. REEFER:
⁴      Q.   Yes.
⁵          The question was, do you see
⁶ that language; yes or no?
⁷      A.   Yes.
⁸      Q.   If you turn the page,
⁹ Dr. Sheinin, to Page 6 of the M7 guidance
¹⁰ marked as Exhibit-5, you'll see some
¹¹ language, a sentence beginning with the
¹² words, The use of a numerical cancer risk
¹³ value.
¹⁴          Do you see that, sir?
¹⁵      A.   Yes.
¹⁶      Q.   And does the M7 guidance
¹⁷ say, The use of a numerical cancer risk
¹⁸ value (1 in 100,000) and its translation
¹⁹ into risk-based doses (TTC) is a highly
²⁰ hypothetical concept that should not be
²¹ regarded as a realistic indication of the
²² actual risk.
²³          Did I read that correctly,
²⁴ sir?

Page 265

¹          MR. DAVIS:  Object to form.
²          MR. REEFER:  What's the
³      nature of the objection, counsel?
⁴          MR. DAVIS:  I said object to
⁵      form.
⁶          You can go ahead.
⁷          MR. REEFER:  Right.  I just
⁸      wanted to clarify the nature so I
⁹      can fix it.
¹⁰          MR. DAVIS:  Well, it's the
¹¹      inherent nature of asking this
¹²      witness about concepts that he's
¹³      not an expert in.  You're asking
¹⁴      him to read a sentence that he
¹⁵      doesn't understand.
¹⁶          MR. REEFER:  Did you ask him
¹⁷      to do the same thing, counsel?
¹⁸          MR. DAVIS:  No, I didn't.  I
¹⁹      asked him -- I had him clarify
²⁰      that he's never seen this
²¹      document, didn't look at it,
²²      didn't consider it.
²³          MR. REEFER:  And did you ask
²⁴      him to read it, counsel?

Confidential Information Subject to Protective Order

---

Page 266

1    MR. DAVIS:  Sure.  Yeah, I
2  asked him to read it to -- in
3  order to -- in order to get the
4  testimony that he never looked at
5  it and never considered it.
6    MR. REEFER:  Okay.  Thank
7  you.
8  BY MR. REEFER:
9    Q.   Let me continue,
10 Dr. Sheinin.
11    The next sentence reads,
12 Nevertheless, the TTC concept provides an
13 estimate of the safe exposures for any
14 mutagenic compound.  However, exceeding
15 the TTC is not necessarily associated
16 with an increased cancer risk, given the
17 conservative assumptions employed in the
18 derivation of the TTC value.
19    Do you see those sentences,
20 Doctor?
21    A.   Yes.
22    MR. DAVIS:  Objection.
23 BY MR. REEFER:
24    Q.   The exact sentence reads --

---

Page 267

1    MR. REEFER:  I haven't
2  finished my -- I haven't finished
3  stating my question.
4  BY MR. REEFER:
5    Q.   The next sentence reads, The
6  most likely increase in cancer incidence
7  is actually much less than 1 in 100,000.
8    Did I read that correctly?
9    A.   Yes.
10    Q.   The next sentence reads, In
11 addition, in cases where a mutagenic
12 compound is a noncarcinogen in a rodent
13 bio assay, there would be no predicted
14 increase in cancer risk.
15    Did I read that correctly?
16    MR. DAVIS:  Jason, are you
17 just going to ask him to confirm
18 that you're reading sentences in
19 the document?  Or are you going to
20 actually ask him any questions
21 about this stuff that he doesn't
22 understand?
23    MR. REEFER:  I am --
24    MR. DAVIS:  This is an utter

---

Page 268

1  waste of time.  This is an
2  absolute waste of time, if this is
3  what you're doing.
4    MR. REEFER:  Counsel, I am
5  putting on the record what you
6  asked my witness to read so as to
7  allow you to ask him questions.
8    MR. DAVIS:  I didn't ask him
9  anything about derivation of TTCs
10 or how they were derived for
11 nitrosamines, because he doesn't
12 know anything about that.  He's
13 not a toxicologist.
14    This is -- this is an
15 absolute waste of time.  You all
16 have other experts -- had other
17 experts who have opined on this
18 stuff, some of whom have been
19 struck.
20    But you all had plenty of
21 experts that could -- they can
22 talk about this.  This is not one
23 of those experts, as he himself
24 has testified.

---

Page 269

1    This is a waste of time.
2  I'm going to make that a
3  continuing objection.  Keep going,
4  if you like.
5    MR. REEFER:  Thank you.
6  BY MR. REEFER:
7    Q.   The next sentence,
8  Dr. Sheinin, I believe, reads, Based on
9  all of the above considerations, any
10 exposure to an impurity that is later
11 identified as a mutagen is not
12 necessarily associated with an increased
13 cancer risk for patients already exposed
14 to the impurity.
15    Did I read that correctly?
16    A.   Yes, you did.
17    Q.   Is it true that a new drug
18 application or abbreviated new drug
19 application may contain standards and
20 specifications in addition to what's
21 found in a compendial monograph?
22    A.   Yes.
23    Q.   Do you remember counsel
24 asking you questions with respect to

---

Confidential Information – Subject to Protective Order



Page 270

1 Exhibit-6, the valsartan drug substance
2 monograph?
3      A.   Yes.
4      Q.   If you look -- if you focus
5 simply on the monograph, irrespective of
6 any other standards or specifications
7 that might be in place, is it true that
8 so long as nitrosamine impurities were
9 not detected above 0.1 percent, the drug
10 substance would comply with compendial
11 standards?
12      A.   It would.
13      Q.   To this day, to the best of
14 your knowledge, does FDA permit the sale
15 of drug products within the United States
16 containing NDMA or NDEA, so long as those
17 levels are below acceptable intake
18 limits?
19      A.   I believe that's true.
20         MR. DAVIS:  Object to form.
21 BY MR. REEFER:
22      Q.   Dr. Sheinin, you were asked
23 a series of questions related to, I
24 think, three or four consecutive

Page 271

1 exhibits, including an e-mail exchange,
2 DMF information requests, and a process
3 validation report.
4         Do you remember generally
5 that line of questioning from Mr. Davis?
6      A.   Oh.  Yeah, I remember.
7

Page 272

Page 273



**Page 274**

**Page 276**

4    Q.   You had discussed,
5  Dr. Sheinin, concepts about whether the
6  impurity profile between a generic drug
7  and an innovator or reference-listed drug
8  must be identical.
9         Do you remember that
10  discussion?
11    A.   Yes.
12    Q.   Do you understand that
13  oftentimes what's referred to as a
14  reference-listed drug is an NDA holder or
15  what some people refer to as an innovator
16  drug?
17    A.   Quite often it is.  It's not
18  necessarily, but not -- most of the time,
19  yeah.  It's pretty -- pretty common.
20    Q.   For -- and I'll refer to,
21  you know, an NDA holder as an innovator
22  drug; is that okay, for shorthand?
23    A.   Yes, okay.
24    Q.   In your experience at FDA,

**Page 275**

**Page 277**

1  will you see batch-by-batch variants in
2  the impurity profiles of API used to
3  manufacture innovator drugs?
4    A.   Yeah.  I think I mentioned
5  that during testimony today, that there's
6  going to be variation from batch to batch
7  and even sometimes there's -- a given
8  impurity is not present at the time of
9  manufacture and sometimes it is,
10  especially if it's a very low-level
11  impurity.
12    Q.   Dr. Sheinin, in your
13  experience at FDA, are you aware of
14  instances where the manufacturer of an
15  innovator drug sources API from multiple
16  sources?
17    A.   Yes.  Sometimes they do that
18  in their original NDA, sometimes they do
19  it, through a supplement, to add another
20  manufacturer.  And I have seen NDAs where
21  there were more than two manufacturers,
22  especially for a, quote/unquote,
23  blockbuster drug, where there's times
24  that one -- one source of a drug

Confidential Information Subject to Protective Order

Page 278

1 substance is having issues and companies
2 need to have alternate sources.
3      Q.   When a manufacturer of an
4 innovator drug sources API from multiple
5 sources, do those API manufacturers have
6 to use identical processes?
7      A.   They don't have to.
8 Sometimes the innovator may have the
9 patent on the synthetic scheme and they
10 want their suppliers to use the same
11 scheme.  Sometimes that's not the case
12 and whoever they are purchasing the drug
13 substance from is using different routes
14 of synthesis.
15      Q.   When an innovator drug
16 manufacturer sources API from multiple
17 manufacturers and those API manufacturers
18 utilize separate and distinct
19 manufacturing processes, would you expect
20 there to be differences in the impurity
21 profile of the API?
22      A.   Definitely, I would.
23      Q.   Does the FDCA adopt the USP
24 compendial standard as the standard by

Page 279

1 which products are evaluated for
2 adulteration?
3      A.   Yes.  I think that's in my
4 report.
5      Q.   If a product complies with
6 the compendial monograph, does that mean
7 it's not adulterated?
8          MR. DAVIS:  Objection.
9      Calls for a legal conclusion that
10     he was unwilling to provide to me
11     in his direct testimony here.
12 BY MR. REEFER:
13     Q.   Do you offer the opinion
14 that the standards set forth in Mylan's
15 DMF were consistent with the valsartan
16 USP monograph for a drug substance?
17     A.   Yes.  The fact that
18 valsartan -- Mylan's valsartan is on the
19 market and being sold in the U.S., to me,
20 that says the quality of the valsartan
21 API is in conformance with the USP
22 monograph.
23     Q.   And you did not need to
24 review the drug master file for that

Page 280

1 opinion, did you?
2      A.   No, I did not.  I also
3 looked at, I think I had mentioned
4 earlier, two certificates of analysis.
5 And I compared the test in the
6 certificates of analysis with the USP
7 monograph and found them to be in
8 agreement.
9      Q.   Did -- have you had an
10 opportunity to review the label from
11 Mylan's valsartan drug product?
12     A.   I have.  And I -- I looked
13 at the package insert.  And in Section
14 11, where it talks about the description,
15 I could see that the heading there was
16 valsartan tablets USP.  And in the
17 discussion of the active ingredient, it
18 says valsartan USP.
19     Q.   And does that -- why is that
20 significant to you?
21     A.   Because that means the --
22 both the drug product and the drug
23 substance meet the requirements set forth
24 in the compendial monographs for those

Page 281

1 two items.
2      Q.   Does the potential presence
3 of NDEA, at levels up to 1.57 parts per
4 million, change your opinion that drug
5 substance manufactured in accordance with
6 the specifications set forth in Mylan's
7 DMF would be compliant with compendial
8 standards?
9      A.   There's not --
10         MR. DAVIS:  Object to form.
11 BY MR. REEFER:
12     Q.   Okay.  Can you explain why
13 that is?
14         COURT REPORTER:  I'm sorry.
15     I need that answer repeated.
16         MR. REEFER:  Could you
17     repeat your answer, Dr. Sheinin.
18         THE WITNESS:  I think I
19     said, no, it does not.
20 BY MR. REEFER:
21     Q.   And can you explain why it
22 does not?
23     A.   Because at 1.57 PPM, it
24 would still meet the acceptance criteria

Confidential Information Subject to Protective Order

Page 282

1 in the test for any other impurity of 0.1
2 percent.
3      Q.   Do you remember a portion of
4 your report where you discuss whether
5 routine testing performed on drug
6 substance would have allowed for the
7 detection of trace levels of nitrosamine
8 impurities?
9      A.   I do recall.
10      Q.   Is it your opinion that
11 routine testing would not have detected
12 levels of NDEA as found in some batches
13 of Mylan's drug substance?
14      MR. DAVIS:  Objection.
15 Object to form.
16      THE WITNESS:  Yes.
17      MR. DAVIS:  Objection.
18 Vague as to what "routine testing"
19 means.
20      MR. REEFER:  Was your answer
21 yes?
22      THE WITNESS:  The answer is
23 yes.
24 BY MR. REEFER:

Page 283

1      Q.   And what's the basis of that
2 opinion?
3      A.   The basis of my opinion is
4 the 30 years I had at the FDA, both in
5 the laboratory and as a supervisory
6 review chemist, and my experience at USP.
7      And even before I worked at
8 USP, I actually served as a volunteer on
9 a number of USP expert committees,
10 evaluating proposed monographs for -- to
11 go into the book.
12      And just from my experience,
13 routine testing would not have picked up
14 an impurity at that low of a level.
15      The fact that FDA had to
16 resort to using mass spec -- using mass
17 spec is a very sensitive detector to
18 begin with, and they had to make that
19 detector even more sensitive because they
20 were looking at a single ion.
21      When you introduce a
22 chemical into a mass spectrometer, it's
23 ionized and then it breaks down into
24 fragments.  The initial ion is called the

Page 284

1 parent ion, and as it breaks down it
2 forms daughter ions.
3      And that -- to be able to
4 look at a single ion for NDEA or a single
5 ion for NDMA increases the sensitivity of
6 that method.  So it's -- basically, I
7 guess I would say it's -- compared to a
8 routine GC or LC analysis, I would call
9 it supercharged.  It's many -- it's
10 multiple times more sensitive than a
11 routine procedure.
12      MR. DAVIS:  I can't hear
13 you, Jason.
14      VIDEO TECHNICIAN:  The phone
15 is on mute, I think.
16      The phone disconnected.
17      - - -
18      (Whereupon, a discussion off
19 the record occurred.)
20      - - -
21      MR. DAVIS:  Let's go off the
22 record.
23      VIDEO TECHNICIAN:  Going off
24 the record.  The time is 5:23 p.m.

Page 285

1      - - -
2      (Whereupon, a brief recess
3 was taken.)
4      - - -
5      VIDEO TECHNICIAN:  We are
6 back on the record.  The time is
7 5:29 p.m.
8 BY MR. REEFER:
9      Q.   Dr. Sheinin, I understand
10 that we were just disconnected from the
11 phone line used for this Zoom deposition
12 and that madam court reporter read back
13 your prior answer.
14      Did you hear her recite that
15 answer?
16      A.   I did.
17      Q.   Was there any additional
18 information that you sought to provide in
19 response to my previous question?
20      A.   No.
21      Q.   Has --
22      MR. DAVIS:  Are you
23 speaking, Jason, or did we lose
24 you again?

Confidential Information Subject to Protective Order

Page 286

1    MR. REEFER:  No, you haven't
2 lost me yet, John.  I was -- my
3 wheels don't turn as fast as yours
4 do, John, as you can probably
5 tell.
6 BY MR. REEFER:
7    Q.   Dr. Sheinin, has -- has FDA
8 made statements indicating that the
9 properties of nitrosamine impurities make
10 them hard to detect in standard
11 laboratory testing?
12    A.   They have.
13    MR. DAVIS:  Object to form.
14    Object to the extent that it's not
15    listed in his -- in the four
16    corners of his report or reliance
17    materials, whatever this is
18    calling for, these statements.
19 BY MR. REEFER:
20    Q.   With respect to your -- the
21 opinion you offered regarding the
22 capabilities of routine testing to detect
23 levels of NDEA as found in some batches
24 of Mylan's drug substance, is it relevant

Page 287

1 for you to compare the specification set
2 forth in the compendium of not more than
3 0.1 percent versus the levels of NDEA
4 detected in Mylan's drug?
5    A.   Yes.
6    Q.   How so?
7    A.   The levels that are found in
8 Mylan's API would be well below the .1
9 percent.  So the testing of the
10 impurity -- testing for impurities in the
11 API, it would pass if -- unless -- unless
12 there was another impurity of some
13 unknown that was greater than .1 percent.
14    Q.   And --
15    A.   The NDEA or NDMA, if it was
16 present, would be well below .1 percent.
17    Q.   And just, I guess, for
18 purposes of comparing apples to apples,
19 does .1 percent translate to 1,000 parts
20 per million?
21    A.   Yes.
22    Q.   And when I refer to routine
23 testing, did you understand that to mean
24 the high-performance liquid

Page 288

1 chromatography methods set forth and
2 described in the monograph for valsartan?
3    A.   Yes.
4    MR. REEFER:  I don't have
5    any further questions at this
6    time, though I may, depending on
7    whether or not Mr. Davis does.
8    MR. DAVIS:  Okay.  Just a
9    few follow-ups, Dr. Sheinin.  And
10    I'll try to take them in the order
11    in which they appeared.
12    - - -
13    EXAMINATION
14    - - -
15 BY MR. DAVIS:
16    Q.   You testified to me earlier
17 that you weren't an expert and not
18 qualified to offer opinions on risk
19 assessment; is that right?
20    A.   Yeah.  I'm not.
21    Q.   So you wouldn't know how an
22 in-process parameter could become what
23 the FDA refers to as a critical quality
24 attribute or a critical process

Page 289

1 parameter; is that right?
2    A.   I -- I have an understanding
3 of what critical quality parameters are.
4 They are parameters that are critical to
5 the manufacturing process.  And --
6    Q.   And the determination of
7 their -- sorry, go ahead.
8    A.   Go ahead.
9    Q.   The determination of whether
10 they are critical or not is through a
11 risk assessment pursuant to ICH Q9,
12 correct?
13    A.   I believe it's in Q9.
14    Q.   Okay.  And do you have any
15 idea of what the FDA expects in terms of
16 inclusion in a DMF regarding critical
17 quality attributes or critical process
18 parameters?
19    A.   I believe FDA expects them
20 to be included in the description of the
21 manufacturing process and the development
22 report and so on.
23    Q.   Okay.  Thank you.
24    Counsel asked you some

Confidential Information Subject to Protective Order

Page 290

¹ questions regarding routine testing.
²        Do you recall that? And
³ whether GC-MS did something that would be
⁴ considered routine testing or not?
⁵        MR. REEFER: Object to the
⁶    form. Beyond the scope of my
⁷    direct.
⁸        THE WITNESS: I recall he
⁹    asked me questions about routine
¹⁰    testing, and I would not consider
¹¹    GC-mass spec to be routine
¹²    testing.
¹³ BY MR. DAVIS:
¹⁴    Q.   When you say "routine
¹⁵ testing," are you referring to routine
¹⁶ testing that's done as part of, like, a
¹⁷ USP monograph, like the specification and
¹⁸ testing procedure for a USP monograph or
¹⁹ an approved DMF specification or ANDA
²⁰ spec?
²¹    A.   Or NDA spec. All of that.
²²    Q.   Right. But an
²³ already-approved specification, correct?
²⁴    A.   No. A company that's

Page 291

¹ submitting an ANDA or an NDA today, for
² the most part, will be using routine
³ analytical procedures.
⁴        GC-mass spec is not anything
⁵ that I would consider routine.
⁶    Q.   Even though the FDA expects
⁷ it to be done when unknown impurities are
⁸ found?
⁹    A.   I'm not aware that the FDA
¹⁰ said you have to use GC-mass spec anytime
¹¹ there's an unknown impurity.
¹²        I'm aware that the method
¹³ that FDA published for valsartan
¹⁴ impurities -- nitrosamine impurities in
¹⁵ valsartan is a GC-mass spec method. But
¹⁶ I'm not aware that FDA has said that any
¹⁷ unknown has to be looked at by GC-mass
¹⁸ spec.
¹⁹    Q.   You are aware that the DEA
²⁰ requires manufacturers to evaluate
²¹ unknown impurities?
²²        Are you aware of that?
²³        MR. REEFER: Object to form.
²⁴    Misstates the testimony.

Page 292

¹        But go on.
²        THE WITNESS: According to
³ ICH Q3A and Q3B, companies are --
⁴    well, as I said earlier, FDA
⁵    considers ICH guidance as
⁶    recommendations. So, accordingly,
⁷    FDA is recommending that those two
⁸    guidances be followed in terms of
⁹    determine -- making a
¹⁰    determination of the impurities in
¹¹    a given API or a drug product.
¹²        I don't see anywhere in
¹³    those guidances where ICH says you
¹⁴    have to use GC-mass spec.
¹⁵ BY MR. DAVIS:
¹⁶    Q.   I'm talking about the FDA
¹⁷ requiring manufacturers to evaluate
¹⁸ unknown impurities.
¹⁹        Are you aware of that
²⁰ obligation?
²¹    A.   I'm not -- I'm not aware of
²² a specific guidance that says -- anything
²³ beyond what's in Q3A or Q3B as to how
²⁴ to -- not how to, but as to what the

Page 293

¹ criteria would be for reporting and
² identifying those impurities.
³        MR. DAVIS: I'm marking Tab
⁴    16 as Exhibit-19.
⁵        - - -
⁶        (Whereupon, Exhibit
⁷    Sheinin-19, No Bates, Warning
⁸    Letter, Mylan Laboratories
⁹    Limited – Unit 7, was marked for
¹⁰    identification.)
¹¹        - - -
¹²        MR. REEFER: I'll take a --
¹³    will you give me a standing
¹⁴    objection, John, to the use of
¹⁵    this exhibit on the basis that
¹⁶    it's beyond the scope of my direct
¹⁷    and, also, it does not apply to
¹⁸    any facility that's been deemed to
¹⁹    be at issue in this litigation?
²⁰        MR. DAVIS: Standing
²¹    objection granted, but also
²²    disagreed with.
²³        MR. REEFER: Very lawyerly.
²⁴ BY MR. DAVIS:



Page 294

1      Q.   You told me earlier,
2  Dr. Sheinin, you hadn't looked at
3  anything related to Unit 7; is that
4  right?
5      A.   That's right.
6      Q.   Okay.  Do you recognize this
7  as a warning letter that was issued to
8  Unit 7 in August of 2020?
9          MR. REEFER:  Objection.
10     Beyond the scope.
11         THE WITNESS:  Yes.
12 BY MR. DAVIS:
13

Page 296

1

Page 295

1

Page 297

1

16 BY MR. DAVIS:
17     Q.   You wouldn't think it
18 relevant to know what the FDA has been
19 advising manufacturers their obligations
20 are regarding analytical testing --
21         MR. REEFER:  Object to form.
22 BY MR. DAVIS:
23     Q.   -- specifically as it
24 relates to nitrosamines?

Page 298

1    MR. REEFER:  Object to form.
2 Misstates the document.  Beyond
3 the scope.  Foundation.
4    Go ahead.
5    THE WITNESS:  I have no idea
6 whatsoever what FDA has asked any
7 other defendant in this case.  I
8 have no way of knowing that.
9    It's -- I mean, you know it.
10 But I have no way to know that.
11 How would you think I would know
12 that?
13 BY MR. DAVIS:
14 [REDACTED]
15 [REDACTED]

Page 299

1 [REDACTED]
8    So I don't require a
9 response to that question, but -- or
10 statement, rather.
11    MR. REEFER:  Object to the
12 colloquy.
13 BY MR. DAVIS:
14    Q.   But let me ask you this,
15 Dr. Sheinin.
16    Is one of the ways to
17 thoroughly evaluate an unknown peak in a
18 GC FID by doing GC-MS?
19    MR. REEFER:  Object to form.
20 Beyond the scope.  Beyond the
21 direct.
22    Go ahead, Dr. Sheinin, if
23 you know.
24    THE WITNESS:  It's one

Page 300

1 possible way.
2 BY MR. DAVIS:
3    Q.   Okay.  Would it be the most
4 prevalent possible way in terms of
5 evaluating unknown peaks that appear in a
6 GC FID?
7    MR. REEFER:  Same objection.
8    THE WITNESS:  It would be a
9 very good way.  I guess partly it
10 depends on if -- if the
11 material -- well, it's one way --
12 GC-mass spec would be one way to
13 evaluate a peak coming out of a GC
14 that's an unknown by
15 flame-ionization detection.
16    But we've been talking here
17 about solvents and recovered
18 solvents.  When you mentioned the
19 API, my question is, are you
20 talking about, when you talk about
21 an API, the assay?  Are you
22 talking about the impurity test
23 that's in the specification or in
24 the USP monograph?  Or are you

Page 301

1 talking about a solvent?
2    There's -- there's a world
3 of differences in how you go about
4 testing for unknowns in the API
5 versus these nitrosamines.  So
6 there's -- I just feel that you
7 were not specific enough in what
8 you were asking me.
9 BY MR. DAVIS:
10    Q.   Okay.  Well, I think you've
11 answered my question, which is, GC-MS is
12 a prevalent way to thoroughly evaluate an
13 unknown peak in a GC, correct?
14    A.   My premise was that I do not
15 consider GC-mass spec to be a routine
16 procedure.  And I stand by that.  I do
17 not consider it to be routine.
18    Q.   You don't consider it to be
19 routine in -- as a procedure that's in an
20 approved specification, that's right.
21    Is that what your testimony
22 is?
23    A.   Yes.
24    Q.   Okay.

Page 302

1    A.   It may -- it may be in an
2 approved specification today because of
3 nitrosamines.  But I do not consider it
4 to be routine.
5    Q.   In an approved
6 specification?
7    A.   In an approved specification
8 or in an application for marketing
9 approval.
10    Q.   You don't think that it's
11 routine that all the workup in a DMF that
12 goes into an ANDA application or drug
13 master file for a product that's to be
14 approved, you don't think that it's
15 routine that companies -- manufacturers
16 do GC-MS?
17       MR. REEFER:  Objection.
18    Asked and answered.
19       THE WITNESS:  I do not
20    consider it to be a routine
21    quality control test.
22 BY MR. DAVIS:
23    Q.   Okay.  A routine quality
24 control test.  Okay.

Page 303

1    A.   Well, you're talking about
2 quality control of a product.  It's not
3 a -- it's not a routine test.
4    Q.   Right.  But quality control
5 is analytical chemistry for an approved
6 product, right?
7    A.   Or it's a proposed
8 specification for inclusion in an
9 application of an ANDA or NDA.  It's the
10 same thing.  It's still -- it's a quality
11 control test.
12    Q.   Are you aware that --
13    A.   That we're talking about.
14    Q.   Are you aware that Mylan's
15 own toxicologist testified to me that he
16 gets about, like, 3 to 4,000 requests for
17 GC-MS per year?
18       Did you review Lance Monar's
19 testimony?  It wasn't even provided to
20 you, was it?
21       MR. REEFER:  Object to form.
22    Foundation.  Beyond the scope.
23       THE WITNESS:  I'd have to
24    look on the list in Appendix B.

Page 304

1    But as I said earlier, I have not
2    reviewed any of those testimonies
3    from anybody from Mylan.
4 BY MR. DAVIS:
5    Q.   Okay.  And that would
6 include, also, Derek Glover's testimony;
7 you haven't reviewed any of his, even
8 though it is listed on Exhibit B, right?
9       MR. REEFER:  Objection.
10    Literally just answered.
11       But go ahead, Dr. Sheinin.
12       THE WITNESS:  I have not
13    reviewed any testimony from
14    anybody at Mylan.
15 BY MR. DAVIS:
16 ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

Page 305

1 ████████████████████████████████████
2 ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
15 ████████████████████████████████████
16 BY MR. DAVIS:
17    Q.   Okay.  Thank you.
18       You told Mr. Reefer that
19 even a -- a Mylan valsartan product that
20 had 1.57 parts per million NDEA would
21 still meet compendial standards because
22 unknown impurities are controlled in the
23 USP monograph at not more than .1
24 percent, which is 1,000 parts per

Page 306

1 million, right?
2      A.   I believe I qualified that
3 also by saying in the specification in
4 the approved application as well.
5      Q.   So why did the recalls even
6 happen, then, if that's what -- if NDEA
7 was only to be controlled at not less
8 than 1,000 parts per million, which
9 appears to be your expert opinion, why
10 are we here?  Why did these recalls
11 happen?
12      A.   I did not -- I did not say
13 that -- I forget what your question was
14 already.  It's been a long day.
15           Can you repeat your
16 question?
17      Q.   Sure.  And I appreciate it's
18 been a long day.
19           You testified to Mr. Reefer,
20 in response to one of his questions, that
21 a Mylan valsartan product containing 1.57
22 parts per million NDEA would still meet
23 compendial -- the USP monograph for
24 valsartan which controlled any other

Page 307

1 impurities at .1 percent; is that right?
2      A.   Yes.
3      Q.   So if that's the case, why
4 did the recalls happen?  Can you tell me
5 that?
6           MR. REEFER:  Object to form.
7 Beyond the scope.  Beyond the
8 redirect.
9           THE WITNESS:  The recalls
10 happened because FDA was told that
11 there were nitrosamines in some
12 products, and FDA's investigation
13 showed that there was -- there was
14 a theoretical risk and,
15 ultimately, they determined that
16 there needs to be a lower
17 acceptance criteria for
18 nitrosamines.  And they called it
19 the acceptable intake level.
20           And there had to be a
21 development of more sensitive
22 analytical procedures to be able
23 to detect and quantify those
24 nitrosamines.

Page 308

1           So that's why there was a
2 recall, and I -- I would expect
3 that companies manufacturing these
4 products will have to include
5 testing for nitrosamines in their
6 specification as a -- doing a
7 supplement to their approved
8 application.
9           So there would be an
10 additional test beyond what's in
11 the USP.  And I would hope that
12 companies would submit the same
13 information to USP, for USP to be
14 able to update the monograph for
15 all of the sartans.
16 BY MR. DAVIS:
17      Q.   So why does it even matter
18 that USP monograph had a not more than .1
19 percent limit, if that's not even the
20 limit that applied to nitrosamines at any
21 point?
22           MR. REEFER:  Object to form.
23 Object to form.  It misstates the
24 testimony.

Page 309

1           THE WITNESS:  I don't -- I
2 just don't understand your
3 question.  It's --
4 BY MR. DAVIS:
5      Q.   Well, I don't understand
6 your report.
7           MR. REEFER:  Come on.
8           MR. DAVIS:  Let me ask it
9 again.  Let me ask it again.
10 BY MR. DAVIS:
11      Q.   Why would it be important
12 for you, in your report, that the USP
13 monograph had a not more than .1 percent
14 limit for other impurities if that's not
15 even the limit that applied to
16 nitrosamines at any point?  Why is that
17 relevant to your report?
18           MR. REEFER:  Objection to
19 form.  Misstates the testimony.
20           But go ahead, Doctor.
21           THE WITNESS:  I'm totally
22 confused by now.
23           The USP monograph is
24 recognized in the Food, Drug and

Confidential Information Subject to Protective Order

Page 310

1    Cosmetic Act as being an official
2    compendium.  And that monograph
3    has to be met in order for a
4    product not to be considered
5    adulterated.
6        That's why the monograph is
7    important.  And that's why the
8    acceptance criteria in the
9    specification for unknown
10   impurities is important.
11 BY MR. DAVIS:
12   Q.   Have you looked at what
13 the -- what the definition of adulterated
14 is in the FD&C Act at all recently?
15   A.   Yes, I have.  I believe I
16 have it in my report.
17   Q.   Okay.  And so you'll agree
18 with me, then, that a product is
19 adulterated if it's manufactured in a way
20 where the manufacturer could not assure
21 that it would -- well, let me just read
22 you the language so I'm not confused or
23 misstating it.
24       MR. REEFER:  What are you

Page 311

1    reading from, John?
2        MR. DAVIS:  21 USC 351.
3  BY MR. DAVIS:
4    Q.   A drug or device shall be
5  deemed adulterated --
6    A.   Wait.  Wait.
7        MR. REEFER:  Hold on.  He
8  said 21 USC 351.
9        THE WITNESS:  Okay.  I
10 thought you said USP.
11       MR. DAVIS:  21 USC 351,
12 United States Code.
13 BY MR. DAVIS:
14   Q.   A drug or a device shall be
15 adulterated, if it is a drug, and the
16 methods used in, or the facilities or
17 controls used for, its manufacture,
18 processing, packing or holding do not
19 conform to or are not operated or
20 administered in conformity with current
21 good manufacturing practice to assure
22 that such drug meets the requirements of
23 this chapter as to safety and has the
24 identity and strength, and meets the

Page 312

1  quality and purity characteristics which
2  it purports or is represented to possess.
3        Have you seen that language
4  before?
5    A.   Yes.
6    Q.   Okay.  So you agree with me,
7  then, that a drug is adulterated if it's
8  manufactured out of compliance with GMP,
9  correct?
10       MR. REEFER:  Object to form.
11 Object to form.  Beyond the scope.
12       THE WITNESS:  The -- that
13 definition is -- I want to look at
14 the definition I copied into my
15 report.
16       MR. REEFER:  He's quoting
17 from a different subsection.
18       THE WITNESS:  Oh, okay.
19 Can you read that again?
20       MR. DAVIS:  Sure.
21 BY MR. DAVIS:
22   Q.   A drug or a device shall be
23 deemed to be adulterated -- and then this
24 is A1 -- or A2B, Subsection A2B, If it is

Page 313

1  a drug and the methods used in, or the
2  facilities or controls used for, its
3  manufacture, processing, packing or
4  holding do not conform to or are not
5  operated or administered in conformity
6  with current good manufacturing practice
7  to assure that such drug meets the
8  requirements in this chapter as to safety
9  and has the identity and strength, and
10 meets the quality and purity
11 characteristics which it purports or is
12 represented to possess.
13       Do you agree with me that
14 that's -- that's a definition of an
15 adulterated drug, a situation in which a
16 drug becomes adulterated, per federal
17 law?
18   A.   Yes.
19   Q.   Okay.  And, in fact, that's
20 what Mylan was told in its November 2019
21 Unit 8 warning letter, Exhibit-3, was it
22 not?
23       MR. REEFER:  Objection.
24 BY MR. DAVIS:

Page 314

1    Q.   We saw that language, right?
2         MR. REEFER:  Object to form.
3    You've covered this in cross.  You
4    know, asked and answered.
5         But go ahead.
6         THE WITNESS:  And yet FDA,
7    within a short period of time,
8    allowed Mylan to reintroduce their
9    valsartan.  So there was no legal
10   action taken, as far as I know,
11   about the valsartan that was the
12   subject of that inspection.
13   BY MR. DAVIS:
14        Q.   Okay.  And for about the
15   umpteenth time today, you have no idea
16   how that valsartan that was brought back
17   to the market differed from the valsartan
18   that Mylan had to recall?
19        MR. REEFER:  As acknowledged
20   by the question itself, asked and
21   answered.
22   BY MR. DAVIS:
23        Q.   Is that a yes?
24        A.   Yes.

Page 315

1    Q.   Okay.  Last questions.
2         Mr. Reefer asked you some
3    questions about procurements of API, I
4    believe, from multiple sources and how
5    that might affect the quality or purity
6    characteristics of the product.
7         Do you remember that
8    discussion with him?
9         A.   Yes.
10        Q.   Okay.  Do you have an
11   understanding that under FDA regulations
12   that a manufacturer like Mylan is
13   responsible for all of its suppliers?
14        MR. REEFER:  Object to form.
15   Beyond the scope.
16        THE WITNESS:  That Mylan is
17   responsible for all of their
18   suppliers?  And to what extent and
19   to what regard?
20   I think that's a -- like an
21   unfinished question.
22   BY MR. DAVIS:
23        Q.   Sure.
24        If Mylan, for example,

Page 316

1    procures raw materials from a vendor, a
2    raw material vendor, and that vendor is
3    out of GMP compliance and the raw
4    materials it's sending to Mylan are no
5    good, it's ultimately Mylan's
6    responsibility to adequately vet its
7    vendors.
8         Isn't that the FDA's
9    position as stated in regulations, and
10   GMP regulations specifically?
11        MR. REEFER:  Object to form.
12   BY MR. DAVIS:
13        Q.   Do you have any
14   understanding of that?
15        MR. REEFER:  Object to form.
16   Beyond the scope of his report.
17   Beyond the scope of my direct.
18        But, I don't know, go ahead.
19        THE WITNESS:  Yes.  Mylan
20   would be responsible for their
21   suppliers.
22        MR. DAVIS:  Okay.  That's
23   all the questions I have.
24        MR. REEFER:  So we'll go

Page 317

1    huddle, and I'll come back to see
2    if -- I'm just kidding, John.
3         VIDEO TECHNICIAN:  No more
4    questions?
5         MR. DAVIS:  We can go off
6    the record.
7         MR. REEFER:  No.  I have --
8         MR. DAVIS:  Sorry, I take it
9    back.
10        MR. REEFER:  I just had -- I
11   just have maybe two questions,
12   three questions.
13             - - -
14         EXAMINATION
15             - - -
16   BY MR. REEFER:
17        Q.   Dr. Sheinin, do you purport
18   to offer any opinions with respect to
19   whether Mylan complied with GMP
20   regulations?
21        A.   No.
22        Q.   Do you intend to offer any
23   opinion with respect to whether Mylan's
24   investigation of unknown peaks, in some

Confidential Information Subject to Protective Order

Page 318

1  form or fashion, complied with rules and
2  regulations?
3      A.   No.
4      Q.   To your knowledge, did
5  what's been described as Mylan Unit 7
6  manufacture API -- API valsartan?
7      A.   I have no idea what Unit 7
8  manufactures.
9          MR. REEFER:  All right.  I
10  think that's all I have.
11         MR. DAVIS:  No further
12  questions.
13         VIDEO TECHNICIAN:  This
14  marks the end of today's
15  deposition.  The time is 6:06 p.m.
16         - - -
17         (Whereupon, the deposition
18  concluded at 6:06 p.m.)
19         - - -
20
21
22
23
24

Page 320

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8          After doing so, please sign
9  the errata sheet and date it.
10         You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14         It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 319

1          CERTIFICATE
2
3
   I, Amanda Maslynsky-Miller, Certified Realtime
4  Reporter, do hereby certify that prior to the
   commencement of the examination, ERIC SHEININ,
5  Ph.D., was remotely sworn by me to testify to
   the truth, the whole truth and nothing but the
6  truth.
7
   I DO FURTHER CERTIFY that the foregoing is a
8  verbatim transcript of the testimony as taken
   stenographically by me at the time, place and
9  on the date hereinbefore set forth, to the best
   of my ability.
10
11 I DO FURTHER CERTIFY that I am neither a
   relative nor employee nor attorney nor counsel
12 of any of the parties to this action, and that
   I am neither a relative nor employee of such
13 attorney or counsel, and that I am not
   financially interested in the action.
14
15
16
                _____
   Amanda Miller
17 Certified Realtime Reporter
   Dated: March 31, 2022
18
19
   (The foregoing certification of this transcript
20 does not apply to any reproduction of the same
   by any means, unless under the direct control
21 and/or supervision of the certifying reporter.)
22
23
24

Page 321

1          - - - - - -
              E R R A T A
2          - - - - - -
3  PAGE  LINE  CHANGE/REASON
4  _____  _____  _____
5  _____  _____  _____
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17 _____  _____  _____
18 _____  _____  _____
19 _____  _____  _____
20 _____  _____  _____
21 _____  _____  _____
22 _____  _____  _____
23 _____  _____  _____
24 _____  _____  _____

Page 322

1
2     ACKNOWLEDGMENT OF DEPONENT

          I,_____, do
3    hereby certify that I have read the
     foregoing pages, 1 - 318, and that the
4    same is a correct transcription of the
     answers given by me to the questions
5    therein propounded, except for the
     corrections or changes in form or
6    substance, if any, noted in the attached
     Errata Sheet.
7
8    _____
     ERIC SHEININ, Ph.D.          DATE
9
10
     Subscribed and sworn
11   to before me this
     _____ day of _____, 20____.
12
     My commission expires:_____
13
14   _____
     Notary Public
15
16
17
18
19
20
21
22
23
24

Page 323

1        LAWYER'S NOTES
2    PAGE  LINE
3    _____  _____  _____
4    _____  _____  _____
5    _____  _____  _____
6    _____  _____  _____
7    _____  _____  _____
8    _____  _____  _____
9    _____  _____  _____
10   _____  _____  _____
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18   _____  _____  _____
19   _____  _____  _____
20   _____  _____  _____
21   _____  _____  _____
22   _____  _____  _____
23   _____  _____  _____
24   _____  _____  _____

Exhibit216

Confidential Information Subject to Protective Order

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   DISTRICT OF NEW JERSEY

 3

 4

 5   IN RE: VALSARTAN              )

     LOSARTAN, AND IRBESARTAN     )

 6   PRODUCTS LIABILITY           )

     LITIGATION                   )

 7                                )

                                  )  No.  2875

 8                                )

                                  ) HON. ROBERT B. KUGLER

 9   This Document Relates to     )

     All Actions                  )

10                                )

                                  )

11

12              CONFIDENTIAL INFORMATION

13            SUBJECT TO PROTECTIVE ORDER

14                      REMOTE

15                  VIDEO-RECORDED

16            EXPERT WITNESS TESTIMONY OF

17                ROGER WILLIAMS, M.D.

18

19        Thursday, February 17, 2022, 7:18 a.m.

20                      - - - -

21

22

23

24   REPORTED BY:  ELAINA BULDA-JONES, CSR 11720

25
```

Confidential Information - Subject to Protective Order

Page 2

APPEARANCES

For the Plaintiffs:
BY: LAYNE HILTON, ESQ.
BY: DAVID STANOCH, ESQ.
BY: CONLEE WHITELEY, ESQ.
Kanner & Whiteley, LLC
701 Camp Street
New Orleans, Louisiana 70130
504.524.5777
D.Stanoch@kanner-law.com
L.hilton@kanner-law.com
C.Whiteley@kanner-law.com

For the Defendants Teva Pharmaceuticals USA, Inc.;
Teva Pharmaceutical Industries, Ltd; Actavis LLC;
and Actavis Pharma, Inc.:

BY: BRIAN RUBENSTEIN, ESQ.
BY: KENNETH DZIKOWSKI, ESQ.
BY: VICTORIA DAVIS LOCKARD, ESQ.
BY: JAMES BROWNING, ESQ.
BY: NILDA ISIDRO, ESQ.
BY: STEVE HARKINS, ESQ.
Greenberg Traurig LLP
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
678.553.2103
Lockardv@gtlaw.com
Rubensteinb@gtlaw.com
Dzikowskik@gtlaw.com
Harkinss@gtlaw.com
Browningj@gtlaw.com
Isidron@gtlaw.com

BY:  CHRISTINE I. GANNON, ESQ.
BY:  LIZA WALSH, ESQ.
Walsh Pizzi O'Reilly Falanga LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
973.757.1100
Cgannon@walsh.law
Lwalsh@walsh.law

Page 3

For the Defendant Albertsons Pharmacy:
BY: CHRISTOPHER B. HENRY, ESQ.
Buchanan Ingersoll & Rooney, P.C.
227 West Trade Street, Suite 600
Charlotte, North Carolina 28202
704.444.3475
Christopher.henry@bipc.com

For the Defendants CVS Pharmacy and Rite Aid:
BY: MITCHELL CHARCHALIS, ESQ.
Barnes & Thornburg, LLP
2029 Century Park East, Suite 300
Los Angeles, California 90067
310.284.3766
Mcharchalis@btlaw.com

For the Defendant Mylan Laboratories:

BY: FRANK H. STOY, ESQ.
Pietragallo Gordon Alfano
    Bosick & Raspanti, LLP
One Oxford Centre
301 Grant Street, 38th Floor
Pittsburgh, Pennsylvania 15219
412.263.4397
FHS@pietragallo.com

For the Defendant Hetero Labs:
BY: WILLIAM P. MURTHA, JR., ESQ.
Hill Wallack LLP
2 Bridge Avenue, Suite 211
Red Bank, New Jersey 07701
732.924.8171
Wmurtha@hillwallack.com

Page 4

For the Defendants Zhejiang Huahai Pharmaceutical
Co., Ltd; Prinston Pharmaceutical, Inc.; Huahai
U.S., Inc.; and Solco Healthcare U.S., LLC
BY: COLEEN W. HILL  ESQ.
Duane Morris, LLP
30 South 17th Street
Philadelphia, Pennsylvania 19103-4196
215.979.1000
CWHill@duanemorris.com

For the Defendant Humana Pharmacy, Inc.:

BY: MEGAN A. ZMICK, ESQ.
Falkenberg Ives LLP
230 W. Monroe Street, Suite 2220
Chicago, Illinois 60606
312.566.4808
Maz@falkenbergives.com

For the Defendant Sciengen Pharmaceuticals Inc.:
BY: KATHLEEN E. KELLY, ESQ.
Hinshaw & Culbertson LLP
53 State Street, 27th Floor
Boston, Massachusetts 02109
617.213.7047
Kekelly@hinshawlaw.com

Also present:

Kristina Lee, videographer

Page 5

INDEX OF EXAMINATIONS

EXAMINATIONS                     PAGE
MR. STANOCH                        9
MS. LOCKARD                      284
MR. STANOCH                      320


INDEX OF EXHIBITS
NO.          DESCRIPTION          PAGE
Exhibit 1    Report of Roger Lea Williams,   11
             M.D., February 17, 2022

Exhibit 2    Roger Williams, List of        11
             Materials Considered - 2.17.22

Exhibit 3    E-mail, 6/21/2018, To: Abid    62
             Hashmi, et al., From:
             Teva.net,
             TEVA-MDL2875-00565758 through
             00565764

Exhibit 4    PowerPoint, Nitrosamine        86
             Impurities, An Overview, 2
             pages

Exhibit 5    Letter, undated, General      104
             Advice from Department of
             Health and Human Services

Exhibit 6    M7(R1) Assessment and Control 112
             of DNA Reactive (Mutagenic)
             Impurities in Pharmaceuticals
             to Limit Potential
             Carcinogenic Risk, Guidance
             for Industry

Page 6

1  Exhibit 7     Valsartan USP Monograph,      128
2           January 28, 2022
3  Exhibit 8     Impurities in Drug Products   145
           and Drug Substances - A USP
4           Approach, Ravi Ravichandran,
           Principal Scientific Liaison
5  Exhibit 9     Overview of USP General       152
           Chapters <476> and <1086>,
6           Prescription/Non-Prescription
           Stakeholder Forum, October 19,
7           2017
8  Exhibit 10    FDA's Overview of the Guidance 156
           for Industry: Control of
9           Nitrosamine Impurities in
           Human Drugs, David Keire,
10          Ph.D., and Dongmei Lu, Ph.D.,
           Office of Pharmaceutical
11          Quality, October 2, 2020
12 Exhibit 11    E-mail, 06 July 2018, To: All, 165
           From: Global Quality
13          Compliance, Re: Lift of Hold
           Status for All Finished
14          Products Manufactured using
           Valsartan API from Jubilant
15          and Mylan
16 Exhibit 12    Generic Drug Manufacturer      210
           Ranbaxy Pleads Guilty and
17          Agrees to Pay $500 Million to
           Resolve False Claims
18          Allegations, cGMP Violations
           and False Statements to the
19          FDA
20 Exhibit 13    Orange Book Preface            224
21 Exhibit 14    Expert: Nitrosamines 'Can Slip 256
           Through the Manufacturing
22          Process,' Making Reference
           Standards Essential to Avoid
23          this Carcinogen in the Drug
           Supply Chain, June 29, 2021
24
   Exhibit 15    Invoices, 5 pages              270
25

Page 7

1  Exhibit 16    NDA Partners LLC, Curriculum   284
           Vitae of Roger Williams, M.D.,
2           November 2021
3  Exhibit 17    Video                          284
4  Exhibit 18    Complete set of materials sent 292
           to Dr. Williams
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1      THE VIDEOGRAPHER:  Okay.  We are now on
2  the record.
3      My name is Kristina Lee.  I am a
4  videographer for Golkow Litigation Services.
5      Today's date is February 17th, 2022, and
6  the time is 7:18 Pacific.
7      This remote video deposition is being held
8  in the matter of Valsartan, Losartan and Irbesartan
9  Products Liability Litigation, MDL No. 2875, for the
10 United States District Court, District of New
11 Jersey.  The deponent is Roger Williams.
12     All parties to this deposition are
13 appearing remotely and have agreed to the witness
14 being sworn in remotely.  Due to the nature of
15 remote reporting, please pause briefly before
16 speaking to ensure all parties are heard completely.
17     All counsel will be noted on the
18 stenographic record.
19     The court reporter is Elaina Bulda-Jones,
20 and she will now swear in the witness.
21          ROGER WILLIAMS, M.D.,
22 called as a witness by the Plaintiffs herein, being
23 first duly sworn by the Certified Shorthand Reporter
24 was thereupon examined and testified as is
25 hereinafter set forth.

Page 9

1      THE REPORTER:  Mr. Stanoch.
2      MR. STANOCH:  Thank you.
3          EXAMINATION
4  BY MR. STANOCH:
5      Q.  Good morning, Dr. Williams.
6      A.  Good morning, Mr. Stanoch.
7      Q.  Could you tell us where you are located
8  today?
9      A.  I'm in San Francisco, California, in 4
10 Embarcadero Center in the offices of Greenberg
11 Traurig.
12     Q.  Thank you.
13     And other than Teva's counsel, Ms. Lockard
14 and Mr. Harkins, and perhaps any tech people, are
15 there anybody else in the room with you?
16     A.  No, there are not.
17     Q.  Other than a box which we have yet to open
18 of potential documents that we sent to your counsel,
19 do you have any documents with you in your room?
20     A.  I see three documents that my counsel has
21 put before me.  One is the report, one is the
22 materials considered, and one is the deposition
23 request.
24     Q.  Perfect.  Anything else?
25     A.  I have a blank pad of paper and a pen, and

Page 10

1 nothing else.
2    Q.   Thank you.
3        Now, you have been deposed a number of
4 times before; is that fair?
5    A.   That's true, Mr. Stanoch.
6    Q.   Right.  So you understand the general
7 rules we will be following here today, that I will
8 be asking you a series of questions, you'll be
9 providing answers, everything everyone says on the
10 record will be taken down by the stenographer and on
11 the video; you understand that?
12    A.   I do.
13    Q.   Right.  And if you do not understand the
14 question, I ask, please tell me; otherwise I will
15 assume you understand; is that fair?
16    A.   That's fair.
17    Q.   Do you understand you should answer the
18 question unless your counsel instructs you
19 otherwise?
20    A.   I do understand that.
21    Q.   Is there any reason why you cannot testify
22 truthfully and accurately today?
23    A.   There is no reason.
24    Q.   Excellent.  Let's do some housekeeping
25 with exhibits, Dr. Williams.  First, before we get

Page 11

1 going, I am going to mark as Williams 1 the revised
2 expert report that your counsel provided to us 20 or
3 so minutes ago.
4        MR. STANOCH:  Stand by, everyone.
5        (Whereupon, Exhibit 1 was marked for
6 identification.)
7 BY MR. STANOCH:
8    Q.   So, Dr. Williams, the copy of your report
9 in front of you given to you by your counsel, we
10 will call that Exhibit 1, and for everyone else's
11 benefit, it's available as Exhibit 1 on the
12 electronic shared files.  Are you good with that,
13 Doctor?
14    A.   I am.
15    Q.   Excellent.  I am going to mark also the
16 revised list of the materials you considered that
17 your counsel also provided a little earlier this
18 morning.  Stand by.
19        (Whereupon, Exhibit 2 was marked for
20 identification.)
21 BY MR. STANOCH:
22    Q.   Exhibit 2, Dr. Williams, that's the list
23 of materials considered that were provided to us 20
24 or so minutes ago.  You have a physical copy in
25 front of you, I understand, from your counsel,

Page 12

1 correct?
2    A.   Yes, I do, Mr. Stanoch.
3    Q.   Very good.  And as a housekeeping matter,
4 Dr. Williams, could you tell us what revisions were
5 made in the copy of your report that we have marked
6 as Exhibit 1 over the report that was originally
7 provided on January 12th, 2022?
8    A.   Yes.  There were two references that
9 needed to be changed.
10       One was a reference to a guidance of FDA
11 that talks about drug substances for ANDAs.  In the
12 unrevised report, that was not provided, so we have
13 now provided that guidance.  And it's listed in the
14 materials considered as well as cited in my report.
15 And I'll be glad to answer questions about that
16 guidance if you wish, Mr. Stanoch.
17       The other change was a reference to a USP
18 guidance that talks about submitting requests for
19 revisions to the United States Pharmacopeia-National
20 Formulary.  And the reason for the change was when I
21 looked at it recently, it spoke to requests for
22 revisions of dietary supplements, which of course is
23 not pertinent in this matter.  So we changed it to
24 requests for revisions for chemical substances, and
25 that is now referenced in the revised report and

Page 13

1 also in the materials considered.  Again, I'll be
2 glad to answer questions about that document if you
3 wish, Mr. Stanoch.
4        And then there were two additional
5 documents that were important to my report relating
6 to the Orange Book, and those were not listed in the
7 materials considered, so we adjusted the materials
8 considered to include those references.  One was an
9 Orange Book from January 2019 summarizing the prior
10 year, 2018.  And then the other Orange Book
11 reference was the Orange Book Supplement No. 8,
12 August for 2018, and those are both referenced in my
13 report and also now listed in the materials
14 considered.
15    Q.   Okay.  Thank you, Doctor.
16       And regarding your report first, I believe
17 the particular footnotes that were updated with the
18 two materials you noted, those are Footnotes 20 and
19 21 of page 17 of your report; is that right?
20    A.   Let me take a quick look just to confirm.
21 Yes, you have it exactly right, Mr. Stanoch.
22    Q.   Very good.  And the materials considered,
23 the two Orange Book references that are now listed
24 in your revised materials considered, I believe it's
25 your testimony that you had relied on them in

Confidential Information - Subject to Protective Order

Page 14

1  preparing your report, they just didn't make it into
2  the reliance materials initially; is that fair?
3      A.  Yes, the materials considered listing.
4  But they were referenced in my report appropriately
5  and cited.
6      Q.  Understood.  And do you happen to have the
7  page of the reliance materials where the two Orange
8  Book sources are now listed?
9      A.  I'm sure I do, but it might help me if we
10  agree on what page that is.
11     Q.  I think it may be page 2, but if you
12  cannot do it quickly, Doctor, we can certainly take
13  care of it at a break.  I don't think there is a
14  controversy on this.
15     A.  Oh, yeah, there it is.  It's under
16  "Regulatory Guidances, Standards, and Documents,"
17  and there is a 2019 Orange Book, which is the second
18  listing in that category, and then the 2018 Orange
19  Book, Cumulative Supplement 8, August 2018, which is
20  the third listing.
21     MR. HARKINS:  Did we lose Mr. Stanoch?
22     THE WITNESS:  Oh, I think he is looking at
23  the materials considered.
24     (Whereupon, a brief discussion off the
25  record.)

Page 15

1      THE VIDEOGRAPHER:  Okay.  We're going off
2  the record.  The time is 7:29.
3      (Whereupon, a brief recess was taken.)
4      THE VIDEOGRAPHER:  Okay.  We're coming
5  back on the record.  The time on the video monitor
6  is 7:37.  Please begin.
7  BY MR. STANOCH:
8      Q.  Okay.  Doctor, thank you for bearing with
9  us with the technical issues.  I believe we were
10  just looking at your revised reliance materials,
11  correct, that's where we were?
12     A.  Yes, I understand.
13     Q.  Uh-huh.  And you were showing us, you
14  know, the two Orange Book sources that are now
15  listed under the "Regulatory Guidances" heading, I
16  believe it was, right?
17     A.  Yes.
18     Q.  All right.  Other than the updates of
19  Footnotes 20 and 21 of your report, does the revised
20  report that's been produced today have any other
21  changes to it over your original January 12th, 2022,
22  report?
23     A.  No, it does not.
24     Q.  Okay.  Thank you.
25     A.  There is a new signature page,

Page 16

1  Mr. Stanoch, with today's date.
2      Q.  Understood.  Other than the two footnote
3  revisions we discussed and the new signature page,
4  are there any other changes in your report, now
5  dated February 17th, 2022, over the original
6  iteration of your report from January 12th, 2022?
7      A.  No, there are not.
8      Q.  Okay.  And on your lists of materials
9  considered, I think there were a few other things
10  that were added between your original lists from
11  January 12th and today besides the two Orange Book
12  sources.  And do you recall that generally, sir?
13     A.  No, actually I can't say I do,
14  Mr. Stanoch.
15     Q.  That's fine.  And, you know, for instance,
16  if you look at page 1 of Exhibit 2, your latest
17  iteration of materials considered, there is now a
18  section that says, "Defendants' Expert Reports (with
19  exhibits)."  Do you see that?
20     A.  Page 1?  Oh, yes, I do see that.
21     Q.  Right.  And the first line is the report
22  of Timothy Anderson.  Do you see that?
23     A.  I do see that.
24     Q.  And then it continues on, correct?
25     A.  Yes.

Page 17

1      Q.  And you could say it in your own words,
2  but it looks like your revised materials here of
3  2/17/2022 is showing that you have now reviewed all
4  of the other defense expert reports listed here,
5  whereas you had not reviewed them at the time you
6  rendered your original report of January 12th, 2022;
7  is that right?
8      A.  Yes.  I think I did not see these expert
9  reports before I concluded my January 12th report.
10     Q.  Uh-huh.  Okay.  And so the --
11     MS. LOCKARD:  And just for the record,
12  Dave, the list updating the list of materials with
13  the new expert report was included in the 2/15
14  production.  So just, I think, to clarify, you have
15  received -- prior version that did have the expert
16  reports listed.
17     MR. STANOCH:  No, I agree, Counsel.  And
18  this isn't controversial.  It's just more
19  housekeeping.
20     MS. LOCKARD:  Right.
21  BY MR. STANOCH:
22     Q.  But I just wanted to establish,
23  Dr. Williams, that as of the date of your original
24  January 12th, 2022, report, you had not reviewed any
25  defense expert reports in this case, right?

Page 18

1    A.   That's true.
2    Q.   And since then, you did review them all at
3  some point, correct?
4    A.   Well, what I would say --
5    MS. LOCKARD:  Objection.  Form.
6    THE WITNESS:  -- is I looked at all of
7  them, and some of them I looked at more carefully
8  than others.
9    MS. LOCKARD:  All of them on the list.
10    THE WITNESS:  All of them on the list,
11  yes.
12  BY MR. STANOCH:
13    Q.   And because you looked at the defense
14  expert reports on the list we're looking at in
15  Exhibit 2 after you issued your original report, is
16  it fair to say that you did not rely on any defense
17  expert report in rendering your January 12th, 2022,
18  opinions?
19    A.   That's accurate, Mr. Stanoch.  Thank you.
20    Q.   Right.  And further, because you only
21  noted two changes, to Footnotes 20 and 21, in your
22  report dated today, did anything in the defense
23  expert reports listed here in Exhibit 2 alter or
24  change your opinions as they were originally
25  expressed in your January 12th, 2022, report?

Page 19

1    A.   No, nothing at all.
2    Q.   It also appears, Doctor, looking at
3  Exhibit 2, your reliance materials list of today,
4  page 2, you see "Deposition Transcripts"?  Do you
5  see that?
6    A.   Yes, I do.
7    Q.   All right.  And I believe you now list
8  four entries there, beginning with, "Transcript of
9  Edward Kaplan," through "Transcript of Ron Najafi
10  Deposition"; do you see those four entries?
11    A.   I do.
12    Q.   Right.  And those were not listed in your
13  original reliance materials in January 12th, 2022,
14  right, because these transcripts postdated your
15  report; is that fair?
16    A.   Exactly.  You can see that from the date
17  in the first part of each entry.
18    Q.   Absolutely right.  And my only point is
19  going to be, Doctor, is that you did not rely on the
20  transcripts of Edward Kaplan, Kali Panagos, John
21  Quick or Ron Najafi in rendering your January 12th,
22  2022, opinions, correct?
23    A.   That's correct.
24    Q.   And nothing in those four transcripts have
25  led you to change or alter your opinions from your

Page 20

1  original January 12th report to your February 17th
2  report, right?
3    A.   No, I have not changed my opinions at all.
4    Q.   Very good.  Thank you, Doctor.  Let's put
5  that aside, and if there is other sort of
6  housekeeping things with the reliance materials, we
7  can hit it later, okay?
8    A.   Thank you.
9    Q.   So, Doctor, your report -- and we will use
10  Exhibit 1, which is the one dated February 17th,
11  2022, this report includes all opinions you are
12  currently offering in this matter, correct?
13    A.   Yes.
14    Q.   At this time, do you intend to offer any
15  other opinions in this matter besides those
16  reflected in your report, Exhibit 1?
17    A.   No.
18    MS. LOCKARD:  I'm going to object to that,
19  as it calls for attorney work product.  Obviously we
20  reserve the right to use Dr. Williams in the
21  liability portion and for liability opinions, but he
22  is not intending to give those opinions today.
23    Court Reporter, can you hear me?
24    THE REPORTER:  Yes, ma'am.
25    MR. STANOCH:  I heard you too,

Page 21

1  Ms. Lockard.
2    MS. LOCKARD:  Okay.
3    MR. STANOCH:  I had nothing to respond to.
4    MS. LOCKARD:  Okay.  No problem.  I just
5  didn't let it come up on the realtime, so I thought
6  maybe we had lost someone, but I see it now.
7  BY MR. STANOCH:
8    Q.   Doctor, you reference, you know, this
9  litigation by caption in Paragraph 2 of your report,
10  right?
11    A.   I'm looking at Paragraph -- "I make this
12  disclosure," is that what you are talking about,
13  Mr. Stanoch?
14    Q.   Yes, sir.  Yes, sir.
15    A.   Yes, that's correct.
16    Q.   And what is your understanding, generally,
17  of this litigation, sir?
18    A.   It relates to the presence of nitrosamine
19  impurities, in terms of my report, in Tab 4, ANDAs
20  that were approved by FDA for Teva.  And there are
21  of course many ramifications to that statement, but
22  I'll stop there in terms of what my report focuses
23  on.
24    Q.   And you can look at your reliance
25  materials, Doctor, but I believe you did not review

Confidential Information - Subject to Protective Order

Page 22

1  any plaintiff-specific discovery materials, did you?
2      A.  I'm not sure I understand your question.
3  Can you point out what you are talking about on my
4  materials-considered list?
5      Q.  Sure.  You did not review any transcripts
6  of any plaintiffs in this litigation, correct?
7      A.  As part of my report?
8      Q.  Correct.
9      A.  Yes, I was speaking particularly in my
10  report about the expert report of Dr. Panagos,
11  Mr. Quick, and Dr. Najafi.  But as I already said, I
12  did not rely on the transcript of the deposition to
13  inform my opinions.  I was looking more at their
14  expert reports.
15      Q.  Understood, Doctor.  You did not review
16  any transcripts of depositions taken of any
17  plaintiff, as opposed to a plaintiff expert, in this
18  litigation, correct?
19      A.  You know, plaintiffs' expert reports, I'm
20  looking at my materials considered, and I think the
21  answer to that question is yes.  I did not review
22  plaintiffs' depositions.
23      Q.  Okay.  You did not --
24      A.  If I am answering -- yeah.  If I am
25  answering your question correctly, Mr. Stanoch.

Page 23

1  Please help me if you think I didn't.
2      Q.  No, this is not a trick question,
3  Dr. Williams.  I agree with you that nowhere in your
4  reliance materials do you list transcripts of
5  depositions taken of a plaintiff, as opposed to a
6  plaintiff expert, so I just wanted to make sure my
7  understanding was correct.  And it sounds like we
8  are in accord, right?
9      A.  Yes.  Yes.  I think we're in agreement
10  now.  One of the reasons I was struggling, I was
11  trying to look for something that wasn't on the
12  list, and that's a little difficult.
13      Q.  Of course.  And you did not review any
14  documents produced by any plaintiff in this
15  litigation, correct?
16      MS. LOCKARD:  And I'll just make the
17  objection that I'll say it's vague and confusing
18  because I don't know that Dr. Williams knows who
19  produced what.  But, I mean, I don't want to answer
20  the question for him, but --
21      THE WITNESS:  Well, yeah, I think
22  Ms. Lockard is stating it correctly.  I don't know
23  what was produced by plaintiffs.  But I find it hard
24  to believe that they wouldn't have produced some of
25  the material that also came to me from my counsel,

Page 24

1  but I wouldn't be able to safely say it was --
2  Mr. Stanoch, does that help?
3  BY MR. STANOCH:
4      Q.  Well, again, Dr. Williams, this is not
5  trying to be a gotcha.  I don't see in your reliance
6  materials, for example, any Bates number for a
7  document that a plaintiff produced the documents.
8  And I just want to confirm, then, you did not look
9  at any documents that were Bates-stamped as being
10  produced from plaintiffs.
11      A.  I think I can agree with that unless my
12  counsel wishes to object.
13      MS. LOCKARD:  No.  I assume you are
14  talking about discovery documents.  And obviously
15  there are plaintiff pleadings and disclosures and
16  then whatnot on the list, but --
17      MR. STANOCH:  Yes, that's right.  And my
18  questions were about discovery materials, Counsel,
19  you know, right.  Right.
20      Q.  And, Dr. Williams, again, so you did not
21  review, for example, copies of individual plaintiff
22  pharmacy records that any given plaintiff might have
23  produced, right?  You don't recall seeing any of
24  that, right?
25      A.  No, you are correct, Mr. Stanoch.

Page 25

1      Q.  Right.  And you don't recall ever
2  reviewing any medical records that a particular
3  plaintiff might have produced in this litigation,
4  correct?
5      A.  I did not.
6      Q.  Uh-huh.  And you don't recall reviewing
7  any insurance materials that any particular
8  plaintiff might have produced in this litigation,
9  correct?
10      A.  I did not.
11      Q.  Uh-huh.  Do your opinions in this case
12  depend on the number of the potential plaintiffs in
13  the litigation?
14      A.  No.
15      Q.  Right.  If this litigation involved one
16  plaintiff or 10,000 plaintiffs, your opinions as
17  expressed in your report would be the same, correct?
18      A.  Yes.
19      Q.  Were you asked to assume by counsel
20  anything for purposes of your report, sir?
21      A.  No, I was not.
22      Q.  Were you asked to assume that Teva's
23  finished-dose valsartan products contained any
24  nitrosamines?
25      A.  Was I asked to make that assumption?  No,

Confidential Information Subject to Protective Order

Page 26

1  I was not asked to make that assumption.

2  Q.  Do you have any opinion on whether Teva's

3  finished-dose products did contain nitrosamines?

4  MS. LOCKARD:  Outside the scope of his

5  report.  Objection.

6  THE WITNESS:  My understanding is that FDA

7  asked Teva to test some samples of their finished --

8  of their drug product manufactured under the four

9  ANDAs and that Teva did supply that information to

10  FDA.  But it's not something I cited to in my

11  report.

12  BY MR. STANOCH:

13  Q.  Uh-huh.  So you don't know one way or the

14  other whether Teva's finished-dose valsartan

15  products contained nitrosamines?

16  MS. LOCKARD:  Objection.  Vague.

17  I think if you want to ask him if he has

18  personal knowledge, that would be a better question.

19  THE WITNESS:  Well, in any case, I do

20  recall seeing some numbers that Teva provided to

21  FDA, but they are not in my report and I don't

22  recollect them now.

23  BY MR. STANOCH:

24  Q.  Uh-huh.  And you are not opining, are you,

25  Doctor, on the levels of nitrosamines that may or

Page 27

1  may not have been in Teva's finished-dose products,

2  correct?

3  A.  No, I'm not.

4  Q.  Uh-huh.  Were you asked to assume by

5  counsel that Teva's finished-dose products did not

6  contain nitrosamines?

7  A.  No, I was not.

8  Q.  Uh-huh.  Were you asked to assume that

9  Teva had no knowledge about the chemical synthesis

10  processes necessary to create valsartan API?

11  A.  I was not asked to make that assumption.

12  Q.  Okay.  Right.  You were not asked to make

13  any assumptions in rendering your opinions, correct?

14  A.  Yes, that's correct.

15  Q.  Okay.  When an API manufacturer becomes

16  aware of a potential genotoxic impurity, sir, what

17  should they do?

18  MS. LOCKARD:  Objection.  Form.  Outside

19  the scope -- his report and the class-certification

20  phase.

21  THE WITNESS:  The way I would answer that,

22  Mr. Stanoch, is it depends on when the discovery was

23  made.  If it is during the development process,

24  prior to approval of either the NDA or ANDA, a

25  company may be able to mitigate the presence of the

Page 28

1  impurity.  After approval, it depends on a number of

2  factors, including -- I'm sorry, Mr. Stanoch.  Were

3  you asking generally about impurities, genotoxic

4  impurities, or nitrosamine impurities?

5  BY MR. STANOCH:

6  Q.  Potential genotoxic impurities generally,

7  not specific to nitrosamines at this question.

8  A.  Okay.  Good.  I would say after approval,

9  if such an impurity is discovered, I think there

10  would be an attempt to work with FDA for a marketed

11  drug in the United States to determine what the

12  limit should be and what corrective action should

13  need to be taken.

14  Q.  Uh-huh.  Should a API manufacturer who

15  becomes aware of a potential genotoxic impurity in

16  API notify their customers who buy that API?

17  MS. LOCKARD:  Objection.  Outside the

18  scope of Dr. Williams' class-certification report

19  opinions and gets into the liability issue.

20  THE WITNESS:  Well, I'm thinking of the

21  specific example in this matter where, yes, you

22  know, the API manufacturer did inform customers.  So

23  I would say that is a good practice in my personal

24  opinion.

25

Page 29

1  BY MR. STANOCH:

2  Q.  You mentioned in your answer the API

3  manufacturer did inform customers here.  What do you

4  mean?

5  A.  Well, if I understand the history in this

6  matter, Prinston, which is a company associated with

7  ZHP in China, did inform FDA that they were finding

8  the NDMA nitrosamine impurity, and I think in turn

9  then FDA began working with the various

10  manufacturers using the ZHP drug substance.

11  Q.  Uh-huh.  When, to your recollection, did

12  ZHP become aware of the potential nitrosamine

13  impurities in valsartan API that you alluded to in

14  your prior answer?

15  MS. LOCKARD:  Objection.  Speculation.

16  THE WITNESS:  I think we can look at my

17  report.

18  BY MR. STANOCH:

19  Q.  Sure.

20  A.  Is it all right if I look at my report

21  now, Mr. Stanoch?

22  Q.  Of course, Doctor.

23  A.  I would say when this became generally

24  known to the public was July 13th, 2018, with the

25  first FDA press release.  And FDA noted in the press

Confidential Information Subject to Protective Order

Page 30

1  release that their understanding came from Prinston
2  Pharmaceuticals, as I said, which in turn, became
3  aware of the impurity through the efforts of ZHP.
4  And when we are talking about the impurity, we are
5  talking about NDMA.
6      Q.  Okay.  What paragraph are you looking at,
7  Doctor, so we can be on the same page?
8      A.  It's Paragraph 92.
9      Q.  Right.  And this is the July 13, 2018,
10 reference to an FDA press release about NDMA in the
11 ZHP valsartan API.  My question was:  When do you
12 recall that ZHP became aware of the NDMA impurity in
13 the valsartan API?
14     MS. LOCKARD:  Objection.  Form.
15 Speculation.
16     THE WITNESS:  Yes, I don't think I have
17 that information in my report or that I cited to it.
18 BY MR. STANOCH:
19     Q.  You don't know when ZHP discovered the
20 potential NDMA impurity in valsartan API?
21     MS. LOCKARD:  Same objection.  Asked and
22 answered as well.
23     THE WITNESS:  I don't think I stated it in
24 my report, Mr. Stanoch.
25

Page 31

1  BY MR. STANOCH:
2      Q.  Don't you think it would be important for
3  you to know when ZHP became aware of the potential
4  for NDMA impurities in valsartan API in rendering
5  your opinions?
6      MS. LOCKARD:  Objection.  Argumentative.
7      THE WITNESS:  Remember, I'm speaking to
8  Teva, so, you know, for the most part, I don't focus
9  on ZHP.  I'm talking about Teva's actions in the
10 context of the finding of nitrosamine impurities.
11 BY MR. STANOCH:
12     Q.  Wouldn't you need to know, sir, when ZHP
13 became aware of the NDMA in valsartan API to assess
14 when Teva, as the customer, should have known about
15 that as well?
16     A.  No, I don't believe so.  I think Teva was
17 aware in the weeks before the FDA press release.
18 But again, my focus is on Teva's activities and what
19 they did when they became aware of the presence of
20 nitrosamine impurities in the ZHP drug substance.
21     Q.  Let's focus on Teva.  When did Teva learn
22 of the potential for NDMA genotoxic impurities in
23 valsartan API?
24     A.  Well --
25     MS. LOCKARD:  I'm going to object to that

Page 32

1  as vague to the extent you are asking about
2  potential genotoxic impurities.
3      MR. STANOCH:  How would you like me to fix
4  the question, Counsel?
5      MS. LOCKARD:  Well, if you are asking
6  about nitrosamines, the presence of nitrosamines,
7  that's more specific than potential genotoxic
8  impurities.
9      MR. STANOCH:  Okay.  I withdraw my prior
10 question.
11     Q.  Doctor, when did Teva become aware of the
12 potential nitrosamine contamination in valsartan
13 API?
14     A.  It was around the time Teva put on hold
15 the manufacture of its four ANDAs because of the
16 presence of these impurities in the ZHP drug
17 substance.
18     Q.  Uh-huh.  And when --
19     A.  And that, I believe, was in June of 2018.
20 Then there were a number of activities that Teva
21 undertook, which of course is a core part of my
22 report, but the most important one in terms of my
23 report were the recalls of the products that
24 contained the ZHP drug substance.
25     Q.  Okay.  Should a drug manufacturer such as

Page 33

1  Teva have quality systems in place to ensure that
2  its API suppliers notify them upon the discovery of
3  potential genotoxic impurities?
4      MS. LOCKARD:  Objection.  Outside the
5  scope of the class-certification expert report.
6      THE WITNESS:  Yes, I did not comment on
7  that in my report.  If you are asking me as a
8  personal question, I could say I would think it
9  likely that Teva would have that kind of agreement
10 or understanding.
11 BY MR. STANOCH:
12     Q.  Uh-huh.  Did you undertake to assess
13 whether that agreement or understanding existed here
14 between Teva and ZHP for valsartan API?
15     A.  No, that was not part of my report or my
16 opinions.
17     MS. LOCKARD:  Objection.  That's outside
18 the scope of the expert report on
19 class-certification issues.
20 BY MR. STANOCH:
21     Q.  Isn't it a finished-dose manufacturer's
22 responsibility to obtain material information about
23 genotoxic impurities from their API source in a
24 timely manner?
25     MS. LOCKARD:  Objection.  It's liability

Confidential Information - Subject to Protective Order

Page 34

1  question.  It's outside the scope of the
2  class-classification expert report opinions.
3        MR. STANOCH:  Counsel, you have said
4  outside the scope and liability issue a number of
5  times.  Could you just -- I'm not picking a fight.
6  I just want to know what you mean by that.
7        MS. LOCKARD:  Well, okay.  We are in the
8  class-certification phase of the case, correct?
9  There are opinions that are very specific that have
10  been directed by Dr. Williams in his report.  These
11  are not liability opinions.
12        The majority of your questions so far this
13  morning have been, what should manufacturers do?
14  What should their quality systems be?  And they are
15  all liability opinions, and that is not the
16  substance of his report.  That's not within his
17  report.  These are squarely liability questions.
18        MR. STANOCH:  Well, I appreciate that,
19  Ms. Lockard.  I'll just say I don't necessarily
20  agree with you that these are outside the scope of
21  the report that he has issued at class, but I'll
22  note your objection and we can keep going.
23        I'm sorry, Madam Reporter.  Would you be
24  kind enough?  Did I have a question pending?
25        THE REPORTER:  Let me check for you.

Page 35

1        MR. STANOCH:  Thank you.
2        (Whereupon, the reporter read the record
3  as follows:
4        "Question:  Isn't it a finished-dose
5  manufacturer's responsibility to obtain material
6  information about genotoxic impurities from their
7  API source in a timely manner?")
8        MS. LOCKARD:  Same objection.
9        THE WITNESS:  You know, the understanding
10  that a drug substance and the corresponding drug
11  product may have genotoxic impurities has been a
12  challenge to FDA and the pharmaceutical industry
13  over many years.  The FDA guidance that spoke to how
14  to deal with that actually came out in 2015.
15        So when you ask a general question like
16  that, it's very difficult for me to answer.  But
17  definitely if the manufacturer of a drug product
18  feels there could be a genotoxic impurity, there is
19  an obligation to work with FDA to understand that
20  and to limit it if necessary.
21        I hope that's responsive to your question,
22  Mr. Stanoch.
23  BY MR. STANOCH:
24        Q.  Partially, but I appreciate you trying,
25  Dr. Williams.  I really do.

Page 36

1        The next question:  What common evidence
2  would you need to look at to determine whether it is
3  a finished-dose manufacturer's responsibility to
4  obtain important information about genotoxic
5  impurities from their API source in a timely
6  fashion?
7        MS. LOCKARD:  Objection.  Vague.
8  Confusing.  Outside the scope of the
9  class-certification expert report.
10        Did you say common evidence?  Or I might
11  have misheard you.
12        THE WITNESS:  Are you waiting for
13  Mr. Stanoch to answer, Ms. Lockard?
14        MS. LOCKARD:  It's okay.  I was, but I
15  have the -- I see on the transcript what he said.
16        All right.  I stand by the objection.
17        THE WITNESS:  You know, the way I would
18  answer it, Mr. Stanoch, it's a very general
19  question.  It's probably more important to focus on
20  nitrosamine impurities because that's what my report
21  focuses on.
22        And all I can say is FDA at many points in
23  this episode said that the finding of these
24  genotoxic nitrosamine impurities was unexpected.  So
25  I don't think I can speculate as to when either a

Page 37

1  drug-substance manufacturer or a dosage-form
2  manufacturer would expect something that was -- or
3  anticipate something that was unexpected.  I think
4  it's important to keep in mind that these impurities
5  were unexpected.
6  BY MR. STANOCH:
7        Q.  Are you finished, Doctor?
8        A.  Yes.
9        Q.  Thank you.
10        I may ask you that from time to time, just
11  for the video, to make sure I don't step over you
12  and vice versa; is that okay?
13        A.  Yes, no problem, Mr. Stanoch.
14        Q.  Thank you.  I appreciate your patience
15  there.
16        You said "unexpected" a number of times in
17  your answer there, and we will certainly get to
18  that.  But let me -- you said that my question would
19  be different if I asked about nitrosamines versus
20  genotoxic impurities generally, so I'm going to ask
21  you the question differently.
22        Question:  What evidence would you need to
23  look at in order to determine whether it is a
24  finished-dose manufacturer's responsibility to
25  obtain important information about nitrosamine

Page 38

1 impurities from their API source in a timely
2 fashion?
3        MS. LOCKARD: Objection. Vague.
4 Confusing. Outside the scope of the
5 class-certification expert report.
6        THE WITNESS: You know, it might be
7 helpful, Mr. Stanoch, to back up a little bit on
8 what are the responsibilities of an ANDA filer in
9 terms of assessing impurities in its drug substance
10 and its drug product.
11        The presence of genotoxic impurities I
12 would say doesn't really come up too often in that
13 primary responsibility. So I think you are asking
14 for something that, if I may say so, is not routine
15 as part of the ANDA requirements or recommendations
16 by FDA.
17 BY MR. STANOCH:
18    Q.  Are you saying it's not the responsibility
19 of a drug-product manufacturer to identify potential
20 genotoxic impurities?
21        MS. LOCKARD: Objection. Clearly outside
22 the scope of the class-certification opinions in the
23 expert report. It's clearly a liability question.
24        MR. STANOCH: This is his last answer,
25 Counsel.

Page 39

1    Q.  Go ahead, Mr. Williams.
2    A.  What I would say, Mr. Stanoch, is, you
3 know, the ANDA applicant has a responsibility to
4 look at the impurities in their drug substance and
5 their drug product and decide whether they need to
6 be reported, identified, and qualified. And those
7 are general recommendations that appear in the
8 guidances I cited.
9        It was only until 2015 that FDA produced
10 the guidance on how to deal with genotoxic
11 impurities, and that, of course, came to a head
12 three years later with the finding of the
13 nitrosamine impurities.
14        So I really can't answer your question
15 about the responsibility of a drug-product
16 manufacturer other than to refer you to that 2015
17 guidance.
18    Q.  You are saying there was no guidance to
19 the drug industry about genotoxic impurities until
20 2015?
21    A.  No, I think there were guidances, which I
22 allude to in my report. But the M7 guidance that
23 we're talking about now I think clarified it in
24 terms of how manufacturers need to focus on the
25 possibility of genotoxic impurities.

Page 40

1    Q.  Was there any industry guidance on
2 genotoxic impurities prior to 2015, Doctor?
3    A.  I think if we look at my report, I could
4 find reference to other documents that had been
5 produced by FDA or the EMA or in ICH, so -- and
6 those documents preceded the 2015 guidance.
7    Q.  Do you agree that a drug-product
8 manufacturer is ultimately responsible for the API
9 that it incorporates into its finished-dose product?
10    A.  Yes, I think that's generally a fair
11 statement, Mr. Stanoch.
12    Q.  Yeah. So Teva is ultimately responsible
13 for the valsartan API that was in its finished-dose
14 valsartan product, correct?
15    A.  Yes, I think I can agree with that.
16        MS. LOCKARD: Objection. It's vague.
17 BY MR. STANOCH:
18    Q.  And that would include the identification,
19 characterization, testing, and control of any
20 potential genotoxic impurities, correct?
21        MS. LOCKARD: Objection. Compound.
22 Vague. Outside the scope of the class-certification
23 expert report.
24        THE WITNESS: Well, remember, ZHP and Teva
25 are working according to FDA requirements that speak

Page 41

1 to identity, strength, quality, purity, and potency.
2 When we talk about purity, we're talking about
3 impurities.
4        And the guidances that ZHP and Teva would
5 use are the ones I cited in my report, both the ICH
6 Q3A and Q3B with revisions, and then also the
7 corresponding ANDA guidances. None of those
8 guidances mention genotoxic impurities.
9 BY MR. STANOCH:
10    Q.  Are you saying, then, that Teva had no
11 obligation to potentially identify genotoxic
12 impurities in its finished-dose valsartan products?
13        MS. LOCKARD: Objection. Vague. Outside
14 the scope of class-certification expert report.
15        THE WITNESS: You know, I think it's clear
16 in my report that FDA gives recommendations in these
17 guidances, and that is what Teva and ZHP would be
18 following to submit their ANDA to FDA for review and
19 approval.
20        Now, if FDA had some concern about
21 genotoxic impurities based on the route of synthesis
22 of the drug substance, they could certainly bring
23 that to Teva's attention or the DMF-holder's
24 attention, in this case, ZHP.
25        But again, to talk about it generally in

Page 42

1 terms of responsibility and liability is not
2 something I dealt with in my report.
3 BY MR. STANOCH:
4    Q.  Uh-huh.  So you are not offering any
5 opinion at this time about which firm would be
6 responsible for the identification of genotoxic
7 impurities in Teva's finished-dose valsartan
8 product?
9    A.  I think if there was some reason to
10 suspect the presence of a genotoxic impurity, any
11 drug manufacturer would have to consider that and
12 discuss it with FDA in terms of what to do, but that
13 was not the case here.
14    Q.  Uh-huh.  Would it be your expectation that
15 Teva would have had systems in place to assure that
16 ZHP would promptly notify it in the event ZHP
17 identified a potential genotoxic impurity in
18 valsartan API?
19       MS. LOCKARD:  Objection.  Vague.  Outside
20 the scope of the class-certification expert report.
21       THE WITNESS:  You know, again, you are
22 asking these very general questions, but I would say
23 both ZHP and Teva are sort of marching, if you will,
24 to laws, regulations and guidances that come from
25 FDA, and for the most part those guidances don't

Page 43

1 speak to genotoxic impurities.
2       So if you are talking about a general
3 moral obligation, I could only answer in a personal
4 opinion, but I'm really trying to focus on the
5 regulatory requirements for an ANDA to be considered
6 and, if possible, approved.
7 BY MR. STANOCH:
8    Q.  Well, Doctor, you are opining on whether
9 or not Teva followed GMP or proper regulatory
10 practice, I'm looking at Paragraph 116, right?
11    A.  116 speaks to Dr. Najafi's report.  Is
12 that where we're looking, Mr. Stanoch?
13    Q.  Oh.  Well, that might be a separate issue,
14 Doctor.  You know, your January 12th report, the
15 numbering -- there is two Paragraph 116s.  It went
16 from 116 to 127, and then it restarted at 110.  I
17 was looking at your conclusion.  Maybe you fixed
18 that in your latest report.  Let's take a look.
19    A.  I'm sorry for those typo errors.
20       Can you point me exactly to where you are
21 looking, then?  Is there a page number?
22    Q.  I am looking at page 46, Doctor.
23    A.  Okay.  Good.
24    Q.  And you see the heading "Conclusion"?
25    A.  Yes, I do.

Page 44

1    Q.  Right.  And the paragraph number there is
2 116.  Do you see that?
3    A.  I do.  I do see that.  Thank you.
4    Q.  Right.  Sure.
5    A.  And your question about that is?  I'm
6 sorry.
7    Q.  Yeah, we will get back to that.  Let's do
8 this housekeeping.  So we scroll back up, that's
9 actually some misnumbering issue.  You have another
10 Paragraph 116 starting under "Dr. Najafi's
11 Declaration" on page 38, right?
12    A.  Yes, I apologize for these errors.  I'm
13 sorry.
14       But I'm sure we can find the part of the
15 report that you want me to talk about.
16    Q.  Sure.
17    A.  So --
18    Q.  Well, hold on.  Hold on.  Sure.  We could
19 fix.  And just to button this up, so then it looks
20 like your paragraph numbering restarts, for the
21 record, on page 44, under the "Rebuttal to
22 Mr. Quick's Expert Declaration."  Do you see that?
23    A.  Yes, I do.  It jumps from 127 and then to
24 110.
25    Q.  Right.

Page 45

1    A.  So I think to make sure we're always
2 talking about the right thing, I think if we just
3 give the paragraph number and the page, we should be
4 fine.  Would that be all right with you,
5 Mr. Stanoch?
6    Q.  Absolutely fine.  And, Doctor, was there
7 some cutting-and-pasting issue with the section on
8 your rebuttal to Mr. Quick that messed up your
9 numbering of your paragraphs here?
10    A.  No, I would say it was a word-processing
11 error, where you have to sort of back up and make
12 sure that the Word program numbers the paragraph
13 correctly.
14    Q.  Sure.  I have been there, Doctor.  I'm
15 sure we all have.
16       No, did you write this whole section, the
17 "Rebuttal to Mr. Quick's Expert Declaration" in your
18 report?
19    A.  I would say, you know, I wrote the report,
20 and I apologize for the limits on my word-processing
21 skills.
22       I did try to correct this.  I think we
23 noticed some of the misnumbering when we were
24 looking at drafts, and apparently I failed to do it
25 in the final document.

Page 46

1    Q.   Again, that's totally understandable.  I
2  was just getting at -- to say if you wrote this
3  section here, "Rebuttal to Mr. Quick's Expert
4  Declaration," or not?
5    A.   Yes, I did.
6    Q.   Uh-huh.  And no one gave you that to cut
7  and paste into the report and that messed up your
8  numbering?
9    A.   No.
10   Q.   Uh-huh.  You said "we" noticed some
11 pagination errors before.  Who is the "we" in your
12 answer a couple answers ago?
13   A.   Well, first of all, it's not a pagination
14 error, it's a paragraph-numbering error.  I can tell
15 you exactly how it happens.  But I think when we
16 were looking at drafts, one of the counsel pointed
17 out that the numbering was not consistent.
18   Q.   Okay.  Moving on, I'm looking at page 46,
19 your "Conclusions," Doctor.  Tell me when you are
20 there.
21   A.   Okay, Mr. Stanoch, I'm there.
22   Q.   And the Paragraph 116 on this page, you
23 write in part, "Teva did not fail to follow cGMP or
24 proper regulatory practice."  Do you see that?
25   A.   I do.

Page 47

1    Q.   Right.  So you are opining on whether or
2  not Teva followed cGMP and proper regulatory
3  practice, right?
4    A.   Yes.
5    Q.   Right.  So in the context of your opinions
6  on cGMP and proper regulatory practice, my question,
7  now several questions ago is:  Do you believe that
8  Teva was following proper regulatory practice in
9  terms of its relationship with ZHP to ensure that it
10 was promptly notified about potential genotoxic
11 impurities in valsartan API?
12   A.   I think the answer is yes.  I think ZHP
13 was communicating to Prinston, Prinston was
14 communicating with FDA, FDA was communicating with
15 Teva.  And Teva promptly recalled all these
16 products, as my report says.  So to me, that's the
17 way the system should work.
18        And Teva never was under any particular
19 GMP failure notice from FDA.  I think FDA was
20 pleased with the way Teva worked out its recalls in
21 order to protect the public when they found out
22 about the nitrosamine impurities.  I don't see a
23 failure, Mr. Stanoch.  I see success.
24   Q.   So you are saying, Doctor, that Teva acted
25 reasonably promptly in the summer of 2018 upon

Page 48

1  learning from ZHP about the NDMA in valsartan API?
2    A.   You know, you are asking a question that
3  sort of asks me to take your word for it.  I don't
4  think I commented on when ZHP or FDA actually
5  informed Teva, but it was certainly in the May,
6  June, July time frame, and I think Teva acted
7  promptly to recall two of its ANDA valsartan
8  products from the U.S. market.
9        And that's the way the system is supposed
10 to work.  That's what recalls do.  It allows the
11 removal of a product that, for one reason or
12 another, needs to be removed from the market, either
13 because it fails GMPs or it fails a specification.
14        What is unusual, and I noted this in my
15 report, is the recall occurred before FDA had set a
16 limit on the nitrosamine impurity.  So Teva was
17 acting, and I'm going to use FDA words, with what I
18 might call an abundance of caution to remove the two
19 valsartan products manufactured in Malta from the
20 U.S. market.
21   Q.   Uh-huh.  So what I hear you saying is the
22 system worked as it should here.
23        ZHP discovered NDMA in valsartan API
24 sometime in the summer of 2018 or shortly before,
25 right?

Page 49

1    A.   Yes, I think you are saying it correctly,
2  Mr. Stanoch.
3    Q.   ZHP told Teva, correct?
4    A.   Well, again, I'm not sure of the routes of
5  communication.  I think Prinston told FDA and FDA
6  told Teva, and pretty soon everybody is talking
7  about this difficult situation.
8    Q.   Well, that's fine, whatever your
9  understanding of the route is.  So ZHP told its
10 affiliate company, Prinston, right?
11   A.   If you want to postulate the route of
12 communication, that's fine with me, Mr. Stanoch.
13   Q.   No, I'm not postulating anything, Doctor.
14 I'm just trying to -- whatever your understanding
15 is, I'm not bickering with it.  I'm just trying to
16 make sure I establish what you think the route is,
17 right?  So ZHP, we already determined, identified
18 NDMA in valsartan API in 2018, right?  We agree with
19 that?
20   A.   And that information came to Prinston and
21 Prinston brought it to FDA, and then FDA started
22 looking at all the manufacturers of valsartan, and
23 there were several, who used the ZHP product.  And
24 that included Teva for two of its four ANDAs.
25   Q.   So how did the information about the NDMA

Confidential Information - Subject to Protective Order

Page 50

1  in 2018 get to Teva?
2      A.  I would be speculating, but to me, it
3  might have come from FDA.
4      Q.  Well, whatever you think your answer is.
5  I'm just trying to see what the telephone route of
6  communication is.
7          And that's what you were referring to more
8  generally as the system working, that the API
9  manufacturer passed the information along, and it
10 went to the FDA and at some point it got to Teva,
11 and then Teva, as you said, instituted its recalls
12 for its product that contained the valsartan API,
13 right?
14     MS. LOCKARD:  Objection.  Vague.
15 Compound.  And outside of the scope to the extent
16 this line of questioning is asking about what ZHP
17 did or should have done.
18     THE WITNESS:  Yeah, I don't want to get
19 into the details of the way you described the routes
20 of communication, but I can certainly say that when
21 these things come up, everybody needs to talk to
22 everybody, including FDA, and FDA is the one that
23 prompted Teva to make the recalls.
24 BY MR. STANOCH:
25     Q.  Yeah, right.  You opine that FDA asked

Page 51

1  Teva to recall its valsartan containing the API from
2  ZHP, right?
3      A.  Well, the recall was voluntary on Teva's
4  part, but they certainly worked closely with FDA to
5  make sure that FDA was satisfied with the way their
6  recall occurred.
7      Q.  Uh-huh.
8      A.  And that recall was in, I want to say,
9  June of 2018.  Wait a minute.  I may have the month
10 wrong.  I'm sorry, Mr. Stanoch.  I can check that if
11 you wish.
12     Q.  Well, I'm looking at Paragraph 109 of your
13 report, Doctor.  Tell me when you are there.
14     A.  All right.  Which paragraph?
15     Q.  109.
16     A.  And I see that on -- can you say the page,
17 Mr. Stanoch?
18     Q.  37, sir.
19     MS. LOCKARD:  It starts on 36.
20     THE WITNESS:  Okay, yes.  I see that,
21 Paragraph 109 on page 36.
22 BY MR. STANOCH:
23     Q.  Stand by.  Right.  Yeah, you know, I have
24 the earlier version of your report, not the one
25 given to me this morning, so I'm sorry if I'm off by

Page 52

1  a page number.  But yes, your Exhibit 1, page 36,
2  Paragraph 109.  It begins, "Somewhat unusual,"
3  right?
4      A.  Yes.  Yes.  We are in the same place,
5  Mr. Stanoch.
6      Q.  Perfect.  And you wrote, "the FDA asked
7  for recalls of drug products"; do you see that?
8      A.  Yes.  I do see that.  And I think that
9  corresponds with what I said previously.
10     Q.  Right, right, right.  Well, you were
11 saying that FDA and Teva were talking previously,
12 but you write in your report that FDA asked for the
13 recalls, right?
14     A.  Well, FDA works with the manufacturer to
15 make a voluntary recall.  I would say the decision
16 on the recall is up to the manufacturer.
17     Q.  Well, that's not what you wrote here in
18 Paragraph 109, is it?
19     A.  You know, I think the way it works is FDA
20 wishes a recall, and a manufacturer -- I don't think
21 FDA has the authority to compel a recall.  So the
22 reason I say it's voluntary is it's up to Teva to
23 say, yes, we will do this recall at your request,
24 and that's what Teva did.
25         I don't think we should quibble about, you

Page 53

1  know, who was actually driving the decision.  I
2  think it's a joint decision between FDA and Teva,
3  but it's a voluntary act on the part of Teva.
4      Q.  Well, you know, Doctor, I can only ask
5  questions about what you opine and write in your
6  report, and what you wrote in your report twice in
7  this paragraph is about the FDA asking for these
8  recalls, correct?
9      A.  That could well be how a recall occurs,
10 FDA finds something and they work with the company
11 to execute a recall.  But Teva was voluntarily
12 making these recalls, and they did so successfully.
13 And they kept FDA apprised of what they were doing,
14 and FDA agreed with it.
15     Q.  Well, you don't write here in this
16 paragraph or anywhere in your report that Teva went
17 to the FDA and said, we're going to recall our
18 product, did you?
19     A.  You know, I stand by the words in the
20 document.  Are you providing alternate words,
21 Mr. Stanoch?
22     Q.  I'm not providing anything alternate,
23 Dr. Williams.  I'm focused on your words in
24 Paragraph 109 of your report, where you twice say
25 the FDA asked for the recalls.

Page 54

1  A. Yes, I have no problem with FDA asking for
2  recalls. Does that seem a problem in terms of how
3  Teva executed the recall?
4  Q. I'm trying to establish based on your
5  words in your report, Doctor, that Teva did not go
6  to the FDA and said, we need to recall our product,
7  rather, the FDA asked Teva to recall the valsartan
8  product, correct?
9  A. I'm not going to debate the words with
10 you. I think you are right, Mr. Stanoch, that
11 Teva -- FDA was asking Teva and Teva responded to
12 this request. It was voluntary because I think Teva
13 could have said, no, we're not going to recall.
14 Teva did not do that. They voluntarily recalled.
15     But you are right, Teva initiated the
16 request based on their findings working with ZHP and
17 other manufacturers.
18 Q. I'm going to go back to sort of the chain
19 of communication about the NDMA discovery in June
20 2018. So do you think there was any direct
21 communication between ZHP and Teva about the NDMA
22 discovered in June 2018?
23 A. Well, I would have to speculate. It may
24 be in my materials considered, but I didn't cite
25 anything in that report, so at this point it would

Page 55

1  be speculative for me to answer. I would be very
2  surprised if ZHP and Teva weren't communicating on
3  this point.
4  Q. Okay. Would it be proper regulatory
5  practice for ZHP to be in communication with its
6  customer Teva about the discovery of NDMA in the
7  valsartan API?
8     MS. LOCKARD: Object to the extent you are
9  asking him about what ZHP should or shouldn't have
10 done. It's outside the report.
11    THE WITNESS: It seems to me, if a
12 drug-substance manufacturer finds an unidentified
13 impurity that is problematic in their drug
14 substance, they would certainly notify their
15 purchasers.
16 BY MR. STANOCH:
17 Q. What cGMP procedures did Teva have in
18 place to assure that ZHP would inform Teva about any
19 genotoxic impurities in APIs that Teva was
20 purchasing?
21    MS. LOCKARD: Objection. Vague. Scope.
22    THE WITNESS: You know, Mr. Stanoch, we
23 may look for it in my materials considered, but I
24 did not study that to form my opinions, and I don't
25 think I cite anything into that part of my -- any

Page 56

1  part of my report. And I'm not a GMP expert, so I
2  very carefully combined my GMP opinions through
3  brief statements in this report.
4  BY MR. STANOCH:
5  Q. That's confusing to me, Doctor, because
6  the conclusion paragraph we were looking at is you
7  are opining that Teva did not fail to follow cGMP or
8  proper regulatory practice, right?
9  A. And I base that on my review of
10 inspections of Teva that occurred over the decade of
11 2010 to the present time. Teva did not have GMP
12 issues insofar as FDA was concerned, including GMP
13 issues related to the nitrosamine impurities.
14 Q. So the only basis for your opinion that
15 Teva did not fail to follow cGMP or proper
16 regulatory practice is the status of any FDA
17 inspections of Teva finished-dose facilities?
18 A. Yes, exactly. And that's where I spent
19 some time in my report, on that inspectional
20 history, and for the most part, I did not see any
21 particular GMP problems that FDA was bringing to
22 Teva's attention.
23 Q. So your opinions are not based in any way
24 on Teva's compliance with cGMP or proper regulatory
25 practice vis-à-vis its API suppliers ZHP and Mylan?

Page 57

1     MS. LOCKARD: Objection. Vague.
2  Confusing.
3     THE WITNESS: Yes, I did not explore
4  separate from FDA inspections how Teva's SOPs
5  conform to FDA's requirements on GMPs. That was not
6  part of my report.
7  BY MR. STANOCH:
8  Q. Okay. Well, why do you list all Teva's
9  SOPs in your reliance materials, then, Doctor?
10 A. There is a huge amount of material in my
11 materials-considered document, and I would say only
12 a small fraction of that was cited in my report, and
13 even that small fraction was voluminous.
14 Q. So am I to take it, then, that the
15 materials that you only relied on for your opinions
16 at this stage are the ones quoted in the -- or cited
17 in the body of your report, not all of them listed
18 in your reliance materials?
19 A. No, I think if it is cited in my report,
20 it should be listed in my materials-considered list.
21 Was that your question, Mr. Stanoch?
22 Q. No. My question is a little different,
23 Doctor. You know, you list a lot of stuff in your
24 reliance materials, including Teva's SOPs, but now
25 you are telling me your opinions don't turn on

Confidential Information Subject to Protective Order

Page 58

1  Teva's SOPs as it relates to Teva's relationship
2  with its API suppliers, right?
3      MS. LOCKARD:  Objection.  Lacks
4  foundation.  Vague.  Misstates the document.
5      THE WITNESS:  Yes, I think I make -- my
6  opinions are clearly stated both at the beginning
7  and at the end of the report and I provide citations
8  to support those opinions, but I certainly didn't
9  get into the adequacy of Teva's SOPs with regard to
10  conformance to FDA's GMPs.  That would have been a
11  completely different report.
12  BY MR. STANOCH:
13      Q.  So how am I to know from your reliance
14  materials, Doctor, which materials you are relying
15  on, the opinions in the body of your report?
16      A.  I think the best way I could answer that,
17  Mr. Stanoch, is to look at the citations in my
18  report, which are also listed in the materials
19  considered.
20      Q.  Got it.  So --
21      MS. LOCKARD:  Objection to that question
22  because you continue to name the list of materials
23  considered as his reliance materials, which is
24  confusing and vague and lacks foundation.
25

Page 59

1  BY MR. STANOCH:
2      Q.  So let me make sure I fully understand it,
3  then.  So the materials you rely upon to render your
4  opinions reflected in your report are the ones that
5  are cited in the body of the report?
6      A.  Yes, I think as a general statement,
7  Mr. Stanoch, that's correct.  And as you can see,
8  it's only a small fraction of all the materials
9  listed in the materials-considered document.
10      Q.  Okay.  So if an item is listed in your
11  materials considered but not cited in the body of
12  the report, you are not relying on that material in
13  rendering your opinions at this time?
14      A.  I think I can agree with that.
15      Q.  That's fine.  It will make the day go
16  faster, Doctor.  Again, I just want to make sure
17  we're on the same field.  I appreciate that.
18      MS. LOCKARD:  So I think we have been
19  going about an hour, if you are at a point in
20  time -- you are changing topics --
21      MR. STANOCH:  That's fine.  Doctor, would
22  you like a break?
23      THE WITNESS:  That would be very nice,
24  Mr. Stanoch.
25      MR. STANOCH:  Let's do it.

Page 60

1      THE VIDEOGRAPHER:  Okay.  So we're going
2  off the record.  The time is 8:42.
3      (Whereupon, a brief recess was taken.)
4      THE VIDEOGRAPHER:  Okay.  We're coming
5  back on the record.  The time on the video monitor
6  is 8:51.  Please begin.
7  BY MR. STANOCH:
8      Q.  Doctor, just yes/no, did you talk to your
9  counsel during the break?
10      A.  Yes, I did.
11      Q.  Did you talk to anyone else?
12      A.  No, not at all.
13      Q.  Did you look at any documents?
14      A.  Did we look at any documents?
15      Q.  Correct.
16      A.  I think there was one document we looked
17  at.
18      Q.  What did you look at?
19      A.  It was a management document of Teva that
20  went out globally to many scores of people about --
21  and it's cited in my report -- about the problem
22  with the ZHP drug substance having nitrosamine
23  impurities.
24      Q.  Where is that cited in your report?
25      THE WITNESS:  Can you tell me where it is

Page 61

1  in the cited materials?
2      Okay.  It's on page 9, and it's Reference
3  9 on page 9, I believe.
4  BY MR. STANOCH:
5      Q.  Is that "Notification Letter from
6  Valsartan re" -- sorry.  Start over.  "Notification
7  Letter from re Valsartan" "update"?
8      MS. LOCKARD:  Just to clear it up, it's --
9  sorry, you're not trying to -- I know you are just
10  trying to figure out which document it is.  The
11  document is 565758.
12      THE WITNESS:  Yes, and it's Reference 9.
13  There are actually two references in Reference 9,
14  and it's the first that we looked at briefly.
15  BY MR. STANOCH:
16      Q.  Why don't you tell me the Bates numbers of
17  the two documents you looked at?
18      MS. LOCKARD:  He looked at one document.
19  He is saying there are two documents referenced in
20  Footnote 9.
21      MR. STANOCH:  Oh, I'm sorry, Counsel.  I
22  thought he was looking at his materials considered.
23  We are looking at his footnote in his report.  Thank
24  you.  That's helpful.  I see it now, thank you.
25      Q.  Did that document refresh your

Confidential Information Subject to Protective Order

Page 62

1  recollection about anything you had looked at
2  before?
3      A.  No.  I don't think it's really pertinent
4  to the questioning.  I'm glad to ask questions about
5  it if you wish, Mr. Stanoch.
6      Q.  Sure.  I just need to get a copy of it and
7  to share it for all of our colleagues who are
8  remote, so give me one second.  Okay.  We will mark
9  that document as Williams Exhibit 3.
10      (Whereupon, Exhibit 3 was marked for
11  identification.)
12      THE WITNESS:  And if I -- Mr. Stanoch, may
13  I point out something in the document that was
14  helpful to some of your questions?
15  BY MR. STANOCH:
16      Q.  Before you do that, let's make sure I have
17  the same document as you.  I'm going to share my
18  screen, Doctor.  You will see it looks like a --
19  it's an e-mail from June 21, 2018, Bates No. 565758.
20  Is this the same document you are holding?
21      A.  Yes, I believe so.
22      Q.  Great.  I'm going to stop sharing now that
23  we're on the same page.
24      This is the document you were referring to
25  that you looked at, right?

Page 63

1      A.  Yes.  And if you look at the four-digit
2  page number ending 5763 --
3      Q.  Okay.
4      A.  -- you can see at the top there is a
5  reference to when ZHP informed Teva that "they came
6  to be aware of a previously unknown impurity that
7  may have genotoxic potential," and that was on
8  June 20th, 2018.
9      Q.  Got it.  And it's your opinion that Teva
10  acted appropriately, promptly, after receiving
11  notification from ZHP on June 20th, 2018?
12      A.  Yes.  The way I would say it, if you look
13  further down, where it says "Investigation," "sites
14  to requested to remove any materials or products
15  using Valsartan API from Zhejiang" -- ZHP.
16      So to me, you know, this is a very rapid
17  response on the part of Teva to a problem brought to
18  their attention by ZHP.  Remember, the date of the
19  e-mail is 6/21 and they are notified by ZHP on 6/20,
20  so I don't think you could have a much more rapid
21  response.
22      And then subsequently to this notice, Teva
23  also issued the recall.  And I believe that was in
24  July 16th, 2018, so that was about a month later.
25      And again, as we discussed before the

Page 64

1  break, FDA asked for the recall, but Teva
2  voluntarily did the recall, working with FDA and to
3  FDA's satisfaction.
4      Q.  You think it was appropriate for Teva to
5  wait, as you said, a month later after being told by
6  ZHP about the NDMA impurity, to institute its
7  recalls?
8      MS. LOCKARD:  Objection to the form of
9  that question.  It lacks foundation and it misstates
10  the evidence.
11      THE WITNESS:  Well, you know, you can
12  imagine, I'm speaking generally, not to anything I
13  said in my report, but this is an incredibly
14  difficult finding, inspecting a company making
15  products all over the globe, including FDA.  And of
16  course FDA is a very stringent regulatory authority,
17  so it doesn't surprise me at all that by the time
18  they sorted through the issues, it took about a
19  month to get the product off the U.S. market.
20  BY MR. STANOCH:
21      Q.  Okay.
22      A.  And that's what my report says.  And at no
23  time was Teva's product ever deemed adulterated or
24  misbranded, and it was always AB-rated.  So I think
25  Teva acted with incredible swiftness.

Page 65

1      And remember, the issue is not actually the
2  nitrosamine impurity be there or not.  It could be
3  there.  It just didn't have a limit.  And FDA set
4  that limit in December 2018.
5      Q.  Uh-huh.  Well, nothing stopped Teva from
6  taking its valsartan with ZHP API in it off the
7  market sooner than when the FDA asked, right?
8      MS. LOCKARD:  Objection.  Vague.
9      THE WITNESS:  No, I think you're asking
10  for sort of a personal opinion.  It seemed to me it
11  happened remarkably quickly, Mr. Stanoch.  It wasn't
12  anything that was delayed.
13      You know, to issue a recall and discuss
14  with the FDA how to do the recall takes some time.
15  So if you ask me, a few weeks, was that unusual, I
16  don't think it was unusual at all.
17  BY MR. STANOCH:
18      Q.  Uh-huh.  It's your opinion that this is
19  how it's supposed to happen, right?  ZHP became
20  aware of the impurity, looks like they told Teva,
21  and then Teva acted, based on this Exhibit 3, right?
22      MS. LOCKARD:  Objection.  Vague.
23      THE WITNESS:  Again, it -- I think I'm
24  speaking personally, but I think Teva's activities
25  here were highly responsible and laudatory.

Confidential Information - Subject to Protective Order

Page 66

¹ BY MR. STANOCH:
²    Q.  Okay.  And would you say that this is an
³ example of -- in your words from prior to the
⁴ break -- as how the system is supposed to work in
⁵ terms of notification about the impurity with
⁶ genotoxic potential finding its way back to Teva?
⁷    A.  Yes, I appreciate those words,
⁸ Mr. Stanoch.  Thank you.
⁹    Q.  And you would expect this to be the case
¹⁰ of how it should work for the discovery of genotoxic
¹¹ impurities in API that a manufacturer like Teva is
¹² buying generally, right?
¹³    A.  Well, that's a very general statement.
¹⁴ But I think in terms of the specifics here with a
¹⁵ very difficult impurity to identify and measure,
¹⁶ which can be there, it just needs a limit, Teva did
¹⁷ something quite remarkable.  They might --
¹⁸    Q.  If -- I'm sorry.  Go ahead.
¹⁹    A.  I'm speculating, but they might have said
²⁰ to FDA, well, let's wait until we figure out what
²¹ the limit should be, and, you know, they may not
²² have needed to do a recall at all.  But they acted
²³ highly responsibly at FDA's request.
²⁴    Q.  Uh-huh.  Right.  If ZHP came to be aware
²⁵ of a genotoxic impurity earlier than 2018, would you

Page 67

¹ expect ZHP to inform Teva of that?
²       MS. LOCKARD:  Objection.  Outside the
³ scope of his opinions.  He is not here to give
⁴ liability opinions about ZHP.
⁵       THE WITNESS:  Yes, and I don't have any
⁶ information on that, Mr. Stanoch, and I don't
⁷ believe I cited anything about that question.
⁸ BY MR. STANOCH:
⁹    Q.  In your answer a moment ago, you said Teva
¹⁰ did something quite remarkable.  Is it your opinion
¹¹ that Teva should have allowed their valsartan to be
¹² sold on the market while the FDA came up with
¹³ interim limits?
¹⁴    A.  I think that's a possible conjecture.
¹⁵    Q.  So you are saying Teva could have --
¹⁶ strike that.
¹⁷       So you are saying Teva could have kept
¹⁸ selling its valsartan with the NDMA in it until the
¹⁹ FDA came up with interim limits?
²⁰       MS. LOCKARD:  Objection.  Vague.
²¹ Speculation.
²²       THE WITNESS:  Yeah, I am speculating, but
²³ I point out that it was unusual for FDA to ask a
²⁴ recall of an impurity which FDA says can be in a
²⁵ drug product and a drug substance.  What was missing

Page 68

¹ from the equation is the limits that FDA set in
² December 2018.
³ BY MR. STANOCH:
⁴    Q.  Were there any acceptable limits for
⁵ nitrosamines in valsartan API as of June 20, 2018?
⁶    A.  Not that I'm aware of, no.
⁷    Q.  Uh-huh.  Right.  Nitrosamines were --
⁸ there was -- strike that.
⁹       Right.  There was no established
¹⁰ acceptable limit for nitrosamines in any valsartan
¹¹ products prior to June 2018, correct?
¹²    A.  Or any chemically synthesized drug in the
¹³ U.S. market.
¹⁴    Q.  Right.  Because no one expected the
¹⁵ nitrosamines to be in them, correct?
¹⁶    A.  You are reiterating what FDA said.  This
¹⁷ was unexpected.
¹⁸    Q.  Well, unexpected, you say that numerous
¹⁹ times in your report, Doctor.  We will get back to
²⁰ that.
²¹       But is it your opinion that without the
²² interim guidelines, there were no guidances out
²³ there which would have indicated what level of
²⁴ nitrosamines were allowable in valsartan API or
²⁵ finished dose?

Page 69

¹    A.  That's my understanding.
²    Q.  Right.  So until the FDA caught ZHP, it
³ was okay for any amount of nitrosamines to be in
⁴ valsartan API; is that what you are saying?
⁵       MS. LOCKARD:  Objection to the form of the
⁶ question.  Argumentative.
⁷       THE WITNESS:  Yeah, no, I'm not saying
⁸ that at all, but of course, you are dealing with an
⁹ impurity which has a presence in food, and sometimes
¹⁰ quite high levels.  So FDA had just never crossed
¹¹ this bridge, nor had U.S. industry.  Now, as a
¹² result of the events of the summer of 2018, they
¹³ have crossed the bridge, so things are better.
¹⁴ BY MR. STANOCH:
¹⁵    Q.  So you are saying until the FDA
¹⁶ established acceptable intake limits for
¹⁷ nitrosamines, it was okay whatever limit -- strike
¹⁸ that.
¹⁹       You are saying that valsartan API could
²⁰ have nitrosamines in it until the FDA established
²¹ interim acceptable limits?
²²    A.  Well, that's true now.  You can have --
²³ FDA will allow nitrosamine in drug products as long
²⁴ as they are within the acceptable intake limits.
²⁵ FDA is not saying that a product needs to have no

Confidential Information Subject to Protective Order

Page 70

1  nitrosamine impurities.  That is not true.
2      Q.  So it's your opinion that a drug
3  manufacturer could have had any amount of
4  nitrosamines in their drugs prior to the interim
5  limits and that did not pose any concern?
6      A.  I don't believe I said that anywhere in my
7  report, but if you can point it out, Mr. Stanoch, I
8  would be glad to comment.
9      Q.  Well, I'm asking you now if that's your
10  opinion, Doctor.
11      A.  You want me to add that to my opinion in
12  my report?
13      Q.  Are you of the view that prior to the
14  FDA's establishment of acceptable intake limits for
15  nitrosamines, there was no prohibition on the amount
16  of nitrosamines that could be in a drug product?
17      A.  I think you are saying that correctly,
18  because FDA didn't know how to measure for it,
19  neither did industry.  That all had to be worked
20  out.  And then once you could measure it, then you
21  could begin, you know, following the recommendations
22  of the 2015 guidance.  And FDA did all that and came
23  to a limit.
24      Now, you are sort of asking the question:
25  What happens before you do all that work?  And I

Page 71

1  guess the answer is, you know, that's how science
2  progresses, that's how regulation progresses, and
3  we're all the better for it now.  I really can't
4  speak to the past.
5      Q.  Well, isn't it incumbent on a drug
6  manufacturer to identify potential genotoxic
7  impurities in its product?
8      A.  You know, Mr. Stanoch, you keep asking
9  these questions that are very general.  Let me point
10  out -- I don't know if you consider this germane,
11  but let me say in the 1980s, before there was
12  analytical technology, there were a whole bunch of
13  impurities that neither FDA nor industry could even
14  measure.  What do you say about that?
15      I mean, are drugs more pure now, better
16  controlled than they were in the 1980s?  And my
17  answer to that is yes.  No question about it.  You
18  know, ICH and FDA worked together to bring that
19  better control for what I will call usual impurities
20  through the ICH documents.
21      And then later on, now, FDA came out with
22  the guidance in 2015 that extended it to genotoxic
23  impurities.  And then the nitrosamine brought it all
24  to the fore for a particular genotoxic impurity.  So
25  we're better off now.

Page 72

1      Q.  Uh-huh.
2      A.  Time marches on, regulation marches on.
3  If you want to go back in the past and say
4  everything was awful or not as good as it is now, I
5  don't want to say that.
6      Q.  Well, respectfully, Dr. Williams, things
7  in the past were awful for some of the plaintiffs
8  who got these drugs with a genotoxic carcinogen in
9  it.  So we are talking about that today, all right?
10  Do you understand that?
11      MS. LOCKARD:  I'm going to object to that.
12  That's not a question --
13      MR. STANOCH:  Withdrawn.  I will withdraw
14  it.
15      Q.  You understand this case is about in part
16  folks who took the drug, and they had nitrosamines
17  in it, right?
18      A.  I do understand that, and I would be loath
19  to have an opinion about whether or how people were
20  damaged by the presence of those nitrosamines.  I'm
21  not offering a toxicology or pharmacology opinion.
22      Q.  Right.  And it's your opinion, though,
23  that until the FDA established the acceptable intake
24  limits -- and when was that?  The final guidance
25  was, what, February 2021, I believe you say?

Page 73

1      A.  No, but there were interim limits
2  established in December 2018, and those carried
3  forward into the guidance that appeared in
4  September 2020, with an update in February 2021.
5      Q.  Uh-huh.  So it's your opinion that prior
6  to December 2018, a drug can have any amount of NDMA
7  in it with no regulatory consequence?
8      A.  I wouldn't offer that opinion.  I think it
9  seems like a dangerous opinion to offer, and I'm
10  surprised you state it.
11      Q.  If a drug had 1,000 nanograms of NDMA in
12  it in January of 2018, would that be appropriate?
13      MS. LOCKARD:  Objection.  Vague.
14      THE WITNESS:  You know, I just can't
15  comment on those kind of questions.  You are getting
16  into how does the FDA set limits for certain
17  impurities.  And, you know, it has to be done
18  carefully and in the context of background, food
19  impurities that are nitrosamine impurities.  I just
20  can't answer that question, Mr. Stanoch.
21  BY MR. STANOCH:
22      Q.  Uh-huh.  So you see no problem with a drug
23  product that had a thousand nanograms of NDMA in it
24  in January 2018?
25      A.  I didn't offer that opinion.

Confidential Information Subject to Protective Order

Page 74

1    Q.  I'm asking you, do you see any issue with
2  a drug having a thousand nanograms of NDMA in it in
3  January 2018?
4        MS. LOCKARD:  Objection.  Vague.  Outside
5  the scope of his class-certification report.
6        THE WITNESS:  You know, and some of it, as
7  you well know, Mr. Stanoch, relates to the amount of
8  drug in the drug product and the duration of dosing.
9  I mean, your hypothesis might be okay for a drug
10 that's just taken once and never taken again as a
11 single oral tablet.
12 BY MR. STANOCH:
13   Q.  Uh-huh.
14   A.  I just can't answer your question.  There
15 are too many factors that you are not specifying.
16   Q.  Uh-huh.  Uh-huh.  So you can't tell me
17 whether it was okay for any valsartan drug to have
18 NDMA in it prior to the interim limits of
19 December 2018?
20       MS. LOCKARD:  Objection.  Vague.
21       THE WITNESS:  No, I do know that.  FDA has
22 said you could have nitrosamine in your drug
23 product.  They say that even now.  The question is:
24 What are the limits?  And, you know, you can read
25 about it in the guidance in terms of daily dose and

Page 75

1  duration of dose.  That's how they come to these
2  limits.
3  BY MR. STANOCH:
4    Q.  Do you agree that there was no acceptable
5  limit for nitrosamines prior to December 2018?
6    A.  That's my understanding.  The FDA did not
7  have limits for the nitrosamine impurities before
8  December 2018.
9    Q.  So without an acceptable limit, then the
10 limit is zero, isn't it?
11   A.  No.  No, no.  I wouldn't say that at all.
12 I don't know how you come to zero.
13   Q.  Uh-huh.  Well, the purpose of a limit is
14 to say you can have this much of a substance in the
15 drug, right?
16   A.  Up to the limit.
17   Q.  Correct.  Up to the limit.  Right.  And so
18 until that limit was determined, you can't have more
19 than zero amount of a substance in it, can you?
20   A.  No, no, I wouldn't agree with that at all.
21   Q.  Well, so even without an interim limit,
22 you are saying it was appropriate for a drug to have
23 some amount of nitrosamine in it?
24       MS. LOCKARD:  Objection.  Asked and
25 answered.

Page 76

1        THE WITNESS:  Yes, I think that's what FDA
2  would say.  And remember, there can be many
3  impurities in a drug substance that are below
4  detectable limit that you just never know about.  I
5  mean, we're getting into hypotheticals that are
6  beyond my report.
7  BY MR. STANOCH:
8    Q.  Is it your opinion, sir, that without the
9  interim guidelines, there were no guidances
10 available which would have indicated what levels of
11 nitrosamines could be present in valsartan?
12       MS. LOCKARD:  Objection.  Asked and
13 answered.
14       THE WITNESS:  Yes, that's my
15 understanding, that those limits came in
16 December 2018 from FDA.
17 BY MR. STANOCH:
18   Q.  Uh-huh.  So prior to December 2018, there
19 was no guidance available to the industry about
20 levels of nitrosamines in valsartan?
21       MS. LOCKARD:  Objection.  Asked and
22 answered.
23       THE WITNESS:  Yes, I -- do you want me to
24 repeat my answer, Mr. Stanoch?
25

Page 77

1  BY MR. STANOCH:
2    Q.  Please answer the question.
3    A.  No, my understanding is I don't think
4  there were specified limits for any nitrosamine
5  impurity before December 2018.
6    Q.  So I'm trying to understand your opinions,
7  Doctor.  So if there is not an established limit for
8  a certain substance in a drug, then you can have
9  that substance in the drug?
10       MS. LOCKARD:  Objection.  Vague.  Also
11 outside the scope of his expert report for class
12 certification.
13       THE WITNESS:  Yes, and I'm looking at my
14 opinion where -- if we go to Page 46, where I look
15 at my conclusions, I don't think I speak to the
16 limit in that set of conclusions.  But if you think
17 I did, please draw my attention to it, Mr. Stanoch.
18 BY MR. STANOCH:
19   Q.  Doctor, you reference interim limits
20 throughout your report, don't you?
21   A.  As provided by FDA in December 2018.  I
22 don't speak to them in any other context, just
23 something that came from FDA.
24   Q.  Uh-huh.  So if there is not an established
25 limit for a certain substance in a drug, you are

Page 78

1 saying that substance can be in the drug, no
2 problem?
3        MS. LOCKARD: Objection. Vague. Asked
4 and answered. Outside the scope of the
5 class-certification expert report.
6        THE WITNESS: And that really isn't what
7 I'm saying. I would say if somebody found a
8 nitrosamine impurity in their drug product in 2018,
9 they would properly follow the 2015 guidance and try
10 to figure out a limit. But as I point out in my
11 report, FDA did that for the entire industry. They
12 didn't wait for a single manufacturer to do it.
13 BY MR. STANOCH:
14     Q. Uh-huh. If a manufacturer found a
15 nitrosamine impurity in their drug product in 2018,
16 they should have properly followed the 2015 guidance
17 to try to figure out a limit, correct?
18     A. I think you are saying it correctly. I'll
19 give a little bit more specification to your
20 example. Let's say an NDA applicant who is building
21 an application for consideration by FDA, if they
22 found a nitrosamine impurity, they could follow the
23 2015 guidance and figure out a limit for it and then
24 submit that to FDA, and FDA would review it and say,
25 yeah, that limit is okay, or, no, we want you to do

Page 79

1 something different.
2        But in this case, FDA did that work for
3 industry. So I would say industry now doesn't need
4 to figure out their own limits. FDA has done that
5 for them. And that's what is described in the
6 guidance that I cite.
7     Q. Uh-huh. And you referenced a 2015
8 guidance. What are you talking about?
9     A. I think that's the M7 guidance.
10     Q. That's the ICH M7(R1) guidance, correct?
11     A. Yes. And I think I do cite that, so it
12 should be in my materials considered.
13     Q. No, you do. I'm not -- issuing with that.
14 I want to make sure I understood what you meant by
15 2015 guidance in your answer.
16        So I understand you are saying the FDA
17 here set limits eventually for nitrosamines. But if
18 a manufacturer had reason to believe its product
19 contained nitrosamines, the appropriate course would
20 have been for them to work towards establishing
21 limits on their own prior to any FDA guidance,
22 correct?
23        MS. LOCKARD: Objection. Outside the
24 scope of his class-certification expert opinions.
25        THE WITNESS: Yes, I could imagine, and

Page 80

1 I'm speculating, that before FDA set limits, an
2 individual company could have done it, and that
3 might have been perfectly okay.
4        And even now, I suppose -- company or a
5 consortium of company could try to convince FDA to
6 set higher limits than the ones they set in
7 December 2018. It's all subject to good data and a
8 good scientific review.
9 BY MR. STANOCH:
10     Q. Uh-huh.
11     A. So I'm not debating what you are saying at
12 all, Mr. Stanoch.
13     Q. Good. And I think we can agree, then,
14 that under the ICH M7(R1) guidance from 2015, it
15 would be incumbent on the manufacturer that
16 discovered a genotoxic impurity to attempt to
17 characterize, test it and potentially set limits on
18 its own without regulatory action, correct?
19        MS. LOCKARD: Objection. Outside the
20 scope.
21        THE WITNESS: Well, I would agree with
22 your statement, except without regulatory action,
23 because whatever the company would do would be
24 subject to FDA review and approval.
25

Page 81

1 BY MR. STANOCH:
2     Q. Fair enough. So then, I guess, to clarify
3 it, we agree, then, that under the ICH M7(R1)
4 guidance from 2015, it would be incumbent on the
5 manufacturer that suspected genotoxic impurity to
6 attempt to characterize it, test it, and potentially
7 set limits for it, and letting the regulatory body
8 know?
9     A. And letting the regulatory body see the
10 data and review it and approve it.
11     Q. That's fair. Let's take that same
12 situation and say we're talking about an API
13 manufacturer first, okay? You with me?
14     A. Okay.
15     Q. Okay. Right. Would you agree that under
16 the ICH M7(R1) guidance from 2015, it would be
17 incumbent on an API manufacturer that suspected a
18 genotoxic impurity to attempt to characterize it,
19 test it and potentially set limits for it, not only
20 in connection with the regulatory body, but also
21 customers purchasing that API?
22        MS. LOCKARD: Objection. This is getting
23 far outside the scope of his class-certification
24 expert report, Counsel. You are asking him about
25 API manufacturers and their requirements. That's a

Page 82

1  liability opinion.  He hasn't been retained for that
2  issue, and specifically not for ZHP or any API
3  manufacturers.
4       THE WITNESS:  You know, and I would add,
5  Mr. Stanoch, that if we're going to talk about it,
6  it might be good to put that guidance on the screen
7  and see exactly who it's directed to.  Usually, when
8  FDA creates a guidance with recommendations, they
9  identify who it's intended for.  And I'll be glad to
10 review that with you if we could sort of find it.
11      It did not figure prominently in my report
12 or my opinions because, as I have already noted, FDA
13 did this for industry.  I didn't have to look at
14 what an industry drug-substance or drug-product
15 manufacturer would have or should have done.
16 BY MR. STANOCH:
17      Q.  We can look at the ICH guidance in a
18 little bit, but sitting here right now, Doctor, is
19 it your view that the ICH M7(R1) guidance applies
20 only to finished-dose manufacturers, not API
21 manufacturers?
22      A.  No, I wouldn't say that.  And if I looked
23 at the nitrosamine guidance, I think when -- if we
24 put that up, I think FDA is speaking to
25 manufacturers of drug products and also drug

Page 83

1  substances.
2       Q.  Uh-huh.  All right.  I'm going to repeat
3  my question a little bit ago because you didn't
4  answer it when you said you wanted to look at the
5  MCH guidance.
6       So would you agree that under the ICH
7  M7(R1) guidance from 2015, it would be incumbent on
8  an API manufacturer that suspected a genotoxic
9  impurity to attempt to characterize it, test it,
10 potentially set limits for it, and to let the
11 regulatory body and its API customers know?
12      MS. LOCKARD:  I am going to object to this
13 question.  He said he's not going to answer it.  He
14 wants to look at the document.  So you are asking
15 him to interpret a document and you are refusing to
16 provide it to him, so I have an objection.
17      We can take a break and get it if you want
18 him to interpret it.  It's also outside the scope of
19 his expert opinion, however.
20 BY MR. STANOCH:
21      Q.  Go ahead, Dr. Williams.
22      A.  I'm sorry, Mr. Stanoch.
23      Q.  Please answer the question.
24      MS. LOCKARD:  If you can answer the
25 question.

Page 84

1       MR. STANOCH:  Enough, Counsel.
2       THE WITNESS:  I would say at this point in
3  time, Mr. Stanoch, I can't add anything more to what
4  I have already said.
5       But I'm not going to disagree with you
6  that, you know, a drug-substance manufacturer that
7  suspects a genotoxic impurity would want to follow
8  the guidance and, you know, make sure that it's a
9  selling point to customers that we're controlling
10 genotoxic impurities.  That's a good drug substance.
11 BY MR. STANOCH:
12      Q.  Uh-huh.  Do you agree that nitrosamines
13 are probable human carcinogens?
14      MS. LOCKARD:  Objection.  Outside the
15 scope of his retention, his expert report, his
16 disclosure.
17      THE WITNESS:  Yeah, I'm certainly not
18 offering opinion about that, but I have read the
19 statements in the materials cited and some of the
20 materials considered that would cause me to agree
21 with what you said, Mr. Stanoch.
22 BY MR. STANOCH:
23      Q.  Do you agree that nitrosamines are
24 genotoxic?
25      A.  Yeah, for purposes of discussions I will

Page 85

1  agree with that, Mr. Stanoch.
2       Q.  Do you agree that nitrosamines are not an
3  active ingredient in any FDA-approved drug?
4       MS. LOCKARD:  Objection.  Speculation.
5       THE WITNESS:  To the best of my knowledge,
6  Mr. Stanoch, I can agree with that.
7  BY MR. STANOCH:
8       Q.  Uh-huh.  Do you agree that the presence of
9  nitrosamines even at trace level is considered
10 unacceptable because these impurities are probable
11 human carcinogens?
12      MS. LOCKARD:  Objection.  Outside the
13 scope of his retention and his expert report on
14 class certification.  He is not here to testify
15 about whether the drug is a potential human
16 carcinogen.  But if you want to waste your time
17 asking him causation questions, have at it.
18      MR. STANOCH:  Counsel, I don't need the
19 colloquy.  Thank you.
20      Please answer, Dr. Williams.
21      THE WITNESS:  Would you restate the
22 question, Mr. Stanoch?  I'm sorry.
23 BY MR. STANOCH:
24      Q.  Sure.  Do you agree that the presence of
25 nitrosamines even at trace level is considered

Page 86

<sup>1</sup> unacceptable because these impurities are probable
<sup>2</sup> human carcinogens?
<sup>3</sup>     MS. LOCKARD:  Same objection.  It's
<sup>4</sup> outside of his scope, the class-certification expert
<sup>5</sup> report.  He is not here to give a causation opinion.
<sup>6</sup>     THE WITNESS:  But in answer to your
<sup>7</sup> question, Mr. Stanoch, no, I don't agree with that.
<sup>8</sup> BY MR. STANOCH:
<sup>9</sup>   Q.  Stand by.  Stand by, sir.
<sup>10</sup>     You are familiar with the U.S.
<sup>11</sup> Pharmacopeia Association, right, the USP?
<sup>12</sup>   A.  Yes, Mr. Stanoch, I am.
<sup>13</sup>   Q.  Yeah, you mean you used to be affiliated
<sup>14</sup> with them, right?
<sup>15</sup>   A.  I was an employee of USP between 2000 and
<sup>16</sup> 2014.
<sup>17</sup>   Q.  Right.  I'm going to mark another exhibit.
<sup>18</sup>     (Whereupon, Exhibit 4 was marked for
<sup>19</sup> identification.)
<sup>20</sup> BY MR. STANOCH:
<sup>21</sup>   Q.  You are going to have to look on your
<sup>22</sup> screen, unfortunately, Dr. Williams.  I don't have a
<sup>23</sup> copy of this in the binder available.
<sup>24</sup>     Can you pull it up, or would you like me
<sup>25</sup> to share my screen?  Exhibit 4.

Page 87

<sup>1</sup>   A.  Oh, I'll rely on you to give me something
<sup>2</sup> that I can look at.
<sup>3</sup>   Q.  Okay.  Stand by, sir.
<sup>4</sup>     I'm now sharing my screen.  This is
<sup>5</sup> Exhibit 4 in the public folder.
<sup>6</sup>     Do you see this, sir?
<sup>7</sup>   A.  Could we open the box and get it out of
<sup>8</sup> the box?
<sup>9</sup>     MS. LOCKARD:  Is it in the binder?
<sup>10</sup>     MR. STANOCH:  It's not in the binder.  I'm
<sup>11</sup> sorry.
<sup>12</sup>     THE WITNESS:  I think you are showing
<sup>13</sup> me -- it looks like a PowerPoint; is that correct?
<sup>14</sup> BY MR. STANOCH:
<sup>15</sup>   Q.  Yeah, this is the -- correct.  This is the
<sup>16</sup> cover page of a webinar in which Naiffer Romero of
<sup>17</sup> USP spoke on nitrosamine impurities?
<sup>18</sup>   A.  Yeah, I don't see it very clearly.  Can
<sup>19</sup> you expand it or --
<sup>20</sup>     MS. LOCKARD:  Can you get it up out of the
<sup>21</sup> box?
<sup>22</sup>     THE WITNESS:  I don't --
<sup>23</sup>     MR. STANOCH:  It's not in the box,
<sup>24</sup> Counsel, I'm sorry.
<sup>25</sup>     THE WITNESS:  Not in the box.

Page 88

<sup>1</sup>     MR. HARKINS:  The exhibit share is what
<sup>2</sup> you are talking about.
<sup>3</sup>     MS. LOCKARD:  The exhibit-share box is
<sup>4</sup> what I'm talking about.
<sup>5</sup>     THE WITNESS:  Oh.
<sup>6</sup>     MR. HARKINS:  Open the chat, Roger.
<sup>7</sup>     THE WITNESS:  Oh.
<sup>8</sup>     (Whereupon, a brief discussion off the
<sup>9</sup> record.)
<sup>10</sup>     THE WITNESS:  Okay.  I'm opening the chat
<sup>11</sup> room, and --
<sup>12</sup>     MR. HARKINS:  Hold on.  Let me -- someone
<sup>13</sup> repaste the link to the exhibit share, please?
<sup>14</sup>     Sorry.  Can someone please repaste the
<sup>15</sup> link to the exhibit share?
<sup>16</sup>     All right.  Can you hear me in the room?
<sup>17</sup>     MR. STANOCH:  We can hear you, Steve.
<sup>18</sup>     THE VIDEOGRAPHER:  I might be able to
<sup>19</sup> retrieve it from the chat.
<sup>20</sup>     MR. HARKINS:  Oh.  I think that's it.
<sup>21</sup>     THE VIDEOGRAPHER:  Okay.  Yeah, you got
<sup>22</sup> it.
<sup>23</sup>     MR. HARKINS:  You control it here on the
<sup>24</sup> separate screen, and you can scroll it down from
<sup>25</sup> there.

Page 89

<sup>1</sup>     THE WITNESS:  Can I make it bigger?
<sup>2</sup>     MR. HARKINS:  You should be able to zoom,
<sup>3</sup> yeah.
<sup>4</sup>     THE WITNESS:  Okay.  I'm looking at it,
<sup>5</sup> Mr. Stanoch.
<sup>6</sup> BY MR. STANOCH:
<sup>7</sup>   Q.  Okay.  Great.
<sup>8</sup>   A.  Please proceed.
<sup>9</sup>   Q.  Sure.  And you see the title page of this
<sup>10</sup> slide, it's a USP webinar presentation?
<sup>11</sup>   A.  I think I do see that, yes.
<sup>12</sup>   Q.  All right.  And then there is -- I have an
<sup>13</sup> excerpt here, I have Slide 8 from that webinar on
<sup>14</sup> the next page, if you scroll down, sir.  The slide
<sup>15</sup> says, "Background."
<sup>16</sup>   A.  Okay.  I'm looking at "Background."
<sup>17</sup>   Q.  Great.  And you will see that it's -- and
<sup>18</sup> the highlighting, by the way, is original in the
<sup>19</sup> document.  I didn't modify this.
<sup>20</sup>   A.  Okay.
<sup>21</sup>   Q.  Do you see on the right it says, "Although
<sup>22</sup> nitrosamines are also present in some foods and
<sup>23</sup> drinking-water supplies, their presence in
<sup>24</sup> medicines, even at trace level is considered
<sup>25</sup> unacceptable because these impurities are probable

Page 90

1 human carcinogens." Did I read that right?
2 A. Yes, I think you read it correctly. And
3 can you tell me the date of this document?
4 Q. It's 2020.
5 A. Oh, I see. All right. Thank you.
6 Q. Uh-huh. And do you agree with that
7 statement from this USP presentation?
8 MS. LOCKARD: Objection. Asked and
9 answered.
10 THE WITNESS: I would say what I rely on
11 is FDA's guidance document, which it does say you
12 can have nitrosamine impurities within acceptable
13 limits.
14 BY MR. STANOCH:
15 Q. Uh-huh.
16 A. So I would not agree with this statement.
17 Q. Okay. And you see there in the middle,
18 there is a fake Post-it that says, "Purpose of ICH
19 M7"; do you see that?
20 A. Yes, I do see that.
21 Q. It reads, "Provide a practical framework
22 that is applicable to the identification
23 categorization, qualification, and control of
24 mutagenic impurities to limit potential carcinogenic
25 risk." Did I read that right?

Page 91

1 A. Yes, I think you are reading it correctly.
2 Q. And would you agree with that statement
3 about the purpose of ICH M7?
4 A. Yes, that seems like a general statement,
5 and I agree with it.
6 Q. Right. And that would have been the case
7 with ICH M7 guidance prior to the FDA's first take
8 at establishing interim limits for nitrosamines in
9 December 2018, correct?
10 A. And although I didn't offer this as an
11 opinion, I think FDA itself tended to follow the ICH
12 M7 document, particularly with regard to the word
13 "control." So when FDA is saying control, they are
14 saying, we can put a limit on the NDMA impurity.
15 Q. Well, the guidance is to the industry to
16 deal with impurities when they find them in their
17 drug substance or their drug products, right?
18 A. Now, are you asking about M7?
19 Q. Yes.
20 A. Yes. And it's a general statement, but I
21 think a specific example is the nitrosamine
22 impurities, and that's what I alluded to in my
23 report.
24 Q. Right. Well, you mention control in the
25 context of the FDA setting limits. The point is,

Page 92

1 though, that a drug-substance or product
2 manufacturer would follow ICH M7 guidance to
3 identify, characterize, qualify, and control
4 mutagenic impurities on its own, correct?
5 A. It could do. I mean, I'm not a
6 toxicologist, but my understanding is that there
7 could be many mutagenic impurities beyond the
8 nitrosamine impurities that we're considering in
9 this matter.
10 Q. Right. And it's the expectation that
11 manufacturers on their own would work to identify,
12 characterize, qualify, and control mutagenic
13 impurities to limit potential carcinogenic risk,
14 correct?
15 MS. LOCKARD: Objection. Outside the
16 scope of his class-certification opinions.
17 THE WITNESS: Yes, and I'm certainly not
18 debating with you the content of the M7 document,
19 Mr. Stanoch. If you read statements from that, I
20 would probably generally agree with your statements.
21 BY MR. STANOCH:
22 Q. Right. And you agree that it's the
23 expectation that manufacturers would follow the ICH
24 M7 guidance themselves, correct?
25 MS. LOCKARD: Objection. Asked and

Page 93

1 answered. Outside the scope.
2 THE WITNESS: With the exception of
3 nitrosamine, where, if I may say so, FDA did the
4 work of M7 on behalf of the entire industry.
5 BY MR. STANOCH:
6 Q. Well, prior to December 2018 there were no
7 FDA interim limits, right?
8 A. That's true.
9 Q. Okay. But we had ICH M7 guidance,
10 correct?
11 A. Yes.
12 Q. And the guidance set forth that
13 manufacturers should identify, characterize,
14 qualify, and control mutagenic impurities to limit
15 potential carcinogenic risk, yes?
16 A. I'm not debating the words of the
17 guidance, if that's your question. I agree with the
18 words of the guidance.
19 Q. Well, I'm asking you about the application
20 of the guidance, Dr. Williams, that even in the
21 absence of the FDA interim limits in December 2018,
22 was the expectation that a manufacturer would still
23 attempt to identify, characterize, qualify, and
24 control mutagenic impurities to limit potential
25 carcinogenic risk?

Confidential Information Subject to Protective Order

Page 94

1    MS. LOCKARD: Objection. Vague. Outside
2  the scope.
3    THE WITNESS: Yeah, I didn't really
4  comment on this, Mr. Stanoch. Do you want me to
5  speculate?
6  BY MR. STANOCH:
7    Q. I would like you to answer the question,
8  Dr. Williams.
9    A. You know, the way I would say it, and I
10 think I have already alluded to this previously, is,
11 you know, an ANDA applicant generally follows the
12 guidances I cited in my report.
13    And to the extent that they -- you know,
14 when they get into qualifying an impurity, they may
15 have to consider mutagenic or DNA-reactive
16 impurities, and then they would turn to the M7
17 guidance. But that is certainly a case-by-case
18 decision, and you would have to suspect the impurity
19 was present and you would have to be able to measure
20 it. So you are asking a very general question.
21    Q. And the ICH M7 guidance is not confined to
22 ANDA applications, correct?
23    A. That's my understanding. Again, if you
24 are going to ask me questions about it, it would
25 probably be best if I could see it.

Page 95

1    Q. Well, we will get to specific parts of it,
2  but -- your understanding that the ICH M7 guidance
3  applies to the life of a drug from application
4  through commercialization, correct?
5    A. Again, you know, I feel very uncomfortable
6  answering questions about a document that I haven't
7  seen and that I cite in my report, but I would say
8  it was not particularly important to my opinions.
9    But again, you know, I'll be glad to walk
10 through it with you, Mr. Stanoch. I don't think it
11 is particularly appropriate for my opinions or
12 important to my opinions, but again, I'm certainly
13 here to be responsive to your questions.
14    Q. Right. And you agree that the ICH M7
15 guidance applies throughout the life of a drug,
16 correct?
17    A. I don't believe I said that. I think what
18 I said is if we're going -- if you are going to ask
19 me that question, I feel like I need to see the
20 guidance.
21    Q. You can't tell me anything about the ICH
22 M7 guidance general applicability without looking at
23 it?
24    A. I think, yes, I'm saying that. I would be
25 hesitant to make statements about the guidance along

Page 96

1  the lines of your questioning.
2    Q. So you can't tell me one way or the other
3  about whether the ICH M7 guidance applies throughout
4  the life of a drug?
5    MS. LOCKARD: Objection. Asked and
6  answered.
7    He said if you are going to ask him
8  questions about the application and interpretation
9  of the guidance, he wants to have it in front of
10 him, which is a fair request.
11 BY MR. STANOCH:
12    Q. You can answer the question, Dr. Williams.
13    MS. LOCKARD: Objection. It's
14 argumentative.
15    THE WITNESS: I prefer not to answer the
16 question without seeing the guidance.
17 BY MR. STANOCH:
18    Q. And which guidance do you want to see,
19 Doctor?
20    A. M7.
21    Q. What version?
22    A. The current version.
23    Q. What year?
24    A. I think it's 2015.
25    Q. Show me where it is in your reliance

Page 97

1  materials and report, which version you want.
2    MS. LOCKARD: Let me just put an objection
3  on the record. You are asking him questions about a
4  guidance that you haven't identified. He is asking
5  to see the guidance that you were questioning him
6  about. If you want to question him about a
7  document, identify it. Now you are telling him
8  to --
9    MR. STANOCH: Counsel, enough. Enough,
10 Counsel. Counsel, enough.
11    (Overlapping speakers.)
12    MR. STANOCH: I'm asking him to tell me
13 the document he wants. I'm asking him to tell me
14 what document he wants. I'm trying to comply with
15 his request, Counsel. Please, let him tell me what
16 he wants to see. Thank you.
17    We have lost Dr. Williams. Dr. Williams,
18 we can't see you.
19    MS. LOCKARD: We're on break. We can go
20 off the record. You can keep running.
21    MR. STANOCH: Wait a minute. Wait a
22 minute. Wait a minute. Wait a minute. I am not
23 agreeing to go off the record. I have a pending
24 question to the witness to tell me what document he
25 said he needs to see. I am not agreeing to go off

Confidential Information Subject to Protective Order

Page 98

1  the record.
2      Q.  Are you going to answer the question,
3  Dr. Williams?
4      MR. STANOCH:  Or, Counsel, are you going
5  to instruct him not to answer it?
6      Well, let it be noted that despite the
7  nonagreement and the pending question, both the
8  witness and counsel have gone off.
9      Let's keep running.
10      THE WITNESS:  I have been instructed by
11  counsel to come back, Mr. Stanoch, and now I'm
12  trying to look for the guidance that you are
13  alluding to.
14      MR. STANOCH:  Thank you.
15      THE WITNESS:  And I would say we can look,
16  if you agree, to the guidance for industry
17  genotoxic -- the other one -- I would really
18  appreciate it if you would pick the guidance because
19  you are talking about it.  But yes, here it is.
20      I have been handed it in a copy.  M7,
21  Revision 1, Addendum to ICH M7.  Now, that makes me
22  a little nervous because it's an addendum, and it
23  makes me wonder, where is the M7(R1)?  But if we can
24  look at M7(R1), I'll be glad to answer questions
25  about it if I can.

Page 99

1  BY MR. STANOCH:
2      Q.  I'm --
3      A.  Can you proceed, Mr. Stanoch?
4      Q.  Well, I want to make sure we have the
5  right documents in front of us, and that I have to mark
6  it, Dr. Williams.  So why don't you tell me the date
7  of the document you are looking at?
8      A.  Well, what I have been handed is M7(R1),
9  dated March 31st, 2017, and then a M7(R1) addendum,
10  so it's lot of paper and I'm looking at two
11  documents.
12      MS. LOCKARD:  And for the record, I still
13  don't know what it is that your question is asking
14  about, so we are trying to print whatever we think
15  you are asking about, but you have refused so far to
16  identify -- counsel has refused to identify the
17  specific guidance that he is asking the doctor to
18  interpret, so --
19      THE WITNESS:  Okay.  I'm prepared to
20  answer questions.  Did you get the dates of the
21  documents I'm looking at?  The M7, Revision 1, is
22  March 2017.
23      MS. LOCKARD:  Can you hear us?
24      MR. STANOCH:  Yeah, I'm trying to pull up
25  the version that you have in the hard copy for the

Page 100

1  benefit of all of your colleagues on Zoom.  Well,
2  that's going to take me time.
3      Q.  Doctor, I can pull up the March 2018
4  guidance.  You want to work with that for now?  Or
5  would --
6      A.  And I also think it would be important to
7  go to my report where I reference this document.
8  Let me see if I can find that.
9      MS. LOCKARD:  And while he is doing that,
10  Exhibit 4 was the USP PowerPoint.  It looks like
11  there are only two pages of that.  Do you have
12  the -- are you making the full PowerPoint the
13  exhibit?
14      MR. STANOCH:  Those are excerpts from the
15  webinar.  We will mark the entire webinar.
16      Q.  Well, Doctor, let's see if we can cut
17  through this a little bit, shall we?  You agree, do
18  you not, that ICH M7 guidance has been in effect --
19  has been effective in different forms for quite some
20  time, yes?
21      A.  I can agree with that, Mr. Stanoch,
22  please, if the --
23      Q.  Sure.  Sure.  And why don't we get a
24  ballpark.  I mean, can we say that at least since
25  2003 there has been some form of ICH M7 guidance?

Page 101

1      A.  You know, I'd hesitate from that, but for
2  purpose of a discussion let me agree so that we can
3  go forward.
4      Q.  I appreciate that.  I won't hold you to
5  the particular date.  I was just trying to pick a
6  date that we could just move forward from.  So --
7  and we can agree, can we not, that there has been
8  revisions and addenda to the M7 guidance over time,
9  correct?
10      A.  Okay.  Let me agree.
11      Q.  And would you agree that even in the
12  absence of FDA interim limits for nitrosamines,
13  there was an expectation that a manufacturer would
14  adhere to the ICH M7 guidance concerning genotoxic
15  impurities, whatever the status of that guidance was
16  at the particular time?
17      MS. LOCKARD:  Objection.  These are
18  liability opinions and outside the scope of his
19  report.
20      THE WITNESS:  Yeah, I am very hesitant
21  with your general statements, but again, I won't
22  contest them so we can move forward.  Go ahead,
23  Mr. Stanoch.
24  BY MR. STANOCH:
25      Q.  I'm a little unclear what you mean by

Confidential Information - Subject to Protective Order

Page 102

1  don't contest them.  Does that mean you will agree
2  with that question?
3      MS. LOCKARD:  Objection.  Vague.
4      THE WITNESS:  You know, it would be
5  much -- can you restate the question?
6  BY MR. STANOCH:
7      Q.  Sure.  Would you agree that even in the
8  absence of FDA interim limits for nitrosamines,
9  there was an expectation that a manufacturer would
10 adhere to the ICH M7 guidance concerning genotoxic
11 impurities as that guidance stood at the particular
12 time?
13     MS. LOCKARD:  Objection.  Vague.  Outside
14 the scope of his expert report.
15     THE WITNESS:  Yes, it's not any opinion I
16 offered, but I won't debate what you are saying, so
17 I can agree with it, Mr. Stanoch.
18 BY MR. STANOCH:
19     Q.  Fair enough.  And do you agree that the
20 ICH M7 guidance includes nitrosamines in the cohort
21 of concern?  And if you need to look at the version
22 in front of you, that's fine, and we could mark it
23 later.
24     A.  I don't know where I see nitrosamines
25 here, and I didn't look for it.

Page 103

1      Q.  All right.  Let --
2      A.  Can you point it out where you see it,
3  Mr. Stanoch?
4      Q.  Sure.  Put that aside, then.  Let's put it
5  a different way.  Are you aware that the FDA has
6  stated that N-nitroso compounds are identified as a
7  cohort of concern in ICH M7 guidance?
8      MS. LOCKARD:  Objection.  Outside the
9  scope of his expert report.
10     THE WITNESS:  Yeah, I see no reason to
11 deny what you are saying, so I'll agree with it to
12 continue the discussion, Mr. Stanoch.
13 BY MR. STANOCH:
14     Q.  Thank you.  I appreciate that, Doctor.
15     And a substance that falls within the ICH
16 cohort of concern should be controlled, correct?
17     MS. LOCKARD:  Objection.  Falls outside of
18 the scope of his class-certification opinions.
19     THE WITNESS:  You know, I could probably
20 agree more readily if you could show me where you
21 are reading in the guidance.  But again, for
22 purposes of the discussion, I won't debate what you
23 are saying, Mr. Stanoch.  I'm sure you are reading
24 it correctly.
25     MS. LOCKARD:  I wouldn't assume that he is

Page 104

1  reading anything correctly.
2      THE WITNESS:  No, okay.
3      All right.  Well, I'm a little hesitant
4  about answering, Mr. Stanoch.
5      MR. STANOCH:  Then stand by for an
6  exhibit, sir.
7      I'm going to mark the next exhibit, sir.
8      (Whereupon, Exhibit 5 was marked for
9  identification.)
10 BY MR. STANOCH:
11     Q.  Exhibit 5.  This is actually Tab 2 in your
12 binder.  You can take the binder out of the box we
13 sent you as a courtesy.
14     MS. LOCKARD:  Hold on.  We are opening the
15 box.  There is one black binder in here.  Tab 2?
16     MR. STANOCH:  Yes, please.
17     MS. LOCKARD:  Okay.
18 BY MR. STANOCH:
19     Q.  Tell me when you have that, Doctor.
20     A.  I think I'm looking at it.  Tab 2, it is a
21 letter from FDA to -- I don't see who it's to.  But
22 it looks to be about a five-page letter.
23     Q.  Right.  It's a general advice letter from
24 the FDA.  You see it in the upper right, "General
25 Advice"?

Page 105

1      A.  I do see that.
2      Q.  Uh-huh.  And do you see --
3      MS. LOCKARD:  There is no Bates number,
4  for those on the call.
5  BY MR. STANOCH:
6      Q.  Would you look at the last paragraph of
7  the first page, sir?
8      A.  Last paragraph, first page.
9      Q.  It begins, "Nitrosamine compounds."  Do
10 you see that?
11     A.  Wait a minute.  Oh, "Nitrosamine
12 compounds."  Yes, I'm with you, Mr. Stanoch.  Go
13 ahead.
14     Q.  Wonderful.  Why don't you read for us the
15 first few sentences of that paragraph?
16     A.  "Nitrosamine compounds are potent
17 genotoxic carcinogens in several nonclinical species
18 and are classified as probable human carcinogens by
19 the International Agency for Research on Cancer.  In
20 fact, 'N-nitroso' compounds are identified as a
21 'cohort of concern' in internationally" recognized
22 "guidance, ICH M7," and then it states the name.
23     Should I stop there?
24     Q.  Keep going.  Slowly, please, for the court
25 reporter.

Page 106

1   A.  "ICH M7 recommends that known mutagenic
2   carcinogens, such as nitrosamines," to "be
3   controlled at or below the acceptable cancer risk
4   level.  Due to their known potent carcinogenic
5   effects, and because it is feasible to limit these
6   impurities by taking reasonable steps to prevent or
7   eliminate their presence, FDA has determined that
8   there is no acceptable specification for
9   nitrosamines in ARB API and DP."
10   Q.  That's fine.  Okay.  And, oh, actually,
11   why don't you read the one more sentence?
12   A.  "Therefore, FDA advises that nitrosamines
13   should be absent (not detectable as described below)
14   from ARB API and ARB drug products."
15   Q.  Okay.  Thank you.
16       So, first of all, were you aware of this
17   general advice letter from the FDA prior to right
18   now?
19   A.  No.
20   Q.  Okay.  Second of all, do you agree with
21   the FDA's statement in this letter that nitrosamine
22   compounds are potent genotoxic carcinogens?
23       MS. LOCKARD:  Objection.  Outside the
24   scope of his class-certification opinions.  He is
25   not here to give a causation opinion.

Page 107

1       THE WITNESS:  And I know I'm not supposed
2   to ask questions, but I don't see a date on this
3   letter.  Is there a date?
4   BY MR. STANOCH:
5   Q.  It doesn't appear that it has a date on
6   it.
7   A.  And also, if I may say so, I think this
8   conflicts with the FDA guidance on nitrosamine
9   impurities, but we can have that conversation if you
10   wish.
11       But anyway, back to you, Mr. Stanoch.  Am
12   I answering your questions about this document?
13   Q.  Well, not yet.  The question was:  Do you
14   agree with the FDA's statement that nitrosamine
15   compounds are potent genotoxic carcinogens?
16       MS. LOCKARD:  Objection.  Outside the
17   scope of his class-certification opinions.  He is
18   not here to give a causation opinion.
19       THE WITNESS:  Yes, and I'm not going to
20   debate the wording in this letter.  It seems like a
21   formal letter from the agency, and I'm not in a
22   position to disagree with FDA on this point.
23       So please continue, Mr. Stanoch.
24   BY MR. STANOCH:
25   Q.  I certainly will.  Thank you, Doctor.

Page 108

1       And the next sentence, do you agree with
2   the FDA that N-nitroso compounds are part of the
3   cohort of concern under ICH M7 guidance?
4   A.  Yes, I see the words, and I think you are
5   reading them correctly.
6   Q.  And do you agree with that statement,
7   regardless of whether I read it correctly?
8       MS. LOCKARD:  Does he agree that it --
9   right.  Objection.  Vague.
10       THE WITNESS:  I see no reason to disagree
11   with the words in this letter.
12   BY MR. STANOCH:
13   Q.  Perfect.  And do you agree, then, that as
14   part of the cohort of concern, nitrosamines should
15   be controlled?
16   A.  Yes, I can agree with that.
17   Q.  All right.  And do you agree generally
18   that nitrosamines can be controlled?
19   A.  Yes, I think FDA documented that in its
20   December 2018 statement.
21   Q.  And do you agree that nitrosamines can be
22   avoided entirely?
23   A.  You know, that's sort of a case-by-case
24   question.
25       But what is perplexing me about this

Page 109

1   letter is I think the FDA guidance says you can have
2   nitrosamine impurities as long as they stay within
3   the acceptable intake limits.
4   Q.  Uh-huh.
5   A.  So I see a dissonance between this letter
6   and the FDA guidance.
7   Q.  Uh-huh.
8   A.  But please continue.
9   Q.  And you say "a case-by-case basis."  Do
10   you mean by that that it would be on a particular
11   manufacturer to assess whether nitrosamines could be
12   avoided entirely in its manufacturing process?
13   A.  Yes, I agree with the way you stated that.
14   Thank you.
15   Q.  Uh-huh.  Yep.  And were you aware prior to
16   seeing this letter that at one point the FDA said
17   that it had determined that there is no acceptable
18   specification for nitrosamines in ARB API and DP?
19   A.  Well, as I say, I think that's not what
20   the guidance says, but I see where it says it here
21   in this letter.
22   Q.  Uh-huh.  You keep saying "guidance."
23   Which guidance do you mean specifically?
24   A.  It was the nitrosamine impurities guidance
25   that I cite in my report.  It came out in September

Confidential Information - Subject to Protective Order

---

Page 110

1 of 2020, and then it was updated in February of
2 2021.
3    Q.   Uh-huh.  So at the time this FDA general
4 advice letter was put out, it was the FDA's view
5 that there is no acceptable specification for
6 nitrosamines in ARB API and DP, correct?
7    A.   Yes, and we don't quite know when because
8 we can't see a date on this letter.
9    Q.   Well, I believe the letter was from
10 sometime in 2019.
11       MS. LOCKARD:  Objection to counsel
12 testifying.
13 BY MR. STANOCH:
14    Q.   Assume the letter was from 2019, Doctor,
15 okay?
16    A.   Okay.  I'm willing to make that
17 assumption.  It may have come out, then --
18    Q.   Great.
19    A.   It may have come out, then, before the
20 first iteration of the draft September 2020
21 guidance, and therefore the guidance superseded this
22 document.
23    Q.   Sure.  Then --
24    A.   That would resolve my dissonance.
25    Q.   And that may be the sequence of events,

---

Page 111

1 Doctor.  But at the time this letter came out,
2 right, the FDA had determined there is no acceptable
3 specification for nitrosamines in ARB API and DP,
4 right?
5    A.   I see the wording in the letter.  I don't
6 disagree with the way you are stating the wording.
7 And I'm willing to make the assumption it came out
8 sometime in 2019.
9    Q.   So then, at the time of this letter, there
10 should be no nitrosamines in any valsartan API or
11 drug product, correct?
12       MS. LOCKARD:  Objection.  Vague.
13 Foundation.
14       THE WITNESS:  Well, I think FDA is even
15 saying in this letter that they provided interim
16 acceptable limits for nitrosamine impurities in
17 ARBs.  So I don't know how to kind of piece together
18 what it's saying here versus, well, the other
19 realities of their December 2018 decision and the
20 guidance that I cited in my report.
21 BY MR. STANOCH:
22    Q.   Uh-huh.  The FDA goes on to say that they
23 used the interim limits only to guide immediate
24 decision-making for the product recalls.  Do you see
25 that?

---

Page 112

1       MS. LOCKARD:  What paragraph are you
2 looking at?
3       MR. STANOCH:  Same one.
4       THE WITNESS:  Uh-huh.  Well, we can keep
5 on looking at this letter.  Is there a question
6 pending, Mr. Stanoch?
7 BY MR. STANOCH:
8    Q.   There was.  The FDA goes on to say they
9 used the interim limits only to guide immediate
10 decision-making for the product recalls.  Do you see
11 that?
12    A.   I do see that.
13    Q.   Uh-huh.  And were you aware of that prior
14 to today?
15       MS. LOCKARD:  Objection.  Vague.
16       THE WITNESS:  And this is the first time I
17 have seen this letter.
18 BY MR. STANOCH:
19    Q.   Okay.  Let's put that aside for now,
20 Doctor.
21    A.   Okay.  Thank you.
22    Q.   Why don't you flip to Tab 3 in your
23 binder.  It will be introduced as Exhibit 6.
24       (Whereupon, Exhibit 6 was marked for
25 identification.)

---

Page 113

1 BY MR. STANOCH:
2    Q.   Tell me when you are there, Doctor.
3    A.   I'm there.  I see it.  M7(R1).  Is that
4 what we're talking about, March 2018?
5    Q.   Yes, sir.  We're on the same document.
6 That's a good step.  So are you familiar with this
7 document?
8    A.   I'm aware of it.  I did not study it
9 closely for my report.
10    Q.   That's okay.  But you understand that it's
11 the ICH guidance as of March 2018, correct?
12    A.   Yes, I do.  And then the one I had printed
13 out for me before was dated 31 March 2017.
14    Q.   Right.  And I don't have a copy of exactly
15 what you were handed.  We can get it.
16       But this goes back to our point that the
17 guidance might have went through various iterations
18 over time generally, right?
19    A.   Yes, exactly.  That's how the ICH
20 guidances work.  So I'm prepared to consider this
21 with you, Mr. Stanoch.
22    Q.   That's great.  So why don't we turn to
23 page 5 of this document, sir?
24    A.   All right.
25    Q.   And tell me when you are there.

---

Page 114

1    A.  I'm there.  Where it says, "General
2  Principles"?
3    Q.  Yes, sir.  And then you see the paragraph
4  in the middle, "A Threshold of Toxicological
5  Concern"?
6    A.  I do see that.
7    Q.  Uh-huh.  And do you see at the end that
8  this March 2018 guidance states, "This group of high
9  potency mutagenic carcinogens, referred to as the
10  cohort of concern, comprises aflatoxin-like-,
11  N-nitroso-, and alkyl-azoxy compounds," correct?
12    A.  Yes, I do see that.
13    Q.  All right.  And N-nitroso compounds, those
14  would include the NDMA and NDEA nitrosamines that
15  you discuss in your report, correct?
16    A.  I think you are saying that correctly.
17  Thank you, Mr. Stanoch.
18    Q.  And then what is your understanding of
19  cohort of concern, sir?
20    A.  As the words say here, it's a group of
21  high-potency mutagenic carcinogens that comprises
22  the three -- excuse me, Mr. Stanoch -- that
23  comprises the three types of compounds stated in the
24  sentence.  A cohort of concern, apparently they are
25  trying to classify some particularly mutagenic

Page 115

1  carcinogens, as stated here in the sentence.
2    Q.  And the purpose of that is to alert
3  industry that limits for the cohort of concern might
4  be much lower than the threshold of toxicological
5  concern that might otherwise be defined per the
6  guidance, right?
7    MS. LOCKARD:  Objection.  Vague.  And
8  outside the scope of his testimony.
9    THE WITNESS:  Yeah.  And you are beginning
10  to ask me questions that I would call
11  pharmacology/toxicology questions.
12    I can read the sentences here and agree
13  with them, Mr. Stanoch.  For example, it says, "Some
14  structural groups were identified to be of such high
15  potency," and then the sentence continues.  And
16  these high potency are referred to as a cohort of
17  concern, and then it lists the three compounds that
18  fall into the structural categories that we have
19  already discussed.
20  BY MR. STANOCH:
21    Q.  Uh-huh.  And then the threshold of
22  toxicological concern, what does that relate to?
23    MS. LOCKARD:  Objection.  Vague.  Outside
24  the scope.
25    THE WITNESS:  Well, if we go back to the

Page 116

1  beginning of the paragraph, it says, "was developed
2  to define an acceptable intake for any unstudied
3  chemical that poses a negligible risk."  So I guess
4  if it is below the threshold, the risk is
5  negligible, but if it is above, you begin to have
6  some concern.  Please correct me if --
7  BY MR. STANOCH:
8    Q.  Right.  I apologize.  Are you done,
9  Doctor?
10    A.  Yes, I think I am.  Thank you,
11  Mr. Stanoch.
12    Q.  Yes.  And just following along, you see
13  later in that paragraph it says, "For application of
14  a TTC in the assessment of acceptable limits of
15  mutagenic impurities," and the sentence continues.
16  Do you see that?
17    A.  I do.
18    Q.  Right.  And the purpose of the TTC was to
19  assess acceptable limits of impurities in drug
20  substances, correct?
21    MS. LOCKARD:  Objection.  Outside the
22  scope of his expert opinion.  You are asking him
23  what the purpose of the TTC was.  This is not part
24  of his class-certification report.
25    THE WITNESS:  Yeah, and -- the only thing

Page 117

1  I can do is read the words and sort of say I have a
2  general understanding of what they are saying.  I'm
3  certainly not a pharmacologist-toxicologist.
4  BY MR. STANOCH:
5    Q.  I'm not asking for a pharmacology or
6  toxicology opinion, Doctor.  I'm asking your
7  understanding in the context of a report where you
8  talk about thresholds of limits that may or may not
9  have existed.
10    We're looking now here at the ICH
11  guidance, the March 20th, 2018, version, and it's
12  talking about acceptable limits of mutagenic
13  impurities, right?
14    A.  But I still don't see limits.  Am I
15  missing limits?
16    Q.  Well, the whole thrust is talking about
17  assessment of acceptable limits, is it not?
18    A.  I think it's talking about it generally,
19  but when I spoke about it in my report, I was
20  talking specifically about the limits that FDA
21  created in December 2018 and nothing more.
22    Q.  Right.  And what I'm getting at, Doctor,
23  is:  Prior to the FDA's interim limits, there
24  already was industry guidance on acceptable limits
25  of mutagenic impurities, correct?

Page 118

1    MS. LOCKARD: Objection. Outside the
2 scope of his opinions.
3    THE WITNESS: If you are talking about
4 this document, I would certainly agree with you.
5 BY MR. STANOCH:
6    Q.  Great.  And you would agree for any other
7 iteration of this M7(R1) guidance prior to this one
8 that spoke of acceptable limits of mutagenic
9 impurities as well, correct?
10   A.  Well, that's a broad statement, but again,
11 let me agree for purposes of discussion.
12   Q.  I appreciate that.  And then let's flip to
13 page 14.  Let me know when you are there, sir.
14   A.  Okay.  I'm there.
15   Q.  And do you see Section E, sir?
16   A.  I do.
17   Q.  Right.  And do you see there is three
18 bullets under Section E?
19   A.  I do.
20   Q.  And the third bullet is talking about the
21 cohort of concern impurities again, fair?
22   A.  I see that, yes.
23   Q.  And it notes, "If these compounds are
24 found as impurities in pharmaceuticals, acceptable
25 intakes for these high-potency carcinogens would

Page 119

1 likely be significantly lower than the acceptable
2 intakes defined in this guidance."
3    Did I read that right?
4    A.  I can agree with your reading of the
5 words.
6    Q.  Uh-huh.  Right.  And then you see it
7 further says, "Although the principles of this
8 guidance can be used, a case-by-case approach
9 using," for example, "carcinogenicity data from
10 closely related structures, if available, should
11 usually be developed to justify acceptable intakes
12 for pharmaceutical development and marketed
13 products."
14    Did I read that correctly?
15   A.  I think you are reading it correctly, yes,
16 no question about that.
17   Q.  I appreciate that, Doctor.
18    And so what the guidance we're looking at
19 here is saying is that for the cohort of concern
20 impurities, which includes the nitrosamine
21 compounds, at least as of the date of this guidance
22 of March 2018, that acceptable intake limits for it
23 should be developed for both the development and
24 marketing of pharmaceutical products?
25   A.  Well, I agree with you.  I think that's

Page 120

1 what we're talking about, what are the acceptable
2 intake limits.  And I think FDA has -- they provided
3 those in December 2018.  That's what I stated in my
4 report.
5    Q.  You --
6    A.  You know, as long as we're sort of looking
7 at this ad hoc document that I did not study or cite
8 in my report other than to notice its availability,
9 Mr. Stanoch, I might draw your attention to the
10 first bullet on this page, where it says, "Higher
11 acceptable intakes may be justified when human
12 exposure to the impurity will be much greater from
13 other sources, e.g., food."  Now, of course that's
14 exactly the case with nitrosamines.
15   Q.  Well, thank you for the gratuitous
16 statement, Doctor, but let's talk about that.
17    All three of these bullets we are looking
18 at, flexibilities in approaches, they are suggesting
19 to manufacturers to conduct a case-by-case approach
20 to come up with acceptable intake limits for
21 products, correct?
22   A.  Yes, and in the case of nitrosamines, in
23 the current matter, FDA did that for manufacturers,
24 as the prior letter you showed me noticed, in
25 December 2018.

Page 121

1    Q.  Right.  Well, prior to the FDA's interim
2 limits for nitrosamines in December of 2018, there
3 already was industry guidance, was there not, that
4 manufacturers should be conducting their own
5 assessments to potentially set limits for impurities
6 such as nitrosamines?
7    MS. LOCKARD: Objection.  Outside the
8 scope of his class-certification opinions.
9    THE WITNESS: Yes, and remember, we're
10 dealing with a situation where FDA said this was
11 unexpected, they didn't know how it occurred.  They
12 had many other caveats that indicated, if you will,
13 their surprise that came about in the summer of
14 2018.  These are very low-level impurities, and you
15 would have to suspect them and then have analytical
16 capability to identify them, notwithstanding all the
17 words in this guidance.
18    So I'm glad to walk through the guidance
19 with you.  I think it's an interesting and important
20 guidance, Mr. Stanoch, but it really only is
21 tangentially related to my report.
22 BY MR. STANOCH:
23   Q.  So it's not important to your opinions
24 that there already was industry guidance on how to
25 address levels of nitrosamines in drugs prior to the

Confidential Information Subject to Protective Order

Page 122

1  December 2018 FDA interim guidance?

2      MS. LOCKARD:  Objection.  Outside of the

3  scope of his opinions.  That's not what he was

4  retained, that's not what he discussed in his expert

5  report.

6      THE WITNESS:  Yeah, I'm listening to the

7  two counsel, and I think the way you both said it is

8  correct.  I was considering other factors and

9  information that I cited in my report that led to my

10  opinions, and I certainly haven't changed my

11  opinions as a result of the review of this document.

12  BY MR. STANOCH:

13      Q.  Okay.  Are you aware of any Novartis

14  Diovan product sold in the --

15          (Reporter clarification.)

16      MR. STANOCH:  No problem.  Let's start

17  over.

18      Q.  Are you aware of any Novartis Diovan

19  product sold in the United States that contained

20  NDMA?

21      A.  I am not.

22      Q.  Are you aware of any Novartis Diovan

23  product sold in the United States that contained

24  NDEA?

25      A.  No, I am not.

Page 123

1      Q.  You are aware, are you not, that Novartis

2  detected NDMA in ZHP's valsartan API prior to

3  June 20th, 2018, correct?

4      A.  You know, I have heard statements to that

5  effect from counsel, but I don't think I have ever

6  seen any documents for it.  I don't think a document

7  exists on my materials-considered list, and I

8  certainly didn't cite anything like that in my

9  report.

10      Q.  Uh-huh.  Can you tell us how --

11      A.  But I would be glad to look at such a

12  document if you have it, Mr. Stanoch.

13      Q.  Uh-huh.  Can you tell us how Novartis was

14  able to identify NDMA in ZHP's valsartan API prior

15  to June 20, 2018?

16      MS. LOCKARD:  Objection.  Outside the

17  scope of his expert opinions on class certification.

18  Lacks foundation.  Speculation.

19      THE WITNESS:  You know, I'm not,

20  Mr. Stanoch.  I just don't have any documents to

21  speak to that.  I would be glad to look at them if

22  you have them.

23  BY MR. STANOCH:

24      Q.  Uh-huh.  Can you tell us how Novartis was

25  able to identify NDMA in ZHP's valsartan API prior

Page 124

1  to June 20, 2018, but Teva could not?

2      MS. LOCKARD:  Objection.  Outside the

3  scope of his expert opinion on class-certification

4  issues.  Vague.  Lacks foundation.  Argumentative.

5      THE WITNESS:  Again, Mr. Stanoch, I just

6  have not seen any documents to that point.  If you

7  can point to them in my materials considered, I

8  would be glad to look at them with you.

9  BY MR. STANOCH:

10      Q.  Uh-huh.  Well, you tell me, Doctor, did

11  you look at any materials that identify how Novartis

12  was able to discover NDMA in ZHP's valsartan API?

13      MS. LOCKARD:  Objection.  Outside the

14  scope of his class-certification opinions.  Lacks

15  foundation.  Speculation.

16      THE WITNESS:  And my apologies,

17  Mr. Stanoch.  I thought I had answered that

18  question.  I have not seen any documents, anywhere,

19  that speak to Novartis' testing of any products for

20  nitrosamines.

21  BY MR. STANOCH:

22      Q.  Can you tell me what methods Novartis used

23  to detect NDMA in ZHP's valsartan API?

24      MS. LOCKARD:  Objection.  Outside the

25  scope of his class-certification opinions.  Lacks

Page 125

1  foundation.  Speculation.

2      THE WITNESS:  No, I cannot, Mr. Stanoch.

3  BY MR. STANOCH:

4      Q.  You cannot tell me why Novartis would have

5  a method for detecting NDMA in ZHP's valsartan API,

6  can you?

7      MS. LOCKARD:  Objection.  Outside the

8  scope of his class-certification opinions.  Lacks

9  foundation.  Calls for speculation.

10      THE WITNESS:  No, I can't, Mr. Stanoch.

11  BY MR. STANOCH:

12      Q.  Why would -- strike that.  Start over.

13      Why would Novartis be testing ZHP's

14  valsartan API for NDMA in the first place?

15      MS. LOCKARD:  Objection.  Outside the

16  scope of his class-certification opinions.  Calls

17  for speculation.  Lacks foundation.

18      THE WITNESS:  I just have no idea,

19  Mr. Stanoch.  It would be guessing, and I could only

20  guess.

21  BY MR. STANOCH:

22      Q.  Well, there is no specification in the

23  Diovan monograph, for example, for nitrosamines,

24  right?

25      A.  When you say "Diovan monograph," I assume

Page 126

1 you are talking about the USP monographs for
2 valsartan API and valsartan drug product, and if
3 that's what we are talking about, Mr. Stanoch, there
4 are no tests for nitrosamine in those monographs.
5    Q.   That would be for both the branded Diovan
6 product as well as generic valsartan products,
7 correct?
8    A.   I think you are saying that correctly,
9 Mr. Stanoch, that USP doesn't distinguish between
10 manufacturers.  The monographs are supposed to apply
11 to all manufacturers of the named article.
12    Q.   When you refer in your report to
13 compendial requirements, what do you mean?
14    A.   Well, in brief, I think, as we have
15 already discussed, we're talking about the
16 monographs, in this case, for valsartan drug
17 substance and valsartan drug product.
18    Q.   Right.  And you have looked at a couple of
19 monographs for valsartan, correct?
20    A.   Yes, I think they were part of the
21 information I looked at, and I think they are in my
22 materials considered.  And I'm glad to talk about
23 them if you wish, Mr. Stanoch.
24    Q.   Of course.  Would you agree that
25 compendial requirements includes the general USP

Page 127

1 chapters?
2    A.   Yes, the way I would say it is there is
3 general notices, which appear at the front of USP
4 and are generally applicable, and then a monograph
5 can reference general chapters that give detailed
6 information about a particular test or procedure.
7    Q.   Got it.  So it's fair to say, then, that
8 compendial requirements includes a drug monograph,
9 general notices and requirements, and conformance to
10 standards?
11    A.   Yes.  And if a monograph references a
12 general chapter, that would be part of the
13 monograph.
14    Q.   And those also would include notices on
15 impurities, correct?
16    A.   My sense is that impurities are a
17 universal test and should be present in most, if not
18 all, drug-substance and drug-product monographs, and
19 that would certainly be true of the valsartan
20 monographs.
21    Q.   Uh-huh, uh-huh.  And we talked earlier
22 that the FDA nitrosamine impurities guidance, I
23 think you said, was updated last September 2021?
24    A.   Well, it appeared first in draft in
25 September '20, and then it was updated in

Page 128

1 February 2021.
2    Q.   I apologize.  That's correct.  I agree
3 with you there.
4       I'm going to mark an exhibit.  Stand by,
5 sir.
6       (Whereupon, Exhibit 7 was marked for
7 identification.)
8 BY MR. STANOCH:
9    Q.   Stand by.
10       Okay.  Exhibit 7, sir, has now been
11 marked.  It also should be Tab 17 in your binder if
12 you would like to look at the hard copy.  Tell me
13 when you are there.
14    A.   Yes, I'm looking at it, Mr. Stanoch.
15 I'm --
16    Q.   Excellent.  And this appears to be a copy
17 of the valsartan USP monograph printed January 28th,
18 2022.  Do you see that?
19    A.   Yes, and -- okay.  Yes, I'm prepared to
20 discuss.
21    Q.   Very good.  So this would be an example of
22 a USP monograph that we were talking moments ago,
23 correct?
24    A.   Exactly.
25    Q.   All right.  And this monograph is for

Page 129

1 valsartan, correct?
2    A.   Yes.
3    Q.   And the date of this is current official
4 from last month, so this was after the FDA's last
5 turn of its nitrosamine impurities guidance in
6 February 2021, right?
7    A.   I'm not sure I understood what you said.
8 It says, "Official Date:  Official as of" May 1,
9 2020.  Are we looking at the same thing?
10    Q.   Right.  And "Official Status" right above
11 that, sir, "Official Status:  Currently Official on
12 28-Jan-2022."  You see that?
13    A.   I do, and that would be about a year after
14 the nitrosamine guidance.
15    Q.   I can agree with that.  And do you see any
16 mention of a test for nitrosamines in this valsartan
17 monograph?
18    A.   All right.  Now hold on just a sec.  Okay.
19 When we get to "Impurities," I see, "Procedure 1:
20 Limit of Valsartan Related Compound A."  "Procedure
21 2:  Limit of Valsartan Related Compound B, Valsartan
22 Related Compound C, and Other Related Compounds."
23 And that's all I see.  I do not see tests for
24 nitrosamine impurities.
25    Q.   Do you see any reference to acceptable

Confidential Information - Subject to Protective Order

Page 130

1 limits for nitrosamines in this monograph?
2    A.  I do not.
3    Q.  Do you see any mention whatsoever of
4 nitrosamines in this valsartan monograph?
5    A.  I don't believe -- I do not, Mr. Stanoch.
6 Please correct me if you think I'm wrong.
7    Q.  No, I think you are correct.  I just
8 wanted to make sure we're on the same page.  I don't
9 see any mention of nitrosamines whatsoever in this
10 monograph, and it sounds like you agree with me,
11 correct?
12    A.  Yes.
13    Q.  So if a drug manufacturer made valsartan
14 exactly per this monograph, they wouldn't
15 necessarily be doing anything to test or control for
16 NDMA, would they?
17    A.  If they just followed the monograph, I
18 think I would agree with you.
19    Q.  Right.  Following a monograph alone would
20 not mean that a product was complying with the FDA's
21 nitrosamine impurity guidance and limits, correct?
22    A.  Oh, I'm sorry.  I'm hesitating a little
23 bit because you alluded back to the nitrosamine
24 impurities guidance.
25    Q.  Well, I'll withdraw the question and I'll

Page 131

1 phrase it again.  Following this monograph alone to
2 manufacture valsartan would not have any specified
3 way of identifying and controlling nitrosamines,
4 correct?
5    A.  I think you are -- yes, I agree with you,
6 Mr. Stanoch.
7    Q.  Uh-huh.  So the fact that a drug complies
8 with a USP monograph alone does not mean the drug is
9 free of any nitrosamine impurities?
10    A.  Yes, I think you are right.  That ability
11 to control nitrosamine would come up in the
12 application to FDA and the FDA review.  It would not
13 be in the USP monograph.
14    Q.  Okay.  And the USP is not responsible for
15 identifying genotoxic impurities in drug product or
16 drug substance, right?
17    A.  No, I agree with your -- that to me is
18 more a regulatory matter.
19    Q.  All right.  USP believes companies are
20 responsible for identifying and assessing genotoxic
21 impurities in their drug product or substance,
22 correct?
23    A.  Yes.  It's up to the manufacturer working
24 with FDA to detect -- I'm trying to think of the
25 string of words -- report, identify, qualify, and

Page 132

1 that specifically applies to a genotoxic impurity
2 such as nitrosamines.
3    Q.  Uh-huh.  Uh-huh.  As of the date of this
4 valsartan monograph, January 28, 2022, if a
5 manufacturer followed it exactly, it would have no
6 way of testing and identifying nitrosamines in the
7 product, correct?
8       MS. LOCKARD:  Objection.  Vague.
9       THE WITNESS:  I think I'll agree with you,
10 Mr. Stanoch.
11 BY MR. STANOCH:
12    Q.  So whether a product was made according to
13 a USP monograph or not does not definitively speak
14 to whether the product contains nitrosamines,
15 correct?
16    A.  Well, remember, you don't make a product
17 according to a monograph.  This is a monograph that
18 has tests, procedures, acceptance criteria, that if
19 you -- I'm trying to get into the USP
20 understanding -- if your drug substance conforms to
21 all these tests, then you can confirm that you have
22 valsartan.
23       Now, as you are discussing, and I agree
24 with you, it doesn't say, does your valsartan have
25 nitrosamine impurities that are adequately

Page 133

1 controlled?  That is a separate matter that is
2 adjudicated by FDA.
3    Q.  Uh-huh.  And USP general notices and
4 requirements may also guide a manufacturer on how to
5 identify nitrosamine impurities, correct?
6    A.  Well, yeah, there may be some statements
7 in there that are very general statements, for
8 example, that you have to follow GMPs, and GMPs may
9 say, yes, you have to think about a genotoxic
10 impurity.
11       And I have heard it said, although I
12 haven't seen it, Mr. Stanoch, I have heard that USP
13 has general chapters on how to measure nitrosamine
14 impurities.
15    Q.  Uh-huh.
16    A.  But I can't confirm that.  I just heard
17 it.  Maybe you are aware of it and I'm not.
18    Q.  And is that discussed anywhere in your
19 report, sir?
20    A.  No, not at all.  And as a matter of fact,
21 this monograph is not discussed in my report.  I
22 think I am talking about monographs that were
23 official at the time of the 2018 time period.
24    Q.  So, well, we can pull those up too,
25 Doctor.  But if someone followed the USP monograph

Page 134

1 for valsartan products in the 2018 time period, so
2 too they would have nothing from the monograph
3 itself about identifying nitrosamines, correct?
4 A. Yes. I agree with that, Mr. Stanoch.
5 Q. Uh-huh. That does not mean, though, that
6 the drug ultimately might not contain any
7 nitrosamines, right?
8 A. Or that they might be controlled in
9 another way.
10 Q. Correct. And it may be that even if a
11 valsartan product was made according to the 2018
12 monograph, that the drug could still be adulterated
13 under FDA regulations?
14 MS. LOCKARD: Objection. Vague.
15 Speculation.
16 THE WITNESS: I'm struggling a little bit
17 with what you said. Now, if you are citing the act,
18 I think we would say it was not adulterated
19 according to the provisions of the act that talk
20 about a USP standard, but it could be adulterated
21 under a private specification, which is allowed in
22 the act in the citation I provided.
23 BY MR. STANOCH:
24 Q. Uh-huh.
25 A. Or it could be part of a GMP violation.

Page 135

1 Q. Let's take examples of some other drugs,
2 Dr. Williams. Let's take an example of a drug that
3 was made according to USP compendial standards. You
4 with me so far?
5 A. I'm a little hesitant to talk about making
6 a drug according to the standards because USP does
7 not give process steps. So you might make a drug
8 according to your process steps and then test it
9 according to a USP monograph.
10 Q. Uh-huh. Well, that's a fair point,
11 Doctor, that a manufacturer's individual process may
12 have issues arise through it that are not covered by
13 the monograph itself.
14 A. Yes, exactly.
15 Q. Right. And it would be incumbent on the
16 manufacturer to understand its own individual
17 process and to assess the potential for any
18 impurities in the product even if the manufacturer
19 is otherwise following the monograph, right?
20 A. I agree with the way you stated that.
21 Thank you.
22 Q. Okay. And so let me go back to my
23 example. I'll try to think -- I'll try to phrase it
24 more accurately for you.
25 Let's take a drug that met all compendial

Page 136

1 requirements. Is that okay?
2 A. Okay.
3 Q. Is that an accurate articulation of a
4 product, that it can meet compendial requirements?
5 A. It seems to me you are making a statement
6 about a hypothetical, and I don't disagree with your
7 hypothetical.
8 Q. Okay. So let's say there is a drug that
9 meets all compendial requirements, but it contains
10 anthrax. Is that drug adulterated?
11 MS. LOCKARD: Objection. Speculation.
12 MR. STANOCH: I can ask a hypothetical,
13 Counsel.
14 Q. Go ahead, Dr. Williams.
15 MS. LOCKARD: Incomplete hypothetical.
16 Objection.
17 THE WITNESS: You know, it's a
18 hypothetical, and I would say, yes, it's got an
19 unacceptable contaminant.
20 BY MR. STANOCH:
21 Q. Let's say a different, slightly different
22 hypothetical. Say a drug met all compendial
23 requirements but there was rat poison in it. Can it
24 be adulterated?
25 MS. LOCKARD: Objection. Calls for

Page 137

1 speculation. Incomplete hypothetical.
2 THE WITNESS: Again, I would say it has a
3 unacceptable contaminant.
4 BY MR. STANOCH:
5 Q. Even though the compendial requirements
6 may not have a test for rat poison, correct?
7 A. Exactly.
8 Q. Uh-huh. And let's take another example.
9 Let's say there is a drug that met all compendial
10 requirements, but broken glass are in the capsules.
11 Could it be adulterated?
12 MS. LOCKARD: Objection. Speculation.
13 Incomplete hypothetical.
14 THE WITNESS: Well, it could be
15 adulterated according to GMPs, but I think it could
16 not be adulterated according to the compendial
17 standard in the act.
18 I have got another good example, which is
19 the tampering of the Tylenol many years ago where
20 somebody put needles in the bottles. I don't know
21 if you remember that, Mr. Stanoch. Do you recall
22 that?
23 BY MR. STANOCH:
24 Q. No, I don't.
25 A. Well, FDA went to great trouble working

Confidential Information - Subject to Protective Order

---

Page 138

1  with a highly responsible manufacturer to get that
2  product off the shelves.
3      Q.  And was that product considered
4  adulterated because of the presence of needles in
5  the bottles?
6      A.  I think you could probably say that it was
7  a GMP failure of some kind, but --
8      Q.  Uh-huh.
9      A.  At a certain point in time, FDA could take
10 action, you know, as it deems appropriate for public
11 health.
12     Q.  Uh-huh.  And in your example of the
13 Tylenols with needles in the bottle, did a consumer
14 who got a bottle with a needle in it before any FDA
15 action, were they holding an adulterated product?
16     A.  I can't remember the details.  I think you
17 are asking sort of a speculative question.  I think
18 you could say it was adulterated because of failure
19 of GMPs.
20     Q.  But you could --
21     A.  You know, FDA has broad authority to
22 remove adulterated products from the market.  I can
23 say that.
24     Q.  Sure.  I would agree with that.  But you
25 can have a product, in this example we're talking

---

Page 139

1  about, the consumer's holding a bottle of Tylenol
2  with needles in it.  That product they are holding
3  is adulterated even prior to an FDA action against
4  the manufacturer, is it not?
5      A.  I think you could say that.  I think
6  people wouldn't quibble with that designation.
7      Q.  Okay.  You can say the same with sort of
8  the other examples.  For example, I mean, we talked
9  about a drug made to compendial requirements that
10 contained anthrax.  That drug in a consumer's hand
11 would be adulterated prior to the FDA taking
12 official action against the manufacturer, correct?
13     MS. LOCKARD:  Objection.  Speculation.
14 Incomplete hypothetical.
15     THE WITNESS:  Yeah, I -- I'm sorry.  I
16 have lost track of your question.  The hypothetical
17 that the product has been willfully adulterated?
18 BY MR. STANOCH:
19     Q.  The question simply was another example.
20 I'll say it again.  Assume you have a product that
21 met all compendial requirements, except it also
22 contained anthrax.  You with me?
23     A.  Yes.  I think you are making general
24 statements that are quite true, Mr. Stanoch, that
25 the compendial standard really is designed to assess

---

Page 140

1  what is there according to tests, procedures, and
2  acceptance criteria.  It couldn't possibly assess
3  all the possible negative things that might be
4  there.
5      Q.  Right.  And in this example, assuming you
6  have a product that met all compendial requirements
7  except it also contained anthrax, the consumer
8  holding that product is holding an adulterated
9  product prior to any FDA action against that
10 manufacturer, fair?
11     A.  Yes.  And as long as we're staying with
12 these hypotheticals, I can say a valsartan monograph
13 could have an impurity procedure for nitrosamines.
14 Of course, it would take very specialized equipment,
15 and it might have the limits set by FDA via the
16 guidance.  So there is nothing precluding that.
17     Q.  So --
18     A.  And I'm not exactly sure why it hasn't
19 occurred, but maybe companies are figuring out a way
20 to keep their manufacturing process such that the
21 limits are met without testing.
22     Q.  Okay.  And you have not seen any USP
23 monograph for valsartan that contains any impurity
24 procedures for nitrosamines, right?
25     A.  I have not.

---

Page 141

1      Q.  Uh-huh.
2      MS. LOCKARD:  We have been going about an
3  hour since the last break, so whenever you get to a
4  stopping point, I would like a break.
5      MR. STANOCH:  Now is fine.
6  Doctor, would you like to take a break?
7      THE WITNESS:  That would be nice,
8  Mr. Stanoch.  Thank you.
9      MR. STANOCH:  Let's do it.  Great.
10     THE VIDEOGRAPHER:  Great.  Then we are
11 going off the record.  The time is 10:49.
12     (Whereupon, a brief recess was taken.)
13     THE VIDEOGRAPHER:  Okay.  We are coming
14 back on the record.  The time on the video monitor
15 is 11:07.  Please begin.
16 BY MR. STANOCH:
17     Q.  Welcome back, Dr. Williams.
18     A.  Hi, Mr. Stanoch.
19     Q.  Did you talk with anyone besides your
20 counsel during the break?
21     A.  No, I did not.
22     Q.  Did you talk with your counsel during the
23 break?
24     A.  Yes, I did.
25     Q.  And did you look at any documents during

---

Confidential Information Subject to Protective Order

Page 142

1  the break?
2      A.  We sort of looked through the documents in
3  the binder you provided, but we didn't review any.
4  And we didn't get through all the documents.  There
5  were a few at the end we didn't look at, at all.
6      Q.  You flipped through the binder of
7  potential exhibits?
8      A.  Yes.
9          MS. LOCKARD:  Just very briefly.
10         MR. STANOCH:  Counsel, I'm going to --
11         MS. LOCKARD:  We didn't go through these
12  documents.
13         MR. STANOCH:  Counsel, and I didn't think
14  I needed to state this, but I'll put on the record,
15  I object to you flipping through the courtesy binder
16  of potential exhibits we prepared at your request
17  for the convenience of the witness.
18         Not all of them may be used.  We want them
19  not to be looked at, certainly to be destroyed
20  without looking at them, the witness or counsel,
21  especially when we're doing it as a courtesy to you
22  and the witness, when we have asked for similar
23  courtesies from your side, not you, Counsel, but
24  other counsel on your side, we have been flat-out
25  rejected when we have asked for hard copies.

Page 143

1      So it's very troubling to me that you are
2  looking through all potential exhibits we provided,
3  and I would ask that that not happen again, now or
4  at a future deposition.
5          MS. LOCKARD:  As the witness said, we did
6  not discuss these documents.  I'm trying to make
7  sure I have copies of them in hand.  We have one
8  binder here that I'm having to walk over and look
9  over Dr. Williams' shoulder, so --
10         MR. STANOCH:  Every single document I
11  marked from the binder, Counsel, is also put up on
12  the screen for all counsel on the Zoom to see.  So I
13  would just ask that no one looks at the binder until
14  the witness is directed to do it.  Thank you.
15         MS. LOCKARD:  Well, I would like to have
16  hard copies in my hand because on some of these we
17  don't even have the full document up on the screen,
18  just showing pages.
19         MR. STANOCH:  Well, first of all, that
20  wasn't the request.  It was for your witness.
21         Second of all, when we have asked for the
22  same thing for our witness, let alone us, we have
23  been flat-out refused by some on your side, not you.
24  So going forward, we can talk about this, but again,
25  for now I'm asking, do not look at the binder until

Page 144

1  an exhibit is marked.  Thank you.
2          MS. LOCKARD:  That's fine.  You may have
3  to give me a moment to find the document in hard
4  copy if I need to.  So --
5  BY MR. STANOCH:
6      Q.  Did you look at any other documents,
7  Doctor, during the break?
8      A.  No, no other documents.
9      Q.  Okay.  Doctor, would you agree that if a
10  manufacturer controls impurities and degradation
11  products in accordance with only a pharmacopeial
12  monograph, that is acceptable to regulators?
13      A.  I think it can be, yes.  If it is a good
14  monograph, it can be sufficient to control the
15  product in the marketplace.
16      Q.  What if the individual monograph is
17  inadequate to control an impurity?
18      A.  If we're talking about the nitrosamine, I
19  would say then there needs to be additional
20  requirements that are private, agreed to with FDA.
21      Q.  Uh-huh.  Well, what agreements with FDA
22  does any valsartan manufacturer have today, given
23  that we looked at the valsartan monograph and there
24  is nothing about nitrosamines in it?
25      A.  Well, I can only speak to Teva, and the

Page 145

1  answer to that is clear, there are no Teva valsartan
2  products in the U.S. marketplace.  As we have
3  already discussed, Teva immediately recalled them --
4  "immediately" can be a little debatable -- when the
5  impurities were discovered.
6      Q.  Uh-huh.  Is it incumbent on the
7  manufacturer that discovers an impurity to develop
8  and validate appropriate analytical procedures,
9  establish acceptance criteria, and communicate with
10  USP?
11      A.  There is no obligation for a manufacturer
12  to work with USP at all.  That's voluntary.
13      Q.  Uh-huh.
14      A.  I would say there is a requirement to do
15  so with FDA if you come to the private
16  specification.
17      Q.  I'm going to mark the next exhibit.  Stand
18  by.
19         (Whereupon, Exhibit 8 was marked for
20  identification.)
21  BY MR. STANOCH:
22      Q.  I have marked Exhibit 8, Doctor, it's
23  actually Tab 12 in your -- tell me when you're
24  there, sir.
25         (Reporter clarification.)

Page 146

1  BY MR. STANOCH:
2     Q.  Binder.  Tell me when you are there.
3     A.  Okay.  I have been handed Tab 12, which
4  looks like it's about 20 or 30 pages of a USP
5  webcast.  So I'm there, Mr. Stanoch.
6     Q.  Very good.  And this is a USP presentation
7  entitled "Impurities in Drug Products and Drug
8  Substances - A USP Approach," yes?
9     A.  Yes.
10    Q.  And you see the last update on the first
11  page is March 2018, right?
12    A.  Wait a minute.  I'm trying to find
13  March 2018.  Where is that?
14    Q.  Slide 1, lower left, light gray text.
15    A.  Yes, it's very faint in my print, but yes,
16  I can see it.  Thank you, Mr. Stanoch.
17    Q.  Not a problem.  It's faint in mine too and
18  in the original.  That's why I was happy to draw
19  your attention to it.
20       So this is prior to the valsartan recalls
21  that began in the summer of 2018, right?
22    A.  March 2018.  Okay.  I'm with you.  Yes.
23  Thank you.  I agree.
24    Q.  Good.  Let's flip to Slide 36.  So if you
25  are looking at the little page numbers in the lower

Page 147

1  right, it would be the page that has Slides 35 and
2  36 on it.
3     A.  34.  So I am looking at 35 and 36.  Yes,
4  I'm there.
5     Q.  Okay.  You see there is a Q and A on Slide
6  36, correct?
7     A.  I do see that.
8     Q.  And the question is:  "If a manufacturer
9  controls impurities and degradation products in
10  accordance with only a pharmacopeial monograph, is
11  that acceptable to the regulators?"  Did I read that
12  right?
13    A.  Yes, you did.
14    Q.  Then there is a three-bullet answer,
15  correct?
16    A.  Yes, I do see that.
17    Q.  Okay.  And it notes first the monographs
18  are based on historic preparation, right?
19    A.  Yes.  I'm not exactly sure what that
20  means, but you are reading it correctly.
21    Q.  And then the next bullet notes that, "A
22  particular manufacturer's manufacturing method for
23  formulation components may lead to unexpected
24  impurities, due to a different route of synthesis,
25  different reagents, et cetera.  Different processes

Page 148

1  may lead to different impurities."
2       Did I read that right?
3     A.  Yes, you read that correctly.
4     Q.  Do you agree with that statement?
5     A.  I do agree with it.
6     Q.  Then it also reads, "If an individual
7  monograph is inadequate to control an impurity, the
8  manufacturer is responsible for developing and
9  validating appropriate analytical procedures,
10  establishing acceptance criteria, and communicating
11  with USP."
12       Did I read that right?
13    A.  Yes, you did.  And I agree with that
14  statement.
15    Q.  Okay.  So what USP is advising in this
16  slide is that it's -- the onus on the manufacturer
17  to understand and evaluate its own process and any
18  impurities that may arise in that process for a
19  drug, correct?
20    A.  Yes, I think you are stating it correctly.
21    Q.  Uh-huh.  If you can flip to the slide --
22  page 63.  Let me know when you are there.
23    A.  Okay.  I'm on page 63, top of the page.
24    Q.  Great.  And it says, "Setting Acceptance
25  Criteria for Impurities," right?

Page 149

1     A.  Yes.
2     Q.  And there is three bullets there?
3     A.  Yes, I see that.
4     Q.  Let me direct your attention to the third
5  bullet.  Are you there?
6     A.  Yes.
7     Q.  And read the first sentence for us.
8     A.  "If a limit for a specified impurity does
9  not exist in the USP, FDA recommends that you
10  qualify the impurity by comparing it to the observed
11  amounts of the impurity in the reference listed
12  drug.  Your acceptance criterion should be similar
13  to the level observed in the" reference listed drug.
14  "Alternatively, the acceptance criteria may be set
15  based on a qualified level that is justified by
16  scientific literature, metabolite data, or toxicity
17  studies."
18    Q.  Do you agree with that statement?
19    A.  I do.
20    Q.  Uh-huh.  So the event that, say, a
21  valsartan USP monograph did not contain a limit for
22  a nitrosamine, the recommendation would be for the
23  manufacturer to qualify the impurity, correct?
24    A.  If the impurity existed in their product,
25  I think you could make that claim.

Confidential Information Subject to Protective Order

Page 150

1    Q.  Do you know if, prior to the summer of
2  2018, Teva ever made any effort to qualify any
3  nitrosamine impurity in its valsartan products?
4    A.  I think they did not.  They did not
5  suspect them, and their analytical tests in their
6  private or public specification wouldn't have picked
7  up a nitrosamine impurity.
8    Q.  Uh-huh.  Again, though, you don't know
9  like what tests Teva in particular might have been
10  employing for valsartan at the time, right?
11    A.  Well, it seems to me we could assume they
12  were following the USP monograph for valsartan --
13    Q.  Uh-huh.
14    A.  -- and valsartan drug product.
15    Q.  Uh-huh.  But you don't know how Novartis
16  was able to detect NDMA in valsartan API whereas
17  Teva did not?
18    MS. LOCKARD:  Objection.  Asked and
19  answered.
20    THE WITNESS:  Yeah, that is sort of a
21  different set of questions.  And Novartis would have
22  been following the monograph, too, for valsartan and
23  valsartan drug product if it existed.
24  BY MR. STANOCH:
25    Q.  Well, that's sort of the point, Doctor,

Page 151

1  that Novartis, following the monograph that did not
2  contain any mention of nitrosamines, nonetheless did
3  a test that detected the nitrosamines, right?
4    MS. LOCKARD:  Objection.  Lacks
5  foundation.  Speculation.  Outside the scope of his
6  opinions.
7    THE WITNESS:  Yeah, I have already stated,
8  Mr. Stanoch, I have no understanding of what
9  Novartis was doing.
10  BY MR. STANOCH:
11    Q.  Would you agree, though, that Novartis
12  performed some test that was not in the monograph
13  that detected the nitrosamines, correct?
14    MS. LOCKARD:  Objection.  Speculation.
15  Lacks foundation.  Outside of his opinions in the
16  class-certification report.
17    THE WITNESS:  I think what I was trying to
18  say is that when Novartis released its Diovan into
19  the U.S. market, it would try to make sure it
20  conformed to the USP valsartan and valsartan
21  drug-product monographs.  Those monographs, as I
22  have already said, apply to brand and generic
23  manufacturers.
24    Now, speaking hypothetically, any company,
25  including Novartis, could do any kind of testing it

Page 152

1  wanted on another product for a myriad of reasons,
2  but I just don't have any information about what
3  Novartis was doing with the ZHP product.
4  BY MR. STANOCH:
5    Q.  You look on the next page, on 65, sir.
6  Tell me when you are there.
7    A.  Yes.  Top of the page?
8    Q.  Yes.  It reads, "USP General Chapters for
9  Impurities: <476> & <1086>"?
10    A.  Yes, I do see that.
11    Q.  And these are examples of general chapters
12  in the USP that would be part of so-called
13  compendial requirements, correct?
14    A.  Yes.  I think we have alluded to this
15  before in our prior discussion.
16    Q.  Thank you.  You can put that aside for
17  now.
18    I'm going to mark the next exhibit.  Stand
19  by, sir.
20    (Whereupon, Exhibit 9 was marked for
21  identification.)
22  BY MR. STANOCH:
23    Q.  This will be Exhibit 9.  It's Tab 13 in
24  your binder, sir.  Tell me when you are there.
25    A.  Okay.  I'm seeing it.  It, again, is a USP

Page 153

1  document.
2    Q.  Correct.
3    A.  "Overview of" -- "General Chapters <476>
4  and <1086>."
5    Q.  Yes, sir.  And the date on that document?
6    A.  Another visual acuity test.  I don't
7  see --
8    Q.  I see October 19th, 2017, right on the
9  title page.
10    A.  Oh, right, yeah.  Right.  Thank you.
11    Q.  Is that right?
12    A.  Yes, exactly, thank you.
13    Q.  Oh, good.  No problem.  And have you seen
14  this -- actually -- strike that.
15    Have you seen the last exhibit prior to
16  today, sir?
17    A.  No, I haven't, nor this one.
18    Q.  Thank you.  Okay.  So let's flip to page
19  13, sir.  Tell me when you are there.
20    A.  And where will I see the page numbers?
21    Q.  It's the lower right of the pages.
22  The title is, "Manufacturers responsibilities in
23  <1086> and <476>."
24    A.  Okay.  I'm there.  I see it.
25    Q.  Okay.  In this slide in the USP

Page 154

1 presentation, sets forth what it says are
2 "Manufacturer's Responsibilities in General Chapter
3 <1086>" and "Manufacturer's Responsibilities in
4 General Chapter <476>." Do you see that?
5    A.  I do see that.
6    Q.  And then why don't you read that first
7 bullet that begins, "If a new impurity"?
8    A.  "If a new impurity is detected above the
9 appropriate identification threshold or when the
10 level of a specified related compound increases as
11 compared to its characteristic impurity profile, the
12 manufacturer is responsible for evaluating the
13 impact on the safety and efficacy of the drug
14 substance or drug product."
15       Shall I continue?
16    Q.  Do you agree with that -- no, why don't
17 you -- just that bullet.  Do you agree with that
18 statement, sir?
19    A.  Yes, I do.
20    Q.  Okay.  Why don't you read the second
21 bullet.
22    A.  "For marketed products, the manufacturers
23 are responsible for controlling organic impurities
24 in accordance with current regulatory standards."
25    Q.  Do you agree with that statement, sir?

Page 155

1    A.  I do.
2    Q.  Could you read the next one under the
3 subheading "Manufacturer's Responsibilities in
4 General Chapter <476>"?
5    A.  The first bullet?
6    Q.  Yes, sir.
7    A.  "If an individual monograph is inadequate
8 to control does not include a procedure for
9 qualifying an impurity or acceptance criterion for
10 an observed impurity, the manufacturer is
11 responsible for developing and validating
12 appropriate analytical procedures and establishing
13 appropriate acceptance criteria."
14    Q.  Do you agree with that statement, sir?
15    A.  Yes, it seems -- I can agree with it.
16    Q.  Could you kindly read the next one, sir?
17    A.  "Manufacturers shall validate or verify,
18 as appropriate analytical procedures must
19 demonstrate their suitability for detection and
20 quantification of impurities in the drug substances
21 and drug products."
22    Q.  Thank you.
23    A.  "Manufacturers shall develop" -- oh, I'm
24 sorry.  I went on.
25    Q.  That's fine.  Let's just stop there at

Page 156

1 that statement you just read.  Do you agree with
2 that statement, sir?
3    A.  I do agree with it.
4    Q.  And could you read the final bullet, sir?
5    A.  Right.  "Manufacturers shall develop
6 acceptance criteria for impurities justified by
7 appropriate safety considerations and consistent
8 with current applicable regulatory guidances."
9    Q.  Do you agree with that statement as well,
10 sir?
11    A.  I do.
12    Q.  Okay.  Thank you.  Let's put that aside
13 for now.  Stand by for the next exhibit.
14       (Whereupon, Exhibit 10 was marked for
15 identification.)
16 BY MR. STANOCH:
17    Q.  I am marking Exhibit 10.  Sir, that should
18 be Tab 14 in your binder.  Let me know when you are
19 there.
20    A.  Yes, I'm there.
21    Q.  Okay.  This is a slide deck from the FDA.
22 You see that, sir?
23    A.  I do.  Dated October 2, 2020.
24    Q.  Correct.  And you see the two names of the
25 presenters there, Dr. -- is it Keire and Dr. Lu?

Page 157

1    A.  I do see those names.
2    Q.  Did you work with them when you were at
3 the FDA?
4    A.  I don't recognize these names.
5    Q.  Quite all right.  And have you seen this
6 slide presentation before, sir?
7    A.  No, I haven't.
8    Q.  Let's turn to page 3.  Tell me when you
9 are there.
10    A.  Is this the one that states,
11 "Pharmaceutical Quality"?
12    Q.  Yes, sir.
13    A.  Yes, I'm there.
14    Q.  It states, "A quality product of any kind
15 consistently meets the expectations of the user,"
16 correct?
17    A.  Yes, I see that.
18    Q.  And then flip to the next slide.  You
19 there?
20    A.  Yes.
21    Q.  Now it says, "A quality product of any
22 kind consistently meets the expectations of the
23 user.  Drugs are no different," correct?
24    A.  I see that.
25    Q.  Do you agree with that characterization of

Page 158

1 pharmaceutical quality?

2 　　MS. LOCKARD: Objection. Outside the

3 scope of his class-certification opinions. Vague.

4 　　THE WITNESS: I don't want to debate what

5 the FDA is saying here, but I will say that users,

6 sometimes including me, can be very uninformed about

7 what the expectation for a product should be. But I

8 don't want to debate it. You know, I certainly can

9 agree with it generally.

10 BY MR. STANOCH:

11 　　Q. Understood. And would you agree, though,

12 that users of a drug have no way of knowing if the

13 drug contains nitrosamines absent the disclosure by

14 the manufacturer or regulator?

15 　　MS. LOCKARD: Objection. Speculation.

16 Vague.

17 　　THE WITNESS: Yes, some kind of

18 disclosure. And I think you were more specific

19 about what I was trying to say. It's very hard for

20 a user to understand what the quality expectations

21 of a medicine are.

22 BY MR. STANOCH:

23 　　Q. Uh-huh. And you can flip to the next page

24 of the slide, sir.

25 　　A. "Patients expect safe and effective"?

Page 159

1 　　Q. Yes. Just read the sentence for me.

2 　　A. "Patients expect safe and effective

3 medicines with every dose they take."

4 　　Q. As a general matter do you agree with

5 that?

6 　　MS. LOCKARD: Objection. Calls for

7 speculation. Vague.

8 　　THE WITNESS: Yeah, and it's very hard for

9 me to know what patients really expect, but I

10 certainly don't disagree generally with the

11 statement.

12 BY MR. STANOCH:

13 　　Q. Uh-huh. And then let's flip to the next

14 page, sir.

15 　　A. "Assuring every dose is safe"?

16 　　Q. Yeah. Why don't you just read that whole

17 statement there on the slide?

18 　　A. "Pharmaceutical quality is assuring every

19 dose is safe and effective, free of contamination

20 and defects."

21 　　Q. Uh-huh. Do you generally agree with that

22 statement?

23 　　A. Yeah, I don't see anything specifically

24 objectionable.

25 　　Q. Uh-huh. And if you can flip to page 9,

Page 160

1 sir. You can tell me when you are there.

2 　　A. Oh, wait. Okay. Yes, I'm on 9.

3 　　Q. And here we see reference to the ICH M7

4 guidance again?

5 　　A. Yes, I do. Yes, exactly.

6 　　Q. And again, there is reference to the

7 nitroso compounds being part of a cohort of concern,

8 right?

9 　　A. Yes, I see that.

10 　　Q. I think we established earlier, but you

11 can correct me if I'm wrong, that we agree that the

12 ICH M7 includes nitroso compounds in the so-called

13 cohort of concern, right?

14 　　MS. LOCKARD: Objection. Asked and

15 answered. Outside the scope of his deposition.

16 　　THE WITNESS: Yes. And this is a very

17 general statement, but I see nothing to disagree

18 with.

19 BY MR. STANOCH:

20 　　Q. Go back to the slide we were looking at

21 prior to this, the pharmaceutical quality slide.

22 　　A. "Pharmaceutical quality is assuring every

23 dose"?

24 　　Q. Yes, sir.

25 　　A. I'm there, Mr. Stanoch.

Page 161

1 　　Q. Very good. Do you believe a valsartan

2 drug that contained nitrosamines was safe and

3 effective and free of contamination and defects?

4 　　MS. LOCKARD: Objection. Outside the

5 scope of his expert opinion for class certification.

6 　　THE WITNESS: I'm sorry. Could you say

7 the question again, Mr. Stanoch?

8 BY MR. STANOCH:

9 　　Q. Do you believe a valsartan drug that

10 contained nitrosamines was safe and effective and

11 free of contamination and defects?

12 　　MS. LOCKARD: Same objection. And vague.

13 　　THE WITNESS: Yeah. Speaking separate

14 from my report, I think it's possible it could be

15 free of contamination and defects, so I guess I'm

16 answering yes to your question.

17 BY MR. STANOCH:

18 　　Q. And you opine that a, you know, recall is

19 taken by companies to remove defective products in

20 the market, correct?

21 　　A. Yes. I would say that's the general

22 purpose of a recall.

23 　　Q. Uh-huh. Right. And so when Teva

24 instituted its recalls for its valsartan products,

25 it was removing defective drug product from the

Confidential Information Subject to Protective Order

Page 162

1  market, correct?
2       MS. LOCKARD:  Objection.  Outside the
3  scope of his opinion.  Also vague and speculation.
4  Asking him to give legal opinion.
5  BY MR. STANOCH:
6       Q.  I'm reading from your report, sir.  There
7  is no speculation.
8       A.  Yeah, I would say Teva recalled its
9  valsartan-containing drug products because of
10  nitrosamine contamination.
11      Q.  Right.  And that contamination is what
12  rendered them defective, making the voluntary recall
13  action appropriate?
14      A.  Well, but what --
15      MS. LOCKARD:  Same objections.
16      THE WITNESS:  The way I would say it, it
17  was -- I'm hesitating on the word "contamination."
18  The nitrosamines could be there within acceptable
19  limits.  When -- but working with FDA, Teva recalled
20  even though the limits hadn't been set.  I'm trying
21  to be specific in terms of what my report says.
22  BY MR. STANOCH:
23      Q.  Okay.  And so let's slightly rephrase
24  that, then, to see if we get on the same page.  You
25  write -- and you can look at Paragraph 69 of your

Page 163

1  report if you would like -- "A recall is a voluntary
2  action taken by a company to remove a defective drug
3  product from the market"; is that right?
4       A.  All right.  I'm going to my report.
5       Q.  Of course.
6       A.  Paragraph 69.
7       Yes, I'm reading from my report, and I see
8  where you are reading, Mr. Stanoch.
9       Q.  And you characterize elsewhere in your
10  report that Teva's recalls of its valsartan products
11  were voluntary, that's what you say, right?
12      A.  Right, right.
13      Q.  And the defect behind the Teva voluntary
14  recalls of its valsartan products were the
15  nitrosamine impurities; is that right?
16      MS. LOCKARD:  Objection.  Vague.  Outside
17  of the scope of his report.
18      THE WITNESS:  Well, the way I would say it
19  is FDA and Teva working together agreed that the
20  levels of nitrosamine impurities were unacceptable.
21  But I have also alluded in my report that it was
22  unusual because neither FDA nor Teva at the time had
23  a specific limit as to what was unacceptable.
24      But I don't think I'm debating you,
25  Mr. Stanoch.  Let me agree that the recall was

Page 164

1  because of a defective product.
2  BY MR. STANOCH:
3       Q.  And is it your understanding that Teva
4  recalled all of its valsartan-containing drug
5  products in the summer of 2018?
6       A.  No.  No.  I think there was -- the recalls
7  in summer of 2018 were for the valsartan drug
8  products using ZHP drug substance.  And then, based
9  on further information that came in over the fall,
10  FDA recalled its valsartan drug products containing
11  the Mylan product.
12      Q.  Right.  Were you aware that Teva initially
13  instituted a hold on the marketing of all its
14  valsartan finished-dose products when it heard from
15  ZHP in late June 2018?
16      A.  Yes.  I think I am aware of that, and I
17  think that's one of the documents -- there are two
18  documents I cite in that regard.
19      Q.  That is correct.  And then shortly after
20  its hold, Teva lifted its hold on valsartan
21  finished-dose made with non-ZHP API, correct?
22      A.  Yes, I think you are stating it correctly,
23  because Teva had no reason to think that it had
24  objectionable nitrosamine impurity levels.
25      Q.  Right.  And I'm going to put up a document

Page 165

1  just to help us with the timeline.  Stand by,
2  Doctor.
3       This will be Teva Exhibit 11.  It should
4  be Tab 24 in your binder, sir.  Let me know when you
5  are there.
6       (Whereupon, Exhibit 11 was marked for
7  identification.)
8       THE WITNESS:  Should I put away the FDA
9  overview exhibit?
10  BY MR. STANOCH:
11      Q.  Yes.
12      A.  Yes, I see this lift of hold dated July 6,
13  2018.
14      Q.  Very good.  So this document appears to be
15  a Teva memo dated July 6, 2018, about lifting hold
16  status for certain valsartan products, correct?
17      A.  Yes.
18      Q.  And so sometime prior to this Teva, as we
19  talked about, instituted a hold on all of its
20  valsartan products, right?
21      A.  Yes.
22      Q.  Right.  And then as of July 6, 2018, Teva,
23  it appears, lifted its hold on valsartan
24  finished-dose products that used non-ZHP valsartan
25  API, correct?

Page 166

1    A.  Yes, I agree.

2    Q.  Uh-huh.  And it looks like Teva had been

3  using valsartan API from Jubilant as well, correct?

4    A.  I would --

5    MS. LOCKARD:  Objection.  Speculation.

6  Foundation.

7  BY MR. STANOCH:

8    Q.  You can look at the document, Doctor.

9    A.  I see the document.  I wasn't aware that

10  the Teva valsartan products used Jubilant drug

11  substance.

12    Q.  Oh, I see.  You also see that Teva lifted

13  the hold on valsartan products as of July 6, 2018,

14  that contained API from Mylan, correct?

15    A.  Yes, I do see that.

16    Q.  Okay.  I think you alluded to that a few

17  questions ago, that you understood that Teva had

18  used Mylan API for some valsartan products sold in

19  the U.S., right?

20    A.  Yes, particularly the -- I'm trying to

21  think.  These were the ones made in the Jerusalem

22  facility.

23    Q.  I would agree with that, sir, yes.  I

24  think we're on the same page.

25    Are you aware of any testing that Teva did

Page 167

1  of its own finished dose that -- just let me start

2  over.

3    Are you aware of any testing that Teva did

4  of its own finished dose that contained API from

5  Mylan prior to its lifting the hold?

6    MS. LOCKARD:  Objection.  Vague.

7    THE WITNESS:  I am not.

8  BY MR. STANOCH:

9    Q.  Are you aware of whether Mylan tested

10  valsartan API that it was selling to Teva prior to

11  Teva's lifting its hold?

12    A.  You know, I have a feeling that there may

13  be some documentation in the materials considered,

14  but I'm not aware of it and I didn't cite it in my

15  report.

16    Q.  Did Teva ever test its own valsartan

17  finished dose that contained API from Mylan prior to

18  Teva's recalling that product later in 2018?

19    MS. LOCKARD:  Objection.  Vague.

20    THE WITNESS:  I just can't say.  I didn't

21  cite it in my report, so I don't know.

22  BY MR. STANOCH:

23    Q.  Do you know when, if at all, Mylan tested

24  valsartan API it was selling to Teva for

25  nitrosamines after this July 6, 2018, hold memo?

Page 168

1    A.  Well, my understanding of the sequence of

2  events is Mylan was saying it couldn't be in their

3  drug substance for valsartan, but Swissmedic did

4  some testing, and that's when Teva became aware that

5  there could be NDEA in the Mylan drug substance.

6  And that went to Teva's recall in November of 2018.

7    Q.  Uh-huh.  Was it appropriate for Teva to

8  lift its hold on products without testing it?

9    MS. LOCKARD:  Objection.  Outside the

10  scope of his class-certification report.

11    THE WITNESS:  Well, I don't know that they

12  didn't test it, so I can't respond to that question.

13  BY MR. STANOCH:

14    Q.  Uh-huh.  Are you aware of whether tests

15  had been developed after June 2018 to detect

16  nitrosamines?

17    A.  Well, the FDA was working on tests, and I

18  think Teva was as well.  And I think Teva's test

19  didn't come along -- online until later, but I don't

20  have those facts readily available now.

21    Q.  Right.  Right.  Are you aware that, at the

22  very least, the FDA announced in the summer of 2018

23  that it had found NDEA in a different manufacturer,

24  Torrent's valsartan products?

25    A.  I am actually not aware of that.

Page 169

1    Q.  Uh-huh.  And I can certainly pull up the

2  notice, but the FDA said that Torrent products were

3  included in the company's recall in August 23rd,

4  2018.  Were you aware of that?

5    A.  I'm sure I looked at it, but I'm not

6  specifically aware of it until you mention it now,

7  Mr. Stanoch.

8    Q.  Uh-huh.  You would agree, then, that if

9  the FDA was testing and finding NDEA in a different

10  manufacturer's product, there were testing methods

11  available to determine NDEA by August 2018, correct?

12    MS. LOCKARD:  Objection.  Speculation.

13  Vague.  And outside the scope of his report.

14    THE WITNESS:  Yeah, I just don't have

15  information to answer the question.

16  BY MR. STANOCH:

17    Q.  Uh-huh.  Can you say one way or the other

18  whether Teva ever tested any of its own product for

19  NDEA prior to its November 2018 recalls?

20    A.  I am sure that information exists, but I

21  don't have it -- I didn't cite it in my report and I

22  didn't comment, and so I can't answer.

23    Q.  Okay.  That's outside the scope of this

24  report; is that fair?

25    A.  But I would be guessing just because I

Page 170

1  don't have the information readily available.
2      Q.  That's a little different.  One is if you
3  want the information, you can look at it in your
4  report; but if you are not opining on it at this
5  time, then you have no opinion at this time, sir.
6  So which is it?
7      A.  I think the way you said it second.  I
8  have no opinion at this time is a good way to state
9  it.
10     Q.  Very well, sir.  We don't need to belabor
11 it.  Thank you.
12         Now, is it appropriate for a drug
13 manufacturer to not test its drug for nitrosamines
14 after being asked to do so by regulators?
15     MS. LOCKARD:  Objection.  That's a
16 liability question, and it's outside the scope of
17 his class-certification report.  Also incomplete
18 hypothetical, vague.
19     THE WITNESS:  Do I answer?
20     MS. LOCKARD:  If you are able to.
21     THE WITNESS:  You know, I would generally
22 say the answer to your question is no, it's not
23 appropriate.
24 BY MR. STANOCH:
25     Q.  Are you aware of whether Teva ever tested

Page 171

1  its valsartan product for any nitrosamines after
2  receiving a request from any regulator to do so?
3      A.  Well, I know they did test their
4  nitrosamine -- I'm sorry, their valsartan-containing
5  drug products at FDA's request, and they provided
6  FDA with that information.
7      Q.  And that was for NDMA, those tests, I
8  think, right?
9      A.  I agree, it was for NDMA, and I can't say
10 whether it was for NDEA.
11     Q.  Okay.  If a finished-dose customer asked
12 Teva, do your products contain NDEA, would it be
13 appropriate for Teva to conduct that testing and see
14 if NDEA is in the products?
15     MS. LOCKARD:  Objection.  Confusing.
16 Vague.
17     THE WITNESS:  Well, I would say if Teva
18 had reason to believe that there was no NDEA in
19 their valsartan products, Teva would refuse.  I
20 mean, it might be a very big deal to do that kind of
21 testing.
22 BY MR. STANOCH:
23     Q.  Uh-huh.
24     A.  So I would say it's not appropriate.
25     Q.  Uh-huh.  And what information would you

Page 172

1  need to have reason to believe you may need to test
2  your product for NDEA?
3      A.  Well, I think in the particular example,
4  Mylan was saying they had reason to believe that
5  there was no possibility of NDEA being in their drug
6  substance.
7      Q.  Uh-huh.
8      A.  And Teva could look at the other
9  ingredients in the manufacturing process and
10 conclude that there was no reason to test --
11     Q.  Uh-huh.
12     A.  -- and that it could be in the market.
13 And I think that's what this memo speaks to.
14     Q.  Okay.  Did Teva, to your knowledge, in
15 fact, look at the Mylan manufacturing process to
16 determine whether or not NDEA could arise?
17     MS. LOCKARD:  Objection.  Vague.  Outside
18 the scope.
19     THE WITNESS:  I can't say I can speak to
20 that, Mr. Stanoch.  My belief is they did.  They
21 were working with Mylan to get the needed
22 information.  But I don't have specific documents to
23 support that view.
24 BY MR. STANOCH:
25     Q.  Uh-huh.  If we go back to the exhibit we

Page 173

1  were looking at a moment ago, the lift hold status
2  memo; do you have that still, sir?
3      A.  Yes, I'm looking at it.  July 6, 2018?
4      Q.  Uh-huh.  Right.  And it states that,
5  "Mylan confirmed via e-mail to not have received any
6  intermediates from Huahai."  Do you see that?
7      A.  I do see that.
8      Q.  And further, so that -- strike that.
9          So that was one basis for Teva's lifting
10 the hold of the Mylan API product, right?
11     A.  Yes.  And you can see in the last bullet
12 on the thing where Teva's concluding possibility for
13 NDMA impurity is negligible.  I don't think the
14 focus was on NDEA just yet.
15     Q.  Uh-huh.  Right.  At the time Teva lifted
16 its hold, it wasn't even discussing, at least in
17 this memo, anything about NDEA, right?
18     A.  Right.  And I think that was the case for
19 FDA.  The concern about NDEA came later, after NDMA.
20     Q.  Uh-huh.  And what is your understanding of
21 the route of how nitrosamines came to be in Mylan's
22 valsartan API?
23     A.  I have seen a description of it, and I
24 think I have even seen statements from Mylan saying
25 that the process was such that nitrosamines couldn't

Confidential Information Subject to Protective Order

Page 174

1  be formed.  But beyond that, I don't have any
2  specific information now.
3      Q.  I mean, do you understand that it was an
4  issue relating to the residual solvents that Mylan
5  was using in the valsartan API manufacturing
6  process?
7      A.  Yes, I do understand that, and that
8  relates to FDA's inspection of Lantech and a warning
9  letter to Lantech about failure to look for the
10 nitrosamine impurity.
11     Q.  You are aware that Lantech was the vendor
12 that was managing the solvent recovery process for
13 Mylan when Mylan was making valsartan API for Teva,
14 right?
15     A.  Yes, I am aware of that.
16     Q.  Uh-huh.  And you understand that Lantech
17 was faulted by the FDA for the manner in which it
18 managed the solvent recovery process for Mylan,
19 right?
20     A.  Yes, I had that general understanding.
21     Q.  And that was the root cause for the NDEA
22 contamination of Mylan's valsartan API, right?
23     A.  That's my understanding as well.
24     Q.  Did Teva know that Mylan was using a
25 solvent-recovery vendor in the manufacture of

Page 175

1  valsartan API?
2      A.  I don't know that.  I couldn't answer that
3  question.
4      Q.  All right.  Sitting here today, can you
5  recall anything you saw suggesting that Teva ever
6  asked Mylan if Mylan was using a vendor for the
7  solvent recovery process in the manufacture of
8  valsartan API?
9      A.  I can't answer that.  I don't have that
10 information.
11     Q.  Uh-huh.  Did Teva know that Mylan was
12 using recycled solvents at all in the manufacture of
13 valsartan API?
14     A.  I can't say what Teva knew or didn't know.
15     Q.  Sitting here today, can you tell me
16 anything you saw suggesting, even, that Teva knew
17 that Mylan was using recycled solvents in the
18 manufacture of valsartan API?
19     A.  I think there is information about it, but
20 I don't have it and I can't comment.
21     Q.  Uh-huh.  Right.  You can't elaborate any
22 more on that, can you?
23     A.  No.
24     Q.  Right.  Shouldn't Teva, as the
25 finished-dose manufacturer, understand whether or

Page 176

1  not its API supplier was using recycled solvents in
2  the valsartan API manufacturing process?
3          MS. LOCKARD:  Objection.  Lacks
4  foundation.  Outside the scope of his report.
5          THE WITNESS:  You know, well, one of the
6  ways I might answer that question is that the DMF
7  system might preclude Teva from knowing because the
8  processes of the DMF may be secret between Mylan and
9  Teva.
10 BY MR. STANOCH:
11     Q.  Well, do you see anything suggesting that
12 Teva ever asked Mylan about whether it was using
13 recycled solvents?
14     A.  I don't recall seeing any information to
15 that point.
16     Q.  Do you recall looking at anything
17 suggesting that Teva ever asked to see Mylan's DMF
18 for valsartan API?
19          MS. LOCKARD:  Objection.  Asked and
20 answered.  It's outside the scope.
21          THE WITNESS:  No, it wasn't a focus of my
22 report, and I don't recall seeing it.
23 BY MR. STANOCH:
24     Q.  Do you agree that the "Residual Solvents"
25 chapter of the USP would be part of the chapters and

Page 177

1  notices which manufacturers should take into account
2  when they are manufacturing their own finished-dose
3  valsartan?
4          MS. LOCKARD:  Objection.  Vague.
5          THE WITNESS:  I think "Residual Solvents"
6  is an ICH document that is important to
7  manufacturers as a recommendation, so I think I
8  would answer that yes.
9  BY MR. STANOCH:
10     Q.  Uh-huh.  Do you know whether Teva adhered
11 to the USP "Residual Solvents" Chapter 467 in
12 assessing the valsartan API it purchased from Mylan?
13     A.  I think my understanding would be that in
14 the certificate of analysis for valsartan, there may
15 be a test for residual solvents.  And we could
16 certainly look at that.
17     Q.  Well, you looked at a number of
18 certificates, I believe, listed in your materials
19 considered, right?
20     A.  No.  That doesn't mean I looked at them.
21 They are listed in my materials considered, but they
22 weren't important to my report and I didn't cite
23 them.
24     Q.  Fair enough.  Can you say sitting here
25 today whether you saw any mention of the use of

Page 178

1 recycled solvents by Mylan in the manufacture of
2 valsartan API?
3    A.  No, I didn't see anything about recycled
4 solvents.
5    Q.  And a moment ago you were talking about
6 the potential confidentiality of DMFs.  Do you
7 remember that?
8    A.  I do.
9    Q.  Is the mere existence of a third-party
10 vendor secret?
11       MS. LOCKARD:  Objection.  Foundation.
12 Speculation.
13       THE WITNESS:  I don't quite understand.
14 Secret from whom?
15 BY MR. STANOCH:
16    Q.  Does the fact that Mylan was using a
17 third-party vendor, Lantech, to manage the solvent
18 recovery process for valsartan API -- strike that.
19       You were suggesting, were you not, that
20 some of Mylan's DMF might have been confidential and
21 not shareable with Teva, right?
22    A.  Right, right.
23    Q.  Right.  So is it your position, sir, that
24 the mere fact that Mylan was using a third-party
25 vendor at all for the solvent recovery process was

Page 179

1 something that would be confidential and not
2 shareable with Teva?
3    A.  Well, it could be.  I just don't know what
4 Mylan wanted to keep confidential in the DMF.
5    Q.  Uh-huh.  And if -- oh.
6    A.  And again, remember, typically what you
7 see in the DMF for the purchaser, in this case,
8 Teva, is the certificate of analysis, the
9 specification for the drug substance.
10    Q.  And again, those certificates and
11 analysis, to the extent you recall sitting here
12 today, made no mention of the use of recycled
13 solvents?
14    A.  It may have a specification for residual
15 solvents.  We would have to look at one to see.  But
16 I don't think that necessarily would tell anything
17 about whether the solvents were recycled or not.
18    Q.  Uh-huh.  And one way Teva could have had
19 additional information about Lantech would be if it
20 had a quality agreement in place with Mylan,
21 correct?
22       MS. LOCKARD:  Objection.  Speculation.
23       THE WITNESS:  You know, quality agreements
24 may relate to contract manufacturers, but for both
25 ZHP and Mylan, these are not contract manufacturers.

Page 180

1 These are sellers of a drug substance that Teva
2 purchased.
3 BY MR. STANOCH:
4    Q.  Uh-huh.  So it's your position that -- oh,
5 strike that.
6       Would it surprise you to know that Mylan
7 was contracting with a third-party vendor in India
8 who had never been inspected by the FDA?
9    A.  No, it wouldn't surprise me.
10    Q.  And do you think Teva would have any issue
11 if it learned that Mylan was contracting with a
12 third-party vendor in India who had never been
13 inspected by the FDA?
14       MS. LOCKARD:  Objection --
15       MR. STOY:  Frank Stoy for Mylan.  I am
16 just going to object to the form of the question.
17       (Reporter clarification.)
18       MR. STOY:  Yes, I just stated an objection
19 to the form of the question.  Thank you.
20       MS. LOCKARD:  I objected as well as vague.
21 And calls for speculation.
22       THE WITNESS:  But I feel like I'm losing
23 Mr. Stanoch.
24 BY MR. STANOCH:
25    Q.  Can you hear me, sir?

Page 181

1    A.  Yeah, now I can hear you clearly.
2    Q.  I will repeat the --
3    A.  Can you repeat --
4    Q.  I would love to because of the
5 interference -- I don't mean that pejoratively --
6 from defense counsel.
7       Sir, do you think Teva would have an issue
8 if it learned that Mylan was using a third-party
9 vendor in India who had never been inspected by the
10 FDA to manage the solvent recovery process?
11       MS. LOCKARD:  Same objection.
12       THE WITNESS:  I can't really speculate
13 what Teva would think about it.  It doesn't seem to
14 me a big issue whether there is or is not an FDA
15 inspection.
16 BY MR. STANOCH:
17    Q.  It's not a big issue if Teva was buying
18 valsartan API from Mylan where Mylan was using a
19 third-party vendor not disclosed to Teva who had
20 never been inspected by the FDA; is that your
21 testimony?
22    A.  I'm not really an expert on solvent
23 recovery processes, but my understanding is that
24 many companies use them.  It's not unusual.  And to
25 me it might be part of the DMF that Mylan would want

Confidential Information Subject to Protective Order

Page 182

1 to keep confidential.
2        And then the issue of an FDA inspection
3 is -- to tell you the truth, Mr. Stanoch, when I saw
4 that FDA had inspected Lantech, this was the first
5 time I had ever heard of FDA inspecting a
6 solvent-recovery manufacturer.
7    Q.  Uh-huh.  And that happened after news of
8 the nitrosamines broke in 2018, though, right?
9    A.  Yes, that's when the inspection occurred
10 for Lantech.
11    Q.  Right.  And Teva never inspected Lantech
12 prior to 2018, did it?
13    A.  I don't know that.
14    Q.  Right.  And did you see anything in any of
15 the documents you reviewed suggesting that Teva ever
16 inspected Lantech prior to 2018?
17    A.  No, I didn't see anything like that.
18    Q.  And you never saw anything even suggesting
19 Teva knew who Lantech was prior to 2018, correct?
20    A.  I never saw anything to that point.
21    Q.  Would it surprise you to know that Mylan
22 was also using Lantech to do second-crop harvesting
23 of valsartan API?
24        MS. LOCKARD:  Objection.  Foundation.
25 Speculation.  Outside the scope of his report.

Page 183

1        THE WITNESS:  I don't understand the
2 question and I have no information to answer it.
3 BY MR. STANOCH:
4    Q.  Uh-huh.  Teva could not make its
5 assessment about the recycled-solvent process
6 without knowing anything about it, correct?
7        MS. LOCKARD:  Objection.  Vague.
8        THE WITNESS:  That seems like a generally
9 true statement, so I can agree.
10 BY MR. STANOCH:
11    Q.  Uh-huh.  And absent a contractual
12 arrangement that would obligate Mylan to disclose
13 that information, Mylan didn't have to disclose it
14 to Teva; is that your statement?
15    A.  No, I'm not making that statement.
16    Q.  Uh-huh.  If there was a contract between
17 Mylan and Teva that governed disclosure of the
18 processes and entities involved in the valsartan API
19 manufacturing process, Teva could have learned about
20 Lantech prior to all the recalls in 2018, right?
21        MS. LOCKARD:  Objection.  Speculation.
22 Foundation.  Outside the scope of his
23 class-certification opinions.
24        THE WITNESS:  Yeah, I would have to
25 speculate on that.  I just have no information to

Page 184

1 support an answer.
2 BY MR. STANOCH:
3    Q.  Okay.  Wouldn't a contract between Mylan
4 and Teva allow those two firms to exchange
5 confidential information?
6        MS. LOCKARD:  Objection.  Speculation.
7 Outside the scope.
8        THE WITNESS:  I could imagine a contract
9 that would support that kind of exchange of
10 information.
11 BY MR. STANOCH:
12    Q.  Right.
13    A.  But it can occur without a contract.
14    Q.  It certainly could, but that exchange did
15 not occur here between Teva and Mylan about the
16 recycled solvents and Lantech, did it?
17    A.  I just have no information to that point,
18 but if that's what you say, I certainly wouldn't
19 debate you.
20    Q.  And you would agree, though, that Teva
21 could have contractually required Mylan to disclose
22 information about the solvent recovery process,
23 correct?
24        MS. LOCKARD:  Objection.  Speculation.
25 Outside the scope.

Page 185

1        THE WITNESS:  Yeah, again, everything you
2 are asking me, I would be required to speculate
3 because I just don't have the information.
4 BY MR. STANOCH:
5    Q.  Do you know whether Teva ever performed a
6 residual solvent analysis with respect to Mylan
7 valsartan API?
8    A.  I do not.
9    Q.  Do you know whether Mylan itself ever
10 conducted a residual solvent analysis for the
11 valsartan API it made?
12    A.  I do not know that.
13    Q.  Uh-huh.  Did Teva ever ask to audit
14 Lantech?
15    A.  Not that I'm aware of.
16    Q.  Right.  Teva didn't even know who Lantech
17 was, right?
18    A.  I don't know that.
19    Q.  Do you have any information suggesting
20 that Teva knew about Lantech and its role in the
21 Mylan valsartan API manufacturing process prior to
22 the recalls?
23        MS. LOCKARD:  Objection.  Speculation.
24 Foundation.  Outside the scope.
25        THE WITNESS:  I just don't know, and it

Confidential Information Subject to Protective Order

Page 186

1 wasn't pertinent to my report.
2 BY MR. STANOCH:
3    Q.   Uh-huh.  Are you aware of any evidence
4 that Teva ever reviewed ZHP's route of synthesis for
5 valsartan API prior to the 2018 recalls?
6       MS. LOCKARD:  Outside the scope.
7 Objection.
8       THE WITNESS:  Well, I think if we look at
9 the Watson CBE-30s -- Watson, of course, is a
10 predecessor company to Teva -- there was information
11 about the route of synthesis and the synthesis
12 change.
13 BY MR. STANOCH:
14    Q.   You are talking about the ZHP process
15 change, correct?
16    A.   Yes.
17    Q.   Right.  And regarding that, ZHP was
18 changing its manufacturing process for valsartan API
19 that it was selling to, at the time, Actavis,
20 correct?
21    A.   I would say Watson, but they were all
22 predecessor companies to Teva.
23    Q.   That's fine.  We can agree that Watson was
24 a predecessor to Actavis and then Actavis was a
25 predecessor to current Teva, right?

Page 187

1    A.   Yes, that sounds right.
2    Q.   Great.  So we can use -- we can understand
3 that as we go through.  So ZHP changed it
4 manufacturing process for the valsartan API it was
5 selling to Watson, right?
6    A.   Yes, that's correct.
7    Q.   And ZHP characterized that as a minor to
8 moderate change, correct?
9    A.   I would have to see the letters from
10 Watson to FDA, but I think you are correct.
11    Q.   And a minor to moderate process change
12 does not require preapproval from the FDA, does it?
13    A.   Well, I couldn't agree with that, because
14 Watson was asking for FDA approval, but they
15 submitted it as a CBE-30.
16    Q.   Right.  And a CBE-30, Change Being
17 Effected, does not technically require preapproval
18 by the FDA, correct?
19    A.   The way I would say it is FDA will always
20 come in and review it, but the change can be
21 implemented if FDA doesn't respond within 30 days.
22    Q.   Right.  A major process change requires a
23 different level of review by the FDA, correct?
24    A.   That would be called the postapproval
25 supplement.

Page 188

1    Q.   So the fact that Watson characterized the
2 ZHP process change as minor to moderate meant that
3 it could implement its change immediately if it
4 wanted, correct?
5    A.   Well, I would say the letter was the
6 CBE-30, so they would wait to hear from FDA and then
7 they could implement after 30 days.
8    Q.   Uh-huh.  And in that context of that
9 submission, did Watson, to your knowledge, review
10 ZHP's entire DMF?
11    A.   As far as I know, they did not.
12    Q.   All right.  Did Watson, Actavis, or Teva,
13 to your knowledge, ever ask ZHP for a copy of ZHP's
14 DMF for valsartan API?
15    A.   As far as I know, they did not.
16    Q.   Nothing stopped any of them from
17 requesting that, correct?
18    A.   Well, I think it would be counter to the
19 way a DMF works, that it's a separate filing to the
20 agency.  So I would say Teva would not ask for it.
21    Q.   Well, that wasn't quite my question, sir.
22 The question was that nothing stopped Teva or its
23 predecessor entities from asking ZHP for a copy of
24 the DMF for valsartan API, correct?
25    A.   I think you are correct.  I mean, the two

Page 189

1 companies could agree to completely share the
2 contents of the DMF.
3    Q.   Right.
4    A.   But typically a DMF is not shared with the
5 purchaser, such as Teva.
6    Q.   Uh-huh.  And the DMF was not shared in
7 this instance, as far as you know, with Teva or its
8 predecessor entities?
9       MS. LOCKARD:  Objection.  Asked and
10 answered.
11       THE WITNESS:  I have to say I just don't
12 know.  If I had to guess, I would say not.
13 BY MR. STANOCH:
14    Q.   Uh-huh.  To your knowledge, did Teva ever
15 ask ZHP to confirm that ZHP's valsartan API did not
16 contain any genotoxic substances?
17    A.   As far as I know, it was not an issue or a
18 basis for communication until the summer of 2018.
19    Q.   Nothing's prevented Teva from ever asking
20 ZHP to confirm that ZHP's valsartan API did not
21 contain any genotoxic substances, correct?
22    A.   Are you saying nothing prevented them?
23    Q.   Yes.  I'll restate it.  Nothing prevented
24 Teva from ever asking ZHP to confirm that ZHP's
25 valsartan API did not contain any genotoxic

Page 190

1 substances, correct?

2    A.   Well, if it was expected, I suppose Teva

3 could certainly have asked, but it was unexpected.

4    Q.   Well, it was unexpected because ZHP said

5 so; isn't that right?

6       MS. LOCKARD:  Objection to form.

7       THE WITNESS:  No, the reason I say it was

8 unexpected, because FDA said so.

9 BY MR. STANOCH:

10    Q.   Well, FDA said it's unexpected because

11 that's how ZHP characterized it originally when it

12 was forced to break all this news in June 2018;

13 isn't that right?

14       MS. LOCKARD:  Objection to form.

15       MS. HILL:  Objection.  Argument.

16       THE WITNESS:  I just don't know that,

17 Mr. Stanoch.  If you know that, it's news to me.

18 BY MR. STANOCH:

19    Q.   Uh-huh.  Uh-huh.  Do you have any

20 information as to where FDA may have gotten the term

21 "unexpected" as to the nitrosamines found in

22 valsartan products?

23    A.   I don't.

24    Q.   And would it surprise you if it came

25 originally from ZHP?

Page 191

1       MS. LOCKARD:  Objection.  Speculation.

2 Foundation.

3       THE WITNESS:  Yeah, I just can't answer.

4 I don't know where it came from.

5 BY MR. STANOCH:

6    Q.   Uh-huh.  If ZHP told the world this

7 nitrosamine impurity was unexpected, but it had

8 information suggesting it knew a year earlier, would

9 that be important?

10       MS. LOCKARD:  Objection to form.

11       THE WITNESS:  I just have to speculate.  I

12 don't know when ZHP had its information.  It seemed

13 to me it was closer to the summer of 2018 time

14 frame.

15 BY MR. STANOCH:

16    Q.   Uh-huh.  Did you evaluate whether ZHP had

17 any information suggesting there may be nitrosamines

18 in its valsartan API prior to June 2018?

19    A.   I did not see any information to that

20 point.

21    Q.   Was that even part of your analysis for

22 purposes of your class-certification report?

23    A.   No.

24    Q.   Uh-huh.  In the context of your consulting

25 work, sir, would you advise a company to purchase

Page 192

1 API from ZHP?

2    A.   I think now they have resolved their

3 issues with FDA, as I understand it, that arose and

4 were summarized in the warning letter, and

5 everything is fine between FDA and the company.

6    Q.   Uh-huh.  So you would?

7    A.   Yes.

8    Q.   Uh-huh.  How about before 2018?

9       MS. LOCKARD:  Objection.  Vague.

10       THE WITNESS:  Well, I would say yes.  My

11 understanding is they had good FDA inspections, and

12 many companies get warning letters where things can

13 be resolved, and that's what happened for ZHP.

14 BY MR. STANOCH:

15    Q.   Uh-huh.  And it's important, then, to know

16 if your API supplier is receiving any adverse

17 inspections from the FDA, correct?

18    A.   That's a separate topic.  And -- is that a

19 question?  I'm sorry.

20    Q.   It's important to know if your API

21 supplier is receiving any adverse inspection

22 findings from the FDA, correct?

23    A.   I think it could be important, yes.

24    Q.   Okay.  Yes.  And a reasonable

25 pharmaceutical manufacturer would want to know if

Page 193

1 its API supplier is receiving adverse inspections

2 and findings from the FDA, correct?

3       MS. LOCKARD:  Objection.  Outside the

4 scope.  That's clearly a liability question.

5       THE WITNESS:  And I -- you know, there are

6 so many variables underlying your question.  I mean,

7 FDA may inspect and make a few observations that are

8 quickly resolved.  I'm not sure that needs to be

9 communicated to buyers.

10 BY MR. STANOCH:

11    Q.   Uh-huh.  If a manufacturer of

12 finished-dose product learns about an FDA inspection

13 and requests information about it from its API

14 supplier, would it be your expectation that the API

15 supplier would provide the information?

16       MS. LOCKARD:  Objection.  Speculation.

17 Foundation.  Incomplete hypothetical.

18       THE WITNESS:  Yes, and I just don't have

19 any basis to have an answer to that question.

20 BY MR. STANOCH:

21    Q.   Well, you consult pharmaceutical

22 manufacturers, don't you, sir?

23    A.   I would say now I am doing primarily

24 litigation, and I have never consulted on the type

25 of questions you are raising now.

Page 194

1    Q.   Right, uh-huh.  Have you ever advised a
2  company that it's prudent for them to have all
3  available information about regulatory inspections
4  of their API supplier?
5    A.   I have not.
6    Q.   Uh-huh.  Are there ways for pharmaceutical
7  manufacturers to independently check on whether
8  their API suppliers have had adverse regulatory
9  findings?
10   A.   Well, certainly a warning letter is
11  public, so that could come to light independent of a
12  drug-substance manufacturer.
13   Q.   Uh-huh.  Are you aware of any processes
14  Teva had in place prior to June 2018 to monitor
15  whether its API suppliers were receiving adverse
16  findings from regulators?
17   A.   I am not.
18   Q.   Uh-huh.  And back to ZHP and Teva.  To
19  your knowledge, Teva never asked ZHP to confirm that
20  ZHP's valsartan API did not contain any genotoxic
21  substances, correct?
22       MS. LOCKARD:  Objection.  Asked and
23  answered.
24       THE WITNESS:  Yes, I am not aware of any
25  communication like that.

Page 195

1  BY MR. STANOCH:
2    Q.   Uh-huh.  Wouldn't it have been prudent for
3  Teva to request such a statement from ZHP regarding
4  the valsartan API?
5       MS. LOCKARD:  Objection.  Outside the
6  scope of his report.  It's liability opinion.
7       You are just -- I'm sorry, Mr. Stanoch,
8  but you have just completely disregarded any sort of
9  line, bright or not, between liability opinion and
10  his class-certification opinion.  I'm honestly at a
11  loss as to whether we need to suspend and call a
12  judge or meet and confer on this.
13       But, I mean, I hate to just keep objecting
14  to every question, but every question is, you know,
15  what would a prudent manufacturer do?  What would be
16  reasonable?  You know, what should they do?  Would
17  it be appropriate?  These are all liability
18  opinions.
19       MR. STANOCH:  Are you done, Counsel?
20       MS. LOCKARD:  No, because I'm having a
21  problem here.
22       MR. STANOCH:  Are you done, Counsel?
23       MS. LOCKARD:  No.  Do you want to go off
24  the record or you want to discuss it on the record?
25  What is your response?

Page 196

1       MR. STANOCH:  Counsel, I'm not debating
2  you now on the record.  I'm going to keep asking my
3  questions.  You are lodging your objections.  I'm
4  asking questions on the facts on which he is opining
5  about.  It's within the scope of his report.
6       He says a number of factual --
7       MS. LOCKARD:  I just want to --
8       MR. STANOCH:  Excuse me.  He makes a
9  number of statements about facts.  I'm entitled to
10  probe the facts as they relate to the opinions in
11  this report.
12       MS. LOCKARD:  You are not asking about
13  facts, though.  You are asking about his opinion as
14  to whether something is reasonable, prudent,
15  appropriate, and those are the questions that I'm
16  objecting to.  Now, I understand --
17       MR. STANOCH:  You have stated your
18  objections.
19       MS. LOCKARD:  -- you are going to keep
20  asking, but we're going to move to strike all this
21  testimony and you are not going to be able to come
22  back and ask him or anyone else these questions.
23       MR. STANOCH:  Well, I disagree with that.
24  I'm asking him questions relating to the facts and
25  the opinions in this report.  And we will keep

Page 197

1  going.
2       MS. LOCKARD:  Well, this will be taken up
3  with Judge Vanaskie, so --
4       MR. STANOCH:  I don't appreciate the
5  threat, Counsel.
6       MS. LOCKARD:  It is not a threat -- a
7  statement.  But go ahead.
8       MR. STANOCH:  For the record, Counsel,
9  I'll state that in his own report, Dr. Williams
10  opines on reasonableness a number of times in terms
11  of methods, in terms of what one would do, in terms
12  of risk assessments, et cetera, so it's in the
13  report.  We can look at it later.
14   Q.   So, Doctor --
15       MS. LOCKARD:  I disagree with your
16  assessment.
17       (Reporter clarification.)
18       MS. LOCKARD:  I said I disagree with the
19  assessment, but go ahead.
20  BY MR. STANOCH:
21   Q.   Uh-huh.  Dr. Williams, you state in
22  Paragraph 84 of your report that there is no issue
23  with the FDA inspection of ZHP in 2017 because an
24  EIR was provided; is that right?
25   A.   Wait a minute, if I could get to where you

Confidential Information Subject to Protective Order

Page 198

1 are now.  Which paragraph?

2 Q.  84.

3 A.  And what page?  Yeah.

4 Q.  I don't have a printed copy of the report

5 you produced this morning, so I can't tell you the

6 exact page, sir.  Sorry.  It's Paragraph 84.

7 A.  Page 28.  Yes.  And, of course, others

8 will comment on ZHP's inspectional history, but this

9 is an example of an inspection that ZHP got in 2017,

10 an FDA 483 with a small number of observations, and

11 as FDA does, they provided an EIR, indicating that

12 the inspection was closed.

13 Q.  Are you suggesting here that because the

14 FDA did not continue the inspection, there were no

15 problems with ZHP's valsartan API?

16 A.  Well, that's a difficult question to give

17 a conjecture about.  What I would say is I can't say

18 more than what the facts state, that ZHP responded

19 to the observations, FDA found them satisfactory and

20 issued an EIR.

21 Q.  Was Teva ever made aware of the FDA

22 inspection of ZHP's facility in 2017?  Did it learn

23 of that in the year 2017?

24 A.  I don't know that.

25 Q.  Right.  Do you know when, if at all, Teva

Page 199

1 learned that FDA inspected ZHP's API facility in

2 2017?

3 A.  I'm not aware of what FDA knew about ZHP

4 inspectional history.  Of course they knew about the

5 warning letter because that was public.

6 Q.  Well, the warning letter was from 2018,

7 after the recalls, right?

8 A.  Yes.

9 Q.  Right.  So I'm asking -- a different

10 question is:  What is your understanding of when

11 Teva knew about the FDA inspection of ZHP that

12 occurred in 2017?

13 A.  I have no information about that.

14 Q.  Right.  So you don't know one way or the

15 other when Teva might have learned that the FDA

16 inspected ZHP's API facility in 2017?

17 A.  Yes, I don't know that.

18 Q.  Do you know when if at all ZHP revealed

19 the observations from the 2017 FDA inspection to

20 Teva?

21 A.  I don't know that they revealed it to

22 Teva.

23 Q.  Was Teva ever relying on the FDA to

24 determine the acceptability of ZHP's valsartan API?

25 A.  Well, I think Teva would be aware that FDA

Page 200

1 was reviewing the DMF and was certainly likely to

2 imagine that FDA would inspect ZHP, so it would be

3 hard to imagine that Teva didn't have some

4 understanding of those possibilities.  But in terms

5 of the discrete facts of those possibilities, I have

6 no information.

7 Q.  Uh-huh.  Is there only a potential cGMP

8 problem with an API supplier if the FDA catches it

9 first?

10 A.  No.  I don't think that is a fair

11 statement.  I would say the essence of GMPs is the

12 manufacturer is supposed to create their own

13 approach to GMPs that then is suitable for an FDA

14 inspection, but the FDA inspection may occur

15 infrequently.

16 Q.  Uh-huh.  Right.  It's incumbent on a

17 manufacturer sourcing API to conduct its own due

18 diligence of the API manufacturer, correct?

19 A.  Are you talking about the purchaser?

20 Q.  Yes.  It's incumbent on the finished-dose

21 manufacturer purchasing API to conduct its own due

22 diligence of the API supplier, correct?

23 A.  I think that's a reasonable statement,

24 yes.

25 Q.  Uh-huh.  And further down in your report,

Page 201

1 beginning Section F, do you see this?  It's "FDA

2 Inspections of Teva Drug Product Manufacturing

3 Facilities"; do you see that, sir?

4 A.  I do.

5 Q.  Okay.  And here you talk about FDA

6 inspections of Teva's own finished-dose facilities

7 that had been manufacturing valsartan prior to the

8 recalls; is that fair?

9 A.  Yes, FDA inspections.

10 Q.  Right.  And are you suggesting that just

11 because the FDA didn't find a problem relating to

12 valsartan, that there was no issue with the

13 valsartan API that the Malta and Jerusalem

14 facilities were sourcing from ZHP and Mylan?

15 A.  I don't know that.  I couldn't comment.

16 Q.  And are you suggesting here that because

17 the FDA did not find any adulteration during the

18 inspections you list in your report here, that

19 Teva's product could not be adulterated with

20 nitrosamines during these same time periods?

21 A.  I'm saying that Teva in my report had

22 recalled all its valsartan products from the market

23 before FDA made any determinations related to

24 adulteration.

25 Q.  Well, Teva's products had API with

Page 202

1  nitrosamines in it prior to the recalls, right?
2      A.  Yes, I think that was the basis for the
3  recall.
4      Q.   Right.  So are you telling me that a
5  valsartan product made by Teva the day before the
6  recalls with nitrosamines is not adulterated, but
7  then once the recall is issued the next day, now
8  that product is adulterated?
9      A.  No, I'm saying the adulteration label, if
10 somebody wanted to say, when did it occur, it
11 occurred with the warning letters that went to ZHP
12 and Mylan, and it also occurred after FDA set limits
13 for the nitrosamine impurities in December 2018.
14 But before that, Teva had recalled all product from
15 the U.S. market.
16     Q.   Uh-huh.
17     A.  Both made in Jerusalem and Malta.
18     Q.   Uh-huh.  Are you saying that valsartan
19 sold by Teva prior to the FDA's issuance of warning
20 letters to ZHP and Mylan could not be considered
21 adulterated?
22     A.  Yes.
23     Q.   So a Teva valsartan product on a certain
24 day that had nitrosamines in it is not adulterated
25 until the FDA issues a warning letter to ZHP or

Page 203

1  Mylan, and then once that happens, then it's
2  adulterated?
3      A.  That's when a formal regulatory definition
4  of adulteration could be stated to have occurred.
5  And it could also have been stated to have occurred
6  when FDA set limits for nitrosamine in December of
7  2018.
8      Q.   So going back to our examples we had
9  talked about before a couple breaks, if there is a
10 product that is containing anthrax, it's not
11 adulterated until the FDA issues a Form 483?
12     A.  No, no, no.  I would say a 483 is not a
13 FDA determination of adulteration.  A regulatory
14 determination of adulteration by FDA is a very
15 serious matter and, you know, it's carefully
16 considered by FDA, and I am suggesting that it could
17 have been determined to have occurred on those three
18 points that I just stated.
19      But Teva had recalled all of its product
20 before FDA made any kind of statement that could be
21 deemed an interpretation of adulteration.
22     Q.   So it sounds like the only three points
23 that you say adulteration could be found is when,
24 number one, FDA issued a warning letter to ZHP,
25 right?

Page 204

1      A.  Yes, yes, go ahead.
2      Q.   Number two would be when FDA issued a
3  warning letter to Mylan, right?  Right?
4      A.  Yes, uh-huh.
5      Q.   Number three would be when FDA set interim
6  limits, which you say occurred in December of 2018,
7  correct?
8      A.  Yes, I think that's -- I'm looking at my
9  report to see if those opinions are clearly stated.
10 Let me check.  But that corresponds to my opinion.
11     Q.   So let's say the FDA never set interim
12 limits and let's say the FDA never issued warning
13 letters to ZHP or Mylan.  In that case, Teva's
14 finished-dose valsartan could never be considered
15 adulterated, according to you?
16     A.  Yes, I think the issue of adulteration
17 arose and was determined, to the extent it was
18 determined at all, after Teva had recalled all
19 product from the market.
20     Q.   So then the answer is that Teva's
21 valsartan products would never be considered
22 adulterated in a world where the FDA did not issue
23 warning letters to ZHP and Mylan and the FDA set no
24 interim limits?
25     A.  Yeah, I don't think FDA -- yeah, if we

Page 205

1  say, was the Mylan product adulterated, I would say
2  it couldn't -- FDA had not made a decision in that
3  regard at least until those three prongs, if you
4  will, had been met.
5      Q.   Say a warning letter finds a product
6  adulterated on January 1, 2022.  Does that mean that
7  on December 31, 2021, that same product was not
8  adulterated?
9      A.  Yeah, I think the issue of adulteration
10 is -- and I'm looking at page 8 in my opinion, under
11 B, and my opinion is clear.  "My opinion that Teva's
12 valsartan products were, at all times prior to
13 Teva's voluntary recalls, AB-rated to their branded
14 counterparts and were not adulterated or
15 misbranded."  That's what I'm saying.
16      Now, if somebody wants to raise an issue
17 of when adulteration occurred, I would say it was
18 when the warning letters went to ZHP and Mylan or
19 when FDA set limits on the nitrosamine impurities in
20 December 2018.  I think that's a very clear
21 conclusion on my report.
22     Q.   Well, how does the FDA take action for
23 adulterated product, then, for product that had
24 already been sold if nothing is adulterated until
25 they issue a warning letter?

Page 206

1    A.  FDA can ask for recalls of products that
2   are objectionable for various reasons.  You
3   mentioned examples yourself.  But it doesn't mean
4   that FDA is making an adulteration charge.  That's a
5   separate issue.
6       Q.  So according to you, adulteration can only
7   exist if the FDA issues a warning letter?
8       A.  I would say an adulteration charge is a
9   regulatory determination by FDA that is very
10  carefully considered.  Even a warning letter doesn't
11  necessarily mean, you know, an adulteration charge.
12  It's really a signal to a company that they need to
13  focus a little bit more on improving their GMPs.
14      All I'm saying is that Teva products were
15  not adulterated at the time of the recall, so Teva
16  never had adulterated product in the U.S. market.
17      Q.  Because you are saying the warning letters
18  were not issued to ZHP or Mylan until after Teva's
19  recalls?
20      A.  Yes.  If somebody wants to make an
21  adulteration claim here, it seems to me it would
22  occur then, or when FDA set limits and a product was
23  above those limits.  The FDA -- oh.
24      Q.  So all the --
25      A.  FDA could have set limits that would have

Page 207

1   let the Teva product be okay.  It was just an
2   uncertainty there.  But because FDA thought the
3   limits were unacceptably high, without a limit being
4   set, Teva and FDA agreed that these products should
5   come off the market, first ZHP-containing product
6   and then the Mylan product.
7       Q.  Uh-huh.
8       A.  And then Teva decided not to reenter the
9   market at all.
10      So Teva never had an adulterated product
11  for any of its four valsartan-containing products in
12  the U.S. market.
13      Q.  Uh-huh.  So from 2012 on, assume all of
14  Teva's products had nitrosamines in it leading up to
15  the recall.  You are saying all of that product
16  cannot be considered adulterated?
17      A.  It was not adulterated --
18      Q.  Uh-huh.
19      A.  -- according to an FDA regulatory
20  determination.
21      Q.  Uh-huh.  The FDA found that the API that
22  Teva was using that entire time was adulterated,
23  though, correct?
24      A.  When do you say that occurred?
25      Q.  Well, you tell me.  It's in the 483s that

Page 208

1   you cite in your report, sir.
2       A.  Is it?  I don't recall FDA making an
3   adulteration claim in the 483s.  Can you show me
4   that?
5       Q.  In the warning letters, I apologize.  In
6   the warning letters the FDA said that Mylan and
7   ZHP's API was adulterated, correct?
8       A.  Yes.  I mean, you are reiterating my
9   claim.  That's a point at which FDA could be said to
10  have determined a charge of adulteration.
11      Q.  Uh-huh.  So --
12      A.  And that is a very carefully considered
13  charge.
14      Q.  All right.  So if I am selling a product
15  starting today, and it contains rat poison, I can
16  keep selling that and keep selling it until the FDA
17  issues me a warning letter, correct?
18      A.  No.  I think your hypothetical, it needs
19  to be refined for this particular case.  There is an
20  impurity, an impurity that we have already talked
21  about is undesirable.  It's part of that cohort of
22  concern.
23      But it can have a limit set on it such
24  that the product is safe and effective and of good
25  quality.  FDA did not do that until December 2018.

Page 209

1   But FDA still had the concern that the levels were
2   too high, so they worked with Teva to recall all
3   product.
4       This is separate from a determination of
5   adulteration.  The only time I have ever seen
6   adulteration raised in this matter is when FDA sent
7   those warning letters, as you say, to ZHP and Mylan.
8       Q.  If not adulterated, what would you call
9   all of Teva's products prior to the FDA's issuance
10  of warning letters to ZHP and Mylan?
11      A.  I would call them AB-rated and of good
12  value to the consumer.
13      Q.  Even if they contained genotoxic
14  impurities above any limit that was ever set to the
15  present?
16      A.  Well, you are getting to the core issue in
17  this matter.
18      First of all, my claim is, and I state it
19  in my report, they were AB-rated.  They were
20  pharmaceutically equivalent.  They were
21  bioequivalent.  They were not misbranded.  They had
22  the appropriate labeling relative to the Novartis
23  reference listed drug.
24      Now, if you have an impurity that comes to
25  light, it's a very low-level impurity, it was

Confidential Information Subject to Protective Order

Page 210

1 unexpected, there are not analytical procedures to
2 adequately measure it, it all of a sudden comes to
3 life, does that make the product worthless? No. It
4 makes the product really fine until FDA and the
5 companies sort through what the appropriate limits
6 should be.
7        Teva didn't do anything wrong. They were
8 making good product at their Malta and Jerusalem
9 facilities. And then FDA comes up with a limit. So
10 then you can say, okay, well, products in the
11 marketplace shouldn't have nitrosamine impurities
12 above that limit. And before all that occurred,
13 Teva had removed all product from the market.
14    Q. Uh-huh. Are you familiar with the FDA's
15 actions against Ranbaxy concerning generic Lipitor?
16        MS. LOCKARD: Outside the scope.
17        THE WITNESS: You know, I could probably
18 be reminded of it, and please do if you think it
19 would be helpful -- if you think it would be
20 helpful, please remind me of that.
21 BY MR. STANOCH:
22    Q. Sure. I'll mark Exhibit 12.
23        (Whereupon, Exhibit 12 was marked for
24 identification.)
25

Page 211

1 BY MR. STANOCH:
2    Q. Unfortunately, I don't think it's in your
3 binder, but it's relatively short. Let me know when
4 you can see it.
5    A. I think it's coming to me; is that right?
6        MS. LOCKARD: It's not in the binder, so
7 it's only on video screen.
8        THE WITNESS: And I don't see it on the
9 video screen yet.
10        (Whereupon, a brief discussion off the
11 record.)
12        MR. STANOCH: What are you whispering to
13 your counsel about, Doctor?
14        MS. LOCKARD: He asked me to remind him of
15 your name, and I said Stanoch.
16        THE WITNESS: I'm sorry. I had a senior
17 moment.
18        MR. STANOCH: Oh, it's okay, Doctor. I
19 wasn't going to call you out before, and I apologize
20 I did now. It's a long day.
21        MS. LOCKARD: You are right. I should not
22 be whispering. I should have done it louder.
23        MR. STANOCH: It's a --
24        THE WITNESS: Well, I apologize, too. I
25 may be getting hypoglycemic.

Page 212

1        MS. LOCKARD: It is 12:45 here. I don't
2 know, how long have been we been on the record,
3 Ms. Videographer, can you say?
4        MR. HARKINS: Two hours since the last
5 break.
6        MS. LOCKARD: Two hours since the last
7 break, so let's ask the questions about this, and
8 then --
9        THE VIDEOGRAPHER: An hour 35 since the
10 last break.
11        MS. LOCKARD: You need a new watch.
12 BY MR. STANOCH:
13    Q. Let me know when you can see this exhibit,
14 sir. I'm trying to screen-share now, if that helps
15 as well.
16    A. Okay. I see the screen share.
17    Q. All right. And you see this is a
18 Department of Justice announcement, May 13, 2013?
19    A. Yes, I do see this, and I'm familiar with
20 this fine.
21    Q. Right. And you are familiar that the DOJ
22 fined Ranbaxy, a generic drug manufacturer, 500
23 million relating to cGMP violations and false
24 statements?
25    A. Yes, I do see that.

Page 213

1    Q. Right. And can you still see it?
2    A. I do see it, yes, thank you.
3    Q. Oh, good. I just wanted to make sure you
4 were able to look at it. And you can look at this
5 document all you want, sir, but the issue here is
6 Ranbaxy, I think, was making generic Lipitor, and it
7 was found to contain pieces of glass, right?
8    A. I would have to read more closely to see
9 the pieces of glass, but I'll take your word for it.
10 Go ahead.
11    Q. Okay. And so would you call generic
12 Lipitor that contained pieces of glass AB-rated?
13    A. Well, we're getting into what causes the
14 FDA to remove an AB rating. An AB rating relates to
15 the review process. So, yes, I would say it's
16 AB-rated.
17        Now, after it's in the market and you find
18 something objectionable or it fails a specification
19 or it's not in conformance with GMPs, it needs to be
20 withdrawn from the market.
21    Q. So would you --
22    A. And that's what happened here.
23    Q. So would you consider Ranbaxy's generic
24 Lipitor that contained pieces of glass adulterated
25 prior to the date of its guilty plea?

Page 214

1    A.  It's not my decision.  It's an agency
2  decision.  Did the agency make a judgment of
3  adulteration?
4    Q.  Well, that's what I'm asking you, sir.
5    A.  I don't see it here.  If you can point it
6  out to me, I would be glad to offer an opinion.
7    Q.  Uh-huh.  It says right there --
8    A.  And I don't --
9    Q.  -- in the first paragraph about the
10  "distribution of certain adulterated drugs."
11    A.  Yes, adulterated drugs, okay.  So there
12  the agency is making a decision that the drugs were
13  adulterated.
14    Q.  Right.  And if you look on, you know, the
15  next page here, "Ranbaxy USA admitted to introducing
16  into interstate commerce certain batches of
17  adulterated drugs that were produced at Paonta Sahib
18  in 2005 and 2006."  You see that?
19    A.  Wait a minute.  I'm trying to catch up
20  with where you are reading.  What paragraph are you
21  in?
22    Q.  Second full paragraph of the second page.
23    A.  Oh.  Yes, I see that.  And your question,
24  I'm sorry, is?
25    Q.  Right.  So you see here, right, that

Page 215

1  Ranbaxy admitted that it was selling batches of
2  adulterated drugs produced at a facility in 2005 and
3  2006, right?
4    A.  Yes.
5    Q.  And that is, what, seven or eight years
6  prior to its guilty plea per this notice of
7  May 13th, 2013, right?
8    A.  I'm trying to stay up with your dates.
9  Okay.  Yes, I see the dates you are emphasizing.
10    Q.  Right.  So Ranbaxy was pleading guilty
11  that it was selling adulterated products for nearly
12  ten years prior to the institution of regulatory
13  action against it, right?
14    A.  Yes.  I see that.
15    Q.  But it sounds like you are telling me that
16  you would not consider any of that Ranbaxy product
17  adulterated up and until the point where the FDA
18  actually issued a warning letter; is that right?
19    A.  No, the way I read this, I think Ranbaxy
20  stated their drugs were adulterated in 2005, 2006,
21  and that's an agency determination.
22    Q.  Right.  They retrospectively made that
23  determination?
24    A.  Well, I don't know if it is retrospective
25  or not, but -- go on.  I'll try to answer your

Page 216

1  questions.
2    Q.  Right.  The FDA said at a later point that
3  the drugs you had been selling since 2005 were
4  adulterated, right?
5    A.  FDA can make a certain decision in time.
6  But in this case, FDA made the decision when it
7  issued the warning letters for ZHP and Mylan.
8    Q.  Right.  And it said in that decision that
9  the valsartan API that you have been making up until
10  this point is adulterated, correct?
11    A.  No, I'm not agreeing with that.
12    Q.  So --
13    A.  I'm saying FDA had -- I'm saying Teva had
14  recalled all product before the agency determination
15  of adulteration.
16    Q.  So the fact that Teva was selling product
17  that the FDA later said contained adulterated API,
18  you are saying that has no effect on whether or not
19  Teva was selling adulterated products?
20    A.  You know, I think we're confusing a lot of
21  issues here.  First of all, we have to look at the
22  warning letters to ZHP and Mylan.  And I'm glad to
23  discuss those if you want to give them to me as
24  exhibits.
25        But FDA made the general statement that

Page 217

1  products -- or drug substances produced at ZHP were
2  adulterated within the meaning of the act because of
3  GMP violations.  I would have to see it.  I'm not
4  even sure it mentions nitrosamines --
5    Q.  Uh-huh.  Okay.
6    A.  -- or the fact that the products
7  containing nitrosamines were adulterated.
8    Q.  Okay.  Let's take out nitrosamines.  So
9  Teva selling valsartan that contained API that the
10  FDA eventually said was adulterated because of cGMP
11  violations has no impact on whether Teva's product
12  was adulterated?
13    A.  Well, I would -- is it possible to look at
14  the ZHP warning letter?
15    Q.  If you have a copy there, sir, go ahead.
16  I don't know if I have it.
17    A.  It's not in your exhibits?
18        MS. LOCKARD:  We have a copy of it.
19        THE WITNESS:  I don't think I cited it in
20  my report.  I don't think it's in a --
21        MS. LOCKARD:  There is no question
22  pending, so you don't have to answer.
23  BY MR. STANOCH:
24    Q.  Uh-huh.  Did you cite the ZHP warning
25  letter from the FDA in your report, sir?

Confidential Information Subject to Protective Order

Page 218

1   A.  I don't think it's in my materials cited.
2   I don't recall seeing it there.  And that's true
3   also for Mylan.  So --
4      Q.  Okay.  Well, we will figure that out.
5   Let's put all this aside for now, and we can come
6   back to it, but we want to go --
7         (Whereupon, a brief discussion off the
8   record.)
9         THE VIDEOGRAPHER:  Okay.  We are going off
10  the record.  The time is 12:51.
11        (Whereupon, a brief recess was taken.)
12        THE VIDEOGRAPHER:  Okay.  We are coming
13  back on the record.  The time on the video monitor
14  is 1:34.  Please begin.
15  BY MR. STANOCH:
16     Q.  Welcome back, Dr. Williams.
17     A.  Thank you, Mr. Stanoch.
18     Q.  During our lunch break did you speak with
19  anyone besides your counsel there with you in San
20  Francisco?
21     A.  No, I didn't.
22     Q.  Did you text or e-mail anybody about your
23  testimony today?
24     A.  No, not at all.
25     Q.  And did you review any documents?

Page 219

1   A.  We did not.
2      Q.  Okay.  Thank you.
3         Could you describe for me what it means
4   that your expert report is only for class
5   certification and not for liability?
6      A.  My understanding is the liability
7   litigation will occur later, and right now we're
8   looking at class certification that relates to
9   economic loss for individual plaintiffs and also
10  large payors.
11     Q.  Uh-huh.  Right.  And prior to the break we
12  were talking a little bit about the Teva recalls,
13  and I think you said that Teva had recalled all of
14  its valsartan product from the market and has not
15  reintroduced it, correct?
16     A.  Yes, that's true, Mr. Stanoch.
17     Q.  Okay.  Are you aware of whether Teva has
18  been undertaking to introduce a new generic
19  combination product that includes valsartan?
20     A.  You know, I believe in the course of some
21  of my research or discussions with counsel, I did
22  hear that.  But I know very little about what they
23  are doing, and it's certainly not in my report.
24     Q.  Okay.  I was going to say, do your
25  opinions in any way relate to the fact that Teva is

Page 220

1   trying to market in the U.S. a new generic
2   combination product that includes valsartan?
3         MS. LOCKARD:  Objection.  Foundation.
4         THE WITNESS:  Was that a question,
5   Mr. Stanoch?
6   BY MR. STANOCH:
7      Q.  Yes.  Did your opinions in any way relate
8   to the fact that Teva is trying to market in the
9   U.S. a new generic combination product that includes
10  valsartan?
11     A.  No, not at all.
12     Q.  Uh-huh.  Uh-huh.  Do you think it would be
13  pertinent to your opinions in this case if you were
14  to eventually evaluate the testing and other
15  parameters that Teva is applying for its new generic
16  combination product that includes valsartan that it
17  may introduce in the U.S.?
18        MS. LOCKARD:  Objection.  Confusing.
19        THE WITNESS:  No, I can't see how that
20  would have any impact on my report --
21  BY MR. STANOCH:
22     Q.  Uh-huh.
23     A.  -- and it certainly wouldn't change my
24  opinions.
25     Q.  Well, would you like to know what testing

Page 221

1   Teva is doing of this new product under development
2   for nitrosamines?
3      A.  I would always be interested in what Teva
4   is doing because of their sophistication as a
5   pharmaceutical company, but it doesn't relate to my
6   report and it doesn't impact my opinions.
7      Q.  Uh-huh.  But if Teva is testing for
8   nitrosamines now for a new product in ways that were
9   available to it prior to 2018, that would be
10  pertinent, would it not?
11        MS. LOCKARD:  Objection.  Speculation.
12  Foundation.
13        THE WITNESS:  Well, the way I would try to
14  couch it in terms of my report is Teva should be
15  following the 2021 guidance on nitrosamine
16  impurities, and how they deal with those
17  recommendations from FDA, as I say, would be of
18  scientific interest to me, but not pertinent to my
19  report.
20  BY MR. STANOCH:
21     Q.  That's fair.  Do you know whether Teva is
22  following the FDA 2021 guidance on nitrosamine
23  impurities regarding its development of a new
24  valsartan combination product for the U.S. market?
25     A.  Do I know what about that?  I'm sorry.

Page 222

1    Q.   Do you know whether Teva -- or strike
2  that.
3        Do you know how, if at all, Teva is
4  following the FDA 2021 guidance on nitrosamine
5  impurities regarding Teva's development of a new
6  valsartan combination product for the U.S. market?
7    A.   No, I have no idea, and I'm sure Teva
8  might regard that as confidential information.
9    Q.   Uh-huh.  You reference throughout your
10  report, and we can look at particular paragraphs,
11  pharmaceutically equivalent and bioequivalent; is
12  that right?
13    A.   Yes, I do speak to those points,
14  Mr. Stanoch.
15    Q.   Okay.  And we can look -- you can look at
16  any paragraph you like, but you can look at, say,
17  Paragraph 60, where you mention both these terms, if
18  that's helpful.
19    A.   Okay.  Thank you.  I'll go to Paragraph
20  60.  Okay.  And that's on page 19?
21    Q.   Are you there?
22    A.   Yes, I am, sir.
23    Q.   Okay.  Now, what do you mean by
24  "bioequivalent," as you use the term in your report?
25    A.   Well, it's a requirement for a generic

Page 223

1  manufacturer to show bioequivalence between their
2  proposed product and the reference listed drug.  And
3  it's expressed in law and regulations as an absence
4  of difference in terms of the rate and extent of the
5  generic product compared to the reference listed
6  drug.
7    Q.   What do you mean by the term
8  "pharmaceutically equivalent" as used in your
9  report?
10    A.   Well, if you, again, look at the law and
11  regulations, "pharmaceutical equivalence" means the
12  same active ingredient; different impurities,
13  possibly; the same dose form; the same strength; and
14  the same route of administration.
15        So the two terms together, if they are met
16  by a generic manufacturer, allow the agency to
17  declare that the products are therapeutically
18  equivalent, and if those requirements are satisfied,
19  among other things, then FDA can give an AB rating
20  in the Orange Book.
21    Q.   And then I think in this paragraph, the
22  second sentence, you explain what you mean by
23  therapeutic equivalence; is that right?
24    A.   Yes, and I may have gotten a little bit
25  ahead of your questioning, but therapeutic

Page 224

1  equivalence means both pharmaceutically equivalent
2  and bioequivalent.
3    Q.   Uh-huh.  Isn't it true, Doctor, that
4  therapeutic equivalence includes pharmaceutical
5  equivalence, bioequivalence, as well as having the
6  same clinical effect and safety profile?
7    A.   No, I wouldn't add that, Mr. Stanoch.  I
8  think the purpose of the bioequivalence study is to
9  say the bioequivalence study substitutes for
10  assessment of clinical safety and efficacy.
11    Q.   Okay.  Let's look at the next exhibit.
12  Stand by.
13        This will be Exhibit 13.  It's Tab 10 in
14  your binder, sir.
15        (Whereupon, Exhibit 13 was marked for
16  identification.)
17  BY MR. STANOCH:
18    Q.   Let me know when you are there.
19    A.   Okay.  I'm looking at the Orange Book
20  preface.
21    Q.   Right.  This is a copy of the Orange Book
22  preface, correct?
23    A.   Yes.
24    Q.   And you are certainly familiar with the
25  Orange Book, I take it, right?

Page 225

1    A.   Yes.
2    Q.   And what is the Orange Book?
3    A.   It's an FDA publication entitled Approved
4  Drug Products with Therapeutic Equivalence
5  Evaluations.  And then after that, we always say,
6  "commonly referred to as the Orange Book."  And the
7  reason for that, it is an orange book.
8        I even know how it came to have the color
9  orange.  It was actually created around the time of
10  Halloween, so that's why it's colored orange.
11        But it lists the FDA-approved products
12  approved under the NDA/ANDA system.
13        I'll stop there, Mr. Stanoch.
14    Q.   Okay.  I appreciate that answer, including
15  the color commentary on the Orange Book, Doctor.
16        If you can turn to the section 1.2,
17  "Therapeutic Equivalence-Related Terms."
18    A.   Yeah, I'm getting there.  1.1.
19        Okay.  I'm there.
20    Q.   And this section talks about certain
21  terms.  Do you see that?
22    A.   I do.
23    Q.   And one of those terms is "therapeutic
24  equivalents," correct?
25    A.   Yes.  Under 1.2.

Page 226

1    Q.  Yes.  And could you just read us that
2  first paragraph there for "Therapeutic Equivalents,"
3  where it says, "Approved drug products are"?
4    A.  "Are drug products in identical dosage
5  forms and route(s) of administration" and "contain
6  identical amounts" --
7    Q.  Oh, oh.  Oh, oh, oh, oh, Doctor.  I'm
8  sorry to stop you.  I was trying to direct you to
9  the paragraph that is there for "Therapeutic
10  Equivalents."  Do you see that a little down?
11    A.  Oh, sure.  Down below?
12    Q.  Yes.  And just that -- it's three lines,
13  the first paragraph.  Do you see that?
14    A.  Yeah, where it says, "Approved drug
15  products"?
16    Q.  Yes, sir.  Could you just read that
17  paragraph?
18    A.  Sure.  "Approved drug products are
19  considered to be therapeutic equivalents if they are
20  pharmaceutical equivalents for which bioequivalence
21  has been demonstrated, and they can be expected to
22  have the same clinical effect and safety profile
23  when administered to patients under the conditions
24  specified in the labeling."
25    Q.  Right.  And that second clause there that

Page 227

1  you read, that is something that is absent from your
2  characterization of therapeutic equivalence in
3  Paragraph 60 of your report, correct?
4    A.  Yes.  I think -- my hope -- everything is
5  aligned and in agreement, but that is what I mean
6  when I made those statements in Paragraph 60.
7    Q.  And earlier I think you said that same
8  clinical effect and safety is not part of
9  therapeutic equivalence.  Are you changing your
10  testimony that you agree that a therapeutic
11  equivalent can be expected to have the same clinical
12  effect and safety profile when administered to
13  patients under the conditions specified in the
14  label?
15    A.  Well, I think, without quibbling with you,
16  Mr. Stanoch, what I was trying to say is in terms of
17  the application process, the demonstration is the
18  end of the sentence.  And if those two types of
19  equivalence are demonstrated, then, as you want to
20  go on and say, they can be expected to have the same
21  clinical effect and safety.  But in terms of the
22  concept of therapeutic equivalence, it stops with
23  demonstration.
24    Q.  Well, because I don't see anywhere in your
25  report, doing a word search, and you can certainly

Page 228

1  look through it, that you don't mention anything
2  about a therapeutic equivalent having the same
3  clinical effect and safety profile.
4    A.  Well --
5    Q.  Why did you leave that part out?
6    A.  You know, Mr. Stanoch, I have to say, it's
7  an unimportant question.  I think everybody knows
8  that if you show pharmaceutical equivalence and
9  bioequivalence, you then are allowed to have the
10  same labeling as the reference listed drug,
11  substantively, and this means you will have the same
12  clinical effect and safety.
13        I don't know why you are questioning my
14  words in my report, so perhaps you can explain that
15  at the right time.
16    Q.  Well, we can agree that your Paragraph 60
17  does not include the words "same clinical effect and
18  safety profile," right?
19    A.  No, and it's certainly understood, and I
20  think any reasonable person would understand, what I
21  meant when I talked about pharmaceutical equivalence
22  and bioequivalence.
23    Q.  So show me in Paragraph 60 where those
24  words appear then, Doctor.
25    A.  Which words?

Page 229

1    Q.  "Same clinical effect and safety profile."
2    A.  I don't say that.  That's what therapeutic
3  equivalence means.
4    Q.  Uh-huh.
5    A.  "Therapeutic equivalence" are the same
6  words as "same clinical effect and safety profile."
7    Q.  Uh-huh.  Right.  And those words do not
8  appear anywhere in your report, though?
9    A.  "Therapeutic equivalence" appears there,
10  and it means the same thing as identical safety and
11  efficacy outcomes.  That's what it means to have the
12  same labeling as the reference listed drug.
13    Q.  Well, Doctor, I want to make sure we're
14  not talking past each other.  I'm looking at your
15  Paragraph 60, and it says, "Therapeutic equivalence
16  means that the drug is pharmaceutically equivalent
17  and bioequivalent for the same use," period; is that
18  right?
19    A.  Mr. Stanoch, I just really am not
20  following your line of questioning.  Can you be more
21  clear?
22    Q.  Oh, absolutely, Doctor.  I'm looking at
23  the words you wrote.
24    A.  I think I'm --
25    Q.  So let's look at Paragraph -- go ahead.

Page 230

1    A.  Mr. Stanoch, let me finish my answer.
2    Q.  Please.
3    A.  I think I am perfectly clear here.
4  Anybody would understand what I'm saying who
5  understands generic substitution.  Now, what is it
6  about my statement or my words that you are not
7  getting?
8    Q.  I'm getting it about the words that are
9  not there, Doctor, that's my first step.  I'm
10 looking at Paragraph 60.  Can we agree --
11   A.  Well --
12   Q.  Let me finish my question, Doctor, I let
13 you finish your answer, please.
14        Your Paragraph 60, when you're defining
15 therapeutic equivalence, you say, "Therapeutic
16 equivalence means that the drug is pharmaceutically
17 equivalent and bioequivalent for the same use,"
18 period, correct?
19   A.  I don't think you are reading my words
20 correctly.
21   Q.  Well, you turn to Paragraph 60,
22 Dr. Williams.
23   A.  Would you please try to read my words
24 correctly?
25   Q.  Why don't you read Paragraph 60 to me,

Page 231

1  Dr. Williams?
2    A.  All right.  I'll be glad to.  "Generic
3  drugs that are pharmaceutically equivalent and
4  bioequivalent to the" reference listed drug and "are
5  deemed therapeutically equivalent and are
6  interchangeable with the" reference listed drug.
7  Now, what part of that don't you understand?
8    Q.  Please keep reading, Doctor.
9    A.  "Therapeutic equivalence means" "the drug
10 is pharmaceutically equivalent and bioequivalent for
11 the same use."  We're talking about the labeling.
12 In other words, if you're pharmaceutically
13 equivalent and bioequivalent, you get to use the
14 same labeling as the referenced listed drug.  If you
15 have the same labeling, you will necessarily have
16 the same clinical effect and safety profile.
17        I think these words are almost
18 self-evident, and I really wonder why I haven't been
19 clear about it with you.
20   Q.  Doctor, I'm asking you to tell us where in
21 Paragraph 60 you write that therapeutic equivalence
22 can be expected to have the same clinical effect and
23 safety profile?
24   A.  I don't write it.  I never said I did.
25   Q.  And you don't write it anywhere in your

Page 232

1  report, correct?
2    A.  I don't need to write it in my report.
3  It's not pertinent.  It's unnecessary.
4    Q.  Uh-huh.  And does valsartan containing
5  nitrosamine impurities have the same safety profile
6  as valsartan that do not have nitrosamine
7  impurities?
8    A.  Impurities are not a determinant of either
9  pharmaceutical equivalence or bioequivalence, and
10 that would include nitrosamine impurities.
11   Q.  We're talking therapeutic equivalence now,
12 aren't we?
13   A.  I don't know.  Is that your question?
14   Q.  That's what we have been talking about,
15 Dr. Williams.  Let me ask it again.
16        Do you believe valsartan containing
17 nitrosamines have the same safety profile as
18 valsartan that does not contain any nitrosamines?
19   A.  Okay.
20        MS. LOCKARD:  Objection.  Form of the
21 question.  Vague.
22        THE WITNESS:  That is a different
23 question.  And I would say, with appropriate limits,
24 yes, the answer to your question is yes.
25

Page 233

1  BY MR. STANOCH:
2    Q.  Well, what do you mean by "appropriate
3  limits"?
4    A.  Well, for example, the interim limits that
5  FDA set in December 2018 for --
6    Q.  In absence of those limits, do you believe
7  valsartan containing nitrosamines has the same
8  safety profile as valsartan that does not contain
9  any nitrosamines?
10   A.  Are you asking my personal opinion?  Or
11 are you asking me as part of my report?
12   Q.  You are the one opining on therapeutic
13 equivalence, Doctor, so I'm asking you, both in your
14 opinions and in your personal knowledge.
15   A.  I would say it would have the same
16 therapeutic outcome in terms of safety and efficacy.
17 If somebody wants to give data that suggests
18 otherwise, the FDA could look at that data.
19   Q.  Uh-huh.  You are talking about therapeutic
20 outcomes, you are referring to whether the drug
21 works for its intended purpose, right?
22   A.  I would say when we look at these words,
23 yes, we are talking about the valsartan molecule.
24   Q.  Right.  And still the issue we're trying
25 to get at here, Doctor, is:  In the absence of

Confidential Information Subject to Protective Order

Page 234

1  interim limits, do you believe valsartan containing
2  nitrosamines, which you have agreed is part of the
3  cohort of concern, has the same safety profile as
4  valsartan that does not contain nitrosamines?
5      A.  Well, let's back up a little bit.  First
6  of all, we understand that the impurity profile can
7  be different in the drug substance of the generic
8  compared to the reference listed drug.  And there
9  could be many, many impurities in those two drug
10 substances with unknown pharmacologic effects.
11         When you see a particular impurity of
12 concern, you would like to put a limit on it,
13 including whether it's a genotoxic impurity or not.
14 That's the whole idea behind reporting,
15 identification, and qualification.
16         I think nitrosamine impurities here are
17 part of the general approach to impurity handling.
18 So I would say if nitrosamine impurities are handled
19 the way other impurities are handed in the world of
20 generic substitution, yes, you would get the same
21 safety and efficacy outcomes.
22     Q.  What if they are not handled in the way
23 other impurities are handled?
24     A.  Well, if I don't -- can you be more
25 specific in your question in terms of how they would

Page 235

1  be handled differently?
2      Q.  Sure.  Prior to June 2018, assume there is
3  valsartan that contains nitrosamines and valsartan
4  that does not contain nitrosamines.  Do they have
5  the same safety profile?
6      A.  We just don't know that.
7      Q.  So then how --
8      A.  I mean, for all I know, the valsartan drug
9  substances that contain nitrosamine may have been at
10 perfectly safe levels.  I just don't know that.
11     Q.  Uh-huh.
12     A.  FDA finally decided they need to be below
13 certain interim limits.  But even there, I think FDA
14 would say the risk was very low and that their
15 limits were very conservative.  So you are asking a
16 question that would be very difficult to answer.
17     Q.  Uh-huh.  Well, in the real world, Doctor,
18 right, if you go to a patient and you say to the
19 patient, do you want this valsartan that contains
20 nitrosamines or do you want this valsartan that does
21 not contain nitrosamines, what do you advise your
22 patient?
23         MS. LOCKARD:  Objection.  Outside the
24 scope of his expertise.
25         THE WITNESS:  I would say nitrosamines are

Page 236

1  commonly found in foodstuffs and they can be allowed
2  in chemically synthesized drugs at certain levels.
3  And the goal here of this whole effort really has
4  been to identify them and make sure they do not
5  exceed those levels.
6  BY MR. STANOCH:
7      Q.  Would you advise patients to keep taking
8  recalled valsartan products?
9          MS. LOCKARD:  Objection.  Speculation.
10 Outside the scope.
11         THE WITNESS:  Well, that seems a very odd
12 question since they were recalled.  Is that a
13 hypothetical?
14 BY MR. STANOCH:
15     Q.  Well, we are just trying to say what you
16 would do with a patient, Doctor.  And by the way,
17 you are a doctor, correct?
18     A.  That's right.
19     Q.  You have an active medical license,
20 correct?
21     A.  I do not.
22     Q.  You do not.  When was your medical license
23 last active?
24     A.  In 1990.  I stopped treating patients
25 clinically when I went to FDA in 1990.

Page 237

1      Q.  Uh-huh.  Uh-huh.  And would you advise a
2  patient, if given the choice, to take valsartan that
3  contained nitrosamines or valsartan that did not
4  contain nitrosamines?
5          MS. LOCKARD:  Objection.  Outside the
6  scope of his expert report and opinions.
7          THE WITNESS:  You know, it's a
8  hypothetical.  I'm going to give you an answer that
9  may not seem appropriate.
10         But I worked once with a very
11 sophisticated chemist at FDA who said you get more
12 impurities in the back of a Washington, D.C., bus
13 than you will ever get from your medicines.
14         So, you know, it's a question of risk,
15 relative risk, severity of risk, and I just don't
16 think I can answer your question.
17 BY MR. STANOCH:
18     Q.  You have a -- oh, sorry.  Go ahead.
19     A.  I would say to patients, FDA will control
20 impurities within the -- nitrosamine impurities
21 within your medical products appropriately in
22 accordance with the new guidance.
23     Q.  Uh-huh.  Prior to the FDA guidance in
24 December 2018, right, would you advise a patient to
25 take valsartan with nitrosamines or the valsartan

Confidential Information Subject to Protective Order

Page 238

1  without nitrosamines?
2      A.  Well, let me point out that FDA told
3  people to keep on taking their valsartan products
4  before the interim limits were set.
5      Q.  And that was so they don't drop dead of a
6  heart attack, correct?
7          MS. LOCKARD:  Objection.  Speculation.
8          THE WITNESS:  I would not say that it way.
9  BY MR. STANOCH:
10     Q.  Right.  Because they did not want to go
11  off your medication for hypertension abruptly until
12  you had a substitute; isn't that right, Doctor?
13     A.  Well, they did not want people to abruptly
14  stop their medicines containing valsartan.
15     Q.  Absolutely correct.  But don't you think
16  the idea there was:  Don't abruptly stop, but you
17  should probably get a different valsartan product or
18  other substitute as soon as you can?
19         MS. LOCKARD:  Objection.  Speculation.
20  Outside the scope of his expert testimony and this
21  report.
22         THE WITNESS:  I'll just stand by what FDA
23  said.  They said, don't -- you know, the risk here
24  is very low.  The recall classification risk was
25  low.  And they were saying, don't stop your

Page 239

1  valsartan medicines abruptly under these
2  circumstances.
3  BY MR. STANOCH:
4      Q.  Uh-huh.  All right.  So let's go back to
5  the safety profile one more time, Doctor.  You are
6  not going to tell us whether you think a valsartan
7  with nitrosamines might have a different safety
8  profile than a valsartan without nitrosamines?
9      A.  I absolutely don't know, and to answer
10  that question would be a very difficult comparative
11  clinical trial.
12     Q.  Uh-huh.  Well, let's say right now with --
13  let's say today --
14         MS. LOCKARD:  Wait.  Hold on a minute.
15  Let him --
16  BY MR. STANOCH:
17     Q.  Oh, go ahead, Doctor.
18     A.  And if you think about what it would take
19  to answer that question, imagine a comparative
20  clinical trial where you have patients randomized
21  between two valsartan-containing products, one with
22  one limit set by FDA and one with no limits before
23  FDA set limits.  Imagine the outcome of that
24  clinical trial.  I think it would be very hard to
25  see a difference.

Page 240

1      Can you imagine how many patients you
2  would have to study to see a difference even if it
3  existed?
4      Q.  Let's talk about today, right.  The FDA
5  limits for nitrosamines exist today, right?
6      A.  Yes.
7      Q.  Does a valsartan drug that contains
8  nitrosamines above those limits have the same safety
9  profile as a valsartan drug with nitrosamines below
10  those limits?
11     A.  Far as I know, they have the same safety
12  and efficacy outcomes.
13     Q.  So then what is the point of the interim
14  limits, then, which say, if you have more than this,
15  you can't sell it?
16     A.  You have to set some kind of limits.
17  That's what an impurity is.  An impurity needs a
18  limit.
19     Q.  But you just said, Doctor, that a
20  valsartan product with nitrosamines above the limits
21  as they exist today is just as safe as one that has
22  nitrosamines below the limit, didn't you?
23     A.  I have no understanding that it has a
24  different safety profile in terms of any kind of
25  risk.

Page 241

1      Q.  If not for safety, Doctor, then why is the
2  FDA setting limits for nitrosamines in the first
3  place?
4      A.  They need to set a limit for the impurity,
5  and they base it on that M7 guidance in terms of how
6  you set limits for genotoxic impurities.
7      Q.  Which is --
8      A.  Remember, it's a very difficult decision
9  because nitrosamine impurities are present in food
10  and foodstuffs and in the environment, in the water.
11  And you saw it in the M7 guidance.  How do you set
12  limits when that kind of impurity is present all
13  around us, if you will?
14         FDA has to do something.  They do it out
15  of an abundance of caution.  But it doesn't mean
16  that something above the limit was therefore toxic.
17     Q.  You can't sell a product today that is
18  above the nitrosamine limits, correct?
19     A.  Well, I'll generally agree with you, but I
20  will also say that in the guidance they say you can
21  be above limits under certain circumstances with FDA
22  approval.
23     Q.  Are you aware of any manufacturer who has
24  sought FDA approval to sell a product with
25  nitrosamines above the now-current limits?

Confidential Information - Subject to Protective Order

Page 242

1    A.  No, I am not.

2    Q.  Uh-huh.  And you are telling me that the

3  FDA limits on nitrosamines have nothing to do with

4  the safety of the drug; is that your testimony

5  today, sir?

6    A.  I think they have to do with reducing

7  risk, and that is how FDA would state it in terms of

8  the M7 guidance and also the nitrosamine guidance.

9    Q.  Risk of what?

10    A.  But that risk is very difficult to

11  quantify.

12    Q.  Risk of what?

13    A.  Risk of whatever a nitrosamine impurity

14  might do.

15    Q.  Uh-huh.  What might it do?

16        MS. LOCKARD:  Objection.  Speculation.

17  Outside the scope of his opinions.

18        THE WITNESS:  I'm sorry.  Was that a

19  question, Mr. Stanoch?  I didn't hear it.

20  BY MR. STANOCH:

21    Q.  Yes, sir.  What might it do, the risk?

22    A.  Well, you can see it in the M7 guidance,

23  that it has the propensity in certain settings to

24  cause cancer.

25    Q.  Right.  Right.  The purpose of the FDA's

Page 243

1  limits currently is because there is a risk, however

2  quantified, to a patient if they take a pill that

3  has nitrosamines above the limit, right?

4        MS. LOCKARD:  Objection.  That's far

5  outside the scope of his opinions.  He's not giving

6  a causation opinion.

7        THE WITNESS:  Yeah, I am not definitely

8  not getting into causation.

9  BY MR. STANOCH:

10    Q.  I'm not asking you either that, Doctor.

11  What we're trying to understand here now is the

12  safety profile of a drug that has nitrosamines above

13  the limit.  And you were telling me, correct me if

14  I'm wrong, that it has nothing to do with safety,

15  correct?

16    A.  No, I'm saying I don't know if there is a

17  difference between the safety profile of the two

18  products.

19    Q.  So --

20    A.  It may be exactly the same, and to prove

21  that it's different would take a lot of work.

22  That's my point.

23    Q.  Uh-huh.  So you are saying that a

24  valsartan drug with nitrosamines above the current

25  limits may be just as safe as a valsartan product

Page 244

1  with nitrosamines below the limit or quantified at

2  zero?

3        MS. LOCKARD:  Objection.  Outside the

4  scope of his opinions.

5        THE WITNESS:  I'm saying that

6  hypothetically that could easily be possible.

7  BY MR. STANOCH:

8    Q.  Uh-huh.  Okay.  Let's look at the exhibit

9  some more.  The next paragraph, do you see where it

10  reads, "FDA classifies as therapeutically

11  equivalent"?  Do you see that?

12    A.  Yes.

13    Q.  And then it lists a number of criteria

14  which the Orange Book says the FDA classifies for

15  purposes of therapeutic equivalence, right?

16    A.  Yes.  Are you reading that final paragraph

17  on this page?

18    Q.  Yes, sir.  The sentence reads, "FDA

19  classifies as therapeutically equivalent those drug

20  products that meet the following general criteria";

21  do you see that?

22    A.  Yes, I do, and then it goes one, two,

23  three -- I guess the last one is four -- five.  It

24  continues on, and I think it ends with five.

25    Q.  Yes, sir.  I agree with that.

Page 245

1        And these are criteria that the Orange

2  Book reports that the FDA uses for classifying drug

3  products as therapeutically equivalent, correct?

4    A.  Yes.

5    Q.  All right.  And one of those is Number 5,

6  is whether the drug product is "manufactured in

7  compliance with Current Good Manufacturing Practice

8  regulations," correct?

9    A.  Yes, I see that.

10    Q.  And another one is 2(b), which is that the

11  drug products "meet compendial or other applicable

12  standards of strength, quality, purity, and

13  identity"; did I read that correctly?

14    A.  Yes, you did.

15    Q.  Right.  So for therapeutic equivalence,

16  meaning compendial standards alone may not be

17  sufficient per the Orange Book's guidance, correct?

18    A.  That's quite true, because sometimes there

19  isn't a compendial standard, so in that case there

20  would be a private, FDA-agreed standard.

21    Q.  Uh-huh.  And there may be other examples

22  as well, correct?

23    A.  Well, I don't know what you mean by that.

24  I'm thinking of the case where there is no

25  compendial standard.

Page 246

1    Q.  Uh-huh.  And there may be standards
2  reflected in ICH or other industry guidance,
3  correct?
4    A.  No, I wouldn't go there.  I'm trying to
5  think of a simple case, that many times FDA doesn't
6  have a monograph for a drug substance or a drug
7  product --
8    Q.  Uh-huh.
9    A.  -- in which case, the quality would be
10  controlled with a private specification agreed to
11  with FDA as part of the review process.
12    Q.  Uh-huh.  This criteria 2(b) does not say
13  anything about the absence of a compendial standard,
14  correct?
15    A.  Well, I think it does.  It says, "meet
16  compendial or other applicable standards."
17    Q.  Uh-huh.
18    A.  The other applicable standards would be
19  the private specification agreed to with FDA.
20    Q.  Uh-huh.  And I think you testified about
21  this earlier, that a manufacturer can agree to
22  different specifications or standards for a drug in
23  consultation with the regulator, right?
24    A.  Yeah, I think that's generally part of
25  what I'm saying here.

Page 247

1    Q.  Then let's flip a few more pages.
2  Unfortunately it's not numbered, Doctor.  This is
3  the section that has 1.7, "Therapeutic Equivalence
4  Evaluation Codes."  Tell me when you are there.
5    A.  Okay.  I'm there.
6    Q.  And if you look at the first paragraph of
7  that page, it begins in bold, "Every product in the
8  Orange Book is subject at all times to regulatory
9  action."  Do you see that?
10    A.  Yes, I do, at the very top of the page.
11    Q.  And you can read that full paragraph if
12  you like, but I want to direct your attention to the
13  penultimate sentence that begins, "FDA believes that
14  retention"; do you see that?
15    A.  Yes, I do see that.
16    Q.  Could you just read that sentence, just
17  that sentence, sir?
18    A.  "FDA believes that retention of a
19  violative product in the Orange Book will not have
20  any significant adverse health consequences, because
21  other legal mechanisms are available to the Agency
22  to prevent the product's actual marketing."
23    Q.  Thank you.  And that means, does it not,
24  that just because a drug is listed in the Orange
25  Book, does not mean that it's immune from being

Page 248

1  found to be adulterated or otherwise improperly
2  marketed, right?
3    A.  Yeah.  I think what we're getting at here,
4  too, is the idea that there can be recalls if a
5  product fails its specifications, and that happens
6  all the time, as I stated in my report.  That
7  doesn't mean it will be taken out of the Orange Book
8  or its AB rating will be changed.  I think that's
9  what we're talking about here.
10    Q.  You can put that aside for now.
11      (Whereupon, a brief discussion off the
12  record.)
13  BY MR. STANOCH:
14    Q.  Are you aware of whether Teva has a master
15  drug file for valsartan?
16    A.  If I understand your question,
17  Mr. Stanoch, are you saying Teva makes its own
18  valsartan?
19    Q.  Right.  Do you understand Teva to have a
20  drug master file for valsartan?
21    A.  Yes, thank you.
22      No, I am not aware of that.  I would think
23  it would be possible.
24    Q.  Would seeing documents related to Teva's
25  own valsartan DMF be pertinent to you in terms of

Page 249

1  whether Teva could have known about nitrosamines
2  forming as part of the API manufacturing process for
3  valsartan?
4      MS. LOCKARD:  Objection.  Lacks
5  foundation.
6      THE WITNESS:  I wouldn't rule it out, but
7  I don't think -- I didn't see any documents like
8  that.
9  BY MR. STANOCH:
10    Q.  Uh-huh.  Stand by.
11      Could you turn in your report, sir -- it's
12  beginning around Paragraph 120, the first Paragraph
13  120.  I think it's around page 41.  I don't have the
14  exact copy you have in front of you.
15    A.  120?
16    Q.  Yes, sir.
17    A.  On page 41?
18    Q.  Yes.
19    A.  "Doctor Panagos asserts"?
20    Q.  Yes.  Are you there?
21    A.  Yes, I am.
22    Q.  Great.  And in this subsection, you're
23  rebutting, if you will, opinions offered by
24  Dr. Panagos, correct?
25    A.  Yes, I agree.

Page 250

1    Q.   Right.  And why don't you read the first
2   couple sentences for us there in Paragraph 120?
3    A.   "Dr. Panagos asserts that the safety and
4   efficacy of a medication must be proven by the
5   manufacturer to the FDA so that the medication may
6   receive approval."  I think it's a she.  She
7   "further states that this information serves as a
8   warranty for the medication ensuring that it meets
9   the quality standards outlined by" "FDA."
10        Should I stop?
11    Q.   You can stop now.
12    A.   Okay.
13    Q.   And you picked up on part of it.  You
14   understand, you know, Dr. Panagos is a female,
15   correct?
16    A.   Yes, I see that now.
17    Q.   Okay.  If you can scroll down, sir, to
18   Paragraph 123.  Tell me when you are there.
19    A.   Yes, I see that statement.
20    Q.   Right.  And it begins, "Dr. Panagos
21   describes TPPs as payors at risk for purchases of
22   affected valsartan containing drugs products."
23    A.   Yes.
24    Q.   And what are TPPs, as you refer to it
25   there?

Page 251

1    A.   I think Dr. Panagos uses that abbreviation
2   for third-party payors.
3    Q.   What is your understanding of a
4   third-party payor in this case?
5    A.   It might be an insurance company or -- you
6   know, I'm trying to think of a term.  You know, a
7   medical care organization that pays for medicinal
8   products.
9    Q.   Uh-huh.  Right.  And then in the next
10   sentence you talk about risk about stopping your
11   antihypertensive treatment?
12    A.   Yes.
13    Q.   Right.  You are talking about two
14   different types of risk here in this paragraph,
15   aren't you?
16    A.   Well, I'm not sure I understand your
17   question.  Perhaps you could continue.
18    Q.   Sure.  So in the first sentence you are
19   referring to TPPs as payors at risk, right?
20    A.   Okay.
21    Q.   Right.  And then later you talk about, you
22   know, risks of stopping antihypertensive treatment,
23   right?
24    A.   Yes.
25    Q.   Right.  So what I'm clarifying is:  You

Page 252

1   are not saying that TPPs were at any sort of
2   physical risk involving valsartan, right?
3    A.   No, as I understand Dr. Panagos, she was
4   referring to financial risk.
5    Q.   Right.  I would agree with that.  You
6   understand that TPPs are at financial risk for
7   purchases of their, say, insureds, right?
8    A.   Yes.  And now I see your point.  It is two
9   different kinds of risks.
10    Q.   Well, I appreciate your clarification.  I
11   think we're on the same page.
12        And then in the next paragraph, in the
13   second sentence, you mention, "Both the TPPs and
14   patients got value for these products up to the
15   point they were recalled from the market."  Do you
16   see that?
17    A.   Yes.
18    Q.   What do you mean by "value" there?
19    A.   Well, I think it gets to my general
20   opinion that these were useful products.  They were
21   pharmaceutical equivalent.  They were bioequivalent.
22   They were AB-rated.  And practitioners and patients
23   used them successfully for the indications such as
24   hypertension.
25    Q.   Right.  So are you opining on whether or

Page 253

1   not patients or TPPs received value for the
2   valsartan they purchased prior to the recalls?
3    A.   I think if you look at my concluding
4   opinions, we have to pay attention to that.
5    Q.   Of course.
6    A.   My opinions are they were not adulterated.
7   They were pharmaceutically equivalent and
8   bioequivalent, and they were AB-rated.  They were
9   not misbranded.
10    Q.   Right.  I'm --
11    A.   So I think I'm answering your question and
12   speaking specifically to my opinions.
13    Q.   Right.  I'm looking at your conclusions,
14   Doctor, at the very last page of your report, and I
15   don't see anything about opinions on who might have
16   received what value for valsartan products, so
17   that's what I'm trying to understand here.
18    A.   I guess if I wanted to extend my
19   conclusions, my opinions to this particular
20   paragraph, I would say third-party payors got value.
21    Q.   Uh-huh.  And again, you define the value
22   that the third-party payors got as what?
23    A.   In terms of getting a safe and effective
24   product that could be used to treat patients in
25   accordance with labeled indications.

Confidential Information Subject to Protective Order

Page 254

1    Q.   And you are including in your definition
2  of a safe and effective drug products that have
3  nitrosamines in them, right?
4    A.   Yes.  And we know the products can have
5  nitrosamines in them.
6    Q.   Including products that had nitrosamines
7  above the FDA's eventual limits, correct?
8    A.   Well, that's the debatable point, and I'm
9  saying I just don't know if they had any different
10 safety and efficacy compared to the products below
11 that limit.
12   Q.   Got it.  You are not a -- you don't know
13 one way or the other whether a valsartan drug that
14 contains nitrosamines above the now-current FDA
15 limits had a different safety profile than valsartan
16 with nitrosamines below the now-current limits?
17   A.   I think you are stating that correctly,
18 Mr. Stanoch.
19   Q.   Uh-huh.  Do patients have a choice when it
20 comes to the drugs that they are prescribed?
21       MS. LOCKARD:  Objection.  Speculation.
22 Outside the scope.
23       THE WITNESS:  Well, they can certainly
24 talk to their doctors, and FDA encourages that, of
25 course.  I would encourage it if I were at FDA.  And

Page 255

1  I would say, yes, they do have a choice.
2  BY MR. STANOCH:
3    Q.   But they would have no way of knowing,
4  would they, about whether the valsartan they
5  received prior to the recalls contained nitrosamines
6  or not, right?
7    A.   Well, I'll make the general statement that
8  I don't think any label for a new drug approved by
9  the NDA or ANDA process has information about
10 impurities on the label.
11   Q.   Uh-huh.  So then based on the --
12 valsartan's labeling part of the recalls, there is
13 no way a consumer would be able to make a decision
14 as to whether they wanted a valsartan product that
15 did or did not contain nitrosamines?
16   A.   The only way they would know in this
17 particular instance is to read the FDA press
18 releases and talk to their physicians and
19 pharmacists.
20   Q.   Right.  And prior to those FDA press
21 releases, there was no way for them to know based on
22 the labeling alone?
23   A.   Well, I think that's generally true, but
24 I'm not sure entirely.
25   Q.   Okay.  Let's mark another exhibit.  Stand

Page 256

1  by, Doctor.
2       (Whereupon, Exhibit 14 was marked for
3  identification.)
4  BY MR. STANOCH:
5    Q.   This is Exhibit 14.  It should be Tab 32
6  in your binder.  Tell me when you are there, sir.
7    A.   Yes, I see this.  Begins, "Expert:
8  Nitrosamines 'Can Slip Through.'"
9    Q.   Correct.  It's an article in Pharmacy
10 Times from June 29, 2021.  Do you see that?
11   A.   Yes, I do see it.
12   Q.   And it says it includes a discussion with
13 "Edwin Gump, Ph.D., vice president of the Small
14 Modules Department at U.S. Pharmacopeia (USP)."  Do
15 you see that?
16   A.   Yes, I do see that.
17   Q.   Are you familiar with Dr. Gump?
18   A.   No, I'm not.
19   Q.   Are you familiar with the Small Molecules
20 Department at USP?
21   A.   Yes, I think I would -- I am familiar with
22 that.
23   Q.   Uh-huh.  And then if you want to -- if you
24 would flip to the third page of this document, sir.
25 Tell me when you are there.

Page 257

1       MS. LOCKARD:  You can -- to review it if
2  you need to.
3       THE WITNESS:  Yeah, I'm looking at the
4  whole document just a second.  It appears to be an
5  interview between a reporter, Alana, and Dr. Gump in
6  a publication for Pharmacy Times.  So you want me to
7  go to the third page?  One, two, three?
8  BY MR. STANOCH:
9    Q.   Yes.  Yep.
10   A.   At the top it starts with, "class"?
11   Q.   Yes, sir.  If you could --
12   A.   Okay.  Got it.
13   Q.   Great.  If you can go on that page down,
14 do you see the bolded name of the reporter, "Alana";
15 you see that?
16   A.   I do see that.
17   Q.   Uh-huh.  And she asks, "Right.  Why are
18 nitrosamines of such particular concern?"  You see
19 that?
20   A.   Yes, yes.
21   Q.   And why don't you read Dr. Gump's response
22 to that question, that first paragraph there,
23 beginning, "So"?
24   A.   "So, I'm not a toxicologist, but
25 nitrosamines, from my reading, these are compounds

Page 258

1 that have been studied for a number of years.
2 There's at least a number of compounds in this class
3 that are known mutagenic carcinogens. So, they're
4 basically fairly nasty cancer-causing actives."
5        Should I stop there?
6    Q.  Yes. That's fine. I can ask questions on
7 that.
8        So do you agree with Dr. Gump that
9 nitrosamines are fairly nasty cancer-causing
10 actives?
11       MS. LOCKARD: Objection. Outside the
12 scope of his expert opinion in the
13 class-certification phase. You are asking him
14 causation opinions.
15       THE WITNESS: Well, I guess what I would
16 agree with is Dr. Gump says he is not a
17 toxicologist, and neither am I, so I agree with him
18 there.
19 BY MR. STANOCH:
20    Q.  So would you agree with him that
21 nitrosamines are fairly nasty cancer-causing
22 actives?
23       MS. LOCKARD: Objection. Outside the
24 scope of his testimony. Asked and answered.
25       THE WITNESS: You know, I don't agree with

Page 259

1 him there. That seems to be a fairly off-the-cuff
2 comment that would take a very sophisticated expert
3 to speak about the clinical impact of a particular
4 nitrosamine impurity.
5 BY MR. STANOCH:
6    Q.  Uh-huh. Then would you agree with
7 Dr. Gump that nitrosamines are compounds that have
8 been studied for a number of years?
9    A.  Yes, I think that's true. I would agree
10 with that.
11   Q.  Uh-huh. Okay. Then why don't you move to
12 the last paragraph of that same page? It reads,
13 "But the one place."
14   A.  "But the one place that people don't
15 really have a choice -- you can choose not to eat
16 that grilled burger -- but people shouldn't have to
17 make a choice" to "have concerns about the quality
18 of their medicines."
19   Q.  Right. Do you agree with that statement
20 from Dr. Gump?
21   A.  Well, again, these seem kind of very
22 general, unscientific statements. I mean, people
23 shouldn't have to make a -- can choose not to drink
24 your water that has nitrosamines. Does he want to
25 say that, that people should not drink their water?

Page 260

1 I mean, these are very general statements, but I
2 don't have a particular opinion about them, and they
3 don't relate to my report.
4    Q.  Well, respectfully, sir, you are opining
5 on the value received from the drugs that are at
6 issue here. And I'm asking you, then, here if you
7 agree with Dr. Gump from the USP Small Molecule
8 Department about whether people don't really have a
9 choice when it comes to their drugs as opposed to
10 different foodstuffs and other things.
11   A.  Is it --
12       MS. LOCKARD: There is not a question
13 pending.
14       THE WITNESS: I just don't understand the
15 question. I mean, was there a question? Could you
16 rephrase it, perhaps, Mr. Stanoch?
17 BY MR. STANOCH:
18   Q.  Do you agree that people can choose not to
19 eat their grilled burger, but people shouldn't have
20 to make a choice or have concerns about the quality
21 of their medicines?
22       MS. LOCKARD: Objection. Vague. Outside
23 the scope of his testimony for class certification.
24       THE WITNESS: And, you know, just
25 continuing on, you know, we can certainly

Page 261

1 cherry-pick statements out of this, but on the next
2 page it says, "The U.S. medicines supply is probably
3 the safest, or safe as any in the world, and we want
4 to make sure that the public really feels confident"
5 about "when they need to take a medicine that they
6 can do so and not have other things they have to
7 concern themselves about like nitrosamines."
8        I can certainly agree with that.
9 BY MR. STANOCH:
10   Q.  You are agreeing to a different statement
11 that I didn't ask you about; is that what you just
12 did, Doctor?
13   A.  Well, you are asking me to read at the
14 bottom of -- maybe I misread where you asked me to
15 read. If so, I apologize.
16   Q.  Well, we have been at the same page,
17 Doctor.
18   A.  Well, maybe I skipped over a page. Yes,
19 you had me read at the bottom of page 3; is that
20 correct, Mr. Stanoch?
21   Q.  Yes, sir.
22   A.  Yes, okay. I'm sorry. I jumped ahead.
23   Q.  Again, do you agree with Dr. Gump's
24 statement in that paragraph, "But the one place that
25 people don't really have a choice -- you can choose

Confidential Information – Subject to Protective Order

Page 262

1 not to eat that grilled burger -- but people
2 shouldn't have to make a choice or have concerns
3 about the quality of their medicines"?
4        MS. LOCKARD: Objection. Vague. Outside
5 the scope of the expert witness report on class
6 certification.
7        THE WITNESS: If you are asking me if I
8 agree with Dr. Gump, I have to say I don't because,
9 you know, the presence of nitrosamine in food and
10 water and foodstuff is very uncertain, and it's
11 certainly not anything I talked about in my report.
12 But I'm not sure people can choose their foods and
13 their water so that they avoid nitrosamines. I just
14 don't know that.
15        Maybe he could make that point with regard
16 to a grilled burger, but what about all the other
17 grilled products and all the other foods that have
18 nitrosamines? It's a very general, if I may say,
19 uninformed statement, so that's why I am hesitating
20 to agree with it.
21 BY MR. STANOCH:
22     Q. So you don't agree?
23     A. I certainly agree that we need to control
24 nitrosamines in our medicines, and that's what this
25 entire effort, which began in 2018, is all about.

Page 263

1     Q. Are you aware of any efforts to control
2 nitrosamines in drug products prior to 2018?
3     A. I am not aware of that, Mr. Stanoch.
4     Q. Uh-huh. Would that be pertinent to the
5 opinions you are offering currently in this case?
6     A. I think it is generally in the sense that
7 science marches on, FDA marches on, drug regulation
8 gets better. We have many, many examples of that in
9 the United States.
10        And is it perfect? Are drugs perfect now?
11 No. But we can hope that in 10 or 20 years they
12 will be better than they are now. And what we see
13 happening here is an example of that happening with
14 regard to valsartan and nitrosamines.
15     Q. So you agree, then, that if information
16 was made known to a API manufacturer prior to the
17 2018 recalls about the potential for nitrosamine
18 impurities, that that should have been something
19 that was dealt with at that time, correct?
20        MS. LOCKARD: Objection. Vague.
21        THE WITNESS: I can't agree with it. It
22 does seem very vague. Perhaps you can restate the
23 question.
24 BY MR. STANOCH:
25     Q. Well, it sounds like you are saying nobody

Page 264

1 knew about nitrosamines until the summer of 2018,
2 right?
3     A. That's what FDA says. I'm not saying
4 that.
5     Q. Uh-huh. Well, you are opining that
6 allegedly the FDA said it was unexpected and nobody
7 knew about it until summer of 2018, right?
8     A. Yes, FDA made a series of statements along
9 those lines.
10     Q. Right.
11     A. And it's definitely a part of my report.
12     Q. It certainly is. I can agree with that.
13        And then once the information came to
14 light about the nitrosamine impurities in valsartan,
15 the regulators in the industry took action, right?
16     A. Well, there was a series of events that
17 now have extended over the past four years and
18 extends to all the chemically synthesized drugs in
19 the country. So I guess you could say it's a very
20 comprehensive set of activities.
21     Q. And if that series of events -- oh, strike
22 that.
23        And if the information about nitrosamine
24 impurities in valsartan came to light earlier, that
25 series of events would have started earlier,

Page 265

1 correct?
2        MS. LOCKARD: Objection. Vague.
3        THE WITNESS: I suppose you could make
4 that hypothetical, and I wouldn't debate you.
5 BY MR. STANOCH:
6     Q. Let's flip to the fourth page of the
7 article in front of you, Doctor.
8     A. One, two, three, four. Okay. Is this the
9 page that starts at the top, "ones that" "need"?
10     Q. Correct, sir. If you can go down to the
11 paragraph where Mr. Gump's name is bolded again, and
12 it begins, "That's a great question." Do you see
13 that?
14     A. Yes, Dr. Gump, "That's a great question."
15     Q. Right. And then can you read the next
16 sentence?
17     A. "So, I think I mentioned that
18 manufacturers have a responsibility to evaluate
19 their processes and their products and look for
20 chance where they could have a risk of
21 nitrosamines."
22     Q. Do you agree with that statement?
23     A. Well, certainly, because Dr. Gump is
24 echoing the FDA guidance that came out well before
25 this interview --

Page 266

1  Q.  Uh-huh.

2  A.  -- particularly in February 2021, and this

3  is the end of June 2021.

4  Q.  Uh-huh.

5  A.  Dr. Gump, if I may say so, is on very safe

6  ground.

7  Q.  And would --

8     (Reporter clarification.)

9     THE WITNESS:  Safe ground, S-A-F-E.

10 BY MR. STANOCH:

11 Q.  Would you agree that prior to summer of

12 2018 manufacturers had a responsibility to evaluate

13 their processes and their products to look for the

14 chances of genotoxic impurities?

15    MS. LOCKARD:  Objection.  Outside the

16 scope.

17    THE WITNESS:  Yes, I think that is what

18 the guidance that we looked at before speaks to, and

19 that had a date -- I guess it was a final date of

20 2018.

21 BY MR. STANOCH:

22 Q.  You are referring to the ICH guidance,

23 correct?

24 A.  Yes, the M7.

25 Q.  Right.  And then there were prior

Page 267

1  iterations of that same guidance, right?

2  A.  Yes.  And other guidances, too, an ICH

3  guidance and, I believe, an EMA guidance.

4  Q.  Uh-huh.  And manufacturers would have

5  responsibilities to evaluate their processes and

6  products for genotoxic impurities under the prior

7  iterations of the ICH and EMA guidance, whatever

8  they may be at that period of time, right?

9  A.  Yes, and there are certainly other

10 statements in Dr. Gump's interview that we could

11 look to.  But I'll wait for your questions,

12 Mr. Stanoch.

13 Q.  Okay.  Very good.  So why don't we

14 actually put that aside for now, Doctor.

15    Some other questions about your

16 professional experience, sir.

17 A.  Yes, please.

18 Q.  You are not a Pharm.D., correct?

19 A.  I am not.

20 Q.  Have you ever dispensed a drug?

21 A.  I have not.

22 Q.  Have you ever prescribed any valsartan or

23 Diovan?

24 A.  I have not.

25 Q.  Have you prescribed any drug since 1990?

Page 268

1  A.  You know, actually, I haven't.  I don't

2  write prescriptions.

3  Q.  Do you know what a pharmacy and

4  therapeutics committee is?

5  A.  I do.

6  Q.  Okay.  And what is that?

7  A.  Well, I would say it's a group of experts

8  that build a formulary for a defined benefit offered

9  to a community.  So, for example, a hospital, a big

10 hospital in an inner city may have a P&T committee

11 that builds a formulary that the physicians and

12 pharmacists in that community can use to write and

13 dispense drugs -- write prescriptions and dispense

14 drugs.

15 Q.  We can call that pharmacy and therapeutics

16 committee a P&T committee, right?

17 A.  Yes, sir.

18 Q.  Have you ever served on a P&T committee?

19 A.  No.

20 Q.  Have you ever consulted with any P&T

21 committee?

22 A.  Well, I remember during my days at USP I

23 met with the Kaiser P&T committee to discuss how

24 they work, but I wouldn't call that a consultation.

25 Q.  Okay.  The --

Page 269

1  A.  They weren't asking my opinion.  It was

2  more an exchange of information.

3  Q.  Fair enough.  And roughly when was that?

4  A.  Oh, gee.  2010.

5  Q.  2010.  Have you ever been asked by any

6  third-party payor to consult on their formulary

7  designs?

8  A.  No.  But I should mention perhaps at this

9  point that USP was asked to consider model

10 guidelines for formularies as part of the Medicare

11 Part D benefit.  And that was a large effort for the

12 organization when I was there, and as far as I know,

13 it's still continuing.

14 Q.  Were you part of that effort while you

15 were working at USP?

16 A.  Yes, as a matter of fact, I chaired an

17 expert committee which created the first model

18 guidelines, and that was a very interesting effort.

19 Q.  Uh-huh.  And what are the name of the

20 guidelines?

21 A.  I would call them the USP model guidelines

22 for the Part D -- to assess Part D formulary plans.

23 Q.  Uh-huh.  You are not opining here, Doctor,

24 about what information a P&T committee relies on

25 when making decisions about reimbursements for drug

Confidential Information Subject to Protective Order

Page 270

1  products, correct?
2      A.  No, I am not.
3      Q.  All right.  Have you ever worked for a
4  third-party payor?
5      A.  I have not.
6      Q.  Do you know what a PBM is?
7      A.  It's a pharmacy benefit manager.
8      Q.  Have you ever worked for a PBM?
9      A.  No, I have not.
10     Q.  Have you ever consulted with a PBM
11  professionally?
12     A.  No, I haven't.
13     Q.  Right.  You are not here to opine on
14  anything a PBM might rely on when it's making any
15  determinations regarding a pharmacy benefit,
16  correct?
17     A.  No.  No.  I don't believe that's any part
18  of my opinions.
19     Q.  Okay.  Let's mark another exhibit.  Stand
20  by.
21         (Whereupon, Exhibit 15 was marked for
22  identification.)
23  BY MR. STANOCH:
24     Q.   This is Exhibit 15.  It should be Tab 31
25  in your binder, sir.  Just let me know when you are

Page 271

1  there.
2      A.  I think it's coming toward me.
3         Okay.  I see something called ProPharma
4  Group.
5      Q.  Right.  And you can look through these
6  pages, but this is all of the invoices that were
7  produced to us for your work in this case.  And if
8  you can just look through them and confirm that this
9  is the totality of the invoices for your work thus
10  far in this case.
11     A.  ProPharma.  I'm a little confused about
12  ProPharma Group.  Oh, maybe I shouldn't be confused
13  about that group.  Okay, yes, I see these are my
14  invoices, and these invoices should be concurrent
15  until the end of January of this year.  Okay.
16     Q.  Right.  I mean, the first few pages, I see
17  the ProPharma Group, dated 11/30/21.  Do you see
18  that?
19     A.  11/30/2021, yes, I do see that.
20     Q.  Right.  And then the next few pages is for
21  work from an invoice dated 12/31/21, right?
22     A.  Yes, I submit my hours monthly.
23     Q.  And then the next page after that is an
24  invoice for your work through January 31, 2022,
25  right?

Page 272

1      A.  Well, wait a minute.  I see a third page
2  that looked like July 2021.  Yes, that could be
3  true.
4      Q.  Right.  Well, I guess there is a couple
5  things here.  First is:  Why do some of your
6  invoices say ProPharma Group and the other one at
7  the end says NDA Partners?
8      A.  My consulting group, NDA Partners, was
9  sold in 2021 to a larger company called Planet
10  Pharma, and then Planet Pharma in turn merged with
11  ProPharma, so the overarching organization for my
12  consulting group, which still exists as NDA
13  Partners, is ProPharma Group.
14     Q.  Got it.
15     A.  And they do the billing.
16     Q.  Did anyone at NDA Partners or ProPharma
17  Group assist you in the preparation of your report
18  that you submitted in this case?
19     A.  No, not at all.
20     Q.  Okay.  You and you alone wrote your
21  report?
22     A.  Yes, I think that's quite true.  I wrote
23  this report.
24     Q.  And the invoice at the end that is on the
25  NDA Partners letterhead, it's dated 7/31/2021?

Page 273

1      A.  Yeah, I think we may be looking at the
2  transition from NDA Partners to ProPharma --
3      Q.  Uh-huh.
4      A.  -- so that's an interesting observation.
5      Q.  And it looks like your first billed work
6  in this matter was 7/1/2021, right?
7      A.  That's when I was first contacted by
8  counsel, and then there was a hiatus.  I really
9  didn't begin substantive work on this report until
10  November.  You can see that in the invoices.
11         And the reason I didn't do any detailed
12  work in July until November was because I was not
13  involved in the causation discussions.
14     Q.  Then if you look on the ProPharma Group
15  invoice dated 1/31/2022, the first entry is for work
16  on January 3rd, 2022, correct?
17     A.  Wait a minute.  I'm having trouble
18  catching up with you.  But I'm setting aside the
19  July one.  Now there is one -- I see a July invoice.
20  If that's what you are talking about, yes, I see
21  that invoice.
22     Q.  And just to go through this, a few things.
23  You say, "Review 82 documents in triplicate."  Do
24  you see that?
25     A.  Yes, I do.

Confidential Information Subject to Protective Order

Page 274

1    Q.   What do you mean by "in triplicate"?
2    A.   Well, I'm laughing a little bit because I
3 think I got the same folder three times.  I had to
4 check with counsel many times to make sure that they
5 were the same documents in the three folders.  So
6 that's what that was all about, and I did have a
7 good review with counsel about the materials I
8 received and where it was all filed.
9    Q.   Uh-huh.  And then further down here, you
10 have some entries for, "Read DB deposition," "Read
11 EG deposition"; do you see those?
12    A.   Yes, those refer -- for example, "EG"
13 refers to Elizabeth Gray.  The "DB" refers, I
14 believe, to Daniel Barreto.
15    Q.   Uh-huh.
16    A.   And then you can see Panagos expert
17 reports.
18    Q.   Uh-huh.  And then that last entry, should
19 that be DB deposition as well?
20    A.   Well, I'm not sure about that.  No, I
21 think it may be a Binsol deposition.
22    Q.   Uh-huh.  So sometimes you listed the
23 specific deposition you read, and sometimes you
24 didn't, it looks like; is that right?
25    A.   I could agree that the way I fill out my

Page 275

1 hours might not be entirely consistent.
2    Q.   And I'm not going to take issue with that,
3 Doctor.  I just want to make sure, though, that even
4 if you call out specific deposition transcripts here
5 in your invoices, is it your position that you did
6 review all the deposition transcripts that were in
7 your materials considered?
8    A.   No, I didn't look at all the depositions.
9 I selected certain depositions that seemed
10 particularly important.
11    Q.   Which ones, then, did you review?
12    A.   Well, we can see from this, I would say
13 Daniel Barreto, Elizabeth Gray and Mr. Binsol.
14 There may have been others, but I might have left
15 them out of my invoice.
16    Q.   Uh-huh.  And if you flip back to the -- I
17 guess the second page.
18    A.   I'm trying to stay with you on page
19 numbers.
20    Q.   Well, I guess it -- yeah, I guess it would
21 be page 1 of 2.
22    A.   Is this December?
23    Q.   Yes.  December 31, 2021.
24    A.   Yes, I'm looking at all that.
25    Q.   Uh-huh.

Page 276

1    A.   How can I assist?
2    Q.   When you say, "Write CBE-30," are you
3 referring to sections of your report?
4    A.   Yes.
5    Q.   Okay.  You weren't writing a CBE-30
6 separately outside of your work, right?
7    A.   Not at all.  Oh, no, no, that would not be
8 true.
9    Q.   Uh-huh.  And when you say, "Attempt to
10 review ANDA files," what does that mean?
11    A.   Well, ANDA, as you know, the ANDA files
12 were very broad and deep and complex.  So I would
13 say I could review them from a high level, but I
14 would not claim that -- I certainly wouldn't claim
15 to counsel that I was reviewing the ANDAs in detail.
16    Q.   Got it.  And it looks that throughout all
17 of your invoice work, your rate was the same, the
18 $695 an hour?
19    A.   Yes.  And remember, that is what goes to
20 the company.  That's not what comes to me.
21    Q.   Uh-huh.  What portion do you get?
22    A.   It's 80 percent.
23    Q.   Okay.  And you don't need a calculator,
24 Doctor, unless you want it, but ballpark it looks
25 like the invoices for your work to date for this

Page 277

1 matter is approximately $90,000 or so?
2    A.   Yes.  Let's say 80 percent of that would
3 come to me, if we're calculating it that way.
4    Q.   Understood.  All right.  You can put those
5 aside for now.  Thank you.
6         Can you pull up your -- I guess it would
7 be Exhibit A to your report, sir.  I'm looking at
8 page 28 of 29 of Exhibit A.  It's your prior
9 deposition testimony.
10    A.   Yes, I think it's coming to me.  Just a
11 second.
12    Q.   Sure.  Let me know when you are there.
13    A.   Wait a minute.  I have it in my CV here.
14         (Whereupon, a brief discussion off the
15 record.)
16         THE WITNESS:  I should have it in front of
17 me.  Hold on just a sec.
18         MS. LOCKARD:  Here you go.
19         THE WITNESS:  Oh.
20         Okay.  I'm with you, Mr. Stanoch.  Please
21 proceed.
22 BY MR. STANOCH:
23    Q.   Great.  And here you have listed, it looks
24 like, 14 matters in the last four years, right?
25    A.   I'm counting 20, with the most recent

Page 278

1 being the trial testimony in November 17th. Are you
2 cutting off some because they are not in the last
3 four years?
4    Q. Oh, no, I'm sorry. The one I'm looking
5 at -- maybe I have an older version in front of
6 me -- only had 14 numbered entries. Let me look at
7 something else.
8    A. It got cut off, but I see 20 in my CV in
9 the final pages. But you may be right if we are
10 just counting the last four years.
11    Q. Well, how many numbered matters do you
12 have in the version that you are looking at, Doctor,
13 20?
14    A. I have 20, yes.
15    Q. Okay. And starting from the top of that,
16 could you -- I just want to know what party you were
17 retained by and in whose behalf you were offering
18 opinions.
19    A. Oh, the first one I actually can't
20 remember. I'd have to look it up to tell you.
21       The second one was sort of a -- it was
22 a -- I could say it this way. It was a squabble
23 between a lot of people. It really didn't have
24 much -- it didn't have anything to do with FDA,
25 really. And it was an individual where some people

Page 279

1 were complaining that he had taken intellectual
2 property from a firm.
3       Supernus versus Actavis I think was a
4 patent issue, and I was on the Supernus side.
5       The fourth one I think was antitrust.
6       The fifth one was a debate about a generic
7 company versus Shire, and I was on the Shire side.
8       Solodyn was antitrust. I was on the part
9 of plaintiffs.
10       Loestrin I think was antitrust, and that
11 was on the part of plaintiffs.
12       Arbor versus ANI was sort of a company
13 squabble, and I was on the ANI side.
14       Fresenius Kabi and Par was an argument
15 about -- I'm summarizing very briefly, but I think
16 it was restraint of trade, and I was on the Par
17 side. They were the defendants, as I recall.
18       Galderma versus Teva was patent, and I was
19 on the Teva side as the -- I'm struggling with what
20 they were. Yeah, they got sued, so they were the
21 defendant.
22       Belcher versus Hospira. I don't remember
23 that one. I'd have to look it up. I apologize.
24       Continuing, Vision versus Sunrise, that
25 was a sort of company squabble over GMPs.

Page 280

1       Restasis was antitrust.
2       Biogen was -- versus Acorda was related to
3 an FDA guidance where I offered testimony.
4       Stewart, Sandoz was failure to warn.
5       Glumetza was antitrust, and that's still
6 active.
7       Braeburn versus Camurus, that was a
8 company squabble where I was on the side of
9 Braeburn.
10       And then Ranbaxy is still -- I'm sorry.
11 The Glumetza, I think, settled, and the Ranbaxy is
12 still in progress, but it's antitrust. I'm on the
13 side of the plaintiffs.
14       Genentech versus InterMune was patent. I
15 was on the side of InterMune, the pioneer.
16       Mallinckrodt versus debtors, that was a
17 squabble between third-party payors, if you will,
18 and Mallinckrodt, and I was on the Mallinckrodt
19 side.
20       Is that helpful, Mr. Stanoch?
21    Q. No, it is. I appreciate you going through
22 that.
23       And, Doctor, for the prior cases you have
24 offered expert opinions in, for those that are class
25 actions, is it fair to say you have always been

Page 281

1 retained by a defendant in those actions?
2    A. You know, I'm not sure that I would
3 identify any of those as class actions. I have to
4 say I'm a little uncertain about just what a class
5 action is, and so I couldn't say I was on one side
6 or the other.
7       If you say an antitrust is a class action,
8 I think I would agree with you that I'm usually on
9 the side of plaintiffs, but I have one now where I
10 believe it's antitrust and I'm on the side of the
11 pioneer --
12    Q. But you just said --
13    A. -- so I don't think I can agree with you
14 that I'm always on one side versus another.
15    Q. Uh-huh. But you are on the side of the
16 defendants now in this case, right?
17    A. Yes.
18    Q. All right. And, the extent you remember,
19 just go through and tell me where you think you were
20 on the side of the defendants in your list of cases.
21    A. Oh, dear. Well, I'll give some examples.
22 I think Mallinckrodt was the defendant. They were
23 getting -- in Genentech I was on the side of the
24 plaintiff.
25       Ranbaxy, I was on the side of plaintiff.

Page 282

1    Braeburn, I think they were the
2 defendants.
3    At Stewart, I was on the side of Sandoz.
4 That was the defendants.
5    Can't remember Biogen.
6    Restasis I was on the side of the payors,
7 so they would be the plaintiffs.
8    I better stop there because I'm a little
9 uncertain about my answers.
10   Q.  Okay.  If you are uncertain, that's okay,
11 Doctor.  I don't need you to guess.  That's quite
12 all right.
13   Stand by.
14   MS. LOCKARD:  We have been going over an
15 hour, so if you get to a good breaking point, that
16 would be helpful.
17 BY MR. STANOCH:
18   Q.  All right.  Doctor, I just want --
19   MR. STANOCH:  Yeah, we'll take a break
20 soon, Counsel.
21   Q.  Doctor, I just want to go back to your --
22 oh, what was it, Tab -- I think it was Exhibit 2.
23 It was Exhibit 2, sir.  It was the Roger Williams
24 list of materials considered, 2/17/2022.
25   A.  Yes, I have that before me, Mr. Stanoch.

Page 283

1    Q.  And I want to make sure I understood this.
2 So the materials listed here, you may or may not
3 have looked at some of these things, but you are
4 only relying on them for purposes of your report if
5 they are cited in the body or footnotes of your
6 report, right?
7    A.  Yes, I think that's a fair summary.
8    Q.  Fine.
9    MR. STANOCH:  Let's take a break, then.
10   THE VIDEOGRAPHER:  Okay.  We are going off
11 the record.  The time is 3:00 p.m.
12   (Whereupon, a brief recess was taken.)
13   THE VIDEOGRAPHER:  Okay.  We are coming
14 back on the record.  The time on the video monitor
15 is 3:35.  Please begin.
16 BY MR. STANOCH:
17   Q.  Okay.  Welcome back, Doctor.  During that
18 lengthy break, did you talk to anyone besides your
19 counsel?
20   A.  No, not at all.
21   Q.  Did you communicate with anyone besides
22 the counsel in the room with you about your
23 testimony?
24   A.  No, not at all.
25   Q.  Did you review any documents?

Page 284

1    A.  No.
2    Q.  Okay.  All right.  I'm going to mark,
3 Doctor, a copy of the CV and your prior testimony in
4 cases which was provided to me by Teva's counsel
5 during the break that will be marked as Exhibit 16.
6    (Whereupon, Exhibit 16 was marked for
7 identification.)
8    MR. STANOCH:  So that should be available
9 to everyone.
10   I will also mark at this time, as
11 Exhibit 17, the video webinar from which the USP
12 excerpt stills were taken.
13   (Whereupon, Exhibit 17 was marked for
14 identification.)
15   MR. STANOCH:  And I have no further
16 questions at this time.  I'll reserve my time
17 pending counsel's questions.  Thank you,
18 Dr. Williams.
19   THE WITNESS:  Thank you, Mr. Stanoch.
20   (Whereupon, a brief discussion off the
21 record.)
22   EXAMINATION
23 BY MS. LOCKARD:
24   Q.  Okay.  Dr. Williams, a copy of your CV was
25 just marked as Exhibit No. 16.

Page 285

1    Do you have a copy of that in front of
2 you?
3    (Whereupon, a brief discussion off the
4 record.)
5    THE WITNESS:  Yes, I do.
6 BY MS. LOCKARD:
7    Q.  All right.  For the benefit of the jury
8 and counsel, can you please give us the benefit of
9 your educational background?
10   MR. STANOCH:  Objection to form.  Beyond
11 the scope.
12 BY MS. LOCKARD:
13   Q.  You can continue.
14   A.  My undergraduate degree was a premed
15 degree, and then after I completed my undergraduate
16 studies, I went to medical school at the University
17 of Chicago.  I stayed on after my medical degree and
18 obtained an internship and residency in internal
19 medicine at the University of Chicago.  And I
20 received honors, both in undergraduate, Phi Beta
21 Kappa, as well as medical school, called AOA, which
22 is the equivalent of Phi Beta Kappa.
23   Then I entered the U.S. Army, and that was
24 a deferred draft, where I stayed for three years.  I
25 actually did research on malaria at Walter Reed

Page 286

1  during the latter half of my service.  In the first
2  half I was stationed in Seoul, Korea.
3      When I finished that service, I entered a
4  clinical pharmacology fellowship at the University
5  of California, San Francisco.  That lasted three
6  years.  And based on my training, I was able to
7  obtain Board certification in both internal medicine
8  and clinical pharmacology.
9      Q.  Were you an officer in the Army?
10     A.  Yes, I was a major.
11     Q.  What licenses have you held?
12     A.  I was licensed to practice medicine in
13  California, but I didn't continue that or my Board
14  certifications when I came to FDA in 1990 because it
15  was a full-time job at FDA and I was not practicing
16  clinical medicine.
17     Q.  Have you held any licenses in
18  pharmacology?
19     A.  Clinical pharmacology.  There is no
20  licensure, but I was Board-certified in clinical
21  pharmacology.
22     Q.  What did you do when you left private
23  practice or -- as a medical doctor?
24     MR. STANOCH:  Objection to form.
25     Go ahead.

Page 287

1      THE WITNESS:  I would say I was never in
2  private practice.  I worked at the University of
3  California, San Francisco, doing clinical
4  investigations for NDA and ANDA sponsors.  And it
5  was there that I built a focus on bioavailability
6  and bioequivalence that I think has continued
7  throughout my career.
8      I spent a year after my service at UCSF in
9  a small company in South San Francisco that was
10  studying an HIV medicine.
11     And then Dr. Carl Peck, who has been a
12  very good mentor and friend, brought me to FDA in
13  1990 to head up the Office of Generic Drugs.  And
14  for those who may remember, that was a difficult
15  time for both the generic industry and FDA.  It had
16  to do with something that briefly is called the
17  generic drug scandal.
18     But I was very pleased to work in the
19  Office of Generic Drugs.  We worked with Congress
20  and with industry to sort of straighten it all out.
21  And I think we did get it straightened out.  We sort
22  of put it back on a solid footing.  And the office
23  has zoomed, if you will, ever since then over the
24  ensuing decades.
25     In 1993, Dr. Peck left, so I came up to

Page 288

1  the level of the center, where I held multiple
2  positions, but I ended my career and the last
3  several years of my time at FDA working as a deputy
4  director for the center director, who was Dr. Janet
5  Woodcock at the time.  Dr. Woodcock is now the
6  commissioner of FDA on an acting basis.
7      And in my role as deputy center director,
8  I had a lot of responsibilities, but I was
9  principally the director of the Office of
10  Pharmaceutical Science.  That office is now the
11  Office of Pharmaceutical Quality at FDA.  And I had
12  oversight for the Office of Generic Drugs, the
13  Office of Clinical Pharmacology and Biopharmaceutics
14  and the Office of Testing and Research and also the
15  Office of Chemistry.  So I had a terrific experience
16  overseeing about four or five of the disciplines
17  that contribute to the review of an NDA, as well as
18  oversight for the Office of Generic Drugs and many
19  other responsibilities.
20     I then left FDA in 2000.  I became chief
21  executive officer and chair of the Council of
22  Experts.  And I would say over my 14-year period
23  there was a rapid expansion of USP, a globalization
24  of our activities, a focus on the science of
25  metrology, which I think is the undergirding science

Page 289

1  for what USP does, and the addition of a lot of
2  compendia.
3      USP started out, when I was there, with
4  USP-NF.  Those are official compendia of the United
5  States.  But we added Food Chemical Codex, a Dietary
6  Supplement Compendium.  We even experimented with a
7  novel compendium that we called the Medicines
8  Compendium.
9      And overall it was a very remarkable
10  experience, and I am forever grateful for having
11  that experience.
12     Q.  What --
13     A.  After leaving USP, I became a consultant
14  at the invitation of Dr. Peck again.  Dr. Peck has
15  been a great mentor, and he was the center director
16  who brought me to FDA.  And I have continued doing
17  consulting in his consulting group, called NDA
18  Partners, as we have discussed, and over the last
19  several years I've focused primarily on litigation.
20     Q.  How many years were you at the FDA,
21  Dr. Williams?
22     MR. STANOCH:  Objection to the form.
23     THE WITNESS:  Ten.
24  BY MS. LOCKARD:
25     Q.  How many years were you at the United

Page 290

1 States Pharmacopeial Convention, the USP?

2     A.  Fourteen.

3         MR. STANOCH:  Same objection.

4 BY MS. LOCKARD:

5     Q.  What year did you leave the USP?

6     A.  It was the beginning of 2014.

7     Q.  And your CV that was marked as Exhibit 16,

8 I was following along, but it has the dates and

9 specific responsibilities and titles for your

10 positions at FDA, USP and otherwise.  Is that still

11 accurate?

12     A.  Yes, no changes.

13     Q.  There are a number of honors and awards

14 listed here in your CV.  Are those still active?

15         MR. STANOCH:  Objection.

16         THE WITNESS:  Yes, no changes.

17         (Reporter clarification.)

18         THE WITNESS:  No changes in those honors

19 and awards.

20 BY MS. LOCKARD:

21     Q.  Have there been any changes in your board

22 memberships or research awards listed on your CV?

23     A.  No, none.  And I would say in my quasi

24 retirement that's all been -- it's been replaced, if

25 you will, by the litigation efforts.

Page 291

1     Q.  Have you done any teaching work?

2         MR. STANOCH:  Objection.

3         THE WITNESS:  Yes, I would say at UCSF I

4 taught pharmacy and medical students and also worked

5 with graduate students on their Ph.D.s.

6 BY MS. LOCKARD:

7     Q.  Have you served on any editorial boards?

8         MR. STANOCH:  Objection.

9         THE WITNESS:  I have been a reviewer for

10 multiple journals and --

11 BY MS. LOCKARD:

12     Q.  Any that would be relevant to this

13 litigation?

14         MR. STANOCH:  Uh-huh.  A standing

15 objection to background.

16         Go ahead.

17         THE WITNESS:  Well, yes, I think all of my

18 writings and research in one way or another relate

19 to what we're talking about here in this, the

20 quality of medicines, therapeutic equivalence,

21 substitution, metrology, measurements.  I feel

22 everything in my wheelhouse, if you will, is related

23 to this litigation.

24 BY MS. LOCKARD:

25     Q.  Do you have any estimates in terms of how

Page 292

1 many journal articles you have contributed to?

2     A.  Well, if you add all my publications,

3 including the USP publications, I think we're well

4 over 200.

5     Q.  Have you participated in writing any books

6 or book chapters?

7     A.  Yes, I have done that.

8     Q.  How many of those?

9     A.  I think you would have to look at the CV,

10 but I'm sure we're in the scores, maybe, or between

11 10 and 20.

12     Q.  And are those journal articles and book

13 chapters all listed on your CV, Dr. Williams?

14     A.  Yes, I think the CV is complete.

15     Q.  Oh, I would like to attach as Exhibit 18 a

16 complete copy of your set of materials that we sent

17 for your consideration.  And we have been handed a

18 thumb drive of that which we can get to the court

19 reporter.

20         (Whereupon, Exhibit 18 was marked for

21 identification.)

22         MS. LOCKARD:  Exhibit 18, for the record,

23 is going to be Dr. Williams' file.

24         MR. STANOCH:  Counsel, this is everything

25 listed in the -- what do you call it, the materials

Page 293

1 considered, Exhibit 2?

2         MS. LOCKARD:  That's correct.

3         MR. HARKINS:  Yes, yeah.

4         MS. LOCKARD:  Yes.

5         MR. STANOCH:  Okay.

6         MR. HARKINS:  Also including the copy of

7 the revised list of materials considered that was

8 submitted with the production of those materials two

9 days ago.

10         (Whereupon, a brief discussion off the

11 record.)

12 BY MS. LOCKARD:

13     Q.  All right.  Dr. Williams, you were asked

14 about a document we reviewed earlier today on a

15 break that was identified as Exhibit 3, and it was

16 the GNTM e-mail.  Do you recall being asked about

17 that?

18     A.  I do recall.

19     Q.  And did that document refresh your

20 recollection about how Teva learned of the

21 nitrosamine issue initially?

22         MR. STANOCH:  Objection to form.

23         THE WITNESS:  Yes.

24         MR. STANOCH:  Asked and answered.

25         Go ahead.

Confidential Information - Subject to Protective Order

Page 294

1    THE WITNESS:  Yes.  This is definitely a
2  document I cited.  It was very important to my
3  opinions.
4    And it has a huge distribution list, GNTM,
5  global notice to management, where Teva is
6  communicating to its scores of sites across the
7  globe.
8    And it starts -- it's an incident
9  category, foreign matter, and it says, "On
10  June 20th, 2018, vendor" ZHP "notified Teva that
11  they came to be aware of a previously unknown
12  impurity that may have genotoxic potential."
13  BY MS. LOCKARD:
14    Q.  But let me stop you there and ask:  So
15  does that clarify for you how Teva learned of the
16  potential --
17    A.  Yes.
18    Q.  -- impurity?
19    A.  Yes.
20    MR. STANOCH:  Objection.
21    THE WITNESS:  And then it --
22  BY MS. LOCKARD:
23    Q.  Okay.  And the next question is:  On that
24  date of the initial notification, is there anything
25  there that indicates what the potential impurity

Page 295

1  was?
2    A.  I don't see that here.  I may be missing
3  it, but I don't see that it states the impurity.
4    Q.  You can put that aside for the moment.
5    Are 483s a final agency determination?
6    A.  No.  I would say they are a set of
7  observations from an Office of Regulatory inspector,
8  typically, who is visiting a manufacturing site and
9  writing observations over a several-day period,
10  either in the United States or overseas.
11    Q.  Are warning letters a final agency
12  determination?
13    A.  The way I would say it is the warning
14  letter is an escalation of FDA's concern.  I
15  sometimes say it's kind of a shot across the bow of
16  a company, that they better pay closer attention to
17  what FDA is saying and do something.
18    But even there, the company is allowed to
19  respond, allowed to resolve issues and ultimately
20  allowed to have their manufacturing site cleared of
21  the issues and the inspection closed out by FDA
22  satisfactorily.
23    Q.  So then is a warning letter necessarily a
24  final determination by FDA?
25    MR. STANOCH:  Objection to form.

Page 296

1    THE WITNESS:  No, I would say it is not.
2  BY MS. LOCKARD:
3    Q.  You were asked some questions about
4  Novartis and testing they allegedly did on some of
5  their products.  Do you recall that?
6    A.  I do.
7    Q.  Do you have any information about
8  Novartis' testing of their Diovan or any other
9  products with respect to nitrosamines?
10    A.  No, I don't recall seeing any information,
11  and it was not pertinent to my report.
12    Q.  Do you know why Novartis was testing or
13  what they were testing, if at all?
14    A.  No, I really don't.  I have no information
15  about it that I remember.
16    Q.  -- Novartis testing relevant to any of the
17  opinions you have given to date in this case?
18    MR. STANOCH:  Objection.
19    THE WITNESS:  It is not.
20  BY MS. LOCKARD:
21    Q.  You were asked some questions about the
22  limits of the nitrosamine, either interim limits or
23  permanent limits, by FDA.  Are you offering any
24  opinions about whether those limits were
25  appropriate?

Page 297

1    A.  No, I am not.
2    Q.  Have you endeavored to render any opinions
3  about the testing methodology employed to detect
4  limits of nitrosamines?
5    A.  No, it's not part of my opinion, although
6  I mention it in my report.
7    Q.  Do you have any opinions in this case
8  about whether nitrosamines are or are not
9  carcinogenic?
10    MR. STANOCH:  Objection to form.
11    THE WITNESS:  No, I'm not offering any
12  opinion that speaks to pharmacology/toxicology of
13  the nitrosamines.
14  BY MS. LOCKARD:
15    Q.  Do you intend to offer any opinions about
16  whether nitrosamines in the Teva products were a
17  potential human carcinogen?
18    MR. STANOCH:  Objection to form.
19    THE WITNESS:  No, I don't offer that
20  either.
21  BY MS. LOCKARD:
22    Q.  Counsel made the point earlier today that
23  even if the USP does not provide for testing of
24  nitrosamines, that a manufacturer can still
25  institute its own testing for nitrosamine.

Page 298

1    MR. STANOCH: Objection. There's no
2 question.
3    THE WITNESS: That's absolutely true. A
4 manufacturer can build additional testing into its
5 private specification working with FDA.
6 BY MS. LOCKARD:
7    Q.  Well, in order for a company to initiate
8 testing of a genotoxic impurity, what do they need
9 to know?
10    A.  Well, that relates to something FDA said
11 in some of their public announcements. You have to
12 suspect that it's there. You wouldn't test for it
13 if you didn't think it was there, so you first have
14 to have a suspicion that it's there. And then I
15 would say you would have to see some identifiable
16 peak on a chromatogram that raises your concern, and
17 that would lead into an understanding of looking at
18 the impurity and assessing its genotoxic potential.
19    Q.  Did you in this case endeavor to do an
20 independent assessment, at this stage of the case,
21 whether Teva violated any cGMPs?
22    MR. STANOCH: Objection to form.
23    THE WITNESS: The only thing I did was
24 look at FDA's record of inspections of Teva's GMPs
25 at its Malta and Jerusalem sites, but I didn't do

Page 299

1 any independent evaluation of Teva's GMP adherence.
2 BY MS. LOCKARD:
3    Q.  Have you endeavored to do any independent
4 assessment of Teva's compliance with any of its
5 policies or procedures?
6    A.  No, not at all. That was not part of my
7 report, and then I didn't cite to any documents to
8 that point.
9    Q.  Now, you were asked about the purpose of
10 your report, and you have heard a lot of objections
11 today about the class-certification opinions that
12 you rendered in your report. Do you have an
13 understanding that you have not been asked by me or
14 my firm to provide any liability opinions at this
15 point in time?
16    MR. STANOCH: Objection to form.
17    THE WITNESS: I do understand that.
18 BY MS. LOCKARD:
19    Q.  Have you intended to give liability
20 opinions today?
21    A.  No.
22    MR. STANOCH: Objection. Form.
23    THE WITNESS: I have tried not to give
24 liability opinions.
25

Page 300

1 BY MS. LOCKARD:
2    Q.  Do you understand that at some point we
3 may ask you to review additional materials and
4 render liability opinions?
5    A.  Yes, I understand that may come later on,
6 but it is not happening now.
7    Q.  Are you willing to do that if so asked?
8    A.  Yes.
9    Q.  Are you qualified to do so at certain
10 elements if so asked?
11    MR. STANOCH: Objection. Form.
12    THE WITNESS: I believe so.
13 BY MS. LOCKARD:
14    Q.  You were asked some questions about what
15 do plaintiffs or patients expect; do you remember
16 that?
17    A.  I do remember that.
18    Q.  Do you intend to offer any opinions about
19 plaintiffs' expectations in this case?
20    MR. STANOCH: Objection to form.
21    THE WITNESS: No, I mean, I tried to
22 answer those questions as best I could, but they
23 were not part of my report and not part of my
24 opinions.
25

Page 301

1 BY MS. LOCKARD:
2    Q.  Do you intend to offer any opinions about
3 various choices available to plaintiffs who were
4 prescribed hypertension medications; is that what --
5    MR. STANOCH: Objection to form.
6 BY MS. LOCKARD:
7    Q.  -- hired to do?
8    MR. STANOCH: Sorry. Sorry, Counsel.
9 Objection to form.
10    THE WITNESS: No, I --
11    (Reporter clarification.)
12    MR. STANOCH: I apologize. I was just
13 objecting. I'm sorry, Victoria.
14    THE REPORTER: Okay. So sorry.
15 BY MS. LOCKARD:
16    Q.  I think I said, is that what you were
17 hired to do?
18    A.  No.
19    Q.  And recognizing you have a medical degree,
20 but do you prescribe, consult, discuss with patients
21 hypertension medications?
22    A.  No, not at all. I am not a practicing
23 clinical doctor.
24    Q.  You were also asked to discuss some issues
25 with respect to recycled solvents in the API that

Confidential Information - Subject to Protective Order

Page 302

1 Teva was supplied.  Do you recall that?

2     A.  I do.

3     Q.  And are you familiar with recycled

4 solvents being used in pharmaceutical manufacturing?

5     A.  You know, actually I'm not.  The first

6 time I read about it was when I started reading

7 materials for this report.

8     Q.  Is it something that you would ordinarily

9 be involved in, in terms of your role at USP or FDA,

10 to investigate recycled solvents?

11         MR. STANOCH:  Objection to form.

12         THE WITNESS:  No.  No, really not.  To me

13 it seems more like a GMP issue, and I don't speak as

14 a GMP expert.

15         (Whereupon, a brief discussion off the

16 record.)

17 BY MS. LOCKARD:

18     Q.  So you don't -- bless you.

19         You don't intend to offer any opinions in

20 this case criticizing the use of recycled solvents,

21 do you?

22         MR. STANOCH:  Objection.

23         THE WITNESS:  No.  As far as I can

24 remember from my report, I don't speak at all to

25 recycled solvents, although FDA speaks about that in

Page 303

1 their guidance as a source of nitrosamine

2 impurities.

3 BY MS. LOCKARD:

4     Q.  Which guidance are you referring to?

5     A.  The 2021 nitrosamine impurities guidance.

6     Q.  You aren't aware of any FDA guidance in

7 2018 or prior that identified recycled solvents as a

8 source of impurities, are you?

9     A.  No.  And to me --

10         MR. STANOCH:  Objection.

11         THE WITNESS:  Oh, I'm sorry.

12         To me it's an example of how FDA and

13 industry learned a great deal from this experience

14 beginning in 2018.

15 BY MS. LOCKARD:

16     Q.  Ultimately, is it important to your review

17 and opinions whether Mylan was using recycled

18 solvents or not in the API it supplied Teva?

19         MR. STANOCH:  Objection.

20         THE WITNESS:  No, to me it doesn't impact

21 my report one way or the other.

22 BY MS. LOCKARD:

23     Q.  Does the presence or absence of a quality

24 agreement with Mylan and Teva impact your opinions

25 in your report in any way?

Page 304

1     A.  No.  And my understanding is that a

2 quality agreement is not pertinent to the purchase

3 of a drug substance from a manufacturer by a

4 drug-product manufacturer.

5     Q.  You were asked about Teva's submission of

6 their CBE-30 --

7     A.  Yes.

8     Q.  -- for the change in ZHP supply of API; do

9 you recall that?

10     A.  I do recall that.

11     Q.  Based on your experience, do you have any

12 concerns with the use of the CBE-30 to convey those

13 changes to FDA by Teva?

14         MR. STANOCH:  Objection.

15         THE WITNESS:  No, I think Teva, Watson at

16 the time, was following FDA guidance, and if FDA had

17 any concerns, they could certainly have communicated

18 that to Teva right away.  And they could have asked

19 Teva to wait and they could have converted it to a

20 postapproval supplement.

21 BY MS. LOCKARD:

22     Q.  Did they do that?

23     A.  They did not.  In fact, in both instances,

24 they approved very rapidly the CBE-30, within days

25 of its submission.

Page 305

1     Q.  You were shown a press release about

2 Ranbaxy and a negotiated guilty plea they entered

3 with respect to their products; do you remember

4 that?

5     A.  I do see it.  As a matter of fact, it's

6 still on my screen.  I'm looking at it to my right.

7     Q.  And you have read through this document,

8 or to some extent; is that correct?

9     A.  I have an understanding of what it's

10 saying.

11     Q.  And to the extent that the document itself

12 and the negotiated plea deal suggests that there was

13 some retrospective determination that Ranbaxy

14 products were determined to be adulterated, is that

15 analogous in any way to the situation with Teva's

16 products?

17         MR. STANOCH:  Objection to form.

18         THE WITNESS:  This entire matter with

19 Ranbaxy, to me, it is a completely different set of

20 circumstances.

21         First of all, it involves the Department

22 of Justice.  It has a huge civil penalty.  It

23 involves fraud and false statements to the agency.

24 It certainly involves GMP violations.

25         And what happens when you see an

Confidential Information Subject to Protective Order

Page 306

1  announcement like this, you are seeing the result of
2  years of effort on the part of FDA and the
3  Department of Justice to have Ranbaxy agree to a set
4  of statements, including the statement about
5  adulteration in the prior years.
6       So I would say it has no relationship at
7  all to my current report or my opinions.
8  BY MS. LOCKARD:
9     Q.  So in the Ranbaxy situation, was the
10  language that was referenced about adulteration, to
11  your knowledge, was that the product of negotiation
12  between Ranbaxy --
13       MR. STANOCH:  Objection to the --
14       (Reporter clarification.)
15  BY MS. LOCKARD:
16     Q.  Government?
17       THE REPORTER:  Thank you.
18       MR. STANOCH:  Objection.  Objection.
19       THE WITNESS:  Well, to the extent I know
20  what happened here, and I know it was a very
21  detailed effort on the part of the agency, yes, it
22  was a negotiated settlement where Ranbaxy and FDA
23  and the Department of Justice are agreeing to the
24  statement that appears on my screen.
25

Page 307

1  BY MS. LOCKARD:
2     Q.  To your knowledge, has Teva been involved
3  in any DOJ investigation, criminal proceeding, FDA
4  fines, like that described in the Ranbaxy press
5  release with respect to its --
6     A.  No, I have not --
7       (Whereupon, a brief discussion off the
8  record.)
9  BY MS. LOCKARD:
10     Q.  Okay.  My question to you, Dr. Williams,
11  was:  To your knowledge, has Teva been involved in
12  any DOJ investigation, criminal proceeding, FDA
13  fines or fraud with respect to its valsartan like
14  that that was described in this Ranbaxy press
15  release that you were provided today?
16       MR. STANOCH:  Objection.
17       THE WITNESS:  Not at all.
18  BY MS. LOCKARD:
19     Q.  Does this Ranbaxy press release and the
20  findings in any way undercut your opinions that you
21  have rendered in this case about Teva's valsartan
22  not being adulterated?
23       MR. STANOCH:  Objection.
24       THE WITNESS:  No, not at all.
25

Page 308

1  BY MS. LOCKARD:
2     Q.  The confidentiality of DMFs was discussed
3  earlier today.  Do you remember that?
4     A.  I do.
5     Q.  Is there any part of the DMF that FDA
6  actually considers to be open?
7     A.  If we look at some of the documents I
8  cited, you will see that FDA considers the DMF
9  entirely confidential.  In Europe sometimes they
10  talk about an open part or a closed part, but FDA
11  thinks of it as all closed, all confidential.
12     Q.  You had said that theoretically you
13  suppose companies could decide on their own to
14  share, but are you familiar with that happening in
15  this case?
16       MR. STANOCH:  Objection.
17       THE WITNESS:  I'm not, and it seems
18  unusual.  It seems to undercut the purpose of the
19  DMF, which is to keep some parts of it confidential.
20       What the buyer, in this case the ANDA
21  holder, would see is the certificate of analysis,
22  which is the specification you use to test the drug
23  substance, and that's all they would see.
24  BY MS. LOCKARD:
25     Q.  And in this situation, would you expect

Page 309

1  Teva and its API suppliers to share the DMF or
2  supply Teva with anything other than the certificate
3  of analyses?
4       MR. STANOCH:  Objection to form.
5       THE WITNESS:  I didn't see any documents
6  otherwise, so my belief is that the two
7  drug-substance manufacturers were keeping their DMF
8  confidential, as is typical of the way DMFs are
9  handled.
10  BY MS. LOCKARD:
11     Q.  Right.  So is it surprising to you if you
12  learn that the companies in this case didn't -- did
13  not share the DMF portion?
14     A.  That would not be surprising.
15       MR. STANOCH:  Objection.
16       THE WITNESS:  That would not be
17  surprising.  That would be typical.
18  BY MS. LOCKARD:
19     Q.  Now, you were asked a line of questions
20  referencing back to your report, and it was under
21  "The FDA Drug Approval Process" section in your
22  report.  You were asked about a line that said, "A
23  recall is a voluntary action taken by a company to
24  remove a defective drug product from the market."
25       Do you recall that?

Confidential Information - Subject to Protective Order

Page 310

1    MR. STANOCH:  Objection.
2    THE WITNESS:  I do recall that.
3  BY MS. LOCKARD:
4    Q.  And had you taken that as a quote from an
5  FDA general statement about drug recalls?
6    MR. STANOCH:  Objection.
7    THE WITNESS:  I think if we look at the
8  FDA website and see what it says about recalls, that
9  is what it says.  That's the terminology they use.
10 BY MS. LOCKARD:
11   Q.  Can a recall occur for reasons other than
12 a defective product?
13   MR. STANOCH:  Objection.
14   THE WITNESS:  Well, I would say this is an
15 interesting example, because at the time Teva and
16 FDA agreed to recall their valsartan products, there
17 was no understanding the products were defective.
18 They were not defective.  FDA had not set limits on
19 nitrosamine impurities.  But still FDA and Teva
20 agreed that they should come off the market because
21 of the presence of the nitrosamine impurities.
22   Later on, when FDA set limits, you could
23 say, well, they might have been considered
24 adulterated, but in the summer of 2018, with regard
25 to the ZHP drug substance, I do not see them as

Page 311

1  being defective products.
2  BY MS. LOCKARD:
3    Q.  So just to be clear, do you hold any
4  opinion that the valsartan products that were sold
5  to customers by Teva were sold in a defective state?
6    MR. STANOCH:  Objection to form.
7    THE WITNESS:  I wouldn't use those words,
8  and that is not part of my opinion.
9  BY MS. LOCKARD:
10   Q.  Does the presence -- does the sheer
11 presence of any nitrosamine render a product
12 defective?
13   MR. STANOCH:  Objection to form.
14   THE WITNESS:  No.  I would say,
15 particularly if we look at the nitrosamine guidance,
16 FDA will allow nitrosamine impurities in ingredients
17 and products as long as they stay within acceptable
18 intake limits.
19 BY MS. LOCKARD:
20   Q.  So is it your opinion that if a drug
21 product is sold -- well, strike that.
22     You were asked about Exhibit 14.  See if
23 we can get a copy of that for you.  It was an
24 interview in the Pharmacy Times.
25   A.  I don't think I have that.

Page 312

1    Q.  Let's see, actually.
2    A.  Oh.
3    Q.  Pull that out of my --
4    A.  Oh.
5    Q.  It's there.
6    A.  Yes.  I see it, thank you.
7    Q.  Are you familiar with the Pharmacy Times?
8    A.  Yes, somewhat.
9    Q.  Have you ever seen this article before
10 today?
11   A.  No, I have not.
12   Q.  Do you see what the date on this article
13 was?
14   A.  June 29th, 2021.
15   Q.  Are you familiar with Edwin Gump?
16   A.  I actually am not.
17   Q.  Are you familiar with the Small Molecules
18 Department at U.S. Pharmacopeia, USP?
19   A.  Yes.
20   MR. STANOCH:  Objection.  Form.
21   THE WITNESS:  I would say I helped create
22 that department when I first came to USP in 2000.
23 BY MS. LOCKARD:
24   Q.  There is also a reference on the second
25 page to the USP Nitrosamines Joint Subcommittee.

Page 313

1  Was that a subcommittee in effect at FDA when you
2  were there?
3    A.  No, it was not.
4    Q.  When was that formed, if you know?
5    A.  I actually don't know, and I'm not sure I
6  see where you are reading.  Could you help me,
7  Ms. Lockard?
8    Q.  If you are looking at the bottom of what
9  is page 2.  Are you with me there?
10   A.  Actually, I am still not.  There is
11 something where it speaks to a subcommittee of an
12 expert committee?
13   Q.  Yeah, it is the very end of page 2, where
14 it says "Alana Hippensteele," she says, "That's
15 fascinating."
16   A.  Oh.
17   Q.  "What is the USP Nitrosamines Joint
18 Subcommittee" --
19   A.  Yes, I see.
20   Q.  -- "and why was it established?"  Do you
21 see that?
22   A.  Yes, I can, you know, understand, I think,
23 what that subcommittee was doing and how it was
24 formed.
25   Q.  Okay.  Can you explain briefly your

1  understanding of what it was doing and how it was
2  formed?
3      A.  Well, USP has the Council of Experts,
4  which has many expert committees.  But the expert
5  committees have the possibility of forming
6  subcommittees, drawing on expertise from different
7  committees.  So I see a subcommittee being formed
8  jointly from several expert committees to consider
9  particularly the topic of nitrosamines in
10  small-molecule medicines.
11      Q.  To your knowledge, did the USP
12  Nitrosamines Joint Subcommittee exist before 2018?
13      A.  I don't know that.  As far as I know, it
14  didn't exist.
15      Q.  All right.  So if you turn to page 4, I
16  believe you were asked to read some of the text on
17  this page, and you were asked if you agreed with it.
18  Do you remember that?
19      A.  Page 4.  Is this the one down at the
20  bottom where he's talking about the grilled burger?
21      Q.  Let me see.  I know the pages aren't
22  numbered, which makes it difficult, but I'm just
23  counting three, four.
24      A.  Oh, okay.  All right.  Thank you.
25      Q.  Okay.  So the very last paragraph on

1  page 4, that begins, "So, and again"; do you see
2  that?
3      A.  Yes, I do see that.
4      Q.  Oh, good.  Can you read that paragraph as
5  well?
6      A.  "So, and again, I think I mentioned, we're
7  talking about really ultratrace levels, parts per
8  million, part per billion.  So, these are not easy
9  analyses to perform.  They require highly complex
10  analytical equipment, and with any test, you need to
11  kind of have what's the control to that test."
12      Q.  So do you agree with that statement?
13      A.  I certainly do.
14      Q.  And if you look at the following page,
15  first paragraph.
16      A.  Yes, and I can read it, but I think what
17  USP is doing is talking about its reference
18  materials, and they are talking about reference
19  materials for nitrosamine impurities.
20      Q.  And in Paragraph 2 it says, "So, having
21  the reference standards is a really important tool
22  for manufacturers."
23      A.  Yeah.
24      Q.  Did I read that correctly?
25      A.  Yes, that's quite true.

1      Q.  And if you skip down, midway on the page
2  Edwin Gump is speaking.
3      A.  He is.
4      Q.  He says, "It's a good question.  So, one
5  of the things that I think the pharmaceutical
6  industry has generally for the most part done very
7  well is look at impurities."  Do you agree with
8  that?
9      A.  I do.
10      Q.  He goes on to say, "I think nitrosamines,
11  for the reasons I just described, are kind of a
12  unique case where they can sort of crop up."  Do you
13  agree with that?
14      A.  I do agree with that.
15      Q.  He goes on, "They aren't necessarily
16  readily identified as part of the components during
17  the manufacturing process, and so they sort of slip
18  through."  Is that your understanding as well?
19      A.  I think I could agree with that.
20      Q.  "Whereas, other types of impurities, I
21  think, manufacturers have a" "better handle on how
22  to control those."
23      A.  Yes, I think he is speaking to what I was
24  trying to comment on as well, that there are sort of
25  general ways of dealing with impurities, but the

1  nitrosamine impurities are -- as FDA said, are very
2  unusual, unexpected.  You have to think that they
3  may be there, and then even when you think that,
4  they are at very low levels and require very special
5  techniques to measure.
6      Q.  So towards the bottom of the page,
7  finally, Mr. Gump is saying, "It really is, I think,
8  a lot better than people think.  You tend to hear
9  about the few problems that occur, but you don't
10  hear about the millions or billions of pills that
11  get distributed every year and help people deal with
12  their health conditions."  Do you agree with that
13  sentiment?
14      A.  I can certainly attest to that.
15      Q.  So, Dr. Williams, you know, just to be
16  clear for the record, you weren't really asked much
17  about your report and your opinions in it.  But have
18  you heard anything today that causes you to change
19  your opinions as stated in your expert report?
20          MR. STANOCH:  Objection to form.
21          THE WITNESS:  No, nothing at all.
22  BY MS. LOCKARD:
23      Q.  Have you been shown any documents today or
24  testimony that changes your opinion in any way?
25      A.  No.

Page 318

1    Q.  So in terms of, really, if we can get to
2  the heart of your opinions, what are your core
3  opinions in this case?
4        MR. STANOCH:  Objection.
5        THE WITNESS:  You know, the way I would
6  summarize those, I think they appear in the last
7  page or two of my report, and I'll try to say it
8  this way.
9        Teva's products, all four
10  valsartan-containing drug products were always
11  pharmaceutically equivalent and bioequivalent to the
12  Diovan reference listed drugs made by Novartis.
13  While they were in the market, they were always
14  AB-rated by FDA.  They were not misbranded because
15  FDA required them to have substantively the same
16  label as Diovan.
17        And they were not adulterated in my view
18  until -- and you could even debate it after that
19  point, but they certainly were not adulterated or
20  defective until FDA issued warning letters to ZHP
21  and Mylan or when FDA set limits in December of
22  2019.
23        So what you have -- and I said it in the
24  report, it's a very unusual situation, where we all
25  know nitrosamine impurities can be genotoxic.  We

Page 319

1  know they are very low level.  They are hard to
2  measure.  They can creep into a product, as Dr. Gump
3  said.
4        And FDA and Teva in the summer of '22
5  (verbatim) were faced with this issue.  Well, we
6  have got them there.  What are we going to do?  And
7  FDA and Teva working together decided to recall,
8  first, all the ZHP products from the market before
9  there was any possibility of a decision about
10  adulteration, and then subsequently, after the
11  Swissmedic report, all the Mylan product from the
12  market, again, before there was any possibility of a
13  decision about adulteration.
14        As I said in the report, this is not a
15  failure.  This is a success story where a
16  responsible company is making a huge effort to
17  protect consumers, to protect patients, and FDA is
18  working very hard to find out what is going on.
19        It spills over into other products.  It
20  keeps spilling over into other products.  And now
21  FDA is asking that essentially all chemical
22  medicines in the market or being developed for the
23  market be assessed for nitrosamine impurities.
24        I'm gratified with the effort.  This is
25  how drug regulation advances.  And I just don't see

Page 320

1  that Teva did anything wrong and everything right.
2        MS. LOCKARD:  I don't have any more
3  questions for you at this time.  I imagine there may
4  be more questions.  Thank you, Dr. Williams.  And I
5  may follow up.
6              EXAMINATION
7  BY MR. STANOCH:
8    Q.  Dr. Williams, prior to your
9  question-and-answer session with Ms. Lockard, you
10  spoke with her during the lengthy 35-minute break,
11  didn't you?
12        MS. LOCKARD:  Object to form.
13  Argumentative.
14        THE WITNESS:  I would say I sat there and
15  listened to her talk out how she was going to
16  question me, but I really didn't engage in that
17  discussion in any substantive way.
18        MR. STANOCH:  Stand by.
19        Nothing further, Doctor.
20        MS. LOCKARD:  Any other questions from
21  others?
22        MR. STANOCH:  And, Counsel, I'll just ask
23  on the record that the binder of potential exhibits
24  be destroyed or returned to me without looking at
25  it, please.

Page 321

1        MS. LOCKARD:  All right.  I did take the
2  exhibits you used out of the binder.
3        MR. STANOCH:  That's fair.  I understand.
4  Thank you.
5        MS. LOCKARD:  I'll put them back.  But I
6  didn't remove the ones that you haven't used and I
7  haven't looked at all of those, so --
8        MR. STANOCH:  I appreciate that.  Thank
9  you, Counsel.
10        THE VIDEOGRAPHER:  Anything further on the
11  record?
12        Okay.  Well, this concludes today's
13  deposition of Dr. Roger Williams.  We are going off
14  the record at 4:24.
15        (Whereupon, the deposition was concluded
16  at 4:24 p.m.)
17
18
19
20
21
22
23
24
25

Page 322

### INSTRUCTIONS TO WITNESS

1

2

3       Please read your deposition over carefully

4  and make any necessary corrections.  You should

5  state the reason in the appropriate space on the

6  errata sheet for any corrections that are made.

7       After doing so, please sign the errata

8  sheet and date it.

9       You are signing same subject to the

10  changes you have noted on the errata sheet, which

11  will be attached to your deposition.

12       It is imperative that you return the

13  original errata sheet to the deposing attorney

14  within thirty (30) days of receipt of the deposition

15  transcript by you.  If you fail to do so, the

16  deposition transcript may be deemed to be accurate

17  and may be used in court.

18

19

20

21

22

23

24

25

---

Page 323

### ERRATA SHEET

1

2

3  PAGE   LINE   CHANGE

4  ____   ____ _____

5           REASON:_____

6  PAGE  LINE   CHANGE

7  ____   ____ _____

8           REASON:_____

9  PAGE  LINE   CHANGE

10  ____   ____ _____

11           REASON:_____

12  PAGE  LINE   CHANGE

13  ____   ____ _____

14           REASON:_____

15  PAGE  LINE   CHANGE

16  ____   ____ _____

17           REASON:_____

18  PAGE  LINE   CHANGE

19  ____   ____ _____

20           REASON:_____

21  PAGE  LINE   CHANGE

22  ____   ____ _____

23           REASON:_____

24

25

---

Page 324

### ACKNOWLEDGMENT OF DEPONENT

1

2

3

4

5       I,_____, do hereby certify

6  that I have read the foregoing pages, and that the

7  same is a correct transcription of the answers given

8  by me to the questions therein propounded, except

9  for the corrections or changes in form or substance,

10  if any, noted in the attached Errata Sheet.

11

12

13  _____  _____

14  ROGER WILLIAMS, M.D.          DATE

15

16

17

18

19

20

21

22

23

24

25

---

Page 325

1  STATE OF CALIFORNIA  )

2  COUNTY OF YOLO          )

3       I, ELAINA BULDA-JONES, a Certified Shorthand

4  Reporter of the State of California, duly authorized

5  to administer oaths pursuant to Section 2025 of the

6  California Code of Civil Procedure, do hereby

7  certify that

8            ROGER WILLIAMS, M.D.,

9  the witness in the foregoing deposition, was by me

10  duly sworn to testify the truth, the whole truth and

11  nothing but the truth in the within-entitled cause;

12  that said testimony of said witness was reported by

13  me, a disinterested person, and was thereafter

14  transcribed under my direction into typewriting and

15  is a true and correct transcription of said

16  proceedings.

17       I further certify that I am not of counsel or

18  attorney for either or any of the parties in the

19  foregoing deposition and caption named, nor in any

20  way interested in the outcome of the cause named in

21  said deposition dated the 22nd day of February, 2022.

22

23

24

25  ELAINA BULDA-JONES, CSR 11720

**WORD INDEX**

**< $ >**
**$500** 6:17
**$695** 276:18
**$90,000** 277:1

**< 0 >**
**00565764** 5:17
**02109** 4:15
**06** 6:12
**07701** 3:21

**< 1 >**
**1** 5:12 11:1,
5, 10, 11 12:6
16:16, 20
20:10, 16
52:1 98:21
99:21 129:8,
19 146:14
205:6 275:21
**1,000** 73:11
**1.1** 225:18
**1.2** 225:16, 25
**1.7** 247:3
**1/31/2022**
273:15
**1:34** 218:14
**10** 6:8
156:14, 17
224:13
263:11 292:11
**10,000** 25:16
**10:49** 141:11
**100** 2:23
**104** 5:20
**1086** 6:5
152:9 153:4,
23 154:3
**109** 51:12, 15,
21 52:2, 18
53:24
**11** 5:12 6:12
165:3, 6
**11/30/2021**
271:19
**11/30/21**
271:17
**11:07** 141:15

**110** 43:16
44:24
**112** 5:22
**116** 43:10, 11,
16 44:2, 10
46:22
**116s** 43:15
**11720** 1:24
325:25
**12** 6:16
145:23 146:3
210:22, 23
**12/31/21**
271:21
**12:45** 212:1
**12:51** 218:10
**120** 249:12,
13, 15 250:2
**123** 250:18
**127** 43:16
44:23
**128** 6:1
**12th** 12:7
15:21 16:6,
11 17:6, 9, 24
18:17, 25
19:13, 21
20:1 43:14
**13** 6:20 30:9
152:23
153:19
212:18
224:13, 15
**13th** 29:24
215:7
**14** 6:21
118:13
156:18 256:2,
5 277:24
278:6 311:22
**145** 6:1
**14-year** 288:22
**15** 6:23
270:21, 24
**152** 6:5
**15219** 3:16
**156** 6:8
**15th** 2:23
**16** 7:1 284:5,
6, 25 290:7

**165** 6:12
**16th** 63:24
**17** 1:19 5:12
7:3 13:19
128:11
284:11, 13
**17th** 4:4 8:5
16:5 20:1, 10
278:1
**18** 7:4
292:15, 20, 22
**19** 6:6 222:20
**19103-4196**
4:4
**1980s** 71:11,
16
**1990** 236:24,
25 267:25
286:14 287:13
**1993** 287:25
**19th** 153:8

**< 2 >**
**2** 3:21 5:12,
18 6:11
11:19, 22
14:11 16:16
18:15, 23
19:3, 4 21:9
104:11, 15, 20
129:21
156:23
275:21
282:22, 23
293:1 313:9,
13 315:20
**2(b** 245:10
246:12
**2.17.22** 5:14
**2/15** 17:13
**2/17/2022**
17:3 282:24
**20** 11:2, 23
13:18 15:19
18:21 68:5
123:15 124:1
127:25 146:4
263:11
277:25 278:8,
13, 14 292:11

**200** 2:16
292:4
**2000** 86:15
288:20 312:22
**2003** 100:25
**2005** 214:18
215:2, 20
216:3
**2006** 214:18
215:3, 20
**2010** 56:11
269:4, 5
**2012** 207:13
**2013** 212:18
215:7
**2014** 86:16
290:6
**2015** 35:14
39:9, 16, 20
40:2, 6 70:22
71:22 78:9,
16, 23 79:7,
15 80:14
81:4, 16 83:7
96:24
**2017** 6:7
99:9, 22
113:13 153:8
197:23 198:9,
22, 23 199:2,
12, 16, 19
**2018** 6:12
13:10, 12
14:18, 19
29:24 30:9
32:19 47:25
48:24 49:18
50:1 51:9
54:20, 22
62:19 63:8,
11, 24 65:4
66:25 68:2, 5,
11 69:12
73:2, 6, 12, 24
74:3, 19 75:5,
8 76:16, 18
77:5, 21 78:8,
15 80:7 91:9
93:6, 21
100:3 108:20
111:19 113:4,

**11** 114:8
117:11, 21
119:22 120:3,
25 121:2, 14
122:1 123:3,
15 124:1
133:23 134:1,
11 146:11, 13,
21, 22 150:2
164:5, 7, 15
165:13, 15, 22
166:13
167:18, 25
168:6, 15, 22
169:4, 11, 19
173:3 182:8,
12, 16, 19
183:20 186:5
189:18
190:12
191:13, 18
192:8 194:14
199:6 202:13
203:7 204:6
205:20
208:25 221:9
233:5 235:2
237:24
262:25 263:2,
17 264:1, 7
266:12, 20
294:10 303:7,
14 310:24
314:12
**2019** 13:9
14:17 110:10,
14 111:8
318:22
**2020** 6:11
73:4 90:4
110:1, 20
129:9 156:23
**2021** 6:23
7:2 72:25
73:4 110:2
127:23 128:1
129:6 205:7
221:15, 22
222:4 256:10
266:2, 3
272:2, 9

275:23  303:5
312:14
**2022**  1:19
5:12  6:1  8:5
12:7  15:21
16:5, 6  17:6,
24  18:17, 25
19:13, 22
20:11  128:18
132:4  205:6
271:24
273:16  325:21
**2025**  325:5
**2029**  3:9
**20th**  63:8, 11
117:11  123:3
294:10
**21**  13:19
15:19  18:21
62:19
**210**  6:16
**211**  3:21
**215.979.1000**
4:5
**22**  319:4
**2220**  4:9
**224**  6:20
**227**  3:3
**22nd**  325:21
**230**  4:9
**23rd**  169:3
**24**  165:4
**2500**  2:16
**256**  6:21
**270**  6:23
**27th**  4:15
**28**  6:1  132:4
198:7  277:8
**28202**  3:3
**284**  5:5  7:1, 3
**2875**  1:7  8:9
**28-Jan-2022**
129:12
**28th**  128:17
**29**  6:23
256:10  277:8
**292**  7:4
**29th**  312:14

**< 3 >**

**3**  5:15  62:9,
10  65:21
112:22  157:8
261:19  293:15
**3:00**  283:11
**3:35**  283:15
**30**  4:4  146:4
187:21  188:7
322:14
**300**  3:9
**301**  3:15
**30305**  2:17
**31**  113:13
205:7  270:24
271:24  275:23
**310.284.3766**
3:10
**312.566.4808**
4:10
**31st**  99:9
**32**  256:5
**320**  5:6
**3333**  2:16
**34**  147:3
**35**  147:1, 3
212:9
**35-minute**
320:10
**36**  51:19, 21
52:1  146:24
147:2, 3, 6
**37**  51:18
**38**  44:11
**38th**  3:15
**3rd**  273:16

**< 4 >**

**4**  5:18  9:9
21:19  86:18,
25  87:5
100:10
314:15, 19
315:1
**4:24**  321:14,
16
**41**  249:13, 17
**412.263.4397**
3:16
**44**  44:21
**46**  43:22

46:18  77:14
**467**  177:11
**476**  6:5
152:9  153:3,
23  154:4
155:4
**483**  198:10
203:11, 12
**483s**  207:25
208:3  295:5

**< 5 >**

**5**  5:20  6:23
104:8, 11
113:23  245:5
**500**  212:22
**504.524.5777**
2:7
**53**  4:15
**565758**  61:11
62:19
**5763**  63:2

**< 6 >**

**6**  5:22
112:23, 24
165:12, 15, 22
166:13
167:25  173:3
**6/20**  63:19
**6/21**  63:19
**6/21/2018**  5:15
**60**  222:17, 20
227:3, 6
228:16, 23
229:15
230:10, 14, 21,
25  231:21
**600**  3:3
**60606**  4:10
**617.213.7047**
4:16
**62**  5:15
**63**  148:22, 23
**65**  152:5
**678.553.2103**
2:17
**69**  162:25
163:6

**< 7 >**

**7**  6:1  128:6,
10
**7/1/2021**  273:6
**7/31/2021**
272:25
**7:18**  1:19  8:6
**7:29**  15:2
**7:37**  15:6
**701**  2:6
**70130**  2:6
**704.444.3475**
3:4
**732.924.8171**
3:22

**< 8 >**

**8**  6:1  13:11
14:19  89:13
145:19, 22
205:10
**8:42**  60:2
**8:51**  60:6
**80**  276:22
277:2
**82**  273:23
**84**  197:22
198:2, 6
**86**  5:18

**< 9 >**

**9**  5:4  6:5
61:2, 3, 12, 13,
20  152:20, 23
159:25  160:2
**90067**  3:9
**92**  30:8
**973.757.1100**
2:24

**< A >**

**a.m**  1:19
**AB**  213:14
223:19  248:8
**abbreviation**
251:1
**Abid**  5:15
**ability**  131:10
**able**  24:1
27:25  88:18
89:2  94:19
123:14, 25

124:12
150:16
170:20
196:21  213:4
255:13  286:6
**AB-rated**
64:24  205:13
209:11, 19
213:12, 16
252:22  253:8
318:14
**abruptly**
238:11, 13, 16
239:1
**absence**  93:21
101:12  102:8
223:3  233:6,
25  246:13
303:23
**absent**  106:13
158:13
183:11  227:1
**Absolutely**
19:18  45:6
229:22
238:15  239:9
298:3
**abundance**
48:18  241:15
**acceptability**
199:24
**acceptable**
68:4, 10
69:16, 21, 24
70:14  72:23
75:4, 9  90:12
106:3, 8
109:3, 17
110:5  111:2,
16  116:2, 14,
19  117:12, 17,
24  118:8, 24
119:1, 11, 22
120:1, 11, 20
129:25
144:12
147:11
162:18  311:17
**acceptance**
132:18  140:2
145:9  148:10,

Confidential Information Subject to Protective Order

24 149:12, 14
155:9, 13
156:6
accord 23:8
account 177:1
accurate
18:19 136:3
290:11 322:16
accurately
10:22 135:24
ACKNOWLE
DGMENT
324:1
Acorda 280:2
act 53:3
134:17, 19, 22
137:17 217:2
Actavis 2:11
186:19, 24
188:12 279:3
acted 47:24
48:6 63:10
64:25 65:21
66:22
acting 48:17
288:6
action 28:12
80:18, 22
138:10, 15
139:3, 12
140:9 162:13
163:2 205:22
215:13 247:9
264:15 281:5,
7 309:23
Actions 1:9
31:9 210:15
280:25 281:1,
3
active 85:3
223:12
236:19, 23
280:6 290:14
actives 258:4,
10, 22
activities
31:18 32:20
65:24 264:20
288:24
actual 247:22

acuity 153:6
ad 120:7
add 70:11
82:4 84:3
224:7 292:2
added 16:10
289:5
addenda 101:8
Addendum
98:21, 22 99:9
addition 289:1
additional
13:4 144:19
179:19 298:4
300:3
address
121:25
adequacy 58:9
adequately
132:25 210:2
adhere 101:14
102:10
adhered
177:10
adherence
299:1
adjudicated
133:2
adjusted 13:7
administer
325:5
administered
226:23 227:12
administration
223:14 226:5
admitted
214:15 215:1
adulterated
64:23 134:12,
18, 20 136:10,
24 137:11, 15,
16 138:4, 15,
18, 22 139:3,
11, 17 140:8
201:19 202:6,
8, 21, 24
203:2, 11
204:15, 22
205:1, 6, 8, 14,
23, 24 206:15,
16 207:10, 16,

17, 22 208:7
209:8 213:24
214:10, 11, 13,
17 215:2, 11,
17, 20 216:4,
10, 17, 19
217:2, 7, 10,
12 248:1
253:6 305:14
307:22
310:24
318:17, 19
adulteration
201:17, 24
202:9 203:4,
13, 14, 21, 23
204:16 205:9,
17 206:4, 6, 8,
11, 21 208:3,
10 209:5, 6
214:3 216:15
306:5, 10
319:10, 13
advances
319:25
adverse
192:16, 21
193:1 194:8,
15 247:20
Advice 5:20
104:23, 25
106:17 110:4
advise 191:25
235:21 236:7
237:1, 24
advised 194:1
advises 106:12
advising
148:15
affiliate 49:10
affiliated
86:13
aflatoxin-like
114:10
Agency
105:19
107:21
188:20 214:1,
2, 12 215:21
216:14
223:16

247:21 295:5,
11 305:23
306:21
ago 11:3, 24
46:12 47:7
67:9 83:3
128:22
137:19
166:17 173:1
178:5 293:9
agree 14:10
17:17 23:3
24:11 34:20
40:7, 15
49:18 59:14
75:4, 20
80:13, 21
81:3, 15 83:6
84:12, 20, 23
85:1, 2, 6, 8,
24 86:7 90:6,
16 91:2, 5
92:20, 22
93:17 95:14
98:16 100:17,
21 101:2, 7,
10, 11 102:1,
7, 17, 19
103:11, 20
106:20
107:14 108:1,
6, 8, 13, 16, 17,
21 109:13
115:12 118:4,
6, 11 119:4,
25 126:24
128:2 129:15
130:10, 18
131:5, 17
132:9, 23
134:4 135:20
138:24 144:9
146:23 148:4,
5, 13 149:18
151:11
154:16, 17, 25
155:14, 15
156:1, 3, 9
157:25 158:9,
11 159:4, 21
160:11

163:25 166:1,
23 169:8
171:9 176:24
183:9 184:20
186:23
187:13 189:1
227:10
228:16
230:10
241:19
244:25
246:21
249:25 252:5
258:8, 16, 17,
20, 25 259:6,
9, 19 260:7,
18 261:8, 23
262:8, 20, 22,
23 263:15, 21
264:12
265:22
266:11
274:25 281:8,
13 306:3
315:12 316:7,
13, 14, 19
317:12
agreed 8:13
53:14 144:20
163:19 207:4
234:2 246:10,
19 310:16, 20
314:17
agreeing
97:23, 25
216:11
261:10 306:23
agreement
23:9 33:9, 13
179:20 227:5
303:24 304:2
agreements
144:21 179:23
Agrees 6:17
ahead 39:1
66:18 83:21
101:22
105:13
136:14 197:7,
19 204:1
213:10

217:*15*
223:*25*
229:*25*
237:*18*
239:*17*
261:*22*
286:*25*
291:*16* 293:*25*
**Aid** 3:*7*
**al** 5:*15*
**Alana** 257:*5,
14* 313:*14*
**Albertsons** 3:*1*
**alert** 115:*2*
**Alfano** 3:*14*
**aligned** 227:*5*
**alkyl-azoxy**
114:*11*
**Allegations**
6:*18*
**allegedly**
264:*6* 296:*4*
**allow** 69:*23*
184:*4* 223:*16*
311:*16*
**allowable**
68:*24*
**allowed** 67:*11*
134:*21* 228:*9*
236:*1* 295:*18,
19, 20*
**allows** 48:*10*
**allude** 39:*22*
**alluded** 29:*13*
91:*22* 94:*10*
130:*23*
152:*14*
163:*21* 166:*16*
**alluding** 98:*13*
**alter** 18:*23*
19:*25*
**alternate**
53:*20, 22*
**Alternatively**
149:*14*
**amount** 57:*10*
69:*3* 70:*3, 15*
73:*6* 74:*7*
75:*19, 23*
**amounts**
149:*11* 226:*6*

**analogous**
305:*15*
**analyses**
309:*3* 315:*9*
**analysis**
177:*14* 179:*8,
11* 185:*6, 10*
191:*21* 308:*21*
**analytical**
71:*12* 121:*15*
145:*8* 148:*9*
150:*5* 155:*12,
18* 210:*1*
315:*10*
**ANDA** 27:*24*
38:*8, 15* 39:*3*
41:*7, 18* 43:*5*
48:*7* 94:*11,
22* 255:*9*
276:*10, 11*
287:*4* 308:*20*
**ANDAs** 12:*11*
21:*19* 26:*9*
32:*15* 49:*24*
276:*15*
**Anderson**
16:*22*
**Angeles** 3:*9*
**ANI** 279:*12,
13*
**announced**
168:*22*
**announcement**
212:*18* 306:*1*

**announcements**
298:*11*
**answer** 10:*17*
12:*15* 13:*2*
22:*21* 23:*19*
27:*21* 29:*2,
14* 35:*16*
36:*13, 18*
37:*17* 38:*24*
39:*14* 43:*3*
46:*12* 47:*12*
50:*4* 55:*1*
58:*16* 67:*9*
71:*1, 17*
73:*20* 74:*14*
76:*24* 77:*2*

79:*15* 83:*4,
13, 23, 24*
85:*20* 86:*6*
94:*7* 96:*12,
15* 98:*2, 5, 24*
99:*20* 145:*1*
147:*14*
169:*15, 22*
170:*19, 22*
175:*2, 9*
176:*6* 177:*8*
183:*2* 184:*1*
191:*3* 193:*19*
204:*20*
215:*25*
217:*22*
225:*14* 230:*1,
13* 232:*24*
235:*16* 237:*8,
16* 239:*9, 19*
300:*22*
**answered**
30:*22* 75:*25*
76:*13, 22*
78:*4* 90:*9*
93:*1* 96:*6*
124:*17*
150:*19*
160:*15*
176:*20*
189:*10*
194:*23*
258:*24* 293:*24*
**answering**
22:*24, 25*
95:*6* 104:*4*
107:*12*
161:*16* 253:*11*
**answers** 10:*9*
46:*12* 282:*9*
324:*7*
**anthrax**
136:*10*
139:*10, 22*
140:*7* 203:*10*
**anticipate** 37:*3*
**antihypertensiv
e** 251:*11, 22*
**antitrust**
279:*5, 8, 10*

280:*1, 5, 12*
281:*7, 10*
**anybody** 9:*15*
218:*22* 230:*4*
**anyway**
107:*11*
**AOA** 285:*21*
**API** 6:*14*
27:*10, 15*
28:*14, 16, 22*
29:*2, 13*
30:*11, 13, 20*
31:*4, 13, 23*
32:*13* 33:*2,
14, 23* 35:*7*
36:*5* 38:*1*
40:*8, 13*
42:*18* 47:*11*
48:*1, 23*
49:*18* 50:*8,
12* 51:*1* 55:*7*
56:*25* 58:*2*
63:*15* 65:*6*
66:*11* 68:*5,
24* 69:*4, 19*
81:*12, 17, 21,
25* 82:*2, 20*
83:*8, 11*
106:*9, 14*
109:*18* 110:*6*
111:*3, 10*
123:*2, 14, 25*
124:*12, 23*
125:*5, 14*
126:*2* 150:*16*
164:*21*
165:*25* 166:*3,
14, 18* 167:*4,
10, 17, 24*
173:*10, 22*
174:*5, 13, 22*
175:*1, 8, 13,
18* 176:*1, 2,
18* 177:*12*
178:*2, 18*
181:*18*
182:*23*
183:*18* 185:*7,
11, 21* 186:*5,
18* 187:*4*
188:*14, 24*

189:*15, 20, 25*
191:*18* 192:*1,
16, 20* 193:*1,
13, 14* 194:*4,
8, 15, 20*
195:*4* 198:*15*
199:*1, 16, 24*
200:*8, 17, 18,
21, 22* 201:*13,
25* 207:*21*
208:*7* 216:*9,
17* 217:*9*
249:*2* 263:*16*
301:*25*
303:*18* 304:*8*
309:*1*
**APIs** 55:*19*
**apologies**
124:*16*
**apologize**
44:*12* 45:*20*
116:*8* 128:*2*
208:*5* 211:*19,
24* 261:*15*
279:*23* 301:*12*
**apparently**
45:*24* 114:*24*
**appear** 39:*7*
107:*5* 127:*3*
228:*24* 229:*8*
318:*6*
**APPEARANC
ES** 2:*1*
**appeared**
73:*3* 127:*24*
**appearing**
8:*13*
**appears** 19:*2*
128:*16*
165:*14, 23*
229:*9* 257:*4*
306:*24*
**applicability**
95:*22*
**applicable**
90:*22* 127:*4*
156:*8* 245:*11*
246:*16, 18*
**applicant**
39:*3* 78:*20*
94:*11*

Confidential Information - Subject to Protective Order

application 78:21 93:19 95:3 96:8 116:13 131:12 227:17

applications 94:22

applies 82:19 95:3, 15 96:3 132:1

apply 126:10 151:22

applying 220:15

appreciate 34:18 35:24 37:14 59:17 66:7 98:18 101:4 103:14 118:12 119:17 197:4 225:14 252:10 280:21 321:8

apprised 53:13

Approach 6:3 119:8 120:19 146:8 200:13 234:17

approaches 120:18

appropriate 64:4 73:12 75:22 79:19 95:11 138:10 145:8 148:9 154:9 155:12, 13, 18 156:7 162:13 168:7 170:12, 23 171:13, 24 195:17 196:15 209:22 210:5 232:23 233:2 237:9 296:25 322:5

appropriately 14:4 63:10 237:21

approval 27:24 28:1, 8 41:19 80:24 187:14 241:22, 24 250:6 309:21

approve 81:10

approved 21:20 43:6 225:3, 12 226:3, 14, 18 255:8 304:24

approximately 277:1

ARB 106:9, 14 109:18 110:6 111:3

Arbor 279:12

ARBs 111:17

Argument 190:15 279:14

Argumentative 31:6 69:6 96:14 124:4 320:13

Army 285:23 286:9

arose 192:3 204:17

arrangement 183:12

article 126:11 256:9 265:7 312:9, 12

articles 292:1, 12

articulation 136:3

aside 20:5 103:4 112:19 152:16 156:12 218:5 248:10 267:14 273:18 277:5 295:4

asked 25:19, 22, 25 26:1, 7 27:4, 8, 11, 12 30:21 37:19 50:25 52:6,

12 53:25 54:7 64:1 65:7 75:24 76:12, 21 78:3 90:8 92:25 96:5 142:22, 25 143:21 150:18 160:14 170:14 171:11 175:6 176:12, 17, 19 189:9 190:3 194:19, 22 211:14 258:24 261:14 269:5, 9 293:13, 16, 24 296:3, 21 299:9, 13 300:7, 10, 14 301:24 304:5, 18 309:19, 22 311:22 314:16, 17 317:16

asking 10:8 28:3 32:1, 5 33:7 38:13 42:22 48:2 50:16 53:7 54:1, 11 55:9 65:9 70:9, 24 71:8 74:1 81:24 83:14 85:17 91:18 93:19 94:20 97:3, 4, 12, 13 99:13, 15, 17 116:22 117:5, 6 138:17 143:25 162:4 185:2 187:14 188:23 189:19, 24 196:2, 4, 12, 13, 20, 24 199:9 214:4 231:20 233:10, 11, 13

235:15 243:10 258:13 260:6 261:23 262:7 269:1 319:21

asks 48:3 257:17

asserts 249:19 250:3

assess 31:13 33:12 109:11 116:19 135:17 139:25 140:2 269:22

assessed 319:23

assessing 38:9 131:20 177:12 298:18

Assessment 5:22 116:14 117:17 183:5 197:16, 19 224:10 298:20 299:4

assessments 121:5 197:12

assist 272:17 276:1

associated 29:6

Association 86:11

assume 10:15 24:13 25:19, 22 27:4, 8 103:25 110:14 125:25 139:20 150:11 207:13 235:2

assuming 140:5

assumption 25:25 26:1 27:11 110:17 111:7

assumptions 27:13

assure 42:15 55:18

Assuring 159:15, 18 160:22

Atlanta 2:17

attach 292:15

attached 322:11 324:10

attack 238:6

attempt 28:10 80:16 81:6, 18 83:9 93:23 276:9

attention 41:23, 24 56:22 63:18 77:17 120:9 146:19 149:4 247:12 253:4 295:16

attest 317:14

attorney 20:19 322:13 325:18

audit 185:13

August 13:12 14:19 169:3, 11

authority 52:21 64:16 138:21

authorized 325:4

availability 120:8

available 11:11 76:10, 19 86:23 119:10 168:20 169:11 170:1 194:3 221:9 247:21 284:8 301:3

Avenue 3:21

Avoid 6:22 262:13

avoided 108:22 109:12

**awards**
290:*13, 19, 22*
**aware** 27:*16*
28:*15* 29:*12*
30:*3, 12* 31:*3,
13, 17, 19*
32:*11* 63:6
65:*20* 66:*24*
68:6 103:5
106:*16*
109:*15*
112:*13* 113:8
122:*13, 18, 22*
123:*1* 133:*17*
164:*12, 16*
166:*9, 25*
167:*3, 9, 14*
168:*4, 14, 21,
25* 169:*4, 6*
170:*25*
174:*11, 15*
185:*15* 186:*3*
194:*13, 24*
198:*21* 199:*3,
25* 219:*17*
241:*23*
248:*14, 22*
263:*1, 3*
294:*11* 303:6
**awful** 72:*4, 7*

**< B >**
**back** 15:5
38:7 44:*7, 8*
45:*11* 54:*18*
60:5 66:6
68:*19* 72:*3*
98:*11* 107:*11*
113:*16*
115:*25*
130:*23*
135:*22*
141:*14, 17*
160:*20*
172:*25*
194:*18*
196:*22* 203:8
218:*6, 13, 16*
234:5 237:*12*
239:*4* 275:*16*
282:*21*

283:*14, 17*
287:*22*
309:*20* 321:5
**background**
73:*18* 89:*15,
16* 285:*9*
291:*15*
**ballpark**
100:*24* 276:*24*
**Bank** 3:*21*
**Barnes** 3:8
**Barreto**
274:*14* 275:*13*
**base** 56:*9*
241:5
**based** 41:*21*
54:*4, 16*
56:*23* 65:*21*
147:*18*
149:*15* 164:8
255:*11, 21*
286:6 304:*11*
**basically** 258:*4*
**basis** 56:*14*
109:*9* 173:*9*
189:*18*
193:*19* 202:*2*
288:6
**batches**
214:*16* 215:*1*
**Bates** 24:6
61:*16* 62:*19*
105:*3*
**Bates-stamped**
24:*9*
**bearing** 15:8
**began** 29:*9*
146:*21* 262:*25*
**beginning**
19:8 58:6
115:*9* 116:*1*
201:*1* 249:*12*
257:*23* 290:6
303:*14*
**begins** 52:*2*
105:*9* 154:7
247:*7, 13*
250:*20* 256:7
265:*12* 315:*1*
**behalf** 93:*4*
278:*17*

**belabor**
170:*10*
**Belcher**
279:*22*
**belief** 172:*20*
309:6
**believe** 13:*16,
24* 15:*9, 16*
19:7 21:*25*
23:*24* 31:*16*
32:*19* 47:7
61:*3* 62:*21*
63:*23* 67:7
70:6 72:*25*
79:*18* 95:*17*
110:*9* 130:5
161:*1, 9*
171:*18* 172:*1,
4* 177:*18*
219:*20*
232:*16* 233:6
234:*1* 267:*3*
270:*17*
274:*14*
281:*10*
300:*12* 314:*16*
**believes**
131:*19*
247:*13, 18*
**benefit** 11:*11*
100:*1* 268:8
269:*11* 270:7,
15* 285:*7, 8*
**best** 58:*16*
85:5 94:*25*
300:*22*
**Beta** 285:*20,
22*
**better** 26:*18*
69:*13* 71:*3,
15, 19, 25*
263:8, 12*
282:8 295:*16*
316:*21* 317:8
**beyond** 76:6
92:7 174:*1*
285:*10*
**bickering**
49:*15*

**big** 171:*20*
181:*14, 17*
268:*9*
**bigger** 89:*1*
**billed** 273:5
**billing** 272:*15*
**billion** 315:8
**billions** 317:*10*
24 15:*16*
**binder** 86:*23*
87:*9, 10*
104:*12, 15*
112:*23*
128:*11* 142:*3,
6, 15* 143:8,
11, 13, 25*
146:*2* 152:*24*
156:*18* 165:*4*
211:*3, 6*
224:*14* 256:6
270:*25*
320:*23* 321:*2*
**Binsol** 274:*21*
275:*13*
**bioavailability**
287:5
**bioequivalence**
223:*1* 224:5,
8, 9* 226:*20*
228:*9, 22*
232:*9* 287:6
**bioequivalent**
209:*21*
222:*11, 24*
224:*2* 229:*17*
230:*17* 231:*4,
10, 13* 252:*21*
253:8 318:*11*
**Biogen** 280:*2*
282:5
**Biopharmaceut
ics** 288:*13*
**bit** 38:7
78:*19* 82:*18*
83:*3* 100:*17*
130:*23*
134:*16*
206:*13*
219:*12*
223:*24* 234:5
274:*2*

**black** 104:*15*
**blank** 9:*25*
**bless** 302:*18*
**Board** 286:7,
13* 290:*21*
**Board-
certified**
286:*20*
**boards** 291:7
**body** 57:*17*
58:*15* 59:5,
11* 81:7, 9, 20*
83:*11* 283:5
**bold** 247:7
**bolded** 257:*14*
265:*11*
**Book** 6:*20*
13:6, 9, 10, 11,
23* 14:8, 17,
19* 15:*14*
16:*11* 223:*20*
224:*19, 21, 25*
225:*2, 6, 7, 15*
244:*14* 245:*2*
247:8, 19, 25*
248:7 292:6,
12*
**books** 292:5
**Book's** 245:*17*
**Bosick** 3:*14*
**Boston** 4:*15*
**bottle** 138:*13,
14* 139:*1*
**bottles** 137:*20*
138:5
**bottom**
261:*14, 19*
313:8 314:*20*
317:6
**bow** 295:*15*
**box** 9:*17*
87:7, 8, 21, 23,
25* 88:*3*
104:*12, 15*
**Braeburn**
280:7, 9* 282:*1*
**brand** 151:*22*
**branded**
126:5 205:*13*
**break** 14:*13*
59:*22* 60:*9*

64:1  66:4
83:17  97:19
141:3, 4, 6, 20,
23  142:1
144:7  190:12
212:5, 7, 10
218:18
219:11
282:19  283:9,
18  284:5
293:15  320:10
breaking
282:15
breaks  203:9
BRIAN  2:11
Bridge  3:21
69:11, 13
brief  14:24
15:3  56:3
60:3  88:8
126:14
141:12
211:10  218:7,
11  248:11
277:14
283:12
284:20  285:3
293:10
302:15  307:7
briefly  8:15
61:14  142:9
279:15
287:16  313:25
bright  195:9
bring  41:22
71:18
bringing  56:21
broad  118:10
138:21  276:12
broke  182:8
broken  137:10
brought  49:21
63:17  71:23
287:12  289:16
BROWNING
2:14
Browningj@gtl
aw.com  2:20
Buchanan  3:2
build  268:8

298:4
building  78:20
builds  268:11
built  287:5
BULDA-
JONES  1:24
8:19  325:3, 25
bullet  118:20
120:10
147:21  149:5
154:7, 17, 21
155:5  156:4
173:11
bullets  118:18
120:17  149:2
bunch  71:12
burger  259:16
260:19  262:1,
16  314:20
bus  237:12
button  44:19
buy  28:16
buyer  308:20
buyers  193:9
buying  66:12
181:17

< C >
C.Whiteley@k
anner-law.com
2:8
calculating
277:3
calculator
276:23
California  3:9
9:9  286:5, 13
287:3  325:1,
4, 6
call  11:10
48:18  71:19
105:4  115:10
195:11  209:8,
11  211:19
213:11
268:15, 24
269:21  275:4
292:25
called  8:22
187:24  271:3
272:9  285:21

287:16  289:7,
17
calls  20:19
125:9, 16
136:25  159:6
180:21
Camp  2:6
Camurus
280:7
Cancer
105:19  106:3
242:24
cancer-causing
258:4, 9, 21
capability
121:16
capsules
137:10
caption  21:9
325:19
Carcinogen
6:23  72:8
85:16  297:17
Carcinogenic
5:24  90:24
92:13  93:15,
25  106:4
297:9
carcinogenicity
119:9
carcinogens
84:13  85:11
86:2  90:1
105:17, 18
106:2, 22
107:15  114:9,
21  115:1
118:25  258:3
care  14:13
251:7
career  287:7
288:2
carefully  18:7
56:2  73:18
203:15
206:10
208:12  322:3
Carl  287:11
Carolina  3:3
carried  73:2

case  17:25
25:11  26:19
34:8  41:24
42:13  66:9
72:15  79:2
91:6  120:14,
22  126:16
173:18  179:7
204:13
208:19  216:6
220:13
245:19, 24
246:5, 9
251:4  263:5
271:7, 10
272:18
281:16
296:17  297:7
298:19, 20
300:19
302:20
307:21
308:15, 20
309:12
316:12  318:3
case-by-case
94:17  108:23
109:9  119:8
120:19
cases  280:23
281:20  284:4
catch  214:19
catches  200:8
catching
273:18
categories
115:18
categorization
90:23
category
14:18  294:9
caught  69:2
causation
85:17  86:5
106:25
107:18  243:6,
8  258:14
273:13
cause  84:20
174:21

242:24
325:11, 20
causes  213:13
317:18
caution  48:18
241:15
caveats  121:12
CBE-30
187:15, 16
188:6  276:2,
5  304:6, 12, 24
CBE-30s
186:9
Center  2:23
9:10  288:1, 4,
7  289:15
Centre  3:15
Century  3:9
certain  73:16
77:8, 25
138:9  165:16
202:23
214:10, 16
216:5  225:20
235:13  236:2
241:21
242:23  275:9
300:9
certainly
14:12  37:17
41:22  48:5
50:20  51:4
55:14  58:8
84:17  92:17
94:17  95:12
107:25  117:3
118:4  122:10
123:8  127:19
142:19  158:8
159:10  169:1
177:16
184:14, 18
190:3  194:10
200:1  219:23
220:23
224:24
227:25
228:19
254:23
260:25  261:8
262:11, 23

264:*12*
265:*23* 267:*9*
276:*14*
304:*17*
305:*24*
315:*13*
317:*14* 318:*19*
**certificate**
177:*14* 179:*8*
308:*21* 309:*2*
**certificates**
177:*18* 179:*10*
**certification**
77:*12* 85:*14*
123:*17* 161:*5*
219:*5, 8*
260:*23* 262:*6*
286:*7*
**certifications**
286:*14*
**Certified** 8:*23*
325:*3*
**certify** 324:*5*
325:*7, 17*
**cetera** 147:*25*
197:*12*
**Cgannon@wals
h.law** 2:*24*
**cGMP** 6:*18*
46:*23* 47:*2, 6*
55:*17* 56:*7,*
*15, 24* 200:*7*
212:*23* 217:*10*
**cGMPs** 298:*21*
**Chain** 6:*23*
54:*18*
**chair** 288:*21*
**chaired** 269:*16*
**challenge**
35:*12*
**chance** 265:*20*
**chances**
266:*14*
**change** 12:*17,*
*20* 18:*24*
19:*25* 186:*12,*
*15* 187:*8, 11,*
*16, 20, 22*
188:*2, 3*
220:*23* 304:*8*
317:*18* 323:*3,*

6, 9, 12, 15, 18,
21
**changed** 12:*9,*
*23* 20:*3*
122:*10* 187:*3*
248:*8*
**changes** 15:*21*
16:*4* 18:*21*
290:*12, 16, 18,*
*21* 304:*13*
317:*24*
322:*10* 324:*9*
**changing**
59:*20* 186:*18*
227:*9*
**chapter**
127:*12* 154:*2,*
*4* 155:*4*
176:*25* 177:*11*
**Chapters** 6:*5*
127:*1, 5*
133:*13* 152:*8,*
*11* 153:*3*
176:*25* 292:*6,*
*13*
**characteristic**
154:*11*
**characterizatio
n** 40:*19*
157:*25* 227:*2*
**characterize**
80:*17* 81:*6,*
*18* 83:*9* 92:*3,*
*12* 93:*13, 23*
163:*9*
**characterized**
187:*7* 188:*1*
190:*11*
**CHARCHALI
S** 3:*8*
**charge** 206:*4,*
*8, 11* 208:*10,*
*13*
**Charlotte** 3:*3*
**chat** 88:*6, 10,*
*19*
**check** 34:*25*
51:*10* 194:*7*
204:*10* 274:*4*
**chemical**
12:*24* 27:*9*

116:*3* 289:*5*
319:*21*
**chemically**
68:*12* 236:*2*
264:*18*
**chemist**
237:*11*
**Chemistry**
288:*15*
**cherry-pick**
261:*1*
**Chicago** 4:*10*
285:*17, 19*
**chief** 288:*20*
**China** 29:*7*
**choice** 237:*2*
254:*19* 255:*1*
259:*15, 17*
260:*9, 20*
261:*25* 262:*2*
**choices** 301:*3*
**choose** 259:*15,*
*23* 260:*18*
261:*25* 262:*12*
**CHRISTINE**
2:*20*
**CHRISTOPHE
R** 3:*2*
**Christopher.he
nry@bipc.com**
3:*4*
**chromatogram**
298:*16*
**circumstances**
239:*2* 241:*21*
305:*20*
**citation** 134:*22*
**citations** 58:*7,*
*17*
**cite** 54:*24*
55:*25* 79:*6,*
*11* 95:*7*
109:*25* 120:*7*
123:*8* 164:*18*
167:*14, 21*
169:*21*
177:*22* 208:*1*
217:*24* 299:*7*
**cited** 12:*14*
14:*5* 26:*10*
30:*17* 39:*8*

41:*5* 57:*12,*
*16, 19* 59:*5,*
*11* 60:*21, 24*
61:*1* 67:*7*
84:*19* 94:*12*
111:*20* 122:*9*
217:*19* 218:*1*
283:*5* 294:*2*
308:*8*
**citing** 134:*17*
**city** 268:*10*
**civil** 305:*22*
325:*6*
**claim** 149:*25*
206:*21* 208:*3,*
*9* 209:*18*
276:*14*
**Claims** 6:*17*
**clarification**
122:*15*
145:*25*
180:*17*
197:*17*
252:*10* 266:*8*
290:*17*
301:*11* 306:*14*
**clarified** 39:*23*
**clarify** 17:*14*
81:*2* 294:*15*
**clarifying**
251:*25*
**class** 34:*21*
77:*11* 85:*14*
123:*17* 161:*5*
219:*4, 8*
257:*10* 258:*2*
260:*23* 262:*5*
280:*24* 281:*3,*
*4, 7*
**class-
certification**
27:*19* 28:*18*
33:*5, 19* 34:*8*
36:*9* 38:*5, 22*
40:*22* 41:*14*
42:*20* 74:*5*
78:*5* 79:*24*
81:*23* 86:*4*
92:*16* 103:*18*
106:*24*
107:*17*

116:*24* 121:*8*
124:*3, 14, 25*
125:*8, 16*
151:*16* 158:*3*
168:*10*
170:*17*
183:*23*
191:*22*
195:*10*
258:*13* 299:*11*
**class-
classification**
34:*2*
**classification**
238:*24*
**classified**
105:*18*
**classifies**
244:*10, 14, 19*
**classify** 114:*25*
**classifying**
245:*2*
**clause** 226:*25*
**clear** 41:*15*
61:*8* 145:*1*
205:*11, 20*
229:*21* 230:*3*
231:*19* 311:*3*
317:*16*
**cleared** 295:*20*
**Clearly** 38:*21,*
*23* 58:*6*
87:*18* 181:*1*
193:*4* 204:*9*
**clinical** 224:*6,*
*10* 226:*22*
227:*8, 11, 21*
228:*3, 12, 17*
229:*1, 6*
231:*16, 22*
239:*11, 20, 24*
259:*3* 286:*4,*
*8, 16, 19, 20*
287:*3* 288:*13*
301:*23*
**clinically**
236:*25*
**closed** 198:*12*
295:*21*
308:*10, 11*

**closely** 51:4 113:9 119:10 213:8

**closer** 191:13 295:16

**Code** 325:6

**Codes** 247:4

**Codex** 289:5

**cohort** 102:20 103:7, 16 105:21 108:3, 14 114:10, 19, 24 115:3, 16 118:21 119:19 160:7, 13 208:21 234:3

**COLEEN** 4:3

**colleagues** 62:7 100:1

**colloquy** 85:19

**color** 225:8, 15

**colored** 225:10

**combination** 219:19 220:2, 9, 16 221:24 222:6

**combined** 56:2

**come** 21:5 38:12 42:24 50:3, 21 75:1, 12 98:11 110:17, 19 120:20 131:11 145:15 168:19 187:20 194:11 196:21 207:5 218:5 277:3 300:5 310:20

**comes** 209:24 210:2, 9 254:20 260:9 276:20

**coming** 15:4 60:4 141:13 211:5 218:12 271:2 277:10 283:13

**comment** 33:6 70:8 73:15 94:4 169:22 175:20 198:8 201:15 259:2 316:24

**commentary** 225:15

**commented** 48:4

**commerce** 214:16

**commercializat ion** 95:4

**commissioner** 288:6

**committee** 268:4, 10, 16, 18, 21, 23 269:17, 24 313:12

**committees** 314:4, 5, 7, 8

**common** 36:1, 10

**commonly** 225:6 236:1

**communicate** 145:9 283:21

**communicated** 193:9 304:17

**communicating** 47:13, 14 55:2 148:10 294:6

**communication** 49:5, 12 50:6, 20 54:19, 21 55:5 189:18 194:25

**community** 268:9, 12

**companies** 131:19 140:19 161:19 181:24 186:22 189:1

**company** 27:25 29:6 49:10 53:10 64:14 80:2, 4, 5, 23 151:24 163:2 186:10 191:25 192:5 194:2 206:12 221:5 251:5 272:9 276:20 279:7, 12, 25 280:8 287:9 295:16, 18 298:7 309:23 319:16

**company's** 169:3

**comparative** 239:10, 19

**compared** 154:11 223:5 234:8 254:10

**comparing** 149:10

**compel** 52:21

**compendia** 289:2, 4

**compendial** 126:13, 25 127:8 135:3, 25 136:4, 9, 22 137:5, 9, 16 139:9, 21, 25 140:6 152:13 245:11, 16, 19, 25 246:13, 16

**Compendium** 289:6, 7, 8

**complaining** 279:1

**Complete** 7:4 292:14, 16

**completed** 285:15

**completely** 8:16 58:11 189:1 195:8 305:19

**complex** 276:12 315:9

**Compliance** 6:13 56:24 245:7 299:4

**complies** 131:7

**comply** 97:14

**complying** 130:20

**components** 147:23 316:16

**Compound** 40:21 50:15 129:20, 21, 22 154:10

**compounds** 103:6 105:9, 12, 16, 20 106:22 107:15 108:2 114:11, 13, 23 115:17 118:23 119:21 129:22 160:7, 12 257:25 258:2 259:7

**comprehensive** 264:20

**comprises** 114:10, 21, 23

**concept** 227:22

**concern** 41:20 70:5 102:21 103:7, 16 105:21 108:3, 14 114:5, 10, 19, 24 115:3, 5, 17, 22 116:6 118:21 119:19 160:7, 13 173:19 208:22 209:1 234:3, 12 257:18 261:7 295:14 298:16

**concerned** 56:12

**concerning** 101:14 102:10 210:15

**concerns** 259:17 260:20 262:2 304:12, 17

**conclude** 172:10

**concluded** 17:9 321:15

**concludes** 321:12

**concluding** 173:12 253:3

**conclusion** 43:17, 24 56:6 205:21

**Conclusions** 46:19 77:15, 16 253:13, 19

**concurrent** 271:14

**conditions** 226:23 227:13 317:12

**conduct** 120:19 171:13 200:17, 21

**conducted** 185:10

**conducting** 121:4

**confer** 195:12

**confident** 261:4

**CONFIDENTI AL** 1:12 178:20 179:1, 4 182:1 184:5 222:8 308:9, 11, 19 309:8

**confidentiality** 178:6 308:2

**confined** 94:21

**confirm** 13:20 24:8 132:21 133:16

189:*15, 20, 24*
194:*19*  271:*8*
**confirmed**
173:*5*
**conflicts**  107:*8*
**conform**  57:*5*
**conformance**
58:*10*  127:*9*
213:*19*
**conformed**
151:*20*
**conforms**
132:*20*
**confused**
271:*11, 12*
**confusing**
23:*17*  36:*8*
38:*4*  56:*5*
57:*2*  58:*24*
171:*15*
216:*20*  220:*18*
**Congress**
287:*19*
**conjecture**
67:*14*  198:*17*
**CONLEE**  2:*5*
**connection**
81:*20*
**consequence**
73:*7*
**consequences**
247:*20*
**conservative**
235:*15*
**consider**
42:*11*  71:*10*
94:*15*  113:*20*
213:*23*
215:*16*  269:*9*
314:*8*
**consideration**
78:*21*  292:*17*
**considerations**
156:*7*
**Considered**
5:*14*  9:*22*
11:*16, 23*
12:*14*  13:*1, 7,
8, 14, 22, 24*
14:*3, 23*  16:*9,
17*  22:*20*

43:*5*  54:*24*
55:*23*  58:*19,
23*  59:*11*
61:*22*  79:*12*
84:*20*  85:*9,
25*  89:*24*
124:*7*  126:*22*
138:*3*  167:*13*
177:*19, 21*
202:*20*
203:*16*
204:*14, 21*
206:*10*
207:*16*
208:*12*
226:*19*  275:*7*
282:*24*  293:*1,
7*  310:*23*
**considering**
92:*8*  122:*8*
**considers**
308:*6, 8*
**consistent**
46:*17*  156:*7*
275:*1*
**consistently**
157:*15, 22*
**consortium**
80:*5*
**consult**
193:*21*  269:*6*
301:*20*
**consultant**
289:*13*
**consultation**
246:*23*  268:*24*
**consulted**
193:*24*
268:*20*  270:*10*
**consulting**
191:*24*  272:*8,
12*  289:*17*
**consumer**
138:*13*  140:*7*
209:*12*  255:*13*
**consumers**
319:*17*
**consumer's**
139:*1, 10*
**contacted**
273:*7*

**contain**  26:*3*
27:*6*  134:*6*
149:*21*  151:*2*
171:*12*
189:*16, 21, 25*
194:*20*  213:*7*
226:*5*  232:*18*
233:*8*  234:*4*
235:*4, 9, 21*
237:*4*  255:*15*
**contained**
25:*23*  26:*15*
32:*24*  50:*12*
79:*19*  122:*19,
23*  139:*10, 22*
140:*7*  161:*2,
10*  166:*14*
167:*4, 17*
209:*13*
213:*12, 24*
216:*17*  217:*9*
237:*3*  255:*5*
**containing**
51:*1*  164:*10*
203:*10*  217:*7*
232:*4, 16*
233:*7*  234:*1*
238:*14*  250:*22*
**contains**
132:*14*  136:*9*
140:*23*
158:*13*
208:*15*  235:*3,
19*  240:*7*
254:*14*
**contaminant**
136:*19*  137:*3*
**contamination**
32:*12*  159:*19*
161:*3, 11, 15*
162:*10, 11, 17*
174:*22*
**content**  92:*18*
**contents**  189:*2*
**contest**
101:*22*  102:*1*
**context**  31:*10*
47:*5*  73:*18*
77:*22*  91:*25*
117:*7*  188:*8*
191:*24*

**continue**
58:*22*  103:*12*
107:*23*  109:*8*
154:*15*
198:*14*
251:*17*
285:*13*  286:*13*
**continued**
287:*6*  289:*16*
**continues**
16:*24*  115:*15*
116:*15*  244:*24*
**continuing**
260:*25*
269:*13*  279:*24*
**contract**
179:*24, 25*
183:*16*  184:*3,
8, 13*
**contracting**
180:*7, 11*
**contractual**
183:*11*
**contractually**
184:*21*
**contribute**
288:*17*
**contributed**
292:*1*
**Control**  5:*22*
6:*8*  40:*19*
71:*19*  88:*23*
90:*23*  91:*13,
24*  92:*3, 12*
93:*14, 24*
130:*15*
131:*11*
144:*14, 17*
148:*7*  155:*8*
237:*19*
262:*23*  263:*1*
315:*11*  316:*22*
**controlled**
71:*16*  103:*16*
106:*3*  108:*15,
18*  133:*1*
134:*8*  246:*10*
**controlling**
84:*9*  131:*3*
154:*23*

**controls**
144:*10*  147:*9*
**controversial**
17:*18*
**controversy**
14:*14*
**convenience**
142:*17*
**Convention**
290:*1*
**conversation**
107:*9*
**converted**
304:*19*
**convey**  304:*12*
**convince**  80:*5*
**copies**  24:*21*
142:*25*  143:*7,
16*
**copy**  11:*8, 24*
12:*5*  62:*6*
86:*23*  98:*20*
99:*25*  113:*14*
128:*12, 16*
144:*4*  188:*13,
23*  198:*4*
217:*15, 18*
224:*21*
249:*14*  284:*3,
24*  285:*1*
292:*16*  293:*6*
311:*23*
**core**  32:*21*
209:*16*  318:*2*
**correct**  12:*1*
15:*11*  16:*24*
18:*3*  19:*22,
23*  20:*12*
21:*15*  22:*6, 8,
18*  23:*7, 15*
24:*25*  25:*4, 9,
17*  27:*2, 13,
14*  34:*8*
40:*14, 20*
45:*22*  49:*3*
53:*8*  54:*8*
59:*7*  60:*15*
68:*11, 15*
75:*17*  78:*17*
79:*10, 22*
80:*18*  87:*13,

Confidential Information Subject to Protective Order

15 91:9 92:4,
14, 24 93:10
94:22 95:4,
16 101:9
103:16 110:6
111:11
113:11
114:11, 15
116:6, 20
117:25 118:9
120:21 122:8
123:3 126:7,
19 127:15
128:2, 23
129:1 130:6,
7, 11, 21
131:4, 22
132:7, 15
133:5 134:3,
10 137:6
139:12 147:6,
15 148:19
149:23
151:13
152:13 153:2
156:24
157:16, 23
160:11
161:20 162:1
164:19, 21
165:16, 25
166:3, 14
169:11
179:21
182:19 183:6
184:23
186:15, 20
187:6, 8, 10,
18, 23 188:4,
17, 24, 25
189:21 190:1
192:17, 22
193:2 194:21
200:18, 22
204:7 207:23
208:7, 17
216:10
219:15
224:22
225:24 227:3
230:18 232:1

236:17, 20
238:6, 15
241:18
243:13, 15
245:3, 8, 17,
22 246:3, 14
249:24
250:15 254:7
256:9 261:20
263:19 265:1,
10 266:23
267:18 270:1,
16 273:16
293:2 305:8
324:7 325:15
corrections
322:4, 6 324:9
corrective
28:12
correctly
22:25 23:22
45:13 49:1
70:17 78:18
90:2 91:1
103:24 104:1
108:5, 7
114:16
119:14, 15
126:8 147:20
148:3, 20
164:22
230:20, 24
245:13
254:17 315:24
corresponding
35:10 41:7
corresponds
52:9 204:10
couch 221:14
Council
288:21 314:3
counsel 8:17
9:13, 18, 20
10:18 11:2, 9,
17, 25 17:17
23:25 24:12,
18 25:19
27:5 32:4
34:3 38:25
46:16 60:9
61:21 81:24

84:1 85:18
87:24 97:9,
10, 15 98:4, 8,
11 99:16
110:11 122:7
123:5 136:13
141:20, 22
142:10, 13, 20,
23, 24 143:11,
12 181:6
195:19, 22
196:1 197:5,
8 211:13
218:19
219:21 273:8
274:4, 7
276:15
282:20
283:19, 22
284:4 285:8
292:24
297:22 301:8
320:22 321:9
325:17
counsel's
284:17
counter
188:18
counterparts
205:14
counting
277:25
278:10 314:23
country
264:19
COUNTY
325:2
couple 46:12
126:18 203:9
250:2 272:4
course 12:22
21:21 23:13
29:22 32:21
39:11 64:16
69:8 79:19
120:13
126:24
140:14 163:5
186:9 198:7
199:4 219:20
253:5 254:25

COURT 1:1
8:10, 19
20:23 105:24
292:18 322:17
courtesies
142:23
courtesy
104:13
142:15, 21
cover 87:16
covered
135:12
create 27:10
200:12 312:21
created
117:21 225:9
269:17
creates 82:8
creep 319:2
criminal
307:3, 12
criteria
132:18 140:2
145:9 148:10,
25 149:14
155:13 156:6
244:13, 20
245:1 246:12
criterion
149:12 155:9
criticizing
302:20
crop 316:12
crossed 69:10,
13
CSR 1:24
325:25
Culbertson
4:14
Cumulative
14:19
current 96:22
120:23 129:3
154:24 156:8
186:25
243:24 245:7
306:7
currently
20:12 129:11
243:1 263:5

Curriculum
7:1
customer
31:14 55:6
171:11
customers
28:16, 22
29:3 81:21
83:11 84:9
311:5
cut 46:6
100:16 278:8
cutting 278:2
cutting-and-
pasting 45:7
CV 277:13
278:8 284:3,
24 290:7, 14,
22 292:9, 13,
14
CVS 3:7
CWHill@duan
emorris.com
4:5

< D >
D.C 237:12
D.Stanoch@ka
nner-law.com
2:7
daily 74:25
damaged
72:20
dangerous
73:9
Daniel 274:14
275:13
data 80:7
81:10 119:9
149:16
233:17, 18
date 8:5 16:1
17:23 19:16
63:18 90:3
99:6 101:5, 6
107:2, 3, 5
110:8 119:21
129:3, 8
132:3 153:5
213:25
266:19

Confidential Information Subject to Protective Order

276:25 294:24 296:17 312:12 322:8 324:14

**dated** 16:5 18:22 20:10 99:9 113:13 156:23 165:12, 15 271:17, 21 272:25 273:15 325:21

**dates** 99:20 215:8, 9 290:8

**Dave** 17:12

**DAVID** 2:4 6:9

**DAVIS** 2:13

**day** 59:15 202:5, 7, 24 211:20 325:21

**days** 187:21 188:7 268:22 293:9 304:24 322:14

**DB** 274:10, 13, 19

**dead** 238:5

**deal** 35:14 39:10 91:16 171:20 221:16 303:13 305:12 317:11

**dealing** 69:8 121:10 316:25

**dealt** 42:2 263:19

**dear** 281:21

**debatable** 145:4 254:8

**debate** 54:9 102:16 103:22 107:20 158:4, 8 184:19 265:4 279:6 318:18

**debating** 80:11 92:18

93:16 163:24 196:1

**debtors** 280:16

**decade** 56:10

**decades** 287:24

**December** 65:4 68:2 73:2, 6 74:19 75:5, 8 76:16, 18 77:5, 21 80:7 91:9 93:6, 21 108:20 111:19 117:21 120:3, 25 121:2 122:1 202:13 203:6 204:6 205:7, 20 208:25 233:5 237:24 275:22, 23 318:21

**decide** 39:5 308:13

**decided** 207:8 235:12 319:7

**decision** 52:15 53:1, 2 94:18 111:19 205:2 214:1, 2, 12 216:5, 6, 8 241:8 255:13 319:9, 13

**decision-making** 111:24 112:10

**decisions** 269:25

**deck** 156:21

**Declaration** 44:11, 22 45:17 46:4

**declare** 223:17

**deemed** 64:23 203:21 231:5 322:16

**deems** 138:10

**deep** 276:12

**defect** 163:13

**defective** 161:19, 25 162:12 163:2 164:1 309:24 310:12, 17, 18 311:1, 5, 12 318:20

**defects** 159:20 161:3, 11, 15

**Defendant** 3:1, 10, 19 4:5, 13 279:21 281:1, 22

**Defendants** 2:8 3:7 4:1 16:18 279:17 281:16, 20 282:2, 4

**defense** 17:4, 25 18:13, 16, 22 181:6

**deferred** 285:24

**define** 116:2 253:21

**defined** 115:5 119:2 268:8

**defining** 230:14

**definitely** 35:17 243:7 264:11 294:1

**definition** 203:3 254:1

**definitively** 132:13

**degradation** 144:10 147:9

**degree** 285:14, 15, 17 301:19

**delayed** 65:12

**demonstrate** 155:19

**demonstrated** 226:21 227:19

**demonstration** 227:17, 23

**deny** 103:11

**Department** 5:20 212:18 256:14, 20

260:8 305:21 306:3, 23 312:18, 22

**depend** 25:12

**depends** 27:22 28:1

**deponent** 8:11 324:1

**deposed** 10:3

**deposing** 322:13

**deposition** 8:7, 12 9:22 19:4, 10 22:12 143:4 160:15 274:10, 11, 19, 21, 23 275:4, 6 277:9 321:13, 15 322:3, 11, 14, 16 325:9, 19, 21

**depositions** 22:16, 22 23:5 275:8, 9

**deputy** 288:3, 7

**describe** 219:3

**described** 50:19 79:5 106:13 307:4, 14 316:11

**describes** 250:21

**DESCRIPTION** 5:11 173:23

**designation** 139:6

**designed** 139:25

**designs** 269:7

**despite** 98:6

**destroyed** 142:19 320:24

**detail** 276:15

**detailed** 127:5 273:11 306:21

**details** 50:19 138:16

**detect** 124:23 131:24 150:16 168:15 297:3

**detectable** 76:4 106:13

**detected** 123:2 151:3, 13 154:8

**detecting** 125:5

**detection** 155:19

**determinant** 232:8

**determination** 203:13, 14 206:9 207:20 209:4 215:21, 23 216:14 295:5, 12, 24 305:13

**determinations** 201:23 270:15

**determine** 28:11 36:2 37:23 169:11 172:16 199:24

**determined** 49:17 75:18 106:7 109:17 111:2 203:17 204:17, 18 208:10 305:14

**develop** 145:7 155:23 156:5

**developed** 116:1 119:11, 23 168:15 319:22

**developing** 148:8 155:11

**development** 27:23 119:12, 23 221:1, 23 222:5

**dietary** 12:22 289:5

**difference** 223:4 239:25 240:2 243:17

Confidential Information - Subject to Protective Order

**different**
37:19  57:22
58:11  79:1
100:19  103:5
136:21
147:24, 25
148:1  150:21
157:23
168:23  169:9
170:2  187:23
199:9  223:12
232:22  234:7
238:17  239:7
240:24
243:21
246:22
251:14  252:9
254:9, 15
260:10
261:10
305:19  314:6
**differently**
37:21  235:1
**difficult**  23:12
35:16  49:7
64:14  66:15
198:16
235:16
239:10  241:8
242:10
287:14  314:22
**diligence**
200:18, 22
**Diovan**
122:14, 18, 22
125:23, 25
126:5  151:18
267:23  296:8
318:12, 16
**direct**  54:20
149:4  226:8
247:12
**directed**
34:10  82:7
143:14
**direction**
325:14
**director**  288:4,
7, 9  289:15
**disagree**  84:5
107:22

108:10  111:6
136:6  159:10
160:17
196:23
197:15, 18
**disciplines**
288:16
**disclose**
183:12, 13
184:21
**disclosed**
181:19
**disclosure**
21:12  84:16
158:13, 18
183:17
**disclosures**
24:15
**discover**
124:12
**discovered**
28:9  30:19
48:23  54:22
80:16  145:5
**discovers**
145:7
**discovery**
22:1  24:14,
18  27:22
33:2  54:19
55:6  66:10
**discrete**  200:5
**discuss**  42:12
65:13  114:15
128:20  143:6
195:24
216:23
268:23
301:20, 24
**discussed**
16:3  63:25
115:19  122:4
126:15
133:18, 21
145:3  289:18
308:2
**discussing**
132:23  173:16
**discussion**
14:24  88:8
101:2  103:12,

22  118:11
152:15
211:10  218:7
248:11
256:12
277:14
284:20  285:3
293:10
302:15  307:7
320:17
**discussions**
84:25  219:21
273:13
**disinterested**
325:13
**dispense**
268:13
**dispensed**
267:20
**disregarded**
195:8
**dissonance**
109:5  110:24
**distinguish**
126:9
**distributed**
317:11
**distribution**
214:10  294:4
**DISTRICT**
1:1, 2  8:10
**DMF**  176:6, 8,
17  178:20
179:4, 7
181:25
188:10, 14, 19,
24  189:2, 4, 6
200:1  248:25
308:5, 8, 19
309:1, 7, 13
**DMF-holder's**
41:23
**DMFs**  178:6
308:2  309:8
**DNA**  5:22
**DNA-reactive**
94:15
**Doctor**  11:13
13:15  14:12
15:8  19:2, 19
20:4, 9  21:8,

25  22:15
26:25  29:22
30:7  32:11
37:7  40:2
43:8, 14, 22
45:6, 14
46:19  47:24
49:13  51:13
53:4  54:5
56:5  57:9, 23
58:14  59:16,
21  60:8
62:18  68:19
70:10  77:7,
19  82:18
96:19  99:17
100:3, 16
103:14
104:19
107:25
110:14  111:1
112:20  113:2
116:9  117:6,
22  119:17
120:16
124:10
133:25
135:11  141:6
144:7, 9
145:22
150:25  165:2
166:8  197:14
211:13, 18
224:3  225:15
226:7  228:24
229:13, 22
230:9, 12
231:8, 20
233:13, 25
235:17
236:16, 17
238:12  239:5,
17  240:19
241:1  243:10
247:2  249:19
253:14  256:1
261:12, 17
265:7  267:14
269:23  275:3
276:24
278:12

280:23
282:11, 18, 21
283:17  284:3
286:23
301:23  320:19
**doctors**  254:24
**Document**  1:9
13:2  24:7
45:25  53:20
57:11  58:4
59:9  60:16,
19  61:10, 11,
18, 25  62:9,
13, 17, 20, 24
83:14, 15
89:19  90:3,
11  91:12
92:18  95:6
97:7, 13, 14,
24  99:7
100:7  107:12
110:24  113:5,
7, 23  118:4
120:7  122:11
123:6, 12
143:10, 17
144:3  153:1,
5  164:25
165:14  166:8,
9  177:6
213:5  256:24
257:4  293:14,
19  294:2
305:7, 11
**documentation**
167:13
**documented**
108:19
**documents**
9:18, 19, 20
13:5  14:16
23:14  24:7, 9,
14  40:4, 6
60:13, 14
61:17, 19
71:20  99:5,
11, 21  123:6,
20  124:6, 18
141:25  142:2,
4, 12  143:6
144:6, 8

164:*17, 18*
172:*22*
182:*15*
218:*25*
248:*24*  249:*7*
273:*23*  274:*5*
283:*25*  299:*7*
308:*7*  309:*5*
317:*23*
**doing**  53:*13*
100:*9*  130:*15*
142:*21*  151:*9*
152:*3*  193:*23*
219:*23*  221:*1,
4*  227:*25*
287:*3*  289:*16*
313:*23*  314:*1*
315:*17*  322:*7*
**DOJ**  212:*21*
307:*3, 12*
**Dongmei**  6:*10*
**dosage**  226:*4*
**dosage-form**
37:*1*
**dose**  68:*25*
74:*25*  75:*1*
159:*3, 15, 19*
160:*23*  167:*1,
4, 17*  223:*13*
**dosing**  74:*8*
**DP**  106:*9*
109:*18*  110:*6*
111:*3*
**Dr**  7:*4*  9:*5*
10:*25*  11:*8,
22*  12:*4*
17:*23*  20:*20*
22:*10, 11*
23:*3, 18*  24:*4,
20*  28:*18*
34:*10*  35:*25*
43:*11*  44:*10*
53:*23*  72:*6*
83:*21*  85:*20*
86:*22*  93:*20*
94:*8*  96:*12*
97:*17*  98:*3*
99:*6*  135:*2*
136:*14*
141:*17*  143:*9*
156:*25*  197:*9,

21* 218:*16*
230:*22*  231:*1*
232:*15*
249:*24*  250:*3,
14, 20*  251:*1*
252:*3*  256:*17*
257:*5, 21*
258:*8, 16*
259:*7, 20*
260:*7*  261:*23*
262:*8*  265:*14,
23*  266:*5*
267:*10*
284:*18, 24*
287:*11, 25*
288:*4, 5*
289:*14, 21*
292:*13, 23*
293:*13*
307:*10*
317:*15*  319:*2*
320:*4, 8*
321:*13*
**draft**  110:*20*
127:*24*  285:*24*
**drafts**  45:*24*
46:*16*
**draw**  77:*17*
120:*9*  146:*18*
**drawing**  314:*6*
**drink**  259:*23,
25*
**drinking-water**
89:*23*
**drive**  292:*18*
**driving**  53:*1*
**drop**  238:*5*
**Drug**  6:*1, 3,
16, 23*  12:*11*
26:*8*  28:*11*
29:*10*  31:*20*
32:*16, 24, 25*
35:*10, 17*
38:*9, 10*  39:*4,
5, 19*  41:*22*
42:*11*  52:*7*
55:*13*  60:*22*
67:*25*  68:*12*
69:*23*  70:*2,
16*  71:*5*
72:*16*  73:*6,

11, 22*  74:*2, 8,
9, 17, 22*
75:*15, 22*
76:*3*  77:*8, 9,
25*  78:*1, 8, 15*
82:*25*  84:*10*
85:*3, 15*
91:*17*  95:*3,
15*  96:*4*
106:*14*
111:*11*
116:*19*  126:*2,
16, 17*  127:*8*
130:*13*  131:*7,
8, 15, 16, 21*
132:*20*  134:*6,
12*  135:*2, 6, 7,
25*  136:*8, 10,
22*  137:*9*
139:*9, 10*
146:*7*  148:*19*
149:*12, 13*
150:*14, 23*
154:*13, 14*
155:*20, 21*
158:*12, 13*
161:*2, 9, 25*
162:*9*  163:*2*
164:*4, 7, 8, 10*
166:*10*  168:*3,
5*  170:*12, 13*
171:*5*  172:*5*
179:*9*  180:*1*
201:*2*  209:*23*
212:*22*  217:*1*
223:*2, 6*
225:*4*  226:*3,
4, 14, 18*
228:*10*
229:*12, 16*
230:*16*  231:*4,
6, 9, 14*
233:*20*  234:*7,
8, 9*  235:*8*
240:*7, 9*
242:*4*  243:*12,
24*  244:*19*
245:*2, 6, 11*
246:*6, 22*
247:*24*
248:*15, 20*

254:*2, 13*
255:*8*  263:*2,
7*  267:*20, 25*
269:*25*
287:*17*  304:*3*
308:*22*
309:*21, 24*
310:*5, 25*
311:*20*
318:*10*  319:*25*
**drug-product**
38:*19*  39:*15*
40:*7*  82:*14*
127:*18*
151:*21*  304:*4*
**Drugs**  6:*9*
70:*4*  71:*15*
72:*8*  121:*25*
135:*1*  157:*23*
214:*10, 11, 12,
17*  215:*2, 20*
216:*3*  231:*3*
236:*2*  250:*22*
254:*20*  260:*5,
9*  263:*10*
264:*18*
268:*13, 14*
287:*13, 19*
288:*12, 18*
318:*12*
**drug-
substance**
37:*1*  55:*12*
82:*14*  84:*6*
92:*1*  127:*18*
194:*12*  309:*7*
**Duane**  4:*3*
**Due**  8:*14*
106:*4*  147:*24*
200:*17, 21*
**duly**  8:*23*
325:*4, 10*
**duration**  74:*8*
75:*1*
**DZIKOWSKI**
2:*13*
Dzikowskik@gt
law.com  2:*19*

**< E >**
**e.g**  120:*13*

**earlier**  11:*17*
51:*24*  66:*25*
127:*21*
160:*10*  191:*8*
227:*7*  246:*21*
264:*24, 25*
293:*14*
297:*22*  308:*3*
**easily**  244:*6*
**East**  3:*9*
**easy**  315:*8*
**eat**  259:*15*
260:*19*  262:*1*
**echoing**
265:*24*
**economic**
219:*9*
**editorial**  291:*7*
**educational**
285:*9*
**Edward**  19:*9,
20*
**Edwin**  256:*13*
312:*15*  316:*2*
**effect**  100:*18*
123:*5*  216:*18*
224:*6*  226:*22*
227:*8, 12, 21*
228:*3, 12, 17*
229:*1, 6*
231:*16, 22*
313:*1*
**Effected**
187:*17*
**effective**
100:*19*
158:*25*  159:*2,
19*  161:*3, 10*
208:*24*
253:*23*  254:*2*
**effects**  106:*5*
234:*10*
**efficacy**
154:*13*
224:*10*
229:*11*
233:*16*
234:*21*
240:*12*  250:*4*
254:*10*

Confidential Information Subject to Protective Order

**effort** 150:*2*
236:*3* 262:*25*
269:*11, 14, 18*
306:*2, 21*
319:*16, 24*
**efforts** 30:*3*
263:*1* 290:*25*
**eight** 215:*5*
**EIR** 197:*24*
198:*11, 20*
**either** 27:*24*
36:*25* 48:*12*
232:*8* 243:*10*
295:*10*
296:*22*
297:*20* 325:*18*
**elaborate**
175:*21*
**ELAINA** 1:*24*
8:*19* 325:*3, 25*
**electronic**
11:*12*
**elements**
300:*10*
**eliminate**
106:*7*
**Elizabeth**
274:*13* 275:*13*
**else's** 11:*10*
**EMA** 40:*5*
267:*3, 7*
**E-mail** 5:*15*
6:*12* 62:*19*
63:*19* 173:*5*
218:*22* 293:*16*
**Embarcadero**
9:*10*
**emphasizing**
215:*9*
**employed**
297:*3*
**employee**
86:*15*
**employing**
150:*10*
**encourage**
254:*25*
**encourages**
254:*24*
**endeavor**
298:*19*

**endeavored**
297:*2* 299:*3*
**ended** 288:*2*
**ends** 244:*24*
**engage** 320:*16*
**ensuing**
287:*24*
**ensure** 8:*16*
33:*1* 47:*9*
**ensuring** 250:*8*
**entered**
285:*23* 286:*3*
305:*2*
**entire** 78:*11*
93:*4* 100:*15*
188:*10*
207:*22*
262:*25* 305:*18*
**entirely**
108:*22*
109:*12*
255:*24* 275:*1*
308:*9*
**entities**
183:*18*
188:*23* 189:*8*
**entitled** 146:*7*
196:*9* 225:*3*
**entries** 19:*8,*
*10* 274:*10*
278:*6*
**entry** 19:*17*
273:*15* 274:*18*
**environment**
241:*10*
**episode** 36:*23*
**equation** 68:*1*
**equipment**
140:*14* 315:*10*
**equivalence**
223:*11, 23*
224:*1, 4, 5*
225:*4* 227:*2,*
*9, 19, 22*
228:*8, 21*
229:*3, 5, 9, 15*
230:*15, 16*
231:*9, 21*
232:*9, 11*
233:*13*
244:*15*

245:*15* 247:*3*
291:*20*
**Equivalence-**
**Related**
225:*17*
**equivalent**
209:*20*
222:*11* 223:*8,*
*18* 224:*1*
227:*11* 228:*2*
229:*16*
230:*17* 231:*3,*
*5, 10, 13*
244:*11, 19*
245:*3* 252:*21*
253:*7* 285:*22*
318:*11*
**equivalents**
225:*24* 226:*2,*
*10, 19, 20*
**errata** 322:*6,*
*7, 10, 13*
323:*1* 324:*10*
**error** 45:*11*
46:*14*
**errors** 43:*19*
44:*12* 46:*11*
**escalation**
295:*14*
**especially**
142:*21*
**ESQ** 2:*4, 5,*
*11, 13, 14, 15,*
*20, 22* 3:*2, 8,*
*10, 20* 4:*3, 5,*
*14*
**essence** 200:*11*
**Essential** 6:*22*
**essentially**
319:*21*
**establish**
17:*22* 49:*16*
54:*4* 145:*9*
**established**
68:*9* 69:*16,*
*20* 72:*23*
73:*2* 77:*7, 24*
160:*10* 313:*20*
**establishing**
79:*20* 91:*8*
148:*10* 155:*12*

**establishment**
70:*14*
**estimates**
291:*25*
**et** 5:*15*
147:*25* 197:*12*
**Europe** 308:*9*
**evaluate**
148:*17*
191:*16*
220:*14*
265:*18*
266:*12* 267:*5*
**evaluating**
154:*12*
**Evaluation**
247:*4* 299:*1*
**Evaluations**
225:*5*
**event** 42:*16*
149:*20*
**events** 69:*12*
110:*25* 168:*2*
264:*16, 21, 25*
**eventual** 254:*7*
**eventually**
79:*17* 217:*10*
220:*14*
**everybody**
49:*6* 50:*21,*
*22* 228:*7*
**evidence** 36:*1,*
*10* 37:*22*
64:*10* 186:*3*
**exact** 198:*6*
249:*14*
**exactly** 13:*21*
19:*16* 43:*20*
46:*15* 56:*18*
82:*7* 113:*14,*
*19* 120:*14*
128:*24*
130:*14* 132:*5*
135:*14* 137:*7*
140:*18*
147:*19*
153:*12* 160:*5*
243:*20*
**EXAMINATIO**
**N** 9:*3* 284:*22*
320:*6*

**EXAMINATIO**
**NS** 5:*1, 3*
**examined** 8:*24*
**example** 24:*6,*
*21* 28:*21*
66:*3* 78:*20*
91:*21* 115:*13*
119:*9* 125:*23*
128:*21* 133:*8*
135:*2, 23*
137:*8, 18*
138:*12, 25*
139:*8, 19*
140:*5* 172:*3*
198:*9* 233:*4*
263:*13* 268:*9*
274:*12*
303:*12* 310:*15*
**examples**
135:*1* 139:*8*
152:*11* 203:*8*
206:*3* 245:*21*
263:*8* 281:*21*
**exceed** 236:*5*
**Excellent**
10:*24* 11:*15*
128:*16*
**exception** 93:*2*
**excerpt** 89:*13*
284:*12*
**excerpts**
100:*14*
**exchange**
184:*4, 9, 14*
269:*2*
**excuse** 114:*22*
196:*8*
**execute** 53:*11*
**executed** 54:*3*
**executive**
288:*21*
**Exhibit** 5:*12,*
*15, 18, 20, 22*
6:*1, 5, 8, 12,*
*16, 20, 21, 23*
7:*1, 3* 11:*5,*
*10, 11, 19, 22*
12:*6* 16:*16*
18:*15, 23*
19:*3* 20:*10,*
*16* 52:*1* 62:*9,*

Confidential Information Subject to Protective Order

10 65:21
86:17, 18, 25
87:5 88:1, 13,
15 100:10, 13
104:6, 7, 8, 11
112:23, 24
128:4, 6, 10
144:1 145:17,
19, 22 152:18,
20, 23 153:15
156:13, 14, 17
165:3, 6, 9
172:25
210:22, 23
212:13
224:11, 13, 15
244:8 255:25
256:2, 5
270:19, 21, 24
277:7, 8
282:22, 23
284:5, 6, 11,
13, 25 290:7
292:15, 20, 22
293:1, 15
311:22
**EXHIBITS**
5:10 10:25
16:19 142:7,
16 143:2
216:24
217:17
320:23 321:2
**exhibit-share**
88:3
**exist** 149:9
206:7 240:5,
21 314:12, 14
**existed** 33:13
117:9 149:24
150:23 240:3
**existence**
178:9
**exists** 123:7
169:20 272:12
**expand** 87:19
**expansion**
288:23
**expect** 37:2
66:9 67:1
158:25 159:2,

9 300:15
308:25
**expectation**
42:14 92:10,
23 93:22
101:13 102:9
158:7 193:14
**expectations**
157:15, 22
158:20 300:19
**expected**
68:14 190:2
226:21
227:11, 20
231:22
**experience**
267:16
288:15
289:10, 11
303:13 304:11
**experimented**
289:6
**EXPERT**
1:16 6:21
11:2 16:18
17:4, 8, 13, 15,
25 18:14, 17,
23 22:10, 14,
17, 19 23:6
33:5, 18 34:2
36:9 38:5, 23
40:23 41:14
42:20 44:22
45:17 46:3
56:1 77:11
78:5 79:24
81:24 83:19
84:15 85:13
86:4 102:14
103:9 116:22
122:4 123:17
124:3 161:5
181:22 219:4
237:6 238:20
256:7 258:12
259:2 262:5
269:17
274:16
280:24
302:14

313:12 314:4,
8 317:19
**expertise**
235:24 314:6
**experts** 268:7
288:22 314:3
**explain**
223:22
228:14 313:25
**explore** 57:3
**exposure**
120:12
**expressed**
18:25 25:17
223:3
**extend** 253:18
**extended**
71:22 264:17
**extends** 264:18
**extent** 32:1
50:15 55:8
94:13 179:11
204:17 223:4
281:18 305:8,
11 306:19

**< F >**
**faced** 319:5
**facilities**
56:17 201:3,
6, 14 210:9
**facility** 166:22
198:22 199:1,
16 215:2
**fact** 105:20
131:7 133:20
172:15
178:16, 24
188:1 216:16
217:6 219:25
220:8 269:16
304:23 305:5
**factors** 28:2
74:15 122:8
**facts** 168:20
196:4, 9, 10,
13, 24 198:18
200:5
**factual** 196:6

**fail** 46:23
56:7, 15
322:15
**failed** 45:24
**fails** 48:13
213:18 248:5
**failure** 47:19,
23 138:7, 18
174:9 280:4
319:15
**faint** 146:15,
17
**fair** 10:4, 15,
16 14:2
18:16 19:15
40:10 81:2,
11 96:10
102:19
118:21 127:7
135:10
140:10
169:24
177:24
200:10 201:8
221:21 269:3
280:25 283:7
321:3
**fairly** 258:4, 9,
21 259:1
**fake** 90:18
**Falanga** 2:22
**Falkenberg**
4:9
**fall** 115:18
164:9
**falls** 103:15,
17
**False** 6:17, 18
212:23 305:23
**familiar** 86:10
113:6 210:14
212:19, 21
224:24
256:17, 19, 21
302:3 308:14
312:7, 15, 17
**far** 34:12
81:23 99:15
135:4 188:11,
15 189:7, 17
240:11 243:4

269:12
271:10
302:23 314:13
**fascinating**
313:15
**fashion** 36:6
38:2
**faster** 59:16
**faulted** 174:17
**FDA** 6:19
12:10 21:20
26:6, 10, 21
28:10 29:7, 9,
25 30:10
31:17 35:12,
13, 19 36:22
38:16 39:9
40:5, 25
41:16, 18, 20
42:12, 25
47:14, 19
48:4, 15, 17
49:5, 21 50:3,
10, 22, 25
51:4, 5 52:6,
11, 12, 14, 19,
21 53:2, 7, 10,
13, 14, 17, 25
54:1, 6, 7, 11
56:12, 16, 21
57:4 64:1, 2,
15, 16 65:3, 7,
14 66:20
67:12, 19, 23,
24 68:1, 16
69:2, 10, 15,
20, 23, 25
70:18, 22
71:13, 18, 21
72:23 73:16
74:21 75:6
76:1, 16
77:21, 23
78:11, 21, 24
79:2, 4, 16, 21
80:1, 5, 24
82:8, 12, 24
91:11, 13, 25
93:3, 7, 21
101:12 102:8
103:5 104:21,

24  106:7, 12,
17  107:8, 22
108:2, 19
109:1, 6, 16
110:3  111:2,
14, 22  112:8
117:20  120:2,
23  121:10
122:1  127:22
131:12, 24
133:2  134:13
137:25  138:9,
14, 21  139:3,
11  140:9, 15
144:20, 21
145:15  149:9
156:21  157:3
158:5  162:19
163:19, 22
164:10  165:8
168:17, 22
169:2, 9
171:6  173:19
174:17  180:8,
13  181:10, 14,
20  182:2, 4, 5
187:10, 12, 14,
18, 19, 21, 23
188:6  190:8,
10, 20  192:3,
5, 11, 17, 22
193:2, 7, 12
197:23
198:10, 11, 14,
19, 21  199:1,
3, 11, 15, 19, 23,
25  200:2, 8,
13, 14  201:1,
5, 9, 11, 17, 23
202:12, 25
203:6, 11, 13,
14, 16, 20, 24
204:2, 5, 11,
12, 22, 23, 25
205:2, 19, 22
206:1, 4, 7, 9,
22, 23, 25
207:2, 4, 19,
21  208:2, 6, 9,
16, 25  209:1,
6  210:4, 9

213:14
215:17  216:2,
5, 6, 13, 17, 25
217:10, 25
221:17, 22
222:4  223:19
225:3  233:5,
18  235:12, 13
236:25
237:11, 19, 23
238:2, 22
239:22, 23
240:4  241:2,
14, 21, 24
242:3, 7
244:10, 14, 18
245:2  246:5,
11, 19  247:13,
18  250:5, 9
254:14, 24, 25
255:17, 20
263:7  264:3,
6, 8  265:24
278:24  280:3
286:14, 15
287:12, 15
288:3, 6, 11,
20  289:16, 20
290:10
295:17, 21, 24
296:23  298:5,
10  302:9, 25
303:6, 12
304:13, 16
306:2, 22
307:3, 12
308:5, 8, 10
309:21  310:5,
8, 16, 18, 19, 22
311:16  313:1
317:1  318:14,
15, 20, 21
319:4, 7, 17, 21
**FDA-agreed**
245:20
**FDA-approved**
85:3  225:11
**FDA's**  6:8
57:5  58:10
64:3  66:23
70:14  90:11

91:7  106:21
107:14  110:4
117:23  121:1
129:4  130:20
171:5  174:8
202:19  209:9
210:14
242:25  254:7
295:14  298:24
**feasible**  106:5
**February**
1:19  5:12
8:5  16:5
20:1, 10
72:25  73:4
110:1  128:1
129:6  266:2
325:21
**feel**  95:5, 19
180:22  291:21
**feeling**  167:12
**feels**  35:18
261:4
**fellowship**
286:4
**female**  250:14
**FHS@pietragal
lo.com**  3:17
**field**  59:17
**fifth**  279:6
**fight**  34:5
**figure**  61:10
66:20  78:10,
17, 23  79:4
82:11  218:4
**figuring**
140:19
**file**  248:15, 20
292:23
**filed**  274:8
**filer**  38:8
**files**  11:12
276:10, 11
**filing**  188:19
**fill**  274:25
**final**  45:25
72:24  156:4
244:16
266:19  278:9
295:5, 11, 24

**finally**  235:12
317:7
**financial**
252:4, 6
**find**  23:23
40:4  44:14
82:10  91:16
100:8  144:3
146:12
201:11, 17
213:17  319:18
**finding**  29:7
31:10  36:23
39:12  64:14
66:6  169:9
**findings**  54:16
192:22  193:2
194:9, 16
307:20
**finds**  53:10
55:12  205:5
**fine**  16:15
45:4, 6  49:8,
12  59:15, 21
102:22
106:10  141:5
144:2  155:25
186:23  192:5
210:4  212:20
258:6  283:8
**fined**  212:22
**fines**  307:4, 13
**finish**  230:1,
12, 13
**Finished**  6:13
26:7  37:7
68:25  167:1,
4, 17  286:3
**finished-dose**
25:23  26:3,
14  27:1, 5
33:21  35:4
36:3  37:24
40:9, 13
41:12  42:7
56:17  82:20
164:14, 21
165:24
171:11
175:25  177:2
193:12

200:20  201:6
204:14
**firm**  42:5
279:2  299:14
**firms**  184:4
**first**  8:23
10:25  13:16
16:21  19:17
29:25  46:13
61:14  81:13
91:7  105:7, 8,
15  106:16
110:20
112:16
120:10
125:14
127:24
143:19
146:10
147:17  149:7
154:6  155:5
182:4  200:9
207:5  209:18
214:9  216:21
226:2, 13
230:9  234:5
241:2  247:6
249:12  250:1
251:18
257:22
269:17
271:16  272:5
273:5, 7, 15
278:19  286:1
298:13  302:5
305:21
312:22
315:15  319:8
**five**  244:23,
24  288:16
**five-page**
104:22
**fix**  32:3  44:19
**fixed**  43:17
**flat-out**
142:24  143:23
**flexibilities**
120:18
**flip**  112:22
118:12
146:24

Confidential Information Subject to Protective Order

148:*21*
153:*18*
157:*18*
158:*23*
159:*13, 25*
247:*1* 256:*24*
265:*6* 275:*16*
**flipped** 142:*6*
**flipping**
142:*15*
**Floor** 2:*23*
3:*15* 4:*15*
**focus** 31:*8, 18,*
*21* 36:*19*
39:*24* 43:*4*
173:*14*
176:*21*
206:*13* 287:*5*
288:*24*
**focused** 53:*23*
289:*19*
**focuses** 21:*22*
36:*21*
**folder** 87:*5*
274:*3*
**folders** 274:*5*
**folks** 72:*16*
**follow** 46:*23*
56:*7, 15* 78:*9,*
*22* 84:*7*
91:*11* 92:*2,*
*23* 133:*8*
320:*5*
**followed** 43:*9*
47:*2* 78:*16*
130:*17* 132:*5*
133:*25*
**following** 10:*7*
41:*18* 47:*8*
70:*21* 116:*12*
130:*19* 131:*1*
135:*19*
150:*12, 22*
151:*1* 221:*15,*
*22* 222:*4*
229:*20*
244:*20* 290:*8*
304:*16* 315:*14*
**follows** 35:*3*
94:*11*

**food** 69:*9*
73:*18* 120:*13*
241:*9* 262:*9*
289:*5*
**foods** 89:*22*
262:*12, 17*
**foodstuff**
262:*10*
**foodstuffs**
236:*1* 241:*10*
260:*10*
**footing** 287:*22*
**footnote** 16:*2*
61:*20, 23*
**footnotes**
13:*17, 18*
15:*19* 18:*21*
283:*5*
**forced** 190:*12*
**fore** 71:*24*
**foregoing**
324:*6* 325:*9,*
*19*
**foreign** 294:*9*
**forever** 289:*10*
**Form** 18:*5*
27:*18* 30:*14*
55:*24* 64:*8*
69:*5* 100:*25*
180:*16, 19*
190:*6, 14*
191:*10*
203:*11*
223:*13*
232:*20*
285:*10*
286:*24*
289:*22*
293:*22*
295:*25*
297:*10, 18*
298:*22*
299:*16, 22*
300:*11, 20*
301:*5, 9*
302:*11*
305:*17* 309:*4*
311:*6, 13*
312:*20*
317:*20*
320:*12* 324:*9*

**formal** 107:*21*
203:*3*
**formed** 174:*1*
313:*4, 24*
314:*2, 7*
**forming** 249:*2*
314:*5*
**forms** 100:*19*
226:*5*
**formularies**
269:*10*
**Formulary**
12:*20* 268:*8,*
*11* 269:*6, 22*
**formulation**
147:*23*
**forth** 8:*25*
93:*12* 154:*1*
**Forum** 6:*6*
**forward** 73:*3*
101:*3, 6, 22*
143:*24*
**found** 47:*21*
78:*7, 14, 22*
118:*24*
168:*23*
190:*21*
198:*19*
203:*23*
207:*21* 213:*7*
236:*1* 248:*1*
**foundation**
58:*4, 24* 64:*9*
111:*13*
123:*18* 124:*4,*
*15* 125:*1, 9,*
*17* 151:*5, 15*
166:*6* 176:*4*
178:*11*
182:*24*
183:*22*
185:*24* 191:*2*
193:*17* 220:*3*
221:*12* 249:*5*
**four** 19:*8, 10,*
*24* 26:*8*
32:*15* 49:*24*
207:*11*
244:*23*
264:*17* 265:*8*
277:*24* 278:*3,*

*10* 288:*16*
314:*23* 318:*9*
**four-digit** 63:*1*
**Fourteen**
290:*2*
**fourth** 265:*6*
279:*5*
**fraction** 57:*12,*
*13* 59:*8*
**frame** 48:*6*
191:*14*
**framework**
90:*21*
**Francisco** 9:*9*
218:*20* 286:*5*
287:*3, 9*
**FRANK** 3:*10*
180:*15*
**fraud** 305:*23*
307:*13*
**free** 131:*9*
159:*19* 161:*3,*
*11, 15*
**Fresenius**
279:*14*
**friend** 287:*12*
**front** 11:*9, 25*
96:*9* 99:*5*
102:*22* 127:*3*
249:*14* 265:*7*
277:*16* 278:*5*
285:*1*
**full** 100:*12*
143:*17*
214:*22* 247:*11*
**full-time**
286:*15*
**fully** 59:*2*
**further** 18:*20*
63:*13* 119:*7*
164:*9* 173:*8*
200:*25* 250:*7*
274:*9* 284:*15*
320:*19*
321:*10* 325:*17*
**future** 143:*4*

**< G >**
**Galderma**
279:*18*

**GANNON**
2:*20*
**Gateway** 2:*23*
**gee** 269:*4*
**Genentech**
280:*14* 281:*23*
**General** 5:*20*
6:*5* 10:*6*
35:*15* 36:*18*
39:*7* 42:*22*
43:*2* 59:*6*
66:*13* 71:*9*
91:*4, 20*
94:*20* 95:*22*
101:*21*
104:*23, 24*
106:*17* 110:*3*
114:*1* 117:*2*
126:*25* 127:*3,*
*5, 9, 12* 133:*3,*
*7, 13* 139:*23*
152:*8, 11*
153:*3* 154:*2,*
*4* 155:*4*
159:*4* 160:*17*
161:*21*
174:*20*
216:*25*
234:*17*
244:*20*
252:*19* 255:*7*
259:*22* 260:*1*
262:*18* 310:*5*
316:*25*
**generally**
16:*12* 21:*16*
28:*3, 6* 29:*23*
37:*20* 40:*10*
41:*25* 50:*8*
64:*12* 66:*12*
92:*20* 94:*11*
108:*17*
113:*18*
117:*18* 127:*4*
158:*9* 159:*10,*
*21* 170:*21*
183:*8* 241:*19*
246:*24*
255:*23* 263:*6*
316:*6*

**Generic** 6:*16*
126:*6* 151:*22*
210:*15*
212:*22* 213:*6,*
*11, 23* 219:*18*
220:*1, 9, 15*
222:*25* 223:*5,*
*16* 230:*5*
231:*2* 234:*7,*
*20* 279:*6*
287:*13, 15, 17,*
*19* 288:*12, 18*
**genotoxic**
27:*16* 28:*3, 6,*
*15* 31:*22*
32:*2, 7* 33:*3,*
*23* 35:*6, 11,*
*18* 36:*4, 24*
37:*20* 38:*11,*
*20* 39:*10, 19,*
*25* 40:*2, 20*
41:*8, 11, 21*
42:*6, 10, 17*
43:*1* 47:*10*
55:*19* 63:*7*
66:*6, 10, 25*
71:*6, 22, 24*
72:*8* 80:*16*
81:*5, 18* 83:*8*
84:*7, 10, 24*
98:*17* 101:*14*
102:*10*
105:*17*
106:*22*
107:*15*
131:*15, 20*
132:*1* 133:*9*
189:*16, 21, 25*
194:*20*
209:*13*
234:*13* 241:*6*
266:*14* 267:*6*
294:*12* 298:*8,*
*18* 318:*25*
**Georgia** 2:*17*
**germane** 71:*10*
**getting** 46:*2*
73:*15* 76:*5*
81:*22* 117:*22*
209:*16*
211:*25*

213:*13*
225:*18* 230:*7,*
*8* 243:*8*
248:*3* 253:*23*
281:*23*
**give** 20:*22*
45:*3* 62:*8*
67:*3* 78:*19*
86:*5* 87:*1*
106:*25*
107:*18* 127:*5*
135:*7* 144:*3*
162:*4* 198:*16*
216:*23*
223:*19*
233:*17* 237:*8*
281:*21* 285:*8*
299:*19, 23*
**given** 11:*9*
24:*22* 51:*25*
144:*22* 237:*2*
296:*17* 324:*7*
**gives** 41:*16*
**giving** 243:*5*
**glad** 12:*15*
13:*2* 62:*4*
70:*8* 82:*9*
95:*9* 98:*24*
121:*18*
123:*11, 21*
124:*8* 126:*22*
214:*6* 216:*22*
231:*2*
**glass** 137:*10*
213:*7, 9, 12, 24*
**Global** 6:*12*
294:*5*
**globalization**
288:*23*
**globally** 60:*20*
**globe** 64:*15*
294:*7*
**Glumetza**
280:*5, 11*
**GMP** 43:*9*
47:*19* 56:*1, 2,*
*11, 12, 21*
134:*25* 138:*7*
217:*3* 299:*1*
302:*13, 14*
305:*24*

**GMPs** 48:*13*
57:*5* 58:*10*
133:*8* 137:*15*
138:*19*
200:*11, 13*
206:*13*
213:*19*
279:*25* 298:*24*
**GNTM**
293:*16* 294:*4*
**Go** 39:*1* 54:*5,*
*18* 59:*15*
66:*18* 72:*3*
77:*14* 83:*21*
97:*19, 23, 25*
100:*7* 101:*3,*
*22* 105:*12*
115:*25*
135:*22*
136:*14*
142:*11*
160:*20*
172:*25* 187:*3*
195:*23* 197:*7,*
*19* 204:*1*
213:*10*
215:*25*
217:*15* 218:*6*
222:*19*
227:*20*
229:*25*
235:*18*
237:*18*
238:*10* 239:*4,*
*17* 246:*4*
257:*7, 13*
265:*10*
273:*22*
277:*18*
281:*19*
282:*21*
286:*25*
291:*16* 293:*25*
**goal** 236:*3*
**goes** 111:*22*
112:*8* 113:*16*
244:*22*
276:*19*
316:*10, 15*
**going** 11:*1, 15*
15:*1* 19:*19*

20:*18* 31:*25*
34:*22* 37:*20*
48:*17* 53:*17*
54:*9, 13, 18*
59:*19* 60:*1*
62:*17, 22*
72:*11* 82:*5*
83:*2, 12, 13*
84:*5* 86:*17,*
*21* 94:*24*
95:*18* 96:*7*
98:*2, 4* 100:*2*
104:*7* 105:*24*
107:*19* 128:*4*
141:*2, 11*
142:*10*
143:*24*
145:*17*
152:*18* 163:*4*
164:*25*
180:*16* 196:*2,*
*19, 20, 21*
197:*1* 203:*8*
211:*19* 218:*9*
219:*24* 237:*8*
239:*6* 275:*2*
280:*21*
282:*14*
283:*10* 284:*2*
292:*23* 319:*6,*
*18* 320:*15*
321:*13*
**Golkow** 8:*4*
**Good** 9:*5, 6*
11:*12* 12:*3*
13:*22* 20:*4*
28:*8, 23*
43:*23* 72:*4*
80:*7, 8, 13*
82:*6* 84:*10*
113:*6* 128:*21*
137:*18*
144:*13* 146:*6,*
*24* 153:*13*
161:*1* 165:*14*
170:*8* 192:*11*
208:*24*
209:*11* 210:*8*
213:*3* 245:*7*
267:*13* 274:*7*
282:*15*

287:*12* 315:*4*
316:*4*
**Gordon** 3:*14*
**gotcha** 24:*5*
**gotten** 190:*20*
223:*24*
**governed**
183:*17*
**Government**
306:*16*
**graduate**
291:*5*
**Grant** 3:*15*
**grateful**
289:*10*
**gratified**
319:*24*
**gratuitous**
120:*15*
**gray** 146:*14*
274:*13* 275:*13*
**Great** 62:*22*
89:*7, 17*
110:*18*
113:*22* 118:*6*
137:*25* 141:*9,*
*10* 148:*24*
187:*2* 249:*22*
257:*13*
265:*12, 14*
277:*23*
289:*15* 303:*13*
**greater** 120:*12*
**Greenberg**
2:*15* 9:*10*
**grilled** 259:*16*
260:*19* 262:*1,*
*16, 17* 314:*20*
**ground** 266:*6,*
*9*
**group** 114:*8,*
*20* 268:*7*
271:*4, 12, 13,*
*17* 272:*6, 8,*
*12, 13, 17*
273:*14* 289:*17*
**groups** 115:*14*
**guess** 71:*1*
81:*2* 116:*3*
125:*20*
161:*15*

189:*12*
244:*23*
253:*18*
258:*15*
264:*19*
266:*19* 272:*4*
275:*17, 20*
277:*6* 282:*11*
**guessing**
125:*19* 169:*25*
**Guidance**
5:*24* 6:*8*
12:*10, 13, 16,*
*18* 35:*13*
39:*10, 17, 18,*
*22* 40:*1, 6*
70:*22* 71:*22*
72:*24* 73:*3*
74:*25* 76:*19*
78:*9, 16, 23*
79:*6, 8, 9, 10,*
*15, 21* 80:*14*
81:*4, 16* 82:*6,*
*8, 17, 19, 23*
83:*5, 7* 84:*8*
90:*11* 91:*7,*
*15* 92:*2, 24*
93:*9, 12, 17,*
*18, 20* 94:*17,*
*21* 95:*2, 15,*
*20, 22, 25*
96:*3, 9, 16, 18*
97:*4, 5* 98:*12,*
*16, 18* 99:*17*
100:*4, 18, 25*
101:*8, 14, 15*
102:*10, 11, 20*
103:*7, 21*
105:*22* 107:*8*
108:*3* 109:*1,*
*6, 20, 22, 23, 24*
110:*21*
111:*20*
113:*11, 17*
114:*8* 115:*6*
117:*11, 24*
118:*7* 119:*2,*
*8, 18, 21*
121:*3, 17, 18,*
*20, 24* 122:*1*
127:*22* 129:*5,*

*14* 130:*21, 24*
140:*16* 160:*4*
221:*15, 22*
222:*4* 237:*22,*
*23* 241:*5, 11,*
*20* 242:*8, 22*
245:*17* 246:*2*
265:*24*
266:*18, 22*
267:*1, 3, 7*
280:*3* 303:*1,*
*4, 5, 6* 304:*16*
311:*15*
**Guidances**
14:*16* 15:*15*
39:*8, 21* 41:*4,*
*7, 8, 17* 42:*24,*
*25* 68:*22*
76:*9* 94:*12*
113:*20* 156:*8*
267:*2*
**guide** 111:*23*
112:*9* 133:*4*
**guidelines**
68:*22* 76:*9*
269:*10, 18, 20,*
*21*
**Guilty** 6:*16*
213:*25* 215:*6,*
*10* 305:*2*
**Gump** 256:*13,*
*17* 257:*5*
258:*8, 16*
259:*7, 20*
260:*7* 262:*8*
265:*14, 23*
266:*5* 312:*15*
316:*2* 317:*7*
319:*2*
**Gump's**
257:*21*
261:*23*
265:*11* 267:*10*

**< H >**
**half** 286:*1, 2*
**Halloween**
225:*10*
**hand** 139:*10*
143:*7, 16*

**handed** 98:*20*
99:*8* 113:*15*
146:*3* 234:*19*
292:*17*
**handle** 316:*21*
**handled**
234:*18, 22, 23*
235:*1* 309:*9*
**handling**
234:*17*
**happen** 14:*6*
65:*19* 143:*3*
**happened**
65:*11* 182:*7*
192:*13*
213:*22* 306:*20*
**happening**
263:*13* 300:*6*
308:*14*
**happens**
46:*15* 70:*25*
203:*1* 248:*5*
305:*25*
**happy** 146:*18*
**hard** 23:*23*
99:*25* 128:*12*
142:*25*
143:*16* 144:*3*
158:*19* 159:*8*
200:*3* 239:*24*
319:*1, 18*
**HARKINS**
2:*15* 9:*14*
14:*21* 88:*1, 6,*
*12, 20, 23*
89:*2* 212:*4*
293:*3, 6*
**Harkinss@gtla**
**w.com** 2:*19*
**harvesting**
182:*22*
**Hashmi** 5:*15*
**hate** 195:*13*
**head** 39:*11*
287:*13*
**heading** 15:*15*
43:*24*
**Health** 5:*21*
138:*11*
247:*20* 317:*12*
**Healthcare** 4:*2*

**hear** 20:*23*
48:*21* 88:*16,*
*17* 99:*23*
180:*25* 181:*1*
188:*6* 219:*22*
242:*19* 317:*8,*
*10*
**heard** 8:*16*
20:*25* 123:*4*
133:*11, 12, 16*
164:*14* 182:*5*
299:*10* 317:*18*
**heart** 238:*6*
318:*2*
**held** 8:*7*
286:*11, 17*
288:*1*
**help** 14:*9*
23:*1* 24:*2*
165:*1* 313:*6*
317:*11*
**helped** 312:*21*
**helpful** 38:*7*
61:*24* 62:*14*
210:*19, 20*
222:*18*
280:*20* 282:*16*
**helps** 212:*14*
**HENRY** 3:*2*
**hereinafter**
8:*25*
**hesitant** 95:*25*
101:*20* 104:*3*
135:*5*
**hesitate** 101:*1*
**hesitating**
130:*22*
162:*17* 262:*19*
**Hetero** 3:*19*
**Hi** 141:*18*
**hiatus** 273:*8*
**high** 69:*10*
114:*8* 115:*14,*
*16* 207:*3*
209:*2* 276:*13*
**higher** 80:*6*
120:*10*
**highlighting**
89:*18*

**highly** 65:*25*
66:*23* 138:*1*
315:*9*
**high-potency**
114:*21* 118:*25*
**Hill** 3:*20* 4:*3*
190:*15*
**HILTON** 2:*4*
**Hinshaw** 4:*14*
**Hippensteele**
313:*14*
**hired** 301:*7,*
*17*
**historic** 147:*18*
**history** 29:*5*
56:*20* 198:*8*
199:*4*
**hit** 20:*7*
**HIV** 287:*10*
**hoc** 120:*7*
**Hold** 6:*13*
32:*14* 44:*18*
88:*12* 101:*4*
104:*14*
129:*18*
164:*13, 20*
165:*12, 15, 19,*
*23* 166:*13*
167:*5, 11, 25*
168:*8* 173:*1,*
*10, 16* 239:*14*
277:*17* 311:*3*
**holder** 308:*21*
**holding** 62:*20*
138:*15* 139:*1,*
*2* 140:*8*
**HON** 1:*8*
**honestly**
195:*10*
**honors** 285:*20*
290:*13, 18*
**hope** 35:*21*
227:*4* 263:*11*
**Hospira**
279:*22*
**hospital** 268:*9,*
*10*
**hour** 59:*19*
141:*3* 212:*9*
276:*18* 282:*15*

hours  212:4, 6
271:22  275:1
housekeeping
10:24  12:3
17:19  20:6
44:8
Huahai  4:1
173:6
huge  57:10
294:4  305:22
319:16
Human  5:21
6:9  84:13
85:11, 15
86:2  90:1
105:18
120:11  297:17
Humana  4:5
hypertension
238:11
252:24  301:4,
21
hypoglycemic
211:25
hypothesis
74:9
hypothetical
136:6, 7, 12,
15, 18, 22
137:1, 13
139:14, 16
170:18
193:17
208:18
236:13  237:8
265:4
hypothetically
151:24  244:6
hypotheticals
76:5  140:12

< I >
ICH  40:5
41:5  71:18,
20  79:10
80:14  81:3,
16  82:17, 19
83:6  90:18
91:3, 7, 11
92:2, 23  93:9
94:21  95:2,

14, 21  96:3
98:21  100:18,
25  101:14
102:10, 20
103:7, 15
105:22  106:1
108:3  113:11,
19  117:10
160:3, 12
177:6  246:2
266:22  267:2,
7
idea  125:18
222:7  234:14
238:16  248:4
identical
226:4, 6
229:10
identifiable
298:15
identification
11:6, 20
40:18  42:6
62:11  86:19
90:22  104:9
112:25  128:7
145:20
152:21  154:9
156:15  165:7
210:24
224:16
234:15  256:3
270:22  284:7,
14  292:21
identified
39:6  42:17
49:17  97:4
103:6  105:20
115:14
293:15  303:7
316:16
identify  38:19
41:11  66:15
71:6  82:9
92:3, 11
93:13, 23
97:7  99:16
121:16
123:14, 25
124:11

131:25  133:5
236:4  281:3
identifying
131:3, 15, 20
132:6  134:3
identity  41:1
245:13
Illinois  4:10
imagine  64:12
79:25  184:8
200:2, 3
239:19, 23
240:1  320:3
immediate
111:23  112:9
immediately
145:3, 4  188:3
immune
247:25
impact  154:13
217:11
220:20  221:6
259:3  303:20,
24
imperative
322:12
implement
188:3, 7
implemented
187:21
important
13:5  31:2
32:22  36:4,
19  37:4, 25
95:8, 12
100:6  121:19,
23  177:6, 22
191:9  192:15,
20, 23  275:10
294:2  303:16
315:21
improperly
248:1
improving
206:13
Impurities
5:18, 23  6:1,
9  21:19  28:3,
4, 6  29:13
31:4, 10, 20,
22  32:2, 8, 16

33:3, 23  35:6,
11  36:5, 20,
24  37:4, 20
38:1, 9, 11, 20
39:4, 11, 13,
19, 25  40:2,
20  41:3, 8, 12,
21  42:7  43:1
47:11, 22
55:19  56:13
60:23  66:11
70:1  71:7, 13,
19, 23  73:17,
19  75:7  76:3
84:10  85:10
86:1  87:17
89:25  90:12,
24  91:16, 22
92:4, 7, 8, 13
93:14, 24
94:16  101:15
102:11  106:6
107:9  109:2,
24  111:16
116:15, 19
117:13, 25
118:9, 21, 24
119:20  121:5,
14  127:15, 16,
22  129:5, 19,
24  130:24
131:9, 15, 21
132:25  133:5,
14  135:18
144:10  145:5
146:7  147:9,
24  148:1, 18,
25  152:9
154:23
155:20  156:6
163:15, 20
202:13
205:19
209:14
210:11
221:16, 23
222:5  223:12
232:5, 7, 8, 10
234:9, 16, 18,
19, 23  237:12,
20  241:6, 9

255:10
263:18
264:14, 24
266:14  267:6
303:2, 5, 8
310:19, 21
311:16
315:19  316:7,
20, 25  317:1
318:25  319:23
impurity
27:16  28:1, 9,
15  29:8  30:3,
4, 12, 20
35:18  42:10,
17  48:16
55:13  63:6
64:6  65:2, 20
66:5, 15, 25
67:24  69:9
71:24  77:5
78:8, 15, 22
80:16  81:5,
18  83:9  84:7
91:14  94:14,
18  120:12
130:21  132:1
133:10
140:13, 23
144:17  145:7
148:7  149:8,
10, 11, 23, 24
150:3, 7
154:7, 8, 11
155:9, 10
164:24
173:13
174:10  191:7
208:20
209:24, 25
234:6, 11, 13,
17  240:17
241:4, 12
242:13  259:4
294:12, 18, 25
295:3  298:8,
18
inadequate
144:17  148:7
155:7
incident  294:8

Confidential Information Subject to Protective Order

include 13:8
40:18 114:14
127:14 155:8
228:17 232:10
included
17:13 49:24
169:3
includes
20:11 102:20
119:20
126:25 127:8
160:12
219:19 220:2,
9, 16 224:4
256:12
including
28:2 50:22
56:12 57:24
64:15 151:25
158:6 225:14
234:13 254:1,
6 292:3
293:6 306:4
Incomplete
136:15 137:1,
13 139:14
170:17 193:17
incorporates
40:9
increases
154:10
incredible
64:25
incredibly
64:13
incumbent
71:5 80:15
81:4, 17 83:7
135:15 145:6
200:16, 20
independent
194:11
298:20 299:1,
3
independently
194:7
INDEX 5:1, 10
India 180:7,
12 181:9

indicated
68:23 76:10
121:12
indicates
294:25
indicating
198:11
indications
252:23 253:25
individual
24:21 80:2
135:11, 16
144:16 148:6
155:7 219:9
278:25
Industries
2:11
Industry 5:24
6:8 35:12
39:19 40:1
69:11 70:19
71:13 76:19
78:11 79:3
82:13, 14
91:15 93:4
98:16 115:3
117:24 121:3,
24 246:2
264:15
287:15, 20
303:13 316:6
inform 22:13
28:22 29:3, 7
55:18 67:1
INFORMATIO
N 1:12 26:9
30:17 33:22
35:6 36:4
37:25 49:20,
25 50:9 67:6
122:9 126:21
127:6 152:2
164:9 169:15,
20 170:1, 3
171:6, 25
172:22 174:2
175:10, 19
176:14
179:19 183:2,
13, 25 184:5,
10, 17, 22

185:3, 19
186:10
190:20 191:8,
12, 17, 19
193:13, 15
194:3 199:13
200:6 222:8
250:7 255:9
263:15
264:13, 23
269:2, 24
296:7, 10, 14
informed 48:5
63:5
infrequently
200:15
Ingersoll 3:2
ingredient
85:3 223:12
ingredients
172:9 311:16
initial 294:24
initially 14:2
164:12 293:21
initiate 298:7
initiated 54:15
inner 268:10
insofar 56:12
inspect 193:7
200:2
inspected
180:8, 13
181:9, 20
182:4, 11, 16
199:1, 16
inspecting
64:14 182:5
inspection
174:8 181:15
182:2, 9
192:21
193:12
197:23 198:9,
12, 14, 22
199:11, 19
200:14 295:21
inspectional
56:19 198:8
199:4
inspections
56:10, 17

57:4 192:11,
17 193:1
194:3 201:2,
6, 9, 18 298:24
inspector
295:7
instance
16:15 189:7
255:17
instances
304:23
institute 64:6
297:25
instituted
50:11 161:24
164:13 165:19
institution
215:12
instruct 98:5
instructed
98:10
INSTRUCTIO
NS 322:1
instructs 10:18
insurance
25:7 251:5
insureds 252:7
intake 69:16,
24 70:14
72:23 109:3
116:2 119:22
120:2, 20
311:18
intakes
118:25 119:2,
11 120:11
intellectual
279:1
intend 20:14
297:15
300:18 301:2
302:19
intended 82:9
233:21 299:19
intending
20:22
interchangeabl
e 231:6
interest 221:18
interested
221:3 325:20

interesting
121:19
269:18 273:4
310:15
interference
181:5
interim 67:13,
19 68:22
69:21 70:4
73:1 74:18
75:21 76:9
77:19 91:8
93:7, 21
101:12 102:8
111:15, 23
112:9 117:23
121:1 122:1
204:5, 11, 24
233:4 234:1
235:13 238:4
240:13 296:22
intermediates
173:6
InterMune
280:14, 15
internal
285:18 286:7
International
105:19
internationally
105:21
internship
285:18
interpret
83:15, 18
99:18
interpretation
96:8 203:21
interstate
214:16
interview
257:5 265:25
267:10 311:24
introduce
219:18 220:17
introduced
112:23
introducing
214:15
investigate
302:10

Confidential Information Subject to Protective Order

**Investigation** 63:13 307:3, 12

**investigations** 287:4

**invitation** 289:14

**invoice** 271:21, 24 272:24 273:15, 19, 21 275:15 276:17

**Invoices** 6:23 271:6, 9, 14 272:6 273:10 275:5 276:25

**involved** 25:15 183:18 273:13 302:9 307:2, 11

**involves** 305:21, 23, 24

**involving** 252:2

**IRBESARTAN** 1:5 8:8

**ISIDRO** 2:14

**Isidron@gtlaw. com** 2:20

**issuance** 202:19 209:9

**issue** 28:19 34:4 43:13 44:9 45:7 65:1, 13 74:1 82:2 174:4 180:10 181:7, 14, 17 182:2 189:17 197:22 201:12 204:16, 22 205:9, 16, 25 206:5 209:16 213:5 233:24 260:6 275:2 279:4 293:21 302:13 319:5

**issued** 18:15 34:21 63:23

198:20 202:7 203:24 204:2, 12 206:18 215:18 216:7 318:20

**issues** 15:9 33:19 56:12, 13 64:18 124:4 135:12 192:3 202:25 203:11 206:7 208:17 216:21 295:19, 21 301:24

**issuing** 79:13

**item** 59:10

**iteration** 16:6, 17 110:20 118:7

**iterations** 113:17 267:1, 7

**its** 32:15 33:2 38:9, 10 40:9, 13 41:12 47:9, 20 48:7 49:9, 24 50:11, 12 51:1 55:5 56:25 58:2 64:6 65:6 66:6 67:18 71:7 79:18 80:18 83:11 92:4 108:19 109:12 120:8 129:5 135:16 148:17 150:3 151:18 154:11 161:24 162:8 163:10, 14 164:4, 10, 13, 20 165:19, 23 167:1, 4, 5, 11, 16 168:8 169:18, 19 170:13 171:1 173:16 176:1 183:4 185:20

186:18 188:3, 22 189:7 191:12, 18 193:1, 13 194:15 200:17, 21 201:22 203:19 207:11 213:25 215:6 219:14 220:15 221:23 233:21 248:5, 8, 17 294:6 297:25 298:4, 18, 25 299:4 304:25 307:5, 13 309:1 315:17

**Ives** 4:9

**< J >**

**JAMES** 2:14

**Janet** 288:4

**January** 6:1 12:7 13:9 15:21 16:6, 11 17:6, 9, 24 18:17, 25 19:13, 21 20:1 43:14 73:12, 24 74:3 128:17 132:4 205:6 271:15, 24 273:16

**JERSEY** 1:2 3:21 8:11

**Jerusalem** 166:21 201:13 202:17 210:8 298:25

**job** 286:15

**John** 19:20

**joint** 53:2 312:25 313:17 314:12

**jointly** 314:8

**journal** 292:1, 12

**journals** 291:10

**JR** 3:20

**Jubilant** 6:14 166:3, 10

**judge** 195:12 197:3

**judgment** 214:2

**July** 6:12 29:24 30:9 48:6 63:24 165:12, 15, 22 166:13 167:25 173:3 272:2 273:12, 19

**jumped** 261:22

**jumps** 44:23

**June** 6:23 32:19 48:6 51:9 54:19, 22 62:19 63:8, 11 68:5, 11 123:3, 15 124:1 164:15 168:15 190:12 191:18 194:14 235:2 256:10 266:3 294:10 312:14

**jury** 285:7

**Justice** 212:18 305:22 306:3, 23

**justified** 120:11 149:15 156:6

**justify** 119:11

**< K >**

**Kabi** 279:14

**Kaiser** 268:23

**Kali** 19:20

**Kanner** 2:5

**Kaplan** 19:9, 20

**Kappa** 285:21, 22

**KATHLEEN** 4:14

**keep** 34:22 37:4 71:8 97:20 98:9 105:24 109:22 112:4 140:20 179:4 182:1 195:13 196:2, 19, 25 208:16 231:8 236:7 238:3 308:19

**keeping** 309:7

**keeps** 319:20

**Keire** 6:9 156:25

**Kekelly@hinsh awlaw.com** 4:16

**KELLY** 4:14

**KENNETH** 2:13

**kept** 53:13 67:17

**kind** 33:9 34:24 73:15 111:17 138:7 151:25 157:14, 22 158:17 171:20 184:9 203:20 240:16, 24 241:12 259:21 295:15 315:11 316:11

**kindly** 155:16

**kinds** 252:9

**knew** 175:14, 16 182:19 185:20 191:8 199:3, 4, 11 264:1, 7

**know** 15:14 16:15 21:8 22:19 23:18, 22 24:19

26:13  28:22
30:19  31:3, 8,
12  34:6  35:9
36:17  38:6
39:3  41:15
42:21  43:14
45:19  48:2
51:23  52:19
53:1, 4, 19
55:22  57:23
58:13  61:9
63:16  64:11
65:13  66:21
70:18, 21
71:1, 8, 10, 18
73:14, 17
74:6, 7, 21, 24
75:12  76:4
81:8  82:4
83:11  84:6, 8
94:9, 11, 13
95:5, 9  99:13
101:1  102:4,
24  103:19
107:1  108:23
110:7  111:17
118:13  120:6
121:11  123:4,
19  136:17
137:20
138:10, 21
148:22  150:1,
8, 15  156:18
158:8  159:9
161:18  165:4
167:12, 21, 23
168:11
170:21  171:3
174:24  175:2,
11, 14  176:5
177:10  179:3,
23  180:6
182:13, 21
185:5, 9, 12,
16, 18, 25
188:11, 15
189:7, 12, 17
190:16, 17
191:4, 12
192:15, 20, 25
193:5  195:14,

16  198:24, 25
199:14, 17, 18,
21  201:15
203:15
206:11
210:17  211:3
212:2, 13
214:14
215:24
216:20
217:16
219:20, 22
220:25
221:21, 25
222:1, 3
224:18  225:8
228:6, 13
232:13  235:6,
8, 10  237:7,
14  238:23
239:9  240:11
243:16
245:23
250:14  251:6,
22  254:4, 9,
12  255:16, 21
258:25
260:24, 25
262:9, 14
268:1, 3
269:12  270:6,
25  276:11
277:12
278:16  281:2
296:12  298:9
302:5  306:19,
20  313:4, 5,
22  314:13, 21
317:15  318:5,
25  319:1
**knowing**
158:12  176:7
183:6  255:3
**knowledge**
26:18  27:9
85:5  172:14
188:9, 13
189:14
194:19
233:14

306:11  307:2,
11  314:11
**known**  29:24
31:14  106:1,
4  249:1
258:3  263:16
**knows**  23:18
228:7
**Korea**  286:2
**Kristina**  4:16
8:3
**KUGLER**  1:8

< L >
**L.hilton@kann
er-law.com**
2:8
**label**  202:9
227:14  255:8,
10  318:16
**labeled**  253:25
**labeling**
209:22
226:24
228:10
229:12
231:11, 14, 15
255:12, 22
**Laboratories**
3:10
**Labs**  3:19
**Lacks**  58:3,
24  64:9
123:18  124:4,
14, 25  125:8,
17  151:4, 15
176:3  249:4
**language**
306:10
**Lantech**
174:8, 9, 11,
16  178:17
179:19  182:4,
10, 11, 16, 19,
22  183:20
184:16
185:14, 16, 20
**large**  219:10
269:11
**larger**  272:9

**lasted**  286:5
**late**  164:15
**latest**  16:16
43:18
**laudatory**
65:25
**laughing**  274:2
**law**  223:3, 10
**laws**  42:24
**LAYNE**  2:4
**Lea**  5:12
**lead**  147:23
148:1  298:17
**leading**  207:14
**learn**  31:21
198:22  309:12
**learned**
180:11  181:8
183:19  199:1,
15  293:20
294:15  303:13
**learning**  48:1
**learns**  193:12
**leave**  228:5
290:5
**leaving**  289:13
**led**  19:25
122:9
**Lee**  4:16  8:3
**left**  146:14
275:14
286:22
287:25  288:20
**legal**  162:4
247:21
**lengthy**
283:18  320:10
**Letter**  5:20
61:5, 7
104:21, 22, 23
106:17, 21
107:3, 20, 21
108:11  109:1,
5, 16, 21
110:4, 8, 9, 14
111:1, 5, 9, 15
112:5, 17
120:24  174:9
188:5  192:4
194:10  199:5,
6  202:25

203:24  204:3
205:5, 25
206:7, 10
208:17
215:18
217:14, 25
295:14, 23
**letterhead**
272:25
**letters**  187:9
192:12
202:11, 20
204:13, 23
205:18
206:17  208:5,
6  209:7, 10
216:7, 22
295:11  318:20
**letting**  81:7, 9
**level**  68:23
85:9, 25
89:24  106:4
149:13, 15
154:10
187:23
276:13  288:1
319:1
**levels**  26:25
69:10  76:10,
20  121:25
163:20
164:24  209:1
235:10  236:2,
5  315:7  317:4
**LIABILITY**
1:6  8:9
20:21  28:19
33:25  34:4,
11, 15, 17
38:23  42:1
67:4  82:1
101:18
170:16  193:4
195:6, 9, 17
219:5, 6
299:14, 19, 24
300:4
**Liaison**  6:4
**license**  236:19,
22

licensed
286:*12*
licenses
286:*11*, *17*
licensure
286:*20*
life  95:*3*, *15*
96:*4*  210:*3*
Lift  6:*13*
165:*12*  168:*8*
173:*1*
lifted  164:*20*
165:*23*
166:*12*  173:*15*
lifting  165:*15*
167:*5*, *11*
173:*9*
light  146:*14*
194:*11*
209:*25*
264:*14*, *24*
Limit  5:*23*
28:*12*  35:*20*
48:*16*  65:*3*, *4*
66:*16*, *21*
68:*10*  69:*17*
70:*23*  75:*5*, *9*,
*10*, *13*, *16*, *17*,
*18*, *21*  76:*4*
77:*7*, *16*, *25*
78:*10*, *17*, *23*,
*25*  90:*24*
91:*14*  92:*13*
93:*14*, *24*
106:*5*  129:*20*,
*21*  149:*8*, *21*
163:*23*  207:*3*
208:*23*
209:*14*  210:*9*,
*12*  234:*12*
239:*22*
240:*18*, *22*
241:*4*, *16*
243:*3*, *13*
244:*1*  254:*11*
limits  45:*20*
67:*13*, *19*
68:*1*, *4*  69:*16*,
*21*, *24*  70:*5*,
*14*  72:*24*
73:*1*, *16*

74:*18*, *24*
75:*2*, *7*  76:*15*
77:*4*, *19*  79:*4*,
*17*, *21*  80:*1*, *6*,
*17*  81:*7*, *19*
83:*10*  90:*13*
91:*8*, *25*  93:*7*,
*21*  101:*12*
102:*8*  109:*3*
111:*16*, *23*
112:*9*  115:*3*
116:*14*, *19*
117:*8*, *12*, *14*,
*15*, *17*, *20*, *23*,
*24*  118:*8*
119:*22*  120:*2*,
*20*  121:*2*, *5*
130:*1*, *21*
140:*15*, *21*
162:*19*, *20*
202:*12*  203:*6*
204:*6*, *12*, *24*
205:*19*
206:*22*, *23*, *25*
207:*3*  210:*5*
232:*23*  233:*3*,
*4*, *6*  234:*1*
235:*13*, *15*
238:*4*  239:*22*,
*23*  240:*5*, *8*,
*10*, *14*, *16*, *20*
241:*2*, *6*, *12*,
*18*, *21*, *25*
242:*3*  243:*1*,
*25*  254:*7*, *15*,
*16*  296:*22*, *23*,
*24*  297:*4*
310:*18*, *22*
311:*18*  318:*21*
line  16:*21*
50:*16*  195:*9*
229:*20*
309:*19*, *22*
323:*3*, *6*, *9*, *12*,
*15*, *18*, *21*
lines  96:*1*
226:*12*  264:*9*
link  88:*13*, *15*
Lipitor
210:*15*  213:*6*,
*12*, *24*

List  5:*12*
11:*16*, *22*
17:*12*  18:*9*,
*10*, *14*  19:*3*, *7*
22:*4*  23:*4*, *12*
24:*16*  57:*8*,
*20*, *23*  58:*22*
123:*7*  201:*18*
281:*20*
282:*24*  293:*7*
294:*4*
listed  12:*13*
13:*6*, *13*, *23*
14:*8*  15:*15*
17:*4*, *16*
18:*23*  19:*12*
57:*17*, *20*
58:*18*  59:*9*,
*10*  149:*11*, *13*
177:*18*, *21*
209:*23*  223:*2*,
*5*  228:*10*
229:*12*  231:*4*,
*6*, *14*  234:*8*
247:*24*
274:*22*
277:*23*  283:*2*
290:*14*, *22*
292:*13*, *25*
318:*12*
listened
320:*15*
listening  122:*6*
listing  14:*3*,
*18*, *20*
lists  16:*8*, *10*
115:*17*
225:*11*  244:*13*
literature
149:*16*
LITIGATION
1:*6*  8:*4*, *9*
21:*9*, *17*  22:*6*,
*18*  23:*15*
25:*3*, *8*, *13*, *15*
193:*24*  219:*7*
289:*19*
290:*25*
291:*13*, *23*
little  11:*17*
23:*12*  38:*7*

57:*22*  78:*19*
82:*18*  83:*3*
98:*22*  100:*17*
101:*25*  104:*3*
130:*22*
134:*16*  135:*5*
145:*4*  146:*25*
170:*2*  206:*13*
219:*12*, *22*
223:*24*
226:*10*  234:*5*
271:*11*  274:*2*
281:*4*  282:*8*
LIZA  2:*22*
LLC  2:*5*, *11*
4:*2*  7:*1*
LLP  2:*15*, *22*
3:*8*, *14*, *20*
4:*3*, *9*, *14*
loath  72:*18*
located  9:*7*
LOCKARD
2:*13*  5:*5*
9:*13*  17:*11*,
*20*  18:*5*, *9*
20:*18*  21:*1*, *2*,
*4*  23:*16*, *22*
24:*13*  26:*4*,
*16*  27:*18*
28:*17*  29:*15*
30:*14*, *21*
31:*6*, *25*  32:*5*
33:*4*, *17*, *25*
34:*7*, *19*  35:*8*
36:*7*, *13*, *14*
38:*3*, *21*
40:*16*, *21*
41:*13*  42:*19*
50:*14*  51:*19*
55:*8*, *21*  57:*1*
58:*3*, *21*
59:*18*  61:*8*,
*18*  64:*8*  65:*8*,
*22*  67:*2*, *20*
69:*5*  72:*11*
73:*13*  74:*4*,
*20*  75:*24*
76:*12*, *21*
77:*10*  78:*3*
79:*23*  80:*19*
81:*22*  83:*12*,

24  84:*14*
85:*4*, *12*  86:*3*
87:*9*, *20*  88:*3*
90:*8*  92:*15*,
*25*  94:*1*  96:*5*,
*13*  97:*2*, *19*
99:*12*, *23*
100:*9*  101:*17*
102:*3*, *13*
103:*8*, *17*, *25*
104:*14*, *17*
105:*3*  106:*23*
107:*16*  108:*8*
110:*11*
111:*12*  112:*1*,
*15*  115:*7*, *23*
116:*21*  118:*1*
121:*7*  122:*2*
123:*16*  124:*2*,
*13*, *24*  125:*7*,
*15*  132:*8*
134:*14*
136:*11*, *15*, *25*
137:*12*
139:*13*  141:*2*
142:*9*, *11*
143:*5*, *15*
144:*2*  150:*18*
151:*4*, *14*
158:*2*, *15*
159:*6*  160:*14*
161:*4*, *12*
162:*2*, *15*
163:*16*  166:*5*
167:*6*, *19*
168:*9*  169:*12*
170:*15*, *20*
171:*15*
172:*17*  176:*3*,
*19*  177:*4*
178:*11*
179:*22*
180:*14*, *20*
181:*11*
182:*24*  183:*7*,
*21*  184:*6*, *24*
185:*23*  186:*6*
189:*9*  190:*6*,
*14*  191:*1*, *10*
192:*9*  193:*3*,
*16*  194:*22*

Confidential Information Subject to Protective Order

**195:**5, *20, 23*
**196:**7, *12, 19*
**197:**2, *6, 15,
18* 210:*16*
211:*6, 14, 21*
212:*1, 6, 11*
217:*18, 21*
220:*3, 18*
221:*11*
232:*20*
235:*23* 236:*9*
237:*5* 238:*7,
19* 239:*14*
242:*16* 243:*4*
244:*3* 249:*4*
254:*21* 257:*1*
258:*11, 23*
260:*12, 22*
262:*4* 263:*20*
265:*2* 266:*15*
277:*18*
282:*14*
284:*23* 285:*6,
12* 289:*24*
290:*4, 20*
291:*6, 11, 24*
292:*22* 293:*2,
4, 12* 294:*13,
22* 296:*2, 20*
297:*14, 21*
298:*6* 299:*2,
18* 300:*1, 13*
301:*1, 6, 15*
302:*17* 303:*3,
15, 22* 304:*21*
306:*8, 15*
307:*1, 9, 18*
308:*1, 24*
309:*10, 18*
310:*3, 10*
311:*2, 9, 19*
312:*23* 313:*7*
317:*22* 320:*2,
9, 12, 20*
321:*1, 5*
**Lockardv@gtla
w.com** 2:*18*
**lodging** 196:*3*
**Loestrin**
279:*10*

**long** 69:*23*
109:*2* 120:*6*
140:*11*
211:*20* 212:*2*
311:*17*
**look** 13:*20*
16:*16* 21:*24*
23:*11* 24:*8*
29:*16, 20*
36:*2* 37:*23*
39:*4* 40:*3*
43:*18* 55:*23*
58:*17* 60:*13,
14, 18* 63:*1,
12* 77:*14*
82:*13, 17*
83:*4, 14*
86:*21* 87:*2*
98:*12, 15, 24*
102:*21, 25*
105:*6* 123:*11,
21* 124:*8, 11*
128:*12*
141:*25* 142:*5*
143:*8, 25*
144:*6* 152:*5*
162:*25* 166:*8*
170:*3* 172:*8,
15* 174:*9*
177:*16*
179:*15* 186:*8*
197:*13* 213:*4*
214:*14*
216:*21*
217:*13*
222:*10, 15, 16*
223:*10*
224:*11* 228:*1*
229:*25*
233:*18, 22*
244:*8* 247:*6*
253:*3* 265:*19*
266:*13*
267:*11* 271:*5,
8* 273:*14*
275:*8* 278:*6,
20* 279:*23*
292:*9* 298:*24*
308:*7* 310:*7*
311:*15*
315:*14* 316:*7*

**looked** 12:*21*
18:*6, 7, 13*
60:*16* 61:*14,
17, 18* 62:*1,
25* 82:*22*
126:*18, 21*
142:*2, 19*
144:*23* 169:*5*
177:*17, 20*
266:*18* 272:*2*
283:*3* 321:*7*
**looking** 14:*22*
15:*10* 18:*14*
19:*2* 21:*11*
22:*13, 20*
30:*6* 43:*10,
12, 17, 21, 22*
45:*24* 46:*16,
18* 49:*22*
51:*12* 56:*6*
61:*22, 23*
77:*13* 89:*4,
16* 95:*22*
99:*7, 10, 21*
104:*20* 112:*2,
5* 117:*10*
119:*18* 120:*6,
17* 128:*14*
129:*9* 142:*20*
143:*2* 146:*25*
147:*3* 160:*20*
173:*1, 3*
176:*16* 204:*8*
205:*10* 219:*8*
224:*19*
229:*14, 22*
230:*10*
253:*13* 257:*3*
273:*1* 275:*24*
277:*7* 278:*4,
12* 298:*17*
305:*6* 313:*8*
320:*24*
**looks** 17:*2*
44:*19* 62:*18*
65:*20* 87:*13*
100:*10*
104:*22*
143:*13* 146:*4*
166:*2* 273:*5*
274:*24*

**276:***16, 24*
277:*23*
**Los** 3:*9*
**LOSARTAN**
1:*5* 8:*8*
**lose** 14:*21*
**losing** 180:*22*
**loss** 195:*11*
219:*9*
**lost** 21:*6*
97:*17* 139:*16*
**lot** 55:*23*
99:*10* 216:*20*
243:*21*
278:*23* 288:*8*
289:*1* 299:*10*
317:*8*
**louder** 211:*22*
**Louisiana** 2:*6*
**love** 181:*4*
**low** 235:*14*
238:*24, 25*
317:*4* 319:*1*
**lower** 115:*4*
119:*1* 146:*14,
25* 153:*21*
**low-level**
121:*14* 209:*25*
**Lu** 6:*10*
156:*25*
**lunch** 218:*18*
**Lwalsh@walsh.
law** 2:*25*

**< M >**
**M.D** 1:*17*
5:*12* 7:*1*
8:*21* 324:*14*
325:*8*
**M7** 39:*22*
79:*9* 90:*19*
91:*3, 7, 12, 18*
92:*2, 18, 24*
93:*4, 9* 94:*16,
21* 95:*2, 14,
22* 96:*3, 20*
98:*20, 21*
99:*21* 100:*18,
25* 101:*8, 14*
102:*10, 20*
103:*7* 105:*22*

**106:***1* 108:*3*
160:*3, 12*
241:*5, 11*
242:*8, 22*
266:*24*
**M7(R1** 5:*22*
79:*10* 80:*14*
81:*3, 16*
82:*19* 83:*7*
98:*23, 24*
99:*8, 9* 113:*3*
118:*7*
**ma'am** 20:*24*
**Madam** 34:*23*
**major** 187:*22*
286:*10*
**majority** 34:*12*
**Making** 6:*22*
53:*12* 64:*14*
100:*12* 135:*5*
136:*5* 139:*23*
162:*12*
174:*13*
183:*15* 206:*4*
208:*2* 210:*8*
213:*6* 214:*12*
216:*9* 269:*25*
270:*14* 319:*16*
**malaria**
285:*25*
**Mallinckrodt**
280:*16, 18*
281:*22*
**Malta** 48:*19*
201:*13*
202:*17* 210:*8*
298:*25*
**manage**
178:*17* 181:*10*
**managed**
174:*18*
**management**
60:*19* 294:*5*
**manager**
270:*7*
**managing**
174:*12*
**manner** 33:*24*
35:*7* 174:*17*
**manufacture**
32:*15* 131:*2*

Confidential Information Subject to Protective Order

174:*25*  175:*7,
12, 18*  178:*1*
**Manufactured**
6:*14*  26:*8*
48:*19*  245:*6*
**Manufacturer**
6:*16*  27:*15*
28:*14, 22*
29:*3*  32:*25*
35:*17*  37:*1, 2*
38:*19*  39:*16*
40:*8*  42:*11*
50:*9*  52:*14,
16, 20*  55:*12*
66:*11*  70:*3*
71:*6*  78:*12,
14*  79:*18*
80:*15*  81:*5,
13, 17*  82:*15*
83:*8*  84:*6*
92:*2*  93:*22*
101:*13*  102:*9*
109:*11*
130:*13*
131:*23*  132:*5*
133:*4*  135:*16,
18*  138:*1*
139:*4, 12*
140:*10*
144:*10, 22*
145:*7, 11*
147:*8*  148:*8,
16*  149:*23*
154:*12*
155:*10*
158:*14*
168:*23*
170:*13*
175:*25*  182:*6*
192:*25*
193:*11*
194:*12*
195:*15*
200:*12, 17, 18,
21*  212:*22*
223:*1, 16*
241:*23*
246:*21*  250:*5*
263:*16*
297:*24*  298:*4*
304:*3, 4*

**manufacturers**
29:*10*  34:*13*
39:*24*  49:*22*
54:*17*  81:*25*
82:*3, 20, 21,
25*  92:*11, 23*
93:*13*  120:*19,
23*  121:*4*
126:*10, 11*
151:*23*
153:*22*
154:*22*
155:*17, 23*
156:*5*  177:*1,
7*  179:*24, 25*
193:*22*  194:*7*
265:*18*
266:*12*  267:*4*
309:*7*  315:*22*
316:*21*

**manufacturer's**
33:*21*  35:*5*
36:*3*  37:*24*
135:*11*
147:*22*  154:*2,
3*  155:*3*
169:*10*
**Manufacturing**
6:*21*  109:*12*
140:*20*
147:*22*  172:*9,
15*  174:*5*
176:*2*  177:*2*
183:*19*
185:*21*
186:*18*  187:*4*
201:*2, 7*
245:*7*  249:*2*
295:*8, 20*
302:*4*  316:*17*
**March**  99:*9,
22*  100:*3*
113:*4, 11, 13*
114:*8*  117:*11*
119:*22*
146:*11, 13, 22*
**marches**  72:*2*
263:*7*
**marching**
42:*23*

**mark**  11:*1, 15*
62:*8*  86:*17*
99:*5*  100:*15*
102:*22*  104:*7*
128:*4*  145:*17*
152:*18*
210:*22*
255:*25*
270:*19*  284:*2,
10*
**marked**  11:*5,
19*  12:*5*
62:*10*  86:*18*
104:*8*  112:*24*
128:*6, 11*
143:*11*  144:*1*
145:*19, 22*
152:*20*
156:*14*  165:*6*
210:*23*
224:*15*  256:*2*
270:*21*  284:*5,
6, 13, 25*
290:*7*  292:*20*
**market**  48:*8,
12, 20*  64:*19*
65:*7*  67:*12*
68:*13*  138:*22*
151:*19*
161:*20*  162:*1*
163:*3*  172:*12*
201:*22*
202:*15*
204:*19*
206:*16*  207:*5,
9, 12*  210:*13*
213:*17, 20*
219:*14*  220:*1,
8*  221:*24*
222:*6*  252:*15*
309:*24*
310:*20*
318:*13*  319:*8,
12, 22, 23*
**marketed**
28:*10*  119:*12*
154:*22*  248:*2*
**marketing**
119:*24*
164:*13*  247:*22*

**marketplace**
144:*15*  145:*2*
210:*11*
**marking**
156:*17*
**Massachusetts**
4:*15*
**master**  248:*14,
20*
**material**
23:*25*  33:*22*
35:*5*  57:*10*
59:*12*
**Materials**
5:*14*  7:*4*
9:*22*  11:*16,
23*  12:*14*
13:*1, 7, 13, 18,
22, 24*  14:*2, 3,
7, 23*  15:*10*
16:*8, 17*  17:*2,
12*  19:*3, 13*
20:*6*  21:*25*
22:*1, 20*  23:*4*
24:*6, 18*  25:*7*
54:*24*  55:*23*
57:*9, 15, 18,
24*  58:*14, 18,
22, 23*  59:*3, 8,
11*  61:*1, 22*
63:*14*  79:*12*
84:*19, 20*
97:*1*  124:*7,
11*  126:*22*
167:*13*
177:*18, 21*
218:*1*  274:*7*
275:*7*  282:*24*
283:*2*  292:*16,
25*  293:*7, 8*
300:*3*  302:*7*
315:*18, 19*
**materials-
considered**
22:*4*  57:*11,
20*  59:*9*  123:*7*
**matter**  8:*8*
12:*3, 23*
20:*12, 15*
28:*21*  29:*6*
92:*9*  120:*23*

131:*18*  133:*1,
20*  159:*4*
203:*15*  209:*6,
17*  269:*16*
273:*6*  277:*1*
294:*9*  305:*5,
18*
**matters**
277:*24*  278:*11*
**Maz@falkenbe
rgives.com**
4:*11*
**MCH**  83:*5*
**Mcharchalis@
btlaw.com**
3:*10*
**MDL**  8:*9*
**mean**  23:*19*
29:*4*  34:*6*
71:*15*  74:*9*
76:*5*  86:*13*
92:*5*  100:*24*
101:*25*  102:*1*
109:*10, 23*
126:*13*
130:*20*  131:*8*
134:*5*  139:*8*
171:*20*  174:*3*
177:*20*  181:*5*
188:*25*  193:*6*
195:*13*  205:*6*
206:*3, 11*
208:*8*  222:*23*
223:*7, 22*
227:*5*  233:*2*
235:*8*  241:*15*
245:*23*
247:*25*  248:*7*
252:*18*
259:*22*  260:*1,
15*  271:*16*
274:*1*  276:*10*
300:*21*
**meaning**
217:*2*  245:*16*
**means**  147:*20*
219:*3*  223:*11*
224:*1*  228:*11*
229:*3, 10, 11,
16*  230:*16*
231:*9*  247:*23*

**meant** 79:*14*
188:*2* 228:*21*
**measure**
66:*15* 70:*18*,
*20* 71:*14*
94:*19* 133:*13*
210:*2* 317:*5*
319:*2*
**measurements**
291:*21*
**mechanisms**
247:*21*
**medical** 25:*2*
236:*19*, *22*
237:*21* 251:*7*
285:*16*, *17*, *21*
286:*23* 291:*4*
301:*19*
**Medicare**
269:*10*
**medication**
238:*11* 250:*4*,
*5*, *8*
**medications**
301:*4*, *21*
**medicinal**
251:*7*
**medicine**
158:*21* 261:*5*
285:*19* 286:*7*,
*12*, *16* 287:*10*
**medicines**
89:*24* 159:*3*
237:*13*
238:*14* 239:*1*
259:*18*
260:*21* 261:*2*
262:*3*, *24*
289:*7* 291:*20*
314:*10* 319:*22*
**meet** 136:*4*
195:*12*
244:*20*
245:*11* 246:*15*
**meets** 136:*9*
157:*15*, *22*
250:*8*
**MEGAN** 4:*5*
**memberships**
290:*22*

**memo** 165:*15*
167:*25*
172:*13* 173:*2*,
*17*
**mention** 41:*8*
91:*24* 129:*16*
130:*3*, *9*
151:*2* 169:*6*
177:*25*
179:*12*
222:*17* 228:*1*
252:*13* 269:*8*
297:*6*
**mentioned**
29:*2* 206:*3*
265:*17* 315:*6*
**mentions**
217:*4*
**mentor**
287:*12* 289:*15*
**mere** 178:*9*, *24*
**merged** 272:*10*
**messed** 45:*8*
46:*7*
**met** 135:*25*
136:*22* 137:*9*
139:*21* 140:*6*,
*21* 205:*4*
223:*15* 268:*23*
**metabolite**
149:*16*
**method** 125:*5*
147:*22*
**methodology**
297:*3*
**methods**
124:*22*
169:*10* 197:*11*
**metrology**
288:*25* 291:*21*
**middle** 90:*17*
114:*4*
**midway** 316:*1*
**Million** 6:*17*
212:*23* 315:*8*
**millions**
317:*10*
**mind** 37:*4*
**mine** 146:*17*
**minor** 187:*7*,
*11* 188:*2*

**minute** 51:*9*
97:*21*, *22*
105:*11*
146:*12*
197:*25*
214:*19*
239:*14* 272:*1*
273:*17* 277:*13*
**minutes** 11:*3*,
*24*
**misbranded**
64:*24* 205:*15*
209:*21* 253:*9*
318:*14*
**misheard**
36:*11*
**misnumbering**
44:*9* 45:*23*
**misread**
261:*14*
**missing** 67:*25*
117:*15* 295:*2*
**Misstates**
58:*4* 64:*9*
**MITCHELL**
3:*8*
**mitigate** 27:*25*
**model** 269:*9*,
*17*, *21*
**moderate**
187:*8*, *11*
188:*2*
**modify** 89:*19*
**Modules**
256:*14*
**molecule**
233:*23* 260:*7*
**Molecules**
256:*19* 312:*17*
**moment** 67:*9*
144:*3* 173:*1*
178:*5* 211:*17*
295:*4*
**moments**
128:*22*
**monitor** 15:*5*
60:*5* 141:*14*
194:*14*
218:*13* 283:*14*
**Monograph**
6:*1* 125:*23*,

*25* 127:*4*, *8*,
*11*, *13* 128:*17*,
*22*, *25* 129:*17*
130:*1*, *4*, *10*,
*14*, *17*, *19*
131:*1*, *8*, *13*
132:*4*, *13*, *17*
133:*21*, *25*
134:*2*, *12*
135:*9*, *13*, *19*
140:*12*, *23*
144:*12*, *14*, *16*,
*23* 147:*10*
148:*7* 149:*21*
150:*12*, *22*
151:*1*, *12*
155:*7* 246:*6*
**monographs**
126:*1*, *4*, *10*,
*16*, *19* 127:*18*,
*20* 133:*22*
147:*17* 151:*21*
**Monroe** 4:*9*
**month** 51:*9*
63:*24* 64:*5*,
*19* 129:*4*
**monthly**
271:*22*
**moral** 43:*3*
**morning** 9:*5*,
*6* 11:*18*
34:*13* 51:*25*
198:*5*
**Morris** 4:*3*
**move** 101:*6*,
*22* 196:*20*
259:*11*
**Moving** 46:*18*
**Mulberry** 2:*23*
**multiple**
288:*1* 291:*10*
**MURTHA**
3:*20*
**Mutagenic**
5:*22* 90:*24*
92:*4*, *7*, *12*
93:*14*, *24*
94:*15* 106:*1*
114:*9*, *21*, *25*
116:*15*

117:*12*, *25*
118:*8* 258:*3*
**Mylan** 3:*10*
6:*15* 56:*25*
164:*11*
166:*14*, *18*
167:*5*, *9*, *17*,
*23* 168:*2*, *5*
172:*4*, *15*, *21*
173:*5*, *10*, *24*
174:*4*, *13*, *18*,
*24* 175:*6*, *11*,
*17* 176:*8*, *12*
177:*12* 178:*1*,
*16*, *24* 179:*4*,
*20*, *25* 180:*6*,
*11*, *15* 181:*8*,
*18*, *25* 182:*21*
183:*12*, *13*, *17*
184:*3*, *15*, *21*
185:*6*, *9*, *21*
201:*14*
202:*12*, *20*
203:*1* 204:*3*,
*13*, *23* 205:*1*,
*18* 206:*18*
207:*6* 208:*6*
209:*7*, *10*
216:*7*, *22*
218:*3* 303:*17*,
*24* 318:*21*
319:*11*
**Mylan's**
173:*21*
174:*22*
176:*17* 178:*20*
**myriad** 152:*1*

**< N >**
**Naiffer** 87:*16*
**Najafi** 19:*9*,
*21* 22:*11*
**Najafi's** 43:*11*
44:*10*
**name** 8:*3*
58:*22* 105:*22*
211:*15*
257:*14*
265:*11* 269:*19*
**named** 126:*11*
325:*19*, *20*

**names** 156:*24*
157:*1, 4*
**nanograms**
73:*11, 23* 74:*2*
**nasty** 258:*4, 9,
21*
**nature** 8:*14*
**NDA** 7:*1*
27:*24* 78:*20*
255:*9* 272:*7,
8, 12, 16, 25*
273:*2* 287:*4*
288:*17* 289:*17*
**NDA/ANDA**
225:*12*
**NDEA** 114:*14*
122:*24* 168:*5,
23* 169:*9, 11,
19* 171:*10, 12,
14, 18* 172:*2,
5, 16* 173:*14,
17, 19* 174:*21*
**NDMA** 29:*8*
30:*5, 10, 12,
20* 31:*4, 13,
22* 48:*1, 23*
49:*18, 25*
54:*19, 21*
55:*6* 64:*6*
67:*18* 73:*6,
11, 23* 74:*2,
18* 91:*14*
114:*14*
122:*20* 123:*2,
14, 25* 124:*12,
23* 125:*5, 14*
130:*16*
150:*16* 171:*7,
9* 173:*13, 19*
**NE** 2:*16*
**nearly** 215:*11*
**necessarily**
34:*19* 130:*15*
179:*16*
206:*11*
231:*15*
295:*23* 316:*15*
**necessary**
27:*10* 35:*20*
322:*4*

**need** 28:*13*
31:*12* 36:*2*
37:*22* 39:*5,
24* 54:*6* 62:*6*
79:*3* 85:*18*
95:*19* 102:*21*
144:*4* 170:*10*
172:*1* 195:*11*
206:*12*
212:*11* 232:*2*
235:*12* 241:*4*
257:*2* 261:*5*
262:*23* 265:*9*
276:*23*
282:*11* 298:*8*
315:*10*
**needed** 12:*9*
66:*22* 142:*14*
172:*21*
**needle** 138:*14*
**needles**
137:*20* 138:*4,
13* 139:*2*
**needs** 48:*12*
50:*21* 66:*18*
69:*25* 97:*25*
144:*19* 193:*8*
208:*18*
213:*19* 240:*17*
**negative** 140:*3*
**negligible**
116:*3, 5*
173:*13*
**negotiated**
305:*2, 12*
306:*22*
**negotiation**
306:*11*
**neither** 70:*19*
71:*13* 163:*22*
258:*17*
**nervous** 98:*22*
**never** 47:*18*
69:*10* 74:*10*
76:*4* 180:*8,
12* 181:*9, 20*
182:*11, 18, 20*
193:*24*
194:*19*
204:*11, 12, 14,
21* 206:*16*

207:*10*
231:*24* 287:*1*
**NEW** 1:*2* 2:*6*
3:*21* 8:*10*
15:*25* 16:*3*
17:*13* 154:*7,
8* 212:*11*
219:*18* 220:*1,
9, 15* 221:*1, 8,
23* 222:*5*
237:*22* 255:*8*
**news** 182:*7*
190:*12, 17*
**nice** 59:*23*
141:*7*
**NILDA** 2:*14*
**Nitrosamine**
5:*18* 6:*9*
21:*18* 28:*4*
29:*8, 12*
31:*10, 20*
32:*12* 36:*20,
24* 37:*25*
39:*13* 47:*22*
48:*16* 56:*13*
60:*22* 65:*2*
69:*23* 70:*1*
71:*23* 73:*19*
74:*22* 75:*7,
23* 77:*4* 78:*8,
15, 22* 82:*23*
87:*17* 90:*12*
91:*21* 92:*8*
93:*3* 105:*9,
11, 16* 106:*21*
107:*8, 14*
109:*2, 24*
111:*16*
119:*20* 126:*4*
127:*22* 129:*5,
14, 24* 130:*21,
23* 131:*9, 11*
132:*25* 133:*5,
13* 144:*18*
149:*22* 150:*3,
7* 162:*10*
163:*15, 20*
164:*24* 171:*4*
174:*10* 191:*7*
202:*13* 203:*6*
205:*19*

210:*11*
221:*15, 22*
222:*4* 232:*5,
6, 10* 234:*16,
18* 235:*9*
237:*20* 241:*9,
18* 242:*8, 13*
259:*4* 262:*9*
263:*17*
264:*14, 23*
293:*21*
296:*22*
297:*25* 303:*1,
5* 310:*19, 21*
311:*11, 15, 16*
315:*19* 317:*1*
318:*25* 319:*23*
**Nitrosamines**
6:*21* 25:*24*
26:*3, 15, 25*
27:*6* 28:*7*
32:*6* 37:*19*
68:*5, 7, 10, 15,
24* 69:*3, 17,
20* 70:*4, 15,
16* 72:*16, 20*
75:*5* 76:*11,
20* 79:*17, 19*
84:*12, 23*
85:*2, 9, 25*
89:*22* 91:*8*
101:*12* 102:*8,
20, 24* 106:*2,
9, 12* 108:*14,
18, 21* 109:*11,
18* 110:*6*
111:*3, 10*
114:*14*
120:*14, 22*
121:*2, 6, 25*
124:*20*
125:*23*
129:*16* 130:*1,
4, 9* 131:*3*
132:*2, 6, 14*
134:*3, 7*
140:*13, 24*
144:*24* 151:*2,
3, 13* 158:*13*
161:*2, 10*
162:*18*

167:*25*
168:*16*
170:*13* 171:*1*
173:*21, 25*
182:*8* 190:*21*
191:*17*
201:*20* 202:*1,
6, 24* 207:*14*
217:*4, 7, 8*
221:*2, 8*
232:*17, 18*
233:*7, 9*
234:*2, 4*
235:*3, 4, 20,
21, 25* 237:*3,
4, 25* 238:*1*
239:*7, 8*
240:*5, 8, 9, 20,
22* 241:*2, 25*
242:*3* 243:*3,
12, 24* 244:*1*
249:*1* 254:*3,
5, 6, 14, 16*
255:*5, 15*
256:*8* 257:*18,
25* 258:*9, 21*
259:*7, 24*
261:*7* 262:*13,
18, 24* 263:*2,
14* 264:*1*
265:*21* 296:*9*
297:*4, 8, 13,
16, 24* 312:*25*
313:*17* 314:*9,
12* 316:*10*
**nitroso** 160:*7,
12*
**N-nitroso**
103:*6* 105:*20*
108:*2* 114:*11,
13*
**nonagreement**
98:*7*
**nonclinical**
105:*17*
**non-ZHP**
164:*24* 165:*24*
**North** 3:*3*
**note** 34:*22*
**noted** 8:*17*
13:*18* 18:*21*

29:25  48:14
82:12  98:6
322:10  324:10
**notes**  118:23
147:17, 21
**Nothing's**
189:19
**notice**  47:19
63:22  120:8
169:2  215:6
294:5
**noticed**  45:23
46:10  120:24
**notices**  127:3,
9, 14  133:3
177:1
**Notification**
61:5, 6  63:11
66:5  294:24
**notified**  47:10
63:19  294:10
**notify**  28:16
33:2  42:16
55:14
**notwithstandin**
**g**  121:16
**Novartis**
122:13, 18, 22
123:1, 13, 24
124:11, 19, 22
125:4, 13
150:15, 21
151:1, 9, 11,
18, 25  152:3
209:22  296:4,
8, 12, 16
318:12
**novel**  289:7
**November**  7:2
168:6  169:19
273:10, 12
278:1
**now-current**
241:25
254:14, 16
**number**  10:3
24:6  25:12
28:1  32:20
34:4  37:16
43:21  44:1
45:3  52:1

63:2  105:3
177:17  196:6,
9  197:10
198:10
203:24  204:2,
5  244:13
245:5  258:1,
2  259:8
290:13
**numbered**
247:2  278:6,
11  314:22
**numbering**
43:15  44:20
45:9  46:8, 17
**numbers**
26:20  45:12
61:16  146:25
153:20  275:19
**numerous**
68:18

**< O >**
**oaths**  325:5
**object**  20:18
24:12  31:25
55:8  72:11
83:12  142:15
180:16  320:12
**objected**
180:20
**objecting**
195:13
196:16  301:13
**Objection**
18:5  23:17
26:5, 16
27:18  28:17
29:15  30:14,
21  31:6  33:4,
17, 25  34:22
35:8  36:7, 16
38:3, 21
40:16, 21
41:13  42:19
50:14  55:21
57:1  58:3, 21
64:8  65:8, 22
67:2, 20  69:5
73:13  74:4,
20  75:24

76:12, 21
77:10  78:3
79:23  80:19
81:22  83:16
84:14  85:4,
12  86:3  90:8
92:15, 25
94:1  96:5, 13
97:2  101:17
102:3, 13
103:8, 17
106:23
107:16  108:9
110:11
111:12
112:15  115:7,
23  116:21
118:1  121:7
122:2  123:16
124:2, 13, 24
125:7, 15
132:8  134:14
136:11, 16, 25
137:12
139:13
150:18  151:4,
14  158:2, 15
159:6  160:14
161:4, 12
162:2  163:16
166:5  167:6,
19  168:9
169:12
170:15
171:15
172:17  176:3,
19  177:4
178:11
179:22
180:14, 18
181:11
182:24  183:7,
21  184:6, 24
185:23  186:7
189:9  190:6,
14, 15  191:1,
10  192:9
193:3, 16
194:22  195:5
220:3, 18
221:11

232:20
235:23  236:9
237:5  238:7,
19  242:16
243:4  244:3
249:4  254:21
258:11, 23
260:22  262:4
263:20  265:2
266:15
285:10
286:24
289:22  290:3,
15  291:2, 8,
15  293:22
294:20
295:25
296:18
297:10, 18
298:1, 22
299:16, 22
300:11, 20
301:5, 9
302:11, 22
303:10, 19
304:14
305:17
306:13, 18
307:16, 23
308:16  309:4,
15  310:1, 6,
13  311:6, 13
312:20
317:20  318:4
**objectionable**
159:24
164:24  206:2
213:18
**objections**
162:15  196:3,
18  299:10
**obligate**
183:12
**obligation**
35:19  41:11
43:3  145:11
**observation**
273:4
**observations**
193:7  198:10,

19  199:19
295:7, 9
**observed**
149:10, 13
155:10
**obtain**  33:22
35:5  36:4
37:25  286:7
**obtained**
285:18
**Obviously**
20:19  24:14
**occur**  184:13,
15  200:14
202:10
206:22  219:7
310:11  317:9
**occurred**
48:15  51:6
56:10  121:11
140:19  182:9
199:12
202:11, 12
203:4, 5, 17
204:6  205:17
207:24  210:12
**occurs**  53:9
**October**  6:6,
11  153:8
156:23
**odd**  236:11
**offer**  20:14
73:8, 9, 25
91:10  214:6
297:15, 19
300:18  301:2
302:19
**offered**
102:16
249:23  268:8
280:3, 24
**offering**  20:12
42:4  72:21
84:18  263:5
278:17
296:23  297:11
**Office**  6:10
287:13, 19, 22
288:9, 10, 11,
12, 13, 14, 15,
18  295:7

**officer** 286:*9*
288:*21*
**offices** 9:*10*
**official** 129:*3,*
*8, 10, 11*
133:*23*
139:*12* 289:*4*
**off-the-cuff**
259:*1*
**Oh** 14:*15, 22*
16:*20* 43:*13*
61:*21* 87:*1*
88:*5, 7, 20*
90:*5* 105:*11*
106:*10*
130:*22*
153:*10, 13, 21*
155:*23* 160:*2*
166:*12* 179:*5*
180:*4* 206:*23*
211:*18* 213:*3*
214:*23* 226:*7,*
*11* 229:*22*
237:*18*
239:*17*
264:*21* 269:*4*
271:*12* 276:*7*
277:*19* 278:*4,*
*19* 281:*21*
282:*22*
292:*15*
303:*11* 312:*2,*
*4* 313:*16*
314:*24* 315:*4*
**Okay** 8:*1*
13:*15* 15:*1, 4,*
*8, 24* 16:*8*
17:*10* 20:*7*
21:*2, 4* 22:*23*
27:*12, 15*
28:*8* 30:*6*
32:*9, 25* 34:*7*
36:*14* 37:*12*
43:*23* 46:*18,*
*21* 51:*20*
55:*4* 57:*8*
59:*10* 60:*1, 4*
61:*2* 62:*8*
63:*3* 64:*21*
66:*2* 69:*3, 17*
74:*9, 17*

78:*25* 80:*3*
81:*13, 14, 15*
87:*3* 88:*10,*
*21* 89:*4, 7, 16,*
*20* 90:*17*
93:*9* 99:*19*
101:*10* 104:*2,*
*17* 106:*10, 15,*
*20* 110:*15, 16*
112:*19, 21*
113:*10*
118:*14*
122:*13*
128:*10, 19*
129:*18*
131:*14*
135:*22* 136:*1,*
*2, 8* 139:*7*
140:*22*
141:*13* 144:*9*
146:*3, 22*
147:*5, 17*
148:*15, 23*
152:*25*
153:*18, 24, 25*
154:*20*
156:*12, 21*
160:*2* 162:*23*
166:*16*
169:*23*
171:*11*
172:*14* 184:*3*
192:*24* 201:*5*
207:*1* 210:*10*
211:*18*
212:*16*
213:*11*
214:*11* 215:*9*
217:*5, 8*
218:*4, 9, 12*
219:*2, 17, 24*
222:*15, 19, 20,*
*23* 224:*11, 19*
225:*14, 19*
232:*19* 244:*8*
247:*5* 250:*12,*
*17* 251:*20*
255:*25*
257:*12*
259:*11*
261:*22* 265:*8*

267:*13* 268:*6,*
*25* 270:*19*
271:*3, 13, 15*
272:*20* 276:*5,*
*23* 277:*20*
278:*15*
282:*10*
283:*10, 13, 17*
284:*2, 24*
293:*5* 294:*23*
301:*14*
307:*10*
313:*25*
314:*24, 25*
321:*12*
**older** 278:*5*
**once** 70:*20*
74:*10* 202:*7*
203:*1* 237:*10*
264:*13*
**ones** 41:*5*
57:*16* 59:*4*
80:*6* 166:*21*
265:*9* 275:*11*
321:*6*
**online** 168:*19*
**onus** 148:*16*
**open** 9:*17*
87:*7* 88:*6*
308:*6, 10*
**opening** 88:*10*
104:*14*
**opine** 50:*25*
53:*5* 161:*18*
270:*13*
**opines** 197:*10*
**opining** 26:*24*
43:*8* 47:*1*
56:*7* 170:*4*
196:*4* 233:*12*
252:*25* 260:*4*
264:*5* 269:*23*
**opinion** 26:*2*
28:*24* 42:*5*
43:*4* 56:*14*
63:*9* 65:*10,*
*18* 67:*10*
68:*21* 70:*2,*
*10, 11* 72:*19,*
*21, 22* 73:*5, 8,*
*9, 25* 76:*8*

77:*14* 82:*1*
83:*19* 84:*18*
86:*5* 91:*11*
102:*15*
106:*25*
107:*18*
116:*22* 117:*6*
124:*3* 161:*5*
162:*3, 4*
170:*5, 8*
195:*6, 9, 10*
196:*13*
204:*10*
205:*10, 11*
214:*6* 233:*10*
243:*6* 252:*20*
258:*12* 260:*2*
269:*1* 297:*5,*
*12* 311:*4, 8,*
*20* 317:*24*
**opinions**
18:*18, 24*
19:*22, 25*
20:*3, 11, 15,*
*21, 22* 22:*13*
25:*11, 16*
27:*13* 28:*19*
31:*5* 33:*16*
34:*2, 9, 11, 15*
38:*22* 47:*5*
55:*24* 56:*2,*
*23* 57:*15, 25*
58:*6, 8, 15*
59:*4, 13* 67:*3,*
*4* 77:*6* 79:*24*
82:*12* 92:*16*
95:*8, 11, 12*
101:*18*
103:*18*
106:*24*
107:*17* 118:*2*
121:*8, 23*
122:*3, 10, 11*
123:*17*
124:*14, 25*
125:*8, 16*
151:*6, 15*
158:*3* 183:*23*
195:*18*
196:*10, 25*
204:*9* 219:*25*

220:*7, 13, 24*
221:*6* 233:*14*
237:*6* 242:*17*
243:*5* 244:*4*
249:*23* 253:*4,*
*6, 12, 15, 19*
258:*14* 263:*5*
270:*18*
278:*18*
280:*24* 294:*3*
296:*17, 24*
297:*2, 7, 15*
299:*11, 14, 20,*
*24* 300:*4, 18,*
*24* 301:*2*
302:*19*
303:*17, 24*
306:*7* 307:*20*
317:*17, 19*
318:*2, 3*
**opposed**
22:*17* 23:*5*
260:*9*
**oral** 74:*11*
**Orange** 6:*20*
13:*6, 9, 10, 11,*
*23* 14:*7, 17,*
*18* 15:*14*
16:*11* 223:*20*
224:*19, 21, 25*
225:*2, 6, 7, 9,*
*10, 15* 244:*14*
245:*1, 17*
247:*8, 19, 24*
248:*7*
**ORDER** 1:*13*
37:*23* 47:*21*
298:*7*
**ordinarily**
302:*8*
**O'Reilly** 2:*22*
**organic** 154:*23*
**organization**
251:*7* 269:*12*
272:*11*
**original** 15:*21*
16:*5, 10* 17:*6,*
*23* 18:*15*
19:*13* 20:*1*
89:*18* 146:*18*
322:*13*

**originally**
12:6  18:24
190:11, 25
**Orleans**  2:6
**outcome**
233:16
239:23  325:20
**outcomes**
229:11
233:20
234:21  240:12
**outlined**  250:9
**Outside**  26:4
27:18  28:17
33:4, 17  34:1,
4, 20  36:8
38:4, 21
40:22  41:13
42:19  50:15
55:10  67:2
74:4  77:11
78:4  79:23
80:19  81:23
83:18  84:14
85:12  86:4
92:15  93:1
94:1  101:18
102:13  103:8,
17  106:23
107:16  115:8,
23  116:21
118:1  121:7
122:2  123:16
124:2, 13, 24
125:7, 15
151:5, 15
158:2  160:15
161:4  162:2
163:16  168:9
169:13, 23
170:16
172:17  176:4,
20  182:25
183:22  184:7,
25  185:24
186:6  193:3
195:5  210:16
235:23
236:10  237:5
238:20
242:17  243:5

244:3  254:22
258:11, 23
260:22  262:4
266:15  276:6
**overall**  289:9
**overarching**
272:11
**Overlapping**
97:11
**overseas**
295:10
**overseeing**
288:16
**oversight**
288:12, 18
**Overview**
5:18  6:5, 8
153:3  165:9
**Oxford**  3:15

**< P >**
**P&T**  268:10,
16, 18, 20, 23
269:24
**P.C**  3:2
**p.m**  283:11
321:16
**Pacific**  8:6
**pad**  9:25
**PAGE**  5:3, 11
13:19  14:7,
10, 11  15:25
16:3, 16, 20
19:4  30:7
43:21, 22
44:11, 21
45:3  46:18,
22  51:16, 21
52:1  61:2, 3
62:23  63:2
77:14  87:16
89:9, 14
105:7, 8
113:23
118:13
120:10  130:8
146:11, 25
147:1  148:22,
23  152:5, 7
153:9, 18, 20
157:8  158:23

159:14, 25
162:24
166:24  198:3,
6, 7  205:10
214:15, 22
222:20
244:17  247:7,
10  249:13, 17
252:11
253:14
256:24  257:7,
13  259:12
261:2, 16, 18,
19  265:6, 9
271:23  272:1
275:17, 18, 21
277:8  312:25
313:9, 13
314:15, 17, 19
315:1, 14
316:1  317:6
318:7  323:3,
6, 9, 12, 15, 18,
21
**pages**  5:19
6:23  100:11
143:18  146:4
153:21  247:1
271:6, 16, 20
278:9  314:21
324:6
**pagination**
46:11, 13
**Panagos**
19:20  22:10
249:19, 24
250:3, 14, 20
251:1  252:3
274:16
**Paonta**  214:17
**paper**  9:25
99:10
**Par**  279:14, 16
**Paragraph**
21:9, 11  30:6,
8  43:10, 15
44:1, 10, 20
45:3, 12
46:22  51:12,
14, 21  52:2,
18  53:7, 16,

24  56:6
105:6, 8, 15
112:1  114:3
116:1, 13
162:25  163:6
197:22  198:1,
6  214:9, 20,
22  222:16, 17,
19  223:21
226:2, 9, 13,
17  227:3, 6
228:16, 23
229:15, 25
230:10, 14, 21,
25  231:21
244:9, 16
247:6, 11
249:12  250:2,
18  251:14
252:12
253:20
257:22
259:12
261:24
265:11
314:25  315:4,
15, 20
**paragraph-
numbering**
46:14
**paragraphs**
45:9  222:10
**parameters**
220:15
**Park**  3:9
**part**  19:17
22:7  31:8
32:21  33:15
38:15  42:25
44:14  46:23
51:4  53:3
55:25  56:1,
20  57:6
63:17  72:15
108:2, 14
116:23
126:20
127:12
134:25
152:12  160:7
176:25

181:25
191:21
208:21  227:8
228:5  231:7
233:11  234:2,
17  246:11, 24
249:2  250:13
255:12
264:11
269:10, 11, 14,
22  270:17
279:8, 11
297:5  299:6
300:23  306:2,
21  308:5, 10
311:8  315:8
316:6, 16
**Partially**  35:24
**participated**
292:5
**particular**
13:17  25:2, 7
47:18  56:21
71:24  101:5,
16  102:11
109:10  127:6
147:22  150:9
172:3  208:19
222:10
234:11
253:19
255:17
257:18  259:3
260:2
**particularly**
22:9  91:12
95:8, 11
114:25
166:20  266:2
275:10
311:15  314:9
**parties**  8:12,
16  325:18
**Partners**  7:1
272:7, 8, 13,
16, 25  273:2
289:18
**parts**  95:1
308:19  315:7
**party**  278:16

passed 50:9
paste 46:7
patent 279:4, 18 280:14
patience 37:14
patient 235:18, 19, 22 236:16 237:2, 24 243:2
Patients 158:25 159:2, 9 226:23 227:13 236:7, 24 237:19 239:20 240:1 252:14, 22 253:1, 24 254:19 300:15 301:20 319:17
pause 8:15
Pay 6:17 253:4 295:16
payor 251:4 269:6 270:4
payors 219:10 250:21 251:2, 19 253:20, 22 280:17 282:6
pays 251:7
PBM 270:6, 8, 10, 14
peak 298:16
Peck 287:11, 25 289:14
pejoratively 181:5
pen 9:25
penalty 305:22
pending 34:24 97:23 98:7 112:6 217:22 260:13 284:17
Pennsylvania 3:16 4:4
penultimate 247:13
people 9:14 60:20 72:19 139:6 238:3, 13 259:14, 16,

22, 25 260:8, 18, 19 261:25 262:1, 12 278:23, 25 317:8, 11
percent 276:22 277:2
Perfect 9:24 52:6 108:13 263:10
perfectly 80:3 230:3 235:10
perform 315:9
performed 151:12 185:5
period 133:23 134:1 229:17 230:18 267:8 288:22 295:9
periods 201:20
permanent 296:23
perplexing 108:25
person 228:20 325:13
personal 26:18 28:23 33:8 43:3 65:10 233:10, 14
personally 65:24
pertinent 12:23 62:3 186:1 220:13 221:10, 18 232:3 248:25 263:4 296:11 304:2
Ph.D 6:10 256:13
Ph.D.s 291:5
Pharm.D 267:18
Pharma 2:11 272:10

Pharmaceutical 2:11 4:1 6:10 35:12

119:12, 24 157:11 158:1 159:18 160:21, 22 192:25 193:21 194:6 221:5 223:11 224:4 226:20 228:8, 21 232:9 252:21 288:10, 11 302:4 316:5
pharmaceutically 209:20 222:11 223:8 224:1 229:16 230:16 231:3, 10, 12 253:7 318:11
Pharmaceuticals 2:8 4:13 5:23 30:2 118:24
pharmacists 255:19 268:12
pharmacologic 234:10
pharmacologist-toxicologist 117:3
pharmacology 72:21 117:5 286:4, 8, 18, 19, 21 288:13
pharmacology/toxicology 115:11 297:12
Pharmacopeia 86:11 256:14 312:18
pharmacopeial 144:11 147:10 290:1
Pharmacopeia-National 12:19
Pharmacy 3:1, 7 4:5 24:22 256:9 257:6 268:3, 15 270:7, 15

291:4 311:24 312:7
phase 27:20 34:8 258:13
Phi 285:20, 22
Philadelphia 4:4
phrase 131:1 135:23
physical 11:24 252:2
physicians 255:18 268:11
pick 98:18 101:5
picked 150:6 250:13
picking 34:5
piece 111:17
pieces 213:7, 9, 12, 24
Piedmont 2:16
Pietragallo 3:14
pill 243:2
pills 317:10
pioneer 280:15 281:11
Pittsburgh 3:16
Pizzi 2:22
place 33:1 42:15 52:4 55:18 125:14 179:20 194:14 241:3 259:13, 14 261:24
plaintiff 22:17 23:5, 6, 14 24:7, 15, 21, 22 25:3, 8, 16 281:24, 25
Plaintiffs 2:3 8:22 22:6, 19, 22 23:23 24:10 25:12, 16 72:7 219:9 279:9, 11 280:13 281:9 282:7

300:15, 19 301:3
plaintiff-specific 22:1
Planet 272:9, 10
plans 269:22
plea 213:25 215:6 305:2, 12
pleading 215:10
pleadings 24:15
Pleads 6:16
please 8:15 10:14 15:6 23:1 60:6 77:2, 17 83:23 85:20 88:13, 14 89:8 97:15 100:22 104:16 105:24 107:23 109:8 116:6 130:6 141:15 210:18, 20 218:14 230:2, 13, 23 231:8 267:17 277:20 283:15 285:8 320:25 322:3, 7
pleased 47:20 287:18
point 18:3 19:18 22:3 43:20 50:10 54:25 55:3 59:19 62:13 67:23 70:7 71:9 78:10 84:2, 9 91:25 103:2 107:22 109:16 113:16 124:6, 7 135:10 138:9 141:4

150:25
176:15
182:20
184:17
191:20 208:9
214:5 215:17
216:2, 10
238:2 240:13
243:22 252:8,
15 254:8
262:15 269:9
282:15
297:22 299:8,
15 300:2
318:19
pointed 46:16
points 36:22
203:18, 22
222:13
poison 136:23
137:6 208:15
policies 299:5
portion 20:21
276:21 309:13
pose 70:5
poses 116:3
position
107:22
178:23 180:4
275:5
positions
288:2 290:10
possibilities
200:4, 5
possibility
39:25 172:5
173:12 314:5
319:9, 12
possible 43:6
67:14 140:3
161:14
217:13 244:6
248:23
possibly 140:2
223:13
postapproval
187:24 304:20
postdated
19:14
Post-it 90:18

postulate
49:11
postulating
49:13
potency 41:1
114:9 115:15,
16
potent 105:16
106:4, 22
107:15
Potential 5:23
9:18 25:12
27:16 28:6,
15 29:12
30:20 31:3,
22 32:2, 7, 12
33:3 38:19
40:20 42:17
47:10 63:7
66:6 71:6
85:15 90:24
92:13 93:15,
24 135:17
142:7, 16
143:2 178:6
200:7 263:17
294:12, 16, 25
297:17
298:18 320:23
potentially
41:11 80:17
81:6, 19
83:10 121:5
PowerPoint
5:18 87:13
100:10, 12
practical
90:21
practice 28:23
43:10 46:24
47:3, 6, 8
55:5 56:8, 16,
25 245:7
286:12, 23
287:2
practicing
286:15 301:22
practitioners
252:22
preapproval

187:12, 17
preceded 40:6
preclude 176:7
precluding
140:16
predecessor
186:10, 22, 24,
25 188:23
189:8
Preface 6:20
224:20, 22
prefer 96:15
premed
285:14
preparation
147:18 272:17
prepared
99:19 113:20
128:19 142:16
preparing
14:1
prescribe
301:20
prescribed
254:20
267:22, 25
301:4
Prescription/N
on-
Prescription
6:6
prescriptions
268:2, 13
presence
21:18 27:25
31:19 32:6,
16 38:11
42:10 69:9
72:20 85:8,
24 89:23
106:7 138:4
262:9 303:23
310:21
311:10, 11
present 4:16
56:11 76:11
89:22 94:19
127:17
209:15 241:9,
12

presentation
89:10 90:7
146:6 154:1
157:6
presenters
156:25
president
256:13
press 29:25
30:10 31:17
255:17, 20
305:1 307:4,
14, 19
pretty 49:6
prevent 106:6
247:22
prevented
189:19, 22, 23
previously
52:9, 11 63:6
94:10 294:11
primarily
193:23 289:19
primary 38:13
Principal 6:4
principally
288:9
Principles
114:2 119:7
Prinston 4:1
29:6 30:1
47:13 49:5,
10, 20, 21
print 99:14
146:15
printed
113:12
128:17 198:4
prior 13:9
17:15 27:24
29:14 32:9
40:2 66:3
68:11 70:4,
13 73:5
74:18 75:5
76:18 79:21
91:7 93:6
106:17
109:15
112:13
117:23 118:7

120:24 121:1,
25 123:2, 14,
25 139:3, 11
140:9 146:20
150:1 152:15
153:15
160:21
165:18 167:5,
10, 17 169:19
182:12, 16, 19
183:20
185:21 186:5
191:18
194:14 201:7
202:1, 19
205:12 209:9
213:25 215:6,
12 219:11
221:9 235:2
237:23 253:2
255:5, 20
263:2, 16
266:11, 25
267:6 277:8
280:23 284:3
303:7 306:5
320:8
private
134:21
144:20
145:15 150:6
245:20
246:10, 19
286:22 287:2
298:5
probable
84:13 85:10
86:1 89:25
105:18
probably
36:19 92:20
94:25 103:19
138:6 210:17
238:17 261:2
probe 196:10
problem 21:4
37:13 54:1, 2
60:21 63:17
73:22 78:2
122:16
146:17

153:*13*
195:*21*  200:*8*
201:*11*
**problematic**
55:*13*
**problems**
56:*21*  198:*15*
317:*9*
**procedure**
127:*6*  129:*19,*
*20*  140:*13*
155:*8*  325:*6*
**procedures**
55:*17*  132:*18*
140:*1, 24*
145:*8*  148:*9*
155:*12, 18*
210:*1*  299:*5*
**proceed**  89:*8*
99:*3*  277:*21*
**proceeding**
307:*3, 12*
**proceedings**
325:*16*
**Process**  6:*22*
27:*23*  109:*12*
135:*7, 8, 11,*
*17*  140:*20*
148:*17, 18*
172:*9, 15*
173:*25*  174:*6,*
*12, 18*  175:*7*
176:*2*  178:*18,*
*25*  181:*10*
183:*5, 19*
184:*22*
185:*21*
186:*14, 18*
187:*4, 11, 22*
188:*2*  213:*15*
227:*17*
246:*11*  249:*2*
255:*9*  309:*21*
316:*17*
**processes**
27:*10*  147:*25*
176:*8*  181:*23*
183:*18*
194:*13*
265:*19*
266:*13*  267:*5*

**produced**
15:*20*  23:*14,*
*19, 23, 24*
24:*7, 10, 23*
25:*3, 8*  39:*9*
40:*5*  198:*5*
214:*17*  215:*2*
217:*1*  271:*7*
**product**  20:*19*
26:*8*  35:*11,*
*17*  38:*10*
39:*5*  40:*9, 14*
42:*8*  48:*11*
49:*23*  50:*12*
53:*18*  54:*6, 8*
64:*19, 23*
67:*25*  69:*25*
70:*16*  71:*7*
73:*23*  74:*8,*
*23*  78:*8, 15*
79:*18*  92:*1*
111:*11, 24*
112:*10*
122:*14, 19, 23*
126:*2, 6, 17*
130:*20*
131:*15, 21*
132:*7, 12, 14,*
*16*  134:*11*
135:*18*  136:*4*
138:*2, 3, 15,*
*25*  139:*2, 17,*
*20*  140:*6, 8, 9*
144:*15*
149:*24*
150:*14, 23*
152:*1, 3*
154:*14*
157:*14, 21*
158:*7*  161:*25*
163:*3*  164:*1,*
*11*  167:*18*
169:*10, 18*
171:*1*  172:*2*
173:*10*
193:*12*  201:*2,*
*19*  202:*5, 8,*
*14, 23*  203:*10,*
*19*  204:*19*
205:*1, 5, 7, 23*
206:*16, 22*

207:*1, 5, 6, 10,*
*15*  208:*14, 24*
209:*3*  210:*3,*
*4, 8, 13*
215:*16*
216:*14, 16*
217:*11*
219:*14, 19*
220:*2, 9, 16*
221:*1, 8, 24*
222:*6*  223:*2,*
*5*  238:*17*
240:*20*
241:*17, 24*
243:*25*  245:*6*
246:*7*  247:*7,*
*19*  248:*5*
253:*24*
255:*14*
306:*11*
309:*24*
310:*12*
311:*11, 21*
319:*2, 11*
**production**
17:*14*  293:*8*
**PRODUCTS**
1:*6*  6:*1, 14*
8:*9*  25:*23*
26:*3, 15*  27:*1,*
*5*  32:*23*
41:*12*  47:*16*
48:*8, 19*  52:*7*
63:*14*  64:*15*
68:*11*  69:*23*
82:*25*  91:*17*
106:*14*
119:*13, 24*
120:*21*
124:*19*  126:*6*
134:*1*  138:*22*
144:*11*  145:*2*
146:*7*  147:*9*
150:*3*  154:*22*
155:*21*
161:*19, 24*
162:*9*  163:*10,*
*14*  164:*5, 8,*
*10, 14*  165:*16,*
*20, 24*  166:*10,*
*13, 18*  168:*8,*

*24*  169:*2*
171:*5, 12, 14,*
*19*  190:*22*
201:*22, 25*
204:*21*
205:*12*  206:*1,*
*14*  207:*4, 11,*
*14*  209:*9*
210:*10*
215:*11*
216:*19*  217:*1,*
*6*  223:*17*
225:*4, 11*
226:*3, 4, 15,*
*18*  236:*8*
237:*21*  238:*3*
239:*21*
243:*18*
244:*20*  245:*3,*
*11*  250:*22*
251:*8*  252:*14,*
*20*  253:*16*
254:*2, 4, 6, 10*
262:*17*  263:*2*
265:*19*
266:*13*  267:*6*
270:*1*  296:*5,*
*9*  297:*16*
305:*3, 14, 16*
310:*16, 17*
311:*1, 4, 17*
318:*9, 10*
319:*8, 19, 20*
**product's**
247:*22*
**professional**
267:*16*
**professionally**
270:*11*
**profile**  154:*11*
224:*6*  226:*22*
227:*12*  228:*3,*
*18*  229:*1, 6*
231:*16, 23*
232:*5, 17*
233:*8*  234:*3,*
*6*  235:*5*
239:*5, 8*
240:*9, 24*
243:*12, 17*
254:*15*

**program**
45:*12*
**progress**
280:*12*
**progresses**
71:*2*
**prohibition**
70:*15*
**prominently**
82:*11*
**prompted**
50:*23*
**promptly**
42:*16*  47:*10,*
*15, 25*  48:*7*
63:*10*
**prongs**  205:*3*
**propensity**
242:*23*
**proper**  43:*9*
46:*24*  47:*2, 6,*
*8*  55:*4*  56:*8,*
*15, 24*
**properly**  78:*9,*
*16*
**property**
279:*2*
**ProPharma**
271:*3, 11, 12,*
*17*  272:*6, 11,*
*13, 16*  273:*2,*
*14*
**proposed**
223:*2*
**propounded**
324:*8*
**protect**  47:*21*
319:*17*

**PROTECTIVE**
1:*13*
**prove**  243:*20*
**proven**  250:*4*
**provide**  58:*7*
83:*16*  90:*21*
193:*15*
297:*23*  299:*14*
**provided**  11:*2,*
*17, 23*  12:*7,*
*12, 13*  26:*20*
77:*21*  111:*15*

120:2  134:22
142:3  143:2
171:5  197:24
198:11  284:4
307:15
**providing**
10:9  53:20, 22
**provisions**
134:19
**prudent**  194:2
195:2, 15
196:14
**public**  29:24
47:21  87:5
138:10  150:6
194:11  199:5
261:4  298:11
**publication**
225:3  257:6
**publications**
292:2, 3
**pull**  86:24
99:24  100:3
133:24  169:1
277:6  312:3
**purchase**
191:25  304:2
**purchased**
177:12  180:2
253:2
**purchaser**
179:7  189:5
200:19
**purchasers**
55:15
**purchases**
250:21  252:7
**purchasing**
55:20  81:21
200:21
**pure**  71:15
**purity**  41:1, 2
245:12
**purpose**  75:13
90:18  91:3
101:2  115:2
116:18, 23
161:22  224:8
233:21
242:25  299:9
308:18

**purposes**
25:20  84:25
103:22
118:11
191:22
244:15  283:4
**pursuant**
325:5
**put**  9:21  20:4
32:14  82:6,
24  91:14
97:2  103:4
110:4  112:19
137:20
142:14
143:11
152:16
156:12
164:25  165:8
218:5  234:12
248:10
267:14  277:4
287:22  295:4
321:5

**< Q >**
**Q3A**  41:6
**Q3B**  41:6
**qualification**
90:23  234:15
**qualified**  39:6
149:15  300:9
**qualify**  92:3,
12  93:14, 23
131:25
149:10, 23
150:2
**qualifying**
94:14  155:9
**Quality**  6:11,
12  33:1
34:14  41:1
157:11, 14, 21
158:1, 20
159:18
160:21, 22
179:20, 23
208:25
245:12  246:9
250:9  259:17
260:20  262:3

288:11
291:20
303:23  304:2
**quantification**
155:20
**quantified**
243:2  244:1
**quantify**
242:11
**quasi**  290:23
**question**
10:14, 18
22:2, 21, 25
23:2, 20
26:18  28:7
30:11  32:4,
10  33:8  34:1,
24  35:4, 15,
21  36:1, 19
37:18, 21, 22
38:23  39:14
44:5  47:6
48:2  57:21,
22  58:21
64:9  67:7
69:6  70:24
71:17  72:12
73:20  74:14,
23  77:2  83:3,
13, 23, 25
85:22  86:7
93:17  94:7,
20  95:19
96:12, 16
97:6, 24  98:2,
7  99:13
102:2, 5
107:13
108:24  112:5
119:16
124:18
130:25
138:17
139:16, 19
147:8  161:7,
16  168:12
169:15
170:16, 22
175:3  176:6
180:16, 19
183:2  188:21,

22  192:19
193:4, 6, 19
195:14
198:16
199:10
214:23
217:21  220:4
228:7  230:12
232:13, 21, 23,
24  234:25
235:16
236:12
237:14, 16
239:10, 19
242:19
248:16
251:17
253:11
257:22
260:12, 15
263:23
265:12, 14
294:23  298:2
307:10  316:4
320:16
**question-and-
answer**  320:9
**questioning**
50:16  62:4
96:1  97:5
223:25
228:13  229:20
**questions**
10:8  12:15
13:2  24:18
34:12, 17
42:22  47:7
53:5  62:4, 14
71:9  73:15
85:17  94:24
95:6, 13  96:8
97:3  98:24
99:20  107:2,
12  115:10, 11
150:21
166:17
193:25  196:3,
4, 15, 22, 24
212:7  216:1
258:6  267:11,
15  284:16, 17

296:3, 21
300:14, 22
309:19  320:3,
4, 20  324:8
**quibble**  52:25
139:6
**quibbling**
227:15
**quick**  13:20
19:21  22:11
45:8
**quickly**  14:12
65:11  193:8
**Quick's**  44:22
45:17  46:3
**quite**  66:17
67:10  69:10
100:19  110:7
139:24  157:5
178:13
188:21
245:18
272:22
282:11  315:25
**quote**  310:4
**quoted**  57:16

**< R >**
**raise**  205:16
**raised**  209:6
**raises**  298:16
**raising**  193:25
**ramifications**
21:21
**Ranbaxy**  6:16
210:15
212:22  213:6
214:15  215:1,
10, 16, 19
280:10, 11
281:25  305:2,
13, 19  306:3,
9, 12, 22
307:4, 14, 19
**Ranbaxy's**
213:23
**randomized**
239:20
**rapid**  63:16,
20  288:23

Confidential Information Subject to Protective Order

**rapidly** 304:*24*
**Raspanti** 3:*14*
**rat** 136:*23*
137:*6* 208:*15*
**rate** 223:*4*
276:*17*
**rating** 213:*14*
223:*19* 248:*8*
**Ravi** 6:*3*
**Ravichandran**
6:*3*
**Reactive** 5:*22*
**read** 35:*2*
74:*24* 84:*18*
90:*1, 2, 25*
92:*19* 105:*14*
106:*11* 108:*7*
115:*12* 117:*1*
119:*3, 14*
147:*11* 148:*2,
3, 12* 149:*7*
154:*6, 20*
155:*2, 16*
156:*1, 4*
159:*1, 16*
213:*8* 215:*19*
226:*1, 16*
227:*1* 230:*23,
25* 245:*13*
247:*11, 16*
250:*1* 255:*17*
257:*21*
261:*13, 15, 19*
265:*15*
274:*10, 23*
302:*6* 305:*7*
314:*16* 315:*4,
16, 24* 322:*3*
324:*6*
**readily**
103:*20*
168:*20* 170:*1*
316:*16*
**reading** 91:*1*
103:*21, 23*
104:*1* 108:*5*
119:*4, 15*
147:*20* 162:*6*
163:*7, 8*
214:*20*
230:*19* 231:*8*

244:*16*
257:*25* 302:*6*
313:*6*
**reads** 90:*21*
148:*6* 152:*8*
244:*10, 18*
259:*12*
**reagents**
147:*25*
**real** 235:*17*
**realities**
111:*19*
**really** 35:*25*
38:*12* 39:*14*
43:*4* 62:*3*
71:*3* 78:*6*
94:*3* 98:*17*
121:*20*
139:*25* 159:*9*
181:*12, 22*
206:*12* 210:*4*
229:*19*
231:*18* 236:*3*
259:*15* 260:*8*
261:*4, 25*
273:*8* 278:*23,
25* 296:*14*
302:*12* 315:*7,
21* 317:*1, 6*
318:*1* 320:*16*
**realtime** 21:*5*
**reason** 10:*21,
23* 12:*20*
42:*9* 48:*11*
52:*22* 79:*18*
103:*10*
108:*10*
164:*23*
171:*18* 172:*1,
4, 10* 190:*7*
225:*7* 273:*11*
322:*5* 323:*5,
8, 11, 14, 17, 20,
23*
**reasonable**
106:*6* 192:*24*
195:*16*
196:*14*
200:*23* 228:*20*
**reasonableness**
197:*10*

**reasonably**
47:*25*
**reasons** 23:*10*
152:*1* 206:*2*
310:*11* 316:*11*
**Rebuttal**
44:*21* 45:*8,
17* 46:*3*
**rebutting**
249:*23*
**recall** 16:*12*
24:*23* 25:*1, 6*
26:*20* 30:*12*
48:*7, 15* 51:*1,
3, 6, 8* 52:*15,
16, 20, 21, 23*
53:*9, 11, 17*
54:*3, 6, 7, 13*
63:*23* 64:*1, 2*
65:*13, 14*
66:*22* 67:*24*
137:*21*
161:*18, 22*
162:*12* 163:*1,
25* 168:*6*
169:*3* 175:*5*
176:*14, 16, 22*
179:*11* 202:*3,
7* 206:*15*
207:*15* 208:*2*
209:*2* 218:*2*
238:*24*
279:*17*
293:*16, 18*
296:*5, 10*
302:*1* 304:*9,
10* 309:*23, 25*
310:*2, 11, 16*
319:*7*
**recalled** 47:*15*
54:*14* 145:*3*
162:*8, 19*
164:*4, 10*
201:*22*
202:*14*
203:*19*
204:*18*
216:*14*
219:*13* 236:*8,
12* 252:*15*

**recalling**
167:*18*
**recalls** 32:*23*
47:*20* 48:*10*
50:*11, 23*
52:*7, 13* 53:*8,
12, 25* 54:*2*
64:*7* 111:*24*
112:*10*
146:*20*
161:*24*
163:*10, 14*
164:*6* 169:*19*
183:*20*
185:*22* 186:*5*
199:*7* 201:*8*
202:*1, 6*
205:*13* 206:*1,
19* 219:*12*
248:*4* 253:*2*
255:*5, 12*
263:*17* 310:*5,
8*
**receipt** 322:*14*
**receive** 250:*6*
**received**
17:*15* 173:*5*
253:*1, 16*
255:*5* 260:*5*
274:*8* 285:*20*
**receiving**
63:*10* 171:*2*
192:*16, 21*
193:*1* 194:*15*
**recess** 15:*3*
60:*3* 141:*12*
218:*11* 283:*12*
**recognize**
157:*4*
**recognized**
105:*21*
**recognizing**
301:*19*
**recollect** 26:*22*
**recollection**
29:*11* 62:*1*
293:*20*
**recommendatio
n** 149:*22*
177:*7*

**recommendatio
ns** 38:*15* 39:*7*
41:*16* 70:*21*
82:*8* 221:*17*
**recommends**
106:*1* 149:*9*
**record** 8:*2, 18*
10:*10* 14:*25*
15:*2, 5* 17:*11*
35:*2* 44:*21*
60:*2, 5* 88:*9*
97:*3, 20, 23*
98:*1* 99:*12*
141:*11, 14*
142:*14*
195:*24* 196:*2*
197:*8* 211:*11*
212:*2* 218:*8,
10, 13* 248:*12*
277:*15*
283:*11, 14*
284:*21* 285:*4*
292:*22*
293:*11*
298:*24*
302:*16* 307:*8*
317:*16*
320:*23*
321:*11, 14*
**records** 24:*22*
25:*2*
**recovery**
174:*12, 18*
175:*7* 178:*18,
25* 181:*10, 23*
184:*22*
**recycled**
175:*12, 17*
176:*1, 13*
178:*1, 3*
179:*12, 17*
184:*16*
301:*25* 302:*3,
10, 20, 25*
303:*7, 17*
**recycled-
solvent** 183:*5*
**Red** 3:*21*
**reducing**
242:*6*

Confidential Information - Subject to Protective Order

Reed 285:25
reenter 207:8
refer 39:16
126:12
250:24 274:12
Reference
6:22 12:10,
17 13:11
21:8 30:10
40:4 61:2, 12,
13 63:5
77:19 100:7
127:5 129:25
149:11, 13
160:3, 6
209:23 222:9
223:2, 5
228:10
229:12 231:4,
6 234:8
312:24
315:17, 18, 21
318:12
referenced
12:25 13:12
14:4 61:19
79:7 231:14
306:10
references
12:8 13:8, 23
61:13 127:11
referencing
309:20
referred
114:9 115:16
225:6
referring 50:7
62:24 233:20
251:19 252:4
266:22 276:3
303:4
refers 274:13
refined 208:19
reflected
20:16 59:4
246:2
refresh 61:25
293:19
refuse 171:19
refused 99:15,

16 143:23
refusing 83:15
regard 58:9
91:12 164:18
205:3 222:8
262:15
263:14 310:24
regarding
13:16 186:17
195:3 221:23
222:5 270:15
regardless
108:7
regulation
71:2 72:2
263:7 319:25
regulations
42:24 134:13
223:3, 11
245:8
regulator
158:14 171:2
246:23
regulators
144:12
147:11
170:14
194:16 264:15
Regulatory
14:16 15:15
43:5, 9 46:24
47:2, 6, 8
55:4 56:8, 16,
24 64:16
73:7 80:18,
22 81:7, 9, 20
83:11 131:18
154:24 156:8
194:3, 8
203:3, 13
206:9 207:19
215:12 247:8
295:7
reimbursement
s 269:25
reintroduced
219:15
reiterating
68:16 208:8
rejected
142:25

relate 115:22
179:24
196:10
219:25 220:7
221:5 260:3
291:18
related 56:13
119:10
121:21
129:20, 21, 22
154:10
201:23
248:24 280:2
291:22
Relates 1:9
21:18 58:1
74:7 174:8
213:14 219:8
298:10
relating 13:5
174:4 196:24
201:11 212:23
relationship
47:9 58:1
306:6
relative
209:22 237:15
relatively
211:3
release 29:25
30:1, 10
31:17 305:1
307:5, 15, 19
released
151:18
releases
255:18, 21
relevant
291:12 296:16
reliance 14:2,
7 15:10 19:3,
13 20:6
21:24 23:4
24:5 57:9, 18,
24 58:13, 23
96:25
relied 13:25
57:15
relies 269:24
rely 18:16
19:19 22:12

59:3 87:1
90:10 270:14
relying 58:14
59:12 199:23
283:4
remarkable
66:17 67:10
289:9
remarkably
65:11
Remember
31:7 40:24
63:18 65:1
76:2 121:9
132:16
137:21
138:16 178:7
179:6 241:8
268:22
276:19
278:20
279:22
281:18 282:5
287:14
296:15
300:15, 17
302:24 305:3
308:3 314:18
remind
210:20 211:14
reminded
210:18
REMOTE
1:14 8:7, 15
62:8
remotely 8:13,
14
removal 48:11
remove 48:18
63:14 138:22
161:19 163:2
213:14
309:24 321:6
removed
48:12 210:13
removing
161:25
render 59:3
297:2 300:4
311:11

rendered 17:6
162:12
299:12 307:21
rendering
18:17 19:21
27:13 31:4
59:13
repaste 88:13,
14
repeat 76:24
83:2 181:2, 3
rephrase
162:23 260:16
replaced
290:24
Report 5:12
9:21 11:2, 8
12:5, 6, 12, 14,
25 13:5, 13,
16, 19 14:1, 4
15:19, 20, 22
16:4, 6, 21
17:6, 9, 13, 24
18:15, 17, 22,
25 19:15
20:1, 2, 9, 11,
16 21:9, 19,
22 22:7, 10
25:17, 20
26:5, 11, 21
27:19 28:18
29:17, 20
30:17, 24
32:22, 23
33:5, 7, 15, 18
34:2, 10, 16,
17, 21 36:9,
20 38:5, 23
39:22 40:3,
23 41:5, 14,
16 42:2, 20
43:11, 14, 18
44:15 45:18,
19 46:7
47:16 48:15
51:13, 24
52:12 53:6,
16, 24 54:5,
25 55:10
56:1, 3, 19
57:6, 12, 17,

Confidential Information Subject to Protective Order

19 58:7, 11, 15, 18 59:4, 5, 12 60:21, 24 61:23 64:13, 22 68:19 70:7, 12 74:5 76:6 77:11, 20 78:5, 11 81:24 82:11 84:15 85:13 86:5 91:23 94:12 95:7 97:1 100:7 101:19 102:14 103:9 109:25 111:20 113:9 114:15 116:24 117:7, 19 120:4, 8 121:21 122:5, 9 123:9 126:12 131:25 133:19, 21 151:16 161:14 162:6, 21 163:1, 4, 7, 10, 17, 21 167:15, 21 168:10 169:13, 21, 24 170:4, 17 176:4, 22 177:22 182:25 186:1 191:22 195:6 196:5, 11, 25 197:9, 13, 22 198:4 200:25 201:18, 21 204:9 205:21 208:1 209:19 217:20, 25 219:4, 23 220:20 221:6, 14, 19 222:10, 24 223:9 227:3, 25 228:14 229:8 232:1, 2

233:11 237:6 238:21 248:6 249:11 253:14 260:3 262:5, 11 264:11 272:17, 21, 23 273:9 276:3 277:7 283:4, 6 296:11 297:6 299:7, 10, 12 300:23 302:7, 24 303:21, 25 306:7 309:20, 22 317:17, 19 318:7, 24 319:11, 14 **REPORTED** 1:24 39:6 325:12 **reporter** 8:19, 23 9:1 20:23, 24 34:23, 25 35:2 105:25 122:15 145:25 180:17 197:17 257:5, 14 266:8 290:17 292:19 301:11, 14 306:14, 17 325:4 **reporting** 8:15 234:14 **Reports** 16:18 17:4, 9, 16, 25 18:14, 23 22:14, 19 245:2 274:17 **request** 9:23 52:23 54:12, 16 66:23 96:10 97:15 142:16 143:20 171:2, 5 195:3 **requested** 63:14

**requesting** 188:17 **requests** 12:18, 21, 24 193:13 **require** 187:12, 17 315:9 317:4 **required** 184:21 185:2 318:15 **requirement** 145:14 222:25 **requirements** 38:15 40:25 43:5 57:5 81:25 126:13, 25 127:8, 9 133:4 136:1, 4, 9, 23 137:5, 10 139:9, 21 140:6 144:20 152:13 223:18 **requires** 187:22 **Research** 105:19 219:21 285:25 288:14 290:22 291:18 **reserve** 20:20 284:16 **residency** 285:18 **residual** 174:4 176:24 177:5, 11, 15 179:14 185:6, 10 **Resolve** 6:17 110:24 295:19 **resolved** 192:2, 13 193:8 **respect** 185:6 296:9 301:25 305:3 307:5, 13 **respectfully** 72:6 260:4

**respond** 21:3 168:12 187:21 295:19 **responded** 54:11 198:18 **response** 63:17, 21 195:25 257:21 **responsibilities** 38:8 153:22 154:2, 3 155:3 267:5 288:8, 19 290:9 **responsibility** 33:22 35:5 36:3 37:24 38:13, 18 39:3, 15 42:1 265:18 266:12 **responsible** 40:8, 12 42:6 65:25 131:14, 20 138:1 148:8 154:12, 23 155:11 319:16 **responsibly** 66:23 **responsive** 35:21 95:13 **restarted** 43:16 **restarts** 44:20 **Restasis** 280:1 282:6 **restate** 85:21 102:5 189:23 263:22 **restraint** 279:16 **result** 69:12 122:11 306:1 **retained** 82:1 122:4 278:17 281:1 **retention** 84:15 85:13 247:14, 18 **retirement**

290:24 **retrieve** 88:19 **retrospective** 215:24 305:13 **retrospectively** 215:22 **return** 322:12 **returned** 320:24 **revealed** 199:18, 21 **review** 18:2 21:25 22:5, 15, 21 23:13 24:21 41:18 56:9 78:24 80:8, 24 81:10 82:10 122:11 131:12 142:3 187:20, 23 188:9 213:15 218:25 246:11 257:1 273:23 274:7 275:6, 11 276:10, 13 283:25 288:17 300:3 303:16 **reviewed** 17:3, 5, 24 182:15 186:4 293:14 **reviewer** 291:9 **reviewing** 25:2, 6 200:1 276:15 **revised** 11:1, 16 12:25 13:24 15:10, 19 17:2 293:7 **Revision** 98:21 99:21 **revisions** 12:4, 19, 22, 24 16:3 41:6 101:8 **Right** 10:6, 13 13:19, 21 15:16, 18 16:21 17:7,

Confidential Information Subject to Protective Order

20, 25  18:20
19:7, 12, 14,
18  20:2, 20
21:10  23:8
24:17, 19, 23,
24  25:1, 15
27:12  29:20
30:9  36:16
43:10  44:1, 4,
11, 25  45:2, 4
47:1, 3, 5
48:25  49:10,
17, 18  50:13,
25  51:2, 14,
23  52:3, 10,
13  54:10, 15
56:8  58:2
62:25  65:7,
19, 21  66:12,
24  68:7, 9, 14
69:2  72:9, 17,
22  75:15, 17
81:15  82:18
83:2  86:11,
14, 17  88:16
89:12, 21
90:1, 5, 25
91:6, 17, 24
92:10, 22
93:7  95:14
99:5  103:1
104:3, 23, 24
106:17  108:9,
17  111:2, 4
113:14, 18, 24
114:13  115:6
116:8, 18
117:13, 22
118:17  119:3,
6  121:1
125:24
126:18
128:25  129:6,
10, 18  130:19
131:10, 16, 19
134:7  135:15,
19  140:5, 24
146:11, 21
147:1, 12, 18
148:2, 12, 25
150:10  151:3

153:8, 10, 11,
21  156:5
157:5  160:8,
13  161:23
162:11  163:3,
4, 11, 12, 15
164:12, 25
165:20, 22
166:19
168:21  171:8
173:4, 10, 15,
17, 18  174:14,
19, 22  175:4,
21, 24  177:19
178:21, 22, 23
182:8, 11, 14
183:20
184:12
185:16, 17
186:17, 25
187:1, 5, 16,
22  188:12
189:3  190:5,
13  194:1
197:24
198:25  199:7,
9, 14  200:16
201:10  202:1,
4  203:25
204:3  208:14
211:5, 21
212:17, 21
213:1, 7
214:7, 14, 25
215:3, 7, 10,
13, 18, 22
216:2, 4, 8
219:7, 11
222:12
223:23
224:21, 25
226:25
228:15, 18
229:7, 18
231:2  233:21,
24  235:18
236:18
237:24
238:10, 12
239:4, 12
240:4, 5

242:25  243:3
244:15  245:5,
15  246:23
248:2, 19
250:1, 20
251:9, 13, 19,
21, 23, 25
252:2, 5, 7, 25
253:10, 13
254:3  255:6,
20  257:17
259:19  264:2,
7, 10, 15
265:15
266:25  267:1,
8  268:16
270:3, 13
271:5, 16, 20,
21, 25  272:4
273:6  274:24
276:6  277:4,
24  278:9
281:16, 18
282:12, 18
283:6  284:2
285:7  293:13
304:18  305:6
309:11
314:15, 24
320:1  321:1
**Risk**  5:24
90:25  92:13
93:15, 25
106:3  116:3,
4  197:12
235:14
237:14, 15
238:23, 24
240:25  242:7,
9, 10, 12, 13, 21
243:1  250:21
251:10, 14, 19
252:2, 4, 6
265:20
**risks**  251:22
252:9
**Rite**  3:7
**Road**  2:16
**ROBERT**  1:8
**ROGER**  1:17
5:12  7:1

8:11, 21  88:6
282:23
321:13
324:14  325:8
**role**  185:20
288:7  302:9
**Romero**  87:16
**Ron**  19:9, 21
**room**  9:15, 19
88:11, 16
283:22
**Rooney**  3:2
**root**  174:21
**roughly**  269:3
**route**  41:21
49:9, 11, 16
50:5  147:24
173:21  186:4,
11  223:14
**route(s**  226:5
**routes**  49:4
50:19
**routine**  38:14
**RUBENSTEIN**
2:11
**Rubensteinb@**
**gtlaw.com**
2:18
**rule**  249:6
**rules**  10:7
**running**  97:20
98:9

**< S >**
**safe**  158:25
159:2, 15, 19
161:2, 10
208:24
235:10
240:21
243:25
253:23  254:2
261:3  266:5, 9
**S-A-F-E**  266:9
**safely**  24:1
**safest**  261:3
**safety**  154:13
156:7  224:6,
10  226:22
227:8, 12, 21
228:3, 12, 18

229:1, 6, 10
231:16, 23
232:5, 17
233:8, 16
234:3, 21
235:5  239:5,
7  240:8, 11,
24  241:1
242:4  243:12,
14, 17  250:3
254:10, 15
**Sahib**  214:17
**samples**  26:7
**San**  9:9
218:19  286:5
287:3, 9
**Sandoz**  280:4
282:3
**sat**  320:14
**satisfaction**
64:3
**satisfactorily**
295:22
**satisfactory**
198:19
**satisfied**  51:5
223:18
**saw**  175:5, 16
177:25  182:3,
18, 20  241:11
**saying**  38:18
39:18  41:10
47:24  48:21
49:1  52:11
61:19  67:15,
17  69:4, 7, 15,
19, 25  70:17
75:22  78:1, 7,
18  79:16
80:11  91:13,
14  95:24
102:16
103:11, 23
109:22
111:15, 18
114:16  117:2
119:19  126:8
158:5  168:2
172:4  173:24
189:22
201:21  202:9,

*18* 205:*15* 206:*14, 17* 207:*15* 216:*13, 18* 230:*4* 238:*25* 243:*16, 23* 244:*5* 246:*25* 248:*17* 252:*1* 254:*9* 263:*25* 264:*3* 295:*17* 305:*10* 317:*7*

**says** 10:*9* 16:*18* 47:*16* 63:*13* 64:*22* 67:*24* 89:*15, 21* 90:*18* 109:*1, 20* 114:*1* 115:*13* 116:*1, 13* 119:*7* 120:*10* 129:*8* 148:*24* 154:*1* 157:*21* 162:*21* 196:*6* 214:*7* 226:*3, 14* 229:*15* 244:*14* 246:*15* 256:*12* 258:*16* 261:*2* 264:*3* 272:*7* 294:*9* 310:*8, 9* 313:*14* 315:*20* 316:*4*

**scandal** 287:*17*
**school** 285:*16, 21*
**science** 71:*1* 263:*7* 288:*10, 24, 25*
**Sciengen** 4:*13*
**Scientific** 6:*4* 80:*8* 149:*16* 221:*18*
**scope** 26:*4* 27:*19* 28:*18* 33:*5, 18* 34:*1, 4, 20* 36:*8* 38:*4, 22* 40:*22* 41:*14* 42:*20* 50:*15* 55:*21* 67:*3*

74:*5* 77:*11* 78:*4* 79:*24* 80:*20* 81:*23* 83:*18* 84:*15* 85:*13* 86:*4* 92:*16* 93:*1* 94:*2* 101:*18* 102:*14* 103:*9, 18* 106:*24* 107:*17* 115:*8, 24* 116:*22* 118:*2* 121:*8* 122:*3* 123:*17* 124:*3, 14, 25* 125:*8, 16* 151:*5* 158:*3* 160:*15* 161:*5* 162:*3* 163:*17* 168:*10* 169:*13, 23* 170:*16* 172:*18* 176:*4, 20* 182:*25* 183:*22* 184:*7, 25* 185:*24* 186:*6* 193:*4* 195:*6* 196:*5* 210:*16* 235:*24* 236:*10* 237:*6* 238:*20* 242:*17* 243:*5* 244:*4* 254:*22* 258:*12, 24* 260:*23* 262:*5* 266:*16* 285:*11*
**scores** 60:*20* 292:*10* 294:*6*
**screen** 62:*18* 82:*6* 86:*22, 25* 87:*4* 88:*24* 143:*12, 17* 211:*7, 9* 212:*16* 305:*6* 306:*24*
**screen-share** 212:*14*
**scroll** 44:*8* 88:*24* 89:*14* 250:*17*
**search** 227:*25*

**sec** 129:*18* 277:*17*
**second** 14:*17* 62:*8* 106:*20* 143:*21* 154:*20* 170:*7* 214:*22* 223:*22* 226:*25* 252:*13* 257:*4* 275:*17* 277:*11* 278:*21* 312:*24*
**second-crop** 182:*22*
**secret** 176:*8* 178:*10, 14*
**section** 16:*18* 45:*7, 16* 46:*3* 118:*15, 18* 201:*1* 225:*16, 20* 247:*3* 309:*21* 325:*5*
**sections** 276:*3*
**see** 9:*20* 16:*19, 20, 22, 23* 17:*8* 19:*4, 5, 10, 16* 21:*5, 6* 24:*5* 36:*15* 43:*24* 44:*2, 3, 22* 46:*24* 47:*22, 23* 50:*5* 51:*16, 20* 52:*7, 8* 56:*20* 59:*7* 61:*24* 62:*18* 63:*4* 73:*22* 74:*1* 81:*9* 82:*7* 87:*6, 18* 89:*9, 11, 17, 21* 90:*5, 17, 19, 20* 94:*25* 95:*19* 96:*18* 97:*5, 16, 18, 25* 100:*8, 16* 102:*24* 103:*2, 10* 104:*21, 24* 105:*1, 2, 10* 107:*2* 108:*4, 10* 109:*5, 20* 110:*8* 111:*5,*

*24* 112:*10, 12* 113:*3* 114:*3, 6, 7, 12* 116:*12, 16* 117:*14* 118:*15, 17, 22* 119:*6* 128:*18* 129:*12, 15, 19, 23, 25* 130:*3, 9* 143:*12* 146:*10, 16* 147:*5, 7, 16* 149:*3* 152:*10* 153:*7, 8, 20, 24* 154:*4, 5* 156:*22, 24* 157:*1, 17, 24* 159:*23* 160:*3, 9, 17* 162:*24* 163:*7* 165:*12* 166:*9, 12, 15* 171:*13* 173:*6, 7, 11* 176:*11, 17* 178:*3* 179:*7, 15* 182:*14, 17* 187:*9* 191:*19* 201:*1, 3* 204:*9* 211:*4, 8* 212:*13, 16, 17, 19, 25* 213:*1, 2, 8* 214:*5, 18, 23, 25* 215:*9, 14* 217:*3* 220:*19* 225:*21* 226:*10, 13* 227:*24* 234:*11* 239:*25* 240:*2* 242:*22* 244:*9, 11, 21* 245:*9* 247:*9, 14, 15* 249:*7* 250:*16, 19* 252:*8, 16* 253:*15* 256:*7, 10, 11, 15, 16* 257:*14, 15, 16, 18* 263:*12* 265:*12* 271:*3, 13, 16, 17, 19*

272:*1* 273:*10, 19, 20, 24* 274:*11, 16* 275:*12* 278:*8* 295:*2, 3* 298:*15* 305:*5, 25* 308:*8, 21, 23* 309:*5* 310:*8, 25* 311:*22* 312:*1, 6, 12* 313:*6, 19, 21* 314:*7, 21* 315:*1, 3* 319:*25*
**seeing** 24:*23* 26:*20* 96:*16* 109:*16* 152:*25* 176:*14, 22* 218:*2* 248:*24* 296:*10* 306:*1*
**seen** 95:*7* 112:*17* 123:*6* 124:*6, 18* 133:*12* 140:*22* 153:*13, 15* 157:*5* 173:*23, 24* 209:*5* 312:*9*
**selected** 275:*9*
**self-evident** 231:*18*
**sell** 240:*15* 241:*17, 24*
**sellers** 180:*1*
**selling** 67:*18* 84:*9* 167:*10, 24* 186:*19* 187:*5* 208:*14, 16* 215:*1, 11* 216:*3, 16, 19* 217:*9*
**senior** 211:*16*
**sense** 127:*16* 263:*6*
**sent** 7:*4* 9:*18* 104:*13* 209:*6* 292:*16*
**sentence** 106:*11* 108:*1*

Confidential Information Subject to Protective Order

114:*24* 115:*1, 15* 116:*15*
149:7 159:*1*
223:*22*
227:*18*
244:*18*
247:*13, 16, 17*
251:*10, 18*
252:*13* 265:*16*
**sentences**
105:*15*
115:*12* 250:*2*
**sentiment**
317:*13*
**Seoul** 286:*2*
**separate**
43:*13* 57:4
88:*24* 133:*1*
161:*13*
188:*19*
192:*18* 206:5
209:*4*
**separately**
276:6
**September**
73:4 109:*25*
110:*20*
127:*23, 25*
**sequence**
110:*25* 168:*1*
**series** 10:8
264:*8, 16, 21, 25*
**serious** 203:*15*
**served** 268:*18*
291:7
**serves** 250:7
**service** 286:*1, 3* 287:8
**Services** 5:*21*
8:4
**session** 320:9
**set** 7:4 8:*25*
48:*15* 65:3
68:*1* 73:*16*
77:*16* 79:*17*
80:*1, 6, 17*
81:7, *19*
83:*10* 93:*12*
121:5 140:*15*
149:*14*

150:*21*
162:*20*
202:*12* 203:6
204:5, *11, 23*
205:*19*
206:*22, 25*
207:4 208:*23*
209:*14* 233:5
238:4 239:*22, 23* 240:*16*
241:*4, 6, 11*
264:*20*
292:*16* 295:6
305:*19* 306:3
310:*18, 22*
318:*21*
**sets** 154:*1*
**setting** 91:*25*
148:*24* 241:2
273:*18*
**settings** 242:*23*
**settled** 280:*11*
**settlement**
306:*22*
**seven** 215:5
**several-day**
295:9
**severity**
237:*15*
**share** 62:7, *17*
86:*25* 88:*1, 13, 15* 189:*1*
212:*16*
308:*14* 309:*1, 13*
**shareable**
178:*21* 179:2
**shared** 11:*12*
189:*4, 6*
**sharing** 62:*22*
87:4
**sheer** 311:*10*
**sheet** 322:6, *8, 10, 13* 323:*1*
324:*10*
**shelves** 138:*2*
**Shire** 279:7
**short** 211:*3*
**Shorthand**
8:*23* 325:*3*

**shortly** 48:*24*
164:*19*
**shot** 295:*15*
**shoulder** 143:9
**Show** 96:*25*
103:*20* 208:3
223:*1* 228:8, *23*
**showed** 120:*24*
**showing**
15:*13* 17:3
87:*12* 143:*18*
**shown** 305:*1*
317:*23*
**side** 142:*23, 24* 143:*23*
279:4, *7, 13, 17, 19* 280:8, *13, 15, 19*
281:5, *9, 10, 14, 15, 20, 23, 25* 282:3, 6
**sign** 322:7
**signal** 206:*12*
**signature**
15:*25* 16:3
**significant**
247:*20*
**significantly**
119:*1*
**signing** 322:9
**similar**
142:*22* 149:*12*
**simple** 246:5
**simply** 139:*19*
**single** 74:*11*
78:*12* 143:*10*
**sir** 16:*12*
21:*14, 17*
25:*20* 27:*16*
31:*12* 51:*18*
76:8 86:9
87:3, 6 89:*14*
104:6, 7
105:7 113:5, *23* 114:3, *19*
118:*13, 15*
128:5, *10*
129:*11*
133:*19*
145:*24* 152:5,

19, *24* 153:5, *16, 19* 154:*18, 25* 155:6, *14, 16* 156:2, *4, 10, 17, 22*
157:6, *12*
158:*24*
159:*14* 160:*1, 24* 162:6
165:4 166:*23*
170:5, *10*
173:2 178:*23*
180:*25* 181:7
188:*21*
191:*25*
193:*22* 198:6
201:3 208:*1*
212:*14* 213:5
214:4 217:*15, 25* 222:*22*
224:*14*
226:*16* 242:5, *21* 244:*18, 25*
247:*17*
249:*11, 16*
250:*17* 256:6, *24* 257:*11*
260:4 261:*21*
265:*10*
267:*16*
268:*17*
270:*25* 277:7
282:*23*
**site** 295:8, *20*
**sites** 63:*13*
294:6 298:*25*
**sitting** 82:*18*
175:4, *15*
177:*24* 179:*11*
**situation** 49:7
81:*12* 121:*10*
305:*15* 306:9
308:*25* 318:*24*
**skills** 45:*21*
**skip** 316:*1*
**skipped**
261:*18*
**slide** 89:*10, 13, 14* 146:*14, 24*
147:5 148:*16, 21* 153:*25*

156:*21* 157:6, *18* 158:*24*
159:*17*
160:*20, 21*
**Slides** 147:*1*
**slightly**
136:*21* 162:*23*
**Slip** 6:*21*
256:8 316:*17*
**Slowly** 105:*24*
**small** 57:*12, 13* 59:8
198:*10*
256:*13, 19*
260:7 287:9
312:*17*
**small-molecule**
314:*10*
**so-called**
152:*12* 160:*12*
**Solco** 4:*2*
**sold** 67:*12*
122:*14, 19, 23*
166:*18*
202:*19*
205:*24* 272:9
311:*4, 5, 21*
**solid** 287:*22*
**Solodyn** 279:8
**solvent**
174:*12, 18*
175:7 178:*17, 25* 181:*10, 22*
184:*22* 185:6, *10*
**solvent-recovery**
174:*25* 182:6
**solvents** 174:4
175:*12, 17*
176:*1, 13, 24*
177:5, *11, 15*
178:*1, 4*
179:*13, 15, 17*
184:*16*
301:*25* 302:*4, 10, 20, 25*
303:7, *18*
**somebody**
78:7 137:*20*
202:*10*

205:*16*
206:*20*  233:*17*
**Somewhat**
52:*2*  312:*8*
**soon**  49:*6*
238:*18*  282:*20*
**sooner**  65:*7*
**sophisticated**
237:*11*  259:*2*
**sophistication**
221:*4*
**SOPs**  57:*4, 9,*
*24*  58:*1, 9*
**sorry**  28:*2*
34:*23*  43:*19*
44:*6, 13*
51:*10, 25*
61:*6, 9, 21*
66:*18*  83:*22*
85:*22*  87:*11,*
*24*  88:*14*
130:*22*
139:*15*
155:*24*  161:*6*
171:*4*  192:*19*
195:*7*  198:*6*
211:*16*
214:*24*
221:*25*  226:*8*
237:*18*
242:*18*
261:*22*  278:*4*
280:*10*  301:*8,*
*13, 14*  303:*11*
**sort**  20:*5*
42:*23*  45:*11*
48:*3*  54:*18*
65:*10*  70:*24*
82:*10*  108:*23*
117:*1*  120:*6*
138:*17*  139:*7*
142:*2*  150:*20,*
*25*  195:*8*
210:*5*  252:*1*
278:*21*
279:*12, 25*
287:*20, 21*
316:*12, 17, 24*
**sorted**  64:*18*
**sought**  241:*24*

**sounds**  23:*7*
130:*10*  187:*1*
203:*22*
215:*15*  263:*25*
**source**  33:*23*
35:*7*  36:*5*
38:*1*  303:*1, 8*
**sources**  14:*8*
15:*14*  16:*12*
120:*13*
**sourcing**
200:*17*  201:*14*
**South**  4:*4*
287:*9*
**space**  322:*5*
**speak**  40:*25*
43:*1*  71:*4*
77:*15, 22*
123:*21*
124:*19*
132:*13*
144:*25*
172:*19*
218:*18*
222:*13*  259:*3*
302:*13, 24*
**speakers**  97:*11*
**speaking**  8:*16*
22:*9*  31:*7*
64:*12*  65:*24*
82:*24*  151:*24*
161:*13*
253:*12*  316:*2,*
*23*
**speaks**  43:*11*
172:*13*
266:*18*
297:*12*
302:*25*  313:*11*
**special**  317:*4*
**specialized**
140:*14*
**species**  105:*17*
**specific**  28:*7,*
*21*  32:*7*  34:*9*
91:*21*  95:*1*
99:*17*  158:*18*
162:*21*
163:*23*
172:*22*  174:*2*
234:*25*

274:*23*  275:*4*
290:*9*
**specifically**
82:*2*  109:*23*
117:*20*  132:*1*
159:*23*  169:*6*
253:*12*
**specification**
48:*13*  78:*19*
106:*8*  109:*18*
110:*5*  111:*3*
125:*22*
134:*21*
145:*16*  150:*6*
179:*9, 14*
213:*18*
246:*10, 19*
298:*5*  308:*22*
**specifications**
246:*22*  248:*5*
**specifics**  66:*14*
**specified**  77:*4*
131:*2*  149:*8*
154:*10*
226:*24*  227:*13*
**specifying**
74:*15*
**speculate**
36:*25*  54:*23*
94:*5*  181:*12*
183:*25*  185:*2*
191:*11*
**speculating**
50:*2*  66:*19*
67:*22*  80:*1*
**Speculation**
29:*15*  30:*15*
67:*21*  85:*4*
123:*18*
124:*15*  125:*1,*
*9, 17*  134:*15*
136:*11*  137:*1,*
*12*  139:*13*
151:*5, 14*
158:*15*  159:*7*
162:*3, 7*
166:*5*  169:*12*
178:*12*
179:*22*
180:*21*
182:*25*

183:*21*  184:*6,*
*24*  185:*23*
191:*1*  193:*16*
221:*11*  236:*9*
238:*7, 19*
242:*16*  254:*21*
**speculative**
55:*1*  138:*17*
**spent**  56:*18*
287:*8*
**spilling**  319:*20*
**spills**  319:*19*
**spoke**  12:*21*
35:*13*  87:*17*
117:*19*  118:*8*
320:*10*
**sponsors**  287:*4*
**squabble**
278:*22*
279:*13, 25*
280:*8, 17*
**squarely**  34:*17*
**stage**  57:*16*
298:*20*
**Stakeholder**
6:*6*
**Stand**  11:*4,*
*18*  36:*16*
51:*23*  53:*19*
86:*9*  87:*3*
104:*5*  128:*4,*
*9*  145:*17*
152:*18*
156:*13*  165:*1*
224:*12*
238:*22*
249:*10*
255:*25*
270:*19*
282:*13*  320:*18*
**standard**
134:*20*
137:*17*
139:*25*
245:*19, 20, 25*
246:*13*
**Standards**
6:*22*  14:*16*
127:*10*  135:*3,*
*6*  154:*24*
245:*12, 16*

246:*1, 16, 18,*
*22*  250:*9*
315:*21*
**standing**
291:*14*
**STANOCH**
2:*4*  5:*4, 6*
9:*1, 2, 4, 6*
10:*5*  11:*4, 7,*
*21*  12:*2, 16*
13:*3, 21*
14:*21*  15:*7*
16:*1, 14*
17:*17, 21*
18:*12, 19*
20:*25*  21:*3, 7,*
*13*  22:*25*
24:*2, 3, 17, 25*
26:*12, 23*
27:*22*  28:*2, 5*
29:*1, 18, 21*
30:*18, 24*
31:*1, 11*  32:*3,*
*9*  33:*11, 20*
34:*3, 18*  35:*1,*
*22, 23*  36:*13,*
*18*  37:*6, 13*
38:*7, 17, 24*
39:*2*  40:*11,*
*17*  41:*9*  42:*3*
43:*7, 12*  45:*5*
46:*21*  47:*23*
49:*2, 12*
50:*24*  51:*10,*
*17, 22*  52:*5*
53:*21*  54:*10*
55:*16, 22*
56:*4*  57:*7, 21*
58:*12, 17*
59:*1, 7, 21, 24,*
*25*  60:*7*  61:*4,*
*15, 21*  62:*5,*
*12, 15*  64:*20*
65:*11, 17*
66:*1, 8*  67:*6,*
*8*  68:*3*  69:*14*
70:*7*  71:*8*
72:*13*  73:*20,*
*21*  74:*7, 12*
75:*3*  76:*7, 17,*
*24*  77:*1, 17,*

Confidential Information Subject to Protective Order

18 78:13
80:9, 12 81:1
82:5, 16
83:20, 22
84:1, 3, 11, 21,
22 85:1, 6, 7,
18, 22, 23
86:7, 8, 12, 20
87:10, 14, 23
88:17 89:5, 6
90:14 92:19,
21 93:5 94:4,
6 95:10
96:11, 17
97:9, 12, 21
98:4, 11, 14
99:1, 3, 24
100:14, 21
101:23, 24
102:6, 17, 18
103:3, 12, 13,
23 104:4, 5,
10, 16, 18
105:5, 12
107:4, 11, 23,
24 108:12
110:13
111:21 112:3,
6, 7, 18 113:1,
21 114:17, 22
115:13, 20
116:7, 11
117:4 118:5
120:9 121:20,
22 122:12, 16
123:12, 20, 23
124:5, 9, 17,
21 125:2, 3,
10, 11, 19, 21
126:3, 9, 23
128:8, 14
130:5 131:6
132:10, 11
133:12 134:4,
23 136:12, 20
137:4, 21, 23
139:18, 24
141:5, 8, 9, 16,
18 142:10, 13
143:10, 19
144:5 145:21

146:1, 5, 16
150:24 151:8,
10 152:4, 22
156:16
158:10, 22
159:12
160:19, 25
161:8, 17
162:5, 22
163:8, 25
164:2 165:10
166:7 167:8,
22 168:13
169:7, 16
170:24
171:22
172:20, 24
176:10, 23
177:9 178:15
180:3, 23, 24
181:16 182:3
183:3, 10
184:2, 11
185:4 186:2,
13 189:13
190:9, 17, 18
191:5, 15
192:14
193:10, 20
195:1, 7, 19,
22 196:1, 8,
17, 23 197:4,
8, 20 210:21
211:1, 12, 15,
18, 23 212:12
217:23
218:15, 17
219:16 220:5,
6, 21 221:20
222:14 224:7,
17 225:13
227:16 228:6
229:19 230:1
233:1 236:6,
14 237:17
238:9 239:3,
16 242:19, 20
243:9 244:7
248:13, 17
249:9 254:18
255:2 256:4

257:8 258:19
259:5 260:16,
17 261:9, 20
262:21 263:3,
24 265:5
266:10, 21
267:12
270:23
277:20, 22
280:20
282:17, 19, 25
283:9, 16
284:8, 15, 19
285:10
286:24
289:22 290:3,
15 291:2, 8,
14 292:24
293:5, 22, 24
294:20
295:25
296:18
297:10, 18
298:1, 22
299:16, 22
300:11, 20
301:5, 8, 12
302:11, 22
303:10, 19
304:14
305:17
306:13, 18
307:16, 23
308:16 309:4,
15 310:1, 6,
13 311:6, 13
312:20
317:20 318:4
320:7, 18, 22
321:3, 8
**Start** 61:6
122:16
125:12 167:1
**started** 49:21
264:25 289:3
302:6
**starting** 44:10
208:15 278:15
**starts** 51:19
257:10 265:9
294:8

**State** 4:15
73:10 142:14
170:8 197:9,
21 198:18
209:18 242:7
311:5 322:5
325:1, 4
**stated** 30:23
58:6 103:6
109:13
114:23 115:1
120:3 135:20
151:7 180:18
196:17 203:4,
5, 18 204:9
215:20 248:6
317:19
**statement**
21:21 40:11
59:6 66:13
80:22 90:7,
16 91:2, 4, 20
106:21
107:14 108:6,
20 118:10
120:16 136:5
148:4, 14
149:18
154:18, 25
155:14 156:1,
2, 9 159:11,
17, 22 160:17
183:9, 14, 15
195:3 197:7
200:11, 23
203:20
216:25 230:6
250:19 255:7
259:19
261:10, 24
262:19
265:22 306:4,
24 310:5
315:12
**Statements**
6:18 56:3
84:19 92:19,
20 95:25
101:21 123:4
133:6, 7
139:24

173:24 196:9
212:24 227:6
259:22 260:1
261:1 264:8
267:10
305:23 306:4
**STATES** 1:1
8:10 12:19
28:11 105:22
114:8 122:19,
23 157:10, 14
173:4 250:7
263:9 289:5
290:1 295:3,
10
**stating** 23:22
111:6 148:20
164:22 254:17
**stationed**
286:2
**Status** 6:13
56:16 101:15
129:10, 11
165:16 173:1
**stay** 109:2
215:8 275:18
311:17
**stayed** 285:17,
24
**staying** 140:11
**stenographer**
10:10
**stenographic**
8:18
**step** 37:11
113:6 230:9
**steps** 106:6
135:7, 8
**STEVE** 2:15
88:17
**Stewart** 280:4
282:3
**stills** 284:12
**stood** 102:11
**stop** 21:22
62:22 105:23
155:25
225:13 226:8
238:14, 16, 25
250:10, 11

258:5  282:8
294:14
**stopped**  65:5
188:16, 22
236:24
**stopping**
141:4  251:10,
22
**stops**  227:22
**story**  319:15
**STOY**  3:10
180:15, 18
**straighten**
287:20
**straightened**
287:21
**Street**  2:6, 23
3:3, 15  4:4, 9,
15
**strength**  41:1
223:13  245:12
**strike**  67:16
68:8  69:17
125:12
153:14  173:8
178:18  180:5
196:20  222:1
264:21  311:21
**string**  131:25
**stringent**
64:16
**structural**
115:14, 18
**structures**
119:10
**struggling**
23:10  134:16
279:19
**students**
291:4, 5
**studied**  258:1
259:8
**studies**  149:17
285:16
**study**  55:24
113:8  120:7
224:8, 9  240:2
**studying**
287:10
**stuff**  57:23

**Subcommittee**
312:25  313:1,
11, 18, 23
314:7, 12
**subcommittees**
314:6
**subheading**
155:3
**SUBJECT**
1:13  80:7, 24
247:8  322:9
**submission**
188:9  304:5,
25
**submit**  41:18
78:24  271:22
**submitted**
187:15
272:18  293:8
**submitting**
12:18
**subsection**
249:22
**subsequently**
63:22  319:10
**substance**
29:10  31:20
32:17, 24
34:16  35:10
38:9  39:4
41:22  55:14
60:22  67:25
75:14, 19
76:3  77:8, 9,
25  78:1
84:10  91:17
103:15
126:17
131:16, 21
132:20
154:14  164:8
166:11  168:3,
5  172:6
179:9  180:1
234:7  246:6
304:3  308:23
310:25  324:9
**Substances**
6:3  12:11, 24
83:1  116:20
146:8  155:20

189:16, 21
190:1  194:21
217:1  234:10
235:9
**substantive**
273:9  320:17
**substantively**
228:11  318:15
**substitute**
238:12, 18
**substitutes**
224:9
**substitution**
230:5  234:20
291:21
**success**  47:23
319:15
**successfully**
53:12  252:23
**sudden**  210:2
**sued**  279:20
**sufficient**
144:14  245:17
**suggesting**
120:18  175:5,
16  176:11, 17
178:19
182:15, 18
185:19  191:8,
17  198:13
201:10, 16
203:16
**suggests**
233:17  305:12
**suitability**
155:19
**suitable**
200:13
**Suite**  2:16
3:3, 9, 21  4:9
**summarize**
318:6
**summarized**
192:4
**summarizing**
13:9  279:15
**summary**
283:7
**summer**
47:25  48:24
69:12  121:13

146:21  150:1
164:5, 7
168:22
189:18
191:13  264:1,
7  266:11
310:24  319:4
**Sunrise**  279:24
**Supernus**
279:3, 4
**superseded**
110:21
**Supplement**
13:11  14:19
187:25  289:6
304:20
**supplements**
12:22
**supplied**
302:1  303:18
**supplier**
176:1  192:16,
21  193:1, 14,
15  194:4
200:8, 22
**suppliers**  33:2
56:25  58:2
194:8, 15
309:1
**supplies**  89:23
**Supply**  6:23
26:9  261:2
304:8  309:2
**support**  58:8
172:23  184:1,
9
**suppose**  80:4
190:2  265:3
308:13
**supposed**  48:9
65:19  66:4
107:1  126:10
200:12
**sure**  14:9
22:2, 5  23:6
29:19  37:11
44:4, 14, 16,
18  45:1, 12,
14, 15  49:4,
16  51:5  59:2,
16  62:6, 16

79:14  84:8
85:24  89:9
99:4  100:23
102:7  103:4,
23  110:23
129:7  130:8
138:24
140:18  143:7
147:19
151:19  169:5,
20  193:8
210:22  213:3
217:4  222:7
226:11, 18
229:13  235:2
236:4  251:16,
18  255:24
261:4  262:12
274:4, 20
275:3  277:12
281:2  283:1
292:10  313:5
**surprise**
64:17  121:13
180:6, 9
182:21  190:24
**surprised**
55:2  73:10
**surprising**
309:11, 14, 17
**suspect**  42:10
94:18  121:15
150:5  298:12
**suspected**
81:5, 17  83:8
**suspects**  84:7
**suspend**
195:11
**suspicion**
298:14
**swear**  8:20
**swiftness**
64:25
**Swissmedic**
168:3  319:11
**sworn**  8:14,
23  325:10
**synthesis**  27:9
41:21  147:24
186:4, 11

Confidential Information Subject to Protective Order

synthesized
68:*12* 236:*2*
264:*18*
system 47:*17*
48:*9, 22* 50:*8*
66:*4* 176:*7*
225:*12*
systems 33:*1*
34:*14* 42:*15*

< T >
Tab 21:*19*
104:*11, 15, 20*
112:*22*
128:*11*
145:*23* 146:*3*
152:*23*
156:*18* 165:*4*
224:*13* 256:*5*
270:*24* 282:*22*
tablet 74:*11*
take 13:*20*
14:*12* 43:*18*
48:*3* 57:*14*
81:*11* 83:*17*
91:*7* 100:*2*
104:*12* 135:*1,
2, 25* 137:*8*
138:*9* 140:*14*
141:*6* 159:*3*
177:*1* 205:*22*
213:*9* 217:*8*
224:*25* 237:*2,
25* 239:*18*
243:*2, 21*
259:*2* 261:*5*
275:*2* 282:*19*
283:*9* 321:*1*
taken 10:*10*
15:*3* 22:*16*
23:*5* 28:*13*
60:*3* 74:*10*
141:*12*
161:*19* 163:*2*
197:*2* 218:*11*
248:*7* 279:*1*
283:*12*
284:*12*
309:*23* 310:*4*
takes 65:*14*

talk 41:*2, 25*
44:*15* 50:*21*
60:*8, 11* 82:*5*
117:*8* 120:*16*
126:*22*
134:*19* 135:*5*
141:*19, 22*
143:*24* 201:*5*
240:*4* 251:*10,
21* 254:*24*
255:*18*
283:*18*
308:*10* 320:*15*
talked 127:*21*
139:*8* 165:*19*
203:*9* 208:*20*
228:*21* 262:*11*
talking 21:*12*
22:*3* 24:*14*
30:*4, 5* 31:*9*
39:*23* 41:*2*
43:*2* 45:*2*
49:*6* 52:*11*
72:*9* 79:*8*
81:*12* 88:*2, 4*
98:*19* 113:*4*
117:*12, 16, 18,
20* 118:*3, 20*
120:*1* 126:*1,
3, 15* 128:*22*
133:*22*
138:*25*
144:*18* 178:*5*
186:*14*
200:*19*
219:*12*
229:*14*
231:*11*
232:*11, 14*
233:*19, 23*
248:*9* 251:*13*
273:*20*
291:*19*
314:*20* 315:*7,
17, 18*
talks 12:*11,
18* 225:*20*
tampering
137:*19*
tangentially

121:*21*
taught 291:*4*
teaching 291:*1*
tech 9:*14*
technical 15:*9*
technically
187:*17*
techniques
317:*5*
technology
71:*12*
telephone 50:*5*
tell 9:*7* 10:*14*
12:*4* 46:*14,
19* 51:*13*
60:*25* 61:*16*
74:*16* 90:*3*
95:*21* 96:*2*
97:*12, 13, 15,
24* 99:*6*
104:*19* 113:*2,
25* 123:*10, 13,
24* 124:*10, 22*
125:*4* 128:*12*
145:*23* 146:*2*
152:*6, 24*
153:*19* 157:*8*
160:*1* 175:*15*
179:*16* 182:*3*
198:*5* 207:*25*
231:*20* 239:*6*
247:*4* 250:*18*
256:*6, 25*
278:*20* 281:*19*
telling 57:*25*
97:*7* 202:*4*
215:*15* 242:*2*
243:*13*
ten 215:*12*
289:*23*
tend 317:*8*
tended 91:*11*
term 190:*20*
222:*24* 223:*7*
251:*6*
terminology
310:*9*
Terminus 2:*16*
terms 21:*19,
22* 32:*22*
38:*9* 39:*24*

42:*1, 12* 47:*9*
54:*2* 66:*5, 14*
74:*25* 162:*21*
197:*10, 11*
200:*4* 221:*14*
222:*17* 223:*4,
15* 225:*17, 21,
23* 227:*16, 21*
233:*16*
234:*25*
240:*24* 241:*5*
242:*7* 248:*25*
253:*23*
291:*25* 302:*9*
318:*1*
terrific 288:*15*
test 26:*7*
80:*17* 81:*6,
19* 83:*9*
127:*6, 17*
129:*16*
130:*15* 135:*8*
137:*6* 151:*3,
12* 153:*6*
167:*16*
168:*12, 18*
170:*13* 171:*3*
172:*1, 10*
177:*15*
298:*12*
308:*22*
315:*10, 11*
tested 167:*9,
23* 169:*18*
170:*25*
testified 8:*24*
246:*20*
testify 10:*21*
85:*14* 325:*10*
testifying
110:*12*
TESTIMONY
1:*16* 13:*25*
115:*8* 181:*21*
196:*21*
218:*23*
227:*10*
238:*20* 242:*4*
258:*24*
260:*23* 277:*9*
278:*1* 280:*3*

283:*23* 284:*3*
317:*24* 325:*12*
testing 40:*19*
124:*19*
125:*13* 132:*6*
140:*21*
151:*25*
166:*25* 167:*3*
168:*4, 8*
169:*9, 10*
171:*13, 21*
220:*14, 25*
221:*7* 288:*14*
296:*4, 8, 12,
13, 16* 297:*3,
23, 25* 298:*4, 8*
tests 126:*4*
129:*23*
132:*18, 21*
140:*1* 150:*5,
9* 168:*14, 17*
171:*7*
Teva 2:*8, 11*
21:*20* 26:*7, 9,
20* 27:*9* 31:*8,
14, 16, 21*
32:*11, 14, 20*
33:*1, 9, 14*
40:*12, 24*
41:*4, 10, 17*
42:*15, 23*
43:*9* 46:*23*
47:*2, 8, 15, 18,
20, 24* 48:*5, 6,
16* 49:*3, 6, 24*
50:*1, 10, 11,
23* 51:*1*
52:*11, 22, 24*
53:*2, 3, 11, 16*
54:*3, 5, 7, 11,
12, 14, 15, 21*
55:*2, 6, 17, 18,
19* 56:*7, 10,
11, 15, 17*
60:*19* 63:*5, 9,
17, 22* 64:*1, 4,
25* 65:*5, 20,
21* 66:*6, 11,
16* 67:*1, 9, 11,
15, 17* 124:*1*
144:*25* 145:*1,

Confidential Information Subject to Protective Order

3 150:2, 9, 17
161:23 162:8,
19 163:13, 19,
22 164:3, 12,
20, 23 165:3,
15, 18, 22
166:2, 10, 12,
17, 25 167:3,
10, 16, 24
168:4, 7, 18
169:18
170:25
171:12, 13, 17,
19 172:8, 14
173:15
174:13, 24
175:5, 11, 14,
16, 24 176:7,
9, 12, 17
177:10
178:21 179:2,
8, 18 180:1,
10 181:7, 13,
17, 19 182:11,
15, 19 183:4,
14, 17, 19
184:4, 15, 20
185:5, 13, 16,
20 186:4, 10,
22, 25 188:12,
20, 22 189:5,
7, 14, 19, 24
190:2 194:14,
18, 19 195:3
198:21, 25
199:11, 15, 20,
22, 23, 25
200:3 201:2,
21 202:5, 14,
19, 23 203:19
204:18
206:14, 15
207:1, 4, 8, 10,
22 209:2
210:7, 13
216:13, 16, 19
217:9 219:12,
13, 17, 25
220:8, 15
221:1, 3, 7, 14,
21 222:1, 3, 7

248:14, 17, 19
249:1 279:18,
19 293:20
294:5, 10, 15
297:16
298:21 302:1
303:18, 24
304:13, 15, 18,
19 307:2, 11
309:1, 2
310:15, 19
311:5 319:4,
7 320:1
**Teva.net** 5:16
**TEVA-
MDL2875-
00565758** 5:16
**Teva's** 9:13
25:22 26:2,
14 27:1, 5
31:9, 18
41:23 42:7
51:3 56:22,
24 57:4, 8, 24
58:1, 9 64:23
65:24 163:10
167:11, 18
168:6, 18
173:9, 12
201:6, 19, 25
204:13, 20
205:11, 13
206:18
207:14 209:9
217:11 222:5
248:24 284:4
298:24 299:1,
4 304:5
305:15
307:21 318:9
**text** 146:14
218:22 314:16
**Thank** 9:2, 12
10:2 13:15
15:8, 24
18:19 20:4, 8
35:1 37:9, 14
44:3 61:23,
24 66:8
85:19 90:5
97:16 98:14

103:14
106:15
107:25
109:14
112:21
114:17
116:10
120:15
135:21 141:8
143:14 144:1
146:16, 23
152:16
153:10, 12, 18
155:22
156:12
170:11
180:19 213:2
218:17 219:2
222:19
247:23
248:21 277:5
284:17, 19
306:17 312:6
314:24 320:4
321:4, 8
**theoretically**
308:12
**therapeutic**
223:23, 25
224:4 225:4,
17, 23 226:2,
9, 19 227:2, 9,
10, 22 228:2
229:2, 5, 9, 15
230:15 231:9,
21 232:11
233:12, 16, 19
244:15
245:15 247:3
291:20
**therapeutically**
223:17 231:5
244:10, 19
245:3
**therapeutics**
268:4, 15
**thing** 45:2
116:25 129:9
143:22
173:12
229:10 298:23

**things** 16:9
20:6 50:21
69:13 72:6
140:3 192:12
223:19
260:10 261:6
272:5 273:22
283:3 316:5
**think** 14:11,
13, 22 16:9
17:8, 14
22:20 23:1, 9,
21 24:11
26:17 28:9
29:8, 16
30:16, 23
31:2, 16 33:8
36:25 37:3
38:13 39:21,
23 40:3, 10,
15 41:15
42:9 45:1, 2,
22 46:15
47:12, 19
48:4, 6 49:1,
5, 16 50:4
52:8, 19, 20,
25 53:2
54:10, 12, 20
55:25 57:19
58:5, 16 59:6,
14, 18 60:16
62:3 63:20
64:4, 24 65:9,
16, 23, 24
66:14 67:14
70:17 73:8
76:1 77:3, 15,
16 78:18
79:9, 11
80:13 82:23,
24 87:12
88:20 89:11
90:2 91:1, 11,
21 94:10
95:10, 17, 24
96:24 99:14
100:6 104:20
107:7 108:4,
19 109:1, 19
111:14

114:16
116:10
117:18
119:15, 25
120:2 121:19
122:7 123:5,
6 126:8, 14,
20, 21 127:23
130:6, 7, 18
131:5, 10, 24
132:9 133:9,
22 134:18
135:23
137:15 138:6,
16, 17 139:5,
23 142:13
144:13
148:20
149:25 150:4
151:17
152:14
158:18
160:10
161:14
163:24 164:6,
16, 17, 22, 23
166:16, 21, 24
168:18 170:7
171:8 172:3,
13 173:13, 18,
24 175:19
177:5, 7, 13
179:16
180:10 181:7,
13 186:8
187:10
188:18, 25
192:2, 23
199:25
200:10, 23
202:2 204:8,
16, 25 205:9,
20 208:18
210:18, 19
211:2, 5
213:6 215:19
216:20
217:19, 20
218:1 219:13
220:12
223:21 224:8

Confidential Information Subject to Protective Order

227:4, 7, 15
228:7, 20
229:24  230:3,
19  231:17
234:16
235:13
237:16
238:15  239:6,
18, 24  242:6
244:24  246:5,
15, 20, 24
248:3, 8, 22
249:7, 13
250:6  251:1,
6  252:11, 19
253:3, 11
254:17  255:8,
23  256:21
259:9  263:6
265:17
266:17  271:2
272:22  273:1
274:3, 21
277:10  279:3,
5, 10, 15
280:11  281:8,
13, 19, 22
282:1, 22
283:7  287:6,
21  288:25
291:17  292:3,
9, 14  298:13
301:16
304:15  310:7
311:25
313:22  315:6,
16  316:5, 10,
19, 21, 23
317:2, 3, 7, 8
318:6
**thinking**
28:20  245:24
**thinks**  308:11
**third**  14:20
118:20  149:4
256:24  257:7
272:1
**third-party**
178:9, 17, 24
180:7, 12
181:8, 19

251:2, 4
253:20, 22
269:6  270:4
280:17
**thirty**  322:14
**Thornburg**
3:8
**thought**  21:5
61:22  124:17
207:2
**thousand**
73:23  74:2
**threat**  197:5, 6
**Three**  2:23
9:20  39:12
114:22, 23
115:17
118:17
120:17  149:2
203:17, 22
204:5  205:3
226:12
244:23  257:7
265:8  274:3,
5  285:24
286:5  314:23
**three-bullet**
147:14
**Threshold**
114:4  115:4,
21  116:4
154:9
**thresholds**
117:8
**thrust**  117:16
**thumb**  292:18
**Thursday**  1:19
**time**  8:6  15:2,
5  17:5  20:14
32:14  37:10
42:5  48:6
56:11, 19
59:13, 20
60:2, 5  64:17,
23  65:14
72:2  84:3
85:16  100:2,
20  101:8, 16
102:12  110:3
111:1, 9
112:16

113:18
133:23  134:1
138:9  141:11,
14  150:10
163:22  170:5,
8  173:15
182:5  186:19
191:13
201:20
206:15
207:22  209:5
216:5  218:10,
13  225:9
228:15  239:5
248:6  263:19
267:8  283:11,
14  284:10, 16
287:15  288:3,
5  299:15
302:6  304:16
310:15  320:3
**timeline**  165:1
**timely**  33:24
35:7  36:5
38:1
**times**  10:4
34:5  37:16
68:19  197:10
205:12  246:5
247:8  256:10
257:6  274:3,
4  311:24
312:7
**Timothy**  16:22
**title**  89:9
153:9, 22
**titles**  290:9
**today**  9:8
10:7, 22
15:20  16:11
18:22  19:3
20:22  72:9
112:14
144:22
153:16  175:4,
15  177:25
179:12
208:15
218:23
239:13  240:4,
5, 21  241:17

242:5  293:14
297:22
299:11, 20
307:15  308:3
312:10
317:18, 23
**Today's**  8:5
16:1  321:12
**told**  49:3, 5, 6,
9  64:5  65:20
191:6  238:2
**tool**  315:21
**top**  63:4
148:23  152:7
247:10
257:10  265:9
278:15
**topic**  192:18
314:9
**topics**  59:20
**Torrent**  169:2
**Torrent's**
168:24
**totality**  271:9
**totally**  46:1
**toxic**  241:16
**toxicity**  149:16
**Toxicological**
114:4  115:4,
22
**toxicologist**
92:6  257:24
258:17
**toxicology**
72:21  117:6
**TPPs**  250:21,
24  251:19
252:1, 6, 13
253:1
**trace**  85:9, 25
89:24
**track**  139:16
**Trade**  3:3
279:16
**training**  286:6
**transcribed**
325:14
**Transcript**
19:8, 9  22:12
36:15  322:15,
16

**transcription**
324:7  325:15
**Transcripts**
19:4, 14, 20,
24  22:5, 16
23:4  275:4, 6
**transition**
273:2
**Traurig**  2:15
9:11
**treat**  253:24
**treating**
236:24
**treatment**
251:11, 22
**trial**  239:11,
20, 24  278:1
**trick**  23:2
**tried**  299:23
300:21
**triplicate**
273:23  274:1
**trouble**
137:25  273:17
**troubling**
143:1
**true**  10:5
18:1  69:22
70:1  93:8
127:19
139:24  183:9
218:2  219:16
224:3  245:18
255:23  259:9
272:3, 22
276:8  298:3
315:25  325:15
**truth**  182:3
325:10, 11
**truthfully**
10:22
**try**  45:22
78:9, 17  80:5
135:23
151:19
215:25
221:13
230:23  318:7
**trying**  23:11
24:5  35:24
43:4  49:14,

Confidential Information Subject to Protective Order

15 50:5  54:4
61:9, 10  77:6
97:14  98:12
99:14, 24
101:5  114:25
131:24
132:19  143:6
146:12
151:17
158:19
162:20
166:20
212:14
214:19  215:8
220:1, 8
226:8  227:16
233:24
236:15
243:11  246:4
251:6  253:17
275:18  316:24
**TTC**  116:14,
18, 23
**turn**  29:8
30:2  57:25
94:16  113:22
129:5  157:8
225:16
230:21
249:11
272:10  314:15
**twice**  53:6, 24
**two**  12:8
13:4, 18, 23
14:7  15:14
16:2, 11
18:21  43:15
48:7, 18
49:24  61:13,
17, 19  99:10
100:11  122:7
156:24
164:17  184:4
188:25  204:2
212:4, 6
223:15
227:18  234:9
239:21
243:17
244:22
251:13  252:8

257:7  265:8
293:8  309:6
318:7
**Tylenol**
137:19  139:1
**Tylenols**
138:13
**type**  193:24
**types**  114:23
227:18
251:14  316:20
**typewriting**
325:14
**typical**  309:8,
17
**typically**
179:6  189:4
295:8
**typo**  43:19

< U >
**U.S**  4:2  48:8,
20  64:19
68:13  69:11
86:10  145:2
151:19
166:19
202:15
206:16
207:12  220:1,
9, 17  221:24
222:6  256:14
261:2  285:23
312:18
**UCSF**  287:8
291:3
**Uh-huh**  15:13
17:10  25:6,
11  26:13, 24
27:4, 8  28:14
29:11  32:18
33:12  42:4,
14  46:6, 10
48:21  51:7
65:5, 18
66:24  68:7
72:1  73:5, 22
74:13, 16
75:13  76:18
77:24  78:14
79:7  80:10

83:2  84:12
85:8  90:6, 15
105:2  109:4,
7, 15, 22
110:3  111:22
112:4, 13
114:7  115:21
119:6  123:10,
13, 24  124:10
127:21  131:7
132:3  133:3,
15  134:5, 24
135:10  137:8
138:8, 12
141:1  144:21
145:6, 13
148:21
149:20  150:8,
13, 15  158:23
159:13, 21, 25
161:23  166:2
168:7, 14
169:1, 8, 17
171:23, 25
172:7, 11, 25
173:4, 15, 20
174:16
175:11, 21
177:10  179:5,
18  180:4
182:7  183:4,
11, 16  185:13
186:3  188:8
189:6, 14
190:19  191:6,
16, 24  192:6,
8, 15  193:11
194:1, 6, 13,
18  195:2
197:21  200:7,
16, 25  202:16,
18  204:4
207:7, 13, 18,
21  208:11
210:14  214:7
217:5, 24
219:11
220:12, 22
221:7  222:9
224:3  229:4,
7  232:4

233:19
235:11, 17
237:1, 23
239:4, 12
242:2, 15
243:23  244:8
245:21  246:1,
8, 12, 17, 20
249:10  251:9
253:21
254:19
255:11
256:23
257:17  259:6,
11  263:4
264:5  266:1,
4  267:4
269:19, 23
273:3  274:9,
15, 18, 22
275:16, 25
276:9, 21
281:15  291:14
**ultimately**
40:8, 12
134:6  295:19
303:16
**ultratrace**
315:7
**unacceptable**
85:10  86:1
89:25  136:19
137:3  163:20,
23
**unacceptably**
207:3
**uncertain**
262:10  281:4
282:9, 10
**uncertainty**
207:2
**unclear**  101:25
**uncomfortable**
95:5
**undated**  5:20
**undercut**
307:20  308:18
**undergirding**
288:25
**undergraduate**
285:14, 15, 20

**underlying**
193:6
**understand**
10:6, 11, 13,
15, 17, 20
11:25  15:12
22:2  29:5
35:19  59:2
72:10, 15, 18
77:6  79:16
113:10
135:16
148:17
158:20  174:3,
7, 16  175:25
178:13  183:1
187:2  192:3
196:16
228:20  230:4
231:7  234:6
243:11
248:16, 19
250:14
251:16  252:3,
6  253:17
260:14
299:19  300:2,
5  313:22
321:3

**understandable**
46:1
**understanding**
21:16  23:7
26:6  30:1
33:10, 13
35:9  49:9, 14
69:1  75:6
76:15  77:3
92:6  94:23
95:2  114:18
117:2, 7
132:20  151:8
164:3  168:1
173:20
174:20, 23
177:13
181:23
192:11
199:10  200:4
219:6  240:23

251:3 298:17 299:13 304:1 305:9 310:17 314:1 316:18

**understands** 230:5

**Understood** 14:6 16:2 22:15 79:14 129:7 158:11 166:17 228:19 277:4 283:1

**undertake** 33:12

**undertaking** 219:18

**undertook** 32:21

**undesirable** 208:21

**unexpected** 36:24 37:3, 5, 16 68:17, 18 121:11 147:23 190:3, 4, 8, 10, 21 191:7 210:1 264:6 317:2

**unfortunately** 86:22 211:2 247:2

**unidentified** 55:12

**unimportant** 228:7

**uninformed** 158:6 262:19

**unique** 316:12

**UNITED** 1:1 8:10 12:19 28:11 122:19, 23 263:9 289:4, 25 295:10

**universal** 127:17

**University** 285:16, 19 286:4 287:2

**unknown** 63:6 234:10 294:11

**unnecessary** 232:3

**unrevised** 12:12

**unscientific** 259:22

**unstudied** 116:2

**unusual** 48:14 52:2 65:15, 16 67:23 163:22 181:24 308:18 317:2 318:24

**update** 61:7 73:4 146:10

**updated** 13:17 110:1 127:23, 25

**updates** 15:18

**updating** 17:12

**upper** 104:24

**USA** 2:8 214:15

**use** 20:9, 20 41:5 48:17 177:25 179:12 181:24 187:2 222:24 229:17 230:17 231:11, 13 268:12 302:20 304:12 308:22 310:9 311:7

**useful** 252:20

**user** 157:15, 23 158:20

**users** 158:5, 12

**uses** 245:2 251:1

**USP** 6:1, 3, 5 12:17 86:11,

15 87:17 89:10 90:7 100:10 126:1, 9, 25 127:3 128:17, 22 131:8, 13, 14, 19 132:13, 19 133:3, 12, 25 134:20 135:3, 6, 9 140:22 145:10, 12 146:4, 6, 8 148:11, 15 149:9, 21 150:12 151:20 152:8, 12, 25 153:25 176:25 177:11 256:14, 20 260:7 268:22 269:9, 15, 21 284:11 288:23 289:1, 3, 13 290:1, 5, 10 292:3 297:23 302:9 312:18, 22, 25 313:17 314:3, 11 315:17

**USP-NF** 289:4

**usual** 71:19

**Usually** 82:7 119:11 281:8

< V >

**vague** 23:17 26:16 32:1 36:7 38:3 40:16, 22 41:13 42:19 50:14 55:21 57:1 58:4, 24 65:8, 22 67:20 73:13 74:4, 20 77:10 78:3 94:1 102:3, 13 108:9 111:12 112:15 115:7,

23 124:4 132:8 134:14 158:3, 16 159:7 161:12 162:3 163:16 167:6, 19 169:13 170:18 171:16 172:17 177:4 180:20 183:7 192:9 232:21 260:22 262:4 263:20, 22 265:2

**validate** 145:8 155:17

**validating** 148:9 155:11

**VALSARTAN** 1:5 6:1, 14 8:8 25:23 26:14 27:10 29:13 30:11, 13, 20 31:4, 13, 23 32:12 33:14 40:13, 14 41:12 42:7, 18 47:11 48:1, 7, 19, 23 49:18, 22 50:12 51:1 54:7 55:7 61:6, 7 63:15 65:6 67:11, 18 68:5, 10, 24 69:4, 19 74:17 76:11, 20 111:10 123:2, 14, 25 124:12, 23 125:5, 14 126:2, 6, 16, 17, 19 127:19 128:17 129:1, 16, 20, 21 130:4, 13 131:2 132:4, 22, 24 134:1, 11 140:12, 23

144:22, 23 145:1 146:20 149:21 150:3, 10, 12, 14, 16, 22, 23 151:20 161:1, 9, 24 163:10, 14 164:7, 10, 14, 20 165:16, 20, 23, 24 166:3, 10, 13, 18 167:10, 16, 24 168:3, 24 171:1, 19 173:22 174:5, 13, 22 175:1, 8, 13, 18 176:2, 18 177:3, 12, 14 178:2, 18 181:18 182:23 183:18 185:7, 11, 21 186:5, 18 187:4 188:14, 24 189:15, 20, 25 190:22 191:18 194:20 195:4 198:15 199:24 201:7, 12, 13, 22 202:5, 18, 23 204:14, 21 205:12 216:9 217:9 219:14, 19 220:2, 10, 16 221:24 222:6 232:4, 6, 16, 18 233:7, 8, 23 234:1, 4 235:3, 8, 19, 20 236:8 237:2, 3, 25 238:3, 14, 17 239:1, 6, 8 240:7, 9, 20 243:24, 25 248:15, 18, 20,

25  249:3
250:22  252:2
253:2, 16
254:13, 15
255:4, 14
263:14
264:14, 24
267:22
307:13, 21
310:16  311:4
**valsartan-**
**containing**
162:9  164:4
171:4  207:11
239:21  318:10
**valsartan's**
255:12
**value**  209:12
252:14, 18
253:1, 16, 20,
21  260:5
**Vanaskie**
197:3
**variables**
193:6
**various**  29:9
113:17  206:2
301:3
**vendor**
174:11, 25
175:6  178:10,
17, 25  180:7,
12  181:9, 19
294:10
**verbatim**
319:5
**verify**  155:17
**versa**  37:12
**version**  17:15
51:24  96:21,
22  97:1
99:25  102:21
117:11  278:5,
12
**versus**  37:19
111:18  279:3,
7, 12, 18, 22, 24
280:2, 7, 14,
16  281:14
**vice**  37:12
256:13

**VICTORIA**
2:13  301:13
**Video**  7:3
8:7  10:11
15:5  37:11
60:5  141:14
211:7, 9
218:13
283:14  284:11
**videographer**
4:16  8:1, 4
15:1, 4  60:1,
4  88:18, 21
141:10, 13
212:3, 9
218:9, 12
283:10, 13
321:10
**VIDEO-**
**RECORDED**
1:15
**view**  70:13
82:19  110:4
172:23  318:17
**violated**
298:21
**violation**
134:25
**Violations**
6:18  212:23
217:3, 11
305:24
**violative**
247:19
**vis-à-vis**  56:25
**Vision**  279:24
**visiting**  295:8
**visual**  153:6
**Vitae**  7:1
**voluminous**
57:13
**voluntarily**
53:11  54:14
64:2
**voluntary**
51:3  52:15,
22  53:3
54:12  145:12
162:12  163:1,
11, 13  205:13

309:23

**< W >**
**Wait**  51:9
64:5  66:20
78:12  97:21,
22  105:11
146:12  160:2
188:6  197:25
214:19
239:14
267:11  272:1
273:17
277:13  304:19
**waiting**  36:12
**walk**  95:9
121:18  143:8
**Wallack**  3:20
**WALSH**  2:22
**Walter**  285:25
**want**  23:19
24:8  26:17
34:6  44:15
49:11  50:18
51:8  59:16
70:11  72:3, 5
76:23  78:25
79:14  83:17
84:7  85:16
94:4  96:18
97:1, 6  99:4
100:4  142:18
158:4, 8
170:3  181:25
192:25
195:23, 24
196:7  213:5
216:23  218:6
227:19
229:13
235:19, 20
238:10, 13
247:12
256:23  257:6
259:24  261:3
275:3  276:24
278:16
282:18, 21
283:1
**wanted**  17:22
23:6  83:4

130:8  152:1
179:4  188:4
202:10  213:3
253:18  255:14
**wants**  83:14
96:9  97:13,
14, 16  205:16
206:20  233:17
**warn**  280:4
**warning**
174:8  192:4,
12  194:10
199:5, 6
202:11, 19, 25
203:24  204:3,
12, 23  205:5,
18, 25  206:7,
10, 17  208:5,
6, 17  209:7,
10  215:18
216:7, 22
217:14, 24
295:11, 13, 23
318:20
**warranty**
250:8
**Washington**
237:12
**waste**  85:16
**watch**  212:11
**water**  241:10
259:24, 25
262:10, 13
**Watson**  186:9,
21, 23  187:5,
10, 14  188:1,
9, 12  304:15
**way**  26:13
27:21  36:17
47:17, 20
48:9  50:19
51:5  52:19
56:23  58:16
63:12  66:6
89:18  94:9
96:2  103:5
109:13  111:6
122:7  127:2
131:3  132:6
134:9  135:20
140:19

158:12
162:16
163:18
169:17  170:7,
8  179:18
187:19
188:19
199:14
215:19
219:25  220:7
221:13
234:19, 22
236:16  238:8
254:13  255:3,
13, 16, 21
274:25  277:3
278:22
291:18
295:13
303:21, 25
305:15
307:20  309:8
317:24  318:5,
8  320:17
325:20
**ways**  176:6
194:6  221:8
316:25
**webcast**  146:5
**webinar**
87:16  89:10,
13  100:15
284:11
**website**  310:8
**weeks**  31:17
65:15
**Welcome**
141:17
218:16  283:17
**well**  12:14
18:4  23:21
24:4  26:19
28:20  29:5
30:22  31:15,
24  32:5  34:7,
18  40:24
43:8, 13
44:18  46:13
49:4, 8  50:4
51:3, 12
52:10, 14, 17

53:4, 9, 15
54:23  57:8
64:11  65:5
66:13, 20
68:18  69:22
70:9  71:5
72:6  74:7
75:13, 21
80:21  91:15,
24  93:6, 19
95:1  98:6
99:4, 8  100:1,
16  104:3
107:13
109:19  110:9
111:14, 18
112:4  115:25
117:16  118:9,
10  119:25
120:15  121:1
124:10
125:22  126:6,
14  127:24
130:25
132:16  133:6,
24  135:10
137:14, 25
143:15, 19
144:21, 25
150:11, 25
156:9  162:14
163:18  166:3
168:1, 11, 17,
18  170:10
171:3, 17
172:3  174:23
176:5, 11
177:17  179:3
180:20  186:8
187:13  188:5,
18, 21  190:2,
4, 10  192:10
193:21
194:10
196:23  197:2
198:16  199:6,
25  201:25
205:22
207:25
209:16
210:10

211:24
212:15
213:13  214:4
215:24
217:13  218:4
220:25
221:13
222:25
223:10  224:5
227:15, 24
228:4, 16
229:13
230:11, 21
233:2, 4
234:5, 24
235:17
236:11, 15
238:2, 13
239:12
241:19
242:22
245:22, 23
246:15
251:16
252:10, 19
254:8, 23
255:7, 23
258:15
259:21  260:4
261:13, 16, 18
263:25  264:5,
16  265:23, 24
268:7, 22
272:1, 4
274:2, 19, 20
275:12, 20
276:11
278:11
281:21
285:21
288:17
291:17  292:2,
3  298:7, 10
306:19
310:14, 23
311:21  314:3
315:5  316:7,
18, 24  319:5
321:12
**went**  43:15
50:10  53:16

60:20  113:17
137:25
155:24  168:6
202:11
205:18
236:25  285:16
**We're**  15:1, 4
18:14  23:9
39:23  41:2
43:12  45:1
53:17  54:13
59:17  60:1, 4
62:23  71:3,
25  76:5
81:12  82:5
84:9  92:8
95:18  97:19
113:4, 5
117:10
119:18  120:1,
6  121:9
126:15  130:8
138:25
140:11
142:21
144:18
166:24
196:20
213:13
216:20  219:7
229:13
231:11
232:11
233:24
243:11  248:3,
9  252:11
277:3  291:19
292:3, 10
315:6
**West**  3:3
**whatnot**  24:16
**whatsoever**
130:3, 9
**wheelhouse**
291:22
**whispering**
211:12, 22
**WHITELEY**
2:5
**willfully**
139:17

**WILLIAM**
3:20
**WILLIAMS**
1:17  5:12
7:1, 4  8:11,
21  9:5  10:25
11:1, 8, 22
12:4  17:23
20:20  23:3,
18  24:4, 20
28:18  34:10
35:25  39:1
53:23  62:9
72:6  83:21
85:20  86:22
93:20  94:8
96:12  97:17
98:3  99:6
135:2  136:14
141:17  143:9
197:9, 21
218:16
230:22  231:1
232:15
282:23
284:18, 24
289:21
292:13, 23
293:13
307:10
317:15  320:4,
8  321:13
324:14  325:8
**willing**  110:16
111:7  300:7
**wish**  12:16
13:3  51:11
62:5  107:10
126:23
**wishes**  24:12
52:20
**withdraw**
32:9  72:13
130:25
**Withdrawn**
72:13  213:20
**within-entitled**
325:11
**WITNESS**
1:16  8:13, 20,
22  14:22

18:6, 10
23:21  26:6,
19  27:21
28:20  29:16
30:16, 23
31:7  33:6
35:9  36:12,
17  38:6
40:24  41:15
42:21  50:18
51:20  55:11,
22  57:3  58:5
59:23  60:25
61:12  62:12
64:11  65:9,
23  67:5, 22
69:7  73:14
74:6, 21  76:1,
14, 23  77:13
78:6  79:25
80:21  82:4
84:2, 17  85:5,
21  86:6
87:12, 22, 25
88:5, 7, 10
89:1, 4  90:10
92:17  93:2
94:3  96:15
97:24  98:8,
10, 15  99:19
101:20  102:4,
15  103:10, 19
104:2  107:1,
19  108:10
111:14  112:4,
16  115:9, 25
116:25  118:3
121:9  122:6
123:19  124:5,
16  125:2, 10,
18  132:9
134:16
136:17  137:2,
14  139:15
141:7  142:17,
20, 22  143:5,
14, 20, 22
150:20  151:7,
17  158:4, 17
159:8  160:16
161:6, 13

162:*16*
163:*18*  165:*8*
167:*7, 20*
168:*11*
169:*14*
170:*19, 21*
171:*17*
172:*19*  176:*5,
21*  177:*5*
178:*13*
179:*23*
180:*22*
181:*12*  183:*1,
8, 24*  184:*8*
185:*1, 25*
186:*8*  189:*11*
190:*7, 16*
191:*3, 11*
192:*10*  193:*5,
18*  194:*24*
210:*17*  211:*8,
16, 24*  217:*19*
220:*4, 19*
221:*13*
232:*22*
235:*25*
236:*11*  237:*7*
238:*8, 22*
242:*18*  243:*7*
244:*5*  249:*6*
254:*23*  257:*3*
258:*15, 25*
260:*14, 24*
262:*5, 7*
263:*21*  265:*3*
266:*9, 17*
277:*16, 19*
284:*19*  285:*5*
287:*1*  289:*23*
290:*16, 18*
291:*3, 9, 17*
293:*23*  294:*1,
21*  296:*1, 19*
297:*11, 19*
298:*3, 23*
299:*17, 23*
300:*12, 21*
301:*10*
302:*12, 23*
303:*11, 20*
304:*15*

305:*18*
306:*19*
307:*17, 24*
308:*17*  309:*5,
16*  310:*2, 7,
14*  311:*7, 14*
312:*21*
317:*21*  318:*5*
320:*14*  322:*1*
325:*9, 12*
**Wmurtha@hill
wallack.com**
3:*22*
**wonder**  98:*23*
231:*18*
**Wonderful**
105:*14*
**Woodcock**
288:*5*
**Word**  45:*12*
48:*3*  91:*12*
162:*17*  213:*9*
227:*25*
**wording**
107:*20*  111:*5,
6*
**word-
processing**
45:*10, 20*
**words**  17:*1*
48:*17*  53:*19,
20, 23*  54:*5, 9*
66:*3, 7*  93:*16,
18*  108:*4, 11*
114:*20*  117:*1*
119:*5*  121:*17*
131:*25*
228:*14, 17, 24,
25*  229:*6, 7,
23*  230:*6, 8,
19, 23*  231:*12,
17*  233:*22*
311:*7*
**work**  20:*19*
28:*10*  35:*19*
47:*17*  48:*10*
53:*10*  66:*4,
10*  70:*25*
79:*2, 20*
92:*11*  93:*4*
100:*4*  113:*20*

145:*12*  157:*2*
191:*25*
243:*21*
268:*24*  271:*7,
9, 21, 24*
273:*5, 9, 12,
15*  276:*6, 17,
25*  287:*18*
291:*1*
**worked**  47:*20*
48:*22*  51:*4*
70:*19*  71:*18*
209:*2*  237:*10*
270:*3, 8*
287:*2, 19*
291:*4*
**working**  29:*9*
40:*25*  50:*8*
54:*16*  64:*2*
131:*23*
137:*25*
162:*19*
163:*19*
168:*17*
172:*21*
269:*15*  288:*3*
298:*5*  319:*7,
18*
**works**  52:*14,
19*  188:*19*
233:*21*
**world**  191:*6*
204:*22*
234:*19*
235:*17*  261:*3*
**worthless**
210:*3*
**write**  45:*16*
46:*23*  52:*12*
53:*5, 15*
162:*25*
231:*21, 24, 25*
232:*2*  268:*2,
12, 13*  276:*2*
**writing**  276:*5*
292:*5*  295:*9*
**writings**
291:*18*
**wrong**  51:*10*
130:*6*  160:*11*

210:*7*  243:*14*
320:*1*
**wrote**  45:*19*
46:*2*  52:*6, 17*
53:*6*  229:*23*
272:*20, 22*

< Y >
**yeah**  14:*15*
22:*24*  23:*21*
40:*12*  44:*7*
50:*18, 25*
51:*23*  67:*22*
69:*7*  78:*25*
84:*17, 25*
86:*13*  87:*15,
18*  88:*21*
89:*3*  94:*3*
99:*24*  101:*20*
103:*10*  115:*9*
116:*25*  122:*6*
133:*6*  139:*15*
150:*20*  151:*7*
153:*10*  159:*8,
16, 23*  161:*13*
162:*8*  169:*14*
181:*1*  183:*24*
185:*1*  191:*3*
198:*3*  204:*25*
205:*9*  225:*18*
226:*14*  243:*7*
246:*24*  248:*3*
257:*3*  273:*1*
275:*20*
279:*20*
282:*19*  293:*3*
313:*13*  315:*23*
**year**  13:*10*
96:*23*  129:*13*
191:*8*  198:*23*
271:*15*  287:*8*
290:*5*  317:*11*
**years**  35:*13*
39:*12*  137:*19*
215:*5, 12*
258:*1*  259:*8*
263:*11*
264:*17*
277:*24*  278:*3,
10*  285:*24*
286:*6*  288:*3*

289:*19, 20, 25*
306:*2, 5*
**Yep**  109:*15*
257:*9*
**yes/no**  60:*8*
**YOLO**  325:*2*

< Z >
**zero**  75:*10, 12,
19*  244:*2*
**Zhejiang**  4:*1*
63:*15*
**ZHP**  29:*7, 10,
12*  30:*3, 11,
12, 19*  31:*3, 9,
12, 20*  32:*16,
24*  33:*14*
40:*24*  41:*4,
17, 24*  42:*16,
23*  47:*9, 12*
48:*1, 4, 23*
49:*3, 9, 17, 23*
50:*16*  51:*2*
54:*16, 21*
55:*2, 5, 9, 18*
56:*25*  60:*22*
63:*5, 11, 15,
18, 19*  64:*6*
65:*6, 19*
66:*24*  67:*1, 4*
69:*2*  82:*2*
152:*3*  164:*8,
15*  179:*25*
186:*14, 17*
187:*3, 7*
188:*2, 13, 23*
189:*15, 20, 24*
190:*4, 11, 25*
191:*6, 12, 16*
192:*1, 13*
194:*18, 19*
195:*3*  197:*23*
198:*9, 18*
199:*3, 11, 18*
200:*2*  201:*14*
202:*11, 20, 25*
203:*24*
204:*13, 23*
205:*18*
206:*18*  209:*7,
10*  216:*7, 22*

Confidential Information Subject to Protective Order

217:*1, 14, 24*
294:*10*   304:*8*
310:*25*
318:*20*   319:*8*
**ZHP-**
**containing**
207:*5*
**ZHP's**   123:*2,*
*14, 25*   124:*12,*
*23*   125:*5, 13*
186:*4*   188:*10,*
*13*   189:*15, 20,*
*24*   194:*20*
198:*8, 15, 22*
199:*1, 16, 24*
208:*7*
**ZMICK**   4:*5*
**zoom**   89:*2*
100:*1*   143:*12*
**zoomed**
287:*23*