# Exhibit B

Page 1

1

                    UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF NEW JERSEY
                        CAMDEN VICINAGE
3

IN RE:  VALSARTAN, LOSARTAN, AND  ) MDL No. 2875
4   IRBESARTAN PRODUCTS LIABILITY      )
    LITIGATION                        )
5

6

7

                    VIDEOTAPED DEPOSITION OF:
8

                      EDWARD H. KAPLAN, M.D.
9

                  WEDNESDAY, JANUARY 19, 2022
10

                9:14 a.m. Central Standard Time
11

12

              TRANSCRIPT of the stenographic notes of the
13

    proceedings in the above-entitled matter as taken by and
14

    before KELLY A. BRICHETTO, a Certified Court Reporter of
15

    the State of Illinois, held at 77 West Wacker Drive,
16

    Suite 3100, Chicago, Illinois, on Wednesday, January 19,
17

    2022, commencing at approximately 9:14 a.m. pursuant to
18

    notice.
19

20

21

22

23

24

Page 2

```
 1   A P P E A R A N C E S :
 2   On behalf of the Plaintiffs:
 3        RACHEL J. GEMAN (In person)
          LIEFF CABRASER HEIMANN & BERNSTEIN
 4        250 Hudson Street
          8th Floor
 5        New York, New York  10013
          (212) 355-9500
 6        rgeman@lchb.com
 7
          On behalf of the Plaintiffs:
 8
          NICHOLAS A. MIGLIACCIO (Via Zoom)
 9        MIGLIACCIO & RATHOD, LLP
          412 H Street NE
10        Suite 302
          Washington, D.C.  20002
11        (202) 470-3520
          nmigliaccio@classlawdc.com
12
13   On behalf of the Plaintiffs Executive
     Committee:
14
          BRETT VAUGHN (Via Zoom)
15        HOLLIS LAW FIRM
          8101 College Boulevard
16        Suite 260
          Overland Park, Kansas  66210
17        (913) 385-5400
          brett@hollislawfirm.com
18
19   On behalf of the Brown Plaintiff:
20        DANIEL NIGH (Via Zoom)
          LEVIN PAPANTONIO THOMAS MITCHELL
21        RAFFERTY & PROCTOR, PA
          316 South Baylen Street
22        Suite 600
          Pensacola, Florida  32501
23
24
```

Page 3

```
 1   On behalf of the Defendant Camber
     Pharmaceuticals, Inc.:
 2
          ANDREW ALBERTO (Via Zoom)
 3        LEWIS BRISBOIS
          550 East Swedesford Road
 4        Suite 270
          Wayne, Pennsylvania  19087
 5        (215) 977-4058
          Andrew.Alberto@lewisbrisbois.com.
 6
 7   On behalf of the Defendant Teva
     Pharmaceuticals USA, Inc.:
 8        GLENN S. KERNER (In person)
          NILDA ISIDRO (In person)
 9        GREENBERG TRAURIG, LLP
          One Vanderbilt Avenue
10        New York, New York 10017
          (212) 801-9200
11        kernerg@gtlaw.com
          isidron@gtlaw.com
12
13   On behalf of the Defendant Teva
     Pharmaceuticals USA, Inc.:
14        KATE WITTLAKE (Via Zoom)
          GREENBERG TRAURIG, LLP
15        Terminus 200
          3333 Piedmont Road NE
16        Suite 2500
          Atlanta, Georgia  30305
17        wittlakek@gtlaw.com
18   On behalf of the Defendant McKesson
     Corporation:
19
          ELLIE NORRIS (Via Zoom)
20        D'LESLI DAVIS (Via Zoom)
          NORTON ROSE FULBRIGHT, LLP
21        2200 Ross Avenue
          Suite 3600
22        Dallas, Texas  75201
          (214) 855-8000
23        ellie.norris@nortonrosefulbright.com
          dlesli.davis@nortonrosefulbright.com
24
```

Page 4

```
 1   On behalf of the Defendant Express
     Scripts:
 2
          JAMES SPUNG (Via Zoom)
 3        HUSCH BLACKWELL, LLP
          736 Georgia Avenue
 4        Suite 300
          Chattanooga, Tennessee  37402
 5        (423) 755-2652
          James.Spung@huschblackwell.com
 6
 7   On behalf of the Defendant Sciegen
     Pharmaceuticals:
 8        GEOFFREY M. COAN (Via Zoom)
          HINSHAW & CULBERTSON, LLP
 9        53 State Street
          27th Floor
10        Boston, Massachusetts  02109
          (617) 213-7045
11        GCoan@hinshawlaw.com
12   On behalf of the Defendants Zhejiang Huahai
13   Pharmaceutical Co., Ltd., Prinston
     Pharmaceutical, Inc. and Solco Healthcare US,
     LLC:
14
          ALYSON LOTMAN (Via Zoom)
15        DUANE MORRIS, LLP
          30 South 17th Street
16        Philadelphia, Pennsylvania 19103
          (215) 979-1177
17        ALotman@duanemorris.com
18   On behalf of Mylan Laboratories, Ltd. and
     Mylan Pharmaceuticals, Inc.:
19
          PIETRAGALLO GORDON ALFANO BOSICK &
20        RASPANTI, LLP
          FRANK STOY (Via Zoom)
21        JASON REEFER
          301 Grant Street
22        38th Floor
          One Oxford Centre
23        Pittsburgh, Pennsylvania  15219
          fhs@pietragallo.com
24
```

Page 5

```
 1   On behalf of the Defendant Amerisource Bergen:
 2        JEFF D. GEOPPINGER (Via Zoom)
          ULMER & BERNE, LLP
 3        600 Vine Street
          Suite 2800
 4        Cincinnati, Ohio  45202
          (513) 698-5000
 5        jgeoppinger@ulmer.com
 6
          On behalf of the Defendant CVS Pharmacy, Inc.
 7        and Rite Aid Corporation:
 8        MITCHELL CHARCHALIS (Via Zoom)
          BARNES & THORNBURG
 9        2029 Century Park East
          Suite 300
10        Los Angeles, California  90067
          mcharchalis@btlaw.com
11
12        - - - - - - - -
13
14   ALSO PRESENT:
          BEN PELTA-HELLER, Videographer
15        SCOTT ZIARKO, Videographer
16
17
18
19
20
21
22
23
24
```

2 (Pages 2 - 5)

Page 6

1    TRANSCRIPT INDEX

2    APPEARANCES . . . . . . . . . . . . . . . . . . . . . . 2

3

4    INDEX OF EXHIBITS . . . . . . . . . . . . . . . . . 4

5

6    EXAMINATION OF EDWARD H. KAPLAN, M.D.

7    BY MR. KERNER . . . . . . . . . . . . . . . . . . . 11

8    BY MS. LOTMAN . . . . . . . . . . . . . . . . . . 107

9    BY MR. KERNER . . . . . . . . . . . . . . . . . . . 115

10   BY MR. GEOPPINGER . . . . . . . . . . . . . . . 121

11   BY MS. LOTMAN . . . . . . . . . . . . . . . . . . . 126

12   BY MS. GEMAN . . . . . . . . . . . . . . . . . . . 128

13

14   REPORTER'S CERTIFICATE . . . . . . . . . . . . . 131

15

16

17   EXHIBIT CUSTODY

18   COURT REPORTER

19

20

21

22

23

24

Page 7

1    INDEX OF EXHIBITS

2    NUMBER        DESCRIPTION            IDENTIFIED

3    Exhibit 1      Notice of Deposition         29

4    Exhibit 2      Curriculum Vitae             37

5    Exhibit 3      Report of Dr. Kaplan         44

6    Exhibit 4      Thumb drive             104

7    Exhibit 5      Dr. Kaplan's Invoices       115

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 8

1    THE VIDEOGRAPHER:  Good morning.  We are now

2    on the record.  My name is Scott Ziarko.  I'm the

3    videographer representing Veritext Legal Solutions.

4        Today's date is January 19th, 2022.  The

5    time is approximately 9:14 a.m.  This deposition is being

6    held at 77 West Wacker Drive in Chicago, Illinois as well

7    as by Zoom meetings in the matter of In Re:  Valsartan,

8    Losartan, et al.  The name of the witness is Edward H.

9    Kaplan, M.D.

10       Our court reporter is Kelly Brichetto who

11   is also with Veritext Legal Solutions.

12       All counsel will be noted in the written

13   record.

14       Would the court reporter please swear in

15   the witness.

16            (Witness sworn.)

17       You may begin.

18       MR. KERNER:  Before we get started, Scott, can

19   we move the video camera just a touch to get the laptops

20   out of the screen since I can't get any closer?

21       THE VIDEOGRAPHER:  There you go.

22       MR. KERNER:  Great.

23       THE WITNESS:  And I have to look at myself.

24       MS. GEMAN:  I'm sorry.  My pen literally just

Page 9

1    died.  Using the word literally correctly.  Is there one

2    back here?

3        MR. KERNER:  We're off to an auspicious

4    beginning.

5        MS. GEMAN:  Indeed.  I have others in my room.

6    I can go get it.

7        MR. KERNER:  You need a pen?

8        MS. GEMAN:  I need a pen.

9        MR. KERNER:  Do we need this on video?

10       THE VIDEOGRAPHER:  Want to go off the record?

11       MR. KERNER:  Yeah, go off the record.

12       THE VIDEOGRAPHER:  The time is 9:15.  We're

13   off the record.

14            (Discussion had off the

15            record.)

16       The time is 9:16 a.m.  We're back on the

17   record.  This is media two.

18       Will the court reporter please swear in

19   the witness.

20

21

22

23

24

Page 10

1          (Witness sworn.)
2    WHEREUPON:
3          EDWARD H. KAPLAN, M.D.,
4    called as a witness herein, having been first duly sworn,
5    was examined and testified as follows:
6          DIRECT EXAMINATION
7    BY MR. KERNER:
8    Q.   Good morning, Dr. Kaplan.
9    A.   Good morning.
10   Q.   My name is Glenn Kerner.  We met a new
11   minutes ago.  I am an attorney representing Teva
12   Pharmaceuticals in this litigation.  I'm here with
13   Greenberg Traurig.  My partner Nilda Isidro is here as
14   well, and I'm going to be asking you a bunch of questions
15   this morning, possibly into this afternoon as well about
16   your report and the litigation and your opinions in the
17   litigation.
18          Have you ever had your deposition taken
19   before?
20   A.   Yes.
21   Q.   How many times?
22   A.   Three or four times, maybe more.  Six times.
23   Q.   Okay.  So then you know how it goes.  You're
24   under oath, so you have sworn to tell the truth.

Page 11

1          The way this works obviously is I'm going to
2    ask you questions.  You're going to answer my questions.
3    It will be recorded by both the videographer and the
4    stenographer here, so there will be a booklet that has --
5    there'll be a transcript that will have all of your
6    testimony in it.  Do you understand that?
7    A.   I do.  Since this is video and I've not been
8    videoed, when I nod my head, that works because in the
9    past --
10   Q.   It doesn't.  No, you still need to answer
11   verbally so the stenographer can get it.
12   A.   Got it.  Okay.
13   Q.   But thank you for asking.
14          If I ask a question and you're not quite sure
15   what I mean, please tell me.
16   A.   Okay.
17   Q.   Because if you answer my question, I'm going
18   to assume that you understood it, and then it will go
19   into the record.  We don't want to have any
20   misunderstandings.  Okay?
21   A.   Okay.
22   Q.   Also, I do have a habit sometimes of speaking
23   quickly, so I want to warn you in advance of that, so
24   let's try not to talk over each other, and I will try as

Page 12

1    well.
2    A.   Okay.
3    Q.   In the prior depositions that you've taken or
4    that you've been deposed, can you tell me when the first
5    one was, approximately?
6    A.   Twenty years ago.
7    Q.   What kind of case was it?
8    A.   Malpractice.
9    Q.   Medical malpractice?
10   A.   Medical malpractice.
11   Q.   And were you a party in that case or were you
12   a witness?
13   A.   A witness.
14   Q.   Were you an expert witness in that case?
15   A.   I believe I was an expert witness in that
16   case.
17   Q.   Were you paid to testify?
18   A.   Yes.
19   Q.   And can you give me some of the details of
20   that case?
21   A.   I can't remember exactly because it's been
22   more than ten years since I've done any, but if it's the
23   one I'm thinking of then, it was -- it was a woman with
24   breast cancer, and I was asked to be an expert for the

Page 13

1    plaintiff.
2    Q.   And what was the claim in that case?
3    A.   The claim was -- was that she was
4    misdiagnosed.  Late diagnosis caused her -- her disease
5    to progress and ultimately caused her demise.
6    Q.   You say that was about 20 years ago you
7    think?
8    A.   I believe it was about 20 years ago.
9    Q.   Where was that case?
10   A.   It was in -- it was on the west -- it was on
11   the north -- in the northwestern United States.
12   Q.   Oregon, Washington, something like that?
13   A.   One of those places.
14   Q.   You don't remember though?
15   A.   I will later on I'm sure.
16   Q.   Okay.  Well, if you remember, please let us
17   know.
18   A.   Okay.
19   Q.   Do you remember the name of the attorney that
20   retained you?
21   A.   I do not.
22   Q.   Do you remember the name of the firm?
23   A.   It was an independent person.  He was not
24   generally a malpractice attorney.  That much I remember.

4 (Pages 10 - 13)

Page 14

1  I don't remember his name.

2      Q.  How did he find you?

3      A.  Through a radiologist friend of mine who was

4  asked -- who had done a lot of this and was asked to find

5  a medical oncologist that could review the case and

6  opine.

7      Q.  And when you say "review the case," did you

8  testify in that case as well?

9      A.  Yes.

10     Q.  At deposition, as you said you did?

11     A.  I testified in court.

12     Q.  And at deposition, both?

13     A.  And in deposition.

14     Q.  And what was the result of that case?

15     A.  I believe that the case was dropped.  I don't

16 think it -- it went to court, but I don't think it -- it

17 progressed after the time I was in the courtroom.

18     Q.  When you say it was dropped, do you know what

19 you mean by that or is that just a layman's term?

20     A.  Honestly I --

21        MS. GEMAN:  I just want to caution you both.

22 Please let him finish his question --

23        THE WITNESS:  Oh.

24        MS. GEMAN:  -- and likewise.

Page 15

1        MR. KERNER:  I warned you.

2        MS. GEMAN:  Right, but there was --

3        MR. KERNER:  Almost.

4        MS. GEMAN:  No, there was one cutoff of the

5  answer.  Thank you, both.

6        THE WITNESS:  Could you repeat the question?

7  BY MR. KERNER:

8      Q.  Sure.  You said the case was dropped.  Do you

9  know what you meant by that?

10     A.  So I can't remember if that case was -- was

11 withdrawn or if it was that they found in favor of the

12 defendant.  I don't -- and it came to conclusion, but

13 after my testimony I didn't have any more interaction.  I

14 think they had -- the attorney and the client had some

15 issues, and I think they may have got other counsel.  I

16 can't remember all the details.

17     Q.  Okay.  Do you remember the name of the case?

18     A.  No, I do not.

19     Q.  Do you remember the name of the defendant --

20     A.  I do not.

21     Q.  -- the name of the doctor?

22     A.  I do not.

23     Q.  Was it a doctor?  Sorry.

24     A.  It was -- it was a doctor, a group of doctors

Page 16

1  and a medical center I believe or a hospital.

2      Q.  Do you know what hospital that was or what

3  medical center it was?

4      A.  I don't remember any of the details.

5      Q.  Okay.  Do you remember anything else about

6  that particular case?

7      A.  No, I really don't.

8      Q.  Okay.  When was the next time you had your

9  deposition taken?

10     A.  I really can't remember the times of these.

11 I know I have had nothing within the last ten years.

12 That's really what I can tell you.

13     Q.  Okay.  I believe you testified that your

14 deposition has been taken three or four times.  So you

15 told us about one.

16     A.  Right.

17     Q.  Can you tell us about another one?

18        MS. GEMAN:  Just objection to the extent it

19 misstates testimony.

20        MR. KERNER:  I'm sorry.  I didn't hear it.

21        MS. GEMAN:  Maybe I should take this off.

22 Sorry.

23        Objection to the extent it misstates

24 testimony.

Page 17

1

2  BY THE WITNESS:

3      A.  I had a deposition taken on a patient that I

4  was caring for.  In fact, this was probably even before

5  that case, so it may have been more like 25 years ago.

6  And it was a young woman who had gastroesophageal cancer

7  or stomach cancer.  I can't remember exactly.  She was my

8  patient for a brief time.  It was towards the end of

9  her -- of her life, and I was asked -- I was deposed

10 to -- as to her condition and to the -- and to the issues

11 surrounding her diagnosis.  I wasn't opining as to -- as

12 to causation or -- or fault.  I was just deposed as her

13 treating doctor.

14 BY MR. KERNER:

15     Q.  Were you a party in that case?

16     A.  No.

17     Q.  You weren't a defendant in that case?

18     A.  No, I was not.

19     Q.  So you were just a fact witness?

20     A.  I was a -- I was a treating physician at the

21 time of her death.

22     Q.  Okay.  Do you remember where that case was

23 pending?

24     A.  It was in my office in Skokie.

Page 18

1    Q.   Do you remember the name of the attorney who
2    took your deposition?
3    A.   I do not.
4    Q.   Do you remember the name of the doctor who
5    was the -- was the doctor -- was there a doctor as the
6    defendant in the case?
7    A.   There probably was, but I wasn't -- I wasn't
8    really asked to look at any of that.  It just was my own
9    records and my own treatment of the patient.
10    Q.   Okay.  And again just to be clear, you don't
11    remember the name of either party or any of the parties
12    in that case?
13    A.   I do not.
14    Q.   Any other depositions that you've taken or
15    you've had rather?
16    A.   I've done other depositions.  I was deposed
17    as an expert reviewing a patient -- it wasn't a -- he
18    became a patient but it was a -- a person who was
19    claiming exposure to toxins in the workplace, and his
20    attorney wanted me to review that and to opine as to
21    whether any of the chemicals that he was exposed to could
22    have been related to his ultimate development of cancer.
23    Q.   What kind of cancer did this person have?
24    A.   I believe it was a soft tissue sarcoma.

Page 19

1    Q.   So he was the plaintiff in that case?
2    A.   He was the -- he was the plaintiff, correct.
3    Q.   And his attorney asked you to review the
4    medical records?
5    A.   To review the -- to review the medical
6    records but also to review the -- the various agents that
7    he was exposed to and see if I could find any -- any
8    specific link or causation for his ultimate cancer.
9    Q.   And were you able to?
10    A.   I was not able to find anything specifically
11    linked.
12    Q.   Do you recall what agents you looked at?
13    A.   I just recall that there were a lot of --
14    of -- of cleaning agents.  He was involved in -- in a
15    factory that used a lot of solvents that were for -- for
16    sterilization and cleaning, and I know I reviewed a lot
17    of -- a lot of literature about those agents, and there
18    was not any specific -- they were all -- they were all
19    pretty much doing all the precautionary things that they
20    needed to do in the work -- in the workforce.
21    Q.   Do you remember what any of the agents were?
22    A.   I really don't.
23    Q.   Do you remember any of the classifications of
24    any of those agents?

Page 20

1    A.   Just that there were some -- some
2    benzene-type products that were -- there were some fairly
3    toxic substances that are used commonly in -- in cleaning
4    solutions in the workplace and at home, but I don't
5    remember specifics.
6    Q.   And I'm sorry if I asked you this already.
7    Do you remember the name of any of the parties in that
8    case?
9    A.   I -- I do not.
10    Q.   What about any of the attorneys that you
11    dealt with?
12    A.   I -- I don't offhand remember the names.  If
13    I need to look --
14    Q.   Why do you say it like that?
15    A.   Because I can't --
16    MS. GEMAN:  Objection.
17    BY THE WITNESS:
18    A.   I can't remember the names.  If I knew that I
19    was going to be asked for depositions from before ten
20    years, I would have reviewed whatever I could find in my
21    old records to -- to get names and dates and places.
22    BY MR. KERNER:
23    Q.   Okay.  And so is it your testimony that you
24    have some old records either at home or in your office

Page 21

1    that you would have reviewed?
2    MS. GEMAN:  Objection, misstates the
3    testimony.
4    BY THE WITNESS:
5    A.   It's -- could you repeat that, please.
6    BY MR. KERNER:
7    Q.   Sure.  Do I understand your testimony to be
8    that you have old records that you didn't review from
9    prior to ten years ago?
10    A.   What I'm saying is I could very well have
11    something like that laying around since I tend not to
12    throw things away, but I haven't looked in certain
13    closets in the house for many years, so I would have to
14    go looking through those if -- if I was being asked or
15    knew I was going to be asked about them.
16    Q.   Okay.  Any other occasions where your
17    deposition was taken?
18    A.   I can't recall any -- any specifics of any
19    other depositions, but I know I've been in my office
20    deposed before.
21    Q.   And before this litigation -- you've been
22    retained as an expert witness in this litigation;
23    correct?
24    A.   Correct.

6 (Pages 18 - 21)

Page 22

1    Q.  For the Plaintiffs; correct?
2    A.  Correct.
3    Q.  Before this litigation how many times have
4 you been retained as an expert witness?
5    A.  Again, it's been awhile.  The last -- last 15
6 years was doing nothing in this regard because I was
7 taking care of my wife who suffered from breast cancer
8 and then ultimately passed away from it, so I was kind of
9 out of the picture, and this is the first I've done in a
10 long time.  But your question was how -- how many times
11 was I an expert?
12    Q.  Correct.
13    A.  Aside from the case that I just mentioned to
14 you, I've been an expert in malpractice cases.  Mostly
15 record review rather than -- rather than deposition.
16 Only a couple times did it actually go to deposition.
17    Q.  Can you ballpark or estimate for me how many
18 times you've been retained as an expert witness either to
19 review documents or testify, a number?
20    A.  In my lifetime?
21    Q.  Yeah.
22    A.  Seven or eight times.
23    Q.  And out of that seven or eight total times,
24 how many times do you think it went to deposition?

Page 23

1    A.  Three.
2    Q.  Okay.  In those seven or eight total times
3 where you've been retained as an expert witness, how many
4 times were you retained for the defendant -- by the
5 defendant?
6    A.  It was about 50/50 percent.
7    Q.  And in the times that you were retained by
8 the defendant, were those defendants physicians?
9    A.  Yes.
10    Q.  Were there any occasions where the defendant
11 was not a physician, where you were retained by a
12 defendant who was not a physician?
13    A.  I don't believe so.
14    Q.  And so those would have been malpractice
15 cases?
16    A.  Correct.
17    Q.  And in the times that you were retained by
18 the plaintiff or plaintiffs, putting aside this
19 litigation, how many of those were medical malpractice
20 cases?
21    A.  All.
22    Q.  All?
23    A.  Um-hum.  Yes.
24    Q.  So is this the first time that you have been

Page 24

1 retained as an expert witness in a case that is not a
2 medical malpractice case?
3    A.  Yes.
4    Q.  And so now you've given us all of the
5 depositions that you can remember as you sit here;
6 correct?
7    A.  Correct.
8    Q.  What's your current professional address?
9    A.  9 -- 9631 Gross Point Road, Skokie, Illinois,
10 60076.
11    Q.  Is that an office or a hospital?
12    A.  It's an office building.
13    Q.  And you have a practice that's just you?
14 What is there?
15    A.  It's a private practice that includes myself,
16 one employed physician and then nurses and physician
17 assistant and staff.
18    Q.  And is it an oncology practice?
19    A.  Yes, hematology and oncology.
20    Q.  Tell me what hematology is.
21    A.  Hematology is the study of -- of
22 blood-related disorders.
23    Q.  So is the practice primarily involved with
24 blood cancers?

Page 25

1    A.  No.
2    Q.  What type of cancers does this practice deal
3 with?  Strike that.
4    Hematology and oncology.  So does the
5 practice deal with more than just cancer?
6    A.  Yes.
7    Q.  Does it deal with blood disorders and
8 cancers?
9    A.  Correct.
10    Q.  What kind of blood disorders does it deal
11 with?
12    A.  Well, aside from the malignant blood
13 disorders such as lymphomas, leukemias there are --
14    Q.  And those are cancers?
15    A.  Those are cancers.  So you want the
16 non-cancers?
17    Q.  Correct.
18    A.  So that would be -- that would be anemia,
19 problems with other blood issues such as low platelet
20 count, thrombocytopenia, bone marrow disorders such as
21 mild dysplastic syndrome, mild proliferative neoplasms,
22 multiple myeloma or plasma self dysplasias which kind of
23 is the broad term for -- for that class of illnesses.
24 Many things called monoclonal gammopathy of uncertain

7 (Pages 22 - 25)

Page 26

1 significance or MGUS which is pre-cursor to multiple
2 myeloma, problems with just low blood counts in general,
3 sickle cell disease, hemophilia. Those conditions are
4 taken care of by my associate.
5    Q.  You anticipated my question. So those blood
6 disorders are dealt with by your associate?
7    A.  Correct.
8    Q.  And what is his or her name?
9    A.  Dr. Marlon Kleinman. Marlon like Brando.
10 Kleinman like Kleinman.
11    Q.  And are you the only oncologist in the
12 practice?
13    A.  He's also an oncologist.
14    Q.  Okay. And in that practice, do you deal
15 exclusively with cancers?
16    A.  No. I also do some hematology. We cover for
17 each other. I do have some patients with those
18 conditions I mentioned.
19    Q.  Okay. What kind of cancers do you deal with
20 in that practice?
21    A.  Pretty much any cancer that there is except
22 mostly I do not take care of acute leukemia. My partner
23 sometimes will. My associate sometimes will, but mostly
24 I take care of everything else. The majority of what I

Page 27

1 do though is solid tumors which would include
2 gastrointestinal malignancies, lung cancer, breast
3 cancer, lymphomas, other -- other GI -- oh, I mentioned
4 gastrointestinal cancers. That could be -- that could be
5 anywhere from the esophagus to the stomach to the small
6 bowel to the large bowel, pancreas, gallbladder, biliary
7 tree cancers, liver cancers.
8    Q.  Why don't you handle acute leukemia cases?
9    A.  Most of the time I believe that that disease
10 requires the facilities of a tertiary care center, and
11 while we may see patients that are also being treated in
12 one of those centers, the majority of the treatment is
13 administered and followed at those centers.
14    Q.  Are there any other cancers you'd put into
15 that same category?
16    A.  No.
17    Q.  What's so unique about acute leukemia that
18 requires that?
19    A.  Acute leukemia requires oftentimes inpatient
20 treatments with close monitoring. It could -- it could
21 require bone marrow transplantation and -- and other
22 procedures that we're just not equipped to handle in
23 an -- an in outpatient clinic, outpatient office.
24    Q.  So you refer them to another facility?

Page 28

1    A.  Most of the time, yes.
2    Q.  By the way, a couple of preliminary questions
3 I should have asked at the beginning.
4        You're not taking any medication that affects
5 your memory today?
6    A.  I don't think so. No, I'm not taking any.
7 I'm sorry.
8    Q.  And you're capable of testifying fully and
9 truthfully today?
10    A.  I better be, yes.
11    Q.  That's a yes?
12    A.  I've already started. Yes. Yes.
13    Q.  I am going to hand you what the court
14 reporter first -- we'll have her mark as Exhibit 1, the
15 Notice of Videotaped Deposition today.
16        (Exhibit No. 1 marked as
17            requested.)
18        MR. KERNER: Rachel, are you looking at the
19 same thing?
20        MS. GEMAN: Yes.
21 BY MR. KERNER:
22    Q.  Dr. Kaplan, have you ever seen what's been
23 marked as Exhibit 1 prior to right now?
24    A.  Yes.

