# EXHIBIT B

Page 1

1                UNITED STATES DISTRICT COURT

2                    DISTRICT OF NEW JERSEY

3                        MDL NO. 2875

4

5    IN RE:  VALSARTAN, LOSARTAN, AND

6    IRBESARTAN PRODUCTS LIABILITY

7    LITIGATION

8

9

10   THIS DOCUMENT RELATES TO:

11   ALL ACTIONS

12   ----------------------------------------

13

14           DEPOSITION OF ZIRUI SONG, MD, Ph.D.

15              TUESDAY, FEBRUARY 8, 2022

16

17           Deposition of ZIRUI SONG, MD, Ph.D. in

18   the above-mentioned matter before Jomanna DeRosa, a

19   Certified Court Reporter (License No. 30XI00188500),

20   and Notary Public of the State of New Jersey, taken

21   via Zoom at Harvard Medical School, 180 Longwood

22   Avenue, Boston, Massachusetts 02115 on Tuesday,

23   February 8, 2022 commencing at 9:14 a.m.

24

25

Page 2

1  A P P E A R A N C E S (via Zoom)
2
3  PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP
4  BY:  CLEM C. TRISCHLER, ESQ.
5  BY:  FRANK H. STOY, ESQ.
6  BY:  JASON M. REEFER, ESQ.
7  One Oxford Centre, 38th Floor
8  301 Grant Street
9  Pittsburgh, Pennsylvania 15219
10  (412)263-1816 (CCT)
11  (412)263-4397 (FHS)
12  (412)263-1840 (JMR)
13  CCT@Pietragallo.com
14  FHS@Pietragallo.com
15  JMR@Pietragallo.com
16
17
18  DUANE MORRIS LLP
19  BY:  ALYSON WALKER LOTMAN, ESQ.
20  30 South 17th Street
21  Philadelphia, PA 19103-4196
22  (215)979-1000
23  alotman@duanemorris.com
24
25

Page 3

1  A P P E A R A N C E S (cont'd)
2  MIGLIACCIO & RATHOD LLP
3  BY:  NICHOLAS MIGLIACCIO, ESQ.
4  BY:  MARK PATRONELLA, ESQ.
5  412 H Street NE, Suite 302
6  Washington, DC 20002
7  (202)470-3520
8  nmigliaccio@classlawdc.com
9  mpatronella@classlawdc.com
10
11  LEWIS BRISBOIS BISGAARD & SMITH LLP
12  BY:  ASHER A. BLOCK, ESQ.
13  550 E. Swedesford Road, Suite 270
14  Wayne, PA 19087
15  (215)977-4066
16  Asher.Block@lewisbrisbois.com
17
18  WALSH PIZZI O'REILLY FALANGA
19  BY:  CHRISTINE GANNON, ESQ.
20  BY:  LIZA WALSH, ESQ.
21  One Riverfront Plaza
22  1037 Raymond Boulevard, Suite 600
23  Newark, NJ 07102
24  (973)842-1576 (CG)
25  (973)757-1101 (LW)

Page 4

1  A P P E A R A N C E S (cont'd)
2  GREENBERG TRAURIG LLP
3  BY:  GREGORY E. OSTFELD, ESQ.
4  77 West Wacker Drive, Suite 3100
5  Chicago, IL 60601
6  (312)476-5056
7  ostfeldg@gtlaw.com
8
9  ULMER & BERNE LLP
10  BY:  JEFFREY GEOPPINGER, ESQ.
11  312 Walnut Street, Suite 1400
12  Cincinnati, OH 45202-4029
13  (513)698-5038
14  jgeoppinger@ulmer.com
15
16
17  LIEFF CABRASER HEIMANN & BERNSTEIN
18  BY:  RACHEL GEMAN, ESQ.
19  250 Hudson Street, 8th Floor
20  New York, NY 10013
21  (212)355-9500
22  rgeman@lchb.com
23
24
25

Page 5

1  A P P E A R A N C E S (cont'd)
2
3  BARNES & THORNBURG LLP
4  BY:  BETH BEHRENS, ESQ.
5  11 South Meridian Street
6  Indianapolis, IN 46204-3535
7  (317)231-6495
8  Beth.Behrens@btlaw.com
9
10
11  CROWELL & MORING
12  BY:  MIMI DENNIS, ESQ.
13  1001 Pennsylvania Avenue NW
14  Washington, DC 20004
15  (202)624-2984 (LB)
16  (202)624-2538 (MD)
17  lbresnahan@crowell.com
18  mdennis@crowell.com
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Page 6

1  A P P E A R A N C E S (cont'd)
2  KANNER & WHITELEY
3  BY:  LAYNE HILTON, ESQ.
4  701 Camp Street
5  New Orleans, LA 70130
6  (504)524-5777
7  L.Hilton@kanner-law.com
8
9
10  MORGAN LEWIS & BOCKIUS
11  BY:  STEVEN HUNCHUCK, ESQ.
12  One Oxford Centre, 32nd Floor
13  Pittsburgh, PA 15219-6401
14  (412)560-7466
15  steven.hunchuck@morganlewis.com
16
17
18  NORTON ROSE FULBRIGHT
19  BY:  ELLIE NORRIS, ESQ.
20  2200 Ross Avenue, Suite 3600
21  Dallas, TX 75201-7932
22  (214)855-8074
23  ellie.norris@nortonrosefulbright.com
24
25  ALSO PRESENT:  JUSTIN BILY, VIDEOGRAPHER

Page 7

1           I N D E X
2  WITNESS       EXAMINATION BY        PAGE
3  Dr. Song    Mr. Trischler         8
4              Mr. Ostfeld         252
5              Ms. Lotman          287
6
7           E X H I B I T S
8
9  NUMBER       DESCRIPTION        PAGE
10  ZS Exhibit 1  Notice of Deposition     17
11  ZS Exhibit 2  Retention Agreement    19
12  ZS Exhibit 3  Invoice            26
13  ZS Exhibit 4  Dr. Song's Report      28
14  ZS Exhibit 5  European Medicines Agency
15              "Lessons Learnt..."    145
16
17  (All exhibits are attached hereto.)
18
19
20
21
22
23
24
25

Page 8

1           THE VIDEOGRAPHER:  We are going on the
2  record at 9:14 on February 8th, 2022.  This is media
3  unit No. 1 of the video recorded deposition of
4  Dr. Zirui Song regarding the Valsartan litigation.
5  My name is Justin Bily from the firm Veritext and I'm
6  the videographer.  The court reporter is Jomanna
7  DeRosa from the firm Veritext.  All counsel will be
8  noted on the stenographic record.  Would the court
9  reporter please swear in the witness and then we can
10  begin.
11
12           ZIRUI SONG, MD, Ph.D., having offices at
13  Harvard Medical School, 180 Longwood Avenue, Boston,
14  Massachusetts 02115, having first been duly sworn by
15  the Notary, then testified as follows:
16
17  DIRECT EXAMINATION
18  BY MR. TRISCHLER:
19      Q.    Good morning, Dr. Song.  Can you hear
20  me?
21      A.    Yes, sir, good morning.
22      Q.    You already provided this information to
23  the court reporter off the record, but I'd like to
24  get it on our transcript, if we can.  Could you start
25  by just giving me your full name?

Page 9

1      A.    Yes.  My first name is Zirui, Z-I-R-U-I,
2  and my last name is Song, S-O-N-G.
3      Q.    And your professional address, please.
4  I only need one of them.
5      A.    My address at Harvard Medical School is
6  180 Longwood Avenue, Boston, Massachusetts 02115.
7      Q.    I know that you've been deposed on a few
8  prior occasions.  Is that correct?
9      A.    Yes.
10      Q.    How many depositions have you given
11  before today?
12      A.    Two.
13      Q.    One of those depositions was in a case
14  called Anderson versus Lab Corp.  Is that correct?
15      A.    Yes.
16      Q.    What was the other deposition?
17      A.    I don't remember the full name, but the
18  defendant was Quest Laboratories.
19      Q.    In the Anderson versus Lab Corp. matter,
20  were you retained as an expert witness for one of the
21  parties to that litigation?
22      A.    Yes, I served as an expert witness for
23  the plaintiffs.
24      Q.    And what was the nature and scope of
25  your opinion testimony that you sought to offer in

3 (Pages 6 - 9)

1 the Anderson matter?

2     A.    Well, I believe you have my report, or

3 rather my transcript in full for that matter, so you

4 could probably answer that question by looking at it.

5 If I were to quickly summarize for you, it was

6 regarding surprise billing.

7     Q.    Were you -- did you offer the opinion

8 that the billing practices of Lab Corp. were

9 inappropriate in some manner or form?

10     A.    To be precise, my expert opinion in that

11 case pertained to the reasonableness of pricing;

12 specifically, in regards to surprise billing.

13     Q.    And in the Quest matter, were you also

14 serving as an expert witness in that piece of

15 litigation?

16     A.    Yes, similarly for the plaintiffs as

17 well.

18     Q.    And what was the nature of your opinion

19 testimony in the Quest matter?

20     A.    Substantively analogous to my response

21 to you regarding in the first matter.

22     Q.    So in both prior depositions that you

23 gave, your testimony focused on the reasonableness of

24 lab charges provided by two labs; one being Quest and

25 one being Lab Corp.. Correct?

1     A.    As a general summary, I would agree with

2 that.

3     Q.    Have you ever been designated as an

4 expert witness to offer opinion testimony in any

5 other civil proceeding, aside from the Valsartan

6 litigation that brings us here today and the two

7 cases that you just told me about?

8     A.    I have not offered a deposition in any

9 other court case; although, I have been retained as

10 an expert witness in other cases.

11     Q.    In other cases where you've been

12 retained, have you written a report similar to what

13 you have done in this case where your opinions were

14 disclosed and produced to the other side in that

15 litigation?

16     A.    Yes.

17     Q.    On how many occasions have you written

18 an expert report as a disclosed expert for litigation

19 purposes?

20     A.    In addition to the two cases that we

21 just discussed?

22     Q.    Yes, sir.

23     A.    There are two additional cases for which

24 I have produced an expert report.

25     Q.    Can you tell me about those two cases,

1 please?

2     A.    As part of your request, I submitted to

3 counsel the full names of those cases, so I believe

4 you have that in your possession.  Substantively,

5 those cases also pertain to surprise billing.

6     Q.    I may have the cases in my possession,

7 but I can assure you I don't know the names as I sit

8 here and ask you the questions.  So, do you know the

9 names of those other two cases?

10     A.    Again, I don't recall the full name off

11 the top of my head, but the defendants in one of the

12 two cases is an emergency medicine set of providers

13 and that case pertained to surprise billing in

14 emergency department care.  And the other of the two

15 cases pertained to surprise billing in anesthesia

16 care for which the defendants were a group of

17 anesthesia care providers.

18     Q.    And did the same law firm retain you in

19 all four of these cases?

20     A.    Yes.

21     Q.    What was that law firm?

22     A.    Wolf Popper (Sic Wolf Popper LLP).

23     Q.    Was there a particular attorney or

24 attorneys at Wolf Popper that you worked with on

25 those cases?

1     A.    There was a group of attorneys with whom

2 I interacted during those cases.

3     Q.    Can you tell me the names of the

4 attorneys in that group, please?

5     A.    Well, off the top of my head, the

6 attorney with whom I interacted the most was probably

7 David Nicholas.  Another of his colleagues with whom

8 I interacted quite often was Matthew Insley-Pruitt,

9 another colleague was Timothy Brennan, another

10 colleague was Chet Waldman.  The only other colleague

11 I can remember off the top of my head is Patricia

12 Avery and I may be forgetting a person or two.

13     Q.    What's the status of those four surprise

14 billing cases, as you called them?

15         MR. MIGLIACCIO:  I'm going to object to

16 the extent that it's vague and may call for a legal

17 conclusion.  And I think you can answer to your

18 knowledge, Dr. Song.

19

20         (Whereupon, the requested portion of the

21 record was read by the reporter.)

22

23         THE WITNESS:  I am not an attorney in

24 those cases, so I do not know that my most up to date

25 knowledge from my own perspective as an expert

Page 14

1 witness is the current status of any of those cases.
2 But, to my knowledge, I believe, as far as I
3 understand from the last time I received updates from
4 counsel --
5        MR. MIGLIACCIO: I do want to caution
6 you, Dr. Song, to not disclose any communications
7 that might not be public with respect to those cases.
8 Those communications might be privileged under Rule
9 26 with the lawyers that you're working with in those
10 cases, so I want to caution you in that regard.
11        THE WITNESS: Understood, thank you.
12 And I was going to finish that statement by just
13 saying that they are ongoing at this time.
14
15 BY MR. TRISCHLER:
16    Q.    As the -- has your opinion been
17 challenged in any of those proceedings, if you know?
18    A.    What do you mean by "challenged"?
19    Q.    Are you aware of whether or not the
20 defendants in any of those proceedings have
21 challenged the admissibility of your testimony,
22 methodology that you used, or the reliability of your
23 testimony? If you don't know, you don't know. But
24 if you know, I'd like to know what the answer is.
25    A.    Well, I'm not a lawyer, so I just wanted

Page 15

1 to understand the definition of "challenged" because
2 I have certainly received and read expert reports
3 from the defense in some of those cases, not all of
4 them. And if that's what you mean by "challenged",
5 there are expert reports from the defense in those
6 cases, but I have not, to my knowledge, been
7 challenged in a different definition of challenged.
8    Q.    Have you been made aware of any motion
9 filed by the defendants seeking to strike or preclude
10 your testimony for any reason?
11    A.    No, I have not.
12    Q.    Are any of the lawyers at Wolf Popper
13 involved in the Valsartan litigation, to your
14 knowledge?
15    A.    To my knowledge, no.
16    Q.    How did you become involved in the
17 Valsartan litigation?
18    A.    I was approached by Greylock McKinnon
19 Associates with a question about my interest in
20 serving as an expert witness in this litigation.
21    Q.    Who approached you at Greylock McKinnon?
22    A.    Renee Rushnawitz.
23    Q.    Tell me who Ms. Rushnawitz is?
24    A.    If I recall correctly, she is the
25 managing director of GMA.

Page 16

1    Q.    And by GMA, for our record, you're
2 referring to Greylock McKinnon and Associates (Sic
3 Greylock McKinnon Associates)?
4    A.    Yes.
5    Q.    What information did Ms. Rushnawitz
6 provide you regarding the Valsartan litigation and
7 what role they were looking to fill?
8    A.    Given that the initial request or
9 question came in probably in September of 2021, I
10 don't recall her exact wording at that time, but it
11 was about my interest in serving as an expert witness
12 on the issue of the pricing of medical services.
13    Q.    And since you're here today and I'm
14 talking to you through a computer, my guess is you
15 indicated to her that you would have some interest in
16 looking at the matter?
17    A.    I would agree with your
18 characterization.
19    Q.    Did Ms. Rushnawitz then put you in
20 contact with some lawyers?
21    A.    I believe the next step was that I had a
22 conversation with counsel, whom you see here today,
23 Nick and Mark in particular.
24    Q.    And can you be more specific with last
25 names, please, because there's a great deal of

Page 17

1 lawyers involved for all the parties in this case, so
2 I want to make sure we have it for the record. What
3 lawyers did you have a conversation with?
4    A.    Recalling back to September of last
5 year, I believe the next step after Renee's initial
6 question was a discussion with Mr. Migliaccio and
7 Mr. Patronella.
8    Q.    I marked as Exhibit No. 1 a copy of the
9 Notice of Deposition that brings us here today. Our
10 tech can put it up on the screen and it's available
11 to you in the chat.
12
13        (Whereupon, Exhibit ZS-1 was marked for
14 identification.)
15
16 BY MR. TISCHLER:
17    Q.    Have you seen the Notice of Deposition
18 before, sir?
19    A.    Yes, I have. I'm not able to scroll to
20 the next pages, so I'm only seeing the first page of
21 a document.
22    Q.    Well, I think if you go into the chat,
23 you should able to see the whole document as we
24 discussed. My only question I have right now is have
25 you seen this notice before?

5 (Pages 14 - 17)

Page 18

1    A.    I just loaded it from the link that you
2  provided and, yes, I have seen it before.
3        Q.    Since you've seen it before, you know
4  that I asked you to provide certain materials in
5  connection with this deposition, including documents
6  relating to your retention in this litigation.
7  Correct?
8        A.    The list of requested materials, yes, I
9  have read through that previously and believe that I
10  have provided, through counsel, everything that you
11  have asked for here.
12      Q.    Right.  And I just want to make sure one
13  of the things that I asked for was documents relating
14  to your retention.  Do you agree?
15      A.    Which paragraph is that?
16      Q.    I honestly don't have it in front of me,
17  but we can go through it if need be.
18            MR. TISCHLER:  Scroll down, please.
19  Further.
20
21  BY MR. TISCHLER:
22      Q.    No. 14 was:  "All consulting contracts
23  and/or retention letters concerning your involvement
24  in this Case between you and any other person or
25  entity, including but not limited to Plaintiffs'

Page 19

1  lawyers or any other organization."  Right?
2        A.    Thank you for zooming in on that, yes.
3        Q.    All right.  And I'll mark as Exhibit
4  No. 2 a copy of a retention agreement that was
5  provided to me on the letterhead of Greylock McKinnon
6  Associates.  Do you see that?
7
8            (Whereupon, Exhibit ZS-2 was marked for
9  identification.)
10
11           THE WITNESS:  Yes, I see it here.
12      Q.    And it's dated October 18, 2021, a
13  little less than four months ago.  Correct?
14      A.    Yes, that's what it says here.
15      Q.    And you told -- and you explained to us
16  that you were initially approached by Renee
17  Rushnawitz at Greylock McKinnon.  Tell us, who is
18  Greylock McKinnon?
19      A.    To my understanding, they are a
20  litigation consulting firm that supports the work of
21  expert witnesses.
22      Q.    Are you employed with Greylock McKinnon?
23      A.    Not employed, no.
24      Q.    You don't have any ownership stake in
25  that company?

Page 20

1    A.    No.
2        Q.    What is your affiliation with them, if
3  any?
4        A.    Only as an expert witness who works with
5  some of the staff members of Greylock McKinnon
6  Associates for the purposes of my expert witness
7  activities.
8        Q.    In this case, I'm trying to understand
9  the nature of the relationship.  In this case, as I
10  understand it, you're billing for work you do at the
11  rate of about $800 an hour.  Is that correct?
12      A.    That is printed on this agreement, yes.
13      Q.    I know it's printed on the agreement.
14  Is that the rate you're charging?
15      A.    Yes, it is.
16      Q.    So how much of that do you get and how
17  much of that does Greylock McKinnon get?
18      A.    My rate here is what is sent to me.  To
19  my knowledge, when Greylock McKinnon Associates works
20  on litigation, they separately bill for the time and
21  effort of their staff members.
22      Q.    So whatever you bill, you keep.
23  Whatever they bill, they keep?
24      A.    Essentially, I would agree with that.
25      Q.    And I think you mentioned that Greylock

Page 21

1  McKinnon advertises their business as economists and
2  consultants for lawyers.  Right?
3            MR. MIGLIACCIO:  Objection.  Misstates
4  testimony.  You can answer.
5            THE WITNESS:  Well, I honestly don't
6  know how Greylock McKinnon Associates advertises
7  themselves.  I have not seen or been aware of an
8  advertisement from them.  I'm aware only of my
9  working relationship with them, which is that of an
10  expert witness who works with some of their staff
11  members in the cases that I have been retained in.
12      Q.    Do you know if Greylock McKinnon does
13  anything other than provide support services to
14  lawyers in litigation?
15      A.    To my knowledge, that is their main
16  professional activity.  I'm not aware of other
17  professional activities that the firm conducts.
18      Q.    Have you ever been on their website?
19      A.    Probably, a couple of years ago,
20  perhaps.
21      Q.    And you agree the website is a form of
22  advertising.  Right?
23      A.    Depends on how one interprets a website.
24  When I visited their website, I may have only been
25  there for informational purposes to learn about them,

6 (Pages 18 - 21)

Page 22

1 but I may not have perceived that information as
2 advertisement.
3      Q.   When you visited their website, did you
4 note that Greylock McKinnon described their business
5 as one that specializes in litigation support?
6      A.   That sounds consistent with how I
7 understand their work to be or the nature of their
8 work, so I would not disagree with that.  However, I
9 don't recall off the top of my head the exact wording
10 of their website material.
11     Q.   When did you establish a business
12 relationship with Greylock McKinnon?
13     A.   I believe either 2019 or 2020.
14     Q.   How many referrals have you received
15 through them?
16          MR. MIGLIACCIO:  Objection.  Vague.
17          THE WITNESS:  Would you mind defining
18 "referrals", please?
19
20 BY MR. TRISCHLER:
21     Q.   How much business have you received from
22 them?
23     A.   Would you mind defining "business",
24 please?  Do you mean the number of cases I have been
25 invited or asked to consider participating in as an

Page 23

1 expert?
2      Q.   Sure, you can answer that question.
3      A.   At the direct request of Greylock
4 McKinnon Associates, two cases to date.
5      Q.   One being Valsartan?
6      A.   Yes, sir.
7      Q.   In the other case that you looked at on
8 referral from Greylock McKinnon, have you been
9 disclosed or identified as an expert in that matter?
10     A.   Yes, I have offered my services as an
11 expert witness.  The counsel in that other case has
12 accepted.  And I believe we have an agreement in
13 place for expert witness work.
14     Q.   Okay.  I appreciate that and I'm trying
15 to be mindful of privileges, so let me ask more
16 precisely.  While you've been retained by a lawyer in
17 that other case that were contacted through
18 Greylock McKinnon, have you written a report or been
19 disclosed to the other side as an expert?
20     A.   I have not yet written a report.
21     Q.   You -- according to the retention
22 agreement that is marked as Exhibit No. 2, Greylock
23 was retained in October of 2021.  And based on this
24 retainer agreement, I take it that your work in
25 connection with this assignment would have begun

Page 24

1 sometime on or after October 18, 2021.  Is that fair
2 to say?
3      A.   That is fair to say, yes.
4      Q.   And since beginning work on this matter
5 in October of 2021, you billed at a rate of $800 per
6 hour.  Correct?
7      A.   Correct.
8      Q.   And what was your understanding of what
9 it was that you were asked to do when you were
10 retained back in October of 2021?
11     A.   Again, as noted earlier, I was asked to
12 provide an expert opinion regarding the pricing of
13 medical services.
14     Q.   I'm looking at the first paragraph of
15 Exhibit 2 which, again, is the retention agreement
16 and it reads:  "I am writing to confirm our agreement
17 that your firms, on behalf of Valsartan Plaintiffs'
18 Executive Committee 2865 (Sic MDL 2875) have
19 retained Greylock McKinnon Associates to provide
20 consulting on economic issues and other related
21 services and, should it become appropriate, for
22 Dr. Zirui Song to provide expert testimony in the
23 matter referenced above on behalf of Plaintiffs as it
24 relates to monitorizing a monitoring -- as it relates
25 to monetizing", excuse me, "a monitoring protocol."

Page 25

1          With that correction at the end, did I
2 read that correctly?
3      A.   Yes, I believe you read this paragraph
4 correctly.
5      Q.   All right.  Is that a fair summary of
6 what you understood your task to be when you were
7 retained and became involved in this litigation in
8 October of 2021?
9      A.   The phrase here "monetizing" is what I
10 mean by "pricing" in my earlier response to you.  In
11 my mind as a trained health economist, when I think
12 about pricing, the more colloquial or layperson term
13 for that may be "monetizing", so that matches my
14 recollection of what I was asked to do.  A monitoring
15 protocol is what I think about, in my mind, as a
16 potential set of medical services.  So when I said
17 "the pricing of medical services", you can take that
18 to be synonymous for "monetizing a monitoring
19 protocol".
20     Q.   And after you were retained in this
21 matter in October of 2021, Greylock McKinnon has
22 apparently issued just one invoice reflecting your
23 work in this case.  Is that true?
24     A.   To date, yes.
25          MR. TRISCHLER:  Can we mark that invoice

7 (Pages 22 - 25)

Page 26

1 as Exhibit 3, please.
2
3          (Whereupon, Exhibit ZS-3 was marked for
4 identification.)
5
6 BY MR. TRISCHLER:
7     Q.   And can we -- and can I assume that the
8 information conveyed in this invoice is accurate,
9 Dr. Song?
10    A.   Give me a moment to review this exhibit,
11 please.  I would say yes, you can assume that the
12 information here is accurate.
13    Q.   All right.  As a healthcare economist,
14 I'm sure you can attest to the importance of fair,
15 accurate and reasonable billing.  Correct?
16    A.   Well, that's a rather general statement,
17 sir, but I would certainly support the principal that
18 when one bills, that the information on the bill
19 ought to be accurate.
20    Q.   So I assume then, that the information
21 on Exhibit No. 3 is a fair and honest summary of the
22 time that you devoted to the task at hand?
23    A.   Certainly, for the time that I've
24 devoted and reported, but I was not the person who
25 generated the number of hours submitted by the staff

Page 27

1 of GMA, which is subsequent to this highlighted
2 section.
3     Q.   The highlighted section that we're
4 looking at now on Exhibit 3 is the section that
5 summarizes the time that you've devoted to the task.
6 Correct?
7     A.   Correct.
8     Q.   And prior to preparing the report that
9 was provided to myself and the other lawyers
10 representing defendants to this litigation, you would
11 have spent a grand total of 41 and a half hours
12 working on this matter.  True?
13    A.   I didn't catch exactly your full
14 question, but let me answer that to the best of what
15 I heard.  The number of hours here reflects exactly
16 the dates printed on the sheet; essentially, October
17 and November of 2021.  So it's correct that all of my
18 work since the retainer agreement was signed through
19 the writing of the report is captured here in this
20 total.
21    Q.   So you were, just to put this in sort of
22 a chronological order for my relatively
23 unsophisticated mind to understand, you were retained
24 on October 18, 2021, and asked to provide opinion
25 testimony about monetizing a monitoring protocol.

Page 28

1 Right?
2          MR. MIGLIACCIO:  Objection.  Misstates
3 testimony.
4          THE WITNESS:  Again, the synonymous
5 phrase that I used for you earlier, and which I've
6 recommended to you as a synonym to what you just read
7 off, is the pricing of medical services.  That's the
8 work that I was retained to do.
9
10 BY MR. TRISCHLER:
11    Q.   And you were retained to do that work on
12 October 18th, 2021.  Right?
13    A.   Yes, per the earlier letter that we
14 reviewed.
15    Q.   And then three weeks later,
16 approximately three weeks later, on November 10,
17 2021, you prepared a report that was filed with the
18 court in the Valsartan litigation and provided to the
19 defendants to this action and we've marked that
20 report as Exhibit 4 to the deposition.  Do I have
21 that right?
22
23          (Whereupon, Exhibit ZS-4 was marked for
24 identification.)
25

Page 29

1          MR. MIGLIACCIO:  You haven't shown that
2 yet, right, Clem?  Am I missing something?
3          MR. TRISCHLER:  I haven't shown it yet,
4 no.
5          MR. MIGLIACCIO:  Okay.  Fair enough.
6 Yeah, being remotely, we don't see you marking.
7          MR. TRISCHLER:  No, I understand.  I'm
8 old fashioned.  I still use old lingo, so I guess
9 I'll rephrase the question because I'm not trying to
10 confuse you, Dr. Song.
11
12 BY MR. TRISCHLER:
13    Q.   The report that you prepared in this
14 matter is dated November 10, 2021.  Correct?
15    A.   That sounds correct from my
16 recollection.  If you would like me to confirm the
17 exact date, then I would ask that we just look at the
18 report together.
19    Q.   Well, I've asked that it be marked as
20 Exhibit No. 4.  It should be in the chat now for you
21 to look at.  Obviously, you're more than welcome to
22 confirm that date.
23    A.   I'm pulling it up now.  On Page 27 of
24 the report, it says November 10, 2021, and that is
25 the date that I signed it.

8 (Pages 26 - 29)

Page 30

1    Q.    So the work that you would have done to
2  prepare this report, obviously, would have been work
3  that was completed between October 18 when you were
4  retained and November 10 when you wrote the report;
5  fair to say?
6    A.    Yes, sir.
7    Q.    Of the 41 and a half hours that we
8  looked at earlier from your billing through November
9  30th, how much of that time was spent prior to the
10 preparation of your report?
11   A.    I'm sorry.  Are you asking about how the
12 40 hours were divided between different types of
13 activities?
14   Q.    Essentially, what I was asking you is:
15 We know from the billing that you devoted 41 and a
16 half hours of work to this assignment through
17 November 30.  Essentially, what I'm asking you is:
18 How much of those -- what percentage or amount of
19 those 41 and a half hours were spent prior to the
20 time you prepared the report on October 10?
21   A.    Got it.  There were, I would say, three
22 major categories of activities that the 40 hours were
23 devoted to.  One was reviewing the documents provided
24 to me by counsel.  The second was time spent meeting
25 with counsel and discussing the case.  And three is

Page 31

1  time spent writing the report.  For an allocation of
2  those hours across these three groups of activities,
3  I probably would say it's fair to think of that as,
4  perhaps, one-third each; or, perhaps, half of the
5  time devoted to writing and editing the report and
6  the other half split evenly among reviewing materials
7  and discussing with counsel.
8    Q.    And am I correct that the materials that
9  you reviewed as part of this assignment are
10 include -- were included by you with your report?
11   A.    I believe all of the materials that I
12 relied on in writing this report has been cited and
13 provided to you or is otherwise shared by you in your
14 possession.  They include Attachment B, which lists
15 all of the papers and references.  They include the
16 complaint.  They include other documents that counsel
17 had provided me.
18   Q.    Doctor, there's no question that you
19 provided a list of documents that you reviewed and
20 relied upon.  As you mentioned, it's cited as
21 Attachment B to the report that we've marked as
22 Exhibit 4.  Correct?
23   A.    Yes, Exhibit 4 is my report and
24 Attachment B is the right attachment.
25   Q.    Yes.  And what I was asking, perhaps

Page 32

1  inartfully, was:  Is there anything that you reviewed
2  or relied upon or were provided with that is not
3  listed in your report or on Attachment B to the
4  report?
5    A.    After my report was submitted, I had
6  also, during a discussion with counsel, reviewed -- I
7  had read other expert reports that counsel had sent
8  me early in our discussions.  They included a report
9  by -- I want to make sure I recall these names
10 correctly, but I may miss one or two -- but a report
11 by Dr. Hecht, I believe, Dr. Lagana, I believe,
12 Dr. Madigan, I believe, Dr. Etminan, I believe,
13 Dr. Panigrahy, I believe.  And if those were not all
14 listed on Attachment B, they are -- they may have
15 been submitted to you after my report as just an
16 accounting of other documents in the case that I had
17 reviewed.
18   Q.    Did you review the reports from Hecht,
19 Lagana, Madigan and Panigrahy before or after you
20 wrote your report dated November 10th, 2021?
21   A.    Largely before.  I may have looked at
22 them again after the report was submitted, but those
23 were early documents provided to me by counsel well
24 before I had begun drafting my own report.
25   Q.    Okay.  Let me ask you a couple of

Page 33

1  questions about your background, if I might.
2             I understand that you received a
3  Bachelor's Degree in Public Health Studies in 2006.
4  Is that right?
5    A.    Yes, from Johns Hopkins.
6    Q.    And then in 2014, you received a medical
7  degree.  Correct?
8    A.    Correct.
9    Q.    And you also received a Ph.D. in Health
10 Policy in 2012?
11   A.    Correct.
12   Q.    After you -- after you received your
13 medical degree in 2014, you would have completed an
14 internship in family medicine.  Is that true?
15   A.    No, sir, it was an internship and
16 residency in total, a three year program in internal
17 medicine, concentrating in primary care medicine at
18 Massachusetts General Hospital.
19   Q.    Should I call it primary care medicine
20 instead of family medicine?  Is that not the correct
21 term these days?
22   A.    Well, technically, it's the residency
23 program in internal medicine.  That's the overall
24 name of the program; and we have a primary care track
25 and a categorical track and I was a trainee in the

Page 34

1 primary care track.
2    Q.    Okay.  We used to call them family
3 doctors.  We don't use that term anymore?  I guess
4 that's what I was getting at.
5    A.    I see.  Thanks for clarifying.  Well, we
6 could talk about this for a while longer, but family
7 medicine still is a recognized specialty in the U.S.
8 as is internal medicine and primary care.  There are
9 simply geographic differences in how the training
10 programs across the country allocate training slots
11 across family medicine and internal medicine and
12 primary care.
13    Q.    Where you were -- you received your --
14 you did your internship and residency at Mass
15 General.  Is that correct?
16    A.    Massachusetts General Hospital, yes.
17    Q.    Does Mass General have a separate
18 internship and residency program for family medicine?
19    A.    No, Mass General does not have a family
20 medicine residency program.
21    Q.    So if you wanted to practice what I call
22 family medicine, you would perform your internship
23 and residency in internal medicine with a focus on
24 primary care?
25    A.    Well, if you'd like to practice family

Page 35

1 medicine, meaning that your practice includes
2 pediatrics, adult medicine, geriatrics, then it would
3 be most appropriate for you to enter a family
4 medicine residency program.  The residency program
5 that I trained and focused on, adult medicine,
6 specifically, adult internal medicine and not only
7 primary care, but also primary care.  So what I mean
8 by that is, during my residency training, I spent a
9 large portion of the time on the inpatient unit of
10 the general medicine service as well as in the
11 intensive care unit, in the cardiac intensive care
12 unit, in the oncology inpatient unit, as well as in
13 areas of subspecialty services, like, rheumatology
14 and dermatology.  And all the while doing that, I was
15 a member of the primary care track, which meant that
16 I had more time allocated to training in primary
17 care, but it does not mean that primary care was the
18 sole focus of my training.
19    Q.    In any event, you completed your -- you
20 would have completed your training sometime in 2017.
21 Do I have that right?
22    A.    Yes, residency spanned the summer of
23 2014 through the summer of 2017.
24    Q.    And as far as your clinical practice
25 today, your practice is in the field of adult primary

Page 36

1 care?
2    A.    I primarily practice adult primary care
3 where I see patients in the outpatient clinic
4 setting.  However, roughly one month out of every
5 calendar year I also practice inpatient medicine as
6 an attending on the resident teaching teams on the
7 inpatient units of the Mass General Hospital.
8    Q.    And you've been practicing in your
9 chosen field for about five years now?
10    A.    If you define practice as starting after
11 residency training, then, yes.  You could also
12 consider practice to be a part of residency training
13 where we are acting as practicing physicians.  So if
14 you do the latter, then you would include the three
15 years of residency training.
16    Q.    Five years of post training practice.
17 Can we agree on that?
18    A.    Yes.
19    Q.    All right.  And you are not an
20 oncologist.  Is that correct?
21    A.    Correct, I am not an oncologist.
22    Q.    You do not practice pathology?
23    A.    I am not a pathologist.
24    Q.    And treating patients -- your clinical
25 practice and the treating of patients, as I

Page 37

1 understand, is just a small part of what you do on a
2 day-to-day basis.  Is that right?
3    A.    I would disagree with that
4 characterization, sir.  First of all, I don't know
5 what you mean by "small".  As a primary care
6 physician, I do engage in clinical thinking and
7 clinical decision making every day.  Even when I'm
8 not in clinic, I often receive pages from patients,
9 receive phone calls from my colleagues from clinic to
10 help them answer a question, I receive lots of
11 messages from our electronic medical records system
12 to do prescription refills, answer patient questions,
13 answer family questions, put in orders to keep care
14 going, even when I'm not actively in a clinic
15 session.  I would consider all of that an active part
16 of practice and when I'm physically in clinic in an
17 active clinic session, I do that two sessions a week,
18 about two half days a week, but there is a lot of
19 work in the life of a primary care physician, a lot
20 of clinical work that occurs outside of the clinic
21 sessions.
22    Q.    This week, starting with Monday,
23 February 7th, 2022, how many hours will you see
24 patients this week?
25    A.    Given that this week has not yet ended,

10 (Pages 34 - 37)

Page 38

1 I cannot possibly tell you how many hours I will
2 spend seeing patients. Who knows what will happen
3 out there in the world in the future. But I was in
4 clinic yesterday, my normal clinic hours for one
5 session on a Monday where I spent roughly four, four
6 and a half hours in direct patient care. Then I had
7 follow up matters to do in the afternoon for my
8 patients; filling prescription refill requests,
9 answering patient questions, following up on test
10 results that I had ordered in the morning, and
11 writing letters to my patients to indicate what the
12 results showed and providing guidance on their next
13 steps. Those activities I typically do at night to
14 wrap up the day. And today, thus far, I have not yet
15 received a page, although, I probably have a few
16 requests for prescription refills and questions
17 waiting for me on the electronic medical records
18 system, which I imagine I will attend to once we are
19 finished here.
20    Q.    Do you spend more time in clinical
21 practice or doing teaching and research?
22    A.    It depends on the week, it depends on
23 the day.
24    Q.    Okay. Have you ever testified that --
25    A.    I can try to be more helpful, sir, but

Page 39

1 on average over, say an academic year or a calendar
2 year, I spend more time doing research and teaching
3 than I do in clinical practice. But I just wanted
4 you to understand that there is variation day-to-day,
5 week-to-week, month-to-month.
6    Q.    Have you ever testified that you spend
7 80 percent of your time doing teaching and research
8 and 20 percent of your time in clinical practice?
9    A.    I have said that in many settings
10 because, formally, as part of my academic
11 appointment, I am what is typically called, and this
12 is very common in academic medicine across the United
13 States, an academic physician who spends roughly 80
14 percent of their time on research and teaching and 20
15 percent of their time on clinical care. That is the
16 general divide that we all, in the academic medicine
17 community, generally live by, as a matter of our
18 formal appointment. That is not to say that in a
19 typical day or week that's a precise allocation of
20 hours.
21    Q.    I'm not asking about a specific day or
22 week at this point in time. I'm just asking
23 generally, you know, in terms of overall allotment of
24 your time, is that 80 to 20 apportionment accurate in
25 your case?

