# EXHIBIT D

Confidential Information - Subject to Protective Order

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   DISTRICT OF NEW JERSEY

 3                     CAMDEN DIVISION

 4

 5   IN RE: VALSARTAN            )

     LOSARTAN, AND IRBESARTAN    )

 6   PRODUCTS LIABILITY          )

     LITIGATION                  )

 7                               )

                                 )  No.  2875

 8                               )

                                 )  HON. ROBERT B. KUGLER

 9   This Document Relates to    )

     All Actions                 )

10                               )

                                 )

11

12            CONFIDENTIAL INFORMATION

13          SUBJECT TO PROTECTIVE ORDER

14                  REMOTE

15               VIDEO-RECORDED

16         EXPERT WITNESS TESTIMONY OF

17           DAVID C. CHAN, JR., M.D.

18

19       Thursday, March 3, 2022, 7:49 a.m.

20                 - - - -

21

22

23

24   REPORTED BY:  ELAINA BULDA-JONES, CSR 11720

25
```

Confidential Information - Subject to Protective Order

---

Page 2

## APPEARANCES

For the Plaintiffs:

BY: LAYNE HILTON, ESQ.
BY: DAVID STANOCH, ESQ.
Kanner & Whiteley, LLC
701 Camp Street
New Orleans, Louisiana 70130
504.524.5777
D.Stanoch@kanner-law.com
L.hilton@kanner-law.com

BY: NICHOLAS MIGLIACCIO, ESQ.
BY: MARK PATRONELLA, ESQ.
Migliaccio & Rathod LLP
412 H Street NE
Washington, D.C. 20002
202.470.3520
Nmigliaccio@classlawdc.com
Mpatronella@classlawdc.com
BY: RACHEL GEMAN, ESQ.
Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street, 8th Floor
New York, New York 10013-1413
212.255.9500
Rgeman@lchb.com

For the Defendants Teva Pharmaceuticals USA, Inc.;
Teva Pharmaceutical Industries, Ltd; Actavis LLC;
and Actavis Pharma, Inc.:

BY: GLENN S. KERNER, ESQ.
BY: KATE M. WITTLAKE, ESQ.
Greenberg Traurig LLP
One Vanderbilt Avenue
New York, New York 10017
212.801.9306
Kernerg@gtlaw.com
Wittlakek@gtlaw.com

---

Page 3

For the Defendant Albertsons Pharmacy:

BY: ASHLEY JONES, ESQ.
Buchanan Ingersoll & Rooney, P.C.
1700 K Street N.W., Suite 300
Washington, D.C. 20006-3807
202.452.7318
Ashley.Jones@bipc.com

For the Defendant CVS Pharmacy and Rite Aid:

BY: KARA KAPKE, ESQ.
Barnes & Thornburg, LLP
2029 Century Park East, Suite 300
Los Angeles, California 90067
310.284.3766
Kara.kapke@btlaw.com

For the Defendants CVS Pharmacy and Rite Aid:
BY: MITCHELL CHARCHALIS, ESQ.
Barnes & Thornburg, LLP
2029 Century Park East, Suite 300
Los Angeles, California 90067
310.284.3766
Mcharchalis@btlaw.com

For the Defendant Mylan Laboratories:

BY: FRANK H. STOY, ESQ.
BY: MELISSA B. CATELLO, ESQ.
Pietragallo Gordon Alfano
    Bosick & Raspanti, LLP
One Oxford Centre
301 Grant Street, 38th Floor
Pittsburgh, Pennsylvania 15219
412.263.4397
FHS@pietragallo.com
MBC@pietragallo.com

---

Page 4

For the Defendant Hetero Labs:
BY: WILLIAM P. MURTHA, JR., ESQ.
Hill Wallack LLP
2 Bridge Avenue, Suite 211
Red Bank, New Jersey 07701
732.924.8171
Wmurtha@hillwallack.com

For the Defendants Zhejiang Huahai Pharmaceutical
Co., Ltd; Prinston Pharmaceutical, Inc.; Huahai
U.S., Inc.; and Solco Healthcare U.S., LLC

BY: ROBERT KUM, ESQ.
BY: REBECCA BAZAN, ESQ.
BY: DANA B. KLINGES, ESQ.
BY: ALYSON WALKER LOTMAN, ESQ.
Duane Morris LLP
865 South Figueroa Street, Suite 3100
Los Angeles, California 90017-5450
213.689.7424
RKum@duanemorris.com
ReBazan@duanemorris.com
Dklinges@duanemorris.com
Alotman@duanemorris.com

For the Defendant Sciengen Pharmaceuticals Inc.:
BY: GEOFFREY M. COAN, ESQ.
Hinshaw & Culbertson LLP
53 State Street, 27th Floor
Boston, Massachusetts 02109
617.213.7047
Gcoan@hinshawlaw.com

Also present:

Joseph Mourgos, videographer

---

Page 5

## INDEX OF EXAMINATIONS

| EXAMINATIONS | PAGE |
| --- | --- |
| MR. MIGLIACCIO | 8 |
| MS. HILTON | 246 |
| MR. STOY | 286 |
| MS. HILTON | 290 |
| MR. MIGLIACCIO | 291 |

## INDEX OF EXHIBITS

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Chan Exhibit 1 | Amended Notice to Take Videotaped Oral Deposition | 11 |
| Chan Exhibit 2 | Expert Rebuttal Report of Dr. David Chan, M.D., January 12, 2022 | 41 |
| Chan Exhibit 3 | Invoices, 16 pages | 77 |
| Chan Exhibit 4 | Expert Report of Professor Zirui Song, M.D., Ph.D., in Support of Plaintiff's Motion for Class Certification | 165 |
| Chan Exhibit 5 | Accuracy of Valuations of Surgical Procedures in the Medicare Fee Schedule, David C. Chan, M.D., et al | 205 |
| Chan Exhibit 6 | Valuations of Surgical Procedures in the Medicare Fee Schedule, Chan, et al. | 216 |

---

Confidential Information - Subject to Protective Order

Page 6

1  Chan Exhibit 7  Industry Input in Policy      225
              Making: Evidence from
2             Medicare, David C. Chan and
              Michael J Dickstein
3
   Chan Exhibit 8  4.4 Consumer Surplus        262
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1      THE VIDEOGRAPHER:  We are now on the
2  record.  My name is Joseph Mourgos.  I am a
3  videographer for Golkow Litigation Services.
4      Today's date is March 3rd, 2022, and the
5  time on the video monitor is 7:49 a.m. Pacific time.
6      This remote video deposition is being held
7  in the matter of Valsartan, Losartan and Irbesartan
8  Products Liability Litigation MDL Number 2875 for
9  the United States District Court, District of
10 New Jersey.
11     The deponent is Dr. David Chan.
12     All parties to this deposition are
13 appearing remotely and have agreed to the witness
14 being sworn in remotely.
15     Due to the nature of remote reporting,
16 please pause briefly before speaking to ensure all
17 parties are heard completely.
18     Counsel has been noted on the stenographic
19 record.
20     The court reporter is Elaina Bulda-Jones
21 and she will now administer the oath.
22          DAVID C. CHAN, JR., M.D.,
23 called as a witness by the Plaintiffs herein, being
24 first duly sworn by the Certified Shorthand Reporter
25 was thereupon examined and testified as is

Page 8

1  hereinafter set forth.
2          EXAMINATION
3  BY MR. MIGLIACCIO:
4      Q.  Good morning, Dr. Chan.  My name is Nick
5  Migliaccio.  I am one of the lawyers for the
6  plaintiffs in this case.  Thanks for taking time
7  with us this morning.
8          Could you state your full name for the
9  record, please.
10     A.  Sure.  Good morning.
11         My name is David Chimin Chan, Junior.
12     Q.  Okay.  And have you ever been deposed
13 before?
14     A.  Yes, I have.
15     Q.  Okay.  I'll go through some ground rules
16 even though you've been through it, but I'll -- I'll
17 just give them anyway.
18         You know, I'm going to ask you a series of
19 questions and I'm going to ask that you give me your
20 best answers to them and if you don't understand a
21 question, I'm going to ask that you tell me and I
22 can rephrase it; is that fair?
23     A.  Yes, thank you.
24     Q.  Great.
25         Are you taking any medication today that

Page 9

1  would impede your ability to recall events or
2  testify truthfully?
3      A.  No.
4      Q.  Okay.  This is not a marathon session.
5  You know, we're not going to try to go through the
6  whole thing in one -- one shot.  So if -- and I know
7  you're a doctor, so obviously, if you have an urgent
8  patient call, just tell us, you know, because we
9  want you to take care of your patients, you know.
10 We understand that.
11         So, you know, and we will take breaks, you
12 know, and if you need a break just ask for one and
13 as long as there's not a, you know, question
14 pending, that -- that's totally fine, fair?
15     A.  Yes, thank you.
16     Q.  In the other depositions that you had,
17 when were those depositions?
18     A.  I believe they were within the last year
19 or two.
20     Q.  Okay.  Got it.
21         And I -- you know, we're taking this
22 deposition remotely, obviously.
23         Do you have anybody else in the room with
24 you there?
25     A.  No.

Confidential Information - Subject to Protective Order

Page 10

1    Q.  Do you have any documents with you?
2    A.  No.
3    Q.  Okay.  Great.
4        Did you see the deposition notice that we
5    sent over in this case?
6    A.  Are you referring to the most recent one
7    about a week -- within a week of this?
8    Q.  That's right.
9    A.  I believe I was forwarded either the
10   notice or some snippet of the notice.
11   Q.  Got it.
12       I'm going to try to share it with you, so
13   forgive me if I fumble with this technology because
14   I might.  But I'm going to do my best to put this
15   into your folder because we're going to have
16   exhibits, obviously.  And I'm going to -- I watched
17   the video, and we'll see if it works.  I should
18   have, perhaps, practiced this.
19       Okay.  I believe I put your deposition
20   notice in the marked exhibits folder.
21   A.  Okay.  Yep, I'm seeing it now.
22   Q.  Okay.  Great.
23       MR. MIGLIACCIO:  I want to mark that as
24   Exhibit 1.  I'm not quite sure how to do that but we
25   can address that.

Page 11

1        (Whereupon, Chan Exhibit 1 was marked for
2    identification.)
3    BY MR. MIGLIACCIO:
4    Q.  Is this the document that you saw?
5    A.  I don't think I saw the entire document.
6    I think I saw some of the questions and document
7    requests.
8    Q.  Okay.  I'm going to look.
9        So Exhibit A, which is on page 3, contains
10   document requests, right?
11   A.  Correct.
12   Q.  Okay.  Did you search for those documents
13   that were requested?
14   A.  To the extent that I had the relevant
15   documents.
16   Q.  Was there anything that you were not able
17   to find?
18   A.  No.
19   Q.  Okay.  Were there any documents that you
20   reviewed in forming your opinion that were not
21   included in the documents that you provided to your
22   lawyers and, you know, to us?
23   A.  Are you referring to the materials
24   considered list that informed my opinion in the
25   report?

Page 12

1    Q.  I'm referring to that, and I'm referring
2    to what we've asked for here in Exhibit A.
3    A.  Okay.
4    Q.  So in other words, if there's anything
5    that we've asked for here that maybe wasn't included
6    on the materials considered list or otherwise not
7    provided to -- to us.
8    A.  That would inform my opinions in the
9    report?
10   Q.  Correct.
11   A.  Okay.  So there was -- there's no other
12   document, specific document informing my opinions in
13   the report other than my expertise as a physician
14   and as a health economist.
15   Q.  Were there any documents or materials that
16   you reviewed in preparation for this deposition that
17   were not included in the materials that were
18   produced to us?
19   A.  No.
20   Q.  So you -- fair to say, then, you haven't
21   looked at anything other than the materials that
22   you've provided?
23   A.  The materials on the materials considered
24   list; is that right?  Yes.
25   Q.  And the materials that have been provided

Page 13

1    to us now?
2    A.  Correct.
3    Q.  Okay.  Were there any documents that you
4    wanted to review but you couldn't get or otherwise
5    were not provided?
6    A.  No.
7    Q.  Okay.  What did you do to prepare for your
8    deposition?
9    A.  What did I do to prepare for this
10   deposition in particular or what did I do during the
11   course of the case to form my opinions?
12   Q.  Just to prepare for this deposition in
13   particular.
14   A.  Okay.  I reviewed the report.  I reviewed
15   some of the other reports from Conti, Song, and
16   Kaplan.
17       I had phone calls with the lawyers, and I
18   had phone calls with Analysis Group.
19   Q.  Who is Analysis Group?
20   A.  Analysis Group is an economic consulting
21   firm.
22   Q.  And where -- where are they located?
23   A.  I believe they have a number of different
24   offices.  Most of the people that I worked with are
25   in the Boston office, but there are also people --

Confidential Information - Subject to Protective Order

---

Page 14

1 there's one person that I worked with who's in the
2 Menlo Park office.
3     Q.  And when you said you had phone calls with
4 the Analysis Group who did you speak with at the
5 Analysis Group?
6     A.  The people that I was in most contact with
7 include several people.  So they include Jessica Lu,
8 Michaela Johnson, Brian Ellman, Richard Mortimer,
9 and Molly Frean.
10     Those were the people that I had the most
11 contact with.
12     Q.  So can you tell me who those people are
13 and we can ask -- I'll ask you about them later when
14 we go through your invoice.
15     But can you just briefly tell me who
16 those -- those individuals are?
17     A.  Sure.
18     MR. STOY:  Object to the form.
19     Go ahead.
20     THE WITNESS:  Do you -- could you be a
21 little bit more specific about what do you mean by
22 who they are?
23 BY MR. MIGLIACCIO:
24     Q.  Well, I know they work for the Analysis
25 Group.  You know, what is -- you know, what is their

---

Page 15

1 position and how -- what did they do in terms of
2 working with you?
3     MR. STOY:  Object to the form.
4     THE WITNESS:  So I can tell you that two
5 of them are partners.  Richard Mortimer and Brian
6 Ellman are partners.
7     Other members are managers or people that
8 I think are at the level below partners but have
9 quite a bit of experience and, you know, have
10 advanced degrees in economics or management.  Those
11 include Michaela Johnson and Jessica Lu.
12     Molly Frean is another analyst who has a
13 Ph.D. in health policy or health economics.
14     And I believe those are the people that I
15 mentioned that I interacted mostly with.
16 BY MR. MIGLIACCIO:
17     Q.  Any physicians in that group?
18     A.  No.
19     Q.  Okay.  Are you the only physician, then, I
20 guess, who worked on this report?
21     A.  Of the people that I mentioned, I'm the
22 only physician.  There could be other people at
23 Analysis Group that performed very -- that performed
24 a role that -- like a role to check the quality
25 control, the document, or look at the code, for

---

Page 16

1 example, that I don't know exactly who they are.
2     And I can't rule out that there might be
3 some physicians in that group.
4     Q.  Who -- who worked on your report?
5     A.  Who, for example, might have kind of
6 checked for typos or who might have been in the --
7 they have an extensive quality control process, I
8 believe, at Analysis Group, to, you know, check --
9 make sure that all the references that I've looked
10 at are in there, make sure that the document is free
11 of typos, make sure the code is free of errors, make
12 sure that stuff is kind of in the correct folders in
13 the -- in the code and in the input data and the
14 exhibits.
15     So there -- I would expect that there is a
16 fairly big team involved in that, just like there's
17 a team involved in my own research that is involved
18 in quality control.
19     Q.  Got it.
20     What did you, you know, read or review to
21 prepare for -- for today's deposition?
22     A.  I believe I mentioned I read my report.  I
23 read the reports of some of the other experts on the
24 plaintiffs' side, including Dr. Song, Dr. Kaplan,
25 and Dr. Conti.

---

Page 17

1     I reviewed some of the primary sources
2 that I relied upon in forming my opinion.  I believe
3 those are the main documents that I read in
4 preparation for this deposition.
5     Q.  And I think you told me you spoke with
6 lawyers, too?
7     A.  Correct.
8     Q.  Who -- who did you speak with?
9     A.  I don't remember all of the names of the
10 lawyers.  But I spoke to Frank Stoy, who's on this
11 call.  I spoke to Bob Kum.  K-U-M is his last name.
12 Glenn Kerner.  Kate Wittlake.
13     I believe those are -- those are the names
14 that I remember speaking to.
15     Q.  And how many sessions did you have
16 speaking to -- to the lawyers?
17     A.  In preparation for the deposition?
18     Q.  Yes.
19     A.  I don't remember exactly the number.  I
20 want to say something like four sessions, three to
21 four sessions.
22     Q.  How long did those sessions each take?
23     A.  I think that they could have been as short
24 as two hours or three hours, and they could have
25 also been longer, more like seven hours.  Around

---

Confidential Information - Subject to Protective Order

Page 18

1  that ballpark.
2      Q.  You may have had one or more, like,
3  seven-hour sessions?
4      A.  Maybe one, correct, one or more.
5      Q.  All right.
6      A.  Seven-hour sessions.
7      Q.  Got it.  Got it.
8          What was discussed during those sessions?
9          MR. STOY:  I'm going to object and
10  instruct you not to answer.
11         That question, Dr. Chan, is -- that's
12  obviously covered by the privilege and work product
13  doctrine.
14         THE WITNESS:  Okay.
15         MR. MIGLIACCIO:  Let me rephrase that.
16     Q.  Which documents were discussed at those --
17  at those sessions?
18         MR. STOY:  And I'll just -- I'll just give
19  a limiting instruction, Dr. Chan.
20         If you know, you can answer the question
21  about particular documents, but I'd ask you not
22  to -- I'd instruct you not to disclose anything in
23  particular that was discussed about any documents.
24         THE WITNESS:  Okay.
25         MR. STOY:  With that instruction, you can

Page 19

1  answer.
2          THE WITNESS:  I would say that we
3  discussed all of the documents that I mentioned in
4  general in -- that I used in preparation for this
5  deposition, including my report, the reports of some
6  of the plaintiffs -- the plaintiff experts,
7  including Dr. Song, Dr. Conti, and Dr. Kaplan.
8          We also discussed some of the primary
9  source material, but I can't remember exactly which
10  ones that we discussed.
11  BY MR. MIGLIACCIO:
12     Q.  When you refer to "primary source
13  material," what do you mean?
14     A.  I mean the materials -- some of the
15  materials that I considered in forming my opinions
16  that are in my materials considered list.
17     Q.  Got it.
18         For the -- did you have preparation
19  sessions outside of speaking with the lawyers; in
20  other words, did you talk to people, those other
21  individuals at the Analysis Group to prepare?
22     A.  I had calls with the Analysis Group to
23  review my report, to review the analyses and the
24  data and the code underlying my report.
25         I also had -- yeah, I also had sessions to

Page 20

1  review the state of the data, like I believe I just
2  mentioned that, the state of the data underlying the
3  analyses in my report.
4          So yes, I did have calls with Analysis
5  Group for that purpose.
6      Q.  And those -- did you have any calls in
7  preparation for this deposition with the Analysis
8  Group?
9      A.  Yes, that -- that was just what I
10  mentioned.
11     Q.  Okay.  Okay.
12         That -- so that -- those calls were not --
13  okay.  I assume you also had calls with them when
14  you were finalizing the report?
15     A.  Correct.
16     Q.  But you were just telling me about calls
17  in preparation for the deposition?
18     A.  Right.
19     Q.  What -- so those calls were -- that --
20  that you had with them, were after the report has
21  been finalized, right?  Because I think the report's
22  dated January 12th.
23         When did you have those calls with the
24  Analysis Group that you just referenced?
25     A.  The calls -- those calls were in

Page 21

1  preparation for the deposition.  And they were in
2  the last two weeks.
3      Q.  Two weeks.
4          Were any of the lawyers on those calls?
5      A.  No.
6      Q.  Okay.  How many of those calls did you
7  have with the Analysis Group?
8      A.  Maybe two.
9      Q.  Two.  And how long were those sessions?
10     A.  I think they were less than four hours
11  each, maybe three hours each.
12     Q.  Got it.
13         Did you discuss -- and you said you were
14  discussing the state of the data, if I -- if you
15  could give me a little more background on that,
16  maybe -- I didn't mean to misstate what you said, so
17  do I have that right?
18     A.  Yes.
19         MR. STOY:  Hang on.
20         Before you answer, Dr. Chan, I'm going to
21  instruct you not to go into any more detail than
22  you've already provided regarding those discussions
23  with Analysis Group.
24         We'd object on the same basis as before
25  with respect to the work product.

Confidential Information - Subject to Protective Order

Page 22

1    Nick, you know, I allowed him to give you
2 sort of a high level overview of, you know, the
3 discussion that might have occurred with Analysis
4 Group, but we're not going to go into any more
5 detail than that.
6    MR. MIGLIACCIO:  Well, Frank, I mean, I
7 think it's relevant to figure out if -- you know, if
8 the date has changed.  I mean, the report was
9 submitted on the 12th of January, and that's what
10 I'm trying to drive at here.
11    MR. STOY:  Well, you -- you can ask
12 Dr. Chan if the data has changed.  I think he can
13 answer that question.  But with respect to
14 particulars about discussions with Analysis Group,
15 my instruction's going to be not to answer those
16 questions.
17    MR. MIGLIACCIO:  All right.  I'll limit my
18 question for the time being to the -- to the data.
19    Q.  Did the data change at the time -- did any
20 data change from the time the report was finalized
21 until now?
22    A.  No, none of the data had changed.  None of
23 the analyses had changed.  It was purely to review
24 what I had already reviewed before.
25    Q.  Okay.  So there wasn't any new work done,

Page 23

1 then, in other words?  That -- that's what I'm
2 trying to -- find out.  No subsequent analysis
3 has -- was completed?
4    A.  No, that's correct.
5    Q.  Okay.  Did you -- did you obtain -- how
6 did you get information about this case at the -- at
7 the beginning when you were -- when you started
8 working on it?
9    A.  Is your question about before I was
10 retained or after I was retained?
11    Q.  Well, how about -- why don't -- I'll ask
12 it this way.
13    Why don't you tell me when you were
14 retained and then we can take it from there.
15    A.  I believe I was retained around December
16 of last year.  It was a pretty short timeline,
17 but -- as I recall, but I don't remember the
18 exact -- when it exactly -- when I was exactly
19 retained, but I think it was around December of last
20 year.
21    Q.  And who -- who contacted you?
22    A.  My initial contact was Brian Ellman at the
23 Analysis Group.
24    Q.  Do you have a working relationship with
25 the Analysis Group or did you have a prior working

Page 24

1 relationship with them?
2    A.  I have worked with the Analysis Group on
3 other cases.
4    Q.  And how long have you worked with them on
5 other cases?
6    A.  I believe my first contact with the
7 Analysis Group was before the pandemic so I think
8 about two to three years.
9    Q.  Okay.  And I'll -- I'll get into those
10 other cases.
11    But I'll just ask you now, were those
12 other cases cases that you provided reports and/or
13 deposition testimony in?
14    MR. STOY:  And before you answer,
15 Dr. Chan, I just want to give you an instruction.
16    You can answer counsel's questions for now
17 with respect to cases where you have been identified
18 as a testifying expert.
19    But for any litigations or other matters
20 where you've been retained as a nontestifying
21 consultant and haven't been publicly disclosed, I
22 would instruct you to not reveal the nature of those
23 disclosures, the parties that retained you, any of
24 that information.
25    With that instruction, you can answer the

Page 25

1 question.
2    MR. MIGLIACCIO:  I'm -- I'm not asking for
3 any of that information.
4    Q.  I'm just asking for where you have
5 prepared a report, you know, that you've been
6 designated as an expert or if you testified at
7 deposition.
8    MR. STOY:  Thank you.
9    THE WITNESS:  Thank you.
10    I don't know exactly what is in the public
11 record and what is not.  I can tell you that I have
12 been deposed in some of these cases.
13 BY MR. MIGLIACCIO:
14    Q.  Where you have been working with the
15 Analysis Group?
16    A.  Correct.
17    Q.  Got it.  Okay.
18    So you said December, you think it was
19 around December of last year that you were hired?
20    A.  Correct.
21    Q.  Got it.
22    And you were contacted by -- I forget the
23 person's name -- can you -- somebody at the Analysis
24 Group, right?
25    A.  Right.  My initial contact was Brian

Confidential Information - Subject to Protective Order

Page 26

1  Ellman at the Analysis Group.
2      Q.  Ellman.  Got it.
3          How was that contact initiated?
4      A.  I believe the first contact was by e-mail.
5      Q.  Okay.  And did you -- have you previously
6  worked with Mr. Ellman before?
7      A.  I had been in conversations with him on
8  another case that I was not retained on.  The cases
9  that I was retained on previously was with another
10  individual at Analysis Group as the main contact,
11  but I did know Brian from previous conversations.
12      Q.  Okay.  And how did you decide that you
13  would agree to -- to offer your opinion in this
14  case?
15          MR. STOY:  Object to the form.
16          Go ahead.
17          THE WITNESS:  Can you restate that
18  question?
19  BY MR. MIGLIACCIO:
20      Q.  Right.
21          How did you come to determine that you
22  would offer an opinion in this case?
23      A.  Is the question how did I come
24  determine -- come to determine that I would agree to
25  be involved in this case?

Page 27

1      Q.  That -- that's fair.  Yeah.
2      A.  Okay.  The initial conversation was with
3  Brian who told me some basic information about the
4  case.  He may have provided me the complaint in the
5  case.  Then I had a discussion with the lawyers
6  involved in the case.
7          I believe I spent some time thinking about
8  the questions involved in the case and what types of
9  questions I would want to answer if I were involved
10  in the case.
11          Then I believe I might have had a
12  subsequent discussion with the lawyers and then came
13  to the conclusion that this was a case that I would
14  agree to be involved in.
15      Q.  What -- what were you initially told about
16  the facts?  What facts were you provided initially?
17      A.  I believe I was mostly just provided legal
18  documents involved in the case.  The complaint
19  involved in the case.
20      Q.  And did there come a point where you asked
21  for other materials?
22      A.  I've only received legal documents from
23  the lawyers.  Analysis Group is -- is essentially
24  assisting me in my research so I kind of -- I
25  directed them to find materials to answer questions

Page 28

1  that I had related to the case.
2          So I received materials that I asked for
3  from Analysis Group.  And from the lawyers, I
4  believe I only received legal documents related to
5  the case.
6      Q.  Were you asked -- I mean, I have a copy of
7  your report here and we'll put it up and it's -- you
8  know, it's lengthy, right.  It's 88 pages or so.
9      A.  Yes.
10      Q.  Were you asked to render all of the
11  opinions that are within this report initially or
12  did the scope of your work evolve over -- over time?
13          MR. STOY:  Object to the form.
14          You can answer.
15          THE WITNESS:  Would you like to restate
16  your question?
17  BY MR. MIGLIACCIO:
18      Q.  Yeah.
19          Was -- were you asked to render all of the
20  opinions that are here in -- in this report that --
21  that you signed in January initially from -- from
22  the outset or were -- were you asked to do a
23  smaller subset of them at the outset that later
24  expanded?
25          MR. STOY:  Object to the form.

Page 29

1          You can answer.
2          THE WITNESS:  My assignment, are you
3  asking about the assignment of my case, my
4  assignment, whether my assignment was fixed from the
5  very beginning or whether my assignment expanded
6  over time?
7  BY MR. MIGLIACCIO:
8      Q.  You -- you can answer that question.  But
9  I may have some further questions for you.
10      A.  My initial assignment was on the claims
11  related to medical monitoring and that involved the
12  reports of Dr. Song and Dr. Kaplan.
13          I believe at a later point in the case, as
14  I was writing my report, given my expertise as an
15  economist, I was asked to weigh in on the claim of
16  worthlessness by Dr. Conti.
17      Q.  Got it.
18          So that was not part of your initial
19  assignment when you -- when you first were retained?
20      A.  When I was first retained, I believe a lot
21  was in flux in the case.  I think there was nothing
22  set in stone, but my initial instructions were to
23  address the claim of medical monitoring.
24      Q.  What documents -- you said you received
25  legal documents at the outset from the lawyers.

Confidential Information Subject to Protective Order

---

Page 30

1   A.   Right.

2   Q.   Do you recall what those documents were

3   that you initially received?

4   A.   I received the complaint.  There was a

5   protective order I -- I believe I received.  And I

6   received reports from some of the plaintiff experts.

7   The ones that I can remember are the reports by

8   Dr. Song, Dr. Kaplan, and Dr. Conti.

9   Q.   Okay.  When you're talking about the

10  complaint, are you referring to the third amended

11  medical monitoring complaint?

12  A.   I don't remember exactly what the name of

13  the complaint was.  I only received one complaint.

14  Q.   Got it.

15       And that -- you've produced that to us, I

16  believe; is that -- is that right?

17  A.   I believe I have.

18  Q.   Okay.  And what documents did you -- I

19  think -- what documents did you ask Analysis Group

20  to gather for you after you received the legal

21  documents?

22       MR. STOY:  Object to the form.

23       Go ahead.

24       THE WITNESS:  I can't remember exactly

25  which documents.  I can tell you in general how my

---

Page 31

1   research process works if that would be helpful.

2   BY MR. MIGLIACCIO:

3   Q.   Yeah, let me -- I'll ask you another

4   question, then.  I'll -- I do -- I'll get into that.

5       I think you said, "I directed them to find

6   materials to answer questions that I had related to

7   the case."

8       What initial questions did you have

9   related to the case that you sought answers --

10  sought -- sought documents for?

11  A.   I can't remember all of the initial

12  questions.  I would say that my questions could be

13  organized in a way that very much reflects the

14  organization of my report.

15       So some of the questions were organized

16  into what are the various risks of cancer, what are

17  the -- what is the state of guidelines regarding

18  screening for cancer, what are the various

19  technologies that we use for screening cancer, what

20  are the various risks that are involved in screening

21  for cancer, what are the characteristics of various

22  screening tests, like the sensitivity and

23  specificity of those screening tests for cancer,

24  what are -- what are -- I guess this falls under the

25  guidelines for screening for cancer, but what are

---

Page 32

1   the considerations for various patients who might be

2   screened for cancer or who might already be screened

3   for cancer for other reasons.

4       So those were some of the questions that I

5   had initially.  I can't remember fully all of the

6   questions.  But those questions prompted requests

7   for documents in a way that is consistent with the

8   way that I do research.

9   Q.   So you had those questions and you

10  prompted requests for -- they prompted requests for

11  documents to Analysis Group to gather information on

12  those questions and provide them to you?

13  A.   Correct.

14  Q.   Got it.

15       And at Analysis Group, I think you told me

16  there were -- there may be some physicians, but did

17  you know of any physicians who were gathering that

18  information for you when you asked for it?

19       MR. STOY:  Object to the form.

20       THE WITNESS:  Would you like to restate

21  that question?

22  BY MR. MIGLIACCIO:

23  Q.   Yeah.

24       I think you testified that there may be

25  some physicians at Analysis Group originally, and I

---

Page 33

1   want to know who you directed these questions to and

2   who would be gathering the information to provide to

3   you and if you knew if those people were physicians?

4       MR. STOY:  Objection to form.

5       THE WITNESS:  As I mentioned, I primarily

6   dealt with the people that I named that I was

7   interacting with at Analysis Group.  There is likely

8   a support team to help those people, but those

9   people are very knowledgeable in healthcare, very

10  knowledgeable in health policy and would interface,

11  I think, well if there were a physician on the

12  health policy question like a screening guideline.

13       So I don't know if they were interfacing

14  with any physicians at Analysis Group.  They could

15  have been.

16  BY MR. MIGLIACCIO:

17  Q.   Got it.

18       What -- what arrangements did you come to

19  regarding your fee and -- and your fees in the --

20  for the report?

21       MR. STOY:  Object to the form.

22       THE WITNESS:  Can you restate that

23  question?

24  BY MR. MIGLIACCIO:

25  Q.   I mean, do you have an arrangement with

---

Confidential Information Subject to Protective Order

Page 34

1  respect to fees for -- for the report?
2       A.  Yes.
3       Q.  And what is that arrangement?
4       A.  The arrangement is that I am paid for my
5  own time at a rate of $850 an hour, as stated in my
6  report.  That is the arrangement that I have with
7  the lawyers in this case.
8           And I also am paid what's called
9  attribution, which is a percentage of the fees that
10 Analysis Group charges for the work in support of my
11 work.
12      Q.  Got it.
13          What is that percentage that you get for
14 attribution?
15      A.  Is that in my report?  I'm not sure --
16      THE WITNESS:  Is that privileged
17 information or is that...
18      MR. MIGLIACCIO:  I don't think that's
19 privileged.  I mean, I can talk with Frank about it,
20 but I think that directly goes to -- to what -- you
21 know, what his compensation is.
22      MR. STOY:  Yeah, you --
23      MR. MIGLIACCIO:  Frank, I --
24      MR. STOY:  You can answer that question,
25 Dr. Chan, if you know.

Page 35

1       THE WITNESS:  Okay.
2           20 percent.
3  BY MR. MIGLIACCIO:
4       Q.  20 percent.
5           So that -- so you receive 20 percent of
6  the fees that attribution -- that Analysis Group has
7  billed and recovered for this report, too?
8       A.  Correct.
9       Q.  Got it.
10          Is that reflected in a written agreement
11 anywhere?
12      A.  That's reflected in an agreement that I
13 have with the Analysis Group.
14      Q.  Do we have that agreement?  I -- I don't
15 recall seeing it.
16      A.  I don't know.
17      MR. MIGLIACCIO:  Frank, do you know?
18      MR. STOY:  I don't believe that is
19 something that we've produced.
20      MR. MIGLIACCIO:  Okay.  I'm going to just
21 mark for the record that I'm -- you know, we do want
22 to see it.  Prefer to see it today, if possible, so
23 we could -- you know, I think it's directly called
24 for by the -- by the Rules and by our request.
25      MR. STOY:  All right.  Well, I'm not sure

Page 36

1  about that, but that's something that we can talk
2  about off the record.
3       MR. MIGLIACCIO:  Sure.
4       MR. STOY:  Your request is noted.
5  BY MR. MIGLIACCIO:
6       Q.  Do your hourly rate -- does your hourly
7  rate change for deposition testimony, like do you
8  have a day rate for this or is it just -- just an
9  hourly rate?
10      A.  It's just the hourly rate.
11      Q.  Same rate.
12          Trial testimony, different rate, same
13 rate?
14      A.  I believe it's the same rate.
15      Q.  And file review, I mean, if -- do you
16 have -- is that a separate rate or is that the same,
17 too?
18      A.  Same rate for everything.
19      Q.  Okay.  So like fair to say, then, that you
20 only have this $850-an-hour rate for whatever you
21 do?
22      A.  Yes.
23      Q.  It's that simple.  Okay.  Got it.
24          Have you billed anything -- let me --
25 strike that.

Page 37

1           What percentage of your income, you know,
2  would you say comes from -- from your expert work?
3       MR. STOY:  And you can answer that
4  question but you don't have to answer -- you don't
5  have to elaborate about, you know, what your income
6  level is.
7       MR. MIGLIACCIO:  I'm not asking for that.
8       Q.  I'm -- yeah, I'm not asking you for that.
9  I understand.
10      A.  Right.  Right.
11          I'm not sure I can kind of give you a
12 precise figure here.  I can maybe tell you the
13 percent of my time that I spent, but you're asking
14 the percent of my income.
15      Q.  Right.  Right.
16          You could tell -- tell me your time and --
17 I mean, you can think about the income question.  We
18 can come back to it later.  I understand it's -- you
19 might have to do some mental --
20      A.  Right.  Yeah.
21      Q.  -- mental arithmetic.
22      A.  I'm afraid that if I answer the income
23 question, you're going to back out my income.
24      Q.  I don't intend to back out your income.  I
25 just want to get -- I'm not trying to -- and this --

Confidential Information - Subject to Protective Order

---

Page 38

1  I mean, I'm not trying to get at sensitive personal
2  information here.  That's not my goal.
3      I just want to see, you know, what you do
4  in terms of, you know, is this a big part of -- of
5  your life or is it a small part?  That's what I'm
6  trying to drive at.
7      A.  Uh-huh.  In terms of the hours that I
8  spend on my work, it's -- I would say it's a
9  relatively small part of my life.
10      If you're -- if you're asking whether this
11  is a small part of my life or a big part of my life,
12  I would say it's -- you know, I spend most of my
13  hours not working on litigation consulting.
14      Q.  If I could -- could you ballpark a
15  percentage of the percentage of your time spent on
16  litigation consulting?
17      A.  I'm sorry, say that again.
18      Q.  Could -- could you ballpark a percentage
19  of the time you spend working on litigation
20  consulting?
21      A.  Ballpark would be less than 20 percent.
22      Q.  Got it.  Got it.
23      I want to ask you some questions about
24  your -- your background.
25      I know, you know, you're a physician and

---

Page 39

1  an economist, you know, and you have multiple
2  degrees.  I -- you know, can you walk me through
3  your educational history and kind of what -- just
4  for starters.
5      A.  Sure.
6      Would you like to refer to the CV or would
7  you like me to just --
8      Q.  We can pull -- you can go -- you can just
9  go and -- because I can try to get the CV up.  I'm
10  sure I'll be able to, you know, once I figure out
11  this technology.  I'm not trying to hide it from
12  you.
13      A.  Sure.
14      My first degree that I post -- after
15  undergrad that I enrolled in was a medical degree at
16  UCLA.  In the middle of that medical degree, I
17  became quite interested in health policy and health
