# EXHIBIT H

## REDACTED

Confidential Information - Subject to Protective Order

1        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW JERSEY
2                    -  -  -
3

   IN RE:  VALSARTAN, LOSARTAN,  :
4  AND IRBESARTAN PRODUCTS        : MDL No. 2875
   LIABILITY LITIGATION           :
5  ------------------------------------------
6  THIS DOCUMENT APPLIES TO ALL  : HON ROBERT B.
   CASES                          : KUGLER
7                    -  -  -
8      CONFIDENTIAL INFORMATION - SUBJECT TO
                PROTECTIVE ORDER
9
                  MARCH 21, 2022
10
                     -  -  -
11
12          Remote Videotape Deposition,
13  taken via Zoom, of ERIC SHEININ, Ph.D.,
14  commencing at 9:35 a.m., on the above
15  date, before Amanda Maslynsky-Miller,
16  Realtime Reporter and Certified Court
17  Reporter in and for the State of New
18  Jersey.
19
20                   -  -  -
21

        GOLKOW LITIGATION SERVICES
22     877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
23
24

Page 2

APPEARANCES:

SLACK DAVIS SANGER LLP
BY: JOHN R. DAVIS, ESQUIRE
BY: BETH QUESTAD, PARALEGAL
6001 Bold Ruler Way
Suite 100
Austin, Texas 78746
(512) 795-8686
jdavis@slackdavis.com
Representing the Plaintiffs

PIETRAGALLO GORDON ALFANO BOSICK
& RASPANTI, LLP
BY: JASON M. REEFER, ESQUIRE
One Oxford Centre
301 Grant Street, 38th Floor
Pittsburgh, Pennsylvania 15219
(412) 263-2000
jmr@pietragallo.com
Representing the Defendant,
Mylan Pharmaceuticals, Inc.

WALSH PIZZI O'REILLY FALANGA LLP
BY: CHRISTINE I. GANNON, ESQUIRE
Three Gateway Center
100 Mulberry Street
15th Floor
Newark, New Jersey 07102
(973) 757-1100
cgannon@walsh.law
Representing the Defendants,
Teva Pharmaceutical Industries, Ltd.,
Teva Pharmaceuticals SA, Inc.,
Actavis LLC, and Actavis Pharma, Inc.

Page 3

APPEARANCES: (Continued)

HINSHAW & CULBERTSON LLP
BY: KATHLEEN E. KELLY, ESQUIRE
53 State Street
27th Floor
Boston, Massachusetts 02109
(617) 213-7000
kekelly@hinshawlaw.com
Representing the Defendant,
SciGen Pharmaceuticals

GREENBERG TRAURIG, LLP
BY: BRIAN RUBENSTEIN, ESQUIRE
1717 Arch Street
Suite 400
Philadelphia, Pennsylvania 19103
(215) 988-7800
rubensteinb@gtlaw.com
Representing the Defendants,
Teva Pharmaceutical Industries, Ltd.,
Teva Pharmaceuticals SA, Inc.,
Actavis LLC, and Actavis Pharma, Inc.

Page 4

APPEARANCES: (Continued)

BARNES & THORNBURG LLP
BY: BETH BEHRENS, ESQUIRE
11 South Meridian Street
Indianapolis, Indiana 46204
(317) 236-1313
beth.behrens@btlaw.com
Representing the Defendants,
CVS Pharmacy, Inc., and Rite Aid
Corporation

ALSO PRESENT:
Brad Matta, Esquire, In-House Counsel, Mylan
Chris Clee, Videographer

- - -

Page 5

- - -
I N D E X
- - -

Testimony of:  ERIC SHEININ, Ph.D.

By Mr. Davis        10, 288
By Mr. Reefer       256, 317

- - -
E X H I B I T S
- - -

NO.          DESCRIPTION              PAGE

Sheinin-1   No Bates
            Expert Report of
            Eric Sheinin, Ph.D.        31

Sheinin-2   No Bates
            1/12/22 Letter,
            Trischler to Counsel       55

Sheinin-3   MYLAN-MDL2875-003457
            11/5/19 FDA Warning
            Letter                     69

Sheinin-4   No Bates
            USP Announces Approval of
            Chapter on Nitrosamines
            Impurities                 78

Page 6

- - -
E X H I B I T S
- - -

NO.        DESCRIPTION                PAGE

Sheinin-5   No Bates
            M7(R1) Assessment and
            Control of DNA Reactive
            (Mutagenic) Impurities in
            Pharmaceuticals to Limit
            Potential Carcinogenic
            Risk, Guidance for
            Industry              83
Sheinin-6   No Bates
            Valsartan Guidance     93
Sheinin-7   MYLAN-MDL2875-00705126
            3/14/19 Cover Letter for
            Master File GDUFA
            Complete Response Letter   101
Sheinin-8   No Bates
            Impurities in Drug Products
            and Drug Substances -
            A USP Approach         117
Sheinin-9   No Bates
            FAQs: Organic Impurities   135
Sheinin-10  MYLAN-MDL2875-00894833
            Valsartan Drug Master
            File, Section 3.2.S.3   170
Sheinin-11  MYLAN-MDL2875-00392350
            11/26/18 E-mail,
            Owens to Smith         182
Sheinin-12  MYLAN-MDL2875-00552465
            DMF DLAPI Information
            Request               188

Page 7

- - -
E X H I B I T S
- - -

NO.        DESCRIPTION                PAGE

Sheinin-13  No Bates
            Valsartan Development
            Report, Addendum IV    202
Sheinin-14  No Bates
            Orange Book Preface,
            Food and Drug Administration,
            Center for Drug Evaluation
            and Research, Approved Drug
            Products with Therapeutic
            Equivalence Evaluations   222
Sheinin-15  12/31/21 ProPharma Group
            Invoice
            #PPGUS000581          247
Sheinin-16  No Bates
            1/31/22 ProPharma Group
            Invoice
            #PPGUS000820          248
Sheinin-17  No Bates
            2/28/22 ProPharma Group
            Invoice
            #PPGUS001080          248
Sheinin-18  No Bates
            Supplement to Exhibit B to
            the Report of
            Eric Sheinin, Ph.D.     253
Sheinin-19  No Bates
            Warning Letter
            Mylan Laboratories
            Limited – Unit 7        293

Page 8

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
Page Line    Page Line    Page Line
None

Request for Production of Documents
Page Line    Page Line    Page Line
None

Stipulations
Page Line    Page Line    Page Line
9      1

Question Marked
Page Line    Page Line    Page Line
None

Page 9

- - -
(It is hereby stipulated and
agreed by and among counsel that
sealing, filing and certification
are waived; and that all
objections, except as to the form
of the question, will be reserved
until the time of trial.)
- - -
VIDEO TECHNICIAN:  Good
morning.  We are now on the
record.  My name is Chris Clee,
I'm a videographer for Golkow
Litigation Services.  Today's date
is March 21st, 2022, and the time
is 9:35 a.m. Eastern Standard
Time.
This remote video deposition
is being held in the matter of
valsartan, Losartan and Irbesartan
Products Liability Litigation, MDL
Number 2875.  The deponent is Eric
Sheinin.
All parties to this

Confidential Information Subject to Protective Order

Page 10

1  deposition are appearing remotely
2  and have agreed to the witness
3  being sworn in remotely.
4      Due to the nature of remote
5  reporting, please pause briefly
6  before speaking to ensure all
7  parties are heard.
8      Counsel will be noted on the
9  stenographic record.  The court
10 reporter is Amanda Miller, who
11 will now swear in the witness.
12      - - -
13      ERIC SHEININ, Ph.D., after
14 having been duly sworn, was
15 examined and testified as follows:
16      - - -
17      EXAMINATION
18      - - -
19 BY MR. DAVIS:
20     Q.  Good morning, Dr. Sheinin.
21 My name is John Davis, I'm at the law
22 firm of Slack Davis Sanger down here in
23 Austin, Texas.
24      How are you doing this

Page 11

1  morning?
2      A.  Okay, John.  I'm doing all
3  right, thank you.  How are you?
4      Q.  Good.  Not too bad.  We're
5  braving some tornado warnings and severe
6  hail threats here, so hopefully we'll
7  keep power throughout this entire thing.
8      A.  Okay.  Good.
9      Q.  Well, let me start by asking
10 you, have you ever given testimony under
11 oath before?
12     A.  Yes, I have.
13     Q.  Okay.  About how many times?
14     A.  Five or six, I think.
15     Q.  Would that have been in the
16 capacity of an expert witness each of
17 those times?
18     A.  I guess so.  One of the
19 times I was still at FDA, and I was --
20 what I was asked to talk about, it was a
21 device/drug combination.  And I had to
22 talk about the -- one of the chemicals in
23 the -- in the device/drug combination.
24      And I guess -- I wasn't

Page 12

1  necessarily called an expert witness, but
2  I was doing it as part of my job at FDA.
3      Q.  Okay.  Would that have been
4  in a court proceeding or some kind of
5  regulatory --
6      A.  It was a deposition.
7      Q.  -- proceeding?
8      A.  It was a deposition.
9      Q.  Okay.  The underlying sort
10 of proceeding that the deposition
11 occurred in, would that have been a court
12 case or some kind of regulatory action?
13     A.  I think it was regulatory.
14 I don't believe it was in a court action.
15     Q.  Do you recall what the
16 device/drug combo was?
17     A.  I'm not sure that I'm at
18 liberty to say.
19     Q.  And then the other -- I
20 think you said five to six times total,
21 once in this FDA proceeding.
22      The other -- each of the
23 other times would have been as an expert
24 witness?

Page 13

1      A.  Yes.
2      Q.  Can you tell me what those
3  instances of you serving as an expert
4  witness in litigation, minus the FDA
5  proceeding, related to?
6      A.  I can tell you that one of
7  them involved a court case in Canada
8  where I -- I did not give a deposition,
9  but I did appear at trial.  And that
10 involved how FDA would look at a pure
11 enantiomer, if the original application
12 was for a racemate, what would be
13 expected from the chemistry perspective.
14      MR. REEFER:  John is an
15      expert on that subject, aren't
16      you, John?
17 BY MR. DAVIS:
18     Q.  I think I'm going to defer
19 to you on all those chemistry terms and
20 just say, that was a -- mostly a
21 scientific-based expert opinion as a
22 process chemist?
23     A.  Not as a process chemist,
24 just as a review chemist and how -- how

Confidential Information – Subject to Protective Order

1  FDA would -- what FDA would want in the
2  application if it was a single enantiomer
3  versus what was -- what was already
4  approved as a racemate.
5      Q.   Okay.
6      A.   It didn't have anything to
7  do with the process.
8      Q.   Well, sure.  I guess let
9  me --
10      A.   The regulatory process.  Let
11  me say that, yeah.
12      Q.   Right.  And that was going
13  to be my question.
14          The opinion you gave in that
15  was -- was a chemistry-related opinion,
16  not anything really focused on regulatory
17  affairs or anything like that, right?
18      A.   Correct.
19      Q.   Okay.
20          MR. REEFER:  Eric -- can I
21  interject just to help us all out?
22          Eric, if you could give a
23  second-or-two pause before
24  answering, that would be helpful

1      for everybody involved, okay?
2          THE WITNESS:  Okay.
3  BY MR. DAVIS:
4      Q.   Okay.  So I think you
5  mentioned there might be a couple of
6  other times you served as an expert
7  witness.
8          Can you give me a brief
9  description of those instances as well?
10      A.   One that I'll -- I should
11  wait.
12          One that I recall was -- it
13  involved a company that received approval
14  for an ANDA, and there was basically a
15  Phase IV commitment that FDA wanted them
16  to do, and there was also litigation that
17  caused the approval to be delayed because
18  of the litigation.
19          And what I testified to
20  involved a timeline that the company, for
21  whatever reason, delayed doing the work
22  that FDA wanted because they knew there
23  was a litigation and they would not be
24  able to launch the product until a

1  certain point in time.  And so they
2  basically took their time responding to
3  FDA.
4          And my part of the -- what I
5  was asked to opine on was what if the
6  company had gone forward and done the
7  work immediately, what would FDA -- how
8  would FDA have looked at the final
9  approval, whether it would have speeded
10  up the -- getting the approval, which, of
11  course, would have been -- the company
12  would have been able to launch sooner.
13          So it was basically
14  something like that.
15      Q.   And so that, the litigation,
16  underlying litigation, would have been a
17  patent litigation, I suppose?
18      A.   Pardon me?
19      Q.   Was this an instance of what
20  we call delayed generic entry litigation?
21          MR. REEFER:  Object to form.
22          Go ahead, if you can.
23          THE WITNESS:  I don't know
24  what that -- what that means.  But

1      the litigation ended sooner than
2      the company expected, so they
3      could have presumably launched
4      sooner if they had done the work
5      sooner.
6  BY MR. DAVIS:
7      Q.   Who did you represent in
8  that case -- or, sorry, and by
9  "represent," I mean on whose behalf did
10  you submit an expert report?
11      A.   You know, I don't recall
12  which company it was.
13      Q.   Was it a follow-on generic
14  company, like, not the first-file ANDA
15  but a follow-on generic company?
16      A.   I believe it was a first
17  generic.
18      Q.   That company wasn't Mylan,
19  was it?
20      A.   No.
21      Q.   Do you know if it was any of
22  the manufacturer defendants in this
23  valsartan MDL litigation?
24      A.   It was not.

Confidential Information Subject to Protective Order

Page 18

¹      Q.   Okay.  Any other instances
² of serving as an expert witness?
³      A.   Yeah.  I recall one,
⁴ actually, it was a functional food.  And
⁵ my part involved evaluating work that the
⁶ other side's contract lab had performed,
⁷ trying to quantify the amount of an
⁸ impurity that was in the functional food
⁹ ingredient.
¹⁰      Q.   Okay.  Any other instances?
¹¹      A.   I believe -- I know there
¹² were a couple of others.  I can't recall
¹³ what the specifics were, but it involved
¹⁴ chemistry.
¹⁵      Q.   What about a Fresenius
¹⁶ dialysis product?  Did you ever give
¹⁷ expert testimony in that -- for Fresenius
¹⁸ in that case?
¹⁹      A.   I don't believe I ever did
²⁰ anything for Fresenius.
²¹      Q.   Okay.  You don't recall a
²² litigation versus Fresenius in the
²³ Northern District of Illinois, Case
²⁴ Number 16-cv-651?

Page 19

¹      A.   I don't recall.  I know I
² did do a deposition on a case in Chicago,
³ so it might be related to that.  But I
⁴ don't -- I don't recall that -- that I
⁵ was involved with Fresenius.
⁶      Q.   In each of those instances
⁷ of serving as an expert witness, were
⁸ your reports and opinions tendered on
⁹ behalf of pharmaceutical manufacturers or
¹⁰ device manufacturers in each of those
¹¹ instances, aside from the FDA one?
¹²      A.   Pharmaceutical
¹³ manufacturers.
¹⁴      Q.   When were you engaged by
¹⁵ Mylan for this case?
¹⁶      A.   I believe it was late 2021.
¹⁷      Q.   By "late 2021," can you give
¹⁸ a month?
¹⁹      A.   November or December.
²⁰      Q.   I noticed on a couple of
²¹ your invoices that the invoices were
²² submitted from an entity called ProPharma
²³ Group.
²⁴          Who are they?

Page 20

¹      A.   I'm not sure all the --
² represent -- how it all came about.
³          But it's, basically, I'm
⁴ doing work through NDA Partners.  And NDA
⁵ Partners has merged a couple of times.
⁶ So I still look at everything I've done
⁷ as through NDA Partners.  So I guess
⁸ ProPharma is maybe now the parent.
⁹      Q.   Does either ProPharma or NDA
¹⁰ Partners take a cut of your expert
¹¹ witness fees?
¹²      A.   Yes, they do.
¹³      Q.   What is that percentage?
¹⁴      A.   I don't know what the
¹⁵ percentage is, but I get $400 an hour.
¹⁶      Q.   Okay.  Just to get a little
¹⁷ background on you, Dr. Sheinin, can you
¹⁸ give me a brief rundown of your
¹⁹ professional career as relates to FDA,
²⁰ USP, and then your work in the consulting
²¹ industry?
²²      A.   Sure.  I received a Ph.D.
²³ from the University of Illinois, College
²⁴ of Pharmacy, in organic chemistry in

Page 21

¹ 1971.
²          And I worked for FDA
³ beginning in February of 1971, in the
⁴ division of drug chemistry.  I was a
⁵ research chemist.  I was doing work on
⁶ nuclear magnetic resonance to identify
⁷ unknown samples and to develop analytical
⁸ methods to quantify the content of
⁹ pharmaceutical products.
¹⁰          Within a couple of years of
¹¹ joining FDA, we bought our first mass
¹² spectrometer on the drug side, and I
¹³ helped to run that instrument along with
¹⁴ another chemist who had come from a
¹⁵ different agency who was a mass
¹⁶ spectrometrist.
¹⁷          And between the two of us,
¹⁸ we published a number of papers, both
¹⁹ using NMR and using mass spec.  We were
²⁰ able to couple a gas chromatograph to the
²¹ mass spectrometer, and we did do research
²² and -- trying to identify unknown
²³ materials that FDA field labs were not
²⁴ able to handle.

Confidential Information Subject to Protective Order

Page 22

1       Around 1978 or so, we had
2  four branches in the division of drug
3  chemistry.  And one of the branch chiefs
4  passed away.  I competed for that
5  position and was selected to become a
6  branch chief.
7       And during that -- my time
8  in that position, I was responsible for
9  supervising a group of chemists who,
10  quote/unquote, performed method
11  validation for analytical methods that
12  companies had submitted in their new drug
13  applications to make sure that a
14  competent FDA analyst could run the
15  procedures and come up with results that
16  were comparable to what the company had
17  provided.
18       We also had somebody in my
19  group who was doing powder -- x-ray
20  powder diffraction studies.
21       Around 1985 or so, FDA
22  merged the Bureau of Drugs and the Bureau
23  of Biologics.  They were called bureaus
24  in those days.  And biologics was in

Page 23

1  charge of the combined bureau, and they
2  made the decision, at one point in time,
3  to move some people to the review area,
4  chemists to the review area, because
5  there was a big backlog of new drug
6  applications that were pending chemistry
7  review.
8       And as it turned out, they
9  closed the entire division of drug
10  chemistry and offered everybody in the
11  division a position in headquarters.  And
12  some people took the position, some
13  people retired, and some people took
14  other positions within the government.
15       I moved to the review area
16  as a supervisory chemist, and I had
17  responsibility, initially, for chemists
18  who were reviewing anti-inflammatory drug
19  applications on the new-drug side.  This
20  was in the division of oncology and
21  radiopharmaceuticals.
22       It was the first division
23  that had two supervisory chemists, and
24  eventually the responsibility ended up

Page 24

1  for all the drugs within the division.
2  So I took over the oncology drugs and the
3  radiopharmaceuticals, which included
4  other imaging agents as well.
5       The bureau -- well, this was
6  now, then, the Center of Drug Evaluation
7  and Research.  And there was a
8  reorganization that took place, and what
9  was created was the Office of
10  Pharmaceutical Science.
11       And within the Office of
12  Pharmaceutical Science, there were four
13  smaller offices.  One was the Office of
14  New Drug Chemistry.  And I competed for
15  one of the three branches -- or one of
16  the three divisions within that office.
17  The Office of New Drug Chemistry had
18  three divisions.  And I was selected as
19  one of the division directors, the
20  Division of New Drug Chemistry 3.
21       And within that office,
22  then, Roger Williams, who was the head of
23  the office of -- Office of Pharmaceutical
24  Science, was also acting as director of

Page 25

1  the Office of New Drug Chemistry.
2       The three division
3  directors -- as I mentioned, there were
4  three divisions.  The three of us
5  competed for the permanent position of
6  director of the Office of New Drug
7  Chemistry, along with approximately
8  80-some people from the outside.
9       I was selected to lead the
10  division of -- the Office of New Drug
11  Chemistry.  And I worked in that position
12  for approximately two years, and then I
13  moved up to be the deputy director in the
14  Office of Pharmaceutical Science, which
15  was what was termed a super office versus
16  the smaller offices.  I stayed in that
17  position for approximately one year.
18       When I reached 30 years at
19  FDA, I was able to retire with a full --
20  a full pension, and I decided to move to
21  USP.
22       My boss at FDA, Roger
23  Williams, had left the year prior to my
24  retirement, and he went to USP as the

Page 26

¹ chief executive officer, executive vice
² president.  And he recruited me to move
³ to USP as a vice president.
⁴        And I had responsibility for
⁵ the scientists at USP who were
⁶ responsible for creating content of USP
⁷ and NF, working with expert -- volunteers
⁸ on expert committees as well as the
⁹ pharmaceutical industry and, at times,
¹⁰ academia.
¹¹        USP had a program to verify
¹² the quality of dietary supplement
¹³ ingredients, and eventually they moved
¹⁴ into dietary supplement products.  And
¹⁵ Roger Williams wanted to start a program
¹⁶ to evaluate the quality of active
¹⁷ pharmaceutical ingredients or drug
¹⁸ substances.
¹⁹        And I moved to that area,
²⁰ and I worked on trying to recruit
²¹ companies to submit their DMFs or just
²² their procedures for their drug
²³ substances.
²⁴        And after working for about

Page 27

¹ a year on that side, I felt, if I was
² ever going to go into consulting, which
³ was something I had thought about when I
⁴ retired from FDA, that now was the time,
⁵ I was still young enough.  And I went
⁶ into consulting.
⁷        And that's kind of a
⁸ nutshell of what my career has been.
⁹ I've been consulting since March of 2007.
¹⁰    Q.   Okay.  Thank you for that.
¹¹ And I'll take a few questions just in
¹² order.
¹³        You mentioned Roger
¹⁴ Williams, who was your former boss at
¹⁵ FDA, right?
¹⁶    A.   Yes.
¹⁷    Q.   Are you aware that he's
¹⁸ submitted an expert report in this case?
¹⁹    A.   I'm not aware.
²⁰    Q.   So you would not have talked
²¹ to him or e-mailed with him about that at
²² all?
²³    A.   No, I have not.
²⁴    Q.   Have you communicated with

Page 28

¹ any of the other defense experts who have
² submitted opinions in this litigation?
³    A.   I have not.
⁴    Q.   You mentioned a -- and so
⁵ just a clarification on a few dates.
⁶        I think you said you retired
⁷ from FDA after 30 years, but you didn't
⁸ give a date.  I assumed that means 2001,
⁹ if you started in 1971?
¹⁰    A.   Yes.  The end of February
¹¹ 2000 -- 2001.
¹²    Q.   Okay.  And then when did
¹³ you -- so you went to USP in 2001 as
¹⁴ well?
¹⁵    A.   Yes.  March of 2001.  I
¹⁶ think I had two weeks --
¹⁷    Q.   And then --
¹⁸    A.   -- two weeks in between.
¹⁹    Q.   Got you.
²⁰        And then you retired from
²¹ USP around 2007-ish?
²²    A.   Yes.
²³    Q.   You mentioned trying to
²⁴ recruit companies to submit their DMFs or

Page 29

¹ drug substance manufacturing procedures
² to USP.
³        Would that be for
⁴ pharmaceutical drugs, or was that in the
⁵ context of dietary supplements?
⁶    A.   No, this was pharmaceutical
⁷ ingredients.  For the most part,
⁸ companies were reluctant to get into it
⁹ because FDA was the legal authority.
¹⁰        There was a -- the European
¹¹ Pharmacopoeia, through the European
¹² Directorate for the Quality of Medicines,
¹³ had a program that actually was required,
¹⁴ through EMA, to -- for companies to
¹⁵ submit their active ingredients for
¹⁶ evaluation.
¹⁷        And I believe Roger was
¹⁸ interested in getting into the same type
¹⁹ of -- same type of program.  But I don't
²⁰ believe that FDA would ever have given up
²¹ the responsibility for evaluating the
²² chemistry of the -- of active
²³ pharmaceutical ingredients or drug
²⁴ substances.

Page 30

1    Q.  In your consulting work
2  since 2007, have you -- have you always
3  consulted for industry?
4          MR. REEFER:  Object to form.
5          THE WITNESS:  I have given
6    some advice, a couple of times, to
7    academia.  And I also did some
8    training for USP.  I did some
9    training courses that USP offered.
10 BY MR. DAVIS:
11   Q.  What percentage would you
12 say, of your consulting work since 2007,
13 has been for industry?
14   A.   Probably 98 percent or more.
15         MR. DAVIS:  I'm going to
16   mark your report, Dr. Sheinin.
17         That's Tab 1, Jason, in the
18   box, if he doesn't have a copy.
19         MR. REEFER:  John, I'm going
20   to stand up, and I'm going to be
21   off camera for a moment.
22         MR. DAVIS:  Sure.
23         MR. REEFER:  Actually, just
24   give me one second, okay?

Page 31

1          For purposes of formality,
2    John, you see me now?
3          MR. DAVIS:  Yes.
4          MR. REEFER:  I just wanted
5    you to see that we have not yet
6    opened the box.  So just give me
7    one moment, okay?  I have
8    scissors.
9          MR. DAVIS:  Not a problem.
10         MR. REEFER:  Tape must have
11   been on sale at Costco when you
12   packaged this.
13         Tab 1, John?
14         MR. DAVIS:  Tab 1.
15         - - -
16         (Whereupon, Exhibit
17   Sheinin-1, No Bates, Expert Report
18   of Eric Sheinin, Ph.D., was marked
19   for identification.)
20         - - -
21 BY MR. DAVIS:
22   Q.  Dr. Sheinin, do you
23 recognize what's been handed to you as
24 Exhibit-1 -- that I've now marked as

Page 32

1  Exhibit-1 as your expert report in this
2  case?
3          A.   Yes.
4    Q.  In coming up with your
5  expert report, did you review at all
6  Federal Rule of Civil Procedure 26, which
7  governs the disclosure of expert reports
8  in federal court litigation?
9          A.  No, I have never seen that.
10   Q.  Well, I'll just tell you
11 that that rule states that, and I'm
12 quoting, The report must contain a
13 complete statement of all opinions the
14 witness will express and the basis and
15 reasons for them.
16         Did you -- did you hear that
17 sentence well?
18   A.  Yes.
19   Q.  Okay.  Do you feel that your
20 expert report that you've submitted in
21 this case complies with what that rule
22 requires, namely, a complete statement of
23 all your opinions and the basis and
24 reasons for them?

Page 33

1          MR. REEFER:  Object to form.
2    Calls for a legal conclusion.
3          THE WITNESS:  Yes.
4  BY MR. DAVIS:
5    Q.  So, in other words, there's
6  no opinions in your -- that aren't in
7  your report that you would be seeking to
8  express in this litigation, correct?
9          MR. REEFER:  Object to form.
10         THE WITNESS:  Yes.
11 BY MR. DAVIS:
12   Q.  "Yes" meaning that there are
13 no other opinions that you're trying to
14 assert in this litigation that you have
15 not put in your expert report?
16         MR. REEFER:  Object to form.
17         THE WITNESS:  That's
18   correct.
19 BY MR. DAVIS:
20   Q.  Turn, if you would, to the
21 second page of your report at Paragraph
22 8.
23         You state there, I offer the
24 opinions set forth in this report to a

Page 34

1 reasonable degree of scientific certainty
2 based on my education, experience,
3 training, expertise and referenced
4 resources.
5         Do you see that?
6     A.   Yes.
7     Q.   I just want to get some
8 clarification of what you mean by
9 "referenced resources."
10        What are you referring to
11 there?
12    A.   I actually copied this
13 beginning from another expert report, and
14 I did not think about what referenced
15 resources I was -- what referenced
16 resources this referred to.
17        But I would assume it would
18 be things like the USP, the NF, FDA
19 guidances, ICH guidances, documents like
20 that.
21    Q.   Did you write this report
22 with a degree of care, Dr. Sheinin?
23    A.   Yes.
24        MR. REEFER:  Object to form.

Page 35

1         THE WITNESS:  A lot of care.
2 BY MR. DAVIS:
3     Q.   But what you're telling me
4 is that you're not sure what you mean by
5 "referenced resources" there because you
6 copied it from another expert report of
7 yours?
8         MR. REEFER:  Object to form.
9     Mischaracterizes testimony.
10        THE WITNESS:  I tried to
11    explain what I would consider
12    referenced resources.  And I would
13    still say the same thing.
14        I would consider these
15    referenced resources things such
16    as USP, the NF, FDA guidances.  I
17    might add FDA policies and
18    procedures, ICH guidances.
19    That -- to me, that's what
20    referenced resources would be.
21 BY MR. DAVIS:
22    Q.   Okay.  Well, referenced
23 resources means resources that are
24 referenced, right?

