# EXHIBIT B

Page 1

1                 UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF NEW JERSEY

2                         CAMDEN VICINAGE

3

4     IN RE: VALSARTAN, LOSARTAN, AND        MDL No. 2875

      IRBESARTAN PRODUCTS LIABILITY

5     LITIGATION

6

      This Document Relates to All Actions

7

8     _____/

9

      VIDEOTAPED

10    DEPOSITION OF:   KALI PANAGOS, PHARM.D., R.PH

11    DATE:            JANUARY 21, 2022

12    TIME:            9:32 a.m. - 5:52 p.m.

13    TAKEN BY:        DEFENDANT

14    PLACE:           RIVERO MESTRE LLP

                       2525 PONCE DE LEON BLVD. SUITE 1000

15                     MIAMI, FL 33134

16    REPORTED BY:     CHELSEA HLAVACH, NOTARY PUBLIC, STATE

                       OF FLORIDA

17

18

19

20

21

22

23

24

25

Page 2

```
 1   A P P E A R A N C E S :
 2
     NILDA ISIDRO, ESQUIRE
 3   OF:  Greenberg Traurig
        One Vanderbilt Avenue
 4      New York, NY 10017
        isidron@gtlaw.com
 5
        Attorney for Teva
 6
     GLENN CERNER, ESQUIRE
 7   OF:  Greenberg Traurig
        One Vanderbilt Avenue
 8      New York, NY 10017
 9      Attorney for Teva
10   JORGE MESTRE, ESQUIRE
     OF:  Rivero Mestre, LLP
11      2525 Ponce de Leon Boulevard, Suite 1000
        Miami, FL 33134
12      jmestre@riveromestre.com
13      Attorney for the Plaintiffs
14   GREGORY HANSEL, ESQUIRE
     OF:  Preti, Flaherty, Beliveau & Pachios, Chartered, LLP
15      One City Center
        Portland, ME 04101
16      ghansel@preti.com
17      Attorney for Maine Automobile Dealers Association
18   CONLEE WHITELEY, ESQUIRE
     OF:  Kanner and Whiteley
19      701 Camp Street
        New Orleans, LA 70130
20
21      Attorney for the Plaintiffs
22   CHARLIE WHARTON, ESQUIRE
     OF:  Rivero Mestre, LLP
        2525 Ponce de Leon Boulevard, Suite 1000
23      Miami, FL 33134
        cwhorton@riveromestre.com
24
25      Attorney for the Plaintiffs
```

Page 3

```
 1   ASHER BLOCK, ESQUIRE
     OF:  Lewis Brisbois
 2      550 E. Swedesford Road, Suite 270
        Wayne, PA 19087
 3
        Attorney for Camber Pharmaceuticals appeared via Zoom
 4
     CHRIS HENRY, ESQUIRE
 5   OF:  Buchanan Ingersoll & Rooney PC
        227 West Trade Street, Suite 600
 6      Charlotte, NC  28202
        704 444 3475 (o)
 7      Christopher.henry@bipc.com
 8      Attorney for Albertson™s LLC appeared via Zoom
 9   CHRISTINE GANNON, ESQUIRE
     OF:  Three Gateway Center
10      100 Mulberry Street, 15th Floor
        Newark, New Jersey 07102
11      Lwalsh@walsh.law
        Cgannon@walsh.law
12
        Attorneys for Teva Pharmaceuticals USA, Inc., Teva
13      Pharmaceutical Industries Ltd., Actavis Pharma, Inc.,
        and Actavis, LLC, appeared via Zoom
14
     CHARLES SCHAFFER, ESQUIRE
15   OF:  Walter Haverfield, LLP
        16990 Savage Road
16      Chagrin Falls, OH 44023-4536
        Crs7270@gmail.com
17
        Attorney for Steamfitters Local 300 and Employers and
18      Laborers Local 100 appeared via Zoom
19   DANA KLINGES, ESQUIRE
     OF:  Duane Morris, LLP
20      30 South 17th Street
        Philadelphia, PA 19103-4196
21      dklinges@duanemorris.com
22      Attorney for ZHP appeared via Zoom
23
24
25
```

Page 4

```
 1   DREW DORNER, ESQUIRE
     OF:  Duane Morris, LLP
 2      505 9th Street, N.W., Suite 1000
        Washington, DC 20004-2166
 3      dtdorner@duanemorris.com
 4      Attorney for ZHP, Prinston, Solco, and Huahai U.S.
        appeared via Zoom
 5
     D'LESLI DAVIS, ESQUIRE
 6   OF:  Norton Rose Fulbright US LLP
        2200 Ross Avenue, Suite 3600
 7      Dallas, Texas  75201-7932
        Ellie.norris@nortonrosefulbright.com
 8
        Attorney for McKesson Corporation appeared via Zoom
 9
     FRANK STOY, ESQUIRE
10   OF:  Pietragallo Gordon Alfano Bosick & Raspanti, LLP
        38th Floor, One Oxford Centre
11      Pittsburgh, PA  15219
        FHS@Pietragallo.com
12
13      Attorney for Mylan Laboratories Ltd. and Mylan
        Pharmaceuticals, Inc., appeared via Zoom
14   JASON REEFER, ESQUIRE
     OF:  Pietragallo Gordon Alfano Bosick & Raspanti, LLP
15      38th Floor, One Oxford Centre
        Pittsburgh, PA  15219
16      FHS@Pietragallo.com
17      Attorney for Mylan Laboratories Ltd. and Mylan
        Pharmaceuticals, Inc., appeared via Zoom
18
     GEOFFREY COAN, ESQUIRE
19   OF:  Hinshaw & Culbertson LLP
        53 State Street, 27th Floor, Boston, MA, 02109
20      Tel: 617-213-7045 | Fax: 617-213-7001
        Gcoan@hinshawlaw.com
21
        Attorney for Sciegen Pharmaceuticals appeared via Zoom
22
     GREG COATES, ESQUIRE
23   OF:  Greenberg Traurig
        500 Campus Drive, Suite 400
24      Florham Park, NJ 07932
        Coatesg@gtlaw.com
25
        Attorney appeared via Zoom
```

Page 5

```
 1   JEFF GEOPPINGER, ESQUIRE
     OF:  Ulmer
 2      312 Walnut Street, Suite 1400
        Cincinnati, Ohio 45202-4029
 3      Jgeoppinger@ulmer.com
 4      Attorney appeared via Zoom
 5   JOHN GISLESON, ESQUIRE
     OF:  Morgan Lewis & Bockius, LLP
 6      One Oxford Centre, 32nd Fl.
        Pittsburgh, PA 15219-6401
 7      john.gisleson@morganlewis.com
 8      Attorney for Aurobindo appeared via Zoom
 9   KARA KAPKE, ESQUIRE
     OF:  Barnes & Thornburg, LLP
10      11 South meridian Street
        Indianapolis, IN 46204-3535
11
        Attorney for CVS and Rite Aid appeared via Zoom
12
     KRISTIN IVES, ESQUIRE
13   OF:  Falkenberg Ives LLP
        230 W. Monroe, Suite 2220
14      Chicago, IL 60606
        Kbi@falkenbergives.com
15
        Attorney for Humana Pharmacy, Inc., appeared via Zoom
16
     LAYNE HILTON, ESQUIRE
17   OF:  Kanner & Whiteley, L.L.C.
        701 Camp Street
18      New Orleans, LA  70130
        Www.kanner-law.com
19
        Attorney for Plaintiffs appeared via Zoom
20
     LUKE BRESNAHAN, ESQUIRE
21   OF:  Crowell & Moring
        1001 Pennsylvania Avenue, NW
22      Washington, DC 20004
        lbresnahan@crowell.com
23
        Attorney appeared via Zoom
24
25
```

2 (Pages 2 - 5)

Page 6

1   RUBEN HONIK, ESQUIRE
     OF: Honik, LLC
2      Mass Torts Made Perfect
     316 South Baylen Street, Number 400
3      Pensacola, FL 32502
     ruben@honiklaw.com
4
     Attorney for the Plaintiffs appeared via Zoom
5
     SARAH ZIMMERMAN, ESQUIRE
6   OF: Husch Blackwell, LLP
     190 Carondelet Plaza, Suite 600
7      St. Louis, MO 63105-3443
     Sarah.Zimmerman@huschblackwell.com
8
     Attorney for Express Scripts appeared via Zoom
9
     STEVEN HARKINS, ESQUIRE
10   OF: Greenberg Traurig
     Terminus 200
11     3333 Piedmont Road NE, Suite 2500
     Atlanta, GA 30305
12     Harkinss@gtlaw.com
13     Attorney for Teva appeared via Zoom
14   WILLIAM MURTHA, ESQUIRE
     OF: William Murtha, Hill Wallack, LLP
15     21 Roszel Road
     Princeton, NJ 08540
16     wmurtha@hillwallack.com
17   Attorney for Hetero Drugs and Hetero Labs appeared via
     zoom
18
     ELLIE NORRIS, ESQUIRE
19   OF: Norton Rose Fulbright US LLP
     2200 Ross Avenue, Suite 3600
20     Dallas, Texas 75201-7932
     Ellie.norris@nortonrosefulbright.com
21
     Attorney for McKesson Corporation appeared via Zoom
22
23
24
25

Page 7

1   C. BRETT VAUGGN, ESQUIRE
     OF: Hollis Law Firm
2     8101 College Blvd, Suite 260
     Overland Park, KS 66210
3
4     Attorney appeared via Zoom

5   DAN CAMPBELL, ESQUIRE
     OF Crowell & Moring
6     1001 Pennsylvania Avenue, NW
     Washington, DC 20004
7     lbresnahan@crowell.com

8     Attorney appeared via Zoom
9
     ALSO PRESENT
10
     BEN PELTA-HELLER, Videographer, appeared via Zoom
11   JAVIER ORDONEZ, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1        I N D E X
2        * * * * *
3   TESTIMONY OF KALI PANAGOS, PHARM.D., R.PH
4     Direct Examination by Ms. Isidro .............. 13
     Cross-Examination by Mr. Gisleson ........... 154
5     Redirect Examination Mr. Geoppinger .......... 175
     Recross-Examination Ms. Isidro ............... 184
6     Further Direct Examination Mr. Hansel ........ 185
     Further Cross-Examination Mr. Gisleson ........ 189
7     Further Further Direct Examination Mr. Dorner . 194
8
     CERTIFICATE OF OATH ............................... 200
9   CERTIFICATE OF REPORTER ......................... 201
     ERRATA SHEET ....................................... 202
10   NOTIFICATION LETTER ................................ 203
11
12       E X H I B I T S
13       * * * * * *
14   Exhibit No. 1 ...................................... 16
     (Notice of Deposition)
15   Exhibit No. 2 ...................................... 17
     (CV)
16
     Exhibit No. 3 ...................................... 85
17   (Report)
18   Exhibit No. 4 ...................................... 90
     (Engagement Letter)
19
     Exhibit No. 5 ...................................... 125
20   (ASHP Report)
21
22
23
24
25

Page 9

1
2
3
4
5
6
7
8
9
10
11
12
13       * * * * * *
14      S T I P U L A T I O N S
15     It is hereby stipulated and agreed by and between
16   counsel present for the respective parties, and the
17   deponent, that the reading and signing of the deposition
18   are hereby reserved.
19
20
21
22
23
24
25

3 (Pages 6 - 9)

Page 10

1    P R O C E E D I N G S
2    * * * * *
3    THE VIDEOGRAPHER:  Good morning.  We are going on
4    the record at 9:32 a.m. on January 21st, 2022.
5    This is Media Unit Number 1 of the video recorded
6    deposition of Kali -- Dr. Kali Panagos.  This
7    deposition is being held at 2525 Ponce de Leon
8    Boulevard, Suite 1000, in Miami, Florida.
9    My name is Javier Ordonez and I am the
10   videographer.  The court reporter is Chelsea Hlavach;
11   both from Veritext.  Will the court reporter please
12   swear in the witness?
13   THE COURT REPORTER:  Can we have counsel please
14   state their appearances?
15   THE VIDEOGRAPHER:  Oh, can counsel please state
16   your name and who you're -- I'm sorry.  State your
17   appearance and who you represent.
18   MS. ISIDRO:  Nilda Isidro from Greenberg Traurig
19   on behalf of Teva.
20   MR. KERNER:  Glenn Kerner from Greenberg Traurig
21   also on behalf of Teva.
22   MR. HANSEL:  Greg Hansel from Preti Flaherty on
23   behalf of Maine Automobile Dealers Association.
24   MR. WHARTON:  Hi.  Charlie Wharton on behalf of
25   Plaintiffs.

Page 11

1    MS. WHITELEY:  Conlee Whiteley on behalf of
2    Plaintiffs.
3    MR. HANSEL:  Before we go on the record further,
4    I guess I have a couple of preliminaries.  First,
5    Jorge Mestre is also here, Chelsea, on behalf of the
6    Plaintiffs.
7    And I see I'm being asked on the Zoom to agree
8    that this be recorded on Zoom, and I don't think
9    that's necessary because we have a videographer and a
10   court reporter.  So I would request that the Zoom not
11   be recorded.
12   MS. ISIDRO:  The Zooms, I believe, have been
13   recorded at prior depositions, and in the event anyone
14   on Zoom asks questions, et cetera, that's -- that's
15   part of the purpose of -- of the Zoom recording, is my
16   understanding.
17   MR. HANSEL:  That would also be audible in the
18   room and would be picked up on the video, the
19   videographer, the court -- the official videographer,
20   as well as by the court reporter.
21   Is that really necessary?
22   MR. KERNER:  Well, let me just ask you a quick
23   question.  My understanding is that the prior
24   depositions have all been recorded on Zoom as well,
25   and this is for you folks and anybody actually on Zoom

Page 12

1    right now, have there been any objections to the
2    depositions being recorded on Zoom or has there been
3    any agreement for this litigation to have the
4    depositions recorded on Zoom?  Because that was my
5    understanding, but I'm asking the group.
6    MS. ISIDRO:  And further --
7    MR. COTES:  Glenn, it's Greg -- it's Greg Cotes.
8    I mean, I've been on dozens and dozens of these in the
9    past six months and I get that recording message every
10   single time and no one's ever said a word about that.
11   MS. ISIDRO:  Yeah.  I would also add that
12   Plaintiffs have -- have raised objections to the
13   number of folks in the room in person, and this was
14   something that was discussed at the recent status
15   conference, and that is also part of the reason why
16   there is the Zoom setup, just in light of the pandemic
17   and concerns about safety that have been raised by
18   Plaintiffs, just as much as by anyone else.
19   And so, again, I don't see the -- the problem
20   with recording the Zoom consistent with all of that.
21   MR. HANSEL:  Okay.  All right.  In that case
22   we'll -- we'll allow it.
23   MS. ISIDRO:  Thank you.
24   THE COURT REPORTER:  Okay.  Will you raise your
25   right hand, please?

Page 13

1    Do you swear or affirm the testimony you are
2    about to give in this matter will be the truth, the
3    whole truth, and nothing but the truth?
4    THE WITNESS:  I do.
5    KALI PANAGOS, PHARM.D., R.PH,
6    having been first duly sworn, was examined and
7    testified as follows:
8    DIRECT EXAMINATION
9    BY MS. ISIDRO:
10   Q.  Good morning, Dr. Panagos.
11   A.  Good morning.
12   Q.  My name is Nilda Isidro.  I'm with the law firm
13   of Greenberg Traurig and I represent Defendant, Teva.
14   A.  Uh-huh.
15   Q.  We're just meeting for the first time this
16   morning, correct?
17   A.  Yes, we are.
18   Q.  Can you please state your full name for the
19   record?
20   A.  My full name is Dr. Kali Panagos.
21   Q.  And what is your current professional address?
22   A.  My current professional address is 105 Down
23   Court, Windermere, Florida -- Florida.
24   Q.  Thank you.  Where do you currently reside?
25   A.  New York.

4 (Pages 10 - 13)

Page 14

1    Q.   Have you ever been deposed before?
2    A.   No, I have not.
3    Q.   Okay.  So I'll just go over a few ground rules on
4    how -- on how this works --
5    A.   Sure.
6    Q.   -- since this is your first deposition.
7        As you can see there's a court reporter to your
8    right who's taking down everything that we say.
9    A.   Uh-huh.
10   Q.   So for that reason, it's very important that you
11   answer verbally, meaning yes -- saying yes or no rather
12   than nodding your head or saying --
13   A.   I understand.
14   Q.   -- uh-huh or huh-uh, and for that same reason,
15   it's important that -- that we not talk over each other,
16   right?  So that you wait that -- until I finish my question
17   before you start to answer, and I'll do the same.  I'll try
18   to wait you finish your answer before I start the
19   next question, just so that the court reporter isn't trying
20   to take both of us -- what both of us are saying down at
21   the same time.  Is that all right?
22   A.   That's right.
23   Q.   Great.  As -- as you've seen this morning, there
24   are some folks who are also on Zoom and so there's that
25   setup as well.  There you may hear -- you may hear

Page 15

1    objections or something coming from Zoom.  You may also
2    later today get questions from folks on -- on -- on the
3    Zoom.
4        If at any time you don't understand my question,
5    please let me know.  If you don't hear my question, please
6    let me know.  If -- however, if you do answer my question,
7    I'm -- I'm going to take that to mean that you understood
8    my questions.  Is that fair?
9    A.   Yes.
10   Q.   Okay.  If at any time you need to take a break,
11   just let me know and -- and we can do that.  I would just
12   ask that if there's a question pending, that that question
13   be answered before we go on a break.
14   A.   Okay.
15   Q.   Do you have any questions about the -- how
16   this -- about how -- the procedures or how this will work
17   today?
18   A.   Not at this time.
19   Q.   Okay.  And as you know you're here to testify
20   under oath.  Is there any reason that you would not -- you
21   would not be able to give truthful and accurate testimony
22   today?
23   A.   No.
24   Q.   You're not on any medications that might
25   interfere with your ability to testify or anything like

Page 16

1    that?
2    A.   No.
3    Q.   Okay.  And do you want to read and sign this
4    deposition?
5    A.   Sure.
6    Q.   Okay.  Now, Doctor, you're appearing here today
7    pursuant to a notice of deposition; is that right?
8    A.   Yes.
9    Q.   Okay.  We're going to go ahead and mark that
10   notice of deposition as Exhibit 1.  And, again, as I
11   mentioned, because of the Zoom, someone's going to be
12   loading these exhibits up on the Zoom as well, so we may
13   just give a little bit of a pause when we mark an exhibit
14   so that they can get caught up as well.
15       (Exhibit No. 1 was marked for identification.)
16       All right.  Doctor, have you seen this document
17   before?
18   A.   No.
19   Q.   Okay.  I'm going to ask you to take a look at
20   Page 6.  There are a number of requests there.  And just if
21   you could take a look at those and let me know, did anyone
22   ask you whether you had any of these documents that are
23   requested here in your possession?
24       MR. HANSEL:  I'm going to object on grounds of
25       work product privilege to any requests for

Page 17

1    communications between counsel and the witness as, you
2    know, we have also responded to this request in
3    writing, as you know.
4        MS. ISIDRO:  I'll rephrase my question.
5    BY MS. ISIDRO:
6    Q.   Prior to the deposition today, did you check
7    whether you had any of the documents that are listed in
8    these requests in your possession?
9    A.   Yes.
10   Q.   Okay.  We're going to go through them one by one.
11   A.   Sure.
12   Q.   And -- and we'll talk about each one.  So the
13   first one is your current up-to-date resume or CV.  There
14   was a CV attached as an exhibit to your report, correct?
15   A.   Correct.
16   Q.   Is that your current CV?
17   A.   Yes.
18   Q.   Since -- since producing your report, have --
19   have there been any updates to the information on that CV?
20   A.   No.
21   Q.   Okay.  Let's go ahead and mark that CV as Exhibit
22   Number 2 and then we'll go through later on the rest of the
23   items on this list.
24       (Exhibit No. 2 was marked for identification.)
25       Okay.  Doctor, so it notes on your CV that you

Page 18

1 received a bachelor of science from St. John's University
2 in 1997; is that right?
3    A. Yes.
4    Q. What was your major?
5    A. Biology.
6    Q. Did you have any minors?
7    A. Computer science.
8    Q. How long did it take you to complete that
9 bachelor of science?
10    A. Four years.
11    Q. And then after that you pursued a second
12 bachelor's degree; is that right?
13    A. Yes.
14    Q. That was from St. John's University in 2000?
15    A. Yes.
16    Q. What was your major then?
17    A. Pharmacy.
18    Q. And did you have any minors at that time?
19    A. No.
20    Q. How long did it take you to complete that
21 bachelor's degree?
22    A. That was completed in 2000.
23    Q. When did you -- when did you begin pursuing that
24 bachelor's degree?
25    A. In '97.

Page 19

1    Q. Okay. And -- and then you received a doctorate
2 from Shenandoah University in 2006?
3    A. Yes.
4    Q. That was also in pharmacy?
5    A. That was a doctorate in pharmacy, yes.
6    Q. Okay. And when did you begin pursuing that
7 doctorate?
8    A. Two years prior to the graduation date.
9    Q. Have you had any other formal education beyond
10 those degrees that we've just discussed?
11    A. No.
12    Q. Okay. So in 2002 you joined the Long Island
13 University's faculty; is that right?
14    A. Yes.
15    Q. And you were on that faculty until 2009?
16    A. Yes, I was part of the faculty and administration
17 till 2009.
18    Q. What -- what was your first role within Long
19 Island University's faculty and administration?
20    A. Director of pharmacy services.
21    Q. And how long did you hold that position?
22    A. I held that until, you know, 2009.
23    Q. Okay. What were your roles and responsibilities
24 under that title?
25    A. My roles and responsibilities were to oversee the

Page 20

1 curriculum of the pharmacy program, the pharmacy advisors
2 reported to me with regards to students -- student
3 advisement for coursework in the pharmacy program, and I
4 also evaluated student progress for remaining and -- within
5 the program as well.
6    Q. Okay. And did you have any other titles or roles
7 within the Long Island University?
8    A. Yes, I served as an adjunct faculty in the
9 department of social sciences.
10    Q. From --
11    A. In the pharmacy program.
12    Q. From what year to what year?
13    A. 2000 and -- jeez. I was -- 2005 about until
14 2009.
15    Q. Okay. Did you teach classes as part of that
16 role?
17    A. I certainly did.
18    Q. What classes did you teach?
19    A. I taught pharmacy orientation, which is an
20 introduction course to pharmacy. I also taught or was part
21 of the recitation courses, which are laboratory type
22 courses in the social sciences division of pharmacy
23 program.
24    Q. Okay. Any other courses that you taught?
25    A. No.

Page 21

1    Q. And other than these two roles that we've just
2 discussed, did you have any other roles or titles within
3 the Long Island University?
4    A. No.
5    Q. You're currently a registered pharmacist in the
6 State of New York?
7    A. Yes, I am.
8    Q. Are you registered or licensed as a pharmacist in
9 any other state?
10    A. No.
11    Q. Do you have any other certifications --
12 professional certifications or qualifications?
13    A. I do.
14    Q. What are they?
15    A. I have an immunizer certification; I am certified
16 in first aid or CPR for infant, child, and adults; I am
17 also certified as an MTM pharmacist; and I also have a New
18 York State Department Adjuster License as well.
19    Q. Okay. You mentioned an immunizer certification.
20 What does that -- what does that mean?
21    A. That means I am permitted to administer
22 immunizations to patients.
23    Q. And what is an MTM pharmacist?
24    A. Medication therapy management.
25    Q. What -- what does medication therapy management

6 (Pages 18 - 21)

Page 22

1  entail?
2      A.  It entails being able to counsel patients on
3  their -- the drugs that they're on and their overall
4  profile and provide them guidance for compliance and
5  adherence.
6      Q.  What do you mean by compliance and adherence?
7      A.  So that they know how to properly take their
8  medication, what the medication is for, and review with
9  them the -- their overall drug profile.
10     Q.  And then you also mentioned New York State
11 Department Adjuster.  What does that entail?
12     A.  At this time I don't have any requirements that
13 it -- that I'm required for that, so it's there, but I
14 don't have any requirements for it.
15     Q.  What does a New York State Department Adjuster
16 do?
17     A.  That is used in the managed care field or in the
18 pharmacy management or if you needed to -- it's more on the
19 business side.  So it's not directly patient care.  It's on
20 the business side of the pharmacy.
21     Q.  What does that mean, more on -- more on the
22 business side?  What types of things?
23     A.  The organization I was employed with, Broadreach
24 Medical Resources, it was beneficial to them if I had this
25 adjuster license.

Page 23

1      Q.  In what way was it beneficial?
2      A.  To adhere with requirements by New York State for
3  the -- their type of business.
4      Q.  What responsibilities did you have with that
5  employer as -- as an adjuster?
6      A.  My responsibilities to that employer were in the
7  capacity of a clinical pharmacist and director of clinical
8  operations, as well as client oversight as well.
9      Q.  Okay.  I'm just trying to understand how the --
10 the New York State Department Adjuster certification comes
11 into play.
12     A.  Uh-huh.
13     Q.  What it allows you to do that you wouldn't be
14 able to do if you had -- if you did not have that
15 certification.
16     A.  It allows the organization to adhere with the
17 requirements of New York State by having an adjuster's
18 license -- an employee with an adjuster's license on staff.
19     Q.  Now, you also mentioned certain clinical
20 affiliations in your CV?
21     A.  Yep.
22     Q.  And -- and those -- one of those is with Hospital
23 of Special Surgery, correct?
24     A.  Correct.
25     Q.  You mention in your report that you have a

Page 24

1  clinical affiliation in pain management and anesthesia at
2  the Hospital for Special Surgery, correct?
3      A.  That is correct.
4      Q.  What does that position entail?
5      A.  That position required me to participate and
6  understand the functions of anesthesiology and pain
7  management of patients as it regards to their procedures
8  that they were -- with regards to their procedures that
9  they were having and work closely with the anesthesia team
10 and pain management -- management team for management of
11 that patient while they were in the hospital.
12     Q.  Did you have any sort of patient facing role in
13 that position?
14     A.  The patients were in surgery, so I was in the
15 surgery room with the anesthesiologists and then we would
16 visit the patient in the post-op.
17     Q.  Okay.  You didn't -- you didn't prescribe any
18 medication or anything like that, correct?
19     A.  No, I did not.
20     Q.  Do you have the ability to prescribe medication?
21     A.  No, I do not.
22     Q.  Okay.  And during what time did you have that
23 clinical affiliation?
24     A.  That was during my time at St. John's pursuing
25 the pharmacy -- my bachelor's of pharmacy degree.

Page 25

1      Q.  Okay.  And then you also list a clinical
2  affiliation with Bellevue Medical Center.
3      A.  Yes.
4      Q.  And during what time did you hold that clinical
5  affiliation?
6      A.  That clinical affiliation was done during my time
7  pursuing my doctorate degree in pharmacy.
8      Q.  Okay.  And what was your role with Bellevue
9  Medical Center?
10     A.  My primary role was participation in the lipid
11 and anticoagulation clinics, participation with the medical
12 and pharmacy teams there to manage patients.
13     Q.  And then you've also listed a clinical
14 affiliation with Northwell Health University.
15     A.  Correct.
16     Q.  During what time frame did you hold that clinical
17 affiliation?
18     A.  That affiliation was done during my time at
19 St. John's University pursuing the bachelor's of pharmacy
20 degree.
21     Q.  And what was your role with Northwell Health?
22     A.  That was an internal medicine rotation with a
23 focus on diabetes, participating in medical rounds and with
24 physicians and pharmacists to manage patients with
25 different diagnoses and conditions for which they were in

7 (Pages 22 - 25)

Page 26

1 the hospital.
2     Q. And, finally, you list as -- under clinical
3 affiliations, advisory panel member, AMGEN for Repatha?
4     A. Correct.
5     Q. During what time frame did you hold that
6 position?
7     A. 2019.
8     Q. And what were your roles and responsibilities as
9 an advisory panel member?
10     A. I was asked to participate in the advisory panel
11 for evaluation of Repatha and discussion about the use of
12 the drug and -- in all capacities.
13     Q. What type of drug is Repatha?
14     A. Repatha is a lipid lowering drug or
15 hypercholesterolemia drug intended for certain populations
16 that meet the criteria for intended use.
17     MR. MESTRE: If you're taking a pause, I just
18 wanted to make my appearance. Jorge Mestre on behalf
19 of the Plaintiffs. And I also wanted to make sure
20 that we're not recording on the Zoom, correct?
21     MR. KERNER: We are and we had that discussion.
22     MR. MESTRE: Oh, we did?
23     MS. ISIDRO: We had that discussion already.
24 Yes.
25     MR. MESTRE: Okay. Okay.

Page 27

1     MR. KERNER: And your co-counsel noted your
2 appearance earlier as well.
3     MR. MESTRE: Thank you.
4 BY MS. ISIDRO:
5     Q. Dr. Panagos, you worked as a pharmacist at
6 Walgreens in New York from 2000 to 2015; is that correct?
7     A. That is correct.
8     Q. Were you the lead pharmacist during that time?
9     A. I was a staff pharmacist.
10     Q. Okay. Besides staff pharmacist, did you ever
11 have any other roles with Walgreens?
12     A. No.
13     Q. What were your duties and responsibilities as a
14 staff pharmacist?
15     A. To manage the pharmacy, so that's all aspects of
16 the pharmacy at the time where I'm assigned, my hours of
17 work, and so that includes the prescriptions, filling the
18 prescriptions, reviewing, filling, dispensing, and
19 counseling the -- the prescriptions that are coming in and
20 for the patients that are coming in.
21     I also supervise the technicians that are working
22 in the pharmacy during that time. They fall under my
23 supervision, including the interns that are on shift at the
24 same time as I am. I'm also responsible that the drug
25 product is the correct drug product is being filled and

Page 28

1 verifying that that is the right medication, the right
2 patient, and ensuring that there aren't any
3 contraindications for the -- for the patient so.
4     Q. And during part of this same time period you also
5 worked at Broadreach Medical Resources; is that right?
6     A. Correct.
7     Q. That was from 2008 to 2018?
8     A. Correct.
9     Q. And what was your role at Broadreach?
10     A. I had several roles -- roles there. I was a
11 clinical pharmacist and then became the director of
12 clinical operations and also the head of client management
13 as well.
14     Q. From what year to what year were you a clinical
15 pharmacist at Broadreach?
16     A. The entire time.
17     Q. And from what year to what year were you director
18 of clinical operation?
19     A. As it states in my CV, 2008 through 2018.
20     Q. So for the full time period?
21     A. Yes.
22     Q. Okay. And from what year to what year were you
23 head of account services and client management?
24     A. It was a couple years later so 2009 or 2010.
25 Shortly thereafter.

Page 29

1     Q. Okay. So within a couple of years of starting at
2 Broadreach through the end of your time there?
3     A. Correct.
4     Q. Okay. What was the split on your time between
5 Broadreach and Walgreens during this time frame?
6     A. I began my time with Broadreach initially
7 part-time.
8     Q. Uh-huh.
9     A. And I was also part-time or per diem -- well,
10 part-time with Walgreens at that time.
11     Q. What were your duties and responsibilities as a
12 clinical pharmist- -- pharmacist at Broadreach?
13     A. My duties included review of prior authorization
14 requests, collaboration with prescribers as needed on
15 behalf of those requests, collaboration with -- or outreach
16 to patients as needed on behalf of those requests. So
17 review of the prior authorization, completing that request,
18 documenting the results or the findings, tracking that, and
19 communicating appropriately.
20     Q. What were your roles and responsibilities as
21 director of clinical operations at Broadreach?
22     A. My roles and responsibilities as clinical
23 operations included ensuring that management of the
24 formulary, management of the prior authorizations,
25 management of every clinical aspect with regards to the

8 (Pages 26 - 29)

Page 30

1  prescription benefit was done efficiently in a proper
2  workflow.
3      Q.  And what were your roles and responsibilities as
4  head of client services and account management at
5  Broadreach?
6      A.  My roles and responsibilities included advising
7  patient -- clients on all aspects of their pharmacy
8  program, which includes their formulary, their plan design,
9  drugs covered and not covered, and providing them with
10  guidance on how to best do that.
11      Q.  Your CV states that you developed industry
12  exclusive prescription indemnity/reference based program
13  during your time at Broadreach.  Can you tell us more about
14  that, what that entailed?
15      A.  That is a prescription type program that is --
16  takes a subset of drugs and applies -- creates a -- a plan
17  that clients or employers may choose if it's appropriate
18  for their employees as a prescription drug offering.  It is
19  structured to allow kind of a different option for
20  employers to take for prescription benefits.
21      Q.  And what was your role in developing that
22  program?
23      A.  My role in developing that program included
24  choice of the medications that would be part of the product
25  offering and that includes both brands and generics, and

Page 31

1  how those medications would be structured within that
2  program for tiering or payments, et cetera.
3      Q.  Your CV also states that you designed evidence
4  based market competitive clinical programs with documented
5  ROI.  Can you tell us what that refers to?
6      A.  Sure.  Clinical programs are a part of a pharmacy
7  benefit offering and they are designed based on evidence
8  based guidelines, which are accepted in the healthcare
9  community as how you -- patients would be treated according
10  to the conditions that they have.  So when you create a
11  clinical program, you do so on clinical merit but in the --
12  you structure it on clinical merit, but you also
13  incorporate other components essential to the prescription
14  drug benefit to help clients manage their population
15  and -- and it's linked to the formulary.
16      Q.  You referenced some evidence-based guidelines.
17  Are there specific evidence-based guidelines that you used
18  in putting together those programs?
19      A.  Yes.
20      Q.  Which ones?
21      A.  There were many.
22      Q.  Can you give some examples?
23      A.  Asthma, diabetes, cardiovascular, just to name a
24  few.  There are many.
25      Q.  So when you say asthma, what does that refer to

Page 32

1  in terms of an evidence-based guidelines?
2      A.  The guidelines set forth by the medical community
3  for treatment of a patient with a diagnosis of asthma.
4      Q.  And for the other conditions that you mentioned,
5  is it the same --
6      A.  The same.
7      Q.  Okay.  Your CV also states that you manage
8  integration of data across medical and prescription,
9  including population, health, and enrollment analytics?
10      A.  Correct.
11      Q.  Can you tell us more about what that entailed?
12      A.  Yes.  My role included review and analysis of the
13  data that -- both on the prescription side and where
14  available on the medical side and being able to evaluate
15  that on behalf of our clients.
16      Q.  What do you mean by the data on the prescription
17  side?
18      A.  Claims data.
19      Q.  And what do you mean by the data on the medical
20  side?
21      A.  Likewise.
22      Q.  Where would you get that data?
23      A.  The data would come from the PBM or the medical
24  carrier.
25      Q.  And finally your CV states that you served as

Page 33

1  subject matter expert on all PBM clinical drug and
2  specialty items.
3      A.  That is correct.
4      Q.  What did you mean by served as a subject matter
5  expert on PBMs?
6      A.  So for our clients and -- I was the person who
7  they would come to for questions about determining -- any
8  question on PBM, actually.  So I served as a subject matter
9  expert to advise on PBM and yeah.
10      Q.  And those clients were -- not -- not specific
11  names, but, you know, what -- what type of entities --
12      A.  Self-insured --
13      Q.  -- were those clients?
14      A.  -- clients, self-insured employer groups.
15      MR. HANSEL:  Please remember to let her finish
16  her question before you begin your answer.
17      THE WITNESS:  Okay.  Thank you.
18  BY MS. ISIDRO:
19      Q.  And what do you mean by served as a subject
20  matter expert on clinical, drug, and specialty items?
21      A.  Again, I would provide guidance and advisement on
22  drugs that are -- were on the formulary or even not on the
23  formulary.  I'd provide the -- would answer any questions
24  related to those drugs.
25      Q.  What does the clinical refer to?

9 (Pages 30 - 33)

Page 34

1     A.   The clinical refers to the medication and the use
2 of the medication from my background and experience as a
3 pharmacist of being able to provide that thought process
4 around the discussion of the medication.
5     Q.   And what do you mean by specialty items?
6     A.   Specialty medications are part of a formulary and
7 they are -- there's -- there's no universal accepted
8 definition for specialty but they're -- tend to be for more
9 complex conditions.
10     Q.   Is that what you're referring to when you use
11 that term in your CV?
12     A.   Correct.
13     Q.   Okay.  You also spent it seems like a year or
14 maybe less than a year at Smith Rx in San Francisco; is
15 that right?
16     A.   That is right.
17     Q.   How -- how -- what is the precise amount of time
18 that you spent at Smith Rx?
19     A.   I think it was from February to December.  Yeah.
20     Q.   What was your role or roles within Smith Rx?
21     A.   Director of clinical services.
22     Q.   That was the only role you held there?
23     A.   Yes.
24     Q.   What were your -- your responsibilities under
25 that role?

Page 35

1     A.   To set up the pharmacy benefits with regards to
2 formulary, prior authorization, reviews to ensure that
3 those were done appropriately and manage the formulary.
4     Q.   Why did you leave that position?
5     A.   There are several reasons.  One, distance from my
6 home.
7     Q.   Your home was in New York at that time?
8     A.   Correct.
9     Q.   What were some of the other reasons?
10     A.   Primarily distance from my home.
11     Q.   And you've been on the Council of Strategic
12 Healthcare Advisors since 2018?
13     A.   Yes.
14     Q.   What are your roles and responsibilities there?
15     A.   They call upon my expertise as needed for cases
16 or surveys, clinical related items for which they deem my
17 qualification's appropriate for response.
18     Q.   Who are you advising in that role?
19     A.   Whatever the particular project at that time
20 calls for, who -- whomever that may be.
21     Q.   What -- are these -- are these all different
22 types of business entities?
23     A.   It could be.
24     Q.   What else could it be?
25     A.   It could be other healthcare professionals,

Page 36

1 industry experts, industry colleagues.  Yeah.
2     Q.   You're the founder of AristaRx Wellness; is that
3 right?
4     A.   That is right.
5     Q.   And you began that in 2018 as well?
6     A.   Correct.
7     Q.   What is AristaRx Wellness?
8     A.   AristaRx Wellness is my LLC that I created.
9     Q.   What does -- what services does AristaRx Wellness
10 offer?
11     A.   Pharmacy benefit consulting.
12     Q.   And to whom do you offer that pharmacy benefit
13 consulting?
14     A.   To primarily self-insured employer groups but
15 could be any group that needs pharmacy benefit consulting.
16     Q.   Do you have any employees?
17     A.   No.
18     Q.   Are you the sole member of that LLC?
19     A.   Yes.
20     Q.   And what are your duties and responsibilities
21 within AristaRx Wellness?
22     A.   To provide pharmacy benefit consulting to my
23 clients.
24     Q.   Is that still an active company?
25     A.   Yes.

Page 37

1     Q.   And the business address that you gave earlier
2 here in Florida, is that for AristaRx Wellness?
3     A.   No.
4     Q.   Okay.  What entity was that address for?
5     A.   ARMSRx.
6     Q.   ARMSRx.  And you've been with ARMSRx since 2019?
7     A.   Yes.
8     Q.   What is -- what roles have you held within
9 ARMSRx?
10     A.   Senior vice president and executive vice
11 president.
12     Q.   And during what time frame were you senior vice
13 president?
14     A.   2019 through 2021, as listed on my CV.
15     Q.   And executive vice president during what time
16 frame?
17     A.   2021 till present.
18     Q.   Okay.  What were your roles and responsibilities
19 as senior VP?
20     A.   To provide advice and guidance to our clients
21 with regards to their pharmacy benefit program, all aspects
22 of their pharmacy benefit program.
23     Q.   And what are your roles and responsibilities as
24 executive vice president?
25     A.   To provide advisement and guidance to our clients

10 (Pages 34 - 37)

Page 38

1  with respect to their pharmacy benefit program, all
2  aspects, and I also oversee or have individuals within our
3  organization who report up to me.
4      Q.  Okay.  So you didn't have individuals who
5  reported up to you as a senior VP?
6      A.  I -- right.
7      Q.  Okay.
8      A.  They -- they report up to me now.
9      Q.  Okay.  Was that the only way in which your role
10  changed from senior VP to executive VP?
11      A.  Yes.
12      Q.  How many people report to you as EVP at ARMSRx?
13      A.  Two.
14      Q.  And what are their roles?
15      A.  They are in account management and PBM
16  operations.
17      Q.  Doctor, you mention in your report that you have
18  20 years of experience, half of which has been dedicated to
19  the managed care and pharmacy consulting industry
20  overseeing clinical development, overall PBM operations,
21  and client services/management, working primarily with
22  self-insured clients, third-party administrators, and TPPs;
23  is that right?
24      A.  That is right.
25      Q.  What is a TPP?

Page 39

1      A.  A third-party payer.
2      Q.  And can you describe what a third-party payer is
3  or does?
4      A.  They are responsible for reimbursement or
5  management of the health care claims, including the
6  prescription benefit.
7      Q.  And how, if at all, is a TPP different from a
8  self-insured employer?
9          MR. HANSEL:  Object to the form.
10      A.  Could you be more specific?
11  BY MS. ISIDRO:
12      Q.  Are there any ways in which a TPP differs from a
13  self-insured employer?
14      A.  There could be.
15      Q.  What are some of the ways in which they could
16  differ?
17      A.  Could you be more specific?
18      Q.  You said there could be differences, so I'm just
19  asking you to elaborate on that.
20          What are some of the differences that could
21  exist?
22      A.  Third-party payers are responsible for the
23  management and reimbursement of the healthcare claims,
24  including the prescription benefit.  Self-insured employers
25  would also be responsible in that same capacity but within

Page 40

1  the confines of their organization.
2      Q.  Okay.  What is a TPA?
3      A.  Third-party administrator.
4      Q.  What does a third-party administrator do?
5      A.  They would administer the benefits, you know, on
6  behalf of an entity or a group.
7      Q.  And how does that differ from a TPP, if at all?
8      A.  So the third-party payer has ultimate
9  responsibility for -- at risk for those claims.  A TPA will
10  manage the claims processing and the functions associated
11  with the benefit but may not have ultimate responsibility
12  or at risk for the claims.
13      Q.  Okay.  Now, I see you have a few documents in
14  front of you right now.  One of them is Exhibit 1, another
15  one is Exhibit 2, but it looks like you might have a few
16  other documents as well; is that right?
17      A.  Yes.
18      Q.  What are the other documents that you have in
19  front of you?
20      A.  My statement, my opinion, my expert report.
21      Q.  Okay.  Anything else that you have in front of
22  you right now?
23      A.  Not document-wise.
24      Q.  Okay.  And this copy of your expert report is one
25  that you've brought with you today, yourself?

Page 41

1      A.  Yes.
2      Q.  Okay.  What is the nature of your work with TPPs?
3      A.  The nature of my work in my role or as a pharmacy
4  benefit consultant -- consultant is to advise on the
5  benefits in all aspects, including formulary, design, and
6  formulary ongoing management, utilization management
7  programs, plan design updates, and -- all functions
8  related to the pharmacy benefit program.
9      Q.  Do you have any experience with P&T committees?
10      A.  I do.
11      Q.  What is the nature of your experience with P&T
12  committees?
13      A.  Throughout my -- my career as a pharmacist, being
14  intimately familiar with P&T committees is -- and
15  understanding what their function is, has been integral in
16  all aspects of my career.
17          I have reviewed countless minutes from P&T
18  committees.  I do that on an ongoing basis to keep track
19  of, if you will, what the progress is and what the
20  functions and what -- the ongoing developments of the P&T
21  committee, and so I'm -- you know, I'm very familiar with
22  what they do and I have, you know, visibility into the P&T
23  committees with whom my clients are engaged with, are
24  involved with.
25      Q.  How do you obtain these minutes from P&T

11 (Pages 38 - 41)

Page 42

1 committees?
2     A. I request them.
3     Q. From whom?
4     A. Whomever the P&T committee is with.
5     Q. And what -- what entities have you requested P&T
6 committee's minutes from?
7     A. PBMs and health plans.
8     Q. Which specific ones?
9     A. That's confidential information.
10     Q. Why is that confidential information?
11     A. It's tied into the clients that I provide
12 counseling -- consulting for.
13     Q. In connection with which company or which of your
14 roles?
15     A. My current role at ARMSRx.
16     Q. Only at ARMSRx?
17     A. Yes.
18     Q. Have you ever been a TPP employee?
19     A. No.
20     Q. Have you ever been a member of a P&T committee?
21     A. No.
22     Q. Do you consider MSP to be a TPP committee?
23     A. No.
24     Q. And is it possible sometimes for both a TPA and a
25 TPP to be involved in processing a particular claim?

Page 43

1     MR. WHARTON: Can I hear that question again,
2 please?
3     MS. ISIDRO: Can you read it back, please?
4     (The requested portion was read back.)
5     A. TPAs manage the claims. They are not processing
6 claims.
7 BY MS. ISIDRO:
8     Q. Who -- who does the pharmacy expect payment from
9 among a TPA or a TPP?
10     A. It depends on the structure of the arrangement
11 and who's ultimately -- oh -- responsible for the payments.
12     Q. So sometimes the pharmacy might expect payment
13 from the TPA first, right?
14     A. Could you be more specific?
15     Q. You mentioned it depends on the structure of the
16 particular arrangement, correct?
17     A. Correct.
18     Q. Are there sometimes arrangements where the
19 pharmacy might expect payment from the TPA first?
20     A. That wasn't the focus of my opinion that I'm
21 rendering here today, but to answer the question, it could
22 be.
23     Q. In your experience with claim adjudication
24 platforms, would both the TPA and the TPP be listed in the
25 claims data?

Page 44

1     A. No.
2     Q. Which would be listed?
3     A. Standard industry claims data for prescriptions
4 would list the client as part of, you know, the fields, the
5 client -- whoever the client is.
6     Q. And would the client -- am I understanding
7 correctly that the client would be either the TPA or the
8 TPP?
9     A. If you're asking with regards to claims data, the
10 information within the industry claims data extract would
11 include the client that is have -- that is receiving the
12 prescription benefit. So it's tied directly into the
13 client, whoever that entity is.
14     Q. Okay. So it may not be possible from that
15 information alone to tell whether the third party in each
16 claim is a TPP or a TPA?
17     A. From that data alone, no.
18     Q. Okay. Dr. Panagos, you also list on your CV
19 certain professional organizations that you're a member of;
20 is that right?
21     A. Yes.
22     Q. You're a member of the American College of
23 Healthcare Executives?
24     A. Yes.
25     Q. When did you first become a member?

Page 45

1     A. 2019.
2     Q. And you're still a member currently?
3     A. Yes.
4     Q. What is required to become a member of that
5 organization?
6     A. The requirements are listed on the website.
7 There are certain qualifications and criteria that you must
8 meet, and I don't recall them all at this moment.
9     Q. Okay. Do you --
10     A. But they are listed there.
11     Q. Do you recall any?
12     A. Must be a pharmacist in good standing or a
13 healthcare professional in good standing.
14     Q. Okay.
15     A. Uh-huh.
16     Q. And you're also a member of the Academy of
17 Managed Care Pharmacy; is that right?
18     A. Yes.
19     Q. When did you become a member of that
20 organization?
21     A. When I was in pharmacy school.
22     Q. And you're still a member currently?
23     A. Yes.
24     Q. What is required to become a member of that
25 organization?

12 (Pages 42 - 45)

Page 46

1    A.   Again, those requirements are listed on the
2    website and they -- it's a professional license or
3    non- -- non-licensed individuals listed on the website.
4    Q.   Okay.  You're a member of Women Leading
5    Healthcare; is that right?
6    A.   Yes.
7    Q.   When did you become a member of that
8    organization?
9    A.   2020.  Yeah.  More recent.
10   Q.   And what is required to become a member of Women
11   Leading Healthcare?
12   A.   Yes.  That requires an appointment.  You have to
13   be invited to join by a current member.
14   Q.   And whom were you invited by?
15   A.   I was invited by a colleague who worked with me
16   at the time.
17   Q.   Worked with you at which of your --
18   A.   At ARMSRx.
19   Q.   You're also a member of Healthcare
20   Businesswomen's Association?
21   A.   Yes.
22   Q.   When did you become a member?
23   A.   I don't remember exactly the year.
24   Q.   Do you remember approximately?
25   A.   Maybe 2019, around that time.

Page 47

1    Q.   Okay.
2    A.   2019.
3    Q.   So recently, in the last few years?
4    A.   Uh-huh.
5    Q.   Okay.  What is required to become a member of
6    Healthcare Businesswomen's Association?
7    A.   It would be -- again, it's listed on the website,
8    all the criteria, but be in the healthcare field, be a
9    woman in the healthcare field.
10   Q.   You're also a member of the American Association
11   of Consultant Pharmacists?
12   A.   Correct.
13   Q.   When did you become a member?
14   A.   2019 as well.  2018 perhaps.  I don't remember
15   exactly.
16   Q.   Okay.  What is required to become a member of
17   that organization?
18   A.   Again, those requirements are listed on the
19   organization's site and among them include being a
20   pharmacist in good standing.
21   Q.   And, finally, you're a member of the American
22   Society of Health Systems Pharmacists?
23   A.   Correct.
24   Q.   When did you become a member?
25   A.   I initially became a member when I was in

Page 48

1    pharmacy school.
2    Q.   Okay.  And you're still a member today?
3    A.   Correct.
4    Q.   What is required to become a member of that
5    organization?
6    A.   It's listed on the site.  A professional licensed
7    or non-licensed individuals may join and they -- a
8    pharmacist in good standing.
9    Q.   Are you a member of any other professional
10   organization besides the ones we've just discussed?
11   A.   No.
12   Q.   During your professional career, have you been a
13   member of any other professional organization besides the
14   ones we've just discussed?
15   A.   No.
16   Q.   Okay.  And do you know whether there are any
17   protocols, standards, or guidelines relating to the
18   practice of pharmacy that are promulgated by any of these
19   professional organizations?
20   A.   Would you please restate the question?
21   Q.   Sure.  Why don't we start with the American
22   College of Healthcare Executives.  Does the American
23   College of Healthcare Executives have any protocols,
24   standards, or guidelines relating to the practice of
25   pharmacy?

Page 49

1    A.   No.
2    Q.   Does the Academy of Managed Care Pharmacy have
3    any protocols, standards, or guidelines relating to the
4    practice of pharmacy?
5    A.   Could you restate that question?
6    Q.   Do you know whether the Academy of Managed Care
7    Pharmacy has any guidelines relating to the practice of
8    pharmacy?
9    A.   Within the scope of managed care, they may
10   provide recommendations or guidance.
11   Q.   Are there any that -- that you are personally
12   aware of?
13   A.   As part of my role in my -- in my day-to-day
14   functions, I review guidance and literature from these
15   organizations and part of up -- keeping up with industry
16   practice, and so it's always evolving, changing, and
17   there's -- based on what's happening in the pharmacy
18   practice and managed care world.
19   Q.   Does the Women Leading Healthcare organization
20   issue any guidelines, protocols, or standards with respect
21   to the practice of pharmacy?
22   A.   Not that I'm aware of.
23   Q.   How about the Healthcare Businesswomen's
24   Association?
25   A.   Not that I am aware of.

13 (Pages 46 - 49)

Page 50

1    Q.  Does the American Association of Consultant
2  Pharmacists issue any guidelines relating to the practice
3  of pharmacy?
4    A.  No, not guidelines.
5    Q.  Any protocols relating to the practice of
6  pharmacy?
7    A.  No.
8    Q.  Any standards relating to the proto- -- to the
9  practice of pharmacy?
10    A.  No.
11    Q.  Does the American Association of Consultant
12  Pharmacists issue any sort of statements at all with
13  respect to the practice of pharmacy?
14    A.  Yes.  They provide information with regards to
15  consultant -- consulting pharmacy, yeah, so.
16    Q.  What type of information?
17    A.  Relevant to the field of consulting -- consultant
18  pharmacists, and that could be all -- anything related to
19  the pharmacy field.
20    Q.  Is that in the nature of continuing education
21  information?
22    A.  They do have continuing education, yes.
23    Q.  What other types of information?
24    A.  Industry information, clinical information as it
25  regards for consultant pharmacists.  So anything tied into

Page 51

1  the pharmacy practice before consulting is -- could be
2  on -- could be on their site or available.
3    Q.  And does the American Society of Health System
4  Pharmacists issue any protocol, standards, or guidelines
5  relating to the practice of pharmacy?
6    A.  Yes, they could.
7    Q.  Are you personally aware of any protocols,
8  standards, or guidelines that they've issued with respect
9  to the practice of pharmacy?
10    A.  They provide, you know, recommendations with
11  regards to health system pharmacists and function within
12  that capacity.
13    Q.  Are you aware whether any of the professional
14  organizations that you're a member of issue any protocol,
15  standards, or guidelines with respect to litigation
16  consulting?
17    A.  No.
18    Q.  No you're not aware or you know that they don't?
19    A.  No, I'm not aware.
20    Q.  Okay.  And do you know whether any of the
21  professional organizations that you're a member of issue
22  any protocols, standards, or guidelines with respect to
23  providing expert testimony?
24    A.  No, I'm not aware.
25    Q.  Okay.  Have you ever engaged in any academic

Page 52

1  research regarding nitrosamines?
2    A.  No.
3    Q.  Have you ever engaged in any professional
4  research regarding nitrosamines?
5    A.  No.
6    Q.  Have you ever published any articles relating to
7  nitrosamines?
8    A.  No.
9    Q.  Have you ever published any articles addressing
10  warranties?
11    A.  No.
12    Q.  Have you ever published any articles relating to
13  Valsartan or Valsartan-containing drugs?
14    A.  No.
15    Q.  Have you ever published any articles relating to
16  bioequivalence?
17    A.  No.
18    Q.  Have you ever published any articles relating to
19  the FDA regulatory requirements that apply to
20  pharmaceutical products?
21    A.  No.
22    Q.  Have you ever engaged in any academic or
23  professional research relating to Valsartan or
24  Valsartan-containing drugs?
25        MR. HANSEL:  Object to the form.

Page 53

1    A.  Could you restate the question, please?
2  BY MS. ISIDRO:
3    Q.  Sure.  Have you ever engaged in any academic
4  research relating to Valsartan or Valsartan-containing
5  drugs?
6        MR. HANSEL:  Object to the form.
7    A.  No.
8  BY MS. ISIDRO:
9    Q.  Have you ever engaged in any professional
10  research relating to Valsartan or Valsartan-containing
11  drugs?
12        MR. HANSEL:  Object to the form.
13    A.  Could you be more specific?
14  BY MS. ISIDRO:
15    Q.  Have you ever researched Valsartan in connection
16  with your professional responsibilities?
17    A.  Yes.
18    Q.  In what context?
19    A.  Again, I, in my role as a clinical pharmacist and
20  consultant, I am staying, you know, up to date with all
21  clinical information, pharmacy updates, medication updates,
22  new to drug -- new to market generic brands, generic
23  specialty, and so it -- I am knowledgeable on the drug.
24    Q.  So when you say you're knowledgeable on the drug,
25  what are you referring to?

14 (Pages 50 - 53)

Page 54

1    A.  I understand what its intended use is for, what
2   category, therapeutic category it's in, the -- its
3   current -- its standing for inclusion in a formulary, and
4   all components, you know, related to the medication in
5   terms of formulary placement.
6       Q.  Anything else?
7          MR. HANSEL:  Object to the form.
8       Q.  Could you be more specific?
9   BY MS. ISIDRO:
10      Q.  Have you conducted any research in Valsartan
11  other -- on Valsartan other than the categories that you
12  just mentioned?
13      A.  No.
14      Q.  Have you ever engaged in any academic or
15  professional research regarding bioequivalence?
16         MR. HANSEL:  Object to the form.
17      A.  My education and my experience are -- involve
18  those -- aspects of bioequivalence, and those are part of
19  the components.
20  BY MS. ISIDRO:
21      Q.  Sorry, part of the components of your
22  education?
23      A.  It's part of the curriculum in some way --
24  throughout the pharmacy program.  So it is -- it's not
25  unfamiliar to me.

Page 55

1       Q.  Did you take any courses on bioequivalence during
2   your pharmacy education?
3       A.  Bioequivalence was incorporated into many courses
4   within the pharmacy program as it relates to the
5   medications we were studying at the time.
6       Q.  So bioequivalence -- bioequivalence is a concept
7   that you're familiar with from your education as a
8   pharmacist, but you haven't taken any courses specifically
9   on bioequivalence; is that correct?
10         MR. HANSEL:  Object to the form.
11      A.  The -- I completed all the coursework required
12  for pharm- -- the pharmacy degree, both the bachelor's
13  degree and the doctor of pharmacy degree and fulfilled all
14  the requirements that those entail.
15  BY MS. ISIDRO:
16      Q.  As you sit here today, you can't specifically
17  recall whether that entailed a course specifically on
18  bioequivalence?
19         MR. HANSEL:  Object to the form.
20      A.  Again, I completed all of the coursework required
21  for a pharmacy degree and I fulfilled all the requirements
22  for both bachelor's and doctorate of pharmacy degree,
23  including licensure in the State of New York   that -- I
24  sufficed all of the academic requirements for all the
25  classwork.

Page 56

1   BY MS. ISIDRO:
2       Q.  As you sit here today, can you recall whether any
3   of those requirements including a course specifically on
4   bioequivalence?
5          MR. HANSEL:  Object to the form.
6       A.  No.
7   BY MS. ISIDRO:
8       Q.  Have you ever authored any publications relating
9   to epidemiology?
10      A.  No.
11      Q.  Have you published any -- withdrawn.  Let me
12  rephrase that.
13         Have you authored any publications in the last
14  ten years?
15      A.  No.
16      Q.  Have you ever authored any publications?
17      A.  No.
18      Q.  Have you ever given any presentations relating to
19  nitrosamines?
20      A.  No.
21      Q.  Have you ever given any presentations relating to
22  product warranties?
23         MR. HANSEL:  Object to the form.
24      A.  I advise my clients on drugs standing -- approval
25  standing, standing, and with regards to helping them with

Page 57

1   the formulary.
2   BY MS. ISIDRO:
3       Q.  And how does that relate to product warranties?
4       A.  That the drug is in good standing and meets the
5   criteria for approval approved by the FDA.
6       Q.  So you've never given a presentation, the focus
7   of which is product warranties?
8          MR. HANSEL:  Object to the form.
9       A.  My professional capacity includes advising my
10  clients and providing them guidance on -- on various drug
11  products, structure of their prescription benefit program,
12  and approvals and drugs in good standing for consideration
13  on the formulary.
14  BY MS. ISIDRO:
15      Q.  Okay.  I'm not asking you though about your
16  responsibilities in your client work.  I'm asking about
17  whether you have ever given a verbal presentation to a
18  group of people with a topic focus on product warranties.
19         MR. HANSEL:  Object to the form.
20      A.  I have given a -- I have spoken to groups of
21  people with regards to the promises that a -- a drug is
22  listed to have or the approval that it has.
23  BY MS. ISIDRO:
24      Q.  How many times have you given that presentation?
25      A.  Many.

15 (Pages 54 - 57)

Page 58

1    Q.    To whom?
2    A.    To my clients.
3    Q.    Your clients in connection with which of your
4    jobs?
5    A.    All of them.
6    Q.    And do you have Power Points that you use for
7    those presentations?
8    A.    I have used Power Points.
9    Q.    Do you keep those Power Points?
10   A.    I share those with the clients.
11   Q.    What have the titles of those presentations been?
12   A.    Those are specific to the client and tied into
13   their prescription benefit program.
14   Q.    And has any of those presentations been
15   specifically focused on the topic of product warranties?
16       MR. HANSEL:  Object to the form.
17   A.    Product warranties are the promises that products
18   make for consideration for inclusion on the pharmacy
19   formulary is a component of that discussion.
20   BY MS. ISIDRO:
21   Q.    What do you understand by the term product
22   warranties?
23   A.    Product warranty is the promise that that product
24   makes that it is safe and effective and meets the criteria
25   for approval, as established by the FDA.

Page 59

1    Q.    What is the basis of your understanding as to the
2    meaning of the term product warranties?
3    A.    The basis of my understanding pulls in my many
4    years of education, my many years of experience in the
5    pharmacy roles that I've held, and my many years of
6    experience in my consulting role, providing guidance to
7    clients about their prescription benefit program and all
8    aspects related to that.
9    Q.    Is it based on anything else or have we just
10   fully discussed your basis for your understanding of that
11   term?
12   A.    I've provided you the basis for that.
13       THE WITNESS:  May I take a break?
14       MR. HANSEL:  Yes.
15       MS. ISIDRO:  Sure.
16       THE WITNESS:  Thank you.
17       THE VIDEOGRAPHER:  The time is 10:49 a.m., and
18   we're going off record.
19           (Break taken.)
20       THE VIDEOGRAPHER:  The time is 11:08 a.m., and
21   we're back on the record.
22   BY MS. ISIDRO:
23   Q.    Dr. Panagos, outside of your client work, have
24   you ever given any formal presentations on product
25   warranties?

Page 60

1    A.    I have given presentations on drug products that
2    are approved for use by the FDA.
3       MS. ISIDRO:  Sorry, can you read back my
4    question, please?
5           (The requested portion was read back.)
6       MR. HANSEL:  I object to the form of the
7    question.  Calls for a legal conclusion; asked and
8    answered.
9    A.    I have given presentations with regard to
10   approved drug products for consideration on product
11   formularies, pharmacy benefit programs.
12   BY MS. ISIDRO:
13   Q.    So is that a no, outside of your client work
14   you've never given formal presentations on product
15   warranties?
16       MR. HANSEL:  Object to the form.
17   A.    I have spoken about drug products that are
18   approved for use to individuals and groups outside of my
19   client base as well.
20   BY MS. ISIDRO:
21   Q.    And to whom have you given those presentations?
22   A.    My patient to patient interactions, as well as my
23   academic work with students.
24   Q.    So you consider your patient to patient
25   interactions to be formal presentations?

Page 61

1    A.    The patient to patient ones are -- the one on one
2    ones are not formal.
3    Q.    Are you --
4    A.    But they are a presentation to the patient about
5    their drug.
6    Q.    So when you refer to your patient to patient
7    interactions, are you referring to any that are not one on
8    one?
9    A.    In that respect it would be members that are part
10   of my client base.  So it could be more than one.
11   Q.    Sorry.  We were talking about outside of your
12   client base?
13       MR. HANSEL:  Object to the form.
14   BY MS. ISIDRO:
15   Q.    Isn't that right?
16       MR. HANSEL:  Object to the form.
17   A.    When consulting a patient regarding their
18   medication it is pharmacist to patient.
19   BY MS. ISIDRO:
20   Q.    Okay.  And that's one on one?
21   A.    Yes.
22   Q.    Other than that, can you think of any formal
23   presentations that you've given outside of your client work
24   relating to -- to product warranties?
25       MR. HANSEL:  Object to the form.

16 (Pages 58 - 61)

Page 62

1    A.   The presentations that I have done are listed in
2  my CV and what I've expressed to you just now.
3  BY MS. ISIDRO:
4    Q.   Okay.  So if it's not listed in your CV, you
5  haven't given a formal presentation on it?
6        MR. HANSEL:  Objection.  That's not what she just
7  said.
8        MS. ISIDRO:  Can you read back the last response,
9  please?
10        (The requested portion was read back.)
11  BY MS. ISIDRO:
12    Q.   So am I understanding correctly that you have not
13  given any formal presentations outside of what is listed in
14  your CV?
15        MR. HANSEL:  Object to the form.
16    A.   No, that's not what I said.  I said what is
17  listed in my CV and what I have just expressed to you in
18  terms of presentations to my clients regarding their drug
19  product or prescription benefit program.
20  BY MS. ISIDRO:
21    Q.   Okay.  And outside of those two categories, there
22  aren't any other formal presentations that you've given?
23        MR. HANSEL:  Object to the form.
24    A.   Formal presentations may include the work I did
25  in academia with my students regarding drug products that

Page 63

1  are approved.
2  BY MS. ISIDRO:
3    Q.   Have you ever taught a course relating to --
4  withdrawn.
5        What are the titles of the courses you've taught?
6    A.   One of the --
7        MR. HANSEL:  Objection:  Asked and answered.
8    A.   Pharmacy orientation is one course.
9  BY MS. ISIDRO:
10    Q.   Any others?
11    A.   The others were recitation courses and the
12  department of social sciences and administrative services
13  within the pharmacy program.
14    Q.   What were the titles of those courses?
15    A.   Those are listed in my CV.
16    Q.   Can -- on which page?
17    A.   Page 2.
18    Q.   Can you show me where it lists the titles of the
19  courses?
20    A.   It lists that I was an adjunct assistant
21  professor of pharmacy in the division of social and
22  administrative sciences.
23    Q.   So it doesn't list the titles of the courses that
24  you taught in that role?
25    A.   Correct.  Those were recitation courses tied into

Page 64

1  the courses that fall under that division so.
2    Q.   And what were the titles of you -- of the courses
3  that you taught in that role?
4    A.   I cannot recall at this time.
5    Q.   Is there anywhere that you would be able to find
6  that information?
7    A.   Yes.
8    Q.   Where?
9    A.   In the records during my time there.  It's
10  information that I've had -- I had with respect to the
11  courses.
12    Q.   You say records of your time there.  Are you
13  referring to your personal records or the organization's
14  records?
15    A.   They would be in both.
16    Q.   Now, looking at Page 3 of your CV, under
17  communication, you state that you were a presenter PBMI
18  Opioid epidemic, Health Underwriters organizations?
19    A.   Correct.
20    Q.   Can you describe what that refers to?
21    A.   PBI (sic) is the Pharmacy Benefit Management
22  Institute and they hold webinars of -- related to the
23  profession and I was a presenter along with my colleague at
24  the time for a presentation on the Opioid epidemic.
25    Q.   When was that presentation?

Page 65

1    A.   2016.
2    Q.   Do you still have the materials from that
3  presentation?
4    A.   No, I do not.
5    Q.   Were you paid to give that presentation?
6    A.   No, I was not.
7    Q.   And was that presentation via webinar you said?
8    A.   Yes.
9    Q.   Do you know how many people attended that
10  presentation?
11    A.   No.
12    Q.   Other than your pharmacy license in New York, do
13  you hold any other professional licenses?
14    A.   No.
15    Q.   Have you ever had your license suspended?
16    A.   No.
17    Q.   Have you ever been punished or sanctioned in any
18  way by a professional board?
19    A.   No.
20    Q.   Have you ever worked or consulted with FDA?
21    A.   No.
22    Q.   Do you hold yourself out as an FDA regulatory
23  expert?
24        MR. HANSEL:  Object to the form of the question.
25    A.   I hold myself as an expert on what the FDA has

17 (Pages 62 - 65)

Page 66

1  approved for drug products, both brand and generics.
2  BY MS. ISIDRO:
3     Q.  Do you hold yourself out as an expert on the
4  process for approval of pharmaceutical products by the FDA?
5        MR. HANSEL:  Object to the form.
6     A.  I understand what the process entails by the FDA.
7  BY MS. ISIDRO:
8     Q.  That wasn't my question.  My question was do you
9  hold yourself out as an expert on the process for approval
10  of pharmaceutical products by the FDA?
11        MR. HANSEL:  Objection.
12     A.  Could you be more specific?
13        MR. HANSEL:  Excuse me.  Asked and answered and
14  that's -- that's getting into a little bit of
15  harassment territory.  She answered the question.
16        MS. ISIDRO:  I take issue with your
17  characterization of that question as harassing.  The
18  witness is consistently failing to answer the question
19  that is asked.  This deposition is going to go for a
20  really long time if that continues.
21        The witness is being asked a question.  If she
22  doesn't understand the question, she can let me know
23  that she doesn't understand the question, but,
24  otherwise, I expect the witness to answer the question
25  that's been asked.

Page 67

1        Can you please read back the last question?
2        MR. HANSEL:  Please also read back the answer
3  when you do that.
4        (The requested portion was read back.)
5     A.  The process for drug approval varies between
6  brand and generics and I have an understanding of the
7  process for -- for both of those drugs to be approved.
8  BY MS. ISIDRO:
9     Q.  Is it your position that having an understanding
10  of the process is all that it takes to be an expert on that
11  process?
12        MR. HANSEL:  Objection.  Calls for a legal
13  conclusion.  Object to the form of the question.
14     A.  I have been asked here today to render an opinion
15  on what TPPs rely on when TPPs rely on or -- or consult
16  when they're making -- with respect -- specifically to
17  generic drugs for formulary decisions, and specific to
18  generic drugs, that process involves an approval by the FDA
19  tied to an ANDA application whereby the manufacturer has to
20  meet the criteria for approval in order for that generic
21  drug to gain their approval.  That's what I've been asked
22  to render an opinion on.
23        Was there something more you were looking for?
24        MS. ISIDRO:  Can you read back the question and
25  the answer, please?

Page 68

1        (The requested portion was read back.)
2  BY MS. ISIDRO:
3     Q.  Dr. Panagos, are you offering any expert opinions
4  in this litigation on the process for approval of
5  pharmaceutical products by the FDA?
6     A.  The process by -- for approval is established by
7  the FDA --
8     Q.  Doctor, I'm going to stop you right there.
9        MR. HANSEL:  Excuse me.  Let her finish her
10  answer.
11  BY MS. ISIDRO:
12     Q.  I'm asking you yes or no questions --
13        MR. HANSEL:  Objection.  No.  You just
14  interrupted the witness.  That's unacceptable.
15        MS. ISIDRO:  I am asking you yes or no questions.
16  You're making speaking objections, which are
17  unacceptable.
18        MR. HONIK:  Let's go off the record.  This is
19  Ruben Honik.  Is the court reporter taking down my
20  comment?
21        THE VIDEOGRAPHER:  The time is 11:24.  We're
22  going off record.
23        (Off the record.)
24        MR. HANSEL:  This is Greg Hansel.  We're going
25  back on the stenographic record.  We are on the record

Page 69

1  stenographically.
2        On behalf of the Plaintiffs, we object pursuant
3  to Federal Rule of Civil Procedure 30(d)(3), motion to
4  terminate or limit which states in part:  A, at any
5  time during a deposition the deponent or a party may
6  move to terminate or limit it on the ground that it is
7  being conducted in bad faith or in a manner that
8  unreasonably annoys, embarrasses, or oppresses the
9  deponent or party.
10        On behalf of the Plaintiffs, Defendants have
11  questioned Dr. Panagos for over two hours or
12  approximately two hours on qualifications only.  In
13  addition to that, Defense counsel has repeatedly
14  re-asked the same question on numerous occasions, in
15  particular a question about whether the witness is
16  qualified as an expert witness under federal procedure
17  in effect.  That question is a legal conclusion, calls
18  for a legal conclusion.  It's a question for the
19  Court.
20        The witness is not an attorney.  The witness does
21  not know standards for acceptance of expert witnesses
22  by federal courts under Daubert and other law.  It is
23  the parties, the Plaintiffs who have offered the
24  expert, and even if the Defendants are not happy with
25  the answer provided by the expert, that is not a

18 (Pages 66 - 69)

Page 70

1  ground to badger the witness, to repeatedly ask the
2  question calling for a legal conclusion, and, in
3  effect, harassing Dr. Panagos.
4       It's discourteous, it's not civil, and the
5  Plaintiffs will not permit it to continue. We would
6  like to request the Defendants for an offer of proof
7  at this time of how much longer they intend to ask the
8  witness about her qualifications and on which topics
9  of her qualifications they intend to examine the
10 witness.
11      We will consider that, and if it is unacceptable
12 under Rule 30(d)(3), we will terminate the portion of
13 the examination on qualifications to the extent only
14 that we believe it is impermissible.
15      Is there anything else you'd like to add, Conlee,
16 Charlie, Jorge?
17      MS. WHITELEY: No.
18      MR. HANSEL: Ruben? Anyone? Thank you.
19      MR. KERNER: The only thing I'd like to say is I
20 would like an opportunity to confer with Defense
21 counsel.
22      MR. HANSEL: Of course.
23      MR. KERNER: So we're going to need a couple of
24 minutes.
25      MR. HANSEL: Sure. We'll step out.

Page 71

1       MR. KERNER: Yeah. I'd appreciate that.
2            (Break taken.)
3       MR. KERNER: And so we will respond to your
4  statements earlier.
5       MS. ISIDRO: So, Counsel, I would like to state
6  for the record that I categorically disagree with any
7  suggestion that the questions that have been -- that
8  have been asked here today are harassing or designed
9  to embarrasses the witness in any way.
10      Unfortunately, the witness has repeatedly
11 answered the question that she has wanted to answer
12 rather than the question that has been asked.
13      In addition, there has been a pattern of speaking
14 objections from Plaintiff's counsel, culminating in
15 this inappropriate attempt to baselessly terminate or
16 limit this deposition and to interfere with
17 Defendant's rights to thoroughly explore the
18 qualifications, as well as the -- the qualifications
19 of the expert that Plaintiffs are offering, as well as
20 the content and the bases for her opinions that she
21 intends to offer in this litigation.
22      I note that you threatened to suspend the
23 deposition of the witness after she was asked not a
24 question about her qualifications but a question about
25 whether she intended to offer specific opinions in

Page 72

1  this litigation. A yes or no question about whether
2  she intended to offer specific opinions regarding the
3  FDA process for drug approval in this litigation.
4       So, with that in mind, I would suggest that we
5  continue with the deposition at this time, and as long
6  as the witness answers the questions that have been
7  asked, bearing in mind that you have an opportunity to
8  Redirect after Defendants have asked their
9  questions -- and so as long as she answers the
10 questions that have been asked, I don't see any reason
11 why there should be any problem continuing with the
12 deposition at this time.
13      MS. WHITELEY: May I ask a question rather
14 than -- do you have an amount of time that you have an
15 idea of how long that you think it will continue on
16 qualifications?
17      MS. ISIDRO: It should not be much longer,
18 assuming the witness does answer the questions that
19 have been asked. But if the witness continues to be
20 evasive and, you know, we continue to have to ask the
21 question ten different ways so that the original
22 question can be answered by the witness, then it -- it
23 will need to go much -- it will need to go longer and
24 it's not on me to -- it's not within my power to be
25 able to determine that. It's -- it's much more within

Page 73

1  the witness's power to determine how she's going to be
2  answering questions.
3       MR. KERNER: Anybody else on the Defense side
4  have anything that they want to add?
5       MR. GISLESON: Yeah. This is John Gisleson from
6  Morgan Lewis on behalf of Aurobindo.
7       We do not believe that the questioning has been
8  in any way inappropriate. The tone has been fair and
9  balanced, and in our view the witness has been
10 nonresponsive and evasive.
11      MR. KERNER: Anyone else on the Defense side?
12      The only thing I'll add is our intention is to
13 move forward efficiently, to continue to ask
14 appropriate questions, to continue to ask
15 professionally, as counsel's been doing all morning,
16 and to treat the witness with respect, as counsel has
17 done all morning, and move forward with the deposition
18 and get through it as quickly as we can.
19      There's no intent to keep this witness here one
20 minute longer than necessary.
21      MR. HANSEL: Anything else from the Defendants?
22      MS. ISIDRO: Not at this time.
23      MR. HANSEL: All right. On behalf of the
24 Plaintiffs, we disagree with your statements that the
25 witness has been nonresponsive or evasive and we stand

19 (Pages 70 - 73)

Page 74

1    by our statements earlier, which I will not repeat.
2        Based on your representations, particularly to
3    Attorney Whiteley's questions, that you intend to
4    reach a conclusion to the questioning about
5    qualifications with reasonable efficiency, we will
6    allow the questioning of Dr. Panagos to continue now,
7    including to a limited extent on qualifications, and
8    I -- I guess if there's one thing I want to reiterate,
9    it's that she is not -- we're not holding her out as
10   an expert on Daubert and on what Federal Court
11   standards are for the acceptance of expert witnesses,
12   which is a legal question for the Court.
13       So, having said that, I will go get Dr. Panagos
14   to -- to get started. Thank you.
15       MS. ISIDRO: Thank you.
16           (Off the record.)
17       THE VIDEOGRAPHER: The time is 12:17 p.m., and we
18   are back on record.
19   BY MS. ISIDRO:
20   Q.   Dr. Panagos, are you intending to offer any
21   opinions in this litigation on the process for obtaining
22   approvals from FDA for pharmaceutical products?
23       MR. HANSEL: Object to the form.
24   A.   The process has already been established by the
25   FDA for approval of drugs.

Page 75

1        Could you restate the question?
2    BY MS. ISIDRO:
3    Q.   Are you intending to offer any opinions in this
4    litigation on the process of obtaining approvals from FDA
5    for generic pharmaceutical products?
6        MR. HANSEL: Object to the form.
7    A.   I am rendering an opinion on what TPPs,
8    third-party payers, rely on with respect to generic drugs
9    for consideration to a drug formulary.
10   BY MS. ISIDRO:
11   Q.   So you're not intending to offer any opinions on
12   the process for obtaining approvals from FDA for generic
13   pharmaceutical products?
14       MR. HANSEL: Object to the form: Asked and
15       answered, argumentative.
16   A.   The process for approval of generic drug products
17   is already established by the FDA.
18   BY MS. ISIDRO:
19   Q.   Would you defer to FDA on that process?
20       MR. HANSEL: Object to the form.
21   A.   Would you please be more specific?
22   BY MS. ISIDRO:
23   Q.   Would you defer to FDA with respect to matters
24   involving the process for obtaining approvals for
25   pharmaceutical products?

Page 76

1        MR. HANSEL: Object to the form.
2    A.   As a pharmacist, I understand the process
3    involved for approval of generic drug products as it
4    entails how those decisions are tied into a formulary
5    placement.
6    BY MS. ISIDRO:
7    Q.   And will you be offering expert opinions in this
8    litigation involving that process?
9        MR. HANSEL: Object to the form. Her report
10       speaks for itself.
11   A.   My expert opinion is what TPPs rely on and
12   consider with respect to generic drugs for placement to the
13   drug formulary.
14   BY MS. ISIDRO:
15   Q.   That is the only category of information on which
16   you intend to offer expert opinions in this litigation?
17       MR. HANSEL: Object to the form.
18   A.   My expert opinion is on what TPPs rely on when
19   consideration -- for consideration of generic drugs as --
20   for consideration to be placed on the formulary and it --
21   reimburse as part of prescription drug program.
22   BY MS. ISIDRO:
23   Q.   That is the only category on which you are -- you
24   will be opining in this litigation?
25       MR. HANSEL: I object to the form of the

Page 77

1    question.
2    BY MS. ISIDRO:
3    Q.   You can answer.
4    A.   As I understand your question, that is what my
5    opinion will be rendered upon.
6    Q.   Have you ever had any formal training in
7    economics?
8    A.   What do you mean by formal? Could you define
9    that?
10   Q.   Have you ever done any coursework in economics?
11   A.   As part of my college degrees, some of the
12   coursework entailed economics.
13   Q.   Was that as part of one of your majors?
14   A.   Yes.
15   Q.   Which ones?
16   A.   Biology and as well as pharmacy.
17   Q.   Have you ever obtained any certifications in
18   economics?
19   A.   No.
20   Q.   Have you ever obtained any degrees in economics?
21   A.   No.
22   Q.   Have you ever had any formal training in business
23   principles?
24   A.   Business coursework was also part of my college
25   education.

20 (Pages 74 - 77)

Page 78

1    Q.  In connection with which of your majors or
2  minors?
3    A.  Both biology, computer science, and pharmacy.  So
4  all -- all -- both majors and the minor.
5    Q.  Outside of your college degrees, have you had any
6  other coursework in business?
7    A.  Only as it pertains to my continuing education
8  credits for upholding my pharmacy degree, so business
9  related to pharmacy continuing education.
10    Q.  Have you received any certificates in business?
11    A.  No.
12    Q.  Have you received any degrees in business?
13    A.  No.
14    Q.  You are not a medical doctor, correct?
15    A.  No.
16    Q.  You're not a pharmacologist?
17    A.  No.
18    Q.  And you're not a toxicologist?
19    A.  No.
20    Q.  Aside from this litigation, have you ever been
21  retained as an expert witness or an expert consultant in
22  connection with litigation?
23    A.  No.
24    Q.  And you testified you've never been
25  deposed before.  Have you ever testified at trial

Page 79

1  before?
2    A.  No.
3    Q.  Have you ever done consulting work for any
4  pharmaceutical company?
5    A.  No.
6    Q.  Have you ever done consulting work for any
7  medical device company?
8    A.  No.
9    Q.  What percent of your income is currently derived
10  from expert testimony or expert consulting in connection
11  with litigation?
12    A.  I have not calculated the percentage, but it's
13  only with regards to the case I'm providing an expert
14  report for here.
15    Q.  Okay.  Doctor, if we could turn back to  Exhibit
16  1, which was your notice of deposition.
17    A.  Uh-huh.
18    Q.  You can pass Exhibit 2 back to me, just so you
19  don't have too many papers in front of you.
20    MR. HANSEL:  She may want to refer to the other
21    exhibits.
22    MS. ISIDRO:  Oh, certainly.  If -- if you would
23    like --
24    MR. HANSEL:  If she could keep them there, I
25    would appreciate it.

Page 80

1  BY MS. ISIDRO:
2    Q.  If you'd like to refer back to them at any point,
3  you're welcome to.  I'm happy to take them back if it's too
4  cluttered.
5    A.  It's okay.
6    MR. HANSEL:  Why don't you leave them nearby.
7    THE WITNESS:  I'm fine.
8    MS. ISIDRO:  Okay.
9    THE WITNESS:  I'm good.  Thank you.
10  BY MS. ISIDRO:
11    Q.  Okay.  And you're I believe still on Page 6,
12  correct?
13    A.  Correct.  Uh-huh.
14    Q.  Okay.  Item Number 2 asks for articles,
15  abstracts, studies, reports, et cetera, and am I
16  understanding your testimony correct, you don't have any
17  items responsive to Number 2?
18    MR. HANSEL:  Excuse me.  I'm going to object.  I
19    object to the form of the question because we've
20    provided a written response as well.
21    A.  Everything is included in my expert report, in my
22  CV.  All the materials necessary for this expert opinion
23  that I'm providing are within the report and my CV.
24  BY MS. ISIDRO:
25    Q.  Okay.  But, Doctor, you've never authored any

Page 81

1  articles, correct?
2    A.  Correct.
3    MR. HANSEL:  Object to the form.
4  BY MS. ISIDRO:
5    Q.  And you've never authored or co-authored any
6  abstracts, correct?
7    A.  Correct.
8    Q.  And you've never authored or co-authored any
9  published studies, correct?
10    A.  Correct.
11    Q.  You've never authored or co-authored any
12  published reports, correct?
13    A.  Correct.
14    Q.  You've never authored or co-authored any
15  publications, correct?
16    A.  Right.
17    Q.  Okay.  You've never authored or co-authored any
18  book chapters?
19    A.  No.
20    Q.  Or any books in their entirety, correct?
21    A.  That is correct.
22    Q.  Do you have in your possession, Doctor, any
23  presentations -- withdrawn.  Let me ask a different
24  question.
25    Have you ever given any presentations or speeches

21 (Pages 78 - 81)

Page 82

regarding drug safety and cancer risk?
A. That's a broad question but I have spoken about drug safety and the potential for side effects or adverse effects as related to that drug. Those can include cancer.
Q. And in what context have -- have those speaking engagements been?
A. In every context as my professional -- in my professional career as a pharmacist. So in my current role, in my academic role, and in my previous roles in my -- with my previous employment.
Q. So has -- have those been specifically with and for your clients?
MR. HANSEL: Object to the form.
A. Primarily for my clients. But also for, if I was involved in a speaking engagement with my organization, it could have been to an audience that was not my client.
BY MS. ISIDRO:
Q. On how many occasions would you have spoken to an audience that went beyond your clients?
A. A few times a year. A few times a year, once a quarter maybe.
Q. During what time frame?
A. Again, it's been throughout my career. So I've been doing this work here now for 20 plus years and so it's been throughout my career, sometimes more, sometimes less.

Page 83

Q. What was most recent one?
A. The most recent engagement was to the Chicago Healthcare Underwriters speaking about pharmacy benefit programs.
Q. When was that?
A. That was, goodness, before COVID. So I'm trying to think of the date. I can't recall the exact date, but it was before the -- the COVID lockdown.
Q. Okay. And were you discussing cancer risk in connection with pharmaceutical products during that presentation?
A. We were discussing pharmacy benefit information, drug safety, drug formulary plan designs.
Q. So you don't specifically recall discussing cancer risk?
A. It was not the focus of the presentation.
Q. To the best of your recollection, was it discussed during the presentation?
A. Again, it was not the focus, but whenever you talk about a drug, you bring in I guess a clinical pharmacist for the side effects or adverse effects or any concerns.
Q. So it's possible that you may have discussed it, but you don't specifically recall discussing it; is that correct?

Page 84

A. Right. That was not the focus of the presentation.
Q. I understand you're saying it's not the focus and I just want to make sure that I'm understanding your answer.
A. Uh-huh.
Q. It was not the focus and you don't specifically recall discussing it, although it's possible you may have discussed it?
MR. HANSEL: Objection. I object to the form. Asked and answered, repeatedly.
BY MS. ISIDRO:
Q. Is that --
A. My --
Q. -- is my understanding correct?
A. My professional responsibility as a pharmacist when speaking about medications includes discussion of any potential concerns with the drug, including cancer, if it's relevant to the discussion. So I believe I'm answering your question.
Q. Okay. So I'll take that to mean that my understanding is correct and you may have discussed it but you don't specifically recall discussing it.
MR. HANSEL: Objection and move to strike. Object to the form.

Page 85

BY MS. ISIDRO:
Q. And please feel free to correct me if I'm wrong in my interpretation.
MR. HANSEL: Again, object to the form.
BY MS. ISIDRO:
Q. Am I correct that your -- that all of the materials that you have relied on in forming your opinions in this case have been listed in the attachments to -- to your report?
A. All the materials have been listed, yes, in the attachment.
Q. Okay. And let's go ahead and mark a copy of your report and its exhibits as Exhibit Number 3.
MS. ISIDRO: She just needs to mark it first. Sorry.
MR. HANSEL: Can I have a copy?
MS. ISIDRO: Oh, I have it here. Sorry about that.
MR. KERNER: Yeah.
MR. HANSEL: I'm sorry.
(Exhibit No. 3 was marked for identification.)
BY MS. ISIDRO:
Q. And, Doctor, if you could turn to exhibit -- excuse me, Appendix A --
A. Uh-huh.

Page 86

1    Q.  -- attached to your report.  If you could just
2  take a moment to review that and confirm for me that that
3  is a complete list of the materials that you have relied on
4  in forming your opinions in connection with this
5  litigation.
6    A.  This is a list of my materials that I've
7  reviewed.  My expert opinion is based on my experience, my
8  education, my day-to-day upkeep of my profession to stay up
9  to date with what's happening, and -- and the materials
10  that I've reviewed are included here.
11    Q.  Okay.  And as far as the materials that you've
12  reviewed, Appendix B --  excuse me --
13    A.  A.
14    Q.  -- Appendix A to your report is a complete list
15  of the materials you've reviewed in connection with this --
16  with your opinions in this litigation?
17      MR. HANSEL:  Object to the form.
18    A.  My day-to-day responsibilities include reviewing
19  many pharmacy and industry articles, data, and information,
20  but with regards to this expert opinion the materials that
21  I reviewed are listed in Appendix A.
22  BY MS. ISIDRO:
23    Q.  You haven't reviewed any medical records in
24  connection with this litigation, correct?
25      MR. HANSEL:  Object to the form.

Page 87

1    A.  Would you please be more specific than medical
2  records?
3  BY MS. ISIDRO:
4    Q.  Have you -- I'll rephrase the question.
5      Have you reviewed any medical records pertaining
6  to the Plaintiffs in this litigation?
7    A.  No.
8    Q.  Have you spoken to any of the Plaintiffs in this
9  litigation?
10    A.  No.
11    Q.  Have you spoken to any of the other experts that
12  Plaintiffs have disclosed in this litigation?
13    A.  No.
14    Q.  Have you issued any invoices in connection with
15  your work in this litigation?
16    A.  I will -- I have not issued any invoices, but I
17  did receive a retainer at the onset.
18    Q.  And what was the amount of the retainer that you
19  received at -- at the outset?
20    A.  $4,500.
21    Q.  Has that retainer been -- let me rephrase that.
22      Have -- have there been amounts consumed from
23  that retainer?
24    A.  Are you asking if I've used the monies?
25    Q.  No, Doctor.

Page 88

1    A.  I mean, consumed is -- you've used the word
2  consumed.  I'm not --
3    Q.  Doctor, have you been tracking your charges in
4  connection with this litigation?
5    A.  Yes.  I keep a record of my -- the time I spend
6  on this case.  Absolutely.
7    Q.  How do you track the time that you spend on this
8  case?
9    A.  I keep a record of the time I spent in my own
10  personal file.
11    Q.  Are they written notes?  Do you use a program or
12  an app to track your time?  How exactly do you keep those
13  records?
14    A.  It's a combination of written and tracked through
15  an Excel.
16    Q.  An Excel spreadsheet that -- that you populate?
17    A.  That's correct.
18    Q.  Okay.  What is your hourly -- what is the hourly
19  rate at which you are being compensated in connection with
20  this litigation?
21    A.  The hourly rate for non-testifying work is $375
22  an hour and for testifying work it's $400 an hour.
23    Q.  What is your arrangement with respect to the
24  retainer?  And I'll explain what I mean.  Is it -- is it
25  something that's just there to guarantee payment or is it

Page 89

1  something on which you collect your fees as they are
2  incurred up to the extent of the retainer or a different
3  arrangement with respect to the retainer?
4    A.  The retainer was for my expert report.
5    Q.  Okay.  And have you calculated the total amount
6  of fees that you have incurred based on your time spent
7  and -- and your hourly rate, up until today?
8    A.  I have kept a report of the time I've spent for
9  this expert report and case and I have that -- I have that
10  recordkeeping, if you will.
11    Q.  What is the total number of non-testifying hours
12  that you have spent to date on this litigation?
13    A.  Approximately 50 to 60 hours.
14    Q.  I'm sorry?  I didn't hear you.
15    A.  Fifty to -- about approximately fifty hours.
16    Q.  Approximately 50 hours.  So at your
17  non-testifying rate of $375 an hour, that would be
18  approximately $18,750 in fees in connection with your
19  non-testifying work so far; is that right?
20    A.  You calculated it so.
21    Q.  So that exceeds the amount of -- of the retainer,
22  correct?
23    A.  Yes.
24    Q.  Will that retainer remain in place and you will
25  invoice Plaintiffs for the full amount of -- of the fees

23 (Pages 86 - 89)

Page 90

1 that you have incurred so far, or will you reduce the
2 amount that you invoice by the amount of the retainer?
3    A.  I will reduce it by the amount of the retainer.
4    Q.  Okay.  When were you first retained in connection
5 with this litigation?
6    A.  The exact date I'm -- I have to look at the exact
7 date, but it was in October I want to say or maybe late
8 September of '21.
9    Q.  Who first contacted you in connection with this
10 litigation?
11    A.  Greg Hansel.
12    Q.  Did you know Greg Hansel before he contacted you
13 in connection with this litigation?
14    A.  No.
15    Q.  Do you know how you came to be contacted in
16 connection with this litigation?
17    A.  I was told it was through my LinkedIn profile.
18    Q.  When you do issue an invoice in connection with
19 your work in this litigation, who will you be sending that
20 invoice to?
21    A.  Preti Flaherty.
22    Q.  I'm going to go ahead and mark this document as
23 Exhibit 4.
24    (Exhibit No. 4 was marked for identification.)
25    Do you recognize this document, Doctor?

Page 91

1    A.  Yes.
2    Q.  And what is it?
3    A.  It is the engagement letter.
4    Q.  Your engagement letter in connection with this
5 litigation?
6    A.  Yes.
7    Q.  All right.  What materials did you initially
8 review in connection with this litigation?
9    A.  All of the materials I reviewed are in the
10 appendix.
11    Q.  Let me ask my question a different way.
12    Did you review any materials prior to making a
13 determination as to whether or not you would agree to your
14 engagement in connection with this litigation?
15    A.  So, again, my day-to-day functions in my
16 professional role include reviewing pharmacy literature and
17 materials, industry relevant information so that I am aware
18 of -- so I can best advise my clients in -- in my
19 professional capacity so.
20    Q.  In making a decision as to whether or not you
21 would agree to be engaged in connection with this
22 litigation, did you review any materials relating to the
23 litigation itself?
24    A.  No.
25    Q.  Did you review any materials relating to the

Page 92

1 claims at issue in the litigation?
2    A.  No.
3    Q.  Has anyone assisted you in doing research or
4 gathering information in connection with the opinions that
5 you're offering in this litigation?
6    A.  No.
7    Q.  What were you asked to do when you were retained
8 in connection with this litigation?
9    A.  I would ask -- I was asked to render an opinion
10 on what TPPs rely on when -- with respect to generic
11 medications.
12    Q.  Other than Plaintiff's counsel, have you spoken
13 to anyone about this litigation?
14    A.  No.
15    MS. ISIDRO:  Counsel, I'm about to start getting
16 into Dr. Panagos's report.  Should we break for lunch
17 at this time and -- and then come back or should we
18 get started and break at a later time?
19    MR. HANSEL:  Let's break.
20    MS. ISIDRO:  Okay.
21    MR. KERNER:  How long?  What do you think?
22    THE VIDEOGRAPHER:  The time is 12:53 p.m., and we
23 are off record.
24    (Break taken.)
25    THE VIDEOGRAPHER:  The time is 1:56 p.m., and we

Page 93

1 are back on the record.
2 BY MS. ISIDRO:
3    Q.  Good afternoon, Dr. Panagos.  Do you still have
4 in front of you Exhibit Number 3, your report with its
5 Appendixes?
6    A.  I do.
7    Q.  All right.  We're going to spend some time going
8 through your opinions as -- as stated in your report.  So
9 I'm going to have you turn to Page 2, and specifically the
10 fourth section of your report in Paragraph 12, you don't
11 have any opinions that are stated in the earlier parts of
12 your report prior to this paragraph; is that correct?
13    A.  Correct.
14    Q.  In Paragraph 12 you state that in July 2018 the
15 FDA announced a voluntary recall of Valsartan, including
16 Valsartan-containing drugs, due to contaminants NDEA and
17 NDMA.  What is your basis for that statement?
18    A.  That information is found on the FDA website.
19    Q.  What do you understand the term contaminants to
20 mean?
21    A.  These contaminants were found in unacceptable
22 levels and probable human carcinogens and do not belong in
23 the medication.
24    Q.  I want to make sure I understood your answer.
25    MS. ISIDRO:  Can you read back the question and

24 (Pages 90 - 93)

Page 94

1    the answer for me, please?
2         (The requested portion was read back.)
3    BY MS. ISIDRO:
4         Q.   Am I understanding you correctly that you
5    understand the term contaminants to mean any substance that
6    does not belong in the medication?
7         MR. HANSEL:  Object to the form.
8         A.   In the scope of this case, a -- the contaminant
9    is a substance that was -- should not have been in the
10   medication and not consistent with the referenced labeled
11   product.
12   BY MS. ISIDRO:
13        Q.   So that is how you are using the word
14   contaminants in this report?
15        MR. HANSEL:  Object to the form.  Asked and
16   answered.
17        A.   I've answered the question.
18   BY MS. ISIDRO:
19        Q.   I just want to make sure I'm understanding your
20   answer.
21        MR. HANSEL:  Object to form.
22   BY MS. ISIDRO:
23        Q.   Have I stated that correctly?
24        MR. HANSEL:  Object to form.
25        A.   Please restate so I can be sure I -- I understand

Page 95

1    the way you restated it.
2         MS. ISIDRO:  Can you read it back, please?
3         (The requested portion was read back.)
4    BY MS. ISIDRO:
5         Q.   I just want to understand, Doctor, whether --
6    what you've discussed in that prior response is a
7    description of how you personally are using the term
8    contaminants in your report.
9         A.   Uh-huh.  So a contaminant is any substance that
10   is in the medication that should not have been there, not
11   consistent with the referenced label product, and
12   inconsistent with the safety and efficacy of the referenced
13   labeled product.
14        Q.   Thank you.  What are you relying on for purposes
15   of your definition of contaminants?
16        A.   My industry knowledge, my pharmacy background, my
17   education, studies, and professional scope in my career.
18        Q.   Anything else?
19        A.   No.
20        Q.   You're not relying on any specific FDA
21   regulations for the purpose of that definition?
22        A.   The scope of my career relies -- you know,
23   involves referring to FDA information so.
24        Q.   Are there specific FDA regulations that you are
25   referring to in terms of your understanding of the

Page 96

1    definition of the term contaminants?
2         A.   Specifically, no.
3         Q.   In the next sentence you say these contaminants
4    are probable human carcinogens according to the
5    International Agency for Research on Cancer classification.
6    Are -- so are you relying on IARC's classification in that
7    statement?
8         A.   Yes.
9         Q.   Have you independently assessed the
10   carcinogenicity of NDEA or NDMA?
11        A.   Not independently.
12        Q.   Are you relying on anything other than the IARC
13   classification in making that statement in your report?
14        MR. HANSEL:  Object to the form.
15        A.   The IARC classification is public information
16   which is what I relied on to make that statement.
17   BY MS. ISIDRO:
18        Q.   Okay.  And you didn't rely on anything else for
19   purposes of that statement?
20        MR. HANSEL:  Object to the form.
21        A.   Yes.
22   BY MS. ISIDRO:
23        Q.   Yes.  I'm sorry, yes, that's correct?
24        A.   Yes.
25        MR. HANSEL:  Object to the form.

Page 97

1    BY MS. ISIDRO:
2         Q.   Okay.  Apart from any alleged presence of NDEA or
3    NDMA in Valsartan-containing drugs, are you offering any
4    criticism of Valsartan-containing drugs?
5         A.   Valsartan -- as long as they're being used for
6    their intended FDA labeled use, no.
7         Q.   The next section, Section 5, talks about
8    background on TPP pharmacy benefits and Paragraphs 14
9    through 18 specifically talk about TPPs; is that correct?
10        A.   Yes.
11        Q.   What are you relying on in making the statements
12   that you make in Paragraphs 14 through 18 with respect to
13   TPPs?
14        A.   I'm relying on the information I've listed in
15   Appendix A.
16        Q.   Can we -- can you please look at that appendix
17   and identify for me which of the items listed on Appendix A
18   you're relying on for purposes of paragraphs 14 through 18
19   of your report?
20        A.   Yeah.  So I have listed in the appendix
21   experts -- excerpts, excuse me, of data, MSP data --
22        Q.   That's the one that says Detail Claim Report, HMO
23   fields added, July 6, 2021?
24        A.   Yes.  And the other items would be the
25   coordination of benefits, third-party liability.

25 (Pages 94 - 97)

Page 98

1    Q.  Okay.  That's further up on the list on Page 1 of
2  Appendix A?
3    A.  Yes.
4    Q.  Okay.  Anything else?
5    A.  And then further down where it says MADA claims
6  for the recalled Valsartan.
7    Q.  Okay.  That's the last item on -- on that page,
8  MADA claims data for recalled Valsartan --
9    A.  Yes.
10    Q.  -- four spreadsheets?
11    A.  Yes.  And then on the next page there are
12  additional items referenced, fourth and fifth down.  The
13  recall status of NDCs.
14    Q.  So you mentioned fourth and fifth down.  Is that
15  MADA Third Party Payor Plaintiff's Fact Sheet, and MSP
16  Third Party Payor Plaintiff's Fact Sheet?
17    A.  Yeah.
18    Q.  And then two down from that, was it the recall
19  status of NDCs listed?  Is that the one you referred to?
20    A.  Uh-huh.
21    Q.  Okay.
22    A.  Yes.
23    Q.  Anything else?
24    A.  My own experience from being an expert in this
25  field and consulting and knowing how these entities work.

Page 99

1    Q.  Have we now discussed all of the bases for your
2  statements in Paragraphs 14 through 18 --
3    MR. HANSEL:  Object to the form.
4  BY MS. ISIDRO:
5    Q.  -- of your report?
6    A.  All of my materials reviewed are in the appendix,
7  so for my -- for the entirety of my expert report.  So I've
8  answered your question, you know, to the best of my
9  knowledge at this point, but I have -- I'd have to go back
10  and study each of the items in the appendix very closely to
11  ensure that I haven't missed a point in those sections, but
12  for purposes of our discussion, I have pointed out those
13  that I believe are relevant.
14    Q.  All right.  The next section of your report,
15  Paragraphs 19 and 20, deals with PBMs; is that correct?
16    A.  Right.
17    Q.  And what did you rely on in formulating the
18  statements that you've included on Paragraphs 19 and 20 of
19  your report?
20    A.  My professional experience, my pharmacy knowledge
21  and education, and the materials in Appendix A.
22    Q.  And with respect to the materials in Appendix A,
23  which of the materials listed in Appendix A formed the
24  basis for your statements in Paragraphs 19 and 20 of your
25  report?

Page 100

1    A.  The American Journal of Managed Care, ASHP,
2  Coordination of Benefits, Formulary Development, The
3  Journal of Managed Care, Drug -- Navigating Drug
4  Formularies and Pharmacy Benefit Management, the Orange
5  Book, Principles of a Sound Drug Formulary, and the U.S.
6  Food and Drug Administration Development Approval Process.
7    Q.  The next section of your report, Paragraphs 21
8  through 28, discusses prescription drug formularies; is
9  that right?
10    A.  Yes.
11    Q.  What did you rely on in formulating the
12  statements in paragraphs 21 through 28 of your report?
13    A.  The same ones I gave you for PBM.
14    Q.  Okay.
15    A.  Including my knowledge, experience, and education
16  in my professional capacity.
17    Q.  Okay.  And nothing additional with respect to
18  Paragraphs 21 and 28, is that correct, as compared with
19  Paragraphs 19 and 20?
20    A.  Just whatever falls under the scope of my
21  professional capacity and my day-to-day functions.
22    Q.  And would you consider Paragraphs 14 through 28
23  to be background for your opinions in this litigation?
24    MR. HANSEL:  Object to the form.  Calls for a
25  legal conclusion.

Page 101

1    A.  Please repeat the question?
2    MS. ISIDRO:  Could you read it back, please?
3    (The requested portion was read back.)
4    MR. HANSEL:  Same objection.
5    A.  They can serve as a background or they're
6  information pertinent to the -- the opinion, relevant and
7  pertinent.
8  BY MS. ISIDRO:
9    Q.  In Paragraphs 29 to 32 you make various
10  statements concerning the Orange Book, correct?
11    A.  29 through -- well, it goes beyond 32.
12  BY MS. ISIDRO:
13    Q.  Okay.
14    A.  But yes.
15    Q.  Okay.  You have a Section D in your report titled
16  Orange Book and that goes 29 through 32; is that correct?
17    A.  In Section D, yes.
18    Q.  Okay.  What is the Orange Book?
19    A.  The Orange Book, also known as the Approved Drug
20  Products with Therapeutic Equivalence Evaluation, is a list
21  of FDA approved drug products and they're -- approved for
22  marketing as -- in the United States as they're labeled --
23  as their label indication.
24    Q.  Doctor, as part of what PBMs do, do PBMs develop
25  formularies?

26 (Pages 98 - 101)

Page 102

1    A. Yes.
2    Q. In doing so, do TP -- excuse me. Withdrawn.
3    Do TPPs review and either adopt a formulary as is
4 or do they customize the PBM formulary?
5    MR. HANSEL: Object to the form.
6    A. Could you be more specific?
7 BY MS. ISIDRO:
8    Q. What specificity are you looking for?
9    When you say customize.
10    Q. Do TPPs make any changes to the formularies that
11 PBMs develop?
12    A. TPPs, they're prescription -- the prescription
13 benefit design is up to the client and they're -- what's
14 included or excluded in that benefit design can be tied
15 into the formulary.
16    Q. Is it possible for a TPP to use its own P&T
17 committee?
18    A. If they have a P&T committee.
19    Q. In fact, you note in your Footnote 2 of your
20 report that in some cases the development and management of
21 a drug formulary is done in-house where the TPP will use
22 its own P&T committee and might consult with the PPM,
23 correct?
24    A. If they have their own P&T committee.
25    Q. And you do state that in Footnote 2 of your

Page 103

1 report, correct?
2    A. I have agreed.
3    Q. Do you have any knowledge as to what share of the
4 proposed TPP class members developed their own formularies
5 versus using a formulary developed by a PBM?
6    A. No, I do not.
7    Q. Short of making an inquiry into each -- each TPP
8 class members whose formulary included the at issue
9 Valsartan, is there any way to tell whether it was the PBM
10 or the TPP to decided whether Valsartan should be included?
11    A. No, I will not speculate.
12    Q. In Paragraph 25 of your report -- it's the bottom
13 of Page 4 and top of Page 5.
14    A. Uh-huh.
15    Q. You mention that the P&T committee is required to
16 base formulary decisions on scientific evidence, standards
17 of practice, peer reviewed medical literature, accepted
18 clinical practice guidelines, and other appropriate
19 information.
20    What is other appropriate information?
21    A. Data specific to the drug they are reviewing. It
22 could include clinical studies.
23    Q. Anything else?
24    A. Yes. It could include other items.
25    Q. Such as?

Page 104

1    A. Drug monographs, product labels, submitted
2 applications for approval, status within the Orange
3 Brook -- Book.
4    Q. Is cost a factor?
5    A. P&T committees make their decisions based on
6 clinical merit.
7    Q. So in your -- the diagram that you include in
8 Paragraph 28 in the fourth tier down --
9    A. Uh-huh.
10    Q. -- it's titled P&2 -- P&T review meetings. Do
11 you see that?
12    A. Yes.
13    Q. It lists safety, efficacy, and cost. What does
14 that refer to, that reference to cost there?
15    A. P&T committees make their decisions primarily
16 based on clinical efficacy, ensuring that the drug that is
17 going to be considered for placement on the formulary is
18 safe and effective. Additional functions may include cost
19 as it pertains to reimbursement of the claim.
20    Q. So that is one of the factors that can be
21 considered via a P&T committee, correct?
22    A. The primary factors are based on clinical merit
23 and not cost.
24    Q. So you would not consider cost a primary factor,
25 correct?

Page 105

1    A. P&T committees are unbiased advisory boards
2 reviewing drug information based on the clinical merit of
3 the -- that's their primary function. Once that is
4 completed, they can include costs or may -- may or may not
5 include that as part of their discussion.
6    Q. Okay. And you did include it as part of the
7 diagram in Paragraph 28?
8    A. Uh-huh.
9    Q. Correct?
10    A. Yes.
11    Q. At the bottom of that diagram, the very last tier
12 of that diagram, you refer to relevant stakeholders. Who
13 are those relevant stakeholders?
14    A. Whoever the entity is deciding on the formulary,
15 whether to adopt that formulary as part of their
16 prescription benefit.
17    Q. The Orange Book is published by the FDA, correct?
18    A. Correct.
19    Q. And the Orange Book lists drug products that are
20 approved by FDA on the basis of safety and effectiveness;
21 is that correct?
22    A. Correct.
23    Q. The Orange Book also contains therapeutic
24 equivalence evaluations for approved generic prescription
25 drug products; is that correct?

27 (Pages 102 - 105)

Page 106

1    A.  Yes.
2    Q.  Who makes those therapeutic equivalence
3  evaluations?
4    A.  The FDA.
5    Q.  When a generic drug manufacturer files an ANDA,
6  one of the things that they must demonstrate to FDA in that
7  ANDA is bioequivalence, correct?
8    A.  That was not within the scope of my report, but I
9  understand that to be part of the requirement.
10    Q.  Okay.  So that consideration is -- is outside the
11  scope of your report and your opinions in this litigation,
12  correct?
13        MR. HANSEL:  Object to the form.
14    A.  As I said, it is part of the process for filing
15  an ANDA or applying for ANDA.
16        MS. ISIDRO:  Can you please read back the answer
17    that mentioned outside of the scope of the report?
18        MR. HANSEL:  And the question also.
19        MS. ISIDRO:  Sure.  Please.
20        (The requested portion was read back.)
21  BY MS. ISIDRO:
22    Q.  For Section D of your report, Paragraphs 29
23  through 32, what did you rely on in formulating those
24  paragraphs of your report?
25    A.  FDA information.

Page 107

1    Q.  Which specific FDA information?
2    A.  On ANDA process, on NDA generic drugs.
3    Q.  Would the FDA information that you relied on be
4  listed in Appendix A of your report?
5    A.  I believe it is listed at -- that's Page 2, U.S.
6  Food and Drug Administration Development Approval Process.
7    Q.  Okay.  Anything else?
8    A.  I relied on my knowledge and experience in the
9  industry, knowing how the process works.
10    Q.  Okay.  Did you also rely on the Orange Book
11  preface that's listed in your Appendix A?
12    A.  Yes, I referenced the Orange Book.
13    Q.  I'm sorry, I miss -- I think I misheard you.  I
14  thought the only item that you had mentioned from
15  Appendix A was the U.S. Food and Drug Administration
16  Development Approval process?
17    A.  Clearly the Orange Book is listed in the
18  Appendix A as well, so let me clarify and say that I
19  referenced that in addition.  I think that's --
20    Q.  Okay.
21    A.  -- quite obvious.
22    Q.  So it would be those two items from Appendix A,
23  correct?
24    A.  In addition to my knowledge and experience,
25  understanding how the process works.

Page 108

1    Q.  Okay.  But not any of the other items listed on
2  Appendix A, other --
3    A.  It could have been --
4    Q.  -- than the two that we've discussed?
5    A.  It could have been -- all of the items in the
6  appendix can have played a role in forming the entirety of
7  my discussion and expert opinion.  That's why they're
8  listed there.
9    Q.  Okay.  Did the MADA Third Party Payor Plaintiff's
10  Fact Sheet form the basis for any of your -- any of the
11  information stated in Paragraphs 29 through 32 of your
12  report?
13    A.  Not as it pertains to the explanation of the
14  Orange Book, the description of the Orange Book.
15    Q.  Is there another aspect to Paragraphs 29 through
16  32 that it does touch upon?
17    A.  By it, you mean -- can you be more clear?
18    Q.  The MADA Third Party Payor Plaintiff's Fact
19  Sheet.
20        MR. HANSEL:  Object to the form.
21    A.  Could you please repeat the question?
22        MS. ISIDRO:  Sorry, could you read the question?
23  I think you were asking for the court reporter to read
24    the question back.
25        (The requested portion was read back.)

Page 109

1        MS. ISIDRO:  I'll restate the question.
2  BY MS. ISIDRO:
3    Q.  Does the MADA Third Party Payor Plaintiff's Fact
4  Sheet form the basis of any aspect of your statements in
5  Paragraphs 29 through 32 of your report?
6    A.  No.  Not the basis.
7    Q.  In Paragraphs 33 through 41 of your report, you
8  discuss definitions and significance of therapeutic
9  equivalence code; is that correct?
10    A.  That is correct.
11    Q.  What did you rely on in formulating your
12  Paragraphs 33 through 41 of your report?
13        MR. HANSEL:  Object to the form.
14    A.  The FDA information on the Orange Book.
15  BY MS. ISIDRO:
16    Q.  Uh-huh.
17    A.  And the explanation of therapeutic equivalence
18  codes, public information.
19    Q.  And just to make sure I understand the
20  explanation of therapeutic equivalence codes, do you mean
21  within the Orange Book itself or are you referring to
22  something different?
23    A.  The TE codes or therapeutic equivalence codes are
24  present in the Orange Book.
25    Q.  Okay.  So the -- so those are the -- that's what

28 (Pages 106 - 109)

Page 110

1  you're referring to?
2      A.  As I understand your question, yes.
3      Q.  Okay.  In Paragraphs 42 and 43 you discuss
4  criteria for entry into the Orange Book; is that correct?
5      A.  Yes.
6      Q.  What is the basis for your statements in
7  Paragraphs 42 and 43?
8      A.  The FDA process established for drugs seeking
9  approval.
10     Q.  Is that the last item listed on Appendix A of
11  your report?
12         MR. HANSEL:  Object to the form.
13     A.  That has the FDA item on the -- on the appendix,
14  yes, but as I said, all of the items in my appendix
15  could've played a role in my -- all of my -- entirety of my
16  expert opinion.
17  BY MS. ISIDRO:
18     Q.  I was asking specifically the response you gave
19  to the prior question.
20         MS. ISIDRO:  So could you read it back, that
21      prior question and answer?
22         (The requested portion was read back.)
23         MR. HANSEL:  Object to the form.
24  BY MS. ISIDRO:
25     Q.  So, Dr. Panagos, in that response when you said

Page 111

1  the FDA process established for drugs seeking approval,
2  were you referring to the last item that's listed in the
3  Appendix A of your report or were you referring to
4  something else?
5         MR. HANSEL:  Object to the form.  Asked and
6      answered repeatedly.
7      The -- the witness has testified numerous times
8      about things she relied on for the entirety of her
9      report, and this repeated attempt to pigeonhole her is
10     just unfair and it -- could we stipulate that her
11     previous testimony about what she's relied on for her
12     entire report will apply to each question about what
13     she relied on for a particular paragraph?
14         MS. ISIDRO:  Let the record reflect that counsel
15     is making an inappropriate speaking objection.
16     Defendants are entitled to explore the basis for the
17     statements and conclusions in Dr. Panagos's report as
18     a proffered expert in this litigation.
19         MR. HANSEL:  Will you stipulate?
20         MS. ISIDRO:  So -- we will not stipulate to waive
21     our rights to explore the basis for her statements and
22     conclusions in her report.
23         MR. DORNER:  Hello.  This is Drew Dorner.  ZHP
24     will not stipulate either to your proposed
25     stipulation.

Page 112

1         MS. ISIDRO:  Could you please read back the last
2      question before the speaking objection, and I don't
3      believe there was an answer, but if there was please
4      read that too.
5         (The requested portion was read back.)
6         MR. HANSEL:  Object to the form.
7      A.  You're referring to the Orange Book, the process
8  by which a drug can gain approval and list -- to be listed
9  in the Orange Book is public information on brand and
10  generic drugs and the processing must follow as established
11  by the FDA.  It's an authoritative source.
12  BY MS. ISIDRO:
13     Q.  So, Doctor, in making your statements in
14  Paragraph 42 of your report, I understand your response to
15  be that you have relied on the U.S. Food and Drug
16  Administration Development Approval Process.  Am I
17  understanding that to be -- am I correctly understanding
18  that to be one of the bases for your statement in Paragraph
19  42 of your report?
20     A.  One of the bases.
21     Q.  Okay.  What are the other bases for your
22  statement in Paragraph 42 of your report?
23     A.  The Orange Book itself, my experience, education,
24  and professional capacity and -- and -- and my day-to-day
25  experience in this field.

Page 113

1      Q.  Any other bases that you're relying on for your
2  statements in Paragraph 42 of your report?
3      A.  No.
4      Q.  And what are you relying on for your statements
5  in Paragraph 43 of your report?
6      A.  The same.
7      Q.  Okay.  You state in Paragraph 44 that a generic
8  drug is a copy of a branded drug in terms of dosage,
9  administration, and performance.  What is your basis for
10  that statement?
11     A.  My understanding of a generic drug from my
12  education, my experience, and the information on -- in --
13  I've listed in Appendix A.
14     Q.  And which of the items listed in Appendix A are
15  you relying on for the statement that a generic drug is a
16  copy of a branded drug in terms of dosage, administration,
17  and performance?
18     A.  All of the information except for the claims
19  data.
20     Q.  So that includes -- so you are relying for
21  purposes of that statement on the MADA Third Party
22  Player -- Third Party Payor Plaintiff's Fact Sheet?
23     A.  No.  I include that as part of the claim, so let
24  me clarify.
25     Q.  Okay.

29 (Pages 110 - 113)

Page 114

1    A. Not the Plaintiff Fact Sheet.
2    Q. Okay. Because you also have an item called MADA
3  Claims Data for Recalled Valsartan.
4    A. Those go together.
5    Q. Okay. So you did not rely on that? You did
6  not -- did you rely on the MSP Third Party Payor
7  Plaintiff's Fact Sheet?
8    A. No.
9    Q. Okay. Other than those three items in Appendix A
10  to your report, you relied on all of the other items for
11  purposes of the statement that a generic drug is a copy of
12  a branded drug in terms of dosage, administration, and
13  performance?
14    A. Including my knowledge, education, all --
15    Q. Did --
16    A. -- and -- yeah.
17    Q. Did you rely on the FIN Declaration for purposes
18  of that statement?
19    A. No.
20    Q. Okay. In Paragraph 44 you go on to say that
21  generic drugs must be bioequivalent to the branded drug,
22  meaning the generic drug will work the same way in the body
23  and be as safe and effective as the brand name drug.
24    A. That is correct.
25    Q. What are you relying on in making that statement

Page 115

1  in Paragraph 44?
2    MR. HANSEL: Object to the form.
3    A. Relying on my education, my degrees, my licensure
4  as a pharmacist. It's a critical component to performing
5  my day-to-day functions and understanding that foundational
6  component, what a generic drug is. So I -- I rely on my
7  education and my experience and the items I've listed in
8  the appendix.
9  BY MS. ISIDRO:
10    Q. What FDA regulation or regulations define the
11  term bioequivalent?
12    A. I was not asked to study that, so -- so I'm not
13  going to answer that at this time. I'd have to study the
14  FDA regulations very closely to be able to give a
15  thoughtful and complete answer to -- to that question.
16    Q. Paragraph 45 you state that the substitution of
17  generic equivalents, drugs considered bioequivalent by FDA,
18  are encouraged by PBMs to provide the best care at an
19  affordable cost.
20    What is your basis for that statement?
21    MR. HANSEL: Object to the form.
22    A. The Orange Book lists drugs that are approved to
23  their referenced listed drug product to be the same and
24  effective and to be considered -- a consideration for the
25  formulary. Those drugs are considered substitutable

Page 116

1  because they are deemed to be safe and effective. It is
2  really -- the -- the foundation or the basis that
3  determined whether a generic drug meets the criteria for
4  inclusion on a -- for consideration on a formulary, they
5  are listed in the Orange Book or not.
6  BY MS. ISIDRO:
7    Q. Is it specifically the FDA's therapeutic
8  equivalence evaluation that -- that determines whether a
9  generic equivalent can be substituted?
10    MR. HANSEL: Object to the form.
11    A. They must have an approved ANDA and have a
12  therapeutic equivalence code assigned to the medication
13  that allows them to be considered substitutable.
14  BY MS. ISIDRO:
15    Q. And which are the codes that allow them to be
16  considered substitutable?
17    A. AB.
18    Q. You state in Paragraph 46 that TPPs and P&T
19  committees expressly rely upon the manufacturer's
20  compliance with all applicable standards, obligations, and
21  regulations.
22    What is your basis for that statement in
23  Paragraph 46?
24    MR. HANSEL: Object to the form.
25    A. The information presented to the FDA for approval

Page 117

1  by an ANDA application is presented by the manufacturer who
2  is responsible for the information they provide.
3  BY MS. ISIDRO:
4    Q. And what is your answer based on?
5    MR. HANSEL: Object to the form.
6    A. The application is submitted by the manufacturer
7  who is responsible for the information they provide the FDA
8  to be considered for approval. That includes all aspects
9  related to that application.
10  BY MS. ISIDRO:
11    Q. What is your support for that response?
12    MR. HANSEL: Object to the form.
13    A. Manufacturers are responsible for their
14  medication. They're responsible for the quality control,
15  ensuring that that medication is safe and effective to --
16  when they're applying for that approval -- seeking approval
17  by the FDA. It's their responsibility to ensure that it's
18  safe and effective.
19  BY MS. ISIDRO:
20    Q. Is that your own opinion?
21    MR. HANSEL: Object to the form.
22    A. In my professional capacity, that is what I
23  believe to be correct.
24  BY MS. ISIDRO:
25    Q. Within Paragraph 46 of your report, what are you

30 (Pages 114 - 117)

Page 118

1  relying on in making a representation as to what TPPs
2  expressly rely upon?
3       MR. HANSEL:  Object to the form.
4       A.  So 46 refers to the P&T committee, which the P&T
5  committee will make the decision whether the drug will be
6  considered for the formulary or not.
7       I don't understand your question if you're asking
8  something else.
9  BY MS. ISIDRO:
10      Q.  Sure.  There's -- there's a statement in
11 Paragraph 46 of your report that TPPs and P&T committees
12 expressly rely upon the manufacturer's compliance with all
13 applicable standards, obligations, and regulations.
14      A.  Correct.  Via the NDA.  The manufacturer has to
15 provide that information to the FDA via their ANDA
16 application to be considered for approval and that's the
17 information that's relied upon for the approval.
18      Q.  Okay.  And you say that that information is -- is
19 expressly relied upon by the TPPs and the P&T committees,
20 correct?
21      A.  That information is relied upon as it's provided
22 in their application submitted to the FDA for approval.
23      Q.  But am I correct in saying that Paragraph 46 of
24 your report states that that information is expressly
25 relied upon by TPPs and P&T committees?

Page 119

1       A.  It's relied upon in that it -- it's provided to
2  the applic- -- in the application for approval.
3       Q.  Okay.  Do you see the word expressly in Paragraph
4  46 of your report?
5       A.  Yes.
6       Q.  What did you mean by the word expressly in
7  Paragraph 46 of your report?
8       A.  That it is -- that it is the responsibility of
9  the manufacturer to provide all the information, in
10 conjunction with their medication, seeking approval by the
11 FDA.  It is their responsibility to do that.
12      Q.  And Paragraph 46 says that TPPs and P&T
13 committees expressly rely, correct?
14      A.  Right.  Because the manufacturers are providing
15 that information on their ANDA application seeking approval
16 by the FDA.
17      Q.  So am I not understanding your sentence in
18 Paragraph 46 correctly, that the TPPs and the P&Ts are the
19 ones who expressly rely upon the information you're
20 referencing?
21      A.  Once that medication is approved, because they
22 have provided that -- the manufacturer has complied with
23 all the requirements needed for approval, that medication
24 is listed in the Orange Book as having complied and so they
25 will -- that suffices the requirement for consideration to

Page 120

1  the formulary.
2       Q.  Can you point to any document in which a TPP
3  expressly relies upon the manufacturer's compliance with
4  all applicable standards, obligations and regulations?
5       A.  That is done via -- referencing the Orange Book
6  and the approval status of the drugs.
7       Q.  So when you say that they expressly rely upon
8  that information, am I understanding correctly that what
9  you mean by that statement is that they --
10      A.  It is the responsibility of the manufacturer to
11 provide that information on their drug application, follow
12 the process established by the FDA for their drugs to be
13 considered for approval in the United States and considered
14 for coverage on the drug formulary.
15      MS. ISIDRO:  Can you please read back the prior
16 question and answer, not this one.
17      (The requested portion was read back.)
18 BY MS. ISIDRO:
19      Q.  Can you point to any document in which a P&T
20 committee expressly relies upon the manufacturer's
21 compliance with all applicable standards, obligations, and
22 regulations?
23      MR. HANSEL:  Object to the form.
24      A.  The Orange Book is a representation of a list of
25 drugs approved safe and effective for use in the United

Page 121

1  States.
2  BY MS. ISIDRO:
3       Q.  Is the Orange Book issued by P&T committees?
4       A.  No.  It's issued by the FDA.
5       Q.  Right.  So the P&T committee is not making any
6  express statements in the Orange Book, correct?
7       A.  No, they're not.
8       Q.  Have you read the ANDA for any
9  Valsartan-containing drug?
10      A.  No.
11      Q.  You state in Paragraph 47 that the AB rating in
12 the FDA Orange Book based as it is on the generic drug
13 manufacturer's ANDA represents a manufacturer's warranty to
14 TPPs and P&T committees for placement on a prescription
15 drug formulary.
16      What do you mean by the term warranty in
17 Paragraph 47?
18      MR. HANSEL:  Objection.  Calls for a legal
19 conclusion.
20      MS. ISIDRO:  It's a term she's used in her
21 report.  I'm entitled to ask her what she means by it
22 when she uses it in her report.
23      Can you please read back the question?
24      MR. HANSEL:  Can we stipulate that every time you
25 ask a question about warranty I'm making a continuing

31 (Pages 118 - 121)

Page 122

1   objection that it's -- I object to the form because it
2   is calling for a legal conclusion? Will you stipulate
3   to that continuing objection so I don't have to repeat
4   myself every time you ask a question about warranty.
5       MS. ISIDRO: No. I will not stipulate to that
6   unless she will withdraw the use of the term warranty
7   from her report in which case I don't have to ask
8   about it anymore.
9       ZOOM PARTICIPANT: There's a pending question.
10  Does the witness remember the question?
11      MS. ISIDRO: I was just going to ask that it be
12  read back, please.
13      THE WITNESS: Thank you.
14      ZOOM PARTICIPANT: Ask her if she remembers it
15  and let her answer it. Do you remember the
16  question?
17      THE WITNESS: I'd like for it to be read back.
18      ZOOM PARTICIPANT: Thank you.
19      THE WITNESS: Thank you.
20      (The requested portion was read back.)
21      MR. HANSEL: Object to the form.
22  A.  The warranty represents their promise or
23  assurance that their drug is safe and effective and
24  equivalent to the referenced listed drug product; the same
25  as the referenced listed drug product.

Page 123

1   BY MS. ISIDRO:
2       Q.  When you use the term warranty in your report, do
3   you understand that to be a legal term?
4       MR. HANSEL: Object to the form.
5       A.  No. It's a term that refers to a promise, an
6   assurance, a guarantee that that manufacturer has set
7   forth.
8   BY MS. ISIDRO:
9       Q.  What are you relying on in making the statements
10  that you've made in Paragraph 47 of your report?
11      MR. HANSEL: Object to the form.
12      A.  When an ANDA is approved, it means that the
13  manufacturer has fulfilled the requirements, including
14  safety and effectiveness, for their drug to be approved.
15  BY MS. ISIDRO:
16      Q.  You reference -- you reference a document in
17  Footnote 6 at the end of Paragraph 47?
18      A.  Uh-huh.
19      Q.  Is that correct?
20      A.  Yes.
21      Q.  Are you relying on that document for purposes of
22  the statement that you've made in Paragraph 47 of your
23  report?
24      MR. HANSEL: Object to the form.
25      A.  Not exclusively.

Page 124

1   BY MS. ISIDRO:
2       Q.  But does it form part of what you're relying on
3   in making the statement in Paragraph 47 of your report?
4       A.  It refers -- Footnote 6 refers to P&T committees.
5   What manufacturers represent in their ANDA is -- when the
6   ANDA's approved, it's -- it means that the manufacturer has
7   sufficed and is compliant to receive approval of a
8   medication deemed safe and effective.
9       Q.  Why do you reference -- withdrawn.
10          Why did you include Footnote 6 on Paragraph 47?
11      A.  As a reference for P&T committees.
12      Q.  And what is the purpose of including that in
13  Paragraph 47?
14      MR. HANSEL: Objection: Asked and answered.
15      A.  ASHP or the guidelines that they -- or
16  they're -- they're a respected industry organization,
17  pharmacy organization that have credible information.
18  BY MS. ISIDRO:
19      Q.  How does the document that is referenced in
20  Footnote 6 relate to your statement in Paragraph 47 of your
21  report?
22      MR. HANSEL: Object to the form. Asked and
23  answered, repeatedly.
24      A.  Again, when a manufacturer's ANDA's approved, it
25  represents that they've met all the requirements needed for

Page 125

1   approval of that drug. That information is public
2   information, industry accepted among professionals.
3   BY MS. ISIDRO:
4       Q.  Does the document referenced in Footnote 6
5   mention warranties at all?
6       MR. HANSEL: Object to the form.
7       A.  I don't recall.
8   BY MS. ISIDRO:
9       Q.  Okay.
10      MS. ISIDRO: Can we mark this as Exhibit 5?
11      (Exhibit No. 5 was marked for identification.)
12      THE WITNESS: Thank you.
13  BY MS. ISIDRO:
14      Q.  Doctor, you've just been handed Exhibit 5. Is
15  that the document that's referenced in Footnote 6?
16      A.  Yes.
17      Q.  I'll give you a moment to look it over so that
18  you can refresh your recollection as to whether that
19  document mentions warranties at all.
20      MR. HANSEL: Objection. It takes more than a
21  moment to determine whether a 12-paged document with 3
22  columns on each page contains a single word at least
23  once.
24      MS. ISIDRO: I'll give her as much time as she
25  needs.

32 (Pages 122 - 125)

Page 126

1 MR. HANSEL: Great.
2 THE WITNESS: Okay. What would you like me to
3 answer?
4 BY MS. ISIDRO:
5 Q. Does Exhibit 5 discuss warranties at all?
6 A. Exhibit 5 discusses P&T committee's formulary
7 systems process for the formulary system, which includes
8 safe and effective medications, which safe and effective
9 medications are the responsibility of the manufacturer to
10 uphold as part of their application process in seeking
11 approval, and then for review by a P&T committee and
12 consideration for the formulary. Exhibit 5 speaks to all
13 of that.
14 Q. But it doesn't speak to warranties, does it?
15 A. A warranty is the promise that that manufacturer
16 makes to -- to the people, to the world that their drug is
17 safe and effective. It is by that promise that they
18 suffice in doing that, that they obtain approval by the
19 FDA.
20 Q. Can you show me where Exhibit 5 discusses the
21 promise that a manufacturer makes to the world?
22 A. If you're looking for those words verbatim, you
23 would not find them, but --
24 Q. Okay.
25 A. -- if you are a clinical person or someone

Page 127

1 familiar with the ASHP or the formulary process, you would
2 understand the process around brand and generic drug
3 approvals, formulary process, P&T committees, this is what
4 we do, and it is industry practice that the drug must meet
5 safe and effective -- be in compliance in order to gain
6 approval by the FDA. Drugs that are not FDA approved would
7 never be part of a drug formulary.
8 Q. Okay. And even if not in those specific words, a
9 promise that a manufacturer makes to the world, can you
10 show me where in Exhibit 5 that concept is discussed?
11 A. Page 910 talks about evaluating medications for
12 inclusion on the -- in the formulary. That entire section
13 refers to the process by which evidence based data should
14 be used as part of the process.
15 Let me go back over here. The section on P&T
16 committee, the section on managing formulary systems, all
17 of those sections include the process that is accepted for
18 drugs that have -- that can be considered for formulary.
19 Q. Okay. Any other sections of Exhibit 5?
20 A. There is sections on Page 9 on -- Page 911,
21 sorry, generic drugs, formulary exceptions, subformularies,
22 therapeutic --
23 MR. MESTRE: Are you getting close to a moment
24 where you can --
25 A. Yeah. I'll just finish this.

Page 128

1 The entire document is a well constructed
2 document industry accepted by professionals as capturing
3 the process for -- capturing the process for medication
4 strategies, approvals, P&T functions, and placement on the
5 formulary. It really is -- provides a lot of insight that
6 the process is established and followed so that drugs can
7 be considered on the formulary if they have obtained FDA
8 approval by demonstrating that they are safe and effective
9 and it's throughout the document that that can be picked up
10 on.
11 BY MS. ISIDRO:
12 Q. And you cited Exhibit 5 as support for your
13 statement in Paragraph 47 of your report, correct?
14 A. Yes.
15 MR. HANSEL: Take a break?
16 MS. ISIDRO: We can go ahead and take a break
17 now.
18 THE VIDEOGRAPHER: The time is 3:09 p.m., and we
19 are going off record.
20 (Break taken.)
21 THE VIDEOGRAPHER: The time is 3:21 p.m., and we
22 are back on the record.
23 BY MS. ISIDRO:
24 Q. Doctor, in Paragraph 52 of your report, you state
25 that manufacturers are responsible for understanding their

Page 129

1 processes which includes presenting the presence of
2 unacceptable -- of unacceptable and impurities.
3 A. Right.
4 Q. What do you mean by the term impurities in that
5 paragraph?
6 A. Any substance that does not belong in the
7 medication.
8 Q. Do you understand -- let me rephrase that.
9 As you use them in your report, are the terms
10 contaminants and impurities interchangeable?
11 A. They --
12 MR. HANSEL: Object to the form.
13 A. They could be.
14 BY MS. ISIDRO:
15 Q. But I -- I'd like to know, specifically as you've
16 used them in your report, are you using the terms as
17 interchangeable?
18 A. Impurities or contaminants are items or things
19 present that should not be there and potentially dangerous,
20 not safe, and not effective.
21 Q. In your report are you referring to different
22 things when you use the term impurities than when you use
23 the term contaminants?
24 A. Within the scope of this case and this report
25 they can be looked at similar.

33 (Pages 126 - 129)

Page 130

1    Q.  Is there any distinction to you in your use of
2 the term impurities in your report versus your use of the
3 term contaminants in your report?
4    A.  No.
5    Q.  Do you know whether FDA views the terms
6 impurities and contaminants as interchangeable?
7    A.  I do not know if they view them as
8 interchangeable.
9    Q.  Okay.  What is your basis for the statement in
10 Paragraph 52 that manufacturers are responsible for
11 understanding their processes, which includes preventing
12 the presence of unacceptable and impurities?
13    A.  Manufacturers are the ones submitting their
14 application requesting approval; therefore, they are
15 responsible for all the information they provide within
16 that application.
17    Q.  And what are you relying on in stating that
18 conclusion?
19    A.  Manufacturers are submitting an ANDA in this --
20 in this case.  They are requesting that approval.  They are
21 providing the information.
22    Q.  So is that your personal opinion based on the
23 fact that they're the ones submitting the information?
24    A.  They are applying for approval, so they must
25 adhere to the requirements set forth by the FDA in order to

Page 131

1 obtain that approval.  So they must provide all of the
2 information required.  Manufacturers must provide that.
3    Q.  Must provide all of the information required
4 by --
5    A.  Required for consideration for approval of their
6 drug by the FDA, yes.
7    Q.  And that is what you are relying on in stating --
8 let me rephrase.
9      And that is what you are relying on in making
10 your statement in Paragraph 52?
11    A.  I'm relying on the fact that manufacturers submit
12 applications for drug approval.  It's a common, known fact.
13    Q.  Are you relying on any specific FDA regulations
14 in making your statement in Paragraph 52?
15    A.  I don't understand your question.
16    Q.  Are there any specific FDA regulations that
17 you're relying on in making your statement in Paragraph 52
18 of your report?
19    A.  The FDA regulates that if a manufacturer is
20 seeking approval of their drug, they must file -- if it's a
21 generic drug, which we're talking about specifically, they
22 must file an ANDA application and meet the requirements for
23 approval.
24    Q.  And is that a specific FDA regulation that you're
25 referring to or is that your general understanding?

Page 132

1    A.  That is the industry accepted understanding of
2 what -- if a manufacturer is seeking approval of their
3 drug, they must file an application with the FDA.  In the
4 case of a generic drug the application is called an ANDA
5 and that is filed with the FDA by the manufacturer who is
6 seeking approval of their drug.  That application must meet
7 the requirements set forth by the FDA to be compliant,
8 safe, and effective.
9    Q.  In Paragraph 55 you state that P&T committees and
10 TPPs rely on an Orange Book listing that a manufacturer™s
11 compliance means their drugs meet FDA regulations and as
12 such are suitable for formulary placement and reimbursable
13 under a prescription drug benefit plan.
14      What is the basis for this statement in Paragraph
15 55 of your report?
16    MR. HANSEL:  Object to the form.
17    A.  My education, experience, and familiarity with
18 P&T committees.
19 BY MS. ISIDRO:
20    Q.  Anything else?
21    MR. HANSEL:  Object to the form.
22    A.  I've answered the question.
23 BY MS. ISIDRO:
24    Q.  Okay.  So that is -- that is the only thing that
25 you're relying on making your statement in Paragraph 55 of

Page 133

1 your report?
2    MR. HANSEL:  Object to the form.
3    A.  As it pertains to generic drugs, yes.
4 BY MS. ISIDRO:
5    Q.  Okay.  And as it pertains to brand drugs?
6    A.  Brand drugs follow another process by the P&T
7 committee which is not the scope of this opinion.
8    Q.  Okay.  So does Paragraph 55 refer to anything
9 other than generic drugs, any other categories of drugs?
10    A.  Again, the Orange Book lists drugs that are
11 approved in the United States.  That's -- also includes
12 brand drugs as well as their generic approved drug product.
13      So to the extent that I understand your question,
14 P&T committees and TPPs will rely on the information in
15 part listed in the Orange Book that lists the approved
16 medications approved by the FDA for sale in the United
17 States or marketing in the United States.
18    Q.  And are you relying on anything other than your
19 education and experience in making that statement?
20    MR. HANSEL:  Object to the form.
21    A.  My experience with P&T committees.  Again, my
22 day-to-day functions are keeping knowledgeable with the
23 industry practice, functions, drug information.  That's all
24 part of what I do so I'm comfortable with what's required
25 or what components are essential.

34 (Pages 130 - 133)

Page 134

1  BY MS. ISIDRO:
2      Q.  And that is what you are relying on in making
3  your statements in Paragraph 55 of your report and nothing
4  else?
5          MR. HANSEL:  Object to the form.
6      A.  If we're being specific on a generic drug, the --
7  they will -- P&T committees will look to the Orange Book
8  for that substitutability rating.  Once that rating is --
9  once that drug has established that classification, it can
10  be considered for the formulary, if it has -- can -- it has
11  met FDA approval and it, in terms of generic drugs, is
12  really what the reference point is so.
13  BY MS. ISIDRO:
14      Q.  Okay.  And -- and what are you basing that answer
15  on?
16          MR. HANSEL:  Object to the form.
17      A.  Understanding how P&T committees work --
18  BY MS. ISIDRO:
19      Q.  Did --
20      A.  -- when -- with regards to generic drugs.
21      Q.  And the basis for that understanding?
22          MR. HANSEL:  Object to the form.
23      A.  My experience with P&T committees.
24  BY MS. ISIDRO:
25      Q.  Anything else?

Page 135

1          MR. HANSEL:  Object to the form.
2      A.  My education, experience, knowledge.
3  BY MS. ISIDRO:
4      Q.  Any specific documents or regulations?
5      A.  I've listed all the documents I've reviewed in
6  Appendix A.
7      Q.  Are there any documents listed in Appendix A that
8  you're relying on for purposes of the statement that you've
9  made in Paragraph 55 of your report?
10      A.  My entire report is based on all of the data and
11  documents in Appendix A and in addition to my education and
12  experience so.
13      Q.  Well, Doctor, I think we've identified specific
14  examples of paragraphs within your report that don't rely
15  on every document listed in Appendix A, correct?
16          MR. HANSEL:  Objection.  Mischaracterizes
17      previous testimony over and over again.  Object to the
18      form.
19  BY MS. ISIDRO:
20      Q.  You can answer the question.
21          MR. HANSEL:  Same objection.
22      A.  Appendix A lists the documents, materials that I
23  reviewed in putting together my expert opinion, a report.
24  I've reviewed all of those documents and taken them into
25  consideration for putting together my expert opinion,

Page 136

1  including my education and 20 plus years of experience
2  within this industry, including familiarity and knowledge
3  on P&T committees.
4  BY MS. ISIDRO:
5      Q.  Paragraph 56 again uses the term warranties.  Is
6  your use of the term warranties in Paragraph 56 referring
7  to the same thing that your use of the term warranty of
8  Paragraph 47 of your report refers to?
9          MR. HANSEL:  Object to the form.
10      A.  Yes.  It refers to the same.
11  BY MS. ISIDRO:
12      Q.  Okay.  What is the basis for your statement in
13  Paragraph 56 of your report?
14          MR. HANSEL:  Objection to form.
15      A.  When a drug is placed on the formulary, it's met
16  the -- it's met the approval criteria approved by the FDA,
17  so it's met that requirement.  It can be considered for
18  placement on the formulary, and based on that consideration
19  or inclusion on the formulary, third-party payors will
20  reimburse that on -- for that drug because it is included
21  on the formulary because it has met FDA approval for being
22  safe and effective.
23  BY MS. ISIDRO:
24      Q.  In Paragraph 57 you state in the case of
25  Valsartan, including VCDs warranties by the manufacturers

Page 137

1  were false.  What time frame are you referring to in that
2  statement?
3      A.  All of the time frame from which contaminants
4  were found in the drug.
5      Q.  And what was that time frame?
6          MR. HANSEL:  Object to the form.  Foundation.
7      Beyond the scope of the report.
8      A.  The time frame is beyond the scope of this report
9  and any of the time that the contaminants were in the drug
10  is -- you know, can be considered.
11  BY MS. ISIDRO:
12      Q.  So in -- in formulating your opinions in this
13  report, you didn't consider the time frame in which the
14  purported contaminants were found; is that correct?
15          MR. HANSEL:  Object to the form.
16      A.  I'm not sure I understand your question.  Could
17  you rephrase that?
18  BY MS. ISIDRO:
19      Q.  I'm just trying to understand your answer that
20  the time frame is outside of the scope of the report.
21      A.  I believe the time frame for the contaminants --
22  it's -- the time frame for the contaminants has been
23  questioned as to when the original contaminants were there,
24  how long they were there, length of time, and so on.  So I
25  cannot comment on -- on that, other than the fact that

35 (Pages 134 - 137)

Page 138

1  there were contaminants within the drug product.
2      Q.  Do you know when presence of NDMA in Valsartan or
3  any VCD was first reported?
4      A.  When it was first reported?  Can you be more
5  specific?  Reported by whom?
6      Q.  By anyone.
7      A.  Again, the time frame on -- I will not speculate
8  on -- on that time frame.  You're not being specific enough
9  when you say anyone.
10     Q.  When is the first report of NDMA in Valsartan or
11  a VCD that you are aware of?
12         MR. HANSEL:  Object to the form.
13     A.  In our -- in my professional capacity, we -- the
14  FDA had reported the contaminants to the world basically
15  so.
16  BY MS. ISIDRO:
17     Q.  When did that occur?
18     A.  I believe it was 2018 or thereabout.  I have
19  to -- I'd have to go back and reference the exact date.
20     Q.  Is that also the first report that you're aware
21  of with respect to NDEA in Valsartan or VCDs?
22         MR. HANSEL:  Object to the form.
23     A.  Yeah.  I can't speculate on those precise dates
24  of those -- each of those components.  I do know that they
25  were present though in the medication.

Page 139

1  BY MS. ISIDRO:
2      Q.  My question --
3      A.  I believe the dates are irrelevant.
4      Q.  Let me clarify my question because my question
5  didn't refer to dates and wasn't calling for dates, so let
6  me restate my question a different way.
7          You referenced a report by FDA to the industry or
8  the world with respect to called contaminants in Valsartan
9  or in VCDs, correct?
10     A.  The FDA issued a recall.  That's what I mean by
11  report.  They issued a recall on those drugs.
12     Q.  Is it your understanding that the recall that you
13  reference was initiated by FDA?
14     A.  The FDA issued the recall.  That's what I am
15  attesting to.  Who initiated the recall, again, what
16  matters is the FDA issued the -- the recall.
17     Q.  What do you mean by the term issued?
18     A.  They provided the guidance that this recall is
19  being set forth.
20     Q.  What is your understanding -- or what is the
21  basis for that statement?
22     A.  Public information found on the FDA website.
23     Q.  And the announcement of a recall was -- is that
24  the first report that you're aware of with respect to
25  presence of NDEA in Valsartan or VCDs?

Page 140

1      A.  Yes.
2      Q.  Do you know when FDA first set interim limits for
3  nitrosamines?
4      A.  No.
5      Q.  Do you know when FDA first established guidance
6  on control of nitrosamines?
7      A.  Nope.  That was not within the scope of my
8  report.
9      Q.  Okay.  In Paragraph 59 of your report you state
10  that the presence of the contaminant rendered the
11  manufacturer Defendant's versions of VCDs not equivalent to
12  the branded product.
13         What do you mean by the term contaminant in
14  Paragraph 59?
15         MR. HANSEL:  Object to the form.  That doesn't
16  read the entire sentence.
17  BY MS. ISIDRO:
18     Q.  Would you prefer if I read the entire sentence,
19  Dr. Panagos?
20     A.  You don't have to.
21     Q.  Okay.  What did you mean by the term contaminant
22  in Paragraph 59 of your report?
23     A.  I referred to item present that should not have
24  been present, not consistent with the reference listed drug
25  product, and in this case unacceptable levels of a probable

Page 141

1  human carcinogen.
2      Q.  Is there a specific probable human carcinogen
3  that you are referring to?
4      A.  The ones found within the drug that should not
5  have been there.
6      Q.  And which ones were those?
7      A.  Both of the contaminants that are -- you've
8  referenced.
9      Q.  I'm sorry, I didn't reference any specific
10  contaminants in my question.
11     A.  You asked me about the contaminants in the
12  previous question where you asked if I -- something about
13  the FDA process around those.
14         So to the extent that I understand your question,
15  I will answer and say that both of the contaminants in the
16  case of these drugs represent a deviation from the
17  reference listed drug product and not equivalent.
18     Q.  Do you remember the names of those two
19  contaminants that you're referring to in your response?
20     A.  They are listed within my report in Section 4,
21  Number 12.  NDA- -- NDEA and NDMA.
22     Q.  Okay.  In Paragraph 59 of your report -- let me
23  rephrase that.
24         What is the basis for your opinion that the
25  presence of the contaminant rendered the manufacturer

36 (Pages 138 - 141)

1   Defendant's versions of VCDs not equivalent to the branded
2   product?
3       A.   The contaminants were not in the branded product
4   and therefore the generic drug could not have been
5   equivalent to the branded product by the presence of the
6   contaminants within the product, within the medication.
7       Q.   In the first half of 2018 do you know whether the
8   branded product was being tested for NDMA?
9       A.   No.   That was not within the scope of this
10  report.
11      Q.   In the first half of 2018 do you know whether the
12  branded product was being tested for NDEA?
13      A.   No.   That was not within the scope of this
14  report.
15      Q.   At any point prior to 2018 do you know whether
16  the branded product was being tested for NDMA?
17      A.   Same response; not within the scope of this
18  report.
19      Q.   And at any point prior to 2018 do you know
20  whether the branded product was being tested for NDEA?
21      A.   Again, not within the scope of this report.
22      Q.   Section 6 of your report you provide summary of
23  your opinions; is that correct?
24      A.   Yep.
25      Q.   And Item B under this summary of opinions again

1   mentions the term warranty.   Is the term warranty being
2   used in that item 6B in the same way as it is being used in
3   Paragraph 47 of your report.
4           MR. HANSEL:   Object to the form.
5       A.   Yes.
6   BY MS. ISIDRO:
7       Q.   In Item D under Section 6, you state that the
8   generic manufacturer -- that -- excuse me.   You state that
9   if the generic manufacturer of product changes in any way
10  from the original product on the ANDA approval, then this
11  changed product is not the same as the brand name
12  medication.
13          What is your basis for that statement in Item D
14  under Section 6 of your report?
15          MR. HANSEL:   Object to the form.
16      A.   Any changes to a generic drug product should be
17  reported to the FDA.   The ANDA in -- in this case or the
18  medications in this case with the contaminants inconsistent
19  with the ANDA submitted for approval.
20          MS. ISIDRO:   Can you read back that last sentence
21      in the answer?   I didn't hear the whole thing.   I'm
22      sorry.
23          (The requested portion was read back.)
24  BY MS. ISIDRO:
25      Q.   Are ANDA holders permitted to make changes to

1   their original ANDA submissions, if you know?
2       A.   They must be reported to the FDA.   Any changes
3   must be reported to the FDA, submitted to the FDA.
4       Q.   In the second part of Statement D under Section 6
5   of summary opinions, you state that equivalence is nulled
6   and the generic manufacturer may no longer rely on the
7   brand name drug label?
8       A.   Right.
9       Q.   What is the basis for that statement in Section
10  6D of your report?
11      A.   Uh-huh.   The two --
12          MR. HANSEL:   Object to the form.
13      A.   The generic drug label no longer is identical or
14  matches the -- the brand drug label is -- is inaccurate and
15  cannot be deemed equivalent, safe, or effective.
16  BY MS. ISIDRO:
17      Q.   And what is your basis for that statement?
18          MR. HANSEL:   Object to the form.
19      A.   For a substitutability to be applied to a
20  particular drug, they must demonstrate that they are safe
21  and effective.   Deviation from that would thereby not
22  demonstrate that.
23  BY MS. ISIDRO:
24      Q.   In Statement I under Section 6 you state that the
25  warranty from manufacturers for this products -- for these

1   products turned out to false.   Is your use --
2       A.   To be false.   Yes.
3       Q.   So it should say to be false there?
4       A.   Uh-huh.
5       Q.   Okay.   Is your use of the term warranty here in
6   this Statement 6I of your report, are you using that term
7   warranty there in the same way -- let me rephrase that
8   question.
9           Are you using the term warranty in Section 6I of
10  your report in the same way that you're using it in
11  Paragraph 47 of your report?
12          MR. HANSEL:   Object to the form.
13      A.   Yes.
14  BY MS. ISIDRO:
15      Q.   What is your basis for the statement in Paragraph
16  6I of your report that the warranty from manufacturers for
17  these products turned out to be false?
18          MR. HANSEL:   Object to the form.
19      A.   The presence of the contaminants in unacceptable
20  levels of probable human carcinogens, misrepresented with
21  inaccurate -- did not adhere to the promise they made,
22  stating that their drug met the criteria set forth by the
23  FDA for approval, which includes that to be that the drug
24  is safe and effective and identical to the brand drug --
25  reference listed drug.

37 (Pages 142 - 145)

Page 146

1    BY MS. ISIDRO:
2        Q.   You used the phrase unacceptable levels --
3        A.   Uh-huh.
4        Q.   -- in your response.  What do you mean by
5    unacceptable levels?
6        A.   Unacceptable levels is a -- what the FDA
7    referenced in referring to the contaminants, and I will --
8    I adhere to the terms that they use.
9        Q.   And you say what -- what the FDA referenced.
10   Where do you mean --
11       A.   When they --
12       Q.   -- that the FDA referenced that?
13       A.   Sorry.
14       Q.   If you could just let me finish my question.
15   Sorry.
16       A.   Uh-huh.
17       Q.   Where are you referring to that the FDA
18   referenced that?
19       A.   On their website.
20       Q.   In what context?
21       A.   In the context of the recall.
22       Q.   In the context of the recall.  The 2018 recall?
23       A.   The recall of Valsartan.
24       Q.   You also state in Paragraph 6I of your report
25   that TPPs paid for medications that they should not have

Page 147

1    based on the manufacturer's false representation?
2        A.   That is correct.
3        Q.   What is your basis for that statement?
4            MR. HANSEL:  Object to the form.
5        A.   Medication would not have been approved with the
6    contaminant and it would not have been considered for an
7    inclusion on a drug formulary and it would not have been
8    reimbursed in any way by a TPP if it was not approved.
9    BY MS. ISIDRO:
10       Q.   Okay.  Is there anything else that you're basing
11   the statement in Paragraph 6I, that TPPs paid for
12   medications that they should not have based -- should not
13   have based on the manufacturer's false representation?
14           MR. HANSEL:  Object to the form.
15       A.   TPPs should not have paid for contaminated
16   medication.
17   BY MS. ISIDRO:
18       Q.   What is your basis for that statement?
19           MR. HANSEL:  Object to the form.
20       A.   The presence of the contaminants within the
21   medications.
22   BY MS. ISIDRO:
23       Q.   Anything else?
24       A.   My statement I -- is accurate the way it's
25   written.

Page 148

1        Q.   Are you aware that FDA has said patients taking
2    prescription medications with potential nitrosamine
3    impurities should not stop taking their medications?
4            MR. HANSEL:  Object to the form.
5        A.   I am aware.
6    BY MS. ISIDRO:
7        Q.   Do you have any knowledge as to the levels of
8    NDMA or NDEA that were found in any particular lot of
9    Valsartan-containing drugs?
10       A.   That was not within the scope of this report.
11       Q.   So, no, you don't have any knowledge as to those
12   levels?
13           MR. HANSEL:  Object to the form.
14       A.   The specific levels, no.
15   BY MS. ISIDRO:
16       Q.   Do you know whether there were certain lots of
17   recalled Valsartan that did not contain any detectable NDMA
18   or NDEA?
19           MR. HANSEL:  Object to the form.
20       A.   Again, not within the scope of this report.  I
21   cannot speculate.
22   BY MS. ISIDRO:
23       Q.   Okay.  So you don't know one way or the other?
24           MR. HANSEL:  Object to the form.  Assumes facts
25   not in evidence.

Page 149

1        A.   I would have to review.  I cannot speculate to
2    that.
3    BY MS. ISIDRO:
4        Q.   So because you're saying you cannot speculate,
5    that means you don't know for a fact one way or the other,
6    correct?
7            MR. HANSEL:  Object to the form.
8        A.   I'm not sure what you mean by one way or another.
9    Could you clarify?
10   BY MS. ISIDRO:
11       Q.   Do you know one way or another whether there were
12   certain lots of recalled Valsartan that did not contain any
13   detectable NDMA or NDEA?
14       A.   No.
15       Q.   Dr. Panagos, would you agree that the main
16   criterion for the inclusion of any product in the Orange
17   Book is that the product is the subject of an application
18   with an approval that has not been withdrawn for safety or
19   efficacy reasons?
20       A.   Current approval, yes.
21       Q.   And you would agree that FDA determines
22   bioequivalence, correct?
23       A.   It's one of the factors that they look for when
24   evaluating drug applications.
25       Q.   In order to -- in order for a prescription drug

38 (Pages 146 - 149)

Page 150

1 product to be considered bioequivalent to another drug
2 product, FDA has to make that determination, correct?
3     A.  It's part of the --
4         MR. HANSEL:  Objection to form.
5     A.  It's part of their consideration.
6 BY MS. ISIDRO:
7     Q.  Is there any other entity that is tasked with
8 determining bioequivalence for prescription drug products
9 in the United States besides FDA?
10    A.  Not to my knowledge.
11    Q.  And FDA's determination as to bioequivalence is
12 made individually for each manufacturer and each product,
13 correct?
14    A.  For each submitted application, each ANDA is
15 evaluated individually.
16    Q.  Okay.  FDA may change a product's therapeutic
17 equivalence rating if the circumstances giving rise to a
18 violation call into question the agency's assessment of
19 whether a product meets the criteria for therapeutic
20 equivalence, correct?
21    A.  Yes.
22    Q.  During the time frame that -- let me rephrase
23 that.
24        Prior to the Valsartan recall in 2018, FDA did
25 not take any steps that would reflect a determination that

Page 151

1 the products were no longer therapeutically equivalent,
2 correct?
3     A.  Not to my knowledge.
4     Q.  You didn't review bioequivalence studies for any
5 manufacturer Defendant's Valsartan-containing products, did
6 you?
7     A.  No.
8     Q.  Did you consult with any actual P&T committees
9 about the inclusion of Valsartan on a formulary?
10    A.  Could you be more specific?
11    Q.  How do you mean?
12    A.  Valsartan is a generic drug.
13    Q.  Uh-huh.
14    A.  It would meet criteria for inclusion on the
15 formulary if it is approved by the FDA following an ANDA
16 application that meets the criteria for approval set forth
17 by the FDA which -- including safety and effectiveness.
18    Q.  Have you personally consulted with any actual P&T
19 committees about the inclusion of Valsartan on a formulary?
20    A.  I'm going to ask you to specify on time frame.
21    Q.  Ever.
22    A.  Following the recall it is -- the -- P&T
23 committees had to kind of create a strategy around how to
24 move forward with that information as it pertains to their
25 drug formularies, and on behalf of my clients I was -- it

Page 152

1 was important to me to know what their strategy was going
2 to be.
3     Q.  In coming up with your opinions in this
4 litigation, did you consult with any P&T committees about
5 the inclusion of Valsartan on a formulary?
6     A.  No.
7     Q.  And in coming up with your opinions in this
8 litigation, did you consult with any P&T committee about
9 its use of the Orange Book?
10    A.  No.  Because I -- I know that's what they use.
11    Q.  And in coming up with your opinions in this
12 litigation, did you consult with any TPPs about the
13 inclusion of Valsartan on a formulary?
14    A.  No.
15    Q.  In coming up with your opinions in this
16 litigation did you consult with any TPP about its use of
17 the Orange Book?
18        MR. HANSEL:  Object to form.
19    A.  Let me clarify that TPPs and committees, it is
20 industry practice that they refer to the authoritative
21 source known as the Orange Book for substitutability, for a
22 list of drugs that are approved by the FDA marketed in the
23 United States.
24        This is an ongoing, continual process, and in my
25 day-to-day functions in my role as a clinical pharmacist

Page 153

1 and a consultant, those are the responsibilities that are
2 consistent in industry and what are adhered -- are adhered
3 to.
4 BY MS. ISIDRO:
5     Q.  In formulating your opinions in this litigation,
6 did you consult with any TPP about its use of the Orange
7 Book?
8     A.  The use of the Orange Book is an established
9 process that is widely accepted and respected.  It is the
10 source of truth in terms of approved products, approved by
11 the FDA and substitutable.  It is the source of truth.  It
12 is relied upon by P&T committees for their generic
13 medications to be considered for inclusion on the
14 formulary.  That does not change.
15    Q.  Dr. Panagos, at this time I'm not asking you
16 about the basis of your opinions with respect to a TPP's
17 use of the Orange Book in general.  I am asking you
18 whether, in formulating your opinions in this litigation,
19 did you consult with any TPP about its use of the Orange
20 Book?
21    A.  No, I did not need to consult with them because
22 I'm confident that is the process that is adhered to.
23    Q.  Let's -- let's go ahead and take a break.
24        THE VIDEOGRAPHER:  It's 4:10 p.m., and we're
25 going off the record.

39 (Pages 150 - 153)

Page 154

1        (Break taken.)
2        THE VIDEOGRAPHER:  It is 4:34 p.m., and we are
3    back on the record.
4        MS. ISIDRO:  Dr. Panagos, I may have some further
5    follow-up for you at -- in a little bit, but I don't
6    have any further questions for you right now.
7        As I mentioned previously, there are some folks
8    on Zoom and I'm not sure whether any of them have any
9    questions for you right now.
10       MR. GISLESON:  Actually, I do have a few
11   questions.  Can you hear me?
12       MR. KERNER:  We can.
13       THE WITNESS:  Yes.
14            CROSS-EXAMINATION
15   BY MR. GISLESON:
16   Q.  Hey, Doctor.  My name is John Gisleson.  I
17   represent a manufacturer named Aurobindo.  Have you heard
18   of Aurobindo before?
19   A.  Yes.
20   Q.  And are you aware that Aurobindo is a
21   manufacturer of Valsartan and Valsartan-containing drugs?
22   A.  Yes, I'm aware.
23   Q.  Did you become aware of any public information
24   that certain batches of Aurobindo Valsartan or
25   Valsartan-containing drugs contained nitrosamine

Page 155

1    A.  I was aware that there were contaminants within
2    Valsartan products.
3    Q.  Did you learn what those contaminants were?
4    A.  The contaminants are referenced within my report,
5    Section 4 --
6    Q.  What was the name of the contaminants?
7    A.  -- Page -- Section 4, excuse me, Page 2, Number
8    12, NDEA and NDMA.
9    Q.  Before this lawsuit and you were hired as an
10   expert, had you ever heard the word nitrosamine before?
11   A.  Yes.
12   Q.  In what context?
13   A.  I am a New York State licensed pharmacist,
14   clinical pharmacist, and in my role, my day-to-day
15   functions, it is my responsibility to understand
16   medications -- FDA medications, approved medications, and
17   any concerns surrounding those medications is part of my
18   responsibility.
19   Q.  And how did you learn what nitrosamine are?
20   A.  There is a component of toxicology that is
21   included in our pharmacy education; however, that was --
22   that is not within the scope of my report or the opinion
23   that I'm rendering here.
24       With regards --
25   Q.  Do you know how nitrosamine perform --

Page 156

1        MR. HANSEL:  Excuse me.  Excuse me, Mr. Gisleson?
2        MR. GISLESON:  Yes?
3        MR. HANSEL:  Please let Dr. Panagos finish her
4    answer.  This is the second --
5        MR. GISLESON:  I'm sorry.  I thought she was
6    finished.
7        MR. HANSEL:  This is the second time you've
8    interrupted her and perhaps there's a lag.  So please
9    give her a moment to make sure -- sometimes she thinks
10   about her answer carefully before she's finished.
11   Thank you.
12       MR. GISLESON:  That's helpful.  Thanks for
13   letting me know.
14   BY MR. GISLESON:
15   Q.  I'm sorry, you can continue.
16   A.  I just want to make -- go back the original
17   question.
18       THE WITNESS:  Could you please restate his
19   original question?
20       MR. HANSEL:  And could you please restate her
21   partial answer.  Thank you.
22       (The requested portion was read back.)
23   A.  Okay.  So any time there is a contaminant or
24   there is an issue with a medication, it is my
25   responsibility to understand that as it pertains to the

Page 157

1    scope of my work and my responsibilities as a pharmacist
2    and as a prescription -- a pharmacy benefit consultant.
3    And so with regards to the generic drugs in this case,
4    those contaminants should not have been there.
5    BY MR. GISLESON:
6    Q.  When did you learn of the presence of
7    nitrosamines in Valsartan-containing drugs?
8    A.  When the FDA issued the recall.
9    Q.  Do you know whether that became publicized in the
10   third-party payor and PBM industries about the recall or
11   voluntary recall of Valsartan-containing drugs?
12   A.  Yes.
13   Q.  Did you speak with different individuals in the
14   industry about the recall?
15   A.  Yes.  As it pertains to my clients.
16   Q.  Did you, personally, recommend that any of your
17   clients remove a Valsartan-containing drug from their
18   formulary because it was reported to have the presence of
19   nitrosamines?
20       MR. HANSEL:  Objection.  This gets into a number
21   of areas that I want to comment on.  This is
22   confidential and Dr. Panagos appears today in her
23   capacity as an expert witness, not in her capacity as
24   a senior vice president or executive vice president of
25   ARMSRx, and to ask her about her advice to her

Page 158

1    confidential clients is outside the permitted scope of
2    this examination.
3    BY MR. GISLESON:
4        Q.  Can you identify any of the clients for whom you
5    work pertaining to formulary issues?
6        A.  I don't think I understand your question.
7            Do you want me to --
8        Q.  Do you consider all of your clients to be
9    confidential?
10       A.  Yes, I do.
11       Q.  Is it correct that you can't identify then any
12   client for whom you have done work concerning a formulary
13   because you consider all of your clients to be
14   confidential?
15       A.  You have to rephrase that question.  It did not
16   make sense.
17       Q.  Do you consider every single one of the clients
18   for whom you have provided counseling on formulary issues
19   to be confidential?
20       A.  My clients that I provide consulting on, that
21   information is confidential, but if you're -- so I'm not
22   sure what you're asking exactly.
23       Q.  Are there any clients that you can identify for
24   whom you have provided consultation or advice concerning
25   inclusion of drugs in a formulary?

Page 159

1            MR. HANSEL:  Object to the form.  Do you mean
2        identify in her mind or --
3            MR. GISLESON:  The names.
4            MR. HANSEL:  -- or testify to because they're
5        confidential -- you know, because they're not
6        confidential?
7            MR. GISLESON:  Correct.
8    BY MR. GISLESON:
9        Q.  Are there any that you can identify that you do
10   not consider to be confidential so that we can have an idea
11   of the kinds of companies that you have counseled on
12   formulary issues?
13           MR. HANSEL:  Just on the confidentiality issue,
14       she can testify about the kinds of companies.
15   BY MR. GISLESON:
16       Q.  Can you identify any third-party payor for who
17   you have -- for whom you have performed work?
18           MR. HANSEL:  Object to the form.
19       A.  My clients include self-insured employers,
20   third-party payers.  I've -- I've indicated those within my
21   expert report.
22   BY MR. GISLESON:
23       Q.  Can you identify any of them by name?
24           MR. HANSEL:  Objection.  Asked and answered.
25       Confidential.

Page 160

1        A.  That information is confidential and does --
2    isn't pertinent to -- or within the scope of this opinion.
3    BY MR. GISLESON:
4        Q.  So you are -- are refusing to identify the names
5    of any third-party payors in any prescription benefit
6    management companies for whom you have done work; is that
7    correct?
8            MR. HANSEL:  Object to the form.  It's not a
9        refusal.  She is bound by client confidentiality, so
10       she is complying with her obligation to maintain
11       client confidentiality.
12           She's not refusing to do anything, Counselor.
13   BY MR. GISLESON:
14       Q.  You will not answer or identify the names of any
15   of the TPPs or PBMs for whom you have done work because, in
16   your view, you're bound by confidentiality agreements that
17   prohibit you from identifying the names of those companies;
18   is that right?
19       A.  Yes.  And I will respect those.
20       Q.  Now, since the time that it became public that
21   certain manufacturers of Valsartan-containing drugs found
22   the presence of nitrosamines in certain batches of their
23   products, are you aware of any TPP anywhere in the country
24   that removed a drug manufacturer from its formulary based
25   on recall?

Page 161

1            MR. HANSEL:  Object to the form.
2        A.  Based on the recall there were strategies put
3    into place, thoughtful, careful strategies put into place
4    with guidance from the FDA.
5    BY MR. GISLESON:
6        Q.  Strategies to do what?
7        A.  How to best manage the recall as it pertains to
8    patients who were taking those drugs and the best way
9    for -- you know, to handle that.
10       Q.  Can you identify any TPP anywhere in the country
11   that removed one of the Defendant's VCDs from their
12   formulary because of the recall?
13       A.  In which time frame?
14       Q.  At any point after the recall was publicized.
15       A.  That was not within the scope of this report.
16   Again, strategies were put into place to efficiently manage
17   the recall, ensure that patients are not hurt by that.
18       Q.  Right.  But this goes to your opinion that the
19   manufacturer warranty for these VCDs was false.  TPPs
20   unjustly paid for medications for which they have not have
21   paid.
22       A.  Right.
23       Q.  My question is:  Can you identify any TPP
24   anywhere in the country, in the United States, that removed
25   one of the Defendant's products from its formulary

41 (Pages 158 - 161)

Page 162

1  following the recall?
2      A.  Following the recall, there were strategies put
3  in place that included those particular NDCs no longer
4  being a part of the formulary.
5      Q.  Were they removed formally from the formularies?
6      A.  I cannot speculate.  They -- they were just
7  not -- they were blocked.
8      Q.  Okay.  So the question's specific.  Can you
9  identify any TPP anywhere in the country that, in fact,
10 removed a manufacturer's VCD from its formulary following
11 the recall?
12     A.  I will go back and say that TPPs or PBMs blocked
13 the -- the drugs that were contaminated.  That time frame
14 is some point after the recall, after sufficient or
15 adequate strategy was put through to -- based on the
16 recommendations and guidance of the FDA.
17     Q.  What do you mean by blocked?
18     A.  The claims were no longer being adjudicated.
19     Q.  What do you mean by no longer adjudicated?
20     A.  If a patient went to the pharmacy with an NDC --
21 with a drug that had an NDC -- for a drug that had an NDC
22 that was a contaminated product, those NDCs would not
23 process -- they would not process on the claim's
24 adjudication so that -- because they were contaminated.
25     Q.  So because the VCDs were blocked, at that point

Page 163

1  the TPP did not pay for any of the VCDs at that point?
2  Strike that.
3      Because the NDC for the BDC was blocked, did that
4  mean that the TPP did not pay for a prescription for that
5  patient?
6      A.  I cannot speculate and that was not within the
7  scope of this report or the opinion that I'm rendering here
8  today.  I do know that the TPPs paid for contaminated
9  products where they should not have because they were not
10 safe and effective.
11     At -- after the FDA issued the recall, there had
12 to be a careful, thoughtful strategy, there was guidance,
13 and so I can't say with certainty that they didn't continue
14 to pay for those claims.
15     Q.  Well, based on your industry expertise, can you
16 identify any TPP who, in fact, paid for a VCD that had the
17 presence of nitrosamine?
18     MR. HANSEL:  Object to the form.  Beyond the
19     scope of the report.  Asked and answered.
20 BY MR. GISLESON:
21     Q.  You can answer.
22     A.  As part of my day-to-day responsibilities, I
23 review claims data that consists of medications and --
24 including possibly these medications with the contaminants.
25     Q.  Can you identify by name any TPP that paid for a

Page 164

1  VCD that had the presence of nitrosamine?
2      A.  If a TPP had the generic drug on their formulary
3  during the time frame for which the contaminants were
4  found, they, in that entirety of that time frame, they
5  essentially paid for something they should not have.
6      Q.  Can you identify any TPP anywhere in the United
7  States that sought a refund from a manufacturer as a result
8  of a beneficiary consuming a VCD that contained a
9  nitrosamine?
10     A.  That's not within the scope of my report or
11 opinion I've been asked to render.
12     Q.  Can you identify any such TPP or PBM anywhere in
13 the country who sought a refund because a patient consumed
14 a VCD that had the presence of nitrosamine?
15     A.  What do you mean by a refund?
16     Q.  Said that they paid for a VCD for one of their
17 beneficiaries and should not have because it contained
18 nitrosamine?
19     MR. HANSEL:  Objection.  Calls for a legal
20     conclusion.
21     A.  I'll go back and say that TPPs paid for a drug
22 that was placed on the formulary because it had sufficed
23 the criteria for approval as set forth by the FDA, and, as
24 such, paid for the claims for those drugs where they should
25 not have.

Page 165

1  BY MR. GISLESON:
2      Q.  Well, you say they shouldn't have, but my
3  question is are you aware of any TPP anywhere in the United
4  States that sought to be reimbursed from a manufacturer
5  because the manufacturer's VCD contained nitrosamine?
6      MR. HANSEL:  Objection.  Calls for a legal
7      conclusion.
8      A.  It is my understanding that TPPs are -- were,
9  from the economic standpoint, negatively affected by
10 these -- payment of these drugs.
11 BY MR. GISLESON:
12     Q.  Understanding.  How?
13     A.  They paid for the drugs during the time period
14 for which they should not have because they were
15 contaminated.  That information is found within claims
16 data.
17     Q.  Can you identify a single TPP that sought a
18 refund prior to this lawsuit being filed because it paid
19 for a VCD consumed by a beneficiary that contained
20 nitrosamine?  And if you can't, that's fine.  I'm just
21 asking based on your industry experience and contacts if
22 you're aware of any TPP that sought a refund.
23     A.  I believe that information is within the
24 complaint.
25     Q.  And that's the only basis for that information

42 (Pages 162 - 165)

Page 166

1  that you have?  None from your own personal experience?
2      A.  That is correct.
3      Q.  Now, you said that once the recall was announced,
4  it was necessary for TPPs to manage how to respond to the
5  recall; is that right?
6      A.  They needed to understand the recall and then
7  determine a strategy.
8      Q.  Did you have an understanding as to what the
9  strategies were that were implemented by TPPs as a result
10  of the recall?
11      A.  Based on FDA guidance.
12      Q.  What do you mean?
13      A.  The recommendations that FDA made as a response
14  to the recall and the concern about the safety of the drug
15  and how to handle that.
16      Q.  Did you become aware that the FDA issued
17  acceptable intake levels?
18          MR. HANSEL:  Objection.  Beyond the scope.
19      Object to the form.
20  BY MR. GISLESON:
21      Q.  You can answer.
22      A.  The FDA commented that the recall was attributed
23  to unacceptable levels of a probable human carcinogen
24  within the medication.
25      Q.  In your experience, did the third-party payors

Page 167

1  and the PBMs become aware that there were acceptable intake
2  levels of nitrosamine impurities in Valsartan and
3  Valsartan-containing drugs?
4          MR. HANSEL:  Object to the form.  Foundation.
5      Object to the foundation.
6      A.  Are you --
7  BY MR. GISLESON:
8      Q.  Let me start over.
9          You communicate with TPPs, right?
10      A.  Yes.
11      Q.  And on and after the recall of
12  Valsartan-containing drugs, you communicated with TPPs; is
13  that correct?
14      A.  Yes.
15      Q.  Approximately how many different TPPs have you
16  communicated with following the recall of the -- of the
17  VCDs?
18      A.  Not sure.
19      Q.  Can you approximate in any way?
20      A.  I do not wish to do that.
21      Q.  Being conservative, is it more than a hundred?
22      A.  No.
23      Q.  Is it more than fifty?
24      A.  No.
25      Q.  Is it more than ten?

Page 168

1      A.  No.
2      Q.  So following the recall, is it more than --
3  strike that.
4          Is it more than five TPPs with whom you've had
5  contact since the recall of -- of VCDs?
6      A.  Again, my clients can include TPPs, self-insured
7  employer groups.  So I've been in contact -- I was in
8  contact with all of them.  I think the number is
9  irrelevant.
10      Q.  In your experience, you certainly advise all
11  those different clients that there were acceptable intake
12  levels for VCDs containing nitrosamines, right?
13          MR. HANSEL:  Object to the form.
14      A.  I advised the clients what the FDA set forth in
15  terms of the recall, the strategy, their recommendation,
16  and guidance.
17  BY MR. GISLESON:
18      Q.  So understood then that for VCDs that
19  contained nitrosamines within the acceptable intake level,
20  that patients could continue to consume those VCDs,
21  correct?
22          MR. HANSEL:  Object to the form.
23      A.  Those -- that drug is taken for cardiovascular
24  issues, hypertension.  A very serious health condition, one
25  for which a patient has to be closely followed, monitored

Page 169

1  by their prescriber, and it is never advisable to abruptly
2  stop a medication like that because of the critical nature
3  for which it's used.
4          How to carefully mitigate the recall and the
5  issues surrounding the recall at the time were of --
6  paramount of importance to my clients, and that's what I
7  did.
8  BY MR. GISLESON:
9      Q.  So what you're saying is that TPPs wanted to
10  ensure the health and safety of their beneficiaries who
11  needed to take VCDs, right?
12          MR. HANSEL:  Objection.  Mr. Gisleson, I'm going
13  to cut off this line of questioning.
14      I object to the form.  It is outside the scope of
15  her report.  You have asked about this issue 12
16  different Ways.  The witness has attempted to be
17  cooperative, even though testifying that it is outside
18  the scope of her report.
19      The report does not get into this.  You're asking
20  about her professional activities for a company that
21  is not the expert in this case.  Dr. Panagos is
22  appearing individually, not on behalf of her employer
23  for whom she did that work.  The work is also
24  confidential.  So we're going to need to move on to
25  another topic.

Page 170

1  BY MR. GISLESON:
2    Q. You said that the manufacturer warranty for these
3  VCDs was false. TPPs unjustly paid for medications for
4  which they should not have paid. Based on your serving as
5  an expert in this case, are you aware that there were TPPs
6  who paid for medications containing nitrosamines because
7  the patients needed those medications for health reasons?
8    A. I understand that there -- in the strategy, that
9  some strategies that took place were advising patients
10  never to abruptly stop their medication and to consult with
11  their prescriber as to a suitable transition.
12    Q. Did different patients have different transition
13  periods?
14    MR. HANSEL: Excuse me. Mr. Gisleson, I have
15    really tried to accommodate your questioning. I know
16    you're trying to tie it to the report. Asking about
17    patients of her clients now is unacceptable.
18    MR. GISLESON: I'm not asking about her client's
19    patients.
20    MR. HANSEL: Well, I'm going to instruct the
21    witness not to answer any questions about the patients
22    of her clients of ARMSRx, which is not the testifying
23    entity here.
24    Do not answer any questions about patients of
25    ARMSRx clients.

Page 171

1  BY MR. GISLESON:
2    Q. Well, Doctor, do you know anything about TPPs and
3  how they managed for the recall who are not your clients?
4    A. In general TPPs were managing the recall in a --
5  in a way that would allow access. As I said before, we --
6  not -- access, ensuring that patients can have time frame
7  to transition to a non-contaminated product.
8    Q. Over what time period did that transition occur,
9  to your knowledge?
10    A. That's not within the scope of my report and
11  that -- that's very patient specific information on how and
12  when a patient consults with their prescriber and
13  pharmacist in their individual case on how to transition to
14  a non-contaminated FDA approved product.
15    Q. Do you know what the FDA definition of
16  bioequivalence is?
17    MR. HANSEL: Objection. Asked and answered.
18    This was gone over in great detail by Attorney Isidro.
19    MR. GISLESON: I don't think we got a clear
20    answer to it.
21  BY MR. GISLESON:
22    Q. Do you know what the FDA definition is of
23  bioequivalence?
24    MR. HANSEL: Object to the form.
25    A. Page 6, Section E under 33 has the definition for

Page 172

1  bioequivalent drug products.
2  BY MR. GISLESON:
3    Q. You looked at that definition before preparing
4  your report?
5    MR. HANSEL: Object to the form. It's in the
6    report.
7    A. I'm not --
8  BY MR. GISLESON:
9    Q. Did you ever have occasion before being retained
10  as an expert in this case to look at the FDA definition of
11  bioequivalence?
12    A. It's part of the scope of my profession.
13    Q. Pardon me?
14    A. It's within the scope of my profession as a
15  pharmacist that bioequivalent is within that knowledge
16  base.
17    Q. Right. But did you read the FDA definition of
18  bioequivalence at any point before you became retained as
19  an expert in this lawsuit?
20    A. Possibly. I read many, many data, information,
21  articles, studies, part of what I do day-to-day. I mean.
22    Q. Do you have any personal experience with the
23  manufacturing of pharmaceutical products?
24    A. No.
25    Q. You said in your report at Paragraph 46 TPPs and

Page 173

1  P&T committees expressly rely upon the manufacturers
2  compliance with all applicable standards, obligations, and
3  regulations. What actions, in your experience, do TPPs
4  take to determine whether manufacturer's complied with
5  applicable standards, obligations, and regulations?
6    A. They reference the Orange Book, that if a drug is
7  listed in the Orange Book, it means that it has been
8  assigned FDA approval, been given FDA approval, which means
9  that they had sufficed -- fulfilled the requirements of the
10  ANDA, which includes that their drug is safe and effective.
11    Q. Anything else?
12    A. If we're referring to generic drugs, this is the
13  authoritative source.
14    Q. When did TPPs begin to implement a block on VCDs
15  based on the recall?
16    MR. HANSEL: Objection. This is beyond the scope
17    of her report. I permitted some questions about this.
18    I believe you've beaten that horse pretty thoroughly.
19    It's not part of her report, she's not being proffered
20    as an expert on that issue, and I would just ask you
21    to please move on.
22    MR. GISLESON: No. I haven't beaten this horse.
23    I'm still riding it and it's still healthy and in good
24    shape. This goes directly to her opinion that TPPs
25    unjustly paid for medications which they should not

44 (Pages 170 - 173)

Veritext Legal Solutions
800-227-8440                                               973-410-4040

Page 174

1    have paid; if there was a block, they didn't pay.
2    BY MR. GISLESON:
3        Q.  So do you have an understanding as to what period
4    of time TPPs implemented blocks concerning VCDs that were
5    found to have the presence of nitrosamines?
6        MR. HANSEL:  Object to the form.
7        A.  The strategy that TPPs put in place following the
8    recall is not a universal strategy across all TPPs and how
9    they did that and when they did that is very much within
10   that entity and was -- is not within the scope of my
11   report, nor what -- what I was asked to render an opinion
12   on.
13       What I do attest to is that TPPs paid for the
14   drugs that were contaminated, would not have been FDA
15   approved with the contaminant because they would not have
16   been the same as the referenced labeled drug.  So it's
17   really as simple as that.
18   BY MR. GISLESON:
19       Q.  If someone wants to know what strategy a
20   particular TPP followed in response to the recall of VCDs,
21   it's necessary to ask that TPP?
22       MR. HANSEL:  Object to the form.  Again, this is
23   outside the scope of her report.
24   BY MR. GISLESON:
25       Q.  You can answer.

Page 175

1        A.  I don't know that that would be public
2    information, but if you were a member or a -- engaged with
3    a TPP, I would -- that information would be available to
4    you.
5        Q.  Are you aware of any public documents that
6    identify the different strategies that TPPs took in
7    response to the VCD recall?
8        A.  Public information?
9        Q.  Yes.
10       A.  No.  The FDA offered guidance on the recall.
11   That was public information.
12       MR. GISLESON:  Those are the questions I have.
13   Thank you very much for your time.
14       THE WITNESS:  You're welcome.
15       MR. KERNER:  Any other Defendants on the Zoom?
16       MR. GEOPPINGER:  Yes.  Yes.  I just have a couple
17   brief follow-up questions.  I just want to clarify
18   something for the record.
19           REDIRECT EXAMINATION
20   BY MR. GEOPPINGER:
21       Q.  Good afternoon, Doctor.  I know it's getting
22   late, so I'll be brief.  My name's Jeff Geoppinger.  I
23   represent AmeriSourceBergen.
24       Doctor, you would agree with me that the
25   definition of bioequivalent can be found in the Code of

Page 176

1    Federal Regulations, correct?
2        MR. HANSEL:  Object to the form.
3        A.  The FDA, yes, does have a definition for
4    bioequivalence.
5    BY MR. GEOPPINGER:
6        Q.  And the FDA's definition is found in the code of
7    federal regulations, correct?
8        A.  Could you be more specific when you say federal
9    regulations?
10       Q.  The Code of Federal Regulations 21CFR of the FDA
11   promulgates its regulations.
12       A.  I did not review.
13       Q.  Are you aware that the definition of
14   bioequivalence is contained -- the FDA's definition is
15   contained within the Code of Federal Regulations?
16       A.  That was not within the scope of my report and I
17   did not review that document, but it's my understanding
18   though that it should be there but I did not review it.  I
19   cannot speculate.
20       Q.  You did not review that definition prior to
21   preparing your report, correct?
22       A.  No.  I reviewed the definition.  I did not -- if
23   you're referring to a particular document that's not
24   consistent in my report, that's what I'm referring to.
25       Q.  I'm sorry, I don't understand the answer.

Page 177

1        MR. HANSEL:  Do you have a document you can show
2    the witness to ask her if she reviewed it?
3        MR. GEOPPINGER:  No.
4    BY MR. GEOPPINGER:
5        Q.  My question is, Doctor, in a -- in the -- in the
6    process of preparing your report, did you review the
7    definition of bioequivalent contained within the Code of
8    Federal Regulations?
9        A.  Yes.
10       Q.  Okay.  On -- in -- a moment ago you referenced
11   Paragraph 33 of your report when asked about that
12   definition.
13       A.  Uh-huh.
14       Q.  Would you agree with me, Doctor, that the
15   language in Paragraph 33 of your report is not the
16   definition of bioequivalence from the Code of Federal
17   Regulations?
18       A.  No, I don't agree with you.
19       Q.  Is it your testimony that the language in
20   Paragraph 33 of your report is the definition of
21   bioequivalence from the Code of Federal Regulations?
22       A.  To my knowledge.
23       Q.  Okay.  When using the term bioequivalence in your
24   report, did you intend to use it as it is defined by the
25   FDA in the Code of Federal Regulations?

45 (Pages 174 - 177)

Page 182

1    objections.  So I caution you that you should probably
2    review that protocol and understand what the scope of
3    your objections can be because that was way outside of
4    the protocol here.
5         MR. HANSEL:  I'm glad you brought that up.  Part
6    of the --
7         MR. KERNER:  Why don't we let her answer this
8    question?
9         MR. HANSEL:  Part of the guidelines in this court
10   are that follow-up questions such as yours,
11   Mr. Geoppinger, are limited to questions not covered
12   earlier or questions specific to a Defendant.
13   Attorney Isidro covered bioequivalence extensively in
14   her -- her examination and so I don't believe your
15   questioning is within the permitted scope.
16        So please, please wrap it up.
17   BY MR. GEOPPINGER:
18        Q.  Doctor, I'll ask the question hopefully for the
19   last time.
20        A.  Okay.
21        Q.  When you use the word bioequivalence as it is
22   written in -- as the last word of Paragraph 59 of your
23   report, are you using that word as it is defined in the
24   Code of Federal Regulations?
25        A.  I am using that word in the context of sameness,

Page 183

1    that the generic drug was the same as the reference listed
2    drug product for safety and effectiveness.
3         MR. MESTRE:  So hold on.  This should not be
4    controversial now.  There's no pending question.  It's
5    5:30 in the afternoon.  I'd like to know the amount of
6    time that's left.
7         THE COURT REPORTER:  Five hours seven minutes.
8         MR. MESTRE:  Thank you.
9    BY MR. GEOPPINGER:
10        Q.  Doctor, that's your definition of bioequivalence?
11        A.  You asked me how I used it in the context of the
12   sentence in Number 59 where it says the presence of the
13   contaminant rendered the Manufacturer Defendants' versions
14   of VCDs not equivalent to the branded product as indicated
15   in the Orange Book which serves as the source of truth for
16   bioequivalence and permits substitutability of the generic
17   drug when it meets those -- that criteria.
18        The drug did -- that we're -- so it did not meet
19   the criteria by presence of the contaminants, was not the
20   same as the branded drug, would not have met FDA approval
21   for bioequivalence, and not the same as the referenced
22   listed product, would not have been listed in the Orange
23   Book.
24        Q.  Doctor, have you now told me how you've defined
25   bioequivalence in your report?

Page 184

1         MR. HANSEL:  Object to the form.
2         A.  As it pertains to Number 59 which you
3    specifically asked me about, I have answered your question.
4         MR. GEOPPINGER:  Thank you, Doctor.  I don't have
5    any more questions.
6         MR. KERNER:  Any other Defendants on the -- the
7    Zoom have questions?
8         MR. HANSEL:  Hearing none, it's -- do the
9    Defendants have any further questions?
10        MS. ISIDRO:  I have just a couple more questions.
11             RECROSS-EXAMINATION
12   BY MS. ISIDRO:
13        Q.  Without identifying any names, are any of the
14   TPPs who are involved in this litigation current clients of
15   yours?
16        A.  No.
17        Q.  Without identifying any names, are any of the
18   TPPs involved in this litigation former clients of yours?
19        A.  No.
20        Q.  And have you ever worked for any of the entities
21   who are Defendants in this litigation?
22        A.  No.
23        MS. ISIDRO:  Any questions?
24        MR. HANSEL:  Yes.  Yes, I do.  Are you finished?
25        MS. ISIDRO:  For the moment, yes.  I may have

Page 185

1    some follow-up after you.
2         MR. HANSEL:  Okay.  Thank you.
3             FURTHER DIRECT EXAMINATION
4    BY MR. HANSEL:
5         Q.  Dr. Panagos, thank you for your patience on a
6    long day.  I have a few questions for you on behalf of the
7    Plaintiffs.
8         You may recall that Mr. Gisleson asked you some
9    questions regarding whether you were aware of any
10   third-party payors in particular who -- who paid for
11   contaminated Valsartan and who were seeking a refund.
12   Before he asked you about that after the lawsuit was filed,
13   he asked you about it in general.
14        Are you aware that Plaintiffs Maine Automobile
15   Dealers Association Insurance Trust and MSP Recovery Series
16   allege in the complaint that they or their assignors in the
17   case of MSP paid for contaminated Valsartan?
18        MS. ISIDRO:  Objection.
19        A.  Yes.  That's within the complaint.
20   BY MR. HANSEL:
21        Q.  And in your report in Appendix A you list various
22   materials you reviewed for your report, right?
23        A.  Yes.
24        Q.  And among those materials are four categories of
25   materials that contain data showing payments by MADA and

47 (Pages 182 - 185)

Page 186

1  MSP and those are the MADA Third Party Payor Plaintiff's
2  Fact Sheet, the MSP Third Party Payor Plaintiff's Facts
3  Sheet --
4        MS. ISIDRO:  Objection.
5  BY MR. HANSEL:
6     Q.  -- the --
7        MR. KERNER:  Objection.  Leading.
8        MR. HANSEL:  I'm not finished.
9  BY MR. HANSEL:
10    Q.  -- the MADA claims data for recalled Valsartan,
11  and excerpts from MSP data July 6th, 2021.
12       Did you -- did you review that data?
13       MS. ISIDRO:  Objection.
14    A.  Yes.
15  BY MR. HANSEL:
16    Q.  Is that the type of data that you ordinarily
17  review in the course of your professional career?
18    A.  Yes, it is.
19       MR. KERNER:  Hang on a second.  There seems to be
20  a bit of echo in the room now.  If somebody who is on
21  the Zoom could mute themselves, that would be helpful.
22  BY MR. HANSEL:
23    Q.  Did that data show in the case of MADA that --
24  that it paid for contaminated lots of Valsartan that were
25  subject to the contamination alleged in the complaint?

Page 187

1        ZOOM PARTICIPANT:  Objection:  Foundation.
2     A.  The data showed that the claims -- there were
3  paid claims.
4  BY MR. HANSEL:
5     Q.  And did the -- did the MSP data show paid claims
6  of MSP's assignors?
7     A.  Yes.
8     Q.  Do you understand that MSP's assignors are
9  third-party payors?
10    A.  Yes.
11    Q.  Do you understand that MSP is an -- is an
12  assignee of third-party payors for Valsartan?
13    A.  Yes, I do.
14    Q.  Do you understand that MSP is suing in its
15  capacity as a holder of valid assignments of those -- of
16  the claims of its assignors?
17       MS. ISIDRO:  Objection.
18       ZOOM PARTICIPANT:  Objection.  Legal conclusion
19  and leading.
20    A.  Yes.
21  BY MR. HANSEL:
22    Q.  And do you understand that MSP alleges in the
23  complaint that it stands in the shoes in effect of its
24  assignor TPPs?
25       MS. ISIDRO:  Objection.

Page 188

1     A.  Yes.
2  BY MR. HANSEL:
3     Q.  Do you understand that the proposed third-party
4  payor class consists of third-party payors as defined in
5  Paragraph 14 of your report?
6     A.  Yes.
7     Q.  Specifically all third-party payors in the United
8  States and its territories and possessions that, since at
9  least January 1, 2012, to the present, paid any amount of
10  money for Valsartan-containing drug, intended for personal
11  or household use, that was manufactured, distributed, or
12  sold by any Active Pharmaceutical Ingredient, Finished
13  Dose, Wholesaler, or Repackager/Relabeler Defendant.
14       MS. ISIDRO:  Objection.
15  BY MR. HANSEL:
16    Q.  Is that your understanding?
17    A.  Yes.
18    Q.  Do you understand that the proposed class so
19  defined is in effect, at least in part, suing for a refund,
20  the word used by Attorney Gisleson, suing for a refund, at
21  least in part in this lawsuit?
22    A.  Yes.
23    Q.  Today you've heard a lot of questions and
24  objections about whether certain topics were within the
25  scope of your report.  Do you remember that?

Page 189

1     A.  Yes.
2     Q.  Does your report set forth the scope of your
3  report accurately?
4     A.  Yes.
5        MS. ISIDRO:  Objection.
6        MR. HANSEL:  Let me take a short break and see if
7  I have any more questions.
8        MR. KERNER:  How long --
9        MR. HANSEL:  Under five minutes.
10       THE VIDEOGRAPHER:  The time is 5:33, and we're
11  going off record.
12          (Break taken.)
13       THE VIDEOGRAPHER:  The time is 5:38 p.m., and
14  we're back on record.
15       MR. HANSEL:  No further questions.
16  Thank you, Dr. Panagos.
17       THE WITNESS:  You're welcome.
18       MR. KERNER:  Anybody else on the phone?
19       MR. GISLESON:  Yeah.  Just a brief follow-up.
20  This is John Gisleson again for Aurobindo.
21       FURTHER CROSS-EXAMINATION
22  BY MR. GISLESON:
23    Q.  You were asked about the MADA, M-A-D-A, claims
24  data.  Do you have any understanding as to how MADA managed
25  its beneficiaries' prescriptions following the VCD recall?

48 (Pages 186 - 189)

Page 190

1    A.  The claims data demonstrates -- shows claims that
2    were paid for.
3    Q.  Do you know what strategy MADA followed in
4    response to the VCD recall?
5    A.  That was not within the scope of my review.
6    Q.  Did you do any investigation to determine how
7    MADA managed its patients, its beneficiaries' prescriptions
8    following the VCD recall in connection with your review of
9    the claims data?
10    A.  I reviewed the claims data which showed that the
11    claims were paid for.  That's it.
12    Q.  Did you seek to learn how MADA managed the recall
13    of VCDs?
14    A.  That's not within the scope of my -- of the
15    opinion I was asked to render.
16    Q.  So you didn't do it?
17    A.  I do not wish to comment or speculate on the
18    strategy that they took.  I reviewed the claims data which
19    showed that they paid for claims for those drugs.
20    Q.  Do you know whether MADA at any point implemented
21    a block concerning NDCs or VCDs that contained nitrosamine
22    impurities?
23    A.  I do not know.
24    Q.  Pardon me?
25    A.  I do not know.

Page 191

1    Q.  And as to MSP's assignors, do you know whether --
2    strike that.
3    Did you do any investigation to determine how any
4    of MSP's assignors managed the VCD recall -- recalls
5    following the identification of nitrosamine impurities?
6    A.  That was not within the scope of my report.  I
7    reviewed the claims data that -- that showed that they paid
8    for the claims.
9    Q.  So as a result of the work that you did in this
10    case, you have no understanding as to how MSP's assignors
11    managed the VCD recall following the discovery of
12    nitrosamine impurities, correct?
13    MR. HANSEL:  Object to the form.  Outside the
14    scope.  Asked and answered.
15    MR. GISLESON:  It hasn't been answered.
16    BY MR. GISLESON:
17    Q.  You can answer the question, please.
18    MR. HANSEL:  Same objection.
19    A.  They were assigned claims data.  I did not review
20    any further assignments or agreements.
21    BY MR. GISLESON:
22    Q.  Including any strategies that any of those
23    assignors followed to manage the recalls, correct?
24    A.  That was not in the scope of my review.  I
25    reviewed the claims data that shows that those claims were

Page 192

1    paid for.
2    Q.  Did you do any investigation to determine whether
3    any of MSP's assignors, assignor TPPs, implemented blocks
4    at any point concerning VCDs containing nitrosamine
5    impurities?
6    MR. HANSEL:  Asked and answered.
7    A.  I was not asked to review their strategies.  I
8    reviewed the claims data.
9    BY MR. GISLESON:
10    Q.  And as a result, you have no knowledge as to what
11    those strategies were, correct?
12    MR. HANSEL:  Objection.
13    A.  That was not --
14    MR. HANSEL:  Asked and answered.  Object to the
15    form.  Repetitive.
16    MR. GISLESON:  I'm just looking for a direct
17    answer to a clear question.
18    MR. HANSEL:  Your question assumes that whatever
19    payment data she already told you she reviewed can be
20    completely divorced from whatever their strategy is,
21    since you brought it up.
22    BY MR. GISLESON:
23    Q.  You can answer the question.
24    A.  If and when they had a strategy, I was not a
25    participant or have knowledge of what that was.  I have

Page 193

1    reviewed the claims data that shows that the claims were
2    paid for.
3    Q.  Any other information than claims data?
4    MR. HANSEL:  Objection.  Asked and answered.
5    A.  Could you be more specific?
6    BY MR. GISLESON:
7    Q.  Sure.  What was the information in the claims
8    data that was important to you?
9    A.  Claims data demonstrated that the plan paid a
10    portion of the medication and the member paid a portion.
11    Q.  Anything else?
12    A.  Indicating that that was re- -- medication was
13    reimbursed or plan paid for.
14    Q.  Anything else?
15    MR. HANSEL:  Object to the form.
16    A.  I -- the claims data followed a standard claims
17    data format, typical of what we see in the industry when
18    you're reviewing claims.
19    BY MR. GISLESON:
20    Q.  Did the claims data identify specific
21    individual -- the names of specific individuals?
22    A.  If you're asking in general if claims data can
23    include those fields, those fields -- can you be more
24    specific as to how you're asking the question and with
25    which --

49 (Pages 190 - 193)

Page 194

1    Q.  Sure.  Did the claims data that you reviewed
2 identify the names of the patients who consumed the VCDs?
3    A.  Not that I recall, no.
4    Q.  I'm sorry, no?
5        MR. HANSEL:  Would you like the court reporter to
6 read back the answer?
7        MR. GISLESON:  I couldn't hear.
8        MR. HANSEL:  Would the court reporter please read
9 back the answer?
10       (The requested portion was read back.)
11       MR. GISLESON:  Thank you very much.
12       Those are all the questions I have.  Thank you
13 for your time and your patience.
14       THE WITNESS:  All right.  Thank you.
15       MR. DORNER:  I have questions within the scope of
16 that.
17          FURTHER FURTHER DIRECT EXAMINATION
18 BY MR. DORNER:
19    Q.  Doctor, my name is Drew Dorner.  I'm here on
20 behalf of CHP.
21       The claims data that you just referred to would
22 only reflect costs associated with the transaction at the
23 time of the adjudication of the claim; is that right?
24       MR. HANSEL:  Object to the form.  Lack of
25 foundation.

Page 195

1        Mr. Dorner, do you have an exhibit?
2        MR. DORNER:  The witness has seen the exhibits,
3 the claims data that she's referring to that she's
4 reviewed.
5        MR. HANSEL:  Well, it's not an exhibit to this
6 deposition.
7        MR. DORNER:  I'm not making it an exhibit.  I'd
8 like an answer to my question.
9    A.  I will answer generally that claims data that has
10 a plan paid amount or claims data that it's at the point of
11 adjudication.
12 BY MR. DORNER:
13    Q.  Okay.  And that only reflects some -- some of --
14 some amount of money that exchanges at the time of that
15 adjudication, but not, for example, any payments that might
16 be made to a TPP well before the adjudication or any
17 payments that might be made to a TPP after the
18 adjudication; is that accurate?
19       MR. HANSEL:  Object to the form.  Lack of
20 foundation.
21    A.  I'm not sure what you're asking.
22 BY MR. DORNER:
23    Q.  Sure.  If a member of a TPP makes a claim for a
24 medication, it's your testimony that there is claims data
25 associated with that that would be reflected in the TPP's

Page 196

1 records.  Am I understanding that correctly?
2    A.  Yes.
3    Q.  Okay.  Where the claims data reflect that
4 particular claim, any amount of money associated with that
5 transaction is -- it reflects only money exchanged at the
6 time of that transaction, right?
7    A.  It reflects the plan paid and any member paid
8 amounts at the date of service.
9    Q.  Okay.  I understand.  And so if either prior to
10 or subsequent to the date of service some amount of money
11 was also exchanged that is related to the -- indirectly or
12 directly related to the claim, that would not be reflected
13 in the particular set of claims data that you were
14 referring to when you were talking with Mr. Gisleson; is
15 that right?
16       MR. HANSEL:  I object to the form of the
17 question.  Lack of foundation.
18 BY MR. DORNER:
19    Q.  You can answer.
20    A.  Could you be more specific when you say exchange
21 of money before or following outside of a claims data?
22    Q.  Sure.  And let me give an example.  In -- in some
23 cases a PBM or a TPP might benefit from a rebate, for
24 example, from a drug manufacturer; is that right?
25       MR. HANSEL:  Objection.  Objection.  This is

Page 197

1 beyond the scope of her report.
2        MR. DORNER:  Hold on.  This is -- no.  No.  We're
3 not getting into speaking objections.  She asked for a
4 specific example.  I'm giving her one.  All right.
5 You can object to the form.
6        THE WITNESS:  Okay.
7        MR. HANSEL:  I object to the form.  It's beyond
8 the scope of her report.  It has nothing to do with
9 her report.  Other experts are addressing this issue.
10 BY MR. DORNER:
11    Q.  You can answer the question, ma'am.
12    A.  The claims data reflects what the plan paid.
13    Q.  On the date of service, right?
14    A.  On the date of service.
15    Q.  It would not reflect in the example that I gave
16 something like a refund; is that right?
17       MR. HANSEL:  Object to the form.
18    A.  Are you referring -- your question is unclear.
19 Are you referring to refund?  You said rebate.  I think
20 you're --
21 BY MR. DORNER:
22    Q.  Yeah.  I -- I -- I caught the same error.  So the
23 example I gave was a rebate.  I apologize.  It wouldn't
24 reflect a -- rebate subsequent to the date of
25 adjudication; is that right?

50 (Pages 194 - 197)

Page 198

1      MR. HANSEL:  Objection:  Beyond the scope.
2      A.  I've answered that the claims data represents
3  what the plan paid at the date of service.  That amount is
4  found clearly within the claims data.
5  BY MR. DORNER:
6      Q.  Well, I appreciate your answer, but I would like
7  an answer to my question.  My question was:  The -- a
8  subsequent rebate would not be reflected in the type of
9  claims data that you were referring to in your prior
10  testimony to Mr. Gisleson; is that accurate?
11      MR. HANSEL:  Object to the form.  Calls for
12      speculation, beyond the scope, asked and answered, no
13      foundation.
14  BY MR. DORNER:
15      Q.  You can answer.
16      A.  To the best of my knowledge, if a rebate applied
17  to these type of drugs, it would not be within the claims
18  data.
19      Q.  And if there were similar payments, not
20  necessarily rebates but things like governmental subsidies
21  that might also be paid well after the date of
22  adjudication, that also wouldn't be reflected in the claims
23  data you were referring to; is that accurate?
24      MR. HANSEL:  Object to the form.  Lack of
25      foundation, calls for speculation, beyond the scope of

Page 199

1  the report, asked and answered.
2      You need to wrap this up, Mr. Dorner.  It has
3  nothing to do with Dr. Panagos's report.
4  BY MR. DORNER:
5      Q.  You can answer.
6      A.  I don't know.
7      MR. DORNER:  Okay.  I have no further questions.
8      MR. KERNER:  Anybody else on the Zoom?
9      MR. HANSEL:  Anyone else in the room?
10      MS. ISIDRO:  Nothing from me, no.
11      MR. HANSEL:  We will read and sign.
12      Thank you very much, Dr. Panagos, and Chelsea,
13  videographer, thanks very much, and for your
14  hospitality, Jorge, thank you.
15      THE VIDEOGRAPHER:  That concludes today's
16  deposition.  The time is 5:52 p.m., and we're going
17  off record.
18      (The deposition concluded at 5:52 p.m.)
19
20
21
22
23
24
25

Page 200

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

     I, CHELSEA HLAVACH, shorthand reporter and Notary
Public, State of Florida, certify that KALI PANAGOS,
PHARM.D., R.PH, appeared before me and was duly
sworn/affirmed Witness my hand and official seal this 21st
day of January, 2022.

     Witness my hand and official seal this 1st day of
February, 2022.

     Chelsea Hlavach, Notary Public
     State of Florida, My Commission:
     GG352672, Expires: August 11, 2023

Page 201

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

     I, CHELSEA HLAVACH, Shorthand Reporter and Notary
Public, State of Florida, HEREBY CERTIFY that I was
authorized to and did stenographically report the
deposition of KALI PANAGOS, PHARM.D., R.PH; that a review
of the transcript was requested; and the foregoing
transcript, pages 10 through 199, inclusive, is a true and
accurate record of my stenographic notes.
     I FURTHER CERTIFY that I am not a relative,
employee, attorney, or counsel to any of the parties, nor
am I a relative or employee of any of the parties' attorney
or counsel connected with the action, nor am I financially
interested in the action.
     Dated this 21st day of January, 2022.

     Chelsea Hlavach, Notary Public,
     State of Florida at Large

51 (Pages 198 - 201)

Page 202

1  GREGORY HANSEL, ESQUIRE
2  ghansel@preti.com
3          February 4, 2022
4  RE:   In Re: Valsartan, Losartan, Et Al
5      1/21/2022, Kali Panagos, Pharm.D (#5024986)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19  If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22          Yours,
23          Veritext Legal Solutions
24
25

Page 204

1  In Re: Valsartan, Losartan, Et Al
2  Kali Panagos, Pharm.D (#5024986)
3          ACKNOWLEDGEMENT OF DEPONENT
4      I, Kali Panagos, Pharm.D, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____    _____
12  Kali Panagos, Pharm.D              Date
13  *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25

Page 203

1  In Re: Valsartan, Losartan, Et Al
2  Kali Panagos, Pharm.D (#5024986)
3          E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Kali Panagos, Pharm.D              Date
25

52 (Pages 202 - 204)

[& - 4]                                                                                    Page 1

| & | | |
|---|---|---|

**&**   2:14 3:5 4:10,14
  4:19 5:5,9,17,21
  7:5

**0**

**02109**   4:19
**04101**   2:15
**07102**   3:10
**07932**   4:24
**08540**   6:15

**1**

**1**   8:13 10:5 16:10
  16:15 40:14 79:16
  98:1 188:9
**1/21/2022**   202:5
**10**   201:10
**100**   3:10,18
**1000**   1:14 2:11,22
  4:2 10:8
**1001**   5:21 7:5
**10017**   2:4,8
**105**   13:22
**10:49**   59:17
**11**   5:10 200:18
**11:08**   59:20
**11:24**   68:21
**12**   93:10,14 125:21
  141:21 155:8
  169:15
**125**   8:19
**12:17**   74:17
**12:53**   92:22
**13**   8:4
**14**   97:8,12,18 99:2
  100:22 188:5
**1400**   5:2
**15219**   4:11,15
**15219-6401**   5:6
**154**   8:4

**15th**   3:10
**16**   8:13
**16990**   3:15
**17**   8:15
**175**   8:5
**17th**   3:20
**18**   97:9,12,18 99:2
**18,750**   89:18
**184**   8:5
**185**   8:6
**189**   8:6
**19**   99:15,18,24
  100:19
**190**   6:6
**19087**   3:2
**19103-4196**   3:20
**194**   8:7
**199**   201:10
**1997**   18:2
**1:56**   92:25
**1st**   200:12

**2**

**2**   8:15 17:22,24
  40:15 63:17 79:18
  80:14,17 93:9
  102:19,25 107:5
  155:7
**20**   38:18 82:24
  99:15,18,24
  100:19 136:1
  204:15
**200**   6:10 8:8
**2000**   18:14,22
  20:13 27:6
**20004**   5:22 7:6
**20004-2166**   4:2
**2002**   19:12
**2005**   20:13
**2006**   19:2
**2008**   28:7,19

**2009**   19:15,17,22
  20:14 28:24
**201**   8:9
**2010**   28:24
**2012**   188:9
**2015**   27:6
**2016**   65:1
**2018**   28:7,19 35:12
  36:5 47:14 93:14
  138:18 142:7,11
  142:15,19 146:22
  150:24
**2019**   26:7 37:6,14
  45:1 46:25 47:2
  47:14
**202**   8:9
**2020**   46:9
**2021**   37:14,17
  97:23 186:11
**2022**   1:11 10:4
  200:10,13 201:17
  202:3
**2023**   200:18
**203**   8:10
**21**   1:11 6:15 90:8
  100:7,12,18
**21cfr**   176:10
**21st**   10:4 200:9
  201:17
**2200**   4:6 6:19
**2220**   5:13
**22695**   200:16
  201:22
**227**   3:5
**230**   5:13
**25**   103:12
**2500**   6:11
**2525**   1:14 2:11,22
  10:7
**260**   7:2

**270**   3:2
**27th**   4:19
**28**   100:8,12,18,22
  104:8 105:7
**28202**   3:6
**2875**   1:4
**29**   101:9,11,16
  106:22 108:11,15
  109:5

**3**

**3**   8:16 64:16 69:3
  70:12 85:13,21
  93:4 125:21
**30**   3:20 69:3 70:12
  202:17
**300**   3:17
**30305**   6:11
**312**   5:2
**316**   6:2
**32**   101:9,11,16
  106:23 108:11,16
  109:5
**32502**   6:3
**32nd**   5:6
**33**   109:7,12 171:25
  177:11,15,20
  178:7
**33134**   1:15 2:11,23
**3333**   6:11
**3475**   3:6
**3600**   4:6 6:19
**375**   88:21 89:17
**38th**   4:10,15
**3:09**   128:18
**3:21**   128:21

**4**

**4**   8:18 90:23,24
  103:13 141:20
  155:5,7 202:3

**[4,500 - adjudicated]**                                                                 Page 2

| | | **9** | **accuracy**  202:9 |

**4,500**  87:20
**400**   4:23 6:2 88:22
**41**  109:7,12
**42**   110:3,7 112:14
   112:19,22 113:2
**43**   110:3,7 113:5
**44**   113:7 114:20
   115:1
**44023-4536**   3:16
**444**   3:6
**45**  115:16
**45202-4029**   5:2
**46**  116:18,23
   117:25 118:4,11
   118:23 119:4,7,12
   119:18 172:25
**46204-3535**   5:10
**47**  121:11,17
   123:10,17,22
   124:3,10,13,20
   128:13 136:8
   143:3 145:11
**4:10**   153:24
**4:34**   154:2

**5**

**5**   8:19 97:7 103:13
   125:10,11,14
   126:5,6,12,20
   127:10,19 128:12
**50**  89:13,16
**500**   4:23
**5024986**   202:5
   203:2 204:2
**505**   4:2
**52**  128:24 130:10
   131:10,14,17
**53**   4:19
**55**  132:9,15,25
   133:8 134:3 135:9
**550**   3:2

**56**   136:5,6,13
**57**  136:24
**59**  140:9,14,22
   141:22 180:24
   181:3 182:22
   183:12 184:2
**5:30**   183:5
**5:33**  189:10
**5:38**  189:13
**5:52**   1:12 199:16
   199:18

**6**

**6**   16:20 80:11
   97:23 123:17
   124:4,10,20 125:4
   125:15 142:22
   143:7,14 144:4,24
   171:25
**60**  89:13
**600**   3:5 6:6
**60606**   5:14
**617-213-7001**   4:20
**617-213-7045**   4:20
**63105-3443**   6:7
**66210**   7:2
**6b**   143:2
**6d**  144:10
**6i**  145:6,9,16
   146:24 147:11
**6th**  186:11

**7**

**701**   2:19 5:17
**70130**   2:19 5:18
**704**   3:6
**75201-7932**   4:7
   6:20

**8**

**8101**   7:2
**85**   8:16

**9**

**9**   127:20
**90**   8:18
**910**   127:11
**911**  127:20
**97**   18:25
**9:32**   1:12 10:4
**9th**   4:2

**a**

**a.m.**   1:12 10:4
   59:17,20
**ab**  116:17 121:11
**ability**   15:25 24:20
**able**   15:21 22:2
   23:14 32:14 34:3
   64:5 72:25 115:14
**abruptly**   169:1
   170:10
**absolutely**   88:6
**abstracts**   80:15
   81:6
**academia**   62:25
**academic**   51:25
   52:22 53:3 54:14
   55:24 60:23 82:9
**academy**   45:16
   49:2,6
**acceptable**  166:17
   167:1 168:11,19
**acceptance**   69:21
   74:11
**accepted**   31:8 34:7
   103:17 125:2
   127:17 128:2
   132:1 153:9
**access**   171:5,6
**accommodate**
   170:15
**account**   28:23
   30:4 38:15

**accuracy**  202:9
**accurate**   15:21
   147:24 179:7
   195:18 198:10,23
   201:11
**accurately**  189:3
**acknowledgement**
   204:3
**acknowledgment**
   202:12
**actavis**   3:13,13
**action**  201:15,16
**actions**   1:6 173:3
**active**   36:24
   188:12
**activities**  169:20
**actual**  151:8,18
**add**   12:11 70:15
   73:4,12
**added**  97:23
**addition**   69:13
   71:13 107:19,24
   135:11
**additional**   98:12
   100:17 104:18
**additionally**
   181:14
**additions**  204:6
**address**   13:21,22
   37:1,4
**addressing**   52:9
   197:9
**adequate**  162:15
**adhere**   23:2,16
   130:25 145:21
   146:8
**adhered**  153:2,2
   153:22
**adherence**   22:5,6
**adjudicated**
   162:18,19

adjudication
    43:23 162:24
    194:23 195:11,15
    195:16,18 197:25
    198:22
adjunct   20:8
    63:20
adjuster   21:18
    22:11,15,25 23:5
    23:10
adjuster's   23:17
    23:18
administer   21:21
    40:5
administration
    19:16,19 100:6
    107:6,15 112:16
    113:9,16 114:12
administrative
    63:12,22
administrator
    40:3,4
administrators
    38:22
adopt   102:3
    105:15
adults   21:16
adverse   82:3
    83:21
advice   37:20
    157:25 158:24
advisable   169:1
advise   33:9 41:4
    56:24 91:18
    168:10
advised   168:14
advisement   20:3
    33:21 37:25
advising   30:6
    35:18 57:9 170:9

advisors   20:1
    35:12
advisory   26:3,9,10
    105:1
affiliation   24:1,23
    25:2,5,6,14,17,18
affiliations   23:20
    26:3
affirm   13:1
affirmed   200:9
affordable   115:19
afternoon   93:3
    175:21 183:5
agency   96:5
agency's   150:18
ago   177:10
agree   11:7 91:13
    91:21 149:15,21
    175:24 177:14,18
    178:7
agreed   9:15 103:2
agreement   12:3
agreements
    160:16 191:20
ahead   16:9 17:21
    85:12 90:22
    128:16 153:23
    181:19
aid   5:11 21:16
al   202:4 203:1
    204:1
albertson   3:8
alfano   4:10,14
allege   185:16
alleged   97:2
    186:25
alleges   187:22
allotted   202:20
allow   12:22 30:19
    74:6 116:15 171:5

allows   23:13,16
    116:13
alluding   181:10
american   44:22
    47:10,21 48:21,22
    50:1,11 51:3
    100:1
amerisourceberg...
    175:23
amgen   26:3
amount   34:17
    72:14 87:18 89:5
    89:21,25 90:2,2,3
    183:5 188:9
    195:10,14 196:4
    196:10 198:3
amounts   87:22
    196:8
analysis   32:12
analytics   32:9
anda   67:19 106:5
    106:7,15,15 107:2
    116:11 117:1
    118:15 119:15
    121:8,13 123:12
    124:5 130:19
    131:22 132:4
    143:10,17,19,25
    144:1 150:14
    151:15 173:10
anda's   124:6,24
anesthesia   24:1,9
anesthesiologists
    24:15
anesthesiology
    24:6
announced   93:15
    166:3
announcement
    139:23

annoys   69:8
answer   14:11,17
    14:18 15:6 33:16
    33:23 43:21 66:18
    66:24 67:2,25
    68:10 69:25 71:11
    72:18 77:3 84:5
    93:24 94:1,20
    106:16 110:21
    112:3 115:13,15
    117:4 120:16
    122:15 126:3
    134:14 135:20
    137:19 141:15
    143:21 156:4,10
    156:21 160:14
    163:21 166:21
    170:21,24 171:20
    174:25 176:25
    178:17,19 181:19
    182:7 191:17
    192:17,23 194:6,9
    195:8,9 196:19
    197:11 198:6,7,15
    199:5
answered   15:13
    60:8 63:7 66:13
    66:15 71:11 72:22
    75:15 84:11 94:16
    94:17 99:8 111:6
    124:14,23 132:22
    159:24 163:19
    171:17 184:3
    191:14,15 192:6
    192:14 193:4
    198:2,12 199:1
answering   73:2
    84:19
answers   72:6,9
    180:8

[anticoagulation - aspects]                                                        Page 4

anticoagulation
  25:11
anybody  11:25
  73:3 189:18 199:8
anymore  122:8
apart  97:2
apologize  197:23
app  88:12
appearance  10:17
  26:18 27:2
appearances
  10:14
appeared  3:3,8,13
  3:18,22 4:4,8,13
  4:17,21,25 5:4,8
  5:11,15,19,23 6:4
  6:8,13,17,21 7:3,7
  7:10 200:8
appearing  16:6
  169:22
appears  157:22
appended  204:7
appendix  85:24
  86:12,14,21 91:10
  97:15,16,17,20
  98:2 99:6,10,21,22
  99:23 107:4,11,15
  107:18,22 108:2,6
  110:10,13,14
  111:3 113:13,14
  114:9 115:8 135:6
  135:7,11,15,22
  185:21
appendixes  93:5
applic  119:2
applicable  116:20
  118:13 120:4,21
  173:2,5 202:8
application  67:19
  117:1,6,9 118:16
  118:22 119:2,15

120:11 126:10
130:14,16 131:22
132:3,4,6 149:17
150:14 151:16
applications  104:2
131:12 149:24
applied  144:19
198:16
applies  30:16
apply  52:19
111:12
applying  106:15
117:16 130:24
appointment
46:12
appreciate  71:1
79:25 198:6
appropriate  30:17
35:17 73:14
103:18,20 179:12
appropriately
29:19 35:3 178:5
approval  56:24
57:5,22 58:25
66:4,9 67:5,18,20
67:21 68:4,6 72:3
74:25 75:16 76:3
100:6 104:2 107:6
107:16 110:9
111:1 112:8,16
116:25 117:8,16
117:16 118:16,17
118:22 119:2,10
119:15,23 120:6
120:13 124:7
125:1 126:11,18
127:6 128:8
130:14,20,24
131:1,5,12,20,23
132:2,6 134:11
136:16,21 143:10

143:19 145:23
149:18,20 151:16
164:23 173:8,8
183:20
approvals  57:12
74:22 75:4,12,24
127:3 128:4
approved  57:5
60:2,10,18 63:1
66:1 67:7 101:19
101:21,21 105:20
105:24 115:22
116:11 119:21
120:25 123:12,14
124:6,24 127:6
133:11,12,15,16
136:16 147:5,8
151:15 152:22
153:10,10 155:16
171:14 174:15
approximate
167:19
approximately
46:24 69:12 89:13
89:15,16,18
167:15
areas  157:21
argumentative
75:15
aristarx  36:2,7,8,9
36:21 37:2
armsrx  37:5,6,6,9
38:12 42:15,16
46:18 157:25
170:22,25
arrangement
43:10,16 88:23
89:3
arrangements
43:18

articles  52:6,9,12
52:15,18 80:14
81:1 86:19 172:21
asher  3:1
ashp  8:20 100:1
124:15 127:1
aside  78:20
asked  11:7 26:10
60:7 63:7 66:13
66:19,21,25 67:14
67:21 69:14 71:8
71:12,23 72:7,8,10
72:19 75:14 84:11
92:7,9 94:15
111:5 115:12
124:14,22 141:11
141:12 159:24
163:19 164:11
169:15 171:17
174:11 177:11
183:11 184:3
185:8,12,13
189:23 190:15
191:14 192:6,7,14
193:4 197:3
198:12 199:1
asking  12:5 39:19
44:9 57:15,16
68:12,15 87:24
108:23 110:18
118:7 153:15,17
158:22 165:21
169:19 170:16,18
178:24 179:2,8,14
179:14,15,17,18
193:22,24 195:21
asks  11:14 80:14
aspect  29:25
108:15 109:4
aspects  27:15 30:7
37:21 38:2 41:5

41:16 54:18 59:8
117:8
**assessed**  96:9
**assessment**  150:18
**assigned**  27:16
116:12 173:8
191:19
**assignee**  187:12
**assignments**
187:15 191:20
**assignor**  187:24
192:3
**assignors**  185:16
187:6,8,16 191:1,4
191:10,23 192:3
**assistant**  63:20
**assisted**  92:3
**associated**  40:10
194:22 195:25
196:4
**association**  2:17
10:23 46:20 47:6
47:10 49:24 50:1
50:11 185:15
**assume**  178:24
179:2
**assumes**  148:24
192:18
**assuming**  72:18
**assurance**  122:23
123:6
**asthma**  31:23,25
32:3
**atlanta**  6:11
**attached**  17:14
86:1 202:11
**attachment**  85:11
**attachments**  85:8
**attempt**  71:15
111:9

**attempted**  169:16
**attended**  65:9
**attest**  174:13
**attesting**  139:15
**attorney**  2:5,9,13
2:17,20,24 3:3,8
3:17,22 4:4,8,12
4:17,21,25 5:4,8
5:11,15,19,23 6:4
6:8,13,17,21 7:3,7
69:20 74:3 171:18
182:13 188:20
201:13,14 202:13
**attorneys**  3:12
**attributed**  166:22
**audible**  11:17
**audience**  82:16,19
**august**  200:18
**aurobindo**  5:8
73:6 154:17,18,20
154:24 189:20
**authored**  56:8,13
56:16 80:25 81:5
81:5,8,8,11,11,14
81:14,17,17
**authoritative**
112:11 152:20
173:13
**authorization**
29:13,17 35:2
**authorizations**
29:24
**authorized**  201:7
**automobile**  2:17
10:23 185:14
**available**  32:14
51:2 175:3 202:6
**avenue**  2:3,7 4:6
5:21 6:19 7:5
**aware**  49:12,22,25
51:7,13,18,19,24

91:17 138:11,20
139:24 148:1,5
154:20,22,23
155:1 160:23
165:3,22 166:16
167:1 170:5 175:5
176:13 179:3
181:13 185:9,14

## b

**b**  8:11 86:12
142:25 180:25
**bachelor**  18:1,9
**bachelor's**  18:12
18:21,24 24:25
25:19 55:12,22
**back**  43:3,4 59:21
60:3,5 62:8,10
67:1,2,4,24 68:1
68:25 74:18 79:15
79:18 80:2,3
92:17 93:1,25
94:2 95:2,3 99:9
101:2,3 106:16,20
108:24,25 110:20
110:22 112:1,5
120:15,17 121:23
122:12,17,20
127:15 128:22
138:19 143:20,23
154:3 156:16,22
162:12 164:21
189:14 194:6,9,10
**background**  34:2
95:16 97:8 100:23
101:5
**bad**  69:7
**badger**  70:1
**balanced**  73:9
**barnes**  5:9
**base**  60:19 61:10
61:12 103:16

172:16
**based**  30:12 31:4,7
31:8,16,17 32:1
49:17 59:9 74:2
86:7 89:6 104:5
104:16,22 105:2
117:4 121:12
127:13 130:22
135:10 136:18
147:1,12,13
160:24 161:2
162:15 163:15
165:21 166:11
170:4 173:15
**baselessly**  71:15
**bases**  71:20 99:1
112:18,20,21
113:1
**basically**  138:14
**basing**  134:14
147:10
**basis**  41:18 59:1,3
59:10,12 93:17
99:24 105:20
108:10 109:4,6
110:6 111:16,21
113:9 115:20
116:2,22 130:9
132:14 134:21
136:12 139:21
141:24 143:13
144:9,17 145:15
147:3,18 153:16
165:25
**batches**  154:24
160:22
**baylen**  6:2
**bdc**  163:3
**bearing**  72:7
**beaten**  173:18,22

**began** 29:6 36:5
**behalf** 10:19,21,23
  10:24 11:1,5
  26:18 29:15,16
  32:15 40:6 69:2
  69:10 73:6,23
  151:25 169:22
  185:6 194:20
**believe** 11:12
  70:14 73:7 80:11
  84:19 99:13 107:5
  112:3 117:23
  137:21 138:18
  139:3 165:23
  173:18 178:3
  179:6 182:14
**beliveau** 2:14
**bellevue** 25:2,8
**belong** 93:22 94:6
  129:6
**ben** 7:10
**beneficial** 22:24
  23:1
**beneficiaries**
  164:17 169:10
  189:25 190:7
**beneficiary** 164:8
  165:19
**benefit** 30:1 31:7
  31:14 36:11,12,15
  36:22 37:21,22
  38:1 39:6,24
  40:11 41:4,8
  44:12 57:11 58:13
  59:7 60:11 62:19
  64:21 83:3,12
  100:4 102:13,14
  105:16 132:13
  157:2 160:5
  196:23

**benefits** 30:20
  35:1 40:5 41:5
  97:8,25 100:2
**best** 30:10 83:17
  91:18 99:8 115:18
  161:7,8 198:16
**beyond** 19:9 82:19
  101:11 137:7,8
  163:18 166:18
  173:16 178:2
  197:1,7 198:1,12
  198:25
**bio** 179:6
**bioequivalence**
  52:16 54:15,18
  55:1,3,6,6,9,18
  56:4 106:7 149:22
  150:8,11 151:4
  171:16,23 172:11
  172:18 176:4,14
  177:16,21,23
  178:10,11,20
  179:9,18 180:19
  180:22 181:1
  182:13,21 183:10
  183:16,21,25
**bioequivalent**
  114:21 115:11,17
  150:1 172:1,15
  175:25 177:7
  178:4,9,25 179:7
  179:12,16 180:20
  180:21 181:17
**biology** 18:5 77:16
  78:3
**bipc.com** 3:7
**bit** 16:13 66:14
  154:5 186:20
**blackwell** 6:6
**block** 3:1 173:14
  174:1 190:21

**blocked** 162:7,12
  162:17,25 163:3
**blocks** 174:4 192:3
**blvd** 1:14 7:2
**board** 65:18
**boards** 105:1
**bockius** 5:5
**body** 114:22
**book** 81:18 100:5
  101:10,16,18,19
  104:3 105:17,19
  105:23 107:10,12
  107:17 108:14,14
  109:14,21,24
  110:4 112:7,9,23
  115:22 116:5
  119:24 120:5,24
  121:3,6,12 132:10
  133:10,15 134:7
  149:17 152:9,17
  152:21 153:7,8,17
  153:20 173:6,7
  178:8 181:16
  183:15,23
**books** 81:20
**bosick** 4:10,14
**boston** 4:19
**bottom** 103:12
  105:11
**boulevard** 2:11,22
  10:8
**bound** 160:9,16
**brand** 66:1 67:6
  112:9 114:23
  127:2 133:5,6,12
  143:11 144:7,14
  145:24
**branded** 113:8,16
  114:12,21 140:12
  142:1,3,5,8,12,16
  142:20 183:14,20

**brands** 30:25
  53:22
**break** 15:10,13
  59:13,19 71:2
  92:16,18,19,24
  128:15,16,20
  153:23 154:1
  189:6,12
**bresnahan** 5:20
**brett** 7:1
**brief** 175:17,22
  189:19
**bring** 83:20
**brisbois** 3:1
**broad** 82:2
**broadreach** 22:23
  28:5,9,15 29:2,5,6
  29:12,21 30:5,13
**brook** 104:3
**brought** 40:25
  182:5 192:21
**buchanan** 3:5
**business** 22:19,20
  22:22 23:3 35:22
  37:1 77:22,24
  78:6,8,10,12
**businesswomen's**
  46:20 47:6 49:23

**c**

**c** 2:1 7:1 10:1
  180:22,25
**calculated** 79:12
  89:5,20
**call** 35:15 150:18
**called** 114:2 132:4
  139:8
**calling** 70:2 122:2
  139:5
**calls** 35:20 60:7
  67:12 69:17
  100:24 121:18

[calls - classification]

164:19 165:6
178:1 198:11,25
**camber** 3:3
**camden** 1:2
**camp** 2:19 5:17
**campbell** 7:4
**campus** 4:23
**cancer** 82:1,4 83:9
83:15 84:18 96:5
**capacities** 26:12
**capacity** 23:7
39:25 51:12 57:9
91:19 100:16,21
112:24 117:22
138:13 157:23,23
187:15
**captures** 178:3,4
179:6,11
**capturing** 128:2,3
**carcinogen** 141:1
141:2 166:23
**carcinogenicity**
96:10
**carcinogens** 93:22
96:4 145:20
**cardiovascular**
31:23 168:23
**care** 22:17,19
38:19 39:5 45:17
49:2,6,9,18 100:1
100:3 115:18
**career** 41:13,16
48:12 82:8,23,25
95:17,22 186:17
**careful** 161:3
163:12
**carefully** 156:10
169:4
**carondelet** 6:6
**carrier** 32:24

**case** 12:21 79:13
85:8 88:6,8 89:9
94:8 122:7 129:24
130:20 132:4
136:24 140:25
141:16 143:17,18
157:3 169:21
170:5 171:13
172:10 181:25
185:17 186:23
191:10
**cases** 35:15 102:20
196:23
**categorically** 71:6
**categories** 54:11
62:21 133:9
185:24
**category** 54:2,2
76:15,23
**caught** 16:14
197:22
**caution** 182:1
**center** 2:15 3:9
25:2,9
**centre** 4:10,15 5:6
**cerner** 2:6
**certain** 23:19
26:15 44:19 45:7
148:16 149:12
154:24 160:21,22
188:24
**certainly** 20:17
79:22 168:10
**certainty** 163:13
**certificate** 8:8,9
200:1 201:1
**certificates** 78:10
**certification** 21:15
21:19 23:10,15
**certifications**
21:11,12 77:17

**certified** 21:15,17
**certify** 200:7
201:6,12
**cetera** 11:14 31:2
80:15
**cfr** 178:10
**cgannon** 3:11
**chagrin** 3:16
**change** 150:16
153:14 203:4,7,10
203:13,16,19
**changed** 38:10
143:11
**changes** 102:10
143:9,16,25 144:2
202:10 204:6
**changing** 49:16
**chapters** 81:18
**characterization**
66:17
**charges** 88:3
**charles** 3:14
**charlie** 2:21 10:24
70:16
**charlotte** 3:6
**chartered** 2:14
**check** 17:6 179:24
180:5
**chelsea** 1:16 10:10
11:5 199:12 200:6
200:17 201:5,22
**chicago** 5:14 83:2
**child** 21:16
**choice** 30:24
**choose** 30:17
**chp** 194:20
**chris** 3:4
**christine** 3:9
**christopher.henry**
3:7

**cincinnati** 5:2
**circumstances**
150:17
**cited** 128:12
**cites** 178:8
**city** 2:15
**civil** 69:3 70:4
**claim** 42:25 43:23
44:16 97:22
104:19 113:23
194:23 195:23
196:4,12
**claim's** 162:23
**claims** 32:18 39:5
39:23 40:9,10,12
43:5,6,25 44:3,9
44:10 92:1 98:5,8
113:18 114:3
162:18 163:14,23
164:24 165:15
186:10 187:2,3,5
187:16 189:23
190:1,1,9,10,11,18
190:19 191:7,8,19
191:25,25 192:8
193:1,1,3,7,9,16
193:16,18,20,22
194:1,21 195:3,9
195:10,24 196:3
196:13,21 197:12
198:2,4,9,17,22
**clarify** 107:18
113:24 139:4
149:9 152:19
175:17 180:18
**class** 103:4,8 188:4
188:18
**classes** 20:15,18
**classification** 96:5
96:6,13,15 134:9

**classwork** 55:25
**clear** 108:17
  171:19 178:20
  192:17
**clearly** 107:17
  198:4
**client** 23:8 28:12
  28:23 30:4 38:21
  44:4,5,5,6,7,11,13
  57:16 58:12 59:23
  60:13,19 61:10,12
  61:23 82:16
  102:13 158:12
  160:9,11
**client's** 170:18
**clients** 30:7,17
  31:14 32:15 33:6
  33:10,13,14 36:23
  37:20,25 38:22
  41:23 42:11 56:24
  57:10 58:2,3,10
  59:7 62:18 82:12
  82:14,19 91:18
  151:25 157:15,17
  158:1,4,8,13,17,20
  158:23 159:19
  168:6,11,14 169:6
  170:17,22,25
  171:3 184:14,18
**clinical** 23:7,7,19
  24:1,23 25:1,4,6
  25:13,16 26:2
  28:11,12,14,18
  29:12,21,22,25
  31:4,6,11,11,12
  33:1,20,25 34:1,21
  35:16 38:20 50:24
  53:19,21 83:20
  103:18,22 104:6
  104:16,22 105:2
  126:25 152:25

155:14
**clinics** 25:11
**close** 127:23
**closely** 24:9 99:10
  115:14 168:25
**cluttered** 80:4
**coaching** 181:21
**coan** 4:18
**coates** 4:22
**coatesg** 4:24
**code** 109:9 116:12
  175:25 176:6,10
  176:15 177:7,16
  177:21,25 178:8
  178:12,22 179:1,4
  181:5,7,9,14,17
  182:24
**codes** 109:18,20
  109:23,23 116:15
**collaboration**
  29:14,15
**colleague** 46:15
  64:23
**colleagues** 36:1
**collect** 89:1
**college** 7:2 44:22
  48:22,23 77:11,24
  78:5
**columns** 125:22
**combination**
  88:14
**come** 32:23 33:7
  92:17
**comes** 23:10
**comfortable**
  133:24
**coming** 15:1 27:19
  27:20 152:3,7,11
  152:15
**comment** 68:20
  137:25 157:21

190:17
**commented**
  166:22
**commission**
  200:17
**committee** 41:21
  42:4,20,22 102:17
  102:18,22,24
  103:15 104:21
  118:4,5 120:20
  121:5 126:11
  127:16 133:7
  152:8
**committee's** 42:6
  126:6
**committees** 41:9
  41:12,14,18,23
  42:1 104:5,15
  105:1 116:19
  118:11,19,25
  119:13 121:3,14
  124:4,11 127:3
  132:9,18 133:14
  133:21 134:7,17
  134:23 136:3
  151:8,19,23 152:4
  152:19 153:12
  173:1
**common** 131:12
**communicate**
  167:9
**communicated**
  167:12,16
**communicating**
  29:19
**communication**
  64:17
**communications**
  17:1
**community** 31:9
  32:2

**companies** 159:11
  159:14 160:6,17
**company** 36:24
  42:13 79:4,7
  169:20
**compared** 100:18
**compensated**
  88:19
**competitive** 31:4
**complaint** 165:24
  185:16,19 186:25
  187:23
**complete** 18:8,20
  86:3,14 115:15
  204:8
**completed** 18:22
  55:11,20 105:4
  202:17
**completely** 192:20
**completing** 29:17
**complex** 34:9
**compliance** 22:4,6
  116:20 118:12
  120:3,21 127:5
  132:11 173:2
**compliant** 124:7
  132:7
**complied** 119:22
  119:24 173:4
**complying** 160:10
**component** 58:19
  115:4,6 155:20
**components** 31:13
  54:4,19,21 133:25
  138:24
**computer** 18:7
  78:3
**concept** 55:6
  127:10
**concern** 166:14

**[concerning - continue]**

concerning 101:10
158:12,24 174:4
190:21 192:4
concerns 12:17
83:22 84:18
155:17
concluded 199:18
concludes 199:15
conclusion 60:7
67:13 69:17,18
70:2 74:4 100:25
121:19 122:2
130:18 164:20
165:7 178:2
187:18
conclusions
111:17,22
condition 168:24
conditions 25:25
31:10 32:4 34:9
conducted 54:10
69:7
confer 70:20
conference 12:15
confident 153:22
179:11
confidential 42:9
42:10 157:22
158:1,9,14,19,21
159:5,6,10,25
160:1 169:24
confidentiality
159:13 160:9,11
160:16
confines 40:1
confirm 86:2
conjunction
119:10
conlee 2:18 11:1
70:15

connected 201:15
connection 42:13
53:15 58:3 78:1
78:22 79:10 83:10
86:4,15,24 87:14
88:4,19 89:18
90:4,9,13,16,18
91:4,8,14,21 92:4
92:8 190:8
conservative
167:21
consider 42:22
60:24 70:11 76:12
100:22 104:24
137:13 158:8,13
158:17 159:10
consideration
57:12 58:18 60:10
75:9 76:19,19,20
106:10 115:24
116:4 119:25
126:12 131:5
135:25 136:18
150:5
considered 104:17
104:21 115:17,24
115:25 116:13,16
117:8 118:6,16
120:13,13 127:18
128:7 134:10
136:17 137:10
147:6 150:1
153:13
consistent 12:20
94:10 95:11
140:24 153:2
176:24
consistently 66:18
consists 163:23
188:4

constructed 128:1
consult 67:15
102:22 151:8
152:4,8,12,16
153:6,19,21
170:10
consultant 41:4,4
47:11 50:1,11,15
50:17,25 53:20
78:21 153:1 157:2
consultation
158:24
consulted 65:20
151:18
consulting 36:11
36:13,15,22 38:19
42:12 50:15,17
51:1,16 59:6
61:17 79:3,6,10
98:25 158:20
consults 171:12
consume 168:20
consumed 87:22
88:1,2 164:13
165:19 194:2
consuming 164:8
contact 168:5,7,8
contacted 90:9,12
90:15
contacts 165:21
contain 148:17
149:12 185:25
contained 154:25
164:8,17 165:5,19
168:19 176:14,15
177:7 190:21
containing 52:13
52:24 53:4,10
93:16 97:3,4
121:9 148:9 151:5
154:21,25 157:7

157:11,17 160:21
167:3,12 168:12
170:6 188:10
192:4
contains 105:23
125:22
contaminant 94:8
95:9 140:10,13,21
141:25 147:6
156:23 174:15
183:13
contaminants
93:16,19,21 94:5
94:14 95:8,15
96:1,3 129:10,18
129:23 130:3,6
137:3,9,14,21,22
137:23 138:1,14
139:8 141:7,10,11
141:15,19 142:3,6
143:18 145:19
146:7 147:20
155:1,3,4,6 157:4
163:24 164:3
183:19
contaminated
147:15 162:13,22
162:24 163:8
165:15 171:7,14
174:14 185:11,17
186:24
contamination
186:25
content 71:20
context 53:18 82:5
82:7 146:20,21,22
155:12 182:25
183:11
continual 152:24
continue 70:5 72:5
72:15,20 73:13,14

74:6 156:15 163:13 168:20
**continues** 66:20 72:19
**continuing** 50:20 50:22 72:11 78:7 78:9 121:25 122:3
**contraindications** 28:3
**control** 117:14 140:6
**controversial** 183:4
**cooperative** 169:17
**coordination** 97:25 100:2
**copies** 202:14
**copy** 40:24 85:12 85:16 113:8,16 114:11
**corporation** 4:8 6:21
**correct** 13:16 17:14,15 23:23,24 24:2,3,18 25:15 26:4,20 27:6,7,25 28:6,8 29:3 32:10 33:3 34:12 35:8 36:6 43:16,17 47:12,23 48:3 55:9 63:25 64:19 78:14 80:12,13,16 81:1,2,6,7,9,10,12 81:13,15,20,21 83:25 84:15,22 85:2,6 86:24 88:17 89:22 93:12 93:13 96:23 97:9 99:15 100:18 101:10,16 102:23

103:1 104:21,25 105:9,17,18,21,22 105:25 106:7,12 107:23 109:9,10 110:4 114:24 117:23 118:14,20 118:23 119:13 121:6 123:19 128:13 135:15 137:14 139:9 142:23 147:2 149:6,22 150:2,13 150:20 151:2 158:11 159:7 160:7 166:2 167:13 168:21 176:1,7,21 191:12 191:23 192:11 204:8
**corrections** 204:6
**correctly** 44:7 62:12 94:4,23 112:17 119:18 120:8 196:1
**cost** 104:4,13,14 104:18,23,24 115:19
**costs** 105:4 194:22
**cotes** 12:7,7
**could've** 110:15
**council** 35:11
**counsel** 9:16 10:13 10:15 17:1 22:2 27:1 69:13 70:21 71:5,14 73:16 92:12,15 111:14 181:12,23,24 201:13,15 202:14
**counsel's** 73:15
**counseled** 159:11

**counseling** 27:19 42:12 158:18
**counselor** 160:12
**countless** 41:17
**country** 160:23 161:10,24 162:9 164:13
**county** 200:3 201:3
**couple** 11:4 28:24 29:1 70:23 175:16 184:10
**course** 20:20 55:17 56:3 63:3,8 70:22 186:17
**courses** 20:21,22 20:24 55:1,3,8 63:5,11,14,19,23 63:25 64:1,2,11
**coursework** 20:3 55:11,20 77:10,12 77:24 78:6
**court** 1:1 10:10,11 10:13 11:10,19,20 12:24 13:23 14:7 14:19 68:19 69:19 74:10,12 108:23 182:9 183:7 194:5 194:8
**courts** 69:22
**coverage** 120:14
**covered** 30:9,9 182:11,13
**covid** 83:6,8
**cpr** 21:16
**create** 31:10 151:23
**created** 36:8
**creates** 30:16
**credible** 124:17

**credits** 78:8
**criteria** 26:16 45:7 47:8 57:5 58:24 67:20 110:4 116:3 136:16 145:22 150:19 151:14,16 164:23 183:17,19
**criterion** 149:16
**critical** 115:4 169:2
**criticism** 97:4
**cross** 8:4,6 154:14 189:21
**crowell** 5:21 7:5
**crowell.com** 5:22 7:6
**crs7270** 3:16
**cs** 202:15
**culbertson** 4:19
**culminating** 71:14
**current** 13:21,22 17:13,16 42:15 46:13 54:3 82:8 149:20 184:14
**currently** 13:24 21:5 45:2,22 79:9
**curriculum** 20:1 54:23
**customize** 102:4,9
**cut** 169:13
**cv** 8:15 17:13,14 17:16,19,21,25 23:20 28:19 30:11 31:3 32:7,25 34:11 37:14 44:18 62:2,4,14,17 63:15 64:16 80:22,23
**cvs** 5:11
**cwhorton** 2:23

**d**

**d** 8:1 10:1 69:3
70:12 101:15,17
106:22 143:7,13
144:4 189:23
**d'lesli** 4:5
**dade** 200:3 201:3
**dallas** 4:7 6:20
**dan** 7:4
**dana** 3:19
**dangerous** 129:19
**data** 32:8,13,16,18
32:19,22,23 43:25
44:3,9,10,17 86:19
97:21,21 98:8
103:21 113:19
114:3 127:13
135:10 163:23
165:16 172:20
185:25 186:10,11
186:12,16,23
187:2,5 189:24
190:1,9,10,18
191:7,19,25 192:8
192:19 193:1,3,8,9
193:16,17,20,22
194:1,21 195:3,9
195:10,24 196:3
196:13,21 197:12
198:2,4,9,18,23
**date** 1:11 17:13
19:8 53:20 83:7,7
86:9 89:12 90:6,7
138:19 196:8,10
197:13,14,24
198:3,21 203:24
204:12
**dated** 201:17
**dates** 138:23 139:3
139:5,5

**daubert** 69:22
74:10
**davis** 4:5
**day** 49:13,13 86:8
86:8,18,18 91:15
91:15 100:21,21
112:24,24 115:5,5
133:22,22 152:25
152:25 155:14,14
163:22,22 172:21
172:21 185:6
200:10,12 201:17
204:15
**days** 202:17
**dc** 4:2 5:22 7:6
**de** 1:14 2:11,22
10:7
**dealers** 2:17 10:23
185:15
**deals** 99:15
**december** 34:19
**decided** 103:10
**deciding** 105:14
**decision** 91:20
118:5
**decisions** 67:17
76:4 103:16 104:5
104:15
**declaration**
114:17
**declare** 204:4
**dedicated** 38:18
**deem** 35:16
**deemed** 116:1
124:8 144:15
204:6
**defendant** 1:13
13:13 182:12
188:13
**defendant's** 71:17
140:11 142:1

151:5 161:11,25
**defendants** 69:10
69:24 70:6 72:8
73:21 111:16
175:15 183:13
184:6,9,21
**defense** 69:13
70:20 73:3,11
**defer** 75:19,23
**define** 77:8 115:10
**defined** 177:24
178:12,21,25
179:4 181:4,7
182:23 183:24
188:4,19
**definition** 34:8
95:15,21 96:1
171:15,22,25
172:3,10,17
175:25 176:3,6,13
176:14,20,22
177:7,12,16,20
178:3,5 179:6,9,11
179:12 181:9,13
181:16 183:10
**definitions** 109:8
**degree** 18:12,21
18:24 24:25 25:7
25:20 55:12,13,13
55:21,22 78:8
**degrees** 19:10
77:11,20 78:5,12
115:3
**demonstrate**
106:6 144:20,22
**demonstrated**
193:9
**demonstrates**
190:1
**demonstrating**
128:8

**department** 20:9
21:18 22:11,15
23:10 63:12
**depends** 43:10,15
**deponent** 9:17
69:5,9 202:13
204:3
**deposed** 14:1
78:25
**deposing** 202:13
**deposition** 1:10
8:14 9:17 10:6,7
14:6 16:4,7,10
17:6 66:19 69:5
71:16,23 72:5,12
73:17 79:16
181:24 195:6
199:16,18 201:8
**depositions** 11:13
11:24 12:2,4
**derived** 79:9
**describe** 39:2
64:20
**description** 95:7
108:14
**design** 30:8 41:5,7
102:13,14
**designed** 31:3,7
71:8
**designs** 83:13
**detail** 97:22
171:18
**detectable** 148:17
149:13
**determination**
91:13 150:2,11,25
**determine** 72:25
73:1 125:21 166:7
173:4 190:6 191:3
192:2

[determined - drug]                                                        Page 12

**determined** 116:3
**determines** 116:8
  149:21
**determining** 33:7
  150:8
**develop** 101:24
  102:11
**developed** 30:11
  103:4,5
**developing** 30:21
  30:23
**development**
  38:20 100:2,6
  102:20 107:6,16
  112:16
**developments**
  41:20
**deviation** 141:16
  144:21
**device** 79:7
**diabetes** 25:23
  31:23
**diagnoses** 25:25
**diagnosis** 32:3
**diagram** 104:7
  105:7,11,12
**diem** 29:9
**differ** 39:16 40:7
**differences** 39:18
  39:20
**different** 25:25
  30:19 35:21 39:7
  72:21 81:23 89:2
  91:11 109:22
  129:21 139:6
  157:13 167:15
  168:11 169:16
  170:12,12 175:6
**differs** 39:12
**direct** 8:4,6,7 13:8
  185:3 192:16

194:17
**directly** 22:19
  44:12 173:24
  196:12
**director** 19:20
  23:7 28:11,17
  29:21 34:21
**disagree** 71:6
  73:24
**disclosed** 87:12
**discourteous** 70:4
**discovery** 191:11
**discuss** 109:8
  110:3 126:5
**discussed** 12:14
  19:10 21:2 48:10
  48:14 59:10 83:18
  83:23 84:9,22
  95:6 99:1 108:4
  127:10
**discusses** 100:8
  126:6,20
**discussing** 83:9,12
  83:14,24 84:8,23
**discussion** 26:11
  26:21,23 34:4
  58:19 84:17,19
  99:12 105:5 108:7
**dispensing** 27:18
**distance** 35:5,10
**distinction** 130:1
**distributed** 188:11
**district** 1:1,1
**division** 20:22
  63:21 64:1
**divorced** 192:20
**dklinges** 3:21
**doctor** 16:6,16
  17:25 38:17 55:13
  68:8 78:14 79:15
  80:25 81:22 85:23

87:25 88:3 90:25
  95:5 101:24
  112:13 125:14
  128:24 135:13
  154:16 171:2
  175:21,24 177:5
  177:14 179:14,22
  180:17 181:3
  182:18 183:10,24
  184:4 194:19
**doctorate** 19:1,5,7
  25:7 55:22
**document** 1:6
  16:16 40:23 90:22
  90:25 120:2,19
  123:16,21 124:19
  125:4,15,19,21
  128:1,2,9 135:15
  176:17,23 177:1
**documented** 31:4
**documenting**
  29:18
**documents** 16:22
  17:7 40:13,16,18
  135:4,5,7,11,22,24
  175:5
**doing** 73:15 82:24
  92:3 102:2 126:18
  179:24,25
**dorner** 4:1 8:7
  111:23,23 194:15
  194:18,19 195:1,2
  195:7,12,22
  196:18 197:2,10
  197:21 198:5,14
  199:2,4,7
**dosage** 113:8,16
  114:12
**dose** 188:13
**dozens** 12:8,8

**dr** 10:6 13:10,20
  27:5 44:18 59:23
  68:3 69:11 70:3
  74:6,13,20 92:16
  93:3 110:25
  111:17 140:19
  149:15 153:15
  154:4 156:3
  157:22 169:21
  185:5 189:16
  199:3,12
**drew** 4:1 111:23
  194:19
**drive** 4:23
**drug** 22:9 26:12
  26:13,14,15 27:24
  27:25 30:18 31:14
  33:1,20 53:22,23
  53:24 57:4,10,21
  60:1,10,17 61:5
  62:18,25 66:1
  67:5,21 72:3 75:9
  75:16 76:3,13,21
  82:1,3,4 83:13,13
  83:20 84:18 100:3
  100:3,5,6,8 101:19
  101:21 102:21
  103:21 104:1,16
  105:2,19,25 106:5
  107:6,15 112:8,15
  113:8,8,11,15,16
  114:11,12,21,22
  114:23 115:6,23
  116:3 118:5
  120:11,14 121:9
  121:12,15 122:23
  122:24,25 123:14
  125:1 126:16
  127:2,4,7 131:6,12
  131:20,21 132:3,4
  132:6,13 133:12

[drug - equivalence]                                                    Page 13

133:23 134:6,9
136:15,20 137:4,9
138:1 140:24
141:4,17 142:4
143:16 144:7,13
144:14,20 145:22
145:23,24,25
147:7 149:24,25
150:1,8 151:12,25
157:17 160:24
162:21,21 164:2
164:21 166:14
168:23 172:1
173:6,10 174:16
178:4,9 179:7,12
179:16 180:20
181:17 183:1,2,17
183:18,20 188:10
196:24
**drugs** 6:17 22:3
30:9,16 33:22,24
52:13,24 53:5,11
56:24 57:12 67:7
67:17,18 74:25
75:8 76:12,19
93:16 97:3,4
107:2 110:8 111:1
112:10 114:21
115:17,22,25
120:6,12,25 127:6
127:18,21 128:6
132:11 133:3,5,6,9
133:9,10,12
134:11,20 139:11
141:16 148:9
152:22 154:21,25
157:3,7,11 158:25
160:21 161:8
162:13 164:24
165:10,13 167:3
167:12 173:12

174:14 190:19
198:17
**dtdorner** 4:3
**duane** 3:19 4:1
**duanemorris.com**
3:21 4:3
**due** 93:16
**duly** 13:6 200:8
**duties** 27:13 29:11
29:13 36:20

**e**

**e** 2:1,1 3:2 8:1,11
10:1,1 171:25
180:22,25,25,25
203:3,3,3
**earlier** 27:2 37:1
71:4 74:1 93:11
182:12
**echo** 186:20
**economic** 165:9
**economics** 77:7,10
77:12,18,20
**education** 19:9
50:20,22 54:17,22
55:2,7 59:4 77:25
78:7,9 86:8 95:17
99:21 100:15
112:23 113:12
114:14 115:3,7
132:17 133:19
135:2,11 136:1
155:21
**effect** 69:17 70:3
187:23 188:19
**effective** 58:24
104:18 114:23
115:24 116:1
117:15,18 120:25
122:23 124:8
126:8,8,17 127:5
128:8 129:20

132:8 136:22
144:15,21 145:24
163:10 173:10
**effectiveness**
105:20 123:14
151:17 183:2
**effects** 82:3,4
83:21,21
**efficacy** 95:12
104:13,16 149:19
**efficiency** 74:5
**efficiently** 30:1
73:13 161:16
**either** 44:7 102:3
111:24 196:9
**elaborate** 39:19
**ellie** 6:18
**ellie.norris** 4:7
6:20
**embarrasses** 69:8
71:9
**employed** 22:23
**employee** 23:18
42:18 201:13,14
**employees** 30:18
36:16
**employer** 23:5,6
33:14 36:14 39:8
39:13 168:7
169:22
**employers** 3:17
30:17,20 39:24
159:19
**employment** 82:10
**encouraged**
115:18
**engaged** 41:23
51:25 52:3,22
53:3,9 54:14
91:21 175:2

**engagement** 8:18
82:15 83:2 91:3,4
91:14
**engagements** 82:6
**enrollment** 32:9
**ensure** 35:2 99:11
117:17 161:17
169:10
**ensuring** 28:2
29:23 104:16
117:15 171:6
**entail** 22:1,11 24:4
55:14
**entailed** 30:14
32:11 55:17 77:12
**entails** 22:2 66:6
76:4
**entire** 28:16
111:12 127:12
128:1 135:10
140:16,18 178:25
**entirety** 81:20
99:7 108:6 110:15
111:8 164:4
**entities** 33:11
35:22 42:5 98:25
184:20
**entitled** 111:16
121:21
**entity** 37:4 40:6
44:13 105:14
150:7 170:23
174:10
**entry** 110:4
**epidemic** 64:18,24
**epidemiology** 56:9
**equivalence**
101:20 105:24
106:2 109:9,17,20
109:23 116:8,12
144:5 150:17,20

178:8
equivalent 116:9
122:24 140:11
141:17 142:1,5
144:15 151:1
183:14
equivalents
115:17
errata 8:9 202:11
202:13,17
erratas 202:15
error 197:22
esquire 2:2,6,10
2:14,18,21 3:1,4,9
3:14,19 4:1,5,9,14
4:18,22 5:1,5,9,12
5:16,20 6:1,5,9,14
6:18 7:1,4 202:1
essential 31:13
133:25
essentially 164:5
established 58:25
68:6 74:24 75:17
110:8 111:1
112:10 120:12
128:6 134:9 140:5
153:8
et 11:14 31:2
80:15 202:4 203:1
204:1
evaluate 32:14
evaluated 20:4
150:15
evaluating 127:11
149:24
evaluation 26:11
101:20 116:8
evaluations
105:24 106:3
evasive 72:20
73:10,25

event 11:13
evidence 31:3,7,16
31:17 32:1 103:16
127:13 148:25
evolving 49:16
evp 38:12
exact 83:7 90:6,6
138:19
exactly 46:23
47:15 88:12
158:22
examination 8:4,4
8:5,5,6,6,7 13:8
70:13 154:14
158:2 175:19
180:10 182:14
184:11 185:3
189:21 194:17
examine 70:9
examined 13:6
example 195:15
196:22,24 197:4
197:15,23
examples 31:22
135:14
exceeds 89:21
excel 88:15,16
exceptions 127:21
excerpts 97:21
186:11
exchange 196:20
exchanged 196:5
196:11
exchanges 195:14
excluded 102:14
exclusive 30:12
exclusively 123:25
excuse 66:13 68:9
80:18 85:24 86:12
97:21 102:2 143:8
155:7 156:1,1

170:14 180:11,21
executive 37:10,15
37:24 38:10
157:24
executives 44:23
48:22,23
exhibit 8:13,15,16
8:18,19 16:10,13
16:15 17:14,21,24
40:14,15 79:15,18
85:13,21,23 90:23
90:24 93:4 125:10
125:11,14 126:5,6
126:12,20 127:10
127:19 128:12
195:1,5,7
exhibits 16:12
79:21 85:13 195:2
exist 39:21
expect 43:8,12,19
66:24
experience 34:2
38:18 41:9,11
43:23 54:17 59:4
59:6 86:7 98:24
99:20 100:15
107:8,24 112:23
112:25 113:12
115:7 132:17
133:19,21 134:23
135:2,12 136:1
165:21 166:1,25
168:10 172:22
173:3
expert 33:1,5,9,20
40:20,24 51:23
65:23,25 66:3,9
67:10 68:3 69:16
69:21,24,25 71:19
74:10,11 76:7,11
76:16,18 78:21,21

79:10,10,13 80:21
80:22 86:7,20
89:4,9 98:24 99:7
108:7 110:16
111:18 135:23,25
155:10 157:23
159:21 169:21
170:5 172:10,19
173:20
expertise 35:15
163:15
experts 36:1 87:11
97:21 197:9
expires 200:18
explain 88:24
explanation
108:13 109:17,20
explore 71:17
111:16,21
express 6:8 121:6
expressed 62:2,17
expressly 116:19
118:2,12,19,24
119:3,6,13,19
120:3,7,20 173:1
extensively 182:13
extent 70:13 74:7
89:2 133:13
141:14
extract 44:10

f

facing 24:12
fact 98:15,16
102:19 108:10,18
109:3 113:22
114:1,7 130:23
131:11,12 137:25
149:5 162:9
163:16 186:2
factor 104:4,24

[factors - form]                                                                    Page 15

**factors**  104:20,22
  149:23
**facts**  148:24 186:2
**faculty**  19:13,15
  19:16,19 20:8
**failing**  66:18
**fails**  202:19
**fair**  15:8 73:8
**faith**  69:7
**falkenberg**  5:13
**falkenbergives.c...**
  5:14
**fall**  27:22 64:1
**falls**  3:16 100:20
**false**  137:1 145:1,2
  145:3,17 147:1,13
  161:19 170:3
**familiar**  41:14,21
  55:7 127:1
**familiarity**  132:17
  136:2
**far**  86:11 89:19
  90:1
**fax**  4:20
**fda**  52:19 57:5
  58:25 60:2 65:20
  65:22,25 66:4,6,10
  67:18 68:5,7 72:3
  74:22,25 75:4,12
  75:17,19,23 93:15
  93:18 95:20,23,24
  97:6 101:21
  105:17,20 106:4,6
  106:25 107:1,3
  109:14 110:8,13
  111:1 112:11
  115:10,14,17
  116:25 117:7,17
  118:15,22 119:11
  119:16 120:12
  121:4,12 126:19

127:6,6 128:7
  130:5,25 131:6,13
  131:16,19,24
  132:3,5,7,11
  133:16 134:11
  136:16,21 138:14
  139:7,10,13,14,16
  139:22 140:2,5
  141:13 143:17
  144:2,3,3 145:23
  146:6,9,12,17
  148:1 149:21
  150:2,9,16,24
  151:15,17 152:22
  153:11 155:16
  157:8 161:4
  162:16 163:11
  164:23 166:11,13
  166:16,22 168:14
  171:14,15,22
  172:10,17 173:8,8
  174:14 175:10
  176:3,10 177:25
  179:4 181:16
  183:20
**fda's**  116:7 150:11
  176:6,14
**february**  34:19
  200:13 202:3
**federal**  69:3,16,22
  74:10 176:1,7,8,10
  176:15 177:8,16
  177:21,25 178:12
  178:22 179:1,5,8
  181:5,8,9,14,18
  182:24
**feel**  85:2
**fees**  89:1,6,18,25
**fhs**  4:11,16
**field**  22:17 47:8,9
  50:17,19 98:25

112:25
**fields**  44:4 97:23
  193:23,23
**fifth**  98:12,14
**fifty**  89:15,15
  167:23
**file**  88:10 131:20
  131:22 132:3
**filed**  132:5 165:18
  185:12
**files**  106:5
**filing**  106:14
**filled**  27:25
**filling**  27:17,18
**fin**  114:17
**finally**  26:2 32:25
  47:21
**financially**  201:15
**find**  64:5 126:23
**findings**  29:18
**fine**  80:7 165:20
**finish**  14:16,18
  33:15 68:9 127:25
  146:14 156:3
**finished**  156:6,10
  184:24 186:8
  188:12
**firm**  7:1 13:12
**first**  11:4 13:6,15
  14:6 17:13 19:18
  21:16 43:13,19
  44:25 85:14 90:4
  90:9 138:3,4,10,20
  139:24 140:2,5
  142:7,11
**five**  168:4 183:7
  189:9
**fl**  1:15 2:11,23 5:6
  6:3
**flaherty**  2:14
  10:22 90:21

**floor**  3:10 4:10,15
  4:19
**florham**  4:24
**florida**  1:16 10:8
  13:23,23 37:2
  200:2,7,17 201:2,6
  201:23
**focus**  25:23 43:20
  57:6,18 83:16,19
  84:1,3,7
**focused**  58:15
**folks**  11:25 12:13
  14:24 15:2 154:7
**follow**  112:10
  120:11 133:6
  154:5 175:17
  182:10 185:1
  189:19
**followed**  128:6
  168:25 174:20
  190:3 191:23
  193:16
**following**  151:15
  151:22 162:1,2,10
  167:16 168:2
  174:7 189:25
  190:8 191:5,11
  196:21
**follows**  13:7
**food**  100:6 107:6
  107:15 112:15
**footnote**  102:19,25
  123:17 124:4,10
  124:20 125:4,15
**foregoing**  201:9
  204:5
**form**  39:9 52:25
  53:6,12 54:7,16
  55:10,19 56:5,23
  57:8,19 58:16
  60:6,16 61:13,16

**[form - generic]**                                                                 Page 16

61:25 62:15,23
65:24 66:5 67:13
74:23 75:6,14,20
76:1,9,17,25 80:19
81:3 82:13 84:10
84:25 85:4 86:17
86:25 94:7,15,21
94:24 96:14,20,25
99:3 100:24 102:5
106:13 108:10,20
109:4,13 110:12
110:23 111:5
112:6 115:2,21
116:10,24 117:5
117:12,21 118:3
120:23 122:1,21
123:4,11,24 124:2
124:22 125:6
129:12 132:16,21
133:2,20 134:5,16
134:22 135:1,18
136:9,14 137:6,15
138:12,22 140:15
143:4,15 144:12
144:18 145:12,18
147:4,14,19 148:4
148:13,19,24
149:7 150:4
152:18 159:1,18
160:8 161:1
163:18 166:19
167:4 168:13,22
169:14 171:24
172:5 174:6,22
176:2 178:1 181:6
181:11 184:1
191:13 192:15
193:15 194:24
195:19 196:16
197:5,7,17 198:11
198:24

**formal**  19:9 59:24
60:14,25 61:2,22
62:5,13,22,24 77:6
77:8,22
**formally**  162:5
**format**  193:17
**formed**  99:23
**former**  184:18
**forming**  85:7 86:4
108:6
**formularies**  60:11
100:4,8 101:25
102:10 103:4
151:25 162:5
**formulary**  29:24
30:8 31:15 33:22
33:23 34:6 35:2,3
41:5,6 54:3,5 57:1
57:13 58:19 67:17
75:9 76:4,13,20
83:13 100:2,5
102:3,4,15,21
103:5,8,16 104:17
105:14,15 115:25
116:4 118:6 120:1
120:14 121:15
126:6,7,12 127:1,3
127:7,12,16,18,21
128:5,7 132:12
134:10 136:15,18
136:19,21 147:7
151:9,15,19 152:5
152:13 153:14
157:18 158:5,12
158:18,25 159:12
160:24 161:12,25
162:4,10 164:2,22
**formulating**  99:17
100:11 106:23
109:11 137:12
153:5,18

**forth**  32:2 123:7
130:25 132:7
139:19 145:22
151:16 164:23
168:14 189:2
**forward**  73:13,17
151:24
**found**  93:18,21
137:4,14 139:22
141:4 148:8
160:21 164:4
165:15 174:5
175:25 176:6
198:4
**foundation**  116:2
137:6 167:4,5
178:15 181:6,18
187:1 194:25
195:20 196:17
198:13,25
**foundational**
115:5
**founder**  36:2
**four**  18:10 98:10
185:24
**fourth**  93:10 98:12
98:14 104:8
**frame**  25:16 26:5
29:5 37:12,16
82:22 137:1,3,5,8
137:13,20,21,22
138:7,8 150:22
151:20 161:13
162:13 164:3,4
171:6
**francisco**  34:14
**frank**  4:9
**free**  85:2
**front**  40:14,19,21
79:19 93:4

**fulbright**  4:6 6:19
**fulfilled**  55:13,21
123:13 173:9
**full**  13:18,20 28:20
89:25
**fully**  59:10
**function**  41:15
51:11 105:3
**functions**  24:6
40:10 41:7,20
49:14 91:15
100:21 104:18
115:5 128:4
133:22,23 152:25
155:15
**further**  8:6,6,7,7
11:3 12:6 98:1,5
154:4,6 184:9
185:3 189:15,21
191:20 194:17,17
199:7 201:12

**g**

**g**  10:1
**ga**  6:11
**gain**  67:21 112:8
127:5
**gannon**  3:9
**gateway**  3:9
**gathering**  92:4
**gcoan**  4:20
**general**  131:25
153:17 171:4
185:13 193:22
**generally**  195:9
**generic**  53:22,22
67:17,18,20 75:5,8
75:12,16 76:3,12
76:19 92:10
105:24 106:5
107:2 112:10
113:7,11,15

114:11,21,22
115:6,17 116:3,9
121:12 127:2,21
131:21 132:4
133:3,9,12 134:6
134:11,20 142:4
143:8,9,16 144:6
144:13 151:12
153:12 157:3
164:2 173:12
183:1,16
**generics** 30:25
66:1 67:6
**geoffrey** 4:18
**geoppinger** 5:1
8:5 175:16,20,22
176:5 177:3,4
178:6,18,23 179:2
179:13,21,23
180:4,11,15,16,23
181:2,12,23
182:11,17 183:9
184:4
**getting** 66:14
92:15 127:23
175:21 197:3
**gg352672** 200:18
**ghansel** 2:16 202:2
**gisleson** 5:5 8:4,6
73:5,5 154:10,15
154:16 156:1,2,5
156:12,14 157:5
158:3 159:3,7,8,15
159:22 160:3,13
161:5 163:20
165:1,11 166:20
167:7 168:17
169:8,12 170:1,14
170:18 171:1,19
171:21 172:2,8
173:22 174:2,18

174:24 175:12
185:8 188:20
189:19,20,22
191:15,16,21
192:9,16,22 193:6
193:19 194:7,11
196:14 198:10
**give** 13:2 15:21
16:13 31:22 65:5
115:14 125:17,24
156:9 196:22
**given** 56:18,21
57:6,17,20,24
59:24 60:1,9,14,21
61:23 62:5,13,22
81:25 173:8 204:9
**giving** 150:17
197:4
**glad** 182:5
**glenn** 2:6 10:20
12:7
**gmail.com** 3:16
**go** 11:3 14:3 15:13
16:9 17:10,21,22
66:19 68:18 72:23
72:23 74:13 85:12
90:22 99:9 114:4
114:20 127:15
128:16 138:19
153:23 156:16
162:12 164:21
180:3 181:19
**goes** 101:11,16
161:18 173:24
**going** 10:3 15:7
16:9,11,19,24
17:10 59:18 66:19
68:8,22,24 70:23
73:1 80:18 90:22
93:7,7,9 104:17
115:13 122:11

128:19 151:20
152:1 153:25
169:12,24 170:20
189:11 199:16
**good** 10:3 13:10
13:11 45:12,13
47:20 48:8 57:4
57:12 80:9 93:3
173:23 175:21
**goodness** 83:6
**gordon** 4:10,14
**governmental**
198:20
**graduation** 19:8
**great** 14:23 126:1
171:18 181:25
**greenberg** 2:3,7
4:23 6:10 10:18
10:20 13:13
**greg** 4:22 10:22
12:7,7 68:24
90:11,12
**gregory** 2:14
202:1
**ground** 14:3 69:6
70:1
**grounds** 16:24
**group** 12:5 36:15
40:6 57:18
**groups** 33:14
36:14 57:20 60:18
168:7
**gtlaw.com** 2:4
4:24 6:12
**guarantee** 88:25
123:6
**guess** 11:4 74:8
83:20
**guidance** 22:4
30:10 33:21 37:20
37:25 49:10,14

57:10 59:6 139:18
140:5 161:4
162:16 163:12
166:11 168:16
175:10
**guidelines** 31:8,16
31:17 32:1,2
48:17,24 49:3,7,20
50:2,4 51:4,8,15
51:22 103:18
124:15 182:9

**h**

**h** 8:11 203:3
**half** 38:18 142:7
142:11
**hand** 12:25 200:9
200:12
**handed** 125:14
**handle** 161:9
166:15
**hang** 186:19
**hansel** 2:14 8:6
10:22,22 11:3,17
12:21 16:24 33:15
39:9 52:25 53:6
53:12 54:7,16
55:10,19 56:5,23
57:8,19 58:16
59:14 60:6,16
61:13,16,25 62:6
62:15,23 63:7
65:24 66:5,11,13
67:2,12 68:9,13,24
68:24 70:18,22,25
73:21,23 74:23
75:6,14,20 76:1,9
76:17,25 79:20,24
80:6,18 81:3
82:13 84:10,24
85:4,16,20 86:17
86:25 90:11,12

92:19 94:7,15,21
94:24 96:14,20,25
99:3 100:24 101:4
102:5 106:13,18
108:20 109:13
110:12,23 111:5
111:19 112:6
115:2,21 116:10
116:24 117:5,12
117:21 118:3
120:23 121:18,24
122:21 123:4,11
123:24 124:14,22
125:6,20 126:1
128:15 129:12
132:16,21 133:2
133:20 134:5,16
134:22 135:1,16
135:21 136:9,14
137:6,15 138:12
138:22 140:15
143:4,15 144:12
144:18 145:12,18
147:4,14,19 148:4
148:13,19,24
149:7 150:4
152:18 156:1,3,7
156:20 157:20
159:1,4,13,18,24
160:8 161:1
163:18 164:19
165:6 166:18
167:4 168:13,22
169:12 170:14,20
171:17,24 172:5
173:16 174:6,22
176:2 177:1 178:1
178:14,23 179:23
180:6,21 181:6,15
182:5,9 184:1,8,24
185:2,4,20 186:5,8

186:9,15,22 187:4
187:21 188:2,15
189:6,9,15 191:13
191:18 192:6,12
192:14,18 193:4
193:15 194:5,8,24
195:5,19 196:16
196:25 197:7,17
198:1,11,24 199:9
199:11 202:1
**happening**  49:17
86:9
**happy**  69:24 80:3
**harassing**  66:17
70:3 71:8
**harassment**  66:15
**harkins**  6:9
**harkinss**  6:12
**haverfield**  3:15
**head**  14:12 28:12
28:23 30:4
**health**  25:14,21
32:9 39:5 42:7
47:22 51:3,11
64:18 168:24
169:10 170:7
**healthcare**  31:8
35:12,25 39:23
44:23 45:13 46:5
46:11,19 47:6,8,9
48:22,23 49:19,23
83:3
**healthy**  173:23
**hear**  14:25,25 15:5
43:1 89:14 143:21
154:11 194:7
**heard**  154:17
155:10 188:23
**hearing**  184:8
**held**  10:7 19:22
34:22 37:8 59:5

**heller**  7:10
**hello**  111:23
**help**  31:14
**helpful**  156:12
186:21
**helping**  56:25
**henry**  3:4
**hereto**  204:7
**hetero**  6:17,17
**hey**  154:16
**hi**  10:24
**hill**  6:14
**hillwallack.com**
6:16
**hilton**  5:16
**hinshaw**  4:19
**hinshawlaw.com**
4:20
**hired**  155:9
**hlavach**  1:16
10:10 200:6,17
201:5,22
**hmo**  97:22
**hold**  19:21 25:4,16
26:5 64:22 65:13
65:22,25 66:3,9
183:3 197:2
**holder**  187:15
**holders**  143:25
**holding**  74:9
**hollis**  7:1
**home**  35:6,7,10
**honik**  6:1,1 68:18
68:19
**honiklaw.com**  6:3
**hopefully**  182:18
**horse**  173:18,22
**hospital**  23:22
24:2,11 26:1
**hospitality**  199:14

**hour**  88:22,22
89:17
**hourly**  88:18,18
88:21 89:7
**hours**  27:16 69:11
69:12 89:11,13,15
89:16 183:7
**house**  102:21
**household**  188:11
**huahai**  4:4
**huh**  13:14 14:9,14
14:14 23:12 29:8
45:15 47:4 79:17
80:13 84:6 85:25
95:9 98:20 103:14
104:9 105:8
109:16 123:18
144:11 145:4
146:3,16 151:13
177:13
**human**  93:22 96:4
141:1,2 145:20
166:23
**humana**  5:15
**hundred**  167:21
**hurt**  161:17
**husch**  6:6
**huschblackwell....**
6:7
**hypercholesterol...**
26:15
**hypertension**
168:24

i

**iarc**  96:12,15
**iarc's**  96:6
**idea**  72:15 159:10
**identical**  144:13
145:24
**identification**
16:15 17:24 85:21

[identification - intention]                                     Page 19

90:24 125:11
191:5
**identified** 135:13
**identify** 97:17
158:4,11,23 159:2
159:9,16,23 160:4
160:14 161:10,23
162:9 163:16,25
164:6,12 165:17
175:6 193:20
194:2
**identifying** 160:17
184:13,17
**il** 5:14
**immunizations**
21:22
**immunizer** 21:15
21:19
**impermissible**
70:14
**implement** 173:14
**implemented**
166:9 174:4
190:20 192:3
**importance** 169:6
**important** 14:10
14:15 152:1 193:8
**impurities** 129:2,4
129:10,18,22
130:2,6,12 148:3
167:2 190:22
191:5,12 192:5
**inaccurate** 144:14
145:21
**inappropriate**
71:15 73:8 111:15
**include** 44:11
47:19 62:24 82:4
86:18 91:16
103:22,24 104:7
104:18 105:4,5,6

113:23 124:10
127:17 159:19
168:6 193:23
**included** 29:13,23
30:6,23 32:12
80:21 86:10 99:18
102:14 103:8,10
136:20 155:21
162:3
**includes** 27:17
30:8,25 57:9
84:17 113:20
117:8 126:7 129:1
130:11 133:11
145:23 173:10
**including** 27:23
32:9 39:5,24 41:5
55:23 56:3 74:7
84:18 93:15
100:15 114:14
123:13 124:12
136:1,2,25 151:17
163:24 191:22
**inclusion** 54:3
58:18 116:4
127:12 136:19
147:7 149:16
151:9,14,19 152:5
152:13 153:13
158:25
**inclusive** 201:10
**income** 79:9
**inconsistent** 95:12
143:18
**incorporate** 31:13
**incorporated** 55:3
**incurred** 89:2,6
90:1
**indemnity** 30:12
**independently**
96:9,11

**indianapolis** 5:10
**indicated** 159:20
183:14
**indicating** 193:12
**indication** 101:23
**indirectly** 196:11
**individual** 171:13
193:21
**individually**
150:12,15 169:22
**individuals** 38:2,4
46:3 48:7 60:18
157:13 193:21
**industries** 3:13
157:10
**industry** 30:11
36:1,1 38:19 44:3
44:10 49:15 50:24
86:19 91:17 95:16
107:9 124:16
125:2 127:4 128:2
132:1 133:23
136:2 139:7
152:20 153:2
157:14 163:15
165:21 193:17
**infant** 21:16
**information** 17:19
42:9,10 44:10,15
50:14,16,21,23,24
50:24 53:21 64:6
64:10 76:15 83:12
86:19 91:17 92:4
93:18 95:23 96:15
97:14 101:6
103:19,20 105:2
106:25 107:1,3
108:11 109:14,18
112:9 113:12,18
116:25 117:2,7
118:15,17,18,21

118:24 119:9,15
119:19 120:8,11
124:17 125:1,2
130:15,21,23
131:2,3 133:14,23
139:22 151:24
154:23 158:21
160:1 165:15,23
165:25 171:11
172:20 175:2,3,8
175:11 193:3,7
**ingersoll** 3:5
**ingredient** 188:12
**initially** 29:6
47:25 91:7
**initiated** 139:13
139:15
**inquiry** 103:7
**insight** 128:5
**institute** 64:22
**instruct** 170:20
**insurance** 185:15
**insured** 33:12,14
36:14 38:22 39:8
39:13,24 159:19
168:6
**intake** 166:17
167:1 168:11,19
**integral** 41:15
**integration** 32:8
**intend** 70:7,9 74:3
76:16 177:24
**intended** 26:15,16
54:1 71:25 72:2
97:6 188:10
**intending** 74:20
75:3,11
**intends** 71:21
**intent** 73:19
**intention** 73:12

**interactions** 60:22
60:25 61:7
**interchangeable**
129:10,17 130:6,8
**interested** 201:16
**interfere** 15:25
71:16
**interim** 140:2
**internal** 25:22
**international** 96:5
**interns** 27:23
**interpretation**
85:3
**interrupted** 68:14
156:8
**interrupting** 180:9
**intimately** 41:14
**introduction**
20:20
**investigation**
190:6 191:3 192:2
**invited** 46:13,14
46:15
**invoice** 89:25 90:2
90:18,20
**invoices** 87:14,16
**involve** 54:17
**involved** 41:24
42:25 76:3 82:15
184:14,18
**involves** 67:18
95:23
**involving** 75:24
76:8
**irbesartan** 1:4
**irrelevant** 139:3
168:9
**isidro** 2:2 8:4,5
10:18,18 11:12
12:6,11,23 13:9,12
17:4,5 26:23 27:4

33:18 39:11 43:3
43:7 53:2,8,14
54:9,20 55:15
56:1,7 57:2,14,23
58:20 59:15,22
60:3,12,20 61:14
61:19 62:3,8,11,20
63:2,9 66:2,7,16
67:8,24 68:2,11,15
71:5 72:17 73:22
74:15,19 75:2,10
75:18,22 76:6,14
76:22 77:2 79:22
80:1,8,10,24 81:4
82:17 84:12 85:1
85:5,14,17,22
86:22 87:3 92:15
92:20 93:2,25
94:3,12,18,22 95:2
95:4 96:17,22
97:1 99:4 101:2,8
101:12 102:7
106:16,19,21
108:22 109:1,2,15
110:17,20,24
111:14,20 112:1
112:12 115:9
116:6,14 117:3,10
117:19,24 118:9
120:15,18 121:2
121:20 122:5,11
123:1,8,15 124:1
124:18 125:3,8,10
125:13,24 126:4
128:11,16,23
129:14 132:19,23
133:4 134:1,13,18
134:24 135:3,19
136:4,11,23
137:11,18 138:16
139:1 140:17

143:6,20,24
144:16,23 145:14
146:1 147:9,17,22
148:6,15,22 149:3
149:10 150:6
153:4 154:4
171:18 180:13
182:13 184:10,12
184:23,25 185:18
186:4,13 187:17
187:25 188:14
189:5 199:10
**isidron** 2:4
**island** 19:12,19
20:7 21:3
**issue** 49:20 50:2
50:12 51:4,14,21
66:16 90:18 92:1
103:8 156:24
159:13 169:15
173:20 181:25
197:9
**issued** 51:8 87:14
87:16 121:3,4
139:10,11,14,16
139:17 157:8
163:11 166:16
**issues** 158:5,18
159:12 168:24
169:5
**item** 80:14 98:7
107:14 110:10,13
111:2 114:2
140:23 142:25
143:2,7,13
**items** 17:23 33:2
33:20 34:5 35:16
80:17 97:17,24
98:12 99:10
103:24 107:22
108:1,5 110:14

113:14 114:9,10
115:7 129:18
**ives** 5:12,13

**j**

**january** 1:11 10:4
188:9 200:10
201:17
**jason** 4:14
**javier** 7:11 10:9
**jeez** 20:13
**jeff** 5:1 175:22
**jersey** 1:1 3:10
**jgeoppinger** 5:3
**jmestre** 2:12
**jobs** 58:4
**john** 5:5 73:5
154:16 189:20
**john's** 18:1,14
24:24 25:19
**john.gisleson** 5:7
**join** 46:13 48:7
**joined** 19:12
**jorge** 2:10 11:5
26:18 70:16
199:14
**journal** 100:1,3
**july** 93:14 97:23
186:11

**k**

**kali** 1:10 8:3 10:6
10:6 13:5,20
200:7 201:8 202:5
203:2,24 204:2,4
204:12
**kanner** 2:18 5:17
**kapke** 5:9
**kara** 5:9
**kbi** 5:14
**keep** 41:18 58:9
73:19 79:24 88:5

88:9,12
**keeping** 49:15
133:22
**kept** 89:8
**kerner** 10:20,20
11:22 26:21 27:1
70:19,23 71:1,3
73:3,11 85:19
92:21 154:12
175:15 179:25
180:8,14 181:21
182:7 184:6 186:7
186:19 189:8,18
199:8
**kind** 30:19 151:23
**kinds** 159:11,14
**klinges** 3:19
**know** 15:5,6,11,19
16:21 17:2,3
19:22 22:7 33:11
40:5 41:21,22
44:4 48:16 49:6
51:10,18,20 53:20
54:4 65:9 66:22
69:21 72:20 90:12
90:15 95:22 99:8
129:15 130:5,7
137:10 138:2,24
140:2,5 142:7,11
142:15,19 144:1
148:16,23 149:5
149:11 152:1,10
155:25 156:13
157:9 159:5 161:9
163:8 170:15
171:2,15,22
174:19 175:1,21
180:2,7 183:5
190:3,20,23,25
191:1 199:6

**knowing** 98:25
107:9
**knowledge** 95:16
99:9,20 100:15
103:3 107:8,24
114:14 135:2
136:2 148:7,11
150:10 151:3
171:9 172:15
177:22 192:10,25
198:16
**knowledgeable**
53:23,24 133:22
**known** 101:19
131:12 152:21
**kristin** 5:12
**ks** 7:2

**l**

**l** 9:14 180:25
**l.l.c.** 5:17
**la** 2:19 5:18
**label** 95:11 101:23
144:7,13,14
**labeled** 94:10
95:13 97:6 101:22
174:16
**labels** 104:1
**laboratories** 4:12
4:17
**laboratory** 20:21
**laborers** 3:18
**labs** 6:17
**lack** 194:24
195:19 196:17
198:24
**lag** 156:8
**language** 177:15
177:19
**large** 201:23
**late** 90:7 175:22

**law** 7:1 13:12
69:22
**law.com** 5:18
**lawsuit** 155:9
165:18 172:19
185:12 188:21
**layne** 5:16
**lbresnahan** 5:22
7:6
**lead** 27:8
**leading** 46:4,11
49:19 186:7
187:19
**learn** 155:3,19
157:6 190:12
**leave** 35:4 80:6
**left** 183:6
**legal** 60:7 67:12
69:17,18 70:2
74:12 100:25
121:18 122:2
123:3 164:19
165:6 178:2
187:18 202:23
**length** 137:24
**leon** 1:14 2:11,22
10:7
**letter** 8:10,18 91:3
91:4
**letting** 156:13
**level** 168:19
**levels** 93:22
140:25 145:20
146:2,5,6 148:7,12
148:14 166:17,23
167:2 168:12
**lewis** 3:1 5:5 73:6
**liability** 1:4 97:25
**license** 21:18
22:25 23:18,18
46:2 65:12,15

**licensed** 21:8 46:3
48:6,7 155:13
**licenses** 65:13
**licensure** 55:23
115:3
**light** 12:16
**likewise** 32:21
**limit** 69:4,6 71:16
**limited** 74:7
182:11
**limits** 140:2
**line** 169:13 203:4
203:7,10,13,16,19
**linked** 31:15
**linkedin** 90:17
**lipid** 25:10 26:14
**list** 17:23 25:1
26:2 44:4,18
63:23 86:3,6,14
98:1 101:20 112:8
120:24 152:22
185:21
**listed** 17:7 25:13
37:14 43:24 44:2
45:6,10 46:1,3
47:7,18 48:6
57:22 62:1,4,13,17
63:15 85:8,10
86:21 97:14,17,20
98:19 99:23 107:4
107:5,11,17 108:1
108:8 110:10
111:2 112:8
113:13,14 115:7
115:23 116:5
119:24 122:24,25
133:15 135:5,7,15
140:24 141:17,20
145:25 173:7
183:1,22,22

[listing - materials]                                                          Page 22

**listing**  132:10
**lists**  63:18,20
  104:13 105:19
  115:22 133:10,15
  135:22
**literature**  49:14
  91:16 103:17
**litigation**  1:5 12:3
  51:15 68:4 71:21
  72:1,3 74:21 75:4
  76:8,16,24 78:20
  78:22 79:11 86:5
  86:16,24 87:6,9,12
  87:15 88:4,20
  89:12 90:5,10,13
  90:16,19 91:5,8,14
  91:22,23 92:1,5,8
  92:13 100:23
  106:11 111:18
  152:4,8,12,16
  153:5,18 184:14
  184:18,21
**little**  16:13 66:14
  154:5
**llc**  3:8,13 6:1 36:8
  36:18
**llp**  1:14 2:10,14,22
  3:15,19 4:1,6,10
  4:14,19 5:5,9,13
  6:6,14,19
**loading**  16:12
**local**  3:17,18
**lockdown**  83:8
**long**  18:8,20 19:12
  19:18,21 20:7
  21:3 66:20 72:5,9
  72:15 92:21 97:5
  137:24 185:6
  189:8
**longer**  70:7 72:17
  72:23 73:20 144:6

144:13 151:1
  162:3,18,19
**look**  16:19,21 90:6
  97:16 125:17
  134:7 149:23
  172:10
**looked**  129:25
  172:3
**looking**  64:16
  67:23 102:8
  126:22 192:16
**looks**  40:15
**losartan**  1:4 202:4
  203:1 204:1
**lot**  128:5 148:8
  188:23
**lots**  148:16 149:12
  186:24
**louis**  6:7
**lowering**  26:14
**luke**  5:20
**lunch**  92:16
**lwalsh**  3:11

**m**

**m**  189:23
**ma**  4:19
**ma'am**  197:11
**mada**  98:5,8,15
  108:9,18 109:3
  113:21 114:2
  185:25 186:1,10
  186:23 189:23,24
  190:3,7,12,20
**main**  149:15
**maine**  2:17 10:23
  185:14
**maintain**  160:10
**major**  18:4,16
**majors**  77:13 78:1
  78:4

**making**  67:16
  68:16 91:12,20
  96:13 97:11 103:7
  111:15 112:13
  114:25 118:1
  121:5,25 123:9
  124:3 131:9,14,17
  132:25 133:19
  134:2 195:7
**manage**  25:12,24
  27:15 31:14 32:7
  35:3 40:10 43:5
  161:7,16 166:4
  191:23
**managed**  22:17
  38:19 45:17 49:2
  49:6,9,18 100:1,3
  171:3 189:24
  190:7,12 191:4,11
**management**
  21:24,25 22:18
  24:1,7,10,10,10
  28:12,23 29:23,24
  29:25 30:4 38:15
  38:21 39:5,23
  41:6,6 64:21
  100:4 102:20
  160:6
**managing**  127:16
  171:4
**manner**  69:7
**manufactured**
  188:11
**manufacturer**
  67:19 106:5 117:1
  117:6 118:14
  119:9,22 120:10
  123:6,13 124:6
  126:9,15,21 127:9
  131:19 132:2,5,10
  140:11 141:25

143:8,9 144:6
  150:12 151:5
  154:17,21 160:24
  161:19 164:7
  165:4 170:2
  183:13 196:24
**manufacturer's**
  116:19 118:12
  120:3,20 121:13
  121:13 124:24
  147:1,13 162:10
  165:5 173:4
**manufacturers**
  117:13 119:14
  124:5 128:25
  130:10,13,19
  131:2,11 136:25
  144:25 145:16
  160:21 173:1
**manufacturing**
  172:23
**mark**  16:9,13
  17:21 85:12,14
  90:22 125:10
**marked**  16:15
  17:24 85:21 90:24
  125:11
**market**  31:4 53:22
**marketed**  152:22
**marketing**  101:22
  133:17
**mass**  6:2
**matches**  144:14
**materials**  65:2
  80:22 85:7,10
  86:3,6,9,11,15,20
  91:7,9,12,17,22,25
  99:6,21,22,23
  135:22 185:22,24
  185:25

**matter** 13:2 33:1,4
  33:8,20
**matters** 75:23
  139:16
**mckesson** 4:8 6:21
**mdl** 1:4
**mean** 12:8 15:7
  21:20 22:6,21
  32:16,19 33:4,19
  34:5 77:8 84:21
  88:1,24 93:20
  94:5 108:17
  109:20 119:6
  120:9 121:16
  129:4 139:10,17
  140:13,21 146:4
  146:10 149:8
  151:11 159:1
  162:17,19 163:4
  164:15 166:12
  172:21
**meaning** 14:11
  59:2 114:22
**means** 21:21
  121:21 123:12
  124:6 132:11
  149:5 173:7,8
**media** 10:5
**medical** 22:24
  25:2,9,11,23 28:5
  32:2,8,14,19,23
  78:14 79:7 86:23
  87:1,5 103:17
**medication** 21:24
  21:25 22:8,8
  24:18,20 28:1
  34:1,2,4 53:21
  54:4 61:18 93:23
  94:6,10 95:10
  116:12 117:14,15
  119:10,21,23

124:8 128:3 129:7
  138:25 142:6
  143:12 147:5,16
  156:24 166:24
  169:2 170:10
  193:10,12 195:24
**medications** 15:24
  30:24 31:1 34:6
  55:5 84:17 92:11
  126:8,9 127:11
  133:16 143:18
  146:25 147:12,21
  148:2,3 153:13
  155:16,16,16,17
  161:20 163:23,24
  170:3,6,7 173:25
**medicine** 25:22
**meet** 26:16 45:8
  67:20 127:4
  131:22 132:6,11
  151:14 183:18
**meeting** 13:15
**meetings** 104:10
**meets** 57:4 58:24
  116:3 150:19
  151:16 183:17
**member** 26:3,9
  36:18 42:20 44:19
  44:22,25 45:2,4,16
  45:19,22,24 46:4,7
  46:10,13,19,22
  47:5,10,13,16,21
  47:24,25 48:2,4,9
  48:13 51:14,21
  175:2 193:10
  195:23 196:7
**members** 61:9
  103:4,8
**memorized** 179:8
  179:10,15

**mention** 23:25
  38:17 103:15
  125:5
**mentioned** 16:11
  21:19 22:10 23:19
  32:4 43:15 54:12
  98:14 106:17
  107:14 154:7
**mentions** 125:19
  143:1
**meridian** 5:10
**merit** 31:11,12
  104:6,22 105:2
**message** 12:9
**mestre** 1:14 2:10
  2:10,22 11:5
  26:17,18,22,25
  27:3 127:23
  179:19 180:2,7
  183:3,8
**met** 124:25 134:11
  136:15,16,17,21
  145:22 183:20
**miami** 1:15 2:11
  2:23 10:8 200:3
  201:3
**middle** 180:4,9
**mind** 72:4,7 159:2
**minor** 78:4
**minors** 18:6,18
  78:2
**minute** 73:20
  179:23
**minutes** 41:17,25
  42:6 70:24 183:7
  189:9
**mischaracterizes**
  135:16
**misheard** 107:13
**misrepresented**
  145:20

**missed** 99:11
**missing** 180:18
**mitigate** 169:4
**mo** 6:7
**moment** 45:8 86:2
  125:17,21 127:23
  156:9 177:10
  184:25
**money** 188:10
  195:14 196:4,5,10
  196:21
**monies** 87:24
**monitored** 168:25
**monographs**
  104:1
**monroe** 5:13
**months** 12:9
**morgan** 5:5 73:6
**morganlewis.com**
  5:7
**moring** 5:21 7:5
**morning** 10:3
  13:10,11,16 14:23
  73:15,17
**morris** 3:19 4:1
**motion** 69:3
**move** 69:6 73:13
  73:17 84:24
  151:24 169:24
  173:21
**msp** 42:22 97:21
  98:15 114:6
  185:15,17 186:1,2
  186:11 187:5,11
  187:14,22
**msp's** 187:6,8
  191:1,4,10 192:3
**mtm** 21:17,23
**mulberry** 3:10
**murtha** 6:14,14

[mute - object]                                                                Page 24

mute  186:21
mylan  4:12,12,17
  4:17

**n**

n  2:1 8:1 9:14 10:1
  180:25
n.w.  4:2
name  10:9,16
  13:12,18,20 31:23
  114:23 143:11
  144:7 154:16
  155:6 159:23
  163:25 194:19
name's  175:22
named  154:17
names  33:11
  141:18 159:3
  160:4,14,17
  184:13,17 193:21
  194:2
nature  41:2,3,11
  50:20 169:2
navigating  100:3
nc  3:6
nda  107:2 118:14
  141:21
ndc  162:20,21,21
  163:3
ndcs  98:13,19
  162:3,22 190:21
ndea  93:16 96:10
  97:2 138:21
  139:25 141:21
  142:12,20 148:8
  148:18 149:13
  155:8
ndma  93:17 96:10
  97:3 138:2,10
  141:21 142:8,16
  148:8,17 149:13
  155:8

ne  6:11
nearby  80:6
necessarily  198:20
necessary  11:9,21
  73:20 80:22 166:4
  174:21 204:6
need  15:10 70:23
  72:23,23 153:21
  169:24 180:5
  199:2
needed  22:18
  29:14,16 35:15
  119:23 124:25
  166:6 169:11
  170:7
needs  36:15 85:14
  125:25
negatively  165:9
never  57:6 60:14
  78:24 80:25 81:5
  81:8,11,14,17
  127:7 169:1
  170:10
new  1:1 2:4,8,19
  3:10 5:18 13:25
  21:6,17 22:10,15
  23:2,10,17 27:6
  35:7 53:22,22
  55:23 65:12
  155:13
newark  3:10
nilda  2:2 10:18
  13:12
nitrosamine  148:2
  154:25 155:10,19
  155:25 163:17
  164:1,9,14,18
  165:5,20 167:2
  190:21 191:5,12
  192:4

nitrosamines  52:1
  52:4,7 56:19
  140:3,6 157:7,19
  160:22 168:12,19
  170:6 174:5
nj  4:24 6:15
nodding  14:12
non  46:3,3 48:7
  88:21 89:11,17,19
  171:7,14
nonresponsive
  73:10,25
nope  140:7
norris  6:18
northwell  25:14
  25:21
norton  4:6 6:19
nortonrosefulbri...
  4:7 6:20
notary  1:16 200:6
  200:17 201:5,22
  204:13,19
note  71:22 102:19
  202:10
noted  27:1 204:7
notes  17:25 88:11
  201:11
notice  8:14 16:7
  16:10 79:16
notification  8:10
nulled  144:5
number  6:2 10:5
  12:13 16:20 17:22
  80:14,17 85:13
  89:11 93:4 141:21
  155:7 157:20
  168:8 183:12
  184:2
numerous  69:14
  111:7

nw  5:21 7:5
ny  2:4,8

**o**

o  3:6 9:14 10:1
  180:25
oath  8:8 15:20
  200:1
object  16:24 39:9
  52:25 53:6,12
  54:7,16 55:10,19
  56:5,23 57:8,19
  58:16 60:6,16
  61:13,16,25 62:15
  62:23 65:24 66:5
  67:13 69:2 74:23
  75:6,14,20 76:1,9
  76:17,25 80:18,19
  81:3 82:13 84:10
  84:25 85:4 86:17
  86:25 94:7,15,21
  94:24 96:14,20,25
  99:3 100:24 102:5
  106:13 108:20
  109:13 110:12,23
  111:5 112:6 115:2
  115:21 116:10,24
  117:5,12,21 118:3
  120:23 122:1,21
  123:4,11,24
  124:22 125:6
  129:12 132:16,21
  133:2,20 134:5,16
  134:22 135:1,17
  136:9 137:6,15
  138:12,22 140:15
  143:4,15 144:12
  144:18 145:12,18
  147:4,14,19 148:4
  148:13,19,24
  149:7 152:18
  159:1,18 160:8

[object - orange]

161:1 163:18
166:19 167:4,5
168:13,22 169:14
171:24 172:5
174:6,22 176:2
178:1,14,23 181:6
181:11 184:1
191:13 192:14
193:15 194:24
195:19 196:16
197:5,7,17 198:11
198:24
**objection** 62:6
63:7 66:11 67:12
68:13 84:10,24
101:4 111:15
112:2 121:18
122:1,3 124:14
125:20 135:16,21
136:14 150:4
157:20 159:24
164:19 165:6
166:18 169:12
171:17 173:16
185:18 186:4,7,13
187:1,17,18,25
188:14 189:5
191:18 192:12
193:4 196:25,25
198:1
**objections** 12:1,12
15:1 68:16 71:14
182:1,3 188:24
197:3
**obligation** 160:10
**obligations** 116:20
118:13 120:4,21
173:2,5
**obtain** 41:25
126:18 131:1

**obtained** 77:17,20
128:7
**obtaining** 74:21
75:4,12,24
**obvious** 107:21
**occasion** 172:9
**occasions** 69:14
82:18
**occur** 138:17
171:8
**october** 90:7
**offer** 36:10,12
70:6 71:21,25
72:2 74:20 75:3
75:11 76:16
**offered** 69:23
175:10
**offering** 30:18,25
31:7 68:3 71:19
76:7 92:5 97:3
**official** 11:19
200:9,12
**oh** 3:16 10:15
26:22 43:11 79:22
85:17
**ohio** 5:2
**okay** 12:21,24
14:3 15:10,14,19
16:3,6,9,19 17:10
17:21,25 19:1,6,12
19:23 20:6,15,24
21:19 23:9 24:17
24:22 25:1,8
26:25,25 27:10
28:22 29:1,4 32:7
33:17 34:13 37:4
37:18 38:4,7,9
40:2,13,21,24 41:2
44:14,18 45:9,14
46:4 47:1,5,16
48:2,16 51:20,25

57:15 61:20 62:4
62:21 79:15 80:5
80:8,11,14,25
81:17 83:9 84:21
85:12 86:11 88:18
89:5 90:4 92:20
96:18 97:2 98:1,4
98:7,21 100:14,17
101:13,15,18
105:6 106:10
107:7,10,20 108:1
108:9 109:25
110:3 112:21
113:7,25 114:2,5,9
114:20 118:18
119:3 125:9 126:2
126:24 127:8,19
130:9 132:24
133:5,8 134:14
136:12 140:9,21
141:22 145:5
147:10 148:23
150:16 156:23
162:8 177:10,23
180:15 181:20
182:20 185:2
195:13 196:3,9
197:6 199:7
**once** 82:20 105:3
119:21 125:23
134:8,9 166:3
**one's** 12:10
**ones** 31:20 42:8
48:10,14 61:1,2
77:15 100:13
119:19 130:13,23
141:4,6
**ongoing** 41:6,18
41:20 152:24
**onset** 87:17

**op** 24:16
**operation** 28:18
**operations** 23:8
28:12 29:21,23
38:16,20
**opining** 76:24
**opinion** 40:20
43:20 67:14,22
75:7 76:11,18
77:5 80:22 86:7
86:20 92:9 101:6
108:7 110:16
117:20 130:22
133:7 135:23,25
141:24 155:22
160:2 161:18
163:7 164:11
173:24 174:11
190:15
**opinions** 68:3
71:20,25 72:2
74:21 75:3,11
76:7,16 85:7 86:4
86:16 92:4 93:8
93:11 100:23
106:11 137:12
142:23,25 144:5
152:3,7,11,15
153:5,16,18
**opioid** 64:18,24
**opportunity** 70:20
72:7
**oppresses** 69:8
**option** 30:19
**orange** 100:4
101:10,16,18,19
104:2 105:17,19
105:23 107:10,12
107:17 108:14,14
109:14,21,24
110:4 112:7,9,23

115:22 116:5
119:24 120:5,24
121:3,6,12 132:10
133:10,15 134:7
149:16 152:9,17
152:21 153:6,8,17
153:19 173:6,7
178:8 181:16
183:15,22
**order**  67:20 127:5
130:25 149:25,25
**ordinarily**  186:16
**ordonez**  7:11 10:9
**organization**
22:23 23:16 38:3
40:1 45:5,20,25
46:8 47:17 48:5
48:10,13 49:19
82:15 124:16,17
**organization's**
47:19 64:13
**organizations**
44:19 48:19 49:15
51:14,21 64:18
**orientation**  20:19
63:8
**original**  72:21
137:23 143:10
144:1 156:16,19
**orleans**  2:19 5:18
**outreach**  29:15
**outset**  87:19
**outside**  59:23
60:13,18 61:11,23
62:13,21 78:5
106:10,17 137:20
158:1 169:14,17
174:23 182:3
191:13 196:21
**overall**  22:3,9
38:20

**overland**  7:2
**oversee**  19:25 38:2
**overseeing**  38:20
**oversight**  23:8
**oxford**  4:10,15 5:6

## p

**p**  2:1,1 9:14 10:1
**p&2**  104:10
**p&t**  41:9,11,14,17
41:20,22,25 42:4,5
42:20 102:16,18
102:22,24 103:15
104:5,10,15,21
105:1 116:18
118:4,4,11,19,25
119:12 120:19
121:3,5,14 124:4
124:11 126:6,11
127:3,15 128:4
132:9,18 133:6,14
133:21 134:7,17
134:23 136:3
151:8,18,22 152:4
152:8 153:12
173:1
**p&ts**  119:18
**p.m.**  1:12 74:17
92:22,25 128:18
128:21 153:24
154:2 189:13
199:16,18
**pa**  3:2,20 4:11,15
5:6
**pachios**  2:14
**page**  16:20 63:16
63:17 64:16 80:11
93:9 98:1,7,11
103:13,13 107:5
125:22 127:11,20
127:20 155:7,7
171:25 203:4,7,10

203:13,16,19
**paged**  125:21
**pages**  201:10
**paid**  65:5 146:25
147:11,15 161:20
161:21 163:8,16
163:25 164:5,16
164:21,24 165:13
165:18 170:3,4,6
173:25 174:1,13
185:10,17 186:24
187:3,5 188:9
190:2,11,19 191:7
192:1 193:2,9,10
193:13 195:10
196:7,7 197:12
198:3,21
**pain**  24:1,6,10
**panagos**  1:10 8:3
10:6 13:5,10,20
27:5 44:18 59:23
68:3 69:11 70:3
74:6,13,20 93:3
110:25 140:19
149:15 153:15
154:4 156:3
157:22 169:21
185:5 189:16
199:12 200:7
201:8 202:5 203:2
203:24 204:2,4,12
**panagos's**  92:16
111:17 199:3
**pandemic**  12:16
**panel**  26:3,9,10
**papers**  79:19
**paragraph**  93:10
93:12,14 103:12
104:8 105:7
111:13 112:14,18
112:22 113:2,5,7

114:20 115:1,16
116:18,23 117:25
118:11,23 119:3,7
119:12,18 121:11
121:17 123:10,17
123:22 124:3,10
124:13,20 128:13
128:24 129:5
130:10 131:10,14
131:17 132:9,14
132:25 133:8
134:3 135:9 136:5
136:6,8,13,24
140:9,14,22
141:22 143:3
145:11,15 146:24
147:11 172:25
177:11,15,20
178:7 180:24,25
181:3 182:22
188:5
**paragraphs**  97:8
97:12,18 99:2,15
99:18,24 100:7,12
100:18,19,22
101:9 106:22,24
108:11,15 109:5,7
109:12 110:3,7
135:14
**paramount**  169:6
**pardon**  172:13
190:24
**park**  4:24 7:2
**part**  11:15 12:15
19:16 20:15,20
28:4 29:7,9,10
30:24 31:6 34:6
44:4 49:13,15
54:18,21,23 61:9
69:4 76:21 77:11
77:13,24 101:24

[part - pharmacist]                                                              Page 27

105:5,6,15 106:9
106:14 113:23
124:2 126:10
127:7,14 133:15
133:24 144:4
150:3,5 155:17
162:4 163:22
172:12,21 173:19
182:5,9 188:19,21
**partial** 156:21
**participant** 122:9
122:14,18 187:1
187:18 192:25
**participate** 24:5
26:10
**participating**
25:23
**participation**
25:10,11
**particular** 35:19
42:25 43:16 69:15
111:13 144:20
148:8 162:3
174:20 176:23
185:10 196:4,13
**particularly** 74:2
**parties** 9:16 69:23
201:13,14
**parts** 93:11
**party** 38:22 39:1,2
39:22 40:3,4,8
44:15 69:5,9 75:8
97:25 98:15,16
108:9,18 109:3
113:21,22 114:6
136:19 157:10
159:16,20 160:5
166:25 185:10
186:1,2 187:9,12
188:3,4,7

**pass** 79:18
**patience** 185:5
194:13
**patient** 22:19
24:11,12,16 28:2,3
30:7 32:3 60:22
60:22,24,24 61:1,1
61:4,6,6,17,18
162:20 163:5
164:13 168:25
171:11,12
**patients** 21:22
22:2 24:7,14
25:12,24 27:20
29:16 31:9 148:1
161:8,17 168:20
170:7,9,12,17,19
170:21,24 171:6
190:7 194:2
**pattern** 71:13
**pause** 16:13 26:17
**pay** 163:1,4,14
174:1
**payer** 39:1,2 40:8
**payers** 39:22 75:8
159:20
**payment** 43:8,12
43:19 88:25
165:10 192:19
**payments** 31:2
43:11 185:25
195:15,17 198:19
**payor** 98:15,16
108:9,18 109:3
113:22 114:6
157:10 159:16
186:1,2 188:4
**payors** 136:19
160:5 166:25
185:10 187:9,12
188:4,7

**pbi** 64:21
**pbm** 32:23 33:1,8
33:9 38:15,20
100:13 102:4
103:5,9 157:10
164:12 196:23
**pbmi** 64:17
**pbms** 33:5 42:7
99:15 101:24,24
102:11 115:18
160:15 162:12
167:1
**pc** 3:5
**peer** 103:17
**pelta** 7:10
**pending** 15:12
122:9 180:1,12
183:4
**pennsylvania** 5:21
7:5
**pensacola** 6:3
**people** 38:12
57:18,21 65:9
126:16
**percent** 79:9
**percentage** 79:12
**perfect** 6:2
**perform** 155:25
**performance**
113:9,17 114:13
**performed** 159:17
**performing** 115:4
**period** 28:4,20
165:13 171:8
174:3
**periods** 170:13
**permit** 70:5
**permits** 183:16
**permitted** 21:21
143:25 158:1
173:17 182:15

**person** 12:13 33:6
126:25
**personal** 64:21
88:10 130:22
166:1 172:22
188:10
**personally** 49:11
51:7 95:7 151:18
157:16
**pertaining** 87:5
158:5
**pertains** 78:7
104:19 108:13
133:3,5 151:24
156:25 157:15
161:7 184:2
**pertinent** 101:6,7
160:2
**pharm** 55:12
**pharm.d** 202:5
203:2,24 204:2,4
204:12
**pharm.d.** 1:10 8:3
13:5 200:8 201:8
**pharma** 3:13
**pharmaceutical**
3:13 52:20 66:4
66:10 68:5 74:22
75:5,13,25 79:4
83:10 172:23
188:12
**pharmaceuticals**
3:3,12 4:13,17,21
**pharmacist** 21:5,8
21:17,23 23:7
27:5,8,9,10,14
28:11,15 29:12
34:3 41:13 45:12
47:20 48:8 53:19
55:8 61:18 76:2
82:8 83:21 84:16

[pharmacist - prescription]                                    Page 28

115:4 152:25
155:13,14 157:1
171:13 172:15
**pharmacists** 25:24
47:11,22 50:2,12
50:18,25 51:4,11
**pharmacologist**
78:16
**pharmacy** 5:15
18:17 19:4,5,20
20:1,1,3,11,19,20
20:22 22:18,20
24:25,25 25:7,12
25:19 27:15,16,22
30:7 31:6 35:1
36:11,12,15,22
37:21,22 38:1,19
41:3,8 43:8,12,19
45:17,21 48:1,18
48:25 49:2,4,7,8
49:17,21 50:3,6,9
50:13,15,19 51:1,5
51:9 53:21 54:24
55:2,4,12,13,21,22
58:18 59:5 60:11
63:8,13,21 64:21
65:12 77:16 78:3
78:8,9 83:3,12
86:19 91:16 95:16
97:8 99:20 100:4
124:17 155:21
157:2 162:20
**pharmist** 29:12
**philadelphia** 3:20
**phone** 189:18
**phrase** 146:2
**physicians** 25:24
**picked** 11:18
128:9
**piedmont** 6:11

**pietragallo** 4:10
4:14
**pietragallo.com**
4:11,16
**pigeonhole** 111:9
**pittsburgh** 4:11,15
5:6
**place** 1:14 89:24
161:3,3,16 162:3
170:9 174:7
**placed** 76:20
136:15 164:22
**placement** 54:5
76:5,12 104:17
121:14 128:4
132:12 136:18
**plaintiff** 114:1
**plaintiff's** 71:14
92:12 98:15,16
108:9,18 109:3
113:22 114:7
186:1,2
**plaintiffs** 2:13,20
2:24 5:19 6:4
10:25 11:2,6
12:12,18 26:19
69:2,10,23 70:5
71:19 73:24 87:6
87:8,12 89:25
181:24 185:7,14
**plan** 30:8,16 41:7
83:13 132:13
193:9,13 195:10
196:7 197:12
198:3
**plans** 42:7
**platforms** 43:24
**play** 23:11
**played** 108:6
110:15

**player** 113:22
**plaza** 6:6
**please** 10:11,13,15
12:25 13:18 15:5
15:5 33:15 43:2,3
48:20 53:1 60:4
62:9 67:1,2,25
75:21 85:2 87:1
94:1,25 95:2
97:16 101:1,2
106:16,19 108:21
112:1,3 120:15
121:23 122:12
156:3,8,18,20
173:21 179:20
181:19 182:16,16
191:17 194:8
**plus** 82:24 136:1
**point** 80:2 99:9,11
120:2,19 134:12
142:15,19 161:14
162:14,25 163:1
172:18 190:20
192:4 195:10
**pointed** 99:12
**points** 58:6,8,9
**ponce** 1:14 2:11,22
10:7
**populate** 88:16
**population** 31:14
32:9
**populations** 26:15
**portion** 43:4 60:5
62:10 67:4 68:1
70:12 94:2 95:3
101:3 106:20
108:25 110:22
112:5 120:17
122:20 143:23
156:22 193:10,10
194:10

**portland** 2:15
**position** 19:21
24:4,5,13 26:6
35:4 67:9
**possession** 16:23
17:8 81:22
**possessions** 188:8
**possible** 42:24
44:14 83:23 84:8
102:16
**possibly** 163:24
172:20
**post** 24:16
**potential** 82:3
84:18 148:2
**potentially** 129:19
**power** 58:6,8,9
72:24 73:1
**ppm** 102:22
**practice** 48:18,24
49:4,7,16,18,21
50:2,5,9,13 51:1,5
51:9 103:17,18
127:4 133:23
152:20
**precise** 34:17
138:23
**preface** 107:11
**prefer** 140:18
178:16
**preliminaries** 11:4
**preparing** 172:3
176:21 177:6
**prescribe** 24:17,20
**prescriber** 169:1
170:11 171:12
**prescribers** 29:14
**prescription** 30:1
30:12,15,18,20
31:13 32:8,13,16
39:6,24 44:12

57:11 58:13 59:7
62:19 76:21 100:8
102:12,12 105:16
105:24 121:14
132:13 148:2
149:25 150:8
157:2 160:5 163:4
**prescriptions**
27:17,18,19 44:3
189:25 190:7
**presence** 97:2
129:1 130:12
138:2 139:25
140:10 141:25
142:5 145:19
147:20 157:6,18
160:22 163:17
164:1,14 174:5
183:12,19
**present** 7:9 9:16
37:17 109:24
129:19 138:25
140:23,24 188:9
**presentation** 57:6
57:17,24 61:4
62:5 64:24,25
65:3,5,7,10 83:11
83:16,18 84:2
**presentations**
56:18,21 58:7,11
58:14 59:24 60:1
60:9,14,21,25
61:23 62:1,13,18
62:22,24 81:23,25
**presented** 116:25
117:1
**presenter** 64:17
64:23
**presenting** 129:1
**president** 37:10,11
37:13,15,24

157:24,24
**preti** 2:14 10:22
90:21
**preti.com** 2:16
202:2
**pretty** 173:18
**preventing** 130:11
**previous** 82:9,10
111:11 135:17
141:12
**previously** 154:7
**primarily** 35:10
36:14 38:21 82:14
104:15
**primary** 25:10
104:22,24 105:3
**princeton** 6:15
**principles** 77:23
100:5
**prinston** 4:4
**prior** 11:13,23
17:6 19:8 29:13
29:17,24 35:2
91:12 93:12 95:6
110:19,21 120:15
142:15,19 150:24
165:18 176:20
196:9 198:9
**privilege** 16:25
**probable** 93:22
96:4 140:25 141:2
145:20 166:23
**probably** 182:1
**problem** 12:19
72:11
**procedure** 69:3,16
**procedures** 15:16
24:7,8
**process** 34:3 66:4
66:6,9 67:5,7,10
67:11,18 68:4,6

72:3 74:21,24
75:4,12,16,19,24
76:2,8 100:6
106:14 107:2,6,9
107:16,25 110:8
111:1 112:7,16
120:12 126:7,10
127:1,2,3,13,14,17
128:3,3,6 133:6
141:13 152:24
153:9,22 162:23
162:23 177:6
**processes** 129:1
130:11
**processing** 40:10
42:25 43:5 112:10
**producing** 17:18
**product** 16:25
27:25,25 30:24
56:22 57:3,7,18
58:15,17,21,23,23
59:2,24 60:10,14
61:24 62:19 94:11
95:11,13 104:1
115:23 122:24,25
133:12 138:1
140:12,25 141:17
142:2,3,5,6,8,12
142:16,20 143:9
143:10,11,16
149:16,17 150:1,2
150:12,19 162:22
171:7,14 178:4
179:7,12 183:2,14
183:22
**product's** 150:16
**products** 1:4
52:20 57:11 58:17
60:1,10,17 62:25
66:1,4,10 68:5
74:22 75:5,13,16

75:25 76:3 83:10
101:20,21 105:19
105:25 144:25
145:1,17 150:8
151:1,5 153:10
155:2 160:23
161:25 163:9
172:1,23 178:9
179:16 180:20
181:17
**profession** 64:23
86:8 172:12,14
**professional** 13:21
13:22 21:12 44:19
45:13 46:2 48:6,9
48:12,13,19 51:13
51:21 52:3,23
53:9,16 54:15
57:9 65:13,18
82:7,8 84:16
91:16,19 95:17
99:20 100:16,21
112:24 117:22
138:13 169:20
186:17
**professionally**
73:15
**professionals**
35:25 125:2 128:2
**professor** 63:21
**proffered** 111:18
173:19
**profile** 22:4,9
90:17
**program** 20:1,3,5
20:11,23 30:8,12
30:15,22,23 31:2
31:11 37:21,22
38:1 41:8 54:24
55:4 57:11 58:13
59:7 62:19 63:13

76:21 88:11
**programs** 31:4,6
31:18 41:7 60:11
83:4
**progress** 20:4
41:19
**prohibit** 160:17
**project** 35:19
**promise** 58:23
122:22 123:5
126:15,17,21
127:9 145:21
**promises** 57:21
58:17
**promulgated**
48:18
**promulgates**
176:11
**proof** 70:6
**proper** 30:1
**properly** 22:7
**proposed** 103:4
111:24 188:3,18
**proto** 50:8
**protocol** 51:4,14
181:24 182:2,4
**protocols** 48:17,23
49:3,20 50:5 51:7
51:22
**provide** 22:4
33:21,23 34:3
36:22 37:20,25
42:11 49:10 50:14
51:10 115:18
117:2,7 118:15
119:9 120:11
130:15 131:1,2,3
142:22 158:20
**provided** 59:12
69:25 80:20
118:21 119:1,22

139:18 158:18,24
**provides** 128:5
**providing** 30:9
51:23 57:10 59:6
79:13 80:23
119:14 130:21
**public** 1:16 96:15
109:18 112:9
125:1 139:22
154:23 160:20
175:1,5,8,11 200:7
200:17 201:6,22
204:19
**publications** 56:8
56:13,16 81:15
**publicized** 157:9
161:14
**published** 52:6,9
52:12,15,18 56:11
81:9,12 105:17
**pulls** 59:3
**punished** 65:17
**purported** 137:14
181:9
**purpose** 11:15
95:21 124:12
**purposes** 95:14
96:19 97:18 99:12
113:21 114:11,17
123:21 135:8
**pursuant** 16:7
69:2
**pursued** 18:11
**pursuing** 18:23
19:6 24:24 25:7
25:19
**put** 161:2,3,16
162:2,15 174:7
**putting** 31:18
135:23,25

**q**

**qualification's**
35:17
**qualifications**
21:12 45:7 69:12
70:8,9,13 71:18,18
71:24 72:16 74:5
74:7
**qualified** 69:16
**quality** 117:14
**quarter** 82:21
**question** 11:23
14:16,19 15:4,5,6
15:12,12 17:4
33:8,16 43:1,21
48:20 49:5 53:1
60:4,7 65:24 66:8
66:8,15,17,18,21
66:22,23,24 67:1
67:13,24 69:14,15
69:17,18 70:2
71:11,12,24,24
72:1,13,21,22
74:12 75:1 77:1,4
80:19 81:24 82:2
84:20 87:4 91:11
93:25 94:17 99:8
101:1 106:18
108:21,22,24
109:1 110:2,19,21
111:12 112:2
115:15 118:7
120:16 121:23,25
122:4,9,10,16
131:15 132:22
133:13 135:20
137:16 139:2,4,4,6
141:10,12,14
145:8 146:14
150:18 156:17,19
158:6,15 161:23

165:3 177:5 178:9
178:16 180:1,11
180:17,19 181:11
182:8,18 183:4
184:3 191:17
192:17,18,23
193:24 195:8
196:17 197:11,18
198:7,7
**question's** 162:8
**questioned** 69:11
137:23
**questioning** 73:7
74:4,6 169:13
170:15 182:15
**questions** 11:14
15:2,8,15 33:7,23
68:12,15 71:7
72:6,9,10,18 73:2
73:14 74:3 154:6
154:9,11 170:21
170:24 173:17
175:12,17 180:5,8
182:10,11,12
184:5,7,9,10,23
185:6,9 188:23
189:7,15 194:12
194:15 199:7
**quick** 11:22
**quickly** 73:18
**quite** 107:21

**r**

**r** 2:1 10:1 203:3,3
**r.ph** 1:10 8:3 13:5
200:8 201:8
**raise** 12:24
**raised** 12:12,17
**raspanti** 4:10,14
**rate** 88:19,21 89:7
89:17

**rating**  121:11
134:8,8 150:17
**reach**  74:4
**read**  16:3 43:3,4
60:3,5 62:8,10
67:1,2,4,24 68:1
93:25 94:2 95:2,3
101:2,3 106:16,20
108:22,23,25
110:20,22 112:1,4
112:5 120:15,17
121:8,23 122:12
122:17,20 140:16
140:18 143:20,23
156:22 172:17,20
194:6,8,10 199:11
202:9 204:5
**reading**  9:17
**really**  11:21 66:20
116:2 128:5
134:12 170:15
174:17
**reason**  12:15
14:10,14 15:20
72:10 202:11
203:6,9,12,15,18
203:21
**reasonable**  74:5
**reasons**  35:5,9
149:19 170:7
**rebate**  196:23
197:19,23,24
198:8,16
**rebates**  198:20
**recall**  45:8,11
55:17 56:2 64:4
83:7,14,24 84:8,23
93:15 98:13,18
125:7 139:10,11
139:12,14,15,16
139:18,23 146:21

146:22,22,23
150:24 151:22
157:8,10,11,14
160:25 161:2,7,12
161:14,17 162:1,2
162:11,14 163:11
166:3,5,6,10,14,22
167:11,16 168:2,5
168:15 169:4,5
171:3,4 173:15
174:8,20 175:7,10
185:8 189:25
190:4,8,12 191:4
191:11 194:3
**recalled**  98:6,8
114:3 148:17
149:12 186:10
**recalls**  191:4,23
**receipt**  202:18
**receive**  87:17
124:7
**received**  18:1 19:1
78:10,12 87:19
**receiving**  44:11
**recitation**  20:21
63:11,25
**recognize**  90:25
**recollection**  83:17
125:18
**recommend**
157:16
**recommendation**
168:15
**recommendations**
49:10 51:10
162:16 166:13
**record**  10:4 11:3
13:19 59:18,21
68:18,22,23,25,25
71:6 74:16,18
88:5,9 92:23 93:1

111:14 128:19,22
153:25 154:3
175:18 180:12
189:11,14 199:17
201:11
**recorded**  10:5
11:8,11,13,24 12:2
12:4
**recording**  11:15
12:9,20 26:20
**recordkeeping**
89:10
**records**  64:9,12,13
64:14 86:23 87:2
87:5 88:13 196:1
**recovery**  185:15
**recross**  8:5 184:11
**redirect**  8:5 72:8
175:19
**reduce**  90:1,3
**reefer**  4:14
**refer**  31:25 33:25
61:6 79:20 80:2
104:14 105:12
133:8 139:5
152:20
**reference**  30:12
104:14 123:16,16
124:9,11 134:12
138:19 139:13
140:24 141:9,17
145:25 173:6
183:1
**referenced**  31:16
94:10 95:11,12
98:12 107:12,19
115:23 122:24,25
124:19 125:4,15
139:7 141:8 146:7
146:9,12,18 155:4
174:16 177:10

183:21 202:6
**referencing**
119:20 120:5
**referred**  98:19
140:23 194:21
**referring**  34:10
53:25 61:7 64:13
95:23,25 109:21
110:1 111:2,3
112:7 129:21
131:25 136:6
137:1 141:3,19
146:7,17 173:12
176:23,24 195:3
196:14 197:18,19
198:9,23
**refers**  31:5 34:1
64:20 118:4 123:5
124:4,4 127:13
136:8,10
**reflect**  111:14
150:25 194:22
196:3 197:15,24
**reflected**  195:25
196:12 198:8,22
**reflects**  195:13
196:5,7 197:12
**refresh**  125:18
**refund**  164:7,13
164:15 165:18,22
185:11 188:19,20
197:16,19
**refusal**  160:9
**refusing**  160:4,12
**regard**  60:9
**regarding**  52:1,4
54:15 61:17 62:18
62:25 72:2 82:1
185:9
**regards**  20:2 24:7
24:8 29:25 35:1

[regards - report]

37:21 44:9 50:14
50:25 51:11 56:25
57:21 79:13 86:20
134:20 155:24
157:3
**registered** 21:5,8
**regulates** 131:19
**regulation** 115:10
131:24
**regulation's** 179:9
**regulations** 95:21
95:24 115:10,14
116:21 118:13
120:4,22 131:13
131:16 132:11
135:4 173:3,5
176:1,7,9,10,11,15
177:8,17,21,25
178:13,22 179:1,5
181:5,8,10,14,18
182:24
**regulatory** 52:19
65:22
**reimbursable**
132:12
**reimburse** 76:21
136:20
**reimbursed** 147:8
165:4 193:13
**reimbursement**
39:4,23 104:19
**reiterate** 74:8
**relabeler** 188:13
**relate** 57:3 124:20
**related** 33:24
35:16 41:8 50:18
54:4 59:8 64:22
78:9 82:4 117:9
196:11,12
**relates** 1:6 55:4

**relating** 48:17,24
49:3,7 50:2,5,8
51:5 52:6,12,15,18
52:23 53:4,10
56:8,18,21 61:24
63:3 91:22,25
**relative** 201:12,14
**relevant** 50:17
84:19 91:17 99:13
101:6 105:12,13
**relied** 85:7 86:3
96:16 107:3,8
111:8,11,13
112:15 114:10
118:17,19,21,25
119:1 153:12
**relies** 95:22 120:3
120:20
**rely** 67:15,15 75:8
76:11,18 92:10
96:18 99:17
100:11 106:23
107:10 109:11
114:5,6,17 115:6
116:19 118:2,12
119:13,19 120:7
132:10 133:14
135:14 144:6
173:1
**relying** 95:14,20
96:6,12 97:11,14
97:18 113:1,4,15
113:20 114:25
115:3 118:1 123:9
123:21 124:2
130:17 131:7,9,11
131:13,17 132:25
133:18 134:2
135:8
**remain** 89:24

**remaining** 20:4
**remember** 33:15
46:23,24 47:14
122:10,15 141:18
188:25
**remembers**
122:14
**remove** 157:17
**removed** 160:24
161:11,24 162:5
162:10
**render** 67:14,22
92:9 164:11
174:11 190:15
**rendered** 77:5
140:10 141:25
183:13
**rendering** 43:21
75:7 155:23 163:7
**repackager**
188:13
**repatha** 26:3,11
26:13,14
**repeat** 74:1 101:1
108:21 122:3
**repeated** 111:9
**repeatedly** 69:13
70:1 71:10 84:11
111:6 124:23
**repetitive** 192:15
**rephrase** 17:4
56:12 87:4,21
129:8 131:8
137:17 141:23
145:7 150:22
158:15
**report** 8:17,20
17:14,18 23:25
38:3,8,12,17 40:20
40:24 76:9 79:14
80:21,23 85:9,13

86:1,14 89:4,8,9
92:16 93:4,8,10,12
94:14 95:8 96:13
97:19,22 99:5,7,14
99:19,25 100:7,12
101:15 102:20
103:1,12 106:8,11
106:17,22,24
107:4 108:12
109:5,7,12 110:11
111:3,9,12,17,22
112:14,19,22
113:2,5 114:10
117:25 118:11,24
119:4,7 121:21,22
122:7 123:2,10,23
124:3,21 128:13
128:24 129:9,16
129:21,24 130:2,3
131:18 132:15
133:1 134:3 135:9
135:10,14,23
136:8,13 137:7,8
137:13,20 138:10
138:20 139:7,11
139:24 140:8,9,22
141:20,22 142:10
142:14,18,21,22
143:3,14 144:10
145:6,10,11,16
146:24 148:10,20
155:4,22 159:21
161:15 163:7,19
164:10 169:15,18
169:19 170:16
171:10 172:4,6,25
173:17,19 174:11
174:23 176:16,21
176:24 177:6,11
177:15,20,24
178:3,7,12,21

[report - right]                                                    Page 33

182:23 183:25
185:21,22 188:5
188:25 189:2,3
191:6 197:1,8,9
199:1,3 201:7
**reported** 1:16 20:2
38:5 138:3,4,5,14
143:17 144:2,3
157:18
**reporter** 8:9 10:10
10:11,13 11:10,20
12:24 14:7,19
68:19 108:23
183:7 194:5,8
200:6 201:1,5
**reports** 80:15
81:12
**represent** 10:17
13:13 124:5
141:16 154:17
175:23
**representation**
118:1 120:24
147:1,13
**representations**
74:2
**represented**
181:15
**represents** 121:13
122:22 124:25
198:2
**request** 11:10 17:2
29:17 42:2 70:6
**requested** 16:23
42:5 43:4 60:5
62:10 67:4 68:1
94:2 95:3 101:3
106:20 108:25
110:22 112:5
120:17 122:20
143:23 156:22

194:10 201:9
**requesting** 130:14
130:20
**requests** 16:20,25
17:8 29:14,15,16
**required** 22:13
24:5 45:4,24
46:10 47:5,16
48:4 55:11,20
103:15 131:2,3,5
133:24 204:13
**requirement**
106:9 119:25
136:17
**requirements**
22:12,14 23:2,17
45:6 46:1 47:18
52:19 55:14,21,24
56:3 119:23
123:13 124:25
130:25 131:22
132:7 173:9
**requires** 46:12
**research** 52:1,4,23
53:4,10 54:10,15
92:3 96:5
**researched** 53:15
**reserved** 9:18
**reside** 13:24
**resources** 22:24
28:5
**respect** 38:1 49:20
50:13 51:8,15,22
61:9 64:10 67:16
73:16 75:8,23
76:12 88:23 89:3
92:10 97:12 99:22
100:17 138:21
139:8,24 153:16
160:19

**respected** 124:16
153:9
**respective** 9:16
**respond** 71:3
166:4
**responded** 17:2
**response** 35:17
62:8 80:20 95:6
110:18,25 112:14
117:11 141:19
142:17 146:4
166:13 174:20
175:7 190:4
**responsibilities**
19:23,25 23:4,6
26:8 27:13 29:11
29:20,22 30:3,6
34:24 35:14 36:20
37:18,23 53:16
57:16 86:18 153:1
157:1 163:22
**responsibility**
40:9,11 84:16
117:17 119:8,11
120:10 126:9
155:15,18 156:25
**responsible** 27:24
39:4,22,25 43:11
117:2,7,13,14
128:25 130:10,15
**responsive** 80:17
**rest** 17:22
**restate** 48:20 49:5
53:1 75:1 94:25
109:1 139:6
156:18,20
**restated** 95:1
**result** 164:7 166:9
191:9 192:10
**results** 29:18

**resume** 17:13
**retained** 78:21
90:4 92:7 172:9
172:18
**retainer** 87:17,18
87:21,23 88:24
89:2,3,4,21,24
90:2,3
**return** 202:13,17
**review** 22:8 29:13
29:17 32:12 49:14
86:2 91:8,12,22,25
102:3 104:10
126:11 149:1
151:4 163:23
176:12,17,18,20
177:6 182:2
186:12,17 190:5,8
191:19,24 192:7
201:8 202:7
**reviewed** 41:17
86:7,10,12,15,21
86:23 87:5 91:9
99:6 103:17 135:5
135:23,24 176:22
177:2 185:22
190:10,18 191:7
191:25 192:8,19
193:1 194:1 195:4
**reviewing** 27:18
86:18 91:16
103:21 105:2
193:18
**reviews** 35:2
**riding** 173:23
**right** 12:1,21,25
14:8,16,21,22 16:7
16:16 18:2,12
19:13 28:1,1,5
34:15,16 36:3,4
38:6,23,24 40:14

[right - served]                                                                    Page 34

40:16,22 43:13
44:20 45:17 46:5
61:15 68:8 73:23
81:16 84:1 89:19
91:7 93:7 99:14
99:16 100:9
119:14 121:5
129:3 144:8 154:6
154:9 160:18
161:18,22 166:5
167:9 168:12
169:11 172:17
185:22 194:14,23
196:6,15,24 197:4
197:13,16,25
**rights**  71:17
111:21
**rise**  150:17
**risk**  40:9,12 82:1
83:9,15
**rite**  5:11
**rivero**  1:14 2:10
2:22
**riveromestre.com**
2:12,23
**road**  3:2,15 6:11
6:15
**roi**  31:5
**role**  19:18 20:16
24:12 25:8,10,21
28:9 30:21,23
32:12 34:20,22,25
35:18 38:9 41:3
42:15 49:13 53:19
59:6 63:24 64:3
82:9,9 91:16
108:6 110:15
152:25 155:14
**roles**  19:23,25
20:6 21:1,2 26:8
27:11 28:10,10

29:20,22 30:3,6
34:20 35:14 37:8
37:18,23 38:14
42:14 59:5 82:9
**room**  11:18 12:13
24:15 186:20
199:9
**rooney**  3:5
**rose**  4:6 6:19
**ross**  4:6 6:19
**roszel**  6:15
**rotation**  25:22
**rounds**  25:23
**ruben**  6:1,3 68:19
70:18
**rule**  69:3 70:12
**rules**  14:3
**rx**  34:14,18,20

**s**

**s**  2:1 3:8 8:11 9:14
9:14 10:1 132:10
203:3
**safe**  58:24 104:18
114:23 116:1
117:15,18 120:25
122:23 124:8
126:8,8,17 127:5
128:8 129:20
132:8 136:22
144:15,20 145:24
163:10 173:10
**safety**  12:17 82:1
82:3 83:13 95:12
104:13 105:20
123:14 149:18
151:17 166:14
169:10 183:2
**sale**  133:16
**sameness**  182:25
**san**  34:14

**sanctioned**  65:17
**sarah**  6:5
**sarah.zimmerman**
6:7
**savage**  3:15
**saying**  14:11,12,20
84:3 118:23 149:4
169:9
**says**  97:22 98:5
119:12 183:12
**schaffer**  3:14
**school**  45:21 48:1
**sciegen**  4:21
**science**  18:1,7,9
78:3
**sciences**  20:9,22
63:12,22
**scientific**  103:16
**scope**  49:9 94:8
95:17,22 100:20
106:8,11,17
129:24 133:7
137:7,8,20 140:7
142:9,13,17,21
148:10,20 155:22
157:1 158:1 160:2
161:15 163:7,19
164:10 166:18
169:14,18 171:10
172:12,14 173:16
174:10,23 176:16
178:2 182:2,15
188:25 189:2
190:5,14 191:6,14
191:24 194:15
197:1,8 198:1,12
198:25
**scripts**  6:8
**seal**  200:9,12
**second**  18:11
144:4 156:4,7

186:19
**section**  93:10 97:7
97:7 99:14 100:7
101:15,17 106:22
127:12,15,16
141:20 142:22
143:7,14 144:4,9
144:24 145:9
155:5,7 171:25
**sections**  99:11
127:17,19,20
**see**  11:7 12:19
14:7 40:13 72:10
104:11 119:3
189:6 193:17
**seek**  190:12
**seeking**  110:8
111:1 117:16
119:10,15 126:10
131:20 132:2,6
185:11
**seen**  14:23 16:16
195:2
**self**  33:12,14 36:14
38:22 39:8,13,24
159:19 168:6
**sending**  90:19
**senior**  37:10,12,19
38:5,10 157:24
**sense**  158:16 181:4
**sent**  202:14
**sentence**  96:3
119:17 140:16,18
143:20 183:12
**september**  90:8
**series**  185:15
**serious**  168:24
**serve**  101:5
**served**  20:8 32:25
33:4,8,19

serves  183:15
service  196:8,10
  197:13,14 198:3
services  19:20
  28:23 30:4 34:21
  36:9 38:21 63:12
serving  170:4
set  32:2 35:1 123:6
  130:25 132:7
  139:19 140:2
  145:22 151:16
  164:23 168:14
  189:2 196:13
setup  12:16 14:25
seven  183:7
shape  173:24
share  58:10 103:3
sheet  8:9 98:15,16
  108:10,19 109:4
  113:22 114:1,7
  186:2,3 202:11
shenandoah  19:2
shift  27:23
shoes  187:23
short  103:7 189:6
shorthand  200:6
  201:5
shortly  28:25
show  63:18 126:20
  127:10 177:1
  186:23 187:5
showed  187:2
  190:10,19 191:7
showing  185:25
shown  181:8
shows  190:1
  191:25 193:1
sic  64:21
side  22:19,20,22
  32:13,14,17,20
  73:3,11 82:3

83:21
sign  16:3 199:11
  202:12
signature  200:16
  201:22
signed  202:20
significance  109:8
signing  9:17
similar  129:25
  198:19
simple  174:17
single  12:10
  125:22 158:17
  165:17
sit  55:16 56:2
site  47:19 48:6
  51:2
six  12:9
smith  34:14,18,20
social  20:9,22
  63:12,21
society  47:22 51:3
solco  4:4
sold  188:12
sole  36:18
solutions  202:23
somebody  186:20
someone's  16:11
sorry  10:16 54:21
  60:3 61:11 85:15
  85:17,20 89:14
  96:23 107:13
  108:22 127:21
  141:9 143:22
  146:13,15 156:5
  156:15 176:25
  180:4 194:4
sort  24:12 50:12
sought  164:7,13
  165:4,17,22

sound  100:5
source  112:11
  152:21 153:10,11
  173:13 183:15
south  3:20 5:10
  6:2
speak  126:14
  157:13
speaking  68:16
  71:13 82:5,15
  83:3 84:17 111:15
  112:2 181:25
  197:3
speaks  76:10
  126:12
special  23:23 24:2
specialty  33:2,20
  34:5,6,8 53:23
specific  31:17
  33:10 39:10,17
  42:8 43:14 53:13
  54:8 58:12 66:12
  67:17 71:25 72:2
  75:21 87:1 95:20
  95:24 102:6
  103:21 107:1
  127:8 131:13,16
  131:24 134:6
  135:4,13 138:5,8
  141:2,9 148:14
  151:10 162:8
  171:11 176:8
  182:12 193:5,20
  193:21,24 196:20
  197:4
specifically  55:8
  55:16,17 56:3
  58:15 67:16 82:11
  83:14,24 84:7,23
  93:9 96:2 97:9
  110:18 116:7

129:15 131:21
  184:3 188:7
specificity  102:8
specify  151:20
speculate  103:11
  138:7,23 148:21
  149:1,4 162:6
  163:6 176:19
  190:17
speculation
  198:12,25
speeches  81:25
spend  88:5,7 93:7
spent  34:13,18
  88:9 89:6,8,12
split  29:4
spoken  57:20
  60:17 82:2,18
  87:8,11 92:12
spreadsheet  88:16
spreadsheets
  98:10
st  6:7 18:1,14
  24:24 25:19
staff  23:18 27:9,10
  27:14
stakeholders
  105:12,13
stand  73:25
standard  44:3
  193:16
standards  48:17
  48:24 49:3,20
  50:8 51:4,8,15,22
  69:21 74:11
  103:16 116:20
  118:13 120:4,21
  173:2,5
standing  45:12,13
  47:20 48:8 54:3
  56:24,25,25 57:4

57:12
**standpoint** 165:9
**stands** 187:23
**start** 14:17,18
  48:21 92:15 167:8
**started** 74:14
  92:18
**starting** 29:1
**state** 1:16 4:19
  10:14,15,16 13:18
  21:6,9,18 22:10,15
  23:2,10,17 55:23
  64:17 71:5 93:14
  102:25 113:7
  115:16 116:18
  121:11 128:24
  132:9 136:24
  140:9 143:7,8
  144:5,24 146:24
  155:13 200:2,7,17
  201:2,6,23
**stated** 93:8,11
  94:23 108:11
**statement** 40:20
  93:17 96:7,13,16
  96:19 112:18,22
  113:10,15,21
  114:11,18,25
  115:20 116:22
  118:10 120:9
  123:22 124:3,20
  128:13 130:9
  131:10,14,17
  132:14,25 133:19
  135:8 136:12
  137:2 139:21
  143:13 144:4,9,17
  144:24 145:6,15
  147:3,11,18,24
**statements** 50:12
  71:4 73:24 74:1

97:11 99:2,18,24
  100:12 101:10
  109:4 110:6
  111:17,21 112:13
  113:2,4 121:6
  123:9 134:3
**states** 1:1 28:19
  30:11 31:3 32:7
  32:25 69:4 101:22
  118:24 120:13
  121:1 133:11,17
  133:17 150:9
  152:23 161:24
  164:7 165:4 188:8
**stating** 130:17
  131:7 145:22
**status** 12:14 98:13
  98:19 104:2 120:6
**stay** 86:8
**staying** 53:20
**steamfitters** 3:17
**stenographic**
  68:25 201:11
**stenographically**
  69:1 201:7
**step** 70:25
**steps** 150:25
**steven** 6:9
**stipulate** 111:10
  111:19,20,24
  121:24 122:2,5
**stipulated** 9:15
**stipulation** 111:25
**stop** 68:8 148:3
  169:2 170:10
**stoy** 4:9
**strategic** 35:11
**strategies** 128:4
  161:2,3,6,16 162:2
  166:9 170:9 175:6
  191:22 192:7,11

**strategy** 151:23
  152:1 162:15
  163:12 166:7
  168:15 170:8
  174:7,8,19 190:3
  190:18 192:20,24
**street** 2:19 3:5,10
  3:20 4:2,19 5:2,10
  5:17 6:2
**strike** 84:24 163:2
  168:3 191:2
**structure** 31:12
  43:10,15 57:11
**structured** 30:19
  31:1
**student** 20:2,4
**students** 20:2
  60:23 62:25
**studies** 80:15 81:9
  95:17 103:22
  151:4 172:21
**study** 99:10
  115:12,13
**studying** 55:5
**subformularies**
  127:21
**subject** 33:1,4,8
  33:19 149:17
  186:25
**submissions** 144:1
**submit** 131:11
**submitted** 104:1
  117:6 118:22
  143:19 144:3
  150:14
**submitting** 130:13
  130:19,23
**subscribed** 204:14
**subsequent** 196:10
  197:24 198:8

**subset** 30:16
**subsidies** 198:20
**substance** 94:5,9
  95:9 129:6
**substitutability**
  134:8 144:19
  152:21 183:16
**substitutable**
  115:25 116:13,16
  153:11
**substituted** 116:9
**substitution**
  115:16
**suffice** 126:18
**sufficed** 55:24
  124:7 164:22
  173:9
**suffices** 119:25
**sufficient** 162:14
**suggest** 72:4
**suggestion** 71:7
**suing** 187:14
  188:19,20
**suitable** 132:12
  170:11
**suite** 1:14 2:11,22
  3:2,5 4:2,6,23 5:2
  5:13 6:6,11,19 7:2
  10:8
**summary** 142:22
  142:25 144:5
**supervise** 27:21
**supervision** 27:23
**support** 117:11
  128:12
**sure** 14:5 16:5
  17:11 26:19 31:6
  48:21 53:3 59:15
  70:25 84:4 93:24
  94:19,25 106:19
  109:19 118:10

137:16 149:8
154:8 156:9
158:22 167:18
193:7 194:1
195:21,23 196:22
surgery 23:23
24:2,14,15
surrounding
155:17 169:5
surveys 35:16
suspend 71:22
suspended 65:15
swear 10:12 13:1
swedesford 3:2
sworn 13:6 200:9
204:14
system 51:3,11
126:7
systems 47:22
126:7 127:16

t

t 8:11 9:14,14
180:22 203:3,3
take 14:20 15:7,10
16:19,21 18:8,20
22:7 30:20 55:1
59:13 66:16 80:3
84:21 86:2 128:15
128:16 150:25
153:23 169:11
173:4 189:6
taken 1:13 55:8
59:19 71:2 92:24
128:20 135:24
154:1 168:23
181:25 189:12
takes 30:16 67:10
125:20
talk 14:15 17:12
83:20 97:9

talking 61:11
131:21 180:23
196:14
talks 97:7 127:11
tasked 150:7
taught 20:19,20,24
63:3,5,24 64:3
te 109:23
teach 20:15,18
team 24:9,10
teams 25:12
technicians 27:21
tel 4:20
tell 30:13 31:5
32:11 44:15 103:9
ten 56:14 72:21
167:25
tend 34:8
term 34:11 58:21
59:2,11 93:19
94:5 95:7 96:1
115:11 121:16,20
122:6 123:2,3,5
129:4,22,23 130:2
130:3 136:5,6,7
139:17 140:13,21
143:1,1 145:5,6,9
177:23 178:10,11
179:16 180:19,20
terminate 69:4,6
70:12 71:15
terminus 6:10
terms 32:1 54:5
62:18 95:25 113:8
113:16 114:12
129:9,16 130:5
134:11 146:8
153:10 168:15
territories 188:8
territory 66:15

tested 142:8,12,16
142:20
testified 13:7
78:24,25 111:7
179:3 181:13
testify 15:19,25
159:4,14
testifying 88:21,22
89:11,17,19
169:17 170:22
testimony 8:3 13:1
15:21 51:23 79:10
80:16 111:11
135:17 177:19
195:24 198:10
202:9,18 204:8
teva 2:5,9 3:12,12
6:13 10:19,21
13:13
texas 4:7 6:20
thank 12:23 13:24
27:3 33:17 59:16
70:18 74:14,15
80:9 95:14 122:13
122:18,19 125:12
156:11,21 175:13
180:15 183:8
184:4 185:2,5
189:16 194:11,12
194:14 199:12,14
thanks 156:12
199:13
therapeutic 54:2
101:20 105:23
106:2 109:8,17,20
109:23 116:7,12
127:22 150:16,19
178:8
therapeutically
151:1

therapy 21:24,25
thereabout 138:18
thing 70:19 73:12
74:8 132:24 136:7
143:21
things 22:22 106:6
111:8 129:18,22
198:20
think 11:8 34:19
61:22 72:15 83:7
92:21 107:13,19
108:23 135:13
158:6 168:8
171:19 179:3
180:18 197:19
thinks 156:9
third 38:22 39:1,2
39:22 40:3,4,8
44:15 75:8 97:25
98:15,16 108:9,18
109:3 113:21,22
114:6 136:19
157:10 159:16,20
160:5 166:25
185:10 186:1,2
187:9,12 188:3,4,7
thornburg 5:9
thoroughly 71:17
173:18
thought 34:3
107:14 156:5
thoughtful 115:15
161:3 163:12
threatened 71:22
three 3:9 114:9
tie 170:16
tied 42:11 44:12
50:25 58:12 63:25
67:19 76:4 102:14
tier 104:8 105:11

[tiering - uh]                                          Page 38

**tiering** 31:2
**till** 19:17 37:17
**time** 1:12 12:10
  13:15 14:21 15:4
  15:10,18 18:18
  22:12 24:22,24
  25:4,6,16,18 26:5
  27:8,16,22,24 28:4
  28:16,20 29:2,4,5
  29:6,7,9,10,10
  30:13 34:17 35:7
  35:19 37:12,15
  46:16,25 55:5
  59:17,20 64:4,9,12
  64:24 66:20 68:21
  69:5 70:7 72:5,12
  72:14 73:22 74:17
  82:22 88:5,7,9,12
  89:6,8 92:17,18,22
  92:25 93:7 115:13
  121:24 122:4
  125:24 128:18,21
  137:1,3,5,8,9,13
  137:20,21,22,24
  138:7,8 150:22
  151:20 153:15
  156:7,23 160:20
  161:13 162:13
  164:3,4 165:13
  169:5 171:6,8
  174:4 175:13
  178:25 179:19,24
  180:2,5 182:19
  183:6 189:10,13
  194:13,23 195:14
  196:6 199:16
  202:19
**time's** 180:6
**timeframe** 202:8
**times** 57:24 82:20
  82:20 111:7

**title** 19:24
**titled** 101:15
  104:10
**titles** 20:6 21:2
  58:11 63:5,14,18
  63:23 64:2
**today** 15:2,17,22
  16:6 17:6 40:25
  43:21 48:2 55:16
  56:2 67:14 71:8
  89:7 157:22 163:8
  188:23
**today's** 199:15
**told** 90:17 181:7
  183:24 192:19
**tone** 73:8
**top** 103:13
**topic** 57:18 58:15
  169:25
**topics** 70:8 188:24
**torts** 6:2
**total** 89:5,11
**touch** 108:16
**toxicologist** 78:18
**toxicology** 155:20
**tp** 102:2
**tpa** 40:2,9 42:24
  43:9,13,19,24 44:7
  44:16
**tpas** 43:5
**tpp** 38:25 39:7,12
  40:7 42:18,22,25
  43:9,24 44:8,16
  97:8 102:16,21
  103:4,7,10 120:2
  147:8 152:16
  153:6,19 160:23
  161:10,23 162:9
  163:1,4,16,25
  164:2,6,12 165:3
  165:17,22 174:20

174:21 175:3
  195:16,17,23
  196:23
**tpp's** 153:16
  195:25
**tpps** 38:22 41:2
  67:15,15 75:7
  76:11,18 92:10
  97:9,13 102:3,10
  102:12 116:18
  118:1,11,19,25
  119:12,18 121:14
  132:10 133:14
  146:25 147:11,15
  152:12,19 160:15
  161:19 162:12
  163:8 164:21
  165:8 166:4,9
  167:9,12,15 168:4
  168:6 169:9 170:3
  170:5 171:2,4
  172:25 173:3,14
  173:24 174:4,7,8
  174:13 175:6
  184:14,18 187:24
  192:3
**track** 41:18 88:7
  88:12
**tracked** 88:14
**tracking** 29:18
  88:3
**trade** 3:5
**training** 77:6,22
**transaction**
  194:22 196:5,6
**transcript** 201:9
  201:10 202:6,20
  204:5,8
**transition** 170:11
  170:12 171:7,8,13

**traurig** 2:3,7 4:23
  6:10 10:18,20
  13:13
**treat** 73:16
**treated** 31:9
**treatment** 32:3
**trial** 78:25
**tried** 170:15
**true** 201:10 204:8
**trust** 185:15
**truth** 13:2,3,3
  153:10,11 183:15
**truthful** 15:21
**try** 14:17 178:19
**trying** 14:19 23:9
  83:6 137:19
  170:16
**turn** 79:15 85:23
  93:9
**turned** 145:1,17
**two** 19:8 21:1
  38:13 62:21 69:11
  69:12 98:18
  107:22 108:4
  141:18 144:11
**type** 20:21 23:3
  26:13 30:15 33:11
  50:16 186:16
  198:8,17
**types** 22:22 35:22
  50:23
**typical** 193:17

───────── **u** ─────────

**u** 9:14 180:25
**u.s.** 4:4 100:5
  107:5,15 112:15
**uh** 13:14 14:9,14
  14:14 23:12 29:8
  45:15 47:4 79:17
  80:13 84:6 85:25
  95:9 98:20 103:14

[uh - videographer]                                                      Page 39

104:9 105:8
109:16 123:18
144:11 145:4
146:3,16 151:13
177:13
**ulmer** 5:1
**ulmer.com** 5:3
**ultimate** 40:8,11
**ultimately** 43:11
**unacceptable**
68:14,17 70:11
93:21 129:2,2
130:12 140:25
145:19 146:2,5,6
166:23 170:17
**unbiased** 105:1
**unclear** 178:16
197:18
**understand** 14:13
15:4 23:9 24:6
54:1 58:21 66:6
66:22,23 76:2
77:4 84:3 93:19
94:5,25 95:5
106:9 109:19
110:2 112:14
118:7 123:3 127:2
129:8 131:15
133:13 137:16,19
141:14 155:15
156:25 158:6
166:6 170:8
176:25 182:2
187:8,11,14,22
188:3,18 196:9
**understanding**
11:16,23 12:5
41:15 44:6 59:1,3
59:10 62:12 67:6
67:9 80:16 84:4
84:15,22 94:4,19

95:25 107:25
112:17,17 113:11
115:5 119:17
120:8 128:25
130:11 131:25
132:1 134:17,21
139:12,20 165:8
165:12 166:8
174:3 176:17
188:16 189:24
191:10 196:1
**understood** 15:7
93:24 168:18
**underwriters**
64:18 83:3
**unfair** 111:10
**unfamiliar** 54:25
**unfortunately**
71:10
**unit** 10:5
**united** 1:1 101:22
120:13,25 133:11
133:16,17 150:9
152:23 161:24
164:6 165:3 188:7
**universal** 34:7
174:8
**university** 18:1,14
19:2 20:7 21:3
25:14,19
**university's** 19:13
19:19
**unjustly** 161:20
170:3 173:25
**unreasonably**
69:8
**update** 179:19
**updates** 17:19
41:7 53:21,21
**uphold** 126:10

**upholding** 78:8
**upkeep** 86:8
**usa** 3:12
**use** 26:11,16 34:1
34:10 54:1 58:6
60:2,18 88:11
97:6 102:16,21
120:25 122:6
123:2 129:9,22,22
130:1,2 136:6,7
145:1,5 146:8
152:9,10,16 153:6
153:8,17,19
177:24 179:22
181:3 182:21
188:11
**uses** 121:22 136:5
**utilization** 41:6

**v**

**v** 180:25
**valid** 187:15
**valsartan** 1:4
52:13,13,23,24
53:4,4,10,10,15
54:10,11 93:15,16
97:3,4,5 98:6,8
103:9,10 114:3
121:9 136:25
138:2,10,21 139:8
139:25 146:23
148:9,17 149:12
150:24 151:5,9,12
151:19 152:5,13
154:21,21,24,25
155:2 157:7,11,17
160:21 167:2,3,12
185:11,17 186:10
186:24 187:12
188:10 202:4
203:1 204:1

**vanderbilt** 2:3,7
**varies** 67:5
**various** 57:10
101:9 185:21
**vast** 181:9
**vauggn** 7:1
**vcd** 138:3,11
162:10 163:16
164:1,8,14,16
165:5,19 175:7
189:25 190:4,8
191:4,11
**vcds** 136:25
138:21 139:9,25
140:11 142:1
161:11,19 162:25
163:1 167:17
168:5,12,18,20
169:11 170:3
173:14 174:4,20
183:14 190:13,21
192:4 194:2
**verbal** 57:17
**verbally** 14:11
**verbatim** 126:22
**verify** 202:9
**verifying** 28:1
**veritext** 10:11
202:14,23
**veritext.com**
202:15
**versions** 140:11
142:1 183:13
**versus** 103:5 130:2
**vice** 37:10,10,12
37:15,24 157:24
157:24
**vicinage** 1:2
**video** 10:5 11:18
**videographer** 7:10
7:11 10:3,10,15

11:9,19,19 59:17
59:20 68:21 74:17
92:22,25 128:18
128:21 153:24
154:2 189:10,13
199:13,15
**videotaped** 1:9
**view** 73:9 130:7
160:16
**views** 130:5
**violation** 150:18
**visibility** 41:22
**visit** 24:16
**voluntary** 93:15
157:11
**vp** 37:19 38:5,10
38:10

**w**

**w** 5:13
**wait** 14:16,18
**waive** 111:20
**walgreens** 27:6,11
29:5,10
**wallack** 6:14
**walnut** 5:2
**walsh.law** 3:11,11
**walter** 3:15
**want** 16:3 73:4
74:8 79:20 84:4
90:7 93:24 94:19
95:5 156:16
157:21 158:7
175:17 180:2,17
**wanted** 26:18,19
71:11 169:9
**wants** 174:19
**warranties** 52:10
56:22 57:3,7,18
58:15,17,22 59:2
59:25 60:15 61:24
125:5,19 126:5,14

136:5,6,25
**warranty** 58:23
121:13,16,25
122:4,6,22 123:2
126:15 136:7
143:1,1 144:25
145:5,7,9,16
161:19 170:2
**washington** 4:2
5:22 7:6
**way** 23:1 38:9
54:23 65:18 71:9
73:8 91:11 95:1
103:9 114:22
139:6 143:2,9
145:7,10 147:8,24
148:23 149:5,8,11
161:8 167:19
171:5 182:3
**wayne** 3:2
**ways** 39:12,15
72:21 169:16
**we've** 19:10 21:1
48:10,14 80:19
108:4 135:13
**webinar** 65:7
**webinars** 64:22
**website** 45:6 46:2
46:3 47:7 93:18
139:22 146:19
**welcome** 80:3
175:14 189:17
**wellness** 36:2,7,8,9
36:21 37:2
**went** 82:19 162:20
**west** 3:5
**wharton** 2:21
10:24,24 43:1
**whiteley** 2:18,18
5:17 11:1,1 70:17
72:13

**whiteley's** 74:3
**wholesaler** 188:13
**widely** 153:9
**william** 6:14,14
**windermere** 13:23
**wise** 40:23
**wish** 167:20
190:17
**withdraw** 122:6
**withdrawn** 56:11
63:4 81:23 102:2
124:9 149:18
**witness** 10:12 13:4
17:1 33:17 59:13
59:16 66:18,21,24
68:14 69:15,16,20
69:20 70:1,8,10
71:9,10,23 72:6,18
72:19,22 73:9,16
73:19,25 78:21
80:7,9 111:7
122:10,13,17,19
125:12 126:2
154:13 156:18
157:23 169:16
170:21 175:14
177:2 178:24
181:20,22 189:17
194:14 195:2
197:6 200:9,12
202:8,10,12,19
**witness's** 73:1
**witnesses** 69:21
74:11
**wmurtha** 6:16
**woman** 47:9
**women** 46:4,10
49:19
**word** 12:10 88:1
94:13 119:3,6
125:22 155:10

178:20,24 179:4,9
179:9,10,11,18
180:23,24 181:3
182:21,22,23,25
188:20
**words** 126:22
127:8
**work** 15:16 16:25
24:9 27:17 41:2,3
57:16 59:23 60:13
60:23 61:23 62:24
79:3,6 82:24
87:15 88:21,22
89:19 90:19 98:25
114:22 134:17
157:1 158:5,12
159:17 160:6,15
169:23,23 191:9
**worked** 27:5 28:5
46:15,17 65:20
184:20
**workflow** 30:2
**working** 27:21
38:21
**works** 14:4 107:9
107:25
**world** 49:18
126:16,21 127:9
138:14 139:8
**wrap** 182:16 199:2
**writing** 17:3
**written** 80:20
88:11,14 147:25
182:22
**wrong** 85:2
**www.kanner** 5:18

**x**

**x** 8:1,11

| y | zooms  11:12 |
|---|---|
| **yeah**  12:11 33:9 | |
| 34:19 36:1 46:9 | |
| 50:15 71:1 73:5 | |
| 85:19 97:20 98:17 | |
| 114:16 127:25 | |
| 138:23 181:23 | |
| 189:19 197:22 | |
| **year**  20:12,12 | |
| 28:14,14,17,17,22 | |
| 28:22 34:13,14 | |
| 46:23 82:20,20 | |
| **years**  18:10 19:8 | |
| 28:24 29:1 38:18 | |
| 47:3 56:14 59:4,4 | |
| 59:5 82:24 136:1 | |
| **yep**  23:21 142:24 | |
| **york**  2:4,8 13:25 | |
| 21:6,18 22:10,15 | |
| 23:2,10,17 27:6 | |
| 35:7 55:23 65:12 | |
| 155:13 | |
| **z** | |
| **zhp**  3:22 4:4 | |
| 111:23 | |
| **zimmerman**  6:5 | |
| **zoom**  3:3,8,13,18 | |
| 3:22 4:4,8,13,17 | |
| 4:21,25 5:4,8,11 | |
| 5:15,19,23 6:4,8 | |
| 6:13,17,21 7:3,7 | |
| 7:10 11:7,8,10,14 | |
| 11:15,24,25 12:2,4 | |
| 12:16,20 14:24 | |
| 15:1,3 16:11,12 | |
| 26:20 122:9,14,18 | |
| 154:8 175:15 | |
| 184:7 186:21 | |
| 187:1,18 199:8 | |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.