Page 29

1    Q.  When was the first time you saw it?
2    A.  I believe it was about three or four weeks
3 ago.
4    Q.  How did you come to see it?
5    A.  It was given to me by the attorneys.
6    Q.  Which attorney?
7    A.  Rachel or one of her colleagues.
8    Q.  You don't remember?
9    A.  I don't -- I don't remember, no.
10    Q.  And you see that it calls for your deposition
11 right here today. So you're here pursuant to this Notice
12 of Deposition; correct?
13    A.  Correct.
14    Q.  There's also a request for some documents
15 here. Did you review that before today?
16    A.  Yeah.
17    Q.  On Monday we received some documents. Were
18 the documents that you provided in response to these
19 requests?
20    A.  Yes.
21    Q.  Any documents in these requests that you
22 didn't provide?
23    A.  Not that I know of, no.
24    Q.  So everything in these requests you provided

8 (Pages 26 - 29)

Page 30

1  on Monday to us; correct?
2      MS. GEMAN: Objection to the extent it calls
3  for a legal conclusion subject to the responses and
4  objections.
5      MR. KERNER: Okay. Let me ask it a different
6  way.
7  BY MR. KERNER:
8      Q.  Is there anything in this set of requests,
9  these 13 requests that you have not provided to us?
10     A.  I -- I do not believe so.
11     Q.  So I asked that as a double negative there.
12  Have you provided everything that was requested in these
13  13 requests --
14     MS. GEMAN: Same objection.
15  BY MR. KERNER:
16     Q.  -- that was in your -- that's in your
17  possession?
18     A.  Yes.
19     Q.  And so request number 6 is for your complete
20  and entire file for the case. You provided that?
21     A.  Yes.
22     Q.  So there's nothing that you have in
23  connection with this case that you haven't provided; is
24  that accurate?

Page 31

1      MS. GEMAN: Same objection.
2  BY THE WITNESS:
3      A.  There -- there were preliminary drafts which
4  I was told I did not need to -- to provide.
5      MS. GEMAN: And I'm just going to caution the
6  witness not to disclose communications with counsel.
7      MR. KERNER: Right.
8  BY THE WITNESS:
9      A.  And communication with counsel.
10  BY MR. KERNER:
11     Q.  I don't want to know about your
12  communications with your counsel. Although I believe
13  counsel here is Plaintiffs' counsel, so you're actually
14  not -- there's not an attorney/client relationship, but
15  we don't need to get into that now.
16     And I'm not looking for your drafts.
17     A.  I'm sorry?
18     Q.  I'm not looking for your drafts today.
19     A.  Okay.
20     Q.  Is there anything else that you didn't
21  provide that was requested --
22     A.  No.
23     Q.  -- in these 13 requests?
24     A.  No, there isn't.

Page 32

1      THE WITNESS: Can I take a break for one
2  second --
3      MR. KERNER: Yeah, of course.
4      THE WITNESS: -- just to ask a question?
5      MR. KERNER: Hang on. Hang on. Do you want
6  to go off the record? Yeah.
7      THE VIDEOGRAPHER: The time is 9:41 a.m. This
8  is the end of media two. We're off the record.
9          (Discussion had off the
10          record.)
11     The time is 9:43 a.m. This is the
12  beginning of media three. We're back on the record.
13  BY MR. KERNER:
14     Q.  We all set?
15     A.  Yes.
16     Q.  Okay. Dr. Kaplan, how did you first become
17  aware of this litigation?
18     A.  I was approached by or I was -- I was
19  contacted by Expert Institute which is a company that has
20  my -- my credentials, my information and they asked me if
21  I'd be interested in discussing and reviewing this case
22  and introduced me to the -- to the legal team that was
23  involved in it.
24     Q.  Who did they introduce you to?

Page 33

1      A.  To -- to the law firm that -- that I'm --
2  that I'm with right now.
3      Q.  Rachel's law firm?
4      A.  Rachel's law firm.
5      Q.  Lieff Cabraser, does that sound familiar?
6      A.  Yeah, that's one of the law firms.
7      Q.  What were the other ones?
8      A.  I don't have the names in front of me.
9      Q.  What did they tell you that they wanted you
10  to do?
11     A.  They asked if I could review or -- or develop
12  a monitoring program for patients that had been shown to
13  be exposed to known carcinogens.
14     Q.  How do you define known carcinogens?
15     A.  Products that have been identified to
16  increase risk of developing malignancies when someone's
17  been exposed to them in certain levels.
18     Q.  And you said the Expert Institute put you in
19  contact with Lieff Cabraser?
20     A.  Correct.
21     Q.  How did they have your contact information?
22     A.  I had responded to e-mail requests awhile ago
23  for somebody who would be interested -- for people who
24  would be interested in being expert witness and sent them

9 (Pages 30 - 33)

Page 34

1 my information, my curriculum vitae, so I was on their
2 file. I don't remember how long ago I did it, but this
3 was the first time I had been contacted by them.
4    Q. How long ago did Plaintiffs' lawyers contact
5 you?
6    A. I believe it was October of 2021, September
7 or October.
8    Q. Just a few months ago?
9    A. Correct. Actually, it may have been a little
10 before. It may have been August.
11    Q. And they asked you to develop a monitoring
12 program for patients exposed to known carcinogens. How
13 did you respond?
14        MS. GEMAN: Objection to the extent it
15 misstates the testimony.
16 BY MR. KERNER:
17    Q. If that's not what you said, please correct
18 it, but I think that's what you said.
19    A. Could you repeat the question?
20    Q. How did you respond to Plaintiffs' request to
21 retain you as an expert?
22    A. I agreed to review the information.
23    Q. What information did you agree to review?
24    A. The testimony of experts that discussed the

Page 35

1 risks associated with nitrosamine products from tainted
2 Valsartan.
3    Q. Which specific expert's testimony did you
4 review?
5    A. I have it in my --
6    Q. In your report?
7    A. -- report.
8    Q. So the experts' testimony that you reviewed
9 are the experts that you've identified in your report?
10    A. Correct.
11    Q. Any others?
12    A. No.
13    Q. And in addition to reviewing their testimony,
14 did you review anything else?
15    A. At that time?
16    Q. Yes.
17    A. No.
18    Q. In preparing your report, did you review
19 anything else or just that testimony?
20    A. No. In preparing my report, I reviewed
21 various articles and resources.
22    Q. And are those articles and resources attached
23 to your report?
24    A. Yes, they are.

Page 36

1        MR. KERNER: Let's mark this next exhibit. I
2 think this is 2; right?
3            (Exhibit No. 2 marked as
4            requested.)
5 BY MR. KERNER:
6    Q. Doctor, we've marked as Exhibit -- well,
7 we've just handed you Exhibit 2. Can you tell me what
8 that is?
9    A. This is a copy of my curriculum vitae.
10    Q. And can you tell me if that's your most
11 current CV?
12    A. I believe it is.
13    Q. And this was attached to your report?
14    A. Yes.
15        MR. KERNER: How do we want to handle exhibits
16 with the Zoom? I realize we didn't do that for the
17 Notice of Deposition. Do we want to get the CV up on the
18 Zoom for folks that are remote?
19        MS. ISIDRO: Yes. That's in progress.
20        MR. KERNER: Great.
21 BY MR. KERNER:
22    Q. So, Doctor, let's go backwards. Let's start
23 with your medical school. Where did you go and when did
24 you graduate?

Page 37

1    A. I went to Loyola University Medical Center in
2 Maywood, Illinois, and I graduated in 1982.
3    Q. Did you have a residency after that?
4    A. I had a residency -- internship and residency
5 at Northwestern University in Chicago.
6    Q. What did you do after the internship and the
7 residency?
8    A. I went on to a hematology/oncology fellowship
9 at Northwestern University in Chicago.
10    Q. And the residency was in internal medicine;
11 correct?
12    A. Correct.
13    Q. And the fellowship was you said at
14 Northwestern --
15    A. Yes.
16    Q. -- in hematology and oncology?
17        That was according to your CV from 1983 to
18 1985?
19    A. The fellowship was 1985 to 1988.
20    Q. Ahh, okay. And so after the fellowship, when
21 it concluded in 1988, what did you do next?
22    A. I joined the faculty at Rush University in
23 Chicago.
24    Q. In what role?

10 (Pages 34 - 37)

Page 38

1    A.    As a medical -- as a hematology/oncology
2  attending physician.
3    Q.    Is that still your role there?
4    A.    No.  I was -- I was full-time there for five
5  years and then went into private practice after that but
6  maintained my -- my teaching role at Rush University and
7  am still an Assistant Professor of Medicine at Rush
8  University.
9    Q.    And you've been an Assistant Professor of
10 Medicine at Rush since 1988?
11   A.    Correct.
12   Q.    What do your responsibilities at Rush entail
13 now?
14   A.    My responsibilities at Rush would entail
15 allowing residents and students to rotate through our
16 office to acquire clinical experience.  There's been
17 teaching roles.  There's been clinical clerkships, but I
18 have had no responsibilities on the campus for a number
19 of years.
20   Q.    When you say "allow them to rotate," what do
21 you mean by that?
22   A.    Providing them a rotation, a clinical
23 rotation in our -- in our -- in our practice for the --
24 for the residents or -- or fellows that wish to have a

Page 39

1  community oncology experience.
2    Q.    Do you supervise them?
3    A.    Yes.
4    Q.    Do you teach them?
5    A.    Yes.
6    Q.    What do you teach them?
7    A.    Teach them clinical -- clinical oncology.
8  For -- for ten years -- until 1995 I was assigned as
9  the -- the Chairman of Oncology at NorthShore
10 University -- at -- sorry -- at Rush NorthShore in
11 Skokie.  That was part of my role at Rush.  After I left
12 full-time faculty at Rush I maintained that role until
13 the hospital was sold to NorthShore University.
14   Q.    Okay.  Now, in looking at your CV, there are
15 a bunch of publications, and I see there's some patents
16 as well and some abstracts and invited lectures and
17 presentations.  How many of these publications dealt with
18 NDMA or NDEA?
19   A.    None.
20   Q.    How about Valsartan or any of the Valsartan
21 drugs?
22   A.    None.
23   Q.    What about the abstracts?
24   A.    None.

Page 40

1    Q.    And the invited lectures and presentations --
2    A.    Concerning?
3    Q.    -- any of them concerning NDMA or NDEA?
4    A.    No.
5    Q.    Or Valsartan?
6    A.    No.
7    Q.    Or the Valsartan drugs?
8    A.    Correct.
9    Q.    Other than the report that the Plaintiffs'
10 attorneys asked you to draft and develop in this
11 litigation have you ever written or presented or spoke
12 outside the litigation on NDMA, NDEA or any of the
13 Valsartan drugs?
14   A.    No, I haven't.
15   Q.    Since the litigation began other than your
16 report, have you written or presented or spoken on NDMA,
17 NDEA or any of the Valsartan drugs?
18   A.    No, I haven't.
19   Q.    So it's limited to this report; correct?
20   A.    Yes.
21   Q.    When the Plaintiffs asked -- Plaintiffs'
22 counsel -- excuse me.  Okay.  I misspoke earlier.
23       When Plaintiffs' counsel asked you to develop
24 a monitoring program, did they give you any more guidance

Page 41

1  or instruction as to how to do it?
2    A.    No.
3    Q.    What they were looking for?
4    A.    No.
5    Q.    They just said develop a program and --
6    A.    They -- they --
7       MR. KERNER:  Go ahead.  I'm sorry.
8       MS. GEMAN:  I just want to caution you.  You
9  can speak to any facts or assumptions provided, but I
10 don't -- I don't see Mr. Kerner is asking beyond that.
11      MR. KERNER:  I think I heard you.
12      MS. GEMAN:  Sorry.
13      MR. KERNER:  That's okay.  I know.
14      THE WITNESS:  Could you repeat the question?
15      MR. KERNER:  I'm not sure that I could.
16 BY MR. KERNER:
17   Q.    When Plaintiffs' counsel asked you to develop
18 a monitoring program, did they give you any instruction
19 or guidance as to what they wanted?
20      MS. GEMAN:  Objection, asked and answered.
21 BY THE WITNESS:
22   A.    They advised me as to the -- the details of
23 the case and asked if I felt that I could present a
24 monitoring program for the group of patients that were

11 (Pages 38 - 41)

Page 42

1 identified as being at high risk for developing a group
2 of cancers.
3 BY MR. KERNER:
4    Q.   And when you said they gave you the details
5 of the case, what did they tell you were the details?
6    A.   The details were that it had been established
7 by their expert reviewers and by the history of the
8 litigation that the Valsartan tainted materials when
9 exposed in certain amounts to patients was considered a
10 risk for the patients ultimately developing malignancies,
11 that these were carcinogens and then the levels that they
12 were exposed to, that they were at risk.  And part of
13 this kind of evaluation or legal review does allow for
14 monitoring, medical monitoring in situation, and my
15 experience with patient care and patient -- patient --
16 review patient care would allow me to develop an
17 appropriate monitoring program in that situation.
18    Q.   Okay.  You said -- and I don't want to
19 misstate your testimony.  I'm trying to remember what you
20 just said -- that their expert reviewers established that
21 Valsartan was considered an increased risk.  Did you do
22 any independent analysis as to Valsartan or NDMA other
23 than what their other experts had established?
24    A.   So my understanding, it wasn't Valsartan that

Page 43

1 was putting the patients at risk.  It was the Valsartan
2 that was manufactured in a way that had been tainted with
3 these dangerous substances.  I did not do independent
4 review.  That's not what I was asked to do.  I was asked
5 to just develop a monitoring program.
6    Q.   Okay.  And -- and to your point, you don't
7 have any criticism of the drug Valsartan; correct?
8    A.   Correct.
9    Q.   And you're relying on the Plaintiffs' other
10 experts for their analysis of any carcinogenic effect of
11 the, as I think you put it, the tainted Valsartan;
12 correct?
13    A.   Correct.
14    Q.   Okay.  Let's get to what we're going to mark
15 as Exhibit 3.
16              (Exhibit No. 3 marked as
17              requested.)
18         The Zoom folks be aware of that as well.
19         Okay.  Doctor, can you tell me what Exhibit 3
20 is?
21    A.   This was the report that I provided to the --
22 to -- to Mr. Slater and the other attorneys.
23    Q.   Who's Mr. Slater?
24    A.   Mr. Slater is the one I was told to -- to

Page 44

1 address.  One of the attorneys -- one of the attorneys
2 for the Plaintiff.
3    Q.   Somebody told you to address it to
4 Mr. Slater?
5    A.   Correct.
6    Q.   Do you remember who told you that?
7    A.   No.
8    Q.   Okay.  You said a moment ago that -- I think
9 you said a moment ago that you were asked to develop a
10 medical monitoring program, and then I think you said the
11 legal review allows for medical monitoring in this case.
12 That's what you said; correct?
13    A.   I think that's what my terminology was, yes.
14    Q.   Prior to this case have you ever created a
15 medical monitoring program?
16    A.   I've not developed a public medical
17 monitoring program but I've been involved in my own
18 patient care of -- of developing monitoring programs.
19    Q.   What do those monitoring programs consist of?
20 And what do you mean by monitoring programs for your
21 patients?
22    A.   So to get into detail, my experience in my
23 practice includes patients that have high risk of
24 developing cancer usually because of genetic

Page 45

1 abnormalities such as BRCA gene or Lynch syndrome.  I
2 follow patients and families of patients that haven't
3 developed cancer that -- but do carry these genetic
4 abnormalities and monitor them for malignancies.
5    Q.   How do you do that?
6    A.   Various ways depending on the situation.
7    Q.   Can you explain that to me?
8    A.   Certainly.  In -- for example, in Lynch
9 syndrome which is genetic abnormality that predisposes to
10 gastrointestinal malignancies, I will follow the patients
11 twice a year.  The ones that do not have cancer, have not
12 developed cancer we'll follow them twice a year with
13 clinical exam, routine exams that include physical exam,
14 history and basic blood analysis.  I will assure that
15 they're getting annual colonoscopies because of the high
16 risk of developing polyposis and ultimately
17 gastrointest -- colonic carcinoma.  I will also follow
18 them for development of uterine cancer by referring them
19 to gynecologist by ordering radiographic studies such as
20 ultrasounds, occasionally CAT scans.
21    Q.   Let me interrupt you for one second, sir.
22 For Lynch syndrome, one of the things you just said I
23 think is that you -- you have them have an annual
24 colonoscopy --

12 (Pages 42 - 45)

Page 46

1    A.    Correct.
2    Q.    -- correct?
3         Do you have all of your patients who are --
4    is it -- are they -- do they have Lynch syndrome or are
5    they susceptible to Lynch syndrome?
6    A.    No.  These are patients --
7         MS. GEMAN:  I just want to --
8    BY THE WITNESS:
9    A.    -- with --
10        MS. GEMAN:  I just want to object.  The
11   witness was not done answering the previous question, so
12   I just want to make sure the record's clear that that
13   wasn't an answer -- a complete answer.
14        MR. KERNER:  Sure, and we'll come back to that
15   in a second.  I appreciate that.
16        MS. GEMAN:  Yeah.
17   BY MR. KERNER:
18   Q.    Lynch syndrome.
19   A.    Thank you.  Patients that have identified
20   Lynch syndrome, it's recommended that they get annual
21   colonoscopies.
22   Q.    Are there patients who perhaps for other
23   reasons, whether it's other history or comorbidities or
24   something, might not be -- might not be appropriate to

Page 47

1    have an annual colonoscopy?
2    A.    Yes.
3    Q.    Can you give me an example or two of a type
4    of patient where you wouldn't -- with Lynch syndrome
5    where you wouldn't provide an annual colonoscopy for?
6    A.    An elderly patient with severe cardiovascular
7    disease, somebody that had a colonoscopy and had a
8    complication such as a perforation, someone that just
9    refuses.
10   Q.    How common are perforations during
11   colonoscopies?
12   A.    Very uncommon.
13   Q.    I'm sorry?
14   A.    Very uncommon.  I believe less than 1
15   percent.  I believe less than .1 percent, but I don't
16   know exactly.
17   Q.    Less than .1 percent?
18   A.    I believe so, but I don't know exactly.
19   Q.    You don't happen to have any data or support
20   that you can cite to me for that figure, do you?
21   A.    No, I don't.
22   Q.    Do you know where that figure comes from?
23   A.    Just from my own experience in -- in
24   practice.

Page 48

1    Q.    So you don't know if it's a national
2    statistic or a worldwide statistic?  It's just a Kaplan
3    statistic of less than .1 percent of perforated colons?
4    A.    As I said, I was guessing it was either 1
5    percent or maybe even .1 percent.  I was not opining as
6    to the exact statistic.  I know that there's literature
7    that could answer that question.
8    Q.    So to be fair, as you sit here right now, you
9    don't really know how many -- what the percentage is of
10   colonoscopy patients who have perforated colons during
11   the procedure?
12   A.    I know it's very rare.
13   Q.    But you don't know what you mean by "very
14   rare"?
15        MS. GEMAN:  Objection.
16   BY MR. KERNER:
17   Q.    What do you mean by "very rare?"
18   A.    I've taken care of over 1,000 patients that
19   have had colonoscopies, probably more like 3,000 patients
20   in my career that have had colonoscopies and I've seen 2
21   perforations.
22   Q.    But, again, as a good doctor who cares about
23   his patients, you consider that as to whether a patient
24   should have an annual colonoscopy; correct?

Page 49

1    A.    Could you repeat that?  I just got stopped at
2    the "good doctor" because I'm glad you said that.
3    Q.    Yeah.  Strike that.
4         As a doctor who's concerned about his
5    patients, I think you testified a few minutes ago that
6    one of the reasons why you may not recommend an annual
7    colonoscopy is if it's an elderly patient, the risk
8    of -- the risk of a perforated colon and some other
9    possible reasons?
10   A.    What I said was if someone had had a
11   perforation in their colon I would not recommend going
12   back necessarily with a colonoscopy.
13   Q.    Any other reasons why you might not recommend
14   the annual colonoscopy for a Lynch syndrome patient?
15   A.    Aside from comorbidities, risk of problems
16   related to anesthesia, I can't think of any other reason
17   I would not recommend an annual colonoscopy.
18   Q.    So there are some risks that are -- that come
19   along with a colonoscopy; correct?
20   A.    Correct.
21   Q.    And so what you do with your patients with
22   Lynch syndrome is you weigh the risks versus the
23   benefits?
24   A.    Correct.

13 (Pages 46 - 49)

Page 50

1    Q.   And in your medical judgment, as a treating
2  physician of those patients, you make the recommendation
3  one way or the other; correct?
4    A.   Correct.
5    Q.   One of the things I think you said is that --
6  I'll let you finish taking your notes.
7    A.   I was saying you said I was a good doctor.
8  Sorry.
9    Q.   One of the things I think you said with
10  respect to Lynch syndrome is that it is recommended that
11  they have annual colonoscopies?
12    A.   Correct.
13    Q.   By whom?
14    A.   By I believe a number of agencies.  The NCCN
15  has it in their guidelines.
16    Q.   What's the NCCN?
17    A.   The NCCN is the National -- I knew you were
18  going to ask me this.  I can't remember what it stands
19  for.  It's a -- it's a -- it's an organization that's --
20  that reviews every malignancy class and has experts from
21  around the country and even around the world will meet
22  regularly and create algorithms for how many conditions
23  are treated but also for screening and for -- and for
24  monitoring.

Page 51

1    Q.   Is it the National Comprehensive Cancer
2  Network?
3    A.   That's it.  Thank you.
4    Q.   And they develop screening protocols, is that
5  what --
6    A.   They have recommendations in their algorithm
7  for what should be done with patients.
8    Q.   They're pretty well-regarded; right?
9    A.   Yes.
10    Q.   Do you generally follow their guidelines?
11    A.   Generally.
12    Q.   Are there specific guidelines that you don't
13  follow?
14    A.   On an individual basis I will review -- and
15  this is usually for treating patients.  I will review
16  their recommendations, and they usually have more than
17  one suggested direction, but we use them to -- help
18  decide on appropriate treatments for patients.
19    Q.   What else do you use to decide on appropriate
20  treatments for patients?
21    A.   My own experience, the literature, any
22  investigational trials that we're involved in or that
23  we've reviewed.
24    Q.   What about the patient him or herself?

Page 52

1    A.   Well, of course, the patient.
2    Q.   What do you look at with respect to the
3  patient?
4    A.   This is when deciding on treatment for the
5  patient?
6    Q.   Yes.
7    A.   The -- the details of the patient's specific
8  situation, the disease itself, of course, the performance
9  status of the patient which is a measure of how
10  functional and how sick they are, the comorbidities,
11  patient's desires themselves.
12    Q.   Family history?
13    A.   In deciding on treatment, usually not.
14    Q.   Would you take family history into account in
15  determining whether a certain procedure is appropriate
16  and may be more likely to be appropriate because of
17  family history?
18    A.   Could you explain that question?
19    Q.   Sure.  For colonoscopy would you be more
20  likely to think a colonoscopy is appropriate annually
21  because they have Lynch syndrome?
22    A.   Yes.  I already mentioned that Lynch --
23    Q.   Right.
24    A.   -- syndrome, but Lynch syndrome, although

Page 53

1  it's linked to family history, it's specific to that
2  patient because they've been diagnosed with carrying the
3  gene.
4    Q.   Fair.  What about a patient who has a first
5  degree relative who has had colon cancer?
6    A.   That would --
7        MS. GEMAN:  Objection, vague.
8  BY THE WITNESS:
9    A.   That would factor into my -- my assessment of
10  the patient's own risk and the need for that patient to
11  undergo genetic testing but wouldn't necessarily --
12  wouldn't necessarily at all factor into my decision about
13  putting them through colonoscopy or any other test.  It's
14  part of the general evaluation of the patient.
15  BY MR. KERNER:
16    Q.   Okay.  So in terms of treatment which is what
17  you're talking about?
18    A.   Correct.
19    Q.   You mentioned comorbidities.  You mentioned
20  the patient's desires.  You mentioned the performance
21  status of the patient.  What do you mean by that?
22    A.   So in part of the evaluation of a patient,
23  and especially oncology patients that are going through
24  treatments or are anticipating going through treatments,

14 (Pages 50 - 53)

Page 54

1 one of the ways to quantitate how the patient is doing is
2 using a -- table, a gauge based on a number of factors
3 to determine how fit they are. There's two accepted
4 methods. One is called the ECOG, Eastern Cooperative
5 Oncology Group Performance Status, and the other is the
6 Karnofsky Performance Status. We usually use the ECOG
7 criteria. It's pretty straightforward. It's from zero
8 to four. Zero is somebody that's totally asymptomatic
9 and performing their normal day-to-day activities. One
10 is somebody that's functional and doing everything but
11 probably at better than 50 percent of their normal
12 activities. Two is -- two and three and four are then
13 progressively worse, with four being near death.
14    Q. And so that will help guide you with the
15 treatment that you're going to provide for the patient;
16 correct?
17    A. Correct.
18    Q. One of the things?
19    A. Correct.
20    Q. And is that something that NCCN also -- it's
21 also part of their guidelines?
22    A. I'm not exactly sure how -- how they would
23 use it in their guidelines. I believe they do. I think
24 there's many studies suggesting that someone that is a

Page 55

1 performance status of three or worse is not likely to
2 benefit from some of the aggressive treatments we might
3 otherwise use that's been established. Although a lot of
4 that's changing because of new therapies that have come
5 out that are even appropriate for very ill patients.
6    Q. Okay. Let's take a look at your report.
7    A. Okay.
8    Q. And we've marked that as Exhibit 3.
9       You want to get that back up for the Zoom?
10       Okay. Did you draft this report?
11    A. Yes.
12    Q. Did Plaintiffs' counsel provide any input in
13 the report?
14    A. Only typographically.
15    Q. And you mean literally typos --
16    A. Correct.
17    Q. -- if there were errors? That's it?
18    A. Yeah.
19    Q. Nothing else?
20    A. I don't believe so, no.
21    Q. Okay. Let's go -- in the first paragraph,
22 "Expert Background Qualifications," you mention that you
23 "designed screening programs for the patient I treat and
24 frequently monitor patients at high risk for cancer or

Page 56

1 cancer recurrence." We've talked a little bit about that
2 already; correct?
3    A. Yes.
4    Q. Anything about the screening programs that
5 you said you designed for your patients that you haven't
6 told us yet?
7       MS. GEMAN: Objection.
8 BY THE WITNESS:
9    A. We didn't talk about patients that have been
10 treated for cancer, and so they're in a unique group
11 that's going to be monitored a little differently than a
12 healthy person that walks in that needs to be evaluated
13 with cancer.
14 BY MR. KERNER:
15    Q. And that's where you're talking about cancer
16 recurrence; correct?
17    A. Correct.
18    Q. So tell me what the difference is in your
19 view with a patient who you're screening for a risk of
20 cancer versus a cancer recurrence. Because I would
21 assume, I shouldn't, but that somebody you're treating
22 for cancer recurrence you might be a little bit more
23 aggressive in terms of your -- in terms of your
24 screening?

Page 57

1    A. I'm not sure what aggressive --
2    Q. Strike that.
3    A. -- means. From where?
4    Q. Tell me -- tell me how your screening is
5 different for patients at high risk for cancer versus
6 patients with cancer recurrence.
7    A. All of the patients will receive general
8 evaluation. By that I mean history, a physical exam,
9 basic laboratory studies. Patients with specific
10 conditions will have blood tests that are designed
11 specifically for that cancer. For example, ovarian
12 cancer with a tumor marker called CA125 or pancreatic
13 cancer with a tumor marker called CA929, I won't do that
14 on a patient who didn't have the history of pancreatic
15 cancer necessarily.
16    Q. Why not?
17    A. Because that test is designed specifically
18 to -- to detect pancreatic cancer recurrence.
19    Q. Okay.
20    A. The other thing might be, as you alluded to,
21 more aggressive procedures, so that might include doing
22 CAT scans more frequently. Somebody that's had lung
23 cancer that's been treated that had surgery but is high
24 risk for recurrence will get CAT scans frequently.

15 (Pages 54 - 57)

Page 58

1    Q.   What do you mean "frequently"?
2    A.   I mean depending on where they are from their
3  treatment and what their situation is and what their
4  symptoms are.  It could be -- it could be every three
5  months, every four months, every six months, every year.
6  It's not set in stone.  It depends on the patient.
7    Q.   And that would be true for patients who you
8  believe are at high risk for cancer.  It depends on the
9  patient in terms of what the screening will be; correct?
10    A.   Well, not necessarily.  Patients that are at
11  high risk for cancer that have no other symptoms or
12  problems I will have a specific general monitoring scheme
13  in mind which is exactly what this is all about.  While
14  as patients that have had a specific problem or have a
15  symptom will necessitate getting additional testing done.
16    Q.   Okay.  So there are -- at least in this first
17  section of your report, there are screening programs for
18  patients at high risk for cancer and for cancer
19  recurrence.  Do you make any other distinctions between
20  asymptomatic or symptomatic patients or patients with
21  specific exposures?
22    MS. GEMAN:  Objection.
23  BY THE WITNESS:
24    A.   I'm not sure I understand the question.