Page 40

1    A.    And I'm just trying to give you the most
2 realistic answer, sir. In the long run, it's fairly
3 accurate, yes.
4    Q.    You testified that's the allocation of
5 your time between research and testing and patient
6 care; haven't you?
7    A.    Well, as far as I recall, I have been
8 asked about this in prior depositions and I've
9 answered substantively the same. However, you've
10 demonstrated a greater interest in this particular
11 topic, and so I'm just giving you a more nuanced and
12 precise and detailed answer. But 80/20 is our
13 general academic versus clinical divide that, again,
14 many, many of my colleagues in academic medicine and
15 I generally follow.
16    Q.    I'm more interested in honest answers
17 than nuanced answers. Can I count on the prior
18 testimony you've given under oath to be honest and
19 truthful?
20    A.    Absolutely.
21    Q.    Okay. So you spend, on average,
22 80 percent of your time on teaching and research.
23 Can you give me some examples of the current research
24 programs that you're working on at present?
25    A.    Sure. How detailed would you like me to

Page 41

1 be? How much would you like to hear?
2    Q.    I just want to know generally what type
3 of research you're working on?
4    A.    Okay. Starting with the most general
5 answer for you, I work on research pertaining to the
6 health policy and health economics. To be a little
7 more specific, pertaining to the determinants of
8 healthcare spending, including prices of care
9 pertaining to the measurement of provider quality and
10 practice patterns and pertaining to disparities in
11 health and healthcare.
12    Q.    When you say "disparities in health and
13 healthcare", what do you mean?
14    A.    An example would be a recent publication
15 in the peer reviewed journal JAMA health forum on
16 December 23rd, 2021, which examined racial and ethnic
17 disparities in hospitalization outcomes among
18 Medicare beneficiaries in the U.S. attributable to
19 the COVID 19 pandemic.
20    Q.    And is that JAMA paper one that you
21 published?
22    A.    Yes, sir, I was the first author on that
23 paper.
24    Q.    And then when you talked about "research
25 on the determinants of healthcare spending", what do

11 (Pages 38 - 41)

Page 42

1 you mean by "determinants"?
2     A.    Well, a very helpful framework we can
3 keep in our minds is that healthcare spending is the
4 product of prices of healthcare services times the
5 quantities of healthcare services. And as a general
6 policy matter, the growth of healthcare spending is
7 important for public payors, private payors,
8 employers and other entities in our society. And any
9 policy that aims to address healthcare spending would
10 need to either act on the price avenue or the
11 quantity avenue because, again, price times quantity
12 always equals spending. And therefore, my research
13 has focused on the prices of care, some on the
14 quantities of care, and a lot of work on efforts to
15 address healthcare spending through payment reform
16 and other policies that directly address spending.
17     Q.    Is any of your research at the -- and
18 the research you do is through the Department of
19 Healthcare Policy at Harvard. Right?
20     A.    Well, my primary appointment, my primary
21 academic appointment is, yes, in the Department of
22 Healthcare Policy at Harvard Medical School.
23 However, I am also a teaching faculty at the
24 Department of Medicine at Mass General where I do my
25 clinical work as we have discussed; but also, where I

Page 43

1 have worked with trainees on research papers, devised
2 research questions that arise from our clinical work,
3 and done research that you could plausibly argue was
4 based at Mass General. So I have these two sites of
5 employment.
6     Q.    Has the development and establishment of
7 treatment guidelines for cancer been the focus of any
8 of your research?
9     A.    As far as it pertains to my primary
10 research in health policy and health economics, not
11 so much.
12     Q.    Are you familiar with the National
13 Comprehensive Cancer Network or NCCN I think it's
14 called?
15     A.    By familiarity, if you mean have I heard
16 of that, yes, I have. However, I would also note
17 that as a primary care physician, I also reference
18 and refer to guidelines from the United States
19 Preventative Services Task Force, or USPSTF, and
20 guidelines from the American Cancer Society, or ACS,
21 and sometimes other guidelines as well.
22     Q.    I appreciate that. I didn't ask about
23 your tools that you use in your clinical practice
24 just yet. All I asked is: If you're familiar with
25 and heard of the National Comprehensive Cancer

Page 44

1 Network; and I think you said you have.
2     A.    I have heard of it.
3     Q.    Have you ever served on an NCCN panel?
4     A.    No, I have not.
5     Q.    Have you ever contributed to the
6 development of an NCCN treatment guideline for any
7 cancer type?
8     A.    I have not contributed to such
9 development of guidelines.
10     Q.    Have you ever published any research on
11 the costs of cancer treatments specific to the cost
12 of cancer treatment by cancer type?
13     A.    That has not been the focus of my
14 research.
15     Q.    As I understand it, NCCN has published
16 guidelines on colorectal screening. Is that true?
17     A.    Did you say NCCN? You just cut out a
18 bit there.
19     Q.    Sorry. Yeah, I'll repeat the question.
20 Has NCCN published guidelines on colorectal
21 screening?
22     A.    Like I was describing earlier, I believe
23 NCCN, similar to USPSTF and the ACS, have put forth
24 guidelines that we as primary care physicians know
25 about; and therefore, to my knowledge, I believe they

Page 45

1 have a guideline or a set of recommendations around
2 colorectal cancer screening.
3     Q.    Were you ever consulted or did you play
4 any role in the development of the clinical practice
5 guidelines for colorectal screening developed by
6 NCCN?
7     A.    No, sir.
8     Q.    Have you ever published any peer review
9 research on the cost of delivering care contemplated
10 by NCCN guidelines for colorectal screening?
11     A.    Specifically pertaining to colorectal
12 cancer screening as published by NCCN, no, I have
13 not.
14     Q.    Let me ask you about lung cancer.
15 Are you aware that NCCN has published
16 clinical practice guidelines for lung cancer
17 screening?
18     A.    Again, I must say that lung cancer
19 screening guidelines are put forth by many
20 professional societies. I would argue prominently by
21 the United States Preventative Services Task Force
22 and the American Cancer Society and I would also
23 expect the NCCN to have a set of recommendations or a
24 guideline around lung cancer screening.
25     Q.    Did you ever -- were you consulted or

12 (Pages 42 - 45)

Page 46

1  did you ever play any role in the development of
2  clinical practice -- NCCN's clinical practice
3  guidelines for lung cancer?
4       A.   No, sir.
5       Q.   Have you ever published any peer review
6  research on the costs of delivering care contemplated
7  by the lung cancer screening guidelines established
8  by NCCN?
9       A.   Specifically pertaining to lung cancer
10 screening guidelines from NCCN, no, I have not.
11      Q.   As part of your clinical practice, I
12 assume you do not treat cancer.  Correct?
13      A.   Would you please define "treat".
14      Q.   Well, that's a fair question.  I'm not
15 sure how I would define it.  I mean, I've always
16 assumed that oncologists treat cancer when a patient
17 has been diagnosed.  A primary care physician might
18 manage the overall health of the patient while
19 they're being under treatment.  But I guess maybe the
20 better question is:  You tell me if you've got a
21 patient that has been diagnosed with cancer, what
22 role do you play in the care, if any?
23      A.   My role as a primary care physician, and
24 to be further helpful to you, sir, because I think I
25 know where you're coming from, again, as I said

Page 47

1  earlier, I'm not an oncologist.  And therefore, if
2  you restrict the definition of "treat" to medical
3  treatment, i.e. chemotherapy or other treatment
4  modalities for cancer, i.e. radiation therapy or
5  surgical oncology therapy, I do not practice those
6  treatments because those are specialized treatments
7  delivered by specialists.  As a primary care
8  physician, however, I do have patients who have had
9  cancer in the past, who currently have cancer, and
10 who may have cancer in the future.  And counseling
11 patients about cancer screening, reviewing their
12 cancer's history with them, coordinating their care
13 with their oncologists, understanding their care from
14 their oncologists, and guiding them through their
15 trajectory of care through the healthcare system in
16 their chapters of life is what a primary care
17 physician does and that's what I strive to do.
18      Q.   Would I be correct in assuming that you
19 do not have any expertise in determining the cause of
20 cancer?
21      A.   Would you please define "expertise"?
22      Q.   Do you hold yourself out as an expert in
23 determining the cause of cancer?
24      A.   For the purposes of this case and
25 specifically for what I was retained to opine on, the

Page 48

1  scope of my opinion certainly does not encompass
2  that.
3       Q.   Well, you're not an epidemiologist.
4  Right?
5       A.   Well, what do you define as an
6  "epidemiologist"?
7       Q.   Someone with a degree and specialized
8  training in determining the cause of disease.
9       A.   Well, first of all, I'm not sure I agree
10 entirely with that definition of epidemiology.
11      Q.   Well, you asked for my definition;
12 didn't you?
13      A.   I did, sir, yes.
14      Q.   You got it.
15      A.   I'm just reflecting -- I appreciate
16 that.  I'm just reflecting that an epidemiologist
17 might challenge that definition.  But I was trained
18 as a health economist, specifically with the health
19 policy Ph.D. degree and I would probably identify
20 more closely with health economists or as a health
21 economist than as an epidemiologist.  Although, one
22 could reasonably argue that some of my new research
23 overlaps with the field of epidemiology.
24      Q.   Have you ever been recognized as an
25 expert in the field of epidemiology?

Page 49

1       A.   Perhaps a student or someone in a course
2  or a colleague or advisee may say that, but I would
3  politely sort of decline that credit and just
4  restrict my expertise to the letter of my training.
5       Q.   Are you a toxicologist?
6       A.   No, I'm not trained as a toxicologist.
7       Q.   Do you intend to offer any opinions on
8  cancer causation in this litigation, either generally
9  or for any particular patient?
10      A.   I have not been retained to opine on
11 anything related to cancer causation in this case.
12      Q.   And I take it that you will not be
13 offering any opinions about causation in this case;
14 fair to say?
15           MR. MIGLIACCIO:  Objection.  It's a
16 vague question, but you can answer.
17           THE WITNESS:  Based on everything I have
18 learned to date, my understanding is that my role as
19 an expert witness in this case is -- does not include
20 opining on cancer causation.
21
22 BY MR. TRISCHLER:
23      Q.   You -- in reading your report that we
24 marked as Exhibit No. 4, it appears to me that you
25 have assumed the existence of a definable class of

13 (Pages 46 - 49)

Page 50

1 individuals with a lifetime cumulative exposure to
2 NDMA or NDEA that is sufficient to create an
3 increased risk of cancer. Right?
4        MR. MIGLIACCIO: I'm going to object to
5 the extent that it calls for a legal conclusion, but
6 you can answer.
7        THE WITNESS: Would you please elaborate
8 on what you mean by "assume"?
9
10 BY MR. TRISCHLER:
11     Q.   Well, just that. Webster's text book
12 definition of assume. For purposes of your report
13 and your work in this case, you've assumed that there
14 is a definable class of individuals who have a
15 lifetime cumulative exposure to NDMA or NDEA that's
16 sufficient to create an increased risk of cancer.
17 Right? That's something that you've assumed and then
18 you're going to monetize a monitoring program for
19 that group or class of patients. Right?
20     A.   I just want to be very specific and
21 precise here. The scope of my work in this case
22 pertains to the pricing of medical services for a
23 potential monitoring program for a potential
24 certifiable class of individuals. My report
25 illustrates how a common methodology can be derived

Page 51

1 and applied to determining the prices of medical
2 services for a potential medical monitoring program.
3 To my knowledge, such a monitoring program has yet to
4 be certified. To my knowledge, such a monitoring
5 program -- such a class has yet to be certified. So
6 in the absence of that, I am illustrating how the
7 common methodology for the pricing of medical
8 services works and providing you a lot of information
9 about the pricing of medical services in general in
10 the U.S.; but I want to be specific about your use of
11 assuming with what I've just stated now.
12     Q.   Will you be offering any opinion on what
13 lifetime cumulative exposure levels create an
14 increased risk of cancer?
15     A.   That is outside the scope of what I was
16 asked to opine on in this case.
17     Q.   Do you know whether there is any --
18 whether there are any individuals who have a lifetime
19 cumulative exposure to NDMA or NDEA that's sufficient
20 to create an increased risk of cancer?
21     A.   Again, that question is well outside of
22 the scope of what I was asked to opine on in this
23 case.
24     Q.   All right. You said it was outside the
25 scope of what you were asked to opine on. The answer

Page 52

1 is you don't know. Right?
2     A.   That's an incorrect characterization.
3 What I would say is that, to my knowledge and reading
4 the documents that we discussed earlier that were
5 provided to me by counsel as part of this case, I
6 understand that there is a scoring system for
7 determining exposure to these carcinogens. So it's
8 not that I don't know anything about the subject
9 matter that you're asking about, but I do want to
10 emphasize that that question is outside the scope of
11 what I was asked to opine on for this case.
12     Q.   How many individuals in America have a
13 lifetime cumulative exposure to NDMA or NDEA
14 sufficient to create an increased risk of cancer? Do
15 you have any idea?
16     A.   That is well outside the scope of my
17 work and my report in this case.
18     Q.   Because it's outside the scope of your
19 work, you don't have any idea what that number is;
20 could be zero, could be 100, could be some other
21 number. Right?
22        MR. MIGLIACCIO: Objection. Compound.
23 Misstates.
24        THE WITNESS: Again, your
25 characterization of my thoughts is not something that

Page 53

1 I would agree with, exactly. I have not fully
2 considered or investigated or researched or thought
3 through a question like that. So at the moment, in
4 the context of my report, which you have in front of
5 you, it is outside the scope of my work in this case.
6
7 BY MR. TRISCHLER:
8     Q.   So is it fair to say that your opinion
9 goes only to whether there is a common method to
10 calculate the cost to fund a medical monitoring
11 program, if one's deemed necessary and appropriate
12 down the road?
13     A.   Maybe I could restate that in a somewhat
14 similar fashion. The scope of my work as an expert
15 witness in this case pertains to the pricing of
16 medical services in a potential medical monitoring
17 program. The scope of my report also includes many
18 underlying facts and discussion of issues around the
19 pricing of medical services, which are germane to the
20 main thesis of my report, which is development and
21 discussion of a common methodology for the pricing of
22 medical services in the U.S. healthcare system.
23     Q.   And that's what you -- that was what --
24 for some reason I think you like to restate what I
25 say and expound upon it. But my question was: What

14 (Pages 50 - 53)

Page 54

1  you've opined and articulated or what you hope to
2  opine or articulate is that there is a common method
3  for pricing medical services among whatever
4  individuals are determined to be part of this class,
5  if one should ever be certified.  Right?
6      A.    A common methodology for pricing medical
7  services, yes, I would agree with that brief summary
8  you just provided.
9      Q.    So in Paragraph 7 of your report, and
10 it's in the chat so you can feel free to pull it up
11 if you need to.
12     A.    Thank you.
13     Q.    Paragraph 7 of your report, you write
14 that Plaintiffs propose a "medical monitoring class
15 is defined as all persons who consumed the Defendants
16 (VCDs) Valsartan-containing drugs, containing NDMA or
17 NDEA, and who accumulated sufficient quantities of
18 lifetime cumulative exposure to require medical
19 monitoring given the increased risk of cellular and
20 genetic injury leading to an increased risk of
21 cancer."
22         Did I read all that correctly?
23     A.    I believe so, yes.
24     Q.    That sentence appears at Page 4 of your
25 report that we've now highlighted.  Correct?

Page 55

1      A.    Correct.
2      Q.    When you refer to an increased risk of
3  cancer in your report, to which types of cancer are
4  you referring?
5      A.    Although the specific types of cancers
6  were outside of the scope of my work in this case, to
7  my understanding in reading the materials provided by
8  counsel that we discussed earlier, my recollection is
9  that the types of cancers that individuals who have
10 consumed a sufficient quantity of these carcinogens
11 would be at risk for include cancers such as;
12 colorectal cancer, lung cancer, and a number of
13 others.
14     Q.    Well, how many others?
15     A.    Recalling off the top of my head, based
16 on my recollection of those other documents in the
17 case, several additional types of cancers.  I believe
18 also including breast cancer is one of the additional
19 types.
20         MR. TISCHLER:  Let's take a short break.
21         THE VIDEOGRAPHER:  The time is 10:28.
22 This ends media unit No. 1 and we're going off the
23 record.
24
25         (Whereupon, a brief recess was taken off

Page 56

1  the record.)
2
3          THE VIDEOGRAPHER:  The time is 10:40.
4  This begins media unit No. 2 and we're back on the
5  record.
6          THE WITNESS:  I just want to revise my
7  recollection from my last response to your question.
8  Right after we went off the record, I thought about
9  your question for a second more and I recollected
10 that breast cancer is actually not, as far as I
11 recall, one of the other cancers in that list that
12 you had asked me about.  But I also remembered
13 esophageal cancer and stomach cancer, pancreatic
14 cancer is several other examples that you had asked
15 about.  So I just wanted to make that revision to my
16 recollection just now.  Thank you.
17         MR. TRISCHLER:  Sure.
18
19 BY MR. TRISCHLER:
20     Q.    After we took a break, you had a chance
21 to go into a little breakout room with Plaintiffs'
22 counsel.  Did they help you refresh your recollection
23 on that?
24     A.    Not at all.  I literally thought about
25 it in the first couple of seconds we were off the

Page 57

1  record and I better remembered based on my prior
2  reading of the case materials.
3      Q.    Good.  So now that you better remember,
4  are you aware of the fact that the plaintiffs in this
5  litigation are alleging that members of this proposed
6  class face an increased risk of nine different
7  cancers?
8      A.    As I just provided you, I think, four or
9  five examples, there is a list of cancers at which
10 exposure to these carcinogens and
11 Valsartan-containing drugs puts an individual at a
12 higher risk of -- nine sounds correct, but I would
13 just refer back to the earlier case documents to
14 verify that.
15     Q.    Well, now just to be clear, I'm not
16 interested in what you read from others because you
17 told me that you've been provided the expert reports
18 from Plaintiffs' expert witnesses and you reviewed
19 those both before and after your report.  Right?
20     A.    Well, this question you're asking about
21 was not -- was not the substance of what I was
22 retained to opine on.  So, yes, I read those
23 additional documents both before and after writing my
24 report.  But because it wasn't central to the
25 question that I was asked to address, I'm just

15 (Pages 54 - 57)

Page 58

1 letting you know that I'm producing for you what I
2 recall from off the top of my head and if you ask me
3 a specific number of items on a specific list, I'm
4 kindly requesting that we simply refer back to that
5 document, which you have in your possession. So nine
6 sounds about right, that's what I recall from
7 reading.
8     Q.    Well, I'll get back to the cancer types
9 in a minute. I'm trying to ask you something
10 different now. I'm trying. You were provided with
11 expert reports from retained experts by the
12 plaintiffs in this litigation. Correct?
13     A.    The reports that I had earlier listed
14 for you, those are the reports that I was provided.
15     Q.    You've not done any independent research
16 on the carcinogenicity of nitrosamines; have you?
17     A.    The carcinogenicity of nitrosamines was
18 well outside of the scope of what I was retained to
19 opine on in this case.
20     Q.    So the answer is, you've not done any
21 independent research on the carcinogenicity of
22 nitrosamines. Correct?
23     A.    Well, your definition of research might
24 differ from mine. I don't want to try to read your
25 mind by what you exactly mean by "research". (Two

Page 59

1 people talking at the same time.)
2     Q.    Well, then let me ask another question,
3 sir, because it's going to be a long day if you don't
4 want to answer direct questions.
5         Aside from reading -- aside from reading
6 expert reports from Plaintiffs' experts that were
7 spoon fed to you by the Plaintiffs' lawyers, have you
8 done any other independent research on the
9 carcinogenicity of nitrosamines?
10     MR. MIGLIACCIO:    Objection to the form
11 of the question. You can answer.
12     THE WITNESS:    Just to be fair, sir, I am
13 trying to answer all of your questions directly and
14 it's actually in my effort to answer precisely and
15 with the appropriate nuance that I think your
16 reaction is getting at. So to restate in a different
17 way, perhaps, the carcinogenicity of nitrosamines is
18 well outside of the scope of my expert report and my
19 work in this case. I, through reading the documents
20 pertaining to this case, certainly read about the
21 carcinogenicity of nitrosamines, but it is the same
22 information that you have at your disposal, as I did,
23 in what I was given.
24
25 BY MR. TISCHLER:

Page 60

1     Q.    Okay. Let's see if we get a nuanced
2 answer or a straight answer that actually answers the
3 question. Other than reading expert reports that
4 were given to you by the Plaintiffs' lawyers, have
5 you done any other independent research on the
6 carcinogenicity of nitrosamine?
7     MR. MIGLIACCIO:    Objection to the form
8 of the question.
9     THE WITNESS:    Independent original
10 research done by myself as a researcher, no.
11
12 BY MR. TRISCHLER:
13     Q.    So you mentioned some of the cancer
14 types that you understand to be at issue in this case
15 and I jotted them down. You mentioned colorectal
16 cancer, lung cancer, pancreatic cancer, esophageal
17 cancer, stomach cancer. Correct?
18     A.    Yes, thank you for writing those down.
19 I believe those were the five examples I recalled off
20 the top of my head for you, both before and after the
21 break just now.
22     Q.    And since you had a chance to remember
23 better during the break, my question is: Do you
24 remember what the other four cancers that Plaintiffs
25 claim could be at issue in this case?

Page 61

1     A.    I can try, sir. To the best of my
2 recollection at the moment and, again, emphasizing
3 that this is unrelated to the pricing of medical
4 services and quite far afield from what I was asked
5 to opine on, I believe another member of that list of
6 nine you're referring to would be blood cancers or
7 what we in medicine call a hematologic malignancies.
8 And so, if you agree with me that there are three
9 more on your list, I would just kindly request
10 that -- unless you would like to force me to keep
11 thinking about the three, I would stop my
12 recollection there.
13     Q.    So those six are the only ones you can
14 remember, sitting here right now?
15     A.    At this moment, with the way you're
16 asking me, those are the ones that I recall.
17     Q.    Well, if I ask the question in a
18 different way, would it help you recall what the
19 other three are?
20     A.    I need to answer all of your questions
21 respectfully, sir, but if in your question you
22 provided me the answer, then certainly I would be
23 able to recall.
24     Q.    Okay. Well, how about bladder, prostate
25 and liver, do they ring a bell?

16 (Pages 58 - 61)

Page 62

1    A.    Okay.  So you just provided to me the
2  other three in your question and, therefore, I can
3  confirm that they too ring a bell.
4    Q.    To monetize a monitoring program to
5  adequately screen for multiple cancer types, don't
6  you agree that you need to know the cancer types at
7  issue?
8          MR. MIGLIACCIO:  Objection.  Misstates.
9          THE WITNESS:  I disagree with the
10 framing and connotation of your question, actually,
11 sir.  As I noted just a moment ago, the pricing of
12 medical services is unrelated to the clinical
13 substance of what you're asking about.  As I clearly
14 stated in my report, every medical service in the
15 United States has a common procedural terminology or
16 CPT code.  That code designates the service, that
17 code is attached to prices we can talk about, prices
18 in public and private aspects of our healthcare
19 system.  But the pricing of medical services is
20 unrelated, uncorrelated with the substance of your
21 question just now.  And furthermore, it's outside the
22 scope of my report, which is to propose a common
23 methodology for pricing medical services.
24    Q.    That's as confusing as can be to me
25 because you've sat here and suggested that there

Page 63

1  exists a common methodology that can be utilized to
2  determine the cost to fund a monitoring program.
3  Right?
4    A.    A common methodology for the pricing of
5  medical services, right.
6    Q.    But as we sit here right now, we don't
7  know how many people will be in that program, how
8  many patients.  Right?
9    A.    Let me --
10    Q.    Do we know how many -- do we know -- no,
11 answer my -- sir, the way the deposition works is
12 you're supposed to answer my question.  My question:
13 Do we know how many people are going to be in the
14 hypothetical program?
15    A.    I respect you and I understand your
16 question and I am honestly providing you the best
17 answer that I can.
18    Q.    How about a "yes" or "no"; do we know
19 how many people will be in this program?
20    A.    Not only is that outside the scope of
21 what I was asked to opine on in this case, which is
22 the pricing of medical services in the U.S.
23 healthcare system that, to my knowledge, has also yet
24 to be finalized or certified in this case.
25    Q.    So we don't know how many people will be

Page 64

1  part of the program.  Right?
2    A.    Well, as a general matter, sir, if you
3  ask me about something that has not been finalized or
4  certified, then in my position as an expert witness
5  and also not being a lawyer in this case, I, of
6  course, cannot purport to give you an answer on
7  something that has not been finalized and certified.
8  And all of this, again, is outside the scope of what
9  my report is focused on, which is -- (two people
10 talking).
11    Q.    Do we know how many people -- do we know
12 how many people in this -- do we know how many people
13 in this program are Medicare recipients?
14    A.    It follows from what I just said that if
15 a final class of individuals has not been determined
16 and certified, then it would not be possible for us
17 to know the exact break down of such a population
18 along dimensions of characteristics, including payor
19 mix.
20    Q.    And we don't -- and do we know what
21 services will be included as part of this
22 hypothetical program?
23    A.    Also very consistent with something I
24 responded to you earlier about the components of a
25 proposed medical monitoring program have not been

Page 65

1  finalized and certified, to my knowledge, in this
2  case, at the moment.  So you are asking me about what
3  is a final certified set of services in a monitoring
4  program and my best answer for you is that, to my
5  knowledge, that finalization of certification has not
6  yet taken place.
7    Q.    And we don't know how many people in
8  this program will have private insurance.  Correct?
9    A.    I believe I've answered this question
10 because you just asked about Medicare.  My answer for
11 you would be analogous.  In fact, I think something
12 that would actually help both of us in this current
13 discussion is what I mentioned earlier this morning,
14 which is the potential spending of a potential
15 medical monitoring program is the prices of the
16 services in that program multiplied by the quantities
17 of those services rendered.  And the quantities of
18 those services rendered, which you're focusing on
19 now, breaks down into how many times those services
20 are done and how many people are in that class.
21 Because the exact services and the exact class have
22 not been finalized and certified, my report focuses
23 on the pricing of medical services.  Price times
24 quantity equals spending.  My report focuses on
25 pricing.  I just explained to you two dimensions of

17 (Pages 62 - 65)

Page 66

1  quantities that are important, but not yet finalized
2  and certified. When you multiply those together, you
3  get estimated spending for a monitoring program. So
4  I want to be precise. If you ask me about prices,
5  which is germane to my report, I'm happy to answer
6  any questions you have. If you ask me about the
7  quantities of services rendered and who are they
8  going to be rendered on, those aspects have not been
9  finalized and certified yet, to my knowledge.
10      Q.    Do we know how many private health
11  insurers are part of this program?
12      A.    Again, that's an element of the
13  quantities of services eventually rendered that has
14  not yet been certified and finalized.
15      Q.    Do we know how many uninsured
16  individuals are part of this program?
17      A.    Again, that's an element of quantities
18  which has not been finalized and certified; and,
19  furthermore, not the focus of what I was retained to
20  opine on in this case, which is what pertains to the
21  pricing of medical services.
22      Q.    And do we know what services are to be
23  provided for each of the nine different cancer types
24  that are part of this global program that's been
25  proposed?

Page 67

1      A.    I believe I just answered that. The
2  quantities of services, which you're precisely asking
3  about here, has not been determined and finalized.
4  And, again, price times quantity equals spending. My
5  report focuses on the pricing of medical services.
6  The quantities aspect has not been finalized and
7  certified. And all your questions or previous
8  questions here are regarding quantities; and so I'm
9  not able to speak to aspects of the case that have
10  not been finalized and certified. Price times
11  quantity equals spending and that's a framework that
12  will always hold true. We can use that as a
13  launching point for your questions.
14      Q.    In your work in this case, have you seen
15  any epidemiological study suggesting or concluding
16  that exogenous intake of NDMA or NDEA is a cause of
17  colorectal cancer in humans?
18      A.    Similar to how you asked me previously
19  about the carcinogenicity of nitrosamines, I had
20  answered already that I did not do independent
21  investigative research into that question. It seems
22  to me that you're asking about that again. So my
23  answer would be the same as earlier, that is outside
24  the scope of what I was retained to opine on in the
25  report. In fact, well outside the scope. That does

Page 68

1  not even pertain to price times quantity equals
2  spending. And also, it's something that we've
3  already addressed.
4      Q.    So are you able to cite an
5  epidemiological study suggesting that exogenous
6  intake of NDMA or NDEA leads to or causes colorectal
7  cancer in humans; yes or no?
8      A.    Cite connotes independent research; does
9  it not? And if it does, I have already answered that
10  I have not done my own independent research on that
11  question, which falls well outside the scope of what
12  I was asked to opine on in this case, sir.
13      Q.    Are you aware of any study, any
14  epidemiological study concluding that exogenous
15  intake of NDMA or NDEA causes lung cancer in humans?
16      A.    I'm going to try to be more helpful for
17  you, sir, because I think repeating my answers, you
18  know, you've already expressed your displeasure at
19  that. So let me just state this, this way.
20      Q.    I'm not expressed any displeasure about
21  anything, sir. I'm looking for straightforward, yes
22  or no, truthful answers to questions.
23      A.    No, I appreciate that and I --
24      Q.    No, please don't -- hold on. Hold on.
25  Please don't interrupt me and please don't

Page 69

1  characterize my view. I'm asking questions. I'm
2  entitled to answers to them. You're not entitled to
3  characterize my thought process.
4      A.    And I'm trying my best to give you the
5  best answers to my knowledge and my ability. So the
6  way I was going to try to give you more helpful
7  answers for you is that, as a general clinical
8  matter, I think it's fair to characterize as common
9  knowledge that NDMA and NDEA are potential
10  carcinogens to human beings. And, therefore, if it
11  is common medical knowledge and you could debate how
12  common it is among physicians of different
13  specialties, but if we take for the moment that it is
14  fairly common medical knowledge, then there must be
15  studies, there must be peer reviewed literature
16  supporting such common knowledge in medicine, as
17  there would be for any clinical conditions that we
18  think about and treat on a day-to-day basis. So, you
19  know, I'm trying to be more helpful to you because,
20  through that angle, I can say that I would expect
21  there to be citable peer reviewed academic studies
22  that address the relationship between NDMA and NDEA
23  and carcinogenicity. But again, whether -- did I
24  undertake that original research myself in this case
25  as part of my work? There I have repeatedly told you

18 (Pages 66 - 69)

Page 70

1 that it's well outside the scope of what I was asked
2 to do.
3    Q.    Do you even remember what my question
4 was, sir?
5    A.    Yes.
6    Q.    My question was: Can you cite an
7 epidemiological study suggesting or concluding that
8 exogenous exposure to NDMA or NDEA causes lung cancer
9 in humans? I'm not looking for you to say you think
10 there is. Can you cite it? If so, tell me what the
11 cite is.
12    A.    Thank you for repeating that question.
13 Because I did not independently undertake such
14 research investigation, given that it was well
15 outside the scope of what I was asked to opine on, I
16 do not have a citation to provide to you off the top
17 of my head at this moment.
18    Q.    Can you cite any epidemiological study
19 published anywhere in the world concluding that
20 exogenous exposure to NDMA or NDEA causes any of the
21 nine cancer types in humans that are alleged to be at
22 issue in this litigation?
23    A.    I would offer the same response I just
24 gave you before. If you want me to elaborate, I can,
25 but I'll pause here.

Page 71

1    Q.    I want you to answer the question. Can
2 you cite any literature?
3    A.    Okay. Because I did not undertake this
4 original research investigation of the evidence
5 underlying carcinogenicity, which is what you're
6 describing in your question, as I've noted before
7 multiple times, given that it was outside the scope
8 of my work in this case, I'm not able to provide you
9 a citation off the top of my head because it is very
10 unrelated to the subject matter of my report.
11    Q.    Nevertheless, while you cannot cite a
12 single study establishing that exogenous NDMA or NDEA
13 exposure causes any of these cancers in humans, it's
14 your opinion that every class member should be
15 screened for all nine of these cancer types. Right?
16       MR. MIGLIACCIO: Objection. Compound.
17 Vague.
18       THE WITNESS: I disagree with your
19 question in a couple of very important ways. So if
20 you will, please give me a little bit of time to
21 explain.
22       No. 1, it is not that I cannot provide a
23 citation for what you're asking about. It is that my
24 scope of work in this case as an expert witness is
25 far afield from this question. And because I believe

Page 72

1 such citations must exist out there in the medical
2 literature, given this is fairly common clinical
3 knowledge, if afforded the time and opportunity to do
4 some of this initial original research investigation,
5 I'm sure that I could provide for you more than one
6 citation to your liking on that question. And the
7 second -- (two people talking).
8
9 BY MR. TRISCHLER:
10    Q.    If you did, you'd be the first.
11    A.    Excuse me, sir. Please let me finish.
12    Q.    If you did, you'd be the first.
13    A.    Please, let me finish my answer, sir.
14 The second area where I must disagree with your
15 question is that, as I'm sure you know, I'm not the
16 only expert retained for the Plaintiffs and you've
17 already established that I'm not an oncologist,
18 you've already established that I'm not a
19 toxicologist and you're asking questions germane to
20 oncology and toxicology. So your questions are
21 outside of the scope of my expertise that you've
22 already helped me define. And furthermore, you have
23 at your disposal, I believe, Dr. Kaplan, who is an
24 oncologist, who would be, presumably in a much better
25 position to answer that question for you relative to

Page 73

1 me as a primary care physician and health economist.
2    Q.    So is it your testimony that it's
3 outside your expertise to define what screening
4 procedure should be employed for stomach cancer?
5    A.    It is certainly outside the scope of
6 what I was asked to opine on in this case.
7    Q.    That wasn't my question. My question
8 is: You just said it was outside the scope of your
9 expertise, I think. So I'm asking you to clarify.
10 Are you suggesting that it's outside the scope of
11 your expertise to define the procedures that should
12 be included in the screening program designed to
13 detect stomach cancer?
14    A.    For the purposes of this case and
15 specifically for my report, sir, which I think is the
16 focus of our discussion today, my expertise pertains
17 to the pricing of medical services. I do work as a
18 physician, as you've already established. I do see
19 patients and have expertise in clinical medicine
20 before I would -- but for what I was asked to opine
21 on in this case, your question, unfortunately, is far
22 afield of that. And I respect the importance of this
23 matter, this litigation, and I respect the other
24 parties involved here including another expert like
25 Dr. Kaplan, so I want to appropriately address your

19 (Pages 70 - 73)

Page 74

1 questions within the scope of what I was asked to do.
2    Q.    Do you have the expertise to establish
3 the procedures that should be employed to detect
4 stomach cancer?  Yes or no.
5           MR. MIGLIACCIO:  Objection.  Asked and
6 answered.
7           MR. TRISCHLER:  No, it wasn't.  It was
8 asked.  It wasn't answered.  He said it was outside
9 the scope of his report.  That wasn't the question.
10 My question is:  Does he have the expertise to do it?
11 That question has not been answered.  For some reason
12 he seems to want to avoid answering it and many
13 others.
14           THE WITNESS:  In an effort, again, to be
15 precise, for the purposes of my work in this case and
16 the report in front of you, that is outside of my
17 purported expert opinion, my proposed expert opinion
18 for you.
19
20 BY MR. TRISCHLER:
21    Q.    I know it's -- you've said that.  My
22 question is:  Is it outside your expertise?
23    A.    And I've also said that I certainly have
24 expertise in clinical medicine outside of my work in
25 this report, but that expertise is not germane to my

Page 75

1 work in this report or in the scope of what I'm doing
2 or what I was retained to do by counsel.  So again,
3 out of respect to the other parties in this case,
4 including counsel, including the other Plaintiffs'
5 experts, I want to just be very precise with you
6 about what I'm doing in my report, which is the
7 pricing of medical services and I would invite you
8 and would be happy to answer any of your questions
9 regarding my report.
10    Q.    I didn't ask you what you did in your
11 report.  Do you understand that?  I asked you:  Are
12 you an expert in formulating the protocols and test
13 procedures and test methods that one should employ in
14 developing a screening program for stomach cancer?
15 It's a different question entirely.  Tell me.
16    A.    Thank you, sir.  That's actually a
17 different question entirely than the questions you
18 asked earlier, so I appreciate that.  I am not an
19 expert in the formulation of the derivation of
20 original clinical guidelines for cancer screening
21 because no single physician is.  Those are
22 professional society guidelines put forth by, you've
23 already said this earlier, the National Comprehensive
24 Cancer Network, NCCN, the American Cancer Society,
25 the United States Preventative Services Task Force.