18  economics and I took two years off where I was a
19  Marshall Scholar in England and had two master's
20  degrees in health policy and health economics.
21      After coming back from that, I completed
22  medical school and started my residency program at
23  Brigham and Women's Hospital in Boston.
24      And I kind of knew that I wanted to do a
25  Ph.D. when I came back from England and I enrolled

---

Page 40

1  in the Ph.D. in economics at MIT after finishing my
2  residency in internal medicine.  I finished my Ph.D.
3  in economics in 2013.
4      And then I had my first job as a faculty
5  here at Stanford.
6      Q.  Got it.
7      So you started -- the -- the -- it sounds
8  like you -- you took time -- did you take time off
9  from medical school?  Do I have that straight or --
10      A.  It was a leave of absence from medical
11  school.  I would say about a third of my class took
12  some form of leave of absence to do some type of
13  research work or some type of fellowship in the
14  middle of med school and mine was to do economics
15  and health policy.
16      Q.  Got it.
17      I didn't mean that in a pejorative way to
18  say "time off."  I understand a leave of absence.
19      So -- and that's when you -- you became a
20  Marshall Scholar and went to -- to get those
21  degrees?
22      A.  Correct.
23      Q.  Got it.
24      And I think I have your CV up here now.
25  We can --

---

Page 41

1      MR. MIGLIACCIO:  I'd like to mark the
2  report and the attachments as Exhibit 2.
3      (Whereupon, Chan Exhibit 2 was marked for
4  identification.)
5  BY MR. MIGLIACCIO:
6      Q.  And I think it's up there now.
7      A.  Okay.  Yeah, I see it.
8      Q.  Yeah.  I see -- I think your CV is
9  Appendix A.
10      A.  Right.
11      Q.  Yeah.
12      A.  Great.
13      Q.  Yeah.  Great.
14      You -- I see.  So that -- and that -- I
15  see.  So you -- you start -- did you start medical
16  school directly after college?
17      A.  Correct.
18      Q.  Okay.  And then you took the leave of
19  absence to become a Marshall Scholar to go and get
20  these other degrees and then finish medical school?
21      A.  Correct.
22      Q.  Got it.
23      And then later, obtained your Ph.D. from
24  MIT?
25      A.  Correct.

---

Confidential Information - Subject to Protective Order

1    Q.  Got it.
2        What did you -- in terms of your career as
3  a physician, could you walk me through that?
4    A.  Sure.
5        My residency was in internal medicine.
6  This was at Brigham and Women's Hospital where I
7  spent quite a bit of time in primary care.  They
8  have a primary care track at -- in this residency
9  program.  So I spent quite a bit in outpatient
10 medicine.  But the average -- still the average
11 residency program is predominantly inpatient
12 medicine, but I spent a little bit more time than
13 the average resident in primary care.
14       I finished that residency in 2008 and
15 that's when I started the Ph.D. program in
16 economics.
17       During the first year of the Ph.D.
18 program, I did not have a steady clinical job.  I --
19 I worked as a physician as a -- what's called a --
20 well, it's a moonlighting position where you would
21 kind of put in -- I probably worked maybe 20 nights
22 that year or 30 nights that year where you kind of
23 worked at a hospital, at the Brigham in particular,
24 and I admitted patients at that hospital.
25       And then in my second year of the Ph.D.

1  program, I had my first clinical job as an attending
2  physician at Beth Israel Deaconess Medical Center,
3  which you see there.
4        Actually, strike that.
5        That -- that was actually in the -- near
6  the beginning of the third year of my Ph.D. so I
7  think I continued to do moonlight -- you can see my
8  appointments at hospitals and affiliated
9  institutions on my CV.
10   Q.  Where -- can you just tell me that page
11 that is?
12   A.  This is A -- A-2.
13   Q.  A-2.  Okay.
14   A.  Yeah, so you could see that...
15   Q.  Yeah.
16   A.  Right.
17       So I had two positions.  I had two
18 positions before I was a staff physician at Beth
19 Israel Deaconess Medical Center.  I was a staff
20 physician at Brigham and Women's Hospital, but my
21 job there was mainly a moonlighting position.
22       And I also later that year, in 2008, was a
23 staff physician at McLean Hospital, which is a
24 hospital in the Massachusetts General Physicians
25 Organization.  Both of those jobs were moonlighting

1  jobs.
2        And I had my first kind of staff job where
3  I was educating residents at Beth Israel Deaconess
4  Medical Center.  This was in 2010, starting in
5  November of 2010.  I had that job all the way until
6  I finished my Ph.D. in June of 2013.
7        And then after that I came here to
8  Palo Alto for an academic appointment at Stanford
9  where I was a staff physician in internal medicine
10 at the Palo Alto Veterans Affairs Health Care
11 System.
12   Q.  Got it.
13       So that first position at Brigham --
14 Brigham and Women's, you said that that had a
15 significant part of outpatient work?  Did I have
16 that straight?
17   A.  It had as much -- had more outpatient
18 exposure than the average internal medicine
19 residency program.
20   Q.  And how do you characterize that or
21 quantify that?
22   A.  You can quantify it by the number of
23 outpatient weeks that we have.  So the typical
24 internal medicine residency is structured in terms
25 of rotations.  You spend some rotations on various

1  inpatient wards.  You spend some rotations in the
2  emergency department, and you spend some rotation
3  doing outpatient care.  And this residency program
4  that I did had more weeks on inpatient care than the
5  typical residency program.
6    Q.  Got it.
7        And did that change at some point where
8  you ended up spending more time like as typical
9  doing inpatient?
10   A.  Yes.  I -- so after residency you have to
11 choose what type of doctor you want to be.  You
12 could either go on to subspecialty fellowship and
13 become, you know, say, a cardiologist or infectious
14 disease doctor or you can remain within general
15 medicine.
16       And within general medicine there are
17 generally two types of jobs you could have.  One is
18 an outpatient job so you spend a hundred -- almost a
19 hundred percent of your time as an outpatient
20 doctor, increasingly so in the way medicine is
21 organized right now.
22       Or you could be an inpatient doctor and
23 spend close to a hundred percent of your time
24 clinically as an inpatient doctor.  And I chose the
25 latter.  So I'm what's called a hospitalist.

Confidential Information - Subject to Protective Order

---

Page 46

1    Q.  Hospitalist.  Got it.  Got it.
2        Did you have any -- as a hospitalist, do
3  you have any specialties or is that -- hospitalist
4  is like a generalist; is that fair?
5    A.   Yes, a hospitalist by definition is a
6  general internist who does not have a subspecialty.
7    Q.   Okay.
8    A.   So internal medicine is their specialty
9  and they have no subspecialty.
10    Q.   Do you have any areas of interest takeaway
11  like a formal subspecialty?  Do you have any areas
12  of interest?  Do hospitalists have that?
13    A.   No.  Hospitalists are quite general.  We
14  see a variety of patients in the inpatient setting.
15        At Palo Alto VA, I see patients who are
16  general medicine patients.  I see oncology patients.
17  I see cardiology patients.  A wide variety of
18  patients who require hospitalization.
19    Q.   Got it.
20        And you've been at Palo Alto VA from 2013
21  to the present?
22    A.   Correct.
23    Q.   How -- how much time do you -- or have you
24  spent there on average, you know, in that period?
25    A.   Right.  I spend four weeks a year since I

---

Page 47

1  started there at -- in 2013.  There are some
2  hospitalists at Palo Alto VA that are full time and
3  I think the full time -- I would have to check but
4  oftentimes the full time -- a full-time hospitalist
5  might see less than -- might be on the wards for
6  less than half of the weeks of the year.  So there's
7  never a hospitalist that works all of the weeks of
8  the year.
9        It's quite an intense job, I would say,
10  and so it's not something like outpatient medicine
11  where in outpatient medicine you can be seeing
12  patients every week of the year.  In hospital
13  medicine, oftentimes a full-time person is half the
14  weeks of the year.
15        And for an academic hospitalist like me
16  that does research in addition to being a
17  hospitalist you can have a range from four weeks a
18  year to, I would say, as much as seven weeks a year,
19  eight weeks a year, within that range.
20    Q.   Got it.
21        Do you do those four weeks a year in a row
22  or do you split them up?
23    A.   I split them up.
24    Q.   Okay.  What is the period -- like the
25  split period that you take?  Is it a week or --

---

Page 48

1    A.   Yeah, it's determined by how the
2  hospitalists group decides to schedule rotations.
3  Before I believe this last year, or the last two
4  years, the rotations were two-week blocks.  So I
5  generally would work in two two-week blocks every
6  year.
7        Starting about a year or two ago, the
8  group decided to change it so that people would
9  generally work in one-week blocks.  And so now I
10  work four one-week blocks.
11    Q.   Got it.  Got it.
12        And has that been the same like from 2013
13  to the present?
14    A.   It has either been one-week blocks or
15  two-week blocks since 2013.
16    Q.   Yeah.  Got it.
17        Four weeks total?
18    A.   Four weeks total.
19    Q.   Got it.  Got it.
20        In your position in -- in Deaconess and
21  in -- the other hospitals back east, what was your
22  schedule there?
23        I mean, I -- that's kind of broad so
24  I'll -- I don't -- let's just start with Beth
25  Israel.

---

Page 49

1    A.   Beth Israel Deaconess, I think my -- I
2  don't know a hundred percent sure, but I believe my
3  schedule was six weeks a year back there.  And that
4  is a reflection of just the different hospitals have
5  different kind of norms in terms of what is the
6  number of weeks that academic physicians will work.
7  And so, as I mentioned, six weeks a year is kind of
8  within the range.
9    Q.   Got it.
10        What -- and what type of people would
11  you -- what would -- how would you describe the
12  patient population, you know, at Beth Israel
13  Deaconess that you saw?
14    A.   It was a fairly general patient
15  population.  I would see a number of different --
16  just the same as in Palo Alto VA, I would see
17  patients with a wide variety of internal medicine
18  complaints ranging from infectious disease to renal
19  to, you know, pulmonology, cardiology, oncology,
20  gastroenterology.
21        There -- there would be a number of
22  different inpatient conditions, that is typical of a
23  hospital medicine practice, that I would see there
24  at Beth Israel Deaconess Medical Center.
25    Q.   Okay.  Would you say there's a difference

---

Page 50

1 at the -- at a VA hospital, like, is the patient
2 population any different than at Beth Israel?
3     A.   The patient population at the VA is
4 predominantly male still.  I would say it's
5 90 percent -- my patients are 90 percent male.  At
6 Beth Israel Deaconess, we did not have that.  You
7 know, the most obvious kind of structural difference
8 is that the VA sees veterans and most veterans are
9 male.
10         You will also have veterans that tend to
11 be linked to certain wars.  So there's veterans of
12 the Vietnam era or veterans of kind of more recent,
13 Iraq and Afghanistan era.  So you'll have the age of
14 the veterans kind of coming in waves that are
15 related to wars as opposed to Beth Israel Deaconess
16 we didn't have them.
17     Q.   Got it.
18         So you see waves or bands of -- of age
19 ranges?
20     A.   Correct.
21     Q.   Got it.
22         The moonlighting job, can you tell me a
23 little bit more about what -- what that was?  I
24 mean, I -- I don't mean to say "job."  The
25 moonlighting schedule, is that better?  Schedule?

Page 51

1     A.   Sure.
2     Q.   Yeah.
3     A.   That was much more -- that was less --
4 that was a flexible -- the reason people have
5 moonlighting jobs is to allow for flexibility.  You
6 don't necessarily commit to a schedule a whole year
7 in advance, which is what I do now.  Nowadays, I
8 will say, what years I'm -- I will know which weeks
9 I'm going to be working a whole year in advance.
10         For the moonlighting job, generally, the
11 way that it works is that people sign up for shifts
12 and this signing up of shifts can happen maybe like
13 two weeks in advance or maybe a month in advance.
14 And generally, these would be for one-night shifts
15 or a shift maybe kind of lasting until the day but
16 not a whole week-shift as what I kind of currently
17 work on.
18     Q.   Got it.  Got it.
19         And did your duties vary as a -- you know,
20 a hospitalist in these -- across these positions or
21 were they similar, would you say?
22     A.   I would say they were quite similar
23 despite the fact that they're on different coasts.
24 Medicine I think is quite homogenous across
25 different medical centers.

Page 52

1         In Palo Alto VA, I solely work with
2 residents, whereas in Beth Israel Deaconess, there
3 was -- there were two different campuses, one in
4 which I worked with residents, the other in which I
5 kind of was more like a community doctor role where
6 I saw the patients alone and interacted directly
7 with the patients and the nurse and didn't have this
8 other group of doctors assisting me as I do now a
9 hundred percent.  That would be kind of the only
10 difference.  But in general, the jobs were quite
11 similar.
12     Q.   Got it.
13         What -- I think you've answered this, but
14 you don't have any specific oncology expertise, is
15 that fair, as a generalist?
16         MR. STOY:  Object to the form.
17         THE WITNESS:  I would say that I don't
18 have oncology subspecialty training.  I do see
19 oncology patients because oncology patients often
20 have medical problems, general medical problems.
21 They get infected.  They can get quite sick
22 ultimately in ways that a general internist will
23 deal with.
24         I do not make decisions in terms of
25 initiation of chemotherapy so if there is such a

Page 53

1 decision like that, I will work in consultation with
2 an oncologist.
3         The way that hospital medicine works is
4 that if it's a general medicine problem on an
5 oncology patient I can -- I have -- you know, I
6 handle that on my own.  Sometimes it makes sense to
7 consult subspecialty physicians like cardiologist,
8 oncologist to help in the management of a patient.
9 BY MR. MIGLIACCIO:
10     Q.   Got it.
11         And when you consult with an oncologist or
12 cardiologist to help with the management of a
13 patient who requires that, like how does the
14 relationship work between the -- the hospitalist and
15 that specialist?
16     A.   It's a collegial relationship.  I will ask
17 them to see the patient and render -- I will have to use
18 legal terms, render their opinions, and they will
19 provide that information to me and ultimately -- it
20 depends on which hospital it is.
21         At the Palo Alto VA, I'm the -- what's
22 called the attending of record.  So I have --
23 ultimately the decision lies with me.  So if -- you
24 know, if you had to point to one decisionmaker, it
25 would be me.

Confidential Information Subject to Protective Order

Page 54

1    That said, I'm going to very much consider
2 what the oncologist or the cardiologist or the
3 nephrologist, you know, the various consultants will
4 kind of provide me. And that information will very
5 much influence what I do.
6    Q.  And these are for -- I think you said, and
7 I don't want to put words in your mouth, like this
8 is for a general medicine problems if the patient
9 has such a problem?
10    A.  Can you state that again?
11    Q.  You're consulting with a specialist if
12 that patient is in your care and they have a problem
13 that's not, you know, an oncology problem or a
14 cardiology problem or -- and -- am I getting this
15 wrong?
16    A.  If it's a general medicine problem, then
17 it's fully within my domain to --
18    Q.  Yeah.
19    A.  -- make a decision without any input from
20 a consultant.
21    Q.  Okay.
22    A.  If there is some type of specialized
23 knowledge beyond general medicine that would be
24 helpful in making my decision, then I might consult
25 them.

Page 55

1    The way that it works at Palo Alto VA is
2 that there is no oncology ward where an oncologist
3 is the attending of record so that means all
4 oncology patients will kind of, quote/unquote,
5 belong to me. I am the attending of record for all
6 oncology patients, and I'll be making -- I'm the
7 person -- I'm the single decisionmaker if you were
8 to name one.
9    If there is a specialized question that I
10 would like input on such as a chemotherapy regimen
11 or, you know, something that's specifically about
12 their cancer, then I will generally consult an
13 oncologist.
14    Q.  Got it.
15    And so you, as -- as -- in your position
16 at Palo Alto, then, if you have a patient who
17 presents with a cancer, that patient will be under
18 your care or will it -- or -- or jointly under your
19 care and jointly under the care of an oncologist?
20    A.  It's hard to define what we mean by
21 "jointly." I would say that some oncology patients
22 we will never consult an oncologist. Some, if their
23 condition is purely medical, for example, you might
24 be an oncology patient to have, like, cancer, you
25 are being treated for this cancer, but you come to

Page 56

1 the hospital for pneumonia. That patient I won't
2 consult an oncologist generally.
3    There are other patients where we need to
4 make a decision about changing a chemotherapy
5 regimen. Then I will consult the oncologist. But
6 while the patient is in the hospital, the patient is
7 under my care and the oncologist is secondary.
8    Q.  Okay. I think I understand.
9    If somebody -- for purposes of diagnosis
10 of a cancer and initial treatment plan, that would
11 be done by an oncologist?
12    A.  For purposes of the treatment plan, like
13 the chemotherapy plan, that would be primarily done
14 by the oncologist. They would have certainly the
15 biggest say in that, with the caveat that the
16 general internist and maybe even the primary care
17 doctor, you're going to try to take the patient's
18 wishes or the patient's preferences into
19 consideration. You have to also consider other
20 comorbidities that the patient has.
21    So it's not purely an oncology decision.
22 It's a holistic decision that's made by generalists
23 and oncologists.
24    With respect to diagnosing cancers, I
25 think that often happens by internist, general

Page 57

1 internists as opposed to oncologist. Oftentimes the
2 cancer is diagnosed initially by a patient who comes
3 in with a complaint and we find cancer. Then after
4 we find cancer, we refer the patient to an
5 oncologist. So I would say the diagnosis of cancer
6 often happens with generalists.
7    Q.  Have you diagnosed cancer before?
8    A.  Yes.
9    Q.  What -- what types of cancer have you
10 diagnosed?
11    A.  Almost all types of cancers, I would say.
12    Q.  What is metastatic cancer?
13    A.  Metastatic.
14    Q.  Metastatic, sorry.
15    A.  That is a cancer that has spread to a
16 distant site.
17    Q.  Is that type of cancer frequently
18 incurable?
19    MR. STOY:  Object to the form.
20    THE WITNESS:  I think it depends on the
21 type of cancer. There are some cancers such as
22 leukemia that are widespread. They are quite
23 treatable and quite curable.
24 BY MR. MIGLIACCIO:
25    Q.  What are the benefits of finding a cancer

Confidential Information - Subject to Protective Order

Page 58

1 early?
2      MR. STOY: Object to the form.
3      Go ahead.
4      THE WITNESS: I think this -- yeah, this
5 gets to my report where there -- there could be
6 benefits and risks of pursuing a cancer early. When
7 you have an earlier cancer, it might be more
8 amenable to treatment in a sense that there's
9 less -- it has to -- I mean, yeah.
10      The cancer needs to be detectable, like if
11 the cancer is small enough where it's not
12 detectable, then you wouldn't generally operate on
13 it to remove it. You also wouldn't give
14 chemotherapy.
15      So there is, I think, still like an
16 optimal time to be thinking about when to detect
17 cancer. You don't want to be detecting cancer or
18 even try to detect cancer when it's just a few --
19 few cells. That would be infeasible.
20      And there -- there is also if -- you know,
21 the disease burden from cancer is quite advanced and
22 for certain cancers, if it's metastatic, it becomes
23 harder to -- the patient's life expectancy from
24 there is -- is lower and the odds of you
25 definitely sending that cancer into remission are

Page 59

1 lower as well.
2      So it's -- it's -- it's a balance. There
3 are -- there are risks and benefits of pursuing a
4 cancer early, and I think there is probable an
5 optimal time to be thinking about whether somebody
6 has cancer.
7      MR. STOY: Nick, I don't want to interrupt
8 you. If you've got -- you know, if this isn't a
9 good spot, but we have been going for a little over
10 an hour so, you know, whenever is a good time to
11 take a break.
12      MR. MIGLIACCIO: Sure. Why don't we just
13 take like five more minutes and then we can take a
14 break, if that's all right.
15      MR. STOY: That's fine.
16      MR. MIGLIACCIO: I know -- even on the
17 East Coast here we're close to lunch but we'll sort
18 that.
19      Q. Can we agree that it's generally
20 preferable to detect a cancer before it becomes
21 metastatic?
22      MR. STOY: Object to the form of the
23 question.
24      Go ahead.
25      THE WITNESS: Yeah, I think there are just

Page 60

1 a lot of considerations here.
2 BY MR. MIGLIACCIO:
3      Q. And I'm only asking about the benefits,
4 not the costs. I understand that -- that, you know,
5 and in your report you lay out your opinions. I
6 understand that, you know, but I'm not asking you
7 about the downsides. I'm only asking you about the
8 upsides.
9      MR. STOY: Same objection.
10      Go ahead.
11      THE WITNESS: Could you state that
12 question again?
13 BY MR. MIGLIACCIO:
14      Q. Yeah.
15      What -- what are the benefits, you know,
16 not -- not the drawbacks, not the costs, what are
17 the benefits of detecting a cancer before it becomes
18 metastatic?
19      A. It's really kind of hard for me to speak
20 generally on this. I think there are a number of
21 different types of cancer. This might differ across
22 different types of cancer.
23      Q. Sure. We can -- we can go through -- we
24 can go cancer by cancer.
25      Let's talk about, like, let's say,

Page 61

1 prostate cancer.
2      A. Uh-huh.
3      Q. Which is one example.
4      A. Okay.
5      Q. What -- what would be the benefits of --
6 of catching that before it becomes metastatic?
7      A. Even then, even if you focus on a specific
8 type of cancer, I think it depends on things that
9 are outside of cancer.
10      Potentially, if -- if -- you know, again,
11 this is a little bit hypothetical, but, you know, if
12 you have a patient with metastatic -- as I
13 mentioned, if you have a patient with metastatic
14 prostate cancer, it becomes harder to treat.
15      And this is kind of a very general
16 statement. As I mentioned, I am not, you know, an
17 oncologist.
18      When somebody comes into the hospital and
19 has a medical problem, I'm generally treating that
20 medical problem. I'm not making chemotherapy
21 decisions, so -- and I'm also not following cancer
22 patients long-term as well. I'm not directing --
23 chemotherapy is usually an outpatient regimen.
24      So, you know, I can speak to this in
25 general terms, but, you know, I think that there are

Confidential Information - Subject to Protective Order

1 just so many different factors to consider in --
2 there are -- it's -- it's a complicated decision
3 that requires, you know, more than just like an
4 inpatient hospitalization, which is what I deal
5 with.
6    Q.  Got it.
7       But we can agree that it's easier to
8 treat, then, before it becomes metastatic, a
9 prostate cancer?
10      MR. STOY:  Object to the form.
11      THE WITNESS:  Again, it depends, but I
12 would say that in many cases, in many cases, it is
13 treating a cancer that has not metastasized, or once
14 a cancer has metastasized, you would need more
15 systemic agents like chemotherapy as opposed to
16 surgery so it rules out certain therapeutic options.
17 And I can at least say that.
18      MR. MIGLIACCIO:  Why don't we -- we can
19 take a break now, a quick break, maybe just ten
20 minutes or so.  I know we need to figure out what
21 we're going to eat here.
22      MR. STOY:  Oh, no, that -- that's fine.
23 I'm more worried about Dr. Chan's lunch and he's
24 still a little ways away.
25      MR. MIGLIACCIO:  Yeah.

1      MR. STOY:  So let's --
2      MR. MIGLIACCIO:  Right.
3      MR. STOY:  Let's come back at 12:10, does
4 that work, 12:10 Eastern time?
5      THE VIDEOGRAPHER:  All right.  We're off
6 the record at 9:01 a.m.
7      (Whereupon, a brief recess was taken.)
8      THE VIDEOGRAPHER:  We are back on the
9 record.  The time is 9:15 a.m. Pacific time.
10 BY MR. MIGLIACCIO:
11   Q.  Okay.  All right.
12      Dr. Chan, I want to ask you a few
13 questions about your prior -- the prior reports and
14 opinions or deposition testimony that you offered
15 in -- I think it looks like three other cases that
16 are listed on your CV.  I am on -- looking at it
17 right now, it looks like it's Appendix B.  Okay.
18      Can you tell me about those cases?  You
19 can start with just -- just from the top.
20   A.  I don't know how much I can reveal.
21      MR. STOY:  Yeah, before you -- before you
22 answer, Dr. Chan, I'll place an objection to the
23 form of the question, and I'll also just caution
24 you, I'm aware that there are protective orders in
25 place in those cases and I believe that there's a

1 confidentiality order that governs any reports that
2 you might have authored in those cases.
3      So, you know, with that instruction to not
4 reveal any potentially confidential information
5 related to those other engagements, you can answer
6 the question to the extent you can.
7      THE WITNESS:  Right.  That leaves very
8 little room for me to discuss this.  I think I can
9 say that you can see the parties involved in each of
10 these cases, the dates of the case, and I was
11 retained as an expert on the defendants' side.  I
12 think I can say that.
13 BY MR. MIGLIACCIO:
14   Q.  Okay.  For each of those three cases?
15   A.  Correct.
16   Q.  Okay.  And those cases -- were those --
17 these are not whistleblower cases, are they?  Are
18 they -- were the cases themselves filed under seal?
19   A.  I don't think they're whistleblower cases.
20   Q.  Okay.  Can you tell me what you know about
21 the case, with the cases from what you know from the
22 publicly filed documents or complaints that were
23 filed in these cases?
24   A.  Are the complaints public?  Can I -- are
25 we certain that the complaints are public?

1   Q.  Well, that's -- that's why I asked if they
2 were -- if they were filed under seal and that's,
3 you know, what I'm trying to find out.  They don't
4 appear to me to be whistleblower cases.  They appear
5 to be --
6      MR. STOY:  Yeah, again, I'll just -- I'll
7 put this -- I'll reference my prior instruction and
8 just say, I mean, I think it's okay to talk about
9 the case generally at a high level but just not to
10 reveal anything that, you know, would potentially be
11 confidential.  And if you -- if you're not able to
12 answer the question with that instruction, then so
13 be it.
14      But I just wanted to place that on the
15 record.
16      THE WITNESS:  Frank, would you instruct me
17 to -- because I just don't know the legal -- the
18 legal details, whether this is the -- the complaints
19 are under seal or not.  Am I allowed to discuss
20 the...
21      MR. STOY:  Yeah, I don't -- I don't know
22 if -- Nick, if these complaints were filed under
23 seal or -- or what is confidential or what isn't.  I
24 just know that there are confidentiality orders in
25 place and --

Page 66

1    MR. MIGLIACCIO:  Uh-huh.
2    MR. STOY:  -- you know, aspects of his
3  report and testimony would be confidential.
4    That is the limit of my knowledge so
5  that's why I put the instruction that I did on the
6  record.
7    MR. MIGLIACCIO:  Yeah, I understand that.
8  And, you know, I do know we asked for this
9  information, these transcripts, and I think you
10  objected to providing them.
11    I -- I think, you know, you could tell us
12  the general subject matter of the case.  I don't
13  think you would be breaching any confidential.
14  That -- that would be my request, that you tell us.
15    MR. STOY:  Yeah, I mean, I think he can
16  answer a question like, you know, what is -- what's
17  the product that was at issue in the case or
18  something like that.  But I just think, you know,
19  it's going to depend on the question.  And if the
20  question is a really broad one, then it's going to
21  be difficult for Dr. Chan to be able to provide an
22  answer.
23    THE WITNESS:  And I would only want to
24  reveal what's public information because I wouldn't
25  want to divulge anything that's under confidential

Page 67

1  order.  And I -- I just don't know what is under
2  confidential order or not.  Yeah, I mean...
3    MR. STOY:  Well, let's wait.  I don't
4  think there's a question pending right now,
5  Dr. Chan, so let's wait and -- wait for a question.
6  BY MR. MIGLIACCIO:
7    Q.  But I mean, there was -- I just wanted to
8  know what the general subject matter of the cases
9  are.  You know, what -- what are the cases about.
10  You can -- you can tell me what the product at issue
11  is.  That -- that's fine.
12    What -- what is the product at issue?
13    THE WITNESS:  Is that okay, Frank?
14    MR. STOY:  Yeah, I think -- I think you
15  can answer that question, if you know.
16    THE WITNESS:  Right.
17    The -- the product at issue in all three
18  of these cases are -- were products by Janssen
19  pharmaceutical or Johnson & Johnson.  They were two
20  specific opioid products produced by Janssen
21  Pharmaceuticals or Johnson & Johnson.
22  BY MR. MIGLIACCIO:
23    Q.  Not Janssen, Johnson & Johnson?
24    A.  They're -- I think -- my understanding is
25  that Janssen is a subsidiary of Johnson & Johnson.

Page 68

1    Q.  Okay.  These -- these are all -- these
2  were deposition -- these aren't trial testimony,
3  this is all deposition testimony?
4    A.  Correct.
5    Q.  Do you know -- and you were retained by
6  the defendants in these respective -- these three
7  cases?
8    A.  I was retained by Janssen Pharmaceuticals.
9  There are multiple defendants in this case.  And I
10  was retained by one of the defendants, which is
11  Janssen Pharmaceuticals.
12    Q.  Okay.  Did you -- was your opinion -- did
13  you rely upon your expertise as a medical doctor or
14  as an economist in -- in offering your opinion?
15    A.  Both.
16    MR. STOY:  Object to the form.
17  BY MR. MIGLIACCIO:
18    Q.  All right.  Have you -- has your testimony
19  been -- been challenged in any of these three cases?
20    A.  No.
21    Q.  Do you know what I mean when I say
22  "challenged"?
23    A.  I'm not a legal expert.  My understanding
24  of your question is that there was a movement by the
25  other side to strike my testimony or strike my

Page 69

1  expertise.
2    Q.  It's to exclude or strike it, yeah,
3  that -- that's my question, right.
4    A.  Right.
5    Q.  Yeah.  And so the answer to that was no?
6    A.  That's no.
7    Q.  Okay.  Did your testimony include any
8  opinion relating to healthcare spending or pricing?
9    MR. STOY:  Object to the form.
10    You can answer that question.
11    THE WITNESS:  It's hard for me to answer
12  that question.  It related to healthcare spending.
13  Not sure about pricing.
14  BY MR. MIGLIACCIO:
15    Q.  Healthcare spending.  Got it.
16    And when were you retained in these cases,
17  if you can recall?
18    A.  I believe my first contact was before the
19  pandemic so that would mean sometime in 2020,
20  earlier 2020.
21    Q.  And is your work being done in those cases
22  also with the Analysis Group?
23    A.  Yes.
24    Q.  Okay.  In all three of them?
25    A.  Yes.

Page 70

1    Q.  Okay.  Do you have -- what is your
2  relationship with the Analysis Group?  Are -- are
3  you a consultant?  Are you an owner?  Are you an
4  employee?  Could you just shed some light on that?
5        MR. STOY:  Object to the form.
6        THE WITNESS:  As I mentioned, I have a --
7  an agreement with the Analysis Group that is --
8  is -- basically allows me to use their services in
9  preparing work for or litigation consulting.  I'm
10  not an employee of Analysis Group.  I'm what's
11  called an affiliate of Analysis Group.  And I
12  believe that just means that I have worked with them
13  in the past and I have a working relationship with
14  Analysis Group.
15  BY MR. MIGLIACCIO:
16    Q.  Got it.
17        What was -- I think we -- we -- we
18  discussed this earlier, but what was the process
19  that you used -- I think you've -- you've answered
20  this.
21        Did your process for preparing your report
22  in this case differ for your process in preparing
23  any expert witness report in other cases?
24        MR. STOY:  Object to the form.
25        THE WITNESS:  Would you like to be more

Page 71

1  specific?
2  BY MR. MIGLIACCIO:
3    Q.  I think you told me about your process
4  this morning.  I'm not sure if you finished your
5  answer, if we finished that line of questioning.
6        But my question is, in the way that you
7  prepared this report, was this -- the way you
8  prepared this report, was it any different from --
9  from what you've done in -- in other cases,
10  including these three that we just looked at?
11        MR. STOY:  Object to the form.
12        You can answer.
13        THE WITNESS:  Different from what I
14  described earlier.  So I think you are referring to
15  my general process of reading the complaint,
16  thinking about the question, identifying lines of
17  inquiry that I would like more information or
18  analyses.
19        Are you referring -- if you're referring
20  to that, then that is my general process of thinking
21  through my opinions in a case of litigation
22  consulting.
23  BY MR. MIGLIACCIO:
24    Q.  Have you -- other than these three
25  reports -- or rather, prior testimony, have you

Page 72

1  offered opinions in any other litigation?
2    A.  No.
3    Q.  So -- so these three that you've been
4  deposed in that are listed on Appendix B, and this
5  case, this is the fourth case in total that you have
6  been retained for and offered expert opinions or --
7  or testimony?
8        I'm not asking for questions about -- I'm
9  not asking for any cases where you may be a
10  consulting expert.  I'm asking, you know, where
11  you've been disclosed and provided opinions or
12  deposition testimony.
13    A.  And could you clarify to me what you mean
14  by provided expert opinions?  Is this -- is this a
15  specific term meaning...
16    Q.  A report, like a report.
17    A.  A report.  Okay.
18    Q.  Yeah.
19    A.  Thank you.
20        MR. STOY:  Dr. Chan, my understanding is
21  he's limiting his question to cases where you've
22  been disclosed as a testifying expert, like in this
23  case, not any case that you might have been retained
24  as a consultant.
25        THE WITNESS:  Okay.

Page 73

1        So the answer is yes.  These -- these are
2  the only cases that I have been disclosed as an
3  expert.
4  BY MR. MIGLIACCIO:
5    Q.  Got it.
6        And -- and -- and the first one looks
7  like -- I mean, you've just started this, you've
8  just started working as a disclosed expert with
9  these four cases, including these three?
10    A.  By "just started working," you can see the
11  dates here --
12    Q.  Right.
13    A.  -- is that what you mean?
14    Q.  Yeah, that -- that's right.  I mean, so
15  you -- there's not an earlier part of your career
16  where you provided expert testimony or expert
17  reports in other cases?
18    A.  Correct.
19    Q.  Okay.  Got it.
20        I have -- in your report here you have a
21  list of materials relied upon.  Looks like that's
22  exhibit -- it's just Appendix C of your report.
23        Do you have that up there?
24    A.  Yes.
25    Q.  So you looked at the Consolidated Third

Confidential - Information Subject to Protective Order

---

Page 74

1 Amended Medical Monitoring Class Action Complaint,
2 Plaintiffs' Memorandum of Law in support of their
3 motion for class certification, and the Third
4 Amended Consolidated Economic Loss Class Action
5 Complaint.
6     A.   Correct.
7     Q.   And I think you testified to this earlier
8 that you looked at Dr. Conti, Dr. Kaplan, and
9 Dr. Song's reports.
10        You also, I see here, looked at the report
11 of Dr. Panigrahy; is that right?
12     A.   I believe so, but I don't particularly
13 remember much about that report.
14     Q.   Okay.  And then are you aware that -- did
15 you ask to see any other expert reports?
16     A.   No.
17     Q.   No.
18        Did you -- are you aware that the
19 plaintiffs had put forward general causation expert
20 reports in this case?
21     A.   Not very aware that.
22     Q.   Are you aware that there were reports by
23 Dr. Etminan, Dr. Hecht, and Dr. Lagana?
24     A.   No, I don't know those names.
25     Q.   Are you aware of Dr. Daniel Catenacci?

---

Page 75

1     A.   No, I don't know who that is.
2     Q.   Dr. Janice Britt?
3     A.   No.
4     Q.   Have you ever heard of those names before?
5     A.   I've never heard those names before.
6     Q.   All right.  What was your recollection --
7 I mean, what is your recollection, as you sit here
8 today, of Dr. Panigrahy's report?
9     A.   I don't have much of a recollection at
10 all, actually.  I don't know who that person is.
11 I -- I might have seen that report, but I don't
12 remember anything about it.
13     Q.   Do you recall anything about the
14 depositions of Judson -- I'm just -- it says,
15 "Depositions and Declarations."
16     A.   Oh.
17     Q.   And it looks like there are one, two,
18 three, four -- seven of them listed there.
19     A.   Uh-huh.  I know some of their medical
20 conditions.  I know that they're specific named --
21 named -- named plaintiffs and so I know -- I know
22 their -- as I mention in my report, I know some of
23 their medical conditions.
24     Q.   Got it.
25        And then I see further below, "Data," you

---

Page 76

1 have various data listed, is that right, on the next
2 page?
3     A.   Uh-huh.
4     Q.   And I'm just going to refer you to the
5 "Medical Expenditure Panel Survey data."
6        Do you see that?
7     A.   Yes.
8     Q.   Who -- who gathered that data for you?
9     A.   I directed the Analysis Group to gather
10 that data, those data.