Page 36

1         Are there any resources that
2 you relied on that aren't -- are not
3 referenced in your report somewhere,
4 either in a footnote or your materials
5 considered list, I believe which is
6 Exhibit B, as you state in Paragraph 7?
7     A.   I don't believe there are
8 any others.
9     Q.   So would I be correct in
10 making the assumption that if there's
11 something that's not referred to
12 somewhere in your report, that you didn't
13 consider it in coming to your opinions?
14        MR. REEFER:  Object to form.
15    Mischaracterizes testimony.
16        THE WITNESS:  Can you repeat
17    the question?
18 BY MR. DAVIS:
19    Q.   Sure.
20        Would I be correct -- what
21 I'm trying to do, Dr. Sheinin, is sort
22 of, you know, capture the view of
23 everything you reviewed for your expert
24 report in this case.  And normally that's

Page 37

1 through either footnoting it as citations
2 in the body of your report or discussing
3 it explicitly in your report or
4 referencing a list of materials that you
5 considered or looked at in the process of
6 writing it.
7         And so what I'm trying to do
8 is clarify whether what's in the report
9 is the complete -- you know, wherever it
10 is in your report, that that's a complete
11 list of everything you looked at in
12 writing your report.
13        Do you follow?
14        MR. REEFER:  Object to form.
15        THE WITNESS:  I follow.  And
16    I believe that's the situation.
17 BY MR. DAVIS:
18    Q.   I just referenced Paragraph
19 7.  You write there that, A list of
20 materials provided for my consideration
21 is attached as Exhibit B.
22        Do you see that?
23    A.   Yes.
24    Q.   Were those materials

Page 38

1  provided by counsel?
2      A.   Yes.
3      Q.   Did you ask for them
4  specifically or was it just a package
5  that was given to you?
6      A.   I believe it was a package
7  that was given to me.
8      Q.   Did you ask counsel or make
9  any inquiries as to whether there was
10  anything additional that you might want
11  to look at?
12      A.   I don't recall asking for
13  other things.
14      Q.    So you just trusted that
15  what was given to you by Mylan's counsel
16  was a complete picture of the relevant
17  information that you might want to look
18  at?
19          MR. REEFER:  Object to form.
20          THE WITNESS:  I was asked to
21      opine on how USP functions and
22      what drug master files are.
23      Anything that I looked at that
24      counsel provided was to get a

Page 39

1      background for the overall
2      picture.
3          But I used my background and
4      my expertise and experience at USP
5      and at FDA to create my report.
6  BY MR. DAVIS:
7      Q.   Well, my question was
8  whether you trusted that what was given
9  to you was a complete picture, including
10  for those topical areas you just
11  referenced, such as USP and drug master
12  files.
13          Is that --
14          MR. REEFER:  Object to form.
15      Asked -- sorry, John.
16  BY MR. DAVIS:
17      Q.   Did you trust that what was
18  given to you by Mylan's counsel painted a
19  complete and accurate picture for you?
20          MR. REEFER:  Object to form.
21      Asked and answered.
22          THE WITNESS:  What -- my
23      background, I believe, was
24      sufficient for me to give my

Page 40

1  opinion on USP and FDA's
2  consideration of drug master
3  files.
4          Anything that I looked at
5  that counsel had provided, as I
6  mentioned, was to provide a
7  background understanding of --
8  basic understanding of the issue.
9  It was nothing that I considered
10  in -- that I would have
11  incorporated into my report.
12          I would have to venture to
13  say that I would -- I would think
14  that the amount of material that I
15  received from counsel is a very,
16  very, very small proportion of the
17  documents that might have been
18  used to fully explain the
19  situation.
20          I just can't imagine that
21  if -- if counsel had provided me
22  everything that is included in the
23  court proceedings, it probably
24  would have more than filled up my

Page 41

1  office.
2          So I just don't understand
3  what -- what the question is
4  getting at.
5  BY MR. DAVIS:
6      Q.   Well, sure, let me ask it, I
7  suppose, in a different way, then, which
8  is, did you -- upon receiving the
9  information that is listed at Exhibit B
10  of your report, upon reviewing that, did
11  you ever go back to counsel and ask for
12  anything else?
13      A.   I'm turning the page.
14          Actually, I may have asked
15  for the response -- Mylan's response to
16  the warning letter.  I can't recall for
17  definite whether that was included in the
18  original group.
19      Q.   Did you ask -- sorry.  Go
20  ahead, Dr. Sheinin.  I didn't mean to cut
21  you off there.
22      A.   I think I may have asked for
23  that response to the warning letter.
24      Q.   Why would you have asked for

Page 42

1  that?
2      A.   Just to get an overall
3  picture of how Mylan responded.
4      Q.   And by "warning letter,"
5  you're referring to the November 2019
6  warning letter issued to Unit 8?
7      A.   Yes.
8      Q.   While we're discussing that,
9  real fast, and we may come back to it,
10  but what's your understanding of how the
11  FDA received Mylan's response to the
12  warning letter?
13          MR. REEFER:  Object to form.
14      Beyond the scope.  Lack of
15      foundation.
16          THE WITNESS:  I am -- I
17      can't say how FDA responded.  I
18      have not seen anything in writing
19      from FDA about the response.
20          But I do know that Mylan --
21      Mylan's valsartan products are
22      back on the market, so I would
23      have to assume that the -- that
24      FDA was satisfied with their

Page 43

1      response, and that's how -- that's
2      why the products are on the market
3      again.
4  BY MR. DAVIS:
5      Q.   Well, do you understand that
6  the warning letter had to do, for Unit 8,
7  in part, with Mylan's practices around
8  recovered solvents and --
9          MR. REEFER:  Object to form
10      as beyond the scope.
11  BY MR. DAVIS:
12      Q.   -- as well as the issue of
13  the nitrosamine contamination in the
14  first place?
15          MR. REEFER:  Object to form.
16      Beyond the scope.  Compound.  And
17      mischaracterizes the document.
18          THE WITNESS:  That is the --
19      the response from Mylan to FDA is
20      not the basis of my report.
21          So I consider that to be --
22      it was irrelevant as to whether --
23      is irrelevant in terms of how FDA
24      might have responded to Mylan's

Page 44

1      response.
2          It doesn't form the basis
3      for anything that's in my report.
4  BY MR. DAVIS:
5      Q.   Did you ask counsel to see a
6  copy of the FDA's close-out letter for
7  Mylan's warning letter?
8      A.   I don't believe I did.
9      Q.   Do you know if one exists?
10      A.   I do not know.
11      Q.   So you wouldn't know if that
12  warning letter remains unresolved to this
13  day?
14          MR. REEFER:  Object to form.
15      Beyond the scope.  Lack of
16      foundation.
17          THE WITNESS:  I have no way
18      of knowing whether it still exists
19      or not.
20  BY MR. DAVIS:
21      Q.   Okay.  And you mentioned
22  Mylan having a -- bringing valsartan back
23  to the market, correct?
24      A.   As far as I know,

Page 45

1  valsartan -- Mylan's valsartan products
2  are on the market.
3      Q.   Do you know if Mylan had to
4  commit to the FDA not to use recovered
5  solvents until they could ensure that
6  they were safely used and that --
7          MR. REEFER:  Object to form.
8      I'm sorry, John.
9  BY MR. DAVIS:
10      Q.   Sorry.  Let me start that
11  question over, Dr. Sheinin.
12          Do you know if -- let me
13  break it down into bits.
14          Do you know if Mylan's
15  valsartan product that's back on the
16  market today is manufactured using
17  recovered solvents?
18          MR. REEFER:  Object to form.
19      Beyond the scope.  Lack of
20      foundation.
21          THE WITNESS:  That's
22      something I don't have knowledge
23      of.  It's -- again, it's not
24      something that I used to create my

Confidential Information - Subject to Protective Order

Page 46

report. Whether or not they're
using recovered solvents, I can't
tell you that. I don't know.
BY MR. DAVIS:
     Q. Okay. Do you know if Mylan
had to change the process chemistry of
its valsartan API to bring it back to the
market?
          MR. REEFER: Object to form.
Beyond the scope. Lack of
foundation.
          THE WITNESS: I'm not a
process chemist, so it's very hard
for me to answer that question.
It's a very specialized area.
          I've never worked in the
pharmaceutical industry, never
worked in developing a process for
manufacturing of a drug substance.
And it's not something that I can
opine on.
BY MR. DAVIS:
     Q. Okay. But you're not --
you're not aware, for example, of whether

Page 47

Mylan had to remove its use of
triethylamine and substitute it with
sodium bicarbonate in an effort to avoid
NDEA or other nitrosamine contamination
in order to bring valsartan back to the
market?
          MR. REEFER: Object to form.
Compound. Beyond the scope. Lack
of foundation.
          THE WITNESS: Again, I'm not
a process chemist, and I would not
attempt to try to interpret or
understand what processes Mylan
used.
          I did not consider whether
or not there was a change in the
manufacturing process to form the
basis for my report. And
that's -- I use my experience at
USP and at FDA to create the
report.
          So it's beyond my
understanding of process
chemistry, which is essentially

Page 48

nothing. It's beyond my
expertise.
BY MR. DAVIS:
     Q. Well, sure, and I'm only
asking this because you brought up the
fact that Mylan has a valsartan product
back on the market.
          And my question is, are you
familiar at all with the circumstances by
which Mylan was able to bring a valsartan
product back to the market?
          MR. REEFER: Same objection.
          THE WITNESS: Again, I'm not
a process chemist. And it's just
beyond what my expertise is. I
did not use any of that type of
information to form the basis for
my report.
BY MR. DAVIS:
     Q. Okay. So is the answer no,
you're not familiar with the
circumstances by which Mylan was able to
bring a valsartan product back to the
market?

Page 49

     A. It's -- I'm not a process
chemist, and understanding the -- what
would go into changing, if that's what
occurred, changing the manufacturing
procedures is not something that I'm
qualified to evaluate.
          And I'm going to have to
stand on that, that it's nothing that I
used in my report.
     Q. Well, my question isn't, you
know, calling for any kind of process
chemistry. I'm just asking what you
reviewed.
          And my question is, did you
review any documents or anything related
to how Mylan was able to bring a
valsartan product back to the market?
     A. My -- again, I'm not a
process chemist. So I -- as to what was
involved and how much work was involved,
I can't really opine on that.
     Q. What about concessions to
the regulator, are you familiar with any
concessions Mylan had to make to the

Page 50

1 regulator, the FDA, in order to bring a
2 valsartan product back on the market?
3         MR. REEFER:  Object to form.
4 Vague.  Beyond the scope.  Lack of
5 foundation.
6         THE WITNESS:  I am -- I
7 am -- let me start over.
8         I am -- I don't know what --
9 I'm not a process chemist, and I
10 just feel that whatever Mylan did
11 to get on the market is beyond
12 what I was asked to look at and
13 what I was asked to opine on.
14         I used my expertise and my
15 background at USP and FDA to
16 create my report.  Anything else
17 was immaterial to providing my
18 opinions that are in my report.
19 BY MR. DAVIS:
20     Q.   Okay.  Well, let me ask it
21 this way, then:  Is the fact that Mylan
22 is back on the market with a valsartan
23 product, under circumstances that you
24 don't know or understand, that's not

Page 51

1 relevant to any of the opinions in your
2 report, is it?
3     A.   I don't believe so.
4     Q.   Okay.  Thank you.
5         You list the ANDAs in
6 Exhibit B to your report, do you not?
7     A.   Yes, I do list them.
8     Q.   Do you understand that those
9 ANDA applications all made reference to a
10 drug master file?
11     A.   Yes.
12     Q.   Did you review the full drug
13 master file?
14     A.   I didn't review any part of
15 the drug master file.
16     Q.   Okay.  So that was my
17 question.
18         So you reviewed the ANDA
19 applications but not the underlying drug
20 master file that those ANDAs made
21 reference to?
22     A.   I glanced at one of the
23 ANDAs.  I did not review all three of
24 them.  And what I saw was mostly -- at

Page 52

1 least the portions of the requirements in
2 the ANDA for the drug substance made
3 reference to the drug master file.
4         So there was very little
5 information in the ANDA itself, and I did
6 not pursue asking counsel to provide me
7 the DMF because I felt it was irrelevant
8 to what my part of the -- creating my
9 report was.
10         I was just -- the ANDAs were
11 there and I thought I probably ought to
12 take a look at them, but there was really
13 nothing for me to understand.  And I just
14 said, I don't need that information to
15 create my report on how USP operates and
16 what a drug master file is.  So I did not
17 pursue it.
18     Q.   Well, that's my -- you kind
19 of touched on my next question, which is,
20 you told me your assignment was to opine
21 on USP and drug master files.
22         But you didn't think to ask
23 Mylan for the drug master file that's at
24 issue in this case?

Page 53

1     A.   I did not because I was
2 giving, in my expert report, a general
3 overview of drug master files.  I was not
4 asked to opine on the quality or the
5 content of Mylan's drug master file, so
6 it was irrelevant.
7     Q.   Okay.  That -- let me
8 clarify exactly what your assignment was
9 in this case, then, because it's nowhere
10 written in your report what your
11 assignment was.
12         And to be honest, I'm a
13 little confused, because you're telling
14 me your assignment was to opine on drug
15 master files generally but not to opine
16 on Mylan's drug master file in any way in
17 this case; is that right?
18     A.   That's correct.  I was not
19 asked to opine on the quality of Mylan's
20 drug master file.
21     Q.   And you did not, in fact,
22 opine on the quality of Mylan's drug
23 master file in your report, did you?
24     A.   I couldn't.  Because, one, I

Confidential Information - Subject to Protective Order

Page 54

¹ wasn't asked to; and, two, I never saw
² the drug master file.
³      Q.   So since it's written
⁴ nowhere in your report, can you tell me
⁵ exactly what your assignment was in this
⁶ case?
⁷      A.   My assignment was to -- the
⁸ basic part of my assignment, the bulk of
⁹ it, was to talk about USP and the
¹⁰ background of USP, in terms of how USP is
¹¹ organized, USP's recognition in the Food,
¹² Drug and Cosmetic Act, and to give a
¹³ brief description, discussion of drug
¹⁴ master files and why -- why there are
¹⁵ drug master -- I talked about why there
¹⁶ are drug master files, types of drug
¹⁷ master files and so on.
¹⁸      I was also asked to comment
¹⁹ on Dr. Najafi's expert report.
²⁰      Q.   Were you asked to comment on
²¹ John Quick's expert report?
²²      A.   I was asked if I -- if I --
²³ if I wanted to comment on John Quick's,
²⁴ as well as Najafi, but I felt that

Page 55

¹ Quick's was more involved with GMPs and,
² that was not my area of expertise at FDA.
³ So commenting on Najafi was more in line
⁴ with the function of my report and the
⁵ expertise that I have.
⁶      Q.   Okay.
⁷      MR. DAVIS:  I'm going to
⁸ mark Tab 2 as Exhibit-2, Jason.
⁹      - - -
¹⁰      (Whereupon, Exhibit
¹¹ Sheinin-2, No Bates, 1/12/22
¹² Letter, Trischler to Counsel, was
¹³ marked for identification.)
¹⁴      - - -
¹⁵      MR. REEFER:  Okay.
¹⁶ BY MR. DAVIS:
¹⁷      Q.   Dr. Sheinin, this was a
¹⁸ letter from Jason's law firm that
¹⁹ accompanied the disclosure of your expert
²⁰ report.
²¹      Do you understand that?
²²      MR. REEFER:  Object to form.
²³ Why don't you start by asking if
²⁴ he's seen it before?

Page 56

¹ BY MR. DAVIS:
²      Q.   Have you seen this letter
³ before?
⁴      A.   I've not seen this letter
⁵ before, and I have never seen a letter
⁶ that looks like this.
⁷      Q.   Well, yeah, let me just
⁸ represent to you, then, that this was a
⁹ letter from Jason's law firm that was
¹⁰ delivered to us accompanying your expert
¹¹ report.
¹²      Do you see that your name is
¹³ referenced in there and it's addressed to
¹⁴ a number of plaintiffs' counsel in this
¹⁵ case?
¹⁶      MR. REEFER:  Object to form.
¹⁷ Lack of foundation.
¹⁸      THE WITNESS:  I see that my
¹⁹ name is on here, yes.  And it's --
²⁰ BY MR. DAVIS:
²¹      Q.   Okay.
²²      A.   -- talking about my expert
²³ report is also enclosed.
²⁴      Q.   If you look down at

Page 57

¹ Paragraph 2, it says that your report is,
² For purposes of rendering opinions as to
³ class certification issues and rebutting
⁴ the class certification opinions of the
⁵ class certification experts disclosed by
⁶ the plaintiffs' executive committee.
⁷      Do you see that?
⁸      A.   I see it.
⁹      Q.   Do you know what class
¹⁰ certification issues you address in your
¹¹ report?
¹²      MR. REEFER:  Object to form.
¹³ Beyond the scope.  Calls for a
¹⁴ legal conclusion.
¹⁵      THE WITNESS:  I don't know
¹⁶ what "class certification" means.
¹⁷ BY MR. DAVIS:
¹⁸      Q.   And the second part of that
¹⁹ is to rebut the reports of the
²⁰ plaintiffs' experts.
²¹      In your case, that's only
²² Dr. Najafi; is that right?  Is that your
²³ testimony?
²⁴      MR. REEFER:  Object to form.

Page 58

1   Mischaracterizes testimony.
2       THE WITNESS:  I discuss
3   Dr. Najafi's report in my report,
4   yes.
5   BY MR. DAVIS:
6       Q.   And there's no other
7   plaintiffs' expert report that you both
8   reviewed and intend to rebut in your
9   report, is there?
10       MR. REEFER:  Object to form.
11   Foundation.
12       Go ahead, Doctor.
13       THE WITNESS:  That's
14   correct.
15   BY MR. DAVIS:
16       Q.   You mentioned, Dr. Sheinin,
17   that your educational background is that
18   you have a Ph.D. in organic chemistry; is
19   that right?
20       A.   That's correct.
21       Q.   Can you, at a very broad
22   level, speaking to a -- most certainly a
23   non-expert like me and Jason --
24       MR. REEFER:  That's right.

Page 59

1   BY MR. DAVIS:
2       Q.   -- tell us -- tell us what
3   organic chemistry is?
4       A.   Organic chemistry is, in the
5   briefest of statements, is the chemistry
6   of carbon compounds.  That's probably the
7   easiest way to explain it.
8       There's different classes of
9   chemicals that are considered organic.
10   There's various functional groups.
11       I can't say 100 percent that
12   every organic chemical contains carbon,
13   but, for the most part, that's -- that's
14   true.  And it's -- involves reactions
15   using other organic chemicals as well as
16   non-organic chemicals to manufacture or
17   synthesize a second organic chemical and
18   sometimes maybe a third and a fourth.
19       That's what my -- my Ph.D.
20   thesis involved synthesizing a number of
21   compounds that were subsequently sent to
22   the National Cancer Institute for testing
23   for activity against -- against cancer.
24   And, unfortunately, none of the chemicals

Page 60

1   I manu -- I synthesized had any activity.
2       I always felt that I was
3   going to get a job working for somebody
4   who is doing organic chemistry.  That
5   turned out not to be the case.  When I
6   joined FDA, we had an organic chemist in
7   our group, and he actually worked as a
8   functioning organic chemist.  I have
9   never worked as a functioning organic
10   chemist.
11       So it's -- I think it's
12   something that is fairly common,
13   certainly it is among people that I knew
14   who went to graduate school with me, they
15   don't necessarily end up working in what
16   your major was.
17       So I'm more of an analytical
18   chemist with knowledge of regulatory.
19   But I've never worked as an organic
20   chemist.
21       Q.   Right.  In fact, I think,
22   you know, in your brief FDA history you
23   gave me, your work with mass spec and
24   GC -- you know, coupling it with a GC in

Page 61

1   the early '70s, that's more analytical
2   chemistry, right?
3       A.   Yes.
4       Q.   So harkening back to your
5   dissertation thesis days when you
6   synthesized a few compounds with the
7   hopes that they might have an effect on
8   cancer, did you work in the lab at all
9   in, you know, synthesizing those --
10   creating those chemical reactions to
11   synthesize those compounds?
12       A.   Oh, yeah.  I mean, that's
13   how I got the compounds.
14       Q.   So in working with -- would
15   you have worked with, like, reagents,
16   catalysts, solvents, all that business,
17   in order to create those chemical
18   reactions that would ultimately yield the
19   compound you wanted to create?
20       MR. REEFER:  Object to form.
21       THE WITNESS:  Yes.  I did
22   the synthesis myself.
23   BY MR. DAVIS:
24       Q.   So how would you know, in

Page 62

1 doing that, what to avoid mixing together
2 to create a dangerous reaction?  What
3 kind of materials would you look at,
4 aside from just your own educational
5 knowledge of how these substances
6 interact?
7           MR. REEFER:  Object to form.
8      Beyond the scope.
9           THE WITNESS:  I relied on my
10      advisor to give me advice on if
11      there was any danger or any
12      possible reactions that he
13      considered to be dangerous.
14 BY MR. DAVIS:
15      Q.   Did you rely on any kind of
16 written materials in addition to just
17 what your advisor told you?
18           MR. REEFER:  Object to form.
19      Beyond the scope.
20           THE WITNESS:  You know,
21      that's over 50 years ago, and I
22      can't remember if there was
23      anything written or not.  But I
24      relied on my advisor.

Page 63

1 BY MR. DAVIS:
2      Q.   Okay.  Do you know what an
3 MSDS is?
4      A.   Yes, I do.
5      Q.   Like a safety data sheet for
6 a particular substance?
7      A.   Yes.
8      Q.   Okay.  Is that something
9 that -- would those have existed at that
10 timeframe?
11      A.   As far as I can remember, I
12 don't believe there were safety data
13 sheets at that time.
14      Q.   If you were doing that kind
15 of organic chemistry today, is that
16 something you might want to look at, the
17 safety data sheets or MSDS?
18           MR. REEFER:  Objection.
19      Form.  Incomplete hypothetical.
20      Beyond the scope.
21           THE WITNESS:  I mean, if I
22      was doing organic chemistry today,
23      I would want to know if there was
24      any safety issues with the

Page 64

1      materials that I'm working with.
2      It's something that did not exist
3      in those days.
4 BY MR. DAVIS:
5      Q.   And if you were doing that
6 today, one of the most prominent
7 resources you could -- you could consult
8 would be the safety data sheet, or MSDS,
9 that accompanies whatever reagent or
10 catalyst it is that you're working with,
11 right?
12           MR. REEFER:  Object to form.
13      Beyond the scope.  Incomplete
14      hypothetical.
15           THE WITNESS:  I would have
16      to assume that I would look at
17      those, at least once, for any
18      chemical that I work with.  I
19      wouldn't have to keep going back
20      to look at them.
21 BY MR. DAVIS:
22      Q.   Okay.
23           MR. REEFER:  Hey, John, this
24      is Jason.  I had a venti coffee

Page 65

1 this morning.  We've been going
2 about an hour and 20 minutes.
3 Would you mind just taking a
4 five-minute bathroom break?
5           MR. DAVIS:  Sure.  Not a
6      problem.
7           Dr. Sheinin, do you need
8      five minutes or ten minutes?  Up
9      to you.
10           We can go off the record, by
11      the way.
12           VIDEO TECHNICIAN:  Going off
13      the record.  The time is
14      10:50 a.m.
15           - - -
16           (Whereupon, a brief recess
17      was taken.)
18           - - -
19           VIDEO TECHNICIAN:  We are
20      back on the record.  The time is
21      11:00 a.m.
22 BY MR. DAVIS:
23      Q.   Just one clean-up question,
24 Dr. Sheinin, before I move on.

Page 66

1    Do you recall telling me
2 that you're not a CGMP expert?
3    A.   Yeah, I recall.
4    Q.   Okay.  So would I take that
5 to mean that you're not offering any
6 opinion in this litigation that Mylan
7 was, in fact, in compliance with CGMPs?
8    A.   I'm not offering an opinion
9 directly on whether they're in compliance
10 with GMPs.  I know that their product is
11 on the market.  I know that FDA has
12 inspected their facilities.  And I know
13 there was a warning letter, and I know
14 that they're back on the market.
15    That's pretty much beyond
16 what I know about Mylan and their GMPs.
17    Q.   But just to clarify, you're
18 not offering any kind of expert opinion
19 in this litigation that Mylan was in
20 compliance with CGMPs, despite stuff
21 that's tangential to that that you've
22 reviewed, correct?
23    A.   My expert report is
24 discussing drug master files and USP.  It

Page 67

1 does not discuss GMPs.  I'm not a -- I'm
2 not -- as I said and you agreed, I'm not
3 an expert in GMPs, and I'm not offering
4 to opine on it.
5    Q.   So, for example, you said
6 you reviewed the FDA warning letter
7 issued to Mylan Unit 8, which
8 manufactured valsartan API; isn't that
9 right?
10    A.   I looked at it.  I wouldn't
11 necessarily say -- I did not review it
12 in depth.  It was not something that I
13 needed for forming my opinions in my
14 expert report.  But I did look at it.
15    Q.   Right.  And would you have
16 seen the statement at the beginning of
17 that letter that the FDA observed CGMP
18 deviations at that facility, which was
19 the -- you know, the reason they were
20 sending the warning letter?
21    MR. REEFER:  Object to the
22 form.  Calls for speculation.
23    Go ahead --
24    MR. DAVIS:  Well, I'm not

Page 68

1 asking -- well, hang on, Jason,
2 I'm not asking him to speculate.
3 I'm just asking if he saw that
4 statement in the letter that he
5 reviewed.
6 BY MR. DAVIS:
7    Q.   Do you recall seeing that
8 statement in the letter that you -- in
9 the warning letter, Dr. Sheinin?
10    A.   I recall the warning letter.
11 Can you put it up on the screen?
12    Q.   Sure.
13    A.   So I can see the exact
14 language.  Or do we have it in our -- in
15 our package?
16    Q.   Just a second, I'll bring it
17 up.
18    MR. REEFER:  Do you have it
19 as an exhibit, John?
20    MR. DAVIS:  Yes.  That would
21 be Tab 15.
22    MR. REEFER:  One moment,
23 okay?
24    MR. DAVIS:  Yep.

Page 69

1    - - -
2    (Whereupon, Exhibit
3 Sheinin-3, MYLAN-MDL2875-003457,
4 11/5/19 FDA Warning Letter, was
5 marked for identification.)
6    - - -
7    MR. DAVIS:  I'm marking that
8 as Exhibit-3.
9    MR. REEFER:  John, I'm not
10 sure if there's a question
11 pending.  I'm sorry.
12    MR. DAVIS:  Sure.
13 BY MR. DAVIS:
14    Q.   Do you have the letter in
15 front of you, Dr. Sheinin?
16    A.   I do.
17    Q.   Do you recognize that to be
18 a copy of the November 5th, 2019, Unit 8
19 warning letter that you reference in
20 Exhibit B to your report?
21    A.   Yes.
22    Q.   And do you see the third
23 paragraph -- second and third paragraph
24 down, This warning letter summarizes

Page 70

¹ significant deviations from CGMP for
² APIs.  And, Because your methods and
³ facilities and controls for manufacturing
⁴ processing, packing or holding do not
⁵ conform to CGMP, your API are
⁶ adulterated.
⁷          Do you see those statements?
⁸     A.   I see them.
⁹     Q.   And because you're not
¹⁰ offering any kind of opinion that Mylan
¹¹ was, in fact, in GMP compliance, you
¹² don't take any issue with what the FDA
¹³ says here, do you?
¹⁴          MR. REEFER:  Object to form.
¹⁵     Mischaracterizes testimony.
¹⁶          THE WITNESS:  This -- this
¹⁷     Paragraph 2 and Paragraph 3, I
¹⁸     would say probably Paragraph 4,
¹⁹     with different dates is pretty
²⁰     much standard boilerplate language
²¹     that's in every warning letter.
²²          Mylan's valsartan product is
²³     on the market, it's in conformance
²⁴     with the requirements of the USP

Page 71

¹     monograph for the API, as well as
²     for the tablets.  And the fact
³     that this language is in here,
⁴     it's in every warning letter that
⁵     I've seen.
⁶ BY MR. DAVIS:
⁷     Q.   Well, just like with your
⁸ report, Dr. Sheinin, you have some stock
⁹ language, for example, that we went over
¹⁰ this morning.
¹¹          It doesn't make it any less
¹² true, right?  It doesn't mean that the --
¹³ just because it's in every FDA warning
¹⁴ letter doesn't mean that this one issued
¹⁵ to Mylan, the FDA doesn't mean it when
¹⁶ they say that Mylan was not in GMP
¹⁷ compliance at Unit 8, correct?
¹⁸     A.   This is -- again, it's
¹⁹ boilerplate language that's in every
²⁰ letter, every warning letter.  The fact
²¹ that FDA has allowed Mylan to come back
²² on the market, has not withheld anything
²³ from Mylan, there are no import alerts
²⁴ that -- over Mylan, and the fact that

Page 72

¹ this is -- again, like in my report, this
² is boilerplate language.  It's nothing
³ that forms the basis for my report.
⁴     Q.   So should I -- should I
⁵ give, for example, the boilerplate
⁶ language in your report less stock
⁷ somehow, or should I take that to
⁸ actually be language in your report?
⁹          MR. REEFER:  Object to form.
¹⁰     Compound.  Vague.
¹¹          THE WITNESS:  You can -- you
¹²     can use that language in my report
¹³     in any way you like.  It's --
¹⁴ BY MR. DAVIS:
¹⁵     Q.   Well, I'm asking -- I'm
¹⁶ asking your opinion, Dr. Sheinin.
¹⁷          Are you telling me that the
¹⁸ language that you cribbed from an old
¹⁹ report, I should put less stock into
²⁰ simply because your --
²¹          MR. REEFER:  Object to form.
²² BY MR. DAVIS:
²³     Q.   -- simply because it's
²⁴ boilerplate?