Page 59

1
2  BY MR. KERNER:
3    Q.   Okay.  In your practice, when you're
4  screening your patients, do you make any distinctions if
5  a patient is symptomatic or asymptomatic in terms of the
6  screening?
7    A.   The basic screening there will be no
8  distinction.  If someone's symptomatic, that goes from
9  screening to evaluation.  So somebody, for example, that
10  has a cough is going to have something done more to
11  evaluate that than someone that comes in without any
12  symptoms, but there's a basic screening that would be
13  provided to anybody that I identified as being at risk.
14    Q.   At risk for what?
15    A.   Developing cancer.
16    Q.   Which type of cancer?
17    A.   All -- all -- I mean it depends on what I'm
18  seeing the patient for.
19    Q.   Sure.  So are there different screening
20  protocols for different risks -- different cancer risks?
21    A.   There are screening programs for -- there's
22  individual decisions that are made based on a patient and
23  the reason the patient's seeing me.  For someone that has
24  a high risk of developing malignancies, that could be one

Page 60

1  or could be many different types, there's going to be
2  general screening protocols that I'll provide.  An
3  example would be someone with tobacco exposure's not just
4  at risk for one cancer, so it would be a number of -- of
5  procedures that are done to monitor them.
6    MR. KERNER:  Okay.  Let's take a five-minute
7  break if we can.  We've been at it a little over an hour.
8    THE VIDEOGRAPHER:  The time is now 10:21 a.m.
9  This is the end of media three.  We're off the record.
10    (WHEREUPON, a break was
11    taken.)
12    The time is now 10:39 a.m.  This is the
13  beginning of media four.  We're back on the record.
14  BY MR. KERNER:
15    Q.   Okay, Doctor.  A few more questions
16  obviously.
17    We're talking about paragraph 1 in your
18  report, and I want to talk about your practice.  You
19  mentioned that you designed screening programs for
20  certain patients.  I think you testified that you have
21  designed screening programs for patients with genetic
22  predisposition such as BRCA or Lynch syndrome; is that
23  correct?
24    A.   Correct.

Page 61

1    Q.   And also I think you said for heavy smokers?
2  Did you say that?  Do you design screening programs for
3  patients of yours that are heavy smokers?
4    A.   I follow guidelines for patients that have --
5  that are heavy smokers.
6    Q.   Which guidelines do you follow?
7    A.   The recommendation to do low-dose CAT scan
8  annually which is an accepted screening protocol.  It's
9  in NCCN and I think other places as well.
10    Q.   Are there any other categories of patients,
11  your patients that you screen regularly?
12    A.   I'm not sure I -- I understand the question,
13  how to answer the question.  Every patient I'm seeing is
14  being screened regularly.
15    Q.   Okay.  Well, you mentioned that you've
16  designed screening programs for patients.  Are there any
17  other categories of patients other than what we've just
18  spoken about that you have designed screening programs
19  for in your practice?
20    A.   Patients that have family -- that have had
21  family histories and -- of -- of -- of genetic
22  abnormalities in high risk cancer that they themselves
23  haven't had but because there's unknown mutations or
24  there have been unknown mutations that may put those

16 (Pages 58 - 61)

Page 62

1  patients at risk, I will create a more intense screening
2  program for that group of patients than for somebody that
3  didn't have any of that history.
4      Q.  Any other categories?
5      A.  Not that I can think of.
6      Q.  Okay.  Scroll down to or move down to the
7  next paragraph.  You say you're compensated for this
8  matter at an hourly rate.  What is your hourly rate?
9      A.  My hourly rate for reviewing records is $500
10  per hour.  For deposition or courtroom testimony it's
11  $600 per hour.
12     Q.  So you're getting paid $600 an hour to be
13  here today?
14     A.  I believe so, yes.
15     Q.  Are you confirming that?  Is that what you're
16  doing now?
17     A.  No.
18     Q.  What are you looking at -- is that your
19  report?
20     A.  That's the -- my -- my report.
21     Q.  Okay.  You also state in that paragraph that
22  the opinions you "state in this report are stated within
23  a reasonable degree of professional certainty."  What
24  does that mean?

Page 63

1      MS. GEMAN:  You can take the time you need to
2  look at the language.
3  BY THE WITNESS:
4      A.  I think that's going to be true of any
5  opinions I have about anything.  Nothing is set in stone.
6  It's going to be within what I consider -- what's
7  considered reasonable based on my profession.
8  BY MR. KERNER:
9      Q.  Tell me what you mean by "professional
10  certainty."
11     A.  In other words, based on my medical expertise
12  rather than just assumptions, lay assumptions.
13     Q.  Is professional certainty different than
14  medical certainty?
15     A.  Probably not.
16     Q.  Did someone tell you to use that phrase?
17     A.  No.
18     Q.  Have you ever used it before?
19     A.  I can't -- I can't recall.
20     Q.  If you go to the top of the next page, you
21  say that in forming your opinions you've "assumed that
22  the people who took the Valsartan in question can be
23  identified along with identification of the manufacturers
24  of their pills, the dosage and levels of NDMA/NDEA and

Page 64

1  duration of use."  What is that assumption based on?
2      A.  Based on the information I was provided by
3  counsel.
4      Q.  What information was that?
5      A.  Information we've already discussed.  It was
6  the reports of their experts.
7      Q.  So that assumption in Section 2 is based on
8  the reports of their experts; correct?
9      A.  Correct.
10     Q.  Anything else?
11     A.  No.
12     Q.  Okay.  And you also assume "that the medical
13  monitoring fund/program to be established can be
14  efficiently administered to ensure that people will only
15  receive funding for appropriate tests or intervention."
16  What is that based on?
17     A.  So my charge was to create a medical
18  monitoring program for a class of patients.  When I put
19  that together, I have no knowledge as to how -- how these
20  types of things are funded or -- or arranged
21  logistically.  I just know that -- what medically makes
22  sense and that's what I put together in my report.
23     MR. KERNER:  Could you read that answer back,
24  please.

Page 65

1      (Requested portion of the
2      record read.)
3  BY MR. KERNER:
4      Q.  And when you say "what medically makes
5  sense," is that based on your review of the reports from
6  Plaintiffs' experts?
7      A.  No.  What medically makes sense is based on
8  my -- my development of what I consider to be appropriate
9  screening for the patients that are at risk.
10     Q.  And what you consider to be appropriate for
11  screening is based on what?
12     A.  Is based on my understanding of the diseases
13  and my review of the literature as outlined.
14     Q.  I'm sorry.  I didn't hear it.
15     A.  As outlined in my report.
16     Q.  What about any of the guidelines that are --
17  the NCCN guidelines, was that something you considered?
18     A.  Yes.
19     Q.  Does your screening program vary from
20  the NCCN guidelines?
21     A.  The NCCN guidelines don't specifically
22  outline the screening program especially for this
23  particular class of patients.  It just outlines details
24  about risks and how they should be monitored.

17 (Pages 62 - 65)

Page 66

1    Q.   In paragraph 3, "Background," you say: "It's
2    been established that Valsartan API manufactured by
3    certain manufacturers here and sold to other companies
4    was contaminated with carcinogens, NDMA and NDEA."  Do
5    you see that?
6    A.   Yes.
7    Q.   And who established that?
8    A.   I don't know who established that.  I know
9    that it's been established based on the -- on the reports
10   that I was given.
11   Q.   Okay.  Anything else -- based on anything
12   else or just the reports that you were given?
13   A.   Just on the reports that I was given.
14   Q.   Okay.  Now, a little further down in
15   paragraph 3 you mention that you constructed a monitoring
16   protocol.  The first thing you did was identify certain
17   cancers; correct?
18   A.   Correct.
19   Q.   And you did that based on the review of four
20   Plaintiffs' experts; correct?
21   A.   Correct.
22   Q.   So how did you do that?  Explain how you did
23   that, please.
24   A.   Explain how I did what?

Page 67

1    Q.   How you identified -- you said: "The
2    following cancers merit monitoring."  You reviewed the
3    reports of these four experts, and what led you to
4    conclude that these nine cancers merited monitoring?
5    A.   These nine cancers were identified as those
6    that were at higher risk based on the exposure to NDMA
7    and NDEA.
8    Q.   By the experts that you relied on; correct?
9    A.   Correct.
10   Q.   Did you consider any other cancers?
11   A.   No.
12   Q.   So is it your opinion, Doctor, that every
13   proposed medical monitoring class member be screened for
14   each of these nine cancers?
15   A.   The screening program that I outlined would
16   cover those nine cancers, nine classes of cancers.
17   Q.   I understand that.  We'll get to that
18   actually, but is it your testimony and is it your opinion
19   that all class members, proposed class members be
20   screened for all of the nine cancers?
21   A.   Yes.
22   Q.   Every single class member should be screened
23   for all nine cancers?
24        MS. GEMAN:  Objection, asked and answered.

Page 68

1    BY THE WITNESS:
2    A.   Yes.
3    BY MR. KERNER:
4    Q.   What's your basis for that opinion?
5    A.   My basis for the opinion is the evidence
6    provided that suggests that these cancers are at
7    increased risk of patients that have had exposure to that
8    carcinogen and the levels they had exposure to, so they
9    deserve to be monitored for those.
10   Q.   And again that's based on the four
11   Plaintiffs' experts that you referred to?
12   A.   Correct.
13   Q.   Is there potential for some of the proposed
14   class members to be excluded from the screening for one
15   or more of the nine cancers that you outlined?
16        MS. GEMAN:  Objection to the extent it calls
17   for a legal conclusion.
18   BY THE WITNESS:
19   A.   Could you repeat the question?
20   BY MR. KERNER:
21   Q.   Sure.  Is there a potential for some of these
22   proposed class members to be excluded from screening, to
23   not be screened for one or more of the nine cancers you
24   outlined?

Page 69

1        MS. GEMAN:  Same objection.
2    BY THE WITNESS:
3    A.   I don't understand -- I don't understand the
4    question.
5    BY MR. KERNER:
6    Q.   Do you think there are any circumstances
7    where any of the potential class members wouldn't need to
8    be screened for all nine of these cancers?
9        MS. GEMAN:  Objection.
10   BY THE WITNESS:
11   A.   I think the basic screening is necessary for
12   every patient.  I think individual patients could then
13   behoove us to look at different things based on that
14   patient, but the basic screening should be true for every
15   patient.
16   Q.   Let's explore that.  What would you look at
17   with respect to individual patients?
18        MS. GEMAN:  Objection.
19   BY THE WITNESS:
20   A.   You mean above and beyond the screening
21   program that's outlined?
22        MR. KERNER:  Can you just read back his last
23   answer, please.
24

18 (Pages 66 - 69)

Page 70

1          (Requested portion of the
2          record read.)
3    BY MR. KERNER:
4        Q.   Okay, Doctor.  You said it would behoove us
5    to look at different things for different patients.  What
6    things would you look at?
7        A.   Well, I think I mentioned in my report if
8    somebody was a heavy smoker I may focus also on diseases
9    associated with tobacco as I would do anyway even if they
10   hadn't had this exposure, but this exposure may increase
11   the risks that they have based on their own history, but
12   yet everybody deserves at least the basic screening
13   whatever their own history is.  But any doctor's gonna
14   look at a patient's individual problem.  Someone has a
15   pain in his arm, he's going to look at the arm.
16       Q.   Sure.  And different patients might require
17   different screening?
18          MS. GEMAN:  Objection.
19   BY THE WITNESS:
20       A.   No.  Different patients may require
21   additional testing to the basic screening.
22   BY MR. KERNER:
23       Q.   Is there any reason or could there be --
24   Strike that.

Page 71

1          Would there be any reason that you can think
2    of based on medical history or comorbidities or anything
3    like that for an individual patient where you wouldn't
4    conduct the same screening for that patient?  For
5    example, would you recommend a colonoscopy every five
6    years for someone who had a prior perforation?
7          MS. GEMAN:  Objection.
8    BY THE WITNESS:
9        A.   Well, as discussed before, a patient that's
10   had a comorbidity or a problem related to a test would
11   not be offered that test.
12   BY MR. KERNER:
13       Q.   Sure.  Okay.  And say, for instance, giving
14   another example, you list prostate cancer here in number
15   6.  What's the appropriate screening that you propose for
16   prostate cancer?
17       A.   Well, first I would limit it to males.
18       Q.   Okay.
19       A.   The appropriate screening for prostate cancer
20   would include a history to determine if there's any
21   urinary symptoms, would include a physical examination
22   which would include prostate exam as part of a regular
23   physical and may include a blood test called a PSA.
24       Q.   And if the person is 80 years old, would you

Page 72

1    recommend PSA?
2        A.   Yes.
3        Q.   What if they're 85 years old?
4        A.   Depends on the clinical status of the
5    patient.  If they're 85 and fit with a good performance
6    status, yes.
7        Q.   Are there any male patients that you would
8    not recommend a PSA for?
9        A.   Patient that declined to have it.  Someone
10   that's had a -- No, strike that.  I -- I can't think of
11   any other specific situations where I would not do PSA
12   unless there -- as we mentioned someone, that was
13   suffering from other medical conditions that would not
14   allow for expectation of longevity.
15       Q.   What's the basis for performing a PSA on an
16   80-year old man?  What's the data or the support for
17   that?
18       A.   Since there's no data on patients that are 80
19   exposed to these carcinogens and since I have seen as
20   others have elderly patients who have developed very
21   aggressive prostate cancer and if caught early could
22   be -- could be given the chance not to have to suffer
23   from progressive metastatic disease, I would recommend
24   doing PSA even in those patients because of the unique

Page 73

1    situation where they've been exposed to these
2    carcinogens.
3        Q.   So you'd recommend a PSA for a fit 90-year
4    old man?
5        A.   Most likely, yes.
6        Q.   Okay.  Are there any risks to the screening
7    procedures that you're proposing?
8        A.   There are risks --
9          MS. GEMAN:  Objection.
10   BY THE WITNESS:
11       A.   There are risks to everything.  A blood draw,
12   the needle could break off, you could get infection, you
13   could have pain.  Most of the things I'm recommending are
14   within the limits of accepted risk for general
15   population.
16   BY MR. KERNER:
17       Q.   Are the risks the same for all individuals?
18       A.   No, of course not.
19       Q.   Why not?
20       A.   Because someone that's had a perforation from
21   a colonoscopy may be at risk for that happening again.
22   Someone that has other conditions of the colon which you
23   didn't mention before like severe diverticulitis or
24   diverticulosis may not be a good candidate for some of

19 (Pages 70 - 73)

Page 74

1 the screening. So, of course, every person has to be
2 evaluated individually.
3    Q. Okay. Are there cases where the risks will
4 outweigh the benefits?
5    A. We've already alluded to some of those, yes.
6    Q. And the answer's yes?
7    A. Yes.
8    Q. In paragraph 4 you talk about in conducting
9 the analysis you "assumed the Plaintiffs' experts are
10 correct that the levels, dosage and duration of use
11 were/are sufficient to increase one's risk of certain
12 cancers and to cause or contribute to causing cancers in
13 users," and you prepared this report consistent with
14 those assumptions. And you're relying on those
15 assumptions for your opinions in this report; correct?
16    A. Correct.
17    Q. In the next paragraph you say: "In order to
18 qualify for medical monitoring, class members must have
19 ingested a cumulative amount of NDMA from both the
20 Valsartan pills and their diet and they've reached the
21 lifetime cumulative exposures associated with
22 statistically significant increased risks in dietary and
23 other studies." Did I read that correctly?
24    A. Yes.

Page 75

1    Q. What is lifetime cumulative exposure?
2    A. The amount of exposure they've had to NDMA
3 and NDEA.
4    Q. Is that a term that you've used in your
5 medical practice over the years?
6    A. What's that?
7    Q. Lifetime cumulative exposure.
8    A. I've used that in regards to many things --
9 exposure to tobacco, exposure to certain chemotherapeutic
10 drugs where the cumulative toxicity has to do with
11 lifetime exposure, a drug called Adriamycin. Your whole
12 life you're at certain risk if you've had cumulative
13 exposure, so yes, I use that term all the time.
14    Q. Are you familiar with the term lifetime
15 cumulative threshold?
16    A. I'm -- I know what that means but what do you
17 mean am I --
18    Q. So you know what it means. What does it mean
19 to you?
20    A. Could you repeat the question?
21    Q. Lifetime cumulative threshold.
22    A. My assumption is that that means that when
23 someone's reached a certain level of exposure like with
24 radiation exposure, like with the drugs, like with these

Page 76

1 toxins, that they are in a class that may be at risk for
2 developing certain things.
3    Q. You say that's your assumption. What is that
4 assumption based on?
5    A. That's my understanding.
6    Q. What is that understanding based on?
7    A. What -- my knowledge of the English language.
8    Q. Okay. So is lifetime cumulative threshold a
9 term that you've used in your medical practice over the
10 years?
11    A. No. It's a term I've seen in the reports.
12    Q. And that's the first time you've seen it
13 in this report?
14    A. Probably.
15    Q. Now you talk about the cumulative amount of
16 NDMA from both the Valsartan pills and their diet reached
17 a lifetime cumulative exposure. You see that in that
18 paragraph; right?
19    A. Can you repeat that, please.
20    Q. Sure. In that same paragraph,
21 you talk about that "the class member must have ingested
22 a cumulative amount of NDMA from both the Valsartan pills
23 and their diet that they've reached lifetime cumulative
24 exposures." Do you see that?

Page 77

1    A. I do.
2    Q. Is NDMA something that you can be exposed to
3 from your diet?
4    A. I believe that the nitrosamine -- the
5 nitrosamines you're exposed to in -- in certain food
6 types.
7    Q. What food types?
8    A. Prepared foods, coldcuts, bacon, things where
9 nitrates are used as preservative or naturally occurring.
10    Q. What about fresh fruit?
11    A. I'm not -- I'm not certain.
12    Q. Vegetables?
13    A. I don't know.
14    Q. How can you tell the level of NDMA -- Strike
15 that.
16       How can you tell whether the level of NDMA is
17 from the Valsartan pill or your diet?
18    A. I don't -- I don't know that you can tell.
19    Q. And are you familiar with indigenous NDMA?
20    A. Yes.
21    Q. What is that?
22    A. NDMA that's just present in the body.
23    Q. You don't mention that in your report?
24    A. No.

20 (Pages 74 - 77)

Page 78

1    Q.   Is indigenous NDMA, can that be part of a
2  lifetime cumulative exposure?
3    A.   Yes.
4    Q.   So it's the Valsartan pill, it's your diet
5  and it's the indigenous NDMA; correct --
6    A.   Correct.
7       MS. GEMAN:  Objection, vague.
8  BY MR. KERNER:
9    Q.   -- that are all -- that all can be part of
10  lifetime cumulative exposure as you used that term here
11  in your report; correct?
12    A.   Correct.
13    Q.   And am I correct that there's no way to
14  identify what percentage of NDMA comes from which
15  factor -- the Valsartan pill, the diet or the indigenous
16  NDMA?
17    A.   I think and my understanding of the experts'
18  evaluation is that the amount of NDMA found in the vast
19  majority of people from indigenous or naturally occurring
20  substances is quite lower than from a toxic -- the toxic
21  levels that were found in the product that we're
22  discussing, so --
23    Q.   What -- sorry.
24    A.   -- it's unlikely that somebody would have

Page 79

1  just from those other things enough exposure, enough
2  levels to render them at significant risk.  While there's
3  so much more exposure from the tainted Valsartan, that
4  it's -- it makes it a much more important issue.
5    Q.   What's your basis for that statement?
6    A.   The experts' review of this.
7    Q.   So other than the Plaintiffs' other experts
8  you have no idea what percentage of NDMA comes from
9  Valsartan, diet or indigenous production; correct?
10    A.   Correct.
11    Q.   And, by the way, with respect to lifetime
12  cumulative exposure, you have not independently evaluated
13  or determined the lifetime cumulative exposure for NDMA
14  or NDEA; correct?
15    A.   That was not my -- my role in that.  I have
16  not done that.
17    Q.   So I'm correct?
18    A.   Yes.
19    Q.   Prior to this litigation -- Strike that.
20       Let's go to the bottom of Page 3, please,
21  your "Opinion on Medical Monitoring."  Do you see that
22  paragraph?
23    A.   Yes.
24    Q.   You say that it's your "opinion to a

Page 80

1  reasonable degree of medical certainty that there exists
2  diagnostic tests that can mitigate the risks of
3  developing cancer faced by the class of people because of
4  their exposure to contaminated Valsartan who have a level
5  of exposure equal to the LTC and this program --" meaning
6  your program; correct?
7    A.   Yes.
8    Q.   "-- is different than the one that would have
9  been prescribed in the absence of that particular
10  exposure and increased risk."  Did I read that correctly?
11    A.   Yes.
12    Q.   So a few things I want to talk to you about
13  in that sentence.  You hold an opinion to a reasonable
14  degree of medical certainty that there are diagnostic
15  tests that mitigate the risk of developing cancer;
16  correct?
17    A.   Correct.
18    Q.   Now, you don't mean that there are tests that
19  can prevent you from developing cancer, do you?
20    A.   There are.
21    Q.   What are they?
22    A.   Colonoscopy, for example.
23    Q.   Any others?
24    A.   Repeat -- can you repeat the question?

Page 81

1       MR. KERNER:  Can you read it back, please.
2          (Requested portion of the
3           record read.)
4  BY THE WITNESS:
5    A.   Yes.  Upper endoscopy, detection of Barrett's
6  esophagus, Pap smear, detection of pre-malignant changes.
7  Mammogram even can detect ductal carcinoma insitu or
8  other conditions that are considered pre-malignant.
9  Evaluation of the liver to look for cirrhosis can
10  predispose to the -- or fatty liver can be a precursor to
11  developing -- to developing hepatocellular cancer.
12  Evaluation of the pancreas can find -- can find certain
13  ductal cystic changes that may be precursors to cancer.
14  That's off the top of my head things that I can think of
15  where it would predict or even prevent cancer.
16  BY MR. KERNER:
17    Q.   And you talk about class of people because of
18  their exposure to contaminated Valsartan?
19    A.   Correct.
20    Q.   And to that you're talking about people who
21  have an exposure greater than or equal to the LCT which
22  is a term you learned in your report for the first time?
23    A.   Correct.
24       MS. GEMAN:  Objection, misstates the

21 (Pages 78 - 81)

Page 82

1 testimony.
2 BY MR. KERNER:
3    Q.   You say: "This program is different than the
4 one that would have been prescribed in the absence of
5 that particular exposure."  Can you -- can you tell me
6 what that sentence means?
7    A.   The whole point of a medical monitoring
8 program for people that have been exposed is that we're
9 doing more than I would do with a normal, healthy person
10 that just came in the office.
11    Q.   Okay.  But what this says is that "The
12 program is different than one that would have been
13 prescribed in the absence of that particular exposure."
14 I think you mean Valsartan; correct --
15    A.   Correct.
16    Q.   -- and increased risk?
17         And you link that to the exposure being
18 greater than or equal to the LCT; correct?
19    A.   Correct.
20    Q.   Do you know if it's possible to reach the LCT
21 based on endogenous NDMA and diet without Valsartan?
22    A.   I do not know the answer to that, but as I
23 stated in my report, I could modify my opinion.  At this
24 point I would think that if somebody does show that

Page 83

1 they've reached the LCT wherever their exposure to the
2 nitrosamines is that they would be appropriate for the
3 screening tests that I --
4    Q.   Even without Valsartan?
5    A.   Yes.  Yes.
6    Q.   And so you would -- you would agree with me
7 then that it's possible to -- Strike that.
8         You don't know whether it's possible to reach
9 the lifetime cumulative threshold without Valsartan;
10 correct?
11    A.   Correct.
12    Q.   And you have no idea; correct?
13    A.   From what I've read, it sounds like it's not
14 likely to reach the levels that were reached with the
15 Valsartan exposure.
16    Q.   And to be clear, when you say "from what I've
17 read," it's from relying on Plaintiffs' other experts --
18    A.   Correct.
19    Q.   -- correct?
20         But your opinion now it sounds like has been
21 modified to now say that if you've reached the LCT
22 without any Valsartan exposure, you would propose the
23 same program; correct?
24         MS. GEMAN:  No.  Objection, misstates the

Page 84

1 testimony.
2         MR. KERNER:  Can you read back my question,
3 please.
4         (Requested portion of the
5          record read.)
6         MS. GEMAN:  Vague as to --
7         MR. KERNER:  I will rephrase that.
8         MS. GEMAN:  Yeah.
9 BY MR. KERNER:
10    Q.   If a patient reached the LCT without any
11 Valsartan exposure, would you recommend the same program?
12         MS. GEMAN:  Objection, vague, incomplete
13 hypothetical.
14 BY THE WITNESS:
15    A.   I was not asked to consider that, but I think
16 it's worth evaluating.
17 BY MR. KERNER:
18    Q.   And you just said you're modifying your
19 opinion.  What were you modifying your opinion to?
20         MS. GEMAN:  Objection, misstates testimony.
21 BY THE WITNESS:
22    A.   I didn't say I was modifying my opinion.  I
23 was saying I would -- I would likely include anybody that
24 could be shown to -- as I said, someone that reached

Page 85

1 those levels should have this monitoring, so if that
2 level came from somewhere else, I don't see why I
3 wouldn't include them in that.
4 BY MR. KERNER:
5    Q.   And do you do that with your patients now?
6    A.   Do I do what?
7    Q.   Do you screen your patients with this kind of
8 exposure now?  Do you screen your patients the way you're
9 describing it for anybody who has achieved this LCT?
10         MS. GEMAN:  Objection, vague.
11 BY THE WITNESS:
12    A.   No, I have no way of monitoring that.  I have
13 no way of evaluating for that.
14 BY MR. KERNER:
15    Q.   You have no way of evaluating what -- whether
16 they reached the LCT?
17    A.   Routinely -- routinely testing for levels of
18 nitrosamines in a person's body.
19    Q.   You're not aware of any test that can
20 determine the lifetime cumulative threshold, are you?
21    A.   I'm not aware of clinically available tests
22 to monitor for that.
23    Q.   And, again, to be specific, lifetime
24 cumulative threshold of nitrosamine or NDMA --

22 (Pages 82 - 85)

Page 86

1    A.   Correct.
2    Q.   -- or NDEA; correct?
3         MS. GEMAN:  I was going to jump in to say can
4    I have that question read.  You were speaking very
5    quickly.  I'm sorry.
6              (Requested portion of the
7              record read.)
8         MS. GEMAN:  Objection.
9         MR. KERNER:  Read that back again, please.
10             (Requested portion of the
11             record read.)
12   BY MR. KERNER:
13   Q.   Let's move on to Page 4.  You talk about
14   specialized testing in Section 2 there.  Do you see that?
15   A.   Yes.
16   Q.   You talk about -- is it Galleri or Galleri?
17   A.   Galleri.
18   Q.   And you say that "early detection or similar
19   liquid biopsy should be performed annually."  On Page 5
20   you again mention Galleri, and you say that "it has been
21   shown to detect certain cancers such as pancreatic and
22   esophageal cancer."  Where is the -- what is the data to
23   support annual Galleri testing?
24        MS. GEMAN:  Objection.