Page 76

1 Those are not individual physician jobs.  Those are
2 professional society guidelines, so neither me nor
3 any other individual physician sitting here, would be
4 nor should be able to say to you that they are the
5 originator of such guidelines.
6    Q.    I didn't ask you that question either,
7 but I'm used to it by this point in time.
8           What screening and detection methods
9 would you use for stomach cancer?
10           MR. MIGLIACCIO:  Objection.  Vague
11 question.
12           THE WITNESS:  Would you mind specifying
13 for what patient?
14
15 BY MR. TRISCHLER:
16    Q.    Well, is it patient dependent?
17    A.    Well, if you're going to ask me how I
18 make a clinical judgment, how I make a clinical
19 judgment about services for patients, without
20 providing me any specificity about the patient or
21 patient population you're thinking of, I think that's
22 an unfair question.  Even in the clinical guidelines,
23 as you know, sir, sorry, I'll finish very quickly,
24 even in clinical guidelines, I'm sure you're well
25 aware that in the specific recommendation statements

Page 77

1 included are characteristics of the patient
2 population to be screened, whether they're average
3 risk, whether they're high risk, whether they've been
4 exposed to a carcinogen like tobacco or whether they
5 have a family history.  So without providing me any
6 specifics, and I know you're getting at individual
7 physician differences -- individual patient
8 differences here in your question, but without
9 providing me any specifics about the patients you're
10 thinking of in your mind, that question, frankly, is
11 clinically inappropriate.
12    Q.    So in order to answer the question of
13 what screening and detection methods you would use to
14 try and detect stomach cancer, you need to know about
15 the patient and the patient history?
16    A.    Well, you may not need to give me
17 everything about a patient, every characteristic, but
18 at least something.  What age group are you thinking
19 of?  What exposure to NDMA or NDEA do you have in
20 mind?  You know, I think those are fair questions in
21 the context of this case for me to answer a clinical
22 question like that.
23    Q.    What -- well, the screening and
24 detection methods that you use to detect stomach
25 cancer differ from the screening methods for liver

20 (Pages 74 - 77)

Page 78

1  cancer?
2     A.    In the context of this case, and this is
3  a good question, I would defer to the expert opinion
4  of oncologists like, potentially, Dr. Kaplan to
5  answer a question like that.  As a primary care
6  physician, I follow guidelines and the
7  recommendations of my specialist colleagues and so I
8  would, again, for pricing of medical services, apply
9  the common methodology for pricing to whatever the
10 services that are certified and finalized end up
11 being.
12    Q.    Well, it's interesting -- it's
13 interesting that you say you follow guidelines, what
14 published guidelines are there for screening of liver
15 cancer?
16    A.    Well, again, it depends on which patient
17 population you're thinking of.  I'll just give you
18 one concrete example to answer your question and I
19 hope it drives home the point.  Okay?  For patients
20 with cirrhosis, commonly due to alcohol or due to
21 fatty liver disease or due to hepatitis, of which
22 there are several types.  Patients with cirrhosis are
23 recommended to receive screening for hepatocellular
24 cancer, HCC, that is a type of cancer of the liver
25 which deserves screening under certain clinical

Page 79

1  conditions.  Okay.  So that is an example of a
2  clinical thought process that requires some detail
3  from the questioner's standpoint if you want a
4  precise clinical answer.
5     Q.    So patient medical history can dictate
6  what screening and detection procedures are done in a
7  given case?
8     A.    To an extent.
9     Q.    And you didn't answer my question as to
10 what guidelines exist for screening, what published
11 guidelines exist for screening.  You said there were
12 recommendations on liver screening for patients
13 diagnosed with cirrhosis, but what published
14 guidelines are there?
15    A.    Right.  I believe I just answered that
16 for you by giving you a very concrete example.  If
17 you look at the -- of course, this was not part of my
18 work in this report and this is off the top of my
19 head as a primary care clinician.  And I would,
20 again, refer you to Dr. Kaplan for a primary opinion
21 on this, but if you look at the guidelines from the
22 gastroenterologies societies, especially the
23 hepatology societies, they would clearly state for
24 you that a patient with A, B or C, pertaining to
25 liver disease, should receive liver screening using

Page 80

1  ultrasound or CT or other modalities at a frequency
2  of X or Y.  That would be the sort of recommendation
3  or the format of a recommendation you would commonly
4  see.  And in my residency training a number of years
5  ago, I can recall learning those guidelines.  So I'm
6  fairly confident sitting here today that they do
7  exist.  But, again, I want to emphasize this is very
8  far afield, sir, from the pricing of medical
9  services.  And I also noted earlier that pricing of
10 medical services in the U.S. is unrelated to these
11 clinical nuanced differences between patients and
12 that's an important point to establish here.  The
13 price of a CPT code of a service is derived from a
14 common methodology, which is unrelated to these
15 differences across patients that you are exploring
16 here with me.
17    Q.    Would you agree with me that screening
18 and detection methods for colorectal cancer differ
19 from, like, screening and detection methods you might
20 employ if you were looking for pancreatic cancer?
21        MR. MIGLIACCIO:  Objection.  Vague.
22 Incomplete hypothetical.
23        THE WITNESS:  I do agree that's a vague
24 question, but I will try to help out the question in
25 this way.  Screening for colorectal cancer involves,

Page 81

1  among other things, colonoscopies.  Colonoscopies are
2  not used to screen for pancreatic cancer.  With those
3  two facts just given to you, the answer to your
4  question is, yes, there are differences in how
5  doctors in America screen for colorectal cancer
6  relative to how they screen for pancreatic cancer.
7
8  BY MR. TRISCHLER:
9     Q.    And have you ever designed or
10 implemented a screening or detection procedure for
11 asymptomatic patients to screen for pancreatic
12 cancer?
13    A.    There are two parts of your question;
14 one is about designing such screening procedures and
15 another is the implementing such screening
16 procedures.  So to break them down, again, consistent
17 with my prior answers, I have not designed screening
18 procedures for pancreatic cancer or screening
19 procedures for any other cancer because, again, they
20 come from large professional society guidelines
21 constructed by a large consortium or committee of
22 experts in those fields.  With regard to the second
23 part of your question which is around implementation,
24 pancreatic cancer is something we think about in
25 primary care, but unlike other cancers, such as

21 (Pages 78 - 81)

Page 82

1 colorectal cancer and lung cancer, there are fewer
2 options for screening for pancreatic cancer.
3     Q.    So if I understand your report and the
4 testimony that I've heard from you so far today, at
5 this stage of the proceedings, you've made no attempt
6 to monetize the cost for services for global
7 colorectal screening for all patients in this
8 proposed class. Right?
9          MR. MIGLIACCIO: Objection. Misstates.
10         THE WITNESS: I really have to offer you
11 an answer that breaks your question into pieces again
12 because there are a few things in there that I
13 don't -- I don't believe we're on the same page on.
14 One is the pricing of medical services, I don't want
15 to get too technical, but it is different from the,
16 in your words, monetizing of costs. I've established
17 that pricing is synonymous with monetizing, so I'm
18 able to work with you on that synonym there --
19     Q.    That synonym comes from you.
20     A.    Yeah, yeah, pricing --
21     Q.    I didn't make it up. It came from your
22 retention agreement and what you said you were going
23 to do.
24         MR. MIGLIACCIO: Objection. Misstates.
25         THE WITNESS: Sir, I'm simply

Page 83

1 reaffirming that the pricing of medical services
2 is --
3
4 BY MR. TRISCHLER:
5     Q.    Well, don't say it's my term, sir.
6     A.    You just used it in your question,
7 that's all I'm referring to. So the term in your
8 question, monetizing of costs and the phrase that
9 I've used consistently with you today, the pricing of
10 medical services, I just want to be specific and
11 precise about this. I'm willing to let us use
12 pricing to mean monetizing in your -- the word you
13 use in your question. When you refer to costs, as I
14 noted in one of the paragraphs of my report, I just
15 want to make a distinction between costs and
16 spending. Spending is price times quantity. Okay?
17 When we estimate the spending of something in
18 healthcare, when we estimate healthcare spending,
19 when we study healthcare spending, when we write
20 about healthcare spending, spending is prices times
21 quantity. That is the substance of what you're
22 asking me about here.
23         Costs, when you use the word "cost," as
24 I noted in my report from a technical academic
25 standpoint, which is the world I live in, costs refer

Page 84

1 to the underlying costs of production of a medical
2 service. Okay? You're connoting spending but I'm
3 going to use the word spending to be precise. Would
4 you mind repeating the second part of your question?
5 It just slipped --
6     Q.    Well, I'm sure it won't be -- the
7 response won't be responsive anyway, but can you read
8 it back, please, Jomanna?
9
10         (Whereupon, the requested portion of the
11 record was read by the reporter.)
12
13         THE WITNESS: Thank you for repeating
14 that. The second part of my response was that
15 because the members of this class have not been
16 finalized and certified, I don't know who they are at
17 this time. And therefore, when you say "global for
18 all members of this class", given that this class has
19 not yet been certified, I'm not able to provide you
20 specific clinical answers or economic answers about
21 pricing related to a class that has not yet been
22 certified.
23
24 BY MR. TRISCHLER:
25     Q.    And for the vast majority of the cancer

Page 85

1 types at issue in this case, can we agree that
2 there's no universally recognized screening or
3 detection guidelines?
4         MR. MIGLIACCIO: Objection. Again,
5 vague question.
6         THE WITNESS: Again, that falls well
7 beyond the scope of my report. You're asking for a
8 clinical judgment here and my opinion is not in that
9 domain for what I was retained to opine on. I want
10 to be helpful to you; as a primary care physician, I
11 do think -- I do think about cancer screening. If
12 you want to reformulate your question or perhaps be a
13 little more specific, I might be happy to try to
14 answer your questions.
15         MR. TRISCHLER: I really don't want to
16 reformulate it. I'd like an answer to it.
17
18 BY MR. TRISCHLER:
19     Q.    Are there established guidelines for the
20 detection and screening of esophageal cancers; yes or
21 no?
22         MR. MIGLIACCIO: Objection. Vague.
23 Incomplete hypothetical.
24         THE WITNESS: It depends what patients
25 you're asking about. As a primary care physician,

22 (Pages 82 - 85)

Page 86

1 that is my best answer for you. You would need to
2 provide me a little more specifics about the patient
3 population you're thinking about in your mind.
4      Q.    The patient population of Valsartan
5 users.
6      A.    To my knowledge, there exist no
7 guidelines recommended by large professional bodies
8 pertaining to patients who have used Valsartan,
9 specifically for the screening of esophageal cancer.
10 To my knowledge, such guidelines don't exist today.
11 So if you're asking me about those guidelines, that
12 would be my best answer.
13     Q.    Well, what guidelines do exist for the
14 screening of esophageal cancer?
15     A.    Okay. Again, I'm going to try to be
16 helpful, sir. And this is outside the scope of what
17 I've been retained to opine on in this report. As a
18 primary care physician, I will say as a general
19 clinical matter for patients at higher risk of
20 developing esophageal cancer, there are clinical
21 services that our specialty colleagues, like
22 gastroenterologists and oncologists may recommend for
23 the screening of esophageal cancer. One such service
24 would be an endoscopy, but it, again, depends on the
25 specific population of high risk patients that you

Page 87

1 are thinking about.
2      Q.    I'm asking you about guidelines that
3 have been published by USPSTF or NCCN for screening
4 and detection of cancer in asymptomatic patients.
5 Have any organizations responsible for developing
6 treatment guidelines, such as NCCN or USPSTF ever
7 published any guidelines for the screening of
8 esophageal cancer?
9          MR. MIGLIACCIO: Objection. Asked and
10 answered.
11         THE WITNESS: And it's well outside the
12 scope of my opinion in this case. At the moment,
13 sitting here, off the top of my head, I'm not able to
14 replicate for you any such guidelines.
15
16 BY MR. TRISCHLER:
17     Q.    Does an inability to replicate mean that
18 there are none?
19     A.    Again, I've just explained that for high
20 risk individuals, we as generalists sometimes receive
21 recommendations from specialists to screen for
22 esophageal cancers with an endoscopy, but again, this
23 is highly hypothetical. Your question is unconnected
24 to Valsartan now, specifically and I would refer you
25 to --

Page 88

1      Q.    Sir, your job -- your job is to answer
2 my questions, not to argue with whether they're
3 outside the scope, whether they're hypothetical.
4 Your job is to answer them. If there are objections
5 to be made, your counsel will make them and the court
6 will rule on them later, at some point in time. I'm
7 entitled to answers to my questions and I would like
8 them.
9          Does NCCN or USPSTF have any published
10 guidelines recommending screening procedures for
11 asymptomatic patients to detect esophageal cancers;
12 yes or no?
13         MR. MIGLIACCIO: I object. First,
14 you've asked that question and he's answered it.
15 He's giving you his best answers. And you're being
16 argumentative at this point. I think he's doing his
17 level best to give you his best answers here.
18         MR. TRISCHLER: That speaking objection
19 is improper under the rules established by this court
20 and under the federal civil procedures. Please
21 refrain from it.
22         MR. MIGLIACCIO: I'll refrain from those
23 speaking objections if you refrain from
24 characterizing his answers as being evasive or that
25 he's not answering questions because he is.

Page 89

1          MR. TRISCHLER: Are you done?
2          MR. MIGLIACCIO: I'll be done when
3 you're done.
4          MR. TRISCHLER: I'm waiting for an
5 answer to the question.
6          THE WITNESS: Okay. Again, let me try
7 to be helpful, sir. First, I want to reaffirm that I
8 respect your role in our discussion here.
9
10 BY MR. TRISCHLER:
11     Q.    You don't have to do that. You just
12 have to answer my question, sir.
13     A.    And that is part of my answer, sir.
14 That's an appropriate preface to my answer for you.
15     Q.    Actually, it's not because it's
16 nonresponsive. I don't need you to -- I don't need
17 you to preface every answer with a comment. Just
18 answer the question.
19         MR. MIGLIACCIO: Objection to your
20 commentary.
21         THE WITNESS: My preface was only a
22 result of your reaction, let me just put that there.
23 As a general clinical matter and speaking as a
24 primary care physician, again, not as an oncologist
25 as you've already established, I don't recall off the

23 (Pages 86 - 89)

Page 90

1 top of my head right now guidelines for
2 asymptomatic -- what was it you said in your
3 question? This is why the clinical detail is
4 important here. I'm trying to recall. You said
5 asymptomatic individuals screening for esophageal
6 cancer and you're asking about guidelines published
7 by the USPSTF or the NCCN or, perhaps, the American
8 Cancer Society. If that's a fair summary of your
9 question, and my answer to you is: A) I would refer
10 to our oncologist expert who would be much better
11 positioned to answer that for you; and B) as a
12 primary care physician, I don't recall as a general
13 clinical issue off the top of my head such
14 guidelines; and C), most importantly, this falls well
15 outside of the scope of what I was asked to opine on
16 in this case.
17
18 BY MR. TRISCHLER:
19     Q.    Are there any guidelines that have been
20 published by NCCN, USPSTF or the American Cancer
21 Society recommending screening for bladder cancers in
22 asymptomatic patients?
23          MR. MIGLIACCIO: Objection. Vague.
24 Incomplete hypothetical.
25          MR. TRISCHLER: Well, there are either

Page 91

1 guidelines or there are not. That's a meritless
2 objection.
3          THE WITNESS: Can you provide any
4 helpful clinical detail outside of asymptomatic, sir?
5
6 BY MR. TRISCHLER:
7     Q.    No.
8     A.    Okay. In the absence of any further
9 clinical detail that you can provide, the best answer
10 I can give you is, as a primary care physician and
11 not an oncologist, I do not recall off the top of my
12 head at this moment any such guidelines or what such
13 guidelines say.
14     Q.    Are you aware whether any guidelines
15 have been published by USPSTF, NCCN or the American
16 Cancer Society recommending screening for pancreatic
17 cancers in asymptomatic individuals?
18          MR. MIGLIACCIO: Same objection.
19          THE WITNESS: And my same response to
20 you, sir. I would just also add, again --
21
22 BY MR. TRISCHLER:
23     Q.    I don't know what that same response
24 means.
25     A.    Okay. Let me try to replicate that --

Page 92

1     Q.    You're either aware, Doctor, of the
2 existence of guidelines or you're not.
3     A.    I've already established for you in an
4 earlier answer that relative to, like, colorectal
5 screening, there are fewer modalities, fewer options
6 we have in clinical medicine as a general clinical
7 matter for screening for pancreatic cancer. I've
8 already offered you that answer, which is, again,
9 unrelated to my expert work in this report. I'm
10 trying to be, now, further helpful and say that as a
11 primary care physician and not as an oncologist, I
12 cannot recall off the top of my head sitting here
13 right now what such guidelines are or what they say
14 regarding asymptomatic individuals for working at a
15 cancer outside of what I just repeated for you from
16 that earlier answer. And, again, I must emphasize
17 how distinct and unrelated this is to the subject
18 matter of what I was retained to opine on in this
19 case.
20     Q.    Are you aware of any guidelines
21 published by USPSTF, NCCN, the American Cancer
22 Society or any other organization recommending
23 screening for liver cancer in asymptomatic
24 individuals?
25          MR. MIGLIACCIO: Same objection.

Page 93

1          THE WITNESS: Out of fairness for this
2 question, I really think that we have discussed this
3 at some length just a few minutes ago with my even
4 providing you an example of a subset of higher risk
5 patients with liver disease who would garner such
6 screenings from professional guidelines, but I've
7 even tried to recall for you. And all of this is as
8 a general primary care physician, not an oncologist,
9 not a specialist; and furthermore, not as an expert
10 who was retained to opine on such matters in this
11 case. They're quite far afield from the common
12 methodology of pricing medical services.
13
14 BY MR. TRISCHLER:
15     Q.    Do you agree that the medical community
16 leaves the decision to screen for a given cancer type
17 and when to the treating physician based on his or
18 her knowledge of the individual patient and in
19 consultation with that patient?
20          MR. MIGLIACCIO: Same objection. Vague
21 and incomplete hypothetical.
22          THE WITNESS: Can you be more specific
23 at all?
24
25 BY MR. TRISCHLER:

24 (Pages 90 - 93)

Page 94

1    Q.    No.
2    A.    Okay.  Could you provide me any aspects
3 of that clinician's specialty, any aspects of the
4 patient's preference, any aspects of shared decision
5 making, and any aspects of what guidelines you're
6 referring to in that question?
7    Q.    No.  I didn't refer to guidelines, so
8 you just do what you want to do.  There's no
9 reference to guidelines in that question, sir.
10    A.    You asked me about decisions.  I've
11 already established before that decisions are
12 informed by guidelines.
13    Q.    Are you going to answer my question or
14 not?
15    A.    I am.
16        MR. MIGLIACCIO:  Objection.
17        THE WITNESS:  I'm on my way to --
18        MR. TISCHLER:  Then answer it, please.
19        THE WITNESS:  Okay.  Guidelines do
20 differ in some ways, so if you're going to ask me
21 about how clinical decisions are made between
22 physicians and patients, I think it is only fair that
23 you provide some context about the role of that
24 physician.  Is it a generalist?  Is it a specialist?
25 The guidelines that you are thinking of that would

Page 95

1 inform such a decision, because guidelines do differ
2 a bit; and importantly, the patient's preference for
3 that screening modality.  And a purely hypothetical
4 question that's devoid of such important detail is
5 very difficult and, in my view, clinically
6 inappropriate to answer.
7
8 BY MR. TRISCHLER:
9    Q.    All those factors that you just outlined
10 need to be considered on a case-by-case basis.
11 Right?
12    A.    I disagree with your characterization of
13 a case-by-case basis and this is the clinical nuance
14 that, to be totally honest with you, sir --
15    Q.    Please, just answer.
16        MR. MIGLIACCIO:  Objection to the
17 harassing colloquy.  Let him answer his question.
18        THE WITNESS:  It's okay.  I don't mind,
19 sir.  And despite your chuckle, I do really seriously
20 mean that in day-to-day clinical life, we must
21 balance the generality and the universality in the
22 uniformity of screening guidelines, which are applied
23 to subpopulations, large subpopulations of the entire
24 U.S. population with patient preferences, physician
25 beliefs, physician specialty and shared decision

Page 96

1 making in that discussion.  And it is not, therefore,
2 correct, your characterization, because screening
3 guidelines offered by professional societies, which
4 we've talked about at some length today, they
5 recognize that despite some individualized
6 differences between patients, such general guidelines
7 about screening for cancer are still well-founded on
8 rigorous avenues, still recommended for
9 subpopulations of the entire nation's population and
10 still ought to be done by and large or on average by
11 physicians.  And that clinical nuance, if you want to
12 focus on my expert as a clinician, which is outside
13 of the scope of my work for this report, is essential
14 because, on the one hand, you are trying to establish
15 the differences across patients, but I'm reflecting
16 for you the important fact that despite differences
17 between patients, as a nation and as a medical
18 profession, we have lots of cancer screening
19 guidelines that pay attention to and respect those
20 differences but, nevertheless, recommend
21 universality, uniformity and a coherent set of
22 screening guidelines that supersede those
23 differences.  Meaning, they are a common methodology
24 for physicians to consider in terms of cancer
25 screening.  And if you're able to work that nuance

Page 97

1 with me, work with that nuance with me, I think our
2 questions and answers can be more clinically precise.
3 If you want to dispose of that nuance, it becomes
4 harder for me to give you clinically precise answers;
5 and that's all I'm trying to inform you of here.  I
6 apologize for the long response.
7
8 BY MR. TRISCHLER:
9    Q.    Well, that's fine.  It's to be expected
10 and it's, actually, a little bit comical because I've
11 been trying to ask you what the guidelines are that
12 need to be followed for these various cancer types,
13 and you haven't -- any of them for bladder,
14 pancreatic, stomach, anything, yet now you go on this
15 long winded answer about saying how we must be
16 mindful of guidelines when we talk about patient
17 screening.  I'm trying to find out which ones they
18 are.  So tell me.
19        MR. MIGLIACCIO:  We're objecting to that
20 harassing comment.
21
22 BY MR. TRISCHLER:
23    Q.    What guidelines exist for -- what
24 published guidelines exist for screening of stomach
25 cancer, name one?

25 (Pages 94 - 97)

Page 98

1      MR. MIGLIACCIO:  Objection.  He's here
2  to opine on issues relating to the pricing of medical
3  services.  If you're asking him other questions, as
4  you have been for hours now, it's outside the scope
5  of his report.  You can keep asking, but you're going
6  to get the same answer.
7      THE WITNESS:  Maybe I can try to
8  level -- would you like to talk about colorectal
9  screening, sir?
10
11  BY MR. TRISCHLER:
12     Q.   No, I didn't ask about that.  I'd like
13  an answers to my questions.  That's the way this
14  works.  So my question is:  Can you cite any NCCN or
15  USPSTF published guidelines on stomach cancer
16  screening?
17     A.   And again, my first clarification needs
18  to be, for whom are you considering?  For what
19  patient population are you asking?
20     Q.   For any patient population.
21     MR. MIGLIACCIO:  Same objection.  Beyond
22  the scope.
23     THE WITNESS:  Right.  And the conceptual
24  basis of many of my previous answers for you was that
25  screening for high risk individuals is different than

Page 99

1  screening for the general population.  In this case
2  we're talking about, this matter pertains to
3  individuals having been exposed to carcinogens, which
4  by definition makes them a high risk subpopulation.
5  I'm asking you to be specific about the population of
6  patients that you're asking me about and you're
7  emphasizing the asymptomatic overall U.S. population,
8  I think.  Therefore, my answers for you minutes ago,
9  my answer for you now is, as a primary care physician
10  and not an oncologist, I cannot cite for you or
11  recall a guideline for stomach cancer, screening for
12  the asymptomatic overall U.S. population in the
13  absence of any subpopulation characteristics that
14  you're able to provide.
15
16  BY MR. TRISCHLER:
17     Q.   Do you read the AMA Journal of Ethics?
18     A.   Ethical training is an essential part of
19  our medical school curriculum and my training as a
20  physician.  I have read the American Medical
21  Association's Code of Medical Ethics.  You said
22  journal, I believe the right word is code of medical
23  ethics, before.  I would be happy to answer any
24  follow-up questions about medical ethics.
25     Q.   Before you do that, can you answer the

Page 100

1  question that I asked?  Do you read the AMA Journal
2  of Ethics, yes or no?
3      A.   I've read the AMA Code of Medical
4  Ethics.
5      Q.   All right.  Do you read the Journal of
6  Ethics?
7      A.   If there is a specific journal title
8  called the American Medical Association Journal of
9  Medical Ethics, it's quite possible that I read that
10  in my life as a researcher and my student -- my life
11  as a student training to be a research or an
12  independent investigator researcher.  I can't recall
13  for you exactly in my ten plus years of training and
14  doing research when I would have read that, but I can
15  be more affirmative and definitive for you that I
16  read the AMA Code of Medical Ethics, which I think,
17  plausibly, should be consistent with what the AMA
18  Journal of Ethics, as you purport, would recommend
19  for physicians in the U.S.
20     Q.   Have you -- the AMA Journal of Ethics
21  published a commentary in which the author wrote
22  that:  "Just because a procedure can be done, doesn't
23  mean it should be done."
24      Do you agree with that statement?
25     MR. MIGLIACCIO:  Objection.  Vague.

Page 101

1  Incomplete hypothetical.  Outside the scope.
2      THE WITNESS:  That is a highly
3  hypothetical characterization of all medical
4  decisions for all patients and you would need to
5  provide me with some specificity for me to answer
6  that question.  And I would actually give you -- I
7  would lend you a further olive branch here, so to
8  speak.  I've done research, original research, some
9  of which is cited in Attachment B, that address the
10  appropriateness of clinical services.  But as you'll
11  see in all of my peer reviewed papers and that of my
12  colleagues in the field studying the appropriateness
13  and quality of care, the critical study of a subject
14  like that requires you to be specific about what
15  service, for whom, what physician and what
16  circumstance.  And if you were to ask me a generality
17  like that, it's not appropriate for me to provide a
18  vague answer.  So if you will, please, any specifics
19  would be very helpful.
20
21  BY MR. TRISCHLER:
22     Q.   If you can't answer the question because
23  it's too difficult for you, just say so, sir.
24      Do you agree with the principle that
25  "just because a procedure can be done, doesn't mean

26 (Pages 98 - 101)

Page 102

1 it should be done?" Yes or no or you can't agree,
2 you need more information, just give me an answer.
3 It's not a hard.
4          MR. MIGLIACCIO: Objection. Asked and
5 answered. He provided you his answer and you just
6 ignored it.
7          THE WITNESS: Yeah. In an effort to be
8 brief here, in addition to the fact that this is well
9 outside the scope of my work in this case, if you
10 look at my work on the quality of care and the
11 appropriateness of care, appropriateness is an
12 important clinical consideration for physicians, for
13 researchers, for the policy making community, and for
14 the patient community. Inherent in your question is,
15 do we think about appropriateness of care? Yes, we
16 think about the appropriateness of care. Are all
17 medical services completely appropriate in all cases
18 for all patients? Certainly not. That does answer
19 your question, sir. But the reason that your
20 question does not merit an overall general "yes" or
21 "no" is that it lacks any clinical detail for any
22 expert, clinical or economic or otherwise, to assess
23 the specific service, the patients, and the providers
24 in the clinical situations in which it's rendered.
25 And those are, you know, factors that, if you read

Page 103

1 the papers I've written on quality and
2 appropriateness, are important for such assessments.
3
4 BY MR. TRISCHLER:
5     Q.   Do you agree that treatment guidelines
6 may be followed in some instances and may be
7 disregarded in others?
8          MR. MIGLIACCIO: Objection. Vague.
9 Incomplete hypothetical. Outside the scope.
10          THE WITNESS: I could not speak for all
11 physicians, obviously. In addition to the fact that
12 this is, again, outside the scope of my work in this
13 case and what I was retained to opine on, as a
14 general research matter in health services research
15 and health policy research, there is evidence showing
16 that physicians do vary in what they do. There is
17 variation between physicians in the care that they
18 provide. That's an empirical fact from the research
19 literature. That's probably the best way I can
20 answer your questions with facts, with that empirical
21 fact.
22
23 BY MR. TRISCHLER:
24     Q.   Do you agree that decisions regarding
25 patient care must be individualized based on

Page 104

1 knowledge of both the individual patient and the
2 available medical evidence on risks and benefits?
3          MR. MIGLIACCIO: Objection. Vague.
4 Incomplete hypothetical. Outside the scope.
5          THE WITNESS: I would ask for you to
6 please be more specific, but I can start an answer by
7 saying that it depends on the clinical situation. In
8 some cases, guidelines supersede individual
9 differences across patients, especially in situations
10 where patients may be very high risk for a bad
11 outcome and in other cases where patients may be at
12 very low risk. Or in other clinical scenarios, it
13 could be more plausible that patient preferences and
14 other factors carry greater influence over the
15 clinical decision. So it depends on the clinical
16 situation, which you have not provided me any details
17 for. So if you could please do that to some extent,
18 I could give you a more precise answer to the
19 situation.
20
21 BY MR. TRISCHLER:
22     Q.   Let me go back to the nine cancer types
23 that are at issue in this litigation.
24     A.   Okay.
25     Q.   Are there some proposed class members to

Page 105

1 be excluded from the screening for one or more of
2 these nine cancers? Or are you suggesting that
3 screening should be done for all nine cancer types
4 for all class members?
5          MR. MIGLIACCIO: Objection. Vague.
6 Misstates.
7          THE WITNESS: I do not have a formal
8 opinion to render on that issue for you in this case,
9 sir, because that is well outside the scope of what I
10 was retained to opine on.
11
12 BY MR. TRISCHLER:
13     Q.   Well, you do offer a framework for
14 screening in your report?
15     A.   I offer illustrative examples of a set
16 of services that could comprise the start or the
17 foundation of potential medical monitoring program.
18 But those examples are meant to be illustrative
19 rather than as a recommendation or as a framework for
20 the final screening program, which again, has not yet
21 been determined and certified.
22     Q.   Are there any risks to the screening
23 procedures that you propose as part of your framework
24 that is yet to be finalized?
25          MR. MIGLIACCIO: Objection. Misstates.

27 (Pages 102 - 105)

Page 106

1 Outside of the scope.
2        THE WITNESS: Which services are you
3 referring to?
4
5 BY MR. TRISCHLER:
6    Q.    The ones in your report.
7    A.    Would you mind being more specific? We
8 have the report in front of us. Would you mind
9 pointing to which services you would like me to
10 answer about?
11   Q.    The ones that you mentioned as
12 illustrative and a framework for this
13 yet-to-be-finalized monitoring program. You cited
14 them in your report. Do you need me to remind you
15 what they are?
16   A.    No, I only am asking for you to be more
17 specific and if you would like to not be more
18 specific, then I'm happy to go through the six
19 illustrative examples I've provided one-by-one and
20 answer your question in turn for each. Would you
21 like me to do that for you?
22   Q.    I'd be delighted.
23   A.    Okay, let me pull up my report. I'm on
24 Page 24 of my report, which contains Table 6 and the
25 title of which is "2021 Medicare Prices and Estimated

Page 107

1 Medicaid and Commercial Prices". These are six
2 illustrative examples that I provide as the beginning
3 for the potential foundation of a potential medical
4 monitoring program.
5        So to answer your question, urinalysis,
6 CPT Code 81001, that is a very common service
7 delivered in the U.S. healthcare system. The risks
8 of a patient providing a urine sample are minimal if
9 not none. Patients are asked to do this in the
10 privacy of a private space in the clinic or in a
11 hospital and it is a non-invasive procedure. And,
12 you know, there are guidelines about when urinalyses
13 are appropriate, when they should be ordered and in
14 the fine print of those guidelines, you may well find
15 a discussion of what, if any, risks there are. But
16 as a general primary care physician who has ordered
17 urinalyses for many patients over the years, the
18 risks are minimal to none.
19       Next, for the complete blood count,
20 85025, this is a very common laboratory service
21 rendered both on the inpatient and outpatient side.
22 The risks to obtaining a blood sample for not just
23 this complete blood count but for electrolytes, for
24 cholesterol, for blood sugar or any other number of
25 laboratory tests that the U.S. healthcare system

Page 108

1 does, the risks are a blood draw. And, you know, on
2 average, population-wide, the risks of a blood draw
3 are also minimal and they are done with such
4 frequency in the U.S.. And, in fact, I have academic
5 papers that I cited in Attachment B that cite
6 evidence that laboratory tests are the most -- as a
7 category -- frequently ordered medical services in
8 the entire country. And despite that frequency, you
9 rarely hear evidence suggesting, or if ever, evidence
10 suggesting that there are prohibitive risks to
11 patients receiving blood draws.
12       Next, is an office visit. That, I
13 think, is a general matter, perhaps with all of us
14 here on the call perhaps having been patients in our
15 own lives or having had family members or friends as
16 patients, involves walking into a physician's office.
17 What are the risks of walking into a physician's
18 office and sitting down for a physician visit? Well,
19 I would say that the bodily harm of doing that is
20 little to none. Certainly, on average, certainly
21 population-wide, that is also one of the most
22 commonly billed services in the United States, a
23 level four office visit.
24       Next, for a low dose chest CT Scan, this
25 is part of the screening guidelines for lung cancer

Page 109

1 and it is, just to be very precise here, recommended
2 by the USPSTF, the American Cancer Society. The
3 reason that it's low dose, which is specifically
4 stated here, is that these professional societies
5 have determined that that is the way to minimize the
6 risks of screening for lung cancer population-wide
7 for high risk individuals. And again, high risk
8 individuals have a definition and this illustrates
9 why I was, you know, asking you to provide more
10 specificity for earlier questions because it
11 demonstrates that, like in this case, high risk
12 individuals are those 50 to 80 years old now with at
13 least 20 back years of smoking, having quit in the
14 last 15 years, totalling roughly 14 and a half/15
15 million people in the country; that's a high risk
16 subpopulation of our national population. For those
17 people to further minimize their risk of radiation
18 from CT scans, these professional society guidelines
19 have recommended low dose radiation CT scans. Other
20 than that, the risks of walking into a facility,
21 getting into a scanner, having the scan taken are
22 minimal to none, in general, in my experience as the
23 general primary care physician.
24       For upper endoscopy and screening
25 coloscopies, those are performed by our

Page 110

1 gastroenterologist specialist colleagues. Those are
2 certainly, to some degree, more invasive procedures
3 than the four examples we just walked through. Upper
4 endoscopies, as mentioned earlier, can be a screening
5 tool used to detect or screen for esophageal cancer,
6 for patients at high risk for esophageal cancer.
7 And, therefore, I was, again, urging you or asking
8 you to provide some specificity with regard to what
9 high risk characteristics you were thinking about in
10 answering your earlier questions because that matters
11 for my clinically nuanced answer. But under -- as
12 far as my knowledge as a general primary care
13 physician and, again, outside the scope of pricing of
14 medical services, I'm not aware of widespread
15 clinical evidence that suggests, on average,
16 substantial harm to patients from upper endoscopies.
17 They're done in a facility setting most often.
18 They're done under a careful conscious sedation or a
19 general anesthesia. They're done with a team of
20 providers. There is counseling beforehand about what
21 the procedure involves. Patients have a chance to
22 answer questions, they consent to the procedure. The
23 procedure is guided by video technology, there are
24 technicians in the room to help make sure that the
25 procedure is safe. So as a general matter, the risks

Page 111

1 of that are also minimal.
2 And lastly, for screening colonoscopies,
3 which, you know, again, are for a specific
4 subpopulation of the overall U.S. population, are the
5 lower GI analogous service to the upper GI endoscopy
6 that we just talked about. And screening
7 colonoscopies, similarly, require conscious sedation
8 or general anesthesia. They're similarly, to some
9 degree, invasive like an upper endoscopy and do
10 require a team of physicians with care providing this
11 in a facility setting, most often; though it can be
12 done in an office setting where there needs to be
13 expertise and care on the part of the
14 gastroenterologist, the endoscopist doing the
15 procedure. But as far as the evidence shows,
16 certainly a part of guidelines, despite any
17 individualized risks of a screening colonoscopy
18 procedure for any given patient across U.S.
19 populations, now starting at age 45, it's recommended
20 that for average risk people even, even for average
21 risk individuals, screening colonoscopies should
22 begin at age 45, population-wide, common methodology,
23 across all people, despite individual differences.
24 That's what the society guidelines say, multiple
25 society guidelines; ACS, USPSTF, and that's another

Page 112

1 example of how they've assessed the risks of this
2 procedure. Despite the risks inevitably being a
3 little bit higher or a little bit lower for a given
4 patient, the recommendations say for a large section
5 of the U.S. population having arrived at a certain
6 age, it's recommended for everybody. It's uniform.
7 It's consistent. Okay, I'm going to stop there.
8 Q. So the six -- so the six components
9 might be a framework for a monitoring plan that you
10 mentioned and you called them illustrative in your
11 report. If I could dare to summarize the
12 testimony that you just gave me: The suggestion was
13 there may certainly be some risks, but they are
14 minimal and the benefits of the services for the
15 vast, vast majority of the patients would outweigh
16 the risks. Is that your testimony?
17 A. For the patient populations that I
18 specified.
19 MR. MIGLIACCIO: You froze, Dr. Song.
20 MR. TRISCHLER: Yeah, I don't hear
21 anything.
22 MR. MIGLIACCIO: Yeah, I think he
23 remains frozen.
24 THE VIDEOGRAPHER: Do you want to go off
25 the record?