11     Q.   Who is your -- who did you interface with
12 with respect to getting that information?
13     A.   Almost all of my calls with the Analysis
14 Group involved the people that I mentioned earlier.
15 All of them.  Some of the calls did not include
16 Molly Frean.  But almost all of the calls involved
17 the other four people that I named, Brian Ellman,
18 Frank Mortimer -- Richard Mortimer, Jessica Lu, and
19 Michaela Johnson.  And I directed them as a group to
20 get those data.
21     Q.   Got it.
22        I want to look at your -- were there any
23 conclusions that you reached that did not make it
24 into your final report?
25     A.   No.

---

Page 77

1     Q.   And let -- let's look at your -- the
2 invoices.  I think I -- I will put -- pull those up
3 for you if we just bear with me for a moment.
4        Did I do it right?  Okay.  It should --
5 they should pop up in a few minutes -- or a few
6 seconds.
7        Let me know when you can see them.
8     A.   Yes, I can see them.
9        (Whereupon, Chan Exhibit 3 was marked for
10 identification.
11 BY MR. MIGLIACCIO:
12     Q.   Okay.  Great.
13        This is -- this is the invoice we were
14 provided with.
15     A.   Uh-huh.
16     Q.   And it's dated February 3rd, 2022.
17     A.   Right.
18     Q.   And it looks like it was "For professional
19 services rendered in connection with the above
20 referenced case for the period ending December 31,
21 2021."
22     A.   Uh-huh.
23     Q.   Are there any other invoices or did you
24 spend any other time on this report?
25        MR. STOY:  Object to -- object to the

---

Page 78

1  form.  I think that's two different questions.
2       THE WITNESS:  Okay.  Yeah.
3  BY MR. MIGLIACCIO:
4    Q.  Yeah.  First, are there any other invoices
5  that haven't been --
6    A.  I have not yet submitted any other
7  invoices.
8    Q.  Okay.  Do you have -- do you have a plan
9  to submit another invoice?
10   A.  Yes.
11   Q.  Okay.  And what would be included on that
12 invoice aside from today's deposition or in
13 preparation for the deposition?
14   A.  I haven't prepared them yet.  Those would
15 be invoices for the months of January and for the
16 month of February.
17   Q.  Okay.  How much time -- so your report
18 looks like it's dated January 12th, right?
19   A.  Right.
20   Q.  Could you estimate how much time you spent
21 in the month of January on the report before it was
22 signed and submitted on the 12th?
23   A.  Off the top of my head, no.  I think it
24 was a significant amount of time given that we were
25 up against a deadline.  But off the top of my head,

Page 79

1  I can't tell you the number of hours.
2    Q.  Got it.  Got it.
3       So to -- to look, I'm looking at the
4  first -- or rather, the second page, page 2, and
5  there I think the people that you've referenced are
6  listed as professionals with their titles and their
7  hours and rates.
8    A.  Right.
9    Q.  Do you see that?
10   A.  I do.
11      MR. STOY:  Object to the form.
12 BY MR. MIGLIACCIO:
13   Q.  Can you tell me, you know, Mortimer,
14 R. Mortimer, what background that person has in
15 terms of degrees or qualifications?
16   A.  Richard Mortimer.  I believe he has a
17 Ph.D. in economics from Berkeley.  He's a principal,
18 which means a partner.  I don't know the difference
19 between a managing principal and a principal, but I
20 think, broadly speaking, they're -- they're like
21 partners at -- at AG.
22   Q.  Fink.  S. Fink?
23   A.  Stephen Fink is another partner.  He was
24 involved -- I -- now I remember he was involved in
25 early discussions in the case but not very much

Page 80

1  subsequently.  Off the top of my head, I don't know
2  what Ph.D. he has, but it's likely -- I believe he's
3  an economist.
4    Q.  Ellman, B. Ellman?
5    A.  Brian Ellman, I think he has an MBA.  I
6  don't remember exactly where the MBA is from.  He's
7  an economist and he's a principal.
8    Q.  M. Johnson?
9    A.  Michaela Johnson, my understanding is a
10 manager is below the level of a partner but is quite
11 experienced, has quite a bit of industry experience
12 as well as consulting experience.  She has an MBA
13 from MIT.
14   Q.  I. Karagodsky?
15   A.  I believe he was on maybe one call or two
16 calls.  I don't know him as well.
17   Q.  Do you know what qualifications he may
18 have?
19   A.  I don't know in particular.
20   Q.  Okay.
21   A.  I believe it's all -- I would expect that
22 all to be on their website if I wanted to look it
23 up.
24   Q.  Got it.
25      F. Balestrieri?

Page 81

1    A.  F. Balestrieri was not on most of the
2  call -- I don't remember that person being on calls.
3    Q.  J. Bernard?
4    A.  I don't remember that person being on
5  calls.
6    Q.  And you don't know Balestrieri or Bernard,
7  their -- their qualifications?
8    A.  No.
9    Q.  J. Lu?
10   A.  Jessica Lu.
11   Q.  Yeah.
12   A.  Was on almost all the calls.  She has an
13 MBA from MIT.  And she's a manager.
14   Q.  S. Livingston?
15   A.  I don't know who that person is.
16   Q.  M. Frean?
17   A.  Right.  Molly Frean.  She has a Ph.D. from
18 University of Pennsylvania.
19   Q.  And did you work with her a lot on this?
20   A.  I would say less than Jessica and
21 Michaela, Brian, and -- she was less present than
22 those four but she was present on a few of the
23 calls.
24   Q.  A. Khan?
25   A.  I don't remember working with that person.

Confidential Information - Subject to Protective Order

| Page 82 | Page 84 |
|---|---|

**Page 82**

1    Q.   And N. Mwonga?

2    A.   I don't remember working with that person

3 either.

4    Q.   T. Radtke?

5    A.   I don't remember working with that person.

6    Q.   Okay.

7       I. Tibrewal?

8    A.   And I don't remember working with that

9 person.

10    Q.   Got it.

11       Were there any other people that you

12 remember working with other than that -- that are --

13 that are listed here?

14    A.   No.

15    Q.   Okay.  Did you review this bill before it

16 was submitted?

17    A.   I submitted my hours, but I don't review

18 the hours of -- submitted by Analysis Group.

19    Q.   Got it.  All right.

20       I want to ask you some questions about the

21 scope of your opinions here in this case.

22       Were you -- or are you offering any

23 opinions on epidemiology or general causation?

24    A.   What do you mean by "general causation"?

25    Q.   Are you offering an opinion whether the

**Page 83**

1 contaminated valsartan at issue in this case, it can

2 cause cancer?

3    A.   I'm not rendering any opinions on whether

4 valsartan with nitrosamine impurities can cause

5 cancer.

6    Q.   Got it.

7       I want to direct you to paragraph 44 of

8 your -- of your report.

9    A.   Okay.

10    Q.   And what -- you state -- and -- "While

11 NDMA and NDEA exposure may be perceived as a

12 potential general cancer risk, it has not been

13 demonstrated as a risk with respect to any specific

14 type of cancer, nor has the presence of nitrosamines

15 in certain valsartan products been shown to present

16 a general or specific cancer risk."

17       Are you offering that opinion or are -- is

18 that -- or is that an assumption that you are

19 stating?

20       MR. STOY:  Object to the form.

21       You can answer.

22       THE WITNESS:  That's not a core opinion

23 that I'm offering.  That is something that I am

24 citing -- it's my understanding that I'm citing from

25 some literature that I reviewed but it's not central

**Page 84**

1 to my opinion.

2 BY MR. MIGLIACCIO:

3    Q.   And you're not offering that opinion

4 specifically?

5    A.   No.

6    Q.   Okay.  Fair to say you did not do anything

7 to review the epidemiology in this case or

8 investigate general causation?

9       MR. STOY:  Object to the form to the

10 extent it misstates his testimony.

11       Go ahead.

12       THE WITNESS:  I would say that I did

13 not -- it's not a core opinion of mine to comment on

14 general causation.  Epidemiology is relevant in

15 other ways, broadly speaking.

16       When you consider epidemiology as the

17 prevalence of other diseases or the characteristics

18 of people that take valsartan versus the people that

19 don't take valsartan, there are other elements of

20 epidemiology that are important for my opinion.

21 BY MR. MIGLIACCIO:

22    Q.   Let me -- let me give you more specific

23 question.

24       You didn't look at the question of -- you

25 didn't look at epidemiology with respect to the

**Page 85**

1 question of whether the contaminated valsartan can

2 cause cancer in this case?

3       MR. STOY:  Object to the form.

4       THE WITNESS:  In my report, there are some

5 sources that I reviewed about what other agencies

6 have said about the link between nitrosamines and

7 the potential for cancer.  But my core opinions do

8 not concern that.

9 BY MR. MIGLIACCIO:

10    Q.   Okay.  Did you review any dietary studies

11 that discussed increased risk of cancer at higher

12 levels of NDMA ingestion?

13    A.   Yes.

14    Q.   You did?

15    A.   Strike that.

16       I reviewed studies on the concentration of

17 NDMA and NDEA in various dietary sources.

18       I also reviewed sources that had

19 estimates, for example, from the FDA on the

20 potential risk of cancer given nitrosamines.

21    Q.   But you're not offering any opinions with

22 respect to those studies?

23    A.   No.

24    Q.   Okay.  When you say this isn't a core

25 opinion that you're offering, does that mean this is

Confidential Information Subject to Protective Order

---

Page 86

1 not an opinion that you would be testifying to at
2 trial if there was a trial in this case?
3         MR. STOY:  Object to the form.
4         THE WITNESS:  I wouldn't be testifying on
5 issues of general causation.
6 BY MR. MIGLIACCIO:
7     Q.  Got it.
8         I want to direct you to paragraph 68 of
9 your complaint -- of your -- I'm sorry, your -- your
10 report where you discuss the M-E-P-S data.
11     A.  The MEPS data.
12     Q.  Right.
13         Can you tell me what MEPS data is?
14     A.  Sure.  I think that paragraph actually
15 does a pretty good job of doing that.
16         MEPS is a data source that's collected by
17 survey.  It is a -- supposed to a representative
18 survey of the U.S. population and it collects data
19 on healthcare utilization, healthcare -- health
20 insurance coverage.  It also has information on
21 patient diseases and demographics.  And it conducts
22 these surveys yearly.  Doesn't necessarily follow
23 the same people all the time, but it conducts a
24 representative survey over time on -- on on -- on this
25 type of information.

---

Page 87

1     Q.  Who -- and who -- what organization
2 sponsors this or -- or, you know, collects the data?
3     A.  I believe it's the federal government.
4     Q.  Okay.  And you directed that this data be
5 pulled for -- for patients who took affected
6 valsartan and non-affected valsartan?
7     A.  As well as patients who don't take --
8     Q.  Valsartan at all.
9     A.  We wanted to compare that.
10         I believe there are three -- three sets of
11 patients:  patients who didn't take valsartan at
12 all, patients who took affected valsartan, patients
13 who took non-affected valsartan.
14     Q.  Was -- how big is this sample, you know,
15 what -- what percentage would you say it -- it
16 captured of the population?
17     A.  I can't -- I don't know exactly right now
18 but I know it's a representative sample and it's --
19 the survey design is -- is meant to, you know,
20 survey enough people so that it -- you know,
21 inferences can be made with reasonable certainty on
22 a representative sample of the U.S.
23     Q.  And I'm just looking at paragraph 68.
24         You state, "I found that the rate of
25 cancer and diabetes in the MEPS data for individuals

---

Page 88

1 who took affected valsartan" -- and when we're
2 talking about affected valsartan we're talking about
3 the valsartan at issue in this case, right, that has
4 the nitrosamine contamination in it, right?
5     A.  To be clear, affected valsartan is --
6 we -- we would have to define it by an NDC code.
7     Q.  Uh-huh.
8     A.  We don't know anything more than that.  We
9 don't know what the lot was that the patient took
10 the valsartan from.  As would be the case for many
11 of the patients in the proposed class.  But we know
12 the NDC number which means we know the manufacturer
13 of the valsartan.  And that's what --
14     Q.  So that's what you're -- that's what
15 you're talking about when you're talking about
16 affected valsartan?
17     A.  Right.  So the valsartan may or may not
18 have actually contained nitrosamines but it was from
19 a manufacturer as specified by the NDC code.
20     Q.  And you say 38 -- just to -- to continue
21 that sentence, "who took affected valsartan
22 (34.8 percent for diabetes, 20.2 percent for cancer)
23 was similar to the rate of individuals who took
24 non-affected valsartan (38.2 percent for diabetes
25 and 19.1 percent for cancer)."

---

Page 89

1     A.  Correct.
2     Q.  Could we agree that 20.2 percent is
3 greater than 19.1 percent?
4     A.  It depends on the -- the -- the number --
5 the number 20.2 and the number 19.1 in complete
6 isolation, if you were just to ask me which number
7 is greater, I would say 20.2.
8         But if you are doing a study on this you
9 would have to ask what the statistical significance
10 is between 20.2 and 19.1.  You would also have to
11 ask whether this is clinically significant given --
12 you know, this is not -- we're not using this as a
13 study of causation at all.
14         You know, you would have to -- you would
15 have to control for a number of different things in
16 order to kind of ask whether there's a clinically
17 and statistically meaningful relationship between
18 affected valsartan and cancer.  This is simply
19 descriptive.
20     Q.  You haven't done any of those things,
21 statistical study or clinical study on that, right?
22     A.  On -- on causation?
23     Q.  Yeah.  With respect to this paragraph.
24     A.  Correct.  The goal of this is not to ask
25 whether valsartan could cause cancer -- affected

Confidential Information Subject to Protective Order

Page 90

1 valsartan could cause cancer.
2      Q.  Got it.
3           Do you have any experience -- we talked, I
4 think at some length, about your -- you know, your
5 work as a hospitalist, as -- as a physician.
6           You know, do you have any experience
7 setting up a medical monitoring program?
8      A.  No.
9      MR. STOY:  Object to the form.
10      You can answer.
11      THE WITNESS:  Okay.
12      No.  By "medical monitoring" -- do you
13 want to be a little bit more specific, actually,
14 before I say --
15 BY MR. MIGLIACCIO:
16      Q.  Yeah.
17           Well, what experience do you have
18 monitoring at-risk patient populations?  I'll put it
19 that way.
20      A.  Patients at risk for -- for what?
21      Q.  For cancer.
22      A.  As a hospitalist, I don't have -- it's not
23 part of my job as a hospitalist to monitor at-risk
24 patient populations for diseases that have not yet
25 become known.

Page 91

1      Q.  Got it.
2           Have you -- have you done anything to
3 monitor at-risk patient populations for diseases
4 that have not become known?  Have you done that in
5 any other part of your work other than a
6 hospitalist, like, you know, as -- in -- in academia
7 or -- or elsewhere?
8      MR. STOY:  Object to the form.
9      THE WITNESS:  In academia, part of my
10 research agenda is on the process of making
11 diagnoses and part of that involves studying the
12 properties of diagnostic tests and the -- the kind
13 of human behavior that goes into the process of
14 making diagnosis.  So that would be related to this
15 idea of screening for diagnoses, identifying
16 diagnoses.  That -- that's -- I think that's all I
17 can say.
18           I've studied it from an academic
19 perspective that's interested in the process of
20 making diagnoses.
21 BY MR. MIGLIACCIO:
22      Q.  The process of making diagnoses, have they
23 related to cancers?
24      A.  They could certainly be applied to the
25 process of diagnosing cancers.

Page 92

1      Q.  They haven't specifically focused on that?
2      A.  They have not specifically focused on the
3 process of making cancer diagnoses.
4      Q.  What -- what -- and it sounds like it's a
5 pretty broad or general interest of yours.  Can you
6 explain a little bit more about, you know, are you
7 writing it -- that as an economist?  Like, what is
8 the -- like, can you give me some more meat on the
9 bone for that?
10      MR. STOY:  Object to the form.
11      THE WITNESS:  I'm writing about this as
12 both a clinician and an economist.  The -- I've
13 written economics papers on the process of making
14 diagnoses and how to understand kind of, you know,
15 various tradeoffs between overdiagnosis versus
16 underdiagnosis as well as the accuracy of the
17 diagnosis process.
18           Some -- some providers may make both more
19 Type I errors and Type II errors, and it's not a
20 tradeoff between those providers and other
21 providers.
22           So this economics literature is focused on
23 systems of care, provider behavior, and kind of
24 specific objects of diagnostic errors such as Type I
25 errors and Type II errors.

Page 93

1           I have applied this type of research for a
2 clinical audience as well.  I'm working on an
3 opinion piece in JAMA for a clinical audience that
4 talks about diagnostic efficiency, what makes for
5 diagnostic errors, and how can we improve the
6 quality of diagnoses.
7 BY MR. MIGLIACCIO:
8      Q.  These -- this research, is it fair to say,
9 has not focused on specific patient subpopulations
10 who are at risk for cancer?
11      A.  It has not specifically focused on that,
12 so -- population.  It has kind of viewed the process
13 of diagnoses more broadly.
14           But, you know, the diagnosis of cancer is
15 one of the major -- one of the -- one of the most
16 important kind of domains of diagnostic
17 decision-making.  I would say cancer is -- is quite
18 important in terms of diagnostic error,
19 misdiagnoses, and how we can improve our process of
20 making diagnoses.
21      Q.  Do you have -- I think -- now -- I think I
22 asked this one way.  I'll ask it another way.
23           Do you have any experience administering a
24 medical monitoring program --
25      A.  No.

Page 94

1    Q.  -- to monitor a group?
2        Before you offered your opinion here in
3  this case, have you had any litigation experience
4  with opining relating to -- offering an opinion with
5  respect to medical monitoring?
6    A.  With respect to medical monitoring for
7  patients at risk for cancer?
8    Q.  Yes.
9    A.  No.
10   Q.  Okay.  Any other aside from that narrow
11  group, anything broader?
12   A.  Some of my other opinions relate to
13  physician behavior.  And physician behavior -- an
14  important part of physician behavior is deciding
15  whether a certain treatment is appropriate for a
16  patient or deciding whether a certain test is
17  appropriate for a certain patient.  And that relates
18  to diagnoses, making diagnoses.
19   Q.  Okay.  Do you know of any medical
20  monitoring programs that have been, you know,
21  approved by courts?
22       MR. STOY:  Object to the form.
23       THE WITNESS:  I haven't researched which
24  medical monitoring programs have been approved by
25  courts.

Page 95

1  BY MR. MIGLIACCIO:
2    Q.  Got it.
3        Have you looked or researched into -- of
4  any medical monitoring programs in the United States
5  that are not approved by courts?  And I'm talking
6  about programs outside of the guidelines that you
7  reference in your report.
8        MR. STOY:  Object to form.
9        THE WITNESS:  Can you state that again,
10  please?
11  BY MR. MIGLIACCIO:
12   Q.  Yeah.
13       Have you looked at or researched any
14  medical monitoring programs in the United States
15  that -- that aren't court-approved, you know, like
16  there's the 9/11 medical monitoring program, is that
17  something you've looked at, then?
18       MR. STOY:  Object as to form.
19       THE WITNESS:  I can't recall whether I've
20  looked at that or not, whether I've looked at the
21  9/11 program.
22  BY MR. MIGLIACCIO:
23   Q.  For -- that -- that was just an example.
24  I mean, you know, there may be others.
25       But you can't recall any others?

Page 96

1    A.  No.
2    Q.  Okay.  I want to direct you to
3  paragraph 32 in your report.
4    A.  Okay.
5    Q.  Okay.  And I'm -- I'm going down toward
6  the -- I guess it's the one -- second -- the third
7  sentence where -- that begins, "In contrast."
8        And it says, "In contrast the screening
9  guidelines I discuss in this section refer to the
10  testing of an apparently healthy, asymptomatic
11  target population."
12   A.  Right.
13   Q.  Would you agree that the screening
14  guidelines that you have discussed in this report
15  are for the average risk population?
16   A.  I am not sure about that.  The
17  guidelines -- some of these guidelines are for
18  smokers, for example.  I don't know what you mean by
19  "average risk population."
20       I -- here, I say patients without
21  symptoms.
22   Q.  Aside from smokers -- smokers have a
23  special set of guidelines, right?
24   A.  Right.
25   Q.  I think you discussed them.  And maybe you

Page 97

1  might have discussed one other.  But smokers have --
2  they get low-dose CT scans.
3        What is the guideline for smokers again?
4    A.  I believe that's in my report in
5  Figure number 1.
6    Q.  Figure 1.  Okay.
7    A.  Yeah.  Would you like to turn to that?
8    Q.  Sure.
9    A.  Okay.  So for lung cancer, the USPSTF has
10  a recommendation of "B" for adults aged 50 to 80
11  with a 20 pack-year smoking history who currently
12  smoke or quits within the last 15 years.
13   Q.  And you reference the USPSTF; is that
14  right?
15   A.  Yes.  Uh-huh.
16   Q.  Who -- what organization is the USPSTF?
17   A.  The USPSTF is the U.S. Preventive Services
18  Task Force, and that is the main organization that
19  comes up with guidelines related to preventive
20  services.
21       My boss is a member of this task force.
22  It's a -- it's -- it's a high profile task force
23  that considers evidence on various -- various
24  population-based guidelines -- I'm sorry, various
25  population-based interventions that you could do

Confidential Information Subject to Protective Order

Page 98

1 or -- or -- or screening tests. And it issues
2 recommendations based on this evidence.
3     Q. Have you ever been a member of the USPS --
4 USPSTF?
5     A. No.
6     Q. Okay. The NCI, you referenced the
7 National Cancer Institute. What -- what does the
8 NCI do?
9     A. The National Cancer Institute is an
10 organization that is an authority on cancer,
11 various -- and in this -- and in this setting, the
12 NCI -- I refer to the NCI if it has any guidelines
13 with respect to screening of cancer.
14     Q. Are you familiar with the National
15 Comprehensive Cancer Network, or NCCN?
16     A. I've heard of that organization.
17     Q. Do -- what do you know about the NCCN?
18     A. I know that that organization also puts
19 out quality measures on cancer care. I'm not sure I
20 know very much more about the NCCN.
21     Q. Is it fair to say that the development and
22 treatment -- the development and establishment of
23 treatment guidelines for cancer has not been a focus
24 area of your research; is that fair to say?
25     MR. STOY: Object to the form.

Page 99

1     THE WITNESS: Could you say that again?
2 BY MR. MIGLIACCIO:
3     Q. That is it fair to say that the
4 development and establishment of treatment
5 guidelines for cancer has not been a focus of your
6 research?
7     A. The --
8     MR. STOY: Object to the form.
9     THE WITNESS: The development and -- of
10 cancer -- the development of cancer guidelines has
11 not been a focus of my research. I have focused on
12 other types of guidelines in my research.
13 BY MR. MIGLIACCIO:
14     Q. What other types of guidelines have you
15 focused on?
16     A. Specifically, I focused on guidelines for
17 the treatment of atrial fibrillation, which in --
18 you know, which are similar in ways that you are
19 developing guidelines based on evidence. There are
20 risks and benefits for recommending a certain course
21 of action for a broad set of patients. And in this
22 particular research, I'm interested in how providers
23 respond to guidelines.
24     Q. So could you -- could you direct me to any
25 papers you have on that subject?

Page 100

1     A. Yeah. Let's turn to the CV.
2     Q. Okay.
3     A. This is in -- under working paper number 2
4 on page A-2.
5     Q. A-2?
6     A. Yeah.
7     Q. Okay.
8     "Fixing Misallocation with Guidelines"?
9     A. Correct.
10     Q. "Awareness versus Adherence"?
11     A. Correct.
12     Q. Got it.
13     NBER, National Bureau of Economic
14 Research?
15     A. Exactly.
16     Q. And you have an appointment or -- with
17 that group right now?
18     A. I do. I have an affiliation with that
19 group.
20     Q. Okay. You've had that for a long time?
21     A. I've had -- well, it's something that you
22 need to be nominated and I guess approved for by
23 the -- this is something that I got in my first year
24 as a faculty. It's called -- it's in my CV under
25 "Faculty Research Fellow, National Bureau of

Page 101

1 Economic Research."
2     Q. Got it. Got it. Got it. Okay.
3     And this working paper was published in
4 July of last year?
5     A. That was the most recent version of the
6 paper, correct.
7     Q. Oh. Has -- it's changed over time? Have
8 there been --
9     A. Yeah, you can see previous versions of the
10 paper if you go to that website.
11     Q. Got it. Got it.
12     And have they all -- have they all related
13 to atrial fibrillation or have they -- those papers
14 changed their focus?
15     A. The -- the empirical focus of the paper
16 has been on atrial fibrillation throughout. The
17 paper of course is motivated much more broadly.
18 It's motivated about how do we form guidelines, how
19 do physicians respond to guidelines; if you're
20 trying to optimize outcomes for a patient
21 population, how should you best make use of
22 guidelines.
23     Q. Your coauthors, there are -- it looks like
24 one, two, three -- four other authors?
25     A. Right.

Confidential Information - Subject to Protective Order

Page 102

1   Q.  Have they been the same authors on -- on
2  this series of papers over time or has it -- has it
3  changed?
4   A.  I believe it's been the same for -- ever
5  since we've had a working paper, it's been the same.
6   Q.  Are they physicians or economists or both?
7   A.  Both.
8   Q.  All right.  So all four are
9  physician/economists?
10   A.  Oh, sorry.  Two of them are -- three --
11  two of them economists.  Leila Agha and Jason
12  Abaluck are economists.  Daniel Singer is a
13  physician.  And Diana Zhu is a Ph.D. student in
14  economics.
15   Q.  Got it.
16      Have you contributed in any way to the
17  development of a USP -- P -- USPSTF guideline
18  relating to cancer?
19   A.  No.
20   Q.  Have you contributed to the evidence-based
21  reviews provided by the NCI as referenced in your
22  report, I think paragraph 35?
23   A.  Paragraph 35.
24   Q.  I mean, I'm not saying that you did.  I'm
25  just asking.  That -- that's my -- I think you --

Page 103

1  you discuss the evidence-based review that NCN
2  does -- NCI does?
3   A.  Uh-huh.
4      No, I have not.
5   Q.  Okay.  Do you consider yourself to be an
6  expert in the formulation of the derivation of the
7  original clinical guidelines in the screening for
8  cancers?
9   A.  The formulation or derivation?
10   Q.  Uh-huh.
11   A.  Could you clarify that?
12   Q.  Or the creation --
13   A.  Okay.  Do I --
14   Q.  -- of the clinical guidelines?
15   A.  Okay.  Sorry, could you restate the
16  question?
17   Q.  Yeah.
18   A.  Do I consider myself an expert in?
19   Q.  In the creation of clinical guidelines for
20  the screening of cancers?
21   A.  No.
22      MR. STOY:  Object to the form.
23      Go ahead.
24  BY MR. MIGLIACCIO:
25   Q.  Can we agree that it can take a long time

Page 104

1  to get screening procedures added to national
2  guidelines at USPSTF?
3      MR. STOY:  Object to the form.
4      THE WITNESS:  I don't know what I would
5  characterize as a long time.  I think it's --
6  there's a reason why we don't -- we require a
7  certain level of evidence in order to change a
8  guideline.  Because evidence is incremental and
9  because evidence can change we want to have a
10  certain level of certainty whenever we have a type
11  of guideline.
12      And as I discuss in my report, when the
13  guidelines are for screening, we have to be very
14  cognizant of the potential risks of screening.  And
15  that's why I think we would have just a higher bar
16  to -- to, you know, recommending a guideline for
17  a -- a new guideline for screening.
18  BY MR. MIGLIACCIO:
19   Q.  And for -- for example, you know, can we
20  agree that it took many years before low-dose CT
21  scans were added as a guideline for tobacco users?
22      MR. STOY:  Object to form.
23      THE WITNESS:  I don't know the particular
24  history of that.  Are you specifically referring to
25  low-dose CT scans as opposed to chest x-rays?

Page 105

1  BY MR. MIGLIACCIO:
2   Q.  Uh-huh.
3   A.  I would need to look into the history of
4  when low-dose CT scans were available.  And, you
5  know, there is a certain -- as I discuss in my
6  report, one of the considerations of using a certain
7  technology for screening is characterizing the
8  performance of that technology in terms of false
9  positives and false negatives as well as
10  characterizing any risk that may come from using
11  this new technology of a CT scan versus a chest
12  x-ray.  I would imagine even if it's low dose, there
13  would be much more radiation than the chest x-ray.
14   Q.  Can you -- there'd be more radiation from
15  a low-dose CT scan than a chest x-ray?
16   A.  Than a chest x-ray.  I would imagine that
17  a CT scan -- a usual CT scan has I think orders of
18  magnitude, more radiation than a single plain film
19  chest x-ray, and even if it's a low-dose CT scan I
20  would have to -- I would have to look at -- review
21  the evidence, but I think there would still be some
22  concern of higher radiation from a low-dose CT scan
23  than a chest x-ray.
24   Q.  But you're not offering that opinion here
25  and now?  You don't know the answer to that without

Confidential Information - Subject to Protective Order

|  | Page 106 |
| --- | --- |

1 reviewing the information?

2    A.  Correct.  I don't know in that specific

3 case.  But I would -- and what -- but what is

4 central to my opinions is that all of these

5 screening tests have potential risks both in terms

6 of false positives and false negatives so that's why

7 you need to understand the testing characteristics

8 for a certain screening procedure but also some of

9 these screening procedures have physical risks such

10 as radiation.

11    Q.  I will be going through more of your

12 report.  I think you -- so to -- I think you have --

13 you have stated in your report that certain

14 thresholds need to be met.

15        And I think that's what you're saying now

16 before a screening guideline is made; fair to say?

17    A.  Correct.

18    Q.  And I'll direct you to some portions of

19 your report on that in -- in a moment.

20        MR. STOY:  Nick, before we --

21        MR. MIGLIACCIO:  Yeah.

22        MR. STOY:  If you're about to jump to

23 another topic, we've been going a little over an

24 hour now.

25        MR. MIGLIACCIO:  Yes.

|  | Page 107 |
| --- | --- |

1        MR. STOY:  Would this be a good time for a

2 quick break?

3        MR. MIGLIACCIO:  Yeah, I think so.  Why

4 don't we go on off the record and we can discuss how

5 long.

6        MR. STOY:  Okay.

7        THE VIDEOGRAPHER:  Off the record at

8 10:19 a.m. Pacific time.

9        (Whereupon, a brief recess was taken.)

10        THE VIDEOGRAPHER:  We are back on the

11 record.  The time is 10:44 a.m. Pacific time.

12 BY MR. MIGLIACCIO:

13    Q.  Okay.  Great.  All right.

14        Dr. Chan, I think we were talking before

15 the break about thresholds and I want to ask you

16 some questions about that.

17        I direct you to paragraph 16 of your

18 report.

19    A.  Okay.

20    Q.  Okay.  And I want to direct you to midway

21 through it, there's a sentence that says, "While

22 there are many risk factors for the nine types of

23 cancers identified by Plaintiffs in this case, a

24 high threshold must be met for a risk factor to be

25 incorporated into a guideline to screen populations

|  | Page 108 |
| --- | --- |

1 of asymptomatic patients."

2        And then you say below, "In my opinion,

3 the evidence related to NDMA and NDEA in affected

4 valsartan fails to meet the bar required to use a

5 uniform screening process on a broad population of

6 asymptomatic patients."

7        Do you have a -- what do you mean by "a

8 high threshold must be met for a risk factor to be

9 incorporated into a guideline to screen

10 populations"?

11    A.  I believe there's another part of my

12 report that kind of elaborates on this threshold.

13    Q.  Okay.

14    A.  Right.  So I think paragraph 35 gets at

15 this here.  Here I talk about the USPSTF guidelines.

16 But I think it's -- it's broadly applicable to the

17 general framework we would need to consider a

18 threshold.

19        Would you like me to read the relevant

20 sentence?

21    Q.  Sure.

22    A.  "USPSTF recommendations are based on a

23 framework which considers questions such as whether

24 screening may reduce morbidity; whether sufficiently

25 sensitive and specific screening tests are

|  | Page 109 |
| --- | --- |

1 available; whether early detection and treatment

2 makes a difference in morbidity; and what the

3 potential harms of screening and subsequent

4 screening-implied treatment may be."

5        So this sentence does not specifically

6 mention the agent in question, such as NDMA and

7 NDEA, but the agent in question and the potential

8 cancer type related to this agent bears on many of

9 these factors in this sentence such as whether a

10 screening may reduce morbidity.

11        The agent needs to be sufficiently

12 associated with cancer in the sense that we expect

13 sufficiently high number of patients associated with

14 this agent or this risk factor, for screening to

15 reduce morbidity.

16    Q.  And you're -- but you are not offering, as

17 we discussed, a general causation opinion here,

18 you're not offering an opinion on -- on what you've

19 just said?

20    A.  I'm not --

21        MR. STOY:  Object to the form.

22        Sorry, Doctor.

23        THE WITNESS:  It's not my assignment to

24 offer an opinion on causation, but as I mentioned

25 earlier, I refer to sources that have some estimate

Page 110

1 of the associated -- a potential associated cancer
2 risk.
3           So, for example, in paragraph 88 of the
4 report, I cite a very conservative estimate, meaning
5 like a worst -- somewhat of a worst-case scenario
6 that the FDA has estimated that the highest dose of
7 valsartan, one additional cancer case may be
8 expected per 8,000 patients exposed to NDMA
9 containing valsartan.  And one additional cancer
10 case maybe expected per 18,000 patients exposed to
11 NDEA containing valsartan.
12     Q.  Yes.  And I -- yeah, I do -- I do see
13 that.
14         "The maximum exposure to NDMA from
15 affected valsartan is approximate" -- "of 29,498
16 micrograms is approximately 12 times the lifetime
17 acceptable intake, implying an excess cancer risk of
18 12 in 100,000 or approximately 1 in 8,000," right,
19 of paragraph 92?
20     A.  Yes.  I was reading paragraph 88 but part
21 of 92 also mentions.
22     Q.  I'm sorry, I think I said paragraph 93,
23 but I may have that wrong, I may have said --
24 given -- yeah, I was referring to paragraph 93.
25     A.  Okay.  Yep, I see that you're reading

Page 111

1 paragraph 93.
2     Q.  Yeah.
3     A.  And I was reading from 88.
4     Q.  Is this 1 in 8,000 risk an acceptable
5 cancer risk to you as a physician?
6     MR. STOY:  Object to the form.
7     THE WITNESS:  I'm not sure what you mean.
8     MR. STOY:  I'm sorry.  I just want to add
9 an objection to the extent it's outside the scope
10 of -- of Dr. Chan's report.
11     Go ahead.  I'm sorry.
12     THE WITNESS:  Right.  I'm not sure what
13 you mean by "acceptable cancer risk," and I'm
14 commenting on this not as a physician per se, but in
15 my analysis of what organizations like the USPSTF
16 and NCI have -- what types of risk factors have made
17 it into a guideline.
18     So if you look at Figure 1 and Figure 2 of
19 my report, particularly Figure 2, there are a number
20 of different risk factors that are associated with
21 all of these nine cancers.  And in my report, I talk
22 about the magnitude of some of these risk factors.
23     Some of these risk factors are quite --
24 much higher than the 1 in 8,000 for NDMA and 1 in --
25 did I say 18,000 for NDEA.  And that is the basis of

Page 112

1 my saying that the R or the threshold is quite high.
2         If you look at the risk factors that make
3 it into a screening guideline, as I read, there are
4 a number of different criteria that need to be met
5 and one of those criteria include a high risk of
6 cancer.
7 BY MR. MIGLIACCIO:
8     Q.  And is your opinion, is that 1 in 8,000 is
9 not a high risk of cancer?
10     A.  I think compared to some of the other
11 risks that I mention in my report it's much lower.
12     Q.  Where do you draw the line as a high risk
13 or low risk, what is the -- what is the numerical
14 threshold?  Do you have one?
15     A.  I'm not sure if I can say precisely where
16 it is, but I can say that 1 in 8,000 is an order or
17 two of magnitude lower than some of the other risks
18 that we have and many of these other risks don't
19 make it into broad population guidelines.
20     Q.  What other risks that we have are you
21 referring to?
22     A.  Yeah, it's in my report.  If I can refer
23 to that.
24         For example, radiation, I think is one
25 thing that I do mention in my report.

Page 113

1         Yes, so I believe this is in figure --
2 this is in Figure 2 and paragraph 42 of my report.
3         The risk for lung cancer including one
4 first degree family member affects -- so family
5 history, you know, you have, like, a relative risk
6 of 2.59 -- 57.  You have radiation therapy at
7 relative risk of two.
8         And if you convert these to number of
9 people you would need to screen to get one cancer,
10 they would be much higher than the number that I
11 just cited for NDMA and NDEA.
12         The relative risk for lung cancer of 8
13 of -- of a 20- to 30-pack history of smoking is 8 --
14 8.2.  So that's substantially even higher than the
15 other relative risk that I just cited.
16         And if you convert these to number of
17 people you would need to screen to find one patient
18 with a -- who truly has the cancer they would be
19 much, much -- much lower than you would need for
20 NDMA and NDEA.