Page 73

¹          MR. REEFER:  Object to form.
²     Argumentative.  Mischaracterizes
³     the testimony.
⁴          THE WITNESS:  Again,
⁵     that's -- it's typical language.
⁶     It's -- and the boilerplate
⁷     language here is just boilerplate
⁸     language.
⁹          It's -- the fact that FDA
¹⁰     let -- has let Mylan back on the
¹¹     market says to me that whatever
¹²     deviations there were from current
¹³     good manufacturing practices are
¹⁴     such that FDA feels comfortable
¹⁵     with Mylan marketing the valsartan
¹⁶     products.
¹⁷ BY MR. DAVIS:
¹⁸     Q.   But that's just pure
¹⁹ speculation on your part.
²⁰          You told me, Dr. Sheinin,
²¹ that you haven't looked at any follow-up
²² on this warning letter to see if it's
²³ been closed out; and you told me you have
²⁴ no idea what circumstances Mylan was

Page 74

1  allowed back on the market, right?
2        MR. REEFER:  Object to form.
3  John, you asked him questions
4  about this warning letter and now
5  you're yelling at him for trying
6  to answer them.
7        MR. DAVIS:  Well, no.  He's
8  told me, Jason, that he's not a
9  CGMP expert.  And I'm just trying
10  to elucidate what he means by that
11  with an example.
12        And my example here --
13        MR. REEFER:  Right.
14        MR. DAVIS:  -- is in this
15  warning letter that FDA issued to
16  Mylan, the FDA says that there's
17  significant CGMP deviations.
18  BY MR. DAVIS:
19     Q.   My question to you,
20  Dr. Sheinin, is, are you offering any
21  opinion that Mylan, in fact, during this
22  timeframe, was in CGMP compliance,
23  contrary to what the FDA says in this
24  warning letter?

Page 75

1        MR. REEFER:  Object to form.
2  Asked and answered.
3        THE WITNESS:  I'm not
4  offering any opinion, because I'm
5  not a GMP expert.
6  BY MR. DAVIS:
7     Q.   Okay.  Thank you.  Thank
8  you.
9        When did you first learn
10  anything about nitrosamines, Dr. Sheinin?
11     A.   I would have to say probably
12  in 2018 when I heard about the reports of
13  nitrosamines being in certain products,
14  FDA announcements.
15        I would think that's the
16  first time that I heard -- well, I
17  probably heard about them in graduate
18  school, but that's -- that's neither here
19  nor there.
20     Q.   Well, that's actually --
21     A.   I knew what a nitrosamine
22  was.
23     Q.   Sorry, I didn't mean to cut
24  you off there.

Page 76

1        Go ahead.
2     A.   But the first time I heard
3  about any issues with nitrosamines was in
4  2018.
5     Q.   Well, my question was
6  actually the more basic one, which is
7  when you first learned what a nitrosamine
8  compound was, not whether there were any
9  issues in medications.
10        And it sounds like the
11  answer is at some point in graduate
12  school for organic chemistry?
13     A.   Yeah, I mean, I -- that's a
14  functional group, and it's -- a
15  nitrosamine, you have to have an amine,
16  and it's -- so that's included in
17  functional groups in organic chemistry.
18     Q.   Right.
19     A.   It's nothing that I worried
20  about as a graduate student.
21     Q.   Right.  You would have to
22  have --
23     A.   It was just a functional
24  group.

Page 77

1     Q.   Sorry.
2        You would have to have an
3  amine and a nitrosating agent under
4  acidic conditions, right?
5     A.   That's nothing that I
6  studied in graduate school.  I knew what
7  a nitrosamine was.  I didn't know how
8  they formed or what reactions it would
9  take.
10     Q.   Do you know who Dr. Edwin
11  Gump is at USP?
12     A.   The name is not familiar.
13  I've been gone for over 15 years, so he
14  must be new or --
15     Q.   If that --
16     A.   -- since I left.
17     Q.   Sorry.
18        Well, he's stated that
19  nitrosamines can be formed, quote, Very
20  simply through really simple chemistries.
21        Do you have any reason to
22  disagree with that statement about how
23  nitrosamines are formed?
24        MR. REEFER:  Object to form.

Confidential Information - Subject to Protective Order

Page 78

1     Beyond the scope.
2         THE WITNESS:  I'd have to
3  see what document -- what's his
4  name, Gump, Dr. Gump that
5  you're --
6  BY MR. DAVIS:
7     Q.   Dr. Edwin Gump.
8     A.   -- referring to?  I'd want
9  to try to see his documents and evaluate
10  it for myself.
11     Q.   Okay.
12        MR. DAVIS:  Let's mark Tab
13  9, Jason, as Exhibit-4.
14             - - -
15        (Whereupon, Exhibit
16        Sheinin-4, No Bates, USP Announces
17        Approval of Chapter on
18        Nitrosamines Impurities, was
19        marked for identification.)
20             - - -
21  BY MR. DAVIS:
22     Q.   And I apologize,
23  Dr. Sheinin, it appears that when I
24  printed this to PDF that part of the

Page 79

1  article's title was cut off.
2        It reads, USP Announces
3  Approval of Chapter on Nitrosamines
4  Impurities, dated December 3rd, 2021.
5        Do you see that?
6     A.   Yes, I do.
7     Q.   And then do -- you'll see in
8  the third paragraph, there's a quote
9  attributed to Edwin Gump, Ph.D., vice
10  president of the Small Molecules
11  Department at USP?
12     A.   Yes.
13     Q.   And he says that, One of the
14  things that makes nitrosamines really
15  tricky is that they actually can be
16  formed very simply through really simple
17  chemistries.
18        Do you see that?
19     A.   Yes.
20     Q.   You don't have any reason
21  to -- you know, putting on your organic
22  chemistry hat, do you disagree with that
23  statement in any way?
24        MR. REEFER:  Object to form.

Page 80

1     Beyond the scope.
2         THE WITNESS:  His statement
3  is nothing that I use in my report
4  to offer my opinion in this case.
5         I'm not sure that it's
6  really that simple.  I would --
7  well, I'm going to leave it at
8  that.  It may be simple, it may
9  not be quite so simple.
10  BY MR. DAVIS:
11     Q.   And in writing your report
12  in this case, did you refresh yourself on
13  the chemistry by which nitrosamines are
14  formed, specifically NDMA and NDEA?
15     A.   I may have looked at
16  whatever documents were provided and --
17  but I did not use any information as to
18  how nitrosamines form, to form the basis
19  for my opinion that's in my written
20  report.  It's not something that I was
21  concerned with.
22     Q.   Did you -- in preparing your
23  report, did you look to see how NDEA
24  specifically was formed in Mylan's

Page 81

1  valsartan API?
2     A.   I did not specifically look
3  to see how NDEA was formed in Mylan's
4  product.
5     Q.   Do you have -- do you have
6  an idea of how NDEA was formed in Mylan's
7  product?
8        MR. REEFER:  Objection.
9  Beyond the scope.  Calls for
10  speculation.
11        THE WITNESS:  I'm not a
12  process chemist, so I am not
13  equipped to make a determination
14  on how NDEA was formed.
15        And it just did not have any
16  influence or input into the basis
17  of my report.  So it's beyond what
18  I was asked to opine on.
19  BY MR. DAVIS:
20     Q.   I think I know the answer to
21  this question.
22        But you're not asserting any
23  kind of opinion, one way or the other,
24  regarding the genotoxic -- genotoxicity

Page 82

1 of NDMA or NDEA, are you?
2      A.   I may be a lot of things,
3 but I'm not a toxicologist.  And the --
4 whether or not it's a potential genotoxic
5 impurity or not is beyond my expertise.
6      Q.   Are you familiar with -- and
7 I think you have already mentioned it
8 just in passing today, but you're
9 familiar with ICH guidelines, correct?
10      A.   I'm very familiar, well,
11 with at least some of the ICH quality
12 guidelines.
13      Q.   Those would be the ones that
14 are ICHQ?  That start with ICHQ?
15      A.   That's correct.
16      Q.   Are you familiar with
17 ICH M7?
18      A.   I know what M7 is.  I would
19 not say that I'm really familiar with it.
20      Q.   Did you look at it in
21 preparing your expert report in this
22 case?
23      A.   I did not.
24      MR. DAVIS:  Let me mark that

Page 83

1      as Tab 7 -- sorry, that's Tab 7,
2      Jason.  I'm going to mark that as
3      Exhibit-5.
4           - - -
5           (Whereupon, Exhibit
6      Sheinin-5, No Bates, M7(R1)
7      Assessment and Control of DNA
8      Reactive (Mutagenic) Impurities in
9      Pharmaceuticals to Limit Potential
10      Carcinogenic Risk, Guidance for
11      Industry, was marked for
12      identification.)
13           - - -
14 BY MR. DAVIS:
15      Q.   Do you have that in front of
16 you, Dr. Sheinin?
17      A.   Yes, I do.
18      Q.   Okay.  The title of -- the
19 specific title of the guidance is,
20 Assessment and Control of DNA Reactive
21 (Mutagenic) Impurities in Pharmaceuticals
22 to Limit Potential Carcinogenic Risk.
23      Do you see that?
24      A.   I see it.

Page 84

1      Q.   If you'd flip to Page 5,
2 Dr. Sheinin, there's a header titled,
3 General Principles.
4      A.   Okay.
5      Q.   Take a few moments, if you
6 would, to read that section, that's
7 Subsection 3, General Principles, and
8 it's on Page 5 and then goes down to
9 the -- about the middle of Page 6.
10      And let me know when you're
11 ready to discuss.
12      A.   Okay.
13      Okay.  I finished reading
14 it.
15      Q.   Let me start with a -- do
16 you see that this guidance refers
17 specifically to nitrosamines?
18      MR. REEFER:  Object to form.
19 Beyond the scope.  Lack of
20 foundation.
21      THE WITNESS:  I see that it
22 mentions N-nitroso compounds,
23 among others.
24 BY MR. DAVIS:

Page 85

1      Q.   And it refers to that group
2 that includes N-nitroso compounds as the
3 cohort of concern of high-potency
4 mutagenic carcinogens.
5      Do you see that?
6      MR. REEFER:  Object to form.
7 Beyond the scope.  Lack of
8 foundation.
9      THE WITNESS:  I see it, but
10 it's not -- I'm not a
11 toxicologist, so I can't evaluate
12 how much the concern is.  It's --
13 I can see the words on the paper,
14 but I'm not in a position to be
15 able to judge whether they're a
16 risk or not.
17 BY MR. DAVIS:
18      Q.   And I'm not asking you to,
19 Dr. Sheinin.
20      The only purpose of this is
21 I just want to ask you to confirm that,
22 on its face, nitrosamines, N-nitroso
23 compounds are subject to this guidance?
24      MR. REEFER:  Object to form.

Confidential Information - Subject to Protective Order

Page 86

1 Beyond the scope. Lack of
2 foundation.
3          THE WITNESS: I'm not a
4 toxicologist, but I can see the
5 words on this paper -- on this
6 page. It says, N-nitroso
7 compounds.
8 BY MR. DAVIS:
9      Q.   Right. And on its face,
10 that means that N-nitroso compounds are
11 subject to what's set forth in this ICH
12 M7 guidance, correct?
13          MR. REEFER: Objection.
14 Same objections.
15          THE WITNESS: I can see on
16 this page that, yes, it says
17 N-nitroso compounds. So N-nitroso
18 compounds are included in this
19 guidance.
20          But that's all I can say.
21 I'm not in a position to be able
22 to evaluate anything involved with
23 N-nitroso compounds.
24 BY MR. DAVIS:

Page 87

1      Q.   Right. But you would agree
2 that this guidance does require
3 manufacturers to do that evaluation,
4 correct?
5          MR. REEFER: Object to form.
6 Beyond the scope. Foundation.
7          Go ahead, if you know.
8          THE WITNESS: Again, I'm not
9 a toxicologist, so what would need
10 to be done in terms of N-nitroso
11 compounds is beyond my expertise.
12 And it does not form the basis for
13 anything that's in my report.
14 BY MR. DAVIS:
15      Q.   The title of the guidance
16 is, Assessment and Control of DNA
17 Reactive Impurities.
18          Do you have any opinion, one
19 way or the other, as to whether Mylan
20 appropriately assessed or controlled for
21 potential nitrosamine impurities in its
22 valsartan?
23      A.   I'm not a toxicologist, so I
24 really can't offer an opinion on whether

Page 88

1 Mylan did or did not do what you think
2 that they should have done in terms of
3 N-nitroso compounds. It's not anything
4 that I used in my report, and it's beyond
5 my expertise.
6      Q.   Okay. You can put that
7 away. We'll move on.
8          You mentioned at the FDA
9 that you acquired a mass spec instrument
10 in the early 1970s, right?
11      A.   Yes.
12      Q.   And then -- and then you
13 coupled that with a gas chromatography
14 system?
15      A.   The instrument
16 manufacturers, Varian, is the one who
17 coupled it. It's nothing that I would be
18 capable of doing.
19          But, yes, the company did
20 couple the GC with the mass spectrometer.
21      Q.   So were you telling me,
22 then, that the FDA acquired a GC-MS that
23 was coupled in the early '70s as well?
24      A.   No. They -- we had gas

Page 89

1 chromatographs already. We bought the
2 mass spectrometer. And I don't recall if
3 it was a package to get the gas
4 chromatograph, but I'm thinking we got
5 the mass spectrometer first and then
6 Varian came out with a mechanism to
7 couple a gas chromatograph to a mass
8 spectrometer.
9          And the mass spectrometer
10 that we had operated in -- you had to
11 have a vacuum, and trying to take the
12 effluent from a gas chromatograph and
13 putting it into a mass spectrometer was
14 not something that we would have been
15 able to do. And it was something that
16 eventually the instrument manufacturers
17 were able to do.
18          I don't believe that when we
19 got our mass spectrometer initially that
20 we had the capability to couple it to a
21 gas chromatograph.
22      Q.   But that was done a little
23 bit later in the 1970s, it sounds like?
24      A.   Yeah. Yeah.

Page 90

Q.   Is the sensitivity -- was the sensitivity of the mass spectrometer back then substantially different from what it is today?
A.   I don't know, but I would expect that advances have been made in mass spectrometry as well as in other types of detectors for gas chromatography.
It's just the nature of the advancement in science that sensitivity is always being improved.
Q.   Well, at least one area that's developed is -- are you familiar with, like, predictive modeling, where you can run a chemical structure through a database and it will flag -- flag it as potentially mutagenic or genotoxic?
MR. REEFER:  Object to form. Beyond the scope.  Lack of foundation.
THE WITNESS:  I'm not familiar with that type of database.

Page 91

BY MR. DAVIS:
Q.   Okay.  Have you ever heard of Derek Nexus?
A.   I've heard of it.  I'm not familiar with it.
Q.   What about QSAR generally?
A.   What about what?
Q.   Quantitative structural-activity relationships, QSAR.
A.   Oh.  I've heard of it.  I really don't know anything about it.
Again, I'm not a toxicologist, so I -- I've heard of it. I don't know how it works, and I don't know how to use it.
Q.   You would agree, wouldn't you, that the GC and mass machines that have existed since they were coupled in the '70s, or even before then, that those were capable of detecting nitrosamines, correct?
MR. REEFER:  Object to form. Beyond the scope.  Incomplete hypothetical.

Page 92

THE WITNESS:  I would have to know how much of any given ingredient or chemical we're talking about, in terms of whether it could be detected or not.
It would -- a lot would depend on what's in the column that's in your gas chromatograph, is it going to come off?  It's very hypothetical, and I really can't give you an opinion one way or the other.
BY MR. DAVIS:
Q.   That's not something you evaluated in this case, whether GC-MS machines were capable of identifying NDEA, NDMA in Mylan's valsartan in the quantities they were present therein?
MR. REEFER:  Same objection.
THE WITNESS:  That's correct, it's nothing that I used to form my opinions in my report.
MR. DAVIS:  I'm going to mark Tab 11, Jason, as Exhibit-6.

Page 93

- - -
(Whereupon, Exhibit Sheinin-6, No Bates, Valsartan Guidance, was marked for identification.)
- - -
MR. REEFER:  He has it, John.  He's just reviewing it.
MR. DAVIS:  Okay.  Sure.
BY MR. DAVIS:
Q.   Do you recognize this, Dr. Sheinin, as the 2020 version of the USP standard for valsartan?
A.   I see that it's the monograph, official as of May 1st of 2020, USP, yes.
Q.   Is this the USP that's currently effective?
A.   I don't know if this is the one that's currently effective.  I'd have to go online to the current -- to the USP online to see if there was a new version since May 1st of 2020.  I can't say yes or no.

Page 94

1  Q.  Do you see at the top there,
2 there's an official status that says,
3 Currently official on 28 January 2022?
4  A.  Yes.
5  Q.  Okay.  Does that suggest to
6 you that, at least as of that date, that
7 that was the current USP monograph for
8 valsartan?
9  A.  Yes.
10  Q.  Is there any place in this
11 2020 monograph that mentions anything
12 about nitrosamines at all?
13  A.  No.
14  Q.  It's not your opinion, is
15 it, then, Dr. Sheinin, that nitrosamines
16 for this monograph only need to be
17 controlled at not more than .1 percent,
18 is it?
19  MR. REEFER:  Objection to
20  form.  I think it's a double
21  negative.
22  But go on, if you
23  understood.
24  THE WITNESS:  Can you repeat

Page 95

1  your question?
2 BY MR. DAVIS:
3  Q.  Okay.  It's not your
4 opinion, is it, Dr. Sheinin, that
5 nitrosamines only need to be controlled
6 at point -- not more than .1 percent, is
7 it?
8  MR. REEFER:  Object to form.
9  Do you mean per the monograph or
10  in general?
11  MR. DAVIS:  I'm asking --
12  I'm asking him generally.
13 BY MR. DAVIS:
14  Q.  My question is, you've told
15 me that nitrosamines aren't mentioned
16 anywhere in this monograph.
17  My question is, does that
18 mean, in your opinion, Dr. Sheinin, that
19 nitrosamines only need to be controlled
20 at not more than .1 percent, as stated in
21 this impurity section on the USP
22 monograph?
23  A.  It's not something that I
24 feel I can address, because I'm not a

Page 96

1 toxicologist and I don't know at what
2 level those nitrosamines would have to be
3 controlled.
4  Q.  They would be -- in other
5 words, what you're telling -- let me
6 crystallize what you're telling me.
7  I think what you're telling
8 me is that, aside from this USP
9 monograph, there would be other -- other
10 regulatory items, so to speak, that would
11 set different limits for nitrosamines,
12 correct?
13  A.  There's always requirements
14 in an NDA or an ANDA application, in the
15 specification, that has tests that are
16 not included in the USP monograph.  So
17 it's entirely possible that there could
18 be additional information in what's filed
19 at FDA than what's in a USP monograph.
20  Q.  Right.  And, I guess, just
21 to tag a general point on that, the USP
22 monograph is not the end-all, be-all in
23 terms of tests that are required to be
24 done on a -- in this case, an API for

Page 97

1 valsartan, or another substance, correct?
2  MR. REEFER:  Object to form.
3  Go ahead.
4  THE WITNESS:  According to
5  the Food, Drug and -- Federal
6  Food, Drug and Cosmetic Act, a
7  drug product or a drug substance
8  or an API, if you will, if there
9  is a USP monograph, that material
10  has to meet the requirements in a
11  USP -- in the USP monograph.
12  FDA has the authority to ask
13  for additional requirements in the
14  specification that's approved
15  generally.  Companies include
16  tests and procedures in their drug
17  application that are not included
18  in the USP monograph.
19 BY MR. DAVIS:
20  Q.  Right.  There are additional
21 tests and limits that can apply that just
22 simply aren't in the USP monograph,
23 correct?
24  A.  Yes, there are -- there are



Page 98

1 tests and procedures and acceptance
2 criteria in the specification that's
3 included in an approved application that
4 are not in the USP.
5      Q.   And in the case of N-nitroso
6 compounds specifically, we just saw ICH
7 M7, which provides some guidance on
8 testing and limits to control for
9 nitrosamine impurities specifically per
10 that guidance, right?
11           MR. REEFER:  Object to form.
12      Beyond the scope.  Lack of
13      foundation.
14           THE WITNESS:  I saw what was
15      on -- whatever -- the Page 5 of
16      that guidance, that it mentioned
17      N-nitroso compounds.
18 BY MR. DAVIS:
19      Q.   You list a number of Mylan
20 fact witness depositions in your Exhibit
21 B to your report.
22           Do you recall listing those?
23      A.   I recall that they are on
24 the list and they are things that counsel

Page 99

1 provided to me.
2      Q.   Did you ask counsel if that
3 was all of the Mylan fact witness
4 depositions that have been taken in the
5 case?
6      A.   I did not.
7      Q.   You don't list the
8 deposition of Wayne Talton.
9           Is there -- did you know
10 that he was deposed in this case?
11      A.   The name is not familiar to
12 me.
13      Q.   You wouldn't know him as
14 Mylan's regulatory affairs corporate
15 witness in this case?
16      A.   No, I would not.
17

Page 100

22           MR. DAVIS:  Let me mark Tab
23      12, Jason.  That will be
24      Exhibit-7.

Page 101

1              - - -
2           (Whereupon, Exhibit
3      Sheinin-7, MYLAN-MDL2875-00705126,
4      3/14/19 Cover Letter for Master
5      File GDUFA Complete Response
6      Letter, was marked for
7      identification.)
8              - - -
9           MR. REEFER:  This is being
10      marked as 7, right, John?
11           MR. DAVIS:  That's correct,
12      Exhibit-7.
13           MR. REEFER:  Okay.  I'm just
14      making sure I was keeping count.
15 BY MR. DAVIS:
16      Q.   Dr. Sheinin, you'll see
17 there's a yellow exhibit sticker -- or
18 maybe it's not yellow if it printed in
19 black-and-white, but there's a sticker on
20 the first page that says Exhibit
21 Plaintiff Talton-11.
22           Do you see that on the top
23 right corner of the very first page of
24 the document?

Confidential Information Subject to Protective Order



Page 102

1  A.  Yeah.
2      PL-Talton-11?
3  Q.  Right.
4  A.  Yes, I see it.
5  Q.  And you'll see that the --
6  yes.
7      And you'll see that the file
8  name on that page of the file, as it was
9  produced to us by Mylan, says, DMF
10  Quality Information Amendment 20190314?
11  A.  Yes.
12  Q.  Okay.  If you go to the
13  fourth page of the document, you'll see a
14  header, valsartan DMF Number 018253.  And
15  then, Response to valsartan DMF letter,
16  dated February 5th, 2019.
17      Do you see that?
18  A.  Yes.
19

Confidential Information - Subject to Protective Order



**Page 106**

23 BY MR. DAVIS:
24     Q.   Right.  And that's because

**Page 107**

1 counsel didn't provide you Mr. Talton's
2 testimony and this exhibit, correct?
3         MR. REEFER:  Object to form.
4     Argumentative.  Beyond the scope.
5     Foundation.
6         THE WITNESS:  I have not
7     seen this document before.  So,
8     yes, I did not receive it.  I've
9     not seen it.
10 BY MR. DAVIS:
11

**Page 108**

7 BY MR. DAVIS:
8     Q.   Turning to your report for a
9 second, Dr. Sheinin, in Paragraphs 64 to
10 66 -- and I'm going to paraphrase you
11 here, and feel free to take issue with my
12 paraphrasing if you'd like, but --
13     A.   Which paragraphs again?
14     Q.   Sure.  Paragraphs 64 through
15 68, under the header, Mylan's Valsartan
16 API Manufactured Between Market Entry in
17 2012 and the Recalls in 2018 Complied
18 With the Standards and Specifications in
19 Place at the Time of Manufacture.
20     A.   Yes.
21     Q.   You write there in that
22 section -- or one of the things you write
23 is that the valsartan USP monograph did
24 not contain any testing or acceptance

**Page 109**

1 criteria for nitrosamine content.
2         And I'm specifically guiding
3 you to Paragraph 66.
4         Do you see that?
5     A.   Yes.
6     Q.   Why is that relevant to you?
7 What's the point of having that in your
8 report?
9     A.   The relevance is that I'm
10 opining on the fact that Mylan's
11 valsartan API, manufactured between
12 market entry in 2012 and the recalls in
13 2018, complied with the standards and
14 specifications in place at the time of
15 the manufacture.
16         So it's relevant in that
17 there was no mention in the USP monograph
18 of the need to test for nitrosamines.
19     Q.   Okay.  But that doesn't mean
20 that Mylan's valsartan was okay simply
21 because it met the USP monograph,
22 correct?
23         MR. REEFER:  Object to form.
24     Vague.

Confidential Information - Subject to Protective Order

Page 110

1      THE WITNESS:  It meant that
2  the -- Mylan's valsartan met the
3  USP monograph prior to recalls of
4  2018, and Mylan's valsartan
5  products are on the market today.
6  They meet the USP monograph.  They
7  meet the specifications in the
8  FDA-approved applications.  They
9  have USP on the label of the --
10  both the drug product, valsartan
11  tablets USP, and they also include
12  the USP on the drug substance,
13  valsartan USP.
14      So at this point I've lost
15  track of what your initial
16  question was.
17  BY MR. DAVIS:
18      Q.   Well, sure, let me -- let me
19  ask it this way.
20      Is it your testimony,
21  Dr. Sheinin, that between Mylan's entry
22  on the market in 2012 and the time of
23  recall in late 2018/early 2019, that
24  nitrosamines only had to be controlled at

Page 111

1  not more than .1 percent per the USP
2  monograph?
3      A.   The monograph, as well as
4  the specification in the approved
5  application, includes, in the impurities
6  section, a requirement for any unknown
7  impurity not more than 0.1 percent.
8      So in order to meet the
9  requirements of the USP monograph and the
10  ANDA specification for the API, any other
11  unknown impurity would need to be
12  controlled to not more than 0.1 percent.
13      Q.   So it is your opinion, then,
14  that during that timeframe Mylan only had
15  to control nitrosamine impurities at not
16  more than .1 percent?
17      Are you saying that the USP
18  standard governs solely Mylan's
19  marketability of its products?
20      A.   I'm not equipped to discuss
21  the marketability of a product.  I'm a
22  chemist, that's not my area.
23      But in order for Mylan to be
24  on the market, they have to meet the USP

Page 112

1  monograph and they have to meet the
2  specification requirements in the
3  approved application.
4      Q.   And the approved application
5  here is the ANDA, correct?
6      A.   Correct.
7      Q.   And that references the DMF
8  in this case by Mylan, which you said you
9  didn't review, correct?
10      A.   Correct.  Because drug
11  master files are not approved or not --
12  and not not approved.
13      Q.   Well, in this case, Mylan --
14  Mylan's ANDA referenced the drug master
15  file, so it became incorporated into the
16  ANDA.
17      Do you understand that?
18      A.   That's correct.  And
19  that's -- that's the way it works.
20      But DMFs by themselves are
21  not approved or not -- and not not
22  approved.  The FDA takes no -- no
23  regulatory action on drug master files.
24      Q.   Right.  But they would have

Page 113

1  taken an action on the ANDA in this case,
2  which incorporated, by reference, the
3  drug master file, correct?
4      A.   Yeah.  As I believe is
5  included in my -- in my expert report,
6  that when there's deficiencies in a drug
7  master file, the NDA or ANDA holder -- or
8  it's possible to have a DMF that
9  references another DMF.
10      So however it works, the FDA
11  would say in a letter to the applicant
12  that there's issues or deficiencies in
13  the drug master file, and the FDA would
14  send a detailed letter to the drug master
15  file holder detailing what those
16  deficiencies or issues are.  But they
17  would not communicate to the NDA or ANDA
18  applicant what those deficiencies are.
19      And I think that's included
20  in my report.  So that's how that works.
21      Q.   Well, sure.  But what I was
22  asking was whether the -- in the setup
23  that Mylan had, where they chose to
24  submit an ANDA and then incorporate, by

Page 114

¹ reference, their drug master file, that's
² submitted with the ANDA to the FDA,
³ correct, and reviewed by the FDA as part
⁴ of the ANDA review process, is it not?
⁵     A.   I don't think that's exactly
⁶ right.
⁷         The drug master file is
⁸ submitted separately to the agency, and
⁹ there's a letter authorizing reference to
¹⁰ the drug master file that's included in
¹¹ the ANDA.  But the ANDA and the drug
¹² master file are not submitted at the same
¹³ time to the same place.
¹⁴     Q.   Okay.  Well, taking that,
¹⁵ that they can come in waves -- I take
¹⁶ your point there.
¹⁷         The point -- the point I'm
¹⁸ trying to make, though, is that when the
¹⁹ ANDA is submitted -- let's say the drug
²⁰ master file is submitted a month
²¹ beforehand.  When the ANDA is submitted,
²² that makes reference and incorporates by
²³ reference the drug master file, that
²⁴ becomes, essentially, part of the ANDA

Page 115

¹ submission that the FDA reviews in
² determining whether to approve the ANDA,
³ correct?
⁴     A.   I wouldn't say -- well, from
⁵ a -- I'm not a lawyer, so I can't say how
⁶ that's incorporated -- a drug master file
⁷ is incorporated into the application.
⁸         But the drug master file may
⁹ or may not be reviewed for a given ANDA.
¹⁰ It depends on whether the drug master
¹¹ file has been reviewed in the past and
¹² found to be acceptable.  So when a new
¹³ ANDA comes in, that drug master file may
¹⁴ or may not be reviewed.  It depends --
¹⁵     Q.   Well, let's -- well, let's
¹⁶ take Mylan's first ANDA here that was
¹⁷ approved.  There were three ANDAs.
¹⁸         You're familiar with that,
¹⁹ right?
²⁰     A.   Yes.
²¹



Page 116

¹³     Q.   Okay.  And you just told me
¹⁴ you haven't reviewed the ANDAs in any
¹⁵ particular detail and you haven't
¹⁶ reviewed the DMF at all, correct?
¹⁷     A.   Correct.
¹⁸     Q.   Let's say, Dr. Sheinin, that
¹⁹ there was a discrepancy between the
²⁰ impurity limits in the USP monograph and
²¹ the limits approved or set by the FDA,
²² whether approving an ANDA or in some
²³ other guidance document or official FDA
²⁴ document that sets limits, which would

Page 117

¹ control in that instance?  Would the USP
² monograph limit control or would the FDA
³ approved limit control?
⁴     A.   If I remember correctly, the
⁵ USP acceptance criteria would control.
⁶ But I'm not 100 percent certain of that.
⁷         MR. DAVIS:  I'm going to
⁸     mark Tab 10, Jason, as Exhibit-8.
⁹         - - -
¹⁰         (Whereupon, Exhibit
¹¹     Sheinin-8, No Bates, Impurities in
¹²     Drug Products and Drug
¹³     Substances - A USP Approach, was
¹⁴     marked for identification.)
¹⁵         - - -
¹⁶ BY MR. DAVIS:
¹⁷     Q.   Do you have this set of USP
¹⁸ slides in front of you, Dr. Sheinin?
¹⁹     A.   I do.
²⁰     Q.   Do you see that it's titled,
²¹ Impurities in Drug Products and Drug
²² Substances - A USP Approach?
²³     A.   Yes.
²⁴     Q.   Do you know who

Confidential Information - Subject to Protective Order

Page 118

1  Dr. Ravichandran is?
2       A.   I do.  I hired him.
3       Q.   Have you seen this
4  presentation before?
5       A.   I don't believe I have.
6            Do you know where it was
7  given?
8       Q.   You might see in very, very
9  grayed-out text on the first page that
10 says, Last update, March 2018.
11           Do you see that?
12      A.   On the first page here of
13 the exhibit?  I don't see anything about
14 that.
15      Q.   Okay.  It might be too
16 grayed out in the way it printed.
17           I'll represent to you that
18 the document --
19      A.   Oh, yeah.  It's very, very
20 light.  I can't -- I can't see that.
21      Q.   And then even smaller text
22 on the bottom right corner of each page,
23 also grayed out, is a, Copyright 2020,
24 USP.