Page 87

1    BY THE WITNESS:
2    A.   The recommendation to do annual testing is
3    based on my own program recommending screening, and I'm
4    recommending the patient be seen by a physician at least
5    annually, so I would include that as part of the routine
6    blood tests and evaluations.
7    Q.   Right.  And my question is a little
8    different.  Other than your own recommendation, and I
9    appreciate that, what is the data that supports Galleri,
10   Galleri's annual testing?
11        MS. GEMAN:  Vague.
12   BY THE WITNESS:
13   A.   There's data that shows Galleri can detect
14   cancers in earlier stages.
15   BY MR. KERNER:
16   Q.   And is that part of any guidelines from NCCN
17   or any other organization?
18   A.   No.
19   Q.   Do you know of any organization that
20   recommends annual testing with Galleri?
21   A.   I know that the American Cancer Society
22   has -- has suggested utilizing this test for evaluating
23   patients, and they're involved in -- in co -- in
24   sponsoring of a bill that -- that was brought to Congress

Page 88

1    in August to allow Medicare to -- to insist that Medicare
2    cover this testing because of its -- its ability to
3    detect cancers earlier.
4         MR. KERNER:  Great.  I move to strike that as
5    nonresponsive.
6    BY MR. KERNER:
7    Q.   My question is do you know of any guidelines
8    or any organization that supports annual testing of
9    Galleri.
10   A.   No.
11        MS. GEMAN:  Objection, asked and answered.
12        MR. KERNER:  Now it's been answered.
13   BY MR. KERNER:
14   Q.   You mentioned that Galleri has been shown to
15   detect certain cancers such as pancreatic and esophageal
16   cancer; correct?
17   A.   Correct.
18   Q.   That's what it says.
19        Okay.  You also recommend Cologuard for colon
20   cancer?
21   A.   Correct.
22   Q.   And you recommend colonoscopy every five
23   years and an upper endoscopy every five years; correct?
24   A.   Correct.

Page 89

1    Q.   So for every patient who has -- every patient
2    on the planet who has achieved this LCT that you've
3    learned of in this litigation for the first time, you
4    want them to have a colonoscopy and an upper GI endoscopy
5    every five years?
6         MS. GEMAN:  Objection, misstates the opinion,
7    misstates testimony, misstates the report, calls for a
8    legal conclusion by the class definition.
9    BY MR. KERNER:
10   Q.   Is that correct?
11   A.   I don't understand.
12   Q.   Any class member, any proposed class member
13   you're suggesting -- Strike that.
14        You're recommending that every single
15   proposed class member has a colonoscopy and an upper
16   endoscopy every five years regardless of comorbidities,
17   regardless of other past history; correct?
18   A.   My recommendations are guidelines that are
19   recommendations for patients and their doctors to
20   consider using, so that would be taken into account when
21   deciding on that test.
22   Q.   So -- okay.  I appreciate that.  And so am I
23   correct that you think ultimately the decision is to be
24   made by the individual and his or her treating physician

23 (Pages 86 - 89)

Page 90

1    as to what particular procedure is appropriate for them,
2    for that person?
3        A.    I'm -- I'm outlining a guideline because of
4    the exposure that can help guide the patient and the
5    doctor in determining -- in determining whether to follow
6    exactly the guideline or make individual recommendations,
7    yes.
8        Q.    And I didn't include the low-dose CT chest
9    scan annually.  It's your recommendation that any
10   proposed class member has a CT scan once a year?
11       A.    No, I don't believe I said that.
12              (Witness peruses document.)
13       Q.    Page 4.
14       A.    Okay.
15       Q.    You do say that; correct?
16       A.    Yes.  I'm sorry.  Because of the exposure
17   that put them at the same risk as someone who'd been a
18   smoker.
19       Q.    And your opinion -- that's your opinion, that
20   the exposure to NDMA or nitrosamines puts them at the
21   same risk as a smoker?
22       A.    Based on the estimate of exposure and risk of
23   lung cancer from that exposure, yes.
24       Q.    On whose estimate?  Based on whose estimate?

Page 91

1        A.    The Plaintiff experts that estimated the
2    relative risk of 1.05 to 3.3 for lung cancer.
3        Q.    So, again, this is basically just based on
4    what the Plaintiffs' experts have opined; correct?
5        A.    Correct.
6        Q.    So, Doctor, what I see in your report is you
7    seem to be recommending in some form or another the
8    Galleri which you say can detect certain cancers such as
9    pancreatic and esophageal; correct?
10       A.    Can you tell me where you're looking, please.
11       Q.    Yeah.  That's on Page 5.  Under "Colonoscopy
12   and Fecal DNA testing" you mention that -- I'm sorry.
13   Under "Galleri" you mention that Galleri is known to
14   detect certain cancers such as pancreatic and esophageal.
15   Do you see that?
16       A.    Yes.
17       Q.    Okay.  And you also have a section on
18   colonoscopy for detecting colon or rectal cancer;
19   correct?
20       A.    Correct.
21       Q.    And then you also discuss a little further up
22   I believe, and we just talked about it briefly, the CT
23   chest scan.  Is that for lung cancer?
24       A.    Yes.

Page 92

1        Q.    Okay.  I don't see any other screening
2    identified in your report.  Do you -- do you think that
3    those are the -- are those the cancers that you would
4    screen for -- pancreatic, esophageal, colorectal and lung
5    cancer?
6            MS. GEMAN:  Objection, misstates testimony,
7    asked and answered.
8    BY THE WITNESS:
9        A.    There's two things there.  There's -- the
10   first is that the Galleri, what you're reading is using
11   pancreatic and esophageal as examples.  It's not listing
12   all the cancers it's screening for, and the reason it was
13   listed as examples is because there's not good
14   screening -- screening tests for detecting those early.
15   The Galleri could, but the Galleri's good for almost
16   every cancer.  That's the point of the Galleri.  The --
17   the other thing is that's not the only testing.  If you
18   look in my program, it includes the annual laboratory
19   studies, exam, history, and those that you're referring
20   to are just specialized testing in addition that I felt
21   was -- was appropriate in order to help detect cancer in
22   earlier stages.
23   BY MR. KERNER:
24       Q.    Where in your report do you talk about

Page 93

1    screening for bladder cancer?
2        A.    So I don't talk specifically about bladder
3    cancer.  It's listed with the other cancers in here, and
4    that would be included in the history because there'll be
5    unique things to -- to patients that have bladder cancer.
6    In the physical examination, laboratory tests could
7    determine -- could be a way to screen for bladder along
8    with others and then the Galleri which can also detect
9    urinary tract cancers and other cancers in earlier
10   stages.
11       Q.    And what about liver cancer?
12       A.    And liver cancer as well.
13       Q.    Galleri?
14       A.    Galleri, but also the things we mentioned.
15   Liver cancer would have signs usually of cirrhosis or
16   hepatic steatosis, fatty liver, and that can be detected
17   by examinations and by laboratory tests and by history.
18       Q.    And if you can help me out here.  Which
19   laboratory tests in your report are you referring to with
20   respect to liver cancer?
21       A.    Liver enzymes.
22       Q.    Where is that?
23       A.    1C:  "Laboratory tests to include blood
24   smear, basic chemistry profile which includes liver

24 (Pages 90 - 93)

Page 94

1 enzymes, kidney function and other labs."
2    Q.   Okay.  Doctor, in paragraph 6 or Section 6,
3 you say midway through the paragraph that you "certify
4 that the monitoring proposals detailed above have the
5 potential to significantly improve the outcomes of
6 patients that may be destined to develop malignancies due
7 to their exposures and do not pose any significant risks
8 or negative consequences."  Do you see that?
9       MS. GEMAN:  Just object to the extent --
10      MR. KERNER:  Excuse me?
11      MS. GEMAN:  I just note that the report speaks
12 for itself.
13      MR. KERNER:  Sure.
14      MS. GEMAN:  You're paraphrasing.
15 BY MR. KERNER:
16   Q.   Well, what I read, did I read that correctly?
17   A.   Yes.
18   Q.   Okay.  What do you mean by "I certify that
19 the monitoring proposals have the potential to
20 significantly improve the outcomes?"  Are you
21 guaranteeing it?
22      MS. GEMAN:  Objection.
23 BY THE WITNESS:
24   A.   Is your question what do I mean by "certify"?

Page 95

1 BY MR. KERNER:
2    Q.   Yes, sir.
3    A.   It means that to the best of my medical
4 knowledge and ability I believe that this does what it's
5 stated to do.
6    Q.   It's your opinion?
7    A.   Correct.
8    Q.   Did somebody tell you to use the word
9 "certify" in there?
10   A.   No.
11   Q.   You also say that:  "These exposures do not
12 pose any --" I'm sorry.  "This monitoring proposal do not
13 pose any significant risks or negative consequences."
14      MS. GEMAN:  Objection.  Again, it misstates
15 the report.  It says:  "As detailed in Dr. Catenacci's
16 report."
17      MR. KERNER:  Yes.
18 BY THE WITNESS:
19   A.   There's a report that's been stricken, and
20 the details of that report is what I was addressing.
21 BY MR. KERNER:
22   Q.   But we would agree, I think you've already
23 agreed, that there could be risks or negative
24 consequences to certain procedures; correct?

Page 96

1       MS. GEMAN:  Objection, vague.
2 BY THE WITNESS:
3    A.   As I stated before, anything you do including
4 a needle stick or walking in a room -- I didn't state
5 that before; I'm stating it now -- has risks.
6    Q.   And that's all I'm asking, right.
7       MS. GEMAN:  Objection, calls for speculation.
8 BY MR. KERNER:
9    Q.   Doctor, in your practice, have you ever
10 concluded that any patient's cancer was caused by NDMA or
11 NDEA?
12   A.   I've never had the opportunity to do that,
13 no.
14   Q.   So the answer's no, you have not?
15      MS. GEMAN:  Objection, asked and answered.
16 BY THE WITNESS:
17   A.   No.
18 BY MR. KERNER:
19   Q.   Over the course of your career how many
20 patients have you treated ballpark?
21   A.   20,000 to 30,000.
22   Q.   Out of that universe of patients, how many of
23 them were cancer patients?
24   A.   Eighty percent.

Page 97

1    Q.   Okay.  Out of that number, how many of those
2 patients did you make a determination as to the actual
3 cause of their cancer?
4    A.   I'm actually not in the habit of making
5 determination as to cause of cancers usually.
6    Q.   And you're not opining here about causation
7 of any of the proposed class members; correct?
8    A.   Correct.
9    Q.   In your report on Page 4, in C you talk about
10 "Periodic testing."  Do you see that?
11   A.   Yes.
12   Q.   And for the colonoscopy you do say every five
13 years as for screening in moderately high risk patients?
14   A.   Correct.
15   Q.   What makes a patient moderately high risk?
16   A.   I believe that's outlined in the NCCN
17 guidelines, but moderately high risk patients would be
18 somebody that had had a polyp, a pre-malignant polyp, an
19 adenomatous polyp.  I think that would be the main
20 definition.
21   Q.   With the proposed class members, have you
22 considered in your program the likelihood of reduced
23 mortality?
24   A.   Could you --

25 (Pages 94 - 97)

Page 98

1    Q.   Are you considering whether the screening is
2    appropriate?
3        A.   Could you repeat the question?
4        MR. KERNER:  Can you read it back, please.
5        (Requested portion of the
6        record read.)
7    BY THE WITNESS:
8        A.   I believe by definition of what we're doing
9    the point is to reduce mortality and morbidity.
10   BY MR. KERNER:
11       Q.   And do we have -- do you have, Doctor, any
12   specific data for each of the tests that you're proposing
13   on whether it, in fact, does that?
14       A.   Not specifically, no.
15       Q.   This is just your -- Well, strike that.
16   Okay.
17       A.   Could we go back to that last question?
18       Q.   Sure.
19       THE WITNESS:  Can you read that back?
20       (Requested portion of the
21       record read.)
22   BY THE WITNESS:
23       A.   I mean there is data, for example, with
24   low-dose CAT scans for lung cancer that it does reduce

Page 99

1    morbidity and mortality by detecting cancer earlier, so
2    there is data.  You asked if I specifically had data for
3    this, so that's the answer.
4        MR. KERNER:  Okay.  I actually need to take a
5    two-minute comfort break, and we'll come right back.
6        THE VIDEOGRAPHER:  The time now is 11:34 a.m.
7    This is the end of media four.  We're off the record.
8        (WHEREUPON, a break was
9        taken.)
10       The time is now 11:56 a.m.  This is the
11   beginning of media five.  We're back on the record.
12   BY MR. KERNER:
13       Q.   Dr. Kaplan, we're not quite there yet, so
14   we're going to just keep chugging along.  All right?
15       A.   Yes, sir.
16       Q.   All right.  A few questions here.
17       You can't point to any medical literature or
18   authoritative source that has actually determined that
19   exposure to NDMA or NDEA reasonably necessitates any sort
20   of medical monitoring for cancer in humans, can you?
21       MS. GEMAN:  Objection.
22   BY THE WITNESS:
23       A.   Can you repeat that, please.
24

Page 100

1    BY MR. KERNER:
2        Q.   Sure.  You can't point to any medical
3    literature or authoritative source that has actually
4    determined that exposure to NDMA or NDEA reasonably
5    necessitates the kind of medical monitoring for cancer in
6    humans, can you?
7        MS. GEMAN:  Objection.
8    BY THE WITNESS:
9        A.   I haven't investigated that.  I know
10   literature exists because the reports that have come out
11   were based on it.  Plus I know the FDA withdrew the drug
12   in a -- in a rapid manner because of their determination
13   there was some risk.  That's all I know.
14   BY MR. KERNER:
15       Q.   Okay.  So but my question is are you aware of
16   any medical literature or authoritative source that
17   determined the kind of medical monitoring that you're
18   proposing for cancer in humans is appropriate for --
19   because of exposure to NDMA or NDEA.
20       MS. GEMAN:  Objection, asked and answered,
21   vague.
22   BY THE WITNESS:
23       A.   There's medical literature to support the
24   monitoring for patients at risk, at similar risk to what

Page 101

1    we've determined or what has been determined for the risk
2    for the specific agents but no, not literature
3    specifically that I know of addressing that and the
4    monitoring.
5    BY MR. KERNER:
6        Q.   And by "that" you mean NDMA and NDEA?
7        A.   NDMA and NDEA, correct.
8        Q.   So the answer to my question is no, you're
9    not aware of any medical literature or authoritative
10   source that determined medical monitoring for NDMA -- as
11   a result of NDMA and NDEA exposure is appropriate --
12       MS. GEMAN:  Objection.
13   BY MR. KERNER:
14       Q.   -- correct?
15       A.   I've never seen literature that -- yes.
16       MR. KERNER:  Did you get that?
17       THE REPORTER:  Yes.
18       MR. KERNER:  I just saw you tilt your head.
19   BY MR. KERNER:
20       Q.   Doctor, you're not offering any specific
21   criticisms or opinions about what a specific Defendant
22   did or didn't do with respect to Valsartan, are you?
23       A.   I'm not opining to that, no.
24       Q.   And you're not offering any opinion that NDMA

26 (Pages 98 - 101)

Page 102

1    or NDEA causes cancer, are you?
2        A.    I'm not being asked to opine to that.
3        Q.    So you're not?
4        A.    I'm using that assumption.
5        Q.    But you -- you're not offering the opinion
6    that NDMA or NDEA causes cancer; correct?
7        A.    I'm suggesting that that's a truism which is
8    why I've created this monitoring, so I guess I'm offering
9    that opinion based on -- I'm offering that as a statement
10   of fact.
11       Q.    Based on what?
12       A.    Based on the reports I've read.
13       Q.    You haven't independently assessed the
14   carcinogenicity of NDMA or NDEA; correct?
15       A.    Correct, I have not independently assessed
16   any of that.
17       Q.    And you're not offering any opinion that
18   Defendants' Valsartan products cause cancer; correct?
19       A.    Could you repeat that, please.
20       Q.    Sure.  I'm going to do it this way.  You
21   haven't independently assessed the -- whether or not the
22   Defendants' Valsartan products cause cancer?
23       A.    I have not independently assessed that.
24       Q.    So you won't be opining on that; correct?

Page 103

1        A.    I won't be opining on -- I won't -- I
2    really --
3        MS. GEMAN:  Do you understand the question?
4        MR. KERNER:  Yeah.
5        MS. GEMAN:  Answer it.
6    BY THE WITNESS:
7        A.    Well, not exactly.  I'm not specifically
8    looking at the data to opine that the drugs with the
9    contaminants have led to cancer, but I'm using others who
10   have done that in order to -- to justify and create my
11   program.
12   BY MR. KERNER:
13       Q.    I understand that.  And the others, again, I
14   want to be specific, are the Plaintiffs' experts --
15       A.    Correct.
16       Q.    -- correct?
17       Doctor, I'm going to move -- I'm going to end
18   my testimony -- end my questioning for the time being,
19   but a couple of ministerial things first.
20       Rachel, as we talked about, we've got -- I
21   want to mark as Exhibit 4 the thumb drive that we
22   discussed which contains the files that you produced on
23   Monday.  So we'll mark that as Exhibit 4.  You can review
24   it.  You can look at it to make sure it is what we tell

Page 104

1    you it is, and I know we discussed this off the record.
2    I don't want to take a lot of time.
3        And, Doctor, I just want to make sure.
4    You've told me all of your opinions that you hold with
5    respect to the case now; correct?
6        A.    I've -- all that I've been asked about, yes.
7        Q.    Well, are there other opinions that you hold
8    that you are going to testify to?
9        A.    Not that I know of.
10       Q.    Okay.  And so we've discussed the facts that
11   support those opinions; correct?
12       A.    Correct.
13       Q.    And you feel like you've had a chance to
14   state your opinions during this deposition?
15       MS. GEMAN:  Objection.
16   BY THE WITNESS:
17       A.    Yes.
18       MR. KERNER:  Okay.  I'm going to pass the
19   witness now.
20       MS. ISIDRO:  Are there others on the Zoom who
21   would like to ask any questions?
22       MS. LOTMAN:  Yes.  This is Alyson Lotman.  I'm
23   going to have a few.  Give me one minute.
24       MS. GEMAN:  Alyson, can you state your

Page 105

1    appearance and which Defendant you represent and firm?
2    This is Rachel Geman speaking.  Thank you.
3        MS. LOTMAN:  Alyson Lotman from Duane Morris.
4    I represent the HP Defendants.
5        I apologize.  If someone else has a few,
6    wants to go before me.  I'm just trying to close some
7    screens before I can get on.
8        Are we still on the record?
9        THE VIDEOGRAPHER:  Yes.
10       MR. KERNER:  Yes.
11       MS. GEMAN:  Yes.
12       MS. LOTMAN:  Thanks.
13       Good afternoon, Dr. Kaplan.  Can you hear
14   me and see me okay?
15       THE WITNESS:  I can hear you.  You're a little
16   picture up there, yeah.
17       MS. LOTMAN:  It might be better that way.
18       THE WITNESS:  I'd rather not look at myself
19   so.
20       MS. LOTMAN:  I understand that feeling.
21   Happens to me a lot when I'm on Zoom.
22       A few questions for you then, Doctor.
23
24

27 (Pages 102 - 105)

Page 106

1     CROSS EXAMINATION
2  BY MS. LOTMAN:
3     Q.  How long did it take for you to develop this
4  plan, medical monitoring plan in your report?
5     A.  I would say about -- about a month, three or
6  four weeks.
7     Q.  Okay.  And over the course of that time how
8  many -- how many hours do you think you actually spent on
9  it?
10    A.  It should be documented.  I think it was
11 probably about 12 to -- probably about 20 hours.
12    Q.  Okay.  And that includes -- does that include
13 reviewing literature?
14    A.  Yes.
15    Q.  And writing the report itself?
16    A.  Correct.
17    Q.  How long do you think it took you to actually
18 formulate your opinions?
19       MS. GEMAN:  Objection.
20 BY THE WITNESS:
21    A.  Ten, twelve hours.
22 BY MS. LOTMAN:
23    Q.  And, Doctor, have you ever -- have you ever
24 crafted a medical monitoring plan such as this for

Page 107

1  litigation before?
2     A.  No.
3     Q.  Have you ever published on medical
4  monitoring?
5     A.  I have not.
6     Q.  Then, Doctor, you talked before about you
7  have your private practice.  You have patients who are
8  asymptomatic but they have certain genetic issues like
9  BRCA; right?
10    A.  Correct.
11    Q.  And so you are conducting additional
12 monitoring because of that genetic issue; right?
13    A.  Correct.
14    Q.  Okay.  For patients who -- do you see any
15 other patients who are asymptomatic who don't have
16 genetic issues?
17    A.  Could you -- could you rephrase it?  Do I see
18 any patients?
19    Q.  Sure.  Sure.  So do you also have any other
20 patients who treat with you who are asymptomatic but did
21 not have a prior cancer who do not have genetic issues?
22       MS. GEMAN:  Objection, vague.
23 BY THE WITNESS:
24    A.  Do I have --

Page 108

1  BY MS. LOTMAN:
2     Q.  Let me reask it --
3     A.  Okay.
4     Q.  -- because I think it's a little unclear.
5  You have patients who have cancer at your practice;
6  right?
7     A.  Correct.
8     Q.  Do you have patients who have certain genetic
9  issues or mutations or elements that you are concerned
10 about like BRCA?
11    A.  Do I -- I couldn't hear you.
12    Q.  You also treat -- sorry.  You also treat
13 patients who have certain genetics like BRCA that you
14 treat as well, you're monitoring?
15    A.  Yes.
16    Q.  Are there any other types of patients that
17 you see?
18    A.  Yes.
19    Q.  Okay.  What are they or who are they?
20    A.  You want their names and phone numbers?
21    Q.  No, Doctor.  I'm just looking for what is
22 their concern that they're seeing an oncologist.
23    A.  So I happen to have a handful of patients
24 that do not see me for oncology, that see me for internal

Page 109

1  medicine either because they were related to a member of
2  the family that I took care of or I know them from the
3  community or from other people, so I do have some general
4  internal medicine patients but not very many.  I don't
5  consider myself a general internist, but you have to be
6  to some degree a general internist in order to be a
7  medical oncologist.  I do see patients that have had
8  abnormal findings, for example, Barrett's esophagus
9  or -- well, we mentioned genetic like Lynch syndrome,
10 people have had multiple polyps that haven't been
11 identified as having a genetic -- a genetic condition
12 that's been identified.  I do follow patients that have
13 had variants of the genetic -- like the BRCA that are
14 variants of uncertain significance and so they'll be
15 monitored to a certain degree, not the same as a known
16 deleterious mutation or known risk mutation but the
17 possibility that it is going to be identified as one, so
18 they're -- they're followed, and then other patients are
19 just concerned.  I've had people come in that are just
20 concerned about their cancer risk, and I also take care
21 of some patients with blood disorders.
22    Q.  Okay.  Doctor, for your patients who smoke,
23 you follow the USPSTF guidelines for screening?
24    A.  I do.

28 (Pages 106 - 109)

Page 110

1    Q.   Are you aware that tobacco is a known human
2  carcinogen?
3    A.   I am.
4    Q.   Okay.  And you don't recommend any extra
5  screening for those patients who have exposures to
6  tobacco?
7    A.   No, I do.  I -- I recommend a number of
8  screening procedures for them, mostly the things we've
9  outlined before -- the annual exams or blood tests, urine
10  tests.
11    Q.   But you don't go to the same specialized plan
12  that you do for the patients in this case?
13       MS. GEMAN:  Objection.
14  BY THE WITNESS:
15    A.   I have not developed a specialized program
16  for that group of patients at this time.
17  BY MS. LOTMAN:
18    Q.   So you treat patients who have exposure to
19  tobacco, a known human carcinogen, and you don't
20  recommend that they have the same types of tests, the
21  specialized testing that you've recommended for the
22  patients who have alleged exposure to nitrosamines?
23       MS. GEMAN:  Objection, misstates the
24  testimony.

Page 111

1  BY THE WITNESS:
2    A.   I don't have a class program for those
3  patients I've -- that I've recommended.  I don't have
4  large enough numbers that I'm seeing, and I haven't been
5  asked to do that.
6  BY MS. LOTMAN:
7    Q.   So for your patients who smoke, you don't
8  have them go through the Galleri?  They don't have
9  Galleri testing, do they?
10    A.   No, but that's something that I intend to
11  start doing.
12    Q.   When do you intend to start doing that?
13    A.   Soon.  I've already ordered the test a few
14  times.  I've recently learned about the test and
15  evaluated its usefulness and have learned more about it,
16  and so I'm starting to order it or recommend it for
17  patients.
18    Q.   How do you order it?
19    A.   It's a prescription.  It's a kit.  You draw
20  blood and you send it off in a kit to the company.
21    Q.   Does Galleri currently have FDA approval?
22    A.   Galleri does not yet have FDA approval.  It
23  does have CLIA certification.
24    Q.   But does not have FDA approval?

Page 112

1    A.   Not yet, no.  But many tests that we do don't
2  have FDA approval, blood tests in the office, other
3  things, but yeah, you're right.  It does not yet have FDA
4  approval.  They're attempting to get FDA approval.
5    Q.   Doctor, do you know the difference between a
6  known human carcinogen and a probable human carcinogen?
7    A.   I'm assuming a known human carcinogen has
8  been proven to cause cancer.  Usually -- I mean in humans
9  most of the probable human carcinogens are based on
10  animal studies and epidemiologic studies.
11    Q.   Okay.  Do you know what a probable human
12  carcinogen is?
13    A.   So I'm saying probable is something that's
14  been shown in, probably in animal studies to increase
15  risk of cancer and to suggest that there's a human risk
16  as well.
17    Q.   Suggest not -- not a -- not know?
18    A.   I'm sorry?
19    Q.   You said suggest and probable; right, for the
20  probable one?  There's not a known carcinogen?  There's a
21  difference; right?
22    A.   Well, known human carcinogen may be a proven
23  carcinogen in the laboratory or in animal studies.
24    Q.   Okay.  Would you make the same about say

Page 113

1  medical monitoring for a probable human carcinogen as you
2  would for a known human carcinogen?
3       MS. GEMAN:  Objection, incomplete
4  hypothetical.
5  BY THE WITNESS:
6    A.   I haven't thought of that, so I don't have an
7  answer.
8       MS. LOTMAN:  Okay.  Those are all of my
9  questions.
10       Thank you very much for your time, Doctor.
11  THE WITNESS:  Sure.
12  MR. KERNER:  Anybody else have any questions?
13       (No response.)
14       Well, if nobody else has any questions, I
15  do very quickly.
16       I just want to mark another exhibit.
17       (Exhibit No. 5 marked as
18            requested.)
19  MS. GEMAN:  This is 5.
20  MR. KERNER:  This is 5.  For the Zoom folks,
21  it says "Invoices."
22  MS. GEMAN:  So in my copy it's three -- yeah,
23  it's three identical pages of October 22nd.
24  THE WITNESS:  I have the same thing.  Oh, it's

29 (Pages 110 - 113)

Page 114

1  October 7th -- I mean November 7th to November 10th.
2      MR. KERNER:  Okay.  Let's do it this way.
3      MS. ISIDRO:  Go off the record.
4      MR. KERNER:  Yeah.  Let's go off the record
5  for a second.
6      THE VIDEOGRAPHER:  The time now is 12:15.
7  This is the end of media five.  We're off the record.
8          (WHEREUPON, a break was
9          taken.)
10     The time is 12:17 p.m.  This is the
11  beginning of media six.  We're back on the record.
12         REDIRECT EXAMINATION
13  BY MR. KERNER:
14     Q.  Okay, Doctor.  We just wanted to mark Exhibit
15  5 and talk about them real quickly.  Can you tell us what
16  Exhibit 5 is?
17     A.  My invoices to -- to the lawyers.
18     Q.  And how many invoices are there?
19     A.  There are four in front of me.
20     Q.  Okay.  And they're all addressed to Nicholas
21  Migliaccio?
22     A.  Correct.
23     Q.  Does that sound right?
24     A.  Correct.

Page 115

1      Q.  Who is that?
2      A.  It's the attorney that is -- one of the
3  attorneys involved in this case.
4      Q.  Okay.  But he's not the one who contacted you
5  initially?
6      A.  No, I think he's the first one that I spoke
7  to or one of the first ones that I spoke to.  I can't
8  recall.
9      Q.  Okay.  So it was not at Lieff Cabraser as you
10  testified earlier?
11     MS. GEMAN:  Objection, misstates testimony.
12  BY THE WITNESS:
13     A.  She's one of the attorneys also that I -- I
14  didn't remember who it was that contacted me first, but
15  she's one that's been on all of our meetings.
16  BY MR. KERNER:
17     Q.  But Mr. Migliaccio was the first one to
18  contact you?
19     MS. GEMAN:  Objection.
20  BY THE WITNESS:
21     A.  I don't recall exactly who was the first one
22  to contact.  That's the one who I was told to send the
23  invoices to.
24

Page 116

1  BY MR. KERNER:
2      Q.  Okay.  Fair enough.  So you -- on October
3  22nd, 2001 you sent an invoice for a retainer of $2,000?
4      MS. GEMAN:  2021 not 2001.
5      MR. KERNER:  Oh, gosh, yeah.  October 22nd,
6  2021.
7      MS. GEMAN:  We're not that slow.
8  BY MR. KERNER:
9      Q.  And that was for $2,000; correct?
10     A.  Correct.
11     Q.  Has that been paid?
12     A.  Yes.
13     Q.  And then the next invoice is November 5th,
14  2021 and that looks to be for time spent from
15  October 20th to November 5th, and you spent 20 hours
16  during that time frame for teleconferences and
17  communication, review of literature, analyses and report
18  review; correct?
19     A.  Correct.
20     Q.  Okay.  And you billed that out at $450 an
21  hour?
22     A.  Correct.
23     Q.  And so the invoice is for $11,250; correct?
24     A.  Correct.