Page 113

1 MR. MIGLIACCIO: Sure. Is it the time
2 that you need for your break, by the way, Clem?
3 THE VIDEOGRAPHER: The time is 11:57.
4 This ends media unit No. 2. We're going off the
5 record.
6 (Luncheon recess: 11:57 a.m.)
7 THE VIDEOGRAPHER: The time is 1:01.
8 This begins media unit No. 3. We're back on the
9 record.
10
11 BY MR. TRISCHLER:
12 Q. Okay, Doctor, I don't want to plow old
13 ground, but right before our lunch break, I was
14 asking you a question that I think you were in the
15 process of answering when we had some Internet
16 connectivity issues. Basically, to try and get
17 through this as quickly as possible, I had asked you
18 whether there were any recognized risks associated
19 with the procedures that you described in your report
20 as frameworks for a monitoring plan. Do you recall
21 that?
22 A. Yes, the beginnings or the foundations
23 of a potential medical monitoring program.
24 Q. And you proceeded to go through those
25 six procedures that are in your report and discuss

29 (Pages 110 - 113)

Page 114

1 what you perceived as risks. And what the question
2 that I had asked you was, you know, your testimony
3 will speak for itself, but the gist of what I heard
4 was that there are some risks associated with almost
5 all medical procedures. But in your judgment and
6 estimation, the risks of these procedures were
7 minimal for the large -- for the -- most of the
8 patient population. Is that a fair summary of what
9 we had discussed?
10    A.    Perhaps another way of putting it would
11 be, on average, across the patients in which the --
12 those example services have been rendered or
13 delivered to, the risks are rather minimal to
14 sometimes essentially none.
15    Q.    But, certainly, the risks would not be
16 the same for all patients across the board. Correct?
17    A.    Well, it depends on which patients
18 you're speaking about. Your question was around a
19 general overall population of patients. But for high
20 risk population of patients, such as patients at high
21 risk of developing cancer, for example, then the
22 balance between benefits and risks might be
23 different. So, you know, guidelines, these large
24 national professional society guidelines do not say
25 that there are none or exactly the same risks for

Page 115

1 every single patient. But despite any risks, and as
2 minimal as they are, the benefits of such screening
3 are thought to be greater than the risks and
4 certainly greater enough for them to be recommended
5 as broadly national screening guidelines.
6    Q.    Well, let me see if I can be more
7 specific what I was -- when you talk about
8 colonoscopies, for instance, those are done under
9 anesthetic. Correct?
10    A.    Again, I just want to preface by saying
11 you're asking me about the clinical portion of my
12 life, of my professional life, and that is not what I
13 was retained to opine on in this case. So we are
14 stepping far afield from the substance of my report
15 to you and what I was retained by counsel to opine
16 on. And I'm trying to be as helpful as I can to you
17 but, you know, the first thing I would just emphasize
18 again is on matters regarding oncology, on matters
19 regarding cancer screening guidelines, treating
20 patients with cancer, I defer to experts who are
21 trained in oncology and who are, you know, to my
22 knowledge, part of this case as expert witness who
23 can provide more of that subspecialized expertise.
24 But, you know, if you wanted to ask general questions
25 about colonoscopies that I can perhaps answer as a

Page 116

1 general primary care physician as a clinical experience
2 in my own clinical experience, I'll be happy to do my
3 best.
4    Q.    Well, after that filibuster, that's
5 exactly what I did, Doctor. I said, are
6 colonoscopies conducted under anesthesia?
7    A.    In my clinical experience for my
8 patients, they can be, but not always.
9    Q.    And does anesthesia pose risks for some
10 patients?
11        MR. MIGLIACCIO: Objection. Vague.
12        THE WITNESS: My clinical expertise does
13 not span into the risks of anesthesia, the risks of
14 anesthesia for patients. I'm certainly not an
15 anesthesiologist nor am I an endoscopist, so I do not
16 have a formal clinical opinion for you on that.
17
18 BY MR. TRISCHLER:
19    Q.    Would you recommend a colonoscopy to an
20 asymptomatic patient who had -- who was diagnosed
21 with congestive heart failure?
22        MR. MIGLIACCIO: Objection. Incomplete
23 hypothetical.
24        THE WITNESS: For that hypothetical
25 patient for whom you have not specified an age or

Page 117

1 family history but only a comorbidity of,
2 hypothetically, congestive heart failure for which
3 you've also not said whether it's heart failure of a
4 certain stage or severity, I do not have enough
5 clinical information to be able to give you a precise
6 clinical recommendation for whether that person
7 should be offered a colonoscopy. I think this was
8 answered with some of our previous questions and
9 answers too, where I think more clinical specificity
10 from you would be a better guide for me to give you a
11 more precise answer.
12
13 BY MR. TRISCHLER:
14    Q.    Would you agree that there are some
15 patients for whom a colonoscopy might not be
16 recommended?
17        MR. MIGLIACCIO: Objection.
18        THE WITNESS: What types of patients do
19 you have in mind?
20
21 BY MR. TRISCHLER:
22    Q.    Any patients or should every American on
23 the planet over the age of 45 receive a colonoscopy,
24 regardless of their medical history, comorbidities or
25 any other underlying medical condition?

30 (Pages 114 - 117)

Page 118

1          MR. MIGLIACCIO: Objection. Outside the
2   scope.
3          THE WITNESS: As far as I understand
4   your question, you're asking me now about what the
5   guidelines state.
6          MR. TRISCHLER: No, I didn't.
7          THE WITNESS: That's how I'm
8   interpreting your question.
9          MR. TRISCHLER: Well, then you're wrong.
10
11  BY MR. TRISCHLER:
12     Q.   I'm asking you -- I'm not asking you how
13  you interpret the guidelines. I'm asking you for
14  your opinion as to whether every -- whether it's your
15  belief that every American over the age of 45 should
16  undergo a colonoscopy, regardless of their medical
17  history and regardless of any underlying
18  comorbidities.
19         MR. MIGLIACCIO: Objection. Outside the
20  scope.
21         THE WITNESS: I'll provide you an answer
22  in two parts. The first part is that I defer to
23  screening guidelines for a question like that. Your
24  question is essentially about one's clinical opinion,
25  which in this case is informed by our national

Page 119

1   guidelines. And second, I can give you one concrete
2   example where the answer to your question would be
3   no, not for everybody over the age of 45. And that's
4   because, as a general primary care physician, I have
5   had clinical experience interpreting guidelines for
6   colorectal cancer screening. And the guidelines,
7   depending on which society you referred to, generally
8   say that beyond the age of 85, universal screening
9   for colorectal screening is no longer systematically
10  recommended. So that's a concrete example of no, not
11  everybody above the age of 45. It's also a
12  demonstration of how further clinical detail or
13  nuances is helpful for a question like this.
14
15  BY MR. TRISCHLER:
16     Q.   Are there other examples of individuals
17  over the age of 45 who you would not recommend
18  receive a colonoscopy?
19     A.   As a primary care physician sitting here
20  and not an oncologist and not having been asked to
21  opine on matters such as this regarding guidelines, I
22  do not have a formal opinion for you on that and
23  this, again, falls well outside of the scope of what
24  I was asked to opine on in this report.
25     Q.   We've been talking a lot about

Page 120

1   guidelines, one of which is the USPSTF. Right?
2      A.   Yes, USPSTF.
3      Q.   And that stands for U.S. Preventive
4   Service Task Force?
5      A.   Preventive Services Task Force, yes.
6      Q.   All right. Do you agree that those
7   guidelines are subject to the treating physician's
8   clinical discretion?
9          MR. MIGLIACCIO: Objection. Incomplete
10  hypothetical, outside the scope.
11         THE WITNESS: That's a very hypothetical
12  question about how every physician uses guidelines as
13  a matter of, and also outside, again, the scope of my
14  work for this case. I have not assessed that
15  question systematically for physicians out there nor
16  researched the evidence space about how physicians
17  respond to those guidelines.
18         As a general primary care physician,
19  again, I'm trying to be helpful here to you. As a
20  general primary care physician, I have certainly made
21  every good faith effort to follow the guidelines and
22  respect my personal discussions with my patients in
23  arriving at my clinical decisions with my patients.
24
25  BY MR. TRISCHLER:

Page 121

1      Q.   For your own clinical practice, sir, do
2   you feel that you're bound to follow the USPSTF
3   guidelines? Or can you vary from them when your
4   clinical judgment dictates that that is the
5   appropriate course of action?
6          MR. MIGLIACCIO: Objection. Outside the
7   scope. Are you ever going to ask him about how he
8   calculates the price associated with the service?
9   That's what he's here to opine about.
10         THE WITNESS: It depends on the patient
11  and the clinical -- the clinical situation at hand.
12  It is -- it is certainly true that, despite
13  individual differences across patients, guidelines
14  can and often do direct physicians to provide on
15  average appropriate preventive care superseding
16  recognized individualized differences across
17  patients. We've talked about this before this
18  morning. I don't know that it's appropriate for me
19  to give you a personal patient anecdote or offer
20  expertise on this kind of specific clinical decision
21  in a given situation without further detail from you,
22  you know, and without seeing the connection to the
23  pricing of healthcare services. So it depends.
24
25  BY MR. TRISCHLER:

31 (Pages 118 - 121)

Page 122

1    Q.    So are you refusing to answer the
2  question?
3    A.    I don't think I've refused, sir, I'm
4  just trying to explain --
5    Q.    Okay.  Well, then, do you view the -- do
6  you view the USPSTF guidelines as mandatory or do you
7  have discretion to deviate from them when your
8  clinical judgment suggests that that's the right
9  course of action for a patient?
10        MR. MIGLIACCIO:  Objection.  Asked and
11  answered.  Outside the scope.
12        MR. TRISCHLER:  Outside the scope is not
13  a proper objection, Nick.  You've made it about 40
14  times in violation of the discovery orders of this
15  court.  I wish you'd stop.
16        MR. MIGLIACCIO:  I wish you'd ask him
17  questions about his report, but you don't seem to be
18  doing that either.
19        THE WITNESS:  If I heard you correctly,
20  sir, did you phrase your question as do I find the
21  USPSTF guidelines to be mandatory?
22
23  BY MR. TRISCHLER:
24    Q.    Would you like the question read back?
25  Would that help you answer the question directly?  If

Page 123

1  it would, I'd be happy to have the court reporter do
2  that.
3    A.    No, it's okay.  Let me just make my best
4  of effort here.  As far as I understood your
5  question, you asked whether I find USPSTF guidelines
6  to be mandatory.  Well, by the very nature of
7  guidelines, they are recommendations.  I don't equate
8  recommendations with mandatory orders.
9    Q.    Have you ever served on a USPSTF expert
10  panel?
11    A.    No, I have not.
12    Q.    Have you ever been affiliated with the
13  National Cancer Institute?
14    A.    No, I have not.
15    Q.    Have you ever developed any screening
16  recommendations for any cancer type that were
17  published by USPSTF or the National Cancer Institute?
18    A.    As we discussed earlier this morning,
19  no, I have not.
20    Q.    Have you ever published any peer
21  reviewed papers recommending a screening program for
22  any cancer type or proposing guidelines on any cancer
23  screening?
24    A.    Recommending or proposing any screening
25  guidelines, not in that way.  In some of my research

Page 124

1  papers, you will find, likely in the introductory
2  section or the discussion section, general statements
3  about high value care, clinically appropriate care
4  that are -- consistent with what guidelines recommend
5  -- (Internet froze.)
6        Let me just try again.  My answer was
7  not exactly in those words because in my published
8  academic papers you will find, likely in the
9  introductory section or the discussion section,
10  statements about delivering high value care,
11  clinically appropriate care as a health policy and
12  research matter that is, in spirit, consistent with
13  what the guidelines recommend.  But outside of that,
14  in my academic work, no, in the way you phrased your
15  question.
16    Q.    What value is a low dose CT Scan of the
17  chest in evaluating the liver cancer?
18        MR. MIGLIACCIO:  Objection.  Vague.
19  Incomplete hypothetical.
20        THE WITNESS:  I was not asked to opine
21  on such questions as that.  I have not looked into
22  that question.  I do not have a formal opinion on
23  that question for you.
24
25  BY MR. TRISCHLER:

Page 125

1    Q.    Well, a low dose CT Scan is one of the
2  foundations of a medical monitoring program that you
3  cite in your report; is it not?
4        MR. MIGLIACCIO:  Objection.
5  Misstatements testimony.  You can answer.
6        MR. TRISCHLER:  Thank you.
7        THE WITNESS:  Yes, but you asked about
8  the use of that low dose chest CT Scan for liver
9  cancer, not for lung cancer.
10
11  BY MR. TRISCHLER:
12    Q.    I know.  Liver cancer is one of the nine
13  cancers that the plaintiffs claim to be at issue
14  here.  So I'm asking about how is one of these
15  foundational elements of your monitoring program of
16  any value in evaluating for liver cancer?
17        MR. MIGLIACCIO:  Objection.  Misstates
18  testimony.
19        THE WITNESS:  In the context of my
20  report and even in our discussion of low dose CT
21  cancer screening earlier this morning, the use of low
22  dose CT cancer screening as an example for
23  illustration purposes in my report, pertains to
24  screening for lung cancer not liver cancer.  You've
25  asked me a question about applying that screening

32 (Pages 122 - 125)

Page 126

1 test for liver cancer and my honest response to you
2 is, I have not looked into that clinical question and
3 I was not retained to do so, I did not do so in
4 writing my report and sitting here with you at the
5 moment, I have not done that investigative work, so I
6 don't have an opinion on that application of the test
7 for you.
8
9 BY MR. TRISCHLER:
10    Q.    Is upper endoscopy of any clinical value
11 in screening for bladder cancer?
12        MR. MIGLIACCIO:  Same objection.
13        THE WITNESS:  An upper endoscopy is used
14 in some cases to -- in certain situations, pardon me,
15 to screen for esophageal cancer.  Any relationship
16 that an upper endoscopy has with other cancer types
17 is not something that was germane to my clinical
18 training, it's not something that I have prior
19 knowledge about, and is not something I have had a
20 chance to look into nor is it within the scope of my
21 work for this case to date.
22
23 BY MR. TRISCHLER:
24    Q.    Have you ever published any papers
25 dealing with the toxicological effects of NDMA or

Page 127

1 NDEA exposure?
2    A.    No, I have not.
3    Q.    And before you were retained in this
4 case, I think you told me that you've never
5 independently researched the carcinogenicity of NDMA
6 or NDEA.  Correct?
7    A.    Because that was not within the scope of
8 what I was retained to opine on; to date, correct, I
9 have not looked into that question.
10    Q.    My question was:  Before you were ever
11 retained in this case, you had never done any
12 independent research in the carcinogenicity of NDMA
13 or NDEA.  Right?
14    A.    Ah, I see.  Thank you for that
15 clarification.  Prior to being retained for this
16 case, to my knowledge and my recollection, I have not
17 done original investigation into that question.
18    Q.    And NDMA and NDEA fall within a class of
19 compounds known as nitrosamines.  Are you aware of
20 that?
21    A.    To the extent of my knowledge,
22 especially that most recent knowledge supplied by the
23 documents in this case, that is my general
24 understanding.  Although, I would need to defer to
25 colleagues in oncology and other subspecialists, such

Page 128

1 as toxicologist or an oncologist for a question such
2 as that.
3    Q.    And do you understand that nitrosamines
4 are ubiquitous?
5        MR. MIGLIACCIO:  Objection.  Assumes
6 facts not in evidence.
7        THE WITNESS:  I was not asked to think
8 about or opine on nitrosamines.  So a question about
9 nitrosamines with respect to its ubiquitousness is
10 not something that I have a formal opinion on at this
11 time.
12
13 BY MR. TRISCHLER:
14    Q.    Each and every one of us are exposed to
15 nitrosamines, including NDMA or NDEA, on a regular
16 basis; are we not?
17    A.    I was not retained to opine on that
18 question.  I have not looked into that question.  I
19 don't have an opinion on that question at this time.
20    Q.    Well, I appreciate that.  I wasn't
21 really asking you as an opinion.  Do you know as a
22 matter of fact whether each and every one of us are
23 exposed to nitrosamines, including NDMA and NDEA, on
24 a regular basis?
25    A.    I'm referring back to all of my training

Page 129

1 as a general primary care physician and I cannot
2 recall a time when I received specific clinical
3 training on that issue, so I don't have an opinion on
4 that.  I don't have an answer for you on that
5 question.
6    Q.    So since you've become involved in this
7 case, are you aware of research suggesting that
8 nitrosamines, including NDMA or NDEA, can be found in
9 the food we eat, the water we drink and the air we
10 breathe?
11    A.    Again, I was not asked to look into that
12 question and I have not taken the time to examine
13 such literature as you've connoted here in that
14 question.
15    Q.    Well, you've read a lot of stuff about
16 the issue, the issues in this case that you weren't
17 asked to opine on.
18    A.    I'm sorry, what was your question?
19    Q.    I said, you've read a lot of materials
20 that include discussion of issues that you were not
21 asked to opine on, like, you told us about
22 Dr. Panigrahy's report, Dr. Hecht's report.  They
23 cover lots of issues that you weren't asked to opine
24 about, but you read them anyway.  Right?
25    A.    I certainly did read them back in

33 (Pages 126 - 129)

Page 130

1 September, October -- or rather October and November
2 time period. I don't recall off the top of my head
3 here today specifics regarding the ubiquitousness of
4 nitrosamines. And I would offer, if they have
5 provided you evidence or citations or formal opinions
6 with regard to that, I defer to them as experts in
7 the field. Just as, by the way, for so many of the
8 questions you've asked me, I emphasize that I am a
9 primary care physician, not an oncologist, not a
10 toxicologist. As routine in our medical practice, we
11 rely on the expertise and opinion of our specialty
12 colleagues in making clinical decisions. And this is
13 analogous here. Seems like if there are specialty
14 colleagues here or other specialty experts with the
15 particular training in such questions, my analogous
16 role would also be to defer to them, even if I've
17 read their reports months ago. You know, I think
18 it's reasonable that deferring to that more
19 subspecialty expertise is appropriate for me as a
20 primary care physician.
21    Q.    All right. Well, thanks for that
22 nonresponsive commentary. But let me see if I can
23 get an answer to the question because the only
24 question I asked you was: Have you read, you,
25 Dr. Song, have you read anything since you've been

Page 131

1 involved in this case suggesting that NDMA and NDEA
2 can be found in the food we eat, the water we drink
3 and the air we breathe?
4         MR. MIGLIACCIO: Objection. Asked and
5 answered. Object to the colloquy there.
6         THE WITNESS: What I recall, at the
7 moment, regarding nitrosamines in the material that
8 I've read in the context of this case is that they
9 were contaminants in Valsartan-containing drugs, that
10 many individuals were exposed to them through the
11 drugs. And that really is the extent of my
12 recollection about their ubiquitousness and I would
13 need to reconsult those reports to give you an answer
14 about other aspects of nitrosamines.
15    Q.    In your clinical practice, have you ever
16 diagnosed a patient with cancer due to NDMA or NDEA
17 exposure?
18    A.    Can you be more precise about diagnosis?
19 What do you mean by diagnosis there?
20    Q.    What's the medical definition of
21 diagnosis or diagnose?
22    A.    Well, I don't mean to put my teaching
23 hat on here, but cancer diagnoses are made in almost
24 all cases of solid tumors based on tissue diagnoses
25 and pathologists' reads. So we've already

Page 132

1 established earlier that I'm not a pathologist;
2 therefore, I never read a pathology slide of a tissue
3 biopsy and formally made the diagnosis of cancer as a
4 pathologist. And liquid malignancies also require a
5 diagnostics step with a specialist, whether that's an
6 oncologist or other specialist. So, because that is
7 the clinical working definition of a diagnosis, which
8 is why I want to be precise about that, I, in my role
9 as a primary care physician, am not in a position to
10 formally diagnose the existence of a cancer.
11    Q.    Have you ever attributed a patient's
12 cancer in your clinical practice to NDMA or NDEA
13 exposure?
14    A.    Such attribution would, in almost all
15 cases, come from specialists, such as an oncologist
16 or perhaps a pathologist or perhaps a toxicologist.
17 Given that my specialty is not in those domains, I
18 would also not be in an appropriate position to
19 attribute causation in cancer for my own patients in
20 a formal clinical sense.
21    Q.    Are you aware of any generally accepted
22 test method that exists to enable one to attribute a
23 given cancer type in a particular patient to NDMA or
24 NDEA exposure, as opposed to any other risk factor?
25         MR. MIGLIACCIO: Objection. Vague.

Page 133

1 Incomplete hypothetical. Outside the scope.
2         THE WITNESS: I recognize the vagueness
3 of that question; and frankly, it falls outside of my
4 clinical expertise and as well outside the domain of
5 my expert opinion for this case.
6
7 BY MR. TRISCHLER:
8    Q.    All right. Does that mean you don't --
9 (audio dropped) that would enable a clinician to
10 attribute a given cancer type to NDMA or NDEA
11 exposure?
12         MR. MIGLIACCIO: Same objection.
13         THE WITNESS: I also think you broke up
14 a bit there. I don't think I caught your second or
15 third word, but with the rest of what you said, which
16 I think I understand, that exceeds my clinical
17 training, sir. So I'm here as a health economist.
18 I'm also here, you know, outside of the scope of what
19 I was retained to do as a practicing clinician. In
20 my clinical training in both of these professions, I
21 have not received enough training to be able to
22 answer that question.
23
24 BY MR. TRISCHLER:
25    Q.    You've talked several times today about

34 (Pages 130 - 133)

Page 134

1  high risk patients.  Do you remember using that term?
2      A.    Yes, I remember using that term earlier
3  today.
4      Q.    Does NCCN define high risk patients?
5      A.    I don't recall off the top of my head
6  whether those guidelines specifically use the word
7  "high risk".  They may use additional, more specific
8  words to connote or denote high risk.  In my
9  professional life as a general primary care physician
10  and in my answers to you earlier, high risk is meant
11  to capture people who are at a higher probability of
12  developing a bad outcome, such as a cancer.
13      Q.    Yeah.  I appreciate that.  I'm sorry I
14  didn't mean to cut you off.  I appreciate that.  I
15  wasn't looking for your definition.  Does NCCN define
16  the term "high risk"?
17      A.    I don't recall the exact words they use.
18      Q.    Does USPSTF define the term "high risk"?
19      A.    Their guidelines certainly, to the
20  extent of my knowledge as a primary care physician,
21  describe higher risk subpopulations of a more general
22  population.  I can give you a very concrete example
23  to illustrate that point.  Let's take one of the
24  things that we've talked about earlier, such as
25  colonoscopies.  The USPSTF clearly states that higher

Page 135

1  risk individuals should receive a more intensive
2  regimen of screening, either more frequent or
3  starting at an earlier age.  And in that, as you can
4  tell, is a reflection of the higher risk that that
5  subpopulation of individuals have or has.
6      Q.    In your clinical practice since 2017, do
7  you treat patients who took recalled Valsartan?
8      A.    As best as I can recall, and I'm going
9  through my inpatient clinical experience in recent
10  years and my outpatient primary care panel, which is
11  why I'm taking a second to think through my patients,
12  I cannot recall a specific example of a patient,
13  either on the inpatient wards or on the outpatient
14  primary care clinic setting, who has consumed
15  contaminated Valsartan.  But to the extent that those
16  patients exist in my panel or in the inpatient
17  setting, it's possible that they may have not been
18  brought to my attention yet.
19      Q.    Are you aware of scientific research
20  establishing that all humans form nitrosamines
21  indigenously?
22      A.    That is beyond the scope of what I was
23  asked to do.  I have not had a chance to look into
24  that question and, sitting here at the moment, it is
25  outside of the training that I received to date.

Page 136

1      Q.    Assume that every person in America is
2  exposed to nitrosamines, including NDMA and NDEA, on
3  a regular basis and that all of us indigenously
4  produce nitrosamines.  Should cancer screens for
5  asymptomatic patients be put in place across the
6  entire American population?
7          MR. MIGLIACCIO:  Objection.  Vague.
8  Incomplete hypothetical.
9          THE WITNESS:  That is a perplexing and I
10  might even offer a potentially misleading
11  hypothetical here and it falls well outside the scope
12  of what I've spent my time and effort opining on in
13  this case.  I would defer to other experts in this
14  case for a question as general and vague as that.
15
16  BY MR. TRISCHLER:
17      Q.    Has the American Medical Association
18  ever recommended or endorsed cancer screening for
19  individuals exposed to NDMA or NDEA?
20      A.    Again, because that's a question outside
21  the scope of what I was retained to do, I've not had
22  a chance to try to answer that question with my own
23  research.
24      Q.    Sitting here today, do you know if the
25  AMA has ever endorsed cancer screening for anyone

Page 137

1  exposed to NDMA or NDEA?
2      A.    Off the top of my head now, no, not at
3  the moment.
4      Q.    Has the American Cancer Society ever
5  recommended or endorsed cancer screening for anyone
6  exposed to NDMA or NDEA?
7      A.    Similarly --
8          MR. MIGLIACCIO:  Objection.  Vague and
9  incomplete hypothetical.  But go ahead.
10          THE WITNESS:  Similarly, I have also not
11  been asked to track down that guideline, if it
12  exists.  And therefore, because I have not spent time
13  examining that question, I don't have an answer for
14  you at the moment.
15
16  BY MR. TRISCHLER:
17      Q.    Well, as a clinician treating patients
18  every day, do you know whether the American Cancer
19  Society has ever recommended or endorsed cancer
20  screening for individuals exposed to NDMA or NDEA?
21          MR. MIGLIACCIO:  Same objection.
22          THE WITNESS:  Off the top of my head, I
23  cannot recall seeing such a guideline.
24
25  BY MR. TRISCHLER:

35 (Pages 134 - 137)

Page 138

1    Q.   Has the FDA ever endorsed or recommended
2 cancer screening for anyone exposed to NDMA or NDEA?
3         MR. MIGLIACCIO:  Same objection.
4         THE WITNESS:  And my same response to
5 you, sir.  I have not been asked to look into that
6 question.  I have not had time to look for that or
7 look into that and sitting here today, I don't have
8 an answer for you at the moment.
9
10 BY MR. TRISCHLER:
11    Q.   Well, as a clinician taking care of
12 patients on a daily basis, which you told us that you
13 do, are you aware of whether or not the FDA has ever
14 recommended or endorsed cancer screening for patients
15 exposed to NDEA or NDMA?
16    A.   I don't recall having come across such a
17 guideline.
18    Q.   When you have new patients come into
19 your practice, do they have to fill out, you know, a
20 questionnaire, like you do when you go to most
21 doctors to start new treatment with them?
22    A.   It can depend on the patient.  Most
23 patients that I've received as new patients for a new
24 intake visit have some history with Massachusetts
25 General Hospital and have some clinical notes or

Page 139

1 prior testing or prior encounters.  Therefore, in our
2 first visit, I generally take the time to meet a new
3 patient to talk about the patient's life, family,
4 work, and then review their clinical history as best
5 as I know from their prior records.  And typically,
6 through that process, we can construct what would
7 otherwise be done in a more natural, organic and, I
8 would say, beneficial way for the doctor/patient
9 relationship as what a survey could do.  But there
10 are also times in my practice, especially in prior
11 years, where a survey has been used, so it varies
12 depending on the situation.
13    Q.   And in your -- in your clinical
14 practice, I think you said you see patients at, I
15 think you called it the clinic at Mass General.  I
16 don't want to mischaracterize it, but is that what
17 it's called?
18    A.   Oh, no problem.  Thanks for clarifying.
19 Yes, so we have one -- the clinic I practice in is
20 one of several main primary care clinics on the
21 campus of Massachusetts General Hospital.  It's not
22 the only one.  It's one of the largest adult medicine
23 primary care practices within Mass General.
24    Q.   Okay.  So if I show up at the clinic for
25 the first time, what you said is that sometimes

Page 140

1 there's a written survey that I have to answer and
2 sometimes there's not.  Right?
3    A.   Yeah, and I imagine my colleagues in
4 clinic have different preferences about whether they
5 would administer a survey or simply meet the patient
6 and speak with the patient more organically.  I've
7 done it both ways as a trainee and as a practitioner
8 after training.
9    Q.   On the survey form used at Mass General,
10 when you're developing, you know, treatment plans and
11 putting in place treatment modalities for new
12 patients, is there a -- do you ask patients on the
13 questionnaire whether they've been exposed to NDMA or
14 NDEA?
15    A.   To the best of my clinical recollection,
16 the surveys, which again were in years prior as I
17 noted before, tended to focus on prior medical
18 history, family history and current symptoms.  And I
19 don't recall a specific instance where there was a
20 specific question asks, as you've asked about here,
21 pertaining precisely to particular carcinogens like
22 NDMA or NDEA.
23    Q.   Do you agree with me that no public
24 health agency in the world and no respected medical
25 society has advocated for broad screening of

Page 141

1 asymptomatic individuals based solely on exposure to
2 NDMA or NDEA?
3         MR. MIGLIACCIO:  Objection.  Vague.
4 Incomplete hypothetical.
5         THE WITNESS:  I appreciate the question,
6 but I think you would also agree my clinical
7 expertise is limited to, my clinical exposure is
8 limited to guidelines that have been a part of my
9 practice from the United States.  I'm a physician
10 practicing in the United States after all.  So when
11 you ask me about any professional societies around
12 the world, I'm not privy to nor are we trained to
13 practice based on guidelines outside of the United
14 States.
15         MR. TRISCHLER:  Fair enough.  I'll
16 rephrase the question.
17
18 BY MR. TRISCHLER:
19    Q.   Are you aware of any public health
20 agency in the United States or any respected medical
21 society in the United States that has advocated for
22 broad screening of asymptomatic individuals based
23 solely on exposure to NDMA or NDEA?
24         MR. MIGLIACCIO:  Same objection.
25         THE WITNESS:  To my knowledge, to date,

36 (Pages 138 - 141)

Page 142

1  I'm not aware of a formalized guideline, such as the
2  colorectal cancer screening or lung cancer screening
3  guidelines that we've talked about in some depth that
4  analogously applies to these carcinogens.  That is
5  not to say that such professional guidelines and the
6  individuals that comprise them haven't talked about
7  these carcinogens.  That's not something I'm privy
8  to.
9
10 BY MR. TRISCHLER:
11     Q.    Either based on your clinical practice
12 or your work in this case, are you aware of any peer
13 reviewed medical literature that has concluded that
14 exposure to NDMA or NDEA necessitates long-term
15 medical monitoring of asymptomatic individuals?
16        MR. MIGLIACCIO:  Same objection.
17        THE WITNESS:  In such a question about
18 my knowledge of the medical literature, because I was
19 not retained to think about this question, I have not
20 had a chance to research the medical literature
21 pertaining to this question.  So I don't have an
22 opinion for you not having done that yet to date.
23
24 BY MR. TRISCHLER:
25     Q.    Okay.  I appreciate that, but I wasn't

Page 143

1  really asking for your opinion.  I was asking whether
2  you're aware of any peer reviewed literature that has
3  concluded that exposure to NDMA or NDEA necessitates
4  long-term monitoring or cancer screening of
5  asymptomatic individuals?
6      A.    Okay.  Thanks for clarifying.  And
7  because I have not looked into the literature
8  pertaining to this question, at the moment, I'm not
9  aware of the type of studies that you just described.
10     Q.    As part of your work in this case, have
11 you reviewed the medical records of any of the
12 medical monitoring class plaintiffs?
13     A.    No, because it is well outside the scope
14 of what I was asked to do for this case.
15     Q.    Do you know who the class plaintiffs
16 are?
17     A.    Not by name off the top of my head
18 because it's unrelated to how medical services are
19 priced in the U.S. healthcare system, which I've also
20 answered several times before.
21     Q.    And I take it that you've never talked to any
22 of those plaintiffs?
23     A.    That is correct, I have not.
24     Q.    You have not reviewed any of their
25 deposition testimony?

Page 144

1      A.    That is correct, I have not because the
2  pricing of medical services is unrelated to the names
3  or the records of any particular individuals because
4  the pricing of medical services is done in a uniform
5  fashion, in a common fashion that, you know, my
6  report goes into detail describing.
7      Q.    Bear with me a second, please.
8      A.    Sure.  No problem.
9        MR. TRISCHLER:  Can we -- I'm going to
10 ask my colleague because he's more adept at documents
11 than I am.  Frank, are you able to pull up the EMA
12 Lessons Learnt publication?
13
14        (Technical difficulties.)
15
16        (Whereupon, a discussion takes place off
17 the record.)
18
19        MR. TRISCHLER:  Thanks, Frank.  So we'll
20 mark this our next sequential exhibit, Dr. Song.  I
21 don't know if we're up to No. 6 or.
22        MR. MIGLIACCIO:  Five, I think.
23        MR. TRISCHLER:  Five, okay.  Whatever
24 the number is.
25

Page 145

1        (Whereupon, Exhibit ZS-5 was marked for
2  identification.)
3
4  BY MR. TRISCHLER:
5      Q.    And this entire document should be
6  available in the chat, either now or very shortly,
7  but I'll represent to you that what I put in front of
8  you as Exhibit No. 5 is a document from the European
9  Medicines Agency.  It's entitled "Lessons Learnt From
10 Presence of N-Nitrosamine Impurities in Sartan
11 Medicines"?
12        Do you see that, sir?
13     A.    I see the title of that report as you've
14 just read it, yes.
15     Q.    And have you ever heard of the European
16 Medicines Agency?
17     A.    I have not, sir.
18     Q.    I'll represent to you that it's the
19 European equivalent of the FDA for countries in the
20 European continent.  Okay?
21     A.    When you say "equivalent", do you have
22 any more information about -- I'm not trying to be
23 difficult here.  I just have never heard of this
24 agency and I don't know how they conduct their work
25 or who is on the committees or panels.  I really have

Page 146

1 no information about them, so I know something about
2 the FDA, but can you be a little more specific about
3 how they do their work?
4     Q.   No, not really.  It's a regulatory
5 agency that approves and monitors drug safety in
6 European nations.
7     A.   Who are they comprised of?  Do you know
8 the types of experts?  Is it basic scientists,
9 clinicians, public health experts, epidemiologists,
10 or other folks from government in these groups?
11    Q.   I don't know.  Perhaps the experts from
12 whom you've read their works, like Dr. Panigrahy and
13 Dr. Hecht and all those fine scientists can help you
14 answer that question.  But let me ask, let me ask
15 mine.
16        MR. TRISCHLER:  Frank, can you scroll
17 ahead to I think it's Page 9 of the document.
18        THE WITNESS:  By the way, I just want to
19 let you know, the document is not yet in the exhibits
20 folder, so I can't access it at the moment.  Let me
21 just try again here.
22        MR. STOY:  Doctor, if you refresh now,
23 it should be in there.
24        THE WITNESS:  Oh, okay.  Thank you so
25 much, Frank.