21     Q.  What is the type of -- of screening that's
22 done for lung cancer?
23     A.  I believe that's in my report.  That
24 should be in Figure 3.
25         So in Figure 3, there are a number of

---

Page 114

1  different potential options and the one that is
2  recommended is low-dose CT scan currently.
3      Q.  And as you testified earlier, that may
4  have a higher radiation dosage than a regular x-ray?
5      A.  Higher, correct.
6      Q.  Higher.  Got it.
7          So that there is, in your opinion, a
8  certain degree of risk that is associated with a
9  low-dose CT scan?
10     A.  Right.
11     Q.  Got it.
12         I see in paragraph 42, you cite to
13 epidemiology studies in footnotes 59 and 60.
14     A.  Uh-huh.
15     Q.  But you have not done so with respect to
16 NDMA, you have not looked at the -- right, at least
17 I don't see the citations for the -- for
18 epidemiology studies and relative risk associated
19 with NDMA.  Or if I am missing something you can
20 point it to me.
21     MR. STOY:  Object to the form.  Object to
22 the extent it mischaracterizes the report.
23         Go ahead.
24         THE WITNESS:  The report does cite the FDA
25 calculation for the number of additional cases of

---

Page 115

1  cancer potentially in -- you know, with the highest
2  dose of NDMA and NDEA.  And that I think can be
3  converted to a relative risk.  I'm not sure if in
4  the report we've done that, but it could be -- it
5  could certainly be converted to a relative risk.
6  BY MR. MIGLIACCIO:
7      Q.  Fair to say, though, the sole basis for
8  your opinion, then, on the -- I'll -- what I'll say
9  is your view that there's a low relative risk, and
10 you can tell me if I'm wrong about that, is the FDA
11 citation that you give here; is that fair?
12     A.  I don't think it's the sole basis.  There
13 are other sources that I do cite that are even --
14 that have a lower to potential -- other sources
15 don't demonstrate a risk of cancer in humans to --
16 you know, based on on NDMA or NDEA, and I believe
17 I've cited one of those sources.
18         So I think there's a range of potential
19 linkages between NDMA and NDEA to cancer, in
20 particular, valsartan -- affected valsartan to
21 cancer.  As I said earlier, causation is not, you
22 know, my -- my main area of focus here.
23         But the magnitude of any potential linkage
24 is relevant to my opinions and that's where I
25 believe the FDA estimate of the linkage is perhaps

---

Page 116

1  the most conservative in the sense that they are
2  considering the highest dose of NDMA and NDEA and
3  over a long period of time.
4      Q.  And you haven't looked at this, though, to
5  offer that opinion, where -- this is like ancillary
6  to -- to your opinion?
7      A.  This is --
8          MR. STOY:  Object -- hang on, Doctor.
9          Object to the form of the question to the
10 extent it mischaracterizes.
11         Go ahead.
12         THE WITNESS:  I would characterize this as
13 this is an input into my opinion in the sense that
14 I've looked at a range of sources that have various
15 linkages between NDMA and affected valsartan to
16 cancer.  Some of which are no linkage.
17         And if I take the most conservative
18 estimate, meaning the highest risk, and compare that
19 to some of the other risks that I list in
20 paragraph 42 and Figure 2, that linkage between NDMA
21 and NDEA and kind of more importantly the linkage
22 between affected valsartan and cancer is low.
23 BY MR. MIGLIACCIO:
24     Q.  And, you know, to be clear, you have not
25 looked at any of the other plaintiffs' expert

---

Page 117

1  reports other than the ones we have discussed
2  already today?
3      A.  Correct.
4      Q.  So the threshold that you're identifying,
5  I see that you cite to paragraph 40 in -- you cite
6  in paragraph 35 to a study or an article in
7  footnote 47.
8          Do you see that?  By Vearrier and
9  Greenberg?
10     A.  Correct.
11     Q.  That -- that's the sole citation you have
12 for that -- that sentence that you read to me
13 earlier about what USPSTF recommendations are based
14 on, right?
15     A.  That is the only citation in that
16 footnote, but I don't think it's -- it's not really
17 the only source that I have for that statement.  In
18 fact, that might be a -- you know, this -- this
19 citation is about the implementation of medical
20 monitoring programs following potentially hazardous
21 exposures, a medical-legal perspective, this seems
22 like it's a comment -- it's a perspective in a
23 framework on how we should think about medical
24 monitoring programs.
25         But there -- if you read all of the USPSTF

---

Confidential Information - Subject to Protective Order

---

Page 118

1  recommendations, which are in separate cites, I
2  don't kind of list them as cites for that particular
3  sentence, but they could very well be related.  If
4  you read any of those USPSTF recommendations, they
5  do walk you through a way of thinking about this
6  framework.
7      Q.  So fair to say there is -- you don't
8  have -- or you're not offering a numerical
9  threshold -- or you're not offering an opinion that
10 there is a numerical threshold, but you just, you
11 know, add as to whether a monitoring program would
12 be appropriate?
13     A.  I think based on the sentence that I read
14 in paragraph 35, this is a multidimensional
15 consideration.  It can -- it depends on a number of
16 different considerations and therefore, if it
17 depends on all of these things, it shouldn't -- one
18 threshold, it wouldn't be a single scale or
19 threshold based on the risk of cancer.
20     That's one important consideration, but
21 there are other considerations that I just read from
22 that sentence.
23     Q.  Uh-huh.  So when you talk about threshold,
24 you say "a high threshold," you know, I think you
25 used that terminology maybe once, twice, three times

---

Page 119

1  in the report.  That's -- what you're referring to
2  is this paragraph?
3      A.  What I -- yeah, when I say "threshold" I
4  don't mean a single number that is -- maps to the
5  risk of cancer.  What I mean is a decision-making
6  threshold that considers a number of different
7  factors and a lot of these factors are
8  individualized for a clinician to reach a
9  decision-making threshold for a given patient.
10     And there's a separate threshold that you
11 might make for a guideline to screen a population of
12 asymptomatic patients and this would also similarly
13 consider a number of different factors here that I
14 just read.
15     Q.  And that's -- that second threshold is the
16 one that I -- I was talking about.
17     A.  Right.
18     Q.  And that's what I think you're referring
19 to in your report for -- for the guidelines?
20     A.  Correct.
21     Q.  Going back to paragraph, I think 32, and I
22 think I asked you about the -- the types of -- the
23 screening guidelines that you have cited elsewhere
24 in your report and -- and you've referred to a broad
25 population of asymptomatic patients.

---

Page 120

1      Does that mean a group of people who are
2  not at increased risk, excluding of course the
3  smokers that we've talked about?
4      A.  No.  I think by definition, any population
5  that you're going to specify screening for has to be
6  at increased risk.  What I mean by asymptomatic
7  means that they don't have symptoms.
8      So if you are talking about lung cancer,
9  they don't have a cough that you want to kind of
10 evaluate further.  If you're talking about colon
11 cancer they don't have abdominal pain.  They don't
12 have symptoms, but they could be at increased risk.
13     Q.  What are the increased risks that are --
14 that are found in the broad asymptomatic population?
15     A.  I believe that's in Figure 2.
16     Q.  Okay.
17     A.  Figure 2, I list the number of different
18 risk factors for each type of cancer in the last
19 column, Figure 2.
20     Q.  Colorectal.  And we've discussed this
21 already, colorectal and lung, there are these
22 additional screening guidelines for people at
23 increased risk, right?
24     A.  There are guidelines to screen certain
25 populations based on age in the setting of

---

Page 121

1  colorectal cancer, and based on age and smoking
2  history in the setting of lung cancer.
3      Q.  Got it.
4      Those are used to define populations for
5  an asymptomatic testing but -- and in -- correct?
6      A.  I'm sorry?
7      Q.  I said those are used to define the
8  populations for asymptomatic testing?
9      A.  Those are used to -- correct.  Correct.
10     Q.  Would you agree that blood tests and stool
11 tests proposed by Dr. Kaplan are not highly
12 invasive?
13     MR. STOY:  Object to the form.
14     Go ahead.
15     THE WITNESS:  Do you want to define
16 "invasive"?
17 BY MR. MIGLIACCIO:
18     Q.  Yeah, I mean, I think you talk about the
19 risks that certain test -- tests may -- may have for
20 people.  And I think you said physical risks
21 earlier?
22     A.  Right.
23     Q.  I think you talk about risks.  Do blood
24 tests or stool tests present physical risks to
25 patients?

---

Confidential Information - Subject to Protective Order

---

Page 122

1    A.  They don't -- you're right that they don't
2  present physical risks.  The physical risks would be
3  quite minor.  But they are not great tests.  And if
4  you look at Figure 3, you'll see that there's really
5  not a recommendation to use many blood tests in most
6  cases.
7        And even for stool tests, you know, a lot
8  of people have colonoscopies rather than fecal --
9  what are called blood -- you know, basically stool
10 tests for colon cancer.
11       So what I also talk about in my report is
12 not just the risk of a physical harm from the
13 screening procedure, it is the risk of getting a
14 false positive and false negative.
15       And if you use tests with lower
16 sensitivity or specificity to screen in a population
17 that is not at particularly high risk for the
18 cancer, you're at risk for getting false positives
19 and false negatives, and that can harm the patient.
20 There are ways in which that can set the patient
21 down a path that would be harmful.
22    Q.  You talk about scrutiny-dependant cancers.
23 I think in paragraph 53.
24    A.  Uh-huh.
25    Q.  And I think you reference four cancers:

Page 123

1  prostate, breast, thyroid, and lung.
2        Do you see that?
3    A.  Yes.
4    Q.  Do you understand that there are nine
5  cancers that Dr. Kaplan has offered an opinion about
6  in this case?
7    A.  Yes.
8    Q.  Okay.  Are you offering the opinion that
9  the following cancers are what you'd call
10 scrutiny-dependent:  liver, stomach, colorectal,
11 intestinal, esophageal, bladder, pancreatic, and
12 blood?
13    A.  These -- what I cite as scrutiny-dependent
14 cancers in this paragraph are examples.  I haven't
15 ruled out the possibility that other cancers could
16 also be scrutiny-dependent.
17       Whether a cancer is scrutiny-dependant or
18 not depends on the technology that we have.  It may
19 not be scrutiny-dependant now but it could be
20 scrutiny-dependent later.  It depends on the -- of
21 course the nature of the cancer, but also the nature
22 of treatment that we have available for that cancer.
23       So what makes it scrutiny-dependent is
24 that our technology to detect the cancer, if we look
25 hard enough, has gotten better.  But our technology

Page 124

1  to treat the cancer has not necessarily gotten
2  better.  And the underlying nature of the cancer
3  when it is, you know, newly detectable may not imply
4  anything toward quality of life or for life
5  expectancy.
6        So the definition of scrutiny-dependent
7  could change over time depending on the technology
8  to screen and the technology to treat.
9    Q.  Got it.
10       Do you have any evidence, though, or any
11 opinion right now that any of those seven cancers I
12 just detailed are scrutiny-dependent?
13    A.  I haven't thought hard enough -- haven't
14 thought about it long enough at this point.  I could
15 return to that at some later point but at this
16 moment of the deposition, I can't offer an opinion
17 on that.
18    Q.  Got it.
19       Is there any way for a physician to know
20 that a certain cancer when caught very early, let's
21 say prostate cancer, I'm just giving an example --
22    A.  Uh-huh.
23    Q.  -- you know if it's caught very early, if
24 it is going to be aggressive or if it is not going
25 to be aggressive?

Page 125

1    A.  I think there are ways to have an educated
2  guess.  Not being an oncologist myself so I don't
3  consider myself an expert on prostate cancer, but
4  I'm -- know more about prostate cancer than the
5  average person.
6        There are ways where you could consider
7  epidemiology, what happens to the average patient
8  that you diagnose with prostate cancer with a given
9  PSA test, for example.  And is there variation when
10 you have a given PSA test.  That kind of -- and
11 reflects on the quality of the PSA test, which we
12 know to be not great.  When you have patients who
13 can have the same PSA test but have -- you know, a
14 test could be neither sensitive nor specific if like
15 the test -- knowing the test doesn't give you that
16 much information.
17       So, again, you can know the general
18 epidemiology of what happens for a patient with
19 these given characteristics and their diagnosis with
20 prostate cancer.  You could also ask what happens
21 when you have additional clinical information such
22 as the PSA test and what that means for the
23 possibilities of whether that cancer is going to be
24 aggressive or not.
25    Q.  But I think you said it would be an

Confidential Information – Subject to Protective Order

Page 126

1 educated guess, really, there's not a way to know
2 whether?
3    A.  We -- we --
4    Q.  -- it's aggressive or not?
5    A.  It's -- it's kind of a spectrum.  We
6 wouldn't know in general with certainty.  But we
7 would have an educated guess and sometimes we would
8 know more and sometimes we would know less.
9    Q.  Uh-huh.  So from the time, let's say, a
10 prostate cancer is -- it's diagnosed, right, by a --
11 by a biopsy, right?  Am I wrong about that?
12    A.  You know more -- you know the most about
13 it, yes, after you've actually taken tissue out and
14 you've kind of looked at that tissue with -- with
15 pathology.
16    Q.  Right.  That's -- is that when the
17 prostate cancer diagnosis is made or is it made
18 based on PSA levels?
19    A.  It would require tissue to diagnose
20 prostate cancer.
21    Q.  So if you do -- if you take a tissue
22 pathology of prostate cancer, can you know with the
23 result of that pathology report whether it's an
24 aggressive cancer or not?
25    A.  It would give you more information.  I --

Page 127

1 again, that would depend on the characteristics of
2 the pathology test.  And the pathology test is
3 probably the best you can know up until that point
4 without kind of foresight into the future.
5       But I would have to review the
6 characteristics of the pathology test and the
7 epidemiology associated with different histologies
8 that you might find on the pathology test.
9    Q.  So fair to say that without foresight in
10 the future you're not going to know the answer, I
11 mean, and nobody has a crystal ball with that
12 foresight to know if -- if that particular tissue
13 biopsy represents an aggressive or less aggressive
14 form of prostate cancer?
15    A.  I think it's fair to say we don't know
16 with a hundred percent certainty.  But I -- I would
17 have to review the evidence to tell you how much
18 uncertainty there is with a tissue biopsy.
19    Q.  How much uncertainty as to?
20    A.  The aggressiveness of the cancer or the
21 life expectancy --
22    Q.  Got it.
23    A.  -- of the patient.
24    Q.  Got it.  Got it.
25       Is that something that you have done in

Page 128

1 your -- I mean, have you studied tissue biopsies of
2 cancers or is this something that you're -- kind of
3 have more general expertise in?
4    A.  This is something as a hospitalist I'm
5 familiar with how patient care, the process of
6 patient care involves tissue biopsy in order to
7 prognosticate and in order to make treatment
8 decisions and in order to diagnose.
9    Q.  Got it.
10       It's not something that you do as -- on
11 a -- on a regular basis?
12    A.  I don't -- if you could clarify what you
13 mean by what I do, so I don't -- I'm not a
14 pathologist.  I'm a hospitalist.
15       As a hospitalist you do kind of make plans
16 to get a biopsy and do -- use the results of the
17 biopsy for decisions.  You often do this in concert
18 with other experts such as oncologists.  So I -- I'm
19 familiar with how they're used with the caveats that
20 I just told you.
21    Q.  Got it.
22       I think, you know, I've asked you and
23 you've told me now several times about, you know,
24 general causation or lack thereof with respect to
25 your opinion.

Page 129

1       I want to ask you about the -- the -- the
2 threshold that the plaintiffs have placed in their
3 class definition.
4       Have you -- have you reviewed that
5 threshold, lifetime cumulative threshold that's in
6 the third amended complaint?
7       MR. STOY:  Object to the form.
8       THE WITNESS:  Have I reviewed the
9 threshold, is your question?
10 BY MR. MIGLIACCIO:
11    Q.  Yes.  Yep.
12    A.  I'm familiar with the statement of some
13 threshold in the acronym lifetime -- LCT, lifetime
14 cumulative threshold.
15    Q.  Got it.
16       Are you offering any opinions with respect
17 to that threshold?
18       MR. STOY:  Object to the form.
19 BY MR. MIGLIACCIO:
20    Q.  Or LCT?
21    A.  I'm offering opinions on whether that
22 threshold is feasible to assess.
23    Q.  In what -- in what way?
24    A.  In the sense that in my report I describe
25 a number of different sources of cancer, a number of

Page 130

1 different sources of nitrosamines, not just affected
2 valsartan, but potentially other drugs and other
3 dietary sources, and endogenous production of
4 nitrosamines.
5        And in my report an opinion of mine is
6 that it would be difficult to assess whether
7 somebody has passed the lifetime cumulative
8 threshold. Aside from the question of whether the
9 lifetime cumulative threshold is actually a valid
10 concept.
11    Q. Do you understand that the lifetime
12 cumulative threshold set forth by the plaintiffs
13 defines a risk or exposure floor?
14        MR. STOY: Object to the form to the
15 extent it assumes facts not on the record.
16        Go ahead.
17        THE WITNESS: Frank, I can barely hear
18 you.
19        MR. STOY: I'm sorry.
20        I made an objection to form to the extent
21 it assumes facts not on the record. I'll speak up.
22        THE WITNESS: Okay.
23        And, Nick, can I hear you ask the question
24 again?
25

Page 131

1 BY MR. MIGLIACCIO:
2    Q. Yes.
3        I mean, do you understand that the
4 lifetime cumulative threshold set forth by the
5 plaintiffs defines a risk or exposure floor, that
6 it's a floor?
7    A. I'm not sure I understand that because,
8 again, I'm not an expert on causation. But if it's
9 possible that nitrosamines don't cause cancer, then
10 I'm not sure how it would set a floor unless if the
11 floor includes zero.
12    Q. Got it.
13        And if it's possible, let's just say
14 for -- hypothetically, for your purposes, I guess,
15 that nitrosamines do cause cancer and that the --
16 the threshold and the system, the scoring system set
17 forth by the plaintiffs details how much nitrosamine
18 is in a particular dosage, would -- then would you
19 understand that -- that it would set a floor?
20        MR. STOY: Objection. Incomplete
21 hypothetical.
22        Go ahead.
23        THE WITNESS: I'm not sure how that would
24 be done. If -- first you -- as you say, you would
25 need to say that nitrosamines do cause cancer. If

Page 132

1 we haven't answered that yet, then I'm not sure how
2 we even know a lower bound on the -- on the causal
3 effect of nitrosamines on cancer.
4 BY MR. MIGLIACCIO:
5    Q. I -- I was asking you to assume that. But
6 that -- that's -- I'm asking you to make that
7 assumption.
8    A. Okay. Sure.
9    Q. Yeah.
10        Then do you understand that it would set
11 a -- a floor, an -- a floor, a risk floor?
12        MR. STOY: Same objections.
13        THE WITNESS: Well, under the assumption
14 that we have a lower bound, then by construction it
15 does set a floor.
16 BY MR. MIGLIACCIO:
17    Q. Got it.
18        How -- I want to ask you some questions
19 about pricing, which I -- I think you detailed
20 elsewhere in -- in your report. I think you use an
21 example of Massachusetts General as one of the
22 hospitals. I think Dr. Song might be associated
23 with Massachusetts General.
24    A. We all love MGH.
25    Q. Yeah. Yeah, yeah.

Page 133

1        Do you know Dr. Song?
2    A. I -- I do.
3    Q. You do. Yeah.
4    A. Yeah.
5    Q. Yeah, I can't imagine there are that many
6 MD-Ph.D. experts out there in the world. Probably a
7 very small number, I guess.
8    A. Yeah. I think less than 20 probably.
9    Q. Wow, wow, wow.
10        So my question about MGH, I mean, is it
11 fair to say that MGH has a -- has a lot of market
12 power?
13        MR. STOY: Object to the form.
14        THE WITNESS: I'm not sure exactly how I
15 would characterize it, but I know that MGH has been
16 involved in litigation regarding its market power.
17 BY MR. MIGLIACCIO:
18    Q. Okay. Did you have any involvement in
19 that?
20    A. No.
21    Q. Let me -- I mean, I think we've taken a
22 break. I'm not -- I do want to go back to one of
23 the -- you know, I want to about explore a little
24 bit more this question of -- of your -- your
25 testimony in the -- in the -- in the opioid

Page 134

1 litigation.
2        You know, Frank can obviously object if --
3 as -- as necessary, but I did want to see if you
4 could testify more about, you know, the subject
5 about -- you know, the subject matter in a general
6 matter.
7        A.  More about what?  Sorry?
8        Q.  The subject matter of that litigation in
9 a -- in a general matter, if you could give us that
10 in -- in a general matter without divulging any
11 confidential information?
12        MR. STOY:  I -- I think the challenge
13 there, Nick, is with a question that he might
14 not be comfortable answering it because he's not
15 sure where those lines are, right.
16        MR. MIGLIACCIO:  Uh-huh.
17        MR. STOY:  A more specific question he
18 might be able to give you a specific answer.
19        MR. MIGLIACCIO:  Well, how -- let me try
20 to -- I'll try to narrower it down a little bit.
21        Q.  Can you tell us how the testimony in those
22 cases is similar to the testimony you're offering
23 here?
24        A.  Sort of -- like thematically, is that --
25 is that your question?

Page 135

1        Q.  Thematically or subject matter.  You know,
2 is the subject matter similar.  Both of those
3 questions, thematically and subject matter.
4        MR. STOY:  Dr. Chan, if you can ask -- if
5 you can answer that question from a high level, I
6 think it's okay.  So that would be my instruction to
7 you.
8        THE WITNESS:  From a high level, I am
9 relying on my expertise as an economist, as a
10 clinician, and as somebody who is familiar with
11 health policy.
12 BY MR. MIGLIACCIO:
13        Q.  Do -- can -- did those other cases, do
14 they involve class action claims?
15        A.  No.
16        Q.  There are transcripts of those
17 depositions, is that right, the ones that you
18 took -- that you gave?
19        THE WITNESS:  Sorry.  Go -- go ahead,
20 Frank.
21        MR. STOY:  No, you can answer that.  Go
22 ahead.
23        THE WITNESS:  I don't know if the
24 transcripts are public, in the public domain.
25        MR. STOY:  He just asked you if

Page 136

1 transcripts exist.
2        THE WITNESS:  Oh.
3 BY MR. MIGLIACCIO:
4        Q.  That's what I'm asking.
5        A.  Yeah.  Yeah, transcripts exist.
6        Q.  They do exist, okay.
7        And do you know, are they -- do you know
8 if they are marked confidential or not in their
9 entirety?
10        A.  I don't know.
11        Q.  Okay.  Got it.
12        Is that litigation currently ongoing?  Can
13 you answer that question?
14        A.  I am not sure.  I think so.
15        Q.  Okay.  I'm not -- I don't want to ask you
16 anything about it.  Just if it -- okay.  Okay.
17        So going back to -- to this question on,
18 you know, Massachusetts General's market power or --
19 or -- you know, is it fair to say that the prices in
20 one area of the country can, you know, differ in --
21 for instance, Massachusetts General may have high
22 prices, but if you go to rural western Massachusetts
23 the prices would be lower, of medical care, medical
24 services?
25        A.  It's fair to say that prices differ a lot

Page 137

1 across different hospitals and different payors.  I
2 am not sure if your prediction is true where
3 Massachusetts General would necessarily have higher
4 prices than western Massachusetts.
5        And I think part of the analyses that I
6 lay out is not just to show the average price of
7 Massachusetts General Hospital but that even within
8 the same hospital, there is wide variation across
9 different payors.
10        Q.  Uh-huh.  And you know about that wide
11 variation, right?  I mean, you -- you have data that
12 demonstrates it?
13        A.  Correct.
14        Q.  So is it fair to say that that variation
15 is knowable?
16        MR. STOY:  Object to the form.
17        THE WITNESS:  Some of the variation's
18 knowable.  With respect to this class, it's likely
19 that we might not know as researchers or as, you
20 know, using publicly available data, what the
21 relevant price would be for the members of the
22 class.
23 BY MR. MIGLIACCIO:
24        Q.  You're talking about the proposed class
25 here in this case?

Page 138

1    A.   Correct.
2    Q.   And you know -- I mean, you know, you
3  understand that this class has not been finally
4  certified yet, right?
5    A.   Correct.
6    Q.   So there -- it's not -- you know,
7  there's -- there is not yet a defined class and the
8  definition could potentially be different than the
9  way it is presently, correct?
10    A.   Correct.
11        The reason I answered the question that
12  way is because what we know about Massachusetts
13  General Hospital -- first of all, this is a recent
14  development within the year that we required
15  hospitals to be more transparent about their prices.
16  There is still uncertainty about whether there's
17  full transparency about the prices and furthermore,
18  we only know prices in the hospital setting.  We
19  don't know prices in the outpatient setting.  So
20  there is still big gaps in what we know.
21    Q.   Tell me about this recent development that
22  just happened with respect to -- that you just
23  referenced.
24    A.   I believe that in the last year or so the
25  government mandated hospitals to be more transparent

Page 139

1  with their prices and the reason it did that was
2  because it was well known that there was a lot of
3  intransparency in what prices would be if a patient
4  kind of walked into the emergency department at
5  Massachusetts General and got a procedure, there
6  could be tenfold, maybe even a hundredfold
7  difference in kind of prices depending on where they
8  went and what provider -- what insurer they had.
9        There was just huge amount of
10  intransparency and uncertainty from patients'
11  perspectives.  The government decided to make that a
12  priority and it started with hospitals, for
13  hospitals to make prices more transparent.
14    Q.   This was legislation, right, like federal
15  legislation?
16    A.   I don't know if it's legislation or an
17  executive order.
18    Q.   Okay.  And are you talking about -- I
19  mean, I've heard of something called surprise
20  billing.  Is that related to -- to what you're
21  talking about now?
22    A.   It's potentially -- it's related.  It's
23  not exactly the same.  Surprise billing is another
24  whole level of complexity where somebody can go to
25  the hospital and they could be in network for

Page 140

1  certain services but out of network for other
2  services because the hospital might employ different
3  people and they might not know what prices they're
4  going to get.
5        So I think surprise billing is
6  specifically about the question about whether
7  they're in -- whether they're in network or out of
8  network, and there could be huge differences in
9  prices faced that are unexpected by patients as a
10  result of that.
11    Q.   Got it.  Got it.
12        So you think that the government --
13  that -- that the government has started with
14  hospitals as -- as -- as a first priority, but it
15  may not have moved to outpatient procedures yet?
16    A.   It has not.  It has not moved to
17  outpatient procedures.
18    Q.   It has not.
19        And do you know when of if it will move to
20  outpatient procedures?
21    A.   I don't.  It's -- I was -- we, you know, I
22  don't think most people saw that the Trump
23  Administration would make price transparency a
24  priority and now we might have other priorities and
25  it's unclear.

Page 141

1        They've been intransparent for decades.
2  They suddenly became transparent in this one kind of
3  sector of the healthcare industry.  Who knows what's
4  going to happen in the future.
5    Q.   When did this happen, like when did the --
6  just January 1 of this year?
7    A.   Within the year, within 2020 -- or
8  actually, 2021.  I'm not -- I would have to review
9  the dates of this.
10    Q.   Sure.
11        And -- and you think it was an executive
12  order that did it?
13    A.   It -- it could have been an executive
14  order.
15    Q.   Okay.
16    A.   I'm not sure.
17    Q.   Got it.
18        Yeah, I -- I won't hold you to it.  We
19  could look at it and figure it out exactly if
20  necessary.
21    A.   Yes.
22    Q.   How does that change or -- your analysis
23  in your report or does it because since this sector
24  now has great -- great transparency?
25        MR. STOY:  Object to the form.

Page 142

1    THE WITNESS: I -- I don't know if I'd
2 characterize it as great transparency. Again,
3 it's -- it's a part of the healthcare -- it's a --
4 it's a sub -- subset of providers that work in
5 hospitals that are now required to disclose prices
6 with various insurers. We don't know whether this
7 information is accurate yet. It's only been out
8 there for a little while.
9    There is a vast majority -- there's a lot
10 of other places that patients get care, most of the
11 time in outpatient settings, that we still don't
12 know what those prices are.
13 BY MR. MIGLIACCIO:
14    Q. Are you doing any research into this, like
15 is this part of your academic research?
16    A. This is not -- it's not currently a part
17 of my research agenda. It's certainly within my
18 scope of expertise, and I could become interested in
19 it at some later point.
20    Q. Yeah. Has -- have the -- has the first
21 dataset become available?
22    A. They are available on the -- on -- I
23 believe they're -- they're required to make the
24 datasets available. If you look at, for example,
25 figure -- where I have like the prices at

Page 143

1 Massachusetts General --
2    Q. Uh-huh.
3    A. -- there is a note that tells you where to
4 download those data.
5    Q. Uh-huh.
6    A. So Figure 8 is where you would look for
7 MGH. And I would imagine that other hospitals have
8 other sites where you could download their data.
9    Q. Got it.
10    So you got this from that -- from that
11 database?
12    A. Correct.
13    Q. That's where this came from. Got it.
14    And had it relates to -- and so the --
15 the -- the CPT HCPS -- HP -- HCPCS code --
16    A. You can call it -- you can call it
17 "hick-picks."
18    Q. "Hick-picks"? Did I say that right?
19    A. Yes.
20    Q. "Hick-picks." Got it. Okay. Thanks.
21    Those codes, so these would be procedures
22 that were done inpatient; is that right?
23    A. These are procedures --
24    Q. Oh, outpatient. Outpatient. Sorry.
25    A. Right. They're outpatient but they're

Page 144

1 done by a hospital. So it's, for example, a clinic
2 that is associated with MGH.
3    Q. Okay. So -- so I'm in Washington, D.C.
4 And I'm just going to, you know, give you a -- like
5 an example of how it is here.
6    MedStar is a big hospital system in the
7 Washington, D.C. area.
8    A. Uh-huh.
9    Q. And if you go to a physician -- as an
10 outpatient, there are many physicians now, it seems
11 to me, that are like the MedStar, you know, office
12 of a certain specialty, but they're an outpatient
13 clinic.
14    Does Massachusetts General have outpatient
15 clinics that do things like urinalysis,
16 colonoscopies, et cetera?
17    A. Yes.
18    Q. Okay. And they're like branded as
19 Massachusetts General, you know, GI specialists?
20 I'm giving a hypothetical, fictional example, but is
21 that a realistic sort of thing?
22    A. That -- that possibility does -- does
23 exist where --
24    Q. Okay.
25    A. -- there's a clinic that is I believe

Page 145

1 owned by MGH and submits claims under the
2 Massachusetts General Hospital tax ID, there are
3 examples of that.
4    Q. Okay. And so the pricing of all these
5 clinics -- or of that particular hypothetical,
6 fictional, potentially, you know, fictional clinic,
7 would be transparent now in this matter?
8    MR. STOY: Object to the form to the
9 extent it misstates his prior testimony. Objection.
10 Incomplete hypothetical.
11    THE WITNESS: You want to restate your
12 question? You had a lot of fictional, hypothetical
13 in there.
14 BY MR. MIGLIACCIO:
15    Q. Sure.
16    I mean, so let's say there's an MGH
17 outpatient clinic that does colonoscopies. The
18 prices of those colonoscopies are now going to be
19 known?
20    MR. STOY: Object to the form. Same
21 objection.
22    THE WITNESS: It's unclear whether we
23 actually do know the prices.
24    I also want to say that we -- I'm not sure
25 if we know all of the -- you know, it's -- it's

Page 146

1 helpful to circle back to this class, and I believe
2 the class are the patients here.
3        So we would be interested in what the
4 patients would pay, not necessarily the price that
5 the provider is getting.  I don't know if we know
6 all of the details of the insurance contract.  I
7 know that this price transparency, it could be
8 limited to just the price that the provider is
9 getting between the provider and the insurance
10 company.
11        It does not give you information on cost
12 sharing in this insurance contract between the
13 patient and the -- and -- and the insurer.  And as I
14 just mentioned, we don't know the quality of this
15 data yet.  These data yet.
16 BY MR. MIGLIACCIO:
17    Q.  But you've used it in your report, at
18 least in Figure 8?
19    A.  Yes.  Because we can see that even if the
20 quality was off, even if we didn't have the price
21 exactly right, it does show quite a bit of
22 variation.  And that variation is illustrative.
23 There's other sources of research out there even
24 before this price transparency.
25        This, you know, within the last year that

Page 147

1 has demonstrated large variation in prices within
2 insurer, within provider, kind of looking at the
3 intersection between providers and insurers.  It's
4 a -- it's a -- it's a research finding as of five,
5 six years ago that there is huge variation in price
6 across different private insurers and private -- and
7 providers.
8    Q.  How -- do you know if there has been any
9 research done to determine whether the price --
10 pricing data is -- is inaccurate?
11        MR. STOY:  Object to the form.
12        THE WITNESS:  This is something that
13 people are currently looking at.  I think it's still
14 pretty new for us to know.
15 BY MR. MIGLIACCIO:
16    Q.  It's required by federal law, right, and
17 this is not something that's being done voluntary, I
18 imagine?
19    A.  That's right.  This new -- at least what I
20 just -- by it, what I just discussed about hospitals
21 publishing data on prices for various procedures and
22 various payors.
23    Q.  I'm looking at footnote 207 of your
24 report.  Can you --
25    A.  Okay.

Page 148

1    Q.  It's on page 69.
2    A.  Uh-huh.
3    Q.  Is that the announcement of this --
4 this -- this new transparency requirement?
5    A.  Possibly.  Although this is a little bit
6 earlier than I thought it would be.
7    Q.  Okay.  Yeah, that's why I was asking
8 because I don't know.
9    A.  It's possible.
10    Q.  All right.  Got it.  Okay.  I mean --
11 yeah.
12        Do you -- with respect to -- to the --
13 this issue that you just raised of pricing the --
14 the split between what the patient pays and what the
15 insurer pays, do you understand that Dr. Song's
16 report focuses on estimating total price, not just
17 the patient's share of the price?
18    A.  That was a little confusing to me, as I
19 understood the complaint to be the -- to be the cost
20 that the patient would bear, not total price.  But I
21 did notice that in Dr. Song's report he didn't delve
22 into issues of cost sharing.
23    Q.  So would -- would -- would it change your
24 opinion now if you understood that he is only
25 focusing on estimating the total price and not just

Page 149

1 the payment -- patient share of the price?
2    A.  I understand what he's doing, but my
3 understanding of the class is that we are interested
4 in what patients would bear.  So I was a bit
5 confused.  It seemed to me that that was an omission
6 in the analysis that he did.
7    Q.  Is it fair to say that the total price is
8 the more appropriate measure for the burden borne by
9 society for -- for testing?
10        MR. STOY:  Object to the form.
11        THE WITNESS:  I think that would be a much
12 more complicated question.  The burden borne by
13 society.  I don't think that total price is a good
14 measure of that either because that includes profits
15 by hospitals and like charges versus what they
16 actually get after negotiations.  There is just a
17 lot of additional complexity there.  I think burden
18 borne to society would have to be better defined.
19 BY MR. MIGLIACCIO:
20    Q.  All right.  I'll give you some -- just
21 some -- I'll set this up with some hypothetical
22 questions for you.
23        Let's say there is a person at risk of
24 developing cancer, you know, as a result of a
25 medication contaminated with a carcinogen, right.

Confidential Information - Subject to Protective Order

1 Let -- let's assume all those things are -- are
2 true.  There's somebody who took a -- you know,
3 ingested a carcinogen and they are at a risk -- a
4 higher risk of developing cancer.
5         Can -- do you follow that?
6     A.  Yes.
7     Q.  Okay.  Who in society should bear the
8 burden for screening that person for cancer risks?
9         MR. STOY:  Objection.  Incomplete
10 hypothetical.  Objection to the extent it calls for
11 a legal conclusion.
12        You can go ahead.
13        THE WITNESS:  Your question is who -- if
14 there is a pill that somebody ingested that puts
15 them at higher risk for cancer, who should be
16 responsible for bearing that burden?