Page 119

1            Do you see that?
2       A.   I see something.  I can't
3  tell you what it says.
4       Q.   Okay.  Do you hold
5  Dr. Ravichandran in high regard?
6            MR. REEFER:  Object to form.
7            THE WITNESS:  Yes.
8  BY MR. DAVIS:
9       Q.   You think he's quite
10 knowledgeable?
11           MR. REEFER:  Object to form.
12 Vague.
13           THE WITNESS:  I think he's
14      knowledgeable.  I don't know that
15      he's more or less knowledgeable
16      than other scientists at USP.
17 BY MR. DAVIS:
18      Q.   Do you think he's quite
19 knowledgeable regarding the USP approach
20 to impurities and drug products and drug
21 substances, which is the title of this
22 presentation?
23           MR. REEFER:  Object to form.
24 Vague.  Foundation.

Page 120

1            THE WITNESS:  I think he's
2       knowledgeable to the point that
3       his supervisor approved giving
4       this presentation.
5            Again, I can't say that he's
6       more or less knowledgeable about
7       the topic than other scientists at
8       USP.  It's -- I -- there's only a
9       handful of USP scientists who are
10      still there from when I left.
11 BY MR. DAVIS:
12      Q.   Flip to Page 9 as it's
13 numbered on these slides.
14           And it's, again, in very
15 small numbering, gray text in the bottom
16 right corner.  You'll see a slide that's
17 titled, Contents.
18           MR. REEFER:  John, if you're
19      going to ask questions about, you
20      know, the substance of this, can
21      we have an opportunity to go
22      through it?  I think Dr. Sheinin
23      said he had not seen the
24      presentation before.

Page 121

1            MR. DAVIS:  I mean, sure.
2       It's 90 pages, Jason, and I only
3       have questions regarding, at most,
4       a couple of them.  So I'm not
5       sure --
6            MR. REEFER:  All right.
7            MR. DAVIS:  -- if fully
8       reviewing the document in
9       different aspects of it will
10      pertain to what I want to talk
11      about.
12           I mean, what if we -- what
13      if we did this, I'll ask my
14      questions, and if Dr. Sheinin
15      wants to review the pages
16      surrounding that for context, I'm
17      happy to let him do that.
18           MR. REEFER:  Yeah.  John,
19      I'm not trying to interrupt you.
20      I just want to give him a fair
21      opportunity based on his testimony
22      he hadn't seen it before.
23           So if the doctor says that,
24      you know, he needs to take a

Page 122

```
1    minute to understand it, I just
2    ask that you let him do so.
3    That's all.
4          Fair enough?
5          MR. DAVIS:  Fair enough.
6          MR. REEFER:  Cool.  Thank
7    you.
8  BY MR. DAVIS:
9     Q.   So you're at Page 9, the
10   table of contents for this presentation,
11   Dr. Sheinin?
12    A.   I see on Page 3 of what
13   you've given me something that says,
14   Contents.  I don't know what's -- I can't
15   see any page numbers.
16    Q.   Yes.  Is it -- did it print
17   out for you as four slides to a page?
18    A.   Two slides to a page.
19    Q.   Two slides to a page.
20    A.   Yes.
21    Q.   Okay.  I see.
22          So the contents section
23   actually appears twice, it appears.  So
24   we can -- we can stick on the one you're
```

Page 123

```
1    on.
2          And, I guess, do you see
3    where it says -- there's a header,
4    Guidelines, guidances?  And it says, ICH
5    FDA, below that?
6     A.   Yes.
7     Q.   Why would -- why would
8    Dr. Ravichandran include ICH/FDA
9    guidelines and guidances in a
10   presentation that's titled, A USP
11   Approach to Impurities?
12         MR. REEFER:  Object to form.
13   Foundation.  Calls for
14   speculation.
15         THE WITNESS:  I don't know
16   why he included them.  I'd have to
17   ask him why he included this as a
18   topic.
19  BY MR. DAVIS:
20    Q.   Why would they be --
21    A.   I'm not --
22    Q.   Why would they be --
23    A.   I'm not in a position --
24         MR. REEFER:  Can you let him
```

Page 124

```
1    finish, John?  Sorry about that.
2          MR. DAVIS:  Yes, go ahead.
3          THE WITNESS:  I'm not in a
4    position to be able to say why he
5    included them.  I don't know.
6  BY MR. DAVIS:
7     Q.   Why would -- let me ask it
8    this way, then:  Why would ICH/FDA
9    guidelines and guidances be germane to
10   discussing in a presentation titled, A
11   USP Approach to Impurities?
12         MR. REEFER:  Object to form.
13   Foundation.  Calls for
14   speculation.
15         THE WITNESS:  I can't tell
16   you exactly why.  I can tell you
17   that there were times when ICH
18   created a guidance, in FDA
19   perspective, in ICH perspective,
20   when they created a guideline
21   where USP eventually modified a
22   general chapter to be in agreement
23   with what ICH did.
24         So that's the only reason I
```

Page 125

```
1    might be able to offer.  But I
2    don't know -- I don't know what
3    was in Ravi's mind as to why he
4    included them in this
5    presentation.  It's beyond my
6    capability to tell you why.
7  BY MR. DAVIS:
8     Q.   Okay.  Turn, if you would,
9    to the slide that's numbered 36.
10    A.   What's the -- I don't see
11   any numbers on any of them, so what's the
12   heading?
13    Q.   Okay.  Flip until you find a
14   USP sort of face page that says,
15   Discussion, in bold lettering.  It should
16   be about 15 or so pages in.
17    A.   I see something that says
18   Discussion and contents listed again.
19    Q.   Yes, correct.
20          And then if you flip a few
21   pages further than that, you'll see a
22   question and answer.
23          The question is, If a
24   manufacturer controls impurities and
```

Page 126

1 degradation products in accordance with
2 only a pharmacopeial monograph, is that
3 acceptable to the regulators?
4        Do you see that?
5    A.   No.
6    Q.   It should be four -- the
7 fifth slide after that discussion face
8 page.
9    A.   So if we're counting
10 slides --
11        MR. REEFER:  John, would you
12 mind if I went over and helped a
13 little bit?
14        MR. DAVIS:  Sure.  If you
15 know where it is, Jason, feel free
16 to show it to him.
17        MR. REEFER:  I think the
18 challenge we're facing is the way
19 it's printed, the slide number is
20 super-duper faint.
21        And so if you don't mind,
22 I'm going to stand up and just
23 walk around the table.
24        MR. DAVIS:  Okay.  Not a

Page 127

1 problem.
2        THE WITNESS:  Maybe I had
3 the wrong discussion slide.
4        MR. REEFER:  I think there's
5 a -- I think there's a number of
6 instances where the heading,
7 Discussion, appears, and I think
8 you guys might have landed on
9 different pages.
10        But, ultimately, Mr. Davis
11 will confirm.  But the top of the
12 slide that I'm looking at, John,
13 says, Source of impurities, and
14 it's got a little demonstrative.
15 And then below that it's the
16 second slide that begins with
17 question.
18        MR. DAVIS:  Yes, that's
19 right.
20        Thanks, Jason.
21        MR. REEFER:  You're welcome.
22 BY MR. DAVIS:
23    Q.   Okay.  So you'll see the
24 question presented there is, If a

Page 128

1 manufacturer controls impurities and
2 degradation products in accordance with
3 only a pharmacopeial monograph, is that
4 acceptable to the regulators?
5        Do you see that?
6    A.   I see it.
7    Q.   And then Ravi responds to
8 that question by saying, in the second
9 bullet point of his answer, that, A
10 particular manufacturer's manufacturing
11 method for formulation components may
12 lead to unexpected impurities due to a
13 different route of synthesis, different
14 reagents, et cetera.  Different processes
15 may lead to different impurities.
16        Do you see that?
17    A.   Yes.
18    Q.   And then -- then he
19 continues in the third bullet, it says,
20 If an individual monograph is inadequate
21 to control an impurity, the manufacturer
22 is responsible for developing and
23 validating appropriate analytical
24 procedures, establishing acceptance

Page 129

1 criteria, and communicating with USP.
2        Do you see that?
3    A.   Yes.
4    Q.   Okay.  At any time between
5 2012 and '18, did you see any evidence
6 that Mylan had attempted to communicate
7 with USP regarding setting an acceptance
8 criteria and test for NDMA or NDEA?
9    A.   I did not see anything
10 that -- of that nature.
11        MR. REEFER:  Object to form
12 and scope.
13        But go ahead.
14 BY MR. DAVIS:
15    Q.   Do you disagree with the way
16 that Ravi has answered the question as
17 presented?
18        MR. REEFER:  Object to form
19 and scope.
20        THE WITNESS:  This is --
21 this is why, when I was at USP, we
22 developed the flexible monograph
23 approach.  Because if the
24 innovator either synthesizes their

Page 130

1   API themselves or purchases it
2   from a third party and an ANDA
3   comes along and a generic company
4   purchases the active ingredient
5   from a different source that's
6   using a different manufacturing
7   procedure, they almost certainly
8   will introduce a different set of
9   impurities; some may be the same
10  as in the innovator's product,
11  some may be different.
12       And USP created this
13  flexible monograph approach
14  between Roger Williams and myself
15  and another chemist who worked for
16  me.  And we have a procedure where
17  a company, as it says here, if the
18  individual monograph is inadequate
19  to control the impurity, the
20  manufacturer is responsible for
21  developing, validating appropriate
22  analytical procedures and
23  communicating with USP.
24       So that's a way for the

Page 131

1   generic to meet the USP monograph,
2   even if they have a different set
3   of impurities.
4        And the way that works,
5   then, if there would be more than
6   one impurity procedure, as I
7   mention in my report, that I
8   don't -- I'm not sure that I
9   mentioned this part in the report,
10  but if you're using Impurity
11  Procedure 1, you don't have to say
12  anything.  If you're using
13  Impurity Procedure 2, you would
14  have to say something in your
15  labeling.  And I give an example
16  in my report to that extent.
17       So that's -- that's the
18  premise for why we developed this
19  flexible monograph approach.
20  BY MR. DAVIS:
21       Q.   So what Ravi is essentially
22  describing here in his answer is the
23  flexible monograph approach, correct?
24       A.   Essentially, yes.

Page 132

1        Q.   Do you agree that
2   manufacturers are responsible for
3   evaluating their manufacturing method for
4   these different impurities that may
5   result from that specific method that
6   they're undertaking?
7            MR. REEFER:  Object to form.
8   Scope.
9            THE WITNESS:  I would agree
10       that manufacturers are responsible
11       for the analytical methods that
12       are used to control impurities in
13       their drug substance and drug
14       product, if that's what you're
15       asking.
16  BY MR. DAVIS:
17       Q.   Right.  They're responsible
18  for evaluating their manufacturing method
19  for potentially different impurities and
20  then if they -- if they find them or
21  are -- let me strike that.
22           Manufacturers are
23  responsible for both evaluating their
24  manufacturing method for these different

Page 133

1   impurities, like Ravi mentions, and then
2   once identified, they are also
3   responsible for developing controls for
4   them, which is what Ravi describes in the
5   third bullet of his answer, correct?
6            MR. REEFER:  Object to form.
7   Scope.
8            You can answer.
9            THE WITNESS:  Companies are
10       responsible for developing the
11       analytical methods and validating
12       them to control whatever
13       impurities are found in their drug
14       substance or in their drug
15       product.
16  BY MR. DAVIS:
17       Q.   Well, they're not -- would
18  you agree, manufacturers aren't just
19  responsible for controlling for
20  impurities they happen to find in their
21  drug substances or products, they're also
22  responsible for evaluating the process
23  chemistry to predict potential impurities
24  that may arise from the chemical

Confidential Information - Subject to Protective Order

Page 134

1 reactions that take place, right?
2          MR. REEFER:  Object to form.
3 Beyond the scope.
4          THE WITNESS:  That's a
5 position or a responsibility for a
6 process chemist who is designing
7 the process.  That's not something
8 that I'm familiar with doing.
9 BY MR. DAVIS:
10     Q.   But you're --
11     A.   I can't agree or disagree
12 with you.
13     Q.   Okay.
14          MR. DAVIS:  Let me mark Tab
15 13, Jason.
16          MR. REEFER:  Can we put the
17 slides away, John, the USP stuff?
18          MR. DAVIS:  Yes, for now.
19          MR. REEFER:  Okay.  That was
20 ominous.
21          THE WITNESS:  Can we go off
22 the record for a second?
23          MR. DAVIS:  Sure.  Yes.
24          MR. REEFER:  I'm sorry,

Page 135

1 before we do, John, can you just
2 say again what you want me to get?
3          MR. DAVIS:  Yes.  Tab 13.
4          MR. REEFER:  Tab 13?
5          MR. DAVIS:  Yes.  I'm
6 marking it as Exhibit-9, before we
7 go off the record.
8          - - -
9          (Whereupon, Exhibit
10 Sheinin-9, No Bates, FAQs: Organic
11 Impurities, was marked for
12 identification.)
13          - - -
14          MR. DAVIS:  Okay.  We can go
15 off.
16          VIDEO TECHNICIAN:  Going off
17 the record.  The time is
18 12:37 p.m.
19          - - -
20          (Whereupon, a discussion off
21 the record occurred.)
22          - - -
23          VIDEO TECHNICIAN:  We are
24 back on the record.  The time is

Page 136

1          12:38 p.m.
2 BY MR. DAVIS:
3     Q.   Okay.  Do you have what's
4 been marked as Exhibit-9 in front of you,
5 Dr. Sheinin?
6     A.   Yes, Tab 13.  I'm trying to
7 write down the numbers.  That's 9.
8          Okay.  Yes, I have it.
9     Q.   You'll see that it's an FAQ
10 document, FAQs: Organic impurities.
11          Do you see that?
12     A.   I see that.  I see also it's
13 a -- something from USP.
14     Q.   Correct.  It's been pulled
15 from the USP website.  The URL is at the
16 bottom, https://www.usp.org, frequently
17 asked questions, organic impurities.
18          Do you see that?
19     A.   Yes.
20     Q.   And one of the FAQs at the
21 bottom, specifically the fourth one at
22 the bottom of Page 1, is, What does it
23 mean to characterize the impurity profile
24 of a product?

Page 137

1          Do you see that?
2     A.   Yes.
3     Q.   And then there's an answer
4 that appears on Page 2 of 3, correct?
5     A.   Where is the answer?
6     Q.   The answer appears on the
7 next page.  It starts with, As described
8 in applicable guidance.
9          Do you see that?
10     A.   Oh, so this is -- this is
11 answering all four of these questions in
12 one --
13     Q.   No, no.  What I've done --
14 I'll explain --
15          MR. REEFER:  It looks like
16          it's probably a drop-down,
17          Dr. Sheinin, so.
18          MR. DAVIS:  That's correct.
19          MR. REEFER:  If you just
20          click on --
21          MR. DAVIS:  He's right.
22 BY MR. DAVIS:
23     Q.   It's a drop-down.  And to
24 make the document less lengthy, I've only

Confidential Information - Subject to Protective Order

Page 138

1  dropped down the question that I'm
2  interested in seeing the answer to.
3      A.   Oh, okay.
4          MR. REEFER:  Then I'll
5      object on the basis that we don't
6      have the complete document before
7      us.
8          But with that said, if you
9      want to ask questions about it, go
10     ahead.
11         MR. DAVIS:  Sure.
12 BY MR. DAVIS:
13     Q.   So do you see where the
14 answer to that question, What does it
15 mean to characterize the impurity profile
16 of a product, starts on Page -- the next
17 page?
18     A.   I'd like to read it.  I'd
19 like to --
20     Q.   Sure.  Take a moment to read
21 it.
22     A.   -- be able to read it.
23         Okay.
24     Q.   Okay.  Have you had a chance

Page 139

1  to read the answer that USP provides to
2  that question?
3      A.   Yes.
4      Q.   And it starts with -- it
5  starts with, As described in the --
6  sorry.  What was that, Dr. Sheinin?
7      A.   I was going to say, are
8  these next bullets, are they part of the
9  answer?  Or are they --
10     Q.   No, those are additional
11 frequently asked questions regarding
12 organic impurities that come up.
13         So what I'm directing your
14 attention to --
15     A.   Okay.
16     Q.   -- is the question and
17 answer that I read out for you, which is,
18 What does it mean to characterize the
19 impurity profile of a product?  And then
20 the answer that USP provides.
21         Do you understand that?
22     A.   Yes.
23     Q.   Okay.  And the first part of
24 the answer starts with, As described in

Page 140

1  applicable guidance, which include but
2  are not limited to -- and then it refers
3  to some of the ICHQ guidances.
4          Do you see that?
5      A.   Yes.
6          MR. REEFER:  Objecting to
7      the form.  Beyond the scope.  But,
8      go ahead.  Sorry.
9  BY MR. DAVIS:
10     Q.   So would you agree that even
11 if there is a USP monograph for a
12 product, that doesn't mean that the
13 manufacturer doesn't also have to comply
14 with other applicable guidance, for
15 example, such as ICH guidances as the USP
16 states here, correct, especially
17 regarding organic impurities, right?
18         MR. REEFER:  Object to form.
19     Beyond the scope.
20     Go ahead, Dr. Sheinin.
21         THE WITNESS:  I believe USP
22     is in agreement with the ICH
23     guidances, in terms of how
24     impurities are handled in their

Page 141

1      monographs.  So there's -- they
2      are in agreement.
3  BY MR. DAVIS:
4      Q.   Well, my question, and maybe
5  you're answering it in an indirect way,
6  but my question is, even if there is a
7  USP monograph for a product, that doesn't
8  mean that any other applicable guidances,
9  as USP terms it here, including,
10 specifically, ICH guidances, that those
11 aren't -- that those aren't likewise
12 applicable even in the presence of a USP
13 monograph?
14         MR. REEFER:  Same objection.
15     Go ahead, Doctor.
16         THE WITNESS:  FDA -- FDA
17     says guidances are suggestions.
18     So I -- there are other approaches
19     that a company can take that could
20     differ from an ICH guidance, as
21     well as an FDA guidance.
22         So I can't say that
23     companies are required to follow
24     other guidances.  They are not

Confidential Information - Subject to Protective Order

Page 142

1  required to.  They can have
2  different approaches.
3  BY MR. DAVIS:
4      Q.  If a company were to take a
5  different approach under an ICH guidance,
6  isn't that something they would have to
7  consult with the FDA about first?
8          MR. REEFER:  Objection.
9      Beyond the scope.
10         THE WITNESS:  FDA's
11     guidances -- ICH guidances, in and
12     of themselves, don't have anything
13     to do with FDA, sort of.  FDA has
14     to publish those guidances before
15     they become FDA official
16     guidances.
17         But once they -- once they
18     publish them, there's no
19     difference between an ICH guidance
20     and an FDA guidance.  They're one
21     and the same.  So I can't
22     distinguish an FDA guidance from
23     an ICH guidance.
24  BY MR. DAVIS:

Page 143

1      Q.  My general question, though,
2  is, even where a USP monograph exists,
3  there are other applicable guidances,
4  regulations, et cetera, that don't just
5  go away, right?
6          MR. REEFER:  Object to form.
7      Beyond the scope.
8          THE WITNESS:  I don't -- I
9      don't discuss these other ICH
10     guidances or other FDA guidances
11     to form the basis of my opinion in
12     my report.  So I'm -- I'm at a
13     loss to understand what you're
14     really asking me.
15  BY MR. DAVIS:
16     Q.  Well, what I'm asking you,
17  and I'll phrase it differently, but just
18  because, you know, you haven't talked
19  about it in your report doesn't mean I'm
20  not entitled to ask you a question about
21  it.
22         My -- let me ask it this
23  way:  When there's a USP monograph, the
24  USP monograph doesn't just supercede

Page 144

1  other applicable FDA guidances,
2  regulations or other FDA authorities that
3  exist, right?
4      A.  As a layperson, not a
5  lawyer, I can't really comment on the
6  legal aspects of that.  So it's difficult
7  for me to give you an answer to that.
8  From a legal perspective, it's out of my
9  area.
10     Q.  So you're not holding
11  yourself out as a regulatory expert?
12     A.  I'm not holding myself out
13  as a legal expert.
14     Q.  Well, my question is a
15  regulatory one, not a legal one.
16         My question is, when there
17  is a USP monograph for a product, does
18  that supercede and just make, you know,
19  irrelevant other -- other applicable
20  regulations or guidances, including, for
21  example, ICH guidances that the FDA has
22  adopted?
23     A.  I think I said earlier that
24  USP in general is in conformance with ICH

Page 145

1  guidances.  So I don't know that there's
2  a difference there.
3          MR. REEFER:  John, if you're
4      happening to transition, do you
5      want to talk a little bit about
6      planning?  We've been on about an
7      hour and 50 minutes here.
8          MR. DAVIS:  Let me just
9      finish this document, and then we
10     can talk about that.
11  BY MR. DAVIS:
12     Q.  If you look at the next
13  paragraph, Dr. Sheinin, it says, The
14  methods used to characterize an impurity
15  profile include, but are not limited to,
16  a sound scientific appraisal of the
17  chemical reactions involved in the
18  synthesis of the drug substance and the
19  impurities associated with raw materials,
20  et cetera, et cetera.
21         Do you see that?
22     A.  Yes.
23     Q.  That's consistent with what
24  Ravi is saying in his presentation we

Confidential Information - Subject to Protective Order

Page 146

1  looked at in Exhibit-8, right, that you
2  can't just rely on a USP monograph, you
3  have to do a sound scientific appraisal
4  of your own manufacturing method, right?
5          MR. REEFER:  Object to form.
6  Asked and answered.
7          THE WITNESS:  The -- whoever
8  is developing the process to
9  create the drug substance is a
10 process chemist, and they would be
11 the ones to understand that
12 process.
13         It's not something that I
14 feel comfortable or capable of
15 second-guessing what a process
16 chemist would do.  It's not
17 something that I have done, as I
18 have not worked in the industry,
19 and it's not something I've done
20 where you have to scale up a
21 process.  It's just not within my
22 expertise.
23 BY MR. DAVIS:
24     Q.   And I'm not -- I'm not

Page 147

1  asking you, Dr. Sheinin, to comment on
2  the substance of any particular
3  scientific appraisal of impurities that
4  was done by anyone, including Mylan.
5          I'm just asking you to
6  confirm what USP is saying here and what
7  Ravi said in his presentation we just
8  looked at in Exhibit-8, that such an
9  obligation exists?
10         MR. REEFER:  Object to the
11 form.  Scope.
12         THE WITNESS:  And I think I
13 discussed before about the purpose
14 of an analytical method is to
15 detect and quantify, or in some
16 cases to qualify, impurities in
17 these materials.
18         So I would have to say that
19 there needs to be analytical
20 procedures to control impurities
21 in drug substances and drug
22 products.
23 BY MR. DAVIS:
24     Q.   Not just analytical

Page 148

1  procedures, though; there actually has to
2  be -- and I hear you when you say this is
3  a process chemist's job to do
4  substantively, but there has -- there has
5  to be an evaluation, i.e., what -- in the
6  USP's terms, a quote, sound scientific
7  appraisal of the chemical reactions.
8          Do you disagree that that's
9  what the -- do you disagree with this USP
10 document here, that that obligation
11 exists?
12         MR. REEFER:  Object to form.
13 Scope.
14         But go ahead, Doctor, you
15 can answer.
16         THE WITNESS:  I'm rereading
17 this paragraph.
18         I have difficulty in putting
19 into general terms this.  Yes, I
20 think you need to be able to look
21 at your analytical method and have
22 a technique, whatever your
23 detection is, to be able to
24 identify whatever impurities are

Page 149

1          in the -- whatever analyte you're
2          looking for.
3  BY MR. DAVIS:
4      Q.   Okay.  But that's analytical
5  chemistry.
6          What --
7      A.   That -- that's what I can
8  talk to.
9      Q.   Okay.  So you have no
10 opinion on whether a manufacturer is
11 required to do a sound scientific
12 appraisal of the chemical reactions
13 involved in its manufacturing process?
14     A.   I did not use anything in
15 this -- that's discussed in this document
16 to form the basis of my opinions about
17 USP.
18         As I mention, I did talk
19 about the flexible monograph approach,
20 and I understand that different routes of
21 synthesis can lead to different
22 impurities.  And that's a way for USP to
23 be able to have companies able to meet
24 the requirements of the monograph, even

Page 150

1  when the impurity profile is different
2  than what is there in the -- from the
3  innovator product.
4      Q.   And as part of that flexible
5  monograph approach, that requires
6  somebody to look at how -- how their
7  method of manufacture may differ from
8  another method and to predict the kinds
9  of impurities that may arise from that --
10  from that -- those changes in the
11  manufacturing method, correct?
12      That's part of the sound
13  scientific appraisal that the USP is
14  referring to here, is it not?
15      MR. REEFER:  Object to form.
16  Scope.
17      Go ahead, Doctor, you can
18  answer.
19      THE WITNESS:  I'll have to
20  fall back on what I've said.
21  There has -- the method that's
22  used is different depending on
23  what the impurity profile is.
24      So there's a -- that's why

Page 151

1      USP created the flexible monograph
2      approach.
3  BY MR. DAVIS:
4      Q.   Are you familiar with FDA
5  guidances on conducting risk assessments?
6      A.   On what?
7      Q.   Conducting risk assessments?
8      A.   For nitrosamines or just in
9  general?
10      Q.   No, generally.
11      A.   No, I'm not.
12      Q.   Okay.  And in working on
13  your report, did you see any evidence
14  that Mylan had done a sound scientific
15  appraisal of the chemical reactions
16  involved in the synthesis of Mylan's
17  valsartan API for impurities?
18      MR. REEFER:  Objection to
19  form.  I'm sorry, John.  I thought
20  you were done.  I apologize.
21      Objection to form.  Beyond
22  the scope.  Asked and answered.
23      THE WITNESS:  I did not look
24  to see if there was anything as

Page 152

1      you described.  I did not go
2  through the drug master file,
3  which is where any information
4  like that would have -- would have
5  been.
6      There was really nothing in
7  the application, in the ANDA that
8  I looked at, that contained any
9  information of that type.  I did
10  not see anything.  I have no way
11  of knowing if it's there or not.
12  BY MR. DAVIS:
13      Q.   Let's say that someone did
14  do a sound scientific appraisal and it
15  led them to believe they might be
16  creating nitrosamine by-products in their
17  drug substance.
18      Are you with me?
19      MR. REEFER:  What's that,
20  John?  You broke up.
21      MR. DAVIS:  Sure.
22  BY MR. DAVIS:
23      Q.   I'm asking you a
24  hypothetical, Dr. Sheinin.