Page 117

1      Q.  Was that paid?
2      A.  Yes, I believe so.
3      Q.  And the third invoice is five days later
4  dated November 10th, and that was for time spent from
5  November 7th to November 10th of 2021; correct?
6      A.  Correct.
7      Q.  And that also was for teleconferences and
8  communication, review of literature, analyses and report
9  review and writing and correcting reports; correct?
10     A.  Correct.
11     Q.  And you spent 11 hours?
12     A.  Correct.
13     Q.  Also billed out at $450 an hour.  I guess
14  there's a .25 percent charge added onto it?
15     A.  Right.
16     Q.  What's that?
17     A.  It was because it was -- there was a time
18  limit.  It was rushed, not rushed, but there was a
19  deadline to get it in, so I had to work within a shorter
20  time frame.
21     Q.  Got it.  And, by the way, the prior invoice
22  on November 5th had that same --
23     A.  Correct.
24     Q.  -- .25 percent?

30 (Pages 114 - 117)

Page 118

1    A.   Correct.
2    Q.   So this third invoice was for $6,187.50, also
3  billed out at $450 an hour; correct?
4    A.   Correct.
5    Q.   And the final invoice that we have is dated
6  December 31st, 2021 for time spent from December 16th to
7  December 31st for teleconference and review of records;
8  correct?
9    A.   Correct.
10    Q.   What records did you review?
11    A.   I don't know the exact records.  It's all the
12  references that we had.  It was discussing my report with
13  the lawyers.  I can't remember specifically.
14    Q.   Okay.  And you spent 11 hours according to
15  the invoice?
16    A.   Correct.
17    Q.   And there was no .25 percent charge on this
18  one; correct?
19    A.   Correct.
20    Q.   And so the total amount due was 5500?
21    A.   Correct.
22    Q.   Has that been paid?
23    A.   I don't think so.  I don't -- I don't
24  remember.

Page 119

1    Q.   Okay.  So -- so overall it looks as though
2  you spent 44 hours --
3    A.   Okay.
4    Q.   -- correct?
5         And you charged approximately $24,000 and
6  change; correct?
7    A.   Okay.  I hadn't added it up.
8    Q.   Will you be providing any additional invoices
9  for time since December 31st?
10    A.   Yes.
11    Q.   Do you have any idea how many hours you've
12  spent since then?
13    A.   In preparing for the deposition, probably
14  another 20 hours --
15    Q.   And --
16    A.   -- including the deposition.
17    Q.   Including the deposition.
18         Okay.  And I think you told us your rate for
19  the deposition was $600 an hour?
20    A.   Correct.
21    Q.   By the way, I note that on the last invoice
22  dated December 31st you billed 11 hours at $500 an hour,
23  so your rate went up from November 10th to December 16th?
24    A.   Inflation.

Page 120

1    Q.   An extra 50 bucks an hour?
2    A.   Yeah.
3         MR. KERNER:  Okay.  That's all I have.
4         THE WITNESS:  Okay.
5         MR. KERNER:  Anybody else has anything, speak
6  now.
7         MR. GEOPPINGER:  Yeah, I have a couple
8  questions, if I may.  Good afternoon, Doctor.  My name is
9  Jeff Geoppinger.  I'm here on behalf of Amerisource
10  Bergen.  Can you see me now?
11         THE WITNESS:  Sort of, yes.
12         MR. GEOPPINGER:  Good afternoon.  Again, my
13  name is Jeff Geoppinger.  I represent Amerisource Bergen
14  in this litigation.  I just have a real quick couple
15  follow-up questions.
16              CROSS EXAMINATION
17  BY MR. GEOPPINGER:
18    Q.   Earlier when you were talking to Ms. Lotman,
19  you mentioned you have patients who you treat who are
20  just concerned about cancer risk.  Did I hear that
21  correctly?
22    A.   Yes.
23    Q.   Are those patients asymptomatic?
24    A.   I think many of them are.  There aren't a lot

Page 121

1  of them in that category, but there are some who are
2  asymptomatic.
3    Q.   I understand.  They don't have an active
4  cancer diagnosis; correct?
5    A.   Correct.
6    Q.   And they don't have any genetic conditions
7  that would predispose them to cancer that they're
8  concerned about or that you're concerned about; correct?
9    A.   None that had been identified, yes.
10    Q.   Okay.  So for those patients, what do you do
11  to treat them?
12    A.   So they're not being treated.  They're being
13  monitored, and it includes basic -- basic exam, something
14  they may get from their internist but with more focus on
15  cancers.
16    Q.   And is that screening the same for all of
17  those patients or does it vary by, you know, individual
18  patient?
19    A.   The basic screening is the same for all of
20  them because they need to have a good exam, they need to
21  have basic laboratory tests, and they need a good
22  history, and I'm finding many of them aren't getting
23  those things done in their general practices, in the
24  primary practice because of very busy doctors, so I'll be

31 (Pages 118 - 121)

Page 122

1 a little more -- I'll take longer, and I'll be a little
2 more detailed, but everybody will get a basic screening.
3 If there's anything discovered, then they would go on to
4 get more unique tests done.
5     Q.  I'm sorry.  I didn't hear the end of that
6 answer.  What was that you said, Doctor?
7     A.  They're all screened the same way.  That's
8 what I wanted to say.
9     Q.  Okay.  And do -- after the basic screening
10 that they all get the same way do some of those patients
11 get additional screening based upon what you find after
12 you do the basic screening?
13     A.  Yes.
14     Q.  Okay.  And do they all get the same
15 additional screening or does it vary by patient?
16     A.  It would vary by what the reason is for doing
17 the additional screening.
18     Q.  Okay.  Now I'm going to ask you a
19 hypothetical.  If one of those asymptomatic patients
20 provided you information that they had -- they ate a lot
21 of bacon or that they had taken Valsartan between 2012
22 and 2018, would your screening of that patient change in
23 any way?
24         MS. GEMAN:  Objection, incomplete

Page 123

1 hypothetical, compound.
2 BY THE WITNESS:
3     A.  It would depend.  I'd have to be there with
4 the patient and see -- hear everything about it.  I can't
5 answer that question with what you've told me.
6 BY MR. GEOPPINGER:
7     Q.  Would it be accurate to say that you would
8 make an individual determination about the screening in
9 that case --
10         MS. GEMAN:  Objection.
11 BY MR. GEOPPINGER:
12     Q.  -- for the patient?
13     A.  After the initial evaluation I would make an
14 independent decision just like with any patient including
15 Valsartan-exposed patients after they've gone through the
16 screening I've recommended.
17     Q.  Okay.  So in my hypothetical I have an
18 asymptomatic patient who tells you that they have -- that
19 they had foods in their diet that may include NDMA, that
20 they may have been taking Valsartan-containing products
21 from 2012 to 2018.  In that situation, would your process
22 for treating an asymptomatic patient be any different
23 than it would be in treating the asymptomatic patients
24 you see right now?

Page 124

1         MS. GEMAN:  Objection, asked and answered,
2 incomplete hypothetical, vague.
3 BY THE WITNESS:
4     A.  The Valsartan is not -- is not a deal -- a
5 detail that I can answer to because the patients we're
6 dealing with have levels that have been proven, have been
7 identified to be in a class.  You're talking about an
8 individual person who's taking the drug.  I wouldn't have
9 any -- right now any -- a plan of how to specifically
10 address that patient.  They would need the same
11 monitoring and the same -- I mean the same evaluation
12 that the patients in the class have had to determine
13 their level of -- of exposure, et cetera.
14 BY MR. GEOPPINGER:
15     Q.  Would it be accurate to say you would treat
16 that patient just like you do the asymptomatic patients
17 you treat now?
18         MS. GEMAN:  Objection.
19 BY THE WITNESS:
20     A.  Again, it depends on -- on the situation of
21 the patient that I have in front of me.  To take one
22 patient is very difficult to answer.  It's not a real
23 patient.
24

Page 125

1 BY MR. GEOPPINGER:
2     Q.  Would you give -- would you recommend for
3 that patient who reveals to you the -- their history of
4 dietary intake of NDMA and potential history of VCB usage
5 and NDMA, would you automatically screen them for all the
6 conditions that you've listed in your report?
7         MS. GEMAN:  Objection, incomplete
8 hypothetical.
9 BY THE WITNESS:
10     A.  Just on the basis of that history I wouldn't
11 necessarily do anything different than what we've already
12 discussed.
13         MR. GEOPPINGER:  Thank you, Doctor.  I don't
14 have any further questions.
15         MR. KERNER:  Anyone else?
16         MS. LOTMAN:  If I may, Doctor.  This is Alyson
17 Lotman.  I have one more question.  I think it's just
18 one.
19         RECROSS EXAMINATION
20 BY MS. LOTMAN:
21     Q.  Who do you recommend to do these screenings?
22         MS. GEMAN:  Objection.
23 BY THE WITNESS:
24     A.  I don't understand your question.  Who do I

32 (Pages 122 - 125)

Page 126

1 recommend?
2 BY MS. LOTMAN:
3    Q.   If these -- if the patients were to get the
4 screening that you recommended here, who should be
5 administering it?
6    A.   Well, as I outlined in my report, it would be
7 either the primary care doctor or an oncologist or a
8 general practitioner, a family practitioner, somebody
9 that would be made aware usually through the patient
10 telling them that they have this exposure, this risk and
11 they have this recommended guideline for screening.
12    Q.   And if their doctor decided that based upon
13 their comorbidities or their medical history that these
14 were unnecessary, do you believe that your plan should
15 stand in place of that doctor's judgment?
16       MS. GEMAN:  Objection, incomplete
17 hypothetical.
18 BY THE WITNESS:
19    A.   My plan is a guideline, just like the NCCN
20 has their guidelines, and it's up to the individual
21 practitioner to -- to decide based on the individual
22 patient what is appropriate for them.
23       MS. LOTMAN:  Thank you very much, Doctor.
24       MS. GEMAN:  Are there any other questions from

Page 127

1 the Defendants?
2            (No response.)
3         Do you have it on your screen?  Did people
4 write in?
5       MS. ISIDRO:  No one else on the Zoom?
6       MS. GEMAN:  Do you formally conclude it and
7 pass it to me?  How are we doing this?
8       MR. KERNER:  Yeah, if none of the Defendants
9 have any questions and you have questions, ask away.
10       MS. GEMAN:  Thank you.
11          CROSS EXAMINATION
12 BY MS. GEMAN:
13    Q.   Dr. Kaplan, what is CLIA certification?
14    A.   CLIA certification is -- is certification
15 that's given by a board that -- that attests to the
16 accuracy and the usefulness of a particular test, that
17 it's considered accurate and it does have some impact for
18 the patient.
19    Q.   Okay.  Can you please take out what's been
20 marked as Exhibit 3 and turn to Page 3.  Does the class
21 as set forth on Page 3 capture the population of people
22 for whom you are recommending your monitoring program?
23    A.   Yes.
24    Q.   I think there was some confusion before.

Page 128

1 You're not recommending that this monitoring program be
2 provided to people who did not take the contaminated
3 Valsartan, i.e. you are not recommending this program to,
4 this exact program to non-class members; correct?
5    A.   The point of this program was medical
6 monitoring for those that had been identified as being at
7 risk because of their intake of Valsartan-contaminated
8 products.
9       MS. GEMAN:  Okay.  Thank you for the
10 clarification.
11       Okay.  We'd like to read and sign.
12       MR. KERNER:  Yeah.
13       THE VIDEOGRAPHER:  The time is now 12:33 p.m.
14 This is the end of media six.
15       This concludes this deposition.  We're off
16 the record.
17       THE REPORTER:  Would anyone like a copy of the
18 transcript?
19       MR. STOY:  This is Frank Stoy.  I'd like an
20 electronic copy, please.
21       MS. LOTMAN:  Alyson Lotman.  I'd like the
22 same.
23       MR. CHARCHALIS:  (Inaudible).
24       MS. ISIDRO:  Mitchell wants an electronic.

Page 129

1 STATE OF ILLINOIS )
                     ) SS:
2 COUNTY OF C O O K )
3
     I, KELLY A. BRICHETTO, a Certified Shorthand
4 Reporter of said state, do hereby certify
  that the within named witness, EDWARD H. KAPLAN, M.D.,
5
  was by me first duly sworn to testify the truth, the
6
  whole truth and nothing but the truth in the cause
7
  aforesaid; that the testimony then given by the
8
  above-referenced witness was by me reduced to stenotype
9
  in the presence of said witness; afterwards transcribed,
10
  and that the foregoing is a true and correct
11
  transcription of the testimony so given by the
12
  above-referenced witness.
13
     I do further certify that this deposition was
14
  taken at the time and place in the foregoing caption
15
  specified and was completed without adjournment.
16
     I do further certify that I am not a relative,
17
  counsel or attorney for either party or otherwise
18
  interested in the event of this action.
19
20
21
22
23
24

Page 130

1  IN WITNESS WHEREOF, I do hereunto set my hand
2  this 21st day of January, 2022.
3
4
5
6
7  KELLY A. BRICHETTO
8  CSR License No. 84-3252
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 131

1  RACHEL J. GEMAN
2  rgeman@lchb.com
3        January 26, 2022
4  RE:   In Re: Valsartan, Losartan, Et Al
5  1/19/2022, Edward  H Kaplan , MD (#5025121)
6  The above-referenced transcript is available for
7  review.
8  Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12  The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19  If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24

Page 132

1  In Re: Valsartan, Losartan, Et Al v.
2  Edward  H Kaplan , MD (#5025121)
3        E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____   _____
24  Edward  H Kaplan , MD              Date

Page 133

1  In Re: Valsartan, Losartan, Et Al v.
2  Edward  H Kaplan , MD (#5025121)
3        ACKNOWLEDGEMENT OF DEPONENT
4  I, Edward  H Kaplan , MD, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____   _____
12  Edward  H Kaplan , MD              Date
13  *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15        _____ DAY OF _____, 20___.
16
17
18        _____
19        NOTARY PUBLIC
20
21
22
23
24

34 (Pages 130 - 133)

[& - 75201]

Page 1

**&**

**&** 2:3,9,21 4:8,19
5:2,8

**0**

**02109** 4:10

**1**

**1** 7:3 28:14,16,23
47:14,15,17 48:3,4
48:5 60:17
**1,000** 48:18
**1.05** 91:2
**1/19/2022** 131:5
**10013** 2:5
**10017** 3:10
**104** 7:6
**107** 6:8
**10:21** 60:8
**10:39** 60:12
**10th** 114:1 117:4,5
119:23
**11** 6:7 117:11
118:14 119:22
**11,250** 116:23
**115** 6:9 7:7
**11:34** 99:6
**11:56** 99:10
**12** 106:11
**121** 6:10
**12498** 130:6
**126** 6:11
**128** 6:12
**12:15** 114:6
**12:17** 114:10
**12:33** 128:13
**13** 30:9,13 31:23
**131** 6:14
**15** 22:5
**15219** 4:23
**16th** 118:6 119:23

**17th** 4:15
**19** 1:9,16
**19087** 3:4
**19103** 4:16
**1982** 37:2
**1983** 37:17
**1985** 37:18,19
**1988** 37:19,21
38:10
**1995** 39:8
**19th** 8:4
**1c** 93:23

**2**

**2** 6:2 7:4 36:2,3,7
48:20 64:7 86:14
**2,000** 116:3,9
**20** 13:6,8 106:11
116:15 119:14
133:15
**20,000** 96:21
**200** 3:15
**20002** 2:10
**2001** 116:3,4
**2012** 122:21
123:21
**2018** 122:22
123:21
**202** 2:11
**2021** 34:6 116:4,6
116:14 117:5
118:6
**2022** 1:9,17 8:4
130:2 131:3
**2029** 5:9
**20th** 116:15
**212** 2:5 3:10
**213-7045** 4:10
**214** 3:22
**215** 3:5 4:16
**21st** 130:2

**2200** 3:21
**22nd** 113:23 116:3
116:5
**24,000** 119:5
**25** 17:5 117:14,24
118:17
**250** 2:4
**2500** 3:16
**26** 131:3
**260** 2:16
**270** 3:4
**27th** 4:9
**2800** 5:3
**2875** 1:3
**29** 7:3

**3**

**3** 7:5 43:15,16,19
55:8 66:1,15
79:20 127:20,20
127:21
**3,000** 48:19
**3.3** 91:2
**30** 4:15 131:17
**30,000** 96:21
**300** 4:4 5:9
**301** 4:21
**302** 2:10
**30305** 3:16
**3100** 1:16
**316** 2:21
**31st** 118:6,7 119:9
119:22
**32501** 2:22
**3333** 3:15
**355-9500** 2:5
**3600** 3:21
**37** 7:4
**37402** 4:4
**385-5400** 2:17
**38th** 4:22

**4**

**4** 6:4 7:6 74:8
86:13 90:13 97:9
103:21,23
**412** 2:9
**423** 4:5
**44** 7:5 119:2
**450** 116:20 117:13
118:3
**45202** 5:4
**470-3520** 2:11

**5**

**5** 7:7 86:19 91:11
113:17,19,20
114:15,16
**50** 54:11 120:1
**50/50** 23:6
**500** 62:9 119:22
**5025121** 131:5
132:2 133:2
**513** 5:4
**53** 4:9
**550** 3:3
**5500** 118:20
**5th** 116:13,15
117:22

**6**

**6** 30:19 71:15 94:2
94:2
**6,187.50** 118:2
**600** 2:22 5:3 62:11
62:12 119:19
**60076** 24:10
**617** 4:10
**66210** 2:16
**698-5000** 5:4

**7**

**736** 4:3
**75201** 3:22

**[755-2652 - answered]**                                           Page 2

**755-2652**  4:5
**77**  1:15 8:6
**7th**  114:1,1 117:5

**8**

**80**  71:24 72:16,18
**801-9200**  3:10
**8101**  2:15
**84-3252**  130:8
**85**  72:3,5
**855-8000**  3:22
**8th**  2:4

**9**

**9**  24:9
**90**  73:3
**90067**  5:10
**913**  2:17
**9631**  24:9
**977-4058**  3:5
**979-1177**  4:16
**9:14**  1:10,17 8:5
**9:15**  9:12
**9:16**  9:16
**9:41**  32:7
**9:43**  32:11

**a**

**a.m.**  1:10,17 8:5
   9:16 32:7,11 60:8
   60:12 99:6,10
**ability**  88:2 95:4
**able**  19:9,10
**abnormal**  109:8
**abnormalities**
   45:1,4 61:22
**abnormality**  45:9
**absence**  80:9 82:4
   82:13
**abstracts**  39:16,23
**accepted**  54:3 61:8
   73:14

**account**  52:14
   89:20
**accuracy**  127:16
   131:9
**accurate**  30:24
   123:7 124:15
   127:17
**achieved**  85:9 89:2
**acknowledgement**
   133:3
**acknowledgment**
   131:12
**acquire**  38:16
**action**  129:19
**active**  121:3
**activities**  54:9,12
**actual**  97:2
**acute**  26:22 27:8
   27:17,19
**added**  117:14
   119:7
**addition**  35:13
   92:20
**additional**  58:15
   70:21 107:11
   119:8 122:11,15
   122:17
**additions**  133:6
**address**  24:8 44:1
   44:3 124:10
**addressed**  114:20
**addressing**  95:20
   101:3
**adenomatous**
   97:19
**adjournment**
   129:16
**administered**
   27:13 64:14
**administering**
   126:5

**adriamycin**  75:11
**advance**  11:23
**advised**  41:22
**aforesaid**  129:8
**afternoon**  10:15
   105:13 120:8,12
**agencies**  50:14
**agents**  19:6,12,14
   19:17,21,24 101:2
**aggressive**  55:2
   56:23 57:1,21
   72:21
**ago**  10:11 12:6
   13:6,8 17:5 21:9
   29:3 33:22 34:2,4
   34:8 44:8,9 49:5
**agree**  34:23 83:6
   95:22
**agreed**  34:22
   95:23
**ahead**  41:7
**ahh**  37:20
**aid**  5:7
**al**  8:8 131:4 132:1
   133:1
**alberto**  3:2
**alfano**  4:19
**algorithm**  51:6
**algorithms**  50:22
**alleged**  110:22
**allotted**  131:20
**allow**  38:20 42:13
   42:16 72:14 88:1
**allowing**  38:15
**allows**  44:11
**alluded**  57:20 74:5
**alotman**  4:17
**alyson**  4:14 104:22
   104:24 105:3
   125:16 128:21

**adriamycin**  75:11
**american**  87:21
**amerisource**  5:1
   120:9,13
**amount**  74:19
   75:2 76:15,22
   78:18 118:20
**amounts**  42:9
**analyses**  116:17
   117:8
**analysis**  42:22
   43:10 45:14 74:9
**andrew**  3:2
**andrew.alberto**
   3:5
**anemia**  25:18
**anesthesia**  49:16
**angeles**  5:10
**animal**  112:10,14
   112:23
**annual**  45:15,23
   46:20 47:1,5
   48:24 49:6,14,17
   50:11 86:23 87:2
   87:10,20 88:8
   92:18 110:9
**annually**  52:20
   61:8 86:19 87:5
   90:9
**answer**  11:2,10,17
   15:5 46:13,13
   48:7 61:13 64:23
   69:23 82:22 99:3
   101:8 103:5 113:7
   122:6 123:5 124:5
   124:22
**answer's**  74:6
   96:14
**answered**  41:20
   67:24 88:11,12
   92:7 96:15 100:20
   124:1

**answering** 46:11
**anticipated** 26:5
**anticipating** 53:24
**anybody** 59:13
  84:23 85:9 113:12
  120:5
**anyway** 70:9
**api** 66:2
**apologize** 105:5
**appearance** 105:1
**appearances** 6:2
**appended** 133:7
**applicable** 131:8
**appreciate** 46:15
  87:9 89:22
**approached** 32:18
**appropriate** 42:17
  46:24 51:18,19
  52:15,16,20 55:5
  64:15 65:8,10
  71:15,19 83:2
  90:1 92:21 98:2
  100:18 101:11
  126:22
**approval** 111:21
  111:22,24 112:2,4
  112:4
**approximately**
  1:17 8:5 12:5
  119:5
**arm** 70:15,15
**arranged** 64:20
**articles** 35:21,22
**aside** 22:13 23:18
  25:12 49:15
**asked** 12:24 14:4,4
  17:9 18:8 19:3
  20:6,19 21:14,15
  28:3 30:11 32:20
  33:11 34:11 40:10
  40:21,23 41:17,20

41:23 43:4,4 44:9
  67:24 84:15 88:11
  92:7 96:15 99:2
  100:20 102:2
  104:6 111:5 124:1
**asking** 10:14
  11:13 41:10 96:6
**assessed** 102:13,15
  102:21,23
**assessment** 53:9
**assigned** 39:8
**assistant** 24:17
  38:7,9
**associate** 26:4,6,23
**associated** 35:1
  70:9 74:21
**assume** 11:18
  56:21 64:12
**assumed** 63:21
  74:9
**assuming** 112:7
**assumption** 64:1,7
  75:22 76:3,4
  102:4
**assumptions** 41:9
  63:12,12 74:14,15
**assure** 45:14
**asymptomatic**
  54:8 58:20 59:5
  107:8,15,20
  120:23 121:2
  122:19 123:18,22
  123:23 124:16
**ate** 122:20
**atlanta** 3:16
**attached** 35:22
  36:13 131:11
**attempting** 112:4
**attending** 38:2
**attests** 127:15

**attorney** 10:11
  13:19,24 15:14
  18:1,20 19:3 29:6
  31:14 115:2
  129:18 131:13
**attorneys** 20:10
  29:5 40:10 43:22
  44:1,1 115:3,13
**august** 34:10 88:1
**auspicious** 9:3
**authoritative**
  99:18 100:3,16
  101:9
**automatically**
  125:5
**available** 85:21
  131:6
**avenue** 3:9,21 4:3
**aware** 32:17 43:18
  85:19,21 100:15
  101:9 110:1 126:9
**awhile** 22:5 33:22

## b

**back** 9:2,16 32:12
  46:14 49:12 55:9
  60:13 64:23 69:22
  81:1 84:2 86:9
  98:4,17,19 99:5,11
  114:11
**background** 55:22
  66:1
**backwards** 36:22
**bacon** 77:8 122:21
**ballpark** 22:17
  96:20
**barnes** 5:8
**barrett's** 81:5
  109:8
**based** 54:2 59:22
  63:7,11 64:1,2,7
  64:16 65:5,7,11,12

66:9,11,19 67:6
  68:10 69:13 70:11
  71:2 76:4,6 82:21
  87:3 90:22,24
  91:3 100:11 102:9
  102:11,12 112:9
  122:11 126:12,21
**basic** 45:14 57:9
  59:7,12 69:11,14
  70:12,21 93:24
  121:13,13,19,21
  122:2,9,12
**basically** 91:3
**basis** 51:14 68:4,5
  72:15 79:5 125:10
**baylen** 2:21
**began** 40:15
**beginning** 9:4 28:3
  32:12 60:13 99:11
  114:11
**behalf** 2:2,7,13,19
  3:1,6,12,18 4:1,6
  4:12,18 5:1,6
  120:9
**behoove** 69:13
  70:4
**believe** 12:15 13:8
  14:15 16:1,13
  18:24 23:13 27:9
  29:2 30:10 31:12
  34:6 36:12 47:14
  47:15,18 50:14
  54:23 55:20 58:8
  62:14 77:4 90:11
  91:22 95:4 97:16
  98:8 117:2 126:14
**ben** 5:14
**benefit** 55:2
**benefits** 49:23
  74:4

**benzene** 20:2
**bergen** 5:1 120:10
   120:13
**berne** 5:2
**bernstein** 2:3
**best** 95:3
**better** 28:10 54:11
   105:17
**beyond** 41:10
   69:20
**biliary** 27:6
**bill** 87:24
**billed** 116:20
   117:13 118:3
   119:22
**biopsy** 86:19
**bit** 56:1,22
**blackwell** 4:3
**bladder** 93:1,2,5,7
**blood** 24:22,24
   25:7,10,12,19 26:2
   26:5 45:14 57:10
   71:23 73:11 87:6
   93:23 109:21
   110:9 111:20
   112:2
**board** 127:15
**body** 77:22 85:18
**bone** 25:20 27:21
**booklet** 11:4
**bosick** 4:19
**boston** 4:10
**bottom** 79:20
**boulevard** 2:15
**bowel** 27:6,6
**brando** 26:9
**brca** 45:1 60:22
   107:9 108:10,13
   109:13
**break** 32:1 60:7,10
   73:12 99:5,8

114:8
**breast** 12:24 22:7
   27:2
**brett** 2:14,17
**brichetto** 1:14
   8:10 129:3 130:7
**brief** 17:8
**briefly** 91:22
**brisbois** 3:3
**broad** 25:23
**brought** 87:24
**brown** 2:19
**btlaw.com.** 5:10
**bucks** 120:1
**building** 24:12
**bunch** 10:14 39:15
**busy** 121:24

**c**

**c** 2:1 97:9 129:2
**ca125** 57:12
**ca929** 57:13
**cabraser** 2:3 33:5
   33:19 115:9
**california** 5:10
**called** 10:4 25:24
   54:4 57:12,13
   71:23 75:11
**calls** 29:10 30:2
   68:16 89:7 96:7
**camber** 3:1
**camden** 1:2
**camera** 8:19
**campus** 38:18
**cancer** 12:24 17:6
   17:7 18:22,23
   19:8 22:7 25:5
   26:21 27:2,3
   44:24 45:3,11,12
   45:18 51:1 53:5
   55:24 56:1,10,13
   56:15,20,20,22