Page 147

1        MR. MIGLIACCIO:  I'm going to state for
2 the record, it appears to be a 98 page document that
3 we're looking at Page 9 of right now.
4        THE WITNESS:  It's taking a while to
5 load here on my computer.
6        MR. TRISCHLER:  And Frank, the document
7 that I wanted to draw the witness's -- the page that
8 I wanted to draw the witness's attention is not Page
9 9 of 98.  It's actually Page 18 of 98.  It's numbered
10 Page 9 of the document.
11       And you can take the time to read as
12 much of this document as you like, Dr. Song.  I want
13 to draw your attention, though, and ask you a
14 question about the paragraph that starts with the
15 question on, "Question of protecting patient's
16 health."
17       If you could highlight that for me
18 please and sort of blow that up.  Could you enlarge
19 that for the witness, please?
20
21 BY MR. TRISCHLER:
22    Q.   Okay.  And if you read this paragraph,
23 Dr. Song, what EMA wrote was:  "On the question of
24 protecting patients health, CHMP did not find
25 evidence to support cancer screening or additional

Page 148

1 monitoring of patients exposed to nitrosamines.
2 First, the theoretical risk of cancer was very low
3 and was itself based on a worst case scenario.
4 Second, the screening methods themselves carry risks
5 for the patient.  Third, there was considerable
6 uncertainty as to which organs or tissues could be at
7 risk from cancer."
8        Do you see that language?
9     A.   As you have just read it, that matches
10 the highlighted portion on my screen.
11    Q.   And based on what you just told me a
12 moment ago, you have not done any independent
13 research to call into question the accuracy of the
14 conclusions published by EMA.  Correct?
15       MR. MIGLIACCIO:  Objection.  Assumes
16 facts not in evidence.
17       THE WITNESS:  As we just talked about a
18 minute ago, I don't have prior knowledge about this
19 European agency.  I don't have any knowledge about
20 how they conducted this work, who was a part of it,
21 what evidence they reviewed or anything regarding
22 this report, to be honest.  And I am seeing this for
23 the first time and certainly have not had a chance to
24 read it and digest it.  I don't feel it's appropriate
25 for me to render any opinion or answer substantive

Page 149

1 questions about this report because I'm seeing it for
2 the first time.  And in my quick scroll through of
3 pages arriving at this page, there seems to be a
4 pretty dense report that would take some time to
5 process through with basic science and things of the
6 like.  So I don't feel that I've had a chance to
7 really think through this report.  What you've read
8 here is what's highlighted on the screen.
9
10 BY MR. TRISCHLER:
11    Q.   Well, earlier you told me that you were
12 not aware of any public health agency or any medical
13 society that had advocated for broad screening of
14 asymptomatic individuals based solely on their
15 exposure to NDMA or NDEA.  Right?
16    A.   Well, because I've not yet had a chance
17 to look into that question and it was not something I
18 was retained to opine on or do in this case.  I had
19 not yet gained knowledge enough to answer that
20 question and I don't see how that pertains to this
21 report directly.
22    Q.   Well, since you've not had a chance to
23 look at that question, then you obviously don't have
24 any information to refute or call into question EMA's
25 conclusions that cancer screening for individuals

Page 150

1 exposed to nitrosamines is not necessary.
2          MR. MIGLIACCIO: Same objection.
3          THE WITNESS: Well, using your logic,
4 sir, if I have not had a chance to review any of this
5 material, how could I formulate any opinion about it
6 in refutation or in support of anything of substance?
7 Again, as I've said just a moment ago, this is the
8 first time that I've seen this document. What would
9 you like me to do with regard to this document that
10 you've uploaded here?
11
12 BY MR. TRISCHLER:
13      Q. So far, just answer my questions. But
14 if there's something you'd like to do, let me know.
15      A. Well, I don't know that it's practical
16 for me to read through this whole report and process
17 it. It seems long enough that it might take the rest
18 of the day for us. So out of respect for your time
19 and that of others, let me hand the microphone back
20 to you and let you direct where you want me to go
21 here.
22      Q. Well, the only place I want you to go is
23 with an answer to my question and that is: Can you
24 cite for me any studies that call into question the
25 conclusion from EMA that cancer screening for

Page 151

1 patients exposed to nitrosamines is not necessary?
2          MR. MIGLIACCIO: Objection. Asked and
3 answered. Outside the scope.
4          THE WITNESS: Again, I've not been
5 retained to work on that question. If asked to do
6 so, I can take the time and effort that that question
7 would deserve to read this material, look into the
8 literature, do my primary independent investigation
9 of that question. But I would just emphasize for
10 you, sir, and I don't mean to be repetitive, that my
11 work in this case pertains to the pricing of medical
12 services within the United States healthcare system
13 and this is well outside the scope of that work.
14
15 BY MR. TRISCHLER:
16      Q. You say it's outside the scope of the
17 work, but if we're going to -- in fairness, if we're
18 going to put in place a monitoring program, we would
19 only want to include within that program services
20 that were necessary. Correct?
21      A. Well, in fairness, I defer to the fact
22 finder or decision maker in a case like this with
23 regard to what the final monitoring program would
24 include. Remember my framework of prices times
25 quantity equals spending. Part of quantities is

Page 152

1 determining who is in the final class that's
2 certified and what services are in the final
3 monitoring program that's certified. Because neither
4 of those certifications have taken place and because
5 I've emphasized my work is on the pricing of medical
6 services, that is outside the scope of what I'm doing
7 and a better expert for answering a question like
8 that would be an oncologist, for example.
9      Q. So you're going to opine on the costs of
10 a monitoring program, but you're not equipped to
11 describe what the necessary elements of that program
12 are. Agreed?
13      A. I disagree with your use of "equipped".
14 I have expertise in areas outside of what I was asked
15 to opine on for this case. I have, to date, not
16 applied that expertise to many, if not most, if
17 perhaps not all of the questions you've actually
18 asked during today's meeting. And it's not that I'm
19 not equipped to do any of that work, it's that I have
20 not, to date, been retained to do any of that work or
21 look into any of those questions.
22      Q. Do you -- strike that.
23          MR. MIGLIACCIO: Can we take a break for
24 two minutes, please?
25          MR. TRISCHLER: Sure.

Page 153

1          THE VIDEOGRAPHER: The time is 2:01.
2 This ends media unit No. 3. We're going off the
3 record.
4
5          (Whereupon, a brief recess was taken off
6 the record.)
7
8          THE VIDEOGRAPHER: The time is 2:18.
9 This begins media unit No. 4. We're back on the
10 record.
11
12 BY MR. TRISCHLER:
13      Q. Early on in the deposition, Dr. Song, we
14 talked about your understanding of how the medical
15 monitoring class was to be defined and you published
16 it on page 4 of your report that I think we marked as
17 Exhibit 4. Do you remember that?
18      A. Let me go to that page in the report.
19 Thank you for putting it up on the screen.
20      Q. If you look at the last sentence of the
21 first paragraph that appears there, what you wrote
22 was that:
23          "The medical monitoring classes are
24 defined as all persons who consumed the defendants
25 Valsartan-containing drugs containing NDMA or NDEA

39 (Pages 150 - 153)

Page 154

1 and who have accumulated sufficient quantities of
2 lifetime cumulative exposure to require medical
3 monitoring," and the you go on.
4        Correct?
5     A.    Those are the words that you just read.
6     Q.    As a physician, how do you determine if
7 a patient had met a lifetime cumulative exposure that
8 is met for NDMA or NDEA?
9          MR. MIGLIACCIO:  Objection.  Asked and
10 answered.
11          THE WITNESS:  I do recall that we talked
12 about this earlier today, but to answer your question
13 again anew, first of all, I defer to our oncologist
14 expert with regard to every component of the medical
15 monitoring program and every component of class
16 definition, as well as other colleagues in the case,
17 such as counsel, and as far as my knowledge is at the
18 moment on this case, this proposed class has not been
19 certified and the accumulated sufficient quantities
20 of lifetime cumulative exposure has been proposed,
21 but not yet finalized.  So it is not my place in this
22 case to think through this definition of class or to
23 opine on the definition of class because No. 1, it is
24 not what I was retained to do, and No. 2, I would
25 defer all substantive questions about the monitoring

Page 155

1 program and about the class to our subspecialty
2 colleagues and counsel, and my expertise that was in
3 this -- that was asked to be applied to this case is
4 with regard to the pricing of medical services.
5
6 BY MR. TRISCHLER:
7     Q.    You wrote this report, including the
8 phrase that we highlighted on page and what we're
9 looking at right now.  Correct?
10    A.    Correct, and I just characterized the
11 meaning of what I wrote for you.
12    Q.    And all I'm asking is whether you as a
13 physician have the ability to determine if a given
14 patient has exceeded what you write as a lifetime
15 cumulative exposure to NDMA or NDEA.  Do you have
16 that ability?
17          MR. MIGLIACCIO:  Same objection.
18          THE WITNESS:  There are various analytic
19 skills and abilities, if you will, that I've been
20 trained to practice in my professional life as a
21 physician and a health economist.  I have not been
22 asked to apply any of those abilities to this case,
23 and I have not been asked to examine the accumulated
24 risk or the cumulative exposure.  I've not been asked
25 to examine that data to make a formulation.  Those,

Page 156

1 as I understand, are aspects of this case performed
2 by other specialists, other technical persons.
3
4 BY MR. TRISCHLER:
5     Q.    Are nitrosamines excreted from the body
6 after exposure?
7          MR. MIGLIACCIO:  Objection.  Vague.
8          THE WITNESS:  Analogous to your previous
9 questions with the vague aspects of the definition,
10 you've used exposure many times, and I'm still
11 struggling with what you mean about exposure.  You
12 have yet to define exposure in your questions
13 regarding exposure.  Is it exposure from contaminated
14 Valsartan, which is the subject matter of this case,
15 or is it exposure as you inferred earlier on from
16 other sources?  They're not the same concept, in my
17 view, because this matter pertains to carcinogens in
18 a contaminated drug.  So what do you mean by
19 "exposure" in that first question?
20
21 BY MR. TRISCHLER:
22    Q.    Are -- those are all good questions.
23 Hopefully, we can get an answer to at least one of
24 them.  Are nitrosamines, such as NDMA or NDEA, that
25 are ingested excreted from the body after ingestion?

Page 157

1     A.    Do you mean ingestion through a small
2 molecule drug, like a tablet, a pill, or a capsule?
3     Q.    That would be one way, or how about in
4 our food or how about in our water?
5     A.    Okay, and what amount of ingestion are
6 you referring to in this question?
7     Q.    It doesn't matter.  You tell me.  I'm
8 only asking you if you know, are a portion of the
9 nitrosamines that an individual ingests, are they
10 excreted or eliminated after the exposure?
11    A.    My training to date as a physician of
12 social scientist is outside the scope of that
13 question and certainly my work in this case falls
14 outside the scope of that question.  I do not have
15 enough training at a biochemical or physiological
16 level in terms of pharmacology to be able to offer
17 you an answer on that.
18    Q.    Do you know one way or the other whether
19 all of the members of this proposed class were
20 exposed to the same levels of NDMA or NDEA?
21    A.    Again, I was not asked to think about
22 that question because that is unrelated to the
23 pricing of medical services and the common
24 methodology for arriving at pricing.  Again, in an
25 effort to be helpful to you, the materials we've

Page 158

1 already talked about in this case, as we've already
2 discussed this morning, propose a point system for
3 arriving at a threshold of exposure. The very
4 presence of a point system conveys to me or connotes
5 to me that exposures can differ across people, but
6 that is not what I was asked to assess in this case.
7     Q.    If exposures to nitrosamines can vary by
8 patient, whether depending upon diet, lifestyle, dose
9 or duration, or any other factor, would you agree
10 with me that it would be difficult or impossible to
11 determine which patients met their lifetime threshold
12 for NDMA or NDEA specifically from taking affected
13 Valsartan as opposed to some other source?
14         MR. MIGLIACCIO: Objection. Incomplete
15 hypothetical. Vague. Compound.
16         THE WITNESS: I'm trying my best to give
17 you an answer, sir, but I do not have enough by
18 biochemistry, physiologic, or pharmacologic training
19 to answer that question.
20
21 BY MR. TRISCHLER:
22     Q.    We talked before about the class
23 plaintiffs. Do you recall having a brief discussion
24 about that?
25     A.    Yes, I believe on several occasions

Page 159

1 today we've talked about that subject.
2     Q.    Sure. I asked you specifically if you
3 reviewed the medical records for any of the medical
4 monitoring class plaintiffs, and you said you had
5 not. Right?
6     A.    That's correct.
7     Q.    And you said that you didn't recall
8 offhand the names of any the medical monitoring
9 plaintiffs and never spoken to any?
10     A.    That is also what I said earlier, yes.
11     Q.    I'll represent to you that one of the
12 plaintiffs in this litigation is a gentleman by the
13 name John Judson, J-U-D-S-O-N. Does that name ring a
14 bell to you?
15     A.    It does not because of what we just
16 talked about.
17     Q.    And I'd like you to assume the following
18 facts for purposes of my next series of questions.
19 I'd like you to assume that Mr. Judson is a
20 64-year-old gentleman with a family history of colon
21 and liver cancer, and because of that family history
22 of cancer, Mr. Judson has been undergoing
23 colonoscopies every three years since 2008, long
24 before he was ever exposed to any recalled Valsartan.
25 And during one of those early screenings, I'd like

Page 160

1 you to assume that one of the colonoscopies that Mr.
2 Judson received was positive for nonmalignant colon
3 polyps, and as a result, he's now under doctors
4 orders and recommendations to get a colon screen
5 every three years. Are you with me so far?
6     A.    I'm taking notes as you speak about this
7 patient.
8     Q.    Good. I'd also like you to assume that
9 Mr. Judson's treating physicians have sent him for
10 regular prostate cancer screens in the form of PSA
11 tests since 2004, long before he ever used any
12 recalled Valsartan. Do you understand those facts as
13 I've asked you to assume them?
14     A.    As you've stated in that way, yes, I
15 believe I understand them.
16     Q.    Based on the history as I have reported
17 it to you, would you agree with me that Mr. Judson is
18 a patient who would have received those colonoscopies
19 and those PSA screenings regardless of any exposure
20 to NDMA or NDEA?
21     A.    You've given me a clinical vignette,
22 which is the first time that I've been presented with
23 a detailed clinical vignette to think through for my
24 work in this case. I have not to date been asked to
25 think through clinical vignettes such as this with an

Page 161

1 individual patient, again, because the scope of my
2 work pertains to medical pricing or pricing of
3 medical services, which is unrelated and uncorrelated
4 to clinical variations across patients, and because
5 you have given me this clinical vignette, it is clear
6 to me that the right person to opine on the
7 appropriateness of screening for this is or any such
8 patient in a scenario like this would be an
9 oncologist, would be someone with expertise in cancer
10 screening and training in oncology more than I have
11 received. So I do not feel comfortable answering
12 your question as it is stated here for this
13 particular patient. I'm sure there are other aspects
14 to this patient's care that an oncologist would want
15 to know outside of what you've provided in the
16 anecdote right now.
17     Q.    It's a shame because I was really hoping
18 to get a responsive answer to my question. Let me
19 try something different.
20         I'm sure that you would agree with me
21 that in a monitoring program, that we should include
22 a program only charges for procedures that are
23 directly related to or necessitated by exposure to
24 NDMA or NDEA; wouldn't you agree?
25     A.    Well, the common methodology for

41 (Pages 158 - 161)

Page 162

1 applying the pricing of medical services could
2 pertain to any service, and after I've described to
3 you how prices are determined, you can take that
4 common methodology and apply it to any given service
5 that might be part of a potential monitoring program.
6         As I think I just said a few minutes
7 ago, I defer all substantive questions about what
8 services are in the monitoring program and who is in
9 the class to the other experts in this case who have
10 been retained, as far as I know, to opine on matter
11 such as those because that question is not part of my
12 work in this case.
13    Q.    Then I don't understand what your work
14 in this case is because I asked you specifically
15 about monetizing the monitoring program, which your
16 own retention agreement, Exhibit 2, says you were
17 retained to do.
18    A.    Yes, and I just explained --
19    Q.    So what I asked you is when you go about
20 monetizing a monitoring program, are you going to
21 include in that program costs for procedures that are
22 not directly related to exposure to NDMA or NDEA?
23    A.    Thank you for further clarifying your
24 question.  I would apply the common methodology for
25 deriving the pricing of medical services to any

Page 163

1 monitoring program that's certified and finalized in
2 a case such as this, and in the certification or the
3 finalization of such monitoring program, your
4 question I imagine will be addressed either by the
5 factfinder or a judge and jury or other expert
6 services.  Therefore, I disagree with your prior
7 characterization because I have answered your
8 question and quite specifically too.  Whether it's
9 commercial prices, Medicare prices, Medicaid prices,
10 we can talk about the pricing of medical services,
11 which is the subject of my report, one can apply the
12 common methodology of pricing to any service.  You're
13 asking about the appropriateness of services.  You're
14 asking about the quantities in price times quantity
15 equals spending, and I'm again just emphasizing my
16 report and my scope of work in this case is about
17 prices.  Price times quantity equals spending.  And I
18 respect your questions about quantities, but
19 quantities are the domain of the other experts, and
20 therefore, I'm happy to answer any questions about
21 prices and I'm happy to say again here you can apply
22 a common methodology around pricing towards any
23 quantities that end up in a final monitoring program.
24 But the content of the monitoring program just as the
25 members of a final certified class are not part of my

Page 164

1 report here.
2    Q.    You're not answering my question, sir.
3 I'm asking you about how you are going to monetize
4 the program, which you told me is part of your work,
5 so I'm asking you, when you sit down to monetize this
6 monitoring program, are you going to include charges
7 for screening procedures that are unrelated to
8 exposure to NDMA or NDEA; yes or no?
9    A.    I first have to make a correction on
10 your question, sir.  You said charges, and clearly in
11 my report as I emphasize in the initial paragraph and
12 throughout the report, we're talking about the prices
13 of medical care in the U.S.  Prices are different
14 from charges in a very explicit way that I discuss at
15 length in my report.  So if I may correct your
16 question, you're asking about prices and how those
17 prices are applied to a monitoring program, and
18 again, my answer is prices are applied in a common
19 methodology that I've described to any components of
20 a final certified monitoring program.  You are asking
21 about what should be in the final monitoring program.
22 Under what conditions, as I understand your question,
23 would it be appropriate for a service to have that
24 pricing applied, and I'm again clearly delineating
25 the subject of my work for this report, which is

Page 165

1 around the pricing of services from the determination
2 of what should be priced, what should be in the
3 monitoring program, whom should receive the
4 monitoring program.  Those are all incredibly
5 important questions, but they were not what I was
6 asked to work on.  To my understanding, other experts
7 have opined on such questions as those, so I would
8 refer you to them.
9    Q.    Based on the assumed facts that I
10 provided to you, Mr. Judson is undergoing a
11 colonoscopy every three years regardless of his
12 exposure to NDMA or NDEA.  Understand?  I'm asking
13 you if you understand those assumed facts.
14    A.    Okay, I'm assuming the facts as you've
15 asked me to, yes.
16    Q.    And you understand that he's been
17 receiving regular PSA screening for prostate cancer
18 before he ever took any Valsartan that may or may not
19 have contained nitrosamine impurities.  Do you
20 understand that?
21    A.    As a primary care physician, I
22 understand what you're saying about this patient.
23    Q.    So including the costs of PSA screens
24 and colonoscopies for patients like Mr. Judson in the
25 class would result in a windfall, would it not, since

Page 166

1 those procedures are ones that he is undergoing
2 irregardless of his exposure to NDMA or NDEA?
3          MR. MIGLIACCIO: Objection to form.
4          THE WITNESS: I'm so sorry, I have to do
5 this again, but I have to correct your question
6 because --
7
8 BY MR. TRISCHLER:
9     Q.    Your job is not to correct a question,
10 sir, your job is to answer it.
11    A.    Your question then doesn't make sense to
12 me because you asked about costs, and clearly my
13 report explains how prices differ from costs. I
14 think you mean prices. I'm trying to honestly help
15 you ask the question in a way --
16    Q.    Well, I'm not as smart as you, so give
17 me all the help I need, Doctor. Don't be
18 condescending.
19          MR. MIGLIACCIO: Objection. Objection
20 to this harassing colloquy. Let him -- let him ask
21 you to clarify his question.
22          THE WITNESS: I'm merely stating when
23 you ask about costs, you're asking about a different
24 financial entity, and I devote an entire paragraph,
25 if not more, than that. If you're asking about

Page 167

1 prices, that's a different entity. I think you would
2 agree with me that this case is important for a lot
3 of people, and we need to get the specifics of the
4 words and the definitions right. I think you're
5 asking about prices. That's No. 1, and my report
6 pertains to the pricing of medical services. You
7 then asked about windfall. I'm confused about that.
8 What do you mean by "windfall"? Can you quantify
9 "windfall" and can you characterize "windfall"?
10
11 BY MR. TRISCHLER:
12    Q.    Do you want me to look it up in a
13 dictionary and give you a dictionary definition of
14 the word? With your years of higher education,
15 you're telling this jury you don't understand what
16 the word "windfall" means? I will look it up.
17    A.    Look, I won't accuse you of
18 condescension, but I'm just looking for some help of
19 the magnitude of windfall. What do you mean? You
20 haven't stated who is receiving a monetary amount of
21 how much. So with those two big variables lingering,
22 I don't know how to judge what you mean by
23 "windfall."
24    Q.    I'm going to give you a dictionary
25 definition since you don't understand what that term

Page 168

1 means. Just bear with me.
2     A.    Okay, thank you.
3     Q.    A piece of unexpected good fortune.
4 Does that help?
5     A.    Okay, what do you mean by your question
6 then? You asked me do you not think --
7
8          (Whereupon, the requested portion of the
9 record was read by the reporter.)
10
11          MR. MIGLIACCIO: Same objection and also
12 to the extent it calls for a legal conclusion.
13          THE WITNESS: Thank you for rereading
14 it. I'm going to assume that by "windfall" you mean
15 an amount that goes to the patient. You're
16 challenging -- you're asking if a service ought to
17 belong in a monitoring program, and if that is your
18 challenge, I think you should present that challenge
19 to the factfinder, the judge, jury, our oncology
20 experts, and others to argue that under these
21 particular circumstances or for this patient, this
22 service or that service ought not to be in a
23 monitoring program. I have not restricted you from
24 doing that in any way, nor have I inferred your
25 preference for doing so. All I've said is that after

Page 169

1 that process take place and after the final
2 monitoring program is determined, the application of
3 prices to this final program after you resolve the
4 issues that you're talking about has a common
5 methodology and is what my report addresses. I do
6 think that answers your question, and in part, it
7 does say that your question remains outside the scope
8 of what I was retained to opine on. That remains
9 true, sir, and I'm saying this respectfully.
10
11 BY MR. TRISCHLER:
12    Q.    Let's assume the final class is decided
13 to consist of 100 people for simplicity sake, okay?
14    A.    Okay.
15    Q.    And that the -- those 100 people include
16 Mr. Judson with his prior history of -- with his
17 family history of colon and liver cancer and with his
18 doctor putting him on a regular screening regimen
19 before he ever started taking Valsartan. Are you
20 with me?
21    A.    Yes, sir, please go ahead.
22    Q.    And then let's assume that since he's in
23 the class, my question is: When you use your common
24 methodology to monetize the monitoring program, are
25 you going to include the cost for his colonoscopies

43 (Pages 166 - 169)

Page 170

1 and his PSA tests or do you have a methodology by
2 which to exclude procedures that are done
3 irregardless of exposure to NDMA or NDEA?
4    A.   If in the final certification of a
5 monitoring program the services that you just asked
6 about for this patient that you just asked about end
7 up being certified as part of the monitoring program,
8 then you would take a common methodology such as one
9 that I proposed for applying the prices of services
10 to quantities and apply those prices to the
11 quantities that you're explicitly addressing here.
12 If, however, a factfinder, a judge, a jury, a
13 decisionmaker decides that for a patient in a
14 particular clinical situation a given service should
15 not be part of the monitoring program, then of course
16 you would not apply the prices that I am proposing in
17 my report or the common methodology for applying
18 prices in my report to that quantity of services.
19 That is what we've been returning to time and time
20 again, sir, prices times quantities equals spending.
21 My report addresses the pricing of medical services.
22 You've asked many questions about quantities, and
23 I've reemphasized the importance of your questions
24 about quantities, but they're not the subject of my
25 work in this case, and they're better answered, at

Page 171

1 least for some of your questions, by others, such as
2 an oncology expert. It's unrelated to the pricing of
3 medical services because the application of the
4 common methodology for pricing to any medical
5 services that are potentially in a monitoring program
6 is common. That application is common. There's a
7 common methodology for doing so. That's what my
8 report pertains to.
9    Q.   So I think if I follow what you're
10 saying, your common pricing methodology would not
11 exclude the prices paid for services like
12 Mr. Judson's. That would be the responsibility of
13 someone else to exclude those from the program?
14       MR. MIGLIACCIO: Objection. Misstates
15 testimony. Assumes facts not in evidence.
16       THE WITNESS: I don't agree entirely
17 with your characterization, but I agree partly with
18 it, so I would just reformulate what you said as
19 whatever services end up being certified in a medical
20 monitoring program, the pricing of those services has
21 a common methodology that I'm discussing in this
22 report, and that is the scope of my work in this case
23 to date.
24
25 BY MR. TRISCHLER:

Page 172

1    Q.   Right, and your common pricing
2 methodology, as you've called it, does not have the
3 ability to distinguish between screening procedures
4 related to NDMA or screening procedures that might be
5 necessitated by some other medical cause or
6 condition?
7       MR. MIGLIACCIO: Objection. Calls --
8 assumes facts not in evidence.
9       THE WITNESS: Thank you for this
10 question, which I think for the first time actually
11 addresses something germane to my report, and that is
12 the pricing of medical services in our U.S.
13 healthcare system, meaning the price for every CPT
14 code of a fee schedule, whether that's a Medicare or
15 commercial insurance or Medicaid, is agnostic to
16 patient level variation to clinician level variation
17 and who orders the CPT code or who orders the service
18 or who bills the CPT code, who has received the CPT
19 code, or who has received the clinical service, under
20 what circumstances those services were delivered to
21 the patients. All of those factors are unrelated to
22 the pricing of medical services in the U.S. I hope
23 that helps clarify things in your question.
24
25 BY MR. TRISCHLER:

Page 173

1    Q.   What would help clarify is a yes or no
2 answer to my question, but I've sort of given up the
3 idea of getting one of those. I'll ask another
4 question.
5       Your common pricing method does not
6 factor in whether any of the healthcare services are
7 related to NDMA exposure or unrelated to NDMA
8 exposure. It's for someone else to do that. That's
9 what you keep telling me.
10       MR. MIGLIACCIO: Objection. Assumes
11 facts not in evidence. Calls for a legal conclusion.
12       THE WITNESS: If you look at how the
13 prices of medical services are derived in the U.S.
14 healthcare system, they're derived not on the things
15 you just listed. In fact, as my report explains, and
16 to be very concrete here, sir, every physician
17 service in the physician fee schedule, which across
18 all payors tends to be based on the Medicare
19 physician fee schedule, is determined by a component
20 of physician work relative to value units, a
21 component of practice expense, practice expense
22 relative to value units, and a component of
23 malpractice risk relative to value units. That
24 system for determining physician prices or for prices
25 of medical services in the U.S. dates back to the

44 (Pages 170 - 173)

Page 174

1 1980s, and in neither or in none of those three
2 components that makes up or comprises the price of a
3 medical service in this country do you find the
4 factors that you just listed.
5          So it is not a subjective choice that
6 I'm making here as a health economist in
7 demonstrating to you how prices are determined for
8 medical services. I'm following a precedent that is
9 decades old and a precedent that exists across payors
10 in the country for a common methodology of deriving
11 prices. There are three components to every price in
12 the fee schedule, as I just summarized for you.
13
14 BY MR. TRISCHLER:
15     Q.    So you monetized this monitoring
16 program. It is irrelevant to your calculation of
17 whether the services were necessitated by NDMA
18 exposure or some other medical circumstance?
19          MR. MIGLIACCIO: Objection. Misstates
20 testimony. Calls for a legal conclusion.
21          THE WITNESS: The services that ought to
22 belong in a potential medical monitoring program are
23 in the domain of other experts and other people in
24 this case. They're not irrelevant to the case. I've
25 just stated many times whatever ends up being

Page 175

1 certified or determined to be part of a final
2 monitoring program would be respected for -- by a
3 physician economist expert like me in thinking about
4 how to price those services, but the determination of
5 what belongs in a medical monitoring program is not
6 within the scope of what I've been asked to do in
7 this case, nor are your factors around
8 appropriateness germane to how medical prices of
9 healthcare services are derived in the U.S.
10 healthcare system across payors in a common way.
11
12 BY MR. TRISCHLER:
13     Q.    You said that the services that are to
14 be included in the monitoring program are the domain
15 experts. Aren't they the domain treating physicians?
16 Don't they have a say?
17          MR. MIGLIACCIO: Objection. Vague.
18          THE WITNESS: We'll we've talked about
19 screening guidelines so much today, and even as
20 physicians follow guidelines, at least in my own
21 experience as a general primary care physician, we
22 talk about and we decide with patients in certain
23 situations what the best course of action is. Your
24 question is so general that I don't know possibly how
25 it applies to the pricing of medical services, which

Page 176

1 I don't think it does, and just as a general clinical
2 matter, doctors and patients discuss what the next
3 step in the management of a clinical condition is,
4 but that is unrelated to how one would price a
5 potential monitoring program and unrelated to how I
6 would treat a final program, a monitoring program,
7 that's certified.
8
9 BY MR. TRISCHLER:
10     Q.    Did I ask you if it was related to that?
11 I simply asked you to respond to a comment that you
12 made where you said that the services of a monitoring
13 program are the domain of the experts. All I asked
14 you was do the treating physicians in these patients
15 have a role to play in that. You made the comment.
16 I'm asking you to follow up on that.
17     A.    Yes, but there's a big difference there,
18 sir. The components of a potential monitoring
19 program are, to my understanding, determined as part
20 of this litigation. Correct? Perhaps as not an
21 attorney, I have misspoken on that. To my
22 understanding, the potential monitoring program that
23 might arise from this litigation will be determined
24 by factfinders and witnesses and a judge or jury in
25 this case. You're asking me about once a potential

Page 177

1 monitoring program exists, do patients or physicians
2 have a role at all in what happens afterwards, and to
3 that very general question, I'm giving you an
4 appropriately general answer, which is well, yes, in
5 my experience as a primary care physician, patients
6 and physicians discuss what the next best step in the
7 management of a clinical condition is. I don't see
8 how that's inconsistent with anything I've said.
9     Q.    All I'm trying to find out is if the
10 treater has a role to play. If you agree that he
11 does, then I guess we're done with that issue.
12     A.    I'm sorry, was there a question in that
13 statement there?
14     Q.    Yes, there was. Does the treater have a
15 role to play in deciding what screening procedures a
16 given patient ought to receive and when?
17          MR. MIGLIACCIO: Same objections.
18          THE WITNESS: With respect, didn't I --
19 let me rephrase. With respect, I just answered that
20 question. I would just refer you back to my answer
21 immediately preceding this one.
22
23 BY MR. TRISCHLER:
24     Q.    Well, with respect, I don't remember the
25 answer, so can you answer the question, please?

45 (Pages 174 - 177)

Page 178

1    MR. MIGLIACCIO: Can the reporter read
2 it back, if you don't remember it?
3    MR. TRISCHLER: I'm asking the witness
4 to answer the question.
5    MR. MIGLIACCIO: Objection. He's asked
6 and answered it.
7
8    (Whereupon, the requested portion of the
9 record was read by the reporter.)
10
11    THE WITNESS: So my previous answer to
12 you in an effort to summarize it so we don't have to
13 track that down and read it out again was simply that
14 the components of a monitoring program, as far as I
15 understand, will be determined by this litigation
16 process and the people within this litigation process
17 once such the monitoring program is certified.
18
19 BY MR. TRISCHLER:
20    Q.   I didn't ask you about the components of
21 the monitoring program, sir.
22    A.   What happens afterwards out in the real
23 world when such a monitoring program is in existence
24 could certainly be influenced by what physicians and
25 patients decide together. That is such a generality.

Page 179

1 You're basically asking me do doctors and patients
2 have a role to play in the healthcare that's
3 rendered, and as a general matter and as a primary
4 care physician, the answer is doctors and patients
5 discuss various aspects of care in how to proceed to
6 the next step of a clinical management of a
7 condition, and that is the best answer as a physician
8 that I can give you and still it remains outside the
9 scope of what my report focuses on.
10
11 BY MR. TRISCHLER:
12    Q.   Have you ever done before what you were
13 asked to do in this case?
14    A.   What do you mean by that, sir?
15    Q.   Have you ever monetized a medical
16 monitoring program?
17    MR. MIGLIACCIO: Objection. Misstates.
18    THE WITNESS: I probably answered this
19 earlier today too when you asked me about what I did
20 in those other cases for which I've been retained as
21 an expert witness, but to answer this anew here, I
22 have been asked to opine on the appropriateness of
23 medical charges and prices. So, that part I think
24 has a natural relation to the pricing of medical
25 services, so that is related to the focus of my

Page 180

1 report here.
2
3 BY MR. TRISCHLER:
4    Q.   I didn't ask you if you've done anything
5 that's related. My question is: Have you ever
6 monetized a medical monitoring program before?
7    MR. MIGLIACCIO: Objection.
8    THE WITNESS: I was just going to add
9 that the appropriateness of charges and prices in
10 those other cases did not pertain to a proposed
11 monitoring program. They pertained to medical
12 services and medical services that may even overlap
13 with a final monitoring program in this case, but
14 they did not pertain specifically to a medical
15 monitoring program.
16
17 BY MR. TRISCHLER:
18    Q.   So have you ever monetized a medical
19 monitoring program before?
20    A.   I have in my research, much of which is
21 cited in the report, applied the prices of medical
22 services to a whole host of medical services, both
23 preventive and diagnostic and therapeutic. I will
24 just give you one concrete example. There is a 2019
25 Journal of American Medical Association or JAMA paper

Page 181

1 on the pricing of medical services. It's two-page
2 paper with an appendix table. I have, in your words,
3 monetized, but again, in my definition, priced a
4 number of medical services clearly using 2016
5 commercial insurer data in a large table in that
6 appendix, and you know, that describes what you're
7 asking about, so there's an example of what I've
8 done.
9    Q.   Does that paper talk about a medical
10 monitoring program established for a class of unknown
11 asymptomatic individuals who are going to be screened
12 for cancer or medical conditions?
13    MR. MIGLIACCIO: Objection. Assumes --
14 to the form of the question.
15    THE WITNESS: Not specifically to a
16 medical monitoring program.
17
18 BY MR. TRISCHLER:
19    Q.   Let me see if I can ask the question
20 maybe for a fifth time and get an answer. Have you
21 ever monetized a medical monitoring program before
22 you were asked to do so in this case?
23    A.   Let me answer more narrowly. For the
24 purposes of litigation as an expert witness, I have
25 not in the other cases that we talked about at the

46 (Pages 178 - 181)

Page 182

1 beginning of the day conducted an exercise to
2 demonstrate the common methodology in applying the
3 prices of medical services to a potential monitoring
4 program. However, the subject of my work in those
5 cases did pertain to the prices of medical services.
6    Q.   Have you ever monetized a medical
7 monitoring program before?
8        MR. MIGLIACCIO: Objection. Asked and
9 answered.
10       THE WITNESS: Please refer do my
11 previous answer, sir.
12
13 BY MR. TRISCHLER:
14    Q.   Have you ever monetized a medical
15 monitoring program before?
16       MR. MIGLIACCIO: He answered your
17 question, counsel.
18       MR. TRISCHLER: No, he has not.
19       MR. MIGLIACCIO: Yes. He has.
20       MR. TRISCHLER: He's avoided it with
21 nonresponsive information --
22       MR. MIGLIACCIO: No, he has not.
23       MR. TRISCHLER: Nick, don't interrupt
24 me, please. I'm entitled to an answer to my
25 question.