17        I don't think that's within the scope of
18 my report.  I don't know if that's within my
19 expertise to say who should be responsible for that.
20 BY MR. MIGLIACCIO:
21    Q.  As a healthcare economist, what -- does
22 your research focus or include expertise on who
23 should pay what in -- in the healthcare system?
24        MR. STOY:  Object to the form.
25        THE WITNESS:  No.  By "should," do you

1 mean some normative sense of who bears
2 responsibility, who should -- as an economist, I
3 think that would take a lot of careful thinking.  We
4 might have the tools to consider that but I wouldn't
5 have the tools to think about it right off the bat
6 on this call.
7        We often -- it depends on contracts.  It
8 depends on the legal system.  We use -- we are quite
9 familiar with contracts and who does pay the burden
10 and we might compare different contracting
11 arrangements and compare which one is better in
12 terms of welfare for society.  But those would be
13 complicated analyses that would take deeper thought.
14 BY MR. MIGLIACCIO:
15    Q.  In the current regime we have in this
16 country for healthcare -- for healthcare generally,
17 who pays for healthcare for an -- an average person?
18 Maybe that -- maybe that's too difficult for you --
19 you know, a hypothetical person, let's give it a
20 hypothetical person.
21        MR. STOY:  Object to the form.
22        THE WITNESS:  Yeah.
23        MR. STOY:  Objection.  Incomplete
24 hypothetical.
25        (Whereupon, a brief discussion off the

1 record.)
2        THE WITNESS:  I was -- I was starting the
3 shortest answer is that it's complicated.  It
4 depends on the person.  It changes year to year
5 depending on healthcare reform or not.  There are
6 just so many variables to consider here I don't
7 think I could give you an answer that would fit
8 within my seven hours probably.
9 BY MR. MIGLIACCIO:
10    Q.  Yeah.  Let me try to -- let me try to put
11 some specificity around this and see if we can fit
12 within the seven hours.
13        Medicare.  Who -- who -- who's eligible in
14 this country?
15    A.  Broadly speaking, there are two types of
16 people that are eligible for Medicare.  People that
17 are above 65 and people with some disability.  There
18 are also special populations such as people that
19 have renal failure and get dialysis.
20    Q.  Let's say somebody's over the age of 65,
21 right, they're eligible for Medicare.
22        Who pays for Medicare for that person who
23 is eligible for it?
24    A.  There are several levels to this.
25 Medicare is a government program so the government

1 runs -- the government funds Medicare through
2 taxpayer dollars.  There are -- again, I could give
3 you a longer answer, but I think the shorter answer
4 is that it's a government-run program that is funded
5 by taxpayer dollars and administered by private
6 contractors.
7        So who pays, it could be like any of
8 those, it could be the taxpayers, it could be the
9 government, or it could be the private contractors
10 that administer Medicare in different jurisdictions.
11    Q.  Where does the money ultimately come from?
12        MR. STOY:  Object to the form.
13 BY MR. MIGLIACCIO:
14    Q.  For that person's healthcare?
15    A.  As I said, it -- you know, one way to
16 trace it back is, you know, taxpayers fund the
17 Medicare program.
18    Q.  Yeah.  Got it.
19        So if there is a person -- strike that.
20        I'll -- I'll ask it a different way.
21        Have you done any research into -- I think
22 you were -- you had talked about the research you've
23 done with diagnoses and trying -- and I don't want
24 to misstate it.  What was that research again?
25    A.  It was research on the diagnostic process,

Confidential Information - Subject to Protective Order

1 the -- yeah, I think I would just succinctly sum it
2 up as the research on the diagnostic process.
3      Q.   And then that related to Afib, right,
4 atrial fibrillation, or was that a different?
5      A.   The guidelines research is related to
6 atrial fibrillation.
7      Q.   Got it.
8           What are the --
9      A.   Go ahead.
10      Q.   What -- what are the risks associated with
11 some -- with -- with an individual or a patient
12 population who does not get timely treatment for
13 atrial fibrillation?
14           MR. STOY:  Object to the form.
15           THE WITNESS:  Your question was whether --
16 what are the risks for patients that don't get
17 timely treatment for atrial fibrillation.
18           I think this is actually -- so I was going
19 to say that my research on diagnoses is not
20 necessarily the research on atrial fibrillation.
21 The research on atrial fibrillation is my research
22 on guidelines.  Timeliness of diagnosis is not
23 really an issue with atrial fibrillation.
24           Atrial fibrillation's a chronic condition.
25 Most people have it, you know, by the time they're

1 very old.  And the question here is how you should
2 treat atrial fibrillation, not whether you should
3 diagnose it or how do you diagnose it.
4 BY MR. MIGLIACCIO:
5      Q.   Got it.
6           The research you did on diagnoses, were
7 those for any particular disease?  Did they focus on
8 anything specific?
9      A.   The research is motivated very broadly.
10 The paper where I dig into a specific clinical
11 setting in depth is in the presentation of patients
12 in the emergency department with potential
13 pneumonia.
14      Q.   And what was your conclusion there?
15      A.   That there are real possibilities of
16 Type I and Type II error in the diagnosis process.
17 That there are questions about how many people we
18 should diagnose or not.
19           But more importantly, there are questions
20 about diagnostic accuracy.  You could diagnose the
21 same number of people but have a much higher
22 accuracy in doing so.  And that the diagnostic
23 process is not just a simple test like a chest x-ray
24 but it also involves human interpretation and
25 involves a system of care that could be prone to

1 error.
2      Q.   Got it.
3           With respect to pricing, is it fair to say
4 that industry and government agencies use averages
5 for pricing certain things?  I'll say, for instance,
6 gasoline?
7           MR. STOY:  Object to the form.  Objection
8 beyond -- to the extent it's beyond the scope.
9           THE WITNESS:  Do you want to be more
10 specific about how they use the averages?
11 BY MR. MIGLIACCIO:
12      Q.   Well, even if there is variation in the
13 real world, I mean, doesn't -- can't you determine
14 the average price of gasoline?
15      A.   I think the question is whether the
16 average price of gasoline, in this case the average
17 price of a service used in screening, is the
18 relevant object.
19           Of course you can calculate an average but
20 the question you should ask is whether it's the
21 right average for the right patient population and
22 whether it's the only thing that matters.
23           Obviously, we -- we measure standard
24 deviation in variants in a lot of settings because
25 we care about variation.  So the question is not

1 whether we can measure an average, but it's whether
2 that average is the right measure for what we want
3 to do.
4      Q.   Uh-huh.  You use averages in your own
5 work; isn't that fair to say?
6           MR. STOY:  Object to the form.
7           THE WITNESS:  Again, the question is what
8 average am I using.  You know, if you're using an
9 average in your research paper, you have to defend
10 that that's the right average, that that's the
11 average that we care about.  And you -- if you're
12 not, you should expect pushback from your peers
13 about whether you're using the right average or not.
14 BY MR. MIGLIACCIO:
15      Q.   Can you give me some examples of where
16 you've used an average and where you've had pushback
17 and where you've defended it?
18           MR. STOY:  Object to the form.  Objection.
19 Beyond the scope of his report.
20           THE WITNESS:  I can't remember the last
21 time I personally got pushback, but I could imagine
22 getting pushback if you are saying that you're
23 interested in one patient population and you're
24 giving the average for another patient population.
25

Confidential Information - Subject to Protective Order

Page 158

BY MR. MIGLIACCIO:

Q.   Got it.

So like two distinct patient populations. What would be an example of like one patient population and an average for a different one?  Can you -- can you give me one?

A.   Yes, I think in this case it would be the average -- if you're using the average price -- the private insurance price for some general patient population that isn't well defined and you're applying that to the patients that took at-issue valsartan.  Those would be two different patient populations.

Q.   I think you stated in your report that the -- when you looked at some of the data, that you saw the average age of a valsartan -- of somebody who took one of the valsartan-containing drugs was 63 years old.

Do you remember that?

A.   Yes, I do.  I would have to look...

Q.   Yeah, I'll -- I see that.

MR. STOY:  And, Nick, while he's looking --

MR. MIGLIACCIO:  Yeah.

MR. STOY:  -- we're coming up on noon

Page 159

Dr. Chan's time so just --

MR. MIGLIACCIO:  Yeah.

MR. STOY:  -- keep that in mind.

MR. MIGLIACCIO:  Sure.  Are you hungry, Dr. Chan, if you want to eat something, please just say the word because I was starving before and I don't want you --

THE WITNESS:  I could -- I could certainly eat, yeah.  I could definitely eat.

MR. MIGLIACCIO:  Please do.  We could take -- we could take a break.

THE WITNESS:  Okay.

MR. MIGLIACCIO:  Yeah.

THE WITNESS:  You want to do 30 minutes?

MR. MIGLIACCIO:  That's fine with me.

MR. STOY:  Will that be okay with the overall time constraints, Nick?

MR. MIGLIACCIO:  I think so.  I -- I really -- I do.  And I'm -- because I think even from now we have like five hours and I think --

MS. HILTON:  Can we go off the record?

THE VIDEOGRAPHER:  We're off the record at 11:56 a.m. Pacific time.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  We are back on the

Page 160

record.  The time is 12:36 p.m.

BY MR. MIGLIACCIO:

Q.   All right.  Dr. Chan, I want to ask you a few questions.

I want to go back to paragraph 42 briefly of your report.  And you have -- I think you detail Figure 2 and discuss risk factors for specific populations.

A.   Okay.

Q.   I think I'm going to read the last sentence of paragraph 42 which states, "Even with these substantial relative risks, again, only age and smoking history are used to define the specific population recommended for colorectal and lung cancer screening."

Did you detail the relative risk of age for colorectal cancer in this paragraph?

A.   Not in this in paragraph.  It might be detailed somewhere else in the report, but I can't find it right now.

Q.   Okay.  All right.

Yeah, well I couldn't find it either so, you know, I -- if we have more time I might ask you to look and see or at least tell me where it can be found.

Page 161

A.   Yeah.

Q.   Because I did not see it myself.

But in the meantime, I will go back and ask you some other questions.

We were talking, I think, before the break about pricing of medical services and -- you know, I want to ask you about Dr. Song.  If you would agree that he's qualified to offer the opinions that he has offered?

MR. STOY:  Object to the form.  Objection to the extent it calls for a legal conclusion with regard to qualifying Dr. Song as an expert.

THE WITNESS:  Yeah, I'm not sure if I can qualify -- I'm qualified to assess whether he's qualified.

BY MR. MIGLIACCIO:

Q.   Would you agree he's well respected in the field?

MR. STOY:  Object to form.

THE WITNESS:  I'm -- I'm not sure how to characterize that.  I know him.

BY MR. MIGLIACCIO:

Q.   Okay.  Have you ever cited his work in any of your own publications?

A.   I'm not sure if I have.

Confidential Information Subject to Protective Order

---

Page 162

1    Q.  Would you agree that the publications that
2  Dr. Song relied upon are well accepted and
3  peer-reviewed in his report?
4        MR. STOY:  Object to the form.
5        THE WITNESS:  I'm not sure -- can you
6  restate that again?
7  BY MR. MIGLIACCIO:
8    Q.  Yeah.
9        Would you agree that the publications that
10  Dr. Song relied upon in his report, and I know
11  you've reviewed it for purposes of yours, would you
12  agree that the publications that he relied upon are
13  well accepted and peer-reviewed?
14        MR. STOY:  Objection to form.
15        THE WITNESS:  I don't remember going over
16  his -- the sources that he relied upon in detail.
17  And I'm not sure how I would characterize whether a
18  publication is well accepted or not.
19  BY MR. MIGLIACCIO:
20    Q.  What do you recall of the -- of the
21  publications that Dr. Song relied upon?
22    A.  I don't recall much.  I would have to look
23  at his report again to refresh my memory.
24    Q.  Okay.  I can -- I think we have that.
25  Let's -- let's go get that.  Bear with me.  I can

---

Page 163

1  try to pull that up for you.  I'm going to try to
2  make this work on my end.  So I won't -- I'll move
3  on to something while -- while I'm trying to do
4  that.
5        I'm going to ask you about some of -- of
6  your own publications.  And I think I -- we had
7  discussed before the break that it's -- the average
8  age of a valsartan user was 63 years old.  I think
9  we -- you -- that's what you detailed in your
10  report, right?
11    A.  Yeah, I would need to look at the relevant
12  paragraph, but that sounds right, yep.
13    Q.  Which paragraph was that?
14    A.  I see something in paragraph 65.  Is that
15  what you're referring to or...
16    Q.  I think that that is what I was referring
17  to.
18    A.  Okay.
19    Q.  It looks to me that you -- that that data
20  was based on data that you -- 63.3 years old, right?
21  And this data was pulled in 2018; is that right?
22    A.  Where do you see that it was pulled in
23  2018?
24    Q.  I'm going to believe that is what I have.
25  I'm going to try to find a citation for you.  I seem

---

Page 164

1  to have lost it for the time being.
2        But would you agree with me that if --
3  that if the average age of a valsartan user is 63,
4  and for us, and here, that the class concludes
5  several years ago, in 2018, would you agree that
6  this class, the proposed class that we have defined,
7  the majority of the class would be -- would be on
8  Medicare?  Can you agree with that, if the age
9  was -- is 63 years old, the average age?
10        MR. STOY:  Objection.  Form.  Incomplete
11  hypothetical.
12        THE WITNESS:  I'm not sure if I can agree
13  with that.  I think we could probably look at that
14  in more detail.  But just based on these facts
15  alone, I'm not sure if that necessarily leads to
16  that conclusion.
17  BY MR. MIGLIACCIO:
18    Q.  What data did you rely upon to determine
19  that the average age of a valsartan user was
20  63.3 years old?
21    A.  I believe what is cited in that sentence
22  comes from another study.
23    Q.  Okay.
24    A.  In footnote number 87.
25    Q.  Uh-huh.

---

Page 165

1    A.  And I think that would be -- it might have
2  been some summary statistics calculated in that
3  study.
4    Q.  Got it.
5        Do you know if that was a meta-analysis,
6  that study?
7    A.  It might have -- it likely drew from other
8  previous studies.
9    Q.  Got it.  Got it.
10        I'm going to show you, if I can now,
11  Dr. Song's report.  And hopefully I'll be able to
12  bring it into your folder here.
13        MR. MIGLIACCIO:  This will be Exhibit 4.
14        (Whereupon, Chan Exhibit 4 was marked for
15  identification.)
16  BY MR. MIGLIACCIO:
17    Q.  Once I rename it.
18    A.  Okay.
19    Q.  You should have it now, hopefully.
20    A.  Yes.
21    Q.  Okay.  So I had asked you about the
22  publications that he uses and used in his -- in
23  his -- in his report.  I wanted to know if they were
24  authoritative, well accepted or peer-reviewed, but I
25  want -- you know, I know you've looked at this in

---

Page 166

1 detail and it's, you know, fairly lengthy but I
2 wanted to ask you if anything here jumps out at you
3 as -- as being none of those things, any of the
4 sources he cites?
5     A.  Are you asking me to refer to the
6 materials relied upon for him?
7     Q.  Right.
8        MR. STOY:  I'm just going to put an
9 objection on the record to -- I mean, there's over a
10 hundred cites here, so...
11       THE WITNESS:  Yeah, I'm not sure if I'll
12 be able to look through this and pull out any
13 sources that don't meet those criteria.  There's
14 certainly some of these that are not peer-reviewed.
15       And I'm not sure what you mean by
16 authoritative and well accepted still.  It's
17 something could be very appropriate for one purpose
18 but not very appropriate for the purposes that we
19 require in this case.
20       We might have a -- an article that is very
21 appropriate when it describes the ratio of prices
22 between private insurance and Medicare for that
23 audience but would not be appropriate if we're
24 trying to apply it to this case.  So what you mean
25 by well accepted and authoritative is -- depends on

Page 167

1 what you're using it for.
2 BY MR. MIGLIACCIO:
3     Q.  Okay.  Let me restate my question.
4     A.  Okay.
5     Q.  You -- you -- you reviewed his report in
6 detail, right, in -- before you offered your
7 opinions?
8     A.  I reviewed his report.  I am not sure what
9 you mean by "in detail."  I have the hours that I
10 reported in terms of how long I spent on reading his
11 report.
12    Q.  You did not in your report that -- the
13 document that you've produced, you did not identify
14 any publications that Dr. Song relied upon that, in
15 your mind, were suspect, did you?
16       MR. STOY:  Objection.  Form.
17       THE WITNESS:  Not specific sources that I
18 thought were suspect.
19 BY MR. MIGLIACCIO:
20    Q.  Okay.
21    A.  But, again, some of these sources are fine
22 for one purpose but not fine for the purposes that
23 we need in this case and I think in my report I do
24 describe those.
25    Q.  Which sources, and can you point me to

Page 168

1 those specifically?
2     A.  I'm not sure which paragraph I mentioned
3 this.  But I think it gets to the point of averages
4 for a different patient population are not the
5 averages that we want here.  This has to do with
6 needing to know how various quantities that we care
7 about, such as prices or such as what services are
8 going to be used, how they might correlate with
9 patient characteristics in patients who might be in
10 a class, and whether those data to come up with
11 those averages even exists anywhere that anybody
12 could use to calculate the relevant average.
13    Q.  Can you direct me to that, to that portion
14 of your report?
15    A.  Sure.  Let's see.  Let me go back to my
16 report.  Now it's kind of hard -- which exhibit is
17 it, is my report?
18    Q.  Yeah, I'm sorry, I renamed them.  I
19 believe it's Exhibit 2.
20    A.  2.  Okay.  Let's see.
21       I think paragraph 100 speaks a little to
22 this.
23       When you say something is correlated with
24 something else, then you can't just calculate the
25 average of that something else without knowing what

Page 169

1 you're conditioning on in the first place.  So if
2 something is correlated that means the average that
3 you care about might change if you switch
4 populations.
5     Q.  And, again, you -- you -- you do know that
6 this population has not been determined with
7 finality, right?
8     A.  Right.  But I know that it would likely be
9 different than the sources that Dr. Song is relying
10 upon and I also think that it wouldn't be feasible
11 even to measure that with the data that we have.
12    Q.  Well, why do you think it would not be
13 feasible?
14    A.  Because the data have not been made
15 public.
16    Q.  Which data have not been made public?
17    A.  Many of the pricing data have not been
18 made public and how that correlates with individual
19 characteristics of patients that would determine
20 what services we need to recommend for the medical
21 monitoring program.  The cost sharing agreements in
22 these contracts are not public.  There are a number
23 of different components to evaluating spending that
24 would not be public.
25    Q.  Isn't it fair to say, though, that you

Confidential Information Subject to Protective Order

Page 170

1 know, the government knows how much it spends
2 annually on -- on Medicare?
3      A.  That, again, is an average.
4      Q.  Uh-huh.
5      A.  That's an overall -- that's an average for
6 how much it's spending for the entire population of
7 Medicare patients.  So there's two problems with
8 that.  Number one, there could be patients in the
9 class that are not Medicare patients.  And number
10 two, there are Medicare patients that aren't in our
11 class.
12      Q.  Right.  I -- but the government
13 nonetheless can determine how much it spends for
14 the -- for the whole population, right?  I mean,
15 that -- that is --
16      A.  Of patients --
17      Q.  -- that is --
18      A.  Of patients under Medicare.  But, again,
19 that's abstracting away from the possibility that we
20 care about cost sharing, which I'm still not clear
21 about if we're -- it depends on who -- you know, my
22 understanding is that the class is any -- any
23 payments that the patients would have to make for
24 monitoring, not the payor.
25      So first, that's one issue.  And then

Page 171

1 another --
2      Q.  Where do you draw that -- I'm sorry,
3 Doctor, to interrupt you.
4      But where do you draw that -- how -- how
5 did you come across that assumption?  Where -- where
6 do you -- where do you draw that assumption from?
7      A.  I think that would be -- I think I
8 discussed this in my -- my assignment and my
9 understanding of the complaint.
10      Q.  Okay.
11      A.  Let's see.
12      So in paragraph 8, it says, "The proposed
13 medical monitoring class consists of individuals
14 'who consumed a sufficiently high Lifetime
15 Cumulative Threshold of NDMA, NDEA, or other
16 nitrosamine, in generic valsartan-containing drugs
17 manufactured by or for Defendants.'"
18      So the -- the class are the individuals
19 who consumed this.  It's not named that the
20 third-party payors are in that class.  This is in
21 contrast to the other class of economic loss where
22 the third-party payors are included in that class.
23      And that's in paragraph 9.
24      Q.  So that -- that is how you have reached
25 that conclusion, that is how you -- you have that

Page 172

1 assumption, right?
2      A.  That's my understanding of the complaint.
3      Q.  Did anybody provide that understanding to
4 you or did you just -- is that your understanding,
5 sitting here with your own interpretation?
6      A.  That's my understanding after having read
7 the complaint and bringing this up with the
8 attorneys involved in the case.
9      Q.  And if you read the beginning portion of
10 paragraph 8, "In regards to the proposed medical
11 monitoring class, I further understand that, among
12 the remedies requested, Plaintiffs seek" -- you
13 know, quote -- "'seek injunctive and monetary
14 relief, including creation of a fund to finance
15 independent medical monitoring services.'"
16      Where do you -- or do you see within that
17 language any implication with respect to cost
18 sharing?
19      A.  It just reads to -- it read to me that the
20 class for medical monitoring were patients, and
21 third-party payors were explicitly not included.
22 They were not named in that class.  And that is
23 contrast with the second class of economic loss
24 where third party payors are explicitly named.
25      Q.  So that's the basis for your -- for that

Page 173

1 assumption and that conclusion?
2      A.  Correct.
3      Q.  And you're not -- not a lawyer, right?
4      A.  No.
5      Q.  Okay.  And this -- this -- this assumption
6 was also provided to you, or in part, by counsel; is
7 that correct?
8      A.  That is --
9      MR. STOY:  Objection.  Asked -- hang on.
10      Objection.  Asked and answered.
11 Objection.  Form.  To the extent it misstates what
12 he previously testified to.
13      THE WITNESS:  Correct.  I previously said
14 that I read the complaint.
15      MR. STOY:  Go ahead.
16      THE WITNESS:  This distinction, I noticed
17 this distinction in the complaint, and I
18 discussed -- I discussed this idea with the lawyers
19 involved in this case.
20 BY MR. MIGLIACCIO:
21      Q.  I see.
22      And is it fair to say that if you -- how
23 many class action complaints have you read?
24      A.  This is my first one.
25      Q.  First one.  Got it.

Page 174

1    Is it fair to say that if you -- if this
2  assumption was incorrect with respect to cost
3  sharing that it would alter your opinions in some
4  fashion?
5    MR. STOY:  Object to the form.
6    THE WITNESS:  I don't know if you want to
7  clarify what you mean by "alter in some fashion,"
8  but there are -- there's a section in my report on
9  cost sharing.
10 BY MR. MIGLIACCIO:
11   Q.  Uh-huh.
12   A.  And that is under the assumption that we
13 are interested in what patients are paying.
14     If we are not interested in what patients
15 are paying and there is some other concept that is
16 not well defined, it would need to be defined first,
17 and it would likely -- it's possible that could lead
18 to other variation that's unaccounted for.
19   Q.  The question of variation of cost sharing,
20 if cost sharing wasn't an issue, there would be no
21 issue with respect to variation of cost sharing,
22 right?
23    MR. STOY:  Object to form.  Incomplete
24 hypothetical.
25    THE WITNESS:  I guess what I'm saying is

Page 175

1  that we need to specify what is the object that we
2  are interested in quantifying.  Even if there is no
3  cost sharing, there's a difference between charges
4  and difference between charges and costs and
5  ultimate amount that's reimbursed plus patient cost
6  sharing.
7     There's many different kind of optics that
8  we could be considering, and we would need to define
9  that first.  And some objects will entail other
10 sources of variation.
11 BY MR. MIGLIACCIO:
12   Q.  But cost sharing would no longer be a
13 source of variation if we're not talking about cost
14 sharing?
15   A.  You're saying but cost sharing would no
16 longer be of interest if we're not talking about
17 cost sharing?
18   Q.  No, would no longer be a source of
19 variation if -- if -- if it's not at issue in this
20 case?
21    MR. STOY:  Objection.  Incomplete
22 hypothetical.
23    Go ahead.
24    THE WITNESS:  If the assumption is that
25 cost sharing is not at issue, then we would not

Page 176

1  consider variation in cost sharing.
2  BY MR. MIGLIACCIO:
3    Q.  Got it.
4      Paragraph 117 in your report, you state
5  that -- let me know when you are there.
6    A.  I'm here.
7    Q.  Yep.  117.
8    A.  Yep.
9    Q.  Yep.  Okay.
10   A.  Yes.
11   Q.  I'm looking for where I -- you state in
12 the middle, "Given the substantial price variation
13 that I summarize above, there is no reason to
14 believe that the average prices experienced by a
15 proposed" -- "proposed class members is the same as
16 the average prices experience" -- "experience by the
17 nation as a whole."
18     I think you just said that earlier.
19   A.  Yeah.
20   Q.  Isn't it fair to say that you have not
21 made an effort to determine the extent to which you
22 say the average prices experienced by proposed class
23 members is the same as the average prices
24 experienced by the nation as a whole?  You haven't
25 tried to -- to determine that?

Page 177

1    A.  In the report I do say how patients
2  take valsartan are different than patients who don't
3  take valsartan.  That is evidence in that direction.
4      But more broadly, in my report, I would
5  say that it would be infeasible to determine the
6  prices for patients in the class as -- for reasons I
7  just told you, including the unavailability of data.
8    Q.  Well, if we take the cost sharing out,
9  which we'll -- we placed aside for these
10 discussions, what other data do you contend is -- is
11 unavailable?
12   A.  Should we also define over what time span
13 this is going to be for?
14   Q.  What -- what time span a medical
15 monitoring program will be for?
16   A.  Right.
17   Q.  Well, I think we can define it within a
18 finite period of time.  We could say one year for --
19 for purposes of our discussion.
20   A.  So you --
21   Q.  I'm -- I'm just -- I'm giving you a
22 hypothetical to say could you determine that for --
23 for one year how much something would cost?
24    MR. STOY:  So you're not -- you're not --
25 that's not a stipulation, huh, Nick?

Confidential Information - Subject to Protective Order

1    MR. MIGLIACCIO:  No, that's a
2 hypothetical.  To aid in the calculations here.
3    THE WITNESS:  So we're not looking into
4 the future by very much.  We're going to restrict
5 patients only to those who have Medicare.
6 BY MR. MIGLIACCIO:
7 Q.  Uh-huh.
8 A.  And we know exactly whether screening is
9 appropriate for every single patient individually,
10 then we could calculate the prices for patients in
11 Medicare for this year.
12 Q.  Got it.
13    Have you made any effort -- you know,
14 since you -- you don't believe that the -- the
15 prices experienced by class members are the same as
16 the prices experienced nationwide, what efforts have
17 you made to determine how far off you believe them
18 to be?
19 A.  I think this is supported by a few
20 analyses in the report.  So it's supported by the
21 fact that patients who take valsartan are different
22 than patients who don't take valsartan.  It's
23 supported by the variation in price among patients
24 seeing the same provider, MGH.
25    It's supported by also variation in price

1 that I -- that I show in other -- other exhibits
2 like figures -- Figure 9, "OptumHealth commercial
3 pricing," variation for the proposed procedures.
4    So if there's variation -- if there's no
5 variation then you would be much more confident that
6 the averages shouldn't differ between groups of
7 patients.  But if there's a lot of variation, that
8 tells you that there's a lot of scope for averages
9 for one population differing from averages for
10 another population.  And that, I think, is enough
11 evidence to show that you could be wildly off.
12 Q.  When you say "wildly off," like, can you
13 ballpark that percentage?
14 A.  Yeah, I mean, I think that's what some of
15 these figures do.  You could be off by a factor of
16 like 400 percent if -- especially if the class is
17 not a big class.
18    If the class is a subset of patients who
19 took at-issue valsartan, it's a small population
20 relative to the entire population.  And therefore,
21 you could be -- you could be in the 5th percentile
22 or in the 95th percentile and the difference between
23 the 5th and the 95th percentile for one given
24 provider is 400 percent.
25 Q.  How do you define like a -- "not a big

1 class"?
2 A.  So, for example, 5th percentile means
3 5 percent of the population is -- is, you know, at
4 the 5th percentile or below.  Or 95th percentile is
5 5 percent of the population is at or above this
6 price.
7    So if you have a class that's 5 percent of
8 the population you could be as unlucky to get
9 something that's 400 percent off if you compare the
10 5th to the 95th percentile.
11 Q.  When we're talking about the size of the
12 class, how do you mean in terms of a small class, a
13 big class, what do you mean by that?
14 A.  So -- so kind of implicit in my previous
15 answer is you would ask how many people are in this
16 class and how many people are in the overall
17 population of the nation.  That's one way of asking
18 that.
19    Or if you are -- even if under the
20 assumption that all members of the class -- you were
21 able to measure prices for some bigger sub -- bigger
22 set of people that include everybody in this set,
23 included people in the class, which I don't think is
24 true, you could use that bigger population.
25    So in our previous example where we're

1 only talking about the Medicare patients, we would
2 look at Medicare patients and we'd ask how big is
3 Medicare patients relative to the size of our class.
4 Q.  And what are your -- do you have
5 assumptions with respect to the size of the class
6 here?
7 A.  No.
8 Q.  You have no assumptions?
9 A.  No.
10 Q.  Okay.
11 A.  I mean, I -- I -- I have some intuition
12 that it's not going to be 50 percent of the U.S.
13 population.
14 Q.  But no assumption on -- on -- on the size,
15 the number, the -- the -- you know, how many people
16 other than that intuition?
17 A.  I haven't -- yeah, I haven't -- no.
18 Q.  Have you asked for that information?
19 A.  I so far have not asked for that
20 information, but I think that would be relevant for
21 moving forward.  I wouldn't -- you know, I would
22 reserve the right to look at that in the future.
23 Q.  Got it.
24    So for calculating the prices as we just
25 went through that hypothetical, in a limited

Confidential Information - Subject to Protective Order

Page 182

1  fashion, that we -- that we could calculate the
2  prices for -- for patients in Medicare for a year,
3  could you calculate that for two years?
4      A.  So I say in my report the farther into the
5  future that you get, the more uncertain this is
6  going to be.
7      Q.  Yeah.
8      A.  It's going to be more uncertain for
9  private insurance than for Medicare, but even within
10  Medicare, the Medicare budget changes every year,
11  the conversion factor between RVUs and dollars could
12  change and does change every year.
13      The geographic price indices between
14  different regions in the country, that changes.  It
15  could change quite drastically.  For example, Alaska
16  doubled in one year.
17      So the farther that you move out, even
18  within Medicare, there would be more uncertainty on
19  prices alone.
20      But I think the bigger point, this might
21  not be -- this is kind of a combination of both
22  Kaplan and Song, is that we can't evaluate the
23  overall spending for a medical monitoring program
24  only by asking about prices.  We have to ask what
25  are the services that are going to be rendered and

Page 183

1  this -- there's a lot of uncertainty about what
2  those services would be the farther we move out.
3      Q.  So how would -- you know, would it be
4  possible to do two years if you knew what the
5  services are or the menu of service?
6      A.  I said it's -- it's possible, but it
7  becomes more uncertain.
8      Q.  Okay.
9      A.  Moving from one year to two years.
10      Q.  How about three years?
11      A.  More uncertain then.
12      Q.  Okay.  So your work in the NBER, do you
13  ever work on budgeting, working in the NBER?
14      A.  The government budget?
15      Q.  Or -- or have you ever dealt with
16  budgeting issues working in that capacity, in -- in
17  that --
18      A.  Can you clarify what you mean by
19  "budgeting issues"?
20      Q.  Where the government, the federal
21  government seeks to budget things out into the
22  future, right, isn't that typically how the federal
23  government works, they have a budget and it -- they
24  have amounts that -- that are -- that are set into
25  the future?

Page 184

1      MR. STOY:  Object to the form.
2      THE WITNESS:  I'm familiar somewhat with
3  how the budget for Medicare has been set.
4  BY MR. MIGLIACCIO:
5      Q.  What -- what is your familiarity with
6  that?
7      A.  So there is some budgeting into the future
8  but this could be changed by Congress any given
9  year.
10      Q.  Uh-huh.  How -- tell me, how is it -- what
11  is your familiarity of how -- how does Medicare get
12  budgeted into the future?
13      A.  It's very complicated.  I know that a lot
14  of it has to do with politics.  I know that one
15  example of this is called a "doc fix" where in order
16  to have a balanced budget there was some promise to
17  eventually lower prices on medical spending for
18  physician services but every year or every couple of
19  years there'd be a delaying of this.
20      So I think there is quite a bit of
21  political influence on what the Medicare budget is.
22  It's not some formula that gets set by something
23  that's free of politics and is kind of -- you know,
24  is -- is -- let to run in some predetermined fashion.
25      Q.  How far out does the Medicare budget get

Page 185

1  set; do you know?
2      A.  I think in -- as I said, in practice, it
3  could change in a year.
4      Q.  Uh-huh.
5      A.  So by definition it's not in practice set
6  in stone.
7      Q.  And is it determined annually, on an
8  annual basis?
9      A.  I think it could change at any point.
10      Q.  The government knows how much it spends on
11  Medicare for a given year, right?
12      MR. STOY:  Objection.  Asked and answered.
13      THE WITNESS:  For -- for a given year, I
14  believe the government could track down how much it
15  spent on Medicare.
16  BY MR. MIGLIACCIO:
17      Q.  Do you believe -- you know, is it your
18  opinion that for one price to be representative of
19  another, they would need to be the same?
20      A.  Say that again.
21      Q.  Is it your opinion that for one price to
22  be representative of another, they would need to be
23  the same?
24      A.  For one price to be representative of
25  another price, the two prices would have to be the

Confidential Information - Subject to Protective Order

Page 186

1  same?

2  Q.  Yes.  That -- that's what I'm asking you.

3  A.  I'm not sure what I -- I'm not -- I'm not

4  sure I understand that question.  Sorry.

5  Q.  So if you were to -- if you were to

6  attempt to estimate the prices for a -- patient

7  population, would you -- you would look at

8  representative prices, right; is that something that

9  you would do?

10      MR. STOY:  Objection.  Incomplete

11  hypothetical.

12      THE WITNESS:  What do you mean by

13  "representative prices"?

14  BY MR. MIGLIACCIO:

15  Q.  You would look at average prices?

16  A.  Average prices.  I'm not sure -- yeah, I'm

17  not sure I understand, like -- ultimately, what we

18  want to do is to be able to quantify total spending.

19  I'm not sure what we mean by "average prices."

20      Like, is there some weighting to the

21  prices?  The average prices alone don't -- some

22  unweighted version of average prices is not going to

23  tell you how much we are going to spend in a medical

24  monitoring program.

25  Q.  I'm going to direct you to paragraph 117.

Page 187

1  You can tell me when you are there.

2  A.  Yes.

3  Q.  Yeah.  I mean, you discuss Dr. Song's

4  proposed estimates.

5  A.  Uh-huh.

6  Q.  Based on national averages and -- and you

7  say, "not average prices specific to members of the

8  proposed class."

9  A.  Uh-huh.

10  Q.  And you say, "Given the substantial price

11  variation that I summarize above, there is no reason

12  to believe that the average price" -- "prices

13  experienced by proposed class members is the same as

14  the average prices experience by the nation as a

15  whole."

16  A.  Uh-huh.

17  Q.  So my question to you is, that given that

18  you don't believe the prices experienced by class