Page 153

1      The hypothetical is, let's
2  say there was someone at a generic
3  manufacturer who did a sound scientific
4  appraisal of the chemical reactions for
5  an API drug product substance and
6  believed, as a result of that sound
7  scientific appraisal, that the process
8  would create nitrosamine by-products.
9      Do you follow me?
10      A.   I follow you.
11      Q.   What would be their
12  obligation under applicable guidances and
13  regulations to do next, do you know?
14      MR. REEFER:  Objection to
15  form.  Incomplete hypothetical.
16  Beyond the scope.  And foundation.
17      But go ahead.
18      THE WITNESS:  I'm not
19  prepared to answer hypothetical
20  questions.  It's --
21  BY MR. DAVIS:
22      Q.   There's no basis for you not
23  to answer any question.
24      MR. REEFER:  John, you

Confidential Information - Subject to Protective Order

Page 154

1    interrupted him.
2        MR. DAVIS:  Well, look, he's
3    saying he's not willing to answer
4    a hypothetical question.  That's
5    not how this works.  I'm
6    entitled --
7        MR. REEFER:  He wasn't --
8        MR. DAVIS:  -- to ask
9    questions --
10       MR. REEFER:  He wasn't --
11   John, he wasn't even able to
12   finish his answer.  So I think
13   it's a little bit presumptuous to
14   suggest how he was going to
15   respond in totality.  Perhaps --
16 BY MR. DAVIS:
17   Q.   You followed --
18       MR. REEFER:  -- you should
19   let him respond.
20 BY MR. DAVIS:
21   Q.   You followed my hypothetical
22 question.
23       What's your answer to it,
24 Dr. Sheinin?

Page 155

1        MR. REEFER:  Object to form.
2    Incomplete hypothetical.  Beyond
3    the scope.  And foundation.
4        But go ahead, Doctor, you
5    can continue your answer.
6        THE WITNESS:  I would have
7    to have some data, I would have to
8    have some real information to be
9    able to address a hypothetical
10   question.
11       It depends.  It could be
12   yes, it could be no.  It's just --
13   it's hypothetical.  It's not real
14   world.
15 BY MR. DAVIS:
16   Q.   No.  I respectfully and
17 wholeheartedly disagree.
18       I'm asking you, not
19 quantitatively, I'm asking you
20 qualitatively, if a person at a
21 pharmaceutical manufacturer did a sound
22 scientific appraisal and said, oh, we
23 might be creating nitrosamine
24 by-products, what's their obligation,

Page 156

1    under the regulations, to do next, do you
2    know?
3        MR. REEFER:  Object --
4    objection to form.  Beyond the
5    scope.  Incomplete hypothetical.
6    And foundation.
7        Go ahead, Doctor, if you
8    know.
9        THE WITNESS:  I don't know
10   what the obligation is under
11   applicable guidance.  I -- I have
12   to go back and reread some of
13   those guidances to see if there is
14   language to that effect that says
15   exactly what you said.
16 BY MR. DAVIS:
17   Q.   Would it be your
18 expectation -- and I get that you haven't
19 actually reviewed the necessary documents
20 in this case.
21       But would it be your
22 expectation that Mylan, here, did a sound
23 scientific appraisal for potential
24 genotoxic impurities, based on its

Page 157

1    detailed laboratory process for creating
2    valsartan API?
3        MR. REEFER:  Object to form.
4    Beyond the scope.
5        You almost acknowledge this
6    is beyond the scope, John.  I
7    mean, you keep asking these
8    questions.  But, you know, at some
9    point there's got to be some
10   connection to the report, right?
11       But with that being said, go
12   ahead, Doctor, if you can --
13       MR. DAVIS:  Let me respond
14   to that briefly, Jason.  I'm
15   entitled to ask him about what's
16   in his report.  I'm also entitled
17   to point out things that he hasn't
18   looked at, at all, or that he
19   might -- he might think relevant
20   or that he might, if he hasn't
21   reviewed them, might -- you know,
22   this is in his wheelhouse.
23       So, you know, I'm entitled
24   to ask the question even if it's

Page 158

1    not in the report, because it's
2    part of his -- his 40 years of
3    work at the regulator and at USP,
4    and it's tangential to what he's
5    got in his report.
6         So, yeah, I'm entitled to
7    ask the question.
8         MR. REEFER:  Well, that's
9    incorrect, John.  You can't force
10   him to offer opinions that he
11   hasn't formulated for purposes of
12   this litigation on the spot, on
13   the fly, based on your
14   hypotheticals.
15        He says that he hasn't done
16   this analysis.  He's not offering
17   the opinion on whether Mylan's DMF
18   was adequate or otherwise.
19   BY MR. DAVIS:
20        Q.   Would you expect that it was
21   adequate, given what you know about the
22   facts of this case?
23        MR. REEFER:  Objection to
24   form.  Foundation.  Scope.

Page 159

1         Go ahead.
2    BY MR. DAVIS:
3         Q.   Would you expect,
4    Dr. Sheinin, that Mylan did, in fact, do
5    a sound scientific appraisal for
6    potential genotoxic impurities, based on
7    its detailed laboratory process, when, in
8    fact, there were genotoxic impurities in
9    Mylan's valsartan?
10        Would you expect --
11        MR. REEFER:  Object to form.
12   BY MR. DAVIS:
13        Q.   -- they did do that, given
14   what the history showed?
15        MR. REEFER:  Object to form.
16   It's compound.  Beyond the scope.
17   Lack of foundation.  Incomplete
18   hypothetical.
19        But go ahead, Doctor.
20        THE WITNESS:  The fact that
21   Mylan is on the market and FDA has
22   not, again, recalled or asked
23   Mylan to recall their product says
24   to me that their DMF is adequate

Page 160

1    and FDA has no reason to take
2    other regulatory action.
3    BY MR. DAVIS:
4         Q.   Are you -- sir, are you not
5    aware that Mylan recalled every single
6    lot and batch of valsartan API that was
7    on the market in 2018 and 2019?  Are you
8    not aware of that fact?
9         A.   I'm aware of that.  I'm also
10   aware that Mylan is back on the market.
11        Q.   Okay.  But you haven't --
12   we've gone over this about four or five
13   times today.
14        You have no idea the
15   circumstances how they got back on the
16   market, do you?
17        MR. REEFER:  Object to form.
18   Argumentative.  Beyond the scope.
19        MR. DAVIS:  Well, he says
20   it's not in his report, and yet he
21   keeps bringing up the fact that
22   Mylan is back on the market, and
23   he doesn't know anything about how
24   they got back on the market.

Page 161

1         So I'm happy -- if you want
2    me to stick to your report,
3    Dr. Sheinin, you have to stick to
4    your report, too.  And you brought
5    this up six times, but you haven't
6    looked at it at all.
7         MR. REEFER:  Because, John,
8    you keep asking him questions
9    about areas that he's not going
10   into.  I mean --
11   BY MR. DAVIS:
12        Q.   You've reviewed the
13   nitrosamine testing data, have you not,
14   Dr. Sheinin?  That's in your materials
15   considered list, is it?
16        MR. REEFER:  Object to form.
17   Beyond the scope.
18        THE WITNESS:  What are you
19   saying I reviewed?
20   BY MR. DAVIS:
21        Q.   Your materials considered
22   list, Exhibit B, refers to you having
23   reviewed Mylan's nitrosamine testing data
24   for its valsartan products.

Confidential Information - Subject to Protective Order

---

Page 162

1    Did you actually look at
2 that?
3    A.   Are you referring to a
4 spreadsheet?
5    Q.   Yes, I am.
6    A.   I did see the spreadsheet.
7    Q.   Okay.  And did you see that
8 NDEA was present in every single line
9 there in that spreadsheet, every -- in
10 each line, representing a different lot
11 or batch of valsartan, that there was
12 NDEA in every single one of them?  Did
13 you see that?
14        MR. REEFER:  Object --
15    object to form.  Mischaracterizes
16    the document.
17        Do you want to look at it,
18    John?
19        MR. DAVIS:  He looked at it.
20    I'm entitled to ask him about it.
21 BY MR. DAVIS:
22    Q.   Did you see the document?
23        You said you saw the
24 spreadsheet that had the nitrosamine

---

Page 163

1 testing data, that's right, Dr. Sheinin,
2 correct?
3    A.   Correct.
4    Q.   Okay.  And did you see that
5 every single lot or batch on that
6 spreadsheet had NDEA in it?
7    A.   I did not notice -- I did
8 not look at the entire spreadsheet, so I
9 can't say that yes or no, every single
10 lot had NDEA -- NDEA in it.  I'd be happy
11 to look at it again.
12    Q.   Do you think that -- do you
13 think that NDEA would have made it into
14 Mylan's valsartan products if they had
15 done a sound scientific appraisal of
16 their chemical manufacturing process?
17        MR. REEFER:  Object to form.
18    Beyond the scope.  Calls for
19    speculation.  Foundation.
20        This is -- John, I'll just
21    let you know, this will be the
22    last question until -- you know, I
23    asked for a break 22 minutes ago.
24    And, you know, this is still going

---

Page 164

1    on.
2        So go ahead, Doctor.
3        THE WITNESS:  That is not
4    something that I can answer.  It's
5    organic chemistry, it's process
6    chemistry, and I can't say yes or
7    no.  It's not within my -- the
8    expertise that I developed over
9    the last 50 years.
10 BY MR. DAVIS:
11    Q.   It's in the FDA's warning
12 letter to Mylan, correct?
13        The FDA, in their warning
14 letter, said to Mylan that your firm had
15 not anticipated the creation of
16 nitrosamines in your drug product.
17        And that was the basis for
18 the warning letter, was that failure, was
19 it not?
20        MR. REEFER:  Object to form.
21    Beyond the scope.  Foundation.
22    Mischaracterizes the document.
23        THE WITNESS:  FDA has said
24    that the formation of nitrosamines

---

Page 165

1    was unexpected.  They did not see
2    it either.  And they did a -- I
3    would hope, did a very thorough
4    review of the drug master file
5    that was submitted by Mylan.  And
6    they did not see it.
7        So it's not something that I
8    would have seen, because it's
9    outside of my expertise.  FDA did
10    not see it either, so --
11 BY MR. DAVIS:
12    Q.   Okay.  Well, you're
13 assuming --
14    A.   -- it's not something --
15    Q.   -- that Mylan disclosed all
16 the facts.
17        You're assuming there that
18 Mylan, in the DMF, actually disclosed the
19 salient information to the FDA, are you
20 not?
21        MR. REEFER:  Object to form.
22    Beyond the scope.  Argumentative.
23    Foundation.
24        He's not reviewed the DMF.

---

Confidential Information - Subject to Protective Order

Page 166

1    He's not offering an opinion on
2   the content of the DMF, whether
3   Mylan's risk evaluation was --
4        MR. DAVIS:  Hang on, Jason.
5        MR. REEFER:  -- or
6   otherwise.
7        MR. DAVIS:  Stop with the
8   speaking objections.  He's brought
9   up that the FDA didn't see it
10  either.  I'm entitled to ask about
11  that.
12  BY MR. DAVIS:
13       Q.   And my question about that,
14  Dr. Sheinin, is, you're making an
15  assumption there that the FDA had the
16  same information in their hands that
17  Mylan did, right, based on what was in
18  the DMF?
19       MR. REEFER:  Objection.
20  Foundation.  Form.  Can't speak to
21  what FDA knew or didn't know.
22       Go ahead, Doctor, if you
23  can.
24       THE WITNESS:  I mean, I have

Page 167

1   not seen the DMF, so I don't know
2   what was in it.
3        I -- maybe I'm naive, but I
4   did not -- when I was at FDA, I
5   did not make an assumption that
6   companies that submitted drug
7   master files were not telling me
8   the truth.  So I'm at a loss
9   there.
10       It's -- I don't know what
11  was in the DMF, so I don't know
12  exactly what FDA reviewed.  But
13  FDA has said in several of their
14  statements on nitrosamines that
15  the presence of nitrosamines was
16  unexpected.  So it goes beyond
17  Mylan, it goes to all the
18  companies who were making similar
19  types of APIs.  The FDA has said
20  this was totally unexpected.  And
21  I believe the EMA has said the
22  same thing, that it was
23  unexpected.
24       MR. REEFER:  With that said,

Page 168

1   John --
2        MR. DAVIS:  Last question --
3   last question before lunch.
4   BY MR. DAVIS:
5        Q.   You said that, you know, you
6   had a right, when you were at FDA, to
7   assume what was being provided to you was
8   the truth, correct?
9        A.   I didn't say it was a right.
10  I said that was me, as Eric Sheinin,
11  assuming that what was in the DMF was the
12  truth.
13       Q.   That's a fair --
14       MR. REEFER:  So, John --
15  BY MR. DAVIS:
16       Q.   That's a fair --
17       MR. REEFER:  John, hold on.
18  BY MR. DAVIS:
19       Q.   -- and reasonable assumption
20  to make, right?
21       MR. REEFER:  Hold on.
22       John, you said last question
23  and, you know.  That was your last
24  question.

Page 169

1        MR. DAVIS:  Let me -- let me
2   tie a bow on it.
3   BY MR. DAVIS:
4        Q.   That was a fair and
5   reasonable assumption for someone in your
6   shoes at the FDA to make, that the DMF
7   that was being provided to them was the
8   truth, was transparent, correct?
9        MR. REEFER:  Object to form.
10  Beyond the scope.
11       Go ahead, Dr. Sheinin, if
12  you want.
13       THE WITNESS:  Yes.  That was
14  my assumption.  And I would think
15  that when FDA investigators come
16  in to the facility and are doing
17  an inspection to make sure that
18  the manufacturer is performing the
19  synthetic scheme to what's in the
20  drug master file that they would
21  be viewing whether or not the
22  processes that are being used to
23  manufacture and synthesize the
24  active ingredient are what's

Page 170

1   included in the drug master file.
2       If there was any
3   discrepancies, I would expect an
4   FDA investigator to note them.
5       MR. REEFER:  So with that
6   being said, John, how long do you
7   need for lunch?  And sort of let's
8   talk planning a little bit.
9       MR. DAVIS:  We can go off
10  the record.
11      VIDEO TECHNICIAN:  Going off
12  the record.  The time is 1:17 p.m.
13          - - -
14      (Whereupon, a luncheon
15  recess was taken.)
16          - - -
17      VIDEO TECHNICIAN:  We are
18  back on the record.  The time is
19  2:19 p.m.
20  BY MR. DAVIS:
21  Q.   Okay.  Dr. Sheinin, I'm
22  going to mark Tab 5.
23          - - -
24      (Whereupon, Exhibit

Page 171

1   Sheinin-10,
2   MYLAN-MDL2875-00894833, Valsartan
3   Drug Master File, Section 3.2.S.3,
4   was marked for identification.)
5          - - -
6   BY MR. DAVIS:
7   Q.   Let me know when you have
8   that document in front of you.
9       MR. REEFER:  And I think,
10  John, this is 10, Exhibit-10, that
11  is.
12      MR. DAVIS:  Exhibit-10,
13  that's right.
14      THE WITNESS:  I have it.
15  BY MR. DAVIS:
16  Q.   Okay.  Let me ask a
17  prefatory question.
18      You told me you did not
19  review any aspect of Mylan's DMF; is that
20  right?
21  A.   That is correct.
22  Q.   Can I ask why, given that
23  you have an entire section of your report
24  dedicated to discussing drug master

Page 172

1   files?
2   A.   I don't think that the --
3   whatever information that was in there
4   was really pertinent to my discussion of
5   drug master files in my report.  I wasn't
6   going to be opining on the adequacy of
7   Mylan's DMF.
8       So in the interest of the
9   time that I had to devote to this
10  project, if I had gotten involved in
11  really looking at the DMF, I probably
12  would have just wanted to keep going and
13  going.
14      So it just -- it wasn't
15  necessary for what I was asked to look
16  at.
17  Q.   Well, let me direct your
18  attention, then, before we turn to
19  Exhibit-10, back to your report for a
20  second.
21      I just want to get
22  clarification on what you mean in
23  Paragraph 68 of your report where you
24  write, Mylan's valsartan USP API

Page 173

1   continued to meet its specification, as
2   well as it's DMF specification,
3   throughout this period.
4       What are you -- what do you
5   mean by "DMF specification" there?
6   A.   By DMF specification I mean
7   what was on file with the FDA.
8   Q.   Okay.  But you didn't review
9   the DMF?
10  A.   That's correct.  But I did
11  look at certificates of analysis, so I
12  could see that Mylan was in compliance
13  with all of the acceptance criteria in
14  the DMF.
15  Q.   So what is -- is a DMF
16  specification similar to a USP
17  specification, it just has a test
18  procedure laid forth, basically?
19  A.   A DMF specification is,
20  basically, the same specification that's
21  in the ANDA.  Because that's where the
22  specification comes from, since Mylan is
23  using a drug master file to report that
24  information to FDA.

Page 174

1    So that means that the DMF
2  specification has more in it than what's
3  in the USP monograph.
4    Q.   Okay.
5    A.   Because the application
6  specification is the same as the DMF
7  specification, and that has additional
8  tests in it.
9    Q.   Is the DMF specification
10 sort of the final output of the ANDA DMF?
11   A.   I don't understand that
12 question. I'm not clear.
13   Q.   Sure.
14     There might be -- for
15 example, let's take a category of
16 testing, like residual solvent testing,
17 that's in the DMF specification.
18     There's a lot of workup in
19 the DMF regarding what to test for that's
20 ultimately put in the DMF specification,
21 is it not -- is there not?
22   A.   That's correct.
23   Q.   So the DMF specification,
24 ultimately, is an output of all of the

Page 175

1  work that's done in the DMF itself,
2  right?
3    A.   Yes and no. I mean, there's
4  other information in the DMF that has
5  nothing to do with the specification.
6    Q.   Sure. But what's in the
7  specification is an output of what's --
8  of the work that's done in the DMF, is it
9  not?
10   A.   I've never heard it
11 expressed in that way. It's the -- the
12 specification is what FDA says you have
13 to meet, your specification.
14     And, in general, what's in
15 the USP monograph is in agreement with
16 the part of the specification that those
17 tests are included in.
18   Q.   You wouldn't just write a
19 DMF specification, would you? There's
20 quite a bit of work that goes into
21 generating a DMF specification, right?
22   A.   Well, yeah. Yeah. Of
23 course.
24   Q.   And where is that work

Page 176

1  documented?
2    A.   Well, part of the work
3  that's in the specification is the
4  analytical methods. And that's -- that's
5  done in Section 4.2 of the application.
6  And Section 4.3 is the validation of the
7  analytical method.
8     So that -- that's -- that
9  has to be done before you can have a
10 specification.
11   Q.   And where -- where is that
12 work documented? It's documented in the
13 DMF, is it not?
14   A.   The method validation work
15 is -- should be documented in the drug
16 master file. So those -- the method
17 validation for each one of the analytical
18 procedures that's used to control the
19 quality of the product should be included
20 in the drug master file.
21   Q.   Okay. Back to Exhibit-10,
22 which I just marked.
23     Do you recognize that as the
24 impurities section of the valsartan drug

Page 177

1  master file?
2    A.   No, I've never seen this,
3  because I didn't look at the drug master
4  file.
5    Q.   Right. I understand that
6  you haven't seen this in particular.
7     But you've seen drug master
8  files generally, correct?
9    A.   Yes.
10   Q.   And a drug master file will
11 have an impurities section, will it not?
12   A.   It should have an impurities
13 section, yeah.
14   Q.   Okay. And does what I've
15 marked here as Exhibit-10 look like that
16 might be the impurities section of
17 Mylan's valsartan USP drug master file?
18   A.   It looks like it.
19   Q.   Okay. And you'll see on
20 the -- there's some numbering in the
21 bottom right corner, starting on the
22 second page.
23   A.   Page numbers?
24   Q.   That's correct.

Page 178

1          Do you see that?
2     A.   Yes.
3     Q.   At the first numbered page,
4 you'll see a table of contents for this
5 DMF impurities section.
6          Do you see that?
7     A.   Yes.
8     Q.   And then at the very end, at
9 Pages 80 to 82, there's a section on
10 genotoxic impurities.
11          Do you see that?
12     A.   Yes.
13     Q.   Why are genotoxic impurities
14 broken out as a separate category of
15 impurities, do you know?
16          MR. REEFER:  Object to form.
17 Scope.
18          THE WITNESS:  I don't know.
19 BY MR. DAVIS:
20     Q.   Okay.
21     A.   I've not seen them --
22 anything that I have looked at, at FDA or
23 USP, where genotoxic impurities were
24 broken out as a separate category of

Page 179

1 impurities.
2          I know impurities, I know
3 inorganic impurities, residual solvents
4 are basically organic impurities, but
5 they are oftentimes categorized different
6 because there's a separate analytical
7 method.  And I have never seen a list
8 like this that had genotoxic impurities
9 as a category.
10     Q.   You don't think that would
11 be because there's separate applicable
12 guidances that govern genotoxic
13 impurities, such as, for example, ICH M7
14 that I've shown you today?
15          MR. REEFER:  Objection.
16 Form and scope.
17          THE WITNESS:  It's possible,
18 but I can't say yes or no.  I
19 don't -- I don't know.
20 BY MR. DAVIS:
21     Q.   Flip, if you would, to the
22 very last two pages of this document,
23 which are numbered 81 and 82.
24     A.   Okay.

Page 180

1     Q.   Do you see the header at the
2 top of Page 81, Genotoxic Impurities?
3     A.   Yes.
4

Page 181

23
24          MR. DAVIS:  I'm going to
mark Tab 24.

Page 182

1    MR. REEFER:  Can we put this
2  away?
3    MR. DAVIS:  Yes.  Tab 24,
4  Jason.
5    MR. REEFER:  Is that one
6  that you sent today or --
7    MR. DAVIS:  Yes, that's one
8  sent today.
9    MR. REEFER:  What's the
10  one -- which one did you send me
11  at lunch?  Is that the one or is
12  that --
13    MR. DAVIS:  That's 25.
14    MR. REEFER:  Okay.  Just one
15  moment, then, okay, John?
16    - - -
17    (Whereupon, Exhibit
18  Sheinin-11,
19  MYLAN-MDL2875-00392350, 11/26/18
20  E-mail, Owens to Smith, was marked
21  for identification.)
22    - - -
23    MR. REEFER:  They're not
24  stapled, but I think that we

Page 183

1    should be able to make due.  So
2    I'm going to hand it to him now,
3    okay, John.
4    MR. DAVIS:  Sure.
5  BY MR. DAVIS:
6    Q.   You'll see, Dr. Sheinin,
7  that this is an internal -- or partly
8  internal Mylan e-mail chain that has a
9  Plaintiff Owens-2 sticker on it.
10    MR. REEFER:  I'm going to
11  object initially to foundation.
12    Is this Exhibit-11 marked,
13  John?
14    MR. DAVIS:  Yes, it is.
15    MR. REEFER:  Thanks.  But I
16  object to foundation.
17    But go ahead, Dr. Sheinin.
18  BY MR. DAVIS:
19    Q.   Sure.  And I'm just making a
20  representation to you here, Dr. Sheinin,
21  I understand that you haven't seen this
22  document before.
23    I'm representing this to you
24  to be a partly internal Mylan e-mail

Page 184

1  chain with a Mylan Bates stamp, as it was
2  produced to us, dated November 2018.
3    Do you see that?
4    A.   Yes.
5    Q.   And I say "partly internal,"
6  because if you go down to the second and
7  third e-mails, there are some FDA e-mail
8  addresses on the e-mails, including for
9  Ms. Dellarese Herbert.
10    Do you see that?
11    A.   Yes.
12    Q.   Okay.  And you'll see on the
13  second page of the e-mail chain, there's
14  an e-mail from Dellarese Herbert at FDA
15  to several Mylan individuals that's dated
16  November 19, 2018.
17    Do you see that?
18    MR. REEFER:  Let me, just
19  for a moment, Eric, object.  I'll
20  object on foundation.
21    But based on your prior
22  representation about who is on the
23  e-mail recipients, I'll let him
24  answer, okay, John?

Page 185

1    Do you understand what I'm
2  saying?
3    MR. DAVIS:  Sure.  Yeah.
4    MR. REEFER:  Yeah.  My point
5  being I don't think that
6  Dr. Sheinin knows exactly who
7  these people are.  But your
8  representation being that those
9  are Mylan employees, with that
10  said, I'll let him go, okay?
11    MR. DAVIS:  Sure.  And I'm
12  happy to ask about e-mail
13  addresses.
14  BY MR. DAVIS:
15    Q.   Do you see some FDA e-mail
16  addresses and some Mylan.com e-mail
17  addresses on that particular e-mail at
18  the top of Page 2?
19    A.   Yes.
20    Q.   And the from e-mail address,
21  it's dellarese.herbert@fda.hhs.gov.
22    Do you see that?
23    A.   Yes.
24    Q.   And there's several Mylan

Confidential - Information Subject to Protective Order

Page 186

1 individuals listed in the to and cc
2 section.
3         Do you see that?
4         MR. REEFER:  Same objection.
5         THE WITNESS:  Yes.
6 BY MR. DAVIS:
7    Q.    Including a Ms. Cassandra
8 Bird.
9         Is that a name you
10 recognize?
11    A.    No.
12    Q.    So you wouldn't know that
13 she was deposed in this case and that --
14 and that there would have been a
15 transcript of her deposition prepared?
16    A.    I don't know that she was
17 deposed.  I don't know who she is.  I
18 have not seen a deposition from her.  I
19 just don't know anything about her.
20    Q.    Right.  And that's because
21 it wasn't provided to you by counsel in
22 the package, right?
23         MR. REEFER:  Object to form.
24         THE WITNESS:  Correct.

Page 187

1 BY MR. DAVIS:
2
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
21 BY MR. DAVIS:
22    Q.    Okay.
23         MR. DAVIS:  I'm going to
24 mark Tab 23 as Exhibit-12.

Page 188

1              - - -
2         (Whereupon, Exhibit
3 Sheinin-12,
4 MYLAN-MDL2875-00552465, DMF DLAPI
5 Information Request, was marked
6 for identification.)
7              - - -
8         MR. REEFER:  Should we put
9 11 away, John, or keep it handy?
10         MR. DAVIS:  We can put it
11 away.
12         MR. REEFER:  Okay.  So now
13 you want 23.  What's on the front
14 page, John?  I'm trying to leaf
15 through this.
16         MR. DAVIS:  Plaintiff
17 Talton-7 is the exhibit stamp.
18         MR. REEFER:  Okay.  Thanks.
19         THE WITNESS:  This is going
20 to be 12; is that right?
21         MR. DAVIS:  Exhibit-12,
22 that's correct.
23 BY MR. DAVIS:
24    Q.    And I only am going to show

Page 189

1 you this for a limited reason,
2 Dr. Sheinin.  So don't fret, I'm not
3 going to make you look at all 100 pages
4 of it.
5         So you'll see --
6    A.    Thank you.
7    Q.    -- in the first -- the first
8 actual page -- a lot of these documents
9 come with a slip page at the front, which
10 is just what's called metadata regarding
11 the document that is as it was produced
12 by Mylan.
13         But you'll see the first
14 actual page, there's a letter from the
15 FDA to Mylan, attention Michael Plastina.
16         Do you see that?
17    A.    Yes.
18    Q.    And it says, This
19 communication is in reference to your
20 drug master file for valsartan.
21         Do you see that?
22    A.    Yes.
23    Q.    Okay.  If you flip to the
24 next page, Page 2, you'll see the actual



Page 190

1 information requests that start at the
2 very bottom, Numbered 1, and then 1 has A
3 through J subparts that continue on the
4 next pages.
5        Do you see that?
6    A.   Yeah.
7        I was looking for the date
8 of this letter.
9    Q.   I can help you with that.
10    A.   It's usually at the end.
11        MR. REEFER:  It's November
12    13th, 2018.  Is that what you were
13    going to say, John?
14        MR. DAVIS:  Yes.
15 BY MR. DAVIS:
16    Q.   That's on Page 7.
17        MR. REEFER:  Dr. Sheinin, if
18    you need to take a moment to
19    familiarize yourself with the
20    document, you're entitled to do
21    so.
22 BY MR. DAVIS:
23    Q.   Do you see the date stamp,
24 Dr. Sheinin, that appears after David

Page 191

1 Skanchy's signature?
2    A.   Yes.
3    Q.   And that date is November
4 13th, 2018?
5    A.   Yes.
6    Q.   What's your understanding
7 of -- what's your understanding of
8 where --
9    A.   I was going to say --
10    Q.   -- where that date falls in
11 the chronology of Mylan's valsartan
12 recall?
13    A.   I'm not sure if it was
14 before or after the recall.  But I think
15 it was -- this was after the recall, I
16 believe.  But I'm -- I can't say for
17 sure.
18    Q.   I'll represent to you that
19 Mylan's recall of all of its lots and
20 batches of valsartan on the market with
21 an expiry occurred in late November and
22 early December, after this letter --
23    A.   Okay.
24    Q.   -- if that gives you some

Page 192

1 context.