57:5,6,11,12,13,15
57:18,23 58:8,11
58:18,18 59:15,16
59:20 60:4 61:22
71:14,16,19 72:21
80:3,15,19 81:11
81:13,15 86:22
87:21 88:16,20
90:23 91:2,18,23
92:5,16,21 93:1,3
93:5,11,12,15,20
96:10,23 97:3
98:24 99:1,20
100:5,18 102:1,6
102:18,22 103:9
107:21 108:5
109:20 112:8,15
120:20 121:4,7
**cancers** 24:24 25:2
   25:8,14,15,16
   26:15,19 27:4,7,7
   27:14 42:2 66:17
   67:2,4,5,10,14,16
   67:16,20,23 68:6
   68:15,23 69:8
   74:12,12 86:21
   87:14 88:3,15
   91:8,14 92:3,12
   93:3,9,9 97:5
   121:15
**candidate** 73:24
**capable** 28:8
**caption** 129:15
**capture** 127:21
**carcinogen** 68:8
   110:2,19 112:6,6,7
   112:12,20,22,23
   113:1,2
**carcinogenic**
   43:10

**carcinogenicity**
   102:14
**carcinogens** 33:13
   33:14 34:12 42:11
   66:4 72:19 73:2
   112:9
**carcinoma** 45:17
   81:7
**cardiovascular**
   47:6
**care** 22:7 26:4,22
   26:24 27:10 42:15
   42:16 44:18 48:18
   109:2,20 126:7
**career** 48:20 96:19
**cares** 48:22
**caring** 17:4
**carry** 45:3
**carrying** 53:2
**case** 12:7,11,14,16
   12:20 13:2,9 14:5
   14:7,8,14,15 15:8
   15:10,17 16:6
   17:5,15,17,22 18:6
   18:12 19:1 20:8
   22:13 24:1,2
   30:20,23 32:21
   41:23 42:5 44:11
   44:14 104:5
   110:12 115:3
   123:9
**cases** 22:14 23:15
   23:20 27:8 74:3
**cat** 45:20 57:22,24
   61:7 98:24
**categories** 61:10
   61:17 62:4
**category** 27:15
   121:1
**catenacci's** 95:15

**caught** 72:21
**causation** 17:12
  19:8 97:6
**cause** 74:12 97:3,5
  102:18,22 112:8
  129:7
**caused** 13:4,5
  96:10
**causes** 102:1,6
**causing** 74:12
**caution** 14:21 31:5
  41:8
**cell** 26:3
**center** 16:1,3
  27:10 37:1
**centers** 27:12,13
**central** 1:10
**centre** 4:22
**century** 5:9
**certain** 21:12
  33:17 42:9 52:15
  60:20 66:3,16
  74:11 75:9,12,23
  76:2 77:5,11
  81:12 86:21 88:15
  91:8,14 95:24
  107:8 108:8,13
  109:15
**certainly** 45:8
**certainty** 62:23
  63:10,13,14 80:1
  80:14
**certificate** 6:14
**certification**
  111:23 127:13,14
  127:14
**certified** 1:14
  129:3
**certify** 94:3,18,24
  95:9 129:4,14,17

**cetera** 124:13
**chairman** 39:9
**chance** 72:22
  104:13
**change** 119:6
  122:22 132:4,7,10
  132:13,16,19
**changes** 81:6,13
  131:10 133:6
**changing** 55:4
**charchalis** 5:8
  128:23
**charge** 64:17
  117:14 118:17
**charged** 119:5
**chattanooga** 4:4
**chemicals** 18:21
**chemistry** 93:24
**chemotherapeutic**
  75:9
**chest** 90:8 91:23
**chicago** 1:16 8:6
  37:5,9,23
**chugging** 99:14
**cincinnati** 5:4
**circumstances**
  69:6
**cirrhosis** 81:9
  93:15
**cite** 47:20
**claim** 13:2,3
**claiming** 18:19
**clarification**
  128:10
**class** 25:23 50:20
  64:18 65:23 67:13
  67:19,19,22 68:14
  68:22 69:7 74:18
  76:1,21 80:3
  81:17 89:8,12,12
  89:15 90:10 97:7

97:21 111:2 124:7
  124:12 127:20
  128:4
**classes** 67:16
**classifications**
  19:23
**classlawdc.com**
  2:11
**cleaning** 19:14,16
  20:3
**clear** 18:10 46:12
  83:16
**clerkships** 38:17
**clia** 111:23 127:13
  127:14
**client** 15:14 31:14
**clinic** 27:23
**clinical** 38:16,17
  38:22 39:7,7
  45:13 72:4
**clinically** 85:21
**close** 27:20 105:6
**closer** 8:20
**closets** 21:13
**coan** 4:8
**coldcuts** 77:8
**colleagues** 29:7
**college** 2:15
**cologuard** 88:19
**colon** 49:8,11 53:5
  73:22 88:19 91:18
**colonic** 45:17
**colonoscopies**
  45:15 46:21 47:11
  48:19,20 50:11
**colonoscopy** 45:24
  47:1,5,7 48:10,24
  49:7,12,14,17,19
  52:19,20 53:13
  71:5 73:21 80:22
  88:22 89:4,15

91:11,18 97:12
**colons** 48:3,10
**colorectal** 92:4
**come** 29:4 46:14
  49:18 55:4 99:5
  100:10 109:19
**comes** 47:22 59:11
  78:14 79:8
**comfort** 99:5
**commencing** 1:17
**committee** 2:13
**common** 47:10
**commonly** 20:3
**communication**
  31:9 116:17 117:8
**communications**
  31:6,12
**community** 39:1
  109:3
**comorbidities**
  46:23 49:15 52:10
  53:19 71:2 89:16
  126:13
**comorbidity** 71:10
**companies** 66:3
**company** 32:19
  111:20
**compensated** 62:7
**complete** 30:19
  46:13 133:8
**completed** 129:16
  131:17
**complication** 47:8
**compound** 123:1
**comprehensive**
  51:1
**concern** 108:22
**concerned** 49:4
  108:9 109:19,20
  120:20 121:8,8

**concerning** 40:2,3
**conclude** 67:4
  127:6
**concluded** 37:21
  96:10
**concludes** 128:15
**conclusion** 15:12
  30:3 68:17 89:8
**condition** 17:10
  109:11
**conditions** 26:3,18
  50:22 57:10 72:13
  73:22 81:8 121:6
  125:6
**conduct** 71:4
**conducting** 74:8
  107:11
**confirming** 62:15
**confusion** 127:24
**congress** 87:24
**connection** 30:23
**consequences** 94:8
  95:13,24
**consider** 48:23
  63:6 65:8,10
  67:10 84:15 89:20
  109:5
**considered** 42:9
  42:21 63:7 65:17
  81:8 97:22 127:17
**considering** 98:1
**consist** 44:19
**consistent** 74:13
**constructed** 66:15
**contact** 33:19,21
  34:4 115:18,22
**contacted** 32:19
  34:3 115:4,14
**containing** 123:20
**contains** 103:22

**contaminants**
  103:9
**contaminated**
  66:4 80:4 81:18
  128:2,7
**contribute** 74:12
**cooperative** 54:4
**copies** 131:14
**copy** 36:9 113:22
  128:17,20
**corporation** 3:18
  5:7
**correct** 19:2 21:23
  21:24 22:1,2,12
  23:16 24:6,7 25:9
  25:17 26:7 29:12
  29:13 30:1 33:20
  34:9,17 35:10
  37:11,12 38:11
  40:8,19 43:7,8,12
  43:13 44:5,12
  46:1,2 48:24
  49:19,20,24 50:3,4
  50:12 53:18 54:16
  54:17,19 55:16
  56:2,16,17 58:9
  60:23,24 64:8,9
  66:17,18,20,21
  67:8,9 68:12
  74:10,15,16 78:5,6
  78:11,12,13 79:9
  79:10,14,17 80:6
  80:16,17 81:19,23
  82:14,15,18,19
  83:10,11,12,18,19
  83:23 86:1,2
  88:16,17,21,23,24
  89:10,17,23 90:15
  91:4,5,9,19,20
  95:7,24 97:7,8,14
  101:7,14 102:6,14

  102:15,18,24
  103:15,16 104:5
  104:11,12 106:16
  107:10,13 108:7
  114:22,24 116:9
  116:10,18,19,22
  116:23,24 117:5,6
  117:9,10,12,23
  118:1,3,4,8,9,16
  118:18,19,21
  119:4,6,20 121:4,5
  121:8 128:4
  129:11 133:8
**correcting** 117:9
**corrections** 133:6
**correctly** 9:1
  74:23 80:10 94:16
  120:21
**cough** 59:10
**counsel** 8:12 15:15
  31:6,9,12,13,13
  40:22,23 41:17
  55:12 64:3 129:18
  131:14
**count** 25:20
**country** 50:21
**counts** 26:2
**county** 129:2
**couple** 22:16 28:2
  103:19 120:7,14
**course** 32:3 52:1,8
  73:18 74:1 96:19
  106:7
**court** 1:1,14 6:18
  8:10,14 9:18
  14:11,16 28:13
**courtroom** 14:17
  62:10
**cover** 26:16 67:16
  88:2

**crafted** 106:24
**create** 50:22 62:1
  64:17 103:10
**created** 44:14
  102:8
**credentials** 32:20
**criteria** 54:7
**criticism** 43:7
**criticisms** 101:21
**cross** 106:1 120:16
  127:11
**cs** 131:15
**csr** 130:8
**ct** 90:8,10 91:22
**culbertson** 4:8
**cumulative** 74:19
  74:21 75:1,7,10,12
  75:15,21 76:8,15
  76:17,22,23 78:2
  78:10 79:12,13
  83:9 85:20,24
**current** 24:8 36:11
**currently** 111:21
**curriculum** 7:4
  34:1 36:9
**cursor** 26:1
**custody** 6:17
**cutoff** 15:4
**cv** 36:11,17 37:17
  39:14
**cvs** 5:6
**cystic** 81:13

**d**

**d** 5:2
**d'lesli** 3:20
**d.c.** 2:10
**dallas** 3:22
**dangerous** 43:3
**daniel** 2:20
**data** 47:19 72:16
  72:18 86:22 87:9

[data - diseases]

87:13 98:12,23
99:2,2 103:8
**date** 8:4 132:24
133:12
**dated** 117:4 118:5
119:22
**dates** 20:21
**davis** 3:20
**day** 54:9,9 130:2
133:15
**days** 117:3 131:17
**deadline** 117:19
**deal** 25:2,5,7,10
26:14,19 124:4
**dealing** 124:6
**dealt** 20:11 26:6
39:17
**death** 17:21 54:13
**december** 118:6,6
118:7 119:9,22,23
**decide** 51:18,19
126:21
**decided** 126:12
**deciding** 52:4,13
89:21
**decision** 53:12
89:23 123:14
**decisions** 59:22
**declare** 133:4
**declined** 72:9
**deemed** 133:6
**defendant** 3:1,6,12
3:18 4:1,6 5:1,6
15:12,19 17:17
18:6 23:4,5,8,10
23:12 101:21
105:1
**defendants** 4:12
23:8 102:18,22
105:4 127:1,8

**define** 33:14
**definition** 89:8
97:20 98:8
**degree** 53:5 62:23
80:1,14 109:6,15
**deleterious** 109:16
**demise** 13:5
**depend** 123:3
**depending** 45:6
58:2
**depends** 58:6,8
59:17 72:4 124:20
**deponent** 131:13
133:3
**deposed** 12:4 17:9
17:12 18:16 21:20
**deposing** 131:13
**deposition** 1:7 7:3
8:5 10:18 14:10
14:12,13 16:9,14
17:3 18:2 21:17
22:15,16,24 28:15
29:10,12 36:17
62:10 104:14
119:13,16,17,19
128:15 129:14
**depositions** 12:3
18:14,16 20:19
21:19 24:5
**describing** 85:9
**description** 7:2
**deserve** 68:9
**deserves** 70:12
**design** 61:2
**designed** 55:23
56:5 57:10,17
60:19,21 61:16,18
**desires** 52:11
53:20
**destined** 94:6

**detail** 44:22 124:5
**detailed** 94:4
95:15 122:2
**details** 12:19
15:16 16:4 41:22
42:4,5,6 52:7
65:23 95:20
**detect** 57:18 81:7
86:21 87:13 88:3
88:15 91:8,14
92:21 93:8
**detected** 93:16
**detecting** 91:18
92:14 99:1
**detection** 81:5,6
86:18
**determination**
97:2,5 100:12
123:8
**determine** 54:3
71:20 85:20 93:7
124:12
**determined** 79:13
99:18 100:4,17
101:1,1,10
**determining** 52:15
90:5,5
**develop** 33:11
34:11 40:10,23
41:5,17 42:16
43:5 44:9 51:4
94:6 106:3
**developed** 44:16
45:3,12 72:20
110:15
**developing** 33:16
42:1,10 44:18,24
45:16 59:15,24
76:2 80:3,15,19
81:11,11

**development**
18:22 45:18 65:8
**diagnosed** 53:2
**diagnosis** 13:4
17:11 121:4
**diagnostic** 80:2,14
**died** 9:1
**diet** 74:20 76:16
76:23 77:3,17
78:4,15 79:9
82:21 123:19
**dietary** 74:22
125:4
**difference** 56:18
112:5,21
**different** 30:5 57:5
59:19,20,20 60:1
63:13 69:13 70:5
70:5,16,17,20 80:8
82:3,12 87:8
123:22 125:11
**differently** 56:11
**difficult** 124:22
**direct** 10:6
**direction** 51:17
**disclose** 31:6
**discovered** 122:3
**discuss** 91:21
**discussed** 34:24
64:5 71:9 103:22
104:1,10 125:12
**discussing** 32:21
78:22 118:12
**discussion** 9:14
32:9
**disease** 13:4 26:3
27:9 47:7 52:8
72:23
**diseases** 65:12
70:8

disorders 24:22
  25:7,10,13,20 26:6
  109:21
distinction 59:8
distinctions 58:19
  59:4
district 1:1,2
diverticulitis
  73:23
diverticulosis
  73:24
dlesli.davis 3:23
dna 91:12
doctor 15:21,23,24
  17:13 18:4,5,5
  36:6,22 43:19
  48:22 49:2,4 50:7
  60:15 67:12 70:4
  90:5 91:6 94:2
  96:9 98:11 101:20
  103:17 104:3
  105:22 106:23
  107:6 108:21
  109:22 112:5
  113:10 114:14
  120:8 122:6
  125:13,16 126:7
  126:12,23
doctor's 70:13
  126:15
doctors 15:24
  89:19 121:24
document 90:12
documented
  106:10
documents 22:19
  29:14,17,18,21
doing 19:19 22:6
  54:1,10 57:21
  62:16 72:24 82:9
  98:8 111:11,12

122:16 127:7
dosage 63:24
  74:10
dose 61:7 90:8
  98:24
double 30:11
dr 7:5,7 10:8 26:9
  28:22 32:16 95:15
  99:13 105:13
  127:13
draft 40:10 55:10
drafts 31:3,16,18
draw 73:11 111:19
drive 1:15 7:6 8:6
  103:21
dropped 14:15,18
  15:8
drug 43:7 75:11
  100:11 124:8
drugs 39:21 40:7
  40:13,17 75:10,24
  103:8
duane 4:15 105:3
duanemorris.com
  4:17
ductal 81:7,13
due 94:6 118:20
duly 10:4 129:6
duration 64:1
  74:10
dysplasias 25:22
dysplastic 25:21

**e**

e 2:1,1 33:22 132:3
  132:3,3
earlier 40:22
  87:14 88:3 92:22
  93:9 99:1 115:10
  120:18
early 72:21 86:18
  92:14

east 3:3 5:9
eastern 54:4
ecog 54:4,6
edward 1:8 6:6
  8:8 10:3 129:5
  131:5 132:2,24
  133:2,4,12
effect 43:10
efficiently 64:14
eight 22:22,23
  23:2
eighty 96:24
either 18:11 20:24
  22:18 48:4 109:1
  126:7 129:18
elderly 47:6 49:7
  72:20
electronic 128:20
  128:24
elements 108:9
ellie 3:19
ellie.norris 3:23
employed 24:16
endogenous 82:21
endoscopy 81:5
  88:23 89:4,16
english 76:7
ensure 64:14
entail 38:12,14
entire 30:20
entitled 1:13
enzymes 93:21
  94:1
epidemiologic
  112:10
equal 80:5 81:21
  82:18
equipped 27:22
errata 131:11,13
  131:17

erratas 131:15
errors 55:17
esophageal 86:22
  88:15 91:9,14
  92:4,11
esophagus 27:5
  81:6 109:8
especially 53:23
  65:22
established 42:6
  42:20,23 55:3
  64:13 66:2,7,8,9
estimate 22:17
  90:22,24,24
estimated 91:1
et 8:8 124:13
  131:4 132:1 133:1
evaluate 59:11
evaluated 56:12
  74:2 79:12 111:15
evaluating 84:16
  85:13,15 87:22
evaluation 42:13
  53:14,22 57:8
  59:9 78:18 81:9
  81:12 123:13
  124:11
evaluations 87:6
event 129:19
everybody 70:12
  122:2
evidence 68:5
exact 48:6 118:11
  128:4
exactly 12:21 17:7
  47:16,18 54:22
  58:13 90:6 103:7
  115:21
exam 45:13,13
  57:8 71:22 92:19
  121:13,20

[examination - foregoing]    Page 9

**examination** 6:6
10:6 71:21 93:6
106:1 114:12
120:16 125:19
127:11
**examinations**
93:17
**examined** 10:5
**example** 45:8 47:3
57:11 59:9 60:3
71:5,14 80:22
98:23 109:8
**examples** 92:11,13
**exams** 45:13 110:9
**excluded** 68:14,22
**exclusively** 26:15
**excuse** 40:22
94:10
**executive** 2:13
**exhibit** 6:17 7:3,4
7:5,6,7 28:14,16
28:23 36:1,3,6,7
43:15,16,19 55:8
103:21,23 113:16
113:17 114:14,16
127:20
**exhibits** 6:4 7:1
36:15
**exists** 80:1 100:10
**expectation** 72:14
**experience** 38:16
39:1 42:15 44:22
47:23 51:21
**expert** 12:14,15,24
18:17 21:22 22:4
22:11,14,18 23:3
24:1 32:19 33:18
33:24 34:21 42:7
42:20 55:22
**expert's** 35:3

**expertise** 63:11
**experts** 34:24 35:8
35:9 42:23 43:10
50:20 64:6,8 65:6
66:20 67:3,8
68:11 74:9 78:17
79:6,7 83:17 91:1
91:4 103:14
**explain** 45:7 52:18
66:22,24
**explore** 69:16
**exposed** 18:21
19:7 33:13,17
34:12 42:9,12
72:19 73:1 77:2,5
82:8 123:15
**exposure** 18:19
67:6 68:7,8 70:10
70:10 75:1,2,7,9,9
75:11,13,23,24
76:17 78:2,10
79:1,3,12,13 80:4
80:5,10 81:18,21
82:5,13,17 83:1,15
83:22 84:11 85:8
90:4,16,20,22,23
99:19 100:4,19
101:11 110:18,22
124:13 126:10
**exposure's** 60:3
**exposures** 58:21
74:21 76:24 94:7
95:11 110:5
**express** 4:1
**extent** 16:18,23
30:2 34:14 68:16
94:9
**extra** 110:4 120:1

**f**
**faced** 80:3
**facilities** 27:10
**facility** 27:24
**fact** 17:4,19 98:13
102:10
**factor** 53:9,12
78:15
**factors** 54:2
**factory** 19:15
**facts** 41:9 104:10
**faculty** 37:22
39:12
**fails** 131:19
**fair** 48:8 53:4
116:2
**fairly** 20:2
**familiar** 33:5
75:14 77:19
**families** 45:2
**family** 52:12,14,17
53:1 61:20,21
109:2 126:8
**fatty** 81:10 93:16
**fault** 17:12
**favor** 15:11
**fda** 100:11 111:21
111:22,24 112:2,3
112:4
**fecal** 91:12
**feel** 104:13
**feeling** 105:20
**fellows** 38:24
**fellowship** 37:8,13
37:19,20
**felt** 41:23 92:20
**fhs** 4:23
**figure** 47:20,22
**file** 30:20 34:2
**files** 103:22

**final** 118:5
**find** 14:2,4 19:7,10
20:20 81:12,12
122:11
**finding** 121:22
**findings** 109:8
**finish** 14:22 50:6
**firm** 2:15 13:22
33:1,3,4 105:1
**firms** 33:6
**first** 10:4 12:4
22:9 23:24 28:14
29:1 32:16 34:3
53:4 55:21 58:16
66:16 71:17 76:12
81:22 89:3 92:10
103:19 115:6,7,14
115:17,21 129:6
**fit** 54:3 72:5 73:3
**five** 38:4 60:6 71:5
88:22,23 89:5,16
97:12 99:11 114:7
117:3
**floor** 2:4 4:9,22
**florida** 2:22
**focus** 70:8 121:14
**folks** 36:18 43:18
113:20
**follow** 45:2,10,12
45:17 51:10,13
61:4,6 90:5
109:12,23 120:15
**followed** 27:13
109:18
**following** 67:2
**follows** 10:5
**food** 77:5,7
**foods** 77:8 123:19
**foregoing** 129:11
129:15 133:5

form   91:7
formally   127:6
forming   63:21
formulate   106:18
forth   127:21
found   15:11 78:18
  78:21
four   10:22 16:14
  29:2 54:8,12,13
  58:5 60:13 66:19
  67:3 68:10 99:7
  106:6 114:19
frame   116:16
  117:20
frank   4:20 128:19
frequently   55:24
  57:22,24 58:1
fresh   77:10
friend   14:3
front   33:8 114:19
  124:21
fruit   77:10
fulbright   3:20
full   38:4 39:12
fully   28:8
function   94:1
functional   52:10
  54:10
fund   64:13
funded   64:20
funding   64:15
further   66:14
  91:21 125:14
  129:14,17

g

gallbladder   27:6
galleri   86:16,16,17
  86:20,23 87:9,13
  87:20 88:9,14
  91:8,13,13 92:10
  92:15,16 93:8,13

93:14 111:8,9,21
  111:22
galleri's   87:10
  92:15
gammopathy
  25:24
gastroesophageal
  17:6
gastrointest   45:17
gastrointestinal
  27:2,4 45:10
gauge   54:2
gcoan   4:11
geman   2:3 6:12
  8:24 9:5,8 14:21
  14:24 15:2,4
  16:18,21 20:16
  21:2 28:20 30:2
  30:14 31:1,5
  34:14 41:8,12,20
  46:7,10,16 48:15
  53:7 56:7 58:22
  63:1 67:24 68:16
  69:1,9,18 70:18
  71:7 73:9 78:7
  81:24 83:24 84:6
  84:8,12,20 85:10
  86:3,8,24 87:11
  88:11 89:6 92:6
  94:9,11,14,22
  95:14 96:1,7,15
  99:21 100:7,20
  101:12 103:3,5
  104:15,24 105:2
  105:11 106:19
  107:22 110:13,23
  113:3,19,22
  115:11,19 116:4,7
  122:24 123:10
  124:1,18 125:7,22
  126:16,24 127:6

127:10,12 128:9
  131:1
gene   45:1 53:3
general   26:2 53:14
  57:7 58:12 60:2
  73:14 109:3,5,6
  121:23 126:8
generally   13:24
  51:10,11
genetic   44:24 45:3
  45:9 53:11 60:21
  61:21 107:8,12,16
  107:21 108:8
  109:9,11,11,13
  121:6
genetics   108:13
geoffrey   4:8
geoppinger   5:2
  6:10 120:7,9,12,13
  120:17 123:6,11
  124:14 125:1,13
georgia   3:16 4:3
getting   45:15
  58:15 62:12
  121:22
gi   27:3 89:4
give   12:19 40:24
  41:18 47:3 104:23
  125:2
given   24:4 29:5
  66:10,12,13 72:22
  127:15 129:8,12
  133:9
giving   71:13
glad   49:2
glenn   3:8 10:10
go   8:21 9:6,10,11
  11:18 21:14 22:16
  32:6 36:22,23
  41:7 55:21 63:20
  79:20 98:17 105:6

110:11 111:8
  114:3,4 122:3
goes   10:23 59:8
going   10:14 11:1,2
  11:17 20:19 21:15
  28:13 31:5 43:14
  49:11 50:18 53:23
  53:24 54:15 56:11
  59:10 60:1 63:4,6
  70:15 86:3 99:14
  102:20 103:17,17
  104:8,18,23
  109:17 122:18
gonna   70:13
good   8:1 10:8,9
  48:22 49:2 50:7
  72:5 73:24 92:13
  92:15 105:13
  120:8,12 121:20
  121:21
gordon   4:19
gosh   116:5
graduate   36:24
graduated   37:2
grant   4:21
great   8:22 36:20
  88:4
greater   81:21
  82:18
greenberg   3:9,14
  10:13
gross   24:9
group   15:24 41:24
  42:1 54:5 56:10
  62:2 110:16
gtlaw.com   3:11,11
  3:17
guaranteeing
  94:21
guess   102:8
  117:13

**guessing** 48:4
**guidance** 40:24
  41:19
**guide** 54:14 90:4
**guideline** 90:3,6
  126:11,19
**guidelines** 50:15
  51:10,12 54:21,23
  61:4,6 65:16,17,20
  65:21 87:16 88:7
  89:18 97:17
  109:23 126:20
**gynecologist** 45:19

**h**

**h** 1:8 2:9 6:6 8:8
  10:3 129:5 131:5
  132:2,3,24 133:2,4
  133:12
**habit** 11:22 97:4
**hand** 28:13 130:1
**handed** 36:7
**handful** 108:23
**handle** 27:8,22
  36:15
**hang** 32:5,5
**happen** 47:19
  108:23
**happening** 73:21
**happens** 105:21
**head** 11:8 81:14
  101:18
**healthcare** 4:13
**healthy** 56:12 82:9
**hear** 16:20 65:14
  105:13,15 108:11
  120:20 122:5
  123:4
**heard** 41:11
**heavy** 61:1,3,5
  70:8

**heimann** 2:3
**held** 1:15 8:6
**heller** 5:14
**help** 51:17 54:14
  90:4 92:21 93:18
**hematology** 24:19
  24:20,21 25:4
  26:16 37:8,16
  38:1
**hemophilia** 26:3
**hepatic** 93:16
**hepatocellular**
  81:11
**hereto** 133:7
**hereunto** 130:1
**high** 42:1 44:23
  45:15 55:24 57:5
  57:23 58:8,11,18
  59:24 61:22 97:13
  97:15,17
**higher** 67:6
**hinshaw** 4:8
**hinshawlaw.com**
  4:11
**histories** 61:21
**history** 42:7 45:14
  46:23 52:12,14,17
  53:1 57:8,14 62:3
  70:11,13 71:2,20
  89:17 92:19 93:4
  93:17 121:22
  125:3,4,10 126:13
**hold** 80:13 104:4,7
**hollis** 2:15
**hollislawfirm.com**
  2:17
**home** 20:4,24
**honestly** 14:20
**hospital** 16:1,2
  24:11 39:13

**hour** 60:7 62:10
  62:11,12 116:21
  117:13 118:3
  119:19,22 120:1
**hourly** 62:8,8,9
**hours** 106:8,11,21
  116:15 117:11
  118:14 119:2,11
  119:14,22
**house** 21:13
**hp** 105:4
**huahai** 4:12
**hudson** 2:4
**hum** 23:23
**human** 110:1,19
  112:6,6,7,9,11,15
  112:22 113:1,2
**humans** 99:20
  100:6,18 112:8
**husch** 4:3
**huschblackwell....**
  4:5
**hypothetical**
  84:13 113:4
  122:19 123:1,17
  124:2 125:8
  126:17

**i**

**i.e.** 128:3
**idea** 79:8 83:12
  119:11
**identical** 113:23
**identification**
  63:23
**identified** 7:2
  33:15 35:9 42:1
  46:19 59:13 63:23
  67:1,5 92:2
  109:11,12,17
  121:9 124:7 128:6