Page 183

1        MR. MIGLIACCIO: Don't interrupt me.
2 You're starting to badger him. I would advise you to
3 move on to your next question, counsel.
4
5 BY MR. TRISCHLER:
6    Q.   Have you ever monetized a medical
7 monitoring program at any point before you were asked
8 to do so in this litigation?
9        MR. MIGLIACCIO: Objection. Asked and
10 answered. Move on to your next question, counsel.
11       MR. TRISCHLER: I'm not moving on. I'm
12 waiting for an answer to my question. If you're
13 going to instruct him not to answer, Nick, let me
14 know because I'll be happy to take it up.
15       MR. MIGLIACCIO: You know what, he's
16 given you the answer to your question many, many
17 times.
18       MR. TRISCHLER: I'm going to ask it
19 again, and you can either allow him to answer or you
20 can instruct him not to answer.
21       MR. MIGLIACCIO: I'm allowing him to
22 answer, but he's given you your answer. I'm not
23 instructing him not to answer any question. You've
24 asked your question. You've gotten your answer. You
25 keep asking it. You know, we can be here until 7:00

Page 184

1 or I don't know how much time we have left if you
2 want to keep asking the same question and get the
3 same answer. That's your choice in the time that you
4 wish to use that remains in the deposition.
5
6 BY MR. TRISCHLER:
7    Q.   Prior to this litigation, have you ever
8 monetized a medical monitoring program?
9    A.   Let me reform late my answer for you.
10 Some questions simply, as I'm sure you know in your
11 wealth of experience, sir, don't have a simply yes or
12 no question because the real world is more
13 complicated than that, and I have explained to you in
14 detail the analogous complexity here. I have in both
15 my research -- I have just cited for you a paper in
16 2019 in JAMA, as well as in my prior work as an
17 expert witness thought through and used the
18 application of a common methodology to attach the
19 prices of medical services to the CPT codes that are
20 the medical services. That work is pertinent and, in
21 my view, relevant and related to the work of applying
22 prices to a potential monitoring program here.
23       And then I, in addition, said as for a
24 proposed medical monitoring program in the other
25 cases that we've discussed, I have not done a

Page 185

1 replication of exactly this report for those, but the
2 subject matter of medical prices is related, and I
3 think a nuanced answer like that, which recognizes
4 the complexity of the world and potentially an
5 academic's life in writing papers and providing
6 expert testimony, is reasonable, sir. Even if your
7 preference is for a simple yes or no answer, I can
8 only do my best in giving you what I think is the
9 best, most truthful answer.
10    Q.   In your other work, particularly your
11 other litigation work, have been involved in looking
12 at the reasonableness and necessity of the prices for
13 medical services. Correct?
14    A.   Reasonableness and fairness, not
15 necessity. Reasonableness and fairness.
16    Q.   In your common pricing methodology, do
17 you concern yourself with the necessity of the
18 services?
19    A.   Again, those cases were about
20 reasonableness and fairness --
21    Q.   I'm not asking you those cases.
22    A.   To my understanding, you're asking me --
23    Q.   Not now. I'm allowed to ask you
24 different questions. Do you understand?
25    A.   I do, but you're also asking a question

47 (Pages 182 - 185)

Page 186

1 immediately off of another one.
2    Q.    So what?
3    A.    Sir, you were simply not clear in
4 changing subjects. That's all I'm saying. Now that
5 I've understood that you changed subjects, I'm happy
6 to start over. If you wouldn't mind just repeating
7 your question, please.
8    Q.    In your common pricing methodology that
9 you hope to employ, do you concern yourself with the
10 necessity of the medical services that are part of
11 this program?
12    A.    Thank you for clarifying that question.
13 I concern myself with the application of the common
14 methodology to whatever the services in the final
15 monitoring program end up being, but necessity was
16 not part of what I was asked to opine on, and
17 therefore, my common methodology is agnostic to how
18 you're asking about necessity. Necessity is
19 inferred -- it's implied by the existence of a
20 service in a final certified monitoring program. I
21 think it's reasonable for us to think of it that way
22 prior to a such a monitoring program being finalized
23 and certified. Therefore, necessity is not
24 irrelevant here. I'm just saying that the common
25 methodology for applying prices is unrelated to the

Page 187

1 way you're phrasing "necessity."
2    Q.    So Michael Rives, do you know who that
3 is, R-I-V-E-S?
4    A.    Off the top of my head, I do not know
5 that name, sir.
6    Q.    Mr. Rives is one of the plaintiffs in
7 this action; did you know that?
8    A.    No, I did not prior to you telling me
9 just now.
10    Q.    Did you know that he undergoes regular
11 endoscopies based on the advice of his physician
12 because due to come underlying medical conditions
13 from which he suffers?
14    MR. MIGLIACCIO: Objection.
15    THE WITNESS: Given what we have
16 established, I have not spoken to any of the
17 plaintiffs, nor reviewed their medical records. The
18 answer is no.
19
20 BY MR. TRISCHLER:
21    Q.    Since Mr. Rives undergoes regular
22 endoscopies for reasons totally unrelated to NDMA or
23 NDEA exposure, including the price of that service in
24 a medical monitoring program would not be necessary;
25 would it?

Page 188

1    A.    That is up to the factfinder and the
2 decisionmaker about what belongs in a medical
3 monitoring program at the end of the day.
4    Q.    Your common cost methodology would not
5 exclude procedures that are -- that have been covered
6 by -- or that the patient has received for reasons
7 unrelated to NDMA or NDEA exposure?
8    MR. MIGLIACCIO: Objection. Assumes
9 facts not in evidence.
10    THE WITNESS: You're supporting my
11 argument here, sir. A common methodology is common
12 because it is applicable across situations that may
13 have some differences, and I've explained several
14 times that applying the prices of medical services to
15 those medical services can be done in a common
16 fashion, and you are again asking about the
17 appropriateness of a certain service in a certain
18 patient's case on a monitoring program, and whatever
19 the monitoring program ends up being at the end of
20 the day is what you can apply in a common
21 methodological way the pricing of medical services.
22 We've talked about this several times, and analogous
23 to your prior anecdote about the 64-year-old man, I'm
24 thinking through this second anecdote in a very
25 similar fashion.

Page 189

1
2 BY MR. TRISCHLER:
3    Q.    Even if a medical monitoring program
4 were to be approved and -- or certified and if even
5 all of the foundations of that program that you
6 discuss in your report were included as part of it, I
7 assume that you would agree with me that every
8 patient who's included in that program would still
9 need to work with his or her treating physician and
10 make an independent evaluation whether the procedures
11 were medically necessary for that patient or whether
12 they were procedures that -- where the risks might
13 outweigh the benefits for that particular patient.
14 Can we agree on that?
15    MR. MIGLIACCIO: Objection. Incomplete
16 hypothetical. Compound.
17    THE WITNESS: I have answered that
18 question for you a little while ago when I said after
19 a medical monitoring program is finalized and
20 certified, what happens to it in the real world given
21 its existence between doctors and patients, I had as
22 a general clinical matter as a primary care physician
23 said to you that patients and physicians have a role
24 to play in determining what the patient receives the
25 next step in management of a clinical condition, and

48 (Pages 186 - 189)

Page 190

1 I think you've just asked about that again, so I'm
2 referring back to that response.
3
4 BY MR. TRISCHLER:
5    Q.   So you have told me on several occasions
6 that the scope of your report is limited to
7 monetizing a medical monitoring program.  Correct?
8    A.   The pricing of services in a proposed
9 medical monitoring program, yes.
10    Q.   And you have not formed any opinions as
11 an expert in this case, other than your opinion that
12 a common pricing methodology can be applied to a
13 medical monitoring program.  Fair to say?
14    A.   That is fair to say, sir.
15    Q.   So it's fair to say that your opinions
16 in this case are limited to that common pricing
17 methodology?
18    A.   That is fair to say, and that is what
19 I've been trying to say for several hours today.  I'm
20 very grateful for your arriving at that summary
21 conclusion.
22    Q.   I'm a little slow, so you got to bear
23 with me.
24    A.   I agree with that statement.
25    Q.   You were not retained to offer any

Page 191

1 opinions on liability on this case.  Correct?
2    A.   That is correct, sir.
3    Q.   And you do not intend to offer any
4 opinions on liabilities issues in this case.  Is that
5 correct?
6    A.   At the moment, I have no such intention.
7    Q.   It is not your opinion that any of the
8 defendants in this case violated any good
9 manufacturing practices; is it?
10        MR. MIGLIACCIO:  Objection.  Outside the
11 scope.
12        THE WITNESS:  I have not considered that
13 question before, nor was I retained to think about
14 that question.  This is the first time I'm hearing
15 that question, so I don't have an answer for you off
16 the top of my head here.
17
18 BY MR. TRISCHLER:
19    Q.   But you don't intend to offer an opinion
20 that the defendants in this case have violated good
21 manufacturing practices; do you?
22    A.   I have not been asked to render an
23 opinion.  I don't intend to render such an opinion on
24 my own.
25    Q.   And you don't intend to offer the

Page 192

1 opinion that any of the Valsartan in this case was
2 adulterated?
3    A.   Again, I have not been asked to render
4 an opinion on that, and on my own accord, I don't
5 intend to render or offer an opinion on that
6 question.
7    Q.   You don't intend to offer the opinion
8 that any of the Valsartan in this case was
9 misbranded; do you?
10    A.   Similar response to you.  Happy to
11 repeat it.  I was not asked to opine on that
12 question, and at the moment, on my own accord, I do
13 not intend to offer an opinion on that question.
14    Q.   And you do not intend to offer the
15 opinion that the defendants in this case violated any
16 legal duties or obligations of any kind.  Is that
17 fair to say?
18        MR. MIGLIACCIO:  Objection.  Calls for a
19 legal conclusion.  Outside the scope.
20        THE WITNESS:  Just to be precise again,
21 sir, I don't mean to drag on.  I have not been asked
22 to render an opinion on that question, and in my own
23 accord, I do not at the moment intend to offer an
24 opinion on that question.
25

Page 193

1 BY MR. TRISCHLER:
2    Q.   Do you intend to offer any opinions to
3 suggest that the defendants violated any express or
4 implied warranties?
5        MR. MIGLIACCIO:  Objection.  Calls for a
6 legal conclusion.
7        THE WITNESS:  Similarly, I was not
8 retained to opine on that question, and likewise, I
9 do not intend to offer an opinion on that question.
10
11 BY MR. TRISCHLER:
12    Q.   Do you intend to offer any opinion
13 suggesting that any of the defendants in this case
14 made any false representations or omissions?
15        MR. MIGLIACCIO:  Objection.  Calls for a
16 legal conclusion.
17        THE WITNESS:  Again, I was not retained
18 to opine on that question, and sitting here today at
19 this moment, I have no intention on my own of
20 providing an opinion on that question.
21
22 BY MR. TRISCHLER:
23    Q.   Do you intend to offer an opinion that
24 any of the defendants in this case engaged in any
25 deceptive or unfair practices?

49 (Pages 190 - 193)

Page 194

1        MR. MIGLIACCIO: Objection. Calls for a
2  legal conclusion.
3        THE WITNESS: My apologies for the
4  repetition.  I was not retained to opine on that
5  question and do not intend to at the moment render an
6  opinion on that question on my own.
7
8  BY MR. TRISCHLER:
9     Q.   Do you intend to offer an opinion that
10 any of the defendants in this case did anything wrong
11 at all?
12        MR. MIGLIACCIO: Objection. Calls for a
13 legal conclusion -- to the extent it calls for a
14 legal conclusion.
15        THE WITNESS:  Again, for that question
16 and especially for such a general question, I was not
17 asked to render an opinion on that issue and on my
18 own accord, sitting here today, do not intend to
19 render an opinion with respect to that question.
20
21 BY MR. TRISCHLER:
22    Q.   Do you have an opinion as to whether the
23 generic Valsartan produced by the defendants in this
24 litigation was bioequivalent to the brand name
25 Valsartan products?

Page 195

1     A.   Since it was outside the scope of what I
2  was asked to do and I have not spent time looking
3  into that question, I do not have an opinion for you
4  on that question here today.
5     Q.   And I trust that you do not intend to
6  offer an opinion at any trial or subsequent hearing
7  in this matter?
8     A.   As a general matter, I don't know of
9  what other questions I may be asked to opine on in
10 the future by counsel.  Sitting here today, I have
11 not been asked to opine on that question, and on my
12 own afford left to myself, I do not intend in the
13 future to offer an opinion on that question.
14    Q.   Is it your opinion that the
15 Valsartan-containing medications produced by the
16 defendants in this litigation was worthless?
17        MR. MIGLIACCIO: Objection to the extent
18 it calls for a legal conclusion.
19        THE WITNESS: I don't want to prolong an
20 unnecessary or an unrelated part of our discussion.
21 When you say, "worthless," what do you mean, sir?
22
23 BY MR. TRISCHLER:
24    Q.   Of no value whatsoever.
25    A.   Okay, I was not asked to render an

Page 196

1  opinion on that question, and sitting here today,
2  under my own accord, I do not plan to offer an
3  opinion on that question.
4     Q.   You've not -- you already told me that
5  you have not looked any of the medical records for
6  any of the class plaintiffs, nor reviewed their
7  depositions or spoken to any of them.  Correct?
8     A.   Correct, I did tell you that before.
9     Q.   So I take it that it is not your opinion
10 that the plaintiffs and the proposed class members in
11 this case suffered a common injury?
12        MR. MIGLIACCIO: Objection. Calls for a
13 legal conclusion.
14        THE WITNESS:  You have not asked me a
15 yes or no question on an issue I was not retained to
16 opine on.  That question is unrelated to the pricing
17 of medical services for a potential monitoring
18 program, so I do not have an opinion one way or the
19 other on that question as it pertains to the pricing
20 of medical service.
21
22 BY MR. TRISCHLER:
23    Q.    Should I infer from that that you do not
24 intend to offer an opinion suggesting that the
25 plaintiffs in this action or the proposed class

Page 197

1  members have suffered some common injury?
2        MR. MIGLIACCIO: Objection to the extent
3  that it calls for a legal conclusion.
4        THE WITNESS:  Well, again, at the
5  moment, I have not been asked to render an opinion on
6  that.  As far as the future, I don't know what I'll
7  be asked to opine on in this case, so I cannot say
8  one way or the other.  My report focuses on common
9  methodology.  You're asking about common injuring.
10 I'm interpreting those two things as different
11 aspects of this case, and given that preface, sitting
12 here today, on my own, I do not intend to offer an
13 opinion on the injury portion of this case.  That
14 does not preclude what I may be asked to do in the
15 future.  Go ahead.
16
17 BY MR. TRISCHLER:
18    Q.    Whether through testing data, test
19 reports, or other materials, have you seen any
20 evidence that any of the plaintiffs to this action
21 have suffered a cellular or genetic injury from
22 exposure to NDMA or NDEA?
23        MR. MIGLIACCIO: Objection to form.  To
24 the extent it calls for a legal conclusion.
25        THE WITNESS: The assessment of cellular

50 (Pages 194 - 197)

Page 198

1 or genetic injury requires expertise that not only
2 was I not asked to provide in this case, but also
3 exceeds the scope of my general clinical practice as
4 a primary care physician.
5
6 BY MR. TRISCHLER:
7    Q.    Since the issue of a cellular or genetic
8 injury is something that exceeds your expertise, I
9 take it that you do not intend to offer an opinion
10 that the plaintiffs and the proposed class members in
11 this case suffered from common cellular or genetic
12 injury?
13        MR. MIGLIACCIO:  Same objection.
14        THE WITNESS:  I have not been retained
15 to do so to date, and on my own accord, I do not
16 intend to provide an opinion for that question.
17
18 BY MR. TRISCHLER:
19    Q.    I'm sorry.  It's fairly clear to me
20 today that your role is limited to monetizing a
21 medical monitoring program, and that being the case,
22 I take it that you do not have any opinion as to
23 whether the plaintiffs and the proposed class members
24 in this case require a common medical monitoring
25 program.  Agreed?

Page 199

1        MR. MIGLIACCIO:  Objection.  Misstates
2 and you can answer.
3        THE WITNESS:  Okay, as I've said several
4 times before, the scope of my work in this case thus
5 far as reflected in my report focuses on the pricing
6 of medical services for a proposed medical monitoring
7 program, and any substantive opinions outside of that
8 scope I would in general say that I am not rendering
9 an opinion on at the moment.
10
11 BY MR. TRISCHLER:
12    Q.    And I take it that you also do not
13 intend to offer an opinion that the plaintiffs and
14 the proposed class members in this case have suffered
15 some sort of economic injury.  Correct?
16        MR. MIGLIACCIO:  Objection and to the
17 extent it calls for a legal conclusion.
18        THE WITNESS:  Similar to my answer
19 before about cellular injury or genetic, I believe
20 that's how you phrased the earlier question, I was
21 not asked to opine on that question to date, and I do
22 not have any intention to, at the moment on my own,
23 to provide a separate opinion from this report on
24 that question.
25

Page 200

1 BY MR. TRISCHLER:
2    Q.    To estimate and project the required
3 spending for a medical monitoring program, do you
4 agree that one would need to know the size and
5 composition of the patient population undergoing
6 monitoring?
7    A.    I've said -- I've said so in several
8 ways already today.  Prices times quantity equals
9 spending, and I've explained that quantities are
10 derived from both what is in a monitoring program and
11 who is in a monitoring program.  So that analogously
12 reflects what you just said.  So your
13 characterization of what information is needed for
14 quantities I generally agree with here, and prices
15 times those quantities would give you spending or
16 estimated spending for a monitoring program.
17    Q.    Just so I understand, you have not done
18 any analysis of the size of the proposed class or who
19 should actually be in it?
20    A.    That is correct.
21        MR. MIGLIACCIO:  Objection.  I object to
22 the extent it calls for a legal conclusion, but you
23 can answer.
24        THE WITNESS:  Thank you.  That is
25 correct.  That was outside the scope of what I was

Page 201

1 retained to opine on.
2
3 BY MR. TRISCHLER:
4    Q.    And you're not -- and it's also outside
5 your scope to say what services should be part of
6 that program that might ultimately be certified?
7    A.    I have also said this several times
8 earlier today, yes.
9    Q.    And in your report, I think it's at page
10 25, if you need to take a look at it.
11    A.    Okay.
12    Q.    I think you talk about actual cost of
13 monitoring and you write something to the effect that
14 estimating spending in a medical monitoring program
15 requires an analysis of several key factors,
16 including the insurer mix, site of care composition,
17 and network status of providers.  Is that true?
18    A.    I'm just referring to the page here on
19 the screen.
20    Q.    Take a look.  I may have given you the
21 wrong page reference.
22    A.    No, you were right, paragraph 39.
23    Q.    Am I right in stating that estimating
24 spending in a medical monitoring program requires an
25 analysis of several key factors, including the

51 (Pages 198 - 201)

Page 202

1 insurer mix, site of care composition, and network
2 status of providers?
3  A.  I stand by what I've written here, yes,
4 and that's because these are aspects of the pricing
5 of medical services, not the quantities, but price
6 times quantities equals spending and these are
7 aspects that I go into detail about in my report,
8 each of these three issues here.
9  Q.  When we talk about insurer mix, what
10 we're talking about there is whether someone is a
11 Medicare recipient.  Correct?
12  A.  Yes, a Medicare beneficiary.
13  Q.  Whether someone is a Medicaid recipient?
14  A.  Correct.
15  Q.  Whether someone has private insurance?
16  A.  Correct.
17  Q.  What deductibles and co-pays of that
18 private insurance might be?
19  A.  No, that pertains to cost sharing and
20 benefit design, and it's important for us to make
21 this distinction.  The price of a medical service is
22 a separate concept.  It's a separate entity than the
23 portion of that price that's typically assigned to
24 patient out-of-pocket responsibility, either through
25 a deductible co-pay or co-insurance.  Here, the

Page 203

1 report addresses the price, the unit price.  In
2 economics, economists often talk about unit price,
3 and the word "unit" is sort of meant to clarify this
4 issue.  Unit price is the price per unit of service
5 with the unit price reflecting the overall price per
6 that unit of service.  Within the overall price, as
7 you've alluded to or we know as a common matter as
8 healthcare consumers in the U.S., there are cost
9 sharing considerations, but insurer mix -- you just
10 asked about insurer mix.  Insurer mix is distinct
11 from cost sharing.
12  Q.  So when you talk about insurer mix in
13 paragraph 39 of your report, what you're talking
14 about is whether someone is a Medicare beneficiary, a
15 Medicaid beneficiary, or whether they have private
16 insurance?
17  A.  Correct.
18  Q.  And one of the class plaintiffs for this
19 is case is a gentleman named Robert Fields.  Do you
20 know whether he had private insurance, whether he was
21 a Medicare beneficiary, or a Medicaid beneficiary?
22  A.  Because I have not reviewed their
23 medical records, as we have previously discussed, and
24 because I have not spoke with the plaintiffs myself
25 firsthand, I don't I do not have that information.

Page 204

1  Q.  What about Mr. Judson, we talked about
2 him, do you know if he had private insurance,
3 Medicare, or Medicaid?
4  A.  Because I did not speak with him, nor
5 review his medical records, no, I don't know off the
6 top of my head.
7  Q.  And how about Robert Kruk, K-R-U-K, the
8 old baseball player, do you know whether he had
9 Medicare, Medicaid, or private insurance?
10  A.  Because I did not review their medical
11 records, nor speak with him myself firsthand, off the
12 top of my head, I don't know.  However, I imagine it
13 would be easily discoverable in this case, and you
14 probably already know what insurance they had.
15  Q.  It's probably easily discoverable.
16 You're right about that.  And there's another
17 plaintiff in this case, a woman named Valerie Annese,
18 A-N-N-E-S-E, do you know whether she had Medicare,
19 Medicaid, or private insurance?
20  A.  Similarly because I did not review her
21 records or speak to her firsthand, I don't have that
22 off the top of my head at the moment.
23  Q.  So do you know the insurer mix among the
24 class plaintiffs to this litigation?
25  A.  Well, as I've just noted to you, I

Page 205

1 haven't spoken to any of the plaintiffs myself
2 one-on-one, nor reviewed this medical records, but
3 that's unrelated to this concept that insurer mix
4 matters for one's calculation of expected spending,
5 and furthermore, the final class of individuals in
6 this case has not been certified, and so once a final
7 class is certified, one of the elements that would be
8 helpful for calculation of expected spending of a
9 medical monitoring program is the insurer mix of that
10 final certified class.  And when we get to that point
11 or if the case gets to that point, I, per this
12 report, would support obtaining such a distribution
13 of insurer mix.  But you're asking me by person, by
14 person, by person what insurance they had is
15 unrelated and does not detract from the concept of
16 that insurer mix is relevant, which I go into detail
17 about in my report.
18  Q.  My only question was:  Do you know the
19 insurer mix among the class plaintiff population in
20 this case, yes or no?
21  MR. MIGLIACCIO:  Objection.  Asked and
22 answered.
23  THE WITNESS:  Because I have not spoken
24 with, nor reviewed the records of each of the
25 plaintiffs in this case and because such

52 (Pages 202 - 205)

Page 206

1 individualized review of their records and their
2 stories does not alter the uniformity or commonality
3 for the approach for pricing medical services in this
4 case, my answer to you is no, but it does not detract
5 from what my report is proposing.
6
7 BY MR. TRISCHLER:
8    Q.    What is the insurer mix nationally
9 across the population of all Americans?
10    A.    If you take 330 million people as the
11 rough overall population of the United States, 55
12 percent of the U.S. population has private insurance
13 within which 49 percentage points of those 55 percent
14 of the population have employer-sponsored health
15 insurance, generally private health insurance,
16 leaving us 6 percent of the remaining privately
17 insured market as being insured by non-group smaller
18 private insurance plans, then 20 percent of the U.S.
19 population has Medicaid and then 14 percent of the
20 U.S. population has Medicare, then 2 percent of the
21 U.S. population has other public programs, notably
22 the VA, TRICARE for the military and the families,
23 and the Indian Health Service. That leaves us with 9
24 percent of the U.S. population remaining which
25 remains uninsured today.

Page 207

1    Q.    At this point, have you done anything to
2 calculate whether the insurer mix among the class
3 plaintiffs matches or mirrors the insurer mix
4 nationally that you just outlined for us?
5    A.    Given that the final class has yet to be
6 determined or certified, it's not possible at the
7 moment to compare the distribution of their payor mix
8 to the national payor mix that I just identified for
9 you.
10    Q.    Well, you said it was easily
11 ascertainable?
12    A.    Is the final class determined to date?
13    Q.    No, I doubt that it ever will be, but I
14 asked you about the class plaintiffs, the class
15 representative plaintiffs. Do you know what the
16 insurer mix among the class plaintiff representatives
17 is as opposed to the national mix that you have
18 outlined for us?
19    A.    You're asking about the individual
20 person by person like you walked me through the
21 previous exercise?
22    Q.    Yes.
23    A.    Because I have not spoken with, nor
24 reviewed the records of the individual plaintiffs in
25 this case, as we already established, I don't yet at

Page 208

1 the moment have the insurer mix distribution for this
2 group of plaintiffs.
3    Q.    Now, in your report, you also state that
4 estimating spending of a medical monitoring program
5 requires an analysis of site of care composition.
6 What is site of care composition? Were you able to
7 hear my question, sir?
8    A.    Yes, I was able to hear it. I was
9 simply looking at the paragraph to refer you to,
10 which goes into site of care in quite some detail.
11    Q.    That's fine. Take your time. I thought
12 because you weren't saying anything, I thought you
13 didn't hear me.
14    A.    No worries. I can give you an answer
15 off the top of my head, but it's easier to do so with
16 reference to the exact paragraph here. So on page 18
17 of my report, paragraph 29, I explain that prices
18 vary based on site of care. To summarize what I'm
19 explaining here in my report, within insurers, prices
20 vary based on whether a service is delivered in the
21 independent physician-owned office setting or broadly
22 speaking, a facility setting. Often facility
23 settings are HOPD or OPD settings I have explained
24 here, which are hospital outpatient departments,
25 HOPD, hospital outpatient departments, or simply OPD,

Page 209

1 outpatient departments. In those types of facility
2 settings, medical services garner both a facility fee
3 and a professional fee, whereas in the former
4 setting, the independent physician-owned office
5 setting, medical services typically garner one fee as
6 opposed to two. So when you add up the two fees in
7 the facility setting and compare that to the one loan
8 fee in the independent office space setting, those
9 numbers are different, and therefore, prices differ
10 across sites of care, and this is a common uniform
11 reality in the pricing of medical services within
12 Medicare and private -- with private and public
13 insurers.
14    Q.    At this point in time, I take it from
15 your prior answers that you do not have any idea
16 whether or how many of the class representative
17 plaintiffs have undergone colonoscopies or
18 endoscopies -- strike the question. I'll rephrase
19 it.
20        Do you know how many of the class
21 representative plaintiffs have undergone
22 colonoscopies prior to their use of any
23 Valsartan-containing medications?
24        MR. MIGLIACCIO: Objection. Vague.
25        THE WITNESS: By "prior to," what time

53 (Pages 206 - 209)

Page 210

1 frame are you asking about?
2
3 BY MR. TRISCHLER:
4     Q.    All I'm asking is, you know, we have a
5 number of class representative plaintiffs. I'm
6 simply asking you, do you know whether they've -- any
7 of them have undergone colonoscopies, even before
8 they ever took any recalled Valsartan?
9     A.    In the absence of reviewing their
10 medical records, I would not have the ability to
11 answer that question.
12    Q.    And I'll represent to you that there are
13 13 class representative plaintiffs that have been
14 identified in this litigation. Okay?
15    A.    Understood. Go ahead.
16    Q.    And assume for purposes of my question
17 of those 13, at least 11 of them have been and
18 continue to receive colonoscopies on a regular basis
19 in consultation with their treating physicians.
20 Okay?
21    A.    Okay.
22    Q.    So of those 11, I assume you do not have
23 any information as to the site of care for those
24 individuals?
25        MR. MIGLIACCIO: I object to the extent

Page 211

1 that it's incomplete. Incomplete hypothetical.
2        THE WITNESS: Because site of care is
3 determined either through an administrative claim or
4 a potential bill and because I have not reviewed the
5 medical records of these individuals, I do not know
6 at the moment the site of care for particular medical
7 services they've incurred.
8
9 BY MR. TRISCHLER:
10    Q.    And for those class representative
11 plaintiffs that have private insurance, I assume you
12 don't have information as to how many of them are
13 receiving screening services or have received past
14 screening services by out-of-network providers?
15        MR. MIGLIACCIO: Objection. Assumes
16 facts not in evidence.
17        THE WITNESS: Well, similarly,
18 out-of-network status can be determined through
19 administrative claims data, which I've done in my
20 prior research, or by potentially looking at a bill
21 that a patient receives, and in the absence having
22 reviewed individual patient records in this case so
23 far, I do not have the data available to answer that
24 question, but I think it's important to emphasize
25 that there is a common methodology whether a service

Page 212

1 is out of network or in network for a service to
2 receive a price. The application of a pricing
3 methodology to services is common across in network,
4 across out of network, across Medicare, commercial,
5 Medicaid, across HOPD site of care, across
6 independent office site of care. These dimensions of
7 variations that I've discussed in my report are
8 certainly agnostic to whether I have personally
9 reviewed any individual's medical record. There are
10 principles of medical pricing that are common, and
11 they can certainly applied to any member of a class
12 or any medical service when such member's services
13 are certified at the end of the day and done so in a
14 common way.
15
16 BY MR. TRISCHLER:
17    Q.    If we look at pricing on a microscale,
18 the actual costs for monitoring procedures for any
19 given individual will depend on a host of factors,
20 such as their insurance program, Medicare status,
21 site of service, and other considerations. Agreed?
22    A.    With respect to your use of the word
23 "cost," I will replace that with "price" because I
24 think that's what you're talking about, not the
25 cost -- underlying cost of delivering the service,

Page 213

1 which I have defined in my report what cost means.
2 So with regard to the prices, the prices do vary
3 across insurers and within insurers in ways that I've
4 described, and that does not detract from the common
5 methodology of applying prices despite this variation
6 to services that are determined to be in a monitoring
7 program. Furthermore, I think importantly -- we
8 should remember that in the application of a common
9 methodology for pricing medical services, as I've
10 discussed in my report, the data are knowable. The
11 data for quantifying medical prices or the prices of
12 medical services are broadly available,
13 ascertainable, knowable, discoverable. As an
14 example, Medicare prices are free for you to peruse
15 online across years across sites of care. That's
16 important for us to remember as we go through these
17 questions because despite the variations that you're
18 asking about, which I expounded upon in my report,
19 that variation does not detract from the common
20 methodology, nor does it take away from the
21 ascertainablity of pricing data for medical services
22 systemwide in the U.S.
23        THE VIDEOGRAPHER: The time is 3:47.
24 This end media unit No. 4. We're going off the
25 record.

54 (Pages 210 - 213)

Page 214

1
2        (Whereupon, a brief recess was taken off
3 the record.)
4
5        THE VIDEOGRAPHER:  The time is 4:03.
6 This begins media unit No. 5.  We're back on the
7 record.
8
9 BY MR. TRISCHLER:
10     Q.    Dr. Song, would you agree with me that
11 there's abundant academic evidence that shows that
12 the pricing information in the U.S. healthcare system
13 is opaque?
14        MR. MIGLIACCIO:  Objection.  Vague.
15        THE WITNESS:  Can you define what you
16 mean by "information" there?
17
18 BY MR. TRISCHLER:
19     Q.    Well, let me see if I can look up the
20 definition of information if you're not --
21     A.    Well, let me be a little more specific
22 then.  Do you mean data, fee schedules, EOBs,
23 published reports about prices?  You know, which of
24 those sorts of things are you thinking about?
25     Q.    Any or all of the above.

Page 215

1     A.    So in my answer then, I'm going to be
2 specific and precise for you.  When you say,
3 "opaque," you know, that's a very general
4 characterization of a whole field of the study of
5 prices of medical services.  It has been commonly
6 written and described in the popular Lay Press, as
7 well as in academic literature, that from a patient's
8 perspective, the prices of the medical care they
9 receive in the U.S. often seems hard to know in
10 advance.  You might readily apply opaque to that kind
11 of characterization.  Even doctors on the frontline
12 treating patients.  Often doctors have reported that
13 it would take a great deal of effort for them to
14 discover what the prices of the medical services they
15 rendered end up being for the patient's insurer and
16 the patient themselves.  That's one real aspect that
17 I can speak to as a consumer of health policy
18 research and reader of the general journalism
19 coverage of the patient's experience here in the U.S.
20 If you talk about my view as a researcher studying
21 large datasets, like IBM market scam claims database,
22 like the Medicare claims database, both of which are
23 gigantic claims databases with unit prices for every
24 claim that's paid covering many tens of millions
25 enrollees and beneficiaries in the country from that

Page 216

1 perspective through which I've written many papers,
2 some of which are cited in attachment B as a
3 researcher as a matter of ascertainablity and
4 discoverability while the prices of medical services
5 there are not opaque.  They're clearly in the claims.
6 There's a common way of studying them and a common
7 way of reporting them.  The figure in my report
8 captures 19 studies reviewed by Kaiser Family
9 Foundation, two of which I authored or co-authored
10 out of 19 and the other 17 being peer studies that do
11 the same thing of studying claims data to report the
12 unit prices.  In all of these 19 papers, the prices
13 are not opaque because we report that as researchers.
14 So there's a description for you of information
15 deserves some specificity and why in my role I can
16 see it -- I can answer your question from a couple of
17 different angles here.
18     Q.    Have you ever testified under oath that
19 there's abundant academic evidence that shows pricing
20 information in the U.S. healthcare system is opaque?
21     A.    Well, again, in the context of the
22 patient's experience, as I just described in
23 detail --
24     Q.    I didn't ask you for an explanation.
25 You offered that testimony.