19  members are the same as the prices --

20  A.  Uh-huh.

21  Q.  -- experienced nationwide, what efforts

22  have you made to determine how far off they are,

23  like how far off do they vary?

24  A.  I think as I said before, the analyses

25  that show that the class members -- or people that

Page 188

1  take valsartan are different than people who don't

2  take valsartan and that prices vary in several of

3  the analyses that I do within Optum or within MGH

4  suggests that they could vary quite a bit.

5  Q.  They could.  But -- but have you

6  determined that they do?

7  A.  I think my level of certainty is quite

8  high that they do vary.  I haven't seen any evidence

9  to suggest that they would be the same.

10  Q.  So how much do they vary?

11  A.  In order to -- in order to do this you

12  would have to first specify the class, right?

13  Q.  Right.  And the class has not yet been

14  determined.

15  A.  Right.

16  Q.  Class hasn't been certified.  So have

17  you --

18  A.  But I can tell you that --

19      MR. STOY:  Hang on, Dr. Chan.  I don't

20  think there was a question pending.

21  BY MR. MIGLIACCIO:

22  Q.  So have you determined, then, how much

23  they vary here?

24      MR. STOY:  Objection.  Asked and answered.

25      THE WITNESS:  If there's no class, then I

Page 189

1  wouldn't be able to -- and I think this is part of

2  the problem of -- of defining a class.  First you

3  would need to know who -- you would need to define

4  the class in order to ask whether it's feasible

5  to -- to the class would of course have to be captured

6  by either a -- fully captured by Medicare data or

7  fully captured by sources of data that are publicly

8  available in order for you to ask how would the

9  prices differ for members of the class versus

10  other -- other patients.

11      What we can do is that we know that

12  patients who take valsartan are different than

13  patients who don't take valsartan.  That's a

14  starting point.  That would suggest that these

15  patients are -- there's no reason why you would

16  think that -- so patients who take valsartan have,

17  you know, hypertension.  They have heart failure.

18      And those by construction, like the fact

19  that they take valsartan implies certain medical

20  conditions that other patients don't have.  You

21  would expect that patients that have certain medical

22  conditions to have different forms of insurance.

23      And if you have different forms of

24  insurance, you would expect that the prices should

25  be different for those patients than for patients

Confidential Information Subject to Protective Order

Page 190

1  who don't take valsartan.
2  BY MR. MIGLIACCIO:
3      Q.  If we disregard the cost sharing, right,
4  that -- that -- that different forms of insurance
5  issue falls away, right?
6      A.  No.  If you are saying, you know, some
7  patients might be more likely to be covered under
8  the VA or some patients might be more likely to have
9  private insurance, again it all depends on what
10  object you really want to focus on.
11      Even if you disregard cost sharing and you
12  say it's the object of how much the insurance
13  company pays providers, which I'm not sure is
14  what -- it hasn't been specified exactly what the
15  object should be, but if that is the object, that
16  would depend on whether the patient has private
17  insurance or Medicare or is a patient at the VA.
18      Q.  But, again -- and -- and I -- I mean, I
19  think you've answered this, but I want to make sure
20  that I understand it.
21      You have not made any effort to determine
22  whether prices experienced -- whether the prices for
23  class members would vary by a certain percentage
24  from the national average prices?
25      A.  I just don't have the --

Page 191

1      MR. STOY:  Objection.
2      Hang on.
3      Objection.  Asked and answered.
4      Go ahead.
5      THE WITNESS:  I don't have the data to do
6  that.  You can -- you can demonstrate that patients
7  who take valsartan are different than patients who
8  don't, but I don't have all of their private
9  insurance prices that they are facing, like -- and I
10  don't think anybody has those data.
11  BY MR. MIGLIACCIO:
12      Q.  So -- so you -- you don't have an answer,
13  then.  You don't -- you -- you have not reached
14  the --
15      A.  Yeah.  And I think it's an opinion that
16  it's not really answerable unless you have much more
17  detailed data sources than are publicly able to
18      Q.  Would you agree that Medicare prices are
19  available by geography at the state and local level?
20      A.  Medicare prices are available, yes,
21  Medicare prices are available if you know the
22  provider type and if you know the geography and if
23  you know the service.
24      Q.  Do you -- do you think that the national
25  average prices are useful in your analysis?  Do you

Page 192

1  think there's -- I mean, you point to them.  Do you
2  think there's some -- are -- are they useful for --
3  for your -- for your opinion?
4      A.  I don't think they would -- they're enough
5  for us to estimate how much paying for medical
6  monitoring would be for this class.
7      Q.  But you used them to argue that -- or to
8  opine, rather, that -- that it -- that it can't be
9  estimated; is that right?
10      A.  In some of the stuff that you've read from
11  my report, I say that the national average price is
12  different from -- for the -- different than the
13  price that would be applicable for members of the
14  class.
15      Q.  And -- and you -- you don't have that
16  delta, you don't have that difference?
17      A.  I don't think anybody has that.  And I
18  don't think it would be feasible to calculate it
19  because you can't calculate the price.
20      Q.  Is it fair to say that you can get much
21  more locally accurate commercial-to-Medicare price
22  ratios by using data that show local variations in
23  these ratios?
24      MR. STOY:  Object to form.
25      THE WITNESS:  Can you restate that

Page 193

1  question?
2  BY MR. MIGLIACCIO:
3      Q.  Yeah.
4      Can you get much more locally accurate
5  commercial-to-Medicare price ratios by using data
6  that shows local variations in these ratios?
7      MR. STOY:  Object to form.
8      THE WITNESS:  I think my point is that you
9  actually don't observe the real ratios for many --
10  for -- in many settings and for many providers, for
11  many insurers.
12      We have, like, limited -- we have limited
13  data.  For example, Optum is from a specific class
14  of insurers.  We have hospital prices for certain
15  insurers.  But we don't have the data relevant that
16  we would need for the prices of this medical class.
17  So we wouldn't be able to calculate the ratios.
18  BY MR. MIGLIACCIO:
19      Q.  This is a general question as to whether
20  you can get more locally accurate
21  commercial-to-Medicare price ratios by using data
22  that shows local variation in these ratios?
23      A.  Do the data exist?  Is it available?
24      Q.  Would you agree to that, yes?
25      A.  I don't think the data are available.

Confidential Information - Subject to Protective Order

Page 194

1    Q.  You don't think -- you don't think that
2  there is data that allows you to get much more
3  locally accurate commercial-to-Medicare price
4  ratios, you don't think it exists?
5    A.  I think we could get data that are more
6  locally accurate than the data that Dr. Song relies
7  upon.  But I don't think we have data available to
8  get us what would be the relevant spending for a
9  medical monitoring program for this class that has
10  not yet been specified.
11    Q.  Tell me about the more accurate local
12  data.  Where does that data exist?  Where can you
13  get it?
14    A.  That is quite hypothetical.
15    I -- you know, I think -- what Dr. Song
16  relies upon is -- or at least in his report, is a --
17  to my understanding, it's a paper that measures
18  private insurance prices for some population of
19  patients that's aggregated and compares that with
20  Medicare prices.  So certainly you could do better
21  than that.
22    There are data on private insurance prices
23  that are incomplete.  So, you know, they're
24  incomplete.  They -- they -- they leave out
25  populations of patients.  They're only in certain

Page 195

1  settings.
2    They may or may not have geographic
3  identifiers.  And if you have geographic
4  identifiers, then you could come up with something
5  that is more, in your words, local to a geography.
6  But geography is not the only variation that we need
7  to account for.
8    Q.  When you say certainly you can do better
9  than that, what -- in your last answer, what do you
10  mean by that and how much better could you do?
11    A.  What I mean is that in Dr. Song's
12  methodology he's using a ratio from a paper that is
13  not published for this purpose.  It's some average
14  ratio in some population of patients that is almost
15  certainly different than the population of patients
16  that we care about in this class.  And it's a single
17  ratio.
18    And if you wanted to get more granular,
19  you could look at different locations, if there are
20  geographic identifiers.  And that's what I mean by
21  you could do better.  If you wanted to have
22  something that accounted for geographic variation in
23  the ratios, you could use local prices from -- and
24  private insurance, but those prices would omit, you
25  know, classes of patients that I just mentioned and

Page 196

1  so they wouldn't -- there would be shortcomings
2  there.
3    So -- so there -- there are different
4  dimensions in which prices vary.  Geography is one
5  of them.  And there are others that you might
6  actually be worse.  If you're focusing on, say,
7  Optum data, Optum data are only from a certain class
8  of private insurers.  So you might do worse if you
9  focus only on Optum data.
10    Q.  What would those shortcomings be?  Could
11  you quantify how big they would be?  How big -- how
12  big would we be from the truth?  Like, how far off?
13    A.  I can tell you that there's big variation.
14  If there's big variation that the potential
15  shortcomings could be as large as the variation.
16    Q.  Do you know how -- have you quantified how
17  large the variation could be?
18    A.  It's possible that the variation could be
19  as large as 400 percent.
20    Q.  What is the basis for that opinion?
21    A.  The basis of that opinion is that there's
22  variation between the 5th and the 95th percentile in
23  prices that is as large as 400 percent and if you
24  have a class that is the size that's small enough,
25  say, 5 percent of the population, then you could

Page 197

1  have very unfortunate variation where it's -- you
2  get your 400 percent off.
3    Q.  Isn't it fair to say that most people
4  reside in the center of the histogram and not at the
5  tail ends, at the 5 percent or the 95th percentile?
6    A.  It depends on the population.
7    MR. STOY:  I was going to object to the
8  form.
9    THE WITNESS:  It depends on the
10  population.  If you say do most doctors reside in
11  the center of the overall U.S. population in terms
12  of income, the answer would be no.  Most doctors
13  reside in the top 5 percent.
14  BY MR. MIGLIACCIO:
15    Q.  Right.  And I'm not asking about income
16  but I -- you know, I appreciate that.
17    I'm asking about, you know, healthcare
18  spending or healthcare prices that people -- that
19  would be paid for a person.
20    A.  I think healthcare spending exhibits some
21  of the same properties as income.  So there are big
22  kind of skewed -- they're -- they are not normally
23  distributed actually, the healthcare spending.
24  They're obviously all positives so they're not
25  normally distributed.  They could be log-normally

Confidential Information - Subject to Protective Order

1  distributed.  So there is a possibility that you
2  have skewed distributions and you could have
3  outliers.
4       This is well known, that certain regions
5  in the U.S. spend way more than others.  There
6  are -- there are -- for example, McAllen, Texas,
7  versus San Antonio, Texas.  So there could be -- you
8  could actually have a small population that is in
9  the tails of the distribution.  The tails can be
10  quite large.
11       Q.  Do you have any reason to believe that
12  people who ingested contaminated valsartan are not
13  in the middle of the population?
14       A.  I don't have any reason to believe that
15  they are in the middle of the population because by
16  definition they have -- you know, first of all, we
17  would have to look at where -- who's in the class.
18       I mean -- so if you just say people who
19  take valsartan versus people who don't take
20  valsartan, that's a little bit easier and then you
21  could say are they similar to the average
22  population.  I think probably not.  They have heart
23  failure.  They have hypertension.
24       Are they similar to some population maybe,
25  like you would have to work on specifying that

1  population, but it's not clear to me how you would
2  specify that population that they're similar to.
3       Q.  And -- but you have not done this analysis
4  to determine where a population of people who
5  consumed valsartan-containing drugs, contaminated
6  valsartan, where they would fall, right?
7       A.  Again, I'm not sure if it's feasible to do
8  this analysis if you want to account for private
9  insurance prices and so forth.
10       Q.  But to answer my question, you haven't
11  done it?
12       A.  I have done an analysis to show how
13  patients who take valsartan are different than
14  patients who don't take valsartan.
15       I haven't done an analysis to show what
16  would the average price be for patients who take
17  valsartan compared to patients who don't take
18  valsartan, but I don't think an analysis could be
19  done if you want to account for private insurance
20  prices.
21       Q.  Fair to say that you would have a reason
22  to assume that a -- that -- that our proposed class
23  would be in the middle because that's where most
24  people are, right?  Most people -- isn't that --
25  isn't there the -- most people do just fall into the

1  center of the histogram chart --
2       A.  It depends on --
3       Q.  -- even though --
4       A.  It depends on the population you're
5  talking about.  If you're comparing two populations,
6  there's no guarantee that the most -- by -- it
7  depends on the distribution.  It depends on whether
8  you're talking about one or two populations.  In
9  this case, we're talking about two populations.
10       So you're asking whether most people in
11  one population falls in the center of another
12  population.  There's no reason to believe that.
13       Q.  But there's also no reason to believe they
14  reside in the tail ends, right?
15       A.  I think there's something that
16  distinguishes the population that takes valsartan.
17  They have heart failure.  They have hypertension.
18  There is something that distinguishes them.  And
19  I -- I don't know if most of the population has
20  heart failure.  Probably most of the population
21  doesn't have heart failure.
22       Q.  Does not.  So you're saying --
23       A.  Does not.
24       Q.  -- you have -- you don't think -- but do
25  you -- do you think the majority of the population

1  that takes valsartan has heart failure?
2       A.  I would need to look further into that.
3       Q.  You're not offering that opinion here?
4       A.  I'm not offering that opinion.  I'm just
5  offering the opinion that there are obvious
6  differences between people that take valsartan and
7  people who don't.
8       Some of this is in my report that
9  describes the characteristics of people who take
10  valsartan versus people who don't take valsartan.
11       Q.  How would heart failure impact Medicare
12  costs for -- for the screening services that
13  Dr. Kaplan has detailed in his report?
14       A.  Right.  So as I mentioned in my report,
15  heart failure or just medical comorbidities would
16  impact whether somebody is a candidate for screening
17  or whether somebody has preferences that would make
18  screening make sense.
19       Heart failure is a disease for whom most
20  adults have a relatively limited life expectancy if
21  they have it.  And given that, that would impact the
22  decision for whether somebody should be screened for
23  cancer.
24       Q.  So it would impact -- and your opinion is
25  it impacts the decision of whether screening would

Confidential Information Subject to Protective Order

Page 202

1 need to be done, but it doesn't impact the price,
2 the cost for a fixed service, right?
3      A.  Oh, I see.  For your -- your price --
4      Q.  Yeah.
5      A.  Your question's about price?
6      Q.  Correct.
7      A.  If you have heart failure, that could
8 certainly -- and you don't have Medicare, that could
9 certainly impact the type of insurance that you
10 have.  If you're a sick patient with heart failure
11 versus a healthy patient without heart failure, and
12 you're choosing between private insurance plans, you
13 would pick a different insurance plan if you have
14 heart failure, likely.
15      Q.  Assuming the person is on Medicare?
16      A.  Assuming the person is not on Medicare.
17      Q.  That's your assumption, the person is not
18 on Medicare?
19      A.  Correct.
20      Q.  Got it.
21          But I mean, as we looked at, the average
22 age for a valsartan -- somebody who takes valsartan
23 was 63, right, that was with that -- that 63.3, and
24 the age of Medicare is 65, right?
25      A.  Right.  The -- the age --

Page 203

1      Q.  Eligibility.
2      A.  -- of Medicare eligibility is 65.  If the
3 average age is -- again, I think you asked this
4 question before.
5          If I know the average age is 63, can I say
6 that the majority of patients on valsartan is on
7 Medicare?  And I think I said that I wouldn't be
8 able to automatically reach that conclusion.  It
9 could be -- because you would need to know the
10 entire distribution.
11          Like, for example, if the distribution is
12 a normal distribution, and half the people are above
13 63 and half the people are below 63, you could have
14 close to half of the people not being on Medicare.
15 It all depends on the shape of the distribution, not
16 just the average of the distribution.
17      Q.  If -- if you take away the cost sharing
18 issue that we talked about at some length, right,
19 the fact that somebody may have heart failure or a
20 comorbidity shouldn't impact the cost for a fixed
21 service, right?
22          MR. STOY:  Object to the form.
23          THE WITNESS:  For -- I --
24 BY MR. MIGLIACCIO:
25      Q.  For a screening service.  I'm sorry to

Page 204

1 interrupt you.
2      A.  I think what I was saying earlier is that
3 patients may choose different insurance plans and
4 different insurance plans may have different prices.
5      Q.  And you -- have you done that analysis
6 here to determine what that -- what that
7 differential might be?
8      A.  For MGH in particular, I show that the
9 differential could be quite a bit.
10      Q.  Have you done it for any other hospital
11 system?
12      A.  No, but I think MGH is quite illustrative.
13      Q.  I want to show you some of your -- I think
14 some of your papers.
15          MR. STOY:  Hey, Nick, would this --
16          MR. MIGLIACCIO:  Yeah.
17          MR. STOY:  Would this be a good time to
18 take ten?
19          MR. MIGLIACCIO:  Sure.  Yeah, we can do
20 that.
21          THE VIDEOGRAPHER:  Okay.  We're off the
22 record.  The time is 1:41 p.m. Pacific time.
23          (Whereupon, a brief recess was taken.)
24          THE VIDEOGRAPHER:  We are back on the
25 record.  The time is 1:57 p.m. Pacific time.

Page 205

1 BY MR. MIGLIACCIO:
2      Q.  All right.  Dr. Chan, I want to ask you a
3 few questions about some of your own academic
4 publications.  And I'm going to move into the
5 exhibit -- the file of paper that you have submitted
6 to the New England Journal of Medicine.
7          Here we go.  I can do it.  All right.  I
8 thought I got -- was getting the hang of this.
9 Okay.
10          MR. MIGLIACCIO:  It will be Exhibit 5.
11          (Whereupon, Chan Exhibit 5 was marked for
12 identification.)
13          MR. MIGLIACCIO:  And it is a New England
14 Journal of Medicine document.
15      Q.  Let me know when you have a chance to see
16 it.
17      A.  It's open.
18      Q.  Okay.  Great.
19          So is it -- is it fair to say that you
20 have asserted in your own work the importance of a
21 common methodology when it comes to the pricing of
22 medical services?
23          MR. STOY:  Object to the form.
24          THE WITNESS:  Is there a -- part of this
25 article you'd like to draw my attention to?

Page 206

1 BY MR. MIGLIACCIO:
2    Q.   I'm asking you generally.  I mean, it's --
3 it's a nine-page article.  I'll ask you some
4 specifics, but I -- that's a general question.
5    A.   Can you ask that again?
6    Q.   Sure.
7         Is it fair to say that you have asserted
8 in your own work the importance of a common
9 methodology when it comes to the pricing of medical
10 services?
11        MR. STOY:  Object to the form.
12        THE WITNESS:  I'm not sure.  I...
13 BY MR. MIGLIACCIO:
14    Q.   In this paper, you discuss using median --
15 median time values in defining benchmarks versus
16 mean values.
17        Do you see that in the Discussion section?
18    A.   Uh-huh.
19    Q.   Then you go on to say that you use medians
20 as an alternative, right?
21    A.   Uh-huh.
22    Q.   And you write "average" or "on average"
23 roughly nine times in -- in this study, right?
24         I mean, you can look for it.
25    A.   Right, yep, 9 percent.  Is that right?

Page 207

1    Q.   No.  I said you used the word "average" --
2    A.   Oh.
3    Q.   -- throughout and -- throughout the --
4    A.   Oh, okay.
5    Q.   -- paper.
6    A.   Yeah.  I think -- yeah, go ahead.  Sorry.
7    Q.   Yeah.  And I do see that you -- that --
8 that 9 percent, is that the average that you --
9 you've reached ultimately?
10    A.   No, actually, that paragraph is an example
11 where...
12    Q.   I'm sorry, were you finishing --
13    A.   No, I'm -- I'm reading it.
14    Q.   Okay.
15    A.   Sorry.
16    Q.   Please, no, go ahead.  I didn't mean to --
17 don't mean to interrupt your reading.
18    A.   Yeah, I think that discussion is just
19 saying that there are different ways of -- different
20 moments in a distribution to consider.  Mean is one,
21 or average.  And the other one is median.  And they
22 just tell you different things.
23    Q.   Would you say this emphasis of averaging,
24 the importance of averaging across data points, is
25 it -- is it important in your research?  Do you do

Page 208

1 it a lot?
2    A.   I think this is similar to our previous
3 discussion about the use of averages in research.
4 It -- it's important to use the right averages.
5         In this case, you know, this is not a
6 paper just comparing one average with another
7 average.  It's a paper that is comparing the average
8 for a given procedure in a survey with an average in
9 a nationally representative data source that --
10 or -- sorry.
11         It's -- it's an average in a data source
12 that measures the time of how long this surgery
13 takes, called NSQIP, and we are asking whether these
14 two averages match up.  And this is actually a
15 research finding.  It's not -- it's not -- we're
16 actually asking whether the two averages for a given
17 procedure match up.  It's not -- it's not
18 predetermined that they would match up.
19         So it's -- it's kind of like -- it's a --
20 it's a -- it's a research inquiry to ask whether
21 using this average is representative of another
22 average.  And in this case, these two measures do
23 closely follow each other, but it's not a foregone
24 conclusion that they would.
25    Q.   But it's fair to say that, you know,

Page 209

1 whether -- whether it was right or wrong, right,
2 whether -- whether the -- whether they matched or
3 they didn't, it's a common methodology to average,
4 right?  You used a common methodology, a methodology
5 of averaging to determine if they -- if they would
6 match the national average, right?
7         MR. STOY:  Object to the form.
8         THE WITNESS:  I don't know what you mean
9 by common method -- I mean, I don't...
10 BY MR. MIGLIACCIO:
11    Q.   You used the methodology of averaging,
12 right?
13    A.   Not really.  I don't think that's what
14 we're doing here.
15    Q.   I thought you just told me that you were
16 determining -- you were looking at something
17 national versus another dataset --
18    A.   Uh-huh.
19    Q.   -- and to see if -- if they matched on
20 average?
21    A.   We were asking whether average times for a
22 given procedure matched average survey responses.
23 This is a research question.  It's not a common
24 methodology per se.  I'm not sure what you mean by
25 "common methodology."

Confidential Information - Subject to Protective Order

Page 210

1    Q.  Well, you used -- I mean, you -- you did
2    these calculations to see if -- if -- if they would
3    match, right, that's what you did?
4    A.  That's maybe in one exhibit in this --
5    okay.  There are several exhibits in this -- in this
6    paper.
7         Exhibit 1, Figure 1, asks whether -- this
8    is kind of -- it's kind of most directly related to
9    what you're saying, which is the -- whether the
10   average time that we observe in one dataset matches
11   the average survey in another -- a survey response
12   for the time in another dataset.
13        Now, Figure 2 is doing something very
14   different, which is asking about discrepancy.
15   That's, you know -- and discrepancy that kind of
16   changes over time.  So that's not just comparing
17   averages.
18        Figure 3 is asking about the implications
19   of discrepancy on different surgical specialties
20   such as orthopedic surgery, urology, general
21   surgery, showing that these implications can be
22   large in terms of dollar terms.
23        For example, orthopedic surgery is paid
24   more than $150 million more than what it would get
25   if they had resorted to another measure.  And

Page 211

1    cardiothoracic surgery is paid about $125 million
2    less than it would have been paid if it kind of used
3    another measure.
4         And then Figure 4 is asking whether
5    discrepancies are kind of resolved with
6    re-evaluation.  So it's focusing on the
7    discrepancies.
8         So I don't think this paper, overall, is
9    only about comparing averages.  It's about -- it's
10   much more.
11   Q.  Got it.  I understand.
12        So -- and I appreciate that clarification.
13        But for -- for Figure 1, who did the
14   averaging work?  Was that something that you did or
15   your team did in -- in gathering -- in gathering the
16   dataset and averaging it?
17   A.  I don't know if I would characterize
18   Figure 1 as like a dataset of just doing averaging
19   work.  It's -- this work overall was done by me and
20   my research team.  Some of them are coauthors on
21   this paper.  Others are research assistants.
22   Q.  What was -- what did you do beyond just
23   averaging it?
24   A.  I would say that's just the first step.
25   We need a dataset with -- we chose these averages

Page 212

1    for this one particular exercise.  But as I said, we
2    also could do it in terms of medians instead of
3    averages.
4    Q.  Uh-huh.
5    A.  And in this exercise, it was a regression.
6    So after you have each individual observation, which
7    is a procedure, a surgical procedure is one
8    observation -- or a surgical procedure at a given
9    point in time is one observation.  We have many
10   observations of these.  Then we run a regression
11   that kind of fits a line on these points here.
12   Q.  When you say you could also use the
13   median, what did you do with respect to the median?
14   A.  So instead of using an average time from
15   the NSQIP data we could use the median time.  That's
16   just a different moment in the distribution.
17   Q.  Uh-huh.
18   A.  And so when we do that, I mention
19   discussion that we get a different result if we use
20   the median instead of the average.
21   Q.  Got it.
22        What was -- what's the difference?
23   A.  It's a 9 percent difference in this case.
24   Q.  Between the average and the median?
25   A.  Uh-huh.

Page 213

1    Q.  Got it.  Okay.
2         Who did that work in determining the
3    median information, was that you or --
4    A.  The same research team.
5    Q.  Got it.  Got it.
6         And that's a methodology that you -- that
7    you use frequently determining medians?
8    A.  Often.  Oftentimes the median is a better
9    measure.  If the distribution is skewed, you might
10   want to use the median instead of the average.
11   Q.  Got it.
12        Are there other measures other than median
13   and average that you use --
14   A.  Yes.
15   Q.  -- in analyzing datasets?
16   A.  Quantiles, like I -- like I mentioned in
17   the -- like I use in the report, there's like
18   95th percentile, 5th percentile.  There's a --
19   they're -- those are called quantiles.
20   Q.  Quantiles.
21   A.  And sometimes you kind of work with logs,
22   like log -- logarithmic transformation.  So you
23   might take a mean of the log instead of a -- just
24   the mean.  So you first take a log, logarithm, of
25   the value, then you take the mean.

Page 214

1    Q.   And you use that methodology as well in
2  your work as an economist, as a healthcare
3  economist?
4    A.   Yeah, I'm not sure if I'd call it a
5  methodology.  They're just different kind of ways
6  to -- ways to characterize distributions.
7         Obviously, the most comprehensive way is
8  just to show the entire distribution but you might
9  focus on various moments of the distribution.  You
10 can focus on quantiles and medians, on averages.
11 You might transform the distribution by first
12 applying a logarithm to it, then taking an average.
13 And that's quite different than just taking the
14 average of the underlying distribution.
15        So there are various kind of
16 transformations of the underlying data and there are
17 different ways to characterize distributions.
18   Q.   When you -- if you were to do that,
19 what -- what would -- what does it do to take the --
20 I think you said take a -- first apply a logarithm
21 to it and then take an average?
22   A.   Uh-huh.
23   Q.   What -- what -- can you explain that a
24 little bit more?
25   A.   Many distributions are skewed.  For

Page 215

1  example, income or spending, medical spending.  So
2  it would be quite fragile if you were to actually
3  take an average of the underlying distribution of
4  spending and it would be much more robust if you
5  took a logarithm.
6         What a logarithm does is it transforms a
7  variable that ranges from just above zero to a very
8  large number, to something that's much more well
9  behaved and symmetric -- potentially around zero, so
10 it transform -- it might transform something to a
11 more normal distribution.
12        And that's kind of -- earlier in my
13 deposition I mentioned something called a log-normal
14 distribution.
15   Q.   Uh-huh.
16   A.   That is something that only starts looking
17 like a normal distribution when you take a
18 logarithm.
19   Q.   Got it.
20        You used -- and used that methodology,
21 too, in -- in -- when you create averages?
22   A.   Yeah, again, I'm not sure if I would call
23 it methodology.  It's just a way of transforming --
24 it's -- it's a very basic mathematical operation to
25 transform data into something that more -- is more

Page 216

1  reliable.
2    Q.   Uh-huh.  Got it.  Got it.
3         Let me -- I want to show you something
4  else.  Bear with me.  Okay.
5         I just put in what we'll make as
6  Exhibit 6, which is your -- your national -- your
7  New England Journal of Medicine response letter.  It
8  should be coming up right quickly.
9         (Whereupon, Chan Exhibit 6 was marked for
10 identification.)
11        THE WITNESS:  Yes.
12 BY MR. MIGLIACCIO:
13   Q.   Let me know if you have that.
14   A.   I do.
15   Q.   Okay.  So this study received three formal
16 published critiques in the form of letters to the
17 editor, right?
18   A.   Uh-huh.
19   Q.   And you responded to those critiques,
20 correct?
21   A.   Yes.
22   Q.   Okay.  And I think -- is it fair to say
23 you acknowledged some limitations of the study
24 including some special cases where your methodology
25 was less applicable --

Page 217

1    A.   Uh-huh.
2    Q.   -- but you went on to defend the study by
3  arguing that, and I quote, "Our study goal was to
4  identify and characterize forms of inaccuracy in the
5  RUC's time estimates and develop a general approach
6  for obtaining better estimates.  The crux of that
7  approach is the use of large, longitudinal data
8  sources."
9    A.   Uh-huh.
10   Q.   And, "We welcome debate, reflection, and
11 refinements regarding the most appropriate data
12 sources and estimation techniques."
13        Did I read that correctly?
14   A.   Yes.
15   Q.   Is it fair to say that you were using
16 estimation techniques in your -- in -- in your
17 paper, in the underlying paper?
18   A.   Estimation techniques.
19        I'm just going to read this again.
20   Q.   Yeah, I want you to -- please take --
21   A.   Yeah.
22   Q.   Feel free.
23   A.   I believe this reply in the critiques are
24 almost entirely about multi-procedure -- cases where
25 more than one procedure is done at the same time; is

Confidential Information Subject to Protective Order

Page 218

1  that right?  That's my interpretation of -- upon
2  re-reading the reply.
3      Q.  Is it fair to say that you used estimation
4  techniques?
5      MR. STOY:  Object to the form.
6      THE WITNESS:  I'm not sure what you mean
7  by "estimation techniques."
8  BY MR. MIGLIACCIO:
9      Q.  So I'm just going to read the last
10 sentence of your reply, which is, "We welcome
11 debate, reflection, and refinements regarding the
12 most appropriate data sources and estimation
13 techniques."
14      Do you see that?
15     A.  Uh-huh.
16     Q.  What did you mean by that?
17     A.  I think I meant -- so the entire goal of
18 this -- this committee called the RUC, the relative
19 value scale update committee, is to form estimates
20 of certain things that are going to go into the
21 decision-making process of how much to price a
22 procedure for Medicare.
23      So they have a technique, which is to, you
24 know, use surveys and ask physicians how long they
25 spend on a given procedure.  That's their estimation

Page 219

1  technique.  And so this paper is about the accuracy
2  of their estimation technique and what's reflected
3  in another data source, in this case, the NSQIP.
4      So I'm not sure if I would say I use
5  estimation techniques or I'm commenting on how their
6  estimation technique compares with measures in
7  another data source.
8      Does that make sense?
9      Q.  I -- I think so.
10     What -- what is the NSQIP?
11     A.  This is the National Surgical Quality
12 Improvement Program data source that measures time
13 spent on various procedures.
14     Q.  How does it do that?
15     A.  That is a good question.  I'm not
16 intimately knowledgeable about exactly all of the
17 mechanisms that are put in place.  But it records
18 the time that a surgery -- a surgical procedure is
19 started and it records the time that the surgical
20 procedure is ended.
21      I would assume that this takes some type
22 of report by the surgeon in question to report the
23 starting and the ending time, and then once you have
24 those, you can -- you -- you measure the amount of
25 time a given procedure took.  So here an estimation

Page 220

1  is about time.
2      Q.  Uh-huh.  Is it fair to say there's a --
3  there's variation in time that surgical procedures
4  take across different people --
5      A.  Yes.
6      Q.  -- of patient populations?
7      A.  Yes.
8      Q.  And what is the R -- the RUC?  What --
9  what is the -- what is RUC seeking to do?  What is
10 the purpose of RUC?
11     A.  The purpose of the RUC is to make
12 recommendations to how Medicare might price services
13 in the Medicare physician fee schedule.
14     Q.  Got it.
15      So there may be variations across patients
16 for patient populations that are reflected in NSQIP.
17 RUC seeks to price those services regardless of the
18 variations; is that fair?
19     A.  Sometimes, you know, it might change.
20 This is -- you know, it's a good question.  Like
21 sometimes, because things vary so much, you might
22 decide to have two different services instead of one
23 service.
24     Q.  Uh-huh.
25     A.  So it's --

Page 221

1      Q.  But the same service, the same service,
2  same price, right?
3      A.  But you could -- so how you define
4  services is completely -- it's a -- it's not set in
5  stone.
6      For example, colonoscopy has multiple
7  services associated with that, right, it's
8  colonoscopy with clipping.  Sometimes you could,
9  like, define a service based on the patient that's
10 getting the service.
11      So when you say one service and it's very
12 different and there's only one price, that's not
13 entirely accurate because medical societies, the
14 AMA, you know, when they figure out how to design
15 CPT codes, they could actually specify different
16 services if those -- if that single service is
17 different enough in different cases.
18     Q.  But there are certain codes, right, so --
19 so if you have -- and I understand that the service
20 could -- there might be different types of
21 colonoscopies.  But let's talk about the one that --
22 I think you said colonoscopy with clipping, right?
23 That's one code, right?
24     A.  I -- I would have to review the codes.
25 There -- there might be multiple codes.

Confidential Information - Subject to Protective Order

Page 222

1    Q.  Okay.  Let's take -- let's hypothetically
2  take one, right, one code.  If that code is being
3  priced, the RUC seeks to -- to -- to impose a price
4  on that code regardless of whether there might be
5  variation of the time spent providing the service in
6  that particular code; is that fair?
7    A.  What I'm saying is that the American
8  Medical Association does not necessarily take that
9  as given.  The American Medical Association, which
10 houses both the RUC and the CPT committee, can
11 recommend that we have two different CPT codes and
12 not one CPT code.
13   Q.  Sure.  But in each CPT code there is one
14 price being paid; is that right?
15   A.  For a given CPT code in a given year and
16 given geography for a given type of provider,
17 Medicare pays one price.
18   Q.  Got it.
19      Regardless of the variation of the patient
20 population that receives that service or regardless
21 of whether the service might take longer in one
22 individual patient versus another?
23   A.  That I'm not a hundred percent sure.  I
24 know that there's a lot more nuance than even I am
25 aware of.

Page 223