Page 193

Confidential Information Subject to Protective Order



Confidential Information - Subject to Protective Order





Page 202

6      MR. DAVIS:  Let's mark Tab
7  25 as Exhibit-13.
8      - - -
9      (Whereupon, Exhibit
10  Sheinin-13, No Bates, Valsartan
11  Development Report, Addendum IV,
12  was marked for identification.)
13      - - -
14      MR. REEFER:  Should we put
15  12 aside, John?
16      MR. DAVIS:  Yes, you may.
17      MR. REEFER:  Okay.  And 25
18  is the new one, right --
19      MR. DAVIS:  That's correct.
20      MR. REEFER:  -- that you
21  sent during lunch?
22      Okay.  Thank you.
23  BY MR. DAVIS:
24      Q.   Did you review any

Page 203

1  development reports related to Mylan's
2  development of its manufacturing process
3  for valsartan API, Dr. Sheinin?
4      A.   Not that I'm aware of.  I
5  don't believe I reviewed any development
6  reports.
7      Q.   You'll see some numbering,
8  C01, C02, C03, it's kind of like stamped
9  numbering in the bottom center of the
10  pages.
11      A.   Yeah.  Some of them are
12  rather blurry.  But I can see there's
13  numbers or something down there.
14

Page 204

18      Q.   Did you -- in preparing your
19  expert report, Dr. Sheinin, did you come
20  to any kind of understanding of how NDEA
21  was formed exactly in Mylan's valsartan
22  API?
23      MR. REEFER:  Object to form.
24  Scope and foundation.

Page 205

1      But go ahead, Doctor, if you
2  know.
3      THE WITNESS:  I did not come
4  to any conclusion on that.  I
5  wasn't asked to look into it.
6  BY MR. DAVIS:
7      Q.   Even though you weren't
8  asked to look into it, do you have at
9  least some kind of understanding of how
10  it formed?
11      MR. REEFER:  Same objection.
12  Asked and answered.
13      THE WITNESS:  I have some
14  understanding, but I don't know
15  the -- all the conditions and what
16  it takes to form NDEA.
17  BY MR. DAVIS:
18      Q.   Dr. Daniel Snyder's
19  deposition testimony and exhibits are
20  listed in your Exhibit B, materials
21  considered, are they not?
22      A.   I see a Dan Snyder, yes.  I
23  did not look at his report.
24      Q.   Well, he's a -- he was a

Page 206

1  Mylan fact witness deposition that was
2  taken in this case.  So he wouldn't have
3  prepared an expert report.  However, his
4  testimony largely centered on Mylan's
5  root cause evaluation.
6         Do you recall reading his
7  testimony?
8      A.  I did not read it.
9      Q.  Did you look at any of the
10 exhibits to his deposition?
11     A.  I don't know anything about
12 him.  I didn't look at it.
13         I think I mentioned earlier
14 all those individuals listed at the end
15 of my list, I did not look at any of
16 their information, reports or depositions
17 or anything.
18     Q.  So it was provided to you
19 but you didn't look at it?
20     A.  Correct.
21     Q.  Okay.  What I've marked as
22 Exhibit-13 here, which is Addendum IV to
23 the valsartan development report, that's
24 also listed in your Exhibit B, materials

Page 207

1  considered, is it not?
2         MR. REEFER:  I'm sorry,
3      John, the correct -- I think you
4      said, maybe, the wrong exhibit
5      number.  Or did I write it down
6      wrong?
7         Oh, I'm sorry.  I'm so
8      sorry, John, I interrupted you.  I
9      messed up.  I wrote down
10     Exhibit-25 because it was Tab 25.
11     I'm sorry to interrupt your
12     examination, John.
13        MR. DAVIS:  Not a problem.
14 BY MR. DAVIS:
15     Q.  So the question,
16 Dr. Sheinin, is what I've marked as
17 Exhibit-13, which is the 70-page document
18 entitled, Addendum IV to Valsartan
19 Development Report, that's also listed in
20 your materials considered, is it not,
21 under Item 8?
22     A.  Yes.
23     Q.  Did you review this?
24     A.  No.

Page 208

1

Page 209

1

17 BY MR. DAVIS:
18     Q.  Let me ask you, Dr. Sheinin,
19 from a -- from a process chemistry
20 perspective, would you assume a different
21 result, in terms of chemical reactions,
22 if the same process was followed every
23 single time?
24        MR. REEFER:  Object to

Page 210

foundation and scope.

THE WITNESS:  And I'm not a process chemist, but my experience has been that when you're manufacturing batch after batch after batch of a drug substance, you're not going to end up with exactly the same impurity profile and you're not going to end up with exactly the same assay value.

So I wouldn't want to say that everything is going to be exactly the same if you run the procedure the same way, with the qualification that I'm not a process chemist.

BY MR. DAVIS:

Q.   But assuming -- let's assume that, you know, all of the -- all of the variables, meaning, like, the reagents, catalysts, the temperatures, the equipment used, all of those things are the same, chemical reactions don't choose to happen sometimes and not others,

Page 211

right?

Isn't that a basic principle of organic chemistry, is that you can reliably cause chemical reactions to occur under certain conditions?

MR. REEFER:  Object to the scope.  Foundation.  Asked and answered.

THE WITNESS:  Again, when companies -- again, not being a process chemist, but companies are running their synthetic schemes, I would assume, the same way, and yet they can -- sometimes an impurity shows up, sometimes it's not.

So it's not always going to be exactly the same even though they run the procedure the same way, use the same chemicals, the same reagents, the same temperatures, the same time.

There is variation in what the results are.

Page 212

BY MR. DAVIS:

Q.   Right.  I'm asking more of a theoretical question, which is, isn't it a -- just a general principle of chemistry that if you -- that chemical reactions will occur in the way you would expect them to reliably?

You don't mix two things and have a completely different result one time or another; chemical reactions occur reliably as a matter of the basic discipline of the science, correct?

MR. REEFER:  Object to form.  Scope.  Asked and answered again.

THE WITNESS:  In general, chemical reactions will go the same way.  But there's different -- to a different extent, I have to go back to I'm not a process chemist, but when they run the procedure the same way, they are going to find differences.  So it's not going to be exactly the same every time.

Page 213

BY MR. DAVIS:

Q.   You did say that you had reviewed the nitrosamine testing spreadsheet, correct?

A.   Yes.

Q.   And that did show NDEA present in every single lot batch that was tested, correct?

A.   I believe what I said was that I did not look at the entire spreadsheet, so I can't say that it was present in every single batch.

But the page that I looked at, I did see it in those lots.  But I did not look at the entire spreadsheet.

MR. DAVIS:  Hey, Jason, let's take a quick break, five minutes.  I'm actually almost done, I just want to review my notes.

MR. REEFER:  No problem.

VIDEO TECHNICIAN:  Going off the record.  The time is 3:13 p.m.

- - -

Confidential Information - Subject to Protective Order

Page 214

1   (Whereupon, a brief recess
2   was taken.)
3           - - -
4       VIDEO TECHNICIAN:  We are
5   back on the record.  The time is
6   3:26 p.m.
7   BY MR. DAVIS:
8       Q.   The last real item I want to
9   touch on, Dr. Sheinin, is your response
10  to Dr. Najafi's report.
11      That discussion appears at
12  Paragraphs 83 through, I guess, the end
13  of your report; is that right?
14      A.   Basically, yeah, I think.  I
15  don't think there's any other
16  subheadings.
17      Q.   Can you describe to me
18  what -- what is your critique of
19  Dr. Najafi's report?
20      A.   The main critique is that
21  he's saying that the impurity profile has
22  to be the same for the generic to be able
23  to say that the API is the same as is
24  used in the reference-listed drug.

Page 215

1       And I believe I go on to
2   discuss why that's not the case.  And,
3   again, I would come back to the fact that
4   when a company makes the drug substance
5   by one route and a second company is
6   making it by a different route, you're
7   going to get, almost for certain, a
8   different impurity profile, and, still,
9   under the definition in the regulations,
10  those two APIs are the same.
11      The impurity profile is
12  immaterial to whether or not the API is
13  the same as what's in the
14  reference-listed drug.  And he doesn't
15  seem to agree with that.
16      Q.   Well, he also doesn't say
17  that, though, does he?  He doesn't say
18  anywhere in his declaration that the
19  impurity profiles generally have to be
20  the same, does he?
21      A.   From what I remember, he's
22  saying that the impurity profiles have to
23  be the same or it's not considered to be
24  the same API.

Page 216

1       Q.   But you can't point me to a
2   particular portion of his report you're
3   referring to where you claim that he says
4   that?
5       A.   I don't have it in front of
6   me, and I'd have to read through his
7   report again.
8       But that's -- that's my
9   understanding and impression, was that he
10  was saying that they're not the same
11  because they have different impurity
12  profiles.
13      Q.   You don't cite the portion
14  of his report you're claiming where he
15  says that in your -- in your report, do
16  you?
17      A.   I don't -- I don't think so.
18      Q.   Okay.  So the answer is no?
19      A.   98, Dr. Najafi concludes
20  that valsartan-containing products that
21  contained NDMA and NDEA were not the
22  generic equivalent of Diovan or Exforge
23  because they contained NDMA and NDEA.
24      And what I'm saying is the

Page 217

1   drug substance used in Mylan's valsartan,
2   by the definition in the regulations, is
3   the same as the valsartan that's used in
4   the innovator product.  But he's saying
5   they're not, and I'm saying that they
6   are.
7       Q.   Well, what's your basis for
8   saying that they are, despite the fact
9   that they had NDMA and NDEA and were all,
10  by the way, recalled?
11      A.   The basis for what I'm
12  saying is that, as I stated a little bit
13  ago, you can have different impurity
14  profiles in the active ingredient and
15  it's still considered the same as that
16  that's used in the reference-listed drug.
17      That's what the regulations
18  describe, that the API is the same.  The
19  impurity profile is immaterial to that,
20  unless -- unless you have a case where
21  there's an impurity that makes up 50
22  percent of the API.
23      I mean, you're not going to
24  have that, so --

Page 218

1    Q.   So -- go ahead, Dr. Sheinin.
2  I didn't mean to cut you off.
3    A.   The impurity profile is not
4  what determines whether the API is the
5  same in the reference-listed drug and the
6  generic drug.
7    Q.   So let me get -- let me see
8  if I understand what you're saying.
9         You're saying, from a
10  general -- as a general proposition, it's
11  possible that an API can have a different
12  impurity profile and still be considered
13  a generic equivalent; is that what you're
14  saying?
15    A.   I'm saying that the API can
16  have a different impurity profile and be
17  considered the same as the
18  reference-listed drug.
19    Q.   And when you say "the
20  same" --
21    A.   I'm saying that the API in a
22  generic drug can have a different
23  impurity profile and still be considered
24  the same as the API that's used in the

Page 219

1  reference-listed drug.
2    Q.   Okay.  And you're saying --
3  by "the same" -- what do you mean by "the
4  same" there?
5    A.   That under the regulations
6  that it's considered the same ingredient
7  if it has the same structure, the same
8  purity -- I guess purity doesn't -- is
9  not really a factor.
10         But if it has the same
11  structure, if it's the same chemical,
12  then it's the same, regardless of what
13  its impurity profile is.
14    Q.   Well, purity is a factor,
15  though.
16         What -- what regulations are
17  you referring to when you say that it
18  doesn't have to be -- that it is the same
19  regardless of the impurity profiles?
20  What regulation are you referring to for
21  your understanding of that?
22    A.   I'd have to go back into the
23  CFR.  It could be in a guidance.  But
24  it's --

Page 220

1    Q.   Are you familiar with the
2  FDA's Orange Book?
3    A.   Yes.
4    Q.   You don't mention the Orange
5  Book anywhere in your report, do you?
6    A.   No, I do not.
7    Q.   And it's not listed in your
8  materials considered, is it?
9    A.   It is not.
10    Q.   Okay.  When is the last time
11  you think you reviewed the -- anything
12  regarding the FDA's Orange Book?
13    A.   It was at some point this
14  year that I can remember looking --
15  looking at the Orange Book.
16    Q.   In your understanding, what
17  is the FDA Orange Book?
18    A.   The Orange Book is --
19         MR. REEFER:  Objection to
20  scope.
21         THE WITNESS:  Sorry.
22         MR. REEFER:  Go ahead.
23         THE WITNESS:  The Orange
24  Book is a -- basically a

Page 221

1  compendium of all the products
2  that are approved by FDA, and
3  they're listed by active
4  ingredient.
5         And it shows whether or not
6  a generic is considered
7  bioequivalent to the
8  reference-listed drug, and it
9  shows which -- which product or
10  products are considered as
11  reference-listed drugs.
12  BY MR. DAVIS:
13    Q.   Well, bioequivalence is just
14  one aspect of therapeutic equivalence,
15  right, which is the larger thing the
16  Orange Book is concerned with, correct?
17    A.   I believe so.
18    Q.   And the Orange Book will
19  list, like you say, various drugs and
20  which ones are therapeutically
21  interchangeable with each other because
22  of a therapeutic equivalence
23  determination, correct?
24         MR. REEFER:  Object to form.

Page 222

1  Scope.
2       THE WITNESS:  Correct.
3       MR. DAVIS:  Let me mark Tab
4  17 as Exhibit-14.
5          -  -  -
6       (Whereupon, Exhibit
7  Sheinin-14, No Bates, Orange Book
8  Preface, Food and Drug
9  Administration, Center for Drug
10 Evaluation and Research, Approved
11 Drug Products with Therapeutic
12 Equivalence Evaluations, was
13 marked for identification.)
14         -  -  -
15 BY MR. DAVIS:
16   Q.   Have you read this
17 FDA-authored Orange Book preface before,
18 Dr. Sheinin?
19   A.   No, I have not.
20   Q.   Do you see that the URL at
21 the bottom of the page is pulled from the
22 www.fda.gov website?
23   A.   Yes.
24   Q.   And you'll see on the second

Page 223

1  page, bottom -- bottom two paragraphs,
2  really, the FDA says that, The
3  therapeutic equivalence evaluations in
4  the Orange Book reflect the FDA's
5  application of specific criteria to the
6  multi-source prescription drug products
7  listed in the Orange Book and approved
8  under the FD&C Act.
9       Do you see that?
10   A.   Yes.
11   Q.   And then the next paragraph
12 down says that, A complete discussion of
13 the background and basis of the FDA's
14 therapeutic equivalence evaluation policy
15 was published in the Federal Register in
16 1979.
17       Do you see that?
18   A.   Yes.
19   Q.   If you go to Page 4, you'll
20 see a section titled, Introduction.
21   A.   Yes.
22   Q.   It says, The Orange Book is
23 composed of four parts.
24       And the first part is,

Page 224

1  Approved prescription drug products with
2  therapeutic equivalence evaluations.
3       Do you see that?
4   A.   Can you read that again?
5   Q.   The first sentence of the
6  introduction reads, The Orange Book is
7  composed of four parts.
8       And then the first part it
9  lists is, Approved prescription drug
10 products with therapeutic equivalence
11 evaluations.
12       Do you see that?
13   A.   Yes.
14   Q.   Okay.
15   A.   I see that.
16   Q.   So would you agree that
17 therapeutic equivalence is really the
18 regulatory touchstone of evaluating
19 whether a generic product is -- can be
20 considered the same as a brand product?
21       MR. REEFER:  Object to form.
22 Scope.
23       THE WITNESS:  I would say
24 that therapeutic equivalence,

Page 225

1       if -- if the generic is
2       therapeutically equivalent to the
3       reference-listed drug, that
4       they're interchangeable.
5  BY MR. DAVIS:
6   Q.   And that's the FDA's way of
7  saying you can -- you can take it to the
8  bank that this drug is going to be the
9  same as the RLD, correct?
10       MR. REEFER:  Object to form.
11 Vague.
12       THE WITNESS:  My -- my way
13       of looking at it is if FDA has
14       approved a generic drug and FDA
15       says it's therapeutically
16       equivalent, that I can take the
17       generic in lieu of taking the
18       reference-listed drug to achieve
19       the desired outcome for whatever
20       reason that I'm taking the drug
21       for.
22 BY MR. DAVIS:
23   Q.   And that's what's most
24 important here, right, for physicians'

Page 226

1  and patients' purposes in evaluating
2  whether a generic is the same as the
3  brand, right?
4          It's not living in some
5  hypothetical world, it's -- there's a
6  reason for that, which is, can I
7  substitute it for the brand, right?
8          MR. REEFER:  Object to form.
9      Scope.  Foundation.
10         THE WITNESS:  Yeah.  The --
11         again, to me, the generic means
12         that the FDA has approved it and
13         it's therapeutically equivalent,
14         so I have no problem with taking
15         the generic in lieu of taking a
16         reference-listed drug.
17 BY MR. DAVIS:
18     Q.   And that's what it means to
19 be -- sorry.  Go ahead.
20     A.   I was going to say, the
21 issue of sameness, we were discussing
22 sameness of the active ingredient.  I
23 don't know that that's exactly the same
24 as the sameness of whether it's

Page 227

1  therapeutically equivalent or not.
2          It's two different -- to me,
3  it's two different uses of "sameness."
4      Q.   Okay.  And you're not sure
5  what Dr. Najafi was referring to in his
6  report, whether he was referring to the
7  defendants at issue, VCDs being
8  therapeutic equivalents or generic
9  equivalents or whether the API was just
10 the same, are you?
11     A.   He's saying
12 valsartan-containing drug products that
13 contain NDMA and NDEA were not the
14 generic equivalent of Diovan or Exforge
15 because they contained NDMA and NDEA.
16         So I'm saying that they are
17 equivalent.
18     Q.   You're saying that they're
19 therapeutically equivalent under the
20 Orange Book?
21     A.   Yes.
22     Q.   But you haven't looked at
23 the Orange Book at all in your report,
24 have you?

Page 228

1      A.   No, I have not.
2      Q.   Okay.  And you're just now
3  looking at the Orange Book preface since
4  I've showed it to you, correct?
5      A.   Correct.
6      Q.   So is this, like, an
7  off-the-cuff opinion that you're making?
8          MR. REEFER:  Object to form.
9      Argumentative.
10         MR. DAVIS:  Well, no, it's a
11     fair question.
12 BY MR. DAVIS:
13     Q.   Dr. Sheinin, you don't --
14 you don't put anywhere in your report the
15 opinion that the NDMA- and
16 NDEA-contaminated valsartan is a
17 therapeutic equivalent to the RLD, do
18 you?  That's nowhere in your report, is
19 it?
20     A.   No.
21     Q.   Okay.  And do you know what
22 criteria, even, the FDA requires for a
23 drug to be considered therapeutically
24 equivalent to an RLD?

Page 229

1          MR. REEFER:  Object to form.
2      Foundation.
3          Go ahead.
4          THE WITNESS:  I know it has
5      to be considered to be
6      bioequivalent.  I'm not sure what
7      the second criteria is.  I know
8      that there's two factors that go
9      into the therapeutic equivalence.
10 BY MR. DAVIS:
11     Q.   So how could you form an
12 opinion that the defendants' valsartan in
13 this case was therapeutically equivalent
14 to the RLD when you're not sure what the
15 definition of therapeutic equivalence is?
16         MR. REEFER:  Object to form.
17     Misstates testimony.  Beyond the
18     scope.
19         THE WITNESS:  What exactly
20     did I say?
21         Najafi said that if it
22     contains NDMA and NDEA, that it's
23     not the generic equivalent.  I did
24     not use the words "therapeutically

Page 230

1 equivalent."
2        And, to me, the fact that
3 NDMA and NDEA may be present does
4 not make it not generically
5 equivalent to the reference-listed
6 drug.
7        It's the active ingredient
8 that's important.  The impurities
9 in general do not contribute to
10 the efficacy of the active
11 ingredient and the drug product.
12 So the presence of impurities is
13 immaterial to whether or not the
14 generic is equivalent to the
15 reference-listed drug.
16 BY MR. DAVIS:
17    Q.   Well, the FDA is not just
18 concerned with efficacy, they're also
19 concerned with safety, aren't they?
20        MR. REEFER:  Object to form.
21 Beyond the scope.
22        THE WITNESS:  They are.  And
23 FDA has said that there is a
24 very -- what's the word I'm

Page 231

1 looking for -- theoretical issue
2 with nitrosamines and that there's
3 a very minimal risk and that these
4 impurities are present at
5 extremely low levels, they are
6 trace impurities.  And there are
7 products that FDA has allowed on
8 the market that do contain
9 nitrosamines.
10 BY MR. DAVIS:
11    Q.   I thought you told me you're
12 not a toxicologist, right, so you have no
13 way to independently evaluate any of
14 those assertions, right?
15    A.   That's correct.  I'm not a
16 toxicologist, but I can read what's
17 written in the FDA statements, that it's
18 a theoretical risk.
19        And it may -- I think it
20 says further in those statements that it
21 may be a cause of cancer; it may.
22        As a scientist, I don't have
23 to be a toxicologist to understand what
24 FDA is saying there.

Page 232

1    Q.   The FDA did require the
2 recall of every single lot and batch of
3 Mylan's valsartan, did they not, though?
4        MR. REEFER:  Objection to
5 form.  Misstates facts.  Beyond
6 the scope.
7        THE WITNESS:  I believe
8 that, yes, FDA recalled all the
9 lots of Mylan's valsartan
10 products.
11 BY MR. DAVIS:
12    Q.   And you're aware that the
13 IARC, EPA and other regulatory bodies
14 that evaluate toxicology have classified
15 NDMA and NDEA as probable human
16 carcinogens, correct?
17        MR. REEFER:  Object to form.
18 Foundation.  Beyond the scope.
19        MR. DAVIS:  He's -- Jason,
20 he's the one who just brought this
21 up.  I've got to delve into it
22 now.
23        MR. REEFER:  He -- John, he
24 clarified that he was --

Page 233

1        MR. DAVIS:  No, he didn't,
2 Jason.  He went off on a tangent,
3 and now I've got to -- now I have
4 to put the lid back on it.
5 BY MR. DAVIS:
6    Q.   So you can answer the
7 question, Dr. Sheinin.
8        Are you aware that the IARC,
9 EPA and other regulatory bodies governing
10 toxicology assessments have classified
11 NDMA and NDEA as probable human
12 carcinogens?  Are you aware of that?
13        MR. REEFER:  Object to form.
14 Foundation.  Beyond the scope.
15        THE WITNESS:  I know that
16 I -- IA-what -- IAR-whatever was
17 mentioned in the M7, I believe, in
18 that paragraph you had me look at.
19        But other than that, I don't
20 know anything else about that
21 organization or what EPA has said
22 or what any other organization has
23 said.
24 BY MR. DAVIS:

Page 234

1    Q.   Are you aware that these
2  entities are so certain that NDMA and
3  NDEA are human carcinogens that it's
4  considered unethical to actually do the
5  studies to confirm that?
6        MR. REEFER:  Object to form.
7    Sorry.
8        Object to form.  Beyond the
9    scope.  Foundation.
10       THE WITNESS:  No, I'm not
11   aware.
12 BY MR. DAVIS:
13   Q.   Okay.  Are you aware that
14 Mylan's valsartan at times contained up
15 to 20 times what the FDA considers safe,
16 acceptable intakes for NDEA?
17       MR. REEFER:  Object to form.
18   Misstates testimony and evidence.
19       But go ahead, Doctor.
20       THE WITNESS:  I'm not aware
21   of -- I didn't do any calculations
22   to see how much above or below
23   the -- what FDA recommended.
24   That's all I can say.

Page 235

1        I did not do any kind of
2    calculation to determine that.
3  BY MR. DAVIS:
4    Q.   Okay.  Thank you.
5        So in Paragraph 99 of your
6  report, you say, As presented above,
7  valsartan manufactured by a different
8  route of synthesis that resulted in a
9  different impurity profile still would be
10 considered the same as that used in the
11 RLD.
12       Do you see that?
13   A.   Yes, I see that.
14   Q.   You're not saying there that
15 valsartan that contains NDMA and NDEA
16 would still be considered the same as
17 that -- as that used in the RDL, are you?
18       Is there a reason you're not
19 saying that -- is there -- let me strike
20 that and rephrase it.
21       Is there a reason that
22 Paragraph 99 reads the way it does as
23 opposed to stating the following, which
24 would be, valsartan that contains NDMA

Page 236

1  and NDEA would still be considered the
2  same as the RLD?
3        MR. REEFER:  Object --
4    object to form.  Vague.
5        But go ahead, Doctor, if you
6    understand.
7        THE WITNESS:  That's the way
8    I always refer to the active
9    ingredient in a generic drug
10   versus the active ingredient in
11   the reference-listed drug.
12       To me, it's always the same.
13   If you have different routes of
14   synthesis, and even if you have a
15   different impurity profile, it's
16   still going to be the same active
17   ingredient.
18 BY MR. DAVIS:
19   Q.   Well, the FDA, in that
20 situation, would have approved that
21 different route of synthesis, correct?
22   A.   Correct.
23   Q.   Okay.  Have you seen any
24 evidence that the FDA approved valsartan

Page 237

1  products where there was an affirmative
2  disclosure that they contained NDMA and
3  NDEA?
4        MR. REEFER:  Object to form.
5    Scope.
6        THE WITNESS:  I have no way
7    to access whether or not there was
8    a valsartan that claimed to have
9    NDMA or NDEA in it and that
10   application was submitted to the
11   FDA and that it was approved.  I
12   have no way of knowing that.  So I
13   can't say if that's a possibility.
14       That information is
15   confidential and the FDA would not
16   release that.  I don't have access
17   to FDA's information anymore.
18 BY MR. DAVIS:
19   Q.   Is it your position that
20 purity has nothing to do with therapeutic
21 equivalence?
22       MR. REEFER:  Object to form.
23   Misstates the testimony.  Beyond
24   the scope.

Confidential Information - Subject to Protective Order

Page 238

1       THE WITNESS:  As long as the
2   drug substance meets the purity
3   acceptance criteria in the assay
4   in its specification, the purity
5   is going to vary for a number of
6   reasons.
7       And I don't believe that
8   that -- that a purity on one API
9   that was in the acceptance
10  criteria for the assay would be
11  considered not to be equivalent to
12  the reference-listed drug active
13  ingredient that had a different
14  assay value.
15      So there's -- that's why, in
16  many cases, the active ingredient
17  has an acceptance criteria of 98.0
18  to 102.0 percent.
19  BY MR. DAVIS:
20      Q.   What about quality, is it --
21  do you have any understanding of whether
22  quality has anything to do with
23  therapeutic equivalence?
24      MR. REEFER:  Object to form.