**identify** 66:16
  78:14
**illinois** 1:15,16 8:6
  24:9 37:2 129:1
**illnesses** 25:23
**impact** 127:17
**important** 79:4
**improve** 94:5,20
**inaudible** 128:23
**include** 27:1 45:13
  57:21 71:20,21,22
  71:23 84:23 85:3
  87:5 90:8 93:23
  106:12 123:19
**included** 93:4
**includes** 24:15
  44:23 92:18 93:24
  106:12 121:13
**including** 96:3
  119:16,17 123:14
**incomplete** 84:12
  113:3 122:24
  124:2 125:7
  126:16
**increase** 33:16
  70:10 74:11
  112:14
**increased** 42:21
  68:7 74:22 80:10
  82:16
**independent** 13:23
  42:22 43:3 123:14
**independently**
  79:12 102:13,15
  102:21,23
**index** 6:1,4 7:1
**indigenous** 77:19
  78:1,5,15,19 79:9
**individual** 51:14
  59:22 69:12,17
  70:14 71:3 89:24

90:6 121:17 123:8
124:8 126:20,21
**individually** 74:2
**individuals** 73:17
**infection** 73:12
**inflation** 119:24
**information** 32:20
33:21 34:1,22,23
64:2,4,5 122:20
**ingested** 74:19
76:21
**initial** 123:13
**initially** 115:5
**inpatient** 27:19
**input** 55:12
**insist** 88:1
**insitu** 81:7
**instance** 71:13
**institute** 32:19
33:18
**instruction** 41:1
41:18
**intake** 125:4 128:7
**intend** 111:10,12
**intense** 62:1
**interaction** 15:13
**interested** 32:21
33:23,24 129:19
**internal** 37:10
108:24 109:4
**internist** 109:5,6
121:14
**internship** 37:4,6
**interrupt** 45:21
**intervention** 64:15
**introduce** 32:24
**introduced** 32:22
**investigated** 100:9
**investigational**
51:22

**invited** 39:16 40:1
**invoice** 116:3,13
116:23 117:3,21
118:2,5,15 119:21
**invoices** 7:7
113:21 114:17,18
115:23 119:8
**involved** 19:14
24:23 32:23 44:17
51:22 87:23 115:3
**irbesartan** 1:4
**isidro** 3:8 10:13
36:19 104:20
114:3 127:5
128:24
**isidron** 3:11
**issue** 79:4 107:12
**issues** 15:15 17:10
25:19 107:8,16,21
108:9

## j

**j** 2:3 131:1
**james** 4:2
**james.spung** 4:5
**january** 1:9,16 8:4
130:2 131:3
**jason** 4:21
**jeff** 5:2 120:9,13
**jersey** 1:2
**jgeoppinger** 5:5
**joined** 37:22
**judgment** 50:1
126:15
**jump** 86:3
**justify** 103:10

## k

**k** 129:2
**kansas** 2:16
**kaplan** 1:8 6:6 7:5
8:9 10:3,8 28:22

32:16 48:2 99:13
105:13 127:13
129:5 131:5 132:2
132:24 133:2,4,12
**kaplan's** 7:7
**karnofsky** 54:6
**kate** 3:14
**keep** 99:14
**kelly** 1:14 8:10
129:3 130:7
**kerner** 3:8 6:7,9
8:18,22 9:3,7,9,11
10:7,10 15:1,3,7
16:20 17:14 20:22
21:6 28:18,21
30:5,7,15 31:7,10
32:3,5,13 34:16
36:1,5,15,20,21
41:7,10,11,13,15
41:16 42:3 46:14
46:17 48:16 53:15
56:14 59:2 60:6
60:14 63:8 64:23
65:3 68:3,20 69:5
69:22 70:3,22
71:12 73:16 78:8
81:1,16 82:2 84:2
84:7,9,17 85:4,14
86:9,12 87:15
88:4,6,12,13 89:9
92:23 94:10,13,15
95:1,17,21 96:8,18
98:4,10 99:4,12
100:1,14 101:5,13
101:16,18,19
103:4,12 104:18
105:10 113:12,20
114:2,4,13 115:16
116:1,5,8 120:3,5
125:15 127:8
128:12

**kernerg** 3:11
**kidney** 94:1
**kind** 12:7 18:23
22:8 25:10,22
26:19 42:13 85:7
100:5,17
**kit** 111:19,20
**kleinman** 26:9,10
26:10
**knew** 20:18 21:15
50:17
**know** 10:23 13:17
14:18 15:9 16:2
16:11 19:16 21:19
29:23 31:11 41:13
47:16,18,22 48:1,6
48:9,12,13 64:21
66:8,8 75:16,18
77:13,18 82:20,22
83:8 87:19,21
88:7 100:9,11,13
101:3 104:1,9
109:2 112:5,11,17
118:11 121:17
**knowledge** 64:19
76:7 95:4
**known** 33:13,14
34:12 91:13
109:15,16 110:1
110:19 112:6,7,20
112:22 113:2

## l

**laboratories** 4:18
**laboratory** 57:9
92:18 93:6,17,19
93:23 112:23
121:21
**labs** 94:1
**language** 63:2
76:7

laptops 8:19
large 27:6 111:4
late 13:4
law 2:15 33:1,3,4
  33:6
lawyers 34:4
  114:17 118:13
lay 63:12
laying 21:11
layman's 14:19
lchb.com 2:6
  131:2
lct 81:21 82:18,20
  83:1,21 84:10
  85:9,16 89:2
learned 81:22 89:3
  111:14,15
lectures 39:16
  40:1
led 67:3 103:9
left 39:11
legal 8:3,11 30:3
  32:22 42:13 44:11
  68:17 89:8 131:23
leukemia 26:22
  27:8,17,19
leukemias 25:13
level 75:23 77:14
  77:16 80:4 85:2
  124:13
levels 33:17 42:11
  63:24 68:8 74:10
  78:21 79:2 83:14
  85:1,17 124:6
levin 2:20
lewis 3:3
lewisbrisbois.co...
  3:5
liability 1:4
license 130:8

lieff 2:3 33:5,19
  115:9
life 17:9 75:12
lifetime 22:20
  74:21 75:1,7,11,14
  75:21 76:8,17,23
  78:2,10 79:11,13
  83:9 85:20,23
likelihood 97:22
likewise 14:24
limit 71:17 117:18
limited 40:19
limits 73:14
line 132:4,7,10,13
  132:16,19
link 19:8 82:17
linked 19:11 53:1
liquid 86:19
list 71:14
listed 92:13 93:3
  125:6
listing 92:11
literally 8:24 9:1
  55:15
literature 19:17
  48:6 51:21 65:13
  99:17 100:3,10,16
  100:23 101:2,9,15
  106:13 116:17
  117:8
litigation 1:4
  10:12,16,17 21:21
  21:22 22:3 23:19
  32:17 40:11,12,15
  42:8 79:19 89:3
  107:1 120:14
little 34:9 56:1,11
  56:22 60:7 66:14
  87:7 91:21 105:15
  108:4 122:1,1

liver 27:7 81:9,10
  93:11,12,15,16,20
  93:21,24
llc 4:13
llp 2:9 3:9,14,20
  4:3,8,15,20 5:2
logistically 64:21
long 22:10 34:2,4
  106:3,17
longer 122:1
longevity 72:14
look 8:23 18:8
  20:13 52:2 55:6
  63:2 69:13,16
  70:5,6,14,15 81:9
  92:18 103:24
  105:18
looked 19:12
  21:12
looking 21:14
  28:18 31:16,18
  39:14 41:3 62:18
  91:10 103:8
  108:21
looks 116:14 119:1
los 5:10
losartan 1:3 8:8
  131:4 132:1 133:1
lot 14:4 19:13,15
  19:16,17 55:3
  104:2 105:21
  120:24 122:20
lotman 4:14 6:8,11
  104:22,22 105:3,3
  105:12,17,20
  106:2,22 108:1
  110:17 111:6
  113:8 120:18
  125:16,17,20
  126:2,23 128:21
  128:21

low 25:19 26:2
  61:7 90:8 98:24
lower 78:20
loyola 37:1
ltc 80:5
lung 27:2 57:22
  90:23 91:2,23
  92:4 98:24
lymphomas 25:13
  27:3
lynch 45:1,8,22
  46:4,5,18,20 47:4
  49:14,22 50:10
  52:21,22,24 60:22
  109:9

## m

m 4:8
m.d. 1:8 6:6 8:9
  10:3 129:5
mail 33:22
main 97:19
maintained 38:6
  39:12
majority 26:24
  27:12 78:19
making 97:4
male 72:7
males 71:17
malignancies 27:2
  33:16 42:10 45:4
  45:10 59:24 94:6
malignancy 50:20
malignant 25:12
  81:6,8 97:18
malpractice 12:8
  12:9,10 13:24
  22:14 23:14,19
  24:2
mammogram 81:7
man 72:16 73:4

**manner** 100:12
**manufactured** 43:2 66:2
**manufacturers** 63:23 66:3
**mark** 28:14 36:1 43:14 103:21,23 113:16 114:14
**marked** 28:16,23 36:3,6 43:16 55:8 113:17 127:20
**marker** 57:12,13
**marlon** 26:9,9
**marrow** 25:20 27:21
**massachusetts** 4:10
**materials** 42:8
**matter** 1:13 8:7 62:8
**maywood** 37:2
**mcharchalis** 5:10
**mckesson** 3:18
**md** 131:5 132:2,24 133:2,4,12
**mdl** 1:3
**mean** 11:15 14:19 38:21 44:20 48:13 48:17 53:21 55:15 57:8 58:1,2 59:17 62:24 63:9 69:20 75:17,18 80:18 82:14 94:18,24 98:23 101:6 112:8 114:1 124:11
**meaning** 80:5
**means** 57:3 75:16 75:18,22 82:6 95:3
**meant** 15:9

**measure** 52:9
**media** 9:17 32:8 32:12 60:9,13 99:7,11 114:7,11 128:14
**medical** 12:9,10 14:5 16:1,3 19:4,5 23:19 24:2 36:23 37:1 38:1 42:14 44:10,11,15,16 50:1 63:11,14 64:12,17 67:13 71:2 72:13 74:18 75:5 76:9 79:21 80:1,14 82:7 95:3 99:17,20 100:2,5 100:16,17,23 101:9,10 106:4,24 107:3 109:7 113:1 126:13 128:5
**medically** 64:21 65:4,7
**medicare** 88:1,1
**medication** 28:4
**medicine** 37:10 38:7,10 109:1,4
**meet** 50:21
**meetings** 8:7 115:15
**member** 67:13,22 76:21 89:12,12,15 90:10 109:1
**members** 67:19,19 68:14,22 69:7 74:18 97:7,21 128:4
**memory** 28:5
**mention** 55:22 66:15 73:23 77:23 86:20 91:12,13

**mentioned** 22:13 26:18 27:3 52:22 53:19,19,20 60:19 61:15 70:7 72:12 88:14 93:14 109:9 120:19
**merit** 67:2
**merited** 67:4
**met** 10:10
**metastatic** 72:23
**methods** 54:4
**mgus** 26:1
**midway** 94:3
**migliaccio** 2:8,9 114:21 115:17
**mild** 25:21,21
**mind** 58:13
**mine** 14:3
**ministerial** 103:19
**minute** 60:6 99:5 104:23
**minutes** 10:11 49:5
**misdiagnosed** 13:4
**misspoke** 40:22
**misstate** 42:19
**misstates** 16:19,23 21:2 34:15 81:24 83:24 84:20 89:6 89:7,7 92:6 95:14 110:23 115:11
**misunderstandin...** 11:20
**mitchell** 2:20 5:8 128:24
**mitigate** 80:2,15
**moderately** 97:13 97:15,17
**modified** 83:21
**modify** 82:23

**modifying** 84:18 84:19,22
**moment** 44:8,9
**monday** 29:17 30:1 103:23
**monitor** 45:4 55:24 60:5 85:22
**monitored** 56:11 65:24 68:9 109:15 121:13
**monitoring** 27:20 33:12 34:11 40:24 41:18,24 42:14,14 42:17 43:5 44:10 44:11,15,17,18,19 44:20 50:24 58:12 64:13,18 66:15 67:2,4,13 74:18 79:21 82:7 85:1 85:12 94:4,19 95:12 99:20 100:5 100:17,24 101:4 101:10 102:8 106:4,24 107:4,12 108:14 113:1 124:11 127:22 128:1,6
**monoclonal** 25:24
**month** 106:5
**months** 34:8 58:5 58:5,5
**morbidity** 98:9 99:1
**morning** 8:1 10:8 10:9,15
**morris** 4:15 105:3
**mortality** 97:23 98:9 99:1
**move** 8:19 62:6 86:13 88:4 103:17

**multiple** 25:22
26:1 109:10
**mutation** 109:16
109:16
**mutations** 61:23
61:24 108:9
**myeloma** 25:22
26:2
**mylan** 4:18,18

**n**

**n** 2:1
**name** 8:2,8 10:10
13:19,22 14:1
15:17,19,21 18:1,4
18:11 20:7 26:8
120:8,13
**named** 129:5
**names** 20:12,18,21
33:8 108:20
**national** 48:1
50:17 51:1
**naturally** 77:9
78:19
**nccn** 50:14,16,17
54:20 61:9 65:17
65:20,21 87:16
97:16 126:19
**ndea** 39:18 40:3
40:12,17 63:24
66:4 67:7 75:3
79:14 86:2 96:11
99:19 100:4,19
101:6,7,11 102:1,6
102:14
**ndma** 39:18 40:3
40:12,16 42:22
63:24 66:4 67:6
74:19 75:2 76:16
76:22 77:2,14,16
77:19,22 78:1,5,14
78:16,18 79:8,13

82:21 85:24 90:20
96:10 99:19 100:4
100:19 101:6,7,10
101:11,24 102:6
102:14 123:19
125:4,5
**ne** 2:9 3:15
**near** 54:13
**necessarily** 49:12
53:11,12 57:15
58:10 125:11
**necessary** 69:11
133:6
**necessitate** 58:15
**necessitates** 99:19
100:5
**need** 9:7,8,9 11:10
20:13 31:4,15
53:10 63:1 69:7
99:4 121:20,20,21
124:10
**needed** 19:20
**needle** 73:12 96:4
**needs** 56:12
**negative** 30:11
94:8 95:13,23
**neoplasms** 25:21
**network** 51:2
**never** 96:12
101:15
**new** 1:2 2:5,5 3:10
3:10 10:10 55:4
**nicholas** 2:8
114:20
**nigh** 2:20
**nilda** 3:8 10:13
**nine** 67:4,5,14,16
67:16,20,23 68:15
68:23 69:8
**nitrates** 77:9

**nitrosamine** 35:1
77:4 85:24
**nitrosamines** 77:5
83:2 85:18 90:20
110:22
**nmigliaccio** 2:11
**nod** 11:8
**non** 25:16 128:4
**nonresponsive**
88:5
**normal** 54:9,11
82:9
**norris** 3:19
**north** 13:11
**northshore** 39:9
39:10,13
**northwestern**
13:11 37:5,9,14
**norton** 3:20
**nortonrosefulbri...**
3:23,23
**notary** 133:13,19
**note** 94:11 119:21
131:10
**noted** 8:12 133:7
**notes** 1:12 50:6
**notice** 1:18 7:3
28:15 29:11 36:17
**november** 114:1,1
116:13,15 117:4,5
117:5,22 119:23
**number** 7:2 22:19
30:19 38:18 50:14
54:2 60:4 71:14
97:1 110:7
**numbers** 108:20
111:4
**nurses** 24:16

**o**

**o** 129:2,2
**oath** 10:24
**object** 46:10 94:9
**objection** 16:18,23
20:16 21:2 30:2
30:14 31:1 34:14
41:20 48:15 53:7
56:7 58:22 67:24
68:16 69:1,9,18
70:18 71:7 73:9
78:7 81:24 83:24
84:12,20 85:10
86:8,24 88:11
89:6 92:6 94:22
95:14 96:1,7,15
99:21 100:7,20
101:12 104:15
106:19 107:22
110:13,23 113:3
115:11,19 122:24
123:10 124:1,18
125:7,22 126:16
**objections** 30:4
**obviously** 11:1
60:16
**occasionally** 45:20
**occasions** 21:16
23:10
**occurring** 77:9
78:19
**october** 34:6,7
113:23 114:1
116:2,5,15
**offered** 71:11
**offering** 101:20,24
102:5,8,9,17
**offhand** 20:12
**office** 17:24 20:24
21:19 24:11,12
27:23 38:16 82:10

[office - patient's]                                                      Page 16

112:2
**oftentimes** 27:19
**oh** 14:23 27:3
  113:24 116:5
**ohio** 5:4
**okay** 10:23 11:12
  11:16,20,21 12:2
  13:16,18 15:17
  16:5,8,13 17:22
  18:10 20:23 21:16
  23:2 26:14,19
  30:5 31:19 32:16
  37:20 39:14 40:22
  41:13 42:18 43:6
  43:14,19 44:8
  53:16 55:6,7,10,21
  57:19 58:16 59:3
  60:6,15 61:15
  62:6,21 64:12
  66:11,14 70:4
  71:13,18 73:6
  74:3 76:8 82:11
  88:19 89:22 90:14
  91:17 92:1 94:2
  94:18 97:1 98:16
  99:4 100:15
  104:10,18 105:14
  106:7,12 107:14
  108:3,19 109:22
  110:4 112:11,24
  113:8 114:2,14,20
  115:4,9 116:2,20
  118:14 119:1,3,7
  119:18 120:3,4
  121:10 122:9,14
  122:18 123:17
  127:19 128:9,11
**old** 20:21,24 21:8
  71:24 72:3,16
  73:4

**once** 90:10
**oncologist** 14:5
  26:11,13 108:22
  109:7 126:7
**oncology** 24:18,19
  25:4 37:8,16 38:1
  39:1,7,9 53:23
  54:5 108:24
**one's** 74:11
**ones** 33:7 45:11
  115:7
**opine** 14:6 18:20
  102:2 103:8
**opined** 91:4
**opining** 17:11 48:5
  97:6 101:23
  102:24 103:1
**opinion** 67:12,18
  68:4,5 79:21,24
  80:13 82:23 83:20
  84:19,19,22 89:6
  90:19,19 95:6
  101:24 102:5,9,17
**opinions** 10:16
  62:22 63:5,21
  74:15 101:21
  104:4,7,11,14
  106:18
**opportunity** 96:12
**order** 74:17 92:21
  103:10 109:6
  111:16,18
**ordered** 111:13
**ordering** 45:19
**oregon** 13:12
**organization**
  50:19 87:17,19
  88:8
**outcomes** 94:5,20
**outline** 65:22

**outlined** 65:13,15
  67:15 68:15,24
  69:21 97:16 110:9
  126:6
**outlines** 65:23
**outlining** 90:3
**outpatient** 27:23
  27:23
**outside** 40:12
**outweigh** 74:4
**ovarian** 57:11
**overall** 119:1
**overland** 2:16
**oxford** 4:22

## p

**p** 2:1,1
**p.m.** 114:10
  128:13
**pa** 2:21
**page** 63:20 79:20
  86:13,19 90:13
  91:11 97:9 127:20
  127:21 132:4,7,10
  132:13,16,19
**pages** 113:23
**paid** 12:17 62:12
  116:11 117:1
  118:22
**pain** 70:15 73:13
**pancreas** 27:6
  81:12
**pancreatic** 57:12
  57:14,18 86:21
  88:15 91:9,14
  92:4,11
**pap** 81:6
**papantonio** 2:20
**paragraph** 55:21
  60:17 62:7,21
  66:1,15 74:8,17
  76:18,20 79:22

94:2,3
**paraphrasing**
  94:14
**park** 2:16 5:9
**part** 39:11 42:12
  53:14,22 54:21
  71:22 78:1,9 87:5
  87:16
**particular** 16:6
  65:23 80:9 82:5
  82:13 90:1 127:16
**parties** 18:11 20:7
**partner** 10:13
  26:22
**party** 12:11 17:15
  18:11 129:18
**pass** 104:18 127:7
**passed** 22:8
**patents** 39:15
**patient** 17:3,8 18:9
  18:17,18 42:15,15
  42:15,16 44:18
  47:4,6 48:23 49:7
  49:14 51:24 52:1
  52:3,5,9 53:2,4,10
  53:14,21,22 54:1
  54:15 55:23 56:19
  57:14 58:6,9 59:5
  59:18,22 61:13
  69:12,14,15 71:3,4
  71:9 72:5,9 84:10
  87:4 89:1,1 90:4
  97:15 121:18
  122:15,22 123:4
  123:12,14,18,22
  124:10,16,21,22
  124:23 125:3
  126:9,22 127:18
**patient's** 52:7,11
  53:10,20 59:23
  70:14 96:10

[patients - predict]    Page 17

**patients** 26:17
27:11 33:12 34:12
41:24 42:9,10
43:1 44:21,23
45:2,2,10 46:3,6
46:19,22 48:10,18
48:19,23 49:5,21
50:2 51:7,15,18,20
53:23 55:5,24
56:5,9 57:5,6,7,9
58:7,10,14,18,20
58:20 59:4 60:20
60:21 61:3,4,10,11
61:16,17,20 62:1,2
64:18 65:9,23
68:7 69:12,17
70:5,16,20 72:7,18
72:20,24 85:5,7,8
87:23 89:19 93:5
94:6 96:20,22,23
97:2,13,17 100:24
107:7,14,15,18,20
108:5,8,13,16,23
109:4,7,12,18,21
109:22 110:5,12
110:16,18,22
111:3,7,17 120:19
120:23 121:10,17
122:10,19 123:15
123:23 124:5,12
124:16 126:3
**pelta** 5:14
**pen** 8:24 9:7,8
**pending** 17:23
**pennsylvania** 3:4
4:16,23
**pensacola** 2:22
**people** 33:23
63:22 64:14 78:19
80:3 81:17,20
82:8 109:3,10,19

127:3,21 128:2
**percent** 23:6 47:15
47:15,17 48:3,5,5
54:11 96:24
117:14,24 118:17
**percentage** 48:9
78:14 79:8
**perforated** 48:3
48:10 49:8
**perforation** 47:8
49:11 71:6 73:20
**perforations** 47:10
48:21
**performance** 52:8
53:20 54:5,6 55:1
72:5
**performed** 86:19
**performing** 54:9
72:15
**periodic** 97:10
**person** 2:3 3:8,8
13:23 18:18,23
56:12 71:24 74:1
82:9 90:2 124:8
**person's** 85:18
**peruses** 90:12
**pharmaceutical**
4:12,13
**pharmaceuticals**
3:1,7,13 4:7,18
10:12
**pharmacy** 5:6
**philadelphia** 4:16
**phone** 108:20
**phrase** 63:16
**physical** 45:13
57:8 71:21,23
93:6
**physician** 17:20
23:11,12 24:16,16
38:2 50:2 87:4

89:24
**physicians** 23:8
**picture** 22:9
105:16
**piedmont** 3:15
**pietragallo** 4:19
**pietragallo.com**
4:23
**pill** 77:17 78:4,15
**pills** 63:24 74:20
76:16,22
**pittsburgh** 4:23
**place** 126:15
129:15
**places** 13:13 20:21
61:9
**plaintiff** 2:19 13:1
19:1,2 23:18 44:2
91:1
**plaintiffs** 2:2,7,13
22:1 23:18 31:13
34:4,20 40:9,21,21
40:23 41:17 43:9
55:12 65:6 66:20
68:11 74:9 79:7
83:17 91:4 103:14
**plan** 106:4,4,24
110:11 124:9
126:14,19
**planet** 89:2
**plasma** 25:22
**platelet** 25:19
**please** 8:14 9:18
11:15 13:16 14:22
21:5 34:17 64:24
66:23 69:23 76:19
79:20 81:1 84:3
86:9 91:10 98:4
99:23 102:19
127:19 128:20

**plus** 100:11
**point** 24:9 43:6
82:7,24 92:16
98:9 99:17 100:2
128:5
**polyp** 97:18,18,19
**polyposis** 45:16
**polyps** 109:10
**population** 73:15
127:21
**portion** 65:1 70:1
81:2 84:4 86:6,10
98:5,20
**pose** 94:7 95:12,13
**possession** 30:17
**possibility** 109:17
**possible** 49:9
82:20 83:7,8
**possibly** 10:15
**potential** 68:13,21
69:7 94:5,19
125:4
**practice** 24:13,15
24:18,23 25:2,5
26:12,14,20 38:5
38:23 44:23 47:24
59:3 60:18 61:19
75:5 76:9 96:9
107:7 108:5
121:24
**practices** 121:23
**practitioner** 126:8
126:8,21
**pre** 26:1 81:6,8
97:18
**precautionary**
19:19
**precursor** 81:10
**precursors** 81:13
**predict** 81:15

**predispose** 81:10
121:7
**predisposes** 45:9
**predisposition**
60:22
**preliminary** 28:2
31:3
**prepared** 74:13
77:8
**preparing** 35:18
35:20 119:13
**prescribed** 80:9
82:4,13
**prescription**
111:19
**presence** 129:10
**present** 5:14 41:23
77:22
**presentations**
39:17 40:1
**presented** 40:11
40:16
**preservative** 77:9
**pretty** 19:19 26:21
51:8 54:7
**prevent** 80:19
81:15
**previous** 46:11
**primarily** 24:23
**primary** 121:24
126:7
**prinston** 4:12
**prior** 12:3 21:9
28:23 44:14 71:6
79:19 107:21
117:21
**private** 24:15 38:5
107:7
**probable** 112:6,9
112:11,13,19,20
113:1

**probably** 17:4
18:7 48:19 54:11
63:15 76:14
106:11,11 112:14
119:13
**problem** 58:14
70:14 71:10
**problems** 25:19
26:2 49:15 58:12
**procedure** 48:11
52:15 90:1
**procedures** 27:22
57:21 60:5 73:7
95:24 110:8
**proceedings** 1:13
**process** 123:21
**proctor** 2:21
**produced** 103:22
**product** 78:21
**production** 79:9
**products** 1:4 20:2
33:15 35:1 102:18
102:22 123:20
128:8
**profession** 63:7
**professional** 24:8
62:23 63:9,13
**professor** 38:7,9
**profile** 93:24
**program** 33:12
34:12 40:24 41:5
41:18,24 42:17
43:5 44:10,15,17
62:2 64:13,18
65:19,22 67:15
69:21 80:5,6 82:3
82:8,12 83:23
84:11 87:3 92:18
97:22 103:11
110:15 111:2
127:22 128:1,3,4,5

**programs** 44:18
44:19,20 55:23
56:4 58:17 59:21
60:19,21 61:2,16
61:18
**progress** 13:5
36:19
**progressed** 14:17
**progressive** 72:23
**progressively**
54:13
**proliferative**
25:21
**proposal** 95:12
**proposals** 94:4,19
**propose** 71:15
83:22
**proposed** 67:13,19
68:13,22 89:12,15
90:10 97:7,21
**proposing** 73:7
98:12 100:18
**prostate** 71:14,16
71:19,22 72:21
**protocol** 61:8
66:16
**protocols** 51:4
59:20 60:2
**proven** 112:8,21
124:6
**provide** 29:22
31:4,21 47:5
54:15 55:12 60:2
**provided** 29:18,24
30:9,12,20,23 41:9
43:21 59:13 64:2
68:6 122:20 128:2
**providing** 38:22
119:8
**psa** 71:23 72:1,8
72:11,15,24 73:3

**public** 44:16
133:19
**publications** 39:15
39:17
**published** 107:3
**pursuant** 1:17
29:11
**put** 27:14 33:18
43:11 61:24 64:18
64:22 90:17
**puts** 90:20
**putting** 23:18 43:1
53:13

**q**

**qualifications**
55:22
**qualify** 74:18
**quantitate** 54:1
**question** 11:14,17
14:22 15:6 22:10
26:5 32:4 34:19
41:14 46:11 48:7
52:18 58:24 61:12
61:13 63:22 68:19
69:4 75:20 80:24
84:2 86:4 87:7
88:7 94:24 98:3
98:17 100:15
101:8 103:3 123:5
125:17,24
**questioning**
103:18
**questions** 10:14
11:2,2 28:2 60:15
99:16 104:21
105:22 113:9,12
113:14 120:8,15
125:14 126:24
127:9,9
**quick** 120:14