Page 217

1     A.    I think I understand your question
2 fully, sir, and I'll give you the response it
3 deserves.  In my other testimony, such as the one you
4 have in your hand that we discussed this morning for
5 the Lab Corp. deposition, which you have the
6 transcript, if I recall, there is -- I can't recall
7 my exact words off the top of my head from several
8 months ago, but it's plausible that I said something
9 to the effect of from the patient's perspective or at
10 least discussing in the context of the patient's
11 perspective having received a surprise billing in
12 those cases, that in general, from the patient's
13 perspective, medical prices in the U.S. healthcare
14 system can often seem opaque, but as you can see,
15 it's important for me to distinguish that perspective
16 from which I was offering that testimony.  If indeed
17 those words are what you're looking at in front of
18 you are as different than the view I have as a
19 research scientist studying large datasets and
20 publishing large sample size studies about the prices
21 of medical services.
22     Q.    Is the testimony that you offer under
23 oath truthful?
24     A.    Absolutely truthful and with the nuance
25 that's appropriate with the statement you're quoting

55 (Pages 214 - 217)

Page 218

1 me on with regard to the patient's perspective.
2    Q.   Did you review the deposition from --
3 the transcript from your prior deposition?
4    A.   I believe I did.
5    Q.   Did you reserve the right to read it and
6 sign it?
7    A.   I honestly can't recall months ago
8 whether I signed the transcript after reading the
9 transcript.  I certainly recall reading the
10 transcript.
11    Q.   Did you make any changes to the
12 transcript when you read it?
13    A.   Nope, not that I recall.  I did not make
14 a change to that transcript.
15    Q.   Do you agree that healthcare providers
16 often lack pricing information on the clinical
17 services that they provide?
18    A.   That sounds very analogous to something
19 I would have testified to in that case, and it's
20 almost word-for-word what I told you a few moments
21 ago about how from the patient's and physician's
22 perspective, there's ample popular press evidence, as
23 well as academic papers, that have pressed evidence the
24 difficulty of both patients and physicians figuring
25 out the unit prices of the care that they've rendered

Page 219

1 and received, and that is, as I've clearly delineated
2 for you, a different way of looking at the opacity of
3 the healthcare prices or the clarity of healthcare
4 prices in the U.S. system relative to the
5 researcher's view working through large datasets and
6 reporting on these prices in peer-reviewed
7 publications.
8    Q.   And is it true that one of the realities
9 of our healthcare system in the United States is that
10 a charge for a procedure, such as a colonoscopy
11 that's administered in New York City, can be
12 different from what -- is charged for the same
13 procedure in Charlotte, North Carolina?
14    MR. MIGLIACCIO:  Objection.  Incomplete
15 hypothetical.
16    THE WITNESS:  Sir, do you mean charge or
17 price?
18
19 BY MR. TRISCHLER:
20    Q.   You tell me.
21    A.   With all due respect, you're asking the
22 question.  I just want to know the entity that you're
23 asking about, and I've defined both in my report.  Do
24 you mean price differences across different
25 geographies or do you mean charge differences across

Page 220

1 different geographies?
2    Q.   Well, with all due respect, I guess
3 we'll try to get answers to both questions.  Is it a
4 reality of our healthcare system that the prices
5 charged for a colonoscopy in New York City is
6 different from the prices of what a patient is
7 charged for a colonoscopy in Charlotte, North
8 Carolina?
9    A.   Okay, I've clarified -- let me restate.
10 I have clearly discussed in my report how and for
11 what reasons prices vary geographically in the U.S.
12 healthcare system.  I would refer you to, just as one
13 example, paragraph 23, if you'd like to take a look
14 at that.  If not, that's okay.  Where I state, now
15 that I'm looking at that page:
16    "Commercial prices for a given service
17 vary substantially by geography due to differences in
18 provider market power relative to insurers," and the
19 reason that we should emphasize or highlight a
20 statement like that is that price variation in
21 commercial health insurance, which I describe here,
22 is different than price variation geographically in
23 Medicare.
24    As I've stated in my report, in the
25 Medicare program, prices are largely uniform across

Page 221

1 the country because it's a single-payor federal
2 program with one fee schedule that has some
3 variations geographically based on costs of living
4 adjustments and whether a provider is a medical
5 education provider or not and various other small
6 adjustments on the fees, but by and large, there is
7 plenty of evidence, as well as freely accessible fee
8 schedule online, that demonstrates to you the
9 uniformity of Medicare prices across geographies in
10 the U.S., but commercial prices differ geographically
11 based on provider market power differences relative
12 to the market power of insurers.  That's prices.  I'm
13 sorry.  That's prices.  So now you can, if you would
14 like, ask the analogous question about charges or ask
15 a different question.
16    Q.   Thanks.  I appreciate you for permitting
17 me to do that.  So the cost of a colonoscopy in New
18 York City then will also differ depending on whether
19 that patient has private insurance or is receiving
20 Medicare.  Correct?
21    A.   Again, I think by "cost" you mean
22 "price," and I have established in my report very
23 clearly why prices differ across payors.  In fact,
24 I've given you table three and table two to show you
25 concrete examples of Medicare and commercial prices

56 (Pages 218 - 221)

Page 222

1  that provides concrete examples for your question.
2      Q.    I'm just looking for an answer to my
3  question.
4      A.    Commercial prices --
5      Q.    Are the prices for a colonoscopy
6  performed in New York City differ for a patient, on
7  average, who is a Medicare beneficiary or a patient
8  who has private insurance, yes or no?
9      A.    Commercial prices, as a general matter
10 of medical services, differ from Medicare prices in
11 the ways that I have clearly laid out in my report.
12     Q.    And even among patients who have the
13 same private insurance, as I understand it, the cost
14 of a colonoscopy can differ if the patient is
15 receiving services from an in-network provider or an
16 out-of-network provider.  Is that true?
17     A.    I've also discussed in my report and
18 devoted a whole section in explaining how and why
19 prices differ in network settings and out-of-network
20 settings.
21     Q.    And in the context of private insurance,
22 the price paid to a service provider is the subject
23 of private negotiations between the insurer and the
24 provider.  True?
25     A.    In most cases in the U.S. healthcare

Page 223

1  system, prices of medical services paid by commercial
2  insurers to healthcare providers are determined
3  through negotiations between commercial insurers and
4  the healthcare providers.
5      Q.    And you don't have any visibility as to
6  the particularity of the negotiations between a
7  hospital or physician's group and a lab provider and
8  that insurer.  Correct?
9      A.    That's not entirely true.  The outcome
10 of the negotiation is reflected through the unit
11 prices that we all study in these large datasets.  We
12 all, meaning the health policy, healthcare services,
13 research community, the community in using use large
14 datasets to study this question of the prices of
15 medical services see in a common way the result of
16 those negotiations because we see in the datasets the
17 unit prices of medical services, as reflected in the
18 papers that we discussed earlier that I have -- some
19 of which I've written.  It's reflected in the tables
20 here that I've provided for you in the report.  And
21 even though we're not privy or present in the actual
22 negotiation in a closed door room between health
23 insurers and providers, the result of that
24 negotiation is reflected through unit prices, which
25 are on a claim by claim level present in these

Page 224

1  datasets.
2      Q.    How much does United Healthcare pay
3  physician's groups in Buffalo, New York for a
4  colonoscopy?
5      A.    I do not have that price off the top of
6  my head, sitting here for you today, but --
7      Q.    How much does CIGNA --
8          MR. MIGLIACCIO:  Objection.  Let him
9  answer the question, please.
10         MR. TRISCHLER:  He just did.  He said he
11 didn't have that information.
12         THE WITNESS:  I added a short dependent
13 clause to the end of my sentence, which was but I can
14 tell you that it's a discoverable or knowable
15 ascertainable fact.
16
17 BY MR. TRISCHLER:
18     Q.    How much does Aetna pay a physician's
19 group in Des Moines, Iowa for a colonoscopy?
20     A.    Similarly, a knowable and discoverable,
21 ascertainable fact and a number that I don't have off
22 the top of my head, sitting here for you today.
23     Q.    How much does Aetna pay a physician's
24 group in Portland, Oregon for a colonoscopy?
25     A.    You know, out of fairness for your

Page 225

1  question actually, I have to ask you, to which
2  physician group, to which hospital?  I recall that in
3  my report, I detail how prices differ across
4  providers based on relative market power, as well as
5  across payors.  If you're going to ask me a
6  hypothetical question about a service, you've given
7  me the insurer, but you haven't given me the
8  provider.  So in fairness, if you're giving me an
9  insurer and a provider, that's what constructs a
10 final price in the end, and those are knowable,
11 discoverable, and ascertainable prices, but your
12 question actually is more general than it should be.
13     Q.    So the insurer -- so the same insurer,
14 whether it be Aetna, United Healthcare, CIGNA,
15 whatever we talk about, they may pay different
16 physician's groups different amounts for service?
17     A.    That's correct.
18     Q.    And they might pay physicians in Buffalo
19 different than they pay physicians in Portland,
20 Oregon?
21     A.    For the same CPT code, yes.  However, in
22 all of our studies, the prices of medical services,
23 such as the combination of 19 studies in the Kaiser
24 Family Foundation review, researchers and analysts
25 and policy makers use common measure of central

57 (Pages 222 - 225)

Page 226

1  tendency, like averages or mediums or market-level
2  averages or market-level mediums, to abstract from
3  the individual provider group or insurer differs in
4  prices to get to a market average, and it is very
5  common for researchers and policymakers, as well as I
6  would -- I would offer you decision makers in the
7  private sectors of our healthcare economy to use
8  those averages and mediums to construct measures of
9  estimated spending, to construct potential sizes of
10 budgets because what they're doing is multiplying an
11 average price or a medium price or a price of 25
12 percentile or a price at the 75th percentile.
13 They're taking a group of data that has variation
14 within it, coming up with a measure central tendency
15 or a measure that reflects on the whole what prices
16 are, multiplying that by the quantities that they're
17 multiplying to a monitoring program, as we discussed
18 earlier, to come up with spending.  So the use of the
19 variation cannot be divorced from the fact that there
20 is variation across geographies.  So as you ask me
21 about variation across geographies, I need to and I
22 will continue to remind you that the use of that data
23 abstracts from that variation and follows a common
24 methodology in how we apply prices.
25     Q.    Medical prices vary across geography.

Page 227

1  Right?
2      A.    I had just read you a quote from my
3  report that alines with that, yes.
4      Q.    And medical costs varies across
5  providers?
6      A.    Hold on.  Let me go back.  I need to
7  revise my previous answer.  In Medicare, again, as I
8  just discussed earlier, prices do not vary much, if
9  at all, across geography.  There are small variations
10 across the country within Medicare.
11     Q.    I assumed your answer referred to
12 private insurance.
13     A.    Well, my fault there, and perhaps we
14 both could have been more specific.  I did not
15 specify that Medicare does not have much price
16 variation across the country.  Commercial insurance
17 has more price variation across the country.  So if
18 you were implicitly asking me about commercial
19 insurance, my answer is yes, commercial insurance
20 prices differ across the country in exactly the ways
21 I have written in my report.
22     Q.    And those ways, for my benefit, they
23 vary across geography, they vary across providers?
24     A.    Right, and it is not --
25     Q.    And they vary across site of care, which

Page 228

1  is another one you mentioned?
2      A.    Yes, as you highlighted earlier in that
3  exhibit on the screen for all of us to see, my report
4  talks about variations between payors or between
5  insurers.  It talks about variation between sites of
6  care, and it talks about variation between in network
7  versus out of network, and all of that you just
8  restated.  The conceptual point I want to drive home
9  here is that as I said in paragraph 23, when prices
10 vary by geography, they vary because of differences
11 in provider market power relative to insurers.  That
12 is an important source or explanation for the
13 variation that we need to keep in mind.  They don't
14 vary because patients are different.  They don't vary
15 because employers are different.  They don't vary
16 because one patient was -- has a certain clinical
17 characteristic and another does not.  They don't even
18 vary because some patients have higher cost sharing
19 and other patients have lower soft sharing.
20 Remember, prices are unit prices.  Cost sharing is
21 the portion of unit prices paid by the patient out of
22 pocket or asked of the patient out of pocket.  So
23 when we think of price variation on the commercial
24 side, there is variation by geography, but the
25 variation is explained by differences of relative

Page 229

1  market power between insurers and providers, not
2  because of the differences in land.  It's not because
3  Portland, Oregon sits somewhere else than Buffalo New
4  York that price differs.  It's because within those
5  two different geographic locations, the relative
6  market power between insurers and providers differ.
7  That's what explains the difference across geography
8  and prices.
9      Q.    And you -- in your report, you use a
10 reference, I think national averages, to highlight
11 those price differences, some of the price
12 differences for services between Medicare and private
13 insurance.  Correct?
14     A.    No, not to highlight, but to abstract
15 from.  It's the opposite of highlighting.  It's
16 showing you a common methodology adopted by
17 researchers and policymakers in a standard practice
18 within both the academic profession and the
19 policymaking community, as well as employers and
20 insurers, by the way, that when we think about price
21 variation in a large dataset or a large population,
22 we extract away from the variation by using a measure
23 of central tendency, such as averages or medians, and
24 in addition, there are instances where a
25 decisionmaker or a factfinder might want to use the

58 (Pages 226 - 229)

Page 230

1  60th as opposed to the median or the 40th percentile
2  as opposed to the median. If there are good reasons
3  for selecting a different percentile, it's up to a
4  decisionmaker to do so, but the common methodology
5  remains, which is despite variation, there are ways
6  of abstracting from the variation, not highlighting
7  the variation in order to use and apply medical
8  prices to quantities of care in a common way.
9      Q.   If you were to apply your common
10 methodology to a class that may be certified, what
11 average would you apply or is that something that you
12 still have to determine?
13     A.   No, sir, that -- I've used ample space
14 in my report to show how that's done and provided
15 those illustrations in the tables in my report to
16 give you concrete examples of how those prices would
17 be derived, and I think in both the texts and various
18 footnotes, I added sufficient detail for the depth of
19 our discussion to describe how that application of
20 the common methodology could be carried out.
21     Q.   What is the average price variance
22 between -- that you are relying upon between Medicare
23 and the private insurance?
24     A.   I think we should go to the report to
25 answer that question.

Page 231

1      Q.   You can. I'm just asking my question.
2  You can go wherever you want.
3      A.   Okay, give me a second.
4      Q.   As long as there's an answer in there
5  somewhere.
6      A.   So the first place we could go, sir, is
7  figure one on page 13. In this figure, you see
8  average Medicare prices compared to average
9  commercial prices across the 19 studies using data
10 from 2010 to 2017. All of these data produced by
11 health economists and other peer experts in the
12 field. Two of the 19 studies, as I noted earlier,
13 are ones that I personally wrote or co-authored, and
14 to the extent I know those two papers and I know the
15 peer 17 papers in this review, these papers compare
16 averages to averages. So that's a concrete
17 illustration of how one would go from an average
18 Medicare price to an average commercial price. So if
19 we take the example on the right-hand side of that
20 figure for physician services, that is largely an
21 independent physician office setting, not an HOPD
22 setting, because an HOPD setting is the data point to
23 the left of that. If we look at that data point on
24 the right side of the figure, 1.43 percent with 1.18
25 to 1.79, as shown in the figure, is the average ratio

Page 232

1  of commercial prices for physician services to
2  Medicare prices for physician services. We can
3  unpack that a number of ways, but that's the way to
4  read this result. Analogously, if you go to the
5  outpatient department setting, HOPD, as I described
6  earlier, hospital outpatient services, on average,
7  are priced at 2.64 in commercial health insurance the
8  level that they are priced in Medicare. Again,
9  comparing averages to averages. So that is a set of
10 concrete examples of how you would derive or
11 formulate a common methodology around measures of
12 central tendency well accepted in the profession or
13 industry for going from Medicare prices to commercial
14 prices, and there are even more direct ways, as I
15 noted earlier. One can go to large dataset and
16 directly measure average commercial prices without
17 using a conversion through this ratio like this
18 figure. That I've done in the JAMA 2019 paper, the
19 exhibit table there that I noted earlier. So let me
20 stop here, but happy to answer more questions on
21 this.
22     Q.   So glad you decided to stop. The ratio
23 you cited is 143 percent. Right? That's what you
24 told me. The ratio of private insurance to Medicare
25 for physician services.

Page 233

1      A.   The ratio is 1.43.
2      Q.   And that's based on a metaanalysis of
3  sorts looking at varies studies done over time?
4      A.   That's a correct characterization of
5  this Kaiser Family Foundation publication.
6      Q.   And some of those studies found the
7  ratio to be larger than 1.43, and some of them found
8  it to be greater. Right?
9      A.   You said larger and greater.
10     Q.   I'm sorry. Some of the studies that
11 were relied upon in the metaanalysis found the ratio
12 to be greater than 1.43, and sometimes to be smaller?
13     A.   If you go to that report, which I linked
14 to in my references list, there is, in fact, another
15 figure that displays for you that information around
16 1.43. That's the measure of central tendency coming
17 out of all this literature. So I would just draw an
18 analogy for you here, sir, because I think what
19 you're asking about here can be aided by an analogy
20 that's not so germane to medical claims data. If one
21 were to ask you what is the average price for a
22 gallon of gasoline in the country, you would not be
23 surprised if the evening news reported an average
24 price. You also wouldn't be surprised if a gallon of
25 gasoline costs a little bit different from one state

59 (Pages 230 - 233)

Page 234

1 to another or one county to another or in a place
2 where there are more gas stations competing against
3 each other for customers or in another place where
4 gas stations have more market power because there's
5 less competition. This is analogous to that. In the
6 healthcare economy, just like the economy for a
7 gallon of gasoline, there are price differences, and
8 price variations, as I've explained in my report, by
9 geography are explained by differences in market
10 power, but what does one do when we think of a common
11 methodology for drawing from that real world price
12 variation to formulate a way of studying or analyzing
13 or using the prices of medical services or the price
14 of gallon of gasoline. For sure you're not
15 suggesting here that because there's price variation
16 across the country or across gas stations, we can't
17 come up with any idea of what a common price or an
18 average price is, and I'm using that illustration
19 here analogously to show in medical care, it's the
20 same exercise. This 1.43 is the national average of
21 the ration of average commercial prices to average
22 Medicare prices. I've gone into great detail to
23 explain where Medicare prices come from, that's the
24 denominator here, where commercial prices come from,
25 that's the numerator here. All of that is in the

Page 235

1 report, but I think the analogy -- well, I hope the
2 analogy helps.
3     Q.    The ratio of 1.43, what physician
4 services is that based on? Is it all physician
5 services that are offered across the country or some
6 segment of physician services?
7     A.    Great question. In the studies that
8 comprise this metaanalysis or review, there are
9 differences in the datasets and the years of data
10 that are used, and therefore, there are differences
11 in the samples of medical services used to construct
12 those studies. Off the top of my head here today, I
13 cannot reconstruct for you from memory the
14 differences in those samples, but suffice to say that
15 these are not 19 identical studies in this review.
16 Obviously, there will be some differences across
17 studies.
18     Q.    And the services that are part of this
19 metaanalysis that arrived at the ratio of 1.43 are
20 not the same -- are not based on the same six
21 services that are the framework for what you
22 described as a medical monitoring plan?
23         MR. MIGLIACCIO: Object to the extent it
24 misstates testimony, but you can answer.
25         THE WITNESS: With a fair degree of

Page 236

1 certainty, I can report to you that at least some of
2 the six illustrative services that I provided in my
3 report also do exist in a number of these studies. A
4 concrete example is my 2019 JAMA paper, which is part
5 of these 19 studies reviewed here, has the price of
6 an office visit. It has both Medicare and commercial
7 and in and out of network, by the way, and it has the
8 price of a number of other services that we could
9 easily refer to. And because I've illustrated for
10 you six common examples of services that are very
11 common, like a urinalysis or an office visit, it
12 would not be surprising to me at all. In fact, I
13 would expect that these services appear in many of
14 these 19 studies. I simply haven't performed the
15 exercise of manually going through each of the 19
16 studies and comparing whether the same six
17 illustrative examples also appears in each of those
18 studies. That's something one could do, but I have
19 not done that to date.
20
21 BY MR. TRISCHLER:
22     Q.    And I wasn't even asking you -- that was
23 not even my question. My question was not do these
24 six services appear anywhere within any of the
25 studies that comprise the metaanalysis. My question

Page 237

1 was: Has there ever been an analysis of just these
2 six services that are the framework for your
3 monitoring plan and tell us what the ratio, payment
4 ratio, was from between Medicare and private
5 insurance in 2018?
6         MR. MIGLIACCIO: Objection to the extent
7 it misstates testimony. You can go on.
8         THE WITNESS: Thank you for that
9 clarification. That actually makes me think about
10 your question differently than the question I thought
11 you had asked, so I appreciate that. One fact about
12 medical pricing that is essential for answering your
13 question here is that when a provider organization
14 negotiates for a commercial price with an insurer,
15 what they negotiate on is the relative value unit or
16 RVU conversion factor, which is then uniformly
17 applied to all services in the physician fee
18 schedule. Therefore, in other words, provider
19 organizations and commercial insurers do not
20 negotiate one for one the price of service A, then
21 service B, and service C, and so on. There are
22 thousands of medical services. What they do, as I
23 believe I explained in my report, is they take the
24 underlying relative value units, the RVUs, of
25 services as given from typically the Medicare

60 (Pages 234 - 237)

Page 238

1 program, and they largely negotiate on the RUV
2 converse factor which then formulates the pricing
3 contract between the private insurer and a private
4 organization. That conversion factor is by
5 definition a common methodology itself because then
6 it's applied to not only these six services in my
7 illustrative examples, but all the fee services in
8 the fee schedule. So when you ask is there a study
9 that only looks at those six services, with that
10 essential fact I just described to you, you can now
11 see whether a study analyzes the six services or 16
12 services in the fee schedule or 600 services of the
13 fee schedule or 1,000 of the services in the fee
14 schedule. Because that RUV conversion factor is
15 common and uniformly applied to all the services in
16 the fee schedule, the resulting ratio of the
17 commercial to Medicare prices should be very similar.
18 So even if there isn't a study that looks at these
19 six services, a study that does so should not, in
20 principle, arrive at a very different ratio of
21 commercial to Medicare prices that a study looks
22 at all of the services.
23    Q.    I appreciate your speculation that you
24 wouldn't expect it to be different. Can I get a
25 simple answer to a simple question?

Page 239

1       Has there been a study looking at the
2 foundational services that you mention in your report
3 and calculating a ratio between Medicare payments and
4 private insurance payments? Has it been done, yes or
5 no?
6       MR. MIGLIACCIO: Objection to the
7 colloquy and also objection to the extent it
8 misstates his testimony.
9       THE WITNESS: Because you're trying to
10 re-ask your question, I'm going to rely on the prior
11 iteration of your question, which specified that you
12 wanted to know about a study that only looked at
13 these six services and nothing else, okay, because
14 you did not specify that in this latter iteration of
15 the question. As I've noted before, many of these 19
16 studies and potentially others outside of the
17 metaanalysis have examined the six services or a
18 subset of these six services. And although I don't
19 know of a study that only looked at these six
20 services and nothing else, the result from an
21 analysis of these six services versus an analysis of
22 16 or 600 or 1,000 services ought to arrive at a
23 similar ratio of commercial to Medicare prices
24 because of the essential fact of the RUV conversion
25 factor being commonly applied the fee schedule, which

Page 240

1 I just described to you.
2    Q.    Do Medicaid reimbursement rates differ
3 from state to state?
4    A.    There is empirical evidence that
5 Medicaid prices differ state to state because we have
6 50 states and 50 different Medicaid programs. They
7 are administered by state governments with financing
8 by the federal government. The Kaiser Family
9 Foundation Medicaid price index or conversion -- I'm
10 not getting the exact name of that source right, but
11 it's in a footnote in my report. I'm happy to find
12 it. That shows you literally in a table format with
13 50 rows the average Medicare -- sorry, the average
14 Medicaid prices across the 50 states, and you can
15 compare them in apples to apples version to each
16 other.
17    Q.    Is the ratio between private insurance
18 and Medicaid, taking a 50 state average, a greater or
19 less than 1.43?
20    A.    If you're asking me to give you a
21 calculation of average commercial prices versus
22 average Medicaid prices, right, I think I heard that
23 correctly, average commercial prices divided by
24 average Medicaid prices should yield a higher ratio
25 than higher average commercial prices divided by

Page 241

1 average Medicare prices. So the average ratio on
2 this figure of average commercial prices divided by
3 average Medicare prices is 1.43 for physician
4 services in the independent office setting.
5 Therefore, if you divide the average commercial
6 prices by average Medicaid prices, which are lower
7 than the average Medicare prices, then the average
8 ought to be higher than 1.43.
9    Q.    Do you know what that ratio is?
10    A.    Off the top of my head, I could give you
11 an informed hypothesis, but I don't know the exact
12 ratio without having done that calculation in recent
13 memory.
14    Q.    That's fine. If you don't know, you
15 don't know.
16    A.    It's not exactly that I don't know, sir.
17 I have a general idea. I even shown you in a
18 footnote here. I think 0.72 is the ratio of
19 average -- just give me one second. I want to get
20 this correct because your characterization that I
21 don't know is simply not accurate here, I apologize.
22       So in footnote to table six on page 24,
23 I write in the fourth line of that footnote:
24       "Medicaid prices are estimated by using
25 the national average Medicaid to Medicare physician

1 fee ratio of 0.72."
2      So there you've got it.  A 0.72 is the
3 national average Medicaid to Medicare physician fee
4 ratio.  So arithmetically, you can use that in
5 combination with 1.43 to derive what the ratio of
6 what 1.43 would be for commercial versus Medicaid.
7 I'm happy to do the math if you want to give me a few
8 minutes, but this is the ingredient you would need to
9 get that math done.
10     Q.    I just asked you if you had it or not.
11 If you don't have it, that's fine.
12     A.    Out of respect, sir, then you qualify or
13 characterize my answer as if I don't know, then I
14 don't know.  Look, I've shown you the formula and
15 discussed with you the ingredients you need to
16 calculate that.  I've simply not performed that
17 calculation.  But I would argue that that's different
18 than having no idea.
19     Q.    So you're not supposed to argue, sir,
20 respectfully.  You're supposed to answer the
21 questions.
22     A.    With respect, by "argument," I don't
23 mean temper or tone, but rather as respectful
24 pushback of your characterization.
25     Q.    There's not supposed to be any argument,

1 respectful or otherwise.  Just supposed to be answers
2 to questions, sir.  So let me try something else.
3      The ratio of 1.43 that you cite, when
4 was that ratio published?
5     A.    I believe April 15, 2020, was the
6 publication of that Kaiser Family Foundation report.
7 The citation is right here in my report.  You can go
8 online and verify that.
9     Q.    Was it based on pricing for commercial
10 insurance and Medicare reimbursements in 2020, 2019?
11 What period of time?
12     A.    Again, as noted in figure one, which we
13 just reviewed together or at least I reviewed on my
14 screen, I'm not sure if you saw it in conjunction, in
15 the box right there, it clearly states using data
16 from 2010 through 2017.
17     Q.    Has there been any ratio published for
18 data from 2018 to 2021?
19     A.    Off the top of my head, I don't have a
20 citation for you.  I would not be surprised if this
21 large academic community continues to work on this
22 issue of price range rations and further work has
23 been published.  I have not had a chance to look into
24 that.  With that all said, price ratios across years,
25 even across these years from 2010 to 2017, which is a

1 longer span, in fact, twice as long as the one that
2 you just proposed from 2018 to 2021 do not shift
3 around all that much.  In other words, the 1.43 you
4 get from 2010 to 2017 data, you can generally expect
5 the ratio from other years to fall somewhere in that
6 vicinity as well.
7     Q.    I appreciate that speculation, but I'm
8 just asking a simple question.  Have you seen any
9 studies establishing a payment ratio between Medicare
10 and commercial insurance covering time period 2018 to
11 2021?
12          MR. MIGLIACCIO:  Object to the colloquy.
13 Asked and answered.
14          THE WITNESS:  So beyond these 19
15 studies, which formulates the evidence based to date,
16 I don't have at the moment an additional citation to
17 provide you from a more recent year of data.
18
19 BY MR. TRISCHLER:
20     Q.    And none of those 19 studies from the
21 metaanalysis include the pricing data from 2018 to
22 2021; do they?
23     A.    To my knowledge, they used data from
24 2010 to 2017.  So I believe 2017 was the last year.
25     Q.    And do you agree that future prices of

1 medical services in the United States remain
2 uncertain given the opaqueness of the U.S. healthcare
3 system?
4     A.    No, I do not agree with that, sir.
5     Q.    Have you ever testified that future
6 prices remain uncertain given the opaqueness of the
7 U.S. healthcare system?
8     A.    Again, from the patient's perspective
9 and the individual frontline clinician's perspective,
10 I've described for you twice now why both stories in
11 the Lay Press and academic articles have
12 characterized the patient's experience in finding out
13 the prices of the care they're receiving as
14 challenging and the prices as opaque to patients.
15 Those prices have been opaque to patients.  They are
16 opaque to patients currently, and therefore, it would
17 not be surprising if they're opaque to patients in
18 the future.  From that perspective, I would not be
19 surprises if I offered testimony in that line of
20 reasoning in the prior transcript that you have in
21 your hand.  Similarly, frontline clinicians
22 themselves have also found it challenging in various
23 news articles and academic studies to discern the
24 unit prices of the care they're actually providing
25 because as we discussed, negotiations over prices

62 (Pages 242 - 245)

Page 246

1 take place at the organizational level, not doc by
2 doc on the front lines relative to insurers.
3 Opaqueness today for frontline doctors and for
4 patients leads me to believe that unless something
5 fundamentally changes about the way prices are
6 reviewed by the U.S. healthcare system large, then we
7 can expect qualitatively the same kind of opaqueness
8 going forward, but that is different from the
9 perspective of empirical researchers like myself and
10 the authors of the other 17 studies in this
11 metaanalysis who examine large datasets comprising
12 millions -- tens of millions of enrollees both
13 Medicare and commercial where that the unit prices
14 are clear. I mean, they are printed per claim and
15 analyzed with statistical software, with statistical
16 precision, and methods. So opaqueness I would not
17 use to characterize that lens of analyzing prices.
18     Q.    Well, none of those 18 -- is it 18 or 19
19 studies?
20     A.    19 studies in this metaanalysis that
21 we're talking about.
22     Q.    So none of those 19 studies in the
23 metaanalysis look at future healthcare costs. True?
24     A.    Well, I submit to you as a matter of
25 general principle that empirical studies of data

Page 247

1 that exist today of past events, data from the future
2 are not part of empirical studies.
3     Q.    Okay. Another way to answer that
4 question is yes, you're right. So those studies do
5 not look at future data or project future ratios?
6     A.    But they tell us something about how --
7     Q.    I didn't ask you that. You've got to
8 answer my question.
9     A.    But it's a misleading question, sir.
10     Q.    You haven't even heard it yet.
11         MR. MIGLIACCIO: Let him ask his
12 question and then you can give your response to it.
13         MR. TRISCHLER: Then you can argue all
14 you want once I get to ask it.
15         MR. MIGLIACCIO: Object to the colloquy.
16 Ask your question, counsel.
17
18 BY MR. TRISCHLER:
19     Q.    Do the 19 studies that comprise the
20 metaanalysis project future ratios of healthcare
21 costs between commercial insurance or future
22 healthcare prices between commercial insurance and
23 Medicare?
24     A.    These 19 studies using 2010 to 2017 data
25 teach us something valuable about how a health policy

Page 248

1 or healthcare services analyst would think about
2 future prices in our healthcare system, specifically
3 the ratios of commercial versus Medicare prices. Of
4 course no one can exactly predict the future.
5 However, if you see empirically, stability of price
6 ratios across years, you would logically or one
7 reasonable-minded person would logically infer that
8 unless a big intervention happened in healthcare
9 pricing or a big federal policy that one did not
10 anticipate came down the road that stability of
11 ratios of prices across years would lead one to
12 believe that the ratios would likely continue to be
13 stable in the absence of a large intervention or
14 policy. So, of course, no study using prior data
15 predicts the future, although some studies do
16 simulation methods to make predictions, these 19
17 studies do that, but of course we learn something
18 about how we think critically about the future based
19 on evidence from the past, and that is exactly an
20 analogy we can draw from these 19 studies as you
21 would draw from many other domains of science. We
22 learn from data from the past to inform how we think
23 about data from the future. So the very fact that
24 future data are not in these studies because of
25 course the future hasn't occurred yet, doesn't mean

Page 249

1 that the studies tell us nothing about how we think
2 through prices in the future. That's the only point
3 that I'm trying to emphasize here. That's why
4 frankly I found my previous question misleading
5 because it didn't give me the room to offer this
6 nuance.
7     Q.    Have you had enough room to offer the
8 nuance now or do you need more?
9     A.    No, sir, I'm satisfied with the answer I
10 just provided you.
11     Q.    Good. Good. Have you given any thought
12 of how long this yet-to-be certified medical
13 monitoring program would remain in place?
14     A.    Again, that is a dimension of
15 quantities, what services are in the monitoring
16 program, who is in the monitoring program, for how
17 long one is in the monitoring program.
18     Q.    So you haven't given it any thought --
19 you faded out, so I didn't hear your answer.
20     A.    I'm sorry if I faded out. What I was
21 saying was the duration of monitoring program
22 analogous to the services within a monitoring program
23 and who is in a monitoring program are all aspects of
24 quantities, and because prices times quantities
25 equals spending and because my report focuses on

63 (Pages 246 - 249)

Page 250

1  prices, not quantities, these substantive questions
2  about quantities are outside the scope of my report,
3  which we've clearly established repeatedly earlier.
4      Q.   So as you sit here today, you don't know
5  whether the program that you are supposed to monetize
6  will provide healthcare services five years into the
7  future, ten years into the future, 20 years into the
8  future, or 50 years into the future.  Right?
9      A.   By the very definition that a monitoring
10  program has not been finalized and certified, I do
11  not know what's in the final certified monitoring
12  program.  Nevertheless, the common methodology for
13  applying prices can be used for any monitoring
14  program that would be certified, and again, that was
15  around quantities or what's in the monitoring program
16  was outside the scope of what I was retained to opine
17  on.
18      Q.   And your methodology then would be,
19  among other things, to look at average prices for
20  physician services from 2010 to 2017 to predict what
21  prices would be for those services in 2040?
22      A.   I disagree with your summary there
23  because there's nothing in my report that restricts
24  the common methodology to just those eight years of
25  data.  As time passes and new data becomes available,

Page 251

1  you can easily extend this common methodology to
2  include newer data from 2018 and onwards, for
3  example, and it does not preclude the -- the use of,
4  as I noted before, the 40th percentile or the 60th
5  percentile or the 75th percentile.  A judge, jury, or
6  decisionmaker, or factfinder could decide to use a
7  different measure of central tendency within the
8  distribution.  An average is but one option.  It's
9  not the only option.
10      MR. TRISCHLER:  I do not have any
11  further questions for you at this time.  Some of the
12  other counsel may.  Thank you for your time.
13      THE WITNESS:  Thank you, sir.
14      THE VIDEOGRAPHER:  The time is 4:59.
15  This ends media unit No. 5.  We're going off the
16  record.
17
18      (Whereupon, a brief recess was taken off
19  the record.)
20
21      THE VIDEOGRAPHER:  The time is 5:08.
22  This begins media unit No. 6.  We're back on the
23  record.
24
25

Page 252

1  CROSS-EXAMINATION
2  BY MR. OSTFELD:
3      Q.   All right.  Hi, Dr. Song.  It's nice to
4  meet you.  My name is Greg Ostfeld.  I represent Teva
5  Pharmaceuticals U.S.A., Inc. and several related
6  entities in this case.  Okay?
7      A.   Hi, Greg.  It's nice to meet you as
8  well.
9      Q.   You've noted a few times today that no
10  class has yet been certified in this case, and that's
11  certainly true.  You were provided with a definition
12  of the proposed medical monitoring class by
13  plaintiff's counsel.  Correct?
14      A.   Proposed to the extent I recollect the
15  documents I read in the case, yes.
16      Q.   And that's the definition that you
17  reference on page 4 of your report and what you and
18  Mr. Trischler discussed earlier.  Right?
19      A.   Yes.
20      Q.   You also discussed a phrase "patient
21  population" a number of times with Mr. Trischler.  Do
22  you remember those discussions?
23      A.   Not the exact context of his questions,
24  but I do recall using the phrase "patient
25  population."

Page 253

1      Q.   And that phrase also appears on page 25
2  of your report.  Probably other places as well, but
3  I'm thinking of the usage on page 25 that you went
4  over with Mr. Trischler.
5      A.   Do you mind if I take a second just to
6  find that?
7      Q.   Of course.
8      A.   In line four of paragraph 29, I wrote
9  "patient population."  I used that phrase there.
10      Q.   And in fact, a patient population is a
11  relatively important component of your model because
12  once you've ascertained the prices of each of the
13  procedures included in the medical monitoring model,
14  you then have to determine the size and composition
15  of the patient population to come up with the
16  quantity size part of your model.  Correct?
17      A.   Not exactly like you phrased it because
18  I'm taking the dimensions of quantity as given in the
19  context of this report.  So I am not making, nor was
20  I asked to make a determination about the elements of
21  quantity, such as the services in the monitoring
22  program, who is in the monitoring program, the
23  duration of the monitoring program.  Those are
24  elements I was not asked to opine on, and to my
25  understanding, are being worked on by other experts

64 (Pages 250 - 253)

Page 254

1 in the case, and my work was around the common
2 methodology of applying my knowledge about pricing --
3 in an approach towards of whatever services end up
4 being in a potential medical monitoring program that
5 gets certified.
6      Q.    I want to make sure I understand your
7 answer correctly.  So as I understand the testimony
8 that you've given several times today, you haven't
9 applied your model to a given class, a given set of
10 services, or a given patient population.  You've
11 demonstrated how your model would be applied.  Is
12 that fair?
13     A.    Because of the absence of a final
14 certified class of patients or a certified or final
15 medical monitoring program, yes, my report provides
16 illustrative examples of how a common methodology for
17 pricing would be applied.
18     Q.    Since your model in simple terms is
19 price times quantity, the quantity side of that
20 formula is essentially the patient population and the
21 procedures that are performed on the patient
22 population once it is ascertained?
23     A.    It includes -- I would agree that it
24 includes those two elements.
25     Q.    And I guess another way of putting it

Page 255

1 might be the price is the price of each of the
2 procedures included in the medical monitoring
3 program.  The quantity is the quantity of those
4 procedures performed on the patient population
5 included in the medical monitoring program.  Is that
6 accurate?
7      A.    That is a fair characterization of price
8 times quantity in this context.
9      Q.    So if the court were to certify the
10 class that you define on page 4 of your report, would
11 the members of that class then constitute the patient
12 population referenced on page 25 of your report for
13 purposes of ultimately applying this model?
14          MR. MIGLIACCIO:  I'll object to the
15 extent that it calls for a legal conclusion, but you
16 can answer that.
17          THE WITNESS:  Yeah, to be concrete, in
18 line two of paragraph 39, when I say the size and
19 composition of the patient population undergoing
20 monitoring, by "patient population," there I do mean
21 a final certified set of class members.
22
23 BY MR. OSTFELD:
24     Q.    Okay.  I think I like the way you said
25 it even better.  If there's a final certified class,

Page 256

1 the members of that final certified class would
2 constitute the patient population?
3      A.    As I'm using it in paragraph 39, lines
4 two and four here, yes.
5      Q.    Now, in this instance, the proposed
6 class definition that you were given consists of all
7 persons who consume the defendants
8 Valsartan-containing drugs containing NDMA or NDEA
9 and who accumulated sufficient quantities of lifetime
10 cumulative exposure to require medical monitoring
11 given the increased risk of cellular and genetic
12 injury leading to an increased risk of cancer.
13 Right?
14     A.    I believe you just read from paragraph 7
15 of my report.  Is that correct?
16     Q.    Probably because I tried to cut and
17 paste from it earlier.
18     A.    To the extent that you read word for
19 word in paragraph 7, I certainly stand by what I
20 wrote.
21     Q.    If that were the class and the court
22 were to ultimately certify to estimate the size and
23 composition of the patient population, we would first
24 have to determine who the members of that class are.
25 Right?