1      For example, if Medicare is -- is paying a
2  teaching hospital or the hospital has like sicker
3  patients in a -- some type of disproportionate
4  service pool where the patients are underserved,
5  Medicare can still deviate from its fee schedule and
6  pay a higher price.  They can pay different prices,
7  even if...
8      So what I just told you is a very stylized
9  world where it's just the geography, the type of
10 provider, the year, and the service.  But largely
11 that's true for Medicare, but even -- even then,
12 there's a lot -- there's more nuance than I think
13 somebody who is steeped in Medicare would be able to
14 tell you.
15   Q.  When you say "largely that's true," you
16 know, what percentage -- you know, how true would
17 that be, you know, would you say 95 percent true,
18 99 percent true?  Do you have an estimate?
19   A.  I can't really give you a number right
20 now, no.
21   Q.  Does such a number exist somewhere?
22   A.  It should.  It should exist somewhere.
23 You can -- go ahead.
24   Q.  Sorry.
25   A.  I think you could do the analysis by

Page 224

1  looking at individual Medicare claims and asking to
2  what extent is the Medicare reimbursement fully
3  determined by the characteristics that I just told
4  you.
5    Q.  Is there a central -- is data kept on
6  deviation from the schedule?  Does that data exist?
7    A.  For Medicare?  Yes.
8    Q.  Uh-huh.  It does?
9    A.  Yes.
10   Q.  Okay.  And that data would be the data
11 that we would look at to determine, you know,
12 whether and what percentage there -- there may be a
13 deviation from the schedule on the whole?
14   A.  Right.  For -- for Medicare?  Yes.
15   Q.  Got it.
16      So for the Medicare prices, then, that we
17 just talked about, taking aside the deviation that
18 we don't -- haven't characterized, those prices are
19 knowable, right, depending on the geography, the
20 services provider -- you listed a few different
21 items, but those prices are knowable, right?
22      MR. STOY:  Object to the form.
23      THE WITNESS:  Aside from the deviations,
24 yeah.  For Medicare, yes.
25

Page 225

1  BY MR. MIGLIACCIO:
2    Q.  Got it.
3      Do you use Medicare data in your work?  Is
4  that -- is that information that you -- you use a
5  lot in your academic work?
6    A.  I use it to some extent.
7    Q.  What extent do you use it?
8    A.  It's hard for me to place a percentage on
9  it.  I would say nontrivial extent, probably not the
10 majority of my work.
11   Q.  What -- okay.
12      I'm going to show you another paper here.
13 Bear with me.
14      MR. MIGLIACCIO:  I'm going to name this
15 Exhibit 7.
16      (Whereupon, Chan Exhibit 7 was marked for
17 identification.)
18 BY MR. MIGLIACCIO:
19   Q.  And it is a paper that you published in --
20 let's see.  I'll tell you in a second.
21      That was published in -- can you see it
22 now -- Quarterly Journal of Economics?
23   A.  Uh-huh.
24   Q.  Okay.  Great.
25      I'll give you a chance to look at that.

1    A.  Yep.

2    Q.  Okay.

3    A.  Uh-huh.

4    Q.  Okay.  This study, you focused on health

5  insurance prices, right?

6    A.  Study focuses on pricing recommendations

7  from the same company that I just described, the

8  RUC.

9    Q.  Uh-huh.

10    A.  And it looks at Medicare prices.  It also

11  looks at private insurance prices.

12    Q.  Got it.

13        You use the term "average" eight times in

14  this paper.

15    A.  Uh-huh.

16    Q.  Is that right?

17    A.  I would need to check.  I don't have

18  any --

19    Q.  Yep.

20    A.  -- reason to dispute it.

21    Q.  Okay.

22    A.  Actually, I think --

23    Q.  More than that.

24    A.  It says 17 times.

25    Q.  Yeah, that's what I got, too.  Glad I'm

1  wearing my reading glasses.  I can -- I can --

2    A.  Yeah.

3    Q.  I wasn't before.

4    A.  I say "median" twice.

5        I see -- say "standard deviation"

6  probably -- it's tucked with standardized so --

7  let's see.  There it is.  I say "standard deviation"

8  five times.

9        I say "variants" once.  "Covariants" once.

10  I say "variation" 32 times.

11    Q.  I see the standardized, too.  Let's --

12  let's look at that.

13        What did you do to standardize this in --

14  you said -- and I'm looking at Figure 3.  I think.

15    A.  Uh-huh.  Figure 3?

16    Q.  Yeah -- or actually, I'll look at where --

17  where you say on page -- I guess on page 1316.

18    A.  Uh-huh.

19    Q.  The bottom of the first paragraph,

20  "Finally, for interpretation, we standardize" -- and

21  I won't try to say that equation because I'll mess

22  it up -- "by subtracting the sample mean and

23  dividing by the sample standard deviation, and

24  denote this standardized measure."

25        What -- so tell us what you did with

1  respect to standardizing.

2    A.  The standard -- the term "standardize"

3  means to do exactly that, you subtract the mean and

4  you divide by the standard deviation.  The mean is

5  the first moment and the standard deviation's the

6  second.  It's the square root of the second moment.

7  And the second moment is a measure of variation.

8    Q.  I see.

9        So what -- what is the -- you were a math

10  major, right, I think I saw that in your resumé.

11    A.  Yes.

12    Q.  I could see how that would come in handy

13  once you move into economics.

14        What is the benefit of standardizing the

15  dataset that you -- that you standardized here?  Why

16  did you do it?

17    A.  The primary benefit is that you can

18  then -- you become -- you make the scale of the

19  variation the same between two different variables.

20  So you're standardizing -- if you divide it by the

21  standard deviation, it means that you're not going

22  to have one data -- one set of observations that --

23  values that range from, say, zero to, like, 8,000

24  and another one that ranges from, like, 0.5 to 3.5.

25        Like it's -- when you standardize

1  something, you make the distributions comparable by

2  having standard deviation by definition being zero.

3  If you divide by the standard deviation, the

4  distribution of the standardized variable is going

5  to have a standard deviation of one and a mean of

6  zero.  So you don't have to worry about what's

7  called the location of the variable, which is the

8  mean, and the variants of the variable because it's

9  all standardized to zero and 1.

10    Q.  Got it.

11        What was the dataset here that you were

12  working with?

13    A.  This one -- the thing that I'm

14  standardizing is quite an involved variable, which

15  is -- it's described in equation 4 there -- where

16  it's quite involved.

17        What I would need to know to do that, to

18  calculate that, is this -- first you would need to

19  know this little A -- okay.  So in order to -- to

20  know this you'd have to go to equation 3, which

21  tells you what this A thing is.

22        This little A thing is -- okay.  And we're

23  actually having to go to equation 2.  I think.

24    Q.  Yeah, yeah, yeah.  And I have to go back

25  to -- yeah, yeah.  Okay.

---

Page 230

1    A.  Okay.  So I don't want to waste your time
2  here because it's going to be quite involved and I'm
3  not sure it's related to --
4    Q.  Yeah, yeah, let me -- let me try to -- let
5  me try to reframe my question.
6       When -- the dataset that you were working
7  with -- I think you say you -- you had three
8  datasets; is that right?  I'm -- I'm just trying to
9  see what -- what was the -- what were the datasets
10  that you were working with in this paper?
11    A.  Uh-huh.  Umm, I believe that it might be
12  in -- is that in the paper described?  There's a
13  Section III.A on page 1310 that talks about the data
14  that I'm using.
15    Q.  Yep.  Yep.  Three sources of data.
16    A.  Yeah.
17    Q.  RUC's liberations.  Yep.
18    A.  Yep.  So there -- there's -- roughly
19  speaking, I know each proposal -- this is about the
20  pricing decisions that the RUC makes, or the pricing
21  recommendations.
22       And so for each CPT code that gets priced,
23  I know who are the people that are on the proposal,
24  so it -- it's a political process in some ways where
25  if there's a CPT code that is done by cardiologists

Page 231

1  that needs to be priced, there will be a proposal
2  that's written by cardiologists and maybe having
3  other subspecialties or specialties on that
4  proposals.
5       So I'll know who are -- what are the
6  identity of the specialties on that proposal, what
7  are the identities of the specialties on this
8  committee called the RUC.  That's one dataset.
9       The other dataset is using Medicare
10  claims.
11       And I believe -- is there a third dataset
12  that is kind of using private sector prices.  So
13  that's not quite used in the equation that you
14  highlighted.  The equation that you highlighted uses
15  the first two datasets.
16    Q.  Got it.
17       But it sounds like -- I mean, you -- you
18  have created some averages.  You've used some
19  standard -- you've standardized certain datasets.
20       What other -- what other techniques did
21  you use with this data?
22    A.  Yeah, I mean, so there are several, right.
23  There's --
24    Q.  Yeah.
25    A.  If you look at equation 2, it's -- it's

Page 232

1  creating a share.  It's -- it's summing up a number
2  of quantities and dividing -- so there's a numerator
3  which is part of the denominator so this is creating
4  a fraction.  And when you have the fractions, I'm
5  creating a vector of fractions that's sum for one.
6  That's equation 3.
7       I'm calculating the Euclidean distance,
8  which is the -- kind of the sum of squares and you
9  take the square root of that and then once you have
10  that, then I'm taking the maximum operator in
11  equation 4 and then I'm taking an average of that.
12       So an average does play a role in this but
13  it's not the only operation that I'm doing here.
14    Q.  Right.  Right.
15       I mean, would you agree with me that --
16  that you do use averages to arrive at a measure of
17  central tendency in -- in your -- in your work?
18       MR. STOY:  Object to the form.
19       THE WITNESS:  Averages have a role here.
20  But as I said earlier in the deposition, it really
21  matters that you get the sample right.  If you take
22  an average of a different sample and try to apply
23  that to another sample, that would be invalid.
24       What I'm doing here is I'm describing --
25  I'm not trying to say that this is a representative

Page 233

1  of some other sample that is not the same.  I'm just
2  describing the sample that I have.  It's just a
3  descriptive thing.  I'm not saying that this should
4  apply for something out of sample.  This is just a
5  description of the sample that I'm talking about.
6  BY MR. MIGLIACCIO:
7    Q.  Is it fair to say that the use of averages
8  to make sense of real world data and formulate
9  useful parameters for policy decisions is a central
10  tool of healthcare economics research?
11       MR. STOY:  Object to the form.
12       THE WITNESS:  Averages are useful but if
13  you don't use them correctly, you could reach very
14  misleading conclusions.
15  BY MR. MIGLIACCIO:
16    Q.  So in this case, in this study, by
17  definition, taking averages across datasets sets,
18  they don't represent all data points exactly, right?
19  An average doesn't represent every single data point
20  exactly, it's an average; is that correct?
21    A.  By definition when you're calculating
22  average you're losing information, yes.
23    Q.  That -- and that's the whole point of
24  using an average, right?
25    A.  The point of using an average is most

Confidential Information - Subject to Protective Order

Page 234

1  often to describe the dataset that you have -- to
2  describe the data that you have at hand.  It becomes
3  dangerous when you use that to extrapolate to
4  another dataset that you don't have or to use -- to
5  extrapolate to another thing that you're interested
6  in that is different.  That's kind of the point that
7  I'm trying to make.
8      Q.  So I'm going to show you one more, one
9  more paper here.  Let's see.  This paper here --
10     A.  Oh.  Let me just -- oh.
11     Q.  Yeah, no, I'm -- I'm still -- I'm going to
12  ask you just a few more questions about this one.
13     A.  Oh, okay.  This is Exhibit 1 or Exhibit 7?
14     Q.  This is still -- this is the same exhibit
15  we were just looking at, so --
16     A.  I just left it.  Okay.  So it's Exhibit 7.
17     Q.  Exhibit 7, yes.  Yep, yep, yep.  Yep.
18         So this paper, is it --
19         (Whereupon, a brief discussion off the
20  record.)
21  BY MR. MIGLIACCIO:
22     Q.  Is it fair to say that this paper is
23  concordant with lots of other studies showing a
24  strong relationship between Medicare and commercial
25  prices?

Page 235

1      MR. STOY:  Object to the form.
2      MR. KUM:  Madam Court Reporter, can you
3  read the question back to me.
4      (Whereupon, the reporter read the record
5  as follows:
6      "Question:  Is it fair to say that this
7  paper is concordant with lots of other studies
8  showing a strong relationship between Medicare and
9  commercial prices?")
10     MR. KUM:  Thank you.
11     THE WITNESS:  So I think we have to be
12  precise about the relationship here.  The figure
13  that talks about this relationship is in -- is
14  Figure 7 on page 1338.
15         And what it shows there is that it shows
16  various kind of slopes here.  Which means that,
17  generally speaking, when you have a procedure that
18  has a higher price in Medicare, you're going to have
19  a procedure that has a higher price in private
20  insurance, okay.
21         But you can see that this slope differs
22  between different types of procedures.  That's kind
23  of the main point of this figure, is that when a
24  procedure is priced by the RUC versus not or when
25  the procedure is priced in a case where the RUC and

Page 236

1  the proposing specialty have higher affiliation
2  versus lower affiliation, you can see a big
3  difference in the slope here.  Which means that the
4  relationship depends on that.
5         Second, is that I think for the purpose of
6  this case, we care not about kind of changes on
7  changes or the slope.  We care about the levels.  We
8  care about if private insurance is, say, 50 percent
9  higher or 20 percent higher or, you know, 10 percent
10 higher than -- than Medicare.  So it's the exact
11 magnitude.
12        So even if we had something that was
13 exactly concordant, meaning if we increased the
14 price in Medicare by 5 percent, the private
15 insurance price would be increased by 5 percent.
16        The level matters a lot when we're coming
17 up with the price of the medical monitoring program
18 or the spending that would be involved in the
19 medical monitoring program because it could be
20 50 percent higher or it could be 20 percent higher
21 uniformly and that could be a big difference in how
22 much we decide to -- you know, how much we're saying
23 that the medical monitoring program has to -- is
24 going to cost.
25        So if you look at this graph on panel A,

Page 237

1  for example, the scale on the Y axis goes from zero
2  to negative 4 logs.  Whereas the scale on the X axis
3  goes from negative 6 to zero.  That's huge in terms
4  of log terms.
5         Usually, when you talk about -- it's hard
6  to kind of interpret exactly, but when something is
7  0.5 logs higher that means it's generally 50 percent
8  higher.  So if -- if you just look at the scale, the
9  scale tells you the private insurance is much more
10 generous than Medicare.  And it could vary by a lot.
11 BY MR. MIGLIACCIO:
12     Q.  Is it fair to say that in many situations,
13 notably when the RUV (verbatim) update committee,
14 the RUC, changes Medicare prices there is a
15 consistent and strong relationship between Medicare
16 prices and commercial insurer prices?
17     A.  I think it depends.
18     Q.  What does it depend on?
19     A.  In this figure, what I'm showing you is
20 that it depends on the -- whether it comes from the
21 RUC.  There are many price changes that don't come
22 from the RUC.  And whether the RUC prices comes
23 from, like, a proposal process where the proposers
24 are more affiliated or less affiliated to the RUC.
25 And that's just one dimension in which it depends.

Confidential Information - Subject to Protective Order

Page 238

1    Q.   Would you say it's fair that this paper
2 supports the use of Medicare as a way to predict or
3 estimate commercial prices, which may be --
4    A.   No.
5    Q.   -- imperfect but does offer an important
6 methodology; in other words, if you know Medicare
7 prices, you could use the existing academic
8 literature to estimate where commercial prices might
9 fall?
10    A.   I think it would be -- go ahead.
11         MR. STOY:  Object.  Object to the form of
12 the question.
13         Go ahead.
14         THE WITNESS:  That's -- that's not -- it
15 would not be fair to say that.
16 BY MR. MIGLIACCIO:
17    Q.   Why not?
18    A.   It, again, depends on the purpose that
19 you're trying to use it for.  If the purpose is to
20 estimate the spending that you would have for a
21 medical monitoring program you might be 50 percent
22 off or you might be a hundred percent off.
23    Q.   I'm -- I'm not asking you about estimating
24 anything for a medical monitoring program.  I'm
25 asking you -- this is an academic paper, right, this

Page 239

1 wasn't published for a particular purpose.  I'm
2 asking if that's a fair reading of your conclusion.
3    A.   Can you restate -- a fair reading --
4 again?
5    Q.   Yeah.
6         Is it fair to say in many situations,
7 notably, when the RUC changes prices, there is a
8 consistent and strong relationship between Medicare
9 prices and commercial insurer prices?
10    A.   It's fair to say that when the RUC changes
11 prices, you will see changes in the same direction
12 in private insurance in general.  This is talking
13 about changes on changes, not levels of prices.  For
14 the medical monitoring program you would need levels
15 of prices, not just changes.
16    Q.   The RUC sets the prices, though, does it
17 not?
18    A.   It recommends prices in some cases.
19    Q.   Okay.  In some cases.
20         Didn't -- we just talked about that in
21 relation to your last paper, didn't we?
22    A.   Correct.
23    Q.   That it recommends prices and -- but
24 for deviation at times, which we haven't quantified,
25 those are the prices that are paid, right?

Page 240

1    A.   The RUC recommends prices, then the
2 federal government decides whether to implement the
3 RUC's recommendations.
4    Q.   Okay.  How often -- so the RUC -- the
5 federal government decides and then what happens
6 after -- if the federal government decides to
7 implement them, then what -- what happens next?
8    A.   Then it goes into the Medicare Physician
9 Fee Schedule.
10    Q.   Got it.  Got it.
11         Is it fair to say that your findings here
12 in this paper -- and I'm not asking you about the
13 medical monitoring at issue in this case -- but just
14 generally, you know, if the findings here provide
15 another data point to support the known relationship
16 between Medicare and commercial prices?
17         MR. STOY:  Objection.  Form and scope.
18         THE WITNESS:  Can you restate the question
19 again?
20 BY MR. MIGLIACCIO:
21    Q.   Yeah.
22         Is it fair to say that your findings here
23 in this paper generally provide another data point
24 to support the known relationship between Medicare
25 and commercial prices?

Page 241

1    A.   It's fair to say that this study supports
2 a relationship between Medicare and commercial
3 prices.
4    Q.   Have other people recognized that
5 relationship?
6    A.   Yes.
7    Q.   Okay.  Who -- who else has recognized that
8 relationship?
9    A.   In the economic literature, I think the
10 paper that most people would cite to you is Clemens
11 and Gottlieb, which I believe I cite in this paper.
12    Q.   Uh-huh.  Tell me about that paper.  Was
13 that peer-reviewed?
14    A.   Yes.
15    Q.   Was this -- was this paper peer-reviewed?
16    A.   Yes.
17    Q.   Is the Clemens and Gottlieb paper known to
18 be reliable?
19    A.   You know, again, it depends on reliable
20 for what?
21    Q.   For the conclusion that there is a
22 relationship, a known relationship between Medicare
23 and commercial prices?
24    A.   Yes.
25    Q.   Okay.  And your paper here, is it reliable

Page 242

1 for that conclusion as well?
2    A.  My paper here is kind of -- adds
3 additional interpretation to that relationship.
4    Q.  And is it reliable for that additional
5 interpretation?
6    A.  I believe so.
7    Q.  Who is Michael J. Dickstein?
8    A.  He is a professor at NYU.
9    Q.  And you were coauthors on this paper?
10    A.  Correct.
11    Q.  Did you receive any comments on it or that
12 you responded to?  Was there any further
13 correspondence with respect to it?
14    A.  In the same way that the --
15        (Technical difficulties.)
16        (Whereupon a brief discussion off the
17 record.)
18        THE WITNESS:  Okay.  I asked, in the same
19 way that the New England Journal paper had
20 correspondence?
21 BY MR. MIGLIACCIO:
22    Q.  Yeah.
23    A.  No.
24    Q.  Okay.
25        MR. MIGLIACCIO:  Why don't we -- I don't

Page 243

1 know how long we've been going but why don't we take
2 a quick five-minute break and go off the record.
3        THE VIDEOGRAPHER:  Okay.  We're off the
4 record at 2:51 p.m. Pacific time.
5        (Whereupon, a brief recess was taken.)
6        THE VIDEOGRAPHER:  We are back on the
7 record at 3:03 p.m. Pacific time.
8 BY MR. MIGLIACCIO:
9    Q.  Okay.  All right.
10        Dr. Chan, just a few more questions before
11 I pass it to my colleague.  Really about the
12 creation of your report.
13        Did you personally write the whole report?
14    A.  I'm not sure what you mean by "personally
15 write," but yes, I did.  I -- I wrote the -- the
16 entire report is mine, and I wrote the report.
17    Q.  And with respect to the individuals that
18 helped you, did you screen them or vet them in any
19 fashion before you used their work?
20    A.  I have a working relationship with
21 Analysis Group, and I did get to work with the
22 people that I mentioned on the call to a pretty
23 close extent.  And I was able to evaluate the
24 quality of their work throughout as I prepared this
25 report.

Page 244

1    Q.  Did you ever meet with any of them?
2    A.  And what do you mean by "meet"?
3    Q.  Like in person.  I assume the answer would
4 be no, but I'm just curious.
5    A.  Yes, the answer is -- is no.  It was all
6 remote, by Zoom, by telephone.
7    Q.  Did you vet the data that -- that was
8 provided to you?  How -- you know, how did you
9 determine that the data that was provided to you was
10 accurate?
11    A.  I did take a look at the data.  I took a
12 look at the code that was used to produce the -- so
13 the -- basically the analytical process, which is
14 the raw data, the code, and the outputs and whether
15 the -- the outputs were consistent with my clinical
16 expertise and my knowledge of health policy.
17        So I evaluated the entire analytical
18 process from being aware of how the raw data looked
19 like, being aware of the analyses that were used to
20 process the data, and the outputs.
21    Q.  Did you -- have you been paid yet for --
22 for your time?
23    A.  I'm not sure if I've been paid for the
24 invoice that I submitted in January -- or, sorry,
25 for December.  That would be the only time that it

Page 245

1 would be paid because I have not submitted invoices
2 for January or February.
3    Q.  All right.  When you do get paid, do you
4 get paid your rate plus the attribution at the same
5 time?
6    A.  It's not always the same time.  I think
7 it's usually separate, if I -- if I remember
8 correctly.
9    Q.  How's -- how is it separate?
10    A.  I believe there are -- there's payment for
11 my time.
12    Q.  Uh-huh.
13    A.  As a deposit or a check.  I think in this
14 case, it's a deposit.  And there is a separate
15 payment for the attribution.
16    Q.  Got it.
17        And -- but are those made like
18 contemporaneously, is I guess what I'm asking?
19    A.  Not necessarily.  I think usually not.
20    Q.  How -- do you know when you would be paid
21 for the attribution?
22    A.  Not really.  It's kind of random.  I don't
23 quite understand the -- when the payments get made.
24    Q.  You get them at some point after you get
25 the -- your payments?

Confidential Information - Subject to Protective Order

Page 246

1    A.  Potentially.  It's not always after.  I
2  don't understand the timing.
3    Q.  Got it.  Okay.
4        MR. MIGLIACCIO:  Well, look, I thank you,
5  you know, for your time, and I want to pass the
6  question -- questions over to Layne.
7        THE WITNESS:  Thank you very much.  Thank
8  you.
9                EXAMINATION
10  BY MS. HILTON:
11    Q.  Good afternoon, Doctor.  My name is Layne
12  Hilton and I am an attorney for the plaintiffs and
13  I'm going to be asking you about the portions of
14  your report that pertain to Dr. Conti's analysis.
15        Do you have an understanding of what the
16  term "medical benefit" means?
17    A.  I have an understanding of what it means
18  to me.  I'm not sure if it's a technical term, but
19  it -- to me it -- I do have an interpretation of
20  that term.
21    Q.  If I were to use the term "medical
22  benefit" to describe the activities of a commercial
23  health insurance plan that pertain to things like
24  doctors' appointments and tests and other sorts
25  of -- you know, all of the things that you basically

Page 247

1  have been discussing with my colleague all day,
2  would that be accurate that all of those activities
3  would fall under something called a medical benefit
4  of a commercial health insurance?
5    A.  So you're referring to benefits of a
6  commercial -- of a -- of a health insurance plan; is
7  that right?
8    Q.  Yes, I am.
9    A.  Okay.  That makes sense.
10    Q.  And -- so would you understand all of
11  those activities that you have been discussing all
12  day to be activities that fall under the medical
13  benefit of a commercial health insurance plan?
14    A.  Correct.
15    Q.  What is your understanding, then, of the
16  pharmacy benefit associated with a commercial health
17  insurance plan?
18    A.  So whereas medical benefit reimburses
19  care -- medical care, including such as office
20  visits or other medical services that are provided,
21  a pharmacy benefit would reimburse the cost of
22  drugs.
23    Q.  Now, I understand from your discussions
24  earlier today that you have provided expert
25  testimony in a variety of cases.  I'm going to ask

Page 248

1  you, without you having to specify which cases, if
2  in any of your previous expert testimony you
3  provided testimony about the pharmacy benefit.
4    A.  Yes.
5    Q.  And what aspects of the pharmacy benefit
6  have you previously testified about?
7    A.  I'm not sure what I can disclose other
8  than that I have testified on the structure of
9  pharmacy benefits in the healthcare landscape.
10    Q.  And are you -- are you referring to
11  tiering structure of formularies?
12    A.  That's part of it.
13    Q.  Have you previously testified about the
14  pharmacy benefit as it relates to generic drugs?
15    A.  Some of my previous testimony does bear on
16  generics.
17    Q.  What aspects of the generic drug pharmacy
18  benefit have you previously testified about?
19    A.  I'm not sure if I could specify other than
20  that generic drugs are covered under pharmacy
21  benefits.  Sometimes pharmacy benefits will favor
22  one drug or another.  Cost considerations and
23  efficacy are some considerations.
24    Q.  Have you ever previously provided
25  testimony about the economic value of certain

Page 249

1  generic prescription drugs to consumers?
2    A.  No.
3    Q.  Have you ever previously testified about
4  the economic value of certain generic prescription
5  drugs to third party payors?
6    A.  I haven't testified on that, no.
7    Q.  Have you ever provided any testimony about
8  the costs of generic prescription drugs paid by
9  consumers at the pharmacy point of sale?
10    A.  I have not testified on that.
11    Q.  Have you ever previously testified about
12  the costs of generic prescription drugs paid by
13  third party payors at the pharmacy point of sale?
14    A.  I'm not sure.
15    Q.  Have you ever provided any testimony about
16  the generic drug approval process?
17    A.  Not directly.  It may have been touched
18  upon in the context of discussing generic drugs.
19    Q.  Have you ever provided any direct
20  testimony about the food and drug cosmetics act?
21    A.  No.
22    Q.  Have you ever provided any direct
23  testimony about the Drug Supply Chain Security Act?
24    A.  No.
25    Q.  In your academic life, as it were, have

Confidential Information - Subject to Protective Order

1   you ever conducted any research on the food and drug
2   cosmetics act?
3       A.   No.
4       Q.   Have you ever conducted any research on
5   the Drug Supply Chain Security Act?
6       A.   No.
7       Q.   Have you ever worked on any FDA task
8   forces related to the approval and regulation of
9   generic prescription drug products?
10      A.   No.
11      Q.   Have you ever worked as an advisor to the
12  FDA's Office of Generic Drugs?
13      A.   Not in that office, no.
14      Q.   Which office with the FDA have you worked
15  for?
16      A.   I believe that is in -- on my CV.  Under
17  Other Professional Positions on page A-2.
18      Q.   Yes, I see it.
19           It looks like you worked for the Center
20  for Devices and Radiological Health?
21      A.   Yes.
22      Q.   And also, you worked in the -- as the --
23  in the White House Office of Science and Technology
24  Policy; is that right?
25      A.   In the office of planning and analysis at

1   the Center for Drug Evaluation and Research.
2       Q.   Great.
3            In the context of your work as a staff
4   fellow with the office of planning and analysis for
5   CDER, as I will shorten it to get us through this,
6   what -- what sort of activities did you engage in?
7       A.   In various policy analyses I worked with a
8   group of economists, mostly, who were in this
9   office.  I -- some of the issues that we analyzed
10  were ways to surveil for potential drug side effects
11  and potential safety -- kind of prescription drug
12  safety programs to -- to ensure that the drugs were
13  being safely used.
14      Q.   Did any of this work relate to potentially
15  counterfeit or illegitimate drugs?
16      A.   No.
17      Q.   Did any of this work with the FDA relate
18  to potentially adulterated or misbranded drugs?
19      A.   No.
20      Q.   Throughout your report, you use the term
21  "affected valsartan."
22           In your own words, how do you define
23  "affected valsartan"?
24      A.   I believe that's in paragraph 11 of my
25  report, "valsartan products that were recalled due

1   to possible nitrosamine impurity."
2       Q.   So your term "affected valsartan" only
3   relates to the valsartan products which were
4   recalled; is that right?
5       A.   Which were eventually recalled, I believe.
6   I think that any valsartan -- valsartan that had the
7   possibility of a nitrosamine impurity -- again, I'm
8   not a -- I haven't read so much on the -- on the
9   exact sequence of events here, but I believe that
10  valsartan products that had the potential for
11  nitrosamine impurities were eventually recalled.
12      Q.   Are you aware that there were valsartan
13  products manufactured by the defendants in this
14  litigation that had expired by the time of the
15  recall and therefore were not part of the scope of
16  the recall?
17      A.   I'm not aware of that.  That wasn't
18  something that I looked into in great detail.
19      Q.   So your report makes no opinion or takes
20  no opinion about products manufactured by the
21  defendants which were expired and never recalled by
22  the FDA; is that right?
23           MR. STOY:  Object to the form.
24  Mischaracterizes testimony.
25           THE WITNESS:  Can you say that again?

1   BY MS. HILTON:
2       Q.   Sure.  It's a confusing question.
3            Does -- do you -- do you have any opinion
4   about valsartan products that were manufactured by
5   the defendants but which expired before the FDA's
6   recall?
7       A.   Were these products ever used by patients?
8       Q.   They were.
9       A.   What do you mean by "expired"?  So they
10  were -- they -- they were expired in the patients'
11  hands or they were prescribed to patients after they
12  had expired?
13      Q.   So as I understand it, for some period of
14  time between 2012 and let's call it 2016 or 2017,
15  there were many valsartan products that bore unique
16  NDC codes that were dispensed to patients at the
17  point of sale that were manufactured by the
18  defendants in this litigation.
19           At the time of the FDA recall, many of
20  these products had expired and had already been
21  consumed by the patients and therefore, were not
22  within the scope of the FDA's recall list.
23           And so my question is -- you know, and
24  perhaps I can ask it a different way.
25           Did you expand your analysis to include

---

Page 254

1  those products which were not a part of the FDA's
2  recall list but were nevertheless manufactured by
3  the defendants, you know, from 2012 until 2018?
4    A.  So these include drugs that were actually
5  consumed by consumers before the recall, before it
6  was known that nitrosamine -- before that -- before
7  nitrosamine impurities were known; is that right?
8    Q.  Correct.
9    A.  I believe I do consider those drugs.
10   Q.  And how did you identify the NDC codes
11 associated with those drugs?
12   A.  I believe the NDC codes are linked to the
13 manufacturer of the drugs.  So we would look for
14 valsartan -- we have a list of -- in my report I
15 believe I do describe how we identified the NDC
16 codes.
17       So for -- this is kind of looking at
18 footnote 23.
19       It says, "For my analyses in this report,
20 I used the list of NDC's identified as recalled on
21 the FDA's website to determine 'affected valsartan'
22 products."
23       So these are -- this is something I'll
24 have to think about whether the NDC codes -- so the
25 NDC codes are specific for a manufacturer of a -- of

---

Page 255

1  this -- of this -- a manufacturer and a molecule
2  and -- so these are drugs that were eventually
3  recalled but even -- but these NDC codes would have
4  existed before the recall.
5    Q.  Correct.  And -- and this was actually an
6  attachment to Dr. Conti's report.  I was -- I guess
7  I was trying to determine if you used the same NDC
8  list that was used by Dr. Conti in her report or if
9  you used a different list.  It looks here like
10 instead you used the FDA recall list; is that right?
11   A.  To the best of my understanding right now,
12 yes, but we could check the two lists to -- to -- to
13 figure out whether they're the same or how they
14 differ.
15   Q.  Thank you.
16       For the purposes of your report related to
17 Dr. Conti, did counsel ask you to make any
18 assumptions in drafting this report?
19   A.  Not to my knowledge.
20   Q.  So counsel did not ask you to assume that
21 the affected valsartan was considered adulterated by
22 the FDA?
23       MR. STOY:  Object to the form.  Calls for
24 a legal conclusion.
25       THE WITNESS:  I'm not sure if that

---

Page 256

1  assumption is required.  I know I considered that
2  possibility, that affected valsartan contained
3  nitrosamine impurities and that there is even a
4  possibility of cancer risk due to these impurities.
5  BY MR. MIGLIACCIO:
6    Q.  So you assume that the affected valsartan
7  contains nitrosamine impurities and that there was a
8  possible cancer risk due to those impurities?
9        MR. STOY:  Objection.  Mischaracterizes
10 his testimony.
11       THE WITNESS:  I considered the possibility
12 that affected valsartan contained nitrosamine
13 impurities that could increase the risk of cancer
14 for some patients.
15 BY MR. MIGLIACCIO:
16   Q.  You didn't assume that the affected
17 valsartan was considered adulterated by the FDA?
18       MR. STOY:  Asked -- asked and answered.
19       THE WITNESS:  Can you restate that
20 question?
21 BY MS. HILTON:
22   Q.  I'll ask it a little bit more clearly.
23       Did you assume that the affected valsartan
24 was considered adulterated by the FDA?
25       MR. STOY:  Objection.  Asked and answered.

---

Page 257

1        THE WITNESS:  I did consider -- you can
2  see in my report that the FDA -- the actions of the
3  FDA are considered in my report but they're not
4  central to my opinion of the value of valsartan.
5  BY MS. HILTON:
6    Q.  And looking at your report, you actually
7  never use the term "adulterated"; is that fair to
8  say?
9    A.  I believe I have -- I don't use that term.
10 I say valsartan with impurities.  I am not an expert
11 to tell the difference between the term of
12 "impurity" versus "adulterated."
13   Q.  So you're not providing any expert
14 testimony about adulteration generally; is that fair
15 to say?
16   A.  Adulteration versus impurity, I don't know
17 any difference between the words.
18   Q.  For the purposes of your report, did you
19 assume that the affected valsartan was manufactured
20 in compliance with all regulations, including
21 Current Good Manufacturing Practices?
22   A.  Can you ask that question again?
23   Q.  Sure.
24       For the purposes of your report, did you
25 assume that the affected valsartan was manufactured

---

Confidential Information - Subject to Protective Order

---

Page 258

1 in compliance with all regulations, including
2 Current Good Manufacturing Practices?
3     A.  I don't think so.  And I don't think that
4 assumption is necessary for my opinions.
5     Q.  Why don't you think that assumption was
6 necessary for your analysis of Dr. Conti's report?
7     A.  Because for the claim of worth -- the
8 worth of valsartan, I am considering what does that
9 valsartan do.  I -- I'm considering the benefits of
10 valsartan in terms of blood pressure control and in
11 terms of treating heart failure.  And I'm
12 considering the possibility of a cancer risk.
13         Whether the valsartan was manufactured in
14 a certain way and whether it met certain
15 regulations, whether supply was allowed by the FDA
16 or not, that is not something that I considered
17 relevant for the assessment of worth.
18     Q.  You are aware, however, that Dr. Conti's
19 value and opinion about the value of the affected
20 valsartan hinges upon the fact that the valsartan
21 was considered adulterated because it was
22 manufactured in a way that did not comply with
23 Current Good Manufacturing Practices, correct?
24     A.  I'm aware of her opinion on that, yes.
25     Q.  So no aspect of your particular report

---

Page 259

1 directly addresses that opinion; is that fair to
2 say?
3         MR. STOY:  Object to the form.