Page 239

1   Vague.  Beyond the scope.
2       THE WITNESS:  As long as the
3   generic or any -- any drug
4   substance meets the acceptance
5   criteria in the specification,
6   then -- and that includes not only
7   the assay but the impurity
8   testing, then I would consider
9   that to be the same as any other
10  API of that same chemical that has
11  also met the acceptance criteria
12  in the specification.
13  BY MR. DAVIS:
14      Q.   Okay.  Let me ask a
15  hypothetical to you, Dr. Sheinin.
16      The specification lists
17  impurities of not more than .1 percent in
18  this case, right, for valsartan?  That's
19  what the specification says, right?
20      A.   The specification for any
21  other unknown impurity is point -- not
22  more than .1 percent.
23      Q.   Right.  Let's say there was
24  some other unknown impurity that was

Page 240

1   guaranteed to kill anyone who ingested
2   the product at levels below .1 percent,
3   percent mortality rate, are you saying
4   that that would be considered the same,
5   from a purity or quality standpoint, as
6   the RLD?
7       MR. REEFER:  Object to form.
8   Assumes facts.  Incomplete
9   hypothetical.
10      Go ahead.
11      THE WITNESS:  That's a very
12  hypothetical question that has no
13  place in the real world.
14      But in the specification, if
15  it's -- if it's -- has -- if it
16  meets the specification, then it's
17  the same.
18  BY MR. DAVIS:
19      Q.   Okay.
20      A.   You have to have other --
21  other testing and other things to come
22  into play for it to be considered not the
23  same.
24      Q.   Okay.  Turn to Page 7 of

Page 241

1   Exhibit-14, which is the FDA Orange Book
2   preface.
3       A.   Okay.
4       Q.   You'll see there's a
5   definition provided there for therapeutic
6   equivalence.
7       Do you see that?
8       A.   Yes.
9       Q.   And it says, FDA classifies
10  as therapeutically equivalent those drug
11  products that meet the following general
12  criteria.
13      Do you see that?
14      A.   Yes.
15      Q.   Okay.  One, they are
16  approved as safe and effective.
17      Do you see that?
18      A.   Yes.
19      Q.   Do you know -- back to my
20  earlier question.
21      You don't know whether the
22  FDA has ever approved any valsartan drug
23  product -- or, rather, any product at all
24  that contains NDMA or NDEA as safe and

Confidential Information — Subject to Protective Order

Page 242

1 effective, with the disclosure that it
2 actually contained NDMA or NDEA, correct?
3      A.   I have no way of knowing
4 that.
5      Q.   Do you have any
6 understanding of whether NDMA or NDEA
7 have any therapeutic benefit?
8           MR. REEFER:  Object to form.
9      Foundation and scope.
10          But go ahead, if you know.
11          THE WITNESS:  I don't know
12     whether they have any therapeutic
13     benefit.  I -- I have not looked
14     into that.
15          I don't -- I don't believe
16     they act -- act to enhance the
17     therapeutic effect of the
18     valsartan, but I don't know what
19     their -- what could possibly be
20     their therapeutic benefit.
21          But I can't answer that
22     question.  I don't know.
23 BY MR. DAVIS:
24     Q.   Okay.  The second criteria

Page 243

1 for meeting therapeutic equivalence is,
2 2, They are pharmaceutical equivalents in
3 that they contain identical amounts of
4 the identical active drug ingredient in
5 the identical dosage form and route of
6 administration.
7           Do you see that?
8      A.   Yes.
9      Q.   2A?
10     A.   I see that.
11     Q.   Is that -- is that what
12 you're talking about when you're saying
13 that the API is the same because it meets
14 the spec?  Are you saying that valsartan
15 API would be pharmaceutically equivalent
16 under 2A there?
17     A.   I would say under 2B, Meet
18 compendial or other applicable standards
19 of strength, quality, purity and
20 identity.
21          If you take A and B
22 together, yes, that's what I'm saying.
23     Q.   Okay.  But you're -- you
24 conceded, though, that there are -- that

Page 244

1 other applicable standards out there
2 other than USP, correct?  For example,
3 the ICH guidelines?
4           MR. REEFER:  Object to form.
5      Misstates testimony.
6           THE WITNESS:  ICH guidelines
7      do not set acceptance criteria for
8      any particular test --
9 BY MR. DAVIS:
10     Q.   For ICH M7 it does, though.
11 We saw that in ICH M7.
12          ICH M7 does set thresholds.
13 In fact, that's how the acceptable
14 intakes for NDMA and NDEA were created by
15 the FDA.
16          MR. REEFER:  John, you
17     interrupted -- John, you
18     interrupted his answer.  I'd like
19     to --
20          MR. DAVIS:  My apologies.
21          MR. REEFER:  -- give him a
22     chance to finish.
23          THE WITNESS:  I'm talking
24     about the ICH quality guidelines.

Page 245

1           I will give you that the ICH
2 Q3C and Q3D do set standards for
3 the amount of residual solvent and
4 the amount of inorganic impurities
5 or elemental impurities.
6           But beyond that, they do not
7 set standards for what the assay
8 has to be, what the level of
9 impurities have to be.  There are
10 impurity guidelines that talk
11 about various categories, but they
12 don't say that the acceptance
13 criteria for a given impurity in a
14 given drug substance or drug
15 product has to meet a certain
16 level.
17           That's what I'm saying.  And
18 that's the guidelines and
19 guidances that I was talking
20 about.  Where it talks here about,
21 meet compendial or other
22 standards, to me, that's the
23 specification that's on file
24 with -- in their application at

Page 246

1    FDA.
2 BY MR. DAVIS:
3    Q.   We saw that ICH M7 sets
4 acceptance criteria, correct?
5        MR. REEFER:  Object to form.
6 Misstates the document.
7        But go ahead, Doctor.
8        THE WITNESS:  The little bit
9 of M7 that I know, it has
10 information in there about these
11 impurities.  But I don't know that
12 they actually said acceptance
13 criteria.  I'd have to go back and
14 study that guideline.
15 BY MR. DAVIS:
16    Q.   Okay.  You haven't studied
17 it for your report here?
18    A.   Correct.
19    Q.   Or for your conclusion in
20 Paragraph 99 of your report, have you?
21    A.   Correct.
22    Q.   And you haven't even studied
23 the FDA's Orange Book definition of
24 therapeutic equivalence here for

Page 247

1 Paragraph 99 of your report, have you?
2    A.   I have not.
3    Q.   Do you see Number 5 a little
4 bit further down?
5    A.   Yes.
6    Q.   And they are manufactured in
7 compliance with current good
8 manufacturing practice regulations.
9        Do you see that as a
10 requirement that the FDA has for a drug
11 product to be considered therapeutically
12 equivalent?
13    A.   Yes.
14        MR. DAVIS:  Just a little
15 recordkeeping.  I'm going to mark
16 Tabs 20, 21 and 22 as Exhibits-15
17 through 17.
18        - - -
19        (Whereupon, Exhibit
20 Sheinin-15, No Bates, 12/31/21
21 ProPharma Group Invoice
22 #PPGUS000581, was marked for
23 identification.)
24        - - -

Page 248

1        (Whereupon, Exhibit
2 Sheinin-16, No Bates, 1/31/22
3 ProPharma Group Invoice
4 #PPGUS000820, was marked for
5 identification.)
6        - - -
7        (Whereupon, Exhibit
8 Sheinin-17, No Bates, 2/28/22
9 ProPharma Group Invoice
10 #PPGUS001080, was marked for
11 identification.)
12        - - -
13        MR. DAVIS:  Do you have
14 those, Jason?  Those are the
15 invoices.
16        MR. REEFER:  Yeah, I was --
17 I was understanding it was just
18 housekeeping, I wasn't about to
19 pull them up.  Do you want me to?
20        MR. DAVIS:  Sure.  I do want
21 him to see them and verify them
22 for me, so.
23        MR. REEFER:  Sure.  Sorry, I
24 just -- I thought you were just

Page 249

1 going to attach them and move on.
2 Remind me what you're looking at,
3 20 --
4        MR. DAVIS:  20 through 22,
5 which are now Exhibits-15 through
6 17.
7        MR. REEFER:  Three one-page
8 documents, correct?
9        MR. DAVIS:  That's right.
10        MR. REEFER:  I'm marking the
11 one dated 12/31/21 as
12 Exhibit-20 --
13        MR. DAVIS:  Okay.
14        MR. REEFER:  -- is that
15 correct?
16        MR. DAVIS:  Yes.  And then
17 do the January one for 21.
18        THE WITNESS:  15, 16 and 17
19 he said -- oh --
20        MR. DAVIS:  Yes.
21        THE WITNESS:  15, 16 and 17.
22        MR. DAVIS:  Yes.  Thank you,
23 Dr. Sheinin.
24        December would be

1    Exhibit-15.  January, 16 and
2    February, 17.
3        MR. REEFER:  All right.
4 BY MR. DAVIS:
5    Q.   Okay.  Just a few brief
6 housekeeping questions on these,
7 Dr. Sheinin.
8        Did you prepare these
9 invoices or did somebody else prepare
10 them?
11   A.   Somebody else.  I report my
12 time on a timekeeping system, and I
13 can't -- there have been -- let me back
14 up.
15       I used to file a time report
16 with NDA Partners, and then they went to
17 a timekeeping system, and I was using
18 that.  And then they went to a different
19 timekeeping system.
20       So I don't know at what
21 point in time that this new timekeeping
22 system went into effect.  But I think
23 it's -- since it's talking -- all these
24 are ProPharma Group, I believe it's the

1 current system.
2        And I enter my time on a
3 daily basis if I'm doing any work for NDA
4 Partners.  And I then enter the, in a
5 comment field, what work I did that day,
6 and it goes on a weekly basis.
7    Q.   Okay.  So even if you didn't
8 generate the actual invoice, the
9 description notations and dates,
10 quantities, et cetera, that's stuff you
11 would have written in your own words,
12 correct?
13   A.   Correct.
14   Q.   Okay.  Are there any
15 invoices prior to -- if you look at
16 Exhibit-15, which is the December
17 invoice, did you do any work on this case
18 prior to December 13th or would that have
19 been the first time you encountered work
20 on this case?
21   A.   I believe that's the first
22 time.
23   Q.   Okay.  And then the last --
24 Exhibit-17, the last entry is February

1 17th, 2022.
2        Do you see that?
3    A.   Yes.
4    Q.   Could you estimate for me
5 the amount of time you've billed in this
6 case since February 17?
7    A.   Not counting today?
8    Q.   Sure.  Not counting today.
9    A.   I think it's somewhere in
10 the neighborhood of 15 to 17 hours this
11 month.  But I can't say for certainty.
12   Q.   Okay.  Would all of that
13 time have been part of preparing for your
14 deposition today?
15   A.   I believe so.
16   Q.   Can you recall doing any
17 work after February 17 that was not
18 dedicated to preparing for today?
19   A.   No, I -- I mean, I -- this
20 is when -- I reviewed the certificates of
21 analysis and I looked at some additional
22 FDA statements.  But it was all in
23 relation to getting ready for today.
24   Q.   Okay.  Would that be the

1 supplement to Exhibit B to your report,
2 where you say you reviewed the deposition
3 of Ron Najafi?
4    A.   Yes.
5        MR. DAVIS:  Let me --
6 just another housekeeping matter.
7 Let me introduce that into
8 evidence.
9        - - -
10       (Whereupon, Exhibit
11 Sheinin-18, No Bates, Supplement
12 to Exhibit B to the Report of Eric
13 Sheinin, Ph.D., was marked for
14 identification.)
15       - - -
16 BY MR. DAVIS:
17   Q.   Okay.  I've marked that as
18 Sheinin-18.  And I don't need --
19 actually, here, what I'll do is just
20 screen share it.
21       Can you see that on your
22 screen, Dr. Sheinin?
23   A.   Yes.
24   Q.   It's a supplement to

Confidential Information - Subject to Protective Order

Page 254

¹ Exhibit B, the report of Eric Sheinin,
² Ph.D., Deposition of Ron Najafi.
³      A.   I see that.
⁴      Q.   Was there anything else you
⁵ reviewed since submitting your expert
⁶ report on January 12th that didn't make
⁷ it into this supplemental exhibit,
⁸ supplement to Exhibit B?
⁹      A.   I don't believe so.
¹⁰      Q.   Okay.
¹¹           MR. DAVIS:  Okay.  That's
¹² all the questions I have for you
¹³ today, Dr. Sheinin.  Thank you for
¹⁴ your time.
¹⁵           I'll pass the witness.
¹⁶           THE WITNESS:  Thank you.
¹⁷           MR. REEFER:  Does anyone
¹⁸ have questions on the phone or
¹⁹ remote?
²⁰           Hearing none, John, let
²¹ me -- let's go off the record.
²²           VIDEO TECHNICIAN:  We're
²³ going off the record.  The time is
²⁴ 4:15 p.m.

Page 255

¹           - - -
²           (Whereupon, a brief recess
³ was taken.)
⁴           - - -
⁵           VIDEO TECHNICIAN:  We're
⁶ back on the record.  The time is
⁷ 4:51 p.m.
⁸           MR. DAVIS:  For the record,
⁹ before you start your questions,
¹⁰ Jason.  I'll note that we've been
¹¹ on a break for over 30 minutes
¹² since I concluded my questioning.
¹³           We'll reserve all rights
¹⁴ regarding how this is all going to
¹⁵ be allocated in terms of cost.  So
¹⁶ I'm going to reserve all that on
¹⁷ the record.
¹⁸           You can go ahead, Jason.
¹⁹           MR. REEFER:  I can also
²⁰ respond.  John, what's the basis
²¹ for your suggestion that my
²² taking -- I don't know if it was
²³ 30 minutes or not, but what's the
²⁴ basis for your suggestion that I

Page 256

¹ owe you costs for a 30-minute
² break in a deposition?
³           MR. DAVIS:  If we get a bill
⁴ for Dr. Sheinin's deposition time,
⁵ there will be a dispute over this
⁶ time period.
⁷           MR. REEFER:  Okay.  Well, I
⁸ guess you can raise that dispute
⁹ when you get the bill.
¹⁰           MR. DAVIS:  Okay.
¹¹           MR. REEFER:  I don't -- I
¹² don't understand the basis of your
¹³ objection.  But let's just move
¹⁴ on, okay?
¹⁵           MR. DAVIS:  Okay.  Go ahead.
¹⁶           MR. REEFER:  Thank you.
¹⁷           - - -
¹⁸           EXAMINATION
¹⁹           - - -
²⁰ BY MR. REEFER:
²¹      Q.   Dr. Sheinin, I just have a
²² few questions to clarify some of the
²³ testimony that you've offered thus far
²⁴ today.  I'll be as brief as I can,

Page 257

¹ recognizing it's already been a long day.
²           Do you remember,
³ Dr. Sheinin, this morning Mr. Davis asked
⁴ you a few questions about some of the
⁵ prior litigation work you've done as an
⁶ expert witness?
⁷      A.   Yes, I remember.
⁸      Q.   Okay.  And one of the
⁹ questions Mr. Davis asked you was whether
¹⁰ your prior work as an expert witness was
¹¹ all performed on behalf of pharmaceutical
¹² manufacturers.
¹³           Do you recall that question?
¹⁴      A.   I don't recall it in that
¹⁵ exact way.
¹⁶      Q.   Do you recall that during
¹⁷ Mr. Davis's previous questions to you, he
¹⁸ asked whether, during your prior work as
¹⁹ an expert consultant, that work was
²⁰ performed on behalf of pharmaceutical
²¹ manufacturers?
²²      A.   It was.
²³      Q.   And just to be clear, that
²⁴ prior work as an expert consultant

Page 258

1 involved litigation featuring
2 pharmaceutical manufacturers as both
3 plaintiffs and defendants, correct?
4      A.   Yes.
5      Q.   Were the only --
6          MR. DAVIS:  Objection.
7      Leading.
8 BY MR. REEFER:
9      Q.   Were the only parties to
10 those lawsuits pharmaceutical
11 manufacturers?
12      A.   Yes.
13      Q.   So, therefore, if you were
14 going to be involved as an expert
15 consultant, would you have any choice but
16 to represent a pharmaceutical
17 manufacturer?
18          MR. DAVIS:  Object to form.
19          THE WITNESS:  I doubt that
20      anybody would hire me.
21 BY MR. REEFER:
22      Q.   And to the best of your
23 recollection, did you represent
24 pharmaceutical manufacturers that were

Page 259

1 both plaintiffs and defendants?
2      A.   I believe so.
3      Q.   Dr. Sheinin, I think marked
4 as Exhibit-3 was a warning letter issued
5 to Unit 8, dated November 5th, 2019.
6      Do you recall talking about
7 that with Mr. Davis?
8      A.   Yes.
9      Q.   Does a warning letter
10 constitute final agency action by the
11 FDA?
12      A.   No, it doesn't.
13      Q.   Have you reviewed FDA's
14 website to determine whether Mylan, at
15 any point in time, has been placed on an
16 import alert?
17      A.   I have.  I could not find
18 any -- any time that Mylan had an import
19 alert.  I don't know how far back the
20 database goes, but it came back and said
21 no -- no response or something to that
22 effect.
23      Q.   So based on your review of
24 information published by FDA, you've seen

Page 260

1 no evidence to suggest Mylan was placed
2 on import alert following the recall of
3 valsartan, correct?
4      A.   Correct.
5      Q.   Under the FDCA, can FDA
6 permit the sale of drug product known by
7 the agency to be adulterated or
8 misbranded?
9      A.   I don't believe so.  I would
10 think not.
11      Q.   If you assume that Mylan's
12 Unit 8 continued to manufacture drug
13 substance for the United States market
14 from the time of the recalls to present,
15 would that confirm in your mind that FDA
16 did not consider drug substance from
17 Unit 8 to be misbranded or adulterated?
18      A.   Yes.
19          MR. DAVIS:  Wait.  Objection
20      to form.  Objection.  Leading.
21 BY MR. REEFER:
22      Q.   Do you remember,
23 Dr. Sheinin, having a discussion with
24 Mr. Davis about the M7 guidance?

Page 261

1      A.   Yes.
2      Q.   Did you testify that the M7
3 guidance was not one which you regularly
4 worked with during your time at FDA?
5      A.   I don't believe I worked
6 with it at all at FDA.
7          MR. REEFER:  And for the
8      record, I think the M7 guidance
9      was marked as Exhibit-5, but I
10      don't want to mess that up.
11 BY MR. REEFER:
12      Q.   If you'd pull out Exhibit-5,
13 please, Dr. Sheinin.
14      A.   Okay.
15      Q.   Dr. Sheinin, do you recall a
16 portion of your testimony with Mr. Davis
17 where he asked you to read beginning on
18 Page 5 of Exhibit-5 under the heading,
19 General Principles?
20      A.   Yes, I remember.  In fact, I
21 had to read this -- parts of two pages,
22 right?
23      Q.   Correct.  Yes, sir.
24          Dr. Sheinin, if you look at

Page 262

¹ the second paragraph under general
² principles, you'll see a sentence
³ beginning with, A threshold of
⁴ toxicological concern.
⁵        Do you see that paragraph,
⁶ sir?
⁷      A.   Yes.
⁸      Q.   And in the second sentence,
⁹ does this document state that, The
¹⁰ methods upon which the TTC -- that being
¹¹ the threshold of toxicological concern --
¹² is based are generally considered to be
¹³ very conservative since they involve a
¹⁴ simple linear extrapolation from the
¹⁵ dose, giving a 50 percent tumor incidence
¹⁶ to a 1 in 106 incidence, using TD50 data
¹⁷ for the most sensitive species and most
¹⁸ sensitive site of tumor induction?
¹⁹        Do you see that language,
²⁰ sir?
²¹        MR. DAVIS:  Before you
²²    answer, Dr. Sheinin, let me place
²³    an objection on the record here.
²⁴        He's testified a billion

Page 263

¹    times today he's not a
²    toxicologist, so asking him about
³    the substance of how thresholds
⁴    for toxicological concern are
⁵    created is totally outside of --
⁶    not only of his report but also of
⁷    his expertise, as he's admitted
⁸    today.
⁹        And I'll object to form,
¹⁰    just for the heck of it.
¹¹        MR. REEFER:  I understand
¹²    your position to be that the
¹³    section of M7 that you required my
¹⁴    witness to read cannot now be read
¹⁵    into the record; is that your
¹⁶    position, counsel?
¹⁷        MR. DAVIS:  No, I'm
¹⁸    objecting to where this is going,
¹⁹    which is -- which is --
²⁰        MR. REEFER:  You don't
²¹    know -- John -- you have no idea
²²    where this is going, John.
²³        MR. DAVIS:  I have a pretty
²⁴    good idea.  All right, go ahead

Page 264

¹        and answer the question.
²        Object to form.
³ BY MR. REEFER:
⁴      Q.   Yes.
⁵        The question was, do you see
⁶ that language; yes or no?
⁷      A.   Yes.
⁸      Q.   If you turn the page,
⁹ Dr. Sheinin, to Page 6 of the M7 guidance
¹⁰ marked as Exhibit-5, you'll see some
¹¹ language, a sentence beginning with the
¹² words, The use of a numerical cancer risk
¹³ value.
¹⁴        Do you see that, sir?
¹⁵      A.   Yes.
¹⁶      Q.   And does the M7 guidance
¹⁷ say, The use of a numerical cancer risk
¹⁸ value (1 in 100,000) and its translation
¹⁹ into risk-based doses (TTC) is a highly
²⁰ hypothetical concept that should not be
²¹ regarded as a realistic indication of the
²² actual risk.
²³        Did I read that correctly,
²⁴ sir?

Page 265

¹        MR. DAVIS:  Object to form.
²        MR. REEFER:  What's the
³    nature of the objection, counsel?
⁴        MR. DAVIS:  I said object to
⁵    form.
⁶        You can go ahead.
⁷        MR. REEFER:  Right.  I just
⁸    wanted to clarify the nature so I
⁹    can fix it.
¹⁰        MR. DAVIS:  Well, it's the
¹¹    inherent nature of asking this
¹²    witness about concepts that he's
¹³    not an expert in.  You're asking
¹⁴    him to read a sentence that he
¹⁵    doesn't understand.
¹⁶        MR. REEFER:  Did you ask him
¹⁷    to do the same thing, counsel?
¹⁸        MR. DAVIS:  No, I didn't.  I
¹⁹    asked him -- I had him clarify
²⁰    that he's never seen this
²¹    document, didn't look at it,
²²    didn't consider it.
²³        MR. REEFER:  And did you ask
²⁴    him to read it, counsel?

Page 266

1    MR. DAVIS:  Sure.  Yeah, I
2  asked him to read it to -- in
3  order to -- in order to get the
4  testimony that he never looked at
5  it and never considered it.
6    MR. REEFER:  Okay.  Thank
7  you.
8  BY MR. REEFER:
9    Q.   Let me continue,
10  Dr. Sheinin.
11    The next sentence reads,
12  Nevertheless, the TTC concept provides an
13  estimate of the safe exposures for any
14  mutagenic compound.  However, exceeding
15  the TTC is not necessarily associated
16  with an increased cancer risk, given the
17  conservative assumptions employed in the
18  derivation of the TTC value.
19    Do you see those sentences,
20  Doctor?
21    A.   Yes.
22    MR. DAVIS:  Objection.
23  BY MR. REEFER:
24    Q.   The exact sentence reads --

Page 267

1    MR. REEFER:  I haven't
2  finished my -- I haven't finished
3  stating my question.
4  BY MR. REEFER:
5    Q.   The next sentence reads, The
6  most likely increase in cancer incidence
7  is actually much less than 1 in 100,000.
8    Did I read that correctly?
9    A.   Yes.
10    Q.   The next sentence reads, In
11  addition, in cases where a mutagenic
12  compound is a noncarcinogen in a rodent
13  bio assay, there would be no predicted
14  increase in cancer risk.
15    Did I read that correctly?
16    MR. DAVIS:  Jason, are you
17  just going to ask him to confirm
18  that you're reading sentences in
19  the document?  Or are you going to
20  actually ask him any questions
21  about this stuff that he doesn't
22  understand?
23    MR. REEFER:  I am --
24    MR. DAVIS:  This is an utter

Page 268

1  waste of time.  This is an
2  absolute waste of time, if this is
3  what you're doing.
4    MR. REEFER:  Counsel, I am
5  putting on the record what you
6  asked my witness to read so as to
7  allow you to ask him questions.
8    MR. DAVIS:  I didn't ask him
9  anything about derivation of TTCs
10  or how they were derived for
11  nitrosamines, because he doesn't
12  know anything about that.  He's
13  not a toxicologist.
14    This is -- this is an
15  absolute waste of time.  You all
16  have other experts -- had other
17  experts who have opined on this
18  stuff, some of whom have been
19  struck.
20    But you all had plenty of
21  experts that could -- they can
22  talk about this.  This is not one
23  of those experts, as he himself
24  has testified.

Page 269

1    This is a waste of time.
2  I'm going to make that a
3  continuing objection.  Keep going,
4  if you like.
5    MR. REEFER:  Thank you.
6  BY MR. REEFER:
7    Q.   The next sentence,
8  Dr. Sheinin, I believe, reads, Based on
9  all of the above considerations, any
10  exposure to an impurity that is later
11  identified as a mutagen is not
12  necessarily associated with an increased
13  cancer risk for patients already exposed
14  to the impurity.
15    Did I read that correctly?
16    A.   Yes, you did.
17    Q.   Is it true that a new drug
18  application or abbreviated new drug
19  application may contain standards and
20  specifications in addition to what's
21  found in a compendial monograph?
22    A.   Yes.
23    Q.   Do you remember counsel
24  asking you questions with respect to

Confidential Information - Subject to Protective Order



Page 270

¹ Exhibit-6, the valsartan drug substance
² monograph?
³     A.   Yes.
⁴     Q.   If you look -- if you focus
⁵ simply on the monograph, irrespective of
⁶ any other standards or specifications
⁷ that might be in place, is it true that
⁸ so long as nitrosamine impurities were
⁹ not detected above 0.1 percent, the drug
¹⁰ substance would comply with compendial
¹¹ standards?
¹²     A.   It would.
¹³     Q.   To this day, to the best of
¹⁴ your knowledge, does FDA permit the sale
¹⁵ of drug products within the United States
¹⁶ containing NDMA or NDEA, so long as those
¹⁷ levels are below acceptable intake
¹⁸ limits?
¹⁹     A.   I believe that's true.
²⁰         MR. DAVIS:  Object to form.
²¹ BY MR. REEFER:
²²     Q.   Dr. Sheinin, you were asked
²³ a series of questions related to, I
²⁴ think, three or four consecutive

Page 271

¹ exhibits, including an e-mail exchange,
² DMF information requests, and a process
³ validation report.
⁴         Do you remember generally
⁵ that line of questioning from Mr. Davis?
⁶     A.   Oh.  Yeah, I remember.
⁷



Page 274

Page 276

```
4       Q.   You had discussed,
5   Dr. Sheinin, concepts about whether the
6   impurity profile between a generic drug
7   and an innovator or reference-listed drug
8   must be identical.
9           Do you remember that
10  discussion?
11      A.   Yes.
12      Q.   Do you understand that
13  oftentimes what's referred to as a
14  reference-listed drug is an NDA holder or
15  what some people refer to as an innovator
16  drug?
17      A.   Quite often it is.  It's not
18  necessarily, but not -- most of the time,
19  yeah.  It's pretty -- pretty common.
20      Q.   For -- and I'll refer to,
21  you know, an NDA holder as an innovator
22  drug; is that okay, for shorthand?
23      A.   Yes, okay.
24      Q.   In your experience at FDA,
```

Page 275

Page 277

```
1   will you see batch-by-batch variants in
2   the impurity profiles of API used to
3   manufacture innovator drugs?
4       A.   Yeah.  I think I mentioned
5   that during testimony today, that there's
6   going to be variation from batch to batch
7   and even sometimes there's -- a given
8   impurity is not present at the time of
9   manufacture and sometimes it is,
10  especially if it's a very low-level
11  impurity.
12      Q.   Dr. Sheinin, in your
13  experience at FDA, are you aware of
14  instances where the manufacturer of an
15  innovator drug sources API from multiple
16  sources?
17      A.   Yes.  Sometimes they do that
18  in their original NDA, sometimes they do
19  it, through a supplement, to add another
20  manufacturer.  And I have seen NDAs where
21  there were more than two manufacturers,
22  especially for a, quote/unquote,
23  blockbuster drug, where there's times
24  that one -- one source of a drug
```

Page 278

1 substance is having issues and companies
2 need to have alternate sources.
3       Q.    When a manufacturer of an
4 innovator drug sources API from multiple
5 sources, do those API manufacturers have
6 to use identical processes?
7       A.    They don't have to.
8 Sometimes the innovator may have the
9 patent on the synthetic scheme and they
10 want their suppliers to use the same
11 scheme.  Sometimes that's not the case
12 and whoever they are purchasing the drug
13 substance from is using different routes
14 of synthesis.
15       Q.    When an innovator drug
16 manufacturer sources API from multiple
17 manufacturers and those API manufacturers
18 utilize separate and distinct
19 manufacturing processes, would you expect
20 there to be differences in the impurity
21 profile of the API?
22       A.    Definitely, I would.
23       Q.    Does the FDCA adopt the USP
24 compendial standard as the standard by

Page 279

1 which products are evaluated for
2 adulteration?
3       A.    Yes.  I think that's in my
4 report.
5       Q.    If a product complies with
6 the compendial monograph, does that mean
7 it's not adulterated?
8          MR. DAVIS:  Objection.
9       Calls for a legal conclusion that
10      he was unwilling to provide to me
11      in his direct testimony here.
12 BY MR. REEFER:
13       Q.    Do you offer the opinion
14 that the standards set forth in Mylan's
15 DMF were consistent with the valsartan
16 USP monograph for a drug substance?
17       A.    Yes.  The fact that
18 valsartan -- Mylan's valsartan is on the
19 market and being sold in the U.S., to me,
20 that says the quality of the valsartan
21 API is in conformance with the USP
22 monograph.
23       Q.    And you did not need to
24 review the drug master file for that

Page 280

1 opinion, did you?
2       A.    No, I did not.  I also
3 looked at, I think I had mentioned
4 earlier, two certificates of analysis.
5 And I compared the test in the
6 certificates of analysis with the USP
7 monograph and found them to be in
8 agreement.
9       Q.    Did -- have you had an
10 opportunity to review the label from
11 Mylan's valsartan drug product?
12       A.    I have.  And I -- I looked
13 at the package insert.  And in Section
14 11, where it talks about the description,
15 I could see that the heading there was
16 valsartan tablets USP.  And in the
17 discussion of the active ingredient, it
18 says valsartan USP.
19       Q.    And does that -- why is that
20 significant to you?
21       A.    Because that means the --
22 both the drug product and the drug
23 substance meet the requirements set forth
24 in the compendial monographs for those

Page 281

1 two items.
2       Q.    Does the potential presence
3 of NDEA, at levels up to 1.57 parts per
4 million, change your opinion that drug
5 substance manufactured in accordance with
6 the specifications set forth in Mylan's
7 DMF would be compliant with compendial
8 standards?
9       A.    There's not --
10         MR. DAVIS:  Object to form.
11 BY MR. REEFER:
12       Q.    Okay.  Can you explain why
13 that is?
14         COURT REPORTER:  I'm sorry.
15      I need that answer repeated.
16         MR. REEFER:  Could you
17      repeat your answer, Dr. Sheinin.
18         THE WITNESS:  I think I
19      said, no, it does not.
20 BY MR. REEFER:
21       Q.    And can you explain why it
22 does not?
23       A.    Because at 1.57 PPM, it
24 would still meet the acceptance criteria

Confidential Information - Subject to Protective Order

1 in the test for any other impurity of 0.1
2 percent.
3      Q.   Do you remember a portion of
4 your report where you discuss whether
5 routine testing performed on drug
6 substance would have allowed for the
7 detection of trace levels of nitrosamine
8 impurities?
9      A.   I do recall.
10      Q.   Is it your opinion that
11 routine testing would not have detected
12 levels of NDEA as found in some batches
13 of Mylan's drug substance?
14      MR. DAVIS:  Objection.
15 Object to form.
16      THE WITNESS:  Yes.
17      MR. DAVIS:  Objection.
18 Vague as to what "routine testing"
19 means.
20      MR. REEFER:  Was your answer
21 yes?
22      THE WITNESS:  The answer is
23 yes.
24 BY MR. REEFER:

1      Q.   And what's the basis of that
2 opinion?
3      A.   The basis of my opinion is
4 the 30 years I had at the FDA, both in
5 the laboratory and as a supervisory
6 review chemist, and my experience at USP.
7      And even before I worked at
8 USP, I actually served as a volunteer on
9 a number of USP expert committees,
10 evaluating proposed monographs for -- to
11 go into the book.
12      And just from my experience,
13 routine testing would not have picked up
14 an impurity at that low of a level.
15      The fact that FDA had to
16 resort to using mass spec -- using mass
17 spec is a very sensitive detector to
18 begin with, and they had to make that
19 detector even more sensitive because they
20 were looking at a single ion.
21      When you introduce a
22 chemical into a mass spectrometer, it's
23 ionized and then it breaks down into
24 fragments.  The initial ion is called the

1 parent ion, and as it breaks down it
2 forms daughter ions.
3      And that -- to be able to
4 look at a single ion for NDEA or a single
5 ion for NDMA increases the sensitivity of
6 that method.  So it's -- basically, I
7 guess I would say it's -- compared to a
8 routine GC or LC analysis, I would call
9 it supercharged.  It's many -- it's
10 multiple times more sensitive than a
11 routine procedure.
12      MR. DAVIS:  I can't hear
13 you, Jason.
14      VIDEO TECHNICIAN:  The phone
15 is on mute, I think.
16      The phone disconnected.
17      - - -
18      (Whereupon, a discussion off
19 the record occurred.)
20      - - -
21      MR. DAVIS:  Let's go off the
22 record.
23      VIDEO TECHNICIAN:  Going off
24 the record.  The time is 5:23 p.m.