**quickly** 11:23 86:5
13:15 114:15
**quite** 11:14 78:20
99:13

**r**

**r** 2:1 132:3,3
**rachel** 2:3 28:18
29:7 103:20 105:2
131:1
**rachel's** 33:3,4
**radiation** 75:24
**radiographic**
45:19
**radiologist** 14:3
**rafferty** 2:21
**rapid** 100:12
**rare** 48:12,14,17
**raspanti** 4:20
**rate** 62:8,8,9
119:18,23
**rathod** 2:9
**reach** 82:20 83:8
83:14
**reached** 74:20
75:23 76:16,23
83:1,14,21 84:10
84:24 85:16
**read** 64:23 65:2
69:22 70:2 74:23
80:10 81:1,3
83:13,17 84:2,5
86:4,7,9,11 94:16
94:16 98:4,6,19,21
102:12 128:11
131:9 133:5
**reading** 92:10
**real** 114:15 120:14
124:22
**realize** 36:16
**really** 16:7,10,12
18:8 19:22 48:9

103:2
**reask** 108:2
**reason** 49:16
59:23 70:23 71:1
92:12 122:16
131:11 132:6,9,12
132:15,18,21
**reasonable** 62:23
63:7 80:1,13
**reasonably** 99:19
100:4
**reasons** 46:23 49:6
49:9,13
**recall** 19:12,13
21:18 63:19 115:8
115:21
**receipt** 131:18
**receive** 57:7 64:15
**received** 29:17
**recommend** 49:6
49:11,13,17 71:5
72:1,8,23 73:3
84:11 88:19,22
110:4,7,20 111:16
125:2,21 126:1
**recommendation**
50:2 61:7 87:2,8
90:9
**recommendations**
51:6,16 89:18,19
90:6
**recommended**
46:20 50:10
110:21 111:3
123:16 126:4,11
**recommending**
73:13 87:3,4
89:14 91:7 127:22
128:1,3
**recommends**
87:20

**record** 8:2,13 9:10
9:11,13,15,17
11:19 22:15 32:6
32:8,10,12 60:9,13
65:2 70:2 81:3
84:5 86:7,11 98:6
98:21 99:7,11
104:1 105:8 114:3
114:4,7,11 128:16
**record's** 46:12
**recorded** 11:3
**records** 18:9 19:4
19:6 20:21,24
21:8 62:9 118:7
118:10,11
**recross** 125:19
**rectal** 91:18
**recurrence** 56:1
56:16,20,22 57:6
57:18,24 58:19
**redirect** 114:12
**reduce** 98:9,24
**reduced** 97:22
129:9
**reefer** 4:21
**refer** 27:24
**referenced** 129:9
129:13 131:6
**referred** 68:11
**referring** 45:18
92:19 93:19
**refuses** 47:9
**regard** 22:6
**regarded** 51:8
**regardless** 89:16
89:17
**regards** 75:8
**regular** 71:22
**regularly** 50:22
61:11,14

**related** 18:22
24:22 49:16 71:10
109:1
**relationship** 31:14
**relative** 53:5 91:2
129:17
**relied** 67:8
**relying** 43:9 74:14
83:17
**remember** 12:21
13:14,16,19,22,24
14:1 15:10,16,17
15:19 16:4,5,10
17:7,22 18:1,4,11
19:21,23 20:5,7,12
20:18 24:5 29:8,9
34:2 42:19 44:6
50:18 115:14
118:13,24
**remote** 36:18
**render** 79:2
**repeat** 15:6 21:5
34:19 41:14 49:1
68:19 75:20 76:19
80:24,24 98:3
99:23 102:19
**rephrase** 84:7
107:17
**report** 7:5 10:16
35:6,7,9,18,20,23
36:13 40:9,16,19
43:21 55:6,10,13
58:17 60:18 62:19
62:20,22 64:22
65:15 70:7 74:13
74:15 76:13 77:23
78:11 81:22 82:23
89:7 91:6 92:2,24
93:19 94:11 95:15
95:16,19,20 97:9
106:4,15 116:17

117:8 118:12
125:6 126:6
**reporter** 1:14 6:18
8:10,14 9:18
28:14 101:17
128:17 129:4
**reporter's** 6:14
**reports** 64:6,8
65:5 66:9,12,13
67:3 76:11 100:10
102:12 117:9
**represent** 105:1,4
120:13
**representing** 8:3
10:11
**request** 29:14
30:19 34:20
**requested** 28:17
30:12 31:21 36:4
43:17 65:1 70:1
81:2 84:4 86:6,10
98:5,20 113:18
**requests** 29:19,21
29:24 30:8,9,13
31:23 33:22
**require** 27:21
70:16,20
**required** 133:13
**requires** 27:10,18
27:19
**residency** 37:3,4,4
37:7,10
**residents** 38:15,24
**resources** 35:21
35:22
**respect** 50:10 52:2
69:17 79:11 93:20
101:22 104:5
**respond** 34:13,20
**responded** 33:22

**response** 29:18
113:13 127:2
**responses** 30:3
**responsibilities**
38:12,14,18
**result** 14:14
101:11
**retain** 34:21
**retained** 13:20
21:22 22:4,18
23:3,4,7,11,17
24:1
**retainer** 116:3
**return** 131:13,17
**reveals** 125:3
**review** 14:5,7
18:20 19:3,5,5,6
21:8 22:15,19
29:15 33:11 34:22
34:23 35:4,14,18
42:13,16 43:4
44:11 51:14,15
65:5,13 66:19
79:6 103:23
116:17,18 117:8,9
118:7,10 131:7
**reviewed** 19:16
20:20 21:1 35:8
35:20 51:23 67:2
**reviewers** 42:7,20
**reviewing** 18:17
32:21 35:13 62:9
106:13
**reviews** 50:20
**rgeman** 2:6 131:2
**right** 15:2 16:16
28:23 29:11 31:7
33:2 36:2 48:8
51:8 52:23 76:18
87:7 96:6 99:5,14
99:16 107:9,12

108:6 112:3,19,21
114:23 117:15
123:24 124:9
**risk** 33:16 42:1,10
42:12,21 43:1
44:23 45:16 49:7
49:8,15 53:10
55:24 56:19 57:5
57:24 58:8,11,18
59:13,14,24 60:4
61:22 62:1 65:9
67:6 68:7 73:14
73:21 74:11 75:12
76:1 79:2 80:10
80:15 82:16 90:17
90:21,22 91:2
97:13,15,17
100:13,24,24
101:1 109:16,20
112:15,15 120:20
126:10 128:7
**risks** 35:1 49:18
49:22 59:20,20
65:24 70:11 73:6
73:8,11,17 74:3,22
80:2 94:7 95:13
95:23 96:5
**rite** 5:7
**road** 3:3,15 24:9
**role** 37:24 38:3,6
39:11,12 79:15
**roles** 38:17
**room** 9:5 96:4
**rose** 3:20
**ross** 3:21
**rotate** 38:15,20
**rotation** 38:22,23
**routine** 45:13 87:5
**routinely** 85:17,17
**rush** 37:22 38:6,7
38:10,12,14 39:10

39:11,12
**rushed** 117:18,18

**s**

**s** 2:1 3:8 132:3
**sarcoma** 18:24
**saw** 29:1 101:18
**saying** 21:10 50:7
84:23 112:13
**says** 82:11 88:18
95:15 113:21
**scan** 61:7 90:9,10
91:23
**scans** 45:20 57:22
57:24 98:24
**scheme** 58:12
**school** 36:23
**sciegen** 4:6
**scott** 5:15 8:2,18
**screen** 8:20 61:11
85:7,8 92:4 93:7
125:5 127:3
**screened** 61:14
67:13,20,22 68:23
69:8 122:7
**screening** 50:23
51:4 55:23 56:4
56:19,24 57:4
58:9,17 59:4,6,7,9
59:12,19,21 60:2
60:19,21 61:2,8,16
61:18 62:1 65:9
65:11,19,22 67:15
68:14,22 69:11,14
69:20 70:12,17,21
71:4,15,19 73:6
74:1 83:3 87:3
92:1,12,14,14 93:1
97:13 98:1 109:23
110:5,8 121:16,19
122:2,9,11,12,15
122:17,22 123:8

123:16 126:4,11
**screenings** 125:21
**screens** 105:7
**scripts** 4:1
**scroll** 62:6
**second** 32:2 45:21
46:15 114:5
**section** 58:17 64:7
86:14 91:17 94:2
**see** 19:7 27:11
29:4,10 39:15
41:10 66:5 76:17
76:24 79:21 85:2
86:14 91:6,15
92:1 94:8 97:10
105:14 107:14,17
108:17,24,24
109:7 120:10
123:4,24
**seeing** 59:18,23
61:13 108:22
111:4
**seen** 28:22 48:20
72:19 76:11,12
87:4 101:15
**self** 25:22
**send** 111:20
115:22
**sense** 64:22 65:5,7
**sent** 33:24 116:3
131:14
**sentence** 80:13
82:6
**september** 34:6
**set** 30:8 32:14 58:6
63:5 127:21 130:1
**seven** 22:22,23
23:2
**severe** 47:6 73:23
**sheet** 131:11

**shorter** 117:19
**shorthand** 129:3
**show** 82:24
**shown** 33:12 84:24
86:21 88:14
112:14
**shows** 87:13
**sick** 52:10
**sickle** 26:3
**sign** 128:11 131:12
**signature** 130:6
**signed** 131:20
**significance** 26:1
109:14
**significant** 74:22
79:2 94:7 95:13
**significantly** 94:5
94:20
**signs** 93:15
**similar** 86:18
100:24
**single** 67:22 89:14
**sir** 45:21 95:2
99:15
**sit** 24:5 48:8
**situation** 42:14,17
45:6 52:8 58:3
73:1 123:21
124:20
**situations** 72:11
**six** 10:22 58:5
114:11 128:14
**skokie** 17:24 24:9
39:11
**slater** 43:22,23,24
44:4
**slow** 116:7
**small** 27:5
**smear** 81:6 93:24
**smoke** 109:22
111:7

**smoker** 70:8 90:18
90:21
**smokers** 61:1,3,5
**society** 87:21
**soft** 18:24
**solco** 4:13
**sold** 39:13 66:3
**solid** 27:1
**solutions** 8:3,11
20:4 131:23
**solvents** 19:15
**somebody** 33:23
44:3 47:7 54:8,10
56:21 57:22 59:9
62:2 70:8 78:24
82:24 95:8 97:18
126:8
**someone's** 33:16
59:8 75:23
**soon** 111:13
**sorry** 8:24 15:23
16:20,22 20:6
28:7 31:17 39:10
41:7,12 47:13
50:8 65:14 76:20
78:23 86:5 90:16
91:12 95:12
108:12 112:18
122:5
**sort** 99:19 120:11
**sound** 33:5 114:23
**sounds** 83:13,20
**source** 99:18
100:3,16 101:10
**south** 2:21 4:15
**speak** 41:9 120:5
**speaking** 11:22
86:4 105:2
**speaks** 94:11
**specialized** 86:14
92:20 110:11,15

110:21
**specific** 19:8,18
35:3 51:12 52:7
53:1 57:9 58:12
58:14,21 72:11
85:23 98:12 101:2
101:20,21 103:14
**specifically** 19:10
57:11,17 65:21
93:2 98:14 99:2
101:3 103:7
118:13 124:9
**specifics** 20:5
21:18
**specified** 129:16
**speculation** 96:7
**spent** 106:8
116:14,15 117:4
117:11 118:6,14
119:2,12
**spoke** 40:11 115:6
115:7
**spoken** 40:16
61:18
**sponsoring** 87:24
**spung** 4:2
**ss** 129:1
**staff** 24:17
**stages** 87:14 92:22
93:10
**stand** 126:15
**standard** 1:10
**stands** 50:18
**start** 36:22 111:11
111:12
**started** 8:18 28:12
**starting** 111:16
**state** 1:15 4:9
62:21,22 96:4
104:14,24 129:1,4

**stated** 62:22 82:23
  95:5 96:3
**statement** 79:5
  102:9
**states** 1:1 13:11
**stating** 96:5
**statistic** 48:2,2,3,6
**statistically** 74:22
**status** 52:9 53:21
  54:5,6 55:1 72:4,6
**steatosis** 93:16
**stenographer** 11:4
  11:11
**stenographic** 1:12
**stenotype** 129:9
**sterilization** 19:16
**stick** 96:4
**stomach** 17:7 27:5
**stone** 58:6 63:5
**stopped** 49:1
**stoy** 4:20 128:19
  128:19
**straightforward**
  54:7
**street** 2:4,9,21 4:9
  4:15,21 5:3
**stricken** 95:19
**strike** 25:3 49:3
  57:2 70:24 72:10
  77:14 79:19 83:7
  88:4 89:13 98:15
**students** 38:15
**studies** 45:19
  54:24 57:9 74:23
  92:19 112:10,10
  112:14,23
**study** 24:21
**subject** 30:3
**subscribed** 133:14
**substances** 20:3
  43:3 78:20

**suffer** 72:22
**suffered** 22:7
**suffering** 72:13
**sufficient** 74:11
**suggest** 112:15,17
  112:19
**suggested** 51:17
  87:22
**suggesting** 54:24
  89:13 102:7
**suggests** 68:6
**suite** 1:16 2:10,16
  2:22 3:4,16,21 4:4
  5:3,9
**supervise** 39:2
**support** 47:19
  72:16 86:23
  100:23 104:11
**supports** 87:9 88:8
**sure** 11:14 13:15
  15:8 21:7 41:15
  46:12,14 52:19
  54:22 57:1 58:24
  59:19 61:12 68:21
  70:16 71:13 76:20
  94:13 98:18 100:2
  102:20 103:24
  104:3 107:19,19
  113:11
**surgery** 57:23
**surrounding**
  17:11
**susceptible** 46:5
**swear** 8:14 9:18
**swedesford** 3:3
**sworn** 8:16 10:1,4
  10:24 129:6
  133:14
**symptom** 58:15
**symptomatic**
  58:20 59:5,8

**symptoms** 58:4,11
  59:12 71:21
**syndrome** 25:21
  45:1,9,22 46:4,5
  46:18,20 47:4
  49:14,22 50:10
  52:21,24,24 60:22
  109:9

**t**

**t** 132:3,3
**table** 54:2
**tainted** 35:1 42:8
  43:2,11 79:3
**take** 16:21 26:22
  26:24 32:1 52:14
  55:6 60:6 63:1
  99:4 104:2 106:3
  109:20 122:1
  124:21 127:19
  128:2
**taken** 1:13 10:18
  12:3 16:9,14 17:3
  18:14 21:17 26:4
  48:18 60:11 89:20
  99:9 114:9 122:21
  129:15
**talk** 11:24 56:9
  60:18 74:8 76:15
  76:21 80:12 81:17
  86:13,16 92:24
  93:2 97:9 114:15
**talked** 56:1 91:22
  103:20 107:6
**talking** 53:17
  56:15 60:17 81:20
  120:18 124:7
**teach** 39:4,6,7
**teaching** 38:6,17
**team** 32:22
**teleconference**
  118:7

**teleconferences**
  116:16 117:7
**tell** 10:24 11:15
  12:4 16:12,17
  24:20 33:9 36:7
  36:10 42:5 43:19
  56:18 57:4,4 63:9
  63:16 77:14,16,18
  82:5 91:10 95:8
  103:24 114:15
**telling** 126:10
**tells** 123:18
**ten** 12:22 16:11
  20:19 21:9 39:8
  106:21
**tend** 21:11
**tennessee** 4:4
**term** 14:19 25:23
  75:4,13,14 76:9,11
  78:10 81:22
**terminology** 44:13
**terminus** 3:15
**terms** 53:16 56:23
  56:23 58:9 59:5
**tertiary** 27:10
**test** 53:13 57:17
  71:10,11,23 85:19
  87:22 89:21
  111:13,14 127:16
**testified** 10:5
  14:11 16:13 49:5
  60:20 115:10
**testify** 12:17 14:8
  22:19 104:8 129:6
**testifying** 28:8
**testimony** 11:6
  15:13 16:19,24
  20:23 21:3,7
  34:15,24 35:3,8,13
  35:19 42:19 62:10
  67:18 82:1 84:1

[testimony - two]                                                                 Page 23

84:20 89:7 92:6
103:18 110:24
115:11 129:8,12
131:9,18 133:8
**testing** 53:11
58:15 70:21 85:17
86:14,23 87:2,10
87:20 88:2,8
91:12 92:17,20
97:10 110:21
111:9
**tests** 57:10 64:15
80:2,15,18 83:3
85:21 87:6 92:14
93:6,17,19,23
98:12 110:9,10,20
112:1,2 121:21
122:4
**teva** 3:6,12 10:11
**texas** 3:22
**thank** 11:13 15:5
46:19 51:3 105:2
113:10 125:13
126:23 127:10
128:9
**thanks** 105:12
**therapies** 55:4
**thing** 28:19 57:20
66:16 92:17
113:24
**things** 19:19 21:12
25:24 45:22 50:5
50:9 54:18 64:20
69:13 70:5,6
73:13 75:8 76:2
77:8 79:1 80:12
81:14 92:9 93:5
93:14 103:19
110:8 112:3
121:23

**think** 13:7 14:16
14:16 15:14,15
22:24 28:6 34:18
36:2 41:11 43:11
44:8,10,13 45:23
49:5,16 50:5,9
52:20 54:23 60:20
61:1,9 62:5 63:4
69:6,11,12 70:7
71:1 72:10 78:17
81:14 82:14,24
84:15 89:23 92:2
95:22 97:19 106:8
106:10,17 108:4
115:6 118:23
119:18 120:24
125:17 127:24
**thinking** 12:23
**third** 117:3 118:2
**thomas** 2:20
**thornburg** 5:8
**thought** 113:6
**three** 10:22 16:14
23:1 29:2 32:12
54:12 55:1 58:4
60:9 106:5 113:22
113:23
**threshold** 75:15
75:21 76:8 83:9
85:20,24
**thrombocytopenia**
25:20
**throw** 21:12
**thumb** 7:6 103:21
**tilt** 101:18
**time** 1:10 8:5 9:12
9:16 14:17 16:8
17:8,21 22:10
23:24 27:9 28:1
29:1 32:7,11 34:3
35:15 38:4 39:12

60:8,12 63:1
75:13 76:12 81:22
89:3 99:6,10
103:18 104:2
106:7 110:16
113:10 114:6,10
116:14,16 117:4
117:17,20 118:6
119:9 128:13
129:15 131:19
**timeframe** 131:8
**times** 10:21,22,22
16:10,14 22:3,10
22:16,18,22,23,24
23:2,4,7,17 111:14
**tissue** 18:24
**tobacco** 60:3 70:9
75:9 110:1,6,19
**today** 28:5,9,15
29:11,15 31:18
62:13
**today's** 8:4
**told** 16:15 31:4
43:24 44:3,6 56:6
104:4 115:22
119:18 123:5
**top** 63:20 81:14
**total** 22:23 23:2
118:20
**totally** 54:8
**touch** 8:19
**toxic** 20:3 78:20
78:20
**toxicity** 75:10
**toxins** 18:19 76:1
**tract** 93:9
**transcribed**
129:10
**transcript** 1:12
6:1 11:5 128:18
131:6,20 133:5,8

**transcription**
129:12
**transplantation**
27:21
**traurig** 3:9,14
10:13
**treat** 55:23 107:20
108:12,12,14
110:18 120:19
121:11 124:15,17
**treated** 27:11
50:23 56:10 57:23
96:20 121:12
**treating** 17:13,20
50:1 51:15 56:21
89:24 123:22,23
**treatment** 18:9
27:12 52:4,13
53:16 54:15 58:3
**treatments** 27:20
51:18,20 53:24,24
55:2
**tree** 27:7
**trials** 51:22
**true** 58:7 63:4
69:14 129:11
133:8
**truism** 102:7
**truth** 10:24 129:6
129:7,7
**truthfully** 28:9
**try** 11:24,24
**trying** 42:19 105:6
**tumor** 57:12,13
**tumors** 27:1
**turn** 127:20
**twelve** 106:21
**twenty** 12:6
**twice** 45:11,12
**two** 9:17 32:8 47:3
54:3,12,12 92:9

99:5

**type** 20:2 25:2 47:3 59:16

**types** 60:1 64:20 77:6,7 108:16 110:20

**typographically** 55:14

**typos** 55:15

**u**

**ulmer** 5:2

**ulmer.com** 5:5

**ultimate** 18:22 19:8

**ultimately** 13:5 22:8 42:10 45:16 89:23

**ultrasounds** 45:20

**um** 23:23

**uncertain** 25:24 109:14

**unclear** 108:4

**uncommon** 47:12 47:14

**undergo** 53:11

**understand** 11:6 21:7 58:24 61:12 67:17 69:3,3 89:11 103:3,13 105:20 121:3 125:24

**understanding** 42:24 65:12 76:5 76:6 78:17

**understood** 11:18

**unique** 27:17 56:10 72:24 93:5 122:4

**united** 1:1 13:11

**universe** 96:22

**university** 37:1,5 37:9,22 38:6,8 39:10,13

**unknown** 61:23,24

**unnecessary** 126:14

**upper** 81:5 88:23 89:4,15

**urinary** 71:21 93:9

**urine** 110:9

**usa** 3:7,13

**usage** 125:4

**use** 51:17,19 54:6 54:23 55:3 63:16 64:1 74:10 75:13 95:8

**usefulness** 111:15 127:16

**users** 74:13

**uspstf** 109:23

**usually** 44:24 51:15,16 52:13 54:6 93:15 97:5 112:8 126:9

**uterine** 45:18

**utilizing** 87:22

**v**

**v** 132:1 133:1

**vague** 53:7 78:7 84:6,12 85:10 87:11 96:1 100:21 107:22 124:2

**valsartan** 1:3 8:7 35:2 39:20,20 40:5,7,13,17 42:8 42:21,22,24 43:1,7 43:11 63:22 66:2 74:20 76:16,22 77:17 78:4,15 79:3,9 80:4 81:18

82:14,21 83:4,9,15 83:22 84:11 101:22 102:18,22 122:21 123:15,20 124:4 128:3,7 131:4 132:1 133:1

**vanderbilt** 3:9

**variants** 109:13,14

**various** 19:6 35:21 45:6

**vary** 65:19 121:17 122:15,16

**vast** 78:18

**vaughn** 2:14

**vcb** 125:4

**vegetables** 77:12

**verbally** 11:11

**verify** 131:9

**veritext** 8:3,11 131:14,23

**veritext.com** 131:15

**versus** 49:22 56:20 57:5

**vicinage** 1:2

**video** 8:19 9:9 11:7

**videoed** 11:8

**videographer** 5:14 5:15 8:1,3,21 9:10 9:12 11:3 32:7 60:8 99:6 105:9 114:6 128:13

**videotaped** 1:7 28:15

**view** 56:19

**vine** 5:3

**vitae** 7:4 34:1 36:9

**w**

**wacker** 1:15 8:6

**walking** 96:4

**walks** 56:12

**want** 9:10 11:19 11:23 14:21 25:15 31:11 32:5 36:15 36:17 41:8 42:18 46:7,10,12 55:9 60:18 80:12 89:4 103:14,21 104:2,3 108:20 113:16

**wanted** 18:20 33:9 41:19 114:14 122:8

**wants** 105:6 128:24

**warn** 11:23

**warned** 15:1

**washington** 2:10 13:12

**way** 11:1 28:2 30:6 43:2 50:3 78:13 79:11 85:8 85:12,13,15 93:7 102:20 105:17 114:2 117:21 119:21 122:7,10 122:23

**wayne** 3:4

**ways** 45:6 54:1

**we've** 36:6,7 51:23 55:8 56:1 60:7 61:17 64:5 74:5 101:1 103:20 104:10 110:8 125:11

**wednesday** 1:9,16

**weeks** 29:2 106:6

**weigh** 49:22

**went**  14:16 22:24
   37:1,8 38:5
   119:23
**west**  1:15 8:6
   13:10
**whereof**  130:1
**wife**  22:7
**wish**  38:24
**withdrawn**  15:11
**withdrew**  100:11
**witness**  8:8,15,16
   8:23 9:19 10:1,4
   12:12,13,14,15
   14:23 15:6 17:2
   17:19 20:17 21:4
   21:22 22:4,18
   23:3 24:1 31:2,6,8
   32:1,4 33:24
   41:14,21 46:8,11
   53:8 56:8 58:23
   63:3 68:1,18 69:2
   69:10,19 70:19
   71:8 73:10 81:4
   84:14,21 85:11
   87:1,12 90:12
   92:8 94:23 95:18
   96:2,16 98:7,19,22
   99:22 100:8,22
   103:6 104:16,19
   105:15,18 106:20
   107:23 110:14
   111:1 113:5,11,24
   115:12,20 120:4
   120:11 123:2
   124:3,19 125:9,23
   126:18 129:5,9,10
   129:13 130:1
   131:8,10,12,19
**wittlake**  3:14
**wittlakek**  3:17

**woman**  12:23 17:6
**word**  9:1 95:8
**words**  63:11
**work**  19:20 117:19
**workforce**  19:20
**workplace**  18:19
   20:4
**works**  11:1,8
**world**  50:21
**worldwide**  48:2
**worse**  54:13 55:1
**worth**  84:16
**write**  127:4
**writing**  106:15
   117:9
**written**  8:12 40:11
   40:16

## y

**yeah**  9:11 22:21
   29:16 32:3,6 33:6
   46:16 49:3 55:18
   84:8 91:11 103:4
   105:16 112:3
   113:22 114:4
   116:5 120:2,7
   127:8 128:12
**year**  45:11,12 58:5
   72:16 73:3 90:10
**years**  12:6,22 13:6
   13:8 16:11 17:5
   20:20 21:9,13
   22:6 38:5,19 39:8
   71:6,24 72:3 75:5
   76:10 88:23,23
   89:5,16 97:13
**york**  2:5,5 3:10,10
**young**  17:6

## z

**zero**  54:7,8

**zhejiang**  4:12
**ziarko**  5:15 8:2
**zoom**  2:8,14,20
   3:2,14,19,20 4:2,8
   4:14,20 5:2,8 8:7
   36:16,18 43:18
   55:9 104:20
   105:21 113:20
   127:5

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Page 131

1    RACHEL J. GEMAN

2    rgeman@lchb.com

3                January 26, 2022

4    RE:    In Re: Valsartan, Losartan, Et Al

5       1/19/2022, Edward  H Kaplan , MD (#5025121)

6       The above-referenced transcript is available for

7    review.

8       Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12      The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19    If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22            Yours,

23           Veritext Legal Solutions

24

Page 132

1    In Re: Valsartan, Losartan, Et Al v.

2    Edward  H Kaplan , MD (#5025121)

3                E R R A T A   S H E E T

4    PAGE__25___  LINE__21___  CHANGE_"mild dysplastic syndrome" should read

5     "myelodysplastic syndromes"._____

6    REASON_stenographer misheard medical term._____

7    PAGE_25____  LINE_21____  CHANGE_"mild proliferative neoplasms" should_

8     read "myeloproliferative neoplasms"._____

9    REASON_ stenographer misheard medical term._____

10   PAGE_25____  LINE_22____  CHANGE_"plasma self" should read "plasma cell

11    dysplasia"._____

12   REASON_stenographer misheard medical term._____

13   PAGE_57____  LINE_13____  CHANGE_"CA 929" should read "CA19-9".____

14   _____

15   REASON_stenographer understood "to" to mean the number 2.____

16   PAGE_____  LINE_____  CHANGE_____

17   _____

18   REASON_____

19   PAGE_____  LINE_____  CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Edward  H Kaplan , MD                          Date

Page 133

1    In Re: Valsartan, Losartan, Et Al v.

2    Edward  H Kaplan , MD (#5025121)

3              ACKNOWLEDGEMENT OF DEPONENT

4       I,  Edward  H Kaplan , MD, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____          2/22/2022
                                       _____

12    Edward  H Kaplan , MD                      Date

13    *If notary is required

14                         SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                         _____ DAY OF _____, 20___.

16

17

18                         _____

19                         NOTARY PUBLIC

20

21

22

23

24