Page 257

1      A.    Yes, that seems synonymous.
2      Q.    So that means that you have to identify
3 all of the persons who consume the defendants
4 Valsartan-containing drugs containing NDMA or NDEA
5 and who accumulated sufficient quantities of lifetime
6 cumulative exposure to require medical monitoring
7 given the increased risk of cellular and genetic
8 injury leading to an increased risk of cancer.
9 Right?
10     A.    Well, you're leading me down a
11 hypothetical here because the class has not been
12 certified.  If in your question you're asking me to
13 assume that a final certified class is certified
14 based on the exact words of the -- of the summary of
15 proposed class definition here, well, then my summary
16 of the proposed class definition here would,
17 therefore, be the definition of the class.  I think
18 you're just equating two things there forward and now
19 backwards.
20     Q.    You understand that you're describing
21 this as a hypothetical, but you understand that this
22 is the hypothetical that the plaintiffs are
23 attempting to make into a reality in the conclusion
24 of this case.  Right?
25          MR. MIGLIACCIO:  Objection to the form

65 (Pages 254 - 257)

Page 258

1 of that question.
2        THE WITNESS: I appreciate your
3 question, sir. Not as an attorney in this case, I
4 feel it's not my place to say what the plaintiffs are
5 trying to do. I am only discussing and offering my
6 expertise on what I've done in this report. I think
7 out of respect for the plaintiffs and plaintiffs'
8 counsel, I'm not going to purport to characterize
9 part or everything that they're doing in this case.
10 That's not for me to do.
11
12 BY MR. OSTFELD:
13     Q. Sure. You understand that your
14 expertise is not being applied in a purely
15 hypothetical context. It being applied to
16 litigation. Right?
17     A. Well, my expertise in this case is being
18 applied to the pricing of medical services, which, in
19 my view, is germane to the substance of the case
20 here, but it's a fairly narrow task that I was
21 retained to conduct, and there are lots of important
22 questions around class membership and definition in
23 the monitoring program components itself that we
24 talked about at length today, which frankly is
25 outside the scope of this report again.

Page 259

1     Q. That's sort of what I'm getting at, is
2 to apply what you have brought to this case.
3 Ultimately, somebody, and it may not be you, but
4 someone is going to have to determine who is in the
5 patient population, somebody is going to have to
6 determine what tests are going to be administered to
7 the members of the patient population, and then your
8 model can be applied to estimate the price of doing
9 so. Right?
10        MR. MIGLIACCIO: I'll object to the
11 extent it calls for a legal conclusion, but you can
12 answer.
13        THE WITNESS: Answering not as an
14 attorney myself, that characterization of a future
15 series of events makes sense to me logically as a
16 health economist offering an opinion here.
17
18 BY MR. OSTFELD:
19     Q. Okay. Whether it's your exact wording
20 or not, you understand that the proposed class
21 definition includes a determination of persons who
22 have consumed enough Valsartan-containing NDMA or
23 NDEA to cross a lifetime cumulative exposure that
24 puts them at a greater increased risk of cancer?
25        MR. MIGLIACCIO: Same objection. You

Page 260

1 can answer.
2        THE WITNESS: To my general knowledge of
3 the facts of the case based on what I've read and
4 based on my discussions with your colleague earlier
5 today, yes, my understanding is that there's a point
6 system that helps define a threshold of cumulative
7 exposure, and that point system and threshold helped
8 define then the proposed class members. That is my
9 general understanding of that area of the case.
10
11 BY MR. OSTFELD:
12     Q. So if a class were certified that meets
13 those characteristics, then to know the size and
14 composition of the class, we have to identify the
15 persons who have crossed those lifetime cumulative
16 exposure thresholds. Right?
17        MR. MIGLIACCIO: Same objection to the
18 extent it calls for a legal conclusion. You may
19 answer.
20        THE WITNESS: I think conceptually
21 you're asking something that's very simple here.
22 It's so simple that I don't know if it's a trick
23 question or not. If the definition of membership
24 into a class is X, once a person satisfies X, then I
25 would expect that person be part of the class.

Page 261

1
2 BY MR. OSTFELD:
3     Q. It's not a trick question. I don't ask
4 trick questions. I ask simple questions, at least I
5 try to, and if I get them wrong, I try to ask even
6 simpler questions.
7        I think you put it very well. To -- if
8 a class is certified, we have to determine who the
9 people are who meet the X criterion that qualifies
10 them for membership in the class. Right?
11        MR. MIGLIACCIO: Same objection. You
12 can answer.
13        THE WITNESS: That seems logical to me.
14
15 BY MR. OSTFELD:
16     Q. And once we know who the people are that
17 meet the X criterion, then we know the size and
18 composition of the class and can apply your model?
19     A. Well, to be precise -- excuse me one
20 second.
21        THE VIDEOGRAPHER: The time is 5:21.
22 We're going off the record.
23
24        (Whereupon, a brief recess was taken off
25 the record.)

66 (Pages 258 - 261)

Page 262

1
2          THE VIDEOGRAPHER:  The time is 5:22.
3  We're back on the record.
4          THE WITNESS:  To be precise, based on
5  your question, if you determine the members in a
6  class, it seems to me, even though this was not a
7  subject that I was asked to opine on, but it's a
8  matter of logic, it seems to me that you've defined
9  the size of the class, but the composition of the
10  class would not yet be defined simply by knowing the
11  members of the class.
12
13  BY MR. OSTFELD:
14      Q.    That's an excellent point.  Let's talk
15  about that a little bit.  Now, I think you said it
16  was not part of your assignment to actually ascertain
17  who the members of the proposed class are.  Correct?
18      A.    Correct.
19      Q.    So you were given a definition, but you
20  then did not then venture out and try to ascertain
21  who in the U.S. population belongs in that proposed
22  class definition.  Correct?
23      A.    Correct.
24      Q.    Okay.  So let's assume somebody else
25  goes out and performs that exercise and they have now

Page 263

1  determined who in the U.S. population is a member of
2  the hypothetical certified class.  Once we have that,
3  how do we then determine the composition of the
4  class?
5          MR. MIGLIACCIO:  Object to the extent
6  that it's a hypothetical -- an incomplete
7  hypothetical at this point.
8          THE WITNESS:  The methodology of how in
9  your question is not something that I have devoted
10  time thinking through and formulating a response to,
11  and again, it was not part of the scope of the work
12  to date that I have a been retained to do in this
13  case, but based on what I've written in my report,
14  aspects, such as insurer mix, are ascertainable by
15  methods plausibly as simple as asking the class
16  members or potentially could be information be
17  volunteered by the class members.  So there may be
18  elements of that methodology for the how in your
19  question that I'm not thinking of at the moment
20  because I have not yet devoted time to that question,
21  but I think as a matter of straightforward logic, if
22  there are aspects of the population that are knowable
23  and ascertainable, there are likely methods to
24  discover or ascertain those attributes.
25

Page 264

1  BY MR. OSTFELD:
2      Q.    Okay.  So that's fair.  Among the
3  factors that you identified that might be relevant to
4  the composition of the class are issues, like
5  insurance mix and age.  Right -- or actually, I think
6  you said life expectancy, not age.  Insurance mix and
7  life expectancy are both things you would want to
8  know about the class?
9      A.    I just want to go to my report where I
10  talk about that.
11      Q.    Okay.
12      A.    So in paragraph 39 -- we've talked about
13  insurers and insurer mix.  So to take the second part
14  of your question first, in paragraph 39 starting in
15  line four, I state that projecting future healthcare
16  use requires assumptions about life expectancy and
17  the development of medical conditions.  Those
18  assumptions I have not been asked to formulate or
19  state or propose or make in any way.
20          I, as a matter of conceptual piece to
21  this common methodology, stating that those elements
22  would be needed in the finalization or certification
23  of a monitoring program and would be helpful for
24  determining quantities.  Again, quantities are what
25  services are in the program, who is in the program,

Page 265

1  for how long in the program.  We talked about this
2  earlier today in some depth, and this section of my
3  report is a reaffirmation of a need of those elements
4  to carry out an estimation of healthcare spending.
5      Q.    So to apply your report to determine
6  quantities, one would want to determine
7  circumstances, such as insurance mix, life
8  expectancy, and development of medical conditions,
9  that may render the monitoring program less
10  appropriate clinically.  Right?
11          MR. MIGLIACCIO:  Objection.  Misstates.
12          THE WITNESS:  Clinical appropriateness
13  is a sort of sophisticated entity.  I just published
14  an original research article about clinical
15  appropriateness.  I think the way you're
16  characterizing that here I would in some ways agree
17  with, but I think it's easier and more applicable to
18  this case to say that life expectancy and the
19  development of medical conditions may inform a
20  factfinder or a decisionmaker at the end of the day
21  regarding what medical services ought to belong in a
22  monitoring program.
23
24  BY MR. OSTFELD:
25      Q.    And Dr. Song, to be clear, I wasn't

67 (Pages 262 - 265)

Page 266

1 trying to characterize. I thought I was reading from
2 your report. I believe what your report says is
3 beyond insurance mix, it says in addition -- let me
4 start with line two of your report. It states:
5         "This involves," this being estimating
6 the size and composition of the patient population.
7 "This includes determining the insurer mix, site of
8 care composition, and network status of the providers
9 for the patient population. In addition, projecting
10 future healthcare use requires assumptions about life
11 expectancy and the development of medical conditions
12 (e.g., cancer and other acute and chronic diseases)
13 that may render the monitoring program less
14 appropriate clinically."
15         Those are your words. Right?
16     A.    Yes, thank you for reminding me. I had
17 not recalled a moment ago that I used the phrase
18 "clinical appropriateness" or "appropriate
19 clinically" in the context of this part of the
20 paragraph. Yes, I think that characterization is
21 fair. Obviously, I stand by what I wrote in this
22 report.
23     Q.    Okay. So once we know who is in our
24 class, these are the kinds of determinations that we
25 need to make about the class members in order to

Page 267

1 determine quantity and apply your model. Right?
2     A.    I think the factfinder through the
3 process of certification would likely take these
4 considerations into account in determining the final
5 monitoring program.
6     Q.    Okay, and I think one of the things you
7 said is at this point you have not yet been engaged
8 to undertake the issue of how to go about determining
9 those, but one way might be to ask the class members.
10 Right?
11     A.    That is a fair characterization of our
12 earlier discussion, yes.
13     Q.    So you go to each class member and you
14 basically say, "Who provides your medical coverage,
15 if anyone," and based on your responses, you know how
16 many Medicaid, you know how many Medicare, you know
17 how many insured, and you know how many uninsured you
18 have in the class?
19     A.    That appears to me to be a common
20 methodology for discerning insurer mix.
21     Q.    And that assumes 100 percent response
22 rate or could we extrapolate from a more limited
23 response rate?
24     A.    For the purposes of our discussion, I
25 think it's fair to assume that if members participate

Page 268

1 within a certified class in a class action case, that
2 there is likelihood -- obviously, this is an
3 empirical question, but likelihood that they would
4 offer some aspects of useful information like that.
5 It is a hypothetical because you're asking about
6 response rates in the future for a not yet determined
7 class, but I'm giving you an informed guess, sort of
8 a hypothesis about how I think a response rate
9 would -- would go.
10     Q.    Okay. How about the issues of life
11 expectancy and medical conditions, how would we go
12 about ascertaining that from the class members?
13     A.    Similarly, you could ask them about
14 medical care that they've received before in the
15 exercise that I was led through by your colleague
16 counsel in earlier hours. He readily demonstrated
17 that you all and I imagine the plaintiffs' counsel
18 have a great deal of information about the medical
19 history of each of the plaintiffs, and again, this is
20 not something I was asked to opine specifically
21 about, but the methodology for determining these
22 assumptions or these elements that are helpful for
23 the calculation of healthcare spending, but as a
24 matter of logic, I would imagine that if you could
25 ascertain those aspects now, you could similarly

Page 269

1 ascertain those aspects of a person's medical history
2 and risk factors similarly for a class.
3     Q.    So in the same manner that we have
4 gathered medical history information about the named
5 plaintiffs, we can go gather that information about
6 the class members and apply it to determine life
7 expectancy and medical conditions?
8         MR. MIGLIACCIO: Objection. It assumes
9 facts not in evidence, and it's an incomplete
10 hypothetical.
11         THE WITNESS: I would agree with you
12 can, but I would not restrict that general method we
13 just walked through as the only potential
14 methodology. For example, if you have a population
15 that is large enough to be representative, you may be
16 able to use a sampling procedure or what is common
17 knowledge about the prevalence of certain diseases in
18 the population to make an informed estimation or
19 calculation of risks going forward. That is an
20 alternative methodology to the one that you've used
21 to gather information to date from the plaintiffs.
22
23 BY MR. OSTFELD:
24     Q.    Okay.
25     A.    I'm sorry, I was just going to add it's

68 (Pages 266 - 269)

Page 270

1 one alternative among potentially others.
2     Q.    Just so I can put some parameters around
3 that, how large of a population would we need and how
4 large of a sample size would we need to apply that
5 alternative methodology?
6         MR. MIGLIACCIO:  Objection. It's an
7 incomplete hypothetical.  Vague.
8         THE WITNESS:  Thanks for these
9 questions.  From a research perspective, from a
10 social science and empirical data perspective, it
11 depends on the outcomes or clinical events you're
12 measuring.  This is not something that I've yet to
13 spend time doing, so at the moment sitting here, I
14 don't have the work done to answer that question, and
15 it was not part of what I was retained to opine on to
16 date, but in a general sense, it depends what you're
17 measuring.
18
19 BY MR. OSTFELD:
20     Q.    Okay.  I want to ask you a few more
21 questions on the phrase "medical conditions that may
22 render the monitoring program less appropriate
23 clinically."  You know, I see that you've listed
24 cancer and other acute and chronic diseases as
25 examples of that.  Help me understand, why would a

Page 271

1 medical condition render a monitoring program less
2 appropriate clinically?
3         MR. MIGLIACCIO:  Objection to the form
4 of the question.  You can answer.
5         THE WITNESS:  Let me provide you my
6 response in two parts.  First, the very definition of
7 monitoring conveys that one is on the lookout or
8 looking for an event that has not yet occurred.  So
9 if a cancer that you're monitoring for has already
10 occurred previously in a person's life, that may
11 change how we feel or how a decisionmaker or
12 factfinder may feel about the appropriateness of the
13 monitoring service.
14         The second part of my answer is that, to
15 my understanding in this case, the proposed class for
16 medical monitoring includes individuals who have not
17 yet developed cancers that you would be monitoring
18 for, and that, again, I'm not an attorney in this
19 case, so please excuse me if I'm off a little bit on
20 the details, but that there are other aspects of this
21 case and other classes of this case that pertain to
22 other individuals that fall outside of this proposed
23 class for medical monitoring.
24
25 BY MR. OSTFELD:

Page 272

1     Q.    Does your -- strike that.
2         Is there a methodology or a method that
3 can be applied to account for the exclusion of class
4 members for whom medical monitoring becomes
5 clinically inappropriate?
6         MR. MIGLIACCIO:  Object to the extent it
7 assumes facts not in evidence.
8         THE WITNESS:  Again, that common
9 methodology was not part of what I was retained to
10 work on or opine on thus far in this case, and I
11 would refer you to the oncologist expert with regard
12 to that specific question.
13
14 BY MR. OSTFELD:
15     Q.    All right, your model makes no
16 assumptions about who the final decisionmaker is in
17 terms of what medical monitoring is appropriate for
18 members of the proposed class.  Right?
19     A.    Correct, it makes no such assumption
20 about who that decisionmaker is.
21     Q.    I think you described earlier that the
22 model is agnostic to that?
23     A.    I agree with that.
24     Q.    So it could be a court, it could be a
25 jury, it could be some board or standard setting

Page 273

1 organization, or it could be individual doctors.
2 Regardless, that's not something that your model
3 requires be one thing versus another?
4         MR. MIGLIACCIO:  Objection.  Assumes
5 facts not in evidence.
6         THE WITNESS:  In the way that you listed
7 those options, those all seem to be reasonable
8 candidates for what a decisionmaker or a
9 decisionmaking body could be, and I'm particularly
10 grateful that you mentioned individual physicians as
11 part of those options because with your colleague
12 earlier, I had discussed at some length about the
13 derivation of professional society guidelines for
14 cancer screening in the United States.  I had noted
15 that those cancer guidelines are constructed by large
16 bodies of scientists and physicians and other cancer
17 experts.  What I didn't get a chance to emphasize
18 earlier on is that those large national professional
19 society guidelines have characteristics that are
20 different from a potential medical monitoring
21 program, and it's plausible that an individual
22 physician, as you just said, could be a decisionmaker
23 or part of a potential decisionmaking body for a
24 medical monitoring program that uses and builds on
25 the evidence base of national professional society

69 (Pages 270 - 273)

Page 274

1  guidelines. So thank you for bringing me back to
2  that point as well.
3
4  BY MR. OSTFELD:
5     Q.    Sure, and I have a follow-up question on
6  that. So to the extent we're trying to apply your
7  model in a forward looking way, you know, we're
8  trying to design a medical monitoring program that's
9  going to be applied for, let's say, the next ten
10 years, is there a method or a methodology to account
11 for that individual physician component of this or an
12 individual physician might decide with their patients
13 that this type of monitoring is not right for their
14 patient under their patient's circumstances?
15          MR. MIGLIACCIO: Objection. It's an
16 incomplete hypothetical and assumes facts not in
17 evidence.
18          THE WITNESS: As best as I understand
19 your question, the common methodology that I proposed
20 in this report respects the potential role of patient
21 and provider preferences, and I've said this in a
22 couple of different ways to your previous colleague
23 as well. I was asked earlier, is there a role for a
24 physician -- physicians and patients. Perhaps I was
25 asked about both. Similar to my answer for you here,

Page 275

1  the concept that I'm trying to convey is that this
2  common methodology about applying prices of services
3  to a potential medical monitoring program does not
4  restrict, does not prohibit, certainly leaves room
5  for physicians and patients to have a discussion
6  about their clinical care as is routine in our
7  healthcare system.
8
9  BY MR. OSTFELD:
10    Q.    Maybe I can put it in more concrete
11 terms because we're talking about the same thing, but
12 in slightly different ways. Maybe we can go back a
13 page in your report to table six. This is your
14 illustrative list of procedures.
15    A.    I'm there at table six.
16    Q.    So each of these six illustrative
17 procedures has a CPT code associated with it. Right?
18    A.    That's correct.
19    Q.    For example, for urinalysis, the CPT
20 code is 81001. Right?
21    A.    This example I've selected in this
22 table, yes, that's the CPT code.
23    Q.    Okay. Is that the only CPT code
24 associated with urinalysis?
25    A.    No, it's not because urinalysis

Page 276

1  comprises a number of CPT codes. I think roughly
2  about ten or 11 from which I have selected one of the
3  most common ones, if not the most common one, and it
4  is also worth noting that across those different
5  urinalysis CPT codes, prices are generally similar,
6  generally similar.
7     Q.    Now, generally as a qualifier, when you
8  say, "generally similar," is there a variance between
9  them?
10    A.    Prices can differ across CPT codes, yes.
11    Q.    Can you estimate the general percentage
12 of variations among different prices for different
13 urinalysis CPT codes?
14    A.    Do you mean within one payor or across
15 payors or one insurer or across insurers?
16    Q.    Let's go with something a little more
17 fixed, like the Medicare price, amongst Medicare
18 prices.
19    A.    As best as I can recall because I've
20 done prior research on this for a paper that I
21 believe I cited in my report, off the top of my head
22 in my analysis for that paper, Medicare prices for
23 urinalysis CPT codes are in the order of, generally
24 speaking, a few dollars. So this example of $3.17 is
25 certainly the ballpark of what I recollect. The

Page 277

1  percentage variation across Medicare prices for those
2  codes is difficult for me to quantify off the top of
3  my head, but to try to be helpful, I can try give you
4  an educated guess that it is small. It is going to
5  be a few percentage points or tens of percentage
6  points, but you will generally not see one urinalysis
7  code priced at $100 or another one, a neighboring CPT
8  code priced at $3. Hopefully, that helps gives you a
9  sense.
10    Q.    It does, and earlier you mentioned
11 private insurance, so let's move over to the
12 commercial price column. How does the variance
13 differ from the commercial price versus Medicare
14 price for the different urinalysis codes?
15    A.    Well, conveniently --
16    Q.    Let's go to a different procedure.
17 Let's go to something different like upper endoscopy.
18 So for upper endoscopy, that's a more expensive and
19 more complicated procedure. Right?
20    A.    You mean more expensive as in higher
21 priced in commercial insurance relative to in
22 Medicare.
23    Q.    Even versus urinalysis, upper endoscopy
24 is more complex and more expensive than urinalysis.
25 Correct?

70 (Pages 274 - 277)

Page 278

1    A.    Yes, sir.  My table supports that.
2    Q.    And unlike a pure lab test for upper
3 endoscopy, the price is not identical for Medicare
4 and commercial.  Correct?
5    A.    Correct.
6    Q.    So this might be a better example.  So
7 within the Medicare price range, let me ask you this:
8 Is there more than CPT code for upper endoscopy?
9    A.    Yes, I believe there is, and I'm not
10 able to recall off the top of my head right now
11 exactly how many codes.
12    Q.    Are you able to recall or estimate the
13 percentage variance for the Medicare prices for the
14 different endoscopy codes?
15    A.    Off the top of my head, I am less able
16 to estimate that variation across codes that I am
17 across the variation of urinalysis codes because
18 upper endoscopy codes can include things like
19 additional elements of the service -- I'm having
20 trouble recalling from the physician fee schedule,
21 which has thousands of physician services.  It's fair
22 to say that it's difficult for me at this moment to
23 recall that variation.
24    Q.    What about for commercial prices, would
25 there be more or less variation for the commercial

Page 279

1 prices of an upper endoscopy versus Medicare?
2    A.    Well, that depends on where you look,
3 sir.  As previously discussed with your colleague,
4 commercial prices vary due to differences in the
5 market power relative to another geography.  So it is
6 plausible that you can find less variation among
7 commercial prices and more variation among commercial
8 prices based on where you look.  Without going
9 through the more granular exercise with you of asking
10 you to be more specific about which area you're
11 thinking about or what type of market power variation
12 you're thinking about, I would just offer as a
13 general comment from the research evidence base that
14 Medicare prices are, in general, more uniform both
15 across geography and across the codes, but I say the
16 second part with some qualification without recalling
17 the exact prices off the top of my head.  And
18 relative to that Medicare benchmark, commercial
19 insurance prices, in general, do exhibit more
20 variation because commercial insurers differ in their
21 market power and providers whom they negotiate with
22 differ in their market power across the country.
23    Q.    And is there more variation between the
24 codes as well on the commercial side?
25    A.    There could be, and it's certainly

Page 280

1 something that's ascertainable and able to be
2 examined.  Off the top of my head, I'm not able to
3 give you a general conclusion about that, about upper
4 endoscopy.
5    Q.    That's sort of the scenic route to get
6 to of what I wanted to talk about in terms of
7 individual doctors and individual providers.  You've
8 used the word "ascertainable" a couple of times, so I
9 want to understand what you mean by that.  When you
10 say that the price variance is ascertainable, are you
11 saying that if you know who the providers are that
12 are going to be providing the screening services and
13 what services they're going to provide, then you can
14 ascertain the prices they're going to charge?
15    A.    That's certainly one feasible route, but
16 it's not the only methodological route.  As I noted
17 earlier, from these large database, and I think I
18 stated in my report, but I will just give this de
19 novo here.  In large datasets, like the MarketScan
20 database, the Fair Health database, the Blue Health
21 Intelligence database, the IQVIA database, and the
22 HCCI database, which are examples of large databases
23 of administrative claims data in the U.S., can
24 discern with common statistical methods and with a
25 fair amount of certainty the average or median or at

Page 281

1 least the range within a reasonable amount of prices
2 for a particular service in a particular geography.
3 Now, it may not match cent for cent to the negotiated
4 price for a particular physician in a particular
5 hospital or facility, but generally speaking, these
6 measures of central tendency, especially within a
7 region, such as an average or median of X percentile,
8 should get you fairly close to what the market
9 average for a price is, and so that would be a large
10 database methodology that would serve as an
11 alternative to the more specific ask each provider
12 methodology that your question referred to.
13    Q.    To apply the measures of central
14 tendency, do you need to know the specific CPT codes
15 or is it enough just know the name of the procedure
16 being administered?
17    A.    Either could work.  That's a design
18 decision.  That's an empirical design decision, which
19 I'm happy to discuss here, but would require some
20 more thought to formulate a more thorough answer.  In
21 some types of services, all of the CPT codes within
22 that shall we call it that category of service are
23 rather similar.  So an example here would be there
24 are roughly ten or 11 codes for urinalysis in the CPT
25 fee schedule, and although they may have some nuanced

71 (Pages 278 - 281)

Page 282

1  differences between them, many of them at the end of
2  the day will give you basic information about cell
3  counts and bacteria counts, and you can run the urine
4  tests that you need off of them, whereas in other
5  services, CPT codes have larger differences within a
6  general category or type of service.  So the design
7  decision is you can either select the most common
8  code, as I've done here using the illustrative
9  examples, or you can determine that for this type of
10 service, there are a number of codes here.  They all
11 generally would supply you the clinical data you need
12 for monitoring or making a clinical decision, and
13 therefore, for this particular example in this
14 hypothetical that I'm raising for you, you may put
15 all those codes together as a design decision.  The
16 common methodology can be applied either way, but
17 it's an empirical sort of study design decision about
18 which path you take.
19     Q.   You told me earlier and you told
20 Mr. Trischler that there's room within this model for
21 the necessary component for individual physician
22 decisionmaking.  I'm still a little confused by that,
23 so let me zero in on that a little bit.  It seems to
24 me to apply your model, you need to know what tests
25 are going to be administered to the members of the

Page 283

1  patient population.  Is that fair?
2     A.   Not exactly.  You need to know what
3  tests are certified as part of the monitoring program
4  and how frequently they are to be administered and
5  what the size of the certified class ends up being.
6     Q.   Okay.
7          THE VIDEOGRAPHER:  The time is 5:57.
8  We're going off the record.
9
10         (Whereupon, a brief recess was taken off
11 the record.)
12
13         THE VIDEOGRAPHER:  The time is 5:59.
14 We're back on the record.
15
16 BY MR. OSTFELD:
17    Q.   So Dr. Song, I believe what you just
18 told me is that what your model needs is the
19 procedures to be performed, the frequency with which
20 they're going to be performed, and the quantity based
21 on the number of members in the class.  Am I
22 remembering your testimony correctly?
23    A.   Those are aspects of quantities that you
24 would then pair with prices to estimate spending.
25    Q.   So I guess my question is this:  With

Page 284

1  respect to frequency, is there a method that can be
2  applied to estimate on a class-wide basis with what
3  frequency individual doctors will make determinations
4  as to which tests are appropriate for which members
5  of the patient population?
6          MR. MIGLIACCIO:  Objection.  Assumes
7  facts not in evidence.  Incomplete hypothetical.
8          THE WITNESS:  We have talked about this
9  earlier today, and this is well outside the scope of
10 what I'm opining on in this report, and I would refer
11 you to the oncologist expert for that question.
12
13 BY MR. OSTFELD:
14    Q.   Okay, so we should ask the oncologist
15 what percentage of time a given test is appropriate
16 for a given patient for a given cancer?
17         MR. MIGLIACCIO:  Same objection.  You
18 can answer.
19         THE WITNESS:  I think that's well within
20 the confines with our earlier discussion and with
21 your colleague where we talked about the elements of
22 the quantities in the medical monitoring program
23 being defined by others in this case outside of what
24 I'm doing on the pricing of medical services.
25

Page 285

1  BY MR. OSTFELD:
2     Q.   You would agree to accurately estimate
3  the pricing of medical services, you need to know the
4  rate or frequency with which each test will be
5  administered within the patient population?
6     A.   No, I do not agree with that, sir.
7     Q.   You need the quantity of total tests?
8     A.   I think you might be switching the
9  phrases "prices" with "spending."  Certainly if you
10 want to determine spending, you need both prices and
11 quantity, but your question used prices.  To
12 accurately estimate prices, you do not necessarily
13 need to have a predetermined quantity.  In fact, my
14 report is a demonstration of that.  I'm focusing on
15 prices in my report with still outstanding
16 components of a quantity that have yet to be
17 certified.
18    Q.   All right.  That's a very fair point.
19 To determine spending for the class, you need to know
20 the frequency with which each screening procedure
21 within the medical monitoring program -- strike that.
22         To estimate total spending --
23    A.   I'm sorry, my child is charging up the
24 stairs.  I'm going to mute myself for a minute.
25         THE VIDEOGRAPHER:  Time is 6:02.  We're

72 (Pages 282 - 285)

Page 286

1 going off the record.
2
3        (Whereupon, a brief recess was taken off
4 the record.)
5
6        THE VIDEOGRAPHER:  The time is 6:03.
7 We're back on the record.
8
9 BY MR. OSTFELD:
10      Q.    So Dr. Song, to estimate total spending,
11 you need to know the total quantity of each test that
12 is going to be performed within the patient
13 population.  Is that fair?
14      A.    As a fair summary of the common
15 methodology to estimate the spending, one needs
16 quantity and one needs prices, and as a general
17 matter, if you give me the quantities or one provides
18 me the certified monitoring program with the quantity
19 of services, I could apply the best estimate with the
20 available data of the prices of those services to
21 those quantities to generate spending.
22      MR. OSTFELD:  I have no further
23 questions.  I will pass the witness.
24      THE WITNESS:  Thank you, sir.
25

Page 287

1 CROSS-EXAMINATION
2 BY MS. LOTMAN:
3      Q.    Good evening, Dr. Song.  My name is
4 Alyson Lotman.  I'm an attorney with Duane Morris in
5 Philadelphia.  I have a few questions for you and I
6 will try to get through them as quickly as possible
7 here.
8        So, Doctor, would a commercial insurance
9 company cover a non-FDA approved test?
10      A.    I'm sorry, would you mind repeating that
11 question, please?
12      Q.    Would a commercial insurance company
13 cover a non-FDA approved test?
14      MR. MIGLIACCIO:  Objection to the
15 hypothetical.  Incomplete.
16      THE WITNESS:  I was not asked to opine
17 on or think through FDA decisions as it pertains to
18 this case.  To the extent that by FDA decisions, you
19 are inquiring about pharmaceuticals.  My
20 understanding is that there is another expert who is
21 an expert with regard to pharmaceuticals in the case
22 for the plaintiffs, so I would defer to the other
23 expert on anything related to pharmaceuticals.  If
24 you're asking about FDA approval of tests, I'm -- off
25 the top of my head, not able to characterize for you

Page 288

1 the pattern or frequency or rate of approvals of FDA
2 approved tests among private insurers.  I would at
3 the very least ask that you provide some specifics
4 about what private insurers and what test and when it
5 was approved, and I could use my clinical knowledge
6 to see if I have anything that might be helpful for
7 you.
8
9 BY MS. LOTMAN:
10      Q.    Your illustrative screening procedures,
11 where did you get those?  What was your source for
12 those six screening procedures?
13      THE VIDEOGRAPHER:  Time is 6:06.  We're
14 going off the record.
15
16        (Whereupon, a brief recess was taken.)
17
18      THE VIDEOGRAPHER:  The time is 6:07.
19 We're back on the record.
20      THE WITNESS:  Thank you for repeating
21 the question.  They were provided to me by counsel.
22
23 BY MS. LOTMAN:
24      Q.    Doctor, did you read Dr. Kaplan's report
25 in this case?

Page 289

1      A.    I have not had a chance to read his
2 report yet because, to my understanding, we submitted
3 the reports at roughly the same time.
4      Q.    Did you review his transcript in this
5 case, the deposition transcript?
6      A.    Yes, I did review his deposition
7 transcript or at least a section of it or it may have
8 been the whole report that was provided to me by
9 counsel.
10      Q.    You read the transcript?
11      A.    I'm sorry, transcript, not report.
12      Q.    I just want to make sure we're both on
13 the same page.  Are you aware that he recommends a
14 different test along with some of the ones you've
15 outlined here that's called the gallery test?
16      A.    I do recall reading that in his report.
17      Q.    Are you aware that that test is not FDA
18 approved yet?
19      A.    I have not had a chance to deeply
20 investigate that test.  So, no, that fact I have not
21 looked into yet.  My knowledge of that test is
22 confined to my recollection of what I read in his
23 transcript.
24      Q.    Understood.  Doctor, is your methodology
25 able to determine the costs and allow for the costs

73 (Pages 286 - 289)

Page 290

1 of non-FDA approved testing?
2    A.    Again, my methodology is agnostic to
3 many factors that I've been asked about today,
4 including FDA approval.  It applies to any services
5 that are in the end part of a potential medical
6 monitoring program.
7    Q.    Doctor, I think it's my last question
8 for you.  It goes back to things that people asked
9 you today, and you talked a lot about patients and
10 their individual doctors and if they made a decision
11 to not, say, have a colonoscopy.  Are you saying that
12 your methodology allows for that, because you would
13 just, in the example of the colonoscopy, you would
14 deduct the individual plaintiffs' colonoscopies from
15 the number of procedures that you are putting into
16 your equation?
17    A.    Can you maybe rephrase your question?
18 Are you asking me to do a mathematical exercise?
19    Q.    No, I'm trying to clarify too for my
20 sake too, Doctor.  Are you saying that if we're
21 talking about a patient and their individual doctor
22 making a decision, and for this hypothetical, we'll
23 use an example of colonoscopy, and patient A decides
24 to their doctor I'm part of this class that I'm not
25 getting colonoscopies for whatever reason him and the

Page 291

1 doctor decided on, are you saying that your
2 methodology allows for that because your number is
3 based upon the number of services actually provided
4 so you wouldn't be including those patient A's
5 potential colonoscopies in the number for the class?
6    A.    Okay, let me provide you two parts to an
7 answer.  The first is that in a retrospective
8 fashion, you can certainly do exactly what you just
9 described.  Once you know what services were
10 delivered to whom, you're able to simply count or sum
11 up the quantities of services delivered.  In a
12 prospective fashion, you may need to estimate that
13 share, and I would also defer to my more expert
14 oncologist subspecialties to comment on what
15 proportion of total portions of services they
16 recommended ought to go into a medical monitoring
17 program consistent with all other aspects of
18 quantity, which I have not been asked to opine on.
19        The other aspect of my answer is, to my
20 knowledge, and this is off the top of my head, if you
21 consider other medical monitoring programs that may
22 have been created through litigation or other similar
23 processes or cases, my educated guess, my hypothesis
24 would be that in those cases, those monitoring
25 programs likely also left some room or discretion for

Page 292

1 patient and physician or clinician preferences and
2 joint decisionmaking.  This would not be unique in
3 this regard.
4    Q.    And Doctor, do you have any information
5 about any other medical monitoring classes that
6 support your last statement there?
7    A.    Off the top of my head, no details that
8 I can recall at the moment.
9        MS. LOTMAN:  Doctor, those are all of my
10 questions for you this evening.  We'll go off the
11 video at this point.
12        THE VIDEOGRAPHER:  The time is 6:13.
13 We're going off the record.
14
15        (Whereupon, the deposition was concluded
16 at 6:13 p.m.)
17
18
19
20
21
22
23
24
25

Page 293

1        CERTIFICATE
2
3
4        I, JOMANNA DEROSA, a Certified Court
5 Reporter and Notary Public of the State of New
6 Jersey, do hereby certify that the foregoing is a
7 true and accurate transcript of the testimony as
8 taken stenographically and digitally at the time,
9 place and on the date hereinbefore set forth, to the
10 best of my ability.
11
12
13    I DO FURTHER CERTIFY that I am neither a
14 relative nor employee nor attorney nor counsel of any
15 of the parties to this action, and that I am neither
16 a relative nor employee of such attorney or counsel,
17 and that I am not financially interested in the
18 action.
19
20
21    _____
22    JOMANNA DEROSA, C.C.R.
     License No. 30XI00188500
23    Notary Public of the
     State of New Jersey
24
25

74 (Pages 290 - 293)

Page 294

```
 1
 2        ERRATA SHEET
        VERITEXT/NEW YORK REPORTING, LLC
 3
     CASE NAME:  In Re: Valsartan, Losartan, Et Al
 4   DATE OF DEPOSITION:  February 8, 2022
     WITNESS' NAME: Zirui Song, MD, Ph.D.
 5
     PAGE/LINE(s)/  CHANGE      REASON
 6   ____/____/_____/_____/_____
     ____/____/_____/_____/_____
 7   ____/____/_____/_____/_____
     ____/____/_____/_____/_____
 8   ____/____/_____/_____/_____
     ____/____/_____/_____/_____
 9   ____/____/_____/_____/_____
     ____/____/_____/_____/_____
10   ____/____/_____/_____/_____
     ____/____/_____/_____/_____
11   ____/____/_____/_____/_____
     ____/____/_____/_____/_____
12   ____/____/_____/_____/_____
     ____/____/_____/_____/_____
13   ____/____/_____/_____/_____
     ____/____/_____/_____/_____
14   ____/____/_____/_____/_____
     ____/____/_____/_____/_____
15   ____/____/_____/_____/_____
     ____/____/_____/_____/_____
16   ____/____/_____/_____/_____
     ____/____/_____/_____/_____
17   ____/____/_____/_____/_____
     ____/____/_____/_____/_____
18   ____/____/_____/_____/_____
19
20   _____
          ZIRUI SONG, MD, Ph.D.
21
     Subscribed and Sworn To
22   Before Me This_____Day
     of_____, 20 .
23   _____
24     Notary Public
25   My Commission Expires_____
```

Veritext Legal Solutions