4         THE WITNESS:  I think it's fair to say
5 that I don't agree with that framework of assessing
6 value.
7 BY MS. HILTON:
8     Q.  Before we get into your proposed framework
9 of value, let's make sure that I understand the sort
10 of limitations of your opinion as it relates to the
11 economic value of the prescription drugs.
12         You're not offering any opinions about the
13 data sources used by Dr. Conti in her calculation of
14 damages, correct?
15     A.  I'm not commenting on the data sources
16 because my primary opinion is at odds with her
17 framework.
18     Q.  You're likewise not offering any opinions
19 on pharmacy benefit structures and the cost paid by
20 consumers or TPPs at the point of sale for the
21 affected valsartan that was dispensed at the
22 pharmacy, correct?
23     A.  Can you restate that?
24     Q.  Sure.
25         Are you offering -- I'll put it more

---

Page 260

1 affirmatively.
2         Are you offering any opinions about the
3 pharmacy benefit structures and the cost paid by
4 consumers or TPPs at the point of sale for affected
5 valsartan?
6     A.  That information is not central to my
7 opinion.  Although the idea of costs and revenues
8 and profits to various parties is something within
9 economic -- my economic expertise.
10     Q.  But you're not offering any of those
11 opinions in this report for this purpose today?
12     A.  Correct.
13     Q.  Right?
14     A.  Correct.
15     Q.  In your -- are you offering any opinions
16 on a drug manufacturer's obligation to comply with
17 Current Good Manufacturing Practices?
18     A.  No.
19     Q.  Are you offering any opinions on contracts
20 which may impact the amount paid for affected by --
21 for affected valsartan by any TPP?
22     A.  No.
23     Q.  I would like to talk to you about getting
24 into the context of a report which I believe was
25 previously marked as Exhibit 2.

---

Page 261

1     A.  Uh-huh.
2     Q.  I'd like to talk to you about
3 paragraph 133 of your report, if you'd like to flip
4 there.
5     A.  Okay.
6     Q.  And in this paragraph you are discussing
7 the -- let's call it supply and demand framework of
8 Dr. Conti's opinion.
9     A.  Uh-huh.
10     Q.  And you write, starting in the middle of
11 that paragraph, "The implementation of her approach
12 relies on faulty reasoning.  Dr. Conti asserts that
13 'according to economic theory, for a consumer
14 product to have economic value, demand for the
15 product must exist and supply must be allowed to
16 meet demand.'  However, the demand curve alone
17 speaks to a product's economic value and is based on
18 each patient's and TPP's willingness to pay for a
19 drug."
20         Do you see that?
21     A.  Yes.
22     Q.  And then to support that economic theory
23 you cite to a -- let's call it a -- a chapter or a
24 textbook or some sort of treatise; is that right?
25     A.  Yes.

---

Page 262

1    MS. HILTON:  I am going to mark for the
2  record --and which -- what exhibit are we on?
3    THE WITNESS:  7.
4    MS. HILTON:  Yeah.  Exhibit 8, I think.
5    THE WITNESS:  7.
6    MS. HILTON:  I am going to mark as
7  Exhibit 8 this citation footnote 252.
8    (Whereupon, Chan Exhibit 8 was marked for
9  identification.)
10 BY MS. HILTON:
11   Q.  Okay.  Let me know when you have Exhibit 8
12 up.
13   A.  Yep.
14   Q.  Can you tell me what particular section of
15 this chapter you were using to support your opinion
16 that the demand curve alone speaks to a
17 pharmaceutical product's economic value and is based
18 on a patient/TPP's willingness to pay for a drug?
19   A.  Okay.  So in these pages, there is no
20 supply curve.  What we call consumer surplus is very
21 closely related to the economic value.  Consumer
22 surplus is the demand curve that lies above the
23 price.
24   Q.  Do you -- does this particular chapter
25 relate to pharmaceutical drug products?

Page 263

1    A.  This is an economic -- an economics
2  textbook which is quite general when we talk about
3  demand curves and supply curves.  This particular
4  chapter uses a very -- it uses any -- it uses just a
5  random example of rock concert tickets but the focus
6  is not about rock concert tickets.
7    Q.  Does this chapter in the discussion of the
8  consumer surplus presuppose that all of the items
9  that are subject to this consumer surplus analysis
10 are items that can legally be on the market?
11   A.  There's no presupposition of that.
12   Q.  So this would relate to anything, even
13 products that are illegal to sell on the market?
14   A.  It could have been illegal rock concert
15 tickets or it could be --
16   Q.  I'm sorry.
17   A.  -- or -- go ahead.
18   Q.  No, continue.
19   A.  They could have been illegal tickets.
20   Q.  Where does it say that it -- that the
21 tickets could have been illegal?
22   A.  It doesn't say it in the text, but if you
23 were to ask any economist -- well, I guess maybe if
24 you were to many economists -- Dr. Conti's an
25 economist -- it does not presuppose the legality.

Page 264

1  That's irrelevant.  It's only relevant in so far as
2  it affects consumer surplus or the demand curve.  It
3  doesn't depend on a supply curve.
4    Q.  If we look at the second page of this
5  particular PDF, it says, "To calculate the aggregate
6  consumer surplus in a market," does that not
7  indicate that there must be the product on the
8  market?
9    A.  You can also talk about consumer surplus
10 for a good that doesn't yet exist.  It does not
11 presuppose that there must be a market for it.  It
12 happens to say in the market, but that's not a
13 requirement.
14   Q.  Where in this particular chapter does it
15 indicate that it is not a requirement of the product
16 at issue for consumer surplus must not be in the
17 market?
18   A.  In this chapter there is no mention of a
19 supply curve.
20   Q.  So that is the basis for your statement --
21   A.  It doesn't require a supply curve.
22 Usually we do have a market and that's why this is
23 kind of the usual setting but when you're talking
24 about willingness to pay and when you're talking
25 about utility you don't need a market.

Page 265

1    Q.  Would you agree that the market for
2  concert tickets is very different than the highly
3  regulated market of prescription drugs?
4    A.  Yes, but this chapter is not about concert
5  tickets.  This chapter is a general economic
6  textbook on economics, on microeconomics, and this
7  chapter is about consumer surplus which applies to
8  both concert tickets and prescription drugs.
9    Q.  If we look at the next sentence of
10 paragraph 133 you go on to write -- I think this is
11 what you were alluding to before -- that sometimes
12 there could be a value for a product that is not yet
13 on the market.
14        You write, "Consider a pill that cures
15 cancer, there is no supply for such a pill as one
16 has not been invented yet, but it is certainly
17 possible to consider the patient and TPP's
18 willingness to pay for such a pill and the inherent
19 economic value such an innovation would provide."
20        Do you see that?
21   A.  Yes.
22   Q.  In this particular example of the
23 hypothetical pill that cures cancer, are you
24 assuming that the pill at issue has been
25 manufactured in compliance with good manufacturing

Confidential Information Subject to Protective Order

Page 266

practices?

A.  No.

Q.  So it is your opinion that consumers and TPPs would be willing to pay for a pill that has not been manufactured in compliance with good manufacturing practices and could not assure that it's safe?

A.  I think it's certainly possible.

Q.  You don't have any evidence to associate that, correct?

A.  I think it's -- I would say it's common sense.  You are pay -- you are willing to pay for the benefits of a good.  If there is some uncertainty about the benefits of the good, that's why things like, you know, good manufacturing processes, that's why those might be valuable, but if -- in this hypothetical world where we already knew that this pill would cure cancer, we wouldn't have to know whether it was manufactured under good manufacturing practices.

Q.  Do you believe that generic drug products that are manufactured in such a way that the product contains glass are valuable?

A.  That's a hypothetical question.  I think it would depend on the circumstance.

Page 267

Q.  Are you -- have you ever heard of a generic drug manufacturer named Ranbaxy?

A.  Can you restate that question?

Q.  Have you ever heard of a generic drug manufacturer named Ranbaxy?

A.  I might have.  I don't recall right now.

Q.  If I were to tell you that Ranbaxy manufactured generic products that contained glass --

MR. STOY:  Are you --

(Whereupon, a brief discussion off the record.)

BY MS. HILTON:

Q.  If I were to tell you that Ranbaxy manufactured generic products that contained glass and that this -- that these products had to be recalled from the market, would it be your position that these glass-contaminated generic products had value?

A.  I don't know enough about this situation to say anything.  It's possible that they could still have value, but I don't know enough.

Q.  What would you need to know in order to assess whether the drug had value or didn't have value?

Page 268

A.  I would need to know the medical benefits of taking that drug and the medical harms of taking that drug.

Q.  Do you agree with Dr. Conti's conclusion that there exists substantial asymmetry of information about the safety and quality of prescription drugs between the manufacturers of those drugs and the patients who purchase and consume those drugs?

MR. STOY:  I'll object to the extent it's beyond the scope of Dr. Chan's analysis.

But you can answer.

THE WITNESS:  I don't have a particular opinion on that.  I think it's possible.  But I think it might depend.

BY MS. HILTON:

Q.  What would it depend on?

A.  Depends on what the product is.  It depends on -- so you -- can -- can you just restate the question?  It's asymmetric information between the manufacturers of a drug and -- and who else?

Q.  And the patients who purchase and consume those drugs.

MR. STOY:  Same objection.

THE WITNESS:  It really depend -- I mean,

Page 269

there are different types of asymmetric information, right, the patient may have more information about their medical condition than the manufacturer.  The manufacturer might have more information about how they manufactured the drug.  So the information is not symmetric in different ways.

BY MS. HILTON:

Q.  Is that a topic of upon which you'll opine in your report?

A.  I don't believe that's a central -- that's a central element required for my opinions in the report.  I think ultimately, at the end of the day, the value of a drug is the medical benefit weighed against any harms of the drug.

Q.  You describe that -- in the body of your report that in order, as you see it, to calculate the economic value of a product to a particular plaintiff or patient, you would need to know something you describe as the ex-ante value as well as the ex-post value; is that right?

A.  In my report, I describe ex-ante value and ex-post value.  I just -- I describe that because there are different concepts.  There are different concepts of value.  It depends on when you're asking about value.

Confidential Information - Subject to Protective Order

Page 270

1       And this is particularly important when
2   there's uncertainty about what actually is in the
3   drug.  Even before we knew that there might be
4   impurities in the valsartan drug, there is still an
5   ex-ante value that could account for the possibility
6   of this impurity.  And then after we find out about
7   the possibility of impurity in some of the lots, the
8   value of the drug could be updated in ex-post way.
9       Q.  You -- you testified that there was the --
10  that it was possible somebody might know about the
11  impurity at the time that they purchased the drug
12  and that would be a part of its ex-ante value?
13      A.  They might know about a possibility of
14  impurity.
15      Q.  What evidence did you review in this case
16  that demonstrated that any one particular patient
17  had any inkling that their valsartan might contain
18  carcinogens?
19      A.  So as one consideration -- one piece of
20  evidence that I -- I mention in the report is that
21  at one point we did know about impurities in
22  valsartan and the FDA recommended patients to
23  continue taking their valsartan.  That's one
24  specific -- that's one specific instance about --
25  about impurities specifically related to

Page 271

1   nitrosamines.
2       But my earlier statement was about the
3   general possibility that we may discover something
4   about a drug that we didn't know.  When you purchase
5   something, there's not a hundred percent certainty
6   about what that thing is in general.  And you may
7   discover something that nobody else -- nobody knew
8   about this thing that you purchased and it could
9   include the possibility of impurities in general.
10      Q.  I want to talk a little about your first
11  statement that the FDA made a statement that people
12  should continue to take their valsartan drugs.
13      You're aware that that statement was made
14  in August 2018, correct?
15      A.  Correct.
16      Q.  So at that point, all of the -- or most of
17  the manufacturers and the defendants in this case
18  had already recalled all of their product off the
19  market at the time that the FDA made this statement,
20  right?
21          MR. STOY:  Object to the form.
22          THE WITNESS:  I don't know the timeline.
23  Can you -- can you say that again?
24  BY MS. HILTON:
25      Q.  Yeah.

Page 272

1       As of August 2018, at the time that the
2   FDA made the statement you just referred to about
3   the possibility of nitrosamine contamination, many
4   of the defendants had started recalling all of their
5   products off the market; isn't that right?
6       A.  I don't know all the details but if what
7   you just said is true, then some of them did not
8   recall just yet.
9       Q.  But regardless, what the FDA said about
10  the drugs in August of 2018 would have no bearing
11  whatsoever on the ex-ante value of a drug purchased
12  from 2012 until June of 2018, right?
13      A.  That statement would have bearing for
14  people who purchased the drug after the statement.
15      Q.  So would not relate to any of the
16  purchases prior to August of 2018?
17      A.  I think it still relates to whether people
18  would purchase before that time in the sense that
19  that statement is talking about potential value.
20  It's talking about the medical benefits of taking
21  that drug and that would be in the consideration of
22  people who purchased it before.
23      What I was saying in the second part of my
24  response about the possibility of impurities is that
25  there's always the possibility that something --

Page 273

1   there might be something about that drug that you
2   don't know just yet and that's what I'm calling the
3   ex-ante value.
4       Q.  How does your opinion regarding the
5   ex-ante value of the affected valsartan change in
6   light of the fact that there was valsartan on the
7   market that did not contain nitrosamines?
8       A.  I did consider that.
9       Q.  How did you consider that?
10      A.  So when you're talking about a demand
11  curve, the demand curve incorporates other products
12  that are already in the market.
13      Q.  So is the ex-ante value of a valsartan
14  that did not contain nitrosamine manufactured by a
15  manufacturer that is not a defendant in this case
16  different than the ex-ante value of the affected
17  valsartan?
18      A.  Can you say that again?
19      Q.  Is the ex-ante value of the uncontaminated
20  valsartan manufactured by manufacturers who are not
21  defendants in this case different than the ex-ante
22  value of the affected valsartan at issue in this
23  litigation?
24      A.  And by ex-ante you mean before we knew
25  which manufacturers were associated with affected

Page 274

1 valsartan; is that right?
2    Q.   Correct.
3    A.   I can't say whether they're exactly the
4 same.  They could still differ.  I don't know the
5 other considerations that might differentiate
6 different manufacturers before it was known which
7 ones were linked to affected valsartan.
8    Q.   In your discussion of the ex-ante value of
9 affected valsartan, you delineated a list of factors
10 that you would look at to determine the value; is
11 that right?
12    A.   Can you point me to the paragraph that
13 you're talking about?
14    Q.   Sure.
15       134.
16    A.   Uh-huh.
17    Q.   From an economics perspective, how would
18 you go about incorporating these values and these
19 factors in a calculation to determine a prescription
20 drug's ex-ante value?
21    A.   That is not a core -- that's not a core
22 analysis that I did in this report, although I talk
23 about it.  The core opinion of this report is
24 whether we can say that affected valsartan is
25 worthless.

Page 275

1    Q.   So you have no opinion whatsoever on how
2 to actually go about calculating the ex-ante value
3 of the affected valsartan; is that right?
4    A.   I have some ideas --
5       MR. STOY:  Objection to form.
6       THE WITNESS:  -- but I don't know if
7 they're kind of -- if they're thought through at the
8 proper level that I would be willing to offer them
9 at this deposition.
10 BY MS. HILTON:
11    Q.   Have you ever conducted a mathematical
12 calculation of a generic prescription drug product's
13 ex-ante value before?
14    A.   I personally have not but I think that
15 there are several ways in which you could address
16 this.
17    Q.   What are those ways?
18    A.   So without having thought in great detail
19 for this deposition, there are ways to value what
20 consumers -- value consumers' utility in terms of
21 different health outcomes.  It would -- you can
22 incorporate the value of getting cancer with the
23 value of controlling hypertension.  The value of
24 treating heart failure.  There are methods to value
25 those things and if -- that's one way to kind of --

Page 276

1 to perhaps to get at these ex-ante values
2 incorporating any uncertainty.
3       There are possibly other ways to do this
4 that I haven't thought to to the level of detail
5 that I think it would require for this deposition.
6    Q.   Have you ever read any literature about
7 conducting the mathematical calculation for the
8 ex-ante value of a generic prescription drug?
9    A.   I'm aware of literature that -- that uses
10 the approach that I just described to you.  And that
11 approach could be applied to the value of a generic
12 prescription drugs.
13    Q.   Is that literature cited in your report?
14    A.   That's -- it's possibly cited in my
15 report.  I can't recall.  This is not a -- as I
16 said, my report primarily addresses the claim of
17 whether valsartan is worthless, not how one would
18 conduct an economic evaluation of the worth.
19    Q.   Well, you, yourself, have never actually
20 endeavored to conduct such a calculation or
21 evaluation of a generic prescription drug's ex-ante
22 value, correct?
23    A.   Specifically --
24       MR. STOY:  Asked and answered.
25       THE WITNESS:  Go ahead, Frank.

Page 277

1       MR. STOY:  I just objected to asked and
2 answered.
3       You can go ahead.
4       THE WITNESS:  That's a very specific
5 question that you asked, whether I endeavored to
6 calculate the ex-ante value before an information
7 revelation of a generic prescription drug.
8       It's hard for me to kind of answer whether
9 I have done cost-effectiveness analyses for analyses
10 of patient utility that could bear on that exact
11 specific question, but I have done economic analyses
12 that value different patient health outcomes and
13 weighed them against each other.
14 BY MS. HILTON:
15    Q.   So the answer is no, you haven't conducted
16 a mathematical calculation to determine the ex-ante
17 value of a prescription generic drug; is that right?
18    A.   It's possible that I have.  I just can't
19 remember.
20    Q.   After determining the ex-ante value of a
21 prescription drug, you write that in order to figure
22 out the -- I guess the injury to a particular
23 plaintiff you have to then ascertain the ex-post
24 value of that product.
25       What is your definition of ex-post value?

Confidential - Information Subject to Protective Order

Page 278

1  A.  What I refer to here as ex-post value is
2  the value that you have after the information
3  revelation.
4      But I think it's important to note that
5  there are many different steps of information
6  revelation that could be possible.
7          There is information revelation that you
8  consumed a drug that could contain nitrosamines.
9  And there's further revelation of you may know
10 whether or not you had a lot that had nitrosamines
11 in it.  And then ultimately you would need to know
12 whether you suffered cancer as a result of
13 nitrosamines.  That could be an event later down the
14 road.  There are many different kind of points in
15 the timeline at which you might have different
16 values.
17     Q.  So is it fair to say there's no real
18 concrete way to actually calculate a -- the effect
19 of valsartan's ex-post value?
20     A.  No, it's not fair to say that.
21     Q.  Why not?
22     A.  There is a framework that you could
23 undertake -- and this is not something that I --
24 again, the key point of my report is that I'm
25 rejecting the idea that anybody who consumed

Page 279

1  affected valsartan had a value of zero.  That is the
2  key point that I'm saying.
3          But if you needed to calculate exactly
4  what somebody's ex-post value would be, as I
5  mentioned, there are methods to use health outcomes
6  and methods to incorporate uncertainty to arrive at
7  a willingness to pay.
8      Q.  Have you ever conducted a mathematical
9  calculation of a generic drug's ex-post value?
10     A.  I think my answer would be similar to your
11 question about whether I've conducted a mathematical
12 analysis to calculate the ex-ante value of a drug.
13 It's possible that I have.  I can't really comment
14 at this point.  The methods that you would use to do
15 such a thing I have done.
16     Q.  If we look at the second-to-last sentence
17 in paragraph 137, you were talking about risk
18 aversion in this paragraph, and you write, "Second,
19 any reduction in economic value depends on a
20 patient's level of risk aversion, which has been
21 shown to vary across individuals."
22         Do you see that?
23     A.  Uh-huh.  Yes.
24     Q.  When discussing risk aversion, isn't it
25 necessary that a person who is averting risk

Page 280

1  actually have knowledge of that risk?
2      A.  No.
3      Q.  Why not?
4      A.  A risk aversion does not require knowledge
5  of risk.  It tells you what -- what is the expected
6  utility of somebody given uncertainty in the future
7  and this person could have many different
8  realizations of whether they get something that's
9  an -- like an -- what would be called a negative
10 shock to their utility versus a positive shock to
11 their utility.
12         All they need to know in order to
13 calculate risk aversion is how that person's utility
14 varies across different states of the world.
15     Q.  So your testimony is that risk aversion
16 and the idea of risk does not require a person to
17 actually have knowledge of the risk; is that right?
18     A.  To measure risk aversion you don't need --
19 you don't -- you don't need to know the person's
20 knowledge.  It does not require a person's knowledge
21 of the risk to measure risk aversion.
22         In order to calculate somebody expected
23 value -- expected willingness to pay at a given
24 point in time you would need to know what are the
25 possible states of the world in the future and you

Page 281

1  would need to know the risk aversion but to know
2  their risk aversion you don't need patient knowledge
3  of various events in the future.
4      Q.  But you do agree that the additional risk
5  that nitrosamines in the affected valsartan could in
6  some instances reduce the economic value of the
7  drug, right?
8      A.  In some instances, yes.
9          MS. HILTON:  Can we go off the record.  I
10 may be close to finish and I just want to check in
11 with my colleagues.
12         THE VIDEOGRAPHER:  Okay.  We're off the
13 record at 4:03 p.m. Pacific time.
14         (Whereupon, a brief recess was taken.)
15         THE VIDEOGRAPHER:  We are back on the
16 record.  The time is 4:09 p.m. Pacific time.
17 BY MS. HILTON:
18     Q.  Dr. Chan, have you ever prescribed
19 valsartan to a patient?
20     A.  Yes.
21     Q.  How did you personally become aware of the
22 recall of the affected valsartan products?
23     A.  I became aware of the recall through this
24 case.
25     Q.  So prior to this case, you had no

Confidential Information Subject to Protective Order

Page 282

1  knowledge that the FDA had initiated an
2  unprecedented classwide recall of the affected
3  valsartan?
4      MR. STOY:  Object to the form.
5      THE WITNESS:  As a hospitalist, I don't
6  decide which valsartan, which -- specifically which
7  NDC gets delivered to a patient, gets dispensed to a
8  patient.  I write valsartan, the dose, the
9  frequency, and I don't concern myself with whether
10 it's branded or generic and if it's generic, which
11 type of valsartan it is.  So there's no reason for
12 me to pay attention to that.
13 BY MS. HILTON:
14     Q.  And do you not concern yourself with these
15 things because the generic is supposed to be the
16 same as the branded drug?
17     MR. STOY:  Object to the form.
18     THE WITNESS:  That's not the reason that I
19 don't pay attention to these things.  The reason
20 that I don't pay attention to these as a
21 hospitalist, personally as a clinician, is that I
22 don't determine which of these drugs, which NDC code
23 is going to be dispensed to a patient for whom I
24 prescribe valsartan.
25

Page 283

1  BY MS. HILTON:
2      Q.  Just generally, though, in your practice
3  as a physician do you have an expectation that the
4  generic products are the same as the branded
5  reference listed drugs?
6      MR. STOY:  Objection.  Beyond the scope of
7  his report.
8      You can answer.
9      THE WITNESS:  This is not a -- this is
10 not -- this is not within the scope of my report.
11 Would you like me to comment on -- I'm not sure.
12 BY MS. HILTON:
13     Q.  Yeah, I'm just asking you, as a physician,
14 you have that expectation that the generic drugs are
15 the same as the reference listed brand drugs?
16     MR. STOY:  Object to the form.
17     Go ahead.
18     THE WITNESS:  I think my main expectation
19 is that they should contain the same active
20 ingredient.  I know that there is a process by which
21 we might identify impurities in drugs and recall
22 drugs.  And that there is no guarantee that a
23 generic drug will be exactly the same as a branded
24 drug.
25

Page 284

1  BY MS. HILTON:
2      Q.  And at what point in your education did
3  you learn about the impurities that may be present
4  in generic drugs?
5      A.  I'm not sure if I remember the time in my
6  education.  But I think it's in some ways common
7  sense.  You know that generic drugs are made by
8  different manufacturers.  You know that they're not
9  exactly the same.  The requirement of generic drugs
10 is that they have the same active ingredient.  It's
11 not required that they're exactly the same.
12     And so it follows naturally that there
13 might be things that differ between generic drugs
14 and branded drugs and that we don't know all of
15 these, including the generic manufacturers at the
16 time, don't know all of these things at this point
17 and some of these things could be revealed later on.
18     Q.  Would it surprise you to know that one of
19 the generic manufacturers in this case had knowledge
20 that their valsartan contained nitrosamines a year
21 before they were actually recalled from the market?
22     MR. STOY:  Object to the form.  Beyond the
23 scope.  Mischaracterizes.
24     THE WITNESS:  I have no knowledge of that.
25     MR. STOY:  Mischaracterizes the evidence.

Page 285

1      Go ahead.
2      THE WITNESS:  I have no knowledge of that.
3  I'm not sure if I can comment on that.
4  BY MS. HILTON:
5      Q.  Okay.  Have you ever monitored any
6  patients for cancer?
7      A.  No, not -- let me just -- let me clarify.
8      I have in the past ordered screening tests
9  for cancer.  My current clinical responsibilities
10 does not primarily focus on screening for cancer as
11 a hospitalist.
12     Q.  What screening tests did you order for
13 cancer?
14     A.  In primary care you could order a number
15 of screening tests such as Pap smears or
16 colonoscopies.
17     Q.  Aside from the opinions that are contained
18 within your report, do you intend to offer any other
19 opinions in this litigation?
20     A.  I don't have any plans to do so right now.
21     MS. HILTON:  Thank you, Doctor.  I have no
22 further questions.
23     MR. STOY:  Thank you.
24     Let's go off the record.
25     THE VIDEOGRAPHER:  Off the record for the

Confidential - Subject to Protective Order

1  day or does anyone have anything else?
2      MR. STOY:  We may have some follow-up
3  questions.  I want to take ten minutes.
4      THE VIDEOGRAPHER:  No problem.
5  We're off the record at 4:15 p.m.
6      (Whereupon, a brief recess was taken.)
7      THE VIDEOGRAPHER:  We are back on the
8  record.  The time is 4:26 p.m. Pacific team.
9          EXAMINATION
10  BY MR. STOY:
11      Q.  All right.  Dr. Chan, good afternoon
12  again.  Welcome back.  I know it's been a long day
13  so I'm going to be brief but I do have a few
14  follow-up questions to ask you, okay?
15      A.  Okay.
16      Q.  My first question is, as a matter of
17  economics, can you explain the interplay between
18  price and value?
19      MS. HILTON:  Objection to form.
20  BY MR. STOY:
21      Q.  Go ahead.
22      A.  Sure.
23          Value relates to the utility that somebody
24  would get from a product and together this forms the
25  demand curve.  Price is something when you have a

1  market and you have supply and where demand meets
2  supply that's where you have price.  So you can have
3  value even if there's no market and even if there's
4  no supply.
5      Q.  Are price and value considered
6  interchangeable terms in economics?
7      A.  No.
8      Q.  Is economic value the same thing as
9  equilibrium price?
10      A.  No.
11      Q.  In paragraph 44 of Dr. Conti's report, and
12  I believe it's maybe Exhibit 3, you can pull it up
13  if you want to, but I'm going to read a statement.
14          She says, and I quote, According to
15  economic theory, for a consumer product to have
16  economic value, demand for the product must exist
17  and supply must be allowed to meet demand.
18          Do you agree with that statement by
19  Dr. Conti regarding economic theory?
20      A.  No, I don't agree with that.  That is not
21  consistent with what I have described as economic
22  theory and the relationship between price and value.
23      Q.  Can a product have economic value even if
24  there is no equilibrium price in the market?
25      A.  Yes.

1      Q.  Is willingness to pay the only thing to
2  consider in determining economic value?
3      A.  Yes.  Willingness to pay and economic
4  value are synonymous.
5      Q.  Dr. Chan, you were shown an article that
6  you had previously written in the New England
7  Journal of Medicine.  I believe it was Exhibit 5.
8          Do you remember that?
9      A.  Yes.
10      Q.  And then you were also shown some comments
11  that were received that were sent to the author.  I
12  believe that was Exhibit 6.
13          Do you remember that?
14      A.  Yes.
15      Q.  Is it uncommon for peer-reviewed
16  publications for the authors to be sent comments by
17  people?
18      A.  I don't know how common it is.  But in
19  this case, this was a comment that was a bit
20  ancillary to the main analysis and we acknowledged
21  the comment.  And the article itself, I think the
22  main points that we made in the article itself are
23  still valid.  The -- it's also -- it also bears
24  mentioning that the comment didn't really make a
25  point about averages versus other types of moments

1  of a statistical distribution.
2      Q.  Did the New England Journal of Medicine
3  retract your article after those comments were
4  submitted?
5      A.  No.
6      Q.  Was the article ever retracted?
7      A.  No.
8      Q.  Now, I want you to go back to your report,
9  Dr. Chan.  And specifically, I want you to look at
10  paragraph 117.
11          Are you there?
12      A.  Okay.  Yep.
13      Q.  Do you recall earlier you were asked some
14  questions with regard to the use of averages?
15      A.  Yes.
16      Q.  Why is Dr. Song's use of averages in his
17  report inappropriate, in your opinion?
18      MS. HILTON:  Objection to form.
19      THE WITNESS:  And I want to clarify that
20  averages are not in and of themselves a bad thing.
21  It depends on how you're using the averages and as I
22  said during the deposition, which sample you're
23  getting the average from and what purpose you're
24  using the average for.
25          The problem with Dr. Song's use of an

Confidential Information - Subject to Protective Order

Page 290

1 average from some publication that looks at another
2 population, probably a general population, comparing
3 private insurance prices and Medicare prices, is
4 that that average might not be applicable to the
5 class at hand, which by definition, would have had
6 to be patients who took valsartan.  And it's
7 possible that that average could be wildly off.
8         MR. STOY:  Okay.  Thank you, Dr. Chan.  I
9 have no further questions.
10        MS. HILTON:  Can we go off the record for
11 a moment.  I just want to confer.
12        THE VIDEOGRAPHER:  Okay.  We're off the
13 record at 4:32 p.m.
14        (Whereupon, a brief recess was taken.)
15        THE VIDEOGRAPHER:  We are back on the
16 record at 4:35 p.m.
17              EXAMINATION
18 BY MS. HILTON:
19    Q.  Doctor, Mr. Stoy asked you questions about
20 equilibrium price.
21        Do you remember that?
22    A.  Yes.
23    Q.  What's your definition of equilibrium
24 price?
25    A.  Equilibrium price is where supply and

Page 291

1 demand meet in terms of price.
2    Q.  And it's your testimony that a product can
3 have economic value even if there is no equilibrium
4 price in the market?
5    A.  Yes.
6        MS. HILTON:  I have no further questions.
7              EXAMINATION
8 BY MR. MIGLIACCIO:
9    Q.  Doctor, I just have I think one.  Maybe --
10 I thought it was one.  We'll see.
11        You -- Mr. Stoy asked you questions about
12 averages in paragraph 117.  And you testified
13 that -- that the average might not be applicable to
14 the class at hand and that it's possible that that
15 average could be wildly off, correct?
16    A.  Correct.
17    Q.  That was your testimony.
18        I just want to confirm you have not, in
19 fact, done any calculations to determine if the
20 average is not applicable to the class at hand or
21 that the average is, in fact, wildly off?
22    A.  I think I said during the deposition that
23 I have evidence that it's likely that members of the
24 class will be different than the average population
25 and that there is scope for getting the average

Page 292

1 wrong if you just look at variation in prices, which
2 we have done in the report.
3    Q.  You have not, in fact, done any
4 calculations, though, to determine if the averages
5 are wildly off or not applicable?
6    A.  The other thing I think I've said in the
7 deposition is that I think it would be quite
8 difficult to actually calculate it so I don't think
9 anybody's done any calculations to show me something
10 about what that price would be other than what the
11 overall average is.
12    Q.  Including you, you have not done?
13    A.  Include me or --
14    Q.  Okay.
15    A.  -- anybody else among the plaintiffs'
16 side.
17    Q.  Got it.
18        MR. MIGLIACCIO:  I have no further
19 questions.  Thank you, Doctor.
20        MR. STOY:  Nothing further from us.
21        THE VIDEOGRAPHER:  Okay.  This marks the
22 end of today's testimony of Dr. David Chan.
23        We are off the record at 4:37 p.m. Pacific
24 time.
25        (Whereupon, the deposition was concluded

Page 293

1
2 at 4:37 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Confidential Information Subject to Protective Order

Page 294

INSTRUCTIONS TO WITNESS

1
2
3        Please read your deposition over carefully
4  and make any necessary corrections.  You should
5  state the reason in the appropriate space on the
6  errata sheet for any corrections that are made.
7        After doing so, please sign the errata
8  sheet and date it.
9        You are signing same subject to the
10 changes you have noted on the errata sheet, which
11 will be attached to your deposition.
12       It is imperative that you return the
13 original errata sheet to the deposing attorney
14 within thirty (30) days of receipt of the deposition
15 transcript by you.  If you fail to do so, the
16 deposition transcript may be deemed to be accurate
17 and may be used in court.
18
19
20
21
22
23
24
25

Page 296

ACKNOWLEDGMENT OF DEPONENT

1
2
3
4
5        I,_____, do hereby certify
6  that I have read the foregoing pages, and that the
7  same is a correct transcription of the answers given
8  by me to the questions therein propounded, except
9  for the corrections or changes in form or substance,
10 if any, noted in the attached Errata Sheet.
11
12
13      _____  _____
14      DAVID C. CHAN, JR., M.D.          DATE
15
16
17
18
19
20
21
22
23
24
25

Page 295

ERRATA SHEET

1
2
3  PAGE  LINE   CHANGE
4  ____  ____  _____
5        REASON:_____
6  PAGE  LINE   CHANGE
7  ____  ____  _____
8        REASON:_____
9  PAGE  LINE   CHANGE
10 ____  ____  _____
11       REASON:_____
12 PAGE  LINE   CHANGE
13 ____  ____  _____
14       REASON:_____
15 PAGE  LINE   CHANGE
16 ____  ____  _____
17       REASON:_____
18 PAGE  LINE   CHANGE
19 ____  ____  _____
20       REASON:_____
21 PAGE  LINE   CHANGE
22 ____  ____  _____
23       REASON:_____
24
25

Page 297

1  STATE OF CALIFORNIA  )
2  COUNTY OF YOLO      )
3        I, ELAINA BULDA-JONES, a Certified Shorthand
4  Reporter of the State of California, duly authorized
5  to administer oaths pursuant to Section 2025 of the
6  California Code of Civil Procedure, do hereby
7  certify that
8              DAVID C. CHAN, JR., M.D.,
9  the witness in the foregoing deposition, was by me
10 duly sworn to testify the truth, the whole truth and
11 nothing but the truth in the within-entitled cause;
12 that said testimony of said witness was reported by
13 me, a disinterested person, and was thereafter
14 transcribed under my direction into typewriting and
15 is a true and correct transcription of said
16 proceedings.
17       I further certify that I am not of counsel or
18 attorney for either or any of the parties in the
19 foregoing deposition and caption named, nor in any
20 way interested in the outcome of the cause named in
21 said deposition dated the 7th day of March, 2022.
22
23
24
25  ELAINA BULDA-JONES, CSR 11720