1      - - -
2      (Whereupon, a brief recess
3 was taken.)
4      - - -
5      VIDEO TECHNICIAN:  We are
6 back on the record.  The time is
7 5:29 p.m.
8 BY MR. REEFER:
9      Q.   Dr. Sheinin, I understand
10 that we were just disconnected from the
11 phone line used for this Zoom deposition
12 and that madam court reporter read back
13 your prior answer.
14      Did you hear her recite that
15 answer?
16      A.   I did.
17      Q.   Was there any additional
18 information that you sought to provide in
19 response to my previous question?
20      A.   No.
21      Q.   Has --
22      MR. DAVIS:  Are you
23 speaking, Jason, or did we lose
24 you again?

Page 286

1    MR. REEFER:  No, you haven't
2  lost me yet, John.  I was -- my
3  wheels don't turn as fast as yours
4  do, John, as you can probably
5  tell.
6  BY MR. REEFER:
7    Q.   Dr. Sheinin, has -- has FDA
8  made statements indicating that the
9  properties of nitrosamine impurities make
10  them hard to detect in standard
11  laboratory testing?
12    A.   They have.
13    MR. DAVIS:  Object to form.
14  Object to the extent that it's not
15  listed in his -- in the four
16  corners of his report or reliance
17  materials, whatever this is
18  calling for, these statements.
19  BY MR. REEFER:
20    Q.   With respect to your -- the
21  opinion you offered regarding the
22  capabilities of routine testing to detect
23  levels of NDEA as found in some batches
24  of Mylan's drug substance, is it relevant

Page 287

1  for you to compare the specification set
2  forth in the compendium of not more than
3  0.1 percent versus the levels of NDEA
4  detected in Mylan's drug?
5    A.   Yes.
6    Q.   How so?
7    A.   The levels that are found in
8  Mylan's API would be well below the .1
9  percent.  So the testing of the
10  impurity -- testing for impurities in the
11  API, it would pass if -- unless -- unless
12  there was another impurity of some
13  unknown that was greater than .1 percent.
14    Q.   And --
15    A.   The NDEA or NDMA, if it was
16  present, would be well below .1 percent.
17    Q.   And just, I guess, for
18  purposes of comparing apples to apples,
19  does .1 percent translate to 1,000 parts
20  per million?
21    A.   Yes.
22    Q.   And when I refer to routine
23  testing, did you understand that to mean
24  the high-performance liquid

Page 288

1  chromatography methods set forth and
2  described in the monograph for valsartan?
3    A.   Yes.
4    MR. REEFER:  I don't have
5  any further questions at this
6  time, though I may, depending on
7  whether or not Mr. Davis does.
8    MR. DAVIS:  Okay.  Just a
9  few follow-ups, Dr. Sheinin.  And
10  I'll try to take them in the order
11  in which they appeared.
12    - - -
13    EXAMINATION
14    - - -
15  BY MR. DAVIS:
16    Q.   You testified to me earlier
17  that you weren't an expert and not
18  qualified to offer opinions on risk
19  assessment; is that right?
20    A.   Yeah.  I'm not.
21    Q.   So you wouldn't know how an
22  in-process parameter could become what
23  the FDA refers to as a critical quality
24  attribute or a critical process

Page 289

1  parameter; is that right?
2    A.   I -- I have an understanding
3  of what critical quality parameters are.
4  They are parameters that are critical to
5  the manufacturing process.  And --
6    Q.   And the determination of
7  their -- sorry, go ahead.
8    A.   Go ahead.
9    Q.   The determination of whether
10  they are critical or not is through a
11  risk assessment pursuant to ICH Q9,
12  correct?
13    A.   I believe it's in Q9.
14    Q.   Okay.  And do you have any
15  idea of what the FDA expects in terms of
16  inclusion in a DMF regarding critical
17  quality attributes or critical process
18  parameters?
19    A.   I believe FDA expects them
20  to be included in the description of the
21  manufacturing process and the development
22  report and so on.
23    Q.   Okay.  Thank you.
24    Counsel asked you some

Page 290

1 questions regarding routine testing.
2         Do you recall that?  And
3 whether GC-MS did something that would be
4 considered routine testing or not?
5         MR. REEFER:  Object to the
6     form.  Beyond the scope of my
7     direct.
8         THE WITNESS:  I recall he
9     asked me questions about routine
10     testing, and I would not consider
11     GC-mass spec to be routine
12     testing.
13 BY MR. DAVIS:
14     Q.   When you say "routine
15 testing," are you referring to routine
16 testing that's done as part of, like, a
17 USP monograph, like the specification and
18 testing procedure for a USP monograph or
19 an approved DMF specification or ANDA
20 spec?
21     A.   Or NDA spec.  All of that.
22     Q.   Right.  But an
23 already-approved specification, correct?
24     A.   No.  A company that's

Page 291

1 submitting an ANDA or an NDA today, for
2 the most part, will be using routine
3 analytical procedures.
4         GC-mass spec is not anything
5 that I would consider routine.
6     Q.   Even though the FDA expects
7 it to be done when unknown impurities are
8 found?
9     A.   I'm not aware that the FDA
10 said you have to use GC-mass spec anytime
11 there's an unknown impurity.
12         I'm aware that the method
13 that FDA published for valsartan
14 impurities -- nitrosamine impurities in
15 valsartan is a GC-mass spec method.  But
16 I'm not aware that FDA has said that any
17 unknown has to be looked at by GC-mass
18 spec.
19     Q.   You are aware that the DEA
20 requires manufacturers to evaluate
21 unknown impurities?
22         Are you aware of that?
23         MR. REEFER:  Object to form.
24     Misstates the testimony.

Page 292

1         But go on.
2         THE WITNESS:  According to
3     ICH Q3A and Q3B, companies are --
4     well, as I said earlier, FDA
5     considers ICH guidance as
6     recommendations.  So, accordingly,
7     FDA is recommending that those two
8     guidances be followed in terms of
9     determine -- making a
10     determination of the impurities in
11     a given API or a drug product.
12         I don't see anywhere in
13     those guidances where ICH says you
14     have to use GC-mass spec.
15 BY MR. DAVIS:
16     Q.   I'm talking about the FDA
17 requiring manufacturers to evaluate
18 unknown impurities.
19         Are you aware of that
20 obligation?
21     A.   I'm not -- I'm not aware of
22 a specific guidance that says -- anything
23 beyond what's in Q3A or Q3B as to how
24 to -- not how to, but as to what the

Page 293

1 criteria would be for reporting and
2 identifying those impurities.
3         MR. DAVIS:  I'm marking Tab
4     16 as Exhibit-19.
5         - - -
6         (Whereupon, Exhibit
7     Sheinin-19, No Bates, Warning
8     Letter, Mylan Laboratories
9     Limited – Unit 7, was marked for
10     identification.)
11         - - -
12         MR. REEFER:  I'll take a --
13     will you give me a standing
14     objection, John, to the use of
15     this exhibit on the basis that
16     it's beyond the scope of my direct
17     and, also, it does not apply to
18     any facility that's been deemed to
19     be at issue in this litigation?
20         MR. DAVIS:  Standing
21     objection granted, but also
22     disagreed with.
23         MR. REEFER:  Very lawyerly.
24 BY MR. DAVIS:



Page 294

1    Q.   You told me earlier,
2  Dr. Sheinin, you hadn't looked at
3  anything related to Unit 7; is that
4  right?
5    A.   That's right.
6    Q.   Okay.  Do you recognize this
7  as a warning letter that was issued to
8  Unit 7 in August of 2020?
9       MR. REEFER:  Objection.
10   Beyond the scope.
11   THE WITNESS:  Yes.
12 BY MR. DAVIS:
13

Page 296

1

Page 295

1

Page 297

1

16 BY MR. DAVIS:
17    Q.   You wouldn't think it
18 relevant to know what the FDA has been
19 advising manufacturers their obligations
20 are regarding analytical testing --
21       MR. REEFER:  Object to form.
22 BY MR. DAVIS:
23    Q.   -- specifically as it
24 relates to nitrosamines?

Confidential Information - Subject to Protective Order

---

Page 298

1    MR. REEFER:  Object to form.
2  Misstates the document.  Beyond
3  the scope.  Foundation.
4    Go ahead.
5    THE WITNESS:  I have no idea
6  whatsoever what FDA has asked any
7  other defendant in this case.  I
8  have no way of knowing that.
9    It's -- I mean, you know it.
10  But I have no way to know that.
11  How would you think I would know
12  that?
13  BY MR. DAVIS:
14
15

[REDACTED]

---

Page 299

1
[REDACTED]

8    So I don't require a
9  response to that question, but -- or
10  statement, rather.
11    MR. REEFER:  Object to the
12  colloquy.
13  BY MR. DAVIS:
14    Q.   But let me ask you this,
15  Dr. Sheinin.
16    Is one of the ways to
17  thoroughly evaluate an unknown peak in a
18  GC FID by doing GC-MS?
19    MR. REEFER:  Object to form.
20  Beyond the scope.  Beyond the
21  direct.
22    Go ahead, Dr. Sheinin, if
23  you know.
24    THE WITNESS:  It's one

---

Page 300

1  possible way.
2  BY MR. DAVIS:
3    Q.   Okay.  Would it be the most
4  prevalent possible way in terms of
5  evaluating unknown peaks that appear in a
6  GC FID?
7    MR. REEFER:  Same objection.
8    THE WITNESS:  It would be a
9  very good way.  I guess partly it
10  depends on if -- if the
11  material -- well, it's one way --
12  GC-mass spec would be one way to
13  evaluate a peak coming out of a GC
14  that's an unknown by
15  flame-ionization detection.
16    But we've been talking here
17  about solvents and recovered
18  solvents.  When you mentioned the
19  API, my question is, are you
20  talking about, when you talk about
21  an API, the assay?  Are you
22  talking about the impurity test
23  that's in the specification or in
24  the USP monograph?  Or are you

---

Page 301

1  talking about a solvent?
2    There's -- there's a world
3  of differences in how you go about
4  testing for unknowns in the API
5  versus these nitrosamines.  So
6  there's -- I just feel that you
7  were not specific enough in what
8  you were asking me.
9  BY MR. DAVIS:
10    Q.   Okay.  Well, I think you've
11  answered my question, which is, GC-MS is
12  a prevalent way to thoroughly evaluate an
13  unknown peak in a GC, correct?
14    A.   My premise was that I do not
15  consider GC-mass spec to be a routine
16  procedure.  And I stand by that.  I do
17  not consider it to be routine.
18    Q.   You don't consider it to be
19  routine in -- as a procedure that's in an
20  approved specification, that's right.
21    Is that what your testimony
22  is?
23    A.   Yes.
24    Q.   Okay.

---

Confidential Information — Subject to Protective Order

Page 302

1    A.   It may -- it may be in an
2  approved specification today because of
3  nitrosamines.  But I do not consider it
4  to be routine.
5    Q.   In an approved
6  specification?
7    A.   In an approved specification
8  or in an application for marketing
9  approval.
10   Q.   You don't think that it's
11 routine that all the workup in a DMF that
12 goes into an ANDA application or drug
13 master file for a product that's to be
14 approved, you don't think that it's
15 routine that companies -- manufacturers
16 do GC-MS?
17       MR. REEFER:  Objection.
18   Asked and answered.
19       THE WITNESS:  I do not
20   consider it to be a routine
21   quality control test.
22 BY MR. DAVIS:
23   Q.   Okay.  A routine quality
24 control test.  Okay.

Page 303

1    A.   Well, you're talking about
2  quality control of a product.  It's not
3  a -- it's not a routine test.
4    Q.   Right.  But quality control
5  is analytical chemistry for an approved
6  product, right?
7    A.   Or it's a proposed
8  specification for inclusion in an
9  application of an ANDA or NDA.  It's the
10 same thing.  It's still -- it's a quality
11 control test.
12   Q.   Are you aware that --
13   A.   That we're talking about.
14   Q.   Are you aware that Mylan's
15 own toxicologist testified to me that he
16 gets about, like, 3 to 4,000 requests for
17 GC-MS per year?
18       Did you review Lance Monar's
19 testimony?  It wasn't even provided to
20 you, was it?
21       MR. REEFER:  Object to form.
22   Foundation.  Beyond the scope.
23       THE WITNESS:  I'd have to
24   look on the list in Appendix B.

Page 304

1    But as I said earlier, I have not
2  reviewed any of those testimonies
3  from anybody from Mylan.
4  BY MR. DAVIS:
5    Q.   Okay.  And that would
6  include, also, Derek Glover's testimony;
7  you haven't reviewed any of his, even
8  though it is listed on Exhibit B, right?
9       MR. REEFER:  Objection.
10   Literally just answered.
11       But go ahead, Dr. Sheinin.
12       THE WITNESS:  I have not
13   reviewed any testimony from
14   anybody at Mylan.
15 BY MR. DAVIS:
16

Page 305

16 BY MR. DAVIS:
17   Q.   Okay.  Thank you.
18       You told Mr. Reefer that
19 even a -- a Mylan valsartan product that
20 had 1.57 parts per million NDEA would
21 still meet compendial standards because
22 unknown impurities are controlled in the
23 USP monograph at not more than .1
24 percent, which is 1,000 parts per

Page 306

million, right?

A.   I believe I qualified that also by saying in the specification in the approved application as well.

Q.   So why did the recalls even happen, then, if that's what -- if NDEA was only to be controlled at not less than 1,000 parts per million, which appears to be your expert opinion, why are we here?  Why did these recalls happen?

A.   I did not -- I did not say that -- I forget what your question was already.  It's been a long day.

Can you repeat your question?

Q.   Sure.  And I appreciate it's been a long day.

You testified to Mr. Reefer, in response to one of his questions, that a Mylan valsartan product containing 1.57 parts per million NDEA would still meet compendial -- the USP monograph for valsartan which controlled any other

Page 307

impurities at .1 percent; is that right?

A.   Yes.

Q.   So if that's the case, why did the recalls happen?  Can you tell me that?

MR. REEFER:  Object to form.  Beyond the scope.  Beyond the redirect.

THE WITNESS:  The recalls happened because FDA was told that there were nitrosamines in some products, and FDA's investigation showed that there was -- there was a theoretical risk and, ultimately, they determined that there needs to be a lower acceptance criteria for nitrosamines.  And they called it the acceptable intake level.

And there had to be a development of more sensitive analytical procedures to be able to detect and quantify those nitrosamines.

Page 308

So that's why there was a recall, and I -- I would expect that companies manufacturing these products will have to include testing for nitrosamines in their specification as a -- doing a supplement to their approved application.

So there would be an additional test beyond what's in the USP.  And I would hope that companies would submit the same information to USP, for USP to be able to update the monograph for all of the sartans.

BY MR. DAVIS:

Q.   So why does it even matter that USP monograph had a not more than .1 percent limit, if that's not even the limit that applied to nitrosamines at any point?

MR. REEFER:  Object to form.  Object to form.  It misstates the testimony.

Page 309

THE WITNESS:  I don't -- I just don't understand your question.  It's --

BY MR. DAVIS:

Q.   Well, I don't understand your report.

MR. REEFER:  Come on.

MR. DAVIS:  Let me ask it again.  Let me ask it again.

BY MR. DAVIS:

Q.   Why would it be important for you, in your report, that the USP monograph had a not more than .1 percent limit for other impurities if that's not even the limit that applied to nitrosamines at any point?  Why is that relevant to your report?

MR. REEFER:  Objection to form.  Misstates the testimony.  But go ahead, Doctor.

THE WITNESS:  I'm totally confused by now.

The USP monograph is recognized in the Food, Drug and

Page 310

1     Cosmetic Act as being an official
2 compendium. And that monograph
3 has to be met in order for a
4 product not to be considered
5 adulterated.
6     That's why the monograph is
7 important. And that's why the
8 acceptance criteria in the
9 specification for unknown
10 impurities is important.
11 BY MR. DAVIS:
12    Q. Have you looked at what
13 the -- what the definition of adulterated
14 is in the FD&C Act at all recently?
15    A. Yes, I have. I believe I
16 have it in my report.
17    Q. Okay. And so you'll agree
18 with me, then, that a product is
19 adulterated if it's manufactured in a way
20 where the manufacturer could not assure
21 that it would -- well, let me just read
22 you the language so I'm not confused or
23 misstating it.
24     MR. REEFER: What are you

Page 311

1 reading from, John?
2     MR. DAVIS: 21 USC 351.
3 BY MR. DAVIS:
4    Q. A drug or device shall be
5 deemed adulterated --
6    A. Wait. Wait.
7     MR. REEFER: Hold on. He
8 said 21 USC 351.
9     THE WITNESS: Okay. I
10 thought you said USP.
11     MR. DAVIS: 21 USC 351,
12 United States Code.
13 BY MR. DAVIS:
14    Q. A drug or a device shall be
15 adulterated, if it is a drug, and the
16 methods used in, or the facilities or
17 controls used for, its manufacture,
18 processing, packing or holding do not
19 conform to or are not operated or
20 administered in conformity with current
21 good manufacturing practice to assure
22 that such drug meets the requirements of
23 this chapter as to safety and has the
24 identity and strength, and meets the

Page 312

1 quality and purity characteristics which
2 it purports or is represented to possess.
3     Have you seen that language
4 before?
5    A. Yes.
6    Q. Okay. So you agree with me,
7 then, that a drug is adulterated if it's
8 manufactured out of compliance with GMP,
9 correct?
10     MR. REEFER: Object to form.
11 Object to form. Beyond the scope.
12     THE WITNESS: The -- that
13 definition is -- I want to look at
14 the definition I copied into my
15 report.
16     MR. REEFER: He's quoting
17 from a different subsection.
18     THE WITNESS: Oh, okay.
19 Can you read that again?
20     MR. DAVIS: Sure.
21 BY MR. DAVIS:
22    Q. A drug or a device shall be
23 deemed to be adulterated -- and then this
24 is A1 -- or A2B, Subsection A2B, If it is

Page 313

1 a drug and the methods used in, or the
2 facilities or controls used for, its
3 manufacture, processing, packing or
4 holding do not conform to or are not
5 operated or administered in conformity
6 with current good manufacturing practice
7 to assure that such drug meets the
8 requirements in this chapter as to safety
9 and has the identity and strength, and
10 meets the quality and purity
11 characteristics which it purports or is
12 represented to possess.
13     Do you agree with me that
14 that's -- that's a definition of an
15 adulterated drug, a situation in which a
16 drug becomes adulterated, per federal
17 law?
18    A. Yes.
19    Q. Okay. And, in fact, that's
20 what Mylan was told in its November 2019
21 Unit 8 warning letter, Exhibit-3, was it
22 not?
23     MR. REEFER: Objection.
24 BY MR. DAVIS:

Page 314

1    Q.   We saw that language, right?
2         MR. REEFER:  Object to form.
3    You've covered this in cross.  You
4    know, asked and answered.
5         But go ahead.
6         THE WITNESS:  And yet FDA,
7    within a short period of time,
8    allowed Mylan to reintroduce their
9    valsartan.  So there was no legal
10   action taken, as far as I know,
11   about the valsartan that was the
12   subject of that inspection.
13   BY MR. DAVIS:
14   Q.   Okay.  And for about the
15   umpteenth time today, you have no idea
16   how that valsartan that was brought back
17   to the market differed from the valsartan
18   that Mylan had to recall?
19        MR. REEFER:  As acknowledged
20   by the question itself, asked and
21   answered.
22   BY MR. DAVIS:
23   Q.   Is that a yes?
24   A.   Yes.

Page 315

1    Q.   Okay.  Last questions.
2         Mr. Reefer asked you some
3    questions about procurements of API, I
4    believe, from multiple sources and how
5    that might affect the quality or purity
6    characteristics of the product.
7         Do you remember that
8    discussion with him?
9    A.   Yes.
10   Q.   Okay.  Do you have an
11   understanding that under FDA regulations
12   that a manufacturer like Mylan is
13   responsible for all of its suppliers?
14        MR. REEFER:  Object to form.
15   Beyond the scope.
16        THE WITNESS:  That Mylan is
17   responsible for all of their
18   suppliers?  And to what extent and
19   to what regard?
20   I think that's a -- like an
21   unfinished question.
22   BY MR. DAVIS:
23   Q.   Sure.
24   If Mylan, for example,

Page 316

1    procures raw materials from a vendor, a
2    raw material vendor, and that vendor is
3    out of GMP compliance and the raw
4    materials it's sending to Mylan are no
5    good, it's ultimately Mylan's
6    responsibility to adequately vet its
7    vendors.
8         Isn't that the FDA's
9    position as stated in regulations, and
10   GMP regulations specifically?
11        MR. REEFER:  Object to form.
12   BY MR. DAVIS:
13   Q.   Do you have any
14   understanding of that?
15        MR. REEFER:  Object to form.
16   Beyond the scope of his report.
17   Beyond the scope of my direct.
18        But, I don't know, go ahead.
19        THE WITNESS:  Yes.  Mylan
20   would be responsible for their
21   suppliers.
22        MR. DAVIS:  Okay.  That's
23   all the questions I have.
24        MR. REEFER:  So we'll go

Page 317

1    huddle, and I'll come back to see
2    if -- I'm just kidding, John.
3         VIDEO TECHNICIAN:  No more
4    questions?
5         MR. DAVIS:  We can go off
6    the record.
7         MR. REEFER:  No.  I have --
8         MR. DAVIS:  Sorry, I take it
9    back.
10        MR. REEFER:  I just had -- I
11   just have maybe two questions,
12   three questions.
13        - - -
14        EXAMINATION
15        - - -
16   BY MR. REEFER:
17   Q.   Dr. Sheinin, do you purport
18   to offer any opinions with respect to
19   whether Mylan complied with GMP
20   regulations?
21   A.   No.
22   Q.   Do you intend to offer any
23   opinion with respect to whether Mylan's
24   investigation of unknown peaks, in some

Page 318

1  form or fashion, complied with rules and
2  regulations?
3       A.   No.
4       Q.   To your knowledge, did
5  what's been described as Mylan Unit 7
6  manufacture API -- API valsartan?
7       A.   I have no idea what Unit 7
8  manufactures.
9            MR. REEFER:  All right.  I
10  think that's all I have.
11           MR. DAVIS:  No further
12  questions.
13           VIDEO TECHNICIAN:  This
14  marks the end of today's
15  deposition.  The time is 6:06 p.m.
16            - - -
17       (Whereupon, the deposition
18  concluded at 6:06 p.m.)
19            - - -
20
21
22
23
24

Page 320

1       INSTRUCTIONS TO WITNESS
2
3       Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8       After doing so, please sign
9  the errata sheet and date it.
10       You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14       It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 319

1       CERTIFICATE
2
3
4  I, Amanda Maslynsky-Miller, Certified Realtime
   Reporter, do hereby certify that prior to the
   commencement of the examination, ERIC SHEININ,
5  Ph.D., was remotely sworn by me to testify to
   the truth, the whole truth and nothing but the
6  truth.
7
8  I DO FURTHER CERTIFY that the foregoing is a
   verbatim transcript of the testimony as taken
   stenographically by me at the time, place and
9  on the date hereinbefore set forth, to the best
   of my ability.
10
11  I DO FURTHER CERTIFY that I am neither a
   relative nor employee nor attorney nor counsel
12  of any of the parties to this action, and that
   I am neither a relative nor employee of such
13  attorney or counsel, and that I am not
   financially interested in the action.
14
15
16
    _____
17  Amanda Miller
    Certified Realtime Reporter
    Dated: March 31, 2022
18
19
    (The foregoing certification of this transcript
20  does not apply to any reproduction of the same
    by any means, unless under the direct control
21  and/or supervision of the certifying reporter.)
22
23
24

Page 321

1            - - - - - -
            E R R A T A
2            - - - - - -
3  PAGE  LINE  CHANGE/REASON
4  _____ ____  _____
5  _____ ____  _____
6  _____ ____  _____
7  _____ ____  _____
8  _____ ____  _____
9  _____ ____  _____
10  _____ ____  _____
11  _____ ____  _____
12  _____ ____  _____
13  _____ ____  _____
14  _____ ____  _____
15  _____ ____  _____
16  _____ ____  _____
17  _____ ____  _____
18  _____ ____  _____
19  _____ ____  _____
20  _____ ____  _____
21  _____ ____  _____
22  _____ ____  _____
23  _____ ____  _____
24  _____ ____  _____

Confidential Information - Subject to Protective Order

Page 322

1
2        ACKNOWLEDGMENT OF DEPONENT

              I,_____, do
3    hereby certify that I have read the
     foregoing pages,  1 - 318, and that the
4    same is a correct transcription of the
     answers given by me to the questions
5    therein propounded, except for the
     corrections or changes in form or
6    substance, if any, noted in the attached
     Errata Sheet.
7
8    _____
     ERIC SHEININ, Ph.D.            DATE
9
10
     Subscribed and sworn
11   to before me this
     _____ day of _____, 20_____.
12
     My commission expires:_____
13
14   _____
     Notary Public
15
16
17
18
19
20
21
22
23
24

Page 323

1            LAWYER'S NOTES
2    PAGE  LINE
3    _____ _____ _____
4    _____ _____ _____
5    _____ _____ _____
6    _____ _____ _____
7    _____ _____ _____
8    _____ _____ _____
9    _____ _____ _____
10   _____ _____ _____
11   _____ _____ _____
12   _____ _____ _____
13   _____ _____ _____
14   _____ _____ _____
15   _____ _____ _____
16   _____ _____ _____
17   _____ _____ _____
18   _____ _____ _____
19   _____ _____ _____
20   _____ _____ _____
21   _____ _____ _____
22   _____ _____ _____
23   _____ _____ _____
24   _____ _